UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

**Case No.: 1:23-cv-6188 (DG) (ST)**

**DECLARATION OF ROBERT ANTHONY URRUTIA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, & <u>PERMANENT INJUNCTION</u>**

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, and LIBERTAS FUNDING LLC,

Defendants.

------------------------------------------------------------------X

Robert Anthony Urrutia declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am the majority shareholder and President of Superb Motors Inc. ("Superb"), a high-end used car dealership in Great Neck on Long Island, and the sole member of Team Auto Sales LLC ("Team"), a wholesale used car operation that I own and operate out of New Jersey.

2.     I am also the owner of Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield, Massachusetts.

3.     After decades of working in the automobile industry, several years ago, I realized my goal of owning dealerships.  I run them properly and profitably.

4.     As outlined herein, Defendant Anthony Deo ("Deo") robbed me not only of what I have worked so hard to earn, but has placed me at the precipice of losing everything as I may be forced to shut down my dealerships if my vehicles and dealer plates are not returned by Deo such that I can maintain financing I received from banks to fund my dealerships' operations.

5.     I beseech this Court to grant the relief requested here to save me from financial ruin and forcing me to shut down my dealerships, which will result in the loss of jobs for approximately 125 employees and other harm, the details of which I provide below.

6.     I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at Superb and Team in addition to information I have learned from employees, customers, vendors, and other third parties concerning the Defendants and their conduct.

7.     Superb, Team, and I consist of one group of Plaintiffs in this case.

8.     The above-entitled case is brought for the purpose of obtaining a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining the Defendants from continuing to unlawfully possess Superb's and Team's vehicle s and dealer plates, as well as possess and utilize Superb's and Team's trade secrets and confidential & proprietary information.

9.     More specifically, this lawsuit is brought to enjoin Defendants from committing and continuing to engage in wide-ranging fraud designed to pillage and plunder Superb and Team of their assets, good will, and viability as a going concern and put Superb, Team, and my other dealerships out of business which will also cause more than 125 individuals to become unemployed.

### i.     How Deo and I Met and Became Partners

10.     In or about February 2022, I was introduced to Anthony Deo ("Deo") through a mutual acquaintance named Michael Morgan ("Morgan").

11.     My initial meeting with Deo – which Morgan and another individual named Frank Ventimiglia (who came with Deo) attended – centered on discussing Deo's funding needs for acquiring an automobile dealership, and me potentially investing in what he asserted were already lucrative businesses, and securing a minority stake in a new Nissan dealership on Long Island.

12.     Although this meeting did not lead to any decisions to work together, Deo's name resurfaced towards the end of October 2022 when I was exploring options for a partner to support Superb, while I dealt with issues at my other dealerships.

13.     On November 3, 2022, I met with Deo and Michael Laurie ("Laurie") of DLA Capital Partners Inc. ("DLA Capital") [1] at Superb to explore a potential partnership.

14.     Interestingly, Laurie dominated the conversation, speaking roughly eighty percent (80%) of the time, despite his supposed role as an "advisor, financier, and unofficial partner" of Deo.

---

[1] Prior to this meeting, I had never met or heard of Laurie or DLA Capital before.

15.     While the meeting seemed promising, it merely marked the start of further discussions.

16.     Our subsequent conversations revolved around our respective visions of what a partnership would look like.

17.     Deo shared a lot about his strained relationship[2] with his former partner, Joshua Aaronson ("Aaronson"), a Plaintiff in this case, during this meeting; I sympathized with him.

18.     Deo then visited Superb on November 12, 2023 to oversee its operations for one day and allow him to gain firsthand insight into the operations before finalizing an agreement.

19.     After a few days of observing operations, Deo and I managed to iron out the details of our partnership and I decided to take the plunge and give Deo a shot.

20.     The terms included his ability to start immediately, my agreement to take responsibility for Superb's losses in November 2022, and the transfer of responsibility to Deo from December 2022 onwards.

21.     As part of our agreement, I personally loaned $300,000.00 to Superb with repayment structured through predetermined installments.[3]   In addition, Deo was also free to decline any vehicles he was not interested in acquiring for resale, and in the event that the partnership was not successful, he would be entitled to a refund of his initial investment, with the amount repaid varying depending on his share of losses or profits.

---

[2] According to Deo, Aaronson had been attempting to undermine him and tarnish his reputation, creating a seemingly grim and irreparable situation that caused Deo much harm.

[3] At the time, vehicle values were especially high due to market turmoil caused by COVID. However, as the market regained balance, vehicle values began to decrease.  As a matter of fairness and propriety, I voluntarily wrote down my vehicle inventory at Superb to market value plus $1,000.00 instead of the higher values attributable to the COVID pandemic.  This is just one example of many regarding how fair and honest I worked with Deo in my dealings with him.

22.     This agreement was memorialized in a Cross-Purchase Agreement, and – subsequently – a shareholders' agreement as well as indemnity agreements.  See copy of Cross-Purchase Agreement annexed hereto as **Exhibit "A."**

23.     Under the terms of our deal, I was to be paid $500,000.00 and given a twenty-five percent (25%) membership interest in Northshore Motor Leasing, LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise"), entities that Deo told me he owned 100%, which I now know to be false, in exchange for a forty-nine (49%) interest in Superb.  Id.

24.     Deo wrote me a check for $100,000.00 as a deposit, which I received and deposited on November 14, 2022.  Unfortunately, that check bounced the following day, on November 15, 2022.  See copies of deposited check returned as insufficient annexed hereto as **Exhibit "B."**

25.     On November 16, 2022, Deo reached out to explain that he had deposited a bank check to cover his payment to me and did not understand why the check bounced; he even shared a screenshot displaying the funds he deposited were in a "hold" status.  See copy of image Deo sent me annexed hereto as **Exhibit "C."**  I believed him.

26.     By November 17, 2022, I had taken the necessary steps to move forward with our partnership by reducing the inventory to market value and absorbing the November 2022 losses.

27.     While Deo agreed to the foregoing approach, an unanticipated issue arose on November 18, 2022 when he revealed to me that Aaronson had allegedly "illegally" withdrawn $735,000.00 from an account Deo claimed was his own; this bolstered Deo's claim that there was a lot of bad blood between him and Aaronson.  See copy of image Deo sent me annexed hereto as **Exhibit "D."**

28.     I felt sympathy for Deo because he claimed that Aaronson was bullying him over their failed partnership, and it appeared that way based on what he sent me.

29.    I later learned, as set forth in detail below, that Harry Thomasson ("Thomasson") assisted Deo in stealing these funds by utilizing his attorney escrow account.

30.    Deo also clarified that his inability to immediately provide the agreed-upon $500,000.00 investment in Superb was a direct result of his problems with Aaronson.

31.    Despite these setbacks, Deo assured me that he would have the funds in a matter of days; he also shared with me that he had involved the police in his dispute with Aaronson, who he claimed had subsequently threatened Aaronson into returning the $735,000.00 or face arrest.

32.    Deo informed me that Aaronson returned the money and then initiated two (2) wire transfers totaling $300,000.00 and $200,000.00 from Car Buyers NYC Inc on November 22 and 29, respectively, all of which made his accusations against Aaronson seem true.[4]  See copy of wires sent by Deo to me annexed hereto as **Exhibit "E."**

**ii.    A Rocky Start from December 2022 through March 2023**

33.    Having paid his contribution as agreed, my partnership with Deo officially began on December 1, 2022.

34.    As part of an overhaul at all my dealerships, I transitioned to a new dealership management system ("DMS") in December at the same time I entered into a partnership with Deo.

_____

[4] As I later found out and as further detailed below, the truth was that Deo had no ownership interest in Northshore or Sunrise, obtained the $735,000.00 from Libertas Funding LLC who would be repaid, with interest, from the future receivables of Northshore and/or Sunrise, and misappropriated those funds for himself.  What's worse, despite Aaronson proving he was entitled to those funds, he was nonetheless threatened with arrest by a detective if he did not turn the funds over to Deo. This is detailed in Aaronson's affidavit in a state court action filed by Aaronson and others against Deo last December, which I only recently learned of.  See NYSCEF Docket Entry 32.  As it turns out, Deo employs a retired and active police officer – Dwight Blankenship and Marc Merckling – and I believe Deo was able to exercise undue influence through his relationships with these officers to force Aaronson to turn these funds over.  Similarly, and as outlined below, despite aggressively seeking the arrest of Deo since August 3, 2023 when I uncovered his fraudulent scheme and providing a mountain of evidence to support my allegations, to this day, Deo has not yet been arrested for his crimes.

35.     At the same time, I had just purchased Team Nissan in Pittsfield, Massachusetts.

36.     As with any large change (and here, there were three), these were characterized by a fair amount of disarray.

37.     These changes also led to a significant backlog of work in managing my group of dealerships, which ultimately resulted in the departure of our Chief Financial Officer ("CFO") three (3) months later, further exacerbating these issues.

38.     It is important to highlight that, from day one, Deo lied and fraudulently induced me into a partnership with him as he did not hold *any* ownership interest in either Northshore or Sunrise (which was part of our deal, as I was entitled to a 25% membership interest in each), and because of ongoing litigation between Deo and Aronson with others.

39.     The foregoing facts establish that Deo breached the representations and warranties he made to me, i.e., Deo's ownership interest in Northshore and Sunrise and the lack of any litigation involving Deo with respect to Northshore and Sunrise, in our Cross-Purchase Agreement.[5]

40.     Separate from the Cross-Purchase Agreement, I had my attorneys prepare a Shareholders' Agreement which stated unequivocally that I had complete dominion and authority over the day-to-day operations of Superb.

41.     In fact, by the Shareholders' Agreement's very terms, Deo's only role was to oversee those operations and either serve as General Manager or appoint one; Deo chose to serve as the General Manager.

---

[5] Moreover, according to Island Auto Group (the other group of Plaintiff dealerships in this case), Deo had never reported any profits while he worked at Northshore or Sunrise, rendering the financial statements he shared with me on November 23, 2022 fraudulent, as were his claims of ownership over Northshore and Sunrise.  It appears that Deo wants to claim every dealership he has ever worked at his own merely because he was tasked with operating them.

42.     On December 12, 2022, I reiterated to Deo the urgency for executing the Shareholders' Agreement and Indemnity Agreements as he had yet to sign them.

43.     On December 21, 2022, I received the executed agreements from Deo.  They are attached hereto as **Exhibit "F," "G," and "H."**

44.     By January 10, 2023, Deo had incurred over $100,000.00 in losses in operating Superb.

45.     Despite earlier claims of a thriving month, Deo's narrative shifted.

46.     Although Deo managed to sell vehicles, his performance appeared less than stellar.

47.     The notion of terminating the partnership loomed, but an alternative approach emerged through our ongoing discussions.

48.     Deo proposed absorbing all losses, with me receiving fixed payments for every car sold, regardless of whether the monthly financial statement revealed a profit or a loss, with the understanding that I will not invest any more capital into Superb as that would fall on Deo.

49.     Deo asserted his ability to transform all stores into profitable entities, armed with a lineup of capable individuals that he relies on, so I accepted his proposal as it was a win-win for me in that I receive income from every car sold and Deo took on the weight of managing Superb.

50.     In January 2023, Deo sold 31 vehicles, and I was paid on February 8, 2023 under our new agreement.

51.     However, my concerns mounted given the extent of his losses.

52.     In response, Deo shared his intentions in securing substantial working capital to leverage his assets, including his residence,[6] for this purpose.

---

[6] Deo told me his Old Westbury home is worth $5 million.  I later learned that he rents his home and does not own it.  It appears every word out of Deo's mouth is a calculated lie.

53.     Deo informed me that he would undertake this effort with Laurie.

54.     On January 28, 2023, Deo sent me promising financial projections; however, the actual sales fell far short of these expectations, resulting in substantial losses for January 2023.

55.     This downward trend persisted even after his February 9, 2023 announcement that Superb had already sold 25 vehicles that month, even though my access to January's data remained incomplete and data in our DMS was far short of that number.

56.     In the ensuing days, Deo blamed various banks for failing to "activate" Superb as a dealership in the banks' lending system such that numerous deals can be accounted for in our DMS system.

57.     It later turned out that there were only two to three deals that were not yet accounted for due to this issue, a far cry from the amount Deo stated accounted for the discrepancies between the financial projections compared to the actual financials.

58.     On or about February 22, 2023, I learned from my accounting team that Deo financed the same cars twice, a practice called double-flooring,[7] that is not permitted by the banks which provide financing.

59.     I immediately confronted Deo about this and said it must be rectified; Deo blamed what had occurred on Aaronson by claiming that *he* was responsible for financing the same vehicles Superb had financed.

---

[7] Dealerships typically operate with the assistance of banks who provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership. When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicles chosen and certain rules attach as a condition of the financing, i.e., with limited exceptions, any such vehicle financed must be present and available for sale at the dealership. In essence, "floor plan" financing is a credit line for dealerships to purchase vehicles for the purpose of reselling them. Once a vehicle is sold, the dealership must repay the bank the principal amount for each vehicle plus interest and any applicable fees.

60.     Not interested in pointing fingers, with my oversight, the floor plan financing issues were quickly resolved.

61.     However, I grew concerned because of these issues and had a serious discussion with Deo about the proper operation of the dealership and to focus on Superb.

62.     We collectively agreed that I would continue to support Deo under the condition that he would put his exclusive focus on Superb.

63.     Although Deo claimed that he was sustaining operations across Superb, Northshore, and Sunrise,[8] I told him that the focus had to be on Superb due to what Deo complained was alleged constraints by Aaronson.

64.     On March 8, 2023, I had a meeting with Nathan Newell ("Newell") of Nissan Extended Services North America ("NESNA")[9] and others, after which I spoke directly to Newell.

65.     Newell raised the topic of Deo with me during our discussion; I shared our endeavors to foster a partnership, which prompted Newell to disclose the challenges he stated were instigated by Aaronson and his partners, as well as a loan taken by Deo that had to be repaid.

66.     I empathized with Deo's predicament and offered Newell my thoughts on how to assist Deo in restructuring the loan.

67.     Newell hesitated to entertain this offer because he did not want Deo to feel as if Newell went behind his back; I never heard a word about the proposal from him again.

---

[8] As set forth in the allegations in the complaint made by the Island Auto Group Plaintiffs, this was not true, as Deo apparently engaged in the same rampant fraud with the Island Auto Group Plaintiffs that he has engaged in at Superb.

[9] NESNA is an arm of Nissan with whom Superb works to offer customers extended warranties. NESNA offers advances to Superb (or any dealership doing business with them) based on future receivables for any such extended warranties sold.

### iii.    March 2023 Served as a Turning Point for Improvements in Superb's Operation

68.    March 2023 ushered in a period of collaboration between Deo and Bruce Novicky ("Novicky"), who serves as the Chief Operating Officer at Superb and my other dealerships.

69.    This occurred because I instructed Deo that he had to work with Novicky to fix his process problems at Superb, during which time Deo blamed many of the financial issues on our accounting department by arguing that the accounting team was not doing its job.

70.    Because it was true that the accounting department was overwhelmed, this provided Deo cover for his actions.

71.    Indeed, in April 2023, an audit was conducted in relation to our efforts to acquire another dealership in New Jersey; the audit unveiled the extent of our accounting department's backlog.

72.    In hindsight, and as further set forth below, this created a window for Deo – and he truly seized the opportunity – to further castigate our accounting team while he had continued and amplified what I now understand was his agenda to misappropriate money from Superb.

73.    For example, unbeknownst to me at the time, Deo opened a bank account with Flushing Bank ("Flushing") on April 4, 2023 by misrepresenting to them that he was the sole shareholder of Superb.[10] See copy of documents obtained from Flushing annexed hereto as **Exhibit "I."**  As is evidenced by the statements appended to this exhibit, the sole purpose of opening the account was to misappropriate Superb's funds to Deo.  See Id. at 16-23.

---

[10] Ironically, I began the process of opening an account with Flushing in March 2023 a month prior.  Flushing asked me for information, documents, and records – many of which I provided – including my tax returns and other documents which indicate that I am the majority shareholder. Further, I spoke directly with David Weinstein (the Vice President and Branch Manager of Flushing's Borough Park branch), and Mr. Weinstein knew that I was the majority shareholder of Superb.  I am therefore baffled as to how Flushing Bank permitted Deo to open an account when his application falsely stated he was the sole shareholder and knew this could not be true.

74.    Deo opened the bank account with Flushing in April 2023 because our CFO had left and I was busy looking for a suitable replacement.

75.    It is unlikely (although not impossible) that Deo would have been able to successfully open an account the way he did had the CFO remained on; what is certain is that the missing cash outlined below would not have gone unnoticed had the CFO remained on.

**iv.    April through July 2023 Brings "Success," but it was the Calm before the Storm**

76.    Following our CFO's departure, Deo became increasingly proactive in carrying out his schemes.

77.    Having established the bank account with Flushing, where he falsely designated himself as the CEO and 100% owner, Deo signed an ACH form authorizing the withdrawal of $426,967.11 through a loan from NESNA using Superb's account with it.  See copy of NESNA ACH authorization for Superb's Chase Operating Account[11] signed by Deo and spreadsheet sent from NESNA with total amount stolen added annexed hereto as **Exhibit "J."**

78.    Strangely, Newell – who works at NESNA – never notified me about this loan nor questioned the authorization, despite direct knowledge of my ownership of Superb following our March 2023 discussion less than a month prior.

79.    In addition, I recently learned that Deo began pocketing all cash deposits left by customers.  See copies of cash reconciliations annexed hereto as **Exhibit "L."**

80.    I recently learned that Deo was able to hide this theft by hiring his CPA – Thomas Jones, a Defendant in this case – to "assist" with the financial statement and bank reconciliations while I continued my search for a replacement of Superb's CFO.

---

[11] As set forth in the Shareholders' Agreement, I had sole check authorization and sole control of all financial accounts.  See Exhibit F; see also copy of signature cards proving that, at no point in time, Deo had *any* authorization to sign checks for that account, annexed hereto as **Exhibit "K."**

81.     I recently learned that while all this was going on, and with the assistance of Jones and his firm, Deo was able to create the illusion that Superb was turning the corner in becoming profitable.  See copy of email exchange between Jones and Superb's accounting department concerning journal entries *Jones* made and *directed* Superb's accounting department to enter annexed hereto as **Exhibit "M."**

82.     Indeed, Superb suddenly earned profits on paper in April, May, and June, which boosted my previously-waning confidence in him as a general manager and partner, as he and Jones ensured that the bank statements and financial reports provided to me had no discrepancies.

83.     It is worthy to note that, throughout this time, Deo and his wife paid themselves in excess of $60,000.00 a month.

84.     The fact that Deo and his wife did so, paid me my share according to our agreement, and made a profit after paying for overhead led me to believe everything was fine, especially in light of Jones' substantiation that the financials were reconciled.  I was wrong.

**v.     Deo Set His Eyes on Team Mitsubishi-Hartford**

85.     In April 2023, Deo expressed interest in partnering up with me at Team Mitsubishi-Hartford, another dealership I own.

86.     I expressed my willingness to consider such a partnership as everything I began to see at Superb helped me view Deo as an expert in used cars who would be a boon to my dealership in Hartford.

87.     Deo displayed an exceptional level of excitement about this opportunity, citing Laurie's success in securing a substantial loan on his behalf to purchase an interest in Team Mitsubishi-Hartford.

88.     In fact, Laurie corroborated Deo's statements.

13

89.     I disclosed to Deo that, based on my valuation of that dealership, his buy-in at that dealership would cost nearly $2 million.

90.     Deo willingly conveyed his eagerness to begin as soon as his funds were available.

91.     I, in turn, assured him that I'd be ready when he was.

92.     In the ensuing months, he continually discussed the plan to partner in Team Mitsubishi-Hartford.

93.     While the prospect sounded promising, it was mere talk.

94.     My primary focus at that time was on maintaining Deo's success at Superb.

95.     In June 2023, I held a meeting with Deo, Laurie, Novicky, and other business executives in my group of dealerships, emphasizing the need for a deliberate pace at Superb.

96.     Deo expressed immense gratitude to me and expressed a firm belief that the deal for Team-Mitsubishi Hartford was sealed.

97.     Laurie mentioned leveraging his assets, including his house, and potential equity in a dealership to secure funding had made the funding possible and that he had the term letter in hand.  Again, I later learned that Deo did not own his house, which Laurie must have known; therefore, Laurie propagated the same lies and deceit Deo dished.

98.     At some point during these discussions, Deo and Laurie requested a floorplan contract for one of my dealerships to provide an example to the hedge fund they allegedly were seeking financing from in order to obtain funding for the deal, which I promptly supplied.

**vi.     A Flurry of Calls from Banks Snowball into an Avalanche of a Problem at Superb**

99.     Towards the end of June 2023 and throughout July 2023, Novicky and I began receiving calls from banks alerting us to a multitude of issues with deals at Superb.

14

100.    As we initiated an investigation, Deo was quick to provide explanations for each concern raised.

101.    However, the discrepancies in the numbers were concerning, and the banks' urgency in requiring us to pay off deals or outright canceling them was a major red flag which impeded dealership operations.

102.    Despite repeated attempts by bank representatives to communicate with Deo about these issues, the concerns raised by them went unanswered, prompting the superiors of the representatives from the banks to intervene.

103.    In response, we pressed Deo to urgently rectify the problems raised by the banks or else they will reverse the deals, which would hurt Superb.

104.    To complicate matters, I was traveling in mid-July and was not as available to intervene as I normally would be.

105.    Notwithstanding, I engaged in numerous conferences with Novicky about the mounting demands from the banks while I was away due to the urgency of the issues.

106.    On July 25, 2023, Novicky received yet another call from a bank, revealing that four cars were double-floored, which he informed me of.

107.    Novicky and I immediately sought answers from Deo about how this was possible, and urged him to immediately address the issue; Deo explained that because the bank unwound some deals, there was a shortage of funds to clear the payments for other cars sold.

108.    Deo pledged to personally contribute the necessary funds to resolve the issue,[12] which he was required to under the terms of the deal him and I made, as well as under the indemnity agreements that he signed.

109.    As July 2023 drew to a close, Novicky informed me he received a distressing call from a bank stating that a staggering 22 cars, totaling $760,000.00, had been double-floored.  See copy of email from NMAC annexed hereto as **Exhibit "N."**

110.    Far from a straw that would break the proverbial camel's bank, at this point, Novicky and I recognized that a serious crisis was unfolding, although we were still unaware of the full extent of Deo's deception.

**vii.    Investigations, Self-Audits, and Damage Control Reign in August 2023**

111.    When Novicky informed me about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with my authority over the day-to-day operations at Superb under the Shareholders' Agreement, I delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that: (i) all "floor planned" vehicles were on premises at Superb as required by banks; and (ii) that all vehicles entered into the DMS were also on premises.

112.    The inventory conducted by Novicky resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger.  See copy of list of missing vehicles and dealer plates annexed hereto as **Exhibit "O."**

---

[12] Novicky and I later discovered that Deo had promptly withdrawn the money he had deposited, issuing a check without the proper authority as he wasn't an authorized signatory on the account.

113.    Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb.

114.    As an example of Deo's clear lies, Deo explained that one particular vehicle was sold; however, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle.

115.    Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale.

116.    Due to the foregoing, I exercised my right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations.

117.    I then discovered that Deo misrepresented to Flushing that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing.

118.    Deo's representation to Flushing was blatantly false.  See Exhibit I.

119.    Deo's actions violated the Shareholders' Agreement because, by its plain terms, only I had check authorization and only I was to have control over bank accounts owned by Superb; Deo opened this account to divert Superb's funds to an account that he can control.  See Exhibit F.

120.    I learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing account and then transmitting those funds into his own personal accounts and those of the remaining Defendants for their substantial assistance to Deo in carrying out his unlawful schemes.  See Exhibit I.

121.    Deo misappropriated approximately $455,000.00 under this scheme thus far.

122.     Deo also misappropriated cash payments from customers by receipting the cash in to Superb's DMS system but never depositing any of those cash payments into Superb's bank account; instead, Deo pocketed the money for himself.  See Exhibit L.

123.     Upon information and belief, Defendant Merckling substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required.

124.     To my knowledge, Merckling was the only individual authorized by Deo to have access to the safe at Superb.

125.     Upon information and belief, Meckling was paid out of these cash funds, rather than through a payroll check, because he is an officer with the Nassau County Police Department and is not permitted to have any outside employment without advance approval from the Nassau County Police Department.

126.     To my knowledge, Deo misappropriated in excess of $500,000.00 by this scheme.

127.     Deo knew that only I had sole check authorization because he executed the Shareholders' Agreement stating so; notwithstanding this, I discovered that Deo signed multiple checks from Superb's bank accounts that were under my control.

128.     During the top-down audit, I discovered that Deo routinely wrote and signed checks issued by Superb and made payable to Northshore; I am advised that Deo's conduct constitutes wire fraud and the use of forged instruments.  See copies of checks Deo signed without authorization from Superb's Chase account, with summary, annexed hereto as **Exhibit "P."**

129.     Deo also purchased five (5) vehicles from Manheim, an auctioneer, under Superb's account; after he was removed, he misappropriated these vehicles without paying for them, leaving me responsible while he has the vehicles in his possession to sell for pure profit.

130.    A copy of a receipt from Manheim providing that Superb is responsible to pay for these vehicles is annexed hereto as **Exhibit "Q."**

131.    In trying to understand Deo's motive for engaging in these schemes, the top-down audit conducted by me soon made Deo's intentions very clear.

132.    For months, while he was repeatedly lying to and stealing from me, Deo has been forming various corporate entities in order to begin his own group of dealerships to be operated under the master entity Gold Coast Motors Automotive Group LLC.

**viii.    Deo's Theft of Confidential Information**

133.    Prior to Deo's working relationship with me, Deo had no familiarity with my dealership processes and know-how, which I imparted to him as a business partner for the mutual success of Superb based on the fact he owed me a fiduciary duty as my partner.

134.    For example, I introduced Deo to Tekion, a unique DMS system that was specifically customized for Superb, and taught Deo the process of successfully operating an automobile dealership using Tekion, such as processes to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement.

135.    The information I imparted to Deo was unique, confidential, and proprietary.

136.    Specifically, the DMS system I implemented at Superb is unique because it was custom-designed for Superb, and cost over $120,000.00 to set up; it contained the blueprint for my success at my dealerships because I knew how to use the customized features of Tekion to profitably operate dealerships.

137.    During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships.

138.    In other words, Deo stole the exact customization used by Superb to use at his competing group of dealerships.

139.    In addition, in a blatant breach of his fiduciary duties to Superb and me, Deo had Superb employees work for his own group of dealerships while they were employed by Superb and were being paid to perform work only for Superb!

140.    Moreover, upon information and belief, Deo illegally imparted the confidential know-how I imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information to these employees for the purpose of setting up Deo's own group of dealerships.

141.    Indeed, Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest.

142.    Defendants Sarah Deo ("Sarah"), Thomasson, Dwight Blankenship ("Blankenship"), Merckling, Laurie, and Jones each substantially assisted Deo in carrying out his unlawful schemes.

143.    Sarah managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

144.    Blankenship and Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

145.    For example, when I called the Nassau County Police Department to remove Deo, Blankenship and Merckling used their positions as retired and active police officers to stymie an investigation and protect Deo from being arrested for his blatantly criminal conduct.

146.    Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing, with whom Laurie has a relationship through his business DLA Capital Partners Inc.

147.    Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with me and Deo and knew that I was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts.

148.    Similarly, although Jones knew that I was the majority shareholder of Superb with sole check authorization and sole control of all bank accounts, he nonetheless was complicit in the fraudulent schemes perpetrated by Deo, as Jones and his firm aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes by, for example, substantiating and certifying the false financial reports provided to me on a monthly basis since in or about April 2023.

149.    Finally, Thomasson serves as counsel to the Defendants and substantially assists them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud.

150.    Thomasson has engaged in the aforesaid fraud together with the remaining Defendants.

151.    For example, although Thomasson purports to maintain an office at 3820 Sunrise Highway, "Box 112," Wantagh, NY, this address is a UPS Store and not an office.

152.    Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants.

153.    The details of Thomasson's fraudulent conduct extend back to the fraudulent schemes Deo perpetrated against the Island Auto Group Plaintiffs, which is detailed in the affidavit of Aaronson, incorporated by reference *supra* at ¶ 34 n. 4.

154.    I also learned and am continuing to learn of other schemes to plunder and destroy Superb.  For example, on February 22, 2023, Deo applied for a license with the Department of Motor Vehicles ("DMV") for one of his competing dealerships and lied to the DMV stating that he had never been convicted of a crime when, in fact, he had.

155.    Specifically, Deo was previously convicted in 2016 for wire fraud in relation to a mortgage.  See United States v. Deo, Case No.: 1:10-cr-00631 (JGK), ECF Docket Entry 31.

156.    Based on my investigations and audits, I now know that since at least April 2023, Deo engaged in non-payment of trade-in vehicles, double-flooring cars, fictitious deals, and the embezzlement of both cash and customer deposits, amounting to over $500,000 in deposits alone.

157.    The practice of double-financing vehicles concealed his actions, evading suspicion, which facilitated his theft with the help of his accountant Jones and the remaining Defendants, as their collaboration was successful in pillaging Superb, and Jones' involvement was aimed to close statements and hide the Defendants' fraudulent activities.

158.    It is evident to me now that Deo never had any intention other than robbing Superb for as much as he could.  He thinks he can get away with it because he has two cops on payroll (but who are being paid cash to avoid the NYPD learning about their employment).

159.    Furthermore, it has come to light that during this entire period, Superb passed every floorplan check with minimal to no deficiencies, a situation that seems implausible considering our discoveries; this raises significant doubts about the contracted auditors hired by the banks, as our most recent audit in July 2023 yielded a deficiency score of 0 cars despite Deo's conduct.

160.    Defendants engaged in wide-ranging schemes to defraud me and the remaining Plaintiffs through wire fraud and the use of forged instruments.

161.    Defendants Sarah Deo, Harry Thomasson, Dwight Blankenship, and Marc Meckling aided and abetted Deo in, among other things, delivering unauthorized checks to banks and presenting them for payment.

162.    Defendants Laurie and Jones enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, i.e., false financial records, false bank applications, and false loan applications, to assist in Deo's and the remaining Defendants' scheme to steal from Superb.

163.    Defendants Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Meckling, Laurie, and Jones assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb.

164.    Defendants are currently benefitting from the confidential information I developed and sourced over thirty years in the automobile dealership industry, and since 2020, when I came to own my first dealership – which Defendants stole from me.

165.    This information includes Superb's customer lists, my contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information.

166.    Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including my decades of experience in the automobile industry, the relationships I developed with contacts in the industry, and the unique know-how I have in how to successfully operate automobile dealerships.

167.    I  went through painstaking efforts, time, and money to build the group of dealerships I own to what they are today.

168.    I have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with me for decades.

169.    Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with me, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means by working with Deo to pillage and plunder Superb because Deo has paid and is paying the remaining Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes.

170.    Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants misappropriated in contravention of their fiduciary duty to Superb and in violation of the law, provided me a unique competitive advantage in the automobile dealership industry, a competitive advantage we have been stripped of by Defendants' unlawful acts.

171.    I took many reasonable measures to keep Superb's confidential information secret.

172. This includes restricting access of this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords.

173. The confidential information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

174. This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business.

175. Deo, Sarah Deo, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means.

176. This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the good will and value of Superb.

177. I am advised and it is obvious to me that the unauthorized acts of these Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful.

178. There was no other way to obtain this information and Deo, Sarah Deo, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of me, to whom they owed fiduciary duties.

179. For example, Deo, Sarah, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system: they stole it from me.

180.    Similarly, Deo, Sarah, Thomasson, Blankenship, and Merckling did not need to search for customers: they simply diverted them from Superb to their own group of dealerships.

181.    Moreover, Deo, Sarah, Thomasson, Blankenship, and Merckling did not need to hire and pay employees: they simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb.

182.    Superb's trade secrets and confidential information that Deo, Sarah, Thomasson, Blankenship, and Merckling misappropriated through gaining my trust by and through Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that I have spent years, if not decades, establishing; meanwhile, Deo, Sarah, Thomasson, Blankenship, and Merckling gained access to information through subterfuge that they would have no other way of obtaining.

183.    Deo, Sarah, Thomasson, Blankenship, and Merckling misappropriated such confidential and trade secret information by engaging in outright misappropriation; no permission was given to them by me to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about Superb's customers for any purpose except for the benefit of Superb.

184.    It is obvious from Deo, Sarah, Thomasson, Blankenship, and Merckling's brazen tactics that they are actively engaged in a scheme to plunder and destroy Superb – a company I spent years building and hundreds of thousands of dollars investing in.

185.    Upon information and belief, a significant number of Superb's customers have been solicited by Deo, Sarah Deo, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information.

186.    Immediate injunctive relief and a permanent injunction is necessary to prevent irreparable harm to Superb.

187.     Without relief, Deo, Sarah, Thomasson, Blankenship, and Merckling will destroy the customer relationships, brand, and goodwill that I have spent years building, and will profit from the business which they stole from me, causing further imminent and irreparable financial harm to Superb.

188.     In addition to shutting down Deo's automotive businesses, specifically, Defendants Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp., Deo, Sarah, Thomasson, Blankenship, and Merckling should be directed to return the misappropriated information and be enjoined from engaging in any further unlawful conduct.  It is also essential that Superb also be permitted to forensically examine Deo, Sarah, Thomasson, Blankenship, and Merckling's email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of their unlawful scheme to steal Superb's business.

189.     I went through painstaking efforts, time, and money – blood, sweat, and tears – to build my group of dealerships to what they are today.

190.     I respectfully request that this abominable conduct by Defendants be appropriately addressed by this Court.

191.     This Court should also Order Defendants to return Superb's vehicles and dealer plates, which I have repeatedly requested Deo return to no avail.  See copies of correspondence to Deo from my counsel annexed hereto as **Exhibits "R" and "S."**

192.     Most of the vehicles are owned by Superb.

193.    However, some of the vehicles are owned by Team, which is a wholesaler that sells vehicles to Superb and other dealerships that I own.

194.    If I do not regain possession of these vehicles, I will be required to pay back $2 million to the banks, which sum of money I do not have available, and which would require me to shut down operations at all my dealerships, and force me to lay off 125 employees.

195.    Beyond the $3 million in damages I have already sustained due to the Defendants' conduct, if this happens, I will lose *everything* I worked so hard to build over the last several years.

196.    I beg that this Court does not permit this to happen.

197.    Immediate injunctive relief is necessary to permit the return of Superb's and Team's vehicles to avoid their imminent doom, together with my other dealerships.

198.    It is also necessary to prevent Defendants from destroying the relationships and goodwill that I have spent decades building with banks, vendors, and customers, from stealing our customers, which Defendants improperly misappropriated, using our trade secrets and confidential information, and causing further imminent and irreparable financial harm to Superb, as Defendants have unquestionably set out to do.

199.    In addition to securing the return of our misappropriated information back to us from Defendants and enjoining Defendants from engaging in any further illegal activity, it is essential that Superb be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of Defendants' unlawful schemes to steal 'Superb's confidential information, customers, and employees.

200.    Based on Defendants' egregious conduct, they should also be shut down pending the outcome of this litigation.

28

201.    I respectfully request that this Court grant the relief requested herein.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 18 , 2023.

_Robert Urrutia_
Robert Urrutia (Aug 18, 2023 18:47 EDT)

Robert Anthony Urrutia

# 2023-08-18 FINAL Urrutia Declaration

Final Audit Report                                              2023-08-18

| | |
|---|---|
| Created: | 2023-08-18 |
| By: | Emanuel Kataev (mail@emanuelkataev.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAARwrtF9736vLqPAEjVA8lbqc9WiD-QvNy |

## "2023-08-18 FINAL Urrutia Declaration" History

🔲 Document created by Emanuel Kataev (mail@emanuelkataev.com)
2023-08-18 - 10:43:40 PM GMT- IP address: 65.51.198.20

📧 Document emailed to tonyu814@gmail.com for signature
2023-08-18 - 10:45:04 PM GMT

🔲 Email viewed by tonyu814@gmail.com
2023-08-18 - 10:45:10 PM GMT- IP address: 66.249.83.194

✍️ Signer tonyu814@gmail.com entered name at signing as Robert Urrutia
2023-08-18 - 10:47:06 PM GMT- IP address: 96.56.214.187

✍️ Document e-signed by Robert Urrutia (tonyu814@gmail.com)
Signature Date: 2023-08-18 - 10:47:08 PM GMT - Time Source: server- IP address: 96.56.214.187

✅ Agreement completed.
2023-08-18 - 10:47:08 PM GMT

Adobe Acrobat Sign