## SHAREHOLDERS AGREEMENT

**AGREEMENT** made this       day of December 2022, among Robert Urrutia ("Urrutia"), Anthony Deo ("Deo") and Superb Motors, Inc., a New York Corporation with its principal place of business located at 15 Lancaster Street, Lynbrook, New York 11563 (hereinafter referred to as the "Corporation,"). Urrutia and Clarke are hereinafter sometimes referred to individually as a "Shareholder" and collectively as the "Shareholders". The Corporation and the Shareholders are hereinafter sometimes referred to individually as a "Party" or collectively as the "Parties".

### W I T N E S S E T H:

**WHEREAS,** the Shareholders own all of the issued stock of the Corporation; and

**WHEREAS**, the Parties wish to set forth herein their mutual rights and obligations with respect to the stock of the Corporation and the management of the Corporation's affairs.

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions contained herein the Parties agree as follows:

1.      ELECTION OF OFFICERS AND MANAGEMENT

(A)     The Parties acknowledge that effective December__, 2022, the outstanding shares of the Corporation's stock are owned by the Shareholders as follows:

      Robert A. Urrutia      -      51%

      Anthony Deo            -      49%

(B)     All Shareholders owning Voting Stock (as defined herein) of the Corporation agree to vote their respective shares so as to elect each of them as a director of each Corporation, with Urrutia as President and Deo as Secretary/Treasurer. The said Shareholders agree that this provision shall remain in full force and effect thereafter as to each such Shareholder unless or until the death of such Shareholder, voluntary relinquishment of such office or the sale of all the shares held by him or her.

(C) Each of the Shareholders agrees that (as long as he agrees to accept the duties and responsibilities set forth below), Robert Urrutia, as President of the Corporation, in addition to all powers and duties he may have by operation of law or pursuant to the by-laws of the Corporation, shall have final authorization on the following matters, which the President alone, and independent of the Shareholders, Directors and Officers of the Corporation, may exercise:

(i) the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires;

(ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided for below with respect to Clarke, it being expressly agreed, that this power does not include the right to terminate a Shareholder.

The powers given to Urrutia enumerated in this Subparagraph (C) shall lapse and revert to the Corporation's Board of Directors only at such time as Urrutia ceases to be President of the Corporation, or at such earlier time as he voluntarily relinquishes such power(s) in writing.

(D) Each of the Shareholders agrees that the Corporation's Board of Directors shall make all decisions on behalf of the Corporation except those which have been delegated to its President in accordance with Subparagraph (C) above. Such decisions shall, upon a vote of all Directors, be made based upon the Agreement of a majority of the Voting Stock (as defined herein).

(E) <u>Voting Shares</u>. Unless otherwise agreed to in a writing signed by Deo and Urrutia, the shares of stock owned by Deo and Urrutia, respectively, shall be entitled to vote. All such shares of stock of the Corporation shall have the right to remove a Director or overturn the decision of the Board of Directors only upon a majority vote of all their shares of the Corporation voting to either remove a Director or to overturn a decision of the Board.

2. ACTIONS'REQUIRING SHAREHOLDER CONSENT

(A) The Shareholders shall use their best efforts to insure, and the Corporation agrees that the following actions shall require the written consent of at least a majority of the Voting

Shares:

    (i)    the issuance of additional capital stock by the Corporation, or, except as otherwise provided in this Agreement, the purchase by the Corporation of any of its outstanding capital stock;

    (ii)    the amendment of the Corporation's Certificate of Incorporation and/or By-laws; and

    (iii)    the merger or consolidation of the Corporation with or into another Corporation, or the sale of the assets of the Corporation substantially, as an entirety or otherwise, not in the regular and ordinary course of business;

    (iv)    the granting of any mortgage, lien or other security interest in the assets of the Corporation;

    (v)    loans and guarantees by the Corporation;

    (vi)    sale or lease of real or personal property by the Corporation.

3.    EMPLOYMENT AND CONSULTING AGREEMENTS

No employment or consulting agreements shall be entered into by the Corporation without a majority vote of the Voting Stock.

4.    DISTRIBUTION OF PROFITS

No less frequently than on a quarterly basis (i.e., every three (3) months), the Corporation shall distribute to stockholders all profits of the Corporation, less such sums needed to meet future obligations as determined by Urrutia on a monthly basis. Clarke shall have the right to inspect books and records of the Corporation relating to Urrutia's decision regarding sums needed to meet future obligations, as well as the calculation employed by Urrutia to determine the amount of profits to be distributed to stockholders. Subject to the terms and conditions hereof, distributions of profit shall be made to the Shareholders in accordance with their proportionate ownership stake as indicated in Section 1.

5.    TRANSFERABILITY

(A)     A Shareholder shall not sell, assign, pledge, hypothecate, encumber or otherwise transfer any of the shares which he or she may now or hereafter hold except in accordance with the provision of this Agreement.

(B)     The Corporation agrees that it will not issue, cancel or transfer any shares in violation of this Agreement.

(C)     Simultaneously with the execution and delivery of this Agreement, the following legend has been endorsed upon each certificate representing shares of stock of the Corporation held by each of the Shareholders:

"THE TRANSFERABILITY OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE PROVISION OF ARTICLE 15 OF THE BUSINESS CORPORATION LAW OF THE STATE OF NEW YORK AND THE PROVISIONS OF A CERTAIN AGREEMENT EFFECTIVE DECEMBER          , 2022, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION, AND ANY SUCH TRANSFER OF SUCH SHARES IN VIOLATION OF SUCH RESTRICTIONS IS VOID."

Each of the Shareholders agrees that this legend shall be endorsed upon any certificate for shares of stock of the Corporation which may be issued in the future.

The Corporation agrees that it will not issue any previously unissued shares or any treasury stock, and the Shareholders agree that they may not transfer any shares of the Corporation's stock except pursuant to this Agreement without: (i) the execution of an agreement, executed by owners of a majority of the Voting Shares and the prospective owners of such previously unissued shares and/or treasury stock, or the transferee of the Shareholder's shares, whereby, among other things, such prospective owners agree to be bound by the terms of this Agreement as though they were original signatories hereto.

6.      RESTRICTIONS ON SALE OF STOCK

(A)     Unless otherwise agreed to by a majority of the Voting Stock of the Corporation,

any Shareholder shall offer to sell all but not less than all of their shares in the Corporation to the Corporation. Upon receipt of said offer, the Corporation shall, if authorized by a majority of the Voting Stock (not including the stock owned by the Shareholder offering to sell its shares to the Corporation), repurchase such stock. If the Corporation purchases such shares, it must buy said shares at the price established in accordance with the provisions of Article "7."

If the Corporation elects not to repurchase said stock, then the Corporation shall notify the offering shareholder and the remaining shareholders of this fact within thirty (30) days of receiving the offer to sell from the offering shareholder. The remaining shareholders shall then have a period of sixty (60) days from receipt of the notification of the Corporation's inability to acquire the stock in proportion to such remaining shareholders' then percentage of ownership, from the offering shareholder to purchase said stock under the same terms and conditions available to the Corporation.

7.   PURCHASE PRICE AND TERMS OF PAYMENT

(A)   The purchase price for the sale of any stock pursuant to the provisions of this Agreement shall be established as follows: the Corporation and the offering Shareholder shall each, at their own expense, hire their own business appraiser to appraise the value of the shares being offered. Such business appraisers selected shall have at least ten (10) years of experience as an appraiser of automobile dealerships. In the event the appraised values established by both appraisers are within ten (10%) percent of one another, the average value shall serve as the purchase price for such shares. In the event that the difference between appraised values is greater than ten (10%), the two appraisers shall hire a third business appraiser (who must also meet the requirements and qualifications established above in this Section 7(A)) and the valuation established by such third appraiser shall serve as the purchase price for the offered shares. In the event a third appraiser is necessary, the lower of the first two appraisals shall serve as the minimum purchase price and the higher of the first two appraisals shall serve as the maximum purchase price for the offered shares. The cost of the third appraisal shall be split evenly between

the Corporation and the offering shareholder.

(B) Unless otherwise agreed to in writing, upon the death of a Shareholder, and/or upon the occurrence of any of the events contemplated in Article 6, the purchase price for the shares of stock to be purchased by the Corporation shall be the value as set forth in (A) above or, if the Corporation has insured the life of the deceased Shareholder, 'then the insurance proceeds reduced by an amount, if any, to be computed by the Corporation's accountant equal to any tax liability incurred by the Corporation as a result of their receipt of said insurance proceeds, whichever is greater.

(C) The amount paid to a Shareholder pursuant to this Agreement whether by virtue of death of a Shareholder or any other form of withdrawal from the Corporation shall be increased or decreased in an amount equal to that Shareholder's proportionate share of net earnings or losses of the Corporation for the year in which the death or withdrawal occurs. The withdrawing Shareholder or the estate of a deceased Shareholder shall be responsible for any taxes with respect to the Purchase Price as described herein, including the proportionate share of net earnings.

(D) Unless stated otherwise in a separate writing, the payment of the Purchase Price shall be as follows:

(i) <u>Pursuant to Section 6(A)</u>. One Hundred (100%) Percent of the Purchase Price shall be paid on the closing date.

(ii) <u>Upon the Death of a Shareholder</u>. If the net life insurance proceeds represent the Purchase Price, they shall be paid to the estate of the deceased Shareholder immediately upon receipt of same by the Corporation. If the stated value exceeds the net insurance proceeds and thereby exceeds the Purchase Price, then the net insurance proceeds shall represent the down payment for the purchase of the deceased Shareholder's shares of stock and the difference shall be paid in twelve (12) equal monthly installments commencing on the first day of the calendar month following the closing date

with interest at 4% Percent. In the event there are no insurance proceeds, then One Hundred (100%) percent of the Purchase Price shall be paid at closing.

(E)     To secure payment of the balance of the Purchase Price due pursuant to Paragraphs 6 (A) or (B) above, such payments shall be evidenced by the Promissory Note of the Corporation or purchasing shareholder(s) which shall be a non-negotiable Promissory Note bearing interest at 4% Percent. If the note(s) is made by purchasing shareholder(s), it shall be guaranteed by Corporation. The Promissory Note(s) shall provide that: (i) it may be prepaid in whole or in part, without penalty; (ii) the entire balance shall become due and payable upon the failure of the Corporation or the Shareholder(s) to pay any installment within thirty (30) days after its due date; (iii) ten

(10) days written notice of default, dishonor, protest and/or presentment shall be given to the Corporation(s) and the guarantors; (iv) it shall be governed by the laws of the State of New York.

(F)     The "closing date" of any purchase made pursuant to this Agreement shall be as follows: In the event of voluntary withdrawal pursuant to paragraph 6(A), thirty (30) days after such voluntary withdrawal. In the event of death of a Shareholder, sixty (60) days after the death of the deceased Shareholder. In the event of Should the "closing date" be a Saturday, Sunday or legal holiday, the "closing date" shall be the next succeeding business day.

(G)     On the "closing date" the certificate or certificates representing all of the shares of stock being purchased pursuant to this Agreement shall be fully endorsed in blank and delivered to the attorney for the Seller to be held by him in escrow to secure payment of the balance of the Purchase Price. Upon payment in full of the Purchase Price, the shares shall be delivered to the purchaser(s). The Seller shall not be entitled to vote the shares purchased hereunder as long as the purchaser(s) is not in default in the payment of the Promissory Note(s) to be delivered to Seller or Seller's estate (hereinafter the "Promissory Note"). In the event of a default under the Promissory Note, the attorney for the Seller shall forthwith re-deliver to the Seller that number of

shares which have not yet been paid for and for that number of shares which have been paid for, such shares shall be delivered forthwith to the Purchaser or Purchasers. The Seller shall regain exclusive equity and voting rights to the extent that the shares redelivered to Seller bear the total number of shares outstanding.

If, in order to comply with the provisions hereinabove set forth with respect to delivery and redelivery, it is necessary that the certificate of stock representing the shares being held in escrow must be subdivided, then the attorney for the Seller shall call upon the Corporation to issue a new certificate or certificates representing that number of shares to be redelivered to the Seller and that number of shares to be redelivered to the Purchaser or Purchasers.

8. DISSOLUTION

(A) Upon the dissolution of the Corporation, the Shareholders agree that any amounts due any former Shareholder pursuant to obligations created under this Agreement and any disability or severance pay obligations to present or former employees of the Corporation, represents liabilities of the Corporation which are, in all respects, superior to any liability or other payment due anyone who may be a Shareholder as of the date of the dissolution with respect to his shares then held.

(B) If dissolution occurs while the Shareholders are alive, the Corporation shall be liquidated under supervision of Urrutia with the cooperation of all other Shareholders, and the corporate assets shall be distributed according to law, or as otherwise agreed upon by the Shareholders, subject to the rights of the creditors.

9. BOARD OF DIRECTORS MEETINGS

The Shareholders, sitting as the Board of Directors of the Corporation, shall meet at least once annually. The dates for such meetings shall be scheduled each January by the President of the Corporation.

10. RESTRICTION ON VOLUNTARY TERMINATIONS AND WITHDRAWALS

In the event that a shareholder withdraws from active participation in the conduct of the

business by said Shareholder's failure and refusal to participate in and to perform the duties and responsibilities assigned to said Shareholder, then his right to receive payment for his shares of stock shall still be determined in accord with the other pertinent provisions of this Agreement, but the obligation to make payments to which the Shareholder would be entitled in accord with the provisions of Article 4 above, herein shall be deferred until the expiration of the twelve (12) month period hereinabove referred to.

11.   SHAREHOLDERS LOANS

Upon a vote of a majority of all Voting Stock of the Corporation for a loan from the Shareholders of the Corporation, such loan shall be made in proportion to their percentage of ownership interest, such sums (hereinafter referred to as "Cash Calls") in amounts as may be required to meet present and future Corporation requirements. Any monies loaned to the Corporation in accordance with the terms of this provision shall bear interest at a rate determined by such vote of at a majority of the Voting Stock.

Should any shareholder for any reason whatsoever fail or refuse to loan to the Corporation his proportionate share of any "Cash Call", the remaining shareholder(s) shall have the right, but not the obligation to loan to the Corporation such sums as may be required to make up the shortfall caused by the refusal or failure of any shareholder to meet such "Cash Call."

In the event that any monies loaned to the Corporation in accordance with a "Cash Call" have not been repaid in full within one (1) year from the date of such loan, then the "Cash Call" shall be deemed a "long term Cash Call" to the extent of the unpaid balance of any outstanding portion of such loan including both principal and interest.

With respect to a "long term Cash Call," any shareholder who fails or refuses for any reason whatsoever to loan to the Corporation his proportionate share shall be deemed to have offered to the remaining shareholders sufficient shares held by him in the Corporation equal to the sums loaned in proportion to such remaining shareholders stock ownership.

Unless otherwise agreed upon, the price per share shall be determined by paragraph "7"

of this agreement and upon acceptance of the non-contributing shareholder's offer as set forth herein will result in the dilution of the non-contributing shareholder's ownership in the Corporation.

Notwithstanding the foregoing, the remaining shareholders shall not be required to purchase the interest of the non-contributing shareholder(s), but shall have the right instead to treat the amount loaned to the Corporation in excess of his proportionate share ownership as a loan.

Any shareholder who has failed to meet its obligations pursuant to this Section 11 ("Defaulting Shareholder") shall forfeit his share of the net profits of the Corporation and such Defaulting Shareholder's proportionate share of the net profits of the Corporation shall be paid to the Corporation. Further, such Defaulting Shareholder's proportionate share of the net profits of the Corporation shall be paid to the Corporation until such time that the Corporation has received the value of the Cash Call which the Defaulting Shareholder did not contribute. At such time as the Corporation has received the value of the Cash Call(s) which the Defaulting Shareholder previously failed to meet, the Defaulting Shareholder's right to receive a proportionate share of the net profits of the Corporation shall be reinstated.

12. BUSINESS RESPONSIBILITIES

(A) Urrutia. In operating the Corporation, Urrutia shall have the following responsibilities:

(i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors;

(ii) capitalization of the Corporation;

(iii) establishment of sales and administrative policies, as well as marketing techniques for automobile sales;

(iv) approval and management of all sales and resales of used vehicles;

(v) approval or disapproval of profit margins:

(vi) establishment of policies and standards for services provided by the Corporation, as well as supervision and complete authority over Corporation's activities;

(vii) review and final approval of financing arrangements with lending institutions to be utilized by the Corporation in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles;

(viii) supervise and have complete control of the accounting department of the Corporation, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by the Corporation.

(ix) Urrutia shall make available to the Corporation the used vehicles in inventory at his affiliated automobile dealerships in New Jersey (Volkswagen of Freehold and Team Mitsubishi of Hartford).

In performing the above services, in each instance, Urrutia shall not be required to obtain the consent of any other Shareholder(s).

(B) Deo. In operating the Corporation, Deo shall have the following responsibilities:

(i) Deo shall propose the individual who will serve as the General Manager of the day-to-day operations of the Corporation as a used motor vehicle dealership. Urrutia shall have final authority to approve or reject such hire. If the individual is ultimately hired, they shall report to both Deo and Urrutia directly and shall be required to be present at the dealership for all operating hours as a full-time employee.

13. MISCELLANEOUS

(A) This Agreement shall not be changed, modified or amended except by a writing signed by the Shareholders and this Agreement may not be discharged except by performance in accordance with its terms or by a writing signed by the Shareholders.

(B) This Agreement, including all schedules referred to herein, sets forth the entire agreement and understanding between the Shareholders as to the matters contained herein, and merges and supersedes all prior discussions, and understandings of every kind and nature among

them. No Shareholder shall be bound by any condition, definition, warranty, or representation other than as expressly provided for in this Agreement.

(C) This Agreement shall be binding upon, and inure to the benefit of, the Shareholder hereto and their respective heirs, executors, legal representatives, successors and permitted assigns. This Agreement and the Shareholder's rights and obligations hereunder may not be delegated or assigned by any Shareholder except on the prior written consent of a majority of the Voting Stock.

(D) All notices, requests, demands and other communications provided for in this Agreement shall be in writing and shall be deemed to have been given at the time when personally delivered, or mailed to any general or branch United States Post Office, enclosed in a registered or certified post-paid envelope, return receipt requested, addressed to the address of the Party stated at the beginning of this Agreement or to such other address as such Party may have fixed by notice, provided, however, that any such notice of change of address shall be effective only upon receipt.

(E) If any provision of this Agreement or the application of any provision hereof to any person or circumstance is held invalid, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected unless the invalid provision substantially impairs the benefits of the remaining portions of this Agreement.

(F) This Agreement shall be governed by and construed under the laws of the State of New York.

(G) The headings of the paragraphs hereof are inserted only for the convenience of the Parties and in no way define, limit or prescribe the intent of this Agreement.

(H) Whenever used herein and required by the context the singular number shall include the plural, the plural shall include the singular number, and the use of either gender shall include both genders, and the words "hereof' and "herein" and "hereafter" and "hereto" shall refer to this entire Agreement and not to any provision, paragraph, subparagraph or section.

**IN WITNESS WHEREOF**, the said parties have duly executed this Agreement the day and year first written above

_____
ROBERT A. URRITIA

_____
ANTHONY DEO