UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                                                               Case No. 2:23-cv-6188 (OEM)(ST)

SUPERB MOTORS, INC., TEAM AUTO SALES LLC., ROBERT ANTHONY URRUTIA, 189 SUNRISE HIGHWAY AUTO LLC., NORTHSHORE MOTOR LEASING, LLC., BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC,

                                    Plaintiffs,

       -against-

ANTHONY DEO, SARA DEO, HARRY THOMASSON, DWIGHT BLAKENSHIP, MARC MERCKLING, MICHAEL LAURIE, TOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES LITTLE & CO., CPA'S LLP, FLUSHING BANK, and LIBERTAS FUNDING, LLC,

                                    Defendants.

------------------------------------------------------------------X

## DECLARATION OF ANTHONY DEO IN OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE

       Anthony Deo, pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury that the following is true and correct:

1

1. My name is Anthony Deo and I am a Defendant in the above captioned action. I have first hand knowledge of the facts recited herein.

2. I submit this Affidavit individually and on behalf of the responding corporate Defendants represented herein by our attorney, Harry Thomasson, whom I have known and who has represented my own and my wife's (Sara Deo, co-defendant herein) professional interests since during or about 2020.

3. During or about 2016, I leased the space and began operating a used car dealership at 180 Michael Drive, Syosset, New York. Attached hereto as Exhibit A are true and accurate copies of the leases for the spaces we rented and operated for the two used car dealerships since 2016 (NorthShore Motor Leasing, LLC, hereinafter, "NorthShore") and 2020 (189 Sunrise Hwy Auto, LLC, hereinafter, "Sunrise").

4. This Court is aware that there is a dispute involving, *inter alia,* settling ownership of NorthShore and Sunrise between the parties to the Nassau County (New York) Supreme Court action entitled *Chabrier, et al., v. Deo, et al.,* Index No. 617224/2022. Accordingly, I will not attempt to explain everything about that lawsuit here.

5. However, for this Court's purposes, a brief explanation is necessary.

6. During the fall of 2022, Wendy Kwun, the CFO of the Josh Aaronson group including co-Plaintiffs from the instant action, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC, (hereinafter, the "Aaronson" group and/or Plaintiffs), one or more of whom,

2

through November, 2022, provided the Floor Plan at both NorthShore and Sunrise, informed me and the Aaronson group that I and my wife were mistakenly *not* being listed as the owners of NorthShore and Sunrise on tax returns, and provided the impetus to correct that mistake. The tax returns prepared and filed in the fall of 2022 for NorthShore and Sunrise were then amended to indicate that I and my wife were the owners of 100% of the stock of those two corporations, **_and these amended returns were specifically approved by Josh Aaronson, the head of the Aaronson group and co-Plaintiff in both the Nassau County Supreme Court case and this case._** Attached hereto as Exhibit B are true and accurate copies of the email chain and tax returns proving same.

7. After the tax returns were prepared and filed as approved by Aaronson, I questioned the whereabouts of certain monies belonging to NorthShore and Sunrise, including substantial sums missing from Pandemic Relief Funds ("PPE" funds). Immediately thereafter and prior to the end of 2022, the Aaronson group 1) left my two dealerships by pulling their Floor Plan support; 2) took all files with them when they appeared at the dealerships on my day off and took said records; 3) locked me out of the dealerships' software; 4) took the licenses for the dealerships; 5) locked me out of the bank accounts for the dealerships; and 6) commenced the Nassau Supreme Court action alleging in an *ex parte* application that I *was not* the owner of my dealerships and needed to be enjoined from their operation.

8. Once our attorney (Harry Thomasson) responded to that motion practice and the Court rendered its decision already given to this Court by attorney Thomasson in letters to this Court last month, the Aaronson group lost their Order to Show Cause in its entirety

3

when the Nassau Court ruled that the Aaronson group "failed to demonstrate a likelihood of success on the merits of their claims."

9. From the outset of the trouble with the Aaronson group that commenced last November, 2022, with their ruination of NorthShore and Sunrise (they still have not given back any books, records, files, or access to software/bank accounts for those two businesses that have been shuttered ever since; demand is renewed here, now, for the return of those books, records, files and access), our outside counsel, Harry Thomasson, told us that we had to "mitigate" our losses from what the Aaronson group did to our businesses.

10. It is from and with this backdrop that I and Anthony "Tony" Urrutia commenced our relationship last November.

11. Tony was told of the Aaronson problems and proposed the following: I would pay him $500,000.00 for one half of Superb Motors, I would take over its day to day on site operations of Superb, I would buy him out of the other half of Superb, and I would eventually also obtain ownership of three dealerships/points owned by Urrutia in Danbury and Hartford, Connecticut, for an initially undetermined price.

12. As an inducement and by way of performing due diligence, Tony provided me with a financial statement prepared by his then-CFO, Alysia Cayer, which was previously forwarded to one of the Floor Plan companies (NMAC) for Superb by Ms. Cayer.

13. A true and accurate copy of that financial statement for the Superb Motors dealership for January, 2022, through and including the end of November, 2022 is attached hereto as Exhibit C.

4

14. For the instant purposes, I ask the Court to notice the following (at least) from Exhibit C: In the upper left corner of the document, the cash on hand and cash investments are both negative numbers. Also, in the lower right-hand corner of the document, the net earnings and total net worth of Superb for the listed eleven months of 2022 are in the negative by nearly three quarters of a million dollars combined. Just above the negative net earnings and negative net worth are indications that in 7 of the 11 listed months, the company was operating in the negative, increasingly as the year went on.

15. In January, 2023, I fully took over day to day operations at Superb. Despite the poor condition of the company as set forth in the document attached as Exhibit C (which I had *nothing* to do either with creating that document or any involvement at all in the company for those 11 months), I knew that it was an opportunity that I could improve (and candidly, the Aaronson group's destruction of NorthShore and Sunrise left me with few options to mitigate my losses).

16. Improvement could come in several ways, I thought, and then set about making those improvements.

17. When I arrived at Superb (I started part time in December, 2022), I knew that the company was only producing about 100 or fewer leads per month on its own. I immediately had Sara, my wife, commence a program to increase leads for sales at Superb; by the time Tony locked me out on August 3, 2023 (as set forth, *infra*) Superb was producing in excess of 4,000 leads per month. When I arrived at Superb parttime in December, there were a couple of employees (other than upper management) standing around with their hands in their pockets on the sales floor. When I left Superb

on the night of the Lockout, there were constantly at least seven employees sitting at desks daily working the phones/leads Sare provided, all day long.

18. When I arrived at Superb the company did not participate in purchasing automobiles at the various auto auctions in and around the greater Long Island and NYC areas; I immediately commenced purchasing at such auctions. Increased automobiles for sale increases sales, a basic in the business, and Tony and I knew that we had plenty of room for extra cars since I had two empty car dealership lots that I leased that Josh Aaronson caused to be empty by destroying NorthShore and Sunrise on the way out the door. Tony agreed to my plan for additional purchases, and we did so, filling the extra space that I had available in the process for the benefit of Superb. In fact, that these Superb cars have been at my other two lots is well documented in the Nassau Supreme Court case, where and when Josh Aaronson trespassed at those lots to take pictures of the cars he wrongfully thought I was selling through NorthShore and/or Sunrise; the attorneys for Aaronson here and in that case along with my attorney (Thomasson) exchanged letters with the Nassau Court Judge (Gianelli) about that very issue.

19. When I arrived at Superb, there was little or no advertising, and absolutely no advertising budget. When I left, Superb was advertising daily.

20. I also started scrutinizing various books and records at Superb, and during or about March, 2023, I noticed peculiarities with certain financial information with the company.

21. Thus, I discussed these numbers and peculiarities with my longtime accountant, Tom Jones at Jones Little (co-Defendants, wrongfully, herein); Tom Jones told me

6

something was wrong and pointed to numbers indicating the possibility of fraud taking place at Superb. Tom Jones suggested an internal audit.

22. Accordingly, I notified the CFO of Tony Urrutia's businesses (Superb plus the three dealerships in Connecticut, a/k/a/ Team Auto Group), Alysia Cayer, that I wanted a forensic review of Superb's finances; attached hereto as Exhibit D are true and accurate emails from when I raised the issue with Ms. Cayer, whom I suspected at the time was doing something wrong, so I cc'd both my accountant and attorney on the emails to let her know that it was a serious matter.

23. Two things unexpectedly occurred within about one (1) week thereafter: Ms. Cayer informed me (as set forth in Exhibit D) that she needed authority from Tony Urrutia to conduct the examination, and when she asked for that authority, Tony Urrutia fired her. I was not consulted on that firing, did not know he was going to fire her, and was surprised to find out that she was fired by Tony.

24. I now surmise that her firing was merely an attempt by Tony to control my interest in finances, to blame Alysia and placate me with the firing, and to prevent any forensic examination from taking place, because while he said that there would be a new CFO "soon," none was ever appointed nor hired by Tony by the time he executed the Lockout on August 3, 2023.

25. In June, 2023, two relevant events occurred for this Court's consideration: 1) My accountant, Tom Jones, produced a routine mid-year Profit and Loss Statement, a true and accurate copy of which is attached as Exhibit E; and 2) Tony Urrutia's/Team Auto's COO, Bruce Novicky, at the stated direction of Tony Urrutia, gave me a copy for the first time of a report produced by one of Superb's Floor Plan providers, NMAC,

which they first gave to Tony Urrutia and/or Team Auto employees at or about the end of February, 2023, after review of Superb's 2022 finances as provided to NMAC by Tony Urrutia/Team Auto/CFO Alysia Cayer.  A true and accurate copy of that report from NMAC reviewing Superb's overall health as of the end of 2022 is attached hereto as Exhibit F.

26. Combined, Exhibits E and F were utilized and discussed at length between Tony Urrutia and I in connection with the discussions over finalizing my complete purchase of Superb and also purchasing the three Team Auto dealerships/points in Connecticut. Exhibit E demonstrates the clear improvements to Superb's overall financial condition (all monies on the ledger reversed from negative balances at the end of November, 2022, prior to my take over of daily operations at the beginning of January).

27. But more important is the report from NMAC detailing NMAC's comparative findings with whatever Tony Urrutia and Team Auto gave NMAC concerning Superb's finances for 2022, including, quite possibly, Exhibit C.

28. NMAC's findings in Exhibit F are disturbing on a number of levels, as Tony Urrutia's COO told me when he gave me the document for the purpose of speeding up my acquisition of the Connecticut dealerships:  Bruce Novicky directly indicated that 1) this was only the report produced by NMAC for Superb; 2) there were reports produced by NMAC for each of Urrutia's/Team Auto's other dealerships; 3) the other reports "are even worse," and 4) given how bad these reports look, if I don't move on the full purchases fast (read:  hurry up and give Tony more money), NMAC could pull the NMAC Floor Plan to each of the dealerships.

29. What Bruce Novicky, Tony Urrutia, and Team Auto apparently forgot, or thought that my accountant would miss, is that on page 6 of the NMAC report attached as Exhibit F contains is the very clear listing of "Advance Amount: $650,000.00."

30. It wasn't until late July that the meaning of this entry was fully known to me and my wife after Tom Jones' review of same: Just before I bought half the company for $500,000.00, Tony Urrutia obtained a loan/effective mortgage against the company for $650,000.00 on November 1, 2022, never told me about it, kept it hidden from me, and took all of that money plus the money I paid him for my shares of the company ($500,000.00) later that month without leaving *any* of that $1,150,000.00 for the company to which it rightfully belongs.

31. At about the same time, I also discovered that $760,000.00 was taken by Tony Urrutia without my knowledge from Superb for his problems with his Connecticut dealerships/points, and even worse, that Tony somehow put my Rolls Royce on his Floor Plan and took that money himself for unknown purposes.

32. Thus, the week before the Lockout, I confronted Tony and told him (angrily) that I was aware of these improprieties, and demanded the money be given back and that my Rolls Royce be taken off of his Floor Plan(s). Please understand, your Honor, I did not ever communicate with Tony's Floor Plan providers, and only Tony and his people controlled the finances at the dealership, meaning that I could not do *anything* regarding sales or money without Tony's full knowledge and approval. He let me run the store, now wants to claim that perfectly normal operations indicate wrongdoing *when I had no final say on anything regarding money at that store.*

33. He immediately proposed that I give him $500,000.00 for the remaining shares of Superb, and another $500,000.00 for the Connecticut dealerships/points, and that I forgive the rest of the money. I spoke with my attorney about the proposal, and as set forth in his accompanying Declaration, he began the process of doing due diligence for the deal in Connecticut, just in case I wanted to proceed.

34. But then the next day there was a second conversation with Tony, much more somber and less upbeat than the first: It was a distinctively "come up with the money or else" kind of tone; I said that paperwork had to be prepared, and he indicated that there was no need for the paperwork, come up with the money and we can do the paperwork afterward. He was clearly in need of money, fast, and I was very leery of what was taking place and told him it would take time.

35. The following week from that conversation, on the evening of August 3, 2023, I was confronted at Superb's dealership by Nassau police and police detectives at the behest of Bruce Novicky, the absentee COO for Team Auto who appeared unexpectedly that night.

36. The police and police detectives told me about two allegations Bruce Novicky was making regarding the dealership: I was told that I stole 102 automobiles, and that I stole the specific sum of $760,000.00. Both of those accusations were and are false. Novicky had the locks changed, and armed guards were posted to keep me out of the dealership.

37. I know exactly what happened to the specific sum of $760,000.00 "missing" from the dealership: Bruce Novicky is an absentee COO for Team Auto, meaning, that while he may appear at the Connecticut dealerships from time to time, he barely ever appears

10

at Superb Motors here on Long Island. And Tony Urrutia spends 90%+ of his time out of the country, and mainly in Costa Rica. Just as I found out in July that Tony took $650,000.00 from Superb just before selling me half the company (and having an undisclosed NMAC lien against the company for that much money), I also was told by Kendra Kernizant, the on-site financial coordinator for Team Auto at Superb that Tony took $760,000.00 from Superb to bail out his Connecticut dealerships, just as Bruce suggested when he gave me Exhibit F to help push me to purchase the Connecticut dealerships apparently without realizing that the loan on page 6 was never disclosed to me. When Bruce was carrying out Tony's orders to Lock me Out on August 3, he falsely and conveniently accused me of taking $760,000.00, when it is simply not possible as I do not control the dealership's finances, Tony and Bruce do along with Kendra, who was hired by them and still works at the dealership without me.

38. The issue before the Court now involves automobiles that were and are in my possession in a revolving fashion (meaning different cars coming and going from my lots) with my partner's (Tony Urrutia's) full knowledge and support since December, 2022. Last week, Mr. Urrutia's attorneys provided a list to my attorney, and Mr. Thomasson forwarded that list to me. Attached hereto as Exhibit G is a true and accurate copy of that list, as marked up by me and my wife to confirm which cars belong to Superb and are in our possession (marked with the word "yes" in the last column) and which cars have nothing to do with this lawsuit wherever they may be, in our possession or not as further marked in the last column of Exhibit G.

39. The answering Defendants oppose the injunction requested by the Plaintiffs (all that is left to decide, as we understand the Court's previous Orders, is the issue of the cars on

this list, Exhibit G, along with supposed proprietary information which I address, below). We oppose the application for those reasons listed in attorney Thomasson's Declaration, but also for a rather simple reason: We do not and cannot trust these Plaintiffs for any reason, and this Court should not do so either.

40. First, during the last week of August, three plus weeks after I was locked out, Superb Motors changed its sign from saying "Superb Motors" to "Team Auto." Attached hereto as Exhibit H is a true and accurate copy of the New York State DMV Regulations as they apply to automobile dealerships; set forth at length in that booklet are clear regulations applying to signs, and one thing that all dealers understand is that the dealership sign is literally sacrosanct in the business.

41. Customers at all times need to be able to identify and find the dealership from which they purchased an automobile. It takes months or longer to change the operating name of a dealership through the NYDMV, and involves, *inter alia,* changes on the licensing of that dealership to coincide with name changes.

42. So either Tony Urrutia planned *everything* set forth herein for months without disclosing to me, his partner and operator of the dealership, what he was doing with that dealership, or he changed that sign without DMV knowledge and approval, thereby endangering its license with the DMV for an impermissible name change. Either way, he seeks equity, as my attorney informs me, with unclean hands.

43. I am left stunned that Tony asked for more money just before taking this action, and told me no paperwork was necessary: If I had given him that money, it would be gone, your Honor.

44. I absolutely improved the operations, value, and cash on hand of Superb during my time operating that dealership, and Tony Urrutia has a demonstrated desperate need for money for unknown reasons involving his operation of Superb and utilizing it as a piggy bank to save his other operations.

45. I, on the other hand, have no businesses currently operating since the Aaronson group ruined my businesses last November.  Although my Gold Coast corporations (Syosset and Sunrise) were recently licensed to sell automobiles for the Syosset and Amityville leased locations, I do not have Floor Plans/autos for active sale, yet, for reasons that will be disclosed when we bring our affirmative claims, but which are irrelevant for this Court's purposes in deciding the limited issue of Superb (and other) cars and injunctive relief now.

46. Moreover, neither I nor my wife ever do either the paperwork or financing of automobiles at any dealerships, including Superb.  The cars in our possession are our cars, our corporate cars, cars that belong to others and are not in our possession, Superb demo cars commonly (throughout the automobile dealership business in the entire United States and not just New York) utilized as a perk of ownership by car dealers everywhere, including Plaintiffs in this action, and also cars that belong to Superb but which are easily more safely stored by me and my businesses than by Tony Urrutia under the dishonest circumstances of this case.  I cannot and will not dispose of these automobiles, Tony Urrutia may have already done so, or, at least, possesses the means that I do not possess to dispose of them going forward.

47. I have a half dozen cars in my possession that are utilized as demos, and will not be disposed of in any fashion (and I cannot without the assistance of Superb's finance

13

team). Over half of the cars on the list are not Superb's, or are not in my possession, as set forth in the attached list. Disgustingly and tellingly, my Rolls Royce is now listed on Tony's attached list. If they claim to have paperwork on that car, it is forged, your Honor, and there will not be money paid for that car to me from Superb, I can assure this Court.

48. In fact, one of the more interesting aspects of this case that should not go unnoticed by this Court is that neither I nor anyone on my behalf controlled the finances at Superb: The finances are controlled by Kendra, the on-site office controller hired by Team Auto/Tony Urrutia; all paperwork on the cars run through her and the GM at the dealership, Eugene Lowe, also hired and paid/controlled by Team Auto and Tony Urrutia. Both Eugene and Kendra remain as employees under the control of Team Auto, Tony, and Bruce, the COO. Discovery will eventually produce Plaintiff controlled documentation as to just how grossly inaccurate Plaintiffs' accusations are.

49. Lastly, it also should not go unnoticed by this Court that the "emergency" that purportedly exists with these cars by and through whatever correspondence/hearsay is presented purportedly from the Floor Plan providers was entirely arranged by Plaintiffs herein. I have not ever met with the assigned representatives from the Floor Plan providers for Superb, barely met them through NorthShore and Sunrise, and Tony Urrutia told me directly (a month or more before the Lockout) that Josh Aaronson spoke to the representatives for NextGear and NMAC to cause "problems" for Superb because of "you people." If the Floor Plan providers know about cars as commonly stored elsewhere, *these Plaintiffs **necessarily** told them to bring about the "emergency" because I did not speak with anyone from NMAC or NextGear in many months at this*

14

*point.* I have already and continue to cooperate with any audits that are common to Floor Plan operations.

50. Those Floor Plan providers have assigned representatives for each dealership. Tens and hundreds of millions of dollars are at stake; these providers are literally multi-billion-dollar corporations, and the Aaronson Plaintiffs may, collectively, approach or even exceed having a billion dollars in assets themselves.

51. Those representatives and the individual Plaintiffs herein have dinners, lunches, parties, and meetings regularly. Gifts are exchanged, the relationships are extremely personal and cozy with the staggering amounts of money involved. I know, because Josh Aaronson and Tony Urrutia have told me all about them, but also told me "you people" are not invited.

52. I didn't always think much of what they were saying, because at first, I thought they were talking about me and those who work with me in operating our (relatively speaking) two small, used car lots in Syosset and Amityville, and then also Superb. But the Urrutia and Aaronson Plaintiffs are all Caucasian, and all controlled the finances first at NorthShore and Sunrise, then at Superb, and initially in their now denied application before this Court, tried to control and prevent my newly licenses businesses from ever operating after the Nassau Court ruled that the Aaronson Plaintiffs "failed to demonstrate a likelihood of success" in their claimed ownership of NorthShore and Sunrise. They have convinced representatives from NMAC, Chase Bank, and NextGear to stop doing business with me; *none of these businesses have ever spoken to me before cutting off business with me, that is the clear and telltale indication that it is being arranged by these powerful Plaintiffs.* And all of those businesses have

15

Caucasian representatives that have close relationships with the individual Caucasian Plaintiffs and have effectively shut down our two of the few, if any, minority owned automobile dealerships on Long Island. It is also a fact, your Honor, that I am of West Indian and African descent, and my wife is of Indian and African descent.

53. My attorney is an outside attorney with no privity to the Plaintiffs whatsoever, other than filing an Answer in a Superb case brought in this Court at the end of July at my direction once the case was brought to our attention after having been served (and unanswered) to Tony Urrutia. My accountants at Jones Little have never had privity with any of these Plaintiffs and have never provided me with anything other than outside accounting services. My wife worked for Superb after working for NorthShore and Sunrise, and did fantastic jobs at expanding leads and marketing/advertising for all three companies. Marc Merckling and Dwight Blakenship are low level workers who help with menial tasks at the dealerships (such as moving, washing, and cleaning cars; picking up and moving cars from auctions; etc.) and provide security as former policemen. Marc never worked for Superb; Dwight worked for Superb for about the last two months I was there prior to the Lockout. Neither has anything to do with money or operations at Superb or any other dealerships, ever. Michael Laurie is an outside financial consultant who helped me obtain legitimate arm's length business loans from the co-Defendant financing companies herein, and was merely paid short money for referrals he provided to Superb, less than $9,000.00 in total (he also sold a car of his own to Superb and received the overage after the loan was paid off, also less than $8,000.00, I believe). That's it. This suggestion that we're operating a criminal enterprise endangering these Plaintiffs is entirely false, brought in bad faith, and

16

candidly laughable, will be proven as such, and will be dealt with separately from the instant application.

54. Accordingly, we ask that the Court deny the application in its entirety. As to those cars listed on the attached list (marked "yes" if they are both Superb cars and in our possession; the rest are inappropriately sought by the Plaintiffs), none will be disposed of pending further order of the Court, and are safer in my possession as co-owner of Superb than they could possibly be at this point with my underhanded partner. I also utilize a half dozen of the Superb cars as demos, as specifically allowed with Tony Urrutia's knowledge and permission since December, and is a common perk of ownership of a dealership. The rest of the cars on that list are inappropriately on the list, and please know your Honor that these Plaintiffs would not know what cars are even on their own lot let alone in my possession *because they are never involved with Superb operations, none of them.* And since Tony joined forces with Josh Aaronson undoubtedly for money he could not and did not get from me, they can pay whatever penalty (there won't be any, your Honor, they can arrange to avoid that) that may come due since *they* tried to "sic" the Floor Plan companies on me; it's their own fault and their underhandedness should not be countenanced by this Court.

55. Lastly, the request to protect Plaintiffs' so-called private intellectual property is nonsensical and misplaced. That request is also overly broad and unclear. For example, Superb (during our time on-site) had no fleet customers, meaning those customers that buy multiple cars from the dealership. Almost without exception, and that occasional exception is a buyer's friend or relative, every car sold is a "one and done" deal. There is nothing that needs protection. Neither I nor any other Defendant

had access to any private financial data utilized in the operation of the business beyond what is attached as Exhibits. None of the Defendants created any paperwork for any deal at the dealership, nor created any financial information nor documentation at the dealership, that work was always done by Team Auto employees (with or without Superb employees hired by and under the control of Tony Urrutia). Granting relief merely opens a door for these Plaintiffs to claim legitimate work from the soon to fully re-open dealerships in Syosset and Amityville as newly licensed is somehow improper is yet another improper attempt by these Plaintiffs to stifle our legitimate work and purposes in the business.

SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF PERJURY.

Dated: Wantagh, New York
September 10, 2023

_____
ANTHONY DEO

Sworn before me this 10th
Day of September, 2023

_____
Notary Public

HARRY ROGER THOMASSON
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02TH6068549
Qualified in Nassau County
My Commission Expires 2/19/26

18