# EXHIBIT A

# GOLDFARB & FLEECE LLP

560 LEXINGTON AVE
NEW YORK, N.Y. 10022
(212) 891-9100

FACSIMILE (212) 751-3738
WWW.GFLEGAL.COM

SIDNEY A. MIGDON
BRUCE S. LEFFLER **
NEAL A. WEINSTEIN †
LISA F. SIEGEL
MARC J. BECKER ††
RONALD E. BURTON ◊
KAMRAN MOATTAR ◊

PAMELA SILVERMAN LEIBOW **
ROBERT M. ZIMMERMAN □
DOUGLAS H. GLADSTONE
SPENCER K. STEIN ◊◊
ANDREW H. MIGDON
MARC E. WASSER ◊◊
S. BRITTA THORNQUIST

DONALD D. ADLER ▲
JOSEPH W. CHOUINARD◊◊
NATHAN NUDELMAN▲
SOYOUNG LEE▲
BINDI DHARIA▲

JENNY KIM ▲◊◊
JENNIVERE L. KENLON
STEVEN M. FENTON
MICHAEL BOLLAG
TARA LASZLO

▲COUNSEL

STANLEY S. GOLDFARB (1906-1975)
CHARLES L. FLEECE (1898-1966)
EMANUEL LUBIN (1914-2000)
MORTON WITZLING (1912-2000)

STEVEN B. SHORE *
LAWRENCE RIVKIN
OF COUNSEL

* NY & FL BAR        ** NY & DC BAR
† NY & GA BAR        †† NY & MA BAR
◊ NY & CT BAR        ◊◊ NY & NJ BAR
□ NY & MO BAR

(212) 891-9145
sstein@gflegal.com

February 1, 2016

**VIA FEDERAL EXPRESS and EMAIL**
Maria Gasparis, Esq.
Tsonis Gasparis Lustig Ring & Kenney LLP
2929 Expressway Drive North
Islandia, NY 11749

Re:    UEA Premier Motors Corp. at 180 Michael Drive

Dear Maria:

Enclosed please find the following in connection with the captioned transaction: (i) two (2) fully-executed original counterparts of the Lease Agreement and (ii) two (2) fully executed original counterparts of the License Agreement.

An original counterpart of each agreement is being sent to Landlord/Licensor along with the checks for the Security Deposit, 1st months' License Fee and 1st months' Minimum Rent.

It has been a pleasure working with you. Please feel free to contact me with any questions, or if I can provide anything else.

Very truly yours,

Spencer K. Stein

SKS:jr/327700
Enc.

cc:    Michael O'Brien, Esq. (w/enc.)



Case 2:23-cv-06188-JMW Document 30-2 Filed 09/11/23 Page 3 of 73 PageID #: 712

**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT (this "Agreement") is made as of the 1ST day of February, 2016 (the "Effective Date"), between 345 UNDERHILL, L.L.C., New York limited liability company, with offices at 48 Harbor Park Drive, Port Washington, New York 11050, Attn: Michael O'Brien, Esq. ("Licensor"), and UEA PREMIER MOTORS CORP., a New York corporation, with offices at 908 Long Island Avenue, Deer Park, NY 11729 ("Licensee").

W I T N E S S E T H:

WHEREAS, Licensor is the owner of that certain building and parcel located at 180 Michael Drive, Syosset, New York (the "Property"); and

WHEREAS, Licensee desires to occupy a portion of the building as indicated on the floor plan attached hereto and made a part hereof as Exhibit "A" consisting of approximately 13,530 square feet (the "Licensed Area") for the operation of temporary offices and warehouse space to (i) store automobiles and (ii) provided Licensee has obtained all required permits and approvals from all governmental authorities, including, without limitation, the Department of Motor Vehicles, to sell automobiles (collectively, the "Permitted Use"); and

WHEREAS, Licensor, as Landlord, and Licensee, as Tenant are contemporaneously entering into a Lease Agreement (the "Lease") dated as of the date hereof for other premises at the Building.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee hereby covenant and agree as follows:

1.      License/Period/Termination Rights/Option for Excess Areas.

(a)      License: Licensor hereby grants to Licensee a non-transferable revocable license to use and occupy the Licensed Area for the sole purpose of the Permitted Use (such license, the "License"). Licensee will use the Licensed Area for no other purpose without the prior written consent of Licensor. Licensee acknowledges that no representations have been made with respect to the use, if any, to which the Licensed Area may be put. Licensee is personally familiar with the conditions of the Licensed Area and agrees to accept possession of the Licensed Area in its present condition on an "AS-IS" basis and agrees that Licensor shall have no obligation to make any repairs or modifications at the Licensed Area whatsoever. Licensor and Licensee acknowledge and agree that the relationship between them is solely that of independent contractors, and nothing herein shall be construed to constitute the parties as employer/employee, partners, joint venturers, co-Licensors, or otherwise as participants in a joint or common undertaking. Neither party, nor its employees, agents, or representatives shall have any right, power or authority to act or create any obligation, express or implied, on behalf of the other. Licensee hereby accepts and assumes full and exclusive liability for, and shall hold Licensor harmless from, the payment of all taxes (except, so long as Licensee is not in holdover, Licensee shall have no obligation to pay any real estate taxes or assessments), monies and other expenses arising from the conduct of Licensee's business in the Licensed Area and/or arising from the License and other rights granted to Licensee in this Agreement, including without limitation, contributions required under state and federal law providing for state and federal payroll taxes or contributions for unemployment insurance or old age pensions, or annuities which are measured by wages, salaries, or other remuneration paid to Licensee or by Licensee to its employees for any and all activities in connection with this Agreement. Nothing contained herein shall be construed as granting to Licensee any property or ownership rights in the Property or the Licensed Area. Subject to Licensee obtaining all required governmental approvals and

00323354.8                                                                1

permits for the Permitted Use, Licensor has no actual knowledge that the Permitted Use is prohibited by law at the Licensed Area.

(b)    Initial Period:  The period of this Agreement (the "License Period") shall commence on the Effective Date and shall end, unless sooner terminated or extended by the provisions of this Agreement or pursuant to law on the date which is sixty (60) days following the Commencement Date of the Lease (the "License Period") (the date on which the License Period shall end is sometimes referred to herein as the "License Termination Date").

(c)    Termination Rights:  Notwithstanding anything herein to the contrary, at any time during the License Period, each of Licensor and Licensee shall have the right to terminate the License and this Agreement for any or no reason, upon sixty (60) days prior written notice to the other party.  In the event that either party shall terminate the License and this Agreement pursuant to the provisions of this paragraph, this Agreement and the License Period shall come to an end and expire on the date set forth in such party's termination notice and, except for accrued liabilities and any other matters stated in this Agreement to survive the end of the License Period or the termination of this Agreement, neither party hereto shall have any further liability pursuant to this Agreement.:

2.    License Fee.  Licensee shall pay to Licensor, during the License Period, a monthly license fee for the License (the "License Fee") equal to $6,250.00, on the first day of each and every calendar month during the License Period, except the License Fees for 1st full calendar month of the License Period shall be paid upon execution of this License.  The License Fee for any month of the License Period of this License which does not begin or end on the first or last day of a calendar month shall be prorated on a daily basis based on a 30 day calendar month.  All License Fees shall be paid by Licensee at the office of Licensor set forth above, or at such other place as Licensor may designate, without any notice, demand, setoff or deduction whatsoever.  Licensee's obligation to make such payments shall survive the License Termination Date or sooner termination or revocation of this License.  All payments shall be made to Licensor at the address set forth above and shall be in addition to any charges under this Agreement as hereinafter described.

3.    Compliance with Law/Hazardous Materials.  Licensee will comply with all federal, state, municipal and other laws, ordinances, rules, directives and regulations ("Legal Requirements") now or hereinafter in effect with respect to the Licensed Area.  Licensee will obtain all licenses and permits required for the usage permitted by this Agreement, and will exhibit such licenses and permits to Licensor at any time, and from time to time, upon request.  Licensee shall not install or bring any Hazardous Substances (as hereinafter defined) into the Licensed Area or Property. In the event that any Hazardous Substances are installed or brought into the Licensed Area or Property by or on behalf of Licensee, then Licensee shall cause the removal of same within twenty four (24) hours of Licensor's demand and shall indemnify and hold Licensor and Licensor's Parties (as hereinafter defined) harmless from any claim, loss, cost, damage, or expense resulting from such Hazardous Substances or from the removal thereof.  In addition to the aforesaid, Licensee shall (i) not generate, store, install, dispose of or otherwise handle any substance, waste or material which is deemed hazardous, toxic, a pollutant or contaminant (referred to herein as "Hazardous Substances") under any Legal Requirements now or hereinafter in effect with respect to the Licensed Area or Property, in any manner contrary to any applicable Legal Requirements; and (ii) at Licensee's  sole cost and expense remove, clean-up and remedy any Hazardous Substance at the Licensed Area or Property to the extent and in the manner required by any applicable Legal Requirements, if the presence of such Hazardous Substances resulted from the action or inaction of Licensee, its employees, contractors, subcontractors, agents, licensees or invitees.  The provisions of this paragraph shall survive the termination or expiration of this Agreement.

4.    No Licensor Liability.  Licensor shall not be obligated to provide security or any other type of protection for Licensee's vehicles or any other personal property in the Licensed Area.  The vehicles, and any other personal property in the Licensed Area, belong to Licensee, shall be there at the sole risk of Licensee and Licensor shall not be liable for any injury to person or property, damage thereto or theft, misappropriation or loss thereof or any other cause whatsoever.  Licensee further agrees that Licensor shall incur no liability of any kind whatsoever to Licensee or to any person, firm or corporation claiming by, through or under Licensee in connection with the License, or the use by the Licensee of all or any portions of the Licensed Area or the Property.

5.    Maintenance.  Licensee is solely responsible damage to the Licensed Area caused by Licensee.  Licensee will keep the Licensed Area in a good, clean and orderly condition, and remove garbage, trash, and other waste from the Licensed Area.  Licensee shall not use the Licensed Area in any way to constitute a public nuisance.

6.    Indemnity/Insurance.

(a)    Licensee agrees to indemnify and save Licensor and the Licensor Parties (as hereinafter defined), harmless from all claims (including costs and expenses of defending against such claims) liability, demand, cause of action, cost, expense, damage or loss arising (or alleged to arise) from this Agreement and the License granted hereunder, or any act or omission or negligence of Licensee or Licensee's agents, contractors, customers, or invitees, or arising from any injury or damage to any person or the property of any person occurring during the License Period or any extension of it in or about the Licensed Area or the Property, or arising from Licensee's default of its obligations under this Agreement.  Subject to the terms of Section 6(d) below, the foregoing indemnification shall not apply to events arising out of Licensor's gross negligence or willful misconduct.  Licensee agrees to use and occupy the Licensed Area at its own risk and in that regard, releases Licensor and the Licensor Parties from all claims for any damage or injury to the full extent permitted by law.  The provision of this paragraph shall survive the termination or expiration of this Agreement.

(b)    Licensee shall at all times during the License Period maintain in full force and effect the following insurance in standard form generally in use in the state in which the Property is located with insurance companies with an AM Best rating of A/VII or better (or a comparable rating in the event that the AM Best rating is no longer published) and authorized to do business in said state:

(i)    Commercial general liability insurance in the amount of at least Two Million Dollars ($2,000,000) per any occurrence resulting in bodily injury, personal injury or property damage and fire legal liability in the amount of at least $500,000 per occurrence.

(ii)    Commercial Automobile Insurance covering all owned, non-owned and hired automobiles of Licensee including the loading and unloading of any automobile, truck or other vehicle with limits of liability not less than $2,000,000 combined single limit for bodily injury liability and property damage liability.

(iii)    Licensee further agrees that any contractor Licensee hires to perform any alterations to the Demised Premises shall furnish Licensee and Licensor with certificates showing evidence of comprehensive public liability and damage insurance in the amount of at least $5,000,000 (with respect to Licensee's general contractor, $2,000,000 with respect to subcontractors) plus required workmen's compensation and employer's liability insurance coverage to the extent required by law.

00323354.8                                    3

The insurance and certificates required in subsections (i) through (iv) above shall name Licensor (and any other parties reasonably requested by Licensor) as an additional insured for the full amount of the insurance herein required, contain a Primary and not Contributory Endorsement, and confirm that such policy contains waiver of subrogation requirements as set forth herein as well as a hold harmless agreement for Licensor's benefit. With respect to each and every policy of insurance required under this Agreement and each renewal thereof, Licensee, upon the execution and delivery of this License by Licensee and thereafter not less than thirty (30) days prior to the expiration of any such policy, shall furnish Licensor with a certificate of insurance executed by the insurer involved which shall contain, in addition to matters customarily set forth in such a certificate under standard insurance industry practices ,to the extent possible, an undertaking by the broker to give Licensor ten (10) days' prior written notice of cancellations, nonrenewal or change in scope or amount of coverage of such policy. In all events, Licensee shall give Licensor at least ten (10) days' prior written notice of any cancellation, non-renewal or change in scope or amount of coverage. Licensee shall, at all times, maintain worker's compensation and employer's liability insurance to comply with the applicable laws of the state in which the Property is located.

(c)    Licensee Insurance:  At all times during the License Period, Licensee shall pay all premiums for and maintain in effect, with a responsible insurance company or companies with an AM Best rating of A/VII or better (or a comparable rating in the event that the AM Best rating is no longer published) licensed to do business within the state in which the f is located, policies of insurance for the benefit of Licensee, as follows:

(i)    Insurance covering Licensee's trade fixtures, furniture, furnishings, equipment and other installations and alterations of Licensee, providing protection to the extent of not less than the full replacement cost thereof against all casualties included under standard insurance industry practices within the classification "All Risk" (including terrorism, flood and earthquake) and insurance covering sprinkler leakage, unless Licensee's insurance otherwise includes sprinkler leakage coverage.

(ii)    Plate glass insurance covering the plate glass in the Demised Premises; provided, however, Licensee may satisfy this requirement by self-insuring and in the event of damage or destruction to said plate glass immediately replacing same.

(iii)    Insurance covering the full replacement cost of any Licensee's Work and all work performed by Licensor on Licensee's behalf (including Licensor's Work), against all casualties included under standard insurance industry practices within the classification "All Risk" which insurance shall be maintained, and under no circumstances terminated by Licensee.

(iv)    Such other insurance against such other hazards and in such amounts as may be customarily carried by Licensees, owners and operators of similar properties as Licensor may reasonably require for its protection from time to time during the License Period.

Licensee will furnish to Licensor, simultaneously with its execution and delivery of this Agreement, certificates of insurance evidencing coverages required by this License. To the extent possible, all policies required hereunder shall contain an endorsement providing that the insurer will not cancel, fail to renew or materially change the coverage of said policy or policies without first giving ten (10) days' prior written notice thereof to the Licensor. In all events, Licensee shall give Licensor at least ten (10) days' prior written notice of any cancellation, non-renewal or material change in coverage.

(d)    Notwithstanding anything to the contrary contained in this License, each party hereto, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or

00323354.8                                        4

otherwise, waives all rights and causes of action against the other party, and the officers, directors or employees of the other party, for any liability arising out of any loss or damage in or to the Building, the Licensed Area and their contents caused by

(1)    any peril normally covered under "all-risk" or "Special Form" policies issued in the State of New York (whether or not such party actually carries such insurance policies and without giving effect to any deductibles or self-insurance retainage), or

(2)    if the scope of coverage is broader than in (1) above, then any peril actually covered under the insurance maintained by such party.

This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party, its officers, employees, agents, directors, contractors or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds. If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium; failure to pay the increase in premium will void the release and waiver benefiting such party but shall not affect the benefit of the corresponding release and waiver enjoyed by the other party. However, if one party's insurance carrier prohibits waiver of subrogation regardless of premium, then the other party's release and waiver shall become null and void, it being understood that in this instance each waiver is given in consideration for the other. Each party covenants that from and after the date possession of the Licensed Area is delivered to Licensee its property damage insurance policies will contain waiver of subrogation endorsements, and that if such endorsements, for any reason whatsoever, are about to become unavailable, it will give the other party not less than thirty (30) days prior written notice of such impending unavailability. In the event of such unavailability each party shall use its commercially reasonable efforts to name the other party as an additional insured (but not loss payee) on its property damage insurance policies.

(e)    All property (whether real or personal) at any time located in or upon the Licensed Area shall be at the risk of Licensee only, and neither Licensor nor Licensor's agents shall become liable for any defects, latent or otherwise, in any buildings or improvements in the Property or any of the equipment, machinery, utilities, appliances, or apparatus therein, or for any damage to said property or to Licensee, or to any other person or property, caused by water leakage, steam, sewerage, gas or odors or for any damage whatsoever done or occasioned by or from any boiler, plumbing, gas, water, steam or other pipes, or any fixtures or equipment or appurtenances whatsoever, or for any damage arising from any act or neglect or arising by reason of the use of, or any defect in, the Licensed Area or any of the fixtures, equipment or appurtenances therein contained, or for any theft of any of said property, or by the act or neglect of any other person or caused in any other manner whatsoever.

7.    Entry by Licensor. During any reasonable time (and following reasonable notice (except no notice shall be required in the event of an emergency)) before and after the commencement of the License Period, Licensor and/or any mortgagee may enter upon the Licensed Area, any portion thereof and any appurtenances thereto (with men and materials, if required) for the purpose: (a) inspecting same; (b) making such repairs, replacements or alterations which it may be required to perform as herein provided or which are required in order to comply with laws and court orders or to prevent waste or deterioration, regardless of whether Licensor is responsible for such repairs, maintenance or compliance with laws or which it may deem desirable for the Licensed Area; and (c) showing the Licensed Area to prospective purchasers, mortgagees or lessees. In exercising its rights under this Section 7 Licensor shall use its

00323354.8                                          5

reasonable efforts to minimize interference with Licensee's business, but Licensor shall have no obligation to employ any labor on an overtime or other premium rate basis.

8.      Utilities.  Licensee shall pay to Licensor an amount equal to $3,750.00 (the "Utility Fee") per month in consideration for electricity, water and gas (if any) supplied to the Licensed Area. Notwithstanding the foregoing, so long as Licensee is not in default under this Agreement or in holdover following the end of the License Period, Licensor waives the requirement for Licensee to pay the Utility Fee.  Licensor shall provide reasonably adequate interior lighting in the Licensed Area.

9.      Attorney Fees.  In the event of any action filed in relation to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party reasonable attorney's fees and other reasonable court costs.

10.     End of Period.  At the expiration or earlier termination of this Agreement, Licensee shall, at its sole cost and expense, vacate the Licensed Area broom clean and in as good order and condition as on the Effective Date, ordinary wear excepted, and remove all of Licensee's vehicles, personal property and all other property and effects of Licensee and all persons claiming through or under Licensee from the Licensed Area and the Property and repair all damage to the Licensed Area occasioned by such removal. Licensor shall have the right to retain any property and effects which shall remain in the Licensed Area after the expiration or termination of the term of this Agreement, and any costs or liabilities incurred by Licensor in removing said vehicles or personal property or to effectuate cleaning or maintenance, or any damages resulting from the License shall be paid by Licensee to Licensor upon demand of Licensor, as additional license fees.  Licensee's obligation under this paragraph shall survive the termination or expiration of the term of this Agreement.

11.     Events of Default/Termination.

        (a)     Licensee agrees that upon the occurrence, at any time prior to or during the License Period of any one or more of the following events (referred to as "Events of Default"):  (i) if Licensee shall default in the timely payment of the License Fee or any other amount payable by Licensee under this Agreement and Licensee shall fail to remedy such default within five (5) days after notice by Licensor to Licensee of such default; or (ii) if Licensee shall default in the observance or performance of any term, covenant or condition of this Agreement on Licensee's part to be observed or performed (excluding the obligation for the payment when due of any charges or fees due Licensor) and Licensee shall fail to remedy such default within fifteen (15) days after notice by Licensor to Licensee of such default; or (iii) if Licensee shall file a voluntary petition in bankruptcy or insolvency, or such proceeding shall be commenced against Licensee or Licensee shall be adjudicated a bankrupt or insolvent, or Licensee shall file or there shall be filed against Licensee any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, or Licensee shall make an assignment for the benefit of creditors, or Licensee shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for Licensee or of all or any part of Licensee's property; or (iv) if Licensee shall default in the observance or performance of any term, covenant or condition on Licensee's part to be observed or performed under any other agreement with Licensor and such default shall continue beyond any grace period set forth in such other agreement for the remedying of such default; or (v) if Licensee shall desert or abandon the Licensed Area; or (vi) if Licensee's interest in this License shall devolve upon or pass to any person, whether by operation of law or otherwise, then, upon the occurrence, at any time prior to or during the License Period, of any one or more such Events of Default, Licensor, at any time thereafter, at Licensor's option, may give to Licensee a five (5) days' notice of termination of this Agreement and the License granted hereunder and, in the event such notice is given, this License and the License Period shall come to an end and expire upon the

00323354.8                                              6

expiration of said five (5) days with the same effect as if the date of expiration of said five (5) days were the expiration date of the term of this Agreement, but Licensee shall remain liable for damages and all other sums payable pursuant to this Agreement, law or otherwise.

(b) Licensee further agrees that if Licensee shall default in the payment when due of any charges or fees due Licensor, or if this License and the License Period shall expire and come to an end as provided herein: (i) Licensor and its agents and servants may immediately, or at any time after such default or after the date upon which this License and the License Period shall expire and come to an end, re-enter the Licensed Area or any part thereof, without notice, either by summary proceedings or by any other applicable action or proceeding, or by legal force or otherwise pursuant to applicable laws and/or regulations (without being liable to indictment, prosecution or damages therefor), and may repossess the Licensed Area and dispossess Licensee and any other persons from the Licensed Area and remove any and all of Licensee's vehicles and other property and effects from the Licensed Area; and (ii) Licensor at its option, may let or license the whole or any part or parts of the Licensed Area, from time to time, either in the name of Licensor or otherwise, to such persons, for such term or terms, at such rental, rentals, fees or charges and upon such other conditions, as Licensor, in its sole discretion, may determine; Licensee, on Licensee's own behalf and on behalf of all persons claiming through or under Licensee, including all creditors, do further hereby waive any and all rights which Licensee and all such persons might otherwise have under any present or future law to redeem the Licensed Area, or to re-enter or repossess the Licensed Area, or to restore the operation of this Agreement, after (i) Licensee shall have been dispossessed by a judgment or by warrant of any court or judge, or (ii) any re-entry by Licensor, or (iii) any expiration or termination of this License and term of this Agreement, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to this license; the words "re-enter", "re-entry" and "re-entered" as used herein shall not be deemed to be restricted to their technical legal meanings; in the event of a breach or threatened breach by Licensee, or any persons claiming through or under Licensee, of any term, covenant or condition of this Agreement on Licensee's part to be observed or performed, Licensor shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Agreement for such breach; the right to invoke the remedies hereinbefore set forth is cumulative and shall not preclude Licensor from invoking any other remedy allowed by law or in equity.

12. Broker. Licensee hereby warrants and represents to Licensor that this Agreement and the License was negotiated without the aid, intervention or employment of any broker other than Premier Commercial Real Estate (the "Broker"). Licensee agrees to indemnify Licensor against any claim by any broker dealt with by Licensee, arising out of the acts of Licensee with regard to the License and to defend, at its own cost and expense, any claim by any broker for commission resulting from this License other than the Broker.

13. Alterations. Licensee agrees that Licensor may (but, shall have no obligation to) make any repairs, alterations or other installations in the Licensed Area which Licensor deems necessary or desirable, provided Licensor shall use its reasonable efforts to minimize interference with Licensee's business, but Licensor shall have no obligation to employ any labor on an overtime or other premium rate basis. Licensee shall not make any repairs, alterations or installations in the Licensed Area without Licensor's prior written consent. Licensor shall not unreasonably withhold or delay its consent solely with respect to alterations which are purely cosmetic in nature, such as painting.

14. Casualty. Licensee agrees that Licensor shall have the right to give to Licensee a fourteen (14) days' notice of termination of this License in the event that the Licensed Area or the Property shall be damaged by fire or other casualty and, in the event such notice is given, this License and the term of this

00323354.8                                                                 7

Agreement shall come to an end and expire upon the expiration of said fourteen (14) days with the same effect as if the date of expiration of said fourteen (14) days were the License Expiration Date.

15.    Assignment/Subletting/Subordination. This Agreement and the grant of the License is personal to the named Licensee and may not be transferred or assigned. Licensee shall not, by operation of law or otherwise, assign, sell, mortgage, pledge or in any manner transfer this Agreement, the License or any interest herein or sub-license the Licensed Area or any part or parts thereof, or grant any concession or sub-license or otherwise permit the use of all or any part thereof by anyone without the prior written consent of Licensor, which consent may be granted or withheld in Licensor's sole and absolute discretion. The consent by Licensor to an assignment, concession or sub-license, shall not in any way be construed to relieve Licensee from obtaining the express consent of Licensor to any further assignment, concession or sub-license for the use of any part of the Licensed Area nor shall the collection of any licensee fees by Licensor from any assignee, sub-licensee or other occupant, after default by Licensee, be deemed a waiver of this covenant or the acceptance of the assignee, sub-licensee or occupant as Licensee or a release of Licensee from the further performance by Licensee of the covenants in this Agreement on Licensee's part to be performed.

16.    Estoppel Certificate. Licensee shall, upon at least ten (10) business days prior written notice by Licensor, execute, acknowledge and deliver to Licensor and/or to any other person specified by Licensor, a reasonable statement certifying that this Agreement is in full force and effect and is not a lease arrangement between Licensee and Licensor and identifying the then applicable License Fee in effect.

17.    Notice. Any notice, consent, request or other communication (collectively "Notices") given pursuant to this Agreement must, unless otherwise provided herein, be in writing, and may, unless otherwise in this Agreement expressly provided, be given or be served by depositing the same in the United States mail, postpaid and certified addressed to the party to be notified, with return requested or by overnight express mail with a reliable overnight courier, addressed to the party to be notified. Notices by mail (except overnight express mail) shall be effective three (3) Business Days after the date mailed. Notices by overnight express mail shall be effective one (1) Business Day after delivery to the overnight mail service. Either party may at any time change its address for notices hereunder by delivering or mailing, or aforesaid, to the other party a notice stating the change and setting forth the changed address. The addresses of the parties are as set forth on Page 1 of this Agreement.

18.    Liens. Licensee shall be responsible for the satisfaction or payment of any liens for any provider of work, labor, material or services claiming by, through or under Licensee. Licensee shall also indemnify, hold harmless and defend Licensor against any such liens, including the reasonable fees of Licensor's attorneys. Such liens shall be discharged by Licensee within twenty (20) days after notice of filing thereof by bonding, payment or otherwise, provided that Licensee may contest, in good faith and by appropriate proceedings any such liens. The provision of this paragraph shall survive expiration or termination of this Agreement.

19.    Governing Law/Counterparts/No Waiver/Trial by Jury. This Agreement shall be governed by and construed under the laws of the State of New York. This Agreement may be executed in one or more identical counterparts, each of which when taken together shall constitute one and the same original instrument. Signatures to this Agreement transmitted by telecopy or e-mail of a .pdf file shall be valid and effective to bind the party so signing. There shall not be a modification or waiver of this Agreement unless the same shall be signed by the party against whom such modification or waiver is sought to be enforced. **LICENSOR AND LICENSEE HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY**

00323354.8                                                                 8

WAY CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF LICENSOR AND LICENSEE, LICENSEE'S USE OR OCCUPANCY OF THE LICENSED AREA, AND/OR ANY CLAIM OF INJURY OR DAMAGE.

20.     Severability.  If any part of any provision of this Agreement or any other agreement, document or writing given pursuant to or in connection with this Agreement shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity only, and the remaining terms and conditions shall be interpreted so as to give the greatest effect possible thereto.

21.     Recordation.  Licensee agrees not to record this License or any memorandum thereof unless required to do so by law (in which event Licensee agrees to execute, upon termination of this License, a recordable instrument evidencing such termination in form reasonably satisfactory to Licensor).

22.     License Only.  This Agreement creates a license only and Licensee acknowledges that Licensee does not and shall not claim at any time any interest or estate of any kind or extent whatsoever in the Licensed Area or Property by virtue of this License.  In connection with the foregoing, Licensee further acknowledges that in no event shall the relationship between Licensor and Licensee be deemed to be a so-called landlord-tenant relationship and that in no event shall Licensee be entitled to avail itself of any rights afforded to tenants under the laws of the state in which the Property is located.

23.     Successors In Licensor's Interest/Limitation of Liability.  The terms, covenants and conditions contained in this Agreement shall bind and inure to the benefit of Licensor and Licensee and, except as otherwise provided in this Agreement to the contrary, their respective heirs, distributees, executors, administrators, successors and assigns.  However, the obligations of Licensor under this Agreement shall no longer be binding upon Licensor named herein after the sale, assignment or transfer by licensor named herein (or upon any subsequent Licensor after the sale, assignment or transfer by such subsequent Licensor) of its interest in the Licensed Area or Property as Licensor or lessee; provided, however, that in the event of any such sale, assignment or transfer, such obligations shall thereafter be binding upon the grantee, assignee or other transferee of such interest, and any such grantee, assignee or transferee, by accepting such interest, shall be deemed to have assumed such obligations.  A license or other transfer of the entire Licensed Area or Property shall be deemed a transfer within the meaning of the foregoing sentence.  Neither the partners (direct or indirect) comprising Licensor, nor the members or shareholders of Licensor (nor any of the partners comprising same), nor any of the partners, members, shareholders, directors or officers of any of the foregoing nor any agent or person acting on the Licensor's or such person's behalf (collectively, the "Licensor's Parties") shall be personally liable for the performance of Licensor's obligations under this Agreement.  Licensee shall look solely to Licensor to enforce Licensor's obligations hereunder and shall not seek any damages against any of the Licensor's Parties. Notwithstanding anything contained in this Agreement to the contrary, Licensee acknowledges and agrees Licensee shall look solely to the estate and interest of Licensor, its successors and assigns, in the Property for the collection of any judgment recovered against, or liability of, Licensor by reason of Licensor's breach of this Agreement or otherwise, and no other property or assets of Licensor or any of Licensor's Parties shall be subject to levy, execution, or other enforcement procedures for the satisfaction of Licensee's remedies under or with respect to either this Agreement, the relationship of Licensor and Licensee hereunder, or the License granted hereunder.  Such exculpation of liability shall be absolute and without any exception whatsoever.

24.     Entire Agreement.  The terms and conditions contained herein supersede all prior oral or written understandings between the parties and constitute the entire agreement between them concerning the subject matter of this Agreement.  This Agreement shall not be modified or amended except by a writing signed by authorized representatives of the parties hereto.  If any terms or provisions of this Agreement or

00323354.8                                    9

the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application thereof to other persons or circumstances shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. This Agreement shall be construed and enforced in accordance with the substantive laws of the State of New York.

25.     Headings.  The descriptive heading of the several paragraphs of this Agreement are inserted for convenience and ease of reference only and do not constitute part of this Agreement.

26.     Intentionally Omitted.

27.     OFAC List Representation.  Licensee represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Licensor is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Licensee shall not permit the Demised Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List.  Licensee shall provide documentary and other evidence of Licensee's identity and ownership as may be reasonably requested by Licensor at any time to enable Licensor to verify Licensee's identity or to comply with any Legal request.  Licensee shall indemnify and hold Licensor harmless from and against all losses, damages, liabilities, cost and expenses (including, without limitation, reasonable attorneys' fees and expenses) that are incurred by Licensor and/or its affiliate that derive from a claim made by a third party against Licensor and/or its affiliates arising or alleged to arise from a misrepresentation made by Licensee hereunder or a breach of any covenant to be performed by Licensee hereunder.

28.     Security Deposit.  Licensee shall, upon execution of this Agreement, deposit with Licensor by certified or cashier's check or money order made payable to Licensor, a security deposit in the amount of $18,750.00 ("**Security Deposit**") to ensure the full and timely performance of each and every obligation, covenant and agreement of Licensee under this Agreement.  Under no circumstances whatsoever shall the Security Deposit be deemed to constitute payment of the final installment of the License Fee, Utility Fees or any other amount payable hereunder, and Licensee may not designate that the Security Deposit be utilized to reduce any other charges due to Licensor at any time during the License Period.  The Security Deposit may be applied by Licensor to offset any damages, beyond normal wear and tear, to the Licensed Area, or, at the sole discretion of Licensor, may be applied against any License Fees, Utility Fees or other charges that are delinquent hereunder.  The Security Deposit shall be maintained by Licensor, without interest, for a maximum of thirty (30) days after the expiration of the License Period or earlier termination of this Agreement, at which time, provided Licensee has fully and faithfully carried out all of said terms, covenants and conditions on Licensee's part to be performed, any unused portion of the Security Deposit shall be refunded to Licensee.  If Licensor applies any part of the Security Deposit to cure any default of Licensee, Licensee shall, upon demand, deposit with Licensor the amount so applied so that Licensor shall have the full Security Deposit on deposit at all times during the License Period.  In the event of a sale or lease of the Property, subject to this Agreement, Licensor shall have the right to transfer the Security Deposit to the vendee or lessee and Licensor shall be considered released by Licensee from all liability for the return of such Security Deposit and Licensee shall look to the new licensor solely for the return of the Security Deposit, and it is agreed that the foregoing shall apply to every transfer or assignment made to the Security Deposit to a new licensor.  Licensee further covenants and agrees that it will not assign or encumber the Security Deposit and that neither Licensor nor its successors and assigns shall be bound by any such assignment or encumbrance.  Notwithstanding the foregoing, provided that Licensee executes and delivers to Licensor the Lease along with the security deposit required with respect to the Lease, simultaneously with Licensee's execution and delivery of this Agreement, Licensor shall

00323354.8

waive the requirement for Licensor to post the Security Deposit. However, Licensee agrees that the security deposit or letter of credit delivered by Licensor under the Lease shall also be available as the Security Deposit under this Agreement and Licensor shall have all of the same rights to such security deposit or letter of credit as if the same was originally posted by Licensee as the Security Deposit under this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURES ON FOLLOWING PAGE.

00323354.8

11

Case 2:23-cv-06188-JMW   Document 30-2   Filed 09/11/23   Page 14 of 73 PageID #: 723

[Signature Page to License Agreement - Portion of 180 Michael Drive, Syosset, New York]

IN WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

LICENSOR:

**345 UNDERHILL, L.L.C.**

By: _____

    Name: Marc Taub

    Title: Manager

LICENSEE:

**UEA PREMIER MOTORS CORP.**

By: _____

    Name:

    Title:

Case 2:23-cv-06188-JMW   Document 30-2   Filed 09/11/23   Page 15 of 73 PageID #: 724

00323354.7

12

[Signature Page to License Agreement - Portion of 180 Michael Drive, Syosset, New York]

IN WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

LICENSOR:

**345 UNDERHILL, L.L.C.**

By: _____
    Name:
    Title:

LICENSEE:

**UEA PREMIER MOTORS CORP.**

By: _____
    Name:   SARA DEO
    Title:    CEO

00323354.6

Case 2:23-cv-06188-JMW   Document 30-2   Filed 09/11/23   Page 17 of 73 PageID #: 726

## EXHIBIT A

### Description of Licensed Area

This floor plan is annexed to this Lease and made a part hereof as Exhibit A solely to indicate by diagonal markings (and referred to as "Temporary Space") the general location of the Licensed Area. All areas, dimensions, locations and conditions are approximate



ANGELO FRANCIS CORVA
& ASSOCIATES, ARCHITECTS
60 HEMPSTEAD AVENUE — SUITE 300
WEST HEMPSTEAD, NEW YORK  11552
(516)481-9500  /  FAX (516)481-9620

**180 MICHAEL DRIVE
SYOSSET, NEW YORK**

00323354.8

A-1

LEASE AGREEMENT

Between

**345 UNDERHILL, L.L.C.,**
as Landlord

- and -

**UEA PREMIER MOTORS CORP.,**
as Tenant

00323152.11

## LEASE AGREEMENT

**INDENTURE** made this 〔S1〕 day of February, 2016 (the "**Effective Date**"), by and between 345 UNDERHILL, L.L.C., a New York limited liability company, with offices at 48 Harbor Park Drive, Port Washington, New York 11050, Attn: Michael O'Brien, Esq., (hereinafter referred to as "**Landlord**"), and UEA PREMIER MOTORS CORP., a New York corporation, with offices at 908 Long Island Avenue, Deer Park, New York 11729, Attn: Sara Deo (hereinafter referred to as "**Tenant**").

## W I T N E S S E T H:

## ARTICLE 1.   DEFINITIONS

**Section 1.1.**    Additional Rent:  In addition to the Minimum Rent, all other payments to be made by Tenant to Landlord, shall be deemed to be and shall become "**Additional Rent**" hereunder whether or not the same be designated as such; and shall be due and payable on demand or together with the next succeeding installment of rent, whichever shall first occur, unless otherwise expressly stated herein.  Landlord shall have the same remedies for failure to pay Additional Rent as for a nonpayment of Minimum Rent. Landlord, at its election, shall have the right to pay or do any act which requires the expenditure of any sums of money by reason of the failure or neglect of Tenant to pay any sums due under or perform any of the provisions of this Lease, and in the event Landlord shall, at its election, pay such sums or do such acts requiring the expenditure of monies, Tenant agrees to pay Landlord, upon demand, all such sums, and the sum so paid by Landlord, together with interest thereon after ten (10) days written notice, shall be deemed Additional Rent and be payable as such.  All payments required to be made by Tenant to Landlord pursuant to this Lease shall be delivered to the office of the Landlord at the address set forth on the first page of this Lease or at such place or places as Landlord may from time to time designate by notice to Tenant and, with respect to Minimum Rent, without prior demand for same.

**Section 1.2.**    Commencement Date:  The date that Landlord delivers the Demised Premises to Tenant with Landlord's Work (as set forth on Exhibit C hereto) substantially completed.

**Section 1.3.**    Common Facilities:  As used herein shall mean all facilities furnished in the Industrial Center and designated for the general use, in common, of all occupants of the Industrial Center, including the Tenant hereunder, its officers, agents, employees and customers.  Common Facilities shall include, but are not limited to, parking areas, streets, sidewalks, canopies, roadways, washrooms, shelter, ramps, landscaped areas and other similar facilities.

**Section 1.4.**    Demised Premises:  Approximately 20,000 aggregate rentable square feet of floor area on the first (1ˢᵗ) floor of the building commonly known as 180 Michael Drive, Syosset, New York (the "**Building**"), designated by cross-hatching on Exhibit A attached hereto and made a part hereof.  The Demised Premises do not include any exterior of the Building, or any space above the bottom of the structural framework supporting the roof or below the finished floor level of the area demised.  The rentable area of the Demised Premises has been mutually agreed to by Landlord and Tenant.

**Section 1.5.**    Industrial Center:  As used herein, the Industrial Center shall mean the land described on Exhibit A-1 attached hereto and by this reference incorporated herein and the Building and all related Common Facilities located thereon, less any deletion by Landlord pursuant hereto, plus such additions and extensions as Landlord may from time to time designate as included with the Industrial Center pursuant hereto.  Exhibit A-2 embodies the proposed outline of the Industrial Center of which the Demised Premises will be a part.  Landlord may amend Exhibit A-2 at any time and make such departures therefrom as Landlord in its sole discretion may from time to time deem proper, including the minor relocation of the Demised Premises as a result of construction, provided said departures therefrom do not materially interfere with Tenant's access to and from the Demised Premises.

**Section 1.6.**    Lease Term: A.    The Lease Term shall be ten (10) years and four (4) months commencing on the Commencement Date (as defined herein), and ending, unless sooner terminated or extended as hereinafter provided, at midnight on the last day of the calendar month in which the ten (10) year and four (4) month anniversary of the Commencement Date shall occur (the "**Expiration Date**").

B.    (i)    Tenant shall have the right, to renew the Lease Term for all of the Demised Premises for two (2) consecutive renewal terms (each, a "**Renewal Term**") of five (5) years each by irrevocable notice (the "**Renewal Notice**") delivered to Landlord not less than twelve (12) months prior to the Expiration Date, or the last day of the first Renewal Term, as applicable, time being of the essence; provided, however, that (a) no Default (as defined in Section 22.1) shall exist either on the date the applicable Renewal Notice is given or on the applicable Renewal Term Commencement Date (as hereinafter defined), and (b) the Tenant named herein (i.e., UEA Premier Motors Corp.) shall not have assigned this Lease, and together with any subsidiaries and affiliates (as such terms are defined in Section 17.8) shall be in occupancy of 100% of the floor area of the Demised

00323152.11

Premises. Upon the giving of the Renewal Notice, this Lease shall be deemed renewed for the applicable Renewal Term with the same force and effect as if the Renewal Term had originally been included in the Lease Term. The first Renewal Term shall commence on the day after the Expiration Date, and the second Renewal Term shall commence on the day after the last day of the first Renewal Term (each, a "**Renewal Term Commencement Date**") and shall terminate on the day preceding the fifth (5th) anniversary of the applicable Renewal Term Commencement Date or such earlier date as this Lease shall terminate pursuant to any of the terms of this Lease.

(ii)    All of the terms, covenants and conditions of this Lease shall continue in full force and effect during the first Renewal Term, except that (a) the Minimum Rent for the first Renewal Term shall be payable as set forth in Section 1.8 below, and (b) Tenant shall have no further right to renew the Lease Term after the second Renewal Term. Any termination, cancellation or surrender of the entire interest of Tenant under this Lease at any time during the Lease Term shall terminate any right of renewal of Tenant hereunder.

(iii)    All of the terms, covenants and conditions of this Lease shall continue in full force and effect during the second Renewal Term, except that (a) the Minimum Rent for the first year of the second Renewal Term shall (x) be equal to the greater of (1) Fair Market Value (as hereinafter defined) and (2) one hundred three percent (103%) of the annual Minimum Rent then in effect on the last month of the first Renewal Term, as applicable, and (y) increase by three percent (3%) on each anniversary of the second Renewal Term Commencement Date, and (b) Tenant shall have no further right to renew the Lease Term. Any termination, cancellation or surrender of the entire interest of Tenant under this Lease at any time during the Lease Term shall terminate any right of renewal of Tenant hereunder.

(iv)    "**Fair Market Value**" shall mean the fair market annual rental value of the Demised Premises at the commencement of the second Renewal Term for a term equal to the second Renewal Term based on comparable space in comparable Buildings in Syosset, New York, and taking into consideration all relevant factors, including the then current Minimum Rent payable hereunder. Landlord and Tenant shall cooperate in good faith to agree on a determination of Fair Market Value as soon as reasonably practical after the giving of Tenant's Renewal Notice.

(v)    If the parties are unable to agree on a determination of Fair Market Value within sixty (60) days after the giving of Tenant's Renewal Notice, Tenant shall have the right to rescind its Renewal Notice within seventy (70) days after the giving of Tenant's Renewal Notice, time being of the essence. In the event the Tenant does not exercise its rights hereunder to rescind the Renewal Notice, such dispute shall be determined by a single arbitrator appointed in accordance with the American Arbitration Association Arbitration Rules for the Real Estate Industry. The arbitrator shall be impartial and shall have not less than 15 years' experience in the County of Nassau related to the leasing of commercial space in comparable buildings in comparable locations, and the fees of the arbitrator shall be shared equally by Landlord and Tenant. Within 15 days following the appointment of the arbitrator, Landlord and Tenant shall attend a hearing before the arbitrator at which each party shall submit a report setting forth its determination of Fair Market Value, together with such information on comparable rentals and such other evidence as such party shall deem relevant. The arbitrator shall, within 30 days following such hearing and submission of evidence, render his or her decision by selecting the determination of Fair Market Value submitted by either Landlord or Tenant which, in the judgment of the arbitrator, most nearly reflects the Fair Market Value. The arbitrator shall have no power or authority to select any Fair Market Value other than one submitted by Landlord or Tenant, or to modify any of the provisions of this Lease, and the decision of the arbitrator shall be final and binding upon Landlord and Tenant, subject to the terms of Section 1.6(B)(iii) above, such that in no event shall the Minimum Rent payable during the Renewal Term be less than the Minimum Rent payable during the last month of the initial Lease Term. If the Fair Market Value has not been determined prior to the Renewal Term Commencement Date, then beginning on the Renewal Term Commencement Date Tenant shall pay Minimum Rent based on Landlord's determination of Fair Market Value submitted to the arbitrator as set forth above, and following the arbitrator's final determination, the amount of any overpayment or underpayment shall be appropriately adjusted between the parties.

(vi)    Landlord and Tenant, at either party's request, shall promptly execute and exchange an appropriate agreement evidencing the extension of the Lease Term for the applicable Renewal Term, and the terms thereof in a form reasonably satisfactory to both parties, but no such agreement shall be necessary in order to make the provisions hereof effective.

C.    Tenant shall be solely responsible to pay all brokers representing Tenant any and all commissions and fees due in connection with Tenant's exercise of its renewal right and the Renewal Term. Tenant shall indemnify, defend and hold Landlord harmless from and against any and all cost, claims, liabilities and expenses, including reasonable attorneys' fees, incurred by Landlord as a result of any claims for fees or commissions claimed by any broker representing Tenant in connection with Tenant's exercise of its renewal right and the Renewal Term. Notwithstanding the foregoing, in the event Tenant exercises its renewal option(s) set forth in this Section 1.6 (in each case referred to herein as the "**Lease Renewal Option**"), and provided that Tenant has not recognized any person or entity other than Broker (as hereinafter defined) as broker in connection with

00323152.11

2

the exercise of such Lease Renewal Option, Landlord will pay Broker a commission in connection with the applicable Renewal Term pursuant to a separate agreement between Landlord and Broker.

**Section 1.7.**     Lease Year:  Shall mean each period of twelve (12) consecutive months during the Lease Term commencing on the Rent Commencement Date, except that the first Lease Year shall be extended by the number of days, if any, required for said first Lease Year to end on the last day of a calendar month.  For example, if the Rent Commencement Date is February 15, 2016, the first Lease Year shall commence upon such date, the second Lease Year shall commence upon March 1, 2016 and so on.

**Section 1.8.**     Minimum Rent:

A.     The annual Minimum Rent shall commence upon the Commencement Date at the rate set forth below for the 1st Lease Year (subject to the paragraph B below) and the annual and monthly Minimum Rent for the remainder of the initial Term and the first Renewal Term is set forth in the following table:

| Rentable square footage = <br><br> 20,000  sf | Percentage Increase Over Prior Lease Year | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|---|
| 1st Lease Year | N/A | $280,000.00 | $23,333.33 |
| 2nd Lease Year | 3% | $288,400.00 | $24,033.33 |
| 3rd Lease Year | 3% | $297,052.00 | $24,754.33 |
| 4th Lease Year | 3% | $305,963.56 | $25,496.96 |
| 5th Lease Year | 3% | $315,142.47 | $26,261.87 |
| 6th Lease Year | 3% | $324,596.74 | $27,049.73 |
| 7th Lease Year | 3% | $334,334.64 | $27,861.22 |
| 8th Lease Year | 3% | $344,364.68 | $28,697.06 |
| 9th Lease Year | 3% | $354,695.62 | $29,557.97 |
| 10th Lease Year | 3% | $365,336.49 | $30,444.71 |
| *11th Lease Year | 3% | $376,296.59 | $31,358.05 |
| *12th Lease Year | 3% | $387,585.48 | $32,298.79 |
| *13th Lease Year | 3% | $399,213.05 | $33,267.75 |
| *14th Lease Year | 3% | $411,189.44 | $34,265.79 |
| *15th Lease Year | 3% | $423,525.12 | $35,293.76 |

* - first Renewal Term, if applicable

B.     **Rent Holiday**:  Provided Tenant is not then in Default in the observance and performance of any of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, Tenant shall be entitled to a conditional rent abatement and shall not be required to pay any portion of the Minimum Rent (i) with respect to (i) the period commencing on the Commencement Date and ending on the date immediately preceding the day sixty (60) days immediately following the Commencement Date (such period, the "**First Rent Holiday Period**"), (ii) with respect to the first (1st) calendar month of the second (2nd) Lease Year (such month, the "**Second Rent Holiday Period**") and (iii) with respect to the first (1st) calendar month of the third (3rd) Lease Year (such month, the "**Third Rent Holiday Period**", which together with the First Rent Holiday Period and the Second Rent Holiday Period is referred to as the "**Rent Holiday Periods**") but during such Rent Holiday Periods Tenant shall otherwise be required to comply with all of the other terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, including, but not limited to, the obligation to make all other payments (other than the Minimum Rent conditionally excused by the provisions of this paragraph) pursuant to the provisions of hereof.  The date next following the expiration of the First Rent Holiday Period is referred to as the "**Rent Commencement Date**".  If at any time during the Term Tenant shall be in Default (as defined in Section 22.1) in the observance and performance of any of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, then the total sum of the Minimum Rent so conditionally excused by operation of the foregoing provisions of this paragraph shall become immediately due and payable by Tenant to Landlord (with it understood that Minimum Rent for the First Rent Holiday Period shall be at the rate set forth for the 1st Lease Year, the Minimum Rent for the Second Rent Holiday Period shall be at the rate set forth in the 2nd Lease Year and the Minimum Rent for the Third Rent Holiday Period shall be at the rate set forth for the 3rd Lease Year).  If, as of the Expiration Date, Tenant shall not then be in default in the observance and performance of any of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, Landlord shall waive payment of all such Minimum Rent so conditionally excused.

00323152.11

3

**Section 1.9.**        Permitted Use:  Tenant shall use the Demised Premises solely (i) for the sale of used late model cars produced by luxury/prestigious manufacturers (e.g. BMW, Mercedes Benz, Jaguar, Audi and Lexus); (ii) warehouse use; and (ii) for related administrative and executive functions, and for no other purposes whatsoever.  In no event shall Tenant sell any cars from the Demised Premises until Tenant has obtained all necessary governmental permits, licenses and approvals required therefor (including from the DMV (as defined below)).  Subject to Tenant obtaining all required governmental approvals and permits for the Permitted Use, Landlord has no actual knowledge that the Permitted Use is prohibited by law at the Demised Premises.

**Section 1.10.**       Real Estate Taxes:  As used herein shall mean all real estate taxes, assessments, water and sewer rents or charges and other governmental impositions and charges of every kind and nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof, which shall or may during the Lease Term be assessed, imposed, become due and payable or be levied by the lawful taxing authorities against the land, buildings and all other improvements in the Industrial Center, or liens upon or arising in connection with the use or occupancy or possession of, or becoming due or payable out of or for, the Industrial Center or any part thereof or any land, buildings or other improvements therein, including all commercially reasonable costs and fees incurred by Landlord in contesting same or in negotiating with the appropriate governmental authorities as to same.

Except as otherwise set forth in the immediately succeeding paragraph of this Section 1.10, nothing herein contained shall be construed to include as a Real Estate Tax any inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax that is or may be imposed upon Landlord; provided, however, that, if at any time during the Lease Term the methods of taxation prevailing at the commencement of the Lease Term shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes now levied, assessed or imposed, there shall be levied, assessed or imposed an income or other tax of whatever nature, then the same shall be included in the computation of Real Estate Taxes hereunder.  As used in this Lease, the term "**Real Estate Taxes**" shall include any excise, transaction, sales or privilege tax hereafter imposed by any government or governmental agency upon Landlord on account of, attributed to, or measured by rent or other charges payable by Tenant, or levied by reason of the public parking made available by Landlord in the Industrial Center.  Tenant shall not have the right to contest the amount or application of any Real Estate Taxes with any governmental authority.

**Section 1.11.**       Tenant's Pro-rata Share:  As used herein shall mean a fraction, the numerator of which shall be the gross rentable area of the Demised Premises and the denominator of which shall be the gross rentable area of all buildings in the Industrial Center.  As of the Commencement Date, Tenant's Pro-rata Share shall be 28.87%.

## ARTICLE 2.   GRANTING CLAUSE

**Section 2.1.**        Lease of Demised Premises:  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby leases and rents to Tenant, and Tenant hereby leases and rents from Landlord, the Demised Premises.  TO HAVE AND TO HOLD said Demised Premises for the Lease Term.

## ARTICLE 3.   POSSESSION AND CONSTRUCTION

**Section 3.1.**        Demise Includes Use of Common Facilities:  The demise to Tenant shall include, in addition to the Demised Premises, the right to the nonexclusive use in common with others of the Common Facilities, subject, however, to the terms and conditions of this Lease and to the rules and regulations set forth in Exhibit B which is attached hereto and made a part hereof.

**Section 3.2.**        Quiet Enjoyment:  Tenant, upon paying the rent and performing Tenant's obligations in this Lease, shall peacefully and quietly have, hold and enjoy the Demised Premises and the appurtenances thereunto appertaining throughout the Lease Term, subject, however, to the provisions of this Lease, to all other agreements, conditions, restrictions and encumbrances and mortgages to which this Lease is or may become subject and subordinate.

**Section 3.3.**        Industrial Center:  Tenant acknowledges that Exhibit A-2 attached hereto is a site plan which generally depicts the layout of the Industrial Center.

**Section 3.4.**        No Preparation of Demised Premises by Landlord:

A.        Tenant shall take possession of the Demised Premises on the Commencement Date in a strictly "as is", "where is" condition, and Landlord shall have no obligation to alter, improve, decorate or otherwise prepare the Demised Premises for Tenant's occupancy, other than to perform the work (hereafter, "**Landlord's Work**") more particularly set forth on Exhibit C attached hereto and made a part hereof.  Landlord agrees to use

00323152.11                                              4

its reasonable efforts to substantially complete Landlord's Work within one hundred twenty (120) days following the Effective Date, provided Landlord shall have no liability and this Lease shall be unaffected if Landlord fails to do so. Landlord shall have no obligation to employ any contractors or labor at overtime or other premiums pay rates. If Landlord is unable to deliver possession of the Demised Premises for any reason, Landlord shall not be subject to any liability for failure to give possession of the Demised Premises and the validity of this Lease shall not be impaired under such circumstances, nor shall the same be construed in any way to extend the Term. The provisions of this Section 3.4A are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law. The taking of possession of the Demised Premises by Tenant shall be deemed delivery of the Demised Premises by Landlord and an absolute and unconditional acceptance of same by Tenant. After the substantial completion of Landlord's Work, Landlord may enter the Demised Premises to complete unfinished details thereof and entry by Landlord, its agents, servants, employees or contractors for such purpose shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord, or its agents, by reason of inconvenience or annoyance to Tenant, or injury to, or interruption of Tenant's business or otherwise. Landlord agrees, however, to complete such unfinished details with reasonable diligence and using its reasonable efforts to minimize interference with Tenant's business without any obligation, however, to employ contractors or labor at overtime or other premium pay rates.

B.    The parties agree that Tenant shall be solely responsible for performing any alteration or other work necessary or desired by Tenant for its occupancy of the Demised Premises.

C.    Landlord has made no representations, warranties or promises with respect to this Lease, to the Demised Premises, to Landlord's Work, to any fixtures, equipment or other property therein or to any matter related thereto, whether express or implied and Tenant acknowledges that it has not relied upon any representations, warranties or promises, whether from Landlord or from any of Landlord's employees, agents or representatives except as may be expressly set forth in this Lease, if any. ALL IMPLIED WARRANTIES ARE EXCLUDED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, IF ANY.

D.    Notwithstanding the foregoing, if the Commencement Date shall fail to occur on or before the date which is nine (9) months following the Effective Date (as extended by reason of Unavoidable Delay and Tenant Delays, the "Outside Delivery Date"), Tenant shall have the right within thirty (30) days after the Outside Delivery Date, as its sole and exclusive remedy therefor, to terminate this Lease by giving notice of termination to Landlord. If Tenant timely delivers the aforesaid termination notice, this Lease shall terminate thirty (30) days after the date of such notice, unless the Commencement Date shall occur within thirty (30) days after Tenant gives such termination notice, in which case Tenant's termination notice shall be void and this Lease shall continue in full force and effect. Failure by Tenant to exercise such right to terminate this Lease within such thirty (30) day period shall constitute a waiver of such right; time being of the essence with respect thereto. Upon termination of the Lease pursuant to the terms of this Section 3.4D, Landlord shall promptly refund to Tenant the Minimum Rent paid by Tenant under Article 4.3 and return to Tenant the security deposit.

**Section 3.5.**    Initial Tenant's Work: Tenant shall, promptly following the Commencement Date, perform all work necessary to prepare the Demised Premises for Tenant's occupancy (the "**Initial Tenant's Work**") at its sole cost, expense and risk in accordance with the design, materials and standards that Landlord shall approve as provided in Article 5 of this Lease. The Initial Tenant's Work shall be performed by Tenant in full compliance with the terms, provisions of conditions set forth in Exhibit C and below in Article 5.

## ARTICLE 4.    TENANT PAYMENTS

**Section 4.1.**    Tenant's Obligations To Pay Minimum Rent and Other Charges: During the Lease Term, Tenant shall pay to Landlord without any prior demand and without any deduction or set-off whatsoever, Minimum Rent in the manner hereinafter set forth. In addition to Tenant's obligation to pay Minimum Rent, Tenant shall pay any tax, whether a sales tax or otherwise (except for income tax or such other tax as is customarily imposed and payable by Landlord), which is or shall be imposed on Tenant's payment of rent hereunder. Tenant further covenants and agrees to pay, as set forth hereinbelow, Tenant's Pro-rata share of Complex Operating Costs and Tenant's Pro-rata Share of increases in Real Estate Taxes over the Base Taxes, both of which are included within the term "Additional Rent".

**Section 4.2.**    Additional Rent Adjustment: Should Tenant's obligations for the payment of Additional Rent cover less than a full calendar year, Tenant's liability for Additional Rent, excluding Real Estate Taxes, shall be subject to a pro rata adjustment based upon a fraction, the numerator of which is the number of days for which Tenant's obligation to pay Additional Rent, excluding Real Estate Taxes, is in effect, and the denominator of which is the number of days in the calendar year.

**Section 4.3.**    Minimum Rent: Tenant shall pay to Landlord the Minimum Rent in the amounts set forth in this Lease. Tenant covenants and agrees to pay to Landlord the Minimum Rent in advance on the first

00323152.11                                                    5

day of each calendar month during the Lease Term, in equal monthly installments, without deduction or set-off. The Minimum Rent shall commence to accrue on the Rent Commencement Date, on which date Tenant shall pay to Landlord the pro-rata amount applicable to the period from the Rent Commencement Date to the last day of the calendar month in which the Commencement Date shall occur. Upon execution of this Lease, Tenant shall pay to Landlord the Minimum Rent for the first full calendar month of the Lease following the Rent Commencement Date, subject to paragraph 3.4D.

**Section 4.4.**    Tenant's Pro-rata Share of Complex Operating Costs.  Commencing with the Commencement Date, and continuing thereafter during the Lease Term, Tenant will pay to Landlord, Tenant's Pro-rata Share of Landlord's operating cost of the Industrial Center ("**Tenant's Pro-rata Share of Complex Operating Costs**"). Tenant's Pro-rata Share of Complex Operating Costs shall be a monthly charge to be paid in advance, on the first day of each month, without deduction or set-off. Tenant's initial Pro-rata Share of Complex Operating Costs shall be estimated by Landlord and the amount of such estimate shall be furnished to Tenant on or about the Commencement Date. After the end of each calendar year of the Lease Term, Landlord will furnish to Tenant a statement (the "**Operating Costs Statement**") of the amount of Landlord's operating costs of the Industrial Center for the immediately preceding calendar year, Landlord's estimate of Landlord's cost of operating the Industrial Center for the then calendar year and Tenant's Pro-rata Share of Complex Operating Costs for the then calendar year. Tenant shall pay any deficiency in Tenant's Pro-rata Share of Complex Operating Costs with respect to both the preceding calendar year and the then calendar year (as a result of any delay in adjusting the monthly Tenant's Pro-rata Share of Complex Operating Costs for the then calendar year) within twenty (20) days after Landlord sends the Operating Costs Statement to Tenant. Landlord may increase the monthly payment of Tenant's Pro-rata Share of Complex Operating Costs to compensate for increased expenses including, but not limited to, snow removal during periods of unusual snow fall. Landlord shall not be responsible for snow and ice removal from all areas where Tenant is granted exclusive parking rights herein, if any, if Tenant's (or its customers', agents', contractors', employees', invitees') vehicles are present in such areas. Landlord shall credit any excess payments made by Tenant against the next regular installment of Tenant's Pro-rata Share of Complex Operating Costs. Nothing herein shall prevent Landlord from making retroactive adjustments to Tenant's Pro-rata Share of Complex Operating Costs in the event that errors are discovered with respect to such calculations for past calendar years. The obligations of Tenant under this Section shall survive the termination of this Lease.

Should Tenant's obligation for the payment of Complex Operating Costs pursuant to this Lease originate or terminate for less than a full calendar year, Tenant's liability for Complex Operating Costs shall be subject to a pro rata adjustment based on the number of months of said calendar year for which Tenant's obligation to pay Complex Operating Costs is in effect.

Notwithstanding the foregoing, Tenant's Pro-rata Share of Complex Operating Costs shall be fixed at One ($1.00) Dollar per rentable square foot of the Demised Premises as set forth in Section 1.4 per annum for the period commencing on the Commencement Date and ending the date which is the day prior to the one (1) year anniversary of the Commencement Date, provided, however, if the Commencement Date is not the 1st day of a calendar month, such period shall end on the last day of the calendar month in which the one (1) year anniversary of the commencement date shall occur.

Tenant's Pro-rata Share of "**Complex Operating Costs**" shall be based on the cost and expense of operating, repairing, replacing, maintaining and managing the Industrial Center in a manner deemed by Landlord reasonable and appropriate and for the best interest of the Industrial Center, including without limitation:

> (a)    All costs and expenses, including capital expenses (the cost of each capital expense, plus interest charges paid thereon, shall be amortized on a straight-line basis over its estimated useful life and only the annual amortization cost of such capital expense shall be included in Tenant's Pro-rata Share of Complex Operating Costs for each calendar year until the cost of such capital expense is fully amortized), of operating, repairing, replacing, maintaining, lighting, cleaning, painting, striping, securing (including cost of uniforms, equipment and all employment taxes) the Industrial Center;

> (b)    All costs and expenses incurred by Landlord in making the Landlord's Repairs as set forth in Section 10.1 hereof;

> (c)    All costs and expenses of paying all personnel employed on a full or part-time basis in the operation, maintenance or repair of the Industrial Center;

> (d)    All costs and expenses of removal of rubbish and debris;

> (e)    All costs and expenses of regulating traffic;

> (f)    All costs and expenses of inspecting and depreciation on (straight-line)

00323152.11                                    6

machinery and equipment used in the operation and maintenance of the Industrial Center and personal property taxes and other charges incurred in connection with such equipment;

(g)    All costs and expenses of the maintenance and replacement of paving, curbs, walkways, drainage and lighting facilities in the Industrial Center including, without limitation;

(h)    All costs and expenses of planting, replanting and replacing flowers, shrubbery and planters in the Common Facilities and the supplies required therefor;

(i)    All costs and expenses in the maintenance and replacement of the roof and any built-up roof system and all items in connection therewith, including but not limited to, flashing, expansion joints, pitch boxes, curbs, gutters, leaders and skylights;

(j)    The cost of all utilities, including the cost of standby water for fire protection, used in connection with the operation of the Industrial Center;

(k)    The cost of snow and ice removal from the Industrial Center;

(l)    The cost of property management services incurred by Landlord;

(m)    The cost of compliance with laws, ordinances, rules, regulations or requirements of any public authority or agency enacted or becoming effective after the Commencement Date; and

(n)    Costs of any items that, under generally accepted accounting principles, are properly classified as a capital cost (collectively, "**Capital Costs**") which are (i) necessary in order to comply with applicable laws which become effective after the date of this Lease, and (ii) those Capital Costs which are undertaken to reduce future Complex Operating Costs (the Capital Costs in (i) and (ii) above, "**Permitted Capital Costs**").

Notwithstanding anything to the contrary, Complex Operating Costs shall not include: (1) leasing commissions, fees and costs, advertising and promotional expenses and other costs incurred in procuring tenants or in selling the Building or Industrial Center; (2) costs of renovating or otherwise improving or decorating space for any tenant or other occupant of the Building or Industrial Center, including Tenant, or relocating any tenant; (3) financing costs including interest and principal amortization of debts and mortgages and the costs of providing the same; (4) depreciation; (5) rental on ground leases or other underlying leases; (6) wages, bonuses and other compensation of employees above the grade of property manager or other employees of Landlord not directly involved in the Industrial Center; (7) any liabilities, costs or expenses associated with or incurred in connection with the removal, enclosure, encapsulation or other handling of asbestos or other hazardous or toxic materials or substances and the cost of defending against claims in regard to the existence or release of Hazardous Substances of materials at the Building or Industrial Center (except with respect to those costs for which Tenant is otherwise responsible pursuant to the express terms of this Lease); (8) charges for electricity, water, or other utilities, services or goods and applicable taxes for which Tenant or any other tenant, occupant, person or other party is obligated to reimburse Landlord or to pay to third parties; (9) attorneys' fees, accounting fees and other expenditures incurred in connection with negotiations, disputes and claims of other tenants or occupants of the Building or Industrial Center or with other third parties; (10) all Capital Costs except for Permitted Capital Costs; (11) costs and expenses incurred in connection with compliance with or the contesting or settlement of any claimed violation of law or requirements of law in effect as of the Commencement Date; (12) all other items for which another party compensates or pays so that Landlord shall not recover any item of cost more than once; (13) costs that are reimbursed out of insurance, warranty or condemnation proceeds, or which are reimbursable by Tenant or other tenants other than pursuant to an expense escalation clause; and/or (14) premiums for property damage and liability insurance.

**Section 4.5.**    Intentionally Omitted:

**Section 4.6.**    Utility Service Charges:  Tenant shall pay all utility charges in accordance with the provisions of Article 8.

**Section 4.7.**    Taxes:

(a)    "**Base Taxes**" shall mean (i) with respect to all Real Estate Taxes other than school taxes, the Real Estate Taxes payable for the calendar year 2016 and (ii) with respect to school taxes, the school taxes payable for the tax fiscal year of July 1, 2015 through June 30, 2016 (the "**Base Tax Years**").

00323152.11                                              7

(b)    "**Comparison Year**" shall mean (i) with respect to all Real Estate Taxes other than school taxes, each calendar year commencing subsequent to the first day of the applicable Base Tax Year and (ii) with respect to school taxes, each tax fiscal year commencing subsequent to the first day of the applicable Base Tax Year.

(c)    "**Statement**" shall mean a statement containing a comparison of the Base Taxes and the Real Estate Taxes for any Comparison Year.

(d)    "**Tax Year**" shall mean (i) with respect to all Real Estate Taxes other than school taxes, each calendar year and (ii) with respect to school taxes, each twelve month period from July 1 through June 30 (or such other periods as hereinafter may be duly adopted by any applicable governmental authority as its fiscal year for real estate tax purpose).

(e)    If the Real Estate Taxes payable for any Tax Year after the Base Tax Year exceed the Base Taxes, Tenant shall pay to Landlord Tenant's Pro-rata Share of such excess ("**Tenant's Tax Payment**"). For each Comparison Year in which any such Tax Year commences, Landlord shall furnish to Tenant a statement setting forth Landlord's reasonable estimate of Tenant's Tax Payment for such Tax Year (the "**Tax Estimate**"). Tenant shall pay to Landlord on the 1st day of each month during such Comparison Year an amount equal to 1/12th of the Tax Estimate for such Tax Year. If Landlord furnishes a Tax Estimate for a Comparison Year subsequent to the commencement thereof, then (i) until the 1st day of the month following the month in which the Tax Estimate is furnished to Tenant, Tenant shall pay to Landlord on the 1st day of each month an amount equal to the monthly sum payable by Tenant to Landlord under this **Section 4.7** for the last month of the preceding Comparison Year; (ii) promptly after the Tax Estimate is furnished to Tenant or together therewith, Landlord shall give notice to Tenant stating whether the installments of the Tax Estimate previously made for such Comparison Year were greater or less than the installments of the Tax Estimate to be made for such Comparison Year in accordance with the Tax Estimate, and (x) if there shall be a deficiency, Tenant shall pay the amount thereof within twenty (20) days after demand, or (y) if there shall have been an overpayment, Landlord shall credit the amount thereof against subsequent payments of Rent next coming due hereunder; and (iii) on the 1st day of the month following the month in which the Tax Estimate is furnished to Tenant, and on the 1st day of each month thereafter throughout the remainder of such Comparison Year, Tenant shall pay to Landlord an amount equal to 1/12th of the Tax Estimate.   Landlord may, during each Comparison Year, furnish to Tenant a revised Tax Estimate for such Comparison Year, and in such case, Tenant's Tax Payment for such Comparison Year shall be adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence.   After the end of each Comparison Year, Landlord shall furnish to Tenant a Statement of Real Estate Taxes applicable to Tenant's Tax Payment payable for such Comparison Year and (A) if such Statement shall show that the sums so paid by Tenant were less than Tenant's Tax Payment due for such Comparison Year, Tenant shall pay to Landlord the amount of such deficiency within twenty (20) days after delivery of the Statement to Tenant, or (B) if such Statement shall show that the sums so paid by Tenant were more than such Tenant's Tax Payment, Landlord shall credit such overpayment against subsequent payments of Tenant's Tax Payment next coming due hereunder.  If there shall be any increase in the Taxes for any Tax Year, whether during or after such Tax Year, or if there shall be any decrease in the Taxes for any Tax Year, Tenant's Tax Payment for such Comparison Year shall be appropriately adjusted and any deficiencies paid or overpayments credited, as the case may be, substantially in the same manner as provided in the preceding sentence.

If the Base Taxes are reduced, the Additional Rent previously paid or payable on account of Tenant's Tax Payment hereunder for all Comparison Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord, within twenty (20) days after demand therefor, any deficiency between the amount of such Additional Rent previously computed and paid by Tenant to Landlord, and the amount due as a result of such recomputation. If the Base Taxes are increased, then Landlord shall either pay to Tenant, or at Landlord's election, credit against subsequent payments of rent due, the amount by which such Additional Rent previously paid on account of Tenant's Tax Payment exceeds the amount actually due as a result of such recomputation.  If Landlord receives a refund of Real Estate Taxes for any Comparison Year, Landlord shall, at its election, either pay to Tenant, or credit against subsequent payments of Tenant's Tax Payment due hereunder, an amount equal to Tenant's Pro-rata Share of the refund, net of any expenses incurred by Landlord in achieving such refund, which amount shall not exceed Tenant's Tax Payment paid for such Comparison Year.  Landlord shall not be obligated to file any application or institute any proceeding seeking a reduction in Taxes.

(f)    Tenant shall be responsible for any applicable occupancy or rent tax for which tenants are primarily responsible, whether now in effect or hereafter enacted and Tenant's Pro-rata Share of all excise, transaction, sales or privilege tax hereafter imposed by any government or governmental agency upon Landlord on account of, attributed to, or measured by rent or other charges payable by occupants of the Industrial Center, or levied by reason of the public parking made available to occupants of the Industrial Center and their guests and invitees (as opposed to leasing out to the general public), by Landlord in the Industrial Center, and, if any such taxes or charges are payable by Landlord, Tenant shall promptly pay such amounts to Landlord, upon Landlord's demand.

00323152.11

8

(g)     Should Tenant's obligation for the payment of Real Estate Taxes pursuant to this Lease originate or terminate for less than a full Tax Year, Tenant's liability for Real Estate Taxes shall be subject to a pro rata adjustment based on the number of months of said Tax Year for which Tenant's obligation to pay Real Estate Taxes is in effect.

(h)     Tenant shall pay promptly when due all taxes directly or indirectly imposed or assessed on Tenant's business operations, machinery, equipment, improvements, inventory and other personal property or assets, whether such taxes are assessed against Tenant, Landlord or the Industrial Center as a single entity.  In the event that such taxes are imposed or assessed against Landlord or the Industrial Center, Landlord, upon request, shall furnish Tenant with all applicable tax bills, public charges and other assessments or impositions.

**Section 4.8.**     Insurance Premiums:  In addition to paying Tenant's Pro-rata Share of Landlord's insurance premiums as part of Tenant's Pro-rata Share of Complex Operating Costs, Tenant agrees to pay, within thirty (30) days after demand, any increase in premiums that may be charged on insurance carried by Landlord resulting from Tenant's particular manner of use or occupancy of the Demised Premises or the Industrial Center (the "**Insurance Premium Charge**").  In determining whether increased premiums are the result of Tenant's use or occupancy of the Demised Premises, a schedule or "make-up" rate of the organization issuing the fire insurance, extended coverage, vandalism and malicious mischief, special extended coverage or any all-risk insurance rates for the Demised Premises or Industrial Center or any rule books issued by the rating organization or similar bodies or rating procedures or rules of Landlord's insurance companies shall be conclusive evidence of the several items and charges which make up the insurance rates and premiums on the Demised Premises and the Industrial Center. If due to the Tenant's failure to occupy the Demised Premises, as herein provided, any such insurance shall be canceled by the insurance carrier, then Tenant shall indemnify and hold Landlord harmless against any loss which would have been covered by such insurance and Tenant also shall pay any increase in premiums on rent insurance as may be carried by Landlord for its protection against rent loss through fire or other casualty, if such increase shall result from Tenant's failure to occupy.

**Section 4.9.**     No Reduction in Rent:  In no event shall any decrease in (i) Real Estate Taxes in any Comparison Year below the Base Taxes, or (ii) any reduction in Base Taxes result in a reduction in the Minimum Rent or any other component of Additional Rent payable hereunder.

## ARTICLE 5.   TENANT'S WORK

**Section 5.1.**     Tenant shall not, without Landlord's prior written approval, make (i) structural changes or alterations in or to the Demised Premises of any nature, (ii) changes or alterations which affect the Building's systems, which term shall include the Building's utility, plumbing, ventilating, electrical, air conditioning or heating systems or (iii) non-structural changes or alterations costing more than $10,000 in the aggregate.  Prior to Tenant's commencing the Initial Tenant's Work described in Section 3.5 above, or any other work in the Demised Premises for which Landlord's prior approval is required, Tenant shall submit to Landlord for Landlord's written approval (which approval shall not be unreasonably withheld, delayed or denied, for interior, non-structural work which does not affect any building systems), complete drawings, plans and specifications (herein collectively referred to as "**Tenant's Plan**") for the improvements and installations to be made by Tenant (said Initial Tenant's Work, together with all other work contemplated in this Article 5 is herein collectively referred to as "**Tenant's Work**").  Tenant shall also submit to Landlord for Landlord's written approval the proposed budget (updated as any work progresses) for all Tenant's Work to be made by Tenant and a list of contractors and subcontractors for Tenant's Work, which approval shall not be unreasonably withheld, delayed or denied.  Upon request, Tenant agrees to employ Landlord's contractor to perform any part of Tenant's Work with respect to the Building's systems, the Building's roof, or the exterior of the Demised Premises and/or any structural aspect of Tenant's Work.  Tenant's Plan shall be fully detailed, shall show complete dimensions, shall not require any changes in the structure of the Building (except as expressly permitted pursuant hereto) and shall not be in violation of any laws, order, rules or regulations of any governmental department or bureau having jurisdiction of the premises.

**Section 5.2.**     Within twenty (20) days after submission to Landlord of Tenant's Plan, Landlord shall either approve same or shall set forth in writing the reasons Landlord does not approve same, in which latter case Tenant shall, within ten (10) days after Landlord's notification, return to Landlord appropriate corrections thereto.  Such corrections shall be subject to Landlord's approval not to be unreasonably withheld as provided above.  Tenant shall pay to Landlord, promptly upon being billed, any reasonable charges or expenses of Landlord's architects and engineers in reviewing Tenant's Plan and/or insuring compliance therewith as well as a construction management fee of six (6%) percent for any Tenant's Work (other than the Initial Tenant's Work) required to be supervised or monitored by Landlord.  Provided Tenant retains Angelo Corva as Tenant's architect, Landlord waives such six (6%) management fee with respect to the Initial Tenant's Work.

**Section 5.3.**     Tenant further agrees that Tenant shall not make any changes in Tenant's Plan subsequent to approval by Landlord unless Landlord consents to such changes.  Tenant shall pay to Landlord all

00323152.11                                          9

reasonable costs and expenses caused by such change which Landlord has actually incurred or sustained in the performance by Landlord of any construction or work in the building. Landlord shall have the right to refuse to consent to any such changes if in the reasonable judgment of Landlord or Landlord's architect such changes materially deviate from Tenant's Plan theretofore approved by Landlord or otherwise violate the terms of this lease. Any charges payable under this subparagraph 5.3 shall be paid by Tenant from time to time upon demand as Additional Rent, whether or not the lease term shall have commenced.

**Section 5.4.** Following compliance by Tenant with its obligations under the foregoing subparagraphs and approval of Tenant's Plan by Landlord, Tenant shall commence Tenant's Work and it shall proceed diligently with same in a good and workmanlike manner using first-class materials in order to complete same within a reasonable period of time.

**Section 5.5.** Tenant agrees that in the performance of Tenant's Work (i) neither Tenant nor its agents or employees shall interfere with any work being done at the Industrial Center by Landlord and its contractors, agents and employees, (ii) that Tenant shall provide Landlord with adequate security (in the form of completion bond, letter of credit or other form, as determined by Landlord) to secure Tenant's full and timely performance and completion of Tenant's Work ("**Security**"), (iii) that Tenant shall comply with any reasonable rules and regulations proposed by Landlord, its agents, contractors or employees, (iv) that all personnel employed by Tenant shall be harmonious and compatible with the labor employed by Landlord and other tenants in the Industrial Center, it being agreed that if in Landlord's judgment the labor is incompatible with the labor employed by Landlord or construction labor employed by other tenants in the Industrial Center, Tenant shall immediately resolve such incompatibility, or upon Landlord's demand immediately withdraw such labor from the premises, (v) that prior to commencing Tenant's Work, Tenant shall procure and deliver to Landlord worker's compensation, public liability, property damage and such other insurance policies, in such form and amounts as shall be reasonably acceptable to Landlord in connection with Tenant's Work, and shall upon Landlord's request cause Landlord, any mortgagee of the Industrial Center and such other entities as Landlord shall designate to be named as additional insureds thereunder, (vi) that Tenant shall hold Landlord, any mortgagee of the Industrial Center and such other entities as Landlord shall designate harmless from and against any and all claims arising from or in connection with any act or omission of Tenant or its agents, contractors and employees, (vii) that Tenant's Work shall be performed in accordance with the approved Tenant's Plan and in compliance with the laws, orders, rules and regulations of any governmental department or bureau having jurisdiction of the demised premises and Tenant shall immediately correct any non-conforming work, (viii) that Tenant shall not permit any lien to attach to the Demised Premises or the land and/or Industrial Center, and (ix) all Tenant's Work shall be performed in such a manner so as not to interfere with the work or operation of Landlord and other tenants of the Industrial Center. All construction staging shall be in areas designated by Landlord.

**Section 5.6.** All trade fixtures and equipment installed or used by Tenant in the Demised Premises shall be fully paid for by Tenant in cash and shall not be subject to conditional bills of sale, chattel mortgage or other title retention agreements, unless the lender under such conditional bill of sale, chattel mortgage or other title retention interest shall in substance expressly acknowledge that its interest does not affect Landlord's interest in the Demised Premises or the Industrial Center.

**Section 5.7.** Notwithstanding anything to the contrary contained herein, Landlord shall not be obligated to give its consent or approval regarding Tenant's Work in the event that such consent or approval is required of, and not given by, Landlord's mortgagee or any ground or superior lessor. Tenant's Work shall in all respects conform to the requirements, if any, imposed by any mortgage or any ground or superior lessor on the Industrial Center with respect to such alterations and improvements.

**Section 5.8.** Landlord may, at any time and from time to time, in addition to any other right of access given to Landlord pursuant to the terms of this lease, enter upon the Demised Premises with one or more engineers and/or architects of Landlord's selection to determine the course and degree of completion of Tenant's Work and its compliance with Tenant's Plan and the terms and conditions of this Lease.

**Section 5.9.** Landlord may require any or all items of Tenant's Work to be removed upon the expiration or earlier termination of the Lease Term, in which case, Tenant shall remove such items of Tenant's Work and return the affected area to the condition existing prior to the installation thereof, such obligation shall survive the expiration or earlier termination of the Lease Term.

## ARTICLE 6. USE OF THE PREMISES

**Section 6.1.** Permitted Use: During the Lease Term the Demised Premises shall be used and occupied solely for the purposes set forth in Section 1.9 and for no other purposes without the written consent of Landlord. Promptly following completion of the Initial Tenant's Work, Tenant shall commence the conduct of its business and shall continuously, actively and diligently thereafter operate its business at the Demised Premises in a high-grade and reputable manner and in accordance with the terms, provisions and conditions of this Lease.

Case 2:23-cv-06188-JMW   Document 30-2   737   Filed 09/11/23   Page 28 of 73 PageID #:

**Section 6.2.**          Operation of Demised Premises:

A.          If any governmental license or permit (including, without limitation, any approvals or permits required by New York State Department of Motor Vehicles ("**DMV**") shall be required for the proper and lawful conduct of Tenant's business in the Demised Premises or any part thereof, Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit the same to Landlord for inspection. Tenant shall at all times comply with the terms and conditions of each such license or permit. Without limiting the generality of the forgoing, Tenant (and not Landlord) shall be responsible at its own cost, expense and risk to obtain a certificate of occupancy for Tenant's use and occupancy of the Demised Premises, it being agreed, however, that Landlord shall reasonably cooperate with Tenant's obtaining any local permitting relating to Tenant's use of the Demised Premises as herein contemplated, and Tenant shall pay Landlord's out-of-pocket expenses paid or incurred in connection therewith. Landlord makes absolutely no representation or warranty that the Permitted Use is permitted under applicable laws of the certificate of occupancy for the Building.

B.          Tenant shall not at any time use or occupy the Demised Premises, or suffer or permit anyone to use or occupy the Demised Premises, or do anything to be done in, brought into or kept on the Demised Premises, which in any manner, but reasonable, in the sole discretion of Landlord (a) violates the Certificate of Occupancy for the Demised Premises; (b) causes or is liable to cause injury to the Demised Premises or the Industrial Center or any equipment, facilities or systems therein; (c) constitutes a violation of the laws and requirements of any public authorities or the requirements of insurance bodies; (d) constitutes a nuisance, public or private; (e) makes unobtainable from reputable insurance companies authorized to do business in the State of New York any fire insurance with extended coverage, or liability, elevator, boiler or other insurance at standard rates required to be furnished by Landlord under the terms of any mortgages covering the Demised Premises; (f) discharges objectionable fumes, vapors or odors into the Demised Premises and/or Industrial Center's flues or vents or otherwise in such manner as may offend other tenants or occupants of the Industrial Center; (g) is in violation of laws or any regulation of any governmental authority (h) interfering with the operations of Landlord or any other occupant of the Industrial Center; (i) causes or is liable to cause damage to the Building or any equipment, facilities or other systems therein; (j) impairs the appearance of the Building; (k) interferes with the efficient and economical maintenance, operation and repair of the Demised Premises or the Building or the equipment, facilities or systems thereof; (l) adversely affect any service provided to, and/or the use and occupancy by, any Building tenant or occupants (m) materially and adversely affects the first-class image of the Building or (n) result in protests or civil disorder or commotions at, or other disruptions of the normal business activities in, the Building. In addition, the Demised Premises may not be used for: (i) a restaurant or bar; (ii) the preparation, consumption, storage, manufacture or sale of food or beverages (except in connection with vending machines (provided that each machine, where necessary, shall have a waterproof pan thereunder and be connected to a drain) and/or warming kitchens (including refrigerators) installed for the use of Tenant's employees only), liquor, tobacco or drugs; (iii) the business of photocopying, multilith or offset printing (except photocopying in connection with Tenant's own business); (iv) a school or classroom; (v) lodging or sleeping; (vi) intentionally omitted; (vii) a payroll office (except in connection with Tenant's own business conducted at the Premises); (viii) a barber, beauty or manicure shop; (ix) an employment agency or similar enterprise; (x) offices of any governmental authority, any foreign government, the United Nations, or any agency or department of the foregoing; (xi) the manufacture, retail sale, storage of merchandise or auction of merchandise, goods or property of any kind to the general public which could reasonably be expected to create a volume of pedestrian traffic substantially in excess of that normally encountered in the Demised Premises; (xii) the rendering of medical, dental or other therapeutic or diagnostic services; or (xiii) any illegal purposes.

C.          Tenant, at Tenant's expense, shall at all times cause all portions of the Demised Premises to be kept in a clean and safe condition, including, without limitation, the windows, doors and loading docks thereof, in a manner reasonably satisfactory to Landlord and in compliance with the requirements of all governmental authorities having jurisdiction therein.

D.          Tenant covenants and agrees at all times during the term of this Lease, except when and to the extent that the Demised Premises may be untenantable by reason of damage by fire or other casualty, to continuously and uninterruptedly use, occupy and operate for the Permitted Use of the Demised Premises.

E.          Tenant covenants and agrees that no part of the loading docks, drives, sidewalks or walkways abutting or leading to the Demised Premises, nor the Demised Premises itself, has been leased to Tenant for retail, commercial or sale purposes and that Tenant shall use no part thereof for such purposes.

F.          Tenant covenants at all times to exterminate and keep the Demised Premises in a clean, sanitary and wholesome condition, and free of rodents, insects and other pests at its own cost and expense.

G.          Tenant shall store all of Tenant's refuse and rubbish in the Demised Premises enclosed areas and in sanitary containers and arrange for it to be removed from the Demised Premises at Tenant's sole cost and expense. Landlord shall not be required to furnish any services or equipment for the removal of such refuse

00323152.11                                         11

and rubbish. Tenant further agrees that the refuse and rubbish to be collected or disposed of from the Demised Premises shall be removed only in accordance with applicable laws and the present or future regulations established by Landlord. If the use of plastic bags for external refuse storage and disposal is unsatisfactory due to vandalism or other cause, Tenant will place refuse, at Landlord's request, in metal containers.

H.    Tenant shall not place any item, merchandise, inventory, fixture or equipment within the Demised Premises which will have a weight in excess of the floor load of the Demised Premises.

**Section 6.3.**    Rules and Regulations:  The rules and regulations set forth in **Exhibit B** are made a part of this Lease, and Tenant agrees to comply with and observe the same.  Tenant's failure to keep and observe the rules and regulations shall constitute a breach of the terms of this Lease in the manner as if the same were contained herein as covenants.  Landlord reserves the right from time to time to reasonably amend or supplement said rules and regulations and to adopt and promulgate additional reasonable rules and regulations applicable to the Demised Premises and the Industrial Center.  Notice of such additional rules and regulations, and amendments and supplements, if any, shall be given to Tenant, and Tenant agrees to comply with and observe all such amendments and supplements from and after the date of such notice.

**Section 6.4.**    Parking:  Tenant shall have the right to (i) the exclusive use of the ten (10) parking spaces as shown on **Exhibit A-2** and (ii) the use in common with other tenants and occupants of the Industrial Center of the other parking spaces in the parking areas of the Industrial Center on a non-exclusive first-come, first serve basis.  In no event may cars or trucks owned or operated by Tenant, its agent, contractors, employees or invitees (collectively, "**Tenant's Vehicles**") (i) obstruct or restrict access or passage over or through the parking areas, roadways or accessways of the Industrial Center, or (ii) be parked in any parking spaces which are for the exclusive use of any other occupant of the Industrial Center.  In the event any of Tenant's Vehicles so obstructing or restricting access or passage through the Industrial Center or being parked in a parking space which are for the exclusive use of another occupant of the Industrial Center, Tenant shall cure the same immediately upon oral notice from Landlord, failing which, Landlord may have any such Tenant Vehicle towed at Tenant's sole cost and expense without liability to Tenant or the owner or operator of such Tenant Vehicle.  In no event shall Tenant park any of its inventory in the parking lot other than for very brief periods in order to load and unload vehicles to and from vehicle carriers and Tenant's showroom and to conduct customer test drives.

## ARTICLE 7.   COMMON FACILITIES.

**Section 7.1.**    Common Facilities Under Control of Landlord:  The Common Facilities shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time, and provided that access to the Demised Premises is not materially and adversely affected, to do any of the following:  add, alter or construct upon any portion of the Industrial Center; change the area, level, location and arrangement of such parking areas and other facilities comprising the Common Facilities; restrict parking by Tenant and its employees to employee parking areas; do such things as in Landlord's reasonable discretion may be necessary regarding said facilities; and make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the Common Facilities, provided that none of the foregoing actions by Landlord shall materially interfere with Tenant's access to and from the Demised Premises, reduce the available parking at the Industrial Center below the minimum amounts required by applicable law or cause any, approval, permit or certificate of occupancy obtained by Tenant for the Demised Premises or its permitted use to be void.  Except as in this Lease specifically provided, Tenant shall have no right or interest in the Common Facilities.  If the Common Facilities shall be changed or diminished in accordance with the terms hereof, Landlord shall not be subject to any liability to Tenant and Tenant shall not be entitled to any compensation or abatement of rent nor shall any change or diminution of such areas be deemed constructive or actual eviction.  Tenant agrees not to hinder, block or deny access of vehicular ingress and egress of any other tenant to and from the Building.  Landlord shall cause the Common Facilities to be kept in reasonably good order and condition, and in a clean and safe condition, including, without limitation, keeping the parking lot lit, paved, striped, and reasonably free of snow and ice.

**Section 7.2.**    Industrial Center as Private Property:  In order to establish that the Industrial Center, and any portion thereof is and will continue to remain private property, the Landlord shall have the unrestricted right in the Landlord's sole discretion, with respect to the entire Industrial Center and/or any portion thereof owned or controlled by the Landlord, to close the same to the general public for one (l) non-business day in each calendar year and, in connection therewith, to seal off all entrances to the Industrial Center or any portion thereof, provided that if such closure will require Tenant to close for business, Landlord provides Tenant with written notice three (3) months prior to the date of closure.

## ARTICLE 8.   UTILITIES

**Section 8.1.**    Obtaining Utilities:  Subject to the terms of this Article 8, Tenant shall make application for, arrange for and pay or cause to be paid and shall be solely responsible for all charges for utility services and shall indemnify Landlord and save it harmless against any liability or charges on account thereof.  In

00323152.11                                            12

the event any such utility charges are not paid by Tenant when due, Landlord may pay the same to the utility company or department furnishing the same and any amount so paid by Landlord shall be paid by Tenant as Additional Rent for the month next following such payment by Landlord.

**Section 8.2.** Installation of Equipment by Tenant: Tenant further agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's expense in accordance with plans and specifications to be approved in writing by Landlord.

**Section 8.3.** Cessation of Utilities: Landlord shall not be liable to Tenant for any damages should the furnishing of any utilities by any utility company be interrupted or required to be terminated because of necessary repairs or improvements or any cause beyond the control of Landlord. Nor shall any such interruption or cessation relieve Tenant from the performance of any of Tenant's covenants, conditions and agreements under this Lease.

**Section 8.4.** Demised Premises Heating and Air-Conditioning: Tenant agrees to operate the heating and air-conditioning servicing the Demised Premises in such a manner so as to maintain an adequate temperature within the Demised Premises during Tenant's business hours and at such temperatures during non-business hours to prevent the freezing of any pipes or plumbing facilities. Tenant agrees to keep in force a standard maintenance agreement, at the sole expense of Tenant, and to furnish a copy of such agreement to Landlord upon request. If Tenant does not provide such maintenance agreement, Landlord shall have the right to enter into such agreement on behalf of Tenant at Tenant's sole cost and expense. Landlord represents that all heating, ventilation and air-conditioning systems serving the Demised Premises will be in working order as of the Commencement Date.

**Section 8.5.** Utilities: (a) General: Tenant shall be solely responsible for and promptly pay all charges for heat, water, electricity, sewer rents or charges, and any other utility used or consumed in the Demised Premises or in providing heating and air-conditioning to the Demised Premises, including in each instance, all sales and other taxes applicable to the sale or supply or resale by Landlord to Tenant of such utilities, said responsibility commencing on the earlier of the Commencement Date or the date Tenant first enters the Demised Premises for any reason.

(b) Water: The existing water meter (direct to the public utility) shall measure the water consumed at the Industrial Center. Tenant shall pay its Pro-rata Share of the charges and fees incurred by Landlord for such water, within thirty (30) days following receipt of a bill from Landlord for same (the foregoing charges, collectively, the "**Premises Water Charges**").

(c) Gas: Prior to the Commencement Date, Landlord, at Landlord's expense, shall install either (i) a gas meter (direct to the public utility) to measure the gas consumed at the Demised Premises only or (ii) a submeter to measure the gas consumed at the Demised Premises only. If Landlord installs a direct meter to measure the gas consumed at the Demised Premises only, Tenant shall pay all charges for gas directly to the public utility. If Landlord installs a submeter to measure gas consumed at the Demised Premises only, Landlord shall cause such gas submeter to be read from time to time and shall bill Tenant (but not more often than monthly) for Tenant's consumption of gas at the Demised Premises based on the reading of the gas submeter and the actual rates paid by Landlord for gas used at the Industrial Center (including all taxes and surcharges), and Tenant shall pay such amount within thirty (30) days following receipt of a bill from Landlord for same (the foregoing charges, collectively, the "**Premises Gas Charges**").

(d) Electricity: (i) As long as Tenant is not in default under any of the terms, covenants or conditions of this Lease on Tenant's part to be observed or performed, Landlord shall redistribute or furnish electrical energy to or for the use of Tenant in the Demised Premises for the operation of the lighting fixtures and the electrical receptacles installed in the Demised Premises on the Commencement Date. If either the quantity or character of electrical service is changed by the corporation(s) and/or other entity(ies) selected by Landlord to supply electrical service to the Building or is no longer available or suitable for Tenant's requirements, no such change, unavailability or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord, or its agents, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business or otherwise.

(ii) Landlord represents that the electrical feeder or riser capacity serving the Demised Premises on the Commencement Date shall be adequate to serve the lighting fixtures and electrical receptacles installed in the Demised Premises on the Commencement Date. Any additional feeders or risers to supply Tenant's additional electrical requirements, and all other equipment proper and necessary in connection with such feeders or risers shall be installed by Landlord or, at Landlord's election, by Tenant upon Tenant's request, at the sole cost and expense of Tenant, provided, that, in Landlord's judgment, such additional feeders or

Case 2:23-cv-06188-JMW   Document 30-2   Filed 09/11/23   Page 31 of 73 PageID #: 740

risers are necessary and are permissible under applicable laws and insurance regulations and the installation of such feeders or riders will not cause permanent damage or injury to the Building or the Demised Premises or cause or create a dangerous or hazardous condition or entail excessive or unreasonable alterations or repairs to or interfere with or disturb other tenants or occupants of the Building. Tenant covenants that at no time shall the use of electrical energy in the Demised Premises exceed the capacity of the existing feeders or risers or wiring installations then serving the Demised Premises.

(iii)     Prior to the Commencement Date, Landlord, at Landlord's expense, shall install either (i) an electricity meter (direct to the public utility) to measure the electricity consumed at the Demised Premises only, or (ii) a submeter to measure the electricity consumed at the Demised Premises only. If Landlord installs a direct meter to measure the electricity consumed at the Demised Premises only, Tenant shall pay all charges for electricity directly to the public utility. If Landlord installs a submeter to measure electricity consumed at the Demised Premises only, Landlord shall cause such electricity submeter to be read from time to time and shall bill Tenant (but not more often than monthly) for Tenant's consumption of electricity at the Demised Premises based on the reading of the electricity submeter and the actual rates paid by Landlord for electricity used at the Industrial Center (including all taxes and surcharges), and Tenant shall pay such within thirty (30) days following receipt of a bill from Landlord for same. With respect to any period when any such submeter is not in good working order, Tenant shall pay Landlord for electricity consumed in the Demised Premises at the rate paid by Tenant to Landlord during the most recent comparable period when such submeter was in good working order or (iv) Tenant shall take good care of any and all submeters and all submetering installation equipment which measures electricity or gas consumed at the Demised Premises, at Tenant's sole cost and expense, and make all repairs thereto occasioned by any acts, omissions or negligence of Tenant or any person claiming through or under Tenant as and when necessary to insure that any such submeter is, at all times during the Demised Term, in good working order.

(iv)     Landlord may, at any time, elect to discontinue the redistribution or furnishing of electrical energy. In the event of any such election by Landlord, (i) Landlord agrees to give reasonable advance notice of any such discontinuance to Tenant, (ii) Landlord agrees to permit Tenant to receive electrical service directly from the corporation(s) and/or other entity(ies) Landlord selects to supply electrical service to the Building and to permit the existing feeders, risers, wiring and other electrical facilities serving the Demised Premises to be used by Tenant for such purpose to the extent they are suitable and safely capable, (iii) Landlord agrees to pay such charges and costs, if any, as such corporation(s) and/or other entity(ies) may impose in connection with the installation of Tenant's meters, (iv) the provisions of Subsection (d) (iii) of this Section 8.5 shall be deemed deleted from this Lease, and (v) this Lease shall remain in full force and effect and such discontinuance shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

## ARTICLE 9.   LIENS

**Section 9.1.**     <u>Discharge of Lien</u>: Tenant shall, prior to the commencement of any work upon the Demised Premises, do all things necessary to prevent the filing of any mechanics' or other liens against the Industrial Center, the Demised Premises or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Demised Premises, or any part thereof, through or under Tenant. If any such lien or notice thereof shall at any time be filed against the Demised Premises, then Tenant shall either cause the same to be discharged of record within thirty (30) days after the date of filing of the same or, if Tenant, in Tenant's discretion and in good faith, determines that such lien should be contested, furnish such security as may be necessary or required to prevent any enforcement or foreclosure proceedings against the Demised Premises during the pendency of such contest. If Tenant shall fail to discharge such lien within such period or fail to furnish such security, then, in addition to any other right or remedy of Landlord resulting from such default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien in such manner as is, or may be, prescribed by law. Tenant shall repay to Landlord, as Additional Rent, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this Section 9.1, including interest and the reasonable costs, expenses and reasonable attorneys' fees actually incurred by Landlord in connection therewith. Notice is hereby given that the Landlord shall not be liable for any labor or materials furnished or to be furnished to the Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the reversion or other estate or interest of the Landlord in and to the Demised Premises or the Industrial Center.

## ARTICLE 10.   MAINTENANCE, REPAIR AND ALTERATIONS

**Section 10.1.**     <u>Landlord and Tenant Repair</u>: Landlord will make necessary structural repairs to the Building's roof, foundation and exterior walls, excepting any work done by Tenant or by Landlord for Tenant ("**Landlord's Repairs**"). Tenant shall promptly notify Landlord of the necessity of any Landlord Repairs upon

Tenant having knowledge thereof. The cost of all repairs made by Landlord shall be included in the Tenant's Pro-rata Share of Complex Operating Costs pursuant to Section 4.4 of this Lease. If any such repair is required by reason of Tenant's negligence or the negligence of any of its contractors, agents, invitees, delivery trucks, vendors, distributors, employees or other person using the Demised Premises with Tenant's consent, express or implied, or Tenant's failure to perform any of its obligations under this Lease, then Landlord may, at its option, make such repair and add the cost thereof to the first installment of Minimum Rent which shall thereupon become due. Except as hereinbefore provided, Tenant covenants and agrees to keep and maintain in good working order, condition and repair the Demised Premises and every part thereof, including fixtures and equipment therein, the exterior and interior portions of all loading docks, drives leading to same, doors, door checks, security gates, windows, glass, all Building systems, including plumbing and sewage facilities within the Demised Premises (and the free flow of sewer lines therein) and all sprinkler, heating, air-conditioning, ventilation, mechanical, electrical and lighting systems and all fixtures, interior walls, floors and ceilings. Tenant shall accomplish any and all repairs, alterations, replacements and modifications at its own expense, using materials and labor of kind and quality equal to the original work. As a material inducement to Landlord to enter into this Lease and to accept Tenant's use of the Demised Premises as herein permitted, Tenant covenants and agrees to and with Landlord that Tenant shall, at its sole cost and expense, surrender the Demised Premises and all areas of the Industrial Center subjected to Tenant's use (including without limitation, all drives and other paved surfaces) at the expiration or earlier termination of this Lease in as good condition as when received, excepting only deterioration caused by ordinary wear and tear or fire and other casualty resulting in termination by Landlord as provided in Article 14 hereof.

If any repairs required to be made by Tenant hereunder are not made within twenty (20) days after written notice delivered to Tenant by Landlord, or if such repairs are of a nature that they cannot be completed within twenty (20) days, then if Tenant, within such twenty (20) day period has not commenced such repair or having commenced such repairs, thereafter fails to diligently continue and complete such repairs, then Landlord may, at its option, make such repairs without liability to Tenant for any loss or damage which may result to its inventory or business by reason of such repairs, and Tenant shall pay to Landlord, as Additional Rent, upon demand, the reasonable cost of such repairs plus interest from the date of payment by Landlord until repaid by Tenant.

Except as provided herein, Landlord shall have no obligation to repair or maintain the Demised Premises, or any part thereof, or any Building system therein, including the plumbing, heating, electrical, air-conditioning or other mechanical installations therein.

**Section 10.2.**      Fixtures and Signs:  Tenant shall not install or fix any sign, device, fixture or attachment on or to the exterior or interior of the Demised Premises or Building, nor place any vents, structure, building, improvement, sign or advertising device or obstruction of any type or kind upon the Common Facilities or on or to the exterior or interior of the Demised Premises, without first obtaining Landlord's written consent which shall not be unreasonably withheld, conditioned or delayed with respect to interior signs and signs located on Tenant's entrance door(s). If Tenant shall do any of the foregoing acts in contravention of this provision, then Landlord shall have the right to remove any such decoration, paint, alteration, sign, device, fixture or attachment, etc., and restore the Demised Premises and/or the Common Facilities to the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by Tenant as an additional charge. Any signage approved for Tenant shall be installed, maintained and at the termination or expiration of this Lease removed by Tenant at Tenant's sole cost, expense and risk. Landlord agrees that Tenant may install a sign displaying Tenant's name on the main entry door(s) to the Demised Premises, the design of which sign shall be subject to Landlord's prior consent, which shall not be unreasonably withheld or delayed. Throughout the term of this Lease, Landlord reserves the right to remodel or renovate the Building and, if necessary in connection therewith in Landlord's reasonable discretion, to require Tenant to replace, at its sole expense, its existing signage once during the original term of this Lease to conform to Landlord's common signage scheme for the Building as to sign size, location and material, but using Tenant's standard logo and sign colors. Landlord, at Tenant's cost, shall provide Tenant with a listing on the pylon marquee sign to be constructed by Landlord and located in the common area of the Industrial Center which listing on the pylon marquee sign shall be commensurate with Tenant's Pro-rata Share of the Building. In addition, Landlord will not unreasonably withhold, condition or delay its consent to one (1) sign located at the Northeast corner of the Building provided (i) such sign is first-class, professionally prepared, reasonably sized and in keeping with the character of the Industrial Center, the occupants of the Industrial Center and other nearby reasonably comparable buildings, (ii) relates solely to the business being conducted at the Demised Premises, (iii) the sign shall not be illuminated, (iv) Tenant shall secure and maintain all required governmental permits and approvals for such signs, (v) the sign shall not extend above the roof of the Building or be located on the roof of the Demised Premises, (vi) Tenant shall remove the sign prior to the end or earlier expiration of the Lease Term and restore the affected portion of the walls of the Building to the condition existing prior to the installation of such sign, which obligation shall survive the end or earlier termination of the Lease Term and (vii) in no event may the total area of such sign installed by Tenant exceed Tenant's Pro-rata Share of the total area of signs which may be legally constructed at the Industrial Center without the need for any variance. Following the execution of this Lease, Tenant may install a sign denoting Tenant's business as may be required for the approval of Tenant's use of the Premises by the DMV, provided such sign complies with the requirements of this **Section 10.2** and Landlord has approved such signs, which approval shall not be unreasonably withheld,

00323152.11                                                    15

delayed or conditioned.

## ARTICLE 11. ENTRY, INSPECTION, POSTING AND DISPLAY

**Section 11.1.**  Posting Notices:  Tenant shall permit Landlord and any authorized representative of Landlord to enter the Demised Premises at all reasonable times during business hours for any of the following purposes:  serving or posting or keeping posted thereon notices required by any law or which Landlord may reasonably deem necessary or appropriate for the protection of Landlord or its interest; inspecting the Demised Premises; inspecting the heating and air-conditioning service facilities and sprinkler facilities; in order to perform repairs, alterations or improvements to the Demised Premises or Building; any other reason that may be necessary to comply with any laws, ordinances, rules, regulations or requirements of any public authority or any applicable standards that may from time to time be established by all carriers of insurance on the Demised Premises, any Board of Underwriters, Rating Bureau or similar bodies or that Landlord may deem necessary to prevent waste, loss, damage, or deterioration to or in connection with the Demised Premises.  Nothing herein shall imply any duty upon the part of Landlord to do any work which, under any provision of this Lease, Tenant may be required to perform, and the performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform the same. Landlord may, during the progress of any work on the Demised Premises, keep and store upon the Demised Premises all necessary materials, tools and equipment without the same constituting a constructive eviction of Tenant in whole or in part, and the rents reserved shall not abate while said work is in progress by reason of loss or interruption of Tenant's business or otherwise.  Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, loss of business or other damage of Tenant by reason of the performance of any work on the Demised Premises, or on account of bringing materials, supplies and equipment into or through the Demised Premises during the course of work on or in or under the Demised Premises, and the obligations of the Tenant under this Lease shall not thereby be affected in any manner whatsoever.  However, Landlord, in connection with the doing of any such work (including the storage of materials, tools and equipment), shall use reasonable efforts to minimize interference with Tenant's business without any obligation to utilize labor at overtime or other premium pay rates.

**Section 11.2.**  Entry to Demised Premises:  Landlord and any authorized representative of Landlord may enter the Demised Premises at all reasonable times during business hours for the purpose of exhibiting the same to prospective purchasers, mortgagees, superior and lessors and, during the final twelve (12) months of the Lease Term and at any time there exists a Default, may exhibit the Demised Premises for hire (including to prospective tenants).

**Section 11.3.**  Landlord's Easement:  Tenant hereby grants to Landlord such licenses and easements in, over or under the Demised Premises or any portion or portions thereof as shall be reasonably required for the installation or maintenance of mains, conduits, pipes, ducts or other facilities to serve the Industrial Center, or any part thereof, including, but not by way of limitation, the premises of any other tenant or occupant; provided, however, that no exercise, occupancy under or enjoyment of any such license or easement shall result in the permanent unreasonable interference with Tenant's use of the Demised Premises as contemplated by this Lease.

## ARTICLE 12. LAWS AND INSURANCE STANDARDS

**Section 12.1.**  Tenant's Compliance With Laws and Insurance Standards:  Tenant shall, during the Lease Term and at Tenant's sole cost and expense, promptly comply in every respect with the following: all codes, laws, ordinances, rules and regulations of all federal, state, county and municipal governments, including without limitation, all Environmental Laws (hereinafter defined) now in force or that may be enacted hereafter; all requirements of the American with Disabilities Act of 1990, as the same may be hereafter modified from time to time; all directions, rules and regulations of the fire marshal, health officer, building inspector, zoning official and/or other proper officers of the governmental agencies having jurisdiction over the Demised Premises; all carriers of insurance on the Demised Premises, any Board of Underwriters, Rating Bureau and any similar bodies, which are applicable to Tenant's use and occupancy of the Demised Premises. Tenant shall, at Tenant's sole cost and expense, make all changes to the Demised Premises which are or hereafter may be required in order to comply with the foregoing; provided, however, that Tenant shall not be obligated to comply with any requirements requiring any structural alterations to the roof, foundation and exterior walls of the Building unless the application of such requirements arises from (i) the manner and nature of Tenant's use or occupancy of the Demised Premises, including the Permitted Use, (ii) Tenant's Work made by Tenant, or (iii) a breach by Tenant of any provisions of this Lease. Any such repairs or alterations shall be made at Tenant's expense (1) by Tenant in compliance with Article 5 if such repairs or alterations do not affect the roof, foundation and exterior walls of the Building, or (2) by Landlord if such repairs or alterations affect the roof, foundation and exterior walls of the Building.  Tenant expressly covenants and agrees to indemnify and save Landlord harmless from any penalties, damages or charges imposed for any violation of any and all laws, ordinances, rules or regulations or violations of the covenants herein expressed, whether occasioned by Tenant or any person upon the Demised Premises.

**Section 12.2.**  Tenant's Use of Demised Premises Impaired:  Tenant shall have no claim against

16

0032152.11

Landlord for any damages should Tenant's use and occupancy of the Demised Premises for the purpose set forth in this Lease be prohibited or substantially impaired by reason of any law, ordinance or regulation of federal, state, county or municipal governments or by reason of any act of any legal or governmental or other public authority, except to the extent such prohibition or impairment results from Landlord's negligence or intentional misconduct or failure to comply with those legal requirements which are Landlord's obligation hereunder.

## ARTICLE 13.     INDEMNIFICATION OF LANDLORD AND LIABILITY INSURANCE

**Section 13.1.**     Tenant Indemnity:  Tenant hereby indemnifies and agrees to defend and hold Landlord and its lenders, managing agents and its and their respective members, partners, affiliates, principals, shareholders, officers, directors, members, trustees, fiduciaries, servants, agents and employees free and harmless from and against all suits, causes, actions, damages, liabilities, penalties, costs, charges, fees and expenses, including without limitation, reasonable attorneys' fees and disbursements, in connection with a breach by Tenant under this Lease or with loss of life, personal injury or property damage arising from or out of any occurrence in, upon, at or from the Demised Premises or the occupancy or use by Tenant of the Demised Premises or occasioned wholly or in part by any act or omission (including, without limitation, any breach of any warranty or representation given by Tenant) by Tenant, its agents, contractors, employees, servants, invitees, licensees or concessionaires, whether or not occurring or resulting in damage or injury within the Demised Premises or upon the Common Facilities and whether or not any such act or omission constitutes a violation of law or this Lease. Tenant shall store its property in and shall occupy the Demised Premises and all other portions of the Industrial Center at its own risk.  Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property of Tenant or to Tenant's business. Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage to either the person or property of Tenant, or of those claiming by, through or under Tenant, that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting or adjoining premises Landlord shall not be responsible or liable for any defect, latent or otherwise, in any building in the Industrial Center or in any of the equipment, machinery, utilities, appliances or apparatus therein. Landlord shall not be responsible or liable for any injury, loss or damage to any person or to any property of Tenant or other person caused by or resulting from bursting, breakage or leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of the Industrial Center or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction or use of any building in the Industrial Center, or machinery, apparatus or equipment therein or thereon; or by or from the acts of negligence of any occupant of the Industrial Center building. Provided Tenant has knowledge of same, Tenant shall give prompt notice to Landlord in case of fire or accidents in the Demised Premises or in the building of which the Demised Premises are a part and of defects therein or in any fixtures or equipment. Landlord shall in no event be liable for any damages arising from any act, omission or negligence of any other tenant at the Industrial Center. In case Landlord shall be made a party to any litigation commenced by or against Tenant, Tenant shall protect and hold Landlord harmless and shall pay all reasonable costs, expenses and attorney's fees in connection therewith. Subject to the terms of Section 14.1(e) below, the foregoing indemnification shall not apply to events arising out of Landlord's gross negligence or willful misconduct. The obligations of Tenant under this Section shall survive the termination of this Lease.

**Section 13.2.**     Tenant Liability Insurance. Tenant shall at all times during the Lease Term maintain in full force and effect the following insurance in standard form generally in use in the state in which the Industrial Center is located with insurance companies with an AM Best rating of A/VII or better (or a comparable rating in the event that the AM Best rating is no longer published) and authorized to do business in said state:

(a)     Commercial general liability insurance in the amount of at least Two Million Dollars ($2,000,000) per any occurrence resulting in bodily injury, personal injury or property damage and fire legal liability in the amount of at least $500,000 per occurrence.

(b)     Commercial Automobile Insurance covering all owned, non-owned and hired automobiles of Tenant including the loading and unloading of any automobile, truck or other vehicle with limits of liability not less than $2,000,000 combined single limit for bodily injury liability and property damage liability.

(c)     Tenant further agrees that any contractor Tenant hires to perform any alterations to the Demised Premises shall furnish Tenant and Landlord with certificates showing evidence of comprehensive public liability and damage insurance in the amount of at least $10,000,000 (with respect to Tenant's general contractor, $3,000,000 with respect to subcontractors) plus required workmen's compensation and employer's liability insurance coverage to the extent required by law.

(d)     If Tenant uses, stores, handles, processes or disposes of Hazardous Materials in the ordinary course of its business, then Tenant shall maintain in full force and effect throughout the Term, Environmental Impairment Liability Insurance with limits of not less than Five Million Dollars ($5,000,000.00) naming Tenant as insured, and Landlord as an additional insured, and providing coverage for bodily injury,

00323152.11                                    17

property damage or injury or damage of actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of Hazardous Materials, including any loss, cost or expense incurred as a result of any cleanup of Hazardous Materials or in the investigation, settlement or defense of any claim, suit, or proceedings against Landlord or its management company arising from Tenant's use, storage, handling, processing or disposal of Hazardous Materials. This paragraph is not intended to limit or modify any of the prohibitions set forth in Article 26 in any way.

The insurance and certificates required in subsections (a) through (c) above shall name Landlord (and any other parties requested by Landlord) as an additional insured for the full amount of the insurance herein required, contain a Primary and not Contributory Endorsement, and confirm that such policy contains waiver of subrogation requirements as set forth herein as well as a hold harmless agreement for Landlord's benefit. With respect to each and every policy of such insurance and each renewal thereof, Tenant, at the beginning of the Lease Term and thereafter not less than thirty (30) days prior to the expiration of any such policy, shall furnish Landlord with a certificate of insurance executed by the insurer involved which shall contain, in addition to matters customarily set forth in such a certificate under standard insurance industry practices, an undertaking by the broker to give Landlord ten (10) days' prior written notice of cancellations, nonrenewal or change in scope or amount of coverage of such policy. Tenant shall, at all times, maintain worker's compensation and employer's liability insurance to comply with the applicable laws of the state in which the Industrial Center is located.

## ARTICLE 14. FIRE INSURANCE, DAMAGE AND DESTRUCTION

**Section 14.1.**        Tenant Insurance: At all times during the Lease Term, Tenant shall pay all premiums for and maintain in effect, with a responsible insurance company or companies with an AM Best rating of A/VII or better (or a comparable rating in the event that the AM Best rating is no longer published) licensed to do business within the state in which the Industrial Center is located, policies of insurance for the benefit of Tenant, as follows:

(a)        Insurance covering Tenant's trade fixtures, furniture, furnishings, equipment and other installations and alterations of Tenant, providing protection to the extent of not less than the full replacement cost thereof against all casualties included under standard insurance industry practices within the classification "All Risk" (including terrorism, flood and earthquake) and insurance covering sprinkler leakage, unless Tenant's insurance otherwise includes sprinkler leakage coverage.

(b)        Plate glass insurance covering the plate glass in the Demised Premises; provided, however, Tenant may satisfy this requirement by self-insuring and in the event of damage or destruction to said plate glass immediately replacing same.

(c)        Insurance covering the full replacement cost of any Tenant's Work and all work performed by Landlord on Tenant's behalf (including Landlord's Work), against all casualties included under standard insurance industry practices within the classification "All Risk" which insurance shall be maintained, and under no circumstances terminated by Tenant.

(d)        Such other insurance against such other hazards and in such amounts as may be customarily carried by tenants, owners and operators of similar properties as Landlord may reasonably require for its protection from time to time during the Lease Term.

Tenant will furnish to Landlord, within five (5) days after Tenant receives notice of Landlord's intention to deliver possession of the Demised Premises and prior to Tenant entering on the Demised Premises, certificates of insurance evidencing coverages required by this Lease. All policies required hereunder shall contain an endorsement providing that the insurer will not cancel, fail to renew or materially change the coverage of said policy or policies without first giving ten (10) days' prior written notice thereof to the Landlord.

(e)        Notwithstanding anything to the contrary contained in this Lease, each party hereto, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other party, and the officers, directors or employees of the other party, for any liability arising out of any loss or damage in or to the Building, the Demised Premises and their contents caused by

(1)        any peril normally covered under "all-risk" or "Special Form" policies issued in the State of New York (whether or not such party actually carries such insurance policies and without giving effect to any deductibles or self-insurance retainage), or

(2)        if the scope of coverage is broader than in (1) above, then any peril actually covered under the insurance maintained by such party.

00323152.11                                                     18

This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party, its officers, employees, agents, directors, contractors or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds. If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium; failure to pay the increase in premium will void the release and waiver benefiting such party but shall not affect the benefit of the corresponding release and waiver enjoyed by the other party. However, if one party's insurance carrier prohibits waiver of subrogation regardless of premium, then the other party's release and waiver shall become null and void, it being understood that in this instance each waiver is given in consideration for the other. Each party covenants that from and after the date possession of the Leased Premises is delivered to Tenant its property damage insurance policies will contain waiver of subrogation endorsements, and that if such endorsements, for any reason whatsoever, are about to become unavailable, it will give the other party not less than thirty (30) days prior written notice of such impending unavailability. In the event of such unavailability each party shall use its commercially reasonable efforts to name the other party as an additional insured (but not loss payee) on its property damage insurance policies.

**Section 14.2.**　　Landlord Repair:  If the Demised Premises shall be partially damaged by any fire or casualty covered under the Landlord's insurance policies, Landlord shall, upon receipt of the insurance proceeds, repair the same; provided, however, the obligation of Landlord to restore the Demised Premises as herein provided shall be limited to such restoration as can be financed by such insurance proceeds as shall actually be received by Landlord, free and clear from collection by any mortgagees and after deducting the cost and expense, if any, including attorneys' fees of settling with the insurer.  In no event Landlord shall be required to insure Tenant's personal property, Tenant's Work or any work performed by Landlord on Tenant's behalf (including Landlord's Work) and Landlord shall have no obligation to repair or restore the same.

**Section 14.3.**　　Lease Termination:  If the Demised Premises (a) by reason of a loss are rendered untenantable or (b) should be damaged as a result of a risk which is not covered by Landlord's insurance or (c) should be damaged in whole or in part during the last three (3) years of the Lease Term or any renewal term thereof or (d) if any or all of the Building or Common Facilities of the Industrial Center are damaged, whether or not the Demised Premises are damaged, to such an extent that the Industrial Center cannot, in the reasonable judgment of Landlord, be operated as an integral unit, then, or in any such event, Landlord may either elect to repair the damage or may cancel this Lease.  Landlord shall give the Tenant written notice of its election to terminate or to continue the Lease within ninety (90) days after such event.  In the event of termination, this Lease shall expire at the end of the calendar month in which such notice of termination is given and Tenant shall vacate and surrender the Demised Premises to the Landlord.  In the event of notice by Landlord that Landlord has elected to continue this Lease, Landlord and Tenant shall commence their respective obligations for repair as soon as is reasonably possible and prosecute the same to completion with all due diligence.

**Section 14.4.**　　Rent Abatement:  The Minimum Rent shall be abated proportionately with the degree in which Tenant's use of the Demised Premises is impaired during the period of any damage, repair or restoration provided for in this Article 14; provided that in the event Landlord elects to repair the damage insurable under Landlord's policies, any abatement of rent shall end five (5) days after notice by Landlord to Tenant that the Demised Premises have been repaired to the extent required to be repaired by Landlord, and in accordance with applicable municipal ordinances with respect to the work required to be performed by Landlord.  Tenant shall continue the operation of its business on the Demised Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management.  Except for the abatement of Minimum Rent hereinabove provided, Tenant shall not be entitled to any compensation or damage for loss in the use of the whole or any part of the Demised Premises and/or any inconvenience or annoyance occasioned by any damage, destruction, repair or restoration.

**Section 14.5.**　　Tenant Repairs:  Unless this Lease is terminated by Landlord, Tenant shall repair, restore and refixture all parts of the Demised Premises not required to be restored by Landlord in a manner and to a condition equal to that existing prior to its destruction or casualty, including, but not by way of limitation, Tenant's Work, all exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of personalty of Tenant.  The proceeds of all insurance carried by Tenant on its property and improvements shall be held in trust by Tenant for the purpose of said repair and replacement.

**Section 14.6.**　　Waiver:  This **Article 14** constitutes an express agreement governing any case of damage or destruction of the Demised Premises the Industrial Center or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other law of like nature and purpose now or hereafter in force, shall have no application in any such case.

## ARTICLE 15.  EMINENT DOMAIN

00323152.11                                                         19

**Section 15.1.**    Entire Taking:    In the event that the whole of the Demised Premises shall be taken under the power of eminent domain, this Lease shall thereupon terminate as of the date possession shall be so taken.

**Section 15.2.**    Partial Taking Other than Demised Premises:    If more than ten percent (10%) of the floor area of the Building in which the Demised Premises is located, whether or not any portion of the Demised Premises is included therein, is taken as aforesaid and Landlord terminates leases for tenants occupying at least seventy-five (75%) percent of the square foot area of the building (including this Lease), then Landlord may, by written notice to Tenant, terminate this Lease, such termination to be effective as of the date possession shall be so taken.

**Section 15.3.**    Partial Taking Demised Premises:    In the event that a portion of the floor area shall be taken under the power of eminent domain and the portion not so taken will not, in the reasonable business judgment of both Landlord and Tenant, be suitable for the operation of Tenant's business notwithstanding Landlord's performance of restoration as hereinafter set out in this Section, this Lease shall thereupon terminate as of the date possession of said portion is taken. In the event of any taking under the power of eminent domain which is not sufficiently extensive to render the Demised Premises unsuitable for the business of the Tenant, the provisions of this Lease shall remain in full force and effect, except that the Minimum Rent shall be reduced in the same proportion that the amount of floor area taken bears to the original total floor area immediately prior to such taking, and Landlord shall, upon receipt of the award in condemnation, make all necessary repairs or alterations to the building in which the Demised Premises are located so as to constitute the portion of the building not taken a complete architectural unit, but Landlord shall not be required to spend for such work an amount in excess of the amount received by Landlord as damages for the part of the Demised Premises so taken. "Amount received by Landlord" shall mean that part of the award in condemnation which is free and clear to Landlord of any collection by mortgagees for the value of the diminished fee, and after payment of all costs involved in collection including but not limited to reasonable attorneys' fees. Tenant, at its own cost and expense, shall, with respect to all exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of personality of Tenant, restore such part of the Demised Premises as is not taken to as near its former condition as the circumstances will permit.

**Section 15.4.**    Condemnation Award:    In the event the Demised Premises or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any competent authority in appropriate proceedings or by any right of eminent domain, the entire compensation award for both leasehold and reversion shall belong to the Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby expressly waives any claim and assigns to Landlord all its right, title and interest to any such award. However, Tenant shall be entitled to claim in such condemnation proceedings such award as may be allowed for relocation costs, fixtures and other equipment installed by it, but only to the extent that the same shall not reduce Landlord's award and only if such award shall be in addition to the award for the land and building (or portion thereof) containing the Demised Premises. To the extent that the Tenant has a claim in condemnation proceedings, as aforesaid, Tenant may claim for condemnors, but not from Landlord, such compensation as may be recoverable by Tenant.

**Section 15.5.**    Rent Proration:    If the Lease is terminated as provided in this Article 15, all rent and other charges shall be paid up to the date that possession is taken by public authority, and Landlord shall make refund of any rent and other charges paid by Tenant in advance and not yet earned.

**Section 15.6.**    Temporary Taking:    Notwithstanding anything to the contrary in the foregoing provisions of this Article 15, the requisitioning of the Demised Premises or any part thereof by military or other public authority for purposes arising out of a temporary emergency or other temporary situation shall constitute a taking of the Demised Premises by eminent domain. During such period, and if this Lease is not terminated under the foregoing provisions of this Article 15, then for the duration of the use and occupancy of the Demised Premises by the requisitioning authority, any obligation of Tenant under this Lease to pay rent based on a Percentage Rent and all of the other provisions of this Lease shall remain in full force and effect, shall be reduced in the same proportion that the amount of the floor area requisitioned bears to the total floor area, and Landlord shall be entitled to whatever compensation may be payable from the requisitioning authority.

**ARTICLE 16.  FINANCIAL INFORMATION; STATEMENT OF TENANT; AMENDMENT TO LEASE**

**Section 16.1.**    Delivery of Information:    Tenant shall, at any time and from time to time within ten (10) days of written request by Landlord, deliver to Landlord any and all of the following:

(a)    Such financial information concerning Tenant and Tenant's business operations as may reasonably be requested by a mortgagee or prospective mortgagee or purchaser of the Industrial Center or any part thereof.

(b)     An executed and acknowledged statement as described in Section 25.4 hereof.

(c) An executed and acknowledged instrument, prepared by Landlord, amending this Lease in such respects as may be required by any mortgagee or prospective mortgagee, provided that any such amendment shall not materially alter or impair any of the rights and remedies of Tenant under this Lease, decrease the Term of the Lease or increase Tenant's financial obligations under this Lease

(d)     Use of Information.  Any financial information delivered pursuant to Section 16.1(a) and any statement delivered pursuant to Section 16.1(b) may be relied upon by any mortgagee or prospective mortgagee or purchaser; provided, however, that any such financial information and any such statement shall be utilized only for bona fide business reasons related to such mortgage or purchase.

**Section 16.2.**     During the first two (2) years of the Lease Term Tenant shall deliver to Landlord updated and current quarterly financial statements of Tenant (certified by a certified public accountant and in form and substance reasonably acceptable to Landlord) on a quarterly basis on each April 1, July 1, October 1 and January 1 occurring during such period. During the remainder of the Lease Term Tenant shall deliver to Landlord updated and current annual financial statements of Tenant (certified by a certified public accountant and in form and substance reasonably acceptable to Landlord) on each January1 occurring during the remainder of the Lease Term.

# ARTICLE 17.  ASSIGNMENT, SUBLETTING AND HYPOTHECATION OF LEASE

**Section 17.1.**     Assignment and Subletting:  Except as herein provided, Tenant shall not, and shall not have the power to, transfer, assign, sublet, enter into license or concession agreements, change ownership, mortgage or hypothecate this Lease or Tenant's interest in and to the Demised Premises without first procuring the written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. Any attempted or purported transfer, assignment, subletting, license or concession agreement, change of ownership, mortgage or hypothecation without Landlord's written consent pursuant to this Section 17.1 or Section 17.2 shall be void and confer no rights upon any third person.  The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. If this Lease be assigned or if the Demised Premises or any part thereof be occupied by anybody other than Tenant, Landlord may collect rent from the assignee, or occupant and apply the net amount collected to the rent reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this provision or the acceptance of the assignee, undertenant or occupant as Tenant.  Nothing herein contained shall relieve or release Tenant or any Guarantor from its covenants and obligations for the term of this Lease.  Tenant agrees to reimburse Landlord for Landlord's reasonable attorney's fees incurred in conjunction with the processing and documentation of any such requested transfer, assignment, subletting, license or concession agreement, change of ownership, mortgage or hypothecation of this Lease or Tenant's interest in and to the Demised Premises.  Notwithstanding the foregoing, Landlord's consent to any proposed assignment or subletting shall not be unreasonably withheld, delayed or conditioned provided that Tenant delivers to Landlord (i) a true and complete statement reasonably detailing the identity of the proposed assignee or subtenant ("Transferee"), the nature of its business and its proposed use of the Premises and the basic economic terms of the proposed assignment or sublease, (ii) current financial information with respect to the Transferee, including its most recent financial statements, and (iii) any other information Landlord may reasonably request, and:

(A)     in Landlord's reasonable judgment, the Transferee is engaged in a business or activity, and the Demised Premises will be used in a manner, which (1) is in keeping with the then standards of the Industrial Center, (2) is for a proposed use (w) which does not place any additional demand on the Building's utilities and services (including parking), (x) for a use which complies with the then existing certificate of occupancy of the Building and the Demised Premises, (y) which is in compliance with the terms of this Lease and the character of the Industrial Center and (z) which does not involve the use, storage or distribution of Hazardous Materials, and (3) does not violate any restrictions set forth in this Lease, any mortgage or superior lease or any negative or exclusive covenant as to use of the Demised Premises or Industrial Center required by any other lease in the Industrial Center;

(B)     the Transferee is reputable with sufficient financial means to perform all of its obligations under this Lease or the sublease, as the case may be;

(C)     if Landlord does not have, or reasonably expects to have within six (6) months thereafter, comparable space available in the Industrial Center;

(D)     the Transferee is not a person or entity (or affiliate of a person or entity) with whom Landlord is then or has been within the prior six (6) months negotiating in connection with the rental of space in the Industrial Center;

00323152.11                                                21

(E)     there shall be not more than two (2) occupants in the Demised Premises, including Tenant;

(F)     Tenant shall, upon demand, reimburse Landlord for all reasonable expenses incurred by Landlord in connection with such assignment or sublease, including any investigations as to the acceptability of the Transferee and all legal costs reasonably incurred in connection with the granting of any requested consent; and

(G)     the Transferee shall not be a governmental entity or be entitled, directly or indirectly, to diplomatic or sovereign immunity, regardless of whether the Transferee agrees to waive such diplomatic or sovereign immunity, and shall be subject to the service of process in, and the jurisdiction of the courts of, County of Nassau and State of New York.

**Section 17.2.**     Documentation Required: Each transfer, assignment, subletting, license, concession agreement, mortgage or hypothecation to which there has been consent shall be by an instrument in writing in form reasonably satisfactory to Landlord, and shall be executed by the transferor, assignor, sublessor, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, sublessee, licensee, concessionaire or mortgagee in each instance, as the case may be; and each transferee, assignee, sublessee, licensee, concessionaire or mortgagee shall agree in writing for the benefit of Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Section shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

**Section 17.3.**     Voting Control:  In the event the Tenant is a corporation, any dissolution, merger, consolidation or other reorganization of such corporation or the sale or other transfer of a controlling percentage of the corporate stock of Tenant shall constitute an assignment of this Lease for all purposes of this Article 17; provided, however, that any transfer by inheritance, for estate planning purposes or by any transaction in Tenant's stock or the stock of a corporation owning or controlling a majority of Tenant's stock which occurs on a major security exchange shall not be considered an assignment hereunder.  If an assignment is made as aforesaid, then Tenant shall so notify Landlord and Landlord shall have the right, at its option, to terminate this Lease upon ten (10) days' notice to Tenant.  The term "controlling percentage", for the purpose of this Article 17, means the ownership of stock possessing, and of the right to exercise voting power of all classes of stock of such corporation issued, outstanding and entitled to vote for the election of directors, whether such ownership be direct or indirect ownership through ownership of stock possessing, and of the right to exercise, at least fifty-one percent (51%) of the total combined voting power of all classes of stock of another corporation or corporations.

In the event Tenant is a partnership, limited liability company, or entity other than a corporation, any dissolution, merger, consolidation or other reorganization of such partnership, limited liability company, or entity or the sale or transfer of a controlling percentage of such partnership, limited liability company, or entity shall constitute an assignment of this Lease for all purposes of this Article 17; provided, however, that any transfer by inheritance or for estate planning purposes shall not be considered an assignment hereunder.  If an assignment is made as aforesaid, then Tenant shall notify Landlord and Landlord shall have the right, at its option, to terminate this Lease upon ten (10) days' notice to Tenant.  The term "controlling percentage," for the purpose of this Article 17 means the ownership of, and the right to exercise, at least fifty-one percent (51%) of the total combined voting rights of said partnership, limited liability company, or entity, whether such ownership be direct or indirect.

With respect to those transfers made for estate planning purposes such transfer must (i) be made exclusively for estate planning purposes for the benefit of the family members of the transferor, (ii) be made directly to family members of the transferor or to a trust of which the sole beneficiaries are the transferor or its family members, and (iii) not affect or alter in any way the management or day-to-day operations of Tenant.  For purposes of this paragraph, the term "family members" shall consist solely of those relatives of the transferor described in Section 318(a)(1) of the 1986 Internal Revenue Code.

**Section 17.4.**     Tenant Includes Approved Assignees and Subtenants:  In the event that Landlord shall agree to any transfer of Tenant's interest in this Lease, then the term "Tenant" shall thereafter be deemed to include, without further reference, the party to whom such interest is transferred, which is, for example, but without limiting the generality thereof, any subtenant, assignee, concessionaire or licensee.  If the Lease be assigned or if the Demised Premises or any part thereof be occupied by anybody other than Tenant, then Landlord may collect rent from the assignee or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this provision or the acceptance of the assignee, subtenant or occupant as Tenant or as a release of Tenant from the further performance of the provisions on its part to be observed or performed herein.  Notwithstanding any assignment or sublease, Tenant shall remain fully liable and shall not be released from performing any of the terms of this Lease.

00323152.11                                                22

**Section 17.5.**    Tenant Include Successors: All rights, obligations and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, successors, subtenants, licensees, concessionaires and assigns of the named Tenant herein, except as expressly provided in this Article or elsewhere in the Lease; and if there shall be more than one Tenant they shall all be bound jointly and severally by the terms, covenants, conditions and agreements herein and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as aforesaid. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships, or individuals, males or females, shall in all instances be assumed as though in each case fully expressed. The assignment by any person or legal entity that constitutes Tenant of the tenant's interest under this Lease shall not relieve such person or legal entity of the obligations of the tenant under this Lease. Such person's or legal entity's liability under this Lease shall continue notwithstanding (x) the subsequent release of any other person or legal entity that constitutes Tenant from liability under this Lease, (y) any limitation on any such other person's or legal entity's liability hereunder by virtue of the Bankruptcy Code, or (z) any modification or amendment of this Lease that Landlord consummates with any such other person or legal entity that constitutes Tenant subsequently, provided, however, that in the event of an assignment of this Lease to an entity which is not an affiliate or subsidiary of Tenant, the liability of the assignor shall not be increased as a result of any such modification or amendment of this Lease that Landlord consummates with any such assignee.

**Section 17.6.**    Successor to Landlord Interest: The term "Landlord," as used in this Lease, so far as covenants, conditions and agreements on the part of the said Landlord are concerned, shall be limited to mean the party executing this Lease as Landlord, its successors and assigns, and in the event of any transfer or transfers of the interest of Landlord in the Industrial Center, the said Landlord (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer or conveyance of all liability as respects the performance of any covenants, conditions and agreements on the part of said Landlord contained in this Lease thereafter to be performed, provided that any amount then due and payable to Tenant by Landlord, or the then grantor, under any provisions of this Lease, shall be paid to Tenant. It being intended by Landlord and Tenant that the covenants, conditions and agreements contained in this Lease on the part of the Landlord shall, subject as aforesaid, be binding on Landlord, its successors and assigns, only during and in respect of their respective successive periods of ownership. Further, Landlord's liability under this Lease shall be limited to and include only the interest of Landlord in the Industrial Center.

**Section 17.7.**    Transfer Premium: Excluding the transactions described in Section 17.8 below, Landlord consents to any assignment of this Lease, or subletting, or other agreement with respect to the occupancy of the Demised Premises or parts thereof (a "Transfer") then, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay Landlord fifty (50%) percent of any Transfer Premium to be received by Tenant from such Transfer. "Transfer Premium" shall mean all rent, Additional Rent or other consideration (but excluding consideration applicable to the value of Tenant's business (as distinguished from the value of this Lease) and personal property, including inventory) payable by any transferee in excess of the Minimum Rent and Additional Rent payable by Tenant under this Lease (on a monthly basis during the Term, and prorated on a per rentable square foot basis, if less than all of the Demised Premises is transferred), after amortizing in equal monthly installments of the period of the Transfer the reasonable expenses incurred by Tenant for any brokerage commissions in connection with the Transfer. If part of the consideration for such Transfer shall be payable other than in cash, Landlord's share of such non-cash consideration shall be in the form as is reasonably satisfactory to Landlord. Fifty (50%) percent of the Transfer Premium shall be paid promptly by Tenant upon Tenant's receipt from time to time of periodic payments from such transferee or such other time as Tenant shall realize a Transfer Premium from such transferee. In lieu of accepting fifty (50%) percent of the Transfer Premium, Landlord may elect in writing within ninety (90) days after Tenant's notice, to increase the monthly Minimum Rent hereunder during the Term of the Transfer by an amount equal to fifty (50%) percent of such Transfer Premium.

**Section 17.8.**    Subsidiaries/Affiliates: As long as Tenant is not in default under any of the terms, covenants or conditions of this Lease on Tenant's part to be observed and performed Tenant shall have the right, without the prior consent of Landlord, to sublet to, or permit the use or occupancy of, all or any part of the Demised Premises by any subsidiary or affiliate of Tenant for the use permitted in this Lease but only for such period as it shall remain a subsidiary or affiliate of Tenant. However, no such subletting shall be valid unless, prior to the execution thereof, Tenant shall give notice to Landlord of the proposed subletting, and within ten (10) days prior the commencement of said subletting, Tenant shall deliver to Landlord an agreement, in form and substance reasonably satisfactory to Landlord, duly executed by Tenant and said subtenant, in which said subtenant shall assume performance of and agree to be personally bound by, all of the terms, covenants and conditions of this Lease which are applicable to said subtenant and such subletting. Tenant shall give prompt notice to Landlord of any such use or

00323152.11                                          23

occupancy of all or any part of the Demised Premises and such use or occupancy shall be subject and subordinate to all of the terms, covenants and conditions of this Lease. No such use or occupancy shall operate to vest in the user or occupant any right or interest in this Lease or the Demised Premises. For purposes of this Section 17.8: (a) a "subsidiary" of Tenant named herein shall mean any corporation, partnership or other business entity not less than fifty-one (51%) percent of whose outstanding voting stock, membership or other equity interest at the time shall be owned by Tenant and (b) an "affiliate" of Tenant shall mean any corporation, partnership or other business entity which controls or is controlled by, or is under common control with Tenant. For the purposes of the definition of "affiliate" the word "control" (including, "controlled by" and "under common control with") as used with respect to any corporation, partnership or other business entity, shall mean the ownership of at least a controlling percentage of the stock, membership or other equity interest in such entity.

## ARTICLE 18. INTENTIONALLY DELETED

## ARTICLE 19. OWNERSHIP OF CERTAIN PROPERTY AND SURRENDER OF PREMISES

**Section 19.1.** Ownership of Property: Upon termination of this Lease, Tenant shall surrender to Landlord the Demised Premises, including, without limitation, all carpeting, additions, alterations, improvements, apparatus and fixtures, except (i) such improvements as Landlord may have required Tenant to remove pursuant to the terms of this Lease and (ii) unattached moveable fixtures, furniture and other items of personal property installed by Tenant, in good and broom clean condition and repair, as aforesaid in Section 10.1 hereof; provided, however, that Tenant, upon written approval by Landlord, which approval shall not be unreasonably withheld, may be permitted to remove such other alterations, additions, improvements and fixtures installed by Tenant and restore the Demised Premises to their original condition at Tenant's expense.

## ARTICLE 20. HOLDOVER BY TENANT

**Section 20.1.** Rents and Liability In The Event Of Holdover: Landlord and Tenant recognize that Landlord's damages resulting from Tenant's failure to timely and properly surrender possession of the Demised Premises may be substantial, may exceed the amount of the rent payable hereunder, and will be impossible to accurately measure. Accordingly, if possession of the Demised Premises is not properly surrendered to Landlord on the expiration date or sooner termination of this Lease, in addition to any other rights or remedies Landlord may have hereunder or at law, Tenant shall (a) pay to Landlord for each month (or any portion thereof) during which Tenant holds over in the Demised Premises after the expiration date or sooner termination of this Lease, a sum equal to the greater of (i) 2 times the Minimum Rent and Additional Rent payable under this Lease for the last full calendar month of the Lease Term, and (ii) 2 times Landlord's determination of the fair market rental value of the Demised Premises, (b) be liable to Landlord for (i) any payment or rent concession which Landlord may be required to make to any tenant obtained by Landlord for all or any part of the Demised Premises (a "New Tenant") in order to induce such New Tenant not to terminate its lease by reason of the holding-over by Tenant, and (ii) the loss of the benefit of the bargain if any New Tenant shall terminate its lease by reason of the holding-over by Tenant, and (c) indemnify Landlord against all claims for damages by any New Tenant. No holding-over by Tenant, nor the payment to Landlord of the amounts specified above, shall operate to extend the Lease Term hereof. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the expiration date or sooner termination of this Lease, and no acceptance by Landlord of payments from Tenant after the expiration date or sooner termination of this Lease shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Section 20.1.

**Section 20.2.** Waiver of Stay: Tenant expressly waives, for itself and for any person or entity claiming through or under Tenant, any rights which Tenant or any such person or entity may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor requirement of like import then in force, in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Article 20.

## ARTICLE 21. ADDITIONAL CONSTRUCTION

**Section 21.1.** Construction By Landlord: Landlord hereby reserves the right, at any time and from time to time, providing reasonable access to the Demised Premises is not materially and adversely affected, to make alterations, additions or deletions to or from the Industrial Center, to build additional stories on the building in which the Demised Premises are contained and to build adjoining same and to construct other or add to other buildings or improvements in the Industrial Center and to add land to or delete land from the Industrial Center; provided, however, that such construction, additions or deletions shall not unreasonably interfere with Tenant's use of the Demised Premises as permitted hereunder or void any permits or approvals obtained by Tenant for its permitted use and occupancy of the Demised Premises, except when such work is necessitated by emergency or required by structural need or applicable law.

**Section 21.2.** Excavation: If an excavation shall be made upon land adjacent to the Demised

00323152.11                                          24

Premises, then, Tenant shall permit the person authorized to cause such excavation license to enter upon the Demised Premises for the purpose of doing such work as such person deems reasonably necessary to preserve the wall or the building of which the Demised Premises form a part from damage and to support the same by proper foundations and Tenant shall not be entitled to any claim for damages or indemnification against Landlord nor shall Tenant be entitled to an abatement of rent.  Reasonable efforts shall be taken to preserve vehicular and personnel access during any such work.

## ARTICLE 22.  DEFAULT; REMEDIES

**Section 22.1.**        Defaults, Conditional Limitation:

(a)        Each of the following events shall constitute a "Default":

(i)        If Tenant, or any Guarantor, shall:  (x) make an assignment for the benefit of creditors; or (y) file or acquiesce to a petition in any court (whether or not pursuant to any statute of the United States or of any State) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings; or (z) make an application in any such proceedings for or acquiesce to the appointment of a trustee or receiver for it or all of any portion of its property.

(ii)        If any petition shall be filed against Tenant, or any Guarantor, to which neither of them acquiesce in any court (whether or not pursuant to any statute of the United States or any State) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and:  (x) Tenant or any Guarantor shall thereafter be adjudicated a bankrupt;, or (y) such petition shall be approved by any such court; or (z) such proceedings shall not be dismissed, discontinued or vacated within thirty (30) days.

(iii)        If, in any proceeding, pursuant to the application of any Person other than Tenant, or any Guarantor to which neither of them acquiesce, a receiver or trustee shall be appointed for Tenant, or any Guarantor or for all or any portion of the property of either and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(iv)        If Tenant shall refuse to take possession of the Demised Premises upon the Commencement Date or shall vacate the Demised Premises and permit the same to remain unoccupied and unattended.

(v)        If Tenant shall fail to pay any Minimum or Additional Rent ("Rent"), or any other charge required to be paid by Tenant hereunder, when the same shall become due and payable, and such failure shall continue for five (5) business days after Landlord shall give written notice of the failure to Tenant.

(vi)        If Tenant shall fail to perform or observe any other requirement of this Lease to be performed or observed by Tenant but not specifically referred to in this Section, and such failure shall continue for thirty (30) days after Landlord shall give written notice of the failure to Tenant.

(b)        This Lease is subject to the following limitation:  If at any time, a Default shall occur, then upon the happening of any one or more of the aforementioned Defaults, Landlord may give to Tenant a written notice of intention to end the Term of this Lease at the expiration of five (5) days from the date of service of such notice of termination.  At the expiration of such five (5) days, this Lease and the Term as well as all of the right, title and interest of Tenant hereunder shall wholly cease and expire, and Tenant shall then quit and surrender the Demised Premises to Landlord.  But notwithstanding such termination, surrender, and the expiration of Tenant's right, title and interest, Tenant's liability under all of the provisions of this Lease shall continue.

**Section 22.2.**        Landlord's Re-Entry:

If this Lease shall be terminated as herein provided, Landlord, or its agents or employees, may re-enter the Demised Premises at any time and remove therefrom Tenant, Tenant's Agents, subtenants, and any licensees, concessionaires or invitees, together with any of its or their property, either by summary dispossess proceedings or by any suitable action or proceeding at law or by legal force or otherwise.  In the event of such termination, Landlord may repossess and enjoy the Demised Premises.  Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant, or proceedings in forcible entry and detainer. Tenant waives any rights to the service of any notice of Landlord's intention to re-enter provided for by any present or future law.  Landlord shall not be liable in any way in connection with any action it takes pursuant to the foregoing.  Notwithstanding any such re-entry, repossession, dispossession or removal, Tenant's liability under all of the provisions of this Lease shall continue.  No such re-entry or taking possession of the Demised Premises by Landlord shall be construed as an election on its part to terminate this Lease unless notice of such intention be given to Tenant or unless the termination thereof shall result as a matter of law or be decreed by a court of competent jurisdiction.  Notwithstanding any re-letting without termination, Landlord may

00323152.11                                                25

at any time thereafter, elect to terminate this Lease for such previous breach.

**Section 22.3.**    Deficiency:

(a)    In case of re-entry, repossession or termination of this Lease, whether the same is the result of the institution of summary or other proceedings or not, Tenant shall remain liable (in addition to accrued liabilities) to the extent legally permissible for: (i) (x) the Rent, and all other charges provided for herein until the date this Lease would have expired (or, in the alternative, as liquidated damages, an amount equal to the Rent and such other charges) had such termination, re-entry or repossession not occurred; and (y) actual expenses to which Landlord may be put in re-entering the Demised Premises, repossessing the same, making good any Default of Tenant, painting, altering or dividing the Demised Premises, combining or placing the same in proper repair, protecting and preserving the same by placing therein watchmen and caretakers, reletting the same (including attorney's fees and disbursements, marshal's fees and broker's fees, in so doing), and any expenses which Landlord may incur during the occupancy of any new tenant; minus (ii) the net proceeds of any re-letting. Tenant agrees to pay to Landlord the difference between items (i) and (ii) hereinabove with respect to each month, at the end of such month. Any suit brought by Landlord to enforce collection of such difference for any one month shall not prejudice Landlord's right to enforce the collection of any difference for any subsequent month. In addition to the foregoing, Tenant shall pay to Landlord such sums as the court which has jurisdiction thereover may adjudge reasonable as attorneys' fees with respect to any successful lawsuit or action instituted by Landlord to enforce the provisions hereof.

(b)    Landlord may re-let the whole or any part of said Demised Premises for the whole of the unexpired Term of this Lease, or longer, or from time to time for shorter period, for any rental then obtainable, giving such concessions of rent and making such special repairs, alterations, decorations and paintings for any new tenant as it may, in its sole and absolute discretion deem advisable. Tenant's liability as aforesaid shall survive the institution of summary proceedings and the issuance of any warrant thereunder.

**Section 22.4.**    Agreed Final Damages:

If Landlord so elects, Tenant shall pay Landlord, on demand, as liquidated and agreed final damages, the Rent and all other charges which would have been payable by Tenant from the date of such demand to the date when this Lease would have expired if it had not been terminated as aforesaid, minus the fair rental value of the Demised Premises for the same period as determined by Landlord in its sole and absolute discretion. Upon payment of such liquidated and agreed final damages, Tenant shall be under no further liability with respect to the period after the date of such demand.

**Section 22.5.**    Waiver of Right of Redemption:

Tenant hereby expressly waives (to the extent legally permissible), for itself and all persons claiming by, through, or under it, any right of redemption or for the restoration of the operation of this Lease under any present or future law in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Demised Premises as herein provided. In the event Landlord commences any action or proceeding for non-payment of Minimum Rent or any items of Additional Rent due hereunder, Tenant shall not interpose any counterclaim of any nature or description in any such action or proceeding. The foregoing, however, shall not be construed as a waiver of Tenant's right to assert such claim in a separate action or proceeding instituted by Tenant.

**Section 22.6.**    Landlord's Right to Perform for Account of Tenant:

If Tenant shall be in Default hereunder, Landlord or any Mortgagee may, at any time thereafter, cure said Default for the account and at the expense of Tenant. Tenant shall pay, with interest at the maximum legal rate, on demand, to Landlord, the amount so paid, expended, or incurred by Landlord or any Mortgagee and any expense of Landlord or any Mortgagee including attorneys' fees incurred in connection with such Default plus administrative costs of Landlord or any Mortgagee in an amount equal to twenty (20%) percent of such costs and expenses, and all of the same shall be deemed to be Additional Rent.

**Section 22.7.**    Additional Remedies, Waivers, Etc.:

With respect to the rights and remedies of and waivers by Landlord: (a) the rights and remedies of Landlord set forth herein shall be in addition to any other right and remedy now and hereafter provided by law. Landlord may exercise such rights and remedies at such times, in such order, to such extent, and as often as Landlord deems advisable without regard to whether the exercise of one right or remedy precedes, concurs with or succeeds the exercise of another, (b) single or partial exercise of a right or remedy shall not preclude: (i) a further exercise thereof; or (ii) the exercise of another right or remedy, from time to time; (c) no delay or omission by Landlord in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to a Default; (d) no waiver of a Default shall extend to or affect any other Default or impair any right or remedy with respect thereto; (e) no action or inaction by Landlord shall constitute a waiver of a Default; and (f) no waiver of a Default shall be effective, unless it is in writing.

00323152.11                                                        26

**Section 22.8.**        Distraint:

In addition to all other rights and remedies, if Tenant shall be in Default hereunder, Landlord shall, to the extent permitted by law, have a right of distress for Rent and a lien on all of Tenant's fixtures, merchandise and equipment in the Demised Premises, as security for Rent and all other charges payable hereunder.

**Section 22.9.**        Consequential Damages:

Tenant agrees that Tenant shall not have any right to sue for or collect, and Landlord shall never have any liability or responsibility whatsoever for, any consequential or indirect damages, whether proximately or remotely related to any default under this Lease or any act, omission or negligence of Landlord or its agents, contractors or employees, and Tenant hereby waives any and all such rights.

**Section 22.10.**       Miscellaneous:

(a)      No waiver of any covenant or condition or of the breach of any covenant or condition of this Lease shall be taken to constitute a waiver of any subsequent breach of such covenant or condition or to justify or authorize the non-observance on any other occasion of the same or of any other covenant or condition hereof, nor shall the acceptance of Minimum Rent or any item of Additional Rent by Landlord at any time when Tenant is in Default under any covenant or condition hereof be construed as a waiver of such Default or of Landlord's right to terminate this Lease on account of such Default, nor shall any waiver or indulgence granted by Landlord to Tenant be taken as an estoppel against Landlord; it being expressly understood that if at any time Tenant shall be in Default in any of its covenants or conditions hereunder, an acceptance by Landlord of Minimum Rent or any item of Additional Rent during the continuance of such Default or the failure on the part of Landlord promptly to avail itself of such other rights or remedies as Landlord may have, shall not be construed as a waiver of such Default, but Landlord may at any time thereafter, if such Default continues, terminate this Lease on account of such Default in the manner herein provided.

(b)      In the event of any breach by Tenant of any of the terms and provisions of this Lease, Landlord shall have the right to injunctive relief as if no other remedies were provided herein for such breach.

(c)      The rights and remedies herein reserved by, or granted to, Landlord are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

(d)      Tenant hereby expressly waives any right to assert a defense based on merger and agrees that neither the commencement of any action or proceeding, nor the settlement thereof, nor the entry of judgment therein, shall bar Landlord from bringing any subsequent actions or proceedings from time to time.

(e)      Intentionally Omitted.

(f)      If a Default shall occur hereunder prior to the date fixed as the commencement of any renewal or extension of this Lease, whether by a renewal option herein contained or by a separate agreement, Landlord may cancel such option or agreement for renewal or extension of this Lease, upon two (2) days' notice to Tenant.

(g)      Wherever in this Lease, Landlord has reserved or is granted the right of "re-entry" into the Demised Premises, the use of such word is not intended, nor shall it be construed, to be limited to its technical legal meaning.

(h)      In the event that Landlord should bring suit for the possession of the Demised Premises, for the recovery of any sum due under this Lease, or because of the breach of any covenant of this Lease, or for any other relief against Tenant, declaratory or otherwise, or should Tenant bring any suit for any relief against Landlord, declaratory or otherwise, arising out of this Lease, the prevailing party in any such suit shall be entitled to recover all costs, expenses and reasonable attorneys' fees that Landlord may have incurred in connection therewith, which shall be enforceable whether or not such suit is prosecuted to judgment.

(i)      Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought by Landlord against Tenant in the courts of the State in which the Industrial Center is located. Tenant hereby waives any objection to jurisdiction or venue in any proceeding before said courts.

## ARTICLE 23. NO WAIVER

**Section 23.1.**        No Waiver Except In Writing. Failure of Landlord or Tenant to insist upon the strict performance of any provisions hereof or of any rules and regulations promulgated hereunder or to exercise any

00323152.11                                    27

option shall not be construed as a waiver for the future of any such provision or rule or option. The receipt by Landlord of any rent or other charge due hereunder with knowledge of the breach of any provision of this Lease shall not be deemed a waiver of such breach. No provision of this Lease shall be deemed to have been waived unless such waiver be in writing signed by the Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent shall be deemed to be other than on account of the earliest rent then unpaid nor shall any endorsement or statement or any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease, and no waiver by Landlord in respect to one tenant shall constitute a waiver in favor of any other tenant in the Industrial Center.

## ARTICLE 24. NOTICES

**Section 24.1.**       Addresses: Except as otherwise provided for herein, any notice, demand, request, consent, approval or other communication which either party hereto is required or desires to give, make, or communicate to the other shall be in writing and shall be given, made, or communicated by United States certified mail, return receipt requested or nationally recognized overnight courier providing evidence of delivery addressed, in the case of Landlord:

> 345 UNDERHILL, L.L.C.
> 48 Harbor Park Drive
> Port Washington, New York 11050
> Attn: Michael O'Brien, Esq.

with a copy to:

> Douglas Gladstone, Esq.
> Goldfarb & Fleece LLP
> 560 Lexington Avenue, 6th Floor
> New York, NY 10022

and addressed, in the case of Tenant, to Tenant's address contained in the preamble of this Lease, subject to the right of either party to designate a different address by notice similarly given, made or communicated, as the case may be, any such notice to be effective on the date the same was received or first refused.

## ARTICLE 25. SUBORDINATION AND ATTORNMENT

**Section 25.1.**       Subordination: This Lease and the rights of Tenant hereunder are and shall be automatically subordinate to any mortgage now or hereafter in force against the land and/or buildings of which the Demised Premises are a part against any buildings hereafter placed upon the land of which the Demised Premises are a part and to all advances made or hereafter to be made upon the security thereof, and to any and all extensions, renewals, modifications or replacements thereof, and to any ground or underlying lease of the land or buildings. The provisions of this Section 25.1 are self-operative and no further instrument of subordination shall be required. However, within ten (10) days of Landlord's written request, Tenant shall execute any agreement reasonably required by any mortgagee or landlord, confirming the foregoing subordination of this Lease. In the event Tenant fails to execute and furnish such agreement to Landlord within said ten (10) day period, Landlord may thereafter terminate this Lease upon ten (10) days prior written notice to Tenant.

**Section 25.2.**       Attornment: Tenant shall, in the event of the sale or assignment of Landlord's interest in the Building of which the Demised Premises form a part or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Demised Premises, attorn to the purchaser and recognize such purchaser as Landlord under this Lease.

**Section 25.3.**       Mortgagee Protection Clause: Tenant agrees to give any mortgagee and/or trustees under any deed of trust or land under any ground lease, by the means described in Section 24.1, a copy of any notice of default served upon Landlord under this Lease, provided that prior to such notice Tenant has been notified, in writing, of the address of such mortgagees and/or trust deed holders and/or landlords. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagees and/or trust deed holders and/or landlords shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such thirty (30) days, any mortgagee and/or trust deed holder and/or landlord has commenced and is diligently pursuing the remedies necessary to cure such default, (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure) in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

**Section 25.4.**       Estoppel: Within 7 days following request from Landlord, any mortgagee or any superior lessor, Tenant shall deliver to Landlord a statement executed and acknowledged by Tenant, in form

00323152.11                                      28

reasonably satisfactory to Landlord, (a) stating the Commencement Date and the expiration date of the Lease Term, and that this Lease is then in full force and effect and has not been modified, assigned, supplemented or amended (or if modified, assigned, supplemented or amended, setting forth all modifications, assignments, supplements and amendments), (b) setting forth if any advance rental has been paid by Tenant and the date to which the Minimum Rent and any Additional Rent have been paid, together with the amount of monthly Minimum Rent and Additional, Rent then payable, (c) stating whether or not, to the best of Tenant's knowledge, Landlord is in default under this Lease, and, if Landlord is in default, setting forth the specific nature of all such defaults, and if the same be true, that all conditions under this Lease to be performed by Landlord have been satisfied (d) stating the amount of the security, if any, under this Lease, (e) stating whether there are any subleases or assignments affecting the Premises, (f) stating the address of Tenant to which all notices and communications under the Lease shall be sent, (g) ratifying this Lease, (h) certifying that there are no known defenses or offsets against the enforcement of this Lease by the Landlord, or stating those claimed by Tenant, and (i) responding to any other matters reasonably requested by Landlord, such mortgagee or such superior lessor.   Tenant acknowledges that any statement delivered pursuant to this Section 25.4 may be relied upon by any purchaser or owner of the Land, Industrial Center or the Building, or all or any portion of Landlord's interest in the Land, Industrial Center or the Building or any superior lease, or by any mortgagee, or assignee thereof or by any superior lessor, or assignee thereof.

**Section 25.5.**     Non-Disturbance Agreements:  Landlord hereby agrees to use reasonable efforts to obtain for Tenant, at no cost to Landlord, a subordination, non-disturbance and attornment agreement from all existing and future Mortgagees, in the standard form customarily employed by such Mortgagees, provided that Landlord shall have no liability to Tenant, and the subordination of this Lease to any Mortgage shall not be affected, in the event that it is unable for any reason, to obtain any such agreements.  Tenant shall reimburse Landlord, within 30 days after demand therefor, for Landlord's out-of-pocket costs, including reasonable attorney's fees and disbursements, incurred in connection with such efforts.

## ARTICLE 26.  HAZARDOUS MATERIALS

**Section 26.1.**     Tenant shall not cause or permit any Hazardous Materials, as herein defined, to be brought upon, stored, treated, used, produced, generated, emitted, disposed, discharged, or released (collectively known as "handled" or "handle") upon, about, above or beneath the Demised Premises or the Industrial Center. Notwithstanding the foregoing, normal quantities of those Hazardous Materials customarily used in the conduct of general administrative and executive office activities (e.g., copier fluids and cleaning supplies) may be used and stored at the Premises without Landlord's prior written consent, provided the same shall be handled in accordance with all applicable federal, state and local laws, statutes, ordinances, regulations, codes, rulings, policies, requirements, orders and decrees including, but not limited to, the Resource Conservation Recovery Act of 1976 (42 U.S.C.. 6901 et seq.), as amended, and the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C.. 9601 et seq.), as amended (collectively known as "**Environmental Laws**") relating to the industrial hygiene, environmental protection or the handling, use, analysis, generation, manufacture, storage, presence, disposal or transportation of Hazardous Materials, defined below.  Tenant hereby agrees to pay the costs of all remediation and corrective measures made necessary or desirable in the event that Tenant shall breach the provisions of this Article.  Tenant hereby indemnifies and agrees to defend and hold harmless, Landlord and its managing agent and its or their respective affiliates, principals, shareholders, officers, directors, partners, members, trustees, fiduciaries, servants, agents and employees from and against any and all liabilities, damages, suits, causes, actions, penalties, costs, charges, fees and expenses, including, without limitation, attorneys' fees and disbursements, for death or injury to any person or damage to any property whatsoever (including water tables and atmosphere) or otherwise resulting from Tenant's failure to comply with its obligations, duties and responsibilities under this Article.  Any acts or omissions of Tenant or its employees, agents, customers, invitees, sub-lessees, assignees, contractors or sub-contractors (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Tenant hereunder.  Tenant agrees to execute affidavits, representations and the like from time to time at Landlord's request conveying Tenant's best knowledge and belief regarding the presence of Hazardous Materials in the Demised Premises.

Except as discharged in strict accordance and conformity with all applicable Environmental Laws, Tenant shall cause any and all Hazardous Materials to be removed from the Demised Premises and transported solely by duly licensed facilities for final disposal of such Hazardous Materials.  Tenant shall in all respects handle any and all Hazardous Materials in, on, under or about the Demised Premises in complete conformity with all applicable Environmental Laws and prudent industry practice regarding the management of such Hazardous Materials.  All reporting obligations to the extent imposed upon Tenant by Environmental Laws are solely the responsibility of Tenant.  Upon expiration or termination of this Lease, Tenant shall cause all Hazardous Materials introduced by Tenant to be removed from the Demised Premises and transported for use, storage or disposal in accordance and in compliance with all applicable Environmental Laws.  Tenant shall not take any remedial action in response to the presence of Hazardous Materials in, on or about the Demised Premises or in the Industrial Center, nor enter into any settlement agreement, consent, decree or other compromise in respect to any claims relating to or in any way connected with the Demised Premises or the Industrial Center without first notifying Landlord of Tenant's

00323152.11                                29

intention to do so and affording Landlord thirty (30) days to appear, intervene or otherwise appropriately assert and protect Landlord's interest with respect thereto. In addition, at Landlord's request, at the expiration of the Lease Term, Tenant shall remove all tanks or fixtures which were placed on the Demised Premises by Tenant, its agents, contractors or employees or any other occupant claiming by, through or under Tenant during the Lease Term and which contain, have contained or are contaminated with, Hazardous Materials.

Tenant shall immediately notify Landlord in writing of (a) any enforcement, clean-up, removal or other governmental or regulatory action instituted, completed or threatened pursuant to any Environmental Laws; (b) any claim made or threatened by any person against Landlord or the Demised Premises relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials; and (c) any reports made to any environmental agency arising out of or in, on or about the Demised Premises or in connection with any Hazardous Materials removed from the Demised Premises, including any complaints, notices, warnings, reports or asserted violations in connection therewith. Tenant shall also provide to Landlord, as promptly a possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Demised Premises or Tenant's use thereof. Upon written request of Landlord (to enable Landlord to defend itself from any claim or charge related to any Environmental Law), Tenant shall promptly deliver to Landlord lists of Hazardous Materials removed or to be removed from the Demised Premises. All such lists shall list the Tenant or its agent as a responsible party and in no way shall attribute responsibility for any such Hazardous Materials to Landlord.

"Hazardous Materials" means: (a) any material or substance; (i) which is defined or becomes defined as a "hazardous substance," "hazardous waste," "infectious waste," "chemical mixture or substance," or "air pollutant" under Environmental Laws; (ii) containing asbestos, urea formaldehyde or polychlorinated biphenyls, (iii) which is oil or petroleum product, including, without limitation, gasoline and other fuels and motor oil, (iv) which is radioactive; or (b) any other material or substance displaying toxic, reactive ignitable or corrosive characteristics, as all such terms are used in their broadest sense, and are defined or become defined by Environmental Laws; or (c) materials which cause a nuisance upon or waste to the Demised Premises or any portion of the Industrial Center.

Tenant acknowledges that Landlord has made no representations to Tenant with respect to the compliance of the Demised Premises with Environmental Laws.

The obligations of Tenant under this Article shall survive the termination of this Lease.

## ARTICLE 27.  MISCELLANEOUS PROVISIONS

**Section 27.1.**    Headings: The captions of the Articles and Sections of this Lease are for convenience only and shall not be considered or referred to in resolving questions of interpretation or construction.

**Section 27.2.**    Time of Essence: Time is of the essence with respect to the performance of each of the covenants and agreements under this Lease.

**Section 27.3.**    Construction of Lease: Parts of this Lease which are written or typed hereon control parts which are pretyped, but pretyped parts of this Lease which are superseded by written or typewritten parts may be utilized in the interpretation of such pretyped parts. Tenant declares that Tenant has read and understands all parts of this Lease, including all pretyped parts hereof. It is agreed that in the construction and interpretation of the terms of this Lease any rule of construction that a document is to be construed most strictly against the party who prepared the same shall not be applied, it being agreed that both parties hereto have participated in the preparation of the final form of this Lease.

**Section 27.4.**    Governing Law: This Lease and the enforcement hereof shall be governed by the laws of the State of New York.

**Section 27.5.**    Severability: If any provision of this Lease or any paragraph, sentence, clause, phrase or word appearing herein be judicially or administratively held invalid or unenforceable for any reason whatsoever, such holding shall not be deemed to affect, alter, modify or impair in any manner whatsoever any other term, provision, paragraph, sentence, clause, phrase or word appearing therein.

**Section 27.6.**    Interest Rate: Where under the terms of this Lease interest shall be provided for, such interest, unless a specific interest rate is set forth, shall be at a rate equal to the prime rate of JP Morgan Chase Manhattan Bank, or any successor thereto, plus four percent (4%), but in no event greater than the highest lawful rate of interest per annum permissible under the law, and shall accrue from the date when the same becomes due and payable by the terms and provisions hereof until paid and shall continue after any judgment until fully satisfied, to which shall be added reasonable attorneys' fees and costs.

**Section 27.7.**      Consent of Landlord:  Where, under the terms of this Lease, the consent of Landlord shall be required, such consent, unless otherwise provided for herein, may be arbitrarily withheld.  If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

**Section 27.8.**      Entire Agreement:  This Lease and the exhibits, riders and/or addenda, if any, attached hereto contain all covenants and agreements between Landlord and Tenant relating in any manner to the rental, use and occupancy of the Demised Premises and the other matters set forth in this Lease.  No prior agreement or understanding pertaining to the same shall be valid or of any force or effect, and the covenants and agreements of this Lease cannot be altered, changed, modified or added to, except in writing signed by Landlord and Tenant.  No representation, inducement, understanding or anything of any nature whatsoever, made, stated or represented on Landlord's behalf, either orally or in writing (except this Lease), has induced Tenant to enter into this Lease.  The submission of this document for examination does not constitute an offer to lease, or a reservation of an option for the Demised Premises, and becomes effective only upon execution and delivery thereof by Landlord and Tenant.

**Section 27.9.**      Default Under Other Agreements:  Any default by Tenant under any instrument, undertaking or agreement executed by Tenant in favor of or with Landlord relating to this Lease, or the tenancy created hereby, shall constitute a breach of this Lease and entitle Landlord to pursue each and all of its rights and remedies hereunder and at law.

**Section 27.10.**      Objection to Statements:  Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute Tenant's acquiescence with respect thereto and shall render such statement, invoice or billing an account stated between Landlord and Tenant.

**Section 27.11.**      Brokerage Commission:  Each of Landlord and Tenant represents and warrants to the other that neither it nor its agents have dealt with any broker, finder or like agent in connection with this Lease except for Premier Commercial Real Estate and (together, the "**Broker**").  Each of Landlord and Tenant shall indemnify, defend, protect and hold the other party harmless from and against any and all damages, costs, claims, liabilities and expenses, including reasonable attorneys' fees, which the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than Broker) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant (other than Broker) in connection with this Lease, and/or the above representation being false.  Landlord shall pay all fees and commission due to Broker in connection with this Lease pursuant to a separate agreement between Landlord and Broker.

**Section 27.12.**      Relationship of Parties:  Anything in this Lease to the contrary notwithstanding, it is agreed that Landlord shall in no event be deemed to be a partner or engaged in a joint venture with or any associate of Tenant, or any party associated with Tenant in the conduct of its business or otherwise, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of its business.  The relationship of Landlord and Tenant as established by this Lease is that of Landlord and Tenant.  None of the language or terminology of this Lease shall be construed to create any other form of relationship between Landlord and Tenant.

**Section 27.13.**      Memorandum of Lease:  Tenant covenants that it shall not record this Lease or a memorandum of this Lease and acknowledges that such covenant is a material term of this Lease.

**Section 27.14.**      Past Due Rent:  If Landlord shall fail to receive, when the same is due and payable, any Minimum Rent, Additional Rent or other amounts or charges to be paid to Landlord by Tenant, as provided in this Lease, Tenant shall pay as Additional Rent interest thereon until fully paid, which shall continue after any judgment until fully satisfied, and if same is not paid within ten (10) days of its due date Tenant shall pay as Additional Rent, a late charge equal to five percent (5%) of each installment past due to cover the administrative costs and expenses involved in administering delinquent accounts.  Notwithstanding the foregoing, with respect to the first late payments of Rent in any calendar year, Landlord shall not charge any late fee or interest unless Tenant fails to make such payment within five (5) days following notice from Landlord that such payment is past due.

**Section 27.15.**      Limitation of Liability:  Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the Building, and subject to the prior rights of any mortgagee of the Industrial Center and subject to Landlord's rights under a leasehold interest of the Industrial Center or part thereof, if any, for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no

00323152.11                                                31

other assets of the Landlord or its managing agent, and its or their respective affiliates, principals, shareholders, officers, directors, partners, members, trustees, fiduciaries, servants, agents and employees, shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

**Section 27.16.**    OFAC List Representation: Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Demised Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any Legal request.

**Section 27.17.**    Inability to Perform: This Lease and the obligation of Tenant to pay Rent and to perform all of the other covenants and agreements of Tenant hereunder shall not be affected, impaired or excused by any Unavoidable Delays. Landlord shall use reasonable efforts to promptly notify Tenant of any Unavoidable Delay which prevents Landlord from fulfilling any of its obligations under this Lease. "Unavoidable Delays" shall mean Landlord's inability to fulfill or delay in fulfilling any of its obligations under this Lease expressly or impliedly to be performed by Landlord or Landlord's inability to make or delay in making any repairs, additions, alterations, improvements or decorations or Landlord's inability to supply or delay in supplying any equipment or fixtures, if Landlord's inability or delay is due to or arises by reason of strikes, labor troubles or by accident, or by any cause whatsoever beyond Landlord's reasonable control, including governmental preemption in connection with a national emergency, laws or any regulation of any governmental authority or shortages, or unavailability of labor, fuel, steam, water, electricity or materials, or delays caused by Tenant or other tenants, mechanical breakdown, acts of God, enemy action, civil commotion, fire or other casualty.

## ARTICLE 28.  SECURITY DEPOSIT

**Section 28.1.**    Cash Security: The sum of $140,000.00.00 representing security (referred to as "Security") for the faithful performance and observance by Tenant of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed is due and payable at the time of the execution and delivery of this Lease. Upon the occurrence of any default (a) by Tenant in the payment or performance of any of the terms, covenants or conditions of this Lease, other than the payment of Minimum Rent or Additional Rent or (b) any failure by Tenant to timely pay any installment of Minimum Rent or Additional Rent as and when due. Landlord may use or apply all or any part of the Security for the payment to Landlord for Tenant's account of any sum or sums due under this Lease, without thereby waiving any other rights or remedies of Landlord with respect to such default. Tenant agrees to replenish all or any part of the Security so used or applied during the Lease Term. Within thirty (30) days after (i) the Expiration Date, or if Tenant exercises a Lease Renewal Option the last day of the applicable Renewal Term, or any other date upon which the Lease Term shall expire and come to an end, and (ii) the full observance and performance by Tenant of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, including, but not limited to, the provisions of Article 19, Landlord shall return to Tenant the balance of the Security then held or retained by Landlord. No interest will be earned on the Security. Tenant agrees that Tenant shall not assign or encumber any part of the Security, and no assignment or encumbrance by Tenant of all or any part of the Security shall be binding upon Landlord, whether made prior to, during, or after the Lease Term. Landlord shall not be required to exhaust its remedies against Tenant or against the Security before having recourse to any other form of security held by Landlord and recourse by Landlord to any form of security shall not affect any remedies of Landlord which are provided in this Lease or which are available to Landlord in law or equity. In the event of any sale, assignment or transfer by Landlord named herein (or by any subsequent Landlord) of its interest in the Building as owner or lessee, Landlord (or such subsequent owner) shall have the right to assign or transfer the Security to its grantee, assignee or transferee and, upon such assignment or transfer and the actual assignment or transfer of the Security, Landlord named herein, (or such subsequent Landlord) shall have no liability to Tenant for the return of the Security and Tenant shall look solely to the grantee, assignee or transferee to whom the Security was transferred or assigned for such return. A lease of the entire Building shall be deemed a transfer within the meaning of the foregoing sentence. Notwithstanding the foregoing, Tenant may, at Tenant's option, in lieu of a cash security deposit, deposit with Landlord, at the time of the execution and delivery of this Lease, an unconditional, irrevocable letter of credit in accordance with the terms of Sections 28.2 through 28.4 hereof.

**Section 28.2.**    Letter of Credit: Tenant may, in lieu of the cash Security set forth in Section 28.1 above, deliver to Landlord, upon Tenant's execution of this Lease, a Letter of Credit (as hereinafter defined) in the amount of $140,000.00 for the faithful performance and observance by Tenant of the terms, covenants and conditions of this Lease. The letter of credit shall be in the form of a clean, irrevocable, non-documentary and unconditional letter of credit (the "Letter of Credit") issued by and drawable upon any commercial bank, trust company, national banking association or savings and loan association with offices for banking purposes in Nassau

County (the "Issuing Bank"), which has outstanding unsecured, uninsured and unguaranteed indebtedness, or shall have issued a letter of credit or other credit facility that constitutes the primary security for any outstanding indebtedness (which is otherwise uninsured and unguaranteed), that is then rated, without regard to qualification of such rating by symbols such as "+" or "-" or numerical notation, "Aa" or better by Moody's Investors Service and "AA" or better by Standard & Poor's Rating Service, and has combined capital, surplus and undivided profits of not less than $2,000,000,000. The Letter of Credit shall (a) name Landlord as beneficiary, (b) have a term of not less than one year, (c) permit multiple drawings, (d) be fully transferable by Landlord without the payment of any fees or charges by Landlord, and (e) otherwise be in form and content satisfactory to Landlord. If upon any transfer of the Letter of Credit, any fees or charges shall be so imposed, then such fees or charges shall be payable solely by Tenant and the Letter of Credit shall specify that it is transferable without charge to Landlord. If Landlord pays any such fees or charges, Tenant shall reimburse Landlord therefor upon demand. The Letter of Credit shall provide that it shall be deemed automatically renewed, without amendment, for consecutive periods of one year each thereafter during the Term (and in no event shall the Letter of Credit expire prior to the 45th day following the Expiration Date or if Tenant exercises a Lease Renewal Option the last day of the applicable Renewal Term) unless the Issuing Bank sends a notice (the "Non-Renewal Notices") to Landlord by certified mail, return receipt requested, not less than 45 days next preceding the then expiration date of the Letter of Credit stating that the Issuing Bank has elected not to renew the Letter of Credit. The Issuing Bank shall agree with all drawers, endorsers and bona fide holders that drafts drawn under and in compliance with the terms of the Letter of Credit will be duly honored upon presentation to the Issuing Bank at an office location in New York, New York. The Letter of Credit shall be subject in all respects to the International Standby Practices 1998, International Chamber of Commerce Publication No. 590.

**Section 28.3.**    Application of Security:  If (a) any Default by Tenant occurs in the payment or performance of any of the terms, covenants or conditions of this Lease, other than the payment of Minimum Rent or Additional Rent, (b) Tenant fails to make any installment of Minimum Rent or Additional Rent as and when due, or (c) Landlord receives a Non-Renewal Notice, Landlord shall have the right by sight draft to draw, at its election, all or a portion of the proceeds of the Letter of Credit and thereafter hold, use, apply, or retain the whole or any part of such proceeds or shall have the right to apply or retain any cash security, as the case may be, (x) to the extent required for the payment of any Fixed Rent or any other sum as to which Tenant is in default including (i) any sum which Landlord may expend or may be required to expend by reason of Tenant's default, and/or (ii) any damages to which Landlord is entitled pursuant to this Lease, whether such damages accrue before or after summary proceedings or other reentry by Landlord and/or (y) as a cash security deposit, unless and until, in the case of clause (c) above, Tenant delivers to Landlord a substitute Letter of Credit which meets the requirements of this Article 28. If Landlord applies or retains any part of the proceeds of the Letter of Credit or cash security, Tenant, upon demand, shall amend the Letter of Credit to increase the amount thereof by the amount so applied or retained or provide Landlord with an additional Letter of Credit in the amount so applied or retained so that Landlord shall have the full amount thereof on hand at all times during the Term. If Tenant shall comply with all of the terms, covenants and conditions of this Lease, the Letter of Credit or cash security, as the case may be, shall be returned to Tenant after the Expiration Date or if Tenant exercises a Lease Renewal Option the last day of the applicable Renewal Term, and after delivery of possession of the Premises to Landlord in the manner required by this Lease.

**Section 28.4.**    Transfer:  Upon a sale or other transfer of the Industrial Center or the Building, Landlord shall have the right to transfer the Letter of Credit or cash security to its transferee.  With respect to the Letter of Credit, within 5 days after notice of such transfer, Tenant, at its sole cost, shall arrange for the transfer of the Letter of Credit to the new landlord, as designated by Landlord in the foregoing notice or have the Letter of Credit reissued in the name of the new landlord.  Upon such transfer, Tenant shall look solely to the new landlord for the return of the Letter of Credit or such cash security and the provisions hereof shall apply to every transfer or assignment made of the Letter of Credit or cash security to a new landlord.  Tenant shall not assign or encumber or attempt to assign or encumber the Letter of Credit or such cash security and neither Landlord nor its successors or assigns shall be bound by any such action or attempted assignment, or encumbrance.

**Section 28.5.**    License Agreement.  Tenant acknowledges that the Security or Letter of Credit given by Tenant hereunder may, at Landlord's option, also be deemed to secure the payment and performance of Tenant's obligations under that certain license agreement between Tenant, as licensee, and Landlord, as licensor, for certain licensed space in the Building.  In the event Landlord applies any of the Security or draws on the Letter of Credit pursuant to the terms of the license agreement, such application of the Security or draw upon the Letter of Credit shall be deemed to be under the terms of this Section 28, including, without limitation, all requirements for Tenant to restore the Security or Letter of Credit to the full amount required.

## ARTICLE 29.  INTERFERENCE

**Section 29.1.**    Tenant agrees that all of Tenant's equipment shall be designed, operated, installed and maintained in such a manner that it shall not, at any time, interfere with any other equipment on or in the Industrial Center or outside of the Industrial Center.  For the purpose hereof, such interference shall include (i)

00323152.11                                           33

any electrical, electromagnetic or radio frequency interference and (ii) any restrictions or limitation of any tenants in the Building to conduct their business therein or use or occupy their space. If, in the judgment of Landlord, any such interference or danger shall occur or might occur as a result of the operation of Tenant's equipment, then Tenant shall promptly correct or cure such situation at Tenant's sole cost and expense including Tenant's promptly ceasing operation and use of Tenant's equipment until the interference or emergency situation has been corrected to the satisfaction of Landlord.

[Remainder of page intentionally left blank]

00323152.11

34

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this 1ST day of February, 2016.

LANDLORD:                                          TENANT:

345 UNDERHILL, L.LC.                              UEA PREMIER MOTORS CORP.

By: _Marc Taub_ (signature)                       By: _____
Name: Marc Taub                                    Name: _____
Title: Manager                                     Title: _____

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this ___1^st___ day of February , 2016.

LANDLORD:                                    TENANT:

345 UNDERHILL, L.LC.                          UEA PREMIER MOTORS CORP.

By: _____          By: _____
Name: _____          Name: _SARA DEO_
Title: _____          Title: _CEO_

LANDLORD:

00323152.8                                    35

EXHIBIT A
DEMISED PREMISES

This floor plan is annexed to this Lease and made a part hereof as Exhibit A solely to indicate by diagonal markings the general location of the Demised Premises. All areas, dimensions, locations and conditions are approximate.



180 MICHAEL DRIVE
SYOSSET, NEW YORK

ANGELO FRANCIS CORVA
& ASSOCIATES, ARCHITECTS

A

00323152.11

## SCHEDULE A - DESCRIPTION

ALL that certain plot,piece or parcel of land, situate, lying and being in the Town of Oyster Bay, County of Nassau and State of New York, known and designated as and by the part of Lot Number 43 and all of Lot Number 44 in Block 157 on a certain map entitled, 'Map of Syosset Industrial Park, Section No. 2, situated at Syosset, Town of Oyster Bay, Nassau County, New York, surveyed August 1959 by Risso, Nelson & Pope, Civil Engineers and Surveyors, Huntington Station, New York, Revised May 18, 1960', and filed in the Office of the Clerk of the County of Nassau on July 14, 1960 as Map Number 7316 which said lot and part of lot when taken together are more particularly bounded and described as follows:

BEGINNING at a point on the northeasterly side of Michael Drive distant 1,215.68 feet southeasterly from the corner formed by the intersection of the northeasterly side of Michael Drive with the southeasterly side of Jericho Turnpike.

RUNNING THENCE north 60 degrees 00 minutes 00 seconds east, 487.46 feet;

RUNNING THENCE south 02 degrees 14 minutes 11 seconds east, 437.56 feet;

RUNNING THENCE south 60 degrees 00 minutes 00 seconds west, 251.21 feet to the northeasterly side of Michael Drive;

RUNNING THENCE northwesterly along the northeasterly side of Michael Drive on the arc of a curve bearing to the left, having a radius of 300.00 feet, a distance of 41.86 feet;

RUNNING THENCE north 30 degrees 00 minutes 00 seconds west, still along the northeasterly side of Michael Drive, 336.61 feet to the point or place of BEGINNING.

TOGETHER WITH an Easement for Ingress and Egress over the following described property:

BEGINNING at a point on the northeasterly side of Michael Drive distant 1,395.15 feet southeasterly from the corner formed by the intersection of the northeasterly side of Michael Drive with the southeasterly side of Jericho Turnpike;

RUNNING THENCE north 60 degrees 00 minutes 00 seconds east, 248.40 feet;

RUNNING THENCE south 30 degrees 00 minutes 00 seconds east, 14.00 feet;

RUNNING THENCE south 60 degrees 00 minutes 00 seconds west, 250.70 feet to the northeasterly side of Michael Drive;

RUNNING THENCE northwesterly along the northeasterly side of Michael Drive on the arc of a curve bearing to the left, having a radius of 300.00 feet, a distance of 14.19 feet to the point or place of BEGINNING.

EXHIBIT A-2
INDUSTRIAL CENTER

This floor plan is annexed to this Lease and made a part hereof as Exhibit A-2 solely to indicate the general layout of the Industrial Center. All areas, dimensions, locations and conditions are approximate.



A-1

00323152.11

EXHIBIT B
(Rules and Regulations)

1.      Tenant shall advise and cause its vendors and distributors to deliver all merchandise in a manner that does not interfere with Landlord's and other tenant's use and enjoyment of the Industrial Center.

2.      All deliveries and pick ups are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives.

3.      Tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface.  In addition, wheel blocking must be available for use.  Tractor trailers are to be removed from the loading areas after unloading.

4       Automobiles and other vehicles of Tenant and its employees and agents shall be parked only in areas designated by Landlord from time to time as "employee parking.", if any.  There shall be absolutely no overnight parking of any kind by Tenant (including its inventory) or its employees or agents at the Industrial Center.  Landlord shall have the right to remove or cause to be removed any automobile or other vehicle of Tenant, its employees or agents that may be parked in any other area not designated for employee parking or which may be parked overnight.  Any such removal shall be without liability of any kind to Landlord, its agents and employees and Tenant hereby indemnifies and agrees to hold Landlord free and harmless against all such liability pursuant to the indemnity provisions contained in this Lease.  Tenant shall, from time to time, upon request of Landlord, supply Landlord with a list of all automobile models and license plate numbers owned by its employees and agents.  In no event may Landlord designate any of Tenant's exclusive parking spaces as employee parking.

5.      Tenant is responsible for storage and removal of its trash, refuse and garbage.  Tenant shall not dispose of the following items in sinks or commodes: Hazardous Waste; plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other items which the same are not designed to receive.  All floor area of the Demised Premises, including vestibules, entrances and returns, loading docks, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition.

6       Tenant shall not permit or suffer any advertising medium to be placed on the Building's walls, on the Demised Premises' exterior walls or windows, on the sidewalks or on the parking lot areas or light poles.  No permission, expressed or implied, is granted to expressed or implied, is granted to exhibit or display any banner, pennant, sign and trade or seasonal decoration of any size, style or material within the Industrial Center, or outside the Demised Premises.

7       Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Demised Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television.  No radio, television or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Demised Premises, unless Landlord has previously given its written consent, which may be arbitrarily withheld.

8.      Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside the Demised Premises, nor shall Tenant use the exterior sidewalks, loading docks or exterior walkways of the Demised Premises to display, store or place any merchandise.  No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the Industrial Center's drives, parking lot or other Common Facilities.

9.      Tenant shall not permit or suffer any portion of the Demised Premises to be used for retail residential, lodging purposes, sleeping, manufacturing, or any immoral or illegal, purpose.

10.     Tenant shall not, in or on any part of the Common Facilities or to other tenants at the Industrial Center:

        (a)     Create a nuisance.

        (b)     Throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind.

        (c)     Deface, damage, or demolish any sign, light standard or fixture, landscaping materials or other improvements within the Industrial Center, or the property of other tenants, business invitees or employees situated within the Industrial Center.

00323152.11                         B-1

11.      No additional locks or bolts of any kind shall be placed upon any of the entrances, doors or windows by Tenant, nor shall any changes be made in existing locks or the mechanism thereof.  Each Tenant must, upon the termination of its tenancy, restore to Landlord all keys of entrances, doors, offices, and toilet rooms, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys so furnished, such Tenant shall pay to Landlord the cost thereof and the cost of any locksmith or other service required by Landlord to obtain access to the Demised Premises, and in the event safes, closets of other lockable fixtures were installed in the Demised Premises, Tenant shall give all keys or combinations thereto to Landlord.

12      Landlord shall have the right to prohibit any advertising, signage or other display by any Tenant which, in Landlord's opinion, tends to impair the reputation of the Industrial Center or its desirability as an industrial center, and upon written notice from Landlord, the Tenant shall refrain from or discontinue such advertising, signage or display.

13.      Tenant shall employ only such labor as will not result in jurisdictional disputes with any labor unions or strikes against or involving Landlord or the Industrial Center and which shall not cause any conflict with any union contract to which Landlord or its contractors or subcontractors may be a party

00323152.11                                B-2

EXHIBIT C
INITIAL TENANT'S WORK AND LANDLORD'S WORK

1.     Prior to the Commencement Date, Landlord shall, at Landlord's sole cost and expense, demise the Demised Premises as shown on Exhibit A and substantially complete the following work:

     a.     Create approximately 2,000 sq. ft. of carpeted office space,

     b.     Create approximately 4,300 sq. ft. of showroom space, ceilings to be repaired and painted (in one building standard color selected by Tenant), air-conditioned with a roll-up door to allow access of cars from warehouse to showroom,

     c.     Create approximately 13,700 sq. ft. of non-air-conditioned warehouse.  Warehouse walls and ceilings to be repaired and painted a single building standard color selected by Tenant,

     d.     Construct two (2) multi stalled bathrooms, ADA compliant,

     e.     Construct one (1) exterior roll-up door allowing access of cars into the warehouse,

     f.     Construct one (1) exterior set of Double Glass doors allowing access of cars into the showroom,

     g.     Construct Glass Door Store Front Entrance on North side as well as one window on North side of office area,

     h.     Install building standard lighting in warehouse and showroom areas,

     i.     All interior walls in showroom and office to be sheet-rocked and painted a single building standard color selected by Tenant,

     j.     Clean and reasonably level floors to be delivered in showroom and warehouse and

     k.     Reseal and striping for parking lot outside of Demised Premises,

(such work, "**Landlord's Work**").  Landlord's Work shall be performed diligently in a good and workmanlike manner and in compliance with all applicable laws.  Following the Commencement Date, Tenant shall commence and diligently prosecute to completion the Initial Tenant's Work. Promptly following execution and delivery of this Lease, Tenant shall directly contract with Angelo Corva, to prepare all plans and specifications for the Initial Tenant's Work and to file all permits and applications for the Initial Tenant's Work. Once Tenant's architect (i.e., Angelo Corva) has prepared detailed plans and specifications for the Initial Tenant's Work (the "**Work Plans**"), Tenant will deliver the Work Plans to Landlord for Landlord's approval.  If Landlord denies its approval of the Work Plans, Tenant will promptly revise the Work Plans and resubmit the same to Landlord for Landlord's approval.  This process shall be repeated until Landlord has approved the Work Plans.  The Work Plans as approved by Landlord shall be referred to as the "**Final Plans**".  The Initial Tenant's Work shall be performed diligently, in a good and workmanlike manner and in compliance with all applicable laws, and performed in compliance by all of the terms, covenants and conditions of this Lease, including, without limitation, Section 4.9 and Article 5.  Without limiting the foregoing, the Initial Tenant's Work shall be performed by a general contractor and using subcontractors reasonably approved by Landlord, all of whom must work in harmony with all labor employed by other tenants at the Building and comply with the terms of Section 4.9.  The Initial Tenant's Work shall be performed substantially in accordance with the Final Plans.  Notwithstanding anything in this Lease to the contrary, any and all work done to or affecting the roof of the Building shall be performed by Landlord's roofing contractor.  Tenant may make changes to the Final Plans to account for field conditions, requirements of law and any shortage or unavailability of supplies (provided comparable supplies are substituted therefor).  Tenant shall pay all fees charged by Landlord's architect with respect to Tenant's Initial Work; including, without limitation, with respect to the preparation of the Work Plans and Final Plans, the supervision of the payment of Landlord's Contribution as provided below and the issuance of the certificate of occupancy covering the Initial Tenant's Work.  Tenant shall be solely responsible for all fees charged by Tenant's architect (i.e., Angelo Corva) with respect to Change Orders, the failure of Tenant to construct the Initial Tenant's Work in accordance with the Final Plans, defects in the Initial Tenant's Work and/or any delay or difficulties in the issuance of the certificate of occupancy due to any of the foregoing.

2.     Tenant shall have the right to make changes from time to time in the Final Plans by submitting to Landlord revised plans and specifications ("**Change Orders**").  All Change Orders shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, delayed or conditioned, provided that Landlord may, in the exercise of its sole and absolute discretion, disapprove any proposed changes (i) affecting the Building's structure, any of the Building systems, or the appearance of the Building, (ii) which would in any way delay the issuance of the certificate of occupancy for the Demised Premises, (iii) which would require the issuance of any variance or special permit or (iv) which would materially delay the performance of Landlord's Work or the Initial Tenant's Work, including, without limitation, incorporating any long lead time items.  Without limiting the generality of the foregoing, no Change Order will be approved unless such Change Orders comply with the requirements of this Lease.  The cost of any Change Orders requested by Tenant shall be borne solely by Tenant paid for by Tenant, and any delay in the performance of the Initial Tenant's Work caused by any Change Order shall be deemed a Tenant Delay.

3.     (a)     Landlord shall pay to Tenant an amount not to exceed $100,000.00 (such amount, hereafter,

"**Landlord's Contribution**") specifically toward the cost of the Reimbursable Tenant's Work Items (as defined below) (excluding any Tenant incurred "soft costs" and Tenant's trade fixtures, movable equipment and other items of personal property), provided that as of the date on which Landlord is required to make payment thereof pursuant to this paragraph 3 (i) this Lease is in full force and effect, and (ii) Tenant is not in Default of the terms, covenants, or conditions of this Lease on Tenant's part to be performed. Tenant shall pay all costs of the Initial Tenant's Work and all costs of the Reimbursable Tenant's Work Items which are in excess of Landlord's Contribution. Landlord's Contribution shall be payable solely on account of labor and materials directly related to the Reimbursable Tenant's Work Items (excluding any Tenant incurred "soft costs" and Tenant's trade fixtures, movable equipment and other items of personal property). Tenant shall not be entitled to receive any portion of Landlord's Contribution not actually expended by Tenant in the performance of the Reimbursable Tenant's Work Items, nor shall Tenant have any right to apply any unexpended portion of Landlord's Contribution as a credit against Rent or any other obligation of Tenant hereunder.

(b)    Landlord shall make progress payments to Tenant on a monthly basis, for the Reimbursable Tenant's Work Items performed during the previous month, up to 90% of Landlord's Contribution. Such progress payments shall be made within thirty (30) days next following the delivery to Landlord of requisitions therefor, signed by the chief financial officer of Tenant, and shall be accompanied by (i) with the exception of the first requisition, copies of partial waivers of lien from all contractors, subcontractors, and material suppliers covering all work and materials which were the subject of previous progress payments by Landlord, (ii) a certification from Landlord's architect that the work for which the requisition is being made has been completed substantially in accordance with the Final Plans, (iii) copies of paid bills and invoices from all contractors, subcontractors, and material suppliers covering all work and materials which are the subject of the progress payment for which Tenant is currently seeking reimbursement and (iv) such other documents and information as Landlord may reasonably request. Landlord shall disburse any amount retained by it hereunder upon submission by Tenant to Landlord of Tenant's requisition therefor accompanied by all documentation required under this paragraph, together with (A) issuance of final lien waivers by all contractors, subcontractors and material suppliers covering all of the Initial Tenant's Work, (B) a certification from Landlord's architect that the Initial Tenant's Work has been substantially completed in accordance with the Final Plans, and (C) copies of all governmental approvals and signoffs in connection with the Initial Tenant's Work. The right to receive Landlord's Contribution is for the exclusive benefit of Tenant, and in no event shall such right be assigned to or be enforceable by or for the benefit of any third party, including any contractor, subcontractor, materialman, laborer, architect, engineer, attorney or other person or entity.

(c)    The "Reimbursable Tenant's Work Items" shall mean those items of the Initial Tenant's Work which are permanent leasehold improvements.

4.    Promptly following Tenant's substantial completion of the Initial Tenant's Work in accordance with the Final Plans as so certified by Landlord's architect, Tenant shall obtain a certificate of occupancy (permanent or temporary) for the Demised Premises covering the Initial Tenant's Work.

5.    If Tenant shall be delayed in substantially completing the Initial Tenant's Work as a result of any act, neglect, failure or omission of Tenant, its agents, servants, employees, contractors or sub-contractors, including, without limitation, Change Orders and Tenant's failure to timely review the Work Plans, any such delay shall be deemed a "**Tenant Delay**".

6.    If the substantial completion of Landlord's Work shall be delayed by reason of Tenant Delay, the Landlord's Work shall be deemed substantially completed for the purposes of determining the Commencement Date as of the date that the Landlord's Work would have been substantially completed but for any such Tenant Delay as determined by Landlord in its sole discretion. Tenant shall pay to Landlord a sum equal to any actual additional out of pocket cost to Landlord in completing Landlord's Work resulting from any Tenant Delay. The failure by Tenant to pay any monies due Landlord pursuant to this Exhibit C within ten (10) days of the date due shall be deemed a Default under the Lease for which Landlord shall be entitled to exercise all remedies available to Landlord for nonpayment of rent and Landlord, may, if it so elects, discontinue construction of Landlord's Work until all such sums are paid and Tenant has otherwise cured such Default (and any delay in the performance of Landlord's Work resulting therefrom shall be deemed to be a Tenant Delay). Upon completion of Landlord's Work, Landlord agrees to promptly refund any overpayment by Tenant to Landlord under this Exhibit C.

7.    Any and all items of furniture, movable equipment and other items of personal property which may be indicated in Exhibit A shall not be provided by Landlord and shall not be a portion of Landlord's Work. Tenant shall be solely responsible to provide all furniture, movable equipment and other items of personal property necessary for the operation of its business.

8.    Landlord and Tenant agree that certain portions of the Landlord's Work constitute "qualified leasehold improvements" pursuant to the Internal Revenue Code of the United States and its rules and regulations. The parties further agree that certain items of Landlord's Work fulfill the following requirements:

00323152.11                                    C-2

- Are made to the interior of the Building.
- Are placed in service more than 3 years after the Building was first placed in service.
- Do not constitute an enlargement of the Building.
- Do not affect the internal structural framework of the Building.
- Do not affect any structural component benefiting common areas of the Building or Industrial Center.

Landlord and Tenant will reasonably cooperate with each other to allow Landlord to have the benefit of any so-called "bonus" or "accelerated" depreciation incentives made available by the Internal Revenue Service.

00323152.11                                   C-3

## ASSIGNMENT OF LEASE AND LEASE MODIFICATION

THIS ASSIGNMENT OF LEASE AND LEASE MODIFICATION (this "Assignment") is made as of the 20 day of June , 2018, between UEA PREMIER MOTORS CORP., a New York corporation ("Assignor"), and NORTHSHORE MOTOR LEASING LLC, a New York limited liability company ("Assignee"), and 180 MICHAEL DRIVE LLC, a New York limited liability company ("Landlord").

### Recitals

WHEREAS, pursuant to an Agreement of Lease dated February 1, 2016, by and between Landlord's predecessor-in-interest, 345 Underhill, L.L.C., as landlord, and Assignor, as tenant, (said Agreement of Lease, as amended to date, the "Lease"), Landlord leased to Assignor approximately 20,000 square feet (the "Premises") in the building known as 180 Michael Drive, Syosset, NY (the "Building"), said premises being more particularly described in the Lease;

WHEREAS, Assignor desires to assign its interest in the Lease to the Assignee, and the Assignee desires to accept the assignment thereof, upon the following terms and conditions.

NOW THEREFORE, for and in consideration of the premises and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Effective as of the date hereof (the "Effective Date"), the Assignor hereby assigns and transfers to the Assignee and its successors and assigns all of its right, title and interest in and to the Lease hereinbefore described.  Assignee hereby agrees to and does accept the assignment, and in addition, expressly assumes and agrees to keep, perform, and fulfill all the terms, covenants, conditions and obligations required to be kept, performed, and fulfilled by the Assignor as the tenant under the Lease.  Assignee acknowledges that this Assignment shall not constitute a release from the further performance of the provisions on its part to be observed or performed under the Lease.  Landlord hereby consents to the assignment subject to the terms hereof.

2.      Representations and Warranties of Assignor.  Assignor hereby represents and warrants to Assignee as follows:

a.      the Lease is in full force and effect and has not been modified or amended, except as otherwise expressly set forth on Exhibit A attached hereto;

b.      Assignor has not received or given any written notice as to any alleged default under the Lease which remains uncured, and there are no defaults under the Lease beyond any applicable grace and cure periods and no event has occurred which with the giving of notice or passage of time would constitute a default under the Lease;

c.      Assignor has not pledged, assigned, hypothecated or encumbered in any way its interest under the Lease;

d.    no one other than Assignor has acquired through or under Assignor any right, title or interest in or to the Lease, except as otherwise expressly set forth in this Assignment; and

e.    Assignor has the power to and can validly assign its interest under the Lease.

3.    Representation of Assignee. Assignee represents that it has full power and authority to assume the obligations of "Tenant" under the Lease, to be assumed by it hereunder, and to perform the applicable obligations thereunder.

4.    Representations of Guarantor: Sara Deo and Anthony Deo (collectively, "Guarantor") hereby represent and warrant that Guarantor owns 100% of the membership or other equity interest in Assignee, and acknowledge that Landlord is relying on said representation and warranty in consenting to the assignment of Tenant's interest in the Lease to Assignee.

5.    General. This Assignment may not be changed or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. The covenants, agreements, terms, provisions and conditions contained in this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.    Notices. Notwithstanding anything to the contrary set forth in Section 24.1 of the Lease (as said Section may have been amended from time to time), any notice, demand, request, consent, approval or other communication under the Lease shall be addressed as follows:

(i) to Landlord at:

180 MICHAEL DRIVE LLC
c/o Taub Development LLC
180 Michael Drive-109-A
Syosset, NY 11791
Attention: Legal

with a copy to:

Douglas Gladstone, Esq.
Goldfarb & Fleece LLP
560 Lexington Avenue, 6th Floor
New York, NY 10022

(ii) to Tenant at:

Northshore Motor Leasing LLC
180 Michael Drive·
Syosset, NY 11791

00366992.2        [00366992.2]        2

7.     Broker. Assignor and Assignee each represent that it dealt with no broker in respect of this Assignment. Assignor and Assignee shall indemnify and hold the other party harmless from any liability arising from any breach of the foregoing representation.

8.     Governing Law. This Assignment and its interpretation and enforcement shall be governed by the laws of the State of New York.

9.     Counterparts. This Assignment may be executed in counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.

10.     Consent. This Assignment is expressly subject to the consent of the Landlord under the Lease.

00366992.2          {00366992.2}          3

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the day and year first above written.

ASSIGNOR:

**UEA PREMIER MOTORS CORP.**

By: _____
Name: SARA DEO
Title: CEO

ASSIGNEE:

**NORTHSHORE MOTOR LEASING LLC**

By: _____
Name: SIMA DEO
Title: CEO

AFFIRMATION OF GUARANTY:

The undersigned acknowledge this Assignment as being a part of the Lease for purposes of the Guaranty and further acknowledge and reaffirm their continued obligations under the Guaranty to guaranty the payment and performance of the Obligations (as defined in the Guaranty) pursuant to the terms of the Guaranty.

_____
**SARA DEO**

_____
**ANTHONY DEO**

ACCEPTED AND AGREED:

**180 MICHAEL DRIVE LLC**

By: _____
Name: MAC D TAUB
Title: manager.

Notarising for Sara Deo
and Anthony Deo.
6/20/18
Rajni Khanna

RAJNI KHANNA
Notary Public - State of New York
NO. 01KH6303223
Qualified in Nassau County
My Commission Expires May 12, 2022

00366992.2        {00366992.2}        4



### GLOBAL LACROSSE FOUNDATION
### "LACROSSE FOR EVERYONE EVERYWHERE"

June 14, 2021

Terms of lease:

*5 yr.  lease w/option to renew.
*Right of first refusal on sale of property
*Lease is for complete use of building downstairs with exception of bathroom on eastern end of building.
*In addition two upstairs offices on west of building are included in the lease.

  *Complete use of property with exception of four corner spots on northeast end of parking lot or similar spots behind the building as agreed.

  *Tenant will make all repairs to the building with the exception of any structural repairs needed such as roof and foundation as outlined in the lease.

 *Lease will begin July 1, 2021 and end on June 30,2026.

  *Tenant will pay $9750 per month rent with an annual increase of $250.

  *Landlord will pay all taxes, sewer and water.

**GLOBAL LACROSSE FOUNDATION, 150 W. MAIN ST. SMITHVILLE OHIO 44677.**
Thank you and we hope to see you at one of our worldwide tournaments!!

**Bruce Casagrande---Chairman**     1+516-807-4790 (Laxforall@gmail.com)

June 16, 2021

**COMMERCIAL SUBLEASE AGREEMENT**
**THIS SUBLEASE** dated this __15TH____ day of JUNE 2021
**BETWEEN:**
TRUTH IN GAMES
(the "Sublandlord")
**OF THE FIRST PART- AND -**
GOLD COAST MOTORS OF SUNRISE LLC.
(collectively) the "Subtenant") **OF THE SECOND PART**
**Background**
 1. This is an agreement (the "Sublease") to sublet real property according to the terms specified below.
 2. The master lease (the "Master Lease") is dated December 4, 2017 and is between 189 SUNRISE CORP. (the "Landlord") and the Sublandlord with respect to the following lands and any improvements on those lands (the "Premises"): 189 SUNRISE HWY, AMITYVILLE, NY 11701.
 3. The Subtenant is willing to undertake certain obligations of the Master Lease.
**IN CONSIDERATION OF** the Sublandlord subletting and the Subtenant renting the Subleased Premises, both parties agree to keep, perform and fulfill the promises, conditions and agreements below:
**Subleased Premises**
 4. The Sublandlord leases to the Subtenant the portion of the Premises (the "Subleased Premises") described as follows: Complete premises and building with exception of two upstairs rooms on East end of building and downstairs bathroom on east end of building. In addition four parking spots on northeast corner of lot or as otherwise agreed will be held for subtenant.
**Term**
 5. The term (the "Term") of this Sublease commences at 12:00 noon on July 1, 2021 and ends at 12:00 noon on June 30, 2026
 6. The provisions of this Sublease are subject to the terms and restrictions of the Master Lease.
**Rent**
 Subject to the provisions of this Sublease, the rent for the Subleased Premises is $9750.00 (the "Rent") per month. A grace period of 10 days will be included after which a fine of $100 may be imposed. Subtenant is said to be in default of lease after 30 days of non-payment.
 5. The Subtenant will pay the Rent to the Sublandlord at 189 Sunrise Hwy, Amityville, NY 11701, or at such other place as the Sublandlord may later designate, on or before the First of each and every month. The subtenant is responsible for all utilities and garbage at the property. Sub Landlord is responsible for yearly taxes of property, water and sewer bill for property.
 A yearly increase of $250 per month will start on July 1, 2022 and run thru length of term.
**Use of Subleased Premises**
 6. Except as otherwise provided in this Sublease, the Subtenant and the agents and employees of the Subtenant will only use the Subleased Premises for a purpose consistent with the permitted use allowed in the Master Lease. Further, the Subtenant agrees to comply with all other applicable provisions of the Master Lease and will not do anything that would constitute a violation of any part or condition of the Master Lease.
 7. The Subleased Premises may also be used for the following purpose(s):
Two storage rooms upstairs.
**Utilities** 8. All payments for utilities and other charges connected with the Subleased Premises, which are to be paid by the Sublandlord under the Master Lease, will be paid by the Subtenant during the Term of this Sublease.
**Maintenance and Repairs**
 9. The Subtenant agrees to surrender and deliver to the Sublandlord the Subleased Premises and all furniture and decorations within the Subleased Premises in as good a condition as they were at the beginning of the Term, reasonable wear and tear excepted. The Subtenant will be liable to the Sublandlord and the Landlord for any damages occurring to the Subleased Premises or the
contents of the Subleased Premises or to the building which are done by the Subtenant or the

*Commercial Sublease Agreement* Page 2 of 9

Subtenant's guests.

10. The Subtenant will immediately report all general maintenance issues and needed repairs to the Sublandlord.

**Damage Deposit**

11. The Subtenant agrees to pay to the Sublandlord a deposit of $14625 (1.5x rent) to cover damages and cleaning. (See Rider) The Sublandlord agrees that if the Subleased Premises and the contents in the Subleased Premises are returned to the Sublandlord in the same condition as when received by the Subtenant, reasonable wear and tear excepted, the Sublandlord will refund to the Subtenant the Deposit, or the amount remaining, at the end of the Term, or within 30 days thereafter. Any reason for retaining a portion of the Deposit will be explained in writing within 30 days to the Subtenant.

**Insurance**

12. The Subtenant, at the expense of the Subtenant, will carry insurance similar to that required of the Sublandlord under the Master Lease. The Subtenant will include the Sublandlord and the Landlord as additional insured parties on all policies of insurance.

13. The Subtenant will provide proof of such insurance to the Sublandlord and the Landlord upon the issuance or renewal of such insurance.

**Alterations and Improvements**

14. The Subtenant will have the same right to make such alterations and improvements to the Subleased Premises as the Sublandlord is allowed in the Master Lease.

15. Any alterations and improvements must comply with all applicable construction laws and regulations regarding property improvements.

16. The Subtenant will ensure that the Subleased Premises remain free and clear of any and all liens arising out of the work performed or materials used in making such improvements to the Subleased Premises.

*Commercial Sublease Agreement* Page 3 of 9

**Taxes**

17. The Subtenant will pay any privilege, excise and other taxes duly assessed against the business of the Subtenant, the Subleased Premises and any personal property on or about the Subleased Premises. The Subtenant will avoid the assessment of any late fees or penalties.

**Event of Default**

18. The Subtenant will default under this Sublease if any one or more of the following events (the "Event of Default") occurs:

a. The Subtenant fails to pay the Rent to the Sublandlord or any amount of it when due or within any grace period, if any.

b. The Subtenant fails to perform any of its obligations under this Sublease or any applicable obligation under the Master Lease.

c. The Subtenant becomes insolvent, commits an act of bankruptcy, becomes bankrupt, takes the benefit of any legislation that may be in force for bankrupt or insolvent debtors, becomes involved in a voluntary or involuntary winding up, dissolution or liquidation proceeding, or if a receiver will be appointed for the affairs of the Subtenant.

d. The Subtenant abandons the Subleased Premises or any part of the Subleased Premises.

e. The Subtenant uses the Subleased Premises for any unpermitted or illegal purposes.

f. The Subtenant fails to commence, diligently pursue, and complete the Subtenant's work to be performed pursuant to this Sublease pertaining to the Subleased Premises.

g. The Subleased Premises, or any part of the Subleased Premises is completely or partially damaged by fire or another casualty that is due to the Subtenant's negligence, willful act, or that of the Subtenant's employee, family, agent, or guest.

h. Any other event of default provided in the Master Lease or the Act.

*Commercial Sublease Agreement* Page 4 of 9

**Remedies**

19. Upon the occurrence of any Event of Default, the Sublandlord has any or all of the following

remedies:

a. Terminate the Sublease upon the greater of any notice required in the Master Lease or the Act and the Term will then immediately become forfeited and void.

b. The Sublandlord may, but is not obligated to, perform on behalf of the Subtenant, any obligation of this Sublease or the Master Lease which the Subtenant has failed to perform. The Sublandlord may seek redress from the Subtenant for such performance.

c. The Sublandlord may reenter the Subleased Premises or any part of the Subleased Premises and in the name of the whole repossess and enjoy the same as of its former state anything contained within the Subleased Premises.

d. Any other remedy provided in the Master Lease or the Act.

20. No reference to or exercise of any specific right or remedy by the Sublandlord will prejudice or preclude the Sublandlord from any other remedy whether allowed at law or in equity or expressly provided for in this Sublease or the Master Lease. No such remedy will be exclusive or dependent upon any other such remedy, but the Sublandlord may from time to time exercise any one or more of such remedies independently or in combination.

21. Upon the expiration, termination or cancellation of the Master Lease or this Sublease, all obligations of the parties under this Sublease will be extinguished.

22. Any improvements remaining on the Subleased Premises upon termination will revert to the Sublandlord and will be free of any encumbrance at the time of such reversion.

**Surrender of Premises**

23. At the expiration of the Term of this Sublease, the Subtenant will quit and surrender the Premises in as good a state and condition as they were at the commencement of this Lease, reasonable use and wear and damages by the elements excepted.

*Commercial Sublease Agreement* Page 5 of 9

**Governing Law**

24. It is the intention of the parties to this Sublease that the tenancy created by this Sublease and the performance under this Sublease, and all suits and special proceedings under this Sublease, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of New York, without regard to the jurisdiction in which any action or special proceeding may be instituted.

**Severability**

25. If there is a conflict between any provision of this Sublease and the applicable legislation of New York (the "Act"), the Act will prevail, and such provisions of the Sublease will be amended or deleted as necessary in order to comply with the Act. Further, any provisions that are required by the Act are incorporated into this Sublease.

26. In the event that any of the provisions of this Sublease will be held to be invalid or unenforceable in whole or in part, those provisions to the extent enforceable and all other provisions will nevertheless, continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Sublease and the remaining provisions had been executed by both parties subsequent to the expungement of the invalid provision.

**Assignment and Subletting**

27. The Subtenant will not assign, transfer or further sublet the Subleased Premises or any part of the Subleased Premises without the prior written consent of the Sublandlord and the Landlord.

**Notices**

28. Unless otherwise specifically provided in this Sublease, all notices from the Subtenant to the Sublandlord will be served or sent to the Sublandlord at the following address:

189A SUNRISE HWY, AMITYVILLE, NY 11701.

30. All notices to be given under this Sublease will be in writing and will be served personally or sent by certified or registered mail using the United States Postal Service.

*Commercial Sublease Agreement* Page 6 of 9

**Master Lease**

31. Except as otherwise expressly provided in this Sublease, the Subtenant will perform all applicable duties and obligations of the Sublandlord under the Master Lease from July 1, 2021 until the end of the Term of this Sublease.

32. Except as otherwise expressly provided in this Sublease, the Sublandlord will have, as to the Subtenant, all applicable rights and remedies that the Landlord has with respect to the Sublandlord in the Master Lease.

33. This Sublease contains all of the conditions and terms made between the parties to this Sublease, and may not be modified orally or in any other manner other than by agreement in writing signed by all parties to this Sublease or their respective successors in interest.

34. This Sublease incorporates and is subject to the Master Lease, a copy of which has been or will be later provided to the Subtenant, and which is incorporated as if it were set out in this Sublease.

**General Provisions**

35. In the event of any legal action concerning this Sublease, the losing party will pay to the prevailing party reasonable attorney's fees and court costs to be fixed by the court and such judgment will be entered.

36. The Sublandlord may enter the Subleased Premises upon 24 hours' notice for any of the following reasons:
a. to inspect the Subleased Premises;
b. to maintain the Subleased Premises; or
c. to make repairs that the Sublandlord is obligated to perform.

37. This Sublease will extend to and be binding upon and inure to the benefit of the respective heirs, executors, administrators, successors and assigns, as the case may be, of each party to this Sublease. All covenants are to be construed as conditions of this Sublease.

38. All sums payable by the Subtenant to the Sublandlord under any provision of this Sublease will be deemed to be Additional Rent and will be recovered by the Sublandlord as rental arrears.

39. Where there is more than one Subtenant executing this Sublease, all Subtenants are jointly and severally liable for each other's acts, omissions and liabilities under this Sublease.

40. The Subtenant will be charged an additional amount of $25.00 for each N.S.F. check or check returned by the Subtenant's financial institution.

41. All schedules to this Sublease are incorporated into and form an integral part of this Sublease.

42. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Sublease. Words in the singular mean and include the plural and vice versa. Words in the masculine include the feminine and vice versa. The words "Sublandlord" and "Subtenant" as used in this Sublease include the plural as well as the singular; no regard for gender is intended by the language in this Sublease.

43. This Sublease may be executed in counterparts.

44. Time is of the essence in this Sublease.

45. The Sublandlord and the Subtenant have no interest or other rights of ownership in each other. The parties to this Sublease are not agents for each other. Under no circumstances will this Sublease be construed as creating a partnership or joint venture between the parties to this Sublease.

46. Each signatory to this Sublease acknowledges receipt of an executed copy of this Sublease.

47. This Sublease will not be valid and binding on the Sublandlord and Subtenant unless and until it has been completely executed by and delivered to both parties and the Landlord has consented to this Sublease.

**IN WITNESS WHEREOF** the Sublandlord and the Subtenant have duly affixed their signatures under hand and seal on this _____16TH_____ day of June 2021.

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through February 19, 2021.

Selected Entity Name: GOLD COAST MOTORS OF SUNRISE LLC
Selected Entity Status Information

Current Entity Name: GOLD COAST MOTORS OF SUNRISE LLC
DOS ID #: 5919236
Initial DOS Filing Date: JANUARY 15, 2021
County: NASSAU
Jurisdiction: NEW YORK
Entity Type: DOMESTIC LIMITED LIABILITY COMPANY
Current Entity Status: ACTIVE

Selected Entity Address Information
**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
GOLD COAST MOTORS OF SUNRISE LLC
180 MICHAEL DRIVE
SYOSSET, NEW YORK, 11791

**Registered Agent**

NONE

This office does not require or maintain information regarding the names and addresses of members or managers of nonprofessional limited liability companies. Professional limited liability companies must include the name(s) and address(es) of the original members, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

TRUTH IN GAMES

_Bruce CASAGRANDe_       _[signature]_       6/15/21
PRINT           SIGNATURE           DATE

GOLD COAST MOTORS OF SUNRISE LLC.

_Anthony Deo_       _[signature]_       6.15.21
PRINT           SIGNATURE           DATE