**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SUPERB MOTORS INC., et al.

      Plaintiffs,

                **MEMORANDUM & ORDER ON**
                **PRELIMINARY INJUNCTION**

     v.
                2:23-cv-6188 (OEM) (JMW)

ANTHONY DEO, et al.,

      Defendants.

 -------------------------------------------------------x
**ORELIA E. MERCHANT, United States District Judge:**

   Before the Court is an application for injunctive relief sought by plaintiffs Superb Motors

Inc. ("Superb Motors"), Team Auto Sales LLC ("Team Auto"), and Robert Anthony Urrutia

("Urrutia"), the owner of Superb and Team (collectively, "Superb" or the "Superb Plaintiffs")[1]

against defendants Anthony Deo ("Deo"), Deo's derivative corporate entities (also car

dealerships), and other individuals named in this action who work for or are otherwise connected

to Deo (collectively referred to in this motion as "Deo Defendants")[2] in connection with certain

vehicles that had been removed from Superb Plaintiffs' various dealership lots.   For the reasons

stated below and, upon review of all submissions and the arguments heard at the September 14,

2023 hearing, the Court finds a preliminary injunction is warranted to maintain the *status quo ante*.

---

[1] Though the Superb Plaintiffs are only three of the 17 named plaintiffs in this action, they are the plaintiffs animating this case and the ones that face irreparable harm.

[2]  Together, Plaintiffs have named a bank and financial companies as defendants, but only insofar as they were part of a purported RICO scheme.  These defendants are DLA Capital Partners, Inc., Thomas Jones, Jones, Little & Co. CPA's LLP, Flushing Bank, and Libertas Funding LLC.  The Court's order for injunctive relief does not apply to them.  *See, e.g.*, Kataev Decl. (ECF 12) ¶ 8.  This injunction binds Superb Plaintiffs and the Deo Defendants only.  For clarity, Deo Defendants are: Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Meckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp., and any agents thereof.

## I.     PROCEDURAL HISTORY

On August 16, 2023, Superb Plaintiffs brought an action against the defendants in this Court alleging that the defendants collectively engaged in numerous acts of fraud and schemes to pocket proceeds from Superb Plaintiffs' car sales in violation of the Civil RICO statute, 18 U.S.C. § 1962, as well as use Superb and Urrutia's trade secrets to compete against Superb Plaintiffs at car dealerships owned by Deo.  Complaint (ECF 1) ¶¶ 1-7, 176-219, 264-328, 334-360; Urrutia TRO Decl. (ECF 11) ¶¶ 99-201.

On August 20, 2023, Superb Plaintiffs filed a motion for a temporary restraining order ("TRO") and a preliminary injunction against defendants.  *See* ECF 9.  On August 25, 2023, this Court then granted the TRO in part only to the extent that the Deo Defendants were enjoined from "disposing of any automobiles in" their "possession belonging to Superb" or the Superb Plaintiffs, as agreed to by defendant's counsel, Harry R. Thomasson, Esq. ("Thomasson").  *Superb Motors Inc. v. Deo*, 2023 WL 5952145, at *5 (E.D.N.Y. August 25, 2023).  All other requests for injunctive relief in the TRO were denied.  *Id.*

On August 26, 2023, Superb Plaintiffs filed a Motion for Reconsideration (ECF 16), which the Court denied on August 27, 2023.  However, in the interest of justice, the Court advanced the preliminary injunction briefing schedule and set a hearing for oral argument on the preliminary injunction application for September 14, 2023.  At the preliminary injunction hearing, the parties indicated they would be amenable to settlement discussions involving the central dispute in this case so far: the relocation of various cars to Superb's lots.  The parties made their arguments and were then referred to Magistrate Judge Wicks to discuss a potential resolution pending this Court's ruling.  The next day, on September 15, 2023, the parties reached some agreements regarding certain cars and entered a stipulation as to them on the record.  *See* Wicks Settlement Rulings (ECF

2

45) ¶¶ 1-7.  Since the conference, the parties have not submitted any further requests, changes, or modifications of this stipulation or informed the Court of any other new or materializing harms.

## II.     RELEVANT FACTUAL BACKGROUND[3]

### A.  Deo & Superb Plaintiffs' Relationship

Urrutia and Deo met in November 2022 to discuss a potential partnership.  Compl.  ¶ 155. At this time, Urrutia solely owned Superb as well as a wholesale operation, Team Auto.  Urrutia TRO Decl. ¶ 1;  Cross Purchase Agreement (ECF 11-1).  On December 1, 2022, Deo and Urrutia entered into the Cross Purchase Agreement in which Deo received a forty-nine percent (49%) ownership stake in Superb via a stock transfer in exchange for $500,000 and a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and Sunrise Hwy Auto LLC ("Sunrise"), the two dealerships Deo claimed and represented to wholly own.  Compl.  ¶¶ 156-157; Urrutia TRO Decl.¶¶ 22-23, 38;  *see generally* Cross Purchase Agreement.  However, Urrutia remained the majority shareholder and president of Superb after the Cross-Purchase Agreement was signed.  Urrutia TRO Decl. ¶ 1.[4]

On December 22, 2022, Urrutia and Deo executed a shareholders agreement (the "Shareholders Agreement") which contained, *inter alia*, certain provisions regarding the "management of the Corporation's affairs."  Shareholders Agreement (ECF 11-6); Compl. ¶¶ 164-70; Urrutia TRO Decl. ¶¶ 41-43.  The Shareholders Agreement granted Urrutia "the right to make all decisions concerning day-to-day operations of the Corporation or to delegate such authority as

---

[3] The following background is taken from the entirety of the record and is undisputed for the purposes of this motion unless otherwise noted.

[4] There is no dispute that the Shareholder Agreement is valid, even though Urrutia claims that Deo misrepresented that he wholly owned Northshore and Sunrise at the time of execution.  Urrutia TRO Decl. ¶ 23**.**  Deo has provided amended tax returns that indicate he was the sole owner but no other corporate documentation.  Deo Preliminary Injunction Decl. at Ex. 3 (ECF 30-3).

the President desires."   Shareholders Agreement (ECF 11-6) ¶ 1(C)(i).   It also contained a

provision that effectively required Urrutia's written consent for:

> . . . (iv) the granting of any mortgage, lien, or other security interest in the assets
> of the Corporation;
>
> (v) loans and guarantees by the Corporation;
>
> (vi) sale or lease of real or personal property by the Corporation.

*Id.* ¶ 2(A)(iv)-(vi).

Additionally, under a section entitled "Business Responsibilities," the Shareholders

Agreement provides, in relevant part, that:

> Urrutia shall have the following responsibilities . . . :
>
> (iii) establishment of sales and administrative policies, as well as marketing
> techniques for automobile sales;
>
> (iv) approval and management of all sales and resales of used vehicles;
>
> (vi) establishment of policies and standards for services provided by the
> Corporation, as well as supervision and complete authority over Corporation's
> activities;
>
> (vii) review and final approval of financing arrangements with lending institutions
> to be utilized by the Corporation in financing the purchase of used vehicles by
> customers and approval of creditworthiness of potential purchasers of automobiles;
>
> (viii) supervise and have complete control of the accounting department of the
> Corporation, which shall include but not be limited to sole check authorization and
> sole control of bank accounts owned by the Corporation."

*Id.* ¶ 12(A)(iii)-(viii); *accord* Compl. ¶¶ 166-69.

Both the Complaint and Urrutia TRO Declaration generally establish that Deo was

delegated day-to-day operations of Superb until August 2023, when Urrutia "exercised his right to

remove Deo from the day-to-day operations of Superb Motors[.]"  Compl. ¶ 189; *see* Urrutia TRO

Decl. ¶ 41 ("Deo chose to serve as the General Manager."); *id.* ¶ 49.

During their partnership, Deo began forming various corporate entities – GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – to begin his own group of dealerships to be operated under the master entity Gold Coast Motors Automotive Group. Compl. ¶ 210. In February of 2023, Deo sought licenses with the Department of Motor Vehicles ("DMV") for one of his competing dealerships. Urrutia TRO Decl. ¶ 154. However, the time at which Urrutia became aware of this is disputed. Deo 9/15/23 Decl. (ECF 43) ¶ 12; *id.* at Ex. B2 at 6-7 (ECF 43-3).

**B. Dealerships: Floor Plan Financing**

As described in the Complaint and Urrutia's TRO Declaration, car dealers buy cars using specialized "floor plan" financing banks:

> Dealerships typically operate with the assistance of banks who provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership. When a dealership obtains such financing, the bank that provides the same perfects a security interest in the vehicles chosen and certain rules attached as a condition of the financing, i.e., with limited exceptions, any such vehicle financed must be present and available for sale at the dealership. In essence, "floor plan" financing is a credit line for dealerships to purchase vehicles for the purpose of reselling them. Once a vehicle is sold, the dealership must repay the bank the principal amount for each vehicle plus interest and any applicable fees.

Urrutia TRO Decl. ¶ 58 n.7.

Banks perfect a security interest in the cars purchased by the dealer; that is, the cars are collateral that the banks can repossess in the event of default. Dealers are generally not allowed to securitize the same collateral (*i.e.*, cars) more than once and banks condition extending floor plan credit subject to the requirement that the bank hold the most senior interest in the collateral. Compl. ¶¶ 178, 179. In car sales parlance, when a dealer securitizes the same car twice to receive two lines of credit, the dealer has engaged in impermissible "double flooring." Urrutia TRO Decl. ¶ 58. If a car is "double floored," each bank is, on paper, the senior lienholder; accordingly, the

practice is forbidden by floor plan financers. *See, e.g.*, Nissan Motor Acceptance Company ("NMAC") Floor Plan Contract (ECF 18-1) at ¶ 1("NMAC shall have a first priority UCC-1 filing on all dealership assets."). Additionally, floor plan financing agreements also require that the collateralized vehicles remain on the dealership's floor and prohibit the vehicles from being used until sold. Compl. ¶ 177. Noncompliance with these conditions will trigger default events which may then result in penalties that include demands for payment on an accelerated schedule, payment in full, or even termination of the floor plan contract in full with the repayment of the balance due. *See, e.g.*, NMAC Notification of Default and Demand for Payment dated August 15, 2023 (ECF 14-1).

### C.  Missing Cars, Double Flooring, and Defaults with Floor Plan Financers

To the Court's knowledge, Superb works with two floor plan financers: NMAC and Next Gear Capital ("Next Gear"). *See generally* Superb Ltr. Mot. for Reconsideration; Next Gear Emails (ECF 11-19).

On July 31, 2023, NMAC contacted Bruce Novicky ("Novicky"), the Chief Operating Officer of Superb Motors, to inform him that NMAC had discovered that certain vehicles NMAC had financed for Superb Motors were also financed with another bank (*i.e.*, double floored) in breach of Superb Motors' floor plan agreement with NMAC. Compl. ¶ 178; Urrutia TRO Decl. ¶ 106.

In any event, on or about August 3, 2023, Urrutia tasked Novicky with doing a physical audit of Superb Motors' car inventory. Novicky's internal audit revealed that "over one hundred (100) vehicles [were] missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger." Compl. ¶¶ 184-85; Urrutia TRO Decl. ¶ 112; Deo Decl. Opp. TRO ¶ 36 (102 vehicles missing); ECF 11-15 ("List of Missing Cars"). Novicky then confronted

Deo about the missing vehicles.  On the evening of August 3, 2023, the police were called to Superb Motors and the detectives questioned Deo regarding the missing cars, but no further action was taken.  Compl. ¶ 181; Deo Decl. Opp. TRO ¶¶ 35, 36; Superb Ltr. dated 8/9/2023 (ECF 12-1) at 2, ¶¶ 5-6.  Later, however, at the September 15, 2023, hearing, Superb's counsel clarified that the list of "missing" vehicles was "currently only 89."  PI Hr'g Tr. 43:7-8.

On August 8, 2023, NMAC itself conducted an inventory audit which resulted in a list of 30 cars marked as "stolen."  NMAC Demand Ltr. dated 9/8/2023 (ECF 14-1).  As a result, NMAC sought payment of $1,183,101.25 by August 11, 2023 for 30 cars reported as "stolen" on the audit. *Id*. at 3.  On August 15, 2023, NMAC performed an inventory audit at the Superb Motors dealership and propounded a demand for payment for $756,914.50 for cars that were "not available for inspection and count at the authorized Dealership Location, which is 215 Northern Blvd., Great Neck, NY 11021, or (b) not verifiable as subject to NMAC's first lien security position under the Wholesale Agreement."  NMAC Demand Ltr. dated 8/15/23 (ECF 14-2).  The balance became due on August 16, 2023.  On August 17, 2023, the plaintiffs filed their case against defendants.

On August 18, 2023, NMAC issued a "Notice of Termination" letter to Urrutia and Superb Motors informing them that "effective as of September 18, 2023, NMAC will terminate the [Floor Plan] Agreement, pursuant to its terms, by which date [Superb Motors] is required to repay to NMAC the remaining outstanding balance owed the Wholesale Agreement."  NMAC Termination Notice (ECF 18-2).  The letter shows, and Superb's counsel confirmed, that Urrutia's three other dealerships were also guarantors to Superb's repayment obligation, and thus, these dealerships were cross-collateralized with Superb Motors.  *See id.*  As for the reason for the termination, NMAC simply stated that it was "in the best interests of NMAC."  *Id.* at 1.

At some point, Urrutia repaid NMAC a balance of nearly $2 million.  *See* Superb Letter Mot. for Reconsideration at 3; PI Hr'g Tr 33:6-9 (describing $1.9 million in payoffs Urrutia had made).  As far as the Court is aware, NMAC has also followed through with terminating its relationship with Urrutia and Superb Motors.  Further, Superb's counsel represented that, in any event, NMAC had effectively already terminated the contract by refusing to allow Superb Motors to continue purchasing or "placing" vehicles on the floor plan financing line.  PI Hr'g Tr. 38:19-25, 39:1-15, 40:20-25.  However, Superb Motors financial problems did not stop with NMAC.  Next Gear also came calling to the tune of $391,698.48 for 12 cars that had been found to be missing from Superb's lots.  *See* PI Hr'g Tr. 33:16-25, 34:1-7; 35:12-15.  At the preliminary injunction hearing, Superb centered this latest "margin call" as the impending threat of irreparable harm.  *See* Next Gear Payoff Demand as of 9/13/2023 (ECF 38-1); PI Hr'g Tr. 22:22-25, 33:11-24 ("If we don't pay almost $400,000 tomorrow, which we cannot do, we will be declared in default, and we'll never get another lender to provide full plan financing for us.  We'll be dead in the water.  Right now, we're limping.  Tomorrow, we'll be dead without this.").

### D.  Trade Secret Allegations

In addition to the alleged stolen or misappropriated vehicles, Superb Plaintiffs also assert that defendants misappropriated confidential information and trade secrets.  Through it's continued filings and at oral argument, it became clear that Superb Plaintiffs claimed interest in two different types of trade secrets: one in a customizable version of a Tekion brand dealer management system ("DMS") that was programmed with Urrutia's dealership and car sales insights and another in a customer relationship management ("CRM") system that contained customer information and sales leads.  PI Hr'g Tr. 88:1-17.

In general terms, Urrutia explains that it cost him over $120,000 to set up and customize the Tekion DMS, which contained his personalized "blueprint for [his] success" in the car sales business.  Urrutia TRO Decl. ¶ 136.  He also alleges that Superb Motors' CRM information is confidential and that these trade secrets and confidential information provided Superb a unique competitive advantage in the automobile dealership industry.  Compl. ¶¶ 247, 336.  As a result, Urrutia asserts he took "many reasonable measures to keep [Superb Motors'] confidential information secret, including restricting access of this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords." Compl. ¶ 248.

Urrutia asserts that Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia as co-owners of Superb Motors.  Compl. ¶ 246.  Urrutia further alleges that during the top-down audit, Novicky discovered that Deo sought to misappropriate the DMS and bring it to his dealerships.  Urrutia TRO Decl. ¶ 137.  Further, Urrutia alleges that Deo stole the exact Tekion DMS customizations (created by Urrutia himself) from Superb Motors to use at Deo's competing group of Gold Coast dealerships, and had Superb Motors employees work for Gold Coast dealerships, even though these employees were employed and being paid by Superb Motors.  Further, Urrutia alleges that Deo allegedly illegally disclosed confidential and proprietary information (customer list with contact information, custom DMS system, etc.) to these employees to set up Deo's Gold Coast dealerships.  Urrutia TRO Decl. ¶¶ 137-141.

### III.  STANDARD OF REVIEW

#### A.  The Preliminary Injunction Standard

Behind all injunctive relief lies the court's inherent equity powers.  *Wagner v. Long Island Univ.*, 419 F. Supp. 618, 622 (E.D.N.Y. 1976).  Courts should deploy their equitable powers only to keep the parties *in statu quo* until the underlying merits can be sorted.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties.").  Accordingly, a party seeking relief in equity must demonstrate that there exists a harm that is sufficiently certain, "imminent," and irreparable such that, absent an injunction, a potential award of damages after litigation would not suffice.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992) (explaining that "courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief" and that "the prospect of [harm at issue] must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury.").  Additionally, a party must show some reasonable chance of success on its underlying legal claim such that the court can entertain the action.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'").  Lastly, a court must also "balance the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief," as well as the "public consequences in employing the extraordinary remedy of injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted).

From these principles, the Second Circuit has derived the now-common test courts must apply before granting injunctive relief: "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence." *Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr*., 368 F. Supp. 3d 723, 725 n.2 (S.D.N.Y. 2019).

**B.  Determining the Status Quo Ante and Applicable Merits Review Standard**

Before discussing the merits of the application, the Court addresses two related antecedent issues: (1) the applicable "status quo ante" and (2) which merits review standard applies.

As the purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held," it is incumbent on the Court to determine the status quo ante. *See N. Am. Soccer League*, 883 F.3d at 37 (quoting *Camenisch*, 451 U.S. at 395). While courts frequently omit the term "ante," the Second Circuit has taken care to explain that "the 'status quo' in preliminary-injunction parlance is really a 'status quo ante.'" S*ee id.* at n.5. This is for good reason.

First, utilizing the "special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Id.* Given the unusual facts of this case, the Court finds this formulation more apt.

Second, determining the status quo ante is essential as it informs or "drives" the applicable merits review standard. *Id.* at 37. Injunctive relief is generally described as "prohibitory" or "mandatory" in nature. *Id.* at 36. If the injunctive relief sought "*alters* the status quo, which

11

usually is done by commanding some positive act," it is considered "mandatory" and, consequently, the Court must set the bar higher for the movant who must show a "substantial likelihood of success on the merits standard." *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (emphasis added); *N. Am. Soccer League*, 883 F.3d at 36-37 ("Because mandatory injunctions disrupt the status quo party seeking, one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merit.") (cleaned up).[5]  Conversely, where an injunction "maintain[s] the status quo[,]" it is "prohibitory" in nature, and the Court may apply the "substantial questions" standard.  *N. Am. Soccer League*, 883 F.3d at 36-37.

However, as the Second Circuit has repeatedly observed, focusing on the semantics of whether the action itself is "prohibitory" or "mandatory" can obscure the purpose of the injunction, which is to maintain the status quo as it was between the parties prior to litigation.  This is a relevant concern for a court exercising its equitable powers, as this Court today.  *See N. Am. Soccer League,* 83 F.3d at 36 n.4 ("We focus on the status quo rather than the 'mandatory' and 'prohibitory' terminology because 'in borderline cases, injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms.'") (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994)); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics.  Determining whether

---

[5] The Court also notes that this case is also not a case in which the plaintiff "seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits" and would thus require the "clear or substantial likelihood" to apply.  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995); *accord JTH Tax*, 62 F.4th at 667.  The injunction the Court imposes today merely freezes for the time being the geographic placement of the cars at issue.  Such a freeze certainly may meaningfully be undone by the end of the litigation when the possessory interests or authority over the vehicles have been sorted.  Moreover, the Court has not granted injunctive relief as to any of the other Superb's requests.  Equally, this is not a case where the "preliminary injunction [] will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," which would also require a heightened standard.  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

the status quo is to be maintained or upset has led to distinctions that are "more semantic [ ] than substantive.").

To ascertain the status quo ante, the Court must look to "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.; accord DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 406 (E.D.N.Y. 2021) (subsequent history omitted). Here, there is no dispute that prior to the pending controversy, and at least as far as August 3, 2023, Superb Motors was a going concern as a car dealership owned in part by both Deo and Urrutia and that Superb Motors was not in default with NMAC or Next Gear.

Further, by the parties' own documentation and assertions by their counsel at oral argument, at some time prior to August 3, 2023 a tranche of cars titled to Superb Motors were removed from Superb Motors' lots.[6] and placed on Deo's Gold Coast Syosset and Amityville lots *prior* to the lenders' floor audits that led to the default findings by NMAC and Next Gear. *See* Urrutia TRO Decl. ¶¶ 111-15; Deo Decl. Opp. TRO ¶ 18 ("In fact, that these Superb cars have been at my other two lots is well documented . . . ") *Id.* ¶ *38* ("Attached hereto as Exhibit G is a true and . . . accurate copy of that list, as marked up by me and my wife to confirm which *cars belong to Superb and are in our possession* . . . ") (emphasis added); *id.* at Ex. G. (ECF 30-8) (listing Superb cars, including cars marked as in Deo's possession, as of 9/11/2023); Thomasson Decl. (ECF 30-1) ¶ 25; Ex. J. to Urrutia P.I. Decl. (ECF 38-10) (Titles to Superb Vehicles); PI H'rg Tr. 74:9-12 (defense counsel explaining "Urrutia knew . . . the cars were being stored over at

---

[6] Superb's counsel conceded at oral argument that cars were not strictly required to be on Superb Motors' Northern Boulevard lot but could also be located at any of Urrutia's other cross-collateralized dealerships for a default event. *See* PI H'rg Tr. at 48:16-25; 49:1-21; *see* Nissan Demand Ltr. Dated 9/18/2023 (ECF 18-2) at 3 (listing the other cross-collateralized dealerships); *see also* Compl. ¶ 154 (listing Urrutia's dealerships). For ease of comprehension, the Court may refer to Superb's lot or lots, but these references include all cross-collateralized dealerships.

Syosset and Amityville for Superb"); 76:13 ("[Deo] doesn't get titles").[7]  So, while the injunction requires affirmative action on the part of the Deo Defendants – a return of the cars to Superb's lots – and is nominally "mandatory,"  this positive action by the Deo Defendants is required to *keep* the parties in status quo ante, *i.e.*, Superb as it was when it was a going concern without default with the cars on the required lots.  Thus, this is, in substance, a "prohibitory" injunction and perhaps exactly one of the "borderline" situations the Second Circuit contemplated when advising courts to eschew semantics when finding the substantive status quo ante.

Given (a) the foregoing finding that the ensuing injunction maintains rather than alters the status quo and (b) the Court's finding below that the balance of hardships decidedly tips in Superb's favor at this juncture, the Court finds it prudent on this record to apply the "substantial questions" standard in its legal merits review.  *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010).

## IV.   DISCUSSION

### A.  Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered."  *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (cleaned up); *accord Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  "To satisfy the irreparable harm requirement, plaintiffs must

---

[7] The Court need not address here any purported knowledge of acquiescence by Superb; the plain terms of at least the NMAC contract require the cars to be on the lot, which is indeed the cause of the harm that Superb was threatened by.  *See* NMAC Floor Plan Agreement (ECF 18-1) at § 3.1 (PDF pg. 9) (Dealer's Responsibilities) (The "Dealer shall keep all Property at a Dealership Location."); § 1.8 (PDF pg. 8) (Definitions) ("'Dealership Location' means Dealer's Address and any other location where Property may be located.").

demonstrate that absent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

At the TRO stage, Superb initially advanced two theories of harm.  One theory was predicated on Deo's purported use of dealership's trade secrets and proprietary dealership information to usurp Superb's business and clientele, while the other theory was predicated on the imminent closure of Urrutia's dealerships given the default events discovered by NMAC and Next Gear.  *See Superb Motors Inc.*, 2023 WL 5952145 at *4.  However, as this litigation has progressed, it has become clear that Superb's primary theory of irreparable harm stems from the latter.  *See e.g.*, Superb Mot. for Reconsideration at 1, 4-5 (explaining how default repayments have left Superb Motors "with no operating capital" and will result in "imminent shut-down of all four (4) dealerships"), Superb Mot. for P.I. (ECF 39) at 3 (claiming that denial of an injunction will result in "plaintiffs being forced to pay another $1 million and forced out of business due to no operating capital"); PI H'rg Tr. 31:4-33:24 (discussing same).  Accordingly, the Court only addresses loss of business theory.[8]

The law finds the threat of a loss of business as a going concern cognizable as an irreparable harm.  The Second Circuit reaffirmed this proposition in *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667-68 (2d Cir. 2023).  In *JTH Tax*, the Circuit agreed with the district court's "implicit" finding that a small tax preparation business franchisee facing termination of her agreements would "suffer

---

[8] To the extent Superb does maintain a theory of irreparable harm stemming from the use of any purported trade secrets, the Court finds any such theory wanting evidence to support such harm in fact, much less of an order of magnitude such that the loss of business to Superb could be irreparable.  *See* PI H'rg Tr. 89:23-91:12.

irreparable harm if she were wrongfully put out of business." *Id.* at n.2.[9]  The court observed that closure of the franchisee's business would render her "unable to provide for her family" and that "she needed to continue operating her business in order to have the funds necessary to defend herself against Liberty." *Id.* at 668.

In doing so, the Court credited a long-running line of Second Circuit that affirmed the principle that irreparable harm may lie where "the very viability of the plaintiff's business" is "threatened." *Id.*  (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)) (internal quotation marks omitted); *See id.* (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (finding that a family-owned car dealership would be irreparably injured by wrongful termination of its franchise agreement because termination would "obliterate[]" the business and "the right to continue a business . . . is not measurable entirely in monetary terms;  the Semmes want to sell automobiles, not to live on the income from a damages award"); then citing *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124, 125-26 (2d Cir. 1984) (holding that a closure of a family-owned business could not "be fully compensated by subsequent monetary damages" because the "ongoing business represent[ed] many years of effort and the livelihood of its husband and wife owners").[10]

---

[9] To be clear, the Circuit panel's affirmation of the loss of business as an irreparable harm was in the context of determining whether the district court had properly applied the heightened injunction standard.  In finding so, the Court concluded that because the plaintiff-appellant tax preparation franchisor wanted to terminate the defendant-appellee tax preparer's franchise, and that franchisee would thus be left without a "*meaningful remedy* if she were erroneously forced to close her locations," the lack of meaningful remedy warranted the heightened standard. *JTH Tax*, 62 F.4th at 668 (emphasis in original).  Thus, the Circuit seemed to indicate that demonstrating a lack of meaningful remedy could also act as an indicium of irreparable harm.  Ultimately, the facts of *JTH Tax* are converse to those here.  In *JTH*, the preparation franchisor was the movant for a preliminary injunction and lost on both the irreparable harm and merits showing, given the heightened standard.  *See generally JTH Tax LLC v. Agnant*, 2022 WL 1556656, at *9 (E.D.N.Y. May 17, 2022), *aff'd*, 62 F.4th 658 (2d Cir. 2023).  However, as discussed above, the grant of injunctive relief here will not make it impossible to render Deo a "meaningful remedy" should he prevail on the merits. *JTH Tax*, 62 F.4th at 668.  Thus, in this case, "there is no reason to impose a higher standard." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 35 (2d Cir. 1995).

[10] The Court is aware that unlike *JTH Tax, Semmes,* and *Roso-Lino*, the facts here do not involve a so-called mom-and-pop or individual-proprietorship business.  Additionally, nor does this  necessarily upend the proprietor's individual and personal livelihood.  Here, Urrutia claims that Superb (and likely his other dealerships) – which do not operate on a franchise model as far as the Court is aware – will go out of business and may have to declare bankruptcy absent injunctive relief.  But the Court knows no more about Urrutia's personal financial picture.  Notwithstanding this, the Second Circuit explicitly explained in *JTH Tax* that

16

Other courts in this district have continued to uphold this principle. *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 106 (E.D.N.Y. 2015), *aff'd in relevant part, vacated on other grounds*, 841 F.3d 133 (2d Cir. 2016) ("A 'substantial loss of business,' particularly where there is a threat of bankruptcy, constitutes irreparable injury sufficient to satisfy this standard."); *Long Island Lighting Co. v. Suffolk Cnty., N.Y.*, 628 F. Supp. 654, 661 (E.D.N.Y. 1986 ) ("It is well settled that an act threatening the destruction of an ongoing business concern constitutes irreparable harm.") (citation omitted); *Janmort Leasing, Inc. v. Econo-Car International Inc.*, 475 F. Supp. 1282 (E.D.N.Y. 1979) ("In this circuit it is firmly settled that the loss or destruction of a going business constitutes irreparable harm."); *Newport Tire & Rubber Company v. Battery,* 504 F. Supp. 143, 150 (E.D.N.Y. 1980) ("In this circuit, it is well settled that an act that threatens an ongoing business with destruction causes that business irreparable injury."); *see also Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1186 (2d Cir.1995) ("Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury.").

With the validity of this proposition settled, the Court can readily conclude from the parties' submissions that irreparable harm will likely befall Superb Plaintiffs absent an injunction.[11] Because of default events from the missing cars, Urrutia and Superb Motors already

---

its decision "not suggest that only small businesses can suffer irreparable harm when forced to close. The principles that we described above have been applied to larger businesses, too." 62 F.4th at 68 (citing *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (operators of a nuclear power plant)). Thus, the Court finds that auto dealerships like Superb Motors fit comfortably within this continuum.

[11] The Court notes that the temporary stipulation capably and swiftly overseen by Magistrate Judge Wicks has actually kept Superb Motors from the alleged financial ruin. However, this does not moot the issue here at the preliminary injunction stage because it is axiomatic that cessation of allegedly wrongful conduct does not moot requests for injunctive relief if the same harm is reasonably likely to recur. *Cf. Ford v. Reynolds*, 326 F. Supp. 2d 392, 405 (E.D.N.Y. 2004) ("Situations 'capable of repetition, yet evading review' constitute an exception to the mootness doctrine.") (citation omitted), *aff'd*, 167 F. App'x 248 (2d Cir. 2006); *Granite State Outdoor Adver., Inc. v. Town of Orange, Conn.,* 303 F.3d 450, 451 (2d Cir. 2002) (a case is moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."). Here, it is clear that absent this temporary stipulation, the cars would remain in Deo's lots (as he maintains he has the right and authority to them), and NMAC and Next Gear would once again perform their monthly audits or "touches" of all the cars on Superb Mortors' lots and find Superb Motors in default and likely

had to pay NMAC nearly $2 million dollars.  *See* Urrutia Reply. Decl. ¶ 4 n.1 ("$2,331,714.23 in payoffs"); Superb Mot. for Recons. (ECF 16) at 3 ("repay early $2 million dollars"); *see also* PI H'rg Tr. 33:5-6, 40:22-41:7.  Further, as far as the Court is aware, NMAC has stopped doing business with Superb and may never act as a lender to Superb or Urrutia again.  *See* Notice of NMAC Termination (ECF 18-2); Urrutia Reply Decl. ¶ 9; PI H'rg Tr. 41:20-25.  Thus, while Superb's operational capital is essentially "depleted," Superb still faces the imminent pains of default with at least one other lender, Top Gear, which is owed $391,698.48 in immediate payment for at least 12 vehicles which are not on Superb's lots, and to which Superb does not currently have possession.  PI H'rg Tr. 22:24-25, 33:11-24, 39:14-15; Urrutia Reply Dec. ¶ 7; Next Gear Payoff Demand (ECF 38-1).

As Urrutia explains, while in default Superb Motors "cannot place *any* vehicles on a floor plan with Next Gear" (or NMAC, given the termination) and "[w]ithout relief, [Superb Motors] cannot establish any new line, will not be able to remain a going concern, and will be forced to default on [its] agreement with Next Gear, because [] Superb do[es] not have the funds to make the aforementioned payoff demanded by Next Gear . . . which default will prevent [it] from having a floor plan with any other bank."  Urrutia Reply Decl. ¶¶ 5-8.  Further, as represented by counsel at the hearing, Superb Motors is also "facing . . . bankruptcy, terminations of employees, and we're going to lose this location."  PI H'rg Tr. 34:3-5.  *See* Superb Ltr. Mot. for Reconsideration at 4 (the required repayment to Next Gear with the given level of operating capital will "result in the imminent shut-down of all four (4) dealerships owned by Urrutia, bankruptcy, and the layoff

---

demand the same accelerated or wholesale payments of the remaining credit lines.  *See* PI H'rg Tr. 32:1-20 (explaining monthly "touches"); 42:1- 43:20 (explaining auditors verification processes); 66:18-20 (Deo's counsel stating there have been "touches on these cars at least [since] since January every month");  *see also* Urrutia Reply Decl. ¶ 58 (48 "vehicles were 'touched' by auditors at NMAC and Next Gear after August 3, 2023, in the days thereafter.").  Accordingly, the Court proceeds and analyzes the motion in its factual posture when it was submitted, notwithstanding the temporary stipulation.

of over 100 employees.  Indeed, Defendants' conduct has already caused the layoff of sixteen (16)

employees out of the twenty-seven (27) originally employed at Superb"); Superb Reply MoL (ECF

39) at 2 (Superb will be "forced to pay another $1 million and forced out of business due to no

operating capital.").

Importantly, Deo does not dispute the veracity or validity of any of the foregoing harms.

*See JTH Tax*, 62 F.4th at 668 ("Notably, Liberty has not endeavored to explain how, if at all, a

court could grant [franchisee] a meaningful remedy if she were wrongfully forced to close.").  At

most, Deo levies accusations without supporting facts that Superb Motors wounds were self-

inflicted and that Urrutia is not to be trusted.  *See* Deo Opp. Decl. (ECF 30) ¶¶ 49 ("[T]he

'emergency' that purportedly exists with these cars by and through whatever

correspondence/hearsay is presented purportedly from the Floor Plan providers was entirely

arranged by [Superb Plaintiffs]"), *id.*  ¶ 39 ("We do not and cannot trust these Plaintiffs for any

reason.").  But, even if these accusations bore out as true, it does not make these harms any less

real to Superb Motors now.[12]

In light of the foregoing record and the possibility of losing Superb Motors as a going

concern as well as Urrutia's other cross-collateralized dealerships, the Court concludes that Superb

has demonstrated irreparable harm.

### B.  Substantial Questions as to the Merits

"A party [] is not required to prove his case in full at a preliminary injunction hearing."

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  As the Court has explained above, *see*

Part II.B, *supra*, the Court concludes the "serious questions" standard applies.  Superb must

demonstrate a "serious question going to the merits" on at least one of its claims to make them a

---

[12] Tellingly, while Deo claims that Urrutia has made many other lies, he does not attack these facts.  *See, e.g.*, Deo 9/15/2023 Decl. in Opp. (ECF 43) ¶¶ 5, 12, 14, 15.

fair ground for trial, with a balance of hardships tipping decidedly in the Superb's favor.  *Id.* "Further, Plaintiffs need not demonstrate a likelihood of success on the merits of *every* claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims." *Home It, Inc. v. Wen,* 2020 WL 353098, at *5 (E.D.N.Y. January 21, 2020) (quoting *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019)) (emphasis added); *see also Eve of Milady v. Impression Bridal, Inc.*, 957 F. Supp. 484, 487 (S.D.N.Y. 1997) ("Where a plaintiff seeks a preliminary injunction and asserts multiple claims upon which the relief may be granted, the plaintiff need only establish a likelihood of success on the merits on one of the claims. Because I find plaintiffs' copyright infringement claims provide a basis for granting a preliminary injunction, I will not address their other claims.") (citing *Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc.*, 683 F. Supp. 50, 52 (S.D.N.Y.), *aff'd*, 859 F.2d 148 (2d Cir. 1988)).  Here, because the Court concludes that there are at least "serious questions" going to Superb's DTSA claim, it does not address merits of any other claims.[13]

Substantively, "[t]he 'serious questions' standard permits a district court to grant a preliminary injunction . . .  where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F.

---

[13] The Court briefly pauses to address what may appear as a tension between the demonstrated irreparable harm to Superb's business predicated upon Deo's allegedly wrongful placement of the cars on his lots with the harms potentially caused by his alleged misappropriation of Superb's trade secrets pursuant to the DTSA.  The Court acknowledges that the DTSA allegations are too speculative at this juncture to warrant a finding of "irreparable harm."  *See* Part III.A, *supra*.  The Court is cognizant that the potential harm flowing from a DTSA claim is not the basis upon which the Court finds irreparable harm will likely inure to Superb. Rule 65 does not require as much.  In any case, the injunction maintaining the cars at Superb's lots will directly ameliorate the business harm created by their absence.  Further, Circuit courts have repeatedly opined that a movant "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728-29 (9th Cir. 2012) ("[T]he risk is not exclusively attributable to the challenged regulation . . . , but the challenged regulation and resulting [effect] will exacerbate that risk.") (citing *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir.2004)); *accord Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018).  Lastly, as the Second Circuit noted in *JTH Tax*, the franchisee "needed to continue operating her business in order to have the funds necessary to defend herself against" the franchisor attempting to terminate her contracts. *JTH Tax*, 62 F.4th at 668.  'The Court is without evidence that Superb could continue to litigate its various claims against Deo absent injunctive relief.

App'x 723, 724 (2d Cir. 2020) (summary order) (quoting *Citigroup*, 598 F.3d at 35). The value of the "serious questions" standard "to assessing the merits of a claim at the preliminary injunction stage lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Id.*

### 1. Defend Trade Secrets Act Claim[14]

The Defend Trade Secret Act ("DTSA") prohibits any person "with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret," from, *inter alia*, knowingly, and without authorization, stealing, misappropriating, copying, duplicating, transmitting, communicating or conveying such information; receiving or possessing such information, knowing that it was "stolen or appropriated, obtained, or converted without authorization;" attempting to commit any such offense; or conspiring with others to commit any such offense, "and one or more of such persons do[es] any act to effect the object of the conspiracy[.]" 18 U.S.C. § 1832(a); *accord Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020).

The statute defines the term "trade secret" to mean:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

---

[14] The Court notes that "the requirements for showing a misappropriation of a trade secret are similar under state and federal law." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). Here, Superb alleges both in their complaint. Compl. ¶¶ 349-68. Because the Court finds that there are substantial questions going to the DTSA claim, it does not address any other claims.

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); *accord Intertek*, 443 F. Supp. 3d at 339.

The term "misappropriation" is defined in the DTSA to mean:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who-- (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-- (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that-- (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5); a*ccord Intertek*, 443 F. Supp. 3d at 340.

Putting these elements together, "[t]o succeed on a claim misappropriation of a trade secret under the DTSA, a plaintiff must show that the trade secret was: (A) acquired by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosed by another without express or implied consent." *Intertek*, 443 F. Supp. 3d at 340. *See Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) ("[U]nder the [DTSA], a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.") (cleaned up).   The term "improper means" is defined to include "theft, bribery,

22

misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;" but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

Here, the evidence in totality raises substantial questions as to whether Deo has misappropriated or copied a trade secret without Superb Motors' authorization and against a fiduciary duty he owed Superb Motors as a forty-percent owner.  *See DFO Glob.  Performance Com. Ltd. (Nevada) v. Nirmel*, No. 20-CV-6093 (JPO), 2021 WL 3475596, at *8 (S.D.N.Y. August 6, 2021) ("It is axiomatic that corporate officers owe fiduciary duties to their corporation."). Superb's submissions and representations at oral argument establish that Urrutia purchased from Tekion a customizable DMS interface for $120,000.00.  Compl. ¶ 214.  Urrutia, who has been established in the car sales business for at least 30 years, then customized the DMS as well as the CRM module, which "contains all the customer's names and the customer database" and claims it as his "blueprint" to success at his dealerships.  Compl. ¶¶ 214-215; Urrutia TRO Decl. ¶ 34, 134-36; *see also* PI H'rg Tr. 58:21-24; Ex. B to Urrutia Reply Decl. (ECF 38-2) (Urrutia-Deo texts) at 1.  As Superb's counsel explained at the PI Hearing:

> Months were spent with the Tekion team.  Mr. Urrutia and others worked at Superb to create a customized setup that allows you to streamline dealership operations. Think of a flow chart discussing the first step of every dealership operation and what's involved.  There are monthly accounting requirements for all sorts of different things, and Mr. Urrutia's unique knowledge of this industry allowed him to customize the setup of Tekion in such a way as to make the dealership more profitable.  That's his know-how; that's his unique knowledge that Deo does not have.
>  . . .
> That customization is based on the knowledge of Mr. Urrutia, who has 30 years of experience in the industry.

PI H'rg Tr. 88:8-17, 63:13-15.

Urrutia avers that "Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary."   Urrutia TRO Decl. ¶¶ 166; *Id.* ¶ 135 ("unique confidential, and proprietary").   While Urrutia indeed taught Deo how to use the Tekion DMS and allowed him access to the system, it was for the purpose of advancing Superb Motors' business, in which Deo was a financial stakeholder and a fiduciary.  *Id.* ¶ 169.

Additionally, Urrutia claims that the purported confidential information had "independent economic value" as it was not generally known or readily ascertainable and that he took "many reasonable measures to keep Superb's confidential information secret" such as "restricting access of this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords."  *Id.* ¶¶ 171-73; PI H'rg Tr. 58:11-24.   However, Superb's counsel clarified at the hearing that:

> COUNSEL: An employee wouldn't be given complete access to the CRM system. He or she would only be given user-level access to do his or her duties.  This list of customers is not something that's publicly posted anywhere that you can just go and get.  So, all of those things are evidence of how we acted to keep, you know, this information a trade secret.
>
> THE COURT: Did every sales associate have access to that information?
>
> COUNSEL: It's my understanding that the CRM system allowed leads to be assigned to people.  I'm not – I can't state specifically whether a salesperson had access to each and every lead, but it's my understanding that leads can be assigned, and they were assigned.

PI H'rg Tr. 60:5-17.

Ultimately, the thrust of Superb's claims at the hearing was that Deo "stole the exact customization to use at his competing group of [Gold Coast] dealerships" in violation of his fiduciary duties to Superb Motors.  Urrutia TRO Decl. ¶¶ 135, 138-39; *see* PI H'rg Tr. 62:11-

24

63:22.  Even if Deo had purchased a Tekion DMS, he would have had to customize it based on his own knowledge.  PI H'rg Tr. 57:20-25.  Superb asserts that because Deo did not have Urrutia's amassed knowledge, Deo resorted to copying the "imparted the confidential know-how Urrutia imported to him, as well as the proprietary information Superb had in its possession, *i.e.*, Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information to these employees for the purpose of setting up Deo's own group of dealerships."  Compl. ¶ 218; Urrutia TRO Decl. ¶¶ 140-41 (The Tekion DMS "contained the blueprint for my success at my dealerships because I knew how to use the customized features of Tekion to profitably operate dealerships."); Urrutia-Deo Texts (ECF 38-2) at 1 (Deo: "I would love to see how Tekion works"); *id.* at 58 (Urrutia: "I need you to understand . . . how Tekion works."); *see also* PI H'rg Tr. 58:1-3 (Deo also "gained the CRM system and he took with him all of the leads for all of the customers that were Superb's."); *id.* 63:7-15 (confidential information derived from Urrutia's amassed 30-year knowledge of the auto sales industry); *id.* 88:14-17.

Superb's counsel admitted that what Deo unlearn what he retained in his memory about the automotive sales business.  However, counsel maintained that Deo "took the [Tekion] setup" by copying or downloading it and taking it to his dealerships and did the same with the customer leads.  *See id.* 89:18-22, 58:1-3 (CRM), 90:9-16.  While Superb's counsel explained that his clients did not have a chain of custody or forensic evidence to prove so at the time of the hearing, Superb Motors had conducted a preliminary investigation, which led Superb to this belief.  *Id.* 91:1-12.  Conspicuously, Deo's own declarations do not dispute this account.[15]  *See generally*, Deo Opp. Decl. (ECF 30); Deo 9/15/2023 Decl. in Opp. (ECF 43).

---

[15] At oral argument, Deo's counsel denied that Deo had any "proprietary information."  However, counsel failed to engage with the difference that it was the customization could be the proprietary trade secret.  *See* PI H'rg Tr. 87:10-15 ("They tell you it's been customized? What does that mean?").

The record does not set out an exemplar of a DTSA claim, but it need not at this juncture. In weighing the evidence available, the Court finds there are at least substantial questions that merit further litigation of the DTSA claim.  "Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *Jasco Tools, Inc. v. Dana Corp. ("In re Dana Corp.")*, 574 F.3d 129, 152 (2d Cir. 2009) (applying New York law).  Additionally, a customer list "developed by a business through substantial effort and kept in confidence may be treated as a trade secret . . .  provided the information it contains is not otherwise readily ascertainable." *Drennen*, 235 F. Supp. 3d 559, 566 (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999)).  "The question of whether or not a customer list is a trade secret is generally a question of fact." *Id.* (quoting *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991)).

The Court concludes there are substantial questions as to whether Deo copied Superb Motors' Tekion DMS customization and used it to benefit himself at Gold Coast or disclosed or disseminated the information to his Gold Coast employees in breach of his duties to Urrutia and Superb Motors.  Superb has provided enough evidence to demonstrate that the claim is "fair ground[s]" for discovery and further litigation.  *Citigroup*, 598 F.3d at 34.  Additionally, the evidence establishes that the CRM system associated with the Tekion DMS system contained customer lists and sales leads generated and compiled by Urrutia over his significant period of time in the auto business.  Though Deo himself claims his Gold Coast dealerships are not "active," other evidence undercuts that contention.  Deo Opp. Decl. (ECF 30) ¶ 45.  *See* Decl. of Nethenal Orgad (ECF 40) ¶¶ 22-26 ("In late July 2023, Deo was throwing a 'car event' at [Gold Coast] Syosset, NY which I was invited to and attended. . . . I noticed that many of the vehicles from Superb were moved there.").

In sum, allowing further litigation and discovery will sift out the facts and identify whether this claim indeed has any merit and whether Deo has any defenses to raise.  The Court's duty at this point is to ensure there is at least the minimum "fair ground[s]" to litigate the claim further, given the irreparable harm Superb faces.  *Citigroup*, 598 F.3d at 34.  The Court finds so in this case.

### C.  Balance of Hardships and Public Interest

#### 1.  Balance of the Hardships

Balancing the hardships each party would endure, the Court concludes they tip decidedly in Superb's favor.  As Superb argues and the Court has laid out above, absent an injunction Superb Motors and the other cross-collateralized dealerships will likely shutter.  Additionally, on top of that irreparable harm, Deo would be in a position to sell or otherwise dispose of the cars without the apparent authority or right to do so.  On the other hand, allowing some cars to remain at Superb's lots and others to stay Deo's possession (as outlined in the Court's Order below) will not harm to Deo.  Moreover, no other conduct attributable to Superb prohibits Deo from obtaining financing and buying and selling other cars.  His dealership may grow and profit—just not using the subject cars at issue.  *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (holding that "the balance of the equities in this case tips decidedly in favor of appellant being granted specific performance of its contract because neither Eagle Sales nor the four new dealers will suffer harm proportionate to appellant's loss of business as a result of a status quo injunction.").

#### 2.  Public Interest

Finally, the Court must consider the effect and consequences of any injunction on the public at large.  *Winter*, 555 U.S. at 13-14;  *see S.E.C. v. Citigroup Glob. Markets Inc.*, 673 F.3d

158, 163 n.1 (2d Cir. 2012) (citations omitted) ("[W]hen a court orders injunctive relief, it should

ensure that injunction does not cause harm to the public interest.").

Here, neither party arguments are neutral as to the issue.  *See, e.g.*, Superb TRO MoL (ECF

10) at 22 ("There is no reason to believe that the relief sought would cause injury to the public.").

This dispute involves private commercial conduct between two business partners.  Still, it is in the

public's interest to ensure that Congress's choice to federally protect trade secrets may be

vindicated upon a valid showing, so the Court finds this element favors granting the injunction.

## V.      CONCLUSION

Considering "all the equities of the situation, including the public interest[,]" the Court

finds that preliminary injunctions are justified in these circumstances to keep the status quo ante

until the merits can be further determined.  *Million Youth March, Inc. v. Safir,* 155 F.3d 124, 125

(2d Cir.1998).  However, it is incumbent on the Court to fashion relief that  keeps the status quo

ante an nothing more.  Thus, the Court continues to assess the scope and terms of such an

injunction. *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of

Educ.,* 464 F.3d 229, 245 (2d Cir. 2006) ("District courts have broad authority in crafting equitable

remedies such as injunctions.") (cleaned up).

Thus, the Court finds the following injunctive the minimum necessary to maintain the

status quo ante.  The Court hereby **ORDERS** the following injunctive relief:

1)   The following **thirty (30)** vehicles (the "**Injuncted Superb Vehicles**") are to Remain

at or otherwise be returned to a Cross-Collateralized Urrutia Dealership Lots[16]:

a.   Two (2) Isuzu flatbed trucks;

b.   Twenty-eight (28) cars listed on the list at ECF 30-8 ("**Markup List**") indicated
with "**YES**",

---

[16] *See* Nissan Termination Ltr. dated 8/18/2023 (ECF 18-2) at 3 (listing cross-collateralized dealerships).  *See also* Compl. ¶
154 (listing Urrutia's dealerships).

     i. ***with the exception of*** the 2023 Chevy Suburban with a Vehicle Identification Number (VIN #) ending in "8675."

2) A Cross-Collateralized Urrutia Dealership Lot ***only*** includes lots located at:

    a. 215 Northern Boulevard, Great Neck, NY 11021 (Superb Motors/Team Auto Direct);

    b. 4360 US Route 9, Freehold, NJ 07728 (Team Auto/VW of Freehold);

    c. 412 New Park Avenue Hartford, CT 06110-2971 (Team Mitsubishi Hartford);

    d. 25 West Housatonic Street, Pittsfield, MA 01201 (Team Nissan of Pittsfield).

3) The following vehicles ("**Injuncted Deo Vehicles**") shall Remain or otherwise be at Deo Defendants' Deo Lots:

    a. 2023 Chevrolet Suburban with a VIN # ending in "8675";

    b. 2020 Mercedes-Benz GLE with a VIN # ending in "4078";

    c. 2019 Land Rover Range Rover with a VIN # ending in "3297";

    d. 2017 Rolls Royce with a VIN # ending in "2728";

    e. 2016 Audi A6 with a VIN # ending in "9650";

    f. 2016 Audi Q5 with a VIN # ending in 0272.

4) A **Deo Lot** only includes:

    a. 180 Michael Drive, Syosset, NY 11791 (Northshore);

    b. 189 Sunrise Highway, Amityville, NY 1701 (Sunrise/Gold Cost).

5) The term "**Remain**" means that the subject injuncted vehicle:

    a. may not leave the geographic area or bounds of the appointed lot;

    b. may not be sold, transferred, gifted, disposed, destroyed, or otherwise encumbered;

    c. may not otherwise change legal or equitable title except as ordered by another court of competent jurisdiction;

    d. may not be driven or otherwise used or maintained on the lot in such a way that would damage the resale value of the vehicle.

6) **No injuncted vehicle may be removed from the appointed lot absent this Court's Order.**

    a.   In the event an injuncted vehicle must be moved from its lot due to emergency or any other good cause, the current possessor must inform the Court prior to the removal in writing on the docket and explain any good cause for the movement of the vehicle.  The same writing must be electronically served on the other party.

7) Deo Defendants shall hold and keep insurance and provide proof thereof to Superb for the **"DEMO" cars**:

    a.   2019 Land Rover Range Rover;
    b.   2023 Chevrolet Suburban.

8) This injunction shall last until the case has settled or dismissed or until the Court resolves the dispute.  Any party seeking to modify the injunction must file a pre-motion conference letter with the Court pursuant to the Court's individual practice rules.

9) **By Monday, October 2, 2023, at 5:00 PM,** Superb and Deo Defendants shall each file a declaration on the docket informing the Court of the status of their compliance with this Order.


**IT IS SO ORDERED.**


Dated: September 29, 2023                /s/   Orelia E. Merchant
       Brooklyn, New York                  **Orelia E. Merchant**
                                      **United States District Judge**