```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU  :  PART  7
 2

 3   - - - - - - - - - - - - - - - - - - X
     BRIAN CHABRIER, INDIVIDUALLY AND AS A        Index No.
 4   MEMBER OF NORTHSHORE MOTOR LEASING,          617224/2022
     LLC, SUING ON BEHALF OF HIMSELF AND
 5   ALL OTHER MEMBERS OF NORTHSHORE MOTOR
     LEASING, LLC SIMILARLY SITUATED
 6   AND IN THE RIGHT OF NORTHSHORE MOTOR
     LEASING, LLC; JOSHUA AARONSON AS A
 7   MEMBER OF 189 SUNRISE HWY AUTO, LLC,
     SUING ON BEHALF OF HIMSELF AND ALL
 8   OTHER MEMBERS OF 189 SUNRISE HWY
     AUTO, LLC SIMILIARLY SITUATED, JORY
 9   BARON, 1581 HYLAN BLVD AUTO, LLC,
     1580 HYLAN BLVD AUTO LLC, 1591 HYLAN
10   BLVD AUTO LLC,1632 HYLAN BLVD
     AUTO LLC, 1239 HYLAN BLVD AUTO LLC,
11   2519 HYLAN BLVD AUTO LLC, 76 FISK
     STREET REALTY LLC, 446 ROUTE 23 AUTO
12   LLC, ISLAND AUTO MANAGEMENT, LLC,

13                        PLAINTIFFS,

14            - AGAINST -

15   ANTHONY DEO, NORTHSHORE MOTOR LEASING,
     LLC, 189 SUNRISE HWY AUTO, LLC,
16   LIBERTAS FUNDING, LLC, HARRY R.
     THOMASSON, ESQ.,
17
                         DEFENDANTS.
18   - - - - - - - - - - - - - - - - - - X

19

20                            31st of May, 2023
                              Mineola, New York
21
     B E F O R E :   HONORABLE  SHARON MJ GIANELLI
22
                              Justice.
23

24

25
```

```
1    A P P E A R A N C E S :

2

     Plaintiffs:
3                           JEFFREY C. RUDERMAN, ESQ.
                            Cyruli Shanks & Zizmor, LLP
4                           Attorneys at Law
                            420 Lexington Avenue, Ste 2320
5                           New York, NY  10170

6
     Defendants:           HARRY ROGER THOMASSON, ESQ.
7                           3280 Sunrise Highway #112
                            Wantagh, NY  11793
8                           On behalf of Anthony Deo, North Shore
                            Motor Leasing, Sunrise Highway
9                           Self as escrow agent

10
                            DAVID EPSTEIN, ESQ.
11                          Faskowitz Law Firm
                            61-43 186th Street, Suite 207
12                          Fresh Meadows, New York, 11365
                            For the defendant Libertas Funding, LLC
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                    3

1              THE CLERK:  Index number of 617224/2022.  Brian

2       Chabrier individually and as a member of North Shore Motor

3       Leasing, LLC, suing on behalf himself and all other members

4       of North Shore Motor Leasing, LLC, similarly situated and

5       in the right of North Shore Motor Leasing, LLC Joshua

6       Aaronson, as a member of the 189 Sunrise Highway auto, LLC,

7       suing on behalf of himself and all other members of the 189

8       Sunrise Highway Auto, LLC, similarly situated Jory Baron,

9       1581 Hylan Boulevard Auto, LLC, 1580 Hylan Boulevard Auto,

10      LLC, 1591 Hylan Auto, LLC, 1632 Hylan Boulevard Auto, LLC,

11      1239 Hylan Boulevard Auto, LLC, 2519 Hylan Boulevard Auto,

12      LLC, 76 Fisk Street Realty, LLC, 446 Route 23 Auto, LLC,

13      Island Auto Management, LLC against Anthony Deo, North

14      Shore Motor Leasing, LLC, 189 Sunrise Highway Auto, LLC,

15      Libertas Funding, LLC, Harry R. Thomasson Esq.

16              Counsel, please state your names for the record.

17              MR. RUDERMAN:  Good morning, your Honor, Jeffrey

18      Ruderman the firm is Cyruli, Shanks & Zizmor, LLP on behalf

19      of plaintiffs.

20              THE COURT:  Good morning, Counsel.

21              MR. THOMASSON:  Harry Thomasson, 3280 Sunrise

22      Highway, Box 122, Wantagh, New York, on behalf of

23      defendants Anthony Deo, North Shore Motor Leasing, Sunrise

24      Highway and myself as escrow agent.  My client, Mr. Deo is

25      here with me this morning, your Honor.

1           THE COURT:  Good morning.

2           MR. EPSTEIN:  David Epstein with the Faskowitz Law

3    Firm, 61-43 186th Street, Suite 207, Fresh Meadows, New

4    York, 11365 for the defendant Libertas Funding, LLC.

5           THE COURT:  Good morning, everyone, have a seat

6    please.

7           Well, we have our hands filled with this one.

8           So there are two motions that are before the court

9    this morning.  Motion sequence one is Plaintiffs' order to

10   show cause with a TRO.  And the court did, in fact, issue a

11   TRO dated December 14th, 2022 in connection with this

12   motion.

13          Now just so that we're clear, the order to show

14   cause seeks an order from the court A, directing defendant

15   Anthony Deo to return to North Shore Maserati demonstration

16   vehicle being used by his son; B directing Deo to return

17   all of the dealerships, quote, dealer, unquote, license

18   plates; C, directing Deo to return all other license plates

19   designated to be issued for vehicles upon sale or lease to

20   a consumer; D, directing Deo to pay off all existing loans

21   on customers trade in vehicles; E, directing Deo to deliver

22   to plaintiffs all unsold vehicles owned by North Shore and

23   Sunrise; F, requiring Deo to account for all receipts and

24   expenditures of the dealerships; G, directing Deo to turn

25   over the books and records of the dealerships for

Proceedings

5

1    inspection and review; H, directing Deo to return all DMV

2    documents and enjoining Deo from taking any and all actions

3    to sell, lease, transfer, pledge or otherwise encumber the

4    assets of North Shore and Sunrise; J, enjoin and restrain

5    Deo from concealing, transferring, altering, modifying,

6    destroying or disposing in any manner of any assets of

7    North Shore and Sunrise; K, from removing any funds of

8    North Shore and Sunrise from its bank accounts; L, using

9    the assets of North Shore and Sunrise to pay for the cost

10   of defending this action; M, concealing, transferring,

11   secreting, altering, modifying, destroying or disposing in

12   any manner any evidence pertaining to the claims asserted

13   herein; N, using any license issued in the name of Brian

14   Chabrier, Joshua Aaronson or Jory, J-O-R-Y, Barron to

15   conduct any business of North Shore and Sunrise enjoining

16   and restraining Libertas, L-I-B-E-R-T-A-S, Funding, LLC,

17   from enforcing any rights against the assets of the

18   dealerships and enjoining and restraining Harry A.

19   Thomasson, Esq. from dispersing the proceeds from Libertas

20   which were deposited into his attorney IOLA account.

21          Now, again, this motion is the -- or this order to

22   show cause is the one on which the TRO was issued on

23   December 14th, 2022.  The court is going to hear argument

24   on this matter after which the court will obviously make a

25   determination on the underlying relief requested.  The

Proceedings                                    6

1      second motion, motion sequence two, and this is the

2      defendants, defendants Anthony Deo, North Shore Motor

3      Leasing, LLC, 189 Sunrise Highway Auto LLC and Harry

4      Thomasson, Esq.  Those defendants, it is their motion to

5      dismiss the complaint based on one, CPLR 3211 A1

6      documentary evidence; two 3211 A3 standing; three, 3211 A1

7      collateral estoppel slash unclean hands; four, 3211 A7,

8      failure to state a cause of action; and the fifth request

9      in motion sequence 002 is a request for a preliminary

10     injunction.  And that preliminary injunction seeks to

11     enjoin Plaintiffs from hereafter encumbering, leaning or

12     dissipating any assets of Baron Nissan compelling

13     enforcement of the Baron Nissan contract, scheduling an

14     immediate trial on the within matters pursuant to CPLR 3211

15     C or in the alternative scheduling an inquest and

16     compelling Plaintiffs to return all files illegally and

17     impermissibly taken from the corporate defendants

18     compelling Plaintiffs to return access to the moving

19     defendant for all software Plaintiffs have removed access

20     to since the court issued the TRO.

21           So those are the two motions that are before the

22     court.  I don't normally take the time to read in such

23     great detail but because they are so divergent from each

24     other, I thought it best to have a cleaner record and

25     obviously this case centers on a dispute concerning car

Proceedings                          7

```
 1      dealerships and ownership interests and levels of

 2      authorization to manage the company, encumber the company,

 3      et cetera.  So that's why we're here today.  And I'm going

 4      to -- I'm trying to think in terms of making sense.  We'll

 5      start with the first.  And, again, the first has to do with

 6      the Plaintiffs' order to show cause which a TRO was issued.

 7              Before we go any further, I'm also in receipt

 8      recently of letters.  The first letter sent by Plaintiffs

 9      who claim that defendant, Mr. Deo, has been violating the

10      court's temporary retraining order which was again issued

11      in December of 2022.  And I just moments ago received a

12      letter on Mr. Thompson -- is this Thompson or Thomasson?

13              MR. THOMASSON:  It's Thomasson.

14              THE COURT:  Mr. Thomasson's letterhead countering

15      that.  So I am in receipt of that.  There is, however, no

16      official motion in connection with any allegations of a

17      violation of the TRO.  With that said, did I state,

18      understate, overstate, misstate anything?

19              MR. THOMASSON:  I think you covered it, your

20      Honor.

21              MR. RUDERMAN:  I think it's covered, your Honor,

22      yes.

23              THE COURT:  So now we'll start with motion

24      sequence one, again, that is the Plaintiffs' order to show

25      cause.  Yes.
```

1           MR. RUDERMAN:  Your Honor, again Jeffrey Ruderman

2     on behalf of the plaintiff in support of the motion for the

3     preliminary injunction which this court already issued

4     temporary retraining order.

5           Plaintiffs' motion is primarily predicated on

6     relation to two particular dealerships as the court is

7     fully aware.  One is North Shore Motors and the other is

8     189 Sunrise.  These dealerships are licensed by Department

9     of Motor Vehicles.  And their license was issued in the

10    names of three of the Plaintiffs Brian Chabrier, Josh

11    Aaronson and Jory Baron.  And that's the crux of the order

12    to show cause and the relief that's requested.

13          The fact of whether the ownership of the

14    dealership is in my client's name or his name is an

15    essential issue in the case, but the primary issue before

16    the court here on injunctive relief really relates to the

17    use of the licenses that are held by these Plaintiffs and

18    the use by Mr. Deo and the operation of the dealerships.

19    But I think what really brings this to a head, what makes

20    this clear and immanent danger and why the preliminary

21    injunction needs to be issued, are these two letters and,

22    your Honor, it is true I did not move for contempt.

23          THE COURT:  It's not a request that you do, an

24    invitation.  I'm just noting it for the record.  Yes.

25          MR. RUDERMAN: And I am clarifying for the record I

Proceedings

9

```
 1    wanted to bring it to the court's attention at this point
 2    in time, we'll deal with it as it goes how it goes, your
 3    Honor, will tell us how we should proceed.  I thought it
 4    was important that we're here.  It's been a long time since
 5    the court has had a chance to review the papers initially
 6    but I thought it was very important.
 7              What's really important, your Honor, is that it is
 8    clear from the paperwork and the letter that I sent that
 9    Mr. Deo took out a loan from Flushing Bank in March of
10    2023.  And in doing so he pledged the assets all of the
11    assets of North Shore Motors.  That's attached to my letter
12    of yesterday.  And it says the proceeds, receivables,
13    products, contract rights, that's right behind the schedule
14    various UCC liens.  It describes the assets that are
15    mentioned.  Which means that every asset of the company of
16    North Shore Motors has been pledged by Mr. Deo to Flushing
17    Bank for some kind of loan.
18              We don't know what it's for.  We don't know how
19    much it's for.  That's apparently undisputed.  The response
20    from Mr. Thomasson, Mr. Deo is, oh, my clients knew about
21    that a year ago when an application was made.  I did speak
22    to my client, they don't have a recollection, but it's
23    irrelevant even if an application was filed a year ago and
24    even if my clients knew about it a year ago.  A lot has
25    happened in that year.
```

1        Specifically in December of this year, this court

2    issued a TRO and the TRO retrains the defendant from, this

3    is on the TRO portion on the order to show cause, taking

4    any action to sell, lease, transfer, pledge or otherwise

5    encumber any assets North Shore and Sunrise include but not

6    limited to any motor vehicles or disposing in any manner

7    the assets or using the assets of North Shore or Sunrise to

8    pay for the action.

9        So whether it was known last year is irrelevant.

10    The point is that we see that Mr. Deo takes matters into

11    his own hands.  He says these companies are mine and I will

12    do with them what I will.  I don't care what the court

13    issued as an order.  Unfortunately that seems to be

14    Mr. Deo's MO because this isn't the first time, your Honor,

15    that Mr. Deo has taken this action.

16        In 2016 Mr. Deo pled guilty to three counts of

17    bank fraud in the Southern District of New York.  We didn't

18    know at the time we filed the papers my clients didn't know

19    when they got involved with Mr. Deo.  Pursuant to the

20    parole requirements, I have the judgement here if your

21    Honor would like to see, that the parole requirement

22    prohibited him from taking any loans for three to five

23    years after his judgment.

24        So Mr. Deo is not averse to doing what he believes

25    needs to be done.  Whether it's compliance with the law or

1      not.  And for that reason alone, your Honor, that he

2      completely flouted this court's direction, that he has a

3      history of criminal activity directly related to banks, in

4      and of itself, is an indication that my client needs

5      protection.  The ownership of the dealership is in dispute.

6              THE COURT:  Is there a violation of parole filed

7      in connection with your allegations?

8              MR. RUDERMAN:  No, because the parole ended prior

9      to it was issued in January of 2016, I believe it would

10     have ended in January of 2021.  So the allegations our

11     position is that he violated the parole, but we now know

12     have a better idea as to what he was dealing with and the

13     context of the relationship.  When Mr. Deo describes in the

14     context of this lawsuit in his very lengthy affidavit

15     which, you know, numerously repeats facts, he said, I met

16     David Baron because he had this struggling business and he

17     had a high interest rate.  David Baron was going to help

18     me.  Give me a lower interest rate.  He doesn't say, oh, I

19     didn't get a loan at that time in 2018 because I couldn't

20     get a loan.

21             I was a convicted felon.  I couldn't get a loan

22     and David Baron was my way out.  He was the person I was

23     going to take advantage of.  Get him to supply me with the

24     loan and when my parole ends, I'm going to do what I want.

25     Right now my hands are tied.  That's not that is something

1    we didn't know, my client didn't know, David Baron has

2    passed away.  I don't think he knew about it either.

3            So these are the context of the relationship.  The

4    false relationship where Mr. Deo has and his relationship

5    with our client.  So further, by the way, your Honor, in

6    connection with the loan taken out Flushing Bank let's keep

7    in minds Mr. Thomasson said, well, it doesn't matter also

8    because he's, Mr. Deo, started a new company.  He's going

9    to start in a new weeks.

10           Well that really begs a bigger question.  Well now

11   he pledged all the assets from North Shore for a loan from

12   Flushing Bank for what Mr. David says it's a nonoperating

13   business.  He borrowed money, pledged assets of

14   nonoperating business and started a new business.  I think

15   we can all guess what that money is being used for.  His

16   new business.  So he has taken money from the disputed

17   assets which he is retrained from touching, borrowing

18   money, taking that money, creating a new company which he's

19   going to apparently get a new license and then go off his

20   merry way.

21           Your Honor, if there is any clear indication as to

22   why this man needs to be restrained from taking any action

23   related to these dealerships, related to these licenses,

24   that's it.  Let's add on to that, by the way, your Honor, I

25   haven't seen these new licenses that he claims he's

1    getting, but I do know on the application for the license

2    to the DMV asked, have you ever been convicted of a felony.

3    I don't know that they just hand out licenses left and

4    right to dealers who deal with financing, et cetera and so

5    forth when somebody is convicted of bank fraud, number one.

6             Number two, I haven't seen his DMV application.  I

7    would suspect, although I can't accuse him, that maybe it

8    doesn't have that little check box and explanation on his

9    application.  Maybe it did and maybe they gave him the

10   license anyway, but I think that's something that he should

11   present to the court and we should all take a good look at

12   that.  And we should also see whether he actually gets a

13   DMV license.

14            Now in our application, your Honor, we set forth a

15   host of facts in support of all the bad acts that Mr. Deo

16   has done.  Not just --

17   THE COURT:  Where I'd like you to start for me is

18   and a clear explanation of the interests and the ownership

19   interests distinction between the ownership interest and

20   the licenses and the use thereof and obviously competing

21   views.

22   MR. RUDERMAN:  I'll try to clarify, your Honor, if

23   I'm understanding the question correctly.

24            So you do not have to -- a licensee from the DMV

25   -- again, your Honor, I am not in the automobile business.

1    We do represent them relatively frequently.  These are my

2    understanding of the way it works.  The DMV license does

3    not have to be held by an owner of the business.  But they

4    usually are held by an owner.  And I could be wrong.  There

5    maybe need to be an ownership interest in order to hold the

6    DMV license.  I don't want to mislead the court in that

7    sense.

8          But in either case, the license is issued to the

9    dealership and in the dealerships name.  So when you submit

10   the application to the DMV, you're asking for the DMV to

11   license a particular entity.  And very importantly, your

12   Honor, has a specific location.  So when you submit the

13   application, you can't just say, I have a company A and we

14   just did -- we'll pop up a tent wherever we want to.

15         The DMV actually comes out and inspects your

16   location to make sure that you are where you say you are.

17   And they issue the license right there.  If you move next

18   door, you have to amend the license to do that.  So it's

19   only for the dealership and it's only at a location and

20   what it's for.  But the DMV wants people personally on the

21   hook for these licenses.

22         So the license is issued to a dealership, but in

23   the internal records of the license, there is a license

24   applicant.  Which is an individual or a group of

25   individuals.  And the DMV holds them personally responsible

1    for what people do with their license.  So hopefully they

2    are, you know, smart enough and thoughtful enough to make

3    sure that the people who are running their dealerships are

4    using their licenses properly.  But if they are not, they

5    are subject to a severe penalties.  And so as your Honor

6    may be aware if you go to dealership, there are plates,

7    there are license plates, there are official DMV state

8    license plates, but they are given to a dealership.  And as

9    well as inspections and all other DMV records are given to

10   the dealership, and since they are held in trust.  And the

11   DMV requires you to account for all of them because we

12   can't just have, right, people walking around with license

13   plates and we don't depot who they are registered to.

14       So there is strict guidelines as to how they are

15   supposed to be maintained and kept.  And the DMV we've had

16   other clients, not this client, who have misplaced some

17   records, the DMV comes down and issues hearings and fines,

18   et cetera and so forth.  And when you have fines or other

19   types of violations that are held against your license it

20   goes on the record.  At some point if there are enough of

21   them the license can be either suspended or even revoked.

22       And that also goes to -- another question on the

23   application for the DMV when you apply for an application

24   which remember, your Honor, the individual does, but he may

25   open two or three or five dealerships.  He would have to

Proceedings                                          16

1          put in a separate application for each one.  The question

2          on that one is has your license with the DMV ever been

3          suspended or revoked.  So my clients, Mr. Chabrier,

4          Mr. Aaronson and Mr. Baron are subject to the whimsy of

5          Mr. Deo in properly and accurately maintaining all the

6          records and the dealership plates and such to make sure

7          that there isn't a hearing that there isn't a violation

8          because if there is, they will then affect their ability in

9          this with this dealership, but very importantly in another

10         dealership.  Whether they open a new one or have an

11         existing one.

12              It will affect their ability to open up another

13         dealership because when they submit their application they

14         will have to explain why their license was suspended or

15         revoked.  And it's not in their hands.

16              Mr. Deo fully admits, I was running everything you

17         didn't touch anything.  Well, he's right.  My client was

18         really the money man.  Owner money man.  It's not uncommon

19         in these types of situations.  But Mr. Deo had the freedom

20         to do whatever he wanted to in his mind because his license

21         was not at stake.  But every one of those complaints that

22         come from customers doesn't affect him.  It affects my

23         clients as the holders of the licenses.  Does that answer

24         your question, your Honor?

25              THE COURT:  Yes.

1          MR. RUDERMAN:  So in support of our motion for the
2     preliminary injunction, we are trying to establish that as
3     the standard we need to establish a likelihood of success
4     on the merits.  We have suffered irreparable harm and
5     balance of the equity.  So the more likelihood of success
6     on the merits, your Honor, we have several causes of action
7     that we laid out.  I don't know if your Honor wants me to
8     go through of each one again.  I'm more than happy I don't
9     know if you want me to go through each cause of action you
10    have and --
11          THE COURT:  No.
12          MR. RUDERMAN:  I didn't think so.  But we believe
13    we set up sufficient facts.  It's all in my brief with
14    appropriate caselaw.  The irreparable harm, your Honor,
15    again, I want to stress again, we're not here today to
16    determine who owns the dealership.  We're not asking the
17    court for that kind of relief.  We understand that that is
18    we believe well beyond what is capable of being handled in
19    a setting like this without discovery, et cetera and so
20    forth, but certainly we are here saying there is no dispute
21    that the licenses were in the names of my clients.
22          MR. THOMASSON:  Objection.  That is a false
23    statement.  I assure you, your Honor, that is heavily
24    disputed.
25          THE COURT:  Okay, okay.

Proceedings

1              MR. RUDERMAN:  Your Honor, I would ask for

2     Mr. Thomasson to wait until I'm finished before he makes

3     comments.

4              MR. THOMASSON:  Objection.  If he says something

5     false, I will object every time.

6              THE COURT:  I understand that there is a need for

7     him to say that.  Otherwise the record could appear as

8     though he acquiesced in your statement.  So under those

9     circumstances, I understand.  Otherwise he will wait until

10    you're done.

11             MR. RUDERMAN:  I'm not testifying, your Honor, I'm

12    just an attorney.  But in either case -- Mr. Deo, it's

13    Mr. Deo, who says in his opposition papers that the

14    licenses were sent by my clients to him to sign and an

15    application amended to change the holders of the license.

16    That's in his own opposition.  Then he says, if I can again

17    refer the court to that -- may I continue?

18             THE COURT:  Yes, you may.

19             MR. RUDERMAN:  So, your Honor, again what Mr. Deo

20    puts in his opposing affidavit, is that he was sent the

21    licenses to sign an amendment to change them well if the

22    licenses are issued in the name and he signed them and sent

23    them back.  My clients said they never received anything

24    back.

25             First of all, there may be good reason why he

1     didn't sign them and sent them back because, again, this

2     issue of declaring that he was never convicted of a felony.

3     That may have been a reason why he didn't send it back.

4     But importantly, the fact that he acknowledges that my

5     clients sent him the application.  And he says, I signed

6     them and sent them back.

7             Well, if the dealerships licenses are issued in

8     the name of the dealership and my clients, individual

9     clients, have nothing to do with them, what did he need to

10    sign anything for?  The dealership holds the license.  So

11    start operating under your name, what difference does it

12    make?  It's because the DMV needs an individual associated

13    with that license and the individuals were my clients not

14    Mr. Deo.

15            So in order for him to take responsibility at the

16    DMV for what went on, the activity of that license, he had

17    to sign the document saying I'm taking over for

18    Mr. Chabrier, Mr. Aaronson and from Mr. Baron.  So there is

19    I don't think there is any doubt with regard to what had to

20    happen for Mr. Deo to take over responsibility.  That is

21    the impetus, your Honor, for the irreparable harm that my

22    clients current and future ability to operate businesses is

23    at stake here.

24            And you know, your Honor, I think we need to take

25    a step back.  What is Mr. Deo fighting about?  Didn't he

Proceedings

20

1        just write to the court saying, I have new licenses coming

2        in three weeks, I don't need your license anymore.  So why

3        is he putting up a fight?  He doesn't need the license.  He

4        doesn't need North Shore.  He's got a new entity he's

5        created.  He's got new licenses in his name he claims.

6             So is there any harm for us getting the TRO which

7        says he can't operate under a license which he says he

8        doesn't need.  So certainly I think for that reason alone

9        there should be no objection by Mr. Deo saying we can get

10       the TRO on the license that he says he doesn't need.  And

11       he doesn't need to operate.

12            And, your Honor, this is not just affecting my

13       client, this is affecting consumers at large.  What the

14       complaint that my client is getting is that customers are

15       coming to them, and but, your Honor, they are coming to

16       them at Baron Nissan this is a new car dealership owned by

17       the Baron family.  And they are coming here and they are

18       asking for some sort of remedy for issues that happened at

19       North Shore Motors 189 Sunrise.  And they are saying why

20       are you coming here.  Somebody at North Shore told us if

21       you have a problem with what we did, go to Baron Nissan and

22       they will take care of it.

23            And what type of problems do they have.  We

24       spelled this out in our papers very clearly.  That these

25       trade-ins these are huge issues.  The one thing you can't

1          do is take a car in from a customer.  And the customer owes

2          money on that car to a finance company.  And, say, I will

3          give you the trade-in.  I will pay off your loan.  I will

4          deduct the amount of your loan from how much I gave you on

5          the value this vehicle.  I will pay off the loan.  And then

6          take the car and sell the car, but not pay off the loan.

7          Now that customer gets a bill from the finance company.

8          $350 for your missed payment.

9                   MR. THOMASSON:  Objection, your Honor, he's says

10         he's not testifying but he's testifying.  This is all

11         outside of the four corners of the motion papers.  I don't

12         mind that much because I'm going to do the same thing to

13         him, but you might want to make a decision on this because

14         I have a lot of stuff to tell you about as well that we

15         have since learned since the papers were put in.

16                  THE COURT:  I do find it useful to be sufficiently

17         informed about -- let's, yes, I have read the papers, but,

18         again, you all operate in your day-to-day practices in this

19         sphere, so I welcome the additional information I don't

20         really see it as testifying.

21                  MR. THOMASSON:  Objection withdrawn.

22                  THE COURT:  Okay.  Thank you.

23                  MR. RUDERMAN:  Thank you, your Honor.

24                  I was just trying to -- I believe all the basis

25         for this is in the papers already.  I'm trying to expand a

Proceedings                          22

 1          little bit give the court a little favor.

 2                  THE COURT:  I recall the reference you just made

 3          in your papers.  I read that in your papers.

 4                  MR. RUDERMAN:  So what's happening is these

 5          customers would be getting notices of default from lenders

 6          saying, you owe money.  And they say what do you mean, I

 7          traded my car in, they were supposed to pay it off.  And

 8          they come to Baron Nissan who has no relationship or

 9          dealings with this entity with these two companies except

10          that they are all relatives who owns, you know, the family

11          relatives who own different companies.

12                  And what they are doing because they are all under

13          one umbrella with the finance company, they are all trying

14          to keep their own businesses and licenses and reputation

15          alive is they are paying these off.  They are actually

16          coming out of pocket.  And this is from some of the

17          plaintiffs, the IAG group, Mr. Aaronson's group and such.

18          They are actually coming out of pocket for cars that they

19          never took in a trade.  And they are paying off these

20          loans.  This is part of our claims.  It's right in our

21          papers.

22                  They are paying off these claims because they

23          don't want customers who they don't even deal to now say,

24          oh, I traded in, you own the company, you're licensed by

25          the company.  They complain to the company and certainly

Proceedings                                23

```
 1          hurting customers who are just innocent bystanders.

 2               Your Honor, under 349 CPL which we have the right

 3          if the consumers at large are being hurt by the actions of

 4          somebody we're involved in or even a competitor, your

 5          Honor, we're allowed to file that complaint.  And that's

 6          what we're doing.  He's got to stop these tactics.  What's

 7          astounding, your Honor, you have read his opposition

 8          papers.  I don't believe there is one time where he said I

 9          didn't do any of those things.

10               So I don't know if Mr. Thomasson going to come up

11          here and say, well, I forgot to put it in that he didn't do

12          -- didn't do all those things.  But I can tell you in the

13          30-page affidavit, I don't think he says once, I didn't do

14          those things.

15               What he said was it's my company.  You don't own

16          it.  I can do what I want.  That's Mr. Deo.  That just

17          seems to be his MO.  And that works great for Mr. Deo.  I

18          don't know if it works for this court.  It certainly

19          doesn't work the customers and it doesn't work for my

20          clients.

21               He needs to be stopped, your Honor.  He needs to

22          be stopped from doing whatever he wants to do.  However he

23          wants to do it.  The cars that are listed, your Honor, on

24          the website now whether those cars whether the website has

25          been changed or not, Mr. Thomasson said it hasn't, I don't
```

1    know if it has or hasn't, but we did Carfax to see where

2    are those cars.  They were listed.  I have here, your

3    Honor, about eight or nine Carfax, which indicate each one

4    of those cars at some point after this was issued was

5    listed as being titled by either Sunrise or North Shore.

6    And then transferred over to Sunrise or North Shore.  I

7    don't know why.

8         And then transferred to another company called

9    Superb Motors which, your Honor, I can only speculate as to

10   what's going on, but clearly these were vehicles at one

11   point that were purchased for resale, but Mr. Deo on behalf

12   of either Sunrise or North Shore either right before or

13   right after the TRO was issued and he said I'm not sure I

14   should sell them for myself.  So I'm going to back door

15   that.

16        I'm going to use Superb Motors and my license

17   company because in order to register the vehicles you need

18   to have a license.  Whether he's using them or not, but

19   that's all subterfuge because the cars belonged to Sunrise

20   North Shore in December, January, February of 2023, your

21   Honor.  I have these Carfaxes here if the Court would like

22   to peruse them.

23        So, again, we just have Mr. Deo conducting

24   business as usual.  He's going to open up another company.

25   He's going to get another license and, you know, hopefully

1    not continue the same type of activities.  But we're here

2    to stop him from what he did before and as it relates to

3    our clients.  And, again, your Honor, what different does

4    it make to him.  He has no desire to continue on operating

5    under our licenses.

6            I will note, your Honor, also that the 735

7    thousand dollars which was taken out by Mr. Deo.  So to be

8    clear, it's a little confusing to us.  It wasn't a loan.

9    What Libertas did is it purchased future receipts of North

10   Shore.  So North Shore makes more money.  As it makes money

11   it's going to have a lien.  It's going to then get paid

12   back by those future receipts.  So they bought about a

13   million dollars worth of receipts for 735 thousand dollars.

14   I guess they make the money on the spread.  And they gave

15   that money.

16           What's really curious, your Honor, is I have been

17   doing this for a long time.  And I can tell you when I have

18   dealt with lenders and banks for clients, the one thing the

19   lender always says, the money goes to the account where you

20   borrow the money, where you finance the money whatever it

21   is.  I'm not giving you money.  You want to start

22   transferring money around that's your business, but I have

23   a relationship with you.

24           Libertas actually allowed the money to go directly

25   to Sunrise although North Shore signed the sale agreement.

Proceedings

26

1    And why did they do that.  Now Mr. Deo insists up and down

2    here, I have a right to write checks.  I wrote checks from

3    North Shore all the time.  He doesn't explain in his papers

4    why he had them give the money to Sunrise.  He sold North

5    Shore's assets for 735 thousand dollars.  Why not put it

6    into North Shore?  Why did he have it switched to Sunrise?

7        And then when the complaint was made, the criminal

8    complaint, which, your Honor, frankly my clients didn't

9    want to be involved in the criminal complaint, gave the

10   money to Mr. Thomasson and Mr. Thomasson apparently gave it

11   to Mr. Deo.  What did he do with that money.  That's North

12   Shore's money. I don't think there is any dispute with

13   regard to that, right.  He sold North Shore's assets.  A

14   million dollars worth of assets for 735 thousand dollars.

15       I think that's what the paperwork shows.  So he

16   took that money and where is that money being used.  He's

17   also prohibited from using North Shore assets to fund this

18   litigation or for any for purpose.  So is he funding

19   litigation.  Is he using it to start another business.

20       We're in the midst of litigation here.  Nothing

21   has been resolved.  Started spending it like that, your

22   Honor, another reason why this restraint should be in

23   place.

24       I'm very curious as to Libertas' arrangement.  I

25   thought they were some third-party maybe they got caught up

1      in something thought they were doing their best.  But here

2      we are four months later, five months later.  They never

3      been paid even 735 nor have they been paid -- I think one

4      monthly payment they took out before the restraining order

5      took place.  They haven't sued Mr. Deo as far as I can

6      tell.

7               I have looked in the various documents.  So they

8      are owed 735.  They brought a counterclaim against my

9      client for the 735.  Everybody agrees the money is in

10     Mr. Deo's hands, but they didn't sue Mr. Deo.  Libertas

11     comes here, we're clean.  I don't think they are so clean,

12     your Honor.  Why are they not suing Mr. Deo for the 735

13     which he has.

14               So there is a lot going on here.  I don't know

15     what he told them.  I'm not involved in all of that.  But

16     we see a lot of bad actors here.  And my client -- I think

17     the biggest mistake my clients made they really just didn't

18     think this through.  And they pumped a lot of money in

19     hoping that he could make this thing work.  They pumped

20     millions, your Honor, you have seen the bank statements

21     millions of dollars into this which is gone.

22               Where did it go?  Mr. Deo had all these cars.  And

23     when he finally returned the cars -- which by the way,

24     Mr. Thomasson points out my clients sold all those cars,

25     yes, just to be clear what happened prior to the lawsuit,

1    all these cars were on the lot at North Shore and we were

2    trying to resolve this without going to litigation.  And

3    one of the things that we were hoping to do is since all of

4    those cars had a lien on them from our lender, Allied Bank,

5    Mr. Thomasson was able to arrange for those vehicles to be

6    returned to my client because we had to sell them to pay

7    back Allied Bank.

8         Ultimately that's what needed to be done.  He

9    agreed to do that.  Unfortunately many of the cars were

10    damaged.  We have pictures of them.  The cars were in very

11    poor shape.  They were what they were.  Some cars were not

12    returned because they were in various shops or loaned to

13    customers.  We don't know what happened to them.  So not

14    all of the vehicles were returned.

15         With regard to the specific relief that's

16    requested in the TRO just to bring it full circle back to

17    what we're asking for, so the first one asking Mr. Deo to

18    return the Maserati.  And Mr. Deo says, well, my son's

19    driving it, that's one of the perks of being in the

20    business.  Well that's all well and good if he bought the

21    car.  But he didn't buy the car.  He didn't have money to

22    the car.  The car was purchased with Allied Bank money

23    which is money my clients borrowed and repaid to Allied.

24         Mr. Deo can't show that he paid for this vehicle.

25    And my clients paid interest on this and then repaid all

happened

1      the money that was borrowed to pay that vehicle so

2      Mr. Deo's son could drive around Penn State with that

3      vehicle.

4           Your Honor, we believe with dealer plates because

5      that car is not registered to any particular state.  So

6      we're missing some dealer plates which means that the

7      dealer plates which are the responsibility of my clients.

8      So if Mr. Deo's son should drive and be well but God forbid

9      he gets into an accident or something happened, my clients'

10     on the hook because their plates, their registration, their

11     insurance which is covering all of that.  That car should

12     be returned.

13          B, directing to return all of the dealer plates.

14     Again, there are some missing.  My client was responsible

15     for those dealer plates.  If they don't turn them back into

16     the DMV, your Honor should understand, my clients just

17     turned in the license and surrenders it and doesn't have

18     all of the paperwork to make everything clean, it triggers

19     automatic audit then the DMV starts looking under the hood

20     of everything.  That's not going to be good for anybody in

21     this particular situation.

22          As a matter of fact, your Honor, I can tell you

23     now and it's going to be my suggestion whether now or later

24     on, aside from the TRO aspect of it, we've tried to resolve

25     the matter informally.  We would suggest when this is all

1    over perhaps the court can direct us to a mandatory

2    mediation program, your Honor.  I think there is some

3    common grounds here.  Mr. Deo doesn't want to be involved

4    in the dealership anymore.  My client doesn't want to be

5    involved with him anymore.  My clients want to shut down

6    the dealership.  Maybe we need a third-party mediator to

7    review that.  I'm throwing that out, your Honor, as a

8    request from us.

9              THE COURT:  We'll get there.

10             MR. RUDERMAN:  So the next formal request, your

11   Honor, is to return all other license plates to the extent

12   that they are out there.  Paying off these existing loans

13   on the trades.  I don't know how many are left, your Honor.

14   My clients satisfied most of them.  But again, these are

15   customers.  This is not money going to us.

16             Mr. Deo took a trade-in.  He should be paying that

17   off.  It shouldn't come out my clients pocket.  Delivering

18   unsold vehicles that are still left.  We don't know where

19   they are.  They were left in some repair shops, et cetera.

20   Hopefully Mr. Deo knows.  Then requiring to account for the

21   books and records, et cetera, and then the restraints that

22   are already in place.  We need those to be reiterated and

23   kept in place.  I don't know if Mr. Deo would keep them,

24   but we need them in place.  That's the only thing that's

25   going to protect my clients going forward at least to the

happened

31

```
 1         extent that they say we did the best we could to try and
 2         restrain him from taking wrongful action.  I'm not going to
 3         address the defendants motion.  I think --
 4                   THE COURT:  Not yet.  We're not there yet.
 5                   MR. RUDERMAN:  I'm finished on my argument.
 6                   THE COURT:  Mr. Thomasson.
 7                   MR. THOMASSON:  Good morning, your Honor, thank
 8         you.
 9                   Your Honor, in 2017 I think it was November 1st
10         Mr. Deo formed North Shore Motors.  Mr. Deo formed North
11         Shore motors.  He formed that corporation and since the
12         beginning of its operation he and his wife operate this
13         business.  Obtained the lease for that location.  It has
14         during the entirety of its existence been operating from
15         Michael Drive in Syosset.  I believe the full address would
16         be 189 Michael Drive in Syosset.  It's certainly in the
17         papers, Judge.  And they have been operating from that
18         location ever since.
19                   In the current industry, your Honor, there are two
20         main lenders that back floor plans.  There is one called
21         Netgear and there is one called Allied.  And the difference
22         between those two companies in a lot of ways really size
23         matters.  Netgear tends to fund floor plans for higher
24         interest rates at smaller dealerships and typically used
25         car dealerships.  And Allied is the big lender for the big
```

happened

1    boys.  And when you operate a dealership, you want to try

2    and get Allied because then you could get more cars and

3    better cars.  And after they operated -- after Sarah and

4    Anthony Deo -- incidentally the only reason Ms. Deo's not

5    here, your Honor, is she's home with the baby.  I know the

6    court was informed about that -- but Mr. and Mr. Deo

7    operated the business from its -- from its -- they hold the

8    leases.  Those documents have been provided to the court.

9    And they still hold the leases.  Nothing has changed in

10   that regard.

11         At no time did any plaintiff hold any lease at

12   North Shore ever.  It's always my clients.  They have been

13   there since 2017.  Somewhere during or about 2019 my

14   clients had a discussion with David Baron and there was a

15   handshake deal for David Baron to provide a floor plan.

16   Which was effectively replacing a Netgear floor plan with

17   an Allied floor plan.  And that of course was a significant

18   step up in this world.

19         As we have learned over time, there was a reason

20   why this was a handshake deal.  Who does it like this?

21   Nobody on this earth does more paperwork than car dealers,

22   your Honor.  They know the importance of contracts like

23   they know we need to breathe air.  It's not even

24   discussable.  But there was no paperwork.  And that was on

25   purpose.  Now who is supposed to do the paperwork?  The

happened

 1    fact of the matter is, Judge, just like landlord-tenant

 2    situation:  The tenant doesn't give a lease to the

 3    landlord; the landlord gives a lease to the tenant.  The

 4    money people make the decisions about what's going on into

 5    the contract and what's not going into the contract.

 6    Standard operating procedure.  Who was the money person?

 7    It was David Baron.  David Baron would not provide the

 8    writing.  Initially he wanted to see how things were going

 9    I think.  My client and it's in the paperwork had a good

10    relationship with David Baron.  Apparently they were pretty

11    close.

12            And it got to a point where once I got involved

13    and I said where is the paperwork to Mr. Deo.  Mr. Deo

14    started pushing him for it.  And it was agreed that they

15    were going to start doing paperwork.  And the first set of

16    paperwork they were doing was for Baron Nissan.  That

17    contract and the money paid for that contract, not penny of

18    which has ever been returned, is before you.  And we say

19    that that contract and that deal is complete.  At least in

20    so far as my client stepped in to David Baron's shoes.

21            David Baron was on his way up from Florida to

22    complete that deal and to get my client in to Baron Nissan

23    when he died.  And so, therefore, my client never got to

24    the point of taking over the entire corporation, but we

25    still take the position that he stepped into David Baron's

happened

1    shoes.  Especially without anyone ever having repaid that

2    money.  Coming forward in time, Judge, what ends up

3    happening is David Baron says to my client actually when

4    they first got involved and there was shake deal to provide

5    the floor plan they just don't, Judge.  Plaintiffs never

6    provided any contact on any of this.  There is nothing in

7    writing.

8            What exactly is the agreement between these two

9    these people?  Well, that's why you have these little sets

10   of documents from us and our paperworks to try and document

11   it as best we can.  Because what happened here was they

12   basically treated these business like their own piggy bank.

13   Since they were the money they told Anthony Deo what was

14   going on.  Whether he liked it or not that was the way he

15   had to do it.  He did a deal with the devils, your Honor,

16   is as simple as that.

17           And he was told what he could and couldn't do and

18   how it was and wasn't going to take place.  With regard to

19   North Shore David Baron said I want to start claiming the

20   ownership.  There was no documentation of that or it would

21   be before you.  And they just started claiming ownership.

22   And he simply said.

23           THE COURT:  How did that manifest?

24           MR. THOMASSON:  That was an agreement verbally

25   between David Baron and Anthony Deo and Sarah Deo that

happened

```
1    that's the way that was going to be.  And they had a right
2    to redeem by putting enough money back into the company
3    themselves.
4              THE COURT:  I recall that.
5              MR. THOMASSON:  We showed that you money, Judge,
6    again, no doubt about it coming from my clients.
7              All right.  So coming forward in time that's how
8    North Shore was set up.  When David Baron dies what happens
9    is Josh Aaronson then becomes the point person.  David
10   Baron's son-in-law.  Josh Aaronson plaintiff Josh Aaronson
11   becomes the point person for these plaintiffs.
12             And apparently they weren't completely overjoyed
13   with what David Baron was doing they didn't necessarily
14   want the head of the Baron corporation to be doing this
15   with Anthony Deo.  And so what they say and do with my
16   client after David Baron's death in May of 2021 is
17   essentially they say we're not giving you Baron Nissan.
18             We will continue with the agreement here at North
19   Shore.  You're getting, you know, as soon as the old money
20   is back you can have the company back because we are not in
21   the used car business and don't want to be.  But we're
22   happy to continue to supplying the floor plan.
23             That's not because they weren't making money,
24   Judge, they were.  And they were taking it left and right
25   any time they wanted.  And eventually that will be before
```

happened

1      the court.  What ends up happening is we have a pandemic.

2      Pandemic money ends up flowing in.  And but just prior to

3      that, your Honor, my clients end up purchasing the Sunrise

4      business which is a much smaller business than North Shore.

5             But, again, we showed you the checks.  There's the

6      checks, Judge, you have them.  My clients paid for Sunrise.

7      In both instances from the moment that it was agreed back

8      in 2021 that he was back -- he and Sarah were back as

9      owners of North Shore and Sunrise they had complete control

10     over those businesses.  In every single way including

11     hiring a lawyer, not this gentleman, not anybody currently

12     representing the Plaintiffs.  The lawyer that represented

13     those two businesses for the last two years was me.

14            I turned around and I said to them writings,

15     writings, writings.  He goes to them wants writings, yes,

16     yes, yes, yes, he gets put off.  He gets put off.  He gets

17     put off.  They are still supplying the floor plan.  He asks

18     for DMV licenses.

19            Let me tell you something, your Honor, everything

20     this man just said to you about the DMV is absolutely

21     false.  What happens with DMV licenses is they are issued

22     in one name and one name only.  The owner of that license

23     are the businesses the corporations.  Does some individual

24     have to sign that application?  They sure do, but it

25     doesn't mean that they are individually involved with that

1    license.  They are not at all.  They sign as the owner of

2    the corporation.  And the effectively allow themselves to

3    have the veil pierced.  And they could be held liable for

4    the corporation, business operations, but it doesn't mean

5    that it is individually applied for.

6            The reason why Anthony Deo pushed him, and again,

7    we supplied you with the documents it's right there in

8    writing, why are they trying to deny it?  Of course they

9    won't say a word about it, they can't.  They know how bad

10   this looks.  There is e-mails back and forth between

11   Anthony Deo and Josh Aaronson on the DMV license here you

12   go, Josh, okay, it's signed.

13           They are asking for it to be signed by Anthony,

14   Anthony Deo sends it back to them.  And then they never

15   sent it in.  They held it on purpose because they knew they

16   were going to do this.  They knew they would be able to say

17   oh no, Anthony Deo signed the application we don't know

18   anything about this.  They didn't know we had this e-mail

19   though to show you what they did.

20           That's not an accident, Judge.  How are they going

21   to explain to you, well, they just simply don't.  Why is it

22   that Josh Aaronson is asking Anthony Deo to sign an

23   application on a DMV license because Anthony Deo at that

24   point was the owner of North Shore.  That's who has to sign

25   the license.  You're not the application.  You're not

happened

38

1    liable individually.  You're liable as the shareholder or

2    member of the corporation.  That's how you're held

3    individually liable, but it really is you're being held as

4    an officer, an owner of the corporation.  That's why you

5    have to sign it.

6          So they give him the illusion that, well, of

7    course you're the owner.  Here you go.  Here sign this.

8    We'll send it in.  We'll take care of it.  No problem.

9    Because their money person an important name for you to

10   know going forward your Honor is Wendy Kwun K-W-U-N.  She's

11   on all these e-mails.  She knows what's what.  This is

12   their CFO.  She knows what's going on.  And what does she

13   find out last year, we have to make sure we have to take

14   care of the tax returns.  If we're going to say Anthony and

15   Sarah are the owners, well certainly we had to do it on the

16   tax returns.

17         I mean, arguably, I think that tax return was

18   filed by them one or more after transfer had actually taken

19   place of both businesses North Shore back to the Deos and

20   Sunrise to the Deos.  I believe one or more tax returns

21   were filed by the Plaintiffs improperly because Wendy Kwun

22   who was in North Shore's offices with Anthony Deo urgently

23   calling Josh Aaronson in front of my client saying OMG we

24   have to fix the taxes.  We have to fix the taxes.

25         So then my client goes to Tom Jones to do the

happened

1    taxes.  And Tom Jones says well where's the writings.

2    Where are the writings here.  And there are none because

3    the people who are the sellers that will do those contracts

4    won't do them.  And never did.  None of these things

5    occurred.

6         But yet those checks all exist.  Who puts money

7    into a business that they are just an employee at.  Nobody.

8    So they had no explanation but about 2 million dollars

9    changing hands on those two business from the Deos what's

10   that all about?  What's that for?  Because they are

11   employee?  They are mere employee?

12        Even worse, if these people really want to say

13   that they are the owners and heavily involved who abandons

14   such a business, your Honor.  You walk out the door at the

15   business you own?  Who does that?  A non-owner does that.

16   That's who does that, your Honor.

17        And it's interesting because the only line I could

18   find in their papers that bares on this issue is somewhere

19   I think it was an affidavit from either Bryant Chabrier or

20   Josh Aaronson and, your Honor, a tax return does not mean

21   that they are the owner.

22        THE COURT:  I recall seeing that.

23        MR. THOMASSON:  There is a single sentence in

24   there that does that.  Oh, isn't that convenient.  Really?

25   It's okay for them to sign off on tax returns which we've

happened

1    given you.  And Josh Aaronson himself approved them,

2    approved, that's what he has right in his email with Wendy

3    Kwun and Tom Jones the accountant for the Deos initiating

4    all of that those tax returns listing the Deos as one

5    hundred percent owners filed last fall were approved by

6    Josh Aaronson.

7           Then after that was done, they come in here and

8    it's not even though it's a mistake, your Honor, it's not a

9    mistake.  Because if it was a mistake, they wouldn't have

10   had that sentence in there.  They wouldn't have said, you

11   know, a tax return doesn't mean they are owners.  They put

12   that in there because they knew what they did.  They knew

13   exactly what they did.  And they wanted to try and cover

14   themselves.  They turned around and they left that building

15   that they are now claiming that they own the corporation

16   that was operating from there, no one threw them out.

17          What's the big dispute, your Honor?  Where is the

18   dispute that happened that caused them to leave?  You

19   haven't been told a word about that.  What happened was

20   once it was forced that the Deos had to be the owners they

21   were going to have to approve the tax returns by their own

22   CFO, they got mad, took their ball and went home.

23          On the way out the door, they just happened to

24   grab 735 thousand dollars out of an account.  And it's

25   funny it must have slipped counsel's mind.  They put it

happened

1    right into Baron Nissan's Chase account.  Oh, how

2    convenient is that?  What does Baron Nissan have to do with

3    that North Shore money?  Whoever took it out.  No, no, they

4    took it just like they took the PPP money.  And they just

5    took it and it was gone.  Brian Chabrier is one of the ones

6    who did that.

7            All I can tell you, your Honor, is that from the

8    time that they left everything they have done is that of a

9    nonowner.  March 15th, 2023, tax first quarterly tax

10   deadline, what did they file on North Shore and Sunrise?

11   Nothing.  No tax return no extension request.  Not a single

12   plaintiff.  Not a soul.  Nothing.  Why not?  It's your

13   corporations.

14           The fact of the matter is, it's not their

15   corporations and they know it.  And they approved it and

16   they approved it in writing.

17           The court I would argue respectfully, your Honor,

18   is bound by that.  These people all agreed everybody on

19   that caption agreed to tell the United States government

20   and the Department of Finance in New York that my clients

21   own those two businesses.  That's inescapable.

22           The fact of the matter is the DMV nebulous

23   suggestions we wonder about this and that, your Honor, my

24   clients paid his dues from a mistake he made while he was

25   trying to get ahead.  By the way, Judge, that was before he

happened

1    married Mrs. Deo.  Mrs. Deo just happens to be kind of the

2    money man in that relationship.  She happens to be the one

3    that brought more than just her beauty and good nature to

4    the corporation.  She also has a family that's wealthy

5    herself.  And helped push everything along.  And has been

6    active participant.  Not just on paper.  She's been active.

7    She's one of the two owners of this business.  Albeit on

8    paper it's only one percent.  But she absolutely works

9    these businesses right beside her husband and always has.

10           My client has not done anything whatsoever to

11   violate this court's order.  Not withstanding what they

12   suggest.  They show you, the court may recall back in

13   April, Josh Aaronson, shows up at his business walks in and

14   starts taking pictures.  Just starts doing it.  That's

15   improper, Judge, that's improper I wrote the court.  There

16   is nothing that I can doing in a letter to the court.  No

17   relief that could be granted.  But what I was really doing

18   was making sure I put everybody on notice.  I will be

19   coming for that phone.

20           And the fact of the matter is there was no need

21   for that.  Was there a mechanic there?  I explained in my

22   letter to you why there was a mechanic there.  We've got

23   cars that are being stored.  They still have 60 thousand

24   dollars a month in lease payments they have to make on

25   these two occasions.  He's doing what he can to stay ahead.

happened

1      To try and stay afloat.  With his two businesses have been

2      shutdown in large part by people telling you that they

3      still own the cooperation.  That's why you signed that

4      order, Judge.  You're not going to let somebody ruin a

5      corporation like if he's not the owner.

6            If he is the owner, I'm not saying he's allowed to

7      do absolutely anything he wants with his own corporation,

8      he shouldn't violate any laws, but we say he hasn't.  He

9      hasn't done anything wrong.  He's not selling any North

10     Shore cars he's not selling any Sunrise cars why?  Because

11     as it was just admitted, we gave them back.

12            No money has impermissibly come out of my escrow

13     account.  As soon as they asked me back in November we're

14     going to send you that money and we want you to hold it.  I

15     said, send me the money it's not yours.  And I'm not

16     holding it.  You're not telling me what to do on behalf of

17     any client.  And before this action was ever commenced,

18     that money was out of my account.

19            What they are doing especially by including me is

20     so obvious.  It's transparent, Judge.  They are engaging in

21     the best defense is a good offense.  And they are

22     absolutely leverages us.  They are thinking our small

23     little operation without their floor plan is going to come

24     and as counsel said, I really don't want to talk about

25     settlement, but the fact of the matter is they are willing

happened

1       to give us anything we want except money as long as we give

2       them a release.

3              You want paper?  Sure we'll give you those files

4       back.  It is absolutely one hundred percent against DMV

5       regulations for those files to be removed from that

6       building.  A hundred percent in arguably.  I have lengthy

7       conversations ongoing with the DMV.  And there will be more

8       after they want to talk about impermissible deals.  What I

9       showed you yesterday, Judge, in my letter is called title

10      washing.

11             That's what's it's called in the business.  Title

12      washing.  They are washing the titles on the North Shore

13      and Sunrise cars before they sell them.  A hundred percent

14      illegal.  A hundred percent term of art in the business.

15      Absolutely not permitted.  That's about the only wrongdoing

16      I have seen them do that I haven't told the DMV about yet.

17      But they will be told about that I'm meeting with them next

18      week.

19             To finalize my client's licenses which have been

20      approved, they have always said you're never going to

21      qualify for a license.  He's already been approved for new

22      licenses.  They wouldn't give them back.  I demanded them.

23      On its face, your Honor, it says very clearly this license

24      granted to North Shore Motors LLC and 189 Sunrise, LLC

25      whatever the names of those two corporations are.  That's

1    who those licenses are granted to.  I have demanded them

2    back, they refuse.  I've demanded the files back, they

3    refuse. I've demanded access to the software and bank

4    accounts again, they refuse.

5            When they took that 735 thousand dollars, Judge,

6    they logged in with David Baron's credentials.  My clients

7    open that bank account.  They didn't open that bank

8    account.  My clients opened it in 2017.  They agreed and

9    put David Baron on that account.  And they logged in Chase

10   Bank told me they logged in with David Baron's dead for

11   year and a half credentials to take that 735 thousand

12   dollars to put in Baron Nissan's accounts.

13           They took that money just like they took the PPP

14   money.  They want to say my clients doing what he wants.

15   My clients the owner and operator of these businesses.  I

16   know when he took over the Sunrise account.  He took over

17   the Sunrise account in 2021, Judge, because I live in

18   Lindenhurst.  189 Sunrise is five minutes from my house.

19   North Shore is up on the north shore it's a pain in the

20   neck to get to especially with traffic.

21           So when I would meet with anybody connected to my

22   work on these two businesses on behalf of the Deos, I would

23   meet at 189 Sunrise.  Where my client staffed the business

24   with people I have known for 20 years in the business on

25   Long Island.

happened

1              If these people were actually interested in ever

2     operating or owning those businesses, they weren't.  They

3     were interested in owning it on paper.  So they could do

4     what they wanted to financially.  This was strictly going

5     to be a money making situation.  And as soon as it was

6     forced to have my client to be doing the tax returns for

7     those two businesses they up and left.

8              There was no straw that broke the camel's back.

9     Are we going to have these people say who were one hundred

10    percent in charge of the books.  They had the money.  They

11    were in charge of the books.  Wendy Kwun came on behalf of

12    these plaintiffs every week to deal with the books and the

13    checks.  We're not getting checks are they going to say

14    who's that.  You have a lawyer representing us?  No you

15    don't.  They have their own lawyer.  And they have plenty

16    of them I'm sure.

17             This is absolutely a sham that's being forced upon

18    this court.  None of this is true.  You have lifelong car

19    dealers and big ones who have no desire -- again, they flat

20    out tell me they don't even hide the fact.  We're not in

21    the used car business.  We're not in the used car business.

22    David Baron decided to do the floor plan there to try and

23    make some money and they stuck with it until my client had

24    to be put on the tax returns.  That's what happened

25    inarguably.

happened

1           THE COURT:  How long did that go on before there

2      was recognition or awareness or push to put Mr. Deo on as

3      owner.

4           MR. THOMASSON:  It was in 2021 when they first

5      sold him Sunrise and acknowledged that the term used was,

6      yes, you have redeemed your interest in North Shore.  I

7      couldn't tell you the exact day, Judge, because it happens

8      there is no paperwork.  But it was in 2021 on both because

9      that's what last years tax returns are for.  Last years tax

10     returns are for 2021.  And so Wendy Kwun knew that.  Tom

11     Jones knew that.  Tom Jones knew that before he filed it, I

12     said you better get approval from them because there is no

13     writing that says who owns it.

14           And it's important for the court to understand

15     that they controlled the writings.  They control the money.

16     They called the shots. They shut it down.  Come in here and

17     tell you that they are the owners.  Shut it down, Judge,

18     they ruined my client's businesses.  They have been shut

19     down for six months.  They demanded the cars back.  We

20     worked something out.  We didn't work anything out.

21           I sat down with Anthony he said all right the

22     floor plans means the cars are backed by them financially,

23     right?  He says, yeah, then we have to give it back.  He

24     says I agree a thousand percent.  Give him the cars.  We

25     gave him every car.  We told them where they were eight or

happened

```
 1    ten of them in various repair shops.  I hope when they say
 2    to you that some of the cars have damage or were in
 3    disrepair, I hope they are not suggesting somebody did
 4    anything to them.  They are just the cars that come from
 5    the various auctions and so forth, maybe some trade-ins
 6    that have not yet been resold.  They are just in the
 7    condition they are in.  Nobody's utilizing these cars or
 8    doing anything with them.  They sit until they are sold or
 9    resold.  That's all that happens.  They were told right
10    where everything was.
11         So as my client's shutdown can't get another penny
12    out of any of the accounts which they also conveniently
13    shut down, the fact of the matter is what do they want to
14    us do about the cars in the repairs shops?  We gave you all
15    the cars we could and told you where the other ones were.
16    We haven't done anything wrong that.
17         My clients I have the paper work on the Maserati.
18    The Maserati was bought by my client.  No question about
19    it.  I have got the paperwork.  He gave them the paperwork
20    if what they did with the paperwork, I don't know.  All I
21    have is copies, your Honor.  They have the originals.
22         We're going to be told we were never given
23    paperwork.  You know what that means, Judge?  Here again
24    the same thing my client's son had that car for two years
25    well they are heavily involved.  They don't get mad or
```

happened

1    upset or say boo.  You don't have e-mails, have your son

2    bring back that Maserati.  Who takes a car from the Baron

3    people when they don't own it?  Who does that?  They lent

4    them for two years?  Is that what they do?  No, they don't.

5    No, they don't.  They are not being honest, your Honor.

6    They knew.  They didn't send the paperwork.  They knew

7    that.  My client gave it to them at their request.  They

8    didn't send in the paperwork.  Because this was all

9    planned.

10           We are going to bleed this place for as much money

11   as long as we can.  Then we're are going to leave.  And

12   we'll pound those people into submission on the way out the

13   door.  We'll offer them back -- they took all the

14   paperwork.  It's illegal to take that take paper work off

15   that property, your Honor.  It's not permitted.  And they

16   are that happy to give it back to us.  As long as we'll

17   give them the release with no money changing hands.  We'll

18   give you the release no problem.  You could have everything

19   you want.  Here, here, here.  Just no money.  Don't think

20   we're giving you any money.

21           Because Anthony Deo's a bad guy?  This is like the

22   James gang, your Honor.  These people do what they want.

23   When we try to serve -- we served subpoenas.  One of the

24   answers as we go forward, tax returns are going to tell

25   everybody an awful lot about who owns what and when.  And I

happened

1    say they are dispositive.  Contrary to that one sentence

2    they try to slip by the court -- the fact -- and apparently

3    didn't.  The fact of the matter is, I served subpoenas on

4    the Island Auto Group which is the umbrella company under

5    which all these Plaintiffs' exist and work.

6           I served subpoenas Mrs. Aaronson initially said to

7    my process server, I have an auto group, North Shore

8    Motors?  I don't know anything about that.  Absolutely not.

9    I hadn't spoken to the process server myself.  So the

10   process server turned around and left.  I told them.  They

11   were mad.  They went back ended up basically throwing it at

12   her and leaving and saying there now you're served.

13          The document I request from them were due on May

14   19.  It's 11 days ago.  I have nothing.  I served the

15   subpoena on their accountants.  I want tax returns.  Give

16   me the tax returns.  Tax returns for anybody that you

17   prepared that indicates ownership of North Shore Motors and

18   Sunrise Highway dealerships.  Those document were due to me

19   on May 19.  I have nothing.  Nobody's reached out.

20   Nobody's asked for more time.  Nobody's asked for anything.

21   I have nothing.  We're now into let's play keep away with

22   the documents that are absolutely going to show that nobody

23   claimed ownership of these dealerships last years on these

24   tax returns.  And nobody filed anything March 15 regarding

25   those two corporations either.  I couldn't wait to show you

1    that today, Judge.  But of course in the back of my head, I

2    said, they are not going to comply with something like a

3    subpoena just to sink themselves on May 30th.

4              THE COURT:  We have to wrap it up.

5              MR. THOMASSON:  I will wrap it up.

6              But as far as their order to show cause, they are

7    not the owners.  They don't even own the DMV licenses.

8    They don't own those corporations.  They are not entitled

9    to any of the relief they are asking for.  And they have

10   already gotten back all of the cars that they should have.

11             I don't know what else I can say about that.  And,

12   furthermore, I haven't had any money from that 735 thousand

13   dollars in my account since before this action was filed.

14   And, furthermore, they were told that, Judge, in writing

15   they were told that.  I believe it's attached to my papers.

16   I told them that this was never going to happen and it

17   didn't.  And I have told them again subsequently that was

18   for leverage.  That's my position on the order to show

19   cause, your Honor.

20             THE COURT:  A minute.

21             MR. THOMASSON: Doesn't Libertas get to go, your

22   Honor?

23             THE COURT:  I'm so sorry.

24             MR. EPSTEIN:  So from libertas perspective we gave

25   them money.  We signed contract with North Shore motors,

happened
52

1       Sunrise.  From our perspective, we provided the monies.

2       The dispute between them during multiple parties here

3       really doesn't involve Libertas.  Other than there is a

4       contract they did receive the money.

5               The Plaintiffs admit that the money was put into

6       the, you know, was given to the Plaintiffs.  The Plaintiffs

7       then personally took out the -- either personally or took

8       the money from the accounts when my clients put it took it

9       into their own pockets, converted the funds because

10      apparently they own the business.  And then notified

11      Libertas about it.

12              And instead of sending it to Libertas saying, hey,

13      we're owners of the company, we never authorized this

14      transaction, hey, this money shouldn't, you know, shouldn't

15      go to us, they instead turned it over to Anthony Deo.  And

16      we're still waiting for that money.  The idea that there is

17      -- they forget also there is a TRO here pending the hearing

18      and that the parties have each told me that they were in

19      settlement discussion.  And I believe that they were in

20      settlement discussions and first by not suing someone

21      doesn't impugn any guilt or liability or anything of that

22      sort that my client's not hammering going to town on

23      Anthony Deo or North Shore.  The answer is simply because

24      we're still in the middle of litigation.  Last time when we

25      were here when they thought there was quick resolution the

happened

1    parties said we're settling this and we pushed it off till

2    today.  The idea that they took the money and they then

3    took it out of their account and then gave it to Anthony

4    Deo is cause for concern on our part.  That on one hand

5    they claim that they own North Shore Motors.  On the other

6    hand they don't owe Libertas any of the debt.  That's

7    number one.

8              Number two, there is no irreparable harm as far as

9    North Shore Motors here which is what they are alleging

10   what they are asking for in their TRO.  They want to enjoin

11   Libertas gave them the money.  The money is nowhere to be

12   found.  Now because each side says it's not my problem it's

13   Anthony Deo problem, even though North Shore admits that

14   they took it in their affidavit.

15             And I quote, when we became aware of the deposits

16   in our Sunrise account we arranged to have the money

17   withdrawn and held to avoid Deo from taking these funds

18   with the assistance of a former police detective employed

19   by North Shore.  The criminal come.

20             THE COURT:  Slow down for the reporter.

21             MR. EPSTEIN:  With the assistance of a former

22   Police detective employed by North Shore threatened

23   criminal complaint and arrest.  As well as the issue we

24   arranged for the money to be placed in the attorney's trust

25   account of Harry Thomasson.  And the point is that they

happened

1       just gave the money back to Deo.  So we gave the company

2       money, the Plaintiffs took it out and then gave it back to

3       Anthony Deo.  And we haven't received money from North

4       Shore or from Anthony Deo.  And the main issue here is that

5       whether or not they believe that they either, you know,

6       whether North Shore whether plaintiffs believe that they

7       owe the money, the point is that they got 735 thousand

8       dollars.  It's not and even if they if they want to say

9       that there's no agreement here they still owe us the 735

10      thousand dollars back.  And they are claiming that it will

11      be irreparable harm if we're able to collect that money.

12              If there is any status quo that should be here is

13      that we should be receiving the money from the plaintiffs

14      and from Sunrise and from North Shore here pursuant to the

15      contract.  Let them pay it to us and while they deal with

16      this disagreement between them, we're at least getting paid

17      on the debt which they owe or at least getting paid back

18      even if not then give us the 735 thousand dollars which we

19      offered both sides already.  Give us the money and we'll

20      walk away from this action tomorrow.

21              I also want to say that during it's just

22      interesting to me from Libertas' perspective that while

23      they are asking to enjoin Libertas and ask for a TRO, both

24      sides here have made allegations against each other

25      regarding of what all the parties have done during the time

happened

1    of this TRO and have used the TRO time to open new

2    corporations, to open new business, to move the cars.  And

3    all that the TRO accomplished from both sides is that

4    Libertas is being stuck while both sides divest the

5    companies of any ability to pay Libertas.

6         And, again, even if Libertas, again, it's money

7    there is no irreparable harm here.  There's no balance of

8    the equities is not in favor of the plaintiff movant

9    because Libertas is entitled to the money and they admit

10   that they got the money.  They admit they took the money

11   into their own possession.  And then they admit they gave

12   it back to Anthony Deo.  Therefore they just took the money

13   and converted it.

14        The only thing they admitted is that they

15   converted all the funds that Libertas gave to North Shore.

16   And, again, even if they don't believe that they own the

17   full amount of what's paid of the about a million dollars

18   that's owed back, at least the 735 should be returned to

19   Libertas.  And if they are just using the TRO to prohibit

20   Libertas from collecting then it's just we're just waiting

21   for them to solve all their issues while we wait on the

22   side.

23        THE COURT:  And you get left out of the cold.

24        MR. EPSTEIN:  We get left out in the cold as we

25   are now.

happened

1          MR. THOMASSON:  Anthony Deo admits, your Honor,

2     that he is going to repay that money as soon as he is able.

3     That is not, I believe no one here disputes that Anthony

4     Deo going to repay that money.  I believe he's also the

5     personal guarantor, Judge, I don't know why Libertas has to

6     be part of this.

7          THE COURT:  I thought I read in the papers that

8     Mr. Deo did personally guarantee the money.

9          MR. THOMASSON:  He did, Judge, I don't know what

10     this is we're discussing regarding Libertas they should not

11     be subject of an order to show cause either.

12          MR. EPSTEIN:  Well because North Shore is claiming

13     that that's their company and that's why they are including

14     us as I guess a necessary party, oh, and but they converted

15     the funds and took them.  So a lot of the issues are being

16     discussed in this court is the same thing as if we brought

17     a lawsuit as well.

18          MR. THOMASSON:  Sword versus shield.

19          THE COURT:  Very brief, Counsel.

20          MR. RUDERMAN:  I'm just going to go through some

21     of the points.

22          THE COURT:  Yes, but very briefly.  We still have

23     the second.

24          MR. RUDERMAN:  I understand.

25          I don't understand why Mr. Thomasson keeps saying

happened

 1    my client orchestrated something and I'm trying to figure

 2    out why to what end what was the purpose.  So my clients

 3    put million dollars of dollars into a dealership which they

 4    are never going to get back to do what Mr. Deo?  So he

 5    didn't have a company and my client lost millions of

 6    dollars.  It makes no sense, your Honor, I mean my client

 7    got involved with this guy.  They funded it.  They hoped to

 8    get out of it.

 9           THE COURT:  Well, what I thought I heard him say

10    just in brief summary is that they were making money from

11    the floor plan and there was no distinction as to ownership

12    and Ms. Kwun recognizing that tax returns needed to be that

13    there had to be an owner associated with the tax returns.

14    And when she made that determination -- and Mr. Deo's name

15    was placed on the tax return that the Plaintiffs no longer

16    found it financially advantageous, right, to continue the

17    relationship as it had been going on a less than formal

18    manner and they pulled out.

19           MR. RUDERMAN:  That's a great statement by

20    Mr. Thomasson.

21           THE COURT:  That's in part what I heard him say.

22           MR. RUDERMAN:  I think I heard the same, your

23    Honor.  Which of course if there was anything to back up

24    what Mr. Thomasson said would be nice.  But if you take a

25    look at the facts that are laid out.  It wasn't like oh we

happened

have to then give it to back to Mr. Deo.  It was, oh, we
want to give it back to go Mr. Deo because we now have
pumped in five million dollars into a losing proposition
run by Mr. Deo.  We like Mr. Deo to take it over when he
takes responsibility for the hole that he put us in.

As a matter of fact, one of my favorite things
Mr. Thomasson said he said the owners on the DMV license
sign it.  Why?  So that the DMV could pierce the corporate
veil and hold the owners liable for the business operation
that's what Mr. Thomasson said.  Is that anything different
from what I said?

I said my clients were listed as the owners.  My
clients are personally liable for all this stuff which
Mr. Deo says he ran everything.  So every problem with that
dealership.  Every customer complaint.  Every dollar that
was not repaid is because of Mr. Deo.  He can't blame it on
anybody else.  As he says here.  But who was on the hook
for it, my clients.  As Mr. Thomasson says, we're
responsible.  We can be sought after by the DMV as the
owners.  We're personally liable.  Not Mr. Deo.  He walks
away scot free.

My clients were petrified.  They said we need to
run from Mr. Deo.  And here's the terms of running away.
The terms of running away, you can sign the tax returns,
we'll transfer that.  We'll transfer the licenses.  We'll

happened

59

1    transfer everything.  You take on all the obligations and

2    the hole you put us in.  When Mr. Thomasson keeps saying my

3    clients falsely gave him the DMV license to have him sign

4    it.  First of all, again, I still don't get why --

5            THE COURT:  He said they asked him to sign it but

6    they never returned them.  That's what he said.

7            MR. RUDERMAN:  He said that Mr. Deo signed them

8    and sent back to our client.  And that my client falsely

9    and fraudulently didn't file them.  Why would they do that?

10   Why would they keep themselves on the hook?  Because,

11   again, it's not disputed that all these customers were

12   complaining.  It's not disputed all these bad things were

13   happening.  My clients are on the hook everyday.

14          And we're here to really extricate my clients from

15   this situation that's all they ever wanted.  To shut down

16   the business?  The business was losing money hand over

17   fist.  My clients were pumping millions of dollars into it.

18   Why would they want to shut it down.  They were going to

19   shut it down and hand it Mr. Deo.  But when he takes it,

20   you have to take the good with the bad.  And the bad with

21   the good.  He only wanted the good.  Give me the tax

22   return.  Give me the license and I'm good.  No, you want

23   it, it's a package deal.  You got us in this situation you

24   take it over.

25          And then you will see all the communications, your

happened

 1      Honor, we're not in discovery yet.  All the communications

 2      where he promised he would take it over.

 3              Now the license that was sent back, your Honor,

 4      the e-mails that are shown there's e-mails from

 5      Mr. Thomasson.  My clients three times, Mr. Deo, did you

 6      sign the license and did you send it back to them?  No

 7      response from Mr. Deo.  No communication from Mr. Deo.  The

 8      only thing we have is Mr. Deo's testimony in this

 9      affidavit.  I send it back to them.  No proof of mailing

10      not even a copy with his signature on it.

11              So he says I sent it back.  It's very good for him

12      to say all these things happened.  Do you understand that

13      80 percent of what I present to the court I have got

14      paperwork for.  How much did Mr. Thomasson have real

15      paperwork?  Very little for the things that he claims my

16      client did.  How about the fact that Baron Nissan who is

17      not even a party to the action the contract which is

18      annexed to the exhibit as exhibit C to Mr. Deo's papers is

19      signed by David Baron so is Mr. Deo.

20              Guess who didn't sign it?  Ron Baron the other

21      person who only owned the other 15 percent.  Do you think

22      David Baron had a right to transfer adjusted interest

23      without David Baron.  Have you seen -- has the court seen?

24      Have we seen it?  Your Honor, I can tell you when two

25      people own a company and we will present it when need to,

happened

```
 1          if there is an operating agreement there will be a
 2          limitation as to what you can do and how much you can
 3          transfer.  All right.  So none of that happened here.  He
 4          couldn't just jump in the shoes.  And believe me he wasn't
 5          selling 250 thousand dollars.  Which by the way was
 6          supposed to go to an escrow account to Mr. Boylan who
 7          represented the dealership.  It didn't go to Mr. Boylan.
 8          Why didn't it go to Mr. Boylan as per the agreement?
 9                    THE COURT:  You have five minutes.
10                    We have to finish the second motion before lunch.
11                    MR. RUDERMAN:  Okay.  Thank you.
12                    We were forced to file the tax return.  We didn't
13          force my clients to file any tax returns.  Is there a
14          document or e-mail?  My client wanted to do that.  They
15          really did.  They wanted to give Mr. Deo the company
16          because he was supposed to take on the obligation, but he
17          didn't.  That's why we're here.  This was a package deal.
18          And he used these tax returns to say there was a
19          standalone.  It was not a standalone, your Honor.
20                    I have given you the case law showing that.  You
21          have to look at the totality of the circumstances.  The tax
22          returns alone don't show ownership or shows ownership if
23          there was a relationship between parties.  Did they have an
24          understanding and an agreement clearly that was breached.
25                    MR. THOMASSON:  It's attached as an exhibit.
```

happened

1          MR. RUDERMAN:  I haven't seen any 2 million

2    dollars.  I don't know where Mr. Deo got 2 million dollars

3    from.  Then said what forced them to take the actions that

4    they did.  What forced them?  That they were five million

5    dollars under water.  And then subject to complaint by

6    customers whose cars were being traded off.  I don't know

7    about the PPP money.  He keeps claiming my clients took it.

8    I don't see anything showing they took any PPP money.  They

9    keep saying it.  I don't see any document supporting this

10   allegation.  All the PPP money was taken by my client.  I

11   haven't seen that.

12          MR. THOMASSON:  We can't get anything from Chase

13   bank, Judge, they shut us out.

14          MR. RUDERMAN:  So again empty allegations, your

15   Honor.  The reason my clients didn't file tax returns, your

16   Honor, because Mr. Deo filed it last year.  We're already

17   in litigation.  This is big mess as you can understand.

18   Okay.  We filed tax returns.  We filed an extension for a

19   tax return.  Mr. Deo had last year and he filed it at the

20   same time the IRS is going to start rejecting things.  You

21   know what, we're here in court right now, the company

22   didn't make any money.  So he's not going to owe any taxes.

23   There is millions of dollars.  Right now we want to sort it

24   out.

25          We certainly don't want any audit coming down.  So

happened

 1    we just put it on hold for now.  The dealership is not

 2    going to owe any money.  Okay.  And he still didn't explain

 3    the Flushing Bank.  What happened to the money?  Flushing

 4    Bank put a lien on all North Shore assets during the TRO

 5    period.  Where's the money.

 6           By the way, where is the 735?  He says, he'll give

 7    it back when he has to.  But he has the money.  Where did

 8    it go?  Those were North Shore's assets.  That is what he

 9    said, he sold North Shore's assets to get cash.  That money

10    belongs to Libertas.  Libertas says give me money.  Well,

11    yes, I took it.  By the way, Libertas keeps saying we gave

12    it to Deo.  We didn't give it Mr. Deo.  Who did we give it

13    to, your Honor?  We gave it to Mr. Thomasson.  He says, you

14    don't tell me what to do with it.  We're here because

15    that's what he said.  Frankly, your Honor, he's kind of a

16    witness.  And he's kind implicated in this whole fact here.

17           I'm not moving to be for him to be disqualified,

18    your Honor, this is something we thought about.  How could

19    Mr. Thomasson sit here and say I will do what I want with

20    the money.  And now Libertas saying it's because of what

21    you did, Mr. Thomasson, with the money that Mr. Deo took

22    it.

23           Now Mr. Deo spent it.  On what?  On what?  This is

24    company money supposed to be operating the dealership.

25    Guess what the dealership isn't operating.  So where's the

happened

1    money.  Where is the Flushing money?  He's using it all to

2    start a new business.  He wants this company.  I think most

3    important thing I don't think Mr. Thomasson argued as to

4    why the TRO should not be issued.  All he argued about --

5    why he should be able to use license of North Shore when he

6    doesn't want it anymore.  Why should he not have to return

7    dealer plates that are left open.  I haven't hard one

8    argument from Mr. Thomasson why the TRO we're here for why

9    should this TRO not be issued.  Not one reason why.  All he

10   says is his clients owed money.  His clients got shut down.

11   The TRO should be issued, your Honor, no reason not to.

12           THE COURT:  Thank you.

13           Now we're going to move on to and you're each

14   going to have five minutes on the second motion which is

15   defendant's motion to dismiss.  I outlined earlier on the

16   record.

17           MR. THOMASSON:  Your Honor, at the core of this

18   motion are the same things we have been discussing for the

19   last hour plus.  My clients are the owners of that business

20   Josh Aaronson's son approved the tax returns showing that

21   my clients are the owners of this business.  That reflects

22   what they were discussing that reflect the money that was

23   given into these two businesses.  And we've shown you the

24   checks that were attached to our documents, Judge.

25           At the core of our motion we're the owners of this

happened

1   and, your Honor, respectfully you have got everything in

2   writing.  You're going to have regarding ownership other

3   than eventually some tax returns that I am going to get no

4   matter how long they try and play keep away.  That's going

5   to show you what it is that happened.  Although I think we

6   just had an admission that indeed they didn't file anymore

7   tax returns after Josh Aaronson approved my clients as

8   owners on the tax returns.

9           And so we really need to make a finding who the

10  owners are because everything flows from that.  Everything.

11  If my clients are the owners since they paid the moneys

12  back in 2021 on those two businesses then they are not

13  entitled to their TRO.  And we are entitled to the relief

14  we are requesting for here.  Because my clients are the

15  owners of North Shore and Sunrise.

16          Their action and their motion should be denied and

17  dismissed because this is inappropriate for them to say

18  that if they are not the owners what do they care about how

19  my guy is operating that business.  It may be that money is

20  owed in one direction or another.  I can assure this court

21  that we certainly think they are going to owe us money for

22  ruining our business if this court find that we are the

23  owners since 2021.

24          We don't see it ourselves.  Now what are they

25  going to do.  Are they going to say that one of their

happened

1    employees while they were the owners were doing things that

2    they didn't know they didn't approve of.  And PS, they

3    didn't show you any of that.  Nothing.  Nothing.  What you

4    fire employees who are running things the wrong way.  You

5    fire employees who are costing you million dollars, if

6    you're the owner.

7         So we're asking for relief here, Judge, to

8    effectuate what we need as owners.  We're also asking if

9    for any reason the court doesn't go far enough, if for any

10   reason, the court can't make certain decisions, we would

11   like something expedited.  We have never said to this court

12   we don't want these corporations.  We're fighting for these

13   corporations.  That's what we're doing here.  We've

14   demanded the licenses back.  They are issued in the name of

15   the corporation.  They have approved us as owners.

16        They won't give it to us.  I need the document to

17   keep -- I have asked for them here.  I need the documents

18   to keep the action going that I am dealing with.  I'm

19   dealing with actions over the years from when they were

20   also involved.  They knew I was involved.  They knew I was

21   dealing with things.  They knew I was being paid by those

22   corporations.  They had the checks.  They had the checking

23   account.  They had control of all of the money.  They knew

24   about me, your Honor, the fact of the matter is I have got

25   stuff going on I can't answer.  I don't have dealer jackets

happened

1    that by law aren't supposed to leave these building.  I

2    have asked for it here.  I have asked for it back.  I have

3    asked for access to the software.  They just shut my

4    clients down and out of everything.

5              They want to complain that people are coming to

6    them when we have nothing for them.  We have no money we

7    can spend on them.  We have no dealer jackets to deal with

8    any issue that anyone has.  They want to say all of these

9    cases this court hasn't been told what cases exist.

10             I have two litigations and half a dozen attorney

11   general complaints.  That's standard.  These are car

12   dealerships.  I have dealt with more than that on new car

13   dealerships, not used dealerships, Judge.  And if anybody's

14   upset since they left and shut us down through your TRO,

15   the fact of the matter is whose fault is that?  They got

16   exactly what they asked for because we can't deal with

17   that.  That's the basis of my relief.  I really wish we

18   cold have more time, but I understand the court's position.

19   We have got to get it done.

20             THE COURT:  Yes.

21             Counsel.

22             MR. EPSTEIN:  I have no position.  It's not my

23   motion to dismiss.  I figure either way it will resolve

24   itself by the court and everything will be dismissed or

25   we'll deal with what the next steps are.

happened                                               68

1                THE COURT:  All right.  Counsel.

2                MR. RUDERMAN:  To clarify, your Honor, the motion

3     to dismiss, I tried to break it down in my brief, really

4     relates to claims concerning ownership issues.  Not all of

5     the allegations in the complaint causes of action relates

6     to the ownership to the extent that the ownership issue is

7     not essential to that cause of action there is no motion to

8     dismiss with regard to that.  I have laid those out.  There

9     is a lot of relief and a left various motions that are not

10    quite articulated and broken down in the motion papers.

11                To the extent that are injunctive relief that was

12    sought as I noted, your Honor, in my opposition papers, the

13    CPLR does not allow for injunctive relief to be granted to

14    a defendant unless they filed counter claim or cross claim

15    just -- so there is no injunctive relief which can be

16    granted.  In other words CPLR 6001.  The absence of an

17    appropriate counter claim or cross claim and the demand for

18    judgment there on preliminary injunction.  In the absence

19    of appropriate counter claim or cross come and demand for

20    judgment thereon preliminary injunction as not available to

21    the defendant.  And that is Pen Cam, Inc, versus Gets 426

22    New York supp second 578 at page 579.  It's a Second

23    Department case 1980.  There are many others that's one I

24    have cited to your Honor.

25                With regard to the other relief that was requested

happened

1    again what Mr. Thomasson keeps arguing is that they are the

2    owners and he's arguing again that my client is not

3    entitled to relief which has nothing to do with his motion.

4    His motion has nothing to do with the relief we are

5    requesting.  The fact of whether they are, in fact, owners

6    or not owners is not has nothing to the fact my clients had

7    the licenses issued as owners and they are personally

8    liable for the actions of Mr. Deo.  So that has nothing to

9    do with the issue.

10            And our motion for the injunctive relief is not

11   dependent on our ownership, my clients ownership.  Only

12   their license which is not should not be in dispute.

13            THE COURT:  You just said your clients not owners

14   but they had the license issued as owners.

15            MR. RUDERMAN:  Correct.  My clients' name were on

16   it.  There was no dispute, I believe, that my clients were

17   owners of the dealership certainly through 2020.  I don't

18   think Mr. Deo disputes that.  I have tax returns that are

19   attached to our papers, your Honor, which is exhibit B.

20   And I think we have another one at the end for Sunrise

21   which is exhibit Z.  Those are tax returns from 2020, your

22   Honor.  All of my clients various clients had different

23   ownership interests.

24            I don't think there is any dispute certainly

25   between some period of time 2020 my clients listed on the

happened

```
 1    tax returns as sole owners of both of these dealerships
 2    Mr. Deo claims that in 2021 he took over ownership.  Those
 3    that was not effectuated until the fall of 2022.  That's
 4    the fact pattern.  So my clients had the license with their
 5    names as owners submitted to the DMV.  I don't think that's
 6    in dispute.
 7               However, what Mr. Deo wanted was he wanted to be
 8    listed as owner.  My clients said fine.  Then you have to
 9    change it with the DMV until we're taken off as owners, we
10    are as Mr. Thomasson said personally liable for all the
11    actions of the dealership.  I don't think that's in dispute
12    here.
13               MR. THOMASSON:  Can I have time to reply, your
14    Honor?
15               THE COURT:  It is your motion.  I will give you
16    the last word.
17               MR. RUDERMAN:  To move on from there, your Honor,
18    the various elements that are necessary to establish
19    dismissal, your Honor.  I have gone through them in great
20    detail.  I believe your Honor has them.  I don't know if
21    you want me to go through all the elements.
22               THE COURT:  Not necessary.
23               MR. RUDERMAN:  If there is any one in particular
24    that your Honor has any question about I think the tax
25    returns is one most at the heart of the -- and the key to
```

happened

1          this one, I presented several cases, your Honor, where the

2          courts have looked at the tax returns.  And they have

3          looked at the circumstances.  And in those cases, your

4          Honor, we have page 15 of my brief, your Honor.  When tax

5          returns are presented to prove ownership, the court found

6          that under Estate of David Barnett, 2019 New York Law

7          Journal Lexus 4749 at page 17.  That in that case

8          decedent's tax return did not quote unquote utterly refute

9          the claimed allegations the decedent demonstrated a

10         practice of giving interest in realty to his nephews.

11         Making possible that he acquired these properties with his

12         nephew in mind.  In that case the question whether or not

13         these tax returns showed absolute ownership they were able

14         to show through extrinsic evidence that he had practice of

15         giving over interest to family members and therefore the

16         fact -- did not mean that they did not have an interest in

17         those entities.

18              So that is one case I presented.  The other one,

19         your Honor, Kimelstein verse Kimelstein 2011 New York

20         Miscellaneous Lexus 5352 Suffolk County case from 2011.

21         Where two brothers were disputing the ownership interest

22         and one brother said that while the tax returns are in my

23         name therefore you don't own anything.  And the court found

24         that that the other brother who claimed an interest had

25         affidavits and checks supporting his claim as to the nature

happened

72

1       of the transaction that he had an interest and the court

2       said you don't get dismissal.  You don't get summary

3       judgment.  These are issues and this is what we're before,

4       your Honor, there are issues here.  I don't think either

5       party has enough here to say to this court we can establish

6       ownership at this point in time and certainly.

7               THE COURT:  Doesn't that cut against some of your

8       other arguments?

9               MR. THOMASSON: Yes, yes.

10              MR. RUDERMAN:  No, your Honor.  The ownership for

11      our purposes of the TRO as long as the license has my

12      clients name on it whether they whether ownership has

13      changed, we do not concede, we believe that the dealership

14      is still owned by my clients that's our position, but I

15      can't say for summary judgment purposes that's established

16      here.

17              I think we have likelihood of success in that.

18      And as your Honor knows, being that there is facts in

19      dispute about it is not a reason not to grant the

20      preliminary injunction.  But I don't know how much stronger

21      I could say this, your Honor, the ownership issue actual

22      ownership issue in dispute but not determined is not

23      determinative of our TRO.

24              THE COURT:  I heard you all of the many times that

25      you have made the points.  Thank you.

happened

1              MR. THOMASSON:  Two points, your Honor, first of

2       all the cases that he cites and I read them the fact of the

3       matter is you had people filing tax returns as a sword and

4       not as a shield.  They weren't doing it out of duty or

5       obligation as owners.  They were trying to create the

6       impression of ownership by filing tax returns.  Or people

7       were instead looking at tax returns and trying to say from

8       the position of a nonfiler that it was that that's the

9       determinative.

10             It's different here, your Honor.  They approved

11      our tax returns being filed with my clients as owners and

12      their approval is in writing and before you.  As confirmed

13      by their CFO and our accountant.  And Josh Aaronson himself

14      approved it that's what he says in those papers.  Approved.

15      That's very different than the case they cite.  In this

16      instance it's not just the tax returns, it's also that

17      approval that's relevant to confirm that my clients are

18      indeed the owners.

19             And it's our position of course it's convenient

20      they know they have a problem with that.  So they styled

21      their papers as in the alternative not the way it's

22      typically done with this, you know, with the contract

23      theory or alternatively fraud, no, no, they do it with the

24      facts.  I never seen anything like that.  We're the owners,

25      your Honor, and this man ruined our company.  Or we're not

happened

1    owners and he's a bad guy anyway.  That's absolutely what

2    they did, your Honor.

3           What I'm saying is as of some point in 2021 as

4    reflected in documents, my guy was in charge.  It is not

5    last fall that he becomes the owner because they approved

6    the tax returns.  The tax returns didn't effectuate his

7    ownership as counsel said.  The tax returns and those

8    e-mails approving them reflect that the paperwork and

9    monies paid back in 2021 absolutely indicate that's when my

10   client redeemed the North Shore business and took over

11   Sunrise.  That's an important distinction, your Honor.

12   That I wanted to make sure you understand.  That's why they

13   are not entitled to relief.

14          Why are they entitled to control North Shore if

15   they are not the owners at the time that they file and they

16   told you that they are the owners.  They committed fraud.

17   And it's important you understand that with regard to the

18   DMV license.  And we gave you the paperwork, Judge, it's

19   there.  Send me the paper work, sign the DMV license.  Why

20   are they asking my clients to sign the DMV license from

21   last year or 2021 whatever the date is on those.

22          It's because he's now the owner.  He gave them the

23   paperwork back.  His affidavits says that.  I gave them the

24   paperwork.  He never knew that he wasn't the owner.  He

25   kept demanding the licenses from them give me the license.

happened

 1        Yes, yes, we will.  We will.  We will.  We will.  And then

 2   they leave and they still haven't given him the licenses

 3   because they want to claim that they are the owners or they

 4   are not.  That's their position.  It's not one it's both.

 5   And I'm just I provided paperwork that I think clarifies

 6   the issue for both motions, your Honor.

 7             THE COURT:  Thank you all very much decision

 8   reserved on motion sequences one and two and you will be

 9   notified accordingly.

10             MR. THOMASSON:  I just ask Judge that you do

11   whatever you can as soon as you're able please.

12             THE COURT:  I will.  Thank you.

13             MR. RUDERMAN:  Thank you, your Honor.

14

15                       CERTIFIED TO BE
                         TRUE AND CORRECT
16

                         *M. León*

                         MELINDA LEON, RPR
18                       SENIOR COURT REPORTER

19

20

21

22

23

24

25