FILED
CLERK

7:59 am, Nov 16, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
SUPERB MOTORS, INC., et al.,   : 23-cv-06188-JMW
                               :
              Plaintiffs,      :
                               :
     - versus -                : U.S. Courthouse
                               : Central Islip, New York
DEO, et al.,                   :
                               : November 9, 2023
           Defendants          : 12:36 p.m.
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE JAMES M. WICKS
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**


**For the Plaintiff:**         **Emanuel Kataev, Esq.**
                               Milman Labuda Law Group PLLC
                               3000 Marcus Avenue, Suite 3W8
                               Lake Success, NY 11042

                               **Russell J. Shanks, Esq.**
                               Cyruli Shanks Hart & Zizmor
                               420 Lexington Ave., Ste. 2320
                               New York, NY 10170


**For the Defendants**:        **Harry R. Thomasson, Jr., Esq.**
                               3280 Sunrise Highway, Box 112
                               Wantagh, NY 11793


          (Appearances continue on next page)


**Transcription Service**:     **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**APPEARANCES CONTINUED**

**For the Defendants**:          **Peter Seiden, Esq.**
                                 Milber Makris Plousadis &
                                  Seiden, LLP
                                 1000 Woodbury Road, Suite 402
                                 Woodbury, NY 11797


                                 **Ariel E. Ronneburger, Esq.**
                                 Cullen and Dykman LLP
                                 333 Earle Ovington Boulevard
                                 2nd Floor
                                 Uniondale, NY 11553

3

Proceedings

1          THE CLERK:  Calling civil case 2023-6188,

2  *Superb Motors, Inc., et al. v. Deo, et al.*

3          Counsel, please state your appearances for the

4  record.

5          MR. KATAEV:  Good afternoon.  Emanuel Kataev of

6  Milman Labuda Law Group PLLC for the plaintiffs Superb

7  Motors, Inc., Team Auto Sales LLC, and Robert Anthony

8  Urrutia.

9          THE COURT:  Good afternoon, Mr. Kataev.

10         MR. SHANKS:  For the remaining plaintiffs,

11 Russell Shanks of Cyruli Shanks & Zizmor.  Good

12 afternoon, your Honor.

13         THE COURT:  Good afternoon, Mr. Shanks.

14         MR. THOMASSON:  Your Honor, on behalf of the

15 Deo clients, the defendants, including Mr. and Mrs. Deo,

16 Mr. Merckling, Mr. Laurie, Mr. Blankenship, the Premier

17 entities and the Gold Coast entities, I'm Harry

18 Thomasson, 3280 Sunrise Highway, Box 112, Wantagh, New

19 York.  Good afternoon, your Honor.

20         THE COURT:  Good afternoon, Mr. Thomasson.

21         MR. SEIDEN:  Good afternoon, your Honor.  Peter

22 Seiden; Miller Makris Plousadis & Seiden, LLP for

23 defendants Jones, Little & Co., CPA's and Thomas Jones.

24         THE COURT:  Good afternoon, Mr. Seiden.

25         MS. RONNEBURGER:  Good afternoon, your Honor.

4

Proceedings

1   Ariel E. Ronneburger; Cullen and Dykman LLP, for

2   defendant Flushing Bank.

3           THE COURT:  Good afternoon, Ms. Ronneburger.

4           MR. KATAEV:  I apologize, your Honor.  I was

5   remiss in mentioning that with us today is one plaintiff,

6   Robert Anthony Urrutia individually and Bruce Novicky

7   who's the chief --

8           THE COURT:  That's okay.  I see him.  I

9   remember him.

10          MR. KATAEV:  Thank you.

11          THE COURT:  Good afternoon as well.

12          THE PLAINTIFF:  Good afternoon, Judge.

13          THE COURT:  Okay.  Let me just get my bearings

14  here for a second.

15          Okay.  All right.  So we're here for a few

16  things.  Let me just set the table here so we can talk

17  about this in a particular order.

18          We have a motion to clarify the preliminary

19  injunction and I guess coupled with that somewhat is the

20  motion for contempt.  Well not really coupled.  It is an

21  independent motion.  Let me just -- what's the, just for

22  document number reference, what is the --

23          MR. KATAEV:  I have 72 for the clarifying, 79

24  for contempt.

25          THE COURT:  72 and 79.  Thank you.  Okay.  And

5

Proceedings

1   then also motion for disqualification.

2          THE CLERK:  85.

3          THE COURT:  Which is 85.  Okay?  So those are

4   the three things we're here for today.

5          First on the clarification, that is the motion

6   for clarification on 72, is this really a motion, Mr.

7   Kataev, for clarification or for modification of her

8   order?  Because I looked at her order and it seems to me

9   it's pretty clear in terms of what she directs.  That

10  doesn't mean you can't move to modify it if you think it

11  needs to be modified, but I didn't see it as a motion for

12  clarification, but you tell me.

13         MR. KATAEV:  Well, at the time it was before

14  Judge Merchant it was a motion to clarify because it

15  appeared to me that we received the relief that we wanted

16  and it may have been sort of a lost in the sauce so to

17  speak as to the remaining parts.  So we wanted to find

18  out from Judge Merchant.

19         At this point now that it's before this Court,

20  I would submit it's a motion to modify.

21         THE COURT:  Yes.  That's certainly --

22         MR. KATAEV:  The same issue remains --

23         THE COURT:  Because you're talking about the 43

24  unaccounted for vehicles.  You're asking for proof of

25  insurance.  Right?  And that the cars be kept and not

6

                          Proceedings

1   used.  And some of that sort of dovetails to the contempt

2   I think.  We'll get into that a little bit.

3              MR. KATAEV:  No, it's more than that, your

4   Honor.

5              THE COURT:  Okay.

6              MR. KATAEV:  We want the 43 remaining vehicles

7   back as we received the 31 vehicles back.

8              THE COURT:  Right.  Where is that in her

9   injunction order?

10             MR. KATAEV:  It's not in there.

11             THE COURT:  That's what I'm saying.  So it's

12  not a -- I don't see that as a clarification.  That must

13  be an independent motion if that's what you're looking

14  for.

15             MR. KATAEV:  Understood.

16             THE COURT:  I don't see it as a clarification

17  of an existing order on the 43.  There are other issues

18  that we'll get into but on the 43 it doesn't mean you

19  can't move for it, can't seek relief on it, can't seek to

20  compel.  But I'll just give you my thoughts.  I mean you

21  may have to go through a little bit of discovery first

22  and then make whatever motion you see fit on those 43

23  because those are not part of her order.  You know, why

24  they're not I don't know, but they're not.

25             MR. KATAEV:  It just doesn't make sense to me,

7

Proceedings

1  your Honor.  We prevailed on the motion and the judge

2  found there's irreparable harm stemming from these

3  vehicles.  It follows that those vehicles should be

4  returned.  And I personally think that there was a

5  mistake there but there's no way to know.

6          THE COURT:  Yes.  And I'm not arguing with you.

7  I'm not arguing with you about that.  I'm just saying it

8  certainly is not -- you can also read her order as

9  denying that part of your application beforehand because

10 she didn't address it.

11         MR. KATAEV:  By omission, yes.

12         THE COURT:  So again, if you want to renew an

13 application for preliminary injunction as to the 43

14 vehicles, I think that's the route.  It's not a

15 clarification I think.

16         MR. KATAEV:  Understood, your Honor.

17         THE COURT:  Because I don't know what to

18 clarify.  She didn't address it.

19         Okay.  Let me turn to the contempt.  Mr.

20 Thomasson, isn't the order clear that the vehicles -- she

21 ordered them not to be driven, no?

22         MR. THOMASSON:  Your Honor, I thought that what

23 happened in mediation --

24         THE COURT:  Yes.

25         MR. THOMASSON:  -- was that we agreed that he

8

Proceedings

1  would be using two of the vehicles for the purpose of

2  demos.  You asked him --

3          THE COURT:  But wasn't that for, that so-called

4  mediation was really for the TRO aspect.

5          MR. THOMASSON:  I understand that, your Honor.

6          THE COURT:  And then she, and then

7  subsequent --

8          MR. THOMASSON:  She didn't make any -- I didn't

9  read any provision in there about it.

10          THE COURT:  Yes.

11          MR. THOMASSON:  I didn't think that -- since

12  she was ordering the insurance to be provided for those

13  two cars as we all agreed, we also agreed that he was

14  providing the insurance for those two cars because he was

15  using those two cars as demos and as a typical perk as a

16  part owner of the business.  I don't know what he's doing

17  that is in contempt.  That's why that insurance was

18  ordered, your Honor.

19          THE COURT:  Except, you know, as I read her

20  order, and again, on a contempt application the question

21  is is there a clear mandate or order that has been

22  violated, right?  So I read her order and you know, she

23  talks about the three vehicles, right, which I have a

24  question about that even.  And then the six which she

25  defined as the injunctive Deo vehicles shall remain in

9

Proceedings

1  your lots.  And I think it's pretty clear from clause 5

2  that they can't leave, they can't be driven, they can't

3  be maintained.  But in 6 she says, you know, if there's

4  an emergency or good cause, apply to the Court ahead of

5  time and we'll take it from there.  How is that not a

6  clear order not to drive the six?

7            MR. THOMASSON:  Well, because, your Honor, she

8  also ordered the insurance information turned over on

9  those two cars.

10            THE COURT:  Well, all she ordered on those two

11  cars to hold and keep insurance.

12            MR. THOMASSON:  Right.  And that was --

13            THE COURT:  And provide proof to Superb.

14  Again, it doesn't say then go ahead and drive it.  I

15  understand it's different than what we discussed in the

16  TRO.

17            MR. THOMASSON:  I understand.

18            THE COURT:  But that's water under the bridge.

19            MR. THOMASSON:  Which was why I submitted the

20  declaration last month --

21            THE COURT:  All right.

22            MR. THOMASSON:  -- and raised two points, that

23  being one of them.

24            THE COURT:  Okay.  Okay.

25            MR. THOMASSON:  And bear in mind, your Honor --

10

Proceedings

1    I'm sorry, if I could just finish the thought.

2                THE COURT:  That's okay.  Of course.

3                MR. THOMASSON:  I was under the impression,

4    even though I didn't agree that it should be a motion to

5    clarify either --

6                THE COURT:  es.

7                MR. THOMASSON:  -- but it is a motion to

8    clarify.  And so I joined in that and said I need these

9    two issues clarified as well.  It's ironic because at the

10   moment I think I need more clarification than they do.

11   They need modification.

12               THE COURT:  You're saying on the contempt

13   aspect of it you need clarification.

14               MR. THOMASSON:  Right, because that's what we

15   were doing and she did order the insurance to be in place

16   for those two cars.  I don't know if she understood from

17   the bare line in your order in which you said when we

18   were here in addition there are two other items.  This

19   was the only thing that was said.

20               THE COURT:  Yes.

21               MR. THOMASSON:  Defendants will provide proof

22   of insurance on the Chevy Suburban and on the Land Rover

23   which are used as demos.  I don't know that she

24   necessarily was understanding that that was part of our

25   entire agreement.

11

Proceedings

1      THE COURT:  I understand.  I understand your

2  position.

3      Mr. Kataev, is it not -- how is that a clear

4  and unambiguous order as to those two vehicles where she

5  carved out those two and said as to those two, provide

6  insurance, maintain and provide insurance to Superb for

7  the demo cars?  How is that -- you know, that is

8  consistent with the TRO and I agree with you the TRO is

9  then subsumed in whatever she did, right?  I mean this

10  isn't an application for contempt of the TRO.  It's an

11  application for contempt of the preliminary injunction.

12      So now we're looking at her order.  And can you

13  say that it is clear and unambiguous as to those two not

14  to be driven?

15      MR. KATAEV:  Yes because --

16      THE COURT:  How?

17      MR. KATAEV:  -- because it says may not be

18  driven.  It doesn't say except.  Second, we --

19      THE COURT:  Well, why didn't she include a

20  requirement to keep and provide insurance on all six?

21  Why did she carve those two out?

22      MR. KATAEV:  Because driving is not the only

23  insurable risk.  Even keeping them on the lot could

24  present a risk.  A tree could fall on them.  Something

25  could happen.

12

Proceedings

1    THE COURT:  True.  But isn't that true with the

2  other four?

3    MR. KATAEV:  Yes.

4    THE COURT:  So why wouldn't she require it for

5  those four?  Why did she do it for just these two?

6    MR. KATAEV:  She merely subsumed what was in

7  the TRO by doing that.  And furthermore --

8    THE COURT:  But now you're saying she subsumed

9  it for some purposes but not for others.

10    MR. KATAEV:  Correct.  And that's because --

11    THE COURT:  Is that really clear and

12  unambiguous to hold someone in contempt of court?  That's

13  the question I have.

14    MR. KATAEV:  Maybe not for the two vehicles,

15  but certainly for the remaining four.

16    THE COURT:  So the remaining four, Mr.

17  Thomasson, have they been used, not used?

18    MR. THOMASSON:  No, your Honor, they're not

19  being used.

20    THE COURT:  They have not been.  Okay.  Okay.

21    All right.  Let me turn to the motion for

22  disqualification.  But before I do on that, on the

23  clarification motion, I'll give you the opportunity, I'm

24  going to deny that for clarification on the -- that's 72,

25  but without prejudice and with leave to renew it as a

13

Proceedings

1   motion for I guess a modification of the injunction or a

2   further injunction as opposed to a clarification of the

3   injunction because that is not addressed in her orders.

4   The contempt, I'm going to reserve decision on that, 79.

5           And now let's talk about disqualification.

6   Okay.  I'm sorry, before we shift gears, there's a couple

7   of questions I did have about her order and your

8   applications to the other, 72, 79.

9           On the list, let me get the list.  And I think

10  this is the list that we were -- this was Exhibit 1 I

11  think on the motion papers.  This is the chart of the

12  vehicles, three-page chart which I think was Exhibit 1 to

13  I think, Mr. Thomasson, your motion?  Is that correct?

14  Do I have the numbering right?

15          MR. THOMASSON:  My motion for what, Judge?

16          THE COURT:  Earlier.  I'm looking at Exhibit 1.

17  I want to make sure we're all looking at the right

18  document.  Hold on.  Marie, what's the docket number?

19          THE CLERK:  30-8.

20          THE COURT:  30-8.  30-8 on the ECF.  That's how

21  it's filed.  But I think within that it's called Exhibit

22  1 for some reason, but it's 30-8.  It's the three-page

23  chart, the one we looked at at the TRO stage, in the

24  mediation for the TRO.  It has yeses and it has

25  descriptions.  You know --

14

Proceedings

1          MR. THOMASSON:  I remember that one.

2          THE COURT:  Okay.  So I look at that chart and

3    unless I'm miscounting, that chart shows 29, not 28, in

4    plaintiff's lots.  What am I missing?  Mr. Kataev?

5          MR. KATAEV:  It's 29 plus two.  We found the

6    two Isuzu flatbed trucks.

7          THE COURT:  Yes, but that would bring it to 31,

8    and she's got 30 in her order.  Mr. Thomasson?

9          MR. KATAEV:  I'm not sure.

10          MR. THOMASSON:  I think you're absolutely

11    right.  That is a mistake because it was 29 that we

12    acknowledged.  And then we also acknowledged the two

13    Isuzu flatbeds on top of it --

14          THE COURT:  That's what I thought.  So it

15    should be --

16          MR. THOMASSON:  -- that are not in that list.

17          THE COURT:  So it should be 31.

18          MR. THOMASSON:  So the total number of cars

19    that I seem to recall that we have any control over --

20          THE COURT:  Yes.

21          MR. THOMASSON:  -- is 31 which all but I think

22    it's six have been given back.  So if people want to

23    waste their time looking for more cars, we don't have

24    them.

25          THE COURT:  Okay.  I thought it was 31.  The

15

Proceedings

1  order says 30.  It says 28 listed on ECF 30-8.

2           MR. KATAEV:  I know where it's from.

3           THE COURT:  Okay.  Go ahead.

4           MR. KATAEV:  I believe it was the Chevy

5  Suburban that they said yes to and that was accepted as

6  one of the six.

7           THE COURT:  I see.

8           MR. KATAEV:  That's my recollection.

9           THE COURT:  I think you're right.  I think

10  that's it.  So it's a Chevy Suburban ending in VIN 8675.

11  That now is in your possession and that was on the yes

12  list originally, so that doesn't count as a yes.  So that

13  brings it to 30.  Does that make sense, Mr. Thomasson?

14           MR. THOMASSON:  If that's the case.  I thought

15  it was on the list.

16           THE COURT:  It's on the list as a yes, your

17  list as a yes, which meant it's in plaintiff's lots

18  but --

19           MR. THOMASSON:  But it would have been one of

20  our 29 then.

21           THE COURT:  One of plaintiff's 29, right?

22  Except --

23           MR. THOMASSON:  No, one of the 29 that we

24  acknowledge with a yes.

25           MR. KATAEV:  That's right.

16

Proceedings

1          THE COURT:  That's right.  But that also now is

2    one of the six that she has in her order that is in your

3    possession.

4          MR. THOMASSON:  Yes.

5          THE COURT:  Okay.  So I think her calculation

6    of 30 is correct.  I just wanted to figure out which

7    vehicle.  Okay.  That's helpful.

8          Now, just going back again on the content issue

9    in the clarification issue, Mr. Thomasson, there are two

10   lots that she identified in her order --

11         MR. THOMASSON:  Yes, your Honor.

12         THE COURT:  -- that these could be kept.  You

13   have made an application I guess for clarification

14   because you lost the ability to now park these cars in

15   the Northshore lot?

16         MR. THOMASSON:  And since the order, not only

17   did we lose the ability since the order to park them at

18   the Northshore lot temporarily, we also have lost the

19   ability to park them at the Amityville lot.  Both of

20   those lots have now been surrendered.  My clients'

21   businesses there were crushed.  And those lots were

22   surrendered in deals with the landlords in the last

23   month, the last few weeks.

24         THE COURT:  All right.  But you didn't make

25   application to her to modify that.  That goes right to

17

Proceedings

1    the contempt, doesn't it?

2              MR. THOMASSON:  I understand, your Honor.  What

3    I had done with those, again, I put it in that

4    declaration a month ago.  I wasn't trying to hide

5    anything from anybody.

6              THE COURT:  Yes.

7              MR. THOMASSON:  Then we got an order at almost

8    the same time that they brought their motion to

9    disqualify, we got an order from the Court that said

10   anything further with respect to the injunction we need

11   to bring in to you.

12             THE COURT:  Yes.  Okay.

13             MR. THOMASSON:  And you set this hearing --

14             THE COURT:  All right.  So --

15             MR. THOMASSON:  -- right after I finished

16   dealing with a motion to disqualify.

17             THE COURT:  All right.  So where are these six

18   vehicles that are supposed to be at these one of two

19   lots?

20             MR. THOMASSON:  They are in my client's

21   possession at their home which is gated.

22             THE COURT:  Okay.

23             MR. THOMASSON:  And it's secured.  And they're

24   still insured.

25             THE COURT:  All right.  They can't stay there.

18

Proceedings

1          MR. THOMASSON:  Okay.

2          THE COURT:  They can't stay there.  There's

3    going to have to be an independent storage facility

4    somewhere.

5          MR. THOMASSON:  Okay.  We will do that.  The

6    only thing I can tell the Court is they're also hip deep

7    in negotiations to get another lot.  So until then --

8          THE COURT:  If they get another lot, you can

9    make application --

10         MR. THOMASSON:  Okay.

11         THE COURT:  -- to have them transferred.  But

12   they're going to have to be transferred.  These six are

13   going to have to go to an independent vehicle storage

14   facility.  There are plenty on Long Island.  And you're

15   going to have to provide the information to Mr. Kataev

16   where they are being kept.  And all should be in the same

17   location.  They should be in the same warehouse facility.

18         MR. THOMASSON:  What can we do in the meantime

19   about the two that they've been using?

20         THE COURT:  Well, her order -- I mean that goes

21   to the heart of the contempt order which I'm going to --

22         MR. THOMASSON:  And the clarification which I

23   piggybacked on.

24         THE COURT:  Yes, yes.  So let's just talk about

25   that for a bit.  But on the storage I'm going to give you

19

Proceedings

1    to the end of Monday to have these cars into a facility,

2    an independent.  Not yours, not plaintiffs.

3                MR. THOMASSON:  Can we make that till the end

4    of Tuesday, your Honor?

5                THE COURT:  End of Tuesday because we got a

6    holiday Friday and I don't know who's open, who's closed.

7                MR. THOMASSON:  And I'm leaving for the

8    weekend.  I have to go see my son.

9                THE COURT:  All right.  And of Tuesday.  But

10   you're going to have to let Mr. Kataev know exactly what

11   facility these vehicles are going to be kept.

12               MR. THOMASSON:  And just so there is no

13   question --

14               THE COURT:  And just to be clear --

15               MR. THOMASSON:  -- is that four or six?

16               THE COURT:  That's all six.  And then we're

17   going to talk in a minute about the two.  But as to all

18   six, are you -- just to be clear, defendants are going to

19   bear the cost of that storage.

20               MR. THOMASSON:  I understand that.

21               THE COURT:  Okay.

22               MR. KATAEV:  Your Honor?

23               THE COURT:  Yes.

24               MR. KATAEV:  We don't want the defendants

25   wasting money that we'd like to collect on a judgment

20

Proceedings

1   down the line.  We offer storage for free at Superb and

2   they will not be moved if that's something that the Court

3   would order.

4            THE COURT:  Well, Mr. Thomasson, is that

5   something your clients would agree?  Just transfer them

6   over to the plaintiffs.

7            MR. THOMASSON:  I have my doubts at the moment.

8   Superb appears to be closed, so I don't know what's going

9   on there.  They have an empty lot.

10           THE COURT:  Yes, let's go independent.  That

11   doesn't mean you can't ask for that at a later time.

12           MR. KATAEV:  That's right.

13           THE COURT:  And make an application without a

14   doubt.  But for now, let's get them into an independent

15   storage facility.

16           All right.  Let's talk about the two.  We did

17   talk about, Mr. Kataev, the two vehicles being used as

18   demos.  That is what we talked about.  Again, the

19   preliminary injunction order supersedes whatever we

20   talked about as the TRO.  I get that.  But now let's just

21   talk as a practical matter because we had a lot of

22   negotiations over this providing insurance and making

23   sure they were insured for that very reason.  And they

24   could use them as demo.  That was the whole purpose,

25   right?  So any reason why we can't at this point as to

21

Proceedings

1  those, since they're insured -- do you have the insurance

2  information?

3          MR. KATAEV:  I have information for two

4  vehicles but I have arguments on this point that I would

5  like to address.

6          THE COURT:  Yes, of course.  Go ahead.

7          MR. KATAEV:  Okay.  First of all, the order

8  that we received from Judge Merchant, the whole purpose

9  of it was to put the parties back at the status quo ante.

10 The status quo ante was that the vehicles were on our

11 lot.  That was the purpose of it.  Okay?  And so those

12 cars aren't on our lot anymore.  Keeping them outside of

13 our lot is just violating the spirit and letter of that

14 order.

15         Second, the whole purpose of this order is also

16 to maintain the resale value of the vehicles.

17         THE COURT:  Right.

18         MR. KATAEV:  Keeping them anywhere that's

19 unsecured as set forth in the preliminary injunction

20 maintained in a way that may damage the resale value --

21         THE COURT:  Well, they're going to be now in a

22 warehouse facility.  So that issue is taken care of.  I

23 guess your question is really let's focus on the two

24 they're using.  I guess your position is the more miles,

25 the less --

22

Proceedings

1        MR. KATAEV:  That's exactly right.

2        THE COURT:  You're depreciating it.

3        MR. KATAEV:  Yeah.  These vehicles are assets

4   on our general ledger.

5        THE COURT:  Yes.

6        MR. KATAEV:  And the more you drive them, the

7   more the resale value goes down.  It doesn't make any

8   sense to permit them to drive.

9        And then the final point on this is the TRO

10  that we entered into was subject to a reservation of all

11  rights pending the order on the preliminary injunction.

12       THE COURT:  Yes.

13       MR. KATAEV:  That preliminary injunction has

14  now been cited.

15       THE COURT:  Yes.

16       MR. KATAEV:  It's clear that you cannot drive

17  them.  She called them the demo vehicles just for

18  purposes of identification.  She didn't say they can be

19  driven as demo vehicles.

20       And while we're on that subject, they keep

21  talking about this as being a perk of ownership.  No

22  dispute, he's a 49 percent member.  But you got to have

23  the benefits of being an owner and you have to have the

24  cons of being an owner.

25       THE COURT:  Yes.

23

Proceedings

1          MR. KATAEV:  We sent a capital call letter for

2   the $4 million loss we suffered.  If he wants to give us

3   a check for 1.96 million, drive the cars.  He's not doing

4   that.  You can't have the benefit of being an owner

5   without the cons.  We suffered all these losses.  They're

6   walking scot free and not paying for anything.  It just

7   doesn't fly.  That's not the way the world works.  So if

8   you're not going to take on your responsibilities as a 49

9   percent member, you can't have the perks.  Either return

10  the vehicles or pay the money to have the benefits of

11  being an owner.

12          THE COURT:  All right.  Mr. Thomasson?

13          MR. THOMASSON:  First of all, they're the ones

14  who decided and shut my client out from being not just a

15  49 percent owner but he was headed towards the other 51

16  percent and at least part of the rest of Mr. Urrutia's

17  businesses up in Connecticut.  I know I started the

18  investigation into lien searches on those businesses.  I

19  think I provided a copy of that to the Court.

20          THE COURT:  Yes.

21          MR. THOMASSON:  And my client was absolutely

22  put in charge by Mr. Urrutia of that business.  Mr.

23  Urrutia made the decision to lock him out.  He's the one

24  who created this entire circumstance.  We of course

25  maintain that it's been improper, illegal, unlawful, and

24

Proceedings

1    damaging to my client for what they've done.  That will

2    be addressed, your Honor.  We obviously haven't brought

3    our complaint yet but we will.

4              THE COURT:  All right.

5              MR. THOMASSON:  But in the meantime, they are

6    arguing basically another bite of the apple, the same

7    things that thus far have not been a part of the

8    mediation and were not really called for on the

9    injunction by Judge Merchant.  They now want to undo that

10   and change what that was.

11             Look, the Court chose the words.  He has to

12   provide the insurance on those two vehicles as demos.  I

13   think she said everything but which the parties agreed he

14   could use.  There's a very brief comment in the

15   transcript the Court used to create that order, that

16   injunction.  There's a very brief comment from this Court

17   that we put on the record about him using those vehicles.

18   I think it was just missed.  That's what it looks like to

19   me given that she also referred to them as demos and for

20   the insurance to be provided.

21             They're looking to undo that order now and have

22   everything back the way it was.  My client will safeguard

23   the vehicles and I will leave here with whatever

24   direction I need from this Court to address these two

25   cars.  If you need more motion paperwork from me or if

25

Proceedings

1    his declaration and my statements now are enough, we'll

2    go with that when they bring their motion for

3    modification.

4            THE COURT:  No, I don't need anything further

5    on that.  But in the meantime, all six should not be

6    driven.

7            MR. THOMASSON:  I understand that.

8            THE COURT:  I think on the face of her order

9    she's directed that all six not be driven.

10           That said, a couple of paragraphs later she

11   calls them demo vehicles, carves them out and says give

12   insurance that almost gives rise to the inference that

13   they're going to be used.  I'm not saying that's what --

14   again, just look at it.  So from a contempt standpoint,

15   Mr. Kataev, I'm not so sure because it has to be a clear

16   and unambiguous order in order to hold someone in

17   contempt.  You wouldn't want to be held in contempt if

18   it's not clear and ambiguous.  So I'm not sure about

19   that.  But I'm going to reserve on that.

20           But in the meantime, none of the six shall be

21   driven.  Understood?

22           MR. THOMASSON:  Understood, your Honor.

23           THE COURT:  Placed in a warehouse.2

24           MR. THOMASSON:  By close of business Tuesday

25   they'll be someplace and I will let Mr. Kataev know.

Proceedings

1          THE COURT:  You've got to let him know, yes.

2          MR. THOMASSON:  Do you want to know?  Do you

3    want me to upload a letter to the Court?

4          THE COURT:  You know what?  That's probably a

5    good idea.  That's probably a good idea, yes.

6          MR. THOMASSON:  I'll upload a letter to the

7    Court that let's everybody know.

8          THE COURT:  Perfect.  Mr. Kataev?

9          MR. KATAEV:  Three points on this.

10          THE COURT:  Yes.

11          MR. KATAEV:  Even if two vehicles are not clear

12    and ambiguous, four vehicles are not.  We haven't

13    received any proof in response to the motion for contempt

14    that the vehicles are actually there.  We received a

15    letter, an unsworn letter from counsel that they are

16    present.  We sent someone there who took pictures and

17    provided proof --

18          THE COURT:  I think he just -- didn't he

19    represent -- he just represented -- do you have all six?

20          MR. THOMASSON:  We have all six, your Honor.

21    My client has all six at his gated home.

22          THE COURT:  Right.

23          MR. THOMASSON:  And he lost Syosset and

24    Amityville.  He's negotiating for a new lot now.

25          THE COURT:  Okay.  The question is, and he's

27

Proceedings

1   right, Mr. Kataev is right, your opposition to the

2   contempt is somewhat silent on the issue of the four, so

3   I just wanted to hear from you and make a representation

4   in open court you've got all six.

5         MR. THOMASSON:  Clearly and unambiguously my

6   client possesses all six of those vehicles.  I will see

7   to it that by close of business on Tuesday they're put

8   somewhere safe, and by close of business on Wednesday I

9   will upload a letter to ECF.

10        THE COURT:  And when I say somewhere safe, just

11  to be clear, you know, a licensed insured storage

12  facility vehicle.  As I say, there are lots on Long

13  Island that store cars.  But it has to be a facility for

14  that purpose and licensed and insured to do that.  All

15  right?

16        MR. THOMASSON:  Understood.

17        MR. KATAEV:  Judge, on this point, one on the

18  aspects of clarification is we asked for date stamped

19  photos of the vehicles and --

20        THE COURT:  Okay, that's not clarification.

21  That was not asked for in the motion originally.  She

22  didn't address it.  If you want to -- again, that would

23  be part of any motion for further modification of an

24  injunction, and I'm not saying don't make it.  You can if

25  you want.  But that definitely isn't something that was

28

Proceedings

1  part of her order.

2          MR. KATAEV:  Understood.  One final --

3          THE COURT:  Or the underlying papers.  I didn't

4  see it in the underlying papers either.

5          MR. KATAEV:  Understood.  One final point on

6  this application.

7          THE COURT:  Yes.  I thought that was the final

8  point.

9          MR. KATAEV:  I always have multiple final

10 points.  Just one last question.

11         THE COURT:  Okay.

12         MR. KATAEV:  So in the May 31, 2023 oral

13 argument transcript, it's Exhibit A to our first amended

14 complaint, I'm going to quote something that Mr.

15 Thomasson said which I think is relevant here.

16         Mr. Thomasson said, "I sat down with Anthony.

17 He said all right, the floor plans means the cars are

18 backed by them financially."  Them referring to

19 Northshore at the time.  He says, "Yes.  Then we have to

20 give them back."  He says, "I agree 1,000 percent."

21         All of these vehicles are backed by the floor

22 plans by Superb.  The same logic should apply here.  In

23 the Northshore case, there was no motion to return the

24 vehicles because Mr. Thomasson voluntarily agreed to

25 provide them.  I have the exhibits with me today.  I also

Proceedings

1  have exhibits with me today that some of the Northshore

2  vehicles were extensively damaged and parted out.  That

3  affects the resale value of the vehicle.

4           THE COURT:  Okay.

5           MR. KATAEV:  This situation here is no

6  different.  The complaint specifies this in great detail.

7           THE COURT:  Which motion are you -- I

8  understand your position fully and some of that is

9  ultimate relief you're seeking in the lawsuit.  But what

10 does it have to do with what we're dealing with today?

11          MR. KATAEV:  It demonstrates a bad faith

12 conduct warranting contempt.  There's been a --

13          THE COURT:  I know, but the threshold issue is

14 is there a clear and unambiguous order?  That's the

15 threshold.  Even if there was intent --

16          MR. THOMASSON:  Could I just address that

17 briefly, Judge?

18          THE COURT:  Which?

19          MR. THOMASSON:  What was just said.

20          THE COURT:  By Mr. Kataev?

21          MR. THOMASSON:  Yes.

22          THE COURT:  Yes.

23          MR. THOMASSON:  What he's reading from in May

24 was the Nassau case.

25          THE COURT:  Okay.

30

Proceedings

1          MR. THOMASSON:  And involved the Northshore

2     situation with Josh Aaronson.

3          THE COURT:  Yes.

4          MR. THOMASSON:  When at that time, in fact to

5     the day, to this day, even though it's inarguable Josh

6     Aaronson approved the Deo's as filing tax returns listing

7     them as the sole owners of Northshore.  That's black and

8     white.

9          Nonetheless, at that moment in May Mr. Kataev

10    just read to you there was no determination, and

11    technically there still is no determination, as to who

12    owns Northshore, whether my clients own it entirely or at

13    all.

14         THE COURT:  I think that goes to ultimate

15    issues in the case.

16         MR. THOMASSON:  Exactly.  Has not been decided.

17         THE COURT:  Yes, I agree.

18         MR. THOMASSON:  When he says to you well this

19    is the exact same situation, uh uh --

20         THE COURT:  Understood.

21         MR. THOMASSON:  -- it's not the exact same

22    situation.

23         THE COURT:  Yes.

24         MR. THOMASSON:  In this case with Superb, my

25    client is part owner.  That's not even debatable.

31

Proceedings

1          THE COURT:  Yes.

2          MR. THOMASSON:  He is absolutely a 49 percent

3    member as conceded throughout the plaintiff's paperwork.

4    So it's not apples, it's not even apples and oranges.

5    This is apples and elephants.  It's not the same thing.

6          THE COURT:  Understood.  All right.  I want to

7    turn to the disqualification motion.  Now, Mr. Kataev,

8    you're really moving on a couple of grounds here, right?

9          MR. KATAEV:  That's correct.

10          THE COURT:  I guess first and foremost the

11    advocate witness.  Mr. Thomasson is a defendant

12    representing some defendants including himself.  He's a

13    witness.  He was involved in the dealership, represented

14    the plaintiffs.  So under the advocate witness rule, he

15    should be out.  That's number one.

16          And then you say in any event he represented

17    Superb and as a prior client, prior representation he is

18    now adverse to he should be disqualified for that reason

19    as well.  Correct?

20          MR. KATAEV:  That's right.

21          THE COURT:  Okay.  Let's just stick with the

22    second prong, that is he represented, Mr. Thomasson

23    represented Superb and therefore he should be out.

24    Doesn't the prior representation have to be substantially

25    related to what is at issue here in order to invoke that

32

Proceedings

1  rule to justify disqualifying counsel?

2          MR. KATAEV:  It does and it is and I can

3  explain how.

4          THE COURT:  Would love to hear it.

5          MR. KATAEV:  So Mr. Thomasson's prior

6  representation of both Northshore and Superb shows that

7  he can't represent the defendants opposing us because

8  when he was defending consumer complaints and Attorney

9  General claims, those claims came about by Deo's wrongful

10 actions which was done while he worked for respective

11 clients.

12          So importantly, a significant part of those

13 claims is we had to make consumers whole.  Those same

14 consumers that filed with the Attorney General and filed

15 in court, we paid that money to resolve those issues.

16          THE COURT:  And you're saying that's what

17 really forms the basis of, or it's in large part a part

18 of this case?

19          MR. KATAEV:  That's right.  And he has

20 knowledge about what happened, intimate knowledge.

21          THE COURT:  And he represented Superb in those

22 consumer fraud cases?

23          MR. KATAEV:  He did.  It's indisputable.  He

24 received checks from Superb, he made a notice of

25 appearance for Superb.  Not for Anthony Deo, for Superb.

33

Proceedings

1          THE COURT:  Mr. Thomasson?

2          MR. THOMASSON:  Yes, your Honor.

3          THE COURT:  Go ahead.

4          MR. THOMASSON:  Several things, your Honor.

5     First of all, we paid those bills.  Well, I sure look

6     forward to finding out who "we" are when it comes to

7     that.

8          THE COURT:  What bills?

9          MR. THOMASSON:  Because Northshore's bills --

10          THE COURT:  Yes.

11          MR. THOMASSON:  -- were paid by Northshore as

12     far as I know.

13          THE COURT:  Wait a second.  What bill?  You're

14     talking about lawyer bills?  What are you talking about?

15          MR. THOMASSON:  Well yes.  When I did some work

16     over the years, I probably did $10,000 give or take of

17     work --

18          THE COURT:  Okay.

19          MR. THOMASSON:  -- for Northshore and I don't

20     know what I did for 189 Sunrise.

21          THE COURT:  But you would agree that the amount

22     doesn't matter?  You could have been doing it pro bono.

23          MR. THOMASSON:  I understand.

24          THE COURT:  It could still trigger a

25     disqualification

34

Proceedings

1        MR. THOMASSON:  I handled some AG letters.

2        THE COURT:  Okay.

3        MR. THOMASSON:  I never had a hearing.

4        THE COURT:  Okay.  But didn't you represent

5   Superb in some of the consumer fraud cases?

6        MR. THOMASSON:  I never represented Superb in

7   anything except for one case.  I filed an answer on a

8   case that Mr. Kataev apparently settled.  I'm told he

9   settled.  He told the Court that he settled it.  I've

10  never seen or heard another word on the case.

11       THE COURT:  Okay.

12       MR. THOMASSON:  My involvement with Superb as a

13  lawyer was the week -- and I explained this to the Court

14  in a letter in the last two weeks.  I represented Superb

15  by filing an answer in a complaint that Mr. Kataev

16  apparently settled the next week --

17       THE COURT:  Okay.

18       MR. THOMASSON:  -- that I have zero knowledge

19  of.

20       THE COURT:  All right.  But how do you file an

21  answer -- was it state or federal?

22       MR. THOMASSON:  Federal.

23       THE COURT:  Okay.  So how do you file an answer

24  under Rule 11 without inquiring into the facts with your

25  client?

35

Proceedings

1          MR. THOMASSON:  I spoke to one of the owners,

2    Anthony Deo, and he said answer it.

3          THE COURT:  Okay.  But I mean in order for you

4    to ascertain the facts, a basis to whether to deny or

5    admit or DKI the allegations, or what affirmative

6    defenses we have, or what counterclaims, or are there

7    cross-claims, or are there third-party, you would have to

8    have had under Rule 1.1 of the Rules of Professional

9    Conduct at least a conversation with your client I would

10   think.  And under Rule 11, that's part of doing a

11   reasonable inquiry.  So it's almost assumed that you did

12   unless you're admitting you didn't.

13         MR. THOMASSON:  I speak with Mr. Deo about the

14   case and he --

15         THE COURT:  Yes,.

16         MR. THOMASSON:  -- told me he denied the

17   accusations.

18         THE COURT:  Okay.

19         MR. THOMASSON:  And then I filed an answer.

20         THE COURT:  Yes, so --

21         MR. THOMASSON:  But I don't know, that case has

22   nothing to do with any of this.  And honestly, I've

23   always wondered, it was the strangest way that it was

24   brought to me.  I don't know if I -- I think I mentioned

25   in the letter the lawyer for the plaintiff called and

36

Proceedings

1  said to me I'm told you're the attorney I should speak to

2  about this problem with Superb.

3          THE COURT:  Okay.

4          MR. THOMASSON:  I don't know who told him.

5  Anthony Deo said he'd never spoken to the man in his

6  life.  And then within days, the lockout occurred and

7  everything was over with.  It has nothing to do with this

8  case.  Zero.

9          THE COURT:  All right.  So let me turn to

10  the --

11          MR. THOMASSON:  And as for Northshore, I think

12  they're improperly named as plaintiffs.

13          THE COURT:  Okay.

14          MR. THOMASSON:  That would certainly be part of

15  my motion to dismiss that's coming.

16          THE COURT:  Understood.

17          MR. THOMASSON:  Part of what I argued in the

18  motion to disqualify was this odd, in the alternative at

19  the beginning, I don't know if it's waiver, it certainly

20  seems to me like it's waiver.  But if for any reason

21  that's not the case, it's almost as though they're

22  premature given what I also think is the very real

23  possibility of the motion to dismiss being granted as to

24  me.

25          THE COURT:  But I want to ask you about that.

37

Proceedings

1   Is this premature or is it they delayed and it's a

2   waiver?  I mean it seems somewhat inconsistent, no?

3           MR. THOMASSON:  Well, I said in the

4   alternative, your Honor.  We are allowed to --

5           THE COURT:  Yes.

6           MR. THOMASSON:  -- to point that out, you know,

7   in the alternative.

8           THE COURT:  Of course, of course.  But it is

9   somewhat inconsistent, right?

10          MR. THOMASSON:  It is.  That's why we're

11  allowed alternative pleading.

12          THE COURT:  Well, it's not a pleading, it's a

13  position you've taken.  We're not talking about a

14  pleading.

15          MR. THOMASSON:  Right.

16          THE COURT:  You're taking a position on a

17  motion.

18          MR. THOMASSON:  I do think that it's waived.

19  But if for any reason the --

20          THE COURT:  Why is it waived?  They should have

21  phrased this earlier on you're saying?

22          MR. THOMASSON:  I've been representing my

23  clients against these plaintiffs for a year.

24          THE COURT:  Okay.

25          MR. THOMASSON:  And now they bring up

38

Proceedings

1   disqualification.

2           THE COURT:  Well, the suit itself is somewhat

3   young, is it not?

4           MR. THOMASSON:  It's somewhat young.  And I

5   don't know if 80 some odd entries make it still young in

6   the last three months.

7           THE COURT:  On the witness advocate rule, my

8   reading of the cases anyway, the premature argument comes

9   into play oftentimes when if you're representing, for

10  example, an existing a defendant but you are not a

11  defendant.  And at some point throughout discovery it's

12  revealed that gee, you were involved in certain aspects

13  and may become a witness.  So that's when the

14  prematurity, you know, is it right really to raise it?

15          Here, you're a defendant in the case.  There's

16  no question at this junction that this state of the facts

17  and procedural setting, you're a witness, are you not?

18          MR. THOMASSON:  I have no knowledge of what

19  this plaintiff or what these plaintiffs claim is

20  wrongdoing against my clients.  I have zero knowledge.

21  I'm as stunned by this lawsuit as I've ever seen.  I

22  think it's the ultimate act of bad faith after 34 years

23  of doing this business.  I've never seen anything in such

24  bad faith.  I don't know anything about what they're

25  talking about.

Proceedings

39

1         Now, I was not involved in operations.  I was

2    never involved in anything having to do with the

3    operation of these businesses.

4         THE COURT:  Should we have limited focused

5    discovery on that issue before we proceed further in the

6    case?

7         MR. THOMASSON:  We can.

8         THE COURT:  All right.  Mr. Kataev?

9         MR. SHANKS:  Judge, may I be heard on behalf of

10   Northshore for a moment?

11        THE COURT:  Sure.  Of course you can.

12        MR. SHANKS:  Okay.  Thank you.  First of all,

13   whether he represented Superb on one occasion or not --

14        THE COURT:  Yes.

15        MR. SHANKS:  -- he's admitted to representing

16   Northshore on many occasions.

17        THE COURT:  I understand.  Yes.

18        MR. SHANKS:  And the ownership of Northshore is

19   at issue.  He moved to dismiss that in the Supreme Court

20   case making the same argument that based on a tax return

21   his client, it couldn't be refuted that his client owned

22   the entire company.

23        THE COURT:  Okay.

24        MR. SHANKS:  Judge Gianelli rejected that.  But

25   there are direct claims against Mr. Thomasson for a

40

Proceedings

1  reason.

2          THE COURT:  Here?

3          MR. SHANKS:  Yes.

4          THE COURT:  Why?

5          MR. SHANKS:  Okay.  He took a $735,000 check

6  which I forwarded to him with directions to hold it in

7  escrow based upon a financing agreement that my client,

8  Northshore, entered into with Libertas.  As soon as we

9  found out, we notified Libertas that the loan was not

10  authorized and that we wanted to return the money.

11          About a year ago, in fact I think it was the

12  eve of Thanksgiving, I was speaking to a Detective Marx

13  in the 6th precinct who was threatening to lock up my

14  client in one hour for (A), stealing $735,000 from Mr.

15  Deo and being involved in identity theft for using the

16  credentials of the bank account of a dead person, Mr.

17  Barren, who was formerly involved with Mr. Deo.

18          THE COURT:  Yes.

19          MR. SHANKS:  First I showed him the operating

20  agreement to refute the argument about ownership.  And

21  then I told him you're totally off base on the identity

22  theft.  We have our own credentials.  I sent it back.

23          Detective Marx was really digging in more than

24  I've seen in my 35 years of practice.  Seemed to be the

25  judge, the jury, and the executionist saying well now

41

Proceedings

1  your client can spend Thanksgiving in jail and you'll

2  work it out with the criminal court instead of the civil

3  court.

4          I spoke to my client.  I said let me refund

5  money.  I called Detective Marx.  Ten minutes later I get

6  a call oh send it to Mr. Thomasson, he wants it.  I said

7  well, is he going to hold it in escrow?  He says I have

8  no idea.  I reached out to Mr. Thomasson.  He didn't call

9  me back.  I reached out through email.  He didn't get

10  back to me.  Mr. Thomasson later told me he doesn't

11  communicate with attorneys because they often misquote

12  him so everything has to be in writing.

13          Two days later I learned that the $735,000 that

14  I sent with instructions to hold in escrow because there

15  was a dispute was turned over not to Northshore, who

16  arguably would be entitled to it because they signed the

17  finance, but to Mr. Deo.  And then I find out Mr. Deo

18  uses that money to invest with Mr. Urrutia.  As I sit

19  here listening to the arguments of co-counsel for

20  plaintiff, I've seen this movie before.  Mr. Deo goes in

21  and he defrauds the banks.  In fact, he pled guilty to

22  bank fraud ten years ago in the southern district.  And

23  he uses Mr. Thomasson to help him do this.  He has no

24  explanation to why he gave the money to Mr. Deo who under

25  no circumstances was entitled to those funds.  Having --

42

Proceedings

1          MR. THOMASSON:  I'm happy to do so now.

2          THE COURT:  Hold on, hold on.

3          MR. SHANKS:  That's why he's an individual

4    defendant.  And there are inherent conflicts between him

5    representing the police officers involved, and when I

6    said earlier, you know, I was so surprised by Detective

7    Marx's position, I later found out that they have two

8    police officers on the payroll at the dealership.  So it

9    became obvious to me they had a friendly detective.

10          But for him to sit here after two cases and to

11    suggest he has no idea and this is bad faith filings,

12    that's what he does.  He likes to get emotional.  It's

13    just disingenuous and he's trying to deceive the Court.

14          THE COURT:  Okay.

15          MR. SHANKS:  There's no way he can represent

16    all of these defendants where he may have different

17    interests from them.  And certainly as it relates to my

18    client, he was party to information that was sensitive to

19    Northshore.  My client never even knew of his existence

20    until last year --

21          THE COURT:  All right.

22          MR. SHANKS:  -- that he was doing work for Mr.

23    Deo at the dealerships.  But I'm hearing the same thing,

24    holding cars hostage, burning out the floor plan lines.

25    My client is $4 million in the hole on floor plan and I

43

Proceedings

1   know Mr. Urrutia is over $1 million too.  And Mr.

2   Thomasson says well, he's out getting a new lot.  He's

3   going to do the same thing to the third set of plaintiffs

4   that he's done to the --

5           THE COURT:  All right.  Well let me ask you

6   then if he intends to seek dismissal, if he gets out of

7   the case, does that change the result on the

8   disqualification?

9           MR. SHANKS:  Well, I think he still -- I don't

10  think it changes the position because he --

11          THE COURT:  Do you think he's still a witness

12  even at that point even as a non-party if he gets out?

13          MR. SHANKS:  Yeah.  He has to answer to the

14  $735,000.

15          THE COURT:  Okay.

16          MR. SHANKS:  No matter what.

17          MR. KATAEV:  And only he can do so.

18          MR. SHANKS:  Absolutely.

19          THE COURT:  Okay.

20          MR. THOMASSON:  I'll be happy to do so right

21  now.

22          THE COURT:  Happy to do so what?

23          MR. THOMASSON:  Explain right now what happened

24  with that money.  Everything that was just told to you is

25  I think an absolute mischaracterization.

44

Proceedings

1          THE COURT:  Well, let me ask you this.  Let me

2    go back to my question.  Should there be limited

3    expedited discovery on your role?

4          MR. THOMASSON:  Again, I don't object to that

5    if that's what you want to do, your Honor.  I would do

6    it.

7          THE COURT:  I'm not -- I'm posing a --

8          MR. THOMASSON:  But I'll be happy -- can I just

9    respond to Mr. Shanks?

10         THE COURT:  Sure.

11         MR. THOMASSON:  Anthony Deo obtained a loan and

12   was applying to the loan and told Mr. Aaronson he was

13   applying for the loan before Mr. Aaronson up and left.

14   That's how Mr. Aaronson knew about that money.  The

15   moment it hit after Mr. Deo was asked by Libertas for his

16   tax returns, which Mr. Deo had approved by Josh Aaronson,

17   he turns around, the money hits the account, Josh

18   Aaronson takes it out and disappears, cleans out all the

19   records and leaves from what he claims to be his

20   business.  He ups and leaves.

21         When discussions took place and I believe -- I

22   don't think it was Mr. Shanks.  I believe it was Mr.

23   Shanks' partner who I'm told fell ill.  Reached out to me

24   and we did have a telephone conversation.  And I

25   responded to either Mr. Shanks or to that other attorney

45

Proceedings

1  from his office in writing and I told them I am not

2  agreeing to any escrow with respect to this money.  My

3  client just got it.  He's the personal guarantor on it.

4  And literally, Josh Aaronson took it out of the

5  Northshore accounts and put it into his own.

6          THE COURT:  But that's -- let me just --

7          MR. THOMASSON:  When the money came back, I

8  gave it back to my client as I told them I was going to

9  do.  Then they bring a lawsuit in which the only role I

10  played in that lawsuit, never an objection to me as

11  attorney, the only role I played in that was as an escrow

12  attorney.  They allege that I was holding the money.  I

13  told them before they brought the lawsuit, I told them

14  after they brought the lawsuit I do not have that money,

15  I did not agree to an escrow agreement, there is no

16  escrow agreement that this Court is ever going to be

17  given.  And the only thing that happened

18  contemporaneously was me telling them in writing, and I

19  can prove it anytime you want it, Judge, that it is not

20  being held in escrow.  That's all that happened with

21  that.  Whatever happened after that, I didn't even know

22  about Superb.  I wasn't asked about Superb.  Not a word,

23  not a sound, not an utterance.

24          Somewhere in the middle of the Aaronson work in

25  the Nassau court this past spring Anthony Deo asked to

46

Proceedings

1   meet with me and I said okay, where do you want me to

2   meet you?  Do you want me to meet you in Amityville or

3   Syosset?  And he said no, I'll meet you at Superb.  And I

4   said I don't know what that is.  And that's when I first

5   heard that he was involved with Superb.

6            I wasn't involved in anything having to do with

7   him getting involved with Superb and I didn't involve

8   myself with anything involving Superb until after the

9   court order in June from that judge.  This business that

10  that judge rejected something of ours, I did bring a

11  motion to dismiss up front and she did deny it, your

12  Honor, but not like what she did to them.  She put an

13  order in place that closed my client's businesses through

14  June from the beginning of December when they got that

15  order.  December, you know, seven months.  They were put

16  out of business.  And then that court lifted that order

17  in its entirety, told them that they didn't have a

18  likelihood of success on the merits and more, which I

19  encourage this Court you have the order, please take a

20  look at that again.  They were entirely rejected.

21           So I wasn't asked to disqualify myself.  They

22  never said one word about me representing those

23  defendants throughout that matter.  I answered their

24  first complaint.  I was in the process of answering their

25  second complaint when they decided to join here and

47

Proceedings

1   dismiss that case.

2           So it's been a year right until this motion to

3   disqualify before anybody says Harry knows things that we

4   need.  I don't anything that they need, Judge.  I worked

5   as an outside counsel for these people doing some car

6   stuff and now they want to say I'm a criminal mastermind

7   stealing my own lamp?  I wish them the best of luck with

8   that.

9           THE COURT:  All right.  Mr. Kataev?

10          MR. KATAEV:  Just quickly on the lamps since

11  it's such an important issue.

12          THE COURT:  Yes, yes, because we're not

13  litigating the merits of the case here.  This is whether

14  you stay in or out.

15          MR. THOMASSON:  Right.

16          THE COURT:  The witness advocate rule and

17  whether your prior representation, however limited it may

18  have been, prohibits you from now representing these

19  defendants here.  That's it.  So listen, it's a highly

20  emotional case.  I get it.  But let's go ahead, Mr.

21  Kataev.

22          MR. KATAEV:  Thank you.  Three points.  The

23  lamp, he redacted the payment information.  We don't know

24  who paid for it.  So just putting that out there.

25          THE COURT:  Okay.  Again, I --

48

Proceedings

1          MR. THOMASSON:  You have that receipt now.

2          THE COURT:  All right.  You know what?  I've

3     heard enough.  Anything else, Mr. Kataev?

4          MR. KATAEV:  Yes.  Him being dismissed as a

5     defendant won't change the witness advocate rule prong of

6     disqualification.  An attorney who is also a witness has

7     conflicting duties in that regard.  And we submitted case

8     law in the papers.  We rely on those papers.  It does not

9     matter whether he gets dismissed.

10          As for discovery limited to do this particular

11     issue, we think that there's enough evidence on its face

12     that such discovery is not warranted.  Only to the extent

13     that this Court is inclined to deny the motion will we

14     ask for that discovery.  But we believe it's pretty cut

15     and dry.  There's no other witness who can testify to the

16     circumstances behind the receipt and disbursement of the

17     $735,000.  There may be other witnesses at the dealership

18     who can testify about what occurred on August 3rd and

19     prior, but there's no dispute that Mr. Thomasson has been

20     visiting that dealership and present dealing in

21     operations since December of 2022.  I want to --

22          MR. THOMASSON:  Never dealt with anything

23     involving operations, your Honor.  Not a single thing.

24          THE COURT:  Just let him finish, let him

25     finish.

49

Proceedings

1    MR. KATAEV:  I want to quote ECF docket entry

2  12-1 at page 3, page numbers 406.  This is a quote from

3  Mr. Thomasson.  "I've been going to Superb since December

4  2022 and have maintained an office there for over a month

5  yet never met or even saw either one of you," referring

6  to Mr. Novicky and Mr. Urrutia, "at Superb even once."

7  By making that statement, he says I'm a witness.  He's

8  using his statements to say I can make these arguments

9  and points.

10    THE COURT:  I've read the papers so I don't

11  need you to rehash what's in the papers.  Okay?

12    MR. THOMASSON:  I would just finish with this,

13  your Honor, if I may.

14    THE COURT:  Yes, yes.

15    MR. THOMASSON:  I could be accused of the

16  Simpson murders but that doesn't mean I should be

17  disqualified for it.  There should be something that

18  becomes relevant and in some way genuinely disqualifying.

19  The fact that I went there to meet with my client and

20  ended up getting an office, and I explained for

21  geographic purposes since I'm going to be moving to

22  Connecticut where my son is institutionalized at this

23  time because of his brain injury, and I have to under

24  Rule 470 of the judiciary law, I have to maintain an

25  office in New York in order to live outside the state.

50

Proceedings

1    That's what that was for.  It doesn't mean that I know it

2    then --

3              THE COURT:  But are you not a witness in this

4    case whether you're a non-party or a party?

5              MR. THOMASSON:  It doesn't mean that they can't

6    try, but I am not aware -- I've been at this for 34

7    years, Judge.  I am not aware of any relevant information

8    I have regarding their claims against my clients.

9              THE COURT:  Okay.  But --

10             MR. THOMASSON:   Nothing.  Zero.  So by them

11   saying well we want to talk to you anyway, I don't blame

12   them.  Eventually this is going to end up flipping on its

13   ear and they're going to be getting deposed as well.

14             THE COURT:  Here's what I'd like.  Letter

15   briefs by the end of next week on the -- there are three

16   cases in particular I'd like you to address one of which

17   was in the papers but I'd like in particular, Mr.

18   Thomasson, your view of the case.  And that is the

19   *Rizzuto* case.  It was cited by Mr. Kataev in his papers

20   but it is an unreported, but 2019 WL 1433067.  I'd like

21   your view on that case.

22             And there are two others that were not cited in

23   the papers that I would like counsel to comment on that

24   I'm looking at.  The *Decker* case.  It's a southern

25   district case, and that's 716 F.Supp.2d at 228.  And the

51

Proceedings

1    *Novel Williams Films* case and that's 128 F.Supp.3d 781

2    (SDNY) a little bit more recent that bear on this issue

3    where a party, it's not just a lawyer representing a

4    client that later it becomes apparent may become a

5    witness.  It's where a lawyer is actually a party to a

6    suit and it bears on this witness advocate rule.  So I'll

7    give you to the end of -- a week from tomorrow, all

8    right, both of you to file letter briefs.  I'm not going

9    to put a page limit.

10         MR. THOMASSON:  Your Honor, is it possible we

11   can do a week from a Monday on that?

12         THE COURT:  Fine.  Monday is fine.  A week from

13   Monday.  All right?  I would like your analysis of those

14   three cases.  All right?

15         MR. KATAEV:  Two quick final points?

16         THE COURT:  Yes.

17         MR. KATAEV:  We covered two of the grounds of

18   disqualification.  I just want to point out that there's

19   a third.  And that's all I'll say.  I'll rely on the

20   papers.  And then similarly, we've talked about the

21   minimization of the work done for Superb but there hasn't

22   been any discussion about the fact that 250 emails

23   containing highly sensitive confidential information and

24   financial information is in the possession of Mr.

25   Thomasson that arises out of the representation.  I just

52

Proceedings

1    want to make those two points on the record.

2            MR. THOMASSON:  I don't know what that means,

3    your Honor, but I guess we'll all find out in due time.

4            THE COURT:  Okay.  Yes.  Fair enough.

5            MR. KATAEV:  And just for the record, those

6    emails were sent in March 2023 long before July 2023 when

7    he claims he first stepped foot there.

8            THE COURT:  Okay.

9            MR. THOMASSON:  250 emails were sent to me in

10   March of 2023 from whom?

11           THE COURT:  Have you produced those to him?

12           MR. KATAEV:  Yes.

13           THE COURT:  Okay.

14           MR. THOMASSON:  From whom?

15           MR. KATAEV:  From Superb.

16           MR. THOMASSON:  Superb Motors emailed me 250

17   times in March?

18           MR. KATAEV:  Yes.

19           THE COURT:  All right.  Well --

20           MR. THOMASSON:  That's news, Judge.

21           THE COURT:  Okay.  I didn't receive the

22   production so I don't know.  I'm not going to comment.

23           MR. KATAEV:  It's reply Exhibit A I believe in

24   the motion to disqualify.

25           THE COURT:  Okay.

53

Proceedings

1      MR. THOMASSON:  If it's in the reply, it's
2  improperly in the reply.  Is that supposed to be brought
3  up front, your Honor?
4      THE COURT:  Well, I'll take a look at it and
5  see.  I mean whether we're going to strike a reply, you
6  didn't ask to strike it, but I'll take a look at it.
7      Listen, I'm affording you the opportunity to
8  put in letter briefs at the end of the week, next week,
9  to supplement your positions on the disqualification
10  because I am going to rule on that soon as well as the
11  contempt soon.  And again, you have leave to renew an
12  application to modify or for an additional injunctive
13  relief.  All right?
14      MR. KATAEV:  Understood, your Honor.  Thank
15  you.
16      THE COURT:  Okay.  Anything else, gentlemen?
17      MR. KATAEV:  We appreciate your time today.
18      MR. SHANKS:  No, your Honor.  Thank you.
19      THE COURT:  Okay.  And I didn't mean to exclude
20  you, Mr. Seiden or the lenders here.  You have a position
21  on these?  You want to be heard on any of these?
22      MR. SEIDEN:  We have no position on these
23  motions, your Honor.
24      THE COURT:  Including the disqualification?
25      MR. SEIDEN:  Including the disqualification.

54

Proceedings

1          THE COURT:  Okay.  All right.  That's true for
2   both?
3          MS. RONNEBURGER:  Yes.  We are the same, your
4   Honor.
5          THE COURT:  Okay, okay.  Thank you very much.
6   I appreciate it.  Have a good afternoon everybody.
7          MR. THOMASSON:  Thanks for your time, Judge.
8          MR. SHANKS:  Thank you, your Honor.
9          THE COURT:  Thank you.  It was very helpful.
10  Thank you.
11                  (Matter concluded)
12                       -oOo-
13
14
15
16
17
18
19
20
21
22
23
24
25

55

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **15th** day of **November**, 2023.

_Mary Greco_
Transcriptions Plus II, Inc.