1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
3    - - - - - - - - - - - - - - - X

4    SUPERB MOTORS INC., et al.,    :
                                         23-CV-6188(OEM)
              Plaintiffs,           :
5
6             -against-             :    United States Courthouse
                                         Brooklyn, New York
     ANTHONY DEO, et al.,           :
7
                                         September 14, 2023
          Defendants.              :    2:00 o'clock p.m.
8
9    - - - - - - - - - - - - - - - X

10        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          BEFORE THE HONORABLE ORELIA E. MERCHANT
11            UNITED STATES DISTRICT JUDGE.

12   APPEARANCES:

13   For Plaintiff:               MILMAN LABUDA LAW GROUP PLLC
                                  3000 Marcus Avenue, Suite 3w8
14                                Lake Success, New York  11042

15                                BY: EMANUEL KATAEV, ESQ.
                                      JAMIE S. FELSEN, ESQ.
16
17                                CYRULI SHANKS & ZIZMORE LLP
                                  420 Lexington Avenue
18                                New York, New York  10170

19                                BY:  JEFFREY C. RUDERMAN, ESQ.

20   For the Defendants:          HARRY R. THOMASSON, JR., ESQ.
                                  3280 Sunrise Highway
21                                Wantagh, New York  11793

22   Court Reporter:              Charleane M. Heading
                                  225 Cadman Plaza East
23                                Brooklyn, New York
                                  (718) 613-2643
24
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

2

```
 1              THE CLERK:  This is a civil cause for a preliminary

 2    injunction hearing in the matter of Superb Motors

 3    Incorporated, et al. versus Deo, et al., docket number

 4    23-CV-6188.

 5              The parties are reminded that pursuant to Local

 6    Civil Rule 1.8, they may not independently record any court

 7    proceedings.  A transcript of the proceedings may be ordered

 8    from the Clerk's Office.

 9              Counsel, please state your appearance for the record

10    starting with the plaintiffs.

11              MR. KATAEV:  Good morning, everyone.  My name is

12    Emanuel Kataev of Milman Labuda Law Group, PLC, and with me

13    is --

14              MR. FELSEN:  Good morning.  This is Jamie Felsen

15    also with the Milman Labuda Law Group.

16              MR. KATAEV:  We represent the moving plaintiffs

17    Superb Motors Inc, Team Auto Sales LLC and Robert Anthony

18    Urrutia.

19              MS. RONNEBURGER:  Good morning, Your Honor.  This is

20    Ariel Ronneburger from Cullen and Dykman LLP.  We represent

21    defendant Flushing Bank.

22              MR. RUDERMAN:  Good morning.  This is Jeffrey

23    Ruderman of Cyruli Shanks & Zizmore.  We represent the other

24    plaintiffs in the action.

25              MR. THOMASSON:  This is Harry Thomasson.  I
```

3

1   represent most of the -- I represent all of the non-lending

2   bank defendants.

3            MR. SEIDEN:  Good morning.  This is Peter Seiden

4   from Milber Makris Plousadis & Seiden LLP.  I represent

5   defendant Jones, Little & Company CPA's LLP.

6            THE COURT:  Is that all counsel?

7            Good morning.

8            MR. KATAEV:  Good morning, Your Honor.

9            THE COURT:  Thank you all for joining today on the

10  call.  As you know, this call is to address Superb plaintiffs'

11  application for a preliminary injunction, but before I get to

12  that, I want to briefly lay out some ground rules.

13           There is a court reporter with us here on the line

14  today and in order for us to have a clear and concise record,

15  I'm going to ask that you wait until the other side finishes

16  replying unless I interject which is something I'll try not to

17  do.

18           Further, each time you speak, I'm going to ask that

19  you speak measuredly and announce who you are and the party

20  you represent.  If you do not, I would have to interrupt you

21  because I just want to make sure, with all of the parties and

22  the representation on the line, that there is a clear record

23  and we want to make sure that there's ease for the court

24  reporter to discern who is speaking.

25           Additionally, as a point of procedure, I'm going to

4

1   ask while there are a number of parties on both sides, at the

2   heart right now, there seems to be a dispute between Mr., is

3   it Urrutia, am I pronouncing that correctly?

4           MR. KATAEV:  "Urrutia," Your Honor.

5           THE COURT:  I'm sorry.  Urrutia and Superb and

6   Mr. Deo and other defendants.

7           I may refer to "plaintiffs" or "Mr. Urrutia" or

8   "Superb" interchangeably or "defendants" and "Mr. Deo"

9   interchangeably for the purposes of this hearing, but if I

10  misspeak, please, Counsel, you know, interrupt me and parse

11  and make clarification if it is that I'm attributing something

12  to a particular defendant or individual plaintiff that you

13  believe is not in alignment with the group, if that makes

14  sense.

15          And, you know, as indicated in the order, this

16  application only concerns the parties discussed in the TRO

17  order.

18          Now, I want to get to a few housekeeping items first

19  and they have to do with the issue of sealing and also service

20  issue.

21          I have reviewed many documents filed in connection

22  with the application for injunctive relief and before we get

23  into those matters, I want to just state a brief history of

24  how we got here given what's on the docket so far.

25          On August 17, 2023, the complaint in this case was

5

1    filed and Judge Gujarati was the judge assigned at the time.

2    On August 20, 2023, Superb filed their applications for a

3    temporary restraining order and preliminary and permanent

4    injunctions and attached declarations and exhibits and these

5    are found at ECF 9 through 12 on the docket.  And on

6    August 21, 2023, Attorney Thomasson who represents Deo

7    defendants responded to the TRO with his first letter

8    requesting more time and later that same day, August 21, 2023,

9    the case was reassigned to me after recusal of Judge Gujuriti.

10        On August 25, 2023, I granted in part and denied in

11   part Superb's TRO with specific instructions and that part

12   that I granted was that part to which it was represented that

13   the parties agreed to.  So defendants were enjoined from

14   disposing of any automobiles in their possession belonging to

15   Superb.

16        And on August 26, 2023, Superb moved for

17   reconsideration of my TRO decision and those, that

18   communication and those filings are found at ECF 16 through 18

19   related to that consideration request.  On August 27, 2023,

20   Attorney Thomasson objected to the motion again by letter and

21   that's on ECF 20 and on the same day, I denied the motion for

22   reconsideration via a docket order and I set a briefing

23   schedule as well as today's hearing.

24        Since then, there have been various letters

25   regarding service issues as well as requests and oppositions

6

1   to making this an evidentiary hearing and those documents can

2   be found on the docket, ECF 23 and 24.

3          I will note that on September 7, 2023, I clarified

4   that the purpose of today's hearing is to address the parties'

5   briefing on the preliminary injunction motion and that the

6   court would reserve decision on holding an evidentiary hearing

7   on the preliminary injunction motion.

8          As of -- well, last night, there were, as of last

9   night checking the docket, there was briefing that had been

10  completed pursuant to my order that briefing be concluded last

11  night.

12         In addition, Attorney Thomasson has made an

13  appearance.  I note that the parties have exchanged further

14  letters regarding service issues and at least looking at the

15  papers, both parties have indicated some sort of preliminary

16  settlement discussion was held between Superb and Deo in

17  advance of this hearing.

18         I'm going to first take up the issue of the sealing

19  and, Counsel Kataev, you filed an ECF document and it's found

20  at 182 under seal, however, I will note that both this

21  District and my individual practice rules prohibit any

22  document being filed under seal as of right.

23         Specifically, the EDNY instructions for filing

24  motions under seal located under the "Forms" tab of the EDNY

25  website indicate or provide that documents must not be filed

7

1   under seal or ex parte unless the court has granted a motion

2   for leave to file under seal.  And then further, my individual

3   practice rules in Section 2, part B, indicates that motions

4   for leave to file documents under seal should be filed via

5   ECF in accordance with those instructions of the EDNY and,

6   further, that the proposed sealed documents should be attached

7   to a motion for leave to file under seal.  And there is a link

8   at my, on my, found in my individual practice rules to those

9   instructions for filing such an application.

10         I am in review of the docket.  I do not see that

11   there's been a motion filed with regard to sealing documents

12   in this matter or an accompanying declaration to explain why

13   the Exhibit 18-2 should be maintained under seal or is

14   entitled to a, to be maintained as such.  To the contrary,

15   there's a presumptive First Amendment right of access.

16         So I don't have an ability based on what's on the

17   record right now to make a specific finding that there's a

18   demonstration or a closure and so, of that particular

19   documented record, and so I note that in a footnote that you

20   have, and I believe it's on your motion for reconsideration, a

21   footnote in a document, it's ECF 16, page 2, at note 4, that

22   you merely recognized that in this footnote that there should

23   be a sealing, but I'm going to say that that's just not enough

24   at this particular point and I'm just going to direct that you

25   please file a motion and a memo by the end of the day tomorrow

8

1   for my consideration if it is that you desire that this

2   particular document, 18-2, be maintained under seal and then I

3   can appropriately consider that particular motion because,

4   otherwise, it would not be able to remain under seal.

5           Is that clear?

6           MR. KATAEV:  Yes.  This is Mr. Kataev speaking on

7   behalf of the moving plaintiffs.  That is clear.  If it is not

8   filed by today, it will be filed by tomorrow.  That's not a

9   problem, Your Honor.

10          THE COURT:  Okay.  Great.  Thank you.

11          MR. THOMASSON:  Your Honor, could I ask about that,

12  please?

13          THE COURT:  I'm sorry.  Just the ground rule here is

14  that before speaking, everyone, if they could please identify

15  yourself and who they represent.

16          MR. THOMASSON:  Sure.  This is Harry Thomasson.  I

17  represent the non-lending and non-accountant defendants.

18          THE COURT:  Okay.  Yes.

19          MR. THOMASSON:  I just wanted to ask is that

20  something that I get an opportunity to respond to or is that

21  purely on their end?  I wasn't able to see the documents yet,

22  I'm sure the Court knows.

23          THE COURT:  Well, let me -- what I will do is maybe

24  we can separately, once the motion is filed, I'll make a

25  determination there and then you would be able to, whether or

1   not it seems that it's something that would require that the

2   court will hear any opposition or any other thoughts on, but

3   right now, I just would like to see that motion filed.

4           MR. THOMASSON:  I understand.

5           THE COURT:  And I will, once I see it filed, I will

6   direct whether or not I believe there should be further

7   briefing on it.

8           MR. THOMASSON:  I understand.

9           THE COURT:  Okay, great.  Thank you.

10          I want to move to the issue of service of the

11   preliminary injunction papers and, in particular, I want, I

12   believe that there have been issues raised in the various

13   letters that have been filed with regard to service and as I

14   see it, there are two different issues here.  There's service

15   of the preliminary injunction papers and there's service of a

16   complaint, summons and complaint, but as Superb stated I think

17   most recently in their letter yesterday found at ECF docket

18   37, the summons and complaint were sent out for service for a

19   process server yesterday and the moving plaintiffs will file

20   all affidavits of service once they receive those.  It seems

21   at this time, if that actually is the case as represented,

22   that that will moot the issue of service regarding the

23   starting of the case.

24          I think germane to this particular proceeding or

25   today, Counsel Thomasson, you've raised that you object to the

1    instant application for injunctive relief on the basis of

2    insufficient and non-effective service of process, and I just

3    want to hear from you your basis for that as it relates to the

4    preliminary injunction request.  And that is, I will just say

5    that I, as I read Rule 65(a), specifically on preliminary

6    injunction regarding notice, the court may issue a preliminary

7    injunction only on notice to the adverse party.

8            And so as it relates to the preliminary injunction,

9    I just want to hear from you if you are asserting that more

10   than just notice is required for us to proceed with the

11   hearing on the issue of the preliminary injunction.

12           MR. THOMASSON:  Your Honor, I have received in the

13   mail three court orders.  Nothing else.

14           THE COURT:  I guess -- let me just -- I want to get

15   directly to it though, Mr. Thomasson.

16           Specifically, my question is I'm reading Rule 65(a),

17   which is the rule of civil procedure that governs injunctions

18   and restraining orders, and I read it as, 65(a)(1), Notice:

19   The court may issue a preliminary injunction only on notice to

20   an adversary party -- I'm sorry -- to an adverse party.  And

21   that notice, not service, is required for a preliminary

22   injunction and by contrast, with a temporary restraining

23   order, the court may issue a temporary restraining without

24   written or oral notice to the adverse party.

25           But here as we're talking about a preliminary

1    injunction and the governing rule being 65(a), in particular,

2    I'm looking at (1) in what is required for the court to have

3    the ability to entertain a preliminary motion -- I'm sorry --

4    to actually issue an injunction is that only that there be

5    notice.  And so, obviously, the purpose of this requirement is

6    to give the opposing party a fair opportunity to oppose the

7    motion of a preliminary injunction and there's Circuit case

8    law to that effect.

9            I guess I'm asking are you arguing or are you

10   asserting now that you and the other defendants have not had

11   notice with regard to -- I'm sorry.  Go ahead.

12           MR. THOMASSON:  Yes.  I'm sorry.  Yes.  I am the

13   only person that has arguably had notice on behalf of my

14   defendants.  They have no notice and have received nothing to

15   date, not a thing.

16           THE COURT:  So I guess -- I'm a bit confused, I have

17   to say, because I understand from a declaration I believe that

18   was filed or a letter that was filed at some point in this

19   action that you, you represent those non-lending and banking

20   defendants in this particular, that have been named in this

21   matter, that you represent them, that they have -- and so are

22   you asserting and -- again, I am separating the issue of

23   service of a complaint with a notice.

24           Are you asserting here that they have no notice that

25   there is a preliminary injunction request that has, motion

1  that has been filed against them?

2  MR. THOMASSON:  They have no notice from the

3  plaintiffs about anything having to do with this case.  And

4  it's important for you to understand that I have remarkably

5  been included as a defendant in this action.  There have been

6  ample discussions as to whether or not I should be proceeding

7  on their behalf.

8  The fact that I have filed opposition both on the

9  technical issue as well as on substantive grounds, I have

10  noticed my appearance purely for the injunctive purposes at

11  this point.  No finality has been decided with regard to my

12  long-term representation just yet and my clients have not seen

13  a piece of paper, as I set forth in the declaration, because

14  they blocked at my instructions last month the plaintiffs and

15  their lawyers from reaching them through electronic means and

16  that's, to the best of my knowledge, that's the only way that

17  anyone has tried to reach my clients.

18  Their business is closed.  They've moved.  Whatever

19  it is that has been sent has not reached -- if anything has

20  been mailed, it hasn't reached my clients and they have

21  nothing.  I'm the one who found about this through an e-mail

22  from plaintiffs' counsel.  That's it.  And I have three court

23  orders that were mailed to me.

24  THE COURT:  And your argument then is that you do

25  not have notice of this otherwise?

1    MR. THOMASSON:  You know, honestly, Your Honor,

2  actually, that's a term I don't like to use.  The fact of the

3  matter is I received an e-mail that said, and this is, it's

4  not in front of me, but I believe I'm directly quoting it:  We

5  are going to court tomorrow to present an emergency

6  preliminary injunction, period.

7    Nope.  They didn't tell me what court.  When they

8  were going.  Where they were going.  Whether it was in person

9  or not in person.  I remember thinking what the heck is this

10  and I had to go find and figure it out for myself.  I thought

11  they went to the state court.  That's where I started looking.

12    MR. KATAEV:  Your Honor, this is Emanuel Kataev

13  speaking for the moving plaintiffs.  May I be heard?

14    THE COURT:  Yes, please.

15    MR. KATAEV:  On August 19, 2023, at 9:57 p.m., I

16  believe it was a Saturday, I e-mailed the individuals listed

17  in the declaration at docket entry 12 and I wrote:  "Dear

18  Messrs. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones

19  and Mrs. Deo, this office represents the moving plaintiffs" --

20  I'll spare the Court the listing of all the names -- "in the

21  above-referenced lawsuit filed against you."  The

22  "above-referenced lawsuit" refers to the subject line where I

23  have the case name and the case number and for the avoidance

24  of doubt, it includes "EDNY" in parentheses.

25    So I'm sorry to say it, I don't mean to cast

1  aspersions, but it's obvious Mr. Thomasson just lied to the

2  Court about the substance of the e-mail and the confusion of

3  where this case was filed.

4        I also took the body of the proposed order to show

5  cause and copied it into the e-mail to show exactly what type

6  of relief I'm seeking.  I can file that with the Court today,

7  if necessary.

8        THE COURT:  No.  I mean -- thank you.  I appreciate

9  that.

10       I'm looking, Mr. Thomasson, at what has been filed

11  as document number 13.  It's a letter of August 21, 2023 and

12  it's from you to this court:  "Your Honor, Please be advised

13  that this office represents Anthony Deo, Sarah Deo, Dwight

14  Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC,

15  Gold Coast Cars of Syosset, Gold Coast cars of Sunrise, LLC,

16  Gold Coast Motors Automotive Group LLC, Gold Coast Motors of

17  LIC, LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors

18  of Smithtown LLC, and UEA Premier Motors Corp. with respect to

19  the above-referenced action.  I am aware that the above" -- "I

20  am aware that the above-referenced plaintiffs have brought an

21  order to show cause before the court and I need to give the

22  court certain information related thereto."  And then it

23  proceeds to go on with the ongoing dispute.

24       I find it disingenuous to represent that the parties

25  here, with you asserting that you represent them, don't have

1    notice that there is a preliminary injunction that's been

2    sought with respect to them.

3          Moreover, there's been an agreement that you

4    represented that would be reached, the premise of which this

5    court entered a temporary restraining order with respect to

6    those issues that you had indicated that your clients agreed

7    to.

8          And so while I, I understand that there are, that

9    procedurally, with respect to service on the complaint, of the

10   complaint and the summons of this action, that you may

11   maintain that, and actually put the plaintiffs to the exercise

12   of actually properly effectuating service.  Right now again, I

13   am looking specifically at the emergency relief that is being

14   sought by the plaintiffs, in particular, the standard for a

15   preliminary injunction, and it is not, it is not, and I'm not

16   hearing that there had to, you arguing about service anymore.

17   You're saying that there's no notice and I'm not seeing that.

18          MR. THOMASSON:  I understand --

19          THE COURT:  Yes.

20          MR. THOMASSON:  I'm sorry, Your Honor.

21          THE COURT:  No.  No.  Go ahead, please.

22          MR. THOMASSON:  I understand your point.  I respect

23   that.  Please be reminded that I had a very difficult two week

24   period that I was dealing with on a personal matter and I may

25   have missed something in an e-mail that indicated where it was

1  that I looked at and while I was up to my neck in literally

2  trying to save my son's life who's just getting into a

3  hospital, by coincidence, today.  I even made a mistake today

4  on what time this hearing was scheduled.  I thought it was

5  this afternoon for some reason.

6          THE COURT:  I understand.  Let me just say this.  I

7  appreciate that, Mr. Thomasson.  I wish your son well.  If

8  this is -- I just want to, I want -- I'm sorry?

9          MR. THOMASSON:  I will move on to the issue of

10 whether or not there's notice.

11         I do represent them.  At that time, it wasn't clear

12 how long or how far I was going to be representing them, but

13 the representation in my letter was accurate as always and I

14 do represent them.  And if that is sufficient notice, then

15 let's move on.

16         THE COURT:  Okay.  So you understand the purpose of

17 this particular proceeding, there's notice that's been

18 provided of this hearing.  Do you dispute that based on the

19 representations previously made to the court?

20         MR. THOMASSON:  No.  All I can tell the Court is my

21 clients don't have anything.  They only have what they've got

22 from me, that's it, not anything from the plaintiffs because,

23 as I set forth in the declaration, the simple fact of the

24 matter is they were told well over a month ago to block

25 contact from these plaintiffs.

1          THE COURT:  Mr. Thomasson, I'm going to ask you

2   specifically, have you advised -- I mean are your clients

3   aware that this, that there is a preliminary injunction being

4   sought against them?  Do they have notice?

5          MR. THOMASSON:  Yes.  Yes, Your Honor.

6          THE COURT:  Okay.  So resolving the issue that your

7   representation is that your clients have notice, is that

8   correct?

9          MR. THOMASSON:  From me, yes.

10         THE COURT:  The question is whether or not they have

11   notice.  I mean is there notice?  Has notice been provided to

12   them?

13         MR. THOMASSON:  I have provided them notice of this,

14   yes, Your Honor.

15         THE COURT:  Okay.  And considering that there had

16   been, I mean there had been declarations, and I guess I am --

17   I will take note that among the many things that have been

18   filed in this matter are not just letters from you,

19   Mr. Thomasson, and I will caution you to not dance too much

20   around this issue because there is a declaration that's been

21   filed with regard to this particular matter by your client.

22   So, certainly, he must know the nature of these proceedings

23   and that there has been a preliminary injunction that has been

24   sought.

25         Is that correct?

1          MR. THOMASSON:  Yes.

2          THE COURT:  Is there any objection to us moving

3    forward at this point with regard to this preliminary

4    injunction hearing?

5          MR. THOMASSON:  No, Your Honor.

6          THE COURT:  I'm sorry.  And, again, that's

7    Mr. Thomasson?

8          MR. THOMASSON:  Yes, Your Honor.  This is Harry

9    Thomasson.  I thought we were engaging --

10          THE COURT:  We were, and I just did that because I

11    looked at the court reporter and she wanted to be sure that

12    she had that right.  So, certainly, I believe I picked up your

13    voice at this point but I just reminded myself to keep it

14    clear and clean for the court reporter since parties are not

15    here in front of me in the courtroom for us to see.

16          So I'm going to now, if there's no objection in

17    moving forward from the plaintiffs' counsel or anyone else on

18    the line or defense counsel, is everyone good with us moving

19    forward at this point?

20          MR. KATAEV:  We're patiently waiting to move

21    forward, Your Honor.

22          THE COURT:  I'm sorry?

23          MR. KATAEV:  This is Emanuel Kataev for the moving

24    plaintiffs.  We're ready to move forward.

25          THE COURT:  Okay.  Defense counsel, are we fine to

19

1    move forward at this point?

2            MR. THOMASSON:  Your Honor, I am fine with moving

3    forward.

4            THE COURT:  Okay.  I just --

5            MR. THOMASSON:  Housekeeping?

6            THE COURT:  Before you get to your housekeeping

7    matter, I'd like to continue with mine, if you don't mind.

8    Just give me a second.

9            I wanted -- before we get to the substance of the

10   preliminary injunction, I have to say that reading the papers

11   and the declarations that have been provided, it seems to me

12   the heart of the issues here are the cars, and that is with

13   regard to the emergency relief here, the cars that were on the

14   list that was provided or submitted, I'm sorry, and I'm

15   looking at a list of cars that were given to Deo by Superb.

16   And I'm looking specifically at Deo's Declaration Exhibit G

17   and I'm also looking at a car list that's at Superb's

18   Exhibit O and that is, and just for the record, that's

19   Document 11-15, that is attachment 15 to docket 11, which is

20   Superb's Exhibit O, and Document 30 on the docket, Exhibit or

21   attachment 8 which is Deo's declaration, Exhibit G.

22           The lists of Exhibit G by the declaration purports

23   to be marked up by Deo, maybe a markup by Deo and his wife,

24   and it seems that it's overlapping with a list that's been

25   provided by Superb as Exhibit O and that is the exhibit to

1   Urrutia's declaration and support of Superb's TRO application.

2           I also note that in the declarations of both

3   parties, Deo and Urrutia, that the parties have had settlement

4   or similar discussions about the vehicles that are contained

5   on these lists and I see that noted on the Thomasson

6   declaration at paragraph 25, and also noted somewhat on

7   ECF 38, paragraph 11.  Specifically, it indicates that the

8   moving plaintiffs explored a proposal with the defendants but

9   could not come to any agreement because defendants insisted on

10  keeping the demonstrator vehicles which are also on the floor

11  plan line or were paid off by Superb, and the moving party

12  plaintiffs cannot agree to do so because it will keep them in

13  default with NMAC and Next Gear.  Further, there is a

14  disagreement as to how many vehicles must be returned.

15          I will say that while the Court does not want to pry

16  substantively into these discussions, it's noted, I believe,

17  in papers by one, if not both of the parties, that the

18  settlement discussions seem not to be appropriate to raise

19  before this court as the finder on these, the particular

20  motion at hand.  It seems that it could be that it would be

21  helpful based on the recent filings that if the parties could

22  agree not to dispose of or otherwise do anything with a

23  certain number of the cars that are marked in these lists,

24  that that might obviate the necessity to hash this out in a

25  way that either party might not find to land where they'd like

1   it to.

2          So before getting to the merits of the application

3   that is the preliminary injunction, I want to just say that I

4   have spoken to a Magistrate Judge in Long Island that is

5   prepared to meet with the parties tomorrow and can actually

6   speak with the parties this afternoon with some ground rules

7   to sit down and discuss perhaps a solution to the cars on the

8   list and the trade secret issues in a, you know, a

9   confidential settlement conference and maybe it would avoid

10  further litigation on these issues altogether.

11         All the parties would have to do is just reach out

12  and they could do so, you know, right now and they would be on

13  the ready to put you on the calendar today.  I will say that

14  the Magistrate Judge I would refer you to at this point would

15  be Magistrate Judge Wicks who is very adept to handling

16  matters like this and sometimes a neutral third party is just

17  what is needed.  The conference would be confidential and none

18  of what is discussed would get back to me or influence my

19  ruling on the application except to the extent that you choose

20  to make it known to me.

21         So I am prepared to kind of proceed with the hearing

22  in terms of hearing the parties out, but my plan would be to

23  direct the parties to reach out to Magistrate Judge Wicks

24  after this proceeding today to get a time to talk with him.

25  And then to the extent you might be able to resolve some of

1   the issues, you might be able to find assurance in the form of

2   a stipulation that I can so order that would make it

3   enforceable by the court and that might, as I said, make it so

4   that the court does not have to reach a result on this that

5   might not be satisfactory to one or multiple parties in this

6   case.

7           Obviously, I'm not going to force anyone to try to,

8   to settle this, but I do think that it strikes me that it

9   could be useful in this particular matter and in the event, as

10  I said, that I don't find grounds for granting the preliminary

11  injunction, I'm sure that the Superb plaintiffs might be able

12  to find some assurance with regard to vehicles and other

13  things that might clarify things in terms of a status as this

14  particular action proceeds, in that way, without just having a

15  word from Mr. Deo of what might happen to the cars at this

16  particular stage.

17          Does that -- I just want to hear from the parties

18  how that rests and if the parties are able to or amenable to

19  reaching out to Magistrate Judge Wicks with regard to this

20  issue as I've just discussed and laid out.

21          Can I hear from plaintiffs' counsel?

22          MR. KATAEV:  Yes, Your Honor.  Thank you.  It sounds

23  very enticing but, unfortunately, we don't have the time to do

24  that.  Tomorrow, a payoff is due of $400,000.  My client does

25  not have the money to make that payoff and the cars need to be

1  returned within 24 hours or we're going to shut down.  We have

2  termination letters ready for everybody because we're

3  concerned that we won't get this relief and we're going to be

4  forced to shut down.

5           It's a great idea and I've been before Judge Wicks

6  and he's excellent, I think he would be great for something

7  like this, but given the time constraints and all the type

8  that has been wasted despite our efforts to try to resolve it,

9  we just unfortunately can't take the time to do that exercise

10  without being adversely affected.

11           THE COURT:  Let me address a couple of your points

12  and I will say that you will be with me for as long as this --

13  I intend on asking the questions that I have with regard to

14  the papers that have been submitted and the positions that

15  have been advanced just now just now in just a few minutes

16  and then I will take all of that under advisement.  So then in

17  that space of time, as I said, Magistrate Judge Wicks is

18  available this afternoon.

19           Again, I am going to take this under advisement and

20  you would be able to speak with him preliminarily today and

21  you can advance to him exactly what you've just said and even

22  put more meat on that to the extent that there might be

23  something else on either side that you all want to discuss in

24  the way of reaching some amicable or place of assurance that

25  you might be able to even close that out by the end of today.

1    I don't know.  But I -- this is a parallel track option.  It

2    is not an either/or.

3            And so, again, to the extent that both parties have

4    indicated that they have tried to, have had settlement

5    discussions, and there seemed to be a couple of points that

6    may not have been able to be hammered out and, in particular,

7    it has been signaled that the parties realize that some parts

8    of it might not be appropriate to discuss with the presiding

9    judge on the case.  The Magistrate Judge, this is what they

10   are there for and as you note, Magistrate Judge Wicks is

11   excellent in this regard, and so I don't believe it would be a

12   waste of time.  In fact, the time would not otherwise be put

13   to anything else as far as I see it from, on your end.

14           So with that said, I'd just like to hear again from

15   you.

16           MR. KATAEV:  This is Emanuel Kataev speaking on

17   behalf of the moving plaintiffs.  With that clarification,

18   Your Honor, that we're going to proceed now and while a

19   decision is pending, we can speak to the Magistrate, we are

20   amenable to that and we will take up the Court's offer to work

21   with Judge Wicks on settlement assuming the other side agrees

22   and we can have a letter filed today on that subject as soon

23   as this conference is over.

24           THE COURT:  Okay.  And let me say this.  If --

25   because I hear you and I was prepared for the suggestion that

1  you would not have wanted, in terms of the timing of this, and

2  so you don't need to put a letter in to get to Magistrate

3  Judge Wicks today.  I'm going to give you right now.

4         All you need to do is, as soon as we get off the

5  line, to call his deputy Doreen.  Her phone number is

6  631-712-5620.  Again, that's 631-712-5620.

7         I'm going to refer the parties to set a time today

8  to speak with Magistrate Judge Wicks.  He is prepared to be

9  able to have preliminary discussions with you today and he can

10 set up, you know, another time, additional time tomorrow.

11 Again, I understand that there -- I hear you and you can

12 elaborate more as we get into some questioning about what it

13 is that's concerning on your end with regard to tomorrow, but

14 if you're saying 24 hours, he's able to see you and hear from

15 you within the next 24 hours, for sure.  And so on multiple

16 occasions, if it is that you want to speak today and again in

17 the morning to try to hammer something out.

18         So, again, I'll just instruct, I will remind you at

19 the end of this to just reach out to Doreen and they will get

20 you in this afternoon.

21         Mr. Thomasson, is that something -- I should have

22 asked and I apologize that I did not.  Are you able to do that

23 this afternoon, participate in that dialogue?

24         MR. THOMASSON:  I am able to participate in that

25 dialogue and willing to do so, although this morning, my son

26

1  was just placed in a new hospital and I have a 5:30

2  appointment that's very important that I have to attend for

3  him and there's nothing else I can do about it.

4         THE COURT:  No, I understand.  I understand, I

5  certainly do.  Again, it's now noon and I think that we might

6  be -- if we can get through here and allow you all to get in

7  touch with him, he would be able to see you or at least speak

8  with you by mid afternoon and you should be clear to be able

9  to make the appointment that you have.

10        MR. THOMASSON:  Thank you.

11        THE COURT:  And so I am going to, with that said, as

12 I indicated, this is a parallel track exercise here.  I am --

13 I understand that that might not do it and that, you know,

14 there's an application that's before the court and am prepared

15 to move forward to hear from the parties now with regard to

16 arguments on the plaintiffs' application for preliminary

17 injunctive relief.

18        As you know and as the parties know, to grant

19 injunctive relief requires the movant to establish irreparable

20 harm and either a likelihood of success on the merits or

21 sufficiently serious questions going to the merits of its

22 claims to make them fair ground for litigation, plus a balance

23 of hardships tipping decidedly in favor of the moving party,

24 and that a preliminary injunction is in the public interest.

25        The showing of irreparable harm is perhaps the

single most important prerequisite and to satisfy the

irreparable harm requirement, plaintiffs must demonstrate that

absent a preliminary injunction, they will suffer an injury

that is neither remote nor speculative but actual and imminent

and one that cannot be remedied if a court waits until the end

of trial to resolve the harm.  Where there's an adequate

remedy at law, such as an award of money damages, injunctions

are unavailable except in extraordinary circumstances.

As to which merits standard apply, it depends on

what the last actual peaceable uncontested status which

preceded the pending controversy was.  And for the purposes of

this hearing, the Court will assume without deciding the issue

of the last peaceable uncontested status, that the lesser

standard applies and that's just for, hypothetically, for the

purposes of this hearing.

I want to hear from plaintiffs' counsel about their

theory of irreparable harm as it relates to the request that

the cars and plates be returned to Superb.

You know, are these plates still at issue,

Mr. Kataev?

MR. THOMASSON:  Objection.  Objection.  This is

Harry Thomasson.

THE COURT:  I'm sorry.  What is your objection?

MR. THOMASSON:  I have a preliminary housekeeping

matter I wanted to address to the Court very briefly, if I

1     may.

2            THE COURT:  Okay.

3            MR. THOMASSON:  I just want to say that to the best

4     of my knowledge as we are proceeding, this is not an

5     evidentiary hearing, but we have been told that there are

6     witnesses that are not parties to this action that are on this

7     call.  If that is okay with the Court, I have no problem

8     whatsoever with it myself, but if it is not an evidentiary

9     hearing and we have witnesses on the line, I just want to at

10     least raise the issue that I don't know whether they should be

11     or should not be on the line.

12            THE COURT:  So I will say that this is not an

13     evidentiary hearing.  I'm only, I think I set forth -- I

14     indicated in the court's order on September 7th, I restated

15     that at the beginning of our time here today, that I will hear

16     argument from the parties on the papers that have been

17     submitted as of the deadline of the court which was yesterday,

18     September 13th, and that the court reserved decision as to

19     whether an evidentiary hearing was warranted.

20            And so if you have -- your concern, if your concern

21     is whether or not there are parties -- well, let me start with

22     this.

23            Are there any parties, individuals that are on the

24     line or in the conference rooms at this point that are not,

25     individuals that are not counsel or parties?  Because I -- if

1   it is that all that are there are parties and counsel, I would

2   want to hear specifically from Mr. Thomasson whether or not he

3   has an objection with regard to parties participating or not

4   participating, not having speaking roles, but listening on

5   this particular hearing.

6           MR. KATAEV:  Your Honor, this is Emanuel Kataev for

7   the moving plaintiffs.  With me is plaintiff Robert Anthony

8   Urrutia and three corporate representatives, Bruce Novicky,

9   James Skarvenski and Alex Kikirov.  There's also a witness who

10  is not a corporate party.  His name is that Nethanel Orgad and

11  he submitted a reply declaration earlier today.

12          My understanding was this is a public proceeding and

13  even if he wasn't in a conference room, he could join in, but

14  if there's some concern or issue, we can ask him to remove

15  himself from this conference room.  I don't think there's any

16  reason or basis to do that.

17          THE COURT:  Right.  No, and I agree to your point

18  to, the point that you state that this is a public hearing,

19  however, to the extent that, you know, even in open court, if

20  this were public hearings and trials, that there could be, and

21  I haven't heard one yet, but there could be a motion to

22  exclude certain witnesses that may be called and the only

23  thing that would -- to the exception of those that are parties

24  and that's why I asked.

25          So you're correct that this is a public hearing, but

1  if there's a witness that might be heard in this particular

2  matter should we move to an evidentiary hearing and there is a

3  motion or a request that that particular witness not be privy

4  to some aspects of the argument here, I just, I would have to

5  hear that.  I haven't heard Mr. Thomasson necessarily

6  articulate it that way, but I believe that's what he's

7  signaling as a concern.

8          So, Mr. Kataev, I will say that, for certain, that I

9  am not going to hear witnesses today, so you can let me know

10 how you would like to proceed so that I can know what I should

11 entertain from Mr. Thomasson.

12         MR. KATAEV:  If he is making a motion, we can deal

13 with it.  This Emanuel Kataev speaking.  But as far as I'm

14 concerned, there is no issue with me.

15         THE COURT:  Mr. Thomasson?

16         MR. THOMASSON:  Your Honor, this is Harry Thomasson.

17         In a general sort of way, we all know that there are

18 times when witnesses can and should be excluded from hearing

19 certain things that take place in a courtroom.  I do not know

20 if any of that is going to happen today and if indeed it

21 happens and a non-party who's on this line, apparently,

22 there's just one but there is one, if, in fact, something gets

23 said that can cause problems down the road, it's not causing

24 problems for me, so I don't have any objection to that person

25 being here.

1    THE COURT:  Okay.  So then having no objection to
2  all that are on this call being on the call, we'll just
3  proceed.
4       And I will go back to the question that I put to
5  Mr. Kataev and that is can you please address for the court
6  your theory of irreparable harm as it relates to the request
7  that the cars and plates be returned to Superb and,
8  specifically, if you can just let me know if this is even
9  still an issue at this point?
10      MR. KATAEV:  Yes, Your Honor.  This is Emanuel
11  Kataev for the moving plaintiffs.
12       It unfortunately very much is an issue.  Dealerships
13  work with floor plan lenders in order to purchase vehicles for
14  resale.  As you can imagine, vehicles are very expensive to
15  come by and the banks provide the runway for dealers to be
16  able to buy cars.  And the way it works is you buy a car with
17  their money and you don't have to pay anything back until it's
18  sold.  And the NMAC agreement that we provided to this court
19  under seal typically provides that no payment is necessary
20  until the vehicle is sold and there's an outer limit date.
21       When you purchase a vehicle with a floor plan
22  lender, the terms of the agreement apply and some of those
23  terms are you must have the vehicle available for sale at the
24  dealership at the lot that you purchased it for.  So, in this
25  instance, these vehicles are not on the lot.

1          So in the normal course of operations at a

2   dealership, every month, a representative of these banks,

3   because they have a security interest in the vehicles, wants

4   to come by to make sure that everything is in order.  It

5   prevents exactly the type of situation we're faced with here.

6   They come once a month to physically touch the vehicle.

7   That's what the term "touch" comes from, where the term

8   "touch" comes from.

9          THE COURT:  I'm sorry.  Mr. Kataev, I'm sorry.  Just

10  if you can slow down just a little bit.  I know that if I'm

11  having trouble with the cadence, I can see that the court

12  reporter is trying to keep up as well.

13         Your last line, you said, "where the term 'touch'

14  comes from," and then you said something else.  I don't know

15  if you repeated the same thing.  Could you just repeat what

16  you said about the touch of the vehicle?

17         MR. KATAEV:  Yes.  What I was saying was that's

18  where the term, that's where the term "touch" comes from.  The

19  representative of the bank comes on a monthly basis to make

20  sure the vehicle is there.

21         If you can prove that the vehicle is there, you can

22  continue borrowing the money that you used to purchase the

23  vehicle until it is sold.  If you can't prove that the car is

24  there, under the terms of the agreement, you have to return

25  the money for the car.  There's a security interest that the

1    bank has in each car.

2         What's happened here is the defendants have used

3    someone else's money to purchase the car, they did not pay

4    anything for these cars, and they took these cars away and

5    left my client holding the bag.  We've already spent almost

6    $1.9 million in payoffs.  We are depleted and dry.  We have no

7    money left in the bank account.  They stole everything.  They

8    stole cash.  They stole funds from the bank account by the

9    checks that we provided to the Court.  There is no money to

10   pay this last payoff that is due tomorrow, September 15th.

11        If we don't pay almost $400,000 tomorrow, which we

12   cannot do, we will be declared in default and we'll never get

13   another lender to provide full plan financing for us.  We'll

14   be dead in the water.  Right now, we're limping.  Tomorrow,

15   we'll be dead without this.

16        The only way to avert this disaster is by having the

17   vehicles returned to the lot and telling Next Gear, Hey, we

18   received the vehicles back, please come take a look.  And they

19   will then say, Okay, you don't have to do the payoff anymore.

20        So there is actual and imminent irreparable harm

21   that's looming.  It's happening tomorrow.  It's not remote.

22   It's not speculative.  The agreements provide for exactly what

23   we're saying is going to happen and we need relief from this

24   court because they're refusing to return the vehicles.

25        The defendants have no right, title or interest to

34

1   these vehicles.  They admit that the vehicles belong to

2   Superb.  We have to get these cars back in order to survive.

3   Otherwise, we're facing all sorts of problems, bankruptcy,

4   terminations of employees, and we're going to lose this

5   location.  The location, location, location is important for

6   every dealership, and this happens to be a good location that

7   does work.

8           The defendants have not provided any evidence to

9   contradict what we stated.  They've only thrown baseless

10  allegations at us which we have proven to this court are

11  false.  Based on all the papers that we submitted and the fact

12  that the, now that the defendants have had an opportunity to

13  be heard and they haven't provided anything, we're entitled to

14  the relief we're seeking.

15          To the extent that a bond is necessary, we don't

16  think it is, we are prepared to get one, but we do need an

17  order from the Court for that.  We submit that no bond is

18  necessary.  We've already been financially devastated as it

19  is.  So they stand nothing to lose by giving us the cars back

20  and they shouldn't hold them hostage.

21          THE COURT:  So, and just so I'm -- I want to make

22  sure because I heard the lead on the issue of money and not

23  having enough money to pay off the lender, and the idea that

24  or the suggestion that with cars back in the lot, you then

25  contact Next Gear, and then ask them to get, you know, to come

1    look at cars.

2          I guess when you say there's nothing that's

3    speculative, I mean being able to extend that line at that

4    point is speculative, isn't it?

5          MR. KATAEV:  No, Your Honor.  My client is here with

6    me.  They have been in discussions with Next Gear.  He can

7    speak further because I'm not privy to those discussions, but

8    it's my understanding that if the cars are returned, they will

9    provide relief from having to do the payoff.

10          If you look at reply Exhibit A to the declaration

11   that we submitted yesterday from Mr. Urrutia, it's spelled out

12   over there.  The remaining vehicles on that line, there are 12

13   of them, and those vehicles are worth almost $400,000.  If we

14   don't put at least those 12 vehicles on the lot tomorrow,

15   we're done.

16          THE COURT:  And so I guess, I also, I noted in --

17   and I'm curious with regard to those 12 vehicles, let me

18   just -- I'll hold on that for just a moment.

19          I want to address the way that in your papers you

20   allude to or refer to the vehicles, in particular, the cars

21   that you're talking about, and you used I think now you just

22   might have said stolen.  I guess if you can -- in the

23   complaint, you use misappropriate and abscond.  You don't say

24   that they were stolen.

25          Is there a legal distinction or something else that

1   you're making here in saying, you know, there's a

2   misappropriation of the vehicles versus that the vehicles were

3   outright stolen?

4        I mean, namely, I guess, one of the concerns or

5   something that I note is that from what was provided to the

6   court that at some point, Mr. Deo technically owns or has a

7   percentage ownership in Superb or had an ownership in Superb.

8   So I'm curious and I'd like to hear from you that how he could

9   have either misappropriated or stolen property that he has

10  interest in.

11       MR. KATAEV:  There's a few, there's a few arguments

12  on that point, Your Honor.

13       First and foremost, by the terms of the agreement

14  with Superb, the vehicles have to be on the lot, not somewhere

15  else.  Second, my client, Mr. Urrutia, faces the sole

16  financial responsibility for that.  Third, the shareholders'

17  agreement with, at Superb specifically outlines that my client

18  has final say on all operational matters including day-to-day

19  operations.

20       The only responsibility that Mr. Deo had as a

21  49 percent minority shareholder was either appointing a

22  general manager or serving as one.  He does not have the

23  authority to remove these vehicles from the lot and he took

24  them as quickly as possible as soon as he saw the looming

25  crisis that was happening, the Ponzi scheme that was coming to

1  a crash, and so since he knew that that was going to happen,

2  he decided to take everything that he could, as much as he

3  could before the inevitable happened that he was going to be

4  kicked out.  That's what happened here.  He did steal them and

5  there's no distinction between my use of the terms

6  misappropriation, absconding and stealing, all one and the

7  same.

8            Superb has title to these vehicles.  The defendants

9  admit that Superb has title for these vehicles.  They belong

10  back at Superb.  Whatever rights Mr. Deo has as a 49 percent

11  shareholder, he's free to pursue them in court.  He can say

12  he's entitled to the value of these vehicles when sold or

13  whatever the situation is.  That's a different story.  What

14  he's doing right now is directly to the detriment of Superb

15  and that's also, believe it or not, to his detriment if he

16  claims that there's any value in his shareholder interest.  He

17  doesn't care about any of that.

18            As you can see from the exhibits filed yesterday,

19  reply Exhibit K, he opened up his own group of dealerships

20  under the nose of Mr. Urrutia who had no idea that he was

21  doing that.  So that's the basis for their claim which is a

22  separate matter but that's what happened here, Your Honor.  He

23  stole them and he needs to return them.

24            THE COURT:  And so you've spoken as to vehicles,

25  specifically, 12 vehicles related to Next Gear and financing

1    related to those vehicles.

2         There's reference to Nissan or NMAC and I just want

3    to understand the claims of or is it that the 12 vehicles

4    alone would do it with your argument now with respect to the

5    irreparable harm and the immediacy of going out of business.

6         Is that that Next Gear alone would do it with regard

7    to those -- if I were to credit your argument and deal with

8    the 12 cars and the $400,000 or approximately $400,000, that

9    line that you say would be then credited if we had the 12,000,

10   your clients had the 12 vehicles back on the lot, I'd like to

11   hear what the interplay is between that and, you know, the

12   NMAC arrangement and the scores more of vehicles that seem to

13   be at issue as well.

14        MR. KATAEV:  Three points on that, Your Honor.

15        THE COURT:  Okay.

16        MR. KATAEV:  First, getting just 12 vehicles back

17   will avert disaster and crisis tomorrow.  That's all it will

18   do.

19        As the Court noted, the termination with NMAC is

20   effective September 19th.  It hasn't happened yet technically,

21   although NMAC stopped allowing us to purchase any vehicle on

22   the floor plan line and so, effectively, it's been terminated

23   but not officially terminated until the 18th.

24        So if this Court entertained just getting those 12

25   cars back, that will be great to avoid disaster by tomorrow,

39

1    but it won't avert disaster on September 18th which is Monday.

2            So, in essence, we need all the cars back so we can

3    go to Nissan and say, Nissan, look, there was a big

4    misunderstanding, we got defrauded, we want to show you that

5    we worked hard to get these vehicles back, can we please work

6    something out to reinstate the floor plan line.

7            I can't guarantee that that would happen, but I can

8    at least say that if it doesn't come, it will never happen.

9    If it does come, there's a possibility.

10           And then, finally, what putting the vehicles back on

11   the lot does is there's a fair chance that we will at least be

12   able to get the money that we paid off back so that we can use

13   the operating capital so we can have that money for operating

14   capital.  Right now, we have no operating capital and that's a

15   big problem.

16           So the vehicles served multiple purposes.  Having

17   the vehicles on the lot gives the dealership the runway to run

18   their operations.  It's specifically designed to allow you to

19   get your overhead paid until a vehicle is sold.  So what

20   happens is if we bought a vehicle for $20,000 from the floor

21   plan lender and next month, we sell it for $30,000, that

22   $10,000 profit is something that we keep, minus the 20,000 we

23   originally gave, minus interest and minus fees.  And that's

24   how dealerships operate in the entire United States of

25   America.

1          We are without that lifeline.  It's a crucial
2   lifeline that we need.
3          THE COURT:  And so let me -- I'd like to maybe move
4   on.
5          In reading the papers, you suggested that I think
6   just a few moments ago, I think you referenced about
7   $1.9 million, and I guess reading the papers, there was the
8   suggestion that Superb has already paid $2 million to NMAC.
9          You know, is that -- I mean the court has never
10  actually seen any evidence of these payments, just the demand,
11  and there have been representations to the court that there's
12  been money paid.  Can you maybe speak to that?
13         MR. KATAEV:  Sure, Your Honor.  If it's necessary,
14  we can definitely provide evidence today that that has, in
15  fact, been paid.  What the Court needs to understand is Mr. --
16         THE COURT:  I'm sorry.  I don't -- I want to
17  interrupt you because I want to be clear.  I'm not, I don't --
18  at this point, I'm not asking that that be provided.  I'm just
19  merely saying I'm noting in referencing it that there wasn't,
20  attached to the documents, I did not see any anything that
21  purported to be evidence of a transaction that had been made,
22  but I did note that there is a representation that close to
23  $2 million was paid and I want to make sure that I'm reading
24  clearly that that's your representation and that is that, that
25  was already paid to NMAC.

1          Is that what you're asserting?

2          MR. KATAEV:  That's exactly right, Your Honor.  It

3   was already paid and I want to explain that the reason why it

4   was paid is because of the great relationships that

5   Mr. Urrutia has with the banks.  He wants to maintain that

6   relationship so he's forced to pay it back even though it's to

7   his complete detriment.

8          He doesn't want to ruin his relationship with these

9   banks.  He has other dealerships that he operates with these

10  same banks.  So that's why it's important for the Court to

11  recognize.  The representation is true that money has been

12  paid and, if necessary, we can provide the evidence and backup

13  for that.

14         THE COURT:  That's not what I'm asking for.  I just

15  wanted to make sure that I was understanding that clearly

16  because, I mean then, the catalyzing event that's been noted

17  for demand of payment from NMAC to the tune of the $2 million,

18  that particular issue and item, that's been mooted then, is

19  that right?

20         MR. KATAEV:  I would respectfully submit that it

21  hasn't been mooted because, again, until the vehicles are

22  returned -- we can go back to NMAC and ask them for relief.

23  We can't guarantee that that relief will happen, but we can

24  guarantee that without the relief, nothing will happen.  So we

25  need the relief we're seeking to have a chance of surviving.

42

1      THE COURT:  And maybe if you can, maybe if you can

2  speak to, maybe logistically, I just have a few questions and

3  that is you mentioned audits a little bit earlier.  Maybe if

4  you can explain about how the audits are conducted with Superb

5  as a matter of practice.

6      You suggested that they were monthly as opposed to

7  random audits.  Am I hearing that correctly?

8      MR. KATAEV:  Yes, Your Honor.

9      So if you look at reply Exhibit A, at docket entry

10 38-1, you will see a list of 12 unverified vehicles.

11 "Unverified" means that it's not verified that they are on the

12 lot.  And if you look at the bottom on the right side, for the

13 first vehicle, it's a Porsche Panamera, there are three

14 options on the right:  Photo, payoff and e-mail.

15     The photo option is an option specifically designed

16 to provide proof that the vehicle is on the lot.  If you take

17 a picture and submit it, that will avoid an audit from

18 happening in the first place.  We can't utilize the photo

19 option because the car is not on our lot.  So what we are

20 forced to do is require the banks to come over which they are

21 entitled to do under the contract and say, Hey, I'm here,

22 you'll find these cars, where are they.  And we say, We don't

23 have them here, and we'll explain the circumstances.  They

24 don't care what the circumstances are.  The car's not here?

25 Pay it off.  That's how it works.

1          What's important for the Court to recognize is that
2     there's a limited exception when a car has to go for repairs
3     because Superb is not a repair shop, not licensed to do
4     repairs.  So there is a limited exception.  You can send the
5     car off for repairs.  And 75 vehicles on the lot, at most,
6     maybe 5 to 10 would be out for repair.
7          In this current situation, there are currently 89
8     vehicles missing.  That's just a statistical improbability.
9     It can't happen.  So what happened on August 3rd which led to
10    what Mr. Thomasson refers to as the lockout is they came to
11    look for these cars and we told them they're on these other
12    lots because we understood that that's where they were since
13    they weren't there.
14         The auditors went and touched 48 of these 89 cars on
15    the Northshore and Sunrise lots that are controlled by the
16    defendants.  They have no right to be there.  He told us as
17    you can see from text messages, Oh, some of these cars needed
18    repair so I had them moved to this lot.  That's not the reason
19    why they're there.  He took them.  He lied and he just took
20    them.
21         THE COURT:  And so maybe -- I'm hearing different
22    things, maybe I -- so to the extent that -- I'm seeing that on
23    August 3rd, there's a reference to 102 cars that were missing.
24    You're referencing 89 cars.  Maybe if you can walk me through
25    the vehicles that you're referring and why there's that

44

1   discrepancy of vehicles that you're arguing about.  That is in

2   your papers that you're referencing.

3         MR. KATAEV:  Sure, Your Honor.  The way it works is

4   we have a general ledger that lists every single act that we

5   have which includes the vehicle by VIN number.

6         We use that list to go on the lot and see which

7   vehicles we have and which vehicles we don't.  So the vehicles

8   we don't have, we ask whoever is in charge at that time,

9   Mr. Deo, where are the vehicles.  And then we verify where

10  they are there.  And the reason why it got reduced from 102 to

11  89 is because we were able to do our homework and account for

12  some of the vehicles.

13        We know that 48 that are part of the floor plan

14  lines between NMAC and Next Gear are in their possession.  We

15  know that some of them, I believe, inclusive of those 48 are

16  demonstrator vehicles, about six of them, that they are

17  driving every single day.  They're not supposed to drive those

18  cars since they're no longer working at the dealership.  They

19  have to return those cars.

20        And so every day that they're driving around in

21  these cars -- which, by the way, those six cars represent

22  almost half of the entire monetary value.  It's a Rolls-Royce,

23  it's a McLaren, there's a GP, other really high end cars --

24  those vehicles are being driven by them every day.  There's no

25  insurance on them.  Any liability is attributable to us, not

1   to them.  God knows what can happen.  You know, even a good

2   faith accident or just a negligence accident could fall on our

3   hands.  The vehicles have to be returned to us.

4         THE COURT:  And so if I'm understanding and reading

5   this correctly, it was August 3rd that in your auditor's own

6   declaration, that it seems to suggest that this is when the

7   cars seem to be missing, right?  And then it seems that the

8   complaint was filed and then there was injunctive relief that

9   was sought on August 20th.  The delay there, what was the

10  wait?  What was going on during that time?

11        MR. KATAEV:  It's my understanding that in or about

12  late July, there was a grand opening of some sort as can be

13  seen on the declaration of Nethanel Orgad.  He was present at

14  that event.  He was invited to it.  And he observed that the

15  vehicles he saw at Superb were at the Northshore lot.

16        We did not know anything that was going on because

17  Mr. Urrutia was on vacation.  We received an e-mail from the

18  bank on July 31st saying there are 22 vehicles that were

19  double-floored which is a fraudulent practice that Mr. Deo

20  did.  Based on that, on August 3rd, we went internally to

21  physically do an audit.  Following that, because of the

22  double-flooring, we knew that NMAC and Next Gear were going to

23  come over and do their own audit which they did on a

24  subsequent date.

25        So, initially, we had a list of 102.  We did

1   research and we found out where some of those vehicles are so

2   we had 89 left.  NMAC's and Next Gear's audit accounted for 48

3   outside of Superb's lot.  They went to 180 Michael Drive and

4   they went to 189 Sunrise Highway and found those vehicles

5   there.  At that time, Defendant Thomasson was cooperating.

6   After that time, he stopped cooperating and that's what

7   required the payoffs.

8           There are still 41 vehicles that are completely

9   unaccounted for, but I do believe, as referenced in the reply

10  declaration of Mr. Urrutia, approximately 30 of those vehicles

11  were sold to wholesalers for which there are no receipts.

12          So that's currently where things stand.  We know

13  that they had 48 at least.  We need all the cars in their

14  possession back and we're going to have to hunt down the

15  remaining unaccounted vehicles.

16          THE COURT:  And can you address for me how it is

17  that in, just as an initial matter, just how it is that, you

18  know, about a hundred cars that are supposed to be on a

19  particular lot, that they're just not there and it's not

20  realized for some time?  I mean in terms of accountability,

21  how is it that that occurs?

22          MR. KATAEV:  I'll tell you, Your Honor.  Mr. Urrutia

23  is not present on a daily basis at Superb.  In fact, he lives

24  outside of the country most of the year and is a resident of

25  New Jersey otherwise.  So he is not there on a daily basis.

1       Because Mr. Deo, the defendant, was a 49 percent

2  partner and paid half a million dollars to become a partner,

3  he had a fiduciary duty and Mr. Urrutia trusted him.  You can

4  see from the text messages, there are daily conversations

5  about what's going on at the dealership.  And so Mr. Deo had

6  full sort of operational control but -- Mr. Deo had full

7  operational control but Mr. Urrutia had the final say on all

8  operations and Mr. Deo briefed all his duties to Mr. Urrutia

9  and what he did.

10      He said things like the vehicles are going out for

11  repair, I'm going to put them in a lot for a day to store

12  them, we don't have any space, or whatever he said whenever

13  questions came up here and there, but the full extent of how

14  many vehicles were missing was not clear until a physical

15  audit was done on August 3rd.

16      THE COURT:  Okay.  Let me just say that I -- so

17  there's, I guess, someone like Mr. Novicky who, I believe he's

18  the COO, is it not that he's on the ground as well and would

19  he not be aware or be able to see or notice that there are

20  about a hundred vehicles that are missing from the lot?

21      MR. KATAEV:  To speak to that, Mr. Novicky generally

22  operates out of the Connecticut dealership that Mr. Urrutia

23  owns.  There are four dealerships.  One in New York, one in

24  New Jersey, one in Connecticut and one in Massachusetts.  So

25  Mr. Novicky is not there either.

1    The way that we make sure that the cars are present

2    are there are monthly audits done and the monthly audits were

3    entrusted to Mr. Deo.  The monthly audits by the banks, I'm

4    referring to.  So every month when the banks came, there

5    weren't any issues.  So because there were no issues, there

6    was nothing to investigate.

7    When we received notice that there were 22 vehicles

8    double-floored, we knew that that was no accident so at that

9    point, Mr. Novicky came and physically himself did an audit.

10    THE COURT:  And that is you said when you received a

11    notice that there were 22 vehicles were double-floored,

12    meaning the ones that you saw on a lot, is that late July that

13    you're talking about in that instance or something else?

14    MR. KATAEV:  Late July, that instance, and I did

15    point out on the record what that is, Your Honor.

16    THE COURT:  So let me ask, looking at the contract,

17    the NMAC contract, and it's appended or attached to the motion

18    for reconsideration, it defines dealership as the dealer shall

19    keep all property at a dealership location in terms of the

20    dealer's responsibilities, and then, in turn, the dealership

21    location means dealer's address and any other location where

22    property may be located.

23    Can you maybe explain to me why it's a problem for

24    the cars to not be exactly at that lot at 215 Northern

25    Boulevard of Superb, that is, if the vehicle is somewhere

1    else, and you're able to identify where it is, how is that not

2    sufficient to avoid the scenario that you are suggesting with

3    regard to NMAC?  It seems from the way the contract is written

4    that that would be commonplace.

5          MR. KATAEV:  Two points on that, Your Honor.  That

6    reference is because this agreement with NMAC is

7    cross-collateralized with the other three dealerships.  So he

8    is allowed, for example, to have a vehicle that's for Superb

9    at his other dealership in New Jersey or in Connecticut.  He's

10   not allowed to just have them out somewhere on an empty lot

11   where there's no operation.  He's allowed to have it at a

12   repair site.

13         In this case, that was not the case.  Right?  The

14   vehicles were at Northshore and Sunrise where they were not

15   supposed to be, but even with that said, after August 3rd,

16   our internal audit, when Defendant Thomasson permitted the

17   auditors from NMAC and Next Gear to go to Northshore and

18   Sunrise, they would accept that that was okay.  He has since

19   not permitted them to come in and he's threatened them that if

20   they come and trespass, he will call the police on them.  So

21   that's where we're at.  He stopped complying with the audit.

22         The document, by the way, is Document 11-4 at

23   page 3.  It's a July 31st e-mail that references 22 units that

24   were double-floored.

25         And for the Court's reference, double-flooring means

1   I got money from one bank for the car which is supposed to be

2   an exclusive relationship and then I went to another bank and

3   got money from that bank for the same car.  So he

4   double-dipped and he cheated and violated two agreements with

5   two different floor plan lenders.

6           THE COURT:  Can you maybe address how this

7   double-flooring and the not having vehicles at Superb at that

8   location at 215 Northern Boulevard or other locations of

9   Superb, how that alleged harm relates to your RICO claim?

10          MR. KATAEV:  Yes, Your Honor.  It's wire fraud.

11          So every time that he, that Mr. Deo said, Hey, I'm

12  purchasing this car, give me $30,000 for it, a wire is placed

13  into the account.  He then takes that money and uses it for

14  purposes outside of what he's supposed to use it for which is

15  overhead.  And what he does then is he says, Hey, other bank,

16  I need $30,000 for this car, and he receives that money too

17  and so he uses that money to float the operations and make it

18  appear that the dealership is operating profitably when, in

19  fact, it's not.  It's wire fraud.  That's the basis of the

20  RICO claim.

21          And also fraudulent instruments because of the

22  Flushing Bank application that he submitted saying he's

23  100 percent owner.  He took all the customer deposits and

24  deposited it into a separate bank account.  And if you look at

25  the statements for those Flushing Bank accounts, the money

1    comes in and the money immediately comes out.  There's no
2    payment of payroll.  There's no payment of rent.  There are no
3    standard things that you would see for a business operating
4    account.  It's clear as day what happened here.

5          THE COURT:  You assert a loss of goodwill as
6    irreparable harm.  Can you point to some facts asserted in the
7    complaint or in the declaration or the exhibits that supports
8    this as an irreparable harm?

9          MR. KATAEV:  Yes.  It's with respect to three
10    separate and distinct relationships with banks that we lend
11    to.

12          There's a reference to the Shorey case which we had
13    to settle and buy back the car, a Maserati, based on the
14    defendant's fraudulent conduct and we have to pay the bank,
15    Ally, over $50,000 to get that car back.  That's money that
16    Mr. Deo sold and that we had to pay to fix that problem.  We
17    lost our relation with Ally as a lender as a result of that.
18    They cut us off.

19          Second, with respect to the floor plan lenders, the
20    NMAC termination letter by itself is enough.

21          And then third, with customers.  There's sworn
22    statements made in the declarations about customers that have
23    been defrauded by the defendants' practices.  This is the
24    lifeblood of a dealership.  It's relationships with the banks
25    that provide the money to allow it to operate and with the

52

1  customers that provide the funding to pay back those banks and

2  keep the profit for the dealership.

3      THE COURT:  To the extent that you say that that's

4  the life of a dealership and the dealership is Superb, is

5  Superb still operating as Superb?

6      MR. KATAEV:  It's still operating as Superb Motors

7  Inc.  There is a DBA application for Team Auto Direct which

8  was always an intended thing, but the actual name is Superb

9  Motors Inc.  The bill of sale is Superb Motors Inc.  When you

10  walk up to the dealership, the name of the dealership on the

11  front of the door is Superb Motors Inc.

12      THE COURT:  And the online presence now, is it now

13  not Superb Auto?

14      MR. KATAEV:  I don't believe it is anymore.  The

15  online presence was SuperbMotors.com.

16      THE COURT:  And it's been changed, hasn't it?

17      MR. KATAEV:  I believe that that aspect of it has

18  been changed, yes.

19      THE COURT:  I mean by --

20      MR. KATAEV:  It's all part of --

21      THE COURT:  I'm sorry?

22      MR. KATAEV:  The purpose of that was for marketing

23  purposes, Your Honor.  We're operating under the DBA.

24      THE COURT:  So for marketing purposes, Superb is now

25  operating as Team Auto Direct, is that correct?

1          MR. KATAEV:  Superb Motors Inc., doing -- Superb

2     Motors Inc. doing business as Team Auto Direct, yes.

3          THE COURT:  Okay.  So I guess I'm just trying to

4     figure out if they're now doing business as something else, in

5     terms of goodwill for a brand, how you establish irreparable

6     harm when you've rebranded.

7          MR. KATAEV:  We've only started the process of

8     rebranding.  The dealership is still Superb Motors Inc. and

9     everyone knows it as that.

10          You know, I would submit that there's, irreparable

11    harm has been done.  We're doing -- we're taking steps that we

12    can so we can mitigate some losses, but all of those steps are

13    in their infancy and nothing has been finalized on that front.

14          THE COURT:  Well, I mean what the court has to

15    decide is whether or not irreparable harm will result, you

16    know, prospectively, not to right necessarily, you know, what

17    you might be seeking ultimately on the merits of this case,

18    right?  So and maybe, it might be helpful in that regard --

19    well, I think I might have enough on that.

20          Let me just ask if you can walk me through your

21    support that is on your claims with regard to -- I'd say

22    you've talked a little bit about the RICO claims, but I just,

23    I'm curious about the allegations about the signing of checks.

24          And, again, I guess to the extent that you allege

25    that there's fraudulent activity here, where the court would

1  be able to find -- and this is, again, relating to your RICO

2  claim -- would be able to find evidence that this would be,

3  that this would meet a fraudulent intent element.  And, again,

4  I guess it strikes me that there seems that there would be

5  some sort of agency relationship or some type of permission

6  for some type of transfer or transaction for someone such as

7  Mr. Deo who has ownership interest and was operating at that

8  time as, you know, with ownership interest in the business.

9           So can you maybe speak to that for me?

10          MR. KATAEV:  Sure.  Under RICO, we have to establish

11  conduct of an enterprise through a pattern of racketeering

12  activity.  The pattern of racketeering activity is based on

13  the fraudulent conduct that he engaged in with double-flooring

14  the vehicles which is not allowed, signing checks that they

15  have no authorization for which is not allowed, failing to

16  deal with consumers in the way that's required of him as a

17  dealer, and other activities that we pointed out in the

18  papers.

19          So that's the fraudulent conduct and there's a

20  pattern of it because we're not the only plaintiffs that have

21  been harmed by his conduct.  The Island Auto Group plaintiffs

22  have the same exact allegations against him.  This is a

23  repeated conduct by him and he has a group of operators that

24  he uses.

25          So the enterprise here is the dealership.  He uses

1  that as a front for his activities and what he wants to do

2  because he knows the dealerships have the availability of

3  bringing in large amounts of cash that he can take and he uses

4  his operators to perform various functions.

5          The accounting people submitted fraudulent financial

6  statements to support that the dealership was operating

7  profitably when it wasn't.  They did this to deceive Urrutia

8  who was not present.  His other operators are Marc Merckling

9  and Dwight Blankenship, two police officers who act as

10  bodyguards for him, and who numerous witnesses I've

11  interviewed stated, oh, those are Anthony Deo's bodyguards.

12  Mr. Merckling is in charge of all the cash.  And he uses all

13  of these individuals to proceed further with his enterprise of

14  getting in as much money as possible, funneling it out and

15  making it seem like everything is running properly when it

16  isn't.

17          That's what went on here and the pattern of

18  racketeering activity is extensive wire fraud.  We showed you

19  the debit authorization.  That debit authorization was for a

20  loan that Mr. Deo took from one of his other dealerships.  He

21  submitted that debit authorization for Superb to pay his loan.

22  He had no authority to do that.

23          The shareholders' agreement clearly says that

24  Mr. Urrutia has sole check authorization and sole control of

25  all financial accounts.  He's not allowed to have any control

1   of any financial accounts.  And he admits that in his papers.

2   He didn't say I was authorized to do any of these things.  He

3   didn't submit in his sworn declaration that I was allowed to

4   sign checks.  And you can see that the shareholders' agreement

5   signature page has his signature and that's the same exact

6   signature on the checks that we submitted in the declaration

7   exhibit in our moving papers.  He wasn't allowed to do any of

8   those things.

9           THE COURT:  So I guess maybe you can connect for me

10  your allegations of a RICO conspiracy in terms of others or

11  how a meeting of the minds for others to conspire to defraud

12  Superb.

13          MR. KATAEV:  Okay.  There's a few --

14          THE COURT:  Are there facts that you allege that

15  specifically have, you know, that other defendants had any

16  meeting of the minds here with regard to the violations that

17  you've alleged and what you've just outlined?

18          MR. KATAEV:  Yes.  Reply Exhibit K is a perfect

19  example of it.

20          Gold Coast Automotive Group was formed sometime in

21  June and all of these employees that are part of Superb have

22  signed a declaration of vows of a duty of fidelity and loyalty

23  to a different dealership.  That was the whole purpose of

24  Mr. Deo's conduct.  It was a bucked out operation.  Get in,

25  take everything, take all the treasure of Superb, and take it

1    with you to go to a different group.

2         He wants to set up his own competing dealerships at

3    181 Michael Drive.  That's why he had his grand opening event.

4    The meeting of the minds is that all of them acted in concert.

5    Mark Merckling took all the cash deposits.  Dwight Blankenship

6    was a bodyguard.  Sarah Deo made sure she had control of the

7    entire CRM system.  The accountants came in to falsify

8    financial statements to make it appear that everything was

9    running profitably when it wasn't.  And Thomasson operated in

10   an office that was a closet inside that dealership and he

11   admits that he was locked out of his office.  What attorney do

12   we know that operates out of an office inside a dealership?

13        We also have thousand dollar checks written to

14   Thomasson.  I guess he's paid a thousand dollars a week,

15   $52,000 a year, for his services.

16        THE COURT:  I'd like to move to your trade secret

17   claims and I'd like to hear from you about the irreparable

18   harm in connection with that claim and how -- if you can maybe

19   just walk me through how I would be able to get to actual and

20   imminent harm and not just speculative harm here.

21        MR. KATAEV:  Very simply, the most important asset

22   that was taken was a downloadable, customized, customization

23   of the DMX system.  It's a very expensive setup that took over

24   six figures to implement.  That's something that Mr. Deo would

25   have to purchase on his own if he wanted to open up a

1  dealership.  He took that.  He also gained the CRM system and

2  he took with him all of the leads for all of the customers

3  that were Superb's.

4        So those two examples by themselves are trade

5  secrets that were misappropriated and he wasn't supposed to

6  have access to them.  If he wanted to open up his own

7  dealership --

8        THE COURT:  I hate to cut you off, but can you speak

9  specifically and narrow in for me on how, what you're

10  referring to is a trade secret?

11        MR. KATAEV:  Well, for one thing, it's not something

12  that's publicly available.  You have to know what it is that

13  you need in the system in order to obtain it.

14        THE COURT:  But specifically -- I'm sorry.  Just  if

15  you can tell me specifically what the trade secrets are that

16  you seek to enjoin the defendant from having access to.

17        MR. KATAEV:  It's not so much having access to it.

18  It's -- well, I guess it was.

19        THE COURT:  It would be.  That's what you're asking

20  me to do and that's why I'm asking the question.

21        MR. KATAEV:  It's to return the information that was

22  stolen via a Tekion customizable setup, customized setup, as

23  well as the CRM system information that contains all the

24  customer's names and the customer database.

25        THE COURT:  And that is -- and so I'm clear, you

1 want, you're seeking a return of the customer database and the

2 customer names?

3      MR. KATAEV: And the customized setup for Tekion

4 which is our dealership management system. Those are

5 referenced in the text messages submitted in reply Exhibit B.

6 Mr. Urrutia talks about the customized setups and how great it

7 is.

8      THE COURT: So is there only one copy of this

9 database?

10      MR. KATAEV: I mean there could be multiple copies

11 but he shouldn't have any access to it. We paid for that for

12 Superb and he can't take that and implement it at another

13 dealership that he's going to compete against us with.

14      They also took our employees, Your Honor, and

15 that's, again, our reply Exhibit K. Those individuals that

16 signed, those are Superb's employees.

17      THE COURT: Right, and I guess, so with regard to,

18 you know, this, the assertion that there's a trade secret

19 that's been used, I have to establish first that there is a

20 trade secret. Right? An essential element there is that

21 there's something that's or secrecy is protected. Right?

22      What efforts has Superb made to maintain secrecy of

23 these purported trade secrets?

24      MR. KATAEV: A few, Your Honor. First, we have all

25 the information in our computer system which is protected by a

1   firewall and can only be accessed at the dealership with

2   appropriate user names and passwords.  Second, they only

3   provided it to key individuals such as Mr. Deo who had a

4   fiduciary duty to Superb.

5          An employee wouldn't be given the complete access to

6   the CRM system.  He would only be given user level access to

7   do his or her duties.  This list of customers is not something

8   that's publicly posted anywhere that you can just go and get.

9   So all of those things are evidence of how we acted to keep,

10  you know, this information a trade secret.

11         THE COURT:  Did every sales associate have access to

12  that information?

13         MR. KATAEV:  It's my understanding that the CRM

14  system allowed leads to be assigned to people.  I'm not -- I

15  can't state specifically whether a salesperson had access to

16  each and every lead, but it's my understanding that leads can

17  be assigned and they were assigned.

18         Mr. Urrutia can speak more to that, if you would

19  like.

20         THE COURT:  I don't.  I guess what I'd like -- I

21  mean, I'm looking for what's been presented in the declaration

22  and those papers that you submitted in support of this

23  application.  I'd like to -- and if there's someplace here

24  that you would like to point me to, please direct me there.  I

25  just did not, I did not see that and wanted to be sure that I

1    was not missing maybe information in that regard.

2          And let me just say if it were that I were to

3    determine that there's a federally protected trade secret

4    here, can you tell me how it is that you believe the

5    defendants have misappropriated the use of that trade secret?

6          MR. KATAEV:  Very simple.  They opened up Gold Coast

7    Automotive Group and they're using that information to further

8    their business interest in that auto group.  They shouldn't be

9    able to do that.  They can't take our information and use it

10   to further their interest at a separate dealership.  My client

11   has no interest in Gold Coast Automotive Group.  Presumably,

12   he's the 100 percent owner of it.

13         I would just like to point out paragraph 133, docket

14   entry 11, in the declaration of Mr. Urrutia.

15         THE COURT:  Yes.

16         MR. KATAEV:  133 through -- hang on -- at least 174.

17         THE COURT:  So I mean to be clear, what you're

18   asking with regard to this database, plaintiffs have the

19   database.  You're asserting that defendants, in particular,

20   Deo, has the database now, and you really don't want him to

21   return it.  You're really asking that he be ordered to delete

22   it or something else?  Because it's not, it strikes me that

23   it's not as if it's a hard system that you're asking that it

24   go back and be put back into your custody in that way.

25         Maybe, if I'm missing something here, maybe I'd just

1   like to hear from you specifically what are you asking for in

2   terms of relief as it relates to this system.

3           MR. KATAEV:  You're exactly right, Your Honor.  The

4   point of the relief we're seeking is that he's not entitled to

5   use it and he should be enjoined from using the system, to

6   delete it and not access it.  We do have it and so it's not

7   something -- it can be something that he physically returns if

8   he has a copy of it a on a flash drive, for example, but to

9   the extent it's on any of his computers or the corporate

10  entity's computers, we ask for it to be removed.

11          THE COURT:  And how is it that he would be able to,

12  as you allege, that he's stolen customizations that were

13  Superb's, I mean how would he be able to do that?  And, again,

14  I go back to, you know, didn't -- did Deo have authorized use

15  for confidential information as part owner of the company?

16          MR. KATAEV:  He did but for the purpose of using it

17  at Superb.  Now that he's taken it to use it elsewhere, he

18  should not have access to it, and that's what the Trade Secret

19  Act allows for.  Many times there are claims made by former

20  employees and former partners in exactly these circumstances.

21          So if he wants it, he can go to Tekion himself, he

22  can pay money to them and he can customize it as he sees fit

23  but he can't copy our customizations that we've implemented,

24  that we taught him or showed to him and, you know, he has to

25  be able to pay for it on his own and customize it on his own.

1          THE COURT:  And so, I mean, to the extent -- in the

2     complaint, you allege that, as you've just stated, that there

3     was, showed that the plaintiffs showed defendant usage of this

4     particular system and certain aspects of it.  I guess you also

5     though state that it's not possible to reverse-engineer or

6     learn by research alone.

7          I just, why is it that Mr. Deo would not have been

8     able to learn these processes on his own?  Why is it that he,

9     you are alleging that he must erase any memory of it or any

10    iteration of it that he may now have come to know through his

11    business and his ownership interest and experience with

12    Superb?

13         MR. KATAEV:  Because he doesn't have that knowledge

14    on his own.  That customization is based on knowledge of

15    Mr. Urrutia who has 30 years of experience in the industry.

16         If you look at the text messages and reply, Mr. Deo

17    constantly says, I have so much to learn from you.  That's an

18    example of it.  He was taking everything that he could without

19    actually going through the process himself for his benefit and

20    never for the benefit of Superb.  Everything that he did from

21    day one of the dealership was a farce and a lie and he didn't

22    do anything in good faith for Superb.

23         THE COURT:  I want to move -- go ahead.

24         MR. KATAEV:  This customized setup took months.

25    I'm sorry.

1    THE COURT:  No.  I'm going to give you an
2    opportunity to finish your response there.  It seems that just
3    because of the delay in the phone line, I don't intend to
4    speak over you here.  Go ahead.
5    MR. KATAEV:  I apologize.  All I was saying was that
6    this customized setup took months to put together.  It was not
7    a simple feat.
8    THE COURT:  And so in terms of the balance of
9    hardships and equities and the public interest factors
10   elements that I must consider, can you speak to your position
11   here?
12   MR. KATAEV:  Sure.
13   With respect to -- with respect to the vehicles,
14   simply put, they don't suffer any harm if they return them.
15   They're not theirs.  They haven't provided anything in the
16   papers that establishes any right or title to the vehicles.
17   We provided the titles as proof of ownership.  It's undeniable
18   that the vehicles are owned by Superb.  It's undeniable that
19   we paid off these vehicles or have to pay off these vehicles
20   if we can't put them on our lot so we need them back in order
21   to survive.
22   Mr. Deo apparently wants to open up his own
23   automobile group.  That's fine.  He just can't do it using the
24   stolen property of Superb and Mr. Urrutia.
25   So, you know, it's our understanding that he never

1   came in to actually operate as a proper general manager.  This

2   was a bucked out operation from the get-go.  The balance of

3   equities dip in our favor because we've been victimized by

4   what amounts to crimes by Mr. Deo and we are seeking relief

5   from the criminal authorities for his conduct.

6           As the Court may know from a review of papers,

7   Mr. Deo was previously convicted of wire fraud in or about

8   2015.  This is not a new thing for him.

9           THE COURT:  Mr. Thomasson, I'm going to give you an

10  opportunity now to respond.

11          MR. THOMASSON:  Thank you, Your Honor.

12          Starting chronologically, November of 2022,

13  Mr. Deo's businesses were completely and totally ruined by

14  Mr. Aronson.

15          Apparently, with a straight face, somebody is trying

16  to suggest to you that it is an absolute coincidence that

17  Urrutia is now aligned with Aronson because Urrutia is

18  apparently telling you that he had no knowledge of what

19  happened with Northshore and Sunrise through Aronson which is

20  a bunch of nonsense.  On its face, they're aligned because

21  Mr. Urrutia made his choice and went with the rich guy.  The

22  simple fact of the matter is he was told from day one what

23  happened to Deo.

24          Since at least January, if not December, they have

25  been storing cars at Superb.  As we laid out in our

1   declarations, Deo went in, knew that that place needed better

2   operation, put in place better operations including even

3   making purchases at auctions and they had virtually no

4   advertising or marketing -- that was Sarah's specialty, by the

5   way -- they went in and started doing that and practically

6   doubled the number of cars on the lot.

7           Well, the thing is, Your Honor, that lot is not that

8   big.  It's pretty tight to begin with, and they had a lot of

9   overflow and since at least January, cars had been stored for

10  Superb at Deo's long-leased lot and those leases are in your

11  possession, Judge.  He's had those leases as car lots for a

12  long time, for years.  And this was with Urrutia's complete

13  and total inarguable knowledge.  But even more inarguable than

14  what was told to Urrutia was the fact that -- and, of course,

15  these audits all had to be cooperating and having the touches

16  at Deo's lots since January.  They had to do their touches

17  there.  There's been full cooperation.  This business that

18  we're not cooperating, you must be kidding me.  He's -- there

19  have been touches on these cars since at least January every

20  month, every month, including August, not yet in September.

21          Aronson, by and through Attorney Ruderman beginning

22  in March was complaining about the cars on those lots and

23  wanted to know what was going on.  And now they've signed

24  documents saying that there were cars brought to Deo's lots in

25  July as he was about to get locked out?  He had no knowledge a

1   lockout was coming.  All that had happened was he raised some

2   questions about finances and we can continued to find out and

3   figure out more and more things about finances.

4          There hasn't been a shred of proof, not a shred of

5   proof of anything illegal winding up in Deo's possession.

6   There has been some checks, Your Honor, that have been

7   presented to this court.  You don't see anything with respect

8   to hundreds of thousands of dollars leaving Superb apparently

9   since December when Deo first really came in and he was there

10  full time, I guess, as of January, there's no proof that he's

11  taking, he's in control.  They haven't shown you any proof

12  that he's in control of the finances.

13         Every person, as a matter of fact, in charge of the

14  daily finances and daily reviews of the daily finances at that

15  and every other car lot in America are completely and

16  100 percent hired and controlled by Urrutia and Team Auto.

17  Deo didn't hire or control a single and solitary person.

18         Every single check that has been written has been

19  written with the daily concurrent knowledge of the Team Auto

20  and the Urrutia people, every single time one was written.  So

21  let everything take place and now they say it's bad.  Well,

22  they say it's bad because that's convenient for them because

23  it's one of two things here, Your Honor.  There's not a lot of

24  gray area.

25         It certainly is our position that we will be

1   advancing -- it's coming slowly but surely -- that these

2   people are collectively acting to harm Mr. Deo intentionally.

3   Where is the proof of wrongdoing, that this guy controlled the

4   finances and could commit wire fraud?  He didn't control

5   anything, Your Honor.  Anything he did was on paper?  What,

6   somebody's writing checks without the full knowledge and

7   approval of the finance people?  It's not possible.  It's not

8   possible what they're saying.

9           Please note that we've got Aronson complaining about

10  cars at Deo's lots, all of the cars, since November have been

11  Superb's.  We've got Aronson complaining since March in the

12  state court action about those cars and received not only no

13  relief when we finally put in our papers on that order to show

14  cause but, in fact, Aronson was told you don't have any merits

15  to your claim.

16          So this is -- now Aronson and Urrutia just happened

17  to team up and they're claiming that, once again, the money

18  people are claiming that my client controlled the money?  He

19  didn't control a dime with these people.  Not 5 cents.  We

20  deny entirely him having taken a single thing from that

21  dealership.  Nothing.

22          I had an office that Mr. Deo asked me to open there

23  so that we could see each other as necessary on business going

24  forward including what was expected to be the purchase of the

25  remainder of Superb as well as the purchase of the Connecticut

1  dealership of Mitsubishi controlled by Urrutia and one or

2  two points that he also owns up in Connecticut.  I had

3  commenced in July and came into that office in July starting

4  that work for Superb and there's two or three checks for a

5  thousand dollars starting to pay me.

6          They now want to weaponize the Shorey case?  The

7  Shorey case, Your Honor, was a document -- I received a phone

8  call from the plaintiffs' lawyer who said to me, and I quote:

9  "I've been told you are Superb's lawyer."  At the time, I

10  didn't think anything of it, but I would love to know who told

11  him what.

12          In any event, he told me about this case, that there

13  was a problem with a car, and he brought a complaint.  I said,

14  Okay, I'll find out what I can find out and I'll get back to

15  you.  So within a week, I had an answer from Deo on the

16  matter, he says, Yes, we denied whatever that's all about,

17  Harry, please file an answer in that case and we'll see what

18  we can do about trying to work it out.  So I filed an answer

19  in that case.  Then all of a sudden, Attorney Kataev, after I

20  file an answer, files a notice of appearance and then informs

21  the court that the case is settled.

22          They want to tell you that something bad happened

23  with that case?  Other than answering the complaint, I know

24  nothing.  I know nothing.  They have absolutely coordinated

25  everything.

1          Take a look at this floor plan nonsense, Your Honor.
2     Have they given you any affidavits from NMAC or Next Gear?
3     They give you a letter.

4          I explained in our documents these representatives
5     of those floor plans know these plaintiffs very well and for
6     many years.  They have this ongoing business and very friendly
7     relationships.  We're told about those relationships.  My
8     clients have never been invited to be a part of it.  That's
9     been a source of upset since the lockout because the only
10    thing I wrote to Next Gear and NMAC was I told them -- no, I
11    didn't write to Next Gear.  I never had contact with Next
12    Gear.  I wrote to NMAC and I said:  This is what's going on,
13    we don't know what the heck is happening with regard to this
14    lockout, we don't know why they've done this with you, can I
15    please have a copy of that contract so I can look at it
16    because I don't have one.

17         And then after we cooperated with three audits in
18    August, three times the cars were touched, the ones that my
19    client possesses anyway, the cars were touched.  We cooperated
20    fully.  And now they're saying that we didn't cooperate or
21    we're not cooperating with them?  There have been touches at
22    my client's two dealerships since November or, well, December,
23    since December, and we've been doing it every month regularly.
24    NMAC and Next Gear know exactly where those cars are stored
25    and that's why that line is in that contract which is filed

1   under seal, Your Honor, to keep it away from us, but I tried

2   to look at it last night and I couldn't.

3        I came back this morning, after dealing with my

4   son's business this morning, I came back, I thought it was

5   early when I came back around 11.  I just happened to get a

6   call from your clerk.  I was going to sit for the next few

7   hours and see what else I can read and figure out about last

8   night's filings because I thought this was this afternoon, but

9   I can't get in as of the moment to see a contract that I

10  requested more than a month ago.  They won't give it to me.

11  Nobody will give it to me.

12       My client has had no contact with NMAC or Next Gear,

13  nothing, zero, nothing.  And now they're saying it's a

14  problem?  If it's a problem, it's because these plaintiffs

15  created it and told them there's a problem.  It's a problem

16  because they say it is.

17       It is not true for these people to be telling you,

18  Your Honor, either that those cars are being stored at that

19  lot without their knowledge.  I can prove if I had to that

20  Mr. Ruderman and Aronson caused all kinds of a ruckus back in

21  March over those cars in that lot and now they're in here

22  telling you, well, we didn't know there were cars at that lot.

23  That's called bad faith.  The fact of the matter is this has

24  been going on because there were too many cars for Superb's

25  parking lot.

1    When I first started going to Superb in mid July, I
2  had to park out on the street.  There wasn't a place for me to
3  park one car in July.  No place.  None.  The fact of the
4  matter -- and that was for a couple of weeks that I was there.
5  But after the lockout, my client called and said, Harry,
6  you're not going to believe this, but there are cops here that
7  said I stole 102 cars and $760,000.
8    That $760,000 is no longer a specific number before
9  the Court.  That's because they found out that that was
10 transferred from Superb up to Urrutia's Mitsubishi dealership
11 that he's been telling my client for months there's a problem
12 with.  We gave you the documents they gave us.
13    Tom Jones isn't doing work for Superb.  Joseph
14 Little aren't doing anything wrong here.  They have more
15 integrity in the car business on Long Island than every other
16 accountant put together.
17    My dealings with Superb consist of answering the
18 complaint.  The thing got settled and I still don't know
19 anything about that case, nothing.  They didn't even have the
20 courtesy of telling me what the settlement terms were or
21 anything else.  Nothing.  Not a thing.  And they notified the
22 Court a half an hour before the hearing in Brooklyn that it
23 was settled.  Fortunately, I didn't go.  At the same time they
24 were filing that, I was filing a letter to explain the lack of
25 my presence at a court ordered hearing on Shorey when it

1   turned out the case was settled, although I never participated

2   in that settlement.  I know nothing about it.  Nothing.  And

3   this allegation going after another guy's lawyer?  That is not

4   only classless, they're going to pay for that one, Judge.

5   It's coming.

6          The fact of the matter is that these people are

7   engaging in the best defense is a good offense.  That's all

8   they're doing.  My client didn't have control of 5 cents at

9   that dealership and couldn't do anything without their full

10  knowledge and approval with respect to finances.  Nothing.

11  Those finances are controlled on site and off site by Urrutia,

12  Team Auto and Urrutia's people.  The onsite controller,

13  Kendra, to the best of our knowledge is still there.

14         Anybody connected to Deo, the few people, he's got a

15  criminal organization that he has with two police officers?

16  I'm so glad they said that.  I'm so glad they said that.

17  These people are earning a few bucks on the side working for

18  Urrutia -- I mean working for Deo.  That's all they've been

19  doing, and moving cars and providing security at dealerships

20  that are not open, Judge.  My client is not trying to do that.

21  That's another thing that's nonsensical.

22         Urrutia was told full well what happened with

23  Aronson.  Deo had absolutely a duty to mitigate.  We all know

24  this basic law, Judge.  You have a duty to mitigate.

25         He opened up a new dealership, a new corporation for

1    the purposes of applying and seeing if he can get his own DMV

2    license or if they also were controlled by Aronson.  It turns

3    out either they're not controlled by Aronson or maybe they

4    have something they're worried about.  I don't know if they're

5    too close with Aronson, but they went ahead and gave Deo his

6    two new licenses and Aronson's lawyer tried to stop that in

7    the state case.  What are they trying to stop here, another

8    bite at the apple?

9            This guy went out and mitigated his damages to

10   reopen two businesses that Urrutia knew fully about, was told

11   everything, was told about Aronson, and knew that the cars

12   were being stored over at Syosset and Amityville for Superb.

13   That's standard operating procedure in the business,

14   Your Honor, as is demo cars.  Demo cars are listed right in

15   the regulations I provided you.  This is just trying to use a

16   TRO as a sword and as a shield.

17           The fact of the matter is, as we move forward in

18   time, Deo starts to see irregularities in daily spreadsheets

19   that are given to him by Urrutia's people.  He sees things

20   that aren't right and he asks Tom Little about it and we gave

21   you the information with respect to the CFO at the end of

22   February who wound up getting fired as soon as Deo said, I

23   want this looked at.

24           It's right there in black and white, Your Honor.  He

25   wanted a forensic audit done for one reason.  He was seeing

1   things in daily reports that didn't look right.  And Little, I

2   mean Tom Jones said something's not right here, look for an

3   audit, the CFO would be able to do it.  She even said in her

4   e-mail, This won't be hard but I have to have permission.  Do

5   you notice that?  Please pay attention to that comment,

6   Your Honor, because there's proof right there that the money

7   people are controlled by Urrutia.

8         He's telling you that Deo controlled the money?

9   That's a lie.  That's a lie.  And that woman was fired within

10  a week for saying that to Deo.  We now think that that was

11  because they were basically trying to serve up a sacrificial

12  lamb to Deo.  We now know that that one -- we told you in the

13  paperwork, Your Honor, that there's this $650,000

14  lead/mortgage that Urrutia took out on November 1st with NMAC

15  that was never disclosed to Deo.  We now know that $240,000

16  were taken at the end of June by Urrutia absolutely without

17  any knowledge or ever being told to Deo.

18        We have just enough documentation that can prove the

19  money that kept going up to Hartford, just like the $760,000

20  figure that no longer gets specifically mentioned.  Oh, Deo's

21  been stealing millions.  He's been stealing millions?  How?

22  Did they show you proof of that, Your Honor?  Did they show

23  you that he has access and was going to banks and conducting

24  wires of money out of Team Auto to Deo's personal bank

25  account?  There's no such thing.  It's a bunch of nonsense.

1        The checks that were written could not be written

2   without Urrutia's specific knowledge no later than, and his

3   entire team's specific knowledge no later than the end of that

4   day when the local controller had to report what was done that

5   day.

6        Do they think the Court has no brains?  This is

7   absolutely unbelievable what they're trying to suggest.

8   Consists of a large criminal organization?  The guy had an

9   accountant.  He has a lawyer.  He's got a couple of guys that

10  work for him.  That's what he's got.  He's got an outside

11  consultant that helps him get, manage his own money with

12  respect to these dealerships.  He's not a money man.  He

13  doesn't close deals.  He doesn't get titles.  He doesn't

14  control the money.  He doesn't do the paperwork.  He doesn't

15  do any of that.

16       When he got there and has been there since January,

17  he was onsite managing the place, and when he wasn't there, he

18  was at Syosset or Amityville trying to get his businesses back

19  up and running.  This was discussed with and fully known by

20  Urrutia, Your Honor, and any suggestion to the contrary is

21  just plain false.  He knew that.

22       Are we going to be told that Deo got into this

23  business with Urrutia and he didn't know Deo was in the

24  business?  That's just nonsense.  All of this is, Your Honor.

25       And I just want to go through my list, my checklist,

1  if I may --

2          THE COURT:  Certainly.

3          MR. THOMASSON:  -- regarding a few things that are

4  important.  That's the gist of it right there.

5          THE COURT:  So --

6          MR. THOMASSON:  Oh, the name change, Your Honor.

7  Oh, my God.  Did you hear, it was mentioned, It's been

8  planned.  I wrote down the quote.  It's been planned.  Really?

9  His partner wasn't told.  Why was it planned?  There was going

10 to be a planned name change?

11         The name change works this way, Your Honor.  There

12 are specific regulations.  That was in the Exhibit H that I

13 had trouble uploading the other night.  You'll see what I mean

14 by that but I eventually got it uploaded because I downloaded

15 a PDF from DMV's site that was protected and I didn't know it

16 was and the federal, the PACER system didn't let me upload it

17 with those protections on it.  But I had to print it out,

18 rescan it and then upload it myself.  But you have the DMV

19 automobile regulations.

20         You have to have a sign for the name of the business

21 that's being operated, that has to be a certain size, it has

22 to be above the doors.  It's right in the regulations.  That

23 sign at Superb is approximately one full story high, maybe a

24 little bit more.  It used to say "Superb Motors."  It now says

25 "Team Auto."  That is what is operating and that is only what

1    is operating.

2         As for the comment, we put in an application for a

3    DBA, no, you don't.  You put in a DBA certificate.  That's

4    what goes on in Nassau County.  That's the only thing that

5    goes on in Nassau County.  There isn't an application.  That

6    business is now Team Auto.

7         We need protection.  Not them.  We don't know what

8    they're doing.  They told us nothing.  We don't know what is

9    and isn't still titled in Superb's name.  DMV would never

10   allow this if they knew.  When we checked at the end of

11   August, has there been any name changes allowed with Superb,

12   their answer was we don't know anything about a name change

13   and, no, there's been no name change applications for Superb.

14        Not only are they doing this, according to two weeks

15   ago, DMV didn't even know about it and they're in violation of

16   regs.  It's a big reg in the business, Your Honor.  The fact

17   of the matter is customers of Superb must be able to see the

18   sign from the road.  That's the whole idea with this

19   regulation.  It's got to be big and bold so there's no

20   mistaking where you have to go if you're a Superb customer.

21   These people are absolutely dissipating the access of Superb.

22        They absolutely have coordinated this emergency with

23   the lenders.  The fact of the matter is, Judge, the lenders

24   came to the lot.  We've cooperated since the lockout fully.

25   NMAC has been there once.  Next Gear has been there twice.

1   I've sent NMAC a letter saying, Hey, wait a minute, give me

2   the contract.  Can I have a contract please?  Not a reply.

3   Not a word, not a sound, not an utterance about my request to

4   NMAC after I identified my client as co-owner of Superb.  They

5   wouldn't give it to me.  And now it's filed under seal?

6           And it turns out, it just so happens to have

7   language that I thought it might because I'm familiar with

8   this from my own exposure over the years somewhat in this

9   business where it says that they're allowed to have basically

10   off-site storage, the other lots that this Court mentioned,

11   the Court picked up on it, thank you, because it's allowed.

12   It's been allowed all year.  All year, it's been going on at

13   that lot.

14           Every defendant that I represent absolutely knows

15   about it.  There have been audits every month at that lot of

16   Superb cars all year.  What are we supposed to do?  They're

17   creating this because they are just simply muscling my client

18   out.  That's all.

19           Urrutia has made his choice.  He's decided that he

20   went to a dance with one girl, saw somebody prettier in his

21   mind, and is leaving with that girl.  He has been explaining

22   to my client the desperate positions he's in.  He's been

23   taking money left and right himself from Superb.  We don't

24   know the full extent of it because we don't control those

25   finances, Your Honor.  We all have to just take their word for

1   it.

2           We don't have affidavits from NMAC, we don't have

3   affidavits from Next Gear.  We don't have affidavits from Ally

4   which is another lienholder.  We have nothing that explains

5   what's going on here.  They don't want to get involved because

6   they've already been involved with their friends, these

7   plaintiffs involved them.  And then they hear from me saying,

8   What are you doing?  Can I have the contract please?  And they

9   go, Uh-Oh, you know what, we'll just do this nice and easy.

10  Now we want the cars to come back.  But they only heard from

11  me after the plaintiffs involved me, Your Honor.

12          If the plaintiffs said it's okay for the cars, or if

13  this Court says it's okay for those cars to remain where

14  they've been all year, then no problem.  The parties are in

15  agreement that they're not going to be wasted or disposed of.

16  So what's the problem here?

17          All they're trying to do is two things.  Number one,

18  they're trying to prevent Deo from the typical perc as an

19  owner of having demo cars that he can use.  Every dealership

20  in America does that, Your Honor.  Every one of them.  And

21  number two, they're also trying to, by listing cars that Deo

22  doesn't have, this isn't an accident, Your Honor.  They

23  already basically seem to admit of the 102 versus 89

24  difference is theirs, it's their mistake, but, oh, no, there's

25  no other mistakes or wrongdoing on our part, the 89 is

1   correct.

2          My client reviewed every one of them onsite himself,

3   went over every single one and gave you a list of what he does

4   and doesn't have.  He can't be ordered to give back something

5   he doesn't have.

6          The floor plan, another one here, Judge.  This is

7   big.  The double, they just told you about double

8   floor-planning.

9          I can't get, I can't get the floor plan contracts

10  from these floor plan providers.  I can't get the floor plan

11  contracts from these plaintiffs, but my client controls the

12  floor plans?  No, no, no, that doesn't work.  That's not

13  honest, Your Honor.  Absolutely not honest.  My client does

14  not control the floor plan and what you just heard and I just

15  heard was an admission that there's double floor-planning

16  going on with their floor plans.

17          Did you hear Mr. Kataev telling you that Mr. Urrutia

18  is 100 percent in charge of the floor plans and responsible

19  for them?  I did.  If there's double floor-planning going on,

20  and my client believes at least on one of them there is, he

21  has a Rolls-Royce.  This isn't an accident that they say that

22  Rolls-Royce is theirs.  Apparently, we just heard an admission

23  that they put it on their floor plan.  My client can't.  No

24  matter what they say, my client cannot, cannot do it.  Only

25  Urrutia-controlled people can do that, not Anthony Deo.

1          If Anthony Deo asks them to rob a bank, it doesn't

2   mean that they're going to go out and rob a bank and if they

3   do it, it's Deo's fault.  It's not.  He didn't do it and had

4   nothing to do with it.

5          I'll tell you, it is as underhanded as can be that

6   they bring up what happened in 2015 to Deo.  He was in the

7   real estate business, Your Honor, and got a slap on the wrist

8   for what ended up being cooperation with the feds and for his

9   own protection, he took the deal that they offered will make

10  it look like you're a big part of this to protect your life

11  going forward because we are not able or willing to provide

12  you protection for the rest of your life.  That's why the man

13  has two police officers around him.  And Urrutia was told and

14  Aronson was told, and now they use it against him.  They don't

15  have access to a sealed record.  They were told because Deo

16  trusted these men and now they're coming back and using this

17  as a sword and not as a shield.

18         I have got a massive lawsuit that I'm working on.  I

19  don't know where it's going to end up.  He's been cut off and

20  cut out by Next Gear, Ally, NMAC, Chase Bank and others

21  without ever being talked to by any of them.  That's going to

22  be the problem for these plaintiffs when the time comes,

23  Your Honor.  Why is it these corporations all cut off Deo

24  without talking with him?  That's a real problem to explain.

25  They certainly --

1          THE COURT:  So, Mr. Thomasson, what I want to do is
2     I want to be sure that we stay focused with the issues at hand
3     today.
4          MR. THOMASSON:  Okay, but it's important for you to
5     just know that fact.
6          We have our own claims to bring and we maintain that
7     what they're engaged in here is not only false, it's what they
8     know is coming that's coming against them.
9          Aronson lost his order to show cause in Nassau,
10    comes over here and is part of the team asking for it again,
11    when it turns out that Aronson approved certain tax documents
12    with Deo as owner but he conveniently never gave back any of
13    the Northshore documents, files or software.  So they put him
14    out of business.  Deo lands on his feet and trying to open
15    businesses, oops, now we have Aronson joining Urrutia saying,
16    oh, no, we can't let him do that, he can't do anything, he's a
17    criminal mastermind.
18          These people are the ones with the money,
19    Your Honor.  Not my client.  They gave my client the authority
20    to run these businesses and now they're saying they didn't
21    like the way it was run?  That's convenience, Your Honor.
22    That's convenience to try and allege wrongdoing that really is
23    illusory.  It's illusory here, Judge.  They haven't shown
24    anything.
25          I sure was waiting for them to say look at these

1   bank record, Your Honor, that we've obtained that show that

2   Deo was transferring money from Superb into his own bank

3   account.  No, they just say he stole money.  He didn't steal

4   any money.

5           THE COURT:  So let me --

6           MR. THOMASSON:  And every check they showed you was

7   approved.

8           THE COURT:  So, Mr. Kataev, I just want to, and I'm

9   sorry, I think I mutilated your last name.  Counsel, can you

10  please pronounce it for me again?

11          MR. KATAEV:  Yes, of course Your Honor.  "Kataev."

12          THE COURT:  Kataev, my apologies.

13          So, Mr. Kataev, I just want to give you an

14  opportunity to address a couple of questions regarding payment

15  of money, transfers, in general, and I just was -- is it your

16  assertion that Urrutia, that it is the plaintiffs' assertion

17  that Urrutia was not aware of Mr. Deo sending wire transfers

18  or writing checks?

19          MR. KATAEV:  That's correct.  As referenced in

20  declaration of Mr. Urrutia, there were backups with accounting

21  and whenever issues came up, Mr. Deo had an explanation for it

22  and the financial, monthly financial reports we received

23  showed that the business was profitable and that's all he

24  really cared about, to make sure that he received what he was

25  entitled to under the agreement, that Deo was paying himself

1  under the agreement, and that all the, that the dealership was

2  profitable.  So he took that at face value.

3         We learned about all of these things after we

4  learned about the missing vehicles.  Once we learned about the

5  missing vehicles, we started digging deeper into the

6  accounting system and learning about everything that was going

7  on.

8         Mr. Thomasson says that Deo had no financial

9  authority.  That's true, he did not have any financial

10 authority, but he doesn't explain why in docket entry 11-9,

11 there's an application to open a separate account with

12 Flushing Bank.

13        We have an account with Chase and we provided the

14 signature cards for that in that same declaration.  He put in

15 here that he's the 100 percent owner when he's not and he

16 doesn't explain that.  That was a fraudulent instrument, a

17 forged instrument.  And if you look at 11-16, those checks are

18 checks that he signed without our knowledge or authority.  He

19 signed those checks out of the Chase account.  If you look at

20 the signature card for the Chase account, he's not an

21 authorized signer.  Chase Bank should have saw that and

22 prevented the check from going forward.  Chase Bank messed up

23 in that regard, but he committed fraud by doing this.  He was

24 not supposed to sign any of those checks.

25        And all of these things happened after Alicia was

1    terminated and as we showed you in the reply exhibit, it was

2    Mr. Deo that wanted Alicia terminated.  He text messaged

3    Urrutia about it and he e-mailed him about it saying we want a

4    forensic team to review what you're doing.  That precipitated

5    her termination, that's what he wanted, and he wanted her out

6    so there would be no one to oversee what was going on.

7              Dealership are complex operations and,

8    unfortunately, in my experience representing them, they could

9    be breeding grounds for fraud.  Mr. Deo is an operator.  He

10   knows what he's doing and he did all of these things on

11   purpose, to take the money out of the dealership.  That's what

12   happened here.

13             All of the incoherent psychobabble you've heard does

14   not address the immediate question.  We're entitled to the

15   cars back, we should get injunctive relief in that regard, and

16   we're entitled that they be enjoined from using our customized

17   setup and get our CRM back.  CRM is Customer Relation

18   Management.

19             THE COURT:  With regard to --

20             MR. THOMASSON:  Can I respond?

21             THE COURT:  Mr. Thomasson, I'm going to allow you a

22   brief moment to respond.

23             MR. THOMASSON:  I just want to say that there is no

24   proprietary information, Your Honor.

25             First of all, my client denies taking anything.

1  That's number one, first and foremost.  I don't think they've

2  shown or demonstrated to you anything about what they claim he

3  takes.  They think or worry or wonder if he's taken something

4  but they have no proof that he has and they have no proof that

5  he's using anything at the moment.

6       His dealerships are still shuttered from what these

7  plaintiffs have done to him.  That's since November.  He's had

8  two-car leases -- excuse me -- two lot leases that he's had

9  for years and hasn't sold a car off of those lots since

10 November.  And he has absolutely no proprietary information

11 whatsoever.  Nothing.

12      They say themselves that the software can be bought.

13 They tell you it's been customized?  What does that mean?  We

14 don't know what that means, even if we had it.  Apparently, he

15 can buy it and we don't know what customized software is.

16      THE COURT:  No, let me stop you right there.

17      And I'll just say, Mr. Kataev, that the software

18 itself, I mean, is not unique to your client's business,

19 right?  I mean anyone could purchase the software, is that

20 correct?

21      MR. KATAEV:  That's correct, Your Honor.  Anyone can

22 purchase the software but it's customized.  The customization

23 is what the issue is.

24      THE COURT:  I mean the customization to -- what

25 you're referring to when you say customization is inputting

1   certain clients' names and customer addresses, for example;

2   that's what you mean by customization?

3            MR. KATAEV:  No.

4            THE COURT:  What do you mean exactly?

5            MR. KATAEV:  So I'll explain.  What you're referring

6   to is the CRM system which is different.  Tekion is a dealer

7   management system.

8            Months were spent with the Tekion team.  Mr. Urrutia

9   and others worked at Superb to create a customized setup that

10  allows you to streamline dealership operations.  Think of like

11  a flow chart that talks about the first step of every

12  dealership operation and what's involved.  There are monthly

13  accounting requirements, all sorts of different things, and

14  Mr. Urrutia's unique knowledge of this industry allowed him to

15  customize the setup of Tekion in such a way to make the

16  dealership more profitable.  That's his know-how, that's his

17  unique knowledge that Deo does not have.

18           THE COURT:  I think I do understand what you're

19  saying but let me ask you this and I'll just posit this to

20  you.

21           I mean, Mr. Urrutia, in his operation and his

22  relationship with Mr. Deo, shared his experience in this

23  business and so while some of it may be reflected in the

24  process flow, as you will, as you said, or the flow chart of

25  this system, the way, customization is what you're calling it,

1   but the thought behind it, the thinking behind it or the

2   experience that lends itself to having things flow a

3   particular way, that is something that Mr. Deo now has

4   internalized in his, that is through his experience of working

5   with your client, right?

6          So I'm trying to figure out how you separate his

7   experience that he's now gained and now say that anything in

8   the way he may set up a system is something that's now a

9   secret of sort or a trade secret or something else that is

10  protected federally in some way that he couldn't have a flow

11  process and utilize it and that it's so unique, if you will,

12  and I'm saying that in the, to meet the elements of a trade

13  secret such that Mr. Deo wouldn't be able to draw on it.

14         MR. KATAEV:  I get the Court's concern.  The answer

15  is simple.  Return to us the files that were stolen and go to

16  Tekion and tell them how you want your dealership management

17  system set up yourself.

18         What's in his head is in his head, no question about

19  that, but he took the setup that we have.  That setup must be

20  returned, deleted, destroyed and he cannot use it.  If it's in

21  his head and he can tell them that this is how I want it set

22  up, whatever setup he wants, that's fine.  That's up to him.

23         THE COURT:  And what's your basis, and can you point

24  me to your basis for establishing that he actually has

25  possession of something or stole, if you will, this,

1   something, this system or process from your client?

2          Can you just point me to what you provided to me

3   that's been submitted in the record thus far that would

4   establish that?

5          MR. KATAEV:  It's just the sworn declaration of

6   Mr. Urrutia where he described, upon having him removed, we

7   started investigating what was going on and we've determined

8   that that was something that was taken among other stuff.

9          THE COURT:  Sorry.  Maybe I'm confused when you say

10  "taken" because I think we walked through this.  These

11  programs, when you say "taken," it's still --

12         MR. KATAEV:  Downloaded.

13         THE COURT:  It still exists, these programs and this

14  technology, it still belongs and exists and is being utilized

15  by your clients, correct?

16         MR. KATAEV:  Yes.  What I mean to say is downloaded.

17         THE COURT:  I'm sorry.  Go ahead.

18         MR. KATAEV:  What I mean to say is it has been

19  downloaded and taken off premises and placed in another

20  computer that doesn't belong to Superb.

21         THE COURT:  And how is it that -- does the

22  declaration actually support how it is that your client

23  believes that it has been, that it is being operated from

24  another computer?

25         MR. KATAEV:  We don't have any chain of custody

1  declaration.  That's something that we would have to flesh out

2  in discovery, Your Honor.  We did ask for expedited discovery

3  on this point but we have fair reason to believe that that's

4  what happened.  That's why he opened up a separate dealership.

5           THE COURT:  So it's based upon your belief, you

6  believe that that's how he must have opened up this

7  dealership?

8           MR. KATAEV:  Based on our investigation, Your Honor.

9           THE COURT:  But you don't actually have an actual

10  factual proffer or basis at this time?

11          MR. KATAEV:  I don't have like forensic evidence

12  that I can share.  I did ask for that in the motion papers.

13          THE COURT:  And --

14          MR. KATAEV:  I just want to --

15          THE COURT:  I want to move to the issue of the

16  sealed document that is 18-2.  Is that something, and again, I

17  look at it from my end.  Is that something that has not been

18  shared with, and I understand -- not I understand.  From what

19  I can see, it obviously has not been made public but I did not

20  understand that it could not be viewed from, by the

21  defendants.

22          Is it that defendant's counsel and all the parties

23  cannot see and have not been able to see what it is that you

24  filed in 18-2 and that that is only seen by the court?

25          MR. KATAEV:  I did it for parties only so it should

1  be viewable by everyone.  I have no way of testing that other

2  than by going on with my log-in which would work.

3          THE COURT:  So if I hear that correctly then, then

4  there's no, you're not asserting that what is filed at 18-2,

5  that your motion is that it be kept from all of the parties;

6  your motion is that it be sealed from public disclosure, is

7  that what you're intending to move for?

8          MR. KATAEV:  That's correct, Your Honor, yes.

9          THE COURT:  Okay.  So I just wanted to be sure that

10  if you were asking for something else, that I specify that you

11  be sure to brief that other issue.  So I'm clear on that and

12  I'll look forward to your motion with regard to that

13  particular document.

14          Is there -- I believe that I've had the opportunity

15  to hear both sides on their papers and I think the relevant

16  arguments on Superb's application for relief.

17          Is there any other party that wants to be heard on

18  this at this time?

19          MR. KATAEV:  I apologize, Your Honor.  One final

20  point.  I want to point out docket entry 11-9, it's an

21  application to Flushing Bank by Deo.

22          Defendants have not explained why it is that they

23  opened up this separate bank account which my client had no

24  knowledge of until he learned about it after Mr. Deo was

25  removed.  They haven't explained that and so they can't say

1   with good conscience or good faith that they had no financial

2   control.  They weren't supposed to have financial control but

3   they took financial control and they did it without

4   authorization.

5        That's my final point.  Thank you for the

6   opportunity.

7        MR. THOMASSON:  Your Honor, can I also have a final

8   point?

9        THE COURT:  Mr. Thomasson, sure.  Your final point?

10        MR. THOMASSON:  Well, I missed that point that

11   counsel just made.  I will eventually in the near future find

12   out an answer for that, but I wanted to make clear to you if

13   they gave you a letter I sent NMAC, but neither NMAC nor they

14   have ever given me the floor plan contract.  Apparently, it

15   was uploaded last night under seal and I had trouble last

16   night looking at it, but other than that, I couldn't get it to

17   be prepared for today with that contract and the Court

18   actually was able to pick up on a key point that I was looking

19   for:  Whether or not there's a prohibition of having cars

20   elsewhere which there isn't.

21        So now everybody subjectively wants to say that

22   Anthony Deo was doing something bad.  No, he isn't, and nobody

23   failed to know about it.  Everybody knew, everybody knew.

24        Thank you.

25        THE COURT:  Would any of the other parties like to

1  be heard at this time?

2          MR. RUDERMAN:  Your Honor, this is Jeffrey Ruderman

3  representing the other plaintiffs in the matter.

4          THE COURT:  Yes.

5          MR. RUDERMAN:  If I may have just a moment.  I don't

6  want to get into the merits of the claims.  My client was

7  mentioned numerous times by Mr. Thomasson, certain allegations

8  or representations that he made, so I just want to address it

9  to that extent.

10          Mr. Thomasson seems to more than imply that somehow

11  that my client was working in coordination with the other

12  plaintiff Superb all along.

13          Just to give the Court a little short history, and

14  I'll keep it very short, my clients were never involved with

15  Superb or any of their dealerships at all.  When they were

16  having their issues with Mr. Deo back in November or earlier,

17  2022, they had nothing to do with Superb or were unaware that

18  Mr. Deo was getting involved with Superb.  And during the

19  period of time when our client did have a temporary

20  restraining order, Mr. Deo then opened up, using Northshore,

21  he filed and obtained a loan with Flushing Bank, with Flushing

22  Bank, and put a lien on Northshore in violation of TRO.  The

23  court did not, given its limiting TRO, we have not followed up

24  on that.

25          I, personally, my client did not know about all of

1   the claims that are being raised here until I believe it was

2   mid August of this year when Mr. Urrutia came to our client

3   and said Mr. Deo has been saying bad things for the past nine

4   months and, guess what, he did all these same things to me, I

5   realized you were the good buys, he was the bad guy, and then

6   that's when we became involved together as plaintiffs.

7        So until that time, we didn't know anything about

8   Superb other than there were cars that were, cars that were

9   being handled on the lots which Mr. Thomasson talks about

10  which were, Superb's name is on it.  That's the only thing we

11  knew.  We had nothing to do with it or we weren't involved in

12  it.  We don't have any secret organization he seemed to

13  indicate or some back-hand or back-door dealings.  We just

14  became involved because we realized that we were both being

15  taken by Mr. Deo.

16       And with regard to Mr. Thomasson saying that my

17  client was aware of his criminal background, I don't know how

18  he makes that statement.  I personally, as an attorney dealing

19  with my client, we hired a private investigator to investigate

20  Mr. Deo during our litigation somewhere in February or March

21  of this year.  He uncovered the criminal complaint, criminal

22  indictment of Mr. Deo.  So for him to say that my client knew

23  all about this, I can represent to the Court they did not

24  know, I did not know.  I have the e-mails from our

25  investigator who showed us look what I found in five minutes

1    about Mr. Deo's background.

2            So I think there's many suspicions about the things

3    that are being alleged by Mr. Thomasson without any support.

4    I argued with him in the Supreme Court of New York.  He's

5    correct the court did not grant my TRO nor did they grant his

6    motion to dismiss our claim.  He claimed he had ownership of

7    all the dealerships.  So when he keeps pushing back that our

8    preliminary injunction was not granted, nor did they grant his

9    motion to dismiss, and based upon many of the same types of

10   boisterous allegations raised by Mr. Thomasson without factual

11   documentary support, he said it very forcefully, Your Honor,

12   but I learned to listen to him and I hear him and when I take

13   it part by part, I realize that none of it, none of it really

14   makes any sense.  None of it is supported by documents and if

15   you look at the documents on the other side, they're quite the

16   contrary.

17           So I ask the Court to look at the documents and take

18   it all into consideration.  My client is not part of this

19   application, not at all.  This is only Superb and their

20   claims.  We shouldn't be brought into this part of it.

21           THE COURT:  Okay.  And let me just -- and I

22   appreciate that.  I want to be very focused on the issues of

23   the injunctive relief that's being, that's before the court at

24   this particular time.

25           Are any other counsel on the line that have any

1    interest with regard to that, this particular issue, that is

2    the motion that is pending that would like to be heard?

3            Okay.

4            MS. RONNEBURGER:  Your Honor, this is Ariel

5    Ronneburger from Cullen and Dykman.  We represent Flushing

6    Bank.  The only point I wanted to make was the counsel who

7    just spoke said Flushing Bank violated the TRO.  The TRO --

8            MR. RUDERMAN:  No.  No.  No.  I apologize.  I don't

9    mean to interrupt.

10           I'm not alleging that Flushing Bank violated the

11   TRO.  I'm saying Mr. Deo violated the TRO by taking out a loan

12   with Flushing Bank.

13           MS. RONNEBURGER:  Thank you.  That was unclear.

14           That was it.

15           THE COURT:  Okay.  So at this juncture, now that all

16   counsel have had an opportunity to address the pending motion

17   and I've been able to hear both sides on their papers and the

18   relevant arguments, I'm going to take this under advisement,

19   in particular, specifically the application for a preliminary

20   injunction.

21           And by this, at this point, the Court has, I

22   believe, what it needs from the parties, but I am going to

23   reserve decision on whether to have a further evidentiary

24   hearing and if a hearing is necessary, I will issue an order

25   with further requirements and the parties will be made aware

1    of that via the docket.

2            I have directed that the parties will communicate

3    and reach out to Magistrate Judge Wicks' chambers.  They are

4    standing by right now to hear from the parties.  As soon as

5    you hang up from me, I expect that you will give a call to

6    that number, to Doreen, the courtroom deputy for Magistrate

7    Judge Wicks, and he will hear you and have a call today with

8    you and set up any subsequent calls that might be necessary to

9    see if there might be, if there may be an agreement that the

10   parties might be able to reach with regard to the immediacy of

11   any particular stipulated agreement with regard to cars.

12           I will say that I will expect that if there is an

13   update by tomorrow with regard to any stipulation, I'll ask

14   that the parties please report so to the court and so if I can

15   have an update in that regard by the close of business

16   tomorrow, that's what I'll ask for.

17           The other thing that I'm expecting is a motion with

18   regard to sealing and I think that is, that is all that we

19   have by way of orders related to the proceeding here today.

20           Is there anything else that I need to hear counsel

21   on at this time?

22           MR. KATAEV:  For the moving plaintiffs, Your Honor,

23   Emanuel Kataev speaking.

24           I know that we presented a lot of evidence and

25   exhibits.  I just want to highlight one of them that's very

1    important.

2           At 11-9, the Flushing Bank statements are included

3    at page 19, and thereabout towards the end, it shows the money

4    deposited from Superb's customers and it shows transfers out

5    to Deo's accounts elsewhere.  This was not a regular business

6    operating account.  This was set up for the sole purpose of

7    siphoning money out.

8           And separately, the discussion about --

9           THE COURT:  Let me just -- and I'm sorry, I just

10    want to be clear.  I've heard argument and I already have, I'm

11    looking right here at my notes.  You just said 11-9 before or

12    somebody did within the last few minutes.

13           I'm not asking for a resummary of your arguments.

14    I'm asking is there any other matter, any other item that

15    needs to be discussed at this time?

16           MR. KATAEV:  Understood, Your Honor.  I apologize.

17           The moving plaintiffs have nothing further.  We

18    thank you for your time today.

19           THE COURT:  Anything from defense counsel, that is,

20    any other item that needs to be addressed by the court at this

21    time?

22           MR. THOMASSON:  Not at this time, Your Honor.  This

23    is Harry Thomasson.  Thank you.

24           THE COURT:  Thank you.

25           And other counsel, are there any other items that

1   they need to be heard on at this time?

2          Okay.  Hearing none --

3          MR. RUDERMAN:  Jeffrey Ruderman, Your Honor.

4   Nothing else.

5          MR. SEIDEN:  No, Your Honor.

6          MS. RONNEBURGER:  No.

7          THE COURT:  Thank you, everyone, for your time.

8          Again, if the parties could please right now reach

9   out to Magistrate Judge Wicks' chambers and I look forward to

10  hearing, hearing and receiving the papers that we've just

11  indicated in the upcoming days.  Thank you very much.

12         MR. KATAEV:  Thank you, Your Honor.

13         MR. THOMASSON:  Thank you, Your Honor.

14         THE COURT:  We stand adjourned.

15         (Matter concluded.)

16

17

18

19

20               *     *     *     *     *

21

22  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

23

24      /s/ Charleane M. Heading              September 18, 2023
    _____      _____
25      CHARLEANE M. HEADING                         DATE