UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, *individually and derivatively as a member of* NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, *individually and derivatively as a member of* 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

Defendants.

-------------------------------------------------------------------X

Case No.: 2:23-cv-6188 (OEM) (JMW)

**PLAINTIFFS' ~~FIRST~~ SECOND AMENDED COMPLAINT**

*Amended as of right pursuant to Fed. R. Civ. P. 15(a)(~~1)(B~~2)*

Plaintiffs Superb Motors Inc., Team Auto Sales LLC, Robert Anthony Urrutia (the "Superb

Plaintiffs"), 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier,

*individually and derivatively as a member of* Northshore Motor Leasing, LLC, Joshua Aaronson, *individually and derivatively as a member of* 189 Sunrise Hwy Auto, LLC, Jory Baron, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively "IAG Plaintiffs") (Superb Plaintiffs and IAG Plaintiffs collectively hereinafter the "Plaintiffs"), by their respective attorneys Milman Labuda Law Group PLLC and Cyruli Shanks & Zizmor LLP, as and for their ~~First~~ Second Amended Complaint against Defendants Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp., (collectively the "Deo Defendants") DLA Capital Partners Inc. ("DLA Capital"), Jones, Little & Co., CPA'S LLP, Thomas Jones, CPA, (collectively the "CPA Defendants"), Flushing Bank, Libertas Funding LLC, and J.P. Morgan Chase Bank, N.A. (collectively the "Bank Defendants") (the Deo Defendants, DLA, CPA Defendants, and the Bank Defendants collectively hereinafter the "Defendants"), hereby allege as follows:

## NATURE OF THE CASE

1.      The Deo Defendants, with the participation of other Defendants, have engaged in outrageous schemes to gain access to the Plaintiffs' businesses by the Deo Defendants holding themselves out as qualified to run automobile dealerships, then usurping operational control of two separate groups of dealerships to pillage and plunder them, while misrepresenting having ownership of Plaintiffs' businesses, leaving Plaintiffs holding the bag while the Deo Defendants start a separate group of dealerships propped up by stolen assets and funds of Plaintiffs.

2.      Defendants' brazen and criminal scheme, carried out by engaging in wire fraud and the use of forged instruments, must be stopped immediately.

3.      Absent relief, Plaintiffs' businesses are at risk of being forced to shut down.

4.      This is an action for damages and injunctive relief related to Defendants' unlawful conspiracy and scheme to engage in wire fraud by, among other things, signing checks they had no authority to sign, opening bank accounts by providing false and misleading information to financial institutions and depositing into those accounts, in the name of Superb Plaintiffs but controlled by Defendants, checks made payable to the Superb Plaintiffs, then to be diverted to Defendants' own use, improper poaching of Superb Plaintiffs' employees, and misappropriating Superb Plaintiffs' confidential information and trade secrets resulting in Defendants' (i) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"); (ii) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (iii) misappropriation of trade secrets; (iv) unfair competition; (v) tortious interference with contractual relations, business relations, and prospective economic advantage; (vi) unjust enrichment; (vii) conversion; (viii) fraud; (ix) breach of fiduciary duty; and (x) civil conspiracy.

5.      Defendants' diabolical scheme to infiltrate and leech off of Plaintiffs' businesses, causing Plaintiffs inconceivable harm, must be stopped.

6.      Specifically, Defendants must be prevented from operating businesses that were formed solely through Defendants' fraudulent schemes and utilizing Superb Plaintiffs' confidential information and trade secrets stolen by the Defendants who have utilized Superb Plaintiffs' employees to compete against Superb Plaintiffs while said employees were being paid by Superb Plaintiffs, all of which is being done to decimate Superb Plaintiffs' businesses.

7.      In addition to being enjoined from their conduct which has threatened the imminent closure of Plaintiffs' businesses, Defendants must pay for damages for the harm they have caused to Plaintiffs' businesses.

**PARTIES**

i.      IAG Plaintiffs

8.      At all times hereinafter mentioned, Northshore Motor Leasing, LLC ("Northshore") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 180 Michael Drive, Syosset, New York 11791.

9.      At all times hereinafter mentioned, 189 Sunrise Hwy Auto, LLC ("Sunrise") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 189 Sunrise Highway, Amityville, New York 11701.

10.     At all times hereinafter mentioned, plaintiff Brian Chabrier ("Chabrier") is an individual residing in the State of New York within the County of Nassau.

11.     At all times hereinafter mentioned, plaintiff Joshua Aaronson ("Aaronson") is an individual residing in the State of New York within the County of Nassau.

12.     At all times hereinafter mentioned, plaintiff Jory Baron ("J. Baron") is an individual residing in the State of New York within the County of Nassau.

13.     At all times hereinafter mentioned, plaintiff 1581 Hylan Blvd Auto LLC ("1581"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

14.     At all times hereinafter mentioned, plaintiff 1580 Hylan Blvd Auto LLC ("1580"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

15.     At all times hereinafter mentioned, plaintiff 1591 Hylan Blvd Auto LLC ("1591"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

16.     At all times hereinafter mentioned, plaintiff 1632 Hylan Blvd Auto LLC ("1632"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

17.     At all times hereinafter mentioned, plaintiff 1239 Hylan Blvd Auto LLC ("1239"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

18.     At all times hereinafter mentioned, plaintiff 2519 Hylan Blvd Auto LLC ("2519"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

19.    At all times hereinafter mentioned, plaintiff 76 Fisk Street Realty, LLC ("76"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

20.    At all times hereinafter mentioned, plaintiff 446 Route 23 Auto LLC ("446"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

21.    At all times hereinafter mentioned, plaintiff Island Auto Management, LLC ("IAM"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New York 10305.

22.    1581, 1580, 1591, 1632, 1239, 2519, 76, 446 and IAM are collectively referred to herein as "Island Auto Group" or "IAG."

ii.    <u>Superb Plaintiffs</u>

23.    Robert Anthony Urrutia ("Urrutia") resides in the State of New Jersey; he is the President of Superb Motors Inc. ("Superb") and member of Team Auto Sales LLC ("Team Auto").

24.    At all times relevant, Superb is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

25.    At all times relevant, Team Auto is and was a limited liability company duly organized under the laws of the State of New Jersey with its principal place of business in Monmouth County, New Jersey.

6

      iii.    <u>Deo Defendants</u>

26.     Upon information and belief, Anthony Deo ("Deo") and Sarah Deo ("S. Deo") are individuals who reside in the State of New York within the County of Nassau and who are married to each other.

27.     Upon information and belief, Harry Thomasson ("Thomasson") is an attorney-at-law who resides in the State of New York within the County of Nassau.

28.     Upon information and belief, Dwight Blankenship ("Blankenship") is a retired police officer who works for Deo and S. Deo and who resides in the State of New York within the County of Nassau.

29.     Upon information and belief, Marc Merckling ("Merckling") is an active police officer who works for Deo and S. Deo and who resides in the State of New York within the County of Nassau.

30.     Upon information and belief, Michael Laurie ("Laurie") is a principal of DLA Capital who resides in the State of New York within the County of Nassau.

31.     At all times relevant, Car Buyers NYC Inc. is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

32.     At all times relevant, Gold Coast Cars of Syosset LLC ("GCC Syosset") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

33.     At all times relevant, Gold Coast Cars of Sunrise LLC ("GCC Sunrise") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

34.     At all times relevant, Gold Coast Motors Automotive Group LLC ("GCM Auto") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

35.     At all times relevant, Gold Coast Cars of LIC LLC ("GCC LIC") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

36.     At all times relevant, Gold Coast Cars of Roslyn LLC ("GCC Roslyn") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

37.     At all times relevant, Gold Coast Cars of Smithtown LLC ("GCC Smithtown") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

38.     At all times relevant, UEA Premier Motors Corp. ("UEA Motors") is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

iv.     <u>CPA Defendants</u>

39.     Upon information and belief, Thomas Jones, CPA ("Jones") is a principal of Jones, Little & Co., CPA's LLP ("Jones CPA LLP") who resides in the State of New York within the County of Nassau.

40.     At all times relevant, Jones CPA LLP is and was a limited liability partnership formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

     v.     <u>DLA Capital</u>

41.    At all times relevant, DLA Capital is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

     vi.     <u>Bank Defendants</u>

42.    At all times relevant, Libertas Funding LLC ("Libertas") is and was a foreign limited liability company duly organized under the laws of the State of Connecticut and authorized to conduct business in the State of New York with offices located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830.

43.    At all times relevant, Flushing Bank was and is a commercial bank organized and existing under and by virtue of the laws of the  State of New York.

44.    At all times relevant, JP Morgan Chase Bank, N.A., was and is a national association organized and existing under and by virtue of the laws of the United States of America

## JURISDICTION AND VENUE

45.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, given that Plaintiff pursues claims under RICO and DTSA, both of which are federal laws.

46.    Further, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

47.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and each of the Defendants resides in this district.

## FACTS

### i.    Deo is Not a Member of Northshore

48.     At all times hereinafter mentioned, Chabrier was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

49.     Upon information and belief, at all times hereinafter mentioned, David Baron was an owner and holder of a one-third (1/3) membership interest in Northshore.

50.     Upon information and belief, David Baron died in 2021, and his estate ("Estate") is now the owner and holder of his one-third (1/3) membership interest in Northshore.

51.     Upon information and belief, at all times hereinafter mentioned, Asad Khan was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

52.     At all times hereinafter mentioned, Deo was never an owner of any membership interest in Northshore.

53.     The operating agreement for Northshore (the "Northshore Operating Agreement") provides that Northshore shall be managed by its members.

54.     Article V (A) of the Northshore Operating Agreement provides that decisions must be approved by a majority in interest of the members.

55.     Article IX (A) of the Northshore Operating Agreement prohibits transfers or assignments of membership interests without the unanimous consent of all members.

56.     Under Article IX (A) of the Northshore Operating Agreement, if the Members do not unanimously approve of the transfer, "the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member."

### ii.     Deo is Not a Member of Sunrise

57.     Upon information and belief, at all times hereinafter mentioned, Aaronson was and still is an owner and holder of a twenty-five (25%) percent membership interest in Sunrise.

58.     At all times hereinafter mentioned, David Baron was an owner and holder of a twenty (25%) percent membership interest in Sunrise.

59.     David Baron died in 2021 and his estate is now the owner and holder of his twenty (25%) percent membership interest in Sunrise.

60.     At all times hereinafter mentioned, J. Baron was and still is an owner and holder of a twenty (25%) percent membership interest in Sunrise.

61.     At all times hereinafter mentioned, Raymond Phelan was and still is an owner and holder of a twenty (25%) percent membership interest in Sunrise.

62.     At all times hereinafter mentioned, Deo was never an owner of any membership interest in Sunrise.

63.     The operating agreement for Sunrise (the "Sunrise Operating Agreement") provides that Sunrise shall be managed by its members.

64.     Article V (A) of the Sunrise Operating Agreement provides that decisions must be approved by a majority in interest of the members.

65.     Article IX (A) of the Sunrise Operating Agreement prohibits transfers or assignments of membership interests without the unanimous consent of all members.

66.     Under Article IX (A) of the Sunrise Operating Agreement, if the Members do not unanimously approve of the transfer, "the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member."

### iii. Defendants 'Unlawful Schemes at Island Auto Group

67.    Northshore operates a retail used car dealership from its lot located at 180 Michael Drive, Syosset, New York 11791.

68.    Sunrise operates a retail used car dealership from its lot located at 189 Sunrise Highway, Amityville, New York 11701.

69.    The operation of a used car dealership in the State of New York requires a license (the "License") issued by the New York State Department of Motor Vehicles ("DMV").

70.    The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance.

71.    Chabrier holds the License as applicant for Northshore.

72.    Aaronson and J. Baron hold the License as applicants for Sunrise.

73.    At all times hereinafter mentioned until December 2022, Deo was employed by Northshore as its general manager.

74.    At all times hereinafter mentioned until December 2022, Deo was employed by Sunrise as its general manager.

75.    As an employee and general manager of both Northshore and Sunrise, Deo was obligated to act in the best interests of Northshore and Sunrise and their respective members.

76.    Deo, however, took numerous actions for his own benefit, causing damage to Northshore and Sunrise and the other IAG Plaintiffs and jeopardizing the Licenses.

### iv. Deo Sells Vehicles for Less Than Their Purchase Price, Causing a Deficiency Toward Repayment of the Floor Plan at IAG

77.    Northshore and Sunrise maintain a floor plan credit line with Ally Bank used to purchase inventory (the "Floor Plan").

78.    Ally Bank maintains a lien on all vehicles purchased using the Floor Plan.

79.     When the vehicles are sold, Ally Bank must be repaid the amount borrowed to purchase that vehicle in order to release the lien or security interest on the vehicle.

80.     The Floor Plan is guaranteed by IAG.

81.     IAG is a group of franchised new car dealerships in New York and New Jersey in which David Baron had certain direct or family ownership.

82.     Chabrier is affiliated with IAG.

83.     Aaronson is affiliated with IAG.

84.     J. Baron is affiliated with IAG.

85.     IAG agreed to guarantee the Floor Plan because of the interrelationship among Northshore, Sunrise, David Baron, Chabrier, Aaronson, and J. Baron.

86.     Deo, on behalf of Northshore and Sunrise, purchased many vehicles using the Floor Plan.

87.     Deo then sold those vehicles for less than their purchase price, causing Northshore and Sunrise to sustain significant damages.

88.     Selling vehicles for less than their purchase price created a deficiency toward repayment of the loan made by Ally Bank to purchase each such vehicle.

89.     As guarantor, IAG had to pay Ally Bank over $3,000,000.00 to satisfy Northshore's and Sunrise's Floor Plan deficiency.

90.     A recent inspection by IAG Plaintiffs as well as a recent audit by Ally Bank of the floor planned vehicles revealed that several vehicles could not be located.

91.     That audit also revealed that several vehicles were damaged.

**v.     Deo Fails to Cause Northshore and Sunrise to Pay Off Existing Loans on Vehicle Trade-Ins**

92.     Northshore and Sunrise accepted customer trade-ins of vehicles to be used toward their purchase ("Trade-ins").

93.     Trade-ins with existing loan or lease balances were required to be satisfied by Northshore.

94.     Deo failed to have Northshore and Sunrise pay off the existing loan or lease balances on numerous Trade-ins.

95.     The prior owners of these vehicles remained liable to make payments on the debt despite no longer having ownership or control of the vehicle.

96.     Deo's failure to cause Northshore and Sunrise to pay off the loans on the Trade-ins has potential criminal liability, civil liability, and loss of the DMV Licenses.

97.     Deo's failure to have Northshore and Sunrise pay off the loans may also affect the ability of the licensees, Chabrier, Aaronson and J. Baron, to obtain a DMV License for any other dealership facility.

98.     In order to avert the consequences of Deo's failure to pay off the loans on Trade-ins, IAG satisfied $191,400.54 of the outstanding obligations and will be paying another $130,226.38.

**vi.    Deo Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Potential Liability to IAG**

99.     Northshore and Sunrise arranged financing for their customers through contracted lenders.

100.    Northshore and Sunrise have written agreements with these lenders that require Northshore and Sunrise to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer.

101.    These agreements also require Northshore and Sunrise to repurchase any loan made by the lender to a consumer if Northshore and Sunrise do not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title.

102.    Deo failed to have Northshore and Sunrise perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Northshore and Sunrise.

103.    As a result of Deo's actions, in clear violation of lender agreements, those lenders demanded repurchase of those loans.

104.    In order to protect the investment of David Baron, Chabrier, Aaronson and J. Baron in Northshore and Sunrise and their goodwill with these lenders, with whom they have other agreements through IAG, IAG has or will have to pay over $850,000.00 if Deo does not do so.

**vii.    Deo Failed to Pay Warranty Companies and Vendors, and Failed to Account for Dealer and Other License Plates**

105.    Northshore and Sunrise sell, on behalf of third party warranty providers, extended warranties to consumers.

106.    Under Deo's direction, Northshore and Sunrise have issued warranties to consumers and collected the fees but have failed to pay over $100,000.00 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid.

107.    Deo has caused Northshore and Sunrise to fail to pay more than $58,000.00 owed to vendors.

108.    In addition, Deo has not completed the documentation necessary to complete registrations for out of state customers and cannot account for numerous missing titles on vehicles.

109.    The DMV License authorizes Northshore and Sunrise to have "dealer" license plates and to issue New York State license plates on purchased vehicles.

110.    These license plates are carefully accounted for, and the License holder is responsible for their protection and proper issuance.

111.    Despite due demand, Deo has refused to account for the dealer license plates and a number of unissued New York State license plates that would ultimately be used for customers.

112.    Upon information and belief, Deo's family and friends continue to use the dealer plates.

### viii.    Deo Wastes Company Assets and Further Obligates IAG Plaintiffs

113.    Deo delivered certain unsold vehicles owned by Northshore and liened by Ally to repair facilities to be repaired.

114.    Despite due demand, however, Deo has failed to disclose the identity or location of the various repair facilities housing these vehicles.

115.    Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges.

116.    Deo has failed to arrange for payment to these facilities or alert IAG Plaintiffs of any garagemen's lien, resulting in the sale of these vehicles at auction to satisfy the garagemen's lien.

117.    Northshore and IAG Plaintiffs remain liable to Ally to satisfy the loans on these vehicles.

### ix.    Deo Takes and Uses Dealership Assets for His Own Purposes

118.    Deo has been treating Northshore, Sunrise, and their respective assets as his own.

16

119.    Deo has personally taken over $230,000.00 in customers 'cash deposits, rather than deposit the money in Northshore's account.

120.    Despite Deo having no signatory authority on Northshore's bank accounts, he has been issuing and signing checks from its accounts to pay for his personal expenses, among other things.

121.    For example, Deo issued a $60,000.00 check from Northshore to Car Buyers NYC, Inc., a corporation formed and owned by Deo.

122.    Deo also used an American Express card issued in the name of Sunrise, which he obtained without authority or approval, to pay for personal expenses.

123.    In addition, Deo failed to terminate $303,043.12 of lender financing for consumers who canceled their purchases.

124.    Upon information and belief, Deo personally took those loan proceeds.

125.    Finally, Deo's son continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG's consent.

**x.    Deo Falsified Financial Statements at Northshore and Sunrise with the Assistance of Jones**

126.    In order for Deo to perpetuate his financial wrongdoings he needed the IAG Plaintiffs and their Floor Plan lender, Ally Bank, to continue to provide the Floor Plan to Northshore and Sunrise.

127.    In order for IAG Plaintiffs and Ally Bank to continue to provide the Floor Plan to Northshore and Sunrise, Northshore and Sunrise were required to provide IAG Plaintiffs and Ally Bank monthly financial reports.

128.    These monthly financial reports were provided to IAG Plaintiffs and Ally Bank by Deo.

129.    Had Deo provided IAG Plaintiffs and Ally Bank the accurate monthly financial reports, IAG Plaintiffs and Ally Bank would have discontinued providing the Floor Plan to Northshore and Sunrise because the accurate monthly financial reports would not have satisfied Ally Bank's financial requirements.

130.    During Deo's tenure overseeing and managing Northshore and Sunrise, he falsely manipulated Northshore's and Sunrise's monthly financial reports submitted to IAG Plaintiffs and Ally Bank.

131.    Deo engaged the services of Jones and Jones CPA LLP on behalf Northshore and Sunrise to work on their financial reporting.

132.    Each month during Deo's tenure overseeing and managing Northshore and Sunrise, Jones was engaged and paid by Northshore and Sunrise to assist Deo in preparing the information to create the monthly financial reports.

133.    Deo and Jones manipulated Northshore's and Sunrise's monthly financial information.

134.    Deo and Jones falsified the monthly financial statements provided to the IAG Plaintiffs and Ally Bank.

135.    Deo and Jones falsified the monthly financial statements with an intent to defraud the the IAG Plaintiffs and Ally Bank.

136.    Deo and Jones falsified the monthly financial statements to induce the IAG Plaintiffs and Ally Bank to continue to provide the Floor Plan to Northshore and Sunrise.

137.    The IAG Plaintiffs and Ally Bank reasonably relied upon the falsified monthly financial statements to continue to provide the Floor Plan to Northshore and Sunrise.

138.    The IAG Plaintiffs and Ally Bank would not have continued to provide the Floor Plan to Northshore and Sunrise had they been aware that Deo was committing the wrongdoings alleged.

139.    The IAG Plaintiffs and Ally Bank would not have continued to provide the Floor Plan to Northshore and Sunrise had they been aware that the monthly financial statements were false.

140.    Due to the falsified monthly financial statements the IAG Plaintiffs and Ally Bank were unaware of the significant losses accruing at Northshore and Sunrise.

141.    When the IAG Plaintiffs and Ally Bank became aware of the significant losses accruing at Northshore and Sunrise, Ally Bank demanded that all financial deficiencies owed to Ally Bank be repaid, which the IAG Plaintiffs did, causing them significant damages.

### xi.    Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain EIDL Loans, The Proceeds of Which Deo Personally Converted

142.    Almost immediately after the death of David Baron, Deo, purportedly on behalf of Northshore, applied through the Small Business Association ("SBA") for a COVID-19 Economic Injury Disaster Loan ("EIDL") in the amount of $196,425.00.

143.    In connection with the EIDL application, Deo falsely claimed to be a fifty percent (50%) owner of Northshore.

144.    Deo submitted the false application without the knowledge or approval of Northshore's members.

145.    Similarly, Deo submitted to the SBA an EIDL application purportedly on behalf of Sunrise, falsely claiming he has been the sole owner of Sunrise since January 1, 2021.

146.    Deo submitted this false application without the knowledge or approval of Sunrise's members.

147.    Upon information belief, Deo personally took the proceeds from each of the EIDL loans.

**xii.    Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain The Libertas Funds and Converts the Libertas Funds**

148.    On or about November 15, 2022, Deo, purportedly on behalf of Northshore, entered into an agreement with Libertas ("Libertas Agreement") pursuant to which Northshore agreed to sell $997,500.00 of its future receipts (the "Future Receipts") to Libertas for the purchase price of $735,000 (the "Libertas Funds").

149.    Deo, purportedly on behalf of Northshore, entered the Libertas Agreement without the knowledge or consent of Northshore's members.

150.    In connection with the Libertas Agreement, Deo falsely misrepresented to Libertas that he was the sole owner of Northshore.

151.    Deo's purported sale of the Future Receipts was the first step in his scheme to wrongfully convert for himself the Libertas Funds.

152.    Deo, aware of his inability to withdraw the Libertas Funds from Northshore's bank account, arranged for the Libertas Funds to be deposited into Sunrise's bank account, from which he was able to withdraw funds.

153.    When IAG Plaintiffs confronted Deo concerning his actions, Deo falsely claimed that he was the sole owner of Northshore and Sunrise.

**xiii.    Despite His Obligation to Safeguard the Libertas Funds, Thomasson Aids and Abets Deo's Conversion by Disbursing the Libertas Funds to Deo**

154.    Upon learning of Deo's misconduct, IAG Plaintiffs took reasonable steps to ensure Deo would not abscond with the Libertas Funds.

155.     At all relevant times, Thomasson claimed to be the attorney for Northshore, Sunrise, and Deo.

156.     Upon information and belief, Thomasson was aware that the Libertas Funds were paid by Libertas to Northshore for the purported sale of the Future Receipts.

157.     Thomasson was aware that there was a dispute among IAG Plaintiffs, Deo, and Libertas concerning Deo's right to have acted on Northshore's behalf with respect to the sale of the Future Receipts.

158.      Thomasson was aware that there was a dispute concerning the rights to the Libertas Funds.

159.     IAG Plaintiffs arranged to place the Libertas Funds into Thomasson's attorney trust account for safekeeping pending resolution of the parties 'dispute, rather than turn over the Libertas Funds to Deo, who was not the rightful owner of the Libertas Funds.

160.     IAG Plaintiffs did so because Detective Marx at Second Precinct of the Nassau County Police Department ("NCPD") threatened to have Aaronson arrested if he did not turn over the funds.

161.     Upon information and belief, Blankenship and Merckling, at the behest of Deo, abused their authority as retired and active police officers to engage Detective Marx to make this threat.

162.     As a result of these threats, and to ensure the Libertas Funds would remain secure, IAG Plaintiffs requested that Thomasson maintain the Libertas Funds in his attorney trust account pending resolution of the parties 'dispute concerning the Libertas Funds.

163.     Despite Thomasson's knowledge of the dispute concerning the parties 'rights to the Libertas Funds, he did as he pleased and immediately disbursed the Libertas Funds to Deo.

164.    Indeed, Thomasson has declared in open Court, in sum and substance, that no one was going to tell him what to do with his escrow account.

165.    And so, despite Thomasson's knowledge that the Libertas Funds were the consideration paid by Libertas to Northshore for the purported sale of the Future Receipts, Thomasson disbursed the Libertas Funds to Deo.

166.    Libertas had interposed counterclaims against the IAG Plaintiffs in a state court action seeking to recover the value of the Future Receipts and/or the return of the Libertas Funds (the "Libertas Claims").  See Chabrier, *et al.* v. Deo, *et al.*, Index No.: 617224/2022 (Nassau County Supreme Court), NYSCEF Docket Entry 57, (the "State Action").

167.    The State Action has been discontinued without prejudice for the specific purpose of asserting in this action all claims and counterclaims raised in the State Action including the Libertas Claims.  See NYSCEF Docket Entry 116.

168.    Libertas specifically asserted the Libertas Claims against the IAG Plaintiffs and, upon information and belief, intends to pursue the Libertas Claims in this case.

**xiv.    Deo Further Encumbers and Diverts Northshore's Assets**

169.    Upon information and belief, Deo, falsely claiming to be the sole owner of Northshore, arranged to borrow funds from Flushing Bank and/or Flushing Financial Solutions (collectively "Flushing").

170.    Deo's representations to Flushing concerning his ownership of Northshore and Sunrise were false and supported by false financial records which were altered by Jones and Jones CPA LLP.

171.    Upon information and belief, Deo employed the assets of Northshore to secure the loan from Flushing and did so for the purpose of personally taking those Flushing loan proceeds.

172.    Deo arranged this loan without the knowledge or approval of Northshore's members.

xv.   **Defendants 'Unlawful Schemes at Superb**

173.   At all times relevant, since its inception in June 2021, Urrutia was the President and majority shareholder of Superb.

174.   In addition to Superb, Urrutia owns Volkswagen of Freehold, Team-Mitsubishi Hartford, and Team Nissan of Pittsfield Massachusetts.

a.   <u>**Deo meets with Urrutia and gains his confidence**</u>

175.   Urrutia first met Deo in November 2022, through a mutual friend in the automobile industry, at which time Deo held himself out to be qualified to run an automobile dealership and sought to enter into a partnership with Urrutia at Superb.

176.   Urrutia and Deo entered into a Cross-Purchase Agreement (the "Cross Purchase Agreement") dated as of December 1, 2022, in which Deo would pay Urrutia $500,000.00 and issue him a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for Deo obtaining a forty-nine percent (49%) interest in Superb.

177.   Prior to entering into and included in the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia[1] that, among other things, he

(i) is the sole owner of Northshore and Sunrise, respectively;

(ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively;

---

[1] Plaintiffs Superb and Urrutia do not pursue claims for breach of those representations and warranties in this case but provide this information as relevant to the facts and circumstances warranting relief here.  Plaintiffs Superb and Urrutia ~~shall~~ pursue their claims concerning the Cross-Purchase Agreement and related causes of action in the Supreme Court of the State of New York, Nassau County.  See Index No.: 618608/2023, NYSCEF Docket Entry 1.

(iii) has not made any representation or warranty that constitutes an untrue statement of a material fact or omits to state a material fact necessary to make it not misleading; and

(iv) has no pending or threatened suit, action, bankruptcy, or administrative proceeding, or other arbitration or proceeding, which could adversely affect the ability of Deo to perform any of his obligations, including Deo's obligation to convey the units of Northshore and Sunrise free and clear of all liens and encumbrances.

178.    Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit on the foregoing agreement.

179.    However, this check bounced the following day due to being returned for insufficient funds.

180.    Due to Thomasson's direct participation in the perpetuation of Deo's fraudulent scheme, unbeknownst to Urrutia, Thomasson enabled Deo to pay Urrutia funds fraudulently obtained from Libertas.

181.    Indeed, on November 21, 2022, $735,000.00 was wired into Thomasson's escrow account due to Blankenship's and Merckling's intervention with the NCPD in making Aaronson believe that he would be arrested if he did not turn over the $735,000.00 fraudulently obtained from Libertas.

182.    Deo then wired Urrutia $500,000.00 in two (2) separate wires of $300,000.00 on November 22, 2022, and $200,000.00 on November 29, 2022, both of which were issued from Car Buyers NYC Inc. despite the fact those funds obviously came from Thomasson's escrow account.

183.    Having paid for his shares of Superb with these stolen funds, on December 1, 2022, Deo executed the Cross-Purchase Agreement.

**b.      Deo has limited powers as a minority shareholder of Superb**

184.     A few weeks later, Urrutia and Deo executed a Shareholders' Agreement.

185.     The Shareholders' Agreement provides that effective December 22, 2022, Urrutia holds a fifty-one percent (51%) interest in Superb while Deo owns a forty-nine percent (49%) interest in Superb.

186.     The Shareholders' Agreement provides that Urrutia is the President, and that he, alone, and independent of any other shareholders, directors, and officers may exercise

(i)  the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires; and

(ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided, it being expressly agreed, that this power does not include the right to terminate a Shareholder.

187.     It similarly provides that all actions requiring shareholder consent require the written consent of least a majority of the voting shares; crucially, this includes the granting of any mortgage, lien, or other security interest in the assets of Superb or any loans or guarantees by Superb.

188.     The Shareholders' Agreement restricts the right to sell the stock of Superb only by a majority of the voting stock of Superb, *i.e.*, by the written consent of Urrutia, its majority shareholder.

189.     The Shareholders' Agreement provides that Urrutia has, among other responsibilities,

(i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors;

(ii) capitalization of the Corporation;

(iii) establishment of policies and standards for services provided by Superb, as well as supervision and complete authority over Superb's activities;

(iv) review and final approval of financing arrangements with lending institutions to be utilized by Superb in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles; and

(v) supervision and complete control of the accounting department of Superb, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by Superb.

190.    In contrast, Deo's only responsibilities under the Shareholders' Agreement were to propose an individual who will serve as the General Manager of the day-to-day operations of Superb, whom Urrutia had final authority to approve or reject.

191.    Notwithstanding the clear and unambiguous language in the foregoing agreements, Superb Plaintiffs later learned that Deo made a series of material false representations.

192.    First, despite his representation that he is the sole member of Northshore and Sunrise, it was discovered that, in fact, Deo is not the sole member of either; in fact, within five days of entering into the Cross-Purchase Agreement, Deo was sued in New York Supreme Court, Nassau County by the actual owners of Northshore and Sunrise!

193.    In that lawsuit, the *real* owners of Northshore and Sunrise alleged that Deo has engaged in financial improprieties and massive fraud that is strikingly similar to the conduct complained of with respect to Superb.  Those claims were dismissed without prejudice so that they can be asserted herein.

194.    Second, because Deo never held any membership interest in Northshore or any ownership interest in Sunrise, Deo misrepresented that he had full power and legal right to transfer and deliver shares of Northshore and Sunrise to Plaintiff.

195.    Third, Deo made a material misrepresentation when he informed Urrutia that there was no active or anticipated litigation against him. Northshore and Sunrise commenced an action against him in state court!

196.    As set forth below, on or after August 3, 2023, the Superb Plaintiffs uncovered numerous schemes perpetrated against them by Defendants.

     **c.**    **Deo Defendants' first scheme against Superb: impermissible double-flooring**

197.    Dealerships typically operate with the assistance of banks that provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership.

198.    When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle, and certain rules attach as a condition of the financing, *i.e.*, with limited exceptions, any such vehicle financed must be present and available for sale at the dealership.

199.    On July 31, 2023, Nissan Motor Acceptance Corporation ("NMAC") contacted Bruce Novicky ("Novicky"), the Chief Operating Officer ("COO") of Superb, to inform him that NMAC discovered that vehicles financed by it were financed, in breach of Superb's floor plan agreement with NMAC, with another bank.

200.    This practice is called "double flooring" in dealership lexicon and is prohibited.

201.    Because of this prohibited conduct, Urrutia was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC.

202.    Novicky confronted Deo about this, who provided inadequate explanations.

203.    Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones each substantially assisted Deo in carrying out this scheme by acting as his agents at his direction in, among other things, filling out applications for financing and making material misrepresentations in said applications, discussing together the plan to defraud Superb Plaintiffs and the floor plan financing companies, and profiting from the scheme together.

204.    Superb and Urrutia thus were damaged by the Defendants' conduct, including – but not limited to – by causing Superb's floor plan line of credit with NMAC to be terminated, resulting in a finding of irreparable harm by this Court.  See ECF Docket Entry 55 ("In light of the foregoing record and the possibility of losing Superb Motors as a going concern …, the Court concludes that Superb has demonstrated irreparable harm").

### d.    Defendants' second scheme against Superb: misappropriation & theft of vehicles

205.    When Novicky informed Urrutia about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, Urrutia delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises.

206.    The inventory resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger. Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb.

207.    As an example of Deo's clear lies, Deo explained that one particular vehicle was sold. However, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle.   Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale.

208.    Due to the foregoing, Urrutia exercised his right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations.  The findings included incontrovertible proof of Deo's duplicity and clear breaches of his fiduciary obligations.

**e.    Defendants' third scheme against Superb: use of forged instruments**

209.    Urrutia discovered that Deo misrepresented to Flushing Bank that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank.

210.    Deo's representation to Flushing Bank was blatantly false.

211.    Deo successfully opened a bank account for Superb  on or about April 4, 2023.

212.    A month prior, Urrutia began the process of opening an account with Flushing in March 2023.

213.    When Urrutia began that process, Flushing Bank requested of Urrutia information, documents, and records – many of which he provided – including his tax returns and other documents which indicate that he is the majority shareholder of Superb.

214.    Urrutia spoke directly with David Weinstein ("Weinstein") – the Vice President and Branch Manager of Flushing's Borough Park branch – and Mr. Weinstein knew that he was the majority shareholder of Superb.

215.    Around the same time, on March 31, 2023, Deo had contacted Robert Puccio ("Puccio") – the  Vice President of Flushing Bank's Business Banking Group located at 99 Park Avenue in Manhattan, who Deo represented was his "personal banker" – to open an account.

216.     Notably, Puccio's email referenced a request for information for "Signer 1" and "Signer 2."

217.     On the same day, Weinstein asked Urrutia whether Urrutia wanted to share his personal tax returns with Puccio, and Weinstein also asked Urrutia for the name of Urrutia's partner at Superb, thereby establishing both that Weinstein knew Deo was not the sole shareholder of Superb, and further establishing that Puccio knew given that Weinstein was in contact with Puccio about opening an account at Superb.

218.     The very same day, Deo informed Novicky that he has a personal banker ready to open an account for Superb with Flushing Bank and that Deo can obtain a $500,000.00 line of credit as well.

219.     Deo added: "Bro. This guy and the Credit underwriter are in my pocket.  Get me the info and 2021 taxes and I will bring it home."

220.     Deo's own communications establish that Flushing Bank and its agents were in on the Deo Defendants' schemes to loot and plunder Superb.

221.     Within days of these communications, Deo successfully opened a bank account with Flushing completely unbeknownst to Urrutia.

222.     Flushing Bank therefore knowingly participated in the Deo Defendants' fraudulent schemes by permitting him to open an account with Superb despite the fact he had no authority to do so.

223.     Deo's actions violated the Shareholders' Agreement because only Urrutia had check authorization and only Urrutia was to have control over bank accounts owned by Superb.

224.     Deo opened this account to divert Superb's funds to an account that he can control with assistance from Flushing Bank.

225.    Upon information and belief, Deo paid Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones out of funds placed in this account for their substantial assistance in carrying out his fraudulent schemes.

226.    The transactions for Superb's Flushing Bank account should have raised red flags for Flushing Bank given the nature of the transactions: (i) money comes in; (ii) money is then immediately transferred out; and (iii) no expenses or payroll are paid out of the sole checking account for a dealership.

227.    Flushing Bank therefore knew and had reason to know that the Deo Defendants were utilizing the bank account for Superb to launder their ill-gotten gains.

228.    Flushing Bank's agents benefitted from assisting the Deo Defendants because they were in Deo's "pocket."

f.    **Defendants' fourth scheme against Superb: misappropriation of funds**

229.    Urrutia learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing Bank account and then transmitting those funds into his own accounts and, upon information and belief, into those of Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones for their substantial assistance to Deo in carrying out his unlawful schemes.

230.    To Urrutia's knowledge, Deo misappropriated approximately $455,000.00 under this scheme.

g.    **Defendants 'fifth scheme against Superb: theft of cash payments by customers**

231.    Deo misappropriated cash payments from customers by receipting the cash in to Superb's DMS system but never depositing any of those cash payments into Superb's bank account and, instead, pocketing the money for himself.

232.     Upon information and belief, Defendants Merckling and Blankenship substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required.

233.     Upon information and belief, Defendants Merckling and Blankenship were paid out of these cash funds because they are officers with the NCPD and are not permitted to have any outside employment without advance approval from the NCPD.

234.     To Urrutia's knowledge, Deo misappropriated in excess of $400,000.00 under this scheme.

### h.     Defendants' sixth scheme against Superb: signing unauthorized checks

235.     Deo knew that only Urrutia had sole check authorization, including because he executed the Shareholders' Agreement stating so. Notwithstanding this, Deo signed multiple checks from Superb's bank accounts that were under the control of Urrutia, although Deo had no authority to sign any checks from any bank account maintained by Superb.

236.     During its top-down audit, Urrutia discovered that Deo routinely wrote and signed checks issued by Superb made payable to Northshore, other entities Deo owns, Thomasson, Laurie, and others; none of these checks was authorized and each was signed by Deo despite the fact he had no authority to do so.

237.     Deo's conduct constitutes wire fraud.

### i.     Defendants' seventh scheme against Superb: purchase of vehicles under its name

238.     Before Deo was removed from Superb, the Deo Defendants purchased five (5) vehicles from Manheim, an automobile auctioneer, under Superb's account.

239.     Upon information and belief, the Deo Defendants intended to sell these vehicles for 100% profit with no cost to Defendants and to leave Superb holding the proverbial bag.

**j.**     <u>Defendants 'eighth scheme against Superb: build their own group of dealerships</u>

240.     In trying to understand Deo's motive for engaging in these schemes, the top-down audit conducted by Urrutia soon made Deo's intentions very clear.

241.     For months, while he was repeatedly lying to and stealing from Superb Plaintiffs, Deo has been forming various corporate entities – GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – in order to begin his own group of dealerships to be operated under the master entity Gold Coast Motors Automotive Group.

242.     Prior to Deo's working relationship with Urrutia, Deo had no familiarity with Urrutia's dealership processes and know-how, which Urrutia imparted to him as a business partner for the mutual success of Superb.

243.     For example, Urrutia introduced Deo to Tekion, a unique DMS system that was specifically customized for Superb.

244.     Urrutia also taught Deo the process of successfully operating an automobile dealership using Tekion, such as processes to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement. *See also* ECF Docket Entry 38-2 at 38 (February 23, 2023 text messages).

245.     The information Urrutia imparted to Deo was unique, confidential, and proprietary.

246.     Specifically, the DMS system Urrutia implemented at Superb is unique because it was custom-designed for Superb and cost over $120,000.00 to set up.

247.     It contained the blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to operate dealerships profitably. During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships.

248.    In other words, Deo stole the exact customization used by Superb to use at his competing group of dealerships.

249.    In addition, in a blatant breach of his fiduciary duties to Superb and Urrutia, Deo had Superb employees work for his own group of dealerships *while they were employed by Superb and were being paid to perform work only for Superb!*

250.    Moreover, Deo illegally imparted the confidential know-how Urrutia imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information, to these employees for the purpose of setting up Deo's own group of dealerships.

251.    Urrutia initially partnered with Bobby Clarke ("Clarke"), who owns a radio station named Irie Jam, 93.5 FM, and with whom Urrutia advertised to over 2 million listeners in the Caribbean community both during and after his partnership with Clarke ended.  See ECF Docket Entry 38-4 and 38-5.

252.    That partnership included approximately $1.5M in advertising, which generated the substantial customer list Urrutia developed to foster business at Superb.

253.    Due to the unique nature of Urrutia's partnership with Clarke, the customer list cannot be reverse engineered or independently generated without a substantial investment in Irie Jam, which the Defendants did not make.

254.    To add insult to injury, Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest.

255.     Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones each substantially assisted Deo in carrying out his unlawful schemes.  S. Deo managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

256.     Blankenship and Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

257.     For example, when Urrutia called the NCPD to remove Deo, upon information and belief, Blankenship and Merckling used their positions as retired and active police officers to stymie an investigation and to protect Deo from being arrested for his blatantly criminal conduct.

258.     Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital. Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with Urrutia and Deo and knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts.

259.     Similarly, although Jones and his firm knew Superb was operating at a loss, they nonetheless altered journal entries in its accounting systems to create the appearance that it was operating profitably in order to deceive Urrutia and maintain his confidence in Deo.

260.     Jones and his firm were thus complicit in the fraudulent schemes perpetrated by Deo, and Jones and his firm aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes.

261.     Finally, Thomasson serves as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud.

262.    Thomasson has engaged in the aforesaid fraud together with the remaining Defendants.

263.    For example, although Thomasson purports to maintain an office at 380 Sunrise Highway, Wantagh, NY, this address is a UPS Store and not an office.

264.    Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants.

265.    Urrutia also learned and is continuing to learn of other schemes to plunder and destroy Superb.

266.    For example, on February 22, 2023, Deo applied for a license with the Department of Motor Vehicles ("DMV") for GCC Sunrise and *lied* to the DMV stating that he had never been convicted of a crime when, in fact, he had. Specifically, Deo  previously was convicted in 2016 for wire fraud in relation to a mortgage.

267.    Defendants engaged in wide-ranging schemes to defraud the Superb Plaintiffs through wire fraud and the use of forged instruments.

268.    Defendants S. Deo, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment.

269.    Defendants Laurie and Jones enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, *i.e.*, false tax returns, false bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb.  Defendants' conduct constitutes a violation of the DTSA, and related state law common claims for misappropriation of trade secrets and unfair competition, as well as, among other things, a breach of Deo's fiduciary duty to Urrutia.

270.     Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb.

271.     Defendants are currently benefitting from the confidential information Urrutia developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he came to own his first dealership, which Defendants stole from the Superb Plaintiffs.

272.     This information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information.

273.     Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including Urrutia's decades of experience in the automobile industry, the relationships Urrutia developed with contacts in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships.

274.     Urrutia went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today.

275.     Superb and Urrutia have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with Urrutia for decades.

276.     Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means.

277.    Defendants have done so by working with Deo to pillage and plunder Superb because Deo has paid and is paying other Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes.

278.    Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants, as set forth herein, misappropriated in contravention of their fiduciary duty to Plaintiff and in violation of the law, provided Plaintiff a unique competitive advantage in the automobile dealership industry, a competitive advantage it has been stripped of by Defendants' unlawful acts.

279.    Superb took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords.

280.    The confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

281.    This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business.

282.    Deo, S. Deo, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means.  This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the goodwill and value of Superb.

283.    The unauthorized acts of Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful.

284.    There was no other way to obtain this information and Deo, S. Deo, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of Superb and Urrutia to whom they owed fiduciary duties.

285.    For example, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system: They simply stole it from Superb and Urrutia.

286.    Similarly, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to search for customers: They simply diverted them from Superb to their own group of dealerships.

287.    Moreover, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to hire and pay employees: They simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb.

288.    Superb's trade secrets and confidential information that Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated through gaining the trust of Urrutia by and through Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that Urrutia has spent years, if not decades, establishing. Meanwhile, Deo, S. Deo, Thomasson, Blankenship, and Merckling through subterfuge gained access to information that they would have no other way of obtaining.

289.    Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated confidential and trade secret information by improper means; no permission was given to them to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about its customers for any purpose except for the benefit of Superb.

290.    It is obvious from the brazen tactics of Deo, S. Deo, Thomasson, Blankenship, and Merckling's that they are actively engaged in a scheme to plunder and to destroy Superb - a company Urrutia spent years building.

291.    Upon information and belief, a significant number of Superb's customers have been solicited by Deo, S. Deo, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information.

292.    Immediate injunctive relief and a permanent injunction is necessary to prevent Deo, S. Deo, Thomasson, Blankenship, and Merckling from destroying the customer relationships, brand, and goodwill that Urrutia and Superb have spent years building, from profiting on a business that they stole from Superb, and causing further imminent and irreparable financial harm to Superb.

293.    In addition to shutting down Deo's other businesses, specifically, Defendants Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp., Deo, S. Deo, Thomasson, Blankenship, and Merckling should be directed to return the misappropriated information and enjoined from engaging in any further unlawful conduct, it is essential that Superb also be permitted forensically to examine Deo, S. Deo, Thomasson, Blankenship, and Merckling's email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of their unlawful scheme to steal Superb's business.

## AS AND FOR THEIR FIRST CAUSE OF ACTION OF ALL PLAINTIFFS
### (Violation of RICO, 18 U.S.C. § 1962 – All Defendants)

294.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

295.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) in that each is either an individual, corporation, or limited liability company, or other person capable of holding a legal interest in property.

296.    At all relevant times, each of the Deo Defendants was, and is, a person that exists separate and distinct from the Enterprise, described below.

297.    Deo controls the Gold Coast entities and is the mastermind of the Enterprise, which consists of Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones, and each of their respective corporate entities.

298.    Deo was previously convicted in 2016 for wire fraud in relation to a mortgage.

299.    Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones are individuals and instrumental in the furtherance of the Enterprise, each of whom engaged in wire fraud or substantially assisted in carrying out the wire fraud through the use of forged instruments as outlined *supra*.

300.    The corporate entity Deo Defendants were utilized by the individual Deo Defendants to assist, enable, and perpetuate their fraudulent schemes.

301.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

302.    Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

303.     Deo Defendants are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise engaged in the conduct of their affairs through a continuing pattern of racketeering activity.

304.     The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of the racketeering activity.

305.     There may also be other members of the enterprise who are unknown at this time.

306.     Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of purportedly working for dealerships.

307.     These activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(c), (d), 18 U.S.C. § 1961(6) because they violate 18 U.S.C. §§ 1341 and 1343.

308.     Deo Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

309.     The racketeering activity was made possible by Deo Defendants' regular and repeated use of the facilities and services of the enterprise.  Deo Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

310.     Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

311.     Deo Defendants each committed at least two such acts or else aided and abetted such acts.

312.     The acts of racketeering were not isolated, but rather the acts of Deo Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission, as is evidenced by the fact two (2) separate groups of dealerships have been impacted by Deo Defendants' unlawful conduct.

313.     Further, the acts of racketeering by Deo Defendants have been continuous.

314.     There was repeated conduct during a period of time beginning in approximately 2018 and continuing to the present, and there is a continued threat of repetition of such conduct.

315.     The Enterprise, as alleged herein, was not limited to the predicate acts and extended beyond the racketeering activity. Rather, it existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of running automobile dealerships.

316.     Plaintiffs specifically allege that Deo Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

317.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud) in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs and others by means of false or fraudulent pretenses, representations, or promises.

318.     For the purpose of executing their scheme or artifice, Deo Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers or received such therefrom.

319.     Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals.

320.     The acts of Deo Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business or that such use could have been foreseen, even if not actually intended.

321.     These acts were done intentionally and knowingly with the specific intent to advance Deo Defendants' scheme or artifice.

322.     Deo Defendants could not have carried out their scheme had they not used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Deo Defendants communicated among themselves and with Plaintiffs and others in furtherance of the scheme to defraud Plaintiffs.

323.     These communications were typically transmitted by wire (*i.e.*, electronically) and/or through the United States mails or private or commercial carriers.

324.     Specifically, each Deo Defendant did transmit the executed form of their operative contracts through electronic mail or other means of electronic communications.

325.     Additionally, upon information and belief, each Deo Defendant did use electronic means of communications in order to advance the aims of the Enterprise.

326.     Deo Defendants did sign checks without authorization and utilized forged instruments and false financial records to obtain bank accounts and financing for Northshore, Sunrise, and Superb without the authority to do so, constituting wire fraud.

327.     Deo Defendants' shared objective was and is to divert funds to their own benefit and to defraud Plaintiffs.

328.     Plaintiffs reasonably and justifiably relied upon Deo Defendants' false representations, false pretenses, and deceptive communications, and have been damaged as a direct and proximate result of Deo Defendants' participation in such enterprise, as alleged herein.

329.    Flushing Bank's employees and agents participated in this scheme by permitting Deo to open a bank account for Superb when they knew that he had no authority to do so. Among other things, Flushing Bank was in possession of documentation indicating that Deo had no such authority.

330.    Chase Bank's employees and agents participated in this scheme by permitting Deo to process checks from Superb's bank account when it knew that he had no authority to sign checks. Deo was not an authorized signatory on Superb's account at Chase Bank.

331.    Deo along with the other "persons" listed above violated 18 USCS § 1962(a) by using income and the proceeds of income derived from a pattern of racketeering activity and through the wrongful activities described in connection with their use and operation of Northshore and 189 Sunrise in which they participated as a principal within the meaning of section 18 U.S.C. § 2 to use or invest such income and proceeds in the acquisition of an interest in Superb which is engaged in, or the activities of which affect, interstate and foreign commerce

332.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding the Project.

333.    S. Deo managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

334.    Blankenship and Merckling each misappropriated cash payments and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

335.    Laurie enabled Deo Defendants by substantially assisting them in opening an account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital.

336.    Jones submitted false financials to create the illusion that Superb was profitable.

337.     Finally, Thomasson serves as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Deo Defendants have engaged in fraud.

338.     In fact, Thomasson helped divert the stolen funds.

339.     The *raison d'etre* of this fraud was to extract money from Plaintiffs and leave them holding the liabilities for Deo Defendants' conduct.

340.     It is prototypical racketeering – i.e., creating a problem (incurring liabilities and taking away the ability to pay those liabilities) for the purpose of solving it through extortion (attempting to obtain or obtaining both operational control and/or ownership of dealerships).

341.     Each defendant benefitted directly from these schemes either through direct participation in Deo's schemes by receiving portions of the money stolen by Deo.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities, *i.e.*, buying and selling vehicles from outside the State of New York.

342.     All communications between the members of the Enterprise were by interstate email and mail, wire transfers, or ACH debits and other interstate wire communications.

343.     Specifically, the Enterprise used interstate emails to communicate and collect monies purportedly owed for made up sales of automobiles that were never actually sold.

344.     Plaintiffs have and will continue to be injured in their businesses and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

345.     The injuries are proximately and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. §1962(d) include, but are not limited to, millions of dollars paid as a result of Defendants' fraudulent conduct.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys fees from Defendants.

## AS AND FOR THEIR SECOND CAUSE OF ACTION OF ALL PLAINTIFFS
### (Conspiracy Under 18 U.S.C. § 1962(d) – All Defendants)

346.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

347.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

348.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the dealerships, purchase and sale of vehicles, opening of bank accounts, and issuing of checks, each Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy in violation of 18 U.S.C. § 1962(c).

349.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud the Plaintiffs, including in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the schemes to steal monies and assets of the dealerships, as well as to obtain operational control of the dealerships.

350.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.  Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

351.   The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars.

352.   Plaintiffs also have suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

353.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

354.   The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

### AS AND FOR THEIR THIRD CAUSE OF ACTION OF SUPERB PLAINTIFFS
**(Injunctive Relief Under RICO, 18 U.S.C. § 1964(a) – Deo Defendants)**

355.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

356.   Superb Plaintiffs have sustained or are immediately in danger of sustaining direct injury as the result of the challenged conduct.

357.   Namely, because Deo Defendants have misappropriated vehicles owned by Superb purchased with floor plan financing with various lenders, Superb Plaintiffs will be required to shut down its operations if Deo Defendants do not immediately return the vehicles.

358.   Due demand has been made for the return of the vehicles, both by Superb and its various lenders, but Deo Defendants have willfully refused to return the vehicles.

359.   Accordingly, Superb is entitled to an injunction, pursuant to 18 U.S.C. § 1964(a), requiring Deo Defendants to return Superb's vehicles, in order to prevent continued actual and threatened harm arising out of the challenged conduct.

## AS AND FOR THEIR FOURTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 – Deo, S. Deo, Merckling, Blankenship, and Thomasson)

360.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

361.     Deo Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836.

362.     Deo Defendants possess trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, financial information, and Superb's customized DMS system information.

363.     Superb Plaintiffs have made and make reasonable efforts to maintain the secrecy of this information, including limiting its disclosure to those who owe a fiduciary duty to the dealerships, *i.e.*, Deo, and Deo Defendants had no authority to utilize confidential information and trade secrets of Superb.

364.     The confidential information and trade secrets belonging to Superb that Deo Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through, proper means by another person who can obtain economic value from the disclosure or use of the information.

365.     Indeed, Deo Defendants utilized this very information as a road map to open a competing group of dealerships and to unfairly compete against Superb in dastardly fashion.

366.     Deo Defendants knew that this information contained confidential information and trade secrets belonging to Superb.

367.     Deo Defendants have no right to retain or to use any of Superb's trade secrets or other confidential and proprietary information due to their illegal conduct.

368.    Upon information and belief, Deo Defendants are retaining and using Superb's confidential information and trade secrets to compete with Superb; Superb did not consent to Deo Defendants' use of the information as set forth above.

369.    At all relevant times, Deo Defendants knew that the information obtained by them contained Superb's proprietary trade secrets that they had no right to receive and could not receive absent their improper acts.   Deo Defendants' conduct thus constitutes knowing, willful, and malicious misappropriation.

370.    Deo Defendants have used Superb's confidential information and trade secrets to sell vehicles, through interstate commerce, and to compete with Superb Plaintiffs, causing substantial loss of sales to them and damage to its relationships with its clients and the potential obliteration of the Superb Plaintiffs' dealerships.   Deo Defendants have wrongfully acquired and used Superb's confidential information and trade secrets and continue to do so, without the express or implied consent of Superb, for Deo Defendants' own benefit and the benefit of others.

371.    The public policy in favor of protecting Superb's interest in maintaining its trade secrets outweighs any interest Deo Defendants could have in using Superb's confidential information and trade secrets.

372.    As a direct and proximate result of Deo Defendants' misappropriation of Superb's confidential information and trade secrets, Superb has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage, including, without limitation, the loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm, or damage unless and until Deo Defendants are restrained from their continued misappropriation of confidential information and trade secrets.

**AS AND FOR THEIR FIFTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – Deo Defendants)**

373.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

374.    Superb operates its business in interstate commerce in New York, New Jersey, Pennsylvania, and other states, by selling vehicles to customers in those states, and the trade secrets misappropriated by Deo Defendants are related to, and intended for use in, interstate commerce.

375.    As set forth above, Deo Defendants improperly acquired Superb's trade secrets, including information regarding its business, operations, services, customers, pricing, sales, and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except those with a fiduciary duty who were obligated to keep this information confidential.

376.    The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

377.    The misappropriated documents concern Superb's operations, services, customers, pricing, sales, and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas, and processes.

378.    Further, Superb has taken reasonable measures to keep such information secret by, *inter alia*, limiting highly sensitive information to those who have a fiduciary duty to it.

379.    The trade secrets misappropriated by Deo Defendants include those which required substantial resources, time, and investment by Superb to create and/or develop, and thus derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information.

380.     Deo Defendants' misappropriation of Superb's trade secrets has caused Superb to suffer harm, including, but not limited to, the loss of clients, loss of reputation, damage to their brand, and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

381.     This harm cannot be adequately remedied at law and requires injunctive relief.

382.     Superb will suffer irreparable and imminent harm in the absence of a permanent injunction.  Deo Defendants' continued misappropriation of Superb's trade secrets and failure to return Superb's documents containing Trade Secrets, including Superb's customer information, will cause Superb further loss of clients, customers, accounts and/or market share.

383.     This imminent injury is neither remote nor speculative, because Superb has already been harmed in precisely this manner by Deo Defendants' misappropriation and use thereof and will continue to be irreparably harmed in the absence of a permanent injunction.

384.     Deo Defendants will not suffer harm from the rightful return of Superb Plaintiffs' proprietary information and trade secrets and will not be prevented from conducting their ordinary business by lawful means; Deo Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Superb Plaintiffs' expense.  The ongoing, continuing, and future harm to Superb Plaintiffs cannot be adequately remedied at law and requires permanent injunctive relief.  The public interest would not be disserved by the issuance of an injunction preventing Deo Defendants from misappropriating Superb Plaintiffs' Trade Secrets.

385.     Accordingly, Superb Plaintiffs are entitled to an injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A), enjoining Deo Defendants from continuing to use Superb Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Superb Plaintiffs' trade secrets and requiring Deo Defendants to return and/or destroy the trade secrets improperly accessed and retained by Deo Defendants, pursuant to 18 U.S.C. § 1836(b)(3)(A)(ii).

## AS AND FOR THEIR SIXTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Misappropriation – Deo Defendants)

386.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

387.   Deo Defendants' actions, as set forth herein, constitute misappropriation under New York law.  Deo Defendants currently possess information belonging to and used in the operation of Superb Plaintiffs' businesses, which information constitutes confidential, proprietary, and trade secret information under New York law.

388.   Such information was developed by Superb Plaintiffs through great effort and expense, in terms of manpower, time, and costs, and is extremely valuable to Superb Plaintiffs, as it is crucial to the operation of its business, cannot easily be  acquired or duplicated by others, and, if made available to others, would enable competition with Superb Plaintiffs to their detriment.

389.   Superb Plaintiffs make reasonable efforts to maintain the secrecy of this information,including limiting its disclosure to those who have a fiduciary duty to them.

390.   Upon information and belief, Deo Defendants knowingly and improperly obtained and used such trade secrets and confidential information for their own benefit.

391.   The improperly retained information constitute trade secrets and Deo Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure Superb Plaintiffs' business and their brand.

392.   As a result, Superb Plaintiffs have suffered direct and consequential damages and are entitledto recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

## AS AND FOR THEIR SEVENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Unfair Competition – Deo Defendants)

393.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

394.    Through Deo Defendants' misappropriation of Superb Plaintiffs' confidential trade secrets, Deo Defendants have stolen customers and poached employees and employed them while they were solely being paid by Superb to work solely for Superb to serve their own dealerships.

395.    As a result of Deo Defendants' use of the trade secrets they misappropriated to obtain a competitive advantage against Superb Plaintiffs, Deo Defendants have caused economic damages to Superb Plaintiffs along with diminishing their goodwill.

## AS AND FOR THEIR EIGHTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Tortious Interference with Contracts, business relations, and prospective economic advantage – Deo Defendants)

396.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

397.    Superb Plaintiffs have entered into valid written agreements with their vendors, customers, and employees concerning their businesses.

398.    Deo Defendants were at all relevant times aware of these agreements between Superb Plaintiffs and their banks, vendors, customers, and employees.

399.    Deo Defendants engaged in conduct designed to damage those relationships.

400.    For example, Deo Defendants double-floored vehicles in violation of their contracts with Superb Plaintiffs' floor plan lenders knowing that doing so would constitute a breach of those agreements.  As another example, Deo Defendants diverted customers away from Superb Plaintiffs to other dealerships owned or operated by Deo Defendants.

401.     As yet another example, Deo Defendants poached employees away from Superb Plaintiffs to other dealerships owned or operated by Deo Defendants, some of which were poached while those employees remained on Superb Plaintiffs' payroll, such that Deo Defendants interfered with Superb Plaintiffs' employment relationship with their employees.

402.     As a consequence of Deo Defendants' acts to sabotage Superb Plaintiffs' relationships with vendors, customers, and employees of Superb Plaintiffs for their benefit, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages in an amount to be proven at trial. Deo Defendants' conduct was intentional, willful, and malicious, thus justifying the award of punitive damages and/or exemplary damages.

## AS AND FOR THEIR NINTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Conversion – Deo Defendants)

403.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

404.     Superb Plaintiffs have a possessory right and legal ownership to their vehicles, dealer plates, confidential information, and trade secrets referenced herein.

405.     Deo Defendants exercised unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets.

406.     Deo Defendants willfully exercised unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets to the detriment of Plaintiff.

407.     Deo Defendants' unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets was and is to their exclusion of their rights.

408.     Deo Defendants' unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets constitutes conversion.

409.     Deo Defendants have thus committed the tort of conversion under New York common law.

## AS AND FOR THEIR TENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Civil Conspiracy – Deo Defendants)

410.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

411.     Deo Defendants conspired with each other for an unlawful purpose, to wit: to obtain Superb Plaintiffs' confidential information and to develop a business to compete with Superb using Superb Plaintiffs' confidential information and property obtained through fraud.

412.     Deo Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, unjust enrichment, and tortious interference with contract.

413.     Deo Defendants each agreed to this common goal and acted in concert with the specific object of harming Superb Plaintiffs for their own personal gain.

414.     Each Deo Defendant performed an overt act in furtherance of the conspiracy.

415.     The unlawful alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

416.     As a result of the Deo Defendants' combined, concerted, and continuing efforts, Superb Plaintiffs were, are, and continue to be damaged.  As a consequence of Deo Defendants' acts to steal from Superb Plaintiffs, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages, in an amount to be determined at trial, directly caused by Deo Defendants' misconduct.

## AS AND FOR THEIR ELEVENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Professional Malpractice –Jones CPA LLP)

417.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

418.    At all times hereinafter mentioned, Defendant Jones CPA LLP was and still is an accounting firm consisting of Certified Public Accountants ("CPA") licensed by the State of New York with offices at East Islip, Hampton Bays, and Port Jefferson Station within the State of New York, and did hold themselves out to the general public as being possessed of the skill and knowledge of such profession.

419.    In or before March 2023, Superb engaged the services of Jones CPA LLP and Jones – by and through the conduct of Deo – to perform various accounting services for Superb.

420.    Included within those accounting services for Superb were the monthly reconciliation of bank accounts, including general ledger, profit and loss, and inventory, as well as the preparation of the monthly financial statement required to be sent to Superb's lenders.

421.    In advising Superb, Jones CPA LLP and Jones each owed a duty of possessing and exercising the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

422.    Under standards of care and conduct prevailing in the accounting industry generally and applicable to Jones CPA LLP specifically, Jones CPA LLP had an affirmative duty to Superb Plaintiffs to undertake each and every one of its tasks for Superb Plaintiffs with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to Superb Plaintiffs accordingly.

423.    In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Jones CPA LLP owed Superb Plaintiffs an affirmative duty to identify and inform Superb Plaintiffs of any fraud red flags, such as suspicious activities or internal control deficiencies.

424.    As set forth above more fully, Jones CPA LLP failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/ or report to Urrutia the existence of Deo's scheme to create a false record that he is the 100% owner of the Superb Plaintiffs' dealerships and to fail to report missing cash that was never deposited into Superb Plaintiffs' dealership bank accounts despite seeing cash receipted in to the dealerships' DMS systems.

425.    As a result, Jones CPA LLP violated their duty to Superb.

426.    Jones CPA LLP did not possess and exercise the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

427.    Jones CPA LLP did not follow the accepted practice and procedure in the community.

428.    Jones CPA LLP actions, as set forth above, and otherwise were careless, negligent, and improper, resulting in damage to Superb due to the foregoing conduct.

429.    Jones CPA LLP rendered services for Superb in such a negligent and improper manner as to cause the loss alleged herein.

430.    Solely by reason of the foregoing negligence of Jones CPA LLP, and without any negligence on the part of Superb contributing thereto, Superb has been damaged by the foregoing conduct.

431.     Jones CPA LLP's wrongful and deficient conduct proximately caused Superb Plaintiffs to suffer damages which are more fully set forth above by failing to cause Superb Plaintiffs to arrest such misconduct earlier or in a preventative manner.

432.     All such losses were reasonably foreseeable at the time Jones CPA LLP were retained to provide accounting services.

433.     As a result of Jones CPA LLP's professional malpractice and fraud, Superb Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial but in no event less than $10 million, plus interest and reasonable attorneys' fees, all of which continue to accrue.

## AS AND FOR THEIR TWELFTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Fraud – Deo and Jones)

434.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

435.     Jones provided Urrutia, by and through Deo, with monthly financials that falsely showed Superb was profitable.

436.     This was false because Defendants' conduct caused Superb substantial losses such that Superb was actually operating at a loss.

437.     As a result, Jones made material misrepresentations of fact in providing the monthly financials to Urrutia by and through Deo.

438.     Jones knew or should have known that the information provided or reviewed by him was false and nonetheless reported to Superb Plaintiffs that the dealership bank accounts were balanced and that there were no discrepancies or issues.

439.     Jones submitted the monthly financials to Urrutia, by and through Deo, with an intent to defraud the Superb Plaintiffs as he stood to gain compensation for engaging in fraud.

440.    The Superb Plaintiffs reasonably relied on Jones's monthly financial statements.

441.    Indeed, Jones is licensed as a CPA and carried himself as knowledgeable in accounting; without him, the Defendants' fraud would not have gone on for so long.

442.    Jones's conduct resulted in damages to the Superb Plaintiffs.

443.    Jones therefore participated in the fraud at the behest of Deo and the remaining Defendants.

444.    Jones' wrongful and deficient conduct proximately caused Superb Plaintiffs to suffer damages which are more fully set forth above by failing to cause Superb Plaintiffs to arrest such misconduct earlier or in a preventative manner.

445.    As a result of Jones' fraud, Superb Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorneys' fees, all of which continue to accrue.

### AS AND FOR THEIR THIRTEENTH CAUSE OF ACTION OF IAG PLAINTIFFS
#### (Permanent Injunction – Against Libertas)

446.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

447.    Libertas claims ownership over Northshore's Future Receipts.

448.    Libertas 'ownership over Northshore's Future Receipts is not legitimate.

449.    IAG Plaintiffs seek a judgment permanently enjoining Libertas from exercising any rights over Northshore's Future Receipts.

### AS AND FOR THEIR FOURTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
#### (Article 4-A of the New York UCC – Against Flushing Bank)

450.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

451.     The fraudulent transfers at issue were not authorized and Deo Defendants did not have authority to make transfers or sign checks on behalf of Superb, Northshore, or Sunrise.

452.     Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Urrutia is the majority shareholder, had sole check authorization, and sole control of bank accounts based on the signature card for Superb's bank accounts and prior meetings with agents of Flushing Bank.

453.     Similarly, Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Deo had no membership interest in Northshore or Sunrise.

454.     A commercially reasonable actor, and certainly a sophisticated bank like Flushing Bank, would have been alerted to the fact that the transfers were fraudulent and, thus, unauthorized.

455.     At a minimum, the suspicious or unusual account activity would have led a commercially reasonable actor to make further inquiries.

456.     If those inquiries were made, they would have confirmed that Deo lacked actual authority.

457.     The New York Uniform Commercial Code ("UCC") provides in pertinent part:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under [§] 4-A-202, . . . the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount …

See UCC § 4-A-204(1).  Because the fraudulent transfers were not authorized, Flushing Bank is required to refund the transfers pursuant to Article 4-A of the N.Y. U.C.C. because Flushing Bank cannot establish that it (i) followed commercially reasonable and agreed upon security procedures; and (ii) acted in good faith and in accordance with the reasonable expectations of the parties.

458.    As a result, section 4-A-204(1) of the N.Y. U.C.C. requires that Flushing Bank refund the payment orders made by Defendants, plus interest.

459.    To date, Flushing Bank has failed to comply with Section 4-A-204(1) by refusing to refund the payment orders made by Defendants to Superb Plaintiffs.

460.    As a direct and proximate result of Flushing Bank's breaches of its duty, Superb Plaintiffs have suffered damages in an amount to be determined at trial.

## AS AND FOR THEIR FIFTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Negligence – Against Flushing Bank)

461.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

462.    As customers of Flushing Bank, Flushing Bank owed Superb Plaintiffs a duty of care, independent of any contractual agreement, to act in a manner consistent with commercially reasonable standards.

463.    Flushing Bank violated this duty of care by, among other things, failing to follow their own "Know Your Customer" procedures.

464.    Flushing Bank had actual knowledge that Urrutia was the majority shareholder of Superb and sole member or shareholder of his remaining dealerships because Urrutia previously provided Flushing Bank with all information concerning his ownership interest in Superb.

465.    As a result, Flushing Bank should have known that Deo's application to open an account with Flushing Bank was fraudulent because it falsely stated that he was the sole shareholder of Superb.

466.    As a direct and proximate result of Flushing Bank's breaches of its duty, Superb Plaintiffs have suffered damages in an amount to be determined at trial.

## AS AND FOR THEIR SIXTEENTH CAUSE
## OF ACTION ON BEHALF OF PLAINTIFF CHABRIER
## AND OTHER MEMBERS OF NORTHSHORE SIMILARLY SITUATED
### (Declaratory Judgment-Against Deo)

457. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

458. Chabrier, Khan, and the Estate of David Baron are the sole members of Northshore.

459. Deo falsely claims to be the sole owner of Northshore.

460. Determination of the ownership of Northshore is necessary to resolve the rights and obligations of each of the parties to each other and to Northshore.

461. There exists a justiciable controversy which is ripe for judgment.

462. Chabrier, on behalf of himself and other members of Northshore similarly situated, seeks a declaratory judgment declaring that he, Khan, and the Estate of David Baron are the sole members of Northshore.

463. Chabrier, on behalf of himself and other members of Northshore similarly situated, has no adequate remedy at law.

## AS AND FOR THEIR SEVENTEENTH CAUSE OF
## ACTION ON BEHALF OF PLAINTIFF AARONSON
## AND OTHER MEMBERS OF SUNRISE SIMILARLY SITUATED
### (Declaratory Judgment-Against Deo)

464. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

465. Aaronson, J. Baron, Raymond Phelan, and the Estate of David Baron are the sole members of Sunrise.

466. Deo falsely claims to be the sole owner of Sunrise.

467.    Determination of the ownership of Sunrise is necessary to resolve the rights and obligations of each of the parties to each other and to Sunrise.

468.    There exists a justiciable controversy which is ripe for judgment.

469.    Aaronson, on behalf of himself and other members of Sunrise similarly situated, seeks a declaratory judgment declaring that Aaronson, J. Baron, Raymond Phelan, and the Estate of David Baron are the sole members of Sunrise.

470.    Aaronson, on behalf of himself and other members of Sunrise similarly situated, has no adequate remedy at law.

### AS AND FOR THEIR EIGHTEENTH CAUSE OF ACTION
### DERIVATIVELY ON BEHALF OF NORTHSHORE
### (Conversion-Against Deo)

471.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

472.    Northshore is the rightful owner of, and has superior rights to, the assets alleged herein, including but not limited to the Libertas Funds.

473.    Deo has exercised unauthorized dominion or control over the assets of Northshore, including the Maserati and the Libertas Funds.

474.    By selling Northshore's Future Receipts to Libertas in exchange for the Libertas Funds, Deo was under an obligation to maintain the Libertas Funds in Northshore's account and/or use the Libertas Funds for the benefit of Northshore and was not permitted to use the Libertas Funds for his own personal benefit.

475.    Despite due demand, Deo has refused to return to Northshore the assets converted, including the Maserati and the Libertas Funds.

476.    Deo has wrongfully converted the foregoing assets for his own, personal use, thereby damaging Northshore.

477.    By reason of the foregoing, Northshore demands judgment against Deo in an amount to be determined by the Court.

## AS AND FOR THEIR NINETEENTH CAUSE OF ACTION
## DERIVATIVELY ON BEHALF OF NORTHSHORE
### (Unjust Enrichment-Against Deo)

478.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

479.    Deo's retention of the assets of Northshore has caused him to be unjustly enriched at Northshore's expense.

480.    The circumstances of Deo's enrichment are such that equity and good conscience require Deo to make restitution.

481.    By reason of the foregoing, Northshore demands judgment against Deo for a sum of $10,000,000.00.

## AS AND FOR THEIR TWENTIETH CAUSE OF ACTION
## DERIVATIVELY ON BEHALF OF NORTHSHORE
### (Breach of Duty of Loyalty-Against Deo)

482.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

483.    As an employee and the general manager of Northshore, Deo owed duties of loyalty and good faith to Northshore.

484.    As set forth in detail above, Deo has breached such duties.

485.    By virtue of the foregoing, Northshore has been damaged in the amount of $10,000,000.00.

## AS AND FOR THEIR TWENTY-FIRST CAUSE OF ACTION
## DERIVATIVELY ON BEHALF OF NORTHSHORE
### (Breach of Fiduciary Duty-Against Deo)

486.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

487.    As an employee and the general manager of Northshore, Deo had a fiduciary duty to act in the best interest of Northshore.

488.    As set forth in detail above, Deo has breached such duty.

489.    By virtue of the foregoing, Northshore has been damaged in the amount of $10,000,000.00.

## AS AND FOR THEIR TWENTY-SECOND CAUSE OF ACTION
## DERIVATIVELY AND DIRECTLY BY CHABRIER AND
## THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
### (Permanent Injunction-Against Deo)

490.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

491.    Deo has misrepresented his ownership of Northshore for the purpose of defrauding Chabrier and the other members of Northshore as well as those conducting business with Northshore.

492.    Deo has engaged in illegal and fraudulent conduct towards the members of Northshore, and has looted, wasted, or otherwise diverted for his own personal use the property and assets of Northshore, thereby enriching himself at Northshore's expense.

493.    Deo has used the License issued to Chabrier to continue to operate Northshore in a manner to perpetuate his wrongful activities.

494.    Deo's actions jeopardize the License issued to Chabrier and put Chabrier at risk of criminal and civil liability.

495. Deo's actions have harmed and will continue harm Chabrier and the other members of Northshore.

496. IAG Plaintiffs have no adequate remedy at law.

497. IAG Plaintiffs seek a permanent injunction restraining Deo from participating in the continued management and operation of Northshore.

**AS AND FOR THEIR TWENTY-THIRD CAUSE OF ACTION
DERIVATIVELY ON BEHALF OF SUNRISE
(Conversion-Against Deo)**

468. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

469. As set forth in detail above, Deo has exercised unauthorized dominion or a right of ownership over the assets of Sunrise, which has superior rights to the assets, and refused their return to Sunrise despite due demand.

470. Deo has converted the assets of Sunrise for his own use.

471. By reason of the foregoing, Sunrise demands judgment against Deo for a sum of $10,000,000.00.

**AS AND FOR THEIR TWENTY-FOURTH CAUSE OF
ACTION DERIVATIVELY ON BEHALF OF SUNRISE
(Unjust Enrichment-Against Deo)**

472. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

473. Deo's retention of the assets of Sunrise has caused him to be unjustly enriched at Sunrise's expense.

474. The circumstances of Deo's unjust enrichment are such that equity and good conscience require Deo to make restitution.

475.    By reason of the foregoing, Sunrise demands judgment against Deo for a sum of $10,000,000.00.

**AS AND FOR THEIR TWENTY-FIFTH CAUSE OF**
**ACTION DERIVATIVELY ON BEHALF OF SUNRISE**
**(Breach of Duty of Loyalty-Against Deo)**

476.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

477.    As an employee and the general manager of Sunrise, Deo owed duties of loyalty and good faith to Sunrise, and as set forth in detail above, Deo has breached such duties.

478.    By virtue of the foregoing, Sunrise has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-SIXTH CAUSE OF**
**ACTION DERIVATIVELY ON BEHALF OF SUNRISE**
**(Breach of Fiduciary Duty-Against Deo)**

479.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

480.    As an employee and the general manager of Sunrise, Deo had a fiduciary duty to act in the best interest of Sunrise.

481.    As set forth in detail above, Deo has breached such duty.

482.    By virtue of the foregoing, Sunrise has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-SEVENTH CAUSE OF ACTION**
**DERIVATIVELY AND DIRECTLY BY AARONSON, J. BARON,**
**AND THOSE MEMBERS OF SUNRISE SIMILARLY SITUATED**
**(Permanent Injunction-Against Deo)**

483.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

484.    Deo has misrepresented his ownership of Sunrise for the purpose of defrauding Aaronson and the other members of Sunrise as well as those conducting business with Sunrise.

485.    Deo has engaged in illegal, fraudulent actions towards the members of Sunrise, and has looted, wasted, or otherwise diverted for his own personal use the property and assets of Sunrise, thereby enriching himself at Sunrise's expense.

486.    Deo has used the License issued to Aaronson and J. Baron to continue to operate Sunrise in a manner to perpetuate his wrongful activities.

487.    Deo's actions jeopardize the License issued to Aaronson and J. Baron and put them at risk of criminal and civil liability.

488.    Deo's actions have harmed and will continue harm Aaronson, J. Baron, and the other members of Sunrise.

489.    IAG Plaintiffs have no adequate remedy at law.

490.    IAG Plaintiffs seek a permanent injunction restraining Deo from participating in the continued management and operation of Sunrise.

### AS AND FOR THEIR TWENTY-EIGHTH CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
(Contribution and Indemnification for Fraud, Breach of Fiduciary Duty, Breach of Loyalty and Conversion-Against Deo)

491.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

492.    Libertas alleges that the Future Receipts are the rightful property of Northshore.

493.    Libertas alleges it has a superior right to the Future Receipts under the Libertas Agreement.

494.    Libertas alleges that the Libertas Funds were the rightful property of Northshore.

495.    Libertas alleges a superior right to the Libertas Funds, as pledged to Libertas.

496.    Libertas has asserted the Libertas Claims against IAG Plaintiffs for tortious interference and conversion concerning the Future Receipts.

497.    Libertas has asserted the Libertas Claims against IAG Plaintiffs for conversion and unjust enrichment in allegedly wrongfully taking the Libertas Funds.

498.    Deo, through fraudulent means, and without the knowledge and consent of Northshore's members, sold the Future Receipts to Libertas in exchange for the Libertas Funds.

499.    Deo, in breach of his fiduciary duties, sold the Future Receipts and acquired the Libertas Funds for himself.

500.    Deo, in breach of his duty of loyalty, sold the Future Receipts and acquired the Libertas Funds for himself.

501.    Deo was unjustly enriched by the sale of the Future Receipts and acquisition of the Libertas Funds.

502.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Deo; Libertas shall have recourse against Deo who, fraudulently and without authority and in breach of his fiduciary duties and duty of loyalty, sold the Future Receipts in exchange for the Libertas Funds and was unjustly enriched thereby and/or converted same.

503.    As such, Deo would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims, and IAG Plaintiffs request that they shall have judgment over and against Deo for any damages assessed against IAG Plaintiffs arising out of Deo's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

504.     If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of Deo's fraud, breach of fiduciary duties and duty of loyalty, unjust enrichment, and conversion.

505.     If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and seek a judgment over and against Deo for any such amounts, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

### AS AND FOR THEIR TWENTY-NINTH CAUSE OF ACTION
### DERIVATIVELY AND DIRECTLY BY CHABRIER AND
### THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
### (Conversion-Against Thomasson)

506.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

507.     IAG Plaintiffs delivered the Libertas Funds to Thomasson, as he demanded, claiming to be the rightful attorney for Northshore.

508.     IAG Plaintiffs delivered the Libertas Funds to Thomasson for safekeeping in his attorney escrow account pending a resolution of the parties 'dispute over the Libertas Funds

509.     By delivering the Libertas Funds to Thomasson, IAG Plaintiffs relinquished possession and control of the Libertas Funds to Thomasson to be held in escrow for the benefit of Northshore.

510.     By failing to safeguard the Libertas Funds, and subsequently disbursing the Libertas Funds to Deo, Thomasson, intentionally and without authority, assumed or exercised control over the Libertas Funds belonging to Northshore, interfering with Northshore's right of possession.

511.    Despite due demand, Thomasson has refused to return to Northshore the Libertas Funds.

512.    Thomasson has wrongfully converted the Libertas Funds, thereby damaging Northshore.

513.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTIETH CAUSE OF ACTION
DERIVATIVELY AND DIRECTLY BY CHABRIER AND
THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED**
(Aiding and Abetting Conversion-Against Thomasson)

514.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

515.    By turning over the Libertas Funds to Deo, Thomasson aided and abetted Deo in intentionally and without authority, assuming or exercising control over the Libertas Funds belonging to Northshore, interfering with Northshore's superior right of possession.

516.    Despite due demand, Thomasson has refused to return the Libertas Funds.

517.    As set forth in detail above, Thomasson has wrongfully aided and abetted Deo in converting the the Libertas Funds, thereby damaging Northshore.

518.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTY-FIRST CAUSE OF ACTION
DERIVATIVELY AND DIRECTLY BY CHABRIER AND
THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED**
(Contribution and Indemnification for Conversion-Against Thomasson)

519.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

520.     If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who converted the Libertas Funds, and as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

521.     If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's conversion of the Libertas Funds.

522.     If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and that IAG Plaintiffs have judgment over and against Thomasson, together with the costs, expenses and disbursements incurred in the defense of the Libertas Claims.

## AS AND FOR THEIR THIRTY-SECOND CAUSE OF ACTION
## DERIVATIVELY AND DIRECTLY BY CHABRIER AND
## THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
### (Contribution & Indemnification for Aiding & Abetting Conversion-Against Thomasson)

523.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

524.     If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's conversion of the Libertas Funds, and as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they

shall have judgment over and against Thomasson for any damages assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

525.   If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of the aiding and abetting conversion of the Libertas Funds by Deo.

526.   If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

### AS AND FOR THEIR THIRTY-THIRD CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED (Contribution and Indemnification for Aiding and Abetting Fraud-Against Thomasson)

527.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

528.   Thomasson aided and abetted Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds.

529.   If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages

assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

530.    If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds.

531.    If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-FOURTH CAUSE OF ACTION
DERIVATIVELY AND DIRECTLY BY CHABRIER AND
THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
(Aiding and Abetting Breach of Fiduciary Duty-Against Thomasson)**

532.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

533.    As set forth above, Thomasson aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds personally for Deo's own benefit.

534.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTY-FIFTH CAUSE OF ACTION
DERIVATIVELY AND DIRECTLY BY CHABRIER AND
THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
(Contribution and Indemnification for Aiding and Abetting Breach of Fiduciary
Duty-Against Thomasson)**

535.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

536.    As set forth above, Thomasson aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit.

537.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

538.    If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds.

539.    If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-SIXTH CAUSE OF ACTION
DERIVATIVELY AND DIRECTLY BY CHABRIER AND
THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
(Aiding and Abetting Breach of Duty of Loyalty-Against Thomasson)**

540.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

541.    As set forth above, Thomasson aided and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit. By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

## AS AND FOR THEIR THIRTY-SEVENTH CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED
### (Contribution and Indemnification for Aiding and Abetting Breach of Duty of Loyalty-Against Thomasson)

542.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

543.    As set forth above, Thomasson aided and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit.

544.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

545.    If Libertas recovers herein against IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds.

546.     If Libertas recovers from IAG Plaintiffs, then IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that IAG Plaintiffs may have to pay, and that IAG Plaintiffs have judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

## AS AND FOR THEIR THIRTY-EIGHTH CAUSE OF ACTION BY IAG PLAINTIFFS
### (Unjust Enrichment-Northshore)

547.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

548.     IAG has paid for Northshore's obligations as follows, which includes:

| | | |
|---|---|---|
| a. | 1581 Hylan Blvd Auto LLC: | $74,000.00 |
| b. | 1580 Hylan Blvd Auto LLC: | $53,800.00 |
| c. | 1591 Hylan Blvd Auto LLC: | $104,809.88 |
| d. | 1632 Hylan Blvd Auto LLC: | $108,000.00 |
| e. | 1239 Hylan Blvd Auto LLC: | $2,322,576.00 |
| f. | 2519 Hylan Blvd Auto LLC: | $385,597.10 |
| g. | 76 Fisk Street Realty LLC: | $683,316.95 |
| h. | 446 Route 23 Auto LLC: | $8,918.58 |
| i. | Island Auto Management, LLC: | $65,606.43 |
| j. | The Maserati automobile paid for by IAG for over $80,000.00. | |

549.     Should the Court find that ownership of Northshore rests with Deo, then Northshore will have been enriched at IAG's expense for all of Northshore's obligations paid for by IAG.

550.     The circumstances of Northshore's enrichment are such that equity and good conscience requires Northshore to make restitution.

551.     By reason of the foregoing, IAG demands judgment against Northshore as follows:

| | | |
|---|---|---|
| a. | 1581 Hylan Blvd Auto LLC: | $74,000.00 |
| b. | 1580 Hylan Blvd Auto LLC: | $53,800.00 |
| c. | 1591 Hylan Blvd Auto LLC: | $104,809.88 |
| d. | 1632 Hylan Blvd Auto LLC: | $108,000.00 |
| e. | 1239 Hylan Blvd Auto LLC: | $2,322,576.00 |
| f. | 2519 Hylan Blvd Auto LLC: | $385,597.10 |
| g. | 76 Fisk Street Realty LLC: | $683,316.95 |
| h. | 446 Route 23 Auto LLC: | $8,918.58 |

       i.      Island Auto Management, LLC:   $65,606.43

       j.      $80,000.00 for the Maserati automobile paid for by IAG.

## AS AND FOR THEIR THIRTY-NINTH CAUSE OF ACTION BY IAG PLAINTIFFS
### (Piercing the Corporate Veil-Against Deo)

552.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

553.    In the event the Court determines that Deo is an owner of, or is the sole owner of Northshore, then IAG Plaintiffs allege the following:

554.    Deo failed to adequately capitalize Northshore.

555.    Deo intermingled his personal assets with Northshore.

556.    Deo used Northshore's assets for his personal use, using the company accounts as his personal piggy bank.

557.    Deo, through his domination and control over Northshore, abused the privilege of doing business in the limited liability form to perpetrate a wrong or injustice such that a Court in equity will intervene by his actions in using Northshore for his own personal purposes.

558.    IAG seeks to pierce the veil of Northshore and enter judgment against Deo for Northshore's obligations to IAG.

## AS AND FOR THEIR FORTIETH CAUSE OF ACTION BY IAG PLAINTIFFS
### (Unjust Enrichment-Against Sunrise)

559.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

560.    IAG has paid for Sunrise's obligations as follows, which may include:

      a.      1581 Hylan Blvd Auto LLC:   $74,000.00

      b.      1580 Hylan Blvd Auto LLC:   $53,800.00

      c.      1591 Hylan Blvd Auto LLC:   $104,809.88

      d.      1632 Hylan Blvd Auto LLC:   $108,000.00

      e.      1239 Hylan Blvd Auto LLC:   $2,322,576.00

      f.      2519 Hylan Blvd Auto LLC:   $385,597.10

| | | |
|---|---|---|
| g. | 76 Fisk Street Realty LLC: | $683,316.95 |
| h. | 446 Route 23 Auto LLC: | $8,918.58 |
| i. | Island Auto Management, LLC: | $65,606.43 |

562.    Should the Court find that ownership of Sunrise rests with Deo, then Northshore will have been enriched at IAG's expense for all of Sunrise's obligations paid for by IAG.

563.    The circumstances of Sunrise's enrichment are such that equity and good conscience requires Sunrise to make restitution.

564.    By reason of the foregoing, IAG demands judgment against Sunrise as follows:

565.    IAG has paid for Sunrise's obligations as follows, which may include:

| | | |
|---|---|---|
| a. | 1581 Hylan Blvd Auto LLC: | $74,000.00 |
| b. | 1580 Hylan Blvd Auto LLC: | $53,800.00 |
| c. | 1591 Hylan Blvd Auto LLC: | $104,809.88 |
| d. | 1632 Hylan Blvd Auto LLC: | $108,000.00 |
| e. | 1239 Hylan Blvd Auto LLC: | $2,322,576.00 |
| f. | 2519 Hylan Blvd Auto LLC: | $385,597.10 |
| g. | 76 Fisk Street Realty LLC: | $683,316.95 |
| h. | 446 Route 23 Auto LLC: | $8,918.58 |
| i. | Island Auto Management, LLC: | $65,606.43 |

## AS AND FOR THEIR FORTY-FIRST CAUSE OF ACTION BY IAG PLAINTIFFS
### (Piercing the Corporate Veil-Against Deo)

566.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

567.    Should it be found that Deo has legitimate ownership of Sunrise, then the following concerning Deo and Sunrise are alleged.

568.    Deo failed to adequately capitalize Sunrise.

569.    Deo intermingled his personal assets with Sunrise.

570.    Deo used Sunrise's assets for his personal use.

571.     Deo, through his domination and control over Sunrise, abused the privilege of doing business in the limited liability form to perpetrate a wrong or injustice such that a Court in equity will intervene by his actions in using Sunrise for his own personal purposes.

572.     IAG seeks to pierce the veil of Sunrise and enter judgment against Deo for Sunrise's obligations to IAG.

**AS AND FOR THEIR FORTY-SECOND CAUSE OF
ACTION DERIVATIVELY ON BEHALF OF NORTHSHORE**
**(Violation of NY GBL § 349-Against Deo)**

573.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

574.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

575.     Deo's business act and practices and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, and unfair acts or practices in the conduct of any business, trade, or commerce.

576.     Many of Deo's practices described herein were specifically directed to consumers.

577.     The practices employed by Deo, accepting Trade-ins whereby Deo represented, and was required but failed to satisfy the consumer's existing loan, are deceptive, and misleading and are in violation of NY GBL § 349.

578.     Deo's deceptive practices were knowing and willful.

579.     Deo's actions impact the public interest because this deception is directed to the purchasing consumer and the public at large.

580.     The foregoing deceptive acts and practices proximately caused actual damages.

581.    IAG Plaintiffs are entitled to recover compensatory damages, statutory damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

582.    Deo should be enjoined from engaging in any further consumer transactions.  IAG Plaintiffs respectfully demand a judgment enjoining Deo's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

### AS AND FOR THEIR FORTY-THIRD CAUSE OF ACTION
**(Accounting)**

583.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

584.    Deo has engaged in illegal and fraudulent actions towards the members of Northshore and looted, wasted, and/or otherwise diverted for his personal use the property and assets of Northshore, thereby enriching himself at Northshore's expense.

585.    The exact amount(s) due Northshore are presently unknown and cannot be ascertained without an accounting, because the information necessary to determine that amount is in the exclusive knowledge of Deo.

586.    IAG Plaintiffs have no adequate remedy at law.

587.    IAG Plaintiffs seek an accounting.

### AS AND FOR THEIR FORTY-FOURTH CAUSE OF ACTION
**(Accounting)**

588.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

589.     Deo has engaged in illegal and fraudulent actions towards the members of Sunrise and has looted, wasted and/or otherwise diverted for his own personal use the property and assets of Sunrise, thereby enriching himself at Sunrise's expense.

590.     The exact amount(s) due Sunrise are presently unknown and cannot be ascertained without an accounting, because the information necessary to determine that amount is in the exclusive knowledge of Deo.

591.     IAG Plaintiffs have no adequate remedy at law.

592.     IAG Plaintiffs seek an accounting.

### AS AND FOR THEIR FORTY-FIFTH CAUSE OF ACTION BY PLAINTIFFS AGAINST THOMASSON
### (Violation of New York Judiciary Law § 487)

593.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

594.     New York Judiciary Law § 487 provides: "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party… is guilty of a misdemeanor…."

595.     On Wednesday, May 31, 2023, Thomasson appeared before the Hon. Sharon M.J. Gianelli, J.S.C. ("Justice Gianelli") for oral argument on the IAG Plaintiffs 'Order to show cause for injunctive relief and the Defendants 'cross-motion to dismiss.   See copy of transcript of proceedings held before Justice Gianelli annexed hereto as **Exhibit "A."**

596.     There, Thomasson represented to Justice Gianelli that there was nothing improper about the use of his escrow account to transfer funds to Deo.

597.     Thomasson made misrepresentations to deceive Justice Gianelli in doing so.

598.     Specifically, Thomasson stated:

> No money has impermissibly come out of my escrow account. As soon as they asked me back in November we're going to send you that money and we want you to hold it. I said, send me the money it's not yours. And I'm not holding it. You're not telling me what to do on behalf of any client. And before this action was ever commenced, that money was out of my account.

See **Exhibit "A"** at 43:12-18.

599.    Thomasson knew or should have known that the monies received and taken from his escrow account were impermissibly taken from the IAG Plaintiffs fraudulently to provide to the Superb Plaintiffs.

600.    Thomasson refused to hold the funds in escrow because he conspired with the Defendants to engage in fraud against the IAG Plaintiffs and the Superb Plaintiffs for his personal benefit and at the direction of the Deo Defendants.

601.    Despite the knowledge of the false information stated before Justice Gianelli, Thomasson decided to continue to advocate for the Deo Defendants and specifically requested the Plaintiffs 'attorneys to submit Thomasson's letters to the Court in relation to any request for injunctive relief.  See ECF Docket Entry 12-3 at 2 ("I insist on my letters and emails also being given to any judge you may approach on the subject or risk intentionally misleading the Court").

602.    In one such letter, Thomasson referred to the $500,000.00 paid to the Superb Plaintiffs and argued that these funds were part of a legitimate transaction when he knew full well they were not.

603.    Further, Thomasson requested that this letter be submitted to this Court in order to bolster this blatantly false proposition.  Thomasson's conduct was egregious in that he perpetuated a fraud upon the IAG Plaintiffs, and – without Thomasson's help – the Deo Defendants would not be able to perpetuate a fraud upon the Superb Plaintiffs, as they would have no money to purchase a forty-nine percent (49%) interest in Superb.

604.    Thomasson has previously engaged in conduct that violates New York Judiciary Law § 487 such that he has an established pattern of legal delinquency.

605.    Indeed, the Second Department has issued Thomasson an Order to show cause for why he should not be sanctioned because Thomasson raised arguments on an appeal that appear to be "completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law", and/or were undertaken primarily to delay or prolong the resolution of the litigation, such that his appeal in that action may be frivolous.  See Thomasson v. Demarco, No. 2020-03791, 607158/19, 191 N.Y.S.3d 431, 433 (2d Dept. 2023) (citing 22 NYCRR 130–1.1(c)(1)).

606.    Thomasson intended to deceive Justice Gianelli in arguing that the escrow transactions were legitimate, causing the IAG Plaintiffs financial harm.

607.    Thomasson intended to deceive this Court in requesting the submission of the foregoing letters to perpetuate this deceitful misrepresentation, causing the Superb Plaintiffs financial harm.

**AS AND FOR THEIR FORTY-SIXTH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK**
**(Violation of New York Uniform Commercial Code §3-419)**

608.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

609.    Flushing Bank, in opening an account in the name of Superb, when it knew or had reason to know that Deo was not, as he represented, the owner of 100% of Superb, did not act in a commercially reasonable manner.

610.    Flushing Bank, in not doing reasonable due diligence when Deo attempted to open an account in the name of Superb, did not act in a commercially reasonable manner.

611.    By opening an account in the name of Superb, based on Deo's representation that he owned 100% of Superb, without proper due diligence and when Urrutia was in the process of seeking to open an account, in the name of Superb, at Flushing Bank and when Flushing Bank had documentation contradicting Deo's claim of 100% ownership of Superb, Flushing Bank did not act in a commercially reasonable manner.

612.    Accordingly, Flushing Bank, as a depositary or collecting bank, is liable, pursuant to N.Y. U.C.C. § 3-419(3), to Superb, the true owner of any cash deposits from Superb, deposited by Deo into an account or accounts opened by him, in the name of Superb, at Flushing Bank, for the full amount of any such cash deposits; is liable to Superb, the true owner of the checks made payable to Superb deposited by Deo into an account or accounts opened by him, in the name of Superb, at Flushing Bank, for the full amount of those checks; and is liable to Superb, the true owner of a $95,000 wire to Superb, wired, according to instructions provided by Deo, into an account or accounts opened by him, in the name of Superb, at Flushing Bank, for the full amount of the wire.

613.    Similarly, Chase Bank, in permitting Deo to draw checks on Superb's account, when it knew or had reason to know that Deo was not an authorized signer on Superb's account with Chase Bank, did not act in a commercially reasonable manner.

614.    Chase Bank, in not doing reasonable due diligence when Deo drew checks on the account in the name of Superb, did not act in a commercially reasonable manner.

615.    By authorizing payment on checks in the name of Superb with Deo's signature, when Chase Bank had documentation contradicting Deo's authority to sign any such checks, Chase Bank did not act in a commercially reasonable manner.

616.     Accordingly, Chase Bank is liable, pursuant to N.Y. U.C.C. §3-419(3), to Superb, the true owner of the funds in its account, for the full amount of those checks drawn by Deo from Superb's account.

617.     For the foregoing reasons, Flushing Bank is liable to Superb in an amount to be determined at trial but believed to be at least $500,000.00.

618.     For the foregoing reasons, Chase Bank is liable to Superb in an amount to be determined at trial but believed to be at least $250,000.00.

## AS AND FOR THEIR FORTY-SEVENTH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK
### (Conversion)

619.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

620.     The cash, checks, and wire transfer deposited into an account or accounts in the name of Superb, opened at Flushing Bank by Deo without authority, belong to Superb.

621.     Similarly, the funds in the account Superb maintained with Chase Bank belong to Superb.

622.     Flushing Bank and Chase Bank each exercised unauthorized dominion over the funds of Superb to the exclusion of Superb's rights.

623.     Accordingly, Flushing Bank is liable to Superb for conversion in an amount to be determined at trial but believed to be at least $500,000.00.

624.     Similarly, Chase Bank is liable to Superb for conversion in an amount to be determined at trial but believed to be at least $250,000.00.

**AS AND FOR THEIR FORTY-EIGHTH CAUSE OF ACTION BY SUPERB
PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK**
**(Negligence)**

625.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

626.    In opening an account and collecting funds in the name of Superb, Flushing Bank and Chase Bank each owed Superb a duty of care.

627.    By opening an account or accounts in the name of Superb, giving banking authority to Deo, without proper due diligence into Deo's ownership or authority, and allowing Deo, without authority, to withdraw funds from accounts deposited in the name of Superb, Flushing Bank breached its duty of care to Superb.

628.    Similarly, by authorizing payments for checks drawn by Deo, despite the fact he is not a signer on Superb's account with Chase Bank, without proper due diligence in verifying the signature is made by an authorized signer, and allowing Deo, without authority, to have payments authorized on checks drawn by him, Chase Bank breached its duty of care to Superb.

629.    Accordingly, Flushing Bank is liable to Superb for negligence in an amount to be determined at trial but believed to be at least $500,000.00.

630.    Similarly, Chase Bank is liable to Superb for negligence in an amount to be determined at trial but believed to be at least $250,000.00.

**AS AND FOR THEIR FORTY-NINTH CAUSE OF ACTION BY SUPERB
PLAINTIFFS AGAINST FLUSHING BANK**
**(Unauthorized Payments)**

631.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

632.     Having accepted the cash, checks, and wire deposited by Deo into an account in the name of Superb, Flushing Bank allowed the funds to be disbursed from accounts in the name of Superb.

633.     The funds paid by Flushing Bank from an account opened by Deo in the name of Superb belonged to Superb.

634.     Flushing Bank, having opened an account in the name of Superb, is liable to Superb for the unauthorized payment of funds from such account.

635.     Accordingly, Flushing Bank is liable to Superb for unauthorized payments in an amount to be determined at trial but believed to be at least $500,000.00.

## AS AND FOR THEIR FIFTIETH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST CHASE BANK
### (Drawee Liability)

636.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

637.     Chase Bank has on file the authorized signatories on Superb's account at Chase Bank.

638.     Deo is not and never was an authorized signatory on Superb's account at Chase Bank.

639.     Nevertheless, Deo signed checks from Superb's account at Chase Bank, and Chase Bank paid them.

640.     Accordingly, as the drawee bank, Chase Bank is liable to Superb for the full amount of the checks paid from Superb's account that were signed by Deo.

641.     For the foregoing reasons, Chase Bank is liable to Superb in an amount to be determined at trial but believed to be at least $250,000.00.

## AS AND FOR THEIR FIFTY-FIRST CAUSE OF ACTION OF IAG PLAINTIFFS
### (Professional Malpractice – Jones CPA LLP)

642.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

643.    At all times hereinafter mentioned, Defendant Jones CPA LLP was and still is an accounting firm consisting of CPAs licensed by the State of New York with offices at East Islip, Hampton Bays, and Port Jefferson Station within the State of New York, and did hold themselves out to the general public as being possessed of the skill and knowledge of such profession.

644.    In or before November 2023, Northshore and Sunrise engaged the services of Jones CPA LLP – by and through the conduct of Deo – to perform various accounting services for Northshore and Sunrise.

645.    Included within those accounting services for Superb were the monthly reconciliation of bank accounts, including general ledger, profit and loss, and inventory, as well as the preparation of the monthly financial statement required to be sent to Ally Bank.

646.    In advising Northshore and Sunrise, Jones CPA LLP each owed a duty of possessing and exercising the degree of learning, knowledge, skill, care and diligence which was ordinarily possessed and exercised by CPAs in the community.

647.    Under standards of care and conduct prevailing in the accounting industry generally and applicable to Jones CPA LLP specifically, Jones CPA LLP had an affirmative duty to IAG Plaintiffs to undertake each and every one of its tasks for IAG Plaintiffs with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to IAG Plaintiffs accordingly.

648.    In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Jones CPA LLP owed IAG Plaintiffs an affirmative duty to identify and inform IAG Plaintiffs of any fraud red flags, such as suspicious activities or internal control deficiencies.

649.    As set forth above more fully, Jones CPA LLP failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/ or report to Chabrier or Aaronson of the existence of Deo's scheme to create false financial records.

650.    As a result, Jones CPA LLP violated their duty to Northshore and Sunrise.

651.    Jones CPA LLP did not possess and exercise the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

652.    Jones CPA LLP did not follow the accepted practice and procedure in the community.

653.    Jones CPA LLP actions, as set forth above, and otherwise were careless, negligent, and improper, resulting in damage to Northshore and Sunrise due to the foregoing conduct.

654.    Jones CPA LLP rendered services for Northshore and Sunrise in such a negligent and improper manner as to cause the loss alleged herein.

655.    Solely by reason of the foregoing negligence of Jones CPA LLP, and without any negligence on the part of Northshore and Sunrise contributing thereto, Northshore and Sunrise has been damaged by the foregoing conduct.

656.    Jones CPA LLP's wrongful and deficient conduct proximately caused IAG Plaintiffs to suffer damages which are more fully set forth above by failing to cause IAG Plaintiffs to arrest such misconduct earlier or in a preventative manner.

657.    All such losses were reasonably foreseeable at the time Jones CPA LLP were retained to provide accounting services.

658.    Due to Jones CPA LLP's professional malpractice and fraud, IAG Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $5 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

## AS AND FOR THEIR FIFTY-SECOND CAUSE OF ACTION OF IAG PLAINTIFFS
### (Fraud – Deo and Jones)

659.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

660.    Deo's and Jones's fraudulent conduct in preparing and providing falsified monthly financial statements to the IAG Plaintiffs and Ally Bank proximately caused IAG Plaintiffs to suffer damages which are more fully set forth above, and all such losses were reasonably foreseeable at the time Jones were retained to provide accounting services.

661.    As a result of Deo's and Jones' fraud, IAG Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $5 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

## DEMAND FOR JURY TRIAL

662.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor as against Defendants as follows:

a.    Awarding treble damages resulting from Defendants' violation of 18 U.S.C. § 1962;

b.    Awarding injunctive relief in returning operational control, vehicles, dealer plates, and any other assets of Plaintiffs pursuant to 18 U.S.C. § 1964(a);

c.    Injunctive relief restraining and enjoining Defendants from further violations of RICO and the DTSA, including the use of confidential information or trade secrets of Superb Plaintiffs, and unfairly competing with Superb Plaintiffs in any manner;

d.    Injunctive relief restraining and enjoining Defendants from having any contact with Plaintiffs' current and/or former employees;

e.    Compensatory damages for misappropriation of Plaintiffs' goodwill, misappropriation and unfair competition, violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962, Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, misappropriation, unfair competition, tortious interference with contract, business relations, and prospective economic advantage, conversion, civil conspiracy, professional malpractice, fraud, according to proof at trial, including but not limited to, lost profits, disgorgement of all profits and revenues received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

f.    Compensatory damages of at least $10,000,000.00 to the IAG Plaintiffs;

g.    Compensatory damages of at least $4,600,000.00 to the Superb Plaintiffs;

h.    Ordering that Defendants return all of Superb Plaintiffs' confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

i.    Prohibiting the Defendants or their agents from selling vehicles to Superb Plaintiffs' customers, whether directly or indirectly;

j.    Punitive and exemplary damages in an amount to be determined at trial in this case;

k.    Interest (pre-judgment & post-judgment);

l.    Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

m.    Enjoining Defendants from operating their enterprise by virtue of their illegal conduct since they were created entirely through theft of Plaintiffs' businesses;

n.    Ordering that Defendants pay the costs of suit, including attorneys' fees; and

o.    Such other and further relief as this Court deems just, equitable, and proper.

Dated: Lake Success, New York
October 13December 11, 2023                    Respectfully submitted,

                                    **MILMAN LABUDA LAW GROUP PLLC**
                                    _____/s_____
                                    Emanuel Kataev, Esq.
                                    3000 Marcus Avenue, Suite 3W8
                                    Lake Success, NY 11042-1073
                                    (516) 328-8899 (office)
                                    (516) 303-1395 (direct dial)
                                    (516) 328-0082 (facsimile)
                                    emanuel@mllaborlaw.com

                                    *Attorneys for Plaintiffs*
                                    *Superb Motors Inc.,*
                                    *Team Auto Sales LLC, &*
                                    *Robert Anthony Urrutia*

Dated: New York, New York
October 13December 11, 2023                    **CYRULI SHANKS & ZIZMOR LLP**
                                    _____/s_____
                                    Jeffrey Ruderman, Esq.
                                    420 Lexington Avenue, Suite 2320
                                    New York, NY 10170-0002
                                    (212) 661-6800 (office)
                                    (347) 379-4622 (direct dial)
                                    (212) 661-5350 (facsimile)
                                    jruderman@cszlaw.com

                                    *Attorneys for Plaintiffs*
                                    *189 Sunrise Hwy Auto LLC,*
                                    *Northshore Motor Leasing, LLC,*
                                    *1581 Hylan Blvd Auto LLC,*
                                    *1580 Hylan Blvd Auto LLC,*

*1591 Hylan Blvd Auto LLC,*
*1632 Hylan Blvd Auto LLC,*
*1239 Hylan Blvd Auto LLC,*
*2519 Hylan Blvd Auto LLC,*
*76 Fisk Street Realty LLC,*
*446 Route 23 Auto LLC,*
*Island Auto Management, LLC,*
*Brian Chabrier,*
*Joshua Aaronson, and*
*Jory Baron*