UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                                         Plaintiffs,

                 -against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP,  FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

                                         Defendants.

----------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.'S MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR LEAVE TO AMEND THE PLEADINGS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTS ......................................................................................................................2

    i. Allegations in the FAC .................................................................................2

    i. Additional Allegations in Plaintiffs' Proposed Third Amended Complaint .......5

STANDARD OF REVIEW ..........................................................................................7

    A. Rule 12(b)(1) ............................................................................................7

    B. Rule 12(b)(6) ............................................................................................7

    C. Rule 15 ....................................................................................................9

ARGUMENT .............................................................................................................9

    I. Legal Standard for RICO Claims ..................................................................9

        A. RICO Substantive Claim Under 18 U.S.C. § 1962(c) ............................9

        B. RICO Conspiracy Claim Under 18 U.S.C. § 1962(d) ..........................11

        C. RICO Investment Claim Under 18 U.S.C. § 1962(a) ..........................15

    II. Plaintiffs state a claim for relief against Defendants under RICO's
        substantive provision ...............................................................................16

        i. The Deo Defendants' Motion to Dismiss Must be Denied ....................17

        ii. The CPA Defendants' Motion to Dismiss is Meritless ..........................24

        iii. J.P. Morgan Chase Bank, N.A.'s ("Chase") Motion to Dismiss Must be
        Denied ................................................................................................28

        iv. Libertas' Motion to Dismiss Must be Denied .......................................31

    III. Plaintiffs state a claim for relief against Defendants under RICO's
        conspiracy provision ................................................................................32

    IV. The Superb Plaintiffs sufficiently state a claim under the DTSA .................33

**V. The Proposed Amendments in The TAC Resolve Most of the Bases Seeking to Dismiss The State Based Causes Of Action** ........................................................37

    **i. 16th and 17th causes of action** ...........................................................38

    **ii. 18th, 21st, 23rd - 26th, and 42nd causes of action**................................39

    **iii. 22nd cause of action** ......................................................................39

    **iv. 27th cause of action** ......................................................................39

    **v. 28th cause of action** .......................................................................40

    **vi. 29th through 37th causes of action** ..................................................41

    **vii. 38th and 40th causes of action** ......................................................42

    **viii. 39th and 41st causes of action** ......................................................42

    **vix. 43rd and 44th cause of action** .......................................................43

    **x. 45th cause of action under New York Judiciary Law § 487** .................43

    **xi. 52nd cause of action** .....................................................................45

    **xii. 13th cause of action** .....................................................................47

    **xiii. Urrutia and Team have Standing to Pursue their Claims against the Defendants**.................................................................................................48

    **xiv. Misappropriation** .........................................................................49

    **xv. Unfair Competition** .......................................................................52

    **xvi. Tortious Interference**.....................................................................53

    **xvii. Conversion as against the Deo Defendants**.........................................55

    **xviii. Negligence & Conversion as Against Chase**.......................................57

    **xix. Civil Conspiracy**..........................................................................58

    **xx. Fraud** .........................................................................................60

**VI. This court should exercise its discretion in favor of exercising supplemental jurisdiction** .........................................................................................................61

**VII. Plaintiffs' cross-motion for leave to amend must be granted** .....................................62

**VIII. Leave to replead must be granted in the event of dismissal** .....................................64

**CONCLUSION** ...............................................................................................................65

## TABLE OF AUTHORITIES

<u>Cases</u>

131 Main St. Assocs. v. Manko,
    897 F. Supp. 1507 (S.D.N.Y. 1995)..................................................................... 29

16 Casa Duse, LLC v. Merkin,
    791 F.3d 247 (2d Cir. 2015).............................................................................. 54

Air China Ltd. v. Li,
    2009 U.S. Dist. LEXIS 27482 (SDNY Mar. 31, 2009) ................................... 22

AIU Ins. Co. v. Olmecs Med. Supply, Inc.,
    2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. 2005)............................................. 30

Albright v. Terraform Labs, Pte. Ltd.,
    641 F. Supp. 3d 48 (S.D.N.Y. 2022)............................................................... 31

Alix v. McKinsey & Co., Inc.,
    2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) ................................................ 29

Amara v CIGNA Corp.,
    775 F3d 510 (2d Cir 2014)............................................................................... 46

Amidax Trading Grp. v. S.W.I.F.T. SCRL,
    671 F.3d 140 (2d Cir. 2011).............................................................................. 8

Angermeir v. Cohen,
    14 F. Supp. 3d 134 (S.D.N.Y. 2014)............................................................... 33

Ap-Fonden v. Goldman Sachs Grp., Inc.,
    2023 WL 4865617 (S.D.N.Y. July 31, 2023) ................................................... 9

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)........................................................................................... 8

Baisch v. Gallina,
    346 F.3d 366 (2d Cir. 2003)............................................................................ 14

Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,
    57 F.3d 146 (2d Cir. 1995).............................................................................. 60

Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo,
    346 F. Supp. 3d 432 (S.D.N.Y. 2018)............................................................. 13

Bell Atl. Corp. v. Twombly,
    550 U.S. 554 (2007)..............................................................................................8

Benzinger v. NYSARC, Inc. New York City Chapter,
    385 F. Supp. 3d 224 (S.D.N.Y. 2019)..................................................................62

Big Vision Private, Ltd. v. E.I. DuPont de Nemours & Co.,
    610 Fed. Appx. 69 (2d Cir. 2015).........................................................................53

Bill Birds, Inc. v. Stein Law Firm, P.C.,
    149 N.E.3d 888, 35 N.Y.3d 173 (2020)................................................................44

Bilt-Rite Steel Buck Corp. v. Duncan's Welding & Corr. Equip., Inc.,
    1990 WL 1299701 (E.D.N.Y. Aug. 24, 1990).......................................................62

Block v. First Blood Assocs.,
    988 F.2d 344 (2d Cir.1993)...................................................................................63

Boyle v. United States,
    556 U.S. 938 (2009)........................................................................................25, 26

Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,
    373 F.3d 296 (2d Cir. 2004)..................................................................................42

Bricklayers Ins. & Welfare Fund v. Innis Constr.,
    2021 U.S. Dist. LEXIS 193357 (E.D.N.Y. 2021)..................................................55

Buday v. N.Y. Yankees P'ship,
    486 Fed. Appx. 894 (2d Cir. 2012)..........................................................................7

Bullion Shark LLC v. Flip A Coin LLC,
    2023 U.S. Dist. LEXIS 217257 (E.D.N.Y. 2023)..................................................51

Carvel Corp. v. Noonan,
    818 N.E.2d 1100, 3. N.Y.3d 182 (2004)................................................................54

Catskill Dev., L.L.C. v. Park Place Entm't Corp.,
    547 F.3d 115 (2d Cir. 2008)..................................................................................54

Catzin v. Thank You & Good Luck Corp.,
    899 F.3d 77 (2d Cir. 2018)....................................................................................61

Cedric Kushner Promotions, Ltd. v. King,
    533 U.S. 158 (2001)..............................................................................................14

iii

Cement & Concrete Workers Dist. Council Welfare Fund v. Baroco Contr. Corp.,
　　2021 U.S. Dist. LEXIS 51509 (E.D.N.Y. 2021) ............................................................. 56

Charles Ramsey Co. v. Fabtech-NY LLC,
　　2020 U.S. Dist. LEXIS 9348 (N.D.N.Y. 2020) ............................................................... 34

City of New York v. Chavez,
　　2012 WL 1022283 (S.D.N.Y. Mar. 26, 2012) .......................................................... 33, 59

City of New York v. Hatu,
　　2019 U.S. Dist. LEXIS 91576 (S.D.N.Y. May 31, 2019) ................................................ 33

Colavito v. New York Organ Donor Network, Inc.,
　　860 N.E. 2d 713, 8 N.Y.3d 43 (2006) ............................................................................. 56

Conte v. Newsday, Inc.,
　　703 F. Supp. 2d 126 (E.D.N.Y. 2010) ............................................................................. 26

Conte v. Tapps Supermarket,
　　2023 WL 6594351 (E.D.N.Y. July 3, 2023) .................................................................... 15

Cortec Indus., Inc. v. Sum Holding L.P.,
　　949 F.2d 42 (2d Cir. 1991) .............................................................................................. 64

Cruz v. TD Bank, N.A.,
　　742 F.3d 520 (2d Cir. 2013) ............................................................................................ 64

Dauphin v. Crownbrook ACC LLC,
　　2014 U.S. Dist. LEXIS 67128 (E.D.N.Y. 2014) ............................................................. 50

Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.,
　　411 F.3d 384 (2d Cir. 2005) ............................................................................................ 48

Elden v. Merrill Lynch,  Pierce, Fenner & Smith, Inc.,
　　2011 U.S. Dist. LEXIS 35886 (S.D.N.Y. 2011) ............................................................. 58

Elliot-Leach v. New York City Dep't of Educ.,
　　201 F. Supp. 3d 238 (E.D.N.Y. 2016) ............................................................................. 64

Elliot-Leach v. New York City Dep't of Educ.,
　　710 Fed. Appx. 449 (2d Cir. 2017) .................................................................................. 64

Environmental Servs. v. Recycle Green Servs.,
　　7 F. Supp. 3d 260 (E.D.N.Y. 2014) ................................................................................. 17

iv

First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,
    385 F.3d 159 (2d Cir. 2004).................................................................... 10, 15, 22

Fischer & Mandel, LLP v. Citibank, N.A.,
    632 F.3d 793 (2d Cir. 2011)............................................................................ 58

Foman v. Davis,
    371 U.S. 178 (1962)................................................................................... 62, 63

Foster v. 2001 Real Estate,
    2015 WL 7587360 (S.D.N.Y. Nov. 24, 2015).............................................. 26

Greenberg v. Blake,
    2010 WL 2400064 (E.D.N.Y. June 10, 2010............................................... 26

Grider v. Texas Oil & Gas Corp.,
    868 F.2d 1147 (10th Cir.) ............................................................................. 16

Gross v. Waywell,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009)........................................................... 31

H.J. Inc. v. Northwestern Bell Tel. Co.,
    492 U.S. 229 (1989)....................................................................................... 31

Harris v. Leon,
    2023 WL 2051171 (S.D.N.Y. Feb. 16, 2023)............................................... 61

Hayden v. Paterson,
    594 F.3d 150 (2d Cir. 2010)............................................................................ 8

Hecht v. Commerce Clearing House, Inc.,
    897 F.2d 21 (2d Cir. 1990)........................................................... 11, 13, 14, 59

Henry Avocado Corp. v. Z.J.D. Bro., LLC,
    2017 WL 6501864 (E.D.N.Y. Dec. 19, 2017) .............................................. 25

Hinterberger v. Catholic Health Sys., Inc.,
    536 Fed. Appx. 14 (2d Cir. 2013).................................................................. 15

Ideal Steel Supply Corp. v. Anza,
    652 F.3d 310 (2d Cir. 2011)........................................................................... 24

In re Firestar Diamond, Inc.,
    2023 WL 6786093 (Bankr. S.D.N.Y. Oct. 13, 2023) ................................... 12

In re Stillwater Asset Backed Offshore Fund Ltd.,
    559 B.R. 563 (Bankr. S.D.N.Y. 2016) .................................................................. 43

Inv. Sci., LLC v. Oath Holdings Inc.,
    2021 U.S. Dist. LEXIS 151076 (S.D.N.Y. 2021) ............................................... 49

Jakob v. JPMorgan Chase Bank, N.A.,
    639 F. Supp. 3d 406 (E.D.N.Y. 2022) ................................................................ 58

Junior Gallery, Ltd. v. Neptune Orient Line, Ltd.,
    1997 WL 26293 (S.D.N.Y. Jan. 22, 1997) ......................................................... 63

Katz Dochrermann & Epstein, Inc. v. Home Box Office,
    1999 U.S. Dist. LEXIS 3971 (S.D.N.Y. Mar. 31, 1999) .................................... 53

Kilpakis v. JPMorgan Chase Fin. Co., LLC,
    229 F. Supp. 3d 133 (E.D.N.Y. 2017) ................................................................ 63

Lefkowitz v. Bank of N.Y.,
    676 F. Supp. 2d 229 (S.D.N.Y. 2009) ................................................................ 55

Liang v. Home Reno Concepts LLC,
    2018 U.S. Dist. Lexis 45402 (E.D.N.Y. 2018) .................................................. 63

Litras v. Litras,
    254 A.D.2d 395 (2d Dep't 1998) ........................................................................ 59

Long Is. Med. Anesthesiology, P.C. v. Rosenberg Fortuna & Laitman, LLP,
    191 A.D.3d 864 (2d Dept. 2021) ........................................................................ 44

LoPresti v. Mass. Mut. Life Ins. Co.,
    30 A.D.3d 474 (2d Dep't 2006) .......................................................................... 53

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,
    797 F.3d 160 (2d Cir. 2015) ............................................................................... 65

Lundy v. Cath. Health Sys. of Long Is. Inc.,
    711 F.3d 106 (2d Cir. 2013) ............................................................................... 16

Martinez v. JPMorgan Chase Bank, N.A.,
    178 F. Supp. 3d 184 (S.D.N.Y. 2016) ................................................................ 29

McCarthy v. Dun & Bradstreet Corp.,
    482 F.3d 184 (2d Cir. 2007) ................................................................................. 9

McKenzie-Morris v. V.P. Records Retail Outlet, Inc.,
    2022 WL 18027555 (S.D.N.Y. Dec. 30, 2022) .............................................................. 65

McLaughlin v. Anderson,
    962 F.2d 187 (2d Cir. 1992)........................................................................... 10, 29

Medidata Sols., Inc. v. Veeva Sys.,
    2018 U.S. Dist. LEXIS 199763, *8 (S.D.N.Y. 2018)......................................... 34

Milanese v. Rust-Oleum Corp.,
    244 F.3d 104, 110 (2d Cir. 2001)....................................................................... 63

Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.,
    531 F. Supp. 3d 673 (S.D.N.Y. 2021)............................................................... 10

Muss Dev., LLC v Nationwide Ins. Co.,
    2015 US Dist LEXIS 142414 (E.D.N.Y. 2015)................................................. 47

Needham & Co., LLC v Access Staffing, LLC,
    2016 US Dist LEXIS 111925 (S.D.N.Y. Aug. 12, 2016).................................. 47

Newmyer v. Philatelic Leasing, Ltd.,
    888 F.2d 385 (6th Cir.1989) .............................................................................. 16

Nielsen Co. (US), LLC v Success Sys., Inc.,
    2013 US Dist LEXIS 38003 (S.D.N.Y. 2013) .................................................. 43

North Atl. Instruments, Inc. v. Haber,
    188 F.3d 38 (2d Cir. 1999).......................................................................... 49, 50

One World, LLC v. Onoufriadis,
    2021 WL 4452070 (2d Cir. 2021)................................................................ 14, 33

Oneida Grp., Inc. v. Steelite Int'l U.S.A., Inc.,
    2017 U.S. Dist. LEXIS 206717 (E.D.N.Y. 2017)............................................. 49

Ouaknine v. MacFarlane,
    897 F.2d 75 (2d Cir. 1990)................................................................................ 16

Palatkevich v. Choupak,
    2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) .................................................. 13

Pasternack v. Shrader,
    863 F.3d 162 (2d Cir. 2017).............................................................................. 63

Perez v. Lopez,
    97 A.D.3d 558 (2d Dept. 2012) ........................................................ 59

Plaza Motors of Brooklyn, Inc. v. Bogdasarov,
    2021 U.S. Dist. LEXIS 230156 (E.D.N.Y. 2021) ........................ 36, 51

Primetime 24 Joint Venture v. DirecTV, Inc.,
    2000 WL 426396 (S.D.N.Y. April 20, 2000) .................................. 63

Related Companies, L.P. v. Ruthling,
    2019 WL 10947100 (S.D.N.Y. July 23, 2019) ................................ 11

Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n,
    896 F.2d 674 (2d Cir. 1990) ............................................................. 8

Ricciuti v. N.Y.C. Transit Auth.,
    941 F.2d 119 (2d Cir. 1991) ........................................................... 64

Robles v. Copstat Sec., Inc.,
    2009 U.S. Dist. LEXIS 112003 (S.D.N.Y. 2009) .......................... 43

Rolls-Royce Motor Cars v. Schudroff,
    929 F. Supp. 117 (S.D.N.Y. 1996)(95 Civ. 2291) ........................ 43

Rose v. Bartle,
    871 F.2d 331, 356–58 (3d Cir.1989) ............................................. 16

S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,
    84 F.3d 629 (2d Cir. 1996) ............................................................ 16

Salinas v. United States,
    522 U.S. 52 (1997) ............................................................. 9, 12, 13

SEC v. Lee,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................... 17

Singh v. Parnes,
    199 F. Supp. 2d 152 (S.D.N.Y. 2002) ........................................... 26

Sit-Up Ltd. v. IAC/InterActiveCorp.,
    2008 U.S. Dist. LEXIS 12017 (S.D.N.Y. Feb. 20, 2008) .............. 50

Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,
    118 F.3d 955 (2d Cir. 1997) .......................................................... 49

Sokolski v. Trans Union Corp.,
 178 F.R.D. 393 (E.D.N.Y. 1998) ........................................................... 62

State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.,
 375 F. Supp. 2d 141 (E.D.N.Y. 2005) .................................................... 14

Superb Motors Inc. v. Deo,
 2023 WL 7181675 (E.D.N.Y. Sept. 29, 2023) ...................................... 35

Superb Motors Inc. v. Deo,
 2023 WL 8358062 (E.D.N.Y. Dec. 1, 2023) ........................................... 9

Syncx LLC v. Kimedics, Inc.,
 2023 U.S. Dist. LEXIS 139369 (S.D.N.Y. 2023) ................................... 50

Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.,
 2016 U.S. Dist. LEXIS 130918 (S.D.N.Y. 2016) ................................... 34

Telecom Int'l Am., Ltd. v. AT&T Corp.,
 280 F.3d 175 (2d Cir. 2011) .................................................................. 52

Tokio Marine & Fire Ins. Co. v. Emp'rs Ins. of Wausau,
 786 F.2d 101, 103 (2d Cir. 1986) .......................................................... 62

Transaero, Inc. v. Chappell,
 2014 U.S. Dist. LEXIS 62635 (E.D.N.Y. 2014) .................................... 52

Turret Labs USA, Inc. v. CargoSprint, LLC,
 2022 U.S. App. LEXIS 6070 (2d Cir. 2022) .................................... 34, 36

United States Fire Ins. Co. v. United Limousine Serv.,
 303 F. Supp. 2d 432 (S.D.N.Y. 2004) ................................................... 33

United States v. Arrington,
 941 F.3d 24 (2d Cir. 2019) ............................................................. 10, 13

United States v. Ciccone,
 312 F.3d 535 (2d Cir. 2002) .................................................................. 13

United States v. Pizzonia,
 577 F.3d 4559 (2d Cir. 2009) ................................................................ 12

United States v. Rastelli,
 870 F.2d 822 (2d Cir. 1989) .................................................................. 14

United States v. Turkette,
    452 U.S. 576 (1981).............................................................................. 25

United States v. Yannotti,
    541 F.3d 112 (2d Cir. 2008).............................................................. 12

United States v. Zemlyansky,
    908 F.3d 1 (2d Cir. 2018).............................................. 10, 11, 12, 13

United States v. Zichettello,
    208 F.3d 72, 100 (2d Cir. 2000)................................................ 12, 14

Vacold LLC v. Cerami,
    2002 WL 193157 (S.D.N.Y. Feb. 6, 2002) ..................................... 64

Williams v. Affinion Grp., LLC,
    889 F.3d 116 (2d Cir. 2018)............................................................... 16

Williams v. Nik-Ney LLC,
    U.S. Dist. LEXIS 2355 (E.D.N.Y. 2016) ....................................... 41

Wood Ex rel. US. V. Applied Research Assocs., Inc.,
    328 F. Appx. 744 (2d Cir. 2009).................................................. 17, 18

**Statutes**

18 U.S.C. § 1961 ....................................................................................... 10

18 U.S.C. § 1962 ................................................................................. 13, 15

18 U.S.C. § 1341 ....................................................................................... 10

18 U.S.C. § 1343 ....................................................................................... 10

18 U.S.C. § 1956 ....................................................................................... 10

18 U.S.C. § 1957 ....................................................................................... 10

28 U.S.C. § 1367 ....................................................................................... 61

Rule 12 ............................................................................................... 7, 8, 9

Rule 15 ............................................................................................... 9, 64

## PRELIMINARY STATEMENT

Short on substance, Defendants move to dismiss the causes of action against them in Plaintiffs'[1] first amended complaint ("FAC") despite the well-pled allegations concerning their substantial role in assisting the Deo Defendants[2] in defrauding the IAG Plaintiffs ("IAG") and in pilfering Superb Motors Inc. ("Superb") of monies belonging to it and allowing them to plunder Superb.

For the reasons set forth below, Defendants were complicit in the RICO[3] scheme alleged in the FAC and Plaintiffs have sufficiently stated each of their claims.

Notwithstanding, and in an abundance of caution, Plaintiffs respectfully cross-move for leave to amend the pleadings to add additional allegations or to correct technical deficiencies – supported by evidence.

Accordingly, the Defendants' motions to dismiss must be denied in their entirety and Plaintiffs' cross-motion to file a Third Amended Complaint must be granted.

---

[1] Plaintiffs Superb Motors Inc., Team Auto Sales LLC, and Robert Anthony Urrutia are collectively hereinafter referred to as the "Superb Plaintiffs," while Plaintiffs 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC, Island Auto Management, LLC, Brian Chabrier, Joshua Aaronson, and Jory Baron are collectively hereinafter referred to as the "IAG Plaintiffs," with the Superb Plaintiffs and IAG Plaintiffs collectively hereinafter referred to as the "Plaintiffs."

[2] The Deo Defendants consist of Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp.

[3] RICO stands for the Racketeer Influenced and Corrupt Organizations Act.

1

**FACTS**

i.      Allegations in the FAC

On August 17, 2023, Plaintiffs – a consortium of two separate automobile dealership groups and their principals – filed suit against Defendants – including individuals who served as general managers of Plaintiffs' dealerships, together with those that supported the general managers – for violations of RICO, the Defend Trade Secrets Act ("DTSA"), and related common law claims under state law.  See ECF Docket Entry 1; see also ECF Docket Entry 65 (FAC).

Plaintiffs allege, *inter alia*, that Deo and his cohort (collectively, the "Deo Defendants") engaged in a pattern of fraudulent conduct with the other Defendants, to deprive Plaintiffs of money, property, and trade secrets in order to establish their own dealerships.

The allegations in the FAC describe Defendants' actions to first plunder the finances of the IAG Plaintiffs by defrauding, cheating, and stealing from the IAG Plaintiffs, their lenders and their customers, and by hiding their actions through financial manipulation. When the IAG Plaintiffs became aware of Defendants' actions, Defendants created false financial records of the IAG Plaintiffs to sell non-existent assets and used those funds to invest in the Superb Plaintiffs' business and commit the same and similar actions.

The FAC adequality alleges how Deo infiltrated Northshore and Sunrise, of which he was the manager (FAC ¶¶ 73-75), not an owner (FAC ¶¶ 48-55, 56-66), to perpetrate mail, wire and bank fraud, as predicate acts of the enterprise.  A used car dealership's lifeblood is its access to capital to purchase used car inventory.  It must also maintain invested capital. Northshore and Sunrise arranged for most of this capital through the relationships between their owners (individual Plaintiffs Aaronson and Chabrier) and the IAG Plaintiffs' Floor Plan financing lender, Ally Bank, N.A. ("Ally"). The invested capital was to accrue from its earnings.

The enterprise that Deo, with his co-Defendants and cohorts, established was formed for the initial purpose to steal money from and through Northshore's and Sunrise's legitimate used car dealerships to be used by Deo and the co-Defendants personally and to benefit a consortium of used car dealerships Deo had formed. They accomplished this through various fraudulent and other wrongful practices. These activities included failing to pay off existing loans on vehicles traded in by customers, taking customer cash deposits, paying personal expenses or those of his other businesses and not paying company debts (FAC ¶¶ 92-98, 105-112, 118-125). Doing so, though, would swiftly deplete Northshore's and Sunrise's operating capital and result in losses, raising the suspicions of Northshore's and Sunrise's owners that had entrusted Deo with their operations.

In order to perpetuate this scheme for as long as possible, Deo needed to keep the operations of Northshore and Sunrise well-funded and appear profitable to both its owners and Ally. As such, Deo, with the assistance of the CPA Defendants, fraudulently manipulated the monthly financial statements of Northshore and Sunrise which were input into and maintained on Northshore's and Sunrise's dealer management system (the "DMS"), and submitted to Ally. (FAC ¶¶ 126-141). Deo also submitted fraudulent applications to obtain COVID-19 emergency funding, claiming ownership in Northshore and Sunrise, and filing Northshore's application with the electronic signature of David Baron the day after David Baron died. (FAC ¶¶ 142-147).

When the IAG Plaintiffs ultimately caught on to the Deo Defendants' scheme, cutting off further funding, Deo and his cohorts found a new mark, the Superb Plaintiffs. But they first needed capital to buy into Superb. Unable to access any more funding from the IAG Plaintiffs or Ally, Deo and Jones orchestrated with Libertas, through the use of falsified ownership of Northshore and Sunrise and financial statements, to monetize $735,000 of future earnings of Northshore and Sunrise (the "Libertas Funds"). (FAC ¶¶ 148-153).

With the assistance of Thomasson, S, Deo, Blankenship, and Merckling, Anthony Deo ("Deo") arranged to wrongfully personally obtain the Libertas Funds. (FAC ¶¶ 154-165).  Libertas' involvement in the enterprise became evident when it was not able to collect on its agreement signed by Deo, and instead of pursuing a claim against Deo as guarantor or Deo and Thomasson, who both admitted to have taken the Libertas Funds, Libertas sued only the IAG Plaintiffs, who turned the Libertas Funds over to Thomasson (and demanded that it remain in his escrow account) under threat of arrest.  (FAC ¶¶ 166-168). Thomasson, an attorney, removed the Libertas Funds from his attorney escrow account despite his knowledge that the Libertas Funds were the consideration paid by Libertas to Northshore for the purported sale of the Future Receipts and provided it to Deo who immediately used the Libertas Funds to buy into Superb to perpetuate the enterprise into the same type of schemes by bankrupting Superb for their own benefit. (FAC ¶¶ 166-168, 182).

To finalize their stripping of any value in Northshore, Deo with the assistance of the CPA Defendants and Defendant Laurie, presented falsified records of ownership of Northshore and Sunrise and financial statements to Flushing to obtain a $500,000.00 secured loan against Northshore's assets, which funds Deo used in furtherance of the enterprise. (FAC ¶¶ 169-172).

The allegations in the FAC also describe Deo's conduct (with assistance from the other Deo Defendants and the CPA Defendants) in manipulating the Superb Plaintiffs' financial records, misappropriating physical inventory, and stealing trade secrets in order to further their illegal enterprise and establish their own dealerships, which Deo formed in 2020, long before he set his sights on Superb.

When Urrutia met Deo in November 2022, he worked to gain Urrutia's trust and confidence.

Urrutia and Deo then entered into the Cross-Purchase Agreement for Urrutia to purportedly obtain a 25% interest in Northshore and Sunrise and for Deo to obtain a 49% interest in Superb, where "Deo made representations and warranties to Urrutia that, among other things, he (is) the sole owner of Northshore and Sunrise, respectively; [and] (ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively" (FAC ¶ 177). However, as set forth in further detail, *supra*, Deo has never been "an owner of any membership interest in Northshore" or Sunrise (see FAC ¶¶ 52 and 62).

Once Deo secured Urrutia's confidence, he and the co-Defendants, as his agents, engaged in a series of prohibited actions including: impermissible double-flooring (FAC ¶¶ 199-200); misappropriating a fleet of Superb's vehicles (FAC ¶ 206); misappropriating cash payments from Superb customers (FAC ¶ 216), signing unauthorized checks from Superb's bank accounts even though "he had no authority to do so (FAC ¶¶ 220-221); "misrepresent[ing] to Flushing Bank that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank" (FAC ¶ 209) in order "to divert Superb's funds into an account that [Deo] c[ould] control (FAC ¶ 212); and impermissibly obtaining Superb's confidential information in order "to cut Superb out of its business" and "build a competing group of dealerships" (FAC ¶ 270).

ii.     Additional Allegations in Plaintiffs' Proposed Third[4] Amended Complaint

The Proposed Third Amended Complaint ("TAC")[5] addresses certain technical deficiencies and provides additional factual support for the allegations in the FAC.

---

[4] When Plaintiffs opposed to Flushing Bank's motion to dismiss, Plaintiffs also cross-moved to file a Second Amended Complaint.  The Third Amended Complaint retains the contents of the proposed Second Amended Complaint and adds further allegations discussed herein.

[5] See Declaration of Emanuel Kataev, Esq. ("Kataev Decl.") ¶¶ 3-5, Exhibits A, B, and C.

The TAC alleges that Deo had made material representations to particular plaintiffs concerning the accuracy of the financial information being input into the IAG Plaintiffs' DMS, and provided to Ally. The allegations specify particular transactions and the nature of each misrepresentation and describe the CPA Defendants' role therein in order to deceive these plaintiffs that resulted in Deo fraudulently obtain financing from Ally.  (TAC ¶¶ 261-301).

There are specific instances alleged wherein Deo misrepresented the condition of vehicles being purchased in order to obtain excessive financing from Ally, to his benefit and the detriment of both the IAG and Superb Plaintiffs.[6] (TAC ¶¶ 133-166). There are also specific instances alleged in which Deo arranged for the financing of vehicles sold to a customer, yet Deo personally retained those financed proceeds even after the transaction was cancelled and the vehicle was sold to another customer, requiring the Plaintiffs to repay the finance company. (TAC ¶¶ 146-166).

The TAC provides examples of occasions on which customers traded in their vehicles to purchase a vehicle from Northshore, Sunrise, or Superb and Deo was to use the financed proceeds from the sale to satisfy the existing loans on those vehicles traded in.  Instead, Deo retained the proceeds, leaving IAG and Superb to pay off the loans. (TAC ¶¶ 295-324).  There are further allegations describing the interrelationship and actions of Libertas as it relates to Deo and the enterprise. (TAC ¶¶ 325-337).

The TAC withdraws the derivative claims previously asserted on behalf of Northshore and Sunrise, now asserting them directly. It also adds the remaining two individual members of Northshore and Sunrise as plaintiffs and includes, in the alternative, Northshore and Sunrise as potential defendants.

---

[6] Unsurprisingly, many of the fraudulent schemes the Deo Defendants perpetrated against the IAG Plaintiffs were later repeated, in dastardly fashion, against the Superb Plaintiffs.

Finally, the TAC clarifies which plaintiffs and which defendants are subject to the particular allegations and causes of actions raised herein concerning the IAG Plaintiffs.

With regard to the Superb Plaintiffs, the TAC provides examples of Deo, with assistance from the Deo Defendants, manipulating used vehicle purchases (TAC ¶¶ 448-513) and double-booking financing (TAC ¶¶ 514-517), as well as examples of Deo purchasing grey-market vehicles (TAC ¶¶ 445-488) which caused a deficiency in the Floor Plan repayment.

The TAC also provides examples of Deo utilizing the services of the CPA Defendants to manipulate monthly financial records in order to obtain Floor Plan financing when, in fact, Superb was operating at a loss (TAC ¶¶ 595-620) as a result of the Deo and his cohorts misappropriating Superb's assets (TAC ¶¶ 623-627) for its own purpose.

In the argument section below, the additional allegations contained in the TAC are addressed in more detail.  For the reasons set forth below, and given the tremendous level of detail concerning the Defendants' concerted conduct to bilk the Plaintiffs out of all their operating capital such that every dealership Deo has touched has been shut down, Defendants' motion to dismiss must be denied and Plaintiffs' cross-motion for leave to file the TAC should be granted.

**<u>STANDARD OF REVIEW</u>**

**A.      Rule 12(b)(1)**

When deciding a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") at the pleading stage, the Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor," except for "argumentative inferences favorable to the party asserting jurisdiction." <u>See</u> <u>Buday v. N.Y. Yankees P'ship</u>, 486 Fed. Appx. 894, 895 (2d Cir. 2012) (summary order).

To the extent a Rule 12(b)(1) motion places jurisdictional facts in dispute, the district court must resolve the disputed jurisdictional fact issues by referring to evidence outside the pleadings. See Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011). In addition, when a defendant moves to dismiss for lack of subject matter jurisdiction and on other grounds, a court should consider the Rule 12(b)(1) challenge first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).

**B.     Rule 12(b)(6)**

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under "the two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). *First*, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; see also Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." See Iqbal, 556 U.S. at 679. To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." See Iqbal, 556 U.S. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 554, 557 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer *possibility* that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556) (emphasis added).[7]

---

[7] As set forth in the Plaintiffs' memorandum of law in opposition to Flushing Bank's motion to dismiss, documents outside of the complaint may be considered on a motion to dismiss.

### C.     Rule 15

Rule 15 instructs courts to "freely give leave" to amend pleadings "when justice so requires." See Fed. R. Civ. P. 15(a)(2).   While leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party" (McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted), it is "[t]he party opposing the amendment [that] has the burden of demonstrating any bad faith, prejudice of the proposed amendment, or futility of the proposed amendment." See Ap-Fonden v. Goldman Sachs Grp., Inc., No. 18-CIV.-12084, 2023 WL 4865617, at *4 (S.D.N.Y. July 31, 2023).   Here, due to the nascent[8] stage of this case, Defendants cannot demonstrate any bad faith or prejudice, nor can they demonstrate futility given the well-pled allegations in the FAC as further set forth below.   In light of the foregoing standard of review, this Court should deny the Defendants' motions.

### ARGUMENT

### DEFENDANTS' MOTION TO DISMISS MUST BE DENIED

### I.     Legal Standard for RICO Claims

#### A.  RICO Substantive Claim Under 18 U.S.C. § 1962(c)

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).   "The elements [of] a[n 18 U.S.C. § 1962] subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." See Salinas v. United States, 522 U.S. 52, 62 (1997); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).

---

[8] See Superb Motors Inc. v. Deo, No. 23-CIV.-6188 (JMW), 2023 WL 8358062, at *1 (E.D.N.Y. Dec. 1, 2023) (referring to this case as being only in its nascent stage).

"'Pattern of racketeering activity' is a defined term and requires at least two acts of 'racketeering activity,' the so-called predicate acts." Id. (quoting 18 U.S.C. § 1961(5)).  Predicate acts include, among other things, mail and wire fraud, money laundering, obstruction of justice, bankruptcy fraud, and National Stolen Property Act violations. See 18 U.S.C. §§ 1341, 1343 (mail and wire fraud); 18 U.S.C. §§ 1956, 1957 (money laundering).

A "[p]laintiff need not prove that the defendant committed any predicate act." See Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d 673, 727 (S.D.N.Y. 2021) (citing United States v. Arrington, 941 F.3d 24, 36 (2d Cir. 2019)); see also De Sole v. Knoedler Gallery LLC, 137 F. Supp. 3d 387, 409 (S.D.N.Y. 2015) (A "plaintiff need only plead facts demonstrating that the defendant agreed to join an enterprise with knowledge that predicate acts would be committed by some member of the enterprise").

Further, the Second Circuit has held that the "bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts." See McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992) (emphasis added). And more recently, the Circuit stated in *dicta* that "it is no great leap to find that one who assists in [a] fraud also conducts or participates in the conduct of the affairs of the enterprise," See Satinwood, 385 F.3d at 178. Rather than requiring that a defendant commit or agree to commit two specific predicate acts, a RICO conspiracy can be established instead by providing assistance to the conspiracy:

> for example [it may] be proven by evidence that the defendant agreed to facilitate a scheme by providing tools, equipment, cover, or space; that the facilitation was knowing because the defendant was aware of the broader scheme, even if he was unaware of the particulars, or because the defendant knowingly benefitted from the scheme; and that other members of the enterprise intended to accomplish specific predicates.

See United States v. Zemlyansky, 908 F.3d 1, 11 n.6 (2d Cir. 2018).

Of specific relevance to this case, "evidence of a defendant's receipt of diverted or stolen funds, and/or facilitation of another's receipt of such funds, may support an inference that the defendant knowingly participated in a claimed RICO conspiracy." See Related Companies, L.P. v. Ruthling, 2019 WL 10947100, at *7 (S.D.N.Y. July 23, 2019) (citing Palazzolo, 346 F. Supp. 3d at 464). "[A] complaint need not allege the conspirators agreed to commit the predicate acts, but only that they agreed to participate in the enterprise's affairs." City of New York v. Chavez, 2012 U.S. Dist. LEXIS 42792, *23 (S.D.N.Y. 2012).

To sustain a claim for a RICO violation under §1962(c) a plaintiff must also establish that defendant's pattern of racketeering caused plaintiff's injury.

The Second Circuit has emphasized that "the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." Hect v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990).

### B.  RICO Conspiracy Claim Under 18 U.S.C. § 1962(d)

18 U.S.C. § 1962(d) provides that, "[i]It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of [18 U.S.C. § 1962]." 18 U.S.C. § 1962(d). A claim for a RICO conspiracy under 18 U.S.C. § 1962(d) requires proof "(a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." See Zemlyansky, 908 F.3d at 11.

"To prove the agreement element, the [plaintiff] must show that the defendant 'knew about and agreed to facilitate [a racketeering] scheme.'" Id. (quoting Salinas, 522 U.S. at 66); see also

United States v. Pizzonia, 577 F.3d 455, 459 (2d Cir. 2009) ("[T]he object of a racketeering conspiracy is to conduct the affairs of a charged enterprise through a pattern of racketeering, not to commit discrete predicate acts"). As to the intent element, critically, "RICO conspiracy does not require proof that the defendant intended that specific criminal acts be accomplished." See In re Firestar Diamond, Inc., No. 18-10509 (SHL), 2023 WL 6786093, at *8 (Bankr. S.D.N.Y. Oct. 13, 2023). "Instead, it suffices to show that he intended that the broad goals of the racketeering scheme be realized, along with evidence that some (or any) members of the conspiracy intended that specific criminal acts be accomplished." Zemlyansky, 908 F.3d at 11; see also Salinas, 522 U.S. at 65 ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense"); United States v. Zichettello, 208 F.3d 72, 100 (2d Cir. 2000) ("To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy").

Crucially, to prove the pattern element—that two or more predicate acts were involved— it "need not [be] establish[ed] that the defendant 'committed or agreed to commit two predicate acts himself.'" Zemlyansky, 908 F.3d at 11 (quoting Salinas, 522 U.S. at 63). Rather, the pattern element may be established "through evidence that 'the co-conspirators, not solely the defendant, agreed to conduct the affairs of the enterprise through a pattern of racketeering.'" Id. (quoting United States v. Yannotti, 541 F.3d 112, 129 n.11 (2d Cir. 2008)); see also Salinas, 522 U.S. at 63-64 ("A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. The partners in a criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of the other"). Indeed, "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts that are elements of a substantive count[,] ... for 'it suffices that

he adopt[ed] the goal of furthering or facilitating the criminal endeavor.'" Zemlyansky, 908 F.3d at 10 (quoting United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002)); Salinas, 522 U.S. at 65 ("It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense").

Of import, courts have recognized that not only are "Section 1962(d) conspiracies ... easier to prove than violations of [Section] 1962(c)," Palatkevich v. Choupak, 2014 WL 1509236, at *22 (S.D.N.Y. Jan. 24, 2014), but RICO conspiracies are also easier to demonstrate than "basic" conspiracies, as RICO conspiracies "do[ ] not require proof that a defendant knowingly agreed to facilitate a specific crime …" and "ha[ve] a more removed *mens rea* requirement" than "basic" conspiracies. See Zemlyansky, 908 F.3d at 11, n.7; see also Salinas, 522 U.S. at 63 ("There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an 'act to effect the object of the conspiracy'") (internal citation omitted); Arrington, 941 F.3d at 36–37 ("To prove a RICO conspiracy ... [the plaintiff] need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme.") (internal citations omitted); Zemlyansky, 908 F.3d at 11 ("[U]nlike 'basic' conspiracy, RICO conspiracy does not require proof that the defendant intended that specific criminal acts be accomplished").

Moreover, courts analyze complaints alleging RICO conspiracies under the more liberal pleading requirements of Rule 8(a). See Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo, 346 F. Supp. 3d 432, 463 (S.D.N.Y. 2018) (citing Hecht, 897 F.2d at 26, n.4 ). Rule

8(a) applies because "it is the sufficiency of the conspiracy allegation rather than the underlying fraud allegation which is being challenged." See State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., 375 F. Supp. 2d 141, 153 (E.D.N.Y. 2005) (quoting Hecht, 897 F.2d at 26 n.4).

"The Second Circuit has held that for a RICO conspiracy claim, the Court must limit its focus to 'whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise.'" Id. (quoting United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000)); see also United States v. Rastelli, 870 F.2d 822, 828 (2d Cir. 1989) ([a plaintiff] need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of the conspiracy. All that we require is that the defendant agree to commit the substantive racketeering offense through agreeing to participate in two predicate acts, and that he know the general nature of the conspiracy and that the conspiracy extends beyond his individual role").

In order to plead a conspiracy claim under RICO, a plaintiff must allege that the defendant participated in "an agreement to violate RICO's substantive provisions." See One World, LLC v. Onoufriadis, 2021 WL 4452070, at *1 (2d Cir. 2021) (summary order) (internal quotation marks omitted). Indeed, the purpose of RICO is, in part, to "protect[ ] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful activity is committed." See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163-65 (2001) (citation omitted). Crucially, "one is liable under RICO if he or she has discretionary authority in carrying out the instructions of the [enterprise's] principals, or played some part in directing the affairs of the RICO enterprise." See Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003) (cleaned up). Generally, "the 'operation or management' test typically has proven to be a

relatively low hurdle for plaintiffs to clear, especially at the pleading stage." See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) (citation omitted); see also D'Addario v. D'Addario, 901 F. 3d 80, 104 (2d Cir. 2018) (holding that "Although the entity defendants (Silver Knot and Red Knot) were used simply to effectuate David's schemes, they also can be understood to have sufficiently assisted David in his conduct of the Estate's affairs simply by their formation and existence: they were necessary tools for the schemes' operation. Such assistance may fairly be considered 'participation' in the operation or management of an enterprise, at least in the circumstances alleged here").

### C.  RICO Investment Claim Under § 1962(a)

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity * * * to invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

See 18 U.S.C. § 1962(a).

To state a violation under section 1962(a), a plaintiff has to plead "(1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce." See Conte v. Tapps Supermarket, No. 22-CIV.-3109 (DG) (JMW), 2023 WL 6594351, at *11 (E.D.N.Y. July 3, 2023), report and recommendation adopted, No. 22-CIV.-3109 (DG) (JMW), 2023 WL 6140182 (E.D.N.Y. Sept. 20, 2023) (citing Hinterberger v. Catholic Health Sys., Inc., 536 Fed. Appx. 14, 16 (2d Cir. 2013) (internal quotation marks and citation omitted)).

Under the plain language of this section, a violation of § 1962(a) consists of investing income derived from a pattern of racketeering activity to acquire an interest in, establish, or operate

an enterprise; the violation is not established by mere participation in predicate acts of racketeering.  See Ouaknine v. MacFarlane, 897 F.2d 75, 82 (2d Cir. 1990).

Accordingly, under the plain terms of the statute, to state a civil claim under § 1964(c) for a violation of § 1962(a), a plaintiff must allege injury "by reason of" defendants' investment of racketeering income in an enterprise.  Accord Rose v. Bartle, 871 F.2d 331, 356–58 (3d Cir.1989); Grider v. Texas Oil & Gas Corp., 868 F.2d 1147, 1149–51 (10th Cir.), cert. denied, 493 U.S. 820 (1989); see also Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385, 397–98 (6th Cir.1989) (not explicitly construing statute, but remanding where plaintiff asserting claim under § 1962(a) might be able to establish injury from investment of racketeering income in enterprise).  With this statutory framework in mind, there can be no question Plaintiffs state a claim against the Defendants for RICO's substantive, conspiracy, and investment provisions based on the allegations in the complaint and the record in this case of which this Court may take judicial notice.

## II.     Plaintiffs state a claim for relief against Defendants under RICO's substantive provision

In order to plead wire fraud, a plaintiff "must show (1) the existence of a scheme to defraud, (2) [the defendants'] knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996); see also Lundy v. Cath. Health Sys. of Long Is. Inc., 711 F.3d 106, 119 (2d Cir. 2013).  Wire fraud has three elements that "must be pled with particularity" -- (1) "a scheme to defraud" (which requires "proof of a material misrepresentation") (2) "to get money or property" (3) "furthered by the use of interstate mail or wires." See Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018).

RICO claims in which the predicate act is based on fraud must meet the heightened pleading standard of FRCP 9(b). See Wood Ex rel. US. V. Applied Research Assocs., Inc., 328 F.

Appx. 744, 747 (2d Cir. 2009). "Where a civil RICO claim is predicated on acts of fraud, a plaintiff must comply with [Rule] 9(b)'s requirement to plead with particularity" See Environmental Servs. v. Recycle Green Servs., 7 F. Supp. 3d 260, 271 (E.D.N.Y. 2014) (internal quotations omitted). A RICO claim based on fraud must: "(1) specify the statements, oral or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent." SEC v. Lee, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010).

"In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter (when required) for each defendant; guilt by association is impermissible. This can consist of allegations as to who 'possessed … knowledge' of the fraud, 'when and how they obtained [that] knowledge,' or even why they 'should have known' of the fraud" (internal citations omitted). Id. at 321.

    i.    <u>The Deo Defendants' Motion to Dismiss Must be Denied</u>

The Deo Defendants argue that Plaintiffs have failed to plead the predicate acts constituting the Deo Defendants' purported fraud with particularity, have failed to identify an enterprise constituting the conspiracy, and failed to establish a nexus between the predicate acts and Plaintiffs' injury. For the reasons set forth below, Plaintiffs have sufficiently stated a substantive RICO claim against the Deo Defendants based on wire fraud.

First, with regard to the IAG Plaintiffs, Plaintiffs have alleged with particularity that the Deo Defendants committed at least two predicate acts constituting wire fraud.

Plaintiffs allege that Deo, with assistance from the Deo Defendants, engaged the services of Defendant Jones and Jones CPA LLP (collectively, the "CPA Defendants"), falsified

Northshore's and Sunrise's monthly financial statements in order to induce the IAG Plaintiffs and Ally to provide a Floor Plan to Northshore and Sunrise, even though the IAG Plaintiffs and Ally "would have discontinued providing the Floor Plan to Northshore and Sunrise" had the monthly financial reports been accurate. FAC ¶¶ 129 and 136. Plaintiffs further allege that these records were transmitted "by the U.S. mails or by private or commercial interstate carriers" (FAC ¶ 304) and/or "transmitted by means of wire communications in interstate commerce" (FAC ¶ 305). The knowing use of these forged instruments to obtain Floor Plan financing constitutes wire fraud.

Further, Plaintiffs allege that Deo, *inter alia*, "falsely claimed to be a fifty percent (50%) owner of Northshore" and "claim[ed] he has been the sole owner of Sunrise since January 1, 2021" in order to obtain COVID-19 Economic Injury Disaster Loans ("EIDL") (FAC ¶¶ 142-143, 145) and falsely claimed full ownership of Northshore and Sunrise in order to obtain the Libertas Funds (FAC ¶¶ 148, 153). Plaintiffs further allege that these records were transmitted "by the U.S. mails or by private or commercial interstate carriers" (FAC, ¶ 304) and/or "transmitted by means of wire communications in interstate commerce" (FAC ¶ 305). The knowing use of these forged instruments to procure funds from Libertas constitutes wire fraud. As such, Plaintiffs have alleged at least two predicate acts constituting wire fraud.

In accordance with the heightened pleading requirement of FRCP 9(b), Plaintiffs have clearly specified the fraudulent statements, the speaker of the statements, when, where, and to whom the fraudulent statements were made, and why the statements were fraudulent. See Wood, 328 F. Appx. at 747. As such, Plaintiffs have satisfied the heightened pleading standard for a substantive RICO claim based on wire fraud.

To the extent that the FAC did not provide the necessary specificity, such is cured by further detailed allegations in the TAC, including the particular parties involved in each instance.

It details how Deo, as manager of Northshore and Sunrise, was charged with the responsibility to manage their inventory purchases and financing with their Floor Plan lender, Ally. In connection therewith, each entry he submitted into Northshore's and Sunrise's DMS concerning vehicle purchases and financial information was a representation that such information was accurate and could be relied upon by Northshore and Sunrise, those members of Northshore and Sunrise who appointed and engaged with Deo for that purpose, and Ally. (TAC ¶¶ 117-132).

The IAG Plaintiffs then describe, in detail, vehicle model, prices, dates, and financing amounts; all specific instances among many in which Deo purchased vehicles for Northshore and Sunrise in poor and damaged condition, represented that the vehicles were in very good salable condition in order to obtain financing in excess of the vehicle's actual purchase price, and kept the difference. (TAC ¶¶ 133-166).

Deo's previously alleged false monthly financial reporting, aided by the CPA Defendants, is further described with the monthly reporting methodology and specific examples of dates, accounting journal entries and false monthly profit amounts being specified in support of the claim. (TAC ¶¶ 261-301).

Similarly particularized are (i) the concerted actions of Deo, the CPA Defendants and Libertas in using false Northshore financial records they created or ratified to justify a sale of Northshore's future receipts for $735,000 (the "Libertas Funds"); (ii) how they, together, manipulated the Libertas Funds' transfer to avoid discovery by the Northshore's members; (iii) when they were discovered, employed the services of Blankenship and Merkling to enlist a police detective to wrestle the funds away from Northshore by threat of arrest, (iv) how they used Thomasson's attorney trust account to pass the funds to Deo personally; and (v) their concerted actions for Libertas to not sue Deo, and instead only sue the IAG Plaintiffs. See TAC ¶¶ 311-368.

Finally, the TAC describes the date that Deo, with the assistance of The CPA Defendants, prepared and submitted specified false financial records of Northshore to Flushing to obtain a $500,000 secured loan for Northshore, funds immediately pocketed by the Deo Defendants. (TAC ¶¶ 369-381). All of these actions constitute predicate acts, with communications or fund transfers made by electronic means.

Second, the Superb Plaintiffs, likewise, have alleged with particularity that the Deo Defendants committed at least two predicate acts constituting wire fraud. Plaintiffs allege that Deo, with assistance from the Deo Defendants, engaged in impermissible double flooring by "filling out applications for financing and making material misrepresentations in said applications" (FAC ¶ 203), conduct which "caus[ed] Superb's floor plan line of credit with NMAC [Nissan Motor Acceptance Corporation] to be terminated, resulting in a finding of irreparable harm by this Court" (FAC ¶ 204). Plaintiffs further allege that these records were transmitted "by the U.S. mails or by private or commercial interstate carriers" (FAC ¶ 304) and/or "transmitted by means of wire communications in interstate commerce" (FAC ¶ 305). The knowing use of these forged instruments to obtain Floor Plan financing constitutes wire fraud.

Plaintiffs also allege that Deo "misrepresented to Flushing Bank that he [wa]s the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank (FAC ¶ 209) and "divert Superb's funds to an account he can control" (FAC ¶ 212). Further, Plaintiffs allege that "Defendants S. Deo, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment." (FAC ¶ 254).

Additionally, Plaintiffs allege that these records were transmitted "by the U.S. mails or by private or commercial interstate carriers" (FAC, ¶ 304) and/or "transmitted by means of wire

communications in interstate commerce" (FAC, ¶ 305). The knowing use of these forged

instruments to obtain these funds constitutes wire fraud.

To the extent that the FAC did not provide the necessary specificity with regard to the

Superb Plaintiffs, the further detailed allegations in the TAC cure any such defect. Specifically,

the TAC alleges that "[t]he Deo Defendants and the CPA Defendants intentionally manipulated

Superb's monthly financial information every month between at least April 2023 through July

2023" (TAC ¶ 603) which they provided to Superb and the Floor Plan lenders in order "to induce

the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb"

(TAC ¶ 606). Further, the TAC alleges that the Deo Defendants and the CPA Defendants:

- on May 12, 2023, directed Superb's controller, Kendra Kernizant ("Kernizant"), to make two (2) adjusting journal entries in the amount $61,559.16 for the April 2023 financial statement in order to show a false profit of $27,842.00;
- directed Kernizant on June 12, 2023 to make adjusting journal entries to the unit count of sold vehicles;
- told Kernizant that there was money found on schedules to be put back into income and directed her to make journal entries removing packs from used car inventory schedule and made adjusting entries for $48,563.00 to change the May 2023 financial statement in order to show a false profit of $26,136.00;
- directed Kernizant to make adjusting journal entries to the unit count of sold vehicles, to not reflect eight (8) unwound sales from prior months, the effect of which was designed to show a greater profit for Superb;
- directed Kernizant to make adjusting journal entries for the amount $12,304.70 to change the June 2023 financial statement in order to show a false profit of $17,361.00;
- directed Kernizant to add money set aside for taxes as "profit" for Superb;
- directed Kernizant to first add, and then not unwind, forty-two (42) deals that fell through with no expectation of consummating those deal, which added $1.5M in profit and $250,000 in net profit; and
- directed Kernizant to floor sold vehicles and other vehicles that did not exist; and
- imputed income from the foregoing fake deals, resulting in the illusion that Superb is profitable and permitted the Deo Defendants to run off with over $800,000.00 in missing cash and checks from customer deposits, and over $450,000.00 in ACH transactions to pay other debts that are not Superb's, among myriad other damages.

(TAC ¶¶ 609-616).

These misrepresentations caused Superb and its Floor Plan lenders to "reasonably rel[y]

upon the falsified monthly financial statements to continue to provide the Floor Plan to Superb"
(TAC ¶ 619) when they "would not have continued" to do so "had they been aware that the monthly
financial statements were false" (TAC ¶ 621).

"For an association of individuals to constitute an enterprise, the individuals must share a
common purpose to engage in a particular fraudulent common course of conduct and work together
to achieve such purposes." Satinwood, Inc., 385 F.3d at 174. Plaintiffs have sufficiently alleged
the existence of an enterprise under 18 U.S. 1962(d). See Air China Ltd. V Li, 2009 U.S. Dist.
LEXIS 27482, at *15-16 (SDNY Mar. 31, 2009)) (sufficiently alleging "that the 'enterprise' whose
affairs were conducted through the pattern of racketeering was an association in fact composed of
the named defendants and others; that all Defendants were associated with the enterprise and
engaged in the particular course of fraudulent conduct alleged in the Complaint and that
Defendants 'work[ed] together to  achieve their common goal' and their fraudulent conduct was
"concerted").

Plaintiffs have described how Deo was the ringleader of the enterprise who was aided in is
goal by the other Deo Defendants.  (TAC ¶¶ 746-749).

Finally, the Plaintiffs have established a nexus between the Deo Defendants' role in the
enterprise and their injuries which caused Northshore, Sunrise, and Superb to sustain millions of
dollars of losses and debts.  Northshore's, Sunrise's, and Superb's losses derive from the predicate
acts committed by the Deo Defendants for the benefit of the enterprise.

The FAC, as further detailed in the TAC, describes the various schemes implemented by
the Deo, with assistance by the Deo Defendants, which all served to pilfer the assets of Northshore,
Sunrise, and Superb.  These acts included defrauding Plaintiffs, their customers, and their lenders,
personally taking cash deposits, and paying personal obligations with company funds.  As noted,

one of the predicate acts was in misrepresenting the damaged and poor condition of used vehicles purchased on-the-cheap so as to obtain financing from Northshore's Sunrise's, and Superb's Floor Plan lenders, in excess of the actual purchase price and keeping the difference. See TAC ¶¶ 448-513.  Another predicate act was purchasing grey-market vehicles which resulted in a total loss to Plaintiffs. See TAC ¶¶ 445-488.

In order to cover up these losses, which would have been promptly discovered by Northshore's, Sunrise's, and Superb's managing members and Floor Plan lenders upon a review of the monthly financial statements, Deo, with the assistance of the CPA Defendants, as another predicate act, falsified the monthly financial reports. See TAC ¶¶ 595-620. These fraudulent entries and submissions prolonged the discovery of the embezzlement and served to maximize the theft as Northshore's, Sunrise's, and Superb's managing members and their Floor Plan lenders were induced to allow Deo to continue to borrow money from the Floor Plan lenders to purchase used vehicle inventory. Ultimately, Northshore, Sunrise, and Superb were left without inventory and both the IAG Plaintiffs and the Superb Plaintiffs repaid the Floor Plan lenders millions of dollars for vehicles that had been sold by Deo without satisfying the Ally loans. (TAC ¶¶ 192-194; 299-301; 497).

Having exhausted all of Northshore and Sunrise's actual assets, Deo implemented two more fraudulent schemes to extract money from non-existent future income of Northshore and Sunrise. Deo, with assistance of the CPA Defendants, used additional fraudulent financial records to sell Northshore's future receipts for the $735,000 Libertas Funds and borrow $500,000 from Flushing in a secured loan against Northshore's assets. (TAC ¶¶ 325, 373-376) These predicate acts not only saddled Northshore with more debt, but Deo then used those funds to buy into Superb, enabling him, and the Deo Defendants to engage in the same illegal acts with the Superb Plaintiffs

as they did with the IAG Plaintiffs (and additional illegal acts such as stealing Superb's confidential information to compete against Superb through the Deo Defendants other automobile dealerships) "which ultimately caused Superb to close." (TAC ¶¶ 385-394).

The Superb Plaintiffs allege that, as a result of the Deo Defendants' Double Floor Plan scheme, NMAC terminated its Floor Plan credit with Superb. See FAC ¶ 204. The Superb Plaintiffs also alleged that Deo Defendants' acts in submitting forged tax returns, bank statements, and false loan applications caused Superb to lose money and business. See, e.g., FAC, ¶ 212. Thus, Plaintiffs have established that their injuries were proximately caused by the Deo Defendants' predicate fraudulent acts.

Therefore, Plaintiffs have established a substantive RICO claim under §1962(c) against the Deo Defendants based on wire fraud.

Plaintiffs have also established a substantive RICO claim under §1962(a) against the Deo Defendants, Libertas and Flushing in that they allege the Deo Defendants used the funds derived by its racketeering activities at Northshore and Sunrise, including those obtained with Libertas's and Flushing's assistance, to invest in Superb and the Deo Dealerships and the Deo Defendants then used such ownership interests to pilfer Superb's assets, and use Superb's DMS system, employees and customer lists to unfairly compete with Superb, as further alleged in the TAC (TAC ¶¶ 684-691) and described *infra* as DTSA claim, wrongful misappropriation, unfair competition and conversion. Ideal Steel Supply Corp. v. Anza, 652 F.3d 310 (2d Cir. 2011) (a business's allegation of injury by a defendant's businesses investment in a more competitive operation using funds derived from racketeering activities was sufficient under §1962(a))

    ii.    <u>The CPA Defendants' Motion to Dismiss is Meritless</u>

As a preliminary matter, although the CPA Defendants argue that their Motion is based on

Rules 12(b)(1) and (6), and provide legal standards for same, the Motion substantively fails to provide any argument for how the Court lacks subject matter jurisdiction over Plaintiffs' claims. The CPA Defendants merely alleged that "if the Civil RICO and Conspiracy claims are dismissed, this Court should abstain from exercising pendent jurisdiction." MOL, pg. 10. However, that is insufficient to establish a lack of subject matter jurisdiction under Rule 12(b)(1).

Further, since the CPA Defendants have failed to provide a legal argument for dismissal under Rule 12(b)(1), they cannot rely on a declaration to dispute the facts in their argument under Rule 12(b)(6). See Henry Avocado Corp. v. Z.J.D. Bro., LLC, No. 17-CIV.-4559 (ARR), 2017 WL 6501864, at *2 (E.D.N.Y. Dec. 19, 2017) ("The defendants' 12 (b)(1) claim fails because it is really a 12(b)(6) claim"), and at *3 ("Here, the defendants sought to introduce an affidavit from Chen that provides a counter-narrative of facts … with their motion to dismiss. … None of this, however, is appropriate to consider on a motion to dismiss. As counsel should know, a motion to dismiss is not a swearing contest").

The CPA Defendants argue that Plaintiffs have failed to allege with specificity two or more predicate acts constituting a pattern of racketeering and have failed to allege injury resulting therefrom. For the reasons set forth below, the Plaintiffs have sufficiently stated a substantive RICO claim against the CPA Defendants based on wire fraud.

First, Plaintiffs have established an association-in-fact enterprise. An association-in-fact enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." See Boyle v. United States, 556 U.S. 938, 945 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

At a minimum, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity

sufficient to permit these associates to pursue the enterprise's purpose." See Boyle, 556 U.S. at 956 (internal quotations omitted). The Second Circuit looks to the "'hierarchy, organization, and activities' of the association to determine 'whether its members functioned as a unit.'" See Foster v. 2001 Real Estate, 2015 U.S. Dist. LEXIS 159489, *9 (S.D.N.Y. Nov. 24, 2015) (quoting Conte v. Newsday, Inc., 703 F. Supp. 2d 126, 133 34 (E.D.N.Y. 2010)).

The Supreme Court's holding in Boyle establishes that a RICO enterprise need not have a formal hierarchy. See Greenberg v. Blake, 2010 U.S. Dist. LEXIS 57617, *21 (E.D.N.Y. June 10, 2010). The allegations in the complaint must "address[] the relationships among defendants in a manner that distinguishes between the "enterprise' and the 'person' who conducted the affairs of the enterprise through a pattern of racketeering." Singh v. Parnes, 199 F. Supp. 2d 152, 162 (S.D.N.Y. 2002).

Plaintiffs allege that "[i]n order for Deo to perpetuate his financial wrongdoings he needed the IAG Plaintiffs and their Floor Plan lender, Ally, to continue to provide the Floor Plan to Northshore and Sunrise" (FAC ¶ 126), which required submitting monthly financial reports (FAC ¶ 127) to IAG and Ally. As such, "Deo and Jones manipulated Northshore's and Sunrise's monthly financial information" (FAC ¶ 133) and "monthly financial statements with an intent to defraud the the [sic] IAG Plaintiffs and Ally" (FAC ¶ 135). The CPA Defendants' wrongdoing, thus, continued over a long period of time in order to facilitate the Deo Defendants' enterprise. Similarly, Plaintiffs allege, "although Jones and his firm knew Superb was operating at a loss, they nonetheless altered journal entries in its accounting systems to create the appearance that it was operating profitably in order to deceive Urrutia and maintain his confidence in Deo" (FAC ¶ 245).

Thus, Plaintiffs have established the associations and relationships between and among the Defendants, and the continuity and, thus, longevity of the Defendants' racketeering activity in

furtherance of the enterprise, to sufficiently allege that the Deo Defendants' enterprise is an association-in-fact.

Second, Plaintiffs have alleged with particularity that the CPA Defendants committed at least two predicate acts constituting wire fraud. With regard to the IAG Plaintiffs, Plaintiffs allege that Jones "manipulated Northshore's and Sunrise's monthly financial information" (FAC, ¶ 133) "with an intent to defraud the the [sic] IAG Plaintiffs and Ally" (FAC, ¶ 135) and "induce the IAG Plaintiffs and Ally to continue to provide the Floor Plan to Northshore and Sunrise" (FAC ¶ 136). Plaintiffs also allege that the CPA Defendants further assisted Deo in procuring the Libertas Funds and the Flushing loan by preparing falsified financial records. These acts are alleged in the FAC and further articulated in the TAC. (TAC ¶¶ 311-337; 369-381).

With regard to the Superb Plaintiffs, despite the CPA Defendants' contention that Jones "performed only limited assistance services for Superb," Plaintiffs sufficiently establish more than two predicate acts constituting a pattern of fraud. Plaintiffs allege that, "although Jones and his firm knew Superb was operating at a loss, they nonetheless altered entries in its accounting system to create the appearance that it was operating profitably in order to deceive Urrutia and maintain his confidence in Deo." FAC ¶ 245. Further, Plaintiffs allege that "Defendants Laurie and Jones enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, *i.e.*, false tax returns, false bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb." FAC ¶ 255. Thus, Plaintiffs have alleged that the CPA Defendants knowingly and actively engaged in fraudulent activities using electronic wire transmission in furtherance of the Deo Defendants' enterprise to defraud the Superb Plaintiffs.

Further, Plaintiffs have sufficiently alleged that the CPA Defendants participated in the operation of the enterprise by directing some of its affairs. For example, Plaintiffs allege that Jones,

*inter alia*, manipulated Northshore's and Sunrise's monthly financial statements (see FAC ¶ 133) and created or submitted false financial documents to banking institutions (see FAC ¶ 245) in order to obtain unauthorized financing for the Deo Defendants. These allegations sufficiently demonstrate the CPA Defendants' knowledge of the Deo Defendants' schemes to defraud the Plaintiffs and their participation in the furtherance thereof via facilitation. The details of this scheme are explained in even greater detail in the TAC. See TAC ¶¶ 311-337; 595-627; 369-381.

Therefore, Plaintiffs have established a substantive RICO claim against the CPA Defendants based on wire fraud.

In describing the predicate acts engaged in by the CPA Defendants in connection with the RICO claim, Plaintiffs allege, with particularity, the fraudulent acts engaged in by the CPA Defendants in support of the fraud claims against them.

### iii.   J.P. Morgan Chase Bank, N.A.'s ("Chase") Motion to Dismiss Must be Denied

Chase argues that Plaintiffs fail to establish a RICO claim because Plaintiffs fail to allege the existence of an enterprise and failed to allege that Chase engaged in a pattern of racketeering. Chase first contends that Plaintiffs failed to establish an association-in-fact enterprise.

The allegations adequately plead an association-in-fact enterprise. The Complaint alleges that Chase assisted in the Deo Defendants' schemes to defraud the Plaintiffs by, *inter alia*, creating, submitting, and/or accepting forged financial documents – knowing that those documents were forged – in order to assist the Deo Defendants in obtaining funds rightfully belonging to the Plaintiffs. Specifically, Plaintiffs allege that "Chase Bank's employees and agents participated in a scheme by permitting Deo to process checks from Superb's bank account when it knew that he had no authority to sign checks. Deo was not an authorized signatory on Superb's account at Chase Bank." FAC, ¶ 316. The FAC clearly alleges that Chase was a participant in the operation of the

Deo Defendants' enterprise. Further, the TAC alleges that, like Flushing, Deo had personal relationships with Chase Chase, and Chase was aware of Deo's overall schemes. Chase directly assisted in (and aided and abetted) the Deo Defendants in carrying out their schemes, which courts have repeatedly held is sufficient to state a RICO claim under such circumstances. This is because it is possible to "operate or manage an enterprise and yet, through delegation, avoid directly committing predicate acts." 131 Main St. Assocs. v. Manko, 897 F. Supp. 1507, 1528 n.17 (S.D.N.Y. 1995). Prohibiting RICO liability for aiding and abetting predicate acts would therefore unduly narrow the reach of the statute. See Alix v. McKinsey & Co., Inc., 2023 U.S. Dist. LEXIS 145872, *35 (S.D.N.Y. Aug. 18, 2023). Thus, a RICO claim may lie against a defendant who "personally committed *or aided and abetted* the commission of two predicate acts." See McLaughlin, 962 F.2d at 192 (emphasis added).

Chase cites to Martinez v. JPMorgan Chase Bank, N.A., 178 F. Supp. 3d 184 (S.D.N.Y. 2016) for the proposition that an allegation that a bank provided services to alleged RICO participants is insufficient to establish participation in an enterprise. However, the Southern District in Martinez specifically held that the plaintiff failed to allege RICO violations as against Chase because the complaint failed to allege that Chase engaged in *intentional* wrongdoing, holding that "[w]ithout sufficiently alleging knowledge, the Amended Complaint merely states that JPM Chase provided banking services to BNP Paribas of Cuban entities, which is insufficient to constitute a RICO enterprise." Id. at 191. Here, on the other hand, Plaintiffs specifically alleged that Chase "knew that [Deo] had no authority to sign checks" on Superb's bank account but nonetheless processed them on Deo's behalf. FAC ¶ 316. Plaintiffs also allege that "Chase Bank, in permitting Deo to draw checks on Superb's account, when it knew or had reason to know that Deo was not an authorized signer on Superb's account with Chase Bank" (FAC ¶ 613) because

"Chase had documentation contradicting Deo's authority to sign any such checks" (FAC ¶ 615).

Assuming, *arguendo*, that Plaintiffs have not sufficiently alleged Chase's degree of participation in the Deo Defendants' enterprise, Plaintiffs should be given the opportunity to establish same through discovery, especially when, in light of the complaint allegations that the Deo Defendants bribed Flushing's principals, employees, and/or agents to commit fraud, a reasonable inference can be made that the Deo Defendants engaged in similar conduct with the principals, employees, and/or agents of Chase. See AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 U.S. Dist. LEXIS 29666, *26 (E.D.N.Y. 2005) ("It is not always reasonable, however, to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise. Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question" (internal citations omitted)). Thus, the Plaintiffs have sufficiently alleged Chase's knowledge of the scheme and participation in furtherance thereof.

Therefore, Plaintiffs have sufficiently alleged Chase's knowledge of the scheme and participation in furtherance thereof.  Accordingly, Plaintiffs sufficiently plead an association-in-fact enterprise.

Second, Chase contends that Plaintiffs have failed to sufficiently allege that Chase engaged in a pattern of racketeering. Plaintiffs allege that "Chase Bank's employees and agents participated in a scheme by permitting Deo to process checks from Superb's bank account when it knew that he had no authority to sign checks. Deo was not an authorized signatory on Superb's account at Chase Bank." FAC ¶ 316. These allegations demonstrate the "existence of a threat of continuing

criminal activity beyond the period during which the predicate acts were performed." Gross v. Waywell, 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009); see also Albright v. Terraform Labs, Pte. Ltd., 641 F. Supp. 3d 48, 54 (S.D.N.Y. 2022) ("Generally . . . only the existence of a 'complex, multi-faceted scheme[]' is ordinarily sufficient to 'satisfy [the] "pattern" element of a plausible RICO claim'" (internal citations omitted)). Thus, Plaintiffs sufficiently allege that Chase's predicate acts "share the same or similar purposes, results, participants, victims or methods, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 240 (1989). They are part of the larger, multi-faceted operation that is the Deo Defendants' enterprise.

Therefore, Plaintiffs have sufficiently alleged a substantive RICO claim based on wire fraud as against Chase.

### iv.   Libertas' Motion to Dismiss Must be Denied

Libertas argues that Plaintiffs have failed to allege an enterprise or predicate acts constituting wire fraud with particularity as against Libertas and that, as such, Plaintiffs fail to allege a substantive RICO claim. The TAC articulates Libertas' knowing participation in the enterprise previously described, and its central role in carrying out its function and purpose. The TAC alleges that "Libertas was aware of the purpose of its actions [regarding the Libertas Funds] and how those actions were intended to further the [enterprise], that "Libertas agreed to work in concert with Deo to implement the scheme and to perform its role in furtherance of the Plan", and that "[t]o appear legitimate, Libertas accepted minimal and knowingly false financial documentation provided by Deo." TAC ¶¶ 327-329. The TAC further alleges that "[i]n order to assist Deo in concealing the transaction, Deo and Libertas agreed not to deposit the Libertas funds in the Northshore bank account, but to deposit the Libertas Funds into the Sunrise bank account."

31

TAC ¶ 335. The Libertas Funds were the lynchpin around which the enterprise was able to pivot following the Deo Defendants' utter devastation of Northshore and Sunrise, to drain Superb of its business and assets. It was the Libertas Funds that were used by Deo to purchase his interest in Superb and invest in the Deo Dealerships and then engage in the same illegal acts (and others) with Superb as he did with Northshore and Sunrise.  Indeed, without the concerted activity of and assistance by Libertas, the Deo Defendants would not have the ability to invest in Superb and the Deo Dealerships.  As set forth below, this forms a quintessential RICO investment claim under 18 U.S.C. § 1962(a).

As set forth in the pleadings, Libertas worked with Deo and the CPA Defendants to accept minimal and dubious financial records electronically provided so as to fund Deo's individual purchase of an interest in Superb in return for a usurious thirty-five percent (35%) return, guaranteed by Deo. Libertas, despite its agreement with Northshore, facilitated Deo's fraud by wiring the Libertas Funds to Sunrise's bank account at Deo's request. Libertas then wired almost $20,000 from Sunrise's bank account in November 2022 despite having no written agreement with Sunrise.  Finally, having been advised that the Libertas Funds had been turned over to Thomasson, who in turn immediately turned them over to Deo, personally, Libertas sought no relief against Thomasson or Deo, despite Deo's guaranty and receipt of the Libertas Funds provided to him by Thomasson. Instead, Libertas solely asserted tort claims against the IAG Plaintiff for having tried to protect the Libertas Funds, knowing that the IAG Plaintiffs had turned the Libertas Funds over to Thomasson. (TAC ¶¶ 360-366).

Accordingly, Plaintiffs state a claim under RICO's substantive and investment provision.

### III.   Plaintiffs state a claim for relief against Defendants under RICO's conspiracy provision

To establish a RICO conspiracy claim, a plaintiff must allege that the defendant

participated in "an agreement to violate RICO's substantive provisions." See <u>One World, LLC v.</u> <u>Onoufriadis</u>, No. 21-374-CV, 2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (summary order) (internal quotation marks omitted).

Critically, an agreement may be shown "by circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." See <u>Chavez</u> at *21 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks omitted).

As set forth in greater detail, *supra*, Plaintiffs plead specific allegations that each Defendant knew of the Deo Defendants' enterprise and facilitated predicate acts in furtherance thereof.

Here, and as set forth *supra*, Plaintiffs have sufficiently alleged that Defendants committed the predicate acts of wire fraud in furtherance of the Deo Defendants' racketeering scheme. Indeed, "'the inference of an agreement'" on those Defendants' part "to join the conspiracy 'is unmistakable.'" See <u>Angermeir v. Cohen</u>, 14 F. Supp. 3d 134, 154-155 (S.D.N.Y. 2014) (citing cases); <u>see</u> <u>also</u> <u>City of New York v. Hatu</u>, 2019 U.S. Dist. LEXIS 91576, *44-45 (S.D.N.Y. May 31, 2019). "Considered as a whole, these allegations 'provide a substantial factual basis from which to infer an agreement among these defendants.'" <u>United States Fire Ins. Co. v. United</u> <u>Limousine Serv.</u>, 303 F. Supp. 2d 432, 454 (S.D.N.Y. 2004) (internal citations omitted).

Accordingly, and because the allegations in the FAC and TAC sufficiently show that the Deo Defendants could not carry out their scheme without the remaining Defendants' assistance, Plaintiffs adequately state a claim against all the Defendants under RICO's conspiracy provision.

## IV.    The Superb Plaintiffs sufficiently state a claim under the DTSA

The Deo Defendants argue that Superb has failed to identify particular trade secrets subject to the Defend Trade Secrets Act ("DTSA") and has failed to specifically allege that it took reasonable measures to keep that information secret. For the reasons set forth below, the Superb

Plaintiffs have sufficiently stated a claim under the DTSA.

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." Medidata Sols., Inc. v. Veeva Sys., 2018 U.S. Dist. LEXIS 199763, *8 (S.D.N.Y. 2018). The Second Circuit has emphasized that:

> Under Section 1836 of the DTSA, the owner of a "trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." § 1836(b)(1). For "financial, business, scientific, technical, economic, or engineering information" to constitute a "trade secret," two factors must be satisfied: (A) the owner must have "taken reasonable measures to keep such information secret"; and (B) the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . ." 18 U.S.C. § 1839(3), (3)(A)-(B).

Turret Labs USA, Inc. v. CargoSprint, LLC, 2022 U.S. App. LEXIS 6070, *2-3 (2d Cir. 2022).

In order to sufficiently state a claim under the DTSA, a plaintiff must also establish that it took reasonable measures to protect the trade secret. Such measures include, *inter alia*, confidentiality agreements and physical security measures such as password protection and two-factor authentication. Medidata Sols., 2018 U.S. Dist. LEXIS at *10; see also Charles Ramsey Co. v. Fabtech-NY LLC, 2020 U.S. Dist. LEXIS 9348, *42-43 (N.D.N.Y. 2020); Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., 2016 U.S. Dist. LEXIS 130918, *18 (S.D.N.Y. 2016).

First, the Superb Plaintiffs have sufficiently particularized the trade secrets that are subject to the DTSA: the Tekion DMS system; and Superb's customer lists/leads.

With respect to the Tekion DMS system, the Superb Plaintiffs have alleged that Tekion is "a unique DMS system that was specifically customized for Superb" (FAC ¶ 228) and that it cost Superb "$120,000.00 to set up" (FAC ¶ 231). Plaintiff has also alleged that the Tekion system "contained a blueprint for Urrutia's success at his dealerships because Urrutia knew how to use

the customized features of Tekion to operate dealerships profitably." FAC ¶ 232.

Thus, contrary to the Deo Defendants' contention that the Tekion system is "nothing more than computer software functionality", the Tekion system utilized by Superb, with its customizations and unique, proprietary functions, constitutes a trade secret.

Critically, the Hon. Orelia E. Merchant, U.S.D.J. previously analyzed the Superb Plaintiffs' DTSA claims in the context of an Order to show cause for a preliminary injunction and found that the DTSA claims raised substantial questions as to whether the Deo Defendants misappropriated the Superb Plaintiffs' trade secrets.  See Superb Motors Inc. v. Deo, 2023 WL 7181675, at *12–14 (E.D.N.Y. Sept. 29, 2023), modified in part on other grounds, No. 23-CV-6188 (JMW), 2024 WL 198398 (E.D.N.Y. Jan. 18, 2024).  As Judge Merchant explained:

> The Court concludes there are substantial questions as to whether Deo copied Superb Motors' Tekion DMS customization and used it to benefit himself at Gold Coast or disclosed or disseminated the information to his Gold Coast employees in breach of his duties to Urrutia and Superb Motors. Superb has provided enough evidence to demonstrate that the claim is "fair ground[s]" for discovery and further litigation. Additionally, the evidence establishes that the CRM system associated with the Tekion DMS system contained customer lists and sales leads generated and compiled by Urrutia over his significant period of time in the auto business. Though Deo himself claims his Gold Coast dealerships are not "active," other evidence undercuts that contention. Deo Opp. Decl. (ECF 30) ¶ 45. *See* Decl. of Nethenal Orgad (ECF 40) ¶¶ 22-26 ("In late July 2023, Deo was throwing a 'car event' at [Gold Coast] Syosset, NY which I was invited to and attended.... I noticed that many of the vehicles from Superb were moved there.").
>
> In sum, allowing further litigation and discovery will sift out the facts and identify whether this claim indeed has any merit and whether Deo has any defenses to raise. The Court's duty at this point is to ensure there is at least the minimum "fair ground[s]" to litigate the claim further, given the irreparable harm Superb faces. *Citigroup*, 598 F.3d at 34. The Court finds so in this case.

Id.  This is law-of-the-case and warrants denial of the motion to dismiss this claim.

The Deo Defendants cite to <u>Turret Labs USA, Inc. v. CargoSpirit, LLC</u> for the proposition that when a trade secret "consists 'primarily, if not entirely,' of a computer software's functionality . . . the reasonableness analysis will often focus on who is given access, and on the important of confidentiality and nondisclosure agreements to maintaining secrecy." <u>Turret Labs USA, Inc</u>, 2022 U.S. App. LEXIS 6070 at *5. However, as discussed, *infra*, the Superb Plaintiffs took reasonable steps to protect the Tekion DMS system.

With regard to the customer lists, Superb has sufficiently alleged that Superb's customer lists constitute a trade secret. Superb alleges that Urrutia established his customer list via a unique partnership with radio station owner Bobby Clarke, and that, based on this relationship, "the customer list cannot be reverse engineered or independently generated without a substantial investment in [radio station] Irie Jam, which the Defendants did not make." FAC ¶¶ 237-239. Superb alleges that "Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest." FAC ¶ 240; <u>see also</u> <u>Plaza Motors of Brooklyn, Inc. v. Bogdasarov</u>, 2021 U.S. Dist. LEXIS 230156, *15 (E.D.N.Y. 2021) (holding that the plaintiff's customer list was a trade secret because it "developed substantial effort over the course of decades to build and maintain databases containing information about all of its customers", information which was "not readily ascertainable through public sources", and that "its secrecy provides independent economic value to Plaza").

Finally, with regard to leads, the Superb Plaintiffs allege that they maintained information on leads sourced through the radio station "Irie Jam and its other marketing efforts in a customer relationship management ('CRM') system, initially Dealertrack and, later, VINSolutions" (TAC ¶ 689), which the Deo Defendants "misappropriated" to "jumpstart their competing group of

36

dealerships" (TAC ¶ 691).

Second, with regard to the Tekion system, Plaintiffs specifically allege that "Superb took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords." FAC ¶ 266. With regard to the customer lists/leads, Plaintiffs allege that "the Superb Plaintiffs took reasonable efforts to maintain the secrecy of this information, including by password protection, maintaining a firewall, and other measures" (TAC ¶ 690).

Thus, Plaintiffs have sufficiently established it took reasonable measures to protect its trade secret, and Plaintiffs have stated a claim under the DTSA.

## V. The Proposed Amendments in The TAC Resolve Most of the Bases Seeking to Dismiss The State Based Causes Of Action

The Deo Defendants seek to dismiss many of the thirty-two (32) state-based causes of action alleged by the IAG Plaintiffs against the Deo Defendants, asserting that those claims raised as derivative on behalf of Northshore or Sunrise must be dismissed because the FAC fails to allege that a request was first made by their members requesting the board of directors to take direct action or that such request would have been futile. And that, as a derivative claim the respective entities, Northshore and Sunrise, must be named as nominal defendants.

A review of the salient facts and allegations reveal that there was no necessity to assert these claims derivatively, and the TAC seeks to recast these claims as direct claims asserted by Northshore or Sunrise, as appropriate. And, because these claims are asserted directly, there is no need to name the entities as nominal defendants for this purpose.

The Deo Defendants also seek to dismiss the 16th and 17th causes of action, which seek declaratory judgment concerning the proper ownership of Northshore and Sunrise, because the IAG Plaintiffs have failed to join necessary parties, particularly the individuals that the IAG Plaintiffs allege are the remaining members of Northshore and Sunrise. The TAC seeks to add these members, Asad Kahn, a member of Northshore, and Iris Baron, Personal Representative of the Estate of David Baron, as the final heretofore unnamed members of both Northshore and Sunrise.

The Deo Defendants also seek to dismiss the 38th and 40th causes of action, in part, for failing to name Northshore and Sunrise as defendants. These claims, pled in the alternative in the event this Court were to find that Deo and S. Deo, and not the various plaintiffs, were the owners of Northshore and Sunrise, seek judgment against Northshore and Sunrise for the millions of dollars expended by the various IAG plaintiffs to cover the losses and debts incurred by Northshore and Sunrise. The TAC seeks to add Northshore and Sunrise as defendants, in the alternative.

As discussed further below, at this infancy stage, prior to the exchange of discovery, the liberal requirements to grant Plaintiffs' cross motion to amend the complaint have been satisfied and all causes of action should survive.

### i.      16th and 17th causes of action

The sole bases raised to dismiss the 16th and 17th causes of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join the other members as plaintiffs and Northshore and Sunrise as nominal defendants. The TAC remedies these alleged deficiencies, and the claim as asserted in the TAC is clearly not futile as the Deo Defendants offer no other basis for their dismissal. This Court should grant the cross-motion to amend the complaint, with these causes of action intact

### ii.      18th - 21st, 23rd - 26th, and 42nd causes of action

The sole bases raised to dismiss the 18th, 19th, 20th, 21st 23rd, 24th, 25th, 26th and 42nd causes of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Northshore or Sunrise as nominal defendants. The TAC remedies these alleged deficiencies and the claim as asserted in the TAC is clearly not futile as the Deo Defendants offer no other basis for their dismissal. This Court should grant the cross-motion to amend the complaint, with these causes of action intact.

### iii.      22nd cause of action

The bases raised to dismiss the 22nd cause of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Northshore as a nominal defendant for corporate waste. The TAC remedies these alleged deficiencies, Northshore now directly asserting the corporate waste claim. Deo also seeks to dismiss the direct claim by Chabrier, that Deo be permanently restrained from using Chabrier's DMV license for Northshore, alleging that Chabrier only has a claim against Northshore not Deo. This is nonsensical. It was Deo's management of Northshore which resulted in the wrongful use of the DMV License, and the existing numerous allegations of wrongdoing of Deo as manager of Northshore, and the risks Chabrier faces if Deo were permitted to continue, are sufficient to support a claim for such injunctive relief. Finally, a new claim was added to the 22nd cause of action in the TAC by Chabrier, Khan and the Estate of David Baron, as all members of Northshore seek a permanent injunction prohibiting Deo and S. Deo from taking actions as the members of Northshore. The claim as asserted in the TAC is clearly not futile. This Court should grant the cross-motion to amend the complaint, with this cause of action intact.

### iv.      27th cause of action

The bases raised to dismiss the 27th cause of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Sunrise as nominal defendants for corporate waste. The TAC remedies these alleged deficiencies, Sunrise now directly asserting the corporate waste claim. Deo also seeks to dismiss the direct claim by Aaronson and J. Baron that Deo be permanently restrained from using their DMV license for Sunrise alleging that Aaronson and J. Baron only have a claim against Sunrise not Deo. This is nonsensical. It was Deo's management of Sunrise which resulted in the wrongful use of the DMV License, and the existing numerous allegations of wrongdoing of Deo as manager of Sunrise, and the risks they face if Deo were permitted to continue, are sufficient to support a claim for such injunctive relief. Finally, a new claim was added to the 27th cause of action in the TAC by Aaronson, J. Baron and the Estate of David Baron, as all members of Sunrise seeking a permanent injunction prohibiting Deo and S. Deo from taking actions as the members of Sunrise. The claim as asserted in the TAC is clearly not futile. This Court should grant the cross-motion to amend the complaint, with this cause of action intact.

### v.      28th cause of action

The bases raised to dismiss the 28th cause of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Northshore as a nominal defendant. The TAC remedies these alleged deficiencies, Northshore and the other IAG Plaintiffs, now directly asserting the claim.

Deo also seeks to dismiss the direct claim by the IAG Plaintiffs in that it seeks contribution and indemnification against Deo for any liability the IAG Plaintiffs may incur from a claim raised by Libertas for the Libertas Funds. Deo asserts that the claim is premature because Libertas has not yet been paid by the IAG Plaintiffs or filed an answer herein with its counterclaims.  Libertas's

assertion of a claim against the IAG Plaintiffs is not mere speculation. Libertas has already filed such a claim in a New York State Court Action as noted in the FAC (FAC ¶ 166). That action was voluntarily discontinued by all parties without prejudice specifically to preserve all rights to assert all such claims in this action. Libertas's claims against the IAG Plaintiffs is not if, but when, and in the interest of judicial economy, such claim should stand. Williams v. Nik-Ney LLC, U.S. Dist. LEXIS 2355, *22 (E.D.N.Y. 2016, 12-CV-3310) ("courts have permitted parties to assert third-party indemnification claims to afford them the earliest possible determination as to the extent to which [they] may expect to be reimbursed for any loss)(internal citations omitted")

Finally, although Deo asserts that only Northshore may maintain the indemnification claim because there is no basis for anyone else's personal liability, in the State Action Libertas's counterclaim was raised against all IAG Plaintiffs. A valid contribution and indemnification does not consider the validity of the direct claim, just that, should a direct claim be successful against any indemnified party, the contribution and indemnification has been asserted. Id. at *20 (allowing a Third-Party Complaint seeking indemnification *in the event that* a judgment is entered against them.)(emphasis original)

### vi.    <u>29th through 37th causes of action</u>

The bases raised to dismiss the 29, 30th, 31st, 32nd, 33rd, 34th, 35th, 36th, and 37th cause of action against Thomasson was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Northshore as a nominal defendant. The TAC remedies these alleged deficiencies and Northshore now directly asserts all direct claims (29th, 30th, 34th and 36th). The contribution and indemnification claims (31st, 32nd, 33rd and 35th) are raised by all IAG Plaintiffs as they merely seek contribution and indemnification should a direct claim be successful against any indemnified party.

### vii.      38th and 40th causes of action

As noted above, the TAC adds Northshore and Sunrise as defendants for the alternative claims raised in the 38th and 40th cause of action, correcting that alleged deficiency. Northshore and Sunrise, as defendants, seek to dismiss these unjust enrichment claims asserting that no unjust enrichment claim my lie because the IAG Plaintiffs "elected to pay the debts" of Northshore and Sunrise, "despite the lack of contractual allegation". "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). Northshore and Sunrise's obligations, which are alleged to have been owed, were paid by the IAG Plaintiffs, enriching Northshore and Sunrise. At the pleading stage the allegations are sufficient to sustain the claim. Crucially, though, the IAG Plaintiffs did not simply voluntarily pay Northshore and Sunrise's obligations. The vast majority of the IAG Plaintiffs' payments covered the claims of Ally, which, as alleged in several paragraphs of the FAC, the IAG Plaintiffs contractually guaranteed. Hence, their payments to the benefit of Northshore and Sunrise were not voluntary, but obligatory.

### viii.      39th and 41st causes of action

Dismissal of the 39th and 41st causes of action for piercing the corporate veil are unnecessary as the TAC omits these as causes of action, instead asserting them as an alternative method of recovery under the 38th and 40th cause of action. The allegations in support are not conclusory but are supported by specific factual allegations throughout the TAC of Deo's domination and control over Northshore and Sunrise to perpetrate a fraud against the IAG Plaintiffs as well as a lack of capitalization and intermingling of funds. Rolls-Royce Motor Cars

v. Schudroff, 929 F. Supp. 117, *122 (S.D.N.Y. 1996)(95 Civ. 2291); Robles v. Copstat Sec., Inc., 2009 U.S. Dist. LEXIS 112003, *12 (S.D.N.Y. 2009)(08 Civ. 9572).

### ix.   43rd and 44th cause of action

The bases raised to dismiss the 43rd and 44th cause of action was the IAG Plaintiffs having asserted the claim derivatively without the prerequisite demand, and failing to join Northshore or Sunrise as nominal defendants. The TAC remedies these alleged deficiencies.  Deo also seeks to dismiss the claim alleging that there is no basis for a claimed entitlement to an accounting.  "Under New York Law, courts have jurisdiction to order an accounting when four factors exist: (1) a fiduciary relationship; (2) entrustment of money and property; (3) no other remedy; and (4) a demand and refusal of an accounting. The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of duty imposed by that relationship respecting property in which the party seeking the accounting has an interest." In re Stillwater Asset Backed Offshore Fund Ltd., 559 B.R. 563, 626 (Bankr. S.D.N.Y. 2016).

The complaint alleges that Deo was the manager of Northshore and Sunrise. As such he owed them a fiduciary duty. Nielsen Co. (US), LLC v Success Sys., Inc., 2013 US Dist LEXIS 38003, at *25 (SDNY 2013, 11 CV 2939) ("As a matter of law, [a]n employee owes a fiduciary duty to his employer")(internal citations omitted). The complaint further alleges that Deo was entrusted with running the dealerships and has refused to account for its financial operations, which he maintained with the CPA Defendants.

This Court should grant the cross-motion to amend the complaint, with these causes of action intact.

### x.   45th cause of action under New York Judiciary Law § 487

The Plaintiffs state a claim against Thomasson for violations of the New York Judiciary Law. "Similar to fraud, Judiciary Law § 487—covering intentional deceit and collusion—imposes liability for the making of false statements with scienter." Bill Birds, Inc. v. Stein Law Firm, P.C., 149 N.E.3d 888, 35 N.Y.3d 173, 178 (2020). "Liability under the statute does not depend on whether the court or party to whom the statement is made is actually misled by the attorney's intentional false statement." *Id*. "An attorney is liable under Judiciary Law § 487(1) if he or she is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." Long Is. Med. Anesthesiology, P.C. v. Rosenberg Fortuna & Laitman, LLP, 191 A.D.3d 864, 866 (2d Dept. 2021) (alterations and internal quotation marks omitted).

Here, the pleadings adequately allege Thomasson's indisputable violation of the Judiciary Law. The FAC alleges that Thomasson appeared before the Hon. Sharon M.J. Gianelli, J.S.C. ("Justice Gianelli") for oral argument on the IAG Plaintiffs' Order to show cause for injunctive relief in their previously-filed-now-withdrawn state court action against the Deo Defendants, where Thomasson represented that there was nothing improper about the use of his attorney escrow account to transfer the funds stolen from the IAG Plaintiffs to the Deo Defendants, when Thomasson knew that this was false. See FAC ¶¶ 595-599. Thomasson knew the funds were the product of the Deo Defendants' fraudulent schemes because he was complicit in them, actively conspired with the Deo Defendants to carry them out, and even maintained an office inside the dealership that the Deo Defendants operated out of. Id. at ¶¶ 600-601, 249-250. Thomasson repeated these misrepresentations in this case, and previously made misrepresentations before the Second Department, where an Order to show cause as to why he should not be sanctioned remains *sub judice*. Id. at ¶¶ 601-605. Thomasson's conduct has harmed the Plaintiffs. Id. at ¶¶ 606-607.

Accordingly, the Judiciary Law § 487 claim against Thomasson must survive.

xi.    **52ⁿᵈ cause of action**

Deo and Jones seek dismissal of the 52ⁿᵈ cause of action, which alleges that Deo and Jones committed fraud against the IAG Plaintiffs in their financial reporting to the IAG Plaintiffs. Deo and Jones assert that the cause of action fails to meet the particularity requirements of Rule 9(b). Deo also seeks to dismiss claiming it fails for reasonable reliance in that, as mere guarantors the IAG Plaintiffs were neither in privity with Northshore and Sunrise, nor provided with the financial reports that were only provided to Ally.

In the FAC, the IAG Plaintiffs describe how monthly financial reports were required to be maintained and provided by Deo to the IAG Plaintiffs and Ally. That Aaronson is not only a member of Sunrise, but is a manager of each of the IAG Plaintiffs and the IAG Plaintiffs and Ally relied upon the accuracy of those financial reports in agreeing to continue to make the Ally Floor Plan available. (FAC ¶ 127-129) And that Deo, with the assistance of the Jones, "manipulated Northshore's and Sunrise's monthly financial information" (FAC ¶ 133) "with an intent to defraud the the [sic] IAG Plaintiffs and Ally Bank" (FAC ¶ 135) and "induce the IAG Plaintiffs and Ally Bank to continue to provide the Floor Plan to Northshore and Sunrise" (FAC ¶ 136). While IAG Plaintiffs maintain that these allegations are sufficiently particular, they have provided significantly greater detail and specificity in the TAC.

The TAC provides extensive and particular allegations describing the nature of the relationship between the IAG Plaintiffs, Northshore and Sunrise, and how their interrelated relationship and oversight created an absolute necessary reliance on the truth and accuracy of the financial reporting by Deo in order for there to be continued floorplan financing which required the continued approval of the IAG Plaintiffs as well as Ally. It also provides detailed accounts of fraudulent transactions entered by Deo and Jones.

The TAC explains that Northshore and Sunrise are part of a larger group of automobile dealerships including IAG and others, which are centrally managed through a management agreement with IAM. IAM's executive offices and accounting department are clearinghouse for the individual dealerships' operations, to which they all report and provide operational and financial information on a daily basis. And that Aaronson was not only a member of Sunrise, but was an executive at IAM and a manager of the other dealerships with the authority to restrict the use of the Floor Plan by any of the dealerships managed by IAM. (TAC ¶¶ 94-103)

Contrary to the argument of Deo, the IAG Plaintiffs are not merely unaffiliated guarantors of Northshore and Sunrise's obligations to Ally and unaffected by their business.  They are subject to a multi-party cross guarantee of all dealerships under the IAM management umbrella. (TAC ¶ 102) As such, not only are the IAG Plaintiffs in privity with Northshore and Sunrise, they have a vested interest in their financial condition and, through IAM, were provided with, and relied upon, the monthly financial reports entered by Deo and Jones as was Ally.

The TAC describes the clear expectations and understandings of the IAG Plaintiffs in hiring Deo as the manager of Northshore and Sunrise. That they required, and he was expected to provide, true and accurate operational and financial reporting. And that they were relying upon Deo doing so in hiring him and allowing him to access the Floor Plan, over which Aaronson had discretionary authority to restrict. (TAC ¶¶ 103; 117-132)

The TAC further alleges that each entry by Deo and Jones into the DMS system was a representation to the IAG Plaintiffs and Ally that such entries were true and accurate. (TAC ¶¶ 117-132; 445). Amara v CIGNA Corp., 775 F3d 510, 529 (2d Cir 2014) (a written statement of account is an implicit representation that the stated amounts were honestly owed.) The IAG Plaintiffs' reliance on Deo, who accepted the position as manager, and Jones, a licensed CPA, to

46

provide true and accurate financial reports was justifiable. Needham & Co., LLC v Access Staffing, LLC, 2016 US Dist LEXIS 111925, at *50 [SDNY Aug. 12, 2016]) ("Reliance on company's own employees to approve invoices in the usual course of business is justifiable.")

The IAG Plaintiffs allege that Deo, along with Jones, intentionally misrepresented the true financial condition of Northshore and Sunrise by making monthly adjustments to their financial records in the DMS to appear profitable, when they were not, to induce the IAG Plaintiffs and Ally to continue to provide the Floor Plan. (TAC ¶ 261-301) The TAC provides detailed examples which allegations provide the dates, methodology, accounts adjusted, communications and amounts. Id.

This Court should grant the cross-motion to amend the complaint, with this cause of action intact.

### xii.   13th Cause of Action

Libertas moves to dismiss the 13th cause of action seeking a permanent injunction enjoining Libertas from exercising any rights over Northshore's Future Receipts. In its motion, Libertas states that the IAG Plaintiffs "seek a declaration that Libertas has no claim to the future receivables of Northshore but couch the claim as seeking a permanent injunction" but fails to satisfy injunctive relief elements. (Memo P. 10).

In responding, the IAG Plaintiffs note that the appropriate claim is one for declaratory judgment, not permanent injunction, and have effectuated such change in the TAC. Further, this cause of action, now the 15th, seeks the relief in favor of Northshore and Sunrise only.

"The Declaratory Judgment Act, by its express terms, vests a district court with discretion to exercise jurisdiction over a declaratory action . . . ." Muss Dev., LLC v Nationwide Ins. Co., 2015 US Dist LEXIS 142414, at *11 [EDNY Oct. 20, 2015, No. 13 CV 4848] quoting Duane

Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005). Therefore, "[i]n order to decide whether to entertain an action for declaratory judgment," the Second Circuit "ha[s] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Id at *11-12 quoting Duane Reade at 389.

Libertas has asserted that it entered into an agreement with Northshore, signed by Deo as its owner, whereby Libertas purchased $997,500.00 of Northshore's future receipts for $735,000.00. And that it has the right to be paid those future receipts by automatic monthly payments from Northshore's bank account.

Northshore alleges that Deo was not the owner of Northshore and had no right to enter into the agreement, and disputes the validity of the agreement. Notably, Libertas never paid Northshore the $735,000.00.

As Libertas has expressed in the New York State Action that it seeks Northshore's future receipts, the resolution of the validity of the agreement would clarify, if not settle, the issue and offer a relief from uncertainty. As such, the declaratory relief requested should be heard.

Further, as Libertas has actually withdrawn a payment in November 2022, but from Sunrise's bank account, Sunrise, likewise seeks declaratory relief if it is subject to such payment obligations and automatic withdrawals.

### xiii.    Urrutia and Team have Standing to Pursue their Claims against the Defendants

Defendants argue that Plaintiffs have failed to establish that Robert Urrutia ("Urrutia") and Team Auto Sales, LLC's ("Team") have standing in the instant action. Plaintiffs allege that Urrutia "is the President of Superb Motors Inc." as well as a "member of Team Auto Sales LLC." FAC, ¶ 23. As President of Superb and a member of Team he has been harmed by the Defendants' conduct

48

and, thus, has standing in this action.

Plaintiffs allege that Team is an automobile wholesaler, owned by Urrutia, that owns thirteen (13) vehicles that the Deo Defendants have absconded with and failed to return. TAC ¶ 384.

Accordingly, Urrutia and Team have standing.

### xiv.   Misappropriation

The Deo Defendants argue "[f]or the same reasons that the Superb Plaintiff's claims under DTSA must be dismissed, so too must their common law claim for misappropriation." Deo MOL, p. 11. For the reasons set forth below, the Superb Plaintiffs have sufficiently stated a claim against the Deo Defendants for misappropriation.

"Under New York law, to succeed on a claim for misappropriation of trade secrets, a plaintiff must show '(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means'" (internal citations omitted). Inv. Sci., LLC v. Oath Holdings Inc., 2021 U.S. Dist. LEXIS 151076, *13 (S.D.N.Y. 2021).

"[A] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999), quoting Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997). "A trade secret, however, 'is not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business.'" Oneida Grp., Inc. v. Steelite Int'l U.S.A., Inc., 2017 U.S. Dist. LEXIS 206717, *15 (E.D.N.Y. 2017), quoting Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 U.S.

Dist. LEXIS 12017, *8 (S.D.N.Y. Feb. 20, 2008).

"'A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable.' 'The question of whether or not a customer list is a trade secret is generally a question of fact'" (internal citations omitted). North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999); see also Dauphin v. Crownbrook ACC LLC, 2014 U.S. Dist. LEXIS 67128, *24 (E.D.N.Y. 2014) ("Courts applying New York law have held that the type of information at issue here, including customer lists and pricing information, can be protected trade secrets"); Syncx LLC v. Kimedics, Inc., 2023 U.S. Dist. LEXIS 139369, *49-50 (S.D.N.Y. 2023) (holding that, in order to establish that a customer list is a trade secret, a plaintiff should provide evidence "that the client contact information was 'difficult to duplicate,' or that it took great time and effort to compile the information, or that 'the customers are not known in the trade or are discoverable only by extraordinary efforts'" (internal citations omitted)).

The Superb Plaintiffs have sufficiently plead a cause of action for misappropriation under New York law. As set forth in further detail, *supra*, Superb has sufficiently particularized the trade secrets, the Tekion DMS system—as well as the customer lists and customer leads—that the Deo Defendants misappropriated in breach of a confidential relationship with/duty to Superb.

First, Plaintiff has alleged that Tekion is "a unique DMS system that was specifically customized for Superb" (FAC, ¶ 228) and that it cost Superb "$120,000.00 to set up" (FAC, ¶ 231). Plaintiff has also allege that the Tekion system "contained a blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to operate dealerships profitably." FAC, ¶ 232.  Plaintiffs have, therefore, sufficiently established that the

Tekion system is a trade secret.

Further, Superb has sufficiently plead that the Deo Defendants have used the customized Tekion DMS system in breach of a confidential relationship with the Superb Defendants. Superb alleges that "Deo stole the exact customization used by Superb to use at his competing group of dealerships" (FAC ¶ 235) and utilized the Tekion customization "for the purpose of setting up [his] own group of dealerships." FAC ¶ 236. As set forth in further detail, supra, Deo had a duty of loyalty to Superb. Thus, Superb has sufficiently alleged a claim for misappropriation of the Tekion system.

Second, Superb has sufficiently alleged that Superb's customer lists constitute a trade secret. Superb alleges that Urrutia established his customer list via a unique partnership with radio station owner Bobby Clarke, and that, based on this relationship, "the customer list cannot be reverse engineered or independently generated without a substantial investment in [radio station] Irie Jam, which the Defendants did not make." FAC ¶¶ 237-239. See Bogdasarov, 2021 U.S. Dist. LEXIS 230156 at *15; see also Bullion Shark LLC v. Flip A Coin LLC, 2023 U.S. Dist. LEXIS 217257, *17-18 (E.D.N.Y. 2023) (finding the plaintiff's customer lists and leads to be trade secrets where "the record show[ed] that Bullion Shark created its master list of existing customers and qualified leads through paid advertising, participating in trade shows, and maintaining a website; Plaintiff took reasonable measures to keep the list a secret; and that the list has independent economic value by giving Plaintiff an advantage over its competitors").

Superb alleges that "Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest." FAC ¶ 240. Further Plaintiffs emphasize in the TAC that it sourced leads through the radio station "Irie Jam and its other marketing efforts in a customer relationship

management ('CRM') system, initially Dealertrack and, later, VINSolutions" (TAC ¶ 689), which the Deo Defendants "misappropriated" to "jumpstart their competing group of dealerships" (TAC ¶ 691). As such, Superb has sufficiently alleged a claim for misappropriation of Superb's customer list(s).

Therefore, Superb has sufficiently stated claims for common law misappropriation of the Tekion system and Superb's customer list(s).

### xv. Unfair Competition

The Deo Defendants argue that, because the Superb Plaintiffs have failed to set forth "allegations that defendants alleged misappropriations is likely to 'confuse or to deceive purchasers as to the origins of the goods'" they have failed to state a claim for common law unfair competition. Deo MOL, p. 12. However, that is not required to state a common law claim for unfair competition in New York. For the reasons set forth below, Plaintiffs have sufficiently stated a cause of action against the Deo Defendants for unfair competition.

The Second Circuit has emphasized that "[a]n unfair competition claim under New York law is not . . . dependent upon a showing of confusion or deception as to the origin of a product or service." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 198 (2d Cir. 2011); see also Transaero, Inc. v. Chappell, 2014 U.S. Dist. LEXIS 62635, *39 (E.D.N.Y. 2014) ("where an unfair competition claim is not based on trademark infringement, but misappropriation of confidential or proprietary information, the plaintiff need not establish either actual confusion or a likelihood of confusion"). Rather, "[t]he essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Id. at 197, quoting Katz Dochrermann & Epstein, Inc. v. Home Box Office, 1999

U.S. Dist. LEXIS 3971 at *4 (S.D.N.Y. Mar. 31, 1999). An unfair competition "claim will fail where a plaintiff cannot demonstrate 'the bad faith misappropriation of a commercial advantage which belonged exclusively to him'" Big Vision Private, Ltd. v. E.I. DuPont de Nemours & Co., 610 Fed. Appx. 69, 70 (2d Cir. 2015), quoting LoPresti v. Mass. Mut. Life Ins. Co., 30 A.D.3d 474 (2d Dep't 2006).

Here, Plaintiffs have sufficiently alleged that the Deo Defendants misappropriated the fruits of the Superb Plaintiff's labors by misappropriating both trade secrets and employees.

Plaintiffs have alleged that "Deo illegally imparted the confidential know-how Urrutia imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information" to Superb employees—who Deo enlisted to work for him while working for and being paid by Superb—"for the purpose of setting up Deo's own group of dealerships." FAC ¶¶ 235-236.

Plaintiffs have also alleged that "Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest." FAC ¶ 240. As such, Plaintiffs have sufficiently alleged that the Deo Defendants, through both fraud and a breach of the fiduciary duty of loyalty to Superb, misappropriated the fruits of the Superb Plaintiffs' labor—including its trade secrets and employees—constituting Superb's exclusive economic advantage to their own benefit.

Therefore, Plaintiffs have sufficiently stated a common law claim for unfair competition.

### xvi.    Tortious Interference

The Deo Defendants argue that Plaintiffs fail to state a claim for common law tortious interference because they do not allege a business relationship between Plaintiffs and a third party

with which Defendants interfered. For the reasons set forth below, Plaintiffs have sufficiently plead a claim for tortious interference.

The Second Circuit has defined the elements of tortious interference as follows:

> To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." (quoting Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008)).

16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015).

While the general rule is that the defendant's conduct in interfering with a plaintiff's third-party business relationship must amount to a crime or independent tort, "New York courts have recognized an exception to this rule 'where a defendant engages in conduct "for the sole purpose of inflicting  intentional harm on plaintiffs"'" (internal citations omitted). Id. at 262. "As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 3. N.Y.3d 182, 192 (2004).

Plaintiffs specifically identify (1) the Superb Plaintiffs' business relationship with the Floor Plan lenders (2) with which the Deo Defendants intentionally interfered (3) in order to harm the Superb Plaintiffs and (4) the resulting harm. The Superb Plaintiffs specifically allege that the "Deo Defendants purposefully double-floored vehicles in violation of their contracts with Superb Plaintiffs' floor plan lenders knowing that doing so would constitute a breach of those agreements." FAC ¶ 388. See also FAC ¶¶ 203-204. The Superb Plaintiffs have sufficiently alleged that the Deo Defendants' conduct, clearly, was directed at the Floor Plan lender and that the Deo

Defendants acted with the intent to harm the Superb Plaintiffs.

The Plaintiffs identify Nissan Motor Acceptance Corporation ("NMAC") as one of Superb's Floor Plan lenders (see FAC, ¶199), which, upon learning of the double floor scheme, terminated its Floor Plan line of credit with Superb (see FAC, ¶ 204), and that ultimately, Superb was forced to close its business (see TAC ¶ 732). This Court has already found that this conduct caused Plaintiffs irreparable harm. See ECF Dkt. No. 55. Thus, Superb has sufficiently alleged that the Deo Defendants intentionally interfered with Superb's business relationship with NMAC in order to cause Superb harm.

As such, the Superb Plaintiffs have sufficiently stated a claim against the Deo Defendants for tortious interference.

### xvii.   Conversion as against the Deo Defendants

The Deo Defendants argue that Plaintiffs fail to state a claim for common law conversion because they fail to specifically identify the property at issue and have failed to allege that a demand was made for the return thereof. For the reasons set forth below, the IAG Plaintiffs have sufficiently plead a claim for common law conversion.

"To state a claim of conversion, the plaintiff must allege that '(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.' Moreover, if the property is money, 'it must be specifically identifiable and subject to an obligation to be returned or otherwise treated in a particular manner.'" Lefkowitz v. Bank of N.Y., 676 F. Supp. 2d 229, 251 (S.D.N.Y. 2009). see also Bricklayers Ins. & Welfare Fund v. Innis Constr., 2021 U.S. Dist. LEXIS 193357, *13 (E.D.N.Y. 2021) (finding that the plaintiff adequately alleged the conversion of union dues where the defendant "'directed that . . .

dues deductions be taken from the paychecks of local members'" "and that rather than 'segregate the dues and remit them to Local 1' [the defendant] commingled them with [his company's] assets"); Cement & Concrete Workers Dist. Council Welfare Fund v. Baroco Contr. Corp., 2021 U.S. Dist. LEXIS 51509, *22 (E.D.N.Y. 2021).

"Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. New York Organ Donor Network, Inc., 860 N.E. 2d 713, 8 N.Y.3d 43, 50 (2006).

The IAG Plaintiffs allege that "Deo, purportedly on behalf of Northshore, entered the Libertas Agreement without the knowledge or consent of Northshore's members" (FAC, ¶ 149). Plaintiffs further allege that: "Northshore is the rightful owner of, and has superior rights to the assets alleged herein, including but not limited to the Libertas Funds" (FAC, ¶ 472); "Deo has exercised dominion or control over the assets of Northshore, including the Maserati and the Libertas Funds" (FAC, ¶ 473); Deo "was not permitted to use the Libertas Funds for his own personal benefit" (FAC, ¶ 474); "Deo has refused to return to Northshore the assets converted, including the Maserati and the Libertas Funds" (FAC, ¶ 475); and "Deo has wrongfully converted the foregoing assets for his own, personal use, thereby damaging Northshore" (FAC, ¶ 476).

The IAG Plaintiffs also allege that, "[d]espite due demand, Deo has refused to account for the dealer license plates [issued by the DMV] and a number of unissued New York State license plates that would ultimately be used for customers" (FAC, ¶ 110) and that "Deo's family and friends continue to use the dealer plates" (FAC, ¶ 111).

Therefore, the IAG Plaintiffs have sufficiently plead a claim for conversion against Deo.

Further, the Superb Plaintiffs have sufficiently plead a claim of conversion against Deo.

The Superb Plaintiffs allege that, after learning of Deo's double-flooring scheme, Superb confronted Deo about "over one hundred (100)" missing vehicles in Superb's inventory (FAC, ¶ 206) and that, when confronted about a particular missing vehicle, "Deo was unable or unwilling to supply documentation to substantiate the supposed sale" (FAC, ¶ 207).

Plaintiffs also allege that: "Urrutia learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing Bank account" and "transmit[ed] those funds into his own bank accounts" (FAC, ¶ 214); "Deo misappropriated cash payments from customers by receipting the cash in to Superb's DMS system but never depositing any of those cash payments into Superb's bank account and, instead, pocketing the money for himself" (FAC, ¶ 216); and "Deo routinely wrote and signed checks issued by Superb made payable to Northshore, other entities Deo owns, Thomasson, Laurie, and others" (FAC, ¶ 221).

Additionally, as set forth in further detail, *supra*, the Superb Plaintiffs have sufficiently alleged that the Deo Defendants misappropriated their trade secrets, inclusive of the Tekion DMS system and customer lists.

The Superb Plaintiffs have plead that the "Deo Defendants willfully exercised dominion over [the] Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets to the detriment of Plaintiff" (FAC, ¶ 394) and to the exclusion of Plaintiffs' rights (FAC, ¶ 395).

Therefore, the Plaintiffs have sufficiently stated a claim for common law conversion.

### xviii.   Negligence and Conversion as Against Chase

Chase argues that Superb's common law claims for negligence and conversion are barred by the UCC because "the allegations [] concern[ing] the negotiation of certain checks drawn on accounts maintained at Chase . . . is governed by UCC Article 4 § 401." Chase MOL, p. 11. While

the Second Circuit has never ruled definitely that such claims are preempted, the Court has held "that Article 4 precludes common law claims that would impose liability *inconsistent with the rights and liabilities* expressly created by Article 4." Fischer & Mandel, LLP v. Citibank, N.A., 632 F.3d 793, 801 (2d Cir. 2011) (emphasis added).

The Eastern District, however, has recently emphasized that although the UCC preempts claims regarding the <u>processing</u> of a wire transfer, "to the extent [a] Plaintiff's breach of contract claim is based on [a] Defendant's actions 'before and after the processing of the wire transfer, such claims are not preempted'" (internal citations omitted)). Jakob v. JPMorgan Chase Bank, N.A., 639 F. Supp. 3d 406, 412 (E.D.N.Y. 2022); <u>see also</u> Elden v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2011 U.S. Dist. LEXIS 35886, *31 (S.D.N.Y. 2011) ("Defendant does not point to any way Plaintiffs' common law claims impose rights or liabilities inconsistent with those under the U.C.C., and no such inconsistencies are apparent to the Court. Accordingly, the Court finds that Plaintiffs' claims are not precluded"). In the vein of <u>Jakob</u>, Plaintiffs' common law claims for negligence and conversion, which involve conduct proceeding and following the processing of checks, do not impose rights or liabilities inconsistent with the UCC. As such, they are not preempted by the UCC.

As Chase has failed to demonstrate how the common law claims for negligence and conversion are inconsistent with the rights and liabilities of the UCC, Plaintiffs have sufficiently plead a cause of action of common law negligence and common law conversion as against Chase.

### xix.   Civil Conspiracy

The Deo Defendants argue that the Superb Plaintiffs have failed to state a common law claim for civil conspiracy because "none of the tort claims alleged" were adequately plead, and because the fraud claims were not adequately plead. For the reasons set forth below, Plaintiffs have

sufficiently plead a cause of action for civil conspiracy.

"Although an independent cause of action for civil conspiracy is not recognized in [New York], a plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme." Litras v. Litras, 254 A.D.2d 395, 396 (2d Dep't 1998). "In order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." Perez v. Lopez, 97 A.D.3d 558, 560 (2d Dep't 2012).

Plaintiffs have sufficiently demonstrated the existence of an agreement between the Defendants regarding the Deo Defendants' enterprise. See Chavez, 2012 U.S. Dist. LEXIS 42792 at *21 (an agreement may be shown "by circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing") (internal quotation marks omitted)). The Deo Defendants each knew of the conspiracy and agreed to facilitate the Deo Defendants' enterprise, as set forth in detail, *supra*, either directly or indirectly. Thus, Plaintiffs have sufficiently plead the existence of a common scheme and agreement in furtherance thereof.

Further, as set forth in further detail, *supra* and *infra*, the Superb Plaintiffs have sufficiently stated causes of action for several torts as against Plaintiffs. Specifically with regard to allegations of wire fraud, Plaintiffs have alleged with particularity at least two overt acts constituting wire fraud. See, e.g., Hecht, 897 F.2d at 26 n.4. Plaintiffs allege that the Deo Defendants engaged in impermissible double flooring by "filling out applications for financing and making material misrepresentations in said applications" (FAC, ¶ 203), conduct which "caus[ed] Superb's floor plan line of credit with NMAC to be terminated, resulting in a finding of irreparable harm by this Court" (FAC, ¶ 204). The knowing use of these forged instruments to obtain Floor Plan financing

constitutes wire fraud.

Plaintiffs also allege that Deo "misrepresented to Flushing Bank that he [wa]s the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank (FAC, ¶ 209) and "divert Superb's funds to an account he can control" (FAC, ¶ 212). Further, Plaintiffs allege that "Defendants S. Deo, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment." FAC, ¶ 254. The knowing use of these forged instruments to obtain these funds constitutes wire fraud.

Therefore, the Superb Plaintiffs have sufficiently stated a cause of action for civil conspiracy.

### xx.    Fraud

The Deo Defendants argue that the Superb Plaintiffs have failed to state a common law fraud claim because the FAC only refers to the fraudulent conduct as "Jones Fraud." However, as stated in detail, *supra*, Plaintiffs have sufficiently stated a claim for wire fraud as against the Deo Defendants.

"To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).

Plaintiffs alleged with particularity that "Jones provided Urrutia, *by and through Deo*, with monthly financials that falsely showed Superb was profitable" (FAC, ¶ 424) while in realty "Superb was actually operating at a loss" (FAC, ¶ 425) (emphasis added). Plaintiffs further alleged that "[t]he Superb Plaintiffs reasonably relied on Jones' monthly financial statements" (FAC, ¶

429) which "resulted in damages to the Superb Plaintiffs" (FAC, ¶ 431). Thus, the Superb Plaintiffs have plead a cause of action for common law fraud as against Deo and Jones.

As set forth in further detail, *supra*, these allegations are sufficiently particular with respect to the fraudulent statements, conduct, parties, and time. As such, Plaintiffs have sufficiently stated a claim for common law fraud as against the Deo Defendants.

## VI.   This court should exercise its discretion in favor of exercising supplemental jurisdiction

For the reasons set forth above, Plaintiffs' federal claims are sufficiently plead so this Court need not reach a determination on whether it should exercise supplemental jurisdiction over Plaintiffs' state law claims against the Defendants in the absence of federal claims.

Even assuming *arguendo* that the Court dismisses the RICO and DTSA claims against any one Defendant, it should exercise supplemental jurisdiction over the state law claims against all the Defendants, as they are inextricably intertwined with each other.

If a court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c), "the district court may then undertake the discretionary inquiry of whether to exercise supplemental jurisdiction." See Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018). "[A] district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values [of] economy, convenience, fairness, and comity." Id. (internal quotation marks omitted). Courts continue to exercise supplemental jurisdiction over claims where the legal issues are relatively straightforward, and efficiency favors retaining jurisdiction. See Harris v. Leon, No. 20-CIV.-10864 (LGS), 2023 WL 2051171, at *8 (S.D.N.Y. Feb. 16, 2023).

Here, because there are multiple Defendants and there exists a risk of inconsistent decisions should Plaintiffs' claims against some Defendants remain in federal court while others are litigated

in state court, this Court should decide in favor of exercising supplemental jurisdiction over the state law claims against the Defendants.  See Benzinger v. NYSARC, Inc. New York City Chapter, 385 F. Supp. 3d 224, 237 (S.D.N.Y. 2019) ("in this case, two defendants remain even if the Court dismisses the claims against UPS. Rather than force the refiling of the case against UPS in a separate court, with the attendant risks of inconsistent judgments among the defendants, the Court retains jurisdiction over the state law claims in the interests of judicial economy and convenience, and now proceeds to consider those claims on the merits"). It is evident from both the FAC and the TAC that the actions of the Defendants are indivisbly interrelated and that, in the event any federal claim is dismissed as against any individual Defendants, the state law claims should be considered together with the federal claims in this Court.

As such, this Court should maintain supplemental jurisdiction over Plaintiffs' claims against Defendants.

## VII.   Plaintiffs' cross-motion for leave to amend must be granted

Although they submit that the pleadings are sufficient to state RICO claims against the Defendants, in an abundance of caution, Plaintiffs cross-move for leave to amend the pleadings.

In the absence of "undue delay, bad faith, or undue prejudice to the opposing party," leave to amend should be permitted. See Tokio Marine & Fire Ins. Co. v. Emp'rs Ins. of Wausau, 786 F.2d 101, 103 (2d Cir. 1986) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  The policy behind this rule is that "[l]iberal amendment promotes judicial economy by making it possible to dispose of all contentions between parties in one lawsuit." See Bilt-Rite Steel Buck Corp. v. Duncan's Welding & Corr. Equip., Inc., 1990 WL 129970, at *1 (E.D.N.Y. Aug. 24, 1990) (citation omitted).

Further, amendments are generally favored because they "tend to facilitate a proper decision on the merits." See Sokolski v. Trans Union Corp., 178 F.R.D. 393, 396 (E.D.N.Y. 1998)

(internal quotation marks omitted). See, e.g., Liang v. Home Reno Concepts LLC, 2018 U.S. Dist. Lexis 45402, *7-8 (E.D.N.Y. 2018).

For this reason, "the rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." See Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017).  The Supreme Court of the United States has held that, if a court chooses to deny leave to amend, it must give some "justifying reason" for doing so. See Foman, 371 U.S. at 182.

"It is well-settled that where, as here, the Plaintiff seeks to amend her complaint while a motion to dismiss is pending, the Court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." Kilpakis v. JPMorgan Chase Fin. Co., LLC, 229 F. Supp. 3d 133, 139 (E.D.N.Y. 2017). "[W]hen a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss under Fed. R. Civ. P. 12(b)(6), leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, i.e., if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

Here, there is no undue delay or bad faith in amending the FAC, given that this case is in its nascent stage and the operative pleading is sufficiently detailed given the complex nature of the claims against multiple defendants.  As an initial matter, the Second Circuit has held that mere delay alone does not permit a district court to deny amendment, nor does it give rise to a finding of bad faith. See Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993); see also Primetime 24 Joint Venture v. DirecTV, Inc., No. 99-CIV.-3307, 2000 WL 426396, at *5 (S.D.N.Y. April 20, 2000) ("[W]hen the opponent of an amendment asserts that the movant is

acting in bad faith, *there must be something more than mere delay or inadvertence for the court to refuse to allow the amendment*") (emphasis added).

Similarly, for the reasons argued *supra*, Plaintiffs' claims against the Defendants are not futile.  See Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (holding that courts should not dismiss complaints for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, and it should not deny leave to file a proposed amended complaint unless that same rigorous standard is met") (quotation omitted).

Accordingly, Plaintiffs' cross-motion for leave to amend the pleadings should be granted in order to permit a merits-based determination of their claims against Defendants for facilitating the Deo Defendants' fraudulent schemes.

## VIII.   Leave to replead must be granted in the event of dismissal

In the event that dismissal is granted (which it should not be), Plaintiffs respectfully seek leave to amend, which shall be freely given when justice so requires.  See Fed. R. Civ. P. 15(a).

Indeed, "'[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" See Cruz v. TD Bank, N.A., 742 F.3d 520, 523 (2d Cir. 2013); see also Vacold LLC v. Cerami, No. 00-CIV.-4024 (AGS), 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)); Elliot-Leach v. New York City Dep't of Educ., 201 F. Supp. 3d 238, 243 (E.D.N.Y. 2016), aff'd, 710 Fed. Appx. 449 (2d Cir. 2017).

Moreover, "[w]ithout the benefit of a ruling [from the Court], many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." See McKenzie-Morris v. V.P. Records Retail Outlet, Inc., No. 1:22-

CIV.-1138 (GHW), 2022 WL 18027555, at *12 (S.D.N.Y. Dec. 30, 2022) (citing <u>Loreley Fin.</u> <u>(Jersey) No. 3 Ltd.</u>, 797 F.3d at 190.

    Accordingly, leave to replead should be granted to the extent any Defendant succeeds on their motion to dismiss.

<strong><u>CONCLUSION</u></strong>

    Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss and grant Plaintiffs' cross-motion for leave to amend the pleadings, together with such other and further relief as this honorable Court deems just, equitable, and proper.

Dated: Lake Success, New York
       March 29, 2024                Respectfully submitted,

                                      **MILMAN LABUDA LAW GROUP PLLC**
                                      By:  */s   Jamie S. Felsen, Esq.*

                                        **SAGE LEGAL LLC**
                                      By: */s/ Emanuel Kataev, Esq.*

                                        **CYRULI SHANKS & ZIZMOR LLP**
                                      By: */s/ Jeffrey Ruderman, Esq.*