UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, ~~—~~189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, *individually and derivatively as a member of* NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, *individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC,* JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, ~~and~~ J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC

Defendants.

-------------------------------------------------------------------X

Case No.: 2:23-cv-6188 ~~(OEM)~~ (JMW)

PLAINTIFFS' ~~SECOND~~ PROPOSED THIRD AMENDED COMPLAINT

*Amended as of right pursuant to Fed. R. Civ. P. 15(a)(2)*

---

Style Definition: Heading 2: Text Outline

Style Definition: Header & Footer: Text Outline

Style Definition: Body: Text Outline

Style Definition: Heading: Text Outline

Style Definition: List Paragraph

Style Definition: Default: Text Outline

Style Definition: Comment Text

Formatted: Header distance from edge:  0.16", Footer distance from edge:  0.55", Different first page header

Plaintiffs Superb Motors Inc., Team Auto Sales LLC, Robert Anthony Urrutia (the "Superb Plaintiffs"), 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, ~~individually and derivatively as a member of~~ Northshore Motor Leasing, LLC, Joshua Aaronson, ~~individually and derivatively as a member of~~ 189 Sunrise Hwy Auto, LLC, Jory Joshua Aaronson, Jory Baron, Asad Khan, Iris Baron Representative of the Estate of David Baron, 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively "IAG Plaintiffs") (Superb Plaintiffs and IAG Plaintiffs collectively hereinafter the "Plaintiffs"), by their respective attorneys Milman Labuda Law Group PLLC, Sage Legal LLC, and Cyruli Shanks & Zizmor LLP, as and for their ~~Second~~ Third Amended Complaint against Defendants Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp., (collectively the "Deo Defendants") DLA Capital Partners Inc. ("DLA Capital"), Jones, Little & Co., CPA'S LLP, Thomas Jones, CPA, (collectively the "CPA Defendants"), Flushing Bank, Libertas Funding LLC, ~~and~~ J.P. Morgan Chase Bank, N.A. (collectively the "Bank Defendants"), 189 Sunrise Hwy Auto LLC ("Sunrise"), and Northshore Motor Leasing, LLC ("Northshore") (the Deo Defendants, DLA, CPA Defendants, ~~and~~ the Bank Defendants, Sunrise, and Northshore collectively hereinafter the "Defendants"),.") hereby allege as follows:

**NATURE OF THE CASE**

2

1.      The Deo Defendants, with the participation of other Defendants, have engaged in outrageous schemes to gain access to the Plaintiffs' businesses by the Deo Defendants holding themselves out as qualified to run automobile dealerships, then usurping operational control of two separate groups of dealerships to pillage and plunder them, while misrepresenting having ownership of ~~Plaintiffs' businesses~~Northshore and Sunrise, leaving Plaintiffs holding the bag while the Deo Defendants start a separate group of dealerships propped up by the stolen assets and funds of Plaintiffs.

2.      Defendants' brazen and criminal scheme, carried out by engaging in wire fraud ~~and~~, mail fraud, the use of forged instruments, and other wrongful criminal acts, must be stopped immediately.

3.      Absent relief, Plaintiffs' businesses are at risk of being forced to shut down.

4.      In fact, Superb has already been forced to shut down due to the Defendants' conduct.

~~4.~~5.      This is an action for damages and injunctive relief related to Defendants' unlawful conspiracy and scheme to engage in wire fraud by, among other things, providing false and misleading financial information to lenders for fraudulent financing, for signing checks they had no authority to sign, opening bank accounts by providing false and misleading information to financial institutions and depositing into those accounts, in the name of Superb Plaintiffs but controlled by Defendants, checks made payable to the Superb Plaintiffs, then to be diverted to Defendants' own use, improper poaching of Superb Plaintiffs' employees, and misappropriating the Superb Plaintiffs' confidential information and trade secrets resulting in Defendants' (i) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"); (ii) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"); (iii)

misappropriation of trade secrets; (iv) unfair competition; (v) tortious interference with contractual relations, business relations, and prospective economic advantage; (vi) unjust enrichment; (vii) conversion; (viii) fraud; (ix) breach of fiduciary duty; ~~and (x) civil conspiracy~~(x) civil conspiracy; (xi) professional malpractice; (xii) declaratory judgment; (xiii) various claims under the New York Uniform Commercial Code ("UCC"); (xix) negligence; (xx) breach of duty of loyalty and violation of the faithless servant doctrine; (xxi) permanent injunction; (xxii) contribution and indemnification; (xxiii) aiding and abetting fraud and various breaches; (xxiv) violation of the New York General Business Law ("GBL"); and (xxv) violation of the New York Judiciary Law § 487.

6.      The allegations herein describe Defendants' actions to first plunder the finances of the IAG Plaintiffs by defrauding, cheating and stealing from the IAG Plaintiffs, their lenders and their customers, and hiding their actions by financial manipulation.

~~5.~~7.      When the IAG Plaintiffs became aware of Defendants' actions, the Deo Defendants and CPA Defendants created false financial records of the IAG Plaintiffs to sell non-existent assets and used those funds to invest in the Superb Plaintiffs' business to commit the same and similar actions.  Defendants' diabolical scheme to infiltrate and leech off of Plaintiffs' businesses, causing Plaintiffs inconceivable harm, which has already forced one dealership to shut down, must be stopped.

~~6.~~8.      Specifically, Defendants must be prevented from operating Plaintiffs' businesses as their own, defrauding Plaintiffs, customers and lending institutions, operating businesses that were formed solely through ~~Defendants'~~Defendants' fraudulent schemes and utilizing the Superb Plaintiffs' confidential information and trade secrets stolen by the Defendants who have utilized Superb Plaintiffs' employees to compete against Superb Plaintiffs while said employees were being paid by Superb Plaintiffs, all of which is being done to decimate Superb Plaintiffs'

4

businesses.

7.9.     In addition to being enjoined from their conduct which has threatened to and cause the imminent closure of Plaintiffs' businesses, Defendants must pay for damages for the harm they have caused to Plaintiffs' businesses.

**PARTIES**

i.   IAG Plaintiffs

8.10.   At all times hereinafter mentioned, Northshore Motor Leasing, LLC ("Northshore") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 180 Michael Drive, Syosset, New YorkNY 11791.

9.11.   At all times hereinafter mentioned, 189 Sunrise Hwy Auto, LLC ("Sunrise") was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 189 Sunrise Highway, Amityville, New YorkNY 11701.

10.12.  At all times hereinafter mentioned, plaintiff Brian Chabrier ("Chabrier") is an individual residing in the State of New York within the County of Nassau.

11.13.  At all times hereinafter mentioned, plaintiff Joshua Aaronson ("Aaronson") is an individual residing in the State of New York within the County of Nassau.

12.14.  At all times hereinafter mentioned, plaintiff Jory Baron ("J. Baron") is an individual residing in the State of New York within the County of Nassau.

*Formatted:* Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

15.     At all times hereinafter mentioned, plaintiff Asad Khan ("Khan") is an individual residing in the State of New York within the County of Nassau.

16.     At all times hereinafter mentioned, plaintiff Iris Baron as Representative of the Estate of David Baron ("Estate of David Baron") is an individual representative of the Estate of David Baron residing in the State of Florida.

13.17.  At all times hereinafter mentioned, plaintiff 1581 Hylan Blvd Auto LLC ("1581"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New YorkNY 10305.

14.18.  At all times hereinafter mentioned, plaintiff 1580 Hylan Blvd Auto LLC ("1580"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New YorkNY 10305.

15.19.  At all times hereinafter mentioned, plaintiff 1591 Hylan Blvd Auto LLC ("1591"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New YorkNY 10305.

16.20.  At all times hereinafter mentioned, plaintiff 1632 Hylan Blvd Auto LLC ("1632"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, New YorkNY 10305.

17.21.  At all times hereinafter mentioned, plaintiff 1239 Hylan Blvd Auto LLC ("1239"), was and still is a domestic limited liability company duly organized and existing under and by the

**Formatted:** Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, ~~New York~~NY 10305.

~~18.~~22.  At all times hereinafter mentioned, plaintiff 2519 Hylan Blvd Auto LLC ("2519"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, ~~New York~~NY 10305.

~~19.~~23.  At all times hereinafter mentioned, plaintiff 76 Fisk Street Realty, LLC ("76"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, ~~New York~~NY 10305.

~~20.~~24.  At all times hereinafter mentioned, plaintiff 446 Route 23 Auto LLC ("446"), was and still is a foreign limited liability company duly organized and existing under and by the virtue of the laws of the State of New Jersey, with its principal place of business at 1580 Hylan Boulevard, Staten Island, ~~New York~~NY 10305.

~~21.~~25.  At all times hereinafter mentioned, plaintiff Island Auto Management, LLC ("IAM"), was and still is a domestic limited liability company duly organized and existing under and by the virtue of the laws of the State of New York, with its principal place of business at 1580 Hylan Boulevard, Staten Island, ~~New York~~NY 10305.

~~22.~~26.  1581, 1580, 1591, 1632, 1239, 2519, 76, 446 and IAM are collectively referred to herein as "Island Auto Group" or "IAG."

27.  1581, 1580, 1591, 1632, 1239, 2519 and 446 are collectively referred to herein as

7

"Island Auto Dealership Group" or "IADG."

ii.     Superb Plaintiffs

~~23.~~28.   Robert Anthony Urrutia ("Urrutia") resides in the State of New Jersey; he is the President of Superb Motors Inc. ("Superb") and member of Team Auto Sales LLC ("Team Auto").

~~24.~~29.   At all times relevant, Superb is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

~~25.~~30.   At all times relevant, Team Auto is and was a limited liability company duly organized under the laws of the State of New Jersey with its principal place of business in Monmouth County, New Jersey.

iii.    Deo Defendants

~~26.~~31.   Upon information and belief, Anthony Deo ("Deo") and Sarah Deo ("S. Deo") are individuals who reside in the State of New York within the County of Nassau and who are married to each other.

~~27.~~32.   Upon information and belief, Harry R. Thomasson, Esq. ("Thomasson") is an attorney-at-law who resides in the State of New York within the County of Nassau.

~~28.~~33.   Upon information and belief, Dwight Blankenship ("Blankenship") is ~~a retired~~an active police officer who works for Deo and S. Deo and who resides in the State of New York within the County of Nassau.

~~29.~~34.   Upon information and belief, Marc Merckling ("Merckling") is ~~an active~~a retired police officer who works for Deo and S. Deo and who resides in the State of New York within the County of Nassau.

~~30.~~35.   Upon information and belief, Michael Laurie ("Laurie") is a principal of DLA

Capital who resides in the State of New York within the County of Nassau.

31.36.   At all times relevant, Car Buyers NYC Inc. ("Car Buyers") is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

32.37.   At all times relevant, Gold Coast Cars of Syosset LLC ("GCC Syosset") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

33.38.   At all times relevant, Gold Coast Cars of Sunrise LLC ("GCC Sunrise") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

34.39.   At all times relevant, Gold Coast Motors Automotive Group LLC ("GCM Auto") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

35.40.   At all times relevant, Gold Coast Cars of LIC LLC ("GCC LIC") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

36.41.   At all times relevant, Gold Coast Cars of Roslyn LLC ("GCC Roslyn") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

37.42.   At all times relevant, Gold Coast Cars of Smithtown LLC ("GCC Smithtown") is and was a limited liability company duly organized under the laws of the State of New York with its principal place of business in Nassau County, New York.

38.43.   At all times relevant, UEA Premier Motors Corp. ("UEA Motors") is and was a

corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

44.     Car Buyers, GCC Syosset, GCC Sunrise, GCM Auto, GCC LIC, GCC Roslyn and GCC Smithtown are collectively referred to herein as the "Deo Dealerships."

    iv.    <u>CPA Defendants</u>

39.     Upon information and belief, Thomas Jones, CPA ("Jones") is a principal of Jones, Little & Co., CPA's LLP ("Jones CPA LLP") who resides in the State of New York within the County of Nassau.

40.45.   At all times relevant, Jones CPA LLP is and was a limited liability partnership formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

    v.    <u>DLA Capital</u>

41.46.   At all times relevant, DLA Capital is and was a corporation duly formed under the laws of the State of New York with its principal place of business in Nassau County, New York.

    vi.    <u>Bank Defendants</u>

42.47.   At all times relevant, Libertas Funding LLC ("Libertas") is and was a foreign limited liability company duly organized under the laws of the State of Connecticut and authorized to conduct business in the State of New York with offices located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830.

43.48.   At all times relevant, Flushing Bank ("Flushing") was and is a commercial bank organized and existing under and by virtue of the laws of the State of New York.

44.49.   At all times relevant, JP Morgan Chase Bank, N.A., ("Chase"), was and is a

national association organized and existing under and by virtue of the laws of the United States of America.

50. Deo and S. Deo have alleged that they are the sole members of Northshore, and should their claim be successful, Northshore is a named defendant herein as a wrongful actor as set forth *infra*.

51. Deo and S. Deo have alleged that they are the sole members of Sunrise, and should their claim be successful, Sunrise is a named defendant herein as a wrongful actor as set forth *infra*.

## JURISDICTION AND VENUE

45.52. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, given that Plaintiff pursues claims under RICO and DTSA, both of which are federal laws.

46.53. Further, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

47.54. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff'sPlaintiffs' claims occurred in this judicial district, and, upon information and belief, each of the Defendants resides in this district.

## FACTS

**I.     i.   The Deo isDefendants Infiltrate the IAG Plaintiffs' Dealerships**

   **i.   The Deos are Not a MemberMembers of Northshore**

48.55.  At all times hereinafter mentioned, Chabrier was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

49.56.  Upon information and belief, atAt all times hereinafter mentioned, David Baron was an owner and holder of a one-third (1/3) membership interest in Northshore.

50.57.  Upon information and belief, David Baron died in 2021, and his estate ("Estate of David Baron") is now the owner and holder of his one-third (1/3) membership interest in Northshore through its representative, Iris Baron.

51.58.  Upon information and belief, atAt all times hereinafter mentioned, Asad Khan was and still is an owner and holder of a one-third (1/3) membership interest in Northshore.

52.59.  At all times hereinafter mentioned, Deo wasand S. Deo were never an owner of any membership interest in Northshore.

53.60.  The operating agreement for Northshore (the "Northshore Operating Agreement") provides that Northshore shall be managed by its members.

54.61.  Article V (A) of the Northshore Operating Agreement provides that decisions must be approved by a majority in interest of the members.

55.62.  Article IX–(A) of the Northshore Operating Agreement prohibits transfers or assignments of membership interests without the unanimous consent of all members.

56.63.  Under Article IX (A) of the Northshore Operating Agreement, if the Members do not unanimously approve of the transfer, "the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member."

**ii.     Deo isThe Deos are Not a MemberMembers of Sunrise**

~~57.~~64.   ~~Upon information and belief, at~~At all times hereinafter mentioned, Aaronson was and still is an owner and holder of a ~~twenty-five (25%)~~one-third (1/3) percent membership interest in Sunrise.

~~58.~~65.   At all times hereinafter mentioned, David Baron was an owner and holder of a ~~twenty (25%)~~one-third (1/3) percent membership interest in Sunrise.

~~59.~~66.   David Baron died in 2021 and ~~his estate~~the Estate of David Baron is now the owner and holder of his ~~twenty (25%)~~one-third (1/3) percent membership interest in Sunrise through its representative, Iris Baron.

~~60.~~67.   At all times hereinafter mentioned, J. Baron was and still is an owner and holder of a ~~twenty (25%)~~one-third (1/3) percent membership interest in Sunrise.

~~61.      At all times hereinafter mentioned, Raymond Phelan was and still is an owner and holder of a twenty (25%) percent membership interest in Sunrise.~~

~~62.~~68.   At all times hereinafter mentioned, Deo ~~was~~and S. Deo were never an owner of any membership interest in Sunrise.

~~63.~~69.   The operating agreement for Sunrise (the "Sunrise Operating Agreement") provides that Sunrise shall be managed by its members.

~~64.~~70.   Article V (A) of the Sunrise Operating Agreement provides that decisions must be approved by a majority in interest of the members.

~~65.~~71.   Article IX (A) of the Sunrise Operating Agreement prohibits transfers or assignments of membership interests without the unanimous consent of all members.

~~66.~~72.   Under Article IX (A) of the Sunrise Operating Agreement, if the Members do not unanimously approve of the transfer, "the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member."

~~13~~

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

### iii.   Defendants' Unlawful Schemes at Island Auto Group

73.    Prior to 2018, Deo and S. Deo owned and operated a used car dealership.

74.    In 2016, Deo pled guilty and was convicted in the United States District Court for the Southern District of New York of two counts of federal wire fraud in connection with a mortgage.

75.    Part of Deo's criminal judgment was that he was prohibited from obtaining future credit lines without the approval of the probation department for a period of five years.

76.    Deo's financial predicament led him to work as the manager for ~~Northshore operates~~and Sunrise, both being used car dealerships, beginning in 2018.

77.    Unbeknownst to the owners of Northshore and Sunrise at that time, was Deo and S. Deo's plan to use the operations, capital, and assets of Northshore and Sunrise to benefit a new group of used car dealerships Deo and S. Deo were too open over the following few years (hereinafter the "Plan").

78.    Attaching themselves to Northshore and Sunrise was particularly advantageous to Deo and S. Deo and the Plan because the members of Northshore and Sunrise were also owners of numerous other new and used car dealerships with access to a significant amount of financing capital.

79.    To carry out the Plan, between 2018 and 2021, Deo and S. Deo formed the Deo Dealerships and recruited the other Deo Defendants over time as part of, and to assist with carrying out, the Plan.

80.    S. Deo managed the finances of the Enterprise and misappropriated the Plaintiffs' leads.

81.     Once the Deo Dealerships were established, each of the individual Deo Defendants would benefit significantly by serving significant and lucrative roles in and for the Deo Dealerships.

**iv. Northshore and Sunrise's Businesses**

67.82.  At all relevant times, Northshore operated a retail used car dealership from its lot located at 180 Michael Drive, Syosset, New YorkNY 11791[1].

68.83.  At all relevant times, Sunrise operatesoperated a retail used car dealership from its lot located at 189 Sunrise Highway, Amityville, New YorkNY 11701.[2]

69.84.  The operation of a used car dealership in the State of New York requires a license (the "License") issued by the New York State Department of Motor Vehicles ("DMV").

70.85.  The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance.

71.86.  Chabrier holds the License as applicant for Northshore.

72.87.  Aaronson and J. Baron hold the License as applicants for Sunrise.

73.88.  At all times hereinafter mentioned from 2018 until December 2022, Deo was employed by Northshore as its general manager.

74.89.  At all times hereinafter mentioned from 2018 until December 2022, Deo was employed by Sunrise as its general manager.

---

[1] Unable to continue his fraudulent activities against Northshore, having depleted all of its assets and inventory, in September 2023 Deo surrendered the premises upon which Northshore operated. See ECF Docket Entry 59 (surrender affidavit for Northshore's premises at 180 Michael Drive).

[2] Unable to continue his fraudulent activities against Sunrise, having depleted all of its assets and inventory, Deo surrendered the premises upon which Sunrise operated in or about December 2023. See ECF Docket Entry 156-1 at 61:4-21.

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

75.90.  As an employee and general manager of both Northshore and Sunrise, in operating Northshore and Sunrise Deo was obligated to act in the best interests of Northshore and Sunrise and their respective members.

76.91.  Deo, however, in operating Northshore and Sunrise took numerous actions for his own to benefit the Plan for the Deo Dealerships, causing damage to Northshore and Sunrise and the other IAG Plaintiffs and jeopardizing the Licenses.

iv.    Deo Sells Vehicles for Less Than Their Purchase Price, Causing a Deficiency Toward Repayment of the Floor Plan at v.    IAG

77.  **. Northshore and** Sunrise maintain a floor plan credit line with Ally Bank used to purchase inventory (the "Floor Plan"). **Sunrise's Business Relationship**

78.    Ally Bank maintains a lien on all vehicles purchased using the Floor Plan.

79.    When the vehicles are sold, Ally Bank must be repaid the amount borrowed to purchase that vehicle in order to release the lien or security interest on the vehicle.

80.    The Floor Plan IAG is guaranteed by IAG.

81.92.  IAG is a part of larger group of associated franchised new and used car dealerships, in New York and New Jersey, including Northshore and Sunrise, in which David Baron had certain direct or family ownership. (the "IAG Operation")

93.    IAG, Northshore, Sunrise and the other associated new and used car dealerships engage IAM as a management company to oversee their operations from a high level at a central business location which houses the executive and accounting offices.

94.    Aaronson is an executive at IAM and a manager of the dealerships in the IAG.

82.95.  Chabrier is affiliated with IAG and IAM.

83.    Aaronson is affiliated with IAG.

84.96.  J. Baron is affiliated with IAG and IAM.

97.     The individual management and accounting for the dealerships which were managed by IMG, including Northshore and Sunrise, were handled at the dealership locations through a dealership management system ("DMS") that was licensed by IMG to operate all their other managed dealerships.

98.     The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership including keeping track of inventory, sales, financing and all financial records and recordkeeping.

99.     All individual dealership operations, including Northshore and Sunrise, are reviewed and maintained by IAM and their executive and accounting departments.

100.    The DMS at each individual dealership, including Northshore and Sunrise, was run through IAM and their executive and accounting departments.

101.    For the benefit of all dealerships managed by IAM, IAM arranged with Ally Bank, N.A. ("Ally") to provide a floor plan credit line to each of the dealerships to purchase vehicle inventory (the "Floor Plan").

102.    In order to facilitate the Floor Plan, Ally required all dealerships managed by IAM, including Northshore and Sunrise, and their principals, including Chabrier, Khan, Estate of David Baron, Aaronson and J. Baron, to execute a cross-guaranty of each other's obligations to Ally of the Floor Plan.

103.    Aaronson had the authority to restrict the use of the Floor Plan by any of the dealerships managed by IAM.

85.104. The IAG Plaintiffs agreed to guarantee the Floor Plan because of the interrelationship among Northshore, Sunrise, David Baron, Chabrier, Aaronson, and J. Baron.

**vi.     Deo Engages in a Scheme with Other Defendants to Pilfer IAG Assets**

105.   Northshore and Sunrise purchase used vehicle inventory using the Ally Floor Plan.

106.   Ally maintains a lien on all vehicles purchased using the Floor Plan.

107.   When a vehicle is sold, Ally must be repaid the amount borrowed to purchase that vehicle, plus accrued interest, in order to release the lien or security interest Ally placed on the vehicle.

108.   Unbeknownst to Ally and the IAG Plaintiffs, since at least 2018 Deo had been using the business operating funds of Northshore and Sunrise to carry out the Plan.

109.   Unbeknownst to Ally and the IAG Plaintiffs, between 2020 through 2021, Deo formed all of the Deo Dealerships with their office at Northshore's business address.

110.   Unbeknownst to Ally and the IAG Plaintiffs, in 2018 Deo began operating Car Buyers and UEA Motors at Northshore's business address.

111.   Deo used Northshore and Sunrise's business operating funds for his own purposes, which left Northshore and Sunrise without sufficient capital to operate.

112.   Deo devised a scheme to keep Northshore and Sunrise capitalized so that he could continue to siphon off Northshore and Sunrise's funds.

113.   The scheme entailed systematic pilfering of funds from Northshore, Sunrise, Ally and the IAG Plaintiffs.

114.   The scheme involved deceiving Ally and the IAG Plaintiffs into funding, at inflated amounts, the purchasing of vehicle inventory, deceiving customers and other lending institutions and manipulating financial records to conceal the subterfuge.

115.   In implementing this scheme, Deo enlisted the services of S. Deo, Blankenship, Merckling, Laurie, Thomasson, Jones and Jones CPA LLP, each with a role to play, as further described herein.

116.     Each of these parties agreed to work in concert with Deo to implement the scheme and to perform their role in furtherance of the Plan.

**vii.     Deo Assumes the Obligations as Manager of Northshore and Sunrise**

117.     In 2018, Deo was engaged by Northshore and Sunrise as their manager for their benefit.

118.     Deo's appointment as manager for Northshore and Sunrise was approved by David Baron, Chabrier, Aaronson, and J. Baron (the "Managing Members"), based upon Deo's obligation and expectation that actions made concerning Northshore and Sunrise would be made for Northshore and Sunrise's benefit.

119.     As Northshore's and Sunrise's manager, Deo was charged with the obligation and expectation that actions made concerning Northshore and Sunrise would be made for their benefit.

86.120.As Northshore's and Sunrise's manager, the Managing Members, Northshore and Sunrise allowed Deo to handle all financial transactions and reporting on behalf of Northshore and Sunrise, purchased many vehicles using the Floor Plan.

121.     As Northshore's and Sunrise's manager, the Managing Members, Northshore and Sunrise allowed Deo then sold thoseto handle vehicle inventory purchases.

122.     As Northshore's and Sunrise's manager, the Managing Members, Northshore and Sunrise allowed Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise.

123.     As Northshore's and Sunrise's manager, the Managing Members, Northshore and Sunrise relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise.

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

124.     As Northshore's and Sunrise's manager, the Managing Members, Northshore and Sunrise relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise.

125.     By accepting the position as manager of Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise.

126.     By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise.

127.     By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to make appropriate vehicle inventory purchases.

128.     Aaronson, along with other managers or members, controls the IAG Plaintiffs.

129.     By Deo accepting the obligation to accurately report financial information of Northshore and Sunrise and to make appropriate vehicle inventory purchases, Aaronson permitted the IAG Plaintiffs to guarantee the Floor Plan of Northshore and Sunrise.

130.     Each time that Deo entered financial information into the DMS system, by doing so, he represented the Managing Members, Northshore, Sunrise, the IAG Plaintiffs and Ally, that such financial information was true and accurate.

131.     Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to the Managing Members, Northshore, Sunrise, the IAG Plaintiffs and Ally, that such vehicle inventory purchase was appropriate.

132.    The Managing Members, Northshore, Sunrise and the IAG Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Northshore and Sunrise incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with Ally to use the Floor Plan.

**viii.    Deo Manipulates Used Vehicle Purchases**

133.    Ally financed the purchase of used vehicles at the rate of eighty (80%) of the wholesale book value of such vehicle in very good condition.

134.    In so doing, Ally, the Managing Members, Sunrise and the IAG Plaintiffs reasonably expected that Northshore and Sunrise would cover the balance of the purchase price not covered by the Ally Floor Plan.

135.    Because Deo had been using Northshore and Sunrise's operating funds to carry out the Plan, they were without funds to purchase quality used cars for inventory.

136.    Deo devised a method to not only purchase used cars, but to withdraw even further funds at the expense of the Managing Members, Northshore, Sunrise and the IAG Plaintiffs.

137.    At least as early as 2018 Deo began purchasing used vehicle inventory for Northshore and Sunrise that were in poor and damaged condition.

138.    Deo did not advise Ally, the Managing Members, Northshore, Sunrise or the IAG Plaintiffs that he was purchasing used vehicle inventory in poor and damaged condition.

139.    The reason Deo did not advise Ally, the Managing Members, Northshore, Sunrise or the IAG Plaintiffs that he was purchasing used vehicle inventory in poor and damaged condition was because Deo intended Ally to fund greater than the actual purchase price of these vehicles, Ally believing these vehicles to be in very good condition.

140.    Because the vehicles were in poor and damaged condition, Deo was able to arrange for Northshore and Sunrise to purchase the vehicles for less than the amount Ally would finance for eighty (80%) percent of the purchase of the same vehicle had it been in very good condition.

141.    By so doing, Ally funded the purchases at eighty (80%) of the wholesale book value of each such vehicle as if they been in very good condition.

142.    The amount Ally funded to Northshore and Sunrise was in excess of the purchase price of the vehicles.

143.    The excess funds funded by Ally were then part of the Northshore and Sunrise funds then taken by Deo, leaving the Managing Members, Northshore, Sunrise or the IAG Plaintiffs subject to repay Ally the fully funded amount if the vehicle did not sell for at least the Floor Plan funding amount.

144.    Had the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally been aware of the true nature of these transactions, they would not have approved of the purchases or financing.

145.    Deo committed this practice on a regular basis, some examples provided herein.

146.    Example 1: On December 21, 2021 Deo arranged for Northshore to purchase a 2017 Audi for $31,000.00 from Herold Motor Cars.

147.    The wholesale book value of this vehicle in very good condition was $39,571.87.

148.    The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle.

149.    Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means.

22

150.    Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition.

151.    As such, Ally funded the purchase for $31,657.50, eighty (80%) percent of the book value.

152.    For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price.

153.    Example 2: On January 25, 2022 Deo arranged for Northshore to purchase a 2019 Mercedes Benz for $34,000.00 from Herold Motor Cars.

154.    The wholesale book value of this vehicle in very good condition was $44,128.12.

155.    The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle.

156.    Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means.

157.    Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition.

158.    As such, Ally funded the purchase for $35,302.50, eighty (80%) percent of the book value.

159.    For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price.

160.    Example 3: On January 25, 2022 Deo arranged for Northshore to purchase a 2016 Jaguar for $27,000.00 from Herold Motor Cars.

161.    The wholesale book value of this vehicle in very good condition was $36,365.62.

162.    The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle.

163.    Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means.

164.    Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition.

165.    As such, Ally funded the purchase for $29,092.50, eighty (80%) percent of the book value.

166.    For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price.

**ix.    Deo Double-books Financing in Violation of the Law & in Breach of Agreements**

167.    Deo devised another scheme to pilfer money from the Managing Members, Northshore, Sunrise and the IAG Plaintiffs.

168.    Deo arranged to finance the same inventoried motor vehicle twice, wrongfully taking the improperly obtained funds, some examples are described below.

169.    Example 1: On April 30, 2022 Deo arranged for Sunrise to sell a 2017 Mercedes Benz to Marlon and Monique Harris ("Harris") for $27,765.00.

170.    Harris paid $3,000.00 down and financed the balance, including fees and taxes, with a lender, Santander Consumer USA ("Santander").

171.    Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means.

172.    Santander paid Sunrise financed proceeds of $25,875.00.

173.   Deo failed to deliver the vehicle to Harris and Harris canceled the purchase and loan.

174.   Deo then transferred the vehicle to Northshore, which then sold it to Bay Motors, Inc. for $30,136.00.

175.   Santander demanded the return of the proceeds from the canceled sale.

176.   Deo did not return the proceeds to Santander.

177.   Aaronson became aware of the Santander demand in November 2022, and arranged for IAM to pay Santander the full amount due, which by that time was $32,294.42.

178.   Example 2: On or about April 4, 2022 Deo arranged for Northshore to sell a 2013 Audi to Reid ("Reid") for a price in excess $25,000.00.

179.   Reid financed the balance, including fees and taxes, with a lender, Santander.

180.   Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means.

181.   Santander paid Northshore financed proceeds of 24,024.58.

182.   Deo failed to deliver the vehicle to Reid and the transaction and loan was canceled.

183.   Deo then transferred the vehicle to Sunrise, which then sold it to Rashawn Newsome for $26,090.00.

184.   Santander demanded the return of the proceeds from the canceled sale.

185.   Deo did not return the proceeds to Santander.

186.   Aaronson became aware of the Santander demand in October 2022, and arranged for IAM to fund Northshore to pay Santander the full amount due, which by that time was $26,453.29.

**x.     Deo's Purchase of Damaged and Poor Condition Vehicles Caused a Deficiency Toward Repayment of the Floor Plan**

87.187.Because of the damaged and poor condition of the vehicles purchased by Deo, many vehicles sold for less than their purchase priceFloor Plan financing, causing Northshore and Sunrise to sustain significant damages.

88.188.Selling vehicles for less than their purchase priceFloor Plan financing created a deficiency toward repayment of the loan made by Ally Bank to purchase each such vehicle.

89.189.As guarantor, various IAG Plaintiffs had to pay Ally Bank over $3,000,000.00 to satisfy Northshore's and Sunrise's Floor Plan deficiency.

90.190.A recentAn inspection by IAG Plaintiffs as well as a recentan audit by Ally Bank of the floor planned vehicles revealed that several vehicles could not be located.

91.191.That audit also revealed that several vehicles were damaged.

v   **xi.   Deo Fails to Pay Off Floor Plan Following Sales**

192.   Deo sold vehicles subject to Floor Plan financing by Ally without paying off the Floor Plan.

193.   This created a deficiency toward repayment of the Floor Plan loan made by Ally to purchase each such vehicle.

194.   As guarantor, various IAG Plaintiffs had to pay Ally over $4,000,000.00 to satisfy Northshore's and Sunrise's Floor Plan deficiency.

**xii.   Deo Fails to Cause Northshore and Sunrise to Pay Off Existing Loans on Vehicle Trade-Ins**

92.195.Northshore and Sunrise each accepted customer trade-ins of vehicles to be used toward their purchase ("(the "Trade-ins" or "trade-in").

26

93. 196. Trade-ins with existing loan or lease balances were required to be satisfied by Northshore or Sunrise in accordance with their respective dealer agreements.

94. 197. Deo failed to have Northshore and Sunrise pay off the existing loan or lease balances on numerous Trade-ins.

95. 198. The prior owners of these traded-in vehicles remained liable to make payments on the debt despite no longer having ownership or control of the vehicle.

199.   Certain IAG Plaintiffs arranged to pay off the loans at their own expense, some examples are described below.

200.   Example 1: On September 12, 2022, customer Wagner Alifonso ("Alifonso") purchased a 2014 BMW for $27,000.00 from Deo at Sunrise.

201.   Alifonso paid $2,000.00 down and traded in his 2014 Honda Odyssey.

202.   Alifonso still owed $12,092.00 to his lender, Truist Bank, for the Odyssey.

203.   Deo appraised the Odyssey at $12,292.00.

204.   Because Alifonso still owed $12,092.00 to his lender, Deo credited Alifonso $200.00 from the Odyssey toward the purchase of the BMW.

205.   Alifonso then financed $30,096.34, being the total price including extended warranty, tax and registration, less the $2,200.00 Deo applied.

206.   Sunrise received the financed proceeds of $30,096.34.

207.   Deo was then supposed to pay, from those proceeds, $12,092.00 to Truist Bank to both relieve Alifonso of the continued obligation to Truist and for Sunrise to own the Odyssey lien free and available for resale.

208.   Deo did not pay off the loan from Truist and Alifonso remained liable for the loan.

209.    For the benefit of the Plan, Deo retained the proceeds that were to have been used to pay off the loan to Truist Bank.

210.    Aaronson arranged for IAM to pay off the loan to Truist Bank in the amount of $12,502.17 on January 10, 2023.

211.    Example 2: On August 29, 2022, customer Santos Arevalo ("Arevalo") purchased a 2018 BMW for $37,995.00 from Deo at Sunrise.

212.    Arevalo paid $2,000.00 down and traded in his 2015 BMW.

213.    Arevalo still owed $20,500.00 to his lender, JP Morgan Chase, for the older BMW.

214.    Deo appraised the older BMW at $21,000.00.

215.    Because Alifonso still owed $20,500.00 to his lender, Deo credited Arevalo $500.00 from the older BMW toward the purchase of the new BMW.

216.    Arevalo then financed $40,188.45, being the total price including extended warranty, tax and registration, less the $2,500.00 Deo applied.

217.    Sunrise received the financed proceeds of $40,188.45.

218.    Deo was then supposed to pay, from those proceeds, $20,500.00 JP Morgan Chase, to both relieve Arevalo of the continued obligation to JP Morgan Chase, and for Sunrise to own the older BMW lien free and available for resale.

219.    Deo did not pay off the loan from JP Morgan Chase and Arevalo remained liable for the loan.

220.    For the benefit of the Plan, Deo retained the proceeds that were to have been used to pay off the loan to JP Morgan Chase.

221.    Aaronson arranged for IAM to pay off the loan to JP Morgan Chase in the amount of $21,237.92 on October 31, 2022.

~~96.~~ 222. Deo's failure to cause Northshore and Sunrise to pay off the loans on the Trade-ins has potential criminal liability, civil liability, and loss of the DMV Licenses.

> **Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

~~97.~~ 223. Deo's failure to have Northshore and Sunrise pay off the loans may also affect the ability of the licensees, Chabrier, Aaronson and J. Baron, to obtain a DMV License for any other dealership facility.

~~98.~~ 224. In order to avert the consequences of Deo's failure to pay off the loans on Trade-ins, IAG satisfied $~~191,400.54~~981,306.22 of ~~the~~these outstanding obligations ~~and will be paying another $130,226.38~~.

~~vi~~

### ~~xiii.~~    **Deo Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Potential Liability to IAG**

~~99.~~ 225. Northshore and Sunrise arranged financing for their customers through contracted lenders.

> **Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

~~100.~~ 226.               Northshore and Sunrise have written agreements with these lenders that require Northshore and Sunrise to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer.

~~101.~~ 227.               These agreements also require Northshore and Sunrise to repurchase any loan made by the lender to a consumer if Northshore and Sunrise do not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title.

~~102.~~ 228.               Deo failed to have Northshore and Sunrise perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Northshore and Sunrise.

103.229.          As a result of Deo's actions, in clear violation of lender agreements, those lenders demanded repurchase of those loans.

104.230.          In order to protect the investment of ~~David Baron, Chabrier, Aaronson and J. Baron~~the Managing Members in Northshore and Sunrise and their goodwill with these lenders, with whom they have other agreements through IAG, IAG has ~~or will have to pay over $850,000.00 if Deo does not do so~~paid over $100,748.11.

**~~vii~~ixiv. Deo Failed to Pay Warranty Companies and Vendors, and Failed to Account for Dealer and Other License Plates**

105.231.          Northshore and Sunrise sell, on behalf of third-party warranty providers, extended warranties to consumers.

106.232.          Under Deo's direction, Northshore and Sunrise have issued warranties to consumers and collected the fees but have failed to pay ~~over~~ $100,~~000.00~~748.11 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid.

233.    Deo has used these collected fees for the benefit of the Plan.

107.234.          Deo has caused Northshore and Sunrise to fail to pay more than $58,000.00 owed to vendors.

108.235.          In addition, Deo has not completed the documentation necessary to complete registrations for out-of-state customers and cannot account for numerous missing titles on vehicles.

109.236.          The DMV License authorizes Northshore and Sunrise to have "dealer" license plates and to issue New York State license plates on purchased vehicles.

110.237.          These license plates are carefully accounted for, and the License holder is responsible for their protection and proper issuance.

*Formatted:* Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

*Formatted:* Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.5"

111.238.            Despite due demand, Deo has refused to account for all of the dealer license plates and a number of unissued New York State license plates that would ultimately be used for customers.

112.239.            Upon information and belief, Deo's family and friends continue to use the dealer plates.

viiixv. **Deo Wastes Company Assets and Further Obligates IAG Plaintiffs**

113.240.            Deo delivered certain unsold vehicles owned by Northshore and liened by Ally to repair facilities to be repaired.

114.241.            Despite due demand, however, Deo has failed to disclose the identity or location of the various repair facilities housing these vehicles.

115.242.            Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges.

116.243.            Deo has failed to arrange for payment to these facilities or alert the IAG Plaintiffs of any garagemen's lien, resulting in the sale of these vehicles at auction to satisfy the garagemen's lien.

117.244.            Northshore and IAG Plaintiffs remain liable to Ally to satisfy the loans on these vehicles.

ixxvi. **Deo Takes and Uses Dealership Assets for His Own Purposes**

118.245.            Deo has been treating Northshore, Sunrise, and their respective assets asfor his own purposes.

119.246.            For the benefit of the Plan, Deo has personally taken over $230,000.00 in customers' cash deposits, rather than deposit the money in Northshore's account.

247.    Despite Deo having no Merckling and Blankenship were enlisted by Deo to assist him in carrying out the Plan.

248.    Among Merckling and Blankenship's roles were to work at Northshore and Sunrise and handle all cash transactions.

249.    Merckling and Blankenship personally handled the cash deposits at Northshore and Sunrise, removed the cash from Northshore and Sunrise, and did not deposit it in the bank.

250.    Merckling and Blankenship were aware of the purpose of their actions and how those actions were intended to further the Plan, and agreed to work in concert with Deo to implement the scheme and to perform their role in furtherance of the Plan.

251.    These cash funds were used to further the Plan.

252.    Deo was not a signatory authority on Northshore's bank accounts, he has.

253.    Deo had no authority to withdraw any funds from Northshore's bank accounts.

120.254.    Despite having no authority, Deo had been issuing and signing checks from its accounts to pay for his personalthe expenses of the Deo Dealerships, among other things.

121.255.    For example, Deo issued a $60,000.00 check from Northshore to Car Buyers NYC, Inc., a corporation formed and owned by Deo.

122.256.    Deo also used an American Express card issued in the name of Sunrise, which he obtained without authority or approval, to pay for personalnon-Sunrise expenses.

257.    In all, Deo has issued such payments for no less than $500,000.00.

123.258.    In addition, Deo failed to terminate $303,043.12and return over $240,000.00 of lender financing for consumers who canceled their purchases.

124.259.            Upon information and belief, Deo personally took those loan proceeds.

125.260.            Finally, Deo's son continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG's consent.

xvii. **Deo Falsified Financial Statements at Northshore and Sunrise with the Assistance of Jones and Jones CPA LLP**

126.261.            In order for Deo to perpetuate his financial wrongdoings he needed the IAG Plaintiffs and their Floor Plan lender, Ally Bank, to continue to provide the Floor Plan to Northshore and Sunrise.

127.262.            In order for IAG Plaintiffs and Ally Bank to continue to provide the Floor Plan to Northshore and Sunrise, Northshore and Sunrise were required to provide IAG Plaintiffs and Ally Bank monthly financial reports.

128.263.            These monthly financial reports were provided to IAG Plaintiffs and Ally Bank by Deo.

129.264.            Had Deo provided IAG Plaintiffs and Ally Bank the accurate monthly financial reports, IAG Plaintiffs and Ally Bank would have discontinued providing the Floor Plan to Northshore and Sunrise because the accurate monthly financial reports would not have satisfied Ally Bank'sAlly's financial requirements.

265.    Deo engaged the services of the CPA Defendants on behalf of Northshore and Sunrise to work on their financial reporting.

266.    Deo engaged the services of the CPA Defendants at least as early as August 2021.

267.    Deo engaged the services of the CPA Defendants specifically for them to further the Plan by having the CPA Defendants manipulate Northshore and Sunrise's monthly financial statements so as to hide the losses incurred by the pilfering of Northshore and Sunrise's assets.

33

Formatted: Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

268.    The CPA Defendants were engaged to make it appear that Northshore and Sunrise were profitable.

269.    In so doing, it was the intention of Deo and the CPA Defendants to induce the IAG Plaintiffs and Ally to continue Ally's floor plan financing for Northshore and Sunrise.

270.    The CPA Defendants were aware of the purpose of their actions and how those actions were intended to further the Plan.

271.    The CPA Defendants agreed to work in concert with Deo to implement the scheme and to perform their role in furtherance of the Plan.

272.    Each month during Deo's tenure overseeing and managing Northshore and Sunrise, beginning in August 2021 the CPA Defendants was engaged and paid by Northshore and Sunrise to assist Deo in preparing the information to create the monthly financial reports.

130.273.                During Deo's tenure overseeing and managing Northshore and Sunrise, he falsely manipulated Northshore's and Sunrise's monthly financial reports submitted to IAG Plaintiffs and Ally Bank.

131.    Deo engagedand the services of Jones and Jones CPA LLP on behalf Northshore and Sunrise to work on their financial reporting.

132.    Each month during Deo's tenure overseeing and managing Northshore and Sunrise, Jones was engaged and paid by Northshore and Sunrise to assist Deo in preparing the information to create the monthly financial reports.

133.274.                Deo and JonesDefendants manipulated Northshore's and Sunrise's monthly financial information every month between at least August 2021 through October 2022.

34

134.275. Deo and Jonesthe CPA Defendants falsified the monthly financial statements provided to the IAG Plaintiffs and Ally Bank.

135.276. Deo and Jonesthe CPA Defendants falsified the monthly financial statements with an intent to defraud the IAG Plaintiffs and Ally Bank.

136.277. Deo and Jonesthe CPA Defendants falsified the monthly financial statements to induce the IAG Plaintiffs and Ally Bank to continue to provide the Floor Plan to Northshore and Sunrise.

278. The IAG Plaintiffs and Ally BankEach financial entry by Deo and the CPA Defendants was a representation that such entry was true and accurate and could be relied upon by the IAG Plaintiffs and Ally.

279. Examples of fraudulent entries made by Deo and the CPA Defendants into the DMS include those described below.

280. On May 11, 2022, the CPA Defendants and Deo directed Northshore's controller, Daniel O'Sullivan ("O'Sullivan"), to make seven (7) adjusting journal entries.

281. The CPA Defendants and Deo directed O'Sullivan to date those adjustments as of April 27, 2022.

282. The adjustments included adjustments to multiple items, including sales and cost of goods sold.

283. The adjustments were not accurate and not based upon legitimate financial records, transactions or accounting principles.

284. The net effect of the adjustments was to change the April 2022 financial statement to show a false profit of $101,725.00.

Formatted: Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

285.     On June 16, 2022, the CPA Defendants and Deo directed O'Sullivan to make over 100 adjusting journal entries.

286.     The CPA Defendants and Deo directed O'Sullivan to date those adjustments as of May 29, 2022.

287.     The adjustments included adjustments to multiple items, including sales and cost of goods sold.

288.     The adjustments were not accurate and not based upon legitimate financial records, transactions or accounting principles.

289.     The net effect of the adjustments was to change the May 2022 financial statement to show a false profit of $142,048.00.

290.     On October 11, 2022, the CPA Defendants and Deo directed O'Sullivan to make over 20 adjusting journal entries.

291.     The CPA Defendants and Deo directed O'Sullivan to date those adjustments as of September 25, 2022.

292.     The adjustments included adjustments to multiple items, including sales and cost of goods sold.

293.     The adjustments were not accurate and not based upon legitimate financial records, transactions or accounting principles.

294.     The net effect of the adjustments was to change the September 2022 financial statement to show a false profit of $43,853.00.

295.     The financial information stored on the DMS as directed to be entered by Deo and the CPA Defendants is the information considered in extending the Ally Floor Plan to Northshore and Sunrise.

137.296.     The IAG Plaintiffs and Ally reasonably relied upon the falsified monthly financial statements to continue to provide the Floor Plan to Northshore and Sunrise.

138.     The IAG Plaintiffs and Ally Bank would not have continued to provide the Floor Plan to Northshore and Sunrise had they been aware that Deo was committing the wrongdoings alleged.

139.297.     The IAG Plaintiffs and Ally Bank would not have continued to provide the Floor Plan to Northshore and Sunrise had they been aware that Deo and the monthly financial statementsCPA Defendants were falsecommitting the wrongdoings alleged.

298.     The IAG Plaintiffs and Ally would not have continued to provide the Floor Plan to Northshore and Sunrise had they been aware that the monthly financial statements were false.

140.299.     Due to the falsified monthly financial statements the IAG Plaintiffs and Ally Bank were unaware of the significant losses accruing at Northshore and Sunrise.

141.300.     When the IAG Plaintiffs and Ally Bank became aware of the significant losses accruing at Northshore and Sunrise, Ally Bank demanded that all financial deficiencies owed to Ally Bank be repaid, which the IAG Plaintiffs did, causing them significant damages.

301.     xiThe IAG Plaintiffs covered the numerous claims and financial deficiencies created by the Deo Defendants, totaling more than $4,000,000.00.

**xviii.** **Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain EIDL Loans, The Proceeds of Which Deo Personally Converted**

142.302.     Almost immediately after the death of David Baron, Deo, purportedly on behalf of Northshore, applied through the Small Business Association ("SBA") for a COVID-19 Economic Injury Disaster Loan ("EIDL") in the amount of $196,425.00.

143.303.    In connection with the EIDL application, Deo falsely claimed to be he had been a fifty percent (50%) owner of Northshore since February 14, 2018.

304.    Deo submitted the EIDL application with David Baron as part owner of Northshore.

305.    Deo submitted the EIDL application with David Baron as the signer of the application.

306.    Deo submitted the false application on May 26, 2021, a day after David Baron died.

144.307.    Deo submitted the EIDL application without the knowledge or approval of Northshore's members.

145.308.    Similarly, Deo submitted to the SBA an EIDL application purportedly on behalf of Sunrise, falsely claiming he has been the sole owner of Sunrise since January 1, 2021.

146.309.    Deo submitted this false application without the knowledge or approval of Sunrise's members.

147.310.    Upon information belief, Deo personally took the proceeds from each both of the EIDL loans.

**xii.xix. Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain The Libertas Funds and Converts the Libertas Funds**

311.    On Beginning in or about around September 2022 Aaronson, Chabrier and J. Baron became aware of significant financial deficiencies in Northshore's and Sunrise's accounts.

312.    Beginning in or around September 2022 Aaronson, Chabrier and J. Baron became aware of numerous claims against Northshore and Sunrise that, *inter alia*, invoices were not being paid, trades were not being paid off, lender liens were not being filed (requiring loan buy-backs), vehicles were missing or damaged (requiring Floor Plan financing payoffs) and other financial distress at Northshore and Sunrise caused by the Deo Defendants.

313.    The IAG Plaintiffs thus cut off any further funding of Northshore and Sunrise.

314.    In or around October 2022, Aaronson confronted Deo and demanded that Deo repay the IAG Plaintiffs for all of the losses the IAG Plaintiffs covered arising from Deo's actions.

315.    In October and November 15, 2022, Deo, purportedly2022, Aaronson and Deo were negotiating a transfer of the ownership in Northshore and Sunrise, and transfer of the DMV license applicant to Deo, in exchange for Deo's obligation to repay the losses incurred by the IAG Plaintiffs.

316.    Deo agreed to move forward with the exchange under the terms laid out by the IAG Plaintiffs.

317.    The proposed exchange never occurred.

318.    Unbeknownst to the IAG Plaintiffs at the time, Deo and the other Deo Defendants had no intention of accepting the obligations for the losses the IAG Plaintiffs incurred.

319.    Unbeknownst to the IAG Plaintiffs at the time, Deo and the other Deo Defendants' wrongful actions having been discovered by the IAG Plaintiffs, were negotiating to take over their next mark, the Superb Plaintiffs, using money that they would misappropriate from Northshore and Sunrise.

320.    It was the Deo Defendants' intention, once operating the Superb Plaintiffs' businesses, to similarly abscond with its assets in furtherance of the Plan.

321.    In November 2022, Deo and other Deo Defendants began negotiation with the Superb Plaintiffs to buy into certain of the Superb Plaintiffs' automobile dealership business, offering to pay $500,000.00 plus a percentage of the ownership Deo represented to have in both Northshore and Sunrise.

322.    In furtherance of the Plan, Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit for the Deo Defendants' investment in Superb, which bounced due to insufficient funds.

323.    The Deo Defendants, now unable to take any further funds out of Northshore and Sunrise, coordinated a new scheme to wrongfully sell the future assets of Northshore so as to obtain the funds necessary to buy into the Superb Plaintiffs' business.

324.    Deo, in New York, enlisted Libertas, in Connecticut, agreeing to work together to strip Northshore of its assets so as to enable Deo to buy into the Superb Plaintiffs' business.

148.325.                Deo and Libertas agreed that Deo would enter into an agreement on behalf of Northshore, entered into an agreement with Libertas ("Libertas Agreement") pursuant to in which Northshore agreed towould sell $997,500.00 of its future receipts (the "Future Receipts") to Libertas for the purchase price of $735,000 (the "Libertas Funds")."), being a thirty-six (36%) percent return on its money.

326.    Deo, purportedly on behalf and Libertas made such agreement despite knowing that Deo was the manager of Northshore, entered thebut not the owner or authorized representative of Northshore.

327.    Libertas was aware of the purpose of the actions of it and Deo and how those actions were intended to further the Plan.

328.    Libertas agreed to work in concert with Deo to implement the scheme and to perform its role in furtherance of the Plan in order to profit off of the Deo Defendants' scheme.

329.    To appear legitimate, Libertas accepted minimal and knowingly false financial documentation provided by Deo.

40

**Formatted:** Indent: Left:  0", First line:  0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

330.   The false financial documentation was prepared by Deo in November 2022 with the assistance of the CPA Defendants.

331.   The false financial documentation included one or more tax returns making it appear that Deo and S. Deo were the sole owners of Northshore.

332.   The false financial documentation included one or more monthly financial statements of Northshore, including October 2022, in which the accurate financial information was revised.

149.333.   The Libertas Agreement without the knowledge or consent of Northshore's members. granted Libertas the unfettered right to unilaterally withdraw funds from the Northshore bank account to pay the amounts due under the Libertas Agreement.

150.334.   In connection with the To induce Libertas Agreement, Deo falsely misrepresentedto engage in this scheme, Deo personally guaranteed payment to Libertas that he was the sole owner of Northshore. .

151.   Deo's purported sale of the Future Receipts was the first step in his scheme to wrongfully convert for himself the Libertas Funds.

152.335.   Deo, aware of his inabilityIn order to withdraw the Libertas Funds from Northshore'sassist Deo in concealing the transaction, Deo and Libertas agreed not to deposit the Libertas funds in the Northshore bank account, arranged forbut to deposit the Libertas Funds to be deposited into Sunrise'sthe Sunrise bank account, from which he was able to withdraw funds. .

153.   When IAG Plaintiffs confronted Deo concerning his actions, Deo falsely claimed that he was the sole owner of Northshore and Sunrise.

41

336.   xiiiThe documentation and communication between Deo and Libertas were made by electronic means.

337.   Libertas wired the Libertas Funds to Sunrise's account in New York on November 18, 2022.

**xx.   Despite His Obligation to Safeguard the Libertas Funds, Thomasson Aids and Abets Deo's Conversion by Disbursing the Libertas Funds to Deo**

154.338.   Upon learning of Deo's misconduct,On November 18, 2022, the IAG Plaintiffs became aware of the Libertas Agreement and took reasonable steps to ensure the Deo Defendants would not abscond with the Libertas Funds, by withdrawing and safeguarding the Libertas Funds.

339.   Thomasson was enlisted by Deo to create an aura of legitimacy over the Enterprise and to defend against claims made by those who were defrauded by the Deo Defendants.

340.   Deo enlisted Blankenship, Merckling and Thomasson to assist in having the Libertas Funds turned over to Deo, individually.

341.   Blankenship, Merckling and Thomasson were aware that Deo was not rightly entitled to the Libertas Funds.

342.   Blankenship, Merckling and Thomasson were aware that in order to perpetuate the Plan, Deo needed the Libertas Funds to buy into the Superb Plaintiffs' operations, which was necessary to take control of Superb and divest it of its assets and business for the benefit of the Deo Dealerships.

343.   Blankenship, Merckling and Thomasson were aware of the purpose of their respective actions and how those actions were intended to further the Plan.

344.   Blankenship, Merckling and Thomasson agreed to work in concert with Deo to implement the scheme and to perform their respective roles in furtherance of the Plan.

345.    Upon information and belief, Blankenship and Merckling, at the behest of Deo, abused their authority as retired and active police officers to engage Detective Eric Marx ("Detective Marx"), at the Second Precinct of the Nassau County Police Department ("NCPD"), to process a false police report filed by Deo in which Deo alleged that Aaronson stole the Libertas Funds.

346.    Upon information and belief, at the behest of Blankenship and Merckling, Detective Marx threatened to have Aaronson arrested if the Libertas Funds were not immediately turned over to Deo.

155. 347.                    At all relevant times, Thomasson claimed to be the attorney for Northshore, Sunrise, and Deo.

156. 348.                    Upon information and belief, Thomasson was aware that the Libertas Funds were paid by Libertas to Northshore (and deposited in Sunrise's account) for the purported sale of the Future Receipts.

349.    Thomasson was aware that the Libertas Funds were sought in order to invest in the Superb Plaintiffs' dealership in furtherance of the Plan.

157. 350.                    Thomasson was aware that there was a dispute among IAG Plaintiffs, Deo, and Libertas concerning Deo's right to have acted on Northshore's behalf with respect to the sale of the Future Receipts.

158. 351.                    Thomasson was aware that there was a dispute concerning the rights to the Libertas Funds.

159. 352.                    As a direct result of the threats by Detective Marx, which, upon information and belief, were made at the behest of Blankenship and Merckling, the IAG Plaintiffs arranged to place the Libertas Funds into Thomasson's attorney trust account for safekeeping

pending resolution of the parties' dispute, rather than turn over the Libertas Funds to Deo, who was not the rightful owner of the Libertas Funds.

160.    IAG Plaintiffs did so because Detective Marx at Second Precinct of the Nassau County Police Department ("NCPD") threatened to have Aaronson arrested if he did not turn over the funds.

161.    Upon information and belief, Blankenship and Merckling, at the behest of Deo, abused their authority as retired and active police officers to engage Detective Marx to make this threat.

162.353.                As a result of these threats, and to ensure the Libertas Funds would remain secure, IAG Plaintiffs requested that Thomasson maintain the Libertas Funds in his attorney trust account pending resolution of the parties' dispute concerning the Libertas Funds.

354.    Aaronson arranged to turn over the Libertas Funds into Thomasson's attorney escrow account on November 21, 2022.

163.355.                Despite Thomasson's knowledge of the dispute concerning the parties' rights to the Libertas Funds, he did as he pleaseddirected and agreed with Deo, and immediately disbursed the Libertas Funds to Deo.

164.356.                Indeed, Thomasson has declared in open Court, in sum and substance, that no one was going to tell him what to do with his attorney escrow account.

357.    AndIn so, despite Thomasson's knowledge that doing, Thomasson knowingly and purposely assisted Deo in his plan to take over Superb for the benefit of the Deo Dealerships.

358.    On the very next day, November 22, 2022, Deo paid his investment of $500,000.00 to the Superb Plaintiffs using the Libertas Funds were the consideration paid by.

44

359.    On or about November 25, 2022 Libertas to withdrew $19,791.70 from Sunrise's account without authorization.

360.    Libertas did so despite having no written agreement with Sunrise.

361.    Libertas has continued to try to withdraw funds from Sunrise's account.

362.    Despite Northshore for being the purported sale obligor under the Libertas Agreement, Libertas has never pursued a claim against Northshore under the Libertas Agreement.

363.    Despite Deo being the guarantor under the Libertas Agreement, Libertas has never pursued a claim against Deo under his guarantee of the Future Receipts. Libertas Agreement.

~~165.~~ 364.    Because of Libertas' complicity in the scheme to strip Northshore of its assets for Deo's benefit and for Deo to use those funds to invest in Superb and bilk the Superb Plaintiffs of their business, because Libertas has not pursued a claim against Deo under his guarantee of the Libertas Agreement or against Thomasson disbursed who took and turned over the Libertas Funds to Deo, despite Thomasson and Deo admitting that Thomasson gave the Libertas Funds to Deo, Libertas conspired with the Deo Defendants in furtherance of the Plan and for its own benefit.

~~166.~~ 365.    Instead, Libertas had interposed counterclaims against the IAG Plaintiffs, but not against Northshore and Sunrise, in a state court action seeking to recover the value of the Future Receipts and/or the return of the Libertas Funds (the "Libertas Claims").  See Chabrier, *et al.* v. Deo, *et al.*, Index No.: 617224/2022 (Nassau County Supreme Court), NYSCEF Docket Entry 57, (the "State Action").

366.    The claims Libertas raised against the IAG Plaintiffs, but not against Northshore and Sunrise, concern tortious interference, conversion and unjust enrichment despite the

45

acknowledgement by Thomasson and Deo that the Libertas Funds were turned over to Thomasson, who turned them over to Deo, just three days after being funded by Libertas.

167.367.    The State Action has since been discontinued without prejudice for the specific purpose of asserting in this action all claims and counterclaims raised in the State Action, including the Libertas Claims.  See NYSCEF Docket Entry 116.

168.368.    Libertas specifically asserted the Libertas Claims against the IAG Plaintiffs, except for Northshore and Sunrise, and, upon information and belief, intends to pursue the Libertas Claims in this case solely against the IAG Plaintiffs.

**xivxxi. Deo Further Encumbers and Diverts Northshore's Assets**

169.369.    Upon information and beliefSeparate from the Libertas transaction, Deo, falsely claiming to be the sole owner of Northshore, arranged to borrow funds from Flushing Bank and/or Flushing Financial Solutions (collectively "Flushing").

370.    Deo's representations to Flushing concerning his ownership of Northshore and Sunrise were false and supported.

371.    Deo, with the assistance of the CPA Defendants, changed certain financial records of Northshore, including the October 2022 financial statement, making it appear that Northshore was profitable.

372.    In March 2023, Deo, working with Laurie and Laurie's connections at Flushing, sought to obtain a loan for Northshore secured by its assets.

373.    On or about March 13, 2023, Deo and Laurie presented the false financial records whichof Northshore to Flushing to obtain a $500,000.00 loan to Northshore.

170.374.        Deo, the CPA Defendants, Laurie and Flushing were altered by Jonesaware of the purpose of their respective actions and Jones CPA LLPhow those actions were intended to further the Plan.

375.    Upon information and belief, The CPA Defendants and Laurie and Flushing agreed to work in concert with Deo to implement the scheme and to perform their respective roles in furtherance of the Plan by arranging for a loan from Flushing.

376.    Despite Northshore having no demonstrable assets, with Laurie's inside Flushing connection, Flushing approved and funded the $500,000.00 loan.

171.377.        Deo employed the assets of Northshore to secure the loan from Flushing and did so for the purpose of personally taking those Flushing loan proceeds for the benefit of the Deo Dealerships.

378.    Deo used the loan from Flushing for purposes other than Northshore.

172.379.    Deo arranged this loan without the knowledge or approval of Northshore's members.

380.    xv.    Defendants 'Unlawful Schemes atDeo also granted Flushing a UCC-lien on all of Northshore's assets without authorization.

381.    Deo Defendants used the Flushing loan proceeds to invest in the Deo Defendant's new automobile dealerships, which were created to unfairly compete with Superb as described below.

**II.    The Deo Defendants Move on to Their Next Victims – Superb, Team, & Urrutia**

**i.    Deo Obtains Ownership of Superb**

173.382.    At all times relevant, since its inception in June 2021, Urrutia was the President and majority shareholder of Superb.

174.383.    In addition to Superb, Urrutia owns Volkswagen of Freehold, Team-

Mitsubishi Hartford, and Team Nissan of Pittsfield Massachusetts.

384.   Urrutia is also the sole member of Team, which is an automobile wholesaler that owns thirteen (13) vehicles that the Deo Defendants have absconded with and failed to return.

### a.   Deo meets with Urrutia and gains his confidence

~~175.~~385.   Urrutia first met Deo in November 2022, through a mutual friend in the automobile industry, at which time Deo held himself out to be qualified to run an automobile dealership and sought to enter into a partnership with Urrutia at Superb.

~~176.~~386.   Urrutia and Deo entered into a Cross-Purchase Agreement (the "Cross Purchase Agreement") dated as of December 1, 2022, in which Deo would pay Urrutia $500,000.00 and issue him a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for Deo obtaining a forty-nine percent (49%) interest in Superb.

~~177.~~387.   Prior to entering into and included in the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia[3] that, among other things, he:

(i)   ~~(i)~~ is the sole owner of Northshore and Sunrise, respectively;

(ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively;

(iii) has not made any representation or warranty that constitutes an untrue statement of a material fact or omits to state a material fact necessary to make it not misleading;

---

[3] Plaintiffs Superb and Urrutia do not pursue claims for breach of those representations and warranties in this case but provide this information as relevant to the facts and circumstances warranting relief here.  Plaintiffs Superb and Urrutia pursue their claims concerning the Cross-Purchase Agreement and related causes of action in the Supreme Court of the State of New York, Nassau County.  See Index No.: 618608/2023, NYSCEF Docket Entry ~~1.~~1.

and

and (iv) has no pending or threatened suit, action, bankruptcy, or administrative proceeding, or other arbitration or proceeding, which could adversely affect the ability of Deo to perform any of his obligations, including Deo's obligation to convey the units of Northshore and Sunrise free and clear of all liens and encumbrances.

178.388.     Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit on the foregoing agreement in furtherance of the Plan.

179.389.     However, this check bounced the following day due to being returned for insufficient funds.

180.390.     Due to Thomasson's direct participation in the perpetuation of Deo's fraudulent scheme, unbeknownst to Urrutia, Thomasson enabled Deo to pay Urrutia funds which were fraudulently obtained from Libertas.

181.391.     Indeed, on November 21, 2022, $735,000.00 was wired into Thomasson's escrow account due to Blankenship's and Merckling's intervention with the NCPD in making Aaronson believe that he would be arrested if he did not turn over the $735,000.00 fraudulently obtained from Libertas.

182.392.     Deo then wired Urrutia $500,000.00 in two (2) separate wires of $300,000.00 on November 22, 2022, and $200,000.00 on November 29, 2022, both of which were issued from Car Buyers NYC Inc. despite the fact those funds obviously came from Thomasson's escrow account.

183.393.     Having paid for his shares of Superb with these stolen funds, on December 1, 2022, Deo executed the Cross-Purchase Agreement.

394.     Deo invested in Superb in furtherance of the Plan.

**b.** **Deo has limited powers as a minority shareholder of Superb**

184.395.    A few weeks later, Urrutia and Deo executed a Shareholders' Agreement.

185.396.    The Shareholders' Agreement provides that effective December 22, 2022, Urrutia holds a fifty-one percent (51%) interest in Superb while Deo owns a forty-nine percent (49%) interest in Superb.  See ECF Docket Entry 11-6.

186.    The Shareholders' Agreement provides that Urrutia is the President, and that he, alone, and independent of any other shareholders, directors, and officers may exercise

:  (i) the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires; and

397.    (ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided, it being expressly agreed, that this power does not include the right to terminate a Shareholder.

187.398.    It similarly provides that all actions requiring shareholder consent require the written consent of least a majority of the voting shares; crucially, this includes the granting of any mortgage, lien, or other security interest in the assets of Superb or any loans or guarantees by Superb.

188.399.    The Shareholders' Agreement restricts the right to sell the stock of Superb only by a majority of the voting stock of Superb, *i.e.*, by the written consent of Urrutia, its as majority shareholder.

189.400.    The Shareholders' AgreementIt provides that Urrutia has, among other responsibilities, Urrutia has:

(i)    (i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors;

(ii) capitalization of the Corporation;

(iii) establishment of policies and standards for services provided by Superb, as well as supervision and complete authority over Superb's activities;

(iv) review and final approval of financing arrangements with lending institutions to be utilized by Superb in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles; and

(v) supervision and complete control of the accounting department of Superb, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by Superb.

~~190.~~401.    In contrast, Deo's only responsibilities under the Shareholders' Agreement were to propose an individual who will serve as the General Manager of the day-to-day operations of Superb, whom Urrutia had final authority to approve or reject.

402.    As Deo did not propose any individual, he served as General Manager of Superb.

~~191.~~403.    Notwithstanding the clear and unambiguous language in the foregoing agreements, Superb Plaintiffs later learned that Deo made a series of material false representations.

~~192.~~404.    First, despite his representation that he is the sole member of Northshore and Sunrise, it was discovered that, in fact, Deo is not the sole member of either; in fact, within five days of entering into the Cross-Purchase Agreement, Deo was sued in ~~New York Supreme Court, Nassau County~~the State Action by the actual owners of Northshore and Sunrise!

~~193.~~405.    In ~~that lawsuit~~the State Action, the *real* owners of Northshore and Sunrise alleged that Deo has engaged in financial improprieties and massive fraud that is strikingly similar to the conduct complained of with respect to Superb.  ~~Those claims were dismissed without prejudice so that they can be asserted herein.~~

Those claims were dismissed without prejudice so that they can be asserted herein.

406.

194.407.    Second, because Deo never held any membership interest in Northshore or any ownership interest in Sunrise, Deo misrepresented that he had full power and legal right to transfer and deliver shares of Northshore and Sunrise to Plaintiff.

195.408.    Third, Deo made a material misrepresentation when he informed Urrutia that there was no active or anticipated litigation against him. Northshore and Sunrise commenced an action against him in state court!

196.409.    As set forth below, on or after August 3, 2023, the Superb Plaintiffs uncovered numerous schemes perpetrated against them by Defendants.

c.    Deo Defendants' first scheme against Superb: impermissible double-flooring

c.    Urrutia's DMV License & Deo's Position as General Manager

410.    At all relevant times, Superb operated a retail used car dealership from its lot located at 215 Northern Boulevard, Great Neck, NY.

411.    The operation of a used car dealership in the State of New York requires a license (the "License") issued by the DMV.

412.    The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance.

413.    At all relevant time, Urrutia held the License as applicant for Superb.

414.    At all times hereinafter mentioned from November 2022 until August 2023, Deo was employed by Superb as its general manager.

415.    As an employee and general manager of Superb, Deo was obligated to act in the best interests of Superb and its majority shareholder Urrutia.

52

416.    Deo, however, took numerous actions for his own benefit, causing damage to the Superb Plaintiffs and jeopardizing the Licenses.

**ii.     Deo Engages in a Scheme with Other Defendants to Pilfer Superb Plaintiffs' Assets**

197.417.      Dealerships typically operate with the assistance of banks that provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership.

198.418.      When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle, and certain rules attach as a condition of the financing, *i.e.*, with limited exceptions, any such vehicle financed must be present and available for sale at the dealership.

419.    Unbeknownst to the Superb Plaintiffs and its floor plan lenders, since at least November 2022, Deo had been using the business operating funds of Superb for his own use and purposes, including for the Plan.

420.    Deo's personal use of Superb's business operating funds left Superb without sufficient capital to operate.

421.    Deo devised various schemes to keep Superb capitalized, or appear to be capitalized, so that he could continue to siphon off Superb's funds.

422.    The schemes entailed the systematic pilfering of funds from the Superb Plaintiffs and its floor plan lenders, many of which were employed by Deo against the IAG Plaintiffs.

423.    The scheme involved deceiving the Superb Plaintiffs and its floor plan lenders into funding, at inflated amounts, the purchasing of vehicle inventory, deceiving customers and other lending institutions, and manipulating financial records to conceal the subterfuge.

424.    In implementing this scheme, Deo enlisted the services of S. Deo, Blankenship, Merckling, Laurie, Thomasson, Jones and Jones CPA LLP, each with a role to play.

425.    Merckling and Blankenship continued to assist Deo in siphoning cash out of Superb, and were responsible for all monetary transactions (i.e., cash and checks), as they were with the IAG Plaintiffs, and were the only ones with access to the safe at Superb.

426.    S. Deo continued to manage the Enterprise and misappropriate leads and other proprietary information from Superb.

427.    Thomasson, whose improper unauthorized release of the Libertas funds resulted in Deo becoming involved with the Superb Plaintiffs, continued to defend Deo against those who pursued claims against him despite his knowledge that Deo engaged in fraudulent and unlawful conduct.

428.    Laurie continued in his alleged role as financier to create the illusory image of Deo as being a successful businessman, while assisting Deo in his daily operations of carrying out the various fraudulent schemes, including by helping him set up bank accounts he was not authorized to implement (as Laurie did with Flushing) and obtaining loans under the Plaintiffs' name (such as the Flushing loan and the Libertas Funds).

429.    The CPA Defendants continued to cook the books to make Superb appear profitable.

430.    Each of these parties agreed with Deo to implement the scheme and to perform their role in furtherance of the scheme, including for the Plan.

431.    In November 2022 Deo was engaged by Superb as its manager for Superb's benefit.

432.    Deo's appointment as manager for Superb was proposed by Deo and approved by Urrutia in accordance with Superb's Shareholders' Agreement and was based upon Deo's obligation and expectation that actions made concerning Superb would be made for Superb's benefit.

433.   As Superb's manager, Deo was charged with the obligation and expectation that actions made concerning Superb would be made for its benefit.

434.   As Superb's manager, Urrutia allowed Deo to handle the day-to-day operations of Superb, including vehicle inventory purchases, and certain aspects of financial reporting on behalf of Superb.

435.   As Superb's manager, Urrutia allowed Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb.

436.   As Superb's manager, Urrutia and Superb relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb.

437.   As Superb's manager, Urrutia and Superb relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb and with respect to audits conducted by floor plan lenders.

438.   By accepting the position as manager of Superb, Deo accepted the obligation to accurately report financial information of Superb.

439.   By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to accurately report financial information of Superb.

440.   By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory.

441.    Urrutia controls Superb in accordance with its Shareholders' Agreement.

442.    By Deo accepting the obligation to accurately report financial information of Superb and to make appropriate vehicle inventory purchases, Urrutia personally guaranteed and cross-collateralized his other three (3) dealerships to guarantee the Floor Plan of Superb.

443.    Superb operated by using a DMS (initially DealerTrack and, later, Tekion) that was licensed by Superb to operate Urrutia's other dealerships as well as Superb.

444.    The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership.

445.    Each time that Deo entered financial information into the DMS system, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders that such financial information was true and accurate.

446.    Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders, that such vehicle inventory purchase was appropriate.

447.    The Superb Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Superb incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by floor plan lenders.

**iii.    Deo Manipulates Used Vehicle Purchases**

448.    The Superb Plaintiffs' floor plan lenders financed the purchase of used vehicles at the rate of one hundred (100%) of the "black book wholesale clean" value.

449.    In so doing, the Superb Plaintiffs' floor plan lenders and the Superb Plaintiffs reasonably expected that Superb would cover the balance of the purchase price not covered by the

Floor Plan.

450.   Because the Deo Defendants[4] had been using Superb's operating funds for their own purposes, they needed to fund fraudulent deals in order to make Superb appear profitable and maintain bank balances; they did so in an apparent Ponzi-like scheme, even though these fraudulent deals would eventually result in a buyback or an unwinding of the deal, in order to "float" Superb while they siphoned cash and check payments out of Superb.

451.   The Deo Defendants devised a method to not only purchase used cars, but to withdraw additional and other funds at the expense of the Superb Plaintiffs.

452.   At least as early as November 2022, the Deo Defendants began purchasing used vehicle inventory for Superb that were grey-market vehicles.

453.   Grey-market vehicles are Canadian vehicles that cost less due to the inability to finance them as retail banks do not permit to be financed, but which the Deo Defendants nonetheless financed with retail banks (in violation of Superb's dealer agreement) with the full knowledge that all such retailed grey-market vehicles would cause the retail bank to require Superb to return the funds for each grey-market vehicle.

454.   The Deo Defendants knew that the banks would require the funds issued for the grey-market vehicles to be returned, but proceeded to do so in order to siphon more and more money out of Superb, and the Deo Defendants intended for the Superb Plaintiffs to be left with the liability for these deals after they had already taken the money earned from this scheme out of Superb.

455.   The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the

---

[4] Although Plaintiffs reference the Deo Defendants collectively throughout this complaint, it should be noted that Deo perpetrated the schemes discussed herein and, as discussed *supra*, with the remaining Deo Defendants assisting him in the manner described herein.

Superb Plaintiffs that they were purchasing grey-market vehicles, because the Deo Defendants knew or should have known that the grey-market vehicles had little to no value to Superb as a used car dealer because most customers cannot afford to purchase a vehicle without some form of financing and none of the retail banks Superb worked with would finance a grey-market vehicle.

456.    The reason the Deo Defendants did not advise the Superb Plaintiffs that they were purchasing grey-market vehicles was because the Deo Defendants schemed to maximize the damage to Superb by creating artificial profits and fraudulent financial statements when they knew the retail banks would later seek for Superb to return the entire amount funded for such deals.

457.    Indeed, because of the grey-market vehicles, the Deo Defendants were able to arrange for Superb to purchase the vehicles for less than an American vehicle and thus make Superb appear more profitable, which was necessary to keep Urrutia's confidence in Deo.

458.    Had the Superb Plaintiffs been aware of the true nature of these transactions, they would not have approved of the purchases or financing of said grey-market vehicles.

459.    The Deo Defendants committed this practice on a regular basis; some examples are provided herein.

460.    Example 1: On July 31February 25, 2023, the Deo Defendants arranged for Superb to sell a 2016 Audi S6 to Aleksandros Papavangjeli ("Papavangjeli") for $31,500.00.

461.    According to Superb's DMS, Papavangjeli purportedly paid $2,200.00 of the $4,500.00 down-payment by credit card and financed the balance, including fees and taxes, with a lender, Chase.

462.    The remaining $2,300.00 for the down-payment was not recorded in Superb's DMS, and was – upon information and belief – stolen by the Deo Defendants.

463.    The Deo Defendants requested by interstate electronic communication for the

Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

464.   On March 1, 2023, Chase paid Superb financed proceeds of $34,597.13.

465.   After Papavangjeli complained in July 2023 that his vehicle had been at a repair shop since March 2023 and was unable to be fixed, Chase learned that Papavangjeli had purchased a grey-market vehicle, which was purchased by Deo on or around January 31, 2023.

466.   As a result, on July 21, 2023, Chase demanded the repurchase of Papavangjeli's retail contract.

467.   On July 25, 2023, the vehicle was placed on Superb's floor plan line, despite the vehicle not being physically present on Superb's lot.

468.   Critically, the Deo Defendants failed to cause Superb to pay Chase back as demanded; the Deo Defendants thus knowingly floored the vehicle in violation of Superb's agreement with its floor plan lender.

469.   Thus, the Deo Defendants were able to obtain $27,150.00 for a vehicle that was not in Superb's possession.

470.   The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle.

471.   On August 10, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back $33,229.44 after having benefitted from the use of the improperly obtained funds.

472.   Indeed, due to the Deo Defendants' fraud, Papavangjeli obtained the vehicle free of charge, which he was able to do because the Deo Defendants failed to perfect a lien against the vehicle on behalf of Chase as required by its dealer agreement.

473.    Example 2: On April 27, 2023, the Deo Defendants arranged for Superb to sell a 2019 BMW X3 to James Daughety ("Daughety") for $40,450.00.

474.    Daughety made a down-payment of $7,500 in cash, which was receipted in Superb's DMS but not deposited in Superb's bank account with Chase, and the balance was financed with Chase.

475.    The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

476.    On or around May 1, 2023, Chase paid Superb the financed proceeds of Daughety's retail contract in the amount of $40,058.00.

477.    Pursuant to Deo's instruction, the vehicle was not issued license plates immediately following the sale.

478.    The vehicle was originally placed on Superb's floor plan line of credit on April, 19, 2023 for the amount of $35,075.00 and was subsequently paid off on May 19, 2023 after receipt of the financed proceeds on May 1, 2023.

479.    The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' retail lenders to fund Daughety's purchase, which was funded by interstate electronic means.

480.    The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle.

481.    On June 13, 2023, the vehicle was improperly "re-floored," *after the May 1, 2023 contract date*, on Superb's floor plan for the amount of $34,225.00.

482.    The Deo Defendants requested by interstate electronic communication for the

Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

483.    The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle.

484.    On July 6, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds.

485.    The DMV paperwork for the vehicle was not sent until July 12, 2023 despite the fact the customer purchased the vehicle on May 1, 2023, almost three (3) months earlier.

486.    On July 21, 2023, Chase demanded the repurchase of the retail contract because it discovered the vehicle was a grey-market vehicle and due to the Deo Defendants' failure to perfect a lien on the vehicle as required by its dealer agreement with Chase.

487.    On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for Daughety for the amount of $39,601.83.

488.    Due to the Deo Defendants' fraudulent conduct, the vehicle remains in Daughety's possession, resulting in a total loss to Superb.

489.    Example 3: On March 28, 2023, the Deo Defendants arranged for Superb to sell a 2019 Land Rover Range Rover Velar to Frankie & Alice Barnes ("Barnes") for $43,200.00.

490.    Barnes paid $2,000.00 down by credit card and financed the balance, including fees and taxes, with a lender, Ally.

491.    The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

492.    On April 3, 2023, Ally paid Superb financed proceeds in the amount of $49,868.09.

493.    On April 18, 2023, Superb's floor plan lender paid $39,675.00, for the same vehicle, which had already been sold.

494.    However, the vehicle had not yet been received at Superb after its purchase from Manheim.

495.    In addition, the vehicle was sold to another customer while in transit to Superb.

496.    As a result of the vehicle not being available in a timely manner, Barnes cancelled the sale.

497.    On or about June 6, 2023, Superb submitted payment to Ally for the repurchase of the retail contract in the amount of $51,081.80.

498.    On June 15, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds.

499.    Example 4: to show the great extent to which the Deo Defendants went to defraud the Plaintiffs and their customers, on May 12, 2023, the Deo Defendants arranged for Superb to sell a 2021 Dodge Durango RT to Sarah Martin ("Martin") for $27,765.00.

500.    Although a $10,000.00 down payment was required, with Martin financing the taxes and fees with Chase, no monies were receipted into Superb's DMS nor were any monies deposited in Superb's bank account with Chase.

501.    On May 16, 2023, Chase paid Superb financed proceeds of $44,696.61.

502.    The Deo Defendants failed to deliver the vehicle to Martin and Martin canceled the purchase and loan.

503.    In fact, the Deo Defendants never purchased the vehicle before making the sale.

504.    On May 23, 2023, despite the fact the Deo Defendants never took possession of the

vehicle, and it was already sold to another dealer by Manheim, the vehicle was placed on Superb's floor plan line.

505.   The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

506.   Superb was funded $39,810 by its floor plan lender.

507.   On May 31, 2023, Superb paid off the vehicle from their floor plan line for $39,810.00.

508.   The Superb Plaintiffs later discovered that between May 2023 and June 2023, Deo arbitrated the purchase of aforementioned vehicle with Manheim New Jersey.

509.   The Deo Defendants therefore knew that the vehicle was not present at the dealership when he placed the vehicle on Superb's floor plan line of credit, nor did the Deo Defendants cancel the retail contract.

510.   Thus, despite the fact that the vehicle sale was arbitrated and the car was never ultimately purchased by the customer, the Deo Defendants instructed to "re-floor" vehicle on June 14, 2023 in the amount of $39,810.00.

511.   On June 26, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds.

512.   On July 21, 2023, Chase demanded the repurchase of the retail contract from the canceled sale because the vehicle was a grey-market vehicle.

513.   After failure to return to the funds in a timely manner, the Superb Plaintiffs repaid Chase in August 2023.

   **iv.     Deo Double-books Financing & Double-floors the Superb Plaintiffs' Vehicles**

514.    The Deo Defendants devised another scheme to pilfer money from the Superb Plaintiffs.

515.    The Deo Defendants arranged to finance the same inventoried motor vehicle twice, wrongfully taking the improperly obtained funds and in violation of the Superb Plaintiffs' agreements with its floor plan lenders.

516.    One example of double-booking is the deal with Martin, discussed *supra*, illustrates how the Deo Defendants engaged in this scheme.

517.    In another example, discussed further below, the Deo Defendants double-floored nearly two dozen vehicles, leading to a August 3, 2023 internal audit by the Superb Plaintiffs and Deo's immediate removal as general manager, and causing damages in excess of $760,000.00 for these vehicles alone.

**v.      The Deo Defendants Fail to Pay Off Floor Plan Following Sales**

518.    The Deo Defendants sold vehicles subject to Floor Plan financing by the Superb Plaintiffs' floor plan lenders without paying off the Floor Plan.

519.    This created a deficiency toward repayment of the Floor Plan loan made by the Superb Plaintiffs' floor plan lenders to purchase each such vehicle.

520.    As guarantor, the Superb Plaintiffs had to pay the Superb Plaintiffs' floor plan lenders over $2,500,000.00 to satisfy Superb's Floor Plan deficiency.

**vi.     The Deo Defendants Fail to Cause Superb to Pay Off Existing Loans on Vehicle Trade-Ins by Customers**

521.    Superb accepted customer trade-ins of vehicles to be used toward the customer's purchase of a vehicle ("Trade-ins" or "trade-in").

522.    Trade-ins with existing loan or lease balances were required to be satisfied by

64

Superb.

523.     The Deo Defendants failed to have Superb pay off the existing loan or lease balances on numerous Trade-ins.

524.     The prior owners of these traded-in vehicles remained liable to make payments on the remaining balance of their loan despite no longer having ownership or control of the Trade-in.

525.     The Superb Plaintiffs were thus forced to pay off the loans at their own expense; some examples are described below.

526.     Example 1: On May 8, 2023, the Deo Defendants arranged for Superb to sell a 2019 Dodge Durango to Patricia Richards ("Richards") for $46,790.00.

527.     Richards paid $2,500.00 down by credit card and financed the balance, including fees and taxes with a lender, TD Bank ("TD").

528.     On May 15, 2023, TD paid the financed proceeds of $50,204.18.

529.     The sale of the 2019 Dodge Durango produced a trade-in to be added to Superb's inventory.

530.     The trade-in of Richards 2019 Dodge Caravan was valued at $12,100.00 by time of sale in October 2023; however, the Deo Defendants appraised the trade-in at $25,000.00 and added the vehicle to Superb's inventory for this amount in May 2023.

531.     The payoff check to relieve Richards of her prior obligation and debt to Capital One was generated on or around July 10, 2023.

532.     Payment was not forwarded to Capital One due to the fact that the payoff check was held in the desk draw of Deo instead of being released.

533.     The Deo Defendants did not pay off the loan from Capital One and Richards

remained liable for the loan.

534.    Due to the fact the trade-in had not been paid off, the vehicle was later repossessed and Superb was caused to pay off the balance of the outstanding loan in addition to late fees and repossession fees.

535.    The Deo Defendants retained the proceeds that were to have been used to pay off the loan to Capital One.

536.    Example 2: On June 3, 2023, Superb arranged to sell a 2016 Mercedes-Benz CLS, to Abdurashid Yusupov & Elcin Abdullaeva ("Yusupov") for $38,990.00.

537.    Yusupov paid $1,000.00 by credit and financed the balance, including fees and taxes, with its lender, Ally.

538.    On June 8, 2023, Ally paid Superb the financed proceeds of $38,952.95.

539.    The sale to Yusupov produced a trade-in of a 2020 Nissan Maxima, valued at $26,500.00.

540.    The payoff check to relieve Yusupov of the prior obligation and debt to Nissan NMAC was generated on or around July 3, 2023.

541.    Payment was not forwarded to the lienholder due to the fact that the payoff check was not approved for release by Deo.

542.    In or about August or September 2023, the vehicle was repossessed by NMAC, after contacting the customer for payment and being informed by the customer that they were no longer in possession of the vehicle, as it had been traded-in at Superb.

543.    The Deo Defendants therefore caused Superb to lose this vehicle due to their refusal to pay the lien on the vehicle off as required for a trade-in.

544.    The Deo Defendants' failure to cause Superb to pay off the loans on the Trade-ins

has potential criminal liability, civil liability, and loss of the DMV Licenses.

545.    The Deo Defendants' failure to have Superb pay off the loans may also affect the ability of the Urrutia to obtain a DMV License for any other dealership facility.

546.    In order to avert the consequences of the Deo Defendants' failure to pay off the loans on Trade-ins, the Superb Plaintiffs satisfied $221,313.39 of the outstanding obligations and will be paying another $118,530.15.

**vii.    The Deo Defendants Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Liability to Superb**

547.    Superb arranged financing for their customers through contracted lenders.

548.    Superb has written agreements with these lenders that require Superb to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer.

549.    These agreements also require Superb to repurchase any loan made by the lender to a consumer if Superb does not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title.

550.    The Deo Defendants failed to have Superb perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Superb.

551.    As a result of the Deo Defendants' actions, in clear violation of Superb's lender agreements, those lenders demanded repurchase of various loans.

552.    In order to protect the investment of the Superb Plaintiffs and their goodwill with these lenders, with whom they have other agreements through other dealerships owned by Urrutia, Superb has or will have to pay over $500,000.00 if the Deo Defendants does not do so.

553.    As an example, on April 19, 2023, the Deo Defendants arranged for Superb to sell

a 2017 BMW X6 to Timothy Jenkins ("Jenkins") for $37,595.00.

554.    Jenkins paid $2,000.00 down (of which $1,400.00 in cash was receipted in to Superb's DMS but was never deposited in Superb's bank account, and $600.00 was paid by credit card), with the balance financed, including fees and taxes, with a lender, Chase.

555.    On April 21, 2023, Chase paid Superb the financed proceeds of $40,681.20.

556.    Per Deo's instruction the vehicle was not issued license plates immediately following the sale.

557.    The DMV paperwork was not sent until July 12, 2023.

558.    The reason why the Deo Defendants did not send out the DMV paperwork was to allow them to place the sold vehicle on Superb's floor plan line of credit, despite the fact a sold vehicle should never be placed on a floor plan line.

559.    By holding back the DMV paperwork, the Deo Defendants were able to show Superb's floor plan lender that they maintained title to the vehicle in order to improperly floor the vehicle.

560.    On July 21, 2023, Chase demanded the repurchase of the retail contract due to the Deo Defendants' failure to perfect the lien as required.

561.    On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for the amount of $43,008.20.

562.    Another two (2) examples of Deo's scheme in failing to perfect liens is the Papavangjeli and Daughety deals referenced *supra*.

**viii.    The Deo Defendants Sold Superb Vehicles They Did Not Own Under False Pretenses**

563.     The Deo Defendants sold Superb vehicles that they knew were not capable of being transferred to Superb, as the vehicles were stuck in limbo in Northshore's DMV VerifiNY system following the surrender of its DMV License, and the Deo Defendants did not have the authority or the ability to transfer these vehicles from Northshore to Superb.

564.     For example, in or about April 2023, Deo sold Superb a 2017 Rolls Royce Dawn for approximately $192,159.00.

565.     In spite of being provided the title to the vehicle by Deo, Superb was never transferred the vehicle out of Northshore because it cannot be taken out of Northshore's account with the DMV VerifiNY system.

566.     As a result, Superb is unable to sell this vehicle and five (5) other vehicles.

**ix.     The Deo Defendants Failed to Pay Warranty Companies and Vendors**

567.     Superb sells, on behalf of third party warranty providers, extended warranties to consumers.

568.     Upon information and belief, under the Deo Defendants' direction, Superb has issued warranties to consumers and collected the fees but have failed to pay over $400,000.00 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid.

569.     The Deo Defendants have used these collected fees for their own benefit.

570.     The Deo Defendants have caused Superb to fail to pay more than $100,000.00 owed to vendors; in addition, the Deo Defendants have not completed the documentation necessary to complete registrations for out-of-state customers and cannot account for numerous missing titles on vehicles.

**x.     Deo Wastes Company Assets and Further Obligates Superb Plaintiffs**

571.    The Deo Defendants delivered certain unsold vehicles owned by Superb and liened by the Superb Plaintiffs' floor plan lenders to repair facilities to be repaired.

572.    Despite due demand, however, the Deo Defendants have failed to disclose the identity or location of the various repair facilities housing these vehicles.

573.    Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges.

574.    The Deo Defendants have failed to arrange for payment to these facilities or alert the Superb Plaintiffs of any garagemen's lien, resulting – upon information and belief – in the sale of these vehicles at auction to satisfy the garagemen's lien.

575.    The Superb Plaintiffs remain liable to the Superb Plaintiffs' floor plan lenders to satisfy the loans on these vehicles.

576.    The Superb Plaintiffs also respectfully incorporate by reference the Supplemental Declaration of Bruce Novicky, ECF Docket Entry 157-1.

577.    As an additional egregious example of the Deo Defendants' brazen conduct, on July 31, 2023, the Deo Defendants arranged to sell a 2019 Audi Q7, to Regine Raymond ("Raymond") for $31,496.14, with $3,000.00 down and the rest, including taxes and fees, to be financed by Santander.

578.    Although a $3,000.00 down payment was required, no monies were recorded to Superb's books.

579.    On August 3, 2023, Santander paid the financed proceeds in the amount of $39,618.70.

580.    However, Raymond never took actual delivery of vehicle because Deo kept the

vehicle in his possession, and not on Superb's lot or showroom.

581.    On June 8, 2023, the vehicle was added to Superb's floor plan line for the amount of $31,185.00 and paid off on July 24, 2023.

582.    During this time, with an active Santander loan, Raymond was unable to drive the vehicle.

583.    On October 23, 2023, Deo was seen operating Raymond's vehicle, with a dealer plate bearing the number 6111633, for his personal use.

584.    To this day, the vehicle was never recovered by Superb, notwithstanding the fact that Superb is the titled owner.

585.    The Deo Defendants' conduct with respect to the Audi Q7 resulted in a total loss to Superb.

**xi.    The Deo Defendants Take and Use Dealership Assets for Their Own Purposes**

586.    The Deo Defendants have been treating Team, Superb, and their respective assets as their own.

587.    Deo has personally taken over $1,252,558.59 in customers' cash deposits, unauthorized ACH transactions, checks, and other cash, rather than deposit or keep the money in Superb's account.

588.    Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, S. Deo, Laurie, Thomasson, and Jones.

589.    Deo was not a signatory on Superb's bank account.

590.    Deo had no authority to withdraw any funds from Superb's bank accounts.

591.    Despite having no authority, Deo had been issuing and signing checks from its

accounts to pay for his personal expenses, among other things.

592.    For example, Deo issued two checks in the amounts of $37,500.00 each, with both checks from Superb to Northshore.

593.    In addition, the Deo Defendants failed to terminate at least $226,081.23 of lender financing for consumers who canceled their purchases.

594.    Upon information and belief, Deo personally took those loan proceeds and/or utilized those funds in order to float his fraudulent operations and to make Superb appear profitable in an effort to continue his schemes undetected.

**xii.    The Deo Defendants Falsified Financial Statements at Superb with the Assistance of the CPA Defendants**

595.    In order for the Deo Defendants to perpetuate their financial wrongdoings, they needed the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb.

596.    In order for the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb, Superb was required to provide the Floor Plan lenders monthly financial reports.

597.    These monthly financial reports were provided to the Superb Plaintiffs and their Floor Plan lenders by the Deo Defendants and the CPA Defendants.

598.    Had the Deo Defendants and the CPA Defendants provided the Superb Plaintiffs and their Floor Plan lenders accurate monthly financial reports, they would have discontinued providing the Floor Plan to Superb because the accurate monthly financial reports would not have satisfied their financial requirements.

599.    The Deo Defendants engaged the services of the CPA Defendants for Superb to

work on its financial reporting.

600.   The Deo Defendants engaged the services of the CPA Defendants at least as early as April 2023.

601.   Each month during the Deo Defendants' tenure overseeing and managing Superb since April 2023, the CPA Defendants were engaged and paid by Superb to assist the Deo Defendants in preparing the information necessary to create the monthly financial reports.

602.   During their tenure overseeing and managing Superb, they falsely manipulated Superb's monthly financial reports submitted to the Superb Plaintiffs and their Floor Plan lenders.

603.   The Deo Defendants and the CPA Defendants intentionally manipulated Superb's monthly financial information every month between at least April 2023 through July 2023.

604.   The Deo Defendants and the CPA Defendants falsified the monthly financial statements provided to the Superb Plaintiffs and their Floor Plan lenders.

605.   The Deo Defendants and the CPA Defendants falsified the monthly financial statements with an intent to defraud the Superb Plaintiffs and their Floor Plan lenders.

606.   The Deo Defendants and the CPA Defendants falsified the monthly financial statements to induce the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb.

607.   Each financial entry by the Deo Defendants and the CPA Defendants was a representation that such entry was true and accurate and could be relied upon by the Superb Plaintiffs and their Floor Plan lenders.

608.   Examples of fraudulent entries made by the Deo Defendants and the CPA Defendants into the DMS include those described below.

609.   On May 12, 2023, the Deo Defendants and the CPA Defendants directed Superb's

controller, Kendra Kernizant ("Kernizant"), to make two (2) adjusting journal entries in the amount $61,559.16 for the April 2023 financial statement in order to show a false profit of $27,842.00.

610.    The Deo Defendants and the CPA Defendants further directed Kernizant on June 12, 2023 to make adjusting journal entries to the unit count of sold vehicles.

611.    Kernizant was told that there was money found on schedules to be put back into income and directed to make journal entries removing packs from used car inventory schedule and made adjusting entries for $48,563.00 to change the May 2023 financial statement in order to show a false profit of $26,136.00.

612.    The Deo Defendants and the CPA Defendants also directed Kernizant to make adjusting journal entries to the unit count of sold vehicles, to not reflect eight (8) unwound sales from prior months, the effect of which was designed to show a greater profit for Superb.

613.    Kernizant made adjusting journal entries for the amount $12,304.70 to change the June 2023 financial statement in order to show a false profit of $17,361.00.

614.    The Deo Defendants and the CPA Defendants also directed Kernizant to add money set aside for taxes as "profit" for Superb.

615.    The Deo Defendants and the CPA Defendants similarly directed Kernizant to first add, and then not unwind, forty-two (42) deals that fell through with no expectation of consummating those deal, which added $1.5M in profit and $250,000 in net profit.

616.    Indeed, the Deo Defendants & CPA Defendants – who closed every statement from April 2023 through July 2023 – imputed income from the foregoing fake deals, which resulted in the illusion that Superb is profitable and permitted the Deo Defendants to run off with over $800,000.00 in missing cash and checks from customer deposits, and over $450,000.00 in ACH transactions to pay other debts that are not Superb's, among myriad other damages.

617.   The Deo Defendants also directed Kernizant to floor sold vehicles and other vehicles that did not exist, which are discussed in various examples, *supra*.

618.   The financial information stored on the DMS as directed to be entered by the Deo Defendants and the CPA Defendants is the information considered in extending the Superb Plaintiffs' Floor Plan to Superb.

619.   The Superb Plaintiffs' and their Floor Plan lenders reasonably relied upon the falsified monthly financial statements to continue to provide the Floor Plan to Superb.

620.   The Superb Plaintiffs and their Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the Deo Defendants and the CPA Defendants were committing the wrongdoings alleged.

621.   The Superb Plaintiffs and the Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the monthly financial statements were false.

622.   Due to the falsified monthly financial statements, the Superb Plaintiffs and the Floor Plan lenders were unaware of the significant losses accruing at Superb.

623.   The Deo Defendants and the CPA Defendants falsified the financial statements to create the illusion that Superb was profitable so that they can continue to steal from the Superb Plaintiffs and prevent the Superb Plaintiffs from discovering their fraud.

624.   When the Superb Plaintiffs and the Floor Plan lenders became aware of the significant losses accruing at Superb, the Floor Plan lenders demanded that all financial deficiencies owed to them be repaid, which the Superb Plaintiffs did, causing them significant damages.

625.   The Superb Plaintiffs covered the numerous claims and financial deficiencies

created by the Deo Defendants.

626.   The Deo Defendants engaged in the conduct complained to hide all of their financial improprieties and to steal funds from Superb.

627.   Worst of all, the Deo Defendants and CPA Defendants submitted a falsified mid-year financial statement to this Court showing approximately an additional $3M in gross with $1.3M in profit, that is similarly false, as Superb's DMS system does not reflect these numbers; the Deo Defendants apparently pulled these numbers out of thin air.  See ECF Docket No. 30-6.

### xiii.    The Straw That Broke the Camel's Back

~~199.~~628.   On July 31, 2023, one of Superb's floor plan lenders, Nissan Motor Acceptance Corporation ("NMAC~~")~~"), contacted Bruce Novicky ("Novicky"), the Chief Operating Officer ("COO") of Superb, to inform him that NMAC discovered that vehicles it financed ~~by it~~ were also financed, in breach of Superb's floor plan agreement with NMAC, with another bank.

629.   Such acts mean that two lenders lent money to Superb to buy the same car for inventory.

~~200.~~630.    This practice is called "double flooring" in dealership lexicon and is prohibited.

~~201.~~631.    Because of this prohibited conduct, Urrutia was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC and ultimately, NMAC terminated its floor plan financing for Superb.

~~202.~~632.    Novicky confronted Deo about this, who provided inadequate explanations.

~~203.~~633.    Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones each substantially assisted Deo in carrying out this scheme by acting as his agents at his direction

in, among other things, filling out applications for financing and making material misrepresentations in said applications, discussing together the plan to defraud Superb Plaintiffs and the floor plan financing companies, and profiting from the scheme together.

~~204.~~634.     Superb and Urrutia thus were damaged by the Defendants' conduct, including – but not limited to – by causing Superb's floor plan line of credit with NMAC to be terminated, resulting in a finding of irreparable harm by this Court.  See ECF Docket Entry 55 ("In light of the foregoing record and the possibility of losing Superb Motors as a going concern …, the Court concludes that Superb has demonstrated irreparable harm").

~~d.     Defendants' second scheme against Superb: misappropriation & theft of vehicles~~

~~205.~~635.     When Novicky informed Urrutia about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, Urrutia delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises.

636.     The inventory resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger.

~~206.~~637.     Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb.

638.     As an example of Deo's clear lies, Deo explained that one particular vehicle was

sold.

639.   However, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle.

207.640.   Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale.

208.641.   Due to the foregoing, Urrutia exercised his right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations.  The findings included incontrovertible proof of Deo's duplicity and clear breaches of his fiduciary obligations.

e.   xiv.   **The Full Extent of the Deo Defendants' third scheme againstFraudulent Schemes Come to Surface**

642.   Upon removing the Deo Defendants from Superb**: use of forged instruments**, the Superb Plaintiffs conducted an investigation into their conduct.

209.643.   Urrutia discovered that Deo misrepresented to Flushing Bank that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing Bank.

210.644.   Deo's representation to Flushing Bank was blatantly false.

211.645.   Deo successfully opened a bank account for Superb on or about April 4, 2023.

212.646.   A month prior, Urrutia began the process of opening an account with Flushing in March 2023.

213.647.   When Urrutia began that process, Flushing Bank requested of Urrutia information, documents, and records – many of which he provided – including his tax returns and other documents which indicate that he is the majority shareholder of Superb.

214.648.   Urrutia spoke directly with David Weinstein ("Weinstein") – the Vice

President and Branch Manager of Flushing's Borough Park branch – and Mr. Weinstein knew that he was the majority shareholder of Superb.

~~215.~~649.     Around the same time, on March 31, 2023, Deo had contacted Robert Puccio ("Puccio") – the  Vice President of ~~Flushing Bank's~~Flushing's Business Banking Group located at 99 Park Avenue in Manhattan, who Deo represented was his "personal banker" – to open an account.

~~216.~~650.     Notably, Puccio's email referenced a request for information for "Signer 1" and "Signer 2."

~~217.~~651.     On the same day, Weinstein asked Urrutia whether Urrutia wanted to share his personal tax returns with Puccio, and Weinstein also asked Urrutia for the name of Urrutia's partner at Superb, thereby establishing both that both Weinstein and Puccio knew Deo was not the sole shareholder of Superb, ~~and further establishing that Puccio knew~~ given that Weinstein was in contact with Puccio about opening an account at Superb.

~~218.~~652.     The very same day, Deo informed Novicky that he has a personal banker ready to open an account for Superb with Flushing ~~Bank~~ and that Deo can obtain a $500,000.00 line of credit as well.

~~219.~~653.     Deo added: "Bro. This guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home."

~~220.~~654.     Deo's own communications establish that Flushing ~~Bank~~ and its agents were in on the Deo Defendants' schemes to loot and plunder Superb.

~~221.~~655.     Within days of these communications, Deo successfully opened a bank account with Flushing completely unbeknownst to Urrutia.

~~222.~~656.     Flushing ~~Bank~~ therefore knowingly participated in the Deo Defendants'

fraudulent schemes by permitting him to open an account with Superb despite the fact they knew he had no authority to do so.

223.657.    Deo's actions violated the Shareholders' Agreement because only Urrutia had check authorization and only Urrutia was to have control over bank accounts owned by Superb.

224.658.    Deo opened this account to divert Superb's funds to an account that he can control with assistance from Flushing Bank.

225.659.    Upon information and belief, Deo paid Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones out of funds placed in this account for their substantial assistance in carrying out his fraudulent schemes.

226.660.    The transactions forin Superb's Flushing Bank account should have raised red flags for Flushing Bank given the nature of the transactions: (i) money comes in; (ii) money is then immediately transferred out; and (iii) no expenses or payroll are paid out of the sole checking account for a dealership.

227.661.    Flushing Bank therefore knew and had reason to know that the Deo Defendants were utilizing the bank account for Superb to launder their ill-gotten gains.

228.662.    Flushing Bank'sFlushing's agents benefitted from assisting the Deo Defendants because they were in Deo's "pocket."

    f.    Defendants' fourth scheme against Superb: misappropriation of funds

229.663.    Urrutia also learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing Bank account and then transmitting those funds into his own accounts and, upon information and belief, into those of Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones for their substantial assistance to Deo in carrying out his unlawful schemes.

230.664.     To Urrutia's knowledge, Deo misappropriated approximately $455,000.00 under this scheme.

g.     **Defendants' fifth scheme against Superb: theft of cash payments by customers**

231.665.     Urrutia also discovered that Deo misappropriated cash payments from customers by receipting the cash in tointo Superb's DMS system but never depositing any of those cash payments into Superb's bank account and, instead, pocketing the money for himself.

232.666.     Upon information and belief, Defendants Merckling and Blankenship substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required.

233.667.     Upon information and belief, Defendants Merckling and Blankenship were paid out of these cash funds because they are officers with the NCPD and are not permitted to have any outside employment without advance approval from the NCPD.

234.668.     To Urrutia's knowledge, Deo misappropriated in excess of $400,000.00 under this scheme.

h.     **Defendants' sixth scheme against Superb: signing unauthorized checks**

669.     Deo knew that only Urrutia had sole check authorization, including because he executed the Shareholders' Agreement stating so.

235.670.     Notwithstanding this, Deo signed multiple checks from Superb's bank accounts that were under the control of Urrutia, although Deo had no authority to sign any checks from any bank account maintained by Superb.

236.671.     During its top-down audit, Urrutia discovered that Deo routinely wrote and signed checks issued by Superb made payable to Northshore, other entities Deo owns, Thomasson, Laurie, and others; none of these checks was authorized and each was signed by Deo despite the

fact he had no authority to do so.

237.672.    Deo's conduct constitutes wire fraud.

i.    Defendants' seventh scheme against Superb: purchase of vehicles under its name

238.673.    Before Deo was removed from Superb, the Deo Defendants purchased five

(5) vehicles from Manheim, an automobile auctioneer, under Superb's account.

239.674.    Upon information and belief, the Deo Defendants intended to sell these

vehicles for 100% profit with no cost to Defendants and to leave Superb holding the proverbial

bag.

j.    Defendants 'eighth scheme against Superb: build their own group of dealerships    xv.    The
Deo Defendants Stole Superb's Proprietary Information to Open its own Dealerships

240.675.    In trying to understand Deo's motive for engaging in these schemes, the

top-down audit conducted by Urrutia soon made Deo's intentions very clear.

241.676.    For months, while he was repeatedly lyingUnbeknownst to and stealing

from Superb PlaintiffsUrrutia, Deo has been forminghad formed various corporate entities – GCC

Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – and his plan was to steal

from Urrutia in order to begin his own group of dealerships to be operated under the newly formed

master entity Gold Coast Motors Automotive Group.

242.677.    Prior to Deo's working relationship with Urrutia, Deo had no familiarity

with Urrutia's dealership processes and know-how, which Urrutia imparted to him as a business

partner for the mutual success of Superb.

243.678.    For example, Urrutia introduced Deo to Tekion, a unique DMS system that

was specifically customized for Superb.

244.679.    Urrutia also taught Deo the process of successfully operating an automobile

dealership using Tekion, such as processes to streamline dealership operations, inventory

management, cash flow management, and reporting features that identify areas of improvement. See also ECF Docket Entry 38-2 at 38 (February 23, 2023 text messages).

245.680.    The information Urrutia imparted to Deo was unique, confidential, and proprietary.

246.681.    Specifically, the DMS system Urrutia implemented at Superb is unique because it was custom-designed for Superb and cost over $120,000.00 to set up.

682.    It contained the blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to operate dealerships profitably.

247.    During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships.

248.    In other words, Deo stole the exact customization used by Superb to use at his competing group of dealerships.

249.683.    In; in addition, in a blatant breach of his fiduciary duties to Superb and Urrutia, Deo had Superb employees work for his own group of dealerships *while they were employed by Superb and were being paid to perform work only for Superb!*

250.684.    Moreover, Deo illegally imparted the confidential know-how Urrutia imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information, to these employees for the purpose of setting up Deo's own group of dealerships.

251.685.    Urrutia initially partnered with Bobby Clarke ("Clarke"), who owns a radio station named Irie Jam, 93.5 FM, and with whom Urrutia advertised to over 2 million listeners in

the Caribbean community both during and after his partnership with Clarke ended.  See ECF

Docket Entry 38-4 and 38-5.

252.686.      That partnership included approximately $1.5M in advertising, which

generated the substantial customer list Urrutia developed to foster business at Superb.

253.687.      Due to the unique nature of Urrutia's partnership with Clarke, the customer

list cannot be reverse engineered or independently generated without a substantial investment in

Irie Jam, which the Defendants did not make.

254.688.      To add insult to injury, Deo and the employees he poached misappropriated

Superb's customer list and used it to divert Superb's customers to other dealerships, including

those in which Deo had an interest.


689.    The Superb Plaintiffs maintained information on leads sourced through Irie Jam

and its other marketing efforts in a customer relationship management ("CRM") system, initially

DriveCentric and, later, VINSolutions.

690.    The Superb Plaintiffs took reasonable efforts to maintain the secrecy of this

information, including by password protection, maintaining a firewall, and other measures.


691.    The Deo Defendants misappropriated Superb's data from its CRM system to

jumpstart their competing group of dealerships.

692.    Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones each

substantially assisted Deo in carrying out his unlawful schemes.

255.693.      S. Deo managed and controlled the improperly-opened bank account in

which Superb's funds were diverted, and misappropriated Superb's CRM system.

256.694.    Blankenship and Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

257.695.    For example, when Urrutia called the NCPD to remove Deo, upon information and belief, Blankenship and Merckling used their positions as retired and active police officers to stymie an investigation and to protect Deo from being arrested for his blatantly criminal conduct.

696.    Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital.

258.697.    Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with Urrutia and Deo and knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts.

259.698.    Similarly, although Jones and his firm knew Superb was operating at a loss, they nonetheless altered journal entries in its accounting systems to create the appearance that it was operating profitably in order to deceive Urrutia and maintain his confidence in Deo.

260.699.    Jones and his firm were thus complicit in the fraudulent schemes perpetrated by Deo, and Jones and his firm aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes.

261.700.    Finally, Thomasson serves as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud.

262.701.    Thomasson has engaged in the aforesaid fraud together with the remaining Defendants.

263.702.    For example, although Thomasson purports to maintain an office at 380 Sunrise Highway, Wantagh, NY, this address is a UPS Store and not an office.

264.703.    Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants.

265.704.    Urrutia also learned and is continuing to learn of other schemes to plunder and destroy Superb.

266.705.    For example, on February 22, 2023, Deo applied for a license withdefrauded the New York State Department of Motor Vehicles ("DMV") when he applied for a license for GCC Sunrise and lied toby lying on the DMV statingapplication falsely claiming that he had never been convicted of a crimefelony when, in fact, he had. Specifically, Deo previously pled guilty, and was convicted in 2016 for, to Federal wire fraud in relation to a mortgage.

267.706.    Defendants engaged in wide-ranging schemes to defraud the Superb Plaintiffs through wire fraud and the use of forged instruments.

268.707.    Defendants S. Deo, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment.

269.708.    Defendants Laurie and Jones enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, *i.e.*, false tax returns, false bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb.  Defendants' conduct constitutes a violation of the DTSA, and related state law common claims for misappropriation of trade secrets and unfair competition, as well as, among other things, a breach of Deo's fiduciary duty to Urrutia.

270.709.    Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, and Jones

**Formatted:** Font: Italic

assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb.

271.710.    Defendants are currently benefitting from the confidential information Urrutia developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he came to own his first dealership, which Defendants stole from the Superb Plaintiffs.

272.711.    This information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information.

273.712.    Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including Urrutia's decades of experience in the automobile industry, the relationships Urrutia developed with contacts in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships.

274.713.    Urrutia went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today.

275.714.    Superb and Urrutia have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with Urrutia for decades.

276.715.    Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means.

277.716.     Defendants have done so by working with Deo to pillage and plunder Superb because Deo has paid and is paying other Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes.

278.717.     Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants, as set forth herein, misappropriated in contravention of their fiduciary duty to Plaintiff and in violation of the law, provided Plaintiff a unique competitive advantage in the automobile dealership industry, a competitive advantage it has been stripped of by Defendants' unlawful acts.

279.718.     Superb took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords.

280.719.     The confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

281.720.     This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business.

282.721.     Deo, S. Deo, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means.  This is evidenced by their bad faith conduct in plundering, pillaging,

and massacring the goodwill and value of Superb.

283.722.    The unauthorized acts of Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful.

284.723.    There was no other way to obtain this information and Deo, S. Deo, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of Superb and Urrutia to whom they owed fiduciary duties.

285.724.    For example, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system: They simply stole it from Superb and Urrutia.

286.725.    Similarly, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to search for customers: They simply diverted them from Superb to their own group of dealerships.

287.726.    Moreover, Deo, S. Deo, Thomasson, Blankenship, and Merckling did not need to hire and pay employees: They simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb.

288.727.    Superb's trade secrets and confidential information that Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated through gaining the trust of Urrutia by and through Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that Urrutia has spent years, if not decades, establishing. Meanwhile, Deo, S. Deo, Thomasson, Blankenship, and Merckling through subterfuge gained access to information that they would have no other way of

obtaining.

289.728.    Deo, S. Deo, Thomasson, Blankenship, and Merckling misappropriated confidential and trade secret information by improper means; no permission was given to them to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about its customers for any purpose except for the benefit of Superb.

290.729.    It is obvious from the brazen tactics of Deo, S. Deo, Thomasson, Blankenship, and Merckling's that they are actively engaged in a scheme to plunder and to destroy Superb - a company Urrutia spent years building.

291.730.    Upon information and belief, a significant number of Superb's customers have been solicited by Deo, S. Deo, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information.

292.731.    Immediate injunctive relief and a permanent injunction is necessary to prevent Deo, S. Deo, Thomasson, Blankenship, and Merckling from destroying the customer relationships, brand, and goodwill that Urrutia and Superb have spent years building, from profiting on a business that they stole from Superb, and causing further imminent and irreparable financial harm to Superb.

293.732.    In addition to shutting down Deo's other businesses, specifically, Defendants Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp., Deo, S. Deo, Thomasson, Blankenship, and Merckling should be directed to return the misappropriated information and enjoined from engaging in any further unlawful conduct, it is

essential that Superb also be permitted forensically to examine Deo, S. Deo, Thomasson, Blankenship, and Merckling's email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of their unlawful scheme to steal Superb's business.

733.    The Deo Defendants' conduct harmed the Plaintiffs, its banking partners, vendors, and consumers at large.

734.    The Deo Defendants routinely engaged in identity theft in order to profit from their fraudulent schemes and in furtherance of the Plan.

735.    As an example, with respect to customer Barnes, discussed *supra*, this customer was told she had approval to purchase a vehicle on March 28, 2023.

736.    However, after leaving a down-payment of $2,000.00 by credit card, and being promised delivery by the following week, Barnes never received the vehicle.

737.    Barnes then contacted Ally to discuss the deal and learned that her financing application was denied and that a second application was submitted for Barnes' spouse without his consent.

738.    Barnes had no knowledge that a financing application was sent by the Deo Defendants using his identity.

739.    Barnes' spouse canceled the fraudulent contract and made a complaint with the Better Business Bureau against Superb.

740.    The total damages sustained by the Superb Plaintiffs that have been ascertained to date is summarized as follows: (i) over $2.5M in inventory and other losses in order to conceal the

91

theft of over $2.0M in cash, checks and ACHs causing over $4.5M in losses; (ii) the value of the injuncted vehicles ($1.5M) and the losses incurred on the depreciation of those vehicles, totaling approximately $500,000.00 to date; and (iii) attorneys' fees, as well as numerous other outstanding liabilities that still remain to be determined at trial.

741.    The Plaintiffs respectfully incorporate by reference the sworn statements made in the following declarations, bearing ECF Docket Entries 11, 12, 17, 18 (under seal), 38, 40, 56, 80, 86, 95, 112, 155, 156-1, 157-1, and 157-15.

**AS AND FOR THEIR FIRST CAUSE OF ACTION OF ALL PLAINTIFFS**
**(Violation of RICO, 18 U.S.C. § 1962 – All Defendants)**

294.742.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

295.743.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) in that each is either an individual, corporation, or limited liability company, or other person capable of holding a legal interest in property.

296.744.    At all relevant times, each of the Deo Defendants was, and is, a person that exists separate and distinct from the Enterprise, described below.

745.    Each of the individuals comprising the Enterprise share a common purpose to engage in a particular concerted fraudulent common course of conduct and work together to achieve such purposes.

297.746.    Deo controls the Gold Coast entities and is the mastermind of the Enterprise, which consists of Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones, and each of their respective corporate entities.

298.747.    Deo was previously convicted in 2016 for wire fraud in relation to a mortgage.

299.748. Defendants S. Deo, Thomasson, Blankenship, Merckling, Laurie, Jones are individuals and instrumental in the furtherance of the Enterprise, each of whom engaged in wire fraud or substantially assisted in carrying out the wire fraud through the use of false financial statements and forged instruments as outlined *supra*.

300.749. The corporate entity Deo Defendants were utilized by the individual Deo Defendants to assist, enable, and perpetuate their fraudulent schemes.

301.750. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

302.751. Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

303.752. Deo Defendants are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise engaged in the conduct of their affairs through a continuing pattern of racketeering activity.

304.753. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of the racketeering activity.

305.754. There may also be other members of the enterprise who are unknown at this time.

306.755. Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of purportedly working for dealerships.

307.756.    These activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(c), (d), 18 U.S.C. § 1961(65) because they violate 18 U.S.C. §§ 1341, 1343 and 13431344.

308.757.    Deo Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterpriseEnterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

309.758.    The racketeering activity was made possible by Deo Defendants' regular and repeated use of the facilities and services of the enterpriseEnterprise.  Deo Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

310.759.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

311.760.    Deo Defendants each committed at least two such acts or else aided and abetted such acts.

312.761.    The acts of racketeering were not isolated, but rather the acts of Deo Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission, as is evidenced by the fact two (2) separate groups of dealerships have been impacted by Deo Defendants' unlawful conduct.

313.762.    Further, the acts of racketeering by Deo Defendants have been continuous.

314.763.    There was repeated conduct during a period of time beginning in approximately 2018 and continuing to the present, and there is a continued threat of repetition of such conduct.

315.764.     The Enterprise, as alleged herein, was not limited to the predicate acts and extended beyond the racketeering activity. Rather, it existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of running automobile dealerships.

316.765.     Plaintiffs specifically allege that Deo Defendants participated in the operation and management of the Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described belowherein.

317.766.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud§§ 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1344 (relating to bank fraud), 1028 (relating to fraud and related activity in connection with identification documents), 1831 and 1832 (relating to economic espionage and theft of trade secrets), 1956 (relating to the laundering of monetary instruments), 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), and 659 (stealing vehicles) in that they devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs and others by means of false or fraudulent pretenses, representations, or promises.

318.767.     For the purpose of executing their scheme or artifice, Deo Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers or received such therefrom.

319.768.     Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals.

320.769.     The acts of Deo Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business or that such use could have been foreseen, even if not actually intended.

770.   Defendants also obtained monies from a financial institution by submitting false documentation.

321. 771.   These acts were done by the agreement amongst the Deo Defendants intentionally and knowingly with the specific intent to advance Deo Defendants' scheme or artifice.

772.   Deo Defendants could not have carried out their scheme had they not used the U.S. mails or private or commercial interstate carriers or interstate wires.

322. 773.   In furtherance of their scheme alleged herein, Deo Defendants communicated among themselves and with Plaintiffs and others in furtherance of the scheme to defraud Plaintiffs.

323. 774.   These communications were typically transmitted by wire (*i.e.*, electronically) and/or through the United States mails or private or commercial carriers.

324. 775.   Specifically, each Deo Defendant did transmit the executed form of their operative contracts through electronic mail or other means of electronic communications.

325. 776.   Additionally, upon information and belief, each Deo Defendant did use electronic means of communications in order to advance the aims of the Enterprise.

326. 777.   Deo Defendants did sign checks without authorization and utilized forged instruments and false financial records to obtain bank accounts and financing for Northshore, Sunrise, and Superb without the authority to do so, constituting wire fraud and bank fraud.

327. 778.   Deo Defendants' shared objective was and is to divert funds to their own benefit and to defraud Plaintiffs.

328. 779.   Plaintiffs reasonably and justifiably relied upon Deo Defendants' false representations, false pretenses, and deceptive communications, and have been damaged as a direct and proximate result of Deo Defendants' participation in such enterprise Enterprise, as alleged

herein.

329.780.    Flushing Bank'sFlushing's employees and agents participated in this scheme by permitting Deo to open a bank account for Superb when they knew that he had no authority to do so. Among other things, Flushing Bank was in possession of documentation indicating that Deo had no such authority.

330.781.    Chase Bank's employees and agents participated in this scheme by permitting Deo to process checks from Superb's bank account when it knew that he had no authority to sign checks. Deo was not an authorized signatory on Superb's account at Chase Bank.

782.    Libertas' employees and agents participated in this scheme by arranging to pay the Libertas Funds for Northshore's assets, despite Deo's lack of authority to sell same, and deliver the Libertas Funds to Sunrise to enable Deo to perpetrate the scheme to wrongfully steal Northshore's assets to invest in Superb, and to continue to withdraw funds from Northshore.

331.783.    Deo along with the other "persons" listed above violated 18 USCS § 1962(a) by using income and the proceeds of income derived from a pattern of racketeering activity and through the wrongful activities described in connection with their use and operation of Northshore and 189 Sunrise in which they participated as a principal within the meaning of section 18 U.S.C. § 2 to use or invest such income and proceeds in the acquisition of an interest in Superb which is engaged in, or the activities of which affect, interstate and foreign commerce.

332.784.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding the Project.

333.785.    S. Deo managed and controlled the improperly-opened bank account in which Superb's funds were diverted.

334.786.   Blankenship and Merckling each misappropriated cash payments and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

335.787.   Laurie enabled Deo Defendants by substantially assisting them in opening an account at Flushing Bank, with whom Laurie has a relationship through his business DLA Capital.

336.788.   Jones created and submitted false financials to create the illusion that Northshore, Sunrise and Superb was were profitable.

337.789.   Finally, Thomasson serves served as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by facilitating the pilfering of Northshore's assets and violative investment in Superb, and defending their blatantly criminal conduct despite knowing that Deo Defendants have engaged in fraud.

338.790.   In fact, Thomasson helped divert the stolen funds.

339.791.   The *raison d'etre* of this fraud was to extract money from Plaintiffs and leave them holding the liabilities for Deo Defendants' conduct.

340.792.   It is prototypical racketeering – i.e., creating a problem (incurring liabilities and taking away the ability to pay those liabilities) for the purpose of solving it through extortion (attempting to obtain or obtaining both operational control and/or ownership of dealerships).

793.   Each defendant benefitted directly from these schemes either through direct participation in Deo's schemes by receiving portions of the money stolen by Deo.

341.794.   The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities, *i.e.*, buying and selling vehicles from outside the State of New York.

342.795.     All communications between the members of the Enterprise were by interstate email and mail, wire transfers, or ACH debits and other interstate wire communications.

343.796.     Specifically, the Enterprise used interstate emails to communicate and collect monies purportedly owed for made up sales of automobiles that were never actually sold or that were purchased for less than represented, and to provide false financial information to lending institutions.

344.797.     Plaintiffs have and will continue to be injured in their businesses and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

345.798.     The injuries are proximately and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. §1962(d) include, but are not limited to, millions of dollars paid as a result of Defendants' fraudulent conduct.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys attorneys' fees from Defendants.

**AS AND FOR THEIR SECOND CAUSE OF ACTION OF ALLTHE SUPERB PLAINTIFFS**
**(Violation of RICO, 18 U.S.C. § 1962(a) – Deo Defendants, Libertas, and Flushing)**

799.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

800.     Since at least 2018 and continuing through 2023, Deo received income directly or indirectly from the operations of Northshore and Sunrise arising from the wrongful acts alleged.

801.     Defendants Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie and Jones are individuals each of whom engaged in wire fraud, mail fraud and bank fraud or substantially assisted in carrying out the wire fraud, mail fraud and bank fraud through, inter alia, sales of automobiles that were never actually sold or that were purchased for less than represented and the preparation and use of false financial statements as outlined *supra*.

**Formatted:** Indent: First line:  0", Right:  -0.25"

99

802.    These predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged.

803.    These activities constitute racketeering activity within the meaning of 18 U.S.C. § 1962(a), (d) and 18 U.S.C. § 1961(5) because they violate 18 U.S.C. §§ 1341, 1343 and 1344.

804.    Defendants Deo, S. Deo, Thomasson, Blankenship, Merckling, Laurie and Jones each committed at least two such acts or else aided and abetted such acts.

805.    Deo along with the other "persons" listed above violated 18 USCS § 1962(a) by using income and the proceeds of income derived from a pattern of racketeering activity and through the wrongful activities described in connection with their use and operation of Northshore and Sunrise in which they participated as a principal within the meaning of section 18 U.S.C. § 2 to use or invest such income and proceeds in the acquisition of an interest in Superb which is engaged in, or the activities of which affect, interstate and foreign commerce.

806.    Blankenship and Merckling each misappropriated cash payments and abused their authority as former or active police officers in carrying out their actions at the behest of Deo.

807.    Jones created and submitted false financials to create the illusion that Northshore, and Sunrise were profitable.

808.    Finally, Thomasson served as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by facilitating the pilfering of Northshore's assets and violative investment in Superb, and defending their blatantly criminal conduct despite knowing that Deo Defendants have engaged in fraud.

809.    In fact, Thomasson helped divert the stolen funds.

810.    The Superb Plaintiffs were then damaged by the Deo Defendants' investment and acquisition of an interest in Superb and investment in the Deo Defendants' competing Deo

Dealerships by use of the income and proceeds derived by a pattern of racketeering in that the Deo Defendants then used such ownership interest to pilfer Superb's assets, and use Superb's DMS system, employees and customer lists to unfairly compete with Superb.

**AS AND FOR THEIR THIRD CAUSE OF ACTION OF [WHICH PLAINTIFFS]**
**(Conspiracy Under 18 U.S.C. § 1962(d) for violation of 18 U.S.C. § 1962(c) – All Defendants)**

346.811.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

347.812.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

348.813.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the dealerships, purchase and sale of vehicles, opening of bank accounts, and issuing of checks, each Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy in violation of 18 U.S.C. § 1962(c.) and agreed to engage in such conspiracy.

349.814.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud the Plaintiffs, including in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the schemes to steal monies and

> Formatted: Indent: First line:  0", Line spacing:  single

assets of the dealerships, as well as to obtain operational control of the dealerships.

350.815.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.  Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

351.816.    The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars.

352.817.    Plaintiffs also have suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

353.818.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

354.819.    The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

**AS AND FOR THEIR ~~THIRD~~FOURTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Conspiracy Under 18 U.S.C. § 1962(d) for violation of 18 U.S.C. § 1962(a) – Deo Defendants, CPA Defendants, & Libertas)**

820.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

821.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(a) as described above, in violation of 18 U.S.C. § 1962(d).

822.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.  Plaintiffs have been and will continue to be injured in their business

and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

823.   The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars.

824.   Plaintiffs also have suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

825.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

826.   The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing in their illegal activity.

**AS AND FOR THEIR FIFTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Injunctive Relief Under RICO, 18 U.S.C. § 1964(a) – Deo Defendants)**

355.827.   Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

356.828.   Superb Plaintiffs have sustained or are immediately in danger of sustaining direct injury as the result of the challenged conduct.

357.829.   Namely, because Deo Defendants have misappropriated vehicles owned by Superb purchased with floor plan financing with various lenders, Superb Plaintiffs will be required to shut down its operations if Deo Defendants do not immediately return the vehicles.

358.830.   Due demand has been made for the return of the vehicles, both by Superb and its various lenders, but Deo Defendants have willfully refused to return the vehicles.

359.831.   Accordingly, Superb is entitled to an injunction, pursuant to 18 U.S.C. § 1964(a), requiring Deo Defendants to return Superb's vehicles, in order to prevent continued actual

and threatened harm arising out of the challenged conduct.

**AS AND FOR THEIR ~~FOURTH~~SIXTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. §1836 – Deo, S. Deo, Merckling, Blankenship, and Thomasson)**

~~360.~~832.      Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~361.~~833.      Deo Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836.

~~362.~~834.      Deo Defendants possess trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, financial information, and Superb's customized DMS system information.

~~363.~~835. Superb Plaintiffs have made and make reasonable efforts to maintain the secrecy of this information, including limiting its disclosure to those who owe a fiduciary duty to the dealerships, *i.e*., Deo, and Deo Defendants had no authority to utilize confidential information and trade secrets of Superb.

~~364.~~836.      The confidential information and trade secrets belonging to Superb that Deo Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through, proper means by another person who can obtain economic value from the disclosure or use of the information.

~~365.~~837.      Indeed, Deo Defendants utilized this very information as a road map to open a competing group of dealerships and to unfairly compete against Superb in dastardly fashion.

~~366.~~838.      Deo Defendants knew that this information contained confidential information and trade secrets belonging to Superb.

367.839.    Deo Defendants have no right to retain or to use any of Superb's trade secrets or other confidential and proprietary information due to their illegal conduct.

368.840.    Upon information and belief, Deo Defendants are retaining and using Superb's confidential information and trade secrets to compete with Superb; Superb did not consent to Deo Defendants' use of the information as set forth above.

369.841.    At all relevant times, Deo Defendants knew that the information obtained by them contained Superb's proprietary trade secrets that they had no right to receive and could not receive absent their improper acts.  Deo Defendants' conduct thus constitutes knowing, willful, and  malicious misappropriation.

370.842.    Deo Defendants have used Superb's confidential information and trade secrets to sell vehicles, through interstate commerce, and to compete with Superb Plaintiffs, causing substantial loss of sales to them and damage to its relationships with its clients and the potential obliteration of the Superb Plaintiffs' dealerships.  Deo Defendants have wrongfully acquired and used Superb's confidential information and trade secrets and continue to do so, without the express or implied consent of Superb, for Deo Defendants' own benefit and the benefit of others.

371.843.    The public policy in favor of protecting Superb's interest in maintaining its trade secrets outweighs any interest Deo Defendants could have in using Superb's confidential information and trade secrets.

372.844.    As a direct and proximate result of Deo Defendants' misappropriation of Superb's confidential information and trade secrets, Superb has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage, including, without limitation, the loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss,

harm, or damage unless and until Deo Defendants are restrained from their continued misappropriation of confidential information and trade secrets.

**AS AND FOR THEIR ~~FIFTH~~SEVENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – Deo Defendants)**

~~373.~~845.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~374.~~846.     Superb operates its business in interstate commerce in New York, New Jersey, Pennsylvania, and other states, by selling vehicles to customers in those states, and the trade secrets misappropriated by Deo Defendants are related to, and intended for use in, interstate commerce.

~~375.~~847.     As set forth above, Deo Defendants improperly acquired Superb's trade secrets, including information regarding its business, operations, services, customers, pricing, sales, and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except those with a fiduciary duty who were obligated to keep this information confidential.

~~376.~~848.     The aforementioned information qualifies as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

~~377.~~849.     The misappropriated documents concern Superb's operations, services, customers, pricing, sales, and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas, and processes.

~~378.~~850.     Further, Superb has taken reasonable measures to keep such information secret by, *inter alia*, limiting highly sensitive information to those who have a fiduciary duty to it.

379.851.    The trade secrets misappropriated by Deo Defendants include those which required substantial resources, time, and investment by Superb to create and/or develop, and thus derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information.

380.852.    Deo Defendants' misappropriation of Superb's trade secrets has caused Superb to suffer harm, including, but not limited to, the loss of clients, loss of reputation, damage to their brand, and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

381.853.    This harm cannot be adequately remedied at law and requires injunctive relief.

382.854.    Superb will suffer irreparable and imminent harm in the absence of a permanent injunction. Deo Defendants' continued misappropriation of Superb's trade secrets and failure to return Superb's documents containing Trade Secrets, including Superb's customer information, will cause Superb further loss of clients, customers, accounts and/or market share.

383.855.    This imminent injury is neither remote nor speculative, because Superb has already been harmed in precisely this manner by Deo Defendants' misappropriation and use thereof and will continue to be irreparably harmed in the absence of a permanent injunction.

384.856.    Deo Defendants will not suffer harm from the rightful return of Superb Plaintiffs' proprietary information and trade secrets and will not be prevented from conducting their ordinary business by lawful means; Deo Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Superb Plaintiffs' expense. The ongoing, continuing, and future harm to Superb Plaintiffs cannot be adequately remedied at law and requires

permanent injunctive relief. The public interest would not be disserved by the issuance of an injunction preventing Deo Defendants from misappropriating Superb Plaintiffs' Trade Secrets.

385.857. Accordingly, Superb Plaintiffs are entitled to an injunction, pursuant to 18 U.S.C. § 1836(b)(3)(A), enjoining Deo Defendants from continuing to use Superb Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Superb Plaintiffs' trade secrets and requiring Deo Defendants to return and/or destroy the trade secrets improperly accessed and retained by Deo Defendants, pursuant to 18 U.S.C. § 1836(b)(3)(A)(ii).

## AS AND FOR THEIR ~~SIXTH~~EIGHTH CAUSE OF ACTION OF SUPERB PLAINTIFFS
### (Misappropriation – Deo Defendants)

386.858. Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

387.859. Deo Defendants' actions, as set forth herein, constitute misappropriation under New York law. Deo Defendants currently possess information belonging to and used in the operation of Superb Plaintiffs' businesses, which information constitutes confidential, proprietary, and trade secret information under New York law.

388.860. Such information was developed by Superb Plaintiffs through great effort and expense, in terms of manpower, time, and costs, and is extremely valuable to Superb Plaintiffs, as it is crucial to the operation of its business, cannot easily be acquired or duplicated by others, and, if made available to others, would enable competition with Superb Plaintiffs to their detriment.

389.861. Superb Plaintiffs make reasonable efforts to maintain the secrecy of this information,including limiting its disclosure to those who have a fiduciary duty to them.

390.862. Upon information and belief, Deo Defendants knowingly and improperly

obtained and used such trade secrets and confidential information for their own benefit.

~~391.~~863.     The improperly retained information constitute trade secrets and Deo Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure Superb Plaintiffs' business and their brand.

~~392.~~864.     As a result, Superb Plaintiffs have suffered direct and consequential damages and are entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

**AS AND FOR THEIR ~~SEVENTH~~NINTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Unfair Competition – Deo Defendants)**

~~393.~~865.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~394.~~866.     Through Deo Defendants' misappropriation of Superb Plaintiffs' confidential trade secrets, Deo Defendants have stolen customers and poached employees and employed them while they were solely being paid by Superb to work solely for Superb to serve their own dealerships.

~~395.~~867.     As a result of Deo Defendants' use of the trade secrets they misappropriated to obtain a competitive advantage against Superb Plaintiffs, Deo Defendants have caused economic damages to Superb Plaintiffs along with diminishing their goodwill.

**AS AND FOR THEIR ~~EIGHTH~~TENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Tortious Interference with Contracts, business relations, and prospective economic advantage – Deo Defendants)**

~~396.~~868.     Plaintiffs incorporate by reference each of the foregoing allegations as

though fully set forth herein.

397.869.    Superb Plaintiffs have entered into valid written agreements with their vendors, customers, and employees concerning their businesses.

398.870.    Deo Defendants were at all relevant times aware of these agreements between Superb Plaintiffs and their banks, vendors, customers, and employees.

399.871.    Deo Defendants engaged in conduct designed to damage those relationships.

400.872.    For example, Deo Defendants double-floored vehicles in violation of their Superb's contracts with Superb Plaintiffs' Superb's floor plan lenders knowing that doing so would constitute a breach of those agreements.  As another example, Deo Defendants diverted customers away from Superb Plaintiffs to other dealerships owned or operated by Deo Defendants.

873.    As another example, the Deo Defendants' routine, systematic, and deliberate non-compliance with the agreements the Plaintiffs had with various banking institutions similarly interfered with the Plaintiffs' contracts with those banks.

874.    Deo Defendants also double-floored vehicles in violation of Team's contracts with Teams' floor plan lenders knowing that doing so would constitute a breach of those agreements.

401.875.    As yet another example, Deo Defendants poached employees away from Superb Plaintiffs to other dealerships owned or operated by Deo Defendants, some of which were poached while those employees remained on Superb Plaintiffs' payroll, such that Deo Defendants interfered with Superb Plaintiffs' employment relationship with their employees.

402.876.    As a consequence of Deo Defendants' acts to sabotage Superb Plaintiffs' relationships with vendors, customers, and employees of Superb Plaintiffs for their benefit, they have been injured, for which they are entitled to recover damages including but not limited to

financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages in an amount to be proven at trial. Deo Defendants' conduct was intentional, willful, and malicious, thus justifying the award of punitive damages and/or exemplary damages.

**AS AND FOR THEIR ~~NINTH~~ELEVENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Conversion – Deo Defendants)**

Formatted: Right:  -0.19"

~~403.~~878. Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~404.~~878. Superb Plaintiffs have a possessory right and legal ownership to their vehicles, dealer plates, confidential information, and trade secrets referenced herein.

~~405.~~879. Deo Defendants exercised unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets.

880. The Superb Plaintiffs demanded the return of the Superb Plaintiffs' vehicles.  See ECF Docket Entries 11-18 and 11-19.

~~406.~~881. Deo Defendants willfully exercised unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets to the detriment of Plaintiff.

~~407.~~882. Deo Defendants' unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets was and is to their exclusion of their rights.

~~408.~~883. Deo Defendants' unauthorized dominion over Superb Plaintiffs' vehicles, dealer plates, confidential information, and trade secrets constitutes conversion.

~~409.~~884. Deo Defendants have thus committed the tort of conversion under New

York common law.

**AS AND FOR THEIR ~~TENTH~~TWELFTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Civil Conspiracy – Deo Defendants)**

~~410.~~885.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~411.~~886.     Deo Defendants conspired with each other for an unlawful purpose, to wit: to obtain Superb Plaintiffs' confidential information and to develop a business to compete with Superb using Superb Plaintiffs' confidential information and property obtained through fraud.

~~412.~~887.     Deo Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, unjust enrichment, and tortious interference with contract.

~~413.~~888.     Deo Defendants each agreed to this common goal and acted in concert with the specific object of harming Superb Plaintiffs for their own personal gain.

~~414.~~889.     Each Deo Defendant performed an overt act in furtherance of the conspiracy.

~~415.~~890.     The unlawful alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

~~416.~~891.     As a result of the Deo Defendants' combined, concerted, and continuing efforts, Superb Plaintiffs were, are, and continue to be damaged.  As a consequence of Deo Defendants' acts to steal from Superb Plaintiffs, they have been injured, for which they are entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and special damages, interest, and punitive damages, in an amount to be determined at trial, directly caused by Deo Defendants' misconduct.

**AS AND FOR THEIR ~~ELEVENTH~~THIRTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**

**(Professional Malpractice –Jones CPA LLP)**

417.892.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

418.893.    At all times hereinafter mentioned, Defendant Jones CPA LLP was and still is an accounting firm consisting of Certified Public Accountants ("CPA") licensed by the State of New York with offices at East Islip, Hampton Bays, and Port Jefferson Station within the State of New York, and did hold themselves out to the general public as being possessed of the skill and knowledge of such profession.

419.894.    In or before March 2023, Superb engaged the services of Jones CPA LLP and Jones – by and through the conduct of Deo – to perform various accounting services for Superb.

420.895.    Included within those accounting services for Superb were the monthly reconciliation of bank accounts, including general ledger, profit and loss, and inventory, as well as the preparation of the monthly financial statement required to be sent to Superb's lenders.

421.896.    In advising Superb, Jones CPA LLP and Jones each owed a duty of possessing and exercising the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

422.897.    Under standards of care and conduct prevailing in the accounting industry generally and applicable to Jones CPA LLP specifically, Jones CPA LLP had an affirmative duty to Superb Plaintiffs to undertake each and every one of its tasks for Superb Plaintiffs with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to Superb Plaintiffs accordingly.

423.898.     In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Jones CPA LLP owed Superb Plaintiffs an affirmative duty to identify and inform Superb Plaintiffs of any fraud red flags, such as suspicious activities or internal control deficiencies.

424.899.     As set forth above more fully, Jones CPA LLP failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/ or report to Urrutia the existence of Deo's scheme to create a false record that he is the 100% owner of the Superb Plaintiffs' dealerships and to fail to report missing cash that was never deposited into Superb Plaintiffs' dealership bank accounts despite seeing cash receipted in to the dealerships' DMS systems.

425.900.     As a result, Jones CPA LLP violated their duty to Superb.

426.901.     Jones CPA LLP did not possess and exercise the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

427.902.     Jones CPA LLP did not follow the accepted practice and procedure in the community.

428.903.     Jones CPA LLP actions, as set forth above, and otherwise were careless, negligent, and improper, resulting in damage to Superb due to the foregoing conduct.

429.904.     Jones CPA LLP rendered services for Superb in such a negligent and improper manner as to cause the loss alleged herein.

430.905.     Solely by reason of the foregoing negligence of Jones CPA LLP, and without any negligence on the part of Superb contributing thereto, Superb has been damaged by

the foregoing conduct.

431.906.     Jones CPA LLP's wrongful and deficient conduct proximately caused Superb Plaintiffs to suffer damages which are more fully set forth above by failing to cause Superb Plaintiffs to arrest such misconduct earlier or in a preventative manner.

432.907.     All such losses were reasonably foreseeable at the time Jones CPA LLP were retained to provide accounting services.

433.908.     As a result of Jones CPA LLP's professional malpractice and fraud, Superb Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial but in no event less than $10 million, plus interest and reasonable attorneys' fees, all of which continue to accrue.

**AS AND FOR THEIR ~~TWELFTH~~FOURTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Fraud – Deo and Jones)**

434.909.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

435.910.     Jones provided Urrutia, by and through Deo, with monthly financials that falsely showed Superb was profitable.

436.911.     This was false because Defendants' conduct caused Superb substantial losses such that Superb was actually operating at a loss.

437.912.     As a result, Jones made material misrepresentations of fact in providing the monthly financials to Urrutia by and through Deo.

438.913.     Jones knew or should have known that the information provided or reviewed by him was false and nonetheless reported to Superb Plaintiffs that the dealership bank

accounts were balanced and that there were no discrepancies or issues.

439.914.       Jones submitted the monthly financials to Urrutia, by and through Deo, with an intent to defraud the Superb Plaintiffs as he stood to gain compensation for engaging in fraud.

440.915.       The Superb Plaintiffs reasonably relied on Jones's monthly financial statements.

441.916.       Indeed, Jones is licensed as a CPA and carried himself as knowledgeable in accounting; without him, the Defendants' fraud would not have gone on for so long.

442.917.       Jones's conduct resulted in damages to the Superb Plaintiffs.

443.918.       Jones therefore participated in the fraud at the behest of Deo and the remaining Defendants.

444.919.       Jones' wrongful and deficient conduct proximately caused Superb Plaintiffs to suffer damages which are more fully set forth above by failing to cause Superb Plaintiffs to arrest such misconduct earlier or in a preventative manner.

445.920.       As a result of Jones' fraud, Superb Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $10 million, plus interest and reasonable attorneys' fees, all of which continue to accrue.

**AS AND FOR THEIR ~~THIRTEENTH~~FIFTEENTH CAUSE OF ACTION OF ~~IAG PLAINTIFFS~~NORTHSHORE AND SUNRISE (~~Permanent Injunction~~Declaratory Judgment – Against Libertas)**

Formatted: Right: -0.38"

446.921.       Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

447.922.                 Libertas claims ownership over Northshore's Future Receipts pursuant to the Libertas Agreement.

923. ~~Libertas 'ownership over~~The Libertas Agreement was executed by Deo without authority.

924. Libertas knew or should have known that Deo was without authority.

925. Pursuant to the Libertas Agreement, Libertas was granted authority to unilaterally withdraw payments due under the Libertas Agreement from the Northshore bank account.

~~448.~~926. Libertas's right to Northshore's Future Receipts is not legitimate.

927. ~~IAG Plaintiffs seek a judgment permanently enjoining~~Libertas's right to withdraw from the Northshore bank account is not legitimate.

928. Libertas ~~from exercising any~~has unilaterally withdrawn funds from Sunrise's bank account.

929. Libertas's right to withdraw from Sunrise's bank account is not legitimate.

930. Determination of Libertas's rights ~~over Northshore's Future Receipts,~~ if any, under the Libertas Agreement is necessary to resolve the rights and obligations between Libertas and Northshore.

931. There exists a justiciable controversy which is ripe for judgment.

~~449.~~932. Northshore and Sunrise have no adequate remedy at law.

**AS AND FOR THEIR ~~FOURTEENTH~~SIXTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Article 4-A of the New York UCC – Against Flushing ~~Bank~~)**

~~450.~~933. Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

~~451.~~934. The fraudulent transfers at issue were not authorized and Deo Defendants did not have authority to make transfers or sign checks on behalf of Superb, Northshore, or Sunrise.

117

**Formatted:** Body, Justified, Indent: Left:  0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.5"

452.935.    Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Urrutia is the majority shareholder, had sole check authorization, and sole control of bank accounts based on the signature card for Superb's bank accounts and prior meetings with agents of Flushing Bank.

453.936.    Similarly, Deo and the remaining Defendants lacked apparent authority to enter into the fraudulent transfers because Flushing Bank knew, or should have known, that Deo had no membership interest in Northshore or Sunrise.

454.937.    A commercially reasonable actor, and certainly a sophisticated bank like Flushing Bank, would have been alerted to the fact that the transfers were fraudulent and, thus, unauthorized.

455.938.    At a minimum, the suspicious or unusual account activity would have led a commercially reasonable actor to make further inquiries.

456.939.    If those inquiries were made, they would have confirmed that Deo lacked actual authority.

457.940.    The New York Uniform Commercial Code ("UCC") provides in pertinent part:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under [§] 4-A-202, . . . the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount …

See UCC § 4-A-204(1).  Because the fraudulent transfers were not authorized, Flushing Bank is required to refund the transfers pursuant to Article 4-A of the N.Y. U.C.C. because Flushing Bank cannot establish that it (i) followed commercially reasonable and agreed upon security procedures; and (ii) acted in good faith and in accordance with the reasonable expectations of the parties.

458.941.     As a result, section 4-A-204(1) of the N.Y. U.C.C. requires that Flushing Bank refund the payment orders made by Defendants, plus interest.

459.942.     To date, Flushing Bank has failed to comply with Section 4-A-204(1) by refusing to refund the payment orders made by Defendants to Superb Plaintiffs.

460.943.     As a direct and proximate result of Flushing Bank's Flushing's breaches of its duty, Superb Plaintiffs have suffered damages in an amount to be determined at trial.

**AS AND FOR THEIR ~~FIFTEENTH~~SEVENTEENTH CAUSE OF ACTION OF SUPERB PLAINTIFFS**
**(Negligence – Against Flushing Bank)**

461.944.     Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

462.945.     As customers of Flushing Bank, Flushing Bank owed Superb Plaintiffs a duty of care, independent of any contractual agreement, to act in a manner consistent with commercially reasonable standards.

463.946.     Flushing Bank violated this duty of care by, among other things, failing to follow their own "Know Your Customer" procedures.

464.947.     Flushing Bank had actual knowledge that Urrutia was the majority shareholder of Superb and sole member or shareholder of his remaining dealerships because Urrutia previously provided Flushing Bank with all information concerning his ownership interest in Superb.

465.948.     As a result, Flushing Bank should have known that Deo's application to open an account with Flushing Bank was fraudulent because it falsely stated that he was the sole shareholder of Superb.

466.949.     As a direct and proximate result of Flushing Bank's Flushing's breaches of

its duty, Superb Plaintiffs have suffered damages in an amount to be determined at trial.

**AS AND FOR THEIR ~~SIXTEENTH~~EIGHTEENTH CAUSE OF ACTION ~~ON BEHALF~~ OF ~~PLAINTIFF~~ CHABRIER, KAHN AND ~~OTHER MEMBERS~~ESTATE OF ~~NORTHSHORE SIMILARLY SITUATED~~DAVID BARON**
**(Declaratory Judgment-Against Deo and S. Deo)**

~~457.~~951.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~458.~~952.    Chabrier, Khan, and the Estate of David Baron are the sole members of Northshore.

~~459.~~953.    Deo and S. Deo falsely ~~claims~~claim to be the sole ~~owner~~owners of Northshore.

~~460.~~954.    Determination of the ownership of Northshore is necessary to resolve the rights and obligations of each of the parties to each other and to Northshore.

~~461.~~955.    There exists a justiciable controversy which is ripe for judgment.

956.    Chabrier, ~~on behalf of himself and other members of Northshore similarly situated, seeks~~Khan, and the Estate of David Baron seek a declaratory judgment declaring that ~~he~~Deo and S. Deo are not members of Northshore.

956.    ~~Chabrier, Khan, and the Estate of David Baron are the sole members of Northshore.~~

~~463.~~957.    Chabrier, ~~on behalf of himself and other members of Northshore similarly situated, has~~have no adequate remedy at law.

**AS AND FOR THEIR ~~SEVENTEENTH~~NINETEENTH CAUSE OF ACTION ~~ON BEHALF~~ OF ~~PLAINTIFF~~ AARONSON, J. BARON AND ~~OTHER MEMBERS~~ESTATE OF ~~SUNRISE SIMILARLY SITUATED~~DAVID BARON**
**(Declaratory Judgment-Against Deo and S. Deo)**

464.958.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

465.959.    Aaronson, J. Baron, Raymond Phelan, and the Estate of David Baron are the sole members of Sunrise.

466.960.    Deo and S. Deo falsely claimsclaim to be the sole ownerowners of Sunrise.

467.961.    Determination of the ownership of Sunrise is necessary to resolve the rights and obligations of each of the parties to each other and to Sunrise.

468.962.    There exists a justiciable controversy which is ripe for judgment.

469.963.    Aaronson, on behalf of himselfJ. Baron and other members of Sunrise similarly situated, seeksthe Estate of David Baron seek a declaratory judgment declaring that Aaronson, J. Baron, Raymond Phelan, and the Estate of David Baron are the sole members of Sunrise.

470.964.    Aaronson, on behalf of himself and other members of Sunrise similarly situated, hasJ. Baron and the Estate of David Baron have no adequate remedy at law.

**AS AND FOR THEIR ~~EIGHTEENTH~~TWENTIETH CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF NORTHSHORE**
**(Conversion-Against Deo)**

471.965.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

472.966.    Northshore is the rightful owner of, and has superior rights to, the assets alleged herein, including but not limited to the Libertas Funds.

473.967.    Deo has exercised unauthorized dominion or control over the assets of Northshore, including the Maserati and the Libertas Funds.

474.968.   By selling Northshore's Future Receipts to Libertas in exchange for the Libertas Funds, Deo was under an obligation to maintain the Libertas Funds in Northshore's account and/or use the Libertas Funds for the benefit of Northshore and was not permitted to use the Libertas Funds for his own personal benefit.

475.969.   Despite due demand, Deo has refused to return to Northshore the assets converted, including the Maserati and the Libertas Funds.

476.970.   Deo has wrongfully converted the foregoing assets for his own, personal use purposes and that of the other Deo Defendants, thereby damaging Northshore.

477.971.   By reason of the foregoing, Northshore demands judgment against Deo in an amount to be determined by the Court.

**AS AND FOR THEIR ~~NINETEENTH~~TWENTY-FIRST CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF NORTHSHORE**
**(Unjust Enrichment-Against Deo)**

478.972.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

479.973.   Deo's retention of the assets of Northshore has caused him to be unjustly enriched at Northshore's expense.

480.974.   The circumstances of Deo's enrichment are such that equity and good conscience require Deo to make restitution.

481.975.   By reason of the foregoing, Northshore demands judgment against Deo for a sum of $10,000,000.00.

**AS AND FOR THEIR ~~TWENTIETH CAUSE~~TWENTY-SECOND OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF NORTHSHORE**
**(Breach of Duty of Loyalty- & Violation of Faithless Servant Doctrine - Against Deo)**

482.976.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

483.977.     As an employee and the general manager of Northshore, Deo owed duties of loyalty and good faith to Northshore.

484.978.     As set forth in detail above, Deo has breached such duties.

485.979.     By virtue of the foregoing, Northshore has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~FIRST~~THIRD CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF NORTHSHORE**
**(Breach of Fiduciary Duty- - Against Deo)**

486.980.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

487.981.     As an employee and the general manager of Northshore, Deo had a fiduciary duty to act in the best interest of Northshore.

488.982.     As set forth in detail above, Deo has breached such duty.

489.983.     By virtue of the foregoing, Northshore has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~SECOND~~FOURTH CAUSE OF ACTION ~~DERIVATIVELY AND DIRECTLY BY~~ OF CHABRIER, KHAN, THE ESTATE OF DAVID BARON AND ~~THOSE MEMBERS OF~~ NORTHSHORE ~~SIMILARLY SITUATED~~**
**(Permanent Injunction- - Against Deo and S. Deo)**

490.984.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

491.985.     Deo has and S. Deo have misrepresented his their ownership of Northshore for the purpose of defrauding Chabrier, Khan and the other members Estate of Northshore David Baron as well as those conducting business with Northshore.

492.986.     Deo has engaged in illegal and fraudulent conduct towards the members of Northshore, and has Deo has looted, wasted, or otherwise diverted for his own personal use purposes, and that of the other Deo Defendants, the property and assets of Northshore, thereby enriching himself at Northshore's expense.

493.987.     Deo has used the License issued to for which Chabrier is the applicant, to continue to operate Northshore in a manner to perpetuate his wrongful activities.

494.988.     Deo's actions jeopardize the License issued to for which Chabrier is the applicant and put Chabrier at risk of criminal and civil liability.

495.989.     Deo's actions have harmed and will continue to harm Chabrier, Khan and the other members Estate of Northshore David Baron.

40.990.IAG Plaintiffs Chabrier, Khan, the Estate of David Baron and Northshore have no adequate remedy at law.

41.991.IAG Plaintiffs Chabrier, Khan, the Estate of David Baron seek a permanent injunction restraining Deo and S. Deo from participating in the continued management and operation representing and taking actions as the members of Northshore.

992.     Chabrier seeks a permanent injunction restraining Deo from taking action which rely upon the use the DMV license for Northshore under which Chabrier is the applicant.

993.     Northshore seeks a permanent injunction restraining Deo and S. Deo from taking actions on behalf of Northshore.

**AS AND FOR THEIR TWENTY-THIRDFIFTH CAUSE OF ACTION**

**~~DERIVATIVELY ON BEHALF~~ OF SUNRISE**
**(Conversion – Against Deo)**

~~468.~~994.      Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~469.~~995.      As set forth in detail above, Deo has exercised unauthorized dominion or a right of ownership over the assets of Sunrise, which has superior rights to the assets, and refused their return to Sunrise despite due demand.

~~470.~~996.      Deo has converted the assets of Sunrise for his own ~~use~~purposes and that of the other Deo Defendants, thereby damaging Northshore.

~~471.~~997.      By reason of the foregoing, Sunrise demands judgment against Deo for a sum of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~FOURTH~~SIXTH CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF SUNRISE**
**(Unjust Enrichment – Against Deo)**

~~472.~~998.      Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~473.~~999.      Deo's retention of the assets of Sunrise has caused him to be unjustly enriched at Sunrise's expense.

~~474.~~1000.      The circumstances of Deo's unjust enrichment are such that equity and good conscience require Deo to make restitution.

~~475.~~1001.      By reason of the foregoing, Sunrise demands judgment against Deo for a sum of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~FIFTH~~SEVENTH CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF SUNRISE**
**(Breach of Duty of Loyalty & Violation of Faithless Servant Doctrine – Against Deo)**

~~476.~~1002.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~477.~~1003.    As an employee and the general manager of Sunrise, Deo owed duties of loyalty and good faith to Sunrise, and as set forth in detail above, Deo has breached such duties.

~~478.~~1004.    By virtue of the foregoing, Sunrise has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~SIXTH~~EIGHTH CAUSE OF ACTION ~~DERIVATIVELY ON BEHALF~~ OF SUNRISE**
**(Breach of Fiduciary Duty - Against Deo)**

~~479.~~1005.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~480.~~1006.    As an employee and the general manager of Sunrise, Deo had a fiduciary duty to act in the best interest of Sunrise.

~~481.~~1007.    As set forth in detail above, Deo has breached such duty.

~~482.~~1008.    By virtue of the foregoing, Sunrise has been damaged in the amount of $10,000,000.00.

**AS AND FOR THEIR TWENTY-~~SEVENTH~~NINTH CAUSE OF ACTION ~~DERIVATIVELY AND DIRECTLY BY OF~~ AARONSON, J. BARON, THE ESTATE OF DAVID BARON AND ~~THOSE MEMBERS OF~~ SUNRISE ~~SIMILARLY SITUATED~~**
**(Permanent Injunction - Against Deo)**

~~483.~~1009.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~484.~~1010.    Deo ~~has~~and S. Deo have misrepresented ~~his~~their ownership of Sunrise for the purpose of defrauding Aaronson, J. Baron and the ~~other members~~Estate of ~~Sunrise~~David Baron as well as those conducting business with Sunrise.

485.1011.    Deo has engaged in illegal, fraudulent actions towards the members of Sunrise, and has Deo has looted, wasted, or otherwise diverted for his own personal use purposes, and that of the other Deo Defendants, the property and assets of Sunrise, thereby enriching himself at Sunrise's expense.

486.1012.    Deo has used the License issued to for which Aaronson and J. Baron are applicants, to continue to operate Sunrise in a manner to perpetuate his wrongful activities.

487.1013.    Deo's actions jeopardize the License issued to for which Aaronson and J. Baron are applicants and put them Aaronson and J. Baron at risk of criminal and civil liability.

488.1014.    Deo's actions have harmed and will continue to harm Aaronson, J. Baron, and the other members Estate of Sunrise David Baron.

489.1015.    IAG Plaintiffs Aaronson, J. Baron and the Estate of David Baron and Sunrise have no adequate remedy at law.

490.1016.    IAG Plaintiffs Aaronson, J. Baron and the Estate of David Baron seek a permanent injunction restraining Deo and S. Deo from participating in representing and taking actions as the continued management and operation members of Sunrise.

1017.   Aaronson and J. Baron seek a permanent injunction restraining Deo from taking action which rely upon the use the DMV license for Sunrise under which Aaronson and J. Baron are the applicant.

1018.   Sunrise seeks a permanent injunction restraining Deo and S. Deo from taking actions on behalf of Sunrise.

**AS AND FOR THEIR** ~~TWENTY-EIGHTH~~**THIRTIETH CAUSE OF ACTION**
~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND~~
~~THOSE MEMBERS~~ **OF** ~~NORTHSHORE SIMILARLY SITUATED~~**THE IAG PLAINTIFFS**
**(Contribution and Indemnification for Fraud, Breach of Fiduciary Duty,**
**Breach of Loyalty and Conversion - - Against Deo)**

491.1019.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained

in the preceding paragraphs as though fully set forth herein.

492.1020.    Libertas alleges that the Future Receipts are the rightful property of

Northshore.

493.1021.    Libertas alleges it has a superior right to the Future Receipts under the

Libertas Agreement.

494.1022.    Libertas alleges that the Libertas Funds were the rightful property of

Northshore.

495.1023.    Libertas alleges a superior right to the Libertas Funds, as pledged to

Libertas.

496.1024.    Libertas has asserted the Libertas Claims against IAG Plaintiffs for tortious

interference and conversion concerning the Future Receipts.

497.1025.    Libertas has asserted the Libertas Claims against IAG Plaintiffs for

conversion and unjust enrichment in allegedly wrongfully taking the Libertas Funds.

498.1026.    Deo, through fraudulent means, and without the knowledge and consent of

Northshore's members, sold the Future Receipts to Libertas in exchange for the Libertas Funds.

499.1027.    Deo, in breach of his fiduciary duties, sold the Future Receipts and acquired

the Libertas Funds for himselfown purposes.

500.1028.    Deo, in breach of his duty of loyalty, sold the Future Receipts and acquired

the Libertas Funds for himself.

501.1029.    Deo was unjustly enriched by the sale of the Future Receipts and acquisition

of the Libertas Funds.

502.1030.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Deo; Libertas shall have recourse against Deo who, fraudulently and without authority and in breach of his fiduciary duties and duty of loyalty, sold the Future Receipts in exchange for the Libertas Funds and was unjustly enriched thereby and/or converted same.

503.1031.    As such, Deo would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims, and IAG Plaintiffs request that they shall have judgment over and against Deo for any damages assessed against any of the IAG Plaintiffs arising out of Deo's actions chargeable to any of the IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

504.1032.    If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of Deo's fraud, breach of fiduciary duties and duty of loyalty, unjust enrichment, and conversion.

505.1033.    If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and seek a judgment over and against Deo for any such amounts, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR ~~TWENTY-NINTH~~THIRTY-FIRST CAUSE OF ACTION ~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS~~ OF NORTHSHORE ~~SIMILARLY SITUATED~~**
**(Conversion - Against Thomasson)**

506.1034.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

507.1035.                IAG Plaintiffs delivered the Libertas Funds to Thomasson, as he demanded, claiming to be the rightful attorney for Northshore.

508.1036.    IAG Plaintiffs delivered the Libertas Funds to Thomasson for safekeeping in his attorney escrow account pending a resolution of the parties 'dispute over the Libertas Funds

509.1037.    By delivering the Libertas Funds to Thomasson, IAG Plaintiffs relinquished possession and control of the Libertas Funds to Thomasson to be held in escrow for the benefit of Northshore.

510.1038.    By failing to safeguard the Libertas Funds, and subsequently disbursing the Libertas Funds to Deo, Thomasson, intentionally and without authority, assumed or exercised control over the Libertas Funds belonging to Northshore, interfering with Northshore's right of possession.

511.1039.    Despite due demand, Thomasson has refused to return to Northshore the Libertas Funds.

512.1040.    Thomasson has wrongfully converted the Libertas Funds, thereby damaging Northshore.

513.1041.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR ~~THIRTIETH~~THIRTY-SECOND CAUSE OF ACTION ~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS~~ OF NORTHSHORE ~~SIMILARLY SITUATED~~**
**(Aiding and Abetting Conversion-Against Thomasson)**

130

514.1042.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

515.1043.    By turning over the Libertas Funds to Deo, Thomasson aided and abetted Deo in intentionally and without authority, assuming or exercising control over the Libertas Funds belonging to Northshore, interfering with Northshore's superior right of possession.

516.1044.    Despite due demand, Thomasson has refused to return the Libertas Funds.

517.1045.    As set forth in detail above, Thomasson has wrongfully aided and abetted Deo in converting the Libertas Funds, thereby damaging Northshore.

518.1046.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTY-FIRSTTHIRD CAUSE OF ACTION**
~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND~~
~~THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED~~
~~OF THE IAG PLAINTIFFS~~
**(Contribution and Indemnification for Conversion-Against Thomasson)**

519.1047.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

520.1048.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who converted the Libertas Funds, and as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against any of the IAG Plaintiffs arising out of Thomasson's actions chargeable to any of the IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

521.1049.    If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's conversion of the Libertas Funds.

522.1050.    If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and that such IAG Plaintiffs have judgment over and against Thomasson, together with the costs, expenses and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-SECONDFOURTH CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATEDTHE IAG PLAINTIFFS (Contribution & Indemnification for Aiding & Abetting Conversion  -  Against Thomasson)**

523.1051.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

524.1052.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's conversion of the Libertas Funds, and as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against IAG Plaintiffs arising out of Thomasson's actions chargeable to any of the IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

525.1053.    If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of the aiding and abetting conversion of the Libertas Funds by Deo.

132

526.1054.    If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and such IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-~~THIRD~~FIFTH CAUSE OF ACTION ~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS~~ OF ~~NORTHSHORE SIMILARLY SITUATED~~THE IAG PLAINTIFFS**
**(Contribution and Indemnification for Aiding and Abetting Fraud~~Against~~ Thomasson)**

527.1055.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

528.1056.    Thomasson aided and abetted Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds.

529.1057.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against any of the IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

~~530.~~1058.    If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's fraud of selling the Future Receipts so as to acquire the Libertas Funds.

~~531.~~1059.    If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and such IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-~~FOURTH~~SIXTH CAUSE OF ACTION**
~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND~~
~~THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED~~
**(Aiding and Abetting Breach of Fiduciary Duty - Against Thomasson)**

~~532.~~1060.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~533.~~1061.    As set forth above, Thomasson aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds personally for Deo's own ~~benefit~~purposes.

~~534.~~1062.    By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTY-~~FIFTH~~SEVENTH CAUSE OF ACTION**
~~DERIVATIVELY AND DIRECTLY BY CHABRIER AND~~
~~THOSE MEMBERS OF~~ ~~NORTHSHORE SIMILARLY SITUATED~~THE IAG PLAINTIFFS
**(Contribution and Indemnification for Aiding and Abetting Breach of Fiduciary Duty - Against Thomasson)**

~~535.~~1063.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

134

536.1064.    As set forth above, Thomasson aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit.

537.1065.    If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against any of the IAG Plaintiffs arising out of Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

538.1066.    If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's breach of fiduciary duty of selling the Future Receipts so as to acquire the Libertas Funds.

539.1067.    If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and such IAG Plaintiffs seek judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR THIRTY-SIXTHEIGHTH CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATED**
**(Aiding and Abetting Breach of Duty of Loyalty - Against Thomasson)**

540.1068.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

1069.   As set forth above, Thomasson aided and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit. purposes.

541.1070.   By reason of the foregoing, Northshore demands judgment against Thomasson in the amount of $735,000.00.

**AS AND FOR THEIR THIRTY-SEVENTHNINTH CAUSE OF ACTION DERIVATIVELY AND DIRECTLY BY CHABRIER AND THOSE MEMBERS OF NORTHSHORE SIMILARLY SITUATEDTHE IAG PLAINTIFFS**
**(Contribution and Indemnification for Aiding and Abetting Breach of Duty of Loyalty-Against Thomasson)**

542.1071.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

543.1072.   As set forth above, Thomasson aided  &and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds for Deo's own personal benefit.

544.1073.   If it is determined that Libertas sustained damages, as alleged in its Libertas Claims, then such damages were necessarily caused by Thomasson; and/or Libertas shall have recourse against Thomasson as the party who aided and abetted Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds, and, as such, Thomasson would ultimately be liable to Libertas for the damages arising out of the causes of action alleged by Libertas in its Libertas Claims; and IAG Plaintiffs request that they shall have judgment over and against Thomasson for any damages assessed against any of the IAG Plaintiffs arising out of

Thomasson's actions chargeable to IAG Plaintiffs running in favor of Libertas and/or for any liability arising out of the aforesaid causes of action.

545.1074.   If Libertas recovers herein against any of the IAG Plaintiffs, such damages will have been caused and brought about by reason of Thomasson's aiding and abetting Deo's breach of the duty of loyalty of selling the Future Receipts so as to acquire the Libertas Funds.

546.1075.   If Libertas recovers from any of the IAG Plaintiffs, then such IAG Plaintiffs will have been injured and seek indemnification and/or contribution for any and all amounts that such IAG Plaintiffs may have to pay, and that such IAG Plaintiffs have judgment over and against Thomasson, together with the costs, expenses, and disbursements incurred in the defense of the Libertas Claims.

**AS AND FOR THEIR ~~THIRTY-EIGHTH~~FORTIETH CAUSE OF ACTION BY IAG ~~PLAINTIFFS~~**

**(Unjust Enrichment-Northshore)**

547.1076.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

548.1077.   IAG has paid for Northshore's obligations as follows~~, which includes~~:

| | | |
|---|---|---|
| ~~a.~~ | ~~1581 Hylan Blvd Auto LLC:~~ | ~~$74,000.00~~ |
| ~~b.~~ | ~~1580 Hylan Blvd Auto LLC:~~ | ~~$53,800.00~~ |
| ~~b.~~ | ~~1591 Hylan Blvd Auto LLC:~~ | ~~$104,809.88~~ |
| ~~b.~~ | ~~1632 Hylan Blvd Auto LLC:~~ | ~~$108,000.00~~ |
| ~~b.~~a. | 1239 Hylan Blvd Auto LLC: | $2,~~322,576.00~~208,932.50 |
| b. | 2519 Hylan Blvd Auto LLC: | ~~$~~385,597.10 |
| ~~b.~~c. | 76 Fisk Street Realty LLC: $683,~~316~~318.95 | |
| ~~b.~~d. | 446 Route 23 Auto LLC: | ~~$8,918~~917.58 |
| ~~b.~~e. | Island Auto Management, LLC: ~~$65,606.43~~$719,988.54 | |
| ~~b.~~f. | The Maserati automobile ~~paid for by IAG for~~ over $80,000.00. | |

1078.   Northshore had purchased vehicles for inventory from IAG for which payment was not made as follows:

| | | |
|---|---|---|
| a. | 1581 Hylan Blvd Auto LLC: | $74,000.00 |
| b. | 1580 Hylan Blvd Auto LLC: | $53,800.00 |
| c. | 1591 Hylan Blvd Auto LLC: | $104,809.88 |
| d. | 1632 Hylan Blvd Auto LLC: | $108,000.00 |

~~549.~~1079.   Should the Court find that ownership of Northshore rests with Deo and S. Deo, then Northshore will have been enriched at IAG's expense for all of Northshore's obligations paid for by IAG.

~~549.~~1080.   The circumstances of Northshore's enrichment are such that equity and good conscience requires Northshore to make restitution.

~~549.~~1081.   By reason of the foregoing, IAG demands judgment against Northshore as follows:

| | | |
|---|---|---|
| ~~a.~~ | ~~1581 Hylan Blvd Auto LLC:~~ | ~~$74,000.00~~ |
| ~~b.~~ | ~~1580 Hylan Blvd Auto LLC:~~ | ~~$53,800.00~~ |
| ~~c.~~ | ~~1591 Hylan Blvd Auto LLC:~~ | ~~$104,809.88~~ |
| ~~d.~~ | ~~1632 Hylan Blvd Auto LLC:~~ | ~~$108,000.00~~ |
| ~~e.~~a. | 1239 Hylan Blvd Auto LLC: | $2,~~322,576.00~~208,932.50 |
| ~~f.~~b. | 2519 Hylan Blvd Auto LLC: | ~~$~~385,597.10 |
| ~~g.~~c. | 76 Fisk Street Realty LLC: | ~~$683,316~~318.95 |
| ~~h.~~d. | 446 Route 23 Auto LLC: | ~~$8,918~~917.58 |
| ~~i.~~e. | Island Auto Management, LLC: | $~~65,606.43~~719,988.54 |
| ~~j.~~f. | ~~$80,000.00 for the~~The Maserati automobile ~~paid for by IAG~~ over $80,000.00. |

**~~AS AND FOR THEIR THIRTY-NINTH CAUSE OF ACTION BY IAG PLAINTIFFS~~**
**~~(Piercing the Corporate Veil Against Deo)~~**

| | | |
|---|---|---|
| g. | 1581 Hylan Blvd Auto LLC: | $74,000.00 |
| h. | 1580 Hylan Blvd Auto LLC: | $53,800.00 |
| i. | 1591 Hylan Blvd Auto LLC: | $104,809.88 |
| j. | 1632 Hylan Blvd Auto LLC: | $108,000.00 |

Should

~~552.~~1082.   ~~Plaintiffs repeat, reiterate, and reallege each and every allegation contained~~

in the preceding paragraphs as though fully set forth herein.

553.   In the event the Court ~~determines~~find that ~~Deo is an owner of, or is the sole owner~~ownership of Northshore~~, then IAG Plaintiffs allege the following~~:

~~554.~~1082.   ~~rests with Deo and S. Deo, Deo and S.~~ Deo failed to adequately capitalize Northshore.

~~555.~~1083.   ~~Deo and S.~~ Deo intermingled ~~his~~their personal assets with Northshore.

~~556.~~1084.   ~~Deo and S.~~ Deo used Northshore's assets for ~~his~~their personal use, using the company accounts as ~~his~~their personal piggy bank.

1085.   ~~Deo, through his~~Deo and S. Deo used Northshore as a vehicle through which to personally benefit themselves, through the fraudulent activities described herein and to cause substantial losses to the IAG Plaintiffs.

~~557.~~1086.   ~~Deo and S.~~ Deo, through their domination and control over Northshore, abused the privilege of doing business in the limited liability form to perpetrate a wrong or injustice such that a Court in equity will intervene by his actions in using Northshore for ~~his~~their own personal purposes.

~~558.~~1087.   ~~IAG seeks to pierce~~By reason of the ~~veil of Northshore~~foregoing, Deo and ~~enter judgment against~~S. Deo are personally liable for Northshore's obligations to IAG and IAG seeks judgment against Deo and S. Deo therefor.

## AS AND FOR THEIR ~~FORTIETH~~FORTY-FIRST CAUSE OF ACTION BY IAG ~~PLAINTIFFS~~
### (Unjust Enrichment-Against Sunrise)

~~559.~~1088.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~560.~~1089.   IAG has paid for Sunrise's obligations as follows~~, which may include~~:

139

a.      1581 Hylan Blvd Auto LLC:      $74,000.00

b.      1580 Hylan Blvd Auto LLC:      $53,800.00

b.      1591 Hylan Blvd Auto LLC:      $104,809.88

b.      1632 Hylan Blvd Auto LLC:      $108,000.00

b.a.    1239 Hylan Blvd Auto LLC:      $2,322,576357,384.00

c.      2519 Hylan Blvd Auto LLC:      $385,597.10

b.      76 Fisk Street Realty LLC:      $683,316.95

b.      446 Route 23 Auto LLC:      $8,918.58

b.      Island Auto Management, LLC:  $65,606.43

552.1090.    Should the Court find that ownership of Sunrise rests with Deo, then NorthshoreSunrise will have been enriched at IAG's expense for all of Sunrise's obligations paid for by IAG.

553.1091.    The circumstances of Sunrise's enrichment are such that equity and good conscience requires Sunrise to make restitution.

554.    By reason of the foregoing, IAG1239 demands judgment against Sunrise as follows:

555.    IAG has paid for Sunrise's obligations as follows, which may include:

a.      1581 Hylan Blvd Auto LLC:      $74,000.00

b.      1580 Hylan Blvd Auto LLC:      $53,800.00

b.      1591 Hylan Blvd Auto LLC:      $104,809.88

b.      1632 Hylan Blvd Auto LLC:      $108,000.00

b.      1239 Hylan Blvd Auto LLC:      $2,322,576.00

b.      2519 Hylan Blvd Auto LLC:      $385,597.10

b.      76 Fisk Street Realty LLC:      $683,316.95

b.      446 Route 23 Auto LLC:      $8,918.58

b.      Island Auto Management, LLC:  $65,606.43

**AS AND FOR THEIR FORTY-FIRST CAUSE OF ACTION BY IAG PLAINTIFFS**

**(Piercing the Corporate Veil Against Deo)**

552.1092.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth hereinamount of $357,384.00.

553.   Should it be foundthe Court find that Deo has legitimate ownership of Sunrise, then the following concerningNorthshore rests with Deo and S. Deo, Deo and Sunrise are alleged.

554.1093.   S. Deo failed to adequately capitalize Sunrise.

555.1094.   Deo and S. Deo intermingled histheir personal assets with Sunrise.

556.1095.   Deo and S. Deo used Sunrise's assets for histheir personal use, using the company accounts as their personal piggy bank.

1096.   Deo, through hisDeo and S. Deo used Sunrise as a vehicle through which to personally benefit themselves, through the fraudulent activities described herein and to cause substantial losses to the IAG Plaintiffs.

557.1097.   Deo and S. Deo, through their domination and control over Sunrise, abused the privilege of doing business in the limited liability form to perpetrate a wrong or injustice such that a Court in equity will intervene by his actions in using Sunrise for histheir own personal purposes.

558.1098.   IAG seeks to pierce By reason of the veil of Sunrise foregoing, Deo and enter judgment againstS. Deo are personally liable for Sunrise's obligations to IAG. and IAG seeks judgment against Deo and S. Deo therefor.

**AS AND FOR THEIR FORTY-SECOND CAUSE OF ACTION DERIVATIVELY ON BEHALF OF NORTHSHORE AND SUNRISE**
**(Violation of NY GBL § 349  - Against Deo)**

559.1099.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

560.1100.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

561.1101.    Deo's business act and practices and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, and unfair acts or practices in the conduct of any business, trade, or commerce.

562.1102.    Many of Deo's practices described herein were specifically directed to consumers.

563.1103.    The practices employed by Deo, accepting Trade-ins whereby Deo represented, and was required but failed to satisfy the consumer's existing loan, are deceptive, and misleading and are in violation of NY GBL § 349.

564.1104.    Deo's deceptive practices were knowing and willful.

565.1105.    Deo's actions impact the public interest because this deception is directed to the purchasing consumer and the public at large.

566.1106.    The foregoing deceptive acts and practices proximately caused actual damages.

567.1107.    IAG PlaintiffsNorthshore and Sunrise are entitled to recover compensatory damages, statutory damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

568.1108.    Deo should be enjoined from engaging in any further consumer transactions.  IAG PlaintiffsNorthshore and Sunrise respectfully demand a judgment enjoining Deo's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

**AS AND FOR THEIR FORTY-THIRD CAUSE OF ACTION OF NORTHSHORE**
**(Accounting)**

~~569.~~1109.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~570.~~1110.   Deo has engaged in illegal and fraudulent actions towards ~~the members of~~ Northshore and looted, wasted, and/or otherwise diverted for his personal use the property and assets of Northshore, thereby enriching himself at Northshore's expense.

~~571.~~1111.   The exact amount(s) due Northshore are presently unknown and cannot be ascertained without an accounting, because the information necessary to determine that amount is in the exclusive knowledge of Deo.

~~572.~~1112.   ~~IAG Plaintiffs have~~Northshore no adequate remedy at law.

~~573.~~1113.   ~~IAG Plaintiffs seek~~Northshore seeks an accounting.

**AS AND FOR THEIR FORTY-FOURTH CAUSE OF ACTION OF SUNRISE**
**(Accounting)**

~~574.~~1114.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

~~575.~~1115.   Deo has engaged in illegal and fraudulent actions towards ~~the members of~~ Sunrise and has looted, wasted and/or otherwise diverted for his own personal use the property and assets of Sunrise, thereby enriching himself at Sunrise's expense.

~~576.~~1116.   The exact amount(s) due Sunrise are presently unknown and cannot be ascertained without an accounting, because the information necessary to determine that amount is in the exclusive knowledge of Deo.

577.1117.    IAG Plaintiffs haveSunrise has no adequate remedy at law.

578.1118.    IAG Plaintiffs seekSunrise seeks an accounting.

**AS AND FOR THEIR FORTY-FIFTH CAUSE OF ACTION
BY PLAINTIFFS AGAINST THOMASSON
(Violation of New York Judiciary Law § 487)**

579.1119.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained

in the preceding paragraphs as though fully set forth herein.

580.1120.    New York Judiciary Law § 487 provides: "An attorney or counselor who:

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive

the court or any party… is guilty of a misdemeanor…."

581.1121.    On Wednesday, May 31, 2023, Thomasson appeared before the Hon.

Sharon M.J. Gianelli, J.S.C. ("Justice Gianelli") for oral argument on the IAG Plaintiffs 'Order to

show cause for injunctive relief and the Defendants 'cross-motion to dismiss.  See ECF Docket

Entry 65-1 (copy of transcript of proceedings held before Justice Gianelli annexed hereto as

Exhibit "A.").

582.1122.    There, Thomasson represented to Justice Gianelli that there was nothing

improper about the use of his escrow account to transfer funds to Deo.

583.1123.    Thomasson made misrepresentations to deceive Justice Gianelli in doing so.

584.1124.    Specifically, Thomasson stated:

No money has impermissibly come out of my escrow account. As soon as
they asked me back in November we're going to send you that money and
we want you to hold it. I said, send me the money it's not yours. And I'm
not holding it. You're not telling me what to do on behalf of any client. And
before this action was ever commenced, that money was out of my account.

See Exhibit "A" at 43:12-18.
See ECF Docket Entry 65-1 at 43:12-18.

144

585.1125.   Thomasson knew or should have known that the monies received and taken from his escrow account were impermissibly taken from the IAG Plaintiffs fraudulently to provide to the Superb Plaintiffs.

586.1126.   Thomasson refused to hold the funds in escrow because he conspired with the Defendants to engage in fraud against the IAG Plaintiffs and the Superb Plaintiffs for his personal benefit and at the direction of the Deo Defendants.

587.1127.   Despite the knowledge of the false information stated before Justice Gianelli, Thomasson decided to continue to advocate for the Deo Defendants and specifically requested the Plaintiffs' attorneys to submit Thomasson's letters to the Court in relation to any request for injunctive relief.  See ECF Docket Entry 12-3 at 2 ("I insist on my letters and emails also being given to any judge you may approach on the subject or risk intentionally misleading the Court").

588.1128.   In one such letter, Thomasson referred to the $500,000.00 paid to the Superb Plaintiffs and argued that these funds were part of a legitimate transaction when he knew full well they were not.

589.1129.   Further, Thomasson requested that this letter be submitted to this Court in order to bolster this blatantly false proposition.  Thomasson's conduct was egregious in that he perpetuated a fraud upon the IAG Plaintiffs, and – without Thomasson's help – the Deo Defendants would not be able to perpetuate a fraud upon the Superb Plaintiffs, as they would have no money to purchase a forty-nine percent (49%) interest in Superb.

590.1130.   Thomasson has previously engaged in conduct that violates New York Judiciary Law § 487 such that he has an established pattern of legal delinquency.

591.1131.    Indeed, the Second Department has issued Thomasson an Order to show cause for why he should not be sanctioned because Thomasson raised arguments on an appeal that appear to be "completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law"., and/or were undertaken primarily to delay or prolong the resolution of the litigation, such that his appeal in that action may be frivolous. See Thomasson v. Demarco, No. 2020-03791, 607158/19, 191 N.Y.S.3d 431, 433 (2d Dept. 2023) (citing 22 NYCRR 130–1.1(c)(1)).

592.1132.    Thomasson intended to deceive Justice Gianelli in arguing that the escrow transactions were legitimate, causing the IAG Plaintiffs financial harm.

593.1133.    Thomasson intended to deceive this Court in requesting the submission of the foregoing letters to perpetuate this deceitful misrepresentation, causing the Superb Plaintiffs financial harm.

**AS AND FOR THEIR FORTY-SIXTH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK**
**(Violation of New York Uniform Commercial Code § 3-419)**

594.1134.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

595.1135.    Flushing Bank, in opening an account in the name of Superb, when it knew or had reason to know that Deo was not, as he represented, the owner of 100% of Superb, did not act in a commercially reasonable manner.

596.1136.    Flushing Bank, in not doing reasonable due diligence when Deo attempted to open an account in the name of Superb, did not act in a commercially reasonable manner.

597.1137.    By opening an account in the name of Superb, based on Deo's representation that he owned 100% of Superb, without proper due diligence and when Urrutia was

in the process of seeking to open an account, in the name of Superb, at Flushing ~~Bank~~ and when Flushing ~~Bank~~ had documentation contradicting Deo's claim of 100% ownership of Superb, Flushing ~~Bank~~ did not act in a commercially reasonable manner.

~~598.~~1138.    Accordingly, Flushing ~~Bank~~, as a depositary or collecting bank, is liable, pursuant to N.Y. U.C.C. § 3-419(3), to Superb, the true owner of any cash deposits from Superb, deposited by Deo into an account or accounts opened by him, in the name of Superb, at Flushing ~~Bank~~, for the full amount of any such cash deposits; is liable to Superb, the true owner of the checks made payable to Superb deposited by Deo into an account or accounts opened by him, in the name of Superb, at Flushing ~~Bank~~, for the full amount of those checks; and is liable to Superb, the true owner of a $95,000 wire to Superb, wired, according to instructions provided by Deo, into an account or accounts opened by him, in the name of Superb, at Flushing ~~Bank~~, for the full amount of the wire.

~~599.~~1139.    Similarly, Chase Bank, in permitting Deo to draw checks on Superb's account, when it knew or had reason to know that Deo was not an authorized signer on Superb's account with Chase Bank, did not act in a commercially reasonable manner.

~~600.~~1140.    Chase Bank, in not doing reasonable due diligence when Deo drew checks on the account in the name of Superb, did not act in a commercially reasonable manner.

~~601.~~1141.    By authorizing payment on checks in the name of Superb with Deo's signature, when Chase Bank had documentation contradicting Deo's authority to sign any such checks, Chase Bank did not act in a commercially reasonable manner.

~~602.~~1142.    Accordingly, Chase Bank is liable, pursuant to N.Y. U.C.C. §3-419(3), to Superb, the true owner of the funds in its account, for the full amount of those checks drawn by Deo from Superb's account.

603.1143.   For the foregoing reasons, Flushing Bank is liable to Superb in an amount to be determined at trial but believed to be at least $500,000.00.

604.1144.   For the foregoing reasons, Chase Bank is liable to Superb in an amount to be determined at trial but believed to be at least $250,000.00.

### AS AND FOR THEIR FORTY-SEVENTH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK
#### (Conversion)

605.1145.   Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

606.1146.   The cash, checks, and wire transfer deposited into an account or accounts in the name of Superb, opened at Flushing Bank by Deo without authority, belong to Superb.

607.1147.   Similarly, the funds in the account Superb maintained with Chase Bank belong to Superb.

608.1148.   Flushing Bank and Chase Bank each exercised unauthorized dominion over the funds of Superb to the exclusion of Superb's rights.

609.1149.   Accordingly, Flushing Bank is liable to Superb for conversion in an amount to be determined at trial but believed to be at least $500,000.00.

610.1150.   Similarly, Chase Bank is liable to Superb for conversion in an amount to be determined at trial but believed to be at least $250,000.00.

### AS AND FOR THEIR FORTY-EIGHTH CAUSE OF ACTION BY SUPERB PLAINTIFFS AGAINST FLUSHING BANK AND CHASE BANK
#### (Negligence)

148

611.1151.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

612.1152.    In opening an account and collecting funds in the name of Superb, Flushing Bank and Chase Bank each owed Superb a duty of care.

613.1153.    By opening an account or accounts in the name of Superb, giving banking authority to Deo, without proper due diligence into Deo's ownership or authority, and allowing Deo, without authority, to withdraw funds from accounts deposited in the name of Superb, Flushing Bank breached its duty of care to Superb.

614.1154.    Similarly, by authorizing payments for checks drawn by Deo, despite the fact he is not a signer on Superb's account with Chase Bank, without proper due diligence in verifying the signature is made by an authorized signer, and allowing Deo, without authority, to have payments authorized on checks drawn by him, Chase Bank breached its duty of care to Superb.

615.1155.    Accordingly, Flushing Bank is liable to Superb for negligence in an amount to be determined at trial but believed to be at least $500,000.00.

616.1156.    Similarly, Chase Bank is liable to Superb for negligence in an amount to be determined at trial but believed to be at least $250,000.00.

**AS AND FOR THEIR FORTY-NINTH CAUSE OF ACTION BY SUPERB
PLAINTIFFS AGAINST FLUSHING BANK**
**(Unauthorized Payments)**

617.1157.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

618.1158.    Having accepted the cash, checks, and wire deposited by Deo into an account in the name of Superb, Flushing Bank allowed the funds to be disbursed from accounts in the name of Superb.

619.1159.    The funds paid by Flushing Bank from an account opened by Deo in the name of Superb belonged to Superb.

620.1160.    Flushing Bank, having opened an account in the name of Superb, is liable to Superb for the unauthorized payment of funds from such account.

621.1161.    Accordingly, Flushing Bank is liable to Superb for unauthorized payments in an amount to be determined at trial but believed to be at least $500,000.00.

**AS AND FOR THEIR FIFTIETH CAUSE OF ACTION BY SUPERB
PLAINTIFFS AGAINST CHASE BANK**
**(Drawee Liability)**

622.1162.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

623.1163.    Chase Bank has on file the authorized signatories on Superb's account at Chase Bank.

624.1164.    Deo is not and never was an authorized signatory on Superb's account at Chase Bank.

625.1165.    Nevertheless, Deo signed checks from Superb's account at Chase Bank, and Chase Bank paid them.

626.1166.    Accordingly, as the drawee bank, Chase Bank is liable to Superb for the full amount of the checks paid from Superb's account that were signed by Deo.

627.1167.    For the foregoing reasons, Chase Bank is liable to Superb in an amount to be determined at trial but believed to be at least $250,000.00.

**AS AND FOR THEIR FIFTY-FIRST CAUSE OF ACTION ~~OF IAG PLAINTIFFS~~**
**OF NORTHSHORE AND SUNRISE**
**(Professional Malpractice – Jones CPA LLP)**

628.1168.    Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

629.1169.    At all times hereinafter mentioned, Defendant Jones CPA LLP was and still is an accounting firm consisting of CPAs licensed by the State of New York with offices at East Islip, Hampton Bays, and Port Jefferson Station within the State of New York, and did hold themselves out to the general public as being possessed of the skill and knowledge of such profession.

630.1170.    In or before November 2023, Northshore and Sunrise engaged the services of Jones CPA LLP – by and through the conduct of Deo – to perform various accounting services for Northshore and Sunrise.

631.1171.    Included within those accounting services for Superb were the monthly reconciliation of bank accounts, including general ledger, profit and loss, and inventory, as well as the preparation of the monthly financial statement required to be sent to Ally ~~Bank~~.

632.1172.    In advising Northshore and Sunrise, Jones CPA LLP each owed a duty of possessing and exercising the degree of learning, knowledge, skill, care and diligence which was ordinarily possessed and exercised by CPAs in the community.

633.1173.    Under standards of care and conduct prevailing in the accounting industry generally and applicable to Jones CPA LLP specifically, Jones CPA LLP had an affirmative duty to ~~IAG Plaintiffs~~Northshore and Sunrise to undertake each and every one of its tasks for ~~IAG~~

Formatted: Indent: Left: 0", First line: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1082 + Alignment: Left + Aligned at: 0.56" + Indent at: 0.56", Tab stops: 1", Left

~~Plaintiffs~~Northshore and Sunrise with caution and care, to be vigilant for discrepancies or irregularities and to report any such findings to ~~IAG Plaintiffs~~Northshore and Sunrise accordingly.

634.1174.    In addition, under Article V of the Principles of Professional Conduct of the AICPA Code of Professional Conduct, Jones CPA LLP owed ~~IAG Plaintiffs~~Northshore and Sunrise an affirmative duty to identify and inform ~~IAG Plaintiffs~~Northshore and Sunrise of any fraud red flags, such as suspicious activities or internal control deficiencies.

635.1175.    As set forth above more fully, Jones CPA LLP failed to exercise independence and due professional care in a variety of ways, including without limitation failing to notice, investigate and/ or report to Chabrier or Aaronson of the existence of Deo's scheme to create false financial records.

636.1176.    As a result, Jones CPA LLP violated their duty to Northshore and Sunrise.

637.1177.    Jones CPA LLP did not possess and exercise the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by CPAs in the community.

638.1178.    Jones CPA LLP did not follow the accepted practice and procedure in the community.

639.1179.    Jones CPA LLP actions, as set forth above, and otherwise were careless, negligent, and improper, resulting in damage to Northshore and Sunrise due to the foregoing conduct.

640.1180.    Jones CPA LLP rendered services for Northshore and Sunrise in such a negligent and improper manner as to cause the loss alleged herein.

641.1181. Solely by reason of the foregoing negligence of Jones CPA LLP, and without any negligence on the part of Northshore and Sunrise contributing thereto, Northshore and Sunrise has been damaged by the foregoing conduct.

642.1182. Jones CPA LLP's wrongful and deficient conduct proximately caused ~~IAG Plaintiffs~~Northshore and Sunrise to suffer damages which are more fully set forth above by failing to cause ~~IAG Plaintiffs~~Northshore and Sunrise s to arrest such misconduct earlier or in a preventative manner.

643.1183. All such losses were reasonably foreseeable at the time Jones CPA LLP were retained to provide accounting services.

644.1184. Due to Jones CPA LLP's professional malpractice and fraud, ~~IAG Plaintiffs~~Northshore and Sunrise have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $5 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

**AS AND FOR THEIR FIFTY-SECOND CAUSE OF ACTION OF IAG PLAINTIFFS**
**(Fraud – Deo and Jones)**

645.1185. Plaintiffs incorporate by reference each of the foregoing allegations as though fully set forth herein.

1186. Deo's and Jones's fraudulent conduct in preparing and providing falsified monthly financial statements to the IAG Plaintiffs and Ally ~~Bank~~proximately caused IAG Plaintiffs to suffer damages which are more fully set forth above, and all such losses were reasonably foreseeable at the time Jones were retained to provide accounting services.

646.1187. Deo's and Jones's fraudulent conduct in preparing and providing falsified tax returns and monthly financial statements to Libertas to further Deo's scheme proximately

caused IAG Plaintiffs to suffer damages which are more fully set forth above, and all such losses were reasonably foreseeable at the time Jones were retained to provide accounting services.

647.1188.    As a result of Deo's and Jones' fraud, IAG Plaintiffs have suffered, and continue to suffer, damages in an amount to be established at trial, but in no event less than $5 million, plus interest and reasonable attorney's fees, all of which continue to accrue.

**AS AND FOR THEIR FIFTY-THIRD CAUSE OF ACTION OF SUPERB**
**(Breach of Fiduciary Duty-Against Deo)**

1189.  Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

1190.  As an owner and General Manager of Superb, Deo had a fiduciary duty to act in the best interest of Superb.

1191.  As set forth in detail above, Deo has breached such duty.

1192.  By virtue of the foregoing, Superb has been damaged in the amount of at least $4,600,000.00.

**AS AND FOR THEIR FIFTY-FOURTH CAUSE OF ACTION OF SUPERB**
**(Breach of Duty of Loyalty & Violation of Faithless Servant Doctrine -Against Deo)**

1193.  Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

1194.  As an owner and General Manager of Superb, Deo owed duties of loyalty and good faith to Superb.

1195.  As set forth in detail above, Deo has breached such duties.

1196.  By virtue of the foregoing, Superb has been damaged in the amount of at least $4,600,000.00.

**DEMAND FOR JURY TRIAL**

154

648.1197.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demandsPlaintiffs demand judgment in its favor as against Defendants as follows:

a.   Awarding treble damages resulting from Defendants' violation of 18 U.S.C. § 1962;

b.   Awarding injunctive relief in returning operational control, vehicles, dealer plates, and any other assets of Plaintiffs pursuant to 18 U.S.C. § 1964(a);

c.   Injunctive relief restraining and enjoining Defendants from further violations of RICO and the DTSA, including the use of confidential information or trade secrets of Superb Plaintiffs, and unfairly competing with Superb Plaintiffs in any manner;

d.   Injunctive relief restraining and enjoining Defendants from having any contact with Plaintiffs' current and/or former employees;

e.   Compensatory damages for misappropriation of Plaintiffs' goodwill, misappropriation and unfair competition, violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1962, Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, misappropriation, unfair competition, tortious interference with contract, business relations, and prospective economic advantage, conversion, civil conspiracy, professional malpractice, fraud, according to proof at trial, including but not limited to, lost profits, disgorgement of all profits and revenues received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

f.   Compensatory damages of at least $10,000,000.00 to the IAG Plaintiffs;

155

g.   Compensatory damages of at least $4,600,000.00 to the Superb Plaintiffs;

h.   Ordering that Defendants return all of Superb Plaintiffs' confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

i.   Prohibiting the Defendants or their agents from selling vehicles to Superb Plaintiffs' customers, whether directly or indirectly;

j.   Punitive and exemplary damages in an amount to be determined at trial in this case;

k.   Interest (pre-judgment & post-judgment);

l.   Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

m.   Enjoining Defendants from operating their enterprise by virtue of their illegal conduct since they were created entirely through theft of Plaintiffs' businesses;

n.   Ordering that Defendants pay the costs of suit, including attorneys' fees; and

o.   Such other and further relief as this Court deems just, equitable, and proper.

Dated: Lake Success, New York

~~December 11, 2023~~March 29, 2024                    Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

~~/s~~

~~Emanuel Kataev~~

*/s   Jamie S. Felsen, Esq.*

Jamie S. Felsen, Esq.

Nicole M. Koster, Esq.

3000 Marcus Avenue, Suite 3W8

Lake Success, NY 11042-1073

(516) 328-8899 (office)

~~(516) 303-1395 (direct dial)~~

(516) 328-0082 (facsimile)

jamiefelsen@mllaborlaw.com

nkoster@mllaborlaw.com

156

**SAGE LEGAL LLC**

*/s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@mllaborlaw.comsagelegal.nyc

*Additional*
*Attorneys for Plaintiffs*
*Superb Motors*
*Inc.,*
*Team Auto Sales LLC, &and*
*Robert Anthony Urrutia*

Formatted: Normal, Indent: Left:  3", First line:  0", No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

Dated: New York, New York
~~December 11, 2023~~ March 29, 2024                    Respectfully submitted,

**CYRULI SHANKS & ZIZMOR LLP**

~~/s~~

 */s/ Jeffrey Ruderman, Esq.*
Jeffrey Ruderman, Esq.
420 Lexington Avenue, Suite 2320
New York, NY 10170-0002
(212) 661-6800 (office)
(347) 379-4622 (direct dial)
(212) 661-5350 (facsimile)
jruderman@cszlaw.com

*Attorneys for Plaintiffs*
*189 Sunrise Hwy Auto LLC,*
*Northshore Motor Leasing, LLC,*
*1581 Hylan Blvd Auto LLC,*
*1580 Hylan Blvd Auto LLC,*
*1591 Hylan Blvd Auto LLC,*
*1632 Hylan Blvd Auto LLC,*
*1239 Hylan Blvd Auto LLC,*
*2519 Hylan Blvd Auto LLC,*
*76 Fisk Street Realty LLC,*
*446 Route 23 Auto LLC,*
*Island Auto Management, LLC,*
*Brian Chabrier,*
*Joshua Aaronson, and*
*Jory Baron*

| Formatted: Indent: Left: 2.5" |