UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                        Plaintiffs,

      -against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

                        Defendants.
-------------------------------------------------------------------X

Case No.: 1:23-cv-6188 (JMW)

**DECLARATION OF ROBERT ANTHONY URRUTIA IN OPPOSITION TO DEO DEFENDANTS' LETTER MOTION FOR CONTEMPT AND IN SUPPORT OF THE SUPERB PLAINTIFFS' CROSS-MOTION TO CONSOLIDATE AND FOR SANCTIONS**

      Robert Anthony Urrutia declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am the majority shareholder and President of Superb Motors Inc. ("Superb"), what used to be a high-end used car dealership in Great Neck on Long Island, and the sole member of Team Auto Sales LLC ("Team"), a wholesale used car operation that I own and operate out of New Jersey.[1]

2.     Superb, Team, and I (the "Superb Plaintiffs") consist of one group of Plaintiffs in this case who have been defrauded and harmed by Defendant Anthony Deo ("Deo") and his cohort.

3.     As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at Superb and Team in addition to information I have learned from employees, customers, vendors, and other third parties concerning the Defendants and their conduct.

4.     I respectfully submit this declaration in opposition to the Deo Defendants'[2] second letter motion for contempt.

5.     As this court knows, under the terms of my deal with Deo, I was to be paid $500,000.00 and given a twenty-five percent (25%) membership interest in Northshore Motor Leasing, LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for a forty-nine (49%) interest in Superb.

---

[1] I am also the owner of Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield, Massachusetts. After decades of working in the automobile industry, several years ago, I realized my goal of owning dealerships. I run them properly and profitably. As outlined here, Deo robbed me not only of what I have worked so hard to earn, but has placed me at the precipice of losing everything as I may be forced to shut down my dealerships due to the Deo Defendants' conduct.

[2] The Deo Defendants are defined as Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp.

2

6. While I received the $500,000.00 from Deo (which I reinvested into Superb), I never received another dollar[3] from him arising from his status as a putative partner (even in spite of a capital call I made in August 2023), nor did I ever receive any interest in Northshore and Sunrise (which it turns out he is not the 100% owner of as he claimed).

7. As this Court may be aware, floor plan lines of credit are essential in the automotive industry, particularly for dealerships.

8. The floor plan provides a revolving line of credit that allows dealerships to purchase inventory—both new and used vehicles—from manufacturers or at auctions.

9. This type of financing enables dealers to maintain an inventory without needing to pay upfront, which is crucial for managing cash flow and maintaining operations, including payroll for employees, rent, and other overhead.

10. Dealers typically pay interest on the amount they borrow through the floor plan until the vehicle is sold, at which point the loan is repaid.

11. Since dealerships rely on maintaining a wide range of inventory to attract customers, these lines of credit are critical for sustaining business operations and sales.

12. Without floor plan financing, many dealerships would struggle to keep sufficient inventory, manage their cash flow effectively, or simply to maintain personnel or a roof over it.

13. Vehicles are placed on the floor plan from day one, as is common in the automotive business, often being bought with funds from a floor plan line directly.

---

[3] In late July 2023, Deo pledged to personally contribute the necessary funds to resolve the issues he caused, which he was required to under the terms of the deal we made and indemnity agreements that he signed. I later discovered that he had promptly withdrawn the money he had deposited, issuing a check to one of his many entities without the appropriate authority as he was not an authorized signatory on the account.

14. When a floor plan line of credit is obtained, the financing entity, i.e., Nissan Motor Acceptance Corporation ("NMAC") in this case, files a UCC-1 to record its security interest.

15. NMAC's UCC-1 over Superb covers all of Superb's assets, including – critically – all vehicles that Superb owns. See copy of NMAC's UCC Financing Statement dated October 21, 2021 annexed hereto as Exhibit "A" ("This FINANCING STATEMENT covers the following assets of [Superb], wherever located, now held or hereafter acquired by [Superb]: 1. All automobiles, trucks, … other vehicles, … including all goods hereafter added to or acquired in replacement or substitution of the foregoing, whether or not inventory or other and whether or not new, used, repossessed, surrendered or other; …").

16. This is critical because, from day one, all of Superb's vehicles were *already encumbered* by NMAC.

17. In July 2023, Deo moved cars from Superb to his lot—an action he admitted to during the February in-person conference—which violated the floor plan agreement by moving vehicles from Superb's lot without authorization. See ECF Docket Entry 156-1 at 56:25-57:22 (referring to 180 Michael Drive, Syosset, NY as the location vehicles were taken to).

18. Critically, 180 Michael Drive is not listed as a Urrutia Cross-Collateralized Dealerships. See ECF Docket Entry 55 at 13 n. 5.

19. As a result, Urrutia was forced to pay off Superb's line of credit in August 2023 using working capital from the Urrutia Cross-Collateralized Dealerships, creating a receivable from Superb to those stores.

20. Under the terms of Superb's agreement with NMAC and the remaining Urrutia Cross-Collateralized Dealerships, each dealership had an operating capital requirement at a set minimum amount.

4

21. Specifically, Team Nissan's minimum was $512,000.00; Team Hartford-Mitsubishi's minimum was $337,000.00; Superb's minimum was $297,000.00; and Volkswagen of Freehold's minimum was $546,000.00.

22. Based on the foregoing, the total combined minimum operating capital requirement for the Urrutia Cross-Collateralized Dealerships was approximately $1.702 million.

23. Prior to my discovery of Deo's fraudulent conduct and misappropriation of vehicles, the now-injuncted Superb cars were floored by Deo for $1.9 million.

24. After Superb received the early August 2023 demand letter, I was forced to pay off the line or face shutdown of the entire floor plan line of credit, which would adversely affect the operation of all the Urrutia Cross-Collateralized Dealerships.

25. However, because Superb's cash was siphoned off by Deo, it did not have sufficient funds to pay off the amount demanded by NMAC; as a result, I was forced to use the floor plan line of credit to make the payoff, which affected the working capital of the remaining Urrutia Cross-Collateralized Dealerships.

26. In doing so, the Superb vehicles were set up as an asset and a receivable since Superb owes the remaining Urrutia Cross-Collateralized Dealerships the money they paid to make the payoff.

27. Critically, it was not necessary for me to transfer title nor ownership of any of the Superb's vehicles in order to floor them; if I have physical possession of the title (regardless of who the titled owner is) and the vehicle is on the property as required by NMAC,[4] I am permitted to borrow the money on the floor plan line, which I did to recapitalize the dealerships.

---

[4] Critically, had Deo never moved the vehicles off of Superb's lot, none of this would have ever happened, i.e., NMAC would not have sent the early August 2023 demand letter for these vehicles.

28. Again, it is crucial to point out that the vehicles do not have to be assigned until they are sold, so they are and remain assigned to Superb.

29. Moreover, the foregoing was done before the existence of any preliminary injunction.

30. In other words, the vehicles have been floored – and thus encumbered – since the beginning.

31. On September 15, 2023, after this Court rather handedly convinced the Deo Defendants to return most of the vehicles to Superb, most if not all of the vehicles were moved from Superb's lot to Volkswagen of Freehold's lot and/or Team Mitsubishi-Hartford's lot in Connecticut.

32. As this Court is aware, both NMAC's Agreement and Judge Merchant's Injunction permit the vehicles to be moved between the lots of the Urrutia Cross-Collateralized Dealerships.

33. When I properly and permissibly moved the vehicles, as I am entitled to under the terms of NMAC's agreement and the Injunction, this is recorded by NMAC.

34. To that end, the dates listed in the exhibits provided by the Deo Defendants reflect the dates that the vehicles were moved to Team Mitsubushi-Hartford's lot in Connecticut.

35. Contrary to the Deo Defendants' strained inference, the vehicles were not further encumbered; rather, they were already encumbered both by NMAC's UCC Financing Statement and by virtue of my decision to refloor these vehicles to make the NMAC payoff in early August 2023 prior to the existence of the Injunction.

36. Again, the dates the Deo Defendants point to merely reflect the date the vehicles were moved; this is done, understandably, so that NMAC may properly conduct audits by location when they visit the dealership(s) to "touch" the vehicles.

6

37. As a result, the Deo Defendants' inferences underpinning their motion for contempt is as strained as it is misguided.

38. Deo's actions thus left the Urrutia Cross-Collateralized Dealerships undercapitalized and out of compliance with NMAC's working capital requirements.

39. In fact, I was forced to borrow from the floor plan lines and other sources to pay off the Superb debt caused by Deo's conduct.

40. I also sent a capital call letter to Deo, who is claiming an ownership interest in Superb, but he never responded to same; Deo only sought to siphon money from Superb and never to reinvest, even as required under the agreement he signed.[5] See ECF Docket Entry 112-7.

41. Deo—who caused Superb's demise—refused to contribute or return the vehicles.

42. Like most dealership owners, I don't have millions of dollars to pay for cars upfront, so I borrowed capital, which affected my ability to purchase inventory for other stores, further damaging my other dealerships.

43. Deo's fraud, including the theft of deposits, down payments, and cars forced me to pay off nearly $3 million for Superb, far exceeding the $1.5 million in cars he was holding.

44. I am the sole guarantor of the debt, but his 49% ownership interest would require him to pay his share if a capital call was made; although I made one, no funds were received.

45. When I drew from the floor plan line to pay the demand in August 2023, I had a thirty (30) day window to secure the vehicles Deo stole and place them on my lot as required.

---

[5] To clarify our transaction: Deo and I entered into a cross-purchase agreement on December 1, 2022 (ECF Docket Entry 11-1) subject to an operating agreement (ECF Docket Entry 11-6) I never signed because Deo failed to deliver a twenty-five percent (25%) interest in Northshore and Sunrise. Due to this, Deo was treated as a General Manager, and even received health insurance benefits as an employee (as opposed to a partner); he was thus treated as an employee as a result of his failure to deliver on what he promised in the cross-purchase agreement.

7

46. This led the Superb Plaintiffs to seek injunctive relief in an effort to recover the vehicles, as I had paid for them and was the rightful owner (under my license, my floor plan, and my business).

47. Thus, it is critical to point out that the vehicles had and still have outstanding payments due under the floor plan line of credit prior to August 2023.

48. Had all of the vehicles been returned, the dealership would have had six (6) months to sell them before curtailment payments of ten percent (10%) kicked in, with a total term of sixteen (16) months to pay, which lead time would have given Superb room to breathe and desperately needed cash flow to survive.

49. Alternatively, had Deo actually acted like an owner and paid money in pursuant to the capital call, this would have been another way to avoid the disaster that ensued.

50. However, the court's decision to hold the vehicles and Deo's dastardly decision to refuse to answer the capital call crippled Superb, and – ultimately – me, by shifting the entire burden of interest payments, curtailments, loss of floor plan lines for other stores, and hundreds of thousands in depreciation onto me personally due to the guaranty.

51. Before August 3, 2023, the vehicles were on the floor plan for $1.9 million, with $395,000.00 unlawfully and impermissibly double-floored by Deo in July 2023 just before his planned exit.

52. Because double flooring is prohibited, I had to and did pay the $395,000.00 immediately.

53. After the court denied the relief I sought, I was forced to pay for $500,000.00 more for the six (6) cars that Deo held and continues to hold, as they were not on the lots as required.

8

54. Currently, $500,000.00 remains due on the floor plan, with only $120,000.00 worth of vehicles owned by Superb.

55. None of these cars were owned outright, except for vehicles older than 2016.

56. I have been paying for all of Superb's obligations under the floor plan line while Deo claims 49% ownership.

57. If there's a dispute over ownership, how is this fair? I have been paying down the line as required by NMAC, and Deo is welcome to the cars if he reimburses me for the cost.

58. Instead, I have been and continue to pay for all of Superb's obligations without the ability to sell the cars, while Deo claims 49% ownership without taking the responsibility of an owner.

59. Last I checked, you have to pay for a car to own it, as I did while Deo did not.

60. There has been no income for Superb, and the losses and debts caused by Deo, as owner or general manager ("GM"), exceed $4.5 million.

61. I do not have and have never had that kind of cash, as I'm a small, factory-approved minority-owned (non-Caucasian) dealership owner.

62. I opened my dealership in August 2020 during the pandemic and have used most of my earnings to grow my business from one to four locations within two (2) years before I was introduced to Deo.

63. Deo's actions have now caused all stores to fail and go out of trust, triggering enforcement of the UCC filings on all assets across all my stores, as they are guaranteed and cross-collateralized by me and between the dealerships.

64. Meanwhile, Deo has incurred no losses, including the $500,000.00 he initially invested and later withdrew through unauthorized bank withdrawals and theft of deposits.

65. He also took payment for six (6) cars he currently possesses (that were injuncted), which he sold to Superb under false pretenses, resulting in a loss exceeding $500,000.00 on the floor plan.

66. NMAC is now enforcing its rights under the agreement and UCC financing statements; if I did not act to obtain capital, Superb would have been forced to surrender the vehicles.

67. As such, flooring the vehicles was necessary to preserve the *status quo*.

68. Deo falsely claims that NMAC helped fabricate this situation in August 2023 due to my relationship with them, aiming to cause him harm.

69. The fact that we are here today proves that the August 3, 2023 lockout was justified and caused by Deo's theft and fraudulent actions.

70. Whether Deo was GM or owner is irrelevant, as he made all day-to-day operational decisions, as all GMs do in dealerships.

71. Deo has not invested a single dollar of his own money in any venture.

72. Instead, he borrowed all the money using established business relationships that the Barons and Urrutia had.

73. His scheme is to claim ownership of the stores, take loans he never intended to repay, steal all he can, and leave the Plaintiffs and any other victim he finds to deal with the fallout.

74. To my knowledge, he borrowed $250,000.00 for the deposit on Baron Nissan but never repaid it, and he has now included their lender in his fraudulent lawsuit as a defendant.

75. He also borrowed $765,000.00 from Libertas against North Shore and Sunrise receivables when the stores were shut down, also with no intention to repay, using some of that money to invest in Superb.

76. I took none of that money but left it in the business for operations, agreeing to let him use it as his runway to turn the store around.

77. Instead, I have been forced to repay all of this because the licenses are in my name, as well as all the lines of credit and guarantees, to avoid losing everything.

78. Now, I am going to lose everything I have worked so hard to achieve, all due to Deo's unlawful conduct.

79. I informed the court in September last year that this is where things were headed if I did not get relief.

80. Now, 126 families lost their jobs, four (4) businesses that took me thirty (30) years of honest work to build are going to be closed or sold at a loss, millions of dollars have been lost, and my family's security has been destroyed—all due to Deo's actions.

81. I have nothing left from a group of dealerships that were growing and thriving.

82. I respectfully request that this Court grant the relief requested herein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 15, 2024.

*Robert Anthony Urrutia*
Robert Anthony Urrutia (Oct 15, 2024 17:04 EDT)
Robert Anthony Urrutia

# Declaration of Robert Anthony Urrutia

Final Audit Report                    2024-10-15

| | |
|---|---|
| Created: | 2024-10-15 |
| By: | Emanuel Kataev (mail@emanuelkataev.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbswSS5GmBFm7Tat_kjg9dIcY1_f5x1EM |

## "Declaration of Robert Anthony Urrutia" History

- Document created by Emanuel Kataev (mail@emanuelkataev.com)
  2024-10-15 - 9:02:29 PM GMT- IP address: 172.56.167.119

- Document emailed to Robert Anthony Urrutia (tonyu814@gmail.com) for signature
  2024-10-15 - 9:02:34 PM GMT

- Email viewed by Robert Anthony Urrutia (tonyu814@gmail.com)
  2024-10-15 - 9:02:41 PM GMT- IP address: 66.102.8.98

- Document e-signed by Robert Anthony Urrutia (tonyu814@gmail.com)
  Signature Date: 2024-10-15 - 9:04:27 PM GMT - Time Source: server- IP address: 186.15.17.187

- Agreement completed.
  2024-10-15 - 9:04:27 PM GMT

Adobe Acrobat Sign