# EXHIBIT 1




# Automotive Wholesale Financing and Security Agreement

This Agreement between NISSAN MOTOR ACCEPTANCE CORPORATION including its INFINITI FINANCIAL SERVICES division ("NMAC"), and TEAM IMPORTS LLC ("Dealer"), describes the terms and conditions of NMAC's agreement to establish and maintain for Dealer a wholesale line of credit.

## 1. DEFINITIONS:

As used in this Agreement, the following terms shall have the meanings stated below:

1.1 **"Advance"** means any loan or extension of credit made by NMAC to or on behalf of Dealer under this Agreement.

1.2 **"Agreement"** means this Automotive Wholesale Financing and Security Agreement, as amended from time to time by written amendments, by NMAC Bulletins, or by written notice from NMAC to Dealer as described in paragraph 2.2.

1.3 **"Charges"** is defined in paragraph 2.2.

1.4 **"Collateral"** is defined in paragraph 2.4. Collateral includes all Property.

1.5 **"Control"** means the possession, directly or indirectly, of the power to direct or cause direction of any person, whether through ownership of equity interests, by contract or otherwise.

1.6 **"Dealer's Address"** is Dealer's chief executive office, or if none, the principal place of business - noted at the end of this Agreement.

1.7 **"Dealer Affiliate"** means any entity operating a vehicle dealership controlling, controlled by or under common control of Dealer.

1.8 **"Dealership Location"** means Dealer's Address and any other location where Property may be located.

1.9 **"Disposition"** means any sale, lease, transfer or other disposition of Property.

1.10 **"Generally Accepted Accounting Principles"** means accounting principles described as generally accepted in currently effective statements of the Auditing Standards Board of the American Institute of Certified Public Accountants.

1.11 **"Guarantor"** means any person who has signed a guaranty of the Indebtedness.

1.12 **"Indebtedness"** means all obligations of Dealer for (i) the repayment of all Advances now outstanding or made in the future; (ii) the repayment of any other indebtedness or obligations of Dealer to NMAC now existing or arising in the future, whether arising under this Agreement or under any other agreement, including any guarantees of the indebtedness of others, and (iii) performance of all other obligations of Dealer to NMAC in connection with the financing of Property for Dealer.

1.13 **"MMNA"** means Mitsubishi Motors North America, Inc.

1.14 **"NMAC Bulletins"** means the NMAC Bulletins and Special Announcements that are published and distributed by NMAC or its agent to Dealers from time to time, which may include rates, program rules, instructions and conditions for NMAC programs and financing arrangements.

1.15 **"Proceeds"** means proceeds as defined in the Uniform Commercial Code in effect in the state of Dealer's Address.

1.16 **"Property"** means all of Dealer's new and used automobiles, trucks, other motor vehicles and merchandise purchased or obtained with financing provided by NMAC under this Agreement, whether or not Dealer plans to sell, lease or otherwise dispose of or use (for demonstration, display or otherwise) such Property, and whether or not Dealer holds such Property as inventory or equipment.

1.17 **"Rate"** is defined in paragraph 2.2.

1.18 **"Vendor"** means a manufacturer, distributor or other seller (including any seller in an auction) of the Property.

1.19 **"Wholesale Floor Plan Payoff Policy"** means NMAC's then current policy applicable to Dealer for Dealer's delivery of payment to NMAC following a Disposition of Property. The Wholesale Floor Plan Payoff Policy may be established by NMAC's initial approval letter for Dealer's wholesale line of credit, by NMAC Bulletins, or by other written notice to Dealer.

## 2. TERMS AND CONDITIONS OF FINANCING

2.1 **Advances Made by NMAC.** Dealer may from time to time request Advances from NMAC for the purchase of Property by the Dealer. Such requests may be made (i) by direct request from Dealer to NMAC or (ii) a request by any Vendor from whom Dealer purchased or may purchase Property, made in any manner (i.e., orally, in writing, or by telecopy or other electronic communication) that NMAC finance, or confirm that it will finance, the payment for Property supplied to Dealer by such Vendor. NMAC, in its sole discretion, shall have the right to determine the extent to which, the terms and conditions on which, and the period for which it will make Advances. NMAC may at any time in its sole discretion establish, rescind or change limits or the extent to which financing accommodations under this Agreement will be made available to Dealer. NMAC may make an Advance by paying the invoice amount of Property ordered by or shipped to Dealer by a Vendor of such Property. NMAC may pay to any such Vendor the invoice amount, and NMAC shall be fully protected in relying in good faith upon any invoice or advice from any Vendor that the Property described on the invoice has been ordered by or shipped to Dealer and the invoice amount is correctly stated. Any invoice amount or other amount advanced by NMAC concerning any Property to any such Vendor shall be an Advance made by NMAC to Dealer under this Agreement and shall be repayable by Dealer according to the requirements of this Agreement. NMAC shall furnish statements to Dealer of Advances made by NMAC to Dealer. Dealer shall review any such statement promptly upon receipt, and advise NMAC in writing of any discrepancy. If Dealer fails to advise NMAC of any discrepancy in any such statement within 10 calendar days from Dealer's receipt of the statement, the statement shall be deemed to be correct and conclusive evidence of Advances by NMAC to Dealer under this Agreement unless Dealer or NMAC establishes by a preponderance of evidence that such Advances were not made or were made in different amounts than shown on the statement.

2.2 **Interest Rate and Charges.** All Advances shall bear interest from the date of the Advance to the date of repayment in good funds by Dealer at the rate established by NMAC in an NMAC Bulletin or as otherwise provided in writing from time to time for Dealer (the "Rate"). Any amount not paid when due shall, at NMAC's option, bear interest at the lower of (i) 5% per annum in excess of the Rate, or (ii) the maximum contract rate permitted by law of the state of Dealer's Address. Interest shall be calculated daily on the unpaid principal balance owed at the close of business each day. Dealer

shall never be required to pay interest that exceeds the maximum interest permitted by applicable law.

In addition to interest, Dealer shall pay service and insurance charges ("Charges") established by NMAC from time to time for Dealer. NMAC shall advise Dealer by NMAC Bulletin or otherwise in writing of changes in the Rate and Charges. Changes in the Rate and Charges shall be effective from the date stated in the notice. If, upon receiving any notice advising Dealer of an increase in the Rate or Charges, Dealer wishes to terminate this Agreement, Dealer may do so by paying to NMAC in good funds, within 10 calendar days after receipt of the notice, the full unpaid balance outstanding under this Agreement and all other amounts due or to become due under this Agreement.

If by the terms of this Agreement, Dealer at any time is required or obligated to pay interest on the principal at a rate in excess of such maximum rate, then the rate of interest hereunder shall be deemed to be reduced immediately and automatically to such maximum rate, interest payable hereunder shall be computed at such maximum rate and any prior interest payment made in excess of such maximum rate shall be immediately and automatically applied to, and shall be deemed to have been payment made in reduction of, the principal.

### 2.3 Payments by Dealer.

2.3.1 **Amounts Due.** The total amount outstanding from time to time of all Advances shall be a single obligation of Dealer, even though Advances are made from time to time. The total amount of all Advances, or any portion of that amount as demanded, together with accrued interest and Charges, shall be payable by Dealer to NMAC upon demand. Dealer shall pay NMAC the interest earned and accrued on the unpaid balance of all Advances during a calendar month upon the earlier of NMAC's demand or the 15th day of the following month. Application of payments to particular obligations shall be in NMAC's sole discretion.

2.3.2 **Repayment Upon Disposition of Property.** Upon any Disposition of Property, Dealer shall promptly pay NMAC the amount due related to the item sold, together with interest, in accordance with NMAC's Wholesale Floor Plan Payoff Policy. If Dealer is in default, Dealer shall, on or before the close of the next business day following any such Disposition, pay NMAC the entire proceeds of such Disposition. Nothing in this Agreement shall be deemed to authorize any Disposition of any Property while Dealer is in default. Dealer shall also pay NMAC, upon demand, the full amount of any rebate, refund or other credit received by Dealer related to any Property financed under this Agreement.

2.4 **NMAC's Security Interest.** As security for the repayment of the Indebtedness and performance of Dealer's other obligations in connection with this Agreement, Dealer grants to NMAC, its successors and assigns, a security interest in all of the following assets of Dealer, no matter where located or when acquired by Dealer (the "Collateral"):

2.4.1 Property, including all automobiles, trucks, truck-tractors, trailers, semi-trailers, buses, mobile homes, motor homes, other vehicles and other merchandise and all parts, accessories, attachments, components and furnishings whether or not affixed thereto or used in connection therewith, including all goods hereafter added to or acquired in replacement or substitution of the foregoing, whether or not inventory or other and whether or not new, used, repossessed, surrendered or other;

2.4.2 All other goods, including without limitation, all inventory, machinery, equipment, tools, appliances and office furniture and fixtures, including all goods hereafter added to or acquired in replacement of the foregoing;

2.4.3 All accounts, accounts receivable, chattel paper, security agreements, instruments, contract rights, leases of property, all rentals due or to become due under any lease of any property, all other rentals, policies and certificates of insurance, deposit accounts, investment property, dealer reserve accounts, manufacturer's statements of origin (MSO's) or certificates of title or ownership relating to vehicles, bills of sale, receipts, journals, records, files, books and ledger sheets, records indicating, summarizing or evidencing Dealer's business operations or financial condition and all computer programs, disk or tape files, printouts, runs or other computer-prepared information and the equipment containing such information, documents and general intangibles, including all monies and credits now due or to become due to Dealer from, and all claims against, vendors of inventory or other lending institutions;

2.4.4 All other assets of Dealer, with the exception of real property, but including fixtures; and

2.4.5 All cash and non-cash proceeds of the foregoing.

Any security interest in any item of Property shall be deemed a purchase money security interest to the extent of the Advance made to enable Dealer to acquire such item of Property. All payments of Indebtedness to NMAC shall be deemed applied in such order and manner as to preserve such purchase money priority notwithstanding the manner in which NMAC, for mutual convenience of the parties hereto, may record such payment. Notwithstanding that all Collateral secures all Indebtedness, it is the intent of the parties that each item of Property first secure the purchase money Indebtedness to which it relates.

## 3.  DEALER'S RESPONSIBILITIES WITH RESPECT TO PROPERTY AND OTHER COLLATERAL

3.1 **Dealer's Possession and Sale of Property.** Dealer's possession of the Property shall be for the sole purpose of storing and exhibiting the Property for sale or lease in the ordinary course of Dealer's business. Dealer shall keep all new Property new and in an unused condition (except for demonstration vehicles, which Dealer may use according to NMAC's policy for demonstration vehicles) and all used Property in at least as good condition as when it was acquired by Dealer. Dealer shall keep all Property at a Dealership Location. All Property may be inspected by NMAC at any time.

Unless and until an event of default has occurred, Dealer may sell or lease the Property in the ordinary course of Dealer's business, but nothing in this Agreement shall be deemed to waive or release any interest NMAC may have under this Agreement or under any other agreement in any Proceeds of any Property, including any accounts receivable, chattel paper, security agreements, instruments, contract rights, documents, vehicles taken in trade and general intangibles. Dealer shall maintain adequate records of the Disposition of any of the Property. Any and all proceeds of any Disposition of any Property by Dealer shall be fully, faithfully and promptly accounted for and paid by Dealer to NMAC to the extent Dealer owes amounts to NMAC related to any Property. If Dealer is in default under this Agreement, all proceeds received upon any Disposition of Property shall be received and held by Dealer separate from its own funds in trust for NMAC.

Except when required to remove or transport the Property from a freight depot or the like to a Dealership Location, Dealer shall not use or operate, or permit the use or operation of, any Property for demonstration or any other purpose without NMAC's express prior written consent in each case. Dealer shall not use any Property illegally, improperly or for hire. As used in this paragraph 3.1 "sale in the ordinary course of Dealer's business" includes only: (i) a bona fide retail sale to a purchaser for his or her own use at the fair market value of the Property sold; (ii) an occasional sale of any Property to another dealer at a price not less than Dealer's cost of the Property sold, provided the sale is not a part of a plan or scheme to liquidate all or any portion of Dealer's business; or (iii) an occasional trade of any Property to another dealer for Property having a value equal to or greater than Dealer's cost of the traded Property. "Lease in the ordinary course of Dealer's business" includes only a bona fide lease to a lessee for his own use at a fair rental value of the Property leased.

3.2 **Dealer's Representations, Warranties and Covenants Regarding Collateral.** Dealer represents and warrants that: (i) upon execution of this Agreement, NMAC shall have a perfected first lien on or security interest in the Property and Proceeds thereof; (ii) Dealer has good title to and is the owner of all the Collateral; (iii) except as disclosed to NMAC in writing, the Collateral is subject to no other liens or security interests except NMAC's; (iv) Dealer has authority to give a security interest in the Collateral; and (v) NMAC need not look behind the signers for Dealer to this Agreement to verify their authority. Dealer agrees that the Collateral is now and shall continue to be personal property, no matter how, or to what extent the Collateral is attached to any real property.

Dealer covenants that: (i) Dealer shall comply with all laws and regulations affecting the Collateral; (ii) Dealer shall keep all Collateral free from all taxes, liens and encumbrances other than liens in favor of NMAC or as approved by NMAC in writing, and any amount that NMAC may pay to release or discharge any taxes, liens or encumbrances on any Collateral, or on any documents executed

in connection with any Collateral, shall be paid by Dealer to NMAC upon demand; (iii) Dealer shall keep the Collateral at all times at a Dealership Location; (iv) except as expressly permitted under this paragraph 3, unless Dealer has the prior written consent of NMAC, Dealer shall not, and shall not attempt to sell, transfer, lease, mortgage, pledge or in any way dispose of all or any part of the Collateral or any interest in the Collateral; and (v) in the event of a default under this Agreement, and without limiting NMAC's default remedies, Dealer shall not declare or pay any dividend or make any other distribution on its share capital or other assets; retire or issue any additional shares of its capital stock, membership interests or other ownership interests; or make any other distribution of profits to or for the benefit of any shareholder, partner or member..

3.3 **Risk of Loss and Insurance Requirements.** Dealer shall always maintain insurance on the Collateral wherever located (including, without limitation, off-lease, repossessed and other vehicles temporarily located at a Dealer's facility) against any risks NMAC may reasonably require. Other than any insurance proceeds actually received by NMAC from insurance obtained by NMAC under this Agreement or any other agreement, all Collateral, including Property, shall be at Dealer's sole risk for any loss or damage. Dealer indemnifies NMAC against and holds NMAC harmless from all claims for injury or damage to persons or property caused by the use or operation of, or otherwise related to, the Collateral. Dealer shall maintain at its own expense liability insurance in form and amounts and with insurance companies as NMAC may reasonably approve from time to time. In addition, Dealer shall insure all Property that is or may be used for demonstration or operated for any other purpose, against loss, including loss due to collision, subject in each case to the deductible amounts and limitations required by NMAC. If Dealer fails to furnish acceptable evidence of any insurance required by NMAC, NMAC may, but does not have any obligation to, obtain the required insurance at Dealer's expense.

3.4 **Credits and Setoffs.** All funds, Proceeds or other property belonging to NMAC, or required to be delivered to NMAC, and received by Dealer shall be received by Dealer in trust for NMAC and shall be paid to NMAC immediately. Dealer grants to NMAC a security interest in any and all credits, monies or properties of Dealer in the possession or control of NMAC or any affiliate of NMAC, to secure all Indebtedness of Dealer to NMAC, and NMAC may offset and apply any of these credits, monies or properties against any Indebtedness of Dealer to NMAC.

## 4. INFORMATION CONCERNING DEALER

To obtain financing from NMAC under this Agreement, Dealer submitted information concerning its business organization and financial condition. Dealer certifies and agrees that all information submitted is complete, true and correct in all respects and that the financial information submitted to NMAC, and any other financial information that may be furnished to NMAC at any time in the future, does and shall fairly present the financial condition of Dealer according to Generally Accepted Accounting Principles applied on a consistent basis. Dealer shall submit to NMAC, in a form that is reasonably acceptable to NMAC: (i) within 120 days after the end of Dealer's fiscal year, a complete statement of Dealer's financial condition for that year; (ii) within 15 days after the last day of each calendar month, a balance sheet and profit and loss statement for that preceding month; and (iii) any other business and financial records or reports that NMAC may reasonably request. In addition, Dealer agrees to notify NMAC immediately of any material change in its ownership, control, business organization or financial condition or of any information relating to Dealer previously furnished to NMAC. Dealer acknowledges and intends that NMAC shall rely, and shall have the right to rely, on this information in extending and continuing to extend financing to Dealer. Dealer authorizes NMAC at all reasonable times in the future to examine, appraise and verify, through on-site audits, contacts with retail purchasers, and otherwise, the existence and condition of all inventory, goods, documents, commercial or other paper and other property in which NMAC has or has had any title, title retention, lien, security or other interest, and all of Dealer's books and records in any way relating to its business. Dealer authorizes NMAC and NMAC's affiliates to exchange credit, account and financial information about Dealer at any time.

## 5. DEFAULT AND REMEDIES

5.1 **Default.** The happening of any of the following events or conditions is a "default" under this Agreement:

5.1.1 Dealer fails to make any payment of any Indebtedness when due, or fails to perform any of the terms, conditions or obligations of Dealer under this Agreement or any other agreement or guaranty between NMAC and Dealer;

5.1.2 Any warranty, representation or statement made or caused to be made by Dealer in connection with this Agreement or any other agreement between NMAC and Dealer is or becomes false or breached in any material way;

5.1.3 Any default by Dealer or any Dealer Affiliate under any present or future agreement with NMAC;

5.1.4 Loss, theft, damage, destruction, sale (except as permitted in paragraph 3) or encumbrance of any of the Collateral or the making of any levy, seizure or attachment on any of the Collateral;

5.1.5 Inability of Dealer or any Guarantor to pay debts as they mature; insolvency of Dealer or any Guarantor; appointment of a receiver, trustee or custodian for Dealer or any Guarantor or Dealer's property; assignment for the benefit of creditors by Dealer or any Guarantor; commencement of any proceeding under any bankruptcy or insolvency law of the United States, any state or any political subdivision by or against Dealer or any Guarantor; or levy on any Collateral of an order of attachment, execution, sequestration or other similar order or writ;

5.1.6 Dissolution, merger, or consolidation of Dealer or of any Guarantor that is a corporation, limited liability company or a partnership or a transfer of all or any substantial part of the assets of Dealer or any Guarantor;

5.1.7 Any Guarantor dies or is incapacitated and Borrower fails to provide Lender, within 90 days thereafter, with a substitute guaranty from a new guarantor all reasonably acceptable to Lender:

5.1.8 Dealer Principal (as designated in the MMNA Dealer Sales and Service Agreement as described in 5.4 below) dies or is incapacitated or otherwise ceases to actively perform as the Dealer Principal of Dealer and Borrower fails to provide Lender, within 90 days thereafter, with reasonable assurances that such death or incapacity or other event will not have a material adverse effect upon Dealer's financial condition, business operations of the development and operation of the Property

5.1.9 Dealer fails to meet any financial requirements, including (but not limited to) any tangible net worth requirements, any working capital requirements, or any net cash requirements imposed on Dealer by MMNA and/or NMAC;

5.1.10 Revocation, surrender, suspension or termination of any license, certificate, franchise, permit or any agreement necessary to allow Dealer to engage in its business or which materially affects the ability of Dealer to carry on its business as an authorized Mitsubishi dealership as it is presently conducted;

5.1.11 The indictment or threatened indictment of Dealer or any officer or partner of Dealer, as applicable, under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against Dealer or any officer or partner of Dealer, as applicable, pursuant to which statute or proceeding penalties or remedies sought or available include forfeiture of any of the assets of Dealer;

5.1.12 Any change in ownership resulting in one or more entities or individuals that have not previously guaranteed the indebtedness under this Agreement thereafter having an ownership interest equal to or exceeding a 10% ownership interest in Dealer; or any change in active management of Dealer, other than a death or incapacity for which a succession plan has been approved by NMAC, without the prior written consent of NMAC;

5.1.13 Failure to allow NMAC to audit the financial records of the Dealer;

5.1.14 Dealer exceeds any of its approved credit lines;

5.1.15 Any of Dealer's checks are returned as non-sufficient funds from any bank for any reason; or

5.1.16 In NMAC's good faith opinion, reasonable grounds for insecurity arise regarding Dealer's performance and adequate assurances are not given by Dealer to NMAC.

5.2 **Remedies.** Whenever a default occurs, or at any time after a default has occurred, NMAC at its option and without demand or notice of any kind, may suspend Dealer's financing of one or more lines under this Agreement, and/or terminate this Agreement and declare the Indebtedness to be immediately due and payable. Upon default, NMAC shall have all rights and remedies available at law or equity, including all the rights and remedies of a secured creditor under the Uniform Commercial Code with respect to the Collateral and all other security under any other agreements between NMAC and Dealer. All rights and remedies of NMAC shall be cumulative and not in the alternative.

5.3 Dealer grants to NMAC, in the event of a default, the right to take possession of the Collateral and any other security by any means not involving a breach of the peace and to sell, lease or in any way dispose of the same. For this purpose, NMAC may enter the premises where the Collateral or other security is located and may remove the same to any other place NMAC may determine, and Dealer waives, to the extent permitted by law, any notice or hearing with respect to the taking of possession. NMAC may, as it deems appropriate, place a representative or contractor at any Dealership Location of Dealer to act as liaison between NMAC and the Dealer, to monitor transactions and to otherwise inspect all business records of Dealer and to monitor all transactions relating to the sale of any item of Collateral given as security under this Agreement. NMAC shall have the right to apply for the appointment of a receiver of Dealer's property, including the Collateral. Dealer shall, upon NMAC's demand, assemble and make the Collateral or other security available to NMAC at a place to be designated by NMAC that is reasonably convenient to both parties. Further, NMAC may collect all monies and credits then due, or to become due, to Dealer from, and all claims of Dealer against, manufacturers or distributors of inventory or other lending institutions.

If there is a default, Dealer shall pay all costs and expenses, including NMAC's attorneys fees and in house counsel fees at prevailing rates, in connection with: (i) any workout, negotiations, or modifications relating to this Agreement; (ii) locating and/or taking possession of any Collateral; (iii) collecting amounts due under this Agreement; and/or (iv) enforcing its rights under this Agreement, in each case including those costs and expenses incurred in bankruptcy proceedings. The security interest granted under this Agreement shall secure, in addition to all other sums of money due under this Agreement, the repayment of all costs of collection and enforcement and all amounts spent by NMAC on behalf of Dealer. Dealer agrees that the sale by NMAC of any new or unused Property repossessed by NMAC to the Vendor of the Property, or to any person designated by such Vendor at the invoice cost to Dealer less any credit granted to Dealer related to the Property and reasonable costs of transportation and reconditioning, shall be deemed a commercially reasonable means of disposing of the Property. Dealer further agrees that if NMAC solicits bids from three or more other dealers in the type of Collateral repossessed by NMAC under this Agreement, any sale by NMAC of such Collateral in bulk or in parcels to the bidder submitting the highest cash bid shall also be deemed a commercially reasonable means of disposing of the Collateral. In any event, it is expressly understood that such means of disposal shall not be exclusive, and that NMAC shall have the right to dispose of any Collateral repossessed under this Agreement by any commercially reasonable means. In addition to all of NMAC's other rights and remedies, Dealer shall be liable for the difference between the amounts obtained by NMAC as a result of the disposition of the Collateral and the amount of the Indebtedness, plus costs of collection, but nothing in this Agreement shall require NMAC to look to any or all of the Collateral in satisfaction of the Indebtedness.

5.4 **Early Termination and Acceleration.** At all times Dealer or a Dealer Affiliate shall hold a valid Dealer Sales and Service Agreement from MMNA for the sale of new Mitsubishi vehicles, and the Dealer or a Dealer Affiliate shall also finance all its new Mitsubishi vehicle inventory through a wholesale line of credit with NMAC. If the Dealer or a Dealer Affiliate fails to fully comply with this requirement, or if any default exists under the Dealer's Sales and Service Agreement with MMNA, NMAC may, at its sole option, but upon written notice, terminate this Agreement and declare all Indebtedness under this Agreement immediately due and payable.

## 6. EFFECTIVE DATE AND TERM

This Agreement becomes effective on the date Dealer signs this Agreement and shall be binding on Dealer and NMAC and their respective successors and assigns from that date until terminated by receipt of written notice by either party from the other; provided, however, that any such termination shall not relieve either party from any obligation incurred before the termination, nor shall it affect the security interest granted under this Agreement, which shall continue until all outstanding obligations and Indebtedness of Dealer to NMAC are paid in full. Any termination shall not affect the obligations of any Guarantor. If the Dealer has an Automotive Wholesale Financing and Security Agreement with NMAC in effect at the time of the signing of this Agreement ("Existing Agreement"), this Agreement shall be deemed to amend and restate the Existing Agreement and replace it entirely and this Agreement shall be effective as of the date of the Existing Agreement.

## 7. GENERAL

7.1 **Time of Essence.** Time is of the essence of this Agreement. Any delay on the part of NMAC in the exercise of any right or remedy shall not operate as a waiver. No single or partial exercise by NMAC of any right or remedy shall preclude any other or further exercise or the exercise of any other right or remedy.

7.2 **Successors and Assigns.** Any reference to NMAC shall include the successors and assigns of NMAC. If more than one party signs this Agreement, the term "Dealer" shall mean all parties signing this Agreement (other than NMAC) and each of them, and all such parties shall be jointly and severally obligated and liable under this Agreement. The covenants and conditions of this Agreement shall apply to and bind Dealer's heirs, executors, administrators, successors and assigns, and shall inure to the benefit of NMAC, its successors and assigns. Dealer shall not assign this Agreement except with the prior written consent of NMAC. Dealer acknowledges and agrees that NMAC may assign this Agreement or any interest hereunder, at any time without notice to or the consent of Dealer.

7.3 **Severability.** When possible, each provision of this Agreement shall be interpreted so that it is effective and valid under applicable law. If any portion of any provision of this Agreement shall be prohibited by or invalid under applicable law, only that portion of the provision shall be ineffective without invalidating the remainder of the provision or the rest of this Agreement.

7.4 **No Agency.** Dealer is not an agent, partner or joint venturer with or for NMAC and NMAC is not an agent, partner or joint venturer with or for Dealer.

7.5 **Amendments.** Except as otherwise stated in this Agreement, no amendment or modification of this Agreement shall be effective unless in writing and signed by the parties to this Agreement. The terms of this Agreement may, however, be modified by NMAC Bulletins and, with respect to Rates and Charges, written notice from NMAC to Dealer as described in paragraph 2.2. Continued use of any wholesale line of credit available under this Agreement after the effective date of an NMAC Bulletin or other notice shall be deemed acceptance by Dealer of the new terms. No waiver shall be effective against NMAC unless written and signed by an executive officer of NMAC.

7.6 **Further Assurances.** Dealer shall execute and deliver to NMAC promissory notes or other evidence of Dealer's Indebtedness under this Agreement, security agreements, financing statements, trust receipts, chattel mortgages, other security instruments and any other documents in such form as NMAC may reasonably request to evidence Dealer's obligations to NMAC, carry out the intent of this Agreement and to perfect and ensure the priority of NMAC's security interest in any Collateral. NMAC's security or other interest in any Collateral shall not be impaired by the delivery to Dealer of any Collateral or of bills of lading, certificates of origin, invoices or other documents related to the Collateral or by the payment by Dealer of any curtailment, security or other deposit or portion of the amount financed. Dealer's signing or the signature of others on Dealer's behalf of any document for the amount of any credit extended shall be evidence of Dealer's obligation and not payment.

7.7 **Signature Authorization.** NMAC may, and Dealer grants a power of attorney to NMAC, for and in the name of Dealer, to endorse and assign any obligation transferred to NMAC by Dealer and any check or other type of payment intended to apply upon such obligation, and to prepare, execute and deliver such documents as necessary to take title to, sell, transfer and deliver good title to any inventory or transfer title or ownership in any inventory or other Collateral. NMAC may complete any blank space and fill in omitted information on any document or paper furnished to NMAC by Dealer. NMAC, where allowed by applicable law, may sign for Dealer any financing statements or similar documents.

7.8 **Governing Law.** This Agreement shall be interpreted in accordance with the laws of the State of Dealer's Address.

7.9 **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same Agreement.

7.10 **Notices.** All notices (including notices by NMAC Bulletins), requests and demands under this Agreement shall be in writing and shall be: (a) made to NMAC at its address below and to Dealer at any Dealership Location (and NMAC Bulletins may be sent to Dealer at any address for Dealer on file with NMAC), or to such other address as either party may designate by written notice to the other; and (b) deemed to have been given or made: if delivered by hand or by telecopy (fax) with fax confirmation received by sender, immediately upon delivery; if by overnight delivery service, one day after dispatch; and if by first class U.S. mail, postage prepaid, three (3) days after mailing.

7.11 **Integration.** This Agreement contains the entire agreement of the parties concerning the subject matter of this Agreement. All prior commitments, proposals and negotiations concerning the subject matter of this Agreement are merged into this Agreement. Neither this Agreement nor any of its provisions shall be amended, modified or discharged orally or by course of conduct, but only by a written agreement signed by both parties, by NMAC Bulletin, or by other written notice as described in paragraph 2.2.

7.12 **WAIVER OF JURY TRIAL.** DEALER AND NMAC EACH WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BEGUN BY EITHER OF THEM AGAINST THE OTHER RELATED DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, THE OBLIGATIONS AND INDEBTEDNESS, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY DEALER OR NMAC, OR ARISING IN ANY WAY, DIRECTLY OR INDIRECTLY, FROM AND/OR RELATED TO THE RELATIONSHIP BETWEEN DEALER AND NMAC. IN NO EVENT WILL NMAC BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

7.13 **Jurisdiction.** Dealer irrevocably submits and consents to the non-exclusive jurisdiction of the State and Federal Courts located in the State of Texas and any other State where any Collateral is located, with respect to any action or proceeding related to this Agreement, the Indebtedness, the Collateral or any matter arising from or relating to this Agreement. In any such action or proceeding, Dealer waives personal service of the summons and complaint or other process and papers and agrees that service of process may be made by mail directed to Dealer at any Dealership Location or other address of which NMAC has received notice under this Agreement or as otherwise provided by law. Service is deemed complete three (3) days after mailing, or as permitted under the court's rules. Any action or proceeding begun by Dealer against NMAC will be litigated only in a Federal Court located in the North District of Texas, or a State Court in the County of Dallas, Texas, and Dealer waives any objection based on forum non conveniens and any objection to venue in connection with any such action or proceeding.

## 8. SIGNATURES

Dated: _____2/10_____, 2021.

**TEAM IMPORTS LLC**

By: _____
Robert A. Urrutia, Member



412 New Park Avenue
Hartford, CT 06106
Telecopy Number: (_____) _____-_____

**NISSAN MOTOR ACCEPTANCE CORPORATION**

By: _____
Todd Voorhies, Sr. Manager, Commercial Credit

8900 Freeport Parkway
Irving, TX 75063
Telecopy Number: (214) 596-3815