UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING, LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                                Plaintiffs,

       -against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

                                Defendants.
-----------------------------------------------------------------X

Case No.: 2:23-cv-6188 (JMW)

**DECLARATION OF ROBERT ANTHONY URRUTIA IN OPPOSITION TO THE DEO DEFENDANTS' LETTER MOTION FOR CONTEMPT AND IN SUPPORT OF THE SUPERB PLAINTIFFS' CROSS-MOTION FOR RECONSIDERATION**

       Robert Anthony Urrutia declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am the majority shareholder and President of Superb Motors Inc. ("Superb") and the sole member of Team Auto Sales LLC ("Team").[1]

2. Superb, Team, and I (the "Superb Plaintiffs") consist of one group of Plaintiffs in this case who have been defrauded and harmed by Defendant Anthony Deo ("Deo") and his cohort.

3. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at Superb and Team in addition to information I have learned from employees, customers, vendors, and other third parties concerning the Defendants and their conduct.

4. I respectfully submit this declaration in opposition to the Deo Defendants' latest letter motion for contempt and in support of the Superb Plaintiffs' cross-motion for reconsideration.

**The Superb Plaintiffs have been Irreparably Harmed**

5. I have reviewed the transcript from the virtual conference held before this Court on Friday, May 23, 2025.

6. This Court repeatedly asked where the irreparable harm was to justify an Order warranting the sale of the remaining injuncted vehicles, an Order this Court previously issued as to the vehicles owned by Superb.

7. I respectfully submit this letter to the Court to address the issue of irreparable harm as it pertains to my case and circumstances.

8. I began my automotive career in 1992 and have since managed some of the most successful dealership groups in the Northeast.

---

[1] I was also the owner of Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield, Massachusetts.

9. In 2020, during the height of the pandemic, I acquired my first dealership.

10. Over nearly thirty (30) years in the automotive industry, prior to the filing of this case in August 2023, I had never once been required to appear in court regarding a customer or employee dispute.

11. After opening my store in 2020, I quickly transformed it from an underperforming location into one of the top-performing dealerships in the Northeast.

12. In June 2021, I launched Superb with Bobby Clarke ("Clarke") who is of Caribbean descent and a co-owner of a Caribbean radio station, and Jemehl Thomas ("Thomas"), a former employee I hired at a prior dealership I managed.

13. As a fellow minority myself—being from Guatemala—I was inspired by the opportunity to serve and uplift a minority community, while offering Thomas an equity stake in Superb through his partnership with Clarke.

14. Initially, the store performed well.

15. However, following the pandemic-era surge in car prices, the market began to correct itself.

16. We were left with high-priced inventory that we could no longer sell at a profit.

17. In late 2022, Clarke chose to exit Superb after losing advertising revenue from competing dealerships—due to our agreement not to allow other dealerships to advertise to our Caribbean audience.

18. We amicably agreed part ways and settled on, among other things, $450,000.00 worth of advertising.

19. I had funded the entire operation and had previously lent Clarke $150,000, and we parted ways as professionals.

20. At that point, I was faced with the decision to either close the used car operations at Superb or bring in a new operator who could expand our market reach.

21. By then, I had already expanded to two (2) franchise dealerships, had Superb operating, and was in the process of closing on a third franchise with Nissan as a minority dealer.

22. I was not inclined to keep the used car operation at Superb open, but I saw potential in that dealership—with the right partner.

23. Then came Deo.

24. I will not rehash the events from November 2022 onward, as the Court is already familiar with the extensive record.

25. However, I must address the Court's position on irreparable harm.

26. Over the course of thirty (30) years, I cultivated franchise relationships, forged trust with major banks, developed a loyal customer base, obtained floor plan financing on favorable terms, strong vendor partnerships, and ironclad goodwill in the community.

27. In just a few months—without proper supervision—Deo dismantled all of it.

28. As a result, I can no longer qualify for a franchise, obtain floorplan financing, or restore the professional relationships he destroyed.

29. These are not merely financial losses—they represent the permanent loss of my ability to operate in an industry to which I dedicated my life for over three (3) decades.

30. At the time, the businesses I built were collectively valued at approximately $15 million.

31. Today, they are worth nothing.

32. That value has been completely destroyed, and with it, my ability to recover the future income and goodwill associated with them.

4

33. These losses are irreversible; no check can undo the damage, rebuild the trust, or restore the opportunities I spent decades earning.

34. Now, at nearly sixty (60) years old, I am forced to start over because I believed I was entering a legitimate business partnership—not becoming entangled in a scheme with someone who has a known history of similar misconduct.

35. I have lost everything—my dealerships, my income, and any future in the dealership industry.

36. If irreparable harm means damage that cannot be remedied by monetary compensation, I respectfully ask this Court: how does one assign a dollar value to a destroyed career that, due to the damage directly inflicted by the Deo Defendants, cannot be rebuilt?

37. It is also highly questionable whether Deo could even satisfy any monetary judgment I may ultimately obtain; he has claimed – false or true, I don't know – that his home is allegedly in foreclosure and his prior attorney withdrew due to non-payment.

38. Meanwhile, I have borne the full financial burden for the injuncted vehicles and in many ways beyond that for Deo's fraudulent conduct.

39. Moreover, the funds Deo claims to have invested in Superb were fraudulently obtained and are subject to significant liens.

40. The remaining vehicles now in his possession—vehicles that I personally paid for—are worth over $500,000.00.

41. This equals the amount Deo claims to have invested, despite that sum being fraudulently borrowed under the Northshore Motors LLC, which loan remains unpaid.

5

42. That $500,000.00 figure does not even begin to account for the cash Deo diverted through deceptive means, including the use of a fake Flushing Bank account, unauthorized Chase checks, and ACH transfers that were routed directly to his own bank account held in Car Buyers NYC Inc.

43. These actions more than offset any losses he claims to have suffered during his short tenure at Superb.

44. By contrast, I have lost between $15 million and $20 million in total—not including the incalculable loss of my life's work and reputation, which cannot be replaced.

45. That is the essence of irreparable harm.

46. Even if I prevail in this case, I ask the Court: how would I collect any judgment?

47. What asset remains, what avenue for restitution is available, when the party who caused this damage has neither the means nor the willingness to make it right?

48. To date, Deo has not provided any evidence that he paid for the vehicles at issue.

49. Meanwhile, I have undertaken significant efforts to comply with the Court's orders at great personal and financial cost.

50. The vehicles in dispute have depreciated by more than 50%, and I continue to incur interest and storage fees in my effort to comply with the injunction.

51. These losses related to the injuncted vehicles alone exceed $1.5 million—on top of the over $3 million Deo's actions have already cost me out of pocket.

52. Deo never contributed more than the $500,000.00 he borrowed against receivables from a business he never owned, and which he sold to me under false pretenses, supposedly free of liens and pending litigation, pursuant to an agreement he executed making representations and warranties to that effect.

53. After NMAC admitted to mistakenly shutting down my floorplan lines of credit—in major part due to what arises from Deo's conduct—I suffered millions more in losses and was ultimately forced out of business.

54. I lost control of the locations where my stores once operated and vehicles were repossessed, even though I had notified them that some cars were subject to an injunction and provided them with a copy of the injunction.

55. This is discussed further below in this declaration.

56. Nearly $1.5 million in vehicles had nothing to do with Superb, yet I was forced to ground them—incurring depreciation, interest, and fee losses that directly contributed to the closure of my dealerships and my current circumstances.

57. Now, Deo falsely and repeatedly claims before this Court that I "stole $20 million."

58. That is categorically untrue.

59. The litigation with NMAC is ongoing, with counterclaims filed, and at no point has NMAC alleged that I stole any monies, let alone such an amount.

60. So again, I respectfully ask: what more is required to establish irreparable harm?

**The Status of the Superb Injuncted Vehicles**

61. As set forth in the accompanying letter brief, twelve (12) vehicles owned by Superb were sold pursuant to this Court's May 8, 2024 Order.

62. That leaves eighteen (18) vehicles remaining out of the thirty (30) Superb Injuncted Vehicles.

63. Two vehicles were inadvertently sold by Nissan Motor Acceptance Company LLC d/b/a NMAC ("Nissan") as reported to his Court by Nissan on May 23, 2025.

64. I had no involvement with Nissan in the sale of those vehicles.

7

65. In fact, I notified Nissan that they took vehicles that were part of the Injunction as soon as I learned of it, and demanded the return of the vehicles.

66. I did not receive any of the funds related to the sale of those vehicles.

67. With those two (2) vehicles sold, that leaves sixteen (16) vehicles.

68. Much like the two vehicles Nissan took, non-party Next Gear Capital Inc ("Next Gear") recently repossessed the two (2) Isuzu flatbed trucks.

69. When I learned that they vehicles were repossessed, I contacted a representative I worked with at Next Gear and informed her that the vehicles were injuncted and could not be sold.

70. Upon providing Next Gear with a copy of the Injunction, Next Gear informed me that they would not sell the two (2) Isuzu flatbed trucks until this Court issued its Order on Nissan's motion for intervention.

71. I recently learned that Next Gear had already sold those vehicles.

72. Just like with the vehicles NMAC took, I had no involvement with Next Gear in the sale of those vehicles and I did not receive any of the funds related to the sale of those vehicles.

73. My attorney did notify Next Gear's counsel about this, and it is my understanding that their counsel was unaware of these circumstances.

74. I was informed by the representative I worked with at Next Gear that "the higher ups" determined that they were not part of the injunction, and understand that their counsel took the same position just yesterday.

75. In both circumstances, with me residing outside of the country and my dealerships shut down with no staff, I was powerless to stop Nissan or Next Gear from doing what they did.

76. I can only unequivocally state that the vehicles were not taken nor sold at my direction or request, and that both NMAC and Next Gear acted unilaterally.

8

77. At the time the foregoing vehicles were taken, both Nissan and Next Gear were in the process of repossessing approximately two hundred other vehicles between the two of them.

78. Separate and apart from Next Gear's repossession, I understand that this Court found me in contempt for not providing odometer readings for these two (2) vehicles.

79. Prior to the May 22, 2025 Order, I provided my counsel with the required odometer readings on February 24, 2025.

80. Regrettably, he did not submit them due to an oversight on his end.

81. These odometer readings have now been provided in compliance with this Court's Orders.

82. With the two (2) Isuzu flatbed trucks[2] sold, that leaves fourteen (14) vehicles.

83. On July 15, 2023, customer Andreia De Olivera Pereira traded in the 2016 Ford F150 ("2016 F150") in exchange for a 2018 Ford F-150, VIN No.: 1FTFW1E56JFD20487, which Superb sold to Pereira.

84. The 2016 F150 had a remaining balance of $27,603.87 due to Lendbuzz Funding ("Lendbuzz").

85. Deo never caused this remaining balance to be paid off despite selling the 2018 F150 and receiving bank financing plus a $5,000.00 down-payment by credit card and/or cash, of which the cash portion was never deposited in Superb's bank account.

---

[2] To add injury to injury, the Superb Plaintiffs are left with a deficiency that they owe to Next Gear for these trucks, which were meant to transport vehicles between my dealerships to save on the cost of transportation and never had anything to do with Superb. Instead, I have suffered the cost of depreciation, transportation, interest, insurance costs, and the deficiency amount notwithstanding the fact Next Gear unilaterally sold the trucks. Meanwhile, Deo has not paid for any of these costs.

9

86. As a result of this conduct, Pereira's credit was likely destroyed, as he remained liable to pay off the balance which Deo was responsible for paying once he accepted the 2016 F150 as a trade-in.

87. Meanwhile, Deo floored the 2016 F150 upon receiving it in July 2023, leaving Superb unable to sell the vehicle because he moved it away from Superb's lot and only returned subject to the Injunction.

88. As a result of the foregoing, in or about March 2024, since this vehicle was never paid off due to Deo's fraudulent conduct, Lendbuzz repossessed the vehicle.

89. We explained to both the repo guy and Lendbuzz about the existence of this Order, but they took the vehicle anyway.

90. After the vehicle was repossessed, we attempted to buy the vehicle back, but Lendbuzz refused.

91. We immediately informed the Court about these circumstances in March 2024 when they occurred. See ECF Docket Entry 157-1 at ¶ 74 n. 9 ("For example, one Injuncted Superb Vehicle bearing VIN No.: 1FTEW1EF1GFB67420 was recently repossessed by a repo company because the Deo Defendants never paid the outstanding lien on it, which they obtained as a trade-in").

92. Because the 2016 F150 was repossessed, at the next audit in or about April 2024, the floor plan financing for that vehicle was required to be paid off, which we did.

93. As a result, I am simply incapable of providing an odometer reading for the 2016 F150 because it was repossessed in March 2024 well before the May 8, 2024 and January 13, 2025 Orders requiring the submission of odometer readings.

10

94. I respectfully ask that the Court reconsider finding me in contempt as it relates to the 2016 F150 because I should not be punished for not being able to do that which is impossible.

95. Indeed, because the Superb Plaintiffs immediately apprised the Court of the whereabouts of this vehicle in March 2024, it should reconsider its finding of contempt.

96. With the one (1) 2016 F150 repossessed, that leaves thirteen (13) vehicles.

97. Those thirteen (13) vehicles currently remain in the Superb Plaintiffs' possession, although none of them were ever owned by Superb and were instead owned by Team.

98. On May 8, 2024, this Court referred to these vehicles as being owned by third parties.

99. However, only two (2) vehicles – the two (2) Isuzu flatbed trucks – were owned by non-party Team Imports LLC d/b/a Team Mitsubishi-Hartford.

100. The remaining thirteen (13) vehicles in my possession were owned by a party, Team Auto Sales LLC, which shut down in March 2025.

101. If this Court stated that Superb established irreparable harm due to its closure such that its vehicles may be sold with the proceeds placed in escrow, I struggle to understand why Team failed to establish irreparable harm due to its later closure such that the remaining vehicles it owns may be sold with he proceeds placed in escrow.

102. To the extent that this Court believes that Team is a non-party, I clarify that it is, and respectfully seek reconsideration of this Court's March 23, 2025 Order denying leave to sell the remaining vehicles.

11

103. Indeed, I cannot help but reiterate that keeping the vehicles injuncted, including those held by Deo, is unworkable to achieve its goal to preserve the assets due to depreciation, and permitting a sale with the proceeds placed in escrow prevents that from happening, takes away the risk of damage, and eliminates the cost of storage, insurance, and transportation.

104. This benefits both parties, each of which have already agreed to a sale.

105. I therefore struggle to understand why this Court will not permit what both parties have stated they wanted when, if the cars continue to be held, both parties stand to suffer but if they are permitted to be sold, the funds can remain in escrow until this matter is decided.

106. I filed an appeal with an emergency motion for a stay based in large part on the foregoing and because I respectfully submit the Court erred in its decision.

107. However, I am advised that, absent the issuance of a stay, I am required to comply with this Court's Order to deliver the vehicles to the Deo Defendants at my cost.

108. I fully respect the authority of this Court and understand that its decisions are made based on the law, the facts, and the arguments submitted by both parties.

109. I do believe that certain facts, highlighted here, were overlooked which warrants reconsideration.

110. In the event that a stay is denied, I respectfully request an extension of time of two (2) weeks to comply with this Court's Orders, which I will figure out a way to do.

111. I humbly thank this Court for its time and attention to this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 30, 2025.

*Robert Anthony Urrutia*
Robert Anthony Urrutia (May 30, 2025 17:54 EDT)
Robert Anthony Urrutia

12