**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

ANTHONY DEO individually and as shareholder/member    Index No. 2:24-cv-06903
of NORTHSHORE MOTOR LEASING LLC and 189                (NJC/JMW)
SUNRISE HWY AUTO LLC; SARA DEO individually
and as shareholder/member of NORTHSHORE MOTOR
LEASING LLC and 189 SUNRISE HWY AUTO LLC; and
NORTHSHORE MOTOR LEASING LLC and 189 SUNRISE
HWY AUTO LLC,

<em>Plaintiffs,</em>

      -against-

RONALD BARON, JOSHUA AARONSON, JORY BARON,
MARCELLO SCIARRINO, DANIEL O'SULLIVAN,
BRIAN CHABRIER, WENDY KWUN, IRIS BARON,
RAYMOND PHELAN, ASAD KHAN, ESTATE OF
DAVID BARON, BARON NISSAN INC., d/b/a/
BARON NISSAN, ISLAND AUTO GROUP OF NEW
YORK LLC, a/k/a/ ISLAND AUTO GROUP OF NY LLC,
d/b/a/ ISLAND AUTO GROUP, ROBERT ANTHONY
URRUTIA, BRUCE NOVICKY, MICHAEL MORGAN,
PARMESHWAR BISSOON, SUPERB MOTORS INC.,
d/b/a/ TEAM AUTO DIRECT, RICHARDS, WITT &
CHARLES, LLP, NEXTGEAR CAPITAL INC., ALLY
FINANCIAL INC., NISSAN MOTOR ACCEPTANCE
COMPANY LLC, d/b/a/ NMAC, JP MORGAN CHASE
BANK N.A., a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK, CYRULI,
SHANKS & ZIZMOR, LLP, MILMAN LABUDA
LAW GROUP, PLLC, JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20, JOHN DOES 1-20,
JANE DOES 1-20, and JOHN DOE CORPORATIONS 1-20,

<em>Defendants.</em>

-------------------------------------------------------------------------X

**AMENDED COMPLAINT**

**JURISDICTION AND VENUE**

1. This action was originally filed in Nassau (NY) Supreme Court, but was

     removed by one or more of the Defendants herein on the basis of the original

1

Complaint having Federal claims. This Amended Complaint does not have any Federal claims; all claims herein arise under New York state law, only.

2. This Court has venue for the within action as all wrongs committed as set forth herein occurred in the counties of Nassau (NY) and Suffolk (NY) only, as every party hereto committed every relevant action herein in those counties, only, and conducted the business, acts, and omissions at issue in this action in those counties, only.

## PARTIES

3. Plaintiff, Anthony Deo (hereinafter, "Anthony Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto Anthony Deo worked in Nassau County, New York. Anthony Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC; references to Anthony Deo herein are intended as Anthony Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

4. Plaintiff, Sara Deo (hereinafter, "Sara Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Sara Deo worked in Nassau County, State of New York. At all times relevant hereto, Sara Deo was and is the wife of Anthony Deo; Sara Deo is also sometimes known as Sara Rahman in one or more documents related hereto. Sara Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189

Sunrise Hwy Auto LLC; references to Sara Deo herein are intended as Sara Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

5. Plaintiff, NorthShore Motor Leasing LLC (hereinafter, "NorthShore"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. Anthony Deo and Sara Deo formed NorthShore in the state of New York during November 2017.

6. Plaintiff, 189 Sunrise Hwy Auto LLC (hereinafter, "189 Sunrise"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Suffolk County, State of New York. Anthony Deo and Sara Deo purchased 189 Sunrise on or about February 12, 2021.

7. Defendant, Ronald Baron (hereinafter, "Ron Baron") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Ron Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Ron Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

8. Defendant, Joshua Aaronson (hereinafter, "Josh Aaronson" or "Josh" or "Aaronson"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Josh owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Aaronson had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

9. Defendant, Jory Baron (hereinafter, "Jory Baron") is an individual who, at all times relevant hereto, was and is a resident of Long Island, State of New York. At all times relevant hereto, Jory Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Jory Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

10. Defendant, Marcello Sciarrino (hereinafter, "Sciarrino") is an individual who, at all times relevant hereto, was and is a resident of Staten Island, State of New York. At all times relevant hereto, Sciarrino owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Sciarrino had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

11. Defendant, Daniel O'Sullivan (hereinafter, "O'Sullivan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County,

State of New York.  At all times relevant hereto, O'Sullivan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, O'Sullivan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

12. Defendant, Brian Chabrier (hereinafter, "Chabrier") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York.  At all times relevant hereto, Chabrier owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, Chabrier had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

13. Defendant, Wendy Kwun (hereinafter, "Kwun") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York.  At all times relevant hereto, Kwun worked for one or more automobile businesses owned and operated by one or more co-Defendants in the State of New York in the greater New York City area.  Upon information and belief, Kwun has multiple family members with residences outside of the United States.

14. Defendant, Iris Baron (hereinafter, "Iris") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York.  At all times relevant hereto, Iris Baron was the wife of David Baron during his lifetime.

15.  Defendant, Raymond Phelan (hereinafter, "Phelan"), is an individual who, at all times relevant hereto, was and is a resident of Suffolk County, State of New York.  At all times relevant hereto, Phelan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, Phelan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

16. Defendant, Asad Khan (hereinafter, "Khan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York.  At all times relevant hereto, Khan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, Khan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

17. Defendant, Estate of David Baron (hereinafter, the "Estate"), is an Estate of and for the benefit of the Decedent, David Baron.  At all relevant times in his lifetime, David Baron (hereinafter, "David Baron") owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area.  At all times relevant hereto, David Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

18. Defendant, Baron Nissan Inc., d/b/a/ Baron Nissan (hereinafter, "Baron Nissan") is a domestic corporation duly formed under the laws of the State of

New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York.  At all times relevant hereto, Baron Nissan was owned and operated by one or more of the Aaronson co-Defendants herein. Baron Nissan is an automobile dealership.

19. Defendant, Island Auto Group of New York LLC, a/k/a/ Island Auto Group of NY LLC, d/b/a/ Island Auto Group (hereinafter, "Island Auto Group"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto was owned and operated by the Aaronson co-Defendants in the State of New York.  Island Auto Group operates the Aaronson Defendants' dealerships, serving as the parent company thereof, whether or not the dealerships at issue are named Defendants herein.

20. Defendant, Robert Anthony Urrutia (hereinafter, "Urrutia") is an individual who, at all times relevant hereto, was and is a resident of the country of Costa Rica.  At all times relevant hereto, Urrutia owned and/or operated one or more automobile businesses inside and outside of the State of New York with one or more co-Defendants.  Urrutia resides in Costa Rica for the purposes of 1) living a lifestyle of wealth desired by Urrutia and his family (there is a lower cost of living in Costa Rica), 2) to avoid paying creditors, and 3) upon information and belief, Urrutia fled the country having stolen in excess of twenty million dollars from various businesses, including his own, and from various other businesses, including NMAC as more fully set forth, *infra;* he is

or is expected to become a wanted man by one or more law enforcement agencies. At all times relevant hereto, Urrutia always maintained and still maintains one or more apartments and/or houses and/or residences in the Greater New York City area (within 75 miles of Manhattan) to serve as his U.S. residence when he is in the United States, notably 327 Lakewood Terrace, Newton, New Jersey, 07860. Upon information and belief, and given that Urrutia has fled the United States, it is expected that he will never willingly return.

21. Defendant, Bruce Novicky (hereinafter, "Novicky") is an individual who, at all times relevant hereto, owned and/or operated multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

22. Defendant, Michael Morgan (hereinafter, "Morgan"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Morgan owned and/or operated multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

23. Defendant, Parmeshwar Bissoon (hereinafter, "Bissoon") is an individual who, at all times relevant hereto, was and is a resident of Queens County, State of New York. At all times relevant hereto, Bissoon worked for one or more businesses in Nassau County, State of New York, owned and operated by one or more of the Urrutia co-Defendants.

24. Defendant, Superb Motors Inc. d/b/a/ Team Auto Direct (hereinafter, "Superb" and "Team Auto") is a domestic corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York.

25. Defendant, Richards, Witt & Charles, LLP, d/b/a/ Richards Witt (hereinafter, "RWC") is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, RWC performed accounting services for various parties hereto and/or their related businesses.

26. Defendant, NextGear Capital Inc. (hereinafter, "NextGear"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NextGear's principal offices are located in Atlanta, Georgia.

27. Defendant, Ally Financial Inc. (hereinafter, "Ally"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Ally's principal offices are located in Detroit, Michigan.

28. Defendant, Nissan Motor Acceptance Company LLC, d/b/a/ NMAC (hereinafter, "NMAC"), is a foreign limited liability company duly formed in

the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NMAC's principal offices are located in Torrance, California and Irving, Texas.

29. Defendant, JP Morgan Chase Bank N.A., a/k/a/ JP Morgan Chase & Co., a/k/a/ Chase Bank N.A., d/b/a/ Chase Bank (hereinafter, "Chase") is a national association duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Chase's principal offices are located in New York City, New York.

30. Defendant, Cyrulli, Shanks & Zizmore LLP (hereinafter, "CSZ"), is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from New York City, State of New York. At all times relevant hereto, CSZ performed attorney services for various parties hereto and/or their related businesses. At various times relevant hereto, CSZ performed services for the corporate Plaintiffs without authorization or agreement of the owners/members/stockholders of 189 Sunrise and NorthShore as then owned and operated by the Deo Plaintiffs.

31. Defendant, Milman Labuda Law Group PLLC (hereinafter, "MLLG"), is a domestic professional limited liability corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of

New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, MLLG performed attorney services for various parties hereto and/or their related businesses. At various times relevant hereto, MLLG performed services for the corporate Plaintiffs without authorization or agreement of the owners/ members/stockholders of 189 Sunrise and NorthShore as then owned and operated by one or both of the Deo Plaintiffs.

32. Defendants John Doe Attorneys 1-20 are twenty unknown attorneys working for and with and employed by CSZ and/or MLLG as attorneys, employees, partners and/or members and being compensated therefore; each of these attorneys are admitted to the bar for the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

33. Defendants John Doe Accountants 1-20 are twenty unknown accountants working for and with and employed by RWC as accountants, employees, partners and/or members and being compensated therefore by RWC; each of these accountants are licensed and/or permitted to perform accounting services in the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

34. Defendants John Does 1-20 are twenty male individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Does 1-20 are also known herein as the "co-Conspirators."

35. Defendants Jane Does 1-20 are twenty female individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. Jane Does 1-20 are also known herein as the "co-Conspirators."

36. Defendants John Doe Corporations 1-20 are twenty businesses, corporations, limited liability companies, limited liability partnerships, or other duly formed companies/businesses that were utilized by one or more of the Defendants herein to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these businesses, corporations or other duly formed companies are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Doe Corporations 1-20 are also known herein as the "co-Conspirators."

37. Defendants Joshua Aaronson, Jory Baron, Ron Baron, Marcello Sciarrino, Daniel O'Sullivan, Brian Chabrier, Wendy Kwun, Iris Baron, Raymond Phelan, Asad Kahn, David Baron (by and through the Estate of David Baron), Baron Nissan, and Island Auto Group (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Aaronson Defendants." David Baron was the agent for the Aaronson Defendants during his lifetime for all purposes relevant hereto; since the death of David Baron during or about May 2021, Joshua Aaronson serves as agent for the Aaronson Defendants for all purposes relevant hereto.

38. Defendants Robert Anthony Urrutia, Bruce Novicky, Michael Morgan, Superb Motors Inc. and Team Auto Direct (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Urrutia Defendants." Urrutia serves as agent for the Urrutia Defendants at all relevant times and for all purposes relevant hereto.

### FACTS COMMON TO ALL COUNTS

A. <u>NorthShore Motor Leasing LLC</u>

39. During and after 2016, the Deos owned and operated a business known as UEA Premier Motors Corporation (hereinafter, "UEA"); the Deos entered into a Lease through UEA to operate a used automobile dealership at and from 180 Michael Drive, Syosset, New York.

40. Until 2018, the Deos had met only one (1) of the individual Defendants herein (David Baron) and did not conduct any business with any of the individual Defendants herein.

41. During or about the fall of 2017, the Deos decided that it was necessary to expand and/or increase their Floor Plan in order to expand and/or increase their profitability at the 180 Michael Drive location.

42. On or about November 1, 2017, the Deos filed papers with the New York Secretary of State's Office to incorporate and duly form the limited liability company/co-Plaintiff NorthShore Motor Leasing LLC as the first step in expanding/increasing profitability.

43. Within one (1) week of forming NorthShore, Sara Deo applied for and was given an Employer Identification Number (hereinafter, "EIN number") from the Internal Revenue Service/IRS. Attached hereto as Exhibit A is a true and accurate copy of the notice provided to Sara Deo of the EIN number from the IRS.

44. NorthShore did not begin operations immediately, instead commencing actual operations during 2018.

45. Operations for NorthShore commenced at 180 Michael Drive, Syosset, New York during or about June 2018. Attached hereto as Exhibit B is a true and accurate copy of the lease assigned by and through the Landlord and formerly held by UEA entered into by the Deos to operate NorthShore Motors, a used car sales business, from 180 Michael Drive, Syosset, New York.

46. Attached hereto as Exhibit U is a true and accurate copy of the receipt Anthony Deo obtained when ordering the corporate book for NorthShore Motor Leasing, LLC, co-Plaintiff herein, when the Deos obtained the lease for NorthShore from UEA that same month, June 2018.

47. Concurrent with and in furtherance of opening NorthShore and conducting business in 2018, Sara Deo opened a bank account for NorthShore with Defendant Chase Bank. Attached hereto as Exhibit C are true and accurate copies of the documents utilized by Chase Bank and Sara Deo to open one or more bank accounts with Chase Bank for NorthShore Motors. The account(s) with Chase Bank for NorthShore were opened by Sara Deo during January 2018; pursuant to internal bank rules and policies as well as applicable law, Sara Deo was required to and did in fact present proof of ownership documents to Chase Bank in order to open said account(s) for NorthShore.

48. After forming the company, obtaining an EIN, obtaining the corporate book, and opening the bank account(s) for NorthShore through Chase Bank, the Deos (together) commenced operations of NorthShore Motors at 180 Michael Drive, Syosset, New York, during 2018.

49. As part of the plan to expand and increase profitability in the automobile sales business from 180 Michael Drive, Syosset, New York, the Deos accepted an offer from David Baron.

50. By and before 2018, David Baron created, owned, and operated the Baron automobile dealership empire in and around Long Island, New York, with one or more of the other Aaronson Defendants; the Aaronson Defendants lead by David Baron during his lifetime purchased, opened and operated a variety of dealerships under the umbrella of Island Auto Group, including the Baron Auto Group and Baron Nissan.

51. The automobile dealerships owned and operated by the Aaronson Defendants since or before 2018 under the umbrella of parent company Island Auto Group include, but are not limited to, Baron Nissan, Baron Honda, Island Chevrolet, Island Chrysler Dodge Jeep Ram, Island GMC, Island Kia, Island Hyundai, Island Mazda, Island Subaru, NY Off Lease, Island Toyota, Island Volkswagen, Baron Auto Mall, Driveworld, Sunrise Auto Outlet, Baron Auto Emporium, Stream Auto Outlet, Long Island Motors, Baron Kia, Tri-County Motors, Rockland Hyundai, Route 1 Chrysler Dodge Jeep Ram of Lawrenceville, 161-10 Hillside Auto Ave, Best Auto Outlet, and co-Plaintiff 189 Sunrise up until selling same to the Deos (a true and accurate copy of the 189 Sunrise purchase documents by the Deos are attached hereto as Exhibit D).

52. The Aaronson Defendants' personal wealth combined with the value of the assets of the automobile dealerships the Aaronson Defendants operate and control exceeds one billion dollars ($1,000,000,000.00).

53. The fact that the assets of the Aaronson Defendants and the dealerships they control are valued in excess of one billion dollars ($1,000,000,000.00) has a huge impact on every party to this action and all of the facts set forth herein.

54. The Aaronson Defendants and the dealerships they control engage in elaborate shell games with the businesses owned and operated by the parties hereto, sometimes to line their own individual pockets, sometimes to make it appear as though the businesses are losing money when they are not (for income tax purposes), and sometimes to divert funds from one business to the benefit of

one or more of the individual Aaronson Defendants or one or more of their Island Auto Group businesses.

55. As between the Deos, at all times relevant hereto it was Anthony Deo who operated NorthShore and eventually 189 Sunrise; Sara Deo assisted Anthony Deo in the operation of these two businesses. The Deos each owned as members and/or stockholders portions of each business; their ownership interests combined constituted 100% of the ownership interests in NorthShore and 189 Sunrise (since 189 Sunrise was purchased in February 2021; *see* Exhibit D hereto).

56. During late 2017 or early 2018, David Baron explained to Anthony Deo that he, David Baron, was the head of the Baron-owned automobile dealerships under the umbrella of the Island Auto Group, detailed his business empire for Anthony Deo, and offered to "help" the Deos with their new business, NorthShore, in ways that he plainly indicated would be mutually beneficial for all three of them, David Baron and the Deos.

57. Specifically, David Baron offered to provide two main types of assistance to the Deos: 1) Baron offered to provide a "floor plan" for the Deos and NorthShore for a fee; this floor plan would be provided by and through the umbrella of Island Auto Group and would be personally guaranteed by David Baron, and 2) if they accepted the floor plan offer, he would also provide his own Accountants to the Deos at no additional cost to the Deos. Since Anthony Deo and Sara Deo were both still new to the used car dealership business and inexperienced in both operations and floor plans, the offer from

the much older and extremely more experienced and wealthy David Baron seemed too good to be true, and they gladly accepted his offer.

58. The offer to provide a floor plan to the Deos was extremely important to the then brand-new business known as NorthShore Motors.

59. A floor plan in the automobile dealership business is the credit provided by one or more lenders to that business; this credit/money is utilized to purchase automobiles for the business to sell to the public at a profit. Each car purchased by the dealership has a value on the floor plan; once that car is sold, the value assigned to the vehicle on the floor plan is then re-paid to the lender, and in simple terms, the dealership keeps the difference as profit between the floor plan value and the paid sales price of the vehicle.

60. Since the Deos were new to the business of selling (used) automobiles, they did not have access to a "big" floor plan, they only had a smaller amount of money available to them through UEA, since unlike the billionaire Aaronson Defendants, the Deos and UEA were not wealthy and did not operate on a scale anywhere near the extremely higher levels of the Aaronson Defendants. Smaller amounts available on floor plans from lenders also come with larger interest rates, so NorthShore could make a lot more money with a bigger floor plan offered through David Baron backed by his companies' billion dollars or more in assets, thereby allowing NorthShore to get a bigger floor plan at lower interest rates than the Deos obtained through UEA and ever could have obtained for NorthShore on their own.

61. Even better, the Deos thought, they would be getting free accounting services through whatever accountants David Baron and the Baron/Aaronson co-Defendants provided, which turned out to be RWC. "Too good to be true" is the understatement of the century compared to what David Baron and the Aaronson Defendants actually did to the Deos and NorthShore (and eventually, 189 Sunrise).

62. In reality, what David Baron and the Aaronson Defendants did was to prey on the Deos by stealing their Northshore dealership (and eventually, 189 Sunrise) from them. The Aaronson Defendants "groomed" the Deos, NorthShore, and eventually, 189 Sunrise, much the same way a pedophile "grooms" a child for eventual abuse.

63. First, the Aaronson Defendants (Josh Aaronson is related to the Barons by marriage; at all time relevant hereto prior to the death of David Baron, David Baron acted as agent for the Aaronson Defendants as they dealt with the Deos; since the death of David Baron, Aaronson acted as the agent for the Aaronson Defendants as they dealt with the Deos) put their own people in charge of all finances for NorthShore, including, but not limited to, one or more (over time) on-site controllers and/or comptroller(s), plus daily oversight from one or more (over time) of the Aaronson Defendants' and Island Auto's chief financial officer(s) (hereinafter, "CFO"), plus daily oversight from one or more of the Aaronson Defendants themselves.

64. Each of these individuals put in place at NorthShore by David Baron initially and then Josh Aaronson (after David Baron's death) on behalf of the

19

Aaronson Defendants had complete, 100% control over all company finances, as the Deos had to obtain permission from one or more of the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals to write checks from their own (NorthShore) business.

65. Through June 16, 2020, the Deos wrote their own checks and operated the NorthShore bank accounts themselves, albeit with the Aaronson Defendants' overview and approval of all company business through the token and Positive Pay systems put in place by the Aaronson Defendants with the cooperation of Chase Bank.

66. On and after June 16, 2020, the Deos had to obtain checks from NorthShore's account(s) from the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals to even get a check to write before obtaining permission to write it, plus the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals continued to maintain off-site oversight on all checks written from NorthShore's accounts through various agreements between the Aaronson Defendants and their companies on the one hand, and Chase Bank as the account provider for NorthShore's bank account(s).

67. Through Chase Bank, the Aaronson Defendants put in place two different systems to control all money at NorthShore (and eventually, 189 Sunrise):  1) a system called "Positive Pay" and 2) a system called "Tokens."

68. Positive Pay is a system offered by Chase Bank to its business customers to ensure complete, 100% control over all checks written from that customer's business checking account.

69. Simply put, Positive Pay *requires* that customer to affirmatively approve (via electronic approval) each check presented for payment to Chase from that customer's checking account before the end of the business day that the check is presented to Chase for payment.  If for *any* reason the customer does not electronically approve each check presented for payment to Chase, then that check is not paid by Chase for that customer.

70. The Aaronson Defendants put co-Defendant Wendy Kwun (Island Auto's CFO) and co-Defendant Daniel O'Sullivan (the person the Aaronson Defendants put in place as controller/comptroller at NorthShore to be their on-site eyes and ears) in charge of the Positive Pay system at NorthShore.  This system allowed the Aaronson Defendants to 1) control all money at the dealership, and 2) know about and approve or disapprove every check written from the dealership.  This Positive Pay system allowed the Aaronson Defendants to perpetuate their fraud against Plaintiffs by allowing the Defendants to seemingly be in charge of writing checks for NorthShore, when in fact, the Aaronson Defendants remained 100% in charge of all monies in and out of the dealership's accounts. Once the Positive Pay system was put into place at NorthShore, the Island Auto Group employees (lead by Wendy Kwun and Daniel O'Sullivan) necessarily approved all checks written from NorthShore accounts within one (1) day of being presented to Chase or else

such check(s) would be declined by Chase and would not be honored by Chase.

71. The Positive Pay system is and was limited to just controlling all checks written from dealership accounts. But there are significant other types of financial transactions that take place at a dealership including, but not limited to, wires in and out of accounts as deals get funded, deposits and on-line banking transfers.

72. Given that the Positive Pay system was limited to controlling just checks written from NorthShore accounts, the Aaronson Defendants also put in place a Token system for all NorthShore accounts at Chase.

73. The Token system worked as follows: An electronic device (the Token) about the size of a wristwatch generates random numbers that must be inputted into the Chase system for any transaction to be approved and allowed from NorthShore's accounts *other than* the checks subjected to the Positive Pay system.

74. At all times relevant hereto, the Aaronson Defendants controlled *every* financial transaction at NorthShore through the floor plan provided by the Aaronson Defendants exclusively, the Positive Pay system, and the Token system, leaving those Defendants 100% in charge of all finances at NorthShore from the time David Baron first provided a floor plan for NorthShore during 2018 through the Aaronson Defendants' departure from NorthShore during November 2022.

75. From the commencement of NorthShore operations around mid-June, 2018, the Deos had an unwritten agreement with David Baron as the point man/agent for the Aaronson Defendants (with greater than one billion dollars ($1,000,000,000.00) in assets to obtain the biggest floor plans at the lowest interest rates) to provide the floor plan under the umbrella of Island Auto Group that would allow the company to sell more cars at a greater profit margin than if the Deos obtained a floor plan themselves.

76. It seemed in all respects to the Deos that both sides of the relationship could profit from this arrangement, so they agreed to David Baron's proposal.

77. What the Deos never agreed to was having the Aaronson Defendants steal their company, NorthShore, from the Deos without the Deos knowing they were defrauded from their own company, NorthShore, and eventually, also defrauded from their interests in 189 Sunrise (and eventually, Baron Nissan).

78. There were many events over time that were all part of the conspiracy perpetuated by the Aaronson Defendants to defraud the Deos of money from their own companies (NorthShore and 189 Sunrise) and to defraud the Deos of the companies themselves.

79. First, the David Baron led Aaronson Defendants put the floor plan in place from utilizing the assets and existing floor plan from "at least" Baron Nissan ("at least" is necessary herein due to the fact that the Deos were certainly never given any company documents from any of the Aaronson Defendants' companies and do not know what the Aaronson Defendants were actually putting on those companies' internal financial and tax documents; Baron

Nissan is what David Baron and Josh Aaronson told the Deos was the source of the NorthShore and 189 Sunrise floor plans).

80. Next, the David Baron led Aaronson Defendants insisted upon putting the Token and Positive Pay systems in place for NorthShore (and eventually 189 Sunrise). The Deos were told that the systems were necessary to safeguard company accounts; in reality, these systems were another step in the direction of stealing the company from the Deos while leaving the Aaronson Defendants in complete control of all company assets and accounts.

81. The David Baron led Aaronson Defendants put their own floor plan providers in place for NorthShore and eventually 189 Sunrise (co-Defendant Ally, NMAC, and NextGear); these providers each answered to the extremely wealthy Aaronson Defendants and followed only the Aaronson Defendants' instructions, the Deos were completely shut out by the Aaronson Defendants and their Professionals from running the two businesses; they were merely given the appearance of running the businesses from the Aaronson Defendants.

82. Since NorthShore did not commence business until 2018, no tax documents needed to be filed (as far as the Deos knew at the time) until sometime in 2019. Prior to June 16, 2020, Sara Deo kept asking Brian Chabrier, Asad Khan, and the controller put in place by the Aaronson Defendants, Melissa Beltre, for the Deos K-1 documents for tax filing purposes; on and after June 16, 2020, Wendy Kwun (the CFO for the Aaronson Defendants and Island Auto) and Daniel O'Sullivan (the controller who succeeded Melissa Beltre

and put in place at NorthShore by the Aaronson Defendants) became the individual Aaronson Defendants who Sara Deo kept asking for the Deos' K-1 documents, the forms *required* by the Internal Revenue Service for the United States (hereinafter, "IRS") and the New York State Department of Finance (hereinafter, "NYSDOF") to be given to the owners of a business reflecting their earnings for the calendar year 2018 forward in time at NorthShore.

83. Upon information and belief, the K-1 documents were, in fact, created and given to the Aaronson Defendants and not the Deos by the companies' accountants, CFOs, controllers and/or other unknown individuals on behalf of and in conspiracy with the Aaronson Defendants to defraud the Deos from their own companies.

84. At all times relevant hereto, the Aaronson Defendants by and through their agents, David Baron first, then Josh Aaronson, falsely and with specific intent to defraud Plaintiffs and in conspiracy with RWC, the attorney co-Defendants, and the Aaronson co-Defendants explained to the Deos that the documents and taxes were complicated and were being filed late, and that the K-1's would be produced when the taxes were prepared and readied for filing. The Deos (reasonably) relied upon these Defendants' words and deeds relating to the taxes, specifically trusted the Aaronson Defendants, trusted that the Aaronson Defendants were being honest with the Deos and were only interested in making profits for the entire companies including the Deos, and didn't have any reason at that time to believe that there was any problem with their ownership of NorthShore (and eventually 189 Sunrise).

85. However, by early 2020, the Deos were wondering where their K-1 forms were from the previous year (2019), as well as when they would be getting their K-1 forms for the 2018 tax year, so their complaints to the CFO and/or the comptroller and/or one or more of the Aaronson Defendants (including David Baron in particular) increased.

86. On or about March 5, 2020, the Aaronson Defendants responded for the first time with a reaction other than trying to continue to delay and put off the Deos: Defendant Asad Khan stormed into NorthShore's offices in Syosset, New York, and began yelling, threatening, and acting like a mad man. This incident is hereinafter referred to as the "Khan" incident.

87. While yelling in the middle of NorthShore's showroom, Khan threatened the lives of both Sara Deo and Anthony Deo, and demanded that both of them vacate, leave, and never come back to NorthShore while also specifically yelling that NorthShore "belongs to me [Khan] and my partners."

88. The police were called, investigated Khan's claims, spoke with Anthony Deo, and Khan was escorted out of the dealership by the police, who told Khan in front of Anthony Deo that the Deos were the owners of the business and not Khan; the policeman also said that he thought Khan was drunk that day.

89. In reality, this was a slip by the Aaronson Defendants insofar as the incident *almost* alerted the Deos to the fraud that already took place by the Aaronson Defendants stealing the NorthShore business from the Deos, but the Deos at that time still did not know about the theft. In fact, after the policeman sided

with the Deos during the Khan incident, the Deos thought that Khan was just drunk and never gave his claims of ownership another thought.

90. In the ensuing few months after the Khan incident, David Baron fed the Deos more lies about tax filing delays, apologized for the Khan incident and claimed he (Khan) *was* merely drunk that day, and did all he could to assuage the Deos' concerns over the Khan incident. But David Baron also pressured Anthony Deo to change the terms of their agreement, demanding that Deo pay more money to the Aaronson Defendants for the floor plan provided; David Baron's "carrot and stick" method caused his relationship with the Deos to change over the next few months, worsening through and until June 16, 2020.

91. On or just before June 16, 2020, Anthony Deo received word that his father was dying and would not live much longer. Anthony Deo called and spoke to David Baron on the morning of June 16, 2020, to inform David Baron that the Deos would be away from NorthShore to deal with the imminent death of Anthony Deo's father; Anthony Deo's father did die on June 17, 2020.

92. While absent from NorthShore's offices on June 16-17, 2020, the Deos learned that David Baron emptied all cars from the lot at NorthShore, and somehow locked the Deos out of NorthShore's bank account(s) at Chase Bank. This date/situation is hereinafter referred to as the "David Baron incident."

93. When the Deos returned from dealing with the death of Anthony Deo's father, they found that all company files, records, books, recording/security cameras,

and most important, all company cars were gone. The business basically did not exist anymore.

94. The David Baron incident was, in reality, a display of power by David Baron in order to get what he wanted from the business and to control the Deos and prevent them from discovering the frauds; David Baron also wanted more money knowingly being paid by the Deos for the floor plan after they resisted David Baron's requests for several months after the Khan incident. In addition, the David Baron incident temporarily scared the Deos and stopped them from asking about the tax preparations and forms; it is now known (since Chase Bank gave the Deos documents during 2024 in Action #2, *infra*) that the David Baron incident was staged mainly by the Aaronson Defendants to obtain and utilize NorthShore's corporate book for 100% fraudulent purposes.

95. Within days of the David Baron incident, discussions between David Baron for the Aaronson Defendants and Anthony Deo took place and seemingly resolved all differences, leading to another series of ongoing events all meant to continue to perpetuate fraud by the Aaronson Defendants against the Deos.

96. In addition to the money that the Deos now know were taken without authorization by the Aaronson Defendants from company account(s) like a piggy bank, a new agreement was leveraged into being by the David Baron incident for even more money per month to be paid by NorthShore and the Deos to the Aaronson Defendants from the NorthShore accounts and/or the Deos' personal accounts.

97. Thereafter, the Aaronson Defendants returned all company cars and access to all company software to allow NorthShore to re-open and continue operations.

98. However, not all of the company's records were returned. While upon first glance the Deos thought all company records were returned, they eventually realized and learned that the company's corporate book was never returned. The David Baron incident helped the Aaronson Defendants to steal even more money from NorthShore and the Deos, lead to more known payments by the Deos, and actually helped the Aaronson Defendants the most through obtaining the corporate book and records without the Deos knowing it initially.

99. Throughout the second half of 2020 after the David Baron incident, David Baron repeatedly expressed remorse to both Deos for the incident he perpetrated on June 16-17, 2020, and kept telling the Deos that he was "going to make up for it." Like Bernie Madoff, David Baron on behalf of the Aaronson Defendants was about to deepen the fraud against the Deos with further promises of riches.

### B. 189 Sunrise Hwy Auto LLC

100. During or about the end of 2020, David Baron proposed and arranged for the Deos to buy 189 Sunrise Hwy Auto LLC, a smaller used car business than NorthShore located at 189 Sunrise Highway, Amityville, Suffolk County, New York.

101. During February 2021, at David Baron's urging, the Deos arranged to purchase 189 Sunrise and paid fifty thousand dollars ($50,000.00) therefore.

Attached hereto as Exhibit D are true and accurate copies of the payments related thereto. At all times relevant hereto, Anthony Deo and David Baron agreed that the sale of 189 Sunrise to the Deos would be a "stock sale," meaning that the corporation's stock would be transferred to the Deos, leaving the corporation in place so that no new licenses, software agreements, or Floor Plan changes would become necessary. In reality, it allowed the Aaronson Defendants to withhold paperwork and stock transfers and keep ownership for themselves, surreptitiously and without the Deos' knowledge.

102. Naturally, after purchasing the business known as 189 Sunrise, the Deos entered into a lease with the landlord/owner of the property. Attached hereto as Exhibit E is a true and accurate copy of the lease entered into by Anthony Deo at the property located at 189 Sunrise Highway, Amityville, New York, in order to allow Anthony Deo to operate the business thereon. Thereafter, Deo was responsible for and made all lease payments at that property, just as the Deos were responsible for and made all lease payments for the property where NorthShore was located since the commencement of the lease for NorthShore.

103. Although the Deos immediately took over the operation of 189 Sunrise after paying for same, their pleas for finalized closing papers/stock transfers were met with the usual delay tactics from the Aaronson Defendants, "they're being prepared," "they're coming," "the [Professionals] are busy" and other statements were told to the Deos at various times first by David Baron and then Josh Aaronson merely as delay tactics.

104.     Although it appeared as though the Deos were the owners and they

certainly paid the money attached hereto as Exhibit D to become the owners

of 189 Sunrise (and even took over day to day operations of 189 Sunrise after

that money was paid), the Aaronson Defendants were, in fact, doing the same

thing in stealing the Deos ownership interests in 189 Sunrise by *not* producing

corporate/closing documents that they perpetrated upon the Deos with

NorthShore:  Behind the scenes and without the Deos' knowledge or approval,

the Aaronson Defendants continued to file all tax forms and returns for 189

Sunrise *as if they were still owners when they were not.*

105.     In the months after the 189 Sunrise Sale, the Deos pushed for the closing

documents for that sale, and also for the corporate book and records for 189

Sunrise to be turned over to the Deos; it was during this time in 2021 that the

Deos first discovered that the corporate book and records for NorthShore were

not returned to NorthShore after the David Baron incident about ten (10)

months earlier.

### C.  Baron Nissan

106.     When confronted by Anthony Deo about the closing documents for 189

Sunrise and corporate books for 189 Sunrise and also NorthShore, David

Baron on behalf of the Aaronson Defendants turned into Bernie Madoff yet

again:  This time he promised to sell the Deos the business known as Baron

Nissan.

107.     During or about May 2021, David Baron on behalf of the Aaronson

Defendants sold to Anthony Deo the business known as Baron Nissan.

Attached hereto as Exhibit F are true and accurate copies of the documents and checks executed in connection with that sale; the Deos paid two hundred fifty thousand dollars ($250,000.00) to purchase Baron Nissan and an additional twenty plus thousand dollars ($20,000.00+) for the first month of rent for that dealership.

108.    It is the express intention of Plaintiffs that the documentation attached as Exhibit F indicating the sale of Baron Nissan is either 1) completely finished and indicates that the sale was finished, or, in the alternative, 2) partially finished and Anthony Deo stepped into the shoes of David Baron at Baron Nissan at the very least at that time.

109.    Later that month (May 2021), with the Deos prepared to physically and actually take over Baron Nissan on June 1, 2021, David Baron died.

### D.  After the Death of David Baron

110.    After the death of David Baron, Josh Aaronson told Anthony Deo that the family needed time to grieve David's death; this was merely another delay tactic by the Aaronson Defendants preventing the Deos from discovering the frauds being committed upon them and their companies.

111.    During or about the fall of 2021, Josh Aaronson informed the Deos that 1) the Aaronson Defendants were not going to "finish" the Baron Nissan sale; 2) that the Baron Nissan deal was not "a done deal;" 3) that the Aaronson Defendants would continue to provide the floor plan at NorthShore and 189 Sunrise, but only for even more money and only if the Deos stopped complaining about tax documents and the Baron Nissan deal.

112.    Aaronson further explained that if the Deos did not like what he, Aaronson, was telling them, he would make sure that the floor plans for NorthShore and 189 Sunrise were immediately shut down, and that the Aaronson Defendants would take back all of "their" cars and ruin the businesses for the Deos.

113.    Simply put, the Deos knew that they had no say and no leverage at their own dealerships (that had literally been stolen from them without their knowledge), and that Aaronson's threats were real, since they also knew that the removal of the cars from the dealerships and cessation of the floor plan at the dealerships would ruin the businesses and had already occurred once before.  The Deos were forced and leveraged into paying even more money to the Aaronson Defendants given the very real and dangerous threats to ruin the businesses.

114.    Thereafter, the Deos demanded either that they be allowed to take over Baron Nissan or that their money be returned from the Baron Nissan deal; Aaronson refused both requests and again threatened to shutter NorthShore and 189 Sunrise.

115.    The Deos asked for NorthShore's and 189 Sunrise's corporate books to be returned to the dealerships; Aaronson refused and again threatened to shutter NorthShore and 189 Sunrise.

116.    The Deos continued to demand tax documents in connection with their ownership interests in NorthShore and 189 Sunrise; initially (after David Baron's death) Josh Aaronson told the Deos to continue to be patient, that it

"wouldn't be much longer" before he would arrange for them to get the tax documents that were required to be given to owners.

117.    In reality, the Aaronson Defendants knew that they were playing "keep away" from the Deos and were just dragging the situation out to steal as much money as they could and to continue creating documents that feigned ownership of the two companies until an eventual departure from the dealerships by the Aaronson Defendants could no longer be avoided.

118.    During June, 2021, the Deos, no longer able or willing to wait in the face of repeated delays and misleading statements from the Aaronson Defendants, and panicked that the Aaronson Defendants first through David Baron, then through Josh Aaronson, Wendy Kwun, and Daniel O'Sullivan, kept telling the Plaintiffs that tax filings were delayed as the reason the Deos were not given tax filings, filed their own tax returns for NorthShore utilizing the actual and accurate numbers kept on the company's software at the company's Syosset, New York location.

*119.*    Unbeknownst to the Deos, in September, 2021, RWC filed fake tax returns for NorthShore alleging ownership not by the Deos but rather by one or more of the Aaronson Defendants; upon information and belief, the numbers utilized in the September 2021 tax filings by RWC were fictitious, not from the company's software, were made up to help the Aaronson co-Defendants in each of their own personal tax filings as well as multiple tax filings by the Island Auto Group stores; upon information and belief the falsity of these filings were known to RWC, each of its participating accountants, and each of

the individual Aaronson co-Defendants.  The September 2021 tax filings by RWC for NorthShore and all related filings for the individual co-Defendants made by RWC at the co-Defendants' direction were false, knowingly false by each of the parties and RWC that RWC filed for in 2021, were made at the direction of the Aaronson Defendants to RWC, and the corporate filings for NorthShore were made without the permission or authority of the Deos.  The information and documentation proving these frauds are exclusively in the possession, custody and control of the Aaronson co-Defendants and RWC, has been demanded by the Plaintiffs, and refused to be turned over (except for the documentation attached as Exhibit Z, which the Deos obtained in late 2022; *see infra*) by the Aaronson Defendants and RWC.

120.    True and accurate copies of the inconsistent tax filings in June and September, 2021, for NorthShore are attached hereto as Exhibit Z.

121.    On or about mid-September, 2022, Aaronson and Wendy Kwun's attitude with the Deos over tax documents changed (obviously) because Wendy Kwun in particular discovered the June, 2021 tax filings for NorthShore made by the Deos, which could have caused the Aaronson Defendants' empire built on lies and tax fraud to crumble:  The Deos were invited to utilize the Aaronson Defendants' new accountants, Citrin Cooperman, to prepare the tax documents as they saw fit for NorthShore and 189 Sunrise, and Aaronson and Kwun would review and approve them for accuracy, which the Deos still did not think had anything to do with ownership, which was inarguably theirs (the Deos) since before September of 2022.

122.    Attached hereto as Exhibit G are true and accurate copies of the email

approvals from Wendy Kwun and Josh Aaronson (Wendy Kwun's direct

boss); these emails make clear that the Aaronson Defendants (and their new

accountants, Citrin Cooperman) knew and approved of the Deos as owners of

both businesses, even though no changes in the operation or ownership took

place contemporaneously with the preparation and filing of the tax documents

accompanying those emails.

123.    Attached hereto as Exhibit H are true and accurate copies of the tax

returns as approved for filing in Exhibit G by Wendy Kwun (an Aaronson

Defendant and CFO for the Aaronson Defendants) and Josh Aaronson on

behalf of the Aaronson Defendants.

124.    During and prior to the approval of the attached tax returns (Exhibit H),

Josh Aaronson's demeanor and Wendy Kwun's demeanor with the Deos

changed:  They became friendlier, and repeatedly told the Deos that the tax

situation was going to resolve "imminently."

125.    Upon information and belief, the Aaronson Defendants and/or Island Auto

Group were making and did make certain financial maneuvers that

necessitated, for the Aaronson Defendants and/or Island Auto Group,

"officially" making the Deos owners (finally) of 189 Sunrise and NorthShore;

these maneuvers in some way benefited the Aaronson Defendants and/or

Island Auto Group financially or such maneuvers never would have been

made; the Aaronson Defendants personal tax returns and their companies'

corporate tax returns will indicate clearly how the Aaronson Defendants

benefited from their corporate shell games with 189 Sunrise and NorthShore.

126.    In the months leading up to and including October, 2022, the Aaronson

Defendants cooperated in approving and filing tax returns indicating that the

Deos were the sole owners of 189 Sunrise and NorthShore (Exhibits G & H);

these returns were also approved by Citrin Cooperman; the danger of the

Aaronson Defendants' empire getting caught in its lies by the state and federal

taxing authorities were, upon information and belief, the cause of Citrin

Cooperman replacing RWC at the Aaronson Defendants' (primary or sole)

accountants.

127.    During or about the end of November, 2022, without any warning to the

Deos, each of the Aaronson Defendants jointly, wrongfully, in furtherance of

their conspiracy/plan to ruin the Plaintiffs knowingly, intentionally, and with

malice towards each of the Plaintiffs 1) took all books and records from 189

Sunrise; 2) took all automobiles from 189 Sunrise; 3) locked out the Deos

from all software required to run 189 Sunrise; 4) locked out the Deos from all

bank accounts required to run 189 Sunrise; 5) took all books and records from

NorthShore; 6) took all automobiles from NorthShore; 7) locked out the Deos

from all software required to run NorthShore; and 8) locked out the Deos from

all bank accounts required to run NorthShore. As a direct and proximate result

of these wrongful acts, 189 Sunrise and NorthShore were shuttered and

ruined; in their last full operating year, these two businesses yielded forty-four

million dollars ($44 million) in combined gross sales.

128.    Within days after ruining the businesses at 189 Sunrise and NorthShore,

the Aaronson Defendants filed a lawsuit in Nassau County (New York)

Supreme Court, *Brian Chabrier, et al., v. Anthony Deo, et al.*, Index No.

617224/2022, in which the Aaronson Defendants utilized the "best defense is

a good offense" strategy by *actually* alleging, *inter alia,* that the Deos and

their hired help stole from the Aaronson Defendants (who were, at all times

relevant hereto, *solely* in charge of *all* company finances for both companies),

and that 189 Sunrise and NorthShore belonged to the Aaronson Defendants

and not the Deos, mere weeks after approving tax returns that indicated that

the Deos were the true owners of 189 Sunrise and NorthShore, which the

Deos certainly are and remain the owners of those two businesses as set forth

in Exhibits A, B, C, D, E, G, H, U, and Z hereto.[1]

### E.    The Urrutia Defendants

129.    At the time that the Aaronson Defendants left the Deos and their

businesses shuttered and ruined during November 2022, Anthony Deo

borrowed money against the Deos' business(es) and personally guaranteed

these funds (hereinafter, the "Borrowed Money").

---

[1] At no time since December 2022, have the Aaronson Defendants filed any tax documents on behalf of 189 Sunrise or NorthShore; only the Deos have filed those tax documents.  Moreover, upon information and belief, the Aaronson's have either benefitted from including related losses on their personal tax filings since ruining 189 Sunrise and NorthShore, or, in the alternative, failed to include those companies on their personal tax filings since shuttering and ruining those two businesses. Either way is telling as to their true intentions regarding those businesses:  Either they admit that the businesses are not the Aaronson Defendants' by not including them on their tax returns, or, those businesses are included for write-off benefits, only. And of course, by ruining 189 Sunrise and NorthShore the Aaronson Defendants managed to ruin 2 of the Island Auto Group's competitors by and through the within illegal conduct.  Please also note that the first action filed by the parties hereto was actually filed by the Deos on behalf of 189 Sunrise and NorthShore via a Summons with Notice, only, in Nassau (NY) Supreme Court, index number 616542/2022. That case by and through a Summons with Notice, only, was not pursued by the Deos for judicial economy purposes given the extensive Complaint pursued by the Aaronson Defendants in Action #1.

130.    After each of the Aaronson Defendants knowingly and with malice participated in shuttering and ruining 189 Sunrise and NorthShore, Anthony Deo utilized some of the Borrowed Money to purchase an interest in co-Defendant Superb Motors Inc., a company owned and operated by co-Defendant Anthony Urrutia.

131.    Attached hereto as Exhibits I-1 and I-2 are true and accurate copies of the Agreements entered between Anthony Deo and Urrutia on or about December 1, 2022.  Through the present, Deo was and remains ready, willing and able to live up to his obligations under the Agreements attached as Exhibits I-1 and I-2.

132.    Anthony Deo met Urrutia through co-Defendant Michael Morgan (hereinafter, "Morgan").  Upon information and belief and at all times relevant hereto, Morgan was and remains banned from the automobile business as the result of an order of the New York Attorney General by and through one or more Court cases brought by the New York Attorney General against one or more of the Aaronson Defendants; Morgan ignores that order and upon information and belief, operates behind the scenes for several companies including Credit Forget It (until it closed) and Select Dealer Services; Morgan specifically assisted the Urrutia Defendants in carrying out the scheme to disenfranchise the Deos from Superb in the incident referred to herein as the Lock-Out, *infra*.

133.    When Deo commenced work at the Superb dealership, he was put in place as the hands-on owner/operator of the dealership by Urrutia, who retained

control of the company and all company finances by and through the agreements attached as Exhibits I-1 and I-2.

134.    From the time that the parties entered into the Agreements attached hereto as Exhibits I-1 and I-2, Deo and Urrutia planned for Deo to purchase the rest of the Superb dealership from Urrutia (Deo only obtained 49% ownership through the purchase attached hereto as Exhibits I-1 and I-2), and the parties also planned for Deo to purchase at least one other dealership (Mitsubishi) from Urrutia located in Hartford, Connecticut.[2]

135.    From the commencement of the agreements attached as Exhibits I-1 and I-2, Urrutia inserted Anthony Deo as the on-site operator of Superb Motors for the two partners (Urrutia and Anthony Deo), with discretion to add employees Deo deemed necessary, subject to Urrutia's approval.  In fact, Anthony Deo did hire several employees to help at the dealership with Urrutia's full knowledge and approval, including Deo's wife, Sara Deo.

136.    Urrutia retained control over all company finances by and through the agreements in Exhibits I-1 and I-2, and utilized the same types of control over company finances as the Aaronson Defendants utilized with 189 Sunrise and NorthShore:  Urrutia had the same token system in place as 189 Sunrise and NorthShore; in addition thereto, Superb also had a texting system in place for the Urrutia Defendants to control all of the company's finances. Superb's

---

[2] Although Deo commenced his due diligence for the Hartford dealership owned by Urrutia, the parties never formally conducted any written transaction in connection therewith. Urrutia has subsequently been sued by co-Defendant NMAC for defrauding NMAC by and through each of Urrutia's four companies, one each located in Massachusetts, Connecticut, New Jersey, and Superb, located on Long Island, NY.  Deo only dealt with Urrutia on Superb; the lawsuits commenced by NMAC against Urrutia allege over twenty million dollars in theft by Urrutia in the operation of these four dealerships.

token and texting systems were put into place by the Urrutia Defendants through Chase Bank.

137.     Urrutia's overseer of the accounts and finances at Superb was co-Defendant Bruce Novicky, Chief Operating Officer (hereinafter, "COO") for Superb and Urrutia.

138.     Through the token and texting systems that Urrutia put in place at Superb, Novicky had final say on all financial transactions at Superb, whether or not the Deos were working at Superb:  If Novicky did not specifically sign into one or the other system and affirmatively approve all financial transactions in a given day through at least one of those systems, then any such transaction(s) that he did not affirmatively approve would be denied by the bank.  Just as with the Aaronson Defendants at 189 Sunrise and NorthShore, the Deos had no *actual* control over *any* financial transaction at Superb; Urrutia had complete knowledge of all transactions and control over all such transactions by and through Novicky's oversight and required approval of all such transactions through the token and texting systems.

139.     Nonetheless, Anthony Deo was certainly aware of company finances, and with Urrutia's knowledge and approval looked into company finances while working at Superb in anticipation of obtaining the outstanding 51% of stock still controlled by Urrutia in Superb.

140.     By the end of February 2023, Deo noticed financial improprieties at Superb, including, but not limited to, terrible finances for 2022 as the company was losing money (Deo did not commence work at Superb until at

least December 2022, or even just after the 1st of the year in 2023). Thus, Deo informed Urrutia of his concerns, and asked the CFO at Superb (Alysia Cayer) to conduct an audit of company finances for Deo to find out what was wrong.

141. Attached hereto as Exhibit J are true and accurate copies of certain emails regarding the audit requested by Deo.

142. Immediately after Deo asked for the audit as approved by Urrutia, Urrutia fired the Urrutia Defendants' Chief Financial Officer (Alysia Cayer) and never replaced her during the time that Deo remained with Superb through the Lock-Out.

143. Upon information and belief, the firing of the CFO at Superb was committed by Urrutia out of fear that Deo would find out that Urrutia was bleeding the company of money for his own personal gain and/or to benefit one or more of Urrutia's other businesses. In addition, by firing the CFO, Urrutia was able and did, in fact, tell Deo that she, Alysia Cayer the CFO, must have been responsible for the irregularities that Deo found, in hopes that it would placate Deo's concerns over company finances.

144. When Anthony Deo joined Superb, he asked for and was granted approval by Urrutia to hire Sara Deo to help Superb, which was not in good financial standing when Anthony bought into the company.

145. In fact, Sara Deo's main skill in the automobile dealership industry is marketing; while Sara Deo worked at Superb, she increased monthly leads from dozens to thousands per month and oversaw a system where the young salespeople at the dealership called those leads to increase sales.

146.    During or about June 2023, Deo asked his own accountant to review
company finances and to produce a Profit and Loss Statement for Superb;
attached hereto as Exhibit K is a true and accurate copy of the Profit and Loss
Statement produced at that time indicating that the company's finances
improved significantly during 2023 (under the direction/operation of the
Deos) from its poor condition as it existed in 2022 (prior to the Deos
becoming involved at Superb).

147.    Thus, it was clear by early summer, 2023, that Superb's finances had
improved considerably under the day-to-day operations of the Deos.

148.    At all times relevant hereto, Anthony Deo kept Urrutia informed of the
disputes with the Aaronson Defendants, since the Agreements attached as
Exhibits I-1 and I-2 called for the cross-collateralization of the Deos' other
dealerships.  Attached hereto as Exhibit L are true and accurate copies of
certain texts between Anthony Deo and Urrutia keeping Urrutia informed in
all respects with the progress Anthony Deo made in the spring of 2023
towards re-opening dealerships at the sites of NorthShore and 189 Sunrise,
including but not limited to Deo's excitement over obtaining his own
dealership licenses for those locations while disputes commenced by the
Aaronson Defendants were sorted out in Court. Some of the exchanges also
cover Deo's request for documentation needed by Deo to open a new Superb
bank account needed and desired by Deo after obtaining, as verbally agreed
between Deo and Urrutia, full ownership by Deo of Superb.

149.     During or about mid-July 2023, Urrutia approached Anthony Deo and pressured him into completing the purchase of outstanding stock in Superb and also to purchase the stock in the Connecticut dealership owned and operated by Urrutia.  Specifically, Urrutia demanded that Deo produce at least five hundred thousand dollars ($500,000.00) "and we can do the paperwork later," Urrutia told Deo, *just as Deo had been approached and dealt with previously to his determent by the Aaronson Defendants*.

150.     Deo immediately commenced due diligence on the Connecticut dealership and told Urrutia that it would take some time to come up with the money for the two deals, and then Deo suggested to Urrutia that the paperwork could be commenced in the interim until Deo could obtain the money for these transactions.  For reasons that were unknown at the time to Deo, Urrutia seemed dissatisfied with Deo's response, and indicated that he wanted Deo to come up with that money quickly and before any paperwork was commenced or he would consider "other offers."  But as Deo informed Urrutia, it was going to take some time for Deo to obtain and deliver to Urrutia that large sum of money.

151.     Less than two (2) weeks after Urrutia demanded money from Deo without concurrent paperwork (just like the Aaronson Defendants did to Deo regarding Baron Nissan and 189 Sunrise), on August 3, 2023, Urrutia 1) locked Deo out of Superb Motors without any warning, discussion, or explanation; and 2) called the Nassau police department and claimed that Deo "stole" one hundred and four (104) cars.

152.     The Nassau police department investigated the claims made by Urrutia in conspiracy with Bruce Novicky and Michael Morgan, and determined that such claims were not proven and to date have done nothing about that criminal complaint made falsely against the Deos.

153.     The reason that the Nassau police department took no action against the Deos is transparently clear:  The Deos did nothing wrong at Superb, and Urrutia and Novicky have completely failed to date to prove *anything* illegal happened to the 104 cars that they alleged (on August 3, 2023) disappeared from the dealership.  In fact, almost all of the cars allegedly "stolen" by the Deos have since been accounted for absent any theft by anyone, which was admitted by the Urrutia Defendants in the Federal Court Action #2 they joined the Aaronson Defendants in wrongfully bringing against the Deos.  (*See*, section F, "Legal Actions Commenced by Certain Defendants Against Plaintiffs," *infra*).

154.     In fact, the allegations and lock-out (hereinafter, the "Lock-Out") that took place on August 3, 2023, were strictly a ruse and were and remain false in all respects, it was just the beginning of a plan/conspiracy devised between the Urrutia Defendants and the Aaronson Defendants to defraud Anthony Deo of their ownership interests and operation in Superb as the Aaronson Defendants had already carried out for 189 Sunrise, and NorthShore; this conspiracy initiated prior to the Court actions has since been continued and conducted by and through state and federal Court actions commenced fraudulently by the Urrutia and Aaronson Defendants (*Id.*).

155.    Later in August 2023, Urrutia joined the Aaronson Defendants in engaging in "the best defense is a good offense" strategy by suing Plaintiffs and alleging that the Deos were actually (and falsely) the wrongdoers in the three (3) dealerships at issue, Superb, NorthShore, and 189 Sunrise (Action #2), and then commenced his own action against Anthony Deo only (Action #3).

F.    <u>Legal Actions Commenced by Certain Defendants against the Plaintiffs</u>

156.    Just after 1) stealing all of the books and records still located at NorthShore and 189 Sunrise (they had already taken the corporate books from those businesses); 2) taking all of the automobiles from NorthShore and 189 Sunrise; 3) locking the Deos out of all company bank accounts for 189 Sunrise and NorthShore; and 4) locking the Deos out of all company software utilized for operating both businesses, the Aaronson Defendants commenced an action against the Plaintiffs and one or more of the Professionals for the Plaintiffs in an action styled as *Brian Chabrier, et al., v. Anthony Deo, et al.*, Nassau County (New York) Supreme Court Index No. 617224/2022 (hereinafter, "Action 1"), before the Honorable Sharon Gianelli, JSC. Attached hereto as Exhibit M is a true and accurate copy of the Complaint utilized by the Aaronson Defendants in an attempt to wrongfully utilize the Nassau Supreme Court to shut down 189 Sunrise and NorthShore; the Deos' prior filing/action brought on by Summons with Notice was discontinued after consultation with chambers from Action #1 for the purpose of judicial economy.  *See, fn. 1, supra.*

157. Action 1 was commenced by the Aaronson Defendants with the Complaint attached hereto as Exhibit M and an Order to Show Cause that effectively shut down NorthShore and 189 Sunrise (through false allegations of wrongdoing by the Deos advanced by the Aaronson Defendants) pending Plaintiffs' response and oral argument related thereto.

158. After oral argument before Judge Gianelli, the Court issued a decision that found, in relevant part, that "the [Aaronson Defendants] have failed to establish a likelihood of success on the merits [of that case], as well as [failed to establish in that case] irreparable injury in the face of the Court's denial. Further, [the Aaronson Defendants] have also fallen short in demonstrating that the equities balance in their favor." Attached hereto as Exhibit N is a true and accurate copy of the Order of the Court, Gianelli, J., dated June 15, 2023; *see* pp. 6, 7, *id.*

159. For obvious reasons including, but not limited to the fact that they 1) lost their Order to Show Cause in its entirety, 2) the Order was dismissed, and 3) the Complaint was determined to fail "to demonstrate a likelihood of success on the merits," the Aaronson Defendants were dissatisfied with having the case before Judge Gianelli.

160. Upon information and belief, Urrutia knew at all relevant times about the Aaronson Defendants both independently through his own contacts as well as through Anthony Deo, who told Urrutia all about the troubles with the Aaronson Defendants well before the Lock-Out. *See, e.g.,* Exhibit L hereto, which lays out to Urrutia Deo's actions to re-open dealerships at the sites of

the former 189 Sunrise and NorthShore and to obtain licenses to sell automobiles thereat, since the Deos still held (through the summer of 2023) the leases for those two (2) sites and were, at all times relevant hereto, the sole shareholders/members of 189 Sunrise and NorthShore, just as represented in Exhibits I-1 and I-2 by Anthony Deo.

161.    Moreover, it is beyond dispute that given the Aaronson Defendants' efforts to engage in the "best defense is a good offense" strategy by, *inter alia*, commencing Action 1, the Deos had an absolute duty to mitigate their damages, and attempted to do so by applying for their own DMV licenses to re-open dealerships where they still had the leases at the locations of NorthShore in Syosset, New York, and 189 Sunrise in Amityville, New York.

162.    Thus, Urrutia and the Aaronson Defendants joined forces during August 2023, to file a new action (Action 2) together against the Deos in a different Court (thereby conveniently avoiding the Nassau Supreme Court Judge that ruled against them), against their companies at issue, as well as against various former employees of the Deos and Professionals for the Deos in order to leverage the Deos and their former employees and Professionals.  Attached hereto as Exhibit O is a true and accurate copy of the Complaint in the Federal action hereinafter referred to as Action 2.  Once again, the Aaronson and Urrutia Defendants wrongfully stopped the Deos from opening and operating their own businesses at the locations where they still held the leases in Syosset and Amityville via their aggressive and fraudulent litigation tactics in Action 2.

163. After filing a Complaint against Deo in the Federal action (Action 2), Anthony Urrutia then filed an action against Anthony Deo in Nassau (NY) Supreme Court (Action 3). A true and accurate copy of the Complaint in Action 3 is attached hereto as Exhibit P.

164. In all respects, the allegations in Actions 1, 2 & 3 by each of the Urrutia Defendants and each of the Aaronson Defendants against the Deos and the Deos' employees, accountant and attorney are transparently false, are intentionally false, and constitute a fraud upon the Courts that said allegations even exist; the allegations against the Deos et al., are merely an attempt to cover up the wrongs committed by each of the Urrutia Defendants and each of the Aaronson Defendants, as well as to prevent the Deos from being able to fund their own and their companies', employees', accountant's and attorney's defenses and potential claims by keeping shuttered the businesses that the Deos own and rightfully should be operating, 189 Sunrise and NorthShore (entirely), and Superb (in partnership with Urrutia).

165. The fraudulent Court actions commenced by each of the Urrutia Defendants and each of the Aaronson Defendants who commenced those actions constitute transparent attempts to engage in "the best defense is a good offense" strategy.

166. Moreover, after nearly two years of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Aaronson Defendants have not obtained (e.g., through subpoenas) nor produced a single document

proving any theft by the Deos by or from 189 Sunrise or NorthShore at any time.

167.    Additionally, after one year of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Urrutia Defendants have not obtained (e.g., through subpoenas) nor produced a single document proving any theft by the Deos by or from Superb at any time.

G.    Cozy Relationships amongst the Defendants

168.    At all times relevant hereto and upon information and belief, each of the Urrutia Defendants, each of the Aaronson Defendants (both with and after David Baron), RWC and each of its accountants involved with the parties hereto, both co-Defendant law firms and each of the attorneys for and with those firms who represented any parties hereto against the others at any time, Chase and various of its employees unknown to Plaintiffs, and Ally, NextGear and NMAC and various of its employees largely unknown to Plaintiffs at this time (whether named or unnamed as Defendants herein) established and enjoyed relationships with the named banks/lenders (whether named or unnamed as Defendants herein) by and through a series of representatives working on behalf of the banks/lenders with and for the Urrutia and Aaronson Defendants (hereinafter, the "Representatives").

169.    The known Representatives for Chase at all relevant times hereto were Deborah Womeldorf, Rajni Khanna, Anthony Tropiano, Javier Cruz, Christopher Varous, Samantha Phillips, Jim Simonetti, Rosa Pesce, and Jason

Kush; upon information and belief, there are more Representatives for Chase currently unknown to Plaintiffs.

170.    The known Representatives for NextGear at all relevant times hereto were Jonathan Abbot and Vincent Fallacaro; upon information and belief, there are more Representatives for NextGear currently unknown to Plaintiffs.

171.    The Representatives for NMAC at all relevant times hereto were Joseph Bennetta, Jack Crowley, Ron Das and Nathan Newell; upon information and belief, there are more Representatives for NMAC currently unknown to Plaintiffs.

172.    The known Representatives for Ally at all relevant times hereto were Kelly-Ann Foster and Cindy O'Pharrow; upon information and belief, there are more Representatives for Ally currently unknown to Plaintiffs.

173.    The relationships between each of the co-Defendants with the bank's/lenders' Representatives specifically named herein were lucrative for all co-Defendants in this action.

174.    On the one hand, these relationships between each of the Urrutia Defendants and the bank's/lenders' Representatives, and between each of the Aaronson Defendants and the bank's/lenders' Representatives, left the Urrutia and Aaronson Defendants with huge sums of money available to them to fund their businesses and lavish lifestyles.  The Defendants' lavish lifestyles include, but are not limited to, multiple homes both domestic and foreign, multiple vacations yearly each both domestic and international, jewelry and gifts for spouses and family members along with false payroll and PPP monies

for no show jobs for those spouses and family members, and, of course, luxury automobiles for the Defendants and their entire families.

175.    Ally, NextGear, NMAC, and Chase made at least tens of millions of dollars (or more) over the years lending money to the Urrutia Defendants and especially the Aaronson Defendants, and certainly did not want those lucrative relationships with those Defendants to end or be disrupted.

176.    E.g., the Urrutia Defendants and the Aaronson Defendants frequently listed automobiles on more than one Floor Plan, as each of their multiple dealerships had its own Floor Plan, thereby allowing the Urrutia Defendants and Aaronson Defendants to list cars on multiple Floor Plans, getting money made available to these Defendants in multiple amounts, instead of rightfully obtaining only one amount for each automobile listed (e.g., each automobile has only one value; these Defendants engaged in illegal valuations of some of their dealerships' autos, then listed that auto on the Floor Plan of more than one dealership in order to obtain multiple amounts of money/value for each automobile).

177.    The practice of putting automobiles on more than one Floor Plan is called "Double Flooring" in the automobile dealership business, is known by all in the automobile dealership business, is illegal in all respects, and in the instant action, was known and intentionally ignored by Ally, NextGear, and NMAC to the detriment of the Plaintiffs; the Double Flooring of automobiles by each of the Urrutia and Aaronson Defendants contributed to the draining of money

and ruination of the three dealerships (Superb, NorthShore, and 189 Sunrise) at issue by the Urrutia and Aaronson Defendants.

178.    At all times relevant hereto, Ally, NextGear and NMAC intentionally ignored and refused to listen to the Deos, who had no ability to put any car on or off of any Floor Plan for any of the three relevant dealerships despite being the owners thereof, which is an important part of the Chinese Wall carefully constructed by the Urrutia Defendants and the Aaronson Defendants to allow these Defendants to completely control 100% of the finances at Superb, NorthShore, and 189 Sunrise; nonetheless, at all times relevant hereto, Ally, NextGear, NMAC and Chase knew and should have known of the involvement of the Deos in the three dealerships in which the Deos held interests: Superb, 189 Sunrise, and NorthShore.

179.    The intentional ignorance of Ally, NextGear, NMAC, and Chase was part of the Cozy Relationships between the Urrutia Defendants/Aaronson Defendants and Ally, NextGear, NMAC, and Chase at all times relevant hereto, driven in all respects by simple greed.

180.    At all times relevant hereto, each of the Representatives for Ally, NextGear, NMAC, and Chase were and are Caucasians, in contrast with the Deos' African and Caribbean heritage.

181.    At all times relevant hereto, each of the Aaronson Defendants and each of the Urrutia Defendants held various meetings and parties with the Representatives of Ally, NextGear, NMAC, and Chase; upon information and

belief, one or more gifts were even exchanged between these parties at such meetings and parties (hereinafter, the "Cozy Relationships").

182.    From time to time, the meetings and parties constituting Cozy Relationships between each of the Urrutia Defendants and each of the Aaronson Defendants with the Representatives Ally, NextGear, NMAC, and Chase were held at restaurants and banquet halls in and around New York City and Long Island, New York.

183.    Periodically, the Deos asked each of the Urrutia Defendants and each of the Aaronson Defendants if the Deos could attend these meetings and parties between the Urrutia Defendants and the Representatives of Ally, NextGear, NMAC, and Chase, and also between the Aaronson Defendants and the Representatives of Ally, NextGear, NMAC, and Chase.

184.    Without exception when making such requests, the Deos were told that "you people" are not invited to these meetings and that the Representatives of Ally, NextGear, NMAC, and Chase "don't want you people at the meetings" even though the meetings were for NorthShore and/or 189 Sunrise and/or Superb at times that the Deos were shareholders/operators of these businesses, as (deceptively, at times) agreed to by each of the Urrutia Defendants and each of the Aaronson Defendants.

### G1: Chase Bank

185.    At all times relevant hereto, Chase Bank was the provider of bank accounts for NorthShore, 189 Sunrise, and Superb Motors.

186.    Attached hereto as Exhibit C are true and accurate copies of documents utilized by Sara Deo to open the bank account(s) at Chase Bank for NorthShore.

187.    Attached hereto as Exhibit Q are true and accurate copies of documents provided by Chase Bank to the Deo Plaintiffs during 2024 court proceedings (in Action 2 in U.S. District Court/EDNY) pertaining to the same account(s) originally opened by Sara Deo with Chase Bank on behalf of NorthShore.

188.    Attached hereto as Exhibit R is a true and accurate copy of a document executed by Sara Deo on or about November 8, 2018, adding David Baron to the Chase account(s) for NorthShore opened by Sara Deo as set forth in Exhibit C hereto for signatory purposes only.

189.    The Deos were treated differently by Chase than the way Chase treated the Urrutia and Aaronson Defendants.

190.    In the immediate aftermath of the David Baron incident during mid-June 2020, Sara Deo went to Chase because she learned there were problems with the account(s) she originally opened for NorthShore during or about January 2018.

191.    At that time, Sara Deo still believed that the account(s) belonging to NorthShore were owned and operated by her, as she originally set up the account.

192.    At that time, Chase, by and through Jane Doe 1, refused to allow Sara Deo to access her own account without first "producing tax returns proving that you [Sara Deo] are the true owner of NorthShore," which the Deos

subsequently learned such tax returns listing them as owners did not exist because the corporation was stolen from them by the Aaronson Defendants by and through, *inter alia*, filing false tax returns.

193.     On and after June 16, 2020, the day of the David Baron incident, David Baron (at first, then Josh Aaronson after David's death in May of 2021) told the Deos to just continue writing checks as before (all of which were known to the Aaronson Defendants necessarily by and through the Token and Positive Pay systems).

194.     However, only after the Aaronson Defendants shuttered NorthShore (and 189 Sunrise) during November 2022, the Deos learned from one or more Chase employees at that time that 1) Sara Deo no longer owned or operated the Chase account for NorthShore; and 2) Sara Deo no longer owned or operated the Chase account for 189 Sunrise, since these accounts were closed by unidentified Aaronson Defendants then on the accounts as owners entirely without any authority and without the Deos' knowledge or approval.  Chase allowed the removal of Sara Deo as owner (and Anthony Deo's privileges) from the Chase accounts for Plaintiff corporations without any notice, not a phone call or conversation, without checking in any way with the Deos, and then refused to give any information or access to the Deos to their own corporate accounts consistently and on-going since.

195.     Accordingly, Sara Deo went to Chase and spoke with Deborah Womeldorf, one of the Representatives with Chase who knew and worked with the Aaronson Defendants and the Deos over time.

196.    On the occasion of late November 2022 that Sara Deo spoke with Chase

Representative Womeldorf, Sare Deo did so for the purpose of removing the

Aaronson Defendants from the NorthShore account(s) she opened for

NorthShore.

197.    On this occasion, the Deos (remembering the request for tax returns from

Chase in the aftermath of the David Baron incident) brought the tax returns

attached hereto as Exhibit H (as approved by the Josh Aaronson Defendants in

the email chain attached hereto as Exhibit G) with them to straighten out the

situation, but this time, Ms. Womeldorf conveniently (again, to the Aaronson

Defendants' benefit and the Deos' detriment) refused to even look at the tax

returns, and refused all of Sara Deo's requests to resolve the situation or

remove the Aaronson Defendants from the accounts for the two corporations.

198.    At all times relevant hereto, Chase Bank provided use of the token system

and the Positive Pay system for the accounts Chase provided to NorthShore

and to 189 Sunrise.

199.    At all times relevant hereto, Chase Bank provided use of the token system

and text confirmations for the accounts Chase provided to Superb Motors.

200.    David Baron died during May 2021.

201.    From the date of David Baron's death through and including the shuttering

of NorthShore's and 189 Sunrise's businesses and accounts by the Aaronson

Defendants in November 2022, the Aaronson Defendants utilized (the

deceased) David Baron's tokens and passwords and usernames to access and

authorize account activities for (at least) the NorthShore and 189 Sunrise accounts.

202.    This use of the deceased David Baron's credentials to access and eventually drain the accounts of all funds in those accounts constitutes criminal fraud and wire fraud at the very least, and was committed in conspiracy with and with the knowledge, allowance, and intentional ignorance of Chase Bank by and through its employees and Representatives.

203.    Immediately after the Aaronson Defendants shuttered NorthShore and its bank accounts in November 2022, Anthony Deo arranged to borrow money ($735,000.00) against his ownership interest in NorthShore, having been acknowledged as the 99% shareholder only weeks before by the Aaronson Defendants and their Accountants (*see* Exhibits G and H).  This loan was obtained solely by Anthony Deo for his companies, 189 Sunrise and NorthShore, and was solely personally guaranteed by Anthony Deo; these funds were intended to save NorthShore and to obtain an interest (with cross collateralization) in Superb.  *See* Exhibits G, H, I-1 and I-2 attached hereto.

204.    During late November 2022, by and through the illegal use of the deceased David Baron's credentials as intentionally allowed and ignored by Chase Bank, the Aaronson Defendants stole that money ($735,000.00) from 189 Sunrise's Chase account "on their way out the door" and shockingly, deposited those funds into one or more of their own corporate accounts.  Upon information and belief, the Aaronson Defendants put that money into an account belonging to Baron Nissan.

205.    Upon learning of the theft, Anthony Deo reported the theft to the Nassau

County (New York) Police Department.  Attached hereto as Exhibit S is a true

and accurate copy of the police report of the incident.

206.    The police contacted the Aaronson Defendants by and through Josh

Aaronson and informed Josh Aaronson that if he did not return the money

immediately, he would be charged with at least one (1) felony criminal

charge.

207.    Thereafter, Aaronson, by and through one or more attorneys from CSZ,

returned the money to Anthony Deo's then attorney, who returned the money

to Anthony Deo, the rightful owner by and through his businesses and

personal guarantee.

208.    By and through his theft of money from Anthony Deo's account just

weeks after personally (and on behalf of the Aaronson Defendants) approving

Deo as the 99% shareholder of NorthShore, Josh Aaronson committed

criminal fraud (by and through the actual theft), criminal conversion (in

conjunction with other Aaronson Defendants by putting the money into one or

more unrelated corporate accounts), criminal theft (stealing the money),

criminal conspiracy (with the co-Aaronson Defendants and Chase Bank and

one or more of Chase Bank's Representatives), federal criminal wire fraud (by

and through the use of a dead man's electronic credentials in conspiracy with

one or more of Chase Bank's Representatives who intentionally ignored both

David Baron's death and the use of the credentials for a year and a half after

his death), and perjury and fraud upon the Court (by and through false

allegations in the Court cases known herein as Action 1 and Action 2; *see* Exhibits M and O).

209. Even worse, Chase Bank had every opportunity to protect their contractual relationship with the Deos and 189 Sunrise and NorthShore, but failed to do so and conveniently ignored information attached hereto that constitutes breaches *per se* of Chase's contractual relationship with 189 Sunrise and NorthShore, and constitutes breaches *per se* of Chase's obligation to engage in good faith and fair dealing given their contractual relationship and fiduciary relationship with these corporate Plaintiffs and the corporate shareholders, the Deos.

210. At all times relevant hereto, Chase knew and should have known of David Baron's death, yet failed to safeguard the Plaintiffs by preventing the use of that dead man's credentials for more than a year and a half after his death until the accounts were drained and closed by the Josh Aaronson lead Defendants.

211. Attached hereto as Exhibit C are the documents indicating Sara Deo's opening of the corporate bank account for NorthShore by and through Chase Bank.

212. Attached hereto as Exhibits Q and R are documents provided by Chase Bank to the Plaintiffs through Action 2 evidenced herein by the Federal Complaint attached as Exhibit O.

213. Any fair reading of these documents alerts the reader to the following incontrovertible facts:

a) Sara Deo opened the NorthShore Bank account during January 2018 (*see* Exhibit C); the documents attached as Exhibit C have been known to Chase and in Chase's possession, custody and control since January, 2018;

b) On November 8, 2018, Sara Deo added David Baron as a signatory to the corporate account for NorthShore (*see* Exhibit R, "Business Account Add Signers Form" produced by Chase to the instant Plaintiffs during and through Action 2); the document attached as Exhibit R has been known to Chase and in Chase's possession, custody and control since November 8, 2018;

c) On and about June 16, 2020, the Aaronson Defendants provided to Chase the eight (8) pages of documents attached hereto as Exhibit Q; the first four (4) pages were faxed to Chase on June 16, 2020, from "Baron Nissan" as set forth in the "fax confirmation print" at the top of each page; the second four (4) pages were delivered to one or more of Chase's Representatives in hand and executed in front of said Representative(s) on the date of each such page between June 16, 2020 and June 18, 2020; these documents were never given to the Deos until 2024; the withholding and failure to even talk to the Deos regarding these documents from Chase constituted on-going violations of their contractual relationship with the Plaintiffs through at least the spring of 2024.

214.    On June 16, 2020, the Aaronson Defendants took advantage of the imminent death of Anthony Deo's father; to do so, they had a plan that required instantaneous reaction to NorthShore *not having either Sara Deo or Anthony Deo present, as one or both always otherwise were.*

215.    On the morning of June 16, 2020, Anthony Deo informed David Baron that Anthony's father was dying, and that he and his wife Sara would be out of the office for the next day few days to deal with his father's impending and expected death.

216.    Whereupon, the Aaronson Defendants, then-led by David Baron, put their plan into immediate action, and rushed to the NorthShore dealership and cleaned it out, mostly as a smokescreen for what the Deos now know (since the production of documents by Chase in Action 2 during 2024, only) was the Aaronson Defendants' real purpose:  The Aaronson Defendants had long since (by the date of the David Baron incident, June 16, 2020) stolen the Deos' corporation, slowly, over time by various acts including filing tax documents, but what the Aaronson Defendants did not have until June 16, 2020, was the corporate book as opened and kept by the Deos, since the Deos had the corporate book since they opened the corporation, obtained the EIN number (Exhibit A hereto), entered into the lease for the space for NorthShore (Exhibit B hereto), opened the Chase Bank account(s) for NorthShore (Exhibit C hereto), and obtained the corporate book for NorthShore (Exhibit U hereto).

217.    But once the Aaronson Defendants obtained the corporate book from the Deos/offices of NorthShore on June 16, 2020, they fraudulently filled out

documents that are transparently fraudulent for all (including Chase and its Representatives) to see:

   a)  Page 1 of Exhibit Q indicates that David Baron, Brian Chabrier, and Asad Khan are the "Managing Members" of NorthShore as of "February 14, 2018" (the fax print clearly indicates this document was sent along with the next three pages to Chase at and immediately after 5:00 p.m. on June 16, 2020, from "Baron Nissan");

   b)  Pages 2-4 of Exhibit Q indicate that David Baron, Brian Chabrier, and Asad Khan were members of NorthShore Motor Leasing LLC ("NorthShore") since January 4, 2018;

   c)  Page 5 of Exhibit Q indicates that David Baron signed the document in front of a Chase Representative on June 16, 2020, the very day Baron stole the corporate book from NorthShore;

   d)  Page 6 of Exhibit Q indicates that David Baron removed Sara Deo from the account on June 16, 2020; again, this is an account(s) that *Sara Deo opened* (*see* Exhibit C hereto) for the Deos' corporation, NorthShore;

   e)  Page 7 of Exhibit Q indicates that David Baron and Brian Chabrier added their names to the accounts on June 16, 2020; and

   f)  Page 8 of Exhibit Q indicates that on or about June 18, 2020, the Aaronson Defendants caused a letter from RWC to be hand delivered to Chase's Representative (there is no mailing address on the letter, it had to be hand delivered to Chase for Chase to have it to turn over in

Action 2 during 2024); this letter is also a transparent attempt to falsely claim ownership of NorthShore since "2018" as set forth by the Aaronson Defendants' accountants, Richards, Witt & Charles, LLP, by named partner Paul Charles, a CPA.

218.    The reason that the documents set forth in Exhibit Q are transparently false is because for the documents set forth in Exhibit Q to be true and accurate, Exhibit R *would not exist.*

219.    Exhibit R is the document through which Sara Deo, the owner and opener of the account(s) at issue for NorthShore at Chase, added David Baron to the account.

220.    If, as set forth in Exhibit Q, David Baron, his partner Asad Khan, and his partner Brian Chabrier were already the owners/members of NorthShore since January and/or February, 2018, then there would be no need for Sara Deo to add David Baron as a signatory to the accounts at Chase; *Baron could and would do so himself through the corporate book that he and his partners would have owned and controlled.* Sara Deo added David Baron to the account since 1) he requested it; given that 2) he was the then-agent/leader of the Aaronson Defendants (and spoke for all of them with regard to the Plaintiffs), the Deos' contractual partners/Floor Plan provider at NorthShore, certainly not because he was an owner/member of NorthShore, neither he nor Chabrier nor Khan were ever made members or owners of NorthShore, they simply stole their purported ownership interests with their decades of inside knowledge of the automobile business over time, with the plan finalized (and

unintentionally revealed) once they stole the corporate book on June 16, 2020 and sent Chase the documents attached hereto as Exhibit Q.

221.    In contrast, the Deos' first automobile venture was, in fact, Premier Autos, NorthShore's predecessor, making them lambs lead to slaughter by David Baron and the Aaronson Defendants.

222.    Startlingly, Exhibit U hereto provides further irrefutable proof of the scheme engaged in by the Aaronson Defendants with Chase Bank regarding the theft of Plaintiffs' Chase Bank account(s) on June 16, 2020, the date of the David Baron incident:  Exhibit U is a true and accurate copy of the receipt for the payment made by Anthony Deo to the Notary Superstore of Huntington Station, New York, to produce the corporate book for NorthShore Motor Leasing LLC, co-Plaintiff herein, clearly dated June 7, 2018, which Deo obtained once the lease was assigned from Premier to NorthShore at the 180 Michael Drive location.

223.    Therefore, it is an impossibility for David Baron, Asad Khan, and Brian Chabrier to have been assigned stock certificates on January 4, 2018, as set forth and attached hereto in Exhibit Q *at* pages 2-4 from the NorthShore corporate book *that wasn't created or produced until more than five (5) months later as set forth in Exhibit U.*  The frauds and extent of frauds and other wrongdoings by the Aaronson Defendants and the Professionals were not known by the Plaintiffs until Chase produced the documents attached hereto as Exhibit Q during document production in Action #2 in 2024 due to the intentionally surreptitious, sneaky, and underhanded methods/conspiracy

by the Aaronson Defendants in conjunction with the RWC, its accountants, and whatever Chase employees were, upon information and belief, likely being paid off in cash from the Aaronson Defendants/Billionaires.

224. Exhibit U inarguably establishes that the Aaronson Defendants lead by David Baron and then Josh Aaronson, their agents at all times relevant hereto with regard to Aaronson Defendants' dealings with any of the Plaintiffs, committed criminal fraud, criminal theft, and criminal wire fraud when they created and caused the purported corporate documents attached hereto in Exhibit Q to be wired/faxed/delivered to Chase Bank on and after June 16, 2020, and they did so in conspiracy with and the cooperation of RWC and Chase Bank itself.

225. When Sara Deo added David Baron to the Chase account(s) as set forth in Exhibit R, he gained further control over the money at the dealership, but could not "prove" his ownership (which he and Khan and Chabrier outright stole) until the death of Anthony Deo's father left the dealership unguarded by the Deos, and then the longstanding plan to steal the corporate book and back-date the documents attached as Exhibit Q was put into action on June 16, 2020.

226. Even if Chase and its Representatives claim that they did not know of the scheme by the Aaronson Defendants to outright steal ownership of NorthShore prior to June 16, 2020, it is impossible to look at the documents attached hereto as Exhibits C, Q, and R (which Chase already possessed when the documents in Exhibit Q arrived after hours on the evening of June 16,

2020) without knowing *immediately* that the documents in Exhibit Q are phony, and a mere phone call to their longtime contracted account holders (the Deos) would have revealed the scheme to everyone. The documents attached hereto as Exhibits C, Q, and R have been fully in Chase's possession, custody, and control since no later than June 18, 2020, and were, at all relevant times, ignored by Chase since that date; the breaches set forth in this paragraph in conjunction with on-going breaches thereafter by Chase in allowing, *inter alia,* the use of a dead man's (David Baron's) credentials by Aaronson Defendants unknown to Plaintiffs given Chase's refusal to cooperate with Plaintiffs on the accounts at issue does not allow for the stoppage of the statute of limitations clock until at least the spring of 2024 when Chase turned over the exhibits attached hereto, if then given that Chase still refuses to cooperate with their contracted account holder, Sara Deo, on behalf of NorthShore and 189 Sunrise. To be clear, Plaintiffs continue to want and have previously informed Chase that they want all documents from their corporate accounts, want the accounts re-opened immediately, and demand that whatever Aaronson Defendants are on those accounts be removed at once.

227. Chase purposely ignored the conflicting evidence and took no steps to verify with and through the Deos the actual status of NorthShore's ownership; Chase and its Representatives simply remained silent, content to side with the rich Caucasians against the Deos; the Cozy Relationships and hidden (from the Plaintiffs) relationships, meals, gifts and other unknown favors carefully fostered by the Aaronson Defendants and the Urrutia Defendants on the one

hand, and Chase and its Representatives on the other hand, quite simply paid off for all of these Defendants, to the detriment of the Plaintiffs.

228.    At all times relevant hereto, Chase and its Representatives and RWC and its employees knew or should have known that the Aaronson Defendants were engaged in illegal activities including, but not limited to, fraudulent conduct regarding the ownership of NorthShore, fraudulent conduct regarding the ownership of 189 Sunrise, fraudulent conduct regarding the accounts of NorthShore and 189 Sunrise, and criminal fraud and wire fraud regarding the access given to the Aaronson Defendants to accounts of 189 Sunrise and NorthShore by Chase Bank and its Representatives via the utilization of a dead man's account credentials for a year and a half after his death.

229.    By utilizing the Chase credentials of a dead man (David Baron) to clean out the 189 Sunrise and NorthShore accounts in November, 2022, the Aaronson Defendants again unknowingly reveal a necessary truth, just as with the obviously phony documents attached hereto as Exhibit Q:  The dead man's electronic credentials wrongfully and illegally utilized by the Aaronson Defendants in November 2022 to clean out the Deos' corporate accounts at Chase *necessarily expire without constant use due to internal bank policies and rules.  Thus, for the Aaronson Defendants to utilize a dead man's Chase credentials in November 2022 to clean out the Deos' corporate accounts, the Aaronson Defendants were necessarily utilizing those credentials on a regular basis since the death of David Baron a year and a half earlier, a fact known or should have been known to Chase but ignored or missed to the detriment of*

*the Plaintiffs but in breach of Chase's duties to the Plaintiffs and contractual obligations by and through the account agreements.*

230.    The use of the dead man's electronic credentials to clean out the Plaintiffs' bank accounts as set forth, above, in November, 2022 constitutes criminal fraud and criminal wire fraud by the Aaronson Defendants, yet was allowed at all times relevant hereto by Chase Bank as a breach of its contractual duties to Plaintiffs.

231.    At all times relevant hereto, Chase and its Representatives violated their own internal rules and policies and procedures regarding minorities, racial inequities, inclusion, handling of accounts, lending, and diversity given that Chase ignored its duties owed to the Plaintiffs, and intentionally sided with the rich Caucasian Aaronson Defendants with whom Chase made millions of dollars over the years; these and other acts and omissions constitute breaches of Chase's contracts with the corporate Plaintiffs and the covenant of good faith and fair dealing Chase owed to all of the Plaintiffs.

232.    When the Deos appeared at Chase Bank with their own determinative tax returns to discuss this matter with Chase's Representative (Deborah Womeldorf) in the immediate aftermath of the Aaronson Defendants' emptying and shutting down 189 Sunrise's and NorthShore's corporate bank accounts in November 2022, Chase Bank took the side of the rich Caucasians, the Aaronson Defendants, against the poor minorities, the Deos, and allowed it to happen, ruining 189 Sunrise, NorthShore, and the Deos' lives in the process. Chase's Representative this time (contrasting how Chase and its

Representatives handled questions from the Deos after the David Baron

incident during June 2020, in which Chase insisted upon seeing tax returns

when that was then in the Aaronson Defendants' best interests) refused to

even consider or look at the Deos proof/tax returns and emails from Josh

Aaronson approving the returns and the Deos as owners of the two companies

at issue.

### G2: Ally, NextGear, and NMAC

233.    Ally, NextGear, and NMAC are the providers of one or more Floor Plans

for 189 Sunrise, NorthShore, and/or Superb.

234.    Floor Plans are the method/loans that automobile dealerships utilize to

fund their purchase of new and/or used automobiles for sale to the public. At

times, other automobiles are financed by and through Floor Plans, including,

but not limited to, automobiles that are traded into a dealership; however an

automobile dealership obtains an automobile, it may be put on to Floor Plans,

including the practice of "Double Flooring" set forth herein.  At all times

relevant hereto, the Automobile Lenders knew and should have known of the

methods employed by the Defendants in putting automobiles on to the Floor

Plans provided by the automobile Lenders to Superb, NorthShore, and 189

Sunrise.

235.    At all times relevant hereto, Superb Motors, solely by and through the

Urrutia Defendants' decisions, entered into a contract/agreement with NMAC

for a Floor Plan to obtain automobiles and then sell those automobiles to the

public on behalf of Superb Motors.

236. At all times relevant hereto, Superb Motors, solely by and through the Urrutia Defendants' decisions, also entered into a contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Superb Motors.

237. At all times relevant hereto, Northshore, solely by and through the Aaronson Defendants' decisions, entered into a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

238. At all times relevant hereto since November 2022, Northshore, solely by and through the Deos' decisions, entered into a contract/agreement with a company called Westlake Financial Services (hereinafter, "Westlake") for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore. During the summer of 2023, the Deos willingly gave up their Floor Plan with Westlake due to the ruination of the company caused by the Urrutia Defendants' and the Aaronson Defendants' wrongful acts and omissions set forth herein, including, but not limited to, the legal actions commenced by the Defendants and referred to herein as Actions 1, 2, and 3.

239. It is telling that the Defendants herein have not sued Westlake in any of their three legal proceedings (Actions 1, 2, and/or 3) even though at all relevant times the Defendants 1) could know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 2) should know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 3) did know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 4) knew that

they, the Defendants, did not have anything to do with NorthShore having its Westlake Floor Plan at times that the Defendants were, in fact, engaged in Actions 1, 2, and/or 3 against the Deos because the Defendants knew that at all times relevant hereto, the Deos were the true owners/ members/stockholders of NorthShore.

240.    Even though the Urrutia and Aaronson Defendants claim ownership interests in NorthShore, these Defendants have not and will not sue Westlake because 1) due to greed, they do not want to be seen in the automobile industry as suing any Floor Plan provider, that could impact the Defendants' ability to obtain and keep Floor Plans from other providers; and 2) they know that at all relevant times, the Deos were, in fact, the true owners/members/ stockholders of NorthShore and had full authority to make decisions on behalf of NorthShore as the sole owners/members/shareholders thereof.

241.    At all times relevant hereto, Westlake did not breach its agreement/ contract with NorthShore and acted in good faith and dealt fairly with the Plaintiffs.

242.    At all times relevant hereto through the early fall of 2022, 189 Sunrise, solely by and through the Aaronson Defendants' decisions, engaged in a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

243.    At all times relevant hereto between November 2022 and August 2023, 189 Sunrise, solely by and through the Deos' decisions, engaged in a

contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

244.    The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without the authority of the Deos, the true owners/members/stockholders of those companies.

245.    The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without any due diligence by the Defendant Floor Plan providers who provided said Floor Plans; such diligence would have revealed the within schemes and conspiracies and would have prevented the Deos' losses.

246.    At all times relevant hereto, each of Ally, NextGear, and NMAC, knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore.

247.    At all times relevant hereto, the Floor Plan providers to 189 Sunrise and NorthShore knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore by and through the fact that at all times for NorthShore, and since February, 2021 for 189 Sunrise, the Deos operated both dealerships and were present to meet and did meet various employees of Ally, NextGear, and NMAC at the dealerships as owners, including during on-site audits by the employees of those three Defendant Floor Plan providers.

248.    Likewise, at all times relevant hereto since December 2022, the Floor Plan providers to Superb knew and/or should have known of Anthony Deo's ownership interests in Superb.

249. At all times relevant hereto since December 2022, the Floor Plan providers to Superb knew and/or should have known of Anthony Deo's ownership interests in Superb by and through the fact that at all times for Superb since December, 2022, the Deos operated Superb and were present to meet the Floor Plan providers/employees through the date of the Lock-Out when the employees were present at the dealership, including during on-site audits by those providers.

250. The lack of due diligence by Ally, NextGear, and NMAC and/or convenient ignoring of the Deos' ownership interests in those three companies constitutes at all times intentional ignorance by those three Defendant Floor Plan providers in order to protect their financial gains made possible by and through the Billionaire Defendants herein, who provided tens of millions of dollars or more in profits over the years to those three companies.

251. If the Floor Plan providers herein uncovered the within schemes and conspiracies in any detail, then the extremely profitable relationships between these Defendants would have been ruined; the Defendant Floor Plan providers have and should have had internal rules, policies and procedures that would have prevented a continuation of their relationships with the co-Defendants; given the enormous sums of money at stake between these Defendant parties (and others not named as parties herein), it was instead easier and far more profitable to ignore the Deos' plight (to the extreme detriment of the Deos and the corporate Plaintiffs) while simultaneously keeping and maintaining at all

times relevant hereto the relationships between the Floor Plan providers and Aaronson and Urrutia Defendants herein.

252.    The agreements and contracts between the Floor Plan providers and the Urrutia/ Aaronson Defendants, whether express or implied, were repeatedly requested to be obtained by the Deos; the Defendant Floor Plan providers herein should have been alerted to the wrongdoings of the co-Defendants by these requests from the Deos, but instead, in order to keep and maintain lucrative relationships, the Floor Plan providers and the Urrutia/Aaronson Defendants refused the Deos' requests each and every time.

253.    The agreements between the Defendants hereto were weaponized by those Defendants, and were wrongfully kept from the Plaintiffs at all times relevant hereto through and including the present and ongoing.

254.    Each and every agreement between any Defendant and any Plaintiff, whether express or implied, was conducted by the Defendants in violation of the implied covenant requiring good faith and fair dealing in New York State on all such agreements/contracts.

255.    At all times relevant hereto, the Aaronson Defendants told the Deos that the Floor Plans were provided by and through Baron Nissan, which was a lie to keep the Deos from discovering the Aaronson Defendants' theft of the Deos corporations, 189 Sunrise and NorthShore.

256.    At all times relevant hereto, the Floor Plan providers told the Deos on behalf of 189 Sunrise and NorthShore that they were not the party to the contract at issue, which the Deos took to mean that Baron Nissan was the

75

contracted party; if the Floor Plan providers told the Deos even once that the party was, in fact, 189 Sunrise and/or NorthShore, it would have alerted the Deos to the within schemes. However, the Floor Plan providers carefully avoided telling the Deos that 189 Sunrise and NorthShore were, in fact, the true parties; this fact demonstrates that the Floor Plan providers (Ally, NextGear and NMAC) for 189 Sunrise and NorthShore (except for Westlake) intentionally ignored the Deos' position foisted upon them by the Aaronson Defendants acting in conspiracy with the Floor Plan providers.

257. At all times relevant hereto, the Floor Plan providers took direction from non-owners of the corporations that are parties hereto, did nothing to verify ownership of the corporate parties hereto, and could not have obtained the corporate book or documentation proving ownership of NorthShore prior to June 16, 2020 since the Aaronson Defendants did not obtain that book and documents until that date; these facts alone should have alerted the Floor Plan providers to the schemes, conspiracies, and wrongdoing set forth herein. Instead, the Floor Plan providers refused and still refuse to even talk to the Deos about these companies to the detriment of the Plaintiffs and to the benefit of the co-Defendants.

258. At all times relevant hereto, the known and unknown Representatives of NMAC for Superb engaged in a Cozy Reletionship with the Urrutia Defendants.

259. At all times relevant hereto prior to the Lock Out in August, 2023, NMAC made millions of dollars with and from the Urrutia dealerships.

260.     The extent of the Cozy Relationship and the extent that NMAC has gone
and continues to go in protecting its dealings set forth herein is further
highlighted by the fact that immediately prior to the original filing of the
underlying Complaint, NMAC intervened and queered a deal for Anthony
Deo to purchase an interest in another automobile dealership on Long Island
called Route 112 Mitsubishi; upon information and belief, one or more
Representatives of NMAC told the owner(s) of 112 Mitsubishi not to sell the
dealership to Anthony Deo and pointed that owner to look at the Federal
Complaint in Action 2 attached hereto as Exhibit O.

261.     Upon reviewing the Federal Complaint attached as Exhibit O, the owner
of 112 Mitsubishi cancelled the deal when all that was left (the parties had
already agreed to terms) was for the parties to execute the documents and
provide payment, which Deo was fully prepared to do.  Upon information and
belief, it was NMAC by and through one or more of its Representatives that
queered the deal for Deo, intentionally and fully interfering with business
relations of Anthony Deo with 112 Mitsubishi.

262.     At all times relevant hereto, Nissan operated various corporations under its
automobile umbrella, including, but not limited to, NMAC and a company
called Nissan Extended Services North America, G.P., a Delaware general
partnership business (hereinafter, "NESNA").

263.     Whereas NMAC provides Floor Plans to automobile dealerships, NESNA
provides warranties for sale to the automobile purchasers at dealerships.

264. Attached hereto as Exhibit X are true and accurate copies of several contracts by and between NESNA on the one hand, and Anthony Deo both personally (as Guarantor) and on behalf of 189 Sunrise (since the Deos' purchase in February 2021) and NorthShore.

265. These contracts provide irrefutable proof that Nissan, NMAC, and NESNA all knew that Anthony Deo was the true party in interest in 189 Sunrise and NorthShore, as it was he, Deo, that was entering into contracts and personally guaranteeing same on behalf of 189 Sunrise and NorthShore for warranties from Nissan; these contracts were, at all relevant times, also in the possession, custody and control of the Aaronson Defendants and were approved by the Aaronson Defendants.

266. The Aaronson Defendants *necessarily* had to approve the contracts attached in Exhibit X:  These contracts include monies owed by the Aaronson Defendants on 189 Sunrise from prior to the sale to the Deos in February 2021; in fact, the Aaronson Defendants *required* Anthony Deo to assume certain debt in connection with the purchase of 189 Sunrise as a *precondition* to letting Deo purchase 189 Sunrise in February 2021.

267. Thus, even as NMAC was cutting off the Deos from Floor Plans and interfering with Anthony Deo's purchase of Route 112 Mitsubishi, NMAC by and through its sister corporation NESNA and by and through the Aaronson Defendants knew that the Deos were the true owners/operators/ stockholders/members of 189 Sunrise and NorthShore, but continued to side

with the Aaronson Defendants in a conspiracy to (successfully) ruin the Deos, their livelihoods, and businesses.

268.    At all times relevant hereto, the known Representatives of Ally and NextGear for 189 Sunrise and NorthShore and one or more unknown Representatives of Ally and NextGear for 189 Sunrise and NorthShore, engaged in a Cozy Reletionship with the Aaronson Defendants.

269.    At all times relevant hereto, Ally and NextGear made tens of millions of dollars and more with and from the Aaronson Defendants through their various dealerships over the years.

270.    At all times relevant hereto, the Floor Plan providers by and through their authorized employees and Representatives knew and should have known of the Deos interests in Superb, NorthShore, and 189 Sunrise.

271.    Despite repeated requests by the Deos to explain to the Floor Plan providers what was going on with 189 Sunrise and NorthShore (since November, 2022) and Superb (since the Lock Out) in order to protect their interests in the three companies at issue, each of the Floor Plan providers 1) sided at all relevant times with the Urrutia and Aaronson Defendants; 2) failed and refused to discuss anything with the Deos, either from the Deos' request or to simply find out what was going on with the companies at issue; 3) shut off the Floor Plans to each of the companies at issue to the detriment of the Deos; 4) ignored their own policies and rules regarding diversity, racial relations, and minority lending practices in siding with the Urrutia/Aaronson Defendants against the Deos; 5) failed and still refuse to create policies and

rules to protect minorities such as the Deos from predatory practices set forth herein and perpetrated by the Urrutia/Aaronson Defendants; 6) have not taken any actions against any of the Urrutia/ Aaronson Defendants for their illegal activities set forth herein, but have instead refused to lend to the Deos ever again; and 7) at the specific requests of the Urrutia/Aaronson Defendants, ruined the Deos' businesses.

272.   The within and other acts and omissions between the Urrutia/Aaronson Defendants in conjunction with the Floor Plan providers constitute a conspiracy to breach all contracts with the Plaintiffs and to intentionally interfere with the Deos' businesses at issue herein.

273.   Said acts and omissions constituting the conspiracy are on-going acts and omissions, and the Floor Plan providers and Urrutia/Aaronson Defendants acted jointly in severally in perpetrating the within ruination of the Deos three businesses at issue as well as their livelihoods.

274.   At all times relevant hereto, and upon information and belief, the Deos were 1) the only African/Caribbean dealership owners/partners in the State of New York; and 2) two of only a handful of any minority owners of automobile dealerships known on Long Island.

### H.   RWC, Accountants

275.   Defendant RWC is an accounting firm that at all times relevant hereto worked with and for the Aaronson Defendants and one or more of the Aaronson Defendants' Island Auto Group dealerships doing accounting work for these co-Defendants by and through various employees of each of those

two firms; upon information and belief, at various times in the last six years, RWC and their employees performed various tasks as accountants for 189 Sunrise and NorthShore.

276.    As such, RWC (both the firm and their employees) owed a duty of care to 189 Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

277.    As such, RWC (both the firm and their employees) maintained contractual relationships (whether express or implied) with 189 Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

278.    Like the Floor Plan providers, RWC made millions of dollars working for and with the Aaronson Defendants, Island Auto Group, 189 Sunrise, and NorthShore.

279.    The duties of care arising from RWC's contracts with 189 Sunrise and NorthShore include, but are not limited to, 1) performing sufficient due diligence to confirm the identity of the shareholders/members of 189 Sunrise; 2) performing sufficient due diligence to confirm the identity of the shareholders/members of NorthShore; 3) strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise; 4) strictly adhering to the covenant of good faith and fair dealing towards NorthShore; 5) utilizing due diligence in preparing and filing all tax documents for 189 Sunrise; 6) utilizing due diligence in preparing and filing all tax documents for NorthShore; 7) utilizing due diligence in preparing any documents to be

utilized on behalf of 189 Sunrise; 8) utilizing due diligence in preparing any documents to be utilized on behalf of NorthShore; 9) utilizing due diligence and strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise in obtaining and utilizing Pandemic Relief Funds; 10) utilizing due diligence and strictly adhering to the covenant of good faith and fair dealing towards NorthShore in obtaining and utilizing Pandemic Relief Funds; 11) correcting any tax filings prepared and filed by RWC for 189 Sunrise that turn out to be incorrect or mistaken due to the failures of the Accountants to perform due diligence; and 12) correcting any tax filings prepared and filed by RWC for NorthShore that turn out to be incorrect or mistaken due to the failures of RWC to perform due diligence.

280.    Instead, the Accountants engaged in a scheme/conspiracy with the Aaronson Defendants and their Island Auto Group dealerships to intentionally ignore obvious red flags both before and after preparing various documents over the years for 189 Sunrise and NorthShore for the simple reason that RWC made millions of dollars or more off of the Aaronson Defendants and their Island Auto Group dealerships; they would and did even go so far as to commit gross malpractice, breaches of contracts, and breaches of their fiduciary duties in their conduct by and for 189 Sunrise and NorthShore.

281.    E.g., the last page of Exhibit Q attached hereto contains a letter produced by RWC that simply constitutes gross malpractice and breaches of its contract with and fiduciary duties towards NorthShore.

282.    There is no possibility that RWC possessed the corporate book for NorthShore or any parts thereof (including stock certificates) prior to the David Baron incident perpetrated on June 16, 2020, yet by that time RWC had already filed (as indicated in the last page of Exhibit Q) tax returns for NorthShore absent any authority from the Deos, the true owners thereof.

283.    To avoid any breaches of duties to NorthShore, at a bare minimum RWC would have needed to know what that letter was to be utilized for; it was, in fact utilized by the Aaronson Defendants to remove Sara Deo from NorthShore's bank accounts, accounts which Sara Deo opened as a shareholder/member of NorthShore. *See, also,* Exhibit C hereto.

284.    The removal of Sara Deo from the accounts with Chase for NorthShore in combination with the Aaronson Defendants obtaining the corporate book and producing the phony stock certificates indicated in Exhibit Q by and through the staged David Baron incident on June 16, 2020, materially damaged the Deos and cost them their interests in NorthShore permanently from at least that moment on, and the letter from RWC contributed significantly to the Aaronson's illegal fraud and theft perpetrated with RWC's help.

285.    RWC, by and through its employees, partners, and/or members, knew or should have known that seeing stock certificates for the first time on and after June 16, 2020, purportedly indicating the Aaronson Defendants' listed interests since January or February 2018 was a red flag and should have prompted the following questions:  Why didn't the Aaronson Defendants produce these certificates to RWC sooner, and what does Sara Deo have to

say about this? A simple call to the dealership would have constituted at least partial due diligence and produced the following answers: The Aaronson Defendants were perpetrating a fraud by obtaining those corporate books and certificates as they were stolen from the dealership on June 16, 2020, by and through the staged David Baron incident; and Sara Deo had no intention of being removed from the accounts of NorthShore, willingly or otherwise, as not a penny of consideration was every paid by the Aaronson Defendants for NorthShore, and if asked by RWC, it would have raised even more red flags easily spotted by any competent accountant.

286.    Instead of doing its work and upholding its duties to 189 Sunrise and NorthShore, RWC badly damaged the dealerships and the Deos by and through its breaches of duties, breaches of agreements with the dealerships, and breaches of duties to the dealerships' shareholders/members, the Deos, in order to continue the revenue stream it obtained for years worth millions of dollars from the Aaronson Defendants, all to the detriment of 189 Sunrise and NorthShore and their shareholders/members, the Deos.

287.    Simply put, at all relevant times related hereto, and for all work performed by RWC and its members, partners, and employees by and for NorthShore and 189 Sunrise (and much of that work is unknown at this time to the Plaintiffs and will be subject to obtaining same during discovery in this action and/or pursuant to within Demands, but upon information and belief, the work extended into, through and including the fall of 2022; RWC's wrongdoing, breaches and malpractice was on an on-going basis through and including that

date), RWC breached contracts, duties of care, duties of good faith and fair dealings, and committed professional malpractice thereby, especially due to intentionally ignoring obvious dishonesty from the Aaronson Defendants regarding 189 Sunrise and NorthShore.

288.    RWC failed and refused to even meet with the Deos, a fact that is telling with respect to wrongful conduct:  Despite ups and downs in their relationship with the Aaronson Defendants over the years, the simple fact remains that it was the (phony, by and for the Aaronson Defendants) business relationship between the Deos and the Aaronson Defendants that the Deos considered left them "on the same side" as their business partners; RWC's failure and refusal to even meet with or speak to the Deos directly suggests that at all times relevant hereto, RWC knew or should have known of the wrongdoings by the Aaronson Defendants against the Deos and 189 Sunrise/NorthShore, knew or should have known that such wrongdoings put the parties on opposite sides in their relationship, and picked the rich Aaronson Defendants to side with after making millions of dollars off of the Aaronson Defendants and their Island Auto Group while simultaneously contributing to the shuttering and ruination of 189 Sunrise and NorthShore.

I.    The Law Firms known as CSZ and MLLG

289.    CSZ and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/ stockholders of those corporate Plaintiffs, the Deos.

290.    Likewise, MLLG and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/stockholders of those corporate Plaintiffs, the Deos.

291.    The unauthorized work performed by the Attorneys includes but is not limited to obtaining Pandemic Relief Funds ("PPP" funds), steering those funds away from the Plaintiffs and instead to the Aaronson Defendants, representing the corporate Plaintiffs in one or more lawsuits, plus other work unknown at this time to the Plaintiffs.  Attached hereto as Exhibit T is a true and accurate copy of an email chain including one or more attorneys employed by MLLG regarding Pandemic Relief Funds for 189 Sunrise and/or NorthShore.

292.    It is also known that by and through the assistance of MLLG, the Aaronson Defendants diverted and converted and stole all of those PPP funds from 189 Sunrise and NorthShore into their own accounts and/or the accounts of one or more of the Island Auto Group and/or family members of the Aaronson Defendants who were listed as employees of the corporate Plaintiffs without any real job ("no show jobs") just to divert PPP funds from NorthShore and 189 Sunrise, and may also have utilized the PPP funds to wrongfully pay MLLG, instead of utilizing those funds lawfully for the benefit of the Plaintiffs.

293.    At all times relevant hereto, CSZ and MLLG knew and should have known of the Deos' interests as owners/members/stockholders of the corporate Plaintiffs.

294.    At all times relevant hereto CSZ and MLLG kept and maintained longstanding lucrative relationships with the Aaronson Defendants and eventually the Urrutia Defendants, providing ample incentive for these two law firms and their employee/attorneys to intentionally ignore multiple red flags with respect to the true owners and operators of the corporate Plaintiffs, the Deos.

295.    Nonetheless, CSZ and MLLG had duties of care owed to the corporate Plaintiffs even if they failed to discover (conveniently or otherwise) the wrongdoings of the co-Defendants responsible for paying those two firms literally millions of dollars over the years or the true owners of 189 Sunrise (since February, 2021) or NorthShore at any time, the Deos.

296.    MLLG and CSZ have filed lawsuits known herein as Actions 1 & 2 (as reflected in the Complaints attached hereto as Exhibits M & O); it is hereby specifically alleged that these two actions (Actions 1 & 2) are frauds upon the Courts in which they are and were filed and constitute on-going intentional interference with the corporate Plaintiffs' businesses and business relations, and the Deos' livelihoods.

297.    It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew or should have known that Actions 1 & 2 constitute frauds upon the Court, and they outright know of

the frauds at least since the filing of the underlying Complaint with Exhibits (and this Amended Complaint with Exhibits).

298.    It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew and should have known that they had and have no authority to initiate or continue any litigation on behalf of any Plaintiff herein since the Deos obtained their ownership interests in the corporate Plaintiffs, February of 2021 for 189 Sunrise, and since the formation of NorthShore in November of 2017.

299.    To that end, CSZ and MLLG are specifically instructed to abandon their representations of the corporate Plaintiffs herein, and to cease and desist from ever again representing any of the Plaintiffs going forward in time.

300.    The within and other acts and omissions by these Attorneys constitute gross attorney malpractice, *per se* attorney malpractice, and breaches of the ethical rules and obligations for each of the attorneys who acted at relevant times purportedly for any of the within Plaintiffs absent proper due diligence and efforts made to determine ownership of the corporate Plaintiffs in light of the within allegations and the extremely important and revealing Exhibits hereto, beyond just undertaking representation of the corporate Plaintiffs on the mere words of the Aaronson Defendants.

301.    Aside from Chase, Ally, NextGear, RWC, CSZ and MLLG named as parties hereto, it is unknown to the Plaintiffs herein whether or not other professionals have in any way wrongfully impacted the Plaintiffs' rights and/or wrongfully caused the Plaintiffs damages, since all of the Defendants

acted in an ongoing conspiracy to keep relevant information away from the Plaintiffs.

302.   Upon information and belief, as with Chase, Ally, NextGear, RWC, CSZ and MLLG herein, other professionals have benefited from payments by the Aaronson Defendants and their companies in unknown amounts but not less than millions of dollars in carrying out the within plan and scheme and conspiracy to harm each of the Plaintiffs, so there is plenty of incentive for all professionals, both known and unknown, whether a named party or not, to serve the Aaronson Defendants and the Island Auto Group even at the expense of ruining 189 Sunrise, NorthShore, and the Deos.

303.   Both David Baron and Josh Aaronson made racist remarks to the Deos over the years; 189 Sunrise and NorthShore served as the Aaronson Defendants' personal piggy banks and were drained of moneys by these Defendants extensively and expertly; upon information and belief, the Aaronson Defendants and/or their Island Auto Group companies benefitted from tax write offs due to the appearance of losses by 189 Sunrise and NorthShore expertly created by the Aaronson Defendants and RWC, so it is expected that additional professionals will be at least witnesses to and in this action, as necessary, over time, especially with respect to those professionals who worked for, with, or represented 189 Sunrise since February 2021 and NorthShore at any time since November 2017.

J.   GENERAL ALLEGATIONS

304.   Unlike the attached and other documentation on behalf of the Deos which

proves that ownership of NorthShore rests with the Deos at relevant times

hereto via the initial incorporation of the business and obtaining the 1)

corporate book, 2) EIN number (Exhibit A), 3) lease (Exhibit B), and 4) Josh

Aaronson approved (Exhibit G) tax returns indicating ownership by the Deos

(Exhibit H), the Aaronson Defendants cannot demonstrate ownership other

than through their transparently false and fraudulent misdated documents

attached as Exhibit Q.

305.   The Aaronson Defendants in particular are unable to prove any

consideration paid for obtaining NorthShore from the Deos, as nothing was

ever paid to the Deos directly for their business, no transfer was ever approved

nor authorized, no documents transferring the business were ever legitimately

created or executed, no emails were created/exchanged indicating a change in

ownership, and the only thing that the Aaronson Defendants ever did for the

businesses directly was to provide arm's length Floor Plans carefully kept

from the Deos and any Deo involvement, and for which the Deos paid the

Aaronson Defendants from the business in ever increasing amounts under the

threat of ruination from the Aaronson Defendants, a plan (ruination of the

corporate Plaintiffs and the Deos' livelihoods) they eventually carried out.

306.   All records indicating payments to the Aaronson Defendants directly for

their Floor Plan provisions are in the exclusive possession, custody and

control of the Aaronson Defendants and Ally, NextGear and NMAC, and the

Aaronson Defendants have refused, to date, to turn over any of the documents they took when they wrongfully shuttered NorthShore and 189 Sunrise and wrongfully closed those businesses' accounts through and with the assistance of Chase.

307.     The lawsuits commenced by the Aaronson Defendants (Actions 1 & 2, Exhibits M & O are the Complaints in those Actions) are, like the documents attached as Exhibit Q, transparently false and brought as frauds upon those Courts:  For the Aaronson Defendants to be believed in their claims that they ever owned NorthShore or 189 Sunrise since the Deos bought same in February 2021, it is necessary to also believe that 1) in November of 2022, the Aaronson Defendants emptied their own profitable companies known as NorthShore and 189 Sunrise and left both locations permanently; 2) they sold off the automobiles from those locations at a loss without transferring those autos to another of their Island Auto Group businesses for a profit; and 3) the Aaronson Defendants left their own businesses and permanently shuttered and ruined their own businesses on purpose.

308.     Simply put, the allegations by the Aaronson Defendants in Actions 1 & 2 are and always have been false, especially considering that it is herein specifically alleged that with respect to the operation of 189 Sunrise and NorthShore, at all relevant times hereto it was the Aaronson Defendants, only, that completely controlled 100% of the companies' finances through the Positive Pay system and token system put in place by the Aaronson Defendants by and through Chase Bank.  The Deos did not and could not

conduct or make any financial decisions impacting those businesses without the direct knowledge and approval, daily, of the Aaronson Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Aaronson Defendants, or that check would not be honored by Chase.

309. Likewise, the Urrutia Defendants operated Superb with the same total control over the company's finances via their own token and texting systems put in place by the Urrutia Defendants by and through Chase Bank. Likewise, the Deos did not and could not conduct or make any financial decisions impacting Superb without the direct knowledge and approval, daily, of the Urrutia Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Urrutia Defendants, or that check would not be honored by Chase.

310. In their zeal to ruin the Deos and their businesses, the Urrutia Defendants even arranged for Anthony Deo to receive a death threat from one of the Superb employees, co-Defendant Parmeshwar Bissoon, who, after speaking with one or more of the Urrutia co-Defendants, told Anthony Deo that he, Bissoon, would "pop" Deo and kill him if he ever sees Deo again for ruining Superb. Attached hereto as Exhibit V is a true and accurate copy of the written words utilized by Bissoon on behalf of the Urrutia Defendants threatening Anthony Deo's life; that text and other, spoken words lead directly to a restraining order to keep Bissoon away from Deo.

311. In fact, none of the Plaintiffs are responsible for the Urrutia Defendants' choice to close all of their businesses; the Urrutia Defendants' businesses

failed due to years-long abuses by these Urrutia Defendants in running their

businesses into the ground, then falsely and fraudulently 1) taking money

from the Deos, 2) trying to take even more money from the Deos, before 3)

Locking-Out the Deos and falsely accusing the Deos of theft that is not even

possible given the Urrutia Defendants' control over all company finances.

312.     As Anthony Deo discovered upon taking over day to day operations at

Superb during or about January 2023:  Superb was in dire financial straits,

Anthony Urrutia and other Urrutia Defendants including Bruce Novicky were

Double Flooring cars, and Urrutia was taking money from Superb to try to

save a Mitsubishi dealership in Hartford, Connecticut that he, Urrutia, ran into

the ground and has subsequently lost back to Mitsubishi; Urrutia is now being

sued by NMAC for over twenty million dollars in thefts from one or more of

his four (4) dealerships, all now closed, in New Jersey, Connecticut,

Massachusetts, and New York (Superb).

313.     With the help of the Deos, Superb's finances improved measurably during

2023 up to the Lock Out.

314.     Just as the Aaronson Defendants have had nearly two years to prove their

false allegations of theft by the Deos set forth in their transparently false

Complaints, so too, have the Urrutia Defendants now had more than a year

and a half to obtain documents or records to prove their own false allegations

of theft by the Deos, yet all of the Defendants have completely failed to prove

or demonstrate any such wrongdoing by the Deos.

315.    Instead, it is the Deos who have attached extensive documentation attached to this Complaint that prove their allegations repeatedly throughout; the Exhibits attached hereto are hereby incorporated herein by reference.

316.    At all times relevant hereto, the Deos trusted and believed their business partners, the Aaronson Defendants and the Urrutia Defendants; their misplaced trust lead to the Deos being woefully harmed by these Defendants who, at all times relevant hereto, were lying and deceiving the Deos for the purposes of defrauding the Deos of money and their businesses, and ruining the Deos and their businesses to prevent the Deos and their businesses from ever operating in the automobile dealership business again.

317.    At all times relevant hereto, the Ally, NextGear, NMAC, Chase, RWC, CSZ, and MLLG had duties of care and contractual obligations to the Deos and/or their businesses at issue, 189 Sunrise, NorthShore, and Superb.

318.    The Defendants herein have each committed one or more crimes and/or civil wrongdoings against each of the Plaintiffs herein, with malice, and which harmed the Plaintiffs in amounts that exceed the jurisdictional limits of this Court.  Not all of the crimes and civil wrongdoings against the Plaintiffs are known to the Deos since at all times relevant hereto, these Defendants have acted deceptively and kept their actions, inactions, and wrongdoings hidden from the Plaintiffs, and kept the Plaintiffs' documents away from the Plaintiffs and refused to return any such documentation to the Plaintiffs.

319.    It is specifically alleged herein that the parties to the Baron Nissan transaction set forth in Exhibit F completed that transaction, and that the Deos

are at least part owners thereof as set forth in the documentation attached as Exhibit F.

320.     The Aaronson Defendants are so underhanded in their handling of the instant situation that when they vacated 189 Sunrise and NorthShore and shut down both businesses and drained the accounts, they also prevented one or both of the businesses from continuing to pay for the then pregnant Sara Deo's health insurance, which they illegally stopped and cancelled without any required notices to Sara Deo.

321.     At all times relevant hereto, these Defendants have engaged in a conspiracy against the Plaintiffs; each Defendant joined the conspiracy against the Plaintiffs as the Plaintiffs came into their lives.  That conspiracy continues, daily, and is on-going against the Plaintiffs by and through, *inter alia,* 1) the fraudulent civil actions commenced against these Defendants and referred to as Actions 1, 2, & 3; 2) RWC taking no steps to correct any tax filings inconsistent with the within facts and continuing to play keep away from the Deos as owners of 189 Sunrise and NorthShore of all documents prepared and filed by those accountants for those businesses; 3) Chase, Ally, NextGear and NMAC, who ruined the Plaintiffs' businesses (including Superb) and have ruined and continue to refuse to allow the Deos to remain in the automobile dealership business; and 4) RWC and MLLG, who wrongfully conducted unauthorized representation of the corporate Plaintiffs and commenced transparently false Actions against the Plaintiffs for the sole purposes of making more money with the co-Defendants and continuing to dissuade the

Plaintiffs from avoiding crushing fees and losses related to defending the fraudulent civil actions and being unable to re-open their own businesses.

322.    Indeed, CSZ and MLLG herein have made multiple offers of settlement to the Plaintiffs that contain no demands whatsoever for money; rather, CSZ and MLLG herein on behalf of the Urrutia and Aaronson Defendants merely want releases for their own and co-Defendants' actions to date, leaving the Plaintiffs ruined. There is not a shred of ethics or integrity in the conduct of CSZ and MLLG named herein in their actions purportedly for and against the Plaintiffs.

323.    At all times relevant hereto, the Defendants withheld information that should have been turned over to the Plaintiffs; withholding information herein both furthered the Defendants' wrongful purposes regarding the ruination and theft of Plaintiffs' businesses, but also served to keep information and documents away from the Plaintiffs that could have and would have alerted them to wrongdoing by the Defendants sooner. Simply put, the Defendants possess information and documents that they continue to keep away from the Plaintiffs at all times relevant hereto; likewise, one or more unnamed professionals are also expected to possess information and documents unknown at this time to the Plaintiffs that is and shall become relevant to Plaintiffs case, requiring discovery thereof.

324.    The Aaronson Defendants committed gross and outrageous acts and omissions herein in conspiracy with all of the named Defendants herein, acts and omissions that offend the senses of all honest people, including, but not

limited to: 1) utilizing the electronic log-in credentials of a dead man to drain and close the Plaintiffs' bank accounts with Chase for both corporate Plaintiffs; 2) stealing NorthShore from the Deos; 3) purposely failing to finish the documentation of the sale of 189 Sunrise to the Deos and surreptitiously misleading the Deos regarding their ownership interests therein; 4) creating and utilizing the transparently phony documents in Exhibit Q to steal the Plaintiffs' businesses, livelihood, and all bank accounts with Chase; 5) stealing all pandemic relief funds (PPP) from both corporate Plaintiffs; 6) placing family members on payroll of one or more of the Urrutia and Aaronson dealerships to give the impression of paying employees when in fact the Defendants herein were engaged in a scheme to defraud the corporate Plaintiffs and the government of PPP funds by diverting and converting these funds to the Defendants and their families herein; 7) committing wire fraud in the creation and transmission of the transparently phony documents in Exhibit Q; and 8) filing lawsuits against the Plaintiffs with false allegations of theft and ownership to continue to ruin the corporate Plaintiffs/competitors of the Defendants as their schemes unraveled and continue to ruin the livelihoods of the Deos thereby.

325. At all times relevant hereto, the Aaronson Defendants not only wrongfully continued to act as the owners/stockholders of 189 Sunrise for their own benefit and the Deos' detriment after the February, 2021 purchase of 189 Sunrise by the Deos, but did so in part to force the Deos out of the lease of the Premises utilized for the operation of 189 Sunrise at 189 Sunrise Highway,

Amityville, New York, for the Aaronson Defendants' own benefit; upon information and belief, immediately after forcing the Deos out of the Premises where 189 Sunrise operated via, *inter alia*, shuttering that business and its software and accounts, the Aaronson Defendants have now opened a new business at that location for their own benefit called Stream Auto Outlet.

326. Demand is herein made to Chase to immediately restore the Plaintiffs' rights and access to the accounts for 189 Sunrise and NorthShore. Since November 2022, Chase has wrongfully and impermissibly prevented any access to those accounts by the Deos; it is and should be abundantly clear to Chase by and through this Complaint and all documents attached hereto that Chase has breached and continues to breach its agreements with the Plaintiffs, breaching internal bank policies and procedures that also harmed and continue to harm in an ongoing basis each of the Plaintiffs, and wrongfully sided with the Aaronson Defendants over the use and access to these accounts and all documents associated with these accounts since June 16, 2020 for NorthShore, and since February 2021 for 189 Sunrise. Full restoration of the Deos' ownership and access to these accounts is necessary and an emergency; Chase's decision to lock-out the Deos from their own company accounts has produced devastating harm upon the Deos and 189 Sunrise and NorthShore, and Chase needs to immediately rectify its serious mistakes and decisions relating thereto. None of Chase's wrongdoing was known or understood by any of the Plaintiffs until the fall of 2022, and each of the breaches and wrongdoings herein against Chase are considered to be ongoing.

327.    In addition, demand is hereby made to Chase to immediately return and
provide (within 30 days of service of this Amended Complaint) to the
Plaintiffs as contracted owners/members/stockholders of all records in
Chase's possession, custody or control regarding 1) daily use of Positive Pay
and Tokens (including identification of each user for each use) by and for 189
Sunrise (since February 2021) and NorthShore (at any time since the accounts
for NorthShore were opened in 2018); 2) daily use of Tokens and texts
(including identification of each user for each use) by and for Superb (since
November 2022); and 3) each and every use of David Baron's user
identifications, passwords, and electronic log-in credentials since May 2021
for 189 Sunrise and NorthShore accounts.

328.    At all times relevant hereto, the Urrutia Defendants and the dealerships
controlled by them and the Aaronson Defendants and the dealerships
controlled by them engage in elaborate shell games with those businesses,
sometimes to line the individual Defendants' own individual pockets,
sometimes to make it appear as though one or more dealerships are losing
money when they are not (to help through tax losses and deductions one or
more of the dealerships), and sometimes to divert funds from one business to
the benefit of one or more of the individual Defendants' other businesses.

329.    E.g., during the Covid pandemic of 2020-2022, millions of dollars were
obtained by the Aaronson Defendants and the Urrutia Defendants for their
dealerships from the Paycheck Protection Program (hereinafter, "PPP") that
were *not* spent as required under that program but were instead diverted for

one or more of the Aaronson Defendants' or Urrutia Defendants' own individual benefit, or those of their family members wrongfully represented to the government by the co-Defendants as employees to wrongfully gain extra money fraudulently from the government and wrongfully take said funds from the three businesses owned by the Deos, 189 Sunrise, NorthShore and Superb.

330.    Included in the diverted funds by the Aaronson Defendants were millions of dollars obtained by the Aaronson Defendants (with the assistance of RWC, CSZ, and/or MLLG) through the PPP program ostensibly for the benefit of Plaintiffs 189 Sunrise and NorthShore, but which were instead diverted for the benefit of one or more of the Aaronson Defendants or their co-Defendants, and never given to 189 Sunrise or NorthShore or, in the alternative, stolen from the corporate accounts of 189 Sunrise and NorthShore by one or more of the Defendants.

331.    Likewise, and upon information and belief, included in the diverted funds by the Urrutia Defendants were millions of dollars obtained by the Urrutia Defendants (with the assistance of the Professionals) through the PPP program ostensibly for the benefit of Superb, but which were instead diverted for the benefit of one or more of the Urrutia Defendants or their accountants and attorneys and never given to Superb or, in the alternative, stolen from the corporate account(s) of Superb.

332.    The PPP fund diversions and thefts harmed and continue to harm the Plaintiffs in an ongoing basis by, *inter alia*, depriving the Plaintiffs of millions

of dollars of assistance needed to save the three corporations at issue (Superb, 189 Sunrise, and NorthShore) as well as save the Deos' livelihoods.

333.    The Aaronson Defendants' individual and business wealth significantly impacts every party hereto, including all co-Defendants, and other unnamed and unknown co-conspirators (the John and Jane Does referenced and sued without their names herein) with the Aaronson Defendants.

334.    Simply put, Chase, Ally, NextGear, NMAC, RWC, CSZ, and MLLG and those similarly situated but unknown by the Plaintiffs and intentionally kept from the Plaintiffs by the Defendants are always happy to work with Billionaires like the Aaronson Defendants/businesses, as these businesses make millions of dollars through the years working with Billionaires like the Aaronson Defendants/businesses. Whenever Billionaires like the Aaronson Defendants/businesses control any given situation through money, they can and do make people do whatever the Aaronson Defendants/businesses want, or, in the alternative, they will simply go out and pay someone else millions of dollars to do their bidding. Thus, just as the Aaronson Defendants controlled the Plaintiffs through the Aaronson Defendants' money and staggering wealth, the Aaronson Defendants also entirely controlled all businesses they work with through the millions of dollars those businesses, whether named parties herein or not, make off of doing the Aaronson Defendants' bidding, as those businesses (of course) simply want to continue to make millions of dollars off of the Aaronson Defendants and their businesses even at the brutal cost of ruining the Plaintiffs' lives and businesses.

335.    For the within and other reasons, these Defendants owe joint and several liability to these Plaintiffs.

336.    With respect to breach of contract claims and unjust enrichment claims herein, the only valid express, explicit, and executed contracts between the Defendants and any of the Plaintiffs consist of 1) whatever documents were executed between Chase and Sara Deo upon the opening of the account(s) for NorthShore; 2) the contracts attached hereto as Exhibits I-1 and I-2 by and between Superb, Urrutia, and Anthony Deo; and 3) the Baron Nissan Purchase contract attached hereto as Exhibit F (and since the Defendants deny that Exhibit F is fully executed, then the money paid therefore is plead in the alternative, whether a fully executed contract or, in the alternative, consisting of unjust enrichment).  All other agreements set forth herein are implied, only, as there are no valid, express, explicit, and executed contracts (hereinafter, "EEE Contracts") between any of the Defendants and any of the Plaintiffs otherwise; at most there are emails, documents, events, and writings that confirm the existence of implied agreements between Defendants and Plaintiffs herein, but not any EEE Contracts other than the within three (3) EEE Contracts.

337.    At the heart of this case is quite simply this: The Greed of each and every Defendant hereto.

338.    At all times relevant since the shuttering of 189 Sunrise and NorthShore in November 2022 by the Aaronson Defendants, and at all times relevant hereto since the Lock-Out on August 3, 2023 by the Urrutia Defendants, the Urrutia

Defendants and the Aaronson Defendants have defamed and slandered the Deos throughout the automobile industry; this intentional defamation and slander is designed to negatively impact the Deos forever more in the automobile industry on and around the greater NYC are, and has, in fact, done so, forever casting the Deos in an unfair, negative light to further ruin their livelihoods and businesses.

339.     Defendants are committing frauds upon the Courts in Actions #2 and #3, as more fully set forth herein.  Now that counsel for the Defendants in Actions #2 and #3 know of the frauds upon the Courts advanced by their clients in those Actions, those attorneys for those clients in Actions #2 and #3 have duties to withdraw their false and fraudulent Complaints in those actions pursuant to New York Disciplinary Rules 3.3(a)(1) and (3), and the Plaintiffs herein call upon counsel for the within Defendants in Actions #2 and #3 to withdraw their false, fraudulent, and frivolous Complaints from Actions #2 and #3 within thirty (30) days of service of this Amended Complaint.

340.     Now that counsel for the within Defendants know of the frauds stated by these Defendants in Actions #2 and #3, to continue to advance those fraudulent Complaints from those Actions in light of the within facts and Exhibits does and will continue to constitute frivolous conduct in violation of New York Disciplinary Rules 3.1(a), 3.1(b)(1) and (3), and the Plaintiffs in this Action call upon counsel for the within Defendants as they appear in Actions #2 and #3 to withdraw those Complaints in Actions #2 and #3 within thirty (30) days of service of this Amended Complaint.

341.    Each of the wrongs set forth herein committed by each of the Defendants against each of the Plaintiffs was committed exclusively in and on Long Island, New York, in the counties of Suffolk and Nassau, only; each of the wrongs set forth herein committed by each of the Defendants against each of the Plaintiffs was a violation of New York state law, only, and not a violation of any other state's or Federal law(s); and each of the wrongs set forth herein committed by each of the Defendants against each of the Plaintiffs is specifically alleged to be on-going in all respects, as the singular plan and scheme engaged in by these Defendants to harm each of the Plaintiffs and protect each of the Defendants is ongoing in one or more ways known and unknown to the Plaintiffs.

## COUNT I:  BREACH OF CONTRACT BY THE AARONSON DEFENDANTS

342.    Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

343.    At all times relevant hereto, the Aaronson Defendants impliedly and/or expressly agreed with the Plaintiffs to provide Floor Plan(s) by and from the Aaronson Defendants' other dealerships (as obtained by the Aaronson Defendants utilizing their Billion Dollar Worth by and through Ally, NextGear and NMAC) for the operation of 189 Sunrise and NorthShore for various fees and/or payments made directly to the Aaronson Defendants.

344.    At all times relevant hereto, the Aaronson Defendants also agreed with the Plaintiffs to provide all software necessary to operate 189 Sunrise and NorthShore.

345. At all times relevant hereto since the Deos 1) formed NorthShore in November 2017; 2) obtained the corporate book for NorthShore in June 2018 (Exhibit U hereto); 3) obtained an EIN/tax identification number for NorthShore in November 2017 (Exhibit A hereto); 4) opened one or more bank accounts from Chase Bank in January 2018 (Exhibit C hereto); and 5) entered into a lease for the operation of NorthShore in Syosset, New York (Exhibit B hereto), the Plaintiffs and Aaronson Defendants agreed that NorthShore belonged to the Deos as the sole shareholders/members; the multitude of excuses and lies told by the Aaronson Defendants to the Deos were entirely made to hide the Aaronson Defendants' illegal and wrongful takeover of the company and to also hide the Aaronson Defendants breaches of their Agreements to provide use of their Floor Plans and software for the benefit of NorthShore.

346. At all times relevant hereto, the Aaronson Defendants and the Deos referred to each other as "partners" since the Aaronson Defendants supplied the Floor Plans for a fee in assisting the Deos with the operation of their (the Deos') companies, 189 Sunrise (since February 2021) and NorthShore since its inception.

347. At all times relevant hereto, the Aaronson Defendants utilized the agreements to provide use of their Floor Plans for the benefit of the Plaintiffs to completely control 100% of both companies' finances, and ultimately, the Aaronson Defendants wielded the Floor Plan agreement(s) as weapons to illegally and wrongfully obtain and maintain both ownership of 189 Sunrise

and NorthShore as well as control of 189 Sunrise and NorthShore, long after NorthShore was opened and owned by the Deos (*see* Exhibits A, B, C, and U), and 189 Sunrise was purchased and the space leased by the Deos (*see* Exhibits D and E); *see also* confirmation of the Deos ownership of both corporations by the Aaronson Defendants in Exhibits G and H.

348.    By and through the Floor Plan agreement(s) with and superior financial might over the Plaintiffs, the Aaronson Defendants 1) gained access to the physical locations of both Plaintiff corporations; 2) utilized the physical access to both Plaintiff corporations to control both companies' software, bank accounts, company documents, and company books; 3) placed Aaronson Defendants into employment and/or oversight positions in both companies to be their on-site eyes and ears so as to assist with such events as the Khan incident and the David Baron incident to further solidify the Aaronson Defendants' theft of both companies and their bank accounts; 4) obtained superior positions over the Plaintiffs in order to control all finances and have their own accountant (RWC) and lawyers (CSZ and MLLG) and Floor Plan providers (Ally, NextGear and NMAC) under the Aaronson Defendants' control in providing services to the corporate Plaintiffs, leaving the Aaronson Defendants able to control the Plaintiffs fully upon the threat of shuttering the Plaintiffs' businesses; 5) obtained full control over the Plaintiff companies' tax returns and documents to further their surreptitious takeover of both companies, taking over NorthShore since they filed tax returns prior to and then obtained the corporate book on June 16, 2020 and falsified documents

that day to take over company accounts, and 189 Sunrise from the date of

selling the company to the Deos (Exhibit D) without ever fully turning over

ownership until fully admitting their theft by and through their approval of the

tax returns indicating the Deos' ownership (Exhibits G & H); and 6) purposely

avoided having EEE Contracts so as to control the situation without being

bound by specific contractual positions and without alerting the Plaintiffs to

the thefts and fraud being perpetrated by the Aaronson Defendants.

349.    At all times relevant hereto, Plaintiffs had a valid implied agreement for

the Aaronson Defendants to provide a Floor Plan to NorthShore and 189

Sunrise.

350.    At all times relevant hereto, the Aaronson Defendants agreed and were

obligated to act in good faith and deal fairly with the Plaintiffs in providing

the Floor Plans for 189 Sunrise and NorthShore.

351.    At all times relevant hereto, Plaintiffs performed what was required of

them under the implied agreements with the Aaronson Defendants:  At all

times relevant hereto, Plaintiffs 1) provided and operated corporations

requiring Floor Plans in forming NorthShore and purchasing 189 Sunrise; 2)

operated NorthShore and 189 Sunrise in good faith themselves; 3) hired and

supervised all employees at NorthShore since its inception; 4) hired and

supervised all employees at 189 Sunrise since its purchase by the Deos in

February 2021; 5) allowed the Aaronson Defendants access to and

placed/allowed one or more of them as additional signatories on bank

accounts as demanded by the Aaronson Defendants (but to the detriment of

the Plaintiffs); 6) agreed to positive pay and token security features on the corporate bank accounts as demanded by the Aaronson Defendants (but to the determent of the Plaintiffs); and 7) paid and overpaid large sums of money/good and valuable consideration (both willingly and unwillingly) to the Aaronson Defendants for the Floor Plans provided.

352.    By and through the within and other acts and omissions, the Aaronson Defendants, each and every one of them, knowingly and intentionally breached all contractual obligations and agreements with the Plaintiffs in multiple ways, including, but not limited to, the following:  1) Each and every Aaronson Defendant knew and should have known of the illegalities, thefts, fraud, and wrongdoings committed as set forth herein by each and every other Aaronson Defendants, and conspired therewith to ignore and breach all agreements with the Plaintiffs; 2) Each and every Aaronson Defendant failed to act in good faith and deal fairly with the Plaintiffs; 3) Each and every Aaronson Defendant assisted in defrauding the Plaintiffs by being the eyes and ears of the other Aaronson Defendants and informing the other Aaronson Defendants of all acts by the Plaintiffs constantly and on-going, such as keeping the Aaronson Defendants informed as to the whereabouts of the Deos to assist in stealing from bank accounts, taking all company records and books, shuttering access to necessary software, and more; 4) Each and every Aaronson Defendant either outright assisted or intentionally ignored the bank account thefts and income tax fraud perpetrated on the Plaintiffs herein; 5) Each and every Aaronson Defendant knows and should know that the

allegations made by the Aaronson Defendants in Actions 1 & 2 against the Plaintiffs herein are false, knowingly false, and perpetrated merely to engage in the "best defense is a good offense" strategy given what is set forth herein as supported by the Exhibits hereto; 6) Each and every Aaronson Defendant engaged in Cozy Relationships with Ally, NextGear, NMAC, RWC, CSZ, MLLG and Chase employees and Representatives to flaunt and take advantage of their wealth so that those businesses always sided with their cash cows, the Aaronson Defendants, so that these outside businesses would conveniently and intentionally ignore red flags and outright wrongdoing to the Plaintiffs' detriment; 7) each and every Aaronson Defendant benefitted from and engaged in PPP theft from 189 Sunrise and NorthShore; 8) Each and every Aaronson Defendant engaged in a conspiracy with Ally, NextGear, NMAC, RWC, CSZ, MLLG and Chase as named herein to defraud the Plaintiffs; and 9) Each and every Aaronson Defendant assisted in the November 2022 shuttering of 189 Sunrise and NorthShore, the stealing of the funds in their bank accounts during the shuttering, the stealing of the two companies' books and records, the theft of both companies' software, the removal and resale for intentional losses of the two companies' automobiles, the cancellation of the Floor Plans from further use at both companies, and the wrongful and harmful recission of all agreements with the Plaintiffs.

353.    By the direct and proximate acts and omissions set forth herein by the Aaronson Defendants as against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

354.    By the direct and proximate acts and omissions set forth herein by the Aaronson Defendants as against the Plaintiffs, the Plaintiffs have lost their livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

355.    By and through the filing of false and fraudulent lawsuits against the Plaintiffs, the Aaronson Defendants have each committed frauds upon the Court, and further breached their agreements to provide Floor Plans and good faith and fair dealing to the Plaintiffs in providing the Floor Plans and other services to the Plaintiffs.

356.    Each of the Plaintiffs bring this Count against each of the Aaronson Defendants.

WHEREFORE, by the within and other acts and omissions, the Aaronson Defendants have breached and continue to breach all contractual obligations and agreements with the Plaintiffs; such breaches have harmed and continue to harm the Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such

other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

### COUNT II: INTENTIONAL INTERFERENCE BY ALL DEFENDANTS AGAINST ALL PLAINTIFFS

#### A. Generally

357. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

358. At all times relevant hereto, each of the parties to this case that work in the automobile industry in and on Long Island, New York, including each of the Plaintiffs, each of the Aaronson Defendants and their corporate companies, each of the Urrutia Defendants and their corporate companies, Ally, NMAC, NextGear, and Chase, all do business with many of the same customers, contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

359. At all times relevant hereto, the businesses related to the automobile dealership industry in and on Long Island, New York, know many of the parties and conduct business with the parties to this lawsuit.

360. RWC, CSZ, and MLLG all specifically conduct business with a variety of automobile dealerships in and on Long Island, New York, in addition to those that are parties to this lawsuit.

361.    Ally, NextGear and NMAC all specifically conduct business with a variety of automobile dealerships in and on Long Island, New York, in addition to those that are parties to this lawsuit.

362.    Each of the Aaronson Defendants and each of the Urrutia Defendants including their unnamed corporate interests conduct business with a variety of automobile dealerships in and on Long Island, New York, in addition to those that are parties to this lawsuit.

363.    Upon information and belief, though lucrative, the automobile dealership industry and businesses in and on Long Island, New York, is a relatively small industry, possibly numbering as small as only hundreds of such dealerships.

364.    Accordingly, and especially if using contacts to deliver messages, it is easy to impact competitors in the automobile dealership industry in and on Long Island, New York, via whispering campaigns, via word of mouth, via casual but hurtful comments, via warnings, and via threats either explicit or implied; quite simply it is easy to interfere with the Plaintiffs' corporate businesses and individual livelihoods, which, upon information and belief, each of the individual Defendants and one or more employees of the corporate Defendants have done and continue to do ongoing.

   B.  Aaronson Defendants, Ally, NextGear, Chase, CSZ, MLLG, and RWC

365.    At all times relevant hereto, NorthShore and 189 Sunrise had on-going business relationships with customers to sell them automobiles; Plaintiff Sara Deo specifically worked to produce customer lists and assign company employees to follow up on said lists; she also supervised the expansion of

customers and the employees who worked on and contacted those customers on the lists she specifically created through her own exclusive efforts on customer lists for NorthShore and 189 Sunrise.

366. At all times relevant hereto, NorthShore and 189 Sunrise had on-going business relationships with various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

367. At all times relevant hereto, the Deos had on-going business relationships with customers to sell them automobiles by and through their businesses, 189 Sunrise and NorthShore.

368. At all times relevant hereto, the Deos had on-going business relationships with various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

369. At all times relevant hereto, the Aaronson Defendants, Ally, NextGear, Chase, RWC, CSZ, and MLLG knew and should have known of the business and business relationships of the corporate Plaintiffs in the automobile dealership industry in and on Long Island, New York.

370.    At all times relevant hereto, the Aaronson Defendants, Ally, NextGear, Chase, RWC, CSZ, and MLLG knew and should have known of the business and business relationships of the Deos in the automobile dealership industry in and on Long Island, New York.

371.    At all times relevant hereto, the Defendants knew and should have known of each contact each of the Plaintiffs had in the automobile industry in and on Long Island, New York, specifically because each of these Defendants intentionally sought to discover Plaintiffs' contacts to further each of the Defendants' interests at the specific expense of the Plaintiffs and in furtherance of the plan and scheme to defraud, ruin, interfere with, and otherwise harm each of the Plaintiffs.

372.    At all times relevant hereto, the corporate Plaintiffs maintained agreements/contracts, whether express or implied, with NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG in addition to the contracts and agreements by and between the Plaintiffs and Aaronson Defendants.

373.    At all times relevant hereto, and while acting in conspiracy with each other and fully hiding information and documents from the Plaintiffs, the Aaronson Defendants and NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG, including other professionals unknown to Plaintiffs herein, acted intentionally to interfere with and ruin the corporate Plaintiffs and the Deos' businesses, livelihoods, and on-going business relationships with customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage

facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York, by and including, but not limited to:  1) Cooperating in the shuttering of 189 Sunrise and NorthShore; 2) Cooperating in the pulling of Floor Plans from 189 Sunrise and NorthShore; 3) Preventing the Plaintiffs from obtaining their own Floor Plans for 189 Sunrise and NorthShore; 4) Turning in the DMV licenses required to operate 189 Sunrise and NorthShore; 5) Defrauding the Plaintiffs of their bank accounts; 6) Defrauding the Plaintiffs of all money in their bank accounts; 7) Defrauding the Plaintiffs of all PPP funds; 8) Stealing the software required to run 189 Sunrise and NorthShore; 9) Filing fraudulent tax returns by and for the corporate Plaintiffs; 10) Stealing the corporate Plaintiffs; 11) Misappropriating monies paid by the Plaintiffs to the Aaronson Defendants; 12) Acting on behalf of the corporate Plaintiffs without any authority or approval from the Deos on behalf of the corporate Plaintiffs; 13) Wrongfully suing the Plaintiffs with Actions (1 & 2) that consist of frauds upon their respective Courts; 14) Disposing of automobiles without authority of the Plaintiffs; 15) Misrepresenting the true value of the corporate Plaintiffs' automobiles in disposing of those automobiles; 16) Stealing the Plaintiff corporations; 17) Fraudulently obtaining the corporate book of NorthShore and utilizing same to steal NorthShore; 18) Constantly and consistently lying to Plaintiffs; 19) Hiding books, records, and documents from Plaintiffs and refusing to return same upon multiple demands; 20) Utilizing Cozy Relationships to defraud the Plaintiffs; 21) Wrongfully and with malice

reneging on all Floor Plans and preventing Plaintiffs from obtaining Floor Plans; 22) Ruining the Plaintiffs reputations in the automobile business; 23) Ignoring corporate policies herein when it involved the Plaintiffs, but doing anything and everything possible for the Aaronson Defendants even to the known detriment of the Plaintiffs in order to keep the Aaronson Defendants' lucrative business; 24) Acting blatantly racist towards the Plaintiffs; 25) Ignoring all ethical duties and obligations to the Plaintiffs; 26) Ignoring all other duties owed to the Plaintiffs; and 27) Knowingly and intentionally refusing to review the within and attached documentation in order to intentionally ignore information beneficial to the Plaintiffs and detrimental to the co-Defendants/co-Conspirators.

374.     By the within and other acts and omissions, the Aaronson Defendants and NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG, including other professionals unknown to Plaintiffs herein, knew and should have known of the staggering interference each of them committed in ruining Plaintiffs' businesses, livelihoods, and on-going business relationships with 189 Sunrise's and NorthShore's customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

375.     By the within and other acts and omissions, the Aaronson Defendants and NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG, including other

professionals unknown to Plaintiffs herein, committed these acts of intentional interference surreptitiously, fraudulently, with malice aforethought, and at various times while utilizing various hidden methods unknown to the Plaintiffs but known to and discoverable from the Defendants.

376.    At all times relevant hereto, the Aaronson Defendants and NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG, including other professionals unknown to Plaintiffs herein knew and should have known of the Plaintiffs' various business relationships, including those with various third parties including the names and identities of customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

377.    At all times relevant hereto, the Aaronson Defendants acted in conspiracy with NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG in conducting the interferences known to Plaintiffs set forth in paragraph 371, *supra,* and committed other interferences unknown to the Plaintiffs absent discovery.

378.    At all times relevant hereto, the Aaronson Defendants in conspiracy with NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG acted with malice and acted illegally and wrongfully in the interferences known to Plaintiffs set forth in paragraph 371, *supra,* and committed other interferences unknown to the Plaintiffs absent discovery.

379.    At all times relevant hereto, the Aaronson Defendants in conspiracy with NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG acted with malice and acted illegally and wrongfully in ruining and ending each of Plaintiffs' business relationships, including those with customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

380.    In fact, by and through their intentional acts and omissions committed with malice at all times relevant hereto, the Aaronson Defendants in conspiracy with NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG completely ended the Plaintiffs' business relationships, including those with customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York, permanently; simply put, the Defendants collectively succeeded in blackballing Plaintiffs from the automobile dealership industry in and on Long Island, New York.

381.    The Aaronson Defendants' and NextGear's, Ally's, NMAC's, Chase's, RWC's, CSZ's, and MLLG's wrongful and illegal and fraudulent acts and omissions that constitute tortious interference with the Plaintiffs' business relations are on-going and have not ceased since these Defendants

commenced such acts, which each of them keep hidden from the Plaintiffs yet are easily discernible to the Plaintiffs since all of Plaintiffs' customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York, that will not do business with any of the Plaintiffs anymore explain in hushed, fearful tones to the Plaintiffs that they have been informed by one or more of the Defendants in this case (at various times naming each of the Defendants to Plaintiffs) that they know of the lawsuits and allegations by Defendants against Plaintiffs and are too afraid to do business with Plaintiffs anymore.

382.   Each of the Plaintiffs bring this Count against each of the Aaronson Defendants, NextGear, Ally, NMAC, Chase, RWC, CSZ, and MLLG.

383.   The within and other interferences against the Plaintiffs by these Defendants have directly and proximately caused and continue to cause massive losses by and harm to each of the Plaintiffs; the Deos have lost their chosen line of work and have been blackballed by these Defendants from the automobile dealership industry on Long Island, New York; the corporate Plaintiffs have been shuttered, closed, and all assets, customers, monies, files, software, security cameras, equipment, employees, and leases completely stolen and lost forever due to these Defendants' actions with malice aforethought.

C. The Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG

384. Plaintiffs restate, reallege, and reaver each of the preceding paragraphs as if specifically re-written here.

385. At all times relevant hereto, Superb had on-going business relationships with customers to sell them automobiles; Plaintiff Sara Deo specifically worked to produce customer lists and assign company employees to follow up on said lists; she also supervised the expansion of customers and the employees who worked on and contacted those customers on the lists she specifically created through her own exclusive efforts on customer lists for Superb.

386. At all times relevant hereto, Superb had on-going business relationships with various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

387. At all times relevant hereto, the Deos had on-going business relationships with customers to sell them automobiles by and through Anthony's interest in Superb.

388. At all times relevant hereto, the Deos had on-going business relationships with various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other

businesses related to the automobile dealership industry in and on Long Island, New York.

389. At all times relevant hereto, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG knew and should have known of the business and business relationships of Superb in the automobile dealership industry in and on Long Island, New York.

390. At all times relevant hereto, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG knew and should have known of the business and business relationships of the Deos in the automobile dealership industry in and on Long Island, New York.

391. At all times relevant hereto, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG knew and should have known of each contact each of the Plaintiffs had in the automobile industry in and on Long Island, New York, specifically because each of these Defendants intentionally sought to discover Plaintiffs' contacts to further each of the Defendants' interests at the specific expense of the Plaintiffs and in furtherance of the plan and scheme to defraud, ruin, interfere with, and otherwise harm each of the Plaintiffs.

392. At all times relevant hereto, Superb maintained agreements/contracts, whether express or implied, with Chase, NextGear, NMAC, CSZ and MLLG in addition to the contracts and agreements by and between the Plaintiffs and the Urrutia Defendants.

393.    At all times relevant hereto, and while acting in conspiracy with each

other and fully hiding information and documents from the Plaintiffs, the

Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG,

including other professionals unknown to Plaintiffs herein, acted intentionally

to interfere with and ruin Superb and the Deos' businesses, livelihoods, and

on-going business relationships with customers, various contractors,

subcontractors, lenders, Floor Plan providers, warranty companies, software

providers, dealerships, landlords and owners, storage facilities, auto

auctioneers and wholesalers, transporters, and other businesses related to the

automobile dealership industry in and on Long Island, New York, by and

including, but not limited to:  1) Cooperating in the shuttering of Superb; 2)

Cooperating in the pulling of Floor Plans from Superb; 3) Preventing the

Plaintiffs from obtaining their own Floor Plans for Superb; 4) Turning in the

DMV licenses required to operate Superb; 5) Defrauding Superb of its assets

and bank accounts; 6) Defrauding Superb of all money in its bank accounts; 7)

Defrauding Superb of all PPP funds; 8) Filing fraudulent tax returns by and

for the corporate Plaintiffs; 9) Preventing the Deos from continuing to operate

and improve the business at Superb; 10) Ruining Superb's business

intentionally and at least in part to hide the Urrutia Defendants' thefts from

Urrutia's three other dealerships besides Superb totally in excess of twenty

million dollars; 11) taking actions and inactions that allowed Urrutia to

permanently flee the country; 12) Taking actions including theft that harmed

Superb including the theft of all monies from the company and the

unauthorized and wrongful shuttering of the business; 13) Wrongfully suing the Plaintiffs with Actions (1 & 2) that consist of frauds upon their respective Courts; 14) Disposing of automobiles without authority; 15) Misrepresenting the true value of the automobiles in disposing of those automobiles; 16) Intentionally harming Anthony Deo's interests in Superb and falsely accusing him of thefts from the company to hide Urrutia's thefts; 17) Constantly and consistently lying to the Deos; 18) Hiding books, records, and documents from Anthony Deo and refusing to return same upon multiple demands; 19) Utilizing Cozy Relationships to defraud the Anthony Deo and his interests in Superb; 20) Wrongfully and with malice reneging on all Floor Plans and preventing Plaintiffs from obtaining Floor Plans; 21) Ruining the Plaintiffs reputations in the automobile business; 22) Acting blatantly racist towards the Plaintiffs; 23) Ignoring all ethical duties and obligations to Anthony Deo; 24) Ignoring all other duties owed to Anthony Deo; and 25) Knowingly and intentionally refusing to review the within and attached documentation in order to intentionally ignore information beneficial to the Plaintiffs and detrimental to the co-Defendants/co-Conspirators.

394.    By the within and other acts and omissions, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG, including other professionals unknown to Plaintiffs herein, knew and should have known of the staggering interference each of them committed in ruining Plaintiffs' businesses, livelihoods, and on-going business relationships with Superb's and 189 Sunrise's and NorthShore's customers, various contractors,

subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

395.    By the within and other acts and omissions, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG, including other professionals unknown to Plaintiffs herein, committed these acts of intentional interference surreptitiously, fraudulently, with malice aforethought, and at various times while utilizing various hidden methods unknown to the Plaintiffs but known to and discoverable from the Defendants.

396.    At all times relevant hereto, the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG, including other professionals unknown to Plaintiffs herein knew and should have known of the Plaintiffs' various business relationships, including those with various third parties including the names and identities of customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

397.    At all times relevant hereto, the Urrutia Defendants acted in conspiracy with Superb, Chase, NextGear, NMAC, CSZ and MLLG, in conducting the interferences known to Plaintiffs set forth in paragraph 391, *supra,* and committed other interferences unknown to the Plaintiffs absent discovery.

398.    At all times relevant hereto, the Urrutia Defendants in conspiracy with Superb, Chase, NextGear, NMAC, CSZ and MLLG, acted with malice and acted illegally and wrongfully in the interferences known to Plaintiffs set forth in paragraph 391, *supra,* and committed other interferences unknown to the Plaintiffs absent discovery.

399.    At all times relevant hereto, the Urrutia Defendants in conspiracy with Superb, Chase, NextGear, NMAC, CSZ and MLLG acted with malice and acted illegally and wrongfully in ruining and ending each of Plaintiffs' and Superb's business relationships, including those with customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York.

400.    In fact, by and through their intentional acts and omissions committed with malice at all times relevant hereto, the Urrutia Defendants in conspiracy with Superb, Chase, NextGear, NMAC, CSZ and MLLG completely ended the Plaintiffs' and Superb's business relationships, including those with customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York, permanently; simply put, these Defendants collectively

succeeded in blackballing Plaintiffs and Superb from the automobile dealership industry in and on Long Island, New York.

401. The Urrutia Defendants and Superb's, Chase's, NextGear's, NMAC's, CSZ's and MLLG's wrongful and illegal and fraudulent acts and omissions that constitute tortious interference with the Plaintiffs' and Superb's business relations are on-going and have not ceased since these Defendants commenced such acts, which each of them keep hidden from the Plaintiffs and Superb yet are easily discernible to the Plaintiffs and Superb since all of Plaintiffs' and Superb's customers, various contractors, subcontractors, lenders, Floor Plan providers, warranty companies, software providers, dealerships, landlords and owners, storage facilities, auto auctioneers and wholesalers, transporters, and other businesses related to the automobile dealership industry in and on Long Island, New York, that will not do business with any of the Plaintiffs or Superb anymore explain in hushed, fearful tones to the Plaintiffs that they have been informed by one or more of the Defendants in this case (at various times naming each of the Defendants to Plaintiffs) that they know of the lawsuits and allegations by Defendants against Plaintiffs and are too afraid to do business with Plaintiffs anymore.

402. Each of the Plaintiffs bring this Count against each of the Urrutia Defendants, Superb, Chase, NextGear, NMAC, CSZ and MLLG.

403. The within and other interferences against the Plaintiffs by these Defendants have directly and proximately caused and continue to cause massive losses by and harm to each of the Plaintiffs and Superb; the Deos

have lost their chosen line of work and have been blackballed by these Defendants from the automobile dealership industry on Long Island, New York; the corporate Plaintiffs and Superb have been shuttered, closed, and all assets, customers, monies, files, software, security cameras, equipment, employees, and leases completely stolen and lost forever due to these Defendants' actions with malice aforethought.

404.    The Urrutia Defendants' and Superb's, Chase's, NextGear's, NMAC's, CSZ's and MLLG's wrongful and illegal and fraudulent acts and omissions that constitute tortious interference with the Plaintiffs' and Superb's business relations are on-going and have not ceased since these Defendants commenced such acts and omissions beginning in August, 2023.

WHEREFORE, by the within and other acts and omissions, the Defendants have intentionally and tortiously interfered with and continue to interfere with all of the Plaintiffs' and Superb's business relations; most of the information consisting of the interferences are known only to the Defendants and is intentionally kept from the Plaintiffs; such interference is the direct and proximate cause of the Plaintiffs' harm stemming from such interference at all times relevant hereto; such interference caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount

allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

### COUNT III: BREACH OF CONTRACT BY THE URRUTIA DEFENDANTS

405. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

406. At all times relevant hereto, the Urrutia Defendants impliedly and/or expressly contracted with the Plaintiffs on various agreements including, but not limited to the express agreements attached hereto as Exhibit I-1 and I-2, for which Anthony Deo transferred and paid to Anthony Urrutia monies/consideration that he, Deo, obtained and personally guaranteed for 49% of the outstanding stock in Superb.

407. At all times relevant hereto Deo met his obligations under the agreements attached hereto as Exhibits I-1 and I-2; Deo also acted in good faith and dealt fairly with Urrutia in all respects regarding Exhibits I-1/I-2 and Superb.

408. However, in various ways, Urrutia, acting in conspiracy with the rest of the Urrutia Defendants, violated and breached the agreements made with Anthony Deo and the corporate Plaintiffs including, but not limited to, as follows:

    a) The Urrutia Defendants conspired to falsely accuse the Deos of theft of money;

    b) The Urrutia Defendants conspired to falsely accuse the Deos of theft of automobiles;

c) Urrutia himself fraudulently induced Deo into the contracts attached as Exhibits I-1 and I-2 (and therefore breaching same from the outset) under false pretenses: the Urrutia Defendants never intended to do business with the Plaintiffs long term and apparently never intended to sell Deo two of the Urrutia Defendants' dealerships (Superb and Hartford Mitsubishi); the Urrutia Defendants conspired to get as much money as possible from the Plaintiffs, then conspired to blamed the Plaintiffs for their own mismanagement that caused the shuttering of all four of the Urrutia Defendants' dealerships, Superb and Hartford Mitsubishi, plus additional dealerships in New Jersey and Massachusetts. This conspiracy was always intended to obtain money from the Plaintiffs only, as Urrutia was bleeding the Urrutia Defendants' companies of money for their own benefit and needed infusions of cash to try to save the companies at the time that Morgan introduced Deo and Urrutia; in fact, NMAC now alleges in three separate lawsuits against Urrutia and he personally stole over twenty million dollars from his companies and NMAC, which cost Anthony Deo his interest in Superb, wrongfully.

d) The Urrutia Defendants made false police reports regarding the theft of money and automobiles against the Deos as part of their plan to wrongfully Lock-Out the Deos from Superb.

e) The Urrutia Defendants continued to drain Superb of money for their own personal gains, and when Deo investigated the thefts, the CFO for Team Auto and the Urrutia Defendants was fired in an attempt to prevent

129

Anthony Deo from discovering the true extent and involvement of the Urrutia Defendants' theft and breaches.

f) The Urrutia Defendants wrongfully shuttered Superb as part of their conspiracy to defraud Anthony Deo out of money invested in Superb.

g) The Urrutia Defendants wrongfully commenced and still wrongfully maintain Actions 2 and 3 (Exhibits O and P hereto) as frauds upon the Court and upon the Plaintiffs herein.

409. As set forth in Exhibits I-1 and/or I-2, Anthony Deo promised to cross-collateralize the Superb acquisition by and through securing Urrutia by and through 189 Sunrise and NorthShore; at all times relevant hereto, just as Deo represented by executing Exhibits I-1 and I-2, he stood prepared and able and did, in fact, secure Urrutia by and through 189 Sunrise and NorthShore, the Deos' companies at the time that Exhibits I-1 and I-2 were executed and which remain so today.

410. Nonetheless, at all times relevant hereto, Urrutia worked in conspiracy with the co-Defendants in this action to shutter and ruin 189 Sunrise and NorthShore so as to try to place blame on the Plaintiffs by and through false allegations fully supported by the Urrutia Defendants in Actions 1, 2, & 3, when the loss and shuttering of the Urrutia Defendants own companies was always due solely to the mismanagement, poor decisions, and outright frauds committed by the Urrutia Defendants.

411.    At all times relevant hereto, Deo kept Urrutia informed as to the 2023 events involving Superb, 189 Sunrise, and NorthShore, both verbally and in writings (*see, e.g.,* Exhibit L hereto).

412.    Urrutia, on the other hand, surreptitiously drained Superb of its monies for Urrutia's and his co-Urrutia Defendants' gain and benefits, shuttered Superb (and his Hartford, Connecticut dealership) and planned and executed the Lock-Out and Action #2 in conspiracy with all of the co-Defendants herein and with malice aforethought and in full breach of all agreements controlled by the Urrutia Defendants with any and all of the Plaintiffs. E.g., Urrutia specifically stole $250,000.00 from the Superb account(s) during July 2023, immediately before the Lock Out.

413.    By the direct and proximate acts and omissions set forth herein by the Urrutia Defendants as against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

414.    By the direct and proximate acts and omissions set forth herein by the Urrutia Defendants as against the Plaintiffs, the Plaintiffs have lost their livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

415.    Each of the Plaintiffs bring this Count against each of the Urrutia Defendants.

WHEREFORE, by the within and other acts and omissions, the Urrutia Defendants have breached and continue to breach all contractual obligations and agreements with the Plaintiffs; such breaches have harmed and continue to harm the

Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

## COUNT IV: CIVIL ASSAULT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND THREAT TO MURDER AGAINST THE URRUTIA DEFENDANTS

416. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

417. At all times relevant hereto, the Urrutia Defendants were headed by Urrutia, Novicky, and Morgan.

418. Upon information and belief, and in order to gain the full support of all of the Urrutia Defendants and employees, Urrutia, Novicky and Morgan spread lies throughout the company about the Deos, especially Anthony Deo.

419. It is unknown by the Plaintiffs the full extent of lies spread through the company by the Urrutia Defendants, but in response thereto, and with the full knowledge of and approval of the Urrutia Defendants, Parmeshwar Bissoon,

one of the Urrutia Defendants herein, specifically threatened the life of Anthony Deo. Attached hereto as Exhibit V is a true and accurate copy of the text(s) sent by Bissoon to Deo threatening his life.

420. At all times relevant hereto, Bissoon's co-Defendants amongst the Urrutia Defendants incited him into making the threats he reduced to writing against Deo as attached in Exhibit V.

421. At all times relevant hereto, the threats contained in Exhibit V constitute an assault and a threat upon the life of Anthony Deo.

422. Specifically, the common meaning and understanding of the word "pop" in the culture of Bissoon, a young male, means and was meant as (to Deo) "shoot" with some type of gun or other weapon.

423. At all times relevant hereto, the words, actions, and omissions from the co-Urrutia Defendants to Bissoon that caused Bissoon to make the statements contained in Exhibit V were made recklessly, intentionally, with malice, and with outrageous indifference to Deo and for Deo's safety.

424. As a direct and proximate result in the conspiracy amongst the Urrutia Defendants to incite Bissoon and cause Bissoon to threaten Deo, Deo and his wife, co-Plaintiff Sara Deo, has been harmed and caused great anguish.

425. Given the within accusations, the Bissoon threats, which resulted in an Order of Protection being issued for Deo and against Bissoon after investigation by one or more Police Officers and a Court of competent jurisdiction, are clearly part of a campaign by the Urrutia Defendants to intimidate the Deos and cause them real fear and mental anguish.

426. As a direct and proximate result of the conspiracy amongst the Urrutia Defendants to incite Bissoon and cause Bissoon to threaten Deo, the Deos live in fear for their lives and await further threats and/or actual harm from the Urrutia Defendants daily.

427. By and through the threat attached hereto as Exhibit V, the Urrutia Defendants intentionally threatened Anthony Deo.

428. By and through the threat attached hereto as Exhibit V, the Urrutia Defendants took steps to actually harm Anthony Deo.

429. By and through the threat attached hereto as Exhibit V, the Urrutia Defendants intentionally caused the Deos anguish and great mental harm.

430. At all times relevant hereto, the Deos reasonably and did believe that the Urrutia Defendants were capable of carrying out the threat attached hereto as Exhibit V, and were capable of actually killing Anthony Deo as threatened in Exhibit V.

431. At all times relevant hereto, and simply part and parcel of the greed exhibited throughout this Complaint, the Urrutia Defendants were and are capable of harming Anthony Deo, and were and are capable of actually killing Anthony Deo.

432. By and through the threat attached hereto as Exhibit V, the Urrutia Defendants were imminently about to assault Anthony Deo, and were imminently about to kill Anthony Deo.

433. At all times relevant hereto, the Urrutia Defendants intended to provoke and have provoked others to commit assault against Anthony Deo, to threaten

the life of Anthony Deo, and to harm Anthony Deo, not just by and through Bissoon, but upon information and belief, others unknown to the Plaintiffs as well.

434.    At all times relevant hereto, the within threats were meant to intimidate both of the Deo Plaintiffs and were meant to cause the Deo Plaintiffs emotional distress; in fact, the within threats *did* intimidate the Deos and has caused them great emotional distress. Simply put, the Deos now live their lives in fear that the next threat from the Urrutia Defendants will actually be carried out, and they live in fear of unexpectedly meeting one or more of the Urrutia Defendants while going about their daily lives and having to face the possibility of being assaulted or even murdered.

435.    The within Count/claims are against the Urrutia Defendants for the harm caused by their assaults and threats to murder Anthony Deo and the intentional infliction of great emotional distress upon both Deos; said harm constitutes great mental anguish and fear within Anthony Deo and his wife, Sara Deo, who both make claim hereunder.

WHEREFORE, by the within and other acts and omissions, the Urrutia Defendants have intentionally and tortiously assaulted and threatened to murder Plaintiff Anthony Deo; the Urrutia Defendants have also intended and did, in fact, wrongfully inflict emotional distress upon the Deos hereby; such assaults, threats to murder and infliction of emotional distress are directly and proximately the cause of the Deos' harm, mental anguish, emotional distress and constant fear for their safety; such assaults and threats to murder Anthony Deo and infliction of emotional distress upon both Deos

caused and continue to cause actual damages, nominal damages, and consequential damages to the individual Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

<u>COUNT V:  PROFESSIONAL MALPRACTICE BY RWC</u>

436.  Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

437.  RWC performed services as accountants for the corporate Plaintiffs hereto, 189 Sunrise and NorthShore, between the years 2018 and the fall of 2022 at a minimum; their wrongful conduct is ongoing since the fall of 2022 insofar as RWC by and through its employees and accountants and members continue to refuse to cooperate in demands of Plaintiffs to return all corporate documents and communications prepared and/or filed by RWC for the corporate Plaintiffs; said demands therefore are hereby renewed for such documents to be returned within thirty days (30) hereof..

438.  At all times relevant hereto regarding NorthShore, and at all times relevant since February 2021 regarding 189 Sunrise, the owners/members/ stockholders of 189 Sunrise and NorthShore were the Deo Plaintiffs herein.

439.    At all times relevant hereto, RWC knew and should have known that the owners/members/stockholders of 189 Sunrise and NorthShore were Anthony Deo and Sara Deo, only.

440.    At all times relevant hereto, the Aaronson Defendants certainly knew of the within frauds and thefts, as they perpetrated same.

441.    At all times relevant hereto, RWC knew and should have known of the frauds perpetrated by the Aaronson Defendants, as RWC were partners in committing the within frauds upon the Plaintiffs.

442.    At all times relevant hereto, RWC owed duties of care to each of the corporate Plaintiffs.

443.    Whether the RWC knew of the frauds and intentionally ignored same, including but not limited to, the theft of 189 Sunrise by the Aaronson Defendants after the Deos purchased same, the theft of NorthShore by the Aaronson Defendants after the Deos opened same, and all of the fraudulent documents including tax returns prepared thereafter by RWC, or, if RWC somehow failed to conduct any diligence in verifying the owners and operators of these two businesses, RWC is liable for massive malpractice claims by, *inter alia*, 1) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as 189 Sunrise; 2) acting as 189 Sunrise's Accountants without authorization from the owners/members/stockholders thereof; 3) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as NorthShore; 4) acting as NorthShore's

Accountants without authorization from the owners/members/stockholders thereof; 5) failing and refusing to correct the accounting mistakes and mistaken tax filings undertaken, prepared, and filed by RWC on behalf of 189 Sunrise; 6) failing and refusing to correct the accounting mistakes and mistaken tax filings undertaken, prepared, and filed by RWC on behalf of NorthShore; 7) cooperating with and assisting the Aaronson Defendants out of greed to keep their lucrative business as clients of RWC while simultaneously being part of the conspiracy to ruin the Plaintiffs herein; 8) intentionally ignoring multiple red flags that certainly did and should alert RWC to the Aaronson's frauds and thefts; 9) assisting in the theft of the PPP funds from 189 Sunrise and NorthShore and benefitting therefrom either directly (by wrongfully taking some of those funds for themselves) or continuing to assist the Aaronson Defendants in stealing those funds from the corporate Plaintiffs and keeping the Billionaire Aaronson Defendants' business for RWC; 10) violating their duties to the Plaintiffs herein by committing the within frauds and utter failures to protect these Plaintiffs; 11) violating every ethical and legal obligation as accountants through their utter failures towards protecting the Plaintiffs herein and intentionally ignoring the Aaronson Defendants' wrongdoing; 12) wrongfully manipulating the Aaronson Defendants' individual and corporate tax returns to assist in their frauds against the Plaintiffs; 13) wrongfully manipulating and failing to audit the Aaronson Defendants' financial statements to assist in their frauds against the Plaintiffs; 14) improperly maintaining records belonging to the Plaintiffs; 15) failing and

refusing to return the corporate Plaintiffs' records upon demand; 16) failing to detect the Aaronson Defendants' embezzlement and thefts from the corporate Plaintiffs; 17) purposely overbilling the Aaronson Defendants in conspiracy with the Aaronson Defendants and in gratitude from the Aaronson Defendants for RWC's intentionally ignoring the within frauds against the Plaintiffs, and for siding with the Aaronson Defendants at all relevant times herein; 18) enabling the Aaronson Defendants tax evasion and tax frauds as individuals, by and through their corporations, and by and through the corporate Plaintiffs herein; and 19) preparing and filing one or more actual state and federal tax returns for NorthShore, notably during or about September, 2021, without ever obtaining actual numbers for the corporation from the company's on-site software and instead relying upon false and made up numbers placed in the company's tax returns.

444.    At all times relevant hereto, RWC owed a duty of care to these Plaintiffs in acting on behalf of the corporate Plaintiffs.

445.    The within acts and omissions and ethical breaches materially deviate from accepted accounting practices and principles and professional standards, including all such standards promulgated by the American Institute of Certified Public Accountants.

446.    The within acts and omissions intended to interfere with the Deos' livelihoods and the corporate Plaintiffs' businesses, intended to interfere with the each of the relationships maintained by the Plaintiffs in the automobile dealership business in and on Long Island, New York, and assisted and

empowered the co-Defendants in shuttering and ruining the corporate Plaintiffs.

447. The within acts, omissions, breaches, frauds, and intentional ignorance constitute deviations from accepted accounting practices by these Accountants at all relevant times, and directly and proximately caused the Plaintiffs harm, while simultaneously helping RWC to keep the Aaronson Defendants as clients and benefitting those clients and RWC financially.

448. At all relevant times, RWC's work for and conduct towards the corporate Plaintiffs was wrongful, performed with malice aforethought, and constituted professional/accounting malpractice.

449. Plaintiffs Demand that RWC immediately provide to the Plaintiffs copies of all corporate records prepared at any time by or in the possession of any member, accountant, partner, stockholder, or associate of their firms on behalf of the corporate Plaintiffs.

450. Plaintiffs Demand that RWC immediately inform the Plaintiffs of the full identities (including names and work addresses) of each member, accountant, partner, stockholder, or associate of their firms who performed any work, filings, or services at any time for Plaintiff NorthShore, and who performed any work, filings, or services for Plaintiff 189 Sunrise since February, 2021; details of work, filings, and services performed are also herein demanded, including all executed fee agreements purporting to refer to the corporate Plaintiffs in any way.

451.    Plaintiffs Demand that the Accountants immediately provide to the Plaintiffs all billing records for NorthShore produced at any time and all billing records for 189 Sunrise produced at any time since February 2021 by or in the possession of any member, accountant, partner, stockholder, associate, or employee of either Defendant Accountant's firm.

452.    Plaintiffs Demand that the Accountants immediately provide all written communications between any member, accountant, partner, stockholder, associate, or employee of either Defendant Accountant's firm and any Aaronson Defendant regarding NorthShore at any time and 189 Sunrise since February 2021.

453.    Notice is hereby given that the Deos are the rightful owners/members/ stockholders of 189 Sunrise (since February 2021) and NorthShore at all times since its inception, and failure to respond to the within Demands within thirty (30) days of service of this Complaint shall be treated as additional acts of accounting malpractice herein at a minimum.

454.    It is the specific intention of the Plaintiffs to sue each and every individual Accountant from RWC who performed any work whatsoever for or on behalf of the corporate Plaintiffs herein at relevant times, but that the individual names of these Accountants are unknown to the Plaintiffs at this time, as that information rests solely with the Defendants in this action and at all relevant times has been and continues to be wrongfully kept from the Plaintiffs herein by all of the Defendants, including the Accountants themselves.

455. The within Count is brought on behalf of all Plaintiffs herein against RWC.

456. RWC acts and omissions on behalf of the corporate Plaintiffs constituted departures from accepted accounting standards, and such acts and omissions and departures directly and proximately caused Plaintiffs' harms. The acts and omissions and departures at issue include, but are not limited to the within alleged wrongdoings in light of a specific duty of care owed by RWC to their purported corporate Plaintiff clients, and RWC failed in all respects to discharge its duty of care as accountants to the Plaintiffs.

457. Upon information and belief, the false returns filed by RWC for one or both of the corporate Plaintiffs was performed, at least in part, to satisfy the Aaronson Defendants and further the Aaronson Defendants shell game schemes with their own personal and corporate tax returns, at least some of which were also prepared by RWC and its accountants.

458. The deviations and departures by RWC in performing its duties to the corporate Plaintiffs exceed and depart from RWC's engagement and duty to the corporate Plaintiffs. At all relevant times, RWC never obtained authority from the owners of 189 Sunrise and NorthShore before performing duties to those businesses because RWC committed further malpractice in failing to determine the true owners (the Deos) given a variety of red flags that RWC should have noticed including, but not limited to failing to recognize the obvious frauds set forth herein alleging Aaronson Defendants' ownership interests as set forth in the corporate book documents transparently/falsely

constructed by the Aaronson Defendants in June of 2021, failing to even

speak with the Deos, and apparently failing to ever check the Secretary of

State to make even rudimentary decisions on ownership of the corporations at

issue.

459.    Upon information and belief, RWC was not even paid by the corporate

Plaintiffs for RWC's work just to further help the Aaronson Defendants any

way RWC could to keep that lucrative account.

460.    In failing to determine the rightful owners of 189 Sunrise and NorthShore;

in failing to determine the rightful owners of 189 Sunrise and NorthShore

given red flags that should have alerted RWC to ownership issues with the

companies such as the transparently fraudulent documents consisting of phony

stock certificates suddenly appearing for NorthShore in June, 2021, after *years*

without RWC ever given those documents; in filing tax returns for the

corporate Plaintiffs without any true authority despite knowledge of the Deos

participation in the company; and in filing tax returns for the corporate

Plaintiffs with falsified numbers and then failing to correct same all suggests

fraud and intent by RWC and/or its employees.

WHEREFORE, by the within and other acts and omissions, RWC and each

individual employed therein who performed work at relevant times for and on behalf of

the corporate Plaintiffs have committed and continue to commit professional/accounting

malpractice and malfeasance against the Plaintiffs; such malpractice and malfeasance has

harmed and continues to harm the Plaintiffs in an on-going basis and continually; such

malpractice and malfeasance is the direct and proximate cause of the Plaintiffs' harm

stemming from such malpractice and malfeasance at all times relevant hereto; such malpractice and malfeasance have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

### COUNT VI: PROFESSIONAL MALPRACTICE BY THE ATTORNEYS

461. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

462. At various times related hereto, the Attorneys named herein (MLLG and CSZ) represented the corporate Plaintiffs hereto; the Defendant Attorneys represented NorthShore at various times since 2017, and the Defendant Attorneys represented 189 Sunrise at various times since February 2021, and the Defendant Attorneys represented Superb as various times since November 2022 (hereinafter, the "Relevant Representation").

463. As to CSZ's and MLLG's representations of NorthShore and 189 Sunrise, at all relevant times since February, 2021 (for 189 Sunrise) and since NorthShore's inception in late 2017, said representations by the Defendant

attorneys was without the authority and is without the authority of those corporations' sole owners/members/stockholders, Sara and Anthony Deo.

464.    It is not known by the Plaintiffs which individual attorneys/partners/ associates/members from MLLG and CSZ represented the corporate Plaintiffs and Superb during the Relevant Representation; the reason it is unknown to Plaintiffs is that these firms never obtained any authority from the Deos, since at no time to date have any attorneys from these law firms ever spoken to the Deos.

465.    These two law firms committed malpractice by 1) failing to obtain authority to represent 189 Sunrise or NorthShore during relevant times; 2) filing multiple fraudulent actions against Plaintiffs in order to assist the Aaronson Defendants in ruining the Plaintiffs, the fraud being known and should be known to these Defendant law firms given, *inter alia,* the assertions herein as well as review of the Exhibits attached hereto and incorporated herein by reference; 3) as set forth *supra,* these law firms upon information and belief have actively participated in ruining these Plaintiffs by and through a whispering campaign engaged in as part of the conspiracy amongst these Defendants to ruin Plaintiffs' business relationships in the automobile industry in and on Long Island, New York; 4) it is beyond dispute that these attorneys/law firms admit to representing the corporate Plaintiffs; to now sue and help to close and forever shutter those businesses is a wrongful conflict that these firms never should have undertaken and is both malpractice and one or more violations of the Attorney Code(s) of Conduct; and 5) likewise, it is a

conflict for these attorney to represent both Anthony Urrutia and Superb against these Plaintiffs given Anthony Deo's known interest in Superb; again, this conflict constitutes both malpractice and a violation of the Attorney Code(s) of Conduct.

466.    Upon information and belief, and by the within and other acts and omissions, the Defendant Attorneys have committed and continue to commit malpractice, negligence, gross negligence, and negligence *per se* by (*inter alia*): 1) Failing to find and act upon the various red flags and other warning signs that the Aaronson Defendants and the Urrutia Defendants were defrauding the Plaintiffs; 2) Aiding and abetting the fraud committed by the Aaronson Defendants and Urrutia against the Plaintiffs; 3) Intentionally ignoring the fraud committed by the Aaronson Defendants and Urrutia Defendants against the Plaintiffs; 4) failing to conduct any diligence in verifying the owners/members/ stockholders and operators of the corporate Plaintiffs and Superb; 5) conveniently siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as 189 Sunrise; 6) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as NorthShore; 7) siding at all relevant times with the Urrutia Defendants regarding the fraud perpetrated in stealing the corporation known as Superb; 8) cooperating with and assisting the Aaronson Defendants out of greed to keep their lucrative business as clients of the Attorneys while simultaneously being part of the conspiracy to ruin the Plaintiffs herein; 9)

cooperating with and assisting the Urrutia Defendants out of greed to keep their lucrative business as clients of the Attorneys while simultaneously being part of the conspiracy to ruin the Plaintiffs herein; 10) assisting in the theft of the PPP funds from 189 Sunrise and NorthShore and benefitting therefrom either directly (by wrongfully taking some of those funds for themselves) or continuing to assist the Aaronson Defendants in stealing those funds from the corporate Plaintiffs while keeping the Billionaire Aaronson Defendants' business for MLLG and CSZ thereby; 11) violating their fiduciary duties to the Plaintiffs herein by committing the within frauds and utter failures to protect these Plaintiffs; 12) violating every ethical and legal obligation as Attorneys through their utter failures towards protecting the Plaintiffs herein while intentionally ignoring the Aaronson Defendants' and Urrutia Defendants' wrongdoing; 13) improperly maintaining records belonging to the Plaintiffs; 14) failing to detect and prevent the Aaronson Defendants' and Urrutia Defendants' embezzlement and thefts from the corporate Plaintiffs and Superb; 15) purposely overbilling the Defendants in conspiracy with the Aaronson Defendants and the Urrutia Defendants and in gratitude from the Aaronson Defendants and Urrutia Defendants for the Attorneys' intentionally ignoring the within frauds against the Plaintiffs, and for siding with the Aaronson Defendants and Urrutia Defendants at all relevant times herein; 16) enabling the Aaronson Defendants' and Urrutia Defendants tax evasion and tax frauds and all frauds set forth herein by the Aaronson Defendants and Urrutia Defendants individually, by and through their businesses/

corporations, and by and through the corporate Plaintiffs and Superb; 17) failing to act in defense of the Plaintiffs given the acts and omissions set forth herein by all co-Defendants; and 18) acting carelessly and recklessly towards the Plaintiffs at all times relevant hereto.

467.    At all times relevant hereto, the Attorneys owed a duty of care and a fiduciary duty to these Plaintiffs and Superb in acting on behalf of the corporate Plaintiffs and Superb and/or the purported owners/members/ stockholders thereof.

468.    The within acts and omissions and fiduciary and ethical breaches materially deviate from accepted attorney practices and principles and professional standards.

469.    The within acts, omissions, fiduciary breaches, frauds, and intentional ignorance constitute deviations from accepted attorney practices by these Attorneys at all relevant times, and directly and proximately caused the Plaintiffs harm including the loss of their business/businesses, while simultaneously helping the Attorneys keep the Aaronson Defendants and Urrutia Defendants as clients and benefitting those clients and the Attorneys financially.

470.    At all relevant times, and by and through the within and other acts and omissions intentionally withheld from Plaintiffs, RWC and MLLG by and through its attorneys acted with unwarranted and wrongful hostility towards the Plaintiffs; utilized dishonest, hidden, surreptitious, unfair and improper

means to carry out the within allegations; and these act and omissions lead directly to and proximately caused Plaintiffs harm.

471.    Plaintiffs Demand that the Attorneys immediately provide to the Plaintiffs copies of all corporate records prepared at any time by or in the possession of any member, attorney, partner, or associate of their firms on behalf of the corporate Plaintiffs.

472.    Plaintiffs Demand that the Attorneys immediately inform the Plaintiffs of the full identities (including names and work addresses) of each member, attorney, partner, or associate of their firms who performed any work, actions, or services at any time for Plaintiff NorthShore, and who performed any work, actions, or services for Plaintiff 189 Sunrise since February 2021; details of work, actions, and services performed are also herein demanded, including all executed fee agreements purporting to refer to the corporate Plaintiffs in any way.

473.    Plaintiffs Demand that the Attorneys immediately provide to the Plaintiffs all billing records for NorthShore produced at any time and all billing records for 189 Sunrise produced at any time since February 2021 by any member, attorney, partner, associate, or employee of either Defendant Attorneys' firm.

474.    Plaintiffs Demand that the Attorneys immediately provide all written communications between any member, attorney, partner, associate, or employee of either Defendant Attorneys' firm and any Aaronson Defendant regarding NorthShore at any time and 189 Sunrise since February 2021.

475. Notice is hereby given that the Deos are the rightful owners/members/ stockholders of 189 Sunrise (since February 2021) and NorthShore at all times since its inception, and failure to respond to the within Demands within thirty (30) days of service of this Complaint shall be treated as additional acts of attorney malpractice herein at a minimum.

476. Furthermore, Notice is hereby given to the Defendant Attorneys as follows: The Defendant Attorneys are hereby reminded of their ethical duties and are to immediately 1) cease and desist from any work or actions purporting to involve the representation of the corporate Plaintiffs or any purported owner/member/stockholder thereof; and 2) withdraw from any action in which the Attorneys claim to represent the corporate Plaintiffs or any owner/member/stockholder thereof. To be clear: No Attorneys named herein nor any of their members, attorneys, partners, associates, or employees have any authority to represent any of the Plaintiffs or anyone claiming any interest in the corporate Plaintiffs ever again.

477. It is the specific intention of the Plaintiffs to sue each and every individual Attorney from MLLG and CSZ who performed any work whatsoever for or on behalf of the corporate Plaintiffs and Superb herein at relevant times, but that the individual names of these Attorneys are unknown to the Plaintiffs at this time, as that information rests solely with the Defendants in this action and at all relevant times has been and continues to be wrongfully kept from the Plaintiffs herein by all of the Defendants, including the Attorneys themselves.

478.     The within Count is brought on behalf of all Plaintiffs herein against each of the Attorneys working for MLLG and CSZ that performed work for any Plaintiff at relevant times, as well as against MLLG and CSZ as law firms.

WHEREFORE, by the within and other acts and omissions, the Attorneys and each individual employed therein who worked at relevant times on behalf of the corporate Plaintiffs and Superb have committed and continue to commit professional/ attorney malpractice, negligence, gross negligence, negligence *per se*, and malfeasance against the Plaintiffs; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance has harmed and continues to harm the Plaintiffs in an on-going basis and continually; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance is the direct and proximate cause of the Plaintiffs' harm stemming from such malpractice and malfeasance at all times relevant hereto; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

## COUNT VII:  BREACH OF CONTRACT BY THE LENDERS

479.   Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

480.   At various times relevant hereto, 189 Sunrise, NorthShore, and Superb maintained various express and/or implied agreements with Chase, Ally, NextGear and/or NMAC.

481.   Specifically, the following express and/or implied agreements are at issue in this Count during the dates listed:

a) One or more agreements by and between NorthShore and Chase regarding all bank accounts in effect since about January 2018;

b) One or more agreements by and between NorthShore and Ally regarding all Floor Plans in effect from about August 2018 until about November 2022;

c) One or more agreements by and between 189 Sunrise and Chase regarding all bank accounts in effect since about February 2021;

d) One or more agreements by and between 189 Sunrise and NextGear regarding all Floor Plans in effect since about November 2022;

e) One or more agreements by and between 189 Sunrise and Ally regarding all Floor Plans in effect from about February 2021 until November 2022;

f) One or more agreements by and between Superb and Chase regarding all bank accounts in effect since about December 2022;

g) One or more agreements by and between Superb and NMAC regarding all Floor Plans in effect since about December 2022; and

152

h) One or more agreements by and between Superb and NextGear regarding all Floor Plans in effect since about December 2022 (paragraphs a-h, *supra*, hereinafter collectively refer to the "Lender Contracts").

482.    At all times relevant hereto, Superb, 189 Sunrise, and NorthShore obtained Floor Plans through the Lender Contracts from the Automobile Lenders; Superb, 189 Sunrise, and NorthShore obtained bank accounts through the Lender Contracts from Chase.

483.    At all times relevant hereto, the Lenders owed duties of care to Superb, 189 Sunrise, and NorthShore arising from the Lenders' contracts with Superb, 189 Sunrise, and NorthShore.

484.    At all times relevant hereto, the Lenders owed the obligations of good faith and fair dealing to Superb, 189 Sunrise, and NorthShore arising from the Lenders' contracts with Superb, 189 Sunrise, and NorthShore.

485.    At all times relevant hereto, the Lenders' duties of care, and obligations of acting in good faith and fair dealing were also owed to the Deos as they were relevant owners and/or members and/or stockholders of Superb (Anthony Deo, 49% since November 2022 via the contract attached hereto as Exhibit I), 189 Sunrise (Anthony and Sara Deo 100% since February 2021 via the purchase attached hereto as Exhibit D, the lease attached hereto as Exhibit E, and the confirmation of ownership by the Aaronson Defendants in Exhibits G and H) and NorthShore (Anthony and Sara Deo 100% since forming the corporation in November 2017; *see* Exhibits A, B, C, G, H, U and Z).

486.    At all times relevant hereto, the Lenders knew or should have known of the Deos' ownership interests in the businesses known as Superb, 189 Sunrise, and NorthShore.

487.    At all times relevant hereto, the Deos individually and on behalf of and through their ownership interests in Superb, 189 Sunrise, and NorthShore fulfilled their obligations on all contractual agreements by and between the Deos, Superb, 189 Sunrise, and NorthShore on the one hand, and Chase, Ally, NextGear and NMAC on the other hand, including paying good and valuable consideration for the agreements and fulfilling their obligations thereunder as account/Floor Plan holders.

488.    At all times relevant hereto, and by and through the within and other acts and omissions, Chase, Ally, NextGear and NMAC and their Representatives whether known and identified herein or not, knowingly and intentionally breached all contractual and fiduciary obligations, duties and agreements with the Plaintiffs in multiple ways, including, but not limited to, the following:  1) Chase, Ally, NextGear and NMAC and their Representatives knew and should have known of the illegalities, thefts, fraud, and wrongdoings committed by the Urrutia Defendants and Aaronson Defendants as set forth herein, and conspired therewith to ignore and breach all agreements with the Plaintiffs due to greed/making more money off of the co-Defendants than the Plaintiffs; 2) Chase, Ally, NextGear and NMAC and their Representatives failed to act in good faith and deal fairly with the Plaintiffs; 3) Chase, Ally, NextGear and NMAC and their Representatives either outright assisted or intentionally

ignored the corporate thefts income tax fraud perpetrated on the Plaintiffs

herein; 4) Chase, Ally, NextGear and NMAC and their Representatives failed

to perform any diligence in confirming ownership interests in Superb, 189

Sunrise and NorthShore before and during the contractual arrangements at the

relevant times; 5) Chase, Ally, NextGear and NMAC acted in concert with the

co-Defendants in wrongfully shutting off the Plaintiffs' access to Floor Plans

and bank accounts in conspiracy with and at the direction of the Urrutia and/or

Aaronson Defendants, respectively; 6) Chase, Ally, NextGear and NMAC and

their Representatives failed and refused to speak with the Deos when

approached by the Deos to discuss the within; 7) Chase, Ally, NextGear and

NMAC and their Representatives engaged in Cozy Relationships with other

co-Defendants on multiple unknown occasions to keep the extraordinarily

wealthy co-Defendants and their businesses as customers at the expense and

to the detriment of the Plaintiffs; simply put, Chase, Ally, NextGear and

NMAC conveniently sided with the demonstrable Billionaires in shutting off

the Plaintiffs from their rightful access to Floor Plans and bank accounts; 8)

By and through wrongful conspiracy, Chase wrongfully allowed the Aaronson

and Urrutia Defendants to steal from the accounts rightfully belonging to the

corporate Plaintiffs and Superb, including theft of the PPP Pandemic Funds

from 189 Sunrise, NorthShore, and Superb.  At all times relevant hereto,

Chase knew or should have known of these thefts, but instead, sided with the

co-Defendants despite the Deos' complaints, and Chase outright sided with

the co-Defendants in their draining and closing of the accounts that Chase

knew or should have known rightfully belonged to the Plaintiffs; these wrongs by Chase were committed since the David Baron incident through the present on-going, and especially since contacts between Chase and the Plaintiffs in November, 2022; 9) Chase, Ally, NextGear and NMAC engaged in a conspiracy with the co-Defendants named herein and the Urrutia Defendants and/or Aaronson Defendants to defraud the Plaintiffs; 10) Chase, Ally, NextGear and NMAC engaged in a conspiracy with either the Aaronson Defendants and/or the Urrutia Defendants in the November 2022 shuttering of 189 Sunrise and NorthShore, the fall 2023 shuttering of Superb, and the forced removal and resale for intentional losses of Superb's, 189 Sunrise's, and NorthShore's automobiles; 11) Chase, Ally, NextGear and NMAC and their Representatives wrongfully engaged in blatant racism towards the Deos at all relevant times by and through their Cozy Relationships with the Urrutia and Aaronson Defendants, their refusals to ever even dine with the Deos when Chase, Ally, NextGear and NMAC by and through their Representatives knew and should have known of their ownership interests in 189 Sunrise, NorthShore and Superb, and siding in all respects with the Aaronson Defendants and Urrutia Defendants in the ruination of the Deos' ownership interests in Superb, 189 Sunrise and NorthShore while also intentionally ignoring the Deos ownership interests and the co-Defendants blatant thefts and ruination of the Deos' companies; 12) Chase, Ally, NextGear and NMAC failed, refused, and continue to fail and refuse to allow access to the Plaintiffs on behalf of Superb, 189 Sunrise, and NorthShore to the information and

documents relevant to these three (3) companies' accounts and contracts despite knowing or should knowing at all relevant times of the Deos' interests in 189 Sunrise, NorthShore, and Superb; and 13) NMAC affirmatively has interfered with the Deos' on-going business interests and queered an agreed upon deal for Deo to obtain an ownership interest in a business known as Route 112 Mitsubishi in Suffolk County, New York.

489.    At all times relevant hereto, the Aaronson Defendants utilized the Lender Contracts to provide Floor Plans for the benefit of the Plaintiffs to completely control 100% of 189 Sunrise and NorthShore, but in conspiracy with Ally, NextGear and NMAC and with Ally's, NextGear's and NMAC's knowledge and acquiescence, the Aaronson Defendants wielded the Lender Contracts as weapons to illegally and wrongfully obtain and maintain both ownership of 189 Sunrise and NorthShore as well as control of 189 Sunrise and NorthShore, long after NorthShore was opened and owned by the Deos (*see* Exhibits A, B, C, and U), and 189 Sunrise was purchased and the space leased by the Deos (*see* Exhibits D and E); *see also* confirmation of the Deos' ownership of both corporations by the Aaronson Defendants in Exhibits G and H.

490.    At all relevant times, Chase, Ally, NextGear and NMAC utilized Cozy Relationships with relationships with the co-Defendants to exclude the Deos from developing any relationships with the Chase's, Ally's, NextGear's and NMAC's Representatives, and as a weapon to stay close with the far wealthier Billionaires/Aaronson Defendants and the Urrutia Defendants, with whom

Chase, Ally, NextGear and NMAC had long lasting, lucrative relationships with and wanted to extend at the cost of ruining the Deos' lives, livelihoods, and corporate co-Plaintiff businesses, NorthShore and 189 Sunrise.

491.    By the direct and proximate acts and omissions and breaches set forth herein by Chase, Ally, NextGear and NMAC against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

492.    By the direct and proximate acts and omissions and breaches set forth herein by Chase, Ally, NextGear and NMAC against the Plaintiffs, the Plaintiffs have lost their livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

493.    The within Count is brought by all Plaintiffs against Chase, Ally, NextGear and NMAC.

WHEREFORE, by the within and other acts and omissions, Chase, Ally, NextGear and NMAC have breached and continue to breach all contractual obligations, fiduciary obligations, and agreements with the Plaintiffs by and through their contracts with the Plaintiffs and Superb; such breaches have harmed and continue to harm the Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars

($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

<u>COUNT VIII: CIVIL CONSPIRACY TO DEFRAUD, FRAUD, AND FRAUDULENT CONCEALMENT BY ALL DEFENDANTS</u>

494. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

495. At all times relevant hereto since November 2017, the Deos were, are, and remain the owners/sole members/sole stockholders of NorthShore.

496. At all times relevant hereto since February 2021, the Deos were, are, and remain the owners/sole members/sole stockholders of 189 Sunrise.

497. The Deos formed NorthShore, obtained its EIN tax identification number, obtained the corporate book for NorthShore, opened the corporate bank accounts with Chase, and entered into the lease where NorthShore operated at 180 Michael Drive, Syosset, New York, during late 2017 and 2018 as set forth in Exhibits A, B, C, and U, hereto.

498. However, the Deos *never* transferred their ownership interests in NorthShore to anyone at any time for any reason nor for any amount of money or other consideration.

499. The Deos *never* executed any documents purporting to transfer their ownership interests in NorthShore to anyone at any time for any reason nor for any amount of money or other consideration.

159

500.     At all times from the opening of NorthShore in 2018 through and
including the day the Aaronson Defendants shuttered NorthShore in
November 2022, NorthShore was solely operated by the Deos, albeit with the
Aaronson Defendants in full control of the company's finances, which the
Deos thought was acceptable given that the Aaronson Defendants were
purportedly supplying one or more Floor Plans from their other dealerships.

501.     Since the Deos always believed that the Floor Plans were somehow
provided from one or more of the Aaronson Defendants' dealerships (notably
Baron Nissan, the Deos were always told), even in the face of total destruction
of their companies, and without knowing the frauds that had been perpetrated
upon them and their companies for years by the Aaronson Defendants in
conspiracy with their co-Defendants herein, the Deos fully cooperated with
the Aaronson Defendants and Ally, NextGear and/or NMAC in returning cars
to the Aaronson Defendants after their companies were shuttered and ruined
in November 2022; the Deos wrongfully believed, still, that the Floor Plans
for NorthShore and 189 Sunrise were not their own company Floor Plans
since the Aaronson Defendants lied so extensively about *everything* related to
the ownership and operations of the two companies.

502.     In fact, the Deos never fully understood the full extent of the frauds
committed upon them until 2024, when Chase provided documents to the
Deos in Action #2; the execution of those documents and transmittal of these
transparently phony documents carelessly proves the full extent of the

Aaronson Defendants' fraud (*see* Exhibit Q compared in all respects to Exhibits C and R).

503.    The Deos purchased 189 Sunrise from the Aaronson Defendants during February 2021 and immediately entered into a lease for the operation of the business at 189 Sunrise Highway, Amityville, New York; Exhibit D proves the purchase of the corporation; Exhibit E proves that the Deos then entered into a lease for the Premises, which was at all times since known to the Aaronson Defendants, who boldly and falsely claim otherwise in Actions #1 and #2 (Exhibits M and O).

504.    The fraud committed by the Aaronson Defendants relating to 189 Sunrise is different than the fraud committed by the Aaronson Defendants with respect to NorthShore:  With NorthShore, the Aaronson Defendants literally stole the corporation from the Deos before approving the tax returns in Exhibits G and H when it was no longer possible to continue the fraud by November 2022; with respect to 189 Sunrise, the Aaronson Defendants took the Deos money in February 2021, then did *nothing* else regarding the ownership transfer until approving the tax returns in Exhibits G and H.

505.    On multiple occasions after the purchase of 189 Sunrise by the Deos (Exhibit D) and the Deos entering into a lease agreement with the owners of the property at 189 Sunrise Highway, Amityville, New York (Exhibit E), the Deos asked the Aaronson Defendants for 1) the software licenses/ agreements; 2) the DMV license; 3) closing documents; 4) the corporate book; and 5) tax

documents, but were denied these documents and proofs each and every time that the Deos made their requests.

506. The Aaronson Defendants made repeated excuses for more than a year, always also threatened to shutter the businesses and pull all cars from the lots, but eventually, after non-stop requests from the Deos in the late summer of 2022, the Aaronson Defendants relented and allowed the Deos to prepare and file the tax returns for NorthShore and 189 Sunrise (*see* Exhibits G and H) as the first step in their exit strategy from 189 Sunrise and NorthShore.

507. By and during November 2022, the Aaronson Defendants committed their biggest frauds ever with respect to 189 Sunrise and NorthShore: They shuttered the businesses and took everything from those businesses needed to operate including all customer files, all software, all money from the accounts, all automobiles, and all licenses.

508. Undoubtedly upset, and upon learning that the accounts were cleaned out by the Aaronson Defendants (while illegally utilizing a dead man's electronic credentials), Anthony Deo complained to Josh Aaronson on the afternoon of November 18, 2022 that he, Deo, was going to go to the police if the money was not promptly returned; in response, Josh Aaronson signaled his intent to wipe out the Deos and their business interests; attached hereto as Exhibit W is a true and accurate copy of the threat that Josh Aaronson sent Anthony Deo as his response for getting caught stealing ("Anthony – unfortunately, this is about to get very ugly").

509.    Deo went to the police on the morning of November 19, 2022, at 9:30 a.m.; the police contacted Josh Aaronson that morning and informed him that he would be arrested for stealing that money if he, Josh Aaronson, did not immediately return the money to Anthony Deo, who had just obtained that money with his own personal guarantee and unrelated to the Aaronson Defendants in every way.

510.    But going to the police caused the Aaronson Defendants to then extend their fraud to the Courts:  Immediately after the police forced the Aaronson Defendants to return the $735,000.00 Deo had just borrowed (that money is *not* an issue herein since it was returned by the Aaronson Defendants then under threat of arrest; this theft is merely further evidence of the illegal lengths the Aaronson Defendants were willing to go to "get even" with the Deos for going to the police), the Aaronson Defendants commenced Action #1 as evidenced by Exhibits M and N hereto, actually claiming ownership of the two corporations *in Court filings as a fraud not only upon the Deos, but upon this Court as well, and utilizing this Court to shutter the Plaintiffs' businesses from the date they obtained their Order to Show Cause in December 2022 until that Court's Order was issued on June 15, 2023* (Exhibit N).

511.    Simply put, the Aaronson Defendants blatantly retaliated against the Deos for daring to stand up to them; the Aaronson Defendants were never going to allow that conduct from "their niggers," referring to the Deos by one or more the Aaronson Defendants before those Defendants shuttered and ruined the Deos' businesses.

512.     At all times relevant hereto, the Aaronson Defendants committed the within frauds in conspiracy with each Aaronson Defendant and each co-Defendant herein by various acts and omissions, some known and referenced herein, and undoubtedly some unknown at this time by the Plaintiffs due to the surreptitious, underhanded, deceitful, and fraudulent methods utilized by the Defendants in dealing with the Plaintiffs:  1) Josh Aaronson was the leader of the pack and agent for all of the Aaronson Defendants in their dealings with the Plaintiffs (and others), and directed all fraudulent activity for the Defendants after the death of the original leader of the pack/agent, David Baron; 2) Jory Baron and Ron Baron are in-laws through marriage with Josh Aaronson who, along with Raymond Phelan, Brian Chabrier, and Asad Khan, were partners in the Aaronson illegal enterprises; these partners all knew and should have known of the frauds against the Deos and 189 Sunrise and NorthShore; these partners benefitted the most financially from the within frauds, notably the theft of all PPP monies from the Plaintiffs; 3) Marcello Sciarrino, Daniel Sullivan, Wendy Kwun, Iris Baron and the Estate of David Baron all benefitted from the frauds committed herein and assisted in not only the thefts of money from the Plaintiffs, but also assisted in stealing all documents from the corporate Plaintiffs and perpetuating lies to the Deos to assist their co-Aaronson Defendants in hiding the thefts from the Deos and misleading the Deos when confronted; Wendy Kwun in particular participated in the frauds involving tax returns, stealing all monies from NorthShore and 189 Sunrise, and the "approvals" attached hereto in Exhibit G; Iris Baron and

the Estate of David Baron stole the monies advanced by the Deos to purchase
Baron Nissan; 4) Baron Nissan, Island Auto Group, and the Aaronson
Defendants other New York dealerships have all been utilized by the
Aaronson Defendants as weapons in committing the within frauds.
Specifically, these dealerships under the umbrella of Island Auto Group are
worth one billion dollars or more ($1,000,000,000.00) and are wielded by the
Aaronson Defendants to control the corporate co-Defendants herein: Either
the corporate co-Defendants do what the Aaronson Defendants wanted done
in fraudulently and intentionally ruining the Plaintiffs by and through forced
ignorance of the corporate co-Defendants, or the Aaronson Defendants will
simply get some other professional to take millions of dollars to do the
Aaronson Defendants' bidding; each of the corporate co-Defendants did the
Aaronson Defendants' dirty work in ruining the Plaintiffs and preventing the
Plaintiffs from remaining in the automobile dealership business; 5) Likewise,
even the Urrutia Defendants joined with the Aaronson Defendants and all of
the corporate co-Defendants in making false and fraudulent claims against the
Plaintiffs herein in Actions 2 and 3 (and committing frauds upon each of those
two Courts, including this Court), and also in defrauding the Deos out of their
investment in Superb, and utilizing Ally, NextGear and NMAC as weapons to
further ruin the Plaintiffs in pulling automobiles and recalling automobiles
from the lots of Superb, 189 Sunrise and NorthShore; and 6) Chase absolutely
intentionally ignored multiple red flags of the Aaronson Defendants illegal
acts and omissions, intentionally refused to consider the Deos' claims or

documents when presented by the Deos, knowingly and intentionally permitted the thefts of all corporate Plaintiffs' monies from 189 Sunrise's and NorthShore's accounts, and at the Aaronson Defendants' direction Chase locked the Plaintiffs out of their own accounts to this day.

513.    The Defendants fully planned to steal from the Plaintiffs and ruin the Plaintiffs either to obtain money directly and wrongfully from those Plaintiffs or, in the case of RWC, CSZ and MLLG, to continue to be paid lucratively by the Urrutia and Aaronson Defendants by continuing to do those Defendants' bidding and/or feign ignorance of those Defendants illegalities as set forth herein and attached hereto in the Exhibits.

514.    At all times relevant hereto, and upon information and belief including the way the Urrutia Defendants acted after the Deos invested in Superb in late 2022, the Urrutia Defendants lead by Urrutia himself fraudulently induced the Deos into making the investment that the Urrutia Defendants never intended to let the Deos benefit from their bargain in making the investment.

515.    Indeed, just weeks before the Lock-Out, the Deos were approached by the Urrutia Defendants by and through Urrutia and were asked for even more money; if they had been able to give Urrutia more money at that time, that money would now be gone, too.

516.    At all times relevant hereto, the Defendants acted by Agreement and with full knowledge/intentionally in conspiring to defraud the Plaintiffs and then each and every Defendant herein took one or more affirmative, deliberate acts to criminally defraud the Plaintiffs.

517.    At all times relevant hereto, the Defendants explicitly committed to injuring and defrauding the Plaintiffs, who were, in fact, defrauded by the within and other fraudulent acts by these Defendants.

518.    At all times relevant hereto, the Defendants acted with criminal intent to defraud the Plaintiffs and ruin the corporate Plaintiffs' business and the Deos' lives; the Defendants were successful in all respects in executing their planned fraud and ruination of the corporate Plaintiffs and the Deos' lives and livelihood.

519.    At all times relevant hereto, the Deos worked at and for 189 Sunrise and NorthShore; Sara Deo performed various duties in running these two businesses including but not limited to developing and implementing marketing strategies and leads for new customers; Anthony Deo ran the day to day operations of 189 Sunrise and NorthShore (and eventually Superb) and performed a variety of tasks therefor.

520.    At all times relevant hereto, the Defendants in carrying out their conspiracy to defraud the Plaintiffs not only stole the corporate Plaintiffs and eventually joined in illegally shuttering both businesses and Superb, but also ruined the Plaintiffs' livelihood and took away their income and jobs working and running their own businesses.

521.    At all times relevant hereto, the Defendants knew that they were committing wrongs, but each continued to carry out the scheme through and including overt acts and assistance with or active participation in Actions 2 & 3.

522. The conspiracy and fraud are on-going at all times relevant hereto, and includes on-going failures and refusals to return documents, bank accounts, corporate records, customer lists, Floor Plans, monies paid by the Plaintiffs for various matters including the purchase of Superb and Baron Nissan; customer deal jackets and their contents, Floor Plans and licenses, all belonging to the Plaintiffs.

523. The within and other frauds and conspiracies to defraud the Plaintiffs have devastated the Plaintiffs and their businesses and caused real, gigantic, and long-lasting/on-going harm including but not limited to the complete ruination of the businesses and the Deos personal lives, including the loss of hundreds of millions of dollars, the Deos' home being foreclosed upon imminently, their temporary residence/landlord evicting the Deos, the ruination of the Plaintiffs and their reputations in the automobile industry, the loss of the Deos' jobs and the shuttering of the corporate Plaintiffs.

524. Each of these Defendants over time, including the corporate Defendants by and through their various Representatives and/or co-Defendants, made multiple materially false representations to the Plaintiffs; the Plaintiffs relied and reasonably relied thereon; the representations were at all relevant times false, knowingly false, and intended to carry out the within frauds, thefts, and embezzlements; and the false representations as relied upon and reasonably relied upon by the Plaintiffs caused immeasurable damages to the Plaintiffs.

525. At all times relevant hereto, the Defendants had and maintained various duties to reveal to the Plaintiffs the within frauds and concealments, but

instead knowingly and intentionally refused to reveal the within to the Plaintiffs, further damaging and increasing the damages suffered by the Plaintiffs thereby.

526.     In every way possible, the within conspiracy to commit fraud, actual frauds committed, and the fraudulent concealment thereof was the direct and proximate cause of the Plaintiffs' harms.

527.     At all times relevant hereto, the Defendants acted jointly and severally in committing the within frauds, fraudulent concealments, thefts, and embezzlements.

528.     At all times relevant hereto, the Defendants acted in conspiracy in committing the within frauds, fraudulent concealments, thefts, and embezzlements.

529.     At all times relevant hereto, the within frauds, fraudulent concealments, thefts, and embezzlements are ongoing and the full extent of the frauds are being fraudulently withheld from the Plaintiffs.

530.     The Defendants further acted in conspiracy to conduct Actions #1, #2, and #3 in bald faced attempts to (again) utilize the power of their staggering financial might as collective Billionaires to force the Plaintiffs to acquiesce and give up the within claims, just as these Defendants conspired to defraud these Plaintiffs and force them to acquiesce to the Defendants' superior positions to the Plaintiffs at all times relevant hereto.

531.     At all times relevant hereto, the Defendants knowingly and intentionally possessed common objectives in carrying out the within crimes and civil

wrongdoings:  The Defendants were each driven by greed, each profited either directly from the within crimes or, as with RWC, CSZ, and MLLG indirectly by keeping the Aaronson Defendants' and Urrutia Defendants' lucrative accounts.  The Urrutia Defendants and Aaronson Defendants were, at all times relevant hereto, also driven not just by greed, but also in eliminating the Plaintiffs as competitors in the automobile dealership industry.

532.    At all times relevant hereto, the corporate co-Defendants including, but not limited to Ally, Chase, NextGear, NMAC, RWC, CSZ, and MLLG and all of their Representatives, acted with at least reckless indifference to the frauds, fraudulent concealments, and conspiracies to commit frauds set forth herein as perpetrated by the Aaronson Defendants and the Urrutia Defendants.

WHEREFORE, by the within and other acts and omissions, the Defendants acted in conspiracy to commit fraud against the Plaintiffs, did commit fraud against the Plaintiffs, and did engage in fraudulent concealment against the Plaintiffs; these Defendants each continue to be unjustly enriched by the within conspiracy to defraud, actual frauds committed, and fraudulent concealments; the harms caused to the Plaintiffs are the direct and proximate result of these Defendants' wrongful conspiracy to commit fraud, actual frauds committed, and fraudulent concealments thereof; such frauds and their harms to the Plaintiffs are on-going, caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars

($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

<u>COUNT IX:  UNJUST ENRICHMENT AGAINST ALL DEFENDANTS<br>EXCEPT THE URRUTIA DEFENDANTS</u>

533.    Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

534.    There are only three (3) EEE Contracts existing between any Plaintiffs and any Defendants herein:  1) whatever documents were executed between Chase and Sara Deo upon the opening of the account(s) for NorthShore (these documents were stolen by the Aaronson Defendants when they emptied and shuttered NorthShore at the end November 2022); 2) the contracts attached hereto as Exhibits I-1 and I-2 by and between Superb, Urrutia, and Anthony Deo; and 3) the Baron Nissan Purchase contract attached hereto as Exhibit F.

535.    Since the Defendants deny that Exhibit F is fully executed (and as set forth *supra* and *infra,* Plaintiffs allege that Exhibit F *is* fully executed or, in the alternative, at least partially executed sufficient to have stepped into the then shoes of David Baron at Baron Nissan), then for all purposes of unjust enrichment, the obligations and money paid by the Plaintiffs for Baron Nissan are also plead in the alternative as unjust enrichment by Baron Nissan and the Aaronson Defendants (and since the Defendants deny that Exhibit F is fully executed, then the money paid therefore is plead in the alternative as unjust

171

enrichment by Baron Nissan and the Aaronson Defendants, especially the Estate of David Baron and his surviving spouse, Defendant Iris Baron).

536.     All other agreements set forth in the Complaint are implied, only, as there are no valid, express, explicit, and executed contracts (hereinafter, "EEE Contracts") between the Defendants and the Plaintiffs as alleged by the Plaintiffs herein other than the three (3) in this paragraph and also set forth previously (*supra*) in this Complaint.

537.     The implied contracts referenced herein by and between parties hereto include, but are not limited to, the following:[3]  All contracts and agreements 1) by and between Chase, Ally, NextGear, and NMAC and 189 Sunrise and NorthShore (the Deos were the owners/members/stockholders thereof but are not a part of whatever contracts are claimed by Chase, Ally, NextGear, and NMAC to exist); 2) by and between the CSZ/MLLG and 189 Sunrise and NorthShore (*Id.*); 3) by and between the RWC and 189 Sunrise and NorthShore (*Id.*); and 4) by and between the Aaronson Defendants and 189 Sunrise and NorthShore (because the Aaronson Defendants carefully and intentionally avoided reducing agreements to writing in order to conceal their true acts and intentions in stealing the corporations at issue and the assets

---

[3] While it remains the Plaintiffs' position that the implied contracts referenced herein are enforceable, the elements of unjust enrichment typically include a finding of no explicit contract in order to proceed under the quasi-contractual theory of unjust enrichment. The determination of whether a quasi-contractual claim such as unjust enrichment should be dismissed as duplicative looks only to whether there is "a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick. Inc. v Long Is. R. Co*., 70 NY2d 382, 389 [1987]; *see also Georgia Malone & Co., Inc. v Rieder*, 86 A D3d 406, 408 [1st Dept 2011] noting that "unjust enrichment is a quasi-contract theory of recovery" and not whether plaintiff may recover under that contract; *see also Pressley v. Ford Models, Inc*., Index No.: 653001/2016 New York Supreme Court, Sherwood, J., "where a valid and enforceable contract would ordinarily preclude quasi-contractual recovery but a bona fide dispute exists as to the existence or applicability of a contract, the plaintiff may proceed on both contractual and quasi contract theories" and the Plaintiffs herein are doing just that.

thereof). It is these relationships, along with the Baron Nissan contract attached hereto as Exhibit F (this unjust enrichment allegation regarding Baron Nissan is hereby specifically plead in the alternative, only, if the contract attached hereto is ultimately deemed a nullity by the Court as the Plaintiffs prefer to have that contract enforced, partially or fully) that are specifically at issue.

538.    At all times relevant hereto, the corporate Defendants by and through their employees and Representatives knew or should have known of the frauds, corporate thefts, and embezzlements set forth herein and perpetrated by the Urrutia Defendants and the Aaronson Defendants against the Plaintiffs.

539.    It is specifically the position of the Plaintiffs herein that the corporate Defendants had to know (and therefore, were a part of the conspiracy, at a bare minimum through intentional ignorance, but certainly done for the reason of keeping their Cozy Relationships with the Billionaire Aaronson Defendants and the Urrutia Defendants) of the frauds, corporate thefts, and embezzlements set forth herein and perpetrated by the Urrutia Defendants and the Aaronson Defendants against the Plaintiffs.

540.    However, there is no denying that the contracts purportedly entered into between the corporate Defendants (except the EEE Contracts) with and for the corporate Plaintiffs were *not* valid contracts and cannot be valid contracts since at all relevant times, those contracts were not 1) seen by the Deos; 2) reviewed by the Deos; 3) given to the Deos at any time prior to or since "execution" of the contracts by the Aaronson Defendants and/or Urrutia

Defendants; 4) reviewed by any Professional for the Deos; and/or 5) executed by the Deos.

541.    Thus, the services performed/provided by the Lenders, Accountants, and Attorneys were provided in the absence of any valid written (EEE) contracts and are thus the subject of Unjust Enrichment claims hereunder.

542.    Likewise, there were no valid written (EEE) contracts by and between the Aaronson Defendants and the Plaintiffs at any time relevant hereto, and thus, the monies made by the Aaronson Defendants in raping the corporate Plaintiffs are all also subject to the within Unjust Enrichment claims in the alternative to the within contract claims; *see fn* 3, *supra*.

543.    Likewise, given that the Defendants claim that the Baron Nissan contract/ purchase is not complete (and the Plaintiffs claim that it is, at least with respect to David Baron's former interest in that company, if not fully completed), the claims against Baron Nissan, the Aaronson Defendants' various interests therein, and Iris Baron/the Estate of David Baron are also subject to the within Unjust Enrichment claims as an alternative to the primary Declaratory Judgment and Constructive Trust claims brought by the Plaintiffs in Count XII, *infra*.

544.    At all times relevant hereto, the Defendants acted in conspiracy to unjustly enrich themselves at the Plaintiffs' expense, including, but not limited to, the following:

 a) With the full cooperation of and in conspiracy with the corporate Defendants, and to satisfy all of the Defendants' limitless greed, the

Aaronson Defendants embezzled and defrauded the corporate Plaintiffs of millions of dollars;

b) With the full cooperation of and in conspiracy with their own corporate co-Defendants and to satisfy all of the Defendants' limitless greed, the Urrutia Defendants wrongfully and intentionally ruined, closed, and embezzled millions of dollars from Superb at the expense of Anthony Deo in a (failed) attempt to save other businesses belonging to the Urrutia Defendants that were, upon information and belief, also raped of all assets and then wrongfully shuttered and closed;

c) With the full cooperation of and in conspiracy with the Aaronson Defendants and Urrutia Defendants and to satisfy all of the Defendants' limitless greed, RWC, CSZ, and MLLG unjustly enriched themselves during the operation of and during and through the shuttering and ruination of Superb, 189 Sunrise, and NorthShore, all at the expense of and ruination of the Plaintiffs herein.

545.    By and through the within and other acts and omissions, these Defendants unjustly enriched themselves each totaling unknown (to the Plaintiffs) millions of dollars in the absence of valid contracts with the Plaintiffs.

546.    By the through the within and other acts and omissions, the within Defendants participated in the conspiracy to ruin and defraud the Plaintiffs, failed and refused to listen to the Deos pleas for help, and then unjustly enriched themselves and benefitted by millions of dollars wrongfully and unjustly taken from these Plaintiffs.

547.    By and through the within and other acts and omissions, the within Defendants were unjustly enriched, at the Plaintiffs' expense, in ways set forth herein that it is against equity and good conscience to permit these Defendants from retaining the millions of dollars unjustly taken from the Plaintiffs that is sought to be recovered herein.

548.    At various times relevant hereto, the Plaintiffs and the Defendants conducted business together in close business relationships; the Defendants relied upon the on-going business relationships to gain the Plaintiffs' trust and induce the Plaintiffs into vulnerable positions that these extremely sophisticated but ill meaning Defendants took advantage of in all respects to unjustly enrich themselves by the within frauds and embezzlements.

549.    At all times relevant hereto, the Plaintiffs reasonably relied upon the Plaintiffs acts and omissions mainly because it still appeared on the surface that the Deos were still the owner/operators of Superb (partially, but fully put into operational control by the Urrutia Defendants), 189 Sunrise, and NorthShore, and since these Defendants hid evidence of the wrongdoing and kept all evidence of the wrongdoings from the Plaintiffs.

550.    It is particularly unjust that the Aaronson Defendants took the money from the Plaintiffs as set forth for the purchase of 189 Sunrise set forth in Exhibit D hereto, then wrongfully ruined that business and stole its money and all documents and software and vehicles needed to operate that business, but have now obtained and utilize that very same address (189 Sunrise Highway, Amityville, New York) for their own business today.  That business and its

ownership/operation by the Aaronson Defendants (who may be doing to

another third party in that business what they did already did as set forth

herein to the Plaintiffs regarding the withholding of contracts and other

documentation while proceeding to conduct business with that third party in

bad faith and unfair dealing in all respects) constitutes further unjust

enrichment by the Aaronson Defendants as they should not even have that

space that they forced the Plaintiffs out of before opening a new dealership on

the very same lot as the Plaintiffs.

551. At the heart of this case is a massive conspiracy by the Defendants acting

at all times herein in an on-going conspiracy to unjustly enrich themselves by

and through stunning greed, outrageous fraud, and shocking thefts and

embezzlements.

552. This Count is brought by all Plaintiffs against all Defendants except the

Urrutia Defendants, with whom the relationship is covered by an explicit

contract.

WHEREFORE, by the within and other acts and omissions, the Aaronson

Defendants and the corporate Defendants, including, but not limited to, RWC, Chase,

Ally, NextGear, NMAC, CSZ and MLLG, have been and continue to be unjustly

enriched; such unjust enrichment is the direct and proximate cause of the Plaintiffs' harm

stemming from such unjust enrichment at all times relevant hereto; such unjust

enrichment caused and continues to cause actual damages, nominal damages, and

consequential damages to the Plaintiffs in an amount to be determined at trial, but not less

than two hundred million dollars ($200,000,000.00), and demand is herein made

therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

<u>COUNT X: DECLARATORY JUDGMENT, CONSTRUCTIVE TRUST AND INJUNCTIVE RELIEF AGAINST THE AARONSON DEFENDANTS</u>

553. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

554. Attached hereto and incorporated herein by reference are the Exhibits to this Complaint.

555. Specifically, Exhibit F is the subject matter of this Count by and for the Deos.

556. The Deos advanced hundreds of thousands of dollars to purchase and lease the business and space of the business known as Baron Nissan.

557. The Baron Nissan deal/contract was executed during May 2021, just days before David Baron died.

558. It is the specific position of the Plaintiffs/Deos herein that the contract attached hereto as Exhibit F is, in all respects, sufficiently executed with consideration paid that the Deos are the rightful owners of Baron Nissan since May 2021.

559. In the alternative, if for any reason the Court disagrees that the contract attached hereto is sufficiently executed for the Deos to be the owners of Baron

Nissan since May 2021, then it is the position of the Plaintiffs/Deos herein that the contract is sufficiently executed such that the Deos then step into the position of David Baron as of May 2021 at Baron Nissan.

560.   At all times relevant hereto, the Deos paid sufficient and actual consideration to complete the purchase of Baron Nissan as they actually paid more than two hundred seventy-five thousand dollars ($275,000.00) therefore, *without any of those sums reimbursed to date.* To be clear, at all times relevant hereto, the Aaronson Defendants have kept the money paid by the Deos for Baron Nissan while simultaneously/conveniently (for the Aaronson Defendants) denying that the contract was complete.

561.   Josh Aaronson relayed the refusal of the Aaronson Defendants to live up to or to "complete" (Aaronson's word) that contract during or about the fall of 2021, but definitely before leaving and ruining 189 Sunrise and NorthShore during November 2022.

562.   The status of the contract attached hereto as Exhibit F gives rise to a *bona fide* justiciable and substantial controversy between the Aaronson Defendants and the Plaintiffs/Deos over the Deos' rightful ownership interests in Baron Nissan; at all times relevant hereto, the Deos advanced their own monies for that purchase and have, to date, been denied the fruits of their bargain by the Aaronson Defendants, who nonetheless kept that money without recourse for the Plaintiffs except by and through this Count.

563. With respect to Exhibit F, the Aaronson Defendants on one side and the Plaintiffs/Deos on the other side of the dispute leaves the parties with adverse legal interests as to the present and prospective obligations under that contract.

564. Thus, declaratory judgment serves a useful and necessary purpose in clarifying or settling the legal issues and justiciable controversy stemming from that contract, and would finalize the controversy and offer relief from the uncertainty caused by the Aaronson Defendants' actions and omissions since the contract was executed and monies were obtained and paid by the Deos therefor.

565. Specifically, the Deos demand that this Court determine and Order that 1) the Deos and/or Anthony Deo are/is the owner(s)/member(s)/stockholder(s) of Baron Nissan in all respects since May 2021; or, in the alternative, that 2) the Deos and/or Anthony Deo at least hold(s) the ownership position of David Baron with Baron Nissan as of and since the date of Exhibit F in May 2021.

566. Plaintiffs specifically allege that the nature of the within wrongdoing by the Aaronson Defendants is a breach of the contract attached hereto as Exhibit F, or, in the alternative, fraud with respect to denying the completion or partial completion thereof.

567. In the alternative, Plaintiffs demand that this Court impose a constructive trust on and for the operation of Baron Nissan moving forward so as to protect the Plaintiffs'/Deos' interests therein.

568. At all times relevant hereto, the Aaronson Defendants were closely involved in a business relationship with the Deos such that there was a confidential, close, and arguably fiduciary relationship between the parties.

569. At all times relevant hereto, the business known as Baron Nissan by and through its owners/members/stockholders promised the Deos that they were buying the corporation as set forth in the contract attached hereto as Exhibit F and known as Baron Nissan.

570. At all times relevant hereto, that business and its assets/stock were transferred to the Deos by and through the contract attached as Exhibit F, yet the Aaronson Defendants have blocked and prevented the Deos from taking and securing their interests in Baron Nissan ever since the execution of Exhibit F; whether David Baron was acting in good faith or not (and committing yet another fraud against the Deos without intending to complete the contract himself), the Deos nonetheless relied upon the documentation presented hereto as exhibit F in paying real and valuable consideration in excess of two hundred seventy five thousand dollars ($275,000.00) therefor, the Deos reasonably relied upon the representations in the attached documentation as real and in good faith, and it is unconscionable and against public policy to not enforce that contract now/herein.

571. At all times relevant hereto, the business known as Baron Nissan was transferred to the Deos by the attached Exhibit F, the Deos acted in good faith by executing that contract, the Deos believed that the Aaronson Defendants

acted in good faith in executing that contract, and the Aaronson Defendants certainly took and kept the valuable consideration paid therefore by the Deos.

572.    Accordingly, the Deos demand that this Court clarify the rights and obligations of the parties pursuant to the contract, determine and Order that the Deos/Anthony Deo are the full owners of Baron Nissan or, in the alternative, determine and Order that the Deos/Anthony Deo stand in the shoes of David Baron with respect to Baron Nissan as of the date of Exhibit F hereto.

573.    If the Court cannot or does not declare that the Deos are fully or partially the owners/members/stockholders of Baron Nissan, then in the alternative, the Plaintiffs demand that the Court impose a constructive trust over Baron Nissan during the pendency of this action to prevent and enjoin the Aaronson Defendants from committing fraud, waste, or transfer of anyone's interests therein.

574.    The Aaronson Defendants have otherwise been unjustly enriched by keeping the money paid by the Deos for Baron Nissan, the Deos should get the benefit of their bargain that has already been paid for in full.

575.    In addition, Plaintiffs demand that a TRO and then a permanent injunction be issued and Ordered by this Court to protect the public from the Aaronson Defendants and their abject and outrageous greed and frauds exhibited throughout this Complaint as proven by the Exhibits hereto (and of course, there are more documents being kept from the Plaintiffs by the Defendants at all relevant times hereto).

576.   Specifically, Plaintiffs demand that the Court enter an injunction against each and every Aaronson Defendant herein 1) preventing each Aaronson Defendant from ever working in the automobile industry in the State of New York ever again; 2) preventing each Aaronson Defendant from holding or obtaining any New York State Department of Motor Vehicles license to operate or own any automobile dealership in the State of New York ever again; and 3) preventing each Aaronson Defendant from ever benefitting from an automobile dealership in the State of New York ever again.

577.   The frauds committed and lead by the Aaronson Defendants set forth herein are not even completely set forth given the extent that all of the Defendants have gone to avoid speaking with or giving the Plaintiffs any documents relating hereto, and especially since the Aaronson Defendants wrongfully and in full conspiracy with their Professionals 1) took all business documents in shuttering 189 Sunrise and NorthShore; 2) locked the Plaintiffs out of their own bank accounts during the shuttering of 189 Sunrise and NorthShore; 3) locked the Plaintiffs out of their own software during the shuttering of 189 Sunrise and NorthShore; 4) withheld to date all documents created by the Professionals on behalf of the corporate Plaintiffs; 5) convinced the Lenders to cease doing business with the Plaintiffs; and 6) turned in to the NYSDMV the licenses necessary for the operation of 189 Sunrise and NorthShore despite the Aaronson Defendants desire to continue operating automobile dealerships at both locations (and, in fact, they are now operating

such a dealership from one of those locations, Stream Auto Outlet from the location of 189 Sunrise Highway, Amityville, New York).

578.    Simply put, the Aaronson Defendants are a danger to the public in their reckless, criminal, frauds perpetrated herein and previously throughout their criminal activities; the Plaintiffs have no documents to serve or service any customer of 189 Sunrise or NorthShore; the Plaintiffs do not even possess their customer lists as they were entirely stolen by these Aaronson Defendants.

579.    At all times relevant hereto the Aaronson Defendants have caused and continue to cause irreparable, egregious harm to the Plaintiffs; the Plaintiffs and the public will be further harmed by not granting the declaratory and injunctive relief demanded herein.

580.    Accordingly, Plaintiffs also demand that this Court immediately determine and Order that the Deos are the rightful owners/members/stockholders of 189 Sunrise since February 2021 and NorthShore since its inception as a part of the imminent application/Order to Show Cause anticipated to be served and made herein upon the completion of service of this Complaint.

WHEREFORE, the Plaintiffs hereby demand that this Court determine, declare, and Order first in a TRO and then in a permanent injunction 1) that the Deos are the rightful owners of 189 Sunrise (since February 2021) and NorthShore since its inception; 2) that the Deos/Anthony Deo did fully purchase the business known as Baron Nissan; or, in the alternative, 2) that the Deos/Anthony Deo step into the shoes/interests of David Baron as of the date of Exhibit F hereto; if this Court fails or refuses to make an

immediate determination via the Motion/Order to Show Cause expected to accompany herewith that the Deos/Anthony Deo is the full/partial owner of Baron Nissan, then in the alternative the Plaintiffs demand that this Court 1) deny any requests without prejudice to renew upon the completion of discovery; and 2) impose a constructive trust upon Baron Nissan on behalf of the Deos/Anthony Deo preventing and enjoining any fraud, waste or transfer of any of the business's assets other than in the normal course of business during the pendency of the within litigation. Demand is also herein made for a TRO first, then a permanent injunction 1) forever banning the Aaronson Defendants from owning or operating or working in the automobile industry in the State of New York as a danger to the public interest. Demand is also herein made for such other relief as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

Dated: January 31, 2025

Respectfully submitted,

Plaintiffs, by counsel,

/S/ HARRY THOMASSON

_____

Harry Thomasson, Esq.
3280 Sunrise Highway
Box 112
Wantagh, NY  11793
Tel. 516-557-5459
hrtatty@verizon.net