1

1        ***UNCERTIFIED ROUGH DRAFT***

2        This unedited rough transcript draft is uncertified

3    and may contain incorrect punctuation, misspelled proper

4    names and/or terminology, an occasional reporter's note,

5    and/or inaccurate/nonsensical word combinations. There

6    WILL BE discrepancies between this form and the final

7    form.

8

9        Please keep in mind that the final certified

10    transcript's page and line numbers WILL NOT match the

11    rough draft due to the addition and/or editing of title

12    pages, indices, appearances of counsel, paragraphing,

13    formatting, and other changes.

14

15        Due to the need to correct entries prior to

16    certification, parties agree to use this transcript

17    draft only for the purpose of augmenting counsel's notes

18    and may not be cited or used in any way or at any time

19    to rebut or contradict the certified transcription of

20    the proceedings and should not be distributed in any

21    form to anyone who has no connection to this case.

22

23

24

25

2

1   UNITED STATES DISTRICT COURT FOR THE EASTERN

2        DISTRICT OF NEW YORK

3   _____

4   SUPERB MOTORS INC.; TEAM AUTO

5   SALES LLC; ROBERT ANTHONY

6   URRUTIA; 189 SUNRISE HWY AUTO

7   LLC; NORTHSHORE MOTOR LEASING

8   LLC; BRIAN CHABRIER; JOSHUA

9   AARONSON; JORY BARON; 1581 HYLAN

10   BLVD AUTO LLC; 1580 HYLAN BLVD

11   AUTO LLC; 1591 HYLAN BLVD AUTO

12   LLC; 1632 HYLAN BLVD AUTO LLC;

13   1239 HYLAN BLVD AUTO LLC; 2519

14   HYLAN BLVD AUTO LLC; 76 FISK

15   STREET REALTY LLC; 446 ROUTE 23

16   AUTO LLC ; ISLAND AUTO

17   MANAGEMENT, LLC; ASAD KHAN; and

18   IRIS BARON REPRESENTATIVE OF THE

19   ESTATE OF DAVID BARON ,

20        Plaintiffs,

21   v.                Case No.

22   ANTHONY DEO; SARAH DEO; HARRY    2:23-CV-6188 (JMW)

23   THOMASSON; DWIGHT BLANKENSHIP;

24   MARC MERCKLING; MICHAEL LAURIE;

25  THOMAS JONES, CPA; CAR BUYERS

⬥

3

1  _____

2  NYC INC; GOLD COAST CARS OF

3  SYOSSET LLC; GOLD COAST CARS OF

4  SUNRISE LLC; GOLD COAST MOTORS

5  AUTOMOTIVE GROUP LLC; GOLD COAST

6  CARS OF LIC LLC; GOLD COAST CARS

7  OF ROSLYN LLC; GOLD COAST CARS

8  OF SMITHTOWN LLC; UEA PREMIER

9  MOTORS CORP.; DLA CAPITAL

10  PARTNERS INC.; JONES, LITTLE &

11  CO., CPA'S LLP; FLUSHING BANK;

12  LIBERTAS FUNDING LLC; CAR BUYERS

13  NYC INC.; GOLD COAST MOTORS OF

14  LIC LLC; GOLD COAST MOTORS OF

15  ROSLYN LLC; GOLD COAST MOTORS OF

16  SMITHTOWN LLC; J.P. MORGAN CHASE

17  BANK, N.A.; 189 SUNRISE HWY AUTO

18  LLC; and NORTHSHORE MOTOR

19  LEASING LLC,

20          Defendants.

21  _____

22

23

24

25

4

1       DEPOSITION OF JESSICA PATROVIC

2  DATE:      Friday, January 30, 2026

3  TIME:      10:00 a.m.

4  LOCATION:    Remote Proceeding

5       411 West Putnam Ave, Suite 220

6       Greenwich, CT 06830

7  REPORTED BY:  Katheleen Fernandez Cruz

8  JOB NO.:    7873397

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

✦

5

1        A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFFS 189 SUNRISE HWY AUTO LLC,

3   NORTHSHORE MOTOR LEASING LLC, BRIAN CHABRIER, JOSHUA

4   AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580

5   HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632

6   HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519

7   HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446

8   ROUTE 23 AUTO LLC , ISLAND AUTO MANAGEMENT, LLC,

9   ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE

10  OF DAVID BARON , 189 SUNRISE HWY AUTO LLC, AND

11  NORTHSHORE MOTOR LEASING LLC:

12     JEFFREY RUDERMAN, ESQUIRE (by videoconference)

13     Cyruli Shanks & Zizmor LLP

14    420 Lexington Ave. Suite 2320

15    New York, NY 10170

16    jruderman@cszlaw.com

17    212-661-6800 ext. 205

18

19

20

21

22

23

24

25
♠

6

1        A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF PLAINTIFFS SUPERB MOTORS INC., TEAM

3    AUTO SALES LLC, AND ROBERT ANTHONY URRUTIA:

4        EMANUEL KATAEV, ESQUIRE (by videoconference)

5        Sage Legal

6        18211 Jamaica Avenue

7        Jamaica, NY 11423

8        emanuel@sagelegal.nyc

9        718-412-2421

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

↑

7

1     A P P E A R A N C E S (Cont'd)

2   ON BEHALF OF DEFENDANTS ANTHONY DEO, SARAH DEO,

3   HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING,

4   MICHAEL LAURIE, CAR BUYERS NYC INC, GOLD COAST CARS

5   OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD

6   COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST CARS

7  OF LIC LLC, GOLD COAST CARS OF ROSLYN LLC, GOLD

8  COAST CARS OF SMITHTOWN LLC, UEA PREMIER MOTORS

9  CORP., CAR BUYERS NYC INC., GOLD COAST MOTORS OF LIC

10  LLC, GOLD COAST MOTORS OF ROSLYN LLC, AND GOLD COAST

11  MOTORS OF SMITHTOWN LLC:

12      JEFFREY BENJAMIN (NOT PRESENT FOR DEPOSITION),

13      ESQUIRE (by videoconference)

14      The Linden Law Group, P.C.

15      250 Park Avenue, 7th Floor

16      New York, NY 100177

17      noemail

18      (212) 655-9536

19

20

21

22

23

24

25
✦

8

1        A P P E A R A N C E S (Cont'd)

2  ON BEHALF OF DEFENDANT FLUSHING BANK:

3      MICHAEL WEISS, ESQUIRE (by videoconference)

4    Cullen and Dykman LLP

5    333 Earle Ovington Blvd,

6    Uniondale, NY 11553

7    mweiss@cullenllp.com

8    (516) 357-3700

9

10    ON BEHALF OF DEFENDANT LIBERTAS FUNDING LLC:

11    JEFFREY CIANCULLI, ESQUIRE (by videoconference)

12    Weir LLP

13    1339 Chestnut St, Suite 500

14    Philadelphia, PA 19107

15    jcianciulli@weirpartners.com

16    (215) 665-8181

17

18    ON BEHALF OF DEFENDANT HARRY THOMASSON:

19    HARRY THOMASSON | PRO SE, ESQUIRE (by

20    videoconference)

21    Harry Thomasson Esq

22    3280 Sunrise Highway

23    Wantagh, NY 11793

24    hrtatty@verizon.net

25

9

1        A P P E A R A N C E S (Cont'd)

2   ALSO PRESENT:

3       Robert Urrutia, Plaintiff (by videoconference)

4       Anthony Deo, Defendant (by videoconference)

5       Alivia Cooney, Paralegal, Sage Legal (by

6       videoconference)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
⬆

10

1           I N D E X

2    EXAMINATION:                    PAGE

3        By Mr. Ruderman            14

4        By Mr. Thomasson           95

5

6           E X H I B I T S

7    NO.      DESCRIPTION            PAGE

8            (None marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

⬆

11

1              J. PATROVIC

2         THE REPORTER:  Good morning everyone.

3     My name is Kathleen Fernandez Cruz; I'm

4     the reporter assigned by Veritext to take

5     the record of this proceeding.  We are now

6     on the record at 10:10 AM Eastern Standard

7     Time.

8         This is the deposition of Jessica

9     Marie Patrovic taken in the matter of

10     Superb Motors, Inc. et al. against Anthony

11     Deo et al., on Friday, January 30th, 2026

12     by remote proceeding witness located at

13     411 West Putnam Avenue, Suite 220,

14     Greenwich, Connecticut 06830.

15         I am a notary authorized to take

16     acknowledgements and administer oaths in

17     New York.  Parties agree that I will swear

18     in the witness remotely.

19         Additionally, absent an objection on

20     the record before the witness is sworn,

21     all parties and the witness understand and

22     agree that any certified transcript

23     produced from the recording of this

24     proceeding:

25          - is intended for all uses permitted
⬆

                          12

1               J. PATROVIC

2     under applicable procedural and

3     evidentiary rules and laws in the same

4     manner as a deposition recorded by

5     stenographic means; and

6          - shall constitute written

7     stipulation of such.

8          Additionally, counselors have agreed

9     to do the usual federal court stipulations

10     for this deposition.

11          All right.  At this time will

12     counselors in attendance please identify

13     yourselves for the record, beginning with

14     plaintiff's counsel.

15          MR. RUDERMAN:  Good morning, Jeffrey

16     Ruderman, Cyruli Shanks & Zizmor, on

17     behalf of all plaintiffs except for

18    Superb, Urrutia and Team.

19        MR. CIANCULLI:  Jeffrey Cianculli

20    appearing on behalf of Libertas Funding

21    and the deponent.

22        MR. THOMASSON:  Harry Thomasson

23    appearing pro se.

24        MR. WEISS:  Michael Weiss, Cullen and

25    Dykman LLP, appearing on behalf of
♠

13

1            J. PATROVIC

2    Flushing Bank.

3        THE REPORTER:  All right.

4        MR. CIANCULLI:  That's it for

5    counsel.

6        MR. RUDERMAN:  No, Emmanuel?

7        MR. CIANCULLI:  He's not on.

8        MR. RUDERMAN:  Oh, he's not on.  All

9    right.  I know he's, he's actually was

10     traveling and so he may have spotty

11     service, but you know, we'll just

12     continue.  Let me just, so we'll just go

13     on and he may, he may be in and out.

14     Okay.

15     THE REPORTER:  So for the record,

16     Mr. Emmanuel Kataev is also here and he is

17     a defense counsel, correct?

18        MR. RUDERMAN:  Yes.  Right.  He

19     represents all the other defendants.

20        MR. CIANCULLI:  Plaintiffs.

21        MR. RUDERMAN:  All the plaintiffs, I

22     apologize.

23        THE REPORTER:  All right.  Thank you

24     very much.  Okay.  At this time I'm going

25     to go ahead and administer the oath to the

♠

14

1          J. PATROVIC

2     witness.

3        Ms. Patrovic, please raise your right

4     hand.

5 WHEREUPON,

6          JESSICA PATROVIC,

7 called as a witness and having been first

8 duly sworn to tell the truth, the whole

9 truth, and nothing but the truth, was

10  examined and testified as follows:

11          THE REPORTER:  Thank you very much

12     Mr. Ruderman, You may continue.

13          MR. RUDERMAN:  Thank you.

14               EXAMINATION

15  BY MR. RUDERMAN:

16     Q    Good morning, Ms. Patrovic,

17  correct?

18     A    Yes.

19     Q    Okay.  Great.  I am an attorney.

20  My name is Jeff Ruderman.  I'm an attorney

21  at the firm of Cyruli Shanks & Zizmor.  We

22  represent a number of the plaintiffs in

23  this action.  We here today to take your

24  deposition in connection with a lawsuit in

25  which one of the defendants is Libertas

⬆


                        15

1               J. PATROVIC

2  Funding.  Do you understand that?

3     A    Yes.

4     Q    Okay.  And you'll excuse me, I

5  have a persistent cough over the last

6  month, so if I cough, I apologize, I'll

7  try to keep it down.  And have you ever

8  been deposed before?

9    A   Yes.

10    Q   Okay.  So you may know

11  the -- the ground rules, but I'm just

12  going to put them on the record, make sure

13  it's all very clear.  So you were just

14  sworn in, you understand you are answering

15  under oath and that the testimony you're

16  giving today is considered the same as if

17  you were in testifying in court today?

18    A   Yes.

19    Q   Okay.  And all answers that you

20  give today need to be verbal because the

21  court reporter cannot take down nods or

22  shrugs or gestures.  Do you understand

23  that?

24    A   Yes.

25    Q   And also I ask that you wait

⬆

16

1              J. PATROVIC

2  till I finish asking my question.  I'll

3  grant you the same courtesy in your answer

4    because the reporter cannot take down both

5    of us speaking at the same time.  Do you

6    understand that?

7        A   Yes.

8        Q    Great.  Is there any reason why

9    you would not be able to give truthful and

10   accurate testimony to the best of your

11   ability today?

12       A   Nope.

13       Q    Okay.  All right.  Ms. Patrovic,

14   what, what is your relationship to, let me

15   back up when I say Libertas, I'm referring

16   to Libertas Funding LLC.  Do you

17   understand that?

18       A   Yes.

19       Q    As far as you know, is that the

20   proper designation name of the entity?

21       A   Yes.

22       Q    Okay.  All right.  So when IF so

23   on a, so what is your relationship to

24   Libertas?

25       A   I handle all of our post-funding

1              J. PATROVIC

2   operations, so I oversee our general

3   servicing and our collections teams And

4   process.

5       Q    And how long have you been in

6   that position?

7       A   Nine years.

8       Q    Over the past nine years, have

9   you had the same position or has it

10   changed?

11       A    I mean, I was the -- the first

12   one nine years ago, so I built the team

13   in.  I've always been head head of this

14   because I was the only one originally.

15       Q    Okay.  So would it be fair to

16   say that since November of 2022 you've

17   been performing pretty much the same

18   function for Libertas?

19       A   Yes.

20       Q    And can you tell me just what

21   your post high school education is?

22       A    Sure.  I went to SUNY Stony

23   Brook.  I got my bachelor's in political

24   science and psychology.

25       Q    And do you have any postgraduate

18

1                    J. PATROVIC

2  degrees?

3     A   Nope.

4     Q   Do you have any certifications

5  of any kind?

6     A   Nope.

7     Q   Okay.  And prior to your working

8  for Libertas, were you employed by

9  somebody else?

10     A   Yeah, I worked for both AT&T

11  and -- and Yelp.

12     Q   And when you first came to

13  Libertas, what was it you were, what was

14  your, what were you hired to do?  What was

15  the -- the purpose of them hiring you?

16     A   Libertas was a young company.

17  They were underwriting and funding,

18  funding transactions and they had no one

19  to service the accounts after they funded.

20  So I was hired to create process around

21  that and service and collect on our first

22  accounts with the goal to ultimately build

23  a team.

24     Q   Do you know when Libertas began

25  operating?

19

1              J. PATROVIC

2      A   September, 2016.

3      Q   And so do you know, and when do

4   you recall when you started working there

5      A   December, 2016.

6      Q   And you said you had been

7   previously deposed.  Were those

8   depositions in connection with your

9   position at Libertas?

10     A   Yes.

11     Q   And were they related generally

12  to Libertas efforts to collect on?

13     A   Yes.

14     Q   Okay.  Other than --

15        THE REPORTER:  I'm sorry, I missed

16     the last part of that question.

17  BY MR. RUDERMAN:

18     Q   Were they related to efforts by

19  Libertas to, to collection on various

20  obligations?

21     A   Yes.

22      MR. RUDERMAN:  She said Yes.

23      THE REPORTER:  Thank you.

24  BY MR. RUDERMAN:

25    Q   Other than actions in which

⬆

20

1           J. PATROVIC

2  Libertas was trying to collect those

3  obligations, have you ever been deposed?

4    A   No.

5    Q   Okay.  Have you ever testified

6  in court before?

7    A   No.

8    Q   Okay.  Now, could you describe

9  generally what the business model of

10  Libertas is?

11    A   Sure.  We, we have leads that

12  generally come in from, from third

13  parties, independent sales organizations,

14  Libertas processes those applications

15  internally, we underwrite our, our

16  underwriters make a credit decision if we

17  want to move forward or if we decline the

18  file because it doesn't fit into our

19  parameters.  If we do decide to fund the

20  file, we, we put out an offer.  That offer

21  is relayed to the merchant, usually by

22  that independent sales organization.  The

23  ISO, they work with them to collect

24  documents.  We get them on, on our

25  merchant interview call where we learn

♠

21

1           J. PATROVIC

2  more about their business.  And if -- if

3  all agrees by all parties, then we, we

4  fund the transaction.

5      Q    And you say you get leads,

6  where, where do these leads typically come

7  from if you know?

8      A    Independent sales organizations.

9  They did their own marketing.

10      Q    I -- I believe you, you, are you

11  aware that there were two other Libertas

12  witnesses that previously deposed?

13      A    Yes.

14      Q    Okay.  And do you know them

15  personally in your business?

16     A   Yes.

17     Q   Okay.  And I believe either one

18  or both of them referred to these ISOs as

19  a, as a broker, is that, would that be a

20  fair description?

21     A   Yeah.  Yep.

22     Q   Okay.  So and so Libertas has

23  relationships with these various ISOs?

24     A   Yes.

25     Q   And would it be fair to say that

⬆

22

1            J. PATROVIC

2  the ISOs have other financing institutions

3  which they have relationships with as

4  well?

5     A   Yes.

6     Q   Okay.  Does, does Libertas

7  provide information to these brokers so

8  that they understand the type of financing

9  and the parameters of financing that you

10  do if you know?

11     A   Yes.

12    Q   Okay.  So what is the, what are

13    the parameters of the financing that that

14    Libertas does if you know?

15    A   I mean you in terms of our, our

16    terms or in terms of who we're funding or

17    what, sorry, what do you mean by

18    parameters?

19    Q   Sure.  Actually, and, and I

20    should have given you this instruction, I

21    apologize if I do ask a question that you

22    don't understand the question or you need

23    clarification, please let me know.  So

24    I'll rephrase the question so it's clearer

25    to you, but if you do answer a question

↑

23

1              J. PATROVIC

2    that I ask, we'll assume, I will assume

3    that you understood the question.  Do you

4    understand that?

5    A   Yes.

6    Q   Okay.  So I'll, I'll, I will try

7    and clarify the question with parameters.

8   Does Libertas have financial parameters in

9   the sense in, in one sense of the max, the

10  minimum and maximum amount that you are

11  willing to finance?

12      A   Yes.

13      Q   Okay.  What is the, what is the

14  range for financing by Libertas?

15      A   I'm actually not involved in

16  that, in that part of our process.

17      Q   Do you, do you know the answer

18  to that question?

19      A   No, I don't.

20      Q   Okay.  But you know, there is a

21  range though.

22      A   Yeah, of course.

23      Q   Okay.  And how would you

24  describe the type of financing?  In other

25  words, is it, is it asset based lending?

♠

24

1               J. PATROVIC

2   Is it credit based lending?

3       A   Sorry.

4       Q   So give me your best words for

5   it.  Sorry.

6       A   It's revenue based financing.

7       Q   And could you describe generally

8   what that means?

9       A   Sure.  We are underwriting based

10  on the business's sales.  We're generally

11  looking at minimum the last three months

12  of, of their sales.  And we are funding,

13  essentially based on what we assume will

14  be their future sales based on, based on

15  how we underwrote that we're purchasing a,

16  their future receivables at a discount.

17      Q   And do, are you familiar with

18  the term of factoring or the business of

19  factoring?

20      A   Yes.

21      Q   Would you consider Libertas

22  similar to a factor?

23      A   No.

24      Q   Okay.  And do you know what the

25  distinction is between the two?

25

1                J. PATROVIC

2      A   I mean, we're not, we're not

3   getting invoices to factor we're, it's a

4   one-time funding.

5      Q   Okay.  So you, based on the

6   underwriting, a -- a -- a set specific

7   amount of money would be financed in

8   return for that there would, excuse me.

9   And it, you would be purchasing then

10   future receivables against that amount

11   That's, that's financed?

12      A   Yes.

13      Q   And as part of that, does, does

14   Libertas take some sort of a security

15   interest in this receivables?

16      A   It, it's really just the future

17   receivables.

18      Q   Do you understand what I meant

19   by when I say a security interest in the

20   receivables?

21      A   It's unsecure.

22      Q   Okay.  So, so as far as you

23   know, there's, there's no, let me back up.

24   Do you understand what the differences

25   between a secured, a secured position and

26

1          J. PATROVIC

2   an unsecured position in this context?

3        A   No.

4        Q   Okay.  Are you familiar with the

5   term UCC one financing statements?

6        A   Oh yeah.

7        Q   Okay.  If I were to tell you

8   that a UCC financing is a way, is a way to

9   secure, to secure an obligation, would

10  that make, does, does that refresh your

11  recollection as to what I might what?

12       A   Yes.

13       Q   Okay.

14       A   Yes.

15       Q   So does knowing that, does, does

16  Libertas have, does, does it secure its

17  positions with, with regards to these

18  purchases as far as you know?

19       A   Yes.

20       Q   Okay.  And do you know if it, if

21  it, it will secure it only if it's in a

22  first lien position or second or something

23  else?

24       A   We generally will file UCC

25  regardless.

27

1            J. PATROVIC

2       Q    Okay.  So even if there's

3    already, so even if there's already a -- a

4    lien on the res on the assets which you

5    are seeking to secure, you would, you

6    might still lend on that financing,

7    correct?

8       A    Correct.

9       Q    Not lend.

10      A    Fund.

11      Q    Okay.  Fund, okay.  I apologize

12   if I go to the word lend.  I, let's

13   clarify.  You, you do not consider your,

14   your transactions to be lending, correct?

15      A    Correct.

16      Q    Right.  Would and is financing

17   an appropriate term to be used?

18      A    Yes.  Use financing.

19      Q    Now, as you call it, revenue

20   based financing.  Does profitability come

21   into the picture as far as you know with

22   regard to the financing?

23    A   Yes.

24    Q   All right.  So does the, does

25   the entity in which you are considering

      28

1              J. PATROVIC

2   financing have to have a certain level of

3   profitability in order for the financing

4   to proceed?

5    A   It's pretty nuanced.  It's on a

6   deal by deal basis.

7    Q   Okay.  Are you involved in that

8   process at all?

9    A   I'm not at all.

10    Q   Okay.  After the, after the

11   fact, after the -- the transaction has

12   been placed, are you ever involved in the

13   process of, of re-looking at the decisions

14   that were made in connection with the

15   financing?

16    A   I'm, when I'm reviewing it,

17   yeah, when I, when I review files.  I'm

18   not involved in credit decisions.

19     Q   Oh, and are you familiar with

20   the parameters in the sense of how much

21   Libertas would finance based upon certain

22   revenue stream or receivables?

23     A   General knowledge.

24     Q   Okay.  But you're not involved

25   in that process either, correct?

♠

29

1               J. PATROVIC

2     A   No, not at all.

3     Q   And, and through the process of,

4   of an applicant to Libertas until the time

5   it's actually financed, money goes out the

6   door from Libertas to the, to the client,

7   are you involved in any of that process at

8   all?

9     A   No.

10     Q   Okay.  So you would not know

11   the, any information about that procedure,

12   that client decisions, if -- if any of

13   those things during any of that period of

14   time?

15     A   Correct.

16    Q   Okay.  So when would be the

17   first time that, let me, let me back that

18   up.  How many, how many employees are in

19   what, what do you call your department by

20   the way?

21    A   Just customer service.

22    Q   Okay.  How many --

23    A   They're all, they're all

24   cross-trained collections and customer

25   service.

⬆

                          30

1               J. PATROVIC

2    Q   Okay.  So it's, so all customer

3   service representatives are also

4   collection representatives?

5    A   Yes.

6    Q   Okay.

7    A   In, in some capacity.

8    Q   Okay.  Including yourself?

9    A   Yes.

10    Q   All Right.  And and how many

11   customer, I'll, I'll call them customer

12  service representatives.  How many are

13  there at Libertas now?

14      A   Including myself, Six.

15      Q   And do you know how many there

16  were, withdrawn, has that number changed

17  since around November, 2022?

18      A   Definitely.  It was either four

19  or five.

20      Q   Okay.  And how many withdrawn

21  are, is each customer service

22  representative assigned a certain number

23  of accounts?

24      A   No.

25      Q   Is there any way, is there any

⬆

31

1               J. PATROVIC

2  specific way in which accounts are, are

3  divided up among the various customer

4  service representatives?

5      A   No, we don't.  It's not account

6  based.  It's, it, it's, we have a process

7  where one person is doing initial reach

8  out and then things escalate.  Also,

9   depending on deal size, we have more

10  senior reps working on larger deals.

11      Q    When you say larger deals, is

12  there a specific dollar cutoff or how do

13  you de designate what's a larger deal?

14      A   It's honestly kind of just how

15  we determine it in our system based on

16  percent paid in balance, how many

17  positions they may have.

18      Q    Is this, are these decisions

19  made solely by you or is there some

20  committee that, that discusses them

21  together?

22      A   It's collaborative with my team.

23      Q    And when a particular account is

24  assigned to a particular customer, ser

25  service representative, does that customer

♠

                        32

1              J. PATROVIC

2   service representative stay with that

3   account until the matter's resolved?

4       A   No.

5    Q   So how did, can, so it can

6    switch to other customer service

7    representatives at any particular time?

8    Correct?

9      A   If it, if it's pretty cut and

10   dry, hi, you missed a, you missed a

11   payment, can we make this up?  Yes.  Then

12   it generally will stay with a junior

13   person.  If, if it gets a little bit more

14   complicated than that, then it will

15   generally get escalated to more senior

16   people

17     Q   Are any of your customer service

18   representatives attorneys?

19     A   No.

20     Q   Okay.  Does, does Libertas have

21   any in-house attorneys?

22     A   Yes.

23     Q   How many attorneys does it have?

24     A   At least four.

25     Q   And generally what, do you know

⬆

33

1        J. PATROVIC

2   what these attorneys, what their roles and

3   responsibilities are in connection with

4   Libertas?

5        A   Yeah.  One is our CEO, sorry,

6   one is our prior CEO, he's now vice

7   chairman, our head of compliance, our

8   in-house counsel, I believe our CFO.

9        Q   So are there functions though

10  they may be attorneys, are any of their

11  functions to act as an attorney?  Other,

12  other than the compliance person, Are

13  there are the other rep --

14       A   Our in-house counsel.

15       Q   They're, they're in-house

16  counsel.  Do any of them deal with the

17  collection efforts concerning clients of

18  Libertas?

19       A   They will for certain

20  escalations, but for the most part, no.

21       Q   So what if a decision is made to

22  engage an attorney, an outside counsel?

23  Was, is that decision made?  Who makes

24  that decision to --

25       A   Typically me.

34

1           J. PATROVIC

2     Q    Okay.  And do you make that

3    decision on your own or with others?

4     A    It depends on, on the -- the

5    deal, but sometimes by myself, sometimes

6    with others.

7     Q    And what considerations do you

8    take into account when deciding whether to

9    put a matter into collection?

10    A    I mean, it's heavily based on,

11   on our client communication cooperation.

12   If, if -- if a merchant is in touch with

13   us and working with us in terms of

14   providing information that we're

15   requesting, and I mean we probably won't

16   send that out to legal.  It's, it's

17   generally if -- if a merchant becomes

18   unresponsive stops payments and there's

19   not really a clear set plan going forward,

20   then at that point we'll usually escalate

21   it to outside counsel.

22    Q    And do you have a -- set list

23   of, of outside attorneys that you

24   typically refer these matters to?

25    A    Yes.

35

1              J. PATROVIC

2      Q   And in, in New York, do you have

3   a specific list of attorneys that you

4   generally refer them to?

5      A   Yes.

6      Q   And are they, do they cover the

7   same territories?  Did you have like

8   different territories that cover by

9   different attorneys?

10      A   We have two different attorneys.

11   There's not really a system in terms of

12   who gets what we, we just send, send to

13   them both so that there's, there's just

14   more variety in terms of collections.

15      Q   And what are the two law firms

16   that you use for collections in New York?

17      A   Faskowitz Law Firm and Empire

18   Recovery Group.

19      Q   Empire Recovery Group are

20   attorneys?

21      A   Yes.

22      Q   Okay.  And who is your main

23  contact with at Faskowitz?

24     A    David Epstein.

25     Q    Now, do you know what percentage

↑

36

1                J. PATROVIC

2  of Libertas financing goes into default?

3     A    I -- I don't.

4     Q    Are you able to give me a fair

5  estimate as to what percentage goes into

6  default?

7     A    I would say 5 percent.

8     Q    And let to be clear, so we

9  understand when I say default, that means

10  that they're not making payments and

11  they're not, for lack of a better term,

12  working with you to make that right.  Do

13  you understand what I'm saying?

14     A    Okay.  So yeah, we have

15  different definitions of default.

16     Q    Okay.  So let's be clear what

17  your definition is.  Default is more

18  important than mine.  What's you tell me?

19     A    Mine is when we consider it

20  written off after we send it to an

21  attorney and we, we assume that that

22  attorney is not able to collect either.

23  I -- I think does your default definition

24  mean when we send it to an attorney.

25    Q  Well, well let's just, let's

↟

37

1          J. PATROVIC

2  just work with the same, don't forget

3  about what mine is.  Okay.  Let's make

4  sure we understand what your definition

5  is.  So when I say a default, you, you in

6  your mind that meant we're not getting

7  paid and, and that's that's it.  We sent

8  it to an attorney.  We don't expect to

9  ever see this money again.  That's what

10  you've considered default?

11    A  Correct.

12    Q  Okay.  So what about a situation

13  where the customer is not paying, you're

14  not hearing from them, they don't have

15  payment arrangements where they're going

16  to make it up, but you haven't written it

17  off yet.  About what percentage go into

18  that category?  What would you call that

19  category?

20      A    I'd say about 15 percent.

21      Q    What do you, what do you define

22  that, what do you describe that as in

23  your, in your business?

24      A    It's, it's pending default.

25      Q    Okay.  And what percentage would

⬆

38

1              J. PATROVIC

2  you say are not yet there?  They missed

3  some payments, but they're working

4  something out with you?

5      A    About 10 percent.

6      Q    Now if a when does, when, what

7  situation arises that would first send a

8  customer account to your department?

9      A    Typically it's, we receive a

10  daily returns report from our bank.  All

11  of our accounts are on auto debit.  So

12  it's, we get this returns report that

13  shows any payments that did not clear that

14  flags us that the payments did not clear.

15  Alternatively, it would be if a customer

16  proactively reaches out before that

17  happens.

18      Q    So every day your bank in which

19  the funds get automatically deposited,

20  sends you a returns, a return report,

21  correct?

22      A    Correct.

23      Q    Okay.  And it would, what would

24  be on that return report that would let

25  you know that a payment that was supposed

⬆

39

1              J. PATROVIC

2  to come in did not come in?

3      A    It's the deal, name, deal ID and

4  the return code and the amount.

5      Q    So we would, so for example, if

6  you had a hundred accounts that you're

7  getting payments on, it would

8  specifically, it wouldn't just list the

9    ones the money came in, you'd have to

10   figure out what's not there.  It would

11   specifically say which ones did not come

12   in?

13       A   Correct.  It's a, it's a list of

14   only the ones with return codes.

15       Q   Okay.  So return code is one in

16   which the ACH was not satisfied for that

17   first required date?

18       A   Correct.  They're NACHA return

19   codes.

20       Q   And if an ACH was supposed to be

21   collected on a particular day and it

22   doesn't come in that day, does the, does

23   the system automatically then try again at

24   a later time?

25       A   No.

⌃

40

1              J. PATROVIC

2       Q   Okay.  So if you get a return

3    code on a particular day, who, who gets

4    that withdraw?  Who gets that return

5    report on a daily basis?

6    A   Our entire customer service

7   team, the underwriting team and some

8   members of upper management.

9    Q   Okay.  So even so even those

10   that worked on underwriting and, and

11   processing the financing would know on the

12   day that day that a deal that they had

13   approved didn't pay, make that payment

14   when they were supposed to?

15    A   Theoretically we have thousands

16   of accounts, so it's, I think a formality

17   that this goes to a lot of people.  I'm

18   not sure that everyone's looking at this

19   every day.

20    Q   So whose responsibility is at

21   Libertas?  Is it to make sure that they

22   look at this for every day to act on it if

23   necessary?

24    A   Myself and my team.

25    Q   Okay.  So it would be the, this,

⌃

41

1        J. PATROVIC

2  this right now would be the six of you?

3     A   Yes.

4     Q   Okay.  And is it divvied up in

5  any way or everybody's looking at the

6  entire report?

7     A   It's a shared document, so we

8  all kind of work on it together.  It's a

9  lot of the accounts on there are repeat

10  accounts, there's more repeat accounts

11  than new accounts.  Typically there are

12  accounts that we're already working on, so

13  it's, again, accounts that are new.  We

14  have our most junior person generally just

15  sending out an email and, and a call as a

16  initial, initial reach out.  And then from

17  there it just gets escalated through the

18  team.

19     Q   And do you have a physical

20  meeting where you all sit together at a

21  round a table and have this?

22     A   We all sit together on the

23  floor.

24     Q   Okay.  So, but is there, is

25  there a -- a regular meeting that you

42

1               J. PATROVIC

2    would have on a daily basis where you

3    would gather to discuss those?  The return

4    report?

5        A    Not, not in like a conference

6    room in that, in that capacity.  I mean

7    we're on, we're all on the same Slack

8    channel, we're very communicative within

9    our, our Slack, like our Instant message

10   client and we all sit together.  So it's

11   pretty verbal and it's a shared document

12   so we can comment on the document as well.

13       Q    So is this just kind of done

14   throughout the day, somebody as you have

15   an opportunity, you send the message to

16   the rest of the team and say, Hey, I

17   noticed that you know, company A didn't

18   make its payment today, who's going to

19   follow up on it or something else?  Or if

20   you want, can you describe the process a

21   little bit better than I am?

22       A    No, it's, I'm saying we don't

23   have a physical meeting in a conference

24   room, but we have a shared channel within

25   Slack, our instant message client, and we

43

1          J. PATROVIC

2   kind of set up our day based on, based on

3   that within that Slack channel.

4       Q   Are these Slack, are, are the

5   communications in the Slack channel, are

6   they available to, for recall, like an

7   email?

8       A   They would be, yeah.

9       Q   And do you know, do you know

10  what the companies, what Libertas's

11  document retention policies with regard to

12  internal communications?

13      A   It's generally two years.

14      Q   Okay.  So after two years, what

15  would happen if you know to the

16  information

17      A   I either gets archived or

18  destroyed.  I'm, I'm not sure.

19      Q   Okay.  Would you, so would you

20  know if communications about an account

21  from November, December of 2022 would

22  still be in your Slack account?

23      A   No, because we started the

24  channel in 2023.

25      Q    Okay.  When you say 2023 would
↑

                    44

1                J. PATROVIC

2  be January, 2023 or sometime else in the

3  year?

4      A    I -- I'm not sure.

5      Q    Okay.  Prior to 2023, how did

6  you communicate with regard to these

7  return reports?

8      A    I mean, I believe we were remote

9  during COVID at the time, I -- I'm not,

10  I'm not sure if we were in office or not,

11  but during COVID we'd have a call every

12  morning after COVID, once we were in the

13  office it was like four people and we all

14  sit together, so we just discuss it in the

15  morning.

16      Q    So the, so prior to having the

17  Slack communication, everything was done

18  verbally on the phone?

19      A    Yes.

20    Q    Some sort of this call.  Okay.

21    Did you ever do Zoom calls?

22    A    Not for this, no.

23    Q    Okay.  Were the, were the

24    conversations that the, that you had

25    recorded conversations?

↑

45

1              J. PATROVIC

2    A    No.

3    Q    Okay.  Okay.  I'm, I'm going to

4    call for the production of any Slack.

5    I'm, I'm not that technologically savvy,

6    so whatever it's called, the Slack

7    communications.  Slack communications,

8    thank you.  To the extent that they

9    related in any way to the account for, for

10   Northshore and Sunrise in this matter

11      MR. KATAEV:  Or Deo.

12      MR. RUDERMAN:  Or Deo, right.

13      Correct.

14   BY MR. RUDERMAN:

15   Q    Now did, were there any written

16   notes that whether it, whether kept

17  electronically or physically with regard

18  to, to accounts that were on the return

19  report?

20      A    Probably.

21      Q    And, and where would those notes

22  have been kept?

23      A    On the account where we log log

24  notes.

25      Q    So is there some sort of a -- a,

↟

46

1              J. PATROVIC

2  is there a database of an electronic

3  database of some kind for all of the

4  information for all of your accounts?

5      A    Yes.

6      Q    Okay.  And is typically all of

7  the information about every account stored

8  on that database as far as you know?  Yes.

9  And that would include the notes not only

10  from your department, but from the

11  underwriting department and the intake

12  department, whatever it may be?

13    A    Yes.

14    Q    Okay.  I'm going to call for the

15    production of all notes that are

16    electronically stored by Libertas in

17    connection with, again, Northshore

18    Sunrise, Oreo and, okay.  Sorry.  Now when

19    a return report comes in and based upon

20    your various communications, who goes

21    about and decides or how is it drawn?  How

22    is it decided?  Okay.  This is one that we

23    need to follow up on and designate

24    somebody to follow up on that?

25    A    I mean, we're following up

47

1                J. PATROVIC

2    pretty much every day just until we figure

3    out what the next step is.

4    Q    Okay.  So if -- if, if you

5    receive a -- a return report that shows an

6    account that did not make its payment that

7    day, there's no waiting you for something

8    else that is, that is an indication

9    somebody needs to follow up on that

10  account, correct?

11     A    Yeah, we contact all of those

12  accounts every day.

13     Q    Okay.  And would you continue to

14  reach out to those accounts every day

15  until withdrawn?  Would you just continue

16  to count them account, reach out to those

17  accounts every day?

18     A    It, it depends on, on the

19  transaction and, and the balance and the

20  return code.

21     Q    So what would be give, give,

22  explain to me what the variables are, how,

23  how that all works?  Sure.

24     A    If we have a -- a deal that's 90

25  percent paid in their balance is $5,000

^

                    48

1           J. PATROVIC

2  and they miss a payment because of

3  insufficient funds, we'll probably call

4  them and then if we can't reach them,

5  we'll just rerun the payment.  We're,

6  we're not really pursuing that, that kind

7  of an account the same as an account with

8  a $500,000 balance that's 20 percent paid

9  in and has blocked our payments, that kind

10  of account we're going to have more of an

11  aggressive strategy and yes, we're

12  probably going to contact every day.

13      Q    What, what percentage of your

14  accounts have declined or unable to

15  process the payment within the first six

16  months?

17      A   I -- I don't have the answer for

18  that.

19      Q    Would you be able to give a fair

20  estimate?

21      A   Honestly, no.  I -- I don't, I

22  don't really, I have no idea.

23      Q    Okay.  Do, do you recall whether

24  that is a, are you able to say whether

25  that's a relatively rare occurrence or

❧

49

1           J. PATROVIC

2  something or some other way to describe

3  it?

4      A   I mean, I'd say it's under 25

5  percent, but we can put it there.  It, it

6  really depends.  I mean, it, it's also

7  circumstantial.  We had a massive

8  snowstorm across the country last week, so

9  we saw a much higher return rate because

10  of that.  And we called companies and they

11  just said, Hey, can you forgive this one?

12  We were closed so that, you know, between

13  holidays we see, we see an uptick in

14  returns.  It, it's pretty circumstantial.

15  I wouldn't say it's that rare.

16      Q   What about, would you say, what

17  would you say the percentages of accounts

18  that fail to make the -- the fifth payment

19  that it's due?

20      A   Under 5 percent.

21      Q   And in your experience, what do,

22  what is the typical, if there is frequency

23  of payments under your, under the various

24  financing you do?

25      A   I think the majority are on

50

1           J. PATROVIC

2   weekly.

3       Q   And do you know over, is there a

4   also a typical timeframe over which the

5   financing needs to be repaid?

6       A   It's typically 12 months.

7       Q   So that's your model.  It's,

8   it's mostly is trying to do a 12 month

9   repayment period with weekly payments?

10  Correct.  Okay.  And now are you familiar

11  let on in preparation for today's

12  deposition other than speaking to an

13  attorney, Mr. Cianculli or any other

14  outside counsel, did you speak to anybody

15  else about your deposition today?

16      A   No.

17      Q   Okay.  Did you review any

18  documents in preparation for today's

19  deposition?

20      A   I -- I reviewed our contract and

21  payment history and, and emails sent.

22      Q   An email sent to whom?

23      A   Harry Thomasson and then also

24  our external counsel David Epstein.

25      Q   And when you, what, what, when

51

1              J. PATROVIC

2   did you have communications with Harry

3   Thomasson?

4     A   Looks like December of 2022.

5     Q   How many communications did you

6   have with Mr. Thomasson in December, 2022?

7     A   Not many.  I see two on here.

8     Q   And do you know how it came

9   about that you had these communications

10   with Mr. Thomasson?

11     A   We were notified by Russell J.

12   Shanks, both us and Harry Thomasson on

13   December 6th, 22, that they will be

14   presenting in the Supreme Court of New

15   York Nassau County in order to show cause

16   restraining Anthony Deo from taking any

17   actions on behalf of Northshore Motor

18   Leasing and Sunrise Highway Auto and

19   restraining Harry Thomasson from releasing

20   735 to Deo or anyone on his behalf and

21   restraining us from taking action to

22   collect a Northshore Motor Leasing.

23     Q   And, and in, Did And did

24  Mr. Thomasson then reach out to you in

25  connection with that?

♠

52

1               J. PATROVIC

2        A   Yes.

3        Q   Do you know what he, what he

4   said?

5        A   Yeah, that the money has to

6   remain in escrow.

7        Q   Mr. Thomasson said the money has

8   to remain in escrow?

9        A   It seems it would be a serious

10  mistake for my client to move money that

11  we have been notified as the subject of a

12  judicial proceeding.

13       Q   That's Mr. Thomasson writing to

14  you?

15       A   It's to someone named Phil.  I'm

16  not sure who Phil is, but we were on the

17  email.

18       Q   So Mr. Thomasson wrote to

19  somebody named Phil.  Do you, are you able

20  to see, see Phil's email address?

21    A   Give me one second.  Oh, Phil

22   is, Phil is one of, is the broker at

23   National Business Capital.

24    Q   National Business Capital.  By

25   the way, just note for the record, I

53

1              J. PATROVIC

2   believe, and correct me if I'm, I'm wrong,

3   Ms. Patrovic has a computer screen in

4   front of her and she's actually looking

5   live at some emails that she's able to

6   access on her computer.  Is that, is that

7   correct Ms. Patrovic?

8    A   That's correct.

9    Q   Okay.  So Phil, do you know, so

10   are you able to tell Phil's last name the

11   email?

12    A   P Fernandes F-E-R-N-A-N-D-E-S

13   looks like at National Biz.

14    Q   Okay.  So in this email

15   Mr. Thomasson is writing, is he writing to

16   you and copying Phil or vice versa or is

17  he writing to both of you?

18      A   I think it was to Phil and Phil

19  forwarded it.

20      Q   Okay.  So Mr. Thomasson is

21  writing an email to Phil at National

22  Business and Phil forwarded the email and

23  in the email that Mr. Thomasson wrote to

24  Phil, could you give me those exact words

25  that he says?

⬧

54

1                J. PATROVIC

2      A   I'm not sure what the original

3  email was, but Dear Phil, we've spoken

4  about this and I pointed out to my client

5  it would be a serious mistake for my

6  client to move money that we have been

7  notified as the subject of a judicial

8  proceeding and one specifically target

9  targeting inter alia that money, no

10  offense intended to anyone, but we all

11  know that moving that money before a

12  decision is made by the court would be a

13  mistake.  That said, I also told Anthony

14   that if he has payments due under the

15   terms of your contract, he can and should

16   continue to make such payments.  Lastly,

17   please also be aware that as I informed

18   everyone on this email chain within the

19   last hour, I'm told by the company's

20   accountant Tom Jones, that he's confident

21   in Anthony's ownership of these businesses

22   for a variety of reasons.  Notably that he

23   was told in writing by Josh and Ms. Kuhn

24   that Anthony is the 99 percent shareholder

25   as represented on the taxes Mr. Jones

 ♠

55

1              J. PATROVIC

2   filed on behalf of Anthony and those

3   corporations.  By the way, he also told me

4   that he coordinated the filing of those

5   returns with Citrin, which is Josh's

6   accounting firm.  I'm sorry for the

7   troubles, but as I dig into all of this in

8   the last two weeks, I feel confident and

9   still feel confident in Anthony's

10   position.  I find Josh's efforts to be

11   inconvenient at best, but after speaking

12   with Tim Jones yesterday, I believe that I

13   will have information by tomorrow that

14   should help to resolve problems in short

15   order.  I will continue to keep everyone

16   informed as soon as I have relevant

17   information.

18       Q   Okay.  Thank you for that,

19          MR. RUDERMAN:  Madam Reporter, were

20       you able to get that she spoke pretty

21       quickly?

22          THE REPORTER:  Yes, I did.

23          MR. RUDERMAN:  Okay.  Great.  Very

24       good.

25   //

⬆

                           56

1              J. PATROVIC

2   BY MR. RUDERMAN:

3       Q   So I don't forget, I will be

4   recalling for the production of all

5   communications that Libertas has with if

6   they have any with Mr. Deo, but certainly

7    and obviously with Mr. Thomasson or

8    concerning Mr. Thomasson or Phil Fernandes

9    concerning the account for Mr. Deo

10   Northshore or Sunrise.  Now are there in,

11   in that email that you have that's the

12   full, there's no further chain in that

13   particular email?

14       A   I'm, I'm looking through the

15   chain now.  Yeah.

16       Q   Thank you.

17       A   Our CEO replied, I don't

18   understand.  We provided the money, just

19   send it back.  It seems pretty simple to

20   me.

21       Q   And who's he sending that email

22   to?

23       A   It's Harry, Phil is copied.

24       Q   Okay.  And and did Mr. -- that's

25   Harry, Mr. Thomasson, did he respond to,

⬆

57

1                J. PATROVIC

2   oh sorry, who's your CEO?

3     A     Sorry.  It was our prior CEO

4     Randy Saluck.  Okay.

5     Q     So Mr. Saluck wrote to Mr.

6     Thomasson to send the money back if

7     there's a dispute Pretty much correct?

8     A     Yes.

9     Q     Okay.  And Mr. Thomasson

10     responded to that?

11     A     Yes.

12     Q     What did he say?

13     A     No order to show cause has been

14     signed yet, as best as I can tell, I'm

15     calling the judge this afternoon.  I'm in

16     Albany on an appeal and will be back

17     tomorrow late lead.

18     Q     Any further communications that

19     you see on that in that context?

20     A     We then included Anthony, I

21     think Anthony spoke to Randy Saluck not on

22     a recorded line, and said that he would

23     provide a new bank account for the other

24     entity we have on the contract.  Randy

25     followed up with Harry copied Anthony,

58

1          J. PATROVIC

2     what is the holdup?  You said you were

3     going to pay us, we need the account to

4     pull from.

5          Q     What, what was the date of that

6     email?

7          A     December 14th, 2022.

8          Q     And we say Anthony, is that, is

9     that Mr. Deo?

10          A     Correct.

11          Q     Do you what, what email address

12     is he using on that, if you can see?

13          A     Yeah, sorry, it's cut off for

14     some reason.  Anthony D at Northshore

15     motors dot com.

16          Q     Okay.  All right.  Any other

17     further communications on that email

18     chain?

19          A     He replied with the bank

20     information that's really.

21          Q     Do, do you know what bank

22     account?

23          A     Yeah, it was BOA and it was for

24     I think 198.  Sorry, one second.

25          Q     You want just the last four?

⬆

59

1          J. PATROVIC

2   Just the last four of just the last four

3   of the account number.

4        A   Okay.  9 4 8 6.

5        Q   And does it say what, what

6   account that was, in other words, what was

7   the name of the account?

8        A   189 Sunrise Auto LLC, Sunrise

9   Highway Auto LLC.

10       Q   And do you, are you familiar

11   with the name of Michael Laurie, L-A-U-R-I

12   -E?

13       A   No.

14       Q   Okay.  Do you see whether he's,

15   did you see his name on any of the emails?

16       A   No.

17       Q   Okay.  So on this entire email

18   chain that you've had, you've mentioned

19   Mr. Fernandes, Mr. Saluck, Mr. Thomasson,

20   Mr. Deo, are there any other parties on

21   any of these emails that you know of that

22   you could see?

23       A   No.

24       Q   And is, is that the entire

25  extent that, that you are aware of with
∧

60

1            J. PATROVIC

2  regards to communications with

3  Mr. Thomasson about this account, that one

4  email chain that you were in your viewing?

5      A   Yeah, I'm searching one more

6  time, give me a second.  Okay.  I have

7  another email chain started by Russell

8  Shanks.

9      Q   Okay.

10     A   It's from December 20th, 2022.

11  It says,

12     Q   I just say is anybody else on

13  that email other than Mr. Shanks?  It's,

14  I'm sorry, who's the email to?  I

15  apologize.  Who's --

16     A   This one is To Harry and me.

17     Q   Okay.

18     A   As you know, the return date on

19  our order to show cause is currently set

20  for January 9th, 2023.  However, I'll be

21  out of state from January 6th to January

22  11th.  As such, I will intend on

23  contacting the court tomorrow and asking

24  it to put the matter on for January 12th,

25  2023 or any day thereafter.  That is

⬆

61

1              J. PATROVIC

2   acceptable to the court.  Please advise if

3   you consent to the same.  I replied we

4   consent.  Please include our attorney,

5   David Epstein copied here on all

6   communication.  Thank you to which Harry

7   responded, it can be done for the 18th,

8   20th, 26th or 27th of January on consent

9   with papers due from me two days before.

10  Do any of these dates work for you?

11  January is busy for me.  Russell responded

12  all but the 20th work for me.  I will

13  reach out to the court.  Thank you.  Yeah.

14  Then our attorney responded, Russell,

15  please let me know when you can discuss

16  this matter and then that's when that

17  email chain ends.

18     Q   So as far as you know, was that

19   ever, was that money the 730 let on my

20   understanding is that the amount that was

21   financed was 750,000 of which Libertas

22   takes a I -- I guess a funding fee of

23   15,000 and they net fund 735,000.  Is that

24   your understanding?

25     A   Yes.

                    62

1                J. PATROVIC

2     Q   Okay.  And that initial money

3   that went, that was financed, I know there

4   made some payments, but that money though

5   was not returned, correct?

6     A   Correct.

7     Q   All right.  There were some

8   subsequent, there were some payments that

9   were made against it, correct?

10     A   Correct.

11     Q   All right.  Do you know how many

12   payments were made?

13     A   There were seven payments of

14  19,791 and 70 cents.

15    Q    Okay.  And?

16    A    The total on that is 138,541 and

17  90 cents.

18    Q    So what, what is the amount that

19  you show on your records is still due on

20  that for that count?

21    A    I mean the full contractual

22  amount would be 8 59 0 6 3 and 10 cents

23    Q    That the -- the, the initial,

24  the amount that was supposed to be repaid,

25  correct me if I'm wrong, is 997,500.  Is

♠

63

1              J. PATROVIC

2  that correct?

3    A    Yes.

4    Q    All right.  So if you deduct the

5  payments you received, you came up with

6  $859,063 and 10 cents?

7    A    Correct.

8    Q    Okay.  Now what, what accounts

9  were those, did those payments come from

10  bank accounts?  If you know.

11      A   The first one was from an

12   account ending in nine five, sorry, still

13   going through this.  I see.  The first one

14   was from an account ending in 9 8 9.

15   Q    9 8 --

16        MR. RUDERMAN:  Tony,

17        MR. THOMASSON:  yeah.

18        MR. RUDERMAN: You got to mute

19   yourself.

20        MR. THOMASSON:  Oh, there you.

21   BY MR. RUDERMAN:

22      Q   And do you know what, what bank

23   That was from

24      A   Chase.

25      Q   Okay.

64

1            J. PATROVIC

2      A   The second one.

3      Q   Do you know the name of, of the

4   holder of that account?

5      A   It should be Northshore Motor

6   Leasing LLC.

7    Q   Are you sure?

8    A   I'm I'm double checking now.

9    That's what it should be.

10       MR. RUDERMAN:  Okay.  While, while,

11   while, while Ms. Patrovic is looking,

12   Mr. Cianculli, we do have a stipulation of

13   confidentiality in connection with this

14   matter.  So I'm going to ask that she

15   provide all of the account numbers in full

16   for, for each account that that made

17   payments, not just the last four digits.

18   And we all agree that that was, that is

19   under the confidentiality order that's

20   been signed by the judge.

21       MR. CIANCULLI:  I understand.

22   BY MR. RUDERMAN:

23    Q   Okay.  So Ms. Patrovic, when you

24   get a chance, if -- if you could provide

25   the full account numbers for any of the

                          65

1           J. PATROVIC

2   accounts that you are referencing today?

3    A   Sure.  Yep.  So this one is

4  Sunrise Auto.

5      MR. CIANCULLI:  The accounts from

6   which these seven payments were made.

7      THE WITNESS:  Correct.  Yes.

8  BY MR. RUDERMAN:

9   Q   And, and let me just make a note

10   here.  I'm also going to want to know the

11   accounts, the account where the money was

12   deposited, but so I don't forget, but yes,

13   go ahead.  Don't we know that, don't we, I

14   just want to confirm that she has the same

15   information.

16   A   Okay.  The money was deposited

17   and the first payment was debited from the

18   same account.  Okay.  It's Chase Bank,

19   Sunrise Auto Outlet.

20   Q   Right.

21   A   7 0 0 1 3 9 8 9 9.

22   Q   Okay.  Right.  That was the

23   first.  And so the first payment came out

24   of that account, correct?

25   A   Yes.

66

1          J. PATROVIC

2     Q   Okay.  And do you know the date

3  of that first payment?

4     A   11 25.

5     Q   22, Correct?

6     A   No, I'm showing the first

7  payment was, oh yeah, sorry, 2022.  Yeah.

8     Q   Okay.  And was that when the

9  first payment was supposed to come out as

10  far as you know?

11    A   Yes.

12    Q   Okay.  And when was the next

13  payment supposed to come out then?

14    A   12 2 22.

15    Q   All right.  And when did the

16  next payment come out?

17    A   12 2 22.

18    Q   And did, did it come out of that

19  same account or from some other account?

20    A   It came out of a Signature Bank

21  account, 189 Sunrise Hwy Auto, LLC.  And

22  the account number on that is 1 5 0 4 7 7

23  9 5 2 8.

24    Q   Okay.  And do you know how it

25  came about that the account, that it, the

67

1          J. PATROVIC

2   account where the money came, came out of

3   was changed?

4      A   I'm sorry, say it again please.

5      Q   Do you know how it came about

6   that the second payment was drawn from a

7   different account than the original one?

8   Do you understand my question?

9      A   Yeah.  Yes.  So I'm just reading

10   the notes.  The, the broker emailed us and

11   said that they had spoken to the merchant

12   and requested that we pull from this

13   account.

14      Q   And is that Mr. Fernandes again?

15      A   That's someone named Joe, I

16   think probably Joe Camberato, who is also

17   at the broker.

18      Q   That, that same national

19   business broker broker.  Okay.  And, and

20   I -- I -- I think I asked for it, but if I

21   didn't, again, all communications email of

22   any or, or of any kind with, with national

23   business or any of its representatives

24   concerning the account for Northshore

25   Sunrise or Deo.  All right.  So Joe writes
⬆

68

1                J. PATROVIC

2   and says that he spoke to the customer and

3   he's, and he wants the payments now to

4   come out of the signature account,

5   correct?

6      A   Yes.

7      Q   Okay.  And that and that second

8   payment went through?

9      A   On 12 two It went through, Yes.

10      Q   Okay.  And then when was the

11   next payment due?

12      A   The next payment Would've been

13   due 12 nine.

14      Q   Okay.

15      A   When we were emailed by Russell

16   Shanks, we, we paused that payment, we

17   weren't sure what was happening, however,

18   we spoke with the merchant, Anthony Deo,

19   he provided a new third account from Bank

20   of America.  That one, the account number

21   is 4 8 3 0 8 2 6 0 9 4 8 6.  So we changed

22  it to that account and debited that

23  payment on 12.  We actually debited two

24  payments on 1216.  That would be the one

25  for 12 nine and then the regular scheduled

♠

69

1           J. PATROVIC

2  one for 1216.  Both of those cleared.

3      Q   And was that also a Sunrise 189

4  Sunrise account or some other company if

5  you know?  Yeah, it

6      A   Was, it was a BOA 189 Sun

7  account.

8      Q   Okay.  All right.  So, so, so

9  far we've got three accounts that the

10  monies have been taken from and we have

11  four payments that were made, correct?

12  That we've discussed before.

13      A   Correct.

14      Q   All right.  What about after

15  that?

16      A   After that the account stayed

17  unchanged, it continued to be that Bank of

18   America account ending in 9 4 8 6 and

19   payments were cleared January 13th,

20   January 20th and January 27th.

21      Q   Okay.  All right.  And by the

22   way, each payment was exact, was how much

23   it was the same amount correct For each

24   payment?

25      A   Yep, exactly.  19,791 and 70

                                      70

1                    J. PATROVIC

2   cents.

3      Q   Okay.  Now after January 20,

4   that was the last payment you received on

5   this account was January 27th for that

6   amount, correct?

7      A   Yes.

8      Q   All right.  And was, did, was

9   the account then set up to automatically

10      A   Yeah.

11      Q   Did ACH every week for that at

12   that account, correct, At Bank of America?

13          Yes.

14          THE REPORTER:  I'm sorry to

15    automatically, what was the rest?

16        MR. RUDERMAN:  Debit, debit that

17    account.

18        THE REPORTER:  Thank you.

19  BY MR. RUDERMAN:

20    Q    Okay.  Now in your experience

21  have, have, do you recall any other

22  situations where, where clients have

23  called up and said switch this account,

24  that account, you know, two or three

25  switches as to what account to draw the

♠

71

1            J. PATROVIC

2  money from.  Is that something you, you

3  find common in your experience?

4    A    I would not say it's common.

5    Q    Okay.  Did, did this raise, for

6  lack of a better term, any red flags with

7  regard to the fact that they kept

8  switching the accounts?

9    A    I mean, I think a red flag was

10  already raised when we received emails

11  from Russell Shanks and Harry Thomasson.

12  I -- I don't think changing the account

13  twice the original funding account to a

14  new account that is fairly common, that is

15  not out of the ordinary to then get a

16  third account after we were contacted that

17  there were issues with Northshore Motors

18  to then get a different account from a

19  different entity that in this situation

20  would not be that out of the ordinary?

21      Q    And did you ever have, as far as

22  you know, the an ACH authorization to

23  withdraw funds from Northshore for any

24  Northshore account?

25      A    Yes.

 

72

1              J. PATROVIC

2      Q    You did.  Do you have that, do

3  you know what account number was

4  authorized?

5      A    Yes, it was the Chase Bank.  6 2

6  3 7 7 8 1 1 2.

7      Q    So 6 2 3 7 7 8 1 1 2?

8    A   Yes.

9    Q    Okay.  And when did you get

10   authorization from that one?

11      A   So our, our contract had this,

12   the 9 8 9 9 account on it.  But we have a

13   blanket authorization in our contract to

14   debit from any receivables accounts for

15   any entities on the, on the contract.

16      Q    When you say a blanket, so is

17   there, is that withdrawn?  I believe that

18   the other Libertas employees talked about

19   a power of attorney that you had.  Is that

20   you're referring to is your, or is it

21   actually some, another authorization

22   that's signed in blank that allows you to

23   pursue that?

24      A   In, in the contract itself, we

25   have a page that says Libertas Funding LLC

⬆

73

1          J. PATROVIC

2   Electric Fund Transfer Authorization.

3   There's that account listed and it says

4    you irrevocably authorize us, which

5    includes for the purpose of this

6    authorization are agents, service

7    providers successors and assigns to take

8    delivery of each weekly delivery amount by

9    initiating an electric fund transfer

10    transfer via the automated clearinghouse

11    network or similar network and a CH from

12    the business deposit account specified

13    below any substitute account you later

14    specify or any other account containing

15    your future receipts collectively the

16    account on or after the date, the

17    associated future receipts were created.

18        Q    So that meant in your

19    understanding that you could choose a

20    different bank account to withdraw the

21    funds from if it was specified in your

22    contract?

23        A    Yeah, that's what this page

24    states.

25        Q    Okay.  Did did Libertas ever

74

1              J. PATROVIC

2   attempt to withdraw funds from any other

3   accounts other than the three accounts

4   that actually got money from?

5      A   Nope.

6      Q   Okay.  So did, did never try to,

7   to withdraw funds from the Chase account

8   at Northshore that you just referred to?

9      A   We were never directed to, so I

10  don't believe we were.  No.

11      Q   When you say directed to, you

12  mean by Mr. Deo or is or by national

13  business?

14      A   Both.

15      Q   Okay.  Was it it was, is it my,

16  based upon what you just read to me, was

17  it not the discretion of Libertas to

18  decide if they wanted to draw against the

19  different accounts?

20      A   It, it is our discretion and

21  there was no reason to do that.

22      Q   Well, was there, well, after not

23  receiving, let's back up a little bit.

24  What, after the, what was the first

25  payment after January, after the January

75

1             J. PATROVIC

2  27th payment that was made?  What was the

3  next payment that was due?

4     A   It was February 3rd.

5     Q   Okay.  And the February 3rd

6  payment did not come in, correct?

7     A   Correct.

8     Q   Okay.  But there was an attempt,

9     A   Correct.

10    Q    So that would've shown up on

11  those re re returns that you had?

12    A   That's correct.

13    Q    Okay.  And that would, that

14  attempt was at the -- the Bank of America

15  account ending in 9 4 8 6?

16    A   Correct.

17    Q   All right.  And when it comes

18  back, does it say what it tell you whether

19  it's blocked?  There's no money.  I mean,

20  what does it say if you know?

21    A   Insufficient funds.

22    Q   All right.  So you would've

23  received a report on that day stating that

24  the money did not come in because they

25  were insufficient funds.

76

1          J. PATROVIC

2     A   It takes three business days, so

3   we received it on the, it's a two three

4   payment.  We received it on two six.

5     Q   Okay.  And when you received it

6   on two six, what, if anything, was the

7   next step that was done in connection with

8   that account?

9     A   Looks like we, we just continued

10   to debit from that account even though it

11   was returning insufficient funds.  We sent

12   it out to our attorney.

13     Q   Okay.  So when you say continue

14   to debit, so you, you, you instructed your

15   servicer to just try to collect and keep

16   hitting that account?

17     A   No, it was on auto debit, so it

18   was just never turned off.

19     Q   Okay.  And would that auto debit

20   just happen weekly or did, was it more

21   frequently now?

22    A    It was auto debit, it was weekly

23   and it was on the days specified according

24   to the contract.

25    Q    Okay.  Was at some point that,
⬆

77

1              J. PATROVIC

2   is that still going on or was that turned

3   off at some point in time?

4    A    That was turned off Three 17.

5    Q    Of 2022?

6    A    No, 2023.

7    Q    Okay.  So for another, more, I'm

8   sorry, I apologize, 2023.  So for another

9   month and a half, the debits kept trying

10  to debit that account, correct?

11    A    Correct.  They were returning

12  due to insufficient funds.

13    Q    Okay.

14    A    So sometimes when that happens,

15  we just rerun.  If they were blocked or

16  the account was closed, we would've just

17  turned them off.

18    Q    Okay.  And according to the

19  records, there's no indication that

20  Liberty has ever tried to debit any other

21  account except for that account 9 4 8 6

22  after March seven, March 17th, 2023?

23      A   Correct.

24      Q   Okay.  Now, when the monies were

25  not did not go through on that February

♠

78

1               J. PATROVIC

2   6th, 2023.  All right.  Do you have any

3   independent recollection as to what was

4   done at that time?

5       A   Sorry, on what date?

6       Q   So on you testified that the

7   first payment that was not made at all or,

8   or made up was February 6th, 2023 and you

9   knew about that, excuse me, February, I

10  think February 3rd, but takes three days

11  for you to get that in.  In either case it

12  was around that date.  Do you have an

13  independent recollection as to what, if

14  anything was done when that monies were

15  not, did not come in on that, that, for

16  that paid period?

17      A    No, at that point our, our

18  attorney David Epstein was working on this

19  externally.

20      Q    Okay.  And I'm going to ask you,

21  I -- I you've, you've reviewed various

22  communications and notes in connection

23  with this account in preparation of

24  today's deposition, correct?

25      A    Correct.

♠

79

1              J. PATROVIC

2      Q    Do you have, did, did reading

3  these notes refresh your recollection or

4  is everything you're saying here today

5  based upon what you're, what you reviewed?

6      A    I mean, both there, there wasn't

7  all that much to recall.  Our, our

8  attorney worked on most of this.  I have

9  no notes between dec between between

10  December 16th and 7 26 or seven 10, which

11  is from our attorney.

12    Q    So when you say December 16th,

13    2022 through September of 2023?

14    A    No, July of 2023.

15    Q    All right.  So for that period

16    of time, you really don't have any

17    internal notes as to what was done other

18    than the fact that it was being handled by

19    your attorney?

20    A    Yeah, once we escalate this to

21    outside counsel, we're generally not

22    working it internally.

23    Q    Okay.  Now, when, who makes the

24    decision as to whether or not to commence

25    suit for collection?

⌖

80

1              J. PATROVIC

2    A    It's generally me, for accounts

3    like this that are a bit more complicated,

4    like when we're contacted by third party

5    attorneys, it would be our general

6    counsel.  Oh, at the time it was our CEO

7    and general counsel.  At this point it's,

8  he's our vice chairman now, but he's still

9  involved in some of the complex decisions.

10     Q   So would, and would you have

11  been involved in those conversations?

12  Yes.  Do you recall being involved in the

13  conver in the conversations about this

14  account?

15     A   Yes.

16     Q   Okay.  Was a decision made at

17  some point as to whether or not suit

18  should or should not be commenced for

19  collection on this account?

20     A   Yes.

21     Q   Okay.  And what was the

22  decision?

23     A   I mean, we sent this to our, our

24  external counsel to just kind of start

25  getting on top of when we initially

↑

81

1              J. PATROVIC

2  received emails from Russell Shanks and

3  Harry Thomasson payments were clearing

4  still.  So we just continued to debit

5  internally and no suit was filed because

6  they were clearing payments.  Once they

7  started returning payments, we notified

8  our attorney and then at that point he, he

9  proceeded

10     Q   Well when you say he proceeded

11  what?

12     A   File suit.

13     Q   So, so is it your understanding

14  that a lawsuit had been, has been

15  commenced by Libertas to try and collect

16  on this?

17     A   He he would be the one to

18  commence the lawsuit.

19     Q   Do you know if he did commence

20  the lawsuit?

21     A   I'm, I'm checking now.

22     Q   Okay.

23        MR. CIANCULLI:  Mr. Ruderman, I -- I

24  think we can probably stipulate that the,

25  I -- I think the only claim that Libertas

1          J. PATROVIC

2     filed was by way of counterclaim in the

3     state court.  Yeah.  If that helps

4     stipulate to that.  I don't believe that

5     there's been any other lawsuit

6     affirmatively filed at this point.

7          MR. RUDERMAN:  Yeah that's --

8          MR. CIANCULLI:  By Libertas.

9          MR. RUDERMAN:  Okay.  I mean, I'd

10     like the witness to do the best that you

11     can to --

12          MR. CIANCULLI:  Yeah, we're getting,

13     we're getting a little close to like what

14     they talked about with counsel.  Let's try

15     to stay away from that.

16          MR. RUDERMAN:  I'll --

17          THE WITNESS:  I'll, yep.  I just, I

18     just searched New York courts.  We never

19     filed for the collections purpose.

20     BY MR. RUDERMAN:

21     Q    Now, now my brief review of the

22     New York courts, I -- I believe there's

23     well over 800 lawsuits that Libertas has

24     over the last several years filed,

25     correct?  Is that summary?

83

1                    J. PATROVIC

2      A   That -- That sounds correct.

3      Q   Okay.  And does Libertas

4   typically have a position to commence

5   lawsuits for those accounts that are, that

6   are in default?

7      A   Yeah, our, our external external

8   counsel files them on our behalf.

9      Q   Okay.  And do you know, sitting

10   here today as to why no action was

11   commenced to pursue a lawsuit against

12   either Northshore or Sunrise or Mr. Deo on

13   this account?

14         MR. CIANCULLI:  Objection.  You can

15      answer.

16         THE WITNESS:  Sorry.

17   BY MR. RUDERMAN:

18      Q   Do you know why no lawsuit has

19   commenced on collection against Northshore

20   Sunrise or Mr. Deo on this account?

21      A   I'd consider this account an

22   anomaly.

23      Q   In in what way?

24      A   We don't get emails like the

25   ones we get from Russell, Russell Shanks

84

1          J. PATROVIC

2   or Harry Thomasson ever and my nine years.

3      Q    So the fact that it's an

4   anomalies does that, is that the reason as

5   far as you know, as to why no lawsuit for

6   collection was made?

7          MR. CIANCULLI:  Objection.

8   BY MR. RUDERMAN:

9      Q    Is it, do you know if it's the,

10   if -- if Libertas believes it's still

11   entitled to payments on this account?

12      A   I think we are entitled to at

13   least the principal amount funded that we

14   never received back.

15      Q    Do you know if Libertas intends

16   on pursuing any claim against Mr. Deo

17   Northshore funding or Sunrise to collect

18   on this account?

19          MR. CIANCULLI:  Objection.

20      A   I don't know.

21      Q    Okay.  And, and if a decision

22   were be made --

23      THE REPORTER:  I'm so sorry I missed

24   that answer.

25      MR. RUDERMAN:  She said I don't know.

♠

85

1       J. PATROVIC

2     THE REPORTER:  Okay.  Thank you.

3  BY MR. RUDERMAN:

4    Q  And if a decision were to be

5  made to either yes, pursue it or not

6  pursue it, whose, whose decision would

7  that be if you know?

8    A  It would be mine And Randy,

9  Alex.  Okay.

10     MR. WEISS:  Mind if we, sorry, do you

11  mind if take a -- a quick restroom break?

12     MR. RUDERMAN:  Oh yeah, I, sure.  I

13  apologize.  We've been going for a little

14  while.  Yeah.  Why don't we take five

15  minutes, go back.  We can go back at 1125.

16     MR. WEISS:  Thank you.

17     MR. RUDERMAN:  All right.

18     THE REPORTER:  Time is 11:19.  Off

19   the record.

20        (Off the record.)

21        THE REPORTER:  We are back on the

22   record at 11:28 AM.

23        You may continue.

24        MR. RUDERMAN:  Thank you.

25   //

                        86

1              J. PATROVIC

2   BY MR. RUDERMAN:

3       Q   Ms. Patrovic, we've now had

4   a -- a few minute break.  Have you, did

5   you communicate with anybody during this

6   break?

7       A   No.

8       Q   Okay.  Now, are you aware of the

9   allegations that are contained in the, in

10   the lawsuits currently pending with

11   Libertas Concerning all, generally all the

12   allegations?

13       A   Not completely, no.

14       Q   Okay.  Are you aware that there

15   are allegations that, that Mr. Deo

16  committed fraud in connection with his

17  applications to Libertas?

18    A   Yes.

19    Q   Do you know if there was any in

20  internal investigation by Libertas as to

21  whether or not there may have been fraud

22  in, in connection with this application?

23    A   If there were, it would've been

24  by the underwriting team, not my team.

25    Q   Okay.  So as you sit here today,
♠

87

1                J. PATROVIC

2  you don't know if there was any

3  investigation about that?

4    A   I'm, I'm sure there was.

5    Q   Okay.  And would you have been

6  told what the result of that investigation

7  would be?

8    A   I probably.

9    Q   Okay.  And so do you know what

10  the results of that fraud investigation

11  were?

12     A   I -- I mean, I don't think that

13   they found anything outside of the

14   ordinary.

15     Q   Okay.  Now, in the agreement

16   there's a provision, I can pull it up if I

17   need to, but I think are you, you're

18   pretty familiar with the agreement?

19     A   Yes.

20     Q   Okay.  If, if you're not, we can

21   pull to the agreement, but that says if

22   the company goes out of business than the

23   under certain terms and conditions, the

24   obligation is no long there, there's no

25   longer further obligation to repay the

⬆

88

1               J. PATROVIC

2   amount, something like that could you?

3   Okay.  Correct.  And may I presume that

4   means if the company legitimately just

5   goes out of business, it just stops

6   operating.  Is that correct?

7     A   Correct.

8     Q   Okay.  Do you know whether or

9  not in this, whether that scenario you

10  believe is the withdrawn, do you know

11  whether or not there is Libertas position

12  that that provision applies in this

13  particular circumstance?

14       MR. CIANCULLI:  Objection.  You can

15    answer

16  BY MR. RUDERMAN:

17     Q   And I'll rephrase if you don't

18  understand.

19     A   I mean, that would apply to any

20  contract.

21     Q   Well, hold on, let me, let me

22  try and rephrase it.  Is it Libertas

23  position that the company Northshore

24  funding, I'm assuming not Northshore,

25  Northshore Motor and 100 Sun among 89

↟

89

1          J. PATROVIC

2  Sunrise, let me back up.  Let me, let me

3  do it this way.  Do you know as you sit

4  here today, whether Northshore Motor is

5  still an operating business?

6      A   I don't know,

7      Q   Do you know if 189 Sunrise is an

8  operating business?

9      A   I don't know.

10     Q   Okay.  Do you know whether

11  Libertas has taken any position to see

12  whether or not the provision within the

13  contract, which says a business that is no

14  longer operating, is no longer obligated

15  for the repayment?

16     A   At that point, it would be

17  external counsel David Epstein.

18     Q   Okay.

19     A   Once we escalate it to outside

20  counsel, he, he's the one kind of handling

21  that.

22     Q   Okay.  So it would be up to him

23  to decide whether or not that provision in

24  the contract would be applicable?

25     A   Correct.  Well, if -- if they're
 ▲

90

1          J. PATROVIC

2  closed or not.

3     Q   Okay.  Well, is there a

4  difference between a company that closes

5  because, for example, the owner took all

6  the money out of the company or a business

7  that closed down 'cause it wasn't making

8  money and is no longer have funds?

9     A   I think yeah, I mean there's a

10  difference.

11     Q   Okay.  So in a situation where a

12  company closes, 'cause it, it wasn't

13  making money went out of business in that

14  situation, that provision would apply in

15  your understanding?  Correct?

16     A   Yes.

17     Q   Okay.  But if the, but if the

18  owner of the company just decides, I'm

19  going to take all the money out of the

20  company, close it down, you believe that

21  there would still be an obligation to

22  repay the debt to Libertas?  Correct?

23     A   Yes.

24     Q   Okay.  And also in the contract,

25  it's the expectation, actually the

91

1              J. PATROVIC

2   obligation that when the monies are

3   financed to the, to the borrower, excuse

4   me, to the client merchant, merchant

5   merchant, that money's going to be used to

6   promote the business, which, which is

7   financing that those monies, correct?

8      A   Yes.

9      Q   Okay.  It's not the intention or

10  your understanding that when it, this

11  money's financed, the merchant is to take

12  that money and, and use it to buy some

13  other asset unrelated to the business?

14  Objection.  You can answer the question.

15      A   I mean, unless otherwise

16  specified, there, there are occasions

17  where that is the case.  Right.

18      Q   So if -- if, if the money is

19  specifically taken saying we we're going

20  to be using this money to buy something

21  outside of the business, otherwise the

22  money is supposed to be, is expected to be

23  used for the benefit of the business

24  itself, correct?

25      A   Yes.

92

1          J. PATROVIC

2     Q   Right.  I mean, you have,

3  Libertas has a vested interest in this

4  business continuing to operate, correct?

5  That's

6     A   Correct.

7     Q   And you're, and when it's

8  financing, it's really stripping a lot of

9  asset value from the company that you

10  don't want to be taking out of the company

11  because it won't have the money to repay

12  the debt that it owes to you.  Correct?

13     A   Correct.

14     Q   Okay.  Had you known, had,

15  excuse me, had Libertas known that the

16  $735,000 would've been taken by the, by

17  Mr. Deo and used for him personally to buy

18  into some other business, would do you

19  think Libertas would have financed this

20  transaction?

21          MR. THOMASSON:  Objection.

22  BY MR. RUDERMAN:

23    Q   You can answer.

24    A   I'm not sure.

25    Q   Okay.  Is that because that's,
↑

93

1              J. PATROVIC

2    I'm not involved in underwriting.  Fair

3    enough.  And if in fact, the monies, if in

4    fact the, that exclusion for a business

5    going out of business withdrawn, there's a

6    personal guarantee on this transaction,

7    correct?

8        A   I believe so.

9        Q   Okay.  And that's a pretty

10   standard practice for Libertas in these

11   types of deals?

12       A   Yes.

13       Q   Okay.  And Mr. Deo is the one

14   who personally guaranteed it, correct?

15   Yes.  Okay.  Is it your understanding that

16   Mr. Deo is still personally liable for the

17   obligation to Libertas?

18           MR. CIANCULLI:  Objection.  You Can

19       answer.

20    A   Yes.

21    Q    Okay.  And do you know if any

22   efforts have been made against Mr. Deo to

23   collect on any of these obligations to

24   Libertas?

25    A   That would be, are our, at our

⬆

94

1                J. PATROVIC

2   external counsel, David Epstein handling

3   that.

4    Q   Okay.  So, so as you sit here

5   today, okay.  You don't, you don't know is

6   what you're saying?

7    A   Correct.

8    Q   And the decision as to whether

9   or not to pursue a claim against Mr. Deo

10   would be handled by outside counsel.

11   Mr. Epstein?

12    A   His advice, Yeah.

13    Q    Okay.  It was based on whether

14   his he advised to do so or not?

15    A   Correct.

16    Q    Okay.  And, but at this point in

17    time, you have not given the instruction

18    to start an action against Mr. Deo,

19    correct?

20    A    Based on my notes, no.

21        MR. RUDERMAN:  I'm just checking my

22    notes.  I'm not, we're almost done.  I

23    just want to make sure that I'm Well,

24    thank you much.  Thank you very much

25    Ms. Patrovic.  I don't have any further

⬆

95

1            J. PATROVIC

2    questions, but I -- I -- I have to open

3    this up to see if any other party or

4    counsel wishes to ask you any questions.

5    Thank you.

6        MR. KATAEV:  For the superb

7    plaintiffs.  No further questions.  Thank

8    you.

9        MR. THOMASSON:  Mr.  Cianculli, I

10    think you are ahead of me in order if

11    there you have any.  I know you don't,

12    but --

13          MR. CIANCULLI:  Yeah, I will not, I

14    will not.  I think you're up, Harry, if

15    you want to ask questions, I think you are

16    next In line.

17          MR. THOMASSON:  I have a few.

18          MR. CIANCULLI:  Okay.

19              EXAMINATION

20   BY MR. THOMASSON:

21    Q    Ms. Patrovic?

22    A    Yes.

23    Q    Is that, is that right

24   Ms. Patrovic?

25    A    It's Patrovic, it's fine.
↑

                    96

1              J. PATROVIC

2    Q    Patrovic, I'm sorry.

3    Ms. Patrovic, you, you spoke about, it

4    seemed, if I understood you correctly,

5    three different levels of difficulties

6    that people get into with repayments of

7    funding at Libertas.  You seem to indicate

8    that there's a group that goes into

9   default and you said that was a

10   guesstimate of about 5 percent and then,

11   and then you talked about roughly 10

12   percent that do some sort of workouts,

13   although that might be my conclusion.  And

14   you talked about 15 percent that are

15   pending troubles.  I'm wondering, are

16   those three separate groups or are some of

17   them a subset of like the 15 percent of

18   people who are almost in trouble?

19        MR. KATAEV:  Objection to form.

20     Compound.

21   BY MR. THOMASSON:

22     Q   Do you understand the question,

23   Ms. Patrovic?

24     A   Yes.

25     Q   Go, go ahead.  Explain that to

⬆

97

1        J. PATROVIC

2   me if you would.

3     A   There, there are three separate

4   buckets.  Essentially I view them as a

5   pipeline.  Deals that are in, for the sake

6  of this, we can use the terms late paused

7  and default deals that are currently,

8  they're working with us, they're on

9  workout plans we call late deals that are

10  on paused.  Those are pending default.

11  That means that we've worked them

12  internally to the best we could at this

13  point we've sent them to outside counsel.

14  And then the last, the last bucket default

15  is if we've determined that outside

16  counsel can't collect in the near future.

17  So right now they're all separate, but

18  accounts move from one to the other.

19      Q   Do you know if this was a case

20  that internally Libertas considers to be

21  at this point a default?

22      A   Yes.

23      Q   Okay.  And during your time with

24  Libertas, you, you said you've been with

25  them for about nine years, is that right?

↑

98

1        J. PATROVIC

2      A    Correct.

3      Q    What was the smallest funding

4   that you became aware of by Libertas?

5      A   A small, probably 5,000.

6      Q    $5,000.  Okay.  And do you know

7   what the largest funding was that you've

8   become aware of since you've been at

9   Libertas?

10       MR. CIANCULLI:  Objection.  You, you

11    can answer if you know.

12       THE WITNESS:  It's probably around 10

13    million.

14   BY MR. THOMASSON:

15      Q    Okay.  So this particular

16   funding, withdrawn, you consider this to

17   be a $750,000 funding, not withstanding

18   that only 735,000 was actually delivered,

19   right?

20      A   Correct.

21      Q    And $750,000, how would you

22   categorize that in your experience at

23   Libertas?

24       MR. RUDERMAN:  Object to form.

25       MR. CIANCULLI:  Yeah, objection.

99

1                J. PATROVIC

2  BY MR. THOMASSON:

3      Q    If if -- if you have any way of

4  describing it, Small, medium, and large

5  For example, how would you describe it

6      A    On 11 17 20 22, That's

7  considered large.

8      Q    That was a large loan?

9      A    Yes.  A large MCA.

10     Q    That was, that was large

11 funding?

12     A    Yes.

13     Q    Okay.  And you don't know

14 Anthony Deo personally, do you?

15     A    No.

16     Q    And you and I have never spoken

17 except I think you indicated you might

18 have been on some email chain with me,

19 right?

20     A    Yes.

21     Q    With respect to the email chains

22 that you saw that contained my name, you

23 said something that I didn't fully

24 understand.  You used the word escrow

25 while talking about one of my emails, but

100

1            J. PATROVIC

2   then I thought you read it and I didn't

3   hear the word escrow.  So I'm wondering

4   when you used the word escrow with respect

5   to my emails, was that your conclusion or

6   a quote from what Something I said

7        MR. KATAEV:  Objection.

8     A   It, The word escrow is not in

9   your email.

10     Q   Okay.  So the, when you used the

11  word escrow in this deposition, that was

12  your term and your conclusion, is that

13  right?

14     A   Yes.

15     Q   Okay.  Did you read us the

16  entire email that I sent when you read

17  that to us?

18     A   The one from 12 eight?  Yes, I

19  did.  That was the full email there.

20     Q   Were there any other emails in

21  which I communicated with Libertas and

22  said anything affirmative other than just

23  being on the chain?

24    A   Not that I could find.  I -- I'm

25   not sure if you had send any directly to

⬆

101

1             J. PATROVIC

2   Randy, but those are the ones in my notes.

3        MR. CIANCULLI:  And To be, to be

4    clear, Mr. Thomasson, that email was not

5    to Libertas, but it was to someone named

6    Phil.

7        MR. THOMASSON:  Okay.  Right.

8   BY MR. THOMASSON:

9    Q   And forgive me, I -- I in, in

10   the, in the moment, I'm not remembering

11   who Phil is.  Ms. Patrovic, do you know

12   who Phil is?

13    A   Yes.  He's someone at the broker

14   company, National Business Capital.

15    Q   Okay.  And did it appear to you

16   that I was responding to something Phil

17   had reached me about?

18    A   Yes.

19    Q   Okay.  When you speak about this

20  case being an anomaly, do you mean that

21  it's unusual for Libertas to be involved

22  in funding that then becomes the subject

23  of an order to show cause?  Is that what

24  you mean?

25      A    Yes.

⬆

102

1              J. PATROVIC

2      Q    Mr. Ruderman was asking you

3  about the merchant and the merchant's use

4  of money obtained through funding from

5  Libertas.  I'm curious, after funding is

6  provided to the merchant by Libertas,

7  whose decision is it as to how they use

8  that money?

9      MR. RUDERMAN:  Objection, form.  You

10      can answer.

11      A    Our underwriting team.

12      Q    Okay.  Now, now my question goes

13  to after the funding has been provided,

14  not whether or not it's going to be

15  provided.  I'm asking you once the money

16  has been provided, whose decision on

17  behalf of the merchant.  Is it as to how

18  the merchant uses the money?

19      A   The merchant.

20      Q   And in this particular instance

21  is, or has Libertas ever been concerned

22  about how the money was used?

23      A   Yes.

24      Q   Okay.  And what is it you found

25  out

103

1              J. PATROVIC

2      A   There are over 10,000 accounts?

3  I'm, I'm not, I'm not sure.

4      Q   Okay.  So you would like it to

5  be utilized for the business.  Is that a

6  fair summation?

7      A   That's Correct.

8      Q   Okay.  And it's the merchant's

9  decision as to how they use it for the

10  business, right?

11      A   Yes.

12      Q   And as you sit here today, do

13    you consider that Anthony Deo obtained

14    this funding from Libertas wrongfully?  If

15    you know.

16        A    I'm able to view the transcripts

17    of my underwriting team, I'm sure who you

18    already spoke to of what Anthony Deo said

19    he was going to use the funds for.  From

20    what I understand, they were not used for,

21    for those things.  That's, that's all I

22    can say with that.

23        Q    Okay.  And with regard to the

24    funding itself, are you aware that it,

25    after their depositions, the underwriting

＾

104

1                 J. PATROVIC

2    team indicates that they still would've

3    funded this deal?  Do you know that that

4    happened?

5        A    I don't.

6        MR. RUDERMAN:  Object to the, object

7    to the form of the question as to whether

8    it's accurately reporting back, but you

9    can answer the question.

10        THE WITNESS:  The, I -- I've have, I

11    didn't speak to them after their

12    depositions.

13  BY MR. THOMASSON:

14      Q    Okay.  And as you sit here

15  today, is there anything about this

16  transaction that you believe has indicated

17  to you that Libertas should not have

18  funded this transaction, at least as of

19  the date of the funding?

20        MR. CIANCULLI:  Objection.  You can

21    answer.

22      A   I'm, I'm not an underwriter, but

23  I trust my underwriting team.

24        MR. THOMASSON:  Okay.  I have no

25    further questions.

♠

105

1        J. PATROVIC

2        MR. CIANCULLI:  Jeff, you're finished

3  still I assume?

4        MR. RUDERMAN:  I have no, I have no

5    further questions.

6          MR. CIANCULLI:  Okay.  Michael, I

7     assume you're not asking any questions?

8          MR. WEISS:  Yes, that's correct.  I

9     have no, I have no, questions.

10          MR. CIANCULLI:  Jess, I think you're,

11     I think you're done.

12          Everybody agree?

13          MR. RUDERMAN:  I'm good.

14     Ms. Patrovic, thank you very much for your

15     time.

16          THE WITNESS:  Thanks.

17          THE REPORTER:  I'm going to go ahead

18     and close off.

19          MR. CIANCULLI:  Thank you.  You can

20     log off.  All right.  Anything else we

21     need to talk about now before I --

22          THE REPORTER:  Let me just --

23          MR. CIANCULLI:  -- Deal with other

24     fires?

25          MR. RUDERMAN:  But, but I -- I do

⬆

106

1          J. PATROVIC

2     want to ask the reporter, we needed an

3     expedited rough transcript for Monday,

4     please.

5          THE REPORTER:  For Monday.  Okay.

6     I'll have someone reach out.

7          MR. RUDERMAN:  Yes.

8          THE REPORTER:  And then let me see

9     Mr. Ruderman.

10         MR. KATAEV:  Splitting that.

11         THE REPORTER:  I'm sorry, Mr. Kataev,

12    I missed that.

13         MR. RUDERMAN:  Yeah, I -- I'm

14    splitting that with Mr. Kataev.

15         THE REPORTER:  Okay.  And that is the

16    expedited as well as the original

17    transcript?

18         MR. RUDERMAN:  Yeah.  Well, right,

19    correct.  Yes.

20         THE REPORTER:  Okay.  And if there

21    are any remaining counsel that are

22    ordering a copy, please let me know now.

23         MR. KATAEV:  I also confirm that's

24    correct.

25         MR. CIANCULLI:  I -- I am not

107

1           J. PATROVIC

2    ordering a transcript.

3        THE REPORTER:  Okay.  All right.  So

4    I will assume no one else is through that

5    silence.  Okay.  I don't believe there's

6    anything further.  Time is 11:48 AM We are

7    off the record.

8        (Whereupon, at 11:48 a.m., the

9         proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25