Exhibit I to
Ronneburger Dec.

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS INC., et al.

v.

DEO, et al.

---

## Examination of Michael Buccino

*Thursday, February 26, 2026*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------x

SUPERB MOTORS INC., TEAM AUTO SALES
LLC, ROBERT ANTHONY URRUTIA, 189
SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR
LEASING, LLC, BRIAN CHABRIER, JOSHUA
AARONSON, JORY BARON, ASAD KHAN, IRIS
BARON REPRESENTATIVE OF THE ESTATE OF
DAVID BARON, 1581 HYLAN BLVD AUTO LLC,
1580 HYLAN BLVD AUTO LLC, 1591 HYLAN
BLVD AUTO LLC, 1632 HYLAN BLVD AUTO
LLC, 1239 HYLAN BLVD AUTO LLC, 2519
HYLAN BLVD AUTO LLC, 76 FISK STREET
REALTY LLC, 446 ROUTE 23 AUTO LLC and
ISLAND AUTO MANAGEMENT, LLC,

                Plaintiffs,

                      Case No.
                      2:23-CV-6188
     -against

ANTHONY DEO, SARAH DEO, HARRY THOMASSON,
DWIGHT BLANKENSHIP, MARC MERCKLING,
MICHAEL LAURIE, THOMAS JONES, CPA, CAR
BUYERS NYC INC., GOLD COAST CARS OF
SYOSSET LLC, GOLD COAST CARS OF SUNRISE
LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP
LLC, GOLD COAST MOTORS OF LIC LLC, GOLD
COAST MOTORS OF ROSLYN LLC, GOLD COAST
MOTORS OF SMITHTOWN LLC, UEA PREMIER
MOTORS GROUP, DLA CAPITAL PARTNERS INC.,
JONES, LITTLE & CO., CPA'S LLP, FLUSHING
BANK, LIBERTAS FUNDING LLC, J.P. MORGAN
CHASE BANK, N.A., 189 SUNRISE HWY AUTO
LLC, and NORTHSHORE MOTOR LEASING, LLC,
                    Defendants.

-----------------------------------------x

**2**

                    February 26, 2026
                    10:12  a.m.

     REMOTE EXAMINATION BEFORE TRIAL of MICHAEL BUCCINO, a 30(b)(6) Witness, taken by Plaintiffs, in the above-entitled action, held at the above date and time, pursuant to Court Order, before Lisa Hiesiger, a Stenographic Reporter and Notary Public within and for the State of New York.

**3**

A P P E A R A N C E S:

    SAGE LEGAL LLC
    Attorneys for Plaintiffs Superb Motors Inc.,
    Team Auto Sales LLC, Robert Anthony Urrutia
      18211 Jamaica Avenue
      Jamaica, New York 11423
      718-412-2421
    BY: EMANUEL KATAEV, ESQ.
      emanuel@sagelegal.nyc

    CYRULI SHANKS & ZIZMOR LLP
    Attorneys for Plaintiffs 189 Sunrise Hwy Auto
    LLC, Northshore Motor Leasing, LLC, Brian
    Chabrier, Joshua Aaronson, Jory Baron, 1581
    HYLAN BLVD AUTO LLC, 1580 Hylan Blvd Auto LLC,
    1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto
    LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd
    Auto LLC, 76 Fisk Street Realty LLC, 446 Route
    23 Auto LLC and Island Auto Management, LLC
      420 Lexington Avenue
      Suite 2320
      New York, New York  10170
      212-661-6800
    BY: JEFFREY RUDERMAN, ESQ.
      jruderman@cszlaw.com

    CULLEN AND DYKMAN LLP
    Attorneys for Defendant Flushing Bank
      333 Earle Ovington Boulevard
      2nd Floor
      Uniondale, New York 11553
      516-357-3700
    BY: ARIEL E. RONNEBURGER, ESQ.
      aronneburger@cullenllp.com

**4**

A P P E A R A N C E S:  (Continued)

    HARRY R. THOMASSON, JR., ESQ.
    Pro Se Defendant
      3280 Sunrise Highway
      Box 112
      Wantaugh, New York  11793

    WEIR LLP
    Attorneys for Defendant
    Libertas Funding LLC
      1339 Chestnut Street
      Suite 500
      Philadelphia, Pennsylvania 19107
      215-665-8181
    BY: JEFFREY S. CIANCIULLI, ESQ.  (A.M. Session)
      JCianciulli@weirlawllp.com

Also Present:

    ROBERT ANTHONY URRUTIA

    ALIVIA COONEY, Paralegal
    Sage Legal LLC

      ~ oOo ~

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

5

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

~ oOo ~

6

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

MR. RUDERMAN:  Jeffrey Ruderman from Cyruli Shanks & Zizmor for IAG plaintiffs we agree.

MR. KATAEV:  Emanuel Kataev from Sage Legal LLP for three of the plaintiffs, and we agree.

MS. RONNEBURGER:  Ariel Ronneburger for Flushing Bank, we agree.

MR. THOMASSON:  Harry Thomasson, pro

7

M. BUCCINO
se, I agree.

MICHAEL BUCCINO, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

THE COURT REPORTER:  Ms. Ronneburger, will you be purchasing a copy of the transcript?

MS. RONNEBURGER:  Yes.

EXAMINATION BY MR. RUDERMAN:

Q.  Good morning, Mr. Buccino.  Did I pronounce that correctly?

A.  Yes.

Q.  So today you are here as a representative of Flushing Bank to provide testimony in connection with this lawsuit in which Flushing Bank is a defendant.  Are you aware of that?

A.  Yes.

Q.  Have you ever been deposed before?

A.  Yes.

Q.  How many times, approximately?

A.  Twice, I think.

Q.  Was that as a representative of

8

M. BUCCINO
Flushing Bank?

A.  At least once, yes.

Q.  The matter that was not Flushing Bank, do you recall what that was in connection with?

A.  It was a debt collection for my old employer.

Q.  I'm going to just provide you with some instructions, although you've been deposed before, just to make sure that the ground rules are clear and we get a clean record.

Before I begin, is there any reason why you would not be able to give truthful and accurate testimony here today?

A.  No.

Q.  So as you can see, the reporter is here taking down all of the questions and answers that you will be asked today and give, so please just make sure that you speak clearly in responding to all of the questions.  Do you understand that?

A.  Yes.

Q.  Also, all of your answers need to be verbal as the reporter can't take down a shrug or

2 (Pages 5 to 8)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

117

M. BUCCINO
the e-mail and then the attachment. I've gone through the discovery.
MR. RUDERMAN: So then I do have, perhaps this will help. Let me see what I have here. Maybe this will help. I'm going to open up another document.
This is an e-mail produced by Flushing under Flushing 03765. And it is from Shane D-I capital G-E-R-O-N-I-M-O, dated March 21, 2023 to Stephen Codispodo and I'm going to mark this as Flushing 14.
(Flushing Exhibit 14, Document Bates stamped Flushing 03765, was marked for identification, as of this date.)
Q. So for the last question, Mr. Buccino, do you recall seeing this document before, this e-mail?
A. Yes.
Q. When do you recall first seeing this?
A. It was in preparation for this deposition.
Q. So you don't recall seeing this back in when the subpoena was first served or in

118

M. BUCCINO
production for the lawsuit?
A. No.
Q. But you definitely recall seeing this recently when you were preparing for today's deposition?
A. Yes.
Q. And the e-mails from Shane DiGeronimo says "I was running searches on Anthony Deo and when I checked the E-court he has a court hearing today 3/31/23. I've attached screenshots below from the summons and complaint from 12/6/22, and I am still reading into the case to see if any further action has occurred."
My first question is, who is Shane DiGeronimo, if you know?
A. He is an employee in the credit center.
Q. So he works -- he would be in the same department as Stephen Codispodo?
A. Yes, they're both credit analysts, I believe, working under Thomas Clemens.
Q. And he appears to have pulled some of the allegations out of the complaint and put them into this body of the e-mail, is that what it

119

M. BUCCINO
looks like?
A. That is what it looks like, yes.
Q. I previously asked you when, if you knew when Flushing Bank first became aware of the summons and complaint, which I showed to you as the previous exhibit. And I believe either you didn't -- I don't know whether you, I think you didn't know but as your attorney noted that there may be some e-mail that might help to pin that down.
Seeing this, do you know whether Flushing bank became aware of this lawsuit any date before the date of this e-mail March 31st, 2023?
A. I don't.
Q. But it would be fair to say that at least as of March 31, 2023 they became aware of this lawsuit?
A. Yes.
Q. Based on your conversations with, or I assume communications whether it was in writing or in person with Mr. Puccio and somebody else in that department about this lawsuit, they indicated that they were satisfied in the

120

M. BUCCINO
business banking department to proceed with a loan despite the fact that this lawsuit existed, correct?
A. Yes.
Q. Let me bring up the complaint again. Let me share the document again. So this is again, I believe, this was Flushing 13.
Mr. Buccino, were you aware that Mr. Deo had arranged for Northshore to obtain financing from a company called Libertas Funding in or around November of 2022?
A. Was I aware of it in November of 2022?
Q. Were you aware sitting here today, were you ever aware that Northshore that Mr. Deo arranged to obtain funding for Northshore in or around November of 2022?
A. No.
Q. Sitting here today, did you ever hear of the name Libertas before in connection with this?
A. I know Libertas is a party in the action.
Q. Do you know what Libertas's

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

121

M. BUCCINO

involvement was in connection with Northshore Motor?

A.  Specifically, no.

Q.  Do you know whether anybody at Flushing Bank was aware prior to funding the loan and approving the loan about Libertas's relationship with Northshore Funding --

A.  I don't know.

Q.  -- Northshore Motor, I'm sorry?

In this litigation it is undisputed that Mr. Deo arranged for Northshore -- for Libertas to provide $735,000 in funding to Northshore and to Sunrise and in exchange they purchased well over $900,000 worth of the receipts of Northshore and Sunrise.  Do you know whether or not Flushing Bank was aware of that?

A.  I do not know.

Q.  Do you know whether they were aware that when they provided the funding or approved this loan that Libertas was required to be paid approximately $20,000 per month in connection with this financing that's from Northshore and Sunrise?

A.  I do not know.

122

M. BUCCINO

Q.  Do you know whether or not they were aware that Northshore and Sunrise were in default of this Libertas Funding at the time that they processed the application and approved the loan for Flushing?

A.  I do not know.

Q.  Do you know whether or not Anthony Deo ever disclosed to Flushing Bank about the Libertas Funding and/or the fact that it was in default?

A.  I don't know.

Q.  Do you know whether Flushing Bank would have financed the transaction at issue if it knew about the Libertas financing and default?

A.  I don't know.

MR. RUDERMAN:  I'm going to share my screen.  I'm showing you a document that is a one-page e-mail Flushing 04572.  I'll mark this as Flushing 15.

(Flushing Exhibit 15, Document Bates stamped Flushing 04572, was marked for identification, as of this date.)

Q.  It's an e-mail from Robert Puccio to Thomas Clemens dated August 4th, 2023.  Do you

123

M. BUCCINO

recall every seeing this e-mail before?

A.  No.

Q.  In this e-mail Mr. Puccio says in speaking to Mr. Clemens "Attached is what the client's attorney sent me."  And there's an attachment called "Jones AFF Executed PDF" and a "letter from Harry PDF," which I'll show you later.  It says that "Even Citrin Cooperman opined and verified that the claims against Northshore's owners are wrong."

Do you know why Mr. Puccio was sending this e-mail to Mr. Clemens?

A.  Specifically, no.

Q.  I'm sharing my screen.  I'm showing you an attachment to that e-mail.  It's a one page e-mail on the letterhead of Harry R. Thomasson, Esquire, dated March 31, 2023.  It looks like -- it's tiny letters -- it looks like it's Flushing 06520.

MR. RUDERMAN:  I'm going to mark this as Flushing 16.

(Flushing Exhibit 16, Document Bates stamped Flushing 06520, was marked for identification, as of this date.)

124

M. BUCCINO

Q.  Do you recall ever seeing this document before?

A.  Yes.

Q.  When did you first see it?

A.  When discussing with Mr. Puccio, and who I believe is Mr. Magaldi at this point, after we received the initial subpoena for the records.

Q.  Do you recall reading this letter when you did see it?

A.  Yes.

Q.  I believe you discussed it before. And this letter was provided to Mr. Puccio in connection with the financing sought by Mr. Deo for Northshore Motor, correct, as far as you know?

A.  Yes.

Q.  And as a result of this letter and I'll provide the other affidavit it was the decision of Flushing Bank to proceed with the financing despite the fact that there was a lawsuit?

A.  As a result of this letter the other letter and the totality of the application, yes.

Q.  I'll bring up the other in order to

31  (Pages 121 to 124)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

125

M. BUCCINO

be complete here.  I'm showing you now the other attachment which is the document Bates stamped Flushing 06517.

MR. RUDERMAN:  I'm going to mark this as Flushing 17.

(Flushing Exhibit 17, Document Bates stamped Flushing 06517, was marked for identification, as of this date.)

Q.   This is, as you saw before, that same caption with the lawsuit by Mr. Chabrier and against Mr. Deo, and it's an affidavit of Thomas Jones, CPA.  Have you ever seen this document before?

A.   Yes.

Q.   And when did you see it first?

A.   The same as the attorney letter.

Q.   You didn't see it at the time that it was presented to Flushing Bank, correct?

A.   I don't know when it was presented, so no.

Q.   Well, it's attached to the e-mail from April.

A.   I saw it later when it was -- when I was looking into the case.

126

M. BUCCINO

Q.   And again, this letter along with the letter from Mr. Thomasson we showed you, and whatever other investigation gave Flushing Bank comfort to proceed with the loan, correct?

A.   Yes.

Q.   Now, by the way, in this affidavit from Mr. Jones it states that number 6 "I spoke with plaintiff's accounting firm, Citrin Cooperman, to coordinate the preparation of both sites' tax returns."  He references a Wendy Kwun, K-W-U-N.  And under number 8, "Ms. Kwun and Citrin Cooperman made clear to me that one or more returns would also need to be amended for one or more plaintiffs herein to reflect the Deo's ownership of the two companies."

Do you know if anybody at Flushing Bank ever reached out to either Ms. Kwun or Citrin Cooperman just to confirm all of the information contained in the affidavit of Mr. Jones?

A.   I don't know.

MR. RUDERMAN:  I'm going to share my screen, this is another e-mail chain provided by Flushing Bank, Bates stamped

127

M. BUCCINO

Flushing 05911, I'll mark that as Flushing 18.

(Flushing Exhibit 18A, Document Bates stamped Flushing 05911, was marked for identification, as of this date.)

Q.   This is two e-mails first from Mr. Buccino to George Bader, B-A-D-E-R, and Tara Cullen, C-U-L-L-E-N.  Do you know who George Bader and Tara Cullen is?

A.   George Bader is another team leader similar to Gerard Magaldi.  Tara Cullen, I don't know her exact title, but she's somewhat of a processor that's within the business banking department.

Q.   Mr. Puccio is writing to them saying "We are not sure why there is a block on the following accounts on the list below.  Tara looked at the account and doesn't see a reason why there is a block.  I can confirm there has not been any fraudulent activity on the account.  Can you please approve the removal of the block on the accounts?"

And in response Mr. Bader responds, "I can't ever release a hold unless we understand

128

M. BUCCINO

fully why a block was put on and who put it on.  Superb Motors is related to Northshore Motor and there is a subpoena involved.  My bet is Buccino's legal office placed the hold."

Do you know what they are referring to in this e-mail?

A.   A hold had been placed on the three accounts listed there preventing any withdrawals or other transactions.

Q.   Do you know why a hold was placed on the account?

A.   In this specific instance a hold was placed because the branch manager at one of our branches had been informed by a third party of a dispute that had been given records suggesting that ownership of the account was questionable, and so he took the initiative to put a block on the accounts.

Q.   When you say a third party, do you know who that third party was?

A.   Tony Urrutia.

Q.   It says "My bet is Buccino's legal office placed the hold."  So was that a correct statement?

32  (Pages 125 to 128)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

169

M. BUCCINO

is an online bank called iGObanking. There may still be certain other subsidiaries working in the real estate and business banking departments, I forget exactly the structure that we have going on over there.

Q.   Flushing Bank is a state charter bank, correct?

A.   Correct.

Q.   Can you describe to me the difference between a state charter bank and a federal charter bank?

A.   Mostly it's who the regulators are that oversee you.  We are overseen by the FDIC but also by the New York State Department of Managing Services.

Q.   Is the difference that federal banks are not overseen by the State Department of Managing Services?

A.   I believe so, yes.

Q.   Flushing Bank is regulated by federal and state agencies while a federal charter bank would only be regulated by a federal institute, correct?

MS. RONNEBURGER:  Objection to form.

170

M. BUCCINO

A.   Possibly, yes.

Q.   Other than that, are you aware of any difference between the state and federal charter banks?

A.   There may be other differences that I'm not aware of.

Q.   Is it fair to say that Flushing Bank has many different policies?

A.   I guess so, yes.

Q.   Do you know if there is a specific policy called a Know Your Customer policy?

A.   I don't know if we specifically titled a policy like that but we do have policies that encompass the Know Your Customer protocols and procedures that we have in place.

Q.   Know Your Customer is an industry term in banking, correct?

A.   Yes.

Q.   To your knowledge, where does that term come from?

A.   Federal regulators, I believe.

Q.   To your knowledge what does Flushing Bank call its Know Your Customer policies?

A.   I believe our Know Your Customer

171

M. BUCCINO

policies are part and parcel of our larger compliance policy.

Q.   And in sum and substance what is the purpose of having a Know Your Customer policy?

A.   It details information you are required to obtain from customers upon first account opening.

Q.   And is part of the reason for regulators for acquiring such policies and banks doing them is for fraud prevention, correct?

A.   Amongst other things, yes.

Q.   Some of the other reasons would include terrorism/counterterrorism efforts, correct?

A.   Sure, yes.

Q.   Other reasons would involve international trade and making sure that a bank is not doing business with an individual or company that is sanctioned, correct?

A.   Correct.

Q.   Is it fair to say that Know Your Customer policies are in place to determine and confirm that the identity of an individual or company is who that individual and company say

172

M. BUCCINO

they are?

A.   Yes.

Q.   You as an individual working in a bank are aware that individuals sometimes claim to be someone they're not in order to obtain credit or open an account or use any financial product, correct?

A.   Yes.

Q.   So for individuals, generally speaking, banks require identifying documents such as passports and/or driver's license and similar government-issued documents, correct?

A.   Yes.

Q.   To your knowledge as it relates to Flushing Bank's compliance policy or Know Your Customer policy, what is required in order to determine that a company and/or its owners are who they say they are?

A.   It varies depending on the corporation or the corporate structure.  If it's an incorporation or an LLC or a partnership, yada yada.  But we generally require documentation showing that the company is registered with New York State if it's claiming to be a New York

43  (Pages 169 to 172)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino --- February 26, 2026

173

M. BUCCINO

State based company. Operating agreements for LLCs, as well as articles of incorporation. And it varies like I said from entity to entity.

Q. To your knowledge is there a requirement of a policy that stock certificates be provided?

A. For a deposit account, no, I don't believe it's required for loans either but I'm not a hundred percent sure.

Q. To your knowledge, are stock certificates ever required?

A. They might be asked for to clarify any underlying issues with other documentation that's been provided, but they're not strictly speaking a requirement or procedure.

Q. What about a tax return?

A. Again, for a deposit account it would not be a requirement but it might be asked for based on circumstances. For a loan, I do believe that they would probably be required, but I'm not a hundred percent sure.

Q. Other than documents you identified such as operating agreements and potentially tax returns, are there any other documents required,

174

M. BUCCINO

to your knowledge, for an LLC or a corporation to prove that it is a validly existing company?

A. Like I said, the articles of incorporation would be required as would documentation from the state verifying that those documents are on file with the state. That the entity is operating under state license.

Q. And now a separate question from that. Under those lines, policies and/or Know Your Customer policies, you would also be required to determine that the individual acting on behalf of the corporate entity is authorized to do so, correct?

A. Yes.

Q. That is separate and apart from whether it's a validly existing corporate entity, correct?

A. Yes.

Q. And what steps, according to Flushing Bank's compliance policies and/or Know Your Customer policies does Flushing Bank take to determine whether the individual acting on behalf of a corporate entity has the authority to act?

A. Well, to review the documents for the

175

M. BUCCINO

corporate entity would be the initial step. They'd also be required to sign off on a certification of beneficial ownership which would validate who owns the company. And any owners would have to sign off on a resolution of authority where they would give authority to any subsequent individuals to actually sign on the accounts.

Q. Is it fair to say that signing off on a certification of beneficial ownership by itself is sufficient according to Flushing Bank's policies to confirm that the individual signing it has the authority to act?

A. No, that's why we request the -- or require the other documentation as reference for such a determination.

Q. Is it fair to say that the State Department documents that you refer to to confirm its valid and existing does not provide who owns the company?

A. Strictly speaking, no.

Q. And while an operating agreement would show who has an interest in the company, you agree with that, right, that the operating

176

M. BUCCINO

agreement would show that?

A. Yes.

Q. Does the fact that an operating agreement can be provided by anybody, and the fact that such an operating agreement does not get certified or filed with the state, for example, are you aware of any policy that because of that, Flushing Bank has an obligation to independently verify the ownership?

A. We perform all regulatory required due diligence on businesses.

Q. What are the regulatory required due diligences?

A. Collection of documents I just referenced. Onsite site visitations for the businesses and BSA review and other hits that might come up.

Q. When documents are received establishing authority to act and/or validity of a corporate entity, are they placed in any repository in Flushing Bank?

A. Yes, we have a central database for all open accounts.

Q. And is there a special name for that

44 (Pages 173 to 176)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

177

M. BUCCINO

central database at Flushing Bank?

A. The system that we use is called Synergy.

Q. S-Y-N-E-R-G-Y?

A. Correct.

Q. That's a third-party company that you contract or Flushing Bank contracts?

A. Yes.

Q. Synergy is a web-based or computer-based product, correct?

A. Yes.

Q. To your knowledge, Flushing Bank had no involvement in creating such a product, correct?

A. Correct.

Q. To your knowledge, Flushing Bank has no claim that such a product is proprietary, correct?

MS. RONNEBURGER: Objection to form.

A. No.

Q. To be clear, the owners of Synergy and Synergy itself may claim that its product is proprietary, but Flushing Bank was not involved in that process, correct?

178

M. BUCCINO

A. Correct.

MR. KATAEV: Plaintiffs are going to call for the production of any agreements between Flushing Bank and Synergy as well as any user manuals or related documentation about the use of such a program. We'll follow up in writing.

MS. RONNEBURGER: We reserve our right to object to these demands, but we will take them under consideration.

MR. KATAEV: You can make a standing reservation of rights.

MS. RONNEBURGER: Okay.

MR. KATAEV: I'll accept that going forward.

Q. So after a documentation of a corporation is placed in Synergy, does that program have the functionality to cross reference all other documents in a repository?

A. No.

Q. Have you presently used the Synergy product?

A. For review, but not for uploading.

Q. Understood. To your knowledge in

179

M. BUCCINO

this case who were or are the individuals that would have uploaded the documents provided by Mr. Deo?

A. Because of the time of the account openings, I'm not a hundred percent sure but today it would be handled by the business services department. I believe they would have been the ones who handled it at the same time as this, but I am a not a hundred percent sure like I said.

Q. Is your answer the same for any document provided to Mr. Puccio by Mr. Deo?

A. So the deposit account documents would have been done by business services, whether they were -- well yeah. Mr. Deo's presentation to Mr. Puccio for deposit accounts would have gone to the business services or would today. I think they would have gone at the time. The loan records or loan application, I'm not exactly sure who would have uploaded those to be honest. Somebody in the lending department. I don't know their procedures as well as I know the deposit account procedures.

Q. Same question for any documents

180

M. BUCCINO

provided by Mr. Urrutia to Mr. Weinstein?

A. So those most likely and to my knowledge did not make it into Synergy because none of the accounts discussed between Mr. Urrutia and Mr. Weinstein were actually opened. They were only discussed and negotiated to some degree, but without an open account you don't get a Synergy file.

Q. You are aware that Mr. Urrutia did provide documentation about his interest in Superb Motors Inc., correct?

A. I am, yes.

Q. Is it fair to say that upon Mr. Weinstein's receipt of those documents -- withdrawn.

Is it fair to say that upon Mr. Weinstein's receipt of those documents that Flushing Bank had corporate knowledge about the ownership interest Mr. Urrutia had in Superb?

MS. RONNEBURGER: Objection to form.

A. Mr. Weinstein had knowledge about Mr. Urrutia's claims.

Q. Do you have any knowledge as to whether Mr. Weinstein uploaded any of the

45 (Pages 177 to 180)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

181

M. BUCCINO
documents received by him from Mr. Urrutia into any company platform system or technology including Synergy and not including Synergy?

A. I don't believe he did, no.

Q. And how do you know that?

A. It wouldn't have been procedure and I don't know of another system that he could have or would have uploaded such documents into for any reason.

Q. In your investigation of the claims in this case, specifically referring to the conversations you've had with Messrs. Puccio and Weinstein, respectively, did you learn about any conversations that those two individuals had with each other about Mr. Urrutia's attempts to open an account?

A. As I said, it was in my conversations with them that it seemed clear to me that their understanding was that the accounts Mr. Urrutia was working with Mr. Weinstein were different from the accounts that Mr. Deo was working with Mr. Puccio, and that there was no overlap between the entities.

Q. What accounts did Mr. Puccio tell you

182

M. BUCCINO
he was seeking to open, for what entities?

A. The accounts that were opened. Superb Motors, Northshore Motor Leasing and Sunrise Highway.

Q. What accounts to your knowledge to Flushing Bank's knowledge, do you understand Mr. Urrutia was seeking to open, in other words, for which corporate entities?

A. Right. Again, I don't recall off the top of my head the name of those entities. They were in e-mails and other conversations, but I don't recall them as well because I was more into open accounts and I haven't looked at those as often.

Q. David Weinstein would know the answer to that question, correct?

A. He would -- whether or not he would know it off the top of his head I don't know, but he would definitely be able to obtain that information which I could as well. I just don't have it right now.

Q. Other than Synergy what other compliance tools does Flushing Bank use in order to protect and deter and/or prevent fraud?

183

M. BUCCINO
A. We have several tools that review checks and ACH for potential red flag items, we do, like I said before, we do an OFAC and other analysis of accounts and entities of individuals at account opening.

Q. You said there are several tools. Can you identify one of the tools?

A. One of the tools we use is called oasis.

Q. Is that another third-party company?

A. I believe so, yes.

MR. KATAEV: We're going to call for the production of any agreement between Flushing Bank and Oasis, as well as any user manuals or related user documentation. We'll follow up in writing.

Q. Other than Oasis, what other tools do you use?

A. I don't recall the exact names offhand that our BSA team has in place.

Q. What does Oasis do?

A. It reviews checks of a certain limit. I believe it changes periodically depending on

184

M. BUCCINO
our four teams internal determinations. But any check over a certain amount would be reviewed against the account history of that check to make sure that the signature lines up, that the check number lines up with all the recent checks, that there's no repeat of the same check number. It will also have a cursory review of the check amount and the payee name to make sure that it doesn't appear to have been doctored in any way, shape or form.

Q. To your knowledge do all banks use a tool such as Oasis?

A. I would assume that most banks use a similar tool for the same purpose.

Q. And while Oasis is typically used to determine whether there are any fraud in relation to checks issued, does Oasis also get used for wire transfers or ACHs?

A. No.

Q. What tools, if any, exist to detect, deter and prevent fraud with respect to ACH transactions?

A. Again, I don't recall the exact name of the tool, so I'd have to get back to you on

46 (Pages 181 to 184)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

185

M. BUCCINO

that.

MR. KATAEV:  We'll mark this as a request and offer an interrogatory that we will propound and follow up in writing.

Q.  Can you describe the functionality of the tool that you cannot name with respect to preventing, detecting and deterring fraud in relation to ACH transactions?

A.  I think generally we have ways of picking up on patterns within ACH transactions in a single account that may seem suspicious either because of amounts or repeated ACH in accounts that didn't previously have repeated ACH, things of that nature.

Q.  Do you have any knowledge as to whether this tool is used automatically from inception or at a later point in time?

MS. RONNEBURGER:  Objection to form.

A.  I think we have general tools in place that are working at all times.  Certain accounts for various reasons might get flagged for more detailed reviews based on circumstance.

Q.  To your knowledge is the tool automated to perform these functions through the

186

M. BUCCINO

use of a computer or are they manually reviewed in realtime?

A.  I think in most cases there is an automation for a first level review and then both in Oasis and in the ACH there is then a second level manual review after it's been flagged.

Q.  If the automated system does not detect anything, it never gets to the second level of review where an individual looks at it, correct?

A.  That's more likely than not true, yes.

MR. KATAEV:  We're going to call for the production of all agreements between Flushing Bank and any third-party entity that was used to detect, to deter and prevent ACH transaction fraud.  We'll follow up in writing.

Q.  As part of Flushing Bank's general policies and those related to fraud prevention, is Flushing Bank required to search for publicly-available information concerning lawsuits about the customer that is seeking to open an account?

187

M. BUCCINO

A.  To my knowledge that is not a requirement, no.

Q.  And you are aware in this case that employees of Flushing Bank did search for and did find existing lawsuits for Northshore and Sunrise, correct?

A.  Yes.

Q.  Now, based on your prior testimony with Mr. Ruderman, an account for Northshore and Sunrise was initially opened in or about March 23rd of 2023, correct?

A.  It sounds possible, yeah, I don't know the exact dates.

Q.  To your knowledge and based on your prior testimony after the account was opened, shortly thereafter, on or about March 31st, 2023, Flushing Bank learned about the lawsuit concerning Northshore and Sunrise, correct?

A.  Yes.

Q.  In relation to Flushing Bank's policies on these subjects, what, if any, steps does Flushing maintain after learning about a lawsuit for an account that just opened?

A.  We wouldn't necessarily take any

188

M. BUCCINO

steps just when we learn that a party that has an account with us is involved in a lawsuit.  That wouldn't necessarily promote anything on our part.  It's actually depending upon the circumstance of the lawsuit.

Q.  Are you aware of any certification or attestation or affirmation contained within the certification of beneficial ownership about the existence of any lawsuits?

A.  The deposit accounts, CBO, I don't believe has anything like that.

Q.  Is there any other document performed that an individual is required to complete on behalf of himself or behalf of an entity that requires certification about no existing lawsuits?

A.  That may be part of the loan process I'm not a hundred percent sure.

Q.  What about opening a bank account in general?

A.  For a deposit account, no, we wouldn't ask about existing lawsuits.

Q.  Generally speaking, if Flushing Bank discovers an order prohibiting opening up a bank

47 (Pages 185 to 188)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

189

M. BUCCINO

account after it opened an account, would that lead to a hold being placed on that account?

MS. RONNEBURGER:  Objection to form.

A.  If we learned of an order preventing the opening of a bank account that we had already opened?

Q.  Yes.

A.  If the opening of the account was subject to that order, then we would act in kind. Yes, we would take the necessary steps to comply with the order.

Q.  Would it matter whether Flushing Bank was a party to that suit or specifically named in the order?

A.  I mean it would depend on the language of the order, but if there's an order a valid court order that says no bank or no institution should open an account for this person or this entity then we would do that.

Q.  Even if the account was already opened, correct?

A.  Well, if the account had already been opened and it shouldn't have been, then we would at the very least put a hold on the account.

190

M. BUCCINO

Q.  That's standard Flushing Bank policy, correct?

A.  Yes.

Q.  Are you involved in the creation of any of these fraud prevention policies or Know Your Customer policies?

A.  No.

Q.  Are you involved in reviewing these policies from time to time?

A.  I mean I do review, them but not for the purposes of signing off on them if that's what you mean.

Q.  You review them in the course of your duties to determine if an employee acting under them is required to do something or not or whether you have to do something or not, right?

A.  Basically, to make sure that accounts are opened and performing within those policies.

Q.  To your knowledge have any such policies been produced in this case?

A.  If they requested it, I'm sure that they were.  I don't know if they were part of the request.

Q.  Are you familiar with how often these

191

M. BUCCINO

policies are revised?

A.  I believe they're reviewed at least annually, but it might be less strict than that.

Q.  Are you aware of any instance in your entire tenure at Flushing Bank where a fraud prevention policy was revised following a fraud event occurring?

A.  Personally, no.  But again, I don't have a hand in actually drafting these policies and procedures, so it's not to say that it wasn't done.

Q.  Since the complaint in this case surfaced, has Flushing Bank changed its policies about proving ownership of an entity before proceeding to open up any financial product?

A.  No.

Q.  Based on your review of the documents produced by Mr. Deo in this case, and your general knowledge about the case overall, do you believe Mr. Deo was truthful in asserting that he was the owner of Northshore, Sunrise and/or Superb?

MS. RONNEBURGER:  Objection to form.

A.  I don't think it's for me to say.

192

M. BUCCINO

Q.  Well, you've reviewed the documents and information, correct?

A.  Yes.

Q.  Based on your objective assessment, do you believe Mr. Deo was truthful in asserting ownership of these entities?

A.  I believe Flushing Bank was proper in its understanding of Mr. Deo's ownership and actions therein.  Whether or not Mr. Deo was truthful was not for me to determine.

Q.  I understand that your position is then Flushing Bank acted appropriately based on the information available to it, correct?

A.  Yes.

Q.  But is it fair to say that after everything happened and after having an opportunity to review all the evidence and information that Flushing Bank erred in its decision-making as to the financial products issued to Mr. Deo?

MS. RONNEBURGER:  Objection to form.

A.  No.

Q.  Now there is a loan that Mr. Deo obtained for $500,000, correct?

48  (Pages 189 to 192)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

193

M. BUCCINO

A. Yes.

Q. And --

A. Well, Northshore obtained, it was not Mr. Deo's personal loan.

Q. Understood, yes. That's what I mean so you could understand that question.

And Flushing Bank is in the business of providing loans in order to earn money by collecting interest on them, correct?

A. Yes.

Q. And in this particular case, Flushing Bank did not receive its principal back nor the interest that it expected to obtain, correct?

A. I believe so, correct.

Q. Flushing Bank was therefore damaged by Northshore or Mr. Deo's inability or refusal to pay back the loan, correct?

A. Yes.

Q. With that in mind, would you agree with me that Flushing Bank erred in its determination to issue the financial loan to Mr. Deo or through Northshore?

MS. RONNEBURGER: Objection to form.

A. No.

194

M. BUCCINO

Q. Even though Flushing Bank lost money by issuing the loan?

A. We lose money by issuing the loan it's part of business.

Q. Did Flushing Bank make any determination as to whether Mr. Deo engaged in fraud?

A. No.

Q. Did Flushing Bank take any steps to report Mr. Deo's conduct to any law enforcement authorities?

A. I'm fairly certain that there would have been SARS filed probably on this matter. If not before then definitely after the lawsuit was filed and the fraud was claimed.

Q. You referred to a term called SARS, can you confirm for us that that is an acronym for something?

A. Yes, it's suspicious activity report that our BSA team would file for suspicious activity.

Q. To your knowledge, was a SARS report only filed after this lawsuit was filed on August of 2023?

195

M. BUCCINO

A. If there was a SARS filed, then it was probably filed then. Yeah, it would have been filed after that report.

Q. Are you aware of any SARS report filed in relation to this case prior to August of 2023?

A. No.

Q. Are you aware of any SARS report ever been filed in relation to this case?

A. Again, I'm fairly certain that we would have filed one based on the nature of the case, but I can't say for certain that it was filed.

MR. KATAEV: We're going to ask Flushing Bank to search for and produce any SARS reports filed in relation to this case. We'll follow up in writing.

Q. Can you explain which policy discusses the filing of the SARS report?

A. It would be our Bank Secrecy Act policy.

Q. Repeat that?

A. The Bank Secrecy Act.

Q. And the Bank Secrecy Act refers to a

196

M. BUCCINO

federal law, correct?

A. Yes.

Q. To your knowledge other than the actual text of the statute comprised of the Bank Secrecy Act, does Flushing Bank have a separate policy dealing with its components of the policy?

A. Yes, we have a BSA policy.

MR. KATAEV: We're going to call for the production of the bank's BSA policy, and we will follow up in writing.

Q. Does Flushing Bank use any electronic system to track its compliance with its own policy and the BSA?

A. Yes.

Q. What was the name of that system?

A. It's escaping me at the moment but there is a system where the BSA keeps all their filings and investigations in.

MR. KATAEV: We will propound an interrogatory and hereby file a request and follow up in writing. We'll also call for the products of any agreement Flushing Bank has with the owner of any such third-party system as well as any user

49 (Pages 193 to 196)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

233

M. BUCCINO

of Superb, he did provide evidence of his ownership in Superb, correct?

A. Yes.

Q. You have no basis to dispute his ownership at this time, do you?

A. I mean as regards this lawsuit, I have no basis to dispute anything or confirm anything for that matter.

Q. But I'm not asking in relation to the lawsuit. I'm asking you based on an individual who's reviewed the documentation. Based on what you've reviewed, do you have any basis to dispute that he's an owner of Superb?

A. No.

Q. Mr. Urrutia made his complaint in August of 2023, correct?

A. That sounds right, yes.

Q. And the bank account at issue here was opened in April of 2023, correct?

A. Yes.

Q. Has Flushing Bank made a determination that the transactions at issue in Superb were authorized?

A. No.

234

M. BUCCINO

Q. Has Flushing Bank made a determination that the transactions at issue in Superb's account were unauthorized?

A. No.

Q. How come to this date that Flushing Bank has not made a determination as to whether the transactions at issue in the Superb account were authorized or not?

A. We're going to let the court do that.

Q. Does Flushing Bank have a position on the subject?

A. No.

MS. RONNEBURGER: Can you clarify your question?

Q. What does Flushing Bank intend to tell the court in writing or by testimony on this point? In other words, is Flushing Bank going to assert that the transactions were authorized or unauthorized?

MS. RONNEBURGER: Objection to form. And to the extent you're asking him about privileged conversations with outside counsel.

MR. KATAEV: I'm not asking him for

235

M. BUCCINO

conversations. I'm asking him what is he going to tell the judge in writing or by testimony about whether the transactions were authorized.

A. At the time they happened our understanding was that the transactions were authorized.

Q. After conducting an investigation, did you ultimately determine that they were unauthorized?

A. No.

Q. So is it fair to say that in the trial in this case, presuming you're the witness and you're going to be asked whether these transactions are authorized, that you're going to say yes, they were?

A. I don't see how it's my position to give an answer to that question.

Q. That's what we're here to determine, we want to know what you're going to say at trial.

A. It's the court's determination not mine, it's not the bank's determination.

Q. I understand but a court makes a

236

M. BUCCINO

determination based on what a party represents. Flushing Bank is a party in this case and you have been produced as a witness. Presumably, you're going to be the witness at trial. What are you going to say at trial about whether these transactions are authorized?

A. That's for the court to determine.

Q. But the court is going to ask you were they authorized according to you?

A. I'll answer it when the court asks me.

Q. You have to answer it now. What will you tell the court about whether or not they were authorized?

A. At the time they were conducted we understood them to be authorized.

Q. And did you later determine that they were unauthorized?

A. We have not made any such determinations.

Q. Are you aware of any rules or law that requires a bank to make a determination as to whether a transaction is authorized upon a complaint that it was not?

59 (Pages 233 to 236)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

237

M. BUCCINO

A. No.

Q. Based on your review of the Uniform Commercial Code, is Flushing Bank under any obligation to make this kind of determination based on a customer complaint?

MS. RONNEBURGER: Objection to form.

A. We have no claims about specific transactions.

Q. When Mr. Urrutia contacted Flushing Bank in August of 2023, did that not constitute a claim that the transactions were not authorized?

A. Arguably.

Q. And upon Mr. Urrutia doing that, was there any complaint process within Flushing Bank about this dispute?

A. The account was put on hold as discussed. And the lawsuit here was filed, and at that point it became a determination for the court to make.

Q. There was approximately a two-week stretch in time between the date the lawsuit was filed and the date Mr. Urrutia contacted Flushing Bank. In that short time frame was any complaint, inquiry or investigation opened as to

238

M. BUCCINO

whether the transactions were authorized?

A. No.

Q. How do you know that?

A. Because it wasn't part of our response to the initial reference by Mr. Urrutia.

Q. Are you aware as to whether any party made a demand for such documentation?

A. What documentation?

Q. Documentation about the existence of any complaint, inquiry about whether the transaction was authorized?

A. This is very circular, I'm not sure what you're asking.

Q. Your basis for testifying that there was no complaint or inquiry opened, is that you didn't see any of the document production, correct?

A. No, I know there was no complaint or inquiry with regards to the transactions because that wasn't our bank response to this entire process.

Q. What do you mean that wasn't our bank response?

A. When the accounts were held, we did a

239

M. BUCCINO

review to determine if the hold should last or if it should come back off and let Mr. Deo transact. We determined not to in an abundance of caution, but we didn't do any investigation into individual transactions. Mr. Urrutia did not submit any kind of formal complaint with regards to specific transactions. And from Mr. Deo's standpoint, I'm not sure if he was in a position to do so because he wasn't the customer on the account.

Q. Since Mr. Urrutia submitted his complaint as a shareholder of Superb, Superb is a customer then, isn't it?

A. Yes.

Q. Do you know whether Flushing Bank is permitted not to make a determination about whether the transactions were authorized based on the existence of a lawsuit?

A. I don't know that.

Q. Are you aware of the existence of any security feature placed on the Superb account in Flushing?

A. I mean there's a hold on the account preventing withdrawals at this point.

240

M. BUCCINO

Q. I'm not talking about reactive steps taken. I'm asking about proactive steps taken at the time or shortly after the account was first opened?

A. No.

Q. In other words, to your knowledge there are no security features that were enabled for the account Flushing had open for Superb, correct?

MS. RONNEBURGER: Objection to form.

A. I don't know what you mean by security features. It wasn't treated any differently than all of our other accounts in terms of security.

Q. I'll give you some example to help you answer the question. Customers are permitted to ask for security features such as Positive Pay, token system, two sign their checks, and so on and so forth, correct?

A. Yes.

Q. Those things are not automatically added to a bank account unless specifically requested, correct?

A. Okay, yes.

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

241

M. BUCCINO

Q.  To your knowledge, no such security features were added to the account Flushing had opened for Superb, correct?

A.  I don't believe so, no.

MR. KATAEV:  We're going to call for the production of any documents that indicate that any such security features were activated for the account that Flushing had opened for Superb.  We'll follow up in writing.

Q.  You don't dispute the fact that Mr. Weinstein knew about Mr. Urrutia's interest in Superb, correct?

A.  Correct.

Q.  You have not made any finding as to whether Mr. Puccio knew about Mr. Urrutia's interest in Superb, correct?

A.  It's our understanding that Mr. Puccio did not know Mr. Urrutia to have any interest in Superb.

Q.  How do you know?

A.  Because he opened the account with Mr. Deo as the whole sole owner and would not have done that otherwise.

242

M. BUCCINO

Q.  Did you ask Mr. Puccio about this?

A.  Specifically, I'm not sure, I may have at the time.

THE WITNESS:  Can I take a moment, I need to talk to my wife.

MR. KATAEV:  Of course, let's go off the record.  It's 4:17 we'll come back at 4:25.

(Recess taken)

MR. KATAEV:  So look, based on his testimony throughout the day and the number of times he said I don't know to things, the plaintiffs have taken the position that you produced a 30(b)(6) witness who does not have knowledge about the subject of this case.

MS. RONNEBURGER:  He has knowledge on the subject of the case.  I will reiterate that your notice of deposition did not list any certain categories.  He has answered all of your questions about account policies.  If you want me to produce another 30(b)(6) witness, we will take that under consideration.  I don't

243

M. BUCCINO

think there will be any objection to that. Specifically, if you're planning on the same person that I would be, so we can discuss that.

MR. KATAEV:  Okay.  So let's do this. Let's give Thomasson or Mr. Thomasson time out of turn to finish his 30 minutes, and then once he's done with the 30 minutes he'll come back for one hour and I'll finish up with him my exhibits.

MS. RONNEBURGER:  Today?

MR. KATAEV:  No, he wants to leave in 30 minutes.  So I want to give him --

MS. RONNEBURGER:  Are you saying you want to give Mr. Thomasson 30 minutes today?

MR. KATAEV:  Yes.

MS. RONNEBURGER:  I don't know if he can do that.  Can you just hold on one moment?

MR. KATAEV:  Yeah, sure.

(Discussion off the record)

MR. KATAEV:  We're back on the record, the witness has said that he has a

244

M. BUCCINO

family emergency that he needs to attend to it.  We currently have approximately under two hours left of testimonial time. We will choose another date to finish the deposition and figure out any remaining issues thereafter.  Does that work for Mr. Ruderman?

MR. RUDERMAN:  Yes.

MR. KATAEV:  Mr. Thomasson?

MR. THOMASSON:  Yes, that's fine with me.

MR. KATAEV:  Mr. Ronneburger?

MS. RONNEBURGER:  Yes, that's fine.

(Continued on the following page to accommodate the jurat.)

61 (Pages 241 to 244)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

245

M. BUCCINO

MR. KATAEV:  That's all of the counsel on the record in this case.  I don't think we need to place anything else on the record, we'll just follow up in writing.

Mr. Buccino, thank you for your time today.  I hope everything is okay, and we'll be in touch with you through your attorney.

(Time noted 4:23 p.m.)

_____

MICHAEL BUCCINO

Sworn and Subscribed
this_____day of _____, 2026.

_____
Notary Public

246

I N D E X

| Witness | | Page |
|---|---|---|
| MICHAEL BUCCINO | Mr. Ruderman | 7 |
| | Mr. Kataev | 134 |

| FLUSHING | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena Duces Tecum | 78 |
| Exhibit 2 | letter of July 19, 2023 | 82 |
| Exhibit 3 | Letter from Mr. Jeffrey Ruderman | 83 |
| Exhibit 4 | Document Bates stamped Flushing 08496 | 84 |
| Exhibit 5 | Document Bates stamped Flushing 00196 | 87 |
| Exhibit 6 | Document Bates stamped Flushing 00008 | 89 |
| Exhibit 7 | Document Bates stamped Flushing 01059 | 95 |
| Exhibit 8 | Document Bates stamped Flushing 7258 | 101 |
| Exhibit 9 | Document entitled "Northshore Motor Leasing Operating Agreement" | 102 |
| Exhibit 9A | Document Bates stamped Flushing 00187 | 103 |

247

| Exhibit 10 | Document Bates stamped Flushing 00162 | 106 |
|---|---|---|
| Exhibit 11 | Document Bates stamped Flushing 00015 | 108 |
| Exhibit 12 | Document Bates stamped Flushing 08560 | 112 |
| Exhibit 13 | Document Bates stamped Flushing 06272 | 115 |
| Exhibit 14 | Document Bates stamped Flushing 03765 | 117 |
| Exhibit 15 | Document Bates stamped Flushing 04572 | 122 |
| Exhibit 16 | Document Bates stamped Flushing 06520 | 123 |
| Exhibit 17 | Document Bates stamped Flushing 06517 | 125 |
| Exhibit 18A | Document Bates stamped Flushing 05911 | 127 |
| Exhibit 18B | Document Bates stamped Flushing 05959 | 130 |
| Exhibit 19 | Document Bates stamped Flushing 08495 | 132 |

248

INFORMATION REQUESTED

| Page | Line |
|---|---|
| 26 | 5 |
| 28 | 9 |
| 94 | 21 |
| 114 | 19 |
| 156 | 5 |
| 160 | 9 |
| 164 | 12 |
| 165 | 7 |
| 165 | 14 |
| 178 | 3 |
| 183 | 13 |
| 185 | 3 |
| 186 | 14 |
| 195 | 15 |
| 196 | 9 |
| 196 | 20 |
| 202 | 10 |
| 215 | 25 |
| 218 | 20 |
| 219 | 14 |
| 222 | 5 |
| 226 | 9 |
| 231 | 3 |
| 241 | 6 |

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  February 26, 2026

249

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )

I, LISA HIESIGER, a Shorthand Reporter and Notary Public within and for the State ofNew York, do hereby certify:

That MICHAEL BUCCINO, the witness whose deposition is hereinbefore set forth, was sworn and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereuntoset my hand this 2nd day of March, 2026.

*Lisa Hiesiger*

LISA HIESIGER.

250

ERRATA SHEET
SUPER MOTORS INC etal v ANTHONY DEO et al.
Date of Deposition: February 12, 2026
Name of Deponent:  MICHAEL BUCCINO

| PAGE | LINE(s) | CHANGE | REASON |
|------|---------|--------|--------|
| | | | |

63  (Pages 249 to 250)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS INC., et al.

v.

DEO, et al.

---

## Continued Examination of Michael Buccino

*Tuesday, March 24, 2026*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  March 24, 2026

251

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
SUPERB MOTORS AUTO, TEAM AUTO SALES,
LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE
HIGHWAY AUTO, LLC, NORTH SHORE MOTOR
LEASING; JORY BARON, ASAD KHAN, IRIS BARON
REPRESENTATIVE OF THE ESTATE OF DAVID BARON,
1581 HYLAN BOULEVARD AUTO, LLC, 1580 HYLAN
BOULEVARD AUTO, 1591 HIGHLAND BOULEVARD
AUTO, LLC, 1632 HIGHLAND BOULEVARD AUTO,
LLC, 1239 HIGHLAND BOULEVARD AUTO, LLC,
2519 HIGHLAND BOULEVARD AUTO, LLC, 76 FISK
STREET REALTY, LLC, 446 ROUTE 23 AUTO, LLC,
AND ISLAND AUTO MANAGEMENT, LLC,
                              Plaintiffs,

        -against-          Case No. 2:23-cv-6188

ANTHONY DEO, SARAH DEO, HARRY THOMASSON,
DWIGHT BLANKENSHIP, MARC MERCKLING,
MICHAEL LAURIE, THOMAS JONES, CPA, CAR
BUYERS NYC, INC. GOLD COAST CARS OF SYOSSET,
LLC, GOLD COAST CARS OF SUNRISE, LLC,
GOLD COAST MOTORS AUTOMOTIVE GROUP, LLC,
GOLD COAST MOTORS OF LIC LLC, GOLD COAST
MOTORS OF  ROSLYN LLC, GOLD COAST MOTORS OF
SMITHTOWN, LLC, UEA PREMIER MOTORS GROUP,
DLA CAPITAL PARTNERS, INC., JONES,
LITTLE & CO., CPA'S, LLP, FLUSHING BANK,
LIBERTAS FUNDING, LLC, JP MORGAN CHASE BANK,
N.A., 189 SUNRISE HIGHWAY AUTO, LLC, AND
NORTHSHORE MOTOR LEASING, LLC.,
                              Defendants.
-----------------------------------------X
                    VIA ZOOM
                  March 24, 2026
                  12:10 p.m.

        CONTINUED EXAMINATION BEFORE TRIAL of MICHAEL
BUCCINO, called by the Plaintiff herein, taken
pursuant to Order and held via Zoom before Eileen
Agnoletto, a stenotype reporter and Notary Public of the
State of New York.

252

A P P E A R A N C E S :

        SAGE LEGAL, LLC
            Attorney for the Plaintiffs Superb
            Motors, Inc., Team Auto Sales, LLC &
            Robert Anthony Urrutia
            182-11 Jamaica Avenue
            Jamaica, New York  11423
        BY:  EMANUEL KATAEV, ESQ.

        CULLEN & DYKMAN, LLP
            Attorney for the Defendant Flushing Bank
            333 Earle Ovington Boulevard - 2nd Floor
            Uniondale, New York 11553
        BY:  ARIEL E. RONNEBURGER, ESQ.

        WEIR, LLP
            Attorney for the Defendant Libertas
                Funding, LLP
            1339 Chestnut Street - Suite 500
            Philadelphia, Pennsylvania  191074
        BY:  JEFFREY S. CIANCIULLI, ESQ.

        ALSO PRESENT:  Robert Anthony Urrutia

253

        IT IS HEREBY STIPULATED AND AGREED, by and
between the attorneys for the respective parties herein,
that the filing, sealing and certification be, and the
same are hereby waived;

        IT IS FURTHER STIPULATED AND AGREED that all
objections, except as to the form of the questions,
shall be reserved to the time of trial;

        IT IS FURTHER STIPULATED AND AGREED that the within
examination may be subscribed and sworn to before any
notary public with the same force and effect as though
subscribed and sworn to before this Court.

254

        THE COURT REPORTER:  All attorneys
participating in this deposition acknowledge that I
am not present in the deposition room and that I
will be reporting this deposition remotely.
        You further acknowledge that in lieu of
an oath administered in person, I will administer
the oath remotely.  Parties and their
Counsel consent to this arrangement and waive any
objections to this manner of reporting.
        Please indicate your agreement by stating
your appearance and agreement on the record.
        Ms. Ronneburger, will you be ordering the
transcript?
        MS. RONNEBURGER:  Yes.
        MR. KATAEV:  Emanuel Kataev for
    plaintiffs, Superb Motors, Team Auto, Inc., LLC
    and Robert Anthony Urrutia.  I agree.
        MS. RONNEBURGER:  Ariel Ronneburger, for
    Cullen & Dykman, LLP, for defendant Flushing
    Bank.  I agree.
M I C H A E L   B U C C I N O, called as a witness by
and on behalf of the Plaintiff, after having been first
duly sworn, was examined and testified as follows:
        THE COURT REPORTER:  Mr. Buccino, can you
    show me me some form of identification?

1 (Pages 251 to 254)

SUPERB MOTORS INC., et al. v. DEO, et al.
Michael Buccino  ---  March 24, 2026

255

MICHAEL BUCCINO

(Whereupon, the witness displayed his driver's license.)

MR. KATAEV:  Also, my client was supposed to join.

EXAMINATION BY
MR. KATAEV:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Now, at your prior deposition you were asked the specific question, which I'll read verbatim:

"Can you describe to me the process from somebody coming in seeking a business loan in the business banking department, where would that process start, where would it go to, who would review it, and up the chain until the loan is processed and approved?"

You did testify that you wouldn't be able to provide much detail on that process, and you were asked:

"Do you know who would be able to provide that type of information?"

So with that background, can you tell me who would be able to provide that type of information?

A.   A number of people, but the head of our business banking team is Theresa Kelly.

256

MICHAEL BUCCINO

Q.   That's the same individual that you previously referred to at the deposition, correct?

A.   Yes.

Q.   Flushing Bank is a commercial bank, correct?

A.   We do commercial business, yes.

Q.   Is it known as a commercial bank or some other type of bank?

A.   We were formally a commercial bank previously, but we are no longer considered technically a commercial bank, strictly.

Q.   What was the last part?

A.   Strictly speaking, strictly we're not a commercial bank.

Q.   Okay.  And when did that change occur, the year approximately?

A.   Yes, I'm not certain about the exact date, but I want to say somewhere around 2018 or so.

Q.   And Flushing Bank is a bank organized under the laws of the State of New York, correct?

A.   Yes.

Q.   And there is no federal charter or any type of federal affiliation with this bank, correct?

A.   We are regulated by the FDIC, but we are organized under the laws of the state.

257

MICHAEL BUCCINO

Q.   Based on your review of the documentation in this case and preparing for this deposition, you understand that Mr. Deo arranged to borrow funds from Flushing representing himself to be a sole owner of North Shore, correct?

A.   Yes.

Q.   As you sit here today, do you know -- withdrawn.

As you sit here today, is it your understanding that Flushing Bank understands that Mr. Deo's representations to it concerning the ownership of North Shore were false?

MS. RONNEBURGER:  Objection to form.

A.   We know his representations are in question.

Q.   Okay.  Do you know one way or another whether his representations are true or false?

A.   As I've said previously, we are going to let the Court determine that.

Q.   Same question for Sunrise.

A.   Same answer.

Q.   As you sit here today, do you know whether Mr. Deo had authority to obtain loans for North Shore?  When I say, you, I mean Flushing Bank.

A.   I'll sorry, can you repeat?

258

MICHAEL BUCCINO

MR. KATAEV:  Read it back please.

(Whereupon, at this time the testimony was read back by the court reporter.)

A.   We understood him to have authority when we transacted with him.

Q.   Do you know the distinction between actual authority and apparent authority?

MS. RONNEBURGER:  Objection to form.

A.   Yes.

Q.   Okay.  To Flushing Bank's understanding, did Mr. Deo have actual authority or apparent authority when he represented himself as the sole owner of North Shore and sought a loan?

A.   Apparent authority.

Q.   Okay.  And what is your basis for saying that?

A.   Documentation that we obtained and our dealings with him, representations that were made.

MR. KATAEV:  Okay.  I'm going to pause the questioning for a second because I jumped right into the questions.  I want to put some items on the record.

We are here today with the only counsel present being that of Flushing Bank and for

2  (Pages 255 to 258)