Exhibit J to
Ronneburger Dec.

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

## SUPERB MOTORS INC., et al.

v.

DEO, et al.

---

## Examination of Anthony D. Deo

*Monday, January 12, 2026*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
SUPERB MOTORS INC., TEAM AUTO SALES LLC,
ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO
LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN
CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD
KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE
OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580
HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC,
1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO
LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET
REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND
AUTO MANAGEMENT, LLC,

          Plaintiffs,
                    Case No.
                    2:23-cv-6188 (JMW)
          -against-
ANTHONY DEO, SARAH DEO, HARRY THOMASSON,
DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL
LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC
INC., GOLD COAST CARS OF SYOSSET LLC, GOLD
COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS
AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC
LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD
COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER
MOTORS CORP., DLA CAPITAL PARTNERS INC.,
JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK,
LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK,
N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE
MOTOR LEASING, LLC,
          Defendants.
- - - - - - - - - - - - - - - - - x
                    333 Earle Ovington Boulevard
                    Second Floor
                    Uniondale, New York 11553
                    January 12, 2026
                    10:03 a.m.

(C A P T I O N   C O N T I N U E D)

(C O N T I N U E D   C A P T I O N)

VIDEORECORDED EXAMINATION BEFORE TRIAL of
ANTHONY D. DEO, the Defendant herein, taken by
EMANUEL KATAEV, in the above-entitled action,
held at the above time and place, pursuant to
Notice and Order, taken before DEVORA HACKNER,
a Stenographic Reporter and Notary Public
within and for the State of New York.

**3**

A P P E A R A N C E S:

SAGE LEGAL LLC
     Attorneys for Plaintiffs
     SUPERB MOTORS INC., TEAM AUTO SALES
     LLC, ROBERT ANTHONY URRUTIA
     18211 Jamaica Avenue
     Jamaica, New York 11423
     718-412-2421
BY:  EMANUEL KATAEV, ESQ.
     emanuel@sagelegal.nyc

CYRULI SHANKS & ZIZMOR LLP
     Attorneys for Plaintiffs
     189 SUNRISE HWY AUTO LLC, NORTHSHORE
     MOTOR LEASING, LLC, BRIAN CHABRIER,
     JOSHUA AARONSON, JORY BARON, 1581
     HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD
     AUTO LLC, 1591 HYLAN BLVD AUTO LLC,
     1632 HYLAN BLVD AUTO LLC, 1239 HYLAN
     BLVD AUTO LLC, 2519 HYLAN BLVD AUTO
     LLC, 76 FISK STREET REALTY LLC, 446
     ROUTE 23 AUTO LLC, and ISLAND AUTO
     MANAGEMENT, LLC
     420 Lexington Avenue
     Suite 2320
     New York, New York 10170
     212-661-6800
BY:  JEFFREY RUDERMAN, ESQ.
     jruderman@cszlaw.com

THE LINDEN LAW GROUP, P.C.
     Attorneys for Defendants
     ANTHONY DEO, SARAH DEO, DWIGHT
     BLANKENSHIP, MARC MERCKLING, MICHAEL
     LAURIE, GOLD COAST CARS OF SYOSSET
     LLC, GOLD COAST CARS OF SUNRISE LLC,
     GOLD COAST MOTORS AUTOMOTIVE GROUP
     LLC, GOLD COAST MOTORS OF LIC LLC,
     GOLD COAST MOTORS OF ROSLYN LLC, and
     GOLD COAST MOTORS OF SMITHTOWN LLC
     250 Park Avenue
     7th Floor
     New York, New York 10017
     212-537-6612
BY:  JEFFREY BENJAMIN, ESQ.
     jbenjamin@nyfraudlaw.com

**4**

HARRY R. THOMASSON, JR.
     Attorney for Defendant
     HARRY THOMASSON
     3280 Sunrise Highway
     Suite Box 112
     Wantagh, New York 11793
     516-557-5459
BY:  HARRY R. THOMASSON, JR., ESQ.
     hrtatty@verizon.net

CULLEN AND DYKMAN LLP
     Attorneys for Defendant
     FLUSHING BANK
     333 Earle Ovington Boulevard
     Second Floor
     Uniondale, New York 11553
     516-357-3700
BY:  ARIEL E. RONNEBURGER, ESQ.
     aronneburger@cullenllp.com

WEIR LLP
     Attorneys for Defendant
     LIBERTAS FUNDING LLC
     1339 Chestnut Street
     Suite 500
     Philadelphia, Pennsylvania 19107
     215-665-8181
BY:  JEFFREY S. CIANCIULLI, ESQ.
     jcianciulli@weirlawllp.com

ALSO PRESENT:

ANDREW GEDACHT, Videographer
ROBERT ANTHONY URRUTIA
SARAH DEO
ALIVIA COONEY, Paralegal
     Sage Legal LLC

TAMMY ARONBAYEV, Paralegal
     Sage Legal LLC

1 (Pages 1 to 4)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

---

**Page 5**

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

---

**Page 6**

A. D. DEO

THE STENOGRAPHER: Jeffrey Benjamin, are you going to be ordering a copy of the deposition?

MR. BENJAMIN: Yes.

MR. KATAEV: We're splitting.

THE STENOGRAPHER: So you're paying for both?

MR. KATAEV: Yes. Mr. Cianciulli, will you be ordering a copy of the transcript?

MR. CIANCIULLI: The answer is I don't know just yet. I'll let you know by the end of the deposition.

THE STENOGRAPHER: You're ordering --

MS. RONNEBURGER: We will be ordering.

THE VIDEOGRAPHER: We are now on the record. Today's date is January 12, 2026. The time

---

**Page 7**

A. D. DEO

now is 10:03 a.m.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

We are taking the deposition of Anthony Deo in the matter of Super Motors Inc., et al. V. Anthony Deo, et al., pending in United States District Court, Eastern District of New York, Case No. 223-CV-6188 JMW.

We are located at the offices of Cullen and Dykman, located at 333 Earle Ovington Boulevard, Uniondale, New York.

My name is Andrew Gedacht, and I am the legal video specialist with Little Reporting.

---

**Page 8**

A. D. DEO

The court reporter is Devora Hackner, also with Little Reporting.

All appearances will be present on the stenographic record.

Will the court reporter please swear in the witness.

ANTHONY D. DEO, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE STENOGRAPHER: State your name like it's on your driver's license for the record.

THE WITNESS: It's Anthony D. Deo.

THE STENOGRAPHER: Thank you. And your address, please.

THE WITNESS: 3 Hunting Lane, Old Westbury, New York 11568.

---

2 (Pages 5 to 8)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

A. D. DEO

EXAMINATION

BY MR. KATAEV:

Q. Good morning, Mr. Deo.

A. Good morning.

Q. Before I begin the deposition, I want to confirm with your counsel that we're going to use the -- use and agree to the usual federal stipulations.

MR. KATAEV: For the record, those are filing, sealing and certification is waived. Objections except as to form are reserved for trial. And examination -- this examination may be sworn to before any notary public.

Counsel, do you agree to these usual federal stips?

MR. BENJAMIN: Yes, agreed.

MR. KATAEV: Okay.

THE VIDEOGRAPHER: Counsel, your microphone.

Q. When you introduced yourself just now, you announced that you are

A. D. DEO

Anthony D. Deo, correct?

A. Yes.

Q. And the "D" stands for Derrick, correct?

A. Yes.

Q. D-E-R-R-I-C-K?

A. Yes.

Q. Okay. Mr. Deo, my name is Emanuel Kataev, as you know. I am the attorney for the plaintiff, Superb Motors Inc., Team Auto Sales LLC, and Robert Anthony Urrutia.

From here on in, I will be referring to Superb Motors Inc. as Superb, unless otherwise stated. Okay?

A. Okay.

Q. I will be referring to Team Auto Sales LLC as Team, unless otherwise stated. Okay?

A. Okay.

Q. And I'll be referring to Plaintiff Robert Anthony Urrutia as Tony, unless otherwise stated. Understood?

A. D. DEO

A. Tony. Okay.

Q. We are conducting your deposition today and I expect it will last the entire day. Besides me, there are other attorneys here who will be seeking to depose you. Those are the attorneys for the Island Auto Group plaintiffs next to me, Mr. Ruderman. And I've spoken to Ms. Ronneburger, the attorney representing Defendant Flushing Bank. She will also be seeking to depose you. And I don't know whether counsel for Libertas will be seeking to depose you, but I want to notify you now that we're going to reserve the right to seek an additional day.

To the extent you disagree with this, or your counsel disagrees with this, we want to meet and confer now on the subject.

Will you agree to come for another day, to the extent that my deposition lasts the whole day?

A. D. DEO

MR. BENJAMIN: No.

MR. KATAEV: Okay. There's -- every party is entitled to seven hours. So we're one party. This is another party. And that's another party. And I don't know if Libertas wants to. But they're all entitled to seven hours each.

So what is your basis for refusing to produce your witness for another day?

MR. BENJAMIN: We haven't even started this deposition yet. So let's see how it goes and -- but at this point, there's no reason I see to go beyond the seven hours yet. At the end of today, maybe we'll revisit the issue. But that's it.

MR. KATAEV: Okay. That's agreeable. We'll meet and confer on this after the deposition is done for the day.

3 (Pages 9 to 12)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

---

13

A. D. DEO

Q. Okay. Mr. Deo, I will be asking you and you will be answering questions today about yourself, Superb, Team, Tony, Island Auto Group, our claims against you and your gang, and other related subjects. Do you understand that?

A. Do I understand, yes.

Q. Your testimony today is subject to the same oath and same penalty of perjury as if you were testifying in court. Do you understand that?

A. Yes.

Q. Have you ever been deposed before?

A. No.

Q. This is your first time doing a deposition?

A. Yeah.

Q. I want to go over some of the ground rules that you should know so that we can have an efficient and effective deposition today. First, keep your voice loud and clear for the

---

14

A. D. DEO

court reporter.

Second, answer in words. No body gestures, no mumbling, no uh-huh, no uh-uh. Say yes or no.

Do you understand that?

A. Yes.

Q. Third, allow me to complete my question before you answer, and I'll give you the same courtesy. The court reporter can't write down what both of us are saying at the same time.

Do you understand that?

A. Yes.

Q. Fourth, if you don't understand the question, tell me and I will rephrase it. If you answer it, I will assume that you understood the question.

Do you understand that?

A. Yes.

Q. We're looking for your best recollection of events today. We're going to go over things that occurred, brief work, sometimes five years ago.

---

15

A. D. DEO

While I don't want you to guess at answers, even if your memory is not crystal clear, I'm still entitled to your best recollection.

Do you understand that?

A. Yes.

Q. In terms of breaks, you could take a break at any time for any reason. I just have a rule that if there's a question pending, you have to answer that question before we take the break.

Do you understand that?

A. I do. Could I tell you something about the breaks? Is that okay?

Q. Sure.

A. I just want to tell you that I -- because of my diabetes and my high blood pressure, I take certain medication that makes me drink a lot and I have to use the bathroom a lot.

Q. Sure.

A. Is that okay?

---

16

A. D. DEO

Q. If you need to use the bathroom, we could take a break.

A. I also have lower back pain, so if you see me trying to crack my back, it's because my back really hurts.

Q. Understood.

A. So it's hard to sit for a long time.

Q. Okay. In terms of the first thing, anytime you need a break, tell us. I want to ask the court reporter to time all the breaks, 'cause I'm entitled to seven hours of testimonial time, not including breaks.

As far as your back, if you need to stand during the deposition, I really have no objection, but we need to tell the videographer.

A. Okay.

Q. Do you understand all of these ground rules?

A. I do.

Q. All right. Is there any reason you cannot participate in today's

---

4 (Pages 13 to 16)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

17

A. D. DEO
deposition and provide truthful answers to questions?
A. Any reason, no.
Q. Have you consumed any drugs, alcohol or medications within the last 24 hours that will affect your ability to testify truthfully today?
A. No.
Q. Is there any reason you can think of why you cannot give truthful answers today?
A. No.
Q. Did you prepare for today's deposition?
A. I don't understand that question.
Q. You knew that you were going to come in and answer questions today, correct?
A. Yes.
Q. And in -- in order to be prepared to answer those questions, did you do anything to prepare?
A. I read the complaint.

18

A. D. DEO
Q. Okay. Other than reading the complaint, were there any other documents that you reviewed?
A. Documents, not really.
Q. Okay. Did you meet with your attorneys to prepare for the deposition?
A. I spoke to Jeff.
Q. When you spoke with Jeff, how -- in what format did you speak to him? By phone, virtual meeting, in person, or some other way?
A. Phone.
Q. How long was that phone call?
A. I don't know. I didn't time it.
Q. Was it more than an hour?
A. I don't think so.
Q. Was it less than an hour?
A. I would say that.
Q. Was it 30 minutes?
A. I -- specifics, I don't know.
Q. Was anyone else on the phone with you when you spoke to Mr. Benjamin?

19

A. D. DEO
A. On the phone with me, no, just my wife and myself.
Q. Other than your wife and Mr. Benjamin, was Mr. Thomasson on the phone?
A. No.
Q. Other than the phone call that you had with Mr. Benjamin and your wife to prepare for the deposition, did you have any other meetings, phone calls or virtual meetings to prepare for the deposition?
A. No.
Q. When did that phone call occur?
A. Yesterday.
Q. Around what time?
A. Geez. Afternoon.
Q. Prior to Mr. Benjamin appearing in this case, your attorney was Mr. Thomasson, correct?
A. Prior to Mr. Benjamin, it was Brian Levine.
Q. And prior to Mr. Levine?
A. Prior to Brian, it was -- it was

20

A. D. DEO
Harry.
Q. Okay. And when you say "Harry," you're referring to Harry Thomasson?
A. Harry Thomasson.
Q. Would it be fair to say that you would have preferred for Mr. Thomasson to represent you in this case?
MR. BENJAMIN: Objection.
A. I can't answer that. I don't know how to answer that question.
THE WITNESS: Am I loud enough? I'm sorry.
THE VIDEOGRAPHER: I got you.
Q. Is it fair to say that you have Mr. Thomasson on a salary?
A. On a salary?
Q. Yes.
A. No.
Q. Has Mr. Thomasson ever presented you with hourly bills for legal services rendered?
MR. BENJAMIN: Objection. I think you're going into the

5 (Pages 17 to 20)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

21

A. D. DEO
attorney-client relationship now on substance.
MR. KATAEV: Are you instructing him not to answer?
MR. BENJAMIN: I am instructing him not to answer as to billing. It's -- he's already answered the question of salary, but...
MR. KATAEV: We're going to mark it for a ruling.
Q. Do you have a signed retainer agreement with Mr. Thomasson?
MR. THOMASSON: Objection. But you can answer.
A. I think I do.
MR. KATAEV: We're going to call for the production of any retainer agreement that you have with Mr. Thomasson with any of your entities or you, personally, or your wife. We'll follow up in writing.
Q. Did you speak with anyone other

22

A. D. DEO
than your attorney or your wife about today's deposition?
A. No.
Q. Other than the complaint, have you looked at any documents to prepare for your deposition?
A. Documents, no.
Q. Which complaint did you review?
A. Yours.
Q. Are you aware that the complaint has been amended a number of times?
A. The third one.
Q. The third one is the one you reviewed?
A. Yeah.
Q. And for the record, the third amended complaint is the one that you reviewed, correct?
A. Yes. I looked at it.
Q. Did you read it cover to cover?
A. That's -- I -- I don't think so.
Q. Generally speaking, outside of today's -- I'm sorry, outside of today's deposition, have you looked at

23

A. D. DEO
any documents that concern this case?
A. That's a hard question to answer. I don't know.
Q. What is your current address?
A. 3 Hunting Lane.
Q. Go ahead.
A. Oh. 3 Hunting Lane, Old Westbury, 11568.
Q. And that's in New York?
A. In New York.
Q. Do you rent or own that property?
A. It's complicated.
Q. Explain it to me.
A. It's -- it's in dispute.
Q. Okay. Do you have a deed with your name on it for that property?
A. No, I don't have a deed.
Q. Did you come to live at that property by means of a lease agreement initially?
A. No.
Q. How did you --
A. It's -- it's complicated.

24

A. D. DEO
Q. Can you tell me more details?
A. It's hard to explain.
Q. Well, how did you first enter that house to live there?
A. I don't understand your question.
Q. Did you sign a lease in order to go to live in that house?
A. No. No, it's -- it's not your typical landlord-tenant situation.
Q. Did someone else sign a lease in order for you to go live in that house?
A. It's -- no, it's the same answer.
Q. So as you sit here today, there's no lease agreement, correct?
A. I didn't say that.
Q. So there is a lease agreement?
A. Not your typical landlord-tenant agreement.
Q. Okay.
A. I hope that answers your question.
Q. Is it fair to say that there is

6 (Pages 21 to 24)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

## 25

A. D. DEO

some writing that exists about your living situation at that house?

A. I have no clue what you're asking.

Q. Is there any agreement that talks about you being able to live in that house?

A. I don't know how to answer that.

MR. KATAEV: I'm going to call for the production of any agreement that deals with leasing, renting, owning, buying or anything to do with that house. I'll follow up in writing.

Q. Now, you said you don't have a deed to that property. Do you have a deed for any real property that you do own?

A. Me, no.

Q. Who do you live with?

A. My family.

Q. Tell me each individual.

A. My wife, my three sons, my

## 26

A. D. DEO

daughter, my in-laws.

Q. Both in-laws?

A. Yes.

Q. Other than those individuals, does anyone else live with you?

A. Live with me, no.

Q. One of your sons is named Efaz, E-F-A-Z, correct?

A. Yes.

Q. What are your other two sons' names?

A. My middle is Mikhail and the baby is Cyrus.

Q. Cyrus is C-Y-R-U-S, correct?

A. Yes.

Q. And can you spell Mikhail's name?

A. M-I-K-H-A-I-L.

Q. And what's your daughter's name?

A. Chloe.

Q. And your in-laws, can you give me their names?

A. My father-in-law is Abdul and my mother-in-law is Fatima.

## 27

A. D. DEO

Q. How many bedrooms is the house?

A. Geez. Six.

Q. What is your date of birth?

A. ▇▇▇▇ 1977.

Q. Where were you born?

A. Trinidad.

Q. When did you first come to the United States?

A. Wow. That was a very long time ago. I --

Q. Do you remember what decade?

A. The '80s.

Q. Early '80s or late '80s?

A. I think it's the late '80s, 'cause '77 -- yeah, late '80s.

Q. Have you visited back to Trinidad?

A. A long time ago.

Q. When was the last time you went there?

A. Oh, geez. Specific, I don't know exactly when, but it's been a long time.

Q. More than ten years?

## 28

A. D. DEO

A. Yeah.

Q. More than 20 years?

A. Probably.

Q. When was the last time you left the country?

A. I think that's probably when I went back.

Q. So ever since you arrived to the United States after visiting Trinidad and coming back, you've never left the country again?

A. I think I visited twice.

Q. Other than those visits, you've never left the country?

A. To my recollection -- let me see. No. No. No.

Q. Okay. And you're married currently, correct?

A. Yes.

Q. To Ms. Deo, who is sitting with us today?

A. Yes.

Q. And when did you first get married to her?

7 (Pages 25 to 28)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

29

A. D. DEO

A. She's going to kill me. I'm sorry.

Q. That's the reason I asked the question.

A. All right. Now that's the toughest question.

Q. Best of your memory.

A. Shit. Don't kill me. Seventeen years.

Q. Seventeen years ago?

A. Yeah.

Q. So that puts us in 2009?

Is it fair to say you don't remember?

A. You're killing me with the exact date, man. The exact date --

Q. If you don't remember, just tell me you don't remember.

A. At the moment, I don't remember the exact --

Q. Okay. If you remember later, you can tell me.

Where were you married?

A. What do you mean?

30

A. D. DEO

Q. Where was the physical location where your wedding took place?

A. Well, we went to the court.

Q. You went to the city, in Manhattan?

A. No, I think -- I think it was Queens.

Q. Okay. Have you been married before?

A. Yes.

Q. What's your prior wife's name?

A. Youna.

Q. Y-O-N-A?

A. Y-O-U-N-A.

Q. Last name?

A. Singh.

Q. Any children with her?

A. No.

Q. How long was that marriage?

A. Oh, wow. Short. I can't tell you.

Q. Less than a year?

A. I -- honestly, I don't remember.

Q. You forgot everything after you

31

A. D. DEO

married this wife? Yes?

A. Yeah. That's going to save me.

Q. Okay. How did your previous marriage end? Divorce?

A. Yes.

Q. Do all of your children currently live with you?

A. Do all of my kids, yes.

Q. Efaz, as well.

A. Yes.

Q. All of your children are being supported by you, correct?

A. That's complicated.

Q. Are there children that support themselves?

A. I don't understand.

Q. Do you provide for your children financially in order for them to have a roof over their heads and eat meals?

A. I used to.

Q. How old is your youngest?

A. He's two.

Q. And you're saying you used to provide for that child? You don't

32

A. D. DEO

provide for that child anymore?

A. It's complicated.

Q. Explain it to me.

A. It's hard to explain.

Q. You can't afford to provide for them?

A. As I said, it's complicated.

Q. Have you ever been arrested before?

A. Arrested, yes.

Q. How many times?

A. Once.

Q. Have you ever been convicted of a crime?

A. I would say officially.

Q. The crime that you were officially convicted of, was that related to the sole arrest that you just testified about?

A. Yeah.

Q. And what was the offense that you were arrested for? Not convicted for, arrested for.

MR. BENJAMIN: Objection.

8 (Pages 29 to 32)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

33

A. D. DEO

But you can answer.

A. I don't understand what you're asking there.

Q. What were you charged with when you were arrested?

A. The details of that case was so long ago.

Q. Are you saying you don't remember?

A. Not to be able to answer.

Q. Do you have any recollection at all about what you were arrested for?

A. It was real estate in the -- involved.

Q. Okay.  Was it related to a mortgage?

A. Could possibly be.

Q. Do you remember what specific property that mortgage was for?

A. No.

Q. Do you remember what county that property was located in?

A. No.

Q. After you were convicted of that

34

A. D. DEO

crime, what was your sentence?

A. You know, the details of that case should have been sealed, but I'm going to answer your question.  Unsupervised -- how do you call that?

Q. Release?

A. Something -- unsupervised -- what's that word?

Q. Are you referring to unsupervised release?

A. No, it's with a "P."

Q. Probation?

A. Yes.  Yes.

Q. Unsupervised probation?

A. Yes.

Q. Other than unsupervised probation, was there any other punishment for the sentence?

A. That's all I recall.

Q. There was also five years' probation, right?

A. It was five years, yes.

Q. Other than probation and -- unsupervised probation of five years,

35

A. D. DEO

was there any other aspect of your sentence that you remember?

A. Not that I recall.

Q. Do you recall -- go ahead, finish.

A. I'm sorry.

Q. Do you recall any restrictions that you agreed to or the judge ordered you abide by as a result of your sentence?

A. Do I remember, no.

Q. Do you recall that you were not allowed to obtain any lines of credit or charges, credit charges?

A. As I said, the details, I don't remember that.  It's been a long time.

Q. But you agree with me that you pled guilty to that crime.  You admitted that you committed that crime, correct?

A. Somehow I feel that's a technical question, so I don't know how to answer it.

Q. Do you recall standing in front

36

A. D. DEO

of a judge and pleading guilty officially?

A. I stood in front of a judge.  I don't know what my lawyer, you know, handled at that moment.

Q. The attorney that you got was referred to you, correct, for that criminal case?

A. Whoa.  I don't remember how I -- how I met him.

Q. Do you remember who the attorney was?

A. He had a -- he had a very long last name with a "C."

Q. Do you remember if anyone referred you to that attorney?

A. I don't -- I don't remember.

Q. Do you remember if that attorney that you were referred to worked out of the same office building as Mr. Laurie?

A. I don't know.

Q. In connection with your criminal arrest and conviction, have you ever cooperated with any federal or state

9 (Pages 33 to 36)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

37

A. D. DEO

agency related to your prosecution?

A. You're asking me questions that should be sealed.

Q. Are you --

A. My life was in danger.

Q. So Mr. Deo, I have to tell you that we are in a private deposition that's subject to a confidentiality stipulation and order. You are required to answer these questions, unless your attorney instructs you not to answer. So I need to know the answer to this question.

Have you cooperated with any federal or state agency in connection with your arrest and conviction?

MR. BENJAMIN: Objection to form.

But you can answer.

A. Yeah.

Q. Was your cooperation part of a deal that you made with any federal or state agency?

A. I -- as I -- I don't remember

38

A. D. DEO

what the lawyer handled at that point.

Q. Did you sign a written plea agreement?

A. I'm not sure.

Q. Was your cooperation with the law enforcement authorities in connection with a man named Louis Berrios?

A. Louis Berria?

Q. Berrios, B-E-R-R-I-O-S.

A. Not that I recall.

Q. Do you know who that person is?

A. I heard that name, yes.

Q. During the time that you cooperated with the law enforcement authorities, did you discuss with them anything to do with Louis Berrios?

A. Oh, I don't recall.

Q. Have you ever met Mr. Berrios?

A. Have I met him, yes.

Q. Did you work with him in any capacity?

A. I worked with him.

Q. Where?

39

A. D. DEO

A. He had a realty company.

Q. Where?

A. West Babylon.

Q. Did you ever work with him outside of the state of New York?

A. I don't -- no.

Q. You testified that your life was in danger and that was part of the reason you entered into this agreement to cooperate with law enforcement authorities. Why was your life in danger?

A. I didn't -- I'm sorry, I didn't say that.

Q. Why was your life in danger?

A. I didn't say that. What you just said, I didn't say that.

Q. Okay. Explain what you said.

A. I said my life was in danger.

Q. Okay. Why was your life in danger?

A. 'Cause guys with guns.

Q. The guys with guns, were they anyone affiliated with Mr. Berrios or

40

A. D. DEO

was it Mr. Berrios, himself?

A. No.

Q. Who were the guys with guns?

A. I don't know their names, specifically.

Q. What did you do that caused your life to be in danger in connection with those guys with guns?

MR. BENJAMIN: Objection to form.

You can answer.

A. I don't know how to answer that question that you're asking.

Q. Why were there guys with guns out to get you?

A. I don't know why they were there.

Q. What were the terms of your agreement to cooperate with law enforcement authorities?

A. I -- I can't remember.

MR. KATAEV: We're going to call for the production of any plea agreement in this case.

10 (Pages 37 to 40)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

41

A. D. DEO

We'll follow up in writing.  In this criminal case.

Q. When was the first time that you met Marc Merckling?

A. He coached my son.

Q. Where?

A. In PAL.

Q. Police Athletic League?

A. Uh-huh.  Yes.  Sorry.

Q. You're doing great.

Where was that PAL program?

A. In Suffolk.

Q. Where you lived?

A. Yes.

Q. And where did you live at that time?

A. In Dix Hills.

Q. Did you own that property?

A. Yes.

Q. You had the deed to that property?

A. Okay.  So that's one of those questions.  I didn't have the deed.

Q. Who did?

42

A. D. DEO

A. My wife did.

Q. Okay.  So she owned that property exclusively?

A. Yes.

Q. And did she buy that property, inherit it, or obtain it by some other means?

A. We bought it.

Q. So it's fair to say that you first met Mr. Merckling at the time you lived in Dix Hills through the PAL program, correct?

A. Yeah.  When he was a coach.

Q. What year or time frame was that about?

A. Wow.

Q. Let's start with this.  When did you first move to Dix Hills?

A. Could I give you a time frame?

Q. That's fine.

A. About 16 years, 17 years, somewhere around there.

Q. Okay.  It's fair to say that you've known Mr. Merckling for

43

A. D. DEO

16 years?

A. Well, I didn't meet him immediately, but around that time.

Q. How long did you live in Dix Hills?

A. My kid is ten -- I'm sorry.  Time frame, time frame -- could I give a --

Q. Range?

A. -- a range?

Q. A range is fine.

A. Around ten years.

Q. Where did you move after you left Dix Hills?

A. We moved to Old Westbury.

Q. The address that you gave today?

A. No.  No.  There was a prior address.

Q. What was the prior address?

A. 3 Saddle Ridge Road.

Q. How long did you live there?

A. Wow.  Couple of years.

Q. What prompted your move from Dix Hills to Old Westbury?

44

A. D. DEO

A. It's a sad story.  My father was dying and I wanted him to live with us.  The house in Dix Hills was under construction and I needed -- we needed to move together quicker.

Q. Okay.  What prompted your move from 3 Saddle Ridge to your current address?

A. A disagreement on sales price.

Q. You originally came in under a lease agreement, right, to 3 Saddle Ridge?

A. The 3 Saddle lease -- what -- what the -- that lease-to-buy thing.

Q. So you entered into a rent-to-buy agreement, correct?

A. Yeah.

Q. That deal did not materialize, correct?

A. Correct.

Q. And that prompted your move to your current address, correct?

A. My father didn't make it, but yeah.

11 (Pages 41 to 44)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

45

A. D. DEO

Q. My sincere condolences.

Did you enter into a similar rent-to-buy agreement for your current address?

A. I answered that question already.

Q. Please repeat it.

A. It's not your conventional landlord -- landlord-tenant agreement.

Q. Okay.  What were the terms of that unconventional agreement?

A. It's hard to explain, but the house wasn't inhabitable at the time, so as a tenant, you can't enter an uninhabitable house.

Q. You're saying that the current property where you live is not habitable; is that right?

A. I didn't say that.

Q. You're saying that that property was uninhabitable at the time that you were supposed to move in there?

A. When we were negotiating, yes.

Q. Okay.  After you left Dix Hills,

46

A. D. DEO

you continued to associate with Marc Merckling, correct?

A. After -- did I know him?

Q. You continued to have conversations with him after you left Dix Hills, correct?

A. Yeah.  Yes.  I'm sorry.  Yes.

Q. Okay.  When was it that you and Mr. Merckling first had a working relationship together?

A. Whoa.  I would say Northshore Motors.  Northshore Motors.

Q. When did you first start working at Northshore Motors?

A. Say it again.

Q. When did you first start working in Northshore Motors?

A. I don't understand that question.  You got to clarify that question a little bit.

Q. I'll rephrase it.

When was the first time you set foot into Northshore Motors, the dealership, to perform work there in

47

A. D. DEO

any capacity?

A. When we --

MR. THOMASSON:  I object as to form.  But I have no objection to an answer.

MR. KATAEV:  You have no authority to object.  You are disqualified.  Please refrain from doing that so I don't have to call the Court.

MR. THOMASSON:  I can object as to form, and I think your question is confusing.

MR. KATAEV:  Again, you have no authority to object.  If you object again, I will call the Court.

Can we please have the question read back.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

48

A. D. DEO

MR. BENJAMIN:  We're talking about Northshore, Counsel, right?  Northshore?

MR. KATAEV:  Correct.

A. Could you rephrase your question, please?

Q. When was the first time you stepped foot into Northshore, as a dealership, to perform any work there in any capacity?  As an owner, as an employee, in any capacity.

A. Well, we --

MR. THOMASSON:  I object as to form.

MR. KATAEV:  All right.  We're going to call the judge.  I'm not going to deal with this.  Let's go off the record.

THE VIDEOGRAPHER:  We're going off the record.  The time is 10:39 a.m.  This is the end of Media No. 1.

- - -

(Whereupon, an

12 (Pages 45 to 48)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 15 of 351 PageID #: 13818

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

**49**

A. D. DEO

off-the-record discussion was held at this time.)

---

MR. KATAEV: All right. Counsel for the witness, Judge Wicks' rules provide that if a contested issue arises during the course of a deposition, we have to make a good faith attempt to resolve this.

You are here representing your client. Mr. Thomasson does not represent Mr. Deo. He's forbidden from representing Mr. Deo.

Will you agree with me to instruct Mr. Thomasson not to make objections on Mr. Deo's behalf?

MR. BENJAMIN: I'm not going to instruct Mr. Thomasson as to anything, but he's a party, and I didn't make the objection, Counsel. So I'm not making an

**50**

A. D. DEO

objection, and I'm not instructing my client not to answer. So I don't know that you need to meet and confer with me. If you feel like you want to call the Court, then that's fine, but...

MR. KATAEV: I am going to call the Court. Let's go on the record.

We're on the record for that, right?

THE STENOGRAPHER: Yes.

MS. FINK: Judge Wicks' chambers.

MR. KATAEV: Good morning, is this Ms. Flanagan?

MS. FINK: Hello?

MR. KATAEV: Good morning. Is this Ms. Flanagan?

MS. FINK: No. This is Jacqueline.

MR. KATAEV: Hi, Jacqueline. Ms. Fink, right?

**51**

A. D. DEO

MS. FINK: Hi. Yes.

MR. KATAEV: This is Emanuel Kataev. I'm the attorney representing the Superb plaintiffs in --

MS. FINK: Okay.

MR. KATAEV: -- Superb Motors V. Deo.

MS. FINK: Okay.

MR. KATAEV: I'm calling because we're in a deposition and a dispute has arisen. I could send over a virtual meeting link pursuant to the judge's rules. We did attempt to meet and confer on the subject.

MS. FINK: Okay. Give me one moment. Whose deposition is this?

MR. KATAEV: Anthony Deo.

MS. FINK: Okay. Are you taking the deposition?

MR. KATAEV: I am, yes.

MS. FINK: You said you are?

**52**

A. D. DEO

I'm sorry, I can't hear you.

MR. KATAEV: Yes, I am.

MS. FINK: Okay. And who is defending it?

MR. KATAEV: Mr. Benjamin. But the issue is that Mr. Thomasson is making objections and we're objecting to him making objections based on his disqualification.

MS. FINK: Okay. And is this in person? Virtual?

MR. KATAEV: The deposition is proceeding in person, except counsel for Libertas and Mr. Thomasson are appearing virtually.

MS. FINK: Okay. Give me one moment. Let me just see if the judge is available.

MR. KATAEV: Thank you.

MS. FINK: No problem.

MR. KATAEV: Off the record.

---

13 (Pages 49 to 52)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

---

53

A. D. DEO

(Whereupon, an off-the-record discussion was held at this time.)

---

MS. FINK:  Mr. Kataev, are you still there?

MR. KATAEV:  Yes.

MS. FINK:  If I have Judge on the line, will everybody hear or --

MR. KATAEV:  Yes.

MS. FINK:  -- will it be easier if we -- okay.  Perfect. Let me just make sure he's available.  One moment.

---

(Whereupon, an off-the-record discussion was held at this time.)

---

MS. FINK:  Mr. Kataev, are you still there?

MR. KATAEV:  I am.

MS. FINK:  Okay.  Perfect.

---

54

A. D. DEO

So I just conferred with Judge Wicks and the deposition can continue to take place.  If Mr. Thomasson is objecting as opposing party, he is able to do so.  He has the same rights as any other party.  And if that's the only objection, then it may proceed.

MR. KATAEV:  Thank you.

MS. FINK:  All right?

MR. KATAEV:  Thank you very much.

MS. FINK:  No problem.  Bye.

MR. THOMASSON:  I only heard part of that.  Could someone please tell me what that ruling was.

MR. KATAEV:  You can object.

MR. THOMASSON:  Yes.  Thank you.

MR. KATAEV:  Can I have the last -- oh, I remember what it was.

---

55

A. D. DEO

Q. So when was the first time you stepped foot --

THE VIDEOGRAPHER:  You want to go back on the video?

MR. KATAEV:  Yes.

THE VIDEOGRAPHER:  We're back on the record.  The time is 10:49 a.m.  This is the start of Media No. 2.

Q. We're back on the record.  I'm going to ask the question again.

When was the first time you walked into Northshore to perform work in that dealership?

MR. THOMASSON:  Objection as to form.

Q. You can answer.

A. I think you asked the same question that I said I needed you to clarify.  I'm sorry.

Q. Why don't you just explain it in your own words, whatever you want to clarify.

A. I don't understand how -- you're

---

56

A. D. DEO

asking the question, like, weird.

Q. When was the first time you worked at Northshore?

A. Again, you're asking it --

Q. What is unclear about the question?

A. Your terminology, I guess.  I don't understand what you're asking.

Q. Okay.  You claim that you're an owner of Northshore, correct?

A. I claim?

Q. Yes.

A. I don't know -- I don't know what you mean by that.

Q. Are you claiming that you're an owner of Northshore; yes or no?

A. I don't know how to answer that question that you're asking.

Q. Okay.  You're not claiming that you're an owner of Northshore?

A. Could you clarify "claim"?

Q. Are you an owner of Northshore?

A. Yes, I am.

Q. Okay.  When did you first work

---

14 (Pages 53 to 56)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

57

A. D. DEO

there?

A. When did I first work --

Q. At Northshore.

A. We opened it in 2017.

Q. Okay.  When did you first work in Northshore?

A. I answered your question.  We opened it in 2017.

Q. And it was immediately operational?

A. Well, you asked when we walked in.

Q. Okay.

A. We were in the building in 2017.

Q. When was Northshore operational?

A. Well, I think we officially started operations in 2018, early.

Q. Okay.  So did you offer Marc Merckling a job at Northshore in 2018, when it first became operational?

A. Whoa.  I don't think so.

Q. When did Marc Merckling first step foot in Northshore?

A. I can't remember the first day

58

A. D. DEO

he came to the store.

Q. When was it in relation to when Northshore first became operational?

A. Say that again.

Q. You said Northshore became operational in 2018, correct?

A. Yes, I did.

Q. Did Marc Merckling help you in any way with Northshore before it became operational?

A. No.

Q. Did Marc Merckling help you at Northshore after it became operational?

A. He worked there.

Q. How soon after Northshore became operational did Marc Merckling work there?

A. Specific time, I don't remember when he came onboard.

Q. Can you give me in relation to when you first opened?  For example, Marc Merckling first started helping me at Northshore about six months after Northshore became operational.

59

A. D. DEO

A. No, it was years.

Q. Years after?

A. Yeah.

Q. So is it -- is it fair to say that Marc Merckling started working with you at Northshore in or about 2020?

A. 2020, I'm not sure.

Q. Okay.  In relation to when COVID occurred --

A. When was COVID?

Q. March of 2020 until November of 2020.  Did Marc Merckling work with you before COVID started or after COVID started?

A. Oh, G-d.  I think it was after.

Q. Okay.  And what were the terms of your deal with Merckling in order for him to perform work at Northshore?

A. I don't understand your question.

Q. Well, there came a time when you asked Marc Merckling to help you out at Northshore, right?

60

A. D. DEO

A. To work?

Q. Yes.

A. Yeah.

Q. Who reached out to who?  Did you reach out to him and ask him to come work at Northshore or did he ask you for work?

A. I think it was in a conversation we were having.  I didn't specifically call him to work.

Q. Okay.  So you were at a social gathering or something and the conversation came up about it?

A. I don't know if it was a social gathering, but it was in a conversation.

Q. Okay.  You were already living in Old Westbury, right?

A. Yeah, we moved there -- we moved there in -- we moved to Old Westbury in 2019.

Q. Okay.  So you were already living in Westbury when Northshore became operational, at some point.

15 (Pages 57 to 60)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 18 of 351 PageID #: 13821

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

61

A. D. DEO

Northshore became operational in 2018. You moved to Old Westbury in 2019. And you asked -- and you made a deal with Merckling for him to work at Northshore in or about 2020 or '21, correct?

A. I think Marc started working at Northshore '20 or '21.

Q. Okay. At the time that Marc Merckling started working in 2021, you were already living in Old Westbury, correct?

A. '21, I was living -- yes, I lived in Old Westbury.

Q. After you moved to Old Westbury, did you still happen to meet with Mr. Merckling in Dix Hills?

A. I -- I don't understand what you mean.

Q. You testified that you met Mr. Merckling at the PAL in Dix Hills, right?

A. At the PAL in Suffolk, yes.

Q. In Suffolk.

A. Yeah, Dix Hills doesn't have a

62

A. D. DEO

PAL.

Q. After you left Old Westbury, you no longer went back to the PAL in Suffolk, did you?

A. No. My son -- I think he finished the program. My son finished the program.

Q. So since you were no longer meeting with Mr. Merckling in Suffolk at the PAL, where was it that you were meeting with him in 2020 and 2021?

A. I mean, I don't know precisely.

Q. Is it fair to say that you became friends with Mr. Merckling through your association with him at the PAL in Suffolk?

A. Yeah, I would consider Marc a friend.

Q. Okay. And so you maintained contact with him throughout the years since then, correct?

A. We spoke.

Q. Okay. So how did it come about that you offered him a job at

63

A. D. DEO

Northshore in '21?

A. I think when he retired.

Q. When did he retire?

A. Oh, I don't know exactly.

Q. Was there a retirement celebration?

A. With me?

Q. Were you present at any retirement celebration?

A. Oh, with him, no.

Q. When was the first time you met Dwight Blankenship?

A. Oh, geez. Whoa. It's definitely after Marc.

Q. Is it fair to say that Marc introduced you to Blankenship?

A. Yes.

Q. And why did Marc introduce you to Blankenship?

A. They worked together. They're SWAT.

Q. When -- when Merckling was offered a job at Northshore, what did you offer to pay him?

64

A. D. DEO

A. I don't remember the terms.

Q. Do you remember if it was an hourly pay or a salary or something else?

A. I don't remember, honestly.

Q. Did you pay him through payroll?

A. I think Marc was on payroll, yes. The controller would know.

Q. Was Marc Merckling paid exclusively through payroll?

A. For Northshore?

Q. For Northshore.

A. I would say so.

Q. Did you ever pay Marc Merckling in cash?

A. In cash? No. Why?

Q. What about Mr. Blankenship?

MR. BENJAMIN: Just answer.

THE WITNESS: I'm sorry. I'm sorry.

Q. What about Mr. Blankenship, how was he paid?

A. I think he was on payroll.

Q. Okay. Was he paid exclusively

16 (Pages 61 to 64)

65

A. D. DEO

through payroll?

A. I think so.

Q. He was never paid in cash?

A. No.

Q. Now, did Mr. Blankenship perform any work at Northshore?

A. Okay.  At Northshore, Dwight -- Dwight, at Northshore, I am not a hundred percent sure, but I think so.

Q. Okay.

A. The time frame is a little fuzzy.

Q. You testified earlier that you needed protection because your life was in danger, correct?

A. Did I say that?

Q. You did testify that your life was in danger, right?

A. Yes.

Q. Did the federal or state government provide you any means of protection because of the fact that your life was in danger?

A. The federal or state government,

66

A. D. DEO

no.

Q. Are you aware that your attorney made representations, your attorney, Mr. Thomasson, made representations at a hearing in this -- in this court about your cooperation with the federal government?

MR. BENJAMIN:  Objection.
But you can answer.

A. I -- repeat what you said, please.

Q. Are you aware that your attorney, Mr. Thomasson, before he was disqualified, made representations to this court that we are involved in about your cooperation with the federal government?

A. I -- I don't recall.

Q. I'm going to read to you an excerpt from a transcript from the September 14, 2023 hearing.

A. September 14, 2023, okay.

Q. Mr. Thomasson stated at that hearing, and I quote, "He was in the

67

A. D. DEO

real estate business, your Honor, and got a slap on the wrist for what ended up being cooperation with the feds, and for his own protection, he took the deal that they offered, will make it look like you're a big part of this to protect your life going forward because we are not able or willing to provide your protection for the rest of your life.  That's why the man has two police officers around him.  And Urrutia was told and Aaronson was told, and now they use it against him.  They don't have access to a sealed record."

Do you remember Mr. Thomasson making those statements at the September 14, 2023 hearing?

A. I don't.

Q. Are these statements true?

A. Yeah.

Q. And if I understand it correctly, you're saying that you hired Mr. Merckling and Mr. Blankenship because the federal government was

68

A. D. DEO

unable to provide you protection; is that right?

A. I didn't say that.

Q. So what Mr. Thomasson represented was incorrect, right?

MR. BENJAMIN:  Objection.

A. You're -- you're going back and forth there.  I don't understand.

Q. I'm going to place up on the screen what will be marked as Deo Exhibit 1.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 1, a 100-page document, was marked for identification.)

- - -

Q. Do you see the front page of this transcript?

A. Yes.

Q. And you see that it says September 14, 2023?

A. Yes.

Q. And you see that for the

17 (Pages 65 to 68)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

69

A. D. DEO

defendants, Mr. Thomasson appeared, correct?

A. Yes.

Q. I'm going to highlight the selected text. I want you to read it and I want you to tell me what's accurate and what is not accurate. Let me know when you're done reading.

MR. BENJAMIN: My only objection is that this was asked and answered. But I guess we'll go through the transcript. That's fine.

You can read it, answer.

A. Could you not highlight it? I can't read it when you --

Q. Sure.

Are you done reading, Mr. Deo?

A. Yes.

Q. Okay. Is there any part of these representations that Mr. Thomasson made that is untrue?

A. No.

Q. This is all accurate?

70

A. D. DEO

A. Yes.

Q. So you hired Mr. Merckling and Mr. Blankenship because the federal government could not protect you?

A. That's not what he said.

Q. He said, "to protect your life going forward because you -- we are not able or willing to provide you protection for the rest of your life," right?

A. To protect -- to protect your life going forward -- yes, that's what it says.

Q. Is that true?

A. That, what you read, yes.

Q. So you hired Mr. Merckling and Mr. Blankenship to protect yourself?

A. Again, that's not what it says.

Q. So what does it say?

A. It says that's why the man has two police officers around him.

Q. So why do you have two police officers around you?

A. They protect me.

71

A. D. DEO

Q. What do they protect you from?

A. Danger.

Q. What kind of danger?

A. Any.

Q. How long after you hired Mr. Merckling did Mr. Blankenship become employed?

A. I told you I don't know exactly when. I know it's after.

Q. Was there a period of time that Mr. Merckling worked without Mr. Blankenship?

A. They didn't start together.

Q. Do you know if more than a year passed before Mr. Blankenship came?

A. Specifics, I don't know.

Q. Do you have any record of when you hired them?

A. I have no records.

Q. You don't keep records?

A. My records were taken from me.

Q. By who?

A. By IAG.

Q. And by "IAG," you're referring

72

A. D. DEO

to Island Auto Group?

A. Yes.

Q. Have you ever applied for a DMV license?

A. Yes.

Q. When was that?

A. I applied, I think, February '23. February.

Q. Was that application approved or denied?

A. That application was approved.

Q. Was that --

A. I applied for two. I'm sorry.

Q. Were both approved?

A. Yes.

Q. For those two applications, before they were approved, were they ever denied?

A. They don't deny and then approve.

Q. Okay. Prior to those applications, were you ever denied a license from the DMV?

A. Denied, no.

18 (Pages 69 to 72)

73

A. D. DEO

Q. Is it fair --

A. Not to my recollection, no.

Q. Is it fair to say that other than your one -- other than your two applications from February 2023, you never previously applied for a license with the DMV?

A. I just want to make sure I remember. I'm not a hundred percent sure, but I don't think so.

Q. Okay. So to the best of your recollection, you were never denied a license from the DMV, correct?

A. No. These two were approved.

Q. Okay. And these are the only two that you applied for, to the best of your --

A. To the best of my recollection.

Q. In applying for a license with the DMV, you have to disclose if you were ever convicted of a felony, correct?

A. There is a box.

Q. It would be against the law to

74

A. D. DEO

submit false information on a DMV application, correct?

MR. BENJAMIN: Objection. You can answer, if you can.

A. I don't know the law on that.

Q. You would never have submitted a false -- withdrawn.

You would never have submitted false information on a DMV application, correct?

A. No.

Q. You know that that would be a crime, correct?

MR. BENJAMIN: Objection.

A. It's the same answer as before. I don't know the law.

Q. Did you ever submit false information on a DMV application?

A. To my understanding, no.

Q. Okay. If I recall your testimony correctly, you said -- what is your understanding?

MR. BENJAMIN: Objection. Of what?

75

A. D. DEO

A. What are you asking?

MR. KATAEV: Can we read back the last question and answer.

- - -

(Whereupon, the referred-to question and answer were read back by the stenographer.)

- - -

Q. To my understanding, what? Yes or no?

A. To my understanding, I didn't submit false information.

Q. Okay. Now, you testified earlier today that you don't remember what you were charged with and what you pled guilty to in the criminal case we previously discussed, right?

A. If that's what I said.

MR. KATAEV: I'm placing up on the screen what will be marked as Deo 2.

- - -

(Whereupon, Plaintiffs'

76

A. D. DEO

Exhibit Deo 2, a five-page document, was marked for identification.)

- - -

Q. Do you recognize this document?

A. I don't. Oh, there's Colleluori's name. Oh, sorry. There's Colleluori's name.

Q. My question is: Do you recognize this document?

A. I don't recognize it.

Q. I'll represent to you that this is a judgment in a criminal case filed against you by the United States of America. Do you see that?

A. Okay.

Q. Do you see it?

A. Judgment in a criminal case -- okay.

Q. Do you see it?

A. Yes, I see.

Q. And --

MR. RUDERMAN: Wire fraud.

Q. In the middle of the page, it

19 (Pages 73 to 76)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

77

A. D. DEO
references one count of conspiracy to commit wire fraud, and a second count of wire fraud.  Do you see that?
A. I see that.
Q. And it says that you pled guilty to those counts, correct?
A. Where is that?  Oh, on top. Okay.
Q. Is that right?
A. Yes.
Q. On the second page of this judgment it says that the defendant is hereby sentenced to probation for a term of five years, correct?
A. Yes.
Q. And on the third page, there are additional probation terms, correct? Is that right?  Is that right?
A. I'm sorry, what did you say?
Q. On the third page, there are additional probation terms, correct?
A. Yes.
Q. The first term is that you have to provide financial information to the

78

A. D. DEO
probation department, right?
A. Yes.
Q. And the second term is that you will incur no new credit card charges nor open any additional lines of credit without approval of the probation department, right?
A. That's what it says.
Q. Did you comply with that term of your probation for five years?
A. To my knowledge, I think I did.
Q. Were you aware of this term prior to today?
A. I believe we talked about it, my lawyer and I.
Q. The final term is that you will forfeit $300,000 to the government, correct?
A. Yes.
Q. Was this forfeiture amount paid?
A. No.
Q. It remains outstanding?
A. I don't know.
Q. You never made any effort to pay

79

A. D. DEO
this forfeiture amount, correct?
A. No, I disagree with that.
Q. You recall paying some portion of it?
A. I don't recall, but me making no effort, that didn't happen.
Q. What effort, if any, did you make to pay the restitution?
A. I -- I can't remember now.
Q. This judgment is signed January 15, 2016, correct?
A. Is that where it says date of imposition of judgment?
Q. Yes.
A. Yes.
Q. You were originally arrested in 2010, weren't you?
A. I don't recall.
Q. Do you remember being arrested?
A. There was a procedure.  I assume that was an arrest.
Q. You surrendered yourself?
A. I think that's what it's called. I don't know when.

80

A. D. DEO
Q. Given that the term of probation was five years, it's fair to say that your probation ended on January 15, 2021, correct?
A. Yeah.
Q. During your five-year probation, did you continue working in the real estate business?
A. In real estate, I think they allowed me -- yeah, they allowed me to keep my license.
Q. Do you still maintain your license?
A. No.  I never took the continuing ed.
Q. Is there any particular reason why it took six years from the date of arrest or surrender for your case to reach a final judgment?
A. Oh, how would I know that?
Q. How many court appearances did you go to for this case?
A. One.
Q. And that was when you pled

20 (Pages 77 to 80)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

81

A. D. DEO

guilty, correct?

A. I think that's what happened that day.

Q. Can you identify the names of the law enforcement officers you worked with in the cooperation?

A. No.

Q. No, you don't remember?  Or no, you don't want to?

A. No, I don't remember.

Q. This crime that you pled guilty to had to do with a property at 9263 218th Street in Queens, right?

A. I have no clue.

Q. Did you ever live at 9263 218th Street?

A. Yes.

Q. Prior to the time that you lived there, you also lived at 4 Darius Court, Huntington Station?

A. Prior?

Q. Yes.

A. No.

Q. Did you live at 4 Darius Court

82

A. D. DEO

in Huntington Station after 218th Street?

A. After.

Q. Did you rent that property?

A. Please clarify.

Q. Did you have a lease agreement to live in that property at 4 Darius Court in Huntington Station?

A. A lease, no.

Q. How is it that you came to live at 4 Darius Court in Huntington Station?

A. Say that again.  I'm sorry.

Q. Withdrawn.

The 4 Darius Court property in Huntington Station, is that the Dix Hills home that you lived in?

A. That's the Dix Hills home.

Q. Is it fair to say that in light of your conviction here that we looked at, you were unable to get a DMV license to operate a dealership?

A. Repeat that.  I'm sorry.

MR. KATAEV:  Read it back,

83

A. D. DEO

please.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

A. That's incorrect.

Q. Why is it incorrect?

A. 'Cause I got two DMV licenses.

Q. The two DMV licenses you got were after the five-year probation period ended, correct?

A. In '23, yes.

Q. Okay.  During the five-year probation period, you agree with me that you will be unable to obtain those licenses from the DMV?

A. I don't agree with you.

Q. Isn't one of the terms of the probation that you can't have any lines of credit?

A. A DMV -- are you asking about a DMV license?

Q. Yes.

84

A. D. DEO

MR. BENJAMIN:  Well, Counsel, you just asked about a line of credit.

MR. KATAEV:  Yes.

MR. BENJAMIN:  Are you asking about the DMV license or a line of credit?

MR. KATAEV:  I'm asking both, in connection.  Right?

Q. You obtain a DMV license and then in order to operate any licensed dealership, you would need to obtain lines of credit.  So with that understanding, that you would need a line of credit in order to operate a dealership, is it fair to say that you would not be able to obtain a DMV license during your five-year probation period?

A. I don't agree with the premise of your question.

Q. Explain why you don't agree.

MR. KATAEV:  Did he answer?

Q. Can you repeat your answer?

21 (Pages 81 to 84)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

85

A. D. DEO

MR. BENJAMIN:  Object to form.

But you can answer.

You want to repeat the question, please.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

THE WITNESS:  Could you repeat the original question.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

A. I don't agree that in order to get a DMV license, you need a line of credit.

Q. Did you disclose your felony conviction to the DMV when you applied for and were approved to get a license from the DMV?

86

A. D. DEO

A. My attorney at the time said my case was sealed and I never have to check that box.

Q. Who was that?

MR. RUDERMAN:  You're pointing to the screen.

A. Yeah.  That's his name.

MR. KATAEV:  Let the record reflect that the witness pointed to the name Anthony Colleluori, C-O-L-L-E-L-U-O-R-I.

Q. You're telling me that this attorney advised you that you don't have to disclose your conviction --

MR. BENJAMIN:  Objection.

Q. -- on any application, correct?

MR. BENJAMIN:  That's a privileged question.

MR. RUDERMAN:  He answered the question.

MR. KATAEV:  He waived --

MR. BENJAMIN:  He didn't waive any -- he's not waiving any further answers in -- in a

87

A. D. DEO

question that is clearly attorney-client privilege. There's no waiver.

MR. RUDERMAN:  The question was not what did your attorney tell you.  The question was who told you.  He answered the question voluntarily that his attorney told him to.

MR. BENJAMIN:  And then the next question was as to advice from his counsel.

MR. RUDERMAN:  Well, once he says that it's his attorney, you can't give a half an answer. Once you open the door, "it's my attorney's advice," you can't just say, "but I won't tell you about that communication."

So I would recommend if you're going to tell him not to answer any further questions, we ask the judge whether or not he now opened the door to any

88

A. D. DEO

questions that he now has with his attorney, his criminal attorney.

MR. BENJAMIN:  Yeah.  Yeah, before a court order, I'm not going to allow him to answer that question.

MR. RUDERMAN:  Okay.

MR. KATAEV:  You're instructing him not to answer?

MR. BENJAMIN:  I'm instructing him not to answer.

MR. KATAEV:  Okay.  Let's go off the record to meet and confer.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:21 a.m.  This is the end of Media No. 2.

MR. KATAEV:  Counsel, I believe the rule is that when attorney-client privilege applies, it's a fragile privilege, such that if the party

22 (Pages 85 to 88)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

89

A. D. DEO

violates the privilege by disclosing an attorney-client communication, which happened here, privilege is waived.

So we're taking the position that by him disclosing that statement by his attorney, the privilege has been waived. What is your basis for instructing him not to answer in light of the fact that privilege has now been waived by your --

MR. BENJAMIN: That it hasn't been waived.

MR. KATAEV: I can't convince you to allow the witness to answer the question since privilege has been waived?

MR. BENJAMIN: No. And I suggest we read the question to the judge when you get him on the phone.

MR. KATAEV: Let's go off the record.

90

A. D. DEO

MR. BENJAMIN: He needs to use the bathroom.

MR. KATAEV: Sure. Let's take a break.

- - -

(Whereupon, a recess was taken at this time.)

- - -

MR. KATAEV: All right. I'm going to call the court now.

THE CLERK: Good morning, Judge Wicks' chambers.

MR. KATAEV: Hi. Good morning. How are you today?

THE CLERK: Good, how are you? What can I do for you?

MR. KATAEV: This is Emanuel Kataev calling. I'm the attorney for the Superb plaintiffs in the Superb V. Deo.

THE CLERK: Yes.

MR. KATAEV: I spoke to Ms. Fink earlier. We had a deposition dispute that was

91

A. D. DEO

resolved. We have another deposition dispute.

THE CLERK: I'm sorry, you cut out there. You have another one? Another dispute?

MR. KATAEV: Another -- another dispute, correct.

THE CLERK: Okay. Sure. Hold on one second. Let me put Ms. Fink on the line and she will talk to you. Okay? Hold on one second.

MR. KATAEV: Okay.

MS. FINK: Hello?

MR. KATAEV: Hi, Ms. Fink.

MS. FINK: Hi.

MR. KATAEV: We're back.

MS. FINK: Okay. What's going on?

MR. KATAEV: So we asked the witness, who is not present right now, only counsel are here --

MS. FINK: Okay.

MR. KATAEV: We asked him

92

A. D. DEO

about why he failed to disclose his conviction on a DMV application that requires it. He voluntarily testified, "My attorney told me that because it's sealed, I don't have to disclose it."

And we identified the attorney by looking at the judgment from the criminal case. The attorney's name was listed on the face of the judgement. We confirmed that that was the attorney.

And when I asked him further questions about it, his attorney instructed him not to answer based on privilege.

Plaintiffs jointly take the position, both sets of plaintiffs, that Mr. Deo has waived privilege.

And Mr. Benjamin, after meeting and conferring with him

23 (Pages 89 to 92)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

93

A. D. DEO

about the subject, as required by this Court's rules, maintained his position that he's instructing the witness not to answer questions because he has not waived his privilege, even though he clearly has.

MS. FINK:  Okay.  Let me go speak with the judge.  Give me one moment.

MR. KATAEV:  Thank you, Ms. Fink.

MS. FINK:  Mr. Kataev, are you still there?

MR. KATAEV:  I am.

MS. FINK:  Okay.  So I spoke with Judge Wicks.  We don't have enough information at the moment, so what we would prefer is if you can file a letter motion.  Suspend the questioning as to this portion, file a letter of motion by tomorrow, 5:00 p.m.  I would do it as a motion to

94

A. D. DEO

compel with a little bit more information, and then opposition would be due the following day, so the 14th, by 5:00 p.m., and then we will rule on it then.

MR. KATAEV:  Okay.  That works.

MS. FINK:  Okay.  And it could be a letter brief.  It doesn't have to be a formal motion.

MR. KATAEV:  Understood. Thank you, Ms. Fink.

MS. FINK:  No problem. Thank you.

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:32 a.m.  This is the start of Media No. 3.

Q. So per the Court's ruling, we have to await a ruling on that decision, so we're going to deal with that after we get an order.

A. Okay.

95

A. D. DEO

Q. Moving on, though, based on the additional terms of your probation, would it be fair to say that during the period of January 15, 2016 until January 15, 2021, the five-year period, you were not allowed to obtain a floor plan line of credit?

A. That's a -- that's an interpretation.

Q. Explain to me how you interpret it.

A. The floor plan belongs to a company, and I'm just -- from reading this right now, it's -- you're asking me to make a determination for something I'm reading right now.

Q. I want to clarify my question. I'm not asking you to make any determination.  I'm asking you, as a witness, what is your understanding of these terms.

So if I understand your answer correctly, your answer is that I may not be able to get a floor plan line of

96

A. D. DEO

credit, but a corporate -- corporate entity might; is that right?

A. Not exactly.  You would have to go back to your original question.

MR. KATAEV:  Can we read it back, please.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

Q. So my question was you.

A. That's the thing.  The determination is a floor plan belongs to a company, in my understanding.

Q. So based on your understanding, if you own a company, are you able to obtain a floor plan -- is the company able -- is the company able to obtain that floor plan line of credit that you own during this probation period?

A. If I own the company, could --

MR. THOMASSON:  I object as to form.

24  (Pages 93 to 96)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

97

A. D. DEO

Q. You can answer.

MR. BENJAMIN: I'm going to object also.

But you can answer, if you're --

A. I don't know how to answer. It's -- it's very confusing.

Q. Did you attempt to apply for a floor plan line of credit through a company or otherwise between the period of January 15, 2016 and January 15, 2021?

A. Did I attempt? I -- I don't remember.

Q. You had a floor plan line for Northshore through Westlake, correct?

A. Northshore -- yes. Yes.

Q. When did you first apply for that floor plan line of credit for Northshore with Westlake?

A. It had to be the end of 2022.

Q. What about the floor plan line you had for NextGear, when did you apply for that one?

98

A. D. DEO

A. NextGear for Northshore?

Q. Or Sunrise.

A. I think around the same time.

Q. You applied for both at the same time, correct?

A. It's around the same time. Exact dates, I -- it's hard for me to tell.

Q. You completed both applications, correct? You can answer.

A. Say your question again. I'm sorry.

MR. KATAEV: Repeat it, please.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

A. Did I submit both applications, yes.

Q. Okay. And you submitted them on behalf of Northshore and/or Sunrise, correct?

99

A. D. DEO

A. Yes.

Q. When you first started operating Northshore, was Island Auto Group involved from the beginning?

A. You have to define who Island Auto Group exactly is in your question.

Q. Okay. I'll withdraw the question.

When you first started operating Northshore, was David Baron involved with you from the beginning?

A. When did I meet David? I don't recall when I exactly met David. The floor plan -- oh, I don't -- wow. Yeah, I don't remember when I met him.

Q. When you first started operating Northshore, was David Baron working with you at that time from the beginning?

A. Isn't that the same question?

Q. Yes.

Do you remember working with David Baron when you first started operating Northshore?

100

A. D. DEO

A. I met David after --

Q. How long --

A. -- we opened the company.

Q. How long after?

A. That's been a long time ago.

Q. You don't remember?

A. Exactly when I met him, no.

Q. Do you remember whether it was months or years after you first started operating Northshore?

A. It wasn't years.

Q. I'm going to present to you what's been -- being marked as Deo 3. Yeah, Deo 3.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 3, an 18-page document, was marked for identification.)

- - -

Q. I'll represent to you, Mr. Deo, that this is an affirmation or affidavit signed by you in connection with the lawsuit brought by the Island

25 (Pages 97 to 100)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

---

**101**

A. D. DEO

Auto Group plaintiffs prior to this federal case. Do you recognize this document?

A. Yes.

Q. And focusing on the last page of this document, you signed and swore to the contents of this affirmation under the pains and penalties of perjury, correct?

A. Yes.

Q. And Mr. Thomasson notarized your affidavit for you and swore you, correct?

A. Yes.

Q. I'd like for you to read paragraphs 3 and 4 of this affirmation. Let me know when you're done.

A. Okay. You could scroll.

Q. Let the record reflect that I'm scrolling up so you could read the rest of paragraph 4.

A. Okay.

Oh, shit. My thing fell.

MR. KATAEV: Off the record.

---

**102**

A. D. DEO

MR. BENJAMIN: He's good.

MR. KATAEV: Back on the record.

Q. Have you read paragraphs 3 and 4 of your March 2023 --

A. Yes.

Q. -- affirmation?

A. I'm sorry. Yes.

Q. In this affirmation, you swear under the penalty of perjury -- in this affidavit, you swear under the penalty of perjury that you applied for and obtained a floor plan line of credit in or about 2016 or 2017, correct?

A. It says that I obtained a floor plan from NextGear.

Q. Okay. Now, it's your position that that's not a violation of your probation because you got it for Northshore, correct?

MR. BENJAMIN: Objection. But you can answer.

A. Yeah. Say that again. I'm sorry.

---

**103**

A. D. DEO

Q. It's your position that you did not violate the terms of your probation from your criminal case because the floor plan line was opened by a corporate entity called Northshore, correct?

A. That -- that Northshore opened in 2017.

Q. Correct. And you're saying that it was not a violation of your probation because the company opened it, not you, correct?

A. I'm not saying that.

Q. What are you saying?

A. It's just saying that I obtained the floor plan from NextGear.

Q. For which company did you obtain a floor plan line from NextGear? Was it Northshore LLC, referenced in paragraph 3? Or was it Northshore Motor Leasing LLC, referenced in paragraph 5?

A. We did not have -- we did not have a NextGear floor plan for

---

**104**

A. D. DEO

Northshore, to my recollection, no.

Q. So are you telling me this statement in paragraph 4 is false, that you obtained a floor plan from NextGear?

A. I didn't say it was false.

Q. Okay. So for which company did you obtain a floor plan line for NextGear?

A. It was UEA Premier.

Q. Okay. And UEA Premier is owned 100 percent by you, correct?

A. I don't think so.

Q. Who is UEA Premier owned by?

A. Wow. I'm not a hundred percent sure.

MR. KATAEV: Plaintiffs are going to call for the production of all organization and formation documents for UEA Premier Motors Corp., a defendant in this action -- case. We'll follow up in writing.

A. Okay.

---

26 (Pages 101 to 104)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

105

A. D. DEO

MR. KATAEV: Plaintiffs are also going to call for the production of all applications and documents for any floor plan line opened with NextGear as a floor plan lender for any dealerships operated by Anthony Deo. We'll follow up in writing as to that as well.

MR. BENJAMIN: Noted.

Q. Going back to the DMV application, focusing on the application, itself, after it was submitted, did you ever amend that application before it was approved?

A. Which application?

Q. There were two, correct?

A. Which --

Q. There was an application for a Gold Coast Motors of Sunrise LLC, correct?

A. Yes.

Q. And there was an application for Gold Coast Motors of Syosset LLC,

106

A. D. DEO

correct?

A. Yes.

Q. My question is: For either of those two applications, after you submitted them, but before they were approved, did you ever amend either of those applications?

A. I -- I don't remember.

MR. KATAEV: I'm going to call for the production of all DMV license application documents, any correspondence regarding those applications between yourself and the DMV, as well as any correspondence between or among the defendants in this case. We'll follow up in writing.

I think now is a good time to take a five-minute break.

Off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 11:45 a.m. This is the end of

107

A. D. DEO

Media No. 3.

- - -

(Whereupon, a recess was taken at this time.)

- - -

THE VIDEOGRAPHER: We are back on the record. The time is 11:52 a.m. This is the start of Media No. 4.

Q. Mr. Deo, welcome back. This is the first break that you -- that we've taken in this deposition, correct?

A. No. Wait. No.

Q. We've --

A. We took a bathroom break.

Q. Okay. During either of the prior breaks, did you discuss your testimony with your attorney?

A. No. I showed him where the bathroom was.

Q. Okay. When was the first time you've ever worked in an automobile dealership?

A. I -- I don't recall exactly

108

A. D. DEO

when. It was a long time ago.

Q. Was it more than 20 years ago?

A. Twenty, no, not 20. Not 20.

Q. So was it 15 years ago?

A. Possibly.

Q. What was the first dealership that you worked at?

A. What's his name? Wow. I can't remember the exact name, but it was -- I know it was in Huntington.

Q. Was it a franchise dealership --

A. No.

Q. -- or a used car lot?

A. No, no, it's a small used car place.

Q. And what was your role when you first started working there?

A. I mean, it wasn't -- it was no hiring. I wasn't an official employee, but I worked at the dealership.

Q. Was it a family relative?

A. No, no, just somebody that I knew.

Q. Did you do sales?

27 (Pages 105 to 108)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

109

A. D. DEO

A. Not regular, you know -- I wasn't the salesperson, if that's what you're asking.

Q. What was your role there?

A. As I said, I didn't have a defined role.

Q. Is it fair to say that you were there just to help out in any way you can?

A. I don't think -- I don't think that's a good description, to help out. I mean, help out is -- it wasn't just to help out.

Q. What would be a good description of your role at that dealership?

A. That's the thing, I didn't really have a defined role.

Q. What was the name of the person that you worked with there?

A. I know his name was Toby.

Q. You don't remember his last name?

A. No.

Q. You don't remember the

110

A. D. DEO

dealership name?

A. He had a couple of dealerships.

Q. Do you remember any of the names of those dealerships?

A. One -- one was named Planet. Planet Motors or something like that.

Q. Okay. Do you remember any other names?

A. Not that I recall.

Q. When you worked with him, did you bounce around from dealership to dealership or stay at one?

A. No, I -- I just -- I just was at the Huntington location.

Q. How long did you work with him?

A. Couple of months. Nothing crazy.

Q. When you worked there, did your work ever involve anything to do with financing applications?

A. No. I did -- they had -- they had F and I -- he had an F and I there.

Q. Did you ever work with that F and I person?

111

A. D. DEO

A. Well, he was in the building. What do you mean work with him?

Q. Did you interact with him for the purpose of performing any dealership duties?

A. Well, he did the deals for the dealership.

Q. And did you work with him when he did the deals?

A. I don't understand your question.

Q. Did you observe the F and I guy --

A. Oh, no, no, no, no. No. I'm sorry.

Q. And for the record, what does F and I stand for?

A. Finance guy.

Q. Finance and?

A. Insurance, I'm guessing.

Q. You're not sure?

A. I'm not sure if the "I" stands for insurance. I know "F" stands for finance. It's usually the finance

112

A. D. DEO

manager.

Q. Okay. Is it fair to say that you learned how the duties of an F and I individual work while working with Toby at that dealership in Huntington?

A. That's not fair to say.

Q. When was the -- withdrawn.
Where was the next dealership you worked at after you stopped working with Toby?

A. I think -- I think we opened up a dealership in Deer Park.

Q. And who was "we"?

A. My wife and I.

Q. What was the name of that dealership?

A. UEA -- no. Wait. Maybe. Universal Exotic, I think.

Q. Okay. And after working for two months with Toby, you went and opened your own dealership?

A. I didn't say two months.

Q. Did you work anywhere between Toby and opening up Universal Exotic?

28 (Pages 109 to 112)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

113

A. D. DEO

A. Work anywhere?

Q. In the automobile industry.

A. I don't think so.

Q. How were you able to operate a dealership with no experience in the automobile industry?

A. Isn't that an assumption on your behalf?

Q. Do you have any experience in operating a dealership before you opened Universal Exotic?

A. Say that again.  I'm sorry.

Q. Did you have any experience in operating a dealership before opening Universal Exotic?

A. Experience in owning a dealership, no.

Q. When you opened up Universal Exotic, did you apply for a floor plan line of credit?

A. I don't recall the terms of that period.

Q. Do you recall which floor plan lenders you worked with when you opened

114

A. D. DEO

Universal Exotic?

A. No, I don't.

Q. Did you form any relationships with banks that financed deals when you worked at Universal Exotic?

A. I -- I don't remember.

Q. What happened to Universal Exotic in Deer Park?

A. I think we moved.

Q. How long was Universal Exotic opened in Deer Park?

A. More than a year.

Q. What was the address where Universal Exotic operated from?

A. I don't know the address.

Q. After you moved from the Deer Park location where you operated Universal Exotic, where did you move to?

A. That's when we went to 180 Michael Drive.

Q. So it's fair to say that Universal Exotic was opened sometime in 2015 or 2016, correct?

115

A. D. DEO

A. Exact dates, I can't be sure.

Q. How long prior to opening Universal Exotic did you work with Toby at Planet?

A. How long before we opened Universal, months.

Q. What was the time frame between working with Toby for a couple of months and opening Universal Exotic?

A. Oh, I don't know, like, the exact time frame.

Q. Was it years?

A. I don't think it was years.

Q. Was it months?

A. Could have been.

Q. If I told you that Universal Exotic Autos Inc. operated from 908 Long Island Avenue in Deer Park, New York, does that refresh your recollection?

A. Long Island Avenue.

Q. And if I told that your Department of State filing date for Universal Exotic Autos Inc. was June 4,

116

A. D. DEO

2013, does that refresh your recollection?

A. I would have to see what you are looking at.

Q. Sure.

MR. KATAEV:  Let the record reflect that I placed up on the screen what will be marked as Deo 4.  It is an entity information page for Universal Exotic Autos Inc.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 4, a two-page document, was marked for identification.)

- - -

Q. Mr. Deo, does the filing date listed here refresh your recollection as to when you first opened Universal Exotic Autos Inc.?

A. I mean, all I could see is when we filed the documents.

Q. Do you remember opening

29 (Pages 113 to 116)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

117

A. D. DEO

Universal Exotic Autos Inc. in June of 2013?

A. I don't recall.

Q. Do you have any reason to dispute that June 4, 2013 was when you first opened Universal Exotic Autos Inc.?

A. That's when we filed the corporation.

Q. To your recollection, how long after you incorporated did you start operating Universal Exotic Autos Inc.?

A. I can't tell you exactly when. I don't know.

Q. And you owned this dealership together with Sarah, correct?

A. The corporate structure that we had, I am not sure.

MR. KATAEV: We're going to call for the production of all corporate formation documentation for Universal Exotic Autos Inc. We'll follow up in writing.

Q. This entity remains active,

118

A. D. DEO

correct?

A. It's -- no, we closed that place.

Q. When did you close it?

A. I think it was 2015.

Q. What bank did you utilize to operate Universal Exotic Autos Inc.?

A. I don't know what your question means.

Q. Did you ever open up a bank account for Universal Exotic Autos Inc.?

A. I think we -- yeah, of course, we had a bank account.

Q. Which bank?

A. I don't -- I don't remember all the way back then.

MR. KATAEV: Okay. We're going to call for the production of all banking records of Universal Exotic Autos Inc.

Q. Does Universal, which I'll refer to as Universal Exotic Autos Inc., does it continue to have any financial

119

A. D. DEO

activity in its accounts today?

A. No, we closed. We closed. We closed that place.

Q. You stopped operating that entity, correct?

A. We closed.

Q. Did you close all the bank accounts when you closed it?

A. I would -- I wouldn't assume so.

Q. You are not sure as you sit here today?

A. If the accounts are closed?

Q. Yes.

A. Yeah, the accounts are closed.

Q. Okay. After this dealership closed, what was the next dealership you worked at or operated?

A. I'm thinking we had a UEA Premier. I think that's the next -- the next one we opened.

Q. And UEA stands for Universal Exotic Auto, right?

A. It's kind of like an acronym.

Q. What was the reason Universal

120

A. D. DEO

Exotic Autos Inc. closed?

A. A reason, I can't remember the reason why we closed it.

Q. Were there any lawsuits involving Universal Exotic Autos Inc.?

A. Oh, I don't recall.

Q. You don't recall one way or the other, right?

A. I don't remember if there were any lawsuits.

Q. When did you open up UEA Premier?

A. Could you do that thing again?

Q. I'll refresh your recollection. No problem.

MR. KATAEV: Let the record reflect that I've placed up on the screen what will be marked as Deo 5. This is an entity information page from the New York State Department of State for UEA Premier Motors Corp.

---

30 (Pages 117 to 120)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

121

A. D. DEO

(Whereupon, Plaintiffs' Exhibit Deo 5, a two-page document, was marked for identification.)

- - -

Q. And the date of initial DOS filing is marked as September 12, 2014. Do you see that?

A. Yes.

Q. Does that refresh your recollection as to when this entity was opened?

A. It was opened, yes, on September 12, 2014.

Q. Why did you open up a separate entity to operate this dealership?

A. Ask that question again.

Q. Why did you open up a separate entity to operate this dealership?

A. Why did I open up this dealership?

Q. Yes. This corporate entity.

A. Okay. Just another dealership.

Q. Why wouldn't you continue using

122

A. D. DEO

Universal Exotic Autos Inc. to move here?

A. I don't recall the thought process at that time.

Q. Okay. You own UEA Premier together with your wife?

A. Again, I don't remember our corporate structure.

MR. KATAEV: I'm going to call for the production of all corporate formation documents for UEA Premier Motors Corp. I'll follow up in writing.

Q. Is this company -- dealership still active?

A. No. It's closed.

Q. When did it close?

A. 2017 when we opened up Northshore.

Q. What prompted you to close UEA Premier Motors Corp. and open up Northshore?

A. We closed 'cause we closed it. We closed UEA.

123

A. D. DEO

Q. Why did you close UEA?

A. We returned a DMV license.

Q. Why did you return it?

A. 'Cause we were requested to return it.

Q. On the DMV application that you submitted for Gold Coast Motors of Syosset LLC, you disclosed that, correct? You disclosed that you surrendered a DMV license before, correct?

A. Was UEA under me?

Q. I don't know. I'm asking you.

A. I said I don't recall.

Q. What were the circumstances under which you returned the DMV license for UEA?

A. We -- we built a very big operation, but we didn't have the right tools as in the right floor plan, the right banks to operate at that location.

Q. Who requested that you return the DMV license?

124

A. D. DEO

A. DMV.

Q. Why did they request that you return the DMV license?

A. Specifics, I don't recall.

Q. Were there e-mail communications about this subject?

A. With DMV, there's no e-mails with DMV.

Q. Were there a letter -- was there letter correspondence with the DMV about this subject?

A. I'm not sure if there was a letter.

Q. To the extent that you remain in possession, custody or control over any such documentation, I ask that you produce that information.

A. Sure.

Q. We'll follow up in writing.

A. Sure.

Q. At Universal Exotic, did you have any floor plan lenders?

A. At Universal at Deer Park, yes, we did.

31 (Pages 121 to 124)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

125

A. D. DEO

Q. Do you remember which?

A. No, no.  Specifically, no.

Q. Not focusing on Universal Exotic, in general, in your entire automotive industry career, which floor plan lenders have you worked with regardless of the entity?

A. That I've worked with?

Q. Yes.

A. NextGear, Ally, NMAC, Westlake. That's the ones I remember.

Q. Those are the only four that you remember?

A. That I remember right now.

Q. Could there be others that you just don't remember?

A. I mean, is there a possibility? Maybe.

Q. What are some of the other floor plan lenders that exist out there?

A. Oh, G-d.  There's a lot.  I don't recall every single one.

Q. Did you apply at other floor plan lenders other than these four?

126

A. D. DEO

A. I wouldn't remember right now.

Q. To the extent that you maintain records of any such applications, I ask that you preserve them.  I'm going to call for their production, and I'll follow up in writing.

A. Okay.

Q. Now, UEA Premier Motors Corp. operated from the get-go at 180 Michael Drive in Syosset, correct?

A. Yeah, that -- that -- when we signed the lease there, yes.  Yes.  To my knowledge, yes.

Q. And that's the same address that Northshore Motors operated from, correct?

A. Yes.  We transferred -- we assigned the lease to -- to Northshore.

Q. Okay.  Now, prior to Northshore Motor Leasing LLC, you opened up Northshore LLC, correct?

A. I don't know what that is.

Q. To your recollection, you never opened up an entity called Northshore

127

A. D. DEO

LLC, correct?

A. I don't know what that is.

Q. What about Northshore Funding and Management LLC?

A. Yes.

Q. When did you open that?

A. Exact time, I don't know when.

Q. What about the year?

A. I -- I don't know exactly what year.

Q. What was the purpose of opening up Northshore Management and Funding LLC?

A. Well, I mean, I know it wasn't a dealership.

Q. What was it?

A. I -- I don't recall the exact reason why.

Q. Which bank did you open an account with for Northshore Funding and Management LLC?

A. I think we had a bank account in -- in Bank of America.

Q. Other than Bank of America, was

128

A. D. DEO

there any other bank with which you had an account for Northshore Funding and Management LLC?

A. Not that I recall right now.

Q. Northshore Funding and Management LLC remains an open, active entity, correct?

A. I think so.

Q. I'm going to ask you to preserve all the bank statements that you have for that entity.  I'm going to call for their production.  I'll follow up in writing.

A. Sure.

Q. Northshore Funding and Management LLC opened after Northshore Motors LLC -- Northshore Motors Leasing LLC, correct?

A. I don't know the -- the time frame, no.

Q. What was the nature of the DMV's complaint with you that resulted in you being asked to rescind or surrender your DMV license there?

32 (Pages 125 to 128)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

129

A. D. DEO
A. Could you be a little bit more specific with your question?
Q. What was the reason the DMV asked you to return the DMV license?
A. For what?
Q. For UEA Premier Motors Corp.
A. The exact reason, I don't know. I know that we did, though.
Q. Did you ever inquire about it?
A. I'm sure at the time I knew.
Q. So you don't remember?
A. I don't recall exactly.
Q. When you opened up Northshore Motors Leasing LLC, did you apply for a DMV license?
A. Did I apply, no.
Q. And you didn't apply for a DMV license because you knew it would be denied over the history of UEA Premier Motors Corp., correct?
A. No. That's an assumption on your behalf.
Q. What was the reason you didn't apply for a DMV license with Northshore

130

A. D. DEO
Motors Leasing LLC?
A. Because Brian did.
Q. And when was the first time you met Brian?
A. It had to be 2018.
Q. And how did you first meet Brian?
A. How, I think either David introduced me to him 'cause I met David before Brian.
Q. And when you refer to Brian, you are referring to --
A. Chabrier. I'm sorry.
Q. When you refer to Brian, you're referring to Brian Chabrier, correct?
A. Chabrier, yes.
MR. KATAEV:
C-H-A-B-R-I-E-R.
Q. And when you refer to David, you're referring to David Baron, correct?
A. David Baron.
Q. How did you first meet David?
A. Asad Khan introduced me to

131

A. D. DEO
David.
Q. And how did you know Asad Khan?
A. I didn't know Asad Khan.
Q. Why did Asad Khan introduce you to David?
A. Because he said that they could supply us with floor plans and better interests floor plans and banks -- retail banks.
Q. When did you first meet Asad Khan?
A. I know it's before David.
Q. Where was Asad working at the time you met him?
A. I met Asad at -- there's a dealership in Copiague. I don't remember the name of the dealership in Copiague. I know I met him in Copiague. It's -- it's on Montauk Highway.
Q. Was it Steam Auto Outlet?
A. No, no.
Q. Is that dealership still open?
A. I don't know.

132

A. D. DEO
Q. What were the circumstances under which you met Asad Khan?
A. There's a -- Jim Collins introduced us.
Q. Who is Jim Collins?
A. He's a -- he used to work for KeyBank.
Q. Is it fair to say that Jim Collins at KeyBank dealt with floor plan lending or financing for vehicles?
A. I don't know if he did those things. I know he worked for KeyBank.
Q. He no longer works there, to your knowledge?
A. I don't know his whereabouts.
Q. When was the last time you ever spoke to Mr. Collins?
A. Oh, wow. Maybe 2018.
Q. Operating a dealership involves a lot of trust, correct?
A. I would guess.
Q. As an individual who operates a dealership, one of the responsibilities is to track vehicles and inventory,

33 (Pages 129 to 132)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

133

A. D. DEO

correct?

A. Repeat that question again, please.

MR. KATAEV:  Read it back, please.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

A. For somebody that operates to track vehicles?  I don't understand what you mean by that.

Q. Is it fair to say that someone who operates a dealership has to be knowledgeable about the status of the inventory of the vehicles?

A. Status of inventory, possibly, yeah.

Q. Possibly?

A. Yeah.

Q. Or definitely?

A. I mean, I -- you would be knowledgeable about it, I would say.

134

A. D. DEO

Q. You would have to be, right?

A. I mean, have to, I think you would be.

Q. Okay.  Another part of the responsibilities of an individual who operates a dealership is making sure deals get finalized, correct?

A. What -- what does that mean?

Q. For example, if you have a deal that requires financing for the customer, you have to take all the steps necessary to get the bank to approve the deal, correct?

A. Well, that's what your F and I manager does.

Q. Would it be fair to say that while you delegate that task to an F and I manager, the responsibility ultimately falls on the person operating the dealership?

A. That task is not delegated.

Q. So does the F and I manager do it, or does the operator of the dealership do it?

135

A. D. DEO

A. Do what?

Q. Make sure that deals get finalized with the bank?

A. Oh, that's the F and I manager.

Q. If the F and I manager fails to do it, is it fair to say that it's the responsibility of the operator of the dealership to make sure it gets done?

A. That's not fair to say.

Q. What happens if an F and I manager fails to do it?

A. Then the deal doesn't get done.

Q. Is it fair to say that the operator of a dealership has to make sure that the deals get done to the best of his or her abilities?

A. That's not necessarily a responsibility, no.

Q. Whose responsibility is it to make sure that prior loans on trade-in vehicles get paid off?

A. A controller.

Q. Is the operator of the dealership responsible for that?

136

A. D. DEO

A. The controller?

Q. Is the operator of the dealership responsible for ensuring that the controller pays off prior loans on a trade-in?

A. That's the controller's job.

Q. And if the controller fails to do it, what happens?

A. Then she fails at her job.

Q. And it's your position that the operator of the dealership is not responsible for that, correct?

A. I think that's the controller's job.

Q. Is it fair to say that the controller is someone that the operator of a dealership hires?

A. That's not fair to say.

Q. Is it fair to say that the operator of the dealership is responsible for supervising the controller?

A. That's not fair to say.

Q. What would you say are the

34  (Pages 133 to 136)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

137

A. D. DEO

responsibilities of an operator of a dealership?

A. I would say there's many different circumstances. Every dealership is different.

Q. In your experience with the dealerships that you've worked at that you operated, what were your responsibilities?

A. Ever? Are you talking about ever?

Q. In your experience, yes.

A. My forte is to purchase vehicles. I know how to source vehicles, advertise. I mean, help in running it.

Q. You play no role in selling vehicles?

A. I -- I wouldn't say I play no role in selling vehicles.

Q. But it's not your primary role?

A. I'm not a salesperson.

Q. Where did you learn to purchase, source vehicles and advertise them?

138

A. D. DEO

A. Self-taught.

Q. Can you explain to me what gray market vehicles are?

A. The first time I heard about that was from Tony with a problem we had with Chase.

Q. Tell me about that problem.

A. Chase, after the fact, deemed certain cars were gray market.

Q. You did not know about the term "gray market vehicles" before that problem?

A. I did not.

Q. What is your understanding of what a gray market vehicle is as you sit here today?

A. The major distinction that I recall we spoke about was that they were previously Canadian sold by the auction.

Q. Isn't it true -- isn't it true that when you purchase vehicles, there's a special notation that that specific vehicle is a gray market

139

A. D. DEO

vehicle?

A. No.

Q. To your knowledge, when you place a vehicle on a floor plan line of credit, is it your understanding that you make a representation that that vehicle is not a gray market vehicle?

A. No.

Q. Generally speaking, when a customer returns a vehicle or cancels a sale, is it fair to say that you have to go through the process of unwinding the deal?

A. The controller absolutely does.

Q. It's your -- withdrawn.

You never participated in the process of unwinding a deal, correct?

A. That's a controller's forte.

Q. To your knowledge, what happens if a deal is not unwound after it is returned or the sale is canceled?

A. It has to be unwind if the sale is canceled.

Q. And what happens if it's just

140

A. D. DEO

not unwound, if the controller fails?

A. If the controller fails at her job?

Q. Yes.

A. It has to get unwound.

Q. Do you know what would happen if a controller fails to unwind a deal?

A. I guess eventually it gets unwound.

Q. Have you ever directed a controller in any dealership that you operated not to unwind a deal?

A. No.

Q. Have you ever -- have you ever directed a controller at any dealership that you operated to hold off on unwinding a deal?

A. No.

Q. When you started -- when you started operating Northshore, did you operate any other dealerships at the same time?

A. Could you define operating?

Q. Being in charge of.

35 (Pages 137 to 140)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

141

A. D. DEO

A. Could you define being in charge of?

Q. Being responsible for running the operations of it.

A. So are you asking while Northshore was opened, was there -- from inception?

Q. From inception.

A. From inception, only Northshore.

Q. When did it come to be that you operated a dealership concurrently with Northshore?

A. Define that question a little bit more, please.

Q. When did it come to be that you operated more than one dealership?

A. Do you have a specific question, like --

Q. Did there come a time when you operated Northshore and Sunrise at the same time?

A. Yes. When we purchased 189 Sunrise in February 2021, we had Northshore and Sunrise going at the

142

A. D. DEO

same time.

Q. Before February of 2021, did you operate any other dealership other than Northshore?

A. Ever?

Q. At the same time as Northshore.

A. No, we only had Northshore.

Q. After February of 2021, is it fair to say that you operated Northshore and Sunrise concurrently?

A. Yeah, we had both dealerships.

Q. And that remained the case through the end of 2022, correct?

A. Wow. I don't know exactly when we closed both of them. Could have been when you guys returned the license without my permission.

Q. And when you refer to "you guys," who is that?

A. The IAG.

Q. When did IAG return the license?

A. I just said I didn't know when.

Q. Is it fair to say that you no longer operated Northshore or Sunrise

143

A. D. DEO

once the license was returned?

A. You can't -- you can't have a dealership if your -- if you don't have a DMV license.

Q. So it's fair to say then that once the license was returned, you no longer operated Northshore or Sunrise, correct?

A. I'm not understanding your question. But I would say you can't run a dealership without a license.

Q. Between the period of February 2021 and November 2022, did you operate any dealership other than Northshore or Sunrise?

A. Northshore and Sunrise was the only two dealerships that we owned. Yes, those are the only two dealerships we owned.

Q. How did you staff Northshore and Sunrise?

A. Ever?

Q. Let's start with yourself. When did you go to Northshore and when did

144

A. D. DEO

you go to Sunrise between the period of February '21 until November '22?

A. We opened Northshore in November 2017 and we bought Sunrise in February 2021.

Q. Okay. After February 2021 when you purchased Sunrise, how did you decide where you were going to be for the day on a daily basis?

A. It's -- it's day to day.

Q. There was no schedule?

A. Particular schedule, I don't -- I didn't make one for myself.

Q. Is it fair to say that you would decide which dealership to go to on a daily basis?

A. It's an independent decision, yes.

Q. When you were at Northshore, who did you make sure was present at Sunrise?

A. Wow. In 2021, who was there --

Q. At any time between February of 2021 until November of 2022.

36 (Pages 141 to 144)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

145

A. D. DEO

A. So then ask your question again.

Q. Between February of '21 until November of 2022, when you went to Northshore, who, if anyone, did you make sure was present at Sunrise?

A. At that point, we would have whichever salesperson or manager there.

Q. What are some of the names of the managers that you relied on?

A. At Sunrise -- you are asking for Sunrise, right?

Q. When you were at Northshore, who did you rely on at Sunrise?

A. Well, I mean, I could be anywhere.

Q. When you were at Northshore, who did you rely on to be at Sunrise?

A. Well, the managers, the managers of Sunrise.  We had a few.  I know one of the managers we had there was a Felix.

Q. What's Felix's last name?

A. I forgot his last name.

Q. Who else?

146

A. D. DEO

A. At one point, we had Eric.

Q. Last name?

A. Out -- Outclot.

Q. Spell it.

A. O-U-T and clot.

Q. Okay.

A. Managers.

Q. Besides Felix and Eric, anyone else?

A. That I recall, no.  I can't recall right this second.

Q. But there were others besides Felix and Eric, correct?

A. There may have.

Q. Do Felix and Eric continue to work with you?

A. No.

Q. When did you stop working with Felix?

A. Precisely when, I don't know.

Q. Has it been years?

A. Yes.

Q. What about Eric, when did you stop working with him?

147

A. D. DEO

A. Same thing.  I know it's years.  I don't know exactly when.

Q. What were the circumstances under which you stopped working with Felix?

A. I don't think he was performing his job properly.

Q. You terminated him?

A. Vaguely remember that.

Q. Did you replace him with Eric?

A. No.  No.  I think Felix came after Eric.

Q. When you were at Sunrise, who did you rely on to be present at Northshore?

A. You are asking the question like I'm putting someone over here.  Your question, it's -- it's -- doesn't make sense --

Q. I'll -- I'll walk back.
       Was there anyone that you placed in charge to make day-to-day decisions of when you were not present at one of the two dealerships or at least to call

148

A. D. DEO

you to let you know what's going on so you could make a decision?

A. Well, I mean, I had managers in place at both locations.

Q. Who were the managers at Northshore --

A. We had --

Q. -- who made those decisions while you were at Sunrise?

A. The managers at Northshore was -- Frank was a manager at Northshore.

Q. Frank Ventimiglia?

A. Yes.

Q. How did you meet him?

A. He interviewed.

Q. When you first opened Northshore?

A. No.  No.  No.  He came afterwards.  Yeah, he came afterwards.

Q. Do you still work with Frank?

A. No, I don't.

Q. What were the circumstances under which you stopped working

The Little Reporting Company
646.650.5055 | www.littlereporting.com

149

A. D. DEO

together?

A. Frank -- Frank left.

Q. He resigned on his own?

A. Yes.

Q. Any specific reason for his resignation?

A. He never told me.

Q. Was there any dispute about pay?

A. With Frank, I don't think so.

Q. At some point in time, you made a business deal with David Baron concerning the floor plan lender -- floor plan lending at Northshore and Sunrise, correct?

A. Could you clarify business deal?

Q. Did you have any agreement with David Baron about Northshore and Sunrise and the floor plan lending?

A. Well, I met David at Northshore.

Q. Okay.

A. And he agreed to provide us with the floor plan and banks.

Q. And what were the terms of your agreement with him?  What did he get in

150

A. D. DEO

exchange for him providing floor plan and banks?

A. Money.

Q. How much?

A. I think it was 15,000 per month.

Q. There was no percentage?

A. No, it was money.

Q. Was it as simple as every month you pay 15,000 and you have the availability of his floor plan lenders and banks?

A. Pretty much the substantive of it.

Q. How often did you meet with David?

A. I mean, we didn't -- David wasn't around that much, no.

Q. Did you consider yourself a friend of David?

A. A friend, I don't know if he was a friend.  He was a business -- business associate.

Q. Okay.  There came a point in time when you visited David at his home

151

A. D. DEO

in Florida, correct?

A. Yes.

Q. What was the reason you went to Florida to meet with David?

A. He asked me to come down and sign this contract.

Q. What contract?

A. The contract for Baron Nissan.

Q. You signed a contract then?

A. We both did.

Q. Where is that contract?

A. I believe it's part of our exhibits in my case against your parties.

Q. There was also a check for $250,000 in connection with that contract, correct?

A. I made out a check to them, yes.

Q. To your knowledge, was that check ever cashed?

A. Absolutely it was.

Q. When did you first meet Michael Morgan?

A. Michael Morgan, I met Michael

152

A. D. DEO

Morgan at Northshore.  Exactly when, I know -- I met him 'cause he sold warranties.

Q. Okay.

A. So he was the owner of the warranty company.

Q. And he was working with you at Northshore?

A. He was a vendor for Northshore, yes --

Q. And Sunrise as well?

A. I believe he was a vendor for Sunrise also.

Q. What were you going to say?  I interrupted you.

A. I think I said it.  I'm not sure.

Q. When you opened up Northshore, did you ever have an operating agreement for that entity?

A. Operating agreement, no.

MR. CIANCIULLI:  Was the answer to that question no?

THE WITNESS:  No.  When we

38  (Pages 149 to 152)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

153

A. D. DEO
opened it, no.
Q. There eventually came to be an operating agreement for Northshore, correct?
A. Which document are you referring to?
Q. I'll place it up on the screen.
MR. KATAEV:  This will be Deo 6.
- - -
(Whereupon, Plaintiffs' Exhibit Deo 6, a 12-page document, was marked for identification.)
- - -
Q. I'm presenting to you what will be marked as Deo 6, an operating agreement dated February 14, 2018. Mr. Deo, do you recognize this document?
A. Could I see the whole document?
Q. Sure.
MR. KATAEV:  Let the record reflect that I've gone through

154

A. D. DEO
all 12 pages of the document and scrolled through them and I've returned to page 11, which lists members information.
Q. Do you see that, Mr. Deo?
A. I see it.
Q. Having reviewed the entire document, at least giving it a cursory review, do you recognize the document?
A. I saw this document in the -- Judge Gianelli's case.
Q. Okay.  And what is your understanding about this operating agreement?
A. This operating agreement was created without my knowledge and consent.
Q. When you made a deal with David Baron to provide the floor plan -- to have him provide floor plan lending, did you agree with him that these three individuals would own Northshore Motors Leasing LLC?
A. That wasn't part of our

155

A. D. DEO
agreement.
Q. Did you reduce your agreement to a writing?
A. What does that mean?
Q. When you and David Baron made a deal to provide floor plan lending in exchange for $15,000 a month, did you have an agreement in writing on the subject?
A. We didn't have a writing.
Q. And your deal with him was to provide floor plan lending for a number of years while Northshore Motors Leasing LLC operated, correct?
A. I mean, in our agreement, we didn't -- I don't specifically remember us putting a time frame on it.
Q. Well, it wasn't a month-to-month deal, was it?
A. What do you mean by "month-to-month"?
Q. You wanted to have this deal for a period of more than one year at least, right?

156

A. D. DEO
A. Oh, you mean like to cancel every month, no, it wasn't a month to month.
Q. It was not a month to month, correct?
A. Yes.
Q. It was a relationship that was supposed to last at least more than a year, correct?
A. I mean, if we're successful, I mean, the relationship should continue.
Q. Okay.  It was your intention for the relationship to go for more than a year, correct?
Assuming it was successful, it was your intention for the deal to last for more than a year?
A. For my relationship with David, sure.
Q. And your relationship with David Baron and that deal did last more than one year, correct?
A. Yeah.
Q. But you never signed any

39 (Pages 153 to 156)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

157

A. D. DEO

contract with him for this -- for this deal that you made with him?

A. I don't think that we had a -- like a written contract.

Q. Okay. Before this operating agreement, who were the members of Northshore?

A. My wife and myself.

Q. Do you recall the percentages?

A. As I said, we didn't have an official operating agreement.

Q. Did you open up Northshore Motors Leasing LLC by yourself or with the help of an attorney?

A. I know we -- we hired somebody. I don't think I opened that one up on my own.

Q. Have you ever opened up a limited liability company by yourself?

A. Are you talking about on the New York State websites?

Q. In general. In any way. Through a website --

A. I've -- I've opened up entities

158

A. D. DEO

on the New York State website, yes.

Q. When was the first time you did that?

A. Wow. I don't remember the first time I did it, no.

MR. KATAEV: I'm going to call for the production of all organization documents of Northshore Motor Leasing LLC. I'll follow up in writing.

Q. To your knowledge, did Northshore Motor Leasing LLC ever apply for pandemic relief loans?

A. Yes.

Q. Were you involved in that process?

A. I know after David died, I -- I applied for the EIDL.

Q. Was that the only pandemic-relief-related loan you applied for?

A. No. We applied for 189 also.

Q. Were those the only two pandemic relief loans you applied for?

A. That I remember.

159

A. D. DEO

Q. Now, you were involved in the process of applying for both, correct?

A. Well, Wendy and Tom Jones were working on that.

Q. Did you, personally, prepare any paperwork for it?

A. No, that was Wendy and Tom.

Q. But you signed an application for the loan, right?

A. I'm sure I would have had to.

Q. Do you know who between Wendy and Mr. Jones prepared the paperwork?

A. As I said, both of them were working on it at the same time.

Q. Do you recall who, if anyone, presented you with the document for signature?

A. I don't remember exactly who showed it to me.

Q. Prior to signing it, did you make sure all the information listed on the application was true and accurate?

A. I mean, my basic information.

Q. Other than your basic

160

A. D. DEO

information, you did not make sure that the information on the application was true and accurate?

A. No. I depended on their expertise.

Q. Now, you and David Baron never shared ownership of Northshore, correct?

A. No.

Q. To your knowledge, David Baron never had any ownership over Northshore Motors -- Northshore Motor Leasing LLC, correct?

A. Not rightfully.

Q. When Mr. Baron wrongfully took ownership over Northshore, what was your understanding as to his percentage of ownership?

A. I don't understand that question.

Q. I'll present to you what's been marked as Deo 7.

- - -

(Whereupon, Plaintiffs'

40 (Pages 157 to 160)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

161

A. D. DEO

Exhibit Deo 7, a five-page document, was marked for identification.)

---

Q. This is a disaster loan assistance loan application dated May 26, 2021, correct?

A. Where is the date?

Q. Top left.

A. Oh, I can't see that.

Q. I'll make it bigger.

A. Yes, that's May 26, 2021.

Q. Now, it says here that you have an application number and that you will be notified through the e-mail address that you submitted, anthonyd@northshoremotors1.com, when we were processing your application, correct?

A. Yes.

Q. That's your e-mail address, correct?

A. That's my e-mail address.

Q. Scrolling down to page 2,

162

A. D. DEO

there's a summary of the information on the loan, correct, loan application?

A. Where do you want me to read?

Q. Starting with the business legal name and trade name?

A. Yes, yes. Okay.

Q. The legal name and trade name of the entity is Northshore Motor Leasing LLC, correct?

A. Yes.

Q. And to your memory, is that the tax ID?

A. Oh, I don't remember the tax ID offhand.

Q. The gross revenues listed for the 12-month period prior to January 31, 2020 has an excess of $19 million, correct?

A. That's what it says there.

Q. To your knowledge, is that number accurate?

A. I wouldn't -- I wouldn't know.

Q. Who did you rely on to provide that information?

163

A. D. DEO

A. Wendy and Tom.

Q. And the business address at 180 Michael Drive is where Northshore operated from, correct?

A. Yes.

Q. And the business phone, whose number is that?

A. I don't specifically recall, but I think that's the office number.

Q. And there's your e-mail address, correct?

A. That is my e-mail address.

Q. Now, it has date business established and current ownership dates, and they are both February 14, 2018, correct?

A. Yes.

Q. And the business activity is automative sales, right?

A. Automative sales, yes.

Q. Then it has a section called business owners information. Do you see that?

A. Yes.

164

A. D. DEO

Q. It has your name listed there, right?

A. Yes.

Q. And that's your cell phone number, isn't it?

A. Yes.

Q. And your e-mail, correct?

A. That's my e-mail.

Q. The ownership percent listed is 50 percent. Do you see that?

A. I do see that.

Q. And it says here that --

A. Why?

Q. -- at the time you were living on Saddle Ridge Road, correct?

A. Yes, that's my address. That's in 2021. Yes.

Q. Now, in the next section, under additional information, it asks for the individual and company that prepared this loan application. Do you see that?

A. Uh-huh. Yes. Yes. I'm sorry. Yes.

41 (Pages 161 to 164)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 44 of 351 PageID #: 13847

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

165

A. D. DEO

Q. And what is the name of the -- what is the name of the individual and the company that prepared this loan application?

A. Tom Jones, CPA; Jones, Little & Company, CPA, LLP.

Q. And those are your accountants, aren't they?

MR. CIANCIULLI: Can the witness please keep his voice up.

THE WITNESS: Oh, I'm sorry.

THE VIDEOGRAPHER: It's not that. That's my microphone. The Zoom one is over there.

MR. KATAEV: You want to speak into this one.

THE WITNESS: Oh, I'm sorry.

MR. KATAEV: Just speak up so that --

THE WITNESS: Okay.

Q. Those are your accountants, correct?

A. Tom Jones, yes.

Q. Okay. When did you first start

166

A. D. DEO

working with Tom Jones?

A. I'm not a hundred percent sure, but I think -- I think Tom -- 2020. It could be 2020.

Q. Who was your accountant when you had Universal Exotic Autos?

A. Oh, I can't recall.

Q. What about UAE [sic] Premier?

A. I can't recall.

Q. Okay. How did you meet Jones?

A. Frank introduced me to Mr. Jones.

Q. Did Frank --

A. Frank Ventimiglia. I'm sorry. Ventimiglia.

MR. KATAEV: V-E-N-T-I-M-I-G-L-I-A. Ventimiglia.

Q. Did Frank also introduce you to Mr. Thomasson?

A. Yes.

Q. Who else did Frank introduce you to?

A. His son.

167

A. D. DEO

Q. What is his son's name?

A. Tommy.

Q. Tommy Ventimiglia?

A. Yes.

Q. Is Tommy Ventimiglia in the automobile dealership business?

A. The last I know, he -- he used to pitch for San Diego.

Q. Okay. He doesn't work in the automotive industry, to your knowledge?

A. I don't -- I don't know.

Q. At the time that this loan application was made in May of 2021, Thomas Jones was your accountant for over a year, correct?

A. Well, I don't know precisely over a year, but I know I met him in 2020. Like this is 2021, May. I don't know if it's over a year.

Q. Okay. To your knowledge, who prepared your 2020 tax returns for yourself and/or your companies?

A. Prepared the 2020 tax returns, that was Citrin Cooperman.

168

A. D. DEO

Q. Who did you work with at Citrin Cooperman?

A. I didn't work with anyone at Citrin. You guys introduced me to Citrin.

Q. Understood.

Now, did Citrin Cooperman also prepare your personal tax returns?

A. My personal, no. Tom prepared my personal.

Q. For 2020, correct?

A. Yes.

Q. And earlier, when you said "you guys introduced me to Citrin" --

A. IAG. Oh, I'm sorry. Finish your question.

Q. -- you're referring to Island Auto Group, correct?

A. Yes.

Q. Okay. It says here that Jones charged you $200 to process this loan application for you, correct?

A. Fee charged or agreed upon, that's what it says.

42 (Pages 165 to 168)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

169

A. D. DEO

Q. Do you have a record of paying Mr. Jones $200 for this loan application?

A. I don't recall.

MR. KATAEV:  I'm going to call for the production of all payments to Jones, Little & Co., CPA's, LLP and Thomas Jones, CPA by Mr. Deo and any of his entities.  I'll follow up in writing.

Q. You electronically signed this loan application, correct?

A. Could I see?  Where?

Q. This e-mail references a signed loan application, correct?

A. Where?

Q. It says loan application, doesn't it?

A. It says loan application.

Q. And you recall electronically signing this loan application, correct?

A. I don't recall signing electronically this loan application.

170

A. D. DEO

Q. You deny signing this application?

A. That wasn't your question.

Q. Mr. Jones submitted this application on your behalf, correct?

A. Is that what it says at the bottom?

Q. I'm asking you.

A. Could we scroll to the bottom?

Q. Sure.

MR. KATAEV:  Let the record reflect that we went to the second page.

A. Scroll up.  All right.  Make it a little bigger so I could read it.

MR. KATAEV:  Let the record reflect that I've complied with the witness's requests.

Q. Oh, bigger.

A. I mean, it doesn't say who actually submitted it.

Q. But you recall that Mr. Jones submitted it on your behalf, correct?

A. I recall that it was submitted.

171

A. D. DEO

I don't recall the details.

Q. Mr. Baron passed away on May 25, 2021, correct?

A. Sadly, yes.

Q. This application was required to be signed by David Baron as well, correct?

A. I don't know that.

Q. This application with David's signature was submitted on the day after he died, correct?

A. I -- I don't know that information.

Q. Do you know how this was submitted with Mr. Baron's electronic signature the day after he died?

A. As I said, I don't know that information.

Q. Did you cause this loan application to be submitted the day after he died?

MR. KATAEV:  Was there -- off the record.

- - -

172

A. D. DEO

(Whereupon, an off-the-record discussion was held at this time.)

- - -

MR. KATAEV:  Read it back, please.  Back on the record.

- - -

(Whereupon, the referred-to question was read back by the stenographer.)

- - -

A. No.

Q. If you did not submit this loan application, who did?

A. I don't recall how it was submitted or when it was submitted.

Q. This loan application conflicts with your statements in this lawsuit that you are the 100 percent owner of Northshore, correct?

Focusing on the --

THE STENOGRAPHER:  We don't have an answer.

MR. KATAEV:  Oh, I'm sorry.

43 (Pages 169 to 172)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 46 of 351 PageID #: 13849

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

173

A. D. DEO
Q. Answer the question, please.
A. Repeat the question, please.
    MR. KATAEV:  Read it back, please.
         - - -
    (Whereupon, the referred-to question was read back by the stenographer.)
         - - -
A. Incorrect.
Q. How do you reconcile your position and statements that you are the 100 percent owner of Northshore when there's a loan application listing you and David as 50/50 owners?
A. I'm looking at something you're showing me.  I don't know where this came about.
Q. Didn't you testify earlier today that you recall this application?
A. I didn't say that.
Q. You're denying that you made this application?
A. I recall a application -- an

174

A. D. DEO
application.  I don't recall seeing this.
Q. Are you saying that there's a different application?
A. I don't know.  I don't know this.
Q. This third page -- I'm sorry, this fifth page references that the name of the signer is David Baron, correct?
A. What I am looking at, it says name of signer, David Baron.
Q. Now, we all agree that David Baron could not have signed this application on May 26, 2021, correct?
A. David passed away on the 25th.
Q. So he could not sign this, correct?
A. He could not.
Q. If Mr. Baron did not sign this application, is it fair to say that you did?
A. No.
Q. If Mr. Baron didn't sign this

175

A. D. DEO
because he passed away and you didn't sign it because you deny signing it, who signed it?
A. Where is it signed?
Q. It says that there is an electronic signature.
A. Where?
Q. On the submission page over here and below.
A. I didn't see it.  I didn't --
Q. To your knowledge -- to your knowledge, did $196,425 get wired into this account listed here ending in 9988?
A. And specifically when?
Q. Any time after May 26th of 2021.
A. No.
Q. You -- you know that for a fact?
A. That that money wasn't wired into that account?
Q. Yes.
A. No.
Q. Is that the account number for Northshore Motor Leasing LLC?

176

A. D. DEO
A. Off the top of my head, I'm not sure.
Q. There's a reference here in red with an arrow that this is a Chase account.  Do you see that?
A. I see that.
Q. Do you recall that the account ending in 9988 is a Chase account?
A. Of the top of my head, no.
Q. When you operated Northshore, did Northshore have a bank account with Chase?
A. Yes.  We had a few.  See what conflicts is when I put in my application, it wasn't for that amount.
Q. What was the amount that you put in an application for?
A. To my recollection, I think it was 500,000.
Q. Okay.  Did you --
A. And I spoke to Wendy Kwun about that too.
Q. Did you receive a loan for 500,000?

44 (Pages 173 to 176)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

177

A. D. DEO

A. No, we didn't.

Q. Did you receive any portion of the amount requested as a loan?

A. We didn't get any EIDL loans, no.

Q. Are you saying that you submitted a separate application with a signature for that $500,000 loan?

A. Say that again. I'm sorry.

Q. Did you sign a separate application for $500,000?

A. I recall -- I recall the amount we applied for, and it does not line up with the application you are showing me.

MR. KATAEV: Okay. We're going to call for the production of that application and any other related documents to that loan application. We'll follow up in writing.

A. Sure.

Q. Now, the date of ownership listed here, February 14, 2018, that's

178

A. D. DEO

the same date as the operating agreement we just looked at, right?

A. I would have to see the operating agreement again.

MR. KATAEV: Let the record reflect that we've gone to that operating agreement on the second page.

Q. Do you see the date of the operating agreement?

A. Excuse me. February 14th.

MR. KATAEV: For the record, that's Deo 6.

Q. I'm sorry. What did you say?

A. February 14, 2018.

Q. That's the same date listed as in the application here, correct?

A. The dates match.

Q. Did you choose this date?

A. Could you scroll down a little bit?

Q. Sure.

A. Okay.

Q. More?

179

A. D. DEO

A. No, that's fine.

Q. Did you choose this date?

A. I didn't choose the date.

Q. How was Jones paid for the services rendered to you and any dealerships you operate or any other companies for that matter?

A. Checks. I would assume checks.

Q. Has Mr. -- has Mr. Jones and his accounting firm always been paid by check?

A. Absolutely, yeah. To my recollection, yes.

Q. You never paid Mr. Jones in cash?

A. No.

MR. KATAEV: We're going to call for the production -- I think we already did. I'll withdraw that.

Q. After David Baron died, you claim that you were added as the 100 percent owner of Northshore in October or November of 2022, correct?

180

A. D. DEO

A. I disagree with that statement.

Q. What do you disagree with specifically?

A. Your entire statement.

Q. You never said that you were added as a hundred percent owner of Northshore after David Baron died?

A. Your question is a little bit confusing.

Q. I'll withdraw the question.

MR. KATAEV: Let's take a break now. Five minutes.

THE VIDEOGRAPHER: We're going off the record. The time is 1:14 p.m. This is the end of Media No. 4.

- - -

(Whereupon, a recess was taken at this time.)

- - -

THE VIDEOGRAPHER: We are back on the record. The time is 1:28 p.m. This is the start of Media No. 5.

45 (Pages 177 to 180)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

181

A. D. DEO

Q. Mr. Deo, you stated during off-the-record discussion that you wish to provide some additional testimony about page 5 of the loan application, which I believe is Deo 7.

A. I asked to see this page.

Q. Is there anything that you want to testify about now that you've seen it?

THE WITNESS: Could I say what I asked? I don't know.

A. I wanted to see if that amount ever hit the Chase Bank accounts.

Q. Did you have an opportunity to do that?

A. What's that?

Q. Did you have an opportunity to do that?

A. What do you mean? No, I want -- I don't have the bank statements.

Q. Okay. So I'm going to move on to my next question.

There came a time in August of 2022 that you applied to open up a bank

182

A. D. DEO

account for Northshore with Flushing Bank, correct?

A. I opened an account with Northshore with Flushing. I don't remember the exact time.

Q. In order to open up a bank account for Northshore with Flushing Bank or any bank, you had to provide information about the specific company, right?

A. You would have to provide information, yes.

Q. And you did, in fact, provide that information, right?

A. To Flushing Bank, yes.

MR. KATAEV: Placed on the screen what will be marked as Deo 8. It's a single-page document Bates stamped Flushing 8. And it starts with an e-mail from Robert Puccio to yourself and Mr. Michael Laurie, L-A-U-R-I-E, dated August 18, 2022.

- - -

183

A. D. DEO

(Whereupon, Plaintiffs' Exhibit Deo 8, a document, was marked for identification.)

- - -

Q. Do you see that?

A. Yes.

Q. In this e-mail, Mr. Puccio sends you a link for an express bank loan. Do you see that?

A. Yes.

Q. Do you recall receiving this e-mail?

A. I don't recall, but it was sent to me, yes.

Q. Okay. And the subject's e-mail is LOC link, right?

A. Yes.

Q. What does LOC stand for?

A. Line of credit, I would assume.

Q. Is it fair to say from your review of this e-mail that you were seeking to obtain a line of credit from Flushing Bank?

A. Yes.

184

A. D. DEO

Q. Do you recall which dealership this was for at the time you applied?

A. No.

Q. How did you meet Mr. Puccio?

A. Mr. Laurie introduced me to him.

Q. To your knowledge, how does Mr. Laurie know Mr. Puccio?

A. Oh, I -- I wouldn't know that.

Q. Did you ever meet with Mr. Puccio face-to-face?

A. I met Mr. Puccio.

Q. How many times?

A. Once, maybe twice. He came to the location.

Q. He came to the location --

A. Northshore. I'm sorry. I'm sorry. I'm sorry.

Q. When you say he came to Northshore, are you referring to a site visit for purposes of the loan?

A. The purpose of his visit, I'm not a hundred percent sure, but he came to Northshore. I know that.

Q. To your knowledge, did

46 (Pages 181 to 184)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

185

A. D. DEO

Mr. Puccio come to Northshore to observe its operations?

A. I -- I don't recall why he came precisely.

Q. How long did Mr. Puccio remain at Northshore when he visited it?

A. Oh, wow.  I wouldn't know.

Q. Were you present on the day that he was there?

A. He met with me.

Q. How long did he meet with you?

A. You just asked that.  I said I didn't know exactly how long.

Q. Was that the only time you ever met with him face-to-face?

A. As I said, it could have been once or twice.

Q. But more than twice, cannot be, right?

A. I -- I don't think it was more than twice.

Q. With respect to the second time he visited you -- withdrawn.

With respect to the second time

186

A. D. DEO

you met with him face-to-face, was that in connection with the visit to Sunrise?

A. I -- I don't recall the purpose of his visit.

Q. Do you recall both meetings were at Northshore?

A. I would say I assume, yes.

Q. Is there any reason why Mr. Puccio would not visit you at Sunrise?

A. I -- I -- I don't know how to answer that question.

Q. Okay.  I'm scrolling up in the e-mail.  The following day in the morning, Mr. Puccio e-mailed yourself and Mr. Laurie with a request for certain documents, correct?

A. Could you stop moving it, please?

Q. I'm sorry?

A. You were -- I'm trying to read it.

Okay.  Okay.  The documents,

187

A. D. DEO

yes.

Q. He did request documents from you, correct?

A. Yes, that's what it says there.

Q. Did you do that?

A. I'm sure I did.

Q. And you, personally, did that, right?

A. Personally send him documents -- I'm not sure if you had to upload it or if you e-mailed it.  I'm not sure.

Q. Okay.  I'm going to show you what will be marked as Deo 9.  I'll represent to you that it is an e-mail chain spanning two pages, Bates stamped Flushing 15 through Flushing 16.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 9, a two-page document, was marked for identification.)

- - -

Q. Do you see that?

A. Yes.

188

A. D. DEO

Q. Now, on the bottom, the August 18th e-mail, that's the e-mail that we just looked at, right?  In Flushing 8, Deo 8.  It has the same link?

A. The e-mail we just looked at requested documents.  Is that what you're referring to?

Q. I'm going back to Deo 8 and just showing you.  This e-mail at the bottom --

A. Okay.

Q. -- is the same as this e-mail in Deo 9, correct?  Is that right?

A. Are you scrolling?  Is it the same paper?  I --

Q. This is Deo 8.

A. Okay.

Q. You see the August 18th e-mail at 11:25 a.m.?

A. Yes.

Q. And then this is Deo 9.  You see the same e-mail?

A. August 18th, yes, it's -- looks

47 (Pages 185 to 188)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 50 of 351 PageID #: 13853
SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

189

A. D. DEO

the same.

Q. Okay. In response to that e-mail on August 23rd at 1:42 p.m. in 2022 --

A. Okay.

Q. -- you sent an e-mail saying, "Both applications have been uploaded with all supporting documents," correct?

A. Yes.

Q. And you sent these documents for the purpose of getting the loan in August of 2022, correct?

A. I was applying for a line of credit.

Q. For Northshore, right?

A. Well, it says "both applications" there.

Q. For Northshore and Sunrise, correct?

A. Possibly.

Q. Reviewing Deo 9, at Flushing 15, Mr. Puccio responded to your e-mail the same day at 2:05 p.m., correct?

190

A. D. DEO

A. Is that the same -- no, it's not the same day.

MR. KATAEV: Let the record reflect that I scrolled down to Mr. Deo's e-mail of August 23, 2022.

Q. Do you see that?

A. Oh, okay. Yes.

Q. And he responded to you the same day, correct?

A. Yes.

Q. He provided you with additional instructions for both applications, correct?

A. Yes.

Q. Did you ultimately obtain a loan from Flushing Bank for Sunrise?

A. I don't think I received a loan for Sunrise.

Q. Why is that?

A. I don't recall the -- the reason.

Q. Mr. Puccio provided you the reason via e-mail, didn't he?

191

A. D. DEO

A. I don't recall the reason.

Q. Referring back to Deo 9 and Flushing 15, this is an e-mail sent later in the day on August 23, 2022 from Mr. Puccio to yourself and Mr. Laurie, correct?

A. It's from Mr. Puccio to -- yes.

Q. In the first paragraph, Mr. Puccio explains why Sunrise does not qualify for a loan, correct?

A. Yes, it showed losses.

Q. He then states in the following paragraph that due to the fact you did not own the company Northshore in 2019, he will need 2020 and '21 tax returns for business and personal. Do you see that?

A. Yes.

Q. You never disputed the fact that you did not own Northshore in 2019, correct?

A. Where did you see that?

Q. I'm asking you. Do you remember disputing that?

192

A. D. DEO

A. With who?

Q. With Mr. Puccio.

A. I don't recall what our conversation was about that particular event.

Q. Just to be clear, your position and statements in this action, including today, are that you have been the owner of Northshore since its inception, correct?

A. Yes.

Q. Mr. Puccio here says that you were not the owner in 2019, correct?

A. That's what he stated.

Q. Did you respond to him and correct him?

A. I mean, is there another e-mail?

Q. I'm asking based on your memory. Do you remember responding to him and correcting him?

A. I don't remember our conversation after that.

Q. You were unable to initially get the loan for Northshore because of UCC

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

193

A. D. DEO

liens from Ally, correct?

A. I remember something like that.

Q. But you got them removed, right?

A. Me, personally, no.

Q. What did you do in order to have it removed?

A. I know my attorney contacted Ally.

Q. And by your attorney, you are referring to Mr. Thomasson?

A. Yes.

Q. Do you know what Mr. Thomasson said to Ally?

A. In particular, no, but I know that they complied and removed the UCCs immediately.

Q. Do you know why they removed the UCCs?

A. I wouldn't know why Ally did.

Q. To your knowledge, what did Mr. Thomasson say to Ally to have the UCC liens removed?

A. As I said, I don't know the particulars of what he said to them.

194

A. D. DEO

Q. Did Mr. Thomasson know what to do to get it removed or you instructed him?

A. I don't understand your question.

Q. Did you instruct Mr. Thomasson on what to tell Ally in order to have the liens removed?

A. I didn't tell him what to say.

MR. KATAEV:  Okay.  I'll place on the screen what will be marked as Deo Exhibit 10.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 10, an 18-page document, was marked for identification.)

- - -

Q. I'll represent to you that this is ECF Docket Entry 30 in this case. And it's a sworn declaration by you. Do you see that?

A. Yes.

Q. Focusing your attention on

195

A. D. DEO

paragraph 6, please read it, and let me know when you are ready for me to scroll.

A. Okay.

Okay.

Q. Have you had an opportunity to read paragraph 6 in full?

A. Yes.

Q. Is it fair to say that based on this paragraph in your declaration, you are claiming that you became a 100 percent owner of Northshore again in November of 2022?

A. Repeat that question.  I'm sorry.

Q. Is it fair to say based on this sworn statement in your declaration that you became a 100 percent owner of Northshore after November of 2022?

MR. THOMASSON:  Objection. I object as to form.

You may answer, if you understand.

A. Yeah, I don't understand your

196

A. D. DEO

question.

Q. Is it fair to say from the statement in paragraph 6 that you are claiming you became a 100 percent owner of Northshore again in November of 2022?

A. That's not what that says.

MR. THOMASSON:  I repeat my objection.

Q. You state -- you state in here that you were mistakenly not being listed as the owners of Northshore and Sunrise on tax returns, correct?

A. Yes, that's what it says.

Q. Okay.  And because you are not being listed as the owner of Northshore and Sunrise on tax returns, other individuals were listed as the owners on those tax returns, correct?

A. You are making an assumption there, but...

Q. I'm just reading what you wrote and trying to understand it.

A. I am also.

49 (Pages 193 to 196)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

197

A. D. DEO

Q. Do you understand what you wrote here?

A. Yeah.

Q. So what did you write here?

A. That I and my wife were mistakenly not being listed as owners.

Q. So --

A. That's all it states.

Q. Okay.  So if you and your wife were mistakenly not being listed as the owners, who were listed as the owners?

A. I know now it was Asad, Brian and David.

Q. Okay.  So my question is:  Since Asad, Brian and David were listed as the owners on the tax returns, and this was fixed in November 2022, you became the owner again in November of 2022, correct?

A. I disagree with that statement.

MR. THOMASSON:  Objection as to form.

Q. In November of 2022, a dispute arose between yourself and Island Auto

198

A. D. DEO

Group, correct?

A. Yes.

Q. As a result of that dispute, Island Auto Group removed files and other documents from the dealership at 180 Michael Drive in Syosset, correct?

A. I disagree with that statement.

Q. What happened in November of 2022 with Island Auto Group?

A. Is there a particular time or a particular incident?

Q. Is it fair to say that you've repeatedly stated in court that files were removed?

A. Yes.

Q. Tell me about that incident. What happened?

A. I mean, I don't know exactly the time frame, but Island removed all the files, folders, documents from the building.

Q. And did that happen because there was a dispute between you and Island Auto Group?

199

A. D. DEO

A. I don't think they removed it 'cause of a dispute.

Q. Why do you think they removed it?

A. I wouldn't know.

Q. Is it fair to say at least that as a result of their removing those files, a dispute arose between you and Island Auto Group?

A. That wasn't the only cause of our dispute.

Q. What were the causes of your dispute with Island Auto Group?

A. As I know now from these depositions, Josh Aaronson logging in with David Baron's login 18 months after he passed away to remove $735,000 from the Chase Bank accounts of 189 Sunrise illegally.

Q. That happened in November of 2022, correct?

A. That happened in November '18.

Q. Did the removal of the 735,000 happen before or after the files were

200

A. D. DEO

removed?

A. I don't know.  I don't know the specific date the files were removed.

Q. Okay.  I'm going to show you what's going to be marked as Deo Exhibit 11.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 11, a 192-page document, was marked for identification.)

- - -

Q. I'll represent to you that this is your complaint filed in Nassau County Supreme Court against Island Auto Group and a host of other defendants.  Do you recognize this document?

A. Yes, of course.

Q. Okay.  I'm going to focus your attention on paragraph 128 of this complaint.  Please read it.  Let me know when you are done.

A. Okay.

50 (Pages 197 to 200)

201

A. D. DEO

Q. This describes what happened in your dispute with Island Auto Group, correct?

A. This described the event you're talking about where they took all the documents, yes.

Q. Is it fair to say that as a result of this happening, Northshore ceased operating as a dealership from that time?

A. Northshore was shuttered and ruined.

Q. And what?

A. Shuttered and ruined.

Q. And ruined.
Northshore never operated again since November 2022, correct?

A. What do you mean "operated"?

Q. Northshore didn't operate as a dealership ever since November of 2022, correct?

A. You didn't describe what "operated" means.

Q. Function as a dealership.

202

A. D. DEO

A. You want to clarify?

Q. Did Northshore buy vehicles since November 2022?

A. Yes, I believe so.

Q. Did Northshore sell vehicles since November 2022?

A. I would assume so.

Q. Northshore did not sell vehicles in a retail environment since November of 2022, correct?

A. I'm not a hundred percent sure, but I'll go with what you're saying.

Q. You were not physically present at 180 Michael Drive since November 2022, correct?

A. Time frame?

Q. Anytime after November 2022 when the events in paragraph 128 occurred. After that?

A. Did I ever go to Northshore? Is that what you are asking?

Q. Did you have customers in Northshore after November 2022 physically in person?

203

A. D. DEO

A. Are you talking about 180 Michael Drive?

Q. Yes.

A. Yes, I'm sure there were customers at 180 Michael Drive, yes.

Q. After November 2022?

A. Yeah. 'Cause I still had the lease.

Q. What did customers tell you when they came to an empty dealership?

A. You are assuming something.

Q. Where did you obtain vehicles after all the vehicles were removed?

A. I had a floor plan.

Q. With?

A. For Northshore, it was Westlake.

Q. And you continued purchasing vehicles using the floor plan with Westlake?

A. I purchased vehicles with Westlake, yes.

Q. And when did you do that?

A. Precisely when, I don't know.

Q. You have statements that you

204

A. D. DEO

received from Westlake every time you purchased vehicles using their floor plan line, correct?

A. Yeah, there were monthly statements.

MR. KATAEV: I'm going to call for the production of all monthly statements from Westlake and any other statements from Westlake. We'll follow up in writing.

A. Sure.

MR. KATAEV: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 1:54 p.m. This is end of Media No. 5.

- - -

(Whereupon, a lunch break was taken at this time.)

- - -

THE VIDEOGRAPHER: We're back on the record. The time is

51 (Pages 201 to 204)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

205

A. D. DEO

2:47 p.m.  This is the start of Media No. 6.

Q. You're familiar with the concept of warranty advances, right?

A. Warranty advance, yes.

Q. Explain to me, how does a warranty advance work?

A. With a warranty provider, you sign up with them, and they advance you funds.  And every warranty you sell, a portion of that goes to pay back the loan.

Q. Do you know how much of the portion goes back?

A. It depends on whatever contract you sign with the warranty provider.

Q. We just got back from a lunch break, correct?

A. Yes.

Q. During the lunch break, did you discuss your testimony with your attorney?

A. No.

Q. During your lunch break, did you

206

A. D. DEO

have any conversation with Mr. Thomasson?

A. No.

Q. In order to obtain a warranty advance, you have to fill out a form and sign an agreement, correct?

A. Yes.

Q. After you sign an agreement, when are the funds issued for the warranty advance?

A. Oh, that's -- it's determined by the warranty vendor.

Q. Is it fair to say that until the warranty vendor signs the contract, you will not be paid the advance?

A. Are you asking about a fully executed contract?

Q. Yes.

A. Yes.

Q. So it doesn't matter when you sign it, it matters when the warranty vendor signs it, correct?

A. Yes, it has to be fully executed.

207

A. D. DEO

MR. KATAEV:  Okay.  So let the record reflect that both Plaintiffs Joshua Aaronson and Brian Chabrier have joined the deposition.

Brian, just mute yourself, please.

MR. CHABRIER:  Oh, I'm sorry.

MR. RUDERMAN:  Brian, can you mute yourself.

MR. CHABRIER:  I'm sorry?

MR. RUDERMAN:  Can you mute yourself.  There's a little microphone --

MR. CHABRIER:  I'm sorry. I'll just go off.

MR. RUDERMAN:  There's a little microphone.  There you go.

Q. Did you sell any warranties in December of 2022 after Northshore -- after the issue at Northshore in November of 2022?

A. For which company?

208

A. D. DEO

Q. Northshore.

A. I think we did.

Q. You have records of the warranties you sold after November of 2022?

A. I have no records.

Q. Why is that?

A. I don't.

Q. Well, you claimed that you don't have records because Island Auto Group took all your records in November of 2022, right?

A. No.  It's -- it's online.  It's online access.

Q. Okay.  Do you have login credentials?

A. I don't.

Q. Which vendors did you obtain warranty advances from for Northshore?

A. NMAC.  I'm sorry, it's not NMAC.

Q. NESNA, N-E-S-N-A, correct?

A. Yes, N-E-S-N-A.

Q. How do you know that you don't have any documentation of warranty

The Little Reporting Company
646.650.5055 | www.littlereporting.com

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 55 of 351 PageID #: 13858

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

209

A. D. DEO
advances with NESNA?
A. Repeat that question.
Q. How do you know that you don't have any documentation of warranty advances with NESNA?
A. I didn't say that.
Q. As you sit here today, are you in possession of any documentation concerning warranty advances for NESNA?
A. I have a contract.
Q. Other than the contract, do you have other documentation concerning funds received and funds paid back?
A. I -- not to my knowledge.
Q. When you obtained a warranty advance for Sunrise through NESNA --
A. Yes.
Q. -- what bank account did the warranty advance go to?
A. I don't recall exactly which account.
MR. KATAEV: We're going to call for production of all documents and communications with

210

A. D. DEO
NESNA. We'll follow up in writing.
Q. Is it fair to say that because of your falling out with Island Auto Group, you were unable to sell warranties at the same pace as you previously could have?
A. That's an assumption.
Q. Is that the case? Is that what happened?
A. I don't agree with that assumption.
Q. You testified earlier today that after November 2022, you continued to sell vehicles at Northshore and Sunrise, correct?
A. Am I supposed to assume that what you are saying is what I said earlier?
Q. I want you to tell me. Did you sell vehicles after November 2022 at Northshore and Sunrise?
A. Yes.
Q. Okay. Where do you maintain the

211

A. D. DEO
deal jackets for all sales that you made after November 2022 for Northshore and Sunrise?
A. I think at that time, we put the deals through Superb.
Q. Okay. So is it fair to say that any vehicle you sold at Northshore or Sunrise should be maintained by Superb?
A. Are you asking about deal jackets?
Q. Yes.
A. The deal jackets should be with Superb, yes.
Q. Okay. There are no other deal jackets at Northshore or Sunrise other than those at Superb, correct?
A. Not that I recall.
Q. Because you were selling vehicles from Northshore and Sunrise out of Superb following November 2022, you did not maintain any deal jackets on the premises of Northshore or Sunrise, correct?
A. Repeat that question again,

212

A. D. DEO
please.
MR. KATAEV: Read it back, please.
- - -
(Whereupon, the referred-to question was read back by the stenographer.)
- - -
A. I'm not -- I'm not sure how to answer that question, but we -- we did keep everything at Sunrise -- not Sunrise, Superb I think.
Q. And as we sit here today, to your knowledge, who has access to those deal jackets, you or Tony?
A. At Superb?
Q. Yes.
A. Tony.
Q. So you are no longer in possession of any of the deal jackets following any sale that happened after November 2022, correct?
A. I don't have any, no.
Q. Is it fair to say that NESNA

53 (Pages 209 to 212)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

213

A. D. DEO
continuously contacted you following the warranty advances you obtained in June of '23 to have those warranty advances paid back?
A. We had conversations, yes.
Q. What were the conversations that you had?
A. To -- well, they knew that I was working -- they knew that we were at Superb.  So I spoke to Tony about putting together a game plan on how I could pay back the warranty advances that I took prior.
Q. And what is it that you and Tony agreed to?
A. That I could put some through my advance and on his advance.
Q. Okay.  And when you say "some," how much?
A. Specifics, I don't recall, but I know he told me that there was a specific number that Superb needed to show every month.
Q. Are there any text messages

214

A. D. DEO
between you and Tony talking about how to resolve this issue with NESNA seeking payment for the warranty advance?
A. I don't recall if there was text messages.
Q. Are there any e-mails between you and Tony on this subject?
A. I don't recall if it was e-mails, texts or phone call.
Q. Is there anything in writing containing your agreement with Tony about how to pay back NESNA for the advances you took at Superb?
A. At this point, I don't know if there's anything in writing.  I'm not sure.
Q. You would agree with me that in order to pay back NESNA, you would need to secure Tony's permission to do that, correct?
A. We had an agreement.
Q. What was your agreement?
A. That we would work out how to do

215

A. D. DEO
this.  Tony knew I had an advance from my days with Northshore and 189.
Q. Did he specifically authorize you to pay any specific amount?
A. Specific amounts, no.
Q. Okay.  Tell me about the first time you met with Tony.
A. Face-to-face, I met Tony in November of 2022.
Q. And you met with Tony one time prior to that, didn't you?
A. Not that I recall.
Q. Okay.  What happened in your meeting with Tony in November of 2022?  Let's start off with who was present?
A. Myself, Tony and Michael Laurie.
Q. Okay.  And what did you -- what did the three of you discuss at the November 2022 meeting?
A. Specifics, I'm not sure, but we were putting a deal together.
Q. And that deal culminated in the cross purchase agreement, correct?
A. Yes.

216

A. D. DEO
Q. Is it fair to say that Laurie led the conversation?
A. I don't agree with that statement.
Q. Is it fair to say that Laurie was involved with you in operating Northshore and Sunrise?
A. I don't agree with that statement.
Q. Is it fair to say that Laurie was involved in operating Superb with you after you started working there?
A. Not -- no.
Q. Did you discuss anything about Joshua Aaronson at that November '22 -- 2022 meeting?
A. About Josh, I'm sure, yeah.
Q. What, if anything, do you recall discussing with Tony about Joshua Aaronson at the November 2022 meeting?
A. Specifics, I wouldn't be able to tell you.
Q. You never mentioned the existence of any lawsuits with Josh

54 (Pages 213 to 216)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

217

A. D. DEO

Aaronson at your November 2022 meeting with Tony, correct?

MR. THOMASSON: Objection as to form.

Q. You can answer.

A. I don't know if any lawsuits existed.

Q. Okay.

A. At that time. I don't remember.

Q. You signed the cross purchase agreement on December 1, 2022, correct?

A. That's when we effectuated that cross purchase agreement, yes.

Q. And the lawsuit that Island Auto Group filed against you was filed on December 6, 2022, correct?

A. If that's what you're saying, I'll take your word for it.

Q. Are you aware of a temporary restraining order that was issued in that lawsuit?

A. I am aware of that.

Q. There was a temporary restraining order issued by the

218

A. D. DEO

Honorable Justice Gianelli, correct?

A. Yes.

Q. I'm going to refer to the temporary restraining order as a TRO. Okay?

A. Okay.

Q. That TRO prohibited you from encumbering Northshore and Sunrise including the purchase of vehicles, correct?

A. I don't remember.

MR. THOMASSON: Objection. The document would speak -- the TRO would speak for itself.

Q. You can speak -- you can answer.

MR. THOMASSON: How can he summarize what the judge did?

MR. KATAEV: Excuse me. Look at Rule 30. You made your objection. If you're going to instruct the witness not to answer, you could do that, otherwise the deposition proceeds.

219

A. D. DEO

MR. THOMASSON: Document speaks for itself.

Q. The TRO prohibited you from encumbering Northshore and Sunrise, including purchasing vehicles, correct?

A. I -- I don't remember the terms of the TRO.

Q. Okay. The -- the TRO prohibited you from removing any funds from Northshore and Sunrise, correct?

A. I don't remember the terms of the TRO.

MR. KATAEV: Let the record reflect that I've placed up on the screen what will be marked as Deo 12. It's Docket Entry 42 in the Island Auto Group versus Deo matter, Index No. 617224 of 2022.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 12, a four-page document, was marked for identification.)

- - -

220

A. D. DEO

Q. Mr. Deo, this is the order to show cause with temporary restraints that Justice Gianelli issued, correct?

A. Order to show cause, yes.

Q. At the bottom, this is Justice Gianelli's signature on that order, correct?

A. I'm assuming it is, yes.

Q. Focusing your attention on page 3 of where I've highlighted the document, it says that pending a hearing and determination of this motion, Deo or anyone acting on his behalf are enjoined and restrained from the following acts, right?

A. Yes, yes, that's what it says.

Q. Under subsection A, it says that you cannot take any action to sell, lease, transfer, pledge or otherwise encumber the assets of Northshore and Sunrise, including any motor vehicles, correct?

A. Yes.

Q. It also says in subsection C

55 (Pages 217 to 220)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

221

A. D. DEO

that you cannot remove any funds, correct?

A. Yes.

Q. From Northshore and Sunrise from its bank accounts or other location where funds are located, correct?

A. Yes.

Q. It says that you can't use the assets of Northshore and Sunrise to pay for the cost of defending this lawsuit, correct?

A. Yes.

Q. And it also prohibits you from concealing, transferring, altering, modifying, destroying or disposing in any manner of any assets of Northshore and Sunrise, correct?

A. Yes.

Q. Okay. You were aware of this order at the time it was issued, correct?

A. Yes.

Q. And that order went into effect on December 14, 2022, correct?

222

A. D. DEO

A. Is that what it said?

Q. It's dated as of --

A. Yes.

Q. -- December 14th, right?

Now, there came a time when this order was vacated, right?

A. Yes.

Q. In or about June of 2023, right?

A. Yes.

Q. In the middle of June?

A. Yes.

Q. Okay. So you agree with me then that between December 14th until the middle of June 2023, you were not allowed to do those acts, right?

A. The TRO was in effect.

Q. You were not allowed to do those acts, correct?

A. The TRO was in effect.

Q. Does the fact that the TRO was in effect mean that you cannot do those acts?

A. I knew that the TRO was in effect.

223

A. D. DEO

Q. Does that mean that you were not allowed to do those acts?

A. The TRO was in effect.

Q. Mr. Deo, if you refuse to answer questions that are asked of you, it's only going to result in an order requiring you to come back.

MR. BENJAMIN: Objection. He answered the question.

A. I thought I --

Q. I implore you --

MR. BENJAMIN: Objection. He answered the question.

Q. I implore you to answer the question.

Does the fact that the TRO was in effect mean that you knew you were not allowed to do those acts?

MR. BENJAMIN: Objection as to his legal conclusion as to a court order, but -- and also that he's answered it three times already.

Q. You can answer.

224

A. D. DEO

A. My answer remains the same.

MR. KATAEV: Okay. We'll move for appropriate relief with the Court.

Q. Going back to the TRO, you were also prohibited from using any license issued in the name of Chabrier, Aaronson or Baron to conduct any business of Northshore and Sunrise, correct?

A. That's what it says there.

Q. Now, you testified earlier that the Island Auto Group plaintiffs in this case wrongfully revoked the DMV license for Northshore and Sunrise, right?

A. I didn't use the word "revoke."

Q. What word did you use?

A. Surrendered.

Q. You testified earlier that the Island Auto Group plaintiffs in this case surrendered the DMV license for Northshore and Sunrise, correct?

A. Yes.

56 (Pages 221 to 224)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

225

A. D. DEO

Q. When did they do that?

A. I told you before, I didn't know exactly when.

Q. In February 2023, you applied for bank accounts with Flushing Bank for both Northshore and Sunrise, correct?

A. I'm not sure of the dates.

Q. I'm going to show you what will be marked as Deo 13.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 13, a 32-page document, was marked for identification.)

- - -

Q. I'll represent to you that this is a 32-page exhibit, Bates stamped Flushing 105 to Flushing 136.

Do you recognize this document?

A. It's an e-mail from me to Rob -- yes, Flushing, account opening requirements -- account opening requirements.

226

A. D. DEO

Q. And in this e-mail on February 27th of '23, you write to, among others, Robert Puccio at Flushing, "Please find all the documents needed to open new accounts for both companies attached," right?

A. Yes, that's what it says.

Q. And you included a copy of the employer identification number for Northshore, a 2021 K-1, your driver's license, lease documents, operating agreements, filing receipts and licenses, correct?

A. Yes.

Q. Now, in order to send these documents, you forwarded an e-mail that you previously exchanged with Signature Bank, correct?

A. Is that somewhere -- oh, Signature Bank.  I don't understand what you just did there.

Q. I'm --

A. This is Signature Bank.

Q. Right.

227

A. D. DEO

A. And this is --

Q. This is a February 2023 e-mail at the top.  And this is how it was produced from Flushing.  It appears to me that you forwarded this e-mail.

A. I -- it would say forward.

THE VIDEOGRAPHER:  Your microphone.

THE WITNESS:  Oh, I'm sorry. Is this better?

THE VIDEOGRAPHER:  Yeah.

Q. Setting aside whether it was forwarded or not, this e-mail here from November 2022 is an exchange between yourself, Laurie and Signature Bank, correct?

A. This was Signature Bank, yes.

Q. In November 2022, do you recall applying or seeking to open bank accounts at Signature Bank for Northshore and Sunrise?

A. For Signature Bank, account opening requirements, it would be safe to assume, yes.

228

A. D. DEO

Q. Did you ever end up opening a bank account with Signature?

A. Yes, I did.

Q. Why is it that you opened up bank accounts with Flushing after having opened one with Signature and previously working with Bank of America or Chase?

A. It's my right.

Q. You open four different bank accounts for the same entities because it's your right?

A. Is there anything that prohibits that?

Q. That's not my question.

My question is:  Why did you do it?

A. Because it's my right.  I could.

Q. That's your only explanation for opening up four different bank -- bank accounts for four --

A. Well, you're --

Q. -- entities?

MR. BENJAMIN:  Objection.

57 (Pages 225 to 228)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

229

A. D. DEO

But you can answer.

A. I mean, you're asking me why I chose different banks to open up accounts, I am saying 'cause it's your right.

Q. After you opened up with Signature, did you cease using the prior bank?

A. What is the prior bank?

Q. Before you opened up the bank account with Signature in November of 2022, you were using a different bank, correct?

A. Oh, yeah.

Q. What bank was that?

A. Chase.

Q. Okay.  You also used Bank of America, correct?

A. For Northshore, no.

Q. You used Bank of America for Car Buyers?

A. Bank of America was Car Buyers.

Q. So you have no specific explanation for why you needed bank

230

A. D. DEO

accounts with Chase, Signature, and Flushing for Northshore, correct?

MR. BENJAMIN:  Just note my objection.

A. Well, Chase locked me out of the accounts.

Q. Okay.  And what about Signature, do they -- do they still work with you?

A. Signature does.

Q. Did any other bank ever lock you out of the accounts?

A. Not like Chase, no.

Q. What was the reason Chase locked you out of their accounts -- out of your account?

A. You would have -- you would have to ask Chase.

Q. Did you ask Chase?

A. I did.

Q. What did they tell you?

A. They said speak to legal.

Q. Did you speak to legal?

A. We tried.

Q. You never got a response?

231

A. D. DEO

A. Not -- no.

Q. Is it fair to say that the reason why this e-mail chain with Signature is present in the e-mail chain with Flushing is because you forwarded the same documents to Flushing that you did for Signature?

A. You asked that question before.  I answered it.  I said I don't know how you got it in this order.

Q. In this November 21st e-mail on page 3 of Deo 13, Robert tells Jessica that you were referred to him by Laurie, correct?

A. Referred to me by Michael Laurie, yes.

Q. Is that Laurie's role in Northshore, referring you to different banks that you can work with?

A. That was no role.

Q. Why was Laurie referring you to different banks?

A. These are the bank -- these are the banks that he knew.

232

A. D. DEO

Q. How did he know these banks?

A. You would have to ask Mr. Laurie.

Q. Did you ask him to refer you to these banks?

A. I didn't ask him to refer me to these banks.

Q. Why did he refer these banks to you?

A. Again, you would have to ask Mr. Laurie.

Q. What -- what was Laurie's role at Northshore?

A. Mr. Laurie had no role, per se, at Northshore.

Q. What, if anything, did Laurie do for you at Northshore?

A. Michael didn't do anything at Northshore.

Q. Starting on page 12 of Deo 13, there's an operating agreement for Northshore Motor Leasing LLC, correct?

A. Yes.

Q. Who created this operating

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

233

A. D. DEO
agreement?
A. Me.
Q. You did it yourself?
A. Yes.
Q. You didn't use an attorney?
A. No.
Q. Mr. Thomasson didn't help you with this?
A. No.
Q. Where did you obtain this operating agreement template?
A. Online.
Q. Focusing on page 17 of Deo 13. On this page, you state that as of June 15, 2020, Northshore was owned 99 percent by you and 1 percent by Sarah, correct?
A. That's what it says, yes.
Q. So is it fair to say that you only had an ownership interest in Northshore as of June 15, 2020?
A. That's what this operating agreement -- this operating agreement says that it's from June 15th.

234

A. D. DEO
Q. This operating agreement does not say that you are an owner of Northshore since its inception in 2017, correct?
A. This operating agreement talks about June 15, 2020.
Q. Why is that you own 99 percent here and Sarah owns only 1 percent?
A. I don't understand your question.
Q. Why did you have it set up with you owning 99 percent and Sarah owning 1 percent?
A. 'Cause that's the way it was.
Q. Why was it that way?
A. I -- I don't understand that question.
Q. Why was it set up this way?
A. 'Cause -- because it's an LLC, it can't be a hundred percent.
Q. Owned by you?
A. Yeah, by one person.
Q. Who told you that?
A. Citrin Cooperman. It's in that

235

A. D. DEO
e-mail chain.
Q. You had discussions with Citrin Cooperman about the makeup of the LLC members?
A. I didn't have discussions with Citrin Cooperman. I was part of an e-mail chain.
Q. With who?
A. It was Ellen Kera, Frank Gallagher from Citrin Cooperman, Theresa Maltz from Citrin Cooperman, Josh Aaronson from Island Auto Group, Wendy Kwun from Island Auto Group, Tom Jones from Jones and Little, and myself.
Q. Did you create this operating agreement for the sole purpose of obtaining pandemic relief funds?
A. Where does it say that?
Q. I'm asking you. Is that the reason why it was created?
A. No. The operating agreement was created 'cause an operating agreement was needed -- made.

236

A. D. DEO
Q. You didn't create this operating agreement because of the desire to obtain pandemic relief funds?
MR. BENJAMIN: Objection. You can answer.
A. I don't know how you're making that relation.
Q. I'm just asking you. Is that the case?
A. I said I don't know how you're making that relation.
Q. It's not your business how I'm making the relation. It's your business to answer the question. My question is: Did you make this operating agreement for the purpose of obtaining pandemic relief funds --
A. No.
Q. -- yes or no?
A. No.
Q. Okay. Focusing on page 19 of Deo 13. This is a K-1 of Northshore, correct?

59 (Pages 233 to 236)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

237

A. D. DEO

A. Yes, it is.

Q. You don't have a K-1 from 2020 like this, do you?

A. I do have a K-1 from 2020.

Q. Listing you as 99 percent owner?

A. Yes.

MR. KATAEV: Okay. We're going to call for the production of all K-1s in which you have an ownership interest in Northshore from 2017 through the present.

Q. What about 2019, do you have a K-1 like this for 2019?

A. No, I don't.

Q. What about 2018?

A. No, I don't.

Q. What about 2017?

A. I don't think one was produced in 2017.

Q. There was no financial activity in 2017?

A. I'm not sure of financial activity in 2017.

Q. We're going to provide you

238

A. D. DEO

prefilled 4506-T forms to get tax transcripts for all these years.

A. Sure.

Q. I'm going to request that you have them signed and returned to us. We'll follow up in writing.

A. Absolutely.

Q. Focusing on page 26 of Deo 13. This is an operating agreement for 189 Sunrise Hwy Auto LLC, correct?

A. Yes.

Q. And in the name of this particular LLC, highway is spelled H-W-Y, correct?

A. Yes.

Q. This operating agreement is identical to the operating agreement we just looked at for Northshore except for the name, correct?

A. I didn't read through the entire document.

Q. You created this operating agreement just like you created the one for Northshore, correct?

239

A. D. DEO

A. I created this one also.

Q. And you didn't have the help of any attorney, correct?

A. No, I didn't.

Q. The date of the operating agreement for Sunrise is February 15, 2021, correct?

A. Yes, that's what it says.

Q. And you have the same ownership makeup here, 99 percent you, and 1 percent your wife, correct?

A. Yes.

Q. Okay. Do you recall submitting a personal financial statement to Flushing Bank?

A. Yes.

Q. Have you ever had $657,000 in personal accounts?

A. Have I ever had, yes.

Q. Where were those funds from?

MR. BENJAMIN: Objection. Are you referencing a certain document, Counsel?

MR. KATAEV: I'm just

240

A. D. DEO

asking.

Q. Where were the funds from when you had that much money in your account?

A. That's a very difficult question to ask.

Q. Why is it a difficult question?

A. I don't know when, time, anything. You are asking me to source every dollar of $655,000?

Q. So the answer is you don't know?

A. Repeat your question.

Q. Let me pull this up. Give me a quick second. I'm getting another exhibit.

MR. KATAEV: I'm going to mark as Deo 14 another operating agreement.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 14, a six-page document, was marked for identification.)

- - -

60 (Pages 237 to 240)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

241

A. D. DEO

Q. This is another operating agreement for Northshore Motor Leasing LLC, correct?

A. It's an operating agreement, yes.

Q. This has the same format as the other operating agreement we looked at, correct?

A. It looks similar.

MR. KATAEV:  Let the record reflect that I am scrolling through the pages.  I'll also represent that this operating agreement is Bates stamped Flushing 8508 through Flushing 8513.

Q. Focusing on the fifth or sixth page of this operating agreement.  This one lists you as the 100 percent owner of Northshore as of June 15, 2020, correct?

A. That's what it says.

Q. That's the same date as the other operating agreement we just

242

A. D. DEO

looked at, correct?

A. Yes.

Q. Which one is the correct one, the hundred percent one or the 99 plus 1?

A. I don't know how to answer that question.

Q. You don't know --

A. I don't know what you are asking.

Q. I'm asking you which operating agreement controls?

A. I --

Q. I'm going to ask you an existential question first.

It can't be both, right?

A. I -- I disagree.

Q. It could either be a hundred percent owned by you or it could be 99 percent owned by you, correct?

A. Well, the other owner is my wife.

Q. But if you are the hundred percent owner, there is no other owner,

243

A. D. DEO

correct?

A. You are comparing it to another document.

Q. I'm showing you a signed document by you.  Do you deny signing this?

A. That's my signature.

Q. Okay.  So I'm asking you which one controls?

A. I don't understand that question.

Q. Which operating agreement is the effective operating agreement?  Is the one where you put a hundred percent or it's the one where you put 99 plus 1?

A. Again, in my interpretation, Sarah is my wife, so I don't see the difference.

Q. Okay.  Do you know why this was changed from 99 and 1 to a hundred?

A. I don't remember why, no.

Q. Do you remember Robert Puccio reaching out to you, telling you that it has to be changed from 99 plus 1 to

244

A. D. DEO

100?

A. I don't remember.

Q. Going back to the personal financial statement we were discussing, do you remember listing notes receivable from Northshore and Sunrise as assets on your personal statement?

A. Do you have the document?

Q. I'm asking you if you remember?

A. I don't remember what the document had on it.

Q. Do you remember listing Northshore, Sunrise as well as Gold Coast Motors of Syosset and Gold Coast Motors of Sunrise as 100 percent owned by in a personal financial statement?

A. I don't remember the actual document.

Q. Do you remember listing four pieces of real property on your personal financial statement?

A. I don't remember the document.

Q. Okay.  When you moved from Dix Hills to Huntington -- sorry,

61 (Pages 241 to 244)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

245

A. D. DEO
withdrawn.
When you moved from Dix Hills to Old Westbury, you sold the Dix Hills property, correct?
A. No.
Q. You claimed that you're an owner of Superb Motors Inc., correct?
A. I am an owner.
Q. You claim that you are a 100 percent owner of Superb, correct?
A. Where did you find that?
Q. Do you claim that you are a hundred percent owner of Superb?
A. That I'm a hundred percent owner, no.
Q. What is your percentage of ownership?
A. 49 percent.
Q. It will be incorrect to list yourself as a hundred percent owner, correct?
A. You are assuming something.
Q. Would it be incorrect for you to do that?

246

A. D. DEO
A. You asked the question the same way --
MR. BENJAMIN: Objection to form. Listing him where?
MR. KATAEV: Anywhere.
Q. You did not list your own --
THE STENOGRAPHER: I don't have an answer.
Q. Can you answer the question, please.
MR. KATAEV: Read it back.
- - -
(Whereupon, the referred-to question was read back by the stenographer.)
- - -
A. Yeah, I don't know how to answer that question.
Q. In the personal financial statement you submitted to Flushing as of March 1, 2023, you did not list Superb Motors as a closely held entity that you own, correct?
A. Again, I don't know the -- are

247

A. D. DEO
you looking at a document?
Q. I'm asking you whether you've ever listed Superb on any personal financial statement?
A. I don't remember.
Q. Okay. Are you currently an owner of the Dix Hills, Huntington property?
A. My wife and I, yes.
Q. Do you pay property taxes at that property?
A. Yes, we do.
Q. Do you have a mortgage on that property?
A. Yes, we do.
Q. Who lives there?
A. Currently?
Q. Yes.
A. We are doing repairs.
Q. What is the address of the property that you own in Bronx?
THE STENOGRAPHER: Counsel, we have an open question.
MR. KATAEV: Let's repeat it

248

A. D. DEO
so he doesn't -- so he answers it.
- - -
(Whereupon, the referred-to question was read back by the stenographer.)
- - -
A. I own several properties in the Bronx in my time.
Q. Okay. Own, past tense?
A. Owned, yeah. I don't own anything in the Bronx anymore.
Q. Okay. I want to focus your attention to February 2023.
A. February 2023. Okay.
Q. At that time, you were operating Superb, correct?
A. February 2023, yes, I was in -- I was in Superb.
Q. There was an incident in which several vehicles were double floored between Superb and Northshore or Sunrise, correct?
A. Could you give me specifics?

62 (Pages 245 to 248)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 65 of 351 PageID #: 13868

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

249

A. D. DEO

Q. I'm asking you, do you remember?

A. I don't recall.

My feet. I'm sorry.

MR. BENJAMIN: You want to get up?

THE WITNESS: No, it's fine. My feet hurt.

MR. KATAEV: I'm placing on the screen what's been marked as Deo 15.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 15, a 15-page document, was marked for identification.)

- - -

Q. I'll represent to you that this is an e-mail exchange.

A. Can you make it bigger?

Okay.

Q. This is an e-mail between you, Alysia and Tony, correct?

A. Yes.

Q. Scrolling down, there is a list

250

A. D. DEO

of six vehicles that appeared on a double-flooring report from NMAC, correct?

A. Yes.

Q. Nancy from NMAC says, "Please follow up with the dealership to resolve the potential double floorings," correct?

A. That's what it says, yes.

Q. Reviewing this e-mail, do you recall the February 2023 incident that I was referring to?

A. From this e-mail.

Q. Do you remember?

A. I said from this e-mail. I'm reading it now.

Q. Yes. Based on your reading of this e-mail, do you remember this incident occurring?

A. Vague memory, yes.

Q. Tony confronted you about this incident, correct?

A. Confronted me?

Q. Yes.

251

A. D. DEO

A. I don't remember a confrontation.

Q. Tony discussed this issue with you, correct?

A. He would have discussed it with his CFO that was flooring cars that she wasn't supposed to.

Q. You're denying that Tony spoke to you about this?

A. We spoke. I didn't deny that.

Q. What did you and Tony speak about when this occurred?

A. How are we going to rectify this.

Q. And what did you say to him and what did he say to you?

A. Alysia needs to pay me for these cars, if they were Sunrise cars.

Q. I'm going to show you what will be marked as Deo 16.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 16, a nine-page document, was marked for

252

A. D. DEO

identification.)

- - -

Q. It's a declaration from Tony, ECF Docket Entry 50-1.

Focusing your attention on paragraph 6. Tony declared in this declaration that when he confronted you about the double-floored vehicles, you informed him that Joshua Aaronson owned the DMV licenses for Northshore and Sunrise, explained that you were bleeding out financially and that you were waiting on Laurie to fund a $1 million working capital loan to recapitalize Northshore, Sunrise and Superb. Do you see that?

A. I see -- I read it.

Q. Is this true?

A. I don't recall this conversation with Tony.

Q. Do you deny stating these statements to Tony in that conversation?

A. Yes.

63 (Pages 249 to 252)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

253

A. D. DEO

Q. Were you working on obtaining a $1 million working capital loan to recapitalize Northshore and Sunrise and Superb?

A. We were working -- I mean, did he have a time frame on this?

Q. This was submitted on September 20, 2023. And it was in relation to the February 2023 double-flooring incident?

A. At various times, I was working on obtaining working capital. I don't know if it's specifically that time period.

Q. Is it fair to say that the $1 million in working capital loans were the loans you were trying to obtain from Flushing at $500,000 a piece for Sunrise and Northshore?

A. I -- I don't know the particulars.

Q. After this incident, Tony had a conversation with you and asked you to focus exclusively on Superb, not

254

A. D. DEO

Sunrise or Northshore, correct?

A. I don't remember.

Do you mind if I stand up for a little bit, please?

Q. Sure.

MR. BENJAMIN: Stand up a little bit.

MR. KATAEV: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 3:40 p.m. This is the end of Media No. 6.

- - -

(Whereupon, an off-the-record discussion was held at this time.)

- - -

THE VIDEOGRAPHER: We're back on the record. The time is 3:42 p.m. This is the start of Media No. 7.

Q. Focusing on the February 2023 double-flooring incident, are you

255

A. D. DEO

denying that you told Tony that because Joshua Aaronson was holding the DMV license -- licenses hostage, you couldn't transfer his ownership interest in Northshore and Sunrise?

A. I don't recall that conversation.

Q. Let's go to Deo 17.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 17, a seven-page document, was marked for identification.)

- - -

Q. This is your DMV application, correct?

A. Application coding sheet.

Q. The facility name is listed as Gold Coast Motors of Sunrise LLC, correct?

A. That's what it says, yes.

Q. And the owner of the corporation is listed as you, correct?

A. Yes.

256

A. D. DEO

Q. I'm going to scroll down to page 7 of this application. You signed it on February 22, 2023, correct?

A. Yes.

Q. Going back up to page 5. Focusing your attention on part 3, box D. It asks, "Have you or any person named in this application been convicted of or forfeited bail for any misdemeanor or felony at any time?" Do you see that?

A. Yes.

Q. Your answer was no, correct?

A. Yes.

Q. That answer was false, correct?

A. Incorrect.

Q. Why was that answer true?

A. What I put there?

Q. Yes.

A. It's because of my conversation -- oh, am I allowed to talk about my conversation with my lawyer?

Q. The same conversation you previously referenced, correct?

64 (Pages 253 to 256)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

257

A. D. DEO

A. I'm not sure if I previously referenced it. But it was because of a conversation I had with my lawyer, that I felt that I could click that box.

Q. Focusing your attention to page 3 of this application, you checked off that this was for a limited liability company, correct?

A. Yes.

Q. And you listed yourself as 100 percent owner of the stock --

A. Yes.

Q. -- of Gold Coast Motors of Sunrise, correct?

A. Yes.

Q. And that's as of February 22, 2023, right?

A. That's when the application was done, I think.

Q. Did there come a time when that was not the case, that you were a hundred percent owner of Gold Coast Motors of Sunrise?

A. Repeat that.

258

A. D. DEO

Q. Did there come a time when that was no longer the case, that you were the 100 percent owner of Gold Coast Motors of Sunrise?

A. Yes.

Q. When was that?

A. I transferred ownership to my son.

Q. What was the percentage that you transferred?

A. I can't recall the specifics.

Q. The application that I showed you, you submitted the same exact application for Gold Coast Motors of Syosset, correct?

A. I would have to see it.

Q. You testified earlier that you submitted two applications, didn't you?

A. I did say I submitted two applications, yes.

Q. The second application was for Gold Coast Motors of Syosset, correct?

A. I had another application for Gold Coast Motors of Syosset, yes.

259

A. D. DEO

Q. In that application, did you list yourself as a hundred percent owner?

A. I would have to see the application.

Q. You don't remember?

A. Not offhand.

Q. Are you currently the 100 percent owner of Gold Coast Motors of Syosset?

A. No. Oh, no, I transferred that to my son.

Q. Your son, Efaz Deo?

A. Efaz.

Q. When did you transfer your ownership interest in Gold Coast Motors of Syosset and Gold Coast Motors of Sunrise to Efaz?

A. Wow. Specific time frame -- what are we, in '25, I think -- I think '25.

Q. This year, this past year?

A. Either '24 or '25. Specifically, I can't tell you.

260

A. D. DEO

Q. Prior to the time that any interest was transferred to Efaz, were you the hundred percent owner of both?

A. Yes.

Q. And that never changed, other than the transfer to Efaz?

A. No.

Q. Okay. Why did you transfer your interest in Gold Coast Motors of Sunrise LLC and Gold Coast Motors of Syosset LLC to Efaz in '24 or '25?

A. Because of everything that's going on here with these cases.

Q. It's fair --

A. And --

Q. Go ahead.

A. Let me finish, please.

And my son wanted to be in the business. I had two licenses. Why not? Instead of him having to apply for brand-new licenses.

Q. Okay. Is it fair to say that you transferred your licenses to Efaz to avoid any order or judgment that

65 (Pages 257 to 260)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

261

A. D. DEO

might come down the pike?
A. That's not --
MR. BENJAMIN: Objection.
You can answer.
A. I mean, I told you why I transferred it.
Q. When you said "everything that's going on," what does that mean?
A. Well, I mean all these cases. I haven't --
Q. He --
A. He wanted to be in the business. There's a bad taste in my mouth.
Q. Hang on.
Okay. I'm showing you what will be marked as Deo 18. This is an operating agreement for Gold Coast Motors of Syosset LLC, correct?
A. Yes.
- - -
(Whereupon, Plaintiffs' Exhibit Deo 18, a 14-page document, was marked for identification.)

262

A. D. DEO
- - -
Q. And this has the same format as the other operating agreements that you prepared, correct?
A. Yes.
Q. So you drafted this operating agreement, correct?
A. Yes.
Q. And no attorney helped you draft it, correct?
A. No.
Q. Thomasson was not involved in drafting this operating agreement, correct?
A. No.
MR. KATAEV: Let the record reflect that I've scrolled through the 14 pages of this operating agreement to the last page titled Certification of Members.
Q. Do you see that?
A. Yes.
Q. This operating agreement lists

263

A. D. DEO

yourself as a 20 percent owner, while Tony is listed as an 80 percent owner, correct?
A. Yes.
Q. And you signed this operating agreement, correct?
A. That's my signature.
Q. And it says that as of January 1, 2023, the ownership makeup was Tony 80 percent and you 20 percent, correct?
A. I disagree with that statement.
Q. Is that what it says, is my question?
A. It says Tony is 80, Anthony is 20.
Q. Are you in possession of any other operating agreement for this entity?
A. Me, no.
Q. This is the only one that you know of, correct?
A. There's my son, I guess.
Q. Setting aside the transfer to

264

A. D. DEO

Efaz in '24 or '25, is there any other operating agreement for this entity?
A. This was for the sole purpose of Tony applying for NMAC -- not NMAC, NextGear line.
Q. Okay. But you don't have any other operating agreement that says you're the hundred percent owner of this entity, right?
A. And it was never executed.
Q. My question is: You don't have any other operating agreement for this entity, correct?
A. I don't remember right this second.
Q. The statement in your DMV application in February 2023 that you're a hundred percent owner of this entity is false, correct?
A. I disagree with that statement.
Q. What is your disagreement based on?
A. That I was a hundred percent owner.

66 (Pages 261 to 264)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 69 of 351 PageID #: 13872

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

265

A. D. DEO

Q. Just because you say so?

A. No, 'cause I was.

Q. Placed up on the screen what will be marked as Deo 19, a cross purchase agreement.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 19, a nine-page document, was marked for identification.)

- - -

Q. Do you recognize this document?

A. Yes.

Q. Paragraph 3 discusses your representations as to Northshore.  Do you see that?

A. I'm -- I'm looking -- I'm reading it.  Yes.

Q. And under sub 1 of paragraph 3, you represent and warrant that you are the sole owner of Northshore, correct?

A. I believe so, yes.

Q. And in paragraph -- subparagraph 6, you represented and warranted that

266

A. D. DEO

there is not pending, nor to your knowledge is there threatened, any suit, action, bankruptcy or administrative proceeding or arbitration or other proceeding which could adversely affect the ability of you to perform any of your obligations under this agreement, including your obligation to convey the Northshore units or stock free and clear of all liens and encumbrances, correct?

A. Yes.

Q. To this day, you've never conveyed a 25 percent interest in Northshore to Tony, correct?

A. I disagree.

Q. Do you have any stock certificates showing that you transferred 25 percent of Northshore to Tony?

A. I don't have any stock certificates.

Q. Okay.  Focusing on paragraph 4 of the same cross purchase agreement.

267

A. D. DEO

These are your representations and warranties as to Sunrise, correct?  Right here.

A. Okay.  Yes.

Q. Is that correct?

A. Yes.

Q. And in sub -- subsection 1 of paragraph 4, you represent and warrant that you're the sole owner of Sunrise, correct?

A. Yes.

Q. And in subsection 6, the identical representation and warranty that to the best of your knowledge, there is not pending, nor to your knowledge is there threatened, any suit, action, bankruptcy or administrative proceeding or arbitration or other proceeding which could adversely affect the ability of you to perform any of your obligations under this agreement, including your obligation to convey the Sunrise units free and clear of all liens and

268

A. D. DEO

encumbrances, correct?

A. That is what I represented at that time, yes.

Q. To this day, you have not conveyed the 25 percent interest in Sunrise to Tony, correct?

A. I disagree with that statement.

Q. What is your basis for disagreeing with the statement?

A. This contract was executed.

Q. After it was executed, you never conveyed the actual units in Northshore or Sunrise to this very day, correct?

A. Isn't this -- the contract conveyed the ownership.

Q. Do you have any stock certificates that are transferred from Northshore or Sunrise to Tony?

A. The stock certificate book was stolen from me.

Q. So because it was stolen from you, you never conveyed those membership interests in those LLCs, correct?

67 (Pages 265 to 268)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

269

A. D. DEO

A. I disagree with your statement again.

Q. You couldn't convey the membership interest in Northshore or Sunrise because they were stolen, correct?

A. I disagree with your statement.

Q. I'm just rephrasing what you said. That's what you just said.

A. No, you're not.

Q. Okay. So tell me what you said.

A. I said I conveyed the ownership to Tony after we executed this contract.

Q. How?

A. By executing the contract.

Q. The cross purchase agreement?

A. Yes.

Q. Other than execution of the cross purchase agreement, did you take any other act to convey to Tony his membership interest of 25 percent in Northshore and Sunrise?

A. What other act is there?

270

A. D. DEO

Q. Stock certificates.

A. I didn't have stock certificates.

Q. So your testimony is that by executing the cross purchase agreement, it automatically conveyed the interest to him?

A. That's what I thought that agreement meant, yes.

Q. Okay. Did you have an attorney represent you when you signed that cross purchase agreement?

A. No.

Q. You -- you were already being represented by Mr. Thomasson in December of 2022, weren't you?

A. For the -- yeah, the case happened after this.

Q. Okay. But didn't Mr. Thomasson represent you before the case happened?

A. Represent me?

Q. In any capacity.

A. I mean, Harry had a couple cases for Northshore --

271

A. D. DEO

Q. He represented you, right?

A. -- that I recall.

Q. He represented you in those cases in Northshore, correct?

A. He represented the company, yes.

Q. You had access to him to ask him any questions about these legal documents, correct?

A. Could I have called Harry, I guess.

Q. But you didn't call him, correct?

A. I didn't -- I didn't have counsel with that, no.

Q. You assumed that by signing the cross purchase agreement, you conveyed the membership interest in Northshore and Sunrise to Tony, correct?

A. I didn't assume.

Q. You believe that that's what occurred?

A. Absolutely.

Q. As of December 1, 2022, you were aware about the threat of litigation,

272

A. D. DEO

because you received a letter from Joshua Aaronson's attorneys, correct?

A. I didn't receive a letter.

Q. Showing you what will be marked as Deo 20. I'm sorry. I'm showing you what will be marked as Deo 19. It's a NYSCEF Docket Entry 30 of Index No. 617224 of 2022.

I'll represent to you that this is a November 18, 2022 letter from Cyruli Shanks & Zizmor LLP, the attorneys in this case, representing the Island Auto Group plaintiffs.

Do you recognize this document?

A. I've never seen this, no.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 19.1, a three-page document, was marked for identification.)

- - -

Q. It says on the bottom of this document that you're copied on the letter.

68 (Pages 269 to 272)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

273

A. D. DEO

A. That's my e-mail address.

Q. Do you deny receiving this e-mail with this letter?

A. I've never seen this e-mail, no.

Q. So because you've never received this letter and because the lawsuit that was later filed on December 6, 2020 -- 20 -- sorry, 2022, happened after the December 1, 2022 cross purchase agreement, in your mind, there was no threat of litigation or any litigation, correct?

A. Correct.

Q. Placing Deo 20 on the screen.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 20, a 28-page document, was marked for identification.)

- - -

Q. This is NYSCEF Docket Entry 1 from the same case as the prior one.

This is the complaint that Island Auto Group filed against you on

274

A. D. DEO

December 7th or December 6, 2022, correct?

A. If this is the one with Judge Gianelli, I think yes.

Q. I'll represent to you that this is the one with Judge Gianelli.

A. Okay.

Q. Okay. So this is -- this is the date you first learned about this lawsuit. It couldn't have been earlier than December 6, 2022, correct?

A. No, no.

Q. Okay. And other than that letter and that lawsuit that I just showed you, there was no other litigation going on. That's your representation as of December 1, 2022, correct?

A. I've never seen that letter.

Q. I understand.

But you -- you found out about that letter later, when it was filed as an exhibit, correct?

A. You just showed me that letter.

275

A. D. DEO

Q. That's the first time you've seen it, correct?

A. I've never seen that letter.

Q. So setting aside that letter you've never seen and this December 6th lawsuit, there was no other litigation going on with Northshore or Sunrise, correct, as of December 1, 2022, when you signed the agreement?

A. Against me?

Q. Any litigation concerning Northshore or Sunrise.

A. I don't know if there was anything. I can't remember.

Q. You don't remember one way or the other, right?

A. I don't remember.

Q. Isn't it true --

A. Well, I -- I don't remember if there was any.

Q. Okay. Isn't it true that you filed your own lawsuit on November 23, 2022, about a week before you signed the cross purchase agreement?

276

A. D. DEO

A. I don't recall.

Q. Placing Deo 21 on the screen, a summons with notice dated November 23, 2022. Index number 616542 of 2022.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 21, a three-page document, was marked for identification.)

- - -

Q. Do you recognize this complaint? Or summons with notice, that is.

A. I don't -- I don't particularly remember this at the moment.

Q. This is a complaint by Northshore and Sunrise against the Island Auto Group plaintiffs in this case, correct?

A. Well, that's what the caption says.

Q. Okay. And this was filed by your attorney, Mr. Thomasson, correct?

A. Okay. So it was filed by Harry, yes.

69 (Pages 273 to 276)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 72 of 351 PageID #: 13875

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

277

A. D. DEO

Q. So you filed this lawsuit, correct?

A. Harry filed the lawsuit.

Q. At your direction, correct?

A. I -- I'm not sure how to answer that question.

Q. The existence of this lawsuit shows that your representation on December 1, 2022, that there was no litigation concerning Northshore and Sunrise is false, correct?

A. I'm sorry, repeat that.

Q. The existence of this November 23, 2022 lawsuit concerning Northshore and Sunrise shows that your representation and warrant in the December 1, 2022 cross purchase agreement is false, correct?

A. That's an incorrect statement.

Q. I'm showing you the cross purchase agreement again at 4, subsection 6. There is not pending, nor to your knowledge is there threatened any suit action, bankruptcy,

278

A. D. DEO

et cetera, which could adversely affect the ability of you to perform under this agreement.

Do you see that?

A. I see that.

Q. Going back to Deo 21, the summons with notice describes the nature of the action. Do you see that?

A. Yes.

Q. You say here that the nature of this action is breach of contract, intentional interference with business or advantageous relations, common law theft of personalty, business records, and intellectual property, and unfair business practices directly and proximately related to defendants' regular and typical pattern and method of conducting business unfairly and unlawfully in the State of New York generally and with plaintiffs. Correct?

A. It says what you just wrote -- read.

279

A. D. DEO

Q. When you say that there was intentional interference with business, you're referring to your ability to, among others things, convey the interest of Northshore and Sunrise to Tony, correct?

A. You're asking me to interpret the law. I can't.

Q. This is your lawsuit, Mr. Deo. I'm asking you what you meant by this lawsuit?

A. I can't interpret what that means.

Q. You don't understand what lawsuit you caused to be filed?

A. I didn't say that.

Q. Generally speaking, when there are developments in this case, are you made aware of what's going on?

A. If need be.

Q. Do you know what this lawsuit is about?

A. Generally, I've gone over it.

Q. I'm referring to this lawsuit on

280

A. D. DEO

the screen.

A. Oh, I don't recall that, no.

Q. You don't remember why this lawsuit was filed?

A. I don't recall.

Q. But it's fair to say that this lawsuit was active at the time you signed the cross purchase agreement, correct?

A. Well, you're telling me now, yes. You tell me -- you tell me when it was filed.

Q. I'm representing to you it was filed on November 23, 2022.

A. Okay.

Q. Okay. You paid $500,000 in order to obtain a 49 percent membership interest in Superb, according to the cross purchase agreement, correct?

A. I gave Tony $500,000, yes.

Q. Okay. Where did you get those funds to pay him?

A. I took a loan.

Q. Okay. You took a loan from

70 (Pages 277 to 280)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 73 of 351 PageID
#: 13876
SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

281

A. D. DEO

Libertas, correct?

A. I took a loan from Libertas.

Q. And the loan from Libertas was based on Northshore's receivables, correct?

A. I can't answer that question. I don't know what that means right now.

MR. KATAEV: We could take five minutes. Off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 4:07 p.m. This is the end of Media No. 7.

- - -

(Whereupon, a recess was taken at this time.)

- - -

THE VIDEOGRAPHER: We are back on the record. The time is 4:14 p.m. This is the start of Media No. 8.

Q. Mr. Deo, I'm going to place up on the screen what will be marked as Deo 22. I'll represent to you that

282

A. D. DEO

this is NYSCEF Docket Entry 17 from the same case we've been looking at, the Island Auto Group lawsuit against you on December 6th. And this is the first page of the agreement of sale of future receipts with Libertas.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 22, a two-page document, was marked for identification.)

- - -

Q. Do you see that?

A. Libertas. Yes, that's what it says.

Q. It says this agreement of sale of future receivables dated as of November 5, 2022 is made between Libertas and the merchant below. Correct? I'm paraphrasing.

A. Oh, okay. Between Libertas and --

Q. The merchant whose name, address and other information is set forth

283

A. D. DEO

below, right?

A. I can't see it. Could you make it a little bigger?

Q. Sure.

A. Okay. Yes. Yes.

Q. Okay. And the merchant listed below is Northshore, correct?

A. That's what it says, yes.

Q. And the owner is --

MR. CIANCIULLI: Objection.

Q. And the owner is listed as you?

THE STENOGRAPHER: Who was that?

MR. CIANCIULLI: I was just putting an objection on the record as to the characterization of the merchant.

MR. KATAEV: Jeffrey Cianciulli.

MR. CIANCIULLI: I don't need to say anything further.

You can answer.

Q. And you list yourself as the hundred percent owner of Northshore

284

A. D. DEO

here, correct?

A. That's what it says, yes.

Q. It says towards the bottom, "In this agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below. We agree to buy from you and you agree to sell to us the amount of future receipts shown below, the amount sold, in exchange for the purchase price below."

Do you see that?

A. I see that.

Q. So when you obtained the loan from Libertas, you did so by encumbering the assets of Northshore, correct?

A. To my understanding, I took a loan from Libertas for 735.

Q. Through the assets of Northshore, correct?

A. I can't -- I can't make that distinction.

71 (Pages 281 to 284)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

285

A. D. DEO

Q. Did you read this agreement before you signed it?

A. The basic information.

Q. Do you realize that by signing this document encumbering the assets of Northshore, your representation on December 1, 2022 that there were no encumbrances on Northshore's assets was false?

A. I mean, that's, I guess your -- your opinion, your judgment. I --

Q. I'm asking you as a matter of fact. Do --

A. If I knew that? No --

Q. You didn't --

A. -- I didn't know that.

Q. And you didn't know that because you didn't have an attorney review this agreement before you signed it, correct?

A. I did not have an attorney review this.

Q. You just signed it because you needed the money, correct?

286

A. D. DEO

MR. BENJAMIN: Objection.

A. That's an incorrect statement.

Q. Why did you sign this?

A. Because I took a loan from Libertas.

Q. But you didn't personally take a loan. The loan was to be repaid from Northshore, correct?

A. It was a business loan.

Q. Okay. Have you ever repaid a dollar of this loan?

A. Did I pay -- start paying back, yes.

Q. How much have you paid towards this loan?

A. Exact amount, I cannot recall at this moment.

Q. What bank account did the payments for this loan come from?

A. There was a couple of them.

Q. Were all of the bank accounts that it was paid from owned by Northshore?

A. I can't recall how it actually

287

A. D. DEO

came out.

Q. Is it possible that a bank account from Sunrise would pay for the loan?

A. Sunrise was part of this deal.

Q. How is Sunrise part of this deal?

A. I remember somewhere in there that both Northshore and Sunrise was involved in this deal.

Q. Did Superb pay any portion of this amount owed back to Libertas?

A. Superb?

Q. Yes.

A. Why would Superb pay this?

Q. I'm asking you, is that the case?

A. No.

Q. Did any other entity, such as Car Buyers pay back any part of this loan amount?

A. I'm not sure.

Q. It's possible?

A. That a different entity?

288

A. D. DEO

Q. Yes.

A. Possible.

Q. Is it fair to say that all of the entities that you own are fluid in that you use UEA Premier, for example, to pay the debts of Car Buyer or vice versa?

A. That's a big assumption.

Q. Does that happen?

A. To use one corporate amount to pay a different corporation, sure.

Q. You don't keep them separate, right?

A. I don't know what you're asking.

Q. If Northshore has an obligation to pay something and Northshore doesn't have money, but another entity you own has money, you pay the debt of Northshore through the other entity, correct?

A. Well, there's some sort of a documentation that has to go on between the companies, I'm sure.

Q. Such as what?

72 (Pages 285 to 288)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

289

A. D. DEO

A. Maybe one loaning it or -- one company loaning another company.

Q. Do you have any other such -- do you have any such loan documents between your companies?

A. Not -- I don't recall.

MR. KATAEV: I'm going to call for the production of any intercompany loans for any corporations owned by Mr. Deo, any intercompany or intercorporate loans. I'll follow up in writing.

Q. Now, you don't deny that this loan from Libertas was used to purchase your interest in Superb for $500,000, correct?

A. The funds was used to -- was sent to Tony, yes.

Q. And you're aware that in order to obtain this loan of 735,000, you had to pay back approximately 900,000, correct?

A. If you bring it up, I think it's

290

A. D. DEO

on there.

Q. I just want to know based on your memory.

A. My memory, I don't know exact numbers. I'm sorry.

Q. Okay. What did you do with the other $235,000 that you obtained from Libertas?

A. I don't recall at this moment.

Q. Didn't you use that money to pay the landlord of your Old Westbury property, where you're currently living?

A. That's an assumption on your behalf.

Q. I'm asking you: Did you use that money for that purpose?

A. I already answered that I don't recall.

Q. Okay. Prior to the time that you obtained the funds from Libertas --

A. Okay.

Q. -- you paid Tony a hundred thousand dollars. Do you remember

291

A. D. DEO

that?

A. I gave Tony a check, yes.

Q. That check bounced, didn't it?

A. The funds didn't clear in time.

Q. You obtained those funds from an individual named Albert Hakim, correct?

A. I'm not sure of the whereabouts of those funds at the moment.

Q. Are you aware that Albert Hakim has sued you?

A. You mentioned that.

Q. Are you aware?

A. Tony mentioned that.

Q. Is that the first time you became aware?

A. Yeah.

Q. The funds that were placed on hold resulting in the bounced check were received from Hakim, correct?

A. I told you I don't recall.

Q. The Island Auto Group plaintiffs took the 735,000 that you received in Sunrise, correct?

A. Yes. Josh used his dad's --

292

A. D. DEO

father-in-law's log-in to move that money, yes.

Q. Ultimately, you received the funds back through Mr. Thomasson's help and he wired it to your Car Buyers account, right?

A. I can't remember how it went. But yes, Harry did wire the money.

Q. Do you remember where he wired the money?

A. As I said, I can't remember exactly which account it went to.

Q. I'm showing you a screenshot of a bank statement marked as Deo Exhibit 23, ECF Docket Entry 11-4 in this case.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 23, a document, was marked for identification.)

- - -

Q. Focusing your attention to the two pending transactions for $735,000. Do you see that?

73 (Pages 289 to 292)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

293

A. D. DEO

A. Yes.

Q. This is a transaction from Libertas to Northshore, correct?

A. It's -- that's the loan that I signed for, yes.

Q. And this transaction reflects Joshua Aaronson taking the funds out by transfer, correct?

A. Well, if you ask the Chase fraud department, David Baron logged in and moved that money.

Q. Okay.  But this shows that it came out, right?

A. That shows that it came out.

Q. Okay.  I'm going to show you Deo 24, ECF Docket Entry 11-5.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 24, a document, was marked for identification.)

- - -

Q. I'll represent to you that this is a screenshot of Superb's checking account on the mobile application of

294

A. D. DEO

Chase, and it shows a $200,000 wire from Bank of America from Car Buyers NYC Inc. and a $300,000 wire from Bank of America Car Buyers NYC Inc.  Do you see that?

A. Yes.

Q. So is it fair to say that the money you received from Mr. Thomasson went to your Car Buyers account?

A. That's -- you're assuming again.

Q. Okay.  Are you saying that the money from Car Buyers that went to Tony came from somewhere else?

A. Is that -- is this Tony's?

Q. I'll represent to you that this is Tony's account at Superb.

A. So it's saying that it came from my Car Buyers account, yes.

Q. Okay.  And I'm asking --

A. 300,000 and 200,000.

Q. The 500,000 that -- of -- the 500,000 came from the 735,000 you recovered from Mr. Thomasson, correct?

A. Say that question again.

295

A. D. DEO

Q. This 500,000 that you paid came from the 735,000 from Libertas, correct?

A. I would say so.

Q. And when Mr. Thomasson recovered those funds from the Aaronson plaintiffs, or Island Auto Group plaintiffs, he sent this money to Car Buyers NYC 1 Inc., right -- NYC Inc.?

A. That's -- I told you I'm not sure where he sent it.

Q. You don't have any operating agreement from Northshore or Sunrise showing that Tony has a 25 percent interest in those entities, correct?

A. I don't think we created one, no.

Q. Okay.  And you deny that in February 2023, after the double-flooring incident, Tony asked you to focus only on Superb and not work on Northshore and Sunrise, correct?

A. I said I don't remember.

296

A. D. DEO

Q. Why is it that you decided to apply for your own DMV license in February of '23?

A. 'Cause I needed -- I still had the lease for 180 Michael Drive.  I still had the lease for 189 Sunrise. And I needed a license there.

Q. Because --

A. I spoke to Tony about it and he said, Let's get new licenses.

Q. Okay.  And while you were working on getting those licenses, he asked you to focus fully on Superb, correct?

A. Again, you're asking the same question.  I said I don't recall.

Q. Based on what you just told me, does that refresh your recollection as to your discussion with him?

A. Say that again.

Q. You told me that you had two lots that you couldn't operate from because you needed licenses, correct?

A. I needed license, yes.

74 (Pages 293 to 296)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

297

A. D. DEO

Q. Okay. Because you couldn't operate from those, while you were waiting to get the licenses, Tony asked you to focus on Superb, correct?

A. I don't recall him saying those things.

Q. Is it fair to say that because you had no license at Sunrise and Northshore, there was no activity at Sunrise or Northshore, correct?

A. That's not fair to say. When you say Sunrise and Northshore, you're talking about the locations, right?

Q. I'm talking about the corporate entities.

A. Oh, I don't think we had any active -- I thought you were talking about their addresses.

Q. Right. I'm referring to the actual corporate entities. Northshore and Sunrise, as corporations, were inactive between February of '23 until July of '23, correct?

A. The corporations were always

298

A. D. DEO

active. They're still active.

Q. There was no money moving between Northshore and Sunrise in the regular course of a dealership business after November 2022, correct?

A. That's an assumption on your behalf.

Q. You told me that because of the issues with Northshore and Sunrise, you had to sell all the cars through Superb, didn't you?

A. I said we ran all the -- we ran all the deals through -- through Superb. I did say that.

Q. Okay. So since all the deals were running through Superb, it's fair to say that you were not running deals through Northshore or Sunrise, correct?

A. Yeah, we didn't run deals through Northshore and Sunrise.

Q. So it's fair to say then -- so it's fair to say then that since November 2022, you ran all deals through Superb for Northshore and

299

A. D. DEO

Sunrise?

A. I know we ran -- I don't know the exact time we started.

Q. Okay.

A. But I know we ran all the deals through -- through Superb.

Q. Okay.

A. Tony and I discussed how to do that.

Q. At some point after November 2022, you ran the deals that you would have run through Northshore and Sunrise through Superb, right?

A. I guess, yes.

Q. And when you ran the deals that way through Superb, there was no financial activity at Northshore and Sunrise, correct?

A. That's an assumption.

Q. You tell me.

A. No, Northshore and Sunrise was paid.

Q. Paid for what?

A. For the deals. I know there was

300

A. D. DEO

some arrangement that we had. I can't recall how we were doing it, but the CFO would cut checks.

Q. The CFO was Bruce?

A. No, Bruce was a COO.

Q. The CFO was Alysia?

A. Yes, that's her name.

Q. So what happened when Alysia left? How was the deal done then?

A. I think we were still doing deals through Superb, yes.

Q. And with Alysia gone, you just paid yourself?

A. What does that mean?

Q. Well, you said that Alysia paid you according to the deal that you made for deals that you ran through Superb that were supposed to go through Northshore and Sunrise, right?

A. I said Alysia cut the checks.

Q. Right. So now that Alysia's gone and can't cut the checks anymore, you cut the checks yourself, right?

A. I never had the ability to cut

75 (Pages 297 to 300)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

301

A. D. DEO

checks, no.

Q. Okay. So how did you get paid after Alysia left?

A. The checks were cut by Kendra and Bruce.

Q. In March of 2023, you sought to open up an account for Superb with Flushing Bank, correct?

A. Is that the date?

Q. I'm asking you if you remember.

A. The exact date when we started having that conversation, I don't know.

Q. At some point, there was a conversation that you had with Tony about opening an account for Superb with Flushing Bank, correct?

A. Yes, it was Tony, Bruce and myself.

Q. Okay. And all three of you agreed that Superb should have an account with Flushing Bank, right?

A. Yes, we agreed.

Q. Okay. And Tony and Bruce went about obtaining a bank account, right?

302

A. D. DEO

A. No.

Q. Who obtained the bank account for Superb with Flushing Bank?

A. Well, Tony said he didn't want to be the guarantor on the line of credit that I was going to apply for.

Q. Right.

A. So he said for me to just do it on my own, and he supplied me with the documents.

Q. Okay. Was it taking a long time to obtain a commercial account with Flushing for Superb?

A. I -- I didn't open a commercial account. I think Tony was trying to, from his deposition.

Q. Do you recall having a text message conversation with Bruce about opening an account for Superb?

A. I told Bruce that I could get the line of credit and to send me the tax returns.

Q. I'm showing you Deo 25.

- - -

303

A. D. DEO

(Whereupon, Plaintiffs' Exhibit Deo 25, a document, was marked for identification.)

- - -

Q. This is a text message exchange between you and Bruce about the Flushing account, correct?

A. It doesn't say any names on it. Where -- Anthony. Okay.

Could you make it a little bigger? I can't see it.

Q. Sure. No problem.

A. Okay.

Okay. The blue is Bruce, right?

Q. Yes.

A. Okay.

Q. I'll represent to you that the blue represents Bruce's messages to you.

A. Okay. Okay. Oh, the NMAC audits, okay. Yes. Okay.

Q. Okay. So focusing on the bottom message for a second, Bruce writes to you -- sorry, you write to Bruce that

304

A. D. DEO

you just spoke to Tony and that Tony is getting Dave to forward the information to Rob Puccio, right?

A. Uh-huh.

Q. Yes?

A. Yes, that's what it says.

Q. And when you refer to "Dave," you're referring to Dave Weinstein at Flushing, correct?

A. David Weinstein, yes.

Q. Okay. And Rob Puccio is another individual that works at Flushing, correct?

A. Yes.

Q. That's the individual who helped you get set up with the Northshore and Sunrise accounts at Flushing, correct?

A. That's the same Rob from before, yes.

Q. That's the same Rob that met with you at Northshore once or twice, correct?

A. Yes.

Q. Going back up you say, "Bro,

76 (Pages 301 to 304)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

305

A. D. DEO

this guy and the credit underwriter are in my pocket. Get me the info and '21 -- 2021 taxes and I will bring it home."

Do you see that?

A. Yes.

Q. When you said that this guy is in your pocket, you're referring to Rob Puccio, correct?

A. This guy -- I guess.

Q. Okay. You guess? You don't know who is in your pocket?

A. I mean, it was a figure of speech.

Q. What did you mean by this figure of speech?

A. That I know him.

Q. So --

A. I think I procured a loan with him --

Q. Okay.

A. -- prior.

Q. For Flushing -- I'm sorry, for --

306

A. D. DEO

A. With Flushing.

Q. With Flushing for Sunrise and Northshore, correct?

A. I think it was just Northshore.

Q. Okay. So when you say that this guy is in your pocket, you mean that you previously got a loan?

A. Yeah, it was a figure of speech.

Q. Okay. You don't mean that you're paying him something to --

A. Absolutely not.

Q. So you deny bribing a bank official, correct?

MR. BENJAMIN: Objection.

Q. I'm asking you.

A. No, I didn't bribe.

Q. Okay. Who's the credit underwriter you're referring to?

A. I don't know any credit underwriters.

Q. So why did you write that the credit writer is in your pocket?

A. It's a figure of speech.

Q. You don't know the identity of

307

A. D. DEO

the credit underwriter of Flushing?

A. There's no way I could.

Q. Were you lying when you sent this message?

A. I disagree with that statement.

Q. So what were you saying over here?

A. It's a figure of speech.

Q. What does the figure of speech "in my pocket" mean?

A. That I know the guy, meaning that he got me a loan before.

Q. "In my pocket" means that you know the guy?

A. To me, yes.

Q. Okay. You said you will bring it home. What did you mean by that?

A. I will effectuate the loan.

Q. Did you work with any particular individual at NESNA?

A. Clarify that question a little bit, please.

Q. Does the name Nathan Newell ring a bell to you?

308

A. D. DEO

MR. KATAEV: N-E-W-E-L-L.

A. I think I spoke to Nathan, yes.

Q. You worked with him extensively while at NESNA, correct?

A. Extensively? I talked to him, yes.

Q. You met with him with him in person, face-to-face?

A. I don't think I've ever met with Nathan, no.

Q. Wasn't Nathan the individual who contacted you about paying back the warranty advance for Northshore and Sunrise?

A. Between him and Ron Daas, yes.

Q. Ron Daas is another individual that worked at NESNA, correct?

A. Yes.

Q. Ron Daas no longer works at NESNA, correct?

A. I don't know that for sure. For a --

Q. Ron Daas --

A. Oh, I'm sorry. I'm sorry.

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

309

A. D. DEO

Q. Go ahead.

A. For a period, he didn't.

Q. To your knowledge, is Ron Daas currently working at NESNA?

A. As I said, I don't know.

Q. Isn't it true that Ron Daas ultimately became employed by you?

A. Ron Daas was employed at -- at Superb for a very short period of time.

Q. Isn't it true that Ron Daas was also employed at Gold Coast dealerships that you own?

A. I don't think he was employed there, no.

Q. How did it come to be that Ron Daas was working at NESNA and all of a sudden he was working at Superb?

A. You would have to ask Ron.

Q. When was the last time you had contact with Ron Daas?

A. 2023.

Q. You ultimately opened an account with Flushing for Superb, correct?

A. Yes, I did.

310

A. D. DEO

Q. You misrepresented to Flushing that you were the 100 percent owner of Superb, correct?

MR. BENJAMIN:  Objection.

Q. You can answer the question.

A. I disagree with that statement.

Q. You represented to Flushing Bank that you were the 100 percent owner of Superb, correct?

A. That was agreed upon by Tony and myself.

Q. What do you have to support your contention that Tony agreed that you could be a 100 percent owner of Superb?

A. For purposes of applying for this line of credit, there was a conversation that Tony and I had.

Q. What did he say in the conversation to lead you to believe that you could represent to a bank that you own Superb 100 percent?

A. That he's not going to guarantee the loan because there's a line of credit for working capital.

311

A. D. DEO

Q. You do understand that there's a big distinction between a personal guarantee and ownership in a corporate entity, don't you?

A. I don't understand your question.

Q. In your mind, does the idea that you, personally, guarantee something mean that you're the 100 percent owner of it?

A. No, our discussion said that that's how I should send it in.

Q. You're telling me that Tony told you to submit a bank application as 100 percent owner of Superb?

A. Yes.

Q. Okay. Do you have anything in writing to show that he asked you to do that?

A. It was a conversation we had.

Q. Did you record any of your conversations with Tony?

A. Why would I record it?  No.

Q. Did you?

312

A. D. DEO

A. No.

Q. Did you?

A. No.

Q. Okay.  So other than your self-serving statements today, you have nothing to prove that Tony told you you could submit a false application listing yourself as --

MR. THOMASSON:  Objection as to form.

MR. KATAEV:  Let me finish the question before you object.

Q. -- a false application listing yourself as a hundred percent owner of Superb?

MR. BENJAMIN:  Objection to form.

A. I disagree with your statement.

Q. You don't have anything, correct?

A. Clarify your statement.

Q. You don't have any evidence to support your contention that Tony asked you to do that, correct, other than

78  (Pages 309 to 312)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

313

A. D. DEO

your self-serving statements?

A. I disagree with your statements.

Q. I'm not asking you whether you agree with my statement.

I'm asking you: Do you have any evidence to show that Tony asked you and authorized you to list yourself as a hundred percent owner of Superb in a bank application?

A. We had a conversation.

Q. I'm asking you do you have --

A. That wasn't -- I'm not finished.

Q. Go ahead.

A. Could I finish?

Q. Please finish.

A. We had a phone conversation that wasn't recorded.

Q. So you don't have anything other than that conversation?

A. I didn't think I needed one.

Q. Okay. So you -- so you admit that you signed and completed this application, correct?

A. What is this? I'm sorry.

314

A. D. DEO

Q. I'll represent to you that this is Deo 26.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 26, a 23-page document, was marked for identification.)

- - -

Q. It's a 23-page compilation of Flushing Bank documents that was submitted in the course of this lawsuit.

You admit that you completed this application, correct?

A. Yes, with the knowledge and approval of Tony.

Q. And you signed this document on April 4, 2023, correct?

A. It is two signatures, different dates.

Q. The first signature?

A. April 4, '23, yes.

Q. Okay. And it says under the signature that you hereby certify to

315

A. D. DEO

the best of your knowledge that the information provided above is complete and correct and you agree to notify the bank of any change in such information, right?

A. Yes. Yes.

Q. And Mr. Puccio helped you open this account, correct?

MS. RONNEBURGER: Objection as to form.

A. I don't know if he helped open the account, but I know Mr. Puccio helped me with the previous line of credit. So I don't know who particularly opened the account. I think I spoke to another lady.

Q. To your knowledge, Mr. Puccio knew that Tony was an owner of Superb, correct?

MS. RONNEBURGER: Objection to form.

A. I disagree with your statement.

Q. Do you know whether Mr. Puccio knew that Tony was an owner of Superb?

316

A. D. DEO

A. You're going to have to ask Mr. Puccio.

Q. But do you know?

A. I don't know.

Q. Okay. What, if anything, did you tell Puccio about the ownership of Superb?

A. Puccio knew that Tony and I were partners.

Q. Did you have any discussion about the ownership of Superb with Puccio?

A. Not that I recall.

Q. How did Puccio know that you and Tony were partners?

A. I told him.

Q. What, specifically, did you tell him?

A. Tony and I are partners. And I told him that Tony is opening accounts for his franchise entities.

Q. What --

A. And I think he was applying for lines of credit for them.

79 (Pages 313 to 316)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

317

A. D. DEO

Q. What did you give Puccio to show that you owned Superb a hundred percent?

A. Did I send it to Puccio?

Q. I'm asking you.

A. I don't recall if I sent him anything.

Q. Tony did not sign any aspect of this document, correct?

A. I -- could I see the whole document?

Q. We've been scanning through it the whole time. Do you want me to start from the top again?

A. No, you could continue going. Okay. That's my signature. That's my signature.

Q. So far from what you've seen in the Flushing Bank application and supporting documentation, Tony's signature is nowhere to be found, correct?

A. I didn't see any signatures of Tony's.

318

A. D. DEO

Q. Okay. You opened this account in early April of 2023, correct?

A. That's what it seems, yes.

Q. Focusing on page 16 of Deo 25, this is the statement for April of 2023, correct?

A. Yes, a statement.

Q. In April of 2023, you made three deposits totalling $114,000, correct?

A. Three deposits, yes.

Q. Why were these specific deposits made in this account instead of in the Superb account with Chase?

A. I don't recall determination, no.

Q. This is the May 2023 Flushing statement for Superb, correct?

A. Scroll up. Yes.

Q. In May of 2023, you made five transfers from this account, correct?

A. One, two, three, four, five, yeah, there were five transfers.

Q. And you made these transfers, right?

319

A. D. DEO

A. Yeah.

Q. You were the only one that had control over this account, correct?

A. Yes.

Q. Okay. It says that all of these transfers were made to an account ending in 8362, correct?

A. Yes.

Q. What account does that belong to?

A. I don't know what account that is.

Q. If I represented to you that this is the Northshore account with Flushing, would that refresh your recollection?

A. I mean, it wouldn't refresh my recollection. If I see a statement from the Northshore account that says that, then...

Q. Was there ever an account -- was there ever an account that you transferred money to from Superb, other than Northshore?

320

A. D. DEO

A. I don't know what this account is.

Q. I'm asking you, other than Northshore, is there any other business entity that you transferred money to from Superb's Flushing account?

A. I don't know what accounts I transferred money out of this account from.

Q. You don't remember?

A. I don't remember.

Q. Is it fair to say that these five transfers you made total $165,000?

A. What did you say? How much?

Q. 165.

A. Yes.

Q. What did you use the 165,000 for?

A. I don't recall at the moment.

Q. You agree with me, though, that at that time that this account existed, Superb continued to use the Chase account, right?

A. Yeah, Superb had a Chase

80 (Pages 317 to 320)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

321

A. D. DEO

account. Absolutely.

Q. And the money that went into the Chase account were credit card payments from customers, correct?

A. The credit card account was linked to Chase, the merchant account, yes.

Q. Ever since April 2023, you never deposited any cash or checks into the Superb Chase account, correct?

A. I don't know if I agree with that statement.

Q. Is it fair to say that every check that you received for Superb went into the Flushing account for Superb?

A. I disagree with that statement.

Q. Can you point me to any check that you deposited into the Superb account with Chase since April of 2023?

A. Point where?

Q. Do you have any evidence to show that you deposited checks into the Chase account for Superb since April of 2023?

322

A. D. DEO

A. I don't have any evidence with me.

Q. Do you have any basis to dispute that all check payments that came to Superb went to the Flushing account for Superb instead of to the Chase account?

A. I can't -- I can't speak on that.

MR. KATAEV: I'm going to correct the record. I referenced with respect to this exhibit that it was Deo 25. It's actually Deo 26.

Thank you, Madam Court Reporter.

MR. THOMASSON: Mr. Kataev, this is Harry Thomasson.

MR. KATAEV: Yes.

MR. THOMASSON: It's a few minutes before 5:00 and I just want to make sure you know that I think there's at least one and maybe two housekeeping conversations that we should have

323

A. D. DEO

before the end of this deposition.

Do you know what time or does anyone know what time we're going 'til today?

MR. KATAEV: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 4:54 p.m. This is the end of Media No. 8.

- - -

(Whereupon, an off-the-record discussion was held at this time.)

- - -

THE VIDEOGRAPHER: We're back on the record. The time is 5:01 p.m. This is the start of Media No. 9.

MR. KATAEV: Good afternoon, everyone. We had an off-the-record meet and confer about this deposition and

324

A. D. DEO

discovery, in general. I'm going to place on the record what I understand is the agreement that we've reached concerning the plaintiff's application, which I believe Flushing is joining, to have Mr. Deo come back for another day of depositions.

The videographer confirmed that we have five hours and nine minutes of testimonial time so far, such that the Superb plaintiffs have one hour and 51 minutes of testimonial time left. The Superb plaintiffs, with the remaining parties, have agreed that we will continue today until 6:00 and that the parties will mutually agree to a new date for Mr. Deo to come in, in which the Superb plaintiffs will complete up to seven hours of testimonial time, whereupon that the Island Auto Group

81 (Pages 321 to 324)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

325

A. D. DEO

plaintiffs will conduct their deposition of Mr. Deo, and thereafter, Flushing Bank will conduct their deposition of Mr. Deo.

In this discussion, we did not hear from Libertas about whether they plan to depose Deo. We can hear from Mr. Cianciulli now.

MR. CIANCIULLI: Yes, I do plan to ask Mr. Deo some questions. And I'd be more than happy to take the next slot, or Mr. Thomasson can take the next slot, whatever the order is appropriate.

MR. KATAEV: Understood. Okay. So as far as our agreement so far, we did agree that Mr. Deo would be produced for another day of deposition with a mutually available date to be worked out, in the broader context of

326

A. D. DEO

potential motion for an extension of time to complete discovery, which the parties will work on in a joint letter motion, to be submitted to the Court.

Does everyone agree with what we've placed on the record so far?

MR. BENJAMIN: Yes, by the Deo defense.

MS. RONNEBURGER: Yes, by Flushing Bank.

MR. RUDERMAN: Yes, by IAG plaintiffs.

MR. KATAEV: Mr. Thomasson, Mr. Cianciulli, do you agree?

MR. THOMASSON: Yes, I agree.

MR. CIANCIULLI: And I also agree on behalf of Libertas.

MR. KATAEV: Okay. With that said, we're going to continue with the testimony of Mr. Deo until 6:00.

327

A. D. DEO

We'll go off the record briefly so that Madam Court Reporter could read back the last question and answer.

THE VIDEOGRAPHER: We're going off the record. The time is 5:04 p.m. This is the end of Media No. 9.

- - -

(Whereupon, the referred-to question and answer were read back by the stenographer.)

- - -

THE VIDEOGRAPHER: We are back on the record. The time is 5:04 p.m. This is the start of Media No. 10.

Q. Mr. Deo, I'm going to present to you what we've marked as Deo 27.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 27, a 43-page document, was marked for identification.)

328

A. D. DEO

- - -

Q. I'll represent to you that this is a compilation of deposit slips and checks that were deposited into the Superb Flushing Bank account. Do you see this?

A. I see it.

Q. On this page, it shows that on April 10, 2023, there were five checks deposited in this account, correct?

A. Yes, five checks.

Q. And they're listed by amount, all five of them. Do you see that?

A. Yes.

Q. 2,000, 6,939, 1,000, 20,000 and 10,000, correct?

A. Yes.

Q. And if I scroll down to the next page, we have a $10,000 check here, right?

A. Can I see the whole check? Superb Motors -- is there any way you could turn it? I can't --

MR. KATAEV: Let the record

82 (Pages 325 to 328)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

329

A. D. DEO

reflect that we're rotating the exhibit pages. Full screen.

Q. Okay. Now that I've rotated them, do you see the deposit slip?

A. Yes.

Q. And the first check here is for $10,000 to Superb, correct?

A. That's a check for 10,000, yes.

Q. And the next check is 20,000 to Superb, correct?

A. Yes.

Q. And these are from Bank of America, right?

A. Both of them, yes.

Q. And that reflects the 10,000 and 20,000 listed in this deposit slip, correct?

A. I can't say that with certainty. I mean, they're the same amounts.

Q. Okay. And we have a thousand from Artex Group. Do you see that?

A. Yes.

Q. The 6,939 and change from Artex Group as well, right?

330

A. D. DEO

A. Artex, yes.

Q. And another 2,000 from Artex, correct?

A. Yes.

Q. Okay. Those are the five checks that consist of that deposit slip, right?

A. As I said, I can't say that with certainty. The amounts seem like they -- they're the same amounts, but I can't say that these are those checks.

Q. Do you have any basis to dispute my representation to you that there are no check deposits made into the Chase Superb account following April 2023?

A. I don't have the Chase accounts with me.

Q. Setting aside the fact that you don't have the Chase documentation in front of you, do you have any independent knowledge that checks to Superb Motors were placed into the Chase Superb account?

A. Of course they were.

331

A. D. DEO

Q. After April 2023?

A. As I said, to give you a sure answer, I would have to review the accounts.

Q. Okay.

A. The statements.

Q. Okay. Tony did not know that these checks were being deposited into the Flushing account, correct?

A. You would have to ask Tony that question.

Q. Tony had no knowledge that you opened this account with Flushing, correct?

A. I disagree.

Q. Tony had no idea that you were depositing these checks for Superb in the Flushing account, correct?

A. I disagree.

Q. What is your basis to disagree with that?

A. Bruce Novicky was completely aware.

Q. Okay. When you opened up an

332

A. D. DEO

account for Superb with Flushing Bank, you also opened up an account for Sunrise with Flushing, correct?

A. I don't recall, but if there was one...

Q. Presenting to you --

A. I don't know if it was at the same time.

Q. Presenting to you what's been marked as Deo 28.

MR. KATAEV: Is that right?

- - -

(Whereupon, Plaintiffs' Exhibit Deo 28, a 58-page document, was marked for identification.)

- - -

Q. This is a compilation of 58 pages of documents relating to the Flushing account you opened for Superb. Do you see the Sunrise corporate name here?

A. You're saying this was for Superb or for Sunrise?

83 (Pages 329 to 332)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

333

A. D. DEO

Q. I apologize, you're right. For Sunrise. Do you see the Sunrise corporate name here?

A. Yes, that is Sunrise.

Q. And this is an application signed by you on March 17th of 2023, correct?

A. It's a document signed by me, yes.

Q. And that coincides with the e-mail that we looked at earlier with Rob Puccio from March of '23, correct?

A. I don't recall the e-mail.

Q. Okay. On this second page, there's a Resolution of Authority with Flushing Bank, correct?

A. You're going to have to blow it up so I could see it. Depository.

Q. This is a Resolution of Authority, correct?

A. Okay. Okay. Yes, I see that on top.

Q. And then next to a limited liability company, there's a check

334

A. D. DEO

mark, correct?

A. There's that thing on the screen.

Q. I'll fix it.

A. A limited liability.

Q. Next to limited liability company, there's a check mark, correct?

A. Yes.

Q. And this says that this LLC was organized under the laws of the State of New York and that the individual signing this resolution constitutes all of the members or managers as appropriate of the company, correct?

A. Yes.

Q. And you're the sole person listed here, correct?

A. Yes.

Q. And your signature is at the bottom right here, correct?

A. That is.

Q. Now, we haven't seen any exhibit like this today for Superb's account with Flushing, right?

335

A. D. DEO

A. I -- I don't recall.

Q. Do you remember signing a document like this, saying that you're the 100 percent owner of Superb, a Resolution of Authority?

A. I -- only if I see a document.

Q. Okay. You signed so many things that you don't remember what you signed?

A. I disagree with that statement.

Q. Now, on this third page you write that you're a 99 percent owner of Sunrise, correct?

A. Could I see what the document is?

Q. Certification of Beneficial Owners.

A. Okay. Yes.

Q. Now, looking at this signed application, do you recall that a bank account was actually opened for you, for Sunrise with Flushing?

A. I do have a -- I'm not a hundred percent sure, but I think we did open

336

A. D. DEO

up a bank account for Sunrise. Either we opened it or we started the process. I'm not sure. I'm not sure if we actually opened it. I'm sorry, I'm rambling.

Q. That's okay.

This is a Site Visitation Form for Flushing. Do you see that?

A. Site Visit -- that thing again -- Site Visitation Form. That's what it says.

Q. And the site visitation occurred on March 17, 2023, according to this document, right?

A. Oh, it does say that, yes.

Q. And Mr. Puccio met with Dwight Blankenship on that day, correct?

A. That's what it says.

Q. You directed Dwight Blankenship to meet with Mr. Puccio, correct?

A. I don't know if I directed him, but he met with Mr. Puccio.

Q. Did you ask Blankenship to do that?

84 (Pages 333 to 336)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 87 of 351 PageID #: 13890

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

337

A. D. DEO

A. I can't recall the conversation at this moment.

Q. As of March 2023, Dwight Blankenship was helping you at Sunrise, correct?

A. I know Dwight was employed with Sunrise -- wait. No, no, no, with Superb. Dwight was employed with Superb. I don't know, what does "helping" mean.

Q. Okay. While Dwight Blankenship was employed by Superb, is it your understanding that he was at Sunrise instead, performing work related to Sunrise?

A. Oh, the employees were interchangeable, as discussed with Tony.

Q. You had all of the employees that worked at Superb work on Northshore and Sunrise as well, correct?

A. Are you talking about the location or are you talking about --

338

A. D. DEO

Q. The location, physically going there.

A. The physical locations, yes.

Q. And whenever you wanted employees of Superb to go to Northshore or Sunrise, you were the one that told them to do that, correct?

A. I don't know exactly how they were directed, but we had employees at all three locations.

Q. You decided where the employees went for the day, correct?

A. I -- I disagree with that statement.

Q. Who decided, if you didn't?

A. I don't know.

Q. This is a statement for Sunrise with Flushing Bank dated March 2023, correct?

A. Okay. Statement of account, yes.

Q. It is, right? For that time period, March of '23?

A. March, yes.

339

A. D. DEO

Q. And there was no activity in March of '23 because the statement starts from March 22nd to the 31st, correct?

A. It doesn't look like there's any activity, no.

Q. But in April of '23, you had four deposits, correct?

A. There is four deposits.

Q. The first deposit listed here is for $5,500 on April 10th, correct?

A. Yes.

Q. And accompanied with that deposit, it shows that the 5,500 was in cash, right?

A. Yes.

Q. And on the bottom left here it shows that Dwight Blankenship was the one who made the cash deposit, correct?

A. That's his name, yes.

Q. You directed Mr. Blankenship to take the 5,500 in cash and deposit it in Sunrise's account, correct?

A. I didn't direct anything, no.

340

A. D. DEO

Q. Are you saying that Mr. Blankenship decided to take the cash himself and deposit it in Sunrise?

A. I don't recall this particular circumstance.

Q. On April 15th, there was $6,000 deposited in cash, correct, 6,100?

A. Yes.

Q. Going back to the first deposit for 5,500, there is a mistake here. It says April 10, 2022 as the date, but it was actually deposited on April 10, 2023, correct?

A. The dates are different.

Q. This coincides with the April 2023 statement, correct?

A. April 2023.

Q. Is that right?

A. Is this from that statement?

Q. Yes. The 5,500 deposit on April 10th matches the $5,500 deposit on April 10th. Do you see that?

A. Okay. The deposits match.

Q. By amount and by date, correct?

85 (Pages 337 to 340)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

341

A. D. DEO

A. You just blew past it.

Q. The next deposit that I have here is on April 28th for $26,500 in cash by Conductor Anthony Deo, correct?

A. I don't know what Conductor Anthony Deo is.

Q. Is this your handwriting?

A. No.

Q. You don't know what the term "conductor" means, right?

A. No.

Q. But that is your name, right?

A. Anthony Deo is my name, yes.

Q. So you made this deposit in cash on April 28th, correct?

A. That's an assumption on your behalf.

Q. You're denying that you made this deposit?

A. I'm saying I don't know.

Q. You have no reason to dispute that you made this deposit of 26,500 in cash, correct?

A. My recollection tells me I don't

342

A. D. DEO

know.

Q. All the deposits that we saw in April of 2023 were in cash, correct?

A. Is that what -- I don't know if that's what you showed.

Q. Let's look at it again.

A. See, there's no distinction here, and you're assuming that those deposit tickets are the same because the numbers match. I can't take that to be true. I don't know for sure.

Q. What -- what would you need for it to be a certainty that the cash deposited in the slips match the deposits in the statement? I'm just curious.

A. I don't remember.

Q. Are you aware that this production came from Flushing Bank?

A. I don't -- I don't know that.

Q. Do you see the Bates stamp on the bottom left here -- the bottom right?

A. Okay.

343

A. D. DEO

Q. Flushing 7211?

A. Uh-huh.

Q. I'll represent to you --

A. Oh, I'm sorry. Yes.

Q. I'll represent to you that this means that Flushing Bank produced it.

A. They produced these documents?

Q. That's correct.

A. Okay.

Q. Based on my representation to you that Flushing Bank produced these documents, do you have any basis to dispute that these cash deposits were all made into the Sunrise account in April of '23?

A. Again, just because Flushing gave it to you doesn't change what my initial statement was.

Q. So you dispute the veracity of these documents; am I understanding you correctly?

A. What do you mean by "veracity"?

Q. You're saying that these statements are false?

344

A. D. DEO

A. I didn't say that.

Q. So what are you saying?

A. I'm saying I can't equate the lower stuff to be these actual things.

Q. Okay. Well, let's look at it again.

We have 5,500, 6,100, 16,000, 26,500, correct?

A. Those are the numbers.

Q. Those are the four amounts, right?

A. Yes.

Q. Here's the 5,500 in cash, right?

A. That's 5,500 in cash.

Q. Here's the 6,100 in cash, right?

A. That ticket says 6,100 and it says cash.

Q. Here's the 26,500, right?

A. What do you mean here is "the 26,500"? That's a deposit of 26,500. I'm seeing that, yes.

Q. Does that number and date match the number and date on the statement?

A. The number matches. The date, I

86 (Pages 341 to 344)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

345

A. D. DEO
would have to see again.
Q. April 28th, right?
A. Yes.
Q. Here's the statement again. April 28th, you see that?
A. Yes.
Q. And we don't have the 16,000 here, do we?
A. Why?
Q. I don't know why.
A. And that's why I can't agree with your statement.
Q. Okay. Other than the 16,000 being missing from here, you have no reason to dispute that those cash deposits were made remaining --
THE STENOGRAPHER: Say again. Other than --
Q. Other than the missing $16,000 deposit, you have no basis to dispute that the remaining cash transactions were deposited in the Sunrise account, correct?
A. That's an incorrect statement.

346

A. D. DEO
Q. What is your basis to dispute the veracity of these documents?
A. Again, what do you mean by "veracity"?
Q. The truthfulness, the accuracy.
A. What is the basis -- say it again. I'm sorry.
Q. What is your basis to dispute the accuracy of these documents?
A. I am not disputing the accuracy.
Q. Okay. In May of '23, you started taking payments out from Sunrise and transferring them to Northshore at 8362, correct?
A. You still didn't tell me what 8362 represents.
Q. I'll represent to you that this is Northshore's account with Flushing.
A. Could I see something that says that?
Q. I don't have that in front of me right now.
A. So how could you represent that?
Q. Well, I'm asking you for your

347

A. D. DEO
testimony.
Did you withdraw money from the Sunrise account into Northshore's account ending in 8362?
A. I don't know.
Q. Okay. Do you see the deposit adjustment for 16,000?
A. Deposit adjustment, yes.
Q. Do you have any understanding as to why 16,000 was adjusted out?
A. I don't know what that would -- I don't know what that would entail.
Oh, wow. Shit. I'm sorry. I'm sorry.
MR. KATAEV: We're good?
THE VIDEOGRAPHER: Yeah.
Q. Okay. After April of '23 through July of '23, did you ever deposit any cash into the Superb Chase account?
A. I can't be certain of that.
Q. I'm going to show you what will be marked as Deo 29.
- - -

348

A. D. DEO
(Whereupon, Plaintiffs' Exhibit Deo 29, a 66-page document, was marked for identification.)
- - -
Q. This is the same Flushing account, except it's for Northshore. Do you see that?
A. Yes.
Q. It's also dated March 2023. It's dated a day before the Sunrise account, correct?
A. If you say so. I just don't remember what the other one said. I'm sorry.
Q. Okay. Just like with the Sunrise account, you have a Resolution of Authority here for the Northshore account, correct?
A. Yes.
Q. And just like with the Sunrise account, you represented that you are the only member or manager of Northshore Motor Leasing LLC, correct?

87 (Pages 345 to 348)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

349

A. D. DEO

A. Can I read it?

Q. Sure.

A. No, the thing that you were referring to.

Okay.

Q. And you signed this document, correct?

A. Yes.

Q. And it's referring to page 3.

Based on the site visitation from page 11, you, personally, met with Mr. Puccio on August 18, 2022, correct?

A. That's what it says, yes.

Q. Looking at the first statement for Northshore in March of '23. You received your $500,000 from Flushing Bank as a loan, correct?

A. Is that what that is?

Q. Did you receive $500,000 from anyone else on March 22nd of 2023?

A. I don't recall, but...

Q. You used Car Buyers NYC Inc. to fund this account on March 20th, correct?

350

A. D. DEO

A. I mean, it looks -- it looks like something was credited from Car Buyers. I don't know how it was done.

Q. This is an example of you using other companies to fund other companies that you own, correct?

A. I disagree with that statement.

Q. As soon as you received the $500,000, you immediately paid Laurie $50,000, correct?

A. It went to DLA Capital, yes.

Q. What was that money for?

A. His commission.

Q. He received a 10 percent commission?

A. Ten percent yes.

Q. You also paid $50,000 back to Car Buyers and then 85,700. What were those monies for?

A. I don't recall at the moment.

Q. Wasn't the purpose of this $500,000 for working capital for Northshore, Sunrise and Superb?

A. I disagree with that statement.

351

A. D. DEO

Q. Isn't that what you told Tony you were doing?

A. When did I say that?

Q. Ever.

A. I disagree with that statement.

Q. Looking at the next month's statement, for April of '23, you paid $9,752.78 towards the loan, correct?

A. Payment to loan.

Q. Then you paid another 75,700 to Car Buyers, correct?

A. I wired, yes.

Q. Why did you wire all this money to Car Buyers?

A. I don't recall.

Q. When you wired the money to Car Buyers, what did you do with the money?

A. I don't recall.

Q. Is it fair to say that you did not use the $500,000 that you received for the purpose of running Northshore or Sunrise or Superb?

A. I disagree with that statement.

Q. Do you have any evidence to show

352

A. D. DEO

that you used the money that you received for working capital for either of those dealerships?

A. I don't have anything at the moment.

Q. Focusing on the May 2023 statement, you continued to send large amounts of money to Car Buyers, correct?

A. Could I see the statement date again? Okay. So Northshore -- okay.

Q. Northshore paid Car Buyers 35,000 and 60,000 and 20,000, right?

A. It wired monies into there, yes.

Q. Then you paid a number of checks from Northshore. Do you see that?

A. Yes.

Q. And you paid some more large sums to Car Buyers, correct?

A. Yes. There's some more wires. There's another one to Northshore.

Q. You moved $30,000 from Northshore's Flushing account to Northshore's Flagstar account, correct?

88 (Pages 349 to 352)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

353

A. D. DEO

A. That's Flagstar, yes.

Q. And Flagstar was the Signature account, right?

A. Yeah, Flagstar used to be Signature.

Q. One of the checks that you paid out was to Zenia Cleaning for $400. Do you see that?

A. Yes.

Q. Was that for your home?

A. She cleans the dealerships and my home.

Q. What's the name of the person that owns Zenia Cleaning?

A. I'm assuming it's Zenia.

MR. KATAEV: Z-E-N-I-A.

Q. And Jeremy Messon is a salesperson, correct?

A. If it's the same Jeremy from Superb, yeah.

Q. Adrian is also a salesperson?

A. Yes.

Q. And Andrew?

A. Oh, I don't know who Andrew is.

354

A. D. DEO

Commission -- is that -- you're scrolling past.

Q. What about William Herrera, is that a salesperson?

A. I don't remember who William Herrera was.

Q. What about Parmeshwar Bissoon?

A. Yes, he was.

Q. Okay. That was your salesperson, right?

A. He worked for, I mean, all three of our companies.

Q. He worked for Northshore before you came to Superb, didn't he?

A. He was a salesperson at -- I don't know if it was Northshore or 189.

Q. Okay. To your knowledge, did Mr. Bissoon ever meet Tony?

A. Oh, I don't know.

Q. Is Andy Vasquez a salesperson?

A. No. We made Andy a manager.

Q. Who is this payment to?

A. That's Marc's company.

Q. What does Marc's company do?

355

A. D. DEO

A. His -- what he listed his company as, I wouldn't know.

Q. What did you pay him $2,000 for?

A. He was an independent contractor.

Q. What kind of services did he provide as an independent contractor?

A. Many.

Q. Give me one example.

A. Security.

Q. Is that the only thing he did?

A. No.

Q. We're now looking at the June 2023 Flushing Bank statement for Northshore Motors, right?

A. Yes. Yes. I'm sorry.

Q. And then here you continue to send large sums of money to Car Buyers, correct?

A. I wired money into Car Buyers -- Car Buyers, yes.

Q. 20,000 and $40,000, as well as 25,000, correct?

A. Yes.

356

A. D. DEO

Q. And an additional 20,000, right?

A. Yes.

Q. What was this payment, $48,000, for?

A. Well, it was wired into Superb. I don't know the particulars of it.

Q. Do you have any records reflecting what that payment is for?

A. I wouldn't have any records.

Q. When you make these wires, do you provide any memo?

A. What do you mean, "memo"?

Q. There's an option when you send wires to make a memo. Are you familiar with that?

A. I -- I don't recall the interface for -- is this -- this is Flushing, right?

Q. Flushing.

A. Yeah, I don't remember what the interface looked like.

Q. All these wires and checks that we've looked at, you were the one that initiated those wires and checks,

89 (Pages 353 to 356)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

357

A. D. DEO

correct?

A. For this account, yes.

Q. No one else had access to this account to make those wires or write those checks, correct?

A. We never got fully set up, no.

Q. What business was Car Buyers engaged in?

A. Consulting, I would say.

Q. Can you be more specific about the type of consulting?

A. Consulting in the car industry.

Q. So in other words, Car Buyers was a way for you to pay yourself?

A. I didn't say that.

MR. BENJAMIN: Objection.

Q. Was it for your consulting services?

A. The company did consulting.

Q. Were you the only consultant at Car Buyers?

A. I don't recall.

Q. Did Car Buyers ever issue any 1099s or W-2s?

358

A. D. DEO

A. I don't recall.

MR. KATAEV: We're going to call for the production of all tax documents for Car Buyers NYC Inc., including the form W-2s, form 1099s, and any other documents that would show that there's some other consultant, other than you. We'll follow up in writing.

Q. I'm going to present what will be Deo 30.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 30, a 12-page document, was marked for identification.)

- - -

Q. Mr. Deo, this is a compilation of 12 checks that you signed without authorization, bearing Docket Entry 11-16 in this case.

This is a check from Superb to Northshore with your signature on it,

359

A. D. DEO

correct?

A. That is my signature.

Q. You did not have the authority to sign this check and present it for payment to Northshore, correct?

A. I disagree with that statement.

Q. What is your basis to disagree with the statement?

A. My conversation with Tony.

Q. Tony -- you're telling me that Tony authorized you to sign these checks?

A. Tony said I could sign checks and he was going to make sure that Bruce took care of it.

Q. Do you have anything in writing to show that Tony authorized this?

A. It was a conversation with me and Tony in July, I think.

Q. Is there anything in writing that indicates what you're saying is true?

A. There was a conversation.

Q. You signed this check from

360

A. D. DEO

Superb's Chase account, payable to Northshore, for $37,500, correct?

A. I signed the check, yes.

Q. The date on this check is July 25, 2023, correct?

A. That is the date.

Q. And the date on the first check we looked at is July 12, 2023, correct?

A. July 12th, yes.

Q. Tony was on vacation in Europe for two to three weeks at this time, wasn't he?

A. I don't know Tony's whereabouts at that time.

Q. You didn't have any contact with Tony in July of 2023 about these checks, did you?

A. Bruce would be the one monitoring the check register after Kendra initiates these contracts. So if not Tony, his representative, Bruce, would. So if Tony had knowledge of it, I wouldn't know.

Q. You said "initiate these

90 (Pages 357 to 360)

Case 2:23-cv-06188-JMW    Document 518-10    Filed 06/01/26    Page 93 of 351 PageID
#: 13896
SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

361

A. D. DEO

contracts." You mean initiate these checks, correct?

A. I mean -- what'd I say, contracts? I meant checks.

Q. So your testimony today is that if you didn't have any conversation with Tony about it, Bruce, as the CFO, authorized it, correct?

A. Bruce was the COO.

Q. And your testimony is that Bruce, as the COO, authorized these checks, correct?

A. He said it was -- he told the controller to print them, yes.

Q. Do you have any text messages with Bruce about this subject?

A. I -- I don't recall. I don't know. I don't know.

Q. Are you aware of any conversations between Bruce and Kendra, the controller at that time, about these checks?

A. I wouldn't know of the conversations between Bruce and Kendra.

362

A. D. DEO

Q. Why is Superb writing checks to Northshore?

A. The context or the reason behind it, at the moment, I wouldn't know. But it was definitely agreed upon. It wasn't just random.

Q. You would agree with me, though, that the shareholders agreement that you did sign with Tony does not allow you to write these checks, correct?

A. I didn't write the checks.

Q. Who wrote these checks?

A. The controller.

Q. You would agree with me that the shareholders agreement that you signed with Tony for Superb does not authorize you to sign these checks, correct?

A. I don't think the shareholders agreement mentioned anything like that.

Q. No? Let's take a look.

I'm presenting to you Deo 31, 13-page shareholders agreement. ECF Docket Entry 11-6.

- - -

363

A. D. DEO

(Whereupon, Plaintiffs' Exhibit Deo 31, a 13-page document, was marked for identification.)

- - -

A. When was it dated?

Q. There's a blank next to day, but it's December 2022?

A. Okay.

Q. And it's signed by you, but not by Tony. Do you see that?

A. Oh, okay.

Q. Is that your signature?

A. That is my signature.

Q. Focusing your attention on page 10, paragraph 12 of this agreement, under subsection A, titled Urrutia, it says, in operating the corporation, Urrutia shall have the following responsibilities: Final say on hiring and firing employees, capitalization, establishment of sales and admin policies, as well as marketing techniques, approval and

364

A. D. DEO

management of all sales and resales, approval or disapproval of profit margins, policies and standards for services provided by the company, a review and final approval of financing agreements, supervise and have complete control of the accounting department, that Urrutia will make available to the corporation the used vehicles in inventory in New Jersey at Volkswagen of Freehold and Team Mitsubishi of Hartford.

Do you see that? Do you see that?

A. I see all those things, yes.

Q. In subsection 8 it says that the complete control of the accounting department of the corporation includes, but is not limited to, sole check authorization, correct?

A. I see it says that.

Q. Do you know what that means?

A. You could explain it.

Q. Sole check authorization means

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

365

A. D. DEO

that he's the only person authorized to sign checks.

A. Okay.

Q. When you signed this agreement, did you understand that?

A. A lot of those things that you just read off changed as we operated, but...

Q. There's nothing in writing indicating that those things changed, correct?

A. I don't know, we had another writing, no.

Q. You didn't have another writing, correct?

A. No.

Q. Okay.  This agreement also says that Urrutia or Tony has sole control of bank accounts owned by the corporation, correct?

A. That's what it says.

Q. The only duties outlined for you in paragraph 12, subsection B, is that you'll propose the individual who will

366

A. D. DEO

serve as the general manager, correct?

THE STENOGRAPHER:  Propose --

Q. Propose the individual who will serve as the general manager of the day-to-day operations, correct?

A. That's what it says there, yes.

Q. Under 13, paragraph 13, subsection A, it says that "This agreement shall not be changed, modified or amended, except by a writing signed by the shareholders and this agreement may not be discharged except by performance, in accordance with its terms or by a writing signed by the shareholders."

Do you see that?

A. I see that.

Q. Do you understand that your position that the deal changed based on your say-so does not fly based on this provision?

A. I disagree with that statement.

Q. Do you understand that your

367

A. D. DEO

position that the deal changed by your conduct without a signed writing has no legal effect?

MR. BENJAMIN:  Objection.

A. I can't -- I can't answer on legal --

THE WITNESS:  I'm sorry.

MR. BENJAMIN:  You're asking a legal conclusion.

MR. KATAEV:  Just object.

MR. BENJAMIN:  I objected, but if you're asking a legal conclusion, I'm just going to instruct him not to answer.

MR. KATAEV:  That's an improper instruction, but we'll mark it for a ruling.

MR. RUDERMAN:  Why don't you meet and confer first --

MR. BENJAMIN:  Are you asking --

MR. RUDERMAN:  He can answer to the best of his understanding, understanding he's not an

368

A. D. DEO

attorney, if he's able to, rather than having another marked ruling.

Up to you.  Rather than your objection directing him not to answer.

MR. BENJAMIN:  What was his answer before my objection anyway?

- - -

(Whereupon, the referred-to answer was read back by the stenographer.)

- - -

MR. KATAEV:  Can we read back the question.

MR. BENJAMIN:  I think he answered it already, so I'll just preserve my objection on the record and allow the answer that he already answered.

MR. KATAEV:  I want to ask one more time.

Can we read it back.

92 (Pages 365 to 368)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

369

A. D. DEO
---
(Whereupon, the referred-to question was read back by the stenographer.)
---
MR. BENJAMIN:  Objection as to asking a legal conclusion.  I think the witness has already answered the question, so...
Q. Please answer it again.
A. I can't answer a legal question.
Q. Presenting to you Deo 32.  I'll represent to you that this is signature cards for the Chase account, ECF Docket Entry 11-11.
---
(Whereupon, Plaintiffs' Exhibit Deo 32, a four-page document, was marked for identification.)
---
Q. The only individuals listed with signing authority for this account are Tony and Karla Cruz, correct?

370

A. D. DEO
A. I can't speak on that.
Q. I'm showing you the document.  I'm asking is your name on here?
A. I don't see my name.
Q. Was this your signature on the bottom left?
A. That's not my signature.
Q. I'm showing you a second signature card, page 2.  Do you see your name or signature anywhere here?
A. No.
Q. What about here?
A. No.
Q. Going to page 3, is your signature here?
A. That's not my signature.
Q. What about on the fourth page?
A. Alex.  When was that?
Q. It's dated October 10, 2022.
A. I didn't know Alex was a partner.
Q. You're not found anywhere on these signature cards, are you?
A. You haven't showed me my name,

371

A. D. DEO
no.
Q. Do you have a signature card that authorizes you to write checks from Superb's account?
A. I don't have a signature card, no.
Q. So you would agree with me that it was improper of you to sign checks without being on the signature card, in light of the shareholders agreement, correct?
A. I disagree with that statement.
Q. Presenting to you Deo 33, which is ECF Docket Entry 112-7.
---
(Whereupon, Plaintiffs' Exhibit Deo 33, a nine-page document, was marked for identification.)
---
Q. Focusing your attention on page 2 of this document.  Please read.  Let me know when I can scroll down.
A. Okay.

372

A. D. DEO
MR. KATAEV:  Let the record reflect that I've scrolled down so he could finish reading the document.
A. What is this?
Q. I'm representing to you that this is a capital call letter sent to you on August 4, 2023, by certified mail, return receipt requested.
Do you recall receiving this document?
A. I'm -- I'm reading this now.
Q. Your testimony is that this is the first time you're seeing this document?
A. Yes.
Q. You never responded to this document, correct?
A. I -- I don't remember seeing this.
Q. Okay.  You were asked to put capital into Superb based on your assertion that you're an owner of Superb.  Did you ever do that?

93 (Pages 369 to 372)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

373

A. D. DEO

A. I put cash into Superb, yes.

Q. When?

A. Various times.

Q. Other than the $500,000, when did you put in cash in Superb, and the $48,000 that we saw from Northshore?

A. As I said, there's various times that I put in.

MR. KATAEV: We're going to call for the production of all documents showing that you placed any money into Superb from any of your corporate accounts or from your personal name. We'll follow up in writing.

Q. This capital call letter from August of 2023 asks you to put in $1.2 million. Did you ever put in $1.2 million into Superb?

A. I did not put 1.276, no.

Q. No. Never, right?

A. I mean, I don't know how much I put in, but I didn't put 1.276, what that's stating.

374

A. D. DEO

Q. After August 4th of 2023, you didn't put a single dollar into Superb, correct?

A. Because you guys locked me out.

Q. 'Cause you stole all the money from Superb, correct?

MR. BENJAMIN: Objection.

Q. Correct?

A. I disagree with your statement.

Q. 'Cause you took all the vehicles from Superb and put it in Northshore and Sunrise without authorization, correct?

A. I disagree with that statement also.

Q. You deny that you took the cars?

A. I deny your statement.

Q. Did you take the cars from Superb to Northshore and Sunrise?

A. We place cars at 189 Sunrise and --

Q. You did -- go ahead. I'm sorry.

A. Let me finish.

And 180 Michael Drive. Everyone

375

A. D. DEO

knew that that happened.

Q. Everyone except Tony, correct?

A. Tony knew also.

Q. What evidence do you have to show that Tony knew that the cars were being moved from Superb -- from Superb to Sunrise and Northshore?

A. That's how we operated business at all three locations.

Q. But you took virtually every single vehicle from Superb in July of '23 and placed it on Northshore and Sunrise?

A. I disagree with that statement.

Q. Okay. Showing you Deo 34. This is a declaration from Nathanel Orgad, N-A-T-H-A-N-L -- A-N-E-L, ECF Docket Entry 40.

- - -

(Whereupon, Plaintiffs' Exhibit Deo 34, a four-page document, was marked for identification.)

- - -

376

A. D. DEO

Q. Do you see that?

A. Yes. Yes.

Q. Paragraph 2020 -- sorry, paragraph 22, "In late July 2023, Deo was throwing a car event at 180 Michael Drive in Syosset, New York, which I was invited to and attended."

Do you see that?

A. Yes.

Q. Paragraph 23, "I noticed that many of the vehicles from Superb were moved there, and in late July 2023, there were only 10 to 15 vehicles left on the lot at Superb."

Do you see that?

A. I see that.

Q. Paragraph 24, "I became concerned about this and actually thought that Superb was closing."

Do you see that?

A. I see that.

Q. Okay. So based on Mr. Orgad's observations, sworn-to observations, are you denying that almost all the

94 (Pages 373 to 376)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

377

A. D. DEO

vehicles were moved from Superb to Northshore and Sunrise?

A. Yes.

Q. Okay. Did you -- absent a court order, did you ever return these vehicles of your own accord?

A. What vehicles are you talking about?

Q. The vehicles that you took from Superb.

A. Are you talking about the injuncted vehicles?

Q. Among others.

A. Only the injuncted vehicles that stayed at Northshore and 189.

MR. KATAEV: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 5:55 p.m. This is the end of Media No. 10.

- - -

(Whereupon, a recess was taken at this time.)

378

A. D. DEO

- - -

THE VIDEOGRAPHER: We are back on the record. The time is 5:58 p.m. This is the start of Media No. 11.

MR. KATAEV: Mr. Deo, subject to all parties' prior agreement that you'll be produced for another day and my representation to you from the videographer that we've been on the record for six hours and three minutes, when we come back at a mutually available date, I will continue my deposition for another 57 minutes, and then the Island Auto Group plaintiffs will start their deposition of you.

I have no further questions for you today, subject to that agreement. Thank you.

MR. BENJAMIN: On the record, I'm just going to request that all exhibits, marked

379

A. D. DEO

exhibits today be sent to me either in a big file or however you want to give them to me.

MR. KATAEV: Also, I'll say this on the record. I did provide the court reporter with access to the exhibits. She will be in contact with me over the next couple of days to ensure that she has all of them. And we will produce them to all counsel of record in the case.

THE VIDEOGRAPHER: Take us off officially for today?

MR. KATAEV: We're off the record. Thank you.

THE VIDEOGRAPHER: This concludes the January 12, 2026 video testimony of Anthony Deo. The time now is 5:59 p.m. and there are 11 media files to this deposition. Thank you.

THE STENOGRAPHER: Harry, I didn't ask you if you wanted a

380

A. D. DEO

copy.

MR. THOMASSON: No, I'm good. Thank you.

THE STENOGRAPHER: How are you going to file all your paperwork?

MR. THOMASSON: I'll deal with Mr. Benjamin.

THE STENOGRAPHER: Mr. Benjamin, you're going to pay for his copy?

MR. BENJAMIN: I'll get back to you on that.

THE STENOGRAPHER: There's no sharing. You know that, right?

MR. BENJAMIN: I know that.

THE STENOGRAPHER: Okay. Jeff, what did you decide?

MR. CIANCIULLI: I would like to have a copy, please.

THE STENOGRAPHER: Does anyone else need a rough besides questioning attorney?

95 (Pages 377 to 380)

Case 2:23-cv-06188-JMW  Document 518-10  Filed 06/01/26  Page 98 of 351 PageID #: 13901

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

381

A. D. DEO
MR. BENJAMIN:  Yeah, PDF.
MS. RONNEBURGER:  How much is the rough?
THE STENOGRAPHER:  I'll get you a quote.
MR. CIANCIULLI:  Just standard.
MS. RONNEBURGER:  Get us a quote for both.
THE STENOGRAPHER:  Quote on both?
MR. BENJAMIN:  Yes, please.
(Time noted:  6:01 p.m.)

382

A. D. DEO
INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

383

A. D. DEO
- - - - - -
E R R A T A
- - - - - -
PAGE  LINE  CHANGE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

384

A C K N O W L E D G E M E N T
STATE OF NEW YORK)
:SS
COUNTY OF _____)
I, ANTHONY D. DEO, hereby certify that I have read the transcript of my testimony taken under oath on January 12, 2026, that the transcript is a true, complete and correct record of what was asked, answered and said during my testimony under oath, and that the answers on the record as given by me are true and correct, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
ANTHONY D. DEO

Signed and subscribed to before me, this _____ day of _____, _____.

_____
Notary Public

96 (Pages 381 to 384)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo  ---  January 12, 2026

385

INDEX OF WITNESSES

WITNESS:  ANTHONY D. DEO
EXAMINATION BY                          PAGE
MR. KATAEV                              9

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Deo 1 | 100-page document | 68 |
| Deo 2 | Five-page document | 76 |
| Deo 3 | 18-page document | 100 |
| Deo 4 | Two-page document | 116 |
| Deo 5 | Two-page document | 121 |
| Deo 6 | 12-page document | 153 |
| Deo 7 | Five-page document | 161 |
| Deo 8 | Document | 183 |
| Deo 9 | Two-page document | 187 |
| Deo 10 | 18-page document | 194 |
| Deo 11 | 192-page document | 200 |
| Deo 12 | Four-page document | 219 |
| Deo 13 | 32-page document | 225 |
| Deo 14 | Six-page document | 240 |
| Deo 15 | 15-page document | 249 |
| Deo 16 | Nine-page document | 251 |
| Deo 17 | Seven-page document | 255 |
| Deo 18 | 14-page document | 261 |
| Deo 19 | Nine-page document | 265 |
| Deo 19.1 | Three-page document | 272 |
| Deo 20 | 28-page document | 273 |
| Deo 21 | Three-page document | 276 |
| Deo 22 | Two-page document | 282 |
| Deo 23 | Document | 292 |
| Deo 24 | Document | 293 |
| Deo 25 | Document | 303 |
| Deo 26 | 23-page document | 314 |
| Deo 27 | 43-page document | 327 |
| Deo 28 | 58-page document | 332 |
| Deo 29 | 66-page document | 348 |
| Deo 30 | 12-page document | 358 |
| Deo 31 | 13-page document | 363 |
| Deo 32 | Four-page document | 369 |

386

| Deo 33 | Nine-page document | 371 |
| Deo 34 | Four-page document | 375 |

(*Indicates exhibit(s) retained by counsel)

INDEX OF REQUESTS

| DESCRIPTION | PAGE |
|---|---|
| Retainer agreement | 21 |
| Agreement | 25 |
| Plea agreement | 40 |
| Organization and formation documents | 104 |
| Applications and documents | 105 |
| DMV license application documents | 106 |
| Corporate formation documentation | 117 |
| Banking records | 118 |
| Corporate formation documents | 122 |
| Documentation | 124 |
| Records | 126 |
| Bank statements | 128 |
| Organization documents | 158 |
| Payments | 169 |
| Application | 177 |
| Statements | 204 |
| Documents and communications | 209 |
| K-1s | 237 |
| Prefilled 4506-T forms | 238 |
| Intercompany loans | 289 |
| Tax documents | 358 |
| Documents | 373 |

INDEX OF RULINGS

| PAGE | LINE | QUESTIONING ATTORNEY |
|---|---|---|
| 21 | 11 | MR. KATAEV |
| 367 | 16 | MR. KATAEV |

387

CERTIFICATE

I, DEVORA HACKNER, a stenographic reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

DEVORA HACKNER
Dated:  January 12, 2026

388

LAWYER'S NOTES
PAGE/LINE   NOTE

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

389

| A | | | |
|---|---|---|---|
| **A-N-E-L** 375:18 | 301:16,22,25 302:3 | 278:9,12 387:11 | **advised** 86:14 |
| **a.m** 1:23 7:2 48:22 | 302:13,16,20 303:8 | **active** 117:25 122:16 | **affect** 17:7 266:7 |
| 55:9 88:19 94:19 | 309:23 315:9,13,16 | 128:7 280:8 297:18 | 267:21 278:2 |
| 106:25 107:9 | 318:2,13,14,21 | 298:2,2 | **affidavit** 100:24 |
| 188:21 | 319:4,7,10,12,15,20 | **activity** 119:2 163:19 | 101:13 102:12 |
| **Aaronson** 1:5 3:10 | 319:22,23 320:2,7,9 | 237:21,24 297:10 | **affiliated** 39:25 |
| 67:13 199:16 207:4 | 320:22,24 321:2,4,6 | 299:18 339:2,7 | **affirmation** 100:23 |
| 216:16,21 217:2 | 321:7,11,16,20,24 | **acts** 220:16 222:16 | 101:8,17 102:8,10 |
| 224:9 235:13 | 322:6,7 328:6,11 | 222:19,23 223:3,19 | **afford** 32:6 |
| 252:10 255:3 293:8 | 330:16,24 331:10 | **actual** 244:18 268:13 | **afternoon** 19:18 |
| 295:7 | 331:14,19 332:2,3 | 297:21 344:5 | 323:22 |
| **Aaronson's** 272:3 | 332:21 334:24 | **added** 179:23 180:7 | **against-** 1:11 |
| **Abdul** 26:24 | 335:22 336:2 | **additional** 11:17 | **agency** 37:2,16,24 |
| **abide** 35:10 | 338:21 339:24 | 77:18,22 78:6 95:3 | **ago** 14:25 27:11,19 |
| **abilities** 135:17 | 343:15 345:23 | 164:20 181:4 | 29:11 33:8 100:6 |
| **ability** 17:7 266:7 | 346:19 347:4,5,21 | 190:13 356:2 | 108:2,3,5 |
| 267:21 278:3 279:4 | 348:8,13,18,20,23 | **address** 8:21 23:5 | **agree** 7:10 9:8,18 |
| 300:25 | 349:24 352:24,25 | 43:17,19,20 44:9,23 | 11:23 35:18 49:17 |
| **able** 25:7 33:11 54:6 | 353:4 357:3,5 360:2 | 45:5 114:14,16 | 83:16,19 84:21,23 |
| 67:9 70:9 84:18 | 369:15,24 371:5 | 126:15 161:16,22 | 85:19 154:22 |
| 95:25 96:18,20,20 | **accountant** 166:6 | 161:24 163:3,11,13 | 174:14 210:12 |
| 113:5 216:22 368:2 | 167:15 | 164:17 247:21 | 214:19 216:4,9 |
| **above-entitled** 2:5 | **accountants** 165:8,22 | 273:2 282:24 | 222:13 284:9,9 |
| **absent** 377:5 | **accounting** 179:11 | **addresses** 297:19 | 313:5 315:4 320:21 |
| **absolutely** 139:15 | 364:8,18 | **adjusted** 347:11 | 321:12 324:20 |
| 151:22 179:13 | **accounts** 119:2,9,13 | **adjustment** 347:8,9 | 325:21 326:7,17,19 |
| 238:8 271:23 | 119:15 181:14 | **admin** 363:24 | 326:21 345:12 |
| 306:12 321:2 | 199:19 221:6 225:6 | **administer** 5:17 | 362:8,15 371:8 |
| **access** 67:15 208:15 | 226:6 227:21 228:6 | **administrative** 266:5 | **agreeable** 12:23 |
| 212:15 271:7 357:4 | 228:12,22 229:5 | 267:19 | **agreed** 5:4,9,14 9:20 |
| 379:8 | 230:2,7,12,15 | **admit** 313:22 314:14 | 35:9 149:22 168:24 |
| **accompanied** 339:14 | 239:19 286:22 | **admitted** 35:20 | 213:16 301:21,23 |
| **accord** 377:7 | 304:18 316:21 | **Adrian** 353:22 | 310:11,14 324:18 |
| **account** 118:12,15 | 320:8 330:17 331:5 | **advance** 205:6,8,10 | 362:6 |
| 127:21,23 128:3 | 365:20 373:14 | 206:6,11,16 209:17 | **agreement** 21:14,20 |
| 175:14,21,24 176:6 | **accuracy** 346:6,10,11 | 209:20 213:18,18 | 23:21 24:17,19,21 |
| 176:8,9,12 182:2,4 | **accurate** 69:8,8,25 | 214:5 215:2 308:14 | 25:6,12 38:4 39:10 |
| 182:8 209:19,22 | 159:23 160:4 | **advances** 205:5 | 40:20,25 44:12,17 |
| 225:23,24 227:23 | 162:22 382:22 | 208:20 209:2,6,10 | 45:4,10,12 82:7 |
| 228:3 229:12 | **acronym** 119:24 | 213:3,5,13 214:15 | 149:17,25 152:21 |
| 230:16 240:5 | **act** 269:22,25 | **advantageous** 278:14 | 152:22 153:4,19 |
| 286:19 287:4 292:7 | **acting** 220:14 | **adversely** 266:7 | 154:15,16 155:2,3,9 |
| 292:13 293:25 | **action** 2:5 104:22 | 267:21 278:2 | 155:16 157:7,12 |
| 294:10,17,19 301:8 | 192:8 220:19 266:4 | **advertise** 137:16,25 | 178:3,5,8,11 206:7 |
| | 267:18 277:25 | **advice** 87:12,18 | 206:9 214:13,23,24 |

215:24 217:12,14 232:22 233:2,12,24 233:24 234:2,6 235:18,23,24 236:3 236:17 238:10,17 238:18,24 239:7 240:19 241:3,5,8,15 241:19,25 242:13 243:13,14 261:18 262:8,14,20,25 263:7,19 264:3,8,13 265:6 266:9,25 267:23 269:18,21 270:6,10,13 271:17 273:11 275:10,25 277:19,22 278:4 280:9,20 282:6,17 284:5 285:2,20 295:14 324:4 325:20 362:9,16,20 362:23 363:18 365:5,18 366:11,14 371:11 378:9,22 386:7,8,8
**agreements** 226:13 262:4 364:7
**ahead** 23:7 35:5 260:17 309:2 313:14 374:23
**al** 7:14,15
**Albert** 291:7,10
**alcohol** 17:6
**Alex** 370:19,21
**ALIVIA** 4:21
**allow** 14:8 88:7 89:17 362:10 368:21
**allowed** 35:14 80:11 80:11 95:7 222:16 222:18 223:3,19 256:22
**Ally** 125:11 193:2,9 193:14,20,22 194:8
**altering** 221:15
**Alysia** 249:23 251:18 300:7,9,13,16,21

301:4
**Alysia's** 300:22
**amend** 105:15 106:7
**amended** 22:12,18 366:12
**America** 76:16 127:24,25 228:8 229:19,21,23 294:3 294:5 329:14
**amount** 78:21 79:2 176:16,17 177:4,13 181:13 215:5 284:6 284:10,11 286:17 287:13,22 288:11 328:13 340:25
**amounts** 215:6 329:20 330:10,11 344:11 352:9
**and/or** 98:24 167:23
**Andrew** 4:18 7:23 353:24,25
**Andy** 354:21,22
**announced** 9:25
**answer** 6:15 14:3,9 14:17 15:12 17:19 17:23 20:10,11 21:5 21:7,16 23:4 24:15 25:9 33:2,11 34:5 35:24 37:11,13,14 37:20 40:12,13 47:6 50:4 55:18 56:18 64:19 66:10 69:15 74:5,16 75:5,8 84:24,25 85:4 87:16 87:23 88:7,11,13 89:11,18 92:18 93:6 95:23,24 97:2,5,7 98:11 102:23 152:24 172:24 173:2 186:14 195:23 212:11 217:6 218:16,23 223:5,15,25 224:2 229:2 236:6,15 240:12 242:7 246:9

246:10,18 256:14 256:16,18 261:5 277:6 281:7 283:23 310:6 327:5,12 331:4 367:6,15,23 368:7,9,13,21 369:11,12
**answered** 21:9 45:6 57:8 69:12 86:20 87:8 223:10,14,23 231:10 290:19 368:19,22 369:10 384:10
**answering** 13:3
**answers** 15:3 17:2,12 24:23 86:25 248:2 384:12
**Anthony** 1:4,12 2:4 3:4,18 4:19 7:13,15 8:18 10:2,13,23 51:21 86:11 105:8 263:16 303:10 341:5,7,14 379:20 384:6,18 385:3
**anthonyd@norths...** 161:18
**anymore** 32:2 248:13 300:23
**anytime** 16:11 202:18
**anyway** 368:10
**apologize** 333:2
**appearances** 8:5 80:22
**appeared** 69:2 250:2
**appearing** 19:19 52:17
**appears** 227:5
**application** 72:10,12 74:3,10,19 86:17 92:4 105:13,14,16 105:17,20,24 106:12 123:7 159:9 159:23 160:3 161:7 161:15,19 162:3

164:22 165:5 167:14 168:23 169:4,14,17,19,21 169:23,25 170:3,6 171:6,10,21 172:15 172:18 173:15,21 173:24,25 174:2,5 174:16,22 176:16 176:18 177:8,12,15 177:19,21 178:18 181:5 255:16,18 256:3,9 257:7,19 258:13,15,22,24 259:2,6 264:18 293:25 311:15 312:8,14 313:10,24 314:15 317:20 324:6 333:6 335:21 386:10,15
**applications** 72:17,23 73:6 98:10,21 105:4 106:5,8,14 110:21 126:4 189:8,19 190:14 258:19,21 386:10
**applied** 72:4,8,14 73:7,17 85:23 98:5 102:13 158:19,21 158:22,24 177:14 181:25 184:3 225:5
**applies** 88:24
**apply** 97:9,19,25 113:20 125:24 129:15,17,18,25 158:13 260:21 296:3 302:7
**applying** 73:20 159:3 189:15 227:20 264:5 310:16 316:24
**appropriate** 224:4 325:18 334:15 382:7
**approval** 78:7 314:17 363:25 364:3,6

approve 72:21 134:14
approved 72:10,12 72:15,18 73:15 85:24 105:16 106:7
approximately 289:23
April 314:19,23 318:3,6,9 321:9,20 321:24 328:10 330:16 331:2 339:8 339:12 340:7,12,13 340:17,18,22,23 341:4,16 342:4 343:16 345:3,6 347:18 351:8
arbitration 266:6 267:20
ARIEL 4:10
arisen 51:13
arises 49:8
ARONBAYEV 4:22
aronneburger@cu... 4:11
arose 197:25 199:9
arrangement 300:2
arrest 32:19 36:24 37:17 79:22 80:19
arrested 32:9,11,23 32:24 33:6,13 79:17 79:20
arrived 28:9
arrow 176:5
Artex 329:22,24 330:2,3
Asad 1:5 130:25 131:3,4,5,11,14,16 132:3 197:13,16
aside 227:13 263:25 275:5 330:19
asked 29:4 55:19 57:12 59:24 61:4 69:11 84:3 91:21,25 92:16 128:24 129:5 151:6 181:7,12

185:13 223:6 231:9 246:2 253:24 295:21 296:14 297:4 311:19 312:24 313:7 372:22 384:10
asking 13:2 25:5 33:4 37:3 40:14 56:2,5,9 56:19 75:2 83:23 84:7,9 95:15,19,20 109:4 123:14 141:6 145:11 147:17 170:9 191:24 192:19 202:22 206:17 211:10 229:3 235:21 236:9 240:2,10 242:11,12 243:9 244:10 247:3 249:2 279:8,11 285:13 287:17 288:15 290:17 294:20 296:16 301:11 306:16 313:4,6,12 317:6 320:4 346:25 367:9 367:13,22 369:8 370:4
asks 164:20 256:8 373:18
aspect 35:2 317:9
assertion 372:24
assets 220:21 221:10 221:17 244:8 284:18,22 285:6,9
assigned 126:19
assistance 161:7
associate 46:2 150:23
association 62:16
assume 14:18 79:21 119:10 179:9 183:20 186:9 202:8 210:18 227:25 271:20
assumed 271:16
assuming 156:16

203:12 220:9 245:23 294:11 342:9 353:16
assumption 113:8 129:22 196:21 210:9,13 288:9 290:15 298:7 299:20 341:17
Athletic 41:9
attached 226:7 382:14 384:15
attempt 49:10 51:16 97:9,14
attended 376:8
attention 194:25 200:22 220:10 248:15 252:6 256:7 257:6 292:23 363:16 371:22
attorney 4:2 10:11 11:11 19:20 22:2 36:7,12,17,19 37:12 51:4 66:3,4,14 86:2 86:14 87:6,10,15 88:3,4 89:8 90:19 92:6,10,15,17 107:19 157:15 193:8,10 205:23 233:6 239:4 262:10 270:11 276:23 285:19,22 368:2 380:25 382:18 386:21
attorney's 87:18 92:12
attorney-client 21:2 87:3 88:23 89:3
attorneys 3:3,8,18 4:7,12 5:5 11:6,8 18:7 272:3,13
auction 138:21
Audio 7:8
audits 303:22
August 181:24 182:24 188:3,20,25

189:4,14 190:6 191:5 349:13 372:9 373:18 374:2
authorities 38:7,17 39:12 40:21
authority 47:8,16 333:16,21 335:6 348:19 359:4 369:24
authorization 358:22 364:21,25 374:13
authorize 215:4 362:17
authorized 5:16 313:8 359:12,18 361:9,12 365:2
authorizes 371:4
Auto 1:3,4,6,6,6,7,7,7 1:8,8,17 3:4,9,10,11 3:11,11,12,12,13,13 10:12,18 11:8 13:5 72:2 99:4,7 101:2 119:23 131:22 168:19 197:25 198:5,10,25 199:10 199:14 200:17 201:3 208:11 210:5 217:15 219:18 224:14,22 235:13 235:14 238:11 272:14 273:25 276:18 282:4 291:22 295:8 324:25 378:18
automatically 270:7
automative 163:20 163:21
automobile 107:23 113:3,7 167:7
automotive 1:14 3:20 125:6 167:11
Autos 115:18,25 116:11,22 117:2,7 117:13,23 118:8,12 118:22,24 120:2,6

122:2 166:7
**availability** 150:11
**available** 52:21 53:16
  325:24 364:9
  378:15
**Avenue** 3:5,14,22
  115:19,22
**avoid** 260:25
**await** 94:22
**aware** 22:11 66:3,13
  78:13 217:20,23
  221:20 271:25
  279:20 289:21
  291:10,13,16
  331:24 342:19
  361:20

_____

**B**

**B** 365:24 385:7
**B-E-R-R-I-O-S**
  38:11
**baby** 26:14
**Babylon** 39:4
**back** 16:4,5,6,16
  27:17 28:8,11 47:20
  47:23 55:5,8,11
  62:4 68:8 75:4,9
  82:25 83:5 85:9,16
  91:18 94:18 96:5,7
  96:10 98:18 102:3
  105:12 107:8,11
  118:18 133:5,9
  147:21 172:6,7,10
  173:4,8 180:23
  188:10 191:3
  204:25 205:12,15
  205:18 209:14
  212:3,7 213:5,13
  214:14,20 223:8
  224:6 244:4 246:12
  246:15 248:6
  254:21 256:6 278:7
  281:20 286:13
  287:13,21 289:23
  292:5 304:25

308:13 323:19
324:8 327:4,13,16
340:10 350:18
368:13,17,25 369:4
378:4,14 380:13
**bad** 261:14
**bail** 256:10
**bank** 1:16,17 4:8
  11:12 118:7,11,15
  118:16 119:8
  127:20,23,24,25
  128:2,11 134:13
  135:4 176:12
  181:14,21,25 182:3
  182:7,9,9,16 183:9
  183:24 190:18
  199:19 209:19
  221:6 225:6,6
  226:19,21,24
  227:16,18,20,21,23
  228:3,6,8,11,21,21
  229:9,10,11,13,16
  229:18,21,23,25
  230:11 231:24
  239:16 286:19,22
  287:3 292:15 294:3
  294:4 301:9,17,22
  301:25 302:3,4
  306:13 310:8,21
  311:15 313:10
  314:11 315:5
  317:20 325:4
  326:13 328:6
  329:13 332:2
  333:17 335:21
  336:2 338:19
  342:20 343:7,12
  349:18 355:15
  365:20 386:13
**banking** 118:21
  386:11
**bankruptcy** 266:4
  267:18 277:25
**banks** 114:5 123:22
  131:9,10 149:23

150:3,12 229:4
231:20,23,25 232:2
232:6,8,9
**Baron** 1:5,5,6 3:10
  99:11,18,24 130:21
  130:23 149:12,18
  151:9 154:20 155:6
  156:22 160:7,11,16
  171:3,7 174:10,13
  174:15,21,25
  179:22 180:8 224:9
  293:11
**Baron's** 171:16
  199:17
**based** 52:10 92:19
  95:2 96:17 192:19
  195:10,17 250:18
  264:22 281:5 290:3
  296:18 343:11
  349:11 366:21,22
  372:23 376:23
**basic** 159:24,25
  285:4
**basis** 12:11 89:10
  144:10,17 268:9
  322:4 330:13
  331:21 343:13
  345:21 346:2,7,9
  359:8
**Bates** 182:20 187:16
  225:19 241:15
  342:22
**bathroom** 15:23 16:2
  90:3 107:16,21
**bearing** 358:22
**bedrooms** 27:2
**beginning** 99:5,12,20
**behalf** 49:20 98:24
  113:9 129:23 170:6
  170:24 220:15
  290:16 298:8
  326:21 341:18
**believe** 78:15 88:22
  151:13 152:13
  181:6 202:5 265:23

271:21 310:20
324:7
**bell** 307:25
**belong** 319:10
**belongs** 95:13 96:15
**Beneficial** 335:17
**Benjamin** 3:24 6:3,6
  9:20 12:2,14 18:25
  19:5,9,19,22 20:9
  20:24 21:6 32:25
  37:18 40:10 48:2
  49:21 52:6 64:19
  66:9 68:7 69:10
  74:4,15,24 84:2,6
  85:2 86:16,18,23
  87:11 88:5,12 89:14
  89:20 90:2 92:24
  97:3 102:2,22
  105:11 223:9,13,20
  228:25 230:4 236:5
  239:22 246:4 249:5
  254:7 261:4 286:2
  306:15 310:5
  312:17 326:10
  357:17 367:5,9,12
  367:21 368:8,18
  369:7 374:8 378:23
  380:9,11,13,18
  381:2,13
**Berria** 38:10
**Berrios** 38:9,11,18,20
  39:25 40:2
**best** 14:22 15:5 29:8
  73:12,17,19 135:17
  267:15 315:2
  367:24
**better** 131:8 227:11
**beyond** 12:18
**big** 67:7 123:19 288:9
  311:3 379:3
**bigger** 161:12 170:16
  170:20 249:20
  283:4 303:12
**billing** 21:8
**bills** 20:22

birth 27:4
Bissoon 354:8,19
bit 46:21 94:2 129:2
   141:15 178:22
   180:9 254:5,8
   307:23
blank 363:8
Blankenship 1:12
   3:19 63:13,17,20
   64:18,22 65:6 67:24
   70:4,18 71:7,13,16
   336:18,20,24 337:5
   337:12 339:19,22
   340:3
bleeding 252:13
blew 341:2
blood 15:21 387:11
blow 333:18
blue 303:15,19
BLVD 1:6,6,6,7,7,7
   3:10,10,11,11,12,12
body 14:4
book 268:20
born 27:6
bottom 170:8,10
   188:2,12 220:6
   272:23 284:4
   303:23 334:21
   339:18 342:23,23
   370:7
bought 42:9 144:5
Boulevard 1:21 4:8
   7:22
bounce 110:12
bounced 291:4,19
box 4:4 73:24 86:4
   256:7 257:5
brand-new 260:22
breach 278:12
break 15:9,13 16:3
   16:11 90:5 106:21
   107:12,16 180:13
   204:21 205:19,21
   205:25
breaks 15:8,16 16:13

16:15 107:18
Brian 1:4 3:9 19:23
   19:25 130:3,5,8,11
   130:12,15,16
   197:13,16 207:5,7
   207:11
bribe 306:17
bribing 306:13
brief 14:25 94:10
briefly 327:3
bring 289:25 305:4
   307:17
Bro 304:25
broader 325:25
Bronx 247:22 248:10
   248:13
brought 100:25
Bruce 300:5,6 301:6
   301:18,24 302:19
   302:21 303:7,15,24
   303:25 331:23
   359:16 360:19,22
   361:8,10,12,17,21
   361:25
Bruce's 303:19
building 36:21 57:15
   111:2 198:22
built 123:19
business 67:2 80:9
   149:12,16 150:22
   150:23 162:5 163:3
   163:7,14,19,23
   167:7 191:17
   224:10 236:13,15
   260:20 261:13
   278:13,15,17,20
   279:3 286:10 298:5
   320:5 357:8 375:9
buy 42:6 202:3 284:9
Buyer 288:7
Buyers 1:13 229:22
   229:23 287:21
   292:6 294:3,5,10,13
   294:19 295:10
   349:23 350:4,19

351:12,15,18 352:9
   352:13,20 355:19
   355:21,22 357:8,14
   357:22,24 358:5
buying 25:13
Bye 54:15

_____
C
_____

C 1:25,25 2:2,2 3:2
   36:15 220:25 384:2
   387:2,2
C-H-A-B-R-I-E-R
   130:19
C-O-L-L-E-L-U-O...
   86:12
C-Y-R-U-S 26:15
call 18:15 19:8,15
   21:19 25:11 34:6
   40:24 47:11,17
   48:17 50:6,10 60:11
   90:11 104:19 105:3
   106:11 117:21
   118:20 122:11
   126:6 128:12
   147:25 158:8 169:7
   177:18 179:19
   204:8 209:24
   214:11 237:9
   271:12 289:9 358:4
   372:8 373:11,17
called 79:24 103:6
   126:25 163:22
   271:10
calling 51:11 90:19
calls 19:11
Canadian 138:20
cancel 156:2
canceled 139:22,24
cancels 139:11
capacity 38:23 47:2
   48:11,12 270:23
capital 1:16 252:15
   253:3,13,17 310:25
   350:12,23 352:3
   372:8,23 373:17

capitalization 363:23
caption 276:20
car 1:13 108:14,15
   229:21,23 287:21
   288:7 292:6 294:3,5
   294:10,13,19 295:9
   349:23 350:3,19
   351:12,15,17 352:9
   352:13,20 355:19
   355:21,22 357:8,13
   357:14,22,24 358:5
   376:6
card 78:5 321:4,6
   370:10 371:3,6,10
cards 369:15 370:24
care 359:16
career 125:6
carefully 382:5
cars 1:13,14 3:19,20
   138:10 251:7,19,19
   298:11 374:17,19
   374:21 375:6
case 1:10 7:18 19:20
   20:8 23:2 33:7 34:4
   36:9 40:25 41:3
   75:18 76:14,19
   80:19,23 86:3 92:11
   101:3 103:4 104:23
   106:18 142:13
   151:14 154:12
   194:21 210:10
   224:15,23 236:10
   257:22 258:3
   270:18,21 272:13
   273:23 276:19
   279:19 282:3
   287:18 292:17
   358:23 379:13
cases 260:14 261:10
   270:24 271:5
cash 64:16,17 65:4
   179:16 321:10
   339:16,20,23 340:4
   340:8 341:5,15,24
   342:4,14 343:14

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

394

344:14,15,16,18
345:16,22 347:20
373:2,6
cashed 151:21
cause 16:13 27:16
39:23 83:10 122:24
123:5 130:10 152:3
171:20 199:3,11
203:8 220:3,5 229:5
234:15,20 235:24
265:3 296:5 374:6
374:11
caused 40:7 279:16
causes 199:13
cease 229:8
ceased 201:10
celebration 63:7,10
cell 164:5
certain 15:21 138:10
186:19 239:23
347:22
certainty 329:19
330:10 342:14
certificate 268:20
certificates 266:19,23
268:18 270:2,4
certification 9:12
262:21 335:17
certified 372:9
certify 314:25 384:6
387:5,10
cetera 278:2
CFO 251:7 300:4,5,7
361:8
Chabrier 1:5 3:9
130:14,16,17 207:5
207:9,13,17 224:8
chain 187:16 231:4,6
235:2,8
chambers 50:16
90:13
change 315:5 329:24
343:18 383:4
changed 243:21,25
260:6 365:8,11

366:11,21 367:2
changes 382:13
384:14
characterization
283:17
charge 140:25 141:2
147:23
charged 33:5 75:17
168:22,24
charges 35:15,15
78:5
Chase 1:17 138:7,9
176:5,9,13 181:14
199:19 228:9
229:17 230:2,6,13
230:14,18,19
293:10 294:2
318:14 320:23,25
321:4,7,11,20,24
322:7 330:15,17,20
330:24 347:20
360:2 369:15
check 86:4 151:16,19
151:21 179:12
291:3,4,19 321:15
321:18 322:5
328:20,22 329:7,9
329:10 330:15
333:25 334:8
358:24 359:5,25
360:4,5,8,20 364:20
364:25
checked 257:7
checking 293:24
checks 179:9,9 300:4
300:21,23,24 301:2
301:5 321:10,23
328:5,10,12 330:6
330:12,22 331:9,18
352:16 353:7
356:23,25 357:6
358:21 359:13,14
360:18 361:3,5,13
361:23 362:2,11,12
362:13,18 365:3

371:4,9
Chestnut 4:13
child 31:25 32:2
children 30:18 31:7
31:12,15,18
Chloe 26:21
choose 178:20 179:3
179:4
chose 229:4
Cianciulli 4:15 6:12
6:15 152:23 165:10
283:11,15,20,21
325:10,12 326:17
326:20 380:21
381:7
circumstance 340:6
circumstances
123:16 132:2 137:5
147:4 148:24
Citrin 167:25 168:2,5
168:6,8,15 234:25
235:3,7,11,12
city 30:5
claim 56:10,12,22
179:23 245:10,13
claimed 208:10 245:7
claiming 56:16,20
195:12 196:5
claims 13:5
clarify 46:20 55:21
55:24 56:22 82:6
95:18 149:16 202:2
307:22 312:22
Cleaning 353:8,15
cleans 353:12
clear 13:25 15:4
192:7 266:11
267:25 291:5
clearly 87:2 93:8
CLERK 90:12,16,22
91:4,9
click 257:5
client 49:13 50:3
close 118:5 119:8
122:18,21 123:2

closed 118:3 119:3,3
119:4,7,9,13,15,17
120:2,4 122:17,24
122:24,25 142:16
closely 246:23
closing 376:20
clot 146:6
clue 25:4 81:15
coach 42:14
coached 41:6
Coast 1:13,14,14,14
1:15,15 3:19,20,20
3:21,21,22 105:21
105:25 123:8
244:15,15 255:20
257:14,23 258:4,15
258:23,25 259:10
259:17,18 260:10
260:11 261:18
309:12
coding 255:18
coincides 333:11
340:16
Colleluori 86:11
Colleluori's 76:8,9
Collins 132:4,6,10,18
come 11:23 17:19
23:20 27:8 60:6
62:24 141:11,16,20
151:6 185:2 223:8
257:21 258:2 261:2
286:20 309:16
324:8,21 378:14
coming 28:11
commercial 302:13
302:15
commission 350:14
350:16 354:2
commit 77:3
committed 35:20
common 278:14
communication
87:20 89:4
communications
124:6 209:25

386:16
**companies** 167:23 179:8 226:7 288:24 289:6 350:6,6 354:13
**company** 39:2 95:14 96:16,18,19,20,23 97:11 100:4 103:12 103:18 104:8 122:15 152:7 157:20 164:21 165:4,7 182:10 191:15 207:25 257:9 271:6 289:3,3 333:25 334:8,15 354:24,25 355:3 357:20 364:5
**comparing** 243:3
**compel** 94:2
**compilation** 314:10 328:4 332:19 358:20
**complaint** 17:25 18:3 22:5,9,11,18 128:23 200:15,23 273:24 276:12,16
**complete** 14:8 315:3 324:23 326:3 364:7 364:18 384:9
**completed** 98:10 313:23 314:14
**completely** 331:23
**complicated** 23:14,25 31:14 32:3,8
**complied** 170:18 193:16
**comply** 78:10
**concealing** 221:15
**concept** 205:4
**concern** 23:2
**concerned** 376:19
**concerning** 149:13 209:10,13 275:12 277:11,15 324:5
**concludes** 379:19

**conclusion** 223:21 367:10,14 369:8
**concurrently** 141:12 142:11
**condolences** 45:2
**conduct** 224:9 325:2 325:5 367:3
**conducting** 11:3 278:20
**conductor** 341:5,6,11
**confer** 11:21 12:23 50:5 51:16 88:16 323:24 367:20
**conferred** 54:2
**conferring** 92:25
**confidentiality** 37:9
**confirm** 9:7
**confirmed** 92:14 324:10
**conflicts** 172:18 176:15
**confrontation** 251:3
**confronted** 250:22,24 252:8
**confusing** 47:14 97:8 180:10
**connection** 36:23 37:16 38:8 40:8 84:10 100:24 151:17 186:3
**consent** 154:18
**consider** 62:18 150:19
**consist** 330:7
**conspiracy** 77:2
**constitutes** 334:13
**construction** 44:5
**consultant** 357:21 358:9
**consulting** 357:10,12 357:13,18,20
**consumed** 17:5
**contact** 62:21 309:21 360:16 379:9
**contacted** 193:8

213:2 308:13
**containing** 214:13
**contention** 310:14 312:24
**contents** 101:8
**contested** 49:8
**context** 325:25 362:4
**continue** 7:9 54:4 80:8 118:25 121:25 146:16 156:12 317:16 324:18 326:24 355:18 378:16
**continued** 46:2,5 203:18 210:15 320:23 352:8
**continuing** 80:15
**continuously** 213:2
**contract** 151:7,8,9,10 151:12,18 157:2,5 205:16 206:15,18 209:11,12 268:11 268:15 269:15,17 278:12
**contractor** 355:6,8
**contracts** 360:21 361:2,5
**control** 124:16 319:4 364:8,18 365:19
**controller** 64:9 135:23 136:2,5,8,17 136:23 139:15 140:2,3,8,12,16 361:15,22 362:14
**controller's** 136:7,14 139:19
**controls** 242:13 243:10
**conventional** 45:9
**conversation** 60:9,14 60:17 192:5,23 206:2 216:3 252:20 252:24 253:24 255:8 256:21,23,24 257:4 301:13,15

302:19 310:18,20 311:21 313:11,17 313:20 337:2 359:10,19,24 361:7
**conversations** 7:6 46:6 213:6,7 311:23 322:25 361:21,25
**convey** 266:10 267:24 269:4,22 279:5
**conveyed** 266:15 268:6,13,16,23 269:13 270:7 271:17
**convicted** 32:14,18 32:23 33:25 73:22 256:10
**conviction** 36:24 37:17 82:21 85:23 86:15 92:3
**convince** 89:17
**COO** 300:6 361:10 361:12
**COONEY** 4:21
**cooperate** 39:11 40:20
**cooperated** 36:25 37:15 38:16
**cooperation** 37:22 38:6 66:7,17 67:4 81:7
**Cooperman** 167:25 168:3,8 234:25 235:4,7,11,12
**Copiague** 131:17,19 131:20
**copied** 272:24
**copy** 6:4,13 226:9 380:2,12,22
**Corp** 1:16 104:22 120:24 122:13,22 126:9 129:7,21
**corporate** 96:2,2 103:6 117:18,22 121:23 122:9,12

288:11 297:15,21
311:4 332:22 333:4
373:14 386:11,12
**corporation** 117:10
255:23 288:12
363:20 364:10,19
365:21
**corporations** 289:11
297:22,25
**correct** 10:2,5 17:20
19:21 22:19 24:17
26:9,15 28:19 31:13
35:21 36:8 42:13
44:17,20,21,23 46:3
46:7 48:5 56:11
58:7 61:6,12 62:22
65:16 69:3 73:14,23
74:3,11,14 77:7,15
77:18,22 78:19 79:2
79:12 80:5 81:2
83:13 86:17 91:8
97:17 98:6,11,25
101:10,14 102:15
102:21 103:7,10,13
104:13 105:18,22
106:2 107:13
114:25 117:17
118:2 119:6 123:10
123:12 126:11,17
126:22 127:2 128:8
128:19 129:21
130:16,22 132:21
133:2 134:8,14
136:13 139:18
142:14 143:9
146:14 149:15
151:2,18 153:5
155:15 156:6,10,15
156:23 159:3 160:9
160:14 161:8,20,23
162:3,10,19 163:5
163:12,17 164:8,16
165:23 167:16
168:12,19,23
169:14,17,23 170:6

170:24 171:4,8,12
172:21 174:11,16
174:19 178:18
179:25 182:3
186:19 187:4
188:15 189:10,14
189:21,25 190:11
190:15 191:7,11,22
192:11,14,17 193:2
196:14,20 197:20
198:2,7 199:22
201:4,18,22 202:11
202:16 204:4
205:19 206:7,23
208:22 210:17
211:17,24 212:23
214:22 215:24
217:3,12,17 218:2
218:11 219:6,11
220:4,8,23 221:3,7
221:12,18,22,25
222:19 224:11,24
225:8 226:14,19
227:17 229:14,19
230:3 231:15
232:23 233:18
234:5 236:25
238:11,15,20,25
239:4,8,12 241:4,9
241:22 242:2,4,21
243:2 245:5,8,11,22
246:24 248:18,24
249:23 250:4,9,23
251:5 254:2 255:17
255:21,24 256:4,14
256:16,25 257:9,15
258:16,23 261:19
262:5,8,11,15 263:4
263:7,12,23 264:14
264:20 265:22
266:12,16 267:3,6
267:11 268:2,7,14
268:25 269:7 271:5
271:9,13,19 272:3
273:13,14 274:3,12

274:19,24 275:3,9
276:19,23 277:3,5
277:12,19 278:23
279:7 280:10,20
281:2,6 282:21
283:8 284:2,19,23
285:21,25 286:9
288:21 289:18,24
291:7,20,24 293:4,9
294:24 295:4,16,24
296:15,24 297:5,11
297:24 298:6,19
299:19 301:9,17
303:8 304:10,14,18
304:23 305:10
306:4,14 308:5,18
308:21 309:24
310:4,10 312:21,25
313:24 314:15,19
315:4,9,20 317:10
317:23 318:3,7,10
318:18,21 319:4,8
321:5,11 322:11
328:11,17 329:8,11
329:18 330:4
331:10,15,19 332:4
333:8,13,17,21
334:2,8,15,18,21
335:14 336:18,21
337:6,23 338:8,13
338:20 339:5,9,12
339:20,24 340:8,14
340:17,25 341:5,16
341:24 342:4 343:9
344:9 345:24
346:15 348:13,20
348:25 349:8,13,18
349:25 350:7,11
351:9,12 352:10,20
352:25 353:19
355:20,24 357:2,6
359:2,6 360:3,6,9
361:3,9,13 362:11
362:18 364:21
365:12,16,21 366:2

366:7 369:25
371:12 372:19
374:4,7,9,14 375:3
384:9,13
**correcting** 192:21
**corrections** 382:6,8
384:13
**correctly** 67:23 74:22
95:24 343:22
**correspondence**
106:13,16 124:11
**cost** 221:11
**counsel** 9:7,18,22
11:14,20 48:3 49:6
49:25 52:16 84:3
87:13 88:21 91:23
239:24 247:23
271:15 379:12
386:3
**count** 77:2,3
**country** 28:6,12,15
**counts** 77:7
**county** 33:22 200:16
384:5
**couple** 43:23 110:3
110:17 115:9
270:24 286:21
379:10
**course** 49:9 118:14
200:20 298:5
314:12 330:25
**court** 1:2 5:19 7:16
8:2,8 13:13 14:2,10
16:12 30:4 47:11,18
50:7,10 66:6,16
80:22 81:21,25 82:9
82:12,16 88:6 90:11
198:14 200:16
223:22 224:5
322:15 326:6 327:3
377:5 379:7 382:23
**Court's** 93:3 94:21
**courtesy** 14:10
**cover** 22:21,21
**COVID** 59:10,12,15

59:15

CPA 1:13 165:6,7 169:9

CPA's 1:16 169:9

crack 16:5

crazy 110:18

create 235:17 236:2

created 154:17 232:25 235:22,24 238:23,24 239:2 295:17

credentials 208:17

credit 35:14,15 78:5 78:6 83:22 84:4,8 84:14,16 85:21 95:8 96:2,21 97:10,20 102:14 113:21 139:6 183:20,23 189:16 302:7,22 305:2 306:18,20,23 307:2 310:17,25 315:15 316:25 321:4,6

credited 350:3

crime 32:15,17 34:2 35:19,20 74:14 81:12

criminal 36:9,23 41:3 75:18 76:14,19 88:3 92:11 103:4

cross 215:24 217:11 217:14 265:5 266:25 269:18,21 270:6,13 271:17 273:10 275:25 277:18,21 280:9,20

Cruz 369:25

crystal 15:4

Cullen 4:7 7:20

culminated 215:23

curious 342:17

current 23:5 44:8,23 45:4,17 163:15

currently 28:19 31:8 247:7,18 259:9

290:13 309:5

cursory 154:9

custody 124:16

customer 134:12 139:11

customers 202:23 203:6,10 284:7 321:5

cut 91:5 300:4,21,23 300:24,25 301:5

Cyruli 3:8 272:12

Cyrus 26:14,15

---

**D**

D 1:25 2:2,4 5:2 6:1 7:1 8:1,10,10,19 9:1 10:1,2,4 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1

118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1

253:1 254:1 255:1 256:1,8 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:2,6 384:18 385:2,3,7

386:5,20
**D-E-R-R-I-C-K** 10:7
**Daas** 308:16,17,20,24
 309:4,7,9,11,17,21
**dad's** 291:25
**daily** 144:10,17
**danger** 37:6 39:9,13
 39:16,20,22 40:8
 65:16,19,24 71:3,4
**Darius** 81:20,25 82:8
 82:12,16
**date** 6:24 27:4 29:17
 29:17 79:13 80:18
 115:24 116:19
 121:7 161:9 163:14
 177:24 178:2,10,17
 178:20 179:3,4
 200:4 239:6 241:24
 274:10 301:10,12
 324:21 325:24
 340:12,25 344:23
 344:24,25 352:11
 360:5,7,8 378:15
 382:11
**dated** 153:19 161:7
 182:24 222:3 276:4
 282:18 338:19
 348:11,12 363:7
 370:20 387:22
**dates** 98:8 115:2
 163:16 178:19
 225:9 314:21
 340:15
**daughter** 26:2
**daughter's** 26:20
**Dave** 304:3,8,9
**David** 1:6 99:11,13
 99:14,18,24 100:2
 130:9,10,20,21,23
 130:24 131:2,6,13
 149:12,18,20
 150:16,17,20,25
 151:5 154:19 155:6
 156:19,21 158:18
 160:7,11 171:7

173:16 174:10,13
 174:14,17 179:22
 180:8 197:14,16
 199:17 293:11
 304:11
**David's** 171:10
**day** 11:5,18,24,25
 12:13,25 57:25 81:4
 94:4 144:10,11,11
 171:11,17,21 185:9
 186:16 189:25
 190:3,11 191:5
 266:14 268:5,14
 324:9 325:22
 336:18 338:13
 348:12 363:8
 378:10 384:21
**day-to-day** 147:23
 366:7
**days** 215:3 379:10
 382:19
**deal** 37:23 44:19
 48:18 59:19 61:4
 67:6 94:23 134:10
 134:14 135:13
 139:14,18,21 140:8
 140:13,18 149:12
 149:16 154:19
 155:7,12,20,23
 156:17,22 157:3
 211:2,10,13,15,22
 212:16,21 215:22
 215:23 287:6,8,11
 300:10,17 366:21
 367:2 380:8
**dealership** 46:25
 48:10 55:15 82:23
 84:13,17 107:24
 108:7,12,21 109:16
 110:2,12,13 111:6,8
 112:6,9,13,17,22
 113:6,11,15,18
 117:16 119:16,17
 121:17,20,22,24
 122:15 127:16

131:17,18,24
 132:20,24 133:16
 134:7,21,25 135:9
 135:15,25 136:4,12
 136:18,21 137:3,6
 140:12,16 141:12
 141:17 142:4 143:4
 143:12,15 144:16
 167:7 184:2 198:6
 201:10,21,25
 203:11 250:7 298:5
**dealerships** 105:8
 110:3,5 137:8
 140:22 142:12
 143:18,19 147:25
 179:7 309:12 352:4
 353:12
**deals** 25:12 111:7,10
 114:5 134:8 135:3
 135:16 211:6
 298:14,16,18,20,24
 299:6,12,16,25
 300:12,18
**dealt** 132:10
**debt** 288:19
**debts** 288:7
**decade** 27:12
**December** 207:22
 217:12,17 221:25
 222:5,14 270:17
 271:24 273:8,10
 274:2,2,12,18 275:6
 275:9 277:10,18
 282:5 285:8 363:9
**decide** 144:9,16
 380:20
**decided** 296:2 338:12
 338:16 340:3
**decision** 94:23
 144:18 148:3
**decisions** 147:23
 148:9
**declaration** 194:22
 195:11,18 252:4,8
 375:17

**declared** 252:7
**deed** 23:17,19 25:18
 25:19 41:21,24
**deemed** 138:9 382:22
**Deer** 112:13 114:9,12
 114:17 115:19
 124:24
**defendant** 2:4 4:2,7
 4:12 11:11 77:13
 104:22
**defendants** 1:19 3:18
 69:2 106:17 200:18
**defendants'** 278:18
**defending** 52:5
 221:11
**defense** 326:11
**define** 99:6 140:24
 141:2,14
**defined** 109:7,18
 284:8
**definitely** 63:15
 133:23 362:6
**delegate** 134:18
**delegated** 134:22
**denied** 72:11,19,23
 72:25 73:13 129:20
**deny** 72:20 170:2
 175:3 243:6 251:11
 252:22 273:3
 289:15 295:19
 306:13 374:17,18
**denying** 173:23 251:9
 255:2 341:19
 376:25
**Deo** 1:12,12 2:4 3:18
 3:18 4:20 6:1 7:1,13
 7:15 8:1,19 9:1,4
 10:1,2,9 11:1 12:1
 13:1,2 14:1 15:1
 16:1 17:1 18:1 19:1
 20:1 21:1 22:1 23:1
 24:1 25:1 26:1 27:1
 28:1,21 29:1 30:1
 31:1 32:1 33:1 34:1
 35:1 36:1 37:1,7

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo   ---   January 12, 2026

399

38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 49:14,16 50:1 51:1 51:9,21 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1,11 68:15 69:1,19 70:1 71:1 72:1 73:1 74:1 75:1,23 76:1,2 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,21 91:1 92:1 92:22 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1,14,15,18 100:22 101:1 102:1 103:1 104:1 105:1,9 106:1 107:1,11 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,9 116:15,19 117:1 118:1 119:1 120:1 120:20 121:1,3 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1,10,13 153:18,20 154:1,6 155:1 156:1 157:1 158:1 159:1 160:1 160:23 161:1,2 162:1 163:1 164:1 165:1 166:1 167:1

168:1 169:1,10 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 178:14 179:1 180:1 181:1,2,6 182:1,18 183:1,3 184:1 185:1 186:1 187:1,14,20 188:1,5,10,15,18,23 189:1,23 190:1 191:1,3 192:1 193:1 194:1,13,16 195:1 196:1 197:1 198:1 199:1 200:1,6,10 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1,17,18,22 220:1,2,14 221:1 222:1 223:1,5 224:1 225:1,11,14 226:1 227:1 228:1 229:1 230:1 231:1,13 232:1,21 233:1,14 234:1 235:1 236:1 236:24 237:1 238:1 238:9 239:1 240:1 240:18,22 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1,11,14 250:1 251:1,21,24 252:1 253:1 254:1 255:1,9,12 256:1 257:1 258:1 259:1 259:14 260:1 261:1 261:17,23 262:1 263:1 264:1 265:1,5 265:9 266:1 267:1 268:1 269:1 270:1 271:1 272:1,6,7,19 273:1,15,18 274:1

275:1 276:1,3,8 277:1 278:1,7 279:1 279:10 280:1 281:1 281:23,25 282:1,10 283:1 284:1 285:1 286:1 287:1 288:1 289:1,11 290:1 291:1 292:1,15,20 293:1,16,20 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1,24 303:1,3 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1,3 314:6 315:1 316:1 317:1 318:1,5 319:1 320:1 321:1 322:1 322:13,13 323:1 324:1,8,21 325:1,3 325:6,9,13,21 326:1 326:11,25 327:1,19 327:20,23 328:1 329:1 330:1 331:1 332:1,11,15 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1,5,7,14 342:1 343:1 344:1 345:1 346:1 347:1 347:24 348:1,3 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1,13,16,20 359:1 360:1 361:1 362:1,22 363:1,3 364:1 365:1 366:1 367:1 368:1 369:1 369:13,19 370:1 371:1,14,18 372:1 373:1 374:1 375:1 375:16,22 376:1,5 377:1 378:1,7 379:1

379:20 380:1 381:1 382:1 383:1 384:6 384:18 385:3,9,9,10 385:10,11,11,12,12 385:13,13,14,14,15 385:15,16,16,17,17 385:18,18,19,19,20 385:20,21,21,22,22 385:23,23,24,24,25 386:2,2
**Deo's** 49:19 190:6
**department** 78:2,8 115:24 120:22 293:11 364:8,19
**depended** 160:5
**depends** 205:16
**depose** 11:7,13,15 325:9
**deposed** 13:15
**deposing** 382:18
**deposit** 328:4 329:5 329:17 330:7 339:11,15,20,23 340:4,10,21,22 341:3,15,20,23 342:10 344:21 345:21 347:7,9,20
**deposited** 321:10,19 321:23 328:5,11 331:9 340:8,13 342:15 345:23
**depositing** 331:18
**deposition** 5:15 6:5 6:18 7:12 9:6 11:4 11:25 12:15,24 13:19,24 16:17 17:2 17:15 18:8 19:10,13 22:3,7,25 37:8 49:9 51:12,19,23 52:14 54:3 90:25 91:3 107:13 207:6 218:24 302:17 323:3,25 325:3,5,23 378:16,19 379:23 382:4,15,19,21

**depositions** 199:16 324:9
**Depository** 333:19
**deposits** 318:10,11 318:12 330:15 339:9,10 340:24 342:3,16 343:14 345:17
**Derrick** 10:4
**describe** 201:23
**described** 201:5
**describes** 201:2 278:8
**description** 109:12 109:15 385:8 386:6
**desire** 236:3
**destroying** 221:16
**details** 24:2 33:7 34:3 35:16 171:2
**determination** 95:16 95:20 96:15 220:13 318:15
**determined** 206:12
**developments** 279:19
**Devora** 2:7 8:2 387:3 387:22
**diabetes** 15:20
**died** 158:18 171:12 171:17,22 179:22 180:8
**Diego** 167:9
**difference** 243:19
**different** 137:5,6 174:5 228:11,21 229:4,13 231:19,23 287:25 288:12 314:20 340:15
**difficult** 240:6,8
**direct** 339:25
**directed** 140:11,16 336:20,22 338:10 339:22
**directing** 368:6
**direction** 277:5
**directly** 278:17

**disagree** 11:19 79:3 180:2,3 197:21 198:8 242:18 263:13 264:21 266:17 268:8 269:2 269:8 307:6 310:7 312:19 313:3 315:23 321:17 331:16,20,21 335:11 338:14 350:8,25 351:6,24 359:7,8 366:24 371:13 374:10,15 375:15
**disagreeing** 268:10
**disagreement** 44:10 264:22
**disagrees** 11:20
**disapproval** 364:3
**disaster** 161:6
**discharged** 366:14
**disclose** 73:21 85:22 86:15 92:2,8
**disclosed** 123:9,10
**disclosing** 89:3,7
**discovery** 324:2 326:3
**discuss** 38:17 107:18 205:22 215:19 216:15
**discussed** 75:19 251:4,6 299:9 337:18
**discusses** 265:15
**discussing** 216:20 244:5
**discussion** 49:2 53:3 53:19 172:3 181:3 254:17 296:20 311:12 316:11 323:15 325:7
**discussions** 235:3,6
**disposing** 221:16
**dispute** 23:16 51:13 90:25 91:3,6,8

117:6 149:9 197:24 198:4,24 199:3,9,12 199:14 201:3 322:4 330:13 341:22 343:14,20 345:16 345:21 346:2,9
**disputed** 191:20
**disputing** 191:25 346:11
**disqualification** 52:11
**disqualified** 47:9 66:15
**distinction** 138:18 284:25 311:3 342:8
**District** 1:2,2 7:16,17
**Divorce** 31:5
**Dix** 41:18 42:12,19 43:5,15,24 44:4 45:25 46:7 61:17,21 61:25 82:17,19 244:24 245:3,4 247:8
**DLA** 1:16 350:12
**DMV** 72:4,24 73:8,14 73:21 74:2,10,19 82:22 83:10,11,18 83:23,24 84:7,11,18 85:20,23,25 92:3 105:12 106:12,15 123:3,7,11,17,25 124:2,4,8,9,11 128:25 129:4,5,16 129:18,25 143:5 224:15,23 252:11 255:3,16 264:17 296:3 386:10
**DMV's** 128:22
**Docket** 194:21 219:17 252:5 272:8 273:22 282:2 292:16 293:17 358:22 362:24 369:15 371:15 375:18

**document** 68:16 76:3 76:6,11 100:19 101:4,7 116:16 121:4 153:6,14,21 153:22 154:2,9,10 154:11 159:17 161:3 182:19 183:3 187:21 194:17 200:11,19 218:14 219:2,23 220:12 225:15,21 238:22 239:24 240:23 243:4,6 244:9,12,19 244:23 247:2 249:15 251:25 255:13 261:24 265:10,13 272:15 272:20,24 273:19 276:9 282:11 285:6 292:20 293:20 303:3 314:7,18 317:10,12 327:24 332:16 333:9 335:4 335:7,15 336:15 348:4 349:7 358:17 363:4 369:20 370:3 371:19,23 372:5,12 372:16,19 375:23 385:9,9,10,10,11,11 385:12,12,13,13,14 385:14,15,15,16,16 385:17,17,18,18,19 385:19,20,20,21,21 385:22,22,23,23,24 385:24,25 386:2,2
**documentation** 117:22 124:17 208:25 209:5,9,13 288:23 317:21 330:20 386:11,12
**documents** 18:4,5 22:6,8 23:2 104:21 105:5 106:13 116:24 122:12 158:9 177:20

186:19,25 187:3,10 188:8 189:9,12 198:6,21 201:7 209:25 226:6,12,17 231:7 271:9 289:5 302:11 314:11 332:20 343:8,13,21 346:3,10 358:5,8 373:12 386:9,10,10 386:12,14,16,18,18
**doing** 13:18 41:11 47:10 247:20 300:3 300:11 351:3 382:10
**dollar** 240:11 286:12 374:3
**dollars** 290:25
**door** 87:17,25
**DOS** 121:7
**double** 248:22 250:8
**double-** 253:10
**double-floored** 252:9
**double-flooring** 250:3 254:25 295:21
**draft** 262:10
**drafted** 262:7
**drafting** 262:14
**drink** 15:22
**Drive** 114:22 126:11 163:4 198:7 202:15 203:3,6 296:6 374:25 376:7
**driver's** 8:17 226:11
**drugs** 17:5
**due** 94:4 191:14
**duly** 8:11 387:7
**duties** 111:6 112:4 365:23
**Dwight** 1:12 3:18 63:13 65:8,9 336:17 336:20 337:4,7,9,12 339:19
**dying** 44:3
**Dykman** 4:7 7:20

**E**

**E** 1:25 2:2 3:2,2 4:10 5:2,2 8:10 383:2 384:2,2,2 385:2,2,2 385:7,7 386:5,5,5 386:20 387:2,2
**E-F-A-Z** 26:9
**e-mail** 124:6 161:16 161:22,24 163:11 163:13 164:8,9 169:16 182:21 183:8,13,16,22 186:16 187:15 188:3,3,7,11,14,20 188:24 189:4,7,24 190:6,25 191:4 192:18 225:22 226:2,17 227:3,6,14 231:4,5,12 235:2,8 249:19,22 250:11 250:14,16,19 273:2 273:4,5 333:12,14
**e-mailed** 186:17 187:12
**e-mails** 124:8 214:8 214:11
**Earle** 1:21 4:8 7:21
**earlier** 65:14 75:16 90:24 168:14 173:20 210:14,20 224:13,21 258:18 274:11 333:12
**early** 27:14 57:18 318:3
**easier** 53:14
**Eastern** 1:2 7:17
**eat** 31:20
**ECF** 194:21 252:5 292:16 293:17 362:23 369:15 371:15 375:18
**ed** 80:16
**Efaz** 26:8 31:10 259:14,15,19 260:3 260:7,12,24 264:2

**effect** 5:18 221:24 222:17,20,22,25 223:4,18 367:4
**effective** 13:24 243:14
**effectuate** 307:19
**effectuated** 217:13
**efficient** 13:23
**effort** 78:25 79:7,8
**EIDL** 158:19 177:5
**either** 106:4,7 107:17 130:9 242:19 259:24 336:2 352:3 379:3
**electronic** 171:16 175:7
**electronically** 169:13 169:22,25
**Ellen** 235:10
**Emanuel** 2:5 3:6 10:10 51:3 90:18
**emanuel@sagelega...** 3:7
**employed** 71:8 309:8 309:9,12,14 337:7,9 337:13
**employee** 48:12 108:20
**employees** 337:17,20 338:6,10,12 363:22
**employer** 226:10
**empty** 203:11
**encumber** 220:21
**encumbering** 218:9 219:5 284:18 285:6
**encumbrances** 266:12 268:2 285:9
**ended** 67:3 80:4 83:13
**enforcement** 38:7,16 39:11 40:21 81:6
**engaged** 357:9
**enjoined** 220:15
**ensure** 379:10
**ensuring** 136:4

**entail** 347:13
**enter** 24:4 45:3,15
**entered** 39:10 44:16
**entire** 11:5 125:5 154:8 180:5 238:21
**entities** 21:22 157:25 169:11 228:12,24 288:5 295:16 297:16,21 316:22
**entitled** 12:4,9 15:4 16:14
**entity** 96:3 103:6 116:10 117:25 119:6 120:20 121:12,17,20,23 125:8 126:25 128:8 128:12 152:21 162:9 246:23 263:20 264:3,10,14 264:20 287:20,25 288:18,20 311:5 320:6
**Entry** 194:21 219:17 252:5 272:8 273:22 282:2 292:16 293:17 358:22 362:24 369:16 371:15 375:19
**environment** 202:10
**equate** 344:4
**Eric** 146:2,9,14,16,24 147:11,13
**errata** 382:8,11,13,17 384:15
**ESQ** 3:6,16,24 4:5,10 4:15
**established** 163:15
**establishment** 363:23
**estate** 1:5 33:14 67:2 80:9,10
**et** 7:14,15 278:2
**Europe** 360:11
**event** 192:6 201:5 376:6
**events** 14:23 202:19

eventually 140:9 153:3
everybody 53:10
evidence 312:23 313:7 321:22 322:2 351:25 375:5
exact 29:16,17,21 98:8 108:10 115:2 115:12 127:8,18 129:8 182:6 258:14 286:17 290:5 299:4 301:12
exactly 27:23 63:5 71:9 96:4 99:7,14 100:8 107:25 117:14 127:10 129:13 142:15 147:3 152:2 159:19 185:14 198:19 209:21 225:4 292:13 338:9
examination 2:3 9:2 9:15,15 385:4
examined 8:13
example 58:22 134:10 288:6 350:5 355:10
excerpt 66:21
excess 162:18
exchange 150:2 155:8 227:15 249:19 284:12 303:6
exchanged 226:18
exclusively 42:4 64:11,25 253:25
Excuse 178:12 218:19
executed 206:18,25 264:11 268:11,12 269:14
executing 269:17 270:6
execution 269:20
exhibit 68:12,15 76:2

100:18 116:15 121:3 153:13 161:2 183:3 187:20 194:13,16 200:7,10 219:22 225:14,19 240:16,22 249:14 251:24 255:12 261:23 265:9 272:19 273:18 274:24 276:8 282:10 292:16,20 293:20 303:3 314:6 322:12 327:23 329:3 332:15 334:23 348:3 358:16 363:3 369:19 371:18 375:22 385:8
exhibit(s) 386:3
exhibits 151:14 378:25 379:2,8
exist 125:21
existed 217:8 320:22
existence 216:25 277:8,14
existential 242:16
exists 25:2
Exotic 112:19,25 113:12,16,20 114:2 114:6,9,11,15,19,24 115:4,10,18,25 116:11,22 117:2,7 117:13,23 118:8,12 118:22,24 119:23 120:2,6 122:2 124:22 125:5 166:7
expect 11:4
experience 113:6,10 113:14,17 137:7,13
expertise 160:6
explain 23:15 24:3 32:4,5 39:19 45:13 55:22 84:23 95:11 138:3 205:7 364:24
explained 252:12

explains 191:10
explanation 228:20 229:25
express 183:9
extension 326:2
extensively 308:4,6
extent 11:19,24 124:15 126:3

**F**

F 5:2 110:23,23,24 111:13,17,24 112:4 134:15,18,23 135:5 135:6,11 385:2,7 386:5,20 387:2
face 92:13
face-to-face 184:11 185:16 186:2 215:9 308:9
facility 255:19
fact 65:23 89:12 138:9 175:19 182:14 191:14,20 222:21 223:17 285:14 330:19
fail 382:20
failed 92:2
fails 135:6,12 136:8 136:10 140:2,3,8
fair 20:6,16 24:25 29:14 42:10,24 59:5 62:14 63:16 73:2,4 80:3 82:20 84:17 95:4 109:8 112:3,7 114:23 132:9 133:15 134:17 135:7,10,14 136:16 136:19,20,24 139:12 142:10,24 143:6 144:15 174:22 183:21 195:10,17 196:3 198:13 199:7 201:8 206:14 210:4 211:7 212:25 216:2,6,11

231:3 233:20 253:16 260:15,23 280:7 288:4 294:8 297:8,12 298:17,22 298:23 320:13 321:14 351:20
faith 49:10
falling 210:5
falls 134:20
false 74:2,8,10,18 75:14 104:4,7 256:16 264:20 277:12,19 285:10 312:8,14 343:25
familiar 205:4 356:15
family 25:23 108:22
far 16:16 317:19 324:13 325:20,21 326:9
father 44:2,24
father-in-law 26:24
father-in-law's 292:2
Fatima 26:25
February 72:9,9 73:6 141:24 142:3,9 143:14 144:3,6,7,24 145:3 153:19 163:16 177:25 178:12,16 225:5 226:3 227:3 239:7 248:15,16,19 250:12 253:10 254:24 256:4 257:17 264:18 295:20 296:4 297:23
federal 9:9,19 36:25 37:16,23 65:21,25 66:7,17 67:25 70:4 101:3
feds 67:4
Fee 168:24
feel 35:22 50:6
feet 249:4,8

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

403

| | | | |
|---|---|---|---|
| **Felix** 145:22 146:9,14 146:16,20 147:6,12 | 260:18 312:12 313:15,16 372:4 374:24 | 385:9,12 | 321:16 322:6 324:7 325:4 326:13 328:6 |
| **Felix's** 145:23 | **finished** 62:7,7 | **five-year** 80:7 83:12 83:15 84:19 95:6 | 331:10,14,19 332:2 |
| **fell** 101:24 | 313:13 | **fix** 334:5 | 332:4,21 333:17 |
| **felony** 73:22 85:22 256:11 | **Fink** 50:15,19,22,25 51:2,7,10,18,22,25 | **fixed** 197:18 | 334:25 335:23 |
| **felt** 257:5 | 52:4,12,19,23 53:6 | **Flagstar** 352:25 353:2,3,5 | 336:9 338:19 |
| **fifth** 174:9 241:18 | 53:9,13,22,25 54:12 | **Flanagan** 50:18,21 | 342:20 343:2,7,12 |
| **figure** 305:14,16 306:9,24 307:9,10 | 54:15 90:24 91:11 91:15,16,17,19,24 | **floor** 1:21 3:23 4:9 95:7,13,25 96:15,19 | 343:17 346:19 348:7 349:17 |
| **file** 93:21,23 379:3 380:6 | 93:9,13,14,17 94:9 94:14,15 | 96:21 97:10,16,20 97:23 99:15 102:14 | 352:24 355:15 356:19,20 |
| **filed** 76:14 116:24 117:9 200:15 | **firing** 363:22 | 102:16 103:5,17,19 103:25 104:5,9 | **fly** 366:22 |
| 217:16,16 273:8,25 | **firm** 179:11 | 105:5,7 113:20,24 | **focus** 200:21 248:14 253:25 295:22 |
| 274:23 275:23 | **first** 8:11 13:18,24 16:10 24:4 27:8 | 123:21 124:23 125:6,20,24 131:8,9 | 296:14 297:5 |
| 276:22,24 277:2,4 279:16 280:5,13,15 | 28:24 41:4 42:11,19 | 132:10 139:5 149:13,14,19,23 | **focusing** 101:6 105:13 125:4 |
| **files** 198:5,14,21 199:9,25 200:4 | 46:10,14,17,23 48:8 55:2,13 56:3,25 | 150:2,11 154:20,21 | 172:22 194:25 220:10 233:14 |
| 379:22 | 57:3,6,21,23,25 58:4,22,23 63:12 | 155:7,13 203:15,19 204:3 | 236:23 238:9 241:18 252:6 |
| **filing** 5:6 9:11 115:24 116:19 121:8 | 77:24 97:19 99:3,10 99:17,24 100:10 | **floored** 248:22 | 254:24 256:7 257:6 266:24 292:23 |
| 226:13 | 107:12,22 108:7,18 | **flooring** 251:7 253:11 | 303:23 318:5 352:7 |
| **fill** 206:6 | 116:21 117:7 130:4 130:7,24 131:11 | **floorings** 250:9 | 363:16 371:22 |
| **final** 78:17 80:20 363:21 364:6 | 138:5 148:18 151:23 158:3,5 | **Florida** 151:2,5 | **folders** 198:21 |
| **finalized** 134:8 135:4 | 165:25 191:9 215:7 | **fluid** 288:5 | **follow** 21:23 25:15 41:2 104:23 105:9 |
| **finance** 111:19,20,25 111:25 | 242:16 274:10 275:2 282:5 291:15 | **Flushing** 1:16 4:8 11:12 182:2,5,8,16 | 106:18 117:24 122:14 124:20 |
| **financed** 114:5 | 314:22 329:7 | 182:20 183:24 | 126:7 128:13 |
| **financial** 77:25 118:25 237:21,23 | 339:11 340:10 349:15 360:8 | 187:17,17 188:5 189:23 190:18 | 158:11 169:11 177:21 204:11 |
| 239:15 244:5,17,22 246:20 247:5 | 367:20 372:15 | 191:4 225:6,20,20 225:23 226:5 227:5 | 210:2 238:7 250:7 289:14 358:10 |
| 299:18 | **FISK** 1:7 3:12 | 228:6 230:3 231:6,8 | 373:15 |
| **financially** 31:19 252:13 | **five** 14:25 34:21,23 34:25 77:15 78:11 | 239:16 241:16,16 246:21 253:19 | **following** 94:4 186:16 191:13 |
| **financing** 110:21 132:11 134:11 | 80:3 180:13 281:10 318:20,22,23 | 301:9,17,22 302:4 302:14 303:8 | 211:21 212:22 213:2 220:16 |
| 364:6 | 320:14 324:11 328:10,12,14 330:6 | 304:10,13,18 305:24 306:2,3 | 330:16 363:21 |
| **find** 226:5 245:12 | **five-minute** 106:21 | 307:2 309:24 310:2 310:8 314:11 | **follows** 8:14 |
| **fine** 42:21 43:12 50:7 69:14 179:2 249:7 | **five-page** 76:2 161:2 | 317:20 318:17 319:16 320:7 | **foot** 46:24 48:9 55:3 57:24 |
| **finish** 35:6 168:16 | | | **forbidden** 49:15 |

force 5:17
foregoing 387:8
forfeit 78:18
forfeited 256:10
forfeiture 78:21 79:2
forgot 30:25 145:24
form 5:10 9:13 37:19
  40:11 47:5,13 48:15
  55:17 85:3 96:25
  114:4 195:22
  197:23 206:6 217:5
  246:5 312:11,18
  315:11,22 336:8,11
  358:6,7 384:14
formal 94:11
format 18:11 241:7
  262:3
formation 104:20
  117:22 122:12
  386:9,11,12
forms 238:2 386:17
forte 137:14 139:19
forth 68:9 282:25
  387:7
forward 67:8 70:8,13
  227:7 304:3
forwarded 226:17
  227:6,14 231:7
found 274:22 317:22
  370:23
four 125:13,25
  228:11,21,22
  244:20 318:22
  339:9,10 344:11
four-page 219:22
  369:19 375:22
  385:14,25 386:2
fourth 14:15 370:18
fragile 88:24
frame 42:15,20 43:8
  43:8 65:12 115:8,12
  128:21 155:18
  198:20 202:17
  253:7 259:20
franchise 108:12

316:22
Frank 148:12,14,22
  149:3,3,10 166:12
  166:14,15,20,23
  235:10
fraud 76:24 77:3,4
  293:10
free 266:11 267:25
Freehold 364:12
friend 62:19 150:20
  150:21,22
friends 62:15
front 35:25 36:4
  68:19 330:21
  346:22
full 195:8 329:3
fully 206:17,24
  296:14 357:7
Function 201:25
fund 252:14 349:24
  350:6
Funding 1:17 4:13
  127:4,13,21 128:3,6
  128:16
funds 205:11 206:10
  209:14,14 219:10
  221:2,7 235:19
  236:4,19 239:21
  240:3 280:23
  289:19 290:22
  291:5,6,9,18 292:5
  293:8 295:7
further 5:9,14 86:25
  87:23 92:16 283:22
  284:8 378:20
  387:10
future 282:6,18
  284:6,10
fuzzy 65:13

**G**

G 384:2 386:20
G-d 59:17 125:22
Gallagher 235:11
game 213:12

gang 13:6
gathering 60:13,16
Gedacht 4:18 7:23
geez 19:18 27:3,22
  63:14
general 125:5 157:23
  324:2 366:2,6
generally 22:23
  139:10 278:22
  279:18,24
gestures 14:4
get-go 126:10
getting 189:13
  240:15 296:13
  304:3
Gianelli 218:2 220:4
  274:5,7
Gianelli's 154:12
  220:7
give 14:10 17:11
  26:22 42:20 43:8
  51:18 52:19 58:21
  87:16 93:10 240:14
  248:25 317:2 331:3
  355:10 379:4
given 80:2 384:12
  387:9
giving 154:9
go 7:10 12:18 13:21
  14:24 23:7 24:9,13
  35:5 48:19 50:10
  55:5 69:13 80:23
  88:14 89:24 93:9
  96:5 139:13 143:25
  144:2,16 156:14
  202:13,21 204:14
  207:18,20 209:20
  254:9 255:9 260:17
  288:23 300:19
  309:2 313:14 323:7
  327:2 338:6 374:23
  377:17
goes 12:16 205:12,15
going 6:3 9:8 11:16
  14:24 17:18 20:25

21:11,18 25:10 29:2
31:3 34:5 40:23
48:17,18,21 49:21
50:9 55:12 66:20
67:8 68:8,10 69:5
70:8,13 87:22 88:7
88:18 90:11 91:20
94:23 97:3 100:13
104:19 105:3,12
106:10,24 117:20
118:20 122:10
126:5 128:10,12
141:25 144:9 148:2
152:15 158:7 169:6
177:18 179:18
180:15 181:22
187:13 188:10
200:5,6,21 204:7,17
209:23 218:4,21
223:7 224:6 225:10
237:9,25 238:5
240:17 242:15
244:4 251:14,20
254:12 256:2,6
260:14 261:9
274:17 275:8 278:7
279:20 281:12,23
289:8 293:16 302:7
304:25 310:23
316:2 317:16
322:10 323:6,10
324:2 326:23 327:7
327:19 333:18
338:2 340:10
347:23 358:3,12
359:15 367:14
370:15 373:10
377:20 378:24
380:6,11
Gold 1:13,13,14,14
  1:15,15 3:19,20,20
  3:21,21,22 105:21
  105:25 123:8
  244:14,15 255:20
  257:14,23 258:4,15

Case 2:23-cv-06188-JMW Document 518-10 Filed 06/01/26 Page 116 of 351 PageID #: 13919

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo --- January 12, 2026

405

258:23,25 259:10 259:17,18 260:10 260:11 261:18 309:12
**good** 9:4,5 49:10 50:17,20 90:12,14 90:16 102:2 106:20 109:12,15 323:22 347:16 380:4
**goods** 284:7
**government** 65:22,25 66:8,18 67:25 70:5 78:18
**gray** 138:3,10,12,16 138:25 139:8
**great** 41:11
**gross** 162:16
**ground** 13:22 16:22
**Group** 1:14 3:17,20 11:8 13:5 72:2 99:4 99:7 101:2 168:19 198:2,5,10,25 199:10,14 200:17 201:3 208:11 210:6 217:16 219:18 224:14,22 235:13 235:14 272:14 273:25 276:18 282:4 291:22 295:8 324:25 329:22,25 378:18
**guarantee** 310:23 311:4,9
**guarantor** 302:6
**guess** 15:2 56:8 69:12 132:22 140:9 263:24 271:11 285:11 299:15 305:11,12
**guessing** 111:21
**guilty** 35:19 36:2 75:18 77:6 81:2,12
**guns** 39:23,24 40:4,9 40:15
**guy** 111:14,19 305:2

305:8,11 306:7 307:12,15
**guys** 39:23,24 40:4,9 40:15 142:17,20 168:5,15 374:5

_____

**H**

**H** 8:10 385:7
**H-W-Y** 238:15
**habitable** 45:19
**Hackner** 2:7 8:3 387:3,22
**Hakim** 291:7,10,20
**half** 87:16
**handled** 36:6 38:2
**handwriting** 341:8
**Hang** 261:15
**happen** 61:16 79:7 140:7 198:23 199:25 288:10
**happened** 81:3 89:4 114:8 198:9,18 199:21,23 201:2 210:11 212:22 215:14 270:19,21 273:9 300:9 375:2
**happening** 201:9
**happens** 135:11 136:9 139:20,25
**happy** 325:15
**hard** 16:8 23:3 24:3 32:5 45:13 98:8
**Harry** 1:12 4:2,3,5 20:2,3,4,5 270:24 271:10 276:24 277:4 292:9 322:18 379:24
**Hartford** 364:13
**head** 176:2,10
**heads** 31:20
**hear** 52:2 53:10 325:8,10
**heard** 38:14 54:16 138:5
**hearing** 66:6,22,25

67:18 220:13
**held** 2:6 49:3 53:4,20 172:4 246:23 254:18 323:16
**Hello** 50:19 91:15
**help** 58:9,13 59:24 109:9,12,13,14 137:16 157:15 233:8 239:3 292:5
**helped** 262:10 304:16 315:8,12,14
**helping** 58:23 337:5 337:11
**hereinbefore** 387:7
**Herrera** 354:4,7
**Hi** 50:24 51:2 90:14 91:16,17
**high** 15:20
**highlight** 69:5,16
**highlighted** 220:11
**highway** 4:3 131:21 238:14
**Hills** 41:18 42:12,19 43:6,15,25 44:4 45:25 46:7 61:17,21 61:25 82:18,19 244:25 245:3,4 247:8
**hired** 67:23 70:3,17 71:6,19 157:16
**hires** 136:18
**hiring** 108:20 363:22
**history** 129:20
**hit** 181:14
**hold** 91:10,12 140:17 291:19
**holding** 255:3
**home** 82:18,19 150:25 305:5 307:18 353:11,13
**honestly** 30:24 64:6
**Honor** 67:2
**Honorable** 218:2
**hope** 24:23
**host** 200:17

**hostage** 255:4
**hour** 18:17,19 324:14
**hourly** 20:22 64:4
**hours** 12:5,10,19 16:14 17:7 324:11 324:23 378:13
**house** 24:5,9,13 25:3 25:8,15 27:2 44:4 45:14,16
**housekeeping** 322:24
**hrtatty@verizon.net** 4:6
**hundred** 65:10 73:10 104:16 166:3 180:7 184:23 202:12 234:21 242:5,19,24 243:15,21 245:14 245:15,21 257:23 259:3 260:4 264:9 264:19,24 283:25 290:24 312:15 313:9 317:3 335:24
**Hunting** 8:22 23:6,8
**Huntington** 81:21 82:2,9,12,17 108:11 110:15 112:6 244:25 247:8
**hurt** 249:8
**hurts** 16:6
**Hwy** 1:4,17 3:9 238:11
**HYLAN** 1:6,6,6,7,7,7 3:10,10,11,11,11,12

_____

**I**

**IAG** 71:24,25 142:21 142:22 168:16 326:14
**ID** 162:13,14
**idea** 311:8 331:17
**identical** 238:18 267:14
**identification** 68:17 76:4 100:20 116:17 121:5 153:15 161:4

183:4 187:22 194:18 200:12 219:24 225:16 226:10 240:24 249:16 252:2 255:14 261:25 265:11 272:21 273:20 276:10 282:12 292:21 293:21 303:4 314:8 327:25 332:17 348:5 358:18 363:5 369:21 371:20 375:24
**identified** 92:9
**identify** 81:5
**identity** 306:25
**illegally** 199:20
**immediately** 43:4 57:10 193:17 350:10
**imperative** 382:16
**implore** 223:12,15
**imposition** 79:14
**improper** 367:17 371:9
**in-laws** 26:2,3,22
**inactive** 297:23
**inception** 141:8,9,10 192:11 234:4
**incident** 198:12,17 248:21 250:12,20 250:23 253:11,23 254:25 295:21
**included** 226:9
**includes** 364:19
**including** 16:15 192:9 218:10 219:6 220:22 266:9 267:23 358:6
**incorporated** 117:12
**incorrect** 68:6 83:8,9 173:11 245:20,24 256:17 277:20 286:3 345:25

**incur** 78:5
**independent** 144:18 330:22 355:5,8
**Index** 219:19 272:8 276:5
**indicates** 359:22 386:3
**indicating** 365:11
**individual** 25:24 112:5 132:23 134:6 164:21 165:3 291:7 304:13,16 307:21 308:12,17 334:12 365:25 366:5
**individuals** 26:5 154:23 196:19 369:23
**industry** 113:3,7 125:6 167:11 357:13
**info** 305:3
**information** 74:2,10 74:19 75:14 77:25 93:19 94:3 116:10 120:21 124:18 154:5 159:22,24 160:2,3 162:2,25 163:23 164:20 171:14,19 182:10 182:13,15 282:25 285:4 304:3 315:3,5
**informed** 252:10
**inhabitable** 45:14
**inherit** 42:7
**initial** 121:7 343:19
**initially** 23:22 192:24
**initiate** 360:25 361:2
**initiated** 356:25
**initiates** 360:21
**injuncted** 377:13,15
**inquire** 129:10
**instruct** 49:18,22 194:7 218:22 367:15
**instructed** 92:18

194:3
**instructing** 21:5,7 50:3 88:11,13 89:10 93:5
**instruction** 367:17
**instructions** 190:14 382:2
**instructs** 37:12
**insurance** 111:21,24
**intellectual** 278:16
**intention** 156:13,17
**intentional** 278:13 279:3
**interact** 111:4
**interchangeable** 337:18
**intercompany** 289:10,12 386:17
**intercorporate** 289:13
**interest** 233:21 237:11 255:6 259:17 260:3,10 266:15 268:6 269:5 269:23 270:7 271:18 279:6 280:19 289:17 295:16
**interested** 387:12
**interests** 131:9 268:24
**interface** 356:18,22
**interference** 278:13 279:3
**interpret** 95:11 279:8 279:13
**interpretation** 95:10 243:17
**interrupted** 152:16
**interviewed** 148:17
**introduce** 63:19 131:5 166:20,23
**introduced** 9:24 63:17 130:10,25 132:5 166:12 168:5

168:15 184:6
**inventory** 132:25 133:18,19 364:11
**invited** 376:8
**involve** 110:20
**involved** 33:15 66:16 99:5,11 158:16 159:2 216:7,12 262:13 287:11
**involves** 132:20
**involving** 120:6
**IRIS** 1:5
**Island** 1:8 3:13 11:8 13:5 72:2 99:4,6 100:25 115:19,22 168:18 197:25 198:5,10,20,25 199:10,14 200:16 201:3 208:11 210:5 217:15 219:18 224:14,22 235:13 235:14 272:14 273:25 276:18 282:4 291:22 295:8 324:25 378:18
**issue** 12:21 49:8 52:7 207:23 214:3 251:4 357:24
**issued** 206:10 217:21 217:25 220:4 221:21 224:8
**issues** 298:10

---

**J**

**J.P** 1:17
**jackets** 211:2,11,13 211:16,22 212:16 212:21
**Jacqueline** 50:23,24
**Jamaica** 3:5,5
**January** 1:23 6:25 79:12 80:4 95:5,6 97:12,12 162:18 263:10 379:19 384:8 387:22

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

407

jbenjamin@nyfra... 3:25
jcianciulli@weirla... 4:16
Jeff 18:9,10 380:20
Jeffrey 3:16,24 4:15 6:2 283:19
Jeremy 353:18,20
Jersey 364:11
Jessica 231:13
Jim 132:4,6,9
JMW 1:10 7:18
job 57:20 62:25 63:24 136:7,10,15 140:4 147:8
joined 207:5
joining 324:7
joint 326:5
jointly 92:20
Jones 1:13,16 159:4 159:13 165:6,6,24 166:2,11,13 167:15 168:21 169:3,8,9 170:5,23 179:5,10 179:15 235:15,15
JORY 1:5 3:10
Josh 199:16 216:18 216:25 235:13 291:25
Joshua 1:5 3:10 207:4 216:16,20 252:10 255:3 272:3 293:8
JR 4:2,5
jruderman@cszla... 3:16
judge 35:9 36:2,4 48:17 49:6 50:15 52:21 53:9 54:2 87:24 89:22 90:13 93:10,18 154:12 218:18 274:4,7
judge's 51:15
judgement 92:13
judgment 76:14,19

77:13 79:11,14 80:20 92:11 260:25 285:12
July 297:24 347:19 359:20 360:6,9,10 360:17 375:12 376:5,13
June 115:25 117:2,6 213:4 222:9,11,15 233:16,22,25 234:7 241:21 355:15
Justice 218:2 220:4,6

**K**

K 384:2
K-1 226:11 236:24 237:3,5,14
K-1s 237:10 386:16
Karla 369:25
Kataev 2:5 3:6 6:7,11 9:3,10,21 10:10 12:3,22 21:4,11,18 25:10 40:23 47:7,15 48:5,16 49:5 50:9 50:17,20,24 51:3,4 51:8,11,21,24 52:3 52:6,14,22,24 53:6 53:8,12,22,24 54:11 54:13,20,23 55:6 75:3,21 82:25 84:5 84:9,24 86:9,22 88:10,14,21 89:16 89:24 90:4,10,14,18 90:19,23 91:7,14,16 91:18,21,25 93:12 93:14,16 94:7,13 96:6 98:14 101:25 102:3 104:18 105:2 106:10 116:7 117:20 118:19 120:17 122:10 130:18 133:5 153:9 153:24 158:7 165:16,19 166:17 169:6 170:12,17

171:23 172:6,25 173:4 177:17 178:6 178:13 179:18 180:12 182:17 190:4 194:11 204:7 204:14 207:2 209:23 212:3 218:19 219:14 224:3 237:8 239:25 240:17 241:11 246:6,12 247:25 249:9 254:9 262:17 281:9 283:19 289:8 308:2 312:12 322:10,17,19 323:7 323:22 325:19 326:16,22 328:25 332:12 347:16 353:17 358:3 367:11,16 368:16 368:23 372:2 373:10 377:17 378:7 379:5,16 385:5 386:22,22
keep 13:25 71:21 80:12 165:11 212:12 288:13
Kendra 301:5 360:21 361:21,25
Kera 235:10
KeyBank 132:8,10 132:13
Khan 1:5 130:25 131:3,4,5,12 132:3
kid 43:7
kids 31:9
kill 29:2,9
killing 29:16
kind 71:4 119:24 355:7
knew 17:18 108:24 129:11,19 213:9,10 215:2 222:24 223:18 231:25 285:15 315:19,25

316:9 375:2,4,6
know 6:16,17 10:10 11:14 12:8 13:22 18:16,22 20:11 23:4 25:9 27:23 34:3 35:23 36:5,5,22 37:13 38:13 40:5,13 40:17 46:4 50:4 56:14,14,18 60:15 62:13 63:5 64:9 69:9 71:9,10,15,17 74:6,13,17 78:24 79:25 80:21 97:7 101:18 108:11 109:2,21 111:24 114:16 115:11 117:15 118:9 123:14 126:23 127:3,8,10,15 128:20 129:8,9 131:3,4,13,19,25 132:12,13,16 137:15 138:11 140:7 142:15,23 145:20 146:21 147:2,3 148:2 150:21 152:3 157:16 158:18 159:12 162:23 167:8,12,17,18,20 171:9,13,15,18 173:18 174:6,6 175:19 181:12 184:8,9,24 185:8,14 186:13 193:8,13,15 193:18,20,24 194:2 195:3 197:13 198:19 199:6,15 200:3,3,24 203:24 205:14 208:24 209:4 213:22 214:16 217:7 225:3 231:10 232:2 236:7 236:11 240:9,12 242:7,9,10 243:20

246:18,25 253:14
253:21 263:23
275:14 279:22
281:8 285:17,18
288:15 290:3,5
299:3,3,6,25 301:13
305:13,18 306:20
306:25 307:12,15
308:22 309:6
315:12,13,15,24
316:4,5,15 319:12
320:2,8 321:12
322:22 323:4,5
331:8 332:8 336:22
337:7,10 338:9,17
341:6,10,21 342:2,5
342:12,21 345:11
347:6,12,13 350:4
353:25 354:17,20
355:3 356:7 360:14
360:24 361:19,19
361:24 362:5
364:23 365:13
370:21 371:24
373:23 380:16,18
**knowledge** 78:12
126:14 132:15
139:4,20 151:20
154:17 158:12
160:11 162:21
167:11,21 175:12
175:13 184:7,25
193:21 209:15
212:15 266:3
267:15,17 277:24
309:4 314:16 315:2
315:18 330:22
331:13 354:18
360:23
**knowledgeable**
133:17,25
**known** 42:25
**Kwun** 176:22 235:14

———————————
**L**
———————————

**L** 5:2,2 384:2 386:20
**L-A-U-R-I-E** 182:23
**lady** 315:17
**landlord** 45:10
290:12
**landlord-tenant**
24:11,20 45:10
**Lane** 8:23 23:6,8
**large** 352:8,19
355:19
**lasts** 11:25
**late** 27:14,15,16
376:5,13
**Laurie** 1:13 3:19
36:21 182:23 184:6
184:8 186:18 191:7
215:17 216:2,6,11
227:16 231:15,17
231:22 232:4,12,15
232:17 252:14
350:10
**Laurie's** 231:18
232:13
**law** 3:17 38:7,16
39:11 40:20 73:25
74:6,17 81:6 278:14
279:9
**laws** 334:11
**lawsuit** 100:25
172:19 217:15,22
221:11 273:7
274:11,15 275:7,23
277:2,4,8,15 279:10
279:12,16,22,25
280:5,8 282:4
314:13
**lawsuits** 120:5,11
216:25 217:7
**lawyer** 36:5 38:2
78:16 256:23 257:4
**LAWYER'S** 388:2
**lead** 310:20
**League** 41:9
**learn** 137:24
**learned** 112:4 274:10

**lease** 23:21 24:8,12
24:17,19 44:12,14
82:7,10 126:13,19
203:9 220:20
226:12 296:6,7
**lease-to-buy** 44:15
**leasing** 1:4,18 3:9
25:13 103:22
126:21 128:18
129:15 130:2
154:24 155:15
157:14 158:10,13
160:13 162:9
175:25 232:23
241:3 348:25
**led** 216:3
**left** 28:5,11,15 43:15
45:25 46:6 62:3
149:3 161:10
300:10 301:4
324:16 339:18
342:23 370:7
376:14
**legal** 3:3 4:21,23 7:24
20:22 162:5,8
223:21 230:22,23
271:8 367:4,7,10,13
369:8,12
**lender** 105:7 149:13
**lenders** 113:25
124:23 125:7,21,25
150:11
**lending** 132:11
149:14,19 154:21
155:7,13
**let's** 12:16 42:18
48:19 50:10 88:14
89:24 90:4 143:24
180:12 204:14
215:16 247:25
254:9 255:9 296:11
323:7 342:7 344:6
362:21 377:17
**letter** 93:21,23 94:10
124:10,11,14 272:2

272:4,11,25 273:4,7
274:15,20,23,25
275:4,5 326:5 372:8
373:17
**Levine** 19:23,24
**Lexington** 3:14
**liability** 157:20 257:9
333:25 334:6,7
**Libertas** 1:17 4:13
11:14 12:8 52:16
281:2,3,4 282:7,15
282:20,22 284:17
284:21 286:6
287:13 289:16
290:9,22 293:4
295:3 325:8 326:21
**LIC** 1:14 3:21
**license** 8:17 72:5,24
73:7,14,20 80:12,14
82:23 83:24 84:7,11
84:19 85:20,24
106:12 123:3,11,18
123:25 124:4
128:25 129:5,16,19
129:25 142:17,22
143:2,5,7,12 224:7
224:16,23 226:12
255:4 296:3,8,25
297:9 386:10
**licensed** 84:12
**licenses** 83:10,11,18
226:14 252:11
255:4 260:20,22,24
296:11,13,24 297:4
**liens** 193:2,23 194:9
266:12 267:25
**life** 37:6 39:8,12,16
39:20,21 40:8 65:15
65:18,24 67:8,11
70:7,10,13
**light** 82:20 89:11
371:11
**limited** 157:20 257:8
333:24 334:6,7
364:20

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

409

**LINDEN** 3:17
**line** 53:10 84:4,8,16
  85:20 91:11 95:8,25
  96:21 97:10,16,20
  97:23 102:14 103:5
  103:19 104:9 105:6
  113:21 139:5
  177:14 183:20,23
  189:15 204:4 264:6
  302:6,22 310:17,24
  315:14 383:4
  386:21
**lines** 35:14 78:6
  83:21 84:14 316:25
**link** 51:14 183:9,17
  188:6
**linked** 321:7
**list** 245:20 246:7,22
  249:25 259:3
  283:24 313:8
**listed** 92:12 116:20
  159:22 162:16
  164:2,10 175:14
  177:25 178:17
  196:13,17,19 197:7
  197:11,12,16 247:4
  255:19,24 257:11
  263:3 283:7,12
  328:13 329:17
  334:18 339:11
  355:2 369:23
**listing** 173:15 237:6
  244:6,13,20 246:5
  312:9,14
**lists** 154:4 241:20
  262:25
**litigation** 271:25
  273:12,13 274:17
  275:7,12 277:11
**little** 1:16 7:25 8:3
  46:21 65:12 94:2
  129:2 141:14 165:6
  169:8 170:16
  178:21 180:9
  207:15,20 235:15

254:5,8 283:4
  303:11 307:22
**live** 23:20 24:5,9,13
  25:7,22 26:6,7 31:8
  41:16 43:5,22 44:3
  45:18 81:16,25 82:8
  82:11
**lived** 41:14 42:12
  61:14 81:19,20
  82:18
**lives** 247:17
**living** 25:3 60:18,24
  61:11,13 164:15
  290:14
**LLC** 1:3,4,4,6,6,6,7,7
  1:7,8,8,8,13,14,14
  1:15,15,15,17,17,18
  3:3,4,9,9,10,11,11
  3:11,12,12,12,13,13
  3:20,20,21,21,21,22
  4:13,21,23 10:12,19
  103:20,22 105:21
  105:25 123:9
  126:21,22 127:2,5
  127:14,22 128:4,7
  128:17,18,19
  129:15 130:2
  154:24 155:15
  157:14 158:10,13
  160:13 162:10
  175:25 232:23
  234:20 235:4
  238:11,14 241:4
  255:20 260:11,12
  261:19 334:10
  348:25
**LLCs** 268:24
**LLP** 1:16 3:8 4:7,12
  165:7 169:9 272:12
**loan** 158:21 159:10
  161:6,7 162:3,3
  164:22 165:4
  167:13 168:22
  169:3,14,17,19,21
  169:23,25 171:20

172:14,18 173:15
  176:24 177:4,9,20
  181:5 183:9 184:21
  189:13 190:17,19
  191:11 192:25
  205:13 252:15
  253:3 280:24,25
  281:3,4 284:16,21
  286:5,8,8,10,12,16
  286:20 287:5,22
  289:5,16,22 293:5
  305:20 306:8
  307:13,19 310:24
  349:18 351:9,10
**loaning** 289:2,3
**loans** 135:21 136:6
  158:14,24 177:5
  253:17,18 289:10
  289:13 386:17
**LOC** 183:17,19
**located** 7:19,21 33:23
  221:7
**location** 30:2 110:15
  114:18 123:23
  184:15,16 221:6
  337:25 338:2
**locations** 148:5
  297:14 338:4,11
  375:10
**lock** 230:11
**locked** 230:6,14
  374:5
**log-in** 292:2
**logged** 293:11
**logging** 199:16
**login** 199:17 208:16
**long** 16:8 18:15 27:10
  27:19,23 30:20 33:8
  35:17 36:14 43:5,22
  71:6 100:3,5,6
  108:2 110:16
  114:11 115:3,6,19
  115:22 117:11
  185:6,12,14 302:12
**longer** 62:4,9 132:14

142:25 143:8
  212:20 258:3
  308:20
**look** 67:7 218:20
  339:6 342:7 344:6
  362:21
**looked** 22:6,20,25
  82:21 178:3 188:4,7
  238:19 241:8 242:2
  333:12 356:22,24
  360:9
**looking** 14:22 92:10
  116:5 173:17
  174:12 247:2
  265:18 282:3
  335:20 349:15
  351:7 355:14
**looks** 188:25 241:10
  350:2,2
**losses** 191:12
**lot** 15:22,23 108:14
  125:22 132:21
  365:7 376:15
**lots** 296:23
**loud** 13:25 20:12
**Louis** 38:8,10,18
**lower** 16:4 344:5
**lunch** 204:21 205:18
  205:21,25
**lying** 307:4

_____

**M**

**M** 384:2
**M-I-K-H-A-I-L**
  26:19
**Madam** 322:15 327:3
**mail** 372:10
**maintain** 80:13 126:3
  210:25 211:22
**maintained** 62:20
  93:3 211:9
**major** 138:18
**makeup** 235:4
  239:11 263:10
**making** 49:25 52:8

52:10 67:17 79:6 134:7 196:21 236:7 236:12,14

**Maltz** 235:12

**man** 29:17 38:8 67:11 70:21

**management** 1:8 3:13 127:5,13,22 128:4,7,17 364:2

**manager** 112:2 134:16,19,23 135:5 135:6,12 145:8 148:12 348:24 354:22 366:2,6

**managers** 145:10,19 145:19,21 146:8 148:4,6,11 334:14

**Manhattan** 30:6

**manner** 221:17

**Marc** 1:12 3:19 41:5 46:2 57:19,23 58:9 58:13,17,23 59:6,14 59:24 61:7,9 62:18 63:15,16,19 64:8,10 64:15

**Marc's** 354:24,25

**March** 27:5 59:13 102:6 246:22 301:7 333:7,13 336:14 337:4 338:19,24,25 339:3,4 348:11 349:16,21,24

**margins** 364:4

**mark** 21:12 240:18 334:2,8 367:18

**marked** 68:11,16 75:22 76:3 100:14 100:19 116:9,16 120:19 121:4,8 153:14,18 160:23 161:3 182:18 183:4 187:14,21 194:13 194:17 200:6,11 219:16,23 225:11 225:15 240:23

249:10,15 251:21 251:25 255:13 261:17,24 265:5,10 272:5,7,20 273:19 276:9 281:24 282:11 292:15,21 293:21 303:4 314:7 327:20,24 332:11 332:16 347:24 348:4 358:17 363:4 368:3 369:20 371:19 375:23 378:25

**market** 138:4,10,12 138:16,25 139:8

**marketing** 363:25

**marriage** 30:20 31:5 387:12

**married** 28:18,25 29:24 30:9 31:2

**match** 178:19 340:24 342:11,15 344:23

**matches** 340:22 344:25

**materialize** 44:19

**matter** 7:13 179:8 206:21 219:19 285:13 387:13

**matters** 206:22

**meals** 31:20

**mean** 29:25 56:15 61:19 62:13 108:19 109:13 111:3 116:23 125:18 127:15 133:14,24 134:3,9 137:16 145:15 148:4 150:17 155:5,16,21 156:2,11,12 159:24 170:21 181:20 192:18 198:19 201:19 222:22 223:2,18 229:3 253:6 261:6,9,10 270:24 285:11

300:15 305:14,16 306:7,10 307:11,18 311:10 319:18 329:20 337:11 343:23 344:20 346:4 350:2 354:12 356:13 361:2,4 373:23

**meaning** 307:12

**means** 23:21 42:8 65:22 118:10 201:24 279:14 281:8 307:14 341:11 343:7 364:23,25

**meant** 270:10 279:11 361:5

**media** 48:23 55:10 88:20 94:20 107:2 107:10 180:17,25 204:19 205:3 254:14,23 281:14 281:22 323:12,21 327:9,18 377:22 378:6 379:22

**medication** 15:22

**medications** 17:6

**meet** 11:21 12:23 18:6 43:3 50:5 51:16 61:16 88:15 99:13 130:7,24 131:11 148:16 150:15 151:5,23 166:11 184:5,10 185:12 323:24 336:21 354:19 367:20

**meeting** 18:12 51:14 62:10,12 92:25 215:15,20 216:17 216:21 217:2

**meetings** 19:11,12 186:7

**member** 348:24

**members** 154:5

157:7 235:5 262:22 334:14

**membership** 268:24 269:5,23 271:18 280:18

**memo** 356:12,13,15

**memory** 15:3 29:8 162:12 192:19 250:21 290:4,5

**mentioned** 216:24 291:12,14 362:20

**merchant** 282:20,24 283:7,18 321:7

**Merckling** 1:12 3:19 41:5 42:11,25 46:3 46:10 57:20,23 58:9 58:13,17,23 59:6,14 59:19,24 61:5,10,17 61:21 62:10,15 63:23 64:10,15 67:24 70:3,17 71:7 71:12

**message** 302:19 303:6,24 307:5

**messages** 213:25 214:7 303:19 361:16

**Messon** 353:18

**met** 36:11 38:20,21 41:5 42:11 61:20 63:12 99:14,16 100:2,8 130:5,10 131:15,16,19 132:3 149:20 151:25 152:3 167:18 184:12 185:11,16 186:2 215:8,9,11 304:21 308:8,10 336:17,23 349:12

**method** 278:19

**Michael** 1:12 3:19 114:22 126:10 151:23,25,25 163:4 182:23 198:7 202:15 203:3,6

215:17 231:16 232:19 296:6 374:25 376:6
**microphone** 9:23 165:14 207:16,20 227:9
**microphones** 7:4
**middle** 26:13 76:25 222:11,15
**Mikhail** 26:13
**Mikhail's** 26:17
**million** 162:19 252:15 253:3,17 373:19,20
**mind** 254:4 273:11 311:8
**minutes** 18:21 180:13 281:10 322:21 324:12,15 378:14 378:17
**misdemeanor** 256:11
**misrepresented** 310:2
**missing** 345:15,20
**mistake** 340:11
**mistakenly** 196:12 197:7,11
**Mitsubishi** 364:12
**mobile** 293:25
**modified** 366:12
**modifying** 221:16
**moment** 29:20 36:6 51:19 52:20 53:16 93:11,19 276:15 286:18 290:10 291:9 320:20 337:3 350:21 352:6 362:5
**money** 150:4,8 175:20 240:4 285:25 288:18,19 290:11,18 292:3,9 292:11 293:12 294:9,13 295:9 298:3 319:24 320:6 320:9 321:3 347:3

350:13 351:14,17 351:18 352:2,9 355:19,21 373:13 374:6
**monies** 350:20 352:15
**monitoring** 360:20
**Montauk** 131:20
**month** 150:6,9 155:8 156:3,3,4,5,5 213:24
**month's** 351:7
**month-to-month** 155:19,22
**monthly** 204:5,9
**months** 58:24 100:10 110:17 112:21,23 115:7,10,15 199:17
**Morgan** 1:17 151:24 151:25 152:2
**morning** 9:4,5 50:17 50:20 90:12,15 186:17
**mortgage** 33:17,20 247:14
**mother-in-law** 26:25
**motion** 93:21,24,25 94:12 220:14 326:2 326:5
**motor** 1:4,18 3:9 103:22 126:21 158:10,13 160:13 162:9 175:25 220:22 232:23 241:3 348:25
**Motors** 1:3,14,14,15 1:15,16 3:4,20,21 3:21,22 7:14 10:12 10:15 46:13,13,15 46:18,24 51:9 104:21 105:21,25 110:7 120:23 122:13,22 123:8 126:9,16 128:18,18 129:7,15,21 130:2

154:23 155:14 157:14 160:13 244:15,16 245:8 246:23 255:20 257:14,24 258:5,15 258:23,25 259:10 259:17,18 260:10 260:11 261:19 328:23 330:23 355:16
**mouth** 261:14
**move** 42:19 43:14,24 44:6,7,22 45:23 114:19 122:2 181:22 224:4 292:2
**moved** 43:16 60:20 60:20,21 61:3,15 114:10,17 244:24 245:3 293:12 352:23 375:7 376:13 377:2
**moving** 95:2 186:20 298:3
**mumbling** 14:4
**mute** 7:6 207:7,12,14
**mutually** 324:20 325:23 378:15

_____

**N**

**N** 1:25,25,25 2:2,2,2 3:2 5:2 8:10,10 384:2,2 385:2,2,7 386:5,20,20
**N-A-T-H-A-N-L** 375:18
**N-E-S-N-A** 208:22 208:23
**N-E-W-E-L-L** 308:2
**N.A** 1:17
**name** 7:23 8:16 10:9 23:18 26:18,20 30:12,16 36:15 38:14 76:8,9 86:8 86:11 92:12 108:9 108:10 109:19,21

109:23 110:2 112:16 131:18 145:23,24 146:3 162:6,6,8,8 164:2 165:2,3 167:2 174:10,13 224:8 238:13,20 255:19 282:24 300:8 307:24 332:22 333:4 339:21 341:13,14 353:14 370:4,5,11,25 373:15
**named** 26:8 38:8 110:6 256:9 291:7
**names** 26:12,23 40:5 81:5 110:4,9 145:9 303:9
**Nancy** 250:6
**Nassau** 200:15
**Nathan** 307:24 308:3 308:11,12
**Nathanel** 375:17
**nature** 128:22 278:9 278:11
**necessarily** 135:18
**necessary** 134:13 382:5
**need** 16:2,11,16,18 37:13 50:5 84:13,15 85:20 191:16 214:20 279:21 283:22 342:13 380:24
**needed** 44:5,5 55:20 65:15 213:23 226:6 229:25 235:25 285:25 296:5,8,24 296:25 313:21
**needs** 90:2 251:18
**negotiating** 45:24
**NESNA** 208:22 209:2 209:6,10,17 210:2 212:25 214:3,14,20 307:21 308:5,18,21

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo   ---   January 12, 2026

412

309:5,17
**never** 28:11,15 65:4
 73:7,13 74:7,9
 78:25 80:15 86:3
 126:24 139:17
 149:8 156:25 160:7
 160:12 179:15
 180:6 191:20
 201:17 216:24
 230:25 260:6
 264:11 266:14
 268:12,23 272:16
 273:5,6 274:20
 275:4,6 300:25
 321:9 357:7 372:18
 373:22
**new** 1:2,22 2:9 3:5,15
 3:15,23,23 4:4,9
 7:17,22 8:13,23
 23:10,11 39:6 78:5
 115:20 120:22
 157:22 158:2 226:6
 278:21 296:11
 324:21 334:12
 364:11 376:7 384:3
 387:5
**Newell** 307:24
**NextGear** 97:24 98:2
 102:17 103:17,19
 103:25 104:6,10
 105:6 125:11 264:6
**nine** 324:11
**nine-page** 251:24
 265:9 371:18
 385:16,18 386:2
**Nissan** 151:9
**NMAC** 125:11
 208:21,21 250:3,6
 264:5,5 303:21
**Northshore** 1:4,17
 3:9 46:12,13,15,18
 46:24 48:3,4,9
 55:14 56:4,11,17,21
 56:23 57:4,7,16,20
 57:24 58:4,6,10,14

58:16,24,25 59:7,20
 59:25 60:7,24 61:2
 61:5,8 63:2,24
 64:12,13 65:7,8,9
 97:17,18,21 98:2,24
 99:4,11,18,25
 100:11 102:21
 103:6,8,20,21 104:2
 122:20,23 126:16
 126:19,20,22,25
 127:4,13,21 128:3,6
 128:16,17,18
 129:14,25 140:21
 141:7,10,13,21,25
 142:5,7,8,11,25
 143:8,16,17,21,25
 144:4,20 145:5,13
 145:17 147:16
 148:7,11,13,19
 149:14,18,20 152:2
 152:9,10,19 153:4
 154:23 155:14
 157:8,13 158:10,13
 160:8,12,13,17
 162:9 163:4 172:21
 173:14 175:25
 176:11,12 179:24
 180:8 182:2,5,8
 184:17,20,24 185:2
 185:7 186:8 189:17
 189:20 191:15,21
 192:10,25 195:13
 195:20 196:6,13,17
 201:9,12,17,20
 202:3,6,9,21,24
 203:17 207:22,23
 208:2,20 210:16,23
 211:3,8,16,20,23
 215:3 216:8 218:9
 219:5,11 220:21
 221:5,10,17 224:10
 224:16,24 225:7
 226:11 227:22
 229:20 230:3
 231:19 232:14,16

232:18,20,23
 233:16,22 234:4
 236:24 237:11
 238:19,25 241:3,21
 244:7,14 248:23
 252:11,16 253:4,20
 254:2 255:6 265:16
 265:22 266:10,16
 266:20 268:13,19
 269:5,24 270:25
 271:5,18 275:8,13
 276:17 277:11,16
 279:6 283:8,25
 284:18,23 285:7
 286:9,24 287:10
 288:16,17,20 293:4
 295:14,23 297:10
 297:11,13,21 298:4
 298:10,19,21,25
 299:13,18,22
 300:20 304:17,22
 306:4,5 308:14
 319:15,20,25 320:5
 337:22 338:6
 346:15 348:8,19,25
 349:16 350:24
 351:22 352:12,13
 352:17,22 354:14
 354:17 355:16
 358:25 359:6 360:3
 362:3 373:7 374:12
 374:20 375:8,13
 377:3,16
**Northshore's** 281:5
 285:9 346:19 347:4
 352:24,25
**notarized** 101:12
**notary** 2:8 8:12 9:16
 384:25 387:4
**notation** 138:24
**note** 7:3 230:4 388:2
**noted** 105:11 381:14
 382:13 384:14
**notes** 244:6 388:2
**notice** 2:7 276:4,13

278:8
**noticed** 376:11
**notified** 161:16
**notify** 11:16 315:4
**November** 59:13
 143:14 144:3,5,25
 145:4 179:25
 195:14,20 196:6
 197:18,19,24 198:9
 199:21,23 201:18
 201:21 202:4,7,10
 202:16,18,24 203:7
 207:24 208:5,12
 210:15,22 211:3,21
 212:23 215:10,15
 215:20 216:16,21
 217:2 227:15,19
 229:12 231:12
 272:11 275:23
 276:4 277:15
 280:15 282:19
 298:6,24 299:12
**Novicky** 331:23
**number** 22:12 155:13
 161:15 162:22
 163:8,10 164:6
 175:24 213:23
 226:10 276:5
 344:23,24,25
 352:16
**numbers** 290:6
 342:11 344:10
**NYC** 1:13 294:4,5
 295:10,10 349:23
 358:5
**NYSCEF** 272:8
 273:22 282:2

---

**O**

**O** 1:25,25 2:2,2 5:2
 8:10,10 384:2 385:2
 385:7 386:5,20
**O-U-T** 146:6
**oath** 5:17 13:11
 384:8,11

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo   ---   January 12, 2026

413

**object** 47:4,8,12,16
  47:17 48:14 54:20
  85:2 96:24 97:4
  195:22 312:13
  367:11
**objected** 367:12
**objecting** 52:9 54:5
**objection** 16:18 20:9
  20:24 21:15 32:25
  37:18 40:10 47:5
  49:24 50:2 54:9
  55:16 66:9 68:7
  69:11 74:4,15,24
  86:16 102:22
  195:21 196:10
  197:22 217:4
  218:13,21 223:9,13
  223:20 228:25
  230:5 236:5 239:22
  246:4 261:4 283:11
  283:16 286:2
  306:15 310:5
  312:10,17 315:10
  315:21 357:17
  367:5 368:6,9,20
  369:7 374:8
**objections** 5:10 9:13
  49:19 52:9,10
**obligation** 266:10
  267:24 288:16
**obligations** 266:8
  267:22
**observations** 376:24
  376:24
**observe** 111:13 185:3
**obtain** 35:14 42:7
  83:17 84:11,13,18
  95:7 96:19,20
  103:18 104:9
  183:23 190:17
  203:13 206:5
  208:19 233:11
  236:4 253:19
  280:18 289:22
  302:13

**obtained** 102:14,16
  103:16 104:5
  209:16 213:3
  284:16 290:8,22
  291:6 302:3
**obtaining** 235:19
  236:18 253:2,13
  301:25
**occur** 19:15
**occurred** 14:24 59:11
  202:19 251:13
  271:22 336:13
**occurring** 250:20
**October** 179:25
  370:20
**off-the-record** 49:2
  53:3,19 172:3 181:3
  254:17 323:15,24
**offense** 32:22
**offer** 57:19 63:25
**offered** 62:25 63:24
  67:6
**offhand** 162:15 259:8
**office** 36:21 163:10
**officer** 5:16
**officers** 67:12 70:22
  70:24 81:6
**offices** 7:20
**official** 108:20
  157:12 306:14
**officially** 32:16,18
  36:3 57:17 379:15
**oh** 23:8 27:22 30:21
  38:19 54:24 59:17
  63:5,11,14 76:7,8
  77:8 80:21 99:15
  101:24 111:15
  115:11 120:7
  125:22 132:19
  135:5 156:2 161:11
  162:14 165:12,18
  166:8 168:16
  170:20 172:25
  184:9 185:8 190:9
  206:12 207:9

226:20 227:10
229:15 256:22
259:12 280:3
282:22 297:17
303:21 308:25
336:16 337:17
343:5 347:14
353:25 354:20
363:13
**okay** 9:21 10:9,16,17
  10:20,21 11:2 12:3
  12:22 13:2 15:17,25
  16:10,20 18:2,6
  20:3 23:17 24:22
  28:18 29:22 30:9
  31:4 33:16 39:19,21
  41:23 42:3,24 44:7
  45:11,25 46:9 51:7
  51:10,18,22 52:4,12
  52:19 53:14,25
  56:10,20,25 57:6,14
  57:19 59:10,18
  60:12,18,23 61:9
  62:20,24 64:25 65:8
  65:11 66:23 69:21
  72:22 73:12,16
  74:21 75:15 76:17
  76:20 77:9 83:15
  88:9,14 91:9,12,14
  91:19,24 93:9,17
  94:7,9,25 98:23
  99:8 101:19,23
  102:18 104:8,12,25
  107:17,22 110:8
  112:3,20 118:19
  119:16 121:24
  122:6 126:8,20
  134:5 144:7 146:7
  149:21 150:24
  152:5 154:13
  156:13 157:6 162:7
  165:21,25 166:11
  167:10,21 168:21
  176:21 177:17
  178:24 181:22

183:16 186:15,25
186:25 187:13
188:13,19 189:3,6
190:9 194:11 195:5
195:6 196:16
197:10,15 200:5,21
200:25 207:2
208:16 210:25
211:7,15 213:19
215:7,14,18 217:9
218:6,7 219:9
221:20 222:13
224:3 229:18 230:8
236:23 237:8
239:14 243:9,20
244:24 247:7
248:11,14,16
249:21 260:9,23
261:16 264:7
266:24 267:5
269:12 270:11,20
274:8,9,14 275:22
276:22,24 280:16
280:17,22,25
282:22 283:6,7
286:11 290:7,21,23
293:13,16 294:12
294:20 295:19
296:12 297:2
298:16 299:5,8
301:3,20,24 302:12
303:10,14,15,17,21
303:21,22,22,23
304:12 305:12,22
306:6,10,18 307:17
311:18 312:5
313:22 314:24
316:6 317:17 318:2
319:6 325:20
326:22 329:4,21
330:6 331:6,8,25
333:15,22,22 335:8
335:19 336:7
337:12 338:21
340:24 342:25

343:10 344:6
345:14 346:12
347:7,18 348:17
349:6 352:12,12
354:10,18 363:10
363:13 365:4,18
371:25 372:22
375:16 376:23
377:5 380:19
**old** 8:23 23:8 31:22
43:16,25 60:19,21
61:3,11,14,15 62:3
245:4 290:12
**onboard** 58:20
**once** 32:13 87:14,17
143:2,7 184:14
185:18 304:22
**ones** 125:12
**online** 208:14,15
233:13
**open** 78:6 87:17
118:11 120:12
121:16,19,21
122:22 127:7,20
128:7 131:24
157:13 181:25
182:7 226:6 227:20
228:11 229:4
247:24 301:8
302:15 315:8,12
335:25
**opened** 57:5,9 58:22
87:25 100:4 103:5,8
103:12 105:6
112:12,21 113:12
113:19,25 114:12
114:24 115:6
116:21 117:7
119:21 121:13,14
122:19 126:21,25
128:17 129:14
141:7 144:4 148:18
152:19 153:2
157:17,19,25 182:4
228:5,7 229:7,11

309:23 315:16
318:2 331:14,25
332:3,21 335:22
336:3,5
**opening** 112:25
113:15 115:3,10
116:25 127:12
225:23,24 227:24
228:2,21 301:16
302:20 316:21
**operate** 82:23 84:12
84:16 113:5 118:8
121:17,20 123:22
140:22 142:4
143:15 179:7
201:20 296:23
297:3
**operated** 105:8
114:15,18 115:18
119:18 126:10,16
137:9 140:13,17
141:12,17,21
142:10,25 143:8
155:15 163:5
176:11 201:17,19
201:24 365:8 375:9
**operates** 132:23
133:12,16 134:7
**operating** 99:3,10,17
99:25 100:11
113:11,15 117:13
119:5 132:20
134:21 140:21,24
152:20,22 153:4,18
154:14,16 157:6,12
178:2,5,8,11 201:10
216:7,12 226:12
232:22,25 233:12
233:23,24 234:2,6
235:17,23,24 236:2
236:17 238:10,17
238:18,23 239:6
240:18 241:2,5,8,14
241:19,25 242:12
243:13,14 248:17

261:18 262:4,7,14
262:20,25 263:6,19
264:3,8,13 295:13
363:19
**operation** 123:20
**operational** 57:11,16
57:21 58:4,7,11,14
58:17,25 60:25 61:2
**operations** 57:18
141:5 185:3 366:7
**operator** 134:24
135:8,15,24 136:3
136:12,17,21 137:2
**opinion** 285:12
**opportunity** 181:15
181:18 195:7
**opposing** 54:6
**opposition** 94:3
**option** 356:14
**order** 2:7 17:22 24:8
24:13 31:19 37:10
59:19 84:12,16
85:19 88:6 94:24
182:7 193:6 194:8
206:5 214:20
217:21,25 218:5
220:2,5,7 221:21,24
222:7 223:7,22
226:16 231:11
260:25 280:18
289:21 325:17
377:6
**ordered** 35:9
**ordering** 6:4,13,20
6:22
**Orgad** 375:17
**Orgad's** 376:23
**organization** 104:20
158:9 386:9,14
**organized** 334:11
**original** 85:13 96:5
382:17
**originally** 44:11
79:17
**Outclot** 146:4

**outcome** 387:13
**Outlet** 131:22
**outlined** 365:23
**outside** 22:23,24 39:6
**outstanding** 78:23
**Ovington** 1:21 4:8
7:21
**owed** 287:13
**owned** 42:3 104:12
104:15 117:16
143:18,20 233:16
234:22 242:20,21
244:16 248:12
252:10 286:23
289:11 317:3
365:20
**owner** 48:11 56:11
56:17,21,23 152:6
172:20 173:14
179:24 180:7
192:10,14 195:13
195:19 196:5,17
197:19 234:3 237:6
241:20 242:22,25
242:25 245:7,9,11
245:14,16,21 247:8
255:23 257:12,23
258:4 259:4,10
260:4 263:2,3 264:9
264:19,25 265:22
267:10 283:10,12
283:25 310:3,9,15
311:10,16 312:15
313:9 315:19,25
335:5,13 372:24
**owners** 163:23
173:16 196:13,19
197:7,12,12,17
335:18
**ownership** 160:8,12
160:17,19 163:15
164:10 177:24
233:21 237:11
239:10 245:18
255:5 258:8 259:17

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthony Deo   ---   January 12, 2026

415

263:10 268:16 269:13 311:4 316:7 316:12
**owning** 25:13 113:17 234:13,13
**owns** 234:9 353:15

_____
**P**
**P** 1:25 2:2 3:2,2 5:2 34:12
**P.C** 3:17
**p.m** 93:24 94:5 180:16,24 189:4,25 204:18 205:2 254:13,22 281:13 281:21 323:11,20 327:8,17 377:21 378:5 379:21 381:14
**pace** 210:7
**page** 68:19 76:25 77:12,17,21 101:6 116:11 120:21 154:4 161:25 170:14 174:8,9 175:9 178:9 181:5,7 220:11 231:13 232:21 233:14,15 236:23 238:9 241:19 256:3,6 257:7 262:21 282:6 318:5 328:9,20 333:15 335:12 349:10,12 363:17 370:10,15,18 371:23 383:4 385:4 385:8 386:6,21
**PAGE/LINE** 388:2
**pages** 154:2 187:16 241:13 262:19 329:3 332:20
**paid** 64:10,23,25 65:4 78:21 135:22 179:5 179:11,15 206:16 209:14 213:5

280:17 286:15,23 290:24 295:2 299:23,24 300:14 300:16 301:3 350:10,18 351:8,11 352:13,16,19 353:7
**pain** 16:4
**pains** 101:9
**PAL** 41:8,12 42:12 61:21,23 62:2,4,11 62:17
**pandemic** 158:14,23 235:19 236:4,18
**pandemic-** 158:20
**paper** 188:17
**paperwork** 159:7,13 380:7
**paragraph** 101:22 103:21,23 104:4 191:9,14 195:2,8,11 196:4 200:22 202:19 252:7 265:15,20,24 266:24 267:9 363:17 365:24 366:9 376:4,5,11,18
**paragraphs** 101:17 102:5
**Paralegal** 4:21,22
**paraphrasing** 282:21
**Park** 3:22 112:13 114:9,12,18 115:19 124:24
**Parmeshwar** 354:8
**part** 37:22 39:9 54:17 67:7 69:21 134:5 151:13 154:25 235:7 256:7 287:6,7 287:21
**participate** 16:25
**participated** 139:17
**particular** 80:17 144:13 192:5 193:15 198:11,12 238:14 307:20

340:5
**particularly** 276:14 315:16
**particulars** 193:25 253:22 356:7
**parties** 5:6 7:10 151:15 324:17,20 326:4 387:11
**parties'** 378:8
**partner** 370:22
**partners** 1:16 316:10 316:16,20
**party** 12:4,5,6,7 49:23 54:6,8 88:25
**passed** 71:16 171:3 174:17 175:2 199:18
**pattern** 278:19
**pay** 63:25 64:4,7,15 78:25 79:9 149:9 150:10 205:12 213:13 214:14,20 215:5 221:10 247:11 251:18 280:23 286:13 287:4,12,16,21 288:7,12,17,19 289:23 290:11 355:4 357:15 380:11
**payable** 360:2
**paying** 6:10 79:4 169:2 286:13 306:11 308:13
**payment** 214:4 351:10 354:23 356:4,9 359:6
**payments** 169:8 284:6 286:20 321:4 322:5 346:13 386:14
**payroll** 64:7,8,11,24 65:2
**pays** 136:5
**PDF** 381:2

**penalties** 101:9
**penalty** 13:11 102:11 102:12
**pending** 7:15 15:11 220:12 266:2 267:16 277:23 292:24
**Pennsylvania** 4:14
**percent** 65:10 73:10 104:13,16 164:10 164:11 166:3 172:20 173:14 179:24 180:7 184:23 195:13,19 196:5 202:12 233:17,17 234:8,9 234:13,14,21 237:6 239:11,12 241:20 242:5,20,21,25 243:15 244:16 245:11,14,15,19,21 257:12,23 258:4 259:3,10 260:4 263:2,3,11,11 264:9 264:19,24 266:15 266:20 268:6 269:23 280:18 283:25 295:15 310:3,9,15,22 311:10,16 312:15 313:9 317:4 335:5 335:13,25 350:15 350:17
**percentage** 150:7 160:18 245:17 258:10
**percentages** 157:10
**Perfect** 53:14,25
**perform** 46:25 48:10 55:14 59:20 65:6 266:8 267:22 278:3
**performance** 366:15
**performing** 111:5 147:7 337:15
**period** 71:11 83:13

83:16 84:20 95:5,6
96:22 97:11 113:23
143:13 144:2
155:24 162:17
253:15 309:3,10
338:24
**perjury** 13:12 101:9
102:11,13
**permission** 142:18
214:21
**person** 18:12 38:13
52:13,15 109:19
110:25 134:20
202:25 234:23
256:8 308:9 334:17
353:14 365:2
**personal** 168:9,10,11
191:17 239:15,19
244:4,8,17,22
246:20 247:4 311:3
373:15
**personally** 21:22
159:6 187:8,10
193:5 286:7 311:9
349:12
**personalty** 278:15
**Philadelphia** 4:14
**phone** 18:12,14,15,23
19:2,6,8,11,15
89:23 163:7 164:5
214:11 313:17
**phones** 7:7
**physical** 30:2 338:4
**physically** 202:14,25
338:2
**pick** 7:5
**piece** 253:20
**pieces** 244:21
**pike** 261:2
**pitch** 167:9
**place** 2:6 7:9 30:3
54:4 68:10 108:16
118:4 119:4 139:5
148:5 153:8 194:12
281:23 324:3

374:21
**placed** 116:8 120:18
147:22 182:17
219:15 265:4
291:18 326:8
330:23 373:12
375:13
**placing** 75:21 249:9
273:15 276:3
**plaintiff** 10:11,23
**plaintiff's** 324:6
**plaintiffs** 1:9 3:3,8
11:9 51:6 90:20
92:20,22 101:2
104:18 105:2 207:4
224:14,22 272:14
276:18 278:22
291:22 295:8,9
324:14,16,22 325:2
326:15 378:18
**Plaintiffs'** 68:14
75:25 100:17
116:14 121:2
153:12 160:25
183:2 187:19
194:15 200:9
219:21 225:13
240:21 249:13
251:23 255:11
261:22 265:8
272:18 273:17
276:7 282:9 292:19
293:19 303:2 314:5
327:22 332:14
348:2 358:15 363:2
369:18 371:17
375:21
**plan** 95:8,13,25 96:15
96:19,21 97:10,16
97:20,23 99:15
102:14,17 103:5,17
103:19,25 104:5,9
105:5,7 113:20,24
123:21 124:23
125:7,21,25 132:11

139:5 149:13,14,19
149:23 150:2,11
154:20,21 155:7,13
203:15,19 204:4
213:12 325:9,13
**Planet** 110:6,7 115:5
**plans** 131:8,9
**play** 137:18,20
**plea** 38:3 40:25 386:8
**pleading** 36:2
**please** 7:3,6 8:9,21
45:8 47:9,19 48:7
54:18 66:12 82:6
83:2 85:6 96:7
98:15 133:4,6
141:15 165:11
172:7 173:2,3,5
186:21 195:2
200:23 207:8 212:2
212:4 226:5 246:11
250:6 254:5 260:18
307:23 313:16
369:11 371:23
380:22 381:13
382:4,10
**pled** 35:19 75:18 77:6
80:25 81:12
**pledge** 220:20
**plus** 242:5 243:16,25
**pocket** 305:3,9,13
306:7,23 307:11,14
**point** 12:17 38:2
60:25 145:7 146:2
149:11 150:24
214:16 299:11
301:14 321:18,21
**pointed** 86:10
**pointing** 86:7
**police** 41:9 67:12
70:22,23
**policies** 363:24 364:4
**portion** 79:4 93:23
177:3 205:12,15
287:12
**position** 89:6 92:21

93:4 102:18 103:2
136:11 173:13
192:7 366:21 367:2
**possession** 124:16
209:9 212:21
263:18
**possibility** 125:18
**possible** 287:3,24
288:3
**possibly** 33:18 108:6
133:19,21 189:22
**potential** 250:8 326:2
**practices** 278:17
**precisely** 62:13
146:21 167:17
185:5 203:24
**prefer** 93:20
**preferred** 20:7
**prefilled** 238:2
386:17
**Premier** 1:15 104:11
104:12,15,21
119:20 120:13,23
122:6,13,22 126:9
129:7,20 166:9
288:6
**premise** 84:21
**premises** 211:23
**prepare** 17:14,24
18:7 19:10,12 22:6
159:6 168:9
**prepared** 17:23
159:13 164:21
165:4 167:22,24
168:10 262:5
**present** 4:17 8:6 63:9
91:22 100:13
144:21 145:6
147:15,24 160:22
185:9 202:14
215:16 231:5
237:12 327:19
358:12 359:5
**presented** 20:21
159:17

presenting 153:17 332:7,10 362:22 369:13 371:14
preserve 126:5 128:10 368:20
pressure 15:21
Pretty 150:13
previous 31:4 315:14
previously 73:7 75:19 138:20 210:8 226:18 228:8 256:25 257:2 306:8
price 44:10 284:12
primary 137:22
print 361:15
prior 19:19,22,24,25 30:12 43:18,20 72:22 78:14 81:19 81:22 101:2 107:18 115:3 126:20 135:21 136:5 159:21 162:17 213:14 215:12 229:9,10 260:2 273:23 290:21 305:23 378:8
private 7:5 37:8
privilege 87:3 88:23 88:25 89:2,5,9,12 89:19 92:19,23 93:7
privileged 86:19
probably 28:4,7
probation 34:13,15 34:18,22,24,25 77:14,18,22 78:2,7 78:11 80:2,4,7 83:12,16,21 84:19 95:3 96:22 102:20 103:3,12
problem 52:23 54:15 94:15 120:16 138:6 138:8,13 303:13
procedure 79:21
proceed 54:10
proceeding 52:15

266:5,6 267:19,20
proceeds 218:25
process 122:5 139:13 139:18 158:17 159:3 168:22 336:3
processing 161:19
procured 305:20
produce 12:12 124:18 379:12
produced 227:5 237:19 325:22 343:7,8,12 378:9
production 21:19 25:11 40:24 104:19 105:4 106:11 117:21 118:20 122:11 126:6 128:13 158:8 169:7 177:18 179:19 204:8 209:24 237:9 289:9 342:20 358:4 373:11
profit 364:3
program 41:12 42:13 62:7,8
prohibited 218:8 219:4,9 224:7
prohibits 221:14 228:14
prompted 43:24 44:7 44:22 122:21
properly 147:8
properties 248:9
property 23:13,18,21 25:18,19 33:20,23 41:19,22 42:4,6 45:18,21 81:13 82:5 82:8,16 244:21 245:5 247:9,11,12 247:15,22 278:16 290:13
propose 365:25 366:3 366:5
prosecution 37:2
protect 67:8 70:5,7

70:12,12,18,25 71:2
protection 65:15,23 67:5,10 68:2 70:10
prove 312:7
provide 17:2 31:18 31:25 32:2,6 49:7 65:22 67:9 68:2 70:9 77:25 149:22 154:20,21 155:7,13 162:24 181:4 182:9 182:12,14 237:25 355:8 356:12 379:7
provided 190:13,24 315:3 364:5
provider 205:9,17
providing 150:2
provision 366:23
proximately 278:18
public 2:8 8:12 9:17 384:25 387:4
Puccio 182:22 183:8 184:5,8,11,12 185:2 185:6 186:11,17 189:24 190:24 191:6,8,10 192:3,13 226:4 243:23 304:4 304:12 305:10 315:8,13,18,24 316:3,7,9,13,15 317:2,5 333:13 336:17,21,23 349:13
pull 240:14
punishment 34:19
purchase 137:14,24 138:23 215:24 217:11,14 218:10 265:6 266:25 269:18,21 270:6,13 271:17 273:11 275:25 277:18,22 280:9,20 284:12 289:16
purchased 141:23 144:8 203:21 204:3

purchasing 203:18 219:6
purpose 111:5 127:12 184:22 186:5 189:13 235:18 236:18 264:4 290:18 350:22 351:22
purposes 184:21 310:16
pursuant 2:6 51:15
put 91:10 176:15,17 211:5 213:17 243:15,16 256:19 372:22 373:2,6,9,18 373:19,21,24,24 374:3,12
puts 29:13
putting 147:18 155:18 213:12 215:22 283:16

**Q**

qualify 191:11
Queens 30:8 81:14
question 5:11 14:9,16 14:19 15:11,12 17:17 20:11 21:9 23:3 24:7,24 29:5,7 34:5 35:23 37:14 40:14 45:6 46:20,21 47:14,20,23 48:7 55:12,20 56:2,7,19 57:8 59:22 75:4,8 76:10 83:5 84:22 85:6,9,13,16 86:19 86:21 87:2,5,7,9,12 88:8 89:18,21 95:18 96:5,10,13 98:12,18 99:7,9,21 106:4 111:12 118:9 121:18 129:3 133:3 133:9 141:14,18 143:11 145:2 147:17,19 152:24

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo --- January 12, 2026

418

160:21 168:17 170:4 172:10 173:2 173:3,8 180:9,11 181:23 186:14 194:6 195:15 196:2 197:15 209:3 211:25 212:7,11 223:10,14,16 228:16,17 231:9 234:11,18 236:15 236:16 240:6,8,13 242:8,16 243:12 246:2,10,15,19 247:24 248:6 263:15 264:12 277:7 281:7 294:25 296:17 307:22 310:6 311:7 312:13 327:5,12 331:12 368:17 369:4,10,12

**questioning** 93:22 380:25 386:21

**questions** 13:3 17:3 17:19,23 37:3,11 41:24 87:23 88:2 92:17 93:6 223:6 271:8 325:14 378:20

**quick** 240:15

**quicker** 44:6

**quote** 66:25 381:6,10 381:11

— **R** —

**R** 3:2 4:2,5 5:2 383:2 383:2 386:5,20 387:2

**rambling** 336:6

**ran** 298:13,13,24 299:3,6,12,16 300:18

**random** 362:7

**range** 43:10,11,12

**reach** 60:6 80:20

**reached** 60:5 324:5

**reaching** 243:24

**read** 17:25 22:21 47:20,23 66:20 69:6 69:15,17 70:16 75:3 75:8 82:25 83:5 85:9,16 89:21 96:6 96:10 98:18 101:16 101:21 102:5 133:5 133:9 162:4 170:16 172:6,10 173:4,8 186:23 195:2,8 200:23 212:3,7 238:21 246:12,15 248:6 252:18 278:25 285:2 327:4 327:12 349:2 365:8 368:13,16,25 369:4 371:23 382:4 384:7

**reading** 18:2 69:9,19 95:14,17 196:23 250:17,18 265:19 372:4,13

**ready** 195:3

**real** 25:19 33:14 67:2 80:8,10 244:21

**realize** 285:5

**really** 16:6,18 18:5 109:18

**realty** 1:8 3:12 39:2

**reason** 12:18 15:10 16:24 17:4,10 29:4 39:10 80:17 117:5 119:25 120:3,4 127:19 129:4,8,24 149:6 151:4 186:10 190:23,25 191:2 230:14 231:4 235:22 341:22 345:16 362:4 382:7

**recall** 34:20 35:4,5,8 35:13,25 38:12,19 66:19 74:21 79:4,6 79:19 99:14 107:25 110:10 113:22,24 117:4 120:7,8 122:4

123:15 124:5 125:23 127:18 128:5 129:13 138:19 146:11,12 157:10 159:16 163:9 166:8,10 169:5,22,24 170:23 170:25 171:2 172:16 173:21,25 174:2 176:8 177:13 177:13 183:12,14 184:2 185:4 186:5,7 190:22 191:2 192:4 209:21 211:18 213:21 214:6,10 215:13 216:19 227:19 239:14 249:3 250:12 252:20 255:7 258:12 271:3 276:2 280:3,6 286:17,25 289:7 290:10,20 291:21 296:17 297:6 300:3 302:18 316:14 317:7 318:15 320:20 332:5 333:14 335:2 335:21 337:2 340:5 349:22 350:21 351:16,19 356:17 357:23 358:2 361:18 372:11

**recapitalize** 252:16 253:4

**receipt** 372:10 382:19

**receipts** 226:13 282:7 284:11

**receivable** 244:7

**receivables** 281:5 282:18

**receive** 176:24 177:3 272:4 349:20

**received** 190:19 204:2 209:14 272:2

273:6 291:20,23 292:4 294:9 321:15 349:17 350:9,15 351:21 352:3

**receiving** 183:12 273:3 372:11

**recess** 90:7 107:4 180:19 281:16 377:24

**recognize** 76:6,11,12 101:3 153:20 154:10 200:18 225:21 265:13 272:15 276:12

**recollection** 14:23 15:5 28:16 33:12 73:3,13,19 104:2 115:21 116:3,20 117:11 120:15 121:12 126:24 176:19 179:14 296:19 319:17,19 341:25

**recommend** 87:21

**reconcile** 173:12

**record** 6:24 7:11 8:7 8:17 9:10 22:17 48:19,21 50:11,12 52:24 55:8,11 67:15 71:18 86:9 88:15,18 89:25 94:18 101:20 101:25 102:4 106:22,24 107:8 111:17 116:7 120:17 153:24 169:2 170:12,17 171:24 172:7 178:6 178:13 180:15,23 190:4 204:15,17,25 207:3 219:14 241:11 254:10,12 254:21 262:17 281:10,12,20 283:17 311:22,24 322:11 323:8,10,19

324:3 326:8 327:2,7 327:16 328:25 368:21 372:2 377:18,20 378:4,13 378:24 379:6,13,17 384:10,12 387:8
**recorded** 313:18
**recording** 7:8
**records** 71:20,21,22 118:21 126:4 208:4 208:7,11,12 278:15 356:8,10 386:11,13
**recovered** 294:24 295:6
**rectify** 251:14
**red** 176:4
**reduce** 155:3
**refer** 118:23 130:12 130:15,20 142:19 218:4 232:5,7,9 304:8
**reference** 176:4
**referenced** 103:20,22 256:25 257:3 322:11
**references** 77:2 169:16 174:9
**referencing** 239:23
**referred** 36:8,17,20 231:14,16
**referred-to** 47:22 75:7 83:4 85:8,15 96:9 98:17 133:8 172:9 173:7 212:6 246:14 248:5 327:11 368:12 369:3
**referring** 10:15,18,22 20:4 34:10 71:25 130:13,16,21 153:6 168:18 184:20 188:9 191:3 193:11 231:19,22 250:13 279:4,25 297:20 304:9 305:9 306:19

349:5,10
**reflect** 86:10 101:20 116:8 120:18 153:25 170:13,18 178:7 190:5 207:3 219:15 241:12 262:18 329:2 372:3
**reflecting** 356:9
**reflects** 293:7 329:16
**refrain** 47:9
**refresh** 115:20 116:2 116:20 120:15 121:11 296:19 319:16,18
**refuse** 223:5
**refusing** 12:12
**regarding** 106:14
**regardless** 125:8
**register** 360:20
**regular** 109:2 278:19 298:5
**related** 13:7 32:19 33:16 37:2 177:20 278:18 337:15 387:10
**relating** 332:20
**relation** 58:3,21 59:10 236:8,12,14 253:10
**relations** 278:14
**relationship** 21:2 46:11 156:8,12,14 156:19,21
**relationships** 114:4
**relative** 108:22
**release** 34:7,11
**relied** 145:10
**relief** 158:14,24 224:4 235:19 236:4 236:18
**relief-related** 158:21
**rely** 145:14,18 147:15 162:24
**remain** 124:15 185:6
**remained** 142:13

**remaining** 324:17 345:17,22
**remains** 78:23 117:25 128:7 224:2
**remember** 27:12 29:15,18,19,20,22 30:24 33:10,19,22 35:3,12,17 36:10,12 36:16,18,19 37:25 40:22 54:24 57:25 58:19 64:2,3,6 67:16 73:10 75:16 79:10,20 81:9,11 97:15 99:16,23 100:7,9 106:9 108:10 109:22,25 110:4,8 114:7 116:25 118:17 120:3,10 122:8 125:2,12,14,15,17 126:2 129:12 131:18 147:10 155:17 158:5,25 159:19 162:14 182:6 191:24 192:20,22 193:3 217:10 218:12 219:7,12 243:22,23 244:3,6,10,11,13,18 244:20,23 247:6 249:2 250:15,19 251:2 254:3 259:7 264:15 275:15,16 275:18,20 276:15 280:4 287:9 290:25 292:8,10,12 295:25 301:11 320:11,12 335:3,9 342:18 348:15 354:6 356:21 372:20
**removal** 199:24
**remove** 199:18 221:2
**removed** 193:4,7,16 193:18,23 194:3,9 198:5,15,20 199:2,4

200:2,4 203:14
**removing** 199:8 219:10
**rendered** 20:23 179:6
**rent** 23:12 82:5
**rent-to-buy** 44:17 45:4
**renting** 25:13
**repaid** 286:8,11
**repairs** 247:20
**repeat** 45:8 66:11 82:24 84:25 85:5,13 98:14 133:3 173:3 195:15 196:9 209:3 211:25 240:13 247:25 257:25 277:13
**repeatedly** 198:14
**rephrase** 14:17 46:22 48:6
**rephrasing** 269:9
**replace** 147:11
**report** 250:3
**reporter** 2:8 8:2,8 14:2,11 16:12 322:16 327:4 379:7 387:3
**Reporting** 7:25 8:4
**represent** 20:8 49:14 76:13 100:22 187:15 194:20 200:14 225:18 241:14 249:18 265:21 267:9 270:12,21,22 272:10 274:6 281:25 293:23 294:16 303:18 310:21 314:2 328:3 343:4,6 346:18,24 369:14
**representation** 139:7 267:14 274:18 277:9,17 285:7 330:14 343:11

378:11
**representations** 66:4
66:5,15 69:22
265:16 267:2
**representative** 1:5
360:22
**represented** 68:6
265:25 268:3
270:16 271:2,4,6
310:8 319:14
348:23
**representing** 11:11
49:12,15 51:5
272:13 280:14
372:7
**represents** 303:19
346:17
**request** 124:3 186:18
187:3 238:5 378:24
**requested** 123:5,24
177:4 188:8 372:10
**requests** 170:19
**required** 37:11 93:2
171:6
**requirements** 225:24
225:25 227:24
**requires** 92:4 134:11
**requiring** 223:8
**resales** 364:2
**rescind** 128:24
**reserve** 11:17
**reserved** 5:11 9:14
**resignation** 149:7
**resigned** 149:4
**resolution** 333:16,20
334:13 335:6
348:18
**resolve** 49:11 214:3
250:8
**resolved** 91:2
**respect** 185:23,25
322:12
**respective** 5:5
**respond** 192:16
**responded** 189:24

190:10 372:18
**responding** 192:20
**response** 189:3
230:25
**responsibilities**
132:24 134:6 137:2
137:10 363:21
**responsibility** 134:19
135:8,19,20
**responsible** 135:25
136:4,13,22 141:4
**rest** 67:10 70:10
101:21
**restitution** 79:9
**restrained** 220:15
**restraining** 217:21
217:25 218:5
**restraints** 220:3
**restrictions** 35:8
**result** 35:10 198:4
199:8 201:9 223:7
**resulted** 128:23
**resulting** 291:19
**retail** 131:10 202:10
**retained** 386:3
**retainer** 21:13,20
386:7
**retire** 63:4
**retired** 63:3
**retirement** 63:6,10
**return** 123:4,6,24
124:4 129:5 142:22
372:10 377:6
382:16
**returned** 123:3,17
139:22 142:17
143:2,7 154:4 238:6
**returns** 139:11
167:22,24 168:9
191:16 196:14,18
196:20 197:17
302:23
**revenues** 162:16
**review** 22:9 154:10
183:22 285:19,23

331:4 364:6
**reviewed** 18:4 22:15
22:19 154:8
**Reviewing** 189:23
250:11
**revisit** 12:20
**revoke** 224:18
**revoked** 224:15
**Ridge** 43:21 44:8,13
164:16
**right** 11:17 16:24
29:6 34:22 44:12
45:19 48:3,16 49:5
50:13,25 54:12
59:25 60:19 61:22
65:19 68:3,6 70:11
75:19 77:10,19,19
78:2,8 81:14 84:10
90:10 91:22 95:15
95:17 96:3 119:23
120:9 123:20,21,22
125:15 126:2 128:5
134:2 145:12
146:12 155:25
159:10 163:20
164:3 170:15 178:3
182:11,15 183:17
185:20 187:9 188:4
188:15 189:17
193:4 205:5 208:13
220:16 222:5,7,9,16
224:17 226:7,25
228:10,13,19 229:6
242:17 257:18
264:10,15 267:4
271:2 275:17 281:8
283:2 288:14 292:7
293:14 295:10
297:14,20 299:14
300:20,22,24
301:22,25 302:8
303:15 304:4 315:6
318:25 320:24
328:21 329:14,25
330:8 332:12 333:2

334:21,25 336:15
338:23 339:16
340:19 341:11,13
342:24 344:12,14
344:16,19 345:3
346:23 352:14
353:4 354:11
355:16 356:2,19
373:22 380:17
**rightfully** 160:15
**rights** 54:7
**ring** 307:24
**Road** 43:21 164:16
**Rob** 225:22 304:4,12
304:19,21 305:9
333:13
**Robert** 1:4 3:4 4:19
10:13,23 182:21
226:4 231:13
243:23
**role** 108:17 109:5,7
109:16,18 137:18
137:21,22 231:18
231:21 232:13,15
**Ron** 308:16,17,20,24
309:4,7,9,11,16,19
309:21
**Ronneburger** 4:10
6:21 11:10 315:10
315:21 326:12
381:3,9
**roof** 31:20
**ROSLYN** 1:15 3:21
**rotated** 329:4
**rotating** 329:2
**rough** 380:24 381:4
**ROUTE** 1:8 3:13
**Ruderman** 3:16 11:9
76:24 86:6,20 87:5
87:14 88:9 207:11
207:14,19 326:14
367:19,23
**ruined** 201:13,15,16
**rule** 15:10 88:22 94:6
218:20

**rules** 13:22 16:22 49:7 51:15 93:3
**ruling** 21:12 54:18 94:21,22 367:18 368:4
**run** 143:12 298:20 299:13
**running** 137:17 141:4 298:17,18 351:22

**S**

**S** 3:2 4:15 5:2,2 385:2 385:2,2,7 386:5,5 386:20
**sad** 44:2
**Saddle** 43:21 44:8,12 44:14 164:16
**Sadly** 171:5
**safe** 227:24
**Sage** 3:3 4:21,23
**salary** 20:17,18 21:9 64:4
**sale** 139:12,22,23 212:22 282:6,17
**sales** 1:3 3:4 10:12,19 44:10 108:25 163:20,21 211:2 363:23 364:2
**salesperson** 109:3 137:23 145:8 353:19,22 354:5,11 354:16,21
**San** 167:9
**Sarah** 1:12 3:18 4:20 117:17 233:18 234:9,13 243:18
**save** 31:3
**saw** 154:11 342:3 373:7
**say-so** 366:22
**saying** 14:12 31:24 33:9 45:17,21 67:23 103:10,14,15,16 174:4 177:7 189:7

202:13 210:19 217:18 229:5 294:12,18 297:6 307:7 332:24 335:4 340:2 341:21 343:24 344:3,4 359:22
**says** 68:22 70:14,19 70:21 77:6,13 78:9 79:13 87:15 102:16 161:14 162:20 164:13 168:21,25 169:19,21 170:7 174:12 175:6 187:5 189:18 192:13 196:8,15 220:12,17 220:18,25 221:9 224:12 226:8 233:19,25 239:9 241:23 250:6,10 255:22 263:9,14,16 264:8 272:23 276:21 278:24 282:16,17 283:9 284:3,4 304:7 314:24 319:6,20 334:10 336:12,19 340:12 344:17,18 346:20 349:14 363:19 364:17,22 365:18,22 366:8,10
**scanning** 317:13
**schedule** 144:12,13
**screen** 68:11 75:22 86:7 116:9 120:19 153:8 182:18 194:12 219:16 249:10 265:4 273:15 276:3 280:2 281:24 329:3 334:4
**screenshot** 292:14 293:24
**scroll** 101:19 170:10 170:15 178:21 195:4 256:2 318:19

328:19 371:24
**scrolled** 154:3 190:5 262:18 372:3
**scrolling** 101:21 161:25 186:15 188:16 241:12 249:25 354:3
**se** 232:15
**sealed** 34:4 37:4 67:15 86:3 92:7
**sealing** 5:6 9:11
**second** 1:21 4:9 14:3 77:3,12 78:4 91:10 91:13 146:12 170:14 178:8 185:23,25 240:15 258:22 264:16 303:24 333:15 370:9
**section** 163:22 164:19
**secure** 214:21
**Security** 355:11
**see** 12:16,18 16:5 28:17 52:20 68:19 68:22,25 76:16,18 76:21,22 77:4,5 116:4,23 121:9 153:22 154:6,7 161:11 163:24 164:11,12,22 169:15 175:11 176:6,7,14 178:4,10 181:7,13 183:6,10 187:24 188:20,23 190:8 191:17,23 194:23 243:18 252:17,18 256:12 258:17 259:5 262:23 265:17 278:5,6,9 282:14 283:3 284:14,15 292:25 294:6 303:12 305:6 317:11,24 319:19

328:7,8,14,22 329:5 329:22 332:22 333:3,19,22 335:7 335:15 336:9 340:23 342:8,22 345:2,6 346:20 347:7 348:9 352:11 352:17 353:9 363:12 364:14,14 364:16,22 366:18 366:19 370:5,10 376:2,9,16,17,21,22
**seeing** 174:2 344:22 372:15,20
**seek** 11:17
**seeking** 11:7,13,15 183:23 214:4 227:20
**seen** 181:9 272:16 273:5 274:20 275:3 275:4,6 317:19 334:23
**selected** 69:6
**self-serving** 312:6 313:2
**Self-taught** 138:2
**sell** 202:6,9 205:11 207:21 210:6,16,22 220:19 284:10 298:11
**selling** 137:18,21 211:19 284:5
**send** 51:14 187:10 226:16 302:22 311:13 317:5 352:8 355:19 356:14
**sends** 183:8
**sense** 147:20
**sensitive** 7:4
**sent** 183:14 189:7,12 191:4 289:20 295:9 295:12 307:4 317:7 372:8 379:2
**sentence** 34:2,19 35:3 35:11

sentenced 77:14
separate 121:16,19
  177:8,11 288:13
September 66:22,23
  67:18 68:23 121:8
  121:15 253:9
serve 366:2,6
services 20:23 179:6
  284:8 355:7 357:19
  364:5
set 46:23 234:12,19
  282:25 304:17
  357:7 387:7
sets 92:21
setting 227:13 263:25
  275:5 330:19
seven 12:5,9,19 16:14
  324:23
seven-page 255:12
  385:17
Seventeen 29:10,11
Shanks 3:8 272:12
shared 160:8
shareholders 362:9
  362:16,19,23
  366:13,17 371:11
sharing 380:16
sheet 255:18 382:8
  382:11,14,17
  384:15
shit 29:9 101:24
  347:14
short 30:21 309:10
show 187:13 200:5
  213:24 220:3,5
  225:10 251:20
  293:16 311:19
  313:7 317:2 321:22
  347:23 351:25
  358:8 359:18 375:6
showed 107:20
  159:20 191:12
  258:13 274:16,25
  342:6 370:25
showing 173:18

177:15 188:11
243:5 261:16
266:19 272:5,6
277:21 292:14
295:15 302:24
370:3,9 373:12
375:16
shown 284:11
shows 277:9,16
  293:13,15 294:2
  328:9 339:15,19
shuttered 201:12,15
sic 166:9
sign 24:8,12 38:3
  151:7 174:18,21,25
  175:3 177:11
  205:10,17 206:7,9
  206:22 286:4 317:9
  359:5,12,14 362:10
  362:18 365:3 371:9
  382:10
signature 159:18
  171:11,17 175:7
  177:9 220:7 226:18
  226:21,24 227:16
  227:18,21,23 228:3
  228:7 229:8,12
  230:2,8,10 231:5,8
  243:8 263:8 314:22
  314:25 317:17,18
  317:22 334:20
  353:3,6 358:25
  359:3 363:14,15
  369:14 370:6,8,10
  370:11,16,17,24
  371:3,6,10
signatures 314:20
  317:24
signed 5:15,18 21:13
  79:11 100:24 101:7
  126:13 151:10
  156:25 159:9
  169:13,16 171:7
  174:15 175:4,5
  217:11 238:6 243:5

256:3 263:6 270:12
275:10,24 280:9
285:3,20,24 293:6
313:23 314:18
333:7,9 335:8,10,20
349:7 358:21
359:25 360:4
362:16 363:11
365:5 366:13,16
367:3 384:20
signer 174:10,13
signing 159:21
  169:23,24 170:2
  175:3 243:6 271:16
  285:5 334:13 335:3
  369:24 382:12
signs 206:15,23
similar 45:3 241:10
simple 150:9
sincere 45:2
Singh 30:17
single 125:23 374:3
  375:12
single-page 182:19
sit 16:8 24:16 119:11
  138:17 209:8
  212:14
site 184:20 336:8,10
  336:11,13 349:11
sitting 28:21
situation 24:11 25:3
six 27:3 58:24 80:18
  250:2 378:13
six-page 240:22
  385:15
sixth 241:18
slap 67:3
slip 329:5,17 330:7
slips 328:4 342:15
slot 325:15,17
small 108:15
SMITHTOWN 1:15
  3:22
social 60:12,15
sold 138:20 152:3

208:5 211:8 245:4
  284:11
sole 32:19 235:18
  264:4 265:22
  267:10 334:17
  364:20,25 365:19
somebody 108:23
  133:12 157:16
son 41:6 62:6,7
  166:25 258:9
  259:13,14 260:19
  263:24
son's 167:2
sons 25:25 26:8
sons' 26:11
soon 58:16 350:9
sorry 20:13 22:24
  29:3 35:7 39:14
  41:10 43:7 46:8
  52:2 55:21 64:20,21
  72:14 76:8 77:20
  82:14,24 91:4 98:13
  102:9,25 111:16
  113:13 130:14
  164:24 165:12,18
  166:15 168:16
  172:25 174:8
  177:10 178:15
  184:17,18,18
  186:22 195:16
  207:10,13,17
  208:21 227:10
  244:25 249:4 272:6
  273:9 277:13 290:6
  303:25 305:24
  308:25,25 313:25
  336:5 343:5 346:8
  347:14,15 348:16
  355:17 367:8
  374:23 376:4
sort 288:22
sought 301:7
source 137:15,25
  240:10
space 382:7

spanning 187:16
speak 18:11 21:25
 93:10 165:17,19
 218:14,15,16
 230:22,23 251:12
 322:8 370:2
speaking 22:23
 139:10 279:18
speaks 219:3
special 138:24
specialist 7:25
specific 27:22 33:19
 58:19 129:3 138:25
 141:18 149:6
 182:10 200:4
 213:23 215:5,6
 229:24 259:20
 318:12 357:11
specifically 40:6
 60:10 125:3 155:17
 163:9 175:16 180:4
 215:4 253:14
 259:25 316:18
specifics 18:22 71:17
 124:5 213:21
 215:21 216:22
 248:25 258:12
specified 284:6
speech 305:15,17
 306:9,24 307:9,10
spell 26:17 146:5
spelled 238:14
splitting 6:8
spoke 18:9,10,24
 62:23 90:23 93:17
 132:18 138:19
 176:22 213:11
 251:9,11 296:10
 304:2 308:3 315:17
spoken 11:10
SS 384:4
staff 143:21
stamp 342:22
stamped 182:20
 187:16 225:19

241:15
stand 16:17 111:18
 183:19 254:4,7
standard 381:8
standards 364:4
standing 35:25
stands 10:4 111:23
 111:24 119:22
start 42:18 46:14,17
 55:9 71:14 94:19
 107:9 117:12
 143:24 165:25
 180:24 205:2
 215:16 254:22
 281:21 286:13
 317:15 323:20
 327:17 378:5,19
started 12:15 57:18
 58:23 59:6,15,16
 61:7,10 99:3,10,17
 99:24 100:10
 108:18 140:20,21
 216:13 299:4
 301:12 336:3
 346:13
Starting 162:5
 232:21
starts 182:21 339:4
state 2:9 8:12,15
 36:25 37:16,24 39:6
 65:21,25 115:24
 120:22,23 157:22
 158:2 196:11,11
 233:15 278:21
 334:11 382:6 384:3
 387:4
stated 10:16,20,24
 66:24 181:2 192:15
 198:14
statement 89:8 104:4
 180:2,5 195:18
 196:4 197:21 198:8
 216:5,10 239:15
 244:5,8,17,22
 246:21 247:5

263:13 264:17,21
 268:8,10 269:2,8
 277:20 286:3
 292:15 307:6 310:7
 312:19,22 313:5
 315:23 318:6,8,18
 319:19 321:13,17
 335:11 338:15,18
 338:21 339:3
 340:17,20 342:16
 343:19 344:24
 345:5,13,25 349:15
 350:8,25 351:6,8,24
 352:8,11 355:15
 359:7,9 366:24
 371:13 374:10,15
 374:18 375:15
statements 67:17,20
 128:11 172:19
 173:13 181:21
 192:8 203:25 204:6
 204:9,10 252:23
 312:6 313:2,3 331:7
 343:25 386:13,15
states 1:2 7:16 27:9
 28:10 76:15 191:13
 197:9
stating 252:22 373:25
Station 81:21 82:2,9
 82:13,17
status 133:17,19
stay 110:13
stayed 377:16
Steam 131:22
stenographer 6:2,9
 6:19 8:15,20 47:24
 50:14 75:9 83:6
 85:10,17 96:11
 98:19 133:10
 172:11,23 173:9
 212:8 246:8,16
 247:23 248:7
 283:13 327:13
 345:18 366:3
 368:14 369:5

379:24 380:5,10,15
 380:19,23 381:5,11
stenographic 2:8 8:6
 387:3
step 57:24
stepped 48:9 55:3
steps 134:13
stips 9:19
STIPULATED 5:4,9
 5:14
stipulation 37:10
stipulations 9:9
stock 257:12 266:11
 266:18,22 268:17
 268:20 270:2,3
stole 374:6
stolen 268:21,22
 269:6
stood 36:4
stop 146:19,25
 186:20
stopped 112:10 119:5
 147:5 148:25
store 58:2
story 44:2
Street 1:7 3:12 4:13
 81:14,17 82:3
structure 117:18
 122:9
stuff 344:5
sub 265:20 267:8
subject 11:22 13:10
 37:9 51:17 93:2
 124:7,12 155:10
 214:9 361:17 378:8
 378:21 382:12
subject's 183:16
subjects 13:7
submission 175:9
submit 74:2,18 75:14
 98:21 172:14
 311:15 312:8
submitted 74:7,9
 98:23 105:15 106:6
 123:8 161:17 170:5

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo   ---   January 12, 2026

424

170:22,24,25
171:11,16,21
172:17,17 177:8
246:21 253:8
258:14,19,20
314:12 326:6
**submitting** 239:14
**subparagraph**
  265:24
**subscribed** 384:20
**subsection** 220:18,25
  267:8,13 277:23
  363:18 364:17
  365:24 366:10
**substance** 21:3
  384:14
**substantive** 150:13
**successful** 156:11,16
**sudden** 309:18
**sued** 291:11
**Suffolk** 41:13 61:23
  61:24 62:5,10,17
**suggest** 89:21
**suit** 266:4 267:18
  277:25
**Suite** 3:14 4:4,14
**summarize** 218:18
**summary** 162:2
**summons** 276:4,13
  278:8
**sums** 352:20 355:19
**Sunrise** 1:4,14,17 3:9
  3:20 4:3 98:3,24
  105:21 141:21,24
  141:25 142:11,25
  143:8,16,17,22
  144:2,5,8,22 145:6
  145:11,12,14,18,20
  147:14 148:10
  149:15,19 152:12
  152:14 186:4,12
  189:20 190:18,20
  191:10 196:14,18
  199:20 209:17
  210:17,23 211:4,9

211:16,20,24
212:12,13 216:8
218:9 219:5,11
220:22 221:5,10,18
224:10,16,24 225:7
227:22 238:11
239:7 244:7,14,16
248:24 251:19
252:12,16 253:4,20
254:2 255:6,20
257:15,24 258:5
259:19 260:11
267:3,10,24 268:7
268:14,19 269:6,24
271:19 275:8,13
276:17 277:12,16
279:6 287:4,6,7,10
291:24 295:14,23
296:7 297:9,11,13
297:22 298:4,10,19
298:21 299:2,14,19
299:22 300:20
304:18 306:3
308:15 332:4,22,25
333:3,3,5 335:14,23
336:2 337:5,8,14,16
337:22 338:7,18
340:4 343:15
345:23 346:14
347:4 348:12,18,22
350:24 351:23
374:13,20,21 375:8
375:14 377:3
**Sunrise's** 339:24
**Super** 7:14
**Superb** 1:3 3:4 10:11
  10:15,16 13:4 51:5
  51:8 90:20,21 211:6
  211:9,14,17,21
  212:13,17 213:11
  213:23 214:15
  216:12 245:8,11,14
  246:23 247:4
  248:18,20,23
  252:17 253:5,25

280:19 287:12,14
287:16 289:17
294:17 295:22
296:14 297:5
298:12,15,17,25
299:7,14,17 300:12
300:18 301:8,16,21
302:4,14,20 309:10
309:18,24 310:4,10
310:15,22 311:16
312:16 313:9
315:19,25 316:8,12
317:3 318:14,18
319:24 320:23,25
321:11,15,16,19,24
322:6,7 324:13,16
324:22 328:6,23
329:8,11 330:16,23
330:24 331:18
332:2,21,25 335:5
337:9,10,13,21
338:6 347:20
350:24 351:23
353:21 354:15
356:6 358:24 362:2
362:17 372:23,25
373:2,6,13,20 374:3
374:7,12,20 375:7,7
375:12 376:12,15
376:20 377:2,11
**Superb's** 293:24
  320:7 334:24 360:2
  371:5
**supervise** 364:7
**supervising** 136:22
**supplied** 302:10
**supply** 131:8
**support** 31:15 310:13
  312:24
**supported** 31:13
**supporting** 189:9
  317:21
**supposed** 45:23
  156:9 210:18 251:8
  300:19

**Supreme** 200:16
**sure** 15:18,24 38:5
  53:15 59:9 65:10
  69:18 73:9,11 90:4
  91:9 104:17 111:22
  111:23 115:2 116:6
  117:19 119:11
  124:13,19,21
  128:15 129:11
  134:7 135:3,9,16,21
  144:21 145:6
  152:18 153:23
  156:20 159:11,22
  160:2 166:3 170:11
  176:3 177:23
  178:23 184:23
  187:7,11,12 202:12
  203:5 204:13
  212:10 214:18
  215:21 216:18
  225:9 237:23 238:4
  254:6 257:2 277:6
  283:5 287:23
  288:12,24 291:8
  295:12 303:13
  308:22 322:22
  331:3 335:25 336:4
  336:4 342:12 349:3
  359:15
**surrender** 80:19
  128:24
**surrendered** 79:23
  123:11 224:20,23
**Suspend** 93:22
**SWAT** 63:22
**swear** 8:9 102:10,12
**swore** 101:7,13
**sworn** 5:16,18 8:11
  9:16 194:22 195:18
  387:7
**sworn-to** 376:24
**Syosset** 1:13 3:19
  105:25 123:9
  126:11 198:7
  244:15 258:16,23

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo --- January 12, 2026

425

258:25 259:11,18 260:12 261:19 376:7

**T**

**T** 1:25,25 2:2,2 5:2,2 8:10 383:2 384:2 385:2,7 386:5 387:2 387:2

**take** 7:9 15:9,12,21 16:3 54:4 90:5 92:20 106:21 134:12 180:12 217:19 220:19 269:21 281:9 286:7 325:15,16 339:23 340:3 342:11 362:21 374:19 379:14

**taken** 2:4,7 71:22 90:8 107:5,13 180:20 204:22 281:17 377:25 384:7

**talk** 91:12 256:22

**talked** 78:15 308:6

**talking** 48:2 137:11 157:21 201:6 203:2 214:2 297:14,15,18 337:24,25 377:8,12

**talks** 25:7 234:6

**TAMMY** 4:22

**task** 134:18,22

**taste** 261:14

**tax** 162:13,14 167:22 167:24 168:9 191:16 196:14,18 196:20 197:17 238:2 302:23 358:5 386:18

**taxes** 247:11 305:4

**Team** 1:3 3:4 10:12 10:18,19 13:4 364:12

**technical** 35:23

**techniques** 363:25

**tell** 14:16 15:15,19 16:11,19 24:2 25:24 29:18,23 30:21 37:7 54:18 69:7 87:7,19 87:22 98:9 117:14 138:8 194:8,10 198:17 203:10 210:21 215:7 216:23 230:21 259:25 269:12 280:12,12 299:21 316:7,18 346:16

**telling** 86:13 104:3 243:24 280:11 311:14 359:11

**tells** 231:13 341:25

**template** 233:12

**temporary** 217:20,24 218:5 220:3

**ten** 27:25 43:7,13 350:17

**tenant** 45:15

**tense** 248:11

**term** 77:15,24 78:4 78:10,13,17 80:2 138:11 341:10

**terminated** 147:9

**terminology** 56:8

**terms** 15:8 16:10 40:19 45:11 59:18 64:2 77:18,22 83:20 95:3,22 103:3 113:22 149:24 219:7,12 366:16

**testified** 8:13 32:20 39:8 61:20 65:14 75:15 92:5 210:14 224:13,21 258:18

**testify** 17:8 65:18 173:20 181:9

**testifying** 13:12

**testimonial** 16:14 324:12,15,24

**testimony** 13:10

74:22 107:19 181:4 205:22 270:5 326:24 347:2 361:6 361:11 372:14 379:20 384:7,11 387:6,9

**text** 69:6 213:25 214:6 302:18 303:6 361:16

**texts** 214:11

**Thank** 8:20 52:22 54:11,13,21 93:12 94:14,16 322:15 378:22 379:17,23 380:4

**theft** 278:15

**Theresa** 235:12

**thing** 16:11 44:15 96:14 101:24 109:17 120:14 147:2 334:3 336:10 349:4 355:12

**things** 14:24 132:13 279:5 297:7 335:8 344:5 364:16 365:7 365:11

**think** 17:11 18:18 20:25 21:17 22:22 27:15 28:7,13 30:7 30:7 47:13 55:19 57:17,22 59:17 60:9 61:7 62:6 63:3 64:8 64:24 65:3,10 72:8 73:11 78:12 79:24 80:10 81:3 98:4 104:14 106:20 109:11,11 112:12 112:12,19 113:4 114:10 115:14 118:6,14 119:20 127:23 128:9 130:9 134:3 136:14 147:7 147:12 149:10 150:6 152:17 157:4 157:17 163:10

166:4,4 176:19 179:20 185:21 190:19 199:2,4 208:3 211:5 212:13 237:19 257:20 259:21,21 274:5 289:25 295:17 297:17 300:11 302:16 305:20 306:5 308:3,10 309:14 313:21 315:17 316:24 322:23 335:25 359:20 362:19 368:18 369:9

**thinking** 119:19

**third** 14:8 22:13,14 22:17 77:17,21 174:8 335:12

**thirty** 382:18

**Thomas** 1:13 167:15 169:9

**Thomasson** 1:12 4:2 4:3,5 19:5,21 20:4,5 20:7,17,21 21:14,15 21:21 47:4,12 48:14 49:13,18,22 52:8,17 54:5,16,21 55:16 66:5,14,24 67:16 68:5 69:2,23 96:24 101:12 166:21 193:11,13,22 194:2 194:7 195:21 196:9 197:22 206:3 217:4 218:13,17 219:2 233:8 262:13 270:16,20 276:23 294:9,24 295:6 312:10 322:17,18 322:20 325:16 326:16,18 380:3,8

**Thomasson's** 292:5

**thought** 122:4 223:11 270:9 297:18 376:20

**thousand** 290:25 329:21
**threat** 271:25 273:12
**threatened** 266:3 267:17 277:25
**three** 25:25 154:22 215:19 223:23 301:20 318:9,11,22 338:11 354:12 360:12 375:10 378:14
**three-page** 272:19 276:8 385:18,19
**throwing** 376:6
**ticket** 344:17
**tickets** 342:10
**time** 2:6 5:11 6:25 7:7 13:18 14:12 15:9 16:9,13,15 18:16 19:17 27:10 27:19,20,24 28:5 35:17 38:15 41:4,17 42:11,15,20 43:4,8 43:8 45:14,22 46:23 48:8,21 49:3 53:4 53:20 55:2,8,13 56:3 58:19 59:23 61:9 63:12 65:12 71:11 81:19 86:2 88:18 90:8 94:18 98:4,6,7 99:19 100:6 106:20,24 107:5,8,22 108:2 115:8,12 122:5 127:8 128:20 129:11 130:4 131:15 132:17 138:5 140:23 141:20,22 142:2,7 144:24 149:11 150:25 155:18 158:3,6 159:15 164:15 167:13 172:4 175:17 180:15,20,23

181:24 182:6 184:3 185:15,23,25 198:11,20 201:11 202:17 204:2,17,22 204:25 211:5 215:8 215:11 217:10 221:21 222:6 240:9 248:10,17 253:7,14 254:12,18,21 256:11 257:21 258:2 259:20 260:2 268:4 275:2 280:8 281:12,17,20 290:21 291:5,15 299:4 302:12 309:10,20 317:14 320:22 323:4,5,10 323:16,19 324:12 324:15,24 326:3 327:7,16 332:9 338:23 360:12,15 361:22 368:24 372:15 377:20,25 378:4 379:21 381:14
**times** 22:12 32:12 184:13 223:23 253:12 373:4,8
**titled** 262:21 363:18
**Toby** 109:21 112:6 112:11,21,25 115:4 115:9
**today** 11:4 12:20 13:4,10,24 14:23 17:8,12,19 24:16 28:22 43:17 75:16 78:14 90:15 119:2 119:12 138:17 173:20 192:9 209:8 210:14 212:14 312:6 323:6 324:19 334:24 361:6 378:21 379:2,15
**today's** 6:24 16:25 17:14 22:3,24,25

**told** 67:13,13 71:9 87:8,10 92:6 115:17 115:23 149:8 213:22 225:3 234:24 255:2 261:6 291:21 295:11 296:18,22 298:9 302:21 311:14 312:7 316:17,21 338:7 351:2 361:14
**Tom** 159:4,8 163:2 165:6,24 166:2,4 168:10 235:14
**Tommy** 167:3,4,6
**tomorrow** 93:24
**Tony** 10:24 11:2 13:5 138:6 212:16,19 213:11,15 214:2,9 214:13 215:2,8,9,11 215:15,17 216:20 217:3 249:23 250:22 251:4,9,12 252:4,7,21,23 253:23 255:2 263:3 263:11,16 264:5 266:16,21 268:7,19 269:14,22 271:19 279:7 280:21 289:20 290:24 291:3,14 294:13 295:15,21 296:10 297:4 299:9 301:15 301:18,24 302:5,16 304:2,2 310:11,14 310:18 311:14,23 312:7,24 313:7 314:17 315:19,25 316:9,16,20,21 317:9 331:8,11,13 331:17 337:19 351:2 354:19 359:10,11,12,14,18 359:20 360:11,17 360:22,23 361:8 362:10,17 363:12

365:19 369:25 375:3,4,6
**Tony's** 214:21 294:15 294:17 317:21,25 360:14
**tools** 123:21
**top** 77:8 161:10 176:2,10 227:4 317:15 333:23
**total** 320:14
**totalling** 318:10
**toughest** 29:7
**track** 132:25 133:13
**trade** 162:6,8
**trade-in** 135:21 136:6
**transaction** 293:3,7
**transactions** 292:24 345:22
**transcript** 6:14 66:21 68:20 69:13 382:20 382:21 384:7,9 387:8
**transcripts** 238:3
**transfer** 220:20 255:5 259:16 260:7 260:9 263:25 293:9
**transferred** 126:18 258:8,11 259:12 260:3,24 261:7 266:20 268:18 319:24 320:6,9
**transferring** 221:15 346:14
**transfers** 318:21,23 318:24 319:7 320:14
**trial** 2:3 5:12 9:14
**tried** 230:24
**Trinidad** 27:7,18 28:10
**TRO** 218:5,8,15 219:4,8,9,13 222:17 222:20,21,24 223:4 223:17 224:6

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo --- January 12, 2026

427

**true** 67:20 70:15 138:22,22 159:23 160:4 252:19 256:18 275:19,22 309:7,11 342:12 359:23 384:9,12 387:8
**trust** 132:21
**truthful** 17:2,11
**truthfully** 17:8
**truthfulness** 346:6
**trying** 16:5 186:23 196:24 253:18 302:16
**turn** 328:24
**Twenty** 108:4
**twice** 28:13 184:14 185:18,19,22 304:22
**two** 26:11 31:23 67:11 70:22,23 72:14,17 73:5,15,17 83:10,11 105:18 106:5 112:20,23 143:18,19 147:25 158:23 187:16 258:19,20 260:20 292:24 296:22 314:20 318:22 322:24 360:12
**two-page** 116:15 121:3 187:20 282:10 385:10,11 385:13,20
**type** 357:12
**typical** 24:11,20 278:19

**U**

**U** 1:25 2:2 5:2 386:5 386:20
**UAE** 166:9
**UCC** 192:25 193:23
**UCCs** 193:16,19
**UEA** 1:15 104:11,12

104:15,21 112:18 119:19,22 120:12 120:23 122:6,13,21 122:25 123:2,13,18 126:9 129:7,20 288:6
**uh-huh** 14:4 41:10 164:24 304:5 343:3
**uh-uh** 14:5
**ultimately** 134:20 190:17 292:4 309:8 309:23
**unable** 68:2 82:22 83:17 192:24 210:6
**unclear** 56:6
**unconventional** 45:12
**understand** 13:7,9,13 14:6,13,15,20 15:6 15:14 16:21 17:16 24:6 31:17 33:3 46:19 55:25 56:9 59:21 61:18 67:22 68:9 95:23 111:11 133:13 160:20 194:5 195:24,25 196:24 197:2 226:21 234:10,17 243:11 274:21 279:15 311:2,6 324:4 365:6 366:20 366:25
**understanding** 74:20 74:23 75:11,13 84:15 95:21 96:16 96:17 138:15 139:6 143:10 154:14 160:18 284:20 337:14 343:21 347:10 367:24,25
**understood** 10:25 14:18 16:7 94:13 168:7 325:19
**underwriter** 305:2 306:19 307:2

**underwriters** 306:21
**unfair** 278:16
**unfairly** 278:20
**uninhabitable** 45:16 45:22
**Uniondale** 1:22 4:9 7:22
**United** 1:2 7:16 27:9 28:10 76:15
**units** 266:11 267:24 268:13
**Universal** 112:19,25 113:12,16,19 114:2 114:6,8,11,15,19,24 115:4,7,10,17,25 116:11,21 117:2,7 117:13,23 118:8,12 118:22,23,24 119:22,25 120:6 122:2 124:22,24 125:4 166:7
**unlawfully** 278:21
**unsupervised** 34:6,8 34:11,15,17,25
**untrue** 69:23
**unwind** 139:23 140:8 140:13
**unwinding** 139:13,18 140:18
**unwound** 139:21 140:2,6,10
**upload** 187:11
**uploaded** 189:8
**Urrutia** 1:4 3:4 4:19 10:13,23 67:13 363:19,20 364:9 365:19
**use** 9:8,8 15:23 16:2 67:14 90:3 221:9 224:18,19 233:6 288:6,11 290:11,17 320:18,23 351:21
**usual** 9:9,19
**usually** 111:25
**utilize** 118:7

**V**

**V** 7:14 51:9 90:21
**V-E-N-T-I-M-I-G-...** 166:18
**vacated** 222:7
**vacation** 360:11
**Vague** 250:21
**Vaguely** 147:10
**various** 253:12 373:4 373:8
**Vasquez** 354:21
**vehicle** 138:16,25 139:2,5,8,8,11 211:8 375:12
**vehicles** 132:11,25 133:13,18 135:22 137:15,16,19,21,25 138:4,12,23 202:3,6 202:9 203:13,14,19 203:21 204:3 210:16,22 211:20 218:10 219:6 220:22 248:22 250:2 252:9 364:10 374:11 376:12,14 377:2,7,8,10,13,15
**vendor** 152:10,13 206:13,15,23
**vendors** 208:19
**Ventimiglia** 148:14 166:15,16,19 167:4 167:6
**veracity** 343:20,23 346:3,5
**versa** 288:8
**versus** 219:18
**vice** 288:7
**video** 7:8,24 55:5 379:20
**videographer** 4:18 6:23 9:22 16:19 20:14 48:20 55:4,7 88:17 94:17 106:23 107:7 165:13 180:14,22 204:16

204:24 227:8,12 254:11,20 281:11 281:19 323:9,18 324:10 327:6,15 347:17 377:19 378:3,12 379:14,18
**VIDEORECORD...** 2:3
**violate** 103:3
**violates** 89:2
**violation** 102:19 103:11
**virtual** 18:12 19:12 51:14 52:13
**virtually** 52:18 375:11
**visit** 184:21,22 186:3 186:6,11 336:10
**visitation** 336:8,11 336:13 349:11
**visited** 27:17 28:13 150:25 185:7,24
**visiting** 28:10
**visits** 28:14
**voice** 13:25 165:11
**Volkswagen** 364:11
**voluntarily** 87:9 92:5

---

**W**

**W** 384:2 385:2
**W-2s** 357:25 358:6
**wait** 107:14 112:18 337:8
**waiting** 252:14 297:4
**waive** 86:24
**waived** 5:7 9:12 86:22 89:5,9,13,15 89:19 92:23 93:7
**waiver** 87:4
**waiving** 86:24
**walk** 147:21
**walked** 55:14 57:12
**want** 9:7 11:15,21 13:21 15:2,19 16:12 50:6 55:4,23 69:6,7

73:9 81:10 85:5 95:18 162:4 165:16 181:8,20 202:2 210:21 248:14 249:5 290:3 302:5 317:14 322:22 368:23 379:4
**Wantagh** 4:4
**wanted** 44:3 155:23 181:13 260:19 261:13 338:5 379:25
**wants** 12:8
**warrant** 265:21 267:9 277:17
**warranted** 265:25
**warranties** 152:4 207:21 208:5 210:7 267:3
**warranty** 152:7 205:5,6,8,9,11,17 206:5,11,13,15,22 208:20,25 209:5,10 209:16,20 213:3,4 213:13 214:4 267:14 308:14
**wasn't** 45:14 100:12 108:19,20 109:3,13 127:15 150:18 154:25 155:19 156:3 170:4 175:20 176:16 199:11 251:8 308:12 313:13,18 350:22 360:13 362:7
**way** 18:13 58:10 109:9 118:18 120:8 157:23 234:15,16 234:19 246:3 275:16 299:17 307:3 328:24 357:15 387:12
**we'll** 12:20,23 21:23 41:2 69:12 104:23 105:9 106:18

117:24 124:20 177:21 204:11 210:2 224:3 238:7 327:2 358:10 367:17 373:15
**we're** 6:7 9:8 11:16 12:5 14:22,23 21:11 21:18 40:23 48:2,17 48:20 50:12 51:12 52:9 55:7,11 88:17 89:6 91:18 94:23 106:23 117:20 118:19 156:11 177:17 179:18 180:14 204:16,24 209:23 237:8,25 254:11,20 281:11 323:5,9,18 326:23 327:6 329:2 347:16 355:14 358:3 373:10 377:19 379:16
**we've** 107:12,15 178:7 282:3 317:13 324:5 326:8 327:20 356:24 378:12
**website** 157:24 158:2
**websites** 157:22
**wedding** 30:3
**week** 275:24
**weeks** 360:12
**Weinstein** 304:9,11
**WEIR** 4:12
**weird** 56:2
**welcome** 107:11
**Wendy** 159:4,8,12 163:2 176:22 235:14
**went** 27:20 28:8 30:4 30:5 62:4 112:21 114:21 145:4 151:4 170:13 221:24 292:8,13 294:10,13 301:24 321:3,15 322:6 338:13

350:12
**weren't** 79:18 270:17
**West** 39:4
**Westbury** 8:23 23:9 43:16,25 60:19,21 60:24 61:3,11,14,15 62:3 245:4 290:12
**Westlake** 97:17,21 125:11 203:17,20 203:22 204:2,9,11
**what'd** 361:4
**whereabouts** 132:16 291:8 360:14
**whichever** 145:8
**whispering** 7:5
**Whoa** 36:10 46:12 57:22 63:14
**Wicks** 54:3 93:18
**Wicks'** 49:7 50:15 90:13
**wife** 19:3,4,9 21:23 22:2 25:25 31:2 42:2 112:15 122:7 157:9 197:6,10 239:12 242:23 243:18 247:10
**wife's** 30:12
**William** 354:4,6
**willing** 67:9 70:9
**wire** 76:24 77:3,4 292:9 294:2,4 351:14
**wired** 175:13,20 292:6,10 351:13,17 352:15 355:21 356:6
**wires** 352:21 356:11 356:15,23,25 357:5
**wish** 181:3
**withdraw** 99:8 179:21 180:11 347:3
**withdrawn** 74:8 82:15 112:8 139:16 185:24 245:2

**witness** 8:9,10,18,22
12:12 20:12 49:6
64:20 85:12 86:10
89:17 91:22 93:5
95:21 152:25
165:11,12,18,21
181:11 218:22
227:10 249:7 367:8
369:9 382:2 385:3
**witness's** 170:19
**witness(es)** 387:6,9
**word** 34:9 217:19
224:18,19
**words** 14:3 55:23
357:14
**work** 14:25 38:22
39:5 46:25 48:10
55:14 56:25 57:3,6
58:17 59:14,20 60:2
60:7,8,11 61:5 65:7
110:16,20,24 111:3
111:9 112:5,24
113:2 115:4 132:7
146:17 148:22
167:10 168:2,4
205:8 214:25 230:9
231:20 295:23
307:20 326:4
337:15,21
**worked** 36:20 38:24
56:4 58:15 63:21
71:12 81:6 107:23
108:8,21 109:20
110:11,19 112:10
113:25 114:6
119:18 125:7,9
132:13 137:8 308:4
308:18 325:24
337:21 354:12,14
**working** 46:10,14,17
59:6 61:7,10 80:8
99:18,23 108:18
112:5,10,20 115:9
131:14 146:19,25
147:5 148:25 152:8

159:5,15 166:2
213:10 216:13
228:8 252:15 253:2
253:3,6,12,13,17
296:13 309:5,17,18
310:25 350:23
352:3
**works** 94:8 132:14
304:13 308:20
**wouldn't** 119:10
121:25 126:2
137:20 162:23,23
184:9 185:8 193:20
199:6 216:22
319:18 355:3
356:10 360:24
361:24 362:5
**wow** 27:10 30:21
42:17 43:23 99:15
104:16 108:9
132:19 142:15
144:23 158:5 185:8
259:20 347:14
**wrist** 67:3
**write** 14:11 197:5
226:3 303:25
306:22 335:13
357:5 362:11,12
371:4
**writer** 306:23
**writes** 303:24
**writing** 21:24 25:2,16
41:2 104:24 105:9
106:19 117:24
122:14 124:20
126:7 128:14 155:4
155:9,11 158:11
169:12 177:22
204:12 210:3
214:12,17 238:7
289:14 311:19
358:11 359:17,21
362:2 365:10,14,15
366:13,16 367:3
373:16

**written** 38:3 157:5
**wrongfully** 160:16
224:15
**wrote** 196:23 197:2
278:24 362:13

—————————— **X** ——————————

**x** 1:3,20 385:2,7,7
386:5,20

—————————— **Y** ——————————

**Y** 8:10
**Y-O-N-A** 30:14
**Y-O-U-N-A** 30:15
**yeah** 13:20 22:16
27:16 28:2 29:12
31:3 32:21 37:21
42:14 44:18,25 46:8
59:4 60:4,20 61:25
62:18 67:21 80:6,11
86:8 88:5,5 99:16
100:15 102:24
118:14 119:15
126:12 133:20,22
142:12 148:21
156:24 179:13
195:25 197:4 203:8
204:5 216:18
227:12 229:15
234:23 246:18
248:12 270:18
291:17 298:20
306:9 318:23 319:2
320:25 347:17
353:5,21 356:21
381:2
**year** 30:23 42:15
71:15 114:13 127:9
127:11 155:24
156:10,15,18,23
167:16,18,20
259:23,23
**years** 14:25 27:25
28:3 29:10,11 34:23
34:25 42:22,22 43:2

43:13,23 59:2,3
62:21 77:15 78:11
80:3,18 100:10,12
108:3,5 115:13,14
146:22 147:2
155:14 238:3
**years'** 34:21
**Yesterday** 19:16
**York** 1:2,22 2:9 3:5
3:15,15,23,23 4:4,9
7:17,22 8:13,23
23:10,11 39:6
115:20 120:22
157:22 158:2
278:21 334:12
376:7 384:3 387:5
**Youna** 30:13
**youngest** 31:22

—————————— **Z** ——————————

**Z-E-N-I-A** 353:17
**Zenia** 353:8,15,16
**Zizmor** 3:8 272:12
**Zoom** 165:15

—————————— **0** ——————————

—————————— **1** ——————————

**1** 48:23 68:12,15
217:12 233:17
234:9,14 239:11
242:6 243:16,21,25
246:22 252:15
253:3,17 263:10
265:20 267:8
271:24 273:10,22
274:18 275:9
277:10,18 285:8
295:10 385:9
**1,000** 328:16
**1.2** 373:19,20
**1.276** 373:21,24
**1:14** 180:16
**1:28** 180:24
**1:42** 189:4

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo  ---  January 12, 2026

430

**1:54** 204:18
**10** 194:13,16 327:18
   328:10 340:12,13
   350:15 363:17
   370:20 376:14
   377:22 385:13
**10,000** 328:17,20
   329:8,9,16
**10:03** 1:23 7:2
**10:39** 48:22
**10:49** 55:9
**100** 104:13 172:20
   173:14 179:24
   195:13,19 196:5
   241:20 244:2,16
   245:11 257:12
   258:4 259:10 310:3
   310:9,15,22 311:10
   311:16 335:5
   385:10
**100-page** 68:15 385:9
**10017** 3:23
**10170** 3:15
**104** 386:9
**105** 225:20 386:10
**106** 386:10
**1099s** 357:25 358:7
**10th** 339:12 340:22
   340:23
**11** 154:4 200:7,10
   349:12 378:6
   379:22 385:14
   386:22
**11-11** 369:16
**11-16** 358:23
**11-4** 292:16
**11-5** 293:17
**11-6** 362:24
**11:21** 88:19
**11:25** 188:21
**11:32** 94:19
**11:45** 106:25
**11:52** 107:9
**112** 4:4
**112-7** 371:15

**114,000** 318:10
**11423** 3:5
**11553** 1:22 4:9
**11568** 8:24 23:9
**116** 385:10
**117** 386:11
**11793** 4:4
**118** 386:11
**12** 1:23 6:25 121:8,15
   154:2 219:17,22
   232:21 358:21
   360:9 363:17
   365:24 379:19
   384:8 385:14
   387:22
**12-month** 162:17
**12-page** 153:13
   358:16 385:11,24
**121** 385:11
**122** 386:12
**1239** 1:7 3:11
**124** 386:12
**126** 386:13
**128** 200:22 202:19
   386:13
**12th** 360:10
**13** 225:11,14 231:13
   232:21 233:14
   236:24 238:9 366:9
   366:9 385:15
**13-page** 362:23 363:3
   385:24
**1339** 4:13
**136** 225:20
**14** 66:22,23 67:18
   68:23 153:19
   163:16 177:25
   178:16 221:25
   240:18,22 262:19
   385:15
**14-page** 261:23
   385:17
**14th** 94:5 178:12
   222:5,14
**15** 79:12 80:4 95:5,6

**97:12,12** 108:5
   187:17 189:23
   191:4 233:16,22
   234:7 239:7 241:21
   249:11,14 376:14
   385:16
**15-page** 249:14
   385:16
**15,000** 150:6,10
   155:8
**153** 385:11
**158** 386:14
**1580** 1:6 3:10
**1581** 1:6 3:10
**1591** 1:6 3:11
**15th** 233:25 340:7
**16** 42:22 43:2 187:17
   251:21,24 318:5
   385:16 386:22
**16,000** 344:8 345:8
   345:14,20 347:8,11
**161** 385:12
**1632** 1:7 3:11
**165** 320:16
**165,000** 320:14,18
**169** 386:14
**17** 42:22 233:14
   255:9,12 282:2
   336:14 385:17
**177** 386:15
**17th** 333:7
**18** 182:24 199:17,23
   261:17,23 272:11
   349:13 385:17
**18-page** 100:18
   194:16 385:10,13
**180** 114:21 126:10
   163:3 198:7 202:15
   203:2,6 296:6
   374:25 376:6
**18211** 3:5
**183** 385:12
**187** 385:13
**189** 1:4,17 3:9 141:23
   158:22 199:19

**215:3** 238:10 296:7
   354:17 374:21
   377:16
**18th** 188:3,20,25
**19** 162:19 236:23
   265:5,9 272:7
   385:18
**19.1** 272:19 385:18
**19107** 4:14
**192-page** 200:10
   385:14
**194** 385:13
**196,425** 175:13
**1977** 27:5

---

**2**

**2** 55:10 75:23 76:2
   88:20 161:25
   370:10 371:23
   385:9
**2,000** 328:16 330:3
   355:4
**2:05** 189:25
**2:23-cv-6188** 1:10
**2:47** 205:2
**20** 28:3 61:8 108:3,4
   108:4 253:9 263:2
   263:11,17 272:6
   273:9,15,18 385:19
**20,000** 328:16 329:10
   329:17 352:14
   355:23 356:2
**200** 168:22 169:3
   385:14
**200,000** 294:2,21
**2009** 29:13
**2010** 79:18
**2013** 116:2 117:3,6
**2014** 121:8,15
**2015** 114:25 118:6
**2016** 79:12 95:5
   97:12 102:15
   114:25
**2017** 57:5,9,15
   102:15 103:9

122:19 144:5 234:4 237:12,18,20,22,24
**2018** 57:18,20 58:7 61:2 130:6 132:19 153:19 163:17 177:25 178:16 237:16
**2019** 60:22 61:3 191:15,21 192:14 237:13,14
**2020** 59:8,9,13,14 61:6 62:12 162:18 166:4,5 167:19,22 167:24 168:12 191:16 233:16,22 234:7 237:3,5 241:21 273:9 376:4
**2021** 61:10 62:12 80:5 95:6 97:13 141:24 142:3,9 143:14 144:6,7,23 144:25 161:8,13 164:18 167:14,19 171:4 174:16 175:17 226:11 239:8 305:4
**2022** 97:22 142:14 143:14 144:25 145:4 179:25 181:25 182:24 189:5,14 190:7 191:5 195:14,20 196:7 197:18,19,24 198:10 199:22 201:18,21 202:4,7 202:11,16,18,24 203:7 207:22,24 208:6,13 210:15,22 211:3,21 212:23 215:10,15,20 216:17,21 217:2,12 217:17 219:19 221:25 227:15,19 229:13 270:17 271:24 272:9,11

273:9,10 274:2,12 274:18 275:9,24 276:5,5 277:10,15 277:18 280:15 282:19 285:8 298:6 298:24 299:12 340:12 349:13 363:9 370:20
**2023** 66:22,23 67:18 68:23 73:6 102:6 222:9,15 225:5 227:3 246:22 248:15,16,19 250:12 253:9,10 254:24 256:4 257:18 263:10 264:18 295:20 301:7 309:22 314:19 318:3,7,9,17 318:20 321:9,20,25 328:10 330:16 331:2 333:7 336:14 337:4 338:19 340:14,17,18 342:4 348:11 349:21 352:7 355:15 360:6 360:9,17 372:9 373:18 374:2 376:5 376:13
**2026** 1:23 6:25 379:19 384:8 387:22
**204** 386:15
**209** 386:16
**20th** 349:24
**21** 61:6,8,13 63:2 144:3 145:3 191:16 276:3,8 278:7 305:3 385:19 386:7,22
**212-537-6612** 3:24
**212-661-6800** 3:15
**215-665-8181** 4:15
**218th** 81:14,16 82:2
**219** 385:14
**21st** 231:12

**22** 144:3 216:16 256:4 257:17 281:25 282:10 376:5 385:20
**223-CV-6188** 7:18
**225** 385:15
**22nd** 339:4 349:21
**23** 1:8 3:13 72:9 83:14 190:6 191:5 213:4 226:3 275:23 276:4 277:15 280:15 292:16,20 296:4 297:23,24 314:23 333:13 338:24 339:3,8 343:16 346:12 347:18,19 349:16 351:8 375:13 376:11 385:20
**23-page** 314:6,10 385:22
**2320** 3:14
**235,000** 290:8
**237** 386:16
**238** 386:17
**23rd** 189:4
**24** 17:7 259:24 260:12 264:2 293:17,20 376:18 385:21
**240** 385:15
**249** 385:16
**25** 171:3 259:21,22 259:24 260:12 264:2 266:15,20 268:6 269:23 295:15 302:24 303:3 318:5 322:13 360:6 385:21 386:8
**25,000** 355:24
**250** 3:22
**250,000** 151:17
**251** 385:16
**2519** 1:7 3:12
**255** 385:17

**25th** 174:17
**26** 161:8,13 174:16 238:9 314:3,6 322:14 385:22
**26,500** 341:4,23 344:9,19,21,21
**261** 385:17
**265** 385:18
**26th** 175:17
**27** 327:20,23 385:22
**272** 385:18
**273** 385:19
**276** 385:19
**27th** 226:3
**28** 332:11,15 385:23
**28-page** 273:18 385:19
**282** 385:20
**289** 386:17
**28th** 341:4,16 345:3,6
**29** 347:24 348:3 385:23
**292** 385:20
**293** 385:21

---

**3**

**3** 8:22 23:6,8 43:21 44:8,12,14 94:20 100:14,15,18 101:17 102:5 103:21 107:2 220:11 231:13 256:7 257:7 265:15 265:20 349:10 370:15 385:10
**3:40** 254:13
**3:42** 254:22
**30** 18:21 194:21 218:20 272:8 358:13,16 382:18 385:24
**30,000** 352:23
**300,000** 78:18 294:4 294:21
**303** 385:21

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthony Deo --- January 12, 2026

432

**31** 162:18 362:22 363:3 385:24
**314** 385:22
**31st** 339:4
**32** 369:13,19 385:25
**32-page** 225:14,19 385:15
**327** 385:22
**3280** 4:3
**33** 371:14,18 386:2
**332** 385:23
**333** 1:21 4:8 7:21
**34** 375:16,22 386:2
**348** 385:23
**35,000** 352:14
**358** 385:24 386:18
**363** 385:24
**367** 386:22
**369** 385:25
**37,500** 360:3
**371** 386:2
**373** 386:18
**375** 386:2

**4**

**4** 81:20,25 82:8,12,16 101:17,22 102:5 104:4 107:10 115:25 116:10,15 117:6 180:17 266:24 267:9 277:22 314:19,23 372:9 385:10
**4:07** 281:13
**4:14** 281:21
**4:54** 323:11
**40** 375:19 386:8
**40,000** 355:23
**400** 353:8
**42** 219:17
**420** 3:14
**43-page** 327:23 385:22
**446** 1:8 3:12
**4506-T** 238:2 386:17

**48,000** 356:4 373:7
**49** 245:19 280:18
**4th** 374:2

**5**

**5** 103:23 120:20 121:3 180:25 181:5 204:19 256:6 282:19 385:11
**5,500** 339:12,15,23 340:11,21,22 344:8 344:14,15
**5:00** 93:24 94:5 322:21
**5:01** 323:20
**5:04** 327:8,17
**5:55** 377:21
**5:58** 378:5
**5:59** 379:21
**50** 164:11
**50-1** 252:5
**50,000** 350:11,18
**50/50** 173:16
**500** 4:14
**500,000** 176:20,25 177:9,12 253:19 280:17,21 289:17 294:22,23 295:2 349:17,20 350:10 350:23 351:21 373:5
**51** 324:15
**516-357-3700** 4:10
**516-557-5459** 4:5
**57** 378:17
**58** 332:19
**58-page** 332:15 385:23

**6**

**6** 27:5 153:10,13,18 178:14 195:2,8 196:4 205:3 217:17 252:7 254:14 265:25 267:13

273:8 274:2,12 277:23 385:11
**6,000** 340:7
**6,100** 340:8 344:8,16 344:17
**6,939** 328:16 329:24
**6:00** 324:19 326:25
**6:01** 381:14
**60,000** 352:14
**616542** 276:5
**617224** 219:19 272:9
**655,000** 240:11
**657,000** 239:18
**66-page** 348:3 385:23
**68** 385:9
**6th** 275:6 282:5

**7**

**7** 160:23 161:2 181:6 254:23 256:3 281:14 385:12
**718-412-2421** 3:6
**7211** 343:2
**735** 284:21
**735,000** 199:18,24 289:22 291:23 292:24 294:23 295:3
**75,700** 351:11
**76** 1:7 3:12 385:9
**77** 27:16
**7th** 3:23 274:2

**8**

**8** 182:19,20 183:3 188:5,5,10,18 281:22 323:12 364:17 385:12
**80** 263:3,11,16
**80s** 27:13,14,14,15,16
**8362** 319:8 346:15,17 347:5
**85,700** 350:19
**8508** 241:16
**8513** 241:17

**9**

**9** 187:14,20 188:15 188:23 189:23 191:3 323:21 327:9 385:5,13
**9,752.78** 351:9
**900,000** 289:23
**908** 115:18
**9263** 81:13,16
**99** 233:17 234:8,13 237:6 239:11 242:5 242:21 243:16,21 243:25 335:13
**9988** 175:15 176:9

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

## SUPERB MOTORS INC., et al.

v.

## DEO, et al.

---

## Continued Examination of Anthony D. Deo

*Thursday, February 12, 2026*

---

## CONDENSED



The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 145 of 351 PageID #: 13948

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

**389**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------x

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                    Plaintiffs,

                              Case No.
                              2:23-CV-6188(JMW)
          -against-
ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS GROUP, DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

                    Defendants.

-----------------------------------x

**390**

                    333 Earle Ovington Boulevard
                    Second Floor
                    Uniondale, New York

                    February 12, 2026
                    10:13 a.m.

        CONTINUED VIDEORECORDED EXAMINATION BEFORE TRIAL of ANTHONY D. DEO, the Defendant herein, taken by Plaintiffs, in the above-entitled action, held at the above place and time, pursuant to Notice and Order, before Lisa Hiesiger, a Stenographic Reporter and Notary Public within and for the State of New York.

**391**

A P P E A R A N C E S:

        SAGE LEGAL LLC
        Attorneys for Plaintiffs Superb Motors Inc., Team Auto Sales LLC, Robert Anthony Urrutia
            18211 Jamaica Avenue
            Jamaica, New York 11423
            718-412-2421
        BY: EMANUEL KATAEV, ESQ.
            emanuel@sagelegal.nyc

        CYRULI SHANKS & ZIZMOR LLP
        Attorneys for Plaintiffs 189 Sunrise Hwy Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, Joshua Aaronson, Jory Baron, 1581 HYLAN BLVD AUTO LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC
            420 Lexington Avenue
            Suite 2320
            New York, New York  10170
            212-661-6800
        BY: JEFFREY RUDERMAN, ESQ.
            jruderman@cszlaw.com

        THE LINDEN LAW GROUP, P.C.
        Attorneys for Defendants Anthony Deo, Sarah Deo, Dwight Blankenship, Marc Merckling, Michael Laurie, Gold Coast CarsOf Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC
            250 Park Avenue
            7th Floor
            New York, New York 10177
            212-537-6612
        BY: JEFFREY BENJAMIN, ESQ. (A.M. Session)
            jbenjamin@nyfraudlaw.com
            BONNIE WALKER, ESQ. (P.M. Session)
            bonnie.walker@bhwlegal.net

**392**

A P P E A R A N C E S:  (Continued)

        CULLEN AND DYKMAN LLP
        Attorneys for Defendant Flushing Bank
            333 Earle Ovington Boulevard
            2nd Floor
            Uniondale, New York 11553
            516-357-3700
        BY:  ARIEL E. RONNEBURGER, ESQ.
            aronneburger@cullenllp.com

        WEIR LLP
        Attorneys for Defendant Libertas Funding LLC
            1339 Chestnut Street
            Suite 500
            Philadelphia, Pennsylvania 19107
            215-665-8181
        BY:  JEFFREY S. CIANCIULLI, ESQ.
            (Via Videoconference)
            JCianciulli@weirlawllp.com

ALSO PRESENT:

        ANDREW GEDACHT, Videographer

        ROBERT ANTHONY URRUTIA
        (Via Videoconference)
        SARAH DEO
        ALIVIA COONEY, Paralegal
        (Via Videoconference)
        Sage Legal LLC

        TAMMY ARONBAYEV, Paralegal (P.M. Session)
        (Via Videoconference)
        Sage Legal LLC

            ~ oOo ~

1 (Pages 389 to 392)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

393

THE VIDEOGRAPHER: We are now on the record. Today's date is February 12th, 2026, the time is 10:13 a.m.

Please note that the microphones are sensitive and may pick up whispering and quiet conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

We are taking the deposition of Anthony Deo in the matter of Superb Motors Inc. et al. v Anthony Deo, et al. pending in the United States District Court Eastern District of New York. Case number 2:23-VC-6188 (JMW).

We are located at the offices of Cullen and Dykman located at 333 Earle Ovington Boulevard, Uniondale, New York. My name is Andrew Gedacht. I am the legal video specialist with Little Reporting Company. The court reporter is Lisa Hiesiger also with Little Reporting Company.

394

Anthony Deo

All appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness.

ANTHONY D. DEO, having been first duly sworn by Lisa Hiesiger, a Notary Public, was called as a witness and testified as follows:

THE COURT REPORTER: Mr. Benjamin, will you be purchasing a copy of the transcript?

MR. BENJAMIN: Yes.

THE COURT REPORTER: Ms. Ronneburger, will you be purchasing a copy of the transcript?

MS. RONNEBURGER: Yes.

CONTINUED EXAMINATION BY MR. KATAEV:

Q. Mr. Deo, we're continuing your deposition. The last time you were here was on January 12th, correct?

A. Yes.

Q. And at the last deposition you had testified about conversations that you had with your criminal defense attorney, correct?

395

Anthony Deo

A. Yeah, there were some talks about something. Could I go on the record and talk about my, you know, having to use the bathroom and my back pain, is that okay?

Q. Whatever we discussed last time applies to today. If you need a break.

A. That's what I'm saying, if I need a break I want to let you guys know.

Q. Just ask and we'll be able to accommodate you.

A. Okay.

Q. Going back to what I was saying, specifically, you had testified that your criminal defense attorney told you that because your criminal case was sealed that you did not have to disclose your criminal conviction to the DMV, is that accurate?

MR. BENJAMIN: The court recorded certain limits on this line of questioning. So you have to answer as to at least under these limits, yes.

THE WITNESS: I'm sorry.

A. Repeat the question, I just wanted to clarify that.

396

Anthony Deo

MR. KATAEV: Read it back, please.

(Record read)

A. No, that's not accurate.

Q. What did you and your criminal defense attorney discuss in relation to your application to the DMV and whether you have to report your criminal conviction to the DMV?

A. We never discussed any DMV application.

Q. At the time you applied for a DMV license, you did not have any conversations with this attorney, correct?

A. I don't understand your question.

Q. When did you apply for the DMV license?

A. Which ones are you referring to?

Q. The Gold Coast Motors of Sunrise and Gold Coast Motors of Syosset?

A. That was in 2023.

Q. And the last time, presumably, you spoke to your criminal defense attorney was 2016, correct?

A. I don't remember when I spoke to him last.

2 (Pages 393 to 396)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 147 of 351 PageID #: 13950

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

397

Anthony Deo

Q.   The judgment in your criminal case was from 2016, correct?

A.   If that's --

Q.   I'm representing to you that that's the year.

A.   If that's the year, yeah.

Q.   After the judgment went into effect, you no longer had any conversations with your criminal defense attorney, correct?

A.   I am not sure, I can't say that with certainty.

Q.   Going back to your testimony from last time, though, what was the conversation that you had with your criminal defense attorney about the sealing of your criminal case and whether that requires you to disclose the criminal conviction to any governmental body?

A.   Well, I mean in regards to what we talked about, because the case was sealed, he told me I never had to check that box.

Q.   Did you ask him?

A.   What do you mean?

Q.   Did you ask him would I have to disclose this?

398

Anthony Deo

A.   I mean I don't remember the back and forth, but all I know is that that's the information that he told me.

Q.   And you only had to check that box in 2023, right?

A.   I don't remember.

Q.   Prior to applying for a DMV license in 2023, you never had to apply for a DMV license before that, correct?

A.   Well, I had a broker license and I kept it.

Q.   Is that a real estate broker license?

A.   Yes, and I was allowed to keep that.

Q.   Before the criminal case was started against you, did you have a real estate broker license?

A.   Yes.

Q.   And so is it fair to say that after your criminal conviction when your renewal came up, you asked your criminal defense attorney whether you had to disclose the conviction?

A.   As I said, I don't know exactly what it was about, if it was about that, I don't know. But I didn't take Continuing Ed is why I didn't

399

Anthony Deo

renew that license.

Q.   I'm sorry, can you repeat that?

A.   Continuing education.

Q.   Is it fair to say that when you applied for a renewal of your real estate broker license, you asked your criminal defense attorney whether you would have to disclose your criminal conviction?

A.   He just asked that and I said I don't remember.

Q.   What specifically did your criminal defense attorney tell you about the requirement to disclose any criminal conviction in any application with the government?

A.   Well, he said my case is sealed and I don't have to check that box.  That's what he said.

Q.   He didn't just voluntarily say that, you asked him, correct?

A.   I don't remember the nature of the conversation.

Q.   It's fair to say, though, at the time you applied for a DMV license in 2023, you did not have any conversation with the criminal

400

Anthony Deo

defense attorney, correct?

A.   In 2023, I don't think so, no.

Q.   Do you know -- withdrawn.
     To your knowledge is your former criminal defense attorney still around?

A.   You said he died.

Q.   Did you know that he passed away?

A.   I don't know.

Q.   Have you ever visited that attorney's office?

A.   When I met him.

Q.   Where was that office?

A.   It's a long time ago, I know it's Woodbury, I think it was Woodbury.

Q.   Was that office in the same location where Michael Laurie has an office?

A.   I wouldn't know that.

Q.   Have you ever been to Michael Laurie's office?

A.   Michael has different offices, so I am not sure which one you're referring to.  I've seen him at different places.

Q.   I don't know what the last exhibit number was, but I believe it was 36 or something.

3  (Pages 397 to 400)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 148 of 351 PageID #: 13951

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

401

Anthony Deo

MR. KATAEV: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 10:21 a.m., and this is the end of media number 1.

(Discussion off the record)

THE VIDEOGRAPHER: We are back on the record. The time is 10:22 a.m., and this is the start of media number 2.

BY MR. KATAEV:

Q.  Mr. Deo, I'm going to place up on the screen what will be marked as Deo 35.

(Deo Exhibit 35, Document titled "Company Newsletter", was so marked for identification, as of this date.)

Q.  I'll represent to you that this is a document filed with the court at docket entry 30-1, titled "Company Newsletter" and dated June 6th, 2023.  Do you recognize this document?

A.  So we're looking at documents, right?

Q.  Yes.

A.  I have two things I wanted to say about documents.

Q.  Okay.

A.  If you don't mind, I want to say it

402

Anthony Deo

on the record.

Q.  Your attorney can ask you questions about things you wanted to say.  I have limited time, so I wanted to focus on my questions.

A.  I am going to say what I need to say on the record.

MR. KATAEV: This won't count as testimony, so can we time stamp this?

THE WITNESS: On the record, I just want to say that I feel -- we feel severely prejudiced with the fact that the IAG plaintiffs has not supplied us in two years with any discovery documents, even though my attorneys have pleaded, asked many times for documents and they haven't gotten anything.  I'm not even sure if Flushing Bank has gotten anything.

MR. BENJAMIN: With that being said, let's focus on what the question he's asking you, at least on these documents we're going to bring that up soon.

THE WITNESS: I feel severely prejudiced, I'm just saying.

MR. BENJAMIN: Let's just take a look

403

Anthony Deo

at the document, and you answer as you can.  You don't have to guess, but answer as you can.

A.  And with regards to their documents I've noticed that you guys have no problem to present doctored documents to me, this court, especially in these depositions.  So the veracity of these documents, I don't know.

MR. BENJAMIN: We're going to make these arguments, but let's just focus on them.

THE WITNESS: I just needed that on the record.

MR. KATAEV: Can we mark the time stamp for the conclusion of this.  For the record, I have to say I move to strike this portion of the testimony as non-responsive.

MR. RUDERMAN: I'll join in that.

Q.  I want to focus on what's on the screen, and my question is do you recognize this company newsletter?

A.  I see a company newsletter.

Q.  Did you create this document?

404

Anthony Deo

A.  Unless I see the full printed document in front of me, I don't know if I can answer your questions regarding something you have up on the screen.

Q.  I'm showing you the full document, it's 11 pages long.

A.  As I said I understand that you're presenting it on the screen.

Q.  Sure, no problem.  Let's go off the record, we'll print the document for you it's not a problem at all?

A.  Please.

THE VIDEOGRAPHER: We're going off the record.  The time is 10:25 a.m., and this is the end of media number 2.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record.  The time is 10:48 a.m., and this is the start of media number 3.

MR. KATAEV: Let the record reflect that during the off the record time we printed all the exhibits that we intend to show today.  We'll still present them on the screen, but Mr. Deo will have the

4 (Pages 401 to 404)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

405

Anthony Deo

opportunity to review them, you know, when answering questions. We will time stamp the time he spends reviewing because that is not testimonial time.

Could I have the last question and answer read back, please?

(Record read)

Q. Mr. Deo, during the off the record time I did present you with this document and give you a full opportunity to read through it, did you create this document?

A. Yeah, I remember this document.

Q. Did you create it?

A. Maybe, probably.

Q. You don't know for sure?

A. A hundred percent, no, but I think I probably did, yeah.

Q. Did you direct anyone to create it or did you do it yourself?

A. I just said I may have created it by myself.

Q. But you don't remember whether you did it by yourself or directed someone to do it, correct?

406

Anthony Deo

A. Not a hundred percent, no.

Q. Now, focusing on the second page of this document the title is "Executive Roles" and it lists three fiduciary duties of corporate officers, correct?

A. Uh-huh, um, yes.

Q. And on the third page you're listed as the president and your wife is listed as the vice president, correct?

A. Yes, that's what it says.

Q. And the chief financial officer is Mr. Laurie, correct?

A. That's what it says.

Q. Do you have a contractual relationship with Mr. Laurie?

A. What does that mean?

Q. Is there any signed agreement between you and Mr. Laurie about how you conduct business with each other?

A. I know he had like a fee agreement or something at some point.

Q. Did you sign that fee agreement?

A. I think I did.

MR. KATAEV: We're going to call for

407

Anthony Deo

the production of that fee agreement and any other agreement that you ever signed with Mr. Laurie or any of his companies or any of your companies and his company with Mr. Laurie. We will follow up in writing.

A. The discovery demands?

Q. Correct.

When was the first time you met Mr. Laurie?

A. Oh, geez, either '20 or '21.

Q. And how did you meet him?

A. Wait, not '20, not '20. Give me a second. '21 or '22, I'm not sure exactly when, sometime in the summer.

Q. And how did you meet him?

A. Um, it was a recommendation to me that he does financial funding, mortgages, things of that sort.

Q. Who recommended him to you?

A. I don't remember who exactly recommended him to me at this moment.

Q. And going back to this document, what was the purpose of this document?

A. Have you ever heard of the saying "a

408

Anthony Deo

rising tide raises all boats," that's what this was. It was a rising tide for all the companies that I was involved in.

Q. Can you explain in more detail what you mean by rising tide for all the companies you're involved with?

A. Absolutely. Tony, myself, the team, we all were trying to get all the businesses up, running, profitable, this included Hartford Mitsubishi, so was part of the whole group so to speak.

Q. Tony is not listed anywhere in these documents, is he?

A. I see what you're saying.

Q. Is he?

A. I don't see his name, no.

Q. You didn't put his name there, correct?

A. No.

Q. So that kind of refutes your point that this is part of a rising tide of what you're doing with Tony, doesn't it?

MR. BENJAMIN: Objection to form.

A. Not necessarily, no.

5 (Pages 405 to 408)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

409

Anthony Deo

Q. Let's go to page 4, at the top your chief administrative officer is Ron Das, do you see that?

A. Ron Das.

Q. Do you see his name?

A. Yes.

Q. You just laughed at -- you know, when looking at that, Ron Das, why is that?

A. A good kid, but definitely not capable.

Q. What happened?

A. He just was not capable. Tony and I didn't think he was capable of doing his job properly. Good kid, though. Good kid.

Q. He was the one that worked at NESNA before, right?

A. Yes, he did work at NESNA.

Q. How did it come to be that he left NESNA and came to work for you?

A. I don't know his circumstance or what happened with NESNA, but I know he was looking for a job and, you know, there was an opportunity.

Q. He asked you for a job?

410

Anthony Deo

A. I don't know if he asked me or we said that we were expanding or something of that sort. But he seemed like a smart kid.

Q. And how did you find out that he was leaving NESNA or that he was no longer with NESNA?

A. He came to the office at Superb.

Q. Now you said Tony and you thought that Ron Das would be a good fit, is that correct?

A. Yeah.

Q. Tony was not involved in hiring Ron Das, was he?

A. He was involved in everything.

Q. Tony never met Ron Das, did he?

A. I'm sure he did at some point.

Q. Did you have any text message or e-mail conversations with Tony about Ron Das?

A. I don't remember at this point. We may have.

Q. Your testimony today is that you told Tony you're hiring Ron Das?

A. Tony knew about it.

Q. Because you told him that you were

411

Anthony Deo

hiring him, correct?

A. In a conversation with Bruce, himself, I don't recall exactly specifics.

Q. You didn't seek approval to hire him, you just hired him, correct?

A. Seek approval, what does that mean?

Q. You didn't seek permission from Tony or Bruce to hire Ron, you just hired him, correct?

A. I mean him saying go ahead, is that approval?

Q. I'm just asking you, did you ask him for permission to hire him or did you just do it?

A. No, we talked about it. I didn't just go out on a limb and hire people.

Q. You didn't need his permission to hire anyone, did you?

A. What do you mean?

Q. You didn't need Tony's permission to hire anyone, did you?

A. He was my partner, we made decisions together.

Q. But did you need his permission to hire anyone?

412

Anthony Deo

A. He was my partner, we made decisions together.

Q. That's not responsive to my question. I didn't ask you if he was your partner. I asked you if you needed his permission to hire anybody?

A. I don't know if I'm answering your question or not, but that's my answer to your question.

Q. The answer is yes, you did need permission or no, you didn't need permission, which one is it?

A. The answer is what I'm telling you.

MR. KATAEV: I'm going to seek a ruling from the court to have you answer that question. We'll mark it for a ruling.

Can I have that back?

THE WITNESS: Do I get to keep copies of that?

MR. KATAEV: I'll give it to you.

THE WITNESS: There you go.

(Handing)

Q. I'm going to show you Deo 36.

(Deo Exhibit 36, Document Bates

6 (Pages 409 to 412)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

413

Anthony Deo

stamped Flushing 3998 to Flushing 3999, was so marked for identification, as of this date.)

Q. It's a short two-page e-mail exchange, Bates stamped Flushing 3998 to Flushing 3999. I want you to look at the screen, please and show you this e-mail dated March 31st, 2023 at 11:48 a.m.?

A. Where's my copy?

Q. It didn't print. I can get it for you but it's a two-page document. Do you want to go off the record again?

MR. BENJAMIN: Maybe you can look at it on the screen and see?

THE WITNESS: No.

MR. KATAEV: Let's go off the record. That's fine.

THE VIDEOGRAPHER: We're going off the record. The time is 10:58 a.m.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 11:20 a.m., and this is the start of media number 4.

Q. Mr. Deo, Deo 36, the exhibit that you

414

Anthony Deo

had an opportunity to look at while we were off the record, that's an e-mail exchange between you and Robert Puccio of Flushing, correct?

A. It's part of the chain, yes.

Q. On March 31, 2023 at 11:48 a.m. Robert Puccio sent you an e-mail asking for certain information, correct?

A. What was the date?

Q. March 31, 2023?

A. Yes.

Q. Part of the information he asked you for, looking at the bottom of the first page says "Signer 1 information," do you see that? It's the second-to-last line.

A. What did you say, the signer information?

Q. Yes. On the screen I'm highlighting it, so you can see it. "Signer 1 information," right there. My question is, do you see that?

A. Oh, it's on the first page?

Q. Yes.

A. You said second.

Q. It's at the bottom of the first page.

A. Yes, I see it.

415

Anthony Deo

Q. On the second page it says "Signer 2 information," correct?

A. Yes.

Q. It's asking for both signers' information, right?

A. I think this is just the regular normal thing that he sends out.

Q. When this e-mail --

A. He highlighted a couple of things when he talked to me about it. Because I don't see that highlighted on this. For the LLC it was different he said.

Q. I'm representing to you that this is the document produced by Flushing Bank.

A. I'd say there was something else on this, as I recall. Specifically, for an LLC that's all he needed.

Q. But on this document there's a reference to signer 1 and signer 2, correct?

A. As I said, man, there's a couple of things that he referenced in this, so I'd have to see the original e-mail.

Q. This is the original e-mail. On March 31 --

416

Anthony Deo

A. It's part of the chain.

Q. On March 31, 2023 when he sent this e-mail, prior to him sending this e-mail you had a conversation with him, correct?

A. I guess.

Q. Right, that's how --

A. We've had conversations.

Q. During that conversation you spoke to him about the business, correct?

A. I don't remember the exact conversation.

Q. Generally speaking, you spoke about the business, correct?

A. We spoke about the weather, I don't know.

Q. The reason why he's asking for signer 1 information and signer 2 information is because he knew that there were at least two owners of Superb, correct?

A. That's a mischaracterization.

MS. RONNEBURGER: Objection to form.

Q. Why is it a mischaracterization?

A. That's an assumption on your behalf.

Q. I'm asking you?

7 (Pages 413 to 416)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

417

Anthony Deo

A.  It's an assumption on your behalf.

Q.  Why is it an assumption?

A.  Can I finish?

Q.  Go ahead.

A.  I don't recall the exact conversation.  You're showing me a part of an e-mail chain.  I'm telling you when he spoke to me about Superb, there was specific information he wanted because it was an LLC.  Where is that?

Q.  You realize Superb Motors is Superb Motors Inc., correct?

A.  But where is that information here?

Q.  Do you realize that Superb Motors Inc. is not an LLC and it's a corporation, yes or no?

A.  Then it's vice versa from what I said, maybe I misspoke.  Maybe for a corporation all he needed was specific information.

Q.  My question is --

A.  As I said -- I am not done.  As I said he requested very specific information to which I asked Tony for and I forwarded him the e-mail, where is that?

Q.  I'm focusing on this question right

418

Anthony Deo

now.  And my question is this, based on this e-mail Robert Puccio knew that there were two owners of Superb, correct?

A.  False.

Q.  How do you know that?

A.  I'm telling you it's false.

Q.  Why would Rob Puccio put signer 1 and signer 2 in this e-mail, if there were not more than one owner?

A.  You would have to ask Rob Puccio that.

Q.  You didn't tell him there was more than one owner?

A.  As I said, I don't recall the conversation.

Q.  Going to after signer 2, it says "Ownership information," do you see that on page 2?

A.  Okay.

Q.  Why don't you take a look at the document that you asked to see?

A.  I just read it.

Q.  Great.  Let the record reflect that he hasn't opened the page to page 2.  Under

419

Anthony Deo

ownership --

MR. BENJAMIN:  Let the record reflect that he reviewed it before.  Just let's not --

A.  And it's a partial document.  Again, that's them doctoring documents and giving it to me.

MR. BENJAMIN:  He's asking you a question about page 2.

THE WITNESS:  I get it.  I get it.

Q.  Under Ownership Information Robert Puccio asked you for a full, name, Social Security number, title, percentage of ownership and ID for each owner, correct?

A.  This is part of an e-mail chain.

Q.  Did he ask you for that?

A.  As I said, do you have the full e-mail chain?  The one that went to Tony.

Q.  Mr. Deo, I'm not required to show you every single e-mail, so you can answer a question.  The question that I'm asking you is based on this e-mail.

A.  Of course not.

Q.  So you can testify based on what you

420

Anthony Deo

see in front of you, and based on your knowledge.  So I'm asking you, does this e-mail ask for the ownership information of each owner of Superb, yes or no?

A.  There were other parts to this e-mail.

MS. RONNEBURGER:  Objection to form.

MR. KATAEV:  Can we reread the question?

(Record read)

A.  This is not a correct representation of the e-mail.

Q.  What is the correct representation of the e-mail?

A.  I don't have it in front of me.  You obviously excluded it.

Q.  The answer is you don't know, right?

A.  I gave my answer.

Q.  Going to the top e-mail, April 3rd, 2023 at 11:22 a.m., do you see that?

A.  Yes, I do.

Q.  On the second line it says, "As David and I understand I will only be opening the joint venture you have with your partner which will be

8  (Pages 417 to 420)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

421

Anthony Deo
located in Great Neck." Do you see that?
A. Yes, I see that.
Q. The Great Neck location he's referring to is Superb, correct?
A. Most likely, absolutely.
Q. And your partner is Tony, correct?
A. No one ever denied that.
Q. I'm asking you to confirm.
A. Tony is my partner.
Q. And he was asking this information so that he can complete and get information about signer 1 and signer 2 for the account, correct?
A. Again, that's false.
Q. So your testimony is that you were the sole owner of Superb at this time?
A. That's a misrepresentation from what I just said.
Q. Didn't you submit an application to open a bank account with Flushing, listing yourself as a hundred percent owner?
A. I think there was an application to Flushing.
Q. And you listed yourself as a hundred percent owner, correct?

422

Anthony Deo
A. Do you have that document?
Q. I do. We'll go over that. Let's talk about Alysia Cayer.
A. Please do.
Q. It's fair to say that you did not get along with Alysia, correct?
A. I don't know if I could answer right now.
Q. You can answer.
A. Do I wait?
Q. You could go ahead.
A. So if you're referring to the CFO that got caught cooking the books by Nissan, then yes Tony and I had an issue with Alysia.
Q. Is it fair to say you did not get along with her?
A. If you're referring to Alysia, the same CFO that cooked the books for Nissan and got caught. Yes, Tony and I did not get along with her.
Q. How do you know that Tony did not get along with her?
A. That's completely expressed, absolutely he didn't.

423

Anthony Deo
Q. How do you know?
A. I don't understand your question.
Q. How do you know that Tony did not get along with Alysia?
A. He said it on numerous occasions.
Q. To who?
A. To me, to Bruce, he released her because she got caught cooking the books.
Q. It's fair to say that you wanted her fired, correct?
A. Did he not say that to you?
Q. I'm not here to answer your questions, you're here to answer mine.
A. Okay.
Q. You wanted her fired, correct?
A. Excuse me?
Q. You wanted her fired, correct?
A. Why would I want her fired?
Q. Did you want her fired?
A. That's what Tony wanted, he made that decision.
Q. Did you want her fired?
A. Why would I want -- I had -- it did not affect me.

424

Anthony Deo
Q. So you didn't want her fired?
A. As I said, that was Tony's decision.
Q. I didn't ask you whether it was Tony's decision I asked whether you wanted her fired?
A. I had no feelings about her being fired or not.
Q. You did not ask for her to be fired?
A. I don't specifically remember asking for her to be fired. He said he was going to fire her. I said okay.
Q. Do you recall when she was fired?
A. Exactly when, no.
Q. Would it refresh your recollection if it was late March/early April?
A. It won't.
Q. I want to present to you what will be marked as Deo Exhibit 37. It's ECF docket entry 38-2 it's a compilation of all the text messages you had with Mr. Urrutia. I'm handing you the --
A. Could I see all of them?
Q. Yes. I'm handing you the full packet, but I'm telling you that I am referencing page 44 -- sorry, 43.

9 (Pages 421 to 424)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

425

Anthony Deo

(Deo Exhibit 37, Compilation of text messages between Anthony Deo with Robert Anthony Urrutia, was so marked for identification, as of this date.)

Q.  So 43 is here and everything preceding 43 is here.

(Handing)

MR. KATAEV:  Let's go off the record while he reviews it.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:32 a.m., and this is the end of media number 4.

(Recess taken)

MR. KATAEV:  We're back on the record.  The time is 11:37 a.m., and this is the start of media number 5.

BY MR. KATAEV:

Q.  During off the record time, Mr. Deo had an opportunity to read the relevant portions of the text messages that I'm sharing on the screen which again is docket entry 38-2, bottom of page 43, beginning with the text message exchange at 12:09 p.m.

Mr. Deo, do you recall exchanging

426

Anthony Deo

these text messages with Tony?

A.  I'm reading it right now.  If you say that they're correct, I'm going to go with that.

Q.  In this text message you're saying, "Please don't mind the wording in the e-mail, it's only to serve our purpose in our struggle with Alysia," correct?

A.  Yes, that's what it says.

Q.  That refers to the issues that you had had with accounting and the other issues, right?

A.  This was that e-mail that I requested for forensic accounting because there were some thefts in Superb.

Q.  Following that e-mail and this text message exchange, you and Tony had a phone conversation, correct?

A.  I don't recall exactly.  March 22nd, 2023.

Q.  Following that e-mail and this text message exchange, Mr. Urrutia had his staff forward you all the financials for all the dealerships, correct?

A.  No, I think what happened was, your

427

Anthony Deo

CFO was angry and she did what's called a data dump where she had no correlation to any numbers. Nothing could be followed and she e-mailed thousands of Toshiba faxes to everyone in that e-mail chain.  Nobody could understand left or right in that e-mail chain including Tony.  And he had no reason to understand why she was doing that.

Q.  Isn't it true that Tony told her to do it?

A.  You would have to ask Tony.

Q.  Isn't there an e-mail that specifically says "Alysia:  Please send all the documents"?

A.  Do you have that e-mail?

Q.  Yes.

A.  So can I see it?

Q.  I'm asking you, based on your memory, do you know whether that's the case?

A.  If I see an e-mail, I can answer you.

Q.  But you don't deny that you received hundreds of e-mails from Toshiba, correct?

A.  That statement is false.  I said I need to see the e-mail.

428

Anthony Deo

Q.  You're denying that you received hundreds of e-mails that you just testified about?

A.  Oh, yeah we got a hundred.  I don't even know how much.

Q.  A lot?

A.  We got a lot of Toshiba fax stuff.

Q.  You never opened any of those, did you?

A.  Me, I mean maybe a couple, but nobody could understand anything.

Q.  Did you ever review any of the documents?

A.  How?

Q.  Did you?

A.  How?

Q.  What do you mean how, did you open them?

A.  How?

Q.  You don't know how to open an e-mail?

A.  Maybe.

Q.  So you're questioning how to open an e-mail, you don't know how to click?

A.  What do you mean?

10 (Pages 425 to 428)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

429

Anthony Deo

Q.   Did you click open the attachments of the e-mail?

A.   Maybe.

Q.   And in your review of it, whatever you did review, did you find anything financially improper?

A.   The data dump was illegible, nobody could understand it.

Q.   Did you follow up to ask for more information or to clarify?

A.   With Tony, sure.

Q.   And how did you do that?

A.   I don't recall at this moment, it could have been an e-mail, it could have been a phone call, maybe it's in these text messages.

MR. KATAEV:  We're going to call for the production of all written communications with Mr. Urrutia about you following up to clarify about this. You've asked us to keep a copy of these messages, that request was granted to you. We're going to ask in an interrogatory for you to identify any texts that show you following up for info and for you to

430

Anthony Deo

produce any e-mails, okay.  We'll follow up in writing.

THE WITNESS:  Are we done with this?

MR. BENJAMIN:  Yes, you can keep that.

Q.   Isn't it true --

A.   Are you done with this?

Q.   Yes.  Isn't it true that you told Tony in relation to that e-mail that he doesn't have to send anything and that is just for our purposes against her?

A.   False.

Q.   The information that was provided to you in the Toshiba contained bank statements, correct?

A.   What's your name?  It's Kataev, right?

Q.   Yes.

A.   I've explained to you two minutes ago that it was a data dump for which nobody could understand what was the contents of what she was sending.

Q.   So if I understand you correctly, if there was a bank statement in there and you

431

Anthony Deo

clicked open the attachment and there was a bank statement facing you that you couldn't understand it?

A.   It was hundreds of e-mails, I don't even know what was there.

Q.   You asked for a forensic investigation, didn't you?

A.   That's not what a forensic investigation is that's a data dump.

Q.   What is a forensic investigation to you?

A.   It's -- there were specifics that I asked for.  She didn't follow that at all.

Q.   So you're saying she gave you documents other than what you asked for?

A.   That's not what I said.  There were specifics and specific questions that she did not provide.

Q.   But you didn't follow up with her?

A.   I followed up with Tony.

Q.   You also testified that she was angry, do you recall that?

A.   Well, that's what Tony said, that's why she was sending hundreds of nonsense e-mails

432

Anthony Deo

that nobody could understand.

Q.   So the only basis for your knowledge that Alysia was angry is because Tony told you, correct?

A.   Probably, yeah, I didn't speak to her.

Q.   Other than that you have no basis to know how she felt about the e-mails?

A.   I mean, yeah, I guess.

Q.   Now, to your knowledge were there any schedules, financial schedules, in the e-mails that were sent to you?

A.   I don't know.

Q.   What about trial balances, do you know about that?

A.   What is that?  I don't know.

Q.   You included Mr. Thomasson in that e-mail, right?

A.   Yes, yes, Harry was on that, Tony, and I think Tom.

Q.   And by Tom you're referring to?

A.   Tom Jones.

Q.   That's the accountant, correct?

A.   Yes.

11 (Pages 429 to 432)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

433

Anthony Deo

Q. You specifically mentioned that Harry and Mr. Jones -- withdrawn.

You specifically mentioned that Mr. Thomasson and Mr. Jones were included as part of your forensic team, quote/unquote, right?

A. Do you have that e-mail in front of you?

Q. I'm asking based on your memory.

A. I don't remember. I need to see an e-mail.

Q. Okay, that's fine. Is it fair to say that you were surprised when you received all of the documents through the Toshiba?

A. That's a false statement.

Q. You were not surprised?

A. I think that's a false statement.

Q. You submitted a sworn declaration saying that Tony fired Alysia in order for her not to provide the documents, didn't you?

A. I may have in my affidavit.

Q. But the Toshiba documents that were sent were the documents, weren't they?

A. False.

Q. In the declaration that you submitted

434

Anthony Deo

you said that Tony fired her so that she doesn't send you anything at all, didn't you?

A. I would like to see the declaration. This is very distracting by the way, it's hard to pay attention to you.

(Deo Exhibit 38, Declaration, was so marked for identification, as of this date.)

Q. Here is Deo 38. Let's go off the record so you could look at it.

A. What is this?

Q. This is the declaration that you asked for.

THE VIDEOGRAPHER: We are going off the record. The time is 11:45 a.m., and this is the end of media number 5.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 11:49 a.m., and this is the start of media number 6.

BY MR. KATAEV:

Q. Mr. Deo, to your knowledge did you ever apply for any loan for Superb?

A. I know that's what our intention was.

435

Anthony Deo

Q. Did you ever act on that intention?

A. Well, I mean that's what the whole Flushing relationship was supposed to be.

Q. After you opened up at Flushing, did you ever apply for a loan?

A. That's the reason we opened it up.

Q. But did you apply for a loan?

A. That was part of the application.

Q. Did you ever obtain a loan?

A. No, we didn't obtain anything from Flushing.

Q. Did you fill out an application?

A. I think there was some online thing, but as I said it was part of the whole process. That's the reason why we had the relationship with Flushing.

MR. KATAEV: I'm going to call for the production of any loan applications that are in the possession custody and control of Mr. Deo. We'll follow up in a separate request to Flushing Bank for any applications by Mr. Deo through Superb for any loan.

Q. Focusing on the declaration in front

436

Anthony Deo

of you at paragraph 22, 23 and 24. You had an opportunity to review this during off the record time, correct?

A. Yes.

Q. In this declaration you discuss how you asked for a forensic review and that two things unexpectedly occurred within one week thereafter, right?

A. Uh-huh, yes.

Q. You said, "When Alysia asked for the authority to provide the documents you sought, Tony fired her." Correct?

A. She was fired, yes.

Q. You also said that you were not consulted on that firing, correct?

A. He didn't say that he was firing her.

Q. You just looked at the text messages, where you discussed Alysia, didn't you?

A. The text messages was about Alysia, yes.

Q. In those text messages you were discussing the fact that Alysia was in your way and Tony's way, correct?

A. Those were the words used.

12 (Pages 433 to 436)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

437

Anthony Deo

Q. And is it fair to say that because Alysia was in both of your way that you were looking to get rid of her?

A. That's a false statement.

Q. So your testimony is those text messages do not discuss firing?

A. It doesn't say firing.

Q. In 24 you say "I now surmise that her firing was merely an attempt" --

A. 24, what do you mean by 24?

Q. Paragraph 24.

A. Oh, this okay.

Q. In paragraph 24 you say "You now surmise her firing was merely an attempt by Tony to control my interest in finances to blame Alysia and placate me with the firing and to prevent any forensic examination from taking place." Correct?

A. Absolutely.

Q. You stand by that testimony even though you received all the documents through the e-mails?

MR. BENJAMIN: Objection to form.

A. Receiving documents is not a forensic

438

Anthony Deo

examination, Mr. Kataev.

Q. What would be a forensic examination?

A. It's systemic and cooperative review of all financials that was requested and in the manner it was requested. What she did was called a data dump.

Q. Okay. You've consistently argued throughout this case that you do not control any of the finances of Superb, correct?

A. I argued?

Q. Is it your position that you control the finances of Superb?

A. You're going back to the original question or this question, what question are you asking?

MR. KATAEV: Read it back, please.

(Record read)

A. No, I didn't control it.

Q. That's one of your defenses in this case, right, that you don't control the finances of Superb?

A. I don't control the finances.

Q. And you say that because the shareholders agreement you signed provides that

439

Anthony Deo

Mr. Urrutia controls the finances and not you, right?

A. I love that you brought up that.

Q. Please answer my question.

A. The shareholders agreement, right, the one that you're saying that is it valid on the first page, on the eighth page, is the whole thing valid or was nothing valid?

Q. My question is based on your understanding of the shareholders agreement, do you have financial authority over Superb?

A. The valid shareholders agreement or the one that's not valid?

Q. I don't know whether it's valid or not valid. My question is based on your understanding of the agreement. Do you have --

A. Do you have that agreement?

Q. I'm not presenting you with the agreement I'm asking you for your understanding based on your knowledge?

A. I'm sorry, I can't answer your question.

Q. What is your explanation for listing yourself as a hundred percent owner to open an

440

Anthony Deo

account with Flushing?

A. I explained that in my last testimony that Tony and I discussed that I was going to be the hundred percent guarantor of the working capital loan we were going to get -- or apply with Flushing Bank. He didn't want anything to do with it because he was applying for his franchises. So he said you handle Superb, I'll do the franchise and that's the reason why I did it.

Q. Did Tony ever give you any stock certificates giving up his shares in Superb?

A. What is stock certificates in Superb?

Q. Are you familiar with the term "stock certificates"?

A. I've heard of it.

Q. Do you have --

A. With regards to Superb I said.

Q. My question is do you have any stock certificates from Tony transferring his interest in Superb to you?

A. We have a cross purchase agreement that transferred 49 percent of Superb stock to me.

13 (Pages 437 to 440)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

441

Anthony Deo

Q.  But you don't have any such document transferring 100 percent to you, correct?

A.  I -- no.

Q.  I'm going to hand to you what will be marked Deo 38.  This is a one-page document.

MR. BENJAMIN:  Didn't we just have 38, is that 39?

MR. RUDERMAN:  Yes.

(Deo Exhibit 39, Compilation of checks, was so marked for identification, as of this date.)

Q.  I'll represent to you that this is an authorization that you signed.  It's ECF docket entry 11-10.

Focusing on the first page, is this your handwriting, Mr. Deo?

A.  It looks like it.

Q.  The signature on the bottom left, that's yours, correct?

A.  Yes.

Q.  And this account number ending in 5518, that is for Superb Motors, correct?

A.  I don't know offhand.

Q.  On the top left it says that "The

442

Anthony Deo

depositor's legal and trade name and address is Superb Motors/Northshore," correct?

A.  Yes.

Q.  And this ACH authorization to Nissan is to pay for Northshore's advances by Superb, correct?

A.  Agreed upon by Tony and I, yes.  We were going to split the payments for Superb for the loan that he took and this was for an advance that I took for Northshore.

Q.  You don't have anything in writing from Tony authorizing you to do that, correct?

A.  Just ask him, he'll tell you.

Q.  But you don't have anything in writing, correct?

A.  Not that I recall.  I don't know.

Q.  You also signed --

A.  That's the only reason why I would do this.

MR. KATAEV:  I'm done with that exhibit.  Let's go off the record, so I could give him additional documents.

MR. BENJAMIN:  We're getting close, aren't we?

443

Anthony Deo

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:58 a.m., and this is the end of media number 6.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:01 p.m., and this is the start of media number 7.

MR. KATAEV:  Let the record reflect that during our off the record discussion I presented to Mr. Deo what will be marked in hard copy as Deo Exhibit 39, it's a compilation of checks.

Q.  Mr. Deo, I'll represent to you that all of these checks are signed by you.  I want to confirm is that your signature on all these checks?

A.  That's my signature.

Q.  In some of these checks you paid Harry Thomasson, correct?

A.  There's Harry, there's commissions, there's Northshore, DLA, Jones, another commission, okay.

Q.  There's also payments to DLA Capital Partners, correct?

444

Anthony Deo

A.  Yes.

Q.  What were those payments for?

A.  I don't see anything in the memo.

Q.  You don't know?

A.  I don't see anything in the memo.

Q.  Do you know what those payments were for?

A.  How am I supposed to remember exactly what these payments were for?

Q.  Is there any reason that --

A.  What was it?  Was it $500, $300, a thousand dollars?

Q.  Is there any reason that you paid DLA Capital Partners $1,090?

A.  As you said there's nothing in the memo.  Kendra created these checks, so maybe she had something in the memo.

Q.  You directed Kendra to create these checks, correct?

A.  I didn't direct Kendra to do anything.  Bruce normally did.  All checks went through Bruce and the check registry because it had to be approved by him.

Q.  All checks that went to Bruce had to

14 (Pages 441 to 444)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

445

Anthony Deo

be signed by him, correct?

A. That's not what I said.

Q. I'm asking.

A. The check registry.

Q. I'm asking you, did all the checks that went through him have to be signed by him?

A. That's a false statement.

Q. Referring to the check to Northshore Motor Leasing, there's one on the screen for $22,640, what is the purpose of this check?

A. As again, there's no memo so I don't know exactly. You're asking me to go off of memory of why a specific check was cut. I would cut -- I mean they would cut checks to Northshore. They also cut, as I recall, over half a million dollars in checks to Robert Urrutia, his company Star Performance, his other company Blue Sky Consulting, Peanut Consulting. I mean there was also various cut to him too.

Q. What would be the reason why Superb would write a check to Northshore, generally speaking?

A. I'm not a hundred percent sure. Could be a car.

446

Anthony Deo

Q. Other than a car is there any other reason?

A. As I said, you have to ask Kendra for the memo.

Q. And you don't dispute that you signed these checks that I presented to you?

A. That is my signature, absolutely. Notice the date, they all occurred in July after I had that conversation face-to-face with Tony when he visited the store and said that I am now going to have check-signing abilities. Which is why you would not find a check prior to this date signed by me.

Q. But you told the court that you always had zero control over the finances?

A. What does that have to do with this?

Q. You signing a check indicates that you do have control over finances.

A. That's an assumption on your part, Mr. Kataev.

Q. Do you dispute that you have financial control because of the fact that you're signing these checks?

A. I cannot make that statement.

447

Anthony Deo

MR. KATAEV: Let's take a break.

MR. BENJAMIN: I think we're done, right?

THE VIDEOGRAPHER: We're going off the record. The time is 12:05 p.m., and this is the end of media number 7.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 12:12 p.m., and this is the start of media number 8.

BY MR. KATAEV:

Q. Mr. Deo, you had invested initially $500,000 into Superb, correct?

A. That's a false statement.

Q. Why is it false?

A. That $500,000 was part of the payment for the cross purchase agreement and it wasn't just an investment into Superb Motors it was so that I could get a cross guaranty from my companies, Northshore Motors and 189 Sunrise.

Q. Other than that $500,000, you also paid 75,000 to Superb, correct?

A. I put a lot of money into Superb.

Q. Other than the $500,000 and the

448

Anthony Deo

$75,000, what other funds did you put into Superb?

A. You're going to have to give me time to go through all the accounts.

MR. KATAEV: We're going to call for production of any documents showing any money coming from you or any of your companies coming into Superb.

THE WITNESS: That would require you giving me some documents.

MR. KATAEV: It's okay.

MR. BENJAMIN: We're going to get there.

THE WITNESS: Okay.

Q. Isn't it true that you were paid back the $75,000 you invested through two payments of $37,500?

A. False.

Q. You denied that you paid yourself back $37,500 twice?

A. I said your statement was false.

Q. Why is it false?

A. Because you're making a conclusion.

Q. What was the purpose of making a

15 (Pages 445 to 448)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 160 of 351 PageID #: 13963

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

449

Anthony Deo

check from Superb to Northshore of $37,500?

A. What am I looking at, am I looking at something here?

Q. Do you recall making any payment from Superb to Northshore?

A. Where?

Q. I'm asking you?

A. Can I see something?

Q. I'm asking you if you recall?

A. I don't recall.

MR. KATAEV: Thank you, Mr. Deo. I have no further questions.

MR. BENJAMIN: So what's the plan, do you want to take a break now?

THE VIDEOGRAPHER: We're going off the record. The time is 12:15 p.m., and this is the end of media number 8.

(Discussion off the record)

THE VIDEOGRAPHER: We are back on the record. The time is 12:17 p.m., and this is the start of media number 9.

EXAMINATION BY MR. RUDERMAN:

Q. Good afternoon, Mr. Deo. My name is Jeffrey Ruderman. I'm an attorney with the firm

450

Anthony Deo

of Cyruli Shanks & Zizmor and we represent, as we described them as the IAG plaintiffs in this matter.

I'm here to continue your deposition that you just completed with Mr. Kataev. Is there any reason why you would not be able to give truthful and accurate testimony today?

A. No.

Q. You previously testified that at the 180 Michael Drive location, there was a company called Universal Exotic Autos which operated, correct?

A. No, it's UEA Premier.

Q. So Universal Exotic Autos did not operate at that location?

A. No, I think that was in Deer Park.

Q. And the UEA did operate at that location?

A. Yes.

Q. And these --

A. That's when we signed the lease in 2016 -- I'm sorry, in 2016, yeah.

Q. And that was a used car dealership, correct?

451

Anthony Deo

A. Yes.

Q. What was your interest in that dealership, your ownership interest, if any?

A. It was owned by my wife and myself.

Q. What was your percentage interest, if you know?

A. I don't remember how we split the percentage.

Q. I believe that's a corporation, correct, it was an Inc.?

A. Is it?

Q. Or was it an LLC, do you know?

A. I don't know offhand.

Q. Did you have a title? In other words president, manager, did you have a title of some kind in connection with the entity?

A. Husband. No, we owned it together.

Q. I'm saying if there were documents needed to be signed for another entity you'd want to put down who you are. Not just, you know, so you might be a CEO you might be a president you might be a vice president, do you recall if there was any title that you had?

A. I'm not a hundred percent sure. I

452

Anthony Deo

can't recall.

Q. Do you know if your wife had any title in connection with that?

A. I'm sure we did. I just don't know at the moment. It was too many years ago.

Q. In order to operate that as an automobile dealership, it had to have a DMV license, correct?

A. Yes, absolutely.

Q. And a license application then would have been submitted to the DMV, correct?

A. Oh, yeah.

Q. Do you know who submitted that license application?

A. I'm not sure. If you have it, I can tell you. Do you have it?

Q. I don't have it. I'm asking you if you know?

A. No, no. I don't remember how we did it.

Q. But it wasn't you, right?

A. I said I don't remember.

Q. Is it possible that it was you?

A. I don't recall, I don't want to

16 (Pages 449 to 452)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

453

Anthony Deo

answer, if I don't remember.

Q. Well, you had submitted an application in your own name for the Golden Coast of Sunrise and Golden Coast of Syosset?

A. Gold Coast, yes.

Q. I believe you had testified previously that those are the first DMV applications that you had ever submitted in your own name. Is that recollection a little fuzzy?

A. That's a false statement.

Q. I'm saying I believe that was your testimony, you tell me if that's not correct?

A. That's not correct. I believe there was one prior, but I don't remember what it was though.

Q. Prior to or other than the Syosset and Sunrise Gold Coast entities and other than the UEA, other than Northshore and other than Sunrise, were there any other DMV licenses that you believe you may have submitted in your own name?

A. I mean it's a lot of years. Probably, I just don't recall what which name, if it's wholesale or retail. I mean...

454

Anthony Deo

Q. Let's just stick with retail. The retail operation as a used automobile dealership, do you believe that other than the Syosset and Sunrise dealerships we just discussed that you held a license or you applied for a license in your name to run a used car retail dealership for any other entity?

A. I know Wendy was supposed to -- we were supposed to fill out the transfer of Northshore and 189 Sunrise, but then she stopped the paperwork, I guess Josh told her to.

MR. RUDERMAN: I'm going to mark that as non-responsive. My question is --

THE WITNESS: You're asking me if we did, so I'm answering your question.

MR. RUDERMAN: No, you went further than the question and I'm moving to mark that part as non-responsive. But we're going to ask the question is:

Q. Do you know whether or not you had held -- you applied for any other licenses?

A. Again, so Wendy was working with me in applying for Northshore and 189 Sunrise.

Q. Okay, fine. Other than --

455

Anthony Deo

A. And that transfer was stopped by, I think, Josh.

MR. RUDERMAN: Objection as non-responsive.

Q. Did you apply is the question. The answer is I applied, I didn't apply. I didn't ask you what happened to it. If I want to know what happened to it, I'll ask you that. Okay?

A. I'm answering your question.

Q. No, you're not. You're answering questions that I didn't ask.

A. It's a complete answer.

Q. No, it's not. It is more than the answer. I'm going to try and ask you to limit your answers to what I asked, otherwise we will stop this and go to the judge because it's not an opportunity for you to make narratives and tell me what you want. Just answer my questions, and we'll move along much faster by the way.

MR. BENJAMIN: We'll try to focus on the question.

MR. RUDERMAN: Let's focus on the question.

Q. Let's keep out Northshore. And let's

456

Anthony Deo

keep out Sunrise and Syosset and Gold Coast of Sunrise and Gold Coast of Syosset. Other than those four and, perhaps, UEA, do you recall whether you submitted any other applications for any other used car retail automobile dealerships?

A. I don't recall.

Q. When you had the UEA operating the 180 Michael Drive, did you have a floor plan?

A. Of course I think we did, yeah.

Q. Did you have --

A. Um, shit, I'm sorry. Which ones, perhaps NextGear. I know it was one of the smaller ones.

Q. It may have been NextGear but you don't recall?

A. Yeah, I don't know which ones.

Q. And do you know if there was a floor -- there was a floor plan for sure, though, you couldn't operate without one, right?

A. Well, you could buy cars cash, you know, which we did but there was also a floor plan.

Q. And do you know who, if anybody, applied for that floor plan?

17 (Pages 453 to 456)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

457

Anthony Deo

A. I would need to see the application.

Q. Well, could you have been the person who applied for that floor plan?

A. I don't remember.

Q. This is back in 2016, correct?

A. Yeah, '15, '16 somewhere around there.

Q. We've already established that the criminal conviction was entered in around 2016, correct. I can show you the document if you need it?

A. That's what you said, that's what Kataev said.

Q. I believe you've already testified, and were shown the document, that you were restricted from opening up additional credit lines for five years pursuant to that criminal judgment, correct?

A. That's what was said, yes.

Q. So --

A. Personal credit lines.

Q. So was it your understanding, though, that if a credit line would be purchased for an entity in which you held a majority interest that

458

Anthony Deo

would not be a violation of that criminal judgment?

A. It's not personal credit.

Q. I'm just asking if it is your understanding that if through an entity in which you held a majority interest, an application for credit was applied for, that would not be a violation of the criminal judgment?

MR. BENJAMIN: The only objection is to the extent there's a legal conclusion if there somewhere, but you can answer.

A. Yeah, I don't know how to answer your question, I'm sorry.

Q. Well, do you understand that --

A. And I don't even know if I was a majority interest. I don't even know what the application had on it.

Q. I'm asking what your understanding was as to whether or not if you had a majority interest in an entity, would that entity's application for credit be a violation of your criminal judgment, to your understanding?

A. I mean you're asking me to interpret, you know, a judgment. I don't know if I can.

459

Anthony Deo

Q. Well --

A. But, I thought it referred to personal credit.

Q. So your understanding -- right or wrong I'm not making a judgment -- to your understanding, though, is you didn't think it would apply to a restriction if an entity in which you held an interest applied for credit, only if you personally applied for credit?

A. I guess.

Q. Okay. Now, based on your understanding that you just expressed, was that based upon your own thoughts or did you ask anyone for advice as to whether or not applying through an entity would or not be a violation of that criminal judgment?

A. I can't remember.

Q. Now, at some point I believe you testified that the license for UEA was suspended or revoked, correct?

A. Yeah, there was I think we had to give it back.

Q. And do you recall what the reason why you had to give it back?

460

Anthony Deo

A. Specifics, no. There were specifics, I would have to go back into records.

Q. How about generally?

A. That's a hard thing to say.

Q. Well, a revocation can happen for various reasons, right? You've been in the business for a while, and there are various reasons that could cause a suspension?

A. Yeah.

Q. One of them could be a complaint raised against you and the DMV investigated and there could be a hearing and it could result in a suspension revocation. Are you familiar with that?

A. I've never been to a DMV hearing or anything of that sort, no.

Q. Has any entity in which you owned or operated ever been subject to a DMV complaint before?

A. People complain all the time, yeah.

Q. As a result of those complaints, did the DMV ever have a hearing as a result of any of those complaints?

A. I've never been a part of any DMV

18 (Pages 457 to 460)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

461

Anthony Deo

hearing.

Q. I didn't ask you if you were a part of it. I've asked you whether any entity that you owned or operated was ever subject to a DMV hearing?

A. Not to my knowledge.

Q. Now, do you know approximately when the license was suspended or revoked for the first initial?

A. I don't know exactly what happened. You're saying suspended or revoked. I'm not sure if we gave it up, if it was revoked, it was a suggestion. I'm not sure of the circumstances at that point, exactly what happened.

Q. Well, at the time that -- at some point whether suspended or revoked, in either case --

A. Or given up.

Q. -- or given up, in either one of those cases the dealership could no longer operate as a retail used dealership once its license was suspended or revoked or you gave it up?

A. Yeah, you can't operate without a

462

Anthony Deo

license, that's why we opened up Northshore Motors.

Q. So Northshore was opened up, I can show it to you if you want, but the Department of Records shows it as November 1st, 2017. Does that sound fair to you?

A. 2017, yes.

Q. And that was soon after the license for UEA was no longer allowed to be used for whatever reason?

A. That's an assumption. I don't know exactly when we gave in the license. It could have overlapped, I don't know.

Q. It was around that time?

A. It could be, yeah.

Q. When you opened up Northshore, at that time who was it that filed the papers to form that entity, if you know?

A. I know we had somebody do it for us. I don't know exactly. I don't recall exactly.

Q. When you were operating UEA at that location, how many employees worked at that location?

A. Oh, geez, I don't remember.

463

Anthony Deo

Q. Was it more than ten?

A. It was a small company. So it could be ten, it wasn't like 30, 40.

Q. Could you tell me what the roles, what the various job positions were at UEA? There's a salesperson, there's this, there's that, can you tell me what the different jobs were?

A. I mean it's normal dealerships, I guess --

Q. You're in the business, right?

A. -- porter, salesperson.

Q. So can you tell me what they were, specifically?

A. Specifically I don't know. But I'm just telling you in general there's salespeople, there's finance, there's receptionists, porters. We may have had a mechanic.

Q. What was your position there?

A. Owner.

Q. What were your roles and responsibilities as owner at UEA?

A. I mean to run the dealership.

Q. What specifically did you do?

464

Anthony Deo

A. Buy cars, advertise. It was just, you know, the general running of the dealership.

Q. Were you involved in the sale of cars?

A. No. I don't think I really sold the cars. I mean there were salespeople involved and we had the F&I.

Q. Did you do F&I?

A. Me, I don't think so.

Q. Did you do aftermarket sales?

A. What's that, what do you mean?

Q. Sales warranty, under coding, all sorts of things you do to vehicles to make more money for the dealership?

A. In 2016?

Q. Yes.

A. Maybe.

Q. Do you recall what type of credit line that dealership had, what the UEA had around that time?

A. I don't remember.

Q. Do you recall what its gross sales were?

A. No.

19 (Pages 461 to 464)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo   ---   February 12, 2026

465

Anthony Deo

Q.  Do you recall how many cars it sold in an average month?

A.  You're asking for specifics that I don't remember at this point.

Q.  You were involved in buying cars, though, correct?

A.  Yeah.

Q.  Were there other people or were you the sole person responsible for that?

A.  I think I may have been the only person buying.

Q.  Was there anybody other than you that was responsible for hiring people at that dealership?

A.  My wife.

Q.  What was her position?

A.  Owner.  Same thing.

Q.  Was she involved in buying cars?

A.  No, no.

Q.  Was she involved in selling?

A.  I mean she would have suggestions.  She would have suggestions, but the actual purchasing it would be me.

Q.  So I'm asking what did she do?  Did

466

Anthony Deo

she go to the dealership on a daily basis?

A.  Yes, she was there.

Q.  What did she do when she was there?

A.  She would help run it.

Q.  How, give me some examples?

A.  Leads.

Q.  Leads, okay.  So was she involved --

A.  Marketing, advertising.

Q.  Was she involved in marketing and advertising?

A.  Uh-huh.

Q.  You have to answer.

A.  Yes, I'm sorry.

Q.  So what, if you know, did she do to get to generate leads or do marketing?

A.  We would advertise.

Q.  Where would you advertise?

A.  In 2016, I don't remember.

Q.  Other than advertising and leads, did your wife have any other involvement, regular involvement, in the business?

A.  I'm sure there were other things that she did other than that, yeah.

Q.  You don't specifically recall

467

Anthony Deo

anything?

A.  It's a while ago.

Q.  So other than -- withdrawn.  So besides yourself and perhaps your wife being able to hire people, was there anybody else that had the authority at UEA to hire employees?

A.  None that I recall at this moment.

Q.  What about firing, did anybody have the authority to fire either than you and your wife?

A.  No, no.  I don't think so.

Q.  And was there, were there managers of any departments?

A.  Yeah, I think we had an F&I manager.  Did we have a sales manager?  I'm not sure, but perhaps.

Q.  So would it be fair to say that as an F&I manager there would have been at least one other, one or more other employees that worked under the F&I manager doing F&I?

A.  That's false, it's not a given.

Q.  So could the F&I manager have been the sole person at the dealership that did F&I?

A.  Uh-huh, yes.

468

Anthony Deo

Q.  And as a sales manager, would that person be overseeing other salespeople or could that person have been the only salesperson?

A.  No, usually a sales manager oversees the sales floor.

Q.  Now, when Northshore was formed in 2000 --

A.  '17.

Q.  In 2017, November 2017 -- withdrawn.  Between the time, if you know, between the time of no longer having a license for UAE and Northshore having a license to operate, did the dealership operate or did a dealership operate at that location?

A.  I don't remember specifics on, time but we never moved out or closed down.  There was never any finality, you know, it just flowed.

Q.  Was there a gap between the time when you no longer had a license under UEA and did not yet have a license under Northshore?

A.  That's what I said, I don't remember if there was or if there was some sort of an overlap.

Q.  If there was a gap between those two

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

469

Anthony Deo

periods of time, would a dealership have been allowed to operate at that location?

A. That's a tough question to answer.

Q. Why is it a tough question to answer?

A. Because there's different circumstances, different variables.

Q. So is there a circumstance that you're aware of where a dealership that had not yet received its license could operate to sell automobiles, used automobiles, in a retail location?

A. So you're asking if a location could sell. Yes, absolutely a location could sell.

Q. Even though it doesn't yet have a license to sell?

A. As I said, there could have been variables where there's a sister location or a different location that's involved in that location. I mean DMV makes a lot of exceptions all the time.

Q. Are you aware of any condition that existed for the 180 Michael Drive location in 2017 and 2018 which would have permitted a used car dealership to operate without a license at

470

Anthony Deo

that specific location?

A. As I said, I don't know if there was an overlap.

Q. What other sister locations could there have been in 2017, 2018?

A. I know when we met with David, there could have been one of their other used car places.

Q. Do you have a recollection of that actually being so or are you just guessing?

A. I'm just saying if there was a gap that could have been a situation.

Q. But you have no idea if that actually happened?

A. Well, the reason I'm saying it is because that's what happened when we did Superb at the same location in '23.

Q. But I'm asking for facts. Sitting here today, do you have any recollection that in fact in 2017, 2018 there was some sister location that allowed Northshore to operate at 180 Michael Drive before it had received its license?

A. I don't know.

Q. But if there was no provision under

471

Anthony Deo

the DMV regulations to allow it to operate, it would not have operated, you would not allow that to happen, correct?

A. I don't think so.

Q. When you were buying cars for UEA, where did you get most of the cars?

A. It's always been either trade-ins, customers or the auctions, Manheim Odessa.

Q. So you would personally go to the auctions to purchase vehicles?

A. It changed in COVID, everything became remote.

Q. I'm talking about 2016.

A. Yes, prior it was a mix. It was online and in person. It was a combination.

Q. And if trades were to come in, who if anybody, at UEA would determine what the trade was worth?

A. It's usually an F&I thing.

Q. So the F&I person would deal with that, not you?

A. I mean, yeah. It's based on the books, the black book.

Q. I understand but I'm saying it would

472

Anthony Deo

not be dealt with you. It's the F&I person who would deal with that, correct?

A. Yes, unless they couldn't determine. If they couldn't determine, they could ask my opinion.

Q. Now when you opened Northshore -- withdrawn.

When you formed Northshore, had you yet met David Baron?

A. No, I don't think we met David when we opened Northshore.

Q. Do you recall approximately when you first met David Baron?

A. Probably in 2018.

Q. So it wasn't before 2018, though, is that a fair statement?

A. I'm not a hundred percent sure.

Q. Is there anything that would refresh your recollection as to when you first met him?

A. I mean I don't know. If he was here, I would ask him.

Q. So when you -- so from the time you formed Northshore until the time you met David Baron, had anybody submitted an application to

21 (Pages 469 to 472)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

473

Anthony Deo

the DMV for Northshore to operate?

A. You're talking about for a license?

Q. Yes, for a license.

A. I don't think we submitted it, we submitted it with Brian because he would get us the play program because of his other affiliations.

Q. So you didn't submit it until it was submitted with Brian? By Brian, you're referring to Brian Chabrier, right?

A. Brian Chabrier, yes.

Q. Do you recall approximately when that application was submitted?

A. I don't know exactly when.

Q. But when you first formed Northshore, you hadn't anticipated Brian Chabrier submitting a DMV application, correct?

A. No, no.

Q. You didn't even know who he was at that time?

A. Right. I hadn't met him yet.

Q. What was the intention of who was going to apply for the DMV license when you first formed Northshore?

474

Anthony Deo

A. I don't remember what our mindset was at that point.

Q. So you formed a new entity, correct?

A. We did, we did for the purposes of continuing at that location, we had a lease.

Q. But you didn't know who was going to submit an application for the DMV application?

A. I don't recall the thinking at that point.

Q. And you didn't submit something for at least two months, right, for November and December, submit an application for Northshore, right?

A. As I said, I don't know exactly the time frame. I mean if I had specifics like if you had the application, I would see exactly when.

Q. I only have an application -- we asked DMV for records a while back and they only showed us the application by Brian. So we have nothing that the DMV gave us showing any earlier applications. Are you aware of any earlier applications than the one from Brian?

A. For Northshore?

475

Anthony Deo

Q. Yes.

A. No, we only submitted one.

Q. So what was the plan if you waited at least two months, which was in 2018, what was the plan for submitting an application for Northshore?

A. What was the date on that application, if you could tell me?

MR. RUDERMAN: We can go off the record for a second.

THE VIDEOGRAPHER: We're going off the record. The time is 12:44 p.m., and this is the end of media number 9.

(Discussion off the record)

THE VIDEOGRAPHER: We are back on the record. The time is 12:45 p.m., and this is the start of media number 10.

BY MR. RUDERMAN:

Q. Mr. Deo, I had an opportunity when we were off the record to find the application provided to us by the DMV for Brian Chabrier. I can tell you that the date of the request is dated April 2nd, 2018. I can put it on the screen if you would like to see that or if

476

Anthony Deo

you want I can have it printed out?

A. April 2nd, okay.

Q. Does that sound right to you?

A. I mean if that's what you're saying you got from the DMV.

Q. Do you want me to put it on the screen, so you can see it?

A. That's okay.

Q. So between November -- so you said you didn't meet David Baron until at least sometime in 2018?

A. 2018.

Q. So you formed Northshore on November 1st, 2017 so that's two months where you haven't even met David Baron, correct?

A. Yes.

Q. During that period of time, what was the thought process to getting Northshore operating?

A. As I said, I don't recall our mindset at that point. I don't remember exactly what the thinking was at that particular time.

Q. And when UEA stopped operating, did it terminate its existing credit lines, floor

22 (Pages 473 to 476)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

477

Anthony Deo

plan lines?

A. When you stop with the license, the floor plan lines absolutely get terminated.

Q. And if you were to restart with a new entity, do you know whether you'd have to submit new applications for floor plan credit lines?

A. With new entities, absolutely.

Q. Do you know if during this period of November, starting November 1st of 2017, whether any applications were made for Northshore to open up new floor plan credit lines?

A. I don't remember if we did anything, no.

Q. If it was done, do you think it would have been somebody other than you that would have been involved in doing that?

A. As I said, I don't remember.

Q. Do you know if you kept the employees on salary during that period of time until you could get your license?

A. I don't recall if there were still employees there. There may have been. I mean not all of them. I'm sure not everyone stayed.

Q. Did you call, did you inform the

478

Anthony Deo

employees that we're starting a new company and that we're going to continue our operation?

A. I don't remember at that moment.

Q. You're aware that in applying for a floor plan line for any credit, the information you provide in connection with that application needs to be truthful and accurate, correct?

A. Sure.

Q. And are you aware that if you provide false information in applying for a financing that it could be considered a crime?

A. I don't know.

Q. You don't know that. Not as an attorney but as an individual sitting right here, you don't know that submitting false information to apply for financing could be a crime?

A. I mean I'm sure if something is done willfully, it could be perceived as such.

Q. In fact, you did have a criminal conviction for some actions in connection with financing, correct?

A. The particulars of it I don't remember.

Q. How many times were you arrested and

479

Anthony Deo

convicted of a crime? How many times have you been arrested and convicted of a crime?

A. Arrested, I'm not sure but I know that the conviction --

MR. BENJAMIN: Just note my objection for the record, but go ahead.

A. That conviction was that one.

Q. Only one conviction, right?

A. Uh-huh.

Q. You don't remember what it was about?

A. Details, no.

Q. Now you've never provided false information in connection with any application for financing or a loan or anything like that, correct?

A. No.

Q. That's whether it was you personally or in connection with any entity in which you held an interest, correct?

A. I don't think so.

Q. Is it possible you did?

A. I said I don't think so.

Q. Well, so is it possible you did? You said you don't think so. Either you know or you

480

Anthony Deo

don't know or something in between?

A. I'd say no.

Q. Was there any other businesses in 2016, 2017 operating at that 180 Michael Drive other than the UEA?

A. If we had other entities, I'm not sure.

Q. Was the retail automobile dealership the only retail operation operating out of that entity prior to Northshore?

A. Retail, yeah. You could only have one retail at a particular location.

Q. Did you have a wholesale operation operating out of that location?

A. I'm not a hundred percent sure, possibly.

Q. Did you have ever a wholesale operation between 2016 and today where you were involved in any wholesale operations for these car dealerships?

A. Yes.

Q. What are the names of those entities, if you can recall?

A. Oh, wow, that was a while ago, I

23 (Pages 477 to 480)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

481

Anthony Deo

don't remember the actual name.

Q.  So there's one entity that you did recall?

A.  Probably, yes, at least one.  At least one.

Q.  Do you currently have a wholesale operation?

A.  Yes, yes.

Q.  Do you remember that one, yes?

A.  We were involved with a wholesale operation.

Q.  What's the name of that entity?

A.  It's Gold Coast of Sunrise.  We switched the license from retail to wholesale.

Q.  So you had previously been shown an application for Gold Coast Motors of Sunrise for a retail operation, correct?

A.  Yes.

Q.  And you were granted an application for that, correct?

A.  Yes.

Q.  But that's no longer operating as a retail location -- a retail operation anymore?

A.  Well, we switched it to wholesale.

482

Anthony Deo

Q.  So what I'm saying is, it's no longer operating for retail?

A.  It's not a retail, no it's a wholesale license.

Q.  You actually had to do a formal process to switch your application from a retail to a wholesale?

A.  Yeah, yeah, it's a process.

Q.  So it's a different license?

A.  Yes, yes.  It's not a retail, it's a wholesale.

Q.  So right now the Sunrise entity cannot sell cars at retail?

A.  No, no.

Q.  So currently what entities are you involved with that do sell retail, used cars at retail?

A.  The Syosset one.

Q.  That's the only one?

A.  Yes.

Q.  Is that the one -- I remember it's a German spelling name.

A.  Regal Auto Haus.

Q.  That's a d/b/a?

483

Anthony Deo

A.  It's a d/b/a.

Q.  So the Syosset Regal Auto Haus is the only used car retail automobile dealership that you're involved with right now?

A.  Yes.

Q.  And you believe that at some point you had other wholesale operations?

A.  Possibly.

Q.  But you don't remember?

A.  I don't recall right now.

Q.  And to have those wholesale operations, those are also licensed by the DMV?

A.  Yes.

Q.  Do you know if you were the person who applied for those licenses?

A.  The structure I don't know.

Q.  Well, in connection with applying for licenses, do you know whether the person who applies for a license needs to have an ownership interest in the dealership?

A.  I would say so.

Q.  So --

A.  Or an agreement, it depends.

Q.  So do you think it's possible that

484

Anthony Deo

entities that you owned at the 180 Michael Drive may have had licenses held by those who were not owners of the dealership?

A.  They don't always go hand in hand in terms of the license versus ownership structure.

Q.  Do they have to have an interest or you don't even know?

A.  It may or may not.

Q.  You're just not sure?

A.  Yeah, it may or may not.

Q.  When UEA was operating, where did it did its banking?

A.  That's going back, I'm not sure.

Q.  Who handled the books and records, the financial books and records of UEA?

A.  I think we had a CPA.  There might have been a bookkeeper there and my wife and myself.

Q.  Do you remember the name of the CPA?

A.  No.

Q.  Do you know if that UEA, what type of tax return you filed.  Whether it was a partnership tax return or a corporate tax return?

A.  I'm not sure if it was an Inc. or an

24 (Pages 481 to 484)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 169 of 351 PageID #: 13972
SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

### 485

Anthony Deo

LLC. I'm not sure.

Q. As an Inc. are you familiar with small closely-held companies, Subchapter S companies, have you ever heard that term before?

A. Explain that.

Q. I'm asking you if you're familiar with the term Subchapter S?

A. An S Corp.?

Q. An S Corp. exactly.

A. Yes, I've heard of that.

Q. In your understanding an S Corp., what's your understanding about the difference between an S Corp. and a regular corporation?

A. That's a CPA question.

Q. Do you know whether any of the corporations you may have had an interest in were an S corporation or not?

A. As I said, that's a CPA. They determine, you know, which one it is.

Q. Other than Mr. Jones, Tom Jones and his company, what other accounting firms have you ever had any engagement with?

A. I know Josh introduced us to Citrin Cooperman.

### 486

Anthony Deo

Q. You didn't use them as your accountants, though, did you?

A. I didn't know them prior, no.

Q. What other accounting firms did you, your wife, and your companies engage with to perform accounting services other than Mr. Jones' company?

A. I mean my recollection goes as far back as Mr. Jones. I don't remember prior who we used.

Q. But you did use a CPA firm?

A. Of course.

Q. Was the UEA operation profitable?

A. We had our challenges.

Q. Does that mean it was or was not profitable?

A. It wasn't the most profitable business. We had too much of a big operation for the current tools that we had at that moment, the location was just gargantuan in terms of the expenses.

Q. Were you considered an employee of UEA?

A. No.

### 487

Anthony Deo

Q. Did you receive a salary at UEA?

A. I'm not sure how we did it over there, but I was an owner.

Q. Did your wife receive a salary over there?

A. As I said, I'm not sure how we did it at that point. If it was a salary, if it was a commission, if it was a check, if it was, you know, minimum profit, I don't remember.

Q. Did you receive income from the operations of UEA, you and your wife?

A. I'm sure at some point we did, yes.

Q. In 2017 do you recall if you received income?

A. I don't remember.

Q. Do you recall approximately how much income you earned?

A. I don't remember.

Q. Do you know --

A. That's a tough question.

Q. Do you know if you earned combined more than $100,000 a year?

A. I mean the recollection, I don't know.

### 488

Anthony Deo

Q. Do you know if you earned less than $50,000 a year?

A. I don't want to answer you if you don't know specifics. I don't know.

Q. You have no clue as to whether you earned 50 -- well, did you earn a million dollars a year, how's that for a question?

A. Probably not a million.

Q. So it's something between zero and a million which may spark your memory?

A. Somewhere in there.

Q. Somewhere in there. So I think 500,000 is a good number. Do you think you earned $500,000?

A. As I said, I don't know.

Q. Is it possible you earned $500,000 from UEA on an annual basis between you and your wife?

A. I don't know. I don't think so, but I don't know.

Q. When you operate an automobile dealership a used car automobile dealership, what is the optimal turnover for cars?

A. What do you mean?

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

489

Anthony Deo

Q. Well, you buy a car, right, as a used car and put it in the store, right?

A. Yes.

Q. The purpose is to sell that car, right?

A. Absolutely.

Q. If you have a floor plan, you're paying interest for the car that you're holding in inventory, correct?

A. Absolutely.

Q. That's an expense to the company?

A. Absolutely.

Q. So you want to sell that car as soon as possible?

A. You want to sell it the first day you get it.

Q. Exactly, but you don't mostly sell the car the next day, correct?

A. Most likely.

Q. But there is a turnover, which is how frequently cars are turned over, right, that you want to sell those cars, right?

A. Yes.

Q. So what when you go into this

490

Anthony Deo

business you have an expectation as to what your turnover will be. I'll sell this car, will be on my lot for 30 days, 60s days, 90 days whatever it might be. Do you understand what I'm explaining?

A. I understand.

Q. So was there an expectation as to turnover when you run UEA as to what it would be in your operation?

A. I mean, as I said, I don't remember the exact operations of UEA at that point, but going back to your question all of those answers are correct. It all depends on your operation. It depends on the expenses. It could be 30, it could be 60, it could be 90, it could be two weeks or it could be 45 days. It's a very unique answer to that particular operation.

Q. By the way if I use the term "turnover," are you also familiar with the term "turn rate"?

A. When you sell the car.

Q. It's not just when you sell the car. It is the time between when you buy the car and when you sell the car that's your turn rate, are you familiar with that term?

491

Anthony Deo

A. Yes.

Q. So you've been in the business selling used cars for how long now? At least ten years?

A. Yeah, at least ten years.

Q. So in your experience selling used cars is there, generally speaking, in the industry a turn rate which is what you try to achieve?

A. As I said, there's no particular number, it depends on that company's finances. A company might be okay with 90, another company might need, you know, two weeks. It all depends on that particular company. There's no right answer to that question.

Q. So as a dealership you don't have a target as to what your turn rate you'd like it to be?

A. I'm sure there is targets when, you know, you're running an operation.

Q. Well, whether you have a small dealership or a large dealership, it's always a goal to try and achieve the best turn rate as possible?

492

Anthony Deo

A. Of course, as I said you want to sell it the same day you get it.

Q. So whether you're running a large dealership or a small dealership, can you explain to me the difference as to why the turn rate would be different?

A. Expenses.

Q. So you buy cars and you sell cars?

A. Yes.

Q. People come in off the street to buy these cars, correct?

A. Absolutely.

Q. How does your expenses relate to your turn rate, if you can explain that?

A. It's what's allowable. What that company could handle. You know, you're not going to sell a Lamborghini in 90 days, it might take a year. So the turn rate for specific cars and specific dealerships are completely different.

Q. When you said expenses, though, you didn't say depending on the makes and models of the car?

A. Well, that's one major thing that would determine a turn rate for a particular

26 (Pages 489 to 492)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

493

Anthony Deo

company.

Q.   So if you're selling very high-end expensive vehicles, your turn rate would be different than someone selling Chevies, for example?

A.   As I said, it all depends on the actual company.  I only used a Lamborghini because the turn rate on a Lamborghini is not quick.

MR. RUDERMAN:  I's now 1 o'clock. Now is probably a good time to take a break.

MR. BENJAMIN:  Sure sounds good.

THE VIDEOGRAPHER:  We're going off the record.  The time is 1:02 p.m., and this is the end of media number 10.

[Luncheon recess taken at 1:02 p.m.)

494

Anthony Deo

AFTERNOON SESSION

1:45 p.m.

A N T H O N Y  D. D E O,
the Witness herein, was examined and testified as follows:

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:45 p.m., and this is the start of media number 11.

EXAMINATION BY MR. RUDERMAN:  (Cont'd)

Q.   Good afternoon, Mr. Deo, we're back on the record.  You've had an opportunity for a break now.  During that break did you speak to your attorney about your testimony today?

A.   No.

Q.   Could you tell me how you first met or came to know David Baron?

A.   Asad Khan introduced me to David.

Q.   How did you know Asad Khan?

A.   A bank rep, it was Collins I think. Collins.  The last name was Collins.  I think it's Tim or Jim Collins.  He introduced me to Asad, he was a bank rep.

Q.   And why was he introducing you to Asad Khan?

495

Anthony Deo

A.   Because at that location we didn't have the right tools and I learned that a franchise affiliation is the type of tool that we would need to be truly successful at that location, and the magnitude over there at Northshore.

Q.   When you say tool, what are you referring to?

A.   Floor plan and financial banks, financing banks.

Q.   So what is it that you did have that you thought you needed that was different, if you could explain that?

A.   I'm sorry, say that again.

Q.   What is it that you had that were the bad tools or not sufficient tools and what were the tools you thought you needed?

A.   Well, we didn't have sufficient banks for customers like financing banks.  And the floor plans were definitely super high interest, and just not for that magnitude of a business. You need better floor plans.

Q.   So this Mr. Collins who introduced you to Asad Khan because he thought Mr. Khan

496

Anthony Deo

might be able to assist you to obtain these better floor plans and financing opportunities?

A.   Absolutely, because of David.

Q.   Well, Mr. Collins didn't introduce you to David, though, he introduced you to Asad Khan?

A.   Yes.

Q.   Who was Asad Khan that he thought, if you know, why he would be able to help you?

A.   He was very close to David and, you know, David owned a lot of franchises.

Q.   Why did Mr. Collins not introduce you to David?

A.   Say that again?

Q.   Why did Mr. Collins not introduce you to David?

A.   He did, oh, Collins, Khan, what are you saying Collins or Khan.

Q.   Mr. Collins introduced you to Asad Khan?

A.   Yes.

Q.   Asad Khan introduced you to David Baron?

A.   Yes.

27 (Pages 493 to 496)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

497

Anthony Deo

Q.  So I'm trying to understand what Mr. Collins, if you know, what he thought Asad Khan knew or had which would be beneficial to you in the operation of your business?

A.  Well, his relationship with David.

Q.  What was Asad Khan's relationship to David?

A.  I know they had businesses together.

Q.  Did Asad Khan was he working for David someplace?

A.  You would have to ask him their structures, but I know they had, you know, a bunch of dealerships together.

Q.  So when you met Mr. Khan what, if anything, did you ask him about how he might be able to help you?

A.  Well, it was Mr. Collins that told me that Asad Khan would have the franchise availability for the franchise affiliation.  So that's why he introduced me to him.

Q.  When you say a franchise affiliation, what are you referring to?

A.  Like a Nissan, perhaps, or a franchise dealership.

498

Anthony Deo

Q.  You mean a new car as a franchise dealership?

A.  Yes.

Q.  As opposed to a stand-alone dealership?

A.  Yes, that's what a franchise affiliation is.

Q.  What was he suggesting that you do with regard to a franchise affiliation?

A.  It's when you have a franchise affiliation you get better availability to floor plans and banks.  So you have to have a connection with a franchise.

Q.  And that's what Mr. Collins told you?

A.  Well, yeah, I mean it's known.

Q.  And what did you understand having a franchise affiliation would be as a stand-alone used car dealership?

A.  I don't understand the question.

Q.  You're indicating that having a franchise affiliation would be beneficial to you. I'm trying to understand what you envisioned what a franchise affiliation meant.  There is the franchise which is a new car dealership with a

499

Anthony Deo

relationship with new car manufacturers.  There's a stand-alone used car dealership.  How did you envision that your stand-alone new used car dealership would have some sort of affiliation, or what type of affiliation were you anticipating to be the new franchise automobile dealership?

A.  It's what's called a cross guarantee. So the franchise would pretty much guarantee the dealings of that independent.

Q.  Well, in your experience don't those usually happen when the franchise dealership also owns both entities and are willing to cross guarantee, because what's the benefit to the franchise dealership to guarantee the obligations of the stand-alone used car dealership?

A.  Money.

Q.  Okay.

A.  A lot of franchises do it for money.

Q.  So you're anticipating that the franchise dealership would provide some sort of floor plan financing to your entity in exchange for a payment of money?

A.  Yes.

Q.  You met with Mr. Asad Khan about

500

Anthony Deo

that?

A.  Yes.

Q.  What, if anything, did he tell you?

A.  That they could do that.

Q.  When you say "they," who is he referring to?

A.  Them, David.

Q.  What is his relationship with David that you understood that he could do that?

A.  As I said, I was told that they had businesses together.

Q.  So he introduced you to David?

A.  Yes.

Q.  When he introduced you to David, was he at that first meeting?

A.  I don't think -- I think David came by himself on the first meeting.

Q.  Was it your understanding that Asad Khan had some interest in a franchise car dealership?

A.  Oh, I wouldn't know if he had interest at that point.

Q.  And how did the meeting get set up between you and David Baron, that first meeting?

28  (Pages 497 to 500)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

501

Anthony Deo

A.   I don't recall, but I know David showed up at the Northshore location.

Q.   So there was some communication where David was going to come and meet you at Northshore?

A.   I would assume so.

Q.   Did you call David or was this arranged through Mr. Khan, as far as you know?

A.   I don't know.  I don't recall.

Q.   Did David come by himself or with anybody else?

A.   I don't remember if he came with anyone else, but I know I sat with David at Northshore.

Q.   And was Northshore operating at the time?

A.   We had opened a corporation, we opened the bank accounts in January.  I mean we didn't have the license yet, I know that.  I guess it was an open corporation.

Q.   Did you still have inventory left over from the UEA company?

A.   That's the thing, I'm not sure if there was an overlap.  I think there was an

502

Anthony Deo

overlap, but I'm not sure.

Q.   Those used cars, if they were purchased with floor plan then the floor plan lender wants you to sell those cars, right, and paid them back at some point in time?

A.   Absolutely.

Q.   So you if you no longer had a license, did the floor plan lender require you to pay back those loans immediately or some other arrangement?

A.   Well, as I said, I don't know when we actually gave up the license for UEA.

MR. RUDERMAN:  Can we go off the record for a second while I find the document?

THE VIDEOGRAPHER:  We're going off the record.  The time is 1:55 p.m., and this is the end of media number 11.

(Discussion off the record)

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:59 p.m., and this is the start of media number 12.

MR. KATAEV:  During the break, I've handed Mr. Deo a paper document which

503

Anthony Deo

we've had marked as Exhibit 40.

(Deo Exhibit 40, Document containing a reference to revocation of facility 7116600, was so marked for identification, as of this date.)

MR. KATAEV:  Mr. Deo, has had an opportunity to review the document.

Q.   I'm going to represent to you that this has been provided to us from the DMV in response to a Freedom of Information law request, and it was in connection with your application for Gold Coast Motors of Sunrise.

In this application you could see the first page of it where it references a revocation of the associate facility being 7116600.  And the last handwritten note is "Okay to continue processing disclosed revocation from 2000" -- it's hard to read -- "no money owed."

If you go to the third page of the document, do you see there's a half a page there which references the Universal Exotic facility name.  Do you see that?

A.   Okay.

Q.   Do you see the facility number is

504

Anthony Deo

that facility number I just referenced.  Now you previously testified that UEA was the license dealership, not Universal Exotic.

Having seen this document, are you sure that the licensed dealership entity at -- I'm sorry, this was at Deer Park, I apologize.  So this was the one that was in Deer Park Universal Exotic.  Was that one also revoked or suspended?

A.   I mean it's saying suspension in 2018.

Q.   It has different dates.  If you go to the last page there's a notice of investigation from 12/14 and violations, but the page before that lists "Suspension of October 30th, 2017."  Do you see that?  It's next-to-the-last page on the left-hand side.  Do you see October 30th, 2017?

A.   Yes, and there's a suspension in 2018.

Q.   In 2018 as well.  So it would appear based on this document that Universal Exotic Autos had a suspension?

A.   Yes, I mean according to this, yes.

29 (Pages 501 to 504)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo   ---   February 12, 2026

505

Anthony Deo

Q. Do you have a recollection of that?

A. If this is coming from the DMV then I guess, I definitely don't have a license anymore.

Q. And the UAE also you testified that one had a suspension or revocation or the license was turned in?

A. Yes.

Q. It doesn't seem to be noted over here that I see?

A. This is for Universal Exotic.

Q. Exactly, but they both no longer had licenses when Northshore, around the time until Northshore started?

A. This is saying that it was suspended well into 2018.

Q. I'm going to turn your attention to the next-to-the-last page. It's not the last page, it's the one before that.

A. Okay.

Q. On the left-hand side, the first suspension going from the bottom up, it says "Suspension date October 30th, 2017," and then it says "Go date, 5/1/18." Do you see that?

A. Go date.

506

Anthony Deo

Q. First the question. Do you see what I'm referring to?

A. Yes, I see where it says "Go date."

Q. Do you know what "Go date" means?

A. No.

Q. And the suspension states 10/30/17, do you see that?

A. Yes.

Q. Do you know when the license for this dealership could no longer be used?

A. Well, I mean if you just go by those things, I mean there's another suspension on the 18th. So, obviously, the license was still in effect.

Q. I didn't say it was revoked.

A. Up until 2018, no.

Q. Well, there are several suspension notices here, we don't know whether that meant that you can continue to operate during that period of time by looking at this document.

A. In between suspensions I'm sure, yeah.

Q. I'm saying as you sit here today, do you recall whether after receiving the first

507

Anthony Deo

suspension if Universal Exotic was allowed to continue to operate?

A. I don't remember in particular, but if I just look at this document, it seems that from '17 to '18 it would be in effect.

Q. What would be in effect?

A. The license.

Q. Well, it says there's a suspension on 10/30/17, does it not?

A. Yes. And then there's another suspension on '18. There's no reason to have another suspension if that one suspension --

Q. Well a suspension is not forever, right, it's for a period of time. It's not revocation?

A. Yes.

Q. So if you have one suspension that's for two, three, four, five months, whatever it may be, there could be another suspension when that earlier suspension ended, right?

A. Yes, it reinstated and then it suspended again. I mean we're just looking at stuff, I'm trying to interpret it.

Q. Do you have any independent

508

Anthony Deo

recollection about this?

A. Dates, no, I'm sorry.

Q. So now you testified about meeting David Baron at Northshore?

A. Yes.

Q. And he came to the location. Are you able to kind of narrow the time frame at all?

A. It had to be 2018 I guess.

Q. Right, January, February, March?

A. Well, it's before we applied for the license.

Q. And at that first meeting, what was discussed?

A. A cross guarantee.

Q. Did you talk to him and ask him for something? Did he ask you what you're there for? How did the conversation come about?

A. I would assume that Asad told him why I wanted to meet him. He came over to see our operation and discuss the details in terms of what I needed in terms of floor plan, which banks and how much money they would get.

Q. So what did you tell them?

A. I needed a better -- bigger better

30 (Pages 505 to 508)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

509

Anthony Deo

floor plan, lower interest.  We definitely needed banks, franchise affiliated banks.  And the number I think we agreed to was 15,000 a month going to him.

Q.   What was he going to -- what was he going to obtain for you for that $15,000 a month?

A.   The better floor plan and the banks.

Q.   How much floor plan?

A.   I mean I don't know if we decided at that point what it is.  I don't recall what we started off with.  I mean it could have been a couple of million, I'm not sure.

Q.   And I understand with regard to the floor plan financing how would an affiliation with the -- withdrawn.

What would you show the floor plan financing company to show this affiliation, what was this affiliation?

A.   That's a David thing.

Q.   You didn't sign --

A.   I didn't play a role in that, I mean they had a huge floor plan with Allied.

Q.   But there had to be some sort of affiliation, as you understood it, between your

510

Anthony Deo

entity and David's entity, correct?

A.   Well, that's where the cross guarantee comes into play.  I mean they had a big floor -- I mean they're billing us, so they had a huge floor plan with Allied.  I don't know what exceptions to the rule or any conversation that they would have, I wouldn't know that.

Q.   You called it a cross guarantee.  Describe that for me, what does that mean?

A.   I did before.  I said the franchise would pretty much be responsible for the independent.

Q.   That's not a cross guarantee that's a guarantee.  A cross guarantee would assume it goes both ways.

A.   That's what it's called in the industry.

Q.   So the franchise was going to guarantee the repayment of the monies that you Northshore borrowed?

A.   No, no, it's just that they're saying that they're affiliated with this independent, and that they pretty much guaranteed that their business is like part of the whole thing.

511

Anthony Deo

Q.   So the guarantee -- well, under this scenario who is the borrower?

A.   I don't know if I understand that question.

Q.   Well, there's a floor plan, right, they're a lender, right?

A.   Uh-huh.

Q.   A lender lends money, right, do you understand that?

A.   Yes.

Q.   And every lender has a borrower, correct?

A.   Yes.

Q.   They borrow the money, right?

A.   It's a line of credit.

Q.   It's a line of credit to a borrower.  Somebody is borrowing the money?

A.   A company, a corporation.

Q.   An entity is borrowing the money, correct?

A.   Yes.

Q.   In this scenario who is the borrower?

A.   I guess the group.

Q.   What group?

512

Anthony Deo

A.   It was, I know it was Island Auto Group or Baron Auto Group, one of the groups.  But it was the group, the group' floor plan that they carved out for us.

Q.   But so was Northshore considered a borrower under this scenario?

A.   As I said, I don't know the terms of the, whatever, you know, agreement they had.

Q.   Well, did the lender provide financing to Northshore?

A.   Yeah, we had a floor plan.

Q.   And is it your understanding that there was no written agreement of any kind from Northshore to the lender in connection with the borrowing that Northshore did?

A.   As I said, I don't know the terms of what happened between David and Ally.

Q.   I'm not asking what happened with David and Ally.  This is your business, Northshore, correct?

A.   Yes.

Q.   You own the business?

A.   Yes.

Q.   Your cars, right, I mean the

31 (Pages 509 to 512)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

513

Anthony Deo

company's cars?

A. Yes.

Q. You're in charge of the cars?

A. What do you mean in charge?

Q. You're in charge of getting the cars, inventorying the cars, getting the cars, keeping the cars, selling the cars?

A. Yes.

Q. There's an outside company, a lender, correct?

A. Yes.

Q. A lender is not involved in your business, right, but they're lending money on vehicles, is that correct?

A. It's a floor plan, yes.

Q. But they're lending money to purchase vehicles, correct?

A. Yes.

Q. They have a security interest in those vehicles, correct?

A. Yes, it's a UCC.

Q. It's more than a UCC. It's contractual rights. In order to have a security agreement, you have to have some writing which

514

Anthony Deo

gives the lender --

A. It was a UCC.

Q. So let me ask you a question. You had other lenders in connection with your operation of your other dealerships, correct?

A. Are you talking about other floor plans?

Q. Other floor plans, right?

A. Yes, small ones.

Q. There's a writing of some kind where the lender agreed to the terms and also you per you as -- not you, but the company that you operated to allow the lender to put a security lien on the cars, right?

A. Yes.

Q. So did Northshore give the lenders, in this scenario with David Baron, the right to put a security lean on the vehicles owned by Northshore?

A. Again, you're asking me about a scenario where David Baron and Ally had a conversation. I'm telling you I wasn't privy to that, so I don't know.

Q. So you don't know how Ally as the

515

Anthony Deo

lender was able to obtain a security lien against the vehicles that were owned by Northshore in which David had no interest?

A. As I said, David was huge. So I don't know what exception they made for him.

Q. So Ally as far as you know Ally is in the business of because they have a good relationship they'll forget all of the banking regulations they have to comply with, and just lend money to entities in which they have no interest?

A. You're asking me to tell you about the banking regulations that Ally has to comply with. I wouldn't know what that is.

Q. So you never asked any questions about that? You never asked any questions about what the relationship was between Ally and Northshore?

A. I was told it was because of the relationship that we were getting the floor plan.

Q. What about the other assets of Northshore, were any of those secured by the agreement by Ally?

A. It was a UCC. I don't know. What do

516

Anthony Deo

you mean?

Q. Was the UCC on just the cars or was it on all of the assets of Northshore?

A. It was supposed to be the cars, yes.

Q. Was it limited only to the cars?

A. I mean the UCC is always limited to only the cars.

Q. What makes you say it's always limited to the cars?

A. That's how floor plans work.

Q. Did you see the UCC?

A. I mean, was it different?

Q. I'm asking you if you saw the UCC?

A. No. I mean I just know that with floor plans, it's limited to the cars.

Q. But you never asked to see whatever agreement that David may have given to Ally in order to provide the financing to Northshore?

A. There was no need for me to ask. He said he was going to provide a floor plan, and he did.

Q. And what happened if Northshore did not repay Ally, what was your understanding in connection with that?

32 (Pages 513 to 516)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

517

Anthony Deo

A.  I don't know what you mean by that question.

Q.  Well, now you're saying that as far as you know Ally has no agreement with Northshore, David has no agreement with Northshore.

Northshore is borrowing money from Ally.  If Northshore does not repay the money to Ally, what was your understanding as to what Northshore's obligations were to Ally?

A.  The first part of your statement I think is false.

Q.  Which one is that?

A.  What you just said.

Q.  What statement was that?

A.  The one you just said.

Q.  Repeat it back to me?

A.  You have to ask the stenographer.

Q.  No.  You just told me it's false.  So you know what it is, don't play games?

A.  I'm not playing games.

Q.  You just told me the first statement is false.  What is my first statement that's false?  You don't remember?

518

Anthony Deo

A.  Repeat it.

Q.  You tell me what it is that was false.

A.  You don't want to repeat it?

Q.  I'm asking you what statement was false.  If you don't remember what it is, then clearly, it's not false because I don't remember what you said?

A.  Repeat it.

Q.  I'm not repeating anything.  You don't remember what it is, so you can't repeat it?

A.  I'm just asking you to repeat it.

MS. WALKER:  Can we have the question repeated, because I no longer know what the question is?

MR. RUDERMAN:  I'm not playing games with Mr. Deo.  He said something I said was false and when I said what was false, he doesn't remember.

THE WITNESS:  Can you calm down?

MS. WALKER:  I understand.  Can we have the last question read back, the question that we're arguing about?

519

Anthony Deo

A.  It isn't that serious.

Q.  It is very serious, Mr. Deo.  We're here for a very serious business.

A.  Calm down.  Your attitude is a little bit much for a deposition, Mr. Ruderman.

Q.  Mr. Deo, please don't tell me how my attitude is.

MR. RUDERMAN:  Can you please read back the question, and we're going to proceed?

(Record read)

Q.  So what statement did I make that was not correct?

A.  The ones you did at the start about David and Ally.

MR. RUDERMAN:  Could you go back up to the statement I said about David and Ally?

(Record read)

Q.  So David has no agreement with Northshore as concerns Ally, correct?

A.  I wouldn't know.

Q.  Well, if Ally is not paid back, what are their rights and remedies against Northshore?

520

Anthony Deo

A.  I would need to see the contract, if there was some agreement or anything.

Q.  Exactly.  There was none, was there?

A.  I don't know.

Q.  So you don't even know if there was an agreement?

A.  How would I know?

Q.  Wouldn't you be the one signing it on behalf of Northshore?

A.  David provided the floor plan.

Q.  No, no, no.  The agreement between Northshore and Ally for Ally to lend money and to get repaid they needed some rights against Northshore to collect, do they not?

A.  That's an assumption, I wouldn't know.

Q.  So you wouldn't know if a lender wants to collect -- how many loans have you been involved with where the lender did not have the borrower sign a document?

A.  You're talking about a particular situation with Ally.

Q.  I'm talking about any situation.  I'm asking you how many loans have you been involved

33 (Pages 517 to 520)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

521

Anthony Deo

with personally or through entities where the lender did not require the borrower to sign something?

A. None.

Q. Right. So why would Ally suddenly agree to lend millions of dollars to Northshore, and have no agreement between Northshore and Ally?

A. Ask David Baron.

Q. So as far as you're concerned, there was no agreement at all?

A. Again, you're making an assumption.

Q. There was no agreement between Northshore and Ally, you would know that, right?

A. Again, you're making an assumption.

Q. Well, then was there an agreement or wasn't there?

A. I didn't know what David and Ally came to an agreement on.

Q. How can he come to an agreement, he didn't own Northshore?

A. Are you asking David?

Q. No, I'm asking you. How can Ally have any rights against Northshore, if David did

522

Anthony Deo

not own any part of Northshore?

A. Again, you're asking me what David did.

Q. No, I'm not. I'm asking you what Ally rights would have against Northshore.

A. So you're asking me about Ally. Each of those questions, I'm not capable to answer.

Q. I'm talking about Ally's relationship with Northshore. Please don't play games with me. Talking in circles like this, Mr. Deo, is not garnering you any favors.

A. I'm answering the question.

Q. No, you're not. You're playing games.

A. Okay.

Q. Northshore borrowed money from Ally, correct?

A. No, incorrect, false.

Q. No? Okay, then explain to me what the relationship was with Ally?

A. They provided a floor plan.

Q. Isn't that borrowing money?

A. They provided a floor plan.

Q. What does providing a floor plan

523

Anthony Deo

mean?

A. It's a line of credit to purchase cars.

Q. Is a line of credit not lending and borrowing?

A. I don't know how to clarify it for you.

Q. Did Ally give money to Northshore to enable it to purchase used car inventory?

A. They provided a floor plan, yes.

Q. Listen to my question, don't change my words, otherwise we'll be here all day asking the same question over and over again.

A. Okay.

Q. Did Ally provide money to Northshore to enable it to purchase used car inventory?

A. Ally provided a floor plan.

Q. Did Ally provide money to Northshore to purchase used car vehicles?

A. They provided a floor plan.

MR. RUDERMAN: Okay, so we're going off the record now. I'm not asking him anymore questions now. I am not playing this game -- on the record -- I'm not

524

Anthony Deo

playing this game. You will be before the judge, and the judge is going to listen to your answers and decide whether you are answering the questions being asked. I'm done. I'm done.

MS. WALKER: If he's asking you a question, you can answer yes or no.

THE WITNESS: I'm answering his questions.

MR. RUDERMAN: No, you're not, you're picking your own decisions as to how to answer my questions. This is a game, we're not playing this game.

MS. WALKER: Are we off the record?

THE WITNESS: No, we're not. And I feel threatened with the way he's acting.

MR. RUDERMAN: I'm not touching you, I'm not threatening you. My threat is that we're going to go before the judge.

THE WITNESS: Your threat is your attitude really.

MR. RUDERMAN: Let's not get into attitudes, please.

Can we call the judge, please?

34 (Pages 521 to 524)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

---

525

Anthony Deo

THE VIDEOGRAPHER:  Do you want to go off the record?

MR. RUDERMAN:  For the moment.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:20 p.m., and this is the end of media number 12.

(Discussion off the record)

THE VIDEOGRAPHER:  We're back on the record.  The time is 2:21 p.m., and this is the start of media number 13.

MS. SARAH DEO:  I'm the wrong one to do that with.

MS. WALKER:  Can I talk to the clients out in the hall?

MR. RUDERMAN:  Please, why don't we go off and let her speak to the client outside?

THE VIDEOGRAPHER:  We're going off the record.  The time is 2:21 p.m.

This is the end of media number 13.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:28 p.m., and this is the start of media number 14.

---

526

Anthony Deo

MR. RUDERMAN:  Mr. Deo, we've taken a short break for a few minutes when you've had an opportunity to meet with your attorney outside and your wife.  And after having had an opportunity to talk with your attorney, I understand that we're going to try to go back on the record to continue with the deposition and hopefully proceed smoothly.  So I had an open question, if you can read back the question please.

(Record read)

A.  I don't know.

Q.  So then where did Northshore get the money from to purchase used cars?

A.  We used the floor plan.

Q.  And what was the floor plan?

A.  I don't understand your question.

Q.  Was the floor plan not money provided by Ally given to Northshore to enable it to purchase vehicles?

A.  It was a line of credit.

MR. RUDERMAN:  Okay, we're going back again.  We're going to contact the judge

---

527

Anthony Deo

because I can't get an answer.

MS. WALKER:  Do we not know what a line of credit is?

MR. RUDERMAN:  I don't have to take his answer.  I asked a specific question.  He either answers the question I ask, and not rephrase my question to the way he wants to answer it.

THE WITNESS:  I'm answering it to the best of my ability.

MR. RUDERMAN:  Okay.  Let's see whether the judge agrees with his answers to my question.  Okay.

MR. KATAEV:  I'm calling now, and there's like no phone.

THE VIDEOGRAPHER:  We're going off the record.  The time is 2:31 p.m., and this is the end of media number 14.

(Discussion off the record)

(A phone call was made to the judge's chambers)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:58 p.m., and this is the start of media number 15.

---

528

Anthony Deo

MR. RUDERMAN:  Mr. Deo, as we were off the record we're going to be moving off from that question right now and mark it to be dealt with at another time.

MR. KATAEV:  Just for the record, the resolution of the discovery dispute was as follows by the court:

We're going to continue the deposition from now until 5 p.m., and mark for a ruling any questions that the parties have a dispute over and we're appearing in court in Judge Wick's courtroom 1020 tomorrow at 9 a.m. to continue the deposition of Mr. Deo for any questions that are marked for a ruling, thank you.

BY MR. RUDERMAN:

Q.  Were you the owner and operator of Northshore Motors in 2018?

A.  Yes.

Q.  Were you the sole owner of Northshore for that year?

A.  I think my wife and I.

Q.  Do you know what percentage ownership

---

35  (Pages 525 to 528)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

529

Anthony Deo

she had and what percentage ownership you had?

A. No, Mr. Ruderman.

Q. Do you have any documents that might help refresh your recollection with regard to that?

A. I didn't bring any documents with me.

Q. I didn't ask if you brought any. I said do you have any documents that might refresh your recollection?

A. I can't think of any right now.

Q. Well, I believe on a tax return for Northshore, which is an LLC, it would have a K-1. Are you familiar with what a K-1 is?

A. Yes.

Q. And the K-1 would express the percentage ownerships of each owner of the entity, is that your understanding?

A. Yes.

Q. So do you have the 2018 tax return for Northshore?

A. I don't have it with me, but that's the disagreement that we had with David.

Q. So do I understand by your testimony that the 2018 tax return for Northshore was

530

Anthony Deo

prepared and filed?

A. '18, I think so. It had to have been prepared, we were doing business.

Q. Do you know whether that 2018 tax return would show that you and your wife were owners of Northshore at that time?

A. That's the problem, that's where we didn't receive our K-1's from David's CPA RWC, and we had a big problem with that.

Q. So in Northshore 2018 who was working at Northshore at that time?

A. At what time?

Q. 2018.

A. There was numerous people I would assume.

Q. What were the roles, the various roles that were engaged in in 2018 in Northshore?

A. Salespeople, porters, finance. I know there was a controller, I can't remember which one at this particular time. My wife and myself.

Q. Was there an F&I person?

A. Yes, finance.

Q. Was there a mechanic?

531

Anthony Deo

A. In 2018, a possibility. I'm not a hundred percent sure. I know we had one afterwards.

Q. And was there a sales manager?

A. Give me a second to try and remember. There could have been. I just, I can't remember the person right this second, if there was one.

Q. Do you know approximately how many salespeople were there at the time?

A. I'm not sure.

Q. Well, at its highest number do you know how many salespeople were there?

A. Oh, yeah, we had quite a few, probably ten salespeople.

Q. And what about F&I people, do you recall how many you had in 2018?

A. In 2018, probably just one. But at our height, I think we had three.

Q. And are the F&I people the people involved in the aftermarket sales, warrantees, et cetera?

A. Yes.

Q. And was your wife working there between 2018 and 2022?

532

Anthony Deo

A. My wife and I were owners and we were at the store.

Q. And what roles and responsibilities did your wife have during that period of time?

A. At what time?

Q. What roles and responsibilities did she have at the Northshore during that period of time?

A. What was the period again?

Q. 2018 to 2022.

A. Oh, I mean every responsibility that an owner would have. I mean you name it. A lot of it was leads, marketing, advertising. That's the primary stuff.

Q. Was she involved in purchasing vehicles?

A. No.

Q. Was she involved in selling --

A. I'm sorry, she did have opinions on what we should focus on in terms of what type of cars.

Q. And was she involved in the sales of vehicles?

A. I mean not in the actual sales, but

36 (Pages 529 to 532)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

533

Anthony Deo

if needed -- if the managers needed an opinion, or any help with anything, I'm sure we jumped in.

Q. Was she involved in any of the financial aspects of the business?

A. What does that mean?

Q. Was she involved in the use of the floor plan financing?

A. I don't understand what exactly you're asking.

Q. Let me back up then. In order to purchase a vehicle using the floor plan financing, there is some process that the dealership had with Ally, correct?

A. Yeah, there's a process.

Q. Can you explain that process?

A. Usually, the controller would floor -- like let's say we bought cars at the auction, the controller would be given the list of cars that we bought. And the controller would then go into Ally and put those cars on the floor plan line of credit.

Q. And was there anybody other than the controller that engaged in that activity?

A. Oh, yeah, if it's that period of time

534

Anthony Deo

absolutely, Wendy, Wendy Kwun, CFO.

Q. Were you ever involved in putting in those and dealing with Ally in the way you just described?

A. No.

Q. Was there anybody else in the dealership who had the authority to do it?

A. Just the controllers and the CFO.

Q. The controller and CFO would obtain that information from whom in order to put it in the system?

A. What information?

Q. You said they would put information about cars that are being purchased, where would they get that information from?

A. As I said, if we bought cars in the auction we would give them a list of cars, and they would make sure these cars were floor planned.

Q. Who would give them a list, who is "we" when you say we?

A. I, I would tell them or I mean they had log-in to our system and they would see which ones were in. They would click it in order to

535

Anthony Deo

have it floored.

Q. Where would the information come from that would enable them to see what cars had been purchased?

A. The dashboard for the particular auction that we would use for the purchase.

Q. So would you be the person, though, who decided which vehicles to purchase?

A. I purchased the vehicles, yes.

Q. Was there anybody else besides you who was involved in deciding which vehicles to purchase?

A. As I said, you know, I would have opinions of the managers in terms of what cars the clients would be seeking. And they would give me opinions on what cars were selling, what's hot, what's not, you know, those opinions.

Q. And then in order to purchase vehicles at the auction, there's a log-on of some kind?

A. Yes. Manheim, Manheim and Odessa.

Q. And you would enter the bids for these cars online?

A. It's an active online auction.

536

Anthony Deo

Q. And if you are the successful bidder, there would be information put into that dashboard which the controller or CFO would be able to see?

A. Absolutely.

Q. And they would then as far as you know use that information in order to communicate with Ally to floor plan these vehicles?

A. Yes.

Q. And did anybody have the authority to -- excuse me, as the owner of Northshore, did you have the authority to hire and fire people at the dealership?

A. Yeah.

Q. Did your wife have the authority to hire and fire people at the dealership?

A. I'm sure.

Q. Did anybody else have the authority to hire and fire people at the dealership?

A. I mean if a manager had an issue with an employee, they would make a suggestion.

Q. But ultimately it would be your decision or your wife's decision whether to hire or fire somebody?

37 (Pages 533 to 536)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

537

Anthony Deo

A. And when we involved with Wendy, she would play a role in helping us with that.

Q. What role would she have as to whether or not to hire or fire somebody?

A. She would have an opinion.

Q. Why would you seek out Wendy's opinion as to whether or not to hire or fire somebody?

A. She was the CFO.

Q. When you say she was the CFO who hired her as the CFO?

A. I would assume Josh or David, I'm not sure.

Q. When did she become the CFO?

A. I wouldn't know that.

Q. Why would you not know that?

A. When Wendy was hired by IAG?

Q. No, when was she hired as the CFO of Northshore?

A. I didn't say CFO of Northshore. She was the CFO of the IAG group.

Q. So what was her role at Northshore?

A. Well, I mean she was the CFO of the group. So she had an office at Northshore so she

538

Anthony Deo

would come there and perform her roles.

Q. What do you mean the group, what group is that?

A. IAG.

Q. Was Northshore a part of the IAG group?

A. I would assume.

Q. Why would you assume that?

A. Because we all worked together.

Q. How did you work together, other than providing the floor plan financing how did you work together?

A. I mean that's a question open for interpretation. I mean we worked together. I'm sorry, I don't know exactly what you're asking.

Q. I'm just trying to get an understanding because you testified that you and David had a meeting and at the meeting there was a very straightforward arrangement that his group was going to provide financing through Ally Bank to Northshore. Other than that, Northshore was an independent entity and was simply paying $15,000 a month for the use of those funds. I'm trying to understand why Wendy was involved in

539

Anthony Deo

the operation or the communication with Northshore at all?

A. Wendy got involved after David passed away.

Q. So before David passed away, she was not involved?

A. No, I never had any dealings with Wendy.

Q. Beforehand, what was David's involvement?

A. With Northshore in particular?

Q. Yes, with Northshore.

A. Nothing. I mean he didn't really have any dealings.

Q. Then why did you say he did?

A. What do you mean?

Q. You just said that before Wendy, David had involvement. And when I asked you what he did, you said that he didn't. I'm trying to understand did he or did he not have involvement in Northshore prior to his death?

A. I didn't say that.

Q. Explain to me what role, if any, did David have in connection with the operation of

540

Anthony Deo

Northshore prior to his death?

A. In the operations, nothing really. I mean David never really did anything with operating in any store.

Q. So why would David have to do with the store, other than his company providing the floor plan financing, did he have anything to do with the store at all?

A. I don't understand the question, I'm sorry.

Q. Did David have anything to do with the operation of Northshore prior to his death?

A. No, he didn't have anything to do with the operation.

Q. So when I said when Wendy -- you said Wendy came in because David had died. Why was Wendy suddenly operating, if David never operated with the store?

A. I didn't say Wendy operated, I said she had roles there.

Q. Why did she suddenly have a role after David died since David didn't have a role?

A. That was Josh's decision.

Q. Why did you have to listen to Josh?

38  (Pages 537 to 540)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo --- February 12, 2026

541

Anthony Deo

A. Why did we have to listen to Josh?
Q. Yes.
A. Because he took over after David died.
Q. He took over what?
A. All of David's dealerships.
Q. But the dealerships, what did the dealerships have to do with you? You had a relationship only with Ally. That's the only thing that -- Northshore had a floor plan financing with Ally as a result of David's relationship with Ally. Why did Josh have to get involved with that?
A. Because after David died, the relationship had to be with Josh.
Q. What relationship had to be with Josh?
A. Well, I mean what happened after David died is the $15,000 a month was then increased to $60,000 a month to Josh. So he made changes and we abided by it.
Q. So before Josh got involved in that, Wendy was not at all involved in Northshore, correct?

542

Anthony Deo

A. I never had Wendy over there, no. We didn't deal with Wendy.
Q. Then once Josh got involved, what was Wendy's involvement? What was the extent of it, what did you do?
A. As I said, you know, like all the stuff that a controller would do with regards to the floor plans and financials and bank accounts and positive pay-in, everything of that sort.
Q. You were okay with that?
A. Why not? Yes.
Q. Weren't you concerned that now there's somebody taking over some financial aspects of Northshore that you had owned and operated yourself all these years?
A. Well, we always had an open book relationship when it came to the financials, we had nothing to hide with one another.
Q. And prior to Wendy getting involved to the extent that she was, where were the books and records and financial records maintained by Northshore?
A. I would assume at Northshore.
Q. Did you have a computer?

543

Anthony Deo

A. Yes.
Q. Did you have a server?
A. We didn't have a server.
Q. So how did you maintain the financial books and records of Northshore in 2018 before Wendy got involved?
A. I would say the controllers they would input -- there were a few DMS systems over the years. Dealer track being one of them. That's where all the financial information would be kept.
Q. And whose dealer track system was that?
A. It's an online system.
Q. Did Northshore have its own account with dealer track?
A. Oh, yeah, every individual dealership had an account.
Q. And all the financial information for every transaction money going in/money going out, sales, everything, parts, mechanics, everything is maintained in the one dealer track system, correct?
A. It should be, yes.

544

Anthony Deo

Q. So at the push of the button you can find out all the financial information you needed with regard to what financially happened with the dealership for that year?
A. I'm sure there was some way for the controllers to get it. I mean I don't know how.
Q. But it was your controller -- in 2018, who was the controller for Northshore?
A. That was always something that we agreed on that the controller would be provided by David.
Q. And who paid the controller?
A. Northshore did.
Q. And who was the controller in 2018?
A. In particular, I don't remember. I remember a few controllers but I don't know who was there upon inception.
Q. But the controller was employed by Northshore, and you were the controller's boss, right?
A. No, David provided the controller.
Q. I understand David provided the controller, but the controller was provided by you or by Northshore?

39 (Pages 541 to 544)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

545

Anthony Deo

A. They were on salary for Northshore. So it's a technical question you're asking. And usually David's controllers would be involved in different stores that he was involved in.

Q. So the controller was not full-time?

A. It's a technical question. I mean they were there full-time but they also did the books for different dealerships.

Q. But at any time you could ask the controller to for the dealer track records, correct?

A. I mean you could request it, sure.

Q. So if you could request the dealer track records, which had all the financial information -- withdrawn.

Was there a checkbook at Northshore?

A. Yes.

Q. Were checks done by a check register electronically or were there handwritten checks or both?

A. When we started it was handwritten checks and then I think we moved on to the system where the controllers could print them.

Q. You had access to all that

546

Anthony Deo

information as well, correct?

A. To print checks.

Q. Not to print checks I'm saying to the checks that would be printed on the check register, what monies went out?

A. It would be in the system.

Q. So in 2018 you were able to file the tax return, you had access to the financial information, correct?

A. Well, that's where David said that we should use RWC. So we provided RWC. The controllers provided RWC with all the financial information for the year. I mean the first year it was done was 2019 -- actually, in 2019 for the prior year. So we used RWC.

Q. Did you get a copy of the tax return?

A. That's the problem. We didn't.

Q. Did you sign the tax return?

A. That's the problem, we didn't, because we were asking for our K-1's.

Q. How do you know the tax returns were filed?

A. It was past that time.

Q. Did you have your own accountants at

547

Anthony Deo

the time, to do your own personal tax returns?

A. Yes, I did.

Q. What was his or her name or the company's name back in 2018?

A. As I said, I don't remember the name.

Q. Did you file personal tax returns in 2018?

A. I'm sure we did.

Q. Did you file in 2019?

A. I'm sure we did.

Q. Did you file in 2020?

A. Tom Jones did, yes.

Q. What about in 2017?

A. I don't know, I'm sure we did. I don't know.

Q. Are you aware that the deposition of employees of Libertas was taken the other day?

A. Yes.

Q. I think you attended that deposition, correct?

A. I was in and out.

Q. And are you aware during that deposition the employees of Libertas stated that they went into a live system that they use, and

548

Anthony Deo

they were told by this live system that you had not filed eight years' worth of personal tax returns. Do you recall hearing that?

A. I think they said it was a glitch in there, too.

Q. Who said there was a glitch?

A. The person that you're referring to.

Q. He said that there was a glitch that it was not all these tax returns that had not been filed?

A. Yes.

Q. So you had filed all the tax returns?

A. I'm sure I did.

MR. RUDERMAN: I'm going to call for the production of tax returns since 2016, and we'll follow that up in writing.

Q. Did you pay any income tax in 2018?

A. I don't recall the particulars of the taxes.

Q. Well, the Northshore Motors is an LLC, correct?

A. Yes.

Q. Two members you and your wife, right?

A. Yes.

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

549

Anthony Deo

Q.  So you had to file a 1065 partnership tax return, correct?

A.  I don't know which one.

Q.  Well, that's the one you filed in 2021 that you've presented numerous times, right, that was a 1065 partnership return, right?

A.  Okay.

Q.  You know what a K-1 is, right?

A.  Yes.

Q.  A K-1 is then something that attaches to your personal tax return?

A.  Yes.

Q.  You take the income from your K-1, and put it on to your personal tax return?

A.  That's CPA stuff.  We get K-1's, we give it to him and he does what he has to do.

Q.  So do you recall ever paying any income tax on any income earned from Northshore for 2018?

A.  That's what I'm telling you, we never got our K-1's.

Q.  Did you ever get a notification from the IRA or any taxing authority stating that income to you has been reported but you've never

550

Anthony Deo

paid any income tax on it?

A.  For 2018?

Q.  For any year for that matter.  Or since 2017 have you ever gotten a notice from the IRS from any taxing authority stating that they're aware that income is attributable to you but you never reported income tax on it?

A.  I don't know.

Q.  Did you get a W-2 from Northshore?

A.  Ever?

Q.  Yes.

A.  Yes.

Q.  What years did you get a W-2?

A.  I don't remember, but recently I'm sure we did.

Q.  And what about for 2019, did you report any income for 2019 for the operations of Northshore?

A.  That would be 2020.  I'm not sure.

Q.  Do you know if you ever paid any income tax in 2019 from any income earned from Northshore in 2018?

A.  I don't know right now.

Q.  Did you get a W-2 from Northshore for

551

Anthony Deo

2019?

A.  Possibly, but I know K-1's were a problem, and they didn't get rectified.

Q.  Did you ever give authority to David Baron or any person at IAG to file tax returns for Northshore in which you were not listed as an owner?

A.  No.

Q.  Did you ever give authority for David Baron or anybody else to provide any documentation to anyone indicating that you or your wife were not a hundred percent owners of the dealership?

A.  No.

Q.  When was the first time you became aware that either David Baron or people at Island Auto had indicated that they believe they held ownership in Northshore?

A.  The misrepresentation was in 2019.  That's when everything started getting heated.

Q.  Can you describe the incident, what happened there?

A.  We kept asking for our K-1's and we kept getting kicked down the road:  It's coming,

552

Anthony Deo

it's coming.

Q.  Who was telling you that?

A.  Various people between David, between Brian, between Asad, it's coming.

Q.  Did you ever think about taking the financial information that you had and having your own accountant prepare the tax returns instead?

A.  How could that be done?  As I said, we gave them to RWC.

Q.  Well, these aren't documents that disappear, right, you can print them out again, correct, from the same source that you gave it to them?

A.  Oh, yeah.

Q.  So you could have printed that information out, hire another accountant to say can you prepare a tax return for me with my K-1's for 2018.  Did you ever think about doing that?

A.  As I said, that is something where we had the discussion with them and they were supposed to rectify it, so I didn't think I had to do it on my own without having a conversation with them.

41  (Pages 549 to 552)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 186 of 351 PageID #: 13989
SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo   ---   February 12, 2026

553

Anthony Deo

Q. Well, you had the conversation, right, did they rectify it?

A. That's why I kept getting kicked down the road and then we had the two incidents that blew up the entire dealership.

Q. What incidents are those?

A. We had one where Asad Khan stormed the dealership and tried to kick us out, that was the first incident of a retaliation of us not getting our K-1's. The second incident was what we called the David Baron incident. That was the day my father died.

Q. Take your time. Do you need a moment.

A. You can do this.

Q. Do you want to go off the record for a little bit.

A. No, it's fine. The day my father died they stormed the dealership, they broke in with locksmiths, they took all the cars, they took all the records, they took the camera system. That's when everything reached its heights.

Q. What date was that?

554

Anthony Deo

A. June 17th.

Q. What year?

A. June 17th, 2020.

MR. RUDERMAN: Can we go off the record for a minute?

THE VIDEOGRAPHER: We're going off the record. The time is 3:26 p.m., and this is the end of media number 15.

(Recess taken)

THE VIDEOGRAPHER: We're back on the record. The time is 3:36 p.m., and this is the start of media number 16.

BY MR. RUDERMAN:

Q. Mr. Deo, in 2018 and 2019 for Northshore who received all of the income generated from those two dealerships?

A. I don't understand the question, I'm sorry.

Q. Did the dealerships generate any income?

A. I'm sure they did, yes.

Q. When I say income, let me talk profit. Was there any profit in the dealership for those two years?

555

Anthony Deo

A. Yes, we had some really good years.

Q. So they generated money, right, the income and the profit is money, correct?

A. Yes.

Q. Did any of that money go to you or your wife?

A. Yes.

Q. And did any of that money other than the $15,000 a month go to Northshore -- excuse me, go to David Baron or any of the Island Auto people?

A. No.

Q. So you later found out -- excuse me, it is my understanding that you later found out that the tax returns for 2018 and 2019 that were filed were filed not listing you or your wife as the owners of the dealership, is that your understanding?

A. Yes, we never received our K-1's.

Q. Is it your understanding, though, that David Baron and others at Island Auto filed the tax returns listing them as the owners of the dealership?

A. I know that now.

556

Anthony Deo

Q. But they never received any of the income from the dealership, you only received income from the dealership, correct?

A. They received their 15,000.

Q. But if the dealerships made a lot of money and then they listed themselves as the owners of the dealerships, then they would have to pay the income tax on that dealership, correct?

A. That's an accounting question.

Q. As a non-accountant you don't know that if you receive income on your tax return you have to pay taxes on it?

A. Well they got the 15,000, I guess they would pay taxes on the money they received.

Q. But the dealership records showed the owners received a lot of money. You just testified about that, right?

A. I'm sorry?

Q. You testified that the dealerships did very well in those two years, correct?

A. Yes.

Q. Which means the dealerships' financial records would show that the dealerships

The Little Reporting Company
646.650.5055 | www.littlereporting.com

Case 2:23-cv-06188-JMW  Document 518-10  Filed 06/01/26  Page 187 of 351 PageID #: 13990

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

557

Anthony Deo

made a lot of money, correct?

A. Yes, we had a lot of working capital that we left into the company.

Q. But whether you left the money in the dealership or not you'd have to pay income tax on it if it's profit, correct?

A. I would say, yes, but as I said I don't know the particulars in terms of accounting.

Q. And whoever is listed as the owner of that dealership, would have had to pay the income tax on the income that was earned, correct?

A. And that's where our concern was. We weren't able to properly do it because we didn't get our K-1's.

Q. But if Island Auto and David Baron listed themselves as the owners of the dealership, they would have had to have paid the income not on the 15,000 but on all the income that Northshore earned for those two years, correct?

MS. WALKER: I'm going to object because he's not a tax expert. He can answer, I just want to put that on the

558

Anthony Deo

record.

MR. RUDERMAN: Go right ahead.

Q. Go ahead.

A. That's what I was going to say, I don't understand the particulars of the accounting when it comes to that.

MR. RUDERMAN: I would appreciate if you kept it to objection to form. The appropriate way to respond is not to give the witness --

MS. WALKER: I'm sorry.

Q. So as you sit here today as a non-CPA professional, you can't tell me that it's your understanding that Island Auto and David Baron listed themselves as the owners of the dealership, they would have had to have reported all the income that the dealership earned and paid taxes on it. You can't tell me that sitting here today as a non-professional?

A. As I said, I don't know.

Q. And you never paid the taxes on it, correct?

A. We never got our K-1's.

Q. So what benefit was there to

559

Anthony Deo

Northshore for them to list themselves as the owners of the dealership?

MS. WALKER: Objection.

A. You would have to ask them.

Q. I mean it is your claim that they improperly listed themselves as owners of the dealership, correct?

A. Yes.

Q. One would presume that they did that because it benefitted them somehow, right?

A. You would have to ask them, Mr. Ruderman.

Q. You won't make that presumption?

A. I cannot.

Q. You can't imagine a reason why they would do that?

MS. WALKER: Objection.

A. Again, I cannot.

Q. I'm going to provide you with -- we talked about this earlier, this is the actual document?

THE VIDEOGRAPHER: We're going off the record. The time is 3:41 p.m., and this is the end of media number 16.

560

Anthony Deo

(Discussion off the record)

THE VIDEOGRAPHER: We're back on the record. The time is 3:45 p.m., and this is the start of media number 17.

BY MR. RUDERMAN:

Q. Mr. Deo, you've been provided with a hard copy of a document that we're going to have marked as 41, Exhibit 41.

(Deo Exhibit 41, Application of Northshore Motor Leasing LLC for a DMV application to operate the retail dealership, was so marked for identification, as of this date.)

Q. Have you had a chance to review that document?

A. Yes, sir.

Q. I'm going to represent to you that this was a document I referred to earlier this is the application of Northshore Motor Leasing LLC for a DMV application to operate the retail dealership. Do you recall ever seeing this document before?

A. Yes.

Q. As a matter of fact this was a

43 (Pages 557 to 560)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

561

Anthony Deo

document you wanted to be submitted in order for Northshore to operate, correct?

A. Well, this is what, you know, we all agreed on, it had to be sent in so that we could get the play program. That was very important for our operation over there.

Q. And on the first page of the document below the company's name --

A. I'm sorry, which one is the first page again? Is this it?

Q. No, it would actually say "Application Coding Sheet" on it and the dealership's name.

A. This?

Q. Yes. It's both sides. Below the dealership's name and address is the name of Brian Chabrier, do you see that?

A. Yes.

Q. To the left of it it lists him as the corporate owner, do you see that?

A. Yes.

Q. Was he the owner at the time?

A. That's how we sent in the application.

562

Anthony Deo

Q. I'm going to draw your attention to, if you would go to the last page of the document I think they're numbered on the bottom it says page 6 of 6 on the very bottom on the right-hand side?

A. 6 of 6?

Q. Yes.

A. Yes.

Q. Do you see there's some redactions there. The DMV redacted some information. There's kind of a squiggle signature, do you see that?

A. That's Brian's signature.

Q. So to the right of that, do you see what the title says?

A. "Owner."

Q. So in this document submitted to the Department of Motor Vehicles, it states that he is the owner, correct?

A. That's what we submitted.

Q. And the statement right above that, above his signature it says "False statements on this application are punishable by law and may result in denial, suspension or revocation of

563

Anthony Deo

your business certificates. I certify I am the owner, partner, officer or managing member of the facility named in this application. I am not a franchisor as defined in the Vehicle and Traffic Law 4628, and all information provided in this application is true. I am, I will continue to be in compliance with all state and local laws and regulations."

Did I read that correctly?

A. Yes.

Q. Were you aware that that's what the certification said on this application for the DMV?

A. I didn't read that, no.

Q. Did you understand that when you're submitting an application to the Department of Motor Vehicles you needed the information to be truthful and accurate?

A. I don't think we put together a false application.

Q. Well, it says that Brian Chabrier is the owner, right?

A. It also says a hundred percent, so is that true?

564

Anthony Deo

Q. I'm not here to answer your questions.

A. I'm sorry?

Q. I'm asking you if that's what it says?

A. As I said, it says that he's a hundred percent.

Q. But it says that he's the owner, correct?

A. He was the hundred percent owner.

Q. You knew that this document was being filed with the Department of Motor Vehicles?

A. As I said, we were told this is how we get our play program.

Q. So is it your intention to provide a false document to the Department of Motor Vehicles?

MS. WALKER: Objection.

A. It wasn't my intent.

Q. If you knew it had to be accurate and Mr. Chabrier was not, in fact, an owner of the Northshore and you knew that, weren't you involved in submitting of an application which had false information?

44 (Pages 561 to 564)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

565

Anthony Deo

MS. WALKER: Objection.

Q. You can answer the question.

A. As I said, this is what David Baron, everybody, was involved in.

Q. And you too?

A. Yes, yes.

Q. So you were involved in a decision to deceive the Department of Motor Vehicles --

MS. WALKER: Objection.

MR. RUDERMAN: Let me finish my question, and then you can object.

Q. -- to deceive the Department of Motor Vehicles by listing David Chabrier as the owner when he was, in fact, not the owner?

MS. WALKER: Objection.

A. That's a false statement.

Q. Was he, in fact, the owner?

A. No.

Q. Does it say that he's the owner?

A. It says he's the hundred percent owner, yes.

Q. Was that true?

A. No.

Q. You knew it was not true when he

566

Anthony Deo

submitted it, correct?

A. Everybody did.

Q. And you?

A. Yes.

Q. Including you.

MR. RUDERMAN: Could we go off the record, please?

THE VIDEOGRAPHER: We're going off the record. The time is 3:49 p.m., and this is the end of media 17.

(Discussion off the record)

THE VIDEOGRAPHER: We are back on the record. The time is 3:51 p.m., and this is the start of media number 18.

MR. RUDERMAN: Mr. Deo, we're back on the record. I provided you with a hard copy of a document that we're going to mark as Exhibit 42.

(Deo Exhibit 42, Agreement for Northshore Motor Leasing, was so marked for identification, as of this date.)

Q. Have you had a chance to review the document?

A. I briefly reviewed it.

567

Anthony Deo

Q. Are you familiar with what this document is?

A. No, no. Could you tell me, please.

Q. This is a document that was provided to us in response to a subpoena by Westlake Financial Services. Are you familiar with Westlake Financial Services?

A. Yes.

Q. What is to your knowledge Westlake Financial Services?

A. Westlake Financial Services is the bank.

Q. Is a bank or the bank?

A. It was a bank that provided financing to customers.

Q. It provides financing to customers. It doesn't provide financing to dealerships for floor plan financing?

A. That's Westlake Flooring Services.

Q. So this is different?

A. Yes.

Q. In this agreement on page 2, it says "This agreement is for" fill in the blank. And it says "Northshore Motor Leasing," do you see

568

Anthony Deo

that?

A. Yes.

Q. It's listed as the dealer?

A. Yes.

Q. And so based upon the agreement, this is some type of an agreement between Westlake Financial Services LLC and Northshore Motor Leasing LLC, based on the first paragraph?

A. Yes.

Q. Do you agree with that?

I'll ask you to turn your attention to the last page of the document. Do you see that last page now?

A. Yes.

Q. There is two signatures there. On the left is a signature over the name "Mark Vazquez," do you know who Mr. Vazquez was in connection with Northshore?

A. He's from Westlake.

Q. Have you ever met or communicated with Mr. Vazquez?

A. Oh, no.

Q. So Mr. Vazquez you never dealt with. Do you know if Westlake ever provided financing

45 (Pages 565 to 568)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 190 of 351 PageID #: 13993

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

### 569

Anthony Deo

services to any customers of Northshore?

A. I wouldn't know that, I mean that's a very particular question.

Q. Well, do you know if Westlake was one of the companies that Northshore did business with to enable a customer to purchase a vehicle?

A. It was one of the banks, yes.

Q. So on this document dated Monday, December 16th, 2019 it says "Northshore Motor Leasing" below that is a signature and below that is Brian Chabrier's name. Do you see that?

A. Yes.

Q. Looking at it, it looks like the same signature that's on the DMV application?

A. I would say so.

Q. And below that Brian's name is listed as owner, do you see that?

A. Yes, I've never seen this document before. I'm assuming it's part of that agreement I had with them to provide banks. So again, this was part of them providing banks. So they did what they had to do.

Q. So you believe that they falsely listed Brian Chabrier as an owner so that

### 570

Anthony Deo

Northshore could provide opportunities for purchasers of vehicles?

A. I didn't say that.

Q. Well, is this document -- is Brian Chabrier being listed as owner accurate or not accurate?

A. It's not accurate.

Q. So this document agreement here presents to Westlake false information as far as you're concerned?

A. I would say yes, if this is how the agreement had to be said I would say yes. Do you have other bank applications like this that I can review?

Q. If I have them, I'll present them to you.

At Northshore was anybody other than you or your wife involved in setting all the wages and commissions for people at the dealership?

A. I guess for the entire existence I guess you would say that would be correct.

Q. And did you oversee the training of all the employees?

### 571

Anthony Deo

A. Oversee?

Q. Yes.

A. Not really.

Q. Would you say you managed in a large sense all the operations of the business?

A. I oversee it. You would say.

Q. What about manage, would that be I fair term or you don't believe that's an appropriate term?

A. It depends on your definition.

Q. What would be your definition? Let's work with yours not mine. If I said manage, what in your mind what does that mean?

A. It would be like in the role of a manager.

Q. Well, did you direct the activities of the people who worked there?

A. I mean when I said I'd oversee it, I mean the entire dealership.

Q. Was there a hierarchy of employees? In other words, like who they report to and supervisors and such?

A. Yes, that's why we had managers. We had a few managers in there.

### 572

Anthony Deo

Q. And was it --

A. I'm sorry.

Q. Go ahead.

A. So they wouldn't just come straight to me. They would go to their sales manager, the F&I manager, they would go to the controller. Or if Wendy was there -- I forgot, there were a couple of girls in the back that would deal directly with Wendy.

Q. So there was a management style where certain lower level employees would deal with their immediate supervisors and back and forth before coming to you with issues, so they can try to resolve them without bothering you?

A. Yes, I would say so.

Q. Anything that couldn't be resolved, would then be brought to you?

A. If it had to come to me, it would.

Q. And you were responsible as the owner for generally all the operations of the dealership?

A. I mean there's people that's responsible, and then there's me.

Q. But ultimately as the owner, the buck

46 (Pages 569 to 572)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 191 of 351 PageID #: 13994

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

573

Anthony Deo

stops here, right?  You're ultimately the one who's responsible for whatever your employees do?

A.  Well, it depends on the question you're asking because there are certain parts of the dealership where we agreed that David and his people or Josh and his people would pretty much have the say --

Q.  So before --

A.  -- a lot of it was with finances.

Q.  So before Wendy came along when David was there, he had certain say with regard to finances, is that what you're saying?

A.  Yeah, yeah.  I mean we had an agreement in terms of his controllers.  I guess that's who would be the ones that would be the intermediary.  It's not -- he was never like there there.

Q.  So it would be the controller who would be the one to interface between the Northshore people and David?

A.  I didn't say that.  I'm just saying in terms of like the financial operation stuff.

Q.  You mean like --

A.  That's what the controller does.

574

Anthony Deo

Q.  So you mean like bookkeeping?

A.  Bookkeeping, a lot of banking, floor planning.  As I said like all the financial stuff.

Q.  Did you check the books and records of the dealership on any regular basis to see how it was doing?

A.  I mean I would ask the controller how are we doing.  You know, my F&I would have a good gauge on gross on our per car, you know, how many units, stuff like that.

Q.  What about cash flow, did you keep track on cash flow?

A.  What do you mean exactly by cash flow?

Q.  Well the dealership has to have enough money just to operate to make sure there's enough money coming in to pay its bills as bills become due?

A.  Absolutely.

Q.  So what was your involvement in making sure the dealership was properly implementing its financial operations?

A.  What do you mean by implementing?

575

Anthony Deo

Q.  I mean actually you've got a dealership, right?

A.  Yes.

Q.  You're the owner, right?

A.  Yes.

Q.  You're either going to make money or loose money, right?

A.  Yes.

Q.  You want the dealership to make money, right?

A.  Of course.

Q.  You want to make sure the dealership makes money?

A.  Yes.

Q.  You do that by being involved in many aspects of the dealership?

A.  Yes.

Q.  Hiring and firing?

A.  We did that.

Q.  You had sales quotas that you'd have the sales managers implement?

A.  I mean there wasn't strict quotas, but we knew what type of numbers we needed to make.

576

Anthony Deo

Q.  So you had a plan, here's how much we want to make and here's how we're going to go make that, right?

A.  Pretty much.

Q.  You would keep a regular check on the operations of the business to make sure that these things are being done?

A.  That's what the controllers would report to us, would report to David.  If we're healthy.  We were extremely healthy so it was never an issue.

Q.  Did there ever come a time when you were not healthy other than after the lawsuit in November 2022, let's put that aside.  But before that?

A.  Yeah, after David passed away it became very, very rocky after Josh took over.  His dealings with us and the other dealerships it was different than David.

Q.  Well, did you no longer have the control over the dealership that you had before?

A.  It was the floor plans, he cut them off until I paid him more money.

Q.  How long a period was that?

47 (Pages 573 to 576)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

577

Anthony Deo

A.  David died in May, I think we maybe three, four months, it was very tough until he decided -- until we agreed on a number and we were going to change from Ally to Toyota.  And then he got Ally back to Northshore and Sunrise.  I had Sunrise at that point too.

Q.  So after you and Josh came to an understanding about how much he wanted paid for the use of the credit of the floor plan line, were you able to then maintain the business the way it had done before?

A.  We took some hits.  When you shut down a huge operation like Northshore and 189, to get it back going it takes a lot.

Q.  So it took a few months before you were able to get the operation going again?

A.  Probably, I mean I can't tell you specifically.  But it took a lot of work for us to get it back running.  I know Wendy and I celebrated in early '22 that we're back on solid ground.

Q.  So from early 2022 when you got back on solid ground, the dealership was then doing well again?

578

Anthony Deo

A.  Yes.

Q.  And so it was doing well, making profits, paying its bills, able to do everything that it can to continue to operate and generate income for you, correct?

A.  Yes.

Q.  And until the lawsuit in December of 2022 until that point in time, did the dealership ever have any other downturns or did it kind of maintain that operation until that period of time?

A.  You're talking about early '22 to December '22?

Q.  Well, I'll use the lawsuit was filed in December of 2022.

A.  Okay, so anytime in between that?

Q.  In between those periods of time, yes.

A.  There was one tremendous incident and this is when Josh, and we now learned from his testimony that he said it was Wendy that used David Baron's log-in to go into our Chase accounts.  I mean David had been deceased 18 months at that point, and he removed the money

579

Anthony Deo

that we borrowed from Libertas.  They moved it to Barry Nissan and --

Q.  So then --

A.  Let me finish.

MR. RUDERMAN:  I'm going to move to strike this as all non-responsive, but if you want to answer the question go ahead.

MS. WALKER:  Go ahead and answer.

MR. RUDERMAN:  If you want to answer, I'm going to move and strike as non-responsive, but if you want to finish your statement you can.

MS. WALKER:  You can finish your statement.

A.  He moved money to Barry Nissan, and then he wired the money from Chevy back to us.

MR. RUDERMAN:  I'll move to strike the part that's not responsive.

Q.  Let's use that as a dividing line.  That happened, I believe, in mid-November of 2022?

A.  That was a --

Q.  Prior to that incident the dealership got back on solid footing early 2022, so until

580

Anthony Deo

that incident in mid-November 2022, was the dealership at that point in time through that entire period kind of operating the way it now was, it was back on solid ground and it was doing well, you know, it was doing as well as other places?

A.  Another incident is when Josh decided to reduce the floor plans -- I can't remember exactly when -- and he started with the help of his GM Marcello, they started -- I mean I would say a blood bath selling of all the vehicles, taking numbers that are atrocious compared to the value of the vehicle, and then pinning the losses onto Northshore for those sales that he did.

Q.  Are you referring to the period of time after the Libertas money issue, when they took the vehicles -- they finally took all the final vehicles that were left at the dealership, you're saying something other than that?

A.  No, no, it was prior to that.  I'm thinking if that happened in November and you're talking summer, late summer.

Q.  They took a bunch of vehicles, so.

A.  Yes, he decided to reduce.  He made a

48 (Pages 577 to 580)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

581

Anthony Deo

decision to reduce our floor plans. I think I angered him, actually, because I kept asking if he was going to complete the Baron Nissan deal. I think that upset him, pissed him off. He reduced, he started reducing the floor plans and he took the vehicles and started selling them with Marcello.

Q. And do you have any documentation concerning this?

A. There was some back and forth with Josh, yes.

Q. Are those in e-mails, or texts or something else?

A. Those are in e-mails, because there was a particular car that I specifically remember he sold a Bentley that was worth $90,000 he sold it for 30. And I asked Josh, I'm, like, what are you guys doing? Where are you getting these numbers from, why are you taking these numbers on these cars? And I don't know if I got a response.

Q. How much did he reduce -- what was the credit line before that?

A. I mean combined I think we had around

582

Anthony Deo

$10 million.

Q. What was it afterwards?

A. Specifically, I don't know. I know he reduced it significantly.

Q. But you don't know was there also -- was there a number of car limit as well on the credit line limit?

A. No, there was not -- it's a dollar amount. It wasn't a number of cars.

Q. And in order to obtain that credit line number, do you know who decided the amounts of money that Ally would be willing to provide as a floor plan line?

A. I wouldn't know.

Q. Was Ally involved in that decision, as far as you know?

A. As I said, we were supposed to go to Toyota and Josh said that he got Ally to come back into Northshore.

Q. Do you know if the financial information was provided to Ally on a regular basis in order for them to determine the amount that the floor plan line they'd be willing to lend?

583

Anthony Deo

A. I don't know if that's the basis, but I know Wendy supplied, Wendy and Dan supplied Ally with the monthly financials. I know Ally required them to get monthly financials absolutely.

Q. So as far as you know, Ally obtained and presumably reviewed monthly financials of Northshore motor?

A. I mean I don't want to presume anything with Ally, but I know they received them from Dan and Wendy.

Q. And how did you become aware as to how much the floor plan line was from Ally?

A. What Josh reduced it to?

Q. No, how would you know what the amount was of their floor plan?

A. I mean through discussion, the controller. There's many ways for us to find out how much our line is. I'm sure Wendy and/or Dan said, okay, this is our limit, we have this amount at this store, this amount at that store.

Q. Was there an amount that you had requested?

A. Oh, no, there was no requested

584

Anthony Deo

amount.

Q. You were operating the store, do you know how much you felt -- let me withdraw.

One of the problems is you say you had with UEA was that you didn't have the tools, you needed bigger tools, which you talked about was a bigger floor plan line, right?

A. Yes.

Q. So you had something in mind as to how much you needed in order to properly operate Northshore?

A. Well, when we started I know it was around maybe 1 million or 2 million. When we ended, it had gotten up to over 10 million or around 10 million.

Q. For both or just for Northshore?

A. No, that was both, that was both.

Q. Did you receive anything in writing indicating that that was ever the amount?

A. I'm sure there's something that was sent. I don't know in particular.

Q. And you said that there's some e-mail communications between you and Josh where he's indicating he's going to reduce the amount of the

49 (Pages 581 to 584)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

585

Anthony Deo

floor plan line to Northshore and Sunrise?

A. The communication what I referred to was about that Bentley.

Q. Other than the Bentley is there any communication in which Josh says I'm going to be reducing the floor plan line to Northshore and Sunrise?

A. I'm sure there was something, yeah.

Q. And did he indicate what he was reducing it to?

A. Perhaps, the specifics I'm not sure at this moment.

Q. But you believe that the communication he would be reducing it and what he was reducing it to is in writing?

A. Perhaps.

Q. And if it was in writing, it would be contained in an e-mail exchange that you had with Josh?

A. I mean it could be an e-mail or a text.

MR. RUDERMAN: So I think I've already requested, but again any communications in writing from whatever

586

Anthony Deo

source concerning the reduction in the capital -- the floor plan line as testified by Mr. Deo.

MR. RUDERMAN: Do you want to take a break now? It's 4:15, how about a five-minute break?

MS. WALKER: Sure.

THE VIDEOGRAPHER: We're going off the record. The time is 4:14 p.m., and this is the end of media number 18.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 4:25 p.m., and this is the start of media number 19.

BY MR. RUDERMAN:

Q. Now Mr. Deo, you had testified about the controller working at Northshore. So if a customer would come in and trade in a vehicle where the customer is still owed money on that car, what was the process for taking that car in as a trade?

A. The process would be your F&I would include that in the deal, the trade-in the car that they're purchasing, and I guess if there is

587

Anthony Deo

a negative equity it would go towards the price of the car. If there was value, it would reduce the price of the car.

Q. And if the dealership took in a car that's still owed money for financing and adjusted the trade-in value on the application, would the dealership Northshore then pay off that trade. They'd pay off the debts still owed on that trade-in vehicle?

A. Absolutely.

Q. Is there an industry standard as to how much time the dealership has before it pays off that trade?

A. I mean to make the car sellable, you would try to pay it off as soon as you get funded on the deal that F&I was working on.

Q. So when the customer purchases the new vehicle and gets finance from that the finance money would come to the dealership, correct?

A. Yes.

Q. And it would use that money as part of it to then pay the debt that's still owed on the vehicle that was traded in?

588

Anthony Deo

A. If there's a loan on it, yes, sure.

Q. And was it the ideal to actually use those particular funds as it came in from the finance of the new vehicle to actually use those funds to immediately pay off the debts on the traded-in vehicle?

A. It's accounted for in that deal. So the controller would take care of if there is a payoff on the trade or if there's ancillary products like a warranty or the tired wheel to cut those checks for those particular items from the proceeds. I mean that's the optimal way you do it.

Q. So it's the F&I person, though, who deals with valuating the trade, the trade-in value, et cetera, correct?

A. That's mostly their thing. They could work in conjunction with the sales manager on the floor when he's pencilling the deal.

Q. And when the person comes in with this vehicle and says they still owe money on the vehicle, how would Northshore know who it's owed to and how much is still owed?

A. Well, there's different ways to find

50 (Pages 585 to 588)

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 195 of 351 PageID #: 13998

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

589

Anthony Deo

out. Sometimes the client would tell you which bank they have a loan with. And then the controller would like after the deal is done the controller would call and get an actual payoff, and satisfied that payoff with whichever bank the customer had a loan with.

Q. And who at the dealership in Northshore would be responsible to provide that information to the controller?

A. Well, we have deal jackets. So --

Q. That's a folder, correct?

A. Yes, a folder deal jacket. In the particular deal, the F&I while inputting the trade-in information would normally put which financial institution that trade-in is linked to that shows up. It shows up on contracts, it would show up on the folder. If they called for a payoff, it would be included in that deal jacket.

Q. That's paper, though, correct? The deal jacket is a paper folder --

A. Yes.

Q. -- with paper inside of it?

A. Yes.

590

Anthony Deo

Q. So would somebody hand that folder, the deal jacket to the controller and say here's a new deal, here are the things you need to do?

A. Well, the process would be that the controllers close out the deals but all that paper is always cross-referenced because all the information is inputted on DMS.

Q. In order for the controller to know oh, I've got a trade that I've got to pay off, he would know that or she would know that because they've been given a deal jacket and in the deal jacket it would have all that information?

A. In the deal jacket and the DMS. Because they close out the deal on a DMS system.

Q. How would they know that a deal is supposed to be closed out, how would they get that information?

A. When they get the folder.

Q. So in order for the controller to know that a deal has just happened, they need to get the deal folder. They would have that paperwork, and they would also have information that was input into the DMS system?

A. Yes, so it's a dual thing.

591

Anthony Deo

Q. And the person who puts that information into the DMS system would have been the F&I manager or somebody else?

A. Well, there's different people that put in different information. So in terms of the finance deal, the F&I would put in a lot of that information. Sales managers would put in like basic information. And then you would have the controller who would do all of the, I guess, bookkeeping, background, banking portion of it.

Q. Now, you're familiar with Tom Jones, correct?

A. Yes.

Q. He was a CPA. And his firm was hired to perform accounting services for Northshore, is that a fair statement?

A. Yes, I hired Tom.

Q. So you hired Tom?

A. Yes.

Q. When did you hire him?

A. I'm thinking I met Tom in 2020.

Q. And how did you meet him? How did you come about to know who he was?

A. My F&I at that time, Frank

592

Anthony Deo

Ventiglimia, he introduced me to Tom.

Q. And why were you -- were you looking for a CPA at that time?

A. Yes.

Q. Why were you looking for a CPA at the time?

A. For Northshore.

Q. I'm sorry?

A. For Northshore.

Q. Why suddenly at that time? Suddenly you decided -- withdraw that.

Did you have a CPA before that?

A. We did, but the CPA for Northshore prior to 2020 was David's RWC. But then we had those incidents, and I needed to have my own.

Q. Well, David's accounting firm that he was using, did they come into the dealership at any regular interval to do any work?

A. There was a girl Sarah that used to come in to collect information, that's the person that we gave information to.

Q. So she came to collect information for what, if you know?

A. For the taxes.

51 (Pages 589 to 592)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

593

Anthony Deo

Q. So somebody from the accounting firm that David used would come to Northshore to get information to enable that accounting firm to prepare the taxes for Northshore, is that correct?

A. Yes.

Q. Other than doing that, do you know anything else that the accounting firm did for Northshore?

A. No, it was really David's guys.

Q. So did you hire Tom Jones to come in to prepare the tax returns for Northshore?

A. Well, after the incidents, I definitely needed to have a handle and to fix all the things that needed to be fixed, yes.

Q. But was he hired, specifically, to prepare the tax returns for Northshore?

A. Yes, financials, tax returns, everything.

Q. Was he hired for any other purpose?

A. No.

Q. Did he perform any regular services other than the -- any services during the year for Northshore other than preparing the annual

594

Anthony Deo

tax returns?

A. Well, yeah, he, Wendy and Dan would go over numbers every month.

Q. What was the purpose, excuse me, did you hire Tom Jones to do that?

A. To go over numbers, yes.

Q. Every month?

A. Every month.

Q. But the prior accountants weren't doing that, correct?

A. I don't think they came in every month but I know what's his name, Dan, the controller would communicate with them.

Q. And --

A. I don't know if they sent her down every month, I'm not sure.

Q. What was Tom looking at as far as you know every month with Wendy and Dan?

A. I wouldn't know specifics on what he would look at. I mean numbers, I mean numbers on the whole.

Q. Was he looking at the numbers for your benefit or for David or Island Auto's benefit or for some other reason?

595

Anthony Deo

A. I mean for us and the company.

Q. Did he report to you then?

A. Well, I hired him.

Q. Right you hired him?

A. Yes.

Q. So you were paying him, Northshore was paying him out of its own pocket?

A. Yes.

Q. To do this monthly meeting and reviewing information, right?

A. Yes.

Q. Would he report to you the results of those meetings?

A. I'm sure we went over, you know, what we did, what the numbers looked like, I'm sure, positive/minus.

Q. At any time do you recall him raising any alarms that the dealership was not doing well or there were any issues with its operations?

A. Well, as I said, after David passed we nosedived. So there wasn't much positive stuff at that point.

Q. And did you have any meetings with Mr. Jones yourself to review the financial

596

Anthony Deo

records of Northshore on any regular basis?

A. What do you mean?

Q. Did you have any meetings with him, just you and Mr. Jones, to review the financial records of Northshore on a regular basis?

A. I'm sure we did, monthly. It had to be a monthly thing.

Q. Other than him telling you the results of what was going on, was there any other purpose for those meetings?

A. I mean I don't see anything -- I can't recall the particular meetings but I don't see anything else. I know at one point we tried applying for SBA. But every time we would try we would get -- it would get kicked back because somebody kept logging in into Chase with David's log-in and the SBA saw a conflict. And at this point David was dead. So the SBA saw a conflict. So our applications would always get kicked back because there was somebody logging in as David Baron to either apply or get forgiveness for PPP and EIDL.

Q. Let's narrow this down, because you're mixing PPE and SBA?

52 (Pages 593 to 596)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  --- February 12, 2026

597

Anthony Deo

A. PPP.

Q. PPP and SBA?

A. That's what Tom was helping me with.

Q. Was he helping you with a regular SBA loan or is this PPM money you're talking?

A. It's EIDL.

Q. How did the SBA know who was logging into the account of Northshore or Sunrise?

MS. WALKER: Objection.

A. I didn't say that.

MS. WALKER: You can answer.

A. I didn't say SBA knew. I'm telling you what Tom and I faced.

Q. I'm trying to understand what it is you're describing. You put in an application for a loan?

A. Yes.

Q. For an EIDL loan. And that loan was you say rejected, correct?

A. Well, it always came back with a problem. There was outstanding -- the reason I'm saying that is because the David Baron log-in was the one that was preventing us from moving forward. So somebody kept logging in under David

598

Anthony Deo

Baron in his Chase account. Because, remember, all the PPP and EIDL came through Chase. So somebody kept doing that, and that prevented us from getting our loans done.

Q. And how do you know that?

A. Well, as I said, it kept getting rejected.

Q. I understand. As you like to say that's a presumption, you're presuming because it got kicked back it was because somebody was logging in. So I'm asking you the connection, how do you know that because it was not going through it was because somebody was using David's credentials to log into Chase?

A. Because there was an outstanding log-in there. So when we logged in, it didn't go through.

Q. Who told you that?

A. That's what was happening at the time between Tom, Wendy and myself.

Q. Well --

A. When it kept getting rejected.

Q. Did you speak to Chase about this?

A. Chase, no.

599

Anthony Deo

Q. You're saying that this is an account by the way Northshore's account, correct?

A. Yes, it was Northshore.

Q. Which you had sole control over Northshore's account, correct?

A. I did have control over Northshore.

Q. After David died, I'm sure you contacted Chase and said David is dead cut off his credentials?

A. That's not how it went.

Q. No, so why didn't you do that?

A. Can I --

Q. No, but you can answer my question, though. Why didn't you do that?

A. I told them that David died when I had the opportunity with the fraud department.

Q. David died on May 21th, 2021. When did you advise Chase that he died and you should no longer allow his credentials?

A. I didn't know that David's credentials were still alive. The first time I found that out was when the Libertas money was moved. I went to Chase, I sat with the manager, and we called the fraud department. The fraud

600

Anthony Deo

department informed us that David Baron moved the money. I then told them that that can't be because David Baron is dead. So they asked when did David Baron die. I mean at that point it was 18 months that David had died. So the manager said okay you need to go to the cops, you need a police report. And that's why I went to the cops that day.

Q. When did the EIDL money get applied for?

A. 2021.

Q. Isn't that the first time that you found out that David's credentials were being used?

A. I know now that that's what was preventing it. Because I didn't know that David's account was still being used. He's dead.

Q. So how do you know now that four years ago the reason your loan didn't go through is because someone was using David's credentials?

A. That's the reason why.

Q. How do you know that's the reason why, did somebody at Chase tell you that's the reason why?

53 (Pages 597 to 600)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

601

Anthony Deo

A.   I mean --
Q.   Are you guessing?
A.   Specifically, I can't remember how. But that's what the information is.
Q.   There was a glitch of some kind which wasn't allowing the EIDL loan to go through?
A.   That's a false statement.
Q.   At the time all you knew was it wasn't going through, right?
A.   That's a false statement.
Q.   That it's a glitch?
A.   Yes.  I didn't clarify or distinguish it as being a glitch.
Q.   So what did you understand it to be in 2021 since you didn't know until after 2025?
A.   We had Tom, Wendy and myself we had no clue.
Q.   So did you reach out to Chase, we need this money, Chase, why won't my loan go through?
A.   I didn't reach out to Chase in 2021, no.
Q.   Is there a reason why you did not reach out to Chase in 2021 when you needed that

602

Anthony Deo

money?
A.   I don't know why we didn't go to Chase, and the SBA was, I guess, difficult.
Q.   Did you try to reach out to the SBA?
A.   I'm sure Wendy and Tom tried, yes.
Q.   So did --
A.   But the SBA at that point was overwhelmed with PPP applications and PPP forgiveness.
Q.   Are you finished?
A.   Yes.
Q.   Do you know if Jones ever prepared any adjusting entries to the financial records of the dealership of Northshore of Sunrise?
A.   I wasn't involved in that nitty-gritty of what they were doing.
Q.   So if he made any adjusting entries, it was done without your knowledge?
A.   I didn't have to be made aware of that.  That was between the accounting department, the CFO and Tom Jones.
Q.   Wouldn't you want to know what they're adjusting and why they're adjusting?
A.   As I said, there's no need for me to

603

Anthony Deo

know that.
Q.   What if you disagreed with what their adjustments were?
A.   I mean I didn't play a role in that.
Q.   Well, it was your dealership, wasn't it?
A.   What does that have to do with anything.
Q.   Every penny that goes in or out of that dealership is your money either going in or out of your pocket, right?
A.   You're asking about adjustments, I didn't need to play a role in adjustments.  The penny and the money, the adjustments, I didn't need to know that.
Q.   If an adjustment said you earned more money or you earned less money than you actually earned, you'd want to know that, right?
A.   Now you're clarifying an adjustment. An adjustment can mean anything.  I don't know what you're referring to.  And as I said, that is too heavy in accounting for me to play a role in. That's why I hired people to do that.
Q.   So you just said to Tom Jones, make

604

Anthony Deo

whatever adjustments you want, you have full discretion and I don't even want to know what they are?
MS. WALKER:  Objection.
A.   No, we had three people.  As I said, we had Dan Sullivan.  It was Wendy Kwun, the CFO of the entire group.  And there was Tom Jones. So if they thought that there were adjustments to be made if they worked together on a financial statement, why would I disagree with that. That's three very capable people.
Q.   So you didn't really care what, you weren't interested in knowing what those adjustments were?  You just figured they know what they're doing and I will leave them to their job?
A.   Not that I didn't care.  It was that was their job.  They were the professionals. They provided me at the end of it with what their results were.
Q.   Did they ask you questions about what they were doing, so they would know whether they should or shouldn't be making certain adjustments?

54 (Pages 601 to 604)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

605

Anthony Deo

A.  Again, I'm saying this is what they did.  They didn't need to involve me in that.  I don't think there is an owner out there that makes adjustments.  When you hire three people, again, this is their specialty.  This is what they do to do it.

Q.  So hands off, they know what they're doing and I stand back?

A.  Well, you trust that they know what they're doing, yes.

MR. RUDERMAN:  We're marking these 43 and 44, and we'll provide Mr. Deo with them.

(Deo Exhibit 43, Document Bates stamped IAG00081, was so marked for identification, as of this date.)

(Deo Exhibit 44, Document Bates stamped IAG00096, was so marked for identification, as of this date.)

Q.  I'll ask you to take a look at them, please.  It's very short, one page each.

A.  I've never seen this.  Why haven't you given us these documents when we called for these two years ago?  I've never seen these

606

Anthony Deo

before.

Q.  Mr. Deo, do you see there's a series of letters on the bottom IAG00081?  Do you see that?

A.  Yes.

Q.  The other one is 00096.

A.  Yes.

Q.  So these are documents that I personally Bates stamped and delivered to your attorney a year-and-a-half ago, so don't ask me why you haven't seen them.

A.  And who was this?

Q.  I gave it to Mr. Thomasson?

A.  This was to Harry?

Q.  Yes.  So don't ask me why you haven't seen them.

So now these are letters from Ally Bank, both dated May 2nd, 2022, providing information as to what the floor plan credit line would be for each one of the dealerships.  Do you see that?

A.  When did you get this to Harry,  I'm sorry?

MR. RUDERMAN:  Can we go off the

607

Anthony Deo

record for a second?

THE VIDEOGRAPHER:  We're going off the record.  The time is 4:50 p.m., and this is the end of media number 19.

(Discussion off the record)

THE VIDEOGRAPHER:  We're back on the record.  The time is 4:51 p.m., and this is the start of media number 20.

BY MR. RUDERMAN:

Q.  I'm looking right now at the letter from Ally Bank concerning Sunrise which is Bates stamped on the bottom with the number 81.

A.  81, okay.

Q.  So this is what was provided by my client indicating that Ally Bank had approved a credit line to Sunrise in May of 2022 for $2,325,000.  Do you see that?

A.  Yes.

Q.  Do you recall that being the floor plan credit line for Sunrise at or around that time?

A.  We were buying cars prior to that. That's why the date doesn't make sense to me.

Q.  I believe this is an annual one, but

608

Anthony Deo

in either case forget about what happened before that.  I'm just asking you if in or around May of 2022, you were aware that the credit line floor plan credit line from Ally to Sunrise was in the amount of $2,325,000?

A.  I don't recall.

Q.  Do you know how this number 2,325,000 is generally determined in the industry by a floor plan like this?

A.  I don't know.

Q.  Do you see where it says "Number of vehicles, 75"?

A.  Yes.

Q.  And you previously testified that there are no number of vehicle limitations in connection with floor plans?

A.  Not to my knowledge.

Q.  So this does not comport with your understanding as to what the floor plan credit line limitations were?

A.  Yeah, it doesn't make sense why there would be a limitation on the number of vehicles.

Q.  There's another box there called "Additional Approval."  It says "Release period

55 (Pages 605 to 608)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

609

Anthony Deo

seven days." Do you see that? It's there in the box right below the numbers.

A. "Release period seven days," yes.

Q. Do you know what that means?

A. No.

Q. When the floor plan lender -- the floor plan financing company provides financing. After a vehicle is sold, that loan needs to be repaid to the floor plan company, correct?

A. There were a couple of scenarios when I think one was seven and one was two or three days. Ally had certain rules that the controller would know more on specifics like that.

Q. So but there was a requirement that the floor plan finance company had that once a vehicle was sold you had a limited number of days in which to pay off that loan?

A. Absolutely, they all do.

Q. And the pay off of that loan is sacrosanct in the industry, is it not?

A. What's that?

Q. That the most important thing to do is to pay off your lender or to pay off the floor plan financing when you sell a car?

610

Anthony Deo

A. That's very important.

Q. That's a non-negotiable car, correct?

A. You have to.

Q. Like you pay your rent because if you don't pay your rent, you're out of business. If you don't pay your floor plan company, you're out of business, right?

A. That's a bit much.

Q. But if you don't pay your floor plan, you're not going to have a floor plan, is that correct?

A. I'm sure if you stop abiding by their rules, they're going to stop providing you with a line of credit.

Q. Did there ever come a time when Northshore did not, as far as you know, abide by the time frames and pay off the financing of its vehicles in accordance with the Ally obligations?

A. I mean monthly we would have audits, and we were fine.

Q. And when you say audits, so somebody would actually come to the dealership, correct?

A. Yes, an Ally representative.

Q. And they would touch the cars, right?

611

Anthony Deo

It's called they would touch the cars and make sure that --

A. I mean yeah, I mean all the VIN numbers they check it, they cross-reference it.

Q. And they make sure that any vehicles that are no longer there, they want to make sure that this was paid off?

A. I mean if it's not physically there, where it was, if it was at a repair shop, if it was sent to auction. There's various reasons why a car wouldn't be there.

Q. But, ultimately, as you understand it, Northshore under your control always paid off the floor plan lender in connection with the vehicles that were sold?

A. Of course, we had to.

Q. And you did it within the time frames required by the floor plan lender, correct?

A. I mean the controllers took care of it, absolutely.

Q. And if the floor plan controller, if the controller did not take care of it, would you know?

A. If they didn't, then we would fail

612

Anthony Deo

the audit.

Q. I mean there's a gap between the date that the payment needs to be made and the audit, right, the audit could take place on the last day of the month and the money had to be paid on the first day of the month. You could be as much as 30 days, right, where that wouldn't happen?

A. I wouldn't know the specifics of that. As I said, the controller, that one of their main responsibilities was to keep this in line. So whenever a deal was settled up, take care of the trade-in, take care of the floor plan, take care of the warranty, you know, any ancillary products and then the rest is profit.

Q. So again, if the controller is not doing that, is not making the payoff to Ally, specifically, when a vehicle is sold, do you become aware of that?

A. Well, because the floor plans was provided by -- we're talking after David, before David?

Q. Let's say after David.

A. After David, all right.

So Wendy would oversee to make sure

56 (Pages 609 to 612)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo   ---   February 12, 2026

613

Anthony Deo

that Dan was doing his job properly.

Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to pay off the floor plan lender in a timely fashion?

A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was.

Q. So you testified that happened sometime after David died but by January of 2022 things were back on even ground?

A. Well, yeah, in the start of '22 we were doing good. And then, I guess, summer, that's when I told you Josh decided to reduce everything. So that's when everything started.

Q. So if the floor plan were to be reduced, did you ever do an analysis of what monies you claim were deficient as a result of Josh cutting down the amount of the floor plan?

A. Well, the deficiency came when they started selling cars I mean below wholesale,

614

Anthony Deo

below reasonable numbers. That's when the deficiency started really hitting and, you know, the amounts just got crazy.

Q. So how many cars were sold under that scenario you just described?

A. I don't know the specific number, but I know there was quite a few.

Q. Is that more than ten?

A. I know there was a few, I mean definitely more than ten.

Q. Was it more than 20?

A. Yes.

Q. Was it more than 30?

A. I don't know.

Q. About how many cars in inventory did Northshore maintain at around that time?

A. I would have to look at the records to find out.

Q. You couldn't give a ballpark? You ran that dealership for your blood and guts for seven years, you couldn't tell me approximately how many cars you kept in inventory?

A. Both stores?

Q. Each store.

615

Anthony Deo

A. Well, the capacity of Sunrise was 70 cars. I mean Northshore had unlimited capacity because we had a holding lot also. So hundreds of cars.

Q. So out of hundreds of cars, you may have sold 20 or 30 cars?

MS. WALKER: Objection.

A. Well, as I said, I don't know the specific numbers. Like, you're asking me to pinpoint a specific number of how much Josh sold with Marcello. I don't know how much, but we were trying to continue business also. So we were doing sales. They were selling, you know, blood bath cars and the numbers were reducing.

Q. About how much were they reduced by?

A. Again, I don't know the specific number.

Q. Do you have any documents which you could refer to that would provide that information?

A. Well, documents is a problem because you guys took -- well, IAG took all the documents for that company. They locked us out of our DMS. They locked us out of the bank account so I don't

616

Anthony Deo

have much stuff, no.

Q. You were locked out of the bank account? When were you locked out of the bank account?

A. Well, after the theft of the Libertas money with David Baron's log-in, we approached Chase to tell them to have everyone off the account. But instead, we got kicked off of the account.

Q. So that was already after November?

A. Yes, that was.

Q. Okay. So when you say you were locked out of the account that was after the Libertas incident?

A. Yes.

Q. Okay. You also stated, I don't recall, you were locked out of something else and I apologize?

A. The DMS.

Q. When were you locked out of the DMS?

A. Specifically, I don't know.

Q. Was that before or after the Libertas incident?

A. Most likely after.

57 (Pages 613 to 616)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

617

Anthony Deo

Q. So up until that time you then presumably had access to your bank accounts. You had access to the DMS system. At that point in time would you have able to look and see what you say would be the losses attributable to the blood bath, as you described it, that Josh and Marcello created?

A. Oh, yeah at that time, sure.

Q. So what documents would you look at, if you had access to the system? What would you be looking at to make that determination?

A. How many cars they sold, like, is that what your question is?

Q. No, you're telling me that as a result of what they did that the dealership lost money, or something along those lines. I don't want to put words in your mouth, but there was something financially bad happened. And I'm asking you to quantify that and you told me you can't because you don't have access to records. So I'm saying, if you had the access to records what would you be looking at to determine to what these losses were?

A. I guess the DMS, because whenever

618

Anthony Deo

they sold a car it had to be put into the DMS. Like Dan could have printed a report that would show what we bought the car for, what the car was sold for and, essentially, what the result was. And tally up, you know, what type of losses.

Q. So you would look in the DMS system to see which vehicles had been sold. And that DMS system would report on a VIN basis, right, what the vehicle was purchased or, what it was floor planned for and what it was sold for?

A. Yeah, the DMS would have that information.

Q. So that's what you would look at to determine what the negative effects, the financial effects, it had on the business?

A. Yeah, as I said, I would ask Dan to run a report for me.

Q. When you say run a report?

A. Well, with the VIN numbers to find out what they sold for.

Q. How would one identify that if you sold hundreds of cars during that period of time, how would we know which vehicles were the ones that were sold by Josh and Marcello under the

619

Anthony Deo

circumstances you described as opposed to the ones that were sold by another salesman. Is there any way to identify them?

A. Well, the customers, they were selling them on the wholesale market. It wasn't to like a regular customer like a Mr. Smith. The other ones that we were selling would be sold to a Mr. Smith or Mr. Jones. Retail as opposed to wholesale.

Q. So if vehicles were being sold to a wholesaler that would be an indication as to these vehicles that were being sold?

A. Yes, to a wholesale company through the auction or whatever they were using.

Q. During that period of time, did you actually submit any purchase of vehicles to Ally through the controller system and it was rejected because it went over the limit that you say Josh had produced?

A. I don't understand that question.

Q. You testified that Josh had put a limit on the amount of the floor plan financing?

A. Yeah, he reduced the floor plan.

Q. So I'm asking whether or not

620

Anthony Deo

Northshore ever attempted to buy vehicles using the floor plan financing, but was rejected by Ally because it now exceeded the limit that Josh had put on it?

A. I don't remember particular incidents like that.

Q. So what prevented the dealership from just buying more vehicles and using the floor plan financing, if you don't recall that there was ever a situation where you were capped as to what you could purchase?

A. Well, after Josh said we were reducing I mean I wasn't buying anymore, we couldn't buy anymore. We were prevented from buying anything.

Q. How were you prevented?

A. He said don't buy anymore.

Q. So the prevention was not something which you tried to purchase vehicles and you couldn't, Josh just said don't do that?

A. Yeah, it's not like you tried to purchase and the system blocks you, that's not it. He said don't purchase anymore vehicles, we're selling these off and don't purchase

58  (Pages 617 to 620)

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

621

Anthony Deo

anymore vehicles.

Q.  And how long of a period was it where you were not purchasing anymore vehicles?

A.  It was a few months.  Specifically, I'm not sure.  But maybe two, three, four months.

Q.  Do you know what your average turn rate was during that period of time?

A.  It's hard to say.

Q.  I mean if you had vehicles that had been sitting there for three, four, 500 days, would you say it's a pretty excessive time for a car to be sitting there?

A.  300 days that's a year.

Q.  I'm saying that's a lot of time, right?

A.  That's a lot of time.

Q.  For even a high-end vehicle.

What would be your goal to try to get cars turned over on what type of rate?

A.  I mean, again, it all depends on what type of vehicle.  The 300 days that you're referring to is that a particular car?

Q.  I'm not referring to a specific.  I'm trying to get an understanding as to what's

622

Anthony Deo

considered in the business you were running, right, putting aside a Lamborghini or a Bentley, most of the cars as I've seen, there's a lot of Mercedes and a lot of Audis.  That's the meat of your business I'd say, right?

A.  Yes.

Q.  So for those cars how long did you try to get these cars in and out in X amount of days?

A.  60 to 90 days.

Q.  So if, in fact, it was going significantly longer than that, the interest is continuing to accrue on the floor plan, is that correct?

A.  Yes, I think interest was like a monthly thing.

Q.  So every month that the car sat on the lot, interest would have to be paid on those vehicles?

A.  Yes, interest.

Q.  So the longer that the car sits in the lot, the car is really depreciating over that time, correct, most cars?

A.  Well, I mean used cars usually

623

Anthony Deo

depreciate, but then you also have to evaluate the number that you bought it at.  So then you look at it and you determine:  Okay, what's this car; what it cost you thus far; are we still in the positive if we sell this car retail -- because there are certain numbers you maintain what the retail value of that car is.  Are we still going to make a profit?  You know, if we sell this wholesale, is it too much of a loss?  Should we continue to push for retail?  So there's a lot of determinations on exactly when to pull the trigger.  You know, should I take a short deal on a retail, should I sell it wholesale, should I continue waiting?  It's a case-by-case basis.

Q.  It's a judgment call?

A.  It is, it is a lot of looking at -- it's not strictly judgment it is based on books.  So you compare, you know, your KBB.  You compare your black book.  You compare the retail values, and you compare JD Power, and you determine what it is.

MR. RUDERMAN:  Can we go off the record for a second?

624

Anthony Deo

THE VIDEOGRAPHER:  We're going off the record.  The time is 5:10 p.m., and this is the end of media number 20.

(Discussion off the record)

THE VIDEOGRAPHER:  We're back on the record.  The time is 5:14 p.m., and this is the start of media number 21.

MR. RUDERMAN:  We're back on the record.  This is Jeff Ruderman.  We are sending a letter to the court as directed with regard to our issue to resolve our few questions, as directed by the court we will appear tomorrow in the courtroom at 9 a.m. to continue the deposition of Anthony Deo.  The parties have agreed, it's now 5:14 to stop the deposition today.  There is four hours and 56 minutes left.

MR. KATAEV:  Three.

MR. RUDERMAN:  Excuse me, three hours and 56 minutes left of testimony concerning questions by the IAG defendants and we'll pick that up tomorrow at 9.  Anything else?

MR. KATAEV:  I did circulate a joint

59 (Pages 621 to 624)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

625

Anthony Deo

letter.  I want everyone to review and approve it, and I think that's it.

THE VIDEOGRAPHER:  This concludes the February 12th, 2026 video testimony of Anthony Deo.  The time now is 5:15 p.m., and there are 21 media files to this deposition.

(Time noted 5:15 p.m.)

_____

ANTHONY D. DEO

Sworn and Subscribed

this_____day of _____, 2026.

_____

Notary Public

626

I N D E X

| WITNESS | EXAMINATION BY | | PAGE |
|---|---|---|---|
| ANTHONY D. DEO | Mr. Kataev | | 394 |
| | Mr. Ruderman | | 449 |

E X H I B I T S

| DEO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Document titled Company Newsletter | 401 |
| Exhibit 36 | Document Bates stamped Flushing 3998 to Flushing 3999 | 412 |
| Exhibit 37 | Compilation of text messages between Anthony Deo with Robert Anthony Urrutia | 425 |
| Exhibit 38 | Declaration | 434 |
| Exhibit 39 | Compilation of checks | 441 |
| Exhibit 40 | Document containing a reference to revocation of facility 7116600 | 503 |
| Exhibit 41 | Application of Northshore Motor Leasing LLC for a DMV application to operate the retail dealership | 560 |
| Exhibit 42 | Agreement for Northshore Motor Leasing | 566 |
| Exhibit 43 | Document Bates stamped IAG00081 | 605 |
| Exhibit 44 | Document Bates stamped IAG00096 | 605 |

627

QUESTIONS MARKED FOR A RULING

| PAGE | LINE |
|---|---|
| 412 | 14 |
| 523 | 19 |

DOCUMENTS OR INFORMATION REQUESTED

| PAGE | LINE |
|---|---|
| 406 | 25 |
| 429 | 17 |
| 435 | 18 |
| 448 | 6 |
| 548 | 15 |
| 585 | 23 |

628

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )

I, LISA HIESIGER, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That  ANTHONY D. DEO, the witness whose deposition is hereinbefore set forth, was sworn and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am  in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of February, 2026.

*Lisa Hiesiger*

LISA HIESIGER

60 (Pages 625 to 628)

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

629

ERRATA SHEET.
SUPER MOTORS INC etal v ANTHONY DEO et al.
Date of Deposition: February 12, 2026
Name of Deponent:  ANTHONY D. DEO

PAGE     LINE(s)     CHANGE     REASON

The Little Reporting Company
646.650.5055 | www.littlereporting.com

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

630

**A**

**a.m** 390:6 391:22 393:4 401:4,8 404:15,19 413:9,20 413:23 414:6 420:21 425:12,16 434:16,20 443:3 528:14 624:15
**Aaronson** 389:6 391:9
**abide** 610:17
**abided** 541:22
**abiding** 610:13
**abilities** 446:12
**ability** 527:11
**able** 395:10 450:7 467:5 496:2,10 497:17 508:8 515:2 536:5 546:8 557:15 577:11,17 578:4 617:5
**above-entitled** 390:11
**absolutely** 408:8 421:6 422:25 437:20 446:8 452:10 469:14 477:4,8 489:7,11,13 492:13 496:4 502:7 534:2 536:6 574:21 583:6 587:11 609:19 611:21
**access** 545:25 546:9 617:3,4,11,21,22
**accommodate** 395:11
**account** 421:13,20 440:2 441:22 543:16,19 597:9 598:2 599:2,3,6 600:18 615:25 616:4,5,9,10,14
**accountant** 432:24 552:8,18
**accountants** 486:3 546:25 594:10

**accounted** 588:8
**accounting** 426:11,14 485:22 486:5,7 556:11 557:10 558:7 591:16 592:17 593:2,4,9 602:21 603:23
**accounts** 448:5 501:19 542:9 578:24 617:3
**accrue** 622:14
**accurate** 395:18 396:4 450:8 478:8 563:19 564:21 570:6,7,8
**ACH** 442:5
**achieve** 491:10,24
**act** 435:2
**acting** 524:17
**action** 390:12 628:16
**actions** 478:21
**active** 535:25
**activities** 571:17
**activity** 533:24
**actual** 465:23 481:2 493:8 532:25 559:21 589:5
**additional** 442:23 457:17 608:25
**address** 442:2 561:17
**adjusted** 587:7
**adjusting** 602:14,18 602:24,24
**adjustment** 603:17 603:20,21
**adjustments** 603:4 603:13,14,15 604:2 604:9,15,25 605:5
**administrative** 409:3
**advance** 442:10
**advances** 442:6
**advertise** 464:2 466:17,18
**advertising** 466:9,11 466:20 532:14

**advice** 459:15
**advise** 599:19
**affect** 423:25
**affidavit** 433:21
**affiliated** 509:3 510:23
**affiliation** 495:4 497:20,22 498:8,10 498:12,18,22,24 499:5,6 509:15,18 509:19,25
**affiliations** 473:8
**aftermarket** 464:11 531:21
**afternoon** 449:24 494:2,11
**ago** 400:14 430:20 452:6 467:3 480:25 600:20 605:25 606:11
**agree** 393:10 521:7 568:11
**agreed** 442:8 509:4 514:12 544:11 561:5 573:6 577:4 624:16
**agreement** 406:18,21 406:23 407:2,3 438:25 439:6,11,13 439:17,18,20 440:23 447:18 483:24 512:9,14 513:25 515:24 516:18 517:5,6 519:21 520:3,7,12 521:8,12,14,17,20 521:21 566:20 567:23,24 568:6,7 569:20 570:9,13 573:15 626:22
**agrees** 527:13
**ahead** 411:11 417:5 422:12 479:7 558:3 558:4 572:4 579:8,9
**al** 393:14,14 629:3

**alarms** 595:19
**alive** 599:22
**ALIVIA** 392:20
**Allied** 509:23 510:6
**allow** 471:2,3 514:14 599:20
**allowable** 492:16
**allowed** 398:14 462:10 469:3 470:22 507:2
**allowing** 601:7
**Ally** 512:18,20 514:22,25 515:7,7 515:14,18,24 516:18,24 517:5,9 517:10,11 519:16 519:19,22,24 520:13,13,23 521:6 521:9,15,19,24 522:6,7,17,21 523:9 523:16,18,19 526:21 533:14,21 534:4 536:9 538:21 541:10,12,13 577:5 577:6 582:13,16,19 582:22 583:4,4,7,11 583:14 606:18 607:12,16 608:5 609:13 610:19,24 612:17 619:17 620:4
**Ally's** 522:9
**Alysia** 422:4,7,15,18 423:5 426:8 427:14 432:4 433:19 436:11,19,20,23 437:3,17
**amount** 582:10,23 583:17,22,22,23 584:2,20,25 608:6 613:23 619:23 622:9
**amounts** 582:12 614:4
**analysis** 613:21

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

631

| | | | |
|---|---|---|---|
| **ancillary** 588:10 612:15 | 424:1 425:1,3,4 426:1 427:1 428:1 | 558:1 559:1 560:1 561:1 562:1 563:1 | **application** 396:7,10 399:15 421:19,22 |
| **and/or** 583:20 | 429:1 430:1 431:1 | 564:1 565:1 566:1 | 435:9,13 452:11,15 |
| **Andrew** 392:16 393:21 | 432:1 433:1 434:1 435:1 436:1 437:1 | 567:1 568:1 569:1 570:1 571:1 572:1 | 453:4 457:2 458:7 458:18,22 472:25 |
| **angered** 581:3 | 438:1 439:1 440:1 | 573:1 574:1 575:1 | 473:14,18 474:8,8 |
| **angry** 427:2 431:23 432:4 | 441:1 442:1 443:1 444:1 445:1 446:1 | 576:1 577:1 578:1 579:1 580:1 581:1 | 474:13,17,19,21 475:6,9,21 478:7 |
| **annual** 488:18 593:25 607:25 | 447:1 448:1 449:1 450:1 451:1 452:1 | 582:1 583:1 584:1 585:1 586:1 587:1 | 479:14 481:17,20 482:7 503:12,14 |
| **answer** 395:21 403:2 403:3 404:4 405:7 | 453:1 454:1 455:1 456:1 457:1 458:1 | 588:1 589:1 590:1 591:1 592:1 593:1 | 560:10,12,20,21 561:13,25 562:24 |
| 412:8,10,13,15 419:21 420:18,19 | 459:1 460:1 461:1 462:1 463:1 464:1 | 594:1 595:1 596:1 597:1 598:1 599:1 | 563:4,7,13,17,21 564:24 569:15 |
| 422:8,10 423:13,14 427:21 439:5,22 | 465:1 466:1 467:1 468:1 469:1 470:1 | 600:1 601:1 602:1 603:1 604:1 605:1 | 587:7 597:16 626:19,20 |
| 453:2 455:7,13,15 455:19 458:12,13 | 471:1 472:1 473:1 474:1 475:1 476:1 | 606:1 607:1 608:1 609:1 610:1 611:1 | **applications** 435:19 435:23 453:9 456:5 |
| 466:13 469:4,5 488:4 490:17 | 477:1 478:1 479:1 480:1 481:1 482:1 | 612:1 613:1 614:1 615:1 616:1 617:1 | 474:23,24 477:7,11 570:14 596:20 |
| 491:16 522:8 524:8 524:13 527:2,6,9 | 483:1 484:1 485:1 486:1 487:1 488:1 | 618:1 619:1 620:1 621:1 622:1 623:1 | 602:9 |
| 557:25 564:2 565:3 579:8,9,10 597:12 | 489:1 490:1 491:1 492:1 493:1 494:1 | 624:1,15 625:1,6,12 626:3,13,14 628:11 | **applied** 396:11 399:6 399:24 454:6,22 |
| 599:14 | 495:1 496:1 497:1 | 629:3,4 | 455:7 456:25 457:4 |
| **answering** 405:3 412:7 454:16 | 498:1 499:1 500:1 501:1 502:1 503:1 | **anticipated** 473:17 **anticipating** 499:6,20 | 458:8 459:9,10 483:16 508:11 |
| 455:10,11 522:13 524:5,9 527:10 | 504:1 505:1 506:1 507:1 508:1 509:1 | **anybody** 412:6 456:24 465:13 | 600:10 **applies** 395:7 483:20 |
| **answers** 455:16 490:12 524:4 527:7 | 510:1 511:1 512:1 513:1 514:1 515:1 | 467:6,9 471:18 472:25 501:12 | **apply** 396:15 398:9 434:24 435:6,8 |
| 527:13 | 516:1 517:1 518:1 | 533:23 534:7 | 440:6 455:6,7 459:8 |
| **Anthony** 389:5,15 390:10 391:4,16 | 519:1 520:1 521:1 522:1 523:1 524:1 | 535:11 536:11,19 551:11 570:18 | 473:24 478:17 596:22 |
| 392:17 393:13,14 394:1 395:1 396:1 | 525:1 526:1 527:1 528:1 529:1 530:1 | **anymore** 481:24 505:4 523:24 | **applying** 398:8 440:8 454:24 459:15 |
| 397:1 398:1 399:1 400:1 401:1 402:1 | 531:1 532:1 533:1 534:1 535:1 536:1 | 620:14,15,18,24 621:2,4 | 478:5,11 483:18 596:15 |
| 403:1 404:1 405:1 406:1 407:1 408:1 | 537:1 538:1 539:1 540:1 541:1 542:1 | **anytime** 578:17 **apologize** 504:7 | **appreciate** 558:8 **approached** 616:7 |
| 409:1 410:1 411:1 412:1 413:1 414:1 | 543:1 544:1 545:1 546:1 547:1 548:1 | 616:19 **appear** 504:22 | **appropriate** 558:10 571:10 |
| 415:1 416:1 417:1 418:1 419:1 420:1 | 549:1 550:1 551:1 552:1 553:1 554:1 | 624:14 **appearances** 394:2 | **approval** 411:5,7,12 608:25 |
| 421:1 422:1 423:1 | 555:1 556:1 557:1 | **appearing** 528:13 | **approve** 625:3 **approved** 444:24 |

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

632

607:16
**approximately** 461:8 472:13 473:13 487:17 531:9 614:22
**April** 420:20 424:16 475:24 476:3
**argued** 438:8,11
**arguing** 518:25
**arguments** 403:11
**ARIEL** 392:7
**ARONBAYEV** 392:22
**aronneburger@cu...** 392:7
**arranged** 501:9
**arrangement** 502:11 538:20
**arrested** 478:25 479:3,4
**Asad** 389:6 494:18 494:19,23,25 495:25 496:6,9,20 496:23 497:3,7,10 497:19 499:25 500:19 508:19 552:5 553:8
**aside** 576:15 622:3
**asked** 398:21 399:7 399:10,20 402:15 409:25 410:2 412:5 414:12 417:23 418:22 419:13 424:5 429:21 431:7 431:14,16 434:14 436:7,11 455:16 461:4 474:20 515:16,17 516:17 524:5 527:6 539:19 581:18 600:4
**asking** 402:21 411:13 414:7 415:5 416:17 416:25 419:9,22 420:3 421:9,11 424:10 427:19

433:9 438:16 439:20 445:4,6,13 449:8,10 452:18 454:15 458:5,19,24 465:4,25 469:13 470:19 485:7 512:19 514:21 515:13 516:14 518:6,14 520:25 521:23,24 522:3,5,7 523:13,23 524:7 533:10 538:16 545:3 546:21 551:24 564:5 573:5 581:3 598:12 603:13 608:3 615:10 617:20 619:25
**aspects** 533:5 542:15 575:17
**assets** 515:22 516:4
**assist** 496:2
**associate** 503:16
**assume** 501:7 508:19 510:15 530:16 537:13 538:8,9 542:24
**assuming** 569:20
**assumption** 416:24 417:2,3 446:20 462:12 520:16 521:13,16
**atrocious** 580:13
**attaches** 549:11
**attachment** 431:2
**attachments** 429:2
**attempt** 437:10,15
**attempted** 620:2
**attended** 547:20
**attention** 434:6 505:17 562:2 568:12
**attitude** 519:5,8 524:22
**attitudes** 524:24

**attorney** 394:25 395:15 396:6,13,22 397:10,15 398:21 399:7,13 400:2,6 402:3 449:25 478:15 494:14 526:5,7 606:11
**attorney's** 400:10
**attorneys** 391:4,8,16 392:4,10 402:15
**attributable** 550:7 617:6
**auction** 533:18 534:18 535:7,20,25 611:11 619:15
**auctions** 471:9,11
**Audio** 393:8
**Audis** 622:5
**audit** 612:2,4,5
**audits** 610:20,22
**authority** 436:12 439:12 467:7,10 534:8 536:11,13,16 536:19 549:24 550:6 551:5,10
**authorization** 441:14 442:5
**authorizing** 442:13
**Auto** 389:4,5,7,8,8,8 389:9,9,10,10,21 391:4,8,10,10,10,10 391:11,11,12,12 482:24 483:3 512:2 512:3 551:18 555:11,22 557:17 558:15
**Auto's** 594:24
**automobile** 452:8 454:3 456:6 480:9 483:4 488:22,23 499:7
**automobiles** 469:11 469:11
**Automotive** 389:17 391:18

**Autos** 450:12,15 504:24
**availability** 497:20 498:12
**Avenue** 391:5,12,20
**average** 465:3 621:7
**aware** 469:9,22 474:23 478:5,10 547:17,23 550:7 551:17 563:12 583:13 602:20 608:4 612:19 613:4

---

**B**

**B** 626:6
**back** 395:5,13 396:2 397:13 398:2 401:7 404:18 405:7 407:23 412:18 413:22 425:15 434:19 438:14,17 443:6 447:9 448:16 448:21 449:20 457:6 459:23,25 460:3 474:20 475:16 484:14 486:10 490:12 494:7,11 502:6,10 502:21 517:18 518:24 519:10,17 519:24 525:9,23 526:8,11,24 527:23 533:11 547:5 554:11 560:3 566:13,16 572:9,13 577:6,15,20,21,23 579:17,25 580:5 581:11 582:20 586:13 596:16,20 597:21 598:11 605:9 607:7 613:15 624:6,9
**background** 591:11
**bad** 495:17 617:19
**balances** 432:15

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

633

**ballpark** 614:20
**bank** 389:20,21 392:4 402:18 415:15 421:20 430:15,25 431:2 435:22 440:7 494:20,23 501:19 538:21 542:9 567:13,14,14,15 570:14 589:3,6 606:19 607:12,16 615:25 616:3,4 617:3
**banking** 484:13 515:9,14 574:3 591:11
**banks** 495:10,11,19 495:20 498:13 508:22 509:3,3,8 569:8,21,22
**Baron** 389:6,7,7 391:9 472:10,14,25 476:11,16 494:17 496:24 500:25 508:5 512:3 514:18 514:22 521:10 551:6,11,17 553:12 555:11,22 557:17 558:15 565:4 581:4 596:22 597:23 598:2 600:2,4,5
**Baron's** 578:23 616:7
**Barry** 579:3,16
**based** 418:2 419:23 419:25 420:2 427:19 433:9 439:10,16,21 459:12,14 471:23 504:23 568:6,9 623:19
**basic** 591:9
**basis** 432:3,8 466:2 488:18 574:7 582:23 583:2 596:2 596:6 618:9 623:16

**Bates** 412:25 413:6 605:15,18 606:10 607:12 626:10,24 626:25
**bath** 580:12 615:15 617:7
**bathroom** 395:4
**beginning** 425:23
**behalf** 416:24 417:2 520:10
**believe** 400:25 451:10 453:7,12,14 453:21 454:4 457:15 459:19 483:7 529:12 551:18 569:24 571:9 579:21 585:14 607:25
**beneficial** 497:4 498:22
**benefit** 499:14 558:25 594:24,25
**benefitted** 559:11
**Benjamin** 391:22 394:10,13 395:19 402:19,25 403:10 408:24 413:14 419:3,9 430:5 437:24 441:7 442:24 447:3 448:13 449:14 455:21 458:10 479:6 493:14
**Bentley** 581:17 585:4 585:5 622:3
**best** 491:24 527:11
**better** 495:23 496:3 498:12 508:25,25 509:8
**bidder** 536:2
**bids** 535:23
**big** 486:19 510:4 530:10
**bigger** 508:25 584:7 584:8

**billing** 510:5
**bills** 574:19,19 578:4
**bit** 519:6 553:18 610:9
**black** 471:24 623:21
**blame** 437:16
**blank** 567:24
**Blankenship** 389:15 391:17
**blew** 553:6
**blocks** 620:23
**blood** 580:12 614:21 615:15 617:6 628:16
**Blue** 445:19
**Blvd** 389:7,8,8,8,9,9 391:10,10,10,10,11 391:11
**boats** 408:2
**body** 397:18
**BONNIE** 391:23
**bonnie.walker@bh...** 391:24
**book** 471:24 542:17 623:21
**bookkeeper** 484:18
**bookkeeping** 574:2,3 591:11
**books** 422:14,19 423:9 471:24 484:15,16 542:21 543:6 545:9 574:6 623:19
**borrow** 511:15
**borrowed** 510:21 522:17 579:2
**borrower** 511:3,12 511:17,23 512:7 520:21 521:3
**borrowing** 511:18,20 512:16 517:8 522:23 523:6
**boss** 544:20
**bothering** 572:15
**bottom** 414:13,24

425:22 441:19 505:22 562:4,5 606:4 607:13
**bought** 533:18,20 534:17 618:4 623:3
**Boulevard** 390:3 392:5 393:20
**box** 397:21 398:5 399:17 608:24 609:3
**break** 395:7,9 447:2 449:15 493:13 494:13,13 502:24 526:3 586:6,7
**Brian** 389:6 391:9 473:6,10,10,11,12 473:17 474:21,24 475:22 552:5 561:18 563:22 569:12,25 570:5
**Brian's** 562:14 569:17
**briefly** 566:25
**bring** 402:22 529:7
**broke** 553:20
**broker** 398:11,13,16 399:6
**brought** 439:4 529:8 572:18
**Bruce** 411:3,9 423:8 444:22,23,25
**buck** 572:25
**bunch** 497:14 580:24
**business** 406:19 416:10,14 460:8 463:12 466:22 486:19 490:2 491:3 495:22 497:5 510:25 512:20,23 513:14 515:8 519:4 530:4 533:5 563:2 569:6 571:6 576:7 577:11 610:6,8 615:13 618:16 622:2,6

businesses 408:9 480:4 497:9 500:12
button 544:2
buy 456:21 464:2 489:2 490:23 492:9 492:11 620:2,15,18
BUYERS 389:16
buying 465:6,12,19 471:6 607:23 613:10 620:9,14,16

**C**

C 391:2 392:2 628:2 628:2
call 406:25 429:16,17 435:18 448:6 477:25 501:8 524:25 527:21 548:15 589:5 623:17
called 394:8 427:2 438:6 450:12 499:8 510:9,17 553:12 589:18 599:25 605:24 608:24 611:2
calling 527:15
calm 518:22 519:5
camera 553:22
capable 409:11,13,14 522:8 604:12
capacity 615:2,3
capital 389:19 440:6 443:24 444:15 557:3 586:3
capped 620:11
car 389:16 445:25 446:2 450:24 454:7 456:6 469:25 470:8 480:21 483:4 488:23 489:2,3,5,9 489:14,19 490:3,21 490:22,23,24 492:23 498:2,19,25 499:2,3,4,16 500:20

523:10,17,20 574:11 581:16 582:7 586:21,21,24 587:3,4,5,15 609:25 610:3 611:12 618:2 618:4,4 621:13,23 622:18,22,23 623:5 623:6,8
care 588:9 604:13,18 611:20,23 612:13 612:13,14
cars 389:16,17 391:18 456:21 464:2,5,7 465:2,6 465:19 471:6,7 482:14,17 488:24 489:22,23 491:4,8 492:9,9,12,19 502:3 502:5 512:25 513:2 513:4,6,7,7,8,8 514:15 516:3,5,6,8 516:10,16 523:4 526:16 532:22 533:18,19,21 534:15,17,18,19 535:4,15,17,24 553:21 581:21 582:10 607:23 610:25 611:2 613:10,25 614:5,16 614:23 615:3,5,6,7 615:15 617:13 618:23 621:20 622:4,8,9,24,25
CarsOf 391:17
carved 512:5
case 389:12 393:16 395:16 397:2,16,20 398:15 399:16 427:20 438:9,21 461:18 608:2
case-by-case 623:16
cases 461:21
cash 456:21 574:13 574:14,15

caught 422:14,20 423:9
cause 460:9
Cayer 422:4
celebrated 577:21
CEO 451:22
certain 395:20 414:8 572:12 573:5,12 604:24 609:13 623:7
certainty 397:12
certificates 440:13,14 440:16,21 563:2
certification 563:13
certify 563:2 628:10 628:15
cetera 531:22 588:17
CFO 422:13,19 427:2 534:2,9,10 536:4 537:10,11,12,15,19 537:21,22,24 602:22 604:7
Chabrier 389:6 391:9 473:11,12,17 475:22 561:18 563:22 564:22 565:14 569:25 570:6
Chabrier's 569:12
chain 414:5 416:2 417:8 419:16,19 427:6,7
challenges 486:15
chambers 527:22
chance 560:15 566:23
change 523:12 577:5 629:5
changed 471:12
changes 541:22
charge 513:4,5,6
Chase 389:21 578:23 596:17 598:2,3,15 598:24,25 599:9,19 599:24 600:24

601:19,20,22,25 602:4 616:8
check 397:21 398:5 399:17 444:23 445:5,9,11,14,22 446:13,18 449:2 487:9 545:19 546:5 574:6 576:6 611:5
check-signing 446:12
checkbook 545:17
checks 441:11 443:13 443:15,17,19 444:17,20,22,25 445:6,15,17 446:7 446:24 545:19,20 545:23 546:3,4,5 588:12 626:16
Chestnut 392:11
Chevies 493:5
Chevy 579:17
chief 406:12 409:3
CIANCIULLI 392:13
circles 522:11
circulate 624:25
circumstance 409:21 469:8
circumstances 461:14 469:7 619:2
Citrin 485:24
claim 559:6 613:22
clarify 395:25 429:11 429:20 523:7 601:13
clarifying 603:20
clearly 518:8
click 428:24 429:2 534:25
clicked 431:2
client 525:17 589:2 607:16
clients 525:15 535:16
close 442:24 496:11 590:6,15
closed 468:17 590:17

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

635

closely-held 485:4
clue 488:6 601:18
Coast 389:16,17,17
  389:18,18,18
  391:17,18,18,19,19
  391:19 396:18,19
  453:4,5,6,18 456:2
  456:3 481:14,17
  503:13
coding 464:13 561:13
collect 520:15,19
  592:21,23
Collins 494:20,21,21
  494:22 495:24
  496:5,13,16,18,19
  496:20 497:3,18
  498:15
combination 471:16
combined 487:22
  581:25
come 409:19 471:17
  492:11 501:5,11
  508:18 521:21
  535:3 538:2 572:5
  572:19 576:13
  582:19 586:19
  587:20 591:24
  592:18,21 593:3,12
  610:16,23
comes 510:4 558:7
  588:21
coming 448:8,9 505:3
  551:25 552:2,5
  572:14 574:19
  613:7
commission 443:23
  487:9
commissions 443:21
  570:20
communicate 536:8
  594:14
communicated
  568:21
communication
  501:4 539:2 585:3,6

585:15
communications
  429:19 584:24
  585:25
companies 407:4,5
  408:3,6 447:21
  448:9 485:4,5 486:6
  569:6
company 393:23,25
  401:14,18 403:23
  403:24 407:5
  445:18,19 450:11
  463:3 478:2 485:22
  486:8 489:12
  491:13,13,15
  492:17 493:2,8
  501:23 509:18
  511:19 513:10
  514:13 540:7 557:4
  595:2 609:8,10,16
  610:7 615:24
  619:14 626:9
company's 491:12
  513:2 547:5 561:9
compare 623:20,20
  623:21,22
compared 580:13
compilation 424:20
  425:2 441:10
  443:13 626:12,16
complain 460:21
complaint 460:11,19
complaints 460:22,24
complete 421:12
  455:13 581:4
completed 450:6
completely 422:24
  492:20
compliance 563:8
comply 515:10,14
comport 608:19
computer 542:25
concern 557:14
concerned 521:11
  542:13 570:11

concerning 581:10
  586:2 607:12
  624:22
concerns 519:22
concludes 625:4
conclusion 403:16
  448:24 458:11
condition 469:22
conduct 406:19
confirm 421:9 443:16
conflict 596:18,19
conjunction 588:19
connection 451:17
  452:4 478:7,21
  479:14,19 483:18
  498:14 503:12
  512:15 514:5
  516:25 539:25
  568:19 598:12
  608:17 611:15
considered 478:12
  486:23 512:6 622:2
consistently 438:8
consulted 436:16
Consulting 445:19,19
Cont'd 494:10
contact 526:25
contacted 599:9
contained 430:15
  585:19
containing 503:3
  626:17
contents 430:22
continue 393:9 450:5
  478:3 503:17
  506:20 507:3 526:9
  528:9,15 563:7
  578:5 615:13
  623:11,15 624:15
Continued 390:9
  392:2 394:18
continuing 394:19
  398:25 399:4 474:6
  622:14
contract 520:2

contracts 589:17
contractual 406:15
  513:24
control 435:21
  437:16 438:9,12,19
  438:21,23 446:16
  446:19,23 576:22
  599:5,7 611:14
controller 530:20
  533:17,19,20,24
  534:10 536:4 542:8
  544:8,9,11,13,15,19
  544:22,24,24 545:6
  545:11 572:7
  573:19,25 574:9
  583:19 586:18
  588:9 589:4,5,10
  590:3,9,20 591:10
  594:14 609:13
  611:22,23 612:10
  612:16 619:18
controller's 544:20
controllers 534:9
  543:8 544:7,17
  545:4,24 546:13
  573:15 576:9 590:6
  611:20
controls 439:2
conversation 397:14
  399:22,25 411:3
  416:5,9,12 417:7
  418:16 426:18
  446:10 508:18
  510:7 514:23
  552:24 553:2
conversations 393:7
  394:24 396:12
  397:9 410:19 416:8
convicted 479:2,3
conviction 395:17
  396:8 397:18
  398:20,22 399:9,14
  457:10 478:21
  479:5,8,9
cooked 422:19

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

636

cooking 422:14 423:9
COONEY 392:20
cooperative 438:4
Cooperman 485:25
copies 412:19
cops 600:7,8
copy 394:11,15
  413:10 429:21
  443:12 546:17
  560:8 566:18
Corp 485:9,10,12,14
corporate 406:5
  484:24 561:21
corporation 417:15
  417:18 451:10
  485:14,18 501:18
  501:21 511:19
corporations 485:17
correct 394:21,25
  396:13,23 397:3,10
  398:10 399:20
  400:2 405:25 406:6
  406:10,13 407:8
  408:19 410:11
  411:2,6,10 414:4,8
  415:3,20 416:5,10
  416:14,20 417:12
  418:4 419:15
  420:12,14 421:5,7
  421:13,25 422:7
  423:11,16,18 426:4
  426:8,18,24 427:23
  430:16 432:5,24
  436:4,13,16,24
  437:19 438:10
  441:3,20,23 442:3,7
  442:13,16 443:20
  443:25 444:20
  445:2 447:14,23
  450:13,25 451:11
  452:9,12 453:13,14
  457:6,11,19 459:21
  465:7 471:4 472:3
  473:18 474:4
  476:16 478:8,22

479:16,20 481:18
481:21 489:10,19
490:13 492:12
510:2 511:13,21
512:21 513:11,15
513:18,21 514:6
519:14,22 522:18
533:14 541:25
543:24 545:12
546:2,10 547:21
548:22 549:3
552:14 555:4 556:4
556:10,22 557:2,7
557:13,22 558:23
559:8 561:3 562:20
564:10 566:2
570:23 578:6
587:21 588:17
589:12,21 591:13
593:6 594:11
597:20 599:3,6
609:10 610:3,12,23
611:19 622:15,24
correctly 430:24
  563:10
correlation 427:3
cost 623:5
count 402:8
COUNTY 628:7
couple 415:10,21
  428:11 509:13
  572:9 609:11
course 419:24 456:10
  486:13 492:2
  575:12 611:17
court 389:2 393:15
  393:23 394:4,10,14
  395:19 401:17
  403:7 412:15
  446:15 528:8,13
  624:11,13
courtroom 528:14
  624:14
COVID 471:12
CPA 389:16 484:17

484:20 485:15,19
486:12 530:9
549:16 591:15
592:4,6,13,14
CPA'S 389:20
crazy 614:4
create 403:25 405:12
  405:14,19 444:19
created 405:21
  444:17 617:8
credentials 598:15
  599:10,20,22
  600:14,21
credit 457:17,22,24
  458:4,8,22 459:4,9
  459:10 464:19
  476:25 477:7,12
  478:6 511:16,17
  523:3,5 526:23
  527:4 533:22
  577:10 581:24
  582:8,11 606:20
  607:17,21 608:4,5
  608:20 610:15
crime 478:12,17
  479:2,3
criminal 394:25
  395:15,16,17 396:5
  396:8,22 397:2,10
  397:15,16,17
  398:15,20,21 399:7
  399:8,12,14,25
  400:6 457:10,18
  458:2,9,23 459:17
  478:20
cross 440:23 447:18
  447:20 499:8,13
  508:15 510:3,9,14
  510:15
cross-reference
  611:5
cross-referenced
  590:7
Cullen 392:4 393:19
current 486:20

currently 481:7
  482:16
custody 435:20
customer 569:7
  586:19,20 587:18
  589:7 619:7
customers 471:9
  495:20 567:16,17
  569:2 619:5
cut 445:14,15,15,16
  445:20 576:23
  588:12 599:9
cutting 613:23
Cyruli 391:8 450:2

————————————
            D
————————————

D 390:10 394:6,6
  494:4,4 625:12
  626:1,3 628:11
  629:4
d/b/a 482:25 483:2
daily 466:2
Dan 583:3,12,20
  594:3,13,19 604:7
  613:2 618:3,17
Das 409:3,5,9 410:10
  410:14,16,19,23
dashboard 535:6
  536:4
data 427:2 429:8
  430:21 431:10
  438:7
date 393:3 401:15
  413:4 414:9 425:5
  434:9 441:12 446:9
  446:13 475:8,23
  503:6 505:23,24,25
  506:4,5 553:25
  560:14 566:22
  605:17,20 607:24
  612:3 629:3
dated 401:18 413:8
  475:24 569:9
  606:19
dates 504:13 508:3

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

637

**David** 389:7 420:23 470:7 472:10,11,14 472:24 476:11,16 494:17,18 496:4,6 496:11,12,14,17,23 497:6,8,11 500:8,9 500:13,15,17,25 501:2,5,8,11,14 508:5 509:20 512:18,20 514:18 514:22 515:4,5 516:18 517:6 519:16,18,21 520:11 521:10,19 521:23,25 522:3 529:23 537:13 538:19 539:4,6,19 539:25 540:4,6,12 540:17,18,23,23 541:4,15,20 544:12 544:22,23 546:11 551:5,10,17 552:4 553:12 555:11,22 557:17 558:15 565:4,14 573:6,11 573:21 576:10,17 576:20 577:2 578:23,24 593:3 594:24 595:21 596:19,21 597:23 597:25 599:8,9,16 599:18 600:2,4,5,6 612:21,22,23,24 613:14 616:7
**David's** 510:2 530:9 539:10 541:7,12 545:4 592:15,17 593:11 596:17 598:14 599:21 600:14,18,21
**day** 489:16,19 492:3 523:13 547:18 553:13,19 600:9 612:5,7 625:15 628:20

**days** 490:4,4,4,16 492:18 609:2,4,13 609:17 612:8 621:11,14,22 622:10,11
**dead** 596:19 599:9 600:4,18
**deal** 471:21 472:3 542:3 572:9,12 581:4 586:24 587:17 588:8,20 589:4,11,13,14,19 589:22 590:3,4,12 590:12,14,15,16,21 590:22 591:7 612:12 623:14
**dealer** 543:10,13,17 543:23 545:11,14 568:4
**dealership** 450:24 451:4 452:8 454:3,7 461:21,22 463:24 464:3,15,20 465:15 466:2 467:24 468:14,15 469:2,9 469:25 480:9 483:4 483:21 484:4 488:23,23 491:17 491:23,23 492:5,5 497:25 498:3,6,19 498:25 499:3,5,7,12 499:15,16,21 500:21 504:4,6 506:11 533:14 534:8 536:14,17,20 543:18 544:5 551:14 553:6,9,20 554:24 555:18,24 556:3,4,9,17 557:6 557:12,19 558:17 558:18 559:3,8 560:13,22 570:21 571:20 572:22 573:6 574:7,17,23 575:3,10,13,17

576:22 577:24 578:9 579:24 580:3 580:19 587:5,8,13 587:20 589:8 592:18 595:19 602:15 603:6,11 610:23 614:21 617:16 620:8 626:21
**dealership's** 561:14 561:17
**dealerships** 426:24 454:5 456:6 463:10 480:21 492:20 497:14 514:6 541:7 541:8,9 545:9 554:17,20 556:6,8 556:21,25 567:18 576:19 606:21
**dealerships'** 556:24
**dealing** 534:4
**dealings** 499:10 539:8,15 576:19
**deals** 588:16 590:6
**dealt** 472:2 528:5 568:24
**death** 539:22 540:2 540:13
**debt** 587:24
**debts** 587:9 588:6
**deceased** 578:24
**deceive** 565:9,13
**December** 474:13 569:10 578:8,14,16
**decide** 524:4
**decided** 509:10 535:9 577:4 580:8,25 582:12 592:12 613:8,18
**deciding** 535:12
**decision** 423:22 424:3,5 536:24,24 540:24 565:8 581:2 582:16
**decisions** 411:22

412:2 524:12
**declaration** 433:18 433:25 434:4,7,13 435:25 436:6 626:15
**Deer** 450:17 504:7,8
**Defendant** 390:10 392:4,10
**defendants** 389:22 391:16 624:22
**defense** 394:25 395:15 396:6,22 397:10,15 398:21 399:7,13 400:2,6
**defenses** 438:20
**deficiency** 613:24 614:3
**deficient** 613:22
**defined** 563:5
**definitely** 409:10 495:21 505:4 509:2 593:15 614:11
**definition** 571:11,12
**delivered** 606:10
**demands** 407:7
**denial** 562:25
**denied** 421:8 448:20
**deny** 427:22
**denying** 428:2
**Deo** 389:15,15 390:10 391:16,17 392:19 393:13,14 394:1,19 395:1 396:1 397:1 398:1 399:1 400:1 401:1 401:11,12,13 402:1 403:1 404:1,25 405:1,9 406:1 407:1 408:1 409:1 410:1 411:1 412:1,24,25 413:1,25,25 414:1 415:1 416:1 417:1 418:1 419:1,20 420:1 421:1 422:1 423:1 424:1,19

425:1,2,3,19,25
426:1 427:1 428:1
429:1 430:1 431:1
432:1 433:1 434:1,7
434:10,23 435:1,21
435:23 436:1 437:1
438:1 439:1 440:1
441:1,6,10,17 442:1
443:1,11,12,14
444:1 445:1 446:1
447:1,13 448:1
449:1,12,24 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1,20 476:1
477:1 478:1 479:1
480:1 481:1 482:1
483:1 484:1 485:1
486:1 487:1 488:1
489:1 490:1 491:1
492:1 493:1 494:1
494:11 495:1 496:1
497:1 498:1 499:1
500:1 501:1 502:1
502:25 503:1,3,7
504:1 505:1 506:1
507:1 508:1 509:1
510:1 511:1 512:1
513:1 514:1 515:1
516:1 517:1 518:1
518:19 519:1,3,7
520:1 521:1 522:1
522:11 523:1 524:1
525:1,12 526:1,2
527:1 528:1,2,15
529:1 530:1 531:1
532:1 533:1 534:1
535:1 536:1 537:1
538:1 539:1 540:1

541:1 542:1 543:1
544:1 545:1 546:1
547:1 548:1 549:1
550:1 551:1 552:1
553:1 554:1,15
555:1 556:1 557:1
558:1 559:1 560:1,7
560:10 561:1 562:1
563:1 564:1 565:1
566:1,16,20 567:1
568:1 569:1 570:1
571:1 572:1 573:1
574:1 575:1 576:1
577:1 578:1 579:1
580:1 581:1 582:1
583:1 584:1 585:1
586:1,4,17 587:1
588:1 589:1 590:1
591:1 592:1 593:1
594:1 595:1 596:1
597:1 598:1 599:1
600:1 601:1 602:1
603:1 604:1 605:1
605:13,15,18 606:1
606:3 607:1 608:1
609:1 610:1 611:1
612:1 613:1 614:1
615:1 616:1 617:1
618:1 619:1 620:1
621:1 622:1 623:1
624:1,16 625:1,6,12
626:3,8,13 628:11
629:3,4
**department** 462:5
562:19 563:17
564:13,17 565:9,13
599:17,25 600:2
602:22
**departments** 467:14
**depending** 492:22
**depends** 483:24
490:13,14 491:12
491:14 493:7
571:11 573:4
621:21

**Deponent** 629:4
**deposition** 393:12
394:20,23 450:5
519:6 526:9 528:10
528:15 547:17,20
547:24 624:15,17
625:8 628:12,13
629:3
**depositions** 403:8
**depositor's** 442:2
**depreciate** 623:2
**depreciating** 622:23
**describe** 510:10
551:22
**described** 450:3
534:5 614:6 617:7
619:2
**describing** 597:16
**DESCRIPTION**
626:8
**detail** 408:5
**details** 479:12 508:21
**determination**
617:12
**determinations**
623:12
**determine** 471:18
472:4,5 485:20
492:25 582:23
617:23 618:15
623:4,22
**determined** 608:9
**die** 600:5
**died** 400:7 540:17,23
541:5,15,20 553:13
553:20 577:2 599:8
599:16,18,19 600:6
613:14
**difference** 485:13
492:6
**different** 400:21,23
415:13 463:8 469:6
469:7,19 482:10
492:7,20 493:5
495:13 504:13

516:13 545:5,9
567:21 576:20
588:25 591:5,6
**difficult** 602:4
**direct** 405:19 444:21
571:17
**directed** 405:24
444:19 624:11,13
**directly** 572:10
**disagree** 604:11
**disagreed** 603:3
**disagreement** 529:23
**disappear** 552:13
**disclose** 395:17
397:17,25 398:22
399:8,14
**disclosed** 503:18
**discovery** 402:14
407:7 528:7
**discretion** 604:3
**discuss** 396:6 436:6
437:7 508:21
**discussed** 395:6
396:9 436:19 440:4
454:5 508:14
**discussing** 436:23
**discussion** 401:6
443:10 449:19
475:15 502:20
525:8 527:20
552:22 560:2
566:12 583:18
607:6 624:5
**dispute** 446:6,22
528:7,12
**distinguish** 601:13
**distracting** 434:5
**District** 389:2,2
393:15,16
**dividing** 579:20
**DLA** 389:19 443:22
443:24 444:14
**DMS** 543:9 590:8,14
590:15,24 591:3
615:24 616:20,21

617:4,25 618:2,7,9 618:12
**DMV** 395:18 396:7,8 396:9,11,15 398:8,9 399:24 452:8,12 453:8,20 460:12,16 460:19,23,25 461:5 469:20 471:2 473:2 473:18,24 474:8,20 474:22 475:22 476:6 483:13 503:10 505:3 560:11,21 562:11 563:14 569:15 626:20
**docket** 401:17 424:19 425:22 441:14
**doctored** 403:7
**doctoring** 419:7
**document** 401:13,17 401:19 403:2,25 404:3,6,11 405:10 405:12,13 406:4 407:23,24 412:25 413:12 415:15,19 418:22 419:6 422:2 441:2,6 457:11,16 502:16,25 503:3,8 503:21 504:5,23 506:21 507:5 520:21 559:22 560:8,16,19,23 561:2,8 562:3,18 564:12,17 566:18 566:24 567:3,5 568:13 569:9,19 570:5,9 605:15,18 626:9,10,17,24,25
**documentation** 551:12 581:9
**documents** 401:20,23 402:14,16,21 403:5 403:7,9 408:14 419:7 427:15 428:14 431:16

433:14,20,22,23 436:12 437:22,25 442:23 448:7,11 451:19 529:4,7,9 552:12 605:24 606:9 615:19,22,23 617:10 627:7
**doing** 408:23 409:14 427:8 467:21 477:17 530:4 552:20 574:8,10 577:24 578:3 580:5 580:6 581:19 593:8 594:11 595:19 598:4 602:17 604:16,23 605:9,11 612:17 613:2,17 615:14
**dollar** 582:9
**dollars** 444:13 445:17 488:7 521:7
**downturns** 578:10
**draw** 562:2
**Drive** 450:11 456:9 469:23 470:23 480:5 484:2
**dual** 590:25
**due** 574:20
**duly** 394:7
**dump** 427:3 429:8 430:21 431:10 438:7
**duties** 406:5
**Dwight** 389:15 391:17
**Dykman** 392:4 393:19

_____
**E**
_____
**E** 391:2,2 392:2,2,7 394:6 494:4 626:1,6 628:2,2
**e-mail** 410:19 413:5 413:8 414:3,7 415:9 415:23,24 416:4,4

417:8,24 418:3,9 419:16,19,21,23 420:3,7,13,15,20 426:6,13,16,21 427:6,7,13,16,21,25 428:21,24 429:3,15 430:10 432:19 433:7,11 584:23 585:19,21
**e-mailed** 427:4
**e-mails** 427:23 428:3 430:2 431:5,25 432:9,12 437:23 581:13,15
**Earle** 390:3 392:5 393:19
**earlier** 474:22,23 507:21 559:21 560:19
**early** 577:21,23 578:13 579:25
**earn** 488:7
**earned** 487:18,22 488:2,7,15,17 549:19 550:22 557:13,21 558:18 603:17,18,19
**Eastern** 389:2 393:16
**ECF** 424:19 441:14
**Ed** 398:25
**education** 399:4
**effect** 397:8 506:15 507:6,7
**effects** 618:15,16
**EIDL** 596:23 597:7 597:19 598:3 600:10 601:7
**eight** 548:3
**eighth** 439:8
**either** 407:11 461:17 461:20 467:10 471:8 479:25 527:7 551:17 575:7 596:22 603:11 608:2

**electronically** 545:20
**EMANUEL** 391:6
**emanuel@sagelega...** 391:7
**employed** 544:19
**employee** 486:23 536:22
**employees** 462:23 467:7,20 477:19,23 478:2 547:18,24 570:25 571:21 572:12 573:3
**enable** 523:10,17 526:21 535:4 569:7 593:4
**ended** 507:21 584:15
**engage** 486:6
**engaged** 530:18 533:24
**engagement** 485:23
**enter** 535:23
**entered** 457:10
**entire** 553:6 570:22 571:20 580:4 604:8
**entities** 453:18 477:8 480:7,23 482:16 484:2 499:13 515:11 521:2
**entity** 451:17,20 454:8 457:25 458:6 458:21 459:8,16 460:18 461:4 462:19 474:4 477:6 479:19 480:11 481:3,13 482:13 499:22 504:6 510:2 510:2 511:20 529:18 538:23
**entity's** 458:21
**entries** 602:14,18
**entry** 401:17 424:19 425:22 441:15
**envision** 499:4
**envisioned** 498:23
**equity** 587:2

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

640

ERRATA 629:2
especially 403:8
ESQ 391:6,14,22,23
    392:7,13
essentially 618:5
established 457:9
estate 389:7 398:13
    398:16 399:6
et 393:14,14 531:21
    588:17 629:3
etal 629:3
evaluate 623:2
everybody 565:5
    566:3
exact 416:11 417:6
    490:11
exactly 398:23
    407:14,21 411:4
    424:14 426:19
    444:9 445:13
    461:11,15 462:13
    462:21,21 473:15
    474:15,17 476:22
    485:10 489:18
    505:12 520:4 533:9
    538:16 574:15
    580:10 623:12
examination 390:9
    394:18 437:18
    438:2,3 449:23
    494:10 626:2
examined 494:5
example 493:6
examples 466:6
exceeded 620:4
exception 515:6
exceptions 469:20
    510:7
excessive 621:12
exchange 413:6
    414:3 425:24
    426:17,22 499:22
    585:19
exchanging 425:25
excluded 420:17

excuse 423:17 536:12
    555:10,14 594:5
    624:20
Executive 406:4
exhibit 400:24
    401:13 412:25
    413:25 424:19
    425:2 434:7 441:10
    442:22 443:12
    503:2,3 560:9,10
    566:19,20 605:15
    605:18 626:9,10,12
    626:15,16,17,19,22
    626:24,25
exhibits 404:23
existed 469:23
existence 570:22
existing 476:25
Exotic 450:12,15
    503:22 504:4,9,23
    505:11 507:2
expanding 410:3
expectation 490:2,7
expense 489:12
expenses 486:22
    490:14 492:8,14,21
expensive 493:4
experience 491:7
    499:11
expert 557:24
explain 408:5 485:6
    492:5,15 495:14
    522:20 533:16
    539:24
explained 430:20
    440:3
explaining 490:5
explanation 439:24
express 529:16
expressed 422:24
    459:13
extent 458:11 542:5
    542:21
extremely 576:11

**F**

F 628:2
F&I 464:8,9 467:15
    467:19,21,21,23,24
    471:20,21 472:2
    530:23 531:16,20
    572:7 574:10
    586:23 587:17
    588:15 589:14
    591:4,7,25
face-to-face 446:10
faced 597:14
facility 503:4,16,22
    503:25 504:2 563:4
    626:18
facing 431:3
fact 402:12 436:23
    446:23 470:21
    478:20 560:25
    564:22 565:15,18
    622:12
facts 470:19
fail 611:25
fair 398:19 399:5,23
    422:6,16 423:10
    433:12 437:2 462:7
    467:18 472:17
    571:9 591:17
false 418:5,7 421:14
    427:24 430:13
    433:15,17,24 437:5
    445:8 447:15,16
    448:19,22,23
    453:11 467:22
    478:11,16 479:13
    517:13,20,24,25
    518:4,7,8,20,20
    522:19 562:23
    563:20 564:17,25
    565:17 570:10
    601:8,11
falsely 569:24
familiar 440:15
    460:14 485:3,7
    490:19,25 529:14

567:2,7 591:12
far 486:9 501:9 515:7
    517:4 521:11 536:7
    570:10 582:17
    583:7 594:18
    610:17 623:5
fashion 613:6
faster 455:20
father 553:13,19
favors 522:12
fax 428:8
faxes 427:5
February 390:6
    393:3 508:10 625:5
    628:20 629:3
fee 406:21,23 407:2
feel 402:11,11,23
    524:17
feelings 424:7
felt 432:9 584:4
fiduciary 406:5
figured 604:15
file 546:8 547:7,10,12
    549:2 551:6
filed 401:17 462:18
    484:23 530:2
    546:23 548:3,11,13
    549:5 555:17,17,22
    564:13 578:15
files 625:7
fill 435:13 454:10
    567:24
final 580:19
finality 468:18
finally 580:18
finance 463:18
    530:19,24 587:19
    587:20 588:5 591:7
    609:16
finances 437:16
    438:10,13,21,23
    439:2 446:16,19
    491:12 573:10,13
financial 406:12
    407:18 432:12

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo --- February 12, 2026

641

439:12 446:23 484:16 495:10 533:5 542:14,22 543:5,11,20 544:3 545:15 546:9,13 552:7 556:25 567:7 567:8,11,12 568:8 573:23 574:4,24 582:21 589:16 595:25 596:5 602:14 604:10 618:16
**financially** 429:6 544:4 617:19
**financials** 426:23 438:5 542:9,18 583:4,5,8 593:19
**financing** 478:11,17 478:22 479:15 495:11,20 496:3 499:22 509:15,18 512:11 516:19 533:8,13 538:12,21 540:8 541:12 567:15,17,18,19 568:25 587:6 609:8 609:8,25 610:18 619:23 620:3,10
**find** 410:5 429:6 446:13 475:21 502:15 544:3 583:19 588:25 614:19 618:20
**fine** 413:18 433:12 454:25 553:19 610:21
**finish** 417:4 565:11 579:5,12,14
**finished** 602:11
**fire** 424:12 467:10 536:13,17,20,25 537:5,8
**fired** 423:11,16,18,19 423:20,23 424:2,6,8 424:9,11,13 433:19

434:2 436:13,14
**firing** 436:16,17 437:7,8,10,15,17 467:9 575:19
**firm** 449:25 486:12 591:15 592:17 593:2,4,9
**firms** 485:22 486:5
**first** 394:7 407:9 414:13,21,24 439:8 441:16 453:8 461:10 472:14,20 473:16,24 489:16 494:16 500:16,18 500:25 503:15 505:21 506:2,25 508:13 517:12,23 517:24 546:14 551:16 553:10 561:8,10 568:9 599:22 600:13 612:7
**Fisk** 389:9 391:11
**fit** 410:10
**five** 457:18 507:19
**five-minute** 586:7
**fix** 593:15
**fixed** 593:16
**floor** 390:4 391:21 392:5 456:9,18,19 456:22,25 457:4 468:6 476:25 477:4 477:7,12 478:6 489:8 495:10,21,23 496:3 498:12 499:22 502:4,4,9 508:22 509:2,8,9,15 509:17,23 510:5,6 511:6 512:4,12 513:16 514:7,9 515:21 516:11,16 516:21 520:11 522:22,24,25 523:11,18,21 526:17,18,20 533:8

533:12,17,21 534:19 536:9 538:12 540:8 541:11 542:9 567:19 574:3 576:23 577:10 580:9 581:2,6 582:14,24 583:14 583:17 584:8 585:2 585:7 586:3 588:20 606:20 607:20 608:4,10,17,20 609:7,8,10,16,24 610:7,10,11 611:15 611:19,22 612:13 612:20 613:5,20,23 618:11 619:23,24 620:3,9 622:14
**floored** 535:2
**Flooring** 567:20
**flow** 574:13,14,16
**flowed** 468:18
**Flushing** 389:20 392:4 402:18 413:2 413:2,6,6 414:4 415:15 421:20,23 435:4,5,12,17,22 440:2,7 626:10,11
**focus** 402:5,20 403:11,21 455:21 455:23 532:21
**focusing** 406:3 417:25 435:25 441:16
**folder** 589:12,13,18 589:22 590:2,19,22
**follow** 407:6 429:10 430:2 431:14,20 435:21 548:17
**followed** 427:4 431:21
**following** 426:16,21 429:20,25
**follows** 394:9 494:6 528:8

**footing** 579:25
**forensic** 426:14 431:7 431:9,11 433:6 436:7 437:18,25 438:3
**forever** 507:14
**forget** 515:9 608:2
**forgiveness** 596:22 602:10
**forgot** 572:8
**form** 408:24 416:22 420:8 437:24 462:19 558:9
**formal** 482:6
**formed** 468:7 472:9 472:24 473:16,25 474:4 476:14
**former** 400:5
**forth** 398:3 572:13 581:11 628:12
**forward** 426:23 597:25
**forwarded** 417:23
**found** 555:14,15 599:23 600:14
**four** 456:4 507:19 577:3 600:19 621:6 621:11 624:18
**frame** 474:16 508:8
**frames** 610:18 611:18
**franchise** 440:10 495:4 497:19,20,22 497:25 498:2,7,10 498:11,14,18,22,24 498:25 499:7,9,12 499:15,21 500:20 509:3 510:11,19
**franchises** 440:9 496:12 499:19
**franchisor** 563:5
**Frank** 591:25
**fraud** 599:17,25,25
**Freedom** 503:11
**frequently** 489:22

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

642

**front** 404:3 420:2,16 433:7 435:25
**full** 404:2,6 405:11 419:13,18 424:23 604:2
**full-time** 545:6,8
**funded** 587:16
**funding** 389:20 392:10 407:18
**funds** 448:2 538:24 588:4,6 613:5
**further** 449:13 454:17 628:15
**fuzzy** 453:10

___
**G**
___

**game** 523:25 524:2 524:13,14
**games** 517:21,22 518:18 522:10,15
**gap** 468:19,25 470:12 612:3
**gargantuan** 486:21
**garnering** 522:12
**gauge** 574:11
**Gedacht** 392:16 393:21
**geez** 407:11 462:25
**general** 463:17 464:3
**generally** 416:13 445:22 460:4 491:8 572:21 608:9
**generate** 466:16 554:20 578:5
**generated** 554:17 555:3
**German** 482:23
**getting** 442:24 476:19 513:6,7 515:21 542:20 551:21,25 553:4,11 581:19 598:5,7,23 613:8
**girl** 592:20
**girls** 572:9

**give** 405:11 407:13 412:21 440:12 442:23 448:4 450:8 459:23,25 466:6 514:17 523:9 531:6 534:18,21 535:17 549:17 551:5,10 558:10 614:20
**given** 461:19,20 467:22 516:18 526:21 533:19 590:12 605:24 628:14
**gives** 514:2
**giving** 419:7 440:13 448:11
**glitch** 548:5,7,9 601:6 601:12,14
**GM** 580:11
**go** 393:10 395:3 401:2 404:10 409:2 411:11,16 412:22 413:13,17 417:5 422:3,12 425:9 426:4 434:10 442:22 445:13 448:5 455:17 460:3 466:2 471:10 475:10 479:7 484:5 489:25 502:14 503:20 504:13 505:24,25 506:4,5 506:12 519:17 524:20 525:2,17 526:8 533:20 553:17 554:5 555:6 555:10,11 558:3,4 562:3 566:7 572:4,6 572:7 576:3 578:23 579:8,9 582:18 587:2 594:4,7 598:17 600:7,20 601:7,20 602:3 606:25 623:24
**goal** 491:24 621:19

**goes** 486:9 510:16 603:10
**going** 395:13 397:13 401:3,11 402:6,22 403:10 404:14 406:25 407:23 412:14,24 413:19 418:17 420:20 424:11 425:11 426:4 429:17,23 434:15 435:18 438:14 440:4,6 441:5 442:9 443:2 446:12 447:5 448:4 448:6,13 449:16 454:13,20 455:15 473:24 474:7 475:12 478:3 484:14 490:12 492:17 493:15 501:5 502:17 503:9 505:17,22 509:5,6,7 510:19 516:21 519:10 523:22 524:3,20 525:5,19 526:8,24,25 527:17 528:3,9 538:21 543:21,21 548:15 554:7 557:23 558:5 559:20,23 560:8,18 562:2 566:9,18 575:7 576:3 577:5 577:15,17 579:6,11 581:4 584:25 585:6 586:9 596:10 598:13 601:10 603:11 607:3 610:11,14 622:12 623:9 624:2
**Gold** 389:16,17,17,18 389:18,18 391:17 391:18,18,19,19,19 396:18,19 453:6,18 456:2,3 481:14,17 503:13

**Golden** 453:4,5
**good** 409:10,15,15 410:10 449:24 488:14 493:12,14 494:11 515:8 555:2 574:10 613:17
**gotten** 402:17,18 550:5 584:15
**government** 399:15
**governmental** 397:18
**granted** 429:22 481:20
**Great** 418:24 421:2,4
**gross** 464:23 574:11
**ground** 577:22,24 580:5 613:15
**group** 389:17,19 391:16,18 408:11 511:24,25 512:3,3,4 537:22,25 538:3,4,7 538:20 604:8
**group'** 512:4
**groups** 512:3
**guarantee** 499:8,9,14 499:15 508:15 510:4,9,14,15,15,20 511:2
**guaranteed** 510:24
**guarantor** 440:5
**guaranty** 447:20
**guess** 403:3 416:6 432:10 454:12 459:11 463:11 501:21 505:4 508:9 511:24 556:15 570:22,23 573:15 586:25 591:10 602:4 613:8,17 617:25
**guessing** 470:11 601:3
**guts** 614:21
**guys** 395:9 403:6 581:19 593:11 615:23

**H**

**H** 394:6 494:4 626:6
**half** 445:17 503:21
**hall** 525:15
**hand** 441:5 484:5,5 590:2 628:20
**handed** 502:25
**handing** 412:23 424:21,23 425:8
**handle** 440:9 492:17 593:15
**handled** 484:15
**hands** 605:8
**handwriting** 441:17
**handwritten** 503:17 545:20,22
**happen** 460:6 471:4 499:12 612:8
**happened** 409:12,22 426:25 455:8,9 461:11,15 470:15 470:17 512:18,19 516:23 541:19 544:4 551:23 579:21 580:22 590:21 608:2 613:13 617:19
**happening** 598:20
**hard** 434:5 443:12 460:5 503:19 560:8 566:17 621:9
**Harry** 389:15 432:20 433:2 443:20,21 606:15,23
**Hartford** 408:10
**Haus** 482:24 483:3
**he'll** 442:14
**healthy** 576:11,11,14
**heard** 407:25 440:17 485:5,11
**hearing** 460:13,16,23 461:2,6 548:4
**heated** 551:21
**heavy** 603:23
**height** 531:19

**heights** 553:24
**held** 390:12 454:6,22 457:25 458:7 459:9 479:20 484:3 551:18
**help** 466:5 496:10 497:17 529:5 533:3 580:10
**helping** 537:3 597:4 597:5
**hereinbefore** 628:12
**hereunto** 628:19
**hide** 542:19
**hierarchy** 571:21
**Hiesiger** 390:14 393:24 394:8 628:8 628:24
**high** 495:21
**high-end** 493:3 621:18
**highest** 531:12
**highlighted** 415:10 415:12
**highlighting** 414:18
**hire** 411:5,9,14,16,18 411:21,25 412:6 467:6,7 536:13,17 536:20,24 537:5,8 552:18 591:21 593:12 594:6 605:5
**hired** 411:6,9 537:12 537:18,19 591:15 591:18,19 593:17 593:21 595:4,5 603:24
**hiring** 410:13,23 411:2 465:14 575:19
**hits** 577:13
**hitting** 614:3
**holding** 489:9 615:4
**hopefully** 526:9
**hostile** 613:8
**hot** 535:18
**hours** 624:18,20

**how's** 488:8
**huge** 509:23 510:6 515:5 577:14
**hundred** 405:17 406:2 421:21,24 428:5 439:25 440:5 445:24 451:25 472:18 480:16 531:3 551:13 563:24 564:8,11 565:21
**hundreds** 427:23 428:3 431:5,25 615:4,6 618:23
**Husband** 451:18
**Hwy** 389:5,21 391:8
**Hylan** 389:7,8,8,8,9,9 391:10,10,10,10,11 391:11

**I**

**I's** 493:11
**IAG** 402:13 450:3 537:18,22 538:5,6 551:6 615:23 624:22
**IAG00081** 605:16 606:4 626:24
**IAG00096** 605:19 626:25
**ID** 419:15
**idea** 470:14
**ideal** 588:3
**identification** 401:15 413:3 425:5 434:8 441:11 503:5 560:14 566:22 605:17,20
**identify** 429:24 618:22 619:4
**illegible** 429:8
**imagine** 559:16
**immediate** 572:13
**immediately** 502:10 588:6

**implement** 575:22
**implementing** 574:24 574:25
**important** 561:6 609:23 610:2
**improper** 429:7
**improperly** 559:7
**in/money** 543:21
**inception** 544:18
**incident** 551:22 553:10,11,12 578:20 579:24 580:2,8 616:15,24
**incidents** 553:5,7 592:16 593:14 620:6
**include** 586:24
**included** 408:10 432:18 433:5 589:19
**including** 427:7 566:6
**income** 487:11,15,18 548:18 549:14,19 549:19,25 550:2,7,8 550:18,22,22 554:16,21,23 555:4 556:3,4,9,13 557:6 557:12,13,20,20 558:18 578:6
**incorrect** 522:19
**increased** 541:21
**independent** 499:10 507:25 510:13,23 538:23
**indicate** 585:10
**indicated** 551:18
**indicates** 446:18
**indicating** 498:21 551:12 584:20,25 607:16
**indication** 619:12
**individual** 478:15 543:18
**industry** 491:9

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

644

510:18 587:12
608:9 609:21
**info** 429:25
**inform** 477:25
**information** 398:4
  414:8,12,14,17,19
  415:3,6 416:18,18
  417:9,13,19,22
  418:18 419:12
  420:4 421:11,12
  429:11 430:14
  478:6,11,16 479:14
  503:11 534:11,13
  534:14,16 535:3
  536:3,8 543:11,20
  544:3 545:16 546:2
  546:10,14 552:7,18
  562:11 563:6,18
  564:25 570:10
  582:22 589:10,15
  590:8,13,18,23
  591:3,6,8,9 592:21
  592:22,23 593:4
  595:11 601:5
  606:20 615:21
  618:13 627:7
**informed** 600:2
**initial** 461:10
**initially** 447:13
**input** 543:9 590:24
**inputted** 590:8
**inputting** 589:14
**inside** 589:24
**institution** 589:16
**insufficient** 613:4
**intend** 404:23
**intent** 564:20
**intention** 434:25
  435:2 473:23
  564:16
**interest** 437:16
  440:21 451:3,4,6
  457:25 458:7,17,21
  459:9 479:20
  483:21 484:7

485:17 489:9
495:21 500:20,23
509:2 513:20 515:4
515:12 622:13,16
622:19,21
**interested** 604:14
  628:17
**interface** 573:20
**intermediary** 573:17
**interpret** 458:24
  507:24
**interpretation**
  538:15
**interrogatory** 429:23
**interval** 592:19
**introduce** 496:5,13
  496:16
**introduced** 485:24
  494:18,22 495:24
  496:6,20,23 497:21
  500:13,15 592:2
**introducing** 494:24
**inventory** 489:10
  501:22 523:10,17
  614:16,23
**inventorying** 513:7
**invested** 447:13
  448:17
**investigated** 460:12
**investigation** 431:8
  431:10,11 504:14
**investment** 447:19
**involve** 605:3
**involved** 408:4,7
  410:13,15 464:4,7
  465:6,19,21 466:8
  466:10 469:19
  477:17 480:20
  481:11 482:17
  483:5 513:13
  520:20,25 531:21
  532:16,19,23 533:4
  533:7 534:3 535:12
  537:2 538:25 539:4
  539:7 541:14,23,24

542:4,20 543:7
545:4,5 564:24
565:5,8 570:19
575:16 582:16
602:16
**involvement** 466:21
  466:22 539:11,19
  539:21 542:5
  574:22
**IRA** 549:24
**IRIS** 389:6
**IRS** 550:6
**Island** 389:10 391:12
  512:2 551:17
  555:11,22 557:17
  558:15 594:24
**issue** 422:15 536:21
  576:12 580:17
  624:12
**issues** 426:10,11
  572:14 595:20
**items** 588:12

_____

**J**
_____

**J.P** 389:20
**jacket** 589:13,20,22
  590:3,12,13,14
**jackets** 589:11
**Jamaica** 391:5,5
**January** 394:21
  501:19 508:10
  613:14
**jbenjamin@nyfra...**
  391:23
**JCianciulli@weirl...**
  392:14
**JD** 623:22
**Jeff** 624:10
**Jeffrey** 391:14,22
  392:13 449:25
**Jim** 494:22
**JMW** 393:17
**job** 409:14,23,25
  463:6 604:17,19
  613:2

**jobs** 463:8
**join** 403:20
**joint** 420:24 624:25
**Jones** 389:16,20
  432:23 433:3,5
  443:22 485:21,21
  486:10 547:13
  591:12 593:12
  594:6 595:25 596:5
  602:13,22 603:25
  604:8 619:9
**Jones'** 486:7
**Jory** 389:6 391:9
**Josh** 454:12 455:3
  485:24 537:13
  540:25 541:2,13,16
  541:18,21,23 542:4
  573:7 576:18 577:8
  578:21 580:8
  581:12,18 582:19
  583:15 584:24
  585:6,20 613:8,18
  613:23 615:11
  617:7 618:25
  619:19,22 620:4,13
  620:21
**Josh's** 540:24
**Joshua** 389:6 391:9
**jruderman@cszla...**
  391:15
**judge** 455:17 524:3,3
  524:20,25 526:25
  527:13 528:13
**judge's** 527:21
**judgment** 397:2,8
  457:19 458:3,9,23
  458:25 459:6,17
  623:17,19
**July** 446:9
**jumped** 533:3
**June** 401:18 554:2,4

_____

**K**
_____

**K-1** 529:13,14,16
  549:9,11,14

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

645

**K-1's** 530:9 546:21
  549:16,22 551:3,24
  552:19 553:11
  555:20 557:16
  558:24
**Kataev** 391:6 394:18
  396:2 401:2,10
  402:8 403:15
  404:21 406:25
  412:14,21 413:17
  420:9 425:9,15,18
  429:17 430:17
  434:22 435:18
  438:2,17 442:21
  443:9 446:21 447:2
  447:12 448:6,12
  449:12 450:6
  457:14 502:24
  503:7 527:15 528:6
  624:19,25 626:3
**KBB** 623:20
**keep** 398:14 412:19
  429:21 430:5
  455:25 456:2
  574:13 576:6
  612:11
**keeping** 513:7
**Kendra** 444:17,19,21
  446:4
**kept** 398:12 477:19
  543:12 551:24,25
  553:4 558:9 581:3
  596:17 597:25
  598:4,7,23 614:23
**Khan** 389:6 494:18
  494:19,25 495:25
  495:25 496:7,9,18
  496:19,21,23 497:3
  497:10,15,19
  499:25 500:20
  501:9 553:8
**Khan's** 497:7
**kick** 553:9
**kicked** 551:25 553:4
  596:16,20 598:11

616:9
**kid** 409:10,15,15
  410:4
**kind** 408:21 451:17
  508:8 512:14
  514:11 535:21
  562:12 578:10
  580:4 601:6
**knew** 410:24 416:19
  418:3 497:4 564:12
  564:21,23 565:25
  575:24 597:13
  601:9
**know** 395:4,9 398:3
  398:23,24 400:4,8,9
  400:14,18,24 403:9
  404:3 405:2,16
  406:21 409:8,21,22
  409:23 410:2 412:7
  416:16 418:6
  420:18 422:8,22
  423:2,4 427:20
  428:6,21,24 431:6
  432:9,14,16,17
  434:25 439:15
  441:24 442:17
  444:5,7 445:13
  451:7,13,14,21
  452:3,5,14,19 454:9
  454:21 455:8
  456:13,17,18,22,24
  458:13,16,17,25,25
  461:8,11 462:12,14
  462:19,20,21
  463:16 464:3
  466:15 468:11,18
  470:3,7,24 472:21
  473:15,20 474:7,15
  477:6,9,19 478:13
  478:14,16 479:4,25
  480:2 483:15,17,19
  484:8,22 485:16,20
  485:24 486:4
  487:10,20,22,25
  488:2,5,5,16,20,21

491:14,21 492:17
  494:17,19 496:10
  496:12 497:3,9,13
  497:13 500:22
  501:2,9,10,14,20
  502:12 506:5,10,19
  509:10 510:6,8
  511:4 512:2,8,9,17
  514:24,25 515:6,7
  515:15,25 516:15
  517:2,5,21 518:16
  519:23 520:5,6,8,17
  520:18 521:15,19
  523:7 526:14 527:3
  528:25 530:5,20
  531:3,9,13 535:14
  535:18 536:8
  537:16,17 538:16
  542:7 544:7,17
  546:22 547:15,16
  549:4,9 550:9,21,24
  551:3 555:25
  556:12 557:9
  558:21 561:4
  568:18,25 569:3,5
  574:10,11 577:20
  580:6 581:21 582:4
  582:4,6,12,15,17,21
  583:2,3,4,7,11,16
  584:4,13,22 588:23
  590:9,11,11,16,21
  591:24 592:24
  593:8 594:13,16,19
  594:20 595:15
  596:14 597:8 598:6
  598:13 599:21
  600:16,17,19,23
  601:16 602:3,13,23
  603:2,16,19,21
  604:3,15,23 605:8
  605:10 608:8,11
  609:5,14 610:17
  611:24 612:9,14
  614:3,7,8,10,15
  615:9,12,14,17

616:22 618:6,24
  621:7 623:9,13,20
**knowing** 604:14
**knowledge** 400:5
  420:2 432:3,11
  434:23 439:21
  461:7 567:10
  602:19 608:18
**known** 498:16
**Kwun** 534:2 604:7

————————
**L**
————————
**Lamborghini** 492:18
  493:8,9 622:3
**large** 491:23 492:4
  571:5
**late** 424:16 580:23
**laughed** 409:8
**Laurie** 389:16 391:17
  400:17 406:13,16
  406:19 407:4,6,10
**Laurie's** 400:20
**law** 391:16 503:11
  562:24 563:6
**laws** 563:8
**lawsuit** 576:14 578:8
  578:15
**leads** 466:7,8,16,20
  532:14
**lean** 514:19
**learned** 495:3 578:21
**lease** 450:22 474:6
**Leasing** 389:6,21
  391:9 445:10
  560:11,20 566:21
  567:25 568:9
  569:11 626:20,23
**leave** 604:16
**leaving** 410:6
**left** 409:19 427:6
  441:19,25 501:22
  557:4,5 561:20
  568:17 580:19
  624:18,21
**left-hand** 504:18

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

646

505:21
**legal** 391:3 392:21,23
 393:21 442:2
 458:11
**lend** 515:11 520:13
 521:7 582:25
**lender** 502:5,9 511:7
 511:9,12 512:10,15
 513:10,13 514:2,12
 514:14 515:2
 520:18,20 521:3
 609:7,24 611:15,19
 613:6
**lenders** 514:5,17
**lending** 513:14,17
 523:5
**lends** 511:9
**let's** 401:2 402:20,25
 403:11 404:10
 409:2 413:17 419:4
 422:3 425:9 434:10
 442:22 447:2 454:2
 455:23,25,25
 524:23 527:12
 533:18 571:12
 576:15 579:20
 596:24 612:23
**letter** 607:11 624:11
 625:2
**letters** 606:4,18
**level** 572:12
**Lexington** 391:12
**Libertas** 389:20
 392:10 547:18,24
 579:2 580:17
 599:23 616:6,15,23
**LIC** 389:18 391:19
**license** 396:12,16
 398:8,9,11,13,17
 399:2,7,24 452:9,11
 452:15 454:6,6
 459:20 461:9,23
 462:2,9,13 468:12
 468:13,20,21
 469:10,16,25

470:23 473:3,4,24
 477:3,21 481:15
 482:5,10 483:20
 484:6 501:20 502:9
 502:13 504:3 505:4
 505:6 506:10,14
 507:8 508:12
**licensed** 483:13 504:6
**licenses** 453:20
 454:22 483:16,19
 484:3 505:13
**lien** 514:15 515:2
**limb** 411:16
**limit** 455:15 582:7,8
 583:21 619:19,23
 620:4
**limitation** 608:23
**limitations** 608:16,21
**limited** 402:4 516:6,7
 516:10,16 609:17
**limits** 395:20,22
**LINDEN** 391:16
**line** 395:20 414:15
 420:23 457:24
 464:20 478:6
 511:16,17 523:3,5
 526:23 527:4
 533:22 577:10
 579:20 581:24
 582:8,12,14,24
 583:14,20 584:8
 585:2,7 586:3
 606:20 607:17,21
 608:4,5,21 610:15
 612:12 627:3,8
**LINE(s)** 629:5
**lines** 457:18,22
 476:25 477:2,4,7,12
 617:17
**linked** 589:16
**Lisa** 390:13 393:23
 394:7 628:8,24
**list** 533:19 534:18,21
 559:2
**listed** 406:8,9 408:13

421:24 551:7 556:7
 557:11,18 558:16
 559:7 568:4 569:17
 569:25 570:6
**listen** 523:12 524:3
 540:25 541:2
**listing** 421:20 439:24
 555:17,23 565:14
**lists** 406:5 504:16
 561:20
**little** 389:20 393:22
 393:24 453:10
 519:5 553:18
**live** 547:25 548:2
**LLC** 389:5,5,6,7,8,8
 389:9,9,9,10,10,10
 389:17,17,18,18,18
 389:19,20,21,21
 391:3,4,9,9,10,10
 391:10,11,11,11,11
 391:12,12,18,18,19
 391:19,19,20
 392:10,21,23
 415:12,17 417:10
 417:15 451:13
 485:2 529:13
 548:22 560:11,20
 568:8,9 626:20
**LLP** 389:20 391:8
 392:4,9
**loan** 434:24 435:6,8
 435:10,19,24 440:6
 442:10 479:15
 588:2 589:3,7 597:6
 597:17,19,19
 600:20 601:7,20
 609:9,18,20
**loans** 502:10 520:19
 520:25 598:5
**local** 563:8
**located** 393:18,19
 421:2
**location** 400:16 421:4
 450:11,16,19
 462:23,24 468:15

469:3,12,13,14,18
 469:19,20,23 470:2
 470:18,21 474:6
 480:13,15 481:24
 486:21 495:2,6
 501:3 508:7
**locations** 470:5
**locked** 615:24,25
 616:3,4,14,18,21
**locksmiths** 553:21
**log** 598:15
**log-in** 534:24 578:23
 596:18 597:23
 598:17 616:7
**log-on** 535:20
**logged** 598:17
**logging** 596:17,21
 597:8,25 598:12
**long** 400:14 404:7
 491:4 576:25 621:3
 622:8
**longer** 397:9 410:6
 461:21 462:10
 468:12,20 481:23
 482:2 502:8 505:12
 506:11 518:16
 576:21 599:20
 611:7 622:13,22
**look** 402:25 413:7,14
 414:2 418:21
 434:11 507:5
 594:21 605:21
 614:18 617:5,10
 618:7,14 623:4
**looked** 436:18 595:16
**looking** 401:20 409:9
 409:22 414:13
 437:4 449:3,3
 506:21 507:23
 569:14 592:3,6
 594:18,23 607:11
 617:12,23 623:18
**looks** 441:18 569:14
**loose** 575:8
**loss** 623:10

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

647

**losses** 580:14 617:6
  617:24 618:6
**lost** 617:16
**lot** 428:7,8 447:24
  453:23 469:20
  490:4 496:12
  499:19 532:13
  556:6,18 557:2,3
  573:10 574:3
  577:15,19 591:7
  615:4 621:15,17
  622:4,5,19,23
  623:12,18
**love** 439:4
**lower** 509:2 572:12
**Luncheon** 493:18

_____

**M**

**magnitude** 495:6,22
**main** 612:11
**maintain** 543:5
  577:11 578:11
  614:17 623:7
**maintained** 542:22
  543:23
**major** 492:24
**majority** 457:25
  458:7,17,20
**making** 448:24,25
  449:5 459:6 521:13
  521:16 574:23
  578:3 604:24
  612:17
**man** 415:21
**manage** 571:8,13
**managed** 571:5
**management** 389:10
  391:12 572:11
**manager** 451:16
  467:15,16,19,21,23
  468:2,5 531:5
  536:21 571:16
  572:6,7 588:19
  591:4 599:24 600:6
**managers** 467:13

533:2 535:15
  571:24,25 575:22
  591:8
**managing** 563:3
**Manheim** 471:9
  535:22,22
**manner** 438:6
**manufacturers** 499:2
**Marc** 389:15 391:17
**Marcello** 580:11
  581:8 615:12 617:7
  618:25
**March** 413:8 414:6
  414:10 415:25
  416:3 426:19
  508:10
**March/early** 424:16
**mark** 403:15 412:16
  454:13,18 528:4,10
  566:19 568:17
**marked** 401:12,14
  413:3 424:19 425:4
  434:8 441:6,11
  443:11 503:2,5
  528:16 560:9,13
  566:21 605:16,19
  627:2
**market** 619:6
**marketing** 466:9,10
  466:16 532:14
**marking** 605:12
**marriage** 628:17
**matter** 393:13 450:4
  550:4 560:25
  628:18
**mean** 397:19,23
  398:2 406:17 408:6
  411:7,11,19 428:11
  428:18,25 432:10
  435:3 437:11
  445:15,20 453:23
  453:25 458:24
  463:10,24 464:7,12
  465:22 469:20
  471:23 472:21

474:16 476:5
  477:23 478:18
  486:9,16 487:24
  488:25 490:10
  498:2,16 501:19
  504:11,25 506:12
  506:13 507:23
  509:10,12,22 510:4
  510:5,10 512:25
  513:5 516:2,7,13,15
  517:2 523:2 532:12
  532:13,25 533:6
  534:23 536:21
  537:24 538:3,14,15
  539:14,17 540:4
  541:19 544:7 545:7
  545:13 546:14
  559:6 569:3 571:14
  571:19,20 572:23
  573:14,24 574:2,9
  574:15,25 575:2,23
  577:18 578:24
  580:11 581:25
  583:10,18 585:21
  587:15 588:13
  594:21,21 595:2
  596:3,12 600:5
  601:2 603:5,21
  610:20 611:4,4,9,20
  612:3 613:25
  614:10 615:3
  620:14 621:10,21
  622:25
**means** 506:5 556:24
  609:5
**meant** 498:24 506:19
**meat** 622:5
**mechanic** 463:19
  530:25
**mechanics** 543:22
**media** 401:5,9 404:16
  404:20 413:24
  425:13,17 434:17
  434:21 443:4,8
  447:7,11 449:18,22

475:14,18 493:17
  494:9 502:19,23
  525:7,11,21,25
  527:19,25 554:9,13
  559:25 560:5
  566:11,15 586:11
  586:15 607:5,9
  624:4,8 625:7
**meet** 407:12,16
  476:11 501:5
  508:20 526:4
  591:23
**meeting** 500:16,18,24
  500:25 508:4,13
  538:19,19 595:10
**meetings** 595:14,24
  596:4,11,13
**member** 563:3
**members** 548:24
**memo** 444:4,6,17,18
  445:12 446:5
**memory** 427:19
  433:9 445:14
  488:11
**mentioned** 433:2,4
**Mercedes** 622:5
**Merckling** 389:15
  391:17
**merely** 437:10,15
**message** 410:18
  425:23 426:5,17,22
**messages** 424:20
  425:3,21 426:2
  429:16,22 436:18
  436:20,22 437:7
  626:12
**met** 400:12 407:9
  410:16 470:7
  472:10,11,14,20,24
  473:22 476:16
  494:16 497:15
  499:25 568:21
  591:22
**Michael** 389:16
  391:17 400:17,19

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

648

400:21 450:11 456:9 469:23 470:22 480:5 484:2
**microphones** 393:5
**mid-November** 579:21 580:2
**million** 445:17 488:7 488:9,11 509:13 582:2 584:14,14,15 584:16
**millions** 521:7
**mind** 401:25 426:6 571:14 584:10
**mindset** 474:2 476:21
**mine** 423:14 571:13
**minimum** 487:10
**minute** 554:6
**minutes** 430:20 526:3 624:18,21
**mischaracterization** 416:21,23
**misrepresentation** 421:17 551:20
**misspoke** 417:18
**Mitsubishi** 408:11
**mix** 471:15
**mixing** 596:25
**models** 492:22
**moment** 407:22 429:14 452:6 467:8 478:4 486:20 525:4 553:15 585:13
**Monday** 569:9
**money** 447:24 448:8 464:15 499:17,19 499:23 503:19 508:23 511:9,15,18 511:20 513:14,17 515:11 517:8,9 520:13 522:17,23 523:9,16,19 526:16 526:20 543:21 555:3,4,6,9 556:7 556:16,18 557:2,5 574:18,19 575:7,8

575:11,14 576:24 578:25 579:16,17 580:17 582:13 586:20 587:6,20,23 588:22 597:6 599:23 600:3,10 601:20 602:2 603:11,15,18,18 612:6 616:7 617:17
**monies** 510:20 546:6 613:22
**month** 465:3 509:4,7 538:24 541:20,21 555:10 594:4,8,9,13 594:17,19 612:6,7 622:18
**monthly** 583:4,5,8 595:10 596:7,8 610:20 622:17
**months** 474:12 475:5 476:15 507:19 577:3,16 578:25 600:6 621:5,6
**MORGAN** 389:20
**mortgages** 407:18
**motor** 389:5,21 391:9 445:10 560:11,20 562:19 563:18 564:13,17 565:9,13 566:21 567:25 568:8 569:10 583:9 626:19,22
**Motors** 389:4,17,18 389:18,19,19 391:4 391:18,19,19,20 393:13 396:18,19 417:11,12,14 441:23 447:19,21 462:3 481:17 503:13 528:20 548:21 629:3
**Motors/Northshore** 442:3
**mouth** 617:18
**move** 403:17 455:20

579:6,11,18
**moved** 468:17 545:23 579:2,16 599:24 600:2
**moving** 454:18 528:3 597:24
**mute** 393:7

**N**

**N** 391:2 392:2 394:6 394:6 494:4,4 626:1
**N.A** 389:21
**name** 393:21 408:17 408:18 409:6 419:13 430:17 442:2 449:24 453:4 453:10,22,24 454:7 481:2,13 482:23 484:20 494:21 503:23 532:13 547:4,5,6 561:9,14 561:17,17 568:17 569:12,17 594:13 629:4
**named** 563:4
**names** 480:23
**narratives** 455:18
**narrow** 508:8 596:24
**nature** 399:21
**necessarily** 408:25
**Neck** 421:2,4
**need** 395:7,8 402:6 411:17,20,24 412:10,11 427:25 433:10 457:2,11 491:14 495:5,23 516:20 520:2 553:14 590:4,21 600:7,7 601:20 602:25 603:14,16 605:3
**needed** 403:13 412:6 415:18 417:19 451:20 495:13,18 508:22,25 509:2

520:14 533:2,2 544:3 563:18 575:24 584:7,11 592:16 593:15,16 601:25
**needs** 478:8 483:20 609:9 612:4
**negative** 587:2 618:15
**NESNA** 409:16,18,20 409:22 410:6,7
**never** 396:9 397:21 398:9 410:16 428:9 460:16,25 468:17 468:18 479:13 515:16,17 516:17 539:8 540:4,18 542:2 549:21,25 550:8 555:20 556:2 558:22,24 568:24 569:19 573:17 576:12 605:23,25
**new** 389:2 390:4,15 391:5,13,13,21,21 392:6 393:16,20 474:4 477:5,7,8,12 478:2 498:2,25 499:2,4,7 587:19 588:5 590:4 628:5,7 628:9
**newsletter** 401:14,18 403:23,24 626:9
**next-to-the-last** 504:17 505:18
**NextGear** 456:13,15
**Nissan** 422:14,19 442:5 497:24 579:3 579:16 581:4
**nitty-gritty** 602:17
**non-accountant** 556:12
**non-CPA** 558:13
**non-negotiable** 610:3
**non-professional** 558:20

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo    ---    February 12, 2026

649

**non-responsive** 403:19 454:14,19 455:5 579:7,12
**nonsense** 431:25
**normal** 415:8 463:10
**normally** 444:22 589:15
**Northshore** 389:5,21 391:9 442:11 443:22 445:9,16,22 447:21 449:2,6 453:19 454:11,24 455:25 462:2,4,17 468:7,13,21 470:22 472:7,9,12,24 473:2 473:16,25 474:13 474:25 475:7 476:14,19 477:11 480:11 495:7 501:3 501:6,15,16 505:13 505:14 508:5 510:21 512:6,11,15 512:16,21 514:17 514:20 515:3,19,23 516:4,19,23 517:6,7 517:8,9 519:22,25 520:10,13,15 521:7 521:8,15,22,25 522:2,6,10,17 523:9 523:16,19 526:15 526:21 528:20,22 529:13,21,25 530:7 530:11,12,18 532:8 536:12 537:20,21 537:23,25 538:6,22 538:22 539:3,12,13 539:22 540:2,13 541:11,24 542:15 542:23,24 543:6,16 544:9,14,20,25 545:2,17 548:21 549:19 550:10,19 550:23,25 551:7,19 554:16 555:10 557:21 559:2

560:11,20 561:3 564:23 566:21 567:25 568:8,19 569:2,6,10 570:2,18 573:21 577:6,14 580:15 582:20 583:9 584:12,17 585:2,7 586:18 587:8 588:23 589:9 591:16 592:8,10,14 593:3,5,10,13,18,25 595:7 596:2,6 597:9 599:4,7 602:15 610:17 611:14 613:5,11 614:17 615:3 620:2 626:19 626:22
**Northshore's** 442:6 517:11 599:3,6
**nosedived** 595:22
**Notary** 390:14 394:8 625:17 628:9
**note** 393:5 479:6 503:17
**noted** 394:2 505:9 625:9
**notice** 390:13 446:9 504:14 550:5
**noticed** 403:6
**notices** 506:19
**notification** 549:23
**November** 462:6 468:10 474:12 476:10,14 477:10 477:10 576:15 580:22 616:11
**number** 393:16 400:25 401:5,9 404:16,20 413:24 419:14 425:13,17 434:17,21 441:22 443:4,8 447:7,11 449:18,22 475:14 475:18 488:14 491:12 493:17

494:9 502:19,23 503:25 504:2 509:4 525:7,11,21,25 527:19,25 531:12 554:9,13 559:25 560:5 566:15 577:4 582:7,10,12 586:11 586:15 607:5,9,13 608:8,12,16,23 609:17 614:7 615:11,18 623:3 624:4,8
**numbered** 562:4
**numbers** 427:3 575:24 580:13 581:20,20 594:4,7 594:21,21,23 595:16 609:3 611:5 614:2 615:10,15 618:20 623:7
**numerous** 423:6 530:15 549:6
**NYC** 389:16

_____

**O**

**O** 394:6,6 494:4,4
**o'clock** 493:11
**object** 557:23 565:12
**objection** 408:24 416:22 420:8 437:24 455:4 458:10 479:6 558:9 559:4,18 564:19 565:2,10,16 597:10 604:5 615:8
**obligations** 499:15 517:11 610:19
**obtain** 435:10,11 496:2 509:7 515:2 534:10 582:11
**obtained** 583:7
**obviously** 420:17 506:14
**occasions** 423:6
**occurred** 436:8 446:9

**October** 504:16,18 505:23
**Odessa** 471:9 535:22
**offhand** 441:24 451:14
**office** 400:11,13,16 400:17,20 410:8 537:25
**officer** 406:12 409:3 563:3
**officers** 406:6
**offices** 393:18 400:21
**oh** 407:11 414:21 428:5 437:13 452:13 462:25 480:25 496:18 500:22 531:14 532:12 533:25 543:18 552:16 568:23 583:25 590:10 617:9
**okay** 395:5,12 401:24 418:20 423:15 424:12 430:2 433:12 437:13 438:8 443:23 448:12,15 454:25 455:9 459:12 466:8 476:3,9 491:13 499:18 503:17,24 505:20 522:16,20 523:15,22 526:24 527:12,14 542:11 549:8 578:17 583:21 600:7 607:14 616:13,17 623:4
**once** 461:22 542:4 609:16 613:12
**one-page** 441:6
**ones** 396:17 456:12 456:14,17 514:10 519:15 534:25 573:16 618:24 619:3,8

online 435:14 471:16 535:24,25 543:15
oOo 392:24
open 421:20 428:18 428:21,23 429:2 431:2 439:25 477:11 501:21 526:10 538:14 542:17
opened 418:25 428:9 435:5,7 462:2,4,17 472:7,12 501:18,19
opening 420:24 457:17
operate 450:16,18 452:7 456:20 461:22,25 468:14 468:14,15 469:3,10 469:25 470:22 471:2 473:2 488:22 506:20 507:3 560:12,21 561:3 574:18 578:5 584:11 626:21
operated 450:12 460:19 461:5 471:3 514:14 540:18,20 542:16
operating 456:8 462:22 476:20,24 480:5,10,15 481:23 482:3 484:12 501:16 540:5,18 580:4 584:3
operation 454:3 478:3 480:10,14,19 481:8,12,18,24 486:14,19 490:9,13 490:17 491:21 497:5 508:21 514:6 539:2,25 540:13,15 561:7 573:23 577:14,17 578:11
operations 480:20 483:8,13 487:12

490:11 540:3 550:18 571:6 572:21 574:24 576:7 595:20
operator 528:19
opinion 472:6 533:2 537:6,8
opinions 532:20 535:15,17,18
opportunities 496:3 570:2
opportunity 405:2,11 409:24 414:2 425:20 436:3 455:18 475:20 494:12 503:8 526:4 526:6 599:17
opposed 498:5 619:2 619:9
optimal 488:24 588:13
order 390:13 433:19 452:7 513:24 516:19 533:11 534:11,25 535:19 536:8 561:2 582:11 582:23 584:11 590:9,20
original 415:23,24 438:14
outcome 628:18
outside 513:10 525:18 526:5
outstanding 597:22 598:16
overlap 468:24 470:4 501:25 502:2
overlapped 462:14
oversee 570:24 571:2 571:7,19 612:25
overseeing 468:3
oversees 468:5
overwhelmed 602:9
Ovington 390:3 392:5 393:20

owe 588:22
owed 503:19 586:20 587:6,9,24 588:23 588:24
owned 451:5,18 460:18 461:5 484:2 496:12 514:19 515:3 542:15
owner 418:10,14 419:15 420:4 421:16,21,25 439:25 463:21,23 465:18 487:4 528:19,22 529:17 532:13 536:12 551:8 557:11 561:21,23 562:17 562:20 563:3,23 564:9,11,22 565:14 565:15,18,20,22 569:18,25 570:6 572:20,25 575:5 605:4
owners 416:19 418:4 484:4 530:7 532:2 551:13 555:18,23 556:8,18 557:18 558:16 559:3,7
ownership 418:18 419:2,12,14 420:4 451:4 483:20 484:6 528:25 529:2 551:19
ownerships 529:17
owns 499:13

_____

**P**

P 391:2,2 392:2,2
P.C 391:16
p.m 391:23 392:22 425:24 443:7 447:6 447:10 449:17,21 475:13,17 493:16 493:18 494:3,8 502:18,22 525:6,10

525:20,24 527:18 527:24 528:10 554:8,12 559:24 560:4 566:10,14 586:10,14 607:4,8 624:3,7 625:6,9
packet 424:24
page 406:3,8 409:2 414:13,21,24 415:2 418:18,25,25 419:10 424:25 425:23 439:8,8 441:16 503:15,20 503:21 504:14,15 504:17 505:18,19 561:8,11 562:3,5 567:23 568:13,14 605:22 626:2,8 627:3,8 629:5
pages 404:7
paid 443:19 444:14 447:23 448:16,20 502:6 519:24 544:13 550:2,21 557:19 558:19,22 576:24 577:9 611:8 611:14 612:6 622:19
pain 395:5
paper 502:25 589:21 589:22,24 590:7
papers 462:18
paperwork 454:12 590:23
paragraph 436:2 437:12,14 568:9
Paralegal 392:20,22
Park 391:20 450:17 504:7,8
part 408:11,22 414:5 414:12 416:2 417:7 419:16 433:5 435:9 435:15 446:20 447:17 454:19 460:25 461:3

510:25 517:12 522:2 538:6 569:20 569:22 579:19 587:23
**partial** 419:6
**particular** 476:23 480:13 490:17 491:11,15 492:25 507:4 520:22 530:21 535:6 539:12 544:16 569:4 581:16 584:22 588:4,12 589:14 596:13 620:6 621:23
**particulars** 478:23 548:19 557:9 558:6
**parties** 393:10 528:12 624:16 628:16
**partner** 411:22 412:2 412:5 420:25 421:7 421:10 563:3
**Partners** 389:19 443:25 444:15
**partnership** 484:24 549:2,7
**parts** 420:6 543:22 573:5
**passed** 400:8 539:4,6 576:17 595:21
**pay** 434:6 442:6 502:10 548:18 556:9,14,16 557:6 557:12 574:19 587:8,9,16,24 588:6 590:10 609:18,20 609:24,24 610:5,6,7 610:10,18 613:5
**pay-in** 542:10
**paying** 489:9 538:23 549:18 578:4 595:7 595:8
**payment** 447:17 449:5 499:23 612:4

**payments** 442:9 443:24 444:3,7,10 448:17
**payoff** 588:10 589:5 589:6,19 612:17
**pays** 587:13
**Peanut** 445:19
**pencilling** 588:20
**pending** 393:14
**Pennsylvania** 392:12
**penny** 603:10,15
**people** 411:16 460:21 465:9,14 467:6 492:11 530:15 531:16,20,20 536:13,17,20 551:17 552:4 555:12 570:20 571:18 572:23 573:7,7,21 591:5 603:24 604:6,12 605:5
**perceived** 478:19
**percent** 405:17 406:2 421:21,25 439:25 440:5,24 441:3 445:24 451:25 472:18 480:16 531:3 551:13 563:24 564:8,11 565:21
**percentage** 419:14 451:6,9 528:25 529:2,17
**perform** 486:7 538:2 591:16 593:23
**Performance** 445:18
**period** 476:18 477:9 477:20 506:21 507:15 532:5,8,10 533:25 576:25 578:11 580:4,16 608:25 609:4 618:23 619:16 621:3,8

**periods** 469:2 578:18
**permission** 411:8,14 411:17,20,24 412:6 412:11,11
**permitted** 469:24
**person** 457:3 465:10 465:12 467:24 468:3,4 471:16,21 472:2 483:15,19 530:23 531:8 535:8 548:8 551:6 588:15 588:21 591:2 592:21
**personal** 457:22 458:4 459:4 547:2,7 548:3 549:12,15
**personally** 459:10 471:10 479:18 521:2 606:10
**Philadelphia** 392:12
**phone** 426:17 429:16 527:16,21
**phones** 393:8
**physically** 611:9
**pick** 393:6 624:23
**picking** 524:12
**pinning** 580:14
**pinpoint** 615:11
**pissed** 581:5
**placate** 437:17
**place** 390:12 393:9 401:11 437:19 612:5
**places** 400:23 470:9 580:7
**plaintiffs** 389:11 390:11 391:4,8 402:13 450:3
**plan** 449:14 456:9,19 456:23,25 457:4 475:4,6 477:2,4,7 477:12 478:6 489:8 495:10 499:22 502:4,4,9 508:22 509:2,8,9,15,17,23

510:6 511:6 512:4 512:12 513:16 515:21 516:21 520:11 522:22,24 522:25 523:11,18 523:21 526:17,18 526:20 533:8,12,21 536:9 538:12 540:8 541:11 567:19 576:2 577:10 582:14,24 583:14 583:17 584:8 585:2 585:7 586:3 606:20 607:21 608:5,10,20 609:7,8,10,16,25 610:7,10,11 611:15 611:19,22 612:14 613:5,20,23 619:23 619:24 620:3,10 622:14
**planned** 534:20 618:11
**planning** 574:4
**plans** 495:21,23 496:3 498:13 514:8 514:9 516:11,16 542:9 576:23 580:9 581:2,6 608:17 612:20
**play** 473:7 509:22 510:4 517:21 522:10 537:3 561:6 564:15 603:5,14,23
**playing** 517:22 518:18 522:14 523:24 524:2,14
**pleaded** 402:15
**please** 393:5,7 394:4 396:2 404:13 405:7 413:7 422:5 426:6 427:14 438:17 439:5 519:7,9 522:10 524:24,25 525:16 526:12 566:8 567:4 605:22

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

652

pocket 595:8 603:12
point 406:22 408:21
   410:17,20 459:19
   461:15,17 465:5
   474:3,10 476:22
   483:7 487:8,13
   490:11 500:23
   502:6 509:11 577:7
   578:9,25 580:3
   595:23 596:14,19
   600:5 602:8 617:4
police 600:8
porter 463:13
porters 463:18
   530:19
portion 403:18
   591:11
portions 425:20
position 438:12
   463:20 465:17
positions 463:6
positive 542:10
   595:22 623:6
positive/minus
   595:17
possession 435:20
possibility 531:2
possible 452:24
   479:22,24 483:25
   488:17 489:15
   491:25
possibly 480:17
   483:9 551:3
Power 623:22
PPE 596:25
PPM 597:6
PPP 596:22 597:2,3
   598:3 602:9,9
preceding 425:7
prejudiced 402:12,24
Premier 389:19
   450:14
prepare 552:8,19
   593:5,13,18
prepared 530:2,4

602:13
preparing 593:25
present 392:15 403:7
   404:24 405:10
   424:18 570:16
presented 443:11
   446:7 549:6
presenting 404:9
   439:19
presents 570:10
president 406:9,10
   451:16,22,23
presumably 396:21
   583:8 617:3
presume 559:10
   583:10
presuming 598:10
presumption 559:14
   598:10
pretty 499:9 510:12
   510:24 573:7 576:5
   621:12
prevent 437:18
prevented 598:4
   620:8,15,17
preventing 597:24
   600:17
prevention 620:19
previously 450:10
   453:8 481:16 504:3
   608:15
price 587:2,4
primary 532:15
print 404:11 413:11
   545:24 546:3,4
   552:13
printed 404:2,23
   476:2 546:5 552:17
   618:3
prior 398:8 416:4
   446:13 453:15,17
   471:15 480:11
   486:4,10 539:22
   540:2,13 542:20
   546:16 579:24

580:21 592:15
   594:10 607:23
privy 514:23
probably 405:15,18
   432:6 453:24
   472:15 481:5 488:9
   493:12 531:15,18
   577:18
problem 403:6
   404:10,12 530:8,10
   546:18,20 551:4
   597:22 615:22
problems 584:5
proceed 519:11
   526:10
proceeds 588:13
process 435:15
   476:19 482:7,9
   533:13,15,16
   586:21,23 590:5
processing 503:18
produce 430:2
produced 415:15
   619:20
production 407:2
   429:18 435:19
   448:7 548:16
   613:11
products 588:11
   612:15
professional 558:14
professionals 604:19
profit 487:10 554:24
   554:24 555:4 557:7
   612:15 623:9
profitable 408:10
   486:14,17,18
profits 578:4
program 473:7 561:6
   564:15
properly 409:15
   557:15 574:23
   584:11 613:2
provide 431:19
   433:20 436:12

478:7,10 499:21
   512:10 516:19,21
   523:16,19 538:21
   551:11 559:20
   564:16 567:18
   569:21 570:2
   582:13 589:9
   605:13 615:20
provided 430:14
   475:22 479:13
   503:10 520:11
   522:22,24 523:11
   523:18,21 526:20
   544:11,22,23,24
   546:12,13 560:7
   563:6 566:17 567:5
   567:15 568:25
   582:22 604:20
   607:15 612:21
provides 438:25
   567:17 609:8
providing 522:25
   538:12 540:7
   569:22 606:19
   610:14
provision 470:25
Public 390:15 394:8
   625:17 628:9
Puccio 414:4,7 418:3
   418:8,11 419:13
pull 613:9 623:13
punishable 562:24
purchase 440:23
   447:18 471:11
   513:17 523:3,10,17
   523:20 526:16,22
   533:12 535:7,9,13
   535:19 569:7
   619:17 620:12,20
   620:23,24,25
purchased 457:24
   502:4 534:15 535:5
   535:10 618:10
purchasers 570:3
purchases 587:18

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

653

purchasing 394:11
  394:15 465:24
  532:16 586:25
  621:4
purpose 407:24
  426:7 445:11
  448:25 489:5
  593:21 594:5
  596:11
purposes 430:12
  474:5
pursuant 390:13
  457:18
push 544:2 623:11
put 408:18 418:8
  447:24 448:2
  451:21 475:24
  476:7 489:3 514:14
  514:19 533:21
  534:11,14 536:3
  549:15 557:25
  563:20 576:15
  589:15 591:6,7,8
  597:16 617:18
  618:2 619:22 620:5
puts 591:2
putting 534:3 622:3

——————————
          Q
——————————
quantify 617:20
question 395:24
  396:14 402:20
  403:22 405:6 412:4
  412:8,9,16 414:20
  417:20,25 418:2
  419:10,22,22
  420:10 423:3
  438:15,15,15 439:5
  439:10,16,23
  440:20 454:14,16
  454:18,20 455:6,10
  455:22,24 458:14
  469:4,5 485:15
  487:21 488:8
  490:12 491:16

498:20 506:2 511:5
  514:4 517:3 518:15
  518:17,24,25
  519:10 522:13
  523:12,14 524:8
  526:11,12,19 527:6
  527:7,8,14 528:4
  538:14 540:10
  545:3,7 554:18
  556:11 565:3,12
  569:4 573:4 579:8
  599:14 617:14
  619:21
questioning 395:21
  428:23
questions 402:3,5
  404:4 405:3 423:14
  431:18 449:13
  455:12,19 515:16
  515:17 522:8
  523:24 524:5,10,13
  528:11,16 564:3
  604:22 624:13,22
  627:2
quick 493:10
quiet 393:7
quite 531:14 614:8
quotas 575:21,23
quote/unquote 433:6

——————————
          R
——————————
R 391:2 392:2 628:2
raised 460:12
raises 408:2
raising 595:18
ran 614:21
rate 490:20,24 491:9
  491:18,24 492:6,15
  492:19,25 493:4,9
  621:8,20
reach 601:19,22,25
  602:5
reached 553:23
read 396:2,3 405:7,8
  405:11 418:23

420:11 425:20
  438:17,18 503:19
  518:24 519:9,12,20
  526:11,13 563:10
  563:15
reading 426:3
real 398:13,16 399:6
realize 417:11,14
really 464:6 524:22
  539:14 540:3,4
  555:2 571:4 593:11
  604:13 614:3
  622:23
Realty 389:10 391:11
reason 416:17 427:8
  435:7,16 440:10
  442:19 444:11,14
  445:21 446:3 450:7
  459:24 462:11
  470:16 507:12
  559:16 594:25
  597:22 600:20,22
  600:23,25 601:24
  629:5
reasonable 614:2
reasons 460:7,9
  611:11
recall 411:4 415:17
  417:6 418:15
  424:13 425:25
  426:19 429:14
  431:23 442:17
  445:16 449:5,10,11
  451:23 452:2,25
  453:24 456:4,7,16
  459:24 462:21
  464:19,23 465:2
  466:25 467:8
  472:13 473:13
  474:9 476:21
  477:22 480:24
  481:4 483:11
  487:14,17 501:2,10
  506:25 509:11
  531:17 548:4,19

549:18 560:22
  595:18 596:13
  607:20 608:7
  616:18 620:10
receive 487:2,5,11
  530:9 556:13
  584:19
received 427:22
  428:2 433:13
  437:22 469:10
  470:23 487:14
  554:16 555:20
  556:2,3,5,16,18
  583:11
receiving 437:25
  506:25
receptionists 463:18
recess 404:17 413:21
  425:14 434:18
  443:5 447:8 493:18
  525:22 554:10
  586:12
recognize 401:19
  403:22
recollection 424:15
  453:10 470:10,20
  472:20 486:9
  487:24 505:2 508:2
  529:5,10
recommendation
  407:17
recommended
  407:20,22
record 393:3,11
  394:3 395:3 396:3
  401:2,4,6,8 402:2,7
  402:10 403:14,17
  404:11,15,19,21,22
  405:8,9 413:13,17
  413:20,23 414:3
  418:24 419:3
  420:11 425:9,12,16
  425:19 434:11,16
  434:20 436:3
  438:18 442:22

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

654

443:3,7,9,10 447:6 447:10 449:17,19 449:21 475:11,13 475:15,17,21 479:7 493:16 494:8,12 502:15,18,20,22 519:12,20 523:23 523:25 524:15 525:3,6,8,10,20,24 526:8,13 527:18,20 527:24 528:3,6 553:17 554:6,8,12 558:2 559:24 560:2 560:4 566:8,10,12 566:14,17 586:10 586:14 607:2,4,6,8 623:25 624:3,5,7,10 628:13
**recorded** 395:19
**recording** 393:9
**records** 460:3 462:6 474:20 484:15,16 542:22,22 543:6 545:11,15 553:22 556:17,25 574:6 596:2,6 602:14 614:18 617:21,22
**rectified** 551:4
**rectify** 552:23 553:3
**redacted** 562:11
**redactions** 562:10
**reduce** 580:9,25 581:2,23 584:25 587:3 613:18
**reduced** 581:6 582:5 583:15 613:21 615:16 619:24
**reducing** 581:6 585:7 585:11,15,16 615:15 620:14
**reduction** 586:2
**refer** 615:20
**reference** 415:20 503:4 626:17
**referenced** 415:22

504:2
**references** 503:15,22
**referencing** 424:24
**referred** 459:3 560:19 585:3
**referring** 396:17 400:22 421:5 422:13,18 432:22 445:9 473:10 495:9 497:23 500:7 506:3 548:8 580:16 603:22 621:23,24
**refers** 426:10
**reflect** 404:21 418:24 419:3 443:9
**refresh** 424:15 472:19 529:5,9
**refutes** 408:21
**Regal** 482:24 483:3
**regard** 498:10 509:14 529:5 544:4 573:12 624:12
**regarding** 404:4
**regards** 397:19 403:5 440:19 542:8
**register** 545:19 546:6
**registry** 444:23 445:5
**regular** 415:7 466:21 485:14 574:7 576:6 582:22 592:19 593:23 596:2,6 597:5 619:7
**regulations** 471:2 515:10,14 563:9
**reinstated** 507:22
**rejected** 597:20 598:8,23 619:18 620:3
**relate** 492:14
**related** 628:15
**relation** 396:6 430:10
**relationship** 406:16 435:4,16 497:6,7 499:2 500:9 515:9 515:18,21 522:9,21

541:10,13,16,17 542:18
**Release** 608:25 609:4
**released** 423:8
**relevant** 425:20
**remedies** 519:25
**remember** 396:24 398:2,7 399:11,21 405:13,23 407:21 410:20 416:11 424:10 433:10 444:9 451:8 452:20 452:23 453:2,15 457:5 459:18 462:25 464:22 465:5 466:19 468:16,22 474:2 476:22 477:13,18 478:4,24 479:11 481:2,10 482:22 483:10 484:20 486:10 487:10,16 487:19 490:10 501:13 507:4 517:25 518:7,8,12 518:21 530:20 531:6,7 544:16,17 547:6 550:15 580:9 581:16 598:2 601:4 620:6
**remote** 471:13
**removed** 578:25
**renew** 399:2
**renewal** 398:20 399:6
**rent** 610:5,6
**rep** 494:20,23
**repaid** 520:14 609:10
**repair** 611:10
**repay** 516:24 517:9
**repayment** 510:20
**repeat** 395:24 399:3 517:18 518:2,5,10 518:12,14
**repeated** 518:16
**repeating** 518:11

**rephrase** 527:8
**report** 396:8 550:18 571:22 576:10,10 595:3,13 600:8 618:3,9,18,19
**reported** 549:25 550:8 558:17
**reporter** 390:14 393:23 394:4,10,14 628:8
**Reporting** 393:22,24
**represent** 401:16 441:13 443:14 450:2 503:9 560:18
**representation** 420:12,14
**representative** 389:7 610:24
**representing** 397:5 415:14
**request** 429:22 435:22 475:24 503:11 545:13,14
**requested** 417:22 426:13 438:5,6 583:24,25 585:24 627:7
**require** 448:10 502:9 521:3
**required** 419:20 583:5 611:19
**requirement** 399:13 609:15
**requires** 397:17
**reread** 420:9
**resolution** 528:7
**resolve** 572:15 624:12
**resolved** 572:17
**respond** 558:10
**response** 503:11 567:6 581:22
**responsibilities** 463:23 532:4,7 612:11

responsibility 532:12
responsible 465:10
  465:14 510:12
  572:20,24 573:3
  589:9
responsive 412:4
  579:19
rest 612:15
restart 477:5
restricted 457:17
restriction 459:8
result 460:13,22,23
  541:12 562:25
  613:22 617:16
  618:5
results 595:13 596:10
  604:21
retail 453:25 454:2,3
  454:7 456:6 461:22
  469:11 480:9,10,12
  480:13 481:15,18
  481:24,24 482:3,4,7
  482:11,14,17,18
  483:4 560:12,21
  619:9 623:6,8,11,14
  623:21 626:21
retaliation 553:10
return 484:23,24,24
  529:12,20,25 530:6
  546:9,17,19 549:3,7
  549:12,15 552:19
  556:13
returns 546:22 547:2
  547:7 548:4,10,13
  548:16 551:6 552:8
  555:16,23 593:13
  593:18,19 594:2
review 405:2 428:13
  429:5,6 436:3,7
  438:4 503:8 560:15
  566:23 570:15
  595:25 596:5 625:2
reviewed 419:4
  566:25 583:8
reviewing 405:4

595:11
reviews 425:10
revocation 460:6,14
  503:4,15,18 505:6
  507:16 562:25
  626:18
revoked 459:21
  461:9,12,13,17,23
  504:9 506:16
rid 437:4
right 398:6 401:20
  409:17 414:20
  415:6 416:7 417:25
  420:18 422:8 426:3
  426:12 427:7
  430:18 432:19
  433:6 436:9 438:21
  439:3,6 447:4
  452:22 456:20
  459:5 460:7 463:12
  473:11,22 474:12
  474:14 476:4
  478:15 479:9
  482:13 483:5,11
  489:2,3,6,22,23
  491:15 495:3 502:5
  507:15,21 508:10
  511:6,7,9,15 512:25
  513:14 514:9,15,18
  521:6,15 528:4
  529:11 531:8
  544:21 548:24
  549:6,7,9 550:24
  552:13 553:3 555:3
  556:19 558:3
  559:11 562:15,22
  563:23 573:2 575:3
  575:5,8,11 576:4
  584:8 595:5,11
  601:10 603:12,19
  607:11 609:3 610:8
  610:25 612:5,8,24
  618:9 621:16 622:3
  622:6
right-hand 562:5

rights 513:24 519:25
  520:14 521:25
  522:6
rising 408:2,3,6,22
road 551:25 553:5
Rob 418:8,11
Robert 389:5 391:4
  392:17 414:4,7
  418:3 419:12 425:3
  445:17 626:13
robust 613:12
rocky 576:18
role 509:22 537:3,4
  537:23 539:24
  540:22,23 571:15
  603:5,14,23
roles 406:4 463:5,22
  530:17,18 532:4,7
  538:2 540:21
Ron 409:3,5,9 410:10
  410:13,16,19,23
  411:9
Ronneburger 392:7
  394:14,17 416:22
  420:8
Roslyn 389:18
  391:19
Route 389:10 391:11
Ruderman 391:14
  403:20 441:9
  449:23,25 454:13
  454:17 455:4,23
  475:10,19 493:11
  494:10 502:14
  518:18 519:6,9,17
  523:22 524:11,18
  524:23 525:4,16
  526:2,24 527:5,12
  528:2,18 529:3
  548:15 554:5,14
  558:3,8 559:13
  560:6 565:11 566:7
  566:16 579:6,10,18
  585:23 586:5,16
  605:12 606:25

607:10 623:24
  624:9,10,20 626:3
rule 510:7
rules 609:13 610:14
ruling 412:15,17
  528:11,16 627:2
run 454:7 463:24
  466:5 490:8 618:18
  618:19
running 408:10
  464:3 491:21 492:4
  577:20 622:2
RWC 530:9 546:12
  546:12,13,16
  552:11 592:15

_____

**S**

S 391:2 392:2,13
  485:4,8,9,10,12,14
  485:18 626:6
sacrosanct 609:21
Sage 391:3 392:21,23
salary 477:20 487:2,5
  487:8 545:2
sale 464:4
sales 389:4 391:4
  464:11,13,23
  467:16 468:2,5,6
  531:5,21 532:23,25
  543:22 572:6
  575:21,22 580:15
  588:19 591:8
  615:14
salesman 619:3
salespeople 463:17
  464:7 468:3 530:19
  531:10,13,15
salesperson 463:7,13
  468:4
Sarah 389:15 391:16
  392:19 525:12
  592:20
sat 501:14 599:24
  622:18
satisfied 589:6

saw 516:14 596:18,19
saying 395:8,13
    402:24 407:25
    408:15 411:11
    426:5 431:15
    433:19 439:7
    451:19 453:12
    461:12 470:12,16
    471:25 476:5 482:2
    496:19 504:11
    505:15 506:24
    510:22 517:4 546:4
    573:13,22 580:20
    597:23 599:2 605:2
    617:22 621:15
says 406:11,14
    414:13 415:2
    418:17 420:23
    426:9 427:14
    441:25 505:22,24
    506:4 507:9 562:4
    562:16,23 563:22
    563:24 564:6,7,9
    565:21 567:23,25
    569:10 585:6
    588:22 608:12,25
SBA 596:15,18,19,25
    597:3,5,8,13 602:4
    602:5,8
scenario 511:3,23
    512:7 514:18,22
    614:6
scenarios 609:11
schedules 432:12,12
screen 401:12 403:22
    404:5,9,25 413:7,15
    414:18 425:22
    445:10 475:25
    476:8
sealed 395:16 397:20
    399:16
sealing 397:16
second 390:4 406:3
    407:14 414:23
    415:2 420:23

475:11 502:15
531:6,8 553:11
607:2 623:25
second-to-last 414:15
secured 515:23
security 419:14
    513:20,24 514:14
    514:19 515:2
see 403:24 404:2
    408:15,17 409:4,6
    413:15 414:14,19
    414:20,25 415:12
    415:23 418:18,22
    420:2,21 421:2,3
    424:22 427:18,21
    427:25 433:10
    434:4 444:4,6 449:9
    457:2 474:17
    475:25 476:8
    503:14,21,23,25
    504:17,18 505:10
    505:24 506:2,4,8
    508:20 516:12,17
    520:2 527:12
    534:24 535:4 536:5
    561:18,21 562:10
    562:12,15 567:25
    568:13 569:12,18
    574:7 596:12,14
    606:3,4,22 607:18
    608:12 609:2 617:5
    618:8
seeing 560:22
seek 411:5,7,8 412:14
    537:7
seeking 535:16
seen 400:23 504:5
    569:19 605:23,25
    606:12,17 622:4
sell 469:10,14,14,16
    482:14,17 489:5,14
    489:16,18,23 490:3
    490:21,22,24 492:2
    492:9,18 502:5
    609:25 623:6,10,14

sellable 587:15
selling 465:21 491:4
    491:7 493:3,5 513:8
    532:19 535:17
    580:12 581:7
    613:25 615:14
    619:6,8 620:25
send 427:14 430:11
    434:3
sending 416:4 430:23
    431:25 624:11
sends 415:8
sense 571:6 607:24
    608:22
sensitive 393:6
sent 414:7 416:3
    432:13 433:23
    561:5,24 584:22
    594:16 611:11
separate 435:22
series 606:3
serious 519:2,3,4
serve 426:7
server 543:3,4
services 486:7 567:7
    567:8,11,12,20
    568:8 569:2 591:16
    593:23,24
Session 391:22,23
    392:22 494:2
set 500:24 628:12,19
setting 570:19
settled 612:12
seven 609:2,4,12
    614:22
severely 402:12,23
Shanks 391:8 450:2
shareholders 438:25
    439:6,11,13
shares 440:13
sharing 425:21
Sheet 561:13 629:2
shit 456:12
shop 611:10
short 413:5 526:3

605:22 623:14
Shorthand 628:8
show 404:24 412:24
    413:8 419:20
    429:24 457:11
    462:5 509:17,18
    530:6 556:25
    589:18 618:4
showed 474:21 501:3
    556:17
showing 404:6 417:7
    448:7 474:22
shown 457:16 481:16
shows 462:6 589:17
    589:17
shut 577:13
side 504:18 505:21
    562:6
sides 561:16
sign 406:23 509:21
    520:21 521:3
    546:19
signature 441:19
    443:16,18 446:8
    562:12,14,23
    568:17 569:11,15
signatures 568:16
signed 406:18 407:3
    438:25 441:14
    442:18 443:15
    445:2,7 446:6,14
    450:22 451:20
signer 414:14,16,19
    415:2,20,20 416:17
    416:18 418:8,9,17
    421:13,13
signers' 415:5
significantly 582:5
    622:13
signing 446:18,24
    520:9
simply 538:23
single 419:21
sir 560:17
sister 469:18 470:5

470:21
**sit** 506:24 558:13
**sits** 622:22
**sitting** 470:19 478:15
    558:19 621:11,13
**situation** 470:13
    520:23,24 613:3
    620:11
**Sky** 445:19
**small** 463:3 485:4
    491:22 492:5
    514:10
**smaller** 456:14
**smart** 410:4
**Smith** 619:7,9
**Smithtown** 389:19
    391:20
**smoothly** 526:10
**Social** 419:13
**sold** 464:6 465:2
    581:17,17 609:9,17
    611:16 612:18
    614:5 615:7,11
    617:13 618:2,5,8,11
    618:21,23,25 619:3
    619:8,11,13
**sole** 421:16 465:10
    467:24 528:22
    599:5
**solid** 577:21,24
    579:25 580:5
**somebody** 462:20
    477:16 511:18
    536:25 537:5,9
    542:14 590:2 591:4
    593:2 596:17,21
    597:25 598:4,11,14
    600:24 610:22
**someplace** 497:11
**soon** 402:22 462:9
    489:14 587:16
**sorry** 395:23 399:3
    424:25 439:22
    450:23 456:12
    458:14 466:14

495:15 504:7 508:3
    532:20 538:16
    540:11 554:19
    556:20 558:12
    561:10 564:4 572:3
    592:9 606:24
**sort** 407:19 410:4
    460:17 468:23
    499:5,21 509:24
    542:10
**sorts** 464:14
**sought** 436:12
**sound** 462:7 476:4
**sounds** 493:14
**source** 552:14 586:2
**spark** 488:11
**speak** 408:12 432:6
    494:13 525:17
    598:24
**speaking** 416:13
    445:23 491:8
**specialist** 393:22
**specialty** 605:6
**specific** 417:9,19,22
    431:18 445:14
    470:2 492:19,20
    527:6 614:7 615:10
    615:11,17 621:24
**specifically** 395:14
    399:12 415:17
    424:10 427:14
    433:2,4 463:15,16
    463:25 466:25
    577:19 581:16
    582:4 593:17 601:4
    612:18 616:22
    621:5
**specifics** 411:4
    431:13,18 460:2,2
    465:4 468:16
    474:16 488:5
    585:12 594:20
    609:14 612:9
**spelling** 482:23
**spends** 405:4

**split** 442:9 451:8
**spoke** 396:22,24
    416:9,13,15 417:8
**squiggle** 562:12
**ss** 628:6
**staff** 426:22
**stamp** 402:9 403:16
    405:3
**stamped** 413:2,6
    605:16,19 606:10
    607:13 626:10,24
    626:25
**stand** 437:21 605:9
**stand-alone** 498:5,18
    499:3,4,16
**standard** 587:12
**Star** 445:18
**start** 401:9 404:20
    413:24 425:17
    434:21 443:8
    447:11 449:22
    475:18 494:9
    502:23 519:15
    525:11,25 527:25
    554:13 560:5
    566:15 586:15
    607:9 613:16 624:8
**started** 398:15
    505:14 509:12
    545:22 551:21
    580:10,11 581:6,7
    584:13 613:7,9,19
    613:25 614:3
**starting** 477:10 478:2
**state** 390:15 563:8
    628:5,9
**stated** 547:24 616:17
**statement** 427:24
    430:25 431:3
    433:15,17 437:5
    445:8 446:25
    447:15 448:22
    453:11 472:17
    517:12,16,23,24
    518:6 519:13,18

562:22 565:17
    579:13,15 591:17
    601:8,11 604:11
**statements** 430:15
    562:23
**states** 389:2 393:15
    506:7 562:19
**stating** 549:24 550:6
**stayed** 477:24
**stenographer** 517:19
**stenographic** 390:14
    394:3
**stick** 454:2
**stock** 440:12,14,15
    440:20,24
**stop** 455:17 477:3
    610:13,14 613:10
    624:17
**stopped** 454:11 455:2
    476:24
**stops** 573:2 613:11
**store** 446:11 489:3
    532:3 540:5,7,9,19
    583:22,22 584:3
    614:25
**stores** 545:5 614:24
**stormed** 553:8,20
**straight** 572:5
**straightforward**
    538:20
**street** 389:9 391:11
    392:11 492:11
**strict** 575:23
**strictly** 623:19
**strike** 403:17 579:7
    579:11,18
**structure** 483:17
    484:6
**structures** 497:13
**struggle** 426:7
**stuff** 428:8 507:24
    532:15 542:8
    549:16 573:23
    574:5,12 595:23
    616:2

Case 2:23-cv-06188-JMW   Document 518-10   Filed 06/01/26   Page 234 of 351 PageID #: 14037

SUPERB MOTORS INC., et al. v. DEO, et al.
Anthoony Deo  ---  February 12, 2026

658

style 572:11
Subchapter 485:4,8
subject 460:19 461:5
submit 421:19 473:9
  474:8,11,13 477:6
  619:17
submitted 433:18,25
  452:12,14 453:3,9
  453:21 456:5
  472:25 473:5,6,10
  473:14 475:3 561:2
  562:18,21 566:2
submitting 473:17
  475:6 478:16
  563:17 564:24
subpoena 567:6
Subscribed 625:14
successful 495:5
  536:2
suddenly 521:6
  540:18,22 592:11
  592:11
sufficient 495:17,19
suggesting 498:9
suggestion 461:14
  536:22
suggestions 465:22
  465:23
Suite 391:13 392:11
Sullivan 604:7
summer 407:15
  580:23,23 613:17
Sunrise 389:5,17,21
  391:8,18 396:18
  447:21 453:5,18,20
  454:5,11,24 456:2,3
  481:14,17 482:13
  503:13 577:6,7
  585:2,8 597:9
  602:15 607:12,17
  607:21 608:5 615:2
super 495:21 629:3
Superb 389:4 391:4
  393:13 410:8
  416:20 417:9,11,11

417:14 418:4 420:4
421:5,16 426:15
434:24 435:23
438:10,13,22
439:12 440:9,13,14
440:19,22,24
441:23 442:3,6,9
445:21 447:14,19
447:23,24 448:3,9
449:2,6 470:17
supervisors 571:23
  572:13
supplied 402:13
  583:3,3
supposed 435:4
  444:9 454:9,10
  516:5 552:23
  582:18 590:17
sure 397:11 400:22
  402:17 404:10
  405:16 407:14
  410:17 429:12
  445:24 451:25
  452:5,16 456:19
  461:12,14 466:23
  467:16 472:18
  477:24 478:9,18
  479:4 480:8,16
  484:10,14,25 485:2
  487:3,7,13 491:20
  493:14 501:24
  502:2 504:6 506:22
  509:13 531:3,11
  533:3 534:19
  536:18 537:14
  544:6 545:13 547:9
  547:11,15 548:14
  550:16,20 554:22
  574:18,23 575:13
  576:7 583:20
  584:21 585:9,12
  586:8 588:2 594:17
  595:15,16 596:7
  599:8 602:6 610:13
  611:3,6,7 612:25

617:9 621:6
surmise 437:9,15
surprised 433:13,16
suspended 459:20
  461:9,12,17,23
  504:10 505:15
  507:23
suspension 460:9,14
  504:11,16,20,24
  505:6,22,23 506:7
  506:13,18 507:2,9
  507:12,13,13,14,18
  507:20,21 562:25
suspensions 506:22
swear 394:4
switch 482:7
switched 481:15,25
sworn 394:7 433:18
  625:14 628:12
Syosset 389:17
  391:17 396:19
  453:5,17 454:4
  456:2,3 482:19
  483:3
system 534:12,24
  543:13,15,23
  545:23 546:7
  547:25 548:2
  553:23 590:15,24
  591:3 617:4,11
  618:7,9 619:18
  620:23
systemic 438:4
systems 543:9

_____

T

T 394:6 494:4 626:6
  628:2,2
take 393:9 398:25
  402:25 418:21
  447:2 449:15
  492:18 493:12
  527:5 549:14
  553:14 586:5 588:9
  605:21 611:23

612:5,12,13,14
  623:13
taken 390:11 404:17
  413:21 425:14
  434:18 443:5 447:8
  493:18 525:22
  526:2 547:18
  554:10 586:12
takes 577:15
talk 395:3 422:4
  508:16 525:14
  526:6 554:23
talked 397:20 411:15
  415:11 559:21
  584:7
talking 471:14 473:3
  514:7 520:22,24
  522:9,11 578:13
  580:23 597:6
  612:21
talks 395:2
tally 618:6
TAMMY 392:22
target 491:18
targets 491:20
tax 484:23,24,24
  529:12,20,25 530:5
  546:9,17,19,22
  547:2,7 548:3,10,13
  548:16,18 549:3,12
  549:15,19 550:2,8
  550:22 551:6 552:8
  552:19 555:16,23
  556:9,13 557:6,13
  557:24 593:13,18
  593:19 594:2
taxes 548:20 556:14
  556:16 558:19,22
  592:25 593:5
taxing 549:24 550:6
team 389:4 391:4
  408:8 433:6
technical 545:3,7
tell 399:13 418:13
  442:14 452:17

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo    ---    February 12, 2026

659

453:13 455:18 463:5,8,14 475:9,23 494:16 500:4 508:24 515:13 518:3 519:7 534:23 558:14,19 567:4 577:18 589:2 600:24 614:22 616:8

**telling** 412:13 417:8 418:7 424:24 463:17 514:23 549:21 552:3 596:9 597:13 617:15

**ten** 463:2,4 491:4,6 531:15 614:9,11

**term** 440:15 485:5,8 490:18,19,25 571:9 571:10

**terminate** 476:25

**terminated** 477:4

**terms** 484:6 486:21 508:21,22 512:8,17 514:12 532:21 535:15 557:9 573:15,23 591:6

**testified** 394:9,24 395:14 428:3 431:22 450:10 453:7 457:15 459:20 494:6 504:3 505:5 508:4 538:18 556:19,21 586:4,17 608:15 613:13 619:22

**testify** 419:25

**testimonial** 405:5

**testimony** 397:13 402:9 403:18 410:22 421:15 437:6,21 440:3 450:8 453:13 494:14 529:24 578:22 624:21 625:5 628:14

**text** 410:18 424:20 425:2,21,23 426:2,5 426:16,21 429:16 436:18,20,22 437:6 585:22 626:12

**texts** 429:24 581:13

**thank** 449:12 528:17

**theft** 616:6

**thefts** 426:15

**they'd** 582:24 587:9

**thing** 415:8 435:14 439:9 460:5 465:18 471:20 492:24 501:24 509:20 510:25 541:11 588:18 590:25 596:8 609:23 622:17

**things** 401:22 402:4 407:18 415:10,22 436:8 464:14 466:23 506:13 576:8 590:4 593:16 613:15

**think** 400:3,15 405:17 406:24 409:14 415:7 421:22 426:25 432:21 433:17 435:14 447:3 450:17 455:3 456:10 459:7,22 464:6,10 465:11 467:12,15 471:5 472:11 473:5 477:15 479:21,23 479:25 483:25 484:17 488:13,14 488:20 494:20,21 500:17,17 501:25 509:4 517:13 528:24 529:11 530:3 531:19 545:23 547:20 548:5 552:6,20,23

562:4 563:20 577:2 581:2,5,25 585:23 594:12 605:4 609:12 622:16 625:3

**thinking** 474:9 476:23 580:22 591:22

**third** 406:8 503:20

**THOMAS** 389:16

**Thomasson** 389:15 432:18 433:5 443:20 606:14

**thought** 410:9 459:3 476:19 495:13,18 495:25 496:9 497:3 604:9

**thoughts** 459:14

**thousand** 444:13

**thousands** 427:5

**threat** 524:19,21

**threatened** 524:17

**threatening** 524:19

**three** 406:5 507:19 531:19 577:3 604:6 604:12 605:5 609:12 621:6,11 624:19,20

**tide** 408:2,3,6,22

**Tim** 494:22

**time** 390:12 393:4,8 394:20 395:6 396:11,21 397:14 399:23 400:14 401:4,8 402:5,9 403:15 404:15,19 404:22 405:3,4,5,10 407:9 413:20,23 421:16 425:12,16 425:19 434:16,20 436:4 443:3,7 447:6 447:10 448:4 449:17,21 460:21 461:16 462:15,18 464:21 468:11,12

468:16,19 469:2,21 472:23,24 473:21 474:16 475:13,17 476:18,23 477:20 490:23 493:12,16 494:8 501:17 502:6 502:18,22 505:13 506:21 507:15 508:8 525:6,10,20 525:24 527:18,24 528:5 530:7,12,13 530:21 531:10 532:5,6,9 533:25 545:10 546:24 547:2 551:16 553:14 554:8,12 559:24 560:4 561:23 566:10,14 576:13 578:9,12,18 580:3,17 586:10,14 587:13 591:25 592:4,7,11 595:18 596:15 598:20 599:22 600:13 601:9 607:4,8,22 610:16,18 611:18 614:17 617:2,5,9 618:23 619:16 621:8,12,15,17 622:24 624:3,7 625:6,9

**timely** 613:6

**times** 402:16 478:25 479:2 549:6

**tired** 588:11

**title** 406:4 419:14 451:15,16,24 452:4 562:16

**titled** 401:13,18 626:9

**today** 395:7 404:24 410:22 450:8 470:20 480:19 494:14 506:24 558:13,20 624:17

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

660

**Today's** 393:3
**told** 395:15 397:21
　398:4 410:22,25
　427:10 430:9 432:4
　446:15 454:12
　497:18 498:15
　500:11 508:19
　515:20 517:20,23
　548:2 564:14
　598:19 599:16
　600:3 613:18
　617:20
**Tom** 432:21,22,23
　485:21 547:13
　591:12,18,19,22
　592:2 593:12 594:6
　594:18 597:4,14
　598:21 601:17
　602:6,22 603:25
　604:8
**tomorrow** 528:14
　624:14,23
**Tony** 408:8,13,23
　409:13 410:9,13,16
　410:19,23,24 411:8
　417:23 419:19
　421:7,10 422:15,20
　422:22 423:4,21
　426:2,17 427:7,10
　427:12 429:12
　430:10 431:21,24
　432:4,20 433:19
　434:2 436:13
　437:15 440:4,12,21
　442:8,13 446:10
**Tony's** 411:20 424:3
　424:5 436:24
**tool** 495:4,8
**tools** 486:20 495:3,17
　495:17,18 584:6,7
**top** 409:2 420:20
　441:25
**Toshiba** 427:5,23
　428:8 430:15
　433:14,22

**touch** 610:25 611:2
**touching** 524:18
**tough** 469:4,5 487:21
　577:3
**Toyota** 577:5 582:19
**track** 543:10,13,17
　543:23 545:11,15
　574:14
**trade** 442:2 471:18
　586:19,22 587:9,14
　588:10,16 590:10
**trade-in** 586:24
　587:7,10 588:16
　589:15,16 612:13
**trade-ins** 471:8
**traded** 587:25
**traded-in** 588:7
**trades** 471:17
**Traffic** 563:5
**training** 570:24
**transaction** 543:21
**transcript** 394:12,16
**transfer** 454:10
　455:2
**transferred** 440:24
**transferring** 440:21
　441:3
**tremendous** 578:20
**trial** 390:10 432:15
**tried** 553:9 596:14
　602:6 620:20,22
**trigger** 623:13
**true** 427:10 430:7,9
　448:16 563:7,25
　565:23,25 628:13
**truly** 495:5
**trust** 605:10
**truthful** 450:8 478:8
　563:19
**try** 455:15,21 491:9
　491:24 526:8 531:6
　572:14 587:16
　596:15 602:5
　621:19 622:9
**trying** 408:9 497:2

498:23 507:24
538:17,25 539:20
597:15 615:13
621:25
**turn** 490:20,24 491:9
　491:18,24 492:6,15
　492:19,25 493:4,9
　505:17 568:12
　621:7
**turned** 489:22 505:7
　621:20
**turnover** 488:24
　489:21 490:3,8,19
**twice** 448:21
**two** 401:22 402:13
　416:19 418:3
　430:20 436:7
　448:17 468:25
　474:12 475:5
　476:15 490:15
　491:14 507:19
　548:24 553:5
　554:17,25 556:22
　557:21 568:16
　605:25 609:12
　621:6
**two-page** 413:5,12
**type** 464:19 484:22
　495:4 499:6 532:21
　568:7 575:24 618:6
　621:20,22

―――――――――

**U**

**UAE** 468:13 505:5
**UCC** 513:22,23
　514:3 515:25 516:3
　516:7,12,14
**UEA** 389:19 450:14
　450:18 453:19
　456:4,8 459:20
　462:10,22 463:6,23
　464:20 467:7
　468:20 471:6,18
　476:24 480:6
　484:12,16,22

486:14,24 487:2,12
488:18 490:8,11
501:23 502:13
504:3 584:6
**Uh-huh** 406:7 436:10
　466:12 467:25
　479:10 511:8
**ultimately** 536:23
　572:25 573:2
　611:13
**um** 406:7 407:17
　456:12
**understand** 396:14
　404:8 420:24 423:3
　427:6,8 428:12
　429:9 430:22,24
　431:3 432:2 458:15
　471:25 490:5,6
　497:2 498:17,20,23
　509:14 511:4,10
　518:23 526:7,19
　529:24 533:9
　538:25 539:21
　540:10 544:23
　554:18 558:6
　563:16 597:15
　598:9 601:15
　611:13 619:21
**understanding**
　439:11,17,20
　457:23 458:6,19,23
　459:5,7,13 485:12
　485:13 500:19
　512:13 516:24
　517:10 529:18
　538:18 555:15,19
　555:21 558:15
　577:9 608:20
　621:25
**understood** 500:10
　509:25
**unexpectedly** 436:8
**Uniondale** 390:4
　392:6 393:20
**unique** 490:16

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo   ---   February 12, 2026

661

**United** 389:2 393:15
**units** 574:12
**Universal** 450:12,15
  503:22 504:4,9,23
  505:11 507:2
**unlimited** 615:3
**unravel** 613:10
**upset** 581:5
**Urrutia** 389:5 391:4
  392:17 424:21
  425:4 426:22
  429:19 439:2
  445:18 626:14
**use** 395:4 486:2,12
  490:18 533:7 535:7
  536:8 538:24
  546:12 547:25
  577:10 578:15
  579:20 587:23
  588:3,5
**usually** 468:5 471:20
  499:12 533:17
  545:4 622:25

———————————
               **V**
———————————

**v** 393:14 629:3
**valid** 439:7,9,9,13,14
  439:15,16
**valuating** 588:16
**value** 580:14 587:3,7
  588:17 623:8
**values** 623:21
**variables** 469:7,18
**various** 445:20 460:7
  460:8 463:6 530:17
  552:4 611:11
**Vazquez** 568:18,18
  568:22,24
**vehicle** 533:12 563:5
  569:7 580:14
  586:19 587:10,19
  587:25 588:5,7,22
  588:23 608:16
  609:9,17 612:18
  618:10 621:18,22

**vehicles** 464:14
  471:11 493:4
  513:15,18,21
  514:19 515:3
  523:20 526:22
  532:17,24 535:9,10
  535:12,20 536:9
  562:19 563:18
  564:13,18 565:9,14
  570:3 580:12,18,19
  580:24 581:7
  608:13,23 610:19
  611:6,16 618:8,24
  619:11,13,17 620:2
  620:9,20,24 621:2,4
  621:10 622:20
**Ventiglimia** 592:2
**venture** 420:25
**veracity** 403:8
**versa** 417:17
**versus** 484:6
**vice** 406:10 417:17
  451:23
**video** 393:8,22 625:5
**Videoconference**
  392:13,18,20,23
**Videographer**
  392:16 393:2 401:3
  401:7 404:14,18
  413:19,22 425:11
  434:15,19 443:2,6
  447:5,9 449:16,20
  475:12,16 493:15
  494:7 502:17,21
  525:2,5,9,19,23
  527:17,23 554:7,11
  559:23 560:3 566:9
  566:13 586:9,13
  607:3,7 624:2,6
  625:4
**VIDEORECORD...**
  390:9
**VIN** 611:4 618:9,20
**violation** 458:2,9,22
  459:16

**violations** 504:15
**visited** 400:10 446:11
**voluntarily** 399:19

———————————
               **W**
———————————

**W-2** 550:10,14,25
**wages** 570:20
**wait** 407:13 422:11
**waited** 475:4
**waiting** 623:15
**WALKER** 391:23
  518:15,23 524:7,15
  525:14 527:3
  557:23 558:12
  559:4,18 564:19
  565:2,10,16 579:9
  579:14 586:8
  597:10,12 604:5
  615:8
**want** 395:9 401:25
  402:11 403:21
  413:7,12 423:19,20
  423:23,24 424:2,18
  440:7 443:15
  449:15 451:20
  452:25 455:8,19
  462:5 476:2,7 488:4
  489:14,16,23 492:2
  518:5 525:2 553:17
  557:25 575:10,13
  576:3 579:8,10,12
  583:10 586:5
  602:23 603:19
  604:2,3 611:7
  617:18 625:2
**wanted** 395:24
  401:22 402:4,5
  417:10 423:10,16
  423:18,21 424:5
  508:20 561:2 577:9
**wants** 502:5 520:19
  527:9
**warrantees** 531:21
**warranty** 464:13
  588:11 612:14

**wasn't** 447:18 452:22
  463:4 472:16
  486:18 514:23
  521:18 564:20
  575:23 582:10
  595:22 601:7,10
  602:16 603:6 619:6
  620:14
**way** 434:5 436:23,24
  437:3 455:20
  490:18 524:17
  527:8 534:4 544:6
  558:10 577:12
  580:4 588:13 599:3
  619:4 628:17
**ways** 510:16 583:19
  588:25
**we'll** 395:10 404:11
  404:24 412:16
  422:3 430:2 435:21
  455:20,21 523:13
  548:17 605:13
  624:23
**we're** 394:19 401:3
  401:20 402:22
  403:10 404:14
  406:25 413:19
  425:11,15 429:17
  429:23 442:24
  443:2 447:3,5 448:6
  448:13 449:16
  454:19 475:12
  478:2,3 493:15
  494:11 502:17
  507:23 518:25
  519:3,10 523:22
  524:14,16,20 525:9
  525:19 526:7,24,25
  527:17 528:3,9,12
  554:7,11 559:23
  560:3,8 566:9,16,18
  576:3,10 577:21
  586:9 605:12 607:3
  607:7 612:21
  620:25 624:2,6,9

we've 416:8 457:9 503:2 526:2
weather 416:15
week 436:8
weeks 490:16 491:14
WEIR 392:9
Wendy 454:9,23 534:2,2 537:2,18 538:25 539:4,9,18 540:16,17,18,20 541:24 542:2,3,20 543:7 572:8,10 573:11 577:20 578:22 583:3,3,12 583:20 594:3,19 598:21 601:17 602:6 604:7 612:25
Wendy's 537:7 542:5
went 397:8 419:19 444:22,25 445:7 454:17 546:6 547:25 595:15 599:11,24 600:8 619:19
weren't 433:23 542:13 557:15 564:23 594:10 604:14
Westlake 567:6,8,10 567:12,20 568:7,20 568:25 569:5 570:10
wheel 588:11
WHEREOF 628:19
whichever 589:6
whispering 393:6
wholesale 453:25 480:14,18,20 481:7 481:11,15,25 482:5 482:8,12 483:8,12 613:25 619:6,10,14 623:10,15
wholesaler 619:12
Wick's 528:13
wife 406:9 451:5

452:3 465:16 466:21 467:5,11 484:18 486:6 487:5 487:12 488:19 526:5 528:24 530:6 530:21 531:24 532:2,5 536:16 548:24 551:13 555:7,17 570:19
wife's 536:24
willfully 478:19
willing 499:13 582:13 582:24
wired 579:17
withdraw 584:4 592:12
withdrawn 400:4 433:3 467:4 468:10 472:8 509:16 545:16
witness 394:5,9 395:23 402:10,23 403:13 412:19,22 413:16 419:11 430:4 448:10,15 454:15 494:5 518:22 524:9,16,21 527:10 558:11 626:2 628:11,14,19
Woodbury 400:15,15
wording 426:6
words 436:25 451:15 523:13 571:22 617:18
work 409:18,20 516:11 538:11,13 571:13 577:19 588:19 592:19
worked 409:16 462:23 467:20 538:10,15 571:18 604:10
working 440:5 454:23 497:10 530:11 531:24

557:3 586:18 587:17
worth 471:19 548:3 581:17
wouldn't 400:18 500:22 510:8 515:15 519:23 520:9,16,18 537:16 569:3 572:5 582:15 594:20 602:23 611:12 612:8,9
wow 480:25
write 445:22
writing 407:6 430:3 442:12,16 513:25 514:11 548:17 584:19 585:16,18 585:25
written 429:18 512:14
wrong 459:6 525:12

_____

**X**

x 389:3,24 622:9 626:1,6

_____

**Y**

Y 394:6 494:4
yeah 395:2 397:7 405:13,18 410:12 428:5 432:6,10 450:23 452:13 456:10,17 457:7 458:13 459:22 460:10,21 461:25 462:16 465:8 466:24 467:15 471:23 480:12 482:9,9 484:11 491:6 498:16 506:23 512:12 531:14 533:15,25 536:15 543:18 552:16 573:14,14 576:17 585:9 594:3

608:22 611:4 613:16 617:9 618:12,17 619:24 620:22
year 397:6,7 487:23 488:3,8 492:19 528:23 544:5 546:14,14,16 550:4 554:3 593:24 621:14
year-and-a-half 606:11
years 402:14 452:6 453:23 457:18 491:5,6 542:16 543:10 550:14 554:25 555:2 556:22 557:21 600:20 605:25 614:22
years' 548:3
York 389:2 390:4,15 391:5,13,13,21,21 392:6 393:16,20 628:5,7,10

_____

**Z**

zero 446:16 488:10
Zizmor 391:8 450:2

_____

**0**

00096 606:7

_____

**1**

1 401:5 414:14,19 415:20 416:18 418:8 421:13 493:11 584:14
1,090 444:15
1:02 493:16,18
1:45 494:3,8
1:55 502:18
1:59 502:22
10 475:18 493:17 582:2 584:15,16

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

663

| | | | |
|---|---|---|---|
| **10/30/17** 506:7 507:10 | **15** 457:7 527:25 554:9 627:13 | 389:13 | 600:12 601:16,22 601:25 |
| **10:13** 390:6 393:4 | **15,000** 509:4,7 538:24 541:20 555:10 556:5,15 557:20 | **2:23-VC-6188** 393:17 | **2022** 531:25 532:11 576:15 577:23 578:9,16 579:22,25 580:2 606:19 607:17 608:4 613:14 |
| **10:21** 401:4 | | **2:28** 525:24 | |
| **10:22** 401:8 | | **2:31** 527:18 | |
| **10:25** 404:15 | | **2:58** 527:24 | |
| **10:48** 404:19 | | **20** 407:11,13,13 607:9 614:12 615:7 624:4 | |
| **10:58** 413:20 | **1580** 389:8 391:10 | | |
| **100** 441:3 | **1581** 389:7 391:9 | | **2023** 396:20 398:6,9 399:24 400:3 401:19 413:8 414:6 414:10 416:3 420:21 426:20 |
| **100,000** 487:23 | **1591** 389:8 391:10 | **2000** 468:8 503:18 | |
| **10170** 391:13 | **16** 457:7 554:13 559:25 | **2016** 396:22 397:3 450:23,23 457:6,10 464:16 466:19 471:14 480:5,19 548:16 | |
| **10177** 391:21 | | | |
| **1020** 528:14 | **1632** 389:8 391:10 | | **2025** 601:16 |
| **1065** 549:2,7 | **16th** 569:10 628:20 | | **2026** 390:6 393:4 625:5,15 628:20 629:3 |
| **11** 404:7 494:9 502:19 | **17** 468:9 507:6 560:5 566:11 627:10 | **2017** 462:6,8 468:10 468:10 469:24 470:6,21 476:15 477:10 480:5 487:14 504:16,19 505:23 547:14 550:5 | |
| **11-10** 441:15 | **17th** 554:2,4 | | **21** 407:11,14 624:8 625:7 |
| **11:20** 413:23 | **18** 507:6,12 530:3 566:15 578:24 586:11 600:6 627:11 | | **212-537-6612** 391:22 |
| **11:22** 420:21 | | | **212-661-6800** 391:14 |
| **11:32** 425:12 | | | **215-665-8181** 392:12 |
| **11:37** 425:16 | | | **21th** 599:18 |
| **11:45** 434:16 | **180** 450:11 456:9 469:23 470:22 480:5 484:2 | **2018** 469:24 470:6,21 472:15,16 475:5,24 476:12,13 504:12 504:21,22 505:16 506:17 508:9 528:20 529:20,25 530:5,11,14,18 531:2,17,18,25 532:11 543:6 544:9 544:15 546:8 547:5 547:8 548:18 549:20 550:3,23 552:20 554:15 555:16 | **22** 407:14 436:2 577:21 578:13,14 613:16 |
| **11:48** 413:9 414:6 | | | |
| **11:49** 434:20 | **18211** 391:5 | | **22,640** 445:11 |
| **11:58** 443:3 | **189** 389:5,21 391:8 447:21 454:11,24 577:14 | | **22nd** 426:19 |
| **11423** 391:5 | | | **23** 389:10 391:12 436:2 470:18 627:14 |
| **11553** 392:6 | **18th** 506:14 | | |
| **12** 390:6 502:23 525:7 629:3 | **19** 586:15 607:5 627:5 | | **2320** 391:13 |
| **12/14** 504:15 | **19107** 392:12 | | **24** 436:2 437:9,11,11 437:12,14 |
| **12:01** 443:7 | **1st** 462:6 476:15 477:10 | | |
| **12:05** 447:6 | | | **25** 627:9 |
| **12:09** 425:24 | | | **250** 391:20 |
| **12:12** 447:10 | | | **2519** 389:9 391:11 |
| **12:15** 449:17 | **2** | | **2nd** 392:5 475:24 476:3 606:19 |
| **12:17** 449:21 | **2** 401:9 404:16 415:2 415:20 416:18 418:9,17,19,25 419:10 421:13 567:23 584:14 | **2019** 546:15,15 547:10 550:17,18 550:22 551:2,20 554:15 555:16 569:10 | |
| **12:44** 475:13 | | | |
| **12:45** 475:17 | | | **3** |
| **1239** 389:9 391:11 | | | **3** 404:20 |
| **12th** 393:3 394:21 625:5 | **2,325,000** 607:18 608:6,8 | **2020** 547:12 550:20 554:4 591:22 592:15 | **3:26** 554:8 |
| **13** 525:11,21 | **2:20** 525:6 | | **3:36** 554:12 |
| **1339** 392:11 | **2:21** 525:10,20 | | **3:41** 559:24 |
| **14** 525:25 527:19 627:4 | **2:23-CV-6188(JM...** | **2021** 549:6 599:18 | |

SUPERB MOTORS INC., et al. v. DEO, et al.

Anthoony Deo  ---  February 12, 2026

664

**3:45** 560:4
**3:49** 566:10
**3:51** 566:14
**30** 463:4 490:4,14 581:18 612:8 614:14 615:7
**30-1** 401:18
**300** 444:12 621:14,22
**30th** 504:16,18 505:23
**31** 414:6,10 415:25 416:3
**31st** 413:8
**333** 390:3 392:5 393:19
**35** 401:12,13 626:9
**36** 400:25 412:24,25 413:25 626:10
**37** 424:19 425:2 626:12
**37,500** 448:18,21 449:2
**38** 434:7,10 441:6,8 626:15
**38-2** 424:20 425:22
**39** 441:8,10 443:12 626:16
**394** 626:3
**3998** 413:2,6 626:11
**3999** 413:2,7 626:11
**3rd** 420:20

_____

**4**

**4** 409:2 413:24 425:13
**4:14** 586:10
**4:15** 586:6
**4:25** 586:14
**4:50** 607:4
**4:51** 607:8
**40** 463:4 503:2,3 626:17
**401** 626:9
**406** 627:9
**41** 560:9,9,10 626:19

**412** 626:10 627:4
**42** 566:19,20 626:22
**420** 391:12
**425** 626:12
**429** 627:10
**43** 424:25 425:6,7,23 605:12,15 626:24
**434** 626:15
**435** 627:11
**44** 424:25 605:13,18 626:25
**441** 626:16
**446** 389:10 391:11
**448** 627:12
**449** 626:3
**45** 490:16
**4628** 563:6
**49** 440:24

_____

**5**

**5** 425:17 434:17 528:10
**5/1/18** 505:24
**5:10** 624:3
**5:14** 624:7,17
**5:15** 625:6,9
**50** 488:7
**50,000** 488:3
**500** 392:11 444:12 621:11
**500,000** 447:14,17,22 447:25 488:14,15 488:17
**503** 626:17
**516-357-3700** 392:6
**523** 627:5
**548** 627:13
**5518** 441:23
**56** 624:18,21
**560** 626:19
**566** 626:22
**585** 627:14

_____

**6**

**6** 434:21 443:4 562:5

562:5,7,7 627:12
**60** 490:15 622:11
**60,000** 541:21
**605** 626:24,25
**60s** 490:4
**6th** 401:19

_____

**7**

**7** 443:8 447:7
**70** 615:2
**7116600** 503:5,16 626:18
**718-412-2421** 391:6
**75** 608:13
**75,000** 447:23 448:2 448:17
**76** 389:9 391:11
**7th** 391:21

_____

**8**

**8** 447:11 449:18
**81** 607:13,14

_____

**9**

**9** 449:22 475:14 528:14 624:14,23
**90** 490:4,15 491:13 492:18 622:11
**90,000** 581:17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT
ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC,
NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER,
JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS
BARON REPRESENTATIVE OF THE ESTATE OF DAVID
BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD
AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN
BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519
HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC,
446 ROUTE 23 AUTO LLC and ISLAND AUTO
MANAGEMENT, LLC,

                  Plaintiffs,   Case No.
                        2:23-cv-6188 (JMW)
       -against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT
BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE,
THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD
COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF
SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP
LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST
MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF
SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA
CAPITAL PARTNERS INC., JONES, LITTLE & CO.,
CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC,
J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY
AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

                  Defendants.

-------------------------------------------------X
                  February 13, 2026
                  9:19 a.m.

                  100 Federal Plaza
                  Central Islip, New York

      CONTINUED EXAMINATION BEFORE TRIAL OF
                ANTHONY DEO

Page 2

(Caption continued:)

CONTINUED EXAMINATION BEFORE TRIAL of ANTHONY DEO, one of the Defendants herein, taken by the Plaintiffs and Co-Defendants, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Notice and Order, held at the above-mentioned time and place, before Susan M. Cirrincione, a Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

HONORABLE JAMES M. WICKS
    100 Federal Plaza
    Central Islip, New York

SAGE LEGAL LLC
    Attorneys for Plaintiffs SUPERB MOTORS INC., TEAM AUTO SALES LLC and ROBERT ANTHONY URRUTIA
    18211 Jamaica Avenue
    Jamaica, NY 11423

    BY:  EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
    Attorneys for Plaintiffs 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, ISLAND AUTO MANAGEMENT, LLC, ASAD KHAN, IRIS BARON, 189 SUNRISE HWY AUTO LLC and NORTHSHORE MOTOR LEASING LLC
    420 Lexington Avenue
    Suite 2320
    New York, NY 10170
    BY:  JEFFREY RUDERMAN, ESQ.

Page 4

A P P E A R A N C E S: (Continued)

THE LINDEN LAW GROUP, P.C.
    Attorneys for Defendants ANTHONY DEO, SARAH DEO, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, GOLD COAST CARS OF SYOSSET LLC, GOLD OAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, and GOLD COAST MOTORS OF SMITHTOWN LLC
    250 Park Avenue
    7th Floor
    New York, NY 10017
    BY:  BONNIE WALKER, ESQ.

HARRY R. THOMASSON, JR., ESQ.
    Attorney Pro Se for Defendant HARRY THOMASSON
    3280 Sunrise Highway
    Suite Box 112
    Wantagh, NY 11793

CULLEN and DYKMAN LLP
    Attorneys for Defendant FLUSHING BANK
    333 Earle Ovington Boulevard
    Second Floor
    Uniondale, NY 11553

    BY:  ARIEL E. RONNEBURGER, ESQ.

Page 5

A P P E A R A N C E S: (Continued)

ALSO PRESENT:

    SARA DEO

    ROBERT ANTHONY URRUTIA (Via Zoom)

    ALIVIA COONEY, Paralegal, Sage Legal LLC (Via Zoom)

    TAMMY ARONBAYER, Paralegal, Sage Legal LLC (Via Zoom)

    JOSEPH BARLETTA, Videographer, Sherack Video

2 (Pages 2 - 5)

Page 6

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

Page 7

Proceedings

THE VIDEOGRAPHER: We are on the record and the time now is approximately 9:19 a.m. Today's date is February 13th, 2026. This is the video deposition of Anthony Deo in the matter of Superb Motors Inc., et al. versus Anthony Deo, et al., index number 2:33-cv-6188, United States District Court, Eastern District of New York. My name is Joseph Barletta, legal videographer with Sherack Video in association with The Little Reporting Company. Today we are at Central Islip Federal Courthouse located at the 100 Federal Plaza, Central Islip, New York.

Will counsels please identify yourselves and state whom you represent.

MR. RUDERMAN: Good morning, Your Honor.

THE COURT: Good morning.

Page 8

Proceedings

MR. RUDERMAN: Jeffrey Ruderman, Cyruli, Shanks and Zizmor on behalf of all the IAG plaintiffs.

THE COURT: Good morning, sir.

MR. KATAEV: Good morning, everyone. Emanuel Kataev of Sage Legal LLC for the plaintiffs, Superb Motors Inc., Team Auto Sales, LLC and Robert Anthony Urrutia.

MS. WALKER: Good morning. I'm Bonnie Walker. I'm with Linden Law Group and I'm here for defendant, Anthony Deo.

MS. RONNEBURGER: Good morning. I'm Ariel Ronneburger with the firm of Cullen and Dykman, LLP and I'm here for the defendant Flushing Bank.

THE COURT: Mr. Thomasson?

MR. THOMASSON: Harry Thomasson. I'm pro se.

Page 9

Proceedings

THE COURT: Okay. All right, so before we get going, you're here today because I directed you to continue the deposition and complete it here today because of the rulings, and yesterday's was the latest. So I've received an email from Mr. Kataev. I know it was from him because he sent me his picture too, and that gave me the rough transcript of the two areas for questioning. I've reviewed them and here's how I'm going to rule on those:

The two of them, the first is the questions about, "Did you need Tony's permission to hire anyone?" And the response was, "My partner, we made decisions together." And then the followup was, "Did you need his permission to hire anyone?" Answer, "He was my partner. We made decisions

3 (Pages 6 - 9)

Page 10

Proceedings together."

So Mr. Kataev, this is your application to do what; have him answer differently, what?

MR. KATAEV: The application, Your Honor, is to answer the question directly, to compel the witness to answer the question yes or no.

THE COURT: Okay, that's denied because he has answered it. That's his answer. His response is he was his partner and they made decisions together. So that presumes permission wasn't needed, was, I don't know, but it was a collective decision.

MR. KATAEV: That's precisely my point, Your Honor.

THE COURT: Okay. It's denied, okay?

Second one, "Did Ally provide money to Northshore to enable it to purchase used car

Page 11

Proceedings inventory?" Answer, "Ally provided the floor plan." Question, "Did Ally provide money to Northshore to purchase used car vehicles?" Answer, "They provided the floor plan."

That one you need to answer yes, no or I don't know. You didn't answer that question, so you've got to answer that. What's the answer to that one? Let me phrase the question again.

MR. DEO: Okay.

THE COURT: Did Ally provide money to Northshore to enable it to purchase used car inventory?

MR. DEO: No.

THE COURT: Okay. All right, you can proceed. You have four hours left in the deposition, all right?

MR. RUDERMAN: Yes, sir.

THE COURT: That's total,

Page 12

Proceedings unless there's an agreement that this is going beyond seven. Multiple parties doesn't matter. Seven is total.

MR. KATAEV: That was the agreement, that multiple parties all get seven hours. That's for Flushing Bank and that's Libertas --

THE COURT: It's all done in seven hours.

MR. RUDERMAN: In other words, we each have seven hours or --

THE COURT: No. The rule is, Rule 30D, and the case is under it, which I've looked at and I'm familiar with and I looked at it again last night, seven hours is total unless there's agreement among the parties or application is made to the court. No application was made, so I don't know if there was an agreement in

Page 13

Proceedings part --

MR. KATAEV: There was agreement amongst the parties.

THE COURT: There was no agreement?

MR. KATAEV: There was.

THE COURT: What's the agreement?

MR. KATAEV: The agreement was that as soon as I finish my seven hours that he would have seven hours and so would Flushing.

THE COURT REPORTER: So 21 hours for a witness?

MR. KATAEV: It's an important witness.

MR. RUDERMAN: I don't believe after myself --

THE COURT: That's not happening. I don't care what the agreement is. That's not happening. You're not doing 21 hours with this witness. And there cannot be any duplication.

4 (Pages 10 - 13)

Page 14

Proceedings

The cases are very clear on that. When you've got multiple parties asking questions, it is seven hours. The parties who are asking questions should confer and agree who's asking what. They can also agree, and I can grant, of course, more time than the seven, which I will, but it's not going to be 21 hours. That's not happening.

MR. RUDERMAN: I don't think, Your Honor, that Libertas or Flushing will come anywhere close --

THE COURT: How much do you need for Libertas or Flushing?

MS. RONNEBURGER: Well, I represent Flushing, so I can't speak --

THE COURT: And Libertas is not here, so too bad, so sad.

MS. RONNEBURGER: An hour, a little more.

THE COURT: So you have

Page 15

Proceedings

what, four hours? You will be done today.

MR. RUDERMAN: I will be done today, sir.

THE COURT: Okay, and your hour is not duplicative of what's been asked, it's questions that bear on Flushing?

MS. RONNEBURGER: It's questions directly related to Flushing.

THE COURT: Okay, and that's it then.

You're not asking questions, Mr. Thomasson, are you?

MR. THOMASSON: I don't anticipate asking any questions, but we're up to ten or twelve hours with this witness.

THE COURT: Ten or twelve hours? How many hours have you taken so far?

MS. RONNEBURGER: We spent seven hours with Mr. Kataev and we

Page 16

Proceedings

spent, it was --

MR. RUDERMAN: Your Honor?

THE COURT: This is going to end today, so you need to talk and divvy up whatever four hours you've got left today.

I know you've got to leave at 1:30.

MR. RUDERMAN: Your Honor, I will leave and they can continue and I can still be on the Zoom.

THE COURT: Okay, but four hours is it. The clock stops, done. He's done. So use it efficiently. There's no more time after that, okay?

MR. RUDERMAN: Your Honor, four hours of testimony time?

THE COURT: Yeah. Yeah. You can run the clocks. I'm not running the clocks. You run the clocks, but from the moment we started five minutes ago, you've got, as long as we're on the

Page 17

Proceedings

record, that's what you got. You got four hours of that, so use it wisely, alright?

MR. KATAEV: We've been asking, Your Honor, the videographer to track the testimony time, so --

THE COURT: That's up to you guys. That's up to you.

And the last thing I'll tell you is in chambers we can see and hear everything. So we are, we have it on. I am listening. My law clerks are listening. My courtroom deputy is listening to everything. I don't mean to babysit, but I'm going to babysit. So if there's any issues, we'll hear it and I'll come right back in, okay?

MR. RUDERMAN: Thank you.

MR. KATAEV: If we need a ruling, do we just say on the record we're waiting for The Court

5 (Pages 14 - 17)

Page 18

Proceedings

for a ruling?

THE COURT: We're going to hear you. One of us will hear you for sure. All right?

MR. DEO: All right.

THE COURT: Again, if you want water or anything -- by the way, there's a bathroom right next door in the jury room. You can go right through that door. My jury rooms have bathrooms. It's closer than going all the way around.

MR. RUDERMAN: Thank you.

THE WITNESS: Thank you.

THE COURT: Okay? Thank you.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:26.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:28.

Page 19

A. Deo

ANTHONY DEO, the Witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. RUDERMAN:

Q    Mr. Deo, you just testified that it is not true that Ally provided monies to Northshore to be able to purchase vehicles; is that correct?

A    Yes.

Q    Where did Northshore receive moneys from? Did they receive it through its portal, the ability to use Ally's money in order to purchase vehicles?

A    I don't understand the question, sir.

Q    Did Northshore have the ability to use Ally, Ally's money, without necessarily receiving the money, to use Ally's money to enable it to purchase vehicles?

A    I don't know.

Q    What don't you understand, Mr. Deo?

Page 20

A. Deo

A    Your question.

Q    What is it about my question that you do not understand?

A    Well, I believe it was a line of credit.

Q    Okay, a line of credit means that one party is providing the credit, correct?

A    Yes.

Q    So Ally is providing credit?

A    Yes.

Q    Credit is not an ephemeral term. It turns into money. It's talking about money, credit to lend money, not cash, but money in credit, correct?

A    Okay. Okay.

Q    So Ally provided that credit, which is essentially money, to enable Northshore to purchase vehicles for its inventory?

A    That's how Northshore purchased vehicles, yes.

Q    And when you purchased these vehicles using the Ally line of credit, Northshore was obligated to repay Ally for those funds?

Page 21

A. Deo

A    Absolutely.

Q    Did there ever come a time where Northshore did not repay any of those funds that Ally had provided to purchase inventory?

A    Not to my knowledge.

Q    And your knowledge is based upon the fact that you were the owner, operator and involved in the operation of the business?

A    I was the owner, yes. I am, sorry.

Q    But your knowledge as to the fact that, as far as you know, it did not, that it always repaid Ally is based upon your knowledge as the owner and operator of the business, correct?

A    I was told by Wendy Kwun and the controller, Daniel O'Sullivan. I get my information about floor plans from them.

Q    So it's your testimony that you were never informed by Mr. O'Sullivan, Wendy Kwun or anybody else that there ever came a time when Northshore did not repay Ally for the moneys that were owed under the floor plan line?

A    We always paid them.

6 (Pages 18 - 21)

Page 22

A. Deo

Q    My question --

A    I'm sorry.

Q    -- is you were never informed by Wendy Kwun, Mr. O'Sullivan or anybody else that there ever came a time when Northshore did not repay Ally for the money that it loaned?

A    No.

MR. RUDERMAN:  Can we go off the record?

THE VIDEOGRAPHER:  Sure.

Off the record at 9:31.

(Discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 9:38.

THE COURT REPORTER:  Mr. Deo, would you raise your right hand for me, please?  Do you solemnly swear or affirm the testimony you're about to give is the truth, the whole truth and nothing but the truth?

THE WITNESS:  I do.

MR. RUDERMAN:  Mr. Deo, the

Page 23

A. Deo

reporter just swore you in, but you were sworn in yesterday.  Do you affirm now that the testimony you gave before this reporter just swore in was also under the oath you had just previously taken?

THE WITNESS:  Yeah.

MR. RUDERMAN:  Thank you.

(Deo's Exhibit 43A, financial statement, Flushing08560, was marked for identification, as of this date.)

Q    (Handing) Mr. Deo, you've been handed a packet of documents.  I'm going to represent to you that that is a series of documents provided to us by Flushing Bank in response our discovery demand.

A    Okay.

Q    You'll notice on the bottom right-hand side are Flushing's, we call them Bate stamps, beginning with Flushing08560.  Do you see that?

A    Yes.

Q    This is a document that Flushing

Page 24

A. Deo

represented to us was provided by you in connection with financing that was obtained from Northshore.  Do you recognize this document?

A    Not completely, but yes.

Q    Do you recall providing financial records to Flushing in order to obtain financing from Flushing?

A    Yes.

Q    That was for Northshore, correct?

A    Yes.

Q    Was this document accurate and truthful when it was submitted to Flushing Bank?

A    Yes.

Q    Now, it shows on the bottom of the first page that the operating profit before income tax, which is the last line on that page, for the month of October 2022 was $76,130.  Do you see that? I'm sorry, I apologize.  It's me. There we go.  Alright, it's bigger now.  Can you see that?  I can make it bigger if you need to.

MS. WALKER:  Can you show where in the document again?

Q    You see it's the last line on the left-hand side which says, highlighted?  Do you

Page 25

A. Deo

see it there?  Do you see that line I highlighted?

A    Okay, yes.

Q    That says profit before income tax $76,130.  Do you see that?

A    Yes.

Q    Was that number accurate as the profit for Northshore for that month?

A    I don't know.  I don't remember. I'm sorry.  Yeah, I specifically don't remember.

Q    You don't remember, but the document was presented to Flushing representing to them that it was accurate, even if you don't remember now?

A    Yes.

Q    To the right of that is the year to date indicating that the profit before income tax for Northshore through October 2022 was $372,037.  Do you see that?

A    Yes.

Q    So again, when presented to Flushing, the representation was made that that was the accurate profit before income tax at that time for Northshore, correct?

7 (Pages 22 - 25)

Page 26

A. Deo

A    Yes, the year to date.

Q    You had no reason to dispute that that number was accurate as presented to Flushing Bank, correct?

A    No.

Q    Now, you testified a few minutes ago that Northshore always paid Ally the moneys that were due for cars that had been sold, correct?

A    Yes.

Q    Did there ever come a time when Northshore was, prior to November of 2022, which is the Libertas time frame, prior to that, did there ever come a time when Northshore was unable to pay its regular debts as they came due, as far as you know?

A    When Josh started selling the cars. That occurred in the summer prior to November.

Q    Are you saying that after that, there did come a time when Northshore was unable to pay its debts as it regularly came due?

A    Because he sold -- well --

Q    My question --

Page 27

A. Deo

A    That's not a yes or no.

Q    Quite right. My question is after the summer, did there come a time when Northshore was not able to pay its debts as they regularly came due?

A    Yes.

Q    Do you know the amount of money that Northshore was short in being able to satisfy its obligations?

A    I don't know.

Q    Did you ever look at any documents to see how much Northshore was short in paying its obligation?

A    I may have. I don't remember.

Q    Do you recall approximately the amount that it was?

A    I don't remember.

Q    Was it more than $100,000?

A    I wouldn't know.

Q    Was it a more than $1,000,000?

A    I don't exactly remember.

Q    Well, if Josh sold a number of cars, you're saying there was some type of a deficiency in Northshore --

Page 28

A. Deo

A    Yes. I'm sorry.

Q    -- because he was selling them, you said, below what he should have been selling them for, correct?

A    Yes.

Q    What was the total inventory worth around that time at Northshore, approximately?

A    I don't remember.

Q    What you stated was that despite the fact that Northshore had some difficulty or deficiency pin aying its debts when it came due, though, it always paid Ally, correct?

A    Yes.

Q    So there was always money to pay the Ally, but maybe not money to pay other things; is that your testimony?

A    That's incorrect.

Q    When there came a time when Northshore was not able to regularly pay its debts, what debts were paid and what debts weren't paid?

A    I don't understand your question.

Q    Well, you're saying that there came a time after the summer of 2022 when

Page 29

A. Deo

Northshore was not able to pay its debts as they regularly came due, correct?

A    I didn't say that.

Q    So let's clarify. Did there come a time prior to November 2022 when Northshore was not able to pay its debts as they regularly became due?

A    No.

Q    So at all times Northshore had sufficient funds coming in from its operations to pay its debts as it regularly came due?

A    The deficiencies with Ally was a problem.

Q    So let's put aside Ally for a moment. Other than Ally, did the Northshore ever have any difficulty, any deficiency in being able to pay its debts as they regularly came due other than for Ally?

A    I'm sure there was problems at that point.

Q    What type of problems?

A    I don't remember specifically at the moment.

Q    Well, were there deficiencies that

8 (Pages 26 - 29)

Page 30

A. Deo

debts could not be paid?

A    Yeah, I'm sure.

Q    Do you know approximately how much that was?

A    I wouldn't know a specific number.

Q    Can you give me a general number?

A    I don't recall at the moment.

Q    Mr. Deo, this was your business. You owned it.  You ran, you hired, you fired, you kept track of everything in this business, but you have no recollection as to even a general number as to how much it was deficient in being able to pay its debts at that time?

A    I don't remember.

Q    With regard to Ally, do you recall what, how much it was deficient in being able to repay Ally at that time?

A    I don't remember the number.

Q    Do you remember the approximate number?

A    Approximately, no.

Q    Not even approximately?  Could you tell me it was under or over $500,000?

A    It could have been over.

Page 31

A. Deo

Q    Is it your understanding that the sole reason for the deficiency in either paying its debts or paying Ally is because Josh was selling the cars during the summer?

A    With a deficiency, yes.

Q    Yet with regard to the deficiency and unable to pay its debts, you're showing that in October of 2022 you represented to Flushing Bank that it made a profit of $76,130, correct?

A    Well, that's what it says here.

Q    Well, that's true and accurate, isn't it?

A    Yes.

Q    You just testified that it was now unable to pay its debts after the summer of '82, the summer of 2022, because Josh sold some cars. So wouldn't that indicate that there wasn't a profit of $76,000 for October?

A    Well, that's what I'm telling you. I don't recall exactly the amounts at that point.  You asked if there were problems.  I said yes, there were problems.

Q    I asked if there were deficiencies and unable to pay the debt.  That's my question.

Page 32

A. Deo

Yes or no, there were or were not deficiencies in the fact that Northshore could not satisfy its debts as they regularly became due after the summer of 2022?

A    And I said they may have been, but mostly Ally.

Q    Mostly Ally, okay.  Well, Ally was the floor plan line, right, you testified about?

A    Right.

Q    That's a big number each month that you have to pay back when you sell cars, correct?

A    Well, yeah, when you sell cars, you have to pay back.

Q    If you're not able to pay back Ally because there wasn't sufficient funds, then how do you justify a $76,000 profit?

A    This was a combination of the controller, Dan, Wendy, the CFO and Tom Jones put it together, the financial statement.  I just, I went with what they gave me.

Q    The document we're looking at right now was prepared by Mr. Jones and Mr. O'Sullivan; is that what you're saying?

Page 33

A. Deo

A    And Wendy.

Q    And Wendy.  Do you know when Wendy was involved in putting this document together?

A    Say it again.  I didn't --

Q    Do you know when Wendy was involved in putting this document together?

A    When?

Q    Yes.

A    Well, every month they put together a financial statement.  So if this is October, then it would be October.

Q    It is your understanding that Wendy was involved in putting together the document that we're looking at right now, this financial statement?

A    Every month.

Q    But this one?  I'm talking about this month.

A    Yes.

Q    And this is the document you relied upon as to its accuracy when it was presented to Flushing Bank, correct?

A    Yes.

MR. RUDERMAN:  Can we go

9 (Pages 30 - 33)

Page 34

A. Deo

off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:49.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:51.

Q    Mr. Deo, I've provided you with a document stapled together for you to review on paper. I have it now online for everybody else to see. We'll have this marked as 44.

(Deo's Exhibit 44, financial record, IAG002563, was marked for identification, as of this date.)

Q    I'll represent to you that this was a document which was provided to your counsel. On the bottom you'll see our Bate stamp, IAG002563, which was provided about a year and a half ago to your counsel.

A    Do you know which one?

Q    Which counsel? It was provided your counsel, Mr. Levine, and it was also provided to Thomasson at that time.

Page 35

A. Deo

I'm going to represent to you that this is a financial record provided to me by my client, and if you take a look at the top of that document, it's for same month of October 2022. Do you see that?

A    I do.

Q    Scroll down. You have the other document still in front of you, correct?

A    Yes.

Q    We're going to take a look at that last line, the last few lines we were looking at before. I'm going to highlight in the box so everybody can see, but that area where it says sales gross expense. Do you see that box?

A    Yes.

Q    I want you to take a look at the one I showed you before and this one and you see, I believe, that the sales amount is the same, correct?

A    The first number is the same, yes.

Q    Is the second number the same, year to date, just to the right of it?

A    Yes.

Q    Let's take a look at the gross for

Page 36

A. Deo

just below the sales number. Do you see how much the gross is showing?

A    Yes.

Q    How much is that showing on the new one?

A    Minus $279,289.

Q    What is it showing in the one that you provided to Flushing Bank?

A    $172,888.

Q    That's a positive number, 172, correct?

A    Yes.

Q    You presented a document showing a plus, a positive gross of 170 plus thousand. The documents our client showed us from its pulling of the same financial record from they EMS system has a minus of $280,000. Can you explain that difference?

A    I don't know why your numbers are different.

Q    Let's go to the bottom line here. We have a profit. The last profit before income tax. Here it's showing a negative $375,048. Do you see that?

Page 37

A. Deo

A    Yes.

Q    And the one you presented to Flushing showed a positive of over $70,000, correct?

A    That was the correct one, yes.

Q    I'm sorry, that was the correct one?

A    Yes.

Q    So you are saying the one on the documents in front of you is not correct?

A    The last one you presented. I don't know what that is. I've never seen this.

Q    Well, I understand you may not have seen it before, but when you say it's not correct, you just testified that you were not involved in the preparation of this document at all, correct?

A    Well, The second one I've never seen this. The first one, this was given to me by the controller, Wendy, and Tom.

Q    As you sit here today, you weren't involved in the preparation of either one of these documents, correct?

A    I didn't prepare them, no.

10 (Pages 34 - 37)

Page 38

A. Deo

Q    So you sitting here today have no idea whether either one is correct; is that a fair statement?

A    No, not true.

Q    You know that the one that was provided to Flushing was correct?

A    Because this one was presented to me. The second one, this is the first time I'm seeing the second one.

Q    So the basis for your belief that the first one I gave you, the one you gave to Flushing, is correct is because it was given to you?

A    It was given to me by them, yes.

Q    That's the sole basis for your belief that it's accurate?

A    Of course.

Q    Who actually handed that document to you?

A    It could have been Dan. He was the controller.

Q    Now, you testified that there may have been, there may have been some deficiency in connection with the ability to pay some debts

Page 39

A. Deo

in Northshore after the summer of 2022, you're not really sure how much, if, you're a little unclear, correct?

A    Correct.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:56.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:58.

Q    Mr. Deo?

A    Yes.

Q    You just testified that the documents that I was showing you, the one that showed numbers different than the one you presented to Flushing, you said that's the first time you've ever seen that before, correct?

A    Yes.

Q    Do you recall that there was a lawsuit in New York County that was started against you about December of 2022?

A    Yes.

Page 40

A. Deo

Q    In that lawsuit, do you recall that the document that I just showed you was marked as an exhibit in that lawsuit?

A    I don't know.

(Deo's Exhibit 44A, Chase Bank statement, IAG001807, was marked for identification, as of this date.)

Q    All right, so you've been handed a document now. This is a document which, again, was presented in discovery. It is Bate stamped on the first page IAG001807. This is a bank statement from Northshore Motor Leasing for September 2022 and it is account number ending in 8112. Do you recall that this was the main operating account for Northshore?

A    I would believe it was.

Q    Okay, and you had full authority, check signing authority, to put money in and take money out? This was your account, correct?

A    Yes.

Q    You were in control of this account, correct?

A    Among others.

Page 41

A. Deo

Q    Did you keep track of the moneys going in and out of this account in September of 2022?

A    What do you mean, keep track?

Q    In other words, take a look online, how are we doing, do we have enough cash available to pay our bills?

A    Take a look, yes.

Q    I'm sorry?

A    Take a look, yes.

Q    I'm going to draw your attention to the second page of the document. It should be highlighted somewhat. These are the deposits and additions. Take a look at September 15th, the first entry.

A    Yes.

Q    You see that? Okay. It states here book transfer, 76 Fisk, F-I-S-K, Street Realty LLC and it's referenced as a loan from Island Auto Group for the amount of $683,318.95. Do you see that?

A    I see that.

Q    Is this the first time you're seeing that?

11 (Pages 38 - 41)

Page 42

A. Deo

A    I saw it in the statement.

Q    I asked you if this is the first time. It this the first time you've seen that?

A    I have might have seen it before, yes.

Q    When did you see it before?

A    I don't recall when.

Q    Did you see it on or around the time that this deposit was made?

A    I may or may not.

Q    Were you aware at that time that a loan of over $680,000 was made to Northshore from Island Auto Group at that time?

A    There was no loan.

Q    So looking at this here, do you know what the reason was that $683,000 was deposited from an Island Auto Group related entity?

A    I'm glad you asked.

Q    I'm glad I asked as well.

A    So am I allowed to tell you?

Q    I'm anxious to hear what your answer is.

A    Okay. So at this point Josh was

Page 43

A. Deo

circumventing Northshore Motors. He sold the cars through his Staten Island dealerships. He would get the money in his Staten Island dealerships, but Northshore was obligated to pay Ally for the cars that he sold. So he would transfer the money back to Northshore to pay Ally. So that's what these moneys are.

Q    So it's your testimony that Josh Aaronson arranged to sell cars that were owned by Northshore and that he then sold the cars and deposited the money into the Northshore account and that's what this represents?

A    Yes.

Q    Does this 683 represent, as far as you know, the amount that he sold the cars for?

A    I wouldn't be able to tell you. I don't have the exact accounting.

Q    That would represent, if he sold, if he put in $683,000, that would be the money that was owed by Northshore to Ally?

A    I can't tell you for sure.

Q    So if what you're saying is true, then there should be records that there were vehicles sold by Josh that represent all of this

Page 44

A. Deo

amount of money?

A    Absolutely.

        MR. RUDERMAN: Sorry, I meant to share this. I apologize. I'm sorry, Bonnie, could you see that now?

        MS. WALKER: Yeah.

        MR. RUDERMAN: I apologize. I'm sorry.

Q    So there's the next line from that. These are your bank statements, right? You get them every month, right?

A    Yeah, it's Northshore's bank statements.

Q    So when you saw they were listed as a loan, did you send an email, a text, reach out and saying why is this listed as a loan?

A    I disagreed with Wendy on this.

Q    So she said it was a loan?

A    Well, between her and Josh.

Q    Did Wendy tell you that she believed it was a loan?

A    I don't recall the conversation, but I told her it wasn't a loan.

Page 45

A. Deo

Q    She said no, it was a loan?

A    I don't recall our conversation. I know I approached Wendy on it, yes.

Q    What was the response of Wendy, if you know?

A    As I said, I don't recall our conversation. I know I approached her with it.

Q    And that was --

A    Because she was at the building.

Q    So this was only done verbally, there was no writing?

A    I don't believe there was a writing.

Q    And the next entry for $8,917.15, is that also the same idea, the cars were sold and he was putting the money back in?

A    I would assume so.

Q    Well, is there any other reason other than that?

A    Well, I don't know the amounts, the exact amounts.

Q    I'm not talking about the amounts.

A    Okay.

Q    I'm talking about all of these

12 (Pages 42 - 45)

Page 46

A. Deo

entries which are listed on the bank statement as a loan, these you say were not a loan and was giving back the money for cars that were sold --

A    To pay costs.

Q    -- that were taken by Josh and sold, correct?

A    Yes.

Q    The next entry that I highlight is the first entry on September 16th. Do you see that one?

A    Wait.

Q    There's only one for September 16th. It's a deposit.

A    Yes.

Q    That one also is listed as a loan from Island Auto for $385,597.10. Do you see that?

A    Yes.

Q    That also represents the sale, the proceeds from the sale of vehicles that Josh took and sold?

A    Yes.

Q    Then if you skip down, there's another entry on September 23rd. This is a

Page 47

A. Deo

deposit of $30,000. I can find the check. There's a check that was written out from one of the Island Auto entities. If you need me to find the check, I can do that, but is there any reason why there would have been a deposit from any Island Auto entity into the account other than the way you described?

A    I wouldn't know.

Q    Let's skip down now to the deposit on September 29th. There's only one. And that's also listed as from a loan from Island Auto Group for $100,929. Do you see that?

A    Yes.

Q    This is also, as far as your testimony, that this is also money that Josh was paying back to Northshore for cars that he had sold, correct?

A    Yes.

Q    We now have 100, we have almost 700, about $1.2 million of cars that he sold?

A    I wouldn't be sure.

Q    About?

A    Okay.

Q    Is that your testimony that based

Page 48

A. Deo

on this, over the summer in 2022, Josh arranged to sell over $1.2 million of Northshore's cars and that he was paying this money back?

A    Well, the moneys went to his company. So yeah, he was giving it back to Northshore so they could pay Ally.

Q    So now if the dealerships were selling all these cars, as you described, as a loss, that's the way you testified earlier?

A    Yes.

Q    Wouldn't that affect the profitability of the dealership?

A    I would assume so.

Q    So again, looking back at the financial statement you have from October of 2022 showing that the dealership was profitable, is that number, do you still believe that that's accurate?

A    I absolutely believe it is.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 10:07.

(A discussion was held off

Page 49

A. Deo

the record.)

THE VIDEOGRAPHER: Back on the record at 10:09.

Q    Mr. Deo, I've handed you a series of documents. We're going to have this marked as 45 and I'm going to represent to you that the stamp on the bottom right-hand side of LIB000332 is a document that was provided to us by Libertas. So Libertas represented to us that this was a document that you presented to them in connection with the Libertas financing, okay?

(Deo's Exhibit 45, Chase Bank statement, LIB000332, was marked for identification, as of this date.)

A    Yes, correct.

Q    I'm going to draw your attention, this is, again, that same account, North Shore Motor Leasing account ending in 8112. This is for the month of October 2022. Do you see that?

A    Yes.

Q    I'm going to draw your attention to page two of the document. I'm going to go down to the deposit on October 12th. If you can

13 (Pages 46 - 49)

Page 50

A. Deo

Q    take a look at that?

A    Yes.

Q    This is listed, again, as a loan from Island Auto for $200,112. Do you see that?

A    Yes.

Q    So is it your testimony that that is also proceeds from cars that Josh sold?

A    I believe so.

Q    Did you --

A    I disagree with the loan distinction, again, but yes.

Q    Would there be any other explanation that you're aware of as to why this money would have been deposited from an Island Auto entity?

A    No.

Q    I'm going to draw your attention to October 19th, another deposit listed as a loan from Island Auto of $421,019. Do you see that?

A    Yes.

Q    Again, the same explanation as to why it's there?

A    I believe so.

Page 51

A. Deo

Q    The next one, October 20th, loan from Island Auto for $201,020. Do you see that?

A    Yes.

Q    Again, it's the same explanation as to why the moneys were deposited?

A    I believe so.

Q    And then October 24th another listed as loan from Island Auto for $80,124. Do you see that?

A    Yes.

Q    And that's the same understanding as to why that money was deposited?

A    I believe so.

Q    And then the last one on this page is October 28th, again, listed as a loan from Island Auto for $80,128. Do you see that?

A    Yes.

Q    Again, it's the same explanation as to why that money is there?

A    Yes.

Q    So now we have, so we have here over $1.2 million deposited over the course of a week and a half. Do you see that?

A    I see that.

Page 52

A. Deo

Q    Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that?

A    Yes.

Q    And it's your testimony that none of that money was a loan to cover deficiencies, but all of that money was simply Josh paying back for the cars that he had sold that he had taken from Northshore?

A    I said it was cover to the deficiencies that he was creating, yes.

Q    When you say the deficiencies he was creating, was there a deficiency other than the fact that he sold cars below, what you testified is below what he should be selling them for?

A    Way below, yes.

Q    So in other words, if a car should have been sold for $50,000 and he sold it for $20,000, he sold it for $30,000 below what he should sell it for, correct?

A    Then that's the deficiency, yes.

Page 53

A. Deo

Q    Well, the deficiency -- let me see if I can correct that, if I'm correct. The deficiency, though, would really be attributable to Ally as to how much had to be paid out? In other words, if you borrowed $50,000 from Ally to buy a car and he sold the car for $20,000, then there's an actual $30,000 --

A    Yes, that's the deficiency.

Q    Are you saying that as a result of him selling cars below what you believe they should be sold for, he created a 2.4 plus million dollar deficiency?

A    It wasn't just what I believe. I'm telling what you the book value was versus what he was selling cars for. And I approached him on that. I told you that yesterday.

Q    I want to be clear here. I want to make sure that I understand. You're claiming that $2.4 million that was deposited from Island Auto to Northshore was because of the losses that were incurred as a result of Josh selling the cars below what you think they should be sold for?

A    And again, it's not what I think.

14 (Pages 50 - 53)

Page 54

A. Deo

It's what it was worth. He was selling it way below what it was worth. That's what I'm saying.

Q I understand, but the deficiency of $2.4 plus million was a deficiency in the amount that he was selling them below what they needed to be sold for?

A Yes.

Q If we look at all of the cars that were sold by Josh, those numbers should match up; is that your understanding?

A More or less, yes.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 10:13.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:18.

Q Mr. Deo, I've handed you documents. This is a Chase Bank account ending in 9899 from 189 Sunrise Hwy Auto LLC.

(Plaintiff's Exhibit 46,

Page 55

A. Deo

Chase Bank statement for account ending in 9899 from 189 Sunrise Hwy Auto LLC, was marked for identification, as of this date.)

Q And you're familiar with that entity, correct?

A Yes.

Q That's the entity you say you purchased in early 2021, correct?

A I did purchase it in February of '21.

Q All right, and this is another account which you had check-signing authority, oversight and oversaw this account?

A Yes.

Q This is THE account that was used by 189 Sunrise to operate its business?

A Yes. This was its operating account.

Q I represent to you on the bottom right is our Bate stamp of IAG001617. Do you see that?

A Yes.

Q I draw your attention to the third

Page 56

A. Deo

page, which is a deposits, it's for deposits October 19th, 20th, 21 and 24. Do you see those?

A Yes.

Q Each one says it's a loan from Island Auto. The first one is for $101,019. The second one is for $80,120. The third one is for $65,121 and the fourth is $55,124. Do you see those?

A Yes.

Q Is the reason for these deposits, as far as you know, the same reason you previously testified, that there were cars that Josh sold and this was paying back the money for the cars that he sold?

A Those were to pay Ally, yes.

Q I understand the money was there to pay Ally. That's not my question. My question is is this the money you say was put in by Josh because he had sold cars from Sunrise and this was the proceeds of the cars that he had sold?

A I believe so.

MR. RUDERMAN: Can we go

Page 57

A. Deo

off the record, please?

THE VIDEOGRAPHER: Off the record at 10:21.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:22.

Q Mr. Deo, before I go on, the document that we just had referred to, the bank statements from 189 Sunrise, was marked as Exhibit 46.

Mr. Deo, I'm handing you another document. We'll mark that as Exhibit 47, and this is a document which was provided to us by Flushing Bank. It's the first page Bate stamp Flushing00162. Do you see that?

A Yes.

(Deo's Exhibit 47, email chain, Flushing00162, was marked for identification, as of this date.)

Q And this appears to be an email, the top one from Robert Puccio on March 7th, 2023. Do you see that?

15 (Pages 54 - 57)

Page 58

A. Deo

A    Yes.

Q    Regarding the Northshore Motor numerated loans, correct?

A    Yes, that's the subject.

Q    Who is Mr. Puccio, as far as you know?

A    He represented Flushing Bank.

Q    And he was a representative that Northshore was using at Flushing to obtain the financing, correct?

A    It was a line of credit, yes.

Q    He says here, referring to Stephen, when he's sending it to somebody at Flushing Bank, please see attached full year 2022 P and L for Northshore Motor.  Do you see that?

A    Yes.

Q    Then scroll down to the second page and what is described as North Shore Motor Leasing LLC profit and loss statement for the year ending December 31st, 2022.  Do you see that?

A    Yes.

Q    Do you know if you or somebody on

Page 59

A. Deo

Northshore's behalf provided this document to Flushing in connection with this financing?

A    I'm gonna assume that I sent it to him.

Q    Do you recall this document?

A    Not offhand, but it's a profit and a P and L statement.

Q    Do you know who prepared this statement?

A    At the moment, no.

Q    Would it be something that you might have prepared?

A    I didn't prepare P and L's.

Q    Was Mr. Jones generally involved in preparing your P and L's?

A    He would be someone and again, Dan would be.

Q    This is in --

A    This is after the --

Q    This is after November of 2022, right, because it's gone a full year?

A    Yeah.  Probably not Wendy.

Q    Probably not Wendy, probably not Dan, correct?

Page 60

A. Deo

A    No.

Q    So somebody who was engaged by Northshore to prepare this?

A    Probably.

Q    It --

A    Probably Tom.

Q    So I'm going to draw your attention to the bottom line here stating net profit after tax of $427,843.  Do you see that?

A    Yes.

Q    Is that number accurate?

A    I believe so.

Q    What's the basis for your belief that it's accurate?

A    It was provided to me.

Q    By whom?

A    As I said, it was probably Tom.

Q    Do you know where Tom would have received the information from to prepare this email?

A    I guess the DMS.

Q    Did you have access to the DMS after November of 2022?

A    I know our access was cut off at

Page 61

A. Deo

some point.  I don't know exactly when.

Q    So despite the fact that you testified that the dealership lost all this money because Josh sold all these cars, it's still your testimony that this accurately represents that Northshore profited $427,843 for 2022?

A    I didn't say that the dealership lost the money.

Q    Ultimately, the dealership, even with what Josh did, it still made a profit of $427,843; is that correct?

A    I don't know how to answer that question.  I'm not sure.

Q    You're not sure if this number is accurate?

A    No, that's not what I'm saying.  Your question is with regards to what Josh did.

Q    Well, you're saying that Josh took some action in selling cars causing losses of some kind to Northshore, correct?

A    I didn't say that.  I said it caused deficiencies in the payments to Ally, which had to be evened out.  That's why he did

16 (Pages 58 - 61)

Page 62

A. Deo

those --

Q   So is it your testimony that after Josh paid those moneys, and we just went through the bank statements, it evened out the money that he had taken out by selling the cars?

A   Well, we paid Ally with those, yes.

Q   I'm saying but did that take care of --

A   I think that would zero it out.

Q   Just to make sure I'm clear here, is it your testimony that when Josh put that money back in in September and October of 2022, he had taken care of whatever deficiencies there may have been that he created so that it netted out to a zero?

A   Yeah.  He had to pay Ally what was due.

Q   So he put the money in to cover those deficiencies so that Ally was completely paid off for the money he had taken when he sold those cars?

A   Say that again.  I'm sorry.

Q   Let me rephrase the question.

Page 63

A. Deo

A   Yes.

Q   So Josh arranged to put the money into the dealership to make sure Ally was paid off for any deficiencies that he may have created when he sold those cars?

A   Yeah, he put back what was due.

Q   Okay.

MR. RUDERMAN:  Can we go off the record?

THE VIDEOGRAPHER:  Yeah.

Off the record at 10:27.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 10:28.

Q   Mr. Deo, I've handed you a document which has J,L&Co. on the top, which relates to Mr. Jones' accounting firm; is that correct?

A   Yes.

Q   It's entitled Anthony Deo statement of financial condition March 1st, 2023.  Have you ever seen this document before?

A   Yes.

Page 64

A. Deo

Q   When was the last time you saw it?

A   I think back then.

Q   Have you seen it since March of 2023?

A   No, I haven't.

MR. RUDERMAN:  Thank you.  I'm sorry, I forgot to share the document.  We're going to mark that as 48.

(Deo's Exhibit 48, Anthony Deo Statement of Financial Condition, March 1, 2023, was marked for identification, as of this date.)

Q   On the next page -- I'm sorry, this was provided to us by Flushing Bank and you can see their Bate stamp on the bottom, Flushing00187.  Do you see that?

A   Yes.

Q   So the second page is the statement by the accountants essentially saying that while they put this together, they based it upon information you provided.  They didn't do their own audit.  Do you understand that?

Page 65

A. Deo

A   Yes.

Q   Do you recall providing information to Mr. Jones to enable him to prepare this document?

A   Sure.

Q   Did you provide any documents in order to have him be able to prepare this statement?

A   No, I don't think any documents.

Q   So you just told him?

A   Yeah.

Q   Did you tell him orally or did you send him an email, a text or something?

A   It have could been a phone call.

Q   You don't recall anything in writing with regard to sending him information even it was documents to make the report?

A   I don't remember.

Q   Now, the last page of the documents is the actual statement of financial condition.  Do you see that?

A   Yes.

Q   Is all the information true and accurate as of the date of this statement?

17 (Pages 62 - 65)

Page 66

A. Deo

A    Back then, yes.

Q    When you say you had cash in the bank of $657,000, was that a personal bank account, business or something else?

A    I think it was a combination.

Q    Where did you do your personal banking?

A    In '23, I can't remember.  Maybe Bank of America or Chase.  Not Chase. Signature.

Q    Is it your account, is it a joint account with your wife or something else?

A    It could have been a combination.

Q    So between the accounts that you had, your wife had and maybe the businesses had, you arrived at $657,000, correct?

A    Roughly.

Q    The notes receivable for $1,275,000, where did that number come in?

A    From the tax returns and the DMSes from Northshore.

Q    At that point in time, this was March of '23, right?  That was after the lawsuit had been started already, correct?

Page 67

A. Deo

A    Yes.

Q    And at that point in time you've been claiming that the business was destroyed by the temporary restraining order and the actions taken by Wendy and Josh and other people at that time, correct?

A    Repeat that question.

Q    I believe it was your allegation that as a result of the lawsuit that they started and the temporary restraining order that they got in December, January, February of 2022 it destroyed the business of Northshore.

A    Well, yeah, it severely impacted it.

Q    Okay, so in March 2023, what do you believe was the collectability of $1,275,000 for North Shore Motor Leasing accounts payable, the leases accounts receivable to you?

A    I'm sorry.

Q    Do you not understand the question?

A    No.

Q    Okay.  So you're trying to obtain a loan for Northshore based upon these financial

Page 68

A. Deo

records, correct?

A    Yes.

Q    That's the purpose of giving this to Flushing, to say you should lend Northshore money and I'm giving you information about financials to enable you, to assist you to consider whether we're a good credit risk or not, correct?

A    Yes.

Q    As part of that, you provided Northshore to Flushing with information indicating that you are owed $1,275,000 from Northshore?

A    From Northshore, yes.

Q    When you presented that, was it your understanding that that was a debt which you believe would be repaid by Northshore?

A    I was hopeful that it would be, yes.

Q    But at the time you did that, did Northshore have any capability to repay that amount?

A    I was hoping it could get back to the point, yes.

Page 69

A. Deo

Q    So at some point in the future you thought maybe you could recover that money?

A    Well, I mean we were trying to get it back going.

Q    Weren't you were also working with Tony at Superb at that time?

A    Yes.

Q    I notice you don't list your interest in Superb here anywhere.  Is there a reason why?

A    I don't know why I didn't.  I should have.

Q    You have also $296,000 from Sunrise.  Is that the same answer, that you were hoping to get money back from Sunrise?

A    Yes.

Q    Now you had values for these various interests that you have.  Gold Coast Motors of Syosset worth $250,000, Gold Coast Motors of Sunrise worth $200,000, North Shore Motor Leasing worth $650,000 and Sunrise Auto Outlet at $180,000, correct?

A    Yes.

Q    Where did those valuations come

18 (Pages 66 - 69)

Page 70

A. Deo

Q from?

A At this point I can't remember, but I'm sure there was a reason why.

Q Did you have any documents that might refresh your recollection as to how you came up with these numbers?

A I don't know.

Q What would you have looked at at the time to determine the values?

A Money on hand mostly, probably.

Q So did North Shore Motor Leasing have $650,000 in hand or something along those lines?

A Maybe assets.

Q What assets did it have?

A I think we had cars and other tangible assets.

Q Were those cars purchased with the floor plan money?

A Some of them was and some of them weren't.

Q How many cars did Northshore have that it purchased with cash?

A I don't remember at this point.

Page 71

A. Deo

Q Do you think that it had approximately $600,000 in cars --

A All the cars, no.

Q Other than cars, the space was leased, correct? You didn't own that, correct?

A No.

Q You had some desks, computers. What other assets other than cars and some office equipment did Northshore have?

A There was a lot of equipment in there.

Q What type of equipment?

A Mechanic equipment, office equipment, computers.

Q Sitting here today, you believe that all those numbers that reflected were accurately calculated to the best of your ability?

A To the best of my ability, yes.

Q You have a residence listed in Dix Hills worth $1,498,000, correct?

A Yes.

Q What's the address for that residence?

Page 72

A. Deo

A It's 4 Darius Court.

Q You list under mortgages payable $789,000, correct?

A Yes.

Q Who is the mortgage owed to?

A Citibank.

Q When did you take out that mortgage?

A I think it was 18 years ago.

Q Is that property titled in your name, your wife, both?

A My wife.

Q Under her married name or her maiden name?

A Oh, I don't --

Q Was is her maiden name, by the way?

A Rahman.

Q And that's R-A-H-M-A-N?

A Yes.

Q So it could be either one, you don't recall?

A I mean, it could be.

Q She currently still owns that

Page 73

A. Deo

house?

A Yes.

Q Is anybody living at that house?

A No. We're fixing it up.

Q When was the last time you lived at that house? When was the last time you lived at that house?

A 2019.

Q The next property is listed in the Bronx worth $1,280,000. Do you see that?

A Yes.

Q What's the address of that property?

A 3011 Matthews.

Q When was that property purchased?

A A very long time ago. I don't remember exactly when.

Q Who was it purchased from?

A From?

Q Yes.

A I don't know.

Q Do you know if the property is held in your name or your wife's or some other?

A My dad.

19 (Pages 70 - 73)

Page 74

A. Deo

Q    I'm sorry?

A    My dad.  It was my dad.

Q    I'm sorry, you listed the property as yours.  Were you on the title to the house at the time?

A    I did for some point.

Q    In March 1st, 2023, were you the titled deed --

A    No, it wasn't deeded to me.

Q    When you represented to Flushing that you owned a residence in the Bronx for $1,280,000, that was not accurate at the time, correct?

A    No.  No, I disagree with what you're saying.

Q    So you did own it at the time?

A    Yes.  Not in title, but I did.

Q    Well, you understand what owning property means, correct?

A    Yes.

Q    There's a deed transferred to you and that deed says you own the property, correct?

A    That is your conventional way,

Page 75

A. Deo

yes.

Q    That's conventional, correct?

A    Yes.

Q    Is there another way that one owns a piece of property that you relied upon when presenting it to Flushing Bank?

A    Well, you can have ownership rights.

Q    You had ownership rights?

A    Yes.

Q    What were those ownership rights to this property?

A    That it was my property.

Q    You said you had ownership rights.  What were those rights?

A    I don't understand your question.

Q    Well, you didn't own the property.  At the time it was deeded and titled to your father you said?

A    Yes.

Q    So you didn't own the property at the time?

A    I guess it's your description.

Q    Well, tell me how you had the

Page 76

A. Deo

right to list that as an asset of yours worth $1,280,000.

A    I believe it was my property, yes.

Q    What was the basis of your belief that it was your property?

A    Because I was the one that purchased it with my dad.

Q    But you were not on the deed?

A    No, he was on the deed.

Q    You purchased it with your dad, you said?

A    Yes.

Q    So at the time that the property was conveyed from some other party, both you and your dad purchased it at the same time?

A    Yes.

Q    And approximately when was that?

A    A very long time ago.  I don't remember exactly when.

Q    Does your dad still own the property?

A    It could be the late '90s.

Q    I'm sorry?

A    It could be the late '90s.

Page 77

A. Deo

Q    Does your dad still own that property?

A    My dad passed away.

Q    I'm sorry.  That's right.  I apologize.

The mortgage that you list here for the Bronx property for $479,000, was that a mortgage you were obligated to pay?

A    Yes.

Q    You were on the note of the mortgage?

A    I don't believe I was on the note.  My dad was on the note, but I paid the mortgage.

Q    So you paid the mortgage, but there was no obligation from the bank for you to pay it, correct?

A    Say it again.

Q    There was no obligation to the bank for you to pay it, you just paid it?

A    I wasn't on the note.

Q    What about the property at the residence of Old Westbury worth $5,295,000?

A    Yes.

Q    What was the address of that?

20 (Pages 74 - 77)

Page 78

A. Deo

A    That's 3 Hunting.

Q    Can you give the entire address, please?

A    3 Hunting Lane, Old Westbury. It's 11568.

Q    Was that property held, titled in your name, your wife's name or some other combination?

A    It was a unique situation. We didn't transfer title yet.

Q    Did you or did you not own the property at that time?

A    I believe I did.

Q    So you were on the deed?

A    We didn't transfer title yet.

Q    When you say, "we," somebody owns the --

A    Well, the seller and us.

Q    So the seller had not transferred the property to you?

A    No.

Q    You had not paid them the money to buy the property yet?

A    There was a contract.

Page 79

A. Deo

Q    There was a contract?

A    Yes.

Q    A contract requires that at the end of the contract to close on it, right?

A    Yes.

Q    At the end of that closing, you, as the purchaser, give the seller all the money the contract requires to purchase the property, correct?

A    Yes.

Q    Did you ever give the seller all the money that was required under the contract?

A    We never finished it.

Q    Okay, so the deed was never transferred to you?

A    I said that.

Q    Well, you say that there's a mortgage here of $2,250,000, correct?

A    It was a hard money. It was in place. It was a hard money in place for that amount.

Q    So you borrowed $2,250,000?

A    It was in place. We never completed it.

Page 80

A. Deo

Q    Did you actually borrow the money or not it?

A    It never transferred hands.

Q    The loan you referred to, the mortgage, never occurred either, it never closed?

A    No. The whole transaction, we didn't complete it.

Q    Did you believe that it was full and appropriate to present to Flushing Bank in March of 2023 that these were your assets that Flushing Bank relied upon in providing financing to Northshore at that time?

A    I believed it was my asset.

MR. RUDERMAN:  Can we go off the record for a second?

THE VIDEOGRAPHER:  Yeah. Off the record at 10:43.

(Discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 10:45.

Q    Mr. Deo, I've handed you a document, five-page document. It is from the

Page 81

A. Deo

New York City Department of Finance Office of the City Register. Have you ever seen this document before?

A    I am not sure.

MR. RUDERMAN:  We'll mark this as 48A.

(Deo's Exhibit 48A, document from the New York City Department of Finance Office of the City Register, was marked for identification, as of this date.)

Q    I'm going to represent to you that I obtained this document from a system called ACRIS, A-C-R-I-S, which is the system in which financial, real estates transactions are recorded in New York State.

A    Okay.

Q    And this is a recording of an order of the Supreme Court of the State of New York, County of the Bronx under index number 20595, 2006 by Justice Lucindo Suarez. That's L-U-C-I-N-D-O, S-U-A-R-E-Z. And the title is Motilal, M-O-T-I-L-A-L, Deo as the plaintiff, and the defendant is 3011 Matthews Inc., et al.

21 (Pages 78 - 81)

Page 82

A. Deo

I want to go down to the decision and there's an Anthony Derrick Deo, individually and is present 3011 Matthews, Inc. Do you know Mr. Motilal Deo?

A That was my dad.

Q That was your dad, okay. Are you familiar with 3011 Matthews Inc.?

A That's the corporation.

Q Is Anthony Derrick Deo you, as far as you know?

A Yes.

Q So based on the order, this was a lawsuit started by your father against you and his company claiming that you forged his signature in transferring the deed to yourself or to this entity. Do you understand that?

A Yes.

Q Do you recall this?

A Yes.

Q This was an order directing the register to void out that transfer that the court found that you had, in fact, forged the deed transferring the property, which you listed as being owned by you, you transferred it from

Page 83

A. Deo

your dad to yourself and this entity. Are you aware of it?

A I'm aware of it.

MR. RUDERMAN: Off the record.

THE VIDEOGRAPHER: Off the record at 10:47.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:52.

Q Mr. Deo, you've been provided with a document. It has been previously marked in this case in these depositions as Exhibit 3. It is the affidavit that you provided in the New York State action in County of Nassau that was commenced by our clients against you. Do you recall this document?

A Yes.

Q You read everything that's in this document? Not just now, but --

A Yeah, prior.

Q You swore that all the information in here is accurate and true, correct?

Page 84

A. Deo

A Yes.

Q Now, yesterday I believe you testified that you never gave anybody the right to claim ownership over Northshore and that you and your wife were the only ones who have the right to claim that they owned Northshore, correct?

A Yes.

Q I draw your attention to paragraph seven, which is on page three of the document.

A Yes.

Q So in paragraph seven, it says in return for supplying the floor plan, Mr. Baron insisted that he be listed as the owner of my business with a, quote, right of redemption, close quote, his words, that we agreed to verbally.

In this affidavit you're indicating that Mr. Baron insisted that he have the, be listed as the owner of the business with a right of redemption. So wouldn't this indicate that Mr. Baron had the right to be listed as the owner of Northshore?

A For purposes of the floor plan and

Page 85

A. Deo

banks, as you indicated yesterday, when they provided those applications to banks.

Q So only with regard to the banks he would be listed as the owner, but for all other purposes, it wouldn't be?

A It shouldn't be. That was my understanding at that point.

Q And those documents to the banks were not between you and Mr. Baron, it's just whatever he told the bank, correct?

A Yes.

Q So there was no transfer of your interest in Northshore to Mr. Baron at all, correct?

A None.

Q So what did he need a right of redemption for?

A Well, we would correct it with the banks and floor plan eventually.

Q What do you mean, correct it with the banks?

A Well, he said that he was the owner to the banks and the floor plan, so we were going to fix that later on.

22 (Pages 82 - 85)

Page 86

A. Deo

Q    How would you fix that?

A    I didn't understand the details at that point.

Q    Did you think that somehow you would tell the banks that you were actually the owner?

A    I said I didn't understand the details of how it was going to be done. We were just trying to get Northshore going.

Q    So your testimony is that when you stated in here that Mr. Baron was going to be listed as the owner of the business, it was solely with the banks and the right of redemption was that at some point in the future you would correct it with the banks perhaps?

A    Banks and the floor plan, yes. That's why we insisted on K-1's.

Q    Do you have any writings of any kind asking for those K-1's?

A    We may have. I'm not sure.

Q    Did you do a diligent search through all of your records to see if, in fact, whether you have such communication?

A    I can't remember if I did. At

Page 87

A. Deo

some point maybe.

Q    Well, as part of this lawsuit, did you do a diligent search for any records related to either your claims or defenses in connection with this lawsuit?

A    Oh, yeah, I did with Brian.

Q    You produced all the documents that you believe you had that were responsive to the various demands?

A    Yes.

Q    Did you find any documents which indicated that you were asking for those K-1's, which you say you didn't get?

A    I don't recall at the moment. I gave a lot of documents to Brian.

Q    I understand. Do you recall if that was one of the documents?

A    I don't recall.

MR. RUDERMAN:  Can we off the record, please?

THE VIDEOGRAPHER:  Yeah. Off the record at 10:56.

(A discussion was held off the record.)

Page 88

A. Deo

THE VIDEOGRAPHER:  Back on record at 11:06.

Q    Mr. Deo, you have a document in front of you or a previous document? That's a profit and loss statement from December 31st, 2022. Do you recall we discussed that document? It's the email with Mr. Puccio.

A    Yes.

Q    With the profit and loss statement behind it and it showed a $472,000 profit. Do you recall that? It was a three-page document.

A    Yes.

Q    And as the owner of North Shore Motor Leasing, that would have been taxable to you, correct?

A    Yes.

Q    Did you, in fact, file an income tax return for 2022 that paid the taxes on that $472,000?

A    Yes.

Q    I'm going to direct to your attorney we call for the production of the tax returns.

MR. RUDERMAN:  I believe

Page 89

A. Deo

there was some other documents that I previously asked if Mr. Deo had any communications asking for K-1's. So I ask you to provide those as well. We'll follow up in writing.

Q    Mr. Deo, do you see another document that you have in front of you? It's a bank statement from Bank of America for Car Buyers NYC Inc. We're going to mark this as Exhibit 49.

(Deo's Exhibit 49, bank statement from Bank of America for Car Buyers NYC Inc., was marked for identification, as of this date.)

Q    I represent to you this is a document that we obtained by a subpoena to Bank of America. Car Buyers NYC Inc. is one of your companies, correct?

A    Yes.

Q    Do you recognize this document?

A    It's a bank statement.

Q    This is from November of 2022. I

23 (Pages 86 - 89)

Page 90

A. Deo

ask you to take a look through that bank statement.

A    Yes.

Q    Do you recall this particular bank statement?

A    I mean just by looking at it right now.

Q    Now, as you previously testified, and it's all on the record, there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson?

A    Yeah. They wired it back.

Q    And it went to Mr. Thomasson's trust account, as far as you know?

A    Escrow? Yeah.

Q    Escrow account, yes.
Did Mr. Thomasson send you that money?

A    Yes. He wired it to me.

Q    When he wired it to you, did it go to you personally or some other entity?

Page 91

A. Deo

A    I think it went to this account.

Q    So there is a deposit, it's called a NYTLR transfer?

A    Yes.

Q    From November 22nd, 2022 in the amount of $723,000.

A    Yes.

Q    So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account?

A    Yes.

Q    That was from the Libertas funds, correct?

A    That's what it was supposed to be, yes.

Q    Now, the amount that Mr. Thomasson got was $735,000. Do you recall that?

A    Yes.

Q    So there's a difference of $12,000?

A    $12,000.

Q    Did Mr. Thomasson keep that money?

A    Well, I owed him money from past

Page 92

A. Deo

and future work, so I told him to keep $12,000 and send me the rest.

Q    Did you have any written communications with him regarding that?

A    I think it was a phone call.

Q    What about the direction for him to transfer the money to this particular account, was it in writing or by phone or something else?

A    I think it was a phone call. I'm not sure.

Q    Now, also on this bank statement is a transfer on, a withdrawal, the second one of November 22nd, 2022. Am I sharing that?

A    What one?

Q    Transfer, a wire transfer on November 22nd, 2022 in the amount of $300,000.

A    Yes.

Q    And that is a transfer to Star Performance Consulting. Do you see that?

A    Yes.

Q    Do you know who Star Performance Consulting is in connection with this?

A    That is one of Tony Urrutia's

Page 93

A. Deo

corporations.

Q    So was this part of the $500,000 that you paid in connection with your Superb agreement?

A    Yes.

Q    If we scroll down a little further to the next page, it's the top of the next page, there's another wire on November 29th, 2022 also to Star Performance Consulting for $200,000. Do you see that?

A    Yes.

Q    Was that the balance of the $500,000 that was paid?

A    Yes.

Q    Now, right before the payment of $300,000 on November 22nd, there is a transfer to DLA Capital Partners for $15,000. Do you see that?

A    Yes.

Q    Do you know who DLA Capital Partners is?

A    That is Michael Laurie's company.

Q    Do you know why you paid him $15,000?

24 (Pages 90 - 93)

Page 94

A. Deo

A    That's his commission.

Q    Commission on what?

A    The Libertas, the Libertas funding.

Q    What was Mr. Laurie's connection with the Libertas funding?

A    Well, he introduced me to them.

Q    Did he introduce you to them directly or did he introduce you to them through a broker of some kind?

A    I think he introduced me to a broker who works with a number of lenders.

Q    Are you familiar with a company National Business?  National Business?

A    No.

Q    Now, if I scroll down on that page, that same page we were on, the next to the last entry is November 28, 2022.  Do you see that?

A    Yes.

Q    That's for a wire transfer for $173,000 to Jun Wang and Associates.  Do you see that?

A    Yes.

Page 95

A. Deo

Q    Do you know what that money is for?

A    That's for my house in Hunting Lane.

Q    So the house you are currently living in, correct?

A    Yes.

Q    That was in connection with a contract to purchase that property, correct?

A    Yes.

Q    You're currently in litigation with the owner of that house, correct?

A    Yes.

Q    Alright.  And in fact, you had started a lawsuit against Mr. Wei, W-E-I, correct?

A    Yes.

Q    That is in the Supreme Court of State of New York, County of Nassau, index number 612890, 2025 in which you make certain claims with regard to breaches by Mr. Wei in connection with the contract?

A    Yes.

Q    Do you know what the current

Page 96

A. Deo

standing is of that lawsuit?

A    Can I --

Q    I'm just asking if you know.

A    Well, it's the same thing.  I think it was dismissed.

Q    You have a lawsuit against the owner of the property, correct?

A    Yes.

Q    Do you have more than one?

A    No.  I think it was dismissed.

Q    It was dismissed?

A    Yes.

MR. RUDERMAN:  Can we go off the record, please?

THE VIDEOGRAPHER:  Yes.  Off the record at 11:13.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 11:15.

Q    Mr. Deo, I'm showing you a document.  It's called stock purchase agreement.  I represent to you that this was a document that was provided mostly through Mr. Thomasson and

Page 97

A. Deo

perhaps some of your other counsel in many filings they've done.  Are you familiar with this document?

A    Yes.

MR. RUDERMAN:  I'd like to mark this as Exhibit 50.

(Deo's Exhibit 50, stock purchase agreement, was marked for identification, as of this date.)

Q    Do you recognize this document?

A    Yes.

Q    It's been your statement throughout this case that you are the rightful owner of 189 Sunrise, correct?

A    Yes.

Q    You claim your ownership as a result of this stock purchase agreement?

A    This and paying of the $50,000 to prior owners.

Q    So now I'm going to draw your attention to the last page of this document.  By the way, these documents were produced in this lawsuit by counsel at the time.  It's marked DEO, the first page is DEO00076, and the last

25 (Pages 94 - 97)

Page 98

A. Deo

page, I don't see signatures on the page. I don't see any signatures on the page. Do you see any signatures on the pages of this document?

A   On this document, no.

Q   Do you have a copy of this document or an original of this document with any signatures on it?

A   Actually, Brian Chabrier held this signature, the signed copy in the safe in his office. In a conversation with him, whenever anyone picked up their check, they would sign the document. I think Jory was the last one to sign it. They never returned the signed document to me.

Q   You don't have a signed copy of the document?

A   No. No. Brian does.

Q   Does Brian have one with your signature on it?

A   I think he did, yes.

Q   Is this the agreement, the terms of the agreement by which you purchased your interest in Sunrise?

Page 99

A. Deo

A   Yes, this was the stock purchase.

Q   You stated that you purchased it by paying $10,000 to each one of the existing members, correct?

A   Yes.

Q   And that satisfied your obligations under the agreement?

A   Yes.

Q   I'm going to draw your attention to paragraph 1.2, bottom of the first page. It states here the purchase price of payment. Do you see that?

A   Yes.

Q   Is it says "the buyer." That's you, right?

A   Yes.

Q   "Is purchasing the shares from the seller for a total purchase price as follows: $50,000 and no cents upon execution of this agreement." You paid that, correct?

A   Yes.

Q   "Representing $10,000 to each of the five individual sellers," which is what you said you did, correct? You have the checks for

Page 100

A. Deo

that?

A   Yes.

Q   And then it says, "And $15,000 per month commencing on blank 2021 representing $3,000 to each of the five individual sellers for each month subsequent to the execution of the agreement until such time that the buyer," you, "is able to cross guaranty the corporation with a franchise automotive dealership defined as the purchase price."

Did you ever pay the $15,000 a month additional as required under this agreement?

A   Actually, yes. And David died, Josh upped that amount to $30,000, which I continued to pay. The purpose of that was for the floor plan.

Q   Well, you previously testified that the deal you had with David Baron for the floor plan was $15,000 a month, correct?

A   That was for Northshore.

Q   That was for Northshore?

A   This is Sunrise.

Q   Is the $15,000 per month that you

Page 101

A. Deo

say you paid for floor plan or for your purchase of the interest in Sunrise --

A   No, it was the floor plan. That's why it has that, to get your own cross guaranty to provide your own floor plan. That's what the statement that you just read was.

Q   Did you have an attorney represent you in connection with this transaction?

A   At that point it was Chris Ring.

Q   Did Mr. Ring review the documents, as far as you know?

A   I'm sure he did.

Q   Did you believe this document accurately reflects what the agreement of the parties was?

A   Yeah.

MR. RUDERMAN:  Can we go off the record?

THE VIDEOGRAPHER:  Yeah. Off the record at 11:21.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 11:24.

26 (Pages 98 - 101)

Page 102

A. Deo

Q    Mr. Deo, you've been presented with a document. This is a document which, through various proceedings so far, you've represented as a stock sale agreement for you to purchase Baron Nissan. Do you recognize this document?

A    Yes.

Q    This was pulled from the Nassau County Clerk's office, but it's the same document we've been presenting each time, correct?

A    Yes.

Q    It's dated May 17th, 2021, correct?

A    Yes.

Q    I'm just scrolling down the screen to the signature page. Could you go to the signature page, please?

MR. RUDERMAN:  51, please.

(Deo's Exhibit 51, stock sale agreement to purchase Baron Nissan, was marked for identification, as of this date.)

Q    Under the seller's signature, we

Page 103

A. Deo

see a signature above David Baron. Do you see that?

A    Yes.

Q    Do you know that to be David Baron's signature?

A    Absolutely.

Q    In fact, you were down in Florida to get Mr. Baron's signature, correct?

A    We actually signed this at his house.

Q    Right. And I believe you have in your various affidavits that you say David died unexpectedly before coming back up, correct?

A    Before coming up May 25th.

Q    Right. Now, you say he died unexpectedly. Wasn't he seriously ill with cancer at the time?

A    David did have cancer, yes.

Q    He had very serious, cancer. You knew that, correct?

A    Yes.

Q    So he didn't die unexpectedly. He died unfortunately, but not unexpectedly, correct?

Page 104

A. Deo

A    No one expected him to pass away, not even himself.

Q    How do you know that?

A    I mean, I met with him. There was no talks about him passing away. There was talks about our future.

Q    Under the companies you see David Baron's signature, correct?

A    Yes.

Q    There is also a signature line for Ron Baron, correct?

A    Yes.

Q    Now, Ron Baron, pursuant to this agreement, owned half of the stock of Baron Nissan, correct?

A    Yes.

Q    Do you have any document that has Ron Baron's signature on it?

A    Yes.

Q    You do?

A    Yes.

Q    Have you presented it to anybody yet?

A    I think it was.

Page 105

A. Deo

Q    When was it presented?

A    Oh, I don't know exactly when. In one of the cases.

Q    Well, You recently brought an Order to Show Cause before Judge Driscoll in the action you started in the Supreme Court in Nassau County, correct?

A    Yes.

Q    And Mr. Thomasson is representing you in connection with that, right?

A    Yes.

Q    And Mr. Thomasson brought an Order to Show Cause to stop the sale of Baron Nissan, correct?

A    Yes.

Q    In that document, he presented no contract with Ron Baron's signature on it. Are you aware of that?

A    I know there is a contract with Ron Baron's signature. I'm not sure what exactly was presented or what the court has.

Q    Have you presented that document to any one of your attorneys?

A    Yes.

27 (Pages 102 - 105)

Page 106

A. Deo

Q    Which attorney did you present it to?

A    Numerous.

Q    So they all have a copy of it?

A    Chris Ring does, Harry does. I'm not sure if Brian Levine has it.

Q    When did you meet with Ron to have him sign that?

A    No, David had Ron sign it.

Q    David had Ron sign it?

A    Yes.

Q    When did you first obtain a copy with Ron's signature on it?

A    Somewhere between 2020 and 2021.

Q    Did Ron sign it before David did?

A    No. David signed first.

Q    So David signs his on May 17th, 2021, correct?

A    It's not the same contract. There's a different contract.

Q    There's a different contract?

A    Yes.

Q    Okay. Have you ever provided a copy of that contract to your counsel?

Page 107

A. Deo

A    Yes.

Q    Have you ever provided, in any filings with the court, a copy of that contract?

A    I'm sure there is. I'm not a hundred percent sure. I'm sure there is.

Q    Are the terms of that contract the same or different than the contract that we're looking at now?

A    It's pretty much the same. The buyer changed. The old contract had Lenny Tarzia --

Q    I'm sorry, the old contract had?

A    Lenny Tarzia. Leonard Tarzia. And the new contract, he changed it to me. Lenny was just going to be on the lease.

Q    Is there any contract wherein Ron Baron agreed to sell you his interest in Baron Nissan?

A    Well, he agreed to sell Baron Nissan.

Q    Please answer my question. Is there any contract in which Ron Baron agreed to sell you Baron Nissan?

A    I believe so.

Page 108

A. Deo

Q    Where is that contract?

A    I believe it's in the chain of contracts.

Q    I'm sorry, you believe it's where?

A    In the chain of contracts.

Q    What does that mean, the chain of contracts?

A    Between the first contract and this contract, and there was emails where Ron did, yes.

Q    Were you in direct communication with Ron Baron?

A    The lawyers and us, between David, Ron, myself, Chris Ring and Joseph -- I don't know his last name.

Q    So you believe there is a contract signed by Ron Baron in which he agreed to sell you his interest in Baron Nissan?

A    Ron Baron did agree to sell me.

Q    Please answer my question. Is there an agreement in which Ron Baron signed stating that he agreed to sell his interest in Baron Nissan to you?

A    I'm not sure.

Page 109

A. Deo

MR. RUDERMAN: If there is such an agreement, I call for its production or any communication concerning it. Thank you.
Can we off the record, please?

THE VIDEOGRAPHER: Yes.
Off the record at 11:30.
(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 11:32.

A    Could I add something to the last question?

Q    You want to modify the answer that you gave?

A    Well, I just remembered. I just wanted to add.

Q    What question was that that you are adding to?

A    Was Ron Baron aware of my purchase of Baron Nissan.

Q    I don't think that was my question.

28 (Pages 106 - 109)

Page 110

A. Deo

A   Well, I don't remember your particular question.

Q   I asked whether there's a document that Ron Baron signed and if there is such a document, to produce it. I didn't ask the question whether he was aware of it. Thank you.

You've been provided with a two-page document. It's an email chain and from the bottom -- I'm going to have this marked as Exhibit 52.

(Deo's Exhibit 52, email chain, top one dated November 2, 2022, 11:06 a.m., was marked for identification, as of this date.)

Q   It is an email from, starting from the bottom to the top, from Wendy Kwun, that is K-W-U-N, at Island Auto Group. It says to Anthony dated October 24th, 2022. Can you look at that last one on the page there, on the second page, which is actually the first in time, and tell me if you recall receiving this email.

A   Yes.

Q   So you had previously testified on

Page 111

A. Deo

a license that needed to be, a license application that needed to be transferred over regarding Northshore and Sunrise to you at the DMV, correct?

A   Yes.

Q   You did receive the paperwork from Northshore and Sunrise to make that change with the DMV, correct?

A   Yes.

Q   On October 24th, 2022, you received an email from Wendy saying please fill out and sign and return them to you, correct?

A   Yes.

Q   And then the next email is dated Wednesday, November 2nd, 2022 from Wendy asking you, have you had a chance to fill out these two forms? So presumably, she didn't receive it yet, correct?

A   That's what I read.

Q   Did you respond to this email?

A   I didn't respond to the email, but I had Dan work on the transfer documents and Dan had the documents at this point.

Q   So he had them on November 2nd at

Page 112

A. Deo

10:59, he already had them?

A   He should have. Yes, we worked on it together.

Q   Then there's another email on that same date from Josh Aaronson to Wendy in which you were copied, right? Anthonyd@Northshoremotors1.com is your email, right?

A   Yes.

Q   So just a few minutes later, he says, "Hi, Anthony. Please make sure to get this back to us today. Thank you."

You say you did give it back to them?

A   I had, like I said, Daniel O'Sullivan worked on it with me and he had the documents.

Q   When you say worked on it with you, what needed to be done that he worked on?

A   Just filling out the application.

Q   You were incapable of filling it out yourself?

A   I am capable.

Q   So why did you have Dan work on

Page 113

A. Deo

it?

A   Because he was my controller.

Q   What information was on there that needed the controller to prepare?

A   He is my controller, so he helped me with a DMV application.

Q   And you signed this application?

A   I'm sure I did.

Q   How did you ensure that it was then transferred over to Josh and Wendy?

A   I -- I mean Daniel was in constant contact with them.

Q   Did you ever ask Daniel if he ever gave it to them?

A   I can't remember.

Q   Did you ever follow up with either Josh or Wendy to say hey, did you get it?

A   Well, obviously there's an issue because they eventually returned the license without transferring it to me. So there was an issue there somewhere.

Q   That's not my question. Did you ever follow up with them and ask --

A   I do not remember.

29 (Pages 110 - 113)

Page 114

A. Deo

Q    Did you ever follow up at any time to make sure that the license to operate the two dealerships you're claiming were yours got transferred to you?

A    Of course I did.

Q    You did?  So how did you go about following up with that?

A    By looking it up online.

Q    You didn't send an email to Josh and Wendy, hey, did you send it in?

A    I don't recall at that point.

Q    Do you recall at any point?

A    I don't recall.

Q    So you just look online to see whether or not it actually happened?

A    Yes.

Q    When did you look it up online?

A    (Indicating).

Q    When?

A    I'm sure there was various times.

Q    How did you good about doing that?

A    Google.

Q    What did you look for on a Google search?

Page 115

A. Deo

A    New York State DMV license.

Q    Is that information available publicly?

A    I'm sure it is.

Q    Well, did you know that when you were doing your Google search?  Did you know that when you were doing your Google search?

A    Sure.

Q    That that would be available publically?

A    Sure.

Q    So as somebody who has been in the car business at this point in time for six years, the way that you were going to find out whether your license was submitted to the DMV was doing a Google search?

A    Well, yeah, because it would update the dates.

Q    Did you ever contact DMV directly?

A    We spoke at some point.  I don't remember exactly when.

Q    Who did you speak to?

A    Joe Fello.

Q    When did you speak to him?

Page 116

A. Deo

A    I don't recall exactly when.

Q    Do you recall a time frame?

A    2023.

Q    Sometime in 2023?

A    Yes.

Q    Is that before or after you submitted the new application for the Gold Coast entities?

A    Before.

Q    Do you have a copy of the dated application with your signature on it?

A    I don't.

MR. RUDERMAN:  Can we go off the record, please?

THE VIDEOGRAPHER:  Yup.  Off the record at 11:38.

(Discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 11:40.

Q    Mr. Deo, yesterday we discussed your ownership of UEA Premier Motors Corp., correct?

A    Yes.

Page 117

A. Deo

Q    I believe you testified that that was a company which you or your wife together wholly owned, correct?

A    Yes.

Q    And that was a used car automobile dealership, retail dealership?

A    Yes.

Q    Operating out of 180 Michael Drive?

A    Yes.

Q    I believe you said you didn't recall who held the license on that, correct?

A    No.

Q    Are you familiar with a gentleman by the name of Louis Beria?

A    Yes.

Q    How do you know Mr. Beria?

A    We worked together in Dolphin Realty.

Q    Dolphin Realty?

A    Yes.

Q    What is Dolphin Realty?

A    A real estate firm.

Q    What did it do?

30 (Pages 114 - 117)

Page 118

A. Deo

A    Buy, sell houses, list houses, like a normal real estate business.

Q    Was it like a broker to the public or did it do its own investments?

A    Oh, no, it's a broker to the public.

Q    So if somebody wanted to list their house for sale, they might come to Dolphin Realty?

A    Yes.

Q    Also, if somebody wanted to buy a house, they might go to you to show houses around that they might purchase?

A    They would go to Dolphin, yes.

Q    Where was Dolphin Realty located?

A    It's closed now.  It used to be located in West Babylon.

Q    That was a licensed real estate?

A    Yes.

Q    You mentioned previously you held a real estate license, correct?

A    Yes.  I was a real estate broker.

Q    Did you use your real estate brokerage license --

Page 119

A. Deo

A    No.

Q    Just let me finish my question.

A    I'm sorry.

Q    That's all right.  The reporter can't get us both speaking at the same time.

A    Gotcha.

Q    Did you use your real estate broker's license in connection with Dolphin Realty?

A    No.

Q    Did you have your own real estate license when you were operating Dolphin Realty?

A    I don't recall.

Q    Did you need a real estate license when you were operating Dolphin Realty?

A    No.

Q    What did you do for Dolphin Realty?

A    Looked at properties, assessed properties.  He would get houses to negotiate short sales, loan modifications.

Q    You personally were not engaging in brokerage activities for Dolphin Realty?

A    No.

Page 120

A. Deo

Q    Was Mr. Beria engaging in brokerage activities --

A    I'm sure, yes.

Q    To your knowledge, did he have a real estate license?

A    I think so.

Q    Do you know if Mr. Beria continued to operate Dolphin Realty?

A    If he continued?  What do you mean?

Q    Continued to run that business.

A    I'm sure he did.

Q    When was this, when you were operating Dolphin Realty?

A    I don't know exactly.  2015 maybe. I'm not sure.  I'm sorry.

Q    Were you operating Dolphin Realty at the same time that you were operating any of the car dealerships?

A    No.

Q    So it was beforehand?

A    Before.

Q    And when you stopped operating Dolphin Realty, is that when you first started

Page 121

A. Deo

getting into ownership of the automobile dealerships?

A    Yes.

Q    Was Mr. Beria involved with automobile dealerships at all?

A    Not really.

Q    Did you close up Dolphin Realty together?

A    No.  No.  That was his family's business.

Q    Were you an employee there?

A    I wouldn't consider that, no.

Q    Did you earn any income from it?

A    I had some commissions, I'm sure.

Q    So you received commissions like a 1099, as an outside contractor?

A    Yeah.

Q    But that was Mr. Beria's business?

A    Yes.

Q    After you left Dolphin, as far as you know, he continued to operate Dolphin for a while?

A    To my knowledge.

Q    About for how long, if you know?

31 (Pages 118 - 121)

Page 122

A. Deo

A    I wouldn't know.

Q    After you left Dolphin Realty, did you have any further communication with Mr. Beria?

A    I'm sure we spoke.

Q    But you had no further business dealings with him, correct?

A    I don't think so, no.

MR. RUDERMAN:  I'm going to have this marked, please.

(Deo's Exhibit 53, dealer agreement between Westlake Financial Services and UEA Premier Motors Corp., was marked for identification, as of this date.)

Q    Let me know when you're finished.

A    Sure.  I'm done.

Q    You done?

A    Yes.

MR. RUDERMAN:  Can we go back on the record, please?

THE VIDEOGRAPHER:  We didn't go off.

MR. RUDERMAN:  Oh, I'm

Page 123

A. Deo

sorry.  Silly me.  Okay.

Q    Mr. Deo, have you had an opportunity to review this document?

A    Yes.

Q    I'm going to represent to you this is a document that we received by a subpoena served on Westlake Financial Services. Yesterday I believe we showed you a similar document in connection with Northshore Motor, which was signed by Brian Chabrier.  Do you recall that?

A    Yes, I do.

Q    So this is a dealer agreement between Westlake Financial Services and UEA Premier Motors Corp.  Do you see that?

A    Yes.

Q    Do you recognize seeing this document before?

A    I mean, it's a similar document, yes.

Q    I'm saying do you recall seeing this document between UEA Premier and Westlake?

A    At that time, sure.

Q    Now, on the first page it says

Page 124

A. Deo

Louis Beria's name.  Do you see that?

A    Yes.

Q    And then on the last page it's signed by UEA Premier Motors Corp., or at least there's a signature above the name Louis Beria with a signature saying Louis Beria.  Do you see that?

A    Yes.

Q    It's dated October 17, 2016?

A    Yes.

Q    And his title is listed as owner?

A    I see.

Q    Were you aware that this document was signed by Mr. Beria as the owner of UEA?

A    At that point, yes.

Q    Was, in fact, Mr. Beria the owner at that time?

A    No.

Q    Was he ever the owner of UEA --

A    No.

Q    How did it come about that Mr. Beria signed this as owner?

A    It's the -- to get the bank.

Q    Sorry?

Page 125

A. Deo

A    It's to get the bank.  So it's an application to get the bank financing.

Q    You were the owner, correct?

A    Yes.

Q    Why didn't you sign it as the owner?

A    I don't recall the circumstances at that point, no.

Q    Is it perhaps because as a result of your judgment, your criminal judgment, you believed that you could not obtain more financing and that's why you didn't sign it?

A    I am not sure.

Q    Is this information that was provided to Westlake Services for your company on your behalf false in that it stated that Beria was the owner?

A    Well, he wasn't the owner.

Q    So it was false, correct?

A    Yes.

Q    You knew that it was false when it was submitted, correct?

A    I guess yes.

Q    Did Mr. Beria actually have any

32 (Pages 122 - 125)

Page 126

A. Deo

relationship with UEA Premier Motors at all?

A    I'm assuming we still had contacts, so yes.

Q    Whether he had contacts, did he have anything to do with the business of the dealership?

A    No.

Q    Do you know what, if anything, he was doing business wise or he was just doing the Dolphin or something else?

A    What he was doing business wise, no.

Q    Do you know whether Mr. Beria ever had any criminal convictions?

A    I found out later on, yes.

Q    What did you find out later on?

A    That he was arrested.

Q    When did you find that out?

A    Specific date I'm not sure.

Q    Was it before or after this October 17th, 2016?

A    Oh, I don't know when he was arrested.

Q    Do you know if he was arrested

Page 127

A. Deo

before you had him sign this document for the bank?

A    I don't know when he was arrested.

Q    Do you know what he was arrested for?

A    It had something to do with real estate in Georgia.

Q    Did you provide any information to any governmental agencies, such as a U.S. attorney or FBI, in connection with that criminal conviction or criminal arrest?

A    No.

Q    You previously testified that you were that afraid for your life during your criminal matter because there were people after you with guns.  Do you recall that?

A    Yes.

Q    Were you afraid that Mr. Beria was one of those people?

A    No.

Q    Or anybody on behalf of Mr. Beria?

A    No.

Q    You never did say who was after you.  Who was after you with guns?

Page 128

A. Deo

A    I don't know the specific people's names.

Q    Do you know why they were after you with guns?

A    I don't know.

Q    So how do you know they were after you?

A    Because I got threats at that time.

Q    From whom?

A    I don't recall.

Q    How were these threats manifested to you?

A    It was a long time ago.  I don't remember.

Q    Are you threatened very often that someone wants to kill you?

A    Say again?

Q    Are you threatened very often by people who want to kill you?

MS. WALKER:  Objection.

Q    You can answer the question.

A    No.

Q    Somebody threatened they wanted to

Page 129

A. Deo

kill you; is that what you're saying?

A    Yes.

Q    You don't remember who it was, correct?

A    No.

Q    You don't remember when it was, correct?

A    Time frame, 15 years ago.

Q    You don't remember why they threatened you, right?

A    No.

Q    You don't remember what it was about at all?

A    Well, it had something to do with my corporation.

Q    So you cooperated with the investigation concerning your particular issue when you had a criminal conviction, correct?

A    It wasn't my issue.

Q    But you had a criminal conviction, correct?

A    Yes.

Q    In connection with that, the circumstances, you cooperated with the FBI or

33 (Pages 126 - 129)

Page 130

A. Deo

the U.S. attorney?

A    The investigation was of someone else.

Q    Not part of what you were convicted for?

A    No.

Q    Who's that person that was being investigated?

A    There was a number of companies.

Q    Do you remember the names of any of those companies?

A    Novelty Realty. There was -- I forget the title company's name, and a mortgage bank. It was association with Novelty.

Q    Did any of these entities have any relationship to Mr. Laurie?

A    Laurie? No.

Q    Did any of these businesses have any relationship with Mr. Beria?

A    No.

Q    Were there any individuals behind these entities that you're aware of?

A    Yes.

Q    Do you believe that those

Page 131

A. Deo

individual or individuals were the ones that sent someone to threaten you with your life?

A    Yes.

Q    Who were these people?

A    I don't remember their names at the moment. There was a lot of them.

Q    There were a lot of people that were under investigation that you were working with?

A    Yes.

Q    One or some of them hired or engaged some people to threaten you with your life?

A    At that point that was my belief, yes.

Q    That was in 2015, approximately?

A    Time frame, around 15 years ago probably.

Q    After that one incident where you were threatened, did they ever threaten you again, as far as you recall?

A    I don't remember.

Q    As a matter of fact, you said that that threat that happened about 15 years ago,

Page 132

A. Deo

you later hired, engaged a police officer or former police officer Marc Merckling for security, correct?

A    I felt more comfortable with him around, yes.

MR. RUDERMAN:  Can we go off the record, please?

THE VIDEOGRAPHER:  Yes.

Off the record at 11:53.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 11:58.

Q    Mr. Deo, going back to the Libertas transaction. You testified that you asked Mr. or you engaged Mr. Laurie for financing and he ended up bringing you ultimately to Libertas, correct?

A    I didn't hear the last part.

Q    You engaged Mr. Laurie for financing and he directed you ultimately to Libertas, correct?

A    Well, either through someone else or, but that's who we ended up with.

Page 133

A. Deo

Q    Had you ever heard of Libertas before Mr. Laurie connected you?

A    No.

Q    What was the purpose of going to Libertas?  What were you trying to do?

A    Working capital.

Q    How much money were you seeking at that time?

A    I'm not sure. I submitted my documents in to see how much I was approved for.

Q    What did you intend to use the money for?

A    For the business.

Q    Can you be more specific when you say "for the business"?

A    Working capital.

Q    Was the dealership undercapitalized at that time?

A    At that point that's when the whole ruination was occurring, so...

Q    Well, you testified that Josh Aaronson paid back all the money that was owed to Ally so it came out to be a net zero.

A    That Ally moneys, yes.

34 (Pages 130 - 133)

Page 134

A. Deo

Q    The Ally moneys. Were there other problems with the dealership other than that?

A    Well, we were shut down. It wasn't operating like a normal business, but it still had expenses to carry on.

Q    When --

A    I think there were employees. We still had the lease.

Q    You say you were shut down. When were you shut down?

A    Well, we weren't operating like a normal business.

Q    When you say, "we weren't operating," at what point in time are you referring to?

A    At the end of 2022 going into 2023.

Q    Do you mean in December of 2022? Could you narrow that down?

A    Well, towards the end. I mean, it was a couple of months.

Q    When you say weren't operating, why weren't you operating?

A    Because he shut down the floor

Page 135

A. Deo

plans.

Q    He shut down the floor plans. You're talking about Josh?

A    Josh, yes.

Q    Do you know when he shut down the floor plans?

A    Precisely I don't know, but I know it was towards the end of the year.

Q    So you needed working capital to do what with, exactly?

A    To, you know, restart everything and just get the business back up and running.

Q    So the money was earmarked for use for that purpose?

A    To get the business back up and running, yes.

Q    And in fact, when you applied for the financing through Libertas, that's what you told them the money was going to be used for, correct?

A    For working capital, yes.

MR. RUDERMAN:  Can we go off the record please?

THE VIDEOGRAPHER:  Yes.

Page 136

A. Deo

Off the record at 12:01.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:02.

Q    Mr. Deo, I've provided you with a document for your review. This is a document with Libertas' name on and it was provided to us by Libertas with the first Bates number LIB000001. It's five zeros. Do you recall ever seeing this document before?

A    Yes.

MR. RUDERMAN:  I'd like this marked as 54, please. Thank you.

(Deo's Exhibit 54, document LIB000001, Agreement of Sale of Future Receipts, was marked for identification, as of this date.)

Q    What do you recognize this document generally to be?

A    It was the agreement for the loan that I had with Libertas.

Q    I'm going to ask you to turn to

Page 137

A. Deo

page, if you look on the right, bottom right-hand side. You'll see that it has one designation, LIB. Can you go to the one LIB and then 11?

A    It's blank.

Q    Go to 12 then. I'm sorry. Okay. There are two signatures there. Can you see that?

A    Yes.

Q    Do you recognize those signatures?

A    Those are my signatures.

Q    Okay, and it says your name. I see your name, Anthony D. Deo, twice there.

A    Yes.

Q    There is also Marc Merckling's name there. Do you see that?

A    I see that, yes.

Q    Any idea how Marc's Merckling's name got on this?

A    That had to be a computer glitch.

Q    As far as you know, you signed this document on behalf of Northshore, correct?

A    Yes. It was a DocuSign.

Q    Going to the next page that ends

35 (Pages 134 - 137)

Page 138

A. Deo

in 13, there's a couple more signatures there. Are those your signatures?

A    It's blurry.

Q    If you're able to make a distinction. If not --

A    It's blurry.

Q    Too blurry, okay.

Then on the next page there's another few signature lines. Do you see those?

A    Yes.

Q    Are those your signatures?

A    Yes.

Q    So there is, again, another one on the sixteenth page, I believe. Are those your signatures?

A    Yes.

Q    This is a document that you signed on behalf of Northshore for Libertas, correct?

A    Northshore and 189, yes.

Q    And 189. This was for Libertas to provide $750,000 in financing to Northshore and Sunrise?

A    Yes, I think that's what was the amount.

Page 139

A. Deo

Q    Right, and they took $15,000 off the top, right, as a fee?

A    There was some sort of a fee.

Q    I draw your attention to --

MR. RUDERMAN:  Go off the record for a second?

THE VIDEOGRAPHER:  Sure. Off the record at 12:06.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:07.

Q    Mr. Deo, I'm drawing your attention to page five of the document. That's also blown up on the screen to make it a little easier to see. It states in paragraph 16 that the merchant, that's Northshore and 189 Sunrise, agrees, covenants, represents and warrants as follows at the time it executes this agreement and on a continuing basis until such time as purchaser has received the completion amount or merchant has filed for bankruptcy or gone out of business in the ordinary course. And subparagraph A entitled business purpose, use of

Page 140

A. Deo

purchase price in bold letters, merchant represents and warrants that it's entering into this agreement solely for the business purposes and not for personal, family and household purposes. And then in regular type, merchant agrees to use the purchase price exclusively for the benefit and advancement of merchant's business operations and for no other purpose. Did you see that?

A    Absolutely.

Q    Did you read this when you signed it?

A    May or may not. It's, you know, page five, paragraph 16. I probably just skimmed through it.

Q    Were you aware that there was a requirement by Libertas in your application and their approval that the funds that they were going to be providing could only be used for the business of Northshore and Sunrise?

A    I mean, that was my intention.

Q    Ultimately, did you use those funds for the purpose of Northshore and Sunrise?

A    It's my belief that I did.

Page 141

A. Deo

Q    We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct?

A    Yes.

Q    $723,000 went into that account, correct?

A    Yes.

Q    That was the money that had come from Libertas, correct?

A    Yes.

Q    And then within a day or two after you transferred $500,000 of those funds to Mr. Urrutia's company, correct?

A    Yes.

Q    Was that money from Libertas not used to invest into the Superb transaction?

A    No.

Q    Why do you say that?

A    Because Tony had a franchise, it was supposed to cross guaranty Northshore Motors and 189 Sunrise.

Q    So that money was okay to use for that purpose because of the cross guaranty; is

36 (Pages 138 - 141)

Page 142

A. Deo

that you are position?

A    Yes.

Q    What about the $173,000 that was paid to the landlord or the owner of the property on Hunting.  Was that also for business purpose?

A    What does that have to do with the Libertas money?

Q    Well, you got $723,000, correct?

A    Yes.

Q    In the account.  You used $500,000 of that to pay to Tony Urrutia's company, correct?

A    Yes.

Q    Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct?

A    I wired the money, yes.

Q    Was not that money from the Libertas funds?

A    It was not.

Q    Did you have other money that was available that did not come from Libertas?

A    I'm sure I did.

Page 143

A. Deo

Q    What's the basis for your belief that you had other money?

A    Because I had other accounts, other things going in and out.

Q    Is it just a coincidence that the account that the $723,000 came in on, that money went out of that account for that real estate transaction soon thereafter?

A    Yes.

Q    The cross guaranty that you were talking about, was that ever executed?

A    Because of the --

Q    My question is was that cross guaranty ever executed?

A    Yes.

Q    Was it executed by Mr. Urrutia? Was it ever signed and executed by Mr. Urrutia?

A    I believe so.

Q    Do you have a copy of that document?

A    I don't know if I did, no.

Q    Have you ever presented it to any of your attorneys?

A    The cross purchase agreement?  I'm

Page 144

A. Deo

sure I did, yes.

Q    One that was signed by Mr. Urrutia.

A    I don't know if I have one signed by him, no.

Q    In fact, you have several lawsuits with Mr. Urrutia which that is at issue, correct?

A    Say that again.

Q    You have several lawsuits with Mr. Urrutia in which the cross guaranty is an issue in the court?

A    There's a lot of issues.

Q    That's not what I asked you.

A    I don't know.

MR. RUDERMAN:  Can we go off the record, please?

THE VIDEOGRAPHER:  Yeah. Off the record at 12:12.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:14.

Q    Mr. Deo, in referencing to the

Page 145

A. Deo

cross guaranty, that is in reference to the cross purchase agreement, correct, that you had with --

A    Yes.

Q    In the cross purchase agreement, is there a reference to a cross guaranty?

A    I -- I don't know.

Q    Are there any other documents that you're aware of that concern this cross guaranty obligation?

A    I mean, if it's not in the cross purchase agreement, that's the only thing we had.

Q    Now, you also, we discussed the Flushing loan as well, correct?  You remember the Flushing loan in March of 2023 we discussed, correct?

A    Yes.

Q    What was the purpose in going to Flushing to obtain financing at that time?

A    Working capital.

Q    Was Northshore an operating entity at that time?

A    It was still open.  The license

37 (Pages 142 - 145)

Page 146

A. Deo

had not been given back yet.

Q    Was it buying and selling cars?

A    Not at the level it's supposed to, but it was still open.

Q    Was it buying and selling cars?

A    Yes.

Q    Did it have any floor plan financing?

A    Yes.

Q    Who was the floor plan financing?

A    Westlake I think at that point.

Q    Were you aware at that time that Judge Gianelli in the Supreme Court action issued an injunction restraining any transactions, financing, liens, et cetera and so forth with regard to Northshore and 189 Sunrise?

A    I didn't know the details of that.

Q    You knew that there was some sort of an order from the court, but you didn't know what the restrictions were?

A    Yeah.  I wasn't fully abreast of what to do and what you can't do.

Q    Without telling me what you discussed, you did discuss it with your attorney

Page 147

A. Deo

at the time, correct?

A    We talked.

Q    Your attorney at the time was Mr. Thomasson?

A    Yes.

Q    Did you ever see a copy of the actual order of the court?

A    No.

Q    Would it be fair to say that based on your conversations after having spoke to Mr. Thomasson, you did not believe that the financing and the sales that you were doing with Northshore would be violative of the court order?

A    No, I didn't think so.

Q    Now, you say you intended to use the Flushing funds for working capital, correct?

A    Yes.

Q    You had gone, actually, to Flushing back in August of 2022 for the first time trying to get some sort of financing from them, correct?

A    Repeat that.  I'm sorry.

Q    The transaction which you actually

Page 148

A. Deo

closed with Flushing was in March or so of 2023, correct?

A    If you say so.  I don't remember exactly when.

Q    But it was in 2023?

A    I think so.

Q    In fact, you had tried to obtain some type of financing back in August of 2022 with Flushing.  Do you remember that?

A    I don't recall.

Q    So you don't recall ever going to Flushing Bank for any type of financing prior to 2023?

A    I don't recall.

Q    Now, did you, in fact, advise Flushing that you intended to use the money for working capital?

A    I'm sure I did, yes.

Q    In fact, that was what their expectation was, correct?

A    I'm not sure.

Q    Well, based upon what you told them, correct?

A    I would assume so.

Page 149

A. Deo

Q    Did you actually draw down on that $500,000 credit line?

A    I think I did, yes.

Q    Do you know what the money was actually used for when it was drawn down?

A    In particular I don't know.

Q    If I told you that money was drawn down and then transferred Car Buyers Network, does that make sense?  Car Buyers NYC, Inc.

A    I would have to see the transaction.

MR. RUDERMAN:  Go off the record?

THE VIDEOGRAPHER:  Sure.  Off the record at 12:18.

(A discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:31.

Q    Mr. Deo, I do not have a printout of the Flushing Bank statements for the Northshore account, but I do have them online and I'd like to show them to you through your counsel's laptop.

38 (Pages 146 - 149)

Page 150

A. Deo

MR. RUDERMAN:  This is 55, please.

(Deo's Exhibit 55, Flushing Bank Statement of Account, Flushing07269, was marked for identification, as of this date.)

Q    So this is documents, came from documents that were produced to us by Flushing Bank.  Do you see that?  The first page has Flushing Bate stamp 07269, and go back up, this is the bank statement from North Shore Motor Leasing beginning on March 17th, 2023 ending March 31st, 2023.  Do you see that?

A    Yes.

Q    This is around the time when Northshore Motor Leasing obtained the $500,000 line of credit from Flushing, correct?

A    Yes.

Q    In fact, if we look on the statement March 22nd, we see Flushing says advance to Northshore Motor $500,000, correct?

A    Yes.

Q    So it would appear that Northshore Motor drew down on the entire credit line at one

Page 151

A. Deo

time.  Is that what it looks like to you?

A    Say that again?  I'm sorry.

Q    It looks like Northshore drew down on the entire credit line at one time because there's a $500,000 advance on March 22nd.

A    I don't know.

Q    Do you not see that?

A    I see the advance.

Q    Of $500,000.  Do you see that?

A    Yeah.

Q    That was the amount of the credit line, was it not?

A    Yes.

Q    So it was the entire credit line was drawn down at that one time?

A    I think it was put in there.

Q    Okay.  The entire advance was funded at that time?

A    Yes.

Q    Okay.  Is that a fair statement?

A    Yes.

Q    Okay.  And the money was then to be used for the betterment of Northshore Motors, correct?

Page 152

A. Deo

A    Yes, for working capital.

Q    Working capital.  The next transaction that we have -- let's go back.  Before that $500,000 was there, there was a $2,000 deposit on March 20th from Car Buyers, correct?

A    Yes.

Q    And then there was a $1,500 origination fee which was drawn out?

A    Yes.

Q    Leaving $500 in the account?

A    Yes.

Q    So then the account gets funded with $500,000, and then the next transaction after that is a transaction on March 22nd wherein $50,000 was transferred out to DLA Capital Partners.  Do you see that?

A    Yes.

Q    What was that for?

A    That was his commission.

Q    So ten percent?

A    Yes.

Q    Out of the $500,000, ten percent or $50,000 was paid to Michael Laurie's company,

Page 153

A. Deo

DLA, as a commission for assisting in getting this financing, correct?

A    Yes.

Q    The next transaction we have is on that same day, wire transfer fee of $30.  The next transaction on the same day is $50,000 to go to Car Buyers NYC.  Do you see that?

A    Yes.

Q    The next transaction after the wire fee on March 27th is another wire transfer to Car Buyers NYC for $85,700.  Do you see that?

A    Yes.

Q    There was no other money in that account other than the $2,000 originally put in by Car Buyers that didn't come from the financing, correct?

A    Yes.

Q    So so far, out of the $500,000, $185,700 was used either to pay a commission to Mr. Laurie or was used to pay Car Buyers NYC, correct?

A    Yes.

Q    Were the funds that went to Car Buyers NYC used for the betterment of North

39 (Pages 150 - 153)

Page 154

A. Deo

Shore Leasing?

A    I don't remember.

Q    Well, you previously testified Car Buyers NYC was a consulting company, correct?

A    Yes.

Q    You're one of the consultants that worked for that company, correct?

A    Yes.

Q    I believe we'd asked at the time and you weren't sure, were there any other consultants that worked for Car Buyers NYC?

A    No.

Q    When the money went into Car Buyers NYC, what did you do with it, if you know?

A    I don't recall.

Q    But it didn't go to North Shore Leasing, correct?

A    It wasn't wired to Northshore, no.

Q    And then we're going to scroll down to the next month's statement, April 1st, 2023, and we see there's a April 3rd loan payment of $9,752.78 and then check order, and then the next big transaction is, again, on

Page 155

A. Deo

April 6th to Car Buyers for $75,700, correct?

A    Yes.

Q    That didn't go to the operations of North Shore Leasing, correct?

A    That's false.

Q    And then the next transaction is to Car Buyers for $500 on April 13th, correct? Do you see that? I can't seem to highlight it, but it's on April 13th.

A    Yes.

Q    There is another one on April 17th to Car Buyers for $25,000, right?

A    Yes.

Q    And then another one on April 25th to Car Buyers for $25,000, correct?

A    Yes.

Q    And then another one to Car Buyers on April 27th for $40,000?

A    Yes.

Q    Now the credit line is down to $138,000 and change at the end of April, correct?

A    Yes.

Q    Out of that $500,000, so far 360

Page 156

A. Deo

somewhat thousand, none of it went to Northshore Leasing's operations, correct?

A    Not directly.

Q    So if we're going to take a look at the May statement and again, we have a payment of a loan for $9,700, and then we've got three payments, $35,000 on May 2nd, $60,000 on May 8th and $20,000 on May 15th, all to Car Buyers, correct?

A    Yes.

Q    Again, those funds didn't go to North Shore Leasing, correct?

A    Correct.

Q    Then you've got a bunch of other checks here. Now we jump to May 24th, May 30th, check, a wire to Car Buyers for $25,000 and another one for $40,000. I do see, though, there's some transfers in. Do you know what these transfers came in from or for?

A    I don't recall.

Q    And then another payment to North Shore on May 31st to a Flagstar Bank. Do you know when that Flagstar Bank was opened?

A    I don't recall.

Page 157

A. Deo

Q    Do you recall opening an account at Flagstar Bank for Northshore?

A    It was called Signature at that point, I think.

Q    So you had opened an account at Signature, and when that change happened, Flagstar took over?

A    Yes, I recall that.

Q    Do you recall opening up a Signature account for Northshore?

A    Yes.

Q    Do you know when that happened?

A    Precisely, no.

Q    You said that Northshore was operating on a more limited basis at the end of 2022 and through 2023?

A    Yes.

Q    Where was the primary account being used by Northshore for its operations at that time? Was it that Signature Flagstar account?

A    I think we had the Signature account and we had the Flushing account. I don't recall if there's anything else.

40 (Pages 154 - 157)

Page 158

A. Deo

Q    Going down to the next statement, the next entry on May 31st.  Again, $20,000 to Car Buyers Network.  Do you see that?

A    Yes.

Q    As far as we sit here today, how much of that $500,000 that Flushing provided a credit line for was used towards the operations of Northshore?

A    I don't know.

Q    Do you know if anything was used for the operations of Northshore?

A    I don't know.

MR. RUDERMAN:  Can we go off?

THE VIDEOGRAPHER:  Off the record at 12:40.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:44.

Q    Mr. Deo, when you first formed Northshore, did you have an operating agreement?

A    No.

Q    Is there a reason why?

Page 159

A. Deo

A    It's not necessary.  It was my wife and myself.

Q    What was the basis of your understanding that it's not necessary just because it was your wife and yourself?

A    I didn't think we needed one.

Q    At some point did you feel otherwise, that you did need an operating agreement?

A    I think we needed one for Libertas and I know we needed one for Flushing.

Q    So in order for them to provide whatever financing they did, they required that you have an operating agreement?

A    They asked for it, yes.

Q    At that point in time did you prepare and sign an operating agreement?

A    Yes.

Q    That would be, Libertas was in November or so of 2022, correct?

A    I think so, yes.

Q    Around March or so of 2023 was Flushing, correct?

A    Well, yes.

Page 160

A. Deo

Q    So prior to those dates, you never had an operating agreement for Northshore?

A    No.

Q    You prepared an operating agreement at that time?

A    Yes.

Q    Where did you get the form for an operating agreement?

A    Online.

Q    Did anybody assist you in filling it out?

A    No.

Q    I believe you testified that you intended on having both your wife and yourself on the operating agreement because it was a LLC, something along those lines.  Do you recall what I'm talking about?

A    Well, Citrin Cooperman told us that we needed to have two people because it wasn't a single member LLC, something like that.

Q    Right.  So because it's not a single member LLC, you need to have at least two people, even if they have a small percentage interest, right?

Page 161

A. Deo

A    That's what they said, yes.

Q    So you assigned your wife one percent interest and you got a 99 percent interest, correct?

A    Yes.

Q    So the tax return, which was then filed on behalf of Northshore and Sunrise reflected those percentages, as you understand?

A    Yes.  Yes.

MR. RUDERMAN:  We can go back on?

THE VIDEOGRAPHER:  We didn't go off.

Q    Mr. Deo, I'm going to share my screen.  Mr. Deo, did you have an opportunity to review a document I presented to you?  And I'm going to ask you if you recognize that document.

A    Yes.

Q    What do you recognize that document to be?

A    It's an operating agreement.

Q    It's an operating agreement for North Shore Motor Leasing?

A    Yes.

41 (Pages 158 - 161)

Page 162

A. Deo

MR. RUDERMAN:  Can I have that marked as 56, please.

(Deo's Exhibit 56, Operating Agreement, Flushing07258, was marked for identification, as of this date.)

Q    I'll represent to you, you can see the Bate stamp on the bottom, it's a Flushing document provided to us, 07258.  Do you see that?

A    Yes.

Q    If we scroll down to the last, the next to the last page of the document, there's two signature lines there.

A    Yes.

Q    And it says certification of member, right?  Correct?

A    Yes.

Q    It has your name at 99 percent, Sara Deo at one percent, correct?

A    Yes.

Q    And that's your signature, yes?

A    Yes.

Q    And that's your wife's signature?

Page 163

A. Deo

A    Yes.

Q    And then the next page is a list of managers and again, your signature and your wife's signature, correct?

A    Correct.

Q    Now, this says this is signed and agreed June 15th of 2020.  Do you see that?

A    Yes.

Q    But this document wasn't created on June 15th of 2020, right?

A    No.

Q    You dated it as of June 15th, 2020?

A    Well, yes.

Q    Why did you pick that date?

A    Because that was what all the CPA's agreed upon with the taxes.  So it was correlated with the tax returns.

Q    In order for you to pursue the loan with Flushing, they wanted to make sure that your operating agreement matched the tax returns as to showing ownership; is that what you're saying?

A    I didn't say that.

Page 164

A. Deo

Q    So what are you saying then?

A    You asked why we chose --

Q    Let me withdraw my question.  You said the CPA's agreed.  Well, what CPA's are you referring to?

A    It was that email chain with Citrin Cooperman, Tom Jones, Josh, Wendy and myself.

Q    My question is not why did you pick to divide that up between yourself and your wife.  My question is why did you pick June 15th, 2020.

A    And that's what I'm answering.  That date was -- that date was determined during that email chain.

Q    Were Citrin Cooperman and Wendy involved with your loan with Flushing in March of 2023?

A    No.

Q    Was this operating agreement signed in October of 2022 when your tax return was done?

A    I don't know when I prepared this.  I'm not sure.  I can't remember.

Page 165

A. Deo

Q    Well, was this done, as far as you know, specifically in order to obtain the Flushing loan?

A    As I said, I used it for both.  I used it for Libertas and I think I used it for Flushing also.

Q    Other than the financing, you don't recall you prepared an operating statement because you didn't need one, an operating agreement, at that time?

A    Correct.

Q    That was not a decision that the CPA's or Citrin Cooperman were involved in when you went to get the Libertas loan, right?

A    What was not a decision?

Q    As to when to date the operating agreement.

A    Well, I correlated the date to the tax returns.

Q    So you looked at the tax returns, you saw the date that it showed you were now the owner and you created an operating agreement that reflected that same date?

A    Yes.

42 (Pages 162 - 165)

Page 166

A. Deo

Q     Did you think there was anything wrong with dating an operating agreement prior to the date it was actually signed?

MS. WALKER:  Objection.

A     It just said that we were the owners on that date.  It didn't say the date we signed.  So I just correlated it to the date.

Q     It says signed -- I'm going to the last page.  Signed and agreed this 15th day of June, 2020.  Does that mean to you that you're indicating on this document that this document was actually signed on June 15th, 2020?

A     Not to my knowledge.

Q     Do you think --

A     My understanding was that that's the date where the ownership was settled with the 99 and the one percent.

Q     Despite the fact that it says the document was signed this 15th of June, 2020, you don't believe that's actually what it means?

A     Well, to my understanding I just correlated it to the date.

Q     But You thought that was okay in the circumstance, correct?

Page 167

A. Deo

A     I didn't understand what you're asking.

Q     Well, you didn't see any difficulty in doing that, in signing it as of June 2020?

A     I disagree with what you're saying.

Q     You did see a problem signing it as of June 2020?

A     I don't understand your question. I'm sorry.

Q     My question was you didn't see any problem signing this document as of June 15, 2020 even though it wasn't June 15, 2020?

A     That's incorrect.

Q     You did see a problem with it?

A     That's incorrect.

Q     So it's both a problem and not a problem?

A     Your question is what the problem is.

Q     What don't you understand?

A     I didn't say I didn't understand.

Q     Well, I asked you did you think it

Page 168

A. Deo

was a problem?  You said no.  I said did you not think it was a problem?  You said no.  So is it a problem or is it not a problem?

A     No.

Q     Not a problem, okay.  Is that your answer?

A     Yes.

Q     Okay, fine.

MR. RUDERMAN:  Can we go off for a record?

THE VIDEOGRAPHER:  Yes. Off the record at 12:53.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 12:54.

Q     Mr. Deo, I'm going to show you another document.  It's entitled Operating Agreement for North Shore Motor Leasing LLC.

A     Yes.

MR. RUDERMAN:  I'd like to have this marked as 57.

(Deo's Exhibit 57, Operating Agreement for North

Page 169

A. Deo

Shore Motor Leasing LLC, was marked for identification, as of this date.)

Q     Do you recognize this document?

A     It's the same operating agreement.

Q     This is, as you can see, it's Bate stamped from Flushing again?

A     Yes.

Q     Flushing Bank, and the first page is Bate stamp 8508.

A     Yes.

Q     I draw your attention to page, to the next to the last page of the document where it say certification of member.  Do you see that?

A     Yes.

Q     This one says Anthony Deo percent is 100 percent, correct?

A     Yes.

Q     And then the next page it has just your signature as manager and dated June 15th. Signed and agreed this 15th day of June, 2020. Do you see that?

A     Yes.

43 (Pages 166 - 169)

Page 170

A. Deo

Q  Was the North Shore Leasing, North Shore Motor Leasing, owned by you 100 percent or 99 percent?

A  It was 99 me, one percent my wife.

Q  Where did this agreement you provided to Flushing Bank, what happened that caused you to sign this agreement?

A  I don't recall.

Q  Do you recall having any communications or written or oral from Flushing Bank indicating, or anybody at Flushing Bank, indicating that it was problematic for your wife to have a one percent interest in the company?

A  I don't remember.

Q  So you have no idea why you have two operating agreements both given to Flushing Bank in connection with this transaction?

A  I don't remember the circumstance.

MR. RUDERMAN:  Can we go off the record, please?

THE VIDEOGRAPHER:  Yeah. Off the record at 12:56.

(A discussion was held off the record.)

Page 171

A. Deo

THE VIDEOGRAPHER:  Back on the record at 12:58.

Q  Mr. Deo, I've presented you with two stapled packets of document.  I'm going to have, the first page, the first one I'm going to mark has a control number of S0950.  Do you see that on one of them?  That would be on the first page on the top left.

A  (Indicating).

Q  S0950?  On the top left of the document there's a control number inquiry. There's a box where it says control number inquiry.  Right below that where it says control (indicating).

MR. RUDERMAN:  We'll have that one marked as 58.

(Deo's Exhibit 58, Control Number Inquiry, IAG000049, was marked for identification, as of this date.)

Q  That's 58.  I'm going to represent to you, Mr. Deo, that this is a document which was provided to your counsel from our firm and that first page is Bate stamped IAG000049.

Page 172

A. Deo

A  I've never seen this.

Q  Sorry?

A  I've never seen this.

Q  I understand.  Have you ever seen anything that looks like this, these types of documents?

A  May or may not.  I mean, it looks like accounting entries.

Q  So I'm going to represent again that this was produced by my client's financing from the dealer track system with regard to a particular vehicle that, if you go to the second page, from Mr. Alifonso, Mr. Wagner Alifonso, with regard to a vehicle that he purchased and traded in from Sunrise, okay?

I'm assuming you don't have any recollection of this person, correct?

A  No.

Q  What I'm going to show you is on the third page of the document you see a check. Do you see that?

A  I see a picture of a check, yes.

Q  That is a check from Island Auto Management to Truist Bank from Island Auto

Page 173

A. Deo

Management.  Have you ever heard of Truist Bank?

A  Yes.

Q  To your knowledge, in your business, what is Truist Bank?

A  It's a bank.

Q  Are they one of the banks which provide automobile financing?

A  They may have.

Q  Now, this check here indicates that Island Auto Management paid off this vehicle, paid off an unpaid loan for this vehicle on January 10th, 2023.  Do you see that? Do you see that check dated January 10th, 2023?

A  Yes.

Q  And the indication here is that this was an unpaid loan on a traded-in vehicle, okay?  Now I'm not asking you to agree to that. My question is do you have any reason to understand why Island Auto would have had to pay off any unpaid trades from a vehicle that had been sold and traded into Sunrise?

A  I don't know.

Q  As far as you know, did any of that occur?

44 (Pages 170 - 173)

Page 174

A. Deo

Q    Well, did Sunrise and Northshore satisfy all traded, all loans of vehicles traded into it in connection with a transaction?

A    To my knowledge, yes.

Q    What's the basis for your knowledge?

A    There was no issues.

Q    Well, how do you know there were no issues?

A    I would be informed by the controller.

Q    You say, the reason you say there were no issues because you say the controller never told you there were issues?

A    Yeah.  He didn't bring anything up.

Q    Was the name of the controller you're referring to Mr. O'Sullivan?

A    Yes.

Q    Is it your testimony that Mr. O'Sullivan never informed you at any time in the fall of 2022 or in January of 2023 that there were any issues with regard to vehicle,

Page 175

A. Deo

trade-in vehicles whose loans had not been paid off?

A    No.

Q    So this is the first time you're hearing about that?

A    Hearing about what?

Q    That there is a claim that there were vehicles whose trades were not paid off.

A    Yes.

MR. RUDERMAN:  Can we go off the record?

THE VIDEOGRAPHER:  Yeah.  Off the record at 1:03.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  Back on the record at 1:04.

Q    Mr. Deo, does Marc Merckling have any interest, ownership interest, in Gold Coast Motors of Syosset?

A    Gold Coast Motors of Syosset, no.

Q    If I told you that a UCC lien search for Gold Coast Motors of Syosset shows that Marc Merckling's name was listed as one of

Page 176

A. Deo

the debtors, would that surprise you?

A    No.

Q    Why would Mr. Merckling be listed as one of the debtors in connection with that entity?

A    He was a guarantor.

Q    Now, there was a Mazerati SUV that your son was driving when he was in college, correct?

A    Yes.

Q    Where is that vehicle right now?

A    It's in my possession.

Q    Who's driving that vehicle?

A    My son, myself.

Q    Who is it registered to?

A    It's not registered.

Q    It's not registered to anybody?

A    Not at the moment.

Q    Is it insured?

A    Yes, it is.

Q    How is it insured without a registration?

A    We have umbrella coverage.

Q    I'm sorry?

Page 177

A. Deo

A    We have an umbrella coverage.

Q    When you say "we," you mean you personally?

A    My family, yes.

Q    You and your wife have an umbrella coverage --

A    Along with the business.

Q    So there's no automobile coverage on that car, correct?

A    Well, there is insurance on it.

Q    There's no automobile policy on it, correct?

A    No particular one, no.

Q    Does it have license plates on it?

A    No.

Q    Is it being driven without a license plate?

A    We have dealer plates.

Q    So you put dealer plates on the car?

A    Yes.

Q    And what dealer plates are being used?

A    Syosset.

45 (Pages 174 - 177)

Page 178

A. Deo

Q That vehicle was originally financed when it was first taken in, correct, on a floor plan?

A Repeat your question.

Q That vehicle was purchased originally by Northshore Motors, correct?

A Yes.

Q When it was purchased, it was purchased with floor plan financing?

A Yes.

Q That financing at some point was paid off?

A Yes.

Q Who paid that off?

A Northshore.

Q That was Northshore's funds that went out to pay that, pay that off?

A Well, Daniel O'Sullivan was supposed to take the moneys owed to me to pay that off from Northshore.

Q What do you mean Daniel O'Sullivan was supposed to take that money from you? I don't understand.

A I have receivable with Northshore.

Page 179

A. Deo

He was supposed to reduce the receivables.

Q The actual payoff, was that floor plan with Ally?

A Yes.

Q To your recollection, what entity paid Ally for the floor plan for that particular vehicle?

A To my recollection, Northshore.

Q But you believe that in the receivables portion of the financial records of Northshore that was supposed to be offset against the moneys you're owed from Northshore?

A Yes.

Q Do you know if that was ever done?

A I don't know.

Q Is it your understanding that Northshore paid all of the warranty contracts that it had obtained from customers?

A Absolutely.

Q And the funds to pay for that were paid out of Northshore's bank account?

A Yes.

Q Do you know that for a fact or you're just assuming that?

Page 180

A. Deo

A I'm just taking that for granted because that's what Danny would do.

Q As you sit here today, you don't know whether that's true or not, you're just assumed that Danny would pay them?

A Yes.

Q You have no knowledge of anybody informing you at any particular time that there were a number of warranties which had not been paid by Northshore?

A Well, there were a couple of them not paid and Danny had to settle it up because he double paid for some and then he had to reduce that. So there was some accounting to do. I think he did it.

Q All of that is done through Northshore's funds, though, correct?

A Yes.

Q You're not aware of any moneys being used by the Island Auto Group or any of them to pay for any of the unpaid warranties, correct?

A I am not sure, no.

Q Why are you not sure?

Page 181

A. Deo

A I said I don't know.

Q It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure?

A I don't know.

Q Other than the tax returns which you filed for Northshore and Sunrise and the contract that we talked about earlier with Sunrise, are there any other documents that you have which you claim established that you are currently the owner of Northshore and Sunrise?

A We have leases for Northshore and Sunrise that my wife and I personally guaranteed. We have bank accounts that we opened up for Northshore and Sunrise from inception. Well, Northshore from inception. Sunrise in '21. I mean there might be other documents that I can't think of it right this second.

Q I'm going to ask for production of any other documents which have not yet been produced which support that position. I'm going ask you to provide those to your counsel and I'm asking for production of those documents.

46 (Pages 178 - 181)

Page 182

A. Deo

Who handled, in Northshore and Sunrise, who handled the cash deposits, putting it into the bank?

A    The controllers, Marc sometimes.

Q    If a customer came in and gave a deposit or purchased the car for cash, that would go initially to whom?

A    The salesperson, then finance and then the safe.

Q    Where was the safe located in each one of the dealerships?

A    We had a few in the back office.

Q    In both dealerships?

A    Yes.  Well, no.  In Sunrise I think it was one.

Q    Who had access to those safes?

A    The controllers, managers, myself.

Q    Was it a key or a combination?

A    It was a combination.  I think one was a key.  I don't remember which one.

Q    What was the process to get that money out of the safe?

A    I don't understand the question.

Q    Well, could anybody just walk in

Page 183

A. Deo

and take the money out or did you have a process where certain people were dedicated, this is their job, take the money out of the safe or whatever needed to be done?

A    Well, that's the controller's job.

Q    The controller would be the person to take the money out of the safe?

A    Yes.

Q    What about counting it?  How did you make sure all that was done properly?

A    I mean, between the managers there were checks and balances.

Q    And then if the controller took the money out of the safe, he would give it to, for example, Mr. Merckling to make the deposit into the bank account, correct?

A    Yes.

Q    Did Mr. Blankenship ever make deposits as well of cash?

A    I don't recall.

Q    So it was mostly Mr. Merckling?

A    To my knowledge, and Dan.

Q    When the money was deposited into the bank, was there any check to make sure?  I

Page 184

A. Deo

don't mean a check, but a reference to know that the amount of money that was given by Mr. O'Sullivan to Mr. Merckling and the deposit that went into the bank matched?

A    Oh, I don't know.

Q    Now, you went to the police, the Nassau County Police Department, concerning the Libertas issue, correct?

A    Yes.

Q    You filed a police report, correct?

A    Yes.

Q    Do you know a Detective Marks?

A    Yes.

Q    Did you know Detective Marks beforehand?

A    No.

Q    Do you know how you ended up with Detective Marks?

A    I don't know.

Q    Did you bring anybody with you to meet with the police department or Detective Marks?

A    Marc drove me there, yes.

Page 185

A. Deo

Q    You said Marc drove you there?

A    Yes.

Q    Where were you at the time beforehand, that you were being driven?

A    Northshore.

Q    And where was Marc?

A    At Northshore.

Q    Is there a reason why you didn't drive yourself?

A    I was a little devastated.

Q    You needed Marc for what purpose?

A    He drove me.

Q    You could have asked somebody, anybody else.  Is there a reason you chose Marc to drive you as opposed to somebody else?

A    He was there.  He offered.

Q    You told him what had happened?

A    Yeah, he was aware.

Q    And he offered to drive you to the police department?

A    Sure.

Q    Did he speak to Detective Marks at all?

A    No.

47 (Pages 182 - 185)

Page 186

A. Deo

Q    Did he speak to anybody at the police department at all?

A    Well, when we entered, between him and myself, we told them why we were there and they escorted us I think to the back or to a room.

Q    Did Mr. Merckling identify himself as a former police officer?

A    I am not sure.

Q    Did anybody recognize him or indicate that they knew who he was?

A    I don't know.

Q    Did he ever mention to Detective Marks that he was a former police officer?

A    I don't know.

Q    You were there, right? To the extent that you were there, did you hear it?

A    I don't know.

Q    You don't know or you don't remember?

A    I don't know.

Q    Did you think there was a benefit to having a former police officer accompany you to file this police report?

Page 187

A. Deo

A    No.

Q    Now, when you took out the Libertas funds, do you know how much money had to be repaid?

A    Somewhere in the whereabouts of $900,000.

Q    Do you know how, over what period of time that had to be repaid?

A    I don't recall at the moment.

Q    You can look. If I represent to you that it was over the course of a year, does that sound right?

A    On or about, yes.

Q    And it was going to be weekly withdrawals of over $19,000?

A    Yes.

Q    When you took out the Libertas funds, did you expect that Northshore or Sunrise would have an additional 19 plus thousand dollars every week in order to pay back the Libertas funds?

A    It was my intention, yes.

Q    Was it a reasonable expectation?

A    To my knowledge, yes.

Page 188

A. Deo

Q    Well, what was your expectation that there would be those kind of funds sufficiently available over the course of the next year?

A    I don't understand your question.

Q    Well, when you took out the money, you anticipated you'd be repaying that money or the entity would be repaying that money, correct?

A    Yes.

Q    Did you do any projections to see how $80,000 a month could be repaid?

A    I mean that was -- we made sufficient amount of money at both dealerships, when operating.

Q    If you pay back $900,000 over the course of one year, did the dealership ever have profit of $900,000 over the course of a year?

A    I'm sure we had, yeah.

Q    Well, you showed the $472,000 of profit for Northshore in 2022 in that financial statement. Do you remember that one?

A    Yes.

Q    Sunrise was about half the volume,

Page 189

A. Deo

correct?

A    Yes.

Q    Even given that, it would be another 200 somewhat thousand dollars?

A    Yes.

Q    So six, $700,000 maximum profit?

A    Yes, bottom line.

Q    Was that before or after you got any income distributed to you?

A    Well, that should be after.

Q    How much money did you draw out from the dealership in 2022?

A    I don't recall. It would be under tax returns.

Q    Well, did you have any regular draws, financial draws, out of Northshore and Sunrise over the course of '21 and '22?

A    What do you mean by that?

Q    Did you take money out of the dealerships over the course of '21 and '22 on any regular basis?

A    Commissions and salaries, sure.

Q    Do you know how much that was?

A    I don't remember.

48 (Pages 186 - 189)

Page 190

A. Deo

Q    That would be reflected on your tax returns?

A    Yes.

Q    So you believe that after paying yourself whatever you were supposed to be paid and paying all the other obligations of the dealership, you thought in November of 2022 there would be sufficient funds to pay almost a million dollars back to Libertas?

A    Yes.

Q    When you took the money out in Flushing, did they know that Libertas was looking to collect almost a million dollars?

A    I don't know.

Q    Did you disclose it to them?

A    I don't remember.

Q    Do you think there was enough money to pay both Libertas and Flushing Bank when you took out another $500,000 from Northshore?

A    Yes.

Q    Was there, in fact, enough money to pay them back?  Was there, in fact, enough money to pay Libertas and/or Flushing?

Page 191

A. Deo

A    I don't understand the question.

Q    Was there enough money in Northshore and Sunrise to pay back Libertas and Flushing?

A    Eventually, no.

Q    Did it, in fact, pay back those loans?

A    Some of it.

Q    It paid back about four payments or so, a little bit more, to Libertas, correct?

A    No, more.

Q    Six payments?

A    I think it was seven or eight.

Q    Well, Libertas testified that somewhere in early January the payments stopped.  Does that sound right to you?

A    I don't remember.

Q    But Libertas has not paid back for most of the amount of money that was supposed to be paid back, correct?

A    Say that again.

Q    Libertas was not repaid most of the money that was supposed to be paid back?

A    No.

Page 192

A. Deo

Q    Have they commenced any action against you to collect on any of that?

A    Not that I know of, no.

Q    Did you guaranty the Flushing loan?

A    I think I did.

Q    Has Flushing started any action against you for the repayment of moneys?

A    No.

Q    Has anybody made a claim against you saying you were supposed to repay that moneys?

A    I don't think so.

Q    Do you have any knowledge as to why Libertas has chosen, presumably chosen, not to pursue a claim against you at this time?

A    I wouldn't know.

Q    Do you have any reason to understand why Flushing is not pursuing any claim against you at this time?

A    I wouldn't know.

MR. RUDERMAN:  Mr. Deo, thank you very much.  I have no further questions.  Let's go off

Page 193

A. Deo

the record.

THE VIDEOGRAPHER:  Off the record at 1:19.

(A recess was taken.)

(Mr. Ruderman left the proceedings and did not return.)

THE VIDEOGRAPHER:  Back on the record at 1:50.

MS. RONNEBURGER:  Good afternoon, Mr. Deo.  My name is Ariel Ronneburger.  I'm with the firm of Cullen and Dykman LLP and we represent Flushing Bank.  It's our codefendant in the matter. I'll just be asking you a few questions today.  I know some of it may reference your previous testimony and I do have your transcript if you need to see it from the first time you were deposed.

THE WITNESS:  Oh, okay.

EXAMINATION BY MS. RONNEBURGER:

49 (Pages 190 - 193)

Page 194

A. Deo

Q    So you previously testified that you had a conversation with Tony Urrutia and Bruce Novicky about opening an account for Superb Motors with Flushing Bank; is that correct?

A    Yes.

Q    What was the substance of that conversation, if you remember?

A    Well, the purpose of opening the Flushing account was for us to obtain a line of credit for working capital for Superb.

Q    Is it accurate to say then that Tony Urrutia was aware that you were going to contact Flushing Bank about opening an account for Superb Motors?

A    Absolutely. I forwarded an email.

MS. RONNEBURGER: I'd like to mark this as Deo 59.

(Deo's Exhibit 59, email chain, top one dated August 17, 2023, 12:10 p.m., was marked for identification, as of this date.)

MS. RONNEBURGER: I believe I'm sharing that.

Page 195

A. Deo

MR. KATAEV: Yes.

Q    If you can just take a quick look at that. Let me know when you have a chance.

A    Yes, I'm ready.

Q    You testified previously that you had received a list of information from Flushing Bank that the bank needed for opening an account for Superb; is that correct?

A    Yes.

Q    Is the email all the way on the bottom from Robert Puccio at Flushing Bank --

A    Yes.

Q    -- dated March 31st, is that that email with the request for information?

A    Yes.

Q    According to this email, you forwarded Flushing Bank's request for information to Bruce Novicky and Tony Urrutia on March 31st, 2023 at 11:56 a.m.; is that correct?

A    Yes.

Q    Why did you forward that email?

A    Because I needed to get information to open the account.

Q    And then if we look above that on

Page 196

A. Deo

April 3rd, 2023 at 11:45 a.m., you send another email to Bruce and Tony which says good morning, guys. Dave Weinstein didn't have any of the information for Superb to send over to Rob. Can you please help me in gathering the information needed so I can get this done ASAP? All I need is the formation documentation. And then you ask for for corporations we will need the certificate of incorporation and filing receipt.

Q    By "get this done," what did you mean?

A    To open up the account.

Q    The formation documentation you were requesting was for Superb Motors, correct?

A    Yes.

Q    At the top there's an email dated August 17th, 2023 from yourself to Mr. Puccio where you say please see email chain below. This shows that their current claims are totally absurd.

Q    What did you mean by their current claims are totally absurd?

A    That Tony was not aware that I opened up the accounts.

Page 197

A. Deo

Q    Did Tony provide you with any of the information needed to open the accounts?

A    Absolutely, between himself and Bruce.

MS. RONNEBURGER: I'm going to mark this as Deo 60.

(Deo's Exhibit 60, email chain plus Certificate of Incorporation of Superb Motors, was marked for identification, as of this date.)

A    Yes.

Q    If you look at, it's several pages in, it says, it's Bate stamped as Flushing05955 and it says Certificate of Incorporation of Superb Motors, Incorporated. Is this the document you requested from Tony?

A    Yes, the formation docs.

Q    And if we look at these emails, it looks like this was forwarded to you from Tony on April 3rd, 2023 at 3:37; is that correct?

A    Yes.

Q    So Tony was aware you were applying for the account as Superb Motors,

50 (Pages 194 - 197)

Page 198

A. Deo

correct?

A Absolutely.

Q And he provided you with the documentation that you requested, correct?

A Yes.

Q I'm going to show you what was previously marked as Deo 25. It's a text message (handing). Previously you testified that this is a text message between you and Bruce Novicky; is that correct?

A Yes.

Q There's a statement here which says bro, this guy and the credit writer are in my pocket. Get me the info and 2021 taxes and I will bring it home.

You testified earlier that "this guy" referred to Robert Puccio; is that correct?

A Yes.

Q You also testified earlier that the statement that Puccio was "in your pocket" was a figure of speech; is that correct?

A Correct.

Q You testified earlier that by "in your pocket" you meant that you knew Robert

Page 199

A. Deo

Puccio; is that correct?

A That we did business before, yes.

Q What was the nature of that business?

A He got me a line for Northshore.

Q And do you recall when that was?

A I think March, yes.

Q Did you ever offer any money to Robert Puccio in connection with opening an account or getting a loan at Flushing Bank?

A Absolutely not.

Q Did you ever offer anything that you would consider to be an incentive to Puccio in connection with opening an account or taking out a loan at Flushing Bank?

A Absolutely not.

Q Did you ever offer anyone at Flushing Bank anything that you would have considered to be an incentive for either opening an account or taking out a loan at Flushing Bank?

A Absolutely not.

Q I'm going to show you what was previously marked as Deo 26 (handing). Just let

Page 200

A. Deo

me know when you're done.

A Yes. Yes.

Q You previously testified that you completed this application for an account for Superb Motors at Flushing Bank with the knowledge and approval of Tony Urrutia; is that correct?

A Yes.

Q Did you complete this application yourself?

A Yes.

Q Is that your signature on the application?

A Yes, it is.

Q Now, here it says you were a hundred percent owner of Superb Motors. Do you see that?

A Yes.

Q Now, in your previous testimony you stated that you told Robert Puccio that you and Tony Urrutia were partners; is that correct?

A Yes.

Q Did you ever have any discussion of ownership interest in Superb Motors with Mr.

Page 201

A. Deo

Puccio?

A No.

Q Did you ever tell him, Mr. Puccio, that Tony Urrutia had any ownership interest in Superb Motors?

A Not that I recall, no.

Q You also previously testified that it was agreed upon by Tony and yourself that you would represent that you were a hundred percent owner of Superb Motors to Flushing Bank; is that correct?

A Yes.

Q When did this conversation happen, if you recall?

A It would have been prior to me applying for the account and the line of credit.

Q Do you know how you had that conversation? Was it by phone, by email?

A A phone conversation.

Q And it was not recorded, correct?

A No.

Q Is it your testimony today that Mr. Urrutia knew that you were going to state that you were a hundred percent owner of Superb

51 (Pages 198 - 201)

Page 202

A. Deo

on this application?

A    Absolutely.  And that -- I'm sorry.

Q    Go ahead.

A    Well, he actually said that he wants nothing to do with the line of credit, that I had to be a hundred percent guarantor for any moneys that we borrowed.

Q    Did he ever see this application, if you know?

A    I don't know.

Q    But he was aware that you were going to state you were a hundred percent owner, to the best of your knowledge?

A    Of course.

Q    By submitting this application, you represented to Flushing Bank that you were a hundred percent owner of Superb?

A    Yes.

Q    At any time did you tell anyone at Flushing Bank that you were not a hundred percent owner of Superb Motors?

A    No.

MS. RONNEBURGER:  I'm going

Page 203

A. Deo

to mark this as Deo 61.

(Deo's Exhibit 61, document from Flushing Bank, Certification of Beneficial Owner(s), was marked for identification, as of this date.)

Q    (Handing).

A    Okay.

Q    I want you to specifically look at the page Bates stamped Flushing Bank, it's Flushing04590.

A    Okay.

Q    It says resolution of authority on top.  Do you see that?

A    Yes.

Q    And then it says account title, Superb Motors, Incorporated.  Do you see that?

A    Yes.

Q    Now, in the middle it says there's depository and withdrawal authorization, signing authorization, borrowing authorization.  Do you see that?

A    Yes.

Q    And if you briefly look through

Page 204

A. Deo

them, it says, for example, that the persons listed below are authorized to endorse, collect, deposit or negotiate any and all checks, bills of exchange.  Is that your name underneath the depository and withdrawal authorization?

A    Yes.

Q    Is that your name underneath the borrowing authorization?

A    Yes.

Q    Is that your signature on this document?

A    Yes.

Q    Is it fair to say that you represented to Flushing Bank by signing this document that you had authority to conduct deposits and withdrawals and signing on behalf of Superb Motors?

MR. KATAEV:  Objection to form.

A    Yes.

Q    After the Superb account was opened, did you tell anyone that the account had been opened?

A    Yes.

Page 205

A. Deo

Q    Who?

A    Tony, Bruce, Kendra, the controller.

Q    How did you tell them?

A    Verbally.  We were supposed to move all our accounts into all of the -- to all Flushing accounts, which would be payments from loan proceeds, credit cards.  Everything was supposed to go into Flushing.

Q    Do you recall, did you have that conversation with all those individuals collectively?

A    No.  No.  It was at different times.

Q    And it was, for all of them it was verbal?

A    Yes.

Q    Did you provide any of those individuals with any documentation showing the account had been opened?

A    I don't remember.

Q    Do you know if you received any bank statements for the Superb account?

A    Yeah.  They were all at the

52 (Pages 202 - 205)

Page 206

A. Deo

office.

Q   Where did you keep them at the office?

A   They were at -- in my office.

Q   Did anyone go in your office?

A   Sure.

Q   Where did you keep them in your office?

A   On the -- on the cabinets.

Q   Was that somewhere publicly visible if somebody --

A   Well, not to the public, but to the controller, to Bruce. Tony was rarely there.

Q   Do you know if the controller or Bruce, did they ever look at them, if you know?

A   Of course.

Q   So Bruce, you believe Bruce Novicky looked at the bank statements for the Superb Motors account at Flushing Bank?

A   He should have seen it. I believe he did, maybe.

Q   So it is your testimony that you believe that Bruce Novicky and Tony Urrutia were

Page 207

A. Deo

aware that this Superb Motors account had been opened?

A   Absolutely.

MR. KATAEV: Objection.

MS. RONNEBURGER: I'd like to mark this as Deo 62 (handing).

(Deo's Exhibit 62, email chain, top one dated August 17th, 2023, 12:09 p.m., was marked for identification, as of this date.)

Q   Let me know when you've had a chance to read that.

A   Yes.

Q   So at the bottom of this it's dated August 17th, 2023 at 10:03 a.m. Robert Puccio states, he asks for a copy of the Superb Motors operating agreement ASAP. And he states also please confirm your ownership percent in Superb Motors. This is an urgent matter as your accounts will be closed if not received today.

If you know, do you know why it was urgent?

A   No, I don't know at this point.

Q   Okay. If we look above, you

Page 208

A. Deo

responded to Robert at 12:09 on that same day, August 17th. You say good morning, Rob. In November 2022 I bought 50 percent of Superb Motors. Subsequently, I purchased the full hundred percent in February 2023 and our lawyers have been working on a contract that states that amount. Now there is a current disagreement that transpired two weeks ago. That is why you are being told the contrary.

Do you recall this email?

A   Yes.

Q   So in this statement, in this email you tell Robert Puccio that you bought 50 percent of Superb Motors in November of 2022. Is that an accurate statement?

A   At that point, yes.

Q   Now, you state that you purchased a hundred percent of Superb Motors in February of 2023. Is that an accurate statement?

A   Yes.

Q   Do you have any documentation showing that you purchased a hundred percent --

A   No documents.

Q   -- of Superb Motors?

Page 209

A. Deo

A   No documents. It was an agreement with Tony and I.

Q   What kind of agreement?

A   It was a verbal agreement that was supposed to be transpired into an actual contract.

Q   Did you pay Tony any money in February of 2023 for that purchase?

A   It was monthly payments. His amount went from $10,000 a month to around 40 plus per month.

Q   Do you have any documentary proof of those payments?

A   Oh, yeah, bank statements.

MS. RONNEBURGER: We would just call for the production of anything that shows the same.

Q   In here you state that the lawyers have been working on a contract that states that amount. Was there ever any finalized contract?

A   No.

Q   Do you have any draft contracts?

A   No drafts.

Q   Do you know who the lawyers were

53 (Pages 206 - 209)

Page 210

A. Deo

working on this?

A    Well, representing me was Harry.

Q    But you never saw any draft contracts drafted by Harry or --

A    It didn't formulate into an actual paper.

Q    Did you speak with Tony or Harry about it?

A    Sure.

Q    When you sent this email to Robert Puccio on August 17th, did you believe, to the best of your knowledge, that you were a hundred percent owner of Superb Motors?

A    Yes.

Q    Did you ever, after this time, tell Robert Puccio or anyone else at Flushing Bank that you were not a hundred percent owner?

A    No.

Q    I'm going to show you what's previously been marked as Plaintiff's, it's Deo 13 (handing).

A    Okay.

Q    Now, you also previously testified that you sought to open accounts for Northshore

Page 211

A. Deo

and 189 Sunrise at Flushing Bank; is that correct?

A    Yes.

Q    Did you also seek to take out a loan for either entity at Flushing Bank?

A    Yes.

Q    Which one?

A    Northshore.

Q    Did you ultimately receive that loan?

A    Yes.

Q    Now, in this email there's a number of attachments.  Why were you forwarding all of these attachments to Robert Puccio?

A    It was the process of opening the accounts and the application for the line of credit.

Q    If we look at, I know we've looked at this document many times today.  If we go to Flushing00116.

MR. KATAEV:  Could you close out of the tools app so we can actually see it better?

Q    This is the operating agreement

Page 212

A. Deo

for Northshore Motors, correct?

A    Yes.

Q    You testified that you prepared this document, correct?

A    Yes.

Q    So if we scroll down to, if we look at what's marked Flushing00121.  So it states that you were 99 percent owner, correct, and that your wife, Sara Deo, is one percent owner, correct?

A    Yes.

Q    Was it your understanding as of the date you sent this to Flushing Bank that you were the 99 percent owner of Northshore Motors and that your wife, Sara, was the one percent owner?

A    Yes.

Q    Why did you provide this document to Flushing Bank?

A    I think it was requested.

Q    Did you believe that this document showed your ownership in Northshore Motors?

A    Yes.

Q    If we look at Flushing00123.  Are

Page 213

A. Deo

you familiar with this document?

A    Yes.  It's my K-1.

Q    Does it state what shows that you're a 99 percent owner --

A    Yes.

Q    -- of Northshore Motors?  Which is what matches the operating agreement, correct?

A    Yes.

Q    Did you use this K-1 to file tax returns?

A    Yes.

Q    Do you believe this K-1 is accurate?

A    Yes.

Q    Who prepared this K-1?

A    It was prepared by Citrin Cooperman.

Q    Let's look at Flushing00127.

A    Yes.

Q    So again, this shows, is this your K-1 for 189 Sunrise?

A    Yes.

Q    And this shows your ownership as 99 percent; is that correct?

54 (Pages 210 - 213)

Page 214

A. Deo

A    Yes.

Q    As of 2021, correct?

A    Yes.

Q    Was this K-1 used to file your tax returns?

A    Yes.

Q    And who prepared this?

A    This was also prepared by Citrin Cooperman.

Q    To the best of your knowledge, this document is accurate?

A    Yes.

Q    We have the same thing if you look at Flushing00130.  This is the operating agreement for 189 Sunrise.  You prepared this, correct?

A    Yes.

Q    And again, on Flushing00135, you are 99 percent owner of 189 Sunrise, according to this document, and Sara is one percent, correct?

A    Correct.

Q    Did you believe at the time you provided these documents to Flushing Bank that

Page 215

A. Deo

they were an accurate representation of your ownership in the companies?

A    Yes.

Q    I'm going to show you, this is what we're going to mark as 63.

(Deo's Exhibit 63, email dated March 21, 2023, 1:45 p.m., was marked for identification, as of this date.)

Q    (Handing).  Let me know when you've had a moment to look at that.

A    Yes.

Q    So I just want to look at the email first.  It's from Robert Puccio to you.  It's dated March 21st, 2023 and its subject Flushing Bank/Northshore Motor Leasing.

A    Yes.

Q    You say please see attached, and then this was in response to a previous email where Mr. Puccio said please see the attached.  We need it to say that you are a hundred percent owner to match the credit application.  Sorry for the delay.

Now, if we look at, and we did

Page 216

A. Deo

look at this before, Flushing0168, it now says you are a hundred percent owner.  Did you complete the credit application to say that you were a hundred percent owner of Northshore?

A    I don't remember the actual application at this point.

Q    Do you recall why you made this change?

A    To be a hundred percent?  I don't remember.

Q    I'm going to show you what we'll mark as Deo 64.

(Deo's Exhibit 64, email chain, top one dated April 3, 2023 at 5:36 p.m., was marked for identification, as of this date.)

Q    (Handing).

A    Okay.

Q    So I'd like you to look at the email from Robert Puccio to you dated April 3rd, 2023 at 11:22 a.m.  Do you see that?  It's right in the middle of the first page.

A    Yes.

Page 217

A. Deo

Q    Toward the end he says also, about the letter your attorney provided, is it possible to get something more detailed?  This is too general and does not provide insight into the situation.

If you know, what is the situation he's referencing?

A    This was '23.  I think it was the lawsuit in December.

Q    Did you have any communications with Mr. Puccio about this lawsuit other than this?

A    No, just this.

Q    And just one other quick question on this.  As David and I understand, I will only be opening the joint venture you have with your partner, which will be located in Great Neck.  And that refers to Superb Motors, you previously testified, correct?

A    Yes.

Q    On April 3rd, 2023 at 5:36 p.m., you said hi, Rob.  I've attached a letter from my attorney, and there are two attachments to this email.  I want you to look at the one that

55 (Pages 214 - 217)

Page 218

A. Deo

says Flushing04043. This is an affidavit of Thomas Jones, CPA.

A   Yes.

Q   In a case in the Supreme Court of the Nassau County is Brian Chabrier versus Anthony Deo. The index number is 617224 of 2022. And who is Thomas Jones again?

A   Tom Jones is my CPA.

Q   If you recall, why did you send this affidavit to Flushing Bank?

A   I don't remember why.

Q   If you could just take a look at the affidavit from Mr. Jones.

A   Okay.

MR. KATAEV:  Do you have a docket entry number?

MS. RONNEBURGER:  No.  It's not on this.  This was the document produced by Flushing Bank which was in its files.

Q   In this affidavit at paragraph ten, Mr. Jones states it was my understanding that there was a hundred percent agreement between the above-captioned parties and their

Page 219

A. Deo

accountants just last fall that Anthony Deo owns 99 percent of Northshore Motor Leasing and 189 Sunrise Highway Auto, LLC and that Sara Deo owns one percent of each company and that their ownership interests in Northshore Motor Leasing LLC commenced on June 15th, 2020, and their ownership interests in 189 Sunrise Highway Auto, LLC commenced on February 12th, 2021.

Reading this statement, do you believe this is an accurate statement by Mr. Jones?

A   Yes.

Q   Does this help you recall why you provided this document to Flushing Bank?

A   To show ownership.

Q   When you contacted Flushing Bank to open an account for Northshore, you believed you were the owner of Northshore according to the operating agreement, correct?

A   Yes.

Q   And when you applied for accounts on behalf 189 Sunrise, you believed you were the owner according to the operating agreements, correct?

Page 220

A. Deo

A   Yes.

MR. KATAEV:  Objection, twofold questions.

MS. RONNEBURGER:  I don't have any further questions.

THE WITNESS:  Okay, thank you.

THE VIDEOGRAPHER:  Are we done?  Let me just go off the record.

Off the record at 2:24.

(Discussion held off the record.)

THE VIDEOGRAPHER:  Back on the record at 2:30.

MR. KATAEV:  Good afternoon, everyone.  This is counsel for Superb, plaintiffs, confirming on behalf of all plaintiffs that we have no further questions.  The only issues that we do need to discuss are confirming Blankenship's deposition virtually on

Page 221

A. Deo

February 18th, finding a new date for Sara Deo and confirming a new date for Michael Laurie.  We don't have a date for him.  So I'd like to meet to confer on that to figure that out.  I recognize that Bonnie may not be able to do that, but if we can't work it out, that would be the subject of further discovery motion practice.

THE COURT REPORTER:  Mr. Kataev, do you want a copy of the transcript today?

MR. KATAEV:  Yes, for plaintiffs, both sets of plaintiffs.

THE COURT REPORTER:  Ms. Ronneburger, did you want a copy of the transcript today?

MS. RONNEBURGER:  Yes.

THE VIDEOGRAPHER:  This concludes the deposition of Anthony Deo.  The time now is approximately 2:31 p.m.  We are

56 (Pages 218 - 221)

Page 222

A. Deo

off the record.

(Time noted:  2:31 p.m.)

Page 224

INDEX TO TESTIMONY

WITNESS          EXAMINATION BY        PAGE

Anthony Deo       Mr. Ruderman          19

                 Ms. Ronneburger        193

INDEX TO EXHIBITS

DEO'S
EXHIBITS       DESCRIPTION            PAGE
Exhibit 43A   Financial statement,       23
              Flushing 08560

Exhibit 44    Financial record,         34
              IAG002563
Exhibit 44A   Chase Bank statement,      40
              IAG001807

Exhibit 45    Chase Bank statement,      49
              LIB000332
Exhibit 46    Chase Bank statement for   54
              account ending in 9899
              from 189 Sunrise Hwy Auto
              LLC

Exhibit 47    Email chain, top one       57
              dated March 7, 2023, 6:04
              p.m., Flushing00162

Exhibit 48    Anthony Deo Statement of   64
              Financial Condition,
              March 1, 2023

Exhibit 48A   Document from the New      81
              York City Department of
              Finance, Office of the
              City Register

Page 223

A C K N O W L E D G M E N T

STATE OF NEW YORK  )

        :ss

COUNTY OF        )

I, ANTHONY DEO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of February 13, 2026; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____

ANTHONY DEO

Signed and subscribed to before me this _____ day of _____, 20__.

_____
Notary Public, State of New York

Page 225

INDEX TO EXHIBITS
(Continued)

DEO'S
EXHIBITS       DESCRIPTION            PAGE
Exhibit 49    Bank statement from Bank   89
              of America for Car Buyers
              NYC Inc.
Exhibit 50    Stock purchase agreement   97
Exhibit 51    Stock sale agreement to   102
              purchase Baron Nissan

Exhibit 52    Email chain, top one      110
              dated November 2, 2022,
              11:06 a.m.

Exhibit 53    Dealer agreement between  122
              Westlake Financial
              Services and UEA Premier
              Motors Corp.
Exhibit 54    Agreement of Sale of      136
              Future Receipts,
              LIB000001
Exhibit 55    Flushing Bank statement,  150
              Flushing07269

Exhibit 56    Operating Agreement,      162
              Flushing07258
Exhibit 57    Operating Agreement for   168
              North Shore Motor Leasing
              LLC
Exhibit 58    Control Number Inquiry,   171
              IAG000049

Exhibit 59    Email chain, top one      194
              dated August 17, 2023,
              12:10 p.m.

57 (Pages 222 - 225)

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 226

INDEX TO EXHIBITS
(Continued)

DEO'S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 60 | Email plus Certificate of Incorporation of Superb Motors | 197 |
| Exhibit 61 | Flushing Bank Certification of Beneficial Owner(s) | 203 |
| Exhibit 62 | Email chain, top one dated August 17, 2023, 12:09 p.m. | 207 |
| Exhibit 63 | Email dated March 21, 2023, 1:45 p.m. | 215 |
| Exhibit 64 | Email chain, top one dated April 3, 2023, 5:36 p.m. | 216 |

TO BE PRODUCED/INSERTED

| DESCRIPTION | PAGE |
|---|---|
| Tax returns | 88 |
| Any communications asking for K-1's | 89 |
| Agreement which Ron Baron signed stating that he agreed to sell his interest in Baron Nissan to Anthony Deo or any communication concerning it | 109 |
| Any other documents that the witness has which he claims establishes that he is the owner of Northshore and Sunrise | 181 |
| Production of anything that shows the witness paid any money to Tony for purchase | 209 |

Page 227

CERTIFICATE

I, SUSAN M. CIRRINCIONE, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness(es) whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness(es).

I further certify that I am not related, either by blood or marriage, to any of the parties in this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of February, 2026.

_Susan Cirrincione_

_____
SUSAN M. CIRRINCIONE

Page 228

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Superb Motors Inc, Et Al. v. Deo, Anthony, Et Al.
DATE OF DEPOSITION: 2/13/2026
WITNESSES' NAME: Anthony Deo

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |

_____
Anthony Deo

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.

_____
(NOTARY PUBLIC)          MY COMMISSION EXPIRES:

58 (Pages 226 - 228)

[& - 17]                                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**  1:17 3:12

**0**

**07258**  162:10
**07269**  150:11
**08560**  224:10

**1**

**1**  64:13 213:3
213:10,13,16
213:22 214:5
224:21
**1's**  86:18,20
87:13 89:5
226:18
**1,000,000**  27:21
**1,275,000**  66:20
67:17 68:13
**1,280,000**  73:11
74:13 76:3
**1,498,000**  71:22
**1,500**  152:9
**1.2**  47:21 48:3
51:23 99:11
**10,000**  99:4,23
209:11
**100**  1:22 3:4
7:17 47:20
169:19 170:3
**100,000**  27:19
**100,929**  47:13
**10017**  4:11

**101,019**  56:7
**10170**  3:20
**102**  225:8
**109**  226:19
**1099**  121:17
**10:03**  207:16
**10:07**  48:24
**10:09**  49:4
**10:13**  54:17
**10:18**  54:21
**10:21**  57:4
**10:22**  57:8
**10:27**  63:12
**10:28**  63:16
**10:43**  80:19
**10:45**  80:23
**10:47**  83:8
**10:52**  83:12
**10:56**  87:23
**10:59**  112:2
**10th**  173:13,14
**11**  137:5
**110**  225:9
**112**  4:16
**11423**  3:9
**11553**  4:20
**11568**  78:6
**11793**  4:16
**11:06**  88:3
110:14 225:10
**11:13**  96:17
**11:15**  96:21
**11:21**  101:21

**11:22**  216:23
**11:24**  101:25
**11:30**  109:9
**11:32**  109:13
**11:38**  116:17
**11:40**  116:21
**11:45**  196:2
**11:53**  132:10
**11:56**  195:20
**11:58**  132:14
**12**  137:7
**12,000**  91:22,23
92:2
**122**  225:11
**1239**  1:7 3:16
**12:01**  136:2
**12:02**  136:6
**12:06**  139:9
**12:07**  139:13
**12:09**  207:10
208:2 226:10
**12:10**  194:22
225:23
**12:12**  144:20
**12:14**  144:24
**12:18**  149:16
**12:31**  149:20
**12:40**  158:17
**12:44**  158:21
**12:53**  168:13
**12:54**  168:17
**12:56**  170:23
**12:58**  171:3

**12th**  49:25
219:9
**13**  1:21 138:2
210:22 223:10
**136**  225:14
**138,000**  155:22
**13th**  7:5 155:8
155:10
**15**  129:9
131:18,25
167:14,15
**15,000**  93:18,25
100:4,12,21,25
139:2
**150**  225:16
**1580**  1:6 3:15
**1581**  1:6 3:14
**1591**  1:7 3:15
**15th**  41:15
156:9 163:8,11
163:13 164:13
166:10,13,20
169:22,23
219:7
**16**  139:17
140:15
**162**  225:17
**1632**  1:7 3:15
**168**  225:19
**16th**  46:10,14
**17**  124:10
194:21 225:23
226:9

**[170 - 207]**                                                                   Page 2

**170**  36:15
**171**  225:21
**172**  36:11
**172,888**  36:10
**173,000**  94:23
   142:4,17
**17th**  102:14
   106:18 126:22
   150:13 155:12
   196:18 207:9
   207:16 208:3
   210:12
**18**  72:10
**180**  117:9
**180,000**  69:23
**181**  226:21
**18211**  3:9
**185,700**  153:20
**189**  1:4,18 3:13
   3:18 54:24
   55:3,18 57:11
   97:15 138:20
   138:21 139:18
   141:23 146:17
   211:2 213:22
   214:16,20
   219:3,8,23
   224:17
**18th**  221:2
**19**  187:20
   224:4
**19,000**  187:16
**193**  224:5

**194**  225:22
**197**  226:5
**19880**  227:24
**19th**  50:19 56:3
**1:03**  175:14
**1:04**  175:18
**1:19**  193:4
**1:30**  16:9
**1:45**  215:8
   226:11
**1:50**  193:9
**1st**  63:23 74:8
   154:22

**2**

**2**  110:13
   225:10
**2,000**  152:6
   153:15
**2,250,000**  79:19
   79:23
**2.4**  52:3 53:12
   53:20 54:6
**2.5**  52:3
**2/13/2026**
   228:3
**20**  223:19
   228:22
**20,000**  52:23
   53:7 156:9
   158:3
**200**  189:5
**200,000**  69:21
   93:10

**200,112**  50:5
**2006**  81:22
**201,020**  51:3
**2015**  120:16
   131:17
**2016**  124:10
   126:22
**2019**  73:9
**2020**  106:15
   163:8,11,14
   164:13 166:11
   166:13,20
   167:6,10,15,15
   169:23 219:7
**2021**  55:10
   100:5 102:14
   106:15,19
   198:15 214:3
   219:9
**2022**  24:18
   25:19 26:13
   28:25 29:6
   31:9,17 32:5
   35:6 39:2,24
   40:15 41:4
   48:2,17 49:21
   58:16,22 59:21
   60:24 61:8
   62:14 67:12
   88:7,19 89:25
   91:6 92:15,18
   93:9 94:19
   110:14,19
   111:11,16

   134:17,19
   147:21 148:9
   157:17 159:21
   164:22 174:24
   188:22 189:13
   190:8 208:4,15
   218:8 225:10
**2023**  57:25
   63:24 64:5,13
   67:16 74:8
   80:12 116:4,5
   134:18 145:17
   148:2,6,14
   150:13,14
   154:23 157:17
   159:23 164:19
   173:13,14
   174:24 194:22
   195:20 196:2
   196:18 197:22
   207:10,16
   208:6,20 209:9
   215:8,16
   216:16,23
   217:22 224:19
   224:21 225:23
   226:9,11,13
**2025**  95:21
**2026**  1:21 7:5
   223:11 227:20
**203**  226:7
**20595**  81:22
**207**  226:9

**[209 - 500,000]**                                                      Page 3

| | | | |
|---|---|---|---|
| **209** 226:24 | **26** 199:25 | **31st** 58:22 88:6 | **44a** 40:6 |
| **20th** 51:2 56:3 152:6 | **279,289** 36:7 | 150:14 156:23 158:3 195:14 195:20 | 224:13 |
| **21** 13:15,24 14:11 55:12 56:3 181:18 189:18,21 215:8 226:11 | **27th** 153:11 155:19 227:20 | **3280** 4:15 | **45** 49:7,13 224:14 |
| **215** 226:11 | **28** 94:19 | **333** 4:19 | **46** 54:25 57:12 224:16 |
| **216** 226:12 | **280,000** 36:18 | **34** 224:11 | **47** 57:14,19 224:18 |
| **21st** 215:16 | **28th** 51:16 | **35,000** 156:8 | **472,000** 88:11 88:20 188:21 |
| **22** 189:18,21 | **296,000** 69:14 | **360** 155:25 | **479,000** 77:8 |
| **22nd** 91:6 92:15,18 93:17 150:21 151:6 152:16 | **29th** 47:11 93:9 | **372,037** 25:20 | **48** 64:10,11 224:20 |
| **23** 1:8 3:17 66:9,24 217:9 224:10 | **2:23** 1:11 | **375,048** 36:24 | **48a** 81:7,8 224:22 |
| **2320** 3:19 | **2:24** 220:12 | **385,597.10.** 46:17 | **49** 89:12,13 224:14 225:5 |
| **23rd** 46:25 | **2:30** 220:16 | **3:37** 197:22 | |
| **24** 56:3 | **2:31** 221:25 222:3 | **3rd** 154:23 196:2 197:22 216:22 217:22 | |
| **24th** 51:8 110:19 111:11 156:16 | **2:33** 7:9 | | |
| **25** 198:8 | **2nd** 111:16,25 156:8 | | |

| | **3** | **4** | **5** |
|---|---|---|---|
| **2320** 3:19 | **3** 78:2,5 83:15 216:16 226:13 | **4** 72:2 | **5,295,000** 77:23 |
| **23rd** 46:25 | **3,000** 100:6 | **40** 209:11 224:13 | **50** 97:7,8 208:4 208:14 225:7 |
| **24** 56:3 | **30** 153:6 | **40,000** 155:19 156:18 | **50,000** 52:22 53:6 97:19 99:20 152:17 152:25 153:7 |
| **24th** 51:8 110:19 111:11 156:16 | **30,000** 47:2 52:23 53:8 100:16 | **420** 3:19 | **500** 152:12 155:8 |
| **25** 198:8 | **300,000** 92:18 93:17 | **421,019** 50:20 | **500,000** 30:24 93:3,14 141:14 142:12 149:3 150:17,22 151:6,10 152:5 152:15,24 |
| **25,000** 155:13 155:16 156:17 | **3011** 73:15 81:25 82:4,8 | **427,843** 60:10 61:7,13 | |
| **250** 4:10 | **30d** 12:17 | **43a** 23:10 224:10 | |
| **250,000** 69:20 | **30th** 156:16 | **44** 34:12,13 224:11 | |
| **2519** 1:7 3:16 | **31** 2:10 | **446** 1:8 3:17 | |
| **25th** 103:15 155:15 | | | |

**[500,000 - abreast]**                                    Page 4

153:19 155:25 158:7 190:20

**51** 102:20,21 225:8

**52** 110:11,12 225:9

**53** 122:12 225:11

**54** 136:15,17 224:16 225:14

**55** 150:2,4 225:16

**55,124** 56:9

**56** 162:3,4 225:17

**57** 168:23,24 224:18 225:19

**58** 171:17,18,22 225:21

**59** 194:19,20 225:22

**6**

**60** 197:7,8 226:5

**60,000** 156:8

**600,000** 71:3

**61** 203:2,3 226:7

**612890** 95:21

**617224** 218:7

**6188** 1:11 7:9

**62** 207:7,8 226:9

**63** 215:6,7 226:11

**64** 216:14,15 224:20 226:12

**65,121** 56:9

**650,000** 69:22 70:13

**657,000** 66:4,17

**680,000** 42:13

**683** 43:15

**683,000** 42:17 43:20

**683,318.95.** 41:21

**6th** 155:2

**7**

**7** 224:19

**70,000** 37:4

**700** 47:21

**700,000** 189:7

**723,000** 91:7 141:5,7 142:10 143:7

**735,000** 90:12 91:19 141:3

**75,700** 155:2

**750,000** 138:22

**76** 1:8 3:16 41:19

**76,000** 31:19 32:18

**76,130** 24:18 25:6 31:10

**789,000** 72:4

**7th** 4:10 57:24

**8**

**8,917.15** 45:15

**80,000** 188:13

**80,120** 56:8

**80,124** 51:9

**80,128** 51:17

**81** 224:22

**8112** 40:16 49:20

**82** 31:16

**85,700** 153:12

**8508** 169:11

**88** 226:17

**89** 225:5 226:18

**8th** 156:9

**9**

**9,700** 156:7

**9,752.78** 154:24

**900,000** 187:7 188:17,19

**90s** 76:23,25

**97** 225:7

**9899** 54:24 55:3 224:16

**99** 161:4 162:20 166:18 170:4,5 212:9 212:15 213:5 213:25 214:20 219:3

**9:19** 1:21 7:4

**9:26** 18:21

**9:28** 18:25

**9:31** 22:12

**9:38** 22:16

**9:49** 34:4

**9:51** 34:8

**9:56** 39:9

**9:58** 39:13

**a**

**a.m.** 1:21 7:4 110:14 195:20 196:2 207:16 216:23 225:10

**aaronson** 1:5 3:14 43:10 90:15 112:6 133:23

**ability** 19:15,19 38:25 71:19,20

**able** 19:10 27:5 27:9 28:20 29:2,7,18 30:14,17 32:16 43:17 65:8 100:9 138:5 221:8

**above** 2:12 103:2 124:6 195:25 207:25 218:25

**abreast** 146:22

**absolutely** 21:2
44:3 48:20
103:7 140:11
179:20 194:17
197:4 198:3
199:12,17,23
202:3 207:4
**absurd** 196:21
196:23
**access** 60:23,25
182:17
**accompany**
186:24
**account** 40:15
40:17,21,24
41:3 43:12
47:7 49:19,20
52:4 54:23
55:2,14,15,17
55:20 66:5,12
66:13 90:18,20
91:2,12 92:9
141:4,5,7
142:12 143:7,8
149:23 150:5
152:12,14
153:15 157:2,6
157:11,19,22
157:24,24
179:22 183:17
194:4,11,15
195:8,24
196:13 197:25
199:11,15,21

200:5 201:17
203:17 204:22
204:23 205:21
205:24 206:21
207:2 219:18
224:16
**accountants**
64:22 219:2
**accounting**
43:18 63:19
172:9 180:15
**accounts** 66:15
67:18,19 91:11
143:4 181:15
196:25 197:3
205:7,8 207:21
210:25 211:17
219:22
**accuracy** 33:22
**accurate** 24:12
25:8,14,24
26:4 31:12
38:17 48:19
60:12,15 61:17
65:25 74:13
83:25 194:13
208:16,20
213:14 214:12
215:2 219:11
**accurately** 61:6
71:18 101:15
**acris** 81:15
**action** 61:21
83:17 105:7

146:14 192:2,8
227:16
**actions** 67:5
**activities**
119:24 120:3
**actual** 53:8
65:21 147:8
179:3 209:6
210:6 216:7
**actually** 38:19
80:2 86:6
98:10 100:15
103:10 110:21
114:16 125:25
147:20,25
149:2,6 166:4
166:13,21
202:6 211:24
**add** 109:14,19
**adding** 109:21
**additional**
100:13 187:20
**additions** 41:15
**address** 71:24
73:13 77:25
78:3
**advance** 150:22
151:6,9,18
**advancement**
140:8
**advise** 148:16
**affect** 48:12
**affidavit** 83:16
84:19 218:2,11

218:14,22
**affidavits**
103:13
**affirm** 22:20
23:4
**afraid** 127:15
127:19
**afternoon**
193:11 220:18
**agencies**
127:10
**ago** 16:24 26:8
34:21 72:10
73:17 76:19
128:15 129:9
131:18,25
208:9
**agree** 14:6,8
108:20 173:18
**agreed** 6:4,9,13
84:17 107:18
107:20,23
108:18,23
163:8,18 164:5
166:10 169:23
201:9 226:19
**agreement** 12:2
12:7,21,25
13:4,6,9,10,22
93:5 96:23
97:9,18 98:23
98:24 99:8,21
100:8,14
101:15 102:5

**[agreement - appropriate]** Page 6

102:22 104:15
108:22 109:3
122:13 123:14
136:18,23
139:20 140:4
143:25 145:3,6
145:13 158:23
159:10,15,18
160:3,6,9,16
161:22,23
162:5 163:22
164:21 165:11
165:18,23
166:3 168:20
168:25 169:6
170:6,8 207:18
209:2,4,5
211:25 213:8
214:16 218:24
219:20 225:7,8
225:11,14,17
225:19 226:19
**agreements**
170:17 219:24
**agrees** 139:19
140:7
**ahead** 202:5
**al** 7:8,9 81:25
228:2,2
**alifonso** 172:14
172:14
**alivia** 5:8
**allegation** 67:9

**allowed** 42:22
**ally** 10:23 11:2
11:4,15 19:9
19:20 20:10,17
20:23,24 21:5
21:14,23 22:7
26:8 28:13,16
29:13,15,16,19
30:16,18 31:4
32:7,8,8,17
43:6,8,21 48:7
53:5,6 56:17
56:19 61:24
62:7,18,21
63:4 133:24,25
134:2 179:4,7
**ally's** 19:15,20
19:21
**alright** 17:4
24:20 52:2
95:15
**america** 66:10
89:10,14,20
225:5
**amount** 27:8,17
35:19 41:21
43:16 44:2
54:7 68:23
79:22 91:7,18
92:18 100:16
138:25 139:22
151:12 184:3
188:15 191:20
208:8 209:11

209:21
**amounts** 31:21
45:21,22,23
**answer** 9:24
10:5,8,9,13
11:2,6,8,10,11
11:12 42:24
61:14 69:15
107:22 108:21
109:16 128:23
168:7
**answered**
10:12
**answering**
164:14
**answers** 223:12
**anthony** 1:4,13
1:25 2:8 3:8
4:5 5:7 7:6,8
8:12,17 63:22
64:11 82:3,10
110:19 112:12
137:14 169:18
218:7 219:2
221:24 223:8
223:16 224:4
224:20 226:20
228:2,3,21
**anthonyd**
112:8
**anticipate**
15:18
**anticipated**
188:8

**anxious** 42:23
**anybody** 21:22
22:5 73:4 84:4
104:23 127:22
160:11 170:12
176:18 180:8
182:25 184:22
185:15 186:2
186:11 192:11
**apologize** 24:19
44:5,9 77:6
**app** 211:23
**appear** 150:24
**appears** 57:23
**application**
10:4,7 12:22
12:24 111:3
112:21 113:7,8
116:8,12 125:3
140:18 200:5
200:10,14
202:2,10,17
211:17 215:23
216:4,8
**applications**
85:3
**applied** 135:18
219:22
**applying**
197:25 201:17
**approached**
45:4,8 53:16
**appropriate**
80:11

| | | | |
|---|---|---|---|
| **approval** 140:19 200:7 | **aside** 29:15 | **assumed** 180:6 | **authority** 40:19 40:20 55:14 203:14 204:16 |
| **approved** 133:11 | **asked** 15:8 31:22,24 42:3 42:20,21 89:3 110:4 132:17 144:15 154:10 159:16 164:3 167:25 185:14 | **assuming** 126:3 172:17 179:25 | **authorization** 203:21,22,22 204:6,9 |
| **approximate** 30:20 | | **attached** 58:15 215:19,21 217:23 | **authorized** 204:3 |
| **approximately** 7:4 27:16 28:8 30:4,22,23 71:3 76:18 131:17 221:25 | **asking** 14:4,5,7 15:15,18 17:6 86:20 87:13 89:4 96:4 111:16 167:3 173:18 181:25 193:16 226:18 | **attachments** 211:14,15 217:24 | **auto** 1:4,4,6,7,7 1:7,7,8,8,8,18 3:8,13,15,15,15 3:16,16,16,17 3:17,18 8:11 41:21 42:14,18 46:17 47:4,7 47:13 50:5,16 50:20 51:3,9 51:17 52:5 53:21 54:24 55:4 56:7 69:22 110:18 172:24,25 173:11,20 180:21 219:4,8 224:17 |
| **april** 154:22,23 155:2,8,10,12 155:15,19,22 196:2 197:22 216:16,22 217:22 226:13 | | **attention** 41:12 49:18,23 50:18 55:25 60:9 84:10 97:22 99:10 139:5,15 169:13 | |
| **area** 35:14 | **asks** 207:17 | **attorney** 4:14 88:23 90:14 101:8 106:2 127:11 130:2 146:25 147:4 217:3,24 | |
| **areas** 9:13 | **assessed** 119:20 | | |
| **ariel** 4:21 8:19 193:12 | **asset** 76:2 80:15 | | |
| **aronbayer** 5:10 | **assets** 70:15,16 70:18 71:9 80:12 | | |
| **arranged** 43:10 48:2 63:3 | **assigned** 161:3 | **attorneys** 3:7 3:13 4:5,19 105:24 143:24 | |
| **arrest** 127:12 | **assist** 68:7 160:11 | **attributable** 53:4 | **automobile** 117:6 121:2,6 173:8 177:9,12 |
| **arrested** 126:18,24,25 127:4,5 | **assisting** 153:2 | **audit** 64:25 | |
| | **associates** 94:23 | **august** 147:21 148:9 194:21 196:18 207:9 207:16 208:3 210:12 225:23 226:9 | **automotive** 1:15 4:8 100:10 |
| **arrived** 66:17 | **association** 7:14 130:15 | | |
| **article** 2:10 | | | **available** 41:8 115:3,10 142:24 188:4 |
| **asad** 1:5 3:17 | **assume** 45:18 48:14 59:4 148:25 | | |
| **asap** 196:7 207:18 | | | |

**avenue** 3:9,19 4:10

**aware** 42:12 50:14 83:3,4 105:19 109:22 110:7 124:14 130:23 140:17 145:10 146:13 180:20 185:19 194:14 196:24 197:24 202:13 207:2

**aying** 28:12

**b**

**babylon** 118:18

**babysit** 17:18 17:18

**back** 17:20 18:24 22:15 32:12,15,16 34:7 39:12 43:7 45:17 46:4 47:17 48:4,6,15 49:3 52:11 54:20 56:15 57:7 62:14 63:7,15 64:3 66:2 68:24 69:5,16 80:22 83:11 88:2 90:16 96:20 101:24 103:14 109:12

112:13,14 116:20 122:22 132:13,15 133:23 135:13 135:16 136:5 139:12 144:23 146:2 147:21 148:9 149:19 150:11 152:4 158:20 161:12 168:16 171:2 175:17 182:13 186:6 187:21 188:17 190:10 190:24 191:4,7 191:10,19,21 191:24 193:8 220:15

**bad** 14:22

**balance** 93:13

**balances** 183:13

**bank** 1:17,18 4:19 8:22 12:9 23:17 24:13 26:5 31:10 33:23 36:9 40:7,13 44:12 44:14 46:2 49:14 54:23 55:2 57:10,16 58:8,15 62:5 64:17 66:4,4 66:10 75:7

77:16,20 80:11 80:13 85:11 89:10,10,13,14 89:19,24 90:2 90:5 92:13 124:24 125:2,3 127:3 130:15 141:2 148:13 149:22 150:5 150:10,12 156:23,24 157:3 169:10 170:7,12,12,18 172:25 173:2,5 173:6 179:22 181:15 182:4 183:17,25 184:5 190:19 193:14 194:5 194:15 195:8,8 195:12 199:11 199:16,19,22 200:6 201:11 202:18,22 203:4,11 204:15 205:24 206:20,21 209:15 210:18 211:2,6 212:14 212:20 214:25 215:17 218:11 218:20 219:15 219:17 224:13 224:14,16

225:5,5,16 226:7

**bank's** 195:18

**banking** 66:8

**bankruptcy** 139:23

**banks** 85:2,3,4 85:9,20,22,24 86:6,14,16,17 173:7

**barletta** 5:11 7:12

**baron** 1:5,6,6 3:14,18 84:14 84:20,23 85:10 85:14 86:12 100:20 102:6 102:22 103:2 104:12,14,15 105:14 107:18 107:18,20,23 107:24 108:13 108:18,19,20 108:22,24 109:22,23 110:5 225:8 226:19,20

**baron's** 103:6,9 104:9,19 105:18,21

**based** 21:7,14 47:25 64:23 67:25 82:13 147:10 148:23

**basis** 38:11,16 60:14 76:5 139:21 143:2 157:16 159:4 174:7 189:22

**bate** 23:22 34:19 40:12 55:22 57:16 64:18 150:11 162:9 169:7,11 171:25 197:15

**bates** 136:10 203:11

**bathroom** 18:9

**bathrooms** 18:12

**bear** 15:9

**beginning** 23:22 150:13

**behalf** 8:4 59:2 125:17 127:22 137:23 138:19 161:8 204:17 219:23 220:20

**belief** 38:11,17 60:14 76:5 131:15 140:25 143:2

**believe** 13:19 20:5 35:19 40:18 45:13 48:18,20 50:9 50:25 51:7,14 53:11,14 56:24

60:13 67:9,17 68:18 71:16 76:4 77:13 78:14 80:10 84:3 87:9 88:25 101:14 103:12 107:25 108:3,5,17 117:2,12 123:9 130:25 138:15 143:19 147:12 154:10 160:14 166:21 179:10 190:5 194:24 206:19,22,25 210:12 212:22 213:13 214:24 219:11

**believed** 44:23 80:15 125:12 219:18,23

**beneficial** 203:5 226:8

**benefit** 140:8 186:23

**beria** 117:16,18 120:2,8 121:5 122:5 124:6,7 124:15,17,23 125:18,25 126:14 127:19 127:22 130:20

**beria's** 121:19 124:2

**best** 71:18,20 202:15 210:13 214:11

**better** 211:24

**betterment** 151:24 153:25

**beyond** 12:3

**big** 32:11 154:25

**bigger** 24:20,21

**bills** 41:8 204:4

**bit** 191:11

**blank** 100:5 137:6

**blankenship** 1:13 4:6 183:19

**blankenship's** 220:24

**blood** 227:15

**blown** 139:16

**blurry** 138:4,7 138:8

**blvd** 1:6,6,7,7,7 1:8 3:14,15,15 3:16,16,16

**bold** 140:2

**bonnie** 4:12 8:15 44:6 221:8

**book** 41:19 53:15

**borrow** 80:2

**borrowed** 53:6 79:23 202:9

**borrowing** 203:22 204:9

**bottom** 23:20 24:15 34:19 36:22 49:8 55:21 60:9 64:18 99:11 110:10,17 137:2 162:9 189:8 195:12 207:15

**bought** 208:4 208:14

**boulevard** 4:19

**box** 4:16 35:13 35:15 171:13

**breaches** 95:22

**brian** 1:5 3:14 87:7,16 98:10 98:19,20 106:7 123:11 218:6

**briefly** 203:25

**bring** 174:17 184:22 198:16

**bringing** 132:18

**bro** 198:14

**broker** 94:11 94:13 118:4,6 118:23

**broker's** 119:9

**brokerage** 118:25 119:24 120:3

**bronx** 73:11 74:12 77:8 81:21

**brought** 105:5 105:13

**bruce** 194:4 195:19 196:3 197:5 198:11 205:3 206:14 206:17,19,19 206:25

**building** 45:10

**bunch** 156:15

**business** 21:9 21:15 30:9,11 55:18 66:5 67:4,13 84:16 84:21 86:13 94:15,15 115:14 118:3 120:12 121:11 121:19 122:7 126:6,10,12 133:14,16 134:5,13 135:13,16 139:24,25 140:4,9,21 142:6 173:5 177:8 199:3,5

**businesses** 66:16 130:19

**buy** 53:7 78:24 118:2,12

**buyer** 99:15 100:8 107:11

**buyers** 1:14 89:11,15,20 91:12 141:5 149:9,10 152:6 153:8,12,16,21 153:25 154:5 154:12,15 155:2,8,13,16 155:18 156:10 156:17 158:4 225:5

**buying** 146:3,6

**c**

**c** 3:2 4:3 5:3 81:15,23 223:2 227:3,3

**cabinets** 206:10

**calculated** 71:18

**call** 23:21 65:15 88:23 92:6,11 109:3 209:17

**called** 81:14 91:3 96:23 157:4

**cancer** 103:18 103:19,20

**capability** 68:22

**capable** 112:24

**capital** 1:17 93:18,21 133:7 133:17 135:10 135:22 145:22 147:18 148:18 152:2,3,18 194:12

**caption** 2:3

**captioned** 218:25

**car** 1:14 10:25 11:5,17 52:21 53:7,7 89:10 89:15,20 91:11 115:14 117:6 120:20 141:5 149:9,10 152:6 153:8,12,16,21 153:24 154:4 154:12,14 155:2,8,13,16 155:18 156:9 156:17 158:4 177:10,21 182:7 225:5

**cards** 205:9

**care** 13:21 62:9 62:15

**carry** 134:6

**cars** 1:14,14 4:7,7 26:9,19 27:24 31:5,17 32:12,14 43:3 43:6,10,11,16 45:16 46:4 47:17,21 48:3 48:9 50:8 52:11,17 53:11 53:16,23 54:10 56:14,16,21,22 61:5,21 62:6 62:23 63:6 70:17,19,23 71:3,4,5,9 146:3,6

**case** 1:10 12:17 83:15 97:14 218:5 228:2

**cases** 14:2 105:4

**cash** 20:14 41:7 66:3 70:24 182:3,7 183:20

**cause** 105:6,14

**caused** 61:24 170:8

**causing** 61:21

**central** 1:23 3:5 7:16,18

**cents** 99:20

**certain** 95:21 183:3

**[certificate - commencing]**

**certificate**
196:10 197:9
197:16 226:5
**certification**
6:6 162:17
169:15 203:4
226:7
**certify** 223:8
227:7,14
**cetera** 146:16
**cfo** 32:20
**chabrier** 1:5
3:14 98:10
123:11 218:6
**chain** 57:20
108:3,6,7
110:9,13 164:7
164:16 194:21
196:19 197:9
207:9 216:16
224:18 225:9
225:22 226:9
226:12
**chambers**
17:12
**chance** 111:17
195:4 207:13
**change** 111:8
155:22 157:7
216:10 228:5
**changed**
107:11,15
**chase** 1:18 40:6
49:13 54:23

55:2 66:10,10
224:13,14,16
**check** 40:20
47:2,3,5 55:14
98:13 154:24
156:17 172:21
172:23,24
173:10,14
183:25 184:2
**checks** 99:25
156:16 183:13
204:4
**chose** 164:3
185:15
**chosen** 192:16
192:16
**chris** 101:10
106:6 108:15
**circumstance**
166:25 170:19
**circumstances**
125:8 129:25
**circumventing**
43:2
**cirrincione**
2:13 227:5,25
**citibank** 72:7
**citrin** 160:19
164:8,17
165:14 213:17
214:9
**city** 81:2,3,9,11
224:23,24

**civil** 2:10
**claim** 84:5,7
97:17 175:8
181:11 192:11
192:17,21
**claiming** 53:19
67:4 82:15
114:4
**claims** 87:5
95:22 196:20
196:23 226:22
**clarify** 29:5
**clear** 14:2
53:18 62:12
**clerk's** 102:10
**clerks** 17:15
**client** 35:4
36:16
**client's** 172:11
**clients** 83:18
**clock** 16:14
**clocks** 16:21,22
16:23
**close** 14:15
79:5 84:17
121:8 211:23
**closed** 80:7
118:17 148:2
207:21
**closer** 18:12
**closing** 79:7
**coast** 1:14,14
1:15,15,15,16
4:6,7,8,8,9

69:19,20 116:8
175:20,22,24
**codefendant**
193:15
**coincidence**
143:6
**collect** 190:14
192:3 204:3
**collectability**
67:17
**collective** 10:18
**collectively**
205:13
**college** 176:9
**combination**
32:19 66:6,14
78:9 182:19,20
**come** 14:14
17:20 21:3
26:12,15,22
27:4 29:5
66:20 69:25
118:9 124:22
141:10 142:24
153:16
**comfortable**
132:5
**coming** 29:11
103:14,15
**commenced**
83:18 192:2
219:7,9
**commencing**
100:5

**commission**
94:2,3 152:21
153:2,20
228:25

**commissions**
121:15,16
189:23

**communication**
86:24 108:12
109:4 122:4
226:20

**communicati...**
89:4 92:5
170:11 217:11
226:18

**companies**
89:21 104:8
130:10,12
215:3

**company** 7:15
48:6 82:15
93:23 94:14
117:3 125:16
141:15 142:13
152:25 154:5,8
170:14 219:5

**company's**
130:14

**compel** 10:9

**complete** 9:6
80:9 200:10
216:4 223:11

**completed**
79:25 200:5

**completely**
24:5 62:21

**completion**
139:22

**computer**
137:21

**computers** 71:8
71:15

**concern** 145:10

**concerning**
109:5 129:18
184:8 226:20

**concludes**
221:23

**condition** 63:23
64:13 65:22
224:21

**conduct** 204:16

**confer** 14:6
221:6

**confirm** 207:19

**confirming**
220:20,24
221:3

**connected**
133:3

**connection**
24:3 38:25
49:12 59:3
87:5 92:24
93:4 94:6 95:9
95:23 101:9
105:11 119:9
123:10 127:11

129:24 170:18
174:5 176:5
199:10,15

**consider** 68:8
121:13 199:14

**considered**
199:20

**constant**
113:12

**consultants**
154:7,12

**consulting**
92:21,24 93:10
154:5

**contact** 113:13
115:20 194:15

**contacted**
219:17

**contacts** 126:4
126:5

**continue** 9:5
16:11

**continued** 1:24
2:3,7 4:3 5:3
100:17 120:8
120:10,12
121:22 225:2
226:2

**continuing**
139:21

**contract** 78:25
79:2,4,5,9,13
95:10,23
105:18,20

106:20,21,22
106:25 107:4,7
107:8,11,13,15
107:17,23
108:2,9,10,17
181:9 208:7
209:7,20,21

**contractor**
121:17

**contracts** 108:4
108:6,8 179:18
209:23 210:5

**contrary**
208:10

**control** 40:23
171:7,12,13,14
171:18 225:21

**controller**
21:18 32:20
37:21 38:22
113:3,5,6
174:13,15,19
183:7,14 205:4
206:14,16

**controller's**
183:6

**controllers**
182:5,18

**conventional**
74:25 75:3

**conversation**
44:24 45:3,8
98:12 194:3,9
201:14,19,20

205:12

**conversations** 147:11

**conveyed** 76:15

**convicted** 130:6

**conviction** 127:12 129:19 129:21

**convictions** 126:15

**cooney** 5:8

**cooperated** 129:17,25

**cooperman** 160:19 164:8 164:17 165:14 213:18 214:10

**copied** 112:7

**copy** 98:7,11,17 106:5,13,25 107:4 116:11 143:20 147:7 207:17 221:13 221:20

**corp** 1:16 116:23 122:15 123:16 124:5 225:13

**corporation** 82:9 100:9 129:16

**corporations** 93:2 196:9

**correct** 19:11 20:8,15 21:16 24:10 25:25 26:5,10 28:5 28:13 29:3 31:10 32:13 33:23 35:9,20 36:12 37:5,6,7 37:11,16,18,24 38:3,7,13 39:4 39:5,20 40:21 40:24 46:7 47:18 49:17 52:24 53:3,3 55:7,10 58:4 58:11 59:25 61:13,22 63:20 66:17,25 67:7 68:2,9 69:23 71:6,6,22 72:4 74:14,20,24 75:3 77:17 79:10,19 83:25 84:8 85:11,15 85:19,21 86:16 88:16 89:21 90:14 91:15 95:7,10,13,17 96:8 97:15 99:5,21,25 100:21 102:12 102:15 103:9 103:14,21,25 104:9,12,16

105:8,15 106:19 111:5,9 111:13,19 116:24 117:4 117:13 118:22 122:8 125:4,20 125:23 129:5,8 129:19,22 132:4,19,23 135:21 137:23 138:19 141:5,8 141:11,15 142:10,14,18 144:9 145:3,16 145:18 147:2 147:18,23 148:3,21,24 150:18,22 151:25 152:7 153:3,17,22 154:5,8,19 155:2,5,8,16,23 156:3,10,13,14 159:21,24 161:5 162:18 162:21 163:5,6 165:12 166:25 169:19 172:18 176:10 177:10 177:13 178:3,7 180:18,23 183:17 184:9 184:12 188:10 189:2 191:11

191:21 194:6 195:9,20 196:15 197:22 198:2,5,11,18 198:22,23 199:2 200:8,22 201:12,21 211:3 212:2,5 212:9,11 213:8 213:25 214:3 214:17,22,23 217:20 219:20 219:25 223:13

**correlated** 163:19 165:19 166:8,23

**costs** 46:5

**counsel** 6:6 34:19,21,23,24 97:2,24 106:25 171:24 181:24 220:19

**counsel's** 149:25

**counsels** 7:20

**counting** 183:10

**county** 39:23 81:21 83:17 95:20 102:10 105:8 184:8 218:6 223:6

**couple** 134:22 138:2 180:12

**course** 14:8 38:18 51:23 114:6 139:24 187:12 188:4 188:18,19 189:18,21 202:16 206:18

**court** 1:2 6:16 7:10,25 8:6,23 9:2 10:11,21 11:15,20,25 12:11,16,23 13:5,8,14,20 14:16,21,25 15:6,13,21 16:4,13,20 17:9,25 18:3,7 18:16 22:17 72:2 81:20 82:23 95:19 105:7,22 107:4 144:13 146:14 146:20 147:8 147:14 218:5 221:12,18

**courthouse** 7:17

**courtroom** 17:16

**covenants** 139:19

**cover** 52:9,13 62:20

**coverage** 176:24 177:2,7 177:9

**cpa** 1:14 218:3 218:9

**cpa's** 1:17 163:18 164:5,6 165:14

**created** 53:12 62:16 63:6 163:10 165:23

**creating** 52:14 52:16

**credit** 20:6,7,8 20:10,12,14,15 20:17,23 58:12 68:8 149:3 150:18,25 151:5,12,15 155:21 158:8 194:12 198:14 201:17 202:7 205:9 211:18 215:23 216:4

**criminal** 125:11 126:15 127:12,12,16 129:19,21

**cross** 100:9 101:5 141:22 141:25 143:11 143:14,25 144:12 145:2,3 145:6,7,10,12

**cullen** 4:18 8:20 193:13

**current** 95:25 196:20,22 208:8

**currently** 72:25 95:6,12 181:12

**customer** 182:6

**customers** 179:19

**cut** 60:25

**cv** 1:11 7:9

**cyruli** 3:12 8:3

**d**

**d** 19:2 81:23 137:14 223:2

**dad** 73:25 74:3 74:3 76:8,11 76:16,21 77:2 77:4,14 82:6,7 83:2

**dan** 32:20 38:21 59:18,25 111:23,23 112:25 181:3 183:23

**daniel** 21:18 112:16 113:12 113:14 178:19 178:22

**danny** 180:3,6 180:13

**darius** 72:2

**date** 7:5 23:13 25:18 26:2 34:16 35:23 40:9 49:16 55:5 57:22 64:15 65:25 81:12 89:17 97:10 102:24 110:15 112:6 122:16 126:20 136:20 150:7 162:7 163:16 164:15,15 165:17,19,22 165:24 166:4,7 166:7,8,17,23 169:4 171:21 194:23 197:12 203:7 207:11 212:14 215:10 216:18 221:2,4 221:5 228:3

**dated** 102:14 110:13,19 111:15 116:11 124:10 163:13 169:22 173:14 194:21 195:14 196:17 207:9 207:16 215:8 215:16 216:16 216:22 224:19 225:10,23

**[dated - deo]** Page 15

226:9,11,13

**dates** 115:19 160:2

**dating** 166:3

**dave** 196:4

**david** 1:6 100:15,20 103:2,5,13,19 104:8 106:10 106:11,16,17 106:18 108:14 217:16

**day** 141:13 153:6,7 166:10 169:23 208:2 223:19 227:20 228:22

**deal** 100:20

**dealer** 122:12 123:14 172:12 177:19,20,23 225:11

**dealership** 48:13,17 61:4 61:9,11 63:4 100:10 117:7,7 126:7 133:18 134:3 188:18 189:13 190:8

**dealerships** 43:3,5 48:8 114:4 120:20 121:3,6 182:12 182:14 188:15

189:21

**dealings** 122:8

**debt** 31:25 68:17

**debtors** 176:2,5

**debts** 26:16,23 27:5 28:12,21 28:21,21 29:2 29:7,12,18 30:2,14 31:4,8 31:16 32:4 38:25

**december** 39:24 58:22 67:12 88:6 134:19 217:10

**decision** 10:18 82:2 165:13,16

**decisions** 9:21 9:25 10:15

**dedicated** 183:3

**deed** 74:9,22,23 76:9,10 78:15 79:15 82:16,24

**deeded** 74:10 75:19

**defendant** 4:14 4:19 8:17,22 81:25

**defendants** 1:19 2:8,9 4:5

**defenses** 87:5

**deficiencies** 29:13,25 31:24 32:2 52:9,14 52:15 61:24 62:15,21 63:5

**deficiency** 27:25 28:12 29:17 31:3,6,7 38:24 52:16,25 53:2,4,9,13 54:5,6

**deficient** 30:13 30:17

**defined** 100:10

**delay** 215:24

**demand** 23:18

**demands** 87:10

**denied** 10:12 10:22

**deo** 1:13,13,25 2:8 4:5,6 5:6 7:7,8 8:17 11:14,19 18:6 19:1,8,25 20:1 21:1 22:1,18 22:25 23:1,14 24:1 25:1 26:1 27:1 28:1 29:1 30:1,9 31:1 32:1 33:1 34:1 34:9 35:1 36:1 37:1 38:1 39:1 39:14 40:1 41:1 42:1 43:1

44:1 45:1 46:1 47:1 48:1 49:1 49:5 50:1 51:1 52:1 53:1 54:1 54:22 55:1 56:1 57:1,9,13 58:1 59:1 60:1 61:1 62:1 63:1 63:17,22 64:1 64:12 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 80:24 81:1,24 82:1,3,5,10 83:1,13 84:1 85:1 86:1 87:1 88:1,4 89:1,3,8 90:1 91:1 92:1 93:1 94:1 95:1 96:1,22 97:1 97:25 98:1 99:1 100:1 101:1 102:1,2 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,22 117:1 118:1

119:1 120:1
121:1 122:1
123:1,3 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1,15
133:1 134:1
135:1 136:1,7
137:1,14 138:1
139:1,14 140:1
141:1 142:1
143:1 144:1,25
145:1 146:1
147:1 148:1
149:1,21 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1,22
159:1 160:1
161:1,15,16
162:1,21 163:1
164:1 165:1
166:1 167:1
168:1,18 169:1
169:18 170:1
171:1,4,23
172:1 173:1
174:1 175:1,19
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1

184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1,23 193:1
193:11 194:1
194:19 195:1
196:1 197:1,7
198:1,8 199:1
199:25 200:1
201:1 202:1
203:1,2 204:1
205:1 206:1
207:1,7 208:1
209:1 210:1,21
211:1 212:1,10
213:1 214:1
215:1 216:1,14
217:1 218:1,7
219:1,2,4
220:1 221:1,3
221:24 222:1
223:8,16 224:4
224:20 226:20
228:2,3,21
**deo's** 23:10
34:13 40:6
49:13 57:19
64:11 81:8
89:13 97:8
102:21 110:12
122:12 136:17
150:4 162:4
168:24 171:18

194:20 197:8
203:3 207:8
215:7 216:15
224:8 225:3
226:3
**deo00076** 97:25
**department**
81:2,10 184:8
184:23 185:21
186:3 224:23
**deposed** 193:22
**deposit** 42:10
46:14 47:2,6
47:10 49:25
50:19 91:3
152:6 182:7
183:16 184:4
204:4
**deposited**
42:18 43:12
50:15 51:6,13
51:23 52:4
53:20 183:24
**deposition** 7:6
9:6 11:22
220:25 221:23
223:10 228:3
**depositions**
83:15
**depository**
203:21 204:6
**deposits** 41:14
56:2,2,12
182:3 183:20

204:17
**deputy** 17:16
**derrick** 82:3,10
**described** 47:8
48:9 58:20
**description**
75:24 224:9
225:4 226:4,16
**designation**
137:4
**desks** 71:8
**despite** 28:10
61:3 166:19
**destroyed** 67:4
67:13
**detailed** 217:4
**details** 86:3,9
146:18
**detective**
184:14,16,20
184:23 185:23
186:14
**determine**
70:10
**determined**
164:15
**devastated**
185:11
**die** 103:23
**died** 100:15
103:13,16,24
**difference**
36:19 91:21

| | | | |
|---|---|---|---|
| **different** 36:21 39:18 106:21 106:22 107:8 205:14 | **discussion** 18:22 22:13 34:5 39:10 48:25 54:18 57:5 63:13 | **docket** 218:17 **docs** 197:19 **document** 23:25 24:4,12 24:23 25:13 | 139:15 143:21 161:17,18,21 162:10,14 163:10 166:12 |
| **differently** 10:5 | 80:20 83:9 | 32:23 33:4,7 | 166:12,20 |
| **difficulty** 28:11 29:17 167:5 | 87:24 96:18 101:22 109:10 | 33:15,21 34:10 34:18 35:5,9 | 167:14 168:19 169:5,14 171:5 |
| **diligent** 86:22 87:4 | 116:18 132:11 136:3 139:10 | 36:14 37:17 38:19 40:3,11 | 171:12,23 172:21 197:18 |
| **direct** 88:22 108:12 | 144:21 149:17 158:18 168:14 | 40:11 41:13 49:9,11,24 | 203:3 204:12 204:16 211:20 |
| **directed** 9:5 132:22 | 170:24 175:15 200:24 220:13 | 57:10,14,15 59:2,6 63:18 | 212:5,19,22 213:2 214:12 |
| **directing** 82:21 **direction** 92:7 | **dismissed** 96:6 96:11,12 | 63:24 64:9 65:5 80:25,25 | 214:21 218:20 219:15 224:22 |
| **directly** 10:8 15:11 94:10 | **dispute** 26:3 **distinction** | 81:4,9,14 83:14,19,22 | **documentary** 209:13 |
| 115:20 156:4 | 50:12 138:6 | 84:11 88:4,5,7 | **documentation** |
| **disagree** 50:11 74:15 167:7 | **distributed** 189:10 | 88:12 89:9,19 89:23 96:23,24 | 196:8,14 198:5 205:20 208:22 |
| **disagreed** 44:19 | **district** 1:2,2 7:10,11 | 97:4,11,22 98:5,6,8,8,14 | **documents** 23:15,17 27:12 |
| **disagreement** 208:8 | **divide** 164:11 | 98:16,18 101:14 102:3,3 | 36:16 37:11,24 39:17 49:6 |
| **disclose** 190:16 | **divvy** 16:6 | 102:7,11 | 54:23 65:7,10 |
| **discovery** 23:18 40:12 | **dix** 71:21 **dla** 1:16 93:18 | 104:18 105:17 105:23 110:4,6 | 65:18,21 70:5 85:9 87:8,12 |
| 221:11 | 93:21 152:17 153:2 | 110:9 123:4,7 123:10,19,20 | 87:16,18 89:2 97:23 101:11 |
| **discuss** 146:25 220:23 | **dms** 60:22,23 | 123:23 124:14 127:2 136:8,8 | 111:23,24 112:18 133:11 |
| **discussed** 88:7 116:22 145:15 | **dmses** 66:21 **dmv** 111:5,9 | 136:12,17,22 137:23 138:18 | 145:9 150:8,9 172:7 181:10 |
| 145:17 146:25 | 113:7 115:2,16 115:20 | | 181:19,22,25 |

**[documents - engaging]**

208:24 209:2 214:25 226:21

**docusign** 137:24

**doing** 13:23 41:7 114:22 115:7,8,17 126:10,10,12 147:13 167:5

**dollar** 53:13

**dollars** 187:21 189:5 190:10 190:14

**dolphin** 117:19 117:21,23 118:9,15,16 119:9,13,16,18 119:24 120:9 120:15,18,25 121:8,21,22 122:3 126:11

**door** 18:10,11

**double** 180:14

**draft** 209:23 210:4

**drafted** 210:5

**drafts** 209:24

**draw** 41:12 49:18,23 50:18 55:25 60:8 84:10 97:21 99:10 139:5 149:2 169:13 189:12

**drawing** 139:14

**drawn** 149:6,8 151:16 152:10

**draws** 189:17 189:17

**drew** 150:25 151:4

**driscoll** 105:6

**drive** 117:10 185:10,16,20

**driven** 177:17 185:5

**driving** 176:9 176:14

**drove** 184:25 185:2,13

**due** 26:9,17,23 27:6 28:12 29:3,8,12,19 32:4 62:19 63:7

**duly** 19:3 227:9

**duplication** 13:25

**duplicative** 15:7

**dwight** 1:13 4:6

**dykman** 4:18 8:21 193:13

**e**

**e** 3:2,2 4:3,3,21 5:3,3 19:2

81:23 95:16 223:2,2 227:3 227:3

**earle** 4:19

**earlier** 48:10 181:9 198:17 198:20,24

**early** 55:10 191:16

**earmarked** 135:14

**earn** 121:14

**easier** 139:17

**eastern** 1:2 7:11

**effect** 6:15

**efficiently** 16:16

**eight** 191:14

**either** 31:3 37:23 38:3 72:22 80:6 87:5 113:17 132:24 153:20 199:20 211:6 227:15

**email** 9:9 44:17 57:19,23 60:21 65:14 88:8 110:9,12,16,23 111:12,15,21 111:22 112:5,8 114:10 164:7 164:16 194:17

194:20 195:11 195:15,17,22 196:3,17,19 197:8 201:19 207:8 208:11 208:14 210:11 211:13 215:7 215:15,20 216:15,22 217:25 224:18 225:9,22 226:5 226:9,11,12

**emails** 108:10 197:20

**emanuel** 3:10 8:9

**employee** 121:12

**employees** 134:8

**ems** 36:18

**enable** 10:25 11:17 19:22 20:18 65:4 68:7

**ended** 132:18 132:25 184:19

**endorse** 204:3

**ends** 137:25

**engaged** 60:3 131:13 132:2 132:17,21

**engaging** 119:23 120:2

ensure 113:10
entered 186:4
entering 140:3
entire 78:3
150:25 151:5
151:15,18
entities 47:4
116:9 130:16
130:23
entitled 63:22
139:25 168:19
entity 42:19
47:7 50:16
55:7,9 82:17
83:2 90:25
145:23 176:6
179:6 188:9
211:6
entries 46:2
172:9
entry 41:16
45:15 46:9,10
46:25 94:19
158:3 218:17
ephemeral
20:12
equipment
71:10,11,13,14
71:15
errata 228:1
es 227:8,13
escorted 186:6
escrow 90:19
90:20 91:11

141:4
esq 3:10,21
4:12,14,21
essentially
20:18 64:22
established
181:11
establishes
226:22
estate 1:6
117:24 118:3
118:19,22,23
118:24 119:8
119:12,15
120:6 127:8
143:8
estates 81:16
et 7:8,9 81:25
146:16 228:2,2
evened 61:25
62:5
eventually
85:20 90:12
113:20 191:6
everybody
34:11 35:14
exact 43:18
45:22
exactly 27:22
31:21 61:2
73:18 76:20
105:3,22
115:22 116:2
120:16 135:11

148:5
examination
1:24 2:7 6:7,14
19:6 193:24
224:3
examined 19:5
example
183:16 204:2
except 6:10
exchange 204:5
exclusively
140:7
excuse 90:13
executed
143:12,15,17
143:18
executes
139:20
execution
99:20 100:7
exhibit 23:10
34:13 40:4,6
49:13 54:25
57:12,14,19
64:11 81:8
83:15 89:12,13
97:7,8 102:21
110:11,12
122:12 136:17
150:4 162:4
168:24 171:18
194:20 197:8
203:3 207:8
215:7 216:15

224:10,11,13
224:14,16,18
224:20,22
225:5,7,8,9,11
225:14,16,17
225:19,21,22
226:5,7,9,11,12
exhibits 224:7
224:9 225:2,4
226:2,4
existing 99:4
expect 187:19
expectation
148:21 187:24
188:2
expected 104:2
expense 35:15
expenses 134:6
expires 228:25
explain 36:19
explanation
50:14,23 51:5
51:19
extent 186:18

**f**

f 41:19 227:3
fact 21:8,12
28:11 32:3
52:17 61:3
82:23 86:23
88:18 95:15
103:8 124:17
131:24 135:18

144:7 148:8,16 148:20 150:20 166:19 179:24 190:23,24 191:7

**fair** 38:4 147:10 151:21 204:14

**fall** 174:24 219:2

**false** 125:17,20 125:22 155:6

**familiar** 12:19 55:6 82:8 94:14 97:3 117:15 213:2

**family** 140:5 177:5

**family's** 121:10

**far** 15:23 21:13 26:17 43:15 47:15 56:13 58:6 82:10 90:18 101:12 102:4 121:21 131:22 137:22 153:19 155:25 158:6 165:2 173:24

**father** 75:20 82:14

**fbi** 127:11 129:25

**february** 1:21 7:5 55:11 67:12 208:6,19 209:9 219:9 221:2 223:10 227:20

**federal** 1:22 3:4 6:2 7:16,18

**fee** 139:3,4 152:10 153:6 153:11

**feel** 159:8

**fello** 115:24

**felt** 132:5

**figure** 198:22 221:7

**file** 88:18 186:25 213:10 214:5

**filed** 139:23 161:8 181:8 184:11

**files** 218:21

**filing** 6:7 196:10

**filings** 97:3 107:4

**fill** 111:12,17

**filling** 112:21 112:22 160:11

**finalized** 209:21

**finance** 81:2,10 182:9 224:23

**financed** 178:3

**financial** 23:11 24:6 32:21 33:11,16 34:14 35:3 36:17 48:16 63:23 64:12 65:21 67:25 81:16 122:14 123:8 123:15 179:11 188:22 189:17 224:10,11,21 225:12

**financials** 68:7

**financing** 24:3 24:7 49:12 58:11 59:3 80:13 125:3,13 132:18,22 135:19 138:22 145:21 146:9 146:11,16 147:13,22 148:9,13 153:3 153:17 159:14 165:8 172:11 173:8 178:10 178:12

**find** 47:2,5 87:12 115:15 126:17,19

**finding** 221:2

**fine** 168:9

**finish** 13:11 119:3

**finished** 79:14 122:17

**fired** 30:10

**firm** 8:20 63:19 117:24 171:24 193:13

**first** 9:17 19:3 24:16 35:21 37:20 38:9,12 39:19 40:13 41:16,24 42:3 42:4 46:10 56:7 57:16 97:25 99:11 106:13,17 108:9 110:21 120:25 123:25 136:10 147:21 150:10 158:22 169:10 171:6,6 171:8,25 175:5 178:3 193:21 215:15 216:24

**fisk** 1:8 3:16 41:19

**five** 16:24 80:25 99:24 100:6 136:11 139:15 140:15

**fix** 85:25 86:2

**fixing** 73:5

**flagstar** 156:23 156:24 157:3,8 157:21
**floor** 4:10,20 11:3,7 21:19 21:24 32:9 70:20 84:14,25 85:20,24 86:17 100:18,21 101:2,4,6 134:25 135:3,7 146:8,11 178:4 178:10 179:3,7
**florida** 103:8
**flushing** 1:17 4:19 8:22 12:9 13:13 14:14,17 14:19 15:9,12 23:17,25 24:7 24:8,13 25:13 25:23 26:5 31:9 33:23 36:9 37:4 38:7 38:13 39:19 57:16 58:8,10 58:15 59:3 64:17 68:5,12 74:11 75:7 80:11,13 145:16,17,21 147:18,21 148:2,10,13,17 149:22 150:4,9 150:11,18,21

157:24 158:7 159:12,24 162:9 163:21 164:18 165:4,7 169:8,10 170:7 170:11,12,17 190:13,19,25 191:5 192:5,8 192:20 193:14 194:5,11,15 195:7,12,18 199:11,16,19 199:21 200:6 201:11 202:18 202:22 203:4 203:11 204:15 205:8,10 206:21 210:17 211:2,6 212:14 212:20 214:25 215:17 218:11 218:20 219:15 219:17 224:10 225:16 226:7
**flushing's** 23:21
**flushing00116** 211:21
**flushing00121** 212:8
**flushing00123** 212:25
**flushing00127** 213:19

**flushing00130** 214:15
**flushing00135** 214:19
**flushing00162** 57:17,20 224:19
**flushing00187** 64:19
**flushing0168** 216:2
**flushing04043** 218:2
**flushing04590** 203:12
**flushing05955** 197:15
**flushing07258** 162:6 225:18
**flushing07269** 150:6 225:16
**flushing08560** 23:12,22
**follow** 89:6 113:17,24 114:2
**following** 114:8
**follows** 19:5 99:19 139:20
**followup** 9:22
**force** 6:15
**forged** 82:15,23
**forget** 130:14

**forgot** 64:8
**form** 6:10 160:8 204:20
**formation** 196:8,14 197:19
**formed** 158:22
**former** 132:3 186:9,15,24
**forms** 111:18
**formulate** 210:6
**forth** 146:17 227:9
**forward** 195:22
**forwarded** 194:17 195:18 197:21
**forwarding** 211:14
**found** 82:23 126:16
**four** 11:22 15:2 16:6,13,19 17:3 191:10
**fourth** 56:9
**frame** 26:14 116:3 129:9 131:18
**franchise** 100:10 141:21
**front** 35:9 37:11 88:5 89:9

**[full - great]** Page 22

**full** 40:19 58:15 59:22 80:10 208:5

**fully** 146:22

**funded** 151:19 152:14

**funding** 1:17 90:11 94:5,7

**funds** 20:25 21:4 29:11 32:17 90:10 91:14 140:19 140:24 141:14 142:21 147:18 153:24 156:12 178:17 179:21 180:18 181:4 187:4,19,22 188:3 190:9

**further** 6:9,13 93:7 122:4,7 192:25 220:6 220:21 221:10 227:14

**future** 69:2 86:15 92:2 104:7 136:19 225:14

**g**

**g** 223:2

**gathering** 196:6

**general** 30:7,13 217:5

**generally** 59:15 136:22

**gentleman** 117:15

**georgia** 127:8

**getting** 121:2 153:2 199:11

**gianelli** 146:14

**give** 22:21 30:7 78:3 79:8,12 112:14 183:15

**given** 37:20 38:13,15 146:2 170:17 184:3 189:4 223:13 227:12

**giving** 46:4 48:6 68:4,6

**glad** 42:20,21

**glitch** 137:21

**go** 18:10,18 22:9 24:20 33:25 36:22 39:6 48:21 49:24 54:14 56:25 57:9 63:9 80:16 82:2 90:24 96:14 101:18 102:18 114:7 116:14 118:13 118:15 122:21

122:24 132:7 135:23 137:4,7 139:6 144:17 149:13 150:11 152:4 153:8 154:18 155:4 156:12 158:14 161:11,14 168:10 170:20 172:13 175:11 182:8 192:25 202:5 205:10 206:6 211:20 220:10

**going** 9:3,15 12:3 14:10 16:4 17:18 18:3,13 23:15 35:2,11,13 41:3,12 49:6,7 49:18,23,24 50:18 60:8 64:9 69:5 81:13 85:25 86:9,10,12 88:22 89:11 97:21 99:10 107:16 110:10 115:15 122:10 123:6 132:15 133:5 134:17 135:20 136:25 137:25 140:20 143:5 145:20

148:12 154:21 156:5 158:2 161:15,18 166:9 168:18 171:5,6,22 172:10,20 181:21,23 187:15 194:14 197:6 198:7 199:24 201:24 202:14,25 210:20 215:5,6 216:13

**gold** 1:14,14,15 1:15,15,16 4:6 4:7,7,8,8,9 69:19,20 116:8 175:20,22,24

**gonna** 59:4

**good** 7:23,25 8:6,8,14,18 68:8 114:22 193:10 196:3 208:3 220:17

**google** 114:23 114:24 115:7,8 115:17

**gotcha** 119:7

**governmental** 127:10

**grant** 14:8

**granted** 180:2

**great** 217:18

**gross** 35:15,25
36:3,15
**group** 1:15 4:5
4:8 8:16 41:21
42:14,18 47:13
110:18 180:21
**guaranteed**
181:15
**guarantor**
176:7 202:8
**guaranty** 100:9
101:5 141:22
141:25 143:11
143:15 144:12
145:2,7,10
192:5
**guess** 60:22
75:24 125:24
**guns** 127:17,25
128:5
**guy** 198:14,18
**guys** 17:10
196:4

**h**

**h** 19:2 72:20
**half** 34:21
51:24 104:15
188:25
**hand** 22:19
23:21 24:25
49:8 70:11,13
137:3 227:20

**handed** 23:15
38:19 40:10
49:5 54:22
63:17 80:24
**handing** 23:14
57:13 198:9
199:25 203:8
207:7 210:22
215:11 216:19
**handled** 182:2
182:3
**hands** 80:4
**happen** 201:14
**happened**
114:16 131:25
157:7,13 170:7
185:18
**happening**
13:21,23 14:11
**hard** 79:20,21
**harry** 1:13 4:14
4:14 8:24
106:6 210:3,5
210:8
**hear** 17:13,20
18:4,4 42:23
132:20 186:18
**heard** 133:2
173:2
**hearing** 175:6,7
**held** 2:11 18:22
22:13 34:5
39:10 48:25
54:18 57:5

63:13 73:24
78:7 80:20
83:9 87:24
96:18 98:10
101:22 109:10
116:18 117:13
118:21 132:11
136:3 139:10
144:21 149:17
158:18 168:14
170:24 175:15
220:13
**help** 196:6
219:14
**helped** 113:6
**hereinbefore**
227:9
**hereto** 6:5
**hereunto**
227:19
**hey** 113:18
114:11
**hi** 112:12
217:23
**highlight** 35:13
46:9 155:9
**highlighted**
24:25 25:3
41:14
**highway** 4:15
219:4,8
**hills** 71:22
**hire** 9:19,24

**hired** 30:10
131:12 132:2
**home** 198:16
**honor** 7:24
10:7,20 14:13
16:3,10,18
17:6
**honorable** 3:4
**hopeful** 68:19
**hoping** 68:24
69:16
**hour** 14:23
15:7
**hours** 11:22
12:8,12,14,20
13:12,13,15,24
14:5,11 15:2
15:20,22,22,25
16:6,14,19
17:3
**house** 73:2,4,7
73:8 74:5 95:4
95:6,13 103:11
118:9,13
142:18
**household**
140:5
**houses** 118:2,2
118:13 119:21
**hundred** 107:6
200:17 201:10
201:25 202:8
202:14,19,22
208:6,19,23

**[hundred - interests]**    Page 24

210:13,18
215:22 216:3,5
216:11 218:24
**hunting** 78:2,5
95:4 142:6
**hwy** 1:4,18
3:13,18 54:24
55:4 224:17
**hylan** 1:6,6,7,7
1:7,8 3:14,15
3:15,15,16,16

**i**

**iag** 8:4
**iag000049**
171:19,25
225:21
**iag001617**
55:22
**iag001807** 40:7
40:13 224:13
**iag002563**
34:14,20
224:12
**idea** 38:3 45:16
137:19 170:16
**identification**
23:13 34:15
40:8 49:15
55:5 57:21
64:14 81:12
89:16 97:10
102:24 110:15
122:16 136:20

150:7 162:7
169:3 171:20
194:23 197:11
203:6 207:11
215:9 216:18
**identify** 7:21
186:8
**impacted** 67:14
**important**
13:17
**incapable**
112:22
**incentive**
199:14,20
**inception**
181:17,17
**incident** 131:20
**income** 24:17
25:5,18,24
36:23 88:18
121:14 189:10
**incorporated**
197:17 203:18
**incorporation**
196:10 197:10
197:16 226:5
**incorrect** 28:18
167:16,18
**incurred** 53:22
**index** 7:9 81:21
95:20 218:7
224:2,7 225:2
226:2

**indicate** 31:18
84:23 186:12
**indicated** 85:2
87:13
**indicates**
173:10
**indicating**
25:18 68:13
84:20 114:19
166:12 170:12
170:13 171:10
171:15
**indication**
173:16
**individual**
99:24 100:6
131:2
**individually**
82:3
**individuals**
130:22 131:2
205:12,20
**info** 198:15
**information**
21:19 60:20
64:24 65:4,17
65:24 68:6,12
83:24 113:4
115:3 125:15
127:9 195:7,15
195:19,24
196:5,6 197:3
**informed** 21:21
22:4 174:12,23

**informing**
180:9
**initially** 182:8
**injunction**
146:15
**inquiry** 171:12
171:14,19
225:21
**inserted** 226:15
**insight** 217:5
**insisted** 84:15
84:20 86:18
**insurance**
177:11
**insured** 176:20
176:22
**intend** 133:12
**intended**
147:17 148:17
160:15
**intention**
140:22 187:23
**interest** 69:10
85:14 98:25
101:3 107:18
108:19,23
160:25 161:4,5
170:14 175:20
175:20 200:25
201:5 226:20
**interested**
227:17
**interests** 69:19
219:6,8

**introduce** 94:9 94:10
**introduced** 94:8,12
**inventory** 11:2 11:18 20:19 21:5 28:7
**invest** 141:18
**investigated** 130:9
**investigation** 129:18 130:3 131:9
**investments** 118:5
**involved** 21:9 33:4,7,14 37:17,23 59:15 121:5 164:18 165:14
**iris** 1:5 3:18
**island** 1:8 3:17 41:21 42:14,18 43:3,4 46:17 47:4,7,12 50:5 50:15,20 51:3 51:9,17 52:5 53:20 56:7 110:18 172:24 172:25 173:11 173:20 180:21
**islip** 1:23 3:5 7:16,18

**issue** 113:19,22 129:18,20 144:8,13 184:9
**issued** 146:15
**issues** 17:19 144:14 174:9 174:11,15,16 174:25 220:22

**j**

**j** 63:18
**j.p.** 1:18
**jamaica** 3:9,9
**james** 3:4
**january** 67:12 173:13,14 174:24 191:16
**jeffrey** 3:21 8:2
**jmw** 1:11
**job** 183:4,6
**joe** 115:24
**joint** 66:12 217:17
**jones** 1:14,17 32:20,24 59:15 63:19 65:4 164:8 218:3,8 218:9,14,23 219:12
**jory** 1:5 3:14 98:14
**joseph** 5:11 7:12 108:15

**josh** 26:18 27:23 31:4,17 42:25 43:9,25 44:21 46:6,21 47:16 48:2 50:8 52:10 53:22 54:11 56:15,21 61:5 61:12,19,20 62:4,13 63:3 67:6 100:16 112:6 113:11 113:18 114:10 133:22 135:4,5 164:8
**joshua** 1:5 3:14
**jr** 4:14
**judge** 105:6 146:14
**judgment** 125:11,11
**jump** 156:16
**jun** 94:23
**june** 163:8,11 163:13 164:12 166:11,13,20 167:6,10,14,15 169:22,23 219:7
**jury** 18:10,11
**justice** 81:22
**justify** 32:18

**k**

**k** 41:19 86:18 86:20 87:13 89:5 110:18 213:3,10,13,16 213:22 214:5 223:2 226:18
**kataev** 3:10 8:8 8:9 9:10 10:3,6 10:19 12:6 13:3,7,10,16 15:25 17:5,23 195:2 204:19 207:5 211:22 218:16 220:3 220:17 221:13 221:15
**keep** 41:2,5 91:24 92:2 206:3,8
**kendra** 205:3
**kept** 30:11
**key** 182:19,21
**khan** 1:5 3:18
**kill** 128:18,21 129:2
**kind** 61:22 86:20 94:11 188:3 209:4
**knew** 103:21 125:22 146:19 186:12 198:25 201:24

**know** 9:10 10:17 11:9 12:25 16:8 19:23 21:13 25:10 26:17 27:8,11,20 30:4,6 33:3,6 34:22 36:20 37:13 38:6 40:5 42:17 43:16 45:4,6,8 45:21 47:9 56:13 58:7,25 59:9 60:19,25 61:2,14 69:12 70:8 73:22,23 82:4,11 90:18 92:23 93:21,24 95:2,25 96:4 101:12 103:5 104:4 105:3,20 108:16 115:6,7 117:18 120:8 120:16 121:22 121:25 122:2 122:17 126:9 126:14,23,25 127:4,5 128:2 128:4,6,7 135:6,8,8,12 137:22 140:14 143:22 144:5 144:16 145:8 146:18,20 149:5,7 151:7 154:16 156:19 156:24 157:13 158:10,11,13 159:12 164:24 165:3 173:23 173:24 174:2 174:10 179:15 179:16,24 180:5 181:2,6 184:2,6,14,16 184:19,21 186:13,16,19 186:20,22 187:4,8 189:24 190:13,15 192:4,18,22 193:17 195:4 200:2 201:18 202:11,12 205:23 206:16 206:17 207:12 207:22,22,24 209:25 211:19 215:11 217:7

**knowledge** 21:6,7,12,14 120:5 121:24 166:14 173:4 174:6,8 180:8 183:23 187:25 192:15 200:7 202:15 210:13 214:11

**kwun** 21:17,22 22:5 110:17

**l**

**l** 58:16 59:8 81:23,24,24 223:2

**l&co** 63:18

**l's** 59:14,16

**landlord** 142:5 142:17

**lane** 78:5 95:5

**laptop** 149:25

**late** 76:23,25

**latest** 9:8

**laurie** 1:13 4:6 130:17,18 132:17,21 133:3 153:21 221:4

**laurie's** 93:23 94:6 152:25

**law** 2:10 4:5 8:16 17:15

**lawsuit** 39:23 40:2,4 66:24 67:10 82:14 87:3,6 95:16 96:2,7 97:24 217:10,12

**lawsuits** 144:7 144:11

**lawyers** 108:14 208:6 209:19

209:25

**lease** 107:16 134:9

**leased** 71:6

**leases** 67:19 181:13

**leasing** 1:5,18 3:14,18 40:14 49:20 58:21 67:18 69:22 70:12 88:15 150:13,17 154:2,19 155:5 156:13 161:24 168:20 169:2 170:2,3 215:17 219:3,6 225:19

**leasing's** 156:3

**leave** 16:8,11

**leaving** 152:12

**left** 11:22 16:7 24:25 121:21 122:3 171:9,11 193:6

**legal** 3:7 5:8,10 7:12 8:10

**lend** 20:14 68:5

**lenders** 94:13

**lenny** 107:11 107:14,16

**leonard** 107:14

**letter** 217:3,23

**letters** 140:2

**[level - look]** Page 27

**level** 146:4
**levine** 34:24 106:7
**lexington** 3:19
**lib** 137:4,4
**lib000001** 136:11,18 225:15
**lib000332** 49:8 49:14 224:15
**libertas** 1:17 12:10 14:13,17 14:21 26:14 49:10,10,12 90:11 91:14 94:4,4,7 132:16,19,23 133:2,6 135:19 136:9,10,24 138:19,21 140:18 141:11 141:17 142:9 142:21,24 159:11,20 165:6,15 184:9 187:4,18,22 190:10,13,19 190:25 191:4 191:11,15,19 191:23 192:16
**lic** 1:15 4:8
**license** 111:2,2 113:20 114:3 115:2,16

117:13 118:22 118:25 119:9 119:13,15 120:6 145:25 177:15,18
**licensed** 118:19
**lien** 175:23
**liens** 146:16
**life** 127:15 131:3,14
**limited** 157:16
**linden** 4:5 8:16
**line** 20:5,7,23 21:24 24:17,24 25:2 32:9 35:12 36:22 44:11 58:12 60:9 104:11 149:3 150:18 150:25 151:5 151:13,15 155:21 158:8 189:8 194:11 199:6 201:17 202:7 211:17 228:5
**lines** 35:12 70:14 138:10 160:17 162:15
**list** 69:9 72:3 76:2 77:7 118:2,8 163:3 195:7

**listed** 44:16,18 46:2,16 47:12 50:4,19 51:9 51:16 71:21 73:10 74:4 82:24 84:15,21 84:24 85:5 86:13 124:12 175:25 176:4 204:3
**listening** 17:14 17:15,16
**litigation** 95:12
**little** 1:17 7:14 14:24 39:3 93:7 139:16 185:11 191:11
**lived** 73:6,7
**living** 73:4 95:7
**llc** 1:4,4,5,6,7,7 1:7,7,8,8,8,9,14 1:15,15,15,16 1:16,17,18,18 3:7,8,13,14,15 3:15,15,16,16 3:16,17,17,17 3:18,18 4:7,7,8 4:8,9,9 5:9,10 8:10,12 41:20 54:24 55:4 58:21 160:16 160:21,23 168:20 169:2 219:4,7,9

224:17 225:20 228:1
**llp** 1:17 3:12 4:18 8:21 193:13
**loan** 41:20 42:13,15 44:17 44:18,20,23,25 45:2 46:3,3,16 47:12 50:4,11 50:20 51:2,9 51:16 52:9 56:6 67:25 80:5 119:22 136:23 145:16 145:17 154:23 156:7 163:21 164:18 165:4 165:15 173:12 173:17 192:6 199:11,16,21 205:9 211:6,11
**loaned** 22:7
**loans** 58:4 174:4 175:2 191:8
**located** 7:17 118:16,18 182:11 217:18
**long** 16:25 73:17 76:19 121:25 128:15
**look** 27:12 35:4 35:11,17,25

41:6,9,11,15 50:2 54:10 90:2 110:19 114:15,18,24 137:2 150:20 156:5 187:11 195:3,25 197:14,20 203:10,25 206:17 207:25 211:19 212:8 212:25 213:19 214:14 215:12 215:14,25 216:2,21 217:25 218:13

**looked** 12:18 12:19 70:9 119:20 165:21 206:20 211:19

**looking** 32:23 33:15 35:12 42:16 48:15 90:7 107:9 114:9 190:14

**looks** 151:2,4 172:6,8 197:21

**loss** 48:10 58:21 88:6,10

**losses** 53:21 61:21

**lost** 61:4,10

**lot** 71:11 87:16 131:7,8 144:14

**louis** 117:16 124:2,6,7

**lucindo** 81:22

**m**

**m** 2:12 3:4 72:20 81:24 223:2 227:5,25

**made** 9:21,25 10:15 12:23,24 25:23 31:10 42:10,13 61:12 188:14 192:11 216:9

**maiden** 72:15 72:17

**main** 40:16

**make** 24:21 53:19 62:12 63:4 65:18 95:21 111:8 112:12 114:3 138:5 139:16 149:10 163:21 183:11,16,19 183:25

**management** 1:9 3:17 172:25 173:2 173:11

**manager** 169:22

**managers** 163:4 182:18

183:12

**manifested** 128:13

**marc** 1:13 4:6 132:3 137:16 175:19,25 182:5 184:25 185:2,7,12,15

**marc's** 137:19

**march** 57:24 63:23 64:4,13 66:24 67:16 74:8 80:12 145:17 148:2 150:13,14,21 151:6 152:6,16 153:11 159:23 164:18 195:14 195:20 199:8 215:8,16 224:19,21 226:11

**mark** 57:14 64:9 81:6 89:11 97:7 171:7 194:19 197:7 203:2 207:7 215:6 216:14

**marked** 23:12 34:12,15 40:4 40:8 49:6,15 55:4 57:11,20 64:14 81:11

83:14 89:15 97:9,24 102:23 110:10,14 122:11,15 136:15,19 150:6 162:3,6 168:23 169:3 171:17,20 194:22 197:11 198:8 199:25 203:5 207:10 210:21 212:8 215:9 216:17

**marks** 184:14 184:16,20,24 185:23 186:15

**marriage** 227:15

**married** 72:14

**match** 54:11 215:23

**matched** 163:22 184:5

**matches** 213:8

**matter** 7:7 12:4 127:16 131:24 193:15 207:20 227:18

**matthews** 73:15 81:25 82:4,8

**maximum** 189:7

**mazerati** 176:8

**mean** 17:17
41:5 69:4
72:24 85:21
90:7 104:5
108:7 113:12
120:11 123:20
134:19,21
140:22 145:12
166:11 172:8
177:3 178:22
181:18 183:12
184:2 188:14
189:19 196:12
196:22

**means** 20:7
74:20 166:21

**meant** 44:5
198:25

**mechanic** 71:14

**meet** 106:8
184:23 221:6

**member** 160:21
160:23 162:18
169:15

**members** 99:5

**mention** 186:14

**mentioned** 2:12
118:21

**merchant**
139:18,23
140:2,6

**merchant's**
140:8

**merckling** 1:13
4:6 132:3
175:19 176:4
183:16,22
184:4 186:8

**merckling's**
137:16,19
175:25

**message** 198:9
198:10

**met** 104:5

**michael** 1:13
4:6 93:23
117:9 152:25
221:4

**middle** 203:20
216:24

**million** 47:21
48:3 51:23
52:3 53:13,20
54:6 190:10,14

**minus** 36:7,18

**minutes** 16:24
26:7 112:11

**modifications**
119:22

**modify** 109:16

**moment** 16:23
29:16,24 30:8
59:11 87:15
131:7 176:19
187:10 215:12

**money** 10:24
11:4,16 19:15

19:20,21,21
20:13,13,14,14
20:18 22:7
27:8 28:15,16
40:20,21 43:4
43:7,12,20
44:2 45:17
46:4 47:16
48:4 50:15
51:13,20 52:9
52:10 56:15,18
56:20 61:5,10
62:5,14,20,22
63:3 68:6 69:3
69:16 70:11,20
78:23 79:8,13
79:20,21 80:2
90:22 91:10,24
91:25 92:8
95:2 133:8,13
133:23 135:14
135:20 141:10
141:17,24
142:9,19,20,23
143:3,7 148:17
149:5,8 151:23
153:14 154:14
178:23 182:23
183:2,4,8,15,24
184:3 187:4
188:7,8,9,15
189:12,20
190:12,19,23
190:25 191:3

191:20,24
199:9 209:8
226:24

**moneys** 19:14
21:24 26:8
41:2 43:8 48:5
51:6 62:4
133:25 134:2
178:20 179:13
180:20 192:9
192:13 202:9

**monies** 19:9

**month** 24:18
25:9 32:11
33:10,17,19
35:5 44:13
49:21 52:2,3
100:5,7,13,21
100:25 188:13
209:11,12

**month's** 154:22

**monthly**
209:10

**months** 134:22

**morgan** 1:18

**morning** 7:24
7:25 8:6,8,14
8:19 196:3
208:3

**mortgage** 72:6
72:9 77:7,9,12
77:14,15 79:19
80:6 130:14

**mortgages** 72:3
**motilal** 81:24
  82:4
**motion** 221:11
**motor** 1:5,18
  3:13,18 40:14
  49:20 58:3,16
  58:20 67:18
  69:22 70:12
  88:15 123:10
  150:12,17,22
  150:25 161:24
  168:20 169:2
  170:3 215:17
  219:3,6 225:19
**motors** 1:4,15
  1:15,16,16,16
  3:7 4:7,8,8,9
  7:7 8:11 43:2
  69:20,21
  116:23 122:15
  123:16 124:5
  126:2 141:22
  151:24 175:21
  175:22,24
  178:7 194:5,16
  196:15 197:10
  197:17,25
  200:6,17,25
  201:6,11
  202:23 203:18
  204:18 206:21
  207:2,18,20
  208:5,15,19,25

  210:14 212:2
  212:15,23
  213:7 217:19
  225:13 226:6
  228:2
**move** 205:7
**multiple** 12:4,7
  14:3

**n**

**n** 3:2 4:3 5:3
  19:2,2 72:20
  81:23 110:18
  223:2,2
**n.a.** 1:18
**name** 7:12
  72:12,14,15,17
  73:24 78:8,8
  108:16 117:16
  124:2,6 130:14
  136:9 137:13
  137:14,17,20
  162:20 174:19
  175:25 193:11
  204:5,8 228:2
  228:3
**names** 128:3
  130:11 131:6
**narrow** 134:20
**nassau** 83:17
  95:20 102:9
  105:8 184:8
  218:6

**national** 94:15
  94:15
**nature** 199:4
**necessarily**
  19:20
**necessary**
  159:2,5
**neck** 217:18
**need** 9:19,23
  11:8 14:17
  16:5 17:23
  24:21 47:4
  85:17 119:15
  159:9 160:23
  165:10 193:20
  196:7,9 215:22
  220:23
**needed** 10:16
  54:8 111:2,3
  112:20 113:5
  135:10 159:7
  159:11,12
  160:20 183:5
  185:12 195:8
  195:23 196:7
  197:3
**negative** 36:24
**negotiate**
  119:21 204:4
**net** 60:9 133:24
**netted** 62:16
**network** 149:9
  158:4

**never** 21:21
  22:4 37:13,19
  79:14,15,24
  80:4,6,6 84:4
  98:15 127:24
  160:2 172:2,4
  174:16,23
  210:4
**new** 1:2,23 2:13
  3:5,20 4:11
  7:11,18 19:4
  36:6 39:23
  81:2,9,17,20
  83:16 95:20
  107:15 115:2
  116:8 221:2,3
  223:4,22
  224:22 227:6
  228:1
**night** 12:20
**nissan** 102:6,23
  104:16 105:14
  107:19,21,24
  108:19,24
  109:23 225:8
  226:20
**normal** 118:3
  134:5,13
**north** 49:19
  58:20 67:18
  69:21 70:12
  88:14 150:12
  153:25 154:18
  155:5 156:13

156:22 161:24
168:20,25
170:2,2 225:19
**northshore**   1:5
1:18 3:13,18
10:24 11:5,16
19:10,13,19
20:18,20,24
21:4,23 22:6
24:4,10 25:9
25:19,25 26:8
26:13,15,22
27:5,9,13,25
28:8,11,20
29:2,6,10,16
32:3 39:2
40:14,17 42:13
43:2,5,7,11,12
43:21 47:17
48:7 52:4,12
53:21 58:3,10
58:16 60:4
61:7,22 66:22
67:13,25 68:5
68:12,14,15,18
68:22 70:23
71:10 80:14
84:5,7,24
85:14 86:10
100:22,23
111:4,8 123:10
137:23 138:19
138:20,22
139:18 140:21

140:24 141:22
145:23 146:17
147:14 149:23
150:17,22,24
151:4,24
154:20 156:2
157:3,11,15,20
158:9,12,23
160:3 161:8
174:3 178:7,16
178:21,25
179:9,12,13,18
180:11 181:8
181:12,13,16
181:17 182:2
185:6,8 187:19
188:22 189:17
190:21 191:4
199:6 210:25
211:9 212:2,15
212:23 213:7
215:17 216:6
219:3,6,18,19
226:22
**northshore's**
44:14 48:3
59:2 178:17
179:22 180:18
181:4
**northshorem...**
112:8
**notary**   2:13
6:15 19:3
223:22 227:5

228:25
**note**   77:11,13
77:14,21
**noted**   222:3
**notes**   66:19
**notice**   2:11
23:20 69:9
**novelty**   130:13
130:15
**november**
26:13,20 29:6
59:21 60:24
89:25 91:6
92:15,18 93:9
93:17 94:19
110:13 111:16
111:25 159:21
190:8 208:4,15
225:10
**novicky**   194:4
195:19 198:11
206:20,25
**number**   7:9
25:8 26:4
27:23 30:6,7
30:13,19,21
32:11 35:21,22
36:2,11 40:15
48:18 60:12
61:16 66:20
81:21 94:13
95:21 130:10
136:10 171:7
171:12,13,19

180:10 211:14
218:7,17
225:21
**numbers**   36:20
39:18 54:11
70:7 71:17
**numerated**
58:4
**numerous**
106:4
**ny**   3:9,20 4:11
4:16,20
**nyc**   1:14 89:11
89:15,20
149:10 153:8
153:12,21,25
154:5,12,15
225:6
**nytlr**   91:4

---

**o**

---

**o**   19:2,2 81:23
81:24 223:2
**o'sullivan**
21:18,21 22:5
32:25 112:17
174:20,23
178:19,22
181:3 184:4
**oast**   4:7
**oath**   23:6
223:10
**objection**
128:22 166:5

**[objection - orally]** Page 32

204:19 207:5 220:3

**objections** 6:10

**obligated** 20:24 43:5 77:9

**obligation** 27:14 77:16,19 145:11

**obligations** 27:10 99:8 190:7

**obtain** 24:7 58:10 67:24 106:13 125:12 145:21 148:8 165:3 194:11

**obtained** 24:3 81:14 89:19 150:17 179:19

**obviously** 113:19

**occur** 173:25

**occurred** 26:19 80:6

**occurring** 133:21

**october** 24:18 25:19 31:9,19 33:12,12 35:6 48:16 49:21,25 50:19 51:2,8 51:16 56:3 62:14 110:19 111:11 124:10

126:22 164:22

**offer** 199:9,13 199:18

**offered** 185:17 185:20

**offhand** 59:7

**office** 71:10,14 81:2,10 98:12 102:10 182:13 206:2,4,5,6,9 224:23

**officer** 132:2,3 186:9,15,24

**offset** 179:12

**oh** 72:16 87:7 105:3 118:6 122:25 126:23 184:6 193:23 209:15

**okay** 9:2 10:11 10:21,22 11:14 11:20 15:6,13 16:13,17 17:21 18:16 20:7,16 20:16 23:19 25:4 32:8 40:19 41:18 42:25 45:24 47:24 49:12 63:8 67:16,24 79:15 81:18 82:7 106:24 123:2 137:7,13 138:8 141:24

151:18,21,23 166:24 168:6,9 172:16 173:18 193:23 203:9 203:13 207:25 210:23 216:20 218:15 220:7

**old** 77:23 78:5 107:11,13

**ones** 84:6 131:2

**online** 34:11 41:7 114:9,15 114:18 149:23 160:10

**open** 145:25 146:5 195:24 196:13 197:3 210:25 219:18

**opened** 156:24 157:6 181:16 196:25 204:23 204:24 205:21 207:3

**opening** 157:2 157:10 194:4 194:10,15 195:8 199:10 199:15,20 211:16 217:17

**operate** 55:18 114:3 120:9 121:22

**operating** 24:16 40:17

55:19 117:9 119:13,16 120:15,18,19 120:24 134:5 134:12,15,23 134:24 145:23 157:16 158:23 159:9,15,18 160:3,5,9,16 161:22,23 162:5 163:22 164:21 165:9 165:10,17,23 166:3 168:19 168:25 169:6 170:17 188:16 207:18 211:25 213:8 214:15 219:20,24 225:17,19

**operation** 21:9

**operations** 29:11 140:9 155:4 156:3 157:20 158:8 158:12

**operator** 21:8 21:15

**opportunity** 123:4 161:16

**opposed** 185:16

**oral** 170:11

**orally** 65:13

**order** 2:11 19:15 24:7 65:8 67:5,11 81:20 82:13,21 105:6,13 146:20 147:8 147:15 154:24 159:13 163:20 165:3 187:21
**ordinary** 139:24
**original** 98:8
**originally** 153:15 178:2,7
**origination** 152:10
**outcome** 227:18
**outlet** 69:23
**outside** 121:17
**oversaw** 55:15
**oversight** 55:15
**ovington** 4:19
**owed** 21:24 43:21 68:13 72:6 91:25 133:23 178:20 179:13
**own** 64:25 71:6 74:17,23 75:18 75:22 76:21 77:2 78:12 101:5,6 118:5 119:12

**owned** 30:10 43:10 74:12 82:25 84:7 104:15 117:4 170:3
**owner** 21:8,10 21:15 84:15,21 84:24 85:5,24 86:7,13 88:14 95:13 96:8 97:15 124:12 124:15,17,20 124:23 125:4,7 125:18,19 142:5 165:23 181:12 200:17 201:11,25 202:14,19,23 203:5 210:14 210:18 212:9 212:11,15,17 213:5 214:20 215:23 216:3,5 219:19,24 226:8,22
**owners** 97:20 166:7
**ownership** 75:8 75:10,12,15 84:5 97:17 116:23 121:2 163:23 166:17 175:20 200:25 201:5 207:19

212:23 213:24 215:3 219:6,8 219:16
**owning** 74:19
**owns** 72:25 75:5 78:17 219:2,4

**p**

**p** 3:2,2 4:3,3 5:3,3 58:16 59:8,14,16
**p.c.** 4:5
**p.m.** 194:22 207:10 215:8 216:17 217:22 221:25 222:3 224:19 225:23 226:10,11,13
**packet** 23:15
**packets** 171:5
**page** 24:16,17 40:13 41:13 49:24 51:15 56:2 57:16 58:20 64:16,21 65:20 80:25 84:11 88:12 93:8,8 94:18 94:18 97:22,25 98:2,2,3 99:11 102:18,19 110:9,20,21 123:25 124:4

137:2,25 138:9 138:15 139:15 140:15 150:10 162:14 163:3 166:10 169:10 169:13,14,21 171:6,9,25 172:14,21 203:11 216:24 224:3,9 225:4 226:4,16 228:5
**pages** 98:4 197:14
**paid** 21:25 26:8 28:13,21,22 30:2 53:5 62:4 62:7,22 63:4 77:14,15,20 78:23 88:19 93:4,14,24 99:21 101:2 133:23 142:5 152:25 173:11 173:12 175:2,9 178:13,15 179:7,18,22 180:11,13,14 190:6 191:10 191:19,21,24 226:24
**paper** 34:11 210:7
**paperwork** 111:7

**paragraph**
84:10,13 99:11
139:17 140:15
218:22
**paralegal**  5:8
5:10
**park**  4:10
**part**  13:2 68:11
87:3 93:3
130:5 132:20
**particular**  90:5
92:8 110:3
129:18 149:7
172:13 177:14
179:7 180:9
**parties**  6:5 12:4
12:7,22 13:4
14:3,5 101:16
218:25 227:16
**partner**  9:21,25
10:14 217:18
**partners**  1:17
93:18,22
152:18 200:22
**party**  20:8
76:15
**pass**  104:2
**passed**  77:4
**passing**  104:6
**past**  91:25
**pay**  26:16,23
27:5 28:15,16
28:20 29:2,7
29:12,18 30:14

31:8,16,25
32:12,15,16
38:25 41:8
43:5,7 46:5
48:7 56:17,19
62:18 77:9,17
77:20 100:12
100:17 142:13
142:17 153:20
153:21 173:20
178:18,18,20
179:21 180:6
180:22 181:4
187:21 188:17
190:9,19,24,25
191:4,7 209:8
**payable**  67:18
72:3
**paying**  27:13
31:3,4 47:17
48:4 52:10
56:15 97:19
99:4 190:5,7
**payment**  93:16
99:12 154:24
156:7,22
**payments**
61:24 156:8
191:10,13,16
205:8 209:10
209:14
**payoff**  179:3
**people**  67:6
127:16,20

128:21 131:5,8
131:13 160:20
160:24 183:3
**people's**  128:2
**percent**  107:6
152:22,24
161:4,4 162:20
162:21 166:18
169:18,19
170:3,4,5,14
200:17 201:10
201:25 202:8
202:14,19,23
207:19 208:4,6
208:15,19,23
210:14,18
212:9,10,15,16
213:5,25
214:20,21
215:22 216:3,5
216:11 218:24
219:3,5
**percentage**
160:24
**percentages**
161:9
**performance**
92:21,23 93:10
**period**  52:5
187:8
**permission**
9:19,23 10:16
**person**  130:8
172:18 183:7

**personal**  66:4,7
140:5
**personally**
90:25 119:23
177:4 181:14
**persons**  204:2
**phone**  65:15
92:6,9,11
201:19,20
**phrase**  11:13
**pick**  163:16
164:11,12
**picked**  98:13
**picture**  9:11
172:23
**piece**  75:6
**pin**  28:12
**place**  2:12
79:21,21,24
**plaintiff**  81:24
**plaintiff's**
54:25 210:21
**plaintiffs**  1:10
2:9 3:7,13 8:5
8:10 220:19,21
221:16,17
**plan**  11:3,7
21:24 32:9
70:20 84:14,25
85:20,24 86:17
100:18,21
101:2,4,6
146:8,11 178:4
178:10 179:4,7

**plans** 21:19 135:2,3,7

**plate** 177:18

**plates** 177:15 177:19,20,23

**plaza** 1:22 3:4 7:18

**please** 7:20 22:19 57:2 58:15 78:4 87:21 96:15 102:19,20 107:22 108:21 109:7 111:12 112:12 116:15 122:11,22 132:8 135:24 136:15 144:18 150:3 162:3 170:21 196:6 196:19 207:19 215:19,21

**plus** 36:15,15 53:12 54:6 187:20 197:9 209:12 226:5

**pocket** 198:15 198:21,25

**point** 10:20 29:21 31:22 42:25 61:2 66:23 67:3 68:25 69:2 70:3,25 74:7

85:8 86:4,15 87:2 101:10 111:24 114:12 114:13 115:14 115:21 124:16 125:9 131:15 133:20 134:15 146:12 157:5 159:8,17 178:12 207:24 208:17 216:8

**police** 132:2,3 184:7,8,11,23 185:21 186:3,9 186:15,24,25

**policy** 177:12

**portal** 19:15

**portion** 179:11

**position** 142:2 181:23

**positive** 36:11 36:15 37:4

**possession** 176:13

**possible** 181:3 217:4

**practice** 2:10 221:11

**precisely** 10:20 135:8 157:14

**premier** 1:16 116:23 122:14 123:16,23 124:5 126:2

225:12

**preparation** 37:17,23

**prepare** 37:25 59:14 60:4,20 65:5,8 113:5 159:18

**prepared** 32:24 59:9,13 160:5 164:24 165:9 212:4 213:16 213:17 214:8,9 214:16

**preparing** 59:16

**present** 5:5 80:11 82:3 106:2

**presented** 25:13,22 26:4 33:23 36:14 37:3,12 38:8 39:19 40:12 49:11 68:16 102:2 104:23 105:2,17,22,23 143:23 161:17 171:4

**presenting** 75:7 102:11

**presumably** 111:18 192:16

**presumes** 10:16

**pretty** 107:10

**previous** 88:5 193:18 200:20 215:20

**previously** 23:7 56:14 83:14 89:3 90:9 100:19 110:25 118:21 127:14 141:2 154:4 194:2 195:6 198:8,9 199:25 200:4 201:8 210:21,24 217:19

**price** 99:12,19 100:11 140:2,7

**primary** 157:19

**printout** 149:21

**prior** 26:13,14 26:19 29:6 52:2 83:23 97:20 148:13 160:2 166:3 201:16

**pro** 4:14 8:25

**probably** 59:23 59:24,24 60:5 60:7,18 70:11 131:19 140:15

**problem** 29:14 167:9,14,17,19

167:20,21 168:2,3,4,4,6

**problematic** 170:13

**problems** 29:20 29:22 31:22,23 134:3

**proceed** 11:21

**proceedings** 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 102:4 193:7

**proceeds** 46:21 50:8 56:22 205:9

**process** 182:22 183:2 211:16

**produce** 110:6

**produced** 87:8 97:23 150:9 172:11 181:23 218:20 226:15

**production** 88:23 109:4 181:21,25 209:17 226:24

**profit** 24:16 25:5,9,18,24 31:10,19 32:18 36:23,23 58:21 59:7 60:10 61:12 88:6,10

88:11 188:19 188:22 189:7

**profitability** 48:13

**profitable** 48:17

**profited** 61:7

**projections** 188:12

**proof** 209:13

**properly** 183:11

**properties** 119:20,21

**property** 72:11 73:10,14,16,23 74:4,20,23 75:6,13,14,18 75:22 76:4,6 76:14,22 77:3 77:8,22 78:7 78:13,21,24 79:9 82:24 95:10 96:8 142:6

**provide** 10:24 11:4,16 65:7 89:5 101:6 127:9 138:22 159:13 173:8 181:24 197:2 205:19 212:19 217:5

**provided** 11:3 11:6 19:9 20:17 21:5 23:17 24:2 34:9,18,20,23 34:25 35:3 36:9 38:7 49:9 57:15 59:2 60:16 64:17,24 68:11 83:13,16 85:3 90:11,13 96:25 106:24 107:3 110:8 125:16 136:7,9 158:7 162:10 170:7 171:24 198:4 214:25 217:3 219:15

**providing** 20:8 20:10 24:6 65:3 80:13 140:20

**public** 2:13 6:15 19:4 118:4,7 206:13 223:22 227:5 228:25

**publically** 115:11

**publicly** 115:4 206:11

**puccio** 57:24 58:6 88:8 195:12 196:18

198:18,21 199:2,10,14 200:21 201:2,4 207:17 208:14 210:12,17 211:15 215:15 215:21 216:22 217:12

**pulled** 102:9

**pulling** 36:17

**purchase** 10:25 11:5,17 19:10 19:16,22 20:19 21:5 55:11 79:9 95:10 96:23 97:9,18 99:2,12,19 100:11 101:2 102:6,22 109:22 118:14 140:2,7 143:25 145:3,6,13 209:9 225:7,8 226:25

**purchased** 20:20,22 55:10 70:19,24 73:16 73:19 76:8,11 76:16 98:24 99:3 172:15 178:6,9,10 182:7 208:5,18 208:23

**purchaser** 79:8 139:22

**purchasing** 99:18

**purpose** 68:4 100:17 133:5 135:15 139:25 140:9,24 141:25 142:7 145:20 185:12 194:10

**purposes** 84:25 85:6 140:4,6

**pursuant** 2:9 104:14

**pursue** 163:20 192:17

**pursuing** 192:20

**put** 29:15 32:21 33:10 40:20 43:20 56:20 62:13,20 63:3 63:7 64:23 151:17 153:15 177:20

**putting** 33:4,7 33:14 45:17 182:3

**q**

**question** 6:11 10:8,10 11:4 11:10,13 19:17

20:2,3 22:2 26:25 27:3 28:23 31:25 56:19,20 61:15 61:19 62:25 67:8,22 75:17 107:22 108:21 109:15,20,25 110:3,7 113:23 119:3 128:23 143:14 164:4 164:10,12 167:11,13,21 173:19 178:5 182:24 188:6 191:2 217:15

**questioning** 9:14

**questions** 9:18 14:4,6 15:8,11 15:16,18 192:25 193:17 220:4,6,22

**quick** 195:3 217:15

**quite** 27:3

**quote** 84:16,17

**r**

**r** 3:2 4:3,14 5:3 72:20 81:15,23 227:3

**rahman** 72:19

**raise** 22:18

**ran** 30:10

**rarely** 206:14

**reach** 44:17

**read** 83:21 101:7 111:20 140:12 207:13 223:9

**reading** 219:10

**ready** 195:5

**real** 81:16 117:24 118:3 118:19,22,23 118:24 119:8 119:12,15 120:6 127:7 143:8

**really** 39:3 53:4 121:7

**realty** 1:8 3:17 41:20 117:20 117:21,23 118:10,16 119:10,13,16 119:19,24 120:9,15,18,25 121:8 122:3 130:13

**reason** 26:3 31:3 42:17 45:19 47:6 56:12,13 69:11 70:4 158:25 173:19 174:14

185:9,15 192:19 228:5

**reasonable** 187:24

**recall** 24:6 27:16 30:8,16 31:21 39:22 40:2,16 42:8 44:24 45:3,7 59:6 65:3,16 72:23 82:19 83:19 87:15,17 87:19 88:7,12 90:5 91:19 110:22 114:12 114:13,14 116:2,3 117:13 119:14 123:12 123:22 125:8 127:17 128:12 131:22 136:11 148:11,12,15 154:17 156:21 156:25 157:2,9 157:10,25 160:17 165:9 170:9,10 183:21 187:10 189:14 199:7 201:7,15 205:11 208:11 216:9 218:10 219:14

**[receipt - remained]**

**receipt** 196:10
**receipts** 136:19
  225:14
**receivable**
  66:19 67:19
  178:25
**receivables**
  179:2,11
**receive** 19:13
  19:14 111:7,18
  211:10
**received** 9:9
  60:20 111:12
  121:16 123:7
  139:22 195:7
  205:23 207:21
**receiving** 19:21
  110:22
**recently** 105:5
**recess** 193:5
**recognize** 24:4
  89:23 97:11
  102:6 123:18
  136:21 137:11
  161:18,20
  169:5 186:11
  221:7
**recollection**
  30:12 70:6
  91:9 172:18
  179:6,9
**record** 7:3 17:2
  17:25 18:19,21
  18:23,25 22:10

22:12,14,16
34:2,4,6,8,14
35:3 36:17
39:7,9,11,13
48:22,24 49:2
49:4 54:15,17
54:19,21 57:2
57:4,6,8 63:10
63:12,14,16
80:17,19,21,23
83:6,8,10,12
87:21,23,25
88:3 90:10
96:15,17,19,21
101:19,21,23
101:25 109:6,9
109:11,13
116:15,17,19
116:21 122:22
132:8,10,12,14
135:24 136:2,4
136:6 139:7,9
139:11,13
144:18,20,22
144:24 149:14
149:16,18,20
158:17,19,21
168:11,13,15
168:17 170:21
170:23,25
171:3 175:12
175:14,16,18
193:2,4,9
220:11,12,14

220:16 222:2
223:12,13
224:11 227:12
**recorded** 81:17
  201:21
**recording**
  81:19
**records** 24:7
  43:24 68:2
  86:23 87:4
  179:11
**recover** 69:3
**redemption**
  84:16,22 85:18
  86:15
**reduce** 179:2
  180:15
**reference** 145:2
  145:7 184:2
  193:18
**referenced**
  41:20
**referencing**
  144:25 217:8
**referred** 57:10
  80:5 198:18
**referring** 58:13
  134:16 164:6
  174:20
**refers** 217:19
**reflected** 71:17
  161:9 165:24
  190:2

**reflects** 101:15
**refresh** 70:6
**regard** 30:16
  31:7 65:17
  85:4 95:22
  146:17 172:12
  172:15 174:25
**regarding** 58:3
  92:5 111:4
**regards** 61:19
**register** 81:3,11
  82:22 224:24
**registered**
  176:16,17,18
**registration**
  176:23
**regular** 26:16
  140:6 189:16
  189:22
**regularly** 26:23
  27:6 28:20
  29:3,7,12,18
  32:4
**related** 15:11
  42:18 87:4
  227:14
**relates** 63:19
**relationship**
  126:2 130:17
  130:20
**relied** 33:22
  75:6 80:13
**remained** 181:5

**[remember - right]**                                                    Page 39

| remember | repayment | representing | responsive 87:9 |
|---|---|---|---|
| 25:10,11,12,15 | 192:9 | 25:13 99:23 | rest 92:3 |
| 27:15,18,22 | repeat 67:8 | 100:5 105:10 | restart 135:12 |
| 28:9 29:23 | 147:24 178:5 | 210:3 | restraining |
| 30:15,19,20 | rephrase 62:25 | represents | 67:5,11 146:15 |
| 65:19 66:9 | report 65:18 | 43:13 46:20 | restrictions |
| 70:3,25 73:18 | 184:11 186:25 | 61:7 139:19 | 146:21 |
| 76:20 86:25 | reporter 13:14 | 140:3 | result 53:10,22 |
| 110:2 113:16 | 22:17 23:2,5 | request 195:15 | 67:10 97:18 |
| 113:25 115:22 | 119:5 221:12 | 195:18 | 125:10 |
| 128:16 129:4,7 | 221:18 | requested | retail 117:7 |
| 129:10,13 | reporting 7:15 | 197:18 198:5 | return 84:14 |
| 130:11 131:6 | 228:1 | 212:21 | 88:19 111:13 |
| 131:23 145:16 | represent 7:22 | requesting | 161:7 164:22 |
| 148:4,10 154:3 | 14:19 23:16 | 196:15 | 193:7 |
| 164:25 170:15 | 34:17 35:2 | required 79:13 | returned 90:13 |
| 170:19 182:21 | 43:15,19,25 | 100:13 159:14 | 98:15 113:20 |
| 186:21 188:23 | 49:7 55:21 | requirement | returns 66:21 |
| 189:25 190:17 | 81:13 89:18 | 140:18 | 88:24 163:19 |
| 191:18 194:9 | 96:24 101:8 | requires 79:4,9 | 163:23 165:20 |
| 205:22 216:7 | 123:6 162:8 | reserved 6:11 | 165:21 181:7 |
| 216:12 218:12 | 171:22 172:10 | residence 71:21 | 189:15 190:3 |
| remembered | 187:11 193:14 | 71:25 74:12 | 213:11 214:6 |
| 109:18 | 201:10 | 77:23 | 226:17 |
| repaid 21:14 | representation | resolution | review 34:10 |
| 68:18 187:5,9 | 25:23 215:2 | 203:14 | 101:11 123:4 |
| 188:13 191:23 | representative | respective 6:6 | 136:8 161:17 |
| repay 20:24 | 1:6 58:9 | respond 111:21 | reviewed 9:14 |
| 21:4,23 22:7 | represented | 111:22 | right 9:3 11:21 |
| 30:18 68:22 | 24:2 31:9 | responded | 11:23 17:20 |
| 192:12 | 49:10 58:8 | 208:2 | 18:5,6,9,11 |
| repaying 188:8 | 74:11 102:5 | response 9:20 | 22:18 23:21 |
| 188:9 | 202:18 204:15 | 10:13 23:18 | 25:17 27:3 |
|  |  | 45:5 215:20 | 32:9,10,24 |

33:15 35:23
40:10 44:12,13
49:8 55:13,22
59:22 66:24
76:2 77:5 79:5
84:4,7,16,22,23
85:17 86:14
90:7 93:16
99:16 103:12
103:16 105:11
112:7,9 119:5
129:11 137:2,3
139:2,3 155:13
160:22,25
162:18 163:11
165:15 171:14
176:12 181:19
186:17 187:13
191:17 216:23
**rightful** 97:14
**rights** 75:9,10
75:12,15,16
**ring** 101:10,11
106:6 108:15
**risk** 68:8
**rob** 196:5
208:3 217:23
**robert** 1:4 3:8
5:7 8:12 57:24
195:12 198:18
198:25 199:10
200:21 207:16
208:2,14
210:11,17

211:15 215:15
216:22
**ron** 104:12,14
104:19 105:18
105:21 106:8
106:10,11,16
107:17,23
108:10,13,15
108:18,20,22
109:22 110:5
226:19
**ron's** 106:14
**ronneburger**
4:21 8:18,19
14:18,23 15:10
15:24 193:10
193:12,25
194:18,24
197:6 202:25
207:6 209:16
218:18 220:5
221:19,21
224:5
**room** 18:10
186:7
**rooms** 18:12
**roslyn** 1:16 4:9
**rough** 9:12
**roughly** 66:18
**route** 1:8 3:17
**ruderman** 3:21
7:23 8:2,3
11:24 12:13
13:18 14:12

15:4 16:3,10
16:18 17:22
18:14,18 19:7
22:9,25 23:9
33:25 39:6
44:4,9 48:21
54:14 56:25
63:9 64:7
80:16 81:6
83:5 87:20
88:25 96:14
97:6 101:18
102:20 109:2
116:14 122:10
122:21,25
132:7 135:23
136:14 139:6
144:17 149:13
150:2 158:14
161:11 162:2
168:10,22
170:20 171:16
175:11 192:23
193:6 224:4
**ruination**
133:21
**rule** 9:15 12:16
12:17
**rules** 2:10
**ruling** 17:24
18:2
**rulings** 9:7
**run** 16:21,22
120:12

**running** 16:22
135:13,17

**s**

**s** 3:2 4:3 5:3
41:19 81:15,23
203:5 226:8
228:5
**s0950** 171:7,11
**sad** 14:22
**safe** 98:11
182:10,11,23
183:4,8,15
**safes** 182:17
**sage** 3:7 5:8,10
8:9
**salaries** 189:23
**sale** 46:20,21
102:5,22
105:14 118:9
136:18 225:8
225:14
**sales** 1:4 3:8
8:12 35:15,19
36:2 119:22
147:13
**salesperson**
182:9
**sara** 5:6 162:21
212:10,16
214:21 219:4
221:3
**sarah** 1:13 4:6

**[satisfied - send]**

**satisfied** 99:7
**satisfy** 27:10
  32:3 174:4
**saw** 42:2 44:16
  64:2 165:22
  210:4
**saying** 26:21
  27:24 28:24
  32:25 37:10
  43:23 44:18
  53:10 54:4
  61:18,20 62:9
  64:22 74:16
  111:12 123:22
  124:7 129:2
  163:24 164:2
  167:8 192:12
**says** 24:25 25:5
  31:11 35:14
  56:6 58:13
  74:23 84:13
  99:15 100:4
  110:18 112:12
  123:25 137:13
  150:21 162:17
  163:7 166:9,19
  169:18 171:13
  171:14 196:3
  197:15,16
  198:14 200:16
  203:14,17,20
  204:2 216:3
  217:2 218:2

**screen** 102:17
  139:16 161:16
**scroll** 35:8
  58:19 93:7
  94:17 154:21
  162:13 212:7
**scrolling**
  102:17
**se** 4:14 8:25
**sealing** 6:7
**search** 86:22
  87:4 114:25
  115:7,8,17
  175:24
**second** 4:20
  10:23 35:22
  37:19 38:9,10
  41:13 56:8
  58:19 64:21
  80:17 92:14
  110:21 139:7
  172:13 181:20
**security** 132:4
**see** 17:12 23:23
  24:19,21,24
  25:2,2,6,20
  27:13 34:12,19
  35:6,14,15,19
  36:2,25 41:18
  41:22,23 42:7
  42:9 44:6
  46:10,17 47:13
  49:21 50:5,20
  51:3,10,17,24

  51:25 52:6
  53:2 55:23
  56:3,10 57:17
  57:25 58:15,16
  58:22 60:10
  64:18,19 65:22
  73:11 86:23
  89:8 92:21
  93:11,18 94:19
  94:23 98:2,3,4
  99:13 103:2,2
  104:8 114:15
  123:16 124:2,7
  124:13 133:11
  137:3,8,14,17
  137:18 138:10
  139:17 140:10
  147:7 149:11
  150:10,14,21
  151:8,9,10
  152:18 153:8
  153:12 154:23
  155:9 156:18
  158:4 162:8,10
  163:8 167:4,9
  167:13,17
  169:7,15,24
  171:7 172:21
  172:22,23
  173:13,14
  188:12 193:20
  196:19 200:18
  202:10 203:15
  203:18,23

  211:24 215:19
  215:21 216:23
**seeing** 38:10
  41:25 123:18
  123:22 136:12
**seek** 211:5
**seeking** 133:8
**seem** 155:9
**seen** 37:13,15
  37:20 39:20
  42:4,5 63:24
  64:4 81:3
  172:2,4,5
  206:22
**sell** 32:12,14
  43:10 48:3
  52:24 107:18
  107:20,24
  108:18,20,23
  118:2 226:19
**seller** 78:19,20
  79:8,12 99:19
**seller's** 102:25
**sellers** 99:24
  100:6
**selling** 26:18
  28:3,4 31:5
  48:9 52:18
  53:11,16,22
  54:2,7 61:21
  62:6 146:3,6
**send** 44:17
  65:14 90:21
  92:3 114:10,11

**[send - sit]** Page 42

196:2,5 218:10
**sending** 58:14
  65:17
**sense** 149:10
**sent** 9:11 59:4
  131:3 210:11
  212:14
**september**
  40:15 41:3,15
  46:10,13,25
  47:11 62:14
**series** 23:16
  49:5
**serious** 103:20
**seriously**
  103:17
**served** 123:8
**services** 122:14
  123:8,15
  125:16 225:12
**set** 227:9,19
**sets** 221:16
**settle** 180:13
**settled** 166:17
**seven** 12:3,5,8
  12:12,14,20
  13:12,13 14:4
  14:9 15:25
  84:11,13
  191:14
**several** 144:7
  144:11 197:14
**severely** 67:14

**shanks** 3:12 8:3
**share** 44:5 64:8
  161:15
**shares** 99:18
**sharing** 92:15
  194:25
**sheet** 228:1
**sherack** 5:11
  7:13
**shore** 49:19
  58:20 67:18
  69:21 70:12
  88:14 150:12
  154:2,18 155:5
  156:13,23
  161:24 168:20
  169:2 170:2,3
  225:19
**short** 27:9,13
  119:22
**show** 24:22
  105:6,14
  118:13 149:24
  168:18 172:20
  198:7 199:24
  210:20 215:5
  216:13 219:16
**showed** 35:18
  36:16 37:4
  39:18 40:3
  88:11 123:9
  141:2 165:22
  188:21 212:23

**showing** 31:8
  36:3,5,8,14,24
  39:17 48:17
  96:22 163:23
  205:20 208:23
**shows** 24:15
  175:24 196:20
  209:18 213:4
  213:21,24
  226:24
**shut** 134:4,10
  134:11,25
  135:3,6
**side** 23:21
  24:25 49:8
  137:3
**sign** 98:13,15
  106:9,10,11,16
  111:13 125:6
  125:13 127:2
  159:18 170:8
**signature** 66:11
  82:16 98:11,21
  102:18,19,25
  103:2,6,9
  104:9,11,19
  105:18,21
  106:14 116:12
  124:6,7 138:10
  157:4,7,11,21
  157:23 162:15
  162:23,25
  163:4,5 169:22
  200:13 204:11

227:24
**signatures** 98:2
  98:3,4,9 137:8
  137:11,12
  138:2,3,12,16
**signed** 6:14,16
  98:11,15,17
  103:10 106:17
  108:18,22
  110:5 113:8
  123:11 124:5
  124:15,23
  137:22 138:18
  140:12 143:18
  144:3,5 163:7
  164:22 166:4,8
  166:9,10,13,20
  169:23 223:18
  226:19
**signing** 40:20
  55:14 167:5,9
  167:14 203:21
  204:15,17
**signs** 106:18
**silly** 123:2
**similar** 123:9
  123:20
**simply** 52:10
**single** 160:21
  160:23
**sir** 8:7 11:24
  15:5 19:18
**sit** 37:22 158:6
  180:4

**[sitting - statement]**

**sitting** 38:2 71:16

**situation** 78:10 217:6,7

**six** 115:14 189:7 191:13

**sixteenth** 138:15

**skimmed** 140:16

**skip** 46:24 47:10

**small** 160:24

**smithtown** 1:16 4:9

**sold** 26:9,24 27:23 31:17 43:2,6,11,16,19 43:25 45:16 46:4,7,22 47:18,21 50:8 52:11,17,22,22 52:23 53:7,12 53:24 54:8,11 56:15,16,21,23 61:5 62:22 63:6 173:22

**sole** 31:3 38:16

**solely** 86:14 140:4

**solemnly** 22:20

**somebody** 58:14,25 60:3 78:17 115:13

118:8,12 128:25 185:14 185:16 206:12

**somewhat** 41:14 156:2 189:5

**son** 176:9,15

**soon** 13:11 143:9

**sorry** 21:11 22:3 24:19 25:11 28:2 37:7 41:10 44:4,6,10 62:24 64:8,16 67:20 74:2,4 76:24 77:5 107:13 108:5 119:4 120:17 123:2 124:25 137:7 147:24 151:3 167:12 172:3 176:25 202:4 215:23

**sort** 139:4 146:19 147:22

**sought** 210:25

**sound** 187:13 191:17

**space** 71:5

**speak** 14:20 115:23,25 185:23 186:2 210:8

**speaking** 119:6

**specific** 30:6 126:20 128:2 133:15

**specifically** 25:11 29:23 165:3 203:10

**speech** 198:22

**spent** 15:24 16:2

**spoke** 115:21 122:6 147:11

**ss** 223:5

**stamp** 34:20 49:8 55:22 57:16 64:18 150:11 162:9 169:11

**stamped** 40:12 169:8 171:25 197:15 203:11

**stamps** 23:22

**standing** 96:2

**stapled** 34:10 171:5

**star** 92:20,23 93:10

**started** 16:24 26:18 39:23 66:25 67:11 82:14 95:16 105:7 120:25 192:8

**starting** 110:16

**state** 2:13 7:21 19:4 81:17,20 83:17 95:20 115:2 201:24 202:14 208:18 209:19 213:4 223:4,22 227:6

**stated** 28:10 86:12 99:3 125:17 200:21

**statement** 23:11 32:21 33:11,16 38:4 40:7,14 42:2 46:2 48:16 49:14 55:2 58:21 59:8,10 63:23 64:12,22 65:9,21,25 88:6,10 89:10 89:14,24 90:3 90:6 92:13 97:13 101:7 150:5,12,21 151:21 154:22 156:6 158:2 165:9 188:23 198:13,21 208:13,16,20 219:10,11 224:10,13,14 224:16,20 225:5,16

**statements** 44:12,15 57:11 62:5 141:3 149:22 205:24 206:20 209:15

**staten** 43:3,4

**states** 1:2 7:10 41:18 99:12 139:17 207:17 207:18 208:7 209:20 212:9 218:23

**stating** 60:9 108:23 226:19

**stephen** 58:14

**stipulated** 6:4,9 6:13

**stipulations** 6:2

**stock** 96:23 97:8,18 99:2 102:5,21 104:15 225:7,8

**stop** 105:14

**stopped** 120:24 191:16

**stops** 16:14

**street** 1:8 3:17 41:19

**suarez** 81:22

**subject** 58:5 215:16 221:10

**submitted** 24:13 115:16 116:8 125:23

133:10

**submitting** 202:17

**subparagraph** 139:25

**subpoena** 89:19 123:7

**subscribed** 223:18 228:22

**subsequent** 100:7

**subsequently** 208:5

**substance** 194:8

**sufficient** 29:11 32:17 188:15 190:9

**sufficiently** 188:4

**suite** 3:19 4:16

**summer** 26:19 27:4 28:25 31:5,16,17 32:5 39:2 48:2

**sunrise** 1:4,15 1:18 3:13,18 4:7,15 54:24 55:3,18 56:21 57:11 69:15,16 69:21,22 90:12 97:15 98:25 100:24 101:3 111:4,8 138:23

139:18 140:21 140:24 141:23 146:17 161:8 172:16 173:22 174:3 181:8,10 181:12,14,16 181:18 182:3 182:15 187:19 188:25 189:18 191:4 211:2 213:22 214:16 214:20 219:4,8 219:23 224:17 226:23

**superb** 1:4 3:7 7:7 8:11 69:7 69:10 93:4 141:18 194:5 194:12,16 195:9 196:5,15 197:10,17,25 200:6,17,25 201:6,11,25 202:19,23 203:18 204:18 204:22 205:24 206:21 207:2 207:17,20 208:4,15,19,25 210:14 217:19 220:19 226:5 228:2

**supplying** 84:14

**support** 181:23

**supposed** 91:16 141:22 146:4 178:20,23 179:2,12 190:6 191:20,24 192:12 205:6 205:10 209:6

**supreme** 81:20 95:19 105:7 146:14 218:5

**sure** 18:5,20 22:11 29:20 30:3 34:3 39:3 39:8 43:22 47:22 48:23 53:19 54:16 61:15,16 62:12 63:4 65:6 70:4 81:5 86:21 92:12 101:13 105:21 106:7 107:5,6,6 108:25 112:12 113:9 114:3,21 115:5,9,12 120:4,13,17 121:15 122:6 122:18 123:24 125:14 126:20 133:10 139:8 142:25 144:2 148:19,22 149:15 154:11

163:21 164:25 180:24,25 181:5 183:11 183:25 185:22 186:10 188:20 189:23 206:7 210:10

**surprise** 176:2

**susan** 2:12 227:5,25

**suv** 176:8

**swear** 22:20

**swore** 23:2,6 83:24

**sworn** 6:16 19:3 23:3 227:9 228:22

**syosset** 1:14 4:7 69:20 175:21 175:22,24 177:25

**system** 36:18 81:14,15 172:12

**t**

**t** 19:2 81:24 223:2 227:3,3

**take** 35:4,11,17 35:25 40:21 41:6,9,11,15 50:2 62:9 72:8 90:2 156:5 178:20,23

183:2,4,8 189:20 195:3 211:5 218:13

**taken** 2:8 15:23 23:7 46:6 52:12 62:6,15 62:22 67:6 178:3 193:5 223:9

**talk** 16:5

**talked** 147:3 181:9

**talking** 20:13 33:18 45:23,25 135:4 143:12 160:18

**talks** 104:6,7

**tammy** 5:10

**tangible** 70:18

**tarzia** 107:12 107:14,14

**tax** 24:17 25:5 25:19,24 36:24 60:10 66:21 88:19,23 161:7 163:19,22 164:22 165:20 165:21 181:7 189:15 190:3 213:10 214:5 226:17

**taxable** 88:15

**taxes** 88:19 163:18 198:15

**team** 1:4 3:8 8:11

**tell** 17:12 30:24 42:22 43:17,22 44:22 65:13 75:25 86:6 110:22 201:4 202:21 204:23 205:5 208:14 210:17

**telling** 31:20 53:15 146:24

**temporary** 67:5 67:11

**ten** 15:19,21 152:22,24 218:23

**term** 20:12

**terms** 98:23 107:7

**testified** 19:5,8 26:7 31:15 32:9 37:16 38:23 39:16 48:10 52:18 56:14 61:4 84:4 90:9 100:19 110:25 117:2 127:14 132:16 133:22 154:4 160:14 191:15 194:2 195:6 198:9,17 198:20,24

200:4 201:8 210:24 212:4 217:20

**testimony** 2:11 16:19 17:8 21:20 22:21 23:4 28:17 43:9 47:16,25 50:7 52:8 61:6 62:3,13 86:11 174:22 193:19 200:20 201:23 206:24 223:9 223:12 224:2 227:8,12

**text** 44:17 65:14 198:8,10

**thank** 17:22 18:14,15,16 23:9 64:7 109:5 110:7 112:13 136:15 192:24 220:7

**thing** 17:11 96:5 145:13 214:14

**things** 28:17 143:5

**think** 14:13 53:23,25 62:11 64:3 65:10 66:6 70:17 71:2 72:10 86:5 91:2 92:6

**[think - tony]** Page 46

92:11 94:12 96:6,11 98:14 98:22 104:25 109:24 120:7 122:9 134:8 138:24 146:12 147:16 148:7 149:4 151:17 157:5,23 159:7 159:11,22 165:6 166:2,15 167:25 168:3 180:16 181:19 182:16,20 186:6,23 190:18 191:14 192:7,14 199:8 212:21 217:9

**third** 55:25 56:8 172:21

**thomas** 1:14 218:3,8

**thomasson** 1:13 4:14,15 8:23,24,25 15:16,17 34:25 90:14,21 91:18 91:24 96:25 105:10,13 147:5,12

**thomasson's** 90:17 91:11 141:4

**thought** 69:3 166:24 190:8

**thousand** 36:15 156:2 187:20 189:5

**threat** 131:25

**threaten** 131:3 131:13,21

**threatened** 128:17,20,25 129:11 131:21

**threats** 128:9 128:13

**three** 84:11 88:12 156:8

**time** 2:12 6:11 7:3 14:9 16:16 16:19 17:8 21:3,22 22:6 25:25 26:12,14 26:15,22 27:4 28:8,19,25 29:6 30:14,18 34:25 38:9 39:20 41:24 42:4,4,10,12,14 52:5 64:2 66:23 67:3,7 68:21 69:7 70:10 73:6,7 73:17 74:6,13 74:17 75:19,23 76:14,16,19 78:13 80:14

97:24 100:8 102:11 103:18 110:22 114:2 115:14 116:3 119:6 120:19 123:24 124:18 128:10,15 129:9 131:18 133:9,19 134:15 139:20 139:21 142:16 145:21,24 146:13 147:2,4 147:22 150:16 151:2,5,16,19 154:10 157:21 159:17 160:6 165:11 174:23 175:5 180:9 185:4 187:9 192:17,21 193:21 202:21 210:16 214:24 221:24 222:3

**times** 29:10 114:21 205:15 211:20

**title** 74:5,18 78:11,16 81:23 124:12 130:14 203:17

**titled** 72:11 74:9 75:19 78:7

**today** 7:15 9:4 9:7 15:3,5 16:5 16:7 37:22 38:2 71:16 112:13 158:6 180:4 193:17 201:23 207:21 211:20 221:14 221:20

**today's** 7:4

**together** 9:22 10:2,15 32:21 33:4,7,11,14 34:10 64:23 112:4 117:3,19 121:9

**told** 21:17 44:25 53:17 65:11 85:11 92:2 135:20 148:23 149:8 160:19 174:16 175:23 185:18 186:5 200:21 208:10

**tom** 32:20 37:21 60:7,18 60:19 164:8 218:9

**tony** 69:7 92:25 141:21 142:13 194:3,14 195:19 196:3 196:24 197:2

197:18,21,24
200:7,22 201:5
201:9 205:3
206:14,25
209:3,8 210:8
226:24
**tony's** 9:19
**took** 46:22
61:20 139:2
142:17 157:8
183:14 187:3
187:18 188:7
190:12,20
**tools** 211:23
**top** 35:4 57:24
63:18 93:8
110:13,17
139:3 171:9,11
194:21 196:17
203:15 207:9
216:16 224:18
225:9,22 226:9
226:12
**total** 11:25 12:5
12:21 28:7
99:19
**totally** 196:20
196:23
**toward** 217:2
**towards** 134:21
135:9 158:8
**track** 17:7
30:11 41:2,5
172:12

**trade** 175:2
**traded** 172:16
173:17,22
174:4,4
**trades** 173:21
175:9
**transaction**
80:8 101:9
132:16 141:18
143:9 147:25
149:12 152:4
152:15,16
153:5,7,10
154:25 155:7
170:18 174:5
**transactions**
81:16 146:16
**transcript** 9:13
193:20 221:14
221:20 223:9
223:11 227:11
**transfer** 41:19
43:7 78:11,16
82:22 85:13
91:4 92:8,14
92:17,17,20
93:17 94:22
111:23 153:6
153:11
**transferred**
74:22 78:20
79:16 80:4
82:25 91:10
111:3 113:11

114:5 141:14
149:9 152:17
**transferring**
82:16,24
113:21
**transfers**
156:19,20
**transpired**
208:9 209:6
**trial** 1:24 2:7
6:12
**tried** 148:8
**true** 19:9 31:12
38:5 43:23
65:24 83:25
180:5 223:11
223:13 227:11
**truist** 172:25
173:2,5
**trust** 90:18
**truth** 22:22,22
22:23
**truthful** 24:13
**trying** 67:24
69:4 86:10
133:6 147:22
**turn** 136:25
**turns** 20:13
**twelve** 15:20,22
**twice** 137:14
**two** 9:13,17
49:24 110:9
111:17 114:3
137:8 141:13

160:20,23
162:15 170:17
171:5 208:9
217:24
**twofold** 220:4
**type** 27:24
29:22 71:13
140:6 148:9,13
**types** 172:6

**u**

**u** 81:23,23
110:18
**u.s.** 127:10
130:2
**ucc** 175:23
**uea** 1:16
116:23 122:14
123:15,23
124:5,15,20
126:2 225:12
**ultimately**
61:11 132:19
132:22 140:23
211:10
**umbrella**
176:24 177:2,6
**unable** 26:16
26:22 31:8,16
31:25
**unclear** 39:4
**under** 12:18
21:24 23:6
30:24 72:3,14

**[under - videographer]** Page 48

79:13 81:21 99:8 100:13 102:25 104:8 131:9 189:14 223:10

**undercapitali...** 133:19

**underneath** 204:5,8

**understand** 19:17,24 20:4 28:23 37:14 53:19 54:5 56:18 64:25 67:21 74:19 75:17 82:17 86:3,8 87:17 161:9 167:2,11 167:23,24 172:5 173:20 178:24 182:24 188:6 191:2 192:20 217:16

**understanding** 31:2 33:13 51:12 54:12 68:17 85:8 159:5 166:16 166:22 179:17 212:13 218:23

**unexpectedly** 103:14,17,23 103:24

**unfortunately** 103:24

**uniondale** 4:20

**unique** 78:10

**united** 1:2 7:10

**unpaid** 173:12 173:17,21 180:22 181:5

**update** 115:19

**upped** 100:16

**urgent** 207:20 207:23

**urrutia** 1:4 3:8 5:7 8:13 143:17,18 144:4,8,12 194:3,14 195:19 200:7 200:22 201:5 201:24 206:25

**urrutia's** 92:25 141:15 142:13

**use** 16:15 17:3 19:15,20,21 118:24 119:8 133:12 135:14 139:25 140:7 140:23 141:24 142:18 147:17 148:17 213:10

**used** 10:25 11:5 11:17 55:17 117:6 118:17 135:20 140:20

141:18 142:12 149:6 151:24 153:20,21,25 157:20 158:8 158:11 165:5,6 165:6 177:24 180:21 214:5

**using** 20:23 58:10

**v**

**v** 228:2

**valuations** 69:25

**value** 53:15

**values** 69:18 70:10

**various** 69:19 87:10 102:4 103:13 114:21

**vehicle** 172:13 172:15 173:12 173:13,17,21 174:25 176:12 176:14 178:2,6 179:8

**vehicles** 11:6 19:10,16,22 20:19,21,23 43:25 46:21 174:4 175:2,9

**venture** 217:17

**verbal** 205:17 209:5

**verbally** 45:11 84:18 205:6

**veritext** 228:1

**versus** 7:8 53:15 218:6

**video** 5:12 7:6 7:13

**videographer** 5:11 7:2,13 17:7 18:20,24 22:11,15 34:3 34:7 39:8,12 48:23 49:3 54:16,20 57:3 57:7 63:11,15 80:18,22 83:7 83:11 87:22 88:2 96:16,20 101:20,24 109:8,12 116:16,20 122:23 132:9 132:13 135:25 136:5 139:8,12 144:19,23 149:15,19 158:16,20 161:13 168:12 168:16 170:22 171:2 175:13 175:17 193:3,8 220:9,15 221:22

**violative** 147:14

**virtually** 220:25

**visible** 206:12

**void** 82:22

**volume** 188:25

### w

**w** 95:16 110:18 223:2

**wagner** 172:14

**wait** 46:12

**waiting** 17:25

**waived** 6:8

**walk** 182:25

**walker** 4:12 8:14,15 24:22 44:8 128:22 166:5

**wang** 94:23

**want** 18:8 35:17 53:18,18 82:2 109:16 128:21 203:10 215:14 217:25 221:13,19

**wantagh** 4:16

**wanted** 109:19 118:8,12 128:25 163:21

**wants** 128:18 202:7

**warranties** 180:10,22

**warrants** 139:19 140:3

**warranty** 179:18

**water** 18:8

**way** 18:9,13 47:8 48:10 52:20 54:2 72:18 74:25 75:5 97:23 115:15 195:11 227:17

**we've** 17:5 102:11 156:7 211:19

**wednesday** 111:16

**week** 51:24 187:21

**weekly** 187:15

**weeks** 208:9

**wei** 95:16,22

**weinstein** 196:4

**wendy** 21:17 21:21 22:5 32:20 33:2,3,3 33:6,14 37:21 44:19,22 45:4 45:5 59:23,24 67:6 110:17 111:12,16 112:6 113:11

113:18 114:11 164:8,17

**went** 32:22 48:5 62:4 90:12,17 91:2 141:3,4,7 143:8 153:24 154:14 156:2 165:15 178:18 184:5,7 209:11

**west** 118:18

**westbury** 77:23 78:5

**westlake** 122:13 123:8 123:15,23 125:16 146:12 225:12

**whereabouts** 187:6

**whereof** 227:19

**wholly** 117:4

**wicks** 3:4

**wife** 66:13,16 72:12,13 84:6 117:3 159:3,6 160:15 161:3 164:12 170:5 170:13 177:6 181:14 212:10 212:16

**wife's** 73:24 78:8 162:25 163:5

**wire** 92:17 93:9 94:22 153:6,11 153:11 156:17

**wired** 90:16,23 90:24 142:19 154:20

**wise** 126:10,12

**wisely** 17:4

**withdraw** 164:4

**withdrawal** 92:14 203:21 204:6

**withdrawals** 187:16 204:17

**witness** 10:9 13:15,17,24 15:20 18:15 19:2 22:24 23:8 193:23 220:7 224:3 226:21,24 227:8,13,19

**witnesses'** 228:3

**words** 12:14 41:6 52:21 53:6 84:17

**work** 92:2 111:23 112:25 221:9

**worked** 112:3 112:17,19,20 117:19 154:8

**[worked - zoom]**                                        Page 50

154:12
**working**  69:6
  131:9 133:7,17
  135:10,22
  145:22 147:18
  148:18 152:2,3
  194:12 208:7
  209:20 210:2
**works**  94:13
**worth**  28:7
  54:2,3 69:20
  69:21,22 71:22
  73:11 76:2
  77:23
**writer**  198:14
**writing**  45:12
  45:14 65:17
  89:7 92:9
**writings**  86:19
**written**  47:3
  92:4 170:11
**wrong**  166:3

**x**

**x**  1:3,20

**y**

**y**  19:2
**yeah**  16:20,20
  23:8 25:11
  30:3 32:14
  44:8,14 48:6
  59:23 62:18
  63:7,11 65:12
  67:14 80:18

83:23 87:7,22
90:16,19
101:17,20
115:18 121:18
144:19 146:22
151:11 170:22
174:17 175:13
185:19 188:20
205:25 209:15
**year**  25:17 26:2
  34:21 35:23
  58:15,22 59:22
  135:9 187:12
  188:5,18,19
**years**  72:10
  115:15 129:9
  131:18,25
**yesterday**  23:3
  53:17 84:3
  85:2 116:22
  123:9
**yesterday's**  9:8
**york**  1:2,23
  2:14 3:5,20
  4:11 7:11,19
  19:4 39:23
  81:2,9,17,21
  83:17 95:20
  115:2 223:4,22
  224:23 227:6
  228:1
**yup**  116:16

**z**

**z**  81:23
**zero**  62:11,17
  133:24
**zeros**  136:11
**zizmor**  3:12 8:4
**zoom**  5:7,9,10
  16:12

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.