UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

                               Case No. 2:23-cv-6188  (JMW)

SUPERB MOTORS, INC., TEAM AUTO SALES LLC.,
ROBERT ANTHONY URRUTIA, 189 SUNRISE
HIGHWAY AUTO LLC., NORTHSHORE MOTOR
LEASING, LLC., BRIAN CHABRIER, JOSHUA
AARONSON, JORY BARON, ASAD KHAN, IRIS
BARON REPRESENTATIVE OF THE ESTATE  OF
DAVID BARON, 1581 HYLAN BLVD AUTO LLC,
1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD
AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239
HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD
AUTO LLC, 76 FISK STREET REALTY LLC, 446
ROUTE 23 AUTO LLC, and ISLAND AUTO
MANAGEMENT, LLC,

                        Plaintiffs,

          -against-

ANTHONY DEO, SARA DEO, HARRY THOMASSON,
DWIGHT BLAKENSHIP, MARC MERCKLING,
MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS
NYC INC., GOLD COAST CARS OF SYOSSET LLC,
GOLD COAST CARS OF SUNRISE LLC, GOLD COAST
MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST
MOTORS OF LIC LLC, GOLD COAST MOTORS OF
ROSLYN LLC, GOLD COAST MOTORS OF
SMITHTOWN LLC, UEA PREMIER MOTORS CORP.,
DLA CAPITAL PARTNERS INC., JONES LITTLE & CO.,
CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING,
LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE
HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC

                        Defendants.

------------------------------------------------------------------X


**DEO DEFENDANTS' JOINT RULE 56.1 STATEMENT**

1

NOW COME Defendants ANTHONY DEO, SARA DEO, HARRY THOMASSON, DWIGHT BLAKENSHIP, MARC MERCKLING, MICHAEL LAURIE, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC (hereinafter, the "Deo Defendants"), pursuant to Local Civil Rule 56.1 of the Eastern District of New York, and submit the within Statement of Material Facts as to which there is no genuine issue to be tried in support of their Motion for Summary Judgment, as follows (headings are for descriptive purposes only):

Note: In addition to other documents, the within 56.1 Statement cites to the Deos' two (2) total verified complaints filed against the within Plaintiffs as 1) the original Verified Complaint in the action styled as *Deo, et al. v. Baron, et al.*, Nassau (NY) Supreme Court Index # 615683/2024, which is hereinafter referred to as "VC"; and 2) the Amended Complaint filed in the same action. The Amended Complaint is also verified, *see* the Affirmation of Anthony Deo filed in the action styled as *Robert Anthony Urrutia v. Anthony Deo,* Nassau (NY) Supreme Court Index # 618608/2023, *at* Docket # 99, filed on April 1, 2025, *at* pp. 2, ¶ 6 (verifying the substance of the Amended Complaint) and ¶ 7 (verifying Exhibits A-Z in the Amended Complaint). The Amended Verified Complaint is hereinafter referred to as "AC".[1]  The AC is hereinafter incorporated, by reference.

---

[1] The Amended Complaint in the Nassau action was originally filed in the EDNY after removal; the EDNY case number is 24-cv-06903, although the case was eventually remanded back to Nassau Supreme Court under the original Nassau (NY) Supreme Court index number, 615683/2024.

## ANTHONY DEO AND SARA DEO ARE THE OWNERS OF NORTHSHORE MOTOR LEASING, LLC, AND 189 SUNRISE HWY AUTO LLC

### A. NORTHSHORE MOTOR LEASING, LLC

1. During and after 2016, Sara and Anthony Deo (hereinafter, the "Deos") owned and operated a business known as UEA Premier Motors Corporation (hereinafter, "UEA").  Verified Complaint, *Deo, et al. v. Baron, et al*., Nassau (NY) Supreme Court Index # 615683/2024, ¶ 43; *see, also*, Amended Complaint, same action, *at* ¶ 39.  The Amended Complaint in the Nassau action was originally filed in the EDNY after removal; the EDNY case number is 24-cv-06903, although the case was eventually remanded back to Nassau Supreme Court under the original Nassau (NY) Supreme Court index number, 615683/2024.  The Verified Complaint is hereinafter referred to as "VC"; the Amended Complaint is hereinafter referred to as "AC".

2. At all relevant times, UEA was a used automobile dealership owned and operated by the Deos at and from 180 Michael Drive, Syosset, New York.  *Id.*

3. Until 2018, the Deos had met only one (1) of the individual Plaintiffs herein (David Baron) and did not conduct any business with any of the individual Plaintiffs herein. *Id. at* ¶ 44 (VC); and *at* ¶ 40 (AC).

4. During or about the fall of 2017, the Deos decided that it was necessary to expand and/or increase their Floor Plan in order to expand and/or increase their profitability at the 180 Michael Drive dealership/location. *Id. at* ¶ 45 (VC); and *at* ¶ 41 (AC).

5. On or about November 1, 2017, the Deos filed papers with the New York Secretary of State's Office to incorporate and duly form NorthShore as the first step in expanding/increasing profitability.  *Id. at* ¶ 46 (VC); and *at* ¶ 42 (AC).

6. Within one (1) week of forming NorthShore, Sara Deo applied for and was given an Employer Identification Number (hereinafter, "EIN number") from the Internal Revenue Service/IRS for NorthShore. *Id. at* ¶ 47 (VC); and *at* ¶ 43 (AC).

7. Attached to both the VC and AC as Exhibit A are true and accurate copies of the notices provided to Sara Deo of the EIN number from the IRS for their new corporation, NorthShore. *See* VC/AC *at* Exhibit A.

8. The Deos had the UEA lease assigned to NorthShore after its incorporation. VC *at* ¶ 49; and AC *at* ¶ 45.

9. Attached to both the VC and AC as Exhibit B are true and accurate copies of the assignment of the UEA lease to NorthShore by the Deos with the agreement of the landlord at 180 Michael Drive, Syosset, New York. *See* Exhibit B to VC and AC.

10. Attached to both the VC and AC as Exhibit U is a true and accurate copy of the receipt for the corporate book for NorthShore obtained by Anthony Deo during June, 2018, the same month as the assignment of the UEA lease to NorthShore, *supra at* ¶ 9. VC *at* ¶ 50; AC *at* ¶ 46; *Id. at* Exhibit U.

11. Attached to both the VC and AC as Exhibit C are true and accurate copies of Chase Bank account records for the bank account opened by Sara Deo on behalf of their (the Deos) then new company, NorthShore. *Id. at* ¶ 51 (VC); *Id. at* ¶ 47 (AC).

12. Sara Deo was required to present proof of ownership of NorthShore to open the Chase Bank account. *Id. at* ¶ 51 (VC); *Id. at* ¶ 47 (AC).

13. After forming the company, obtaining an EIN, obtaining the corporate book, and opening the bank account(s) for NorthShore through Chase Bank, the Deos (together) commenced operations ofNorthShore Motors at 180 Michael Drive,

4

Syosset, New York, during 2018. *Id. at* ¶ 52 (VC); *Id. at* ¶ 48 (AC).

14. As part of the plan to expand and increase profitability in the automobile sales business from 180 Michael Drive, Syosset, New York, the Deos accepted an offer from David Baron. *Id. at* ¶ 53 (VC); *Id. at* ¶ 49 (AC).

15. Specifically, David Baron offered to provide two main types of assistance to the Deos: 1) Baron offered to provide a "floor plan" for the Deos and NorthShore for a fee; this floor plan would be provided by and through the umbrella of Island Auto Group and would be personally guaranteed by David Baron, and 2) if they accepted the floor plan offer, he would also provide his own Accountants to the Deos at no additional cost to the Deos. *Id. at* ¶ 61 (VC); *Id. at* ¶ 57 (AC).

16. In 2018, Anthony Deo and Sara Deo were both still new to the used car dealership business and inexperienced in both operations and floor plans. *Id.*

17. In 2018, David Baron was older and more experienced than the Deos in the operation of automobile dealerships. *Id.*

18. In 2018, David Baron was much wealthier than the Deos. *Id.*

19. The Baron/Aaronson family's extensive automobile dealership holdings over the years include more than twenty (20) automobile dealerships. *Id. at* ¶ 55 (VC); *Id. at* ¶ 51 (AC).

20. The offer from David Baron to provide a bigger Floor Plan with less interest to the Deos and NorthShore was accepted by the Deos. *Id. at* ¶ 61, 64, 79, 80 (VC); *Id. at* 57, 60, 75, 76 (AC).

21. The offer from David Baron to provide accounting services for NorthShore was accepted by the Deos. *Id. at* ¶ 65, 80 (VC); *Id. at* 61, 76 (AC).

22. After NorthShore commenced operations in 2018, and in response to a request by David Baron, Sara Deo agreed to and did in fact put one or more Baron partners including David Baron on to NorthShore's Chase Bank account as signatories, only. *Id. at* Exhibit R (VC and AC).

23. Since NorthShore did not commence business until 2018, no income tax returns or K-1s needed to be filed for NorthShore, and none were, until sometime in 2019. *Id. at* ¶ 86 (VC); *Id. at* ¶ 82 (AC).

24. However, no tax documents were given to the Deos for NorthShore's first two years of work, so the Deos kept asking both the individual Plaintiffs in this action as well as Plaintiffs' longtime employees, Melissa Beltre, Wendy Kwun and Daniel O'Sullivan, for K-1s, but none were forthcoming to the Deos. *Id. at* ¶ 86-89 (VC); *Id. at* ¶ 82-85 (AC).

25. The Deos eventually had their own accountant, Thomas Jones, prepare and file returns with K-1s for themselves on behalf of NorthShore as owners thereof.

### B. 189 Sunrise Hwy Auto LLC

26. During or about the end of 2020, David Baron proposed and arranged for the Deos to buy 189 Sunrise Hwy Auto LLC, a smaller used car business than NorthShore located at 189 Sunrise Highway, Amityville, Suffolk County, New York. VC *at* ¶ 104; AC *at* ¶ 100.

27. During February 2021, the Deos arranged to purchase 189 Sunrise and paid fifty thousand dollars ($50,000.00) therefore. *Id. at* ¶ 105 (VC); *Id. at* ¶ 101 (AC).

6

28. Attached to both the VC and AC as Exhibit D are true and accurate copies of the money paid by Anthony Deo for the purchase of 189 Sunrise Hwy Auto LLC (hereinafter, "189 Sunrise").

29. After purchasing the business known as 189 Sunrise, the Deos entered into a lease with the landlord/owner of the property. VC *at* ¶ 106; AC *at* ¶ 102.

30. After purchasing the business known as 189 Sunrise, the Anthony Deo took over control and operation of the business. *Id.*

31. Attached to both the VC and AC as Exhibit E is a true and accurate copy of the lease entered into by Anthony Deo at the property/business located at and known as 189 Sunrise in Amityville, New York. VC and AC *at* Exhibit E.

32. After entering into the lease attached to the complaints as Exhibit E, the Deos made every payment thereon until after the business was shuttered by Plaintiffs. VC *at* ¶ 106; AC *at* ¶ 102.

33. The Deos made every payment on the lease for NorthShore since the assignment in 2018 that the Deos entered into for NorthShore's location in Syosset. *Id.*

34. After purchasing the business known as 189 Sunrise and taking over same, Anthony Deo took over the NESNA warranty contracts from the Plaintiffs for that business. VC *at* ¶ 265-267; AC *at* ¶ 264-266.

35. Anthony Deo also took over the warranty contracts for NorthShore as supplied by NESNA. *Id.*

36. Attached to both the VC and AC as Exhibit X are true and accurate copies of several contracts by and between NESNA on the one hand, and Anthony Deo both personally

7

(as Guarantor) and on behalf of 189 Sunrise (since the Deos' purchase in February 2021) and NorthShore.  *Id.*

37. Exhibit X to the two complaints provide irrefutable proof that Nissan, NMAC, NESNA and the Plaintiffs all knew that Anthony Deo was the true party in interest in 189 Sunrise and NorthShore, as it was he, Deo, that was entering into contracts and personally guaranteeing same on behalf of 189 Sunrise and NorthShore for warranties from Nissan.  *Id.*

38. The contracts attached to the Deos' two complaints at Exhibit X were, at all relevant times, also in the possession, custody and control of the Plaintiffs, who approved Anthony Deo's assumption of those contracts. *Id.*

39. The Plaintiffs *necessarily* had to approve the contracts attached to the Deos' two complaints as Exhibit X: These contracts include monies owed by the Plaintiffs from warranties sold at 189 Sunrise prior to the sale of 189 Sunrise to the Deos in February 2021.  *Id.*

40. Plaintiffs *required* Anthony Deo to assume the 189 Sunrise warranty contracts in connection with the purchase of 189 Sunrise as a *precondition* to letting Deo purchase 189 Sunrise in February 2021.  *Id.*

C. Tax Returns and Ownership of NorthShore and 189 Sunrise

41. The Deos periodically demanded tax documents from the Plaintiffs before and after David Baron's death.  VC *at* ¶ 120; AC *at* ¶ 116.

42. In June 2021, the Deos filed their own tax returns for NorthShore for tax year 2020. AC *at* ¶ 118.

43. Unbeknownst to the Deos, in September 2021, Plaintiffs also filed tax returns for NorthShore for tax year 2020. *Id. at* ¶ 119.

44. True and accurate copies of the inconsistent tax filings in June and September 2021, for NorthShore are attached to the AC as Exhibit Z.

45. After the parties discovered the inconsistent, multiple tax filings attached to the Amended Complaint as Exhibit Z, the Deos were invited by the Plaintiffs to utilize Plaintiffs 2022 accountants, Citrin Cooperman, to prepare and file tax returns listing the Deos as owners of both NorthShore and 189 Sunrise. AC *at* ¶ 121.

43. Attached to both the VC and the AC as Exhibit G are true and accurate copies of the emails reflecting the communications over tax returns in the fall of 2022 by and between Wendy Kwun, Joshua Aaronson, Anthony Deo, accountants for the Plaintiffs at Citrin Cooperman, and the accountant for Anthony Deo, Thomas Jones. VC *at* ¶ 123; AC *at* ¶ 122.

44. Attached to both the VC and the AC as Exhibit H are the tax returns "approved" by Joshua Aaronson in the emails attached to the VC and the AC as Exhibit G. VC *at* ¶ 124; AC *at* ¶ 123.

45. Joshua Aaronson, with the full authority of the co-Plaintiffs (Aaronson Transcript *at* pp. 116, lines 2-21), honestly approved Anthony Deo as owner of 189 Sunrise and NorthShore in the emails attached to the VC and AC as Exhibit G for the tax returns attached to the VC and AC as Exhibit H. Aaronson Transcript *at* pp. 104, lines 5-11

46. Joshua Aaronson authorized Plaintiffs' accountants, Citrin Cooperman, to prepare the tax returns attached as Exhibit H that indicate the Deos are the sole owners (99% by

Anthony Deo, 1% by Sara Deo) of 189 Sunrise and NorthShore. Aaronson Transcript, pp. 164, line 23-pp. 165, line 3.

47. Joshua Aaronson does not object that the tax returns in Exhibit H to the VC and the AC were filed by the Deos ("if they had to be filed, they had to be filed"). Aaronson Transcript pp. 227, line 20-pp. 228, line 5.

### D.  Plaintiffs' Admissions in Depositions

#### 1.  Joshua Aaronson

48. Joshua Aaronson ("JA") has spent a quarter of a century working in the car business. Aaronson Transcript pp. 7, line 24-pp. 8, line 2.

49. JA has owned 20-25 automobile dealerships in his career. Aaronson Transcript pp. 12, line 3-pp. 15, line 17; also, pp. 21, lines 7-13.

50. JA currently owns in excess of twenty (20) automobile dealerships.  JA Transcript, pp. 12, lines 3-19, and pp. 13, line 18-pp. 14, line 23.

51. JA does not know who owns NorthShore.  JA Transcript pp. 21, line 7-pp. 24, line 24; also *at* pp. 107, lines 4-10.

52. There are no written agreements between any Plaintiff and the Deos regarding ownership of 189 Sunrise and NorthShore.  JA Transcript, pp. 233, line 10-pp. 234, line 16.

53. JA has no knowledge of who controlled NorthShore bank accounts.  JA Transcript, pp. 36, lines 6-10; also *at* pp. 132, lines 10-12.

54. JA has no knowledge of security on NorthShore Bank accounts.  JA Transcript, pp. 132, lines 18-20.

55. Anthony Deo was responsible for NorthShore business.  JA Transcript, pp. 132, lines 3-6.

56. No one else beyond Anthony Deo had responsibilities running NorthShore.  JA Transcript, pp. 132, lines 7-9.

57. Anthony Deo had authority to write checks at NorthShore.  JA Transcript, pp. 134, line 19-pp.135, line 2; *see also* pp. 39, line 24-pp. 40, line 13.

58. Sara Deo brought customers to NorthShore.  JA Transcript, pp. 38, lines 10-23.

59. Plaintiffs assert that there are additional ownership conditions beyond just the income tax returns as approved at Exhibits G and H to the VC and AC, but that such conditions are not in writing.  JA Transcript, pp. 50, line 24-pp. 51, line 24.

60. Sara Deo opened Chase Bank account(s) for NorthShore.  JA Transcript, pp. 60, line 17-pp. 62, line 17.

61. The 189 Sunrise checks/money utilized by Anthony Deo to purchase 189 Sunrise as attached to the VC and AC at Exhibit D were all kept by the Plaintiffs, including JA and his partners.  JA Transcript, pp. 68, line 17-pp. 69, line 2.

62. Anthony Deo held the lease attached to the VC and AC at Exhibit E for 189 Sunrise.  JA Transcript, pp. 73, line 14-pp. 74, line 2.

63. Only the Deos had contracted with any Plaintiffs, but none of the other Deo Defendants contracted with Plaintiffs.  JA Transcript, pp. 187, line 10-pp. 188, line 8.

64. JA is not aware of the contracts between the Deos and any Plaintiffs.  JA Transcript, pp. 217, line 24-pp. 218, line 3.

65. The owner of a dealership typically is responsible/pays for warranty contracts such as those entered by Anthony Deo for 189 Sunrise and NorthShore attached to the VC and AC as Exhibit X.  JA Transcript, pp. 232, lines 13-25.

66. The owner of dealerships typically pays for the lease, and Anthony Deo was the lessee after paying for 189 Sunrise on February 21, 2021.  JA Transcript, pp. 233, lines 2-6.

67. JA had full authority of his Plaintiff partners for his work at NorthShore after David Baron's death.  JA Transcript, pp. 116, lines 2-21.

68. JA did nothing to investigate losses at NorthShore that arose prior to David Baron's death.  JA Transcript, pp. 260, lines 7-12.

69. Dan O'Sullivan paid off cars for 189 Sunrise and NorthShore.  JA Transcript, pp. 254, line 23-pp. 255, line 24.

70. If there were losses at NorthShore, they could have occurred during David Baron's lifetime and resolved during David Baron's lifetime.  JA Transcript, pp. 258, line 19-pp. 260, line 18.

71. JA does not know when losses occurred at NorthShore/189 Sunrise. *Id.*

72. JA does not know whether or not David Baron and Anthony Deo agreed on anything to clear up losses at 189 Sunrise/NorthShore.  *Id.*

73. JA does not know Harry Thomasson.  JA Transcript, pp. 37, lines 2-9.

74. JA does not know if Harry Thomasson was involved in NorthShore business.  *Id.*; also pp. 189, lines 8-16.

75. JA does not know Marc Merckling.  JA Transcript, pp. 37, lines 10-23; *see also*, pp. 38, lines 5-9.

76. JA does not know if Marc Merckling was involved in NorthShore business. *Id.*

12

77. JA does not know Dwight Blankenship.  JA Transcript, pp. 37, line 24-pp. 38, line 4.

78. JA does not know if Dwight Blankenship was involved in NorthShore business. *Id.*

79. JA does not know Michael Laurie.  JA Transcript, pp. 37, lines 10-23.

80. JA does not know if Michael Laurie was involved in NorthShore business. *Id.*

81. JA has no firsthand knowledge of Anthony Deo wrongfully taking any cars, cash, or license plates from 189 Sunrise and NorthShore.  JA Transcript, pp. 124, lines 13-17.

82. JA has no firsthand knowledge of wrongdoing by Sara Deo at NorthShore.  JA Transcript, pp. 138, line 23-pp. 142, line 10; *see also* pp. 146, line 8-pp. 147, line 19.

83. Plaintiffs did not lose any money individually for NorthShore debts.  JA Transcript, pp. 148, line 9-pp. 150, line 12.

84. JA does not know of actionable harm caused to Plaintiffs by Harry Thomasson.  JA Transcript, pp. 150, line 13-pp. 154, line 19; pp. 165, line 4-pp. 168, line 12; pp. 178, line 12-pp. 184, line 6.

85. JA does not know of wrongdoing by Marc Merckling.  JA Transcript, pp. 170, line 22-pp. 171, line 11.

86. Dwight Blankenship did nothing wrong to the Plaintiffs that JA could identify.  JA Transcript, pp. 171, lines 12-17.

87. Michael Laurie did nothing wrong to the Plaintiffs that JA could identify.  JA Transcript, pp. 171, lines 18-22.

88. Plaintiffs' claims against the individual Defendants other than Anthony Deo are derivative from merely their association with Anthony Deo. JA Transcript, pp. 186, lines 6-15.

89. JA does not know any specifics about money missing due to Anthony Deo's actions. JA Transcript, pp. 194, line 25-pp. 195, line 20; pp. 196, lines 14-19; pp. 200, line 16-pp. 201, line 3.

90. JA knows about an FBI investigation because he spoke with the FBI about this case. JA Transcript, pp. 221, lines 7-8.

91. JA did not make any criminal allegations to the FBI against Harry Thomasson, Marc Merckling, Dwight Blankenship, Michael Laurie, or Sara Deo. JA Transcript, pp. 222, line 23-pp. 223, line 13.

92. JA approved Exhibit H to the VC and AC indicating the Deos as owners of 189 Sunrise and NorthShore (Anthony Deo 99%; Sara Deo 1%) on those tax returns. JA Transcript, pp. 43, lines 8-15.

93. JA was not trying to mislead taxing authorities by approving Exhibit H to the VC and AC (the tax returns indicating the Deos' ownership of 189 Sunrise and NorthShore). JA Transcript, pp. 45, lines 6-17.

94. The accountants at Citrin Cooperman who prepared the tax returns attached to the VC and AC as Exhibit H were authorized by JA to prepare those returns. JA Transcript, pp. 45, line 25-pp. 46, line 25; also pp. 164, line 23-pp. 165, line 3.

95. The accountants at Citrin Cooperman who prepared the tax returns attached to the VC and AC as Exhibit H were accountants utilized by JA and the Island Auto Group. *Id.*

96. JA opened a business in 2023 called Stream Auto Outlet at the location of the former 189 Sunrise business he closed months earlier. JA Transcript, pp. 69, line 11-pp. 70, line 9.

14

97. JA approved the tax returns attached to the VC and AC as Exhibit H.  JA Transcript, pp. 96, line 24-pp. 98, line 24.

98. JA "honestly" approved Anthony Deo as owner of 189 Sunrise and NorthShore.  JA Transcript, pp. 104, lines 6-11

99. JA stopped filing tax documents for 189 Sunrise after Anthony Deo provided checks attached to the VC and AC as Exhibit D to purchase 189 Sunrise in February 2021.  JA Transcript, pp. 174, line 2-pp. 175, line 20.

100.    Plaintiffs never revised any tax returns for 189 Sunrise or NorthShore since the tax returns attached to the VC and AC were approved by JA.  JA Transcript, pp. 175, line 21-pp. 176, line 15.

101.    JA stopped listing 189 Sunrise on his personal tax returns after Anthony Deo paid the money (Sunrise purchase checks) set forth in Exhibit D attached to the VC and AC.  JA Transcript, pp. 245, line 15-pp. 246, line 4.

102.    JA authenticates the emails in which he approved the tax returns listing Sara Deo and Anthony Deo as owners of NorthShore and 189 Sunrise, but he does not remember the discussions over tax returns leading up to the production of those returns by Citrin Cooperman, IAG's accountants.  JA Transcript, pp. 88, line 7-pp. 94, line 17.

### 2.   Iris Baron

103.    Iris Baron (hereinafter, "IB") does not know Harry Thomasson.  IB Transcript, pp. 7, lines 7-14.

104.    IB never heard the name Harry Thomasson prior to her deposition on January 5, 2026.  *Id.*

105.    IB has no knowledge of any harm caused by Harry Thomasson to the Estate of David Baron.  IB Transcript, pp. 24, line 16-pp. 25, line 9.

106.    IB has no knowledge of wrongdoing by Michael Laurie against Plaintiffs. IB Transcript, pp. 40, lines 16-22.

107.    IB has no knowledge of wrongdoing by Marc Merckling against Plaintiffs. IB Transcript, pp. 40, line 25-pp. 41, line 15.

108.    The only reason Iris Baron knows of the allegations in this case against Anthony Deo is because Josh Aaronson, her son-in-law, told her so.  IB Transcript, pp. 41, line 20-pp. 43, line 11; also pp. 52, line 22-pp. 53, line 22.

109.    IB has no knowledge of wrongdoing by Dwight Blankenship, Harry Thomasson, Marc Merckling, or Michael Laurie.  IB Transcript, pp. 43, line 14-pp. 44, line 9.

110.    IB has no 1st hand knowledge of wrongdoing by the Deos except for what she was told by her son-in-law Josh Aaronson.  IB Transcript, pp. 53, lines 11-22.

111.    IB has nothing to do with NorthShore's business.  IB Transcript, pp. 41, lines 14-15.

112.    IB did not authorize the use of her name in this lawsuit.  IB Transcript, pp. 8, lines 9-22.

### 3.  Jory Baron

113.    Jory Baron (hereinafter, "JB") received a Bachelor of Science degree in business management from Hofstra University.  JB Transcript, pp. 7, line 18-pp. 8, line 4.

114.    JB took the National Automotive Dealer Association training.  JB Transcript, pp. 8, line 5-pp. 9, line 19.

115.    JB has worked at various automobile dealerships including Rockland Hyundai, Yonkers Auto Mall, Baron Nissan, and Baron Honda.  JB Transcript, pp. 9, line 20-pp. 10, line 3.

116.    JB has no 1st hand knowledge of wrongdoing against him by Harry Thomasson ("I was given information…it was passed on to me.")  JB Transcript, pp. 25, line 20-pp. 26, line 3.

117.    JB has no knowledge of Harry Thomasson's involvement in car sales.  JB Transcript, pp. 27, lines 5-6.

118.    JB knows that Harry Thomasson was not involved in car sales at 189 Sunrise and NorthShore.  JB Transcript, pp. 30, lines 6-10.

119.    JB has no knowledge of wrongdoing by Harry Thomasson involving Floor Plans. JB Transcript, pp. 27, line 15-pp. 30, line 5.

120.    JB has no knowledge that Harry Thomasson took money from 189 Sunrise. JB Transcript, pp. 30, lines 11-14.

121.    JB has no knowledge of Harry Thomasson's communication(s) with Anthony Deo.  JB Transcript, pp. 31, lines 5-11.

122.    JB has no knowledge of any wrongs Harry Thomasson committed against NorthShore.  JB Transcript, pp. 31, line 12-pp. 32, line 4.

123.    JB does not know Marc Merckling.  JB Transcript, pp. 32, lines 5-9.

124.    JB does not know Dwight Blankenship.  JB Transcript, pp. 32, lines 21-25.

125.    JB cannot say what, if anything, Dwight Blankenship did to wrong or harm 189 Sunrise or NorthShore.  JB Transcript, pp. 33, lines 2-6.

126.    JB does not know Michael Laurie.  JB Transcript, pp. 33, lines 7-9.

127.    JB has no knowledge of wrongdoing by Michael Laurie.  JB Transcript, pp. 33, lines 10-15.

128.    JB says that Sara Deo did nothing wrong to 189 Sunrise or NorthShore.  JB Transcript, pp. 34, lines 8-12.

129.    JB has no knowledge of Sara Deo's day-to-day activities at 189 Sunrise and/or NorthShore.  JB Transcript, pp. 36, lines 10-23.

130.    JB possesses no writing regarding the February 21, 2021 transaction involving 189 Sunrise as set forth in the VC and AC as Exhibit D.  JB Transcript, pp. 54, lines 8-19.

131.    Baron Nissan was fined $250,000.00 by the New York State Attorney General regarding improprieties involving lease buyouts.  JB Transcript, pp. 52, lines 16-21.

### 4.   Asad Khan

132.    Asad Khan (hereinafter, "AK") has worked in automobile dealerships for 32 years. AK Transcript, pp. 14, lines 5-6.

133.    AK has been involved in three or four Consumer Affairs cases over the years working at automobile dealerships.  AK Transcript, pp. 12, line 17-pp. 14, line 12.

134.    AK has been involved in at least one lawsuit prior to the instant action.  AK Transcript, pp. 14, lines 13-17.

135.    AK never met Harry Thomasson.  AK Transcript, pp. 8, lines 24-25.

136.    AK never knew the name Harry Thomasson prior to his deposition on December 22, 2025. AK Transcript, pp. 9, lines 2-8.

137.    AK's first conversation, ever, with Harry Thomasson was his deposition on December 22, 2025.  AK Transcript, pp. 81, line 14-pp. 82, line 6.

18

138.    Harry Thomasson did nothing at NorthShore. AK Transcript, pp. 34, line 20-pp. 35, line 5.

139.    Harry Thomasson had "nothing to do with NorthShore." AK Transcript, pp. 35, lines 2-5.

140.    Harry Thomasson did not steal from NorthShore. AK Transcript, pp. 35, lines 6-21.

141.    Harry Thomasson did not steal from Asad Khan. *Id.*

142.    AK does not recognize the name Michael Laurie.  AK Transcript, pp. 52, lines 10-24; also pp. 80, lines 13-19.

143.    AK does not recognize the name Dwight Blankenship. AK Transcript, pp. 52, line 25-pp. 53, line 7; also pp. 80, lines 8-12.

144.    AK knows that Sara Deo and Anthony Deo "made peace with David Baron" over NorthShore disputes. AK Transcript, pp. 59, lines 22-23.

145.    AK does not know Marc Merckling.  AK Transcript, pp. 72, lines 17-21.

146.    AK does not know NorthShore's accountant Tom Jones.  AK Transcript, pp. 72, lines 22-23.

147.    AK does not know anything about the Gold Coast Defendants in this action.  AK Transcript, pp. 72, line 24-pp. 73, line 6.

148.    AK does not know anything about Defendant DLA Capital.   AK Transcript, pp. 73, lines 7-9.

149.     AK has no knowledge of thefts from NorthShore.  AK Transcript, pp. 95, lines 17-24; also pp. 115, line 11-pp. 116, line 25.

150.    AK authorized Josh Aaronson to make all decisions for him regarding NorthShore. AK Transcript, pp. 33, lines 14-20; also pp. 49, lines 11-17.

151.    AK and Brian Chabrier authorized and approved Josh Aaronson making all decisions for them at NorthShore. AK Transcript, pp. 155, line 23-pp. 156, line 23.

152.    One or more representatives from "AFC (Ally Financial) and NextGear" disparaged Anthony Deo to AK.  AK Transcript, pp. 101, line 25-pp. 103, line 25.

153.    AK has no knowledge of nor any involvement in 189 Sunrise.  AK Transcript, pp. 38, lines 13-23.

154.    AK has no knowledge of the corporate co-Plaintiffs.  AK Transcript, pp. 39, line 4-pp. 40, line 3; also pp. 71, line 18-pp. 72, line 16.

155.    AK has no idea where the files, computers, videos, or phone system are from NorthShore. AK Transcript, pp. 50, lines 9-23.

156.    AK has no knowledge of the whereabouts of NorthShore's checks, account records, billing records, telephone records, or video files.  AK Transcript, pp. 159, line 21-pp. 160, line 16.

157.    AK has received no money from NorthShore since 2019.  AK Transcript, pp. 67, lines 12-22.

158.    AK knew of the Baron Nissan sale to Anthony Deo as set forth in the VC and AC at Exhibit F. AK Transcript, pp. 108, line 16-pp. 109, line 8.

159.    Only owners go on dealership bank accounts.  AK Transcript, pp. 128, lines 5-8.

160.    Tokens are security on commercial bank accounts such as NorthShore's accounts. AK Transcript, pp. 149, line 20-pp. 151, line 4.

161.    NorthShore's accounts utilized tokens.  *Id.*

162.    Anthony Deo did not have a token for the NorthShore accounts. *Id.*

163.    AK "watched" NorthShore's bank accounts with "his" controllers, Melissa Beltre and Dan O'Sullivan. AK Transcript, pp. 29, lines 11-22.

164.    NorthShore was only on AK's tax returns through 2019.  AK Transcript, pp. 27, lines 16-22.

165.    AK has not put NorthShore on his own tax returns since 2019.  AK Transcript, pp. 67, line 23-pp. 68, line 18.

166.    AK last received any money from NorthShore in 2019. *Id.*

167.    AK never received any money from 189 Sunrise or Superb Motors. AK Transcript, pp. 68, lines 19-24.

168.    AK never received any money from the within co-Plaintiffs.  AK Transcript, pp. 69, lines 2-21; also pp. 71, lines 5-7.

169.    Josh Aaronson utilized a Power of Attorney from David Baron after David Baron died.  AK Transcript, pp. 157, line 10-pp. 158, line 15.

5.    Dan O'Sullivan

170.    Daniel O'Sullivan (hereinafter, "DO") worked in automobile dealerships for 45 years. DO Transcript, pp. 213, lines 13-25.

171.    DO worked in Baron family dealerships for 43 out of his 45 years working in automobile dealerships. *Id.*

172.    DO has "great loyalty" to the Baron family.  *Id.*

173.    DO took the job as controller at NorthShore at the behest of David Baron.  DO Transcript, pp. 48, lines 4-21.

174.    DO always did what David Baron said to do. *Id.*

175. David Baron worked as a controller at an automobile dealership owned by David Baron known as Port Motors. DO Transcript, pp. 217, lines 2-9.

176. David Baron worked daily at the dealership he owned known as Port Motors. *Id.*

177. David Baron did not work at NorthShore on a daily basis. *Id.*

178. DO was the controller at NorthShore. DO Transcript, pp. 16, lines 22-24.

179. DO was responsible for paying the bills at NorthShore. DO Transcript, pp. 20, lines 2-9.

180. Controllers at NorthShore and 189 Sunrise were responsible for doing the financial statements for the dealerships. DO Transcript, pp. 19, lines 16-25.

181. Controllers at NorthShore and 189 Sunrise make sure that the financial statements are correct. *Id.*

182. Controllers at NorthShore and 189 Sunrise do all postings to the dealerships' software/Dealer Track systems. *Id.*

183. Controllers at NorthShore and 189 Sunrise make sure all deals are correct. *Id.*

184. Controllers at NorthShore and 189 Sunrise pay all taxes. *Id.*

185. While controller for 189 Sunrise and NorthShore, DO paid all bills and all taxes. DO Transcript, pp. 23, line 23-pp. 24, line 2.

186. DO thought Anthony Deo was an owner of NorthShore from the time he started working there. DO Transcript, pp. 52, line 24-pp. 53, line 3; also pp. 55, lines 13-15 (Anthony Deo "was the boss").

187. NorthShore's and 189 Sunrise's Dealer Track software allowed DO to access and input all financial information for the two dealerships. DO Transcript, pp. 59, line 12-pp. 60, line 2.

188. The financial information that DO could access and did input into the Dealer Track system includes all car sales and inventory and floor plan financing. *Id.*

189. DO accessed and input into the Dealer Track system all used car information at the two dealerships. DO Transcript, pp. 66, lines 7-22.

190. The schedule of used cars at both dealerships included how much money is owed on each used car. DO Transcript, pp. 67, lines 19-25.

191. DO created the schedules for NorthShore and 189 Sunrise on the Dealer Track system by posting all deals on the Dealer Track system. DO Transcript, pp. 69, lines 3-11.

192. When a deal was done agreeing to sell a car at NorthShore and 189 Sunrise, DO posted the deal to 3 schedules for each dealership. DO Transcript, pp. 70, line 22-pp. 71, line 4.

193. The three schedules where DO posted car deals at the two dealerships were the used car schedule, the motor vehicle schedule, and the due from finance schedule. *Id.*

194. DO did, in fact, post every used car sale at the two dealerships to the used car schedule, the motor vehicle schedule, and the due from finance schedule. *Id.*

195. Schedules for both dealerships were reviewed every day or every other day by DO. DO Transcript, pp. 75, lines 10-22; pp. 78, lines 15-17; pp. 102, lines 14-19; also pp. 103, lines 13-18.

196. Business slowed down at the two dealerships due to Covid (DO: "Covid killed us"). DO Transcript, pp. 90, lines 3-5.

197. Nothing but Covid caused business to slow down at 189 Sunrise and NorthShore. DO Transcript, pp. 94, lines 10-14.

198.    Tom Jones was Anthony Deo's accountant.  DO Transcript, pp. 95, line 21-pp. 98, line 8.

199.    Tom Jones came into the dealerships every month or two.  *Id.*

200.    No accountants other than Tom Jones came into the two dealerships.  *Id.*

201.    DO gave Tom Jones bank statements for the two dealerships.  DO Transcript, pp. 125, lines 14-24.

202.    Tom Jones did the bank reconciliations for both dealerships each month. DO Transcript, pp. 125, line 25-pp. 127, line 11.

203.    Floor plan providers/lenders came into the two dealerships every month to review all cars and make sure all cars are on the floor plans.  DO Transcript, pp. 114, lines 4-23.

204.    Floor plan providers/lenders came into the two dealerships every month to review all car payoffs.  *Id.*

205.    DO was responsible for arranging the floor plan audits.  DO Transcript, pp. 116, lines 10-24.

206.    No cars were ever missing from the monthly audits.  DO Transcript, pp. 118, line 5-pp. 119, line 4.

207.    DO paid off cars for NorthShore and 189 Sunrise.  DO Transcript, pp. 117, lines 7-21.

208.    David Baron had an arms' length relationship with NorthShore.  DO Transcript, pp. 123, lines 12-18.

209.    David Baron was not involved in the day to day operation of NorthShore or 189 Sunrise.  *Id.*

24

210.    David Baron knew what the Deos' salary and commissions were at the two dealerships.  DO Transcript, pp. 119, line 2-pp. 122, line 14.

211.    David Baron came into NorthShore 3 times per week.  DO Transcript, pp. 124, lines 2-23.

212.    When David Baron came to NorthShore, he would spend an hour or two at the dealership.  *Id.*

213.    When David Baron came to NorthShore, he would talk to Anthony Deo and have lunch.  *Id.*

214.    David Baron would look at financial records 1 time per month.  *Id.*

215.    The two dealerships did not scan files, they only kept hard copies of all papers. DO Transcript, pp. 127, line 12-pp. 128, line 4.

216.    All checks were created through the computer, only, so that there would be transparency for checks at the two dealerships. DO Transcript, pp. 131, lines 4-18.

217.    David Baron only took money from the dealerships in small amounts every 3 or 4 months and only in small amounts when he did take money.  DO Transcript, pp. 131, line 19-pp. 132, line 22.

218.    David Baron never took salary from either 189 Sunrise or NorthShore.  *Id.*

219.    Anthony and Sara Deo were each paid $5,000.00 per week.  DO Transcript, pp. 119, line 2-pp. 121, line 24.

220.    Anthony Deo was also paid a commission each month from 189 Sunrise and NorthShore to his company known as Car Buyers.  *Id.*

221.    David Baron knew that Anthony Deo and Sara Deo were getting paid $5,000.00 each per week.  DO Transcript, pp. 122, lines 4-14.

222.    David Baron knew about the commissions paid to Anthony Deo each month to Car Buyers.  *Id.*

223.    Asad Khan and Brian Chabrier also got checks from the two dealerships "once in a while." DO Transcript, pp. 132, line 23-pp. 133, line 14.

224.    Asad Khan's, Brian Chabrier's, and David Baron's checks stopped when Covid struck.  DO Transcript, pp. 133, line 22-pp. 134, line 18.

225.    Jory Baron had nothing to do with NorthShore or 189 Sunrise. DO Transcript, pp. 136, lines 8-20.

226.    Josh Aaronson, Jory Baron, and Raymond Phelan never took money out of 189 Sunrise or NorthShore.  DO Transcript, pp. 138, line 19-pp. 139, line 6.

227.    Asad Khan rarely came into the dealerships.  DO Transcript, pp. 139, line 10-pp. 140, line 20.

228.    Asad Khan did nothing at 189 Sunrise or NorthShore. *Id.*

229.    Asad Khan did not see documents when he came to the two dealerships.  *Id.*

230.    Brian Chabrier rarely came into the two dealerships.  DO Transcript, pp. 141, line 23-pp. 142, line 7.

231.    Customers would pay cash for cars sometimes.  DO Transcript, pp. 153, line 14-pp. 154, line 4.

232.    When customers paid cash for a car at the two dealerships, that cash would either be deposited into the dealership's account, or given to Anthony Deo. DO Transcript, pp. 153, line 14-pp. 154, line 4.

26

233. When cash was deposited into the dealerships' safes, it would be wrapped in the deal contract for identification of the cash payment on that deal. DO Transcript, pp. 156, line 4-pp. 157, line 20.

234. When cash was paid on a deal, the deal folder/jacket would be noted. *Id.*

235. When cash was paid on a deal, it would also be recorded in the Dealer Track software for 189 Sunrise and NorthShore. *Id.*

236. DO, Marc Merckling, or Dwight Blankenship removed cash from the safes, but not Anthony Deo. DO Transcript, pp. 159, lines 5-9.

237. DO was responsible for keeping track of cash at the two dealerships. DO Transcript, pp. 159, line 18-pp. 160, line 8.

238. DO made cash deposits at the banks for the two dealerships. *Id.*

239. Marc Merckling and Dwight Blankenship would also make cash deposits for the two dealerships, but only if it was a large deposit. *Id.*

240. When Anthony Deo took cash out of the dealerships, DO would make a record of that cash. DO Transcript, pp. 160, line 15-pp. 161, line 19.

241. When Anthony Deo took cash out of the two dealerships, DO would make a corresponding deduction from Anthony Deo's capital account for that dealership. DO Transcript, pp. 161, line 20-pp. 162, line 4.

242. Having a capital account at an automobile dealership means that you are an owner of the dealership. DO Transcript, pp. 162, lines 18-23.

243. Anthony Deo had a capital account for each dealership as far as DO knew. DO Transcript, pp. 162, line 18-pp. 163, line 10.

244. The record of any cash that was not deposited into the accounts at 189 Sunrise

and NorthShore is the deductions from Anthony Deo's capital accounts. DO Transcript, pp. 165, line 4-pp. 166, line 19.

245.    When DO deducted cash taken by Anthony Deo from his capital account, it reduced the amount of Anthony Deo's investment in the two businesses by that amount. DO Transcript, pp. 162, line 24-pp. 163, line 10.

246.    All cash taken from the two dealerships by Anthony Deo was disclosed to DO. DO Transcript, pp. 166, line 23-pp. 167, line 2.

247.    All cash paid at the two dealerships was either credited to that customer's deal and deposited into dealership accounts, or, if taken by Anthony Deo, DO would make the corresponding deduction from Anthony Deo's capital account.  DO Transcript, pp. 167, lines 11-19.

248.    All cash at the two dealerships was accounted for by DO in one of several ways. DO Transcript, pp. 167, line 11-pp. 169, line 3.

249.    The ways that DO accounted for all cash paid to the two dealerships were 1) DO deposited that cash into dealership accounts himself (pp. 168, lines 5-10); 2) DO personally confirmed each deposit receipt when Marc Merckling or Dwight Blankenship made large deposits (pp. 168, lines 11-22); or 3) DO would make a corresponding deduction from Anthony Deo's capital account (pp. 167, lines 11-19).

250.    All cash at 189 Sunrise and NorthShore was tracked and recorded by DO personally.  DO Transcript, pp. 168, line 23-pp. 169, line 3.

251.    DO applied Anthony Deo's American Express card payments to/from each dealership's accounts.  DO Transcript, pp. 206, line 16-pp. 207, line 20.

252.    There was a "management fee" paid at Anthony Deo's direction by DO to the

28

Plaintiffs for providing floor plans to 189 Sunrise and NorthShore. DO Transcript, pp. 218, line 3-pp. 219, line 6.

253.   The "management" fee for 189 Sunrise and NorthShore was in the amount of $60,000-$65,000 per month. *Id.*

254.   All cash deposits made by Marc Merckling and Dwight Blankenship were always actually deposited into the dealership accounts. DO Transcript, pp. 223, lines 15-22.

255.   DO knows that all cash deposits made by Marc Merckling and Dwight Blankenship were actually deposited into dealership accounts because he confirmed the deposits himself.  *Id.*

256.   When Anthony Deo took cash from the dealerships, DO knew because he gave the cash to Anthony Deo.  DO Transcript, pp. 232, lines 15-18.

257.   When cash was not put into dealership accounts after being given to Anthony Deo by DO, DO would "always" make a deduction from Anthony Deo's capital account, "every time."  DO Transcript, pp. 232, line 19-pp. 233, line 5.

258.   Although cash was taken by Anthony Deo from the two dealerships, it was entirely deducted from Anthony Deo's capital account by DO.  DO Transcript, pp. 235, line 23-pp. 236, line 5.

259.   DO did not discuss the cash taken by Anthony Deo with David Baron.  DO Transcript, pp. 236, lines 6-14.

260.   DO never told David Baron that Anthony Deo did anything improper at the dealerships. *Id.*

261.   There is no reason for shortfalls in the two dealerships except for the $65,000.00 monthly management fee paid to the Plaintiffs for providing the floor plans and cash

29

taken by Anthony Deo.  DO Transcript, pp. 238, lines 7-10.

262.    The deduction of cash from Anthony Deo's capital account for cash taken from the businesses by Anthony Deo is "proper accounting."  DO Transcript, pp. 244, line 7-pp. 245, line 5.

263.    There was nothing improper about Anthony Deo taking cash from the dealerships as far as the controller (DO) for those two dealerships knows. *Id.*

264.    The reason Marc Merckling and Dwight Blankenship made occasional large cash deposits for the two dealerships was because they were policemen who were licensed to carry guns.  DO Transcript, pp. 245, lines 6-16.

265.    Marc Merckling and Dwight Blankenship were paid whatever Anthony Deo said to pay them.  DO Transcript, pp. 151, lines 3-16.

266.    DO got back the deposit slips made by Marc Merckling and Dwight Blankenship "every time."  DO Transcript, pp. 245, lines 17-23.

267.    Positive Pay was on the accounts at 189 Sunrise and NorthShore, which caused all checks to be verified daily.  DO Transcript, pp. 252, line 20-pp. 253, line 17.

268.    DO also verified all checks from the two dealerships' accounts daily.  *Id.*

269.    DO saw the two dealerships' tax returns.  DO Transcript, pp. 136, line 21-pp. 137, line 12.

270.    The two dealerships' tax returns seen by DO were prepared by the Deos' accountant, Tom Jones. DO Transcript, pp. 137, lines 21-25.

271.    DO has no knowledge of Harry Thomasson and never met him.  DO Transcript, pp. 142, line 21-pp. 143, line 3.

272. DO met with Plaintiffs' attorney, Mr. Ruderman, at Mr. Ruderman's house before the deposition of DO. DO Transcript, pp. 208, lines 7-19.

273. While privately meeting with Plaintiffs' attorney, Mr. Ruderman, at Mr. Ruderman's house before the deposition, DO filled out a handwritten statement at Mr. Ruderman's request. *Id.*

274. Mr. Ruderman is not DO's attorney. *Id.*

### 6. Brian Chabrier

275. Brian Chabrier (hereinafter, "BC") took automobile dealer training classes through Nissan. BC Transcript, pp. 10, lines 2-14.

276. BC met Josh Aaronson around the year 2000. BC Transcript, pp. 11, lines 8-10.

277. Josh Aaronson is BC's partner in automobile dealerships. BC Transcript, pp. 11, line 11-pp. 12, line 7.

278. BC has been an owner of at least 3 automobile dealerships. BC Transcript, pp. 12, line 20-pp. 13, line 4.

279. When BC visited 189 Sunrise's and NorthShore's dealerships, he was not there long, merely walked around and spoke to a few employees, occasionally signed checks, then left. BC Transcript, pp. 16, line 12-pp. 17, line 10.

280. BC has no knowledge of how anyone was put on 189 Sunrise's and NorthShore's bank accounts. BC Transcript, pp. 19, line 22-pp. 20, line 24.

281. When a person is the only person on a dealership bank account (e.g., Sara Deo when she opened NorthShore's bank account(s) at Exhibit C to VC and AC), she is the owner of that account. BC Transcript, pp. 21, line 11-pp. 23, line 12.

282. David Baron was BC's boss. BC Transcript, pp. 30, lines 14-21.

283.    BC does not remember details involving income tax returns for 189 Sunrise and NorthShore.  BC Transcript, pp. 32, line 24-pp. 35, line 21.

284.    BC authorized Josh Aaronson for all day-to-day operations of 189 Sunrise and NorthShore. BC Transcript, pp. 37, line 3-pp.38, line 15.

285.    BC does not know of any written contract involving the purchase of 189 Sunrise by Anthony Deo as reflected in Exhibit D to the VC and the AC. BC Transcript, pp. 38, line 22-pp. 39, line 4.

286.    BC did not see a written contract involving the purchase of 189 Sunrise by Anthony Deo as reflected in Exhibit D to the VC and the AC.  *Id.*

287.    BC does not recall the Deos' 600 page complaint.  BC Transcript, pp. 44, lines 16-21.

288.    Joshua Aaronson is the head of the IAG Group.  BC Transcript, pp. 45, line 12-pp. 46, line 9.

289.    BC does not know Thomas Jones, Anthony Deo's accountant for the two dealerships.  BC Transcript, pp. 46, lines 14-23.

290.    BC believes that Harry Thomasson wrongfully took $730,000 from him, but as of the date of his deposition on January 9, 2026, he could not say who obtained that loan nor who guaranteed it.  BC Transcript, pp. 47, lines 3-14.

291.    As of January 9, 2026, BC does not know that Anthony Deo obtained and guaranteed a loan from Libertas in the amount of $735,000.00.  BC Transcript, pp. 52, line 15-pp. 53, line 19.

292.    BC found out from Josh Aaronson that Anthony Deo obtained the Libertas loan. BC Transcript, pp. 127, lines 2-15.

293. The DMV license to sell cars at NorthShore was in the name of NorthShore. BC Transcript, pp. 47, lines 15-19.

294. BC has "no problem" with Josh Aaronson approving the tax returns listing the Deos as owners of 189 Sunrise and NorthShore as attached to the VC and the AC at Exhibits G and H.

295. 189 Sunrise and NorthShore had tokens for security on the 189 Sunrise and NorthShore bank accounts. BC Transcript, pp. 64, line 12-pp. 65, line 14.

296. Only BC and Josh Aaronson had the tokens necessary to access 189 Sunrise's and NorthShore's bank accounts. BC Transcript, pp. 59, line 17-pp. 60, line 14.

297. BC looked at 189 Sunrise's and NorthShore's bank accounts and checks daily. BC Transcript, pp. 60, line 22-pp. 61, line 24.

298. BC does not know if the Deos were on the 189 Sunrise and NorthShore bank accounts. BC Transcript, pp. 62, lines 4-20.

299. BC does not know if the Deos signed checks on the 189 Sunrise and NorthShore bank accounts. *Id.*

300. BC and his partners took money from the 189 Sunrise and NorthShore bank accounts. BC Transcript, pp. 62, line 21-pp. 63, line 18.

301. BC ceased receiving K-1's for NorthShore and 189 Sunrise after the tax returns in Exhibit H to the VC and the AC were approved by Josh Aaronson in Exhibit G to the VC and the AC. BC Transcript, pp. 72, line 8-pp. 73, line 21.

302. BC stopped receiving K-1's for NorthShore and 189 Sunrise after the tax returns in Exhibit H to the VC and the AC were approved by Josh Aaronson in Exhibit G to the VC and the AC because BC stopped being the owner of those businesses on the

tax returns and Anthony Deo was the new owner of those businesses on the tax returns. *Id.*

303.    Anthony Deo had day-to-day control over 189 Sunrise and NorthShore. BC Transcript, pp. 76, lines 18-20.

304.    BC's only allegation of harm to him by Harry Thomasson involves Thomasson's return of the $735,000.00 Anthony Deo obtained in a loan from Libertas back to him. BC Transcript, pp. 59, lines 2-10.

305.    BC has no other allegations of harm to him by Harry Thomasson other than the return of the loan money to Anthony Deo. *Id.*

306.    BC cannot give any reason to not trust the accuracy of the tax returns provided as Exhibit H in the VC and AC. BC Transcript, pp. 154, lines 6-10.

307.    Wendy Kwun is the controller for IAG.  BC Transcript, pp. 42, line 16-pp. 43, line 2.

### 7.   Wendy Kwun

308.    Wendy Kwun (hereinafter, "WK")  is a controller at automobile dealerships for at least twenty (20) years.  WK Transcript, pp. 61, lines 12-20.

309.    WK's first year working in an automobile dealership was 1986.  WK Transcript, pp. 12, lines 12-14.

310.    WK first worked at an automobile dealership owned at least in part by the Baron family in the 1990's at Baron Auto Mall.  WK Transcript, pp. 14, lines 5-23; also pp. 16, line 25-pp. 17, line 4.

311.    WK also worked at the Baron-owned Baron Daewoo dealership.  WK Transcript, pp. 17, lines 5-24.

312. WK also worked at the Baron-owned Brooklyn Dodge dealership. WK Transcript, pp. 18, line 9-pp. 19, line 9.

313. WK has worked for the Baron family non-stop since about 2015 when she started working at Island Hyundai. WK Transcript, pp. 27, line 6-pp. 28, line 5.

314. WK also worked for an accountant, Ellen Kera, the same person on the tax approval email chain attached to the VC and the AC as Exhibit G. WK Transcript, pp. 20, line 23-pp. 22, line 2.

315. Wendy Kwun went to help 189 Sunrise and NorthShore in the summer of 2021. WK Transcript, pp. 68, line 25-pp. 70, line 8.

316. WK went to help 189 Sunrise and NorthShore during the summer of 2021 because the controller at 189 Sunrise and NorthShore was having trouble with the operating system. *Id.*

317. When WK went to help with the operating system at NorthShore and 189 Sunrise, the controller was Dan O'Sullivant for those two dealerships. WK Transcript, pp. 62, line 24-pp. 63, line 6; also pp. 83, lines 6-18.

318. Dan O'Sullivan needed help with the computer system and processes at 189 Sunrise and NorthShore. WK Transcript, pp. 83, line 19-pp. 84, line 14.

319. WK does not know if Dan O'Sullivan wrongfully took money out of 189 Sunrise and NorthShore bank accounts. WK Transcript, pp. 84, lines 15-18.

320. WK knows that Thomas Jones was the accountant at 189 Sunrise and NorthShore during her time helping those two dealerships. WK Transcript, pp. 89, lines 12-24.

321. WK knows that the accounts at 189 Sunrise and NorthShore had security called Positive Pay on those accounts. WK Transcript, pp. 99, lines 20-24.

322.    WK knew about the email chain including Josh Aaronson's approval of the tax returns as set forth in the VC and AC at Exhibits G and H.  WK Transcript, pp. 108, line 12-pp. 109, line 4.

323.    WK "connected the accountants" to each other for the email chain attached to the VC and AC as Exhibit G.  *Id.*

324.    WK is aware that Josh Aaronson approved the tax returns attached to the VC and AC as Exhibit H.  WK Transcript, pp. 111, lines 3-14.

325.    WK agrees that the tax returns attached to the VC and AC as Exhibit H list the Deos as owners of 189 Sunrise and NorthShore.  WK Transcript, pp. 112, lines 12-18.

326.    WK knows that Josh Aaronson approved the tax returns for 189 Sunrise and NorthShore attached to the VC and the AC as Exhibit H. WK Transcript, pp. 126, lines 9-11.

327.    WK knows that K-1's indicate ownership.  WK Transcript, pp. 133, lines 9-21.

328.    When WK worked at 189 Sunrise and NorthShore in 2021 and 2022, Josh Aaronson was her boss.  WK Transcript, pp. 118, lines 10-13.

329.    WK took the $735,000.00 on her own decision after Anthony Deo obtained the loan from Libertas.  WK Transcript, pp. 145, lines 2-13.

330.    WK "does not know" why she moved the $735,000.00 to an IAG account after Anthony Deo obtained that money from Libertas. WK Transcript, pp. 148, lines 15-18.

331.    WK has no first-hand knowledge of the reasons why 189 Sunrise and NorthShore accounts had shortfalls even after spending over a year working on those accounts from 2021-2022.  WK Transcript, pp. 217, lines 15-19.

332. But WK did know about the $60-65,000.00 payments to IAG for supplying, *inter alia,* the floor plans to 189 Sunrise and NorthShore. WK Transcript, pp. 199, line 23-pp. 200, line 12.

333. WK has no knowledge of Anthony Deo taking cash from 189 Sunrise or NorthShore. WK Transcript, pp. 218, line 23-pp. 219, line 2.

334. WK has no memory of Anthony Deo doing anything improper regarding 189 Sunrise and NorthShore accounts. WK Transcript, pp. 220, lines 3-8.

335. The "shortfalls" in 189 Sunrise and NorthShore accounts took place in August, 2022, after WK was working there for over a year on various financial matters including the bank accounts. WK Transcript, pp. 224, lines 15-24.

336. The monthly fees in the amount of $60-65,000.00 were paid by the Deos. WK Transcript, pp. 227, line 24-pp. 229, line 17.

337. The monthly fees in the amount of $60-65,000.00 were paid by the Deos to Island Chrysler Jeep Dodge. *Id.*

338. Kwun has access to 189 Sunrise and NorthShore bank accounts since the summer of 2021. WK Transcript, pp. 78, lines 9-21.

### 8. Robert Anthony Urrutia

339. Robert Anthony Urrutia (hereinafter, "TU") has over twenty years of experience with training in the automobile dealership industry. TU Transcript, pp. 7, lines 2-24.

340. TU owned a total of four (4) dealerships: Plaintiff Superb Motors, a Volkswagen dealership in New Jersey, a Mitsubishi dealership in Hartford, Connecticut, and a Nissan dealership in Massachusetts. TU Transcript, pp. 10, lines 18-24.

341.    Bruce Novicky was hired by TU's to be COO for Team Auto/the four dealerships. TU Transcript, pp. 107, lines 13-20.

342.    Anthony Deo was not involved in TU's dealerships in New Jersey, Connecticut, or Massachusetts. TU Transcript, pp. 11, line 20-pp. 12, line 10.

343.    TU doesn't know Harry Thomasson and never spoke to Harry Thomasson prior to TU's deposition on January 8, 2026.  TU Transcript, pp. 15, lines 10-15.

344.    TU knows Harry Thomasson performed some legal service(s) for Superb Motors (because "there's checks" to Harry Thomasson), but as of January 8, 2026, he does not know what Harry Thomasson did for Superb Motors. TU Transcript, pp. 15, line 16-pp. 16, line 3.

345.    Harry Thomasson handled one (1) lawsuit for Superb, which TU learned through this action.  TU Transcript, pp. 16, lines 4-24.

346.    Harry Thomasson's work for Anthony Deo before Anthony Deo's involvement with Superb [on or about December 1, 2022] "doesn't really involve" TU. TU Transcript, pp. 46, lines 3-9.

347.    TU's allegations against Harry Thomasson consist of Thomasson's work for Anthony Deo as an attorney since TU disagrees with how Thomasson has handled Deo's attorney work.  TU Transcript, pp. 46, line 14-pp. 47, line 3.

348.    TU says that Anthony Deo should have an attorney for the lawsuits involving Anthony Deo.  TU Transcript, pp. 47, lines 4-6.

349.    Harry Thomasson's "wrongdoing" began with his representation of Anthony Deo in the Josh Aaronson lawsuit in December 2022.  TU Transcript, pp. 133, line 5-pp. 134, line 12.

350.    Harry Thomasson is not involved in the operation of car dealerships.  TU Transcript, pp. 136, line 18-pp. 137, line 13.

351.    Harry Thomasson never handled any money involving Superb accounts. TU Transcript, pp. 225, lines 6-12.

352.    Harry Thomasson never dealt with any Superb vehicles.  TU Transcript, pp. 225, lines 13-19; also pp. 228, lines 6-11.

353.    Harry Thomasson never took any money from Superb bank accounts. TU Transcript, pp. 225, lines 20-23.

354.    TU has no knowledge of whether or not Harry Thomasson knew of Anthony Deo's source(s) of funds. TU Transcript, pp. 227, lines 19-22.

355.    TU does not know that Harry Thomasson performed legal services for Anthony Deo's business known as Car Buyers.  TU Transcript, pp. 227, lines 23-25.

356.    There are no other accusations that TU thinks Harry Thomasson did wrong to TU or Superb. TU Transcript, pp. 137, line 15-pp. 138, line 6.

357.    TU's allegations about conversations between Harry Thomasson, Marc Merckling, and Dwight Blankenship are just assumptions and without any direct knowledge by TU.  TU Transcript, pp. 136, line 18-pp. 137, line 13.

358.    Dwight Blankenship had permission to move Superb vehicles.  TU Transcript, pp. 33, line 20-pp. 34, line 18.

359.    TU does not know as of January 8, 2026 if Dwight Blankenship took cash or checks for himself from Superb Motors.  TU Transcript, pp. 33, lines 10-16.

360.    TU claims Michael Laurie "played his role" in harming TU/Superb, but has no other causes of action against Laurie that he knew of by January 8, 2026, the date of his deposition.  TU Transcript, pp. 228, line 23-pp. 231, line 13.

361.    The deposition transcript contains all of the allegations that TU can make against the Deo Defendants.  TU Transcript, pp. 231, line 14-pp. 232, line 4.

362.    There is a text from Anthony Deo to Bruce Novicky (Superb 000122) that indicates Deo was opening Flushing bank accounts for Superb, and that there was also a $500,000.00 loan available to Superb.  TU Transcript, pp. 250, line 3-24.

363.    TU never told Anthony Deo not to open the Flushing accounts (Superb 000122).  TU Transcript, pp. 251, lines 4-7.

364.    TU knew Anthony Deo was opening the Flushing accounts before they were opened (from Bruce Novicky), or immediately thereafter in April, 2023.  TU Transcript, pp. 251, line 24-pp. 254, line 19.

365.    TU's knowledge of the Flushing accounts came from TU speaking with Bruce Novicky, TU's Team Auto COO.  TU Transcript, pp. 263, line 21-pp. 264, line 2.

366.    TU told Flushing bank that AD was his partner, but never clarified the percentages of that partnership to Flushing.  TU Transcript, pp. 269, lines 8-19.

367.    TU did not perform due diligence on 189 Sunrise or NorthShore before contracting with Anthony Deo, he just "ran Anthony's name."  TU Transcript, pp. 60, lines 8-21.

368.    Anthony Deo had no authority or ability to take money out of Superb's bank accounts.  TU Transcript, pp. 73, line 25-pp. 74, line 10.

40

369.    Anthony Deo had authority to run all day-to-day operations of Superb Motors. TU Transcript, pp. 34, lines 13-18.

370.    TU had a token system on Superb's bank accounts for security.  TU Transcript, pp. 77, lines 14-16.

371.    There were different levels of security on the token system.  TU Transcript, pp. 78, lines 15-21.

372.    The different levels of security on the token system for Superb's accounts included "view only" and two different people needed to authorize wires.  *Id.*

373.    Anthony Deo's token was for view only.  TU Transcript, pp. 78, lines 22-24.

374.    Since Anthony Deo's token was for view only, he could not and did not authorize anything on Superb accounts.  TU Transcript, pp. 78, line 25-pp. 79, line 10.

375.    Checks were given to Anthony Deo to sign by Kendra in the accounting department at Superb.  TU Transcript, pp. 79, lines 11-23.

376.    Kendra was hired by either TU or TU's Team Auto COO, Bruce Novicky.  *Id.*

377.    TU does not know whether his COO, Bruce Novicky, gave Anthony Deo authority to sign checks. TU Transcript, pp. 138, lines 8-12.

378.    TU caused money to be transferred out of Superb accounts for his own purposes. TU Transcript, pp. 82, lines 14-24.

379.    TU lost his three stores in New Jersey (VW), Connecticut (Mitsubishi), and Massachusetts (Nissan) due to mistakes by the floor plan providers to those dealerships, NMAC.  TU Transcript, pp. 83, line 15-pp. 85, line 12.

380.    TU's accusations of car theft by Anthony Deo have changed from 104, to 102, to 92, to 89, to 83, to 36, to 43, to the "teens."  TU Transcript, pp. 85, line 25-pp. 87, line 18.

381.    The accusation of over 100 cars stolen by Anthony Deo made to the Nassau (NY) Police Department on the night of the LockOut was false. TU Transcript, pp. 148, lines 5-11.

382.    TU never saved Superb's videotape of the Superb lot and dealership after bringing this lawsuit and then closing Superb.  TU Transcript, pp. 87, line 19-pp. 89, line 4.

383.    TU never saved the video that would have shown what cars were on the Superb lot on the night of the LockOut (August 3, 2023) *id.*, although TU could still view the videotape on the night of the LockOut. TU Transcript, pp. 88, line 25-pp. 89, line 4.

384.    TU did not save and does not have video of the Superb lot in the month leading up to the LockOut.  TU Transcript, pp. 224, lines 2-12.

385.    TU closed Superb at the end of October or beginning of November, 2023, 2 or more months after commencing this lawsuit, and nearly 3 or more months after the LockOut when the litigation hold would apply.  TU Transcript, pp. 118, lines 8-13.

386.    TU authorized Team Auto's COO, Bruce Novicky, to supply Anthony Deo with Superb's certificate of incorporation and filing receipt when Anthony Deo was opening an account with Flushing Bank. TU Transcript, pp. 97, line 22-pp. 98, line 24.

387.    TU knew of the bank account getting opened at Flushing Bank in April of 2023 and supplied the documents for that.  TU Transcript, pp. 141, line 15-pp. 143, line 21.

42

388. TU knew that Anthony Deo was opening a dealership known as Gold Coast Motors of Syosset. TU Transcript, pp. 100, line 15-pp. 101, line 14.

389. TU admits that he knew Superb vehicles were moved at times to NorthShore. TU Transcript, pp. 101, line 18-pp. 102, line 12.

390. TU was going to be an owner of Gold Coast Motors of Syosset if he set up a floor plan for Gold Coast Motors of Syosset. TU Transcript, pp. 105, line 10-pp. 106, line 21.

391. TU never set up a floor plan for Gold Coast Motors of Syosset. *Id.*

392. TU does not know if Anthony Deo could or did deal directly with floor plan provider(s) at Superb. TU Transcript, pp. 190, line 16-pp. 191, line 8.

393. TU does not know if Anthony Deo could put cars on or off of floor plans at Superb. *Id.*

394. The emails regarding Anthony Deo's concerns over the accounting department at Superb attached to the VC and AC as Exhibit L were known in real time to TU. TU Transcript, pp. 112-113.

395. TU authorized Bruce Novicky to deal with the issues in the emails attached to the VC and AC as Exhibit L. *Id.*

396. TU never knew until this lawsuit that there was a texting system on Superb accounts for added security. TU Transcript, pp. 115, line 8-pp. 116, line 6.

397. TU now claims that the original "deal" with Anthony Deo as reflected in the agreements attached to the VC and AC as Exhibits I-1 (cross purchase agreement) and I-2 (shareholders agreement) were never finalized. TU Transcript, pp. 163, line 19-pp. 164, line 17.

398.    TU now claims Anthony Deo never became a 49% owner of Superb.  TU Transcript, pp. 166, lines 3-20.

399.    The harm supposedly caused by Anthony Deo to TU's other (non-Superb) three stores was indirect because TU had cross collateralized those stores, leading to these damages being consequential, if any.  TU Transcript, pp. 170, lines 12-19.

400.    TU discussed with Anthony Deo his concerns over Deo's purchase of "gray market" cars only after the cars were purchased and the floor plan provider(s) complained to TU.  TU Transcript, pp. 175, line 3-pp. 177, line 5.

401.    The value of overhead per month during the months in 2023 when Anthony Deo was in charge of day-to-day operations and making payments at Superb is $200,000.00 per month.  *Id.*

402.    All overhead at Superb was paid by Anthony Deo during his time at Superb.  TU Transcript, pp. 194, line 25-pp. 196, line 20.

403.    Anthony Deo told TU about his differences with Josh Aaronson and did not hide those differences from TU.  TU Transcript, pp. 35, lines 4-19.

404.    TU suggested to Anthony Deo that he get his own DMV dealer license(s) since Anthony Deo "was going through all of this" with Josh Aaronson.  *Id.*

405.    TU knew from his discussions with Anthony Deo about the trouble between Deo and Josh Aaronson before Sara Deo gave birth in January 2023 (while she was still pregnant). TU Transcript, pp. 161, lines 9-16.

406.    When Bruce Novicky left TU's employ in July 2024, it hurt TU's then 3 remaining stores (New Jersey, Connecticut, and Massachusetts).  TU Transcript, pp. 109, lines 6-16.

407.    And when someone else named "James" also quit, those dealerships were also hurt more. TU Transcript, pp. 109, line 25-pp. 110, line 9.

408.    While TU told Flushing Bank in April of 2023 that Anthony Deo was his partner, TU indicated in his deposition on January 8, 2026 that he meant to tell Flushing that Anthony Deo "was going to be" TU's partner.    TU Transcript, pp. 272, line 11-pp. 273, line 23.

409.    TU was an "absentee owner" of Superb. TU Transcript, pp. 162, lines 3-9.

Dated: June 1, 2026                                Respectfully submitted,


/S/ *Nipun Marwaha*                                /S/ *Harry R. Thomasson*

_____                         _____
Nipun Marwaha, Esq.                                Harry R. Thomasson, *Pro Se*
1539 Franklin Avenue, Ste. 201                     3280 Sunrise Highway, Box 112
Mineola, New York  11501                           Wantagh, New York  11793
Tel. 516-503-4624                                  Tel.  516-557-5459
Email:  nipun@marwahalaw.com                       Email:  hrtatty@verizon.net