# EXHIBIT F

## STOCK SALE AGREEMENT

THIS AGREEMENT made this ⟨17⟩ day of ⟨May⟩, 202⟨0⟩, by and between:

**DAVID BARON, RON BARON** c/o Joseph S. Aboyoun, Esq., Aboyoun Dobbs LLC, 77 Bloomfield Ave, Pine Brook, New Jersey 07058 (hereinafter collectively referred to as "SELLER");

And

**ANTHONY DEO** c/o Christopher Ring, Esq. 737 Smithtown Bypass, Smithtown, New York 11787 (hereinafter collectively referred to as "BUYER")

And

**BARON NISSAN INC.,** a New York Corporation, with a principal place of business situate at 235 Glen Cove Road, Greenvale, New York 11548 (hereinafter referred to as "COMPANY")

---

## RECITALS:

1. **WHEREAS**, DAVID BARON is the owner and holder of FIFTY (50%) percent of the issued and outstanding capital stock of COMPANY;

2. **WHEREAS**, RON BARON is the owner and holder of FIFTY (50%) percent of the issued and outstanding capital stock of COMPANY;

3. **WHEREAS**, COMPANY is a motor vehicle dealership establishment which conducts business at 235 Glen Cove Road, Greenvale, New York 11548 (the "Premises"), and is duly franchised by NISSSAN NORTH AMERICA ("NISSAN") for the sale of NISSAN motor vehicles, parts and accessories, and is licensed by the State of New Jersey to conduct said business at said Premises aforementioned;

4. **WHEREAS**, SELLER desires to sell, transfer and convey to BUYER, and BUYER desires to purchase and acquire from SELLER, ONE HUNDRED (100%) percent of the capital stock in COMPANY; and

5. **WHEREAS**, the parties desire to memorialize their understandings regarding said stock conveyance and related matters herein.

In consideration of the mutual promises herein contained, the parties agree as follows:

1. Stock Conveyance. At closing, SELLER shall sell, transfer and convey, and BUYER shall purchase and acquire, a FORTY-NINE (49%) percent of the capital stock interest in

1

COMPANY ("Stock Interest") free and clear of all encumbrances. Said conveyance shall be evidenced by the execution and delivery by SELLER at closing of a Stock Power representing the requisite share transfer to BUYER. With the effectuation of the foregoing conveyance, the issued and outstanding capital stock of the COMPANY shall be owned and held as follows:

DAVID BARON 51 shares (51%)
ANTHONY DEO 49 shares (49%)
**TOTAL 100 shares (100%)**

1. Purchase Price; Payment.

   A. The aggregate purchase price to be paid for the subject conveyance shall be the sum of TWO MILLION EIGHT-HUNDRED THOUSAND ($2,800,000.00) DOLLARS, subject to certain adjustments to be made at closing as more specifically addressed in Paragraph 5.

   B. The price shall be paid and satisfied as follows:

      (i)      A Deposit sum of TWO HUNDRED FIFTY THOUSAND ($250,000.00) DOLLARS paid by BUYER concurrently herewith, receipt of which is hereby acknowledged, and held in escrow by the law firm of ABOYOUN DOBBS LLC ("ESCROWEE"), in a non-interest bearing attorney trust account, until closing of title to be paid to SELLER, or returned to BUYER in the event the contingencies hereinafter provided are not satisfied;

      (ii)     The parties hereto shall, simultaneous hereto, execute the Escrow Agreement attached hereto as **EXHIBIT "A"**.

      (iii)    The balance in lump sum, in wired funds at closing, subject to adjustment herein provided.

      (iv)

2. Excluded Assets. The following assets are considered excluded from the subject transaction:

   a. Pre-owned vehicles, except as provided in Paragraph 5 below;
   b. Cash;
   c. Receivables

3. Floorplan Debt, New Vehicles, Service Loaners, and Demonstrator Vehicles.

   a. Floor Plan. The parties shall procure the approval of the COMPANY'S Floor Plan Lender regarding the change of ownership contemplated hereby and the continuance of the COMPANY's floor plan facilities with said floor plan company in an amount sufficient to operate the COMPANY from and after the Closing Date within a period of 120 days next succeeding the date hereof. The approval shall include the release of SELLER from any personal guaranty, liability or obligation.

2

b. <u>Eligible New Vehicles</u>. All new never registered NISSAN motor vehicles are included in the subject transaction subject to the purchase price adjustments in Paragraph 5 below. ("New Vehicles").

c. <u>Demonstrator Vehicles</u>. All demonstrator vehicles are included in the subject transaction subject to the purchase price adjustments in Paragraph 5 below. ("Demo Vehicles").

d. <u>Loaner Vehicles</u>. All loaner vehicles are included in the subject transaction subject to the purchase price adjustments in Paragraph 5 below. ("Loaner Vehicles").

e. <u>Parts and Accessories Inventories</u>. COMPANY'S entire inventory of Nissan Parts and Accessories and non-Factory Parts and Accessories, and Miscellaneous Inventory are included in the subject transaction subject to the purchase price adjustments in Paragraph 5 below.

Other included assets:

(a)    all operating data and records of Company, including, without limitation, customer lists, customer leads, deal jackets, and service files (with any reasonable costs associated with the delivery of such operating data and records to Buyer being borne by Buyer);

(b)    all of the proprietary and license rights of Company, including, without limitation, all post office boxes, trade names, telephone or facsimile numbers and all ring down lines connected thereto and web-sites of or used by Seller (only such websites devoted exclusively to Baron Nissan including e mail addresses and URL's). operating rights, other licenses and permits and other similar intangible property and rights relating in any way to the products or business of Company;

4. <u>Purchase Price Adjustment.</u> The Purchase Price set forth in Paragraph 2 above shall be subject to the following adjustments:

a. <u>New Cars.</u> With respect to New Vehicles, the Purchase Price shall be increased by the factory invoice price for each such motor vehicle, less all factory holdbacks paid or payable to SELLER or COMPANY. Notwithstanding anything herein contained to the contrary, the Purchase Price shall be increased on a dollar for dollar basis for any vehicle COMPANY purchased outright or swapped with another dealer.  Buyer shall also receive all :"final pay" credits paid or to be paid by Nissan. Seller shall credit buyer for any credits due on "in transit" vehicles which are paid or to be paid to Seller; and Swapped vehicles, if 2020 model year shall be priced as if purchased from Nissan.

b. <u>Demo Vehicles.</u> With respect to current model year Demo Vehicles, the Purchase Price shall be increased by the factory invoice price for each such motor vehicle, less twenty

3

cents ($.20) per mile for each mile reflected on the odometer of each such demonstrator unit as of the date of closing.

c. <u>Loaners.</u> With respect to the Loaner Vehicle inventory, the Purchase Price shall be increased by the factory invoice price for each such motor vehicle.

d. <u>Used Vehicles.</u> COMPANY'S Used Motor Vehicles may be purchased by the BUYER subject to the BUYER and SELLER agreeing on a mutually acceptable price. COMPANY is under no obligation to sell and BUYER is under no obligation to purchase any Used Motor Vehicle. If any Used Motor Vehicles are purchased, a list of COMPANY'S Used Motor Vehicles being purchased by BUYER, including make, model and serial number, and purchase price, shall be attached as a schedule to the Bill of Sale at Closing.

e. <u>Parts and Accessories.</u> Prior to the Closing Date, BUYER and SELLER shall retain a mutually acceptable outside parts counting or inventory service ("Parts Inventory Service"), the fees and costs of which will be equally borne by BUYER and SELLER. As close as possible to the Closing Date, BUYER and SELLER shall cause the Parts Inventory Service to identify, make a physical count of, and prepare an inventory list of the Nissan Parts and Accessories, the non-factory parts and accessories, outside vendor parts and accessories, oil, gas, and grease inventories and miscellaneous supplies. If necessary, such physical count shall be adjusted to the Closing Date by the Parties to account for any Nissan Parts and Accessories, the Non-Factory Parts and Accessories, and/or Miscellaneous Inventory received or sold between the date of the count and the Closing Date.

  i. The Purchase Price set forth in Paragraph 2 shall be increased on a dollar-for-dollar basis for (i) COMPANY'S entire inventory of new, never used, returnable Nissan Parts and Accessories, which are listed in the applicable manufacturer's then current parts and accessories catalog, and (ii) all non-factory parts and accessories, outside vendor parts and accessories, oil, gas, and grease inventories and miscellaneous supplies computed at COMPANY'S cost.

  ii. The term "returnable", as used herein, shall mean such items of inventory as are eligible for a regular return for full value in the ordinary course of business or in connection with each Franchisor's return programs, if applicable, and listed in the Franchisor's then current parts and accessories catalog. At closing, SELLER shall assign to BUYER its unused rights to return Nissan Parts and Accessories to the respective Franchisor pursuant to COMPANY'S Dealer Sales and Service Agreement, to the extent assignable.

f. <u>Work In Process.</u> BUYER shall reimburse SELLER on the closing date for COMPANY'S net direct cost of completed labor and parts installed, or materials used, or in process of installation on any uncompleted repair orders in process and in COMPANY'S possession on the closing date. Said uncompleted repair orders shall become the property of BUYER. BUYER shall complete such repair work and shall be

4

entitled to collect the entire proceeds covering such repair work from the customers of COMPANY. With respect to such work-in-process, BUYER hereby agrees to indemnify and hold SELLER harmless from any and all claims in connection with or arising from work performed in connection with such work-in-process by themselves, respectively (including reasonable attorneys' fees and costs).

5.  Outstanding Contracts and Orders and Assumed Liabilities.

    a.  The parties understand that there may be, on the date of closing, outstanding sales and contracts and/or orders ("Contracts and/or Orders") between COMAPNY and third-party purchasers for the sale or lease of new NISSAN motor vehicles. For the purpose of arranging for the proper fulfillment of the Contracts and/or Orders and all deposits paid on account thereof, the parties have agreed that SELLER shall adjust the purchase price in Paragraph 2 for all ordered new, current-model year motor vehicles and previous-model year motor vehicles to third party purchasers, whereby said purchase price shall be discounted dollar for dollar for all deposit monies received in connection with the Contracts and/or Orders prior to closing. BUYER covenants and agrees to perform said Contracts and/or Orders in place and instead of SELLER. In consideration of the foregoing, SELLER shall receive from BUYER a sum equal to fifty (50%) percent of the gross profit thereon as and when each Contract and/or Order is fully consummated (to be paid within five (5) business days of consummation of each subject sale). The term "gross profit", as used herein, shall mean the aggregate sales price received by BUYER (inclusive of all financing and insurance and other back-end monies received with respect to the Contract and/or Order), less (i) dealer cost (excluding preparation cost); and (ii) actual and customary sales commissions to be paid on the Contracts and/or Orders.

6.  Intentionally Omitted.

7.  Lease Aspects.

    a.  As an express and prime inducement for the parties to enter into the within Agreement, BUYER has agreed to enter into that certain Lease Agreement attached hereto and made a part hereof as Exhibit "C-1" ("Lease"). The Lease shall be entered into by the Dealership Entity and shall be personally guaranteed by the BUYER by executing the form of Lease Guaranty attached hereto and made a part hereof as Exhibit "C-2" ("Guaranty"). Both the Lease and Guaranty shall be executed and delivered to the SELLER at closing.

8.  Contingency. The parties' respective obligations hereunder are contingent upon the satisfaction of the foregoing:

    A.  Franchise. Within a period of ninety (90) days next succeeding the date hereof, the parties shall procure the written approval by Nissan North America, Inc. ("Nissan") of the subject stock ownership change, authorizing BUYER'S sale and factory authorized service of NISSAN motor vehicles, parts, and accessories at the Premises, specifically

5

subject to known facility repair and modification and existing warranty loan from Nissan Motor Acceptance Corporation estimated to be $850,000, which BUYER acknowledges and SELLER shall continue to repay as a post-closing obligation. SELLER shall cooperate with BUYER in connection with said approval. SELLER shall promptly dispatch notification of the within Agreements to NISSAN in accordance with the provisions of the applicable provisions of the New York Motor Vehicles Dealers Franchise Act (the "Act"), and BUYER shall promptly submit to NISSAN all information required by said Act and NISSAN to obtain the subject approvals. BUYER represents that it will pursue NISSAN approval in good faith and with all due expediency, and that it knows of no reason why it's application would be rejected by Nissan

B. <u>Termination</u>. If the aforesaid contingency is not satisfied or waived within said seventy-five (75) day period SELLER may give written notice to BUYER that it terminates this Agreement or SELLER, in its sole discretion, may extend said period in thirty (30) day increments to permit satisfaction of the Franchise Contingency. In the event of such termination, the Escrowee is authorized to release to BUYER the deposit monies paid hereunder within seven (7) days of written request for same and neither party shall have any liability to the other.

9. <u>The Closing</u>

a. <u>Closing Date.</u> The Closing Date shall be not later than fifteen days after the satisfaction of all conditions set forth in Section 9 herein.

b. <u>Transactions at Closing</u>. At the Closing, the following transactions shall occur, all of which shall be deemed to occur simultaneously:

i. <u>SELLER shall deliver or cause to be delivered to BUYER:</u>
   1. A Stock Assignment evidencing the change in ownership contemplated herein;
   2. At any point on the buyer may purchase the remaining 51% for the purchase price of a dollar ($1)
   3. Appropriate certificates of title, or certificates of origin, or other evidence of ownership, duly endorsed for all vehicles owned by Company
   4. Any and all assignment and assumption agreements as may be required by this Agreement;
   5. The Customer Lists, and a list of work in process, sublet repairs and We-Owes which is current as of the Closing Date;
   6. Resignations of SELLER as a dealer owner and dealer operator for the Franchise;
   7. Such other documents as requested by NISSAN; and
   8. Such other documents as may be reasonably necessary to complete the transactions contemplated by this Agreement

   ii.   <u>BUYER shall deliver or cause to be delivered to SELLER:</u>

      1.  Wire transfer in immediately available federal funds, for the Purchase Price less the amount of the Deposit;

      2.  Any and all assignment and assumption agreements as may be required by this Agreement;

      3.  Certification of BUYER certifying that all representations and warranties made by BUYER to SELLER are true and correct as of the Closing Date;

      4.  Such other documents required by NISSAN; and

      5.  Such other documents as may be reasonably necessary to complete the transactions contemplated by this Agreement, or as may be reasonably requested by SELLER.

   iii.  SELLER and BUYER shall execute and deliver at Closing IRS Form 8594 and a Closing Statement reciting the documents delivered, the parties' debits and credits, and actions, if any, to be taken after the Closing Date.

   iv.  SELLER and BUYER agree to attach to the Closing Statement an undertaking to reconcile post-Closing adjustments with respect to monies due to or from the Franchise following the Closing Date.

10.  <u>Dispute Resolution.</u> This Agreement is subject to the dispute resolution process set forth in the Agreement.

   a.  <u>Non-Binding Mediation.</u> In the event any controversy or claim arises out of or related to this Agreement or the breach thereof, the dispute shall be submitted to non-binding mediation. This mediation shall be conducted in Nassau County, New York or in such other location mutually agreed to by the parties. If the parties are unable to agree on an acceptable mediator, the parties agree to submit the dispute for mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure. The mediation shall be conducted and completed within fifteen (15) days after referral of the dispute to the mediator or, if the mediator=s schedule does not allow, as soon as the mediator=s schedule allows. The expense of the mediation shall be borne equally between the parties.

   b.  <u>Arbitration.</u> In the event of a dispute between BUYER and SELLER with respect to any issue arising under this Agreement as a matter to be decided by arbitration, such dispute shall be determined by arbitration held in Nassau County, New York.

     i.  BUYER and SELLER shall agree upon the appointment of a single arbitrator who shall be a fit and impartial person and who shall have had at least ten (10) years' experience as either an arbitrator or judge. If BUYER and SELLER shall fail to agree upon the appointment of an arbitrator, then the arbitrator shall be appointed by the American Arbitration Association.

ii. The arbitrator, after being duly sworn to perform his/her duties with impartiality and fidelity, shall proceed with all reasonable dispatch to determine the question submitted. The arbitration shall be conducted in accordance with the Rules of the American Arbitration Association (or any successor thereto), and the award of the arbitrator shall be binding, final and conclusive on the parties. The decision of the arbitrator shall be rendered within thirty (30) days after his/her appointment, and such decision shall be in writing and in duplicate, one counterpart thereof to be delivered to each of the parties. Either party shall have the right to enter a judgment based upon the award of the arbitrator.

iii. The fees of the arbitrator as well as the expenses incident to the proceedings, shall be borne equally between BUYER and SELLER however the arbitrator shall be entitled to award costs, expenses and reasonable attorney's fees and expenses to the prevailing party in any proceeding.

11. <u>BUYER Representations</u>.

(a) <u>Representations and Warranties of BUYER</u>. BUYER hereby represents, warrants, and covenants to SELLER as follows:

(b) <u>Good Standing</u>. BUYER is an individual duly organized, validly existing and in good standing, and is qualified to do business under the laws of the State of New York, and is qualified and in good standing under the laws of any other state in which it transacts business, and has the requisite corporate power and any required third party approval to effectuate this transaction and carry on the Dealership's operations. BUYER has no knowledge of any matter or condition that might: (i) disqualify or prevent BUYER from being approved as an authorized NISSAN dealer by NISSAN, and has no action pending or overtly threatened against it which might disqualify BUYER from being approved as a NISSAN dealer by NISSAN; or (ii) prevent BUYER from maintaining the financing necessary to complete the transactions contemplated hereunder.

(c) <u>Binding Agreement</u>. This Agreement and the transactions contemplated herein have been duly and validly authorized by all necessary action, and this Agreement and the documents executed in connection herewith have been duly executed and delivered by or on behalf of BUYER and constitute the valid and binding obligations of BUYER, enforceable against BUYER in accordance with their terms except to the extent limited by bankruptcy, insolvency, reorganization, or creditor's rights.

(d) <u>Absence of Defaults</u>. Neither the execution and delivery of this Agreement, nor compliance with the terms and provisions hereof, on the part of BUYER will breach any statute or regulation of any governmental authority or will at the Closing Date conflict with or result in a breach of any of the terms, conditions, or provisions of any agreement or instrument to which BUYER is a party or by which BUYER is or may be bound or to which its properties may be subject or constitute a default thereunder or result in the creation or imposition of any lien, charge, or encumbrance or cause of action or claim of any nature whatsoever against BUYER.

8

(e) <u>Authority and Power</u>. BUYER has full, complete, and unrestricted power and authority to enter into this Agreement, to purchase the Assets as contemplated by this Agreement, to perform its obligations under this Agreement, and to carry out the transactions contemplated hereby. BUYER will deliver a copy of the Company's resolutions authorizing execution of this Agreement upon execution of this Agreement.

(f) <u>Bankruptcy</u>. No insolvency proceedings of any character, including, without limitation, bankruptcy, receivership, reorganization, composition, or arrangement with creditors, voluntary or involuntary, affecting BUYER are pending or, to the knowledge of BUYER, threatened, and BUYER has not made any assignment for the benefit of creditors nor taken any other action with a view to or which would constitute the basis for the institution of such insolvency proceeding.

(g) <u>Financial Capacity</u>. BUYER has sufficient funds to pay the Purchase Price and the fees and expenses required to be paid by BUYER to consummate the transaction contemplated by this Agreement.

(h) <u>No Litigation</u>. There are no material litigation, judgments or insolvency proceedings threatened or pending against BUYER which would impair BUYER's ability to consummate the transactions contemplated by this Agreement.

(i) <u>Business Judgment</u>. BUYER acknowledges that in entering into this Agreement, BUYER is relying solely on its own business judgment and accepts the assets being transferred and the respective Business "as is", except as may be otherwise expressly represented elsewhere herein.

13. <u>**REPRESENTATIONS AND WARRANTIES OF SELLER.**</u> Seller makes the following representations and warranties to Buyer:

9

a. <u>Corporate Status</u>.  Baron Nissan is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York and has the requisite power and authority to own its properties and assets and to carry on its business as now being conducted. Seller has fully complied with all of the requirements of any statute governing the use and registration of fictitious names, and has the legal right to use to use the names under which it operates its business, subject to the Nissan Dealer Agreement (as defined in <u>Section 3.8</u>) and rights to Nissan. There is no pending or threatened proceeding for the dissolution, liquidation, insolvency or rehabilitation of Seller. Seller owns and operates the Nissan Business pursuant to Dealer Sales and Service Agreement between Nissan and Baron Nissan.

b. <u>Taxes.</u>  That all federal, state, or local taxes imposed upon COMPANY which are due and payable either prior to or at Closing will be current.

c. <u>Stock Ownership.</u>  Seller is the sole legal, beneficial, record, and equitable owner of the Transferred Membership Interests, free and clear of all Encumbrances. The Transferred Membership Interests were issued in compliance with applicable laws and the organizational documents of the COMPANY and are not subject to or in violation of any preemptive acquisition or similar rights of any Person

d. <u>Power and Authority</u>.  Seller has the full power and authority to execute and deliver this Agreement, to perform its respective obligations hereunder and to consummate the transactions contemplated hereby.  Seller has taken all action necessary to authorize the execution and delivery of this Agreement, the performance of its respective obligations hereunder and the consummation of the transactions contemplated hereby.

e. <u>Enforceability</u>.  This Agreement has been duly executed and delivered by Seller, and constitutes the legal, valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

f. <u>No Violation</u>.  The execution and delivery of this Agreement by Seller, the performance by Seller of its obligations hereunder and the consummation by it of the transactions contemplated by this Agreement will not (a) contravene any provision of the Articles of Incorporation or Bylaws of Seller, (b) violate or conflict with any law, statute, ordinance, rule, regulation, decree, writ, injunction, judgment or order of any governmental authority or of any award which is either applicable to, binding upon or enforceable against Seller.

10

g. <u>Litigation</u>.  There is no action, suit or other legal or administrative proceeding or governmental investigation pending, or to the knowledge of Seller, threatened, anticipated or contemplated against, by or affecting Seller, or the Purchased Assets, or which question the validity or enforceability of this Agreement or the transactions contemplated hereby, and, to the knowledge of Seller, there is no basis for any of the foregoing.  There are no outstanding orders, decrees or stipulations issued by any governmental authority in any proceeding to which Seller is or was a part which have not been complied with in full or which continue to impose any material obligations on Seller.

h. <u>Compliance with Laws.</u>  To Seller's actual knowledge, Seller is, and the Purchased Assets are, in material compliance with all laws, regulations and orders applicable to it, its business and operations, including, without limitation, any and all federal, state or local environmental law, statute, code, rule or regulation.  With the exception of the Dealer Sales and Service Agreement held by Seller (the "Dealer Agreement"), Seller is not subject to any contract, decree or injunction in which it is a party which restricts the continued operation of any business or the expansion thereof to other geographical areas, customers and suppliers or lines of business.

i. <u>Labor and Employment Matters</u>.  Company is a party to and bound by a collective bargaining agreement, a copy of which is attached hereto as part of Buyer agrees to assume the collective bargaining agreement

14. <u>Indemnification</u>.

a. SELLER ("Releasee") shall be released, defended, indemnified and held harmless with regard to the representations, warranties, covenants or agreements made by BUYER for the amount of any and all liabilities, losses, damages, claims, costs, and expenses, interest, awards, judgments and penalties (including, without limitation, reasonable attorneys' fees and expenses) actually suffered or incurred by SELLER (including, without limitation, any action brought or otherwise initiated by any of them)  collectively, "Damages") to the extent arising out of or resulting from: (a) the business operation and/or any matters arising therefrom or associated therewith of COMPANY after the Closing. BUYER shall provide full indemnification plus costs, expenses and attorney's fees and expenses for any such claims made for the period after the closing—along with NYS and US tax claims, employment claims, environmental claims and the like.

b. BUYERS ("Releasee") shall be released, defended, indemnified and held harmless with regard to the representations, warranties, covenants or agreements made by SELLER for the amount of any and all liabilities, losses, damages, claims, costs, and expenses, interest, awards, judgments and penalties (including, without limitation, reasonable attorneys' fees and expenses) actually suffered or incurred by BUYER (including, without limitation, any action brought or otherwise initiated by any of them)  collectively, "Damages") to the extent arising out of or resulting from: (a) the business operation and/or any matters arising therefrom or associated therewith of COMPANY prior to the Closing. SELLER shall provide full indemnification plus costs, expenses and attorney's fees and expenses for any such

claims made for the period prior to the closing, including NYS and US tax claims, employment claims, environmental claims, union or collective bargaining claims and the like.

15. Further Assurances. From and after the Closing, each party shall execute, acknowledge and deliver all such further instruments, documents, bills of sale, assignments, transfers, conveyances and assurances as may be required or appropriate to affect the intent and purpose of this Agreement.

16. Cooperation. Each of the parties agrees to cooperate with the other in the preparation and filing of all forms, notifications, reports and information, if any, required or reasonably deemed advisable pursuant to any law, rule or regulation in connection with the transactions contemplated by this Agreement and to use their respective efforts to agree jointly on a method to overcome any objections by any governmental authority to any such transactions.

17. Notification of Certain Matters. Each party to this Agreement shall give prompt notice to the others of the occurrence or non-occurrence of any event which would likely cause any representation or warranty contained herein to be untrue or inaccurate, or any covenant, condition or agreement contained herein not to be complied with or satisfied (provided, however, that any such disclosure shall not in any way be deemed to amend, modify or in any way affect the representations, warranties and covenants made by any party in or pursuant to this Agreement).

18. Confidentiality. Except as may be required by law, rule, regulation or as otherwise permitted or expressly contemplated herein, no party hereto and none of their respective affiliates, employees, agents and representatives shall disclose to any third party this Agreement or the subject matter or terms hereof or any confidential information or other proprietary knowledge concerning the business or affairs of any other party which it may have acquired from such party in the course of pursuing the transactions contemplated by this Agreement without the prior written consent of the other parties hereto; provided, that any information that is otherwise publicly available, without breach of this provision, or has been obtained from a third party without a breach of such third party's duties, or independently developed by the party as evidence by the records of such developing party, shall not be deemed confidential information, and after the Closing Buyer shall not be restricted with respect to any confidential information that was included among the Purchased Assets. In the event either party is served with an order from a court of competent jurisdiction requiring the disclosure information deemed confidential pursuant to this paragraph the party receiving such order shall notify the other party of any such order immediately upon its receipt of the same and shall use its commercially reasonable efforts to provide the other party with an opportunity to contest such order. The obligations of this paragraph shall survive termination of this Agreement.

19. Files. Buyer shall retain the deal jackets/folders (for completed sales as well as dead deals) for the minimum period required by New York law. For three (3) years after the Closing Date

Buyer shall permit Seller to access and review at the Buyer's office or location of the documents, any deal jackets/folders for sales occurring prior to the Closing Date upon reasonable notice to Buyer.

20. <u>Risk of Loss Pending Closing</u>.  Risk of loss and/or damage to the Premises and the subject matter of this Agreement by casualty and liability for personal injury, property and leasehold improvement damage shall be borne by SELLER until the closing of title.  If and in the event the Premises and/or the subject matter of the within Agreement is damaged or destroyed (in whole or in part) prior to the closing of title, the parties shall nevertheless proceed to closing, provided the BUYER receives an assignment of the insurance proceeds and the exclusive rights to adjust the loss with SELLER'S insurer.  BUYER shall utilize the insurance proceeds to repair the Premises.  SELLER agrees to maintain its insurance coverage in full force and effect insuring the Premises and the subject matter of this Agreement.  SELLER shall promptly notify BUYER in writing of any loss and/or damage contemplated by the provisions hereof.

21. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws.

22. <u>Independent Counsel</u>.  This Agreement has been prepared at the joint request of SELLER and BUYER.  Each party has retained and has consulted with separate counsel as follows: BUYER-Howard E. Greenberg, Esq. 180 East Main Street, Suite 300, Smithtown, New York 11787, hgreenberg@hgreenberglaw.net; SELLER – Joseph S. Aboyoun, Esq. of Aboyoun Dobbs LLC. Both represent that they have had ample opportunity to consult with said counsel before the execution hereof, or have waived the right to do so.  Both further represent that they have not relied upon the advice of their counsel in connection herewith.

23. <u>Notices</u>.  Any notice, communication, request, reply or advice or other notice pertaining to this Agreement to be given, made or accepted by either party to the other must be in writing and shall be given or be served only by dispatching the same by Federal Express (or any other established overnight courier delivery service), or by email or facsimile, with a posting of the hard copy within twenty-four (24) hours of said transmittal, and such notice so dispatched shall become effective on the date of receipt, or by email to the addresses below.  For purposes thereof, the addresses of the parties hereto are as follows:

If to SELLER:    Joseph S. Aboyoun, Esq.
         ABOYOUN DOBBS LLC
         77 Bloomfield Ave
         Pine Brook, NJ  07058
         jaboyoun@aboyoundobbs.com

If to BUYER:    ANTHONY DEO
         c/o Christopher Ring, Esq.
         737 Smithtown Bypass
         Smithtown, New York 11787
         Phone – 631-257-5845
         E-mail – cring@cringlaw.com

24. <u>Broker</u>. Each party warrants and represents to the other that the Business was not shown to BUYER by any broker. All parties warrant and represent that no person was contracted with and/or contacted by, or negotiated with or on behalf of either party, in connection with the subject matter of this Agreement and/or any part hereof and covenants and agrees to indemnify and save the other harmless with respect to the claims of any broker for said commissions. This provision shall survive Closing.

25. <u>David Baron's Personal Office</u>: David Baron shall have exclusive occupancy of his personal office at the Premises at no charge for a period of 24 months following the closing.

26. <u>Assignment</u>. This Agreement may not be assigned by BUYER without the prior written consent of SELLER, which may be withheld in the sole, absolute and unreviewable discretion of the SELLER.

27. <u>Miscellaneous Provisions</u>.

(a) This Agreement shall constitute the entire agreement of the parties with respect to the subject matter hereof, supersedes any and all other agreements, written or oral, between the parties concerning the subject of this Agreement (except for the other agreements referred to herein), and may not be altered, modified, amended, or terminated, except in a writing signed by all of the parties. Notwithstanding the foregoing, if this transaction does not close, this Agreement shall have no effect on any prior agreement that may exist between the parties.

(b) This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, executors, representatives, successors, and assigns.

(c) This Agreement shall be deemed to have been made and executed in the State of New York, and the validity, construction, interpretation, effect, and enforcement thereof shall be governed by the laws of the State of New York.

(d) The various terms, provisions, and covenants herein contained shall be deemed to be separable and severable, and the invalidity or unenforceability of any of them shall in no manner affect or impair the validity or enforceability of the remainder thereof.

(e) This Agreement may be executed simultaneously in two or more counterparts, each of which shall in such event be deemed an original, but all of which together shall constitute one and the same instrument.

(f) This Agreement may not be amended or modified except by an instrument in writing signed by SELLER and BUYER.

14

(g)    The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

(h)    This Agreement shall be binding upon and inure solely to the benefit of the parties signatory to this Agreement and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

(i)    Except as required by law, no party to this Agreement shall make, or cause to be made, any press release or public announcement with respect to this Agreement or the transactions contemplated hereby or otherwise communicate by any media without the prior written consent of the other party hereto (which consent shall not be unreasonably withheld) and the parties hereto shall cooperate as to the timing and contents of any such press release or public announcement.

(j)    The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement is not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof in addition to any other remedy at law or equity.

(k)    The parties have jointly participated in the negotiation and drafting this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and caused their proper corporate seal to be hereto affixed, the day and year first above written.

WITNESS:

SELLER:

_____     _____
                                    DAVID BARON

_____     _____
                                    RON BARON

ATTEST:

COMPANY:

BARON NISSAN, INC.

_____     By:_____
                                    DAVID BARON, President

WITNESS:

BUYER:

_____     _____
                                    ANTHONY DEO

16

**1007**

**GOLD COAST MOTORS OF SUNRISE LLC**

1-32/210 N
2990

Date ___5·17·21___

Pay To The
Order Of ___David Baron___                                    $ 250,000 . 0̸⁄∞

___Two hundred & fifty thousand ⊗_____ Dollars

**BANK OF AMERICA**

ACH R/T 021000322

For ___Deposit Nissan Stock Sale___

⑆001007⑆ ⑈021000322⑉ 48308 2346406⑆

---

**1006**

**GOLD COAST MOTORS OF SUNRISE LLC**

1-32/210 NY
29904

Date ___5·17·21___

Pay To The
Order Of ___Ron Baron___                                      $ 22 500 . 00⁄∞

___Twenty two thousand five hundred 00⁄∞_____ Dollars

**BANK OF AMERICA**

ACH R/T 021000322

For ___Nissan Rent___

⑆001006⑆ ⑈021000322⑉ 48308 2346406⑆

---

**1005**

**GOLD COAST MOTORS OF SUNRISE LLC**

1-32/210 N
2990

Date ___5·17·21___

Pay To The
Order Of ___David Baron___                                    $ 22500 . 0̸

___Twenty two thousand five hundred ⊗_____ Dollars

**BANK OF AMERICA**

ACH R/T 021000322

For ___Nissan Rent___

⑆001005⑆ ⑈021000322⑉ 48308 2346406⑆

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** made this 17 day of May 2021, by and between:

307 Glen Cove Road Inc., a New York Corporation and Baron Realty Inc., a New York Corporation c/o Joseph S. Aboyoun, Esq., Aboyoun Dobbs LLC, 77 Bloomfield Avenue, Pine Brook, New Jersey 07058 hereinafter referred to as "LESSOR");

AND

**GOLD COAST MOTORS OF ROSLYN LLC**, a New York Limited Company c/o Harry R. Thomasson Esq. 3280 Sunrise Hwy Ste 112, Wantagh NY 11793 (hereinafter referred to as "LESSEE").

### WITNESSETH:

1.        **DEMISE OF PREMISES**. In consideration of the rents herein reserved and the terms, covenants, agreements and conditions herein contained, LESSOR hereby leases and demises to LESSEE, for the term of years herein specified, those certain tracts of land located at 1) 235 Glen Cove Road, Greenvale, New York 11548 ("235 Property") ; and 2) 307 Glen Cove Road, Greenvale, New York 11548 ("307 Property") all as more specifically described in EXHIBIT "A", attached hereto and made a part hereof, together with the improvements located on said land, whether now standing or hereafter erected (said land, building and improvements being herein collectively called the "Premises").

Subject to all present and future liens, encumbrances, conditions, rights, easements, restrictions, right of way covenants, other matters of record, and zoning and building laws, ordinances, regulations, and codes affecting or governing the buildings and land, or which may hereafter affect or govern the building and/or land, and such other matters as may be disclosed by inspection or survey; and subject to the conditions and limitations herein set forth, the term of this Lease shall be for ten (10) years, and shall be deemed to have commenced _____ (the "Commencement Date"), and shall extend through _____ ("Base Term"), at which time this Lease shall terminate, except as otherwise herein provided, or, unless terminated sooner as herein provided.

2.        **RENTAL**.

(a)        LESSEE covenants and agrees to pay to LESSOR as base rent for the Premises ("Base Rent") the following:

i) For the period _____through and including _____, the sum of FORTY-FIVE THOUSAND DOLLARS ($45,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $27,000 is paid to Baron Realty Inc. and $18,000 is paid to 307 Glen Cove Road Inc. **However, notwithstanding the foregoing, Lessee shall receive a rent credit for the 1st and 6th month in this FIRST year only.**

ii) For the period _____through and including _____, the sum of FORTY-SIX THOUSAND DOLLARS ($46,000.00) per month, , which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $27,600 is paid to Baron Realty Inc. and $18,400 is paid to 307 Glen Cove Road Inc.

iii)For the period _____through and including _____, the sum of FORTY-SEVEN THOUSAND DOLLARS ($47,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $28,200 is paid to Baron Realty Inc. and $18,800 is paid to 307 Glen Cove Road Inc.

iv) For the period _____through and including _____, the sum of FORTY-EIGHT THOUSAND DOLLARS ($48,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $28,800 is paid to Baron Realty Inc. and $19,200 is paid to 307 Glen Cove Road Inc.

v) For the period _____through and including _____, the sum of FORTY-NINE THOUSAND DOLLARS ($49,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $29,400 is paid to Baron Realty Inc. and $19,600 is paid to 307 Glen Cove Road Inc.

vi) For the period _____through and including _____, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

vii) For the period _____through and including _____, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

viii) For the period _____through and including _____, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

ix) For the period _____through and including _____, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

x) For the period _____through and including _____, the sum of FIFTY THOUSAND DOLLARS ($50,000.00) per month, which shall be broken down between Baron Realty Inc. and

307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

(b)         In addition to the Base Rent, LESSEE shall pay as Additional Rent any and all real estate taxes, assessments, sewer and water charges, insurance charges and such further and additional sums payable by LESSEE as herein provided.

(c)         For purposes of this Lease, a "Lease Year" shall be deemed to be each consecutive period of twelve (12) full calendar months during the term, commencing on the Commencement Date, and ending each year on the day prior to the anniversary Commencement Date of the following year.

(d)         All charges payable pursuant to this Lease whether as Additional Rental or otherwise, are hereinafter called and qualify as "Additional Rent." All payments of Additional Rent, unless otherwise provided herein, shall be due and payable to LESSOR in the same manner as set forth in subparagraph (a) hereof on the first (1st) day of the calendar month, or as otherwise set forth in this Lease. Base Rent and Additional Rent are sometimes referred to collectively as "Rent."

(e)         Each of said monthly Base Rent payments shall be paid on the first (1st) day of each and every month, in advance, during the Base Term hereof (or any extension thereof). Rent shall be paid at such address as LESSOR shall designate without set off or deduction of any kind.

(f)         In the event that any payment of Rent due hereunder shall be overdue for more than five (5) days, it shall bear an interest at a rate per annum which is five (5%) higher than the "Prime Rate" of interest as published in the Wall Street Journal. In addition a "late charge" of five (5%) percent for each dollar so overdue shall be charged by the LESSOR for each month or part thereof that the same remains overdue. This charge shall be in addition to and not in lieu of any other remedy the LESSOR may have under the circumstances and is in addition to any reasonable fees and charges of any agents or attorneys LESSOR may employ as a result of any default in the payment of Rent hereunder, whether authorized herein or by law. Any such "late charges," if not previously paid, at the option of the LESSOR, shall be added to and shall become part of the succeeding rental payment to be made hereunder and shall be deemed to constitute Additional Rent. Notwithstanding this late charge and interest, LESSEE shall be in Default under this Lease if all payments required to be made by LESSEE are not made at or before the times herein stipulated.

(g)         If LESSEE shall fail to pay any monthly installment of Rent pursuant to the terms of this Lease, when each such payment is due, for two (2) consecutive months, or three (3) times in any period of twelve (12) consecutive months, then in addition to its other available remedies, LESSOR may, by giving written notice to LESSEE, exercise any of the following options as a condition of LESSEE's curing such Default:  (A) declare the Rent reserved under this Lease for the next six (6) months (or at LESSOR's sole option for a lesser period) to be due and payable within ten (10) days of such notice; or (B) require an additional security deposit to be paid to LESSOR within ten (10) days of such notice, in an amount not to exceed six (6) months' rent. LESSOR may invoke any of the options provided for herein at any time during which a Default has occurred.

(h)          This Lease is a net net net lease. All charges whatsoever against the Premises shall be the obligation of LESSEE and not LESSOR, and shall be deemed Additional Rent. All monies payable by LESSEE or chargeable to LESSEE under this Lease shall likewise be deemed Additional Rent. LESSOR shall have all the rights and remedies with respect to nonpayment of Additional Rent as is provided in case of nonpayment of rent.

(i)          This Lease shall be jointly and severally guaranteed by ANTHONY DEO; LEONARD TARZIA (collectively "GUARANTOR") (and any other persons who are or shall become principals of LESSEE) during the Base Term of this Lease (or any extension thereof), as provided in those certain Lease Guaranties and Stock Pledges, attached hereto and made a part of this Lease. Said Guaranties and Pledges are annexed hereto as Exhibit B, C, D and E, and incorporated by reference herein.

(j)          <u>EXTENTION TERM</u>. LESSOR grants to LESSEE (but not any permitted successors or assignees) the option to extend the Base Term (the "Extension Option") with respect to all of the rentable area of the Premises leased by LESSEE as of the end of the Base Term for one (1) ten-year period (the "Extension Term"). The Extension Term shall commence immediately following the end of the Base Term. The Extension Option shall be exercised, if at all, by written notice to LESSOR at any time during the Initial Term on or before the date that is twelve (12) months prior to the end of the Base Term, which notice shall be irrevocable by LESSEE. Notwithstanding the foregoing, if an Event of Default occurs under this Lease, LESSOR shall have, in addition to all of LESSOR'S other rights and remedies under this Lease, the right to terminate any exercise of LESSEE'S Extension Option and to cancel unilaterally LESSEE'S exercise of the Extension Option, in which event the end of the Base Term shall be and remain the then scheduled Expiration Date, and LESSEE shall have no further rights under this Lease to renew or extend the Base Term. Upon valid exercise of LESSE'S Extension Option, the Base Term shall be extended by a period of ten (10) years subject to the same terms hereof, with the exception that the Base Rent shall increase as follows:

i) For the period _____ through and including _____, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

ii) For the period _____ through and including _____, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

iii) For the period _____ through and including _____, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

iv) For the period _____ through and including _____, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

v) For the period _____ through and including _____, the sum of FIFTY-FIVE THOUSAND DOLLARS ($55,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

vi) For the period _____ through and including _____, the sum of SIXTY THOUSAND DOLLARS ($60,000.00) per month which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

vii) For the period _____ through and including _____, the sum of SIXTY THOUSAND DOLLARS ($60,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

viii) For the period _____ through and including _____, the sum of SIXTY THOUSAND DOLLARS ($60,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

ix) For the period _____ through and including _____, the sum of SIXTY THOUSAND DOLLARS ($60,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

x) For the period _____ through and including _____, the sum of SIXTY THOUSAND DOLLARS ($60,000.00) per month, which shall be broken down between Baron Realty Inc. and 307 Glen Cove Road Inc. on a 60%/40% basis, such that $30,000 is paid to Baron Realty Inc. and $20,000 is paid to 307 Glen Cove Road Inc.

3.      **REAL ESTATE TAXES; ASSESSMENTS; WATER CHARGES, ETC..**

a.      LESSEE shall be solely responsible for all charges for heat, water, sewer, refuse removal, gas, electricity, pest extermination and all other utilities used or consumed on the Premises. LESSOR shall not be liable to LESSEE for interference in or interruption of any utility service, nor shall any curtailment or interruption constitute a constructive eviction or grounds for rental abatement in whole or

in part hereunder. If LESSOR shall pay for any of LESSEE'S utilities, LESSOR may charge the amount of such payments to LESSEE as additional rent, payable the month following LESSOR'S invoice.

b.        LESSEE shall be liable for all taxes levied against personal property and trade fixtures placed by LESSEE in the Premises. LESSEE shall, during the Initial Term, any renewal Option Term and any period of holdover tenancy of this Lease, pay all real estate taxes, assessments and governmental charges of any kind and nature whatsoever levied or assessed against the Premises or any part thereof. All such payments shall be made at least ten (10) days before any interest or penalties begin to accrue. If LESSOR shall pay for any of the foregoing LESSEE'S taxes (including any payment by LESSOR in an escrow payment to LESSOR'S Lender), LESSOR may charge the amount of such payments to LESSEE as additional rent payable monthly to LESSOR. LESSEE shall deliver to LESSOR, within ten (10) days prior to the date interest and penalties would begin to accrue, proof reasonably satisfactory to LESSOR that such taxes, assessments and charges have been timely paid. Taxes for the first and last quarters of this Lease shall be apportioned between LESSOR and LESSEE. LESSEE may, at LESSEE'S sole cost and expense, challenge the real estate taxes on the premises. LESSOR shall cooperate in any such proceedings.

c.        Taxes, water rents, rates and charges, sewer rents and other governmental impositions and charges, assessed during any Term hereof and any period of holdover tenancy, but payable in installments shall be adjusted and prorated, and LESSEE shall pay the prorated share thereof only for the period of the Initial Term of this Lease, any Option Term exercised by LESSEE and any period of holdover tenancy. Any imposition which may be payable in installments, as permitted by law or agreement with the appropriate governmental authority, may be paid in that manner. If LESSOR pays any of the foregoing, LESSEE shall remit payment within one month of LESSOR'S invoice for such amounts.

d.        If LESSEE shall desire to contest the validity or amount of any payment herein required to be made by it as additional rent to any person other than LESSOR, LESSEE shall promptly give Notice to LESSOR of its intention to do so. During any such contest LESSEE will prevent any divesting of LESSOR'S title, reversion or other interest in or to the Premises and will further prevent the enforcement or public sale on any lien for such payment and the enforcement of any court or administrative order preventing or delaying the payment of any installment of rent. LESSEE agrees that it will pay, and save LESSOR harmless from and against any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection therewith, and that promptly after the final determination of such contest it will fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein, together with all penalties, fines, interest, costs and expenses resulting therefrom.

e.        Notwithstanding the foregoing, if the holder of any Mortgage upon the fee title to the Premises requires that payments be made to such holder on account of any imposition. for the benefit of such holder, then LESSEE agrees, upon Notice from LESSOR, to make such deposits with any such mortgagee according to the terms of such Mortgage. Deposits by LESSEE with such mortgagee of amounts otherwise required to be paid hereunder shall, to the extent thereof, be in

satisfaction of the obligation of LESSEE hereunder, provided that, upon LESSOR'S request or demand, LESSEE shall furnish proof satisfactory to LESSOR that such deposits have been made.

f.        LESSEE shall furnish to LESSOR for its inspection, within thirty (30) days after the date any amount is payable by LESSEE as provided in this article, official receipts of the appropriate taxing or other authority or other proof satisfactory to LESSOR evidencing payment.

g.        In addition to the foregoing impositions, LESSEE, at all times during the Base Term hereof (or any extension thereof), and at its sole cost and expense, agrees to pay promptly and when due and be responsible for, all taxes, licenses, fees, assessments or other charges levied or imposed upon the business of LESSEE or upon any fixtures, furnishings, or equipment on or at the Premises.

## 4.        <u>USE OF PREMISES; POSSESSION; TERM</u>.

(a)        LESSEE shall use the Premises exclusively for the operation of a duly-franchised Nisan motor vehicle dealership and related and ancillary uses in connection therewith, all of which shall be in accordance with the zoning ordinances and general ordinances of the Township of North Hempstead, New York.  Any change in all or part of the present use of the Premises as contemplated hereunder shall require written consent of LESSOR in its sole and unreviewable discretion.

(b)        LESSEE shall, at its sole cost and expense, comply in all material respects with all laws, orders, ordinances and regulations of federal, state, county and municipal authorities (i.e., environmental, health, safety, fire, zoning and building) and with any direction made pursuant to law of any public officer or officers, which shall, with respect to the occupancy, use or manner of use of the Premises or to any abatement of nuisance, impose any violation, order or duty upon LESSOR or LESSEE arising therefrom or required by reason of a breach of any of LESSEE'S covenants or agreements hereunder.   Furthermore, LESSEE shall comply with all reasonable requirements of insurance carriers and underwriters or of the Board of Fire Underwriters, Fire Insurance Rating Organization, Fire Prevention, or any other similar body.

(c)        LESSEE will indemnify and hold harmless both LESSOR and the Premises against any liability arising by virtue of the failure of LESSEE to comply with any statute, rule, regulation, order, or requirement governing the conduct of its business on the Premises and/or connected with the Premises.

(d)        Notwithstanding any other provisions of this Lease to the contrary, upon termination of this Lease, LESSEE shall remain liable to LESSOR for any and all damages resulting to the Premises from LESSEE'S conduct of its business including, but not limited to, a finding by any governmental agency regulating LESSEE'S business that the Premises are either totally or partially condemned or restricted to certain future uses because of LESSEE'S use (or misuse) of the Premises and/or noncompliance with any statute, rule, regulation, order, or requirement governing the conduct of its business. LESSEE shall comply with and pay the expense of any governmental order to clean up the demised premises issued within six (6) months after the termination of this Lease.  LESSEE shall defend

against any condemnation proceedings instituted by virtue of its conduct of its business, and shall solely bear the expense thereof.

(e)     If LESSEE receives notice of any violation of law, ordinance, rule, order, or regulation applicable to the Premises, or other legal notice by federal, state, or local governmental authority relating to or affecting the Premises, LESSEE shall give prompt notice thereof to LESSOR.

(f)     If LESSEE is prohibited from conducting its business on the Premises due to LESSEE'S violation of said law, ordinance, rule, order or regulation, LESSEE shall not be relieved of its obligations under the terms and conditions of this Lease.

(g)     LESSOR shall deliver possession of the Premises to LESSEE and LESSEE agrees to accept possession of the Premises on the date hereof.  LESSEE acknowledges that it has inspected and examined the Premises and has entered into this Lease without any representations (either express or implied on the part of the LESSOR, its agents or representatives, as to the condition thereof and is leasing and accepting the Premises, including the fixtures, furniture, machinery, and equipment, "as is". No representations or promises have been made on the part of the LESSOR, its agents, employees or representatives, or by any real estate broker, prior to or at the execution of this Lease and LESSOR is not bound by, and LESSEE will make no claim on account of, any representation, promise or assurance, express or implied, with respect to condition, repairs, changes, improvements, services, accommodations, concessions or any other matter, other than as contained herein.  LESSEE, at it sole cost and expense, shall be required to procure any and all approvals from any governmental authorities having jurisdiction thereover, relating to or arising out of, the business of LESSEE or its use or occupancy of the Premises, which approvals shall include but shall not be limited to, applicable use permits, Certificates of Continued Occupancy, storage tank registrations, and environmental protection approvals.  LESSEE agrees to make prompt application and to proceed diligently and in good faith to procure all necessary approvals, to furnish LESSOR with true copies of all writings submitted or received in connection therewith, and to forthwith notify LESSOR in writing of all determinations regarding such approvals.

(h)     This Lease and the tenancy hereby created shall cease and terminate at the end of the Base Term hereof (except when terminated sooner in accordance herein), without the necessity of any notice from LESSOR to terminate the same, and LESSEE hereby waives the receipt of notice to vacate the Premises and agrees that LESSOR shall be entitled to the benefit of all provisions of law respecting the payment of Rent and summary recovery of possession of the Premises from a LESSEE holding over to the same extent as if statutory notice had been given.  Following the date of entry on the Premises by LESSEE, LESSEE shall not have the right to cancel this Lease, seek a diminution of rent, sue for damages, or assert any other contractual, legal or equitable remedy based either on a claim that LESSOR failed to deliver possession in accordance with the terms of this Lease, or based on a claim that the size, location, layout, dimensions or construction of the building(s), the Premises or any part thereof, were not furnished in accordance with the terms hereof.

**5.** **DISCHARGE OF LIENS AND ENCUMBRANCES**. LESSEE will not create or permit to be created or to remain, and will promptly discharge at its sole cost and expense, any liens, including mechanics' liens, encumbrances or other charges upon the Premises or any part thereof or upon the net rent or any Additional Rent payable hereunder or upon LESSEE'S leasehold interest in the Premises, except that it may contest any such liens or encumbrances and bond them if required by LESSOR or LESSOR'S mortgagee. Failure to comply with this paragraph shall entitle LESSOR to resort to such remedies as are herein provided in the case of any default under this Lease, in addition to such as are permitted by law.

Nothing in this Lease shall be construed as constituting the consent or request of LESSOR, express or implied, by inference, or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or services or the furnishing of any materials at or to the premises.

**6.** **NON-LIABILITY OF LESSOR; INDEMNIFICATION**.

(a) LESSOR shall not be liable for injury or damage to property or person, including, but not limited to, LESSEE, its agents and employees; an assignee, its officers, agents and employees; and a sub-LESSEE, its officers, agents and employees, irrespective of how such injury or damage may be caused.

(b) LESSEE and GUARANTOR shall indemnify, hold harmless and defend LESSOR and Ron Baron, and David Baron, and their successors and assigns, from and against any and all costs, expenses (including reasonable counsel fees, expert witness fees and expenses), liabilities, losses, damages, suits, actions, fines, penalties, claims or demands of any kind and asserted by or on behalf of any person, independent contractor or governmental authority, arising out of or in any way connected with, and LESSOR shall not be liable to LESSEE on account of (i) any failure by LESSEE to perform any of the agreements, terms, covenants or conditions of this Lease required to be performed by LESSEE, (ii) any failure by LESSEE to comply with any applicable statutes, ordinances, regulations or orders of any governmental authority, (iii) all loss or damage caused or alleged to have been caused by the negligence of LESSEE or the condition or security of the Building and the Premises, or (iv) any accident, death or personal injury, or damage to property, which shall occur in or about the Premises. LESSOR agrees that it will promptly advise LESSEE of any claims against LESSOR in connection with the Premises so that LESSEE may assume the defense of the same in a timely manner.

**7.** **REPAIRS; ALTERATIONS; FIXTURES**.

(a) LESSEE has examined the Premises and has entered into this Lease without any representation by LESSOR, express or implied, as to the condition thereof. LESSEE agrees, at its sole cost and expense, to perform all maintenance and to make all reasonable or necessary repairs to the Premises, the land, buildings, improvements, fixtures and appurtenances thereto, including any Structural Repairs, including but not limited to, all interior and exterior portions thereof, slabs, pavement and walkways, footings, foundations, load-bearing walls and columns, roof joists and roof surfaces of

the Building, gutters, leaders, and drainage systems, windows and plate glass, structure, roof, exterior, site improvements, while this Lease is in effect, including during any period of holdover tenancy, to the end that the Premises are kept and maintained in a good, safe and attractive condition at all times and upon surrender thereof to LESSOR. LESSEE also agrees to perform and pay for all maintenance and repair expenses with respect to all lawn, yard, shrubbery, trees, snow removal, debris removal, dewatering and sprinkler system charges. LESSEE further agrees at its own expense to maintain or replace all components of or entire systems of the Premises, such as the plumbing, septic, electrical, hot water, HVAC heating and air conditioning, if the foregoing cannot be returned to ordinary wear and tear conditions by repairs, to the end that such components and systems are in good operating condition at all times, including upon surrender thereof to the LESSOR. At the expiration of the Term, including during any period of holdover tenancy, or upon the earlier termination of this Lease, LESSEE shall surrender and deliver up the Premises, the land, buildings, improvements, fixtures and appurtenances thereto to the LESSOR in a good and safe condition, ordinary wear and tear excepted. In addition to the foregoing, LESSEE shall pay for two HVAC service contracts (one for heating units and one for air conditioning units), providing for inspections four times per year and unit tune ups. LESSEE shall make no structural alterations to the Premises without LESSOR'S prior written consent, which such consent shall not be unreasonably withheld. All repairs shall be in quality and class substantially equal to the original work or installations and shall be done in good workmanlike manner, and in full compliance with all ordinances, regulations and orders of governmental bodies having jurisdiction thereon.

(b)        All completed work affixed to the Premises shall, unless otherwise agreed to by LESSOR at LESSEE'S request, become the property of LESSOR and shall remain upon, and be surrendered with, the Premises, as a part thereof, at the end of the Base Term or renewal term, as the case may be. At LESSOR'S request, LESSEE shall obtain and deliver to LESSOR written and unconditional releases of mechanics' liens upon the Premises for all completed work, labor and services and materials furnished in connection with such work. Where furnished by or at the expense of LESSEE, all movable property, furniture, furnishings and trade fixtures, other than those affixed to the Premises so that they cannot be removed without material damage, shall remain the property of LESSEE, and shall be removed at or prior to the termination of this Lease or any extension thereof. In case of damage by reason of such removal, LESSEE shall restore the Premises to good order and condition. LESSEE specifically acknowledges that the Premises are not factory compliant as determined by Nissan North America, and hereby agree to undertake at their sole cost and expense any and all renovations, modifications, imaging or other requirements by Nissan North America without any lease offset whatsoever. Moreover, the cost of such work shall be deemed Additional Rent payable by LESSEE.

(c)        LESSOR or its designee shall have the right at any reasonable time to inspect the Premises. Such inspection shall not, however, interfere unreasonably or unnecessarily with the business of LESSEE. LESSOR may make any repairs which are essential for the protection and maintenance of the Premises or any part thereof if LESSEE fails to commence such repairs within twenty (20) days of demand by LESSOR, or such lesser period as may be proper if failure to make repairs shall create an emergency condition. The cost of such work shall be deemed Additional Rent payable by LESSEE.

(d)  Anything to the contrary herein notwithstanding, LESSEE shall indemnify and hold harmless LESSOR from and against any damages sustained by persons or property in connection with the occupancy or use of the Premises, and for any damages or monies paid out by LESSOR in settlement of any claims or judgment, as well as for all reasonable expenses and attorneys' fees incurred therewith, and costs incurred in repairing any damage to the Premises.

8.  **INSURANCE**.

(a)  All insurance provided for in this Article shall be effected by LESSEE, at its sole cost and expense, under valid policies as herein required. LESSEE shall not cause any such insurance to be canceled nor permit any such insurance to lapse.

(b)  LESSEE shall arrange to provide LESSOR and its mortgagee(s) (if requested) with certificates of insurance, in duplicate, for all insurance required hereunder to be effected by LESSEE. Failure by LESSEE to provide the necessary insurance or evidence thereof shall not be deemed a modification of the terms and conditions of this Lease. Approval by LESSOR of any insurance provided by LESSEE shall not relieve or decrease the liability of the LESSEE under this Lease.

(c)  All policies of insurance required by this paragraph shall provide that the proceeds thereof shall be payable to LESSOR or LESSOR and mortgagee, as their interests may appear. No insurance proceeds shall be payable to LESSEE.

(d)  Certificates of insurance for insurance coverages required hereunder shall be deposited with LESSOR not more than thirty (30) days after the Commencement Date, and not less than thirty (30) days prior to the expiration dates of said insurance coverages. In the event LESSEE shall fail to deposit with LESSOR any certificates of insurance required hereunder, LESSOR may, at its option, obtain said insurance at the expense of LESSEE, and the cost thereof shall be immediately paid by LESSEE as Additional Rent.

(e)  During the entire Base Term of this Lease and any extension thereof, LESSEE shall, at its own cost and expense, obtain insurance policies with any company properly licensed under the laws of the State of New York which shall:

i.  Provide and keep in force "all-risk" fire and casualty insurance with an extended coverage endorsement including vandalism, malicious mischief and any loss arising out of sprinkler damage, upon the Premises during the entire Term of this Lease and any period of holdover tenancy in an amount equivalent to not less than one hundred percent (100%) of the full replacement cost of the Building, but in no event less than the amount required by any lending institution now or hereafter holding a Mortgage on the Premises. The replacement cost at the inception of the Lease shall be $10,000,000, and any increases in policy limits recommended by LESSOR'S lender or insurance carrier shall be used to establish replacement cost. Any insurance coverage shall also provide insurance

against loss of rents for a period of one (1) year and against loss or damage by explosion of steam boilers, pressure vessels or similar apparatus, now or hereafter installed in the Building and against such other risks and with such limits as may be reasonably determined by the LESSOR from time to time. LESSEE shall select, provide and keep in force, at LESSEE'S sole expense, fire and casualty insurance on all of LESSEE'S personal property, contents, inventory, merchandise, leasehold improvements, and the property of others kept on the Premises, which insurance shall be placed on an "all risk" and "replacement cost" basis. At least ten days in advance of the due date for any invoice or statement therefore, such premiums shall be paid by the LESSEE either directly or by reimbursement to LESSOR as LESSOR shall request and, in the former case, LESSOR shall be furnished with satisfactory evidence of such payment. All policies shall contain an agreement by the insurers that such policies shall not be cancelled without at least thirty (30) days prior written Notice to the LESSOR and/or to the holder of any Mortgage to whom losses hereunder may be payable.

ii.     Provide and keep in force for the benefit of LESSOR, public liability insurance against liability for death, personal injury or property damage in the amount of THREE MILLION DOLLARS ($3,000,000.00) in respect of injuries to any one person and FIVE MILLION DOLLARS ($5,000,000.00) in respect of injuries from any one occurrence, and in the amount of THREE MILLION DOLLARS ($3,000,000.00) in respect of property damage from any one occurrence. Any such insurance may be obtained by LESSEE, if it so elects, under a blanket policy of liability insurance maintained by LESSEE for its benefit and for the benefit of LESSOR with respect to the Premises, and in such case, LESSEE shall deliver to LESSOR a certificate that such insurance is in force and effect. LESSEE'S liability coverage shall include garage keeper's legal liability insurance covering claims made for theft of or damage to customer property, with limit of not less than $2,000,000. LESSEE shall cause LESSOR and Ron Baron and David Baron, individually, and their successors and assigns, to be identified and insured as additional insureds under all such policies, and LESSEE shall provide LESSOR with a Certificate reflecting all such insurance annually and each time that LESSEE changes insurance carriers.

(f)                    (i)     LESSEE shall not violate or permit to be violated any of the conditions or provisions of any such insurance policies, and LESSEE shall so perform and satisfy the requirements of the insurance companies writing such policies that at all times well-rated insurance companies are willing to write and/or continue such insurance.

(ii) LESSEE shall cooperate in connection with the collection of any insurance monies that may be due in the event of loss, and shall execute and deliver to LESSOR without charge,

such proofs of loss and other instruments which may be required for the purpose of obtaining the recovery of any such insurance monies for the coverage aforementioned.

(g)      Each such insurance policy or certificate of insurance issued by the insurer shall contain an agreement by the insurer that such policy shall not be canceled or changed as respects coverage, without at least fifteen (15) days' prior written notice to LESSOR and to the holder of any mortgage to which this Lease is or may be subject and subordinate.

(h)      LESSOR shall have the right to cause LESSEE to obtain and to maintain without any co-insurance, and LESSEE shall, upon written notice to LESSEE obtain and maintain such other insurance coverages as LESSOR may deem necessary or proper, all of which insurance coverages, if maintained, shall be in such amounts and with such companies as LESSOR may deem reasonable or proper, including, without limitation, rental insurance sufficient to include both Base Rent and Additional Rent; sprinkler damage insurance; and public liability insurance. In the event that LESSEE fails to obtain or maintain such insurances, then LESSOR shall obtain and maintain same, and LESSEE shall, as Additional Rent hereunder, reimburse LESSOR for the cost of any such insurance within ten (10) days after LESSEE'S receipt of a statement from LESSOR setting forth the premiums paid by LESSOR.

(i)      In the event the LESSEE fails to maintain the required insurance policies hereunder and/or the requested coverages and/or the coverages are insufficient to fully address the claim, LESSEE shall be liable for any monetary deficiencies resulting therefrom. This liability is separate and apart from the LESSOR'S rights and remedies as a result of said default.

(j)      Any casualty insurance carried by LESSEE with respect to the Premises and property contained in the Premises or occurrences related to them shall include a clause or endorsement denying to LESSEE rights of subrogation against LESSOR. To the extent of coverage provided, LESSEE waives any right of recovery against LESSOR for injury or loss due to hazards covered by insurance containing such clause or endorsement.

9.      **DAMAGE BY FIRE OR OTHER CAUSE**.

(a)      (i) If the Premises shall be partially damaged by fire or other causes, the damage shall be repaired by LESSEE promptly with insurance proceeds from the policy(ies) required to be maintained by LESSEE, as more specifically provided in Clause (iii) hereof. LESSEE shall be responsible for any deficiency between the insurance proceeds and the amount required to restore the premises. Said deficiency shall be deposited in escrow pursuant to the Restoration Agreement, as provided in Clause iii hereof. Rent under this Lease shall continue to be payable pending making of repairs, notwithstanding any disruption of LESSEE'S business during this period. LESSEE shall give immediate notice to LESSOR in case of fire affecting the Premises.

(ii)      If the Premises are totally or substantially damaged or are rendered wholly or substantially unleaseable, by fire or other cause, or if the proceeds of any applicable insurance policy

covering the Premises received by LESSOR shall be insufficient to permit repair of the same, or if LESSOR shall decide not to restore or not rebuild same in its sole discretion, or if the Premises shall be so damaged that LESSOR shall decide to construct a substantially new structure, then, or in any of such events, LESSOR may, at its option terminate this LEASE upon written notice to LESSEE within ninety (90) days next succeeding the fire or other case. If LESSOR does not elect to terminate, LESSEE will have the obligation to promptly repair and restore the premises with insurance proceeds from the policy(ies) required to be maintained by LESSEE, together with additional funds from LESSEE which may be required to cover any difference (i.e., deficiency) between the full cost of restoration and the available insurance proceeds, as more specifically provided in Clause (iii) hereof. Notwithstanding anything herein contained to the contrary, in the event that the casualty occurs during the Base Term, LESSEE shall have the right to restore premises provided that:

(1) the insurance proceeds are sufficient to fund said restoration or LESSEE immediately deposits in escrow with the LESSOR'S attorney a sum equal to the deficiency;

(2) The LESSOR and LESSEE shall enter into a reasonably acceptable Restoration Agreement, as more specifically provided in Clause (iii) hereof.

(iii) In the event of a re-building, the parties shall enter into a Restoration Agreement that is acceptable to LESSOR in its sole discretion, which shall include the following terms:

(1) The escrow of the insurance proceeds, as well as LESSEE'S deficiency contribution (if applicable) in order to fund construction, including a reasonably acceptable disbursement program which shall require a retainage of no less than ten (10%) percent;

(2) LESSOR shall have the right to reasonably approve the reconstruction plans;

(3) LESSOR shall have the right to reasonably approve all applications to all governmental agencies regulating the restoration;

(4) The restoration shall meet with all requirements of the Township of Butler, as well as all other governmental entities regulating the restoration; and

(5) At its option, LESSOR shall have the right to assume full control and supervision over the restoration program at any time.

(iv) LESSEE hereby expressly waives any statutory provisions terminating lease agreements upon destruction of the Premises by fire, and consents that the provisions of this paragraph shall govern and control in lieu thereof. Whether or not the damage or destruction be due to the fault or neglect of LESSEE, the debris shall be removed by and at the expense of the LESSEE.

(b)  No damages, compensation, or claims shall be payable by LESSOR to LESSEE for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or delay in making same, or adjusting any fire insurance claim, provided that, in the event that LESSOR elects to rebuild, it proceeds with diligence and in a reasonable manner with the restoration of the Premises.

## 10.  ASSIGNMENT, SUBLETTING, MORTGAGING.

(a)  This Lease may not be assigned, mortgaged, or encumbered without the prior written consent of LESSOR in its sole and unreviewable discretion. The sale or transfer (in the aggregate) of five (5%) percent or more of the issued and outstanding capital stock of LESSEE (in either a single transaction, a series of transactions, or unrelated transactions which, in the aggregate, equal or exceed five (5%) percent) shall be deemed to be an assignment for purposes of this paragraph. Any attempt by LESSEE to assign this Lease without prior written consent by LESSOR shall, at the option of LESSOR, render this Lease null, void, and of no further effect, and, in addition to said remedy, LESSOR shall have any and all additional rights provided to it hereunder or otherwise with respect to LESSEE'S default. LESSEE will not sublet or permit the Premises or any part thereof to be used by others, without LESSOR'S (and/or mortgagee's) prior written consent in each instance which consent may be unreasonably withheld in the absolute discretion of the LESSOR. The consent by LESSOR to any assignment or subletting shall not in any manner be construed to relieve LESSEE from obtaining LESSOR'S express written consent to any other or further assignment or subletting.

(b)  In any such instance, LESSEE shall give LESSOR written notice of its desire to assign this Lease or sublet all or any portion of the Leased Premises at least 90 days prior to the proposed effective date of such assignment or subletting. LESSEE's notice shall be accompanied by (1) a copy of the proposed instrument of assignment or subletting; (2) a statement describing the identity and business experience of the proposed assignee or subtenant and, if the same is a partnership, trust or corporation, of each partner, trustee, shareholder, officer and director thereof; (3) a current financial statement and the most recently filed federal income tax return of each entity and person described in (2) above; and (4) such other information as LESSOR may request. LESSOR will endeavor to advise LESSEE of its decision to consent or not consent to the LESSEE's proposed assignment or subletting not less than 20 days prior to the proposed effective date thereof. However, in the event that LESSOR does not respond to LESSEE's request within the period provided in this paragraph, LESSOR shall be deemed to have withheld consent to LESSEE's proposed assignment of this Lease or subletting of the Leased Premises. Any assignment or subletting by LESSEE without LESSOR's prior written consent shall be void and of no force or effect. The acceptance by LESSOR of the payment of any Base Rent or additional rent following any assignment or other transfer prohibited by this Section shall not be deemed to be a consent by LESSOR to any such assignment or other transfer nor shall the same be deemed to be a waiver of any right or remedy of LESSOR hereunder. In the event that LESSOR does consent to LESSEE's proposed assignment or subletting, no such assignment or subletting shall operate to relieve LESSEE of its obligations to fully perform all covenants and conditions of this Lease.

(c)        In addition to LESSOR's right to withhold consent to the proposed assignment of this Lease or subletting of all or a portion of the Leased Premises, LESSOR may, at its sole election, (l) terminate this Lease in the case of a proposed assignment or subletting of the entire Leased Premises, or (2) recapture the portion of the Leased Premises which LESSEE proposed to sublet (if that is less than the entire Leased Premises). In the latter event, LESSEE shall, at its own cost, erect such demising walls as are necessary to physically separate that portion of the Leased Premises which LESSOR elects to recapture from the remainder of the Leased Premises. Such construction shall be completed in a good and workmanlike manner, in accordance with all applicable laws and governmental regulations, and the resulting separate spaces shall each have their own access to the common areas of the Property. If LESSOR recaptures either all or any portion of the Leased Premises, pursuant to the provisions of this paragraph, LESSEE shall vacate the Leased Premises or applicable portion thereof, as the case may be, on the date on which LESSEE's proposed assignment or subtenancy would have been effective had LESSOR consented to the same, and LESSEE shall surrender the space recaptured to LESSOR in the condition required by this Lease as though the Lease had expired by its terms with respect to such space.

(d)        In the event that the LESSEE seeks the LESSOR's consent to a proposed subletting or assignment, the LESSEE agrees to be responsible for the LESSOR's reasonable attorneys' fees and other costs of reviewing the credentials of the prospective assignee/SUBLESSEE and preparing the necessary documents. Simultaneously with making its initial request for consent to an assignment or subletting, and as a condition precedent to the LESSOR's consideration of same, LESSEE shall remit to the LESSOR the sum of $3,500.00 to be applied toward these reasonable fees and costs.

(e)        Each time that the LESSOR approves a subtenancy or assignment, such approval shall be conditioned upon the annual Base Rent then in effect being increased by no less than seven (7%) percent. If the effective date of a subletting or assignment falls in the middle of a lease year, the payment of this increase in Base Rent for that lease year shall be prospective only from the effective date forward, but the entire increased Base Rent amount shall be used to calculate the following lease years' Base Rent increases.

(f)        If this Lease shall be assigned, or if the Premises or any part thereof be sublet or occupied by any person or persons other than LESSEE, LESSOR may, after default by LESSEE, collect rent from the assignee, SUBLESSEE occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy, or collection of rent shall be deemed acceptance of the assignee, SUBLESSEE or occupant as a LESSEE, or a release of LESSEE or GUARANTOR from the full performance of all the terms, conditions and covenants of this Lease. In the event of any assignment or sublease of the demised Premises, in whole or in part, LESSEE shall pay the LESSOR a sum equal to (i) any consideration paid to LESSEE for the lease or sublease rights (as the case may be) or any rent by any assignee or SUBLESSEE in excess of the rent then being paid by LESSEE to LESSOR pursuant to the provisions of this Lease, and (ii) any other profit or gain realized by LESSEE from such assignment or subletting. The foregoing shall exclude any consideration paid to LESSEE for leasehold improvements. All sums payable hereunder by LESSEE shall be paid to LESSOR as Additional Rent immediately upon the receipt thereof by LESSEE.

(g)        Each permitted assignee or transferee (and any guarantors of the obligations of such assignee or transferee) shall assume and be deemed to have assumed this Lease and shall be and remain liable jointly and severally with LESSEE and GUARANTOR for the payment of the rent, Additional Rent and adjustments of rent, and for the due performance herein contained on LESSEE'S part to be performed for the Base Term of this Lease and any extension thereof.  No assignment shall be binding on LESSOR unless such assignee or LESSEE shall deliver to LESSOR a duplicate original of the instrument of assignment which contains a covenant of assumption by the assignee of all of the obligations aforesaid and shall obtain from LESSOR the aforesaid written consent prior thereto.  In addition, and as a condition precedent to an assignment or subletting, each stockholder or member (as the case may be) of the assignee entity shall jointly and severally guarantee this Lease by executing a form of Guaranty substantially similar to the Guaranty executed by GUARANTORS under this Lease.

## 11.        **BANKRUPTCY**.

(a)        If at any time after the date hereof, there shall be filed by or against LESSEE in any court pursuant to any statute either of the United States or of any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of LESSEE'S property, and within sixty (60) days thereafter LESSEE fails to secure a discharge thereof, or if LESSEE makes an assignment for the benefit of creditors or petitions for or enters into an arrangement under the United States Bankruptcy Code, this Lease, at the option of LESSOR, exercised by written notice sent at any time of the happening of any one or more of such events, shall be and becomes terminated as of the date of such notice.

(b)        In the event of cancellation or termination as provided in subparagraph (a) hereof, neither LESSEE nor any person claiming through or under LESSEE by virtue of any statute or of an order of any court shall be entitled to possession or to remain in possession of the Premises, and LESSOR, in addition to the other rights and remedies LESSOR has by virtue of any other provisions herein or elsewhere in this Lease contained or by virtue of any statute or rule of law, may retain as liquidated damages any rent, security, deposit, or monies received by it from LESSEE or others on behalf of LESSEE.

(c)        In the event of the termination of this Lease pursuant to subparagraph (a) hereof, LESSOR shall forthwith, notwithstanding any other provisions of this Lease to the contrary, be entitled to recover from LESSEE as and for liquidated damages an amount equal to the difference between the rent received hereunder for the unexpired portion of the term demised and the then fair and reasonable rental value of the Premises for the same period.  In the computation of such damages, the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the Premises for the period for which such installment was payable shall be discounted to the date of termination at the prime rate as published from time to time by the Wall Street Journal.  If such Premises or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such reletting shall be deemed prima facie to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of reletting.  Nothing herein contained shall limit or prejudice the right of LESSOR to prove for and obtain as liquidated damages by reason of such termination an amount equal to the

maximum allowed by any statute or rule of law in effect at the time when such damages are to be proved.

12.    **CONDEMNATION; EMINENT DOMAIN**.  If the land and Premises leased herein, or of which the leased Premises are part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation thereof, or if in lieu of any formal condemnation proceedings or actions, the LESSOR shall grant an option to purchase and/or shall sell and convey the said Premises or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land and Premises or any portion thereof, then this Lease, at the sole option of LESSOR, shall terminate, and the Base Term hereof (or any extension thereof) shall end as of the date on which the governmental authority actually takes possession of the Premises or portion thereof; and LESSEE shall have no claim or right to claim or be entitled to any portion of any amount which may be awarded as damages or paid to LESSOR as the result of such condemnation proceedings or paid as the purchase price for such option, sale or conveyance in lieu of formal condemnation proceedings; and all rights of LESSEE to damages, if any, are hereby assigned to LESSOR.  LESSEE agrees to execute and deliver any instruments, at the expense of LESSOR, as may be deemed necessary or required to expedite any condemnation proceedings or to effectuate a proper transfer of title to such governmental or other public authority, agency, body, or public utility seeking to take or acquire the said lands and Premises or any portion thereof.  LESSEE covenants and agrees to vacate the said Premises, remove all LESSEE'S personal property therefrom, and deliver up peaceable possession thereof to LESSOR or to such other party designated by LESSOR in the aforementioned notice.  Failure by LESSEE to comply with any provisions in this clause shall subject LESSEE to such costs, expenses, damages and losses as LESSOR may incur by reason of LESSEE'S breach hereof.  In the event that LESSOR elects to continue this Lease notwithstanding said taking, LESSEE shall not be entitled to any diminution of rent.  Nothing herein contained shall preclude LESSEE from submitting a claim to the governmental authorities for any loss of business, moving expenses, and related claims which are unrelated to the premises, provided that the LESSEE'S award shall not in any manner diminish the LESSOR'S award.

13.    **DEFAULTS, REMEDIES, WAIVER OF REDEMPTION.**

(a)    If LESSEE fails in fulfilling any of the covenants of this Lease, including the covenants for the payment of periodic rent or Additional Rent or performance of any obligations hereunder, or if the Premises become substantially vacant or deserted then, in any one or more of such events, if LESSEE shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of such a nature that the same cannot be completely cured or remedied within said notice period, and if LESSEE shall not have, with reasonable diligence and in good faith, proceeded to remedy or cure such default, then LESSOR may serve a notice of cancellation of this Lease upon LESSEE and this Lease and the Base Term hereof (or any extension thereof) shall end and expire as fully and completely as if the date of expiration were the day herein definitely fixed for the end and expiration of this Lease and the Base Term hereof (or any extension thereof), and LESSEE shall then quit and surrender the Premises to LESSOR, but LESSEE shall remain liable as hereinafter provided.

(b)         In case of any such default, termination, reentry, expiration or dispossession, by summary proceedings or otherwise, (i) the periodic rent and Additional Rent shall become due thereupon and be paid up to the time of such termination, reentry, dispossession or expiration together with such expenses as LESSOR may incur for reasonable legal expenses, reasonable attorneys' fees, brokerage, keeping the Premises in good order, or for preparing the same for reletting; (ii) LESSOR may relet the Premises or any part thereof; and (iii) LESSEE or the legal representatives of LESSEE shall also pay LESSOR as liquidated damages the deficiency between the rents and Additional Rents hereby reserved or covenants to be paid, and the net amount, if any, of the rents collected or to be collected on account of the Lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the Base Term of this Lease (or any extension thereof).  In computing such damages, there shall be added to the said deficiency such expenses as LESSOR may incur in connection with reletting such as legal expenses, attorneys' fees, brokerage, keeping the Premises in good order, or for preparing the same for reletting.  Any such damages shall be paid in monthly installments by LESSEE on the rent days specified in this Lease and any suit brought to collect the amount of deficiency for any month or months shall not prejudice in any way the rights of LESSOR to collect the deficiency for any subsequent month or months by a similar proceeding.  LESSOR, at LESSOR'S option, may make such reasonable alterations, repairs, replacements and decorations in the Premises as reasonably necessary for the purpose of reletting the Premises; and the making of such reasonable alterations, repairs, replacements, or decorations shall not operate or be construed to release LESSEE from liability hereunder as aforesaid.  LESSOR shall in no event be liable in any way whatsoever for failure to relet the Premises, or in the event that the Premises are relet, for failure to collect the rent thereof under such reletting.  Any legal action by LESSOR may be an action for the full amounts of all rents and damages suffered or to be suffered by LESSOR.  In the event of a breach or written notification of anticipatory breach by LESSEE of any of the covenants or provisions hereof, LESSOR shall have the right of injunction and the right to invoke any remedy allowed by law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for.  Mention in this Lease of any particular remedy shall not preclude LESSOR from any other remedy, in law or in equity.  The foregoing remedies and rights of LESSOR are cumulative and nonexclusive.

(c)         LESSEE hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of LESSEE being evicted or dispossessed for any cause, or in the event of LESSOR obtaining possession of the Premises as otherwise permitted by this Lease.

14.         **ENVIRONMENTAL MATTERS**.

(a)         Hazardous Discharge of Environmental Complaints.

(i)         If LESSEE receives any notice of the happening of any event involving an emission, spill, release or discharge into or upon (1) the air, (2) soils or any improvements located thereon, (3) surface water or ground water, or (4) the sewer, septic system or waste treatment, storage or disposal systems servicing the Premises, of any toxic or hazardous substances or wastes (intended hereby and hereafter to include any and all such material listed in any federal, state or local law, code and ordinance and all rules and regulations promulgated thereunder, as hazardous or potentially hazardous) (any of which is hereafter referred to as a "Hazardous Discharge"), or any complaint, order,

directive, claim, citation, or notice by any governmental authority or any other person or entity with respect to (5) air emissions, (6) spills, releases or discharges to soils or any improvements located thereon, surface water, ground water or the sewer, septic system or waste treatment, storage or disposal system servicing the Premises, (7) noise emissions, (8) solid or liquid waste disposal, (9) the use, generation, storage, transportation or disposal of toxic or hazardous substances or wastes or (10) other environmental, health or safety matters affecting LESSEE, the Premises, any improvements located thereon, or the business therein conducted (any of which is hereafter referred to as an "Environmental Complaint"), then LESSEE shall give immediate oral and written notice of same to LESSOR, detailing all relevant facts and circumstances.

(ii) Without limitation on the foregoing, LESSOR shall have the option, but shall not be obligated, to exercise any of its rights as provided in this Lease, and may enter onto the Premises and take any actions as it deems necessary or advisable to cleanup, remove, resolve, or minimize the impact of, or otherwise deal with, any Hazardous Discharge or Environmental Complaint upon LESSOR'S receipt of any notice from any person or entity asserting the happening of a Hazardous Discharge or an Environmental Complaint on or pertaining to the Premises. All costs and expenses incurred by LESSOR in the exercise of any such rights shall be deemed to be Additional Rent hereunder and shall be payable by LESSEE to LESSOR upon demand, but only if said event or occurrence is attributable to LESSEE'S use of the Premises or term of LESSEE'S occupancy, and not from any condition that existed prior to the Commencement Date of this Lease.

(iii) Should the NYDEP AND NYSDEC or other governmental agency determine that a cleanup plan be prepared and that a cleanup be undertaken because of any spills or discharges of hazardous substances or wastes at or onto the Premises which occur during the Term of this Lease, then LESSEE shall, at LESSEE'S own expense, shall prepare and submit the required plans and financial assurances, and carry out the approved plans. LESSEE shall satisfy all environmental obligations which arise from any closing, terminating or transferring of operations of an industrial establishment at the Premises pursuant to NY law.

(iv) LESSEE shall indemnify, defend and hold LESSOR, Ron Baron and David Baron, and their successors and assigns harmless with respect to all matters (including reasonable attorneys' fees, expert witness fees, expenses and costs) arising out of or in any way connected with (i) any spills, discharge or migration of hazardous substances or wastes at or onto the Premises which occur during the Term of this Lease (unless attributable to or caused by LESSOR or its employees, agents or representatives), (ii) LESSEE'S failure to provide all information, make all submissions and take all actions required by any governmental agency, and (iii) any other failure to comply with the provisions of this Paragraph. LESSEE'S obligations and liabilities under this paragraph shall continue so long as LESSOR remains responsible for any spills or discharges of hazardous substances or wastes at the Premises which occur during the Term of this Lease. LESSEE'S failure to abide by the terms of this paragraph shall be restrainable by injunction.

(v) The indemnification provisions contained in this Paragraph shall include all costs, fines, penalties, damages, liabilities (whether statutory or otherwise), claims and actions of any kind, cleanup costs, reasonable consultants', experts' and attorneys' fees and any other reasonable and

necessary expenses incurred by the party entitled to indemnification hereunder. The parties hereby acknowledge and agree that the provisions of this paragraph shall survive the termination or expiration of this Lease and shall remain enforceable in accordance with the terms hereof.

(b)     Events of Environmental Default.  The occurrence of any of the following events shall also constitute an event of default under this Lease, entitling LESSOR to all of the rights and remedies provided herein, and further:

(i)     If LESSOR receives its first notice of a Hazardous Discharge or Environmental Complaint from a source other than LESSEE, and the LESSOR does not receive notice (which may be given in oral form, provided same is followed with all due dispatch by written notice given by certified mail, return receipt requested) of such Hazardous Discharge or Environmental Complaint from LESSEE within twenty-four (24) hours of such Hazardous Discharge or Environmental Complaint; or

(ii)     If any federal, state or local agency asserts or creates a lien upon the Premises, or any portion thereof, by the occurrence of a Hazardous Discharge or Environmental Complaint; or

(iii)     If any federal, state or local agency asserts a claim against LESSEE or LESSOR for damages or cleanup costs relating to a Hazardous Discharge or Environmental Complaint; provided, however, that such claim shall not constitute a default, if, within five (5) days of the occurrence giving rise to the claim:

(a)     LESSEE can prove to LESSOR'S satisfaction that LESSEE has commenced and is diligently pursuing either (A) a cure or correction of the event which constitutes the basis for the claim and continues diligently to pursue such cure or correction to completion, or (B) proceedings for an injunction, a restraining order or other appropriate emergent relief preventing such agency or agencies from asserting such claim, which relief is granted within ten (10) days of the occurrence giving rise to the claim, and the injunction, order, or emergent relief is not thereafter dissolved or reversed on appeal; and

(b)     In either of the foregoing events, LESSEE has posted a bond, letter of credit, or other security satisfactory in form, substance and amount to LESSOR and the agency or entity asserting the claim to secure the proper and complete cure or correction of the event which constitutes the basis for a claim.

(c)     Environmental Reports.  LESSEE shall promptly provide LESSOR with true, accurate, and complete copies of any and all documents, including reports, submissions, notices, orders, directives, findings and correspondence made by LESSEE to the appropriate state governmental entity or entities, including but not limited to the New York Department of Environmental Protection ("NYDEP AND NYSDEC"), the United States Environmental Protection Agency ("EPA"), the United States Occupational Safety and Health Administration ("OSHA"), or any other federal, state, or local authority pursuant to: (1) the Worker and Community Right to Know Act, N.J.S.A. §34:5A-1 et seq.,

and the regulations promulgated thereunder (collectively the "Right to Know Act"); (2) the Toxic Catastrophe Prevention Act,, and the regulations promulgated thereunder (collectively, "TCPA"); (3) the Occupational Safety and Health Act of 1979, 29 U.S.C. §651 et seq., and the regulations promulgated thereunder (collectively, the "OSH Act"); or (4) any other federal, state, or local law, code, or ordinance and all rules and regulations promulgated thereunder which require informational submissions concerning environmental, health, or safety matters (the foregoing laws, regulations, etc. may hereafter be referred to as "applicable environmental laws."

(d)     LESSOR'S Rights.

(i)  At any time upon request of LESSOR, LESSEE must give any representatives of LESSOR access during normal business hours to, and permit any of them to examine, audit, copy or make extracts from, any and all books, records, and documents in possession of LESSEE, its agents or any independent contractor relating to LESSEE'S affairs and to inspect the Premises.

(ii)  At no cost to LESSOR, LESSOR may require that LESSEE from time to time promptly cause such tests and procedures as LESSOR deems appropriate to be conducted by professionals and in a manner both satisfactory to LESSOR for the purpose of ensuring compliance with all federal, state and local environmental, health and safety laws, codes and ordinances and all rules and regulations promulgated thereunder, and having the Premises certified to LESSOR as such.  If required without cause, such tests and procedures shall be commenced promptly after not less than thirty (30) days' notice from LESSOR and only up to an aggregate annual cost of FIVE THOUSAND DOLLARS ($5,000.00).  If required with any cause whatsoever, such tests and procedures shall be commenced immediately upon notice from LESSOR and completed with all possible dispatch, without regard to costs or other burden or disposition.

(e)     LESSEE'S Indemnification.  LESSEE shall indemnify and hold LESSOR free and harmless from any and all liabilities, damages, claims, penalties, fines, settlements, causes of action, lawsuits, liabilities, losses, damages, and costs or expenses, including reasonable attorneys' fees and costs of litigation, environmental consultant and laboratory fees, and the cost and expense of investigating and defending any claims or proceedings resulting or arising from, or by reason of any of the following:  (i) the presence, disposal, release or threatened release of any hazardous substances as defined herein by New York or Federal Law ("Hazardous Substances") that is on, from or affecting the Premises including the soil, water, vegetation, buildings personal property, persons, animals or otherwise, any personal injury (including wrongful death) or property damage (real or personal) arising out of or relating to the Hazardous Substances, any lawsuits or administrative order relating to the Hazardous Substances, or any violation of any laws applicable to the Hazardous Substances; or (ii) any breach of this paragraph occurring during the Base Term of this Lease (or any extension thereof).

(f)     Use Prohibition From Violation.  If LESSEE is prohibited from conducting its business on the Premises due to LESSEE'S violation of applicable environmental law, LESSEE shall not be relieved of its obligations under the terms of this Lease.

(g)     Continuing Obligations.  LESSEE agrees that each and every provision of this paragraph shall survive the expiration or earlier termination of the Base Term (or any extension thereof),

regardless of the reason for such termination, it being agreed and acknowledged that LESSOR would not have entered into this Lease but for the provisions of this paragraph and the survival thereof. If LESSEE is prohibited from conducting its business on the Premises due to LESSEE'S violation of applicable environmental laws, LESSEE shall not be relieved of its objection under the terms of this Lease. LESSEE'S obligations and liabilities under this paragraph shall continue so long as LESSOR remains responsible for any spills and discharges of hazardous substances or wastes at the Premises. LESSEE'S failure to abide by the terms of this paragraph may be restrainable by injunction.

(h)        <u>Environmental Conditions Precedent to Assignment and Sublease.</u>

(i)        As an additional condition precedent to any sublease of the Premises or to assignment of this Lease, LESSEE shall, at LESSEE'S own expense, comply with all State and Federal environmental protection laws.

(ii)       At its sole cost and expense, LESSEE shall promptly furnish to LESSOR true and complete copies of all documents, submissions and correspondence provided by LESSEE to the Bureau and all documents, reports, directives and correspondence provided by the Bureau to LESSEE. LESSEE shall also promptly furnish to LESSOR true and complete copies of all sampling and test results obtained from samples and tests taken at and around the Premises.

(iii)      As a condition precedent to LESSEE'S right to sublease the Premises or to assign the Lease, LESSEE shall have received from the Bureau either (1) a non-qualified approval of LESSEE'S negative declaration or (2) a non-applicability letter, for which LESSEE shall promptly apply pursuant to New York or Federal Law. If this condition shall not be satisfied, then LESSOR shall have the right (in addition to any other rights that LESSOR may have under this Lease Agreement) to withhold consent to sublease or assignment.

(iv)       Environmental Exculpation. The LESSEE acknowledges and agrees that the LESSOR shall have no liability or obligation and shall incur no expense with respect to any environmental contamination and/or violation regarding the Premises, irrespective of when said contamination and/or violation is alleged to have occurred even if it is contended that said contamination and/or violation occurred prior to the Commencement Date of the Pre-existing Lease (as defined herein).

(i)        Phase 1. During its tenancy, LESSEE, at its sole cost and expense, and for its own use and edification, but not as a contingency to this Lease or a basis to terminate this Lease, shall have the right to conduct and perform a Phase I Environmental Site Assessment in accordance with ASTM standards only (the "Phase I Assessment"). LESSEE hereby expressly agrees that unless requested by LESSOR in writing to disclose such results, LESSEE shall maintain the confidentiality of its Phase I report and specifically, shall not disclose such information to LESSOR, any third party or any governmental entity unless required to do so by law. LESSEE hereby agrees to indemnify and hold LESSOR harmless from any damages, liabilities or claims for property damage or personal injury and mechanics liens caused by or arising from LESSEE and its agents and contractors in the conduct of such Phase I Assessment. Prior to any entry upon any Property by LESSEE or any officer, employee, agent, consultant or contractor of LESSEE, LESSEE shall provide LESSOR with an insurance certificate reflecting liability insurance coverage of not less than $2,000,000 and naming LESSOR as an additional

insured and to restore the Property to the substantially the same condition that existed prior to such inspections or investigations.

**15.**     **COVENANT OF QUIET ENJOYMENT**.  LESSOR covenants that upon LESSEE paying the rent and Additional Rent and observing and performing all the terms, covenants, and provisions of this Lease on LESSEE'S part to be observed and performed, LESSEE may peaceably and quietly enjoy the Premises, subject nevertheless to the terms and conditions of this Lease and, provided, however, that a foreclosure of any mortgage now or hereafter affecting the Premises or a condemnation of the Premises shall not be construed as a breach of this covenant, nor shall any action by reason thereof be brought against LESSOR.

**16.**     **SUBORDINATION**.  This Lease shall be subject and subordinate at all times to the lien of existing mortgages and of mortgages which hereafter may be made a lien on the Premises.  Although no instrument or act on the part of the LESSEE shall be necessary to effectuate such subordination, LESSEE will, nevertheless, execute and deliver such further instruments subordinating this Lease to the lien of any such mortgages as may be desired by the mortgagee.  The LESSEE hereby appoints the LESSOR its attorney-in-fact, irrevocably, to execute and deliver any such instrument for the LESSEE.

**17.**     **BROKER**.  The parties warrant and represent that neither have retained the services of a broker or salesperson in connection with the Lease of the subject Premises and that there is no brokerage commission due in connection with this Lease.  LESSEE further warrants and represents that it was not shown the subject Premises nor induced to purchase the same as a result of any efforts of a real estate broker or salesperson.  LESSEE agrees to indemnify and hold harmless LESSOR against and from any claims for any brokerage commissions and all costs, expenses, and liabilities in connection therewith, including, without limitation, attorneys' fees and expenses, arising out of any conversations or negotiations had by LESSEE with any broker.

**18.**     **CERTIFICATE**.  LESSEE agrees, at any time, and from time to time, upon LESSOR'S reasonable request and not less than ten (10) days' prior notice by LESSOR, to execute, acknowledge, and deliver a statement to LESSOR in writing, in form satisfactory to LESSOR, setting forth in memorandum form the duration of this Lease, parties thereto and such other facts as may be required for recording of a memorandum of lease, and also such certificate as LESSOR may reasonably request, certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates to which the periodic rent, Additional Rent and other charges have been paid, and stating whether or not to the best knowledge of the signer of such certificate, there exists any default in the performance of any covenant, agreement, term, provision or condition contained in this Lease, and if so, specifying each such default of which the signer may have knowledge, it being intended that any such statement delivered pursuant hereto may be relied upon by LESSOR and by any mortgagee of any mortgage affecting the Premises, and by any LESSOR under a ground or underlying lease affecting the Premises, and by any purchaser or prospective purchaser of the Premises.

**19.**     **SURRENDER OF PREMISES**.  Upon the expiration or termination of the Base Term of this Lease (or any extension thereof), LESSEE shall quit and surrender the Premises in good order

and condition in compliance with all applicable governmental laws, rules, regulations and other requirements, including, but not limited to, all environmental, health, safety, zoning, fire and building requirements, and shall remove all its property therefrom. LESSEE'S obligation to observe or perform this covenant shall survive the expiration of or other termination of the Base Term of this Lease (or any extension thereof). No surrender shall be deemed to have been made or accepted except by a writing executed by LESSOR, which acceptance shall not be unreasonably withheld.

20.     **RIGHT OF FIRST REFUSAL.** If at any time during the Base Term or any extension thereof, LESSOR shall receive a bona fide offer to purchase the entire Premises from a third party which is not affiliated with LESSOR or its owners, members or affiliates, which offer LESSOR is willing to accept ("Outside Contract"), LESSOR shall give written notice ("Sale Notice") thereof, to LESSEE. LESSEE shall have a right of first refusal ("Refusal Right") to purchase the entire Premises in accordance with the terms and provisions of the Outside Offer. If LESSEE desires to exercise the Refusal Right, LESSEE shall deliver written notice to that effect to LESSOR within twenty (20) days after receipt of the Sale Notice ("Refusal Period"). If LESSEE exercises the Refusal Right within the Refusal Period, LESSOR and LESSEE shall promptly execute a contract which includes the same material terms and conditions as the Outside Contract ("Sale Contract") and LESSEE shall deposit when due any earnest money deposit required thereunder. If LESSEE does not execute a Sale Contract within fifteen (15) days after LESSEE'S receipt of such Sale Contract from LESSOR, signed on behalf of LESSOR, or if LESSEE defaults in its obligations under such Sale Contract, then LESSOR shall be free to consummate the sale pursuant to the Outside Contract (or another contract on any terms satisfactory to LESSOR with any other purchaser). If LESSEE does not exercise the Refusal Right by the time and in the manner set forth herein, then (i) the Refusal Right shall forever be waived, null and void and of no effect, and (ii) LESSOR shall be free to consummate a sale of the Premises or any portion thereof with any purchaser of its choosing on any terms it finds satisfactory throughout the term of this lease or any extension thereof. The rights granted to LESSEE under this Paragraph shall not survive the expiration, or termination of this Lease.

The provisions of this Paragraph shall not apply and LESSEE shall not have any Refusal Right (i) with respect to the sale, conveyance, assignment or other transfer (A) to any person or entity controlling, controlled by, or under common control with LESSOR or any of its direct or indirect owners, (B) by gift, descent or devise, or (C) to any sale (or conveyance in lieu thereof) by foreclosure or enforcement of a lien or security interest, or (ii) at any time once an Event of Default (as defined in this Agreement) has occurred. Any conveyance of the Premises to LESSEE pursuant to this Paragraph shall be "as-is" with respect to the physical condition of the Premises.

21.     **SECURITY DEPOSIT.** The initial security deposit under this Lease shall be the sum equal to two months Base Rent, to wit, NINETY THOUSAND DOLLARS ($90,000.00). Said deposit shall be returned to LESSEE at the termination of said Lease, without interest, provided LESSEE is not then in default of any obligation hereunder. At each increase in Base Rent through the initial term, (and any extensions thereof), LESSEE shall provide to LESSOR the difference between the security deposit then held, and two months current Base Rent, such that LESSOR always maintains a security deposit of two months current Base Rent. For the sake of clarity, in year two, LESSEE shall provide an additional TWO-THOUSAND DOLLARS ($2,000.00), so that LESSOR maintains NINETY-TWO THOUSAND

DOLLARS ($92,000.00) as security, and so on and so forth through the initial term, (and any extensions thereof).

**22.**     **HOLDING OVER.**   Any holding over or continued occupancy by LESSEE after the expiration of the Base Term of the Lease (or any option period, if applicable) shall not operate to extend or renew the Lease or to imply or create a new lease.   In such event, LESSOR shall have the right to immediately terminate the LESSEE'S occupancy or to treat the LESSEE'S occupancy as a month-to-month tenancy, in which event LESSEE shall continue to perform all obligations, including the payment of rental at a rate equal to the greater of:  (i) two hundred (200%) percent of the rental as shall be in effect immediately prior to the termination of the Base Term hereof (or any extension thereof); or (ii) as otherwise provided by applicable law.   In no event, however, shall LESSEE or GUARANTOR be relieved of any liability to LESSOR for damages resulting from such holding over.

**23.**     **INTENTIONALY OMMITTED**

**24.**     **ATTORNMENT.**   Neither the foreclosure of any mortgage affecting the Premises, nor the institution of any suit, action, summary, or other proceeding by LESSOR or any mortgagee, nor the sale, conveyance or transfer of the Premises by LESSOR, shall by operation of law or otherwise, result in the cancellation or termination of this Lease or the obligations of LESSEE hereunder, and LESSEE covenants and agrees to attorn to the LESSOR, the holder of any mortgage, or the purchaser, grantee or transferee of the Premises.

**25.**     **EXCULPATION.**   Notwithstanding anything to the contrary set forth in the Lease, it is specifically understood and agreed by LESSEE that there shall be absolutely no personal liability on the part of LESSOR or on the part of the principals, partners or shareholders (as the case may be) of LESSOR with respect to any of the terms, covenants and conditions of the Lease, and LESSEE shall look solely to the equity, if any, of LESSOR in the land and building for satisfaction of each and every remedy of LESSEE in the event of any breach of LESSOR of any of the terms, covenants and conditions of the Lease to be performed by LESSOR; such exculpation of personal liability to be absolute and without any exception whatsoever.

**26.**     **FINANCIAL INFORMATION: CONFIRMATION OF FINANCING.**  From time to time and, in any event, within 90 days, of the close of each fiscal year of the LESSEE, commencing with the fiscal year ending in 2020, the LESSEE will provide to LESSOR and to LESSOR'S mortgagee, if any, the balance sheet, statement of income and capital and statement of cash flows of the LESSEE ("Financial Information"). Such statements shall set forth the corresponding figures of the previous fiscal year in comparative form, all in reasonable detail and certified by the Chief Financial Officer, or if none, the President, of LESSEE.

**27.**     **SUCCESSORS AND ASSIGNS.**

(a)            The covenants, conditions, and agreements contained in this Lease shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and, except as otherwise provided herein, their assigns.

(b)          The term "LESSOR", wherever used in this Lease, shall be limited to mean and include only the owner or owners at the time in question of the Premises, to whom this Lease may be assigned, or a mortgagee in possession, so that in the event of any sale, assignment or transfer of the Premises, or of such underlying Lease, such owner, or mortgagee in possession shall thereupon be released and discharged from all covenants, conditions, and agreements of LESSOR hereunder; but such covenants, conditions and agreements shall be binding upon each new owner or mortgagee in possession until the Premises are resold, reassigned, or retransferred.

28.          **FORCE MAJEURE.** LESSOR shall not be liable for any failure or delay in performing an obligation under this lease that is due to any of the following causes (which events and/or circumstances are hereinafter referred to as "Force Majeure"), to the extent beyond its reasonable control: acts of God, accidents, riots, civil unrest, war (whether declared or not), armed conflict or the serious threat of same (including but not limited to hostile attack, blockade, military embargo), invasion, kidnapping and detention in a foreign prison, terrorist act, plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine or other employee restrictions, civil commotion, civil war, riot, rebellion, revolution, insurrection, sabotage or piracy, breakdown of communication facilities, breakdown of web host, breakdown of internet service provider, natural catastrophes, governmental acts or omissions, changes in laws or regulations, national strikes, fire, explosion, generalized lack of availability of raw materials or energy. In such event, then the LESSOR'S performance of such obligation shall be excused for a period of such delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Nothing in this paragraph shall in any way apply to payment of any sums of money required to be paid by LESSEE or any other obligation of LESSEE hereunder.

29.          **NON-LIABILITY OF LESSOR.** The LESSOR shall not be liable for any damage or injury which may be sustained by the LESSEE or any other person, as a consequence of the failure, breakage, leakage or obstruction of the water, plumbing, steam, sewer, waste or soil pipes, roof, drains, leaders, gutters, valleys, downspouts, or the like, or of the electrical, gas, power, conveyor, refrigeration, sprinkler, air conditioning or heating systems, elevators or hoisting equipment; or by reason of the elements; or resulting from the carelessness, negligence or improper conduct on the part of the LESSOR or the LESSOR'S contractors, or attributable to any interference with, interruption of or failure, beyond the control of the LESSOR, of any services to be furnished or supplied by the LESSOR, including any failure to make LESSOR'S Structural Repairs. The parties agree that LESSEE shall seek recourse for any such losses against its insurers or third parties unrelated to the LESSOR only.

30.          **NOTICES**. Any notice, request, or demand permitted or required to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by LESSOR or LESSEE, shall be in writing. Unless otherwise required by such law or regulation, such notice, request, or demand shall be given, and shall be served personally, or dispatched via electronic mail, or by an established overnight courier delivery service and such notice so dispatched shall be effective upon receipt, or by certified mail, return receipt requested and such notice so dispatched shall be effective five (5) days after the date it is dispatched, to the other party at each address set forth below:

As to LESSOR:  307 GLEN COVE ROAD INC., and
BARON REALTY INC.
c/o Joseph S. Aboyoun, Esq.
Aboyoun Dobbs LLC
77 Bloomfield Avenue
Pine Brook, New Jersey 07054
jaboyoun@aboylaw.com

As to LESSEE &
GUARANTOR:

GOLD COAST MOTORS OF ROSLYN LLC
ANTHONY DEO,
c/o Harry R. Thomasson Esq.
3280 Sunrise Hwy Ste 112,
Wantagh NY 11793
Phone – 516-557-5459
E-mail – HRTAtty@verizon.net

Either party may, however, by written notice as aforesaid, designate a different address or addresses for notices, requests, or demands to it.

**31. <u>DAVID BARON'S PERSONAL OFFICE</u>:** David Baron shall have exclusive occupancy of his personal office at the Premises at no charge for 2 years, or any extension thereof. He shall have an irrevocable license to access said office at any time. At all times he shall be provided with keys, alarm codes and any other requirement for him to have unimpeded access to said office throughout the Base Term and any extension thereof.

**32. <u>MISCELLANEOUS PROVISIONS</u>.**

(a)     The failure of LESSOR or LESSEE to seek redress for violation of, or to insist upon the strict performance of, any covenants or condition of this Lease, shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation.  The receipt by LESSOR of rent or the payment of rent by LESSEE with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach.  No provision of this Lease shall be deemed to have been waived by LESSOR or LESSEE unless such waiver be in writing signed by LESSOR or LESSEE.  No payment by LESSEE or receipt by LESSOR of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed on accord and satisfaction, and LESSOR may accept such check or payment without prejudice to LESSOR'S right to recover the balance of such rent or pursue any other remedy in this Lease provided.

(b)     This Lease with the exhibits annexed hereto contains the entire agreement between LESSOR and LESSEE and shall be in place and instead of any and all prior or existing leases (and amendments thereto).  Any executory agreement hereafter made between LESSOR and LESSEE shall be ineffective or effect an abandonment of this Lease, in whole or in part, unless such executory agreement is in writing and signed by both parties.

(c)     If any term or provision of this Lease shall to any extent be invalid or unenforceable, the remainder of this Lease shall not be affected thereby, and the balance of the terms and provisions of this Lease shall be valid and enforceable to the fullest extent either hereunder or as permitted by law.

(d)     In the event of a legal dispute, or any action or proceeding is commenced to obtain a declaration of rights hereunder or to enforce any provision or rights hereof, whether legal or equitable, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees, costs and expenses, in addition to all other relief to which it may be entitled therein.

(e)     The parties have jointly participated in the negotiation and drafting this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statue or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(f)     This Lease shall be construed and interpreted in accordance with the laws of the State of New York. Venue for any action arising under the terms of this Lease shall be in Nassau County, New York.

(g)     LESSOR AND LESSEE HEREBY KNOWINGLY AND VOLUNTARILY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON OR IN RESPECT OF ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LESSOR AND LESSEE HEREUNDER, LESSEE'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE.

(h)     No failure by LESSOR to insist upon the strict performance of any term, covenant, agreement, provision, condition or limitation of this Lease to be kept, observed or performed by LESSEE, and no failure by LESSOR to exercise any right or remedy consequent upon a breach of any such term, covenant, agreement, provision, condition or limitation of this Lease, shall constitute a waiver of any such breach or of any such term, covenant, agreement, provision, condition or limitation.

(i)     Time is of the essence with respect to the performance of each of the covenants, obligations and agreements of this Lease.

(j)     The captions of the paragraphs in this Lease are inserted only as a matter of convenience and for reference and they in no way define, limit, or describe the scope of this Lease or the intent of any other provision thereof.

(k)     As used herein, the masculine shall include the feminine; the singular shall include the plural; the neuter shall include the masculine and feminine; and vice versa.

(l)        It is expressly understood and agreed by and between the parties hereto that this Lease sets forth all of the promises, agreements, conditions and understandings between LESSOR and/or its agents and LESSEE relative to the Premises, that any inconsistent provision of any leasing communication or other documents exchanged by the parties are superseded, and that there are no oral promises, agreements, conditions, or understandings between the parties with respect thereto.

**IN WITNESS WHEREOF**, LESSOR and LESSEE have respectively signed and sealed this Lease as of the day and year first above written.

WITNESS:                              LESSEE:

_____ **LLC**

_____     By:_____

                                                      , President

WITNESS:                              GUARANTOR:

_____     By:_____

                                          ANTHONY DEO, Individually

ATTEST:                               LESSOR:

                                          BARON REALTY INC.

_____     By:_____

                                          David Baron, President

                                          307 GLEN COVE ROAD INC.

_____     By:_____

                                          David Baron, President

# EXHIBIT "A"

# DESCRIPTION OF PREMISES

# EXHIBIT "B"

## PERSONAL UNLIMITED GUARANTY OF ANTHONY DEO

**FOR VALUE RECEIVED**, and as an inducement to 307 GLEN COVE ROAD INC., AND BARON REALTY INC. (hereinafter collectively referred to as ALESSOR@) to enter into a certain Lease Agreement, dated _____ ___, 2020(ALease Agreement@), ANTHONY DEO, an Individual c/o Howard E. Greenberg, Esq. 180 East Main Street, Suite 300, Smithtown, New York 11787 (hereinafter referred to as ALESSEE@), to which this Guaranty is attached.

The undersigned, ANTHONY DEO (hereinafter referred to as the AGUARANTOR@) hereby guarantees to LESSOR, its successors and assigns, and expressly agrees that the validity of this Guaranty and the obligations of GUARANTOR hereunder shall be and the same are direct and primary and shall in no way be terminated, affected, or impaired by reason of the assertion by LESSOR against LESSEE, its successors or assigns, of any of the rights or remedies reserved to LESSOR pursuant to the provisions of the Lease Agreement or by reason of the waiver by LESSOR of, or the failure of LESSOR to enforce, any of the terms, covenants, conditions or obligations of LESSEE under the Lease Agreement, or the granting of any indulgence or extension of time to LESSEE, its successors or assigns, all of which may be given or done without notice to GUARANTOR.

GUARANTOR waives notice of default in the payment of rent, additional rent, or any other amounts contained or reserved in the Lease Agreement, and notice of a breach of non-performance of any of the covenants, conditions or agreements contained in the Lease Agreement.

GUARANTOR further covenants and agrees that the Lease Agreement and this Guaranty shall remain and continue in full force and effect as to any amendment, modification, renewal, or extension of the Lease Agreement, to all of which GUARANTOR hereby consents in advance, and no course of dealing between LESSOR, its successors and assigns, and LESSEE, its successors and assigns, shall diminish, impair in any respect, or abrogate the obligation of GUARANTOR hereunder.

GUARANTOR further agree that his liability hereunder shall be primary and that, in any right of action which shall accrue to LESSOR, its successors and assigns, may, at its option, proceed against GUARANTOR without having commenced any action, or having obtained any judgment, against LESSEE.

GUARANTOR further represents to LESSOR, as an inducement for it to make the Lease Agreement, that GUARANTOR have a financial interest in LESSEE.

GUARANTOR agrees that, in the event LESSEE shall become insolvent or shall be adjudged a bankrupt, or shall file a petition for reorganization, arrangement or similar relief under any present or future provision of the United States Bankruptcy Code or the bankruptcy or

receivership laws of the State of New York, or if such a petition filed by creditors of LESSEE shall be approved by a court, or if LESSEE shall seek a judicial readjustment of the rights of its creditors under any present or future federal or state law or if a receiver of all or part of its property and assets is appointed by any state of federal court, and in any such proceeding the Lease Agreement shall be terminated or rejected, or the obligations of LESSEE thereunder shall be modified, GUARANTOR agree that they will immediately pay to LESSOR or its successors or assigns an amount equal to all fixed, contingent, and additional rent accrued to the date of such termination, rejection, or modification, and when due, the rent and additional rent which would have been payable under the Lease Agreement during the unexpired portion of the term thereby demised, less the aggregate of rentals received by LESSOR, its successors and assigns, from lessees occupying the demised premises or any portion thereof during such unexpired portion of the term demised by the Lease Agreement or any part of said unexpired term.

GUARANTOR=S obligation to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of LESSEE or its estate in bankruptcy resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute, or from the decision of any court. By execution of the within Guaranty, the GUARANTOR does hereby covenant, agree, and acknowledge that they irrevocably submit to the jurisdiction of the State of New York and agree that the within Guaranty shall be construed in accordance with the laws of the State of New York in connection with their obligations as GUARANTOR as in this Guaranty provided.

This Guaranty is for the benefit of LESSOR and any present or future bona fide first mortgagee, its successors and assigns, as additional collateral for any present or future mortgage loan to LESSOR.

[Signature page follows]

## SIGNATURE PAGE TO GUARANTY

IN WITNESS WHEREOF, GUARANTORS have hereunto set their hands and seal this ___ day of August , 2020.

WITNESS:

_____          _____
            As To                              Anthony Deo

STATE OF NEW YORK        )
                                              SS.:
COUNTY OF                     )

On this _____ day of _____, 2020, before me personally came ANTHONY DEO, to me known and known to me to be the person described in and who executed the foregoing instrument and he acknowledged to me that he executed same.

_____
Notary Public

## EXHIBIT "C"

## MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT

**THIS MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT** (the "**Agreement**") is made as of August ___, 2020, by and between 307 Glen Cove Road Inc., and Baron Realty Inc. (collectively the "**SECURED PARTY**"), and Anthony Deo (the "**PLEDGOR**").

## WITNESSETH:

**WHEREAS**, the PLEDGOR and the SECURED PARTY have entered into that Lease Agreement, dated as of the date hereof (the "**LEASE**"); and

**WHEREAS**, the SECURED PARTY desires collateral security for the satisfaction of the PLEDGOR's obligations in the LEASE; and

**WHEREAS**, PLEDGOR has agreed to collateralize his membership interest in _____ LLC as security for repayment of the LEASE; and

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained, the parties hereto, intending to be legally bound hereby, do hereby agree as follows:

1.      LEASE Obligations.  The performance and satisfaction of the LEASE Obligations shall be secured pursuant to the terms of this Agreement. Capitalized terms used but not specifically defined herein shall have the same meanings as prescribed in the LEASE.

2.      Collateral Security.  As collateral security for the satisfaction of the LEASE Obligations, the PLEDGOR does hereby pledge and grant to the SECURED PARTY a security interest in and to his One Hundred Percent (100%) membership interest in _____ LLC (the "Company") (collectively the "**Collateral**").

3.      Cash Dividends; Voting Rights.  Unless and until an Event of Default (as defined below) shall have occurred, and subject to the terms of the Operating Agreement of the Company, the PLEDGOR shall be permitted to receive all profits, losses, income, surplus, return on capital and equity interest distributions paid in the normal course of business of the Company and to exercise all voting, consent, administration, management and other powers, rights and remedies of the PLEDGOR with respect to the Company and the Collateral.

4.      Event of Default.  Each of the following shall be an "**Event of Default**" hereunder:

> a.  a failure of PLEDGOR to perform any obligation required pursuant to the Lease; or

b. a breach by PLEDGOR of this Agreement.

c. Any failure of or by PLEDGOR to comply with, perform or observe any one or more terms, covenants, agreements, or undertakings in this Agreement; or

d. Any statement, warranty, or representation contained in this Agreement being or becoming materially untrue, false, or erroneous; or

e. Any uninsured material loss, theft, damage, or destruction to any of the Collateral, or the creation of any lien against the Collateral, or the making of any levy, seizure, or attachment thereof or thereon; or

f. If PLEDGOR shall have applied for or consented to the appointment of a custodian, receiver, trustee, or liquidator of all or a substantial part of his or its assets; a custodian shall have been appointed with or without the consent of PLEDGOR or if PLEDGOR or Company has made a general assignment for the benefit of creditors, or has filed a voluntary petition in bankruptcy, or a petition or answer seeking reorganization or an arrangement with creditors, or have an arrangement with creditors to take advantage of any insolvency law, or an answer admitting the material allegations of a petition in bankruptcy, reorganization, or insolvency proceeding; or taken action for the purpose of effectuating any of the foregoing; or a petition in bankruptcy is filed against PLEDGOR or Company and shall not have been dismissed for a period of sixty (60) consecutive days, or if an Order for Relief has been entered under the United States Bankruptcy Code, or a judgment or decree shall have been entered without the application, approval, or consent of any person by any court of competent jurisdiction approving the petition seeking the reorganization of Company, or appointing a receiver, trustee, custodian, or liquidator of any of PLEDGOR's or Company's assets and such order, judgment, or decree shall have continued unstayed and in effect for a period of thirty (30) days.

5.  Additionally, the occurrence of any "Default" or "Event of Default," as those terms may be defined or otherwise utilized in the Lease and/or all related documents executed in furtherance thereof, shall constitute an Event of Default hereunder.

6.  Occurrence of Event of Default.  Following the occurrence of an Event of Default, the SECURED PARTY may, in its sole discretion, exercise the SECURED PARTY's rights under this Agreement by providing a written notice and an opportunity to cure of no less than twelve business days (the "Default Notice") to such effect to the PLEDGOR.

7.  Certain Rights of SECURED PARTY.  In case (i) an Event of Default shall have occurred, and (ii) a Default Notice is given and the default is not cured within the timeframes agreed to by the Parties but no less than twelve business days, the SECURED PARTY shall have the right to:

(a)    Vote all or any of the Transferred Interest, and give all consents, waivers and ratifications with respect thereto and otherwise act in all matters with respect thereto.

(b)    Exercise all corporate rights with respect to the Transferred Interest including, without limitation, all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any portion of the Transferred Interest as if he were the absolute owner thereof.

(c)    Exercise any and all rights provided by the laws of the State of New York, including the Uniform Commercial Code in effect therein and any other law, whether by statute or otherwise applicable to the rights of a secured party, the holder of a pledge or the holder of a security interest in limited liability company membership interests or security generally prior to or upon default in the obligations of the person or persons creating the pledge or security interest in said membership interests as collateral security for the performance of such obligations.

(d)    The SECURED PARTY's rights and remedies under this Agreement and any other agreement or instrument between the SECURED PARTY and the PLEDGOR shall be cumulative and not exclusive of any other right or remedy which the SECURED PARTY may have, and the SECURED PARTY may exercise any right and remedy which the SECURED PARTY may have under such agreement or instrument without exercising any rights under any other agreement or instrument.

8.    Secured Party Appointed Attorney-In-Fact.    The SECURED PARTY, its successors and assigns, is hereby appointed the attorney-in-fact, with full power of substitution, of the PLEDGOR for the purpose of carrying out the provisions of this Pledge Agreement and continuing any action and executing any instruments which such attorney-in-fact may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.    The PLEDGOR will indemnify and save the SECURED PARTY harmless from and against any liability or damage which it may incur, in good faith and without gross negligence, in the exercise and performance of any of the SECURED PARTY's powers and duties specifically set forth herein.

9.    Escrow and Delivery.  SECURED PARTY and PLEDGOR hereby designate and appoint ABOYOUN DOBBS LLC as ESCROW AGENT ("ESCROW AGENT") to serve in accordance with the terms of this Pledge Agreement, and ESCROW AGENT hereby accepts such designation and appointment.   The PLEDGEE shall deposit the COLLATERAL with ESCROW AGENT simultaneously with the execution hereof.  The COLLATERAL shall be held by ESCROW AGENT as agent for SECURED PARTY and PLEDGOR.

10.    Responsibilities of Escrow Agent. The acceptance by ESCROW AGENT of his duties under this Pledge Agreement is subject to the following terms and conditions, which the parties to this Pledge Agreement hereby agree shall govern and control with respect to their rights, duties, liabilities, and immunities:

(a)    ESCROW AGENT shall act hereunder as depository;

(b)    ESCROW AGENT shall not be liable, except for his own gross negligence or willful misconduct;

(c)     ESCROW AGENT may consult with, and obtain advice from counsel in the event of any bona fide questions as to any of the provisions hereof or his duties hereunder; and he shall incur no liability and shall be fully protected in acting in good faith in accordance with the opinion and instructions of such counsel;

(d)     ESCROW AGENT shall not in any way be bound or affected by any notice of modification or cancellation of this Agreement by PLEDGOR and SECURED PARTY, nor shall ESCROW AGENT be bound by any modification of his obligations hereunder unless the same shall be consented to by ESCROW AGENT in writing.  ESCROW AGENT shall be entitled to rely upon any judgment, certification, demand, notice, or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of a court issuing any judgment, provided that regarding the delivery of the COLLATERAL, ESCROW AGENT shall rely upon (i) a notice or other communication signed by SECURED PARTY and PLEDGOR, or (ii) a judgment of a court of competent jurisdiction;

(e)     ESCROW AGENT may act in reliance upon any instrument or signature reasonably believed by him to be genuine, and ESCROW AGENT may assume that any person purporting to give any notice of receipt of advice or make any statement in connection with the provisions hereof has been duly authorized to do so;

(f)     This Pledge Agreement sets forth exclusively the duties of ESCROW AGENT with respect to any and all matters pertinent hereto.  Except as otherwise expressly provided herein, ESCROW AGENT shall not refer to, and shall not be bound by, the provisions of any other agreement;

(g)     Except with respect to claims based upon ESCROW AGENT's willful misconduct or gross negligence, PLEDGOR and SECURED PARTY, jointly and severally, shall indemnify and hold harmless ESCROW AGENT from and against any claims arising out of or in connection with this Pledge Agreement, such indemnification to include all reasonable costs and expenses incurred by ESCROW AGENT, including, but not limited to, reasonable attorneys' fees;

(h)     In the event of any disagreement among the parties to this Pledge Agreement, or among them or any one of them and any other person, resulting in adverse claims or demands being made in connection with the subject matter of the escrow, or in the event that ESCROW AGENT in good faith is in doubt as to what action he should take hereunder, ESCROW AGENT may, at his option, refuse to comply with any claims or demands on him, until (i) the rights of all parties shall have been fully and finally adjudicated by a court of competent jurisdiction or (ii) all differences shall have been adjusted and all doubt resolved by written agreement executed by all parties thereto;

(i)     ESCROW AGENT shall not be proscribed from representing SECURED PARTY with respect to any dispute between PLEDGOR and SECURED PARTY or by reason of the fact that ESCROW AGENT is serving as such hereunder.  It is acknowledged that ESCROW AGENT is merely to serve as a stakeholder and that he will not have a conflict of interest if he represents PLEDGOR in connection with any such dispute.

11.     Release of Collateral.  Upon the end of the LEASE without any default by LESSEE thereof, this Agreement shall be automatically terminated and the SECURED PARTY may file a UCC-3 Termination Statement or such similar document to terminate all of the SECURED PARTY's rights under this Agreement should same be necessary.

12.     Entire Agreement.  This Agreement, including the LEASE its exhibits, Guaranties, and any other documents signed contemporaneously herewith and any exhibits and schedules attached hereto or thereto respectively, contains and constitutes the entire agreement of the parties on the matters which are addressed in this Agreement, and supersedes all prior discussions and agreement between them, whether oral or written, of any nature whatsoever with respect to the subject matter hereof.

13.     Benefits.  This Agreement shall bind and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

14.     Governing Law.  This Agreement shall be deemed to be a contract made under the laws of the State of New York and shall be construed with and governed by the laws of said State, without giving effect to the conflicts of law principles of such State.

15.     Jurisdiction; Venue.  Each party hereby expressly consents to the exclusive jurisdiction of the federal and state courts located in the State of New York in connection with any action brought to enforce or otherwise relating to this Agreement and consents that process or other application to any of said courts may be served upon him, her or it within or without any such court's jurisdiction by mail or by personal service, provided a reasonable time for appearance is allowed.  Each party also expressly waives any objection to proper venue with respect to any such courts.

16.     Assignment.  Neither of the parties hereto may assign any rights or obligations hereunder without the prior written consent of the other party hereto.  Any assignment in violation of this provision shall be null and void.

17.     Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect as far as possible.

18.     Modification.  This Agreement may not be modified except in a writing signed by all parties to this Agreement.

19.     Notices.  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if hand-delivered or mailed by certified mail, return receipt requested:

As to SECURED PARTY:         307 GLEN COVE ROAD INC., and
                             BARON REALTY INC.
                             c/o Joseph S. Aboyoun, Esq.
                             Aboyoun Dobbs LLC
                             77 Bloomfield Avenue
                             Pine Brook, New Jersey 07054
                             jaboyoun@aboylaw.com


As to PLEDGOR:               ANTHONY DEO,

c/o Harry R. Thomasson Esq.
3280 Sunrise Hwy Ste 112, Wantagh NY
11793
Phone – 516-557-5459
E-mail – HRTAtty@verizon.net

Or such other addresses or to such other persons as the SECURED PARTY or the PLEDGOR shall have last designated by written notice to the other parties.

20.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

21.     Delivery by Facsimile. This Agreement, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

22.     Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY WAIVES ANY AND ALL RIGHTS EACH PARTY MAY HAVE TO TRIAL BY JURY OF ANY ISSUE ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

[Signature page follows]

# SIGNATURE PAGE TO MEMBERSHIP INTEREST PLEDGE AND SECURITY AGREEMENT

## PLEDGOR:

ANTHONY DEO

## SECURED PARTY:

BARON REALTY INC.

By: _____
David Baron, President

307 GLEN COVE ROAD INC.

By: _____
David Baron, President

## ESCROW AGENT:

_____
Joseph S. Aboyoun, Esq.