SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------------X

ANTHONY DEO individually and as shareholder/member
of NORTHSHORE MOTOR LEASING LLC and 189
SUNRISE HWY AUTO LLC; SARA DEO individually
and as shareholder/member of NORTHSHORE MOTOR
LEASING LLC and 189 SUNRISE HWY AUTO LLC; and
NORTHSHORE MOTOR LEASING LLC and 189 SUNRISE
AUTO LLC,

                                     Plaintiffs,

      -against-

RONALD BARON, JOSHUA AARONSON, JORY BARON,
MARCELLO SCIARRINO, DANIEL O'SULLIVAN,
BRIAN CHABRIER, WENDY KWUN, IRIS BARON,
RAYMOND PHELAN, ASAD KHAN, ESTATE OF
DAVID BARON, BARON NISSAN INC., d/b/a/
BARON NISSAN, ISLAND AUTO GROUP OF NEW
YORK LLC, a/k/a/ ISLAND AUTO GROUP OF NY LLC,
d/b/a/ ISLAND AUTO GROUP, ROBERT ANTHONY
URRUTIA, BRUCE NOVICKY, MICHAEL MORGAN,
PARMESHWAR BISSOON, SUPERB MOTORS INC.,
d/b/a/ TEAM AUTO DIRECT, RICHARDS, WITT &
CHARLES, LLP, CITRIN COOPERMAN & COMPANY
LLP, d/b/a/ CITRIN COOPERMAN, NEXTGEAR
CAPITAL INC., ALLY FINANCIAL INC.,
NISSAN MOTOR ACCEPTANCE COMPANY LLC,
d/b/a/ NMAC, JP MORGAN CHASE BANK N.A.,
a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK, CYRULI,
SHANKS & ZIZMOR, LLP, MILMAN LABUDA
LAW GROUP, PLLC, JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20, JOHN DOES 1-20,
JANE DOES 1-20, JOHN DOE CORPORATIONS 1-20,
and NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                                   Defendants.

-------------------------------------------------------------------------X

Index No.

**SUMMONS**

Plaintiffs designate
Nassau County as the
Place for trial.

The basis for venue is
the events set forth
herein took place in
Nassau County, NY.

To the within Defendant(s):

1

YOU ARE HEREBY SUMMONED to answer the Verified Complaint in this action and to serve a copy of your answer or, if the Verified Complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

Dated: Wantagh, New York
September 4 , 2024

Respectfully submitted,

Plaintiffs, by Counsel,

Harry Thomasson, Esq.
3280 Sunrise Highway
Box 112
Wantagh, NY  11793
Tel. 516-557-5459
hrtatty@verizon.net

TO:

1) RON BARON
   98 Goose Hill Rd.
   Cold Spring Harbor, NY 11724
And
   10 Bancroft Ln.
   Kings Point, NY 11024

2) JOSHUA AARONSON
   55 Oak Drive
   Roslyn, NY  11576

3) JORY BARON
   10 Bancroft Ln
   Great Neck, NY 11024

2

And
> 21 Wayside Ln
> Huntington NY 11743

4) MARCELLO SCIARRINO
> 37 Montauk Pl.
> Staten Island, NY 10314

5) DANIEL O'SULLIVAN
> 75 The Circle
> Glen Head, NY 11545

6) BRIAN CHABRIER
> 4 Creek Ridge Rd.
> Bayville, NY 11709

7) WENDY KWUN
> 671 4th Pl S
> Garden City, NY 11530

8) IRIS BARON
> 105 Via Palacio
> Palm Beach Gardens FL 33418

And
> 6 Old Wagon Ln.
> Old Westbury, NY 11568

9) RAYMOND PHELAN
> 3 Dolphin Ln.
> West Islip, NY 11795

10) ASAD KHAN
> 239-50 Jericho Turnpike,
> Floral Park, NY 11001

And

> 271-10 Grand Central 9H
> Floral Park, NY

11) ESTATE OF DAVID BARON
> 6 Old Wagon Ln.
> Old Westbury, NY 11568

3

12) BARON NISSAN INC., d/b/a/ BARON NISSAN
   235 Glen Cove Rd.
   Greenvale, NY  11548

13) ISLAND AUTO GROUP OF NEW YORK LLC, a/k/a/ ISLAND AUTO GROUP
   OF NY LLC d/b/a/ ISLAND AUTO GROUP
   55 Oak Drive
   Roslyn, NY  11576

14) ROBERT ANTHONY URRUTIA
   327 Lakewood Terrace
   Newton, NJ  07860

15) BRUCE NOVICKY
   36 High Ridge Rd.
   Brookfield, CT 06804

16) MICHAEL MORGAN
   65-07 Admiral Drive
   Middle Village, NY

17) PARMESHWAR BISSOON
   11516 120th St.
   South Ozone Park, NY 11420

18) SUPERB MOTORS INC., d/b/a/ TEAM AUTO DIRECT
   15 Lancaster Street
   Lynbrook, NY  11563

19) RICHARDS, WITT & CHARLES, LLP
   100 Ring Rd West
   Garden City, NY 11530

20) CITRIN COOPERMAN & COMPANY LLP, d/b/a/ CITRIN COOPERMAN
   c/o Corporate Service Bureau Inc.
   283 Washington Ave.
   Albany, NY  12206

21) NEXTGEAR CAPITAL INC.
   c/o CT Corporation Service Co.
   80 State Street
   Albany, NY  12207

And

   6205 Peachtree Dunwoody Rd.
   Atlanta, GA  30328

22) ALLY FINANCIAL INC.
   c/o CT Corporation System
   111 8th Ave. 13th Floor
   New York City, NY 10017

And

   500 Woodward Ave.
   Detroit, MI 48226

23) NISSAN MOTOR ACCEPTANCE COMPANY LLC, d/b/a/ NMAC
   8900 Freeport Parkway
   Irving, TX 75063

And

   c/o CT Corporation Service Co.
   80 State Street
   Albany, NY 12207

24) JP MORGAN CHASE BANK N.A., a/k/a/ JP MORGAN CHASE & CO., a/k/a/
   CHASE BANK N.A., d/b/a/ CHASE BANK
   c/o CT Corporation System
   111 8th Ave. 13th Floor
   New York City, NY 10017

25) CYRULI, SHANKS & ZIZMOR, LLP
   420 Lexington Avenue, Suite 2320
   New York City, NY 10170

26) MILMAN LABUDA LAW GROUP, PLLC
   3000 Marcus Avenue
   Suite 3W8
   Lake Success, New York 11042

27) NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES
   Customer Service Counter – Rm. 136
   Swan Street Building
   Empire State Plaza
   Albany, NY 12228


JOHN DOES 1-20
JANE DOES 1-20
JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20
JOHN DOE CORPORATIONS 1-20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---------------------------------------------------------------------------X

ANTHONY DEO individually and as shareholder/member
of NORTHSHORE MOTOR LEASING LLC and 189
SUNRISE HWY AUTO LLC; SARA DEO individually
and as shareholder/member of NORTHSHORE MOTOR
LEASING LLC and 189 SUNRISE HWY AUTO LLC; and
NORTHSHORE MOTOR LEASING LLC and 189 SUNRISE
AUTO LLC,

                            *Plaintiffs,*

   -against-

RONALD BARON, JOSHUA AARONSON, JORY BARON,
MARCELLO SCIARRINO, DANIEL O'SULLIVAN,
BRIAN CHABRIER, WENDY KWUN, IRIS BARON,
RAYMOND PHELAN, ASAD KHAN, ESTATE OF
DAVID BARON, BARON NISSAN INC., d/b/a/
BARON NISSAN, ISLAND AUTO GROUP OF NEW
YORK LLC, a/k/a/ ISLAND AUTO GROUP OF NY LLC,
d/b/a/ ISLAND AUTO GROUP, ROBERT ANTHONY
URRUTIA, BRUCE NOVICKY, MICHAEL MORGAN,
PARMESHWAR BISSOON, SUPERB MOTORS INC.,
d/b/a/ TEAM AUTO DIRECT, RICHARDS, WITT &
CHARLES, LLP, CITRIN COOPERMAN & COMPANY
LLP, d/b/a/ CITRIN COOPERMAN, NEXTGEAR
CAPITAL INC., ALLY FINANCIAL INC.,
NISSAN MOTOR ACCEPTANCE COMPANY LLC,
d/b/a/ NMAC, JP MORGAN CHASE BANK N.A.,
a/k/a/ JP MORGAN CHASE & CO., a/k/a/
CHASE BANK N.A., d/b/a/ CHASE BANK, CYRULI,
SHANKS & ZIZMOR, LLP, MILMAN LABUDA
LAW GROUP, PLLC, JOHN DOE ATTORNEYS 1-20,
JOHN DOE ACCOUNTANTS 1-20, JOHN DOES 1-20,
JANE DOES 1-20, JOHN DOE CORPORATIONS 1-20,
and NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

                            *Defendants.*

---------------------------------------------------------------------------X

Index No.

**VERIFIED COMPLAINT**

1

## PARTIES

1. Plaintiff, Anthony Deo (hereinafter, "Anthony Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto Anthony Deo worked in Nassau County, New York. Anthony Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC; references to Anthony Deo herein are intended as Anthony Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

2. Plaintiff, Sara Deo (hereinafter, "Sara Deo"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Sara Deo worked in Nassau County, State of New York. At all times relevant hereto, Sara Deo was and is the wife of Anthony Deo; Sara Deo is also sometimes known as Sara Rahman in one or more documents related hereto. Sara Deo pursues the instant action individually and as a shareholder/member of NorthShore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC; references to Sara Deo herein are intended as Sara Deo individually and as a shareholder/member of one or both corporate co-Plaintiffs.

3. Plaintiff, NorthShore Motor Leasing LLC (hereinafter, "NorthShore"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of

2

New York. Anthony Deo and Sara Deo formed NorthShore during November 2017.

4. Plaintiff, 189 Sunrise Hwy Auto LLC (hereinafter, "189 Sunrise"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Suffolk County, State of New York. Anthony Deo and Sara Deo purchased 189 Sunrise on or about February 12, 2021.

5. Defendant, Ronald Baron (hereinafter, "Ron Baron") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Ron Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Ron Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

6. Defendant, Joshua Aaronson (hereinafter, "Josh Aaronson" or "Josh" or "Aaronson"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Josh owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Aaronson had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

3

7. Defendant, Jory Baron (hereinafter, "Jory Baron") is an individual who, at all times relevant hereto, was and is a resident of Long Island, State of New York. At all times relevant hereto, Jory Baron owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Jory Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

8. Defendant, Marcello Sciarrino (hereinafter, "Sciarrino") is an individual who, at all times relevant hereto, was and is a resident of Staten Island, State of New York. At all times relevant hereto, Sciarrino owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Sciarrino had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

9. Defendant, Daniel O'Sullivan (hereinafter, "O'Sullivan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, O'Sullivan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, O'Sullivan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

10. Defendant, Brian Chabrier (hereinafter, "Chabrier") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of

4

New York. At all times relevant hereto, Chabrier owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Chabrier had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

11. Defendant, Wendy Kwun (hereinafter, "Kwun") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Kwun worked for one or more automobile businesses owned and operated by one or more co-Defendants in the State of New York in the greater New York City area.

12. Defendant, Iris Baron (hereinafter, "Iris") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Iris Baron was the wife of David Baron during his lifetime.

13. Defendant, Raymond Phelan (hereinafter, "Phelan"), is an individual who, at all times relevant hereto, was and is a resident of Suffolk County, State of New York. At all times relevant hereto, Phelan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Phelan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

14. Defendant, Asad Khan (hereinafter, "Khan") is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New

York. At all times relevant hereto, Khan owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, Khan had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

15. Defendant, Estate of David Baron (hereinafter, the "Estate"), is an Estate of and for the benefit of the Decedent, David Baron. At all relevant times in his lifetime, David Baron (hereinafter, "David Baron") owned and/or operated one or more automobile businesses in the State of New York in the greater New York City area. At all times relevant hereto, David Baron had disclosed and/or undisclosed co-Defendants as partners in the ownership and/or operation of said automobile businesses.

16. Defendant, Baron Nissan Inc., d/b/a/ Baron Nissan (hereinafter, "Baron Nissan") is a domestic corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, Baron Nissan was owned and operated by one or more of the Aaronson co-Defendants herein. Baron Nissan is an automobile dealership.

17. Defendant, Island Auto Group of New York LLC, a/k/a/ Island Auto Group of NY LLC, d/b/a/ Island Auto Group (hereinafter, "Island Auto Group"), is a domestic limited liability company duly formed under the laws of the State of New York, authorized to do business and operate in the State of New

6

York, and at all times relevant hereto was owned and operated by the Aaronson co-Defendants in the State of New York. Island Auto Group operates the Aaronson Defendants' dealerships, serving as the parent company thereof, whether or not the dealerships at issue are named Defendants herein.

18. Defendant, Robert Anthony Urrutia (hereinafter, "Urrutia") is an individual who, at all times relevant hereto, was and is a resident of the country of Costa Rica. At all times relevant hereto, Urrutia owned and/or operated one or more automobile businesses inside and outside of the State of New York with one or more co-Defendants. Urrutia resides in Costa Rica for the purposes of 1) living a lifestyle of wealth desired by Urrutia and his family (there is a lower cost of living in Costa Rica), and 2) to avoid paying creditors. At all times relevant hereto, Urrutia always maintained and still maintains one or more apartments and/or houses and/or residences in the Greater New York City area (within 75 miles of Manhattan) to serve as his U.S. residence when he is in the United States.

19. Defendant, Bruce Novicky (hereinafter, "Novicky") is an individual who, at all times relevant hereto, owned and/or operated multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

20. Defendant, Michael Morgan (hereinafter, "Morgan"), is an individual who, at all times relevant hereto, was and is a resident of Nassau County, State of New York. At all times relevant hereto, Morgan owned and/or operated

7

multiple automobile businesses with and for co-Defendant Urrutia, including, but not limited to, co-Defendant Superb Motors Inc., in and near the State of New York.

21. Defendant, Parmeshwar Bissoon (hereinafter, "Bissoon") is an individual who, at all times relevant hereto, was and is a resident of Queens County, State of New York. At all times relevant hereto, Bissoon worked for one or more businesses in Nassau County, State of New York, owned and operated by one or more of the Urrutia co-Defendants.

22. Defendant, Superb Motors Inc. d/b/a/ Team Auto Direct (hereinafter, "Superb" and "Team Auto") is a domestic corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York.

23. Defendant, Richards, Witt & Charles, LLP, d/b/a/ Richards Witt (hereinafter, "RWC") is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, RWC performed accounting services for various parties hereto and/or their related businesses.

24. Defendant, Citrin Cooperman & Company LLP, d/b/a/ Citrin Cooperman (hereinafter, "Citrin") is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and

8

operate in the State of New York, and at all times relevant hereto operated in and from Nassau and Suffolk Counties, State of New York. Citrin's principal offices are operated from New York City, New York. At all times relevant hereto, Citrin performed accounting services for various parties hereto and/or their related businesses.

25. Defendant, NextGear Capital Inc. (hereinafter, "NextGear"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NextGear's principal offices are located in Atlanta, Georgia.

26. Defendant, Ally Financial Inc. (hereinafter, "Ally"), is a foreign corporation duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Ally's principal offices are located in Detroit, Michigan.

27. Defendant, Nissan Motor Acceptance Company LLC, d/b/a/ NMAC (hereinafter, "NMAC"), is a foreign limited liability company duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. NMAC's principal offices are located in Torrance, California and Irving, Texas.

9

28. Defendant, JP Morgan Chase Bank N.A., a/k/a/ JP Morgan Chase & Co., a/k/a/ Chase Bank N.A., d/b/a/ Chase Bank (hereinafter, "Chase") is a national association duly formed in the United States of America outside of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto conducted business in Nassau County, State of New York. Chase's principal offices are located in New York City, New York.

29. Defendant, Cyrulli, Shanks & Zizmore LLP (hereinafter, "CSZ"), is a domestic limited liability partnership duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from New York City, State of New York. At all times relevant hereto, CSZ performed attorney services for various parties hereto and/or their related businesses. At various times relevant hereto, CSZ performed services for the corporate Plaintiffs without authorization or agreement of the owners/members/stockholders of 189 Sunrise and NorthShore as then owned and operated by the Deo Plaintiffs.

30. Defendant, Milman Labuda Law Group PLLC (hereinafter, "MLLG"), is a domestic professional limited liability corporation duly formed under the laws of the State of New York, authorized to do business and operate in the State of New York, and at all times relevant hereto operated in and from Nassau County, State of New York. At all times relevant hereto, MLLG performed attorney services for various parties hereto and/or their related

10

businesses. At various times relevant hereto, MLLG performed services for the corporate Plaintiffs without authorization or agreement of the owners/members/stockholders of 189 Sunrise and NorthShore as then owned and operated by one or both of the Deo Plaintiffs.

31. Defendants John Doe Attorneys 1-20 are twenty unknown attorneys working for and with and employed by CSZ and/or MLLG as attorneys, employees, partners and/or members and being compensated therefore; each of these attorneys are admitted to the bar for the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

32. Defendants John Doe Accountants 1-20 are twenty unknown accountants working for and with and employed by Citrin and/or RWC as accountants, employees, partners and/or members and being compensated therefore by Citrin and/or RWC; each of these accountants are licensed and/or permitted to perform accounting services in the State of New York and at various times performed various services for one or more of the corporate Plaintiffs without authorization from the owners/members/stockholders of the corporate Plaintiffs when the owners/members/stockholders were one or both of the Deo Plaintiffs.

33. Defendants John Does 1-20 are twenty male individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant

11

hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Does 1-20 are also known herein as the "co-Conspirators."

34. Defendants Jane Does 1-20 are twenty female individuals living and/or working in Nassau and/or Suffolk Counties, New York at all times relevant hereto. Said individuals assisted one or more of the co-Defendants to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these individuals are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. Jane Does 1-20 are also known herein as the "co-Conspirators."

35. Defendants John Doe Corporations 1-20 are twenty businesses, corporations, limited liability companies, limited liability partnerships, or other duly formed companies/businesses that were utilized by one or more of the Defendants herein to carry out the schemes, conspiracies and wrongdoings against the Plaintiffs as more fully set forth herein; the identities of these businesses, corporations or other duly formed companies are known only to one or more of the Defendants at this time and are unknown to Plaintiffs at this time. John Doe Corporations 1-20 are also known herein as the "co-Conspirators."

36. Defendant New York State Department of Motor Vehicles (hereinafter "NYSDMV") is named as a necessary party given the injunctive relief sought in Count XII; there are no substantive claims herein against the NYSDMV.

37. Defendants Joshua Aaronson, Jory Baron, Ron Baron, Marcello Sciarrino, Daniel O'Sullivan, Brian Chabrier, Wendy Kwun, Iris Baron, Raymond Phelan, Asad Kahn, David Baron (by and through the Estate of David Baron), Baron Nissan, and Island Auto Group (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Aaronson Defendants." David Baron was the agent for the Aaronson Defendants during his lifetime for all purposes relevant hereto; since the death of David Baron during or about May 2021, Joshua Aaronson serves as agent for the Aaronson Defendants for all purposes relevant hereto.

38. Defendants Robert Anthony Urrutia, Bruce Novicky, Michael Morgan, Superb Motors Inc. and Team Auto Direct (and any d/b/a's or derivative businesses relating thereto) are hereinafter collectively referred to as the "Urrutia Defendants." Urrutia serves as agent for the Urrutia Defendants at all relevant times and for all purposes relevant hereto.

39. Defendants NextGear, Ally Financial, NMAC, and Chase Bank are hereinafter collectively referred to as the "Lenders."

40. Defendants Richards Witt and Citrin Cooperman are hereinafter collectively referred to as the "Accountants."

41. Defendants CSZ and MLLG are hereinafter collectively referred to as the "Attorneys."

13

42. The Lenders and Accountants and Attorneys are hereinafter collectively referred to as the "Professionals."

## FACTS COMMON TO ALL COUNTS

### A.  NorthShore Motor Leasing LLC

43. During and after 2016, the Deos owned and operated a business known as UEA Premier Motors Corporation (hereinafter, "UEA"); the Deos entered into a Lease through UEA to operate a used automobile dealership at and from 180 Michael Drive, Syosset, New York.

44. Until 2018, the Deos had met only one (1) of the individual Defendants herein (David Baron) and did not conduct any business with any of the individual Defendants herein.

45. During or about the fall of 2017, the Deos decided that it was necessary to expand and/or increase their Floor Plan in order to expand and/or increase their profitability at the 180 Michael Drive location.

46. On or about November 1, 2017, the Deos filed papers with the New York Secretary of State's Office to incorporate and duly form the limited liability company/co-Plaintiff NorthShore Motor Leasing LLC as the first step in expanding/increasing profitability.

47. Within one (1) week of forming NorthShore, Sara Deo applied for and was given an Employer Identification Number (hereinafter, "EIN number") from the Internal Revenue Service/IRS.  Attached hereto as Exhibit A is a true and accurate copy of the notice provided to Sara Deo of the EIN number from the IRS.

14

48. NorthShore did not begin operations immediately, instead commencing actual operations during 2018.

49. Operations for NorthShore commenced at 180 Michael Drive, Syosset, New York during or about June 2018. Attached hereto as Exhibit B is a true and accurate copy of the lease assigned by and through the Landlord and formerly held by UEA entered into by the Deos to operate NorthShore Motors, a used car sales business, from 180 Michael Drive, Syosset, New York.

50. Attached hereto as Exhibit U is a true and accurate copy of the receipt Anthony Deo obtained when ordering the corporate book for NorthShore Motor Leasing, LLC, co-Plaintiff herein, when the Deos obtained the lease for NorthShore from UEA that same month, June 2018.

51. Concurrent with and in furtherance of opening NorthShore and conducting business in 2018, Sara Deo opened a bank account for NorthShore with Defendant Chase Bank. Attached hereto as Exhibit C are true and accurate copies of the documents utilized by Chase Bank and Sara Deo to open one or more bank accounts with Chase Bank for NorthShore Motors. The account(s) with Chase Bank for NorthShore were opened by Sara Deo during January 2018; pursuant to internal bank rules and policies as well as applicable law, Sara Deo was required to and did in fact present proof of ownership documents to Chase Bank in order to open said account(s) for NorthShore.

15

52. After forming the company, obtaining an EIN, obtaining the corporate book, and opening the bank account(s) for NorthShore through Chase Bank, the Deos (together) commenced operations of NorthShore Motors at 180 Michael Drive, Syosset, New York, during 2018.

53. As part of the plan to expand and increase profitability in the automobile sales business from 180 Michael Drive, Syosset, New York, the Deos accepted an offer from David Baron.

54. By and before 2018, David Baron created, owned, and operated the Baron automobile dealership empire in and around Long Island, New York, with one or more of the other Aaronson Defendants; the Aaronson Defendants lead by David Baron during his lifetime purchased, opened and operated a variety of dealerships under the umbrella of Island Auto Group, including the Baron Auto Group and Baron Nissan.

55. The automobile dealerships owned and operated by the Aaronson Defendants since or before 2018 under the umbrella of parent company Island Auto Group include, but are not limited to, Baron Nissan, Baron Honda, Island Chevrolet, Island Chrysler Dodge Jeep Ram, Island GMC, Island Kia, Island Hyundai, Island Mazda, Island Subaru, NY Off Lease, Island Toyota, Island Volkswagen, Baron Auto Mall, Driveworld, Sunrise Auto Outlet, Baron Auto Emporium, Stream Auto Outlet, Long Island Motors, Baron Kia, Tri-County Motors, Rockland Hyundai, Route 1 Chrysler Dodge Jeep Ram of Lawrenceville, 161-10 Hillside Auto Ave, Best Auto Outlet, and co-Plaintiff 189 Sunrise up until selling same to the Deos (a true and accurate copy of the

16

189 Sunrise purchase documents by the Deos are attached hereto as Exhibit D).

56. The Aaronson Defendants' personal wealth combined with the value of the assets of the automobile dealerships the Aaronson Defendants operate and control exceeds one billion dollars ($1,000,000,000.00).

57. The fact that the assets of the Aaronson Defendants and the dealerships they control are valued in excess of one billion dollars ($1,000,000,000.00) has a huge impact on every party to this action and all of the facts set forth herein.

58. The Aaronson Defendants and the dealerships they control engage in elaborate shell games with the businesses owned and operated by the parties hereto, sometimes to line their own individual pockets, sometimes to make it appear as though the businesses are losing money when they are not (for income tax purposes), and sometimes to divert funds from one business to the benefit of one or more of the individual Aaronson Defendants or one or more of their Island Auto Group businesses.

59. As between the Deos, at all times relevant hereto it was Anthony Deo who operated NorthShore and eventually 189 Sunrise; Sara Deo assisted Anthony Deo in the operation of these two businesses. The Deos each owned as members and/or stockholders portions of each business; their ownership interests combined constituted 100% of the ownership interests in NorthShore and 189 Sunrise (since 189 Sunrise was purchased in February 2021; *see* Exhibit D hereto).

17

60. During late 2017 or early 2018, David Baron explained to Anthony Deo that he, David Baron, was the head of the Baron-owned automobile dealerships under the umbrella of the Island Auto Group, detailed his business empire for Anthony Deo, and offered to "help" the Deos with their new business, NorthShore, in ways that he plainly indicated would be mutually beneficial for all three of them, David Baron and the Deos.

61. Specifically, David Baron offered to provide two main types of assistance to the Deos: 1) Baron offered to provide a "floor plan" for the Deos and NorthShore for a fee; this floor plan would be provided by and through the umbrella of Island Auto Group and would be personally guaranteed by David Baron, and 2) if they accepted the floor plan offer, he would also provide his own Accountants to the Deos at no additional cost to the Deos. Since Anthony Deo and Sara Deo were both still new to the used car dealership business and inexperienced in both operations and floor plans, the offer from the much older and extremely more experienced and wealthy David Baron seemed too good to be true, and they gladly accepted his offer.

62. The offer to provide a floor plan to the Deos was extremely important to the then brand-new business known as NorthShore Motors.

63. A floor plan in the automobile dealership business is the credit provided by one or more lenders to that business; this credit/money is utilized to purchase automobiles for the business to sell to the public at a profit. Each car purchased by the dealership has a value on the floor plan; once that car is sold, the value assigned to the vehicle on the floor plan is then re-paid to the

18

lender, and in simple terms, the dealership keeps the difference as profit between the floor plan value and the paid sales price of the vehicle.

64. Since the Deos were new to the business of selling (used) automobiles, they did not have access to a "big" floor plan, they only had a smaller amount of money available to them through UEA, since unlike the billionaire Aaronson Defendants, the Deos and UEA were not wealthy and did not operate on a scale anywhere near the extremely higher levels of the Aaronson Defendants. Smaller amounts available on floor plans from lenders also come with larger interest rates, so NorthShore could make a lot more money with a bigger floor plan offered through David Baron backed by his companies' billion dollars or more in assets, thereby allowing NorthShore to get a bigger floor plan at lower interest rates than the Deos obtained through UEA and ever could have obtained for NorthShore on their own.

65. Even better, the Deos thought, they would be getting free accounting services through the Accountants/co-Defendants herein for their new business. "Too good to be true" is the understatement of the century compared to what David Baron and the Aaronson Defendants actually did to the Deos and NorthShore (and eventually, 189 Sunrise).

66. In reality, what David Baron and the Aaronson Defendants did was to prey on the Deos by stealing their Northshore dealership (and eventually, 189 Sunrise) from them. The Aaronson Defendants "groomed" the Deos, NorthShore, and eventually, 189 Sunrise, much the same way a pedophile "grooms" a child for eventual abuse.

67. First, the Aaronson Defendants (Josh Aaronson is related to the Barons by marriage; at all time relevant hereto prior to the death of David Baron, David Baron acted as agent for the Aaronson Defendants as they dealt with the Deos; since the death of David Baron, Aaronson acted as the agent for the Aaronson Defendants as they dealt with the Deos) put their own people in charge of all finances for NorthShore, including, but not limited to, one or more (over time) on-site controllers and/or comptroller(s), plus daily oversight from one or more (over time) of the Aaronson Defendants' and Island Auto's chief financial officer(s) (hereinafter, "CFO"), plus daily oversight from one or more of the Aaronson Defendants themselves.

68. Each of these individuals put in place at NorthShore by David Baron initially and then Josh Aaronson (after David Baron's death) on behalf of the Aaronson Defendants had complete, 100% control over all company finances, as the Deos had to obtain permission from one or more of the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals to write checks from their own (NorthShore) business.

69. Through June 16, 2020, the Deos wrote their own checks and operated the NorthShore bank accounts themselves, albeit with the Aaronson Defendants' overview and approval of all company business through the token and Positive Pay systems put in place by the Aaronson Defendants with the cooperation of Chase Bank.

70. On and after June 16, 2020, the Deos had to obtain checks from NorthShore's account(s) from the Aaronson Defendants and/or the Aaronson

20

Defendants' employees and/or Professionals to even get a check to write before obtaining permission to write it, plus the Aaronson Defendants and/or the Aaronson Defendants' employees and/or Professionals continued to maintain off-site oversight on all checks written from NorthShore's accounts through various agreements between the Aaronson Defendants and their companies on the one hand, and Chase Bank as the controlling Lender for NorthShore's bank account(s).

71. Through Chase Bank, the Aaronson Defendants put in place two different systems to control all money at NorthShore (and eventually, 189 Sunrise): 1) a system called "Positive Pay" and 2) a system called "Tokens."

72. Positive Pay is a system offered by Chase Bank to its business customers to ensure complete, 100% control over all checks written from that customer's business checking account.

73. Simply put, Positive Pay *requires* that customer to affirmatively approve (via electronic approval) each check presented for payment to Chase from that customer's checking account before the end of the business day that the check is presented to Chase for payment. If for *any* reason the customer does not electronically approve each check presented for payment to Chase, then that check is not paid by Chase for that customer.

74. The Aaronson Defendants put co-Defendant Wendy Kwun (Island Auto's CFO) and co-Defendant Daniel O'Sullivan (the person the Aaronson Defendants put in place as controller/comptroller at NorthShore to be their on-site eyes and ears) in charge of the Positive Pay system at NorthShore.

21

This system allowed the Aaronson Defendants to 1) control all money at the dealership, and 2) know about and approve or disapprove every check written from the dealership.  This Positive Pay system allowed the Aaronson Defendants to perpetuate their fraud against Plaintiffs by allowing the Defendants to seemingly be in charge of writing checks for NorthShore, when in fact, the Aaronson Defendants remained 100% in charge of all monies in and out of the dealership's accounts. Once the Positive Pay system was put into place at NorthShore, the Island Auto Group employees (lead by Wendy Kwun and Daniel O'Sullivan) necessarily approved all checks written from NorthShore accounts within one (1) day of being presented to Chase or else such check(s) would be declined by Chase and would not be honored by Chase.

75. The Positive Pay system is and was limited to just controlling all checks written from dealership accounts.  But there are significant other types of financial transactions that take place at a dealership including, but not limited to, wires in and out of accounts as deals get funded, deposits and on-line banking transfers.

76. Given that the Positive Pay system was limited to controlling just checks written from NorthShore accounts, the Aaronson Defendants also put in place a Token system for all NorthShore accounts at Chase.

77. The Token system worked as follows:  An electronic device (the Token) about the size of a wristwatch generates random numbers that must be inputted into the Chase system for any transaction to be approved and

22

allowed from NorthShore's accounts *other than* the checks subjected to the Positive Pay system.

78. At all times relevant hereto, the Aaronson Defendants controlled *every* financial transaction at NorthShore through the floor plan provided by the Aaronson Defendants exclusively, the Positive Pay system, and the Token system, leaving those Defendants 100% in charge of all finances at NorthShore from the time David Baron first provided a floor plan for NorthShore during 2018 through the Aaronson Defendants' departure from NorthShore during November 2022.

79. From the commencement of NorthShore operations around mid-June, 2018, the Deos had an unwritten agreement with David Baron as the point man/agent for the Aaronson Defendants (with greater than one billion dollars ($1,000,000,000.00) in assets to obtain the biggest floor plans at the lowest interest rates) to provide the floor plan under the umbrella of Island Auto Group that would allow the company to sell more cars at a greater profit margin than if the Deos obtained a floor plan themselves.

80. It seemed in all respects to the Deos that both sides of the relationship could profit from this arrangement, so they agreed to David Baron's proposal.

81. What the Deos never agreed to was having the Aaronson Defendants steal their company, NorthShore, from the Deos without the Deos knowing they were defrauded from their own company, NorthShore, and eventually, also defrauded from their interests in 189 Sunrise (and eventually, Baron Nissan).

23

82. There were many events over time that were all part of the conspiracy perpetuated by the Aaronson Defendants to defraud the Deos of money from their own companies (NorthShore and 189 Sunrise) and to defraud the Deos of the companies themselves.

83. First, the David Baron led Aaronson Defendants put the floor plan in place from utilizing the assets and existing floor plan from "at least" Baron Nissan ("at least" is necessary herein due to the fact that the Deos were certainly never given any company documents from any of the Aaronson Defendants' companies and do not know what the Aaronson Defendants were actually putting on those companies' internal financial and tax documents; Baron Nissan is what David Baron and Josh Aaronson told the Deos was the source of the NorthShore and 189 Sunrise floor plans).

84. Next, the David Baron led Aaronson Defendants insisted upon putting the Token and Positive Pay systems in place for NorthShore (and eventually 189 Sunrise). The Deos were told that the systems were necessary to safeguard company accounts; in reality, these systems were another step in the direction of stealing the company from the Deos while leaving the Aaronson Defendants in complete control of all company assets and accounts.

85. The David Baron led Aaronson Defendants also put their own Professionals in place for NorthShore and eventually 189 Sunrise; these Professionals answered to the extremely wealthy Aaronson Defendants and followed only the Aaronson Defendants' instructions, the Deos were completely shut out by the Aaronson Defendants and their Professionals from running the two

24

businesses; they were merely given the appearance of running the businesses from the Aaronson Defendants.

86. Since NorthShore did not commence business until 2018, no tax documents needed to be filed (as far as the Deos knew at the time) until sometime in 2019. Prior to June 16, 2020, Sara Deo kept asking Brian Chabrier, Asad Khan, and the controller put in place by the Aaronson Defendants, Melissa Beltre, for the Deos K-1 documents for tax filing purposes; on and after June 16, 2020, Wendy Kwun (the CFO for the Aaronson Defendants and Island Auto) and Daniel O'Sullivan (the controller who succeeded Melissa Beltre and put in place at NorthShore by the Aaronson Defendants) became the individual Aaronson Defendants who Sara Deo kept asking for the Deos' K-1 documents, the forms *required* by the Internal Revenue Service for the United States (hereinafter, "IRS") and the New York State Department of Finance (hereinafter, "NYSDOF") to be given to the owners of a business reflecting their earnings for the calendar year 2018 forward in time at NorthShore.

87. Upon information and belief, the K-1 documents were, in fact, created and given to the Aaronson Defendants and not the Deos by the companies' Accountants, CFOs, controllers and/or other Professionals in conspiracy with the Aaronson Defendants to defraud the Deos from their own companies.

88. At all times relevant hereto, the Aaronson Defendants explained to the Deos that the documents and taxes were complicated and were being filed late, and that the K-1's would be produced when the taxes were prepared and readied

25

for filing. The Deos trusted the Aaronson Defendants, trusted that the Aaronson Defendants were being honest with the Deos and were only interested in making profits for the entire companies including the Deos, and didn't have any reason at that time to believe that there was any problem with their ownership of NorthShore (and eventually 189 Sunrise).

89. However, by early 2020, the Deos were wondering where their K-1 forms were from the previous year (2019), as well as when they would be getting their K-1 forms for the 2018 tax year, so their complaints to the CFO and/or the comptroller and/or one or more of the Aaronson Defendants (including David Baron in particular) increased.

90. On or about March 5, 2020, the Aaronson Defendants responded for the first time with a reaction other than trying to continue to delay and put off the Deos:  Defendant Asad Khan stormed into NorthShore's offices in Syosset, New York, and began yelling, threatening, and acting like a mad man.  This incident is hereinafter referred to as the "Khan" incident.

91. While yelling in the middle of NorthShore's showroom, Khan threatened the lives of both Sara Deo and Anthony Deo, and demanded that both of them vacate, leave, and never come back to NorthShore while also specifically yelling that NorthShore "belongs to me [Khan] and my partners."

92. The police were called, investigated Khan's claims, spoke with the Anthony Deo, and Khan was escorted out of the dealership by the police, who told Khan in front of Anthony Deo that the Deos were the owners of the business

26

and not Khan; the policeman also said that he thought Khan was drunk that day.

93. In reality, this was a slip by the Aaronson Defendants insofar as the incident *almost* alerted the Deos to the fraud that already took place by the Aaronson Defendants stealing the NorthShore business from the Deos, but the Deos at that time still did not know about the theft. In fact, after the policeman sided with the Deos during the Khan incident, the Deos thought that Khan was just drunk and never gave his claims of ownership another thought.

94. In the ensuing few months after the Khan incident, David Baron fed the Deos more lies about tax filing delays, apologized for the Khan incident and claimed he (Khan) *was* merely drunk that day, and did all he could to assuage the Deos' concerns over the Khan incident. But David Baron also pressured Anthony Deo to change the terms of their agreement, demanding that Deo pay more money to the Aaronson Defendants for the floor plan provided; David Baron's "carrot and stick" method caused his relationship with the Deos to change over the next few months, worsening through and until June 16, 2020.

95. On or just before June 16, 2020, Anthony Deo received word that his father was dying and would not live much longer. Anthony Deo called and spoke to David Baron on the morning of June 16, 2020, to inform David Baron that the Deos would be away from NorthShore to deal with the imminent death of Anthony Deo's father; Anthony Deo's father did die on June 17, 2020.

27

96. While absent from NorthShore's offices on June 16-17, 2020, the Deos learned that David Baron emptied all cars from the lot at NorthShore, and somehow locked the Deos out of NorthShore's bank account(s) at Chase Bank. This date/situation is hereinafter referred to as the "David Baron incident."

97. When the Deos returned from dealing with the death of Anthony Deo's father, they found that all company files, records, books, recording/security cameras, and most important, all company cars were gone. The business basically did not exist anymore.

98. The David Baron incident was, in reality, a display of power by David Baron in order to get what he wanted from the business and to control the Deos and prevent them from discovering the frauds; David Baron also wanted more money knowingly being paid by the Deos for the floor plan after they resisted David Baron's requests for several months after the Khan incident. In addition, the David Baron incident temporarily scared the Deos and stopped them from asking about the tax preparations and forms; it is now known (since Chase Bank gave the Deos documents during 2024 in Action #2, *infra*) that the David Baron incident was staged mainly by the Aaronson Defendants to obtain and utilize NorthShore's corporate book for 100% fraudulent purposes.

99. Within days of the David Baron incident, discussions between David Baron for the Aaronson Defendants and Anthony Deo took place and seemingly

resolved all differences, leading to another series of ongoing events all meant to continue to perpetuate fraud by the Aaronson Defendants against the Deos.

100. In addition to the money that the Deos now know were taken without authorization by the Aaronson Defendants from company account(s) like a piggy bank, a new agreement was leveraged into being by the David Baron incident for even more money per month to be paid by NorthShore and the Deos to the Aaronson Defendants from the NorthShore accounts and/or the Deos' personal accounts.

101. Thereafter, the Aaronson Defendants returned all company cars and access to all company software to allow NorthShore to re-open and continue operations.

102. However, not all of the company's records were returned. While upon first glance the Deos thought all company records were returned, they eventually realized and learned that the company's corporate book was never returned. The David Baron incident helped the Aaronson Defendants to steal even more money from NorthShore and the Deos, lead to more known payments by the Deos, and actually helped the Aaronson Defendants the most through obtaining the corporate book and records without the Deos knowing it initially.

103. Throughout the second half of 2020 after the David Baron incident, David Baron repeatedly expressed remorse to both Deos for the incident he perpetrated on June 16-17, 2020, and kept telling the Deos that he was "going to make up for it." Like Bernie Madoff, David Baron on behalf of the

29

Aaronson Defendants was about to deepen the fraud against the Deos with further promises of riches.

### B. 189 Sunrise Hwy Auto LLC

104. During or about the end of 2020, David Baron proposed and arranged for the Deos to buy 189 Sunrise Hwy Auto LLC, a smaller used car business than NorthShore located at 189 Sunrise Highway, Amityville, Suffolk County, New York.

105. During February 2021, at David Baron's urging, the Deos arranged to purchase 189 Sunrise and paid fifty thousand dollars ($50,000.00) therefore. Attached hereto as Exhibit D are true and accurate copies of the payments related thereto. At all times relevant hereto, Anthony Deo and David Baron agreed that the sale of 189 Sunrise to the Deos would be a "stock sale," meaning that the corporation's stock would be transferred to the Deos, leaving the corporation in place so that no new licenses, software agreements, or Floor Plan changes would become necessary. In reality, it allowed the Aaronson Defendants to withhold paperwork and stock transfers and keep ownership for themselves, surreptitiously and without the Deos' knowledge.

106. Naturally, after purchasing the business known as 189 Sunrise, the Deos entered into a lease with the landlord/owner of the property. Attached hereto as Exhibit E is a true and accurate copy of the lease entered into by Anthony Deo at the property located at 189 Sunrise Highway, Amityville, New York, in order to allow Anthony Deo to operate the business thereon. Thereafter,

30

Deo was responsible for and made all lease payments at that property, just as the Deos were responsible for and made all lease payments for the property where NorthShore was located since the commencement of the lease for NorthShore.

107.    Although the Deos immediately took over the operation of 189 Sunrise after paying for same, their pleas for finalized closing papers/stock transfers were met with the usual delay tactics from the Aaronson Defendants, "they're being prepared," "they're coming," "the [Professionals] are busy" and other statements were told to the Deos at various times first by David Baron and then Josh Aaronson merely as delay tactics.

108.    Although it appeared as though the Deos were the owners and they certainly paid the money attached hereto as Exhibit D to become the owners of 189 Sunrise (and even took over day to day operations of 189 Sunrise after that money was paid), the Aaronson Defendants were, in fact, doing the same thing in stealing the Deos ownership interests in 189 Sunrise by *not* producing corporate/closing documents that they perpetrated upon the Deos with NorthShore: Behind the scenes and without the Deos' knowledge or approval, the Aaronson Defendants continued to file all tax forms and returns for 189 Sunrise *as if they were still owners when they were not.*

109.    In the months after the 189 Sunrise Sale, the Deos pushed for the closing documents for that sale, and also for the corporate book and records for 189 Sunrise to be turned over to the Deos; it was during this time in 2021 that the Deos first discovered that the corporate book and records for NorthShore

31

were not returned to NorthShore after the David Baron incident about ten (10) months earlier.

### C. Baron Nissan

110. When confronted by Anthony Deo about the closing documents for 189 Sunrise and corporate books for 189 Sunrise and also NorthShore, David Baron on behalf of the Aaronson Defendants turned into Bernie Madoff yet again: This time he promised to sell the Deos the business known as Baron Nissan.

111. During or about May 2021, David Baron on behalf of the Aaronson Defendants sold to Anthony Deo the business known as Baron Nissan. Attached hereto as Exhibit F are true and accurate copies of the documents and checks executed in connection with that sale; the Deos paid two hundred fifty thousand dollars ($250,000.00) to purchase Baron Nissan and an additional twenty plus thousand dollars ($20,000.00+) for the first month of rent for that dealership.

112. It is the express intention of Plaintiffs that the documentation attached as Exhibit F indicating the sale of Baron Nissan is either 1) completely finished and indicates that the sale was finished, or, in the alternative, 2) partially finished and Anthony Deo stepped into the shoes of David Baron at Baron Nissan at the very least at that time.

113. Later that month (May 2021), with the Deos prepared to physically and actually take over Baron Nissan on June 1, 2021, David Baron died.

D. After the Death of David Baron

114.  After the death of David Baron, Josh Aaronson told Anthony Deo that the family needed time to grieve David's death; this was merely another delay tactic by the Aaronson Defendants preventing the Deos from discovering the frauds being committed upon them and their companies.

115.  During or about the fall of 2021, Josh Aaronson informed the Deos that 1) the Aaronson Defendants were not going to "finish" the Baron Nissan sale; 2) that the Baron Nissan deal was not "a done deal;" 3) that the Aaronson Defendants would continue to provide the floor plan at NorthShore and 189 Sunrise, but only for even more money and only if the Deos stopped complaining about tax documents and the Baron Nissan deal.

116.  Aaronson further explained that if the Deos did not like what he, Aaronson, was telling them, he would make sure that the floor plans for NorthShore and 189 Sunrise were immediately shut down, and that the Aaronson Defendants would take back all of "their" cars and ruin the businesses for the Deos.

117.  Simply put, the Deos knew that they had no say and no leverage at their own dealerships (that had literally been stolen from them without their knowledge), and that Aaronson's threats were real, since they also knew that the removal of the cars from the dealerships and cessation of the floor plan at the dealerships would ruin the businesses. The Deos were forced and leveraged into paying even more money to the Aaronson Defendants given the very real and dangerous threats to ruin the businesses.

33

118. Thereafter, the Deos demanded either that they be allowed to take over Baron Nissan or that their money be returned from the Baron Nissan deal; Aaronson refused both requests and again threatened to shutter NorthShore and 189 Sunrise.

119. The Deos asked for NorthShore's and 189 Sunrise's corporate books to be returned to the dealerships; Aaronson refused and again threatened to shutter NorthShore and 189 Sunrise.

120. The Deos continued to demand tax documents in connection with their ownership interests in NorthShore and 189 Sunrise; initially (after David Baron's death) Josh Aaronson told the Deos to continue to be patient, that it "wouldn't be much longer" before he would arrange for them to get the tax documents that were required to be given to owners.

121. In reality, the Aaronson Defendants knew that they were playing "keep away" from the Deos and were just dragging the situation out to steal as much money as they could and to continue creating documents that feigned ownership of the two companies until an eventual departure from the dealerships by the Aaronson Defendants could no longer be avoided.

122. By late summer 2022, Aaronson and Wendy Kwun's attitude over tax documents changed: The Deos were invited to prepare the tax documents as they saw fit and Aaronson and Kwun would review and approve them, which the Deos immediately undertook to prepare for the previous year, which the Aaronson Defendants indicated was "on extension."

34

123. Attached hereto as Exhibit G are true and accurate copies of the email approvals from Wendy Kwun and Josh Aaronson (Wendy Kwun's direct boss); these emails make clear that the Aaronson Defendants knew and approved of the Deos as owners of both businesses, even though no changes in the operation or ownership took place contemporaneously with the preparation and filing of the tax documents accompanying those emails.

124. Attached hereto as Exhibit H are true and accurate copies of the tax returns as approved for filing in Exhibit G by Wendy Kwun (an Aaronson Defendant and CFO for the Aaronson Defendants) and Josh Aaronson on behalf of the Aaronson Defendants.

125. During and prior to the approval of the attached tax returns (Exhibit H), Josh Aaronson's demeanor and Wendy Kwun's demeanor with the Deos changed: They became friendlier, and repeatedly told the Deos that the tax situation was going to resolve "imminently."

126. Upon information and belief, the Aaronson Defendants and/or Island Auto Group were making and did make certain financial maneuvers that necessitated, for the Aaronson Defendants and/or Island Auto Group, "officially" making the Deos owners (finally) of 189 Sunrise and NorthShore; these maneuvers in some way benefited the Aaronson Defendants and/or Island Auto Group financially or such maneuvers never would have been made; the Aaronson Defendants personal tax returns and their companies' corporate tax returns will indicate clearly how the Aaronson

35

Defendants benefited from their corporate shell games with 189 Sunrise and NorthShore.

127. In the months leading up to and including October, 2022, the Aaronson Defendants cooperated in approving and filing tax returns indicating that the Deos were the sole owners of 189 Sunrise and NorthShore (Exhibits G & H).

128. During or about the end of November, 2022, without any warning to the Deos, the Aaronson Defendants 1) took all books and records from 189 Sunrise; 2) took all automobiles from 189 Sunrise; 3) locked out the Deos from all software required to run 189 Sunrise; 4) locked out the Deos from all bank accounts required to run 189 Sunrise; 5) took all books and records from NorthShore; 6) took all automobiles from NorthShore; 7) locked out the Deos from all software required to run NorthShore; and 8) locked out the Deos from all bank accounts required to run NorthShore. As a direct and proximate result of these wrongful acts, 189 Sunrise and NorthShore were shuttered and ruined; in their last full operating year, these two businesses yielded forty-four million dollars ($44 million) in gross sales.

129. Within days after ruining the businesses at 189 Sunrise and NorthShore, the Aaronson Defendants filed a lawsuit in Nassau County (New York) Supreme Court, *Brian Chabrier, et al., v. Anthony Deo, et al.*, Index No. 617224/2022, in which the Aaronson Defendants utilized the "best defense is a good offense" strategy by *actually* alleging, *inter alia*, that the Deos and their hired help stole from the Aaronson Defendants (who were, at all times relevant hereto, *solely* in charge of *all* company finances for both

36

companies), and that 189 Sunrise and NorthShore belonged to the Aaronson Defendants and not the Deos, mere weeks after approving tax returns that indicated that the Deos were the true owners of 189 Sunrise and NorthShore, which the Deos certainly are and remain the owners of those two businesses as set forth in Exhibits A, B, C, D, E, G, H and U hereto.[1]

### E.  The Urrutia Defendants

130.  At the time that the Aaronson Defendants left the Deos and their businesses shuttered and ruined during November 2022, Anthony Deo borrowed money against the Deos' business(es) and personally guaranteed these funds (hereinafter, the "Borrowed Money").

131.  After the Aaronson Defendants shuttered and ruined 189 Sunrise and NorthShore, Anthony Deo utilized some of the Borrowed Money to purchase an interest in co-Defendant Superb Motors Inc., a company owned and operated by co-Defendant Anthony Urrutia.

132.  Attached hereto as Exhibits I-1 and I-2 are true and accurate copies of the Agreements entered between Anthony Deo and Urrutia on or about December 1, 2022.  Through the present, Deo was and remains ready, willing and able to live up to his obligations under the Agreements attached as Exhibits I-1 and I-2.

---

[1] At no time since December 2022, have the Aaronson Defendants filed any tax documents on behalf of 189 Sunrise or NorthShore; only the Deos have filed those tax documents.  Moreover, upon information and belief, the Aaronson's have either benefitted from including related losses on their personal tax filings since ruining 189 Sunrise and NorthShore, or, in the alternative, failed to include those companies on their personal tax filings since shuttering and ruining those two businesses. Either way is telling as to their true intentions regarding those businesses:  Either they admit that the businesses are not the Aaronson Defendants' by not including them on their tax returns, or, those businesses are included for write-off benefits, only. And of course, by ruining 189 Sunrise and NorthShore the Aaronson Defendants managed to ruin 2 of the Island Auto Group's competitors by and through the within illegal conduct.

37

133. Anthony Deo met Urrutia through co-Defendant Michael Morgan (hereinafter, "Morgan"). Upon information and belief and at all times relevant hereto, Morgan was and remains banned from the automobile business as the result of an order of the New York Attorney General by and through one or more Court cases brought by the New York Attorney General against one or more of the Aaronson Defendants; Morgan ignores that order and upon information and belief, operates behind the scenes for several companies including Credit Forget It (until it closed) and Select Dealer Services; Morgan specifically assisted the Urrutia Defendants in carrying out the scheme to disenfranchise the Deos from Superb in the incident referred to herein as the Lock-Out.

134. When Deo commenced work at the Superb dealership, he was put in place as the hands-on owner/operator of the dealership by Urrutia, who retained control of the company and all company finances by and through the agreements attached as Exhibits I-1 and I-2.

135. From the time that the parties entered into the Agreements attached hereto as Exhibits I-1 and I-2, Deo and Urrutia planned for Deo to purchase the rest of the Superb dealership from Urrutia (Deo only obtained 49% ownership through the purchase attached hereto as Exhibits I-1 and I-2), and the parties also planned for Deo to purchase at least one other dealership (Mitsubishi) from Urrutia located in Hartford, Connecticut.[2]

---

[2] Although Deo commenced his due diligence for the Hartford dealership owned by Urrutia, the parties never formally conducted any written transaction in connection therewith.

136. From the commencement of the agreements attached as Exhibits I-1 and I-2, Urrutia inserted Anthony Deo as the on-site operator of Superb Motors for the two partners (Urrutia and Anthony Deo), with discretion to add employees Deo deemed necessary, subject to Urrutia's approval. In fact, Anthony Deo did hire several employees to help at the dealership with Urrutia's full knowledge and approval, including Deo's wife, Sara Deo.

137. Urrutia retained control over all company finances by and through the agreements in Exhibits I-1 and I-2, and utilized the same types of control over company finances as the Aaronson Defendants utilized with 189 Sunrise and NorthShore: Urrutia had the same token system in place as 189 Sunrise and NorthShore; in addition thereto, Superb also had a texting system in place for the Urrutia Defendants to control all of the company's finances. Superb's token and texting systems were put into place by the Urrutia Defendants through Chase Bank.

138. Urrutia's overseer of the accounts and finances at Superb was co-Defendant Bruce Novicky, Chief Operating Officer (hereinafter, "COO") for Superb and Urrutia.

139. Through the token and texting systems that Urrutia put in place at Superb, Novicky had final say on all financial transactions at Superb, whether or not the Deos were working at Superb: If Novicky did not specifically sign into one or the other system and affirmatively approve all financial transactions in a given day through at least one of those systems, then any such transaction(s) that he did not affirmatively approve would be denied by the

bank. Just as with the Aaronson Defendants at 189 Sunrise and NorthShore, the Deos had no *actual* control over *any* financial transaction at Superb; Urrutia had complete knowledge of all transactions and control over all such transactions by and through Novicky's oversight and required approval of all such transactions through the token and texting systems.

140. Nonetheless, Anthony Deo was certainly aware of company finances, and with Urrutia's knowledge and approval looked into company finances while working at Superb in anticipation of obtaining the outstanding 51% of stock still controlled by Urrutia in Superb.

141. By the end of February 2023, Deo noticed financial improprieties at Superb, including, but not limited to, terrible finances for 2022 as the company was losing money (Deo did not commence work at Superb until at least December 2022, or even just after the 1st of the year in 2023). Thus, Deo informed Urrutia of his concerns, and asked the CFO at Superb (Alysia Cayer) to conduct an audit of company finances for Deo to find out what was wrong.

142. Attached hereto as Exhibit J are true and accurate copies of certain emails regarding the audit requested by Deo.

143. Immediately after Deo asked for the audit as approved by Urrutia, Urrutia fired the Urrutia Defendants' Chief Financial Officer (Alysia Cayer) and never replaced her during the time that Deo remained with Superb through the Lock-Out.

40

144. Upon information and belief, the firing of the CFO at Superb was committed by Urrutia out of fear that Deo would find out that Urrutia was bleeding the company of money for his own personal gain and/or to benefit one or more of Urrutia's other businesses. In addition, by firing the CFO, Urrutia was able and did, in fact, tell Deo that she, Alysia Cayer the CFO, must have been responsible for the irregularities that Deo found, in hopes that it would placate Deo's concerns over company finances.

145. When Anthony Deo joined Superb, he asked for and was granted approval by Urrutia to hire Sara Deo to help Superb, which was not in good financial standing when Anthony bought into the company.

146. In fact, Sara Deo's main skill in the automobile dealership industry is marketing; while Sara Deo worked at Superb, she increased monthly leads from dozens to thousands per month and oversaw a system where the young salespeople at the dealership called those leads to increase sales.

147. During or about June 2023, Deo asked his own accountant to review company finances and to produce a Profit and Loss Statement for Superb; attached hereto as Exhibit K is a true and accurate copy of the Profit and Loss Statement produced at that time indicating that the company's finances improved significantly during 2023 (under the direction/operation of the Deos) from its poor condition as it existed in 2022 (prior to the Deos becoming involved at Superb).

148. Thus, it was clear by early summer, 2023, that Superb's finances had improved considerably under the day-to-day operations of the Deos.

41

149. At all times relevant hereto, Anthony Deo kept Urrutia informed of the disputes with the Aaronson Defendants, since the Agreements attached as Exhibits I-1 and I-2 called for the cross-collateralization of the Deos' other dealerships. Attached hereto as Exhibit L are true and accurate copies of certain texts between Anthony Deo and Urrutia keeping Urrutia informed in all respects with the progress Anthony Deo made in the spring of 2023 towards re-opening dealerships at the sites of NorthShore and 189 Sunrise, including but not limited to Deo's excitement over obtaining his own dealership licenses for those locations while disputes commenced by the Aaronson Defendants were sorted out in Court. Some of the exchanges also cover Deo's request for documentation needed by Deo to open a new Superb bank account needed and desired by Deo after obtaining, as verbally agreed between Deo and Urrutia, full ownership by Deo of Superb.

150. During or about mid-July 2023, Urrutia approached Anthony Deo and pressured him into completing the purchase of outstanding stock in Superb and also to purchase the stock in the Connecticut dealership owned and operated by Urrutia. Specifically, Urrutia demanded that Deo produce at least five hundred thousand dollars ($500,000.00) "and we can do the paperwork later," Urrutia told Deo, *just as Deo had been approached and dealt with previously to his determent by the Aaronson Defendants.*

151. Deo immediately commenced due diligence on the Connecticut dealership and told Urrutia that it would take some time to come up with the money for the two deals, and then Deo suggested to Urrutia that the paperwork could be

commenced in the interim until Deo could obtain the money for these transactions. For reasons that were unknown at the time to Deo, Urrutia seemed dissatisfied with Deo's response, and indicated that he wanted Deo to come up with that money quickly and before any paperwork was commenced or he would consider "other offers." But as Deo informed Urrutia, it was going to take some time for Deo to obtain and deliver to Urrutia that large sum of money.

152. Less than two (2) weeks after Urrutia demanded money from Deo without concurrent paperwork (just like the Aaronson Defendants did to Deo regarding Baron Nissan and 189 Sunrise), on August 3, 2023, Urrutia 1) locked Deo out of Superb Motors without any warning, discussion, or explanation; and 2) called the Nassau police department and claimed that Deo "stole" one hundred and four (104) cars.

153. The Nassau police department investigated the claims made by Urrutia through Bruce Novicky and Michael Morgan, and determined that such claims were not proven and to date have done nothing about that criminal complaint made falsely against the Deos.

154. The reason that the Nassau police department took no action against the Deos is transparently clear: The Deos did nothing wrong at Superb, and Urrutia and Novicky have completely failed to date to prove *anything* illegal happened to the 104 cars that they alleged (on August 3, 2023) disappeared from the dealership. In fact, almost all of the cars allegedly "stolen" by the Deos have since been accounted for absent any theft by anyone, which was

43

admitted by the Urrutia Defendants in the Federal Court Action #2 they joined the Aaronson Defendants in wrongfully bringing against the Deos. (*See,* section F, "Legal Actions Commenced by Certain Defendants Against Plaintiffs," *infra*).

155.    In fact, the allegations and lock-out (hereinafter, the "Lock-Out") that took place on August 3, 2023, were strictly a ruse and were and remain false in all respects, it was just the beginning of a plan/conspiracy devised between the Urrutia Defendants and the Aaronson Defendants to defraud Plaintiffs of their ownership interests and operation in Superb, 189 Sunrise, and NorthShore; this conspiracy has been conducted by and through state and federal Court actions commenced fraudulently by the Urrutia and Aaronson Defendants (*Id.*).

156.    Later in August 2023, Urrutia joined the Aaronson Defendants in engaging in "the best defense is a good offense" strategy by suing Plaintiffs and alleging that the Deos were actually (and falsely) the wrongdoers in the three (3) dealerships at issue, Superb, NorthShore, and 189 Sunrise (Action #2), and then commenced his own action against Anthony Deo only (Action #3).

F.    Legal Actions Commenced by Certain Defendants against the Plaintiffs

157.    Just after 1) stealing all of the books and records still located at NorthShore and 189 Sunrise (they had already taken the corporate books from those businesses); 2) taking all of the automobiles from NorthShore and 189 Sunrise; 3) locking the Deos out of all company bank accounts for 189

44

Sunrise and NorthShore; and 4) locking the Deos out of all company software utilized for operating both businesses, the Aaronson Defendants commenced an action against the Plaintiffs and one or more of the Professionals for the Plaintiffs in an action styled as *Brian Chabrier, et al., v. Anthony Deo, et al.*, Nassau County (New York) Supreme Court Index No. 617224/2022 (hereinafter, "Action 1"), before the Honorable Sharon Gianelli, JSC. Attached hereto as Exhibit M is a true and accurate copy of the Complaint utilized by the Aaronson Defendants in an attempt to wrongfully utilize the Nassau Supreme Court to shut down 189 Sunrise and NorthShore.

158. Action 1 was commenced by the Aaronson Defendants with the Complaint attached hereto as Exhibit M and an Order to Show Cause that effectively shut down NorthShore and 189 Sunrise (through false allegations of wrongdoing by the Deos advanced by the Aaronson Defendants) pending Plaintiffs' response and oral argument related thereto.

159. After oral argument before Judge Gianelli, the Court issued a decision that found, in relevant part, that "the [Aaronson Defendants] have failed to establish a likelihood of success on the merits [of that case], as well as [failed to establish in that case] irreparable injury in the face of the Court's denial. Further, [the Aaronson Defendants] have also fallen short in demonstrating that the equities balance in their favor." Attached hereto as Exhibit N is a true and accurate copy of the Order of the Court, Gianelli, J., dated June 15, 2023; *see* pp. 6, 7, *id.*

160. For obvious reasons including, but not limited to the fact that they 1) lost their Order to Show Cause in its entirety, 2) the Order was dismissed, and 3) the Complaint was determined to fail "to demonstrate a likelihood of success on the merits," the Aaronson Defendants were dissatisfied with having the case before Judge Gianelli.

161. Upon information and belief, Urrutia knew at all relevant times about the Aaronson Defendants both independently through his own contacts as well as through Anthony Deo, who told Urrutia all about the troubles with the Aaronson Defendants well before the Lock-Out. *See, e.g.,* Exhibit L hereto, which lays out to Urrutia Deo's actions to re-open dealerships at the sites of the former 189 Sunrise and NorthShore and to obtain licenses to sell automobiles thereat, since the Deos still held (through the summer of 2023) the leases for those two (2) sites and were, at all times relevant hereto, the sole shareholders/members of 189 Sunrise and NorthShore, just as represented in Exhibits I-1 and I-2 by Anthony Deo.

162. Moreover, it is beyond dispute that given the Aaronson Defendants' efforts to engage in the "best defense is a good offense" strategy by, *inter alia*, commencing Action 1, the Deos had an absolute duty to mitigate their damages, and attempted to do so by applying for their own DMV licenses to re-open dealerships where they still had the leases at the locations of NorthShore in Syosset, New York, and 189 Sunrise in Amityville, New York.

46

163.  Thus, Urrutia and the Aaronson Defendants joined forces during August 2023, to file a new action (Action 2) together against the Deos in a different Court (thereby conveniently avoiding the Nassau Supreme Court Judge that ruled against them), against their companies at issue, as well as against various former employees of the Deos and Professionals for the Deos in order to leverage the Deos and their former employees and Professionals. Attached hereto as Exhibit O is a true and accurate copy of the Complaint in the Federal action hereinafter referred to as Action 2. Once again, the Aaronson and Urrutia Defendants wrongfully stopped the Deos from opening and operating their own businesses at the locations where they still held the leases in Syosset and Amityville via their aggressive and fraudulent litigation tactics in Action 2.

164.  After filing a Complaint against Deo in the Federal action (Action 2), Anthony Urrutia then filed an action against Anthony Deo in this Court (Action 3). A true and accurate copy of the Complaint in Action 3 is attached hereto as Exhibit P.

165.  In all respects, the allegations in Actions 1, 2 & 3 by the Urrutia Defendants and the Aaronson Defendants against the Deos and the Deos' employees and Professionals are transparently false, are intentionally false, and constitute a fraud upon the Courts that said allegations even exist; the allegations against the Deos and their employees and Professionals are merely an attempt to cover up the wrongs committed by the Urrutia Defendants and the Aaronson Defendants, as well as to prevent the Deos

47

from being able to fund their own and their companies', employees', and Professionals' defenses and potential claims by keeping shuttered the businesses that the Deos rightfully should be operating.

166. The fraudulent Court actions commenced by the Urrutia Defendants and the Aaronson Defendants constitute transparent attempts to engage in "the best defense is a good offense" strategy.

167. Moreover, after nearly two years of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Aaronson Defendants have not obtained (e.g., through subpoenas) nor produced a single document proving any theft by the Deos by or from 189 Sunrise or NorthShore at any time.

168. Additionally, after one year of pursuing the Deos in Court actions alleging millions of dollars of thefts by the Deos, the Urrutia Defendants have not obtained (e.g., through subpoenas) nor produced a single document proving any theft by the Deos by or from Superb at any time.

G. The Lenders and Cozy Relationships

169. At all times relevant hereto, the Urrutia Defendants, the Aaronson Defendants (both with and after David Baron), and their respective Professionals (whether named or unnamed as Defendants herein) established and enjoyed relationships with the Lenders (whether named or unnamed as Defendants herein) by and through a series of representatives working on behalf of the Lenders with and for the Urrutia and Aaronson Defendants (hereinafter, the "Representatives").

170. The known Representatives for Chase at all relevant times hereto were Deborah Womeldorf, Rajni Khanna, Anthony Tropiano, Javier Cruz, Christopher Varous, Samantha Phillips, Jim Simonetti, Rosa Pesce, and Jason Kush; upon information and belief, there are more Representatives for Chase currently unknown to Plaintiffs.

171. The known Representatives for NextGear at all relevant times hereto were Jonathan Abbot and Vincent Fallacaro; upon information and belief, there are more Representatives for NextGear currently unknown to Plaintiffs.

172. The Representatives for NMAC at all relevant times hereto were Joseph Bennetta, Jack Crowley, Ron Das and Nathan Newell; upon information and belief, there are more Representatives for NMAC currently unknown to Plaintiffs.

173. The known Representatives for Ally at all relevant times hereto were Kelly-Ann Foster and Cindy O'Pharrow; upon information and belief, there are more Representatives for Ally currently unknown to Plaintiffs.

174. The relationships between the Urrutia Defendants and the Aaronson Defendants with the Lenders and their Representatives were lucrative for all parties thereto.

175. On the one hand, these relationships between the Urrutia Defendants and the Lenders' Representatives, and between the Aaronson Defendants and the Lenders' Representatives, left the Urrutia and Aaronson Defendants with huge sums of money available to them to fund their businesses and lavish lifestyles. The Defendants' lavish lifestyles include, but are not limited to,

49

multiple homes both domestic and foreign, multiple vacations yearly each both domestic and international, jewelry and gifts for spouses and family members, and, of course, luxury automobiles for the Defendants and their entire families.

176.  The Lenders made tens of millions of dollars (or more) over the years lending money to the Urrutia Defendants and especially the Aaronson Defendants, and certainly did not want those lucrative relationships with those Defendants to end or be disrupted.

177.  E.g., the Urrutia Defendants and the Aaronson Defendants frequently listed automobiles on more than one Floor Plan, as each of their multiple dealerships had its own Floor Plan, thereby allowing the Urrutia Defendants and Aaronson Defendants to list cars on multiple Floor Plans, getting money made available to these Defendants in multiple amounts, instead of rightfully obtaining only one amount for each automobile listed (e.g., each automobile has only one value; these Defendants engaged in illegal valuations of some of their dealerships' autos, then listed that auto on the Floor Plan of more than one dealership in order to obtain multiple amounts of money/value for each automobile).

178.  The practice of putting automobiles on more than one Floor Plan is called "Double Flooring" in the automobile dealership business, is known by all in the automobile dealership business, is illegal in all respects, and in the instant action, was known and intentionally ignored by the Automobile Lenders to the detriment of the Plaintiffs; the Double Flooring of automobiles by the

50

Urrutia and Aaronson Defendants contributed to the draining of money and ruination of the three dealerships (Superb, NorthShore, and 189 Sunrise) at issue by the Urrutia and Aaronson Defendants.

179. At all times relevant hereto, the Deos had no direct contact with any of the Automobile Lenders and had no ability to put any car on or off of any Floor Plan for any of the three relevant dealerships, which is an important part of the Chinese Wall carefully constructed by the Urrutia Defendants and the Aaronson Defendants to allow these Defendants to completely control 100% of the finances at Superb, NorthShore, and 189 Sunrise; nonetheless, at all times relevant hereto, the Automobile Lenders knew and should have known of the involvement of the Deos in the three dealerships in which the Deos held interests: Superb, 189 Sunrise, and NorthShore.

180. The intentional ignorance of the Lenders was part of the Cozy Relationships between the Urrutia Defendants/Aaronson Defendants and the Lenders at all times relevant hereto, driven in all respects by simple greed.

181. At all times relevant hereto, the Lenders' Representatives were and are Caucasians, in contrast with the Deos' African and Caribbean heritage.

182. At all times relevant hereto, the Aaronson Defendants and the Urrutia Defendants held various meetings and parties with the Representatives of the Lenders; upon information and belief, one or more gifts were even exchanged between these parties at such meetings and parties (hereinafter, the "Cozy Relationships").

51

183.   From time to time, the meetings and parties constituting Cozy Relationships between the Urrutia Defendants and Aaronson Defendants with the Representatives were held at restaurants and banquet halls in and around New York City and Long Island, New York.

184.   Periodically, the Deos asked the Urrutia Defendants and the Aaronson Defendants if the Deos could attend these meetings and parties between the Urrutia Defendants and the Lenders' Representatives, and also between the Aaronson Defendants and the Lenders' Representatives.

185.   Without exception when making such requests, the Deos were told that "you people" are not invited to these meetings and that "the Lenders don't want you people at the meetings" even though the meetings were for NorthShore and/or 189 Sunrise and/or Superb at times that the Deos were shareholders/operators of these businesses, as (deceptively, at times) agreed to by the Urrutia Defendants and Aaronson Defendants.

186.   The racism against the Deos by the Lenders was part of the Cozy Relationships between the Urrutia Defendants/Aaronson Defendants and the Lenders and their Representatives at all times relevant hereto.

### G1: Chase Bank

187.   At all times relevant hereto, Chase Bank was the provider of bank accounts for NorthShore, 189 Sunrise, and Superb Motors.

188.   Attached hereto as Exhibit C are true and accurate copies of documents utilized by Sara Deo to open the bank account(s) at Chase Bank for NorthShore.

189. Attached hereto as Exhibit Q are true and accurate copies of documents provided by Chase Bank to the Deo Plaintiffs during 2024 court proceedings (in Action 2 in U.S. District Court/EDNY) pertaining to the same account(s) originally opened by Sara Deo with Chase Bank on behalf of NorthShore.

190. Attached hereto as Exhibit R is a true and accurate copy of a document executed by Sara Deo on or about November 8, 2018, adding David Baron to the Chase account(s) for NorthShore opened by Sara Deo as set forth in Exhibit C hereto.

191. The Deos were treated differently by the Lenders than the way the Lenders treated the Urrutia and Aaronson Defendants.

192. In the immediate aftermath of the David Baron incident during mid-June 2020, Sara Deo went to Chase because she learned there were problems with the account(s) she originally opened for NorthShore during or about January 2018.

193. At that time, Sara Deo still believed that the account(s) belonging to NorthShore were owned and operated by her, as she originally set up the account.

194. At that time, Chase, by and through Jane Doe 1, refused to allow Sara Deo to access her own account without first "producing tax returns proving that you [Sara Deo] are the true owner of NorthShore," which the Deos subsequently learned such tax returns listing them as owners did not exist because the corporation was stolen from them by the Aaronson Defendants by and through, *inter alia*, filing false tax returns.

53

195. On and after June 16, 2020, the day of the David Baron incident, David Baron (at first, then Josh Aaronson after David's death in May of 2021) told the Deos to just continue writing checks as before (all of which were known to the Aaronson Defendants necessarily by and through the Token and Positive Pay systems).

196. However, after the Aaronson Defendants shuttered NorthShore (and 189 Sunrise) during November 2022, the Deos learned that the NorthShore Chase account was closed by the Aaronson Defendants in the days leading up to the Aaronson Defendants abandoning, stealing everything including cars and all company documents, and shuttering 189 Sunrise and NorthShore. Accordingly, Sara Deo went to Chase and spoke with Deborah Womeldorf, one of the Representatives with Chase who knew and worked with the Aaronson Defendants and the Deos over time.

197. On the occasion of late November 2022 that Sara Deo spoke with Chase Representative Womeldorf, Sare Deo did so for the purpose of removing the Aaronson Defendants from the NorthShore account(s) she opened for NorthShore.

198. On this occasion, the Deos (remembering the request for tax returns from Chase in the aftermath of the David Baron incident) brought the tax returns attached hereto as Exhibit H (as approved by the Josh Aaronson Defendants in the email chain attached hereto as Exhibit G) with them to straighten out the situation, but this time, Ms. Womeldorf conveniently (again, to the Aaronson Defendants' benefit and the Deos' detriment) refused to even look

54

at the tax returns, and refused all of Sara Deo's requests to resolve the situation or remove the Aaronson Defendants from the accounts for the two corporations.

199. At all times relevant hereto, Chase Bank provided use of the token system and the Positive Pay system for the accounts Chase provided to NorthShore and to 189 Sunrise.

200. At all times relevant hereto, Chase Bank provided use of the token system and text confirmations for the accounts Chase provided to Superb Motors.

201. David Baron died during May 2021.

202. From the date of David Baron's death through and including the shuttering of NorthShore's and 189 Sunrise's businesses and accounts by the Aaronson Defendants in November 2022, the Aaronson Defendants utilized (the deceased) David Baron's tokens and passwords and usernames to access and authorize account activities for (at least) the NorthShore and 189 Sunrise accounts.

203. This use of the deceased David Baron's credentials to access and eventually drain the accounts of all funds in those accounts constitutes criminal fraud and wire fraud at the very least, and was committed in conspiracy with and with the knowledge, allowance, and intentional ignorance of Chase Bank by and through its employees and Representatives.

204. Immediately after the Aaronson Defendants shuttered NorthShore and its bank accounts in November 2022, Anthony Deo arranged to borrow money ($735,000.00) against his ownership interest in NorthShore, having been

55

acknowledged as the 99% shareholder only weeks before by the Aaronson Defendants and their Accountants (*see* Exhibits G and H). This loan was obtained solely by Anthony Deo for his companies, 189 Sunrise and NorthShore, and was solely personally guaranteed by Anthony Deo; these funds were intended to save NorthShore and to obtain an interest (with cross collateralization) in Superb. *See* Exhibits G, H, I-1 and I-2 attached hereto.

205. During late November 2022, by and through the illegal use of the deceased David Baron's credentials as intentionally allowed and ignored by Chase Bank, the Aaronson Defendants stole that money ($735,000.00) from 189 Sunrise's Chase account "on their way out the door" and shockingly, deposited those funds into one or more of their own corporate accounts. Upon information and belief, the Aaronson Defendants put that money into an account belonging to Baron Nissan.

206. Upon learning of the theft, Anthony Deo reported the theft to the Nassau County (New York) Police Department. Attached hereto as Exhibit S is a true and accurate copy of the police report of the incident.

207. The police contacted the Aaronson Defendants by and through Josh Aaronson and informed Josh Aaronson that if he did not return the money immediately, he would be charged with at least one (1) felony criminal charge.

208. Thereafter, Aaronson, by and through one or more Professionals, returned the money to a Professional of Anthony Deo's choosing, who returned the money to Anthony Deo.

209. By and through his theft of money from Anthony Deo's account just weeks after personally (and on behalf of the Aaronson Defendants) approving Deo as the 99% shareholder of NorthShore, Josh Aaronson committed criminal fraud (by and through the actual theft), criminal conversion (in conjunction with the other Aaronson Defendants by putting the money into one or more unrelated corporate accounts), criminal theft (stealing the money), criminal conspiracy (with the co-Aaronson Defendants and Chase Bank and one or more of Chase Bank's Representatives), federal criminal wire fraud (by and through the use of a dead man's electronic credentials in conspiracy with one or more of Chase Bank's Representatives who intentionally ignored both David Baron's death and the use of the credentials for a year and a half after his death), and perjury and fraud upon the Court (by and through false allegations in the Court cases known herein as Action 1 and Action 2; *see* Exhibits M and O).

210. Even worse, Chase Bank had every opportunity to protect their contractual relationship with the Deos and 189 Sunrise and NorthShore, but intentionally failed to do so and intentionally ignored information attached hereto that constitutes breaches *per se* of Chase's contractual relationship with 189 Sunrise and NorthShore, and constitutes breaches *per se* of Chase's obligation to engage in good faith and fair dealing given their contractual relationship and fiduciary relationship with these corporate Plaintiffs and the corporate shareholders, the Deos.

57

211. Attached hereto as Exhibit C are the documents indicating Sara Deo's opening of the corporate bank account for NorthShore by and through Chase Bank.

212. Attached hereto as Exhibits Q and R are documents provided by Chase Bank to the Plaintiffs through Action 2 evidenced herein by the Federal Complaint attached as Exhibit O.

213. Any fair reading of these documents alerts the reader to the following incontrovertible facts:

a) Sara Deo opened the NorthShore Bank account during January 2018 (*see* Exhibit C); the documents attached as Exhibit C have been known to Chase and in Chase's possession, custody and control since January, 2018;

b) On November 8, 2018, Sara Deo added David Baron as a signatory to the corporate account for NorthShore (*see* Exhibit R, "Business Account Add Signers Form" produced by Chase to the instant Plaintiffs during and through Action 2); the document attached as Exhibit R has been known to Chase and in Chase's possession, custody and control since November 8, 2018;

c) On and about June 16, 2020, the Aaronson Defendants provided to Chase the eight (8) pages of documents attached hereto as Exhibit Q; the first four (4) pages were faxed to Chase on June 16, 2020, from "Baron Nissan" as set forth in the "fax confirmation print" at the top of each page; the second four (4) pages were delivered to one or more of

58

Chase's Representatives in hand and executed in front of said Representative(s) on the date of each such page between June 16, 2020 and June 18, 2020.

214. On June 16, 2020, the Aaronson Defendants took advantage of the imminent death of Anthony Deo's father; to do so, they had a plan that required instantaneous reaction to NorthShore *not having either Sara Deo or Anthony Deo present, as one or both always otherwise were.*

215. On the morning of June 16, 2020, Anthony Deo informed David Baron that Anthony's father was dying, and that he and his wife Sara would be out of the office for the next day few days to deal with his father's impending and expected death.

216. Whereupon, the Aaronson Defendants, then-led by David Baron, put their plan into immediate action, and rushed to the NorthShore dealership and cleaned it out, mostly as a smokescreen for what the Deos now know (since the production of documents by Chase in Action 2 during 2024, only) was the Aaronson Defendants' real purpose: The Aaronson Defendants had long since (by the date of the David Baron incident, June 16, 2020) stolen the Deos' corporation, slowly, over time by various acts including filing tax documents, but what the Aaronson Defendants did not have until June 16, 2020, was the corporate book as opened and kept by the Deos, since the Deos had the corporate book since they opened the corporation, obtained the EIN number (Exhibit A hereto), entered into the lease for the space for NorthShore (Exhibit B hereto), opened the Chase Bank account(s) for

59

NorthShore (Exhibit C hereto), and obtained the corporate book for NorthShore (Exhibit U hereto).

217.    But once the Aaronson Defendants obtained the corporate book from the Deos/offices of NorthShore on June 16, 2020, they fraudulently filled out documents that are transparently fraudulent for all (including Chase and its Representatives) to see:

a)    Page 1 of Exhibit Q indicates that David Baron, Brian Chabrier, and Asad Khan are the "Managing Members" of NorthShore as of "February 14, 2018" (the fax print clearly indicates this document was sent along with the next three pages to Chase at and immediately after 5:00 p.m. on June 16, 2020, from "Baron Nissan");

b)    Pages 2-4 of Exhibit Q indicate that David Baron, Brian Chabrier, and Asad Khan were members of NorthShore Motor Leasing LLC ("NorthShore") since January 4, 2018;

c)    Page 5 of Exhibit Q indicates that David Baron signed the document in front of a Chase Representative on June 16, 2020, the very day Baron stole the corporate book from NorthShore;

d)    Page 6 of Exhibit Q indicates that David Baron removed Sara Deo from the account on June 16, 2020; again, this is an account(s) that *Sara Deo opened* (*see* Exhibit C hereto) for the Deos' corporation, NorthShore;

e)    Page 7 of Exhibit Q indicates that David Baron and Brian Chabrier added their names to the accounts on June 16, 2020; and

60

f) Page 8 of Exhibit Q indicates that on or about June 18, 2020, the Aaronson Defendants caused a letter from one of their Professionals to be hand delivered to Chase's Representative (there is no mailing address on the letter, it had to be hand delivered to Chase for Chase to have it to turn over in Action 2 during 2024); this letter is also a transparent attempt to falsely claim ownership of NorthShore since "2018" as set forth by the Aaronson Defendants' Professional, Richards, Witt & Charles, LLP, by named partner Paul Charles, a CPA.

218. The reason that the documents set forth in Exhibit Q are transparently false is because for the documents set forth in Exhibit Q to be true and accurate, Exhibit R *would not exist.*

219. Exhibit R is the document through which Sara Deo, the owner and opener of the account(s) at issue for NorthShore at Chase, added David Baron to the account.

220. If, as set forth in Exhibit Q, David Baron, his partner Asad Khan, and his partner Brian Chabrier were already the owners/members of NorthShore since January and/or February, 2018, then there would be no need for Sara Deo to add David Baron as a signatory to the accounts at Chase; *Baron could and would do so himself through the corporate book that he and his partners would have owned and controlled.* Sara Deo added David Baron to the account since 1) he requested it; given that 2) he was the then-agent/leader of the Aaronson Defendants, the Deos' contractual partners/Floor Plan provider

61

at NorthShore, certainly not because he was an owner/member of NorthShore, neither he nor Chabrier nor Khan were ever made members or owners of NorthShore, they simply stole their purported ownership interests with their decades of inside knowledge of the automobile business over time, with the plan finalized (and unintentionally revealed) once they stole the corporate book on June 16, 2020 and sent Chase the documents attached hereto as Exhibit Q.

221. In contrast, the Deos' first automobile venture was, in fact, Premier Autos, NorthShore's predecessor, making them lambs lead to slaughter by David Baron and the Aaronson Defendants.

222. Startlingly, Exhibit U hereto provides further irrefutable proof of the scheme engaged in by the Aaronson Defendants with Chase Bank regarding the theft of Plaintiffs' Chase Bank account(s) on June 16, 2020, the date of the David Baron incident:  Exhibit U is a true and accurate copy of the receipt for the payment made by Anthony Deo to the Notary Superstore of Huntington Station, New York, to produce the corporate book for NorthShore Motor Leasing LLC, co-Plaintiff herein, clearly dated June 7, 2018, which Deo obtained once the lease was assigned from Premier to NorthShore at the 180 Michael Drive location.

223. Therefore, it is an impossibility for David Baron, Asad Khan, and Brian Chabrier to have been assigned stock certificates on January 4, 2018, as set forth and attached hereto in Exhibit Q *at* pages 2-4 from the NorthShore corporate book *that wasn't created or produced until more than five (5)*

62

*months later as set forth in Exhibit U.* The frauds and extent of frauds and other wrongdoings by the Aaronson Defendants and the Professionals were not known by the Plaintiffs until Chase produced the documents attached hereto as Exhibit Q during document production in Action #2 in 2024 due to the intentionally surreptitious, sneaky, and underhanded methods/conspiracy by the Aaronson Defendants in conjunction with the Professionals.

224.   Exhibit U inarguably establishes that the Aaronson Defendants committed criminal fraud, criminal theft, and criminal wire fraud when they created and caused the purported corporate documents attached hereto in Exhibit Q to be wired/faxed to Chase Bank on and after June 16, 2020, and they did so in conspiracy with and the cooperation of RWC and Chase Bank itself.

225.   When Sara Deo added David Baron to the Chase account(s) as set forth in Exhibit R, he gained further control over the money at the dealership, but could not "prove" his ownership (which he and Khan and Chabrier outright stole) until the death of Anthony Deo's father left the dealership unguarded by the Deos, and then the longstanding plan to steal the corporate book and back-date the documents attached as Exhibit Q was put into action on June 16, 2020.

226.   Even if Chase and its Representatives did not know of the scheme by the Aaronson Defendants to outright steal ownership of NorthShore prior to June 16, 2020, it is impossible to look at the documents attached hereto as Exhibits C, Q, and R (which Chase already possessed when the documents in Exhibit Q arrived after hours on the evening of June 16, 2020) without

knowing *immediately* that the documents in Exhibit Q are phony, and a mere phone call to their longtime contracted account holders (the Deos) would have revealed the scheme to everyone. The documents attached hereto as Exhibits C, Q, and R have been fully in Chase's possession, custody, and control since no later than June 18, 2020, and were, at all relevant times, intentionally ignored by Chase since that date.

227. Chase purposely ignored the conflicting evidence and took no steps to verify with and through the Deos the actual status of NorthShore's ownership; Chase and its Representatives simply remained silent, content to side with the rich Caucasians against the poor minorities; the Cozy Relationships carefully fostered by the Aaronson Defendants and the Urrutia Defendants on the one hand, and Chase and its Representatives on the other hand, quite simply paid off for all of these Defendants.

228. At all times relevant hereto, Chase and its Representatives and the Accountants knew or should have known that the Aaronson Defendants were engaged in illegal activities including, but not limited to, fraudulent conduct regarding the ownership of NorthShore, fraudulent conduct regarding the ownership of 189 Sunrise, fraudulent conduct regarding the accounts of NorthShore and 189 Sunrise, and criminal fraud and wire fraud regarding the access given to the Aaronson Defendants to accounts of 189 Sunrise and NorthShore by Chase Bank and its Representatives via the utilization of a dead man's account credentials for a year and a half after his death.

64

229. By utilizing the Chase credentials of a dead man (David Baron) to clean out the 189 Sunrise and NorthShore accounts in November, 2022, the Aaronson Defendants again unknowingly reveal a necessary truth, just as with the obviously phony documents attached hereto as Exhibit Q: The dead man's electronic credentials wrongfully and illegally utilized by the Aaronson Defendants in November 2022 to clean out the Deos' corporate accounts at Chase *necessarily expire without constant use due to internal bank policies and rules. Thus, for the Aaronson Defendants to utilize a dead man's Chase credentials in November 2022 to clean out the Deos' corporate accounts, the Aaronson Defendants were necessarily utilizing those credentials on a regular basis since the death of David Baron a year and a half earlier, a fact necessarily known to and ignored by Chase to the detriment of the Plaintiffs.*

230. The use of the dead man's electronic credentials to clean out the Plaintiffs' bank accounts as set forth, above, constitutes criminal fraud and criminal wire fraud by the Aaronson Defendants, and was knowingly allowed at all times relevant hereto by Chase Bank.

231. At all times relevant hereto, Chase and its Representatives violated their own internal rules and policies and procedures regarding minorities, racial inequities, inclusion, handling of accounts, lending, and diversity given that Chase ignored its duties owed to the Plaintiffs, and intentionally sided with the rich Caucasian Aaronson Defendants with whom Chase made millions of dollars over the years; these and other acts and omissions constitute breaches

of Chase's contracts with the corporate Plaintiffs and the covenant of good faith and fair dealing Chase owed to all of the Plaintiffs.

232. By the within and other acts and omissions, Chase Bank by and through its Representatives/employees violated the Deos' Civil Rights as guaranteed by the U.S. Constitution and related statutes.

233. When the Deos appeared at Chase Bank with their own determinative tax returns to discuss this matter with Chase's Representative (Deborah Womeldorf) in the immediate aftermath of the Aaronson Defendants' emptying and shutting down 189 Sunrise's and NorthShore's corporate bank accounts in November 2022, Chase Bank took the side of the rich Caucasians, the Aaronson Defendants, against the poor minorities, the Deos, and allowed it to happen, ruining 189 Sunrise, NorthShore, and the Deos' lives in the process. Chase's Representative this time (contrasting how Chase and its Representatives handled questions from the Deos after the David Baron incident during June 2020, in which Chase insisted upon seeing tax returns when that was in the Aaronson Defendants' best interests) refused to even consider or look at the Deos proof/tax returns and emails from Josh Aaronson approving the returns and the Deos as owners of the two companies at issue.

### G2: The Automobile Lenders

234. Ally, NextGear, and NMAC are the Automobile Lenders herein as they are the providers of one or more Floor Plans for 189 Sunrise, NorthShore, and/or Superb.

235. Floor Plans are the method/loans that automobile dealerships utilize to fund their purchase of new and/or used automobiles for sale to the public. At times, other automobiles are financed by and through Floor Plans, including, but not limited to, automobiles that are traded into a dealership; however an automobile dealership obtains an automobile, it may be put on to Floor Plans, including the practice of "Double Flooring" set forth herein. At all times relevant hereto, the Automobile Lenders knew and should have known of the methods employed by the Defendants in putting automobiles on to the Floor Plans provided by the automobile Lenders to Superb, NorthShore, and 189 Sunrise.

236. At all times relevant hereto, Superb Motors, solely by and through the Urrutia Defendants' decisions, entered into a contract/agreement with NMAC for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Superb Motors.

237. At all times relevant hereto, Superb Motors, solely by and through the Urrutia Defendants' decisions, also entered into a contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Superb Motors.

238. At all times relevant hereto, Northshore, solely by and through the Aaronson Defendants' decisions, entered into a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

239. At all times relevant hereto since November 2022, Northshore, solely by and through the Deos' decisions, entered into a contract/agreement with a company called Westlake Financial Services (hereinafter, "Westlake") for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore. During the summer of 2023, the Deos willingly gave up their Floor Plan with Westlake due to the ruination of the company caused by the Urrutia Defendants' and the Aaronson Defendants' wrongful acts and omissions set forth herein, including, but not limited to, the legal actions commenced by the Defendants and referred to herein as Actions 1, 2, and 3.

240. It is telling that the Defendants herein have not sued Westlake in any of their three legal proceedings (Actions 1, 2, and/or 3) even though at all relevant times the Defendants 1) could know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 2) should know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 3) did know that the Deos obtained a Floor Plan from Westlake for NorthShore; and 4) knew that they, the Defendants, did not have anything to do with NorthShore having its Westlake Floor Plan at times that the Defendants were, in fact, engaged in Actions 1, 2, and/or 3 against the Deos because the Defendants knew that at all times relevant hereto, the Deos were the true owners/ members/stockholders of NorthShore.

241. Even though the Urrutia and Aaronson Defendants claim ownership interests in NorthShore, these Defendants have not and will not sue Westlake

because 1) due to greed, they do not want to be seen in the automobile industry as suing any Floor Plan provider, that could impact the Defendants' ability to obtain and keep Floor Plans from other providers; and 2) they know that at all relevant times, the Deos were, in fact, the true owners/members/ stockholders of NorthShore and had full authority to make decisions on behalf of NorthShore as the sole owners/members/shareholders thereof.

242. At all times relevant hereto, Westlake did not breach its agreement/ contract with NorthShore and acted in good faith and dealt fairly with the Plaintiffs.

243. At all times relevant hereto through the early fall of 2022, 189 Sunrise, solely by and through the Aaronson Defendants' decisions, engaged in a contract/agreement with Ally for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

244. At all times relevant hereto between November 2022 and August 2023, 189 Sunrise, solely by and through the Deos' decisions, engaged in a contract/agreement with NextGear for a Floor Plan to obtain automobiles and then sell those automobiles to the public on behalf of Northshore.

245. The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without the authority of the Deos, the true owners/members/stockholders of those companies.

246. The Floor Plans obtained by the Aaronson Defendants for use at NorthShore and 189 Sunrise were obtained without any due diligence by the Automobile Lenders who provided said Floor Plans; such diligence would

69

have revealed the within schemes and conspiracies and would have prevented the Deos' losses.

247. At all times relevant hereto, the Automobile Lenders to 189 Sunrise and NorthShore knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore.

248. At all times relevant hereto, the Automobile Lenders providing Floor Plans to 189 Sunrise and NorthShore knew and/or should have known of the Deos' ownership interests in 189 Sunrise and NorthShore by and through the fact that at all times for NorthShore, and since February, 2021 for 189 Sunrise, the Deos operated both dealerships and were present to meet the Automobile Lenders and their various Representatives when the Representatives were present at the dealerships, including during on-site audits by the Automobile Lenders.

249. Likewise, at all times relevant hereto since December 2022, the Automobile Lenders providing Floor Plans to Superb knew and/or should have known of the Deos' ownership interests in Superb.

250. At all times relevant hereto since December 2022, the Automobile Lenders providing Floor Plans to Superb knew and/or should have known of the Deos' ownership interests in Superb by and through the fact that at all times for Superb since December, 2022, the Deos operated Superb and were present to meet the Automobile Lenders and their various Representatives when the Representatives were present at the dealership, including during on-site audits by the Automobile Lenders.

70

251. The lack of due diligence by the Automobile Lenders to determine ownership of the 3 dealerships at issue and uphold their contractual obligations to those dealerships constitutes at all times intentional ignorance by the Automobile Lenders herein in order to protect their financial gains made possible by and through the Billionaire Defendants herein, who provided tens of millions of dollars or more in profits over the years to the Automobile Lenders herein.

252. If the Lenders herein uncovered the within schemes and conspiracies in any detail, then the extremely profitable relationships between these Defendants would have been ruined; the corporate Defendants have and should have had internal rules, policies and procedures that would have prevented a continuation of the relationships between the Defendants; given the enormous sums of money at stake between these parties (and others not named as parties herein), it was instead easier and far more profitable to ignore the Deos' plight (to the extreme detriment of the Deos) while simultaneously keeping and maintaining at all times relevant hereto the relationships between the Defendants herein.

253. The agreements and contracts between the Lenders and the Urrutia/ Aaronson Defendants, whether express or implied, were repeatedly requested to be obtained by the Deos; the Defendants herein should have been alerted to the wrongdoings of the co-Defendants by these requests from the Deos, but instead, in order to keep and maintain lucrative relationships, the Lenders

71

and the Urrutia/Aaronson Defendants refused the Deos' requests each and every time.

254. The agreements between the Defendants hereto were weaponized by those Defendants, and were wrongfully kept from the Plaintiffs at all times relevant hereto through and including the present.

255. Each and every agreement between any Defendant and the Plaintiffs, whether express or implied, was conducted by the Defendants in violation of the implied covenant requiring good faith and fair dealing in New York State on all such agreements/contracts.

256. At all times relevant hereto, the Aaronson Defendants told the Deos that the Floor Plans were provided by and through Baron Nissan, which was a lie to keep the Deos from discovering the Aaronson Defendants' theft of the Deos corporations, 189 Sunrise and NorthShore.

257. At all times relevant hereto, the Automobile Lenders told the Deos on behalf of 189 Sunrise and NorthShore that they were not the party to the contract at issue, which the Deos took to mean that Baron Nissan was the contracted party; if the Automobile Lenders told the Deos even once that the party was, in fact, 189 Sunrise and/or NorthShore, it would have alerted the Deos to the within schemes. However, the Automobile Lenders carefully avoided telling the Deos that 189 Sunrise and NorthShore were, in fact, the true parties; this fact demonstrates that the Automobile Lenders for 189 Sunrise and NorthShore (except for Westlake) intentionally ignored the

72

Deos' position foisted upon them by the Aaronson Defendants acting in conspiracy with the Automobile Lenders.

258. At all times relevant hereto, the Lenders took direction from non-owners of the corporations that are parties hereto, did nothing to verify ownership of the corporate parties hereto, and could not have obtained the corporate book or documentation proving ownership of NorthShore prior to June 16, 2020 since the Aaronson Defendants did not obtain that book and documents until that date; these facts alone should have alerted the Lenders to the schemes, conspiracies, and wrongdoing set forth herein. Instead, the Lenders refused to even talk to the Deos about these companies to the detriment of the Plaintiffs and to the benefit of the co-Defendants.

259. At all times relevant hereto, the known and unknown Representatives of NMAC for Superb engaged in a Cozy Reletionship with the Urrutia Defendants.

260. At all times relevant hereto prior to the Lock Out in August, 2023, NMAC made millions of dollars with and from the Urrutia dealerships.

261. The extent of the Cozy Relationship and the extent that NMAC has gone and continues to go in protecting its dealings set forth herein is further highlighted by the fact that immediately prior to the filing of this Third-Party Complaint, NMAC intervened and queered a deal for Anthony Deo to purchase an interest in another automobile dealership on Long Island called Route 112 Mitsubishi; upon information and belief, one or more Representatives of NMAC told the owner(s) of 112 Mitsubishi not to sell the

73

dealership to Anthony Deo and pointed that owner to look at the Federal Complaint in Action 2 attached hereto as Exhibit O.

262.  Upon reviewing the Federal Complaint attached as Exhibit O, the owner of 112 Mitsubishi cancelled the deal when all that was left (the parties had already agreed to terms) was for the parties to execute the documents and provide payment, which Deo was fully prepared to do.  Upon information and belief, it was NMAC by and through one or more of its Representatives that queered the deal for Deo, intentionally and fully interfering with business relations of Anthony Deo.

263.  At all times relevant hereto, Nissan operated various corporations under its automobile umbrella, including, but not limited to, NMAC and a company called Nissa Extended Services North America, G.P., a Delaware general partnership business (hereinafter, "NESNA").

264.  Whereas NMAC provides Floor Plans to automobile dealerships, NESNA provides warranties for sale to the automobile purchasers at dealerships.

265.  Attached hereto as Exhibit X are true and accurate copies of several contracts by and between NESNA on the one hand, and Anthony Deo both personally (as Guarantor) and on behalf of 189 Sunrise (since the Deos' purchase in February 2021) and NorthShore.

266.  These contracts provide irrefutable proof that Nissan, NMAC, and NESNA all knew that Anthony Deo was the true party in interest in 189 Sunrise and NorthShore, as it was he, Deo, that was entering into contracts and personally guaranteeing same on behalf of 189 Sunrise and NorthShore

74

for warranties from Nissan; these contracts were, at all relevant times, also in the possession, custody and control of the Aaronson Defendants and were approved by the Aaronson Defendants.

267. The Aaronson Defendants *necessarily* had to approve the contracts attached in Exhibit X: These contracts include monies owed by the Aaronson Defendants on 189 Sunrise from prior to the sale to the Deos in February 2021; in fact, the Aaronson Defendants *required* Anthony Deo to assume certain debt in connection with the purchase of 189 Sunrise as a *precondition* to letting Deo purchase 189 Sunrise in February 2021.

268. Thus, even as NMAC was cutting off the Deos from Floor Plans and interfering with Anthony Deo's purchase of Route 112 Mitsubishi, NMAC by and through its sister corporation NESNA and by and through the Aaronson Defendants knew that the Deos were the true owners/operators/ stockholders/members of 189 Sunrise and NorthShore, but continued to side with the Aaronson Defendants in a conspiracy to (successfully) ruin the Deos, their livelihoods, and businesses.

269. At all times relevant hereto, the known Representatives of Ally and NextGear for 189 Sunrise and NorthShore and one or more unknown Representatives of Ally and NextGear for 189 Sunrise and NorthShore, engaged in a Cozy Reletionship with the Aaronson Defendants.

270. At all times relevant hereto, Ally and NextGear made tens of millions of dollars and more with and from the Aaronson Defendants through their various dealerships over the years.

271. At all times relevant hereto, the Automobile Lenders by and through their Representatives knew and should have known of the Deos interests in Superb, NorthShore, and 189 Sunrise.

272. Despite repeated requests by the Deos to explain to the Automobile Lenders what was going on with 189 Sunrise and NorthShore (since November, 2022) and Superb (since the Lock Out) in order to protect their interests in the three companies at issue, the Automobile Lenders 1) sided at all relevant times with the Urrutia and Aaronson Defendants; 2) failed and refused to discuss anything with the Deos, either from the Deos' request or to simply find out what was going on with the companies at issue; 3) shut off the Floor Plans to each of the companies at issue to the detriment of the Deos; 4) ignored their own policies and rules regarding diversity, racial relations, and minority lending practices in siding with the Urrutia/Aaronson Defendants against the Deos; 5) failed and still refuse to create policies and rules to protect minorities such as the Deos from predatory practices set forth herein and perpetrated by the Urrutia/Aaronson Defendants; 6) have not taken any actions against any of the Urrutia/Aaronson Defendants for their illegal activities set forth herein, but have instead refused to lend to the Deos ever again; and 7) at the specific requests of the Urrutia/Aaronson Defendants, ruined the Deos' businesses.

273. The within and other acts and omissions between the Urrutia/Aaronson Defendants in conjunction with the Lenders constitute a conspiracy to breach

76

all contracts with the Plaintiffs and to intentionally interfere with the Deos' businesses at issue herein.

274.  Said acts and omissions constituting the conspiracy are on-going acts and omissions, and the Lenders and Urrutia/Aaronson Defendants acted jointly in severally in perpetrating the within ruination of the Deos three businesses and their lives.

275.  At all times relevant hereto, and upon information and belief, the Deos were 1) the only African/Caribbean dealership owners/partners in the State of New York; and 2) two of only a handful of any minority owners of automobile dealerships known on Long Island.

## H.  The Accountants

276.  Defendants RWC and Citrin are accounting firms that at all times relevant hereto worked with and for the Aaronson Defendants and one or more of the Aaronson Defendants' Island Auto Group dealerships doing accounting work for these co-Defendants by and through various employees of each of those two firms; at various times in the last six years, these firms and their employees performed various tasks as accountants for 189 Sunrise and NorthShore.

277.  As such, these Accountants (both the firms and their employees) owed a fiduciary duty to 189 Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

278.  As such, these Accountants (both the firms and their employees) maintained contractual relationships (whether express or implied) with 189

77

Sunrise and NorthShore, separate and apart from any duties owed to the Aaronson Defendants and Island Auto Group.

279. Like the Lenders, the Accountants made millions of dollars working for and with the Aaronson Defendants, Island Auto Group, 189 Sunrise, and NorthShore.

280. The duties of care arising from the Accountants' (both the firms' and each employee therein) contracts (implied, only, since the Deos never contracted with the Defendant Accountants either individually or on behalf of their corporations, 189 Sunrise and NorthShore) with and fiduciary duties owed to 189 Sunrise and NorthShore include, but are not limited to, 1) performing sufficient due diligence to confirm the identity of the shareholders/members of 189 Sunrise; 2) performing sufficient due diligence to confirm the identity of the shareholders/members of NorthShore; 3) strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise; 4) strictly adhering to the covenant of good faith and fair dealing towards NorthShore; 5) utilizing due diligence in preparing and filing all tax documents for 189 Sunrise; 6) utilizing due diligence in preparing and filing all tax documents for NorthShore; 7) utilizing due diligence in preparing any documents to be utilized on behalf of 189 Sunrise; 8) utilizing due diligence in preparing any documents to be utilized on behalf of NorthShore; 9) utilizing due diligence and strictly adhering to the covenant of good faith and fair dealing towards 189 Sunrise in obtaining and utilizing Pandemic Relief Funds; 10) utilizing due diligence and strictly adhering to the covenant of good faith and fair

78

dealing towards NorthShore in obtaining and utilizing Pandemic Relief Funds; 11) correcting any tax filings prepared and filed by the Accountants for 189 Sunrise that turn out to be incorrect or mistaken due to the failures of the Accountants to perform due diligence; and 12) correcting any tax filings prepared and filed by the Accountants for NorthShore that turn out to be incorrect or mistaken due to the failures of the Accountants to perform due diligence.

281. Instead, the Accountants engaged in a scheme/conspiracy with the Aaronson Defendants and their Island Auto Group dealerships to intentionally ignore obvious red flags both before and after preparing various documents over the years for 189 Sunrise and NorthShore for the simple reason that the Accountants made millions of dollars or more off of the Aaronson Defendants and their Island Auto Group dealerships; they would and did even go so far as to commit gross malpractice, breaches of contracts, and breaches of their fiduciary duties in their conduct by and for 189 Sunrise and NorthShore.

282. E.g., the last page of Exhibit Q attached hereto contains a letter produced by RWC that simply constitutes gross malpractice and breaches of its contract with and fiduciary duties towards NorthShore.

283. There is no possibility that RWC possessed the corporate book for NorthShore or any parts thereof (including stock certificates) prior to the David Baron incident perpetrated on June 16, 2020, yet by that time RWC

79

had already filed (as indicated in the last page of Exhibit Q) tax returns for NorthShore absent any authority from the Deos, the true owners thereof.

284.    To avoid any breaches of duties to NorthShore, at a bare minimum RWC would have needed to know what that letter was to be utilized for; it was, in fact utilized by the Aaronson Defendants to remove Sara Deo from NorthShore's bank accounts, accounts which Sara Deo opened as a shareholder/member of NorthShore. *See, also,* Exhibit C hereto.

285.    The removal of Sara Deo from the accounts with Chase for NorthShore in combination with the Aaronson Defendants obtaining the corporate book and producing the phony stock certificates indicated in Exhibit Q by and through the staged David Baron incident on June 16, 2020, materially damaged the Deos and cost them their interests in NorthShore permanently from at least that moment on, and the letter from RWC contributed significantly to the Aaronson's illegal fraud and theft perpetrated with RWC's help.

286.    RWC, by and through its employees, partners, and/or members, knew or should have known that seeing stock certificates for the first time on and after June 16, 2020, purportedly indicating the Aaronson Defendants' listed interests since January or February 2018 was a red flag and should have prompted the following questions: Why didn't the Aaronson Defendants produce these certificates to their Accountants sooner, and what does Sara Deo have to say about this? A simple call to the dealership would have constituted at least partial due diligence and produced the following answers: The Aaronson Defendants were perpetrating a fraud by obtaining those

corporate books and certificates as they were stolen from the dealership on June 16, 2020, by and through the staged David Baron incident; and Sara Deo had no intention of being removed from the accounts of NorthShore, willingly or otherwise, as not a penny of consideration was every paid by the Aaronson Defendants for NorthShore, and if asked by RWC, it would have raised even more red flags easily spotted by any competent accountant.

287. Instead of doing its work and upholding its duties to 189 Sunrise and NorthShore, RWC badly damaged the dealerships and the Deos by and through its breaches of duties, breaches of agreements with the dealerships, and breaches of duties to the dealerships' shareholders/members, the Deos, in order to continue the revenue stream it obtained for years worth millions of dollars from the Aaronson Defendants, all to the detriment of 189 Sunrise and NorthShore and their shareholders/members, the Deos.

288. Simply put, at all relevant times related hereto, and for all work performed by RWC and its members, partners, and employees by and for NorthShore and 189 Sunrise (and much of that work is unknown at this time to the Plaintiffs and will be subject to obtaining same during discovery in this action and/or pursuant to within Demands), RWC breached contracts, duties of care, duties of good faith and fair dealings, and committed professional malpractice thereby, especially due to intentionally ignoring obvious dishonesty from the Aaronson Defendants regarding 189 Sunrise and NorthShore.

289.  Likewise, Citrin faces the same scrutiny and is held to the same standards and duties of care as RWC (and Citrin's employees, members, and partners) with respect to work performed by and for 189 Sunrise and NorthShore.

290.  Likewise, Citrin conveniently ignored red flags regarding the dishonesty of the Aaronson Defendants regarding the operations of 189 Sunrise and NorthShore.

291.  Citrin knew or should have known of the Deos' purchase of 189 Sunrise as set forth in Exhibit D hereto; yet either conveniently ignored that purchase in performing work for the Aaronson Defendants or utterly failed in its duties to find out and know about that purchase, including the funds for that purchase and how those funds were accounted for on the Aaronson Defendants' personal and business tax returns prepared by Citrin.

292.  At a bare minimum, Citrin would have necessarily known about the lease the Deos entered into for the space at 189 Sunrise as the accountants would have needed to know about the lease's payments for tax purposes. *See also* Exhibit E hereto.

293.  Likewise, the email chain and tax returns attached hereto as Exhibits G and H raised staggering red flags missed by Citrin that cost the Plaintiffs their businesses and livelihoods:  1) When did the Deos obtain their interests in 189 Sunrise and NorthShore? 2) What was the consideration paid for the Deos' interests in 189 Sunrise and NorthShore? 3) What consideration was paid by the Aaronson Defendants for their interests in 189 Sunrise and NorthShore? 4) Do tax returns (personal and corporate) need amendments

82

due to the new ownership interests indicated in Exhibits G and H?  5) How to contact, meet, and understand the Deos and their interests in these two businesses?  All of these questions and more should have been asked of the Deos by Citrin (and RWC) or any competent accountant, but were instead intentionally ignored to the Aaronson Defendants' benefit and to the Plaintiffs' detriment.

294.  Quite literally, the Deos have never met anyone from Citrin; all work performed by Citrin for the Deos' two companies at issue (189 Sunrise and NorthShore) was performed by Citrin at the sole direction of the Aaronson Defendants and without any input from the Deos, the true owners/members/ stockholders.

295.  By the within and other acts and omissions, Citrin and its employees, partners, and members have breached their duties of care and fiduciary duties to 189 Sunrise, NorthShore, and the Deos; Citrin has also breached its agreements with 189 Sunrise and NorthShore and committed malpractice thereby.

296.  The Accountants failed and refused to even meet with the Deos, a fact that is telling with respect to wrongful conduct:  Despite ups and downs in their relationship with the Aaronson Defendants over the years, the simple fact remains that it was the (phony, by and for the Aaronson Defendants) business relationship between the Deos and the Aaronson Defendants that the Deos considered left them "on the same side" as their business partners; the Accountants failure and refusal to even meet with or speak to the Deos

directly suggests that at all times relevant hereto, the Accountants knew of the wrongdoings by the Aaronson Defendants against the Deos and 189 Sunrise/ NorthShore, knew that such wrongdoings put the parties on opposite sides in their relationship, and picked the rich Aaronson Defendants to side with after making millions of dollars off of the Aaronson Defendants and their Island Auto Group while simultaneously contributing to the shuttering and ruination of 189 Sunrise and NorthShore.

## I.    The Attorneys

297.    CSZ and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/ stockholders of those corporate Plaintiffs, the Deos.

298.    Likewise, MLLG and its employees, members, and/or partners, engaged in representing the corporate Plaintiffs, 189 Sunrise (since February 2021) and NorthShore (at any time) without the authorization or approval of the owners/members/stockholders of those corporate Plaintiffs, the Deos.

299.    The unauthorized work performed by the Attorneys includes but is not limited to obtaining Pandemic Relief Funds ("PPP" funds), steering those funds away from the Plaintiffs and instead to the Aaronson Defendants, representing the corporate Plaintiffs in one or more lawsuits, plus other work unknown at this time to the Plaintiffs. Attached hereto as Exhibit T is a true and accurate copy of an email chain including one or more attorneys

84

employed by MLLG regarding Pandemic Relief Funds for 189 Sunrise and/or NorthShore.

300. It is also known that by and through the assistance of various Professionals including but not limited to at least MLLG, the Aaronson Defendants diverted and converted and stole all of those PPP funds from 189 Sunrise and NorthShore into their own accounts and/or the accounts of one or more of the Island Auto Group, and may also have utilized the PPP funds to wrongfully pay their Professionals, instead of utilizing those funds lawfully for the benefit of the Plaintiffs.

301. At all times relevant hereto, the Attorneys knew and should have known of the Deos' interests as owners/members/stockholders of the corporate Plaintiffs.

302. At all times relevant hereto the Attorneys kept and maintained longstanding lucrative relationships with the Aaronson Defendants, providing ample incentive for the Attorneys to intentionally ignore multiple red flags with respect to the true owners and operators of the corporate Plaintiffs, the Deos.

303. MLLG and CSZ have filed lawsuits known herein as Actions 1 & 2 (as reflected in the Complaints attached hereto as Exhibits M & O); it is hereby specifically alleged that these two actions (Actions 1 & 2) are frauds upon the Courts in which they are and were filed and constitute on-going intentional interference with the Plaintiffs' businesses and business relations.

304. It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew and should have known that Actions 1 & 2 constitute frauds upon the Court.

305. It is hereby specifically alleged that at all relevant times, CSZ and MLLG and their attorneys/partners/members/employees knew and should have known that they had and have no authority to initiate or continue any litigation on behalf of any Plaintiff herein since the Deos obtained their ownership interests in the corporate Plaintiffs, February of 2021 for 189 Sunrise, and since the formation of NorthShore in November of 2017.

306. To that end, CSZ and MLLG are specifically instructed to abandon their representations of the corporate Plaintiffs herein, and to cease and desist from ever again representing any of the Plaintiffs going forward in time.

307. The within and other acts and omissions by these Attorneys constitute gross attorney malpractice, *per se* attorney malpractice, and breaches of the ethical rules and obligations for each of the attorneys who acted at relevant times purportedly for any of the within Plaintiffs absent proper due diligence and efforts made to determine ownership of the corporate Plaintiffs in light of the within allegations and the extremely important and revealing Exhibits hereto, beyond just undertaking representation of the corporate Plaintiffs on the mere words of the Aaronson Defendants.

308. Aside from the Lenders, Accountants and Attorneys named as parties hereto, it is unknown to the Plaintiffs herein whether or not other Professionals have in any way wrongfully impacted the Plaintiffs rights

and/or wrongfully caused the Plaintiffs damages, since all of the Defendants acted in a conspiracy to keep relevant information away from the Plaintiffs.

309. Upon information and belief, as with the named Lenders, Accountants and Attorneys herein, other Professionals have benefited from payments by the Aaronson Defendants and their companies in unknown amounts but not less than millions of dollars, so there is plenty of incentive for all Professionals, both known and unknown, whether a named party or not, to serve the Aaronson Defendants and the Island Auto Group even at the expense of ruining 189 Sunrise, NorthShore, and the Deos.

310. Both David Baron and Josh Aaronson made racist remarks to the Deos over the years, 189 Sunrise and NorthShore served as the Aaronson Defendants personal piggy banks and were drained of moneys by these Defendants extensively and expertly, upon information and belief, the Aaronson Defendants and/or their Island Auto Group companies benefitted from tax write offs due to the appearance of losses by 189 Sunrise and NorthShore expertly created by the Aaronson Defendants and their Accountants, so it is expected that additional Professionals will be witnesses and parties to this action, as necessary, over time, especially with respect to those professionals who worked for, with, or represented 189 Sunrise since February 2021 and NorthShore at any time since November 2017.

## J.   GENERAL ALLEGATIONS

311. Unlike the attached and other documentation on behalf of the Deos which proves that ownership of NorthShore rests with the Deos at relevant times

hereto via the initial incorporation of the business and obtaining the 1) corporate book, 2) EIN number (Exhibit A), 3) lease (Exhibit B), and 4) Josh Aaronson approved (Exhibit G) tax returns indicating ownership by the Deos (Exhibit H), the Aaronson Defendants cannot demonstrate ownership other than through their transparently false and fraudulent misdated documents attached as Exhibit Q.

312. The Aaronson Defendants in particular are unable to prove any consideration paid for obtaining NorthShore from the Deos, as nothing was ever paid to the Deos directly for their business, no transfer was ever approved nor authorized, no documents transferring the business were ever created or executed, no emails were created/exchanged indicating a change in ownership, and the only thing that the Aaronson Defendants ever did for the businesses directly was to provide arm's length Floor Plans carefully kept from the Deos and any Deo involvement, and for which the Deos paid the Aaronson Defendants from the business in ever increasing amounts under the threat of ruination from the Aaronson Defendants, a plan they eventually carried out.

313. All records indicating payments to the Aaronson Defendants directly for their Floor Plan provisions are in the exclusive possession, custody and control of the Aaronson Defendants and the Lenders, and the Aaronson Defendants have refused, to date, to turn over any of the documents they took when they wrongfully shuttered NorthShore and 189 Sunrise and wrongfully closed those businesses' accounts through and with the assistance of Chase.

314.  The lawsuits commenced by the Aaronson Defendants (Actions 1 & 2, Exhibits M & O are the Complaints in those Actions) are, like the documents attached as Exhibit Q, transparently false and brought as frauds upon those Courts:  For the Aaronson Defendants to be believed in their claims that they ever owned NorthShore or 189 Sunrise since the Deos bought same in February 2021, it is necessary to also believe that 1) in November of 2022, the Aaronson Defendants emptied their own profitable companies known as NorthShore and 189 Sunrise and left both locations permanently; 2) they sold off the automobiles from those locations at a loss without transferring those autos to another of their Island Auto Group businesses for a profit; and 3) the Aaronson Defendants left their own businesses and permanently shuttered and ruined their own businesses on purpose.

315.  Simply put, the allegations by the Aaronson Defendants in Actions 1 & 2 are and always have been false, especially considering that it is herein specifically alleged that with respect to the operation of 189 Sunrise and NorthShore, at all relevant times hereto it was the Aaronson Defendants, only, that completely controlled 100% of the companies' finances through the Positive Pay system and token system put in place by the Aaronson Defendants by and through Chase Bank.  The Deos did not and could not conduct or make any financial decisions impacting those businesses without the direct knowledge and approval, daily, of the Aaronson Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Aaronson Defendants, or that check would not be honored by Chase.

89

316.   Likewise, the Urrutia Defendants operated Superb with the same total control over the company's finances via their own token and texting systems put in place by the Urrutia Defendants by and through Chase Bank. Likewise, the Deos did not and could not conduct or make any financial decisions impacting Superb without the direct knowledge and approval, daily, of the Urrutia Defendants. If the Deos even wrote a check, it was necessarily known to and approved by the Urrutia Defendants, or that check would not be honored by Chase.

317.   In their zeal to ruin the Deos and their businesses, the Urrutia Defendants even arranged for Anthony Deo to receive a death threat from one of the Superb employees, co-Defendant Parmeshwar Bissoon, who, after speaking with one or more of the Urrutia co-Defendants, told Anthony Deo that he, Bissoon, would "pop" Deo and kill him if he ever sees Deo again for ruining Superb. Attached hereto as Exhibit V is a true and accurate copy of the written words utilized by Bissoon on behalf of the Urrutia Defendants threatening Anthony Deo's life; that text and other, spoken words lead directly to a restraining order to keep Bissoon away from Deo.

318.   In fact, none of the Plaintiffs are responsible for the Urrutia Defendants' choice to close all of their businesses; the Urrutia Defendants' businesses failed due to years-long abuses by these Urrutia Defendants in running their businesses into the ground, then falsely and fraudulently 1) taking money from the Deos, 2) trying to take even more money from the Deos, before 3)

90

Locking-Out the Deos and falsely accusing the Deos of theft that is not even possible given the Urrutia Defendants' control over all company finances.

319.  As Anthony Deo discovered upon taking over day to day operations at Superb during or about January 2023: Superb was in dire financial straits, Anthony Urrutia and other Urrutia Defendants including Bruce Novicky were Double Flooring cars, and Urrutia was taking money from Superb to try to save a Mitsubishi dealership in Hartford, Connecticut that he, Urrutia, ran into the ground and has subsequently lost back to Mitsubishi.

320.  With the help of the Deos, Superb's finances improved measurably during 2023 up to the Lock Out.

321.  Just as the Aaronson Defendants have had nearly two years to prove their false allegations of theft by the Deos set forth in their transparently false Complaints, so too, have the Urrutia Defendants now had more than a year to obtain documents or records to prove their own false allegations of theft by the Deos, yet all of the Defendants have completely failed to obtain or demonstrate any such wrongdoing by the Deos.

322.  Instead, it is the Deos who have attached extensive documentation attached to this Complaint that prove their allegations repeatedly throughout; the Exhibits attached hereto are hereby incorporated herein by reference.

323.  At all times relevant hereto, the Deos trusted and believed their business partners, the Aaronson Defendants and the Urrutia Defendants; their misplaced trust lead to the Deos being woefully harmed by these Defendants who, at all times relevant hereto, were lying and deceiving the Deos for the

91

purposes of defrauding the Deos of money and their businesses, and ruining the Deos and their businesses to prevent the Deos and their businesses from ever operating in the automobile dealership business again.

324.    At all times relevant hereto, the Lenders and Accountants and Attorneys had duties of care, contractual obligations, and fiduciary duties to the Deos and/or their businesses at issue, 189 Sunrise, NorthShore, and Superb.

325.    The Defendants herein have each committed one or more crimes and civil wrongdoings against each of the Plaintiffs herein.  Not all of the crimes and civil wrongdoings against the Plaintiffs are known to the Deos since at all times relevant hereto, these Defendants have acted deceptively and kept their actions, inactions, and wrongdoings hidden from the Plaintiffs, and kept the Plaintiffs' documents away from the Plaintiffs and refused to return any such documentation to the Plaintiffs.

326.    It is specifically alleged herein that the parties to the Baron Nissan transaction set forth in Exhibit F completed that transaction, and that the Deos are at least part owners thereof as set forth in the documentation attached as Exhibit F.

327.    The Aaronson Defendants are so underhanded in their handling of the instant situation that when they vacated 189 Sunrise and NorthShore and shut down both businesses and drained the accounts, they also prevented one or both of the businesses from continuing to pay for the then pregnant Sara Deo's health insurance, which they illegally stopped and cancelled without any required notices to Sara Deo.

92

328. At all times relevant hereto, these Defendants have engaged in a conspiracy against the Plaintiffs; each Defendant joined the conspiracy against the Plaintiffs as the Plaintiffs came into their lives. That conspiracy continues, daily, and is on-going against the Plaintiffs by and through, *inter alia,* 1) the fraudulent civil actions commenced against these Defendants and referred to as Actions 1, 2, & 3; 2) the Accountants taking no steps to correct any tax filings inconsistent with the within facts and continuing to play keep away from the Deos as owners of 189 Sunrise and NorthShore of all documents prepared and filed by those accountants for those businesses; 3) the Lenders who ruined the Plaintiffs' businesses (including Superb) and have ruined and continue to refuse to allow the Deos to remain in the automobile dealership business; and 4) the Attorneys who wrongfully conducted unauthorized representation of the corporate Plaintiffs and commenced transparently false Actions against the Plaintiffs for the sole purposes of making more money with the Defendants and continuing to dissuade the Plaintiffs from avoiding crushing fees and losses related to defending the fraudulent civil actions and being unable to re-open their own businesses.

329. Indeed, the named Attorneys herein have made multiple offers of settlement to the Plaintiffs that contain no demands whatsoever for money; rather, the Attorneys herein on behalf of the Urrutia and Aaronson Defendants merely want releases for their clients' actions to date, leaving the Plaintiffs ruined. There is not a shred of ethics or integrity in the conduct of

the Attorneys named herein in their actions purportedly for and against the Plaintiffs.

330.    At all times relevant hereto, the Defendants withheld information that should have been turned over to the Plaintiffs; withholding information herein both furthered the Defendants' wrongful purposes regarding the ruination and theft of Plaintiffs' businesses, but also served to keep information and documents away from the Plaintiffs that could have and would have alerted them to wrongdoing by the Defendants sooner. Simply put, the Defendants possess information and documents that they continue to keep away from the Plaintiffs at all times relevant hereto; likewise, one or more unnamed Professionals are also expected to possess information and documents unknown at this time to the Plaintiffs that is and shall become relevant to Plaintiffs case, requiring discovery thereof.

331.    The Aaronson Defendants committed gross and outrageous acts and omissions herein in conspiracy with all of the named Defendants herein, acts and omissions that offend the senses of all honest people, including, but not limited to: 1) utilizing the electronic log-in credentials of a dead man to drain and close the Plaintiffs' bank accounts with Chase for both corporate Plaintiffs; 2) stealing NorthShore from the Deos; 3) purposely failing to finish the documentation of the sale of 189 Sunrise to the Deos and surreptitiously misleading the Deos regarding their ownership interests therein; 4) creating and utilizing the transparently phony documents in Exhibit Q to steal the Plaintiffs' businesses, livelihood, and all bank accounts

94

with Chase; 5) stealing all pandemic relief funds (PPP) from both corporate Plaintiffs; 6) placing family members on payroll of one or more of the Urrutia and Aaronson dealerships to give the impression of paying employees when in fact the Defendants herein were engaged in a scheme to defraud the government of PPP funds by diverting and converting these funds to the Defendants herein; 7) committing wire fraud in the creation and transmission of the transparently phony documents in Exhibit Q; and 8) filing lawsuits against the Plaintiffs with false allegations of theft and ownership to continue to ruin the corporate Plaintiffs/competitors of the Defendants as their schemes unraveled and continue to ruin the livelihoods of the Deos thereby.

332.    At all times relevant hereto, the Aaronson Defendants not only wrongfully continued to act as the owners/stockholders of 189 Sunrise for their own benefit and the Deos' detriment after the February, 2021 purchase of 189 Sunrise by the Deos, but did so in part to force the Deos out of the lease of the Premises utilized for the operation of 189 Sunrise at 189 Sunrise Highway, Amityville, New York, for the Aaronson Defendants' own benefit; upon information and belief, immediately after forcing the Deos out of the Premises where 189 Sunrise operated via, *inter alia*, shuttering that business and its software and accounts, the Aaronson Defendants have now opened a new business at that location for their own benefit called Stream Auto Outlet.

333.    Demand is herein made to Chase to immediately restore the Deos' rights and access to the accounts for 189 Sunrise and NorthShore. Since November

95

2022, Chase has wrongfully and impermissibly prevented any access to those accounts by the Deos; it is and should be abundantly clear to Chase by and through this Complaint and all documents attached hereto that Chase has knowingly, negligently, intentionally, in breach of all agreements, in breach of Civil Rights laws, in breach of internal bank policies and procedures, and in breach of its fiduciary duties, wrongfully sided with the Aaronson Defendants over the use and access to these accounts and all documents associated with these accounts since June 16, 2020 for NorthShore, and since February 2021 for 189 Sunrise. Full restoration of the Deos' ownership and access to these accounts is necessary and an emergency; Chase's decision to lock-out the Deos from their own company accounts has produced devastating effects on the Deos and 189 Sunrise and NorthShore, and Chase needs to immediately rectify its serious mistakes and decisions relating thereto.

334. In addition, demand is hereby made to Chase to immediately return and provide (within 30 days of service of this Complaint) to the Deos as contracted owners/members/stockholders of all records in Chase's possession, custody or control regarding 1) daily use of Positive Pay and Tokens (including identification of each user for each use) by and for 189 Sunrise (since February 2021) and NorthShore (at any time since the accounts for NorthShore were opened in 2018); 2) daily use of Tokens and texts (including identification of each user for each use) by and for Superb (since November 2022); and 3) each and every use of David Baron's user

identifications, passwords, and electronic log-in credentials since May 2021 for 189 Sunrise and NorthShore accounts.

335. At all times relevant hereto, the Urrutia Defendants and the dealerships controlled by them and the Aaronson Defendants and the dealerships controlled by them engage in elaborate shell games with those businesses, sometimes to line the individual Defendants' own individual pockets, sometimes to make it appear as though one or more dealerships are losing money when they are not (to help through tax losses and deductions one or more of the dealerships), and sometimes to divert funds from one business to the benefit of one or more of the individual Defendants' other businesses.

336. E.g., during the Covid pandemic of 2020-2022, millions of dollars were obtained by the Aaronson Defendants and the Urrutia Defendants for their dealerships from the Paycheck Protection Program (hereinafter, "PPP") that were *not* spent as required under that program but were instead diverted for one or more of the Aaronson Defendants' or Urrutia Defendants' own individual benefit.

337. Included in the diverted funds by the Aaronson Defendants were millions of dollars obtained by the Aaronson Defendants (with the assistance of the Professionals) through the PPP program ostensibly for the benefit of Plaintiffs 189 Sunrise and NorthShore, but which were instead diverted for the benefit of one or more of the Aaronson Defendants or their Professionals and never given to 189 Sunrise or NorthShore or, in the alternative, stolen from the corporate accounts of 189 Sunrise and NorthShore.

97

338. Likewise, and upon information and belief, included in the diverted funds by the Urrutia Defendants were millions of dollars obtained by the Urrutia Defendants (with the assistance of the Professionals) through the PPP program ostensibly for the benefit of Superb, but which were instead diverted for the benefit of one or more of the Urrutia Defendants or their Professionals and never given to Superb or, in the alternative, stolen from the corporate account(s) of Superb.

339. The Aaronson Defendants' individual and business wealth significantly impacts every party hereto, including the Accountants, the Lenders, the Professionals, and other unnamed and unknown co-conspirators (the John and Jane Does referenced and sued without their names herein) with the Aaronson Defendants. Collectively, the Accountants, the Lenders, the Attorneys and other unnamed co-conspirators are hereinafter referred to as the Professionals.

340. Simply put, the Professionals are always happy to work with Billionaires like the Aaronson Defendants/businesses, as the Professionals make millions of dollars through the years working with Billionaires like the Aaronson Defendants/businesses. Whenever Billionaires like the Aaronson Defendants/businesses control any given situation through money, they can and do make people do whatever the Aaronson Defendants/businesses want, or, in the alternative, they will simply go out and pay someone else millions of dollars to do their Professional bidding. Thus, just as the Aaronson Defendants controlled the Plaintiffs through the Aaronson Defendants'

money, the Aaronson Defendants also entirely controlled the Professionals they work with through the millions of dollars the Professionals make off of doing the Aaronson Defendants' bidding, as those Professionals simply want to continue to make millions of dollars off of the Aaronson Defendants and their businesses even at the brutal cost of ruining the Plaintiffs' lives and businesses.

341. For the within and other reasons, these Defendants owe joint and several liability to these Plaintiffs.

342. With respect to breach of contract claims and unjust enrichment claims herein, the only valid express, explicit, and executed contracts between the Defendants and any of the Plaintiffs consist of 1) whatever documents were executed between Chase and Sara Deo upon the opening of the account(s) for NorthShore; 2) the contracts attached hereto as Exhibits I-1 and I-2 by and between Superb, Urrutia, and Anthony Deo; and 3) the Baron Nissan Purchase contract attached hereto as Exhibit F (and since the Defendants deny that Exhibit F is fully executed, then the money paid therefore is plead in the alternative, whether fully executed or consisting of unjust enrichment). All other agreements set forth herein are implied, only, as there are no valid, express, explicit, and executed contracts (hereinafter, "EEE Contracts") between any of the Defendants and any of the Plaintiffs otherwise; at most there are emails, documents, events, and writings that confirm the existence of implied agreements between Defendants and Plaintiffs herein, but not any EEE Contracts other than the within three (3) EEE Contracts.

99

343.  At the heart of this case is quite simply this:  The Greed of each and every Defendant hereto.

344.  At all times relevant since the shuttering of 189 Sunrise and NorthShore in November 2022 by the Aaronson Defendants, and at all times relevant hereto since the Lock-Out on August 3, 2023 by the Urrutia Defendants, the Urrutia Defendants and the Aaronson Defendants have defamed and slandered the Deos throughout the automobile industry; this intentional defamation and slander is designed to negatively impact the Deos forever more in the automobile industry on and around the greater NYC are, and has, in fact, done so, forever casting the Deos in an unfair, negative light to further ruin their livelihoods and businesses.

345.  Defendants are committing frauds upon the Courts in Actions #2 and #3, as more fully set forth herein.  Now that counsel for the Defendants in Actions #2 and #3 know of the frauds upon the Courts advanced by their clients in those Actions, those attorneys for those clients in Actions #2 and #3 have duties to withdraw their false and fraudulent Complaints in those actions pursuant to New York Disciplinary Rules 3.3(a)(1) and (3), and the Plaintiffs herein call upon counsel for the within Defendants in Actions #2 and #3 to withdraw their false, fraudulent, and frivolous Complaints from Actions #2 and #3 within thirty (30) days of service of this Third-Party Complaint.

346.  Now that counsel for the within Defendants know of the frauds stated by these Defendants in Actions #2 and #3, to continue to advance those

100

fraudulent Complaints from those Actions in light of the within facts and Exhibits does and will continue to constitute frivolous conduct in violation of New York Disciplinary Rules 3.1(a), 3.1(b)(1) and (3), and the Plaintiffs in this Action call upon counsel for the within Defendants as they appear in Actions #2 and #3 to withdraw those Complaints in Actions #2 and #3 within thirty (30) days of service of this Third-Party Complaint.

## COUNT I:  BREACH OF CONTRACT BY THE AARONSON DEFENDANTS

347.  Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

348.  At all times relevant hereto, the Aaronson Defendants impliedly and/or expressly agreed with the Plaintiffs to provide Floor Plan(s) by and from the Aaronson Defendants' other dealerships (as obtained by the Aaronson Defendants utilizing their Billion Dollar Worth by and through the Lenders) for the operation of 189 Sunrise and NorthShore for various fees and/or payments made directly to the Aaronson Defendants.

349.  At all times relevant hereto, the Aaronson Defendants also agreed with the Plaintiffs to provide all software necessary to operate 189 Sunrise and NorthShore.

350.  At all times relevant hereto since the Deos 1) formed NorthShore in November 2017; 2) obtained the corporate book for NorthShore in June 2018 (Exhibit U hereto); 3) obtained an EIN/tax identification number for NorthShore in November 2017 (Exhibit A hereto); 4) opened one or more bank accounts from Chase Bank in January 2018 (Exhibit C hereto); and 5)

101

entered into a lease for the operation of NorthShore in Syosset, New York (Exhibit B hereto), the Plaintiffs and Aaronson Defendants agreed that NorthShore belonged to the Deos as the sole shareholders/members; the multitude of excuses and lies told by the Aaronson Defendants to the Deos were entirely made to hide the Aaronson Defendants' illegal and wrongful takeover of the company and to also hide the Aaronson Defendants breaches of their Agreements to provide use of their Floor Plans and software for the benefit of NorthShore.

351. At all times relevant hereto, the Aaronson Defendants and the Deos referred to each other as "partners" since the Aaronson Defendants supplied the Floor Plans for a fee in assisting the Deos with the operation of their (the Deos') companies, 189 Sunrise and NorthShore.

352. At all times relevant hereto, the Aaronson Defendants utilized the agreements to provide use of their Floor Plans for the benefit of the Plaintiffs to completely control 100% of both companies' finances, and ultimately, the Aaronson Defendants wielded the Floor Plan agreement(s) as weapons to illegally and wrongfully obtain and maintain both ownership of 189 Sunrise and NorthShore as well as control of 189 Sunrise and NorthShore, long after NorthShore was opened and owned by the Deos (*see* Exhibits A, B, C, and U), and 189 Sunrise was purchased and the space leased by the Deos (*see* Exhibits D and E); *see also* confirmation of the Deos ownership of both corporations by the Aaronson Defendants in Exhibits G and H.

102

353. By and through the Floor Plan agreement(s) with and superior financial might over the Plaintiffs, the Aaronson Defendants 1) gained access to the physical locations of both Plaintiff corporations; 2) utilized the physical access to both Plaintiff corporations to control both companies' software, bank accounts, company documents, and company books; 3) placed Aaronson Defendants into employment and/or oversight positions in both companies to be their on-site eyes and ears so as to assist with such events as the Khan incident and the David Baron incident to further solidify the Aaronson Defendants' theft of both companies and their bank accounts; 4) obtained superior positions over the Plaintiffs in order to control all finances and Professionals providing services to the corporate Plaintiffs, leaving the Aaronson Defendants able to control the Plaintiffs fully upon the threat of shuttering the Plaintiffs' businesses; 5) obtained full control over the companies tax returns and documents to further their surreptitious takeover of both companies, taking over NorthShore since they filed tax returns prior to and then obtained the corporate book on June 16, 2020 and falsified documents that day to take over company accounts, and 189 Sunrise from the date of selling the company to the Deos (Exhibit D) without ever fully turning over ownership until fully admitting their theft by and through their approval of the tax returns indicating the Deos' ownership (Exhibits G & H); and 6) purposely avoided having EEE Contracts so as to control the situation without being bound by specific contractual positions and without alerting

103

the Plaintiffs to the thefts and fraud being perpetrated by the Aaronson Defendants.

354. At all times relevant hereto, Plaintiffs had a valid implied agreement for the Aaronson Defendants to provide a Floor Plan to NorthShore and 189 Sunrise.

355. At all times relevant hereto, the Aaronson Defendants agreed and were obligated to act in good faith and deal fairly with the Plaintiffs in providing the Floor Plans for 189 Sunrise and NorthShore.

356. At all times relevant hereto, Plaintiffs performed what was required of them under the implied agreements with the Aaronson Defendants: At all times relevant hereto, Plaintiffs 1) provided and operated corporations requiring Floor Plans in forming NorthShore and purchasing 189 Sunrise; 2) operated NorthShore and 189 Sunrise in good faith themselves; 3) hired and supervised all employees at NorthShore since its inception; 4) hired and supervised all employees at 189 Sunrise since its purchase by the Deos in February 2021; 5) allowed the Aaronson Defendants access to and placed/allowed one or more of them as additional signatories on bank accounts as demanded by the Aaronson Defendants (but to the detriment of the Plaintiffs); 6) agreed to positive pay and token security features on the corporate bank accounts as demanded by the Aaronson Defendants (but to the determent of the Plaintiffs); and 7) paid and overpaid large sums of money/good and valuable consideration (both willingly and unwillingly) to the Aaronson Defendants for the Floor Plans provided.

104

357. By and through the within and other acts and omissions, the Aaronson Defendants, each and every one of them, knowingly and intentionally breached all contractual obligations and agreements with the Plaintiffs in multiple ways, including, but not limited to, the following: 1) Each and every Aaronson Defendant knew and should have known of the illegalities, thefts, fraud, and wrongdoings committed as set forth herein by each and every other Aaronson Defendants, and conspired therewith to ignore and breach all agreements with the Plaintiffs; 2) Each and every Aaronson Defendant failed to act in good faith and deal fairly with the Plaintiffs; 3) Each and every Aaronson Defendant assisted in defrauding the Plaintiffs by being the eyes and ears of the other Aaronson Defendants and informing the other Aaronson Defendants of all acts by the Plaintiffs constantly and on-going, such as keeping the Aaronson Defendants informed as to the whereabouts of the Deos to assist in stealing from bank accounts, taking all company records and books, shuttering access to necessary software, and more; 4) Each and every Aaronson Defendant either outright assisted or intentionally ignored the bank account thefts and income tax fraud perpetrated on the Plaintiffs herein; 5) Each and every Aaronson Defendant knows and should know that the allegations made by the Aaronson Defendants in Actions 1 & 2 against the Plaintiffs herein are false, knowingly false, and perpetrated merely to engage in the "best defense is a good offense" strategy given what is set forth herein as supported by the Exhibits hereto; 6) Each and every Aaronson Defendant engaged in Cozy

105

Relationships with the Lenders, Accountants, and Professionals to flaunt and take advantage of their wealth so that the Lenders, Accountants, and Professionals always sided with their cash cows, the Aaronson Defendants, so that these outside businesses would conveniently and intentionally ignore red flags and outright wrongdoing to the Plaintiffs' detriment; 7) each and every Aaronson Defendant benefitted from and engaged in PPP theft from 189 Sunrise and NorthShore; 8) Each and every Aaronson Defendant engaged in a conspiracy with the Professionals named herein to defraud the Plaintiffs; and 9) Each and every Aaronson Defendant assisted in the November 2022 shuttering of 189 Sunrise and NorthShore, the stealing of the funds in their bank accounts during the shuttering, the stealing of the two companies' books and records, the theft of both companies' software, the removal and resale for intentional losses of the two companies' automobiles, and the pulling of the Floor Plans from further use at both companies.

358. By the direct and proximate acts and omissions set forth herein by the Aaronson Defendants as against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

359. By the direct and proximate acts and omissions set forth herein by the Aaronson Defendants as against the Plaintiffs, the Plaintiffs have lost their livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

360. By and through the filing of false and fraudulent lawsuits against the Plaintiffs, the Aaronson Defendants have each committed frauds upon the

106

Court, and further breached their agreements to provide Floor Plans and good faith and fair dealing to the Plaintiffs in providing the Floor Plans and other services to the Plaintiffs.

361. Each of the Plaintiffs bring this Count against each of the Aaronson Defendants.

WHEREFORE, by the within and other acts and omissions, the Aaronson Defendants have breached and continue to breach all contractual obligations and agreements with the Plaintiffs; such breaches have harmed and continue to harm the Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

## COUNT II: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS BY THE AARONSON DEFENDANTS AND THE PROFESSIONALS

362. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

107

363. At all times relevant hereto, NorthShore and 189 Sunrise had on-going business relationships with customers to sell them automobiles.

364. At all times relevant hereto, the Aaronson Defendants and the Professionals knew and should have known of the business and business relationships of the corporate Plaintiffs.

365. At all times relevant hereto, the corporate Plaintiffs maintained agreements/contracts, whether express or implied, with the Lenders, the Accountants, and the Attorneys (the "Professionals") in addition to the contracts and agreements by and between the Plaintiffs and Aaronson Defendants.

366. At all times relevant hereto, and while acting in conspiracy with each other and fully hiding information and documents from the Plaintiffs, the Aaronson Defendants and their Professionals both named and unnamed/ unknown to Plaintiffs herein, acted intentionally to interfere with and ruin the corporate Plaintiffs and the Deos' businesses, livelihoods, and on-going business relationships with customers and others by and including, but not limited to:  1) Cooperating in the shuttering of 189 Sunrise and NorthShore; 2) Cooperating in the pulling of Floor Plans from 189 Sunrise and NorthShore; 3) Preventing the Plaintiffs from obtaining their own Floor Plans for 189 Sunrise and NorthShore; 4) Turning in the DMV licenses required to operate 189 Sunrise and NorthShore; 5) Defrauding the Plaintiffs of their bank accounts; 6) Defrauding the Plaintiffs of all money in their bank accounts; 7) Defrauding the Plaintiffs of all PPP funds; 8) Stealing the

108

software required to run 189 Sunrise and NorthShore; 9) Filing fraudulent tax returns by and for the corporate Plaintiffs; 10) Stealing the corporate Plaintiffs; 11) Misappropriating monies paid by the Plaintiffs to the Aaronson Defendants and their Professionals; 12) Acting on behalf of the corporate Plaintiffs without any authority or approval from the Deos on behalf of the corporate Plaintiffs; 13) Wrongfully suing the Plaintiffs with Actions (1 & 2) that consist of frauds upon their respective Courts; 14) Disposing of automobiles without authority of the Plaintiffs; 15) Misrepresenting the true value of the corporate Plaintiffs' automobiles in disposing of those automobiles; 16) Stealing the Plaintiff corporations; 17) Fraudulently obtaining the corporate book of NorthShore and utilizing same to steal NorthShore; 18) Constantly and consistently lying to Plaintiffs; 19) Hiding books, records, and documents from Plaintiffs and refusing to return same upon multiple demands; 20) Utilizing Cozy Relationships to defraud the Plaintiffs; 21) Wrongfully and with malice reneging on all Floor Plans and preventing Plaintiffs from obtaining Floor Plans; 22) Ruining the Plaintiffs reputations in the automobile business; 23) Ignoring corporate policies herein when it involved the Plaintiffs, but doing anything and everything possible for the Aaronson Defendants even to the known detriment of the Plaintiffs in order to keep the Aaronson Defendants' lucrative business; 24) Acting blatantly racist towards the Plaintiffs; 25) Ignoring all ethical duties and obligations by the Professionals; 26) Ignoring all fiduciary duties held by all of the Defendants; and 27) Knowingly and intentionally refusing to review

109

the within and attached documentation in order to intentionally ignore information beneficial to the Plaintiffs and detrimental to the co-Defendants/co-Conspirators.

367. By the within and other acts and omissions, the Aaronson Defendants and the Professionals of their choosing knew and should have known of the staggering interference each of them committed in ruining Plaintiffs' businesses, livelihoods, and on-going business relationships with 189 Sunrise's and NorthShore's customers.

368. At all times relevant hereto, the Aaronson Defendants and their Professionals knew of the Plaintiffs' business relationships, including those with third parties and customers.

369. At all times relevant hereto, the Aaronson Defendants and their Professionals intentionally interfered with the Plaintiffs' business relationships, including those with third parties and customers.

370. At all times relevant hereto, the Aaronson Defendants and their Professionals acted with malice and acted illegally and wrongfully in interfering with the Plaintiffs' business relationships, including those with third parties and customers.

371. At all times relevant hereto, the Aaronson Defendants and their Professionals ruined and ended the Plaintiffs' business relationships, including those with third parties and customers.

372. In fact, by and through their intentional acts and omissions committed with malice at all times relevant hereto, the Aaronson Defendants and the

110

Professionals completely ended the Plaintiffs' businesses and ruined same for all time to come.

373. The Aaronson Defendants' and the Professionals' wrongful and illegal and fraudulent acts and omissions that constitute tortious interference with the Plaintiffs' business relations are on-going and have not ceased since theses Defendants commenced such acts and omissions in 2017 regarding NorthShore, and since February 2021 regarding 189 Sunrise.

374. Each of the Plaintiffs bring this Count against each of the Aaronson Defendants and their Professionals.

WHEREFORE, by the within and other acts and omissions, the Aaronson Defendants and their Professionals, including, but not limited to, the Accountants, Lenders, and Attorneys, have intentionally and tortiously interfered with and continue to interfere with all of the Plaintiffs' business relations; such interference is the direct and proximate cause of the Plaintiffs' harm stemming from such interference at all times relevant hereto; such interference caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is

111

necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

<u>COUNT III: BREACH OF CONTRACT BY THE URRUTIA DEFENDANTS</u>

375. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

376. At all times relevant hereto, the Urrutia Defendants impliedly and/or expressly contracted with the Plaintiffs on various agreements including, but not limited to the express agreements attached hereto as Exhibit I-1 and I-2, for which Anthony Deo transferred and paid to Anthony Urrutia monies/consideration that he, Deo, obtained and personally guaranteed for 49% of the outstanding stock in Superb.

377. At all times relevant hereto Deo met his obligations under the agreements attached hereto as Exhibits I-1 and I-2; Deo also acted in good faith and dealt fairly with Urrutia in all respects regarding Exhibits I-1/I-2 and Superb.

378. However, in various ways, Urrutia, acting in conspiracy with the rest of the Urrutia Defendants, violated and breached the agreements made with Anthony Deo and the corporate Plaintiffs including, but not limited to, as follows:

a) The Urrutia Defendants conspired to falsely accuse the Deos of theft of money;

b) The Urrutia Defendants conspired to falsely accuse the Deos of theft of automobiles;

112

c) Urrutia himself fraudulently induced Deo into the contracts attached as Exhibits I-1 and I-2 (and therefore breaching same from the outset) under false pretenses: the Urrutia Defendants never intended to do business with the Plaintiffs long term and apparently never intended to sell Deo two of the Urrutia Defendants' dealerships (Superb and Hartford Mitsubishi); the Urrutia Defendants conspired to get as much money as possible from the Plaintiffs, then conspired to blamed the Plaintiffs for their own mismanagement that caused the shuttering of two of the Urrutia Defendants' dealerships, Superb and Hartford Mitsubishi. This conspiracy was always intended to obtain money from the Plaintiffs only, as Urrutia was bleeding the Urrutia Defendants' two companies of money for their own benefit and needed infusions of cash to try to save both companies at the time that Morgan introduced Deo and Urrutia;

d) The Urrutia Defendants made false police reports regarding the theft of money and automobiles against the Deos as part of their plan to wrongfully Lock-Out the Deos from Superb;

e) The Urrutia Defendants continued to drain Superb of money for their own personal gains, and when Deo investigated the thefts, the CFO for Team Auto and the Urrutia Defendants was fired in an attempt to prevent Deo from discovering the true extent and involvement of the Urrutia Defendants' theft and breaches;

113

f) The Urrutia Defendants wrongfully shuttered Superb in a last-ditch and ultimately failed attempt to save the Urrutia Defendant's other company(ies); and

g) The Urrutia Defendants wrongfully commenced and still wrongfully maintain Actions 2 and 3 (Exhibits O and P hereto) as frauds upon the Court and upon the Plaintiffs herein.

379. As set forth in Exhibits I-1 and/or I-2, Anthony Deo promised to cross-collateralize the Superb acquisition by and through securing Urrutia by and through 189 Sunrise and NorthShore; at all times relevant hereto, just as Deo represented by executing Exhibits I-1 and I-2, he stood prepared and able and did, in fact, secure Urrutia by and through 189 Sunrise and NorthShore, the Deos' companies at the time that Exhibits I-1 and I-2 were executed and which remain so today.

380. Nonetheless, at all times relevant hereto, Urrutia worked in conspiracy with the co-Defendants in this action to shutter and ruin 189 Sunrise and NorthShore so as to try to place blame on the Plaintiffs by and through false allegations fully supported by the Urrutia Defendants in Actions 1, 2, & 3, when the loss and shuttering of the Urrutia Defendants own companies was always due solely to the mismanagement, poor decisions, and outright frauds committed by the Urrutia Defendants.

381. At all times relevant hereto, Deo kept Urrutia informed as to the 2023 events involving Superb, 189 Sunrise, and NorthShore, both verbally and in writings (*see, e.g.,* Exhibit L hereto).

114

382.  Urrutia, on the other hand, surreptitiously drained Superb of its monies for Urrutia's and his co-Urrutia Defendants' gain and benefits, shuttered Superb (and his Hartford, Connecticut dealership) and planned and executed the Lock-Out and Action #2 in conspiracy with all of the co-Defendants herein and with malice aforethought and in full breach of all agreements controlled by the Urrutia Defendants with any and all of the Plaintiffs. E.g., Urrutia specifically stole $250,000.00 from the Superb account(s) during July 2023, immediately before the Lock Out.

383.  By the direct and proximate acts and omissions set forth herein by the Urrutia Defendants as against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

384.  By the direct and proximate acts and omissions set forth herein by the Urrutia Defendants as against the Plaintiffs, the Plaintiffs have lost their livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

385.  Each of the Plaintiffs bring this Count against each of the Urrutia Defendants.

WHEREFORE, by the within and other acts and omissions, the Urrutia Defendants have breached and continue to breach all contractual obligations and agreements with the Plaintiffs; such breaches have harmed and continue to harm the Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal

115

damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

## COUNT IV: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS BY THE URRUTIA DEFENDANTS AND THE PROFESSIONALS

386. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

387. At all times relevant hereto, NorthShore, 189 Sunrise, and Superb had on-going business relationships with customers to sell them automobiles, and also had contracts and agreements with third parties including various Professionals.

388. At all times relevant hereto, the Urrutia Defendants and their Professionals knew and should have known of the business and business relationships of the corporate Plaintiffs.

389. At all times relevant hereto, the corporate Plaintiffs maintained agreements/contracts, whether express or implied, with the Lenders in addition to the contracts and agreements by and between the Plaintiffs and Urrutia Defendants.

116

390. At all times relevant hereto, and while acting in conspiracy with each other and fully hiding information and documents from the Plaintiffs, the Urrutia Defendants and their Professionals both named and unnamed/ unknown to Plaintiffs herein, acted intentionally to interfere with and ruin the corporate Plaintiffs and the Deos' businesses, livelihoods, and on-going business relationships with customers and others by and including, but not limited to: 1) Cooperating in the shuttering of 189 Sunrise and NorthShore and Superb; 2) Cooperating in the discontinuation and cancelling of Floor Plans for 189 Sunrise and NorthShore and Superb; 3) Preventing the Plaintiffs from obtaining their own Floor Plans for 189 Sunrise and NorthShore and Superb; 4) Turning in the DMV licenses required to operate 189 Sunrise and NorthShore and Superb; 5) Defrauding the Plaintiffs out of money in Superb's bank accounts; 6) Filing fraudulent tax returns by and for Superb; 7) Misappropriating monies paid by the Plaintiffs to the Urrutia Defendants and their Professionals; 8) Wrongfully suing the Plaintiffs with Actions (2 & 3) that consist of frauds upon their respective Courts; 9) Disposing of automobiles without authority of the Plaintiffs; 10) Misrepresenting the true value of automobiles in disposing of those automobiles and Double Flooring same; 11) Constantly and consistently lying to Plaintiffs; 12) Hiding books, records, and documents from Plaintiffs and refusing to return same upon multiple demands; 13) creating phony lists of automobiles and wrongfully utilizing same in Actions 2 & 3 and in false reports alleging wrongdoing by the Plaintiffs to the Nassau County Police

117

Department; 14) Utilizing Cozy Relationships to defraud the Plaintiffs; 15) Wrongfully and with malice reneging on all Floor Plans and interfering with the Plaintiffs' efforts to obtain further Floor Plans; 16) Ruining the Plaintiffs reputations in the automobile business; 17) Ignoring corporate policies herein when it involved the Plaintiffs, but doing anything and everything possible for the Urrutia Defendants even to the known detriment of the Plaintiffs in order to keep the Urrutia Defendants' perceived lucrative business; 18) Acting blatantly racist towards the Plaintiffs; 19) Knowingly and intentionally refusing to review the within and attached documentation in order to intentionally ignore information beneficial to the Plaintiffs and detrimental to the co-Defendants/co-Conspirators; and 20) NMAC, by and through one or more of its Representatives, intentionally interfering with an agreed upon deal by Anthony Deo to purchase an interest in the business known as Route 112 Mitsubishi.

391. During or about November 2022, after the Aaronson Defendants shuttered and ruined NorthShore and 189 Sunrise, Anthony Deo began looking to save his businesses and to work with new partners.

392. At that time, co-Defendant Morgan was working with and for Superb and introduced Anthony Deo to Urrutia, who at that time was spending large amounts of his time in Costa Rica and claimed, to Deo, that he wanted a partner to operate Superb since he, Urrutia, did not want to be hands-on at the site.

393. As is now known to the Plaintiffs, and upon information and belief, Morgan is and at all relevant times hereto has been close to both the Urrutia Defendants (Morgan was working with Urrutia and Superb when he introduced Anthony Deo to Urrutia in November 2022) and the Aaronson Defendants (Morgan worked with the Aaronson Defendants at and with several of the Aaronson Defendants' dealerships; Morgan was close at all relevant times with co-Defendant Wendy Kwun, a leading Aaronson Defendant).

394. Also upon information and belief, Morgan is an individual sanctioned by the New York Attorney General in one or more legal cases; his sanctions purportedly include banishment from the automobile business due to mistreatment of the poor and minorities.

395. Nonetheless, Morgan works in the automobile business; since November of 2022 Anthony Deo possesses knowledge that Morgan worked for and with Superb, the Urrutia Defendants, the Aaronson Defendants, and industry related businesses called Credit Forget It (now closed) and an automobile business called Select Dealer Services.

396. The Lock-Out was planned and executed by all of the Urrutia Defendants, but the main planners amongst the Urrutia Defendants were Urrutia himself, Novicky, and Morgan.

397. During the shuttering of Superb and the dissolution of its assets, Novicky and Morgan were the two main contributors to Urrutia's plan; they developed the fake list of automobiles they falsely alleged to the police that Deo

119

supposedly stole, and it was Novicky in particular who falsely accused the Deos of theft of monies when it was Novicky who controlled all company finances by and through the Token and Texting systems in place by and through Chase for the Superb account(s).

398.    By the within and other acts and omissions, the Urrutia Defendants and the Professionals of their choosing knew and should have known of the staggering interference each of them committed in ruining Plaintiffs' businesses, livelihoods, and on-going business relationships with 189 Sunrise's and NorthShore's and Superb's customers.

399.    At all times relevant hereto, the Urrutia Defendants and their Professionals knew of the Plaintiffs' business relationships, including those with third parties and customers.

400.    At all times relevant hereto, the Urrutia Defendants and their Professionals intentionally interfered with the Plaintiffs' business relationships, including those with third parties and customers.

401.    At all times relevant hereto, the Urrutia Defendants and their Professionals acted with malice and acted illegally and wrongfully in interfering with the Plaintiffs' business relationships, including those with third parties and customers.

402.    At all times relevant hereto, the Urrutia Defendants and their Professionals ruined and ended the Plaintiffs' business relationships, including those with third parties and customers.

120

403. In fact, by and through their intentional acts and omissions committed with malice at all times relevant hereto, the Urrutia Defendants and the Professionals completely ended the Plaintiffs' businesses and ruined same for all time to come.

404. The Urrutia Defendants' and the Professionals' wrongful and illegal and fraudulent acts and omissions that constitute tortious interference with the Plaintiffs' business relations are on-going and have not ceased since these Defendants commenced such acts and omissions beginning in November 2022.

405. Each of the Plaintiffs bring this Count against each of the Urrutia Defendants and their Professionals.

WHEREFORE, by the within and other acts and omissions, the Urrutia Defendants and their Professionals, including, but not limited to, their Accountants, Lenders, and Attorneys, have intentionally and tortiously interfered with and continue to interfere with all of the Plaintiffs' business relations; such interference is the direct and proximate cause of the Plaintiffs' harm stemming from such interference at all times relevant hereto; such interference caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such

121

other damages and amounts as this Court and/or the jury at trial may determine is

necessary and just.  Plaintiffs hereby demand a trial by jury on all counts/damages so

triable.

## COUNT V:  CIVIL ASSAULT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND THREAT TO MURDER AGAINST THE URRUTIA DEFENDANTS

406.    Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

407.    At all times relevant hereto, the Urrutia Defendants were headed by Urrutia, Novicky, and Morgan.

408.    Upon information and belief, and in order to gain the full support of all of the Urrutia Defendants and employees, Urrutia, Novicky and Morgan spread lies throughout the company about the Deos, especially Anthony Deo.

409.    It is unknown by the Plaintiffs the full extent of lies spread through the company by the Urrutia Defendants, but in response thereto, and with the full knowledge of and approval of the Urrutia Defendants, Parmeshwar Bissoon, one of the Urrutia Defendants herein, specifically threatened the life of Anthony Deo.  Attached hereto as Exhibit V is a true and accurate copy of the text(s) sent by Bissoon to Deo threatening his life.

410.    At all times relevant hereto, Bissoon's co-Defendants amongst the Urrutia Defendants incited him into making the threats he reduced to writing against Deo as attached in Exhibit V.

411.    At all times relevant hereto, the threats contained in Exhibit V constitute an assault and a threat upon the life of Anthony Deo.

122

412.    Specifically, the common meaning and understanding of the word "pop" in the culture of Bissoon, a young male, means and was meant as (to Deo) "shoot" with some type of gun or other weapon.

413.    At all times relevant hereto, the words, actions, and omissions from the co-Urrutia Defendants to Bissoon that caused Bissoon to make the statements contained in Exhibit V were made recklessly, intentionally, with malice, and with outrageous indifference to Deo and for Deo's safety.

414.    As a direct and proximate result in the conspiracy amongst the Urrutia Defendants to incite Bissoon and cause Bissoon to threaten Deo, Deo and his wife, co-Plaintiff Sara Deo, has been harmed and caused great anguish.

415.    Given the within accusations, the Bissoon threats, which resulted in an Order of Protection being issued for Deo and against Bissoon after investigation by one or more Police Officers and a Court of competent jurisdiction, are clearly part of a campaign by the Urrutia Defendants to intimidate the Deos and cause them real fear and mental anguish.

416.    As a direct and proximate result of the conspiracy amongst the Urrutia Defendants to incite Bissoon and cause Bissoon to threaten Deo, the Deos live in fear for their lives and await further threats and/or actual harm from the Urrutia Defendants daily.

417.    By and through the threat attached hereto as Exhibit V, the Urrutia Defendants intentionally threatened Anthony Deo.

418.    By and through the threat attached hereto as Exhibit V, the Urrutia Defendants took steps to actually harm Anthony Deo.

123

419.    By and through the threat attached hereto as Exhibit V, the Urrutia Defendants intentionally caused the Deos anguish and great mental harm.

420.    At all times relevant hereto, the Deos reasonably and did believe that the Urrutia Defendants were capable of carrying out the threat attached hereto as Exhibit V, and were capable of actually killing Anthony Deo as threatened in Exhibit V.

421.    At all times relevant hereto, and simply part and parcel of the greed exhibited throughout this Complaint, the Urrutia Defendants were and are capable of harming Anthony Deo, and were and are capable of actually killing Anthony Deo.

422.    By and through the threat attached hereto as Exhibit V, the Urrutia Defendants were imminently about to assault Anthony Deo, and were imminently about to kill Anthony Deo.

423.    At all times relevant hereto, the Urrutia Defendants intended to provoke and have provoked others to commit assault against Anthony Deo, to threaten the life of Anthony Deo, and to harm Anthony Deo, not just by and through Bissoon, but upon information and belief, others unknown to the Plaintiffs as well.

424.    At all times relevant hereto, the within threats were meant to intimidate both of the Deo Plaintiffs and were meant to cause the Deo Plaintiffs emotional distress; in fact, the within threats *did* intimidate the Deos and has caused them great emotional distress.  Simply put, the Deos now live their lives in fear that the next threat from the Urrutia Defendants will actually be

124

carried out, and they live in fear of unexpectedly meeting one or more of the Urrutia Defendants while going about their daily lives and having to face the possibility of being assaulted or even murdered.

425.    The within Count/claims are against the Urrutia Defendants for the harm caused by their assaults and threats to murder Anthony Deo and the intentional infliction of great emotional distress upon both Deos; said harm constitutes great mental anguish and fear within Anthony Deo and his wife, Sara Deo, who both make claim hereunder.

WHEREFORE, by the within and other acts and omissions, the Urrutia Defendants have intentionally and tortiously assaulted and threatened to murder Plaintiff Anthony Deo; the Urrutia Defendants have also intended and did, in fact, wrongfully inflict emotional distress upon the Deos hereby; such assaults, threats to murder and infliction of emotional distress are directly and proximately the cause of the Deos' harm, mental anguish, emotional distress and constant fear for their safety; such assaults and threats to murder Anthony Deo and infliction of emotional distress upon both Deos caused and continue to cause actual damages, nominal damages, and consequential damages to the individual Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as

125

this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

<u>COUNT VI: PROFESSIONAL MALPRACTICE BY THE ACCOUNTANTS</u>

426. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

427. The Accountants hereto, Citrin and RWC, performed services as accountants for the corporate Plaintiffs hereto, 189 Sunrise and NorthShore.

428. At all times relevant hereto regarding NorthShore, and at all times relevant since February 2021 regarding 189 Sunrise, the owners/members/stockholders of 189 Sunrise and NorthShore were the Deo Plaintiffs herein.

429. At all times relevant hereto, the Accountants knew and should have known that the owners/members/stockholders of 189 Sunrise and NorthShore were Anthony Deo and Sara Deo, only.

430. At all times relevant hereto, the Aaronson Defendants certainly knew of the within frauds and thefts, as they perpetrated same.

431. At all times relevant hereto, the Accountants knew and should have known of the frauds perpetrated by the Aaronson Defendants, as the Accountants were partners in committing the within frauds upon the Plaintiffs.

432. At all times relevant hereto, the Accountants owed duties of care to each of the Plaintiffs.

433. At all times relevant hereto, the Accountants owed fiduciary duties to each of the Plaintiffs.

126

434. Whether the Accountants knew of the frauds and intentionally ignored same, including but not limited to, the theft of 189 Sunrise by the Aaronson Defendants after the Deos purchased same, the theft of NorthShore by the Aaronson Defendants after the Deos opened same, and all of the fraudulent documents including tax returns prepared thereafter by the Accountants, or, if the Accountants somehow failed to conduct any diligence in verifying the owners and operators of these two businesses, the Accountants are liable for massive malpractice claims by, *inter alia,* 1) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as 189 Sunrise; 2) acting as 189 Sunrise's Accountants without authorization from the owners/members/stockholders thereof; 3) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as NorthShore; 4) acting as NorthShore's Accountants without authorization from the owners/members/stockholders thereof; 5) failing and refusing to correct the accounting mistakes and mistaken tax filings undertaken, prepared, and filed by the Accountants on behalf of 189 Sunrise; 6) failing and refusing to correct the accounting mistakes and mistaken tax filings undertaken, prepared, and filed by the Accountants on behalf of NorthShore; 7) cooperating with and assisting the Aaronson Defendants out of greed to keep their lucrative business as clients of the Accountants while simultaneously being part of the conspiracy to ruin the Plaintiffs herein; 8) intentionally ignoring multiple red flags that certainly did and should alert

127

the Accountants to the Aaronson's frauds and thefts; 9) assisting in the theft of the PPP funds from 189 Sunrise and NorthShore and benefitting therefrom either directly (by wrongfully taking some of those funds for themselves) or continuing to assist the Aaronson Defendants in stealing those funds from the corporate Plaintiffs and keeping the Billionaire Aaronson Defendants' business for Citrin and RWC, respectively; 10) violating their fiduciary duties to the Plaintiffs herein by committing the within frauds and utter failures to protect these Plaintiffs; 11) assisting the Aaronson Defendants in violating the Deos' Civil Rights; 12) violating every ethical and legal obligation as Accountants through their utter failures towards protecting the Plaintiffs herein and intentional ignoring the Aaronson Defendants' wrongdoing; 13) wrongfully manipulating the Aaronson Defendants' individual and corporate tax returns to assist in their frauds against the Plaintiffs; 14) wrongfully manipulating and failing to audit the Aaronson Defendants' financial statements to assist in their frauds against the Plaintiffs; 15) improperly maintaining records belonging to the Plaintiffs; 16) failing to detect the Aaronson Defendants' embezzlement and thefts from the corporate Plaintiffs; 17) purposely overbilling the Aaronson Defendants in conspiracy with the Aaronson Defendants and in gratitude from the Aaronson Defendants for the Accountants' intentionally ignoring the within frauds against the Plaintiffs, and for siding with the Aaronson Defendants at all relevant times herein; and 18) enabling the Aaronson Defendants tax evasion

128

and tax frauds as individuals, by and through their corporations, and by and through the corporate Plaintiffs herein.

435. At all times relevant hereto, the Accountants owed a duty of care and a fiduciary duty to these Plaintiffs in acting on behalf of the corporate Plaintiffs.

436. The within acts and omissions and fiduciary and ethical breaches materially deviate from accepted accounting practices and principles and professional standards, including all such standards promulgated by the American Institute of Certified Public Accountants.

437. The within acts, omissions, fiduciary breaches, frauds, and intentional ignorance constitute deviations from accepted accounting practices by these Accountants at all relevant times, and directly and proximately caused the Plaintiffs harm, while at simultaneously helping the Accountants keep the Aaronson Defendants as clients and benefitting those clients and the Accountants financially.

438. Plaintiffs Demand that the Accountants immediately provide to the Plaintiffs copies of all corporate records prepared at any time by or in the possession of any member, accountant, partner, stockholder, or associate of their firms on behalf of the corporate Plaintiffs.

439. Plaintiffs Demand that the Accountants immediately inform the Plaintiffs of the full identities (including names and work addresses) of each member, accountant, partner, stockholder, or associate of their firms who performed any work, filings, or services at any time for Plaintiff NorthShore, and who

129

performed any work, filings, or services for Plaintiff 189 Sunrise since February, 2021; details of work, filings, and services performed are also herein demanded, including all executed fee agreements purporting to refer to the corporate Plaintiffs in any way.

440. Plaintiffs Demand that the Accountants immediately provide to the Plaintiffs all billing records for NorthShore produced at any time and all billing records for 189 Sunrise produced at any time since February 2021 by or in the possession of any member, accountant, partner, stockholder, associate, or employee of either Defendant Accountant's firm.

441. Plaintiffs Demand that the Accountants immediately provide all written communications between any member, accountant, partner, stockholder, associate, or employee of either Defendant Accountant's firm and any Aaronson Defendant regarding NorthShore at any time and 189 Sunrise since February 2021.

442. Notice is hereby given that the Deos are the rightful owners/members/ stockholders of 189 Sunrise (since February 2021) and NorthShore at all times since its inception, and failure to respond to the within Demands within thirty (30) days of service of this Complaint shall be treated as additional acts of accounting malpractice herein at a minimum.

443. It is the specific intention of the Plaintiffs to sue each and every individual Accountant from RWC and Citrin who performed any work whatsoever for or on behalf of the corporate Plaintiffs herein at relevant times, but that the individual names of these Accountants are unknown to the Plaintiffs at this

130

time, as that information rests solely with the Defendants in this action and at all relevant times has been and continues to be wrongfully kept from the Plaintiffs herein by all of the Defendants, including the Accountants themselves.

444.    The within Count is brought on behalf of all Plaintiffs herein against Citrin and RWC.

WHEREFORE, by the within and other acts and omissions, the Accountants and each individual employed therein who performed work at relevant times for and on behalf of the corporate Plaintiffs have committed and continue to commit professional/accounting malpractice and malfeasance against the Plaintiffs; such malpractice and malfeasance has harmed and continues to harm the Plaintiffs in an on-going basis and continually; such malpractice and malfeasance is the direct and proximate cause of the Plaintiffs' harm stemming from such malpractice and malfeasance at all times relevant hereto; such malpractice and malfeasance have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

131

## COUNT VII: PROFESSIONAL MALPRACTICE BY THE ATTORNEYS

445. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

446. At various times related hereto, the Attorneys named herein (MLLG and CSZ) represented the corporate Plaintiffs hereto; the Defendant Attorneys represented NorthShore at various times since 2017, and the Defendant Attorneys represented 189 Sunrise at various times since February 2021, and the Defendant Attorneys represented Superb as various times since November 2022 (hereinafter, the "Relevant Representation").

447. During the Relevant Representation of the corporate Plaintiffs and Superb, the Defendant Attorneys also represented one or more of the purported owners/members/stockholders of the corporate Plaintiffs and Superb in various matters.

448. It is not known by the Plaintiffs which individual attorneys/partners/ associates/members from MLLG and CSZ represented the corporate Plaintiffs and Superb and/or purported owners/members/stockholders of the corporate Plaintiffs and Superb during the Relevant Representation.

449. However, the Plaintiffs herein do know that at no time did the Defendant Attorneys ever discuss representation of the corporate Plaintiffs and Superb or their purported owners/members/stockholders with any of the Deos, and at no time did the Defendant Attorneys obtain any permission from the Deos to undertake representation of the corporate Plaintiffs or Superb or the Deos as

132

the rightful owners/members/stockholders of the corporate Plaintiffs and partially Superb.

450. By the within and other acts and omissions, the Defendant Attorneys have committed and continue to commit malpractice, negligence, gross negligence, and negligence *per se* by (*inter alia*): 1) Failing to find and act upon the various red flags and other warning signs that the Aaronson Defendants and the Urrutia Defendants were defrauding the Plaintiffs; 2) Aiding and abetting the fraud committed by the Aaronson Defendants and Urrutia against the Plaintiffs; 3) Intentionally ignoring the fraud committed by the Aaronson Defendants and Urrutia Defendants against the Plaintiffs; 4) failing to conduct any diligence in verifying the owners/members/stockholders and operators of the corporate Plaintiffs and Superb; 5) conveniently siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as 189 Sunrise; 6) siding at all times relevant hereto with the Aaronson Defendants regarding the fraud perpetrated in stealing the corporation known as NorthShore; 7) siding at all relevant times with the Urrutia Defendants regarding the fraud perpetrated in stealing the corporation known as Superb; 8) cooperating with and assisting the Aaronson Defendants out of greed to keep their lucrative business as clients of the Attorneys while simultaneously being part of the conspiracy to ruin the Plaintiffs herein; 9) cooperating with and assisting the Urrutia Defendants out of greed to keep their lucrative business as clients of the Attorneys while simultaneously being part of the

133

conspiracy to ruin the Plaintiffs herein; 10) assisting in the theft of the PPP funds from 189 Sunrise and NorthShore and benefitting therefrom either directly (by wrongfully taking some of those funds for themselves) or continuing to assist the Aaronson Defendants in stealing those funds from the corporate Plaintiffs while keeping the Billionaire Aaronson Defendants' business for MLLG and CSZ thereby; 11) violating their fiduciary duties to the Plaintiffs herein by committing the within frauds and utter failures to protect these Plaintiffs; 12) assisting the Aaronson Defendants and Urrutia Defendants in violating the Deos' Civil Rights; 13) violating every ethical and legal obligation as Attorneys through their utter failures towards protecting the Plaintiffs herein while intentionally ignoring the Aaronson Defendants' and Urrutia Defendants' wrongdoing; 14) improperly maintaining records belonging to the Plaintiffs; 15) failing to detect and prevent the Aaronson Defendants' and Urrutia Defendants' embezzlement and thefts from the corporate Plaintiffs and Superb; 16) purposely overbilling the Defendants in conspiracy with the Aaronson Defendants and the Urrutia Defendants and in gratitude from the Aaronson Defendants and Urrutia Defendants for the Attorneys' intentionally ignoring the within frauds against the Plaintiffs, and for siding with the Aaronson Defendants and Urrutia Defendants at all relevant times herein; 17) enabling the Aaronson Defendants' and Urrutia Defendants tax evasion and tax frauds and all frauds set forth herein by the Aaronson Defendants and Urrutia Defendants individually, by and through their businesses/ corporations, and by and

134

through the corporate Plaintiffs and Superb; 18) failing to act in defense of the Plaintiffs given the acts and omissions set forth herein by all co-Defendants; and 19) acting carelessly and recklessly towards the Plaintiffs at all times relevant hereto.

451. At all times relevant hereto, the Attorneys owed a duty of care and a fiduciary duty to these Plaintiffs and Superb in acting on behalf of the corporate Plaintiffs and Superb and/or the purported owners/members/ stockholders thereof.

452. The within acts and omissions and fiduciary and ethical breaches materially deviate from accepted attorney practices and principles and professional standards.

453. The within acts, omissions, fiduciary breaches, frauds, and intentional ignorance constitute deviations from accepted attorney practices by these Attorneys at all relevant times, and directly and proximately caused the Plaintiffs harm including the loss of their business/businesses, while simultaneously helping the Attorneys keep the Aaronson Defendants and Urrutia Defendants as clients and benefitting those clients and the Attorneys financially.

454. Plaintiffs Demand that the Attorneys immediately provide to the Plaintiffs copies of all corporate records prepared at any time by or in the possession of any member, attorney, partner, or associate of their firms on behalf of the corporate Plaintiffs.

455. Plaintiffs Demand that the Attorneys immediately inform the Plaintiffs of the full identities (including names and work addresses) of each member, attorney, partner, or associate of their firms who performed any work, actions, or services at any time for Plaintiff NorthShore, and who performed any work, actions, or services for Plaintiff 189 Sunrise since February 2021; details of work, actions, and services performed are also herein demanded, including all executed fee agreements purporting to refer to the corporate Plaintiffs in any way.

456. Plaintiffs Demand that the Attorneys immediately provide to the Plaintiffs all billing records for NorthShore produced at any time and all billing records for 189 Sunrise produced at any time since February 2021 by any member, attorney, partner, associate, or employee of either Defendant Attorneys' firm.

457. Plaintiffs Demand that the Attorneys immediately provide all written communications between any member, attorney, partner, associate, or employee of either Defendant Attorneys' firm and any Aaronson Defendant regarding NorthShore at any time and 189 Sunrise since February 2021.

458. Notice is hereby given that the Deos are the rightful owners/members/stockholders of 189 Sunrise (since February 2021) and NorthShore at all times since its inception, and failure to respond to the within Demands within thirty (30) days of service of this Complaint shall be treated as additional acts of attorney malpractice herein at a minimum.

459. Furthermore, Notice is hereby given to the Defendant Attorneys as follows: The Defendant Attorneys are hereby reminded of their ethical

136

duties and are to immediately 1) cease and desist from any work or actions purporting to involve the representation of the corporate Plaintiffs or any purported owner/member/stockholder thereof; and 2) withdraw from any action in which the Attorneys claim to represent the corporate Plaintiffs or any owner/member/stockholder thereof. To be clear: No Attorneys named herein nor any of their members, attorneys, partners, associates, or employees have any authority to represent any of the Plaintiffs or anyone claiming any interest in the corporate Plaintiffs ever again.

460. It is the specific intention of the Plaintiffs to sue each and every individual Attorney from MLLG and CSZ who performed any work whatsoever for or on behalf of the corporate Plaintiffs and Superb herein at relevant times, but that the individual names of these Attorneys are unknown to the Plaintiffs at this time, as that information rests solely with the Defendants in this action and at all relevant times has been and continues to be wrongfully kept from the Plaintiffs herein by all of the Defendants, including the Attorneys themselves.

461. The within Count is brought on behalf of all Plaintiffs herein against each of the Attorneys working for MLLG and CSZ that performed work for any Plaintiff at relevant times, as well as against MLLG and CSZ as law firms.

WHEREFORE, by the within and other acts and omissions, the Attorneys and each individual employed therein who worked at relevant times on behalf of the corporate Plaintiffs and Superb have committed and continue to commit professional/attorney malpractice, negligence, gross negligence, negligence *per se*, and malfeasance

137

against the Plaintiffs; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance has harmed and continues to harm the Plaintiffs in an on-going basis and continually; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance is the direct and proximate cause of the Plaintiffs' harm stemming from such malpractice and malfeasance at all times relevant hereto; such malpractice, negligence, gross negligence, negligence *per se*, and malfeasance have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

### COUNT VIII: BREACH OF CONTRACT BY THE LENDERS

462. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

463. At various times relevant hereto, 189 Sunrise, NorthShore, and Superb maintained various express and/or implied agreements with the Lenders.

464. Specifically, the following express and/or implied agreements are at issue in this Count during the dates listed:

138

a) One or more agreements by and between NorthShore and Chase regarding all bank accounts in effect since about January 2018;

b) One or more agreements by and between NorthShore and Ally regarding all Floor Plans in effect from about August 2018 until about November 2022;

c) One or more agreements by and between 189 Sunrise and Chase regarding all bank accounts in effect since about February 2021;

d) One or more agreements by and between 189 Sunrise and NextGear regarding all Floor Plans in effect since about November 2022;

e) One or more agreements by and between 189 Sunrise and Ally regarding all Floor Plans in effect from about February 2021 until November 2022;

f) One or more agreements by and between Superb and Chase regarding all bank accounts in effect since about December 2022;

g) One or more agreements by and between Superb and NMAC regarding all Floor Plans in effect since about December 2022; and

h) One or more agreements by and between Superb and NextGear regarding all Floor Plans in effect since about December 2022 (paragraphs a-h, *supra*, hereinafter collectively refer to the "Lender Contracts").

465.    At all times relevant hereto, Superb, 189 Sunrise, and NorthShore obtained Floor Plans through the Lender Contracts from the Automobile Lenders; Superb, 189 Sunrise, and NorthShore obtained bank accounts through the Lender Contracts from Chase.

139

466.  At all times relevant hereto, the Lenders owed duties of care to Superb, 189 Sunrise, and NorthShore arising from the Lenders' contracts with Superb, 189 Sunrise, and NorthShore.

467.  At all times relevant hereto, the Lenders owed fiduciary obligations to Superb, 189 Sunrise, and NorthShore arising from the Lenders' contracts with Superb, 189 Sunrise, and NorthShore.

468.  At all times relevant hereto, the Lenders owed the obligations of good faith and fair dealing to Superb, 189 Sunrise, and NorthShore arising from the Lenders' contracts with Superb, 189 Sunrise, and NorthShore.

469.  At all times relevant hereto, the Lenders' duties of care, fiduciary duties, and obligations of acting in good faith and fair dealing were also owed to the Deos as they were relevant owners and/or members and/or stockholders of Superb (Anthony Deo, 49% since November 2022 via the contract attached hereto as Exhibit I), 189 Sunrise (Anthony and Sara Deo 100% since February 2021 via the purchase attached hereto as Exhibit D, the lease attached hereto as Exhibit E, and the confirmation of ownership by the Aaronson Defendants in Exhibits G and H) and NorthShore (Anthony and Sara Deo 100% since forming the corporation in November 2017; *see* Exhibits A, B, C, G, H and U).

470.  At all times relevant hereto, the Lenders knew or should have known of the Deos' ownership interests in the businesses known as Superb, 189 Sunrise, and NorthShore.

471.    At all times relevant hereto, the Deos individually and on behalf of and through their ownership interests in Superb, 189 Sunrise, and NorthShore fulfilled their obligations on all contractual agreements by and between the Deos, Superb, 189 Sunrise, and NorthShore on the one hand, and the Lenders on the other hand, including paying good and valuable consideration for the agreements and fulfilling their obligations thereunder as account/Floor Plan holders.

472.    At all times relevant hereto, and by and through the within and other acts and omissions, the Lenders, each and every one of them and their Representatives whether known and identified herein or not, knowingly and intentionally breached all contractual and fiduciary obligations, duties and agreements with the Plaintiffs in multiple ways, including, but not limited to, the following:  1) Each and every Lender and their Representatives knew and should have known of the illegalities, thefts, fraud, and wrongdoings committed by the Urrutia Defendants and Aaronson Defendants as set forth herein, and conspired therewith to ignore and breach all agreements with the Plaintiffs due to greed/making more money off of the co-Defendants than the Plaintiffs; 2) Each and every Lender and their Representatives failed to act in good faith and deal fairly with the Plaintiffs; 3) Each and every Lender and their Representatives either outright assisted or intentionally ignored the corporate thefts income tax fraud perpetrated on the Plaintiffs herein; 4) Each and every Lender and their Representatives failed to perform any diligence in confirming ownership interests in Superb, 189 Sunrise and NorthShore

141

before and during the contractual arrangements at the relevant times; 5) Each and every Lender and their Representatives sided with the co-Defendants in wrongfully shutting off the Plaintiffs' access to Floor Plans and bank accounts in conspiracy with and at the direction of the Urrutia and/or Aaronson Defendants, respectively; 6) Each and every Lender and their Representatives failed and refused to speak with the Deos when approached by the Deos to discuss the within; 7) Each and every Lender and their Representatives engaged in Cozy Relationships with other Lenders, and/or Accountants, and/or Urrutia Defendants, and/or Aaronson Defendants and/or Professionals to keep the extraordinarily wealthy co-Defendants and their businesses as customers at the expense and to the detriment of the Plaintiffs; simply put, the Lenders sided with the demonstrable Billionaires in shutting off the Plaintiffs from their rightful access to Floor Plans and bank accounts; 8) By and through wrongful conspiracy, Chase wrongfully allowed the Aaronson and Urrutia Defendants to steal from the accounts rightfully belonging to the corporate Plaintiffs and Superb, including theft of the PPP Pandemic Funds from 189 Sunrise, NorthShore, and Superb. At all times relevant hereto, Chase knew or should have known of these thefts, but instead, sided with the co-Defendants despite the Deos' complaints, and Chase outright sided with the co-Defendants in their draining and closing of the accounts that Chase knew or should have known rightfully belonged to the Plaintiffs; 9) Each and every Lender engaged in a conspiracy with the Professionals named herein and the Urrutia Defendants and/or Aaronson

142

Defendants to defraud the Plaintiffs; 10) Each and every Automobile Lender engaged in a conspiracy with either the Aaronson Defendants and/or the Urrutia Defendants in the November 2022 shuttering of 189 Sunrise and NorthShore, the fall 2023 shuttering of Superb, and the forced removal and resale for intentional losses of Superb's, 189 Sunrise's, and NorthShore's automobiles; 11) Each and every Lender and their Representatives wrongfully engaged in blatant racism towards the Deos at all relevant times by and through their Cozy Relationships with the Urrutia and Aaronson Defendants, their refusals to ever even dine with the Deos when the Lenders knew and should have known of their ownership interests in 189 Sunrise, NorthShore and Superb, and siding in all respects with the Aaronson Defendants and Urrutia Defendants in the ruination of the Deos' ownership interests in Superb, 189 Sunrise and NorthShore while also intentionally ignoring the Deos ownership interests and the co-Defendants blatant thefts and ruination of the Deos' companies; 12) Each and every Lender failed, refused, and continues to fail and refuse to allow access to the Plaintiffs on behalf of Superb, 189 Sunrise, and NorthShore to the information and documents relevant to these three (3) companies' accounts and contracts despite knowing or should knowing at all relevant times of the Deos' interests in 189 Sunrise, NorthShore, and Superb; and 13) NMAC affirmatively has interfered with the Deos' on-going business interests and queered an agreed upon deal for Deo to obtain an ownership interest in a business known as Route 112 Mitsubishi in Suffolk County, New York.

143

473.   At all times relevant hereto, the Aaronson Defendants utilized the Lender Contracts to provide Floor Plans for the benefit of the Plaintiffs to completely control 100% of 189 Sunrise and NorthShore, but in conspiracy with the Lenders and with the Lenders' knowledge and acquiescence, the Aaronson Defendants wielded the Lender Contracts as weapons to illegally and wrongfully obtain and maintain both ownership of 189 Sunrise and NorthShore as well as control of 189 Sunrise and NorthShore, long after NorthShore was opened and owned by the Deos (*see* Exhibits A, B, C, and U), and 189 Sunrise was purchased and the space leased by the Deos (*see* Exhibits D and E); *see also* confirmation of the Deos' ownership of both corporations by the Aaronson Defendants in Exhibits G and H.

474.   At all relevant times, the Lenders utilized Cozy Relationships to exclude the Deos from developing any relationships with the Lenders' Representatives, and as a weapon to stay close with the far wealthier Billionaires/Aaronson Defendants and the Urrutia Defendants, with whom the Lenders had long lasting, lucrative relationships with and wanted to extend at the cost of ruining the Deos' lives, livelihoods, and corporate co-Plaintiff businesses, NorthShore and 189 Sunrise.

475.   By the direct and proximate acts and omissions and breaches set forth herein by the Lenders against the Plaintiffs, the Plaintiffs have been and continue to be harmed.

476.   By the direct and proximate acts and omissions and breaches set forth herein by the Lenders against the Plaintiffs, the Plaintiffs have lost their

144

livelihoods and businesses, the corporate Plaintiffs and the Deos themselves have been and continue to be harmed and ruined.

477.    The within Count is brought by all Plaintiffs against all Lenders.

WHEREFORE, by the within and other acts and omissions, the Lenders have breached and continue to breach all contractual obligations, fiduciary obligations, and agreements with the Plaintiffs by and through their contracts with the Plaintiffs and Superb; such breaches have harmed and continue to harm the Plaintiffs in an on-going basis and continually; such breaches are the direct and proximate cause of the Plaintiffs' harm stemming from such breaches at all times relevant hereto; such breaches have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

<u>COUNT IX: CONSTITUTIONAL VIOLATIONS AND
CIVIL RIGHTS VIOLATIONS BY ALL DEFENDANTS</u>

478.    Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

145

479.  At all times relevant hereto, and upon information and belief, Sara Deo and Anthony Deo were the only partners of African and Caribbean descent to own automobile dealerships in the State of New York.

480.  Moreover, Sara Deo and Anthony Deo were two of only a handful of minority owners of any automobile dealerships on Long Island, New York.

481.  At all times relevant hereto, the Defendants knew and should have known of the Deos' status as minority owners of automobile dealerships.

482.  At all times relevant hereto, the Urrutia Defendants and the Aaronson Defendants acted as slaveowners and slavemasters in their treatment of the Deos.

483.  At all times relevant hereto, the Defendants violated the Plaintiffs rights to 1) Due Process in the illegal and wrongful taking of the Deos' money and personal property, including but not limited to, 189 Sunrise and NorthShore and all corporate assets thereof; 2) freedom from discrimination due to the Deos' race; and 3) be treated fairly and in good faith in their dealings with these Defendants.

484.  At all times relevant hereto, the Deos were treated as sub-humans by these Defendants.

485.  At all times relevant hereto, the Defendants put up an impenetrable Chinese Wall to prevent the Deos from discovering: the within frauds; conspiracies; embezzlements; thefts; PPP Pandemic Fund applications, diversions, and thefts; the within interferences; the secrets of controlling 189 Sunrise and NorthShore as purported owners; fraudulent tax returns and

146

filings for 189 Sunrise and NorthShore; incomplete sale and transfer of 189 Sunrise; incomplete sale and transfer of Baron Nissan and failure and refusal to return the Deos' payment therefore; secret removal of the Deos from all corporate bank and software accounts; sacrifice of 189 Sunrise's DMV license to operate as an automobile dealership; sacrifice of NorthShore's DMV license to operate as an automobile dealership; excluding the Deos from the Cozy Relationships between the Urrutia/Aaronson Defendants on the one hand, and the Professionals on the other hand; and wrongfully keeping all corporate records, documents, tax returns, software, and licenses from the Deos through the present.

486. Each and every Defendant hereto lied to the Deos either directly or through their acts, omissions, and intentional ignorance of the within wrongdoings by co-Defendants to mistreat the Deos without the Deos knowledge or detection.

487. Through the years, the Deos complained of the treatment, knowing something was wrong (e.g., never getting tax returns or related documents and instead being told endless lies about delays) but could not and did not detect or know that their entire lives and corporations were being looted and stolen from them.

488. When the Deos complained to the Urrutia Defendants or the Aaronson Defendants, they were met with a mixture of denials, misdirections, and/or threats from these Defendants.

489. E.g., whenever the Deos wanted their tax documents for either 189 Sunrise or NorthShore, they were delayed by the Aaronson Defendants and their Professionals, notably the Accountants and Lenders working in conspiracy with the Aaronson Defendants; indeed, to date, the Deos have none of 189 Sunrise's or NorthShore's or Superb's tax returns prepared for the Aaronson or Urrutia Defendants by their respective Professionals; the Deos only possess the tax returns that their own Professionals prepared, which are attached hereto as Exhibit H.

490. Over time, the Aaronson Defendants changed tactics, and became outright abusive to the Deos, threatening them, calling them "you people," outright refusing to allow the Deos to attend meetings, luncheons, dinners or parties with the Professionals, and taking aggressive actions such as the Khan incident, the David Baron incident, and the threats to shutter 189 Sunrise and NorthShore as eventually carried out during November 2022.

491. Likewise, the Urrutia Defendants mistreated the Deos based upon the color of their skin: Like the Aaronson Defendants, the Urrutia Defendants mistreated the Deos in the absence of any witnesses with such threats and comments as "you people;" the Aaronson Defendants also falsely and with malice reported the Deos to the Police on the night of the Lock-Out, falsely and with malice and blatant racism accusing the Deos of theft of more than one hundred (100+) automobiles which, to date, has never been proven by the Urrutia Defendants.

148

492. Startlingly, these accusations are not new to the Aaronson Defendants, the mistreatment of minorities through their automobile and lending businesses.

493. The Aaronson Defendants have all been involved in a lengthy list of cases alleging wrongdoing in the treatment of minorities like the Deos, including, but not limited to, the following, upon information and belief:

a) *Benjmain Lawsky v Condor Capital Corp, et al*, U.S. District Court, Southern District of New York, Docket No.14-cv-02863; this case alleged sub-prime stealing from the poor and minorities and resulted in fines and prohibition for multiple Aaronson Defendants from engaging in such lending again in the State of New York;

b) The Case of Credit Forget It (now closed), another company involving the Aaronson and/or Urrutia Defendants being fined in excess of $14 million for their treatment of minorities and their credit; this case involved the prohibition of Defendant Michael Morgan from working in the automobile industry, a prohibition he flaunts and ignores as he still works for and operates Select Dealer Services, and works for one or more of the co-Defendants' automobile dealerships (he was the individual that introduced Defendant Urrutia and Anthony Deo during or about November 2022); these businesses also utilizes Wendy Kwun as the manipulator of the financial records for these companies, as Kwun and Morgan have worked together in several automobile businesses over the years;

c) *Baron Auto Mall, et al.* (and other Baron owned and operated automobile dealerships) v. New York City Department of Consumer Affairs, and Jonathan Mintz, Commissioner of the New York City Department of Consumer Affairs, U. S. District Court (EDNY) docket number CV-07-3120; in this case, the Aaronson Defendants engaged in the "best defense is a good offense" strategy by suing the Department of Consumer Affairs in an ultimately failed attempt to prevent that department and its Commissioner from making decisions on the Aaronson Defendants' mistreatments of minorities and the poor;

d) A number of cases brought by minorities mistreated at dealerships owned and operated by the Aaronson Defendants including *Stidhum v. 161-10 Hillside Auto Ave*, U.S. District Court (EDNY) docket no. 21-cv-07163 AND 19-cv-1625; *Sosa, Ivanhoe v. 161-10 Hillside Ave Auto, LLC* New York (Queens) Supreme Court docket no. 720157/2022; *Manrique v. 161-10 Hillside Auto Ave LLC*, New York (NYC) Supreme Court docket no. 655970/2019; *Addaewusu v. NY Off Lease LLC*, New York (Bronx)

149

Supreme Court docket no. 811125/2022E; *Doe v. Long Island Motors, Inc.*, U.S. District Court (EDNY) docket no. 21-cv-1232; *Ebanks v. Ruiz, Rivera, Stream Auto Outlet*, U.S. District Court (EDNY) docket no. 22-cv-02350; *Harris v. Stream Auto Outlet*, U.S. District Court (EDNY) docket no. 21-cv-05027; *Terrero and Cruz v. Sunrise Auto Outlet d/b/a/ Baron Auto Emporium*, U.S. District Court (EDNY) docket no. 23-cv-03115; *Chattopadhyay v. Baron Auto Emporium*, U.S. District Court (EDNY) docket no. 21-cv-06695; and *Mignone v. Asad Khan and Best Auto Outlet*; New York Supreme Court (Nassau) docket no. 616848/2022; and

e) Recently, five Nissan Dealerships including Baron Nissan were fined on or about March 28, 2024, millions of dollars by the NYS Attorney General for cheating minority customers.

494. On one occasion in late 2021 or early 2022 while Defendants Josh Aaronson, Brian Chabrier and Wendy Kwun were meeting in the conference room at NorthShore (after the death of David Baron), Anthony Deo walked down the hall and overheard Brian Chabrier tell Josh Aaronson and Wendy Kwun about "how many niggers we screwed through Baron Auto Mall;" Wendy Kwun and Josh Aaronson just laughed. Deo went back to his office without alerting the Defendants that he heard their conversation.

495. On another occasion, Anthony Deo overheard David Baron on the telephone in the conference room saying to someone , "I bought my Westbury home with the funds we made off of those niggers." Again, Deo went back to his office without alerting the David Baron that he, Deo, heard the conversation.

496. Defendant Urrutia also made inappropriate racial comments to the Deos, on one occasion when the Deos were alone with Defendant Urrutia in an office at Superb, Urrutia commented that he "hates interracial marriages" as he spoke to the Deos (of two different races).

150

497. During the Khan incident, Asad Khan yelled at one point, "this is my dealership, and the Deos are my fucking niggers." The Khan incident was so upsetting to the Deos, that they obtained statements from the NorthShore employees present during at least some of his rants; attached hereto as Exhibit Y are true and accurate copies of incident reports obtained by the Deos after and relating to the Khan incident.

498. The Deos fumed over the within, yet felt helpless to do anything about it as the Aaronson Defendants and the Urrutia Defendants controlled all of both companies' finances, and the Aaronson Defendants not only threatened the Deos with the shuttering of their businesses, they actually did so on three separate occasions: The Khan incident, the David Baron incident, and the ultimate shuttering and permanent ruination of the businesses during November 2022.

499. Although the Urrutia Defendants did not threaten the Deos to the extent of the Aaronson Defendants, the Urrutia Defendants were sickening in their method for ridding themselves of the Deos: They said nothing to alert the Deos to their plan of the Lock-Out, which was obviously planned as the Urrutia Defendants and Defendant Novicky in particular gave the police a typed list of automobiles obviously prepared before the police were called. This list of over one hundred (100+) automobiles were allegedly "stolen by and sold off by the Deos" as the Urrutia Defendants alleged to the police on the night of the Lock-Out: The Urrutia Defendants literally told the police

151

(with absolutely no evidence through the date of the filing of this Complaint) that the Deos stole cars, a startlingly racist comment.

500. At all times relevant hereto, the Defendants acted intentionally, willfully, maliciously, oppressively, fraudulently, outrageously, and recklessly in their dealings with and crimes against the Deos and their corporate co-Plaintiffs.

501. Likewise, the Lenders violated endless state and federal laws, rules and regulations prohibiting racial discrimination in Lending; the Lenders refused to even meet with the Deos, failed and refused to ask the Deos their side of events before shutting the Deos' Floor Plans off, barring the Deos from their own bank accounts, and refusing to even eat a meal with the Deos during their Cozy Relationships with the uber rich, Caucasian co-Defendants by and through the Lenders' almost entirely Caucasian Representatives.

502. In August 2024, NMAC interfered with and queered an agreed upon deal with only paperwork left before Anthony Deo obtained an interest in a business known as Route 112 Mitsubishi. At all times relevant hereto, NMAC queered that deal knowingly and intentionally, and in reckless disregard for Anthony Deo's rights and business relationship established sufficiently to buy an interest in that business. This interference is blatantly racist in all regards, and was meant only hurt Anthony Deo directly and his wife, Sara Deo, indirectly.

503. The Accountants and Attorneys also violated extensive state and federal anti-discrimination statutes in their unethical and racially charged treatment of the Defendants: The Accountants and Attorneys never even spoke to the

152

Deos while representing the corporate Plaintiffs owned in all respects by the Deos; the Accountants and Attorneys utterly failed to inquire about and intentionally ignored the Deos' ownership of 189 Sunrise and NorthShore before undertaking representation thereof; the Accountants and Attorneys utterly failed to inquire about and intentionally ignored the Deos' ownership of 189 Sunrise and NorthShore after undertaking representation thereof; the Accountants and Attorneys breached all fiduciary duties in siding with the Aaronson and Urrutia Defendants during their representation of the Aaronson and Urrutia Defendants by and through their failures to detect and prevent the stunning frauds set forth herein (and possibly participated in the PPP Pandemic Relief applications, thefts and embezzlements by wrongfully taking money from that Fund for themselves); the Accountants and Attorneys failed to follow their own internal rules and policies and procedures in respecting minorities; and the Attorneys filed, pursued, and continue to pursue completely racist and fraudulent Actions 2 & 3 after dismissing the equally fraudulent Action 1 after that Judge (Gianellli, J.) ruled against the Aaronson Defendants regarding their specious claims and utterly vapid Order to Show Cause.

504. At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against the Deos on the basis of their race and national origin in violation of the United States Constitution.

505. At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against the Deos on the basis of

153

their race and national origin in violation of the 1964 Civil Rights Act, as amended.

506.    At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against the Deos on the basis of their race and national origin in violation of Title VI of the 1964 Civil Rights Act, as amended, by discriminating against the Plaintiffs by 1) by excluding the Plaintiffs, denying the Plaintiffs from participation in, denying the Plaintiffs the benefits of, and subjecting the Plaintiffs to discrimination under one or more programs and/or activities receiving Federal financial assistance including, but not limited to, all programs involving lending and/or banking with and for minorities; and 2) by excluding the Plaintiffs, denying the Plaintiffs from participation in, denying the Plaintiffs the benefits of, and subjecting the Plaintiffs to discrimination under one or more programs and/or activities receiving Federal financial assistance including, but not limited to, all programs involving Pandemic Relief Funds ("PPP") that should have been given to the Plaintiffs but which were instead wrongfully diverted and converted into monies for the Defendants and their families.

507.    At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against the Deos on the basis of their race and national origin in violation of the Due Process and Equal Protection Clauses of the United States Constitution.

508.    At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against and deprived the Deos of

154

their rights and property on the basis of 1) their race and national origin, and 2) in the absence of any legal ruling/law of the land or appropriate judgment of their peers in violation of the New York State Constitution, Article I, section 1.

509.  At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against and deprived the Deos of their rights and property in the absence of Due Process in violation of the New York State Constitution, Article I, section 6.

510.  At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against and deprived the Deos of their rights and property in violation of the equal protection clause of the New York State Constitution, Article I, section 11.

511.  At all times relevant hereto, and by the within and other acts and omissions, the Defendants discriminated against and deprived the Deos of their rights and property on the basis of their race and in violation of their civil rights under the New York State Constitution, Article I, section 11.

512.  At all times relevant hereto, the Defendants effectively subjected the Deos to involuntary servitude on the basis of their race and in violation of their civil rights under the United State Constitution, Thirteenth Amendment.

513.  The Defendants actions and omissions set forth herein that violated the Deos' State and Federal Constitutional Rights were, at all relevant times, intentional, knowing, egregious, outrageous, and the direct and proximate cause of the Deos' personal harms and loss of property set forth herein.

155

WHEREFORE, by the within and other acts and omissions, the Defendants have violated the Plaintiffs' Constitutional Rights as set forth in the United State Constitution and the State of New York Constitution by denying the Plaintiffs' rights to 1) Due Process; 2) Equal Protection under law; 3) be free from discrimination on the basis of their race and national origin; 4) be free from the wrongful taking of their property; and 5) be free from involuntary servitude. These Constitutional and Civil Rights violations have harmed and continue to harm the Plaintiffs in an on-going basis and continually; These Constitutional and Civil Rights violations are the direct and proximate cause of the Plaintiffs' harm stemming from such violations at all times relevant hereto; such Constitutional and Civil Rights violations have caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts and for all damages so triable.

### COUNT X:  CIVIL CONSPIRACY TO DEFRAUD, FRAUD, AND FRAUDULENT CONCEALMENT BY ALL DEFENDANTS

514.   Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

156

515. At all times relevant hereto since November 2017, the Deos were, are, and remain the owners/sole members/sole stockholders of NorthShore.

516. At all times relevant hereto since February 2021, the Deos were, are, and remain the owners/sole members/sole stockholders of 189 Sunrise.

517. The Deos formed NorthShore, obtained its EIN tax identification number, obtained the corporate book for NorthShore, opened the corporate bank accounts with Chase, and entered into the lease where NorthShore operated at 180 Michael Drive, Syosset, New York, during late 2017 and 2018 as set forth in Exhibits A, B, C, and U, hereto.

518. However, the Deos *never* transferred their ownership interests in NorthShore to anyone at any time for any reason nor for any amount of money or other consideration.

519. The Deos *never* executed any documents purporting to transfer their ownership interests in NorthShore to anyone at any time for any reason nor for any amount of money or other consideration.

520. At all times from the opening of NorthShore in 2018 through and including the day the Aaronson Defendants shuttered NorthShore in November 2022, NorthShore was solely operated by the Deos, albeit with the Aaronson Defendants in full control of the company's finances, which the Deos thought was acceptable given that the Aaronson Defendants were purportedly supplying one or more Floor Plans from their other dealerships.

521. Since the Deos always believed that the Floor Plans were somehow provided from one or more of the Aaronson Defendants' dealerships (notably

157

Baron Nissan, the Deos were always told), even in the face of total destruction of their companies, and without knowing the frauds that had been perpetrated upon them and their companies for years by the Aaronson Defendants in conspiracy with their co-Defendants herein, the Deos fully cooperated with the Aaronson Defendants and the Automobile Lenders herein in returning cars to the Aaronson Defendants after their companies were shuttered and ruined in November 2022; the Deos wrongfully believed, still, that the Floor Plans for NorthShore and 189 Sunrise were not their own company Floor Plans since the Aaronson Defendants lied so extensively about *everything* related to the ownership and operations of the two companies.

522.   In fact, the Deos never fully understood the full extent of the frauds committed upon them until 2024, when Chase provided documents to the Deos in Action #2; the execution of those documents and transmittal of these transparently phony documents carelessly proves the full extent of the Aaronson's fraud (*see* Exhibit Q compared in all respects to Exhibits C and R).

523.   The Deos purchased 189 Sunrise from the Aaronson Defendants during February 2021 and immediately entered into a lease for the operation of the business at 189 Sunrise Highway, Amityville, New York; Exhibit D proves the purchase of the corporation; Exhibit E proves that the Deos then entered into a lease for the Premises, which was at all times since known to the

158

Aaronson Defendants, who boldly and falsely claim otherwise in Actions #1 and #2 (Exhibits M and O).

524. The fraud committed by the Aaronson Defendants relating to 189 Sunrise is different than the fraud committed by the Aaronson Defendants with respect to NorthShore: With NorthShore, the Aaronson Defendants literally stole the corporation from the Deos before approving the tax returns in Exhibits G and H when it was no longer possible to continue the fraud by November 2022; with respect to 189 Sunrise, the Aaronson Defendants took the Deos money in February 2021, then did *nothing* else regarding the ownership transfer until approving the tax returns in Exhibits G and H.

525. On multiple occasions after the purchase of 189 Sunrise by the Deos (Exhibit D) and the Deos entering into a lease agreement with the owners of the property at 189 Sunrise Highway, Amityville, New York (Exhibit E), the Deos asked the Aaronson Defendants for 1) the software licenses/ agreements; 2) the DMV license; 3) closing documents; 4) the corporate book; and 5) tax documents, but were denied these documents and proofs each and every time that the Deos made their requests.

526. The Aaronson Defendants made repeated excuses for more than a year, always also threatened to shutter the businesses and pull all cars from the lots, but eventually, after non-stop requests from the Deos in the late summer of 2022, the Aaronson Defendants relented and allowed the Deos to prepare and file the tax returns for NorthShore and 189 Sunrise (*see* Exhibits G and H) as the first step in their exit strategy from 189 Sunrise and NorthShore.

527. By and during November 2022, the Aaronson Defendants committed their biggest frauds ever with respect to 189 Sunrise and NorthShore: They shuttered the businesses and took everything from those businesses needed to operate including all customer files, all software, all money from the accounts, all automobiles, and all licenses.

528. Undoubtedly upset, and upon learning that the accounts were cleaned out by the Aaronson Defendants (while illegally utilizing a dead man's electronic credentials), Anthony Deo complained to Josh Aaronson on the afternoon of November 18, 2022 that he, Deo, was going to go to the police if the money was not promptly returned; in response, Josh Aaronson signaled his intent to wipe out the Deos and their business interests; attached hereto as Exhibit W is a true and accurate copy of the threat that Josh Aaronson sent Anthony Deo as his response for getting caught stealing ("Anthony – unfortunately, this is about to get very ugly").

529. Deo went to the police on the morning of November 19, 2022, at 9:30 a.m.; the police contacted Josh Aaronson that morning and informed him that he would be arrested for stealing that money if he, Josh Aaronson, did not immediately return the money to Anthony Deo, who had just obtained that money with his own personal guarantee and unrelated to the Aaronson Defendants in every way.

530. But going to the police caused the Aaronson Defendants to then extend their fraud to the Courts: Immediately after the police forced the Aaronson Defendants to return the $735,000.00 Deo had just borrowed (that money is

160

*not* an issue herein since it was returned by the Aaronson Defendants then under threat of arrest; this theft is merely further evidence of the illegal lengths the Aaronson Defendants were willing to go to "get even" with the Deos for going to the police), the Aaronson Defendants commenced Action #1 as evidenced by Exhibits M and N hereto, actually claiming ownership of the two corporations *in Court filings as a fraud not only upon the Deos, but upon this Court as well, and utilizing this Court to shutter the Plaintiffs' businesses from the date they obtained their Order to Show Cause in December 2022 until this Court's Order was issued on June 15, 2023* (Exhibit N).

531.  Simply put, the Aaronson Defendants blatantly retaliated against the Deos for daring to stand up to them; the Aaronson Defendants were never going to allow that conduct from "their niggers."

532.  At all times relevant hereto, the Aaronson Defendants committed the within frauds in conspiracy with each Aaronson Defendant and each co-Defendant herein by various acts and omissions, some known and referenced herein, and undoubtedly some unknown at this time by the Plaintiffs due to the surreptitious, underhanded, deceitful, and fraudulent methods utilized by the Defendants in dealing with the Plaintiffs: 1) Josh Aaronson was the leader of the pack, and directed all fraudulent activity for the Defendants after the death of the original leader of the pack, David Baron; 2) Jory Baron and Ron Baron are in-laws through marriage with Josh Aaronson who, along with Raymond Phelan, Brian Chabrier, and Asad Khan, were partners in the

161

Aaronson illegal enterprises; these partners all knew and should have known of the frauds against the Deos and 189 Sunrise and NorthShore; these partners benefitted the most financially from the within frauds, notably the theft of all PPP monies from the Plaintiffs; 3) Marcello Sciarrino, Daniel Sullivan, Wendy Kwun, Iris Baron and the Estate of David Baron all benefitted from the frauds committed herein and assisted in not only the thefts of money from the Plaintiffs, but also assisted in stealing all documents from the corporate Plaintiffs and perpetuating lies to the Deos to assist their co-Aaronson Defendants in hiding the thefts from the Deos and misleading the Deos when confronted; Wendy Kwun in particular participated in the frauds involving tax returns, stealing all monies from NorthShore and 189 Sunrise, and the "approvals" attached hereto in Exhibit G; Iris Baron and the Estate of David Baron stole the monies advanced by the Deos to purchase Baron Nissan; 4) Baron Nissan, Island Auto Group, and the Aaronson Defendants other New York dealerships have all been utilized by the Aaronson Defendants as weapons in committing the within frauds. Specifically, these dealerships under the umbrella of Island Auto Group are worth one billion dollars or more ($1,000,000,000.00) and are wielded by the Aaronson Defendants to control the Professionals herein: Either the Professionals do what the Aaronson Defendants wanted done in fraudulently and intentionally ruining the Plaintiffs by and with forced ignorance of the Professionals, or the Aaronson Defendants will simply get some other Professional to take millions of dollars to do the Aaronson Defendants'

162

bidding; each of the Professionals did the Aaronson Defendants' dirty work in ruining the Plaintiffs and preventing the Plaintiffs from remaining in the automobile dealership business; 5) Likewise, even the Urrutia Defendants joined with the Aaronson Defendants and all of the Professionals in making false and fraudulent claims against the Plaintiffs herein in Actions 2 and 3 (and committing frauds upon each of those two Courts, including this Court), and also in defrauding the Deos out of their investment in Superb, and utilizing the Automobile Lenders as weapons to further ruin the Plaintiffs in pulling automobiles and recalling automobiles from the lots of Superb, 189 Sunrise and NorthShore; and 6) Chase absolutely intentionally ignored multiple red flags of the Aaronson Defendants illegal acts and omissions, intentionally refused to consider the Deos' claims or documents when presented by the Deos, knowingly and intentionally permitted the thefts of all corporate Plaintiffs' monies from 189 Sunrise's and NorthShore's accounts, and at the Aaronson Defendants' direction Chase locked the Plaintiffs out of their own accounts to this day.

533.    The Defendants fully planned to steal from the Plaintiffs and ruin the Plaintiffs either to obtain money directly and wrongfully from those Plaintiffs or, in the case of the Professionals, to continue to be paid lucratively by the Urrutia and Aaronson Defendants by continuing to do those Defendants' bidding and/or feign ignorance of those Defendants illegalities as set forth herein.

163

534. At all times relevant hereto, and upon information and belief including the way the Urrutia Defendants acted after the Deos invested in Superb in late 2022, the Urrutia Defendants lead by Urrutia himself fraudulently induced the Deos into making the investment that the Urrutia Defendants never intended to let the Deos benefit from their bargain in making the investment.

535. Indeed, just weeks before the Lock-Out, the Deos were approached by the Urrutia Defendants by and through Urrutia and were asked for even more money; if they had been able to give Urrutia more money at that time, that money would now be gone, too.

536. At all times relevant hereto, the Defendants acted by Agreement and with full knowledge/intentionally in conspiring to defraud the Plaintiffs and then each and every Defendant herein took one or more affirmative, deliberate acts to in fact defraud the Plaintiffs.

537. At all times relevant hereto, the Defendants explicitly committed to injuring and defrauding the Plaintiffs, who were, in fact, defrauded by the within and other fraudulent acts by these Defendants.

538. At all times relevant hereto, the Defendants acted with criminal intent to defraud the Plaintiffs and ruin the corporate Plaintiffs' business and the Deos' lives; the Defendants were successful in all respects in executing their planned fraud and ruination of the corporate Plaintiffs and the Deos' lives and livelihood.

539. At all times relevant hereto, the Deos worked at and for 189 Sunrise and NorthShore; Sara Deo performed various duties in running these two

164

businesses including but not limited to developing and implementing marketing strategies and leads for new customers; Anthony Deo ran the day to day operations of 189 Sunrise and NorthShore and performed a variety of tasks therefor.

540. At all times relevant hereto, the Defendants in carrying out their conspiracy to defraud the Plaintiffs not only stole the corporate Plaintiffs and eventually joined in illegally shuttering both businesses, but also ruined the Plaintiffs' livelihood and took away their income and jobs working and running their own businesses.

541. At all times relevant hereto, the Defendants knew that they were committing wrongs, but each continued to carry out the scheme through and including overt acts and assistance with or active participation in Actions 2 & 3.

542. The conspiracy and fraud are on-going at all times relevant hereto, and includes on-going failures and refusals to return documents, bank accounts, corporate records, customer lists, Floor Plans, monies paid by the Plaintiffs for various matters including the purchase of Superb and Baron Nissan; customer deal jackets and their contents, Floor Plans and licenses, all belonging to the Plaintiffs.

543. The within and other frauds and conspiracies to defraud the Plaintiffs have devastated the Plaintiffs and their businesses and caused real, gigantic, and long-lasting/on-going harm including but not limited to the complete ruination of the businesses and the Deos personal lives, including the loss of

165

hundreds of millions of dollars, the Deos' home being foreclosed upon imminently, their temporary residence/landlord evicting the Deos, the ruination of the Plaintiffs and their reputations in the automobile industry, the loss of the Deos' jobs and the shuttering of the corporate Plaintiffs.

544. Each of these Defendants over time, including the corporate Defendants by and through their various Representatives and/or co-Defendants, made multiple materially false representations to the Plaintiffs; the Plaintiffs relied and reasonably relied thereon; the representations were at all relevant times false, knowingly false, and intended to carry out the within frauds, thefts, and embezzlements; and the false representations as relied upon and reasonably relied upon by the Plaintiffs caused immeasurable damages to the Plaintiffs.

545. At all times relevant hereto, the Defendants had and maintained various duties to reveal to the Plaintiffs the within frauds and concealments, but instead knowingly and intentionally refused to reveal the within to the Plaintiffs, further damaging and increasing the damages suffered by the Plaintiffs thereby.

546. In every way possible, the within conspiracy to commit fraud, actual frauds committed, and the fraudulent concealment thereof was the direct and proximate cause of the Plaintiffs' harms.

547. At all times relevant hereto, the Defendants acted jointly and severally in committing the within frauds, fraudulent concealments, thefts, and embezzlements.

166

548.    At all times relevant hereto, the Defendants acted in conspiracy in committing the within frauds, fraudulent concealments, thefts, and embezzlements.

549.    The Defendants further acted in conspiracy to conduct Actions #1, #2, and #3 in bald faced attempts to (again) utilize the power of their staggering financial might as collective Billionaires to force the Plaintiffs to acquiesce and give up the within claims, just as these Defendants conspired to defraud these Plaintiffs and force them to acquiesce to the Defendants' superior positions to the Plaintiffs at all times relevant hereto.

550.    At all times relevant hereto, the Defendants knowingly and intentionally possessed common objectives in carrying out the within crimes and civil wrongdoings:  The Defendants were each driven by greed, each profited either directly from the within crimes or, as with the Professionals, indirectly by keeping the Aaronson Defendants' and Urrutia Defendants' lucrative accounts.  The Urrutia Defendants and Aaronson Defendants were, at all times relevant hereto, also driven not just by greed, but also in eliminating the Plaintiffs as competitors in the automobile dealership industry.

551.    At all times relevant hereto, the corporate co-Defendants including, but not limited to the Professionals and all of their Representatives, acted with at least reckless indifference to the frauds, fraudulent concealments, and conspiracies to commit frauds set forth herein as perpetrated by the Aaronson Defendants and the Urrutia Defendants.

167

WHEREFORE, by the within and other acts and omissions, the Defendants acted in conspiracy to commit fraud against the Plaintiffs, did commit fraud against the Plaintiffs, and did engage in fraudulent concealment against the Plaintiffs; these Defendants each continue to be unjustly enriched by the within conspiracy to defraud, actual frauds committed, and fraudulent concealments; the harms caused to the Plaintiffs are the direct and proximate result of these Defendants' wrongful conspiracy to commit fraud, actual frauds committed, and fraudulent concealments thereof; such frauds and their harms to the Plaintiffs are on-going, caused and continue to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

## COUNT XI: UNJUST ENRICHMENT AGAINST ALL DEFENDANTS EXCEPT THE URRUTIA DEFENDANTS

552.  Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

553.  There are only three (3) EEE Contracts existing between any Plaintiffs and any Defendants herein: 1) whatever documents were executed between Chase and Sara Deo upon the opening of the account(s) for NorthShore

(these documents were stolen by the Aaronson Defendants when they emptied and shuttered NorthShore at the end November 2022); 2) the contracts attached hereto as Exhibits I-1 and I-2 by and between Superb, Urrutia, and Anthony Deo; and 3) the Baron Nissan Purchase contract attached hereto as Exhibit F.

554. Since the Defendants deny that Exhibit F is fully executed (and as set forth *supra* and *infra,* Plaintiffs allege that Exhibit F *is* fully executed or, in the alternative, at least partially executed sufficient to have stepped into the then shoes of David Baron at Baron Nissan), then for all purposes of unjust enrichment, the obligations and money paid by the Plaintiffs for Baron Nissan are also plead in the alternative as unjust enrichment by Baron Nissan and the Aaronson Defendants (and since the Defendants deny that Exhibit F is fully executed, then the money paid therefore is plead in the alternative as unjust enrichment by Baron Nissan and the Aaronson Defendants, especially the Estate of David Baron and his surviving spouse, Defendant Iris Baron).

555. All other agreements set forth in the Complaint are implied, only, as there are no valid, express, explicit, and executed contracts (hereinafter, "EEE Contracts") between the Defendants and the Plaintiffs as alleged by the Plaintiffs herein other than the three (3) in this paragraph and also set forth previously (*supra*) in this Complaint.

169

556. The implied contracts referenced herein by and between parties hereto include, but are not limited to, the following:[3] All contracts and agreements 1) by and between the Lenders and 189 Sunrise and NorthShore (the Deos were the owners/members/stockholders thereof but are not a part of whatever contracts are claimed by the Lenders to exist); 2) by and between the Attorneys and 189 Sunrise and NorthShore (*Id.*); 3) by and between the Accountants and 189 Sunrise and NorthShore (*Id.*); and 4) by and between the Aaronson Defendants and 189 Sunrise and NorthShore (because the Aaronson Defendants carefully and intentionally avoided reducing agreements to writing in order to conceal their true acts and intentions in stealing the corporations at issue and the assets thereof). It is these relationships, along with the Baron Nissan contract attached hereto as Exhibit F (this unjust enrichment allegation regarding Baron Nissan is hereby specifically plead in the alternative, only, if the contract attached hereto is ultimately deemed a nullity by the Court as the Plaintiffs prefer to have that contract enforced, partially or fully) that are specifically the subject of this Count.

---

[3] While it remains the Plaintiffs' position that the implied contracts referenced herein are enforceable, the elements of unjust enrichment typically include a finding of no explicit contract in order to proceed under the quasi-contractual theory of unjust enrichment. The determination of whether a quasi-contractual claim such as unjust enrichment should be dismissed as duplicative looks only to whether there is "a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick. Inc. v Long Is. R. Co.*, 70 NY2d 382, 389 [1987]; *see also Georgia Malone & Co., Inc. v Rieder*, 86 A D3d 406, 408 [1st Dept 2011] noting that "unjust enrichment is a quasi-contract theory of recovery" and not whether plaintiff may recover under that contract; *see also Pressley v. Ford Models, Inc.*, Index No.: 653001/2016 New York Supreme Court, Sherwood, J., "where a valid and enforceable contract would ordinarily preclude quasi-contractual recovery but a bona fide dispute exists as to the existence or applicability of a contract, the plaintiff may proceed on both contractual and quasi contract theories" and the Plaintiffs herein are doing just that.

170

557. At all times relevant hereto, the Lenders, Accountants, and Attorneys knew or should have known of the frauds, corporate thefts, and embezzlements set forth herein and perpetrated by the Urrutia Defendants and the Aaronson Defendants against the Plaintiffs.

558. It is specifically the position of the Plaintiffs herein that the Lenders, Accountants, and Attorneys had to know (and therefore, were a part of the conspiracy, at a bare minimum through intentional ignorance, but certainly done for the reason of keeping their Cozy Relationships with the Billionaire Aaronson Defendants and the Urrutia Defendants) of the frauds, corporate thefts, and embezzlements set forth herein and perpetrated by the Urrutia Defendants and the Aaronson Defendants against the Plaintiffs.

559. However, there is no denying that the contracts purportedly entered into between the Lenders, Accountants, and Attorneys (except the EEE Contracts) with and for the corporate Plaintiffs were *not* valid contracts and cannot be valid contracts since at all relevant times, those contracts were not 1) seen by the Deos; 2) reviewed by the Deos; 3) given to the Deos at any time prior to or since "execution" of the contracts by the Aaronson Defendants and/or Urrutia Defendants; 4) reviewed by any Professional for the Deos; and/or 5) executed by the Deos.

560. Thus, the services performed/provided by the Lenders, Accountants, and Attorneys were provided in the absence of any valid written (EEE) contracts and are thus the subject of Unjust Enrichment claims hereunder.

171

561. Likewise, there were no valid written (EEE) contracts by and between the Aaronson Defendants and the Plaintiffs at any time relevant hereto, and thus, the monies made by the Aaronson Defendants in raping the corporate Plaintiffs are all also subject to the within Unjust Enrichment claims in the alternative to the within contract claims; *see fn 3, supra.*

562. Likewise, given that the Defendants claim that the Baron Nissan contract/ purchase is not complete (and the Plaintiffs claim that it is, at least with respect to David Baron's former interest in that company, if not fully completed), the claims against Baron Nissan, the Aaronson Defendants' various interests therein, and Iris Baron/the Estate of David Baron are also subject to the within Unjust Enrichment claims as an alternative to the primary Declaratory Judgment and Constructive Trust claims brought by the Plaintiffs in Count XII, *infra.*

563. At all times relevant hereto, the Defendants acted in conspiracy to unjustly enrich themselves at the Plaintiffs' expense, including, but not limited to, the following:

a) With the full cooperation of and in conspiracy with the Professionals and to satisfy all of the Defendants' limitless greed, the Aaronson Defendants embezzled and defrauded the corporate Plaintiffs of millions of dollars;

b) With the full cooperation of and in conspiracy with their own Professionals and to satisfy all of the Defendants' limitless greed, the Urrutia Defendants wrongfully and intentionally ruined, closed, and embezzled millions of dollars from Superb at the expense of Anthony

Deo in a (failed) attempt to save other businesses belonging to the Urrutia Defendants;

c) With the full cooperation of and in conspiracy with the Aaronson Defendants and Urrutia Defendants and to satisfy all of the Defendants' limitless greed, the Professionals named herein unjustly enriched themselves during the operation of and during and through the shuttering and ruination of Superb, 189 Sunrise, and NorthShore, all at the expense of and ruination of the Plaintiffs herein.

564. By and through the within and other acts and omissions, these Defendants unjustly enriched themselves each totaling unknown (to the Plaintiffs) millions of dollars in the absence of valid contracts with the Plaintiffs.

565. By the through the within and other acts and omissions, the within Defendants participated in the conspiracy to ruin and defraud the Plaintiffs, failed and refused to listen to the Deos pleas for help, and then unjustly enriched themselves and benefitted by millions of dollars wrongfully and unjustly taken from these Plaintiffs.

566. By and through the within and other acts and omissions, the within Defendants were unjustly enriched, at the Plaintiffs' expense, in ways set forth herein that it is against equity and good conscience to permit these Defendants from retaining the millions of dollars unjustly taken from the Plaintiffs that is sought to be recovered herein.

567. At various times relevant hereto, the Plaintiffs and the Defendants conducted business together in close business relationships; the Defendants

173

relied upon the on-going business relationships to gain the Plaintiffs' trust and induce the Plaintiffs into vulnerable positions that these extremely sophisticated but ill meaning Defendants took advantage of in all respects to unjustly enrich themselves by the within frauds and embezzlements.

568. At all times relevant hereto, the Plaintiffs reasonably relied upon the Plaintiffs acts and omissions mainly because it still appeared on the surface that the Deos were still the owner/operators of Superb (partially, but fully put into operational control by the Urrutia Defendants), 189 Sunrise, and NorthShore, and since these Defendants hid evidence of the wrongdoing and kept all evidence of the wrongdoings from the Plaintiffs.

569. It is particularly unjust that the Aaronson Defendants took the money from the Plaintiffs as set forth for the purchase of 189 Sunrise set forth in Exhibit D hereto, then wrongfully ruined that business and stole its money and all documents and software and vehicles needed to operate that business, but have now obtained and utilize that very same address (189 Sunrise Highway, Amityville, New York) for their own business today. That business and its ownership/operation by the Aaronson Defendants (who may be doing to another third party in that business what they did already did as set forth herein to the Plaintiffs regarding the withholding of contracts and other documentation while proceeding to conduct business with that third party in bad faith and unfair dealing in all respects) constitutes further unjust enrichment by the Aaronson Defendants as they should not even have that

space that they forced the Plaintiffs out of before opening a new dealership on the very same lot as the Plaintiffs.

570.   At the heart of this case is a massive conspiracy by the Defendants acting at all times herein in an on-going conspiracy to unjustly enrich themselves by and through stunning greed, outrageous fraud, and shocking thefts and embezzlements.

571.   This Count is brought by all Plaintiffs against all Defendants except the Urrutia Defendants, with whom the relationship is covered by an explicit contract.

WHEREFORE, by the within and other acts and omissions, the Aaronson Defendants and the Professionals, including, but not limited to, the Accountants, Lenders, and Attorneys, have been and continue to be unjustly enriched; such unjust enrichment is the direct and proximate cause of the Plaintiffs' harm stemming from such unjust enrichment at all times relevant hereto; such unjust enrichment caused and continues to cause actual damages, nominal damages, and consequential damages to the Plaintiffs in an amount to be determined at trial, but not less than two hundred million dollars ($200,000,000.00), and demand is herein made therefore; Demand is herein made for exemplary and punitive damages in an amount to be determined at trial, but not less than one billion dollars ($1,000,000,000.00), and demand is herein made therefore; Demand is herein made for all attorney fees, all costs, interest in the maximum amount allowed by law, and such other damages and amounts as this Court and/or the jury at trial may determine is necessary and just.  Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

## COUNT XII: DECLARATORY JUDGMENT, CONSTRUCTIVE TRUST AND INJUNCTIVE RELIEF AGAINST THE AARONSON DEFENDANTS

572. Plaintiffs restate and reallege each of the preceding paragraphs as if specifically re-written here.

573. Attached hereto and incorporated herein by reference are the Exhibits to this Complaint.

574. Specifically, Exhibit F is the subject matter of this Count by and for the Deos.

575. The Deos advanced hundreds of thousands of dollars to purchase and lease the business and space of the business known as Baron Nissan.

576. The Baron Nissan deal/contract was executed during May 2021, just days before David Baron died.

577. It is the specific position of the Plaintiffs/Deos herein that the contract attached hereto as Exhibit F is, in all respects, sufficiently executed with consideration paid that the Deos are the rightful owners of Baron Nissan since May 2021.

578. In the alternative, if for any reason the Court disagrees that the contract attached hereto is sufficiently executed for the Deos to be the owners of Baron Nissan since May 2021, then it is the position of the Plaintiffs/Deos herein that the contract is sufficiently executed such that the Deos then step into the position of David Baron as of May 2021 at Baron Nissan.

579. At all times relevant hereto, the Deos paid sufficient and actual consideration to complete the purchase of Baron Nissan as they actually paid more than two hundred seventy-five thousand dollars ($275,000.00)

176

therefore, *without any of those sums reimbursed to date.* To be clear, at all times relevant hereto, the Aaronson Defendants have kept the money paid by the Deos for Baron Nissan while simultaneously/conveniently (for the Aaronson Defendants) denying that the contract was complete.

580. Josh Aaronson relayed the refusal of the Aaronson Defendants to live up to or to "complete" (Aaronson's word) that contract during or about the fall of 2021, but definitely before leaving and ruining 189 Sunrise and NorthShore during November 2022.

581. The status of the contract attached hereto as Exhibit F gives rise to a *bona fide* justiciable and substantial controversy between the Aaronson Defendants and the Plaintiffs/Deos over the Deos' rightful ownership interests in Baron Nissan; at all times relevant hereto, the Deos advanced their own monies for that purchase and have, to date, been denied the fruits of their bargain by the Aaronson Defendants, who nonetheless kept that money without recourse for the Plaintiffs except by and through this Count.

582. With respect to Exhibit F, the Aaronson Defendants on one side and the Plaintiffs/Deos on the other side of the dispute leaves the parties with adverse legal interests as to the present and prospective obligations under that contract.

583. Thus, declaratory judgment serves a useful and necessary purpose in clarifying or settling the legal issues and justiciable controversy stemming from that contract, and would finalize the controversy and offer relief from the uncertainty caused by the Aaronson Defendants' actions and omissions

177

since the contract was executed and monies were obtained and paid by the Deos therefor.

584.    Specifically, the Deos demand that this Court determine and Order that 1) the Deos and/or Anthony Deo are/is the owner(s)/member(s)/stockholder(s) of Baron Nissan in all respects since May 2021; or, in the alternative, that 2) the Deos and/or Anthony Deo at least hold(s) the ownership position of David Baron with Baron Nissan as of and since the date of Exhibit F in May 2021.

585.    Plaintiffs specifically allege that the nature of the within wrongdoing by the Aaronson Defendants is a breach of the contract attached hereto as Exhibit F, or, in the alternative, fraud with respect to denying the completion or partial completion thereof.

586.    In the alternative, Plaintiffs demand that this Court impose a constructive trust on and for the operation of Baron Nissan moving forward so as to protect the Plaintiffs'/Deos' interests therein.

587.    At all times relevant hereto, the Aaronson Defendants were closely involved in a business relationship with the Deos such that there was a confidential, close, and arguably fiduciary relationship between the parties.

588.    At all times relevant hereto, the business known as Baron Nissan by and through its owners/members/stockholders promised the Deos that they were buying the corporation as set forth in the contract attached hereto as Exhibit F and known as Baron Nissan.

178

589.   At all times relevant hereto, that business and its assets/stock were transferred to the Deos by and through the contract attached as Exhibit F, yet the Aaronson Defendants have blocked and prevented the Deos from taking and securing their interests in Baron Nissan ever since the execution of Exhibit F; whether David Baron was acting in good faith or not (and committing yet another fraud against the Deos without intending to complete the contract himself), the Deos nonetheless relied upon the documentation presented hereto as exhibit F in paying real and valuable consideration in excess of two hundred seventy five thousand dollars ($275,000.00) therefor, the Deos reasonably relied upon the representations in the attached documentation as real and in good faith, and it is unconscionable and against public policy to not enforce that contract now/herein.

590.   At all times relevant hereto, the business known as Baron Nissan was transferred to the Deos by the attached Exhibit F, the Deos acted in good faith by executing that contract, the Deos believed that the Aaronson Defendants acted in good faith in executing that contract, and the Aaronson Defendants certainly took and kept the valuable consideration paid therefore by the Deos.

591.   Accordingly, the Deos demand that this Court clarify the rights and obligations of the parties pursuant to the contract, determine and Order that the Deos/Anthony Deo are the full owners of Baron Nissan or, in the alternative, determine and Order that the Deos/Anthony Deo stand in the

179

shoes of David Baron with respect to Baron Nissan as of the date of Exhibit F hereto.

592. If the Court cannot or does not declare that the Deos are fully or partially the owners/members/stockholders of Baron Nissan, then in the alternative, the Plaintiffs demand that the Court impose a constructive trust over Baron Nissan during the pendency of this action to prevent and enjoin the Aaronson Defendants from committing fraud, waste, or transfer of anyone's interests therein.

593. The Aaronson Defendants have otherwise been unjustly enriched by keeping the money paid by the Deos for Baron Nissan, the Deos should get the benefit of their bargain that has already been paid for in full.

594. In addition, Plaintiffs demand that a TRO and then a permanent injunction be issued and Ordered by this Court to protect the public from the Aaronson Defendants and their abject and outrageous greed and frauds exhibited throughout this Complaint as proven by the Exhibits hereto (and of course, there are more documents being kept from the Plaintiffs by the Defendants at all relevant times hereto).

595. Specifically, Plaintiffs demand that the Court enter an injunction against each and every Aaronson Defendant herein 1) preventing each Aaronson Defendant from ever working in the automobile industry in the State of New York ever again; 2) preventing each Aaronson Defendant from holding or obtaining any New York State Department of Motor Vehicles license to operate or own any automobile dealership in the State of New York ever

180

again; and 3) preventing each Aaronson Defendant from ever benefitting from an automobile dealership in the State of New York ever again.

596. The frauds committed and lead by the Aaronson Defendants set forth herein are not even completely set forth given the extent that all of the Defendants have gone to avoid speaking with or giving the Plaintiffs any documents relating hereto, and especially since the Aaronson Defendants wrongfully and in full conspiracy with their Professionals 1) took all business documents in shuttering 189 Sunrise and NorthShore; 2) locked the Plaintiffs out of their own bank accounts during the shuttering of 189 Sunrise and NorthShore; 3) locked the Plaintiffs out of their own software during the shuttering of 189 Sunrise and NorthShore; 4) withheld to date all documents created by the Professionals on behalf of the corporate Plaintiffs; 5) convinced the Lenders to cease doing business with the Plaintiffs; and 6) turned in to the NYSDMV the licenses necessary for the operation of 189 Sunrise and NorthShore despite the Aaronson Defendants desire to continue operating automobile dealerships at both locations (and, in fact, they are now operating such a dealership from one of those locations, Stream Auto Outlet from the location of 189 Sunrise Highway, Amityville, New York).

597. Simply put, the Aaronson Defendants are a danger to the public in their reckless, criminal, frauds perpetrated herein and previously throughout their criminal activities; the Plaintiffs have no documents to serve or service any customer of 189 Sunrise or NorthShore; the Plaintiffs do not even possess

181

their customer lists as they were entirely stolen by these Aaronson Defendants.

598. At all times relevant hereto the Aaronson Defendants have caused and continue to cause irreparable, egregious harm to the Plaintiffs; the Plaintiffs and the public will be further harmed by not granting the declaratory and injunctive relief demanded herein.

599. Accordingly, Plaintiffs also demand that this Court immediately determine and Order that the Deos are the rightful owners/members/stockholders of 189 Sunrise since February 2021 and NorthShore since its inception as a part of the imminent application/Order to Show Cause anticipated to be served and made herein upon the completion of service of this Complaint.

WHEREFORE, the Plaintiffs hereby demand that this Court determine, declare, and Order first in a TRO and then in a permanent injunction 1) that the Deos are the rightful owners of 189 Sunrise (since February 2021) and NorthShore since its inception; 2) that the Deos/Anthony Deo did fully purchase the business known as Baron Nissan; or, in the alternative, 2) that the Deos/Anthony Deo step into the shoes/interests of David Baron as of the date of Exhibit F hereto; if this Court fails or refuses to make an immediate determination via the Motion/Order to Show Cause expected to accompany herewith that the Deos/Anthony Deo is the full/partial owner of Baron Nissan, then in the alternative the Plaintiffs demand that this Court 1) deny any requests without prejudice to renew upon the completion of discovery; and 2) impose a constructive trust upon Baron Nissan on behalf of the Deos/Anthony Deo preventing and enjoining any fraud, waste or transfer of any of the business's assets other than in the normal course of business during

182

the pendency of the within litigation. Demand is also herein made for a TRO first, then a permanent injunction 1) forever banning the Aaronson Defendants from owning or operating or working in the automobile industry in the State of New York as a danger to the public interest; 2) Ordering the NYSDMV to immediately and permanently revoke any license obtained from the NYSDMV for the purpose of owning or operating any automobile dealership in the State of New York in the name of any Aaronson Defendant for any of their corporations. Demand is also herein made for such other relief as this Court and/or the jury at trial may determine is necessary and just. Plaintiffs hereby demand a trial by jury on all counts/damages so triable.

Dated: 9|4|24

Respectfully submitted,

Plaintiffs, by counsel,

Harry Thomasson, Esq.
3280 Sunrise Highway
Box 112
Wantagh, NY  11793
Tel. 516-557-5459
hrtatty@verizon.net

183

CERTIFICATION PURSUANT TO
22 NYCRR 130-1.1


I hereby certify pursuant to 22 NYCRR § 130-1.1-a that, to the best of my

knowledge, information and belief, formed after an inquiry reasonable under the

circumstances, the presentation of the instant papers and the contentions therein are not

frivolous as defined in 22 NYCRR § 130-1.1(c):


Dated: 9/4/24

HARRY R. THOMASSON
3280 Sunrise Highway
Box 112
Wantagh, New York, 11793
(516) 557-5459


184

## VERIFICATION

STATE OF NEW YORK )
                    ) ss.:

COUNTY OF NASSAU )

**ANTHONY DEO,** being duly sworn, deposes and says:

I have read the foregoing Verified Complaint, and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe it to be true.

The grounds of my belief as to all matters not stated upon my own knowledge are information provided to me from or contained in the file. I execute this Verification individually and as a member/stockholder on behalf of the Corporate co-Plaintiffs.

_____
ANTHONY DEO

Sworn to before me this
4th day of September 2024.

_____
Notary Public

HARRY ROGER THOMASSON
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02TH6068549
Qualified in Nassau County
My Commission Expires _____

## VERIFICATION

STATE OF NEW YORK )
                   ) ss.:
COUNTY OF NASSAU )

**SARA DEO,** being duly sworn, deposes and says:

I have read the foregoing Verified Complaint, and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe it to be true.

The grounds of my belief as to all matters not stated upon my own knowledge are information provided to me from or contained in the file. I execute this Verification individually and as a member/stockholder on behalf of the Corporate co-Plaintiffs.

_____
SARA DEO

Sworn to before me this
4th day of September 2024.

_____
Notary Public

> HARRY ROGER THOMASSON
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 02TH6068549
> Qualified in Nassau County
> My Commission Expires  2/9/26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------------------X

ANTHONY DEO, *et al.,*                                                  Index No.

                               Plaintiffs,

    -against-

RON BARON, *et al.,*

                            Defendants.
-------------------------------------------------------------------------------X

## SUMMONS AND VERIFIED COMPLAINT

Plaintiffs' Attorney:

Harry Thomasson, Esq.
3280 Sunrise Highway
Box 112
Wantagh, NY 11793
Tel. 516-557-5459
hrtatty@verizon.net

Lead Defendant:

RON BARON
98 Goose Hill Rd.
Cold Spring Harbor, NY 11724

And

10 Bancroft Ln.
Kings Point, NY 11024

Dated: Wantagh, New York
       September 4, 2024

                                   Plaintiffs, by Counsel,

                                   Harry Thomasson, Esq.