Case 2:23-cv-06188-JMW    Document 521-30    Filed 06/01/26    Page 1 of 287 PageID #: 15132

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HIGHWAY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                          Plaintiffs,  Case No.
          - against -         2:23-cv-6188
                          (JMW)COUNTY

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

                          Defendants.
-------------------------------------------------x

                Zoom Deposition

                January 7, 2026
                10:07 a.m.

     Deposition of Plaintiff, JOSHUA

AARONSON, pursuant to Court Order and

Notice, before Diana Mitchell, a Notary

Public of the State of New York.

*Rich Moffett Court Reporting, Inc.*

2

A P P E A R A N C E S:

SAGE LEGAL LLC

Attorneys for Plaintiffs Superb Motors,

Inc., Team Auto Sales, LLC and Robert

Anthony Urrutia

        18211 Jamaica Avenue,

        Jamaica, New York 11423-2327

BY:   EMANUEL KATAEV, ESQ.


CYRULI SHANKS & ZIZMOR LLP

Attorneys for Plaintiffs 189 Sunrise Highway

Auto LLC, Northshore Motor Leasing, LLC,

Brian Chabrier, Joshua Aaronson, Jory Baron,

Asad Khan, Iris Baron Representative of the

Estate of David Baron, all Hylan Blvd Auto

LLCs, 76 Fisk Street Realty LLC, 446 Route

23 Auto LLC and Island Auto Management, LLC

        420 Lexington Avenue, Suite 2320

        New York, New York 10170-0002

BY:   RUSSELL SHANKS, ESQ.

*Rich Moffett Court Reporting, Inc.*

3

A P P E A R A N C E S (Cont'd):

HARRY R. THOMASSON, ESQ.

Pro Se Defendant

    3280 Sunrise Highway

    Wantagh, New York 11793


CULLEN & DYKMAN, LLP

Attorneys for Defendant Flushing Bank

    333 Earle Ovington Boulevard

    Uniondale, New York 11553

BY:  ARIEL RONNEBURGER, ESQ.


WEIR, LLP

Attorneys for Defendant Libertas

Funding, LLC

    The Widener Building

    1339 Chestnut Street, Suite 500

    Philadelphia, Pennsylvania 19107

NOT PRESENT


ALSO PRESENT:
    ROBERT ANTHONY URRUTIA
    ANTHONY DEO
    SARAH DEO
    ALIVIA COONEY, Paralegal

4

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

5

J O S H U A    A A R O N S O N, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

THE COURT REPORTER:  Please state your full name for the record.

THE WITNESS:  My name is Joshua Aaronson.

THE COURT REPORTER:  Please state your address for the record.

THE WITNESS:  My address is 55 Oak Drive, Roslyn, New York 11576.

*          *          *

EXAMINATION BY

MR. THOMASSON:

Q    Good morning, Mr. Aaronson. My name is Harry Thomasson.  I am an attorney that's going to be taking your deposition this morning, and I have some questions for you.

Have you taken any drugs or medication today that you think would

6

render it difficult or impossible to understand my questions?

A       No.

Q       Do you think that you are able to understand my questions all right today?

A       Yes.

Q       Where did you go to high school, Mr. Aaronson?

A       Clarkstown North High School in Rockland County.

Q       Rockland County, New York?

A       Yes.

Q       Did you go to college after that?

A       I did, yes.

Q       Where did you go to college?

A       Syracuse University.

Q       Did you get a four-year degree there?

A       I did, yes.

Q       What is that degree in?

A       Human development and business.

7

Q       Did you go to any other schools besides Syracuse University after high school?

A       No.

Q       So you have one four-year degree; is that correct?

A       Correct.

Q       Do you have any professional licenses?

A       No.

Q       Do you have any professional training?

A       In regards to what?

Q       Have you been in the car business your whole life?

A       The majority of my working life, yes.

Q       So you came out of school and you got into something else, but eventually you got into the car business; is that right?

A       Correct.

Q       When did you get into the car business?

8

A      I believe 2001, 2002.

Q      What is your date of birth, sir?

A      6/9/76.

Q      So you got into the car business when you were about, give or take, 25 years old?

A      Sounds right.

Q      Since you got into the car business, have you been trained on anything?

A      I don't understand your question.  I'm -- I'm --

Q      Well, you haven't gone back to school at all this century, right?

A      No, but perhaps --

MR. THOMASSON:  Did somebody have an objection?

MR. KATAEV:  No.  Go ahead, sorry.

Q      But perhaps you've, nonetheless, been in a classroom where they were teaching something that you needed to know for the car business, have

*Rich Moffett Court Reporting, Inc.*

9

you had any type of training like that since you have been in the car business?

A    No.

Q    With regard to getting the degree that you received, did that include any classes or class work on accounting?

A    I don't remember.  I imagine I took an accounting class, but I don't remember.

Q    If you did, would it be safe to say you took probably just one to fill in a requirement?

A    I'm not sure but so...

Q    You have no present memory of taking any accounting classes; would that be safe to say?

A    Yes.  I believe I took an accounting class in college.

Q    Do you know what the other topics were that you took while you were in college?

A    I took a lot of classes in college.

*Rich Moffett Court Reporting, Inc.*

10

Q     Well, not including requirements, I'm talking about towards your degree, do you remember what types of classes they were?

A     They were based on my degree, human development.  Like I said, I took a lot of different classes in college.

Q     So did you take human-resource-type classes at all?

A     I don't remember.  It was over -- it was now over 30 years ago.

Q     So it was a general business degree?

A     No, no, human development.

Q     Which at Syracuse University is in the business category?

A     Retail was -- no, it's not in the business category, retail category.

Q     So it was in a category to assist with salesmanship?

A     I don't remember.

Q     Do you have any known difficulties with your memory, Mr. Aaronson?

11

A    No.

Q    So it's just a product of being at this point old information that you don't remember that; is that fair to say?

A    Correct.

Q    Do you know what a personal guaranty is, Mr. Aaronson?

A    Yes, I do.

Q    How would you describe a personal guaranty?

A    Depends on, you know, what you're guaranteeing, but you know, you're saying that you're going to take care of an obligation.

Q    Personally?

A    Yes, correct.

Q    I understand.

And that's something that you certainly have learned in the car business about personal guaranties, yes?

A    Correct.

Q    Do you own any dealerships at this time?

12

A        Yes, I do.

Q        What dealerships do you have an ownership interest in?

A        Several.

Q        Could you tell me their names?

A        Island Auto Group, which are nine dealerships in Staten Island.  I own three dealerships with d/b/a's of Stream Auto Outlet.  I own a dealership, Rockland Hyundai.  I own a dealership, Honda of the Bronx, and I own a dealership, Route 1 Jeep Chrysler Dodge Ram in New Jersey.

Q        I tried to keep track of the numbers there.  Would it be fair to say that you own about 15 dealerships?

A        Yeah, give or take, yes.

Q        Has that number changed over the years?

A        Yeah.  Yeah, obviously, yes.

Q        There have been other dealerships that you have owned as well; is that right?

*Rich Moffett Court Reporting, Inc.*

13

A       Yes.

Q       When did you obtain your first dealership?

A       I want to say around 2003.

Q       Do you remember what the name of that dealership was?

A       Baron Auto Mall in the Bronx.

Q       Were you married in 2003?

A       Yes.

Q       Is it fair to say that your wife's maiden name is Baron?

A       That is her maiden name, yes.

Q       So since 2003 you have obtained a number of dealerships; is that right?

A       Yes.

Q       Other than the 15 or so that you already named, including the Baron Auto Mall, are there any others that you remember owning that perhaps you don't still own?

A       Yes.

Q       What other ones would that be?

14

A       I also have Yonkers Auto Barn, that I mentioned, that I currently still own in Yonkers.  I own the Baron Auto Mall.  I no longer own my first dealership, which is Baron Auto Mall in the Bronx.  I no longer own Baron Auto Mall, which was in Yonkers.  I sold three other Kia dealerships I once owned and then sold.  I sold -- I had another, yeah, yeah, I owned a Baron Auto Mall in Long Island City.  I owned Hillside Auto Mall in Queens, Hillside Auto Outlet in Queens.  I believe that's all.  I have to, you know, I believe that's all.

Q       So would it be fair to say that you have now told me the names of all of the dealerships that you can remember having an ownership interest in yourself; is that fair to say?

A       Yeah, I had also Sunrise Auto Outlet, I just remembered that one, in Long Island.

Q       Any others that you can recall at this time?

15

A        No, there possibly is more, but I don't remember any.

Q        I understand.

A        Yeah, yeah, Yonkers Kia, I sold that, too.

Q        So you have had over 20 dealerships that you had an ownership interest in this century; is that correct?

A        That is correct.

Q        Could it be more than 25?

A        I don't believe so, no.

Q        So it's between 20 and 25 dealerships that you have had an ownership interest in this century; is that correct?

A        Sounds correct, yes.

Q        And would it also be correct to say that you owned no dealerships during the last century?

A        Yes.

Q        If your first dealership was --

A        Approximately, approximately,

16

approximately, approximately.

Q      Okay, I understand.

A      Yes.

Q      What role do you play at the dealership in terms of your hands-on work when you own a dealership; what do you do, how do you operate as an owner of a dealership?

MR. SHANKS:  Objection as to form.  He's mentioned 20 or so dealerships, are you referring to a specific dealership?

Q      Mr. Aaronson, I'm sorry, I still have Mr. Shanks on my screen.

Mr. Aaronson, have you held any title at any of these dealerships, other than as an owner?

A      Not that I am aware of, no.

Q      When you own a dealership, are you on the payroll, have you ever been on a payroll?

A      I own dealerships, so it depends on the dealership.

Q      So at some of the dealerships

17

that you have owned you have also been on the payroll; is that correct?

A      No, it depends on the dealership and how the dealership's doing at the time.

Q      Well, I'm not asking whether or not you take money from the dealerships, I am asking whether or not you're on payroll at any of the dealerships.

A      I don't understand your question.  To me payroll means you're getting money, so I apologize, I don't understand your question.

Q      Okay, well, you understand that in these dealerships there are employees, yes?

A      Yes.

Q      And they get a paycheck, right?

A      Yes.

Q      Do you get a paycheck at any of these dealerships?

A      I believe that out of one I

18

get a paycheck.

Q       What one would that be?

A       Yonkers Auto Mall.

Q       Do you still own that one?

A       Yes.

Q       Do you remember what year you met Anthony Deo?

A       I believe the -- I'm not 100 percent sure, but I believe it's the year my father-in-law passed away.

Q       What year would that be, if you know?

A       2021.

Q       Had you met Anthony Deo prior to David Baron's death?

A       I don't remember.  I don't believe so.

Q       Do you recall the circumstances under which you did meet Anthony Deo?

A       No.  No, I don't.  I don't know the exact -- I don't remember the exact circumstance.

Q       But it would be fair to say,

19

would it not, that you met him because of business and not because of a personal reason?

A    Yes.

Q    Would it also be fair to say that you met him because you were going to be the new person responsible on behalf of Auto Island Group to deal with that dealership; is that a fair thing to say?

A    No --

Q    When you dealt with --

A    -- no, it's not a fair to say.

Q    How would you put it, what was the reason that you had to meet Anthony Deo?

A    I was helping my mother-in-law out.

Q    Would that be Iris Baron?

A    Yes, she just lost her husband, and I was going to help her out 'cause her husband owned the dealership.

Q    Who told you that?

20

A        That's what -- that's what she does.  She does own it.

Q        Who first told you that they owned Northshore Motors?

MR. SHANKS:  Objection. You're now limited to Northshore Motors, the first one you just used the word dealership.  I just want to be clear, are you asking about Northshore Motors?

MR. THOMASSON:  Yes, I'm asking about Northshore Motors.

Q        Mr. Aaronson, how did you first learn that David Baron had an interest in Northshore Motors?

A        I believe Brian Chabrier, Asad Khan and David Baron were the only owners of the dealership.

Q        Well, I'm sure that you believe that, but that's not my question. My question is --

A        That's what I was told. That's what I was told.

Q        Who told you that?

21

A    DMV paperwork and -- and my business and -- and my mother-in-law, you know.  They were the owners of the dealerships, I don't remember who told it to me.

Q    But knowledge of the ownership of Northshore Motors is based upon what you were told; is that correct?

A    I don't remember, but yes, yes, I'll go with yes, because I don't remember, but yes, that's -- that's what I was told, and that's what it is.

MR. SHANKS:  Just note my objection to the categorization of his testimony, because he also said DMV paperwork, but he answered it, so it's okay.

MR. THOMASSON:  Please don't be giving any answer now, Mr. Shanks.

MR. SHANKS:  I'm not.  You categorized his statement incorrectly.    Go on.

Q    What DMV paperwork are you

*Rich Moffett Court Reporting, Inc.*

22

referring to, Mr. Aaronson, when you say that you believe that the Northshore Motor Leasing Corporation is owned by Asad Khan, Brian Chabrier and David Baron?

A        I believe the ones that go to Motor Vehicle in Albany.

Q        That would be for the purpose of obtaining the license at Northshore Motors?

A        The motor vehicle license and the -- yeah, it shows ownership.

Q        Well, the owner of that license is Northshore Motors, isn't it?

A        I am not 100 percent sure.

Q        And there is a personal guaranty associated with that license, isn't there?

A        I believe so.

Q        Do you know who the personal guarantor was on that license?

A        Whatever was on the motor vehicle license.

Q        Do you know who that was?

23

        A       I believe it was David Baron, Asad and Brian Chabrier.

        Q       So is it your position that being on the license as personal guarantors afford those individuals the ability to control that license?

        A       I believe so, yeah.  It's -- yes, it's -- they're the ones on the license.

        Q       Okay.

                And therefore, they can make decisions about that license; is that fair to say?

        A       No.  I mean, it's fair to say, but no, it depends on the circumstances and the arrangement.

        Q       Well, what was the circumstance and arrangement, as you understood it, regarding that license?

                MR. SHANKS:  At what time?  I don't understand.  When they applied for the license?

        Q       When, Mr. Aaronson, do you believe they first gained ownership of

24

Northshore Motor Leasing?

A        I'm not sure.

Q        Do you know when Northshore Motor Leasing was formed?

A        No.

Q        Do you know who formed it?

A        No.

Q        Do you agree that the license at Northshore Motor Leasing was owned by Northshore Motor Leasing?

A        I don't agree and I don't know.

Q        When you say that you don't agree, is that because you believe that the personal guarantors are, in fact, the owners of that license?

A        I don't know.

Q        Do you know if Northshore Motors was at any time purchased by Asad Khan, Brian Chabrier and David Baron?

A        I don't know.  If you have documents that you want to show me and ask me questions about --

MR. SHANKS:  Just answer the

25

question.  You don't have to go beyond.

THE WITNESS:  Okay.

MR. SHANKS:  He answered the question, Mr. Thomasson.

MR. THOMASSON:  Diana, can I ask you to read back the last question and answer?

(Record read.)

Q    Do you know who formed Northshore Motors at the Secretary of State's office, Mr. Aaronson?

A    No.

Q    Do you know who supplied the floor plans at Northshore Motors at any time?

A    I believe so.  I just want to make sure that Northshore Motors is what we're referring to is the -- yes, is Northshore Motors the business?  Because I'm not sure of the exact LLC if there's a d/b/a, so but I believe I do know, yes.

Q    Do you understand that when I speak about Northshore Motors, I am only

26

talking about the Northshore Motors that we're all familiar with that was on Michael Drive in Syosset?

A       Yes.

Q       Okay, I'll use the short version of Northshore Motors if you want, but if you would prefer, I would be happy to use the full legal term.  What would be best for you?

A       Northshore Motors is fine.

Q       So would it be fair to say that you don't know who formed Northshore Motors; is that right?

A       Correct, I'll say I believe that David Baron, Asad and Brian Chabrier were the owners of Northshore Motors.

Q       Okay, but I am not asking you that.  I am just asking about who formed the corporation, but you don't know who did that; is that right?

A       Once again, I believe that David Baron, Brian Chabrier and Asad Khan formed Northshore Motors.

Q       Okay, but you don't have any

27

firsthand knowledge of that, do you?

A    I don't remember.

Q    So you believe they formed it, but you don't know yourself today that they formed it; is that correct?

A    I believe that they formed it, yes, and I know they're -- yes, I believe they formed it.

Q    Do you know where the incorporation papers are for Northshore Motors?

A    No.

Q    When Northshore Motors was closed in November of 2022, was there paperwork that you either took or caused to be taken from that building?

A    I don't remember.

Q    Do you at present have any paperwork from Northshore Motors?

A    Not that I am aware of.

Q    Do you know where the file jackets are for Northshore Motors?

A    I don't know what you mean by "file jackets."

28

Q        For car sales, do you know where any of those file folders are on car sales today, do you know where they are?

A        I'm not -- no, I'm not 100 percent sure where they are.

MR. SHANKS:  For the record, Mr. Thomasson, as we have advised you, our office had some deal folders and we offered to allow you to inspect them, if you would like, a number of times.

MR. THOMASSON:  I will take you up on that, Mr. Shanks.  I'm just not there yet.

MR. SHANKS:  Okay.

MR. THOMASSON:  Thank you.

MR. SHANKS:  Sure.

Q        When did you close Northshore Motors in November of 2022, Mr. Aaronson?

A        Well, it was closed, it was out of business, you know.  You know, we owed millions and millions of dollars to the bank, so I guess if that's -- that

*Rich Moffett Court Reporting, Inc.*

29

would make it close.  Then we just had to pay off the bank and customers' cars and a whole host of other things.

Q    And that was as of November of 2022 you are personally aware that Northshore closed; is that correct?

A    I'm not sure what you mean by "closed."  Close as, like, the business?

Q    Yes, as an operating, existing business.

A    Yeah, it was -- yes, it can no longer operate.  We owed millions and millions of dollars to a variety of people.

Q    That business closed in November of 2022, correct?

A    I'm not sure of the exact timeline, but it sounds about right.

Q    Do you remember sending a text to Anthony Deo that said in sum and substance, "This is about to get ugly"?

A    Yes.

Q    Do you remember why you sent that text?

30

A    Because I thought -- there were millions of dollars that my mother-in-law was going to have to pay in order to satisfy all the lost money and the money that was taken from Mr. Deo, and we were going to end up in court.

Q    What document are you talking about the money that was taken from Mr. Deo?

A    There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank. There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it.

And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000. It turns out

31

the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was something not right that was going on at that business, so we immediately knew that we were going to have a problem.

Q     So that's why you sent a text that said, "This is about to get ugly"?

A     Yes, that we were going to have to sue Anthony.

Q     Did you send him a text that said you were about to sue Anthony?

A     I don't remember.  I don't believe so.

Q     At the time that you realized there were problems at Northshore during or about November of 2022, did you take anything from that building?

A     Not that I remember, no.

Q     Do you know of anyone who did take anything from that building?

A     I believe we took some folders, and we owed a lot of -- we owed

32

a lot of money to different customers on customers' trades that weren't being paid off and they were supposed to be, so we wanted to get ahold of what's owed out there to, you know, satisfy our obligation to the consumer and also to our bank.  So I believe there were some folders taken in order to help get rid of all the problems that -- that were going on over at Northshore Motors.

Q     Who took those folders?

A     I'm not sure.

Q     Were you the one who directed someone to take those folders?

A     I just think that, in general, when you have a problem that, you know, that we signed for, because it was our business, that we were going to handle them.  So I'm sure someone at my office, or even the office that we're currently working there, would have helped to solve a problem, because consumers were all calling and asking about their payoffs and their trades, and

33

Anthony was directing them to Baron Nissan, so we needed to solve this.

Q    And therefore, you could say, in sum and substance, that you don't know who took folders from Northshore Motors in November of 2022; is that correct?

A    Any folders that were taken would have been by an office that I am familiar with.  I don't know of other folders that were taken.  I just know that we took some folders that we were using to -- to solve problems.

Q    But you don't know who took them, correct, who physically took those folders?

A    No.  No, I don't know who physically carried the folders out of the building, no.

Q    Do you know whether or not every folder taken from the building was turned over to Mr. Shanks?

A    I believe anything that was asked to be turned over to Mr. Shanks was turned over.

*Rich Moffett Court Reporting, Inc.*

34

Q      That's not what I asked.  I asked you if the person you don't know who took folders or the people that you don't know who took folders from Northshore Motors in November of 2022 turned over all of them to Mr. Shanks?

A      I'm not sure.

Q      Do you know how many folders were taken at that time?

A      No.

Q      Was it more than a dozen?

A      I said I don't know.

Q      You have no idea how many?

A      No.

Q      Who was in charge of the bank accounts at Northshore Motors?

MR. SHANKS:  Can you give a timeframe, Harry?

Q      At any time that you are aware of, Mr. Aaronson, on this business that was formed in 2017, at the present time you are aware of since that date, do you know who was in charge of bank accounts for Northshore Motors?

*Rich Moffett Court Reporting, Inc.*

35

MR. SHANKS:  Just note my objection to "in charge."

You can answer, if you understand or you can --

MR. THOMASSON:  I'll withdraw that, Mr. Shanks.

MR. SHANKS:  Thank you.

Thank you.

Q     Mr. Aaronson, who had decisionmaking capability over the bank accounts at Northshore Motors, if you know, since it was formed?

A     I can't speak to since it was formed because I wasn't involved.

Q     So for whatever years you are aware of since 2017, who had decisionmaking capability over the bank accounts of Northshore Motors?

A     I would imagine my father-in-law had, you know, control over the bank accounts.

MR. SHANKS:  Mr. Thomasson, I am just going to instruct him, only if you know.  Don't imagine, you

36

know, but answer Mr. Thomasson's question.

A    I don't -- I don't -- I don't know.

Q    You don't know who was in charge of the bank accounts for anytime at Northshore Motors; is that what you are saying?

A    Correct.

Q    So after David Baron died in 2021, did you become involved in that business?

A    I was helping my mother-in-law, but I was --

Q    Is that a yes?

A    I was somewhat involved, yes.

Q    Okay.

What is it you did at that business?

A    I would occasionally speak with Anthony Deo, that was my involvement.

Q    That was it?

A    Yes.

37

Q       Have you and I ever met?

A       I don't believe so.

Q       Do you know if I was involved at all with that business?

A       No.

Q       Do you know today whether or not I was involved with that business?

A       No.

Q       Did you know someone named Michael Laurie?

A       I do not know someone named Michael Laurie.

Q       Based on your experience with Northshore Motors, was Michael Laurie involved at all in working with Northshore Motors?

A       I've heard the name, but I don't know who Michael is.

Q       Do you know today whether or not he did any work with Northshore Motors?

A       I don't know.

Q       Do you know today whether or not Dwight Blankenship did any work with

38

Northshore Motors?

A        I'm not aware.  I do not know.

Q        Do you know today whether or not Marc Merckling did any work with Northshore Motors?

A        I've heard the name, but I don't know what they did.

Q        Do you know whether or not Sarah Deo did any work with Northshore Motors?

A        Yes, she did.

Q        What did she do?

A        I believe it was her responsibility to go bring the customers into the dealership.

Q        She worked on obtaining customers?

A        I'm not 100 percent sure of her job specifications, but I believe that was one of the main things that she did.

Q        How often were you in touch with anyone from Northshore Motors

39

between David Baron's death and November of 2022?

A    I spoke to Anthony very occasionally, very rarely.

Q    How would you describe what you mean by "very rarely"?

A    Depending on the time.  There were times I would go a few months without speaking to him, Anthony, and then there were times where we would speak a couple of times in a month.

Q    So typically you would speak with Anthony, at most, a couple of times a month?

A    Until things got -- when we realized that Anthony wasn't operating the business properly and doing what he told us, at that time I think we spoke more than a few times a month, because I was really checking in with him to make sure that he was fulfilling obligations that he promised me he would.

Q    And do you know whether or not Anthony Deo had any control over any

40

of the Northshore bank accounts after David Baron's death?

A     I believe he had access to some bank accounts.

Q     Was that with your knowledge and approval?

A     I know Anthony signed checks from the bank accounts, so yes, it was with my knowledge.

Q     Did you allow him to sign checks?

A     Yes.

Q     What authority was Anthony Deo given in the operation of Northshore Motors?

A     To run the business, to run the day-to-day business.

Q     Was that with your knowledge and approval after David Baron's death?

A     Yes.

Q     Were you authorized by Brian Chabrier, Asad Khan and Iris Baron on behalf of David Baron's estate to oversee operations at Northshore Motors?

41

A        Yes.

Q        Did each of them specifically give you that authority or was it just understood in the family?

A        I believe it was understood. My mother-in-law knew that I -- I was working with Anthony.

Q        And you were authorized by her to work with Anthony on Northshore?

A        Yes.

Q        Was that with her knowledge and approval?

A        Yes.

Q        Would you describe David Baron as, between he, Asad Khan and Brian Chabrier, as the person that was the senior partner?

           MR. SHANKS:  Objection.  What do you mean by "senior partner"?

           MR. THOMASSON:  I'd like to hear what his answer is, and then I'll ask a follow up.

A        He's definitely older, if that's what you're asking.

42

Q       Well, if David Baron wanted something done at Northshore Motors, would Asad Khan and Brian Chabrier defer to him, was that your understanding?

A       I don't know their business relationship in that regard.

Q       Well, after David Baron's death, were Brian Chabrier and Asad Khan deferring to Iris Baron on Northshore Motors?

A       Not that I'm aware of, no, they weren't -- yeah, I don't think they spoke to my mother-in-law about that.

Q       Did Asad Khan and Brian Chabrier give you any direction after David Baron's death regarding the operation of Northshore Motors?

A       No, we didn't really speak about it.

Q       Was it just generally understood that you would be the one to go in after David Baron and be the representative of ownership?

A       Yes.

43

Q        Do you believe at all times between David Baron's death and November of 2022 that you had authority from Iris Baron, Brian Chabrier and Asad Khan to operate Northshore Motors for them?

A        Yes.

Q        Do you remember in September of 2022 approving some tax returns prepared by Citrin Cooperman indicating that Anthony Deo was 99 percent owner of Northshore Motors and Sarah Deo was 1 percent owner of Northshore Motors, do you remember doing that?

A        Yes.

Q        Why did you do that?

A        Because Anthony and I had had an understanding that he was going -- he had a lot of obligations to fulfill in order to get ownership of Northshore.  He promised me he was going to, you know, including switching the motor vehicle license out of his name, paying off all cars to the bank, paying off all debts from the business, and so it was just an

44

accounting thing that he was supposed to do things that he never completed.

Q    Are you saying that he was supposed to do things that he never completed before those tax returns were prepared or after?

A    Both.

Q    So then why did you approve him as owner at that time?

A    'Cause he was supposed to -- he told me --

MR. SHANKS:  Note my objection to form.  Tax returns approved, approved as owner, two different things.

Q    Mr. Aaronson, when you approved those tax returns, were you approving Anthony Deo and Sarah Deo as owners of Northshore?

A    No, it was just more of an accounting thing to me.  He was supposed to eventually get ownership if he completed certain, you know, items, such as switching motor vehicle into his name,

45

which he never did.  You know, paying off the, you know, paying off the banks, which he never did.  Paying off all customer trade-ins, which he never did.

Q    Mr. Aaronson, are you saying that when you approved those tax returns that indicate Anthony Deo and Sarah Deo combined were the 100 percent owners of Northshore, are you testifying under oath that you were misleading the IRS and the New York State Department of Finance?

MR. SHANKS:  Objection.

Q    Were you attempting to mislead them when those tax returns were prepared, Mr. Aaronson, yes or no?

A    No, I was not.  Anthony and I had the deal that he was going to, if he can, pay off all the banks, switch the motor vehicle to, you know, do a whole host of things to complete, he would get ownership, and it was assumed that he was going to do those things, and he never did.

Q    Whose accountant was Citrin

46

Cooperman at that time?

A     Citrin Cooperman is a firm that I've used -- I use and have used in the past.

Q     Did you direct Citrin Cooperman to prepare those returns?

A     Citrin Cooperman was going to prepare those returns, that I was aware of, yes.

Q     That was with your knowledge and authority?

A     It was my knowledge, yes.

Q     Did you authorize Citrin Cooperman to prepare those returns?

A     I don't remember but I believe so.

Q     Who would have provided the authority for Citrin Cooperman to prepare those returns?

A     I'm not sure.

Q     But it was your accountant at that time; is that right?

A     It was the accounting firm that we used, yes.

47

Q      It wasn't Anthony Deo's accountant, was it?

A      I don't know who Anthony uses for accounting.

Q      But it was at the direction of you or someone on your behalf that those returns were prepared, correct?

A      No, that -- yes, yes.

Q      And you have testified that you were not trying to mislead either the IRS or the Department of Finance here in New York in having those returns prepared and submitted, correct?

A      I don't understand your question.

Q      Do you believe that those returns were accurate?

A      I never -- I don't remember if I had ever seen the returns.

Q      Well, there exists an email with your approval of those returns, right?

MR. SHANKS:  Objection. Unless you want to show him the

48

email you're referring to.

MR. THOMASSON:  I don't have to show him the email, Mr. Shanks. We're three years into him having it in his hands.

MR. SHANKS:  Mr. Thomasson, with all due respect, with all due respect, you're referring to an email, who knows what it says. Show the email and ask all the questions you want.  I'm fine with that.

MR. THOMASSON:  Don't tell me how to conduct the deposition, Mr. Shanks.

Q     Mr. Aaronson, do you know whether or not there is an email out there that you approved those tax returns, do you know whether or not that exists?

A     Can you please show me the email, and I could tell you?

Q     Well, I am just asking you a simple question.  Do you right now know

49

whether or not there is such an email? We'll get to it, but I'm asking you now if you know that there is one?

A        I'm not sure what the line of questions is, so I would have to understand --

Q        Didn't you already testify a few minutes ago that you are aware you approved those returns?

A        I approved that Anthony would be doing the returns under his name.  I wasn't sure if Sarah Deo's name, but yes, I approved that, that I am aware of, but I don't think that's what your question was.

Q        Did you, in fact, make that approval verbally?

A        I don't remember, it was a long time ago.

Q        Do you remember whether or not you made that approval in writing?

A        I know that I sent an email that said that Anthony should put the returns in his name.

50

Q        And that was because you were approving him on those returns as owner of Northshore, weren't you?

MR. SHANKS:  Objection.  Tax returns don't approve ownership. You know better, you're a lawyer.

MR. THOMASSON:  Mr. Shanks, you're feeding him answers, please stop doing that.

MR. SHANKS:  No, I am not.

MR. THOMASSON:  Yes, you are.

MR. SHANKS:  You like to put legal conclusions at the beginning of your questions.

MR. THOMASSON:  Okay, Mr. Shanks.  No problem.  No problem.  I'll take care of it.

Q        Mr. Aaronson, do you know what "ownership" means, yes or no?

A        I know what "ownership" means.

Q        Okay.

When those tax returns were prepared, were you approving Anthony Deo

51

as owner of Northshore Motors for all purposes involving those tax returns?

A       No, it was an accounting thing that I was just -- at that time he was supposed to become an owner if he did several things, which he eventually did not do.  Anthony gave me his word that he was going to do them, and he did not do them.

Q       Is that in writing anywhere, Mr. Aaronson?

A       I'm not sure.

Q       Did you have a contract with Mr. Deo?

A       I don't believe so.  I know I asked Anthony Deo several times to switch the banks, switch, you know, whether I emailed it or not, to switch motor vehicle, and said, "You gotta switch motor vehicle into your name."  All the things that he was going to do in order to eventually get ownership of the dealerships, that I know for sure.

Q       Okay, so let's finish up this

52

with the following:  Which is it, Mr. Aaronson, when you approved Anthony Deo on those tax returns as owner, were you intending for him to be the owner for all purposes regarding the tax returns? It could be the tax return only, mind you, but I just want to know if you were approving him as owner for all purposes on the tax returns, yes or no?

A      Can you please repeat the question?

MR. THOMASSON:  Can you please repeat the question for me, Diana?

(Record read.)

MR. SHANKS:  Objection as to form.  If he understands it, he could answer.

A      Yeah, I don't -- I apologize, I don't answer -- I don't understand that question.

MR. THOMASSON:  Yeah, you just sent him another answer, Mr. Shanks.  That's the last time.

53

Don't do it again, I'll call the judge.

MR. SHANKS:  You can call the judge.  Hey, Mr. Thomasson, stop being combative, first of all.

MR. THOMASSON:  You're being combative.  Stop interrupting this deposition and feeding your client answers.

MR. SHANKS:  I just want the question to be clear, okay?

MR. THOMASSON:  Yeah, it's very clear.  We just had him saying that he knows exactly what "ownership" means.  He's being evasive and you know it, and you're feeding him answers.

MR. SHANKS:  Ask your question and he can answer it.

MR. THOMASSON:  No problem, it's on the transcript.

Q    Mr. Aaronson, once again, I want to make sure I didn't misunderstand something, you do understand what the

54

word "ownership" means, right?

A   Yeah, yeah, yes, I do understand ownership.

Q   You do understand that those tax returns you approved list Anthony Deo as 99 percent shareholder and Sarah Deo as 1 percent shareholder; is that correct?

A   If you're saying so, yes.

Q   Okay.

Do you know what those tax returns said then?

A   I didn't -- I don't believe I saw the tax returns.

MR. THOMASSON:  Okay, we're going to have to take a little break.  I've got to upload some exhibits, so anybody who needs a break can take it now.

MR. SHANKS:  Okay, it's 11:03, how long?

MR. THOMASSON:  Why don't we do 11:30 at this point?  I've got a bunch of exhibits we need to go

55

over this afternoon with Mr. Aaronson.

MR. SHANKS:  Okay, 11:30.

(Recess taken.)

(Defendants' Exhibit A, Department of the Treasury Internal Revenue Service document, deemed marked for identification.)

Q    Mr. Aaronson, can you see what's marked as Exhibit A?

A    Hold on one second.

Yeah, I see Exhibit A, yes.

Q    If I were to pull this down here, are you able to identify what this is?

A    It looks like some sort of tax form.

Q    It's an application for an EIN number.  Are you familiar with that term?

A    Yes.

Q    You would have learned that in your business classes, wouldn't you?

A    Or just over the course of my

56

time doing business in owning several businesses.

Q       Do you see who it is who applied for that EIN number?

A       I see Sarah's name, yes.

Q       Rahman is her maiden name?

A       If you say so, yes.

Q       Do you know why she applied for that number?

A       No idea.

(Defendants' Exhibit B, Northshore Assignment of Lease and Lease Modification, deemed marked for identification.)

Q       Can you now see the word Exhibit B?

A       I see a file Exhibit B, Northshore Lease.

Q       Yes, do you see the word Exhibit B on the screen?

A       No.

Q       You don't see it?

A       I see the word Exhibit B.

Q       Yeah, just in big letters on

57

the screen, do you see that?

MR. SHANKS:  No, it wasn't like the last one.

A     No, no, no.

MR. SHANKS:  It's not up.

A     You have a list of files that we can see.

Q     Right, I know what that is but --

MR. SHANKS:  I don't see Exhibit B, no.

A     We don't see it.  We just see a list of exhibits.

MR. THOMASSON:  We had some trouble earlier.  Okay, I'll try this a different way.

A     We don't see anything now.

Q     Right.

Do you now see Exhibit B?

A     Yes.

Q     Do you now see the top of the first page of Exhibit B?

A     Yes.

Q     Do you see the title,

58

Assignment of Lease and Lease Modification?

A       Yes.

Q       Do you see here, Mr. Aaronson, on the signature page that it was an assignment from UEA Premier Motors Corp. to Northshore Motor Leasing of UEA's original lease for the Michael Drive premises, do you see that?

A       I see Sarah's name signed in two separate places, yes.

Q       Do you know why she would be signing to take over this lease if she wasn't the owner?

A       I have no idea.

Q       Do you see further down the signature page that Sarah Deo and Anthony Deo signed as personal guarantors on that lease?

A       I see the word guaranty, and I see their names signed, yes, correct.

Q       Do you have an understanding that as of the date of this document, which is the 20th day of June in 2018, do

59

you see that as of that date that Sarah and Anthony Deo were the personal guarantors on the lease at Michael Drive for Northshore Motors, do you see that?

A    I didn't see the whole -- obviously, I didn't have a chance to read everything, but I see that it appears that way, yes.

Q    Have you ever seen this document before?

A    I don't believe so, no.  I'm not sure.

Q    Have you ever seen that EIN document that was Exhibit A?

A    No, I don't believe so.

Q    Do you now have an opinion of who the personal guarantors were on that lease?

A    From what you just showed me it looks like Sarah was.

Q    And Anthony, right?

A    Yeah, I guess, yes.  I saw Sarah's name signed a couple of times, I saw Anthony's name signed once.

*Rich Moffett Court Reporting, Inc.*

60

Q        Do you have any lease documents for Northshore Motors in your possession, custody or control?

A        I don't believe so.

Q        Are you aware of any lease document, other than this one, with regard to the lease of Northshore Motors at the Michael Drive location?

A        I'm not aware.  I wasn't aware of this lease or the other lease -- or any other lease, I should say.

                    (Defendants' Exhibit C, Business Depository Certificate from Chase Bank, deemed marked for identification.)

Q        Can you see on your screen Exhibit C?

A        Yes.

Q        Can you see here that this is a bank account document involving Northshore Motor Leasing LLC in the opening of an account at Chase, can you see that?

A        Yes.

61

Q        Have you ever seen this document before?

A        I'm not sure.  I don't believe so.

Q        Can you see the date of the document is January 25, 2018, upper-right corner there of the document?

A        Yeah, I see that date, yes.

Q        Do you see here in the middle of that document, it says, "Sarah Deo, Member"?

A        Yes, I see that.

Q        Do you see just below that it indicates that Anthony Deo is a signer to be added later?

A        I see that, yes.

Q        Do you see who signed for the opening of the Northshore Motors bank account on the last page?

A        Yeah, Sarah.

Q        Have you ever seen this document before now that I have shown you the document?

A        I don't believe so.

62

Q       The last page, actually, I'm sorry, the signature of Sarah Deo was on the third of four pages, but the last page contains an account summary for Northshore Motor Leasing, do you see that?

A       Yup, the address.

Q       Do you see that this last page indicates it's an account summary for Northshore Motor Leasing LLC, do you see that?

A       I do, yes.

Q       Do you understand that Northshore Motor Leasing LLC is the full legal name for the corporation?

A       I believe so, yes.

Q       Do you recognize the phone number on the last page of this document?

A       I do not.

Q       Do you know if that could have been the phone number to Northshore Motor Leasing, if you know?

A       I'm not sure.  I don't know.

                (Defendants' Exhibit D, Check

63

          Payable to David Baron dated

          February 12, 2021, deemed marked

          for identification.)

     Q     Do you see Exhibit D on your

screen?

     A     Yes.

     Q     Do you see that this is a

check payable to David Baron in the

amount of $10,000?

     A     Yes, yes.

     Q     Do you see that in the

notation it says, "For the purpose of

Sunrise Auto Outlet," do you see that?

     A     Yeah, that's what it says.

     Q     Do you know where Sunrise

Auto Outlet was located?

     A     Yes.

     Q     Where was it located?

     A     I believe it's 189 Sunrise

Highway.

     Q     Was that Amityville?

     A     I believe so, yes.

     Q     Was the corporate name, if

you know, for that business 189 Sunrise

*Rich Moffett Court Reporting, Inc.*

64

Highway Inc., if you know?

A    I'm not 100 percent sure, but it sounds right.

Q    And this was a $10,000 check that indicates it's for the purchase of Sunrise Auto Outlet from Northshore Funding and Management LLC, do you see that?

A    I see a check.  I don't know what it -- it's for, but it looks like it's for a purchase, yes.

Q    Do you recognize the signature line there at all?

A    If that's Sarah's, possibly, I would think.

Q    Do you see here that that money was deposited, according to the back of the check that is now on the screen?

A    Yes.

Q    On the same date there is a $10,000 check written to someone named Joshua Aaronson, do you see that?

A    I see that, yes.

65

Q        Would that be the same Joshua Aaronson as you?

A        Yes, that is me.

Q        Do you remember getting a check from Northshore Funding and Management LLC on that date?

A        I don't remember the exact date, no.

Q        Do you remember getting this check?

A        Yes.

Q        What was this $10,000 check for?

A        I think it was the beginning of what was part of the availability to eventually purchase our dealership.

Q        Did you cash that check?

A        I did, yes.

Q        Did you ever give that money back to anyone?

A        Not that particular check because it was cashed, but we gave a lot of money back.

Q        But this check you kept; is

66

that right?

      A      Yeah, I mean, it got deposited into the bank.

      Q      Okay.

             Is that your signature on the back of the check?

      A      Yes.

      Q      Same day, same amount to Brian Chabrier, do you see that?

      A      I do, yes.

      Q      Was that also money for the purchase of 189 Sunrise?

      A      Yeah, I guess it was some sort of down payment on what would be eventually if other obligations were met to be able to purchase it, yes.

      Q      Do you think there were other obligations with regard to this?

      A      Yes.

      Q      Let me rephrase that.  I'm sorry, I didn't finish the sentence.  It was my fault.

             Do you believe there were other obligations for Anthony Deo to

67

purchase 189 Sunrise at the time that this check was given?

A    I believe so, yes.

Q    Are they in writing?

A    I'm not sure but I believe so, yes.

Q    You believe that there is a contract for the purchase of 189 Sunrise?

A    I don't -- I never signed any contract so...  But I believe there -- I know this wasn't, you know, what was going to take, you know, the -- the checks that you're showing me wasn't going to be what would eventually allow us to transfer ownership over to Anthony.

Q    Uh-huh.

And as far as you know, none of this money was ever given back to Anthony, was it?

A    Well, millions and millions and millions of dollars were given back because of losses because of Anthony Deo, so I think it all depends on how you want to --

68

Q    We'll get to that, but this specific money was cashed and kept; is that fair to say?

A    It was cashed, I can't say kept, because we're out a lot of money, so it wasn't kept.

Q    Well, you think that it should be used as an offset; would that be a fair way of putting it?

A    A lot of money was lost, so if you want to call that an offset, yes, it would be a pimple on a huge problem, you know.

Q    Right, we'll get to what you think is lost, no problem.

But this money, on or about February 12th of 2021, was given towards the purchase of 189 Sunrise, right?

A    It was -- I would imagine it was the beginning of what was supposed to be towards the purchase, yes.

Q    And it was never given back, right?

A    This specific check was not

69

given back.

Q    Jory Baron received one that day too for $10,000?

A    Uh-huh.

Q    Who were the owners of Sunrise Auto Outlet at that time?

A    I believe it was Jory, Brian, my father-in-law, may he rest in peace, myself and possibly Ray Phalon.

Q    Is there any business located at that same location now, if you know?

A    Yes, there is.

Q    What business is at that location now?

A    Stream Auto Outlet.

Q    Who are the owners of that business?

A    Me and Josh, me, Josh Aaronson, and my business partner Gustavo Ruiz.

Q    How long has that been the case that you have been the owners of the business at that location at this time?

A    I want to say two years, but

70

I'm not exactly sure of the specific date, or you know.

Q    Would it be fair to say that it was sometime in 2023 that you obtained that location?

A    Yeah, it's -- yes, it's around two years ago, so that sounds about right.

Q    Did you have to wait for Anthony Deo to leave that location before you could gain that location, if you know?

A    I don't remember.

Q    Do you know who held the lease after February 12, 2021, at that location?

A    No.

Q    Until it closed, do you know who held the lease?

A    No.

Q    Was it you?

A    I don't know.

Q    Could it have been Anthony Deo?

71

A    I don't know who it could have been.

Q    There is another check for $10,000 that day.  Is it the same answer, this was money that was towards the purchase of 189 Sunrise; is that right?

A    Correct, correct, yes.

(Defendants' Exhibit E, Lease dated June 15, 2021, deemed marked for identification.)

Q    Do you have the word Exhibit E on your screen?

A    I do, yes.

Q    Do you see that this was a lease executed in June of 2021, do you see that that's the date on this lease?

MR. SHANKS:  Mr. Thomasson, are you referring to a lease?  I don't know, is this actually -- oh, oh, okay, you're scanning down.

Q    Do you see at the top of this page we've got two dates, June 16th and June 15th of 2021, do you see that?

A    Yeah, I see those two dates.

72

Q      Do you see that Gold Coast Motors of Sunrise LLC is the lessor, do you see that?

A      Gold Coast Motors, yeah, yeah, yup, I see it, yes.

Q      Do you see that?

A      Correct.

Q      Do you know if that is a business owned and operated by the Deos?

A      I don't know, so but...

Q      Have you ever heard the term Gold Coast Motors?

A      Yes, yes, I have heard it, yes.

Q      When you heard that term, did you have any knowledge of who were the owners of Gold Coast Motors?

A      No.

Q      Did you know if Gold Coast Motors was in any way related to the Deos?

A      I'm not sure.  I don't believe so.

Q      Do you see that we've got a

73

date here that indicates that Gold Coast Motors of Sunrise LLC was created on January 15, 2021, in the Division of Corporations for the New York State Department of State, do you see that, Mr. Aaronson?

A        Yes.

Q        Do you see who it is that signed this lease on behalf of Gold Coast Motors of Sunrise on June 15, 2021, do you see that?

A        Yeah, Anthony Deo.

Q        Do you see on the first page of the lease under the word Background that it indicates that this lease pertains to 189 Sunrise Highway in Amityville, New York, do you see that?

A        189, I see 189 Sunrise Corp., yeah, yup, correct.

Q        So you will agree that Anthony Deo, as of June of 2021, held the lease at this business, do you understand that?

A        Yes, it looks that -- it

74

appears that way.

MR. SHANKS:  Are you using Anthony Deo as being the same as Gold Coast Motors?

MR. THOMASSON:  Well, okay.

Q     Do you see that on some level Anthony Deo was involved with the lease for these premises as of June 15, 2021, do you see that?

A     Yes, it looks that way.

Q     Did you know that?

A     No, not that I remember.

Q     No?

Who would know that on behalf of any of your co-plaintiffs, would any of your co-plaintiffs know that Anthony Deo, through his business, held the lease at 189 Sunrise?

A     I can't speak for, you know, the other people you're mentioning.

Q     So you didn't have regular meetings with the owners of Northshore or 189 Sunrise; is that correct?

A     Correct.

75

Q      Did you ever speak with Brian Chabrier about Northshore or 189 Sunrise prior to November of 2022?

A      Yes, occasionally.  Very rarely but yes.

Q      Did you ever speak with Asad Khan about Northshore or 189 Sunrise prior to November of 2022?

A      Not that I remember.

Q      Did you speak with David Baron at all about either Northshore or 189 Sunrise prior to November of 2022?

A      Yeah, he -- the only time I spoke to David Baron about it was when he told me that Anthony, I guess, did something that was, you know, David was below boarding him, and my mother-in-law had to go to the dealership, I guess, to remove cars, and I guess he got in some -- that was the only time I ever spoke to my mother-in-law about it, because he was very upset that him and his wife had to wake up or go in the middle of the night because Anthony did

76

something that was supposedly, you know, not -- really bad and that David wanted to try and resolve it. So that's the only time I remember speaking to my father-in-law about it.

Q   Do you know if that difference of opinion between Anthony, on the one hand, and David and Iris, on the other hand, got straightened out?

A   I'm not 100 percent sure, but I know they continued to do business afterwards.

Q   So would it be fair to say that even if you don't know the details it got resolved somehow as between them; is that fair to say?

MR. SHANKS:  Objection. Calls for speculation.

A   Yeah, I don't know.

Go ahead.

MR. SHANKS:  He can answer if he wants.

A   Yeah, I don't know what was resolved.

77

Q        I didn't ask you if you knew what it was, but you knew that there was a problem, yet business ended up continuing, so did you draw the conclusion from that that whatever difference of opinion occurred on the occasion that you're discussing ended up eventually getting resolved as between them?

A        I don't know that it got resolved, because unfortunately, in business you can sometimes continue to do business and it doesn't mean something's resolved.

Q        Uh-huh.

A        I know there are obligations, you know, and Anthony promised that my father-in-law would have to come off in order to -- for my father-in-law to get out of the business, so I don't know what was resolved or not resolved in that regard.

Q        Do you know whether or not Anthony Deo on behalf of Gold Coast

78

Motors was taking over the lease at 189 Sunrise?

A        I do not.

Q        Who would know, if you know?

A        I have no idea.  Maybe Anthony would know.

Q        Would any of your co-plaintiffs know, if you know?

A        I don't know what they -- they would know, so no.

Q        You have never discussed the lease of 189 Sunrise with any of your co-plaintiffs; is that fair to say?

A        Yes.

Q        And you don't think you have ever seen this document; is that right?

A        I don't believe so.

Q        This document was attached to a complaint that was served upon you during or about September of 2024, do you remember that complaint?

A        You would have to show it to me.

Q        So you have no memory at this

79

time of seeing a thick complaint brought against you in federal court a year and a half ago; is that correct?

A    This -- I've seen a lot of documents during this time, so I'm not exactly sure what you're referring to, and I thought I'm looking at a lease now is what I thought I was looking at.

Q    Yes, I'm not talking about the lease at the moment.  Let me take it off the screen so you're not confused.

Are you aware that a complaint was served on you by Anthony Deo and Sarah Deo in a federal court action in the Eastern District of New York approximately a year and a half ago during September of 2024, do you have a memory of that document being served on you?

A    Yes.

Q    Did you ever read it?

A    No.

Q    What did you do with that document after it was served on you?

80

A        I'm not sure, but I -- I'm not sure, but it was a large document. It was a very large document, if I remember correctly.

(Defendants' Exhibit F, Stock Sale Agreement dated May 17, 2021, deemed marked for identification.)

Q        Do you have Exhibit F on your screen?

A        I do.

Q        Do you see that on the first page it indicates that this document is the stock sale agreement between David Baron and Ron Baron, on the one hand, and Anthony Deo, on the other hand, regarding Baron Nissan Inc., do you see that?

A        I see a stock sale agreement, and I see David and Ron's name, and I see Anthony's name, so I'm going to say yes.

Q        Do you know what a stock sale agreement is?

A        I'm not 100 percent sure, but it's you're selling, you know, I don't know what percentage or whatever, but

81

there's some sort of sale going on of an entity that somebody owns and someone's trying to purchase something.

Q    Were you aware at any time that Anthony Deo was purchasing Baron Nissan?

A    Not until -- yeah, I was aware at some point, yes.

Q    Did you ever have a conversation with Anthony Deo about the purchase of Baron Nissan?

A    Yeah, after my father-in-law's death, if anything.

Q    What is it you discussed?

A    I don't remember.  I knew it would never be sold, so it -- I can't imagine what my conversation with -- I knew it would never be sold to Anthony, I should say.

Q    Do you know who prepared this document?

A    No idea.  I see Joseph Aboyoun's name.

Q    Who is Joseph Aboyoun?

82

A    He's an attorney.

Q    Was he an attorney for David Baron and/or Ron Baron?

A    I don't know but very possibly.  I see his name next to David Baron.

Q    How do you know the name Joseph Aboyoun?

A    He's an attorney that I've worked with in the past, and I do work with.

Q    So you have worked with Joseph Aboyoun?

A    Yes, I have worked with Joseph Aboyoun, yes.

Q    On what?

A    On a lot of my dealings with buying dealerships, and -- or just in general, auto-related stuff.

Q    Is he an attorney for the Island Auto Group?

A    He's one of our many attorneys for Island Auto Group.  He has his own practice, he's a partner in a law

83

firm.

Q       Do you see here that at the top of this stock sale agreement David and Ron Baron are listed collectively as the seller, do you see that?

A       I see their two names, yes.

Q       And in the last sentence of that paragraph it says, "Hereinafter, collectively referred to as 'seller.'" Do you see that?

A       Yeah, I can see that, yes.

Q       And then with regard to Anthony Deo just below it says parenthetically that, "He is hereinafter collectively referred to as 'buyer.'"  Do you see that?

A       I see that, yes.

Q       Could you read into the record what paragraph number 4 says?

A       "Whereas, seller desires to sell, transfer and convey to buyer, and buyer desires to purchase and acquire from seller 100 percent of the capital stock in the company."

84

Q      If we look just up here, do you see under Baron Nissan Inc. at the top of the page it was parenthetically referred to as, "Hereinafter referred to as 'company,'" do you see that?

A      Yes.

Q      Having just read paragraph number 4, do you have an understanding that this document was for the purpose of transferring the stock ownership in Baron Nissan from David Baron and Ron Baron to Anthony Deo, do you understand that?

A      No, I don't.  I would have to read the full document.

Q      So from paragraph number 4, you do not have an understanding that that means that David Baron and Ron Baron were transferring, by this document, their ownership interests to Anthony Deo, you do not understand that?

A      I do not understand that, no. I don't agree with what you're saying, so I don't understand it.

Q      What is it that you disagree

85

with --

A    In order to answer a question I would have to read the whole document to give an answer that they are 100 percent willing to sell.  I'd have to see signatures, because it's just a piece of paper, and I don't know --

Q    We'll get there.

A    -- and I don't know, it could be three, six or nine.

MR. SHANKS:  The two of you are speaking over one another.

MR. THOMASSON:  I understand.

MR. SHANKS:  Just for the record and for the court reporter.

Q    When you just read this, we'll get to the rest of the document, do you have an understanding that this is a document designed to transfer ownership of stock in Baron Nissan, regardless of whether or not it was executed, do you understand that that's what this document is for?

MR. SHANKS:  Harry, is your

86

question is this document transferring ownership?

MR. THOMASSON:  I didn't ask that.

Q    Do you understand that the description of this document in the document at the beginning of the document indicates that it is for the purpose of transferring the stock of Baron Nissan from David Baron and Ron Baron to Anthony Deo, do you understand, as a preliminary question, that that's what the purpose of this document is according to the first page?

A    No, according to number 4, which is what you asked me to read, it looks like there is a point where it is, I don't know who wrote the document, that the buyer desires, meaning Anthony desires, to acquire the stock.  I understand that from that paragraph, from that one, number 4, yes.

Q    And the stock is the stock of Baron Nissan, right?

87

A        Related to number 4, yes, that's what -- that's what -- yes.

Q        Okay, all right, that's what I'm asking.

A        Okay, great.

Q        Now, on this particular document we don't have any signatures, do you see that?

A        I don't see any signatures, correct.

Q        Or at least on page 49 there are no signatures there, correct?

A        Yes.

Q        You do however, on page 60, have a signature of Anthony Deo as pledgor, do you see that?

A        I see Anthony's signature, yes.

Q        And under Baron Realty we have David Baron's signature at least once, right?

A        I see his signature, yes.

Q        Was Baron Realty Inc. the holder of the lease at Baron Nissan, if

88

you know?

A       I believe so.

(Defendants' Exhibit G, Email Chain, deemed marked for identification.)

Q       Do you see Exhibit G on your screen, Mr. Aaronson?

A       I do, yes.

Q       Can you see that this is an email chain with certain people in that email?

A       Yes.

Q       It's an email from Thomas Jones to Wendy Kwun and Frank Gallagher, do you see that?

A       I do, yes.

Q       Who is Wendy Kwun?

A       Wendy works with us at Island Auto Group.

Q       Did she at any time work on Northshore Motors' matters?

A       Yes.

Q       Did she at any time work on 189 Sunrise matters?

89

A       I'm not sure.

Q       If she worked for either, on matters involving either of those two businesses, would that have been for you and your group?

A       Yes.

Q       Who is Frank Gallagher?

A       It looks like he works for Citrin Cooperman, an accountant.

Q       But you're not familiar with him?

A       No.

Q       You see Anthony Deo is there, you see that he is a cc --

A       Yes, I do.

Q       -- on that email, anthonyd@northshoremotors1.com, do you see his email address?

A       I do, yes.

Q       Is that the email address that's used for the business at Northshore Motors?

A       I have no idea.

Q       Do you know who owns and

90

operates the email address

northshoremotors1.com?

    A    I do not, no.

    Q    Again, Theresa Martz from Citrin Cooperman, is that a name you're familiar with?

    A    I've seen the name before, yes. I don't know Theresa, but I've seen her name.

        MR. THOMASSON: I have to take a break for two seconds, so I'll be right back.

    A    So do I, so I'll be right back, too.

        MR. THOMASSON: Let's take five minutes, everyone.

        (Recess taken.)

    Q    At the top of this email chain, Mr. Aaronson, we have a series of cc's that include Anthony Deo, Theresa Martz, someone from Citrin Cooperman, Josh Aaronson from Island Auto Group, that would be you, right?

    A    Yes.

91

Q      And Ellen Kera, someone else from Citrin Cooperman, do you see that?

A      I do, yes.

Q      Do you know Frank Gallagher, Theresa Martz and/or Ellen Kera?

A      I know Ellen, yes, I know Aaron -- Ellen.

Q      How do you know Ellen?

A      She's -- I work with Ellen, she's an accountant.  She works for Citrin Cooperman, and she's an accountant that I've used over the years.

Q      And Citrin Cooperman is an Island Auto Group accountant for that business?

A      No, no, Citrin Cooperman is a big accounting firm, and Ellen is a partner in that accounting firm.

Q      Right, but --

A      Island Auto Group works with Citrin Cooperman.  We retain them to do some of our accounting for us.

Q      Okay.

How long have they been doing

92

work, obviously, at least since '22, right?

A        Yes.

Q        Earlier than that, do you know?

A        Yes.  I'm not sure exactly how long, but -- but several years.

Q        Okay.

And Thomas Jones, do you have an understanding that that was an accountant for Anthony Deo?

A        Yes.

Q        Please read this email to yourself, Mr. Aaronson.

A        Read.

Q        Do you have an understanding what this email is for?

A        Well, according to Tom, that he is saying that Anthony Deo and Sarah on this return would show 100 percent ownership between the two of them.

Q        Since June 15th of 2020, do you see that?

A        I see that, yes.

93

Q       When was the first time you saw this email?

A       I'm not sure.

Q       Is it likely that you would have seen it on or about the date of the email which is October 5th of '22?

A       October 5th --

MR. SHANKS:  Objection as to form, just because you used "likely."  You could ask him if he saw it then.

Q       Do you know if you saw it then?

A       I'm not sure, no.

Q       And is it possible that you saw it then?

A       Yes, it is possible.

Q       But you have seen this before today certainly, yes?

A       No, not that I remember.

Q       Okay.

This next email on October 6, do you have a memory of seeing this email before today?

94

A      No, I do not.

Q      Were there discussions at that time in September and October of 2022 between you and Anthony Deo regarding the tax returns for Northshore Motors?

A      Not that -- I don't remember.

Q      I just want to clarify your answer, Mr. Aaronson, because you kind of said two things there.  Is your answer that you don't remember whether there were discussions between you and Anthony Deo in the fall of 2022 over tax returns; is that your answer?

A      The answer is I don't remember.

Q      Okay.

Is it possible that there were discussions between you two in the fall of 2022 over tax returns?

A      Yes.

Q      Since the fall of 2022, have you or anyone at your direction filed any tax documents of any type for Northshore

95

Motors or 189 Sunrise Highway?

    A     I don't believe so.

    Q     How long before the fall of 2022 did you stop filing tax documents for those two businesses?

    A     I'm not -- I wasn't involved in one of those businesses, so I have no idea.

    Q     What about with Northshore, was there any time prior to 2022 that you stopped filing tax documents for that business?

    A     I'm not 100 percent sure, but yes, there was a time that we stopped.

    Q     Why did you stop filing tax documents for Northshore Motors?

    A     I would imagine it was because I had an understanding with Anthony that he was going to take over the business if he filled -- completed some obligations, such as paying off all the cars, transferring the motor vehicle, which I asked him, you know, a few times, "Anthony, when are you transferring your

96

motor vehicle?" and he was eventually supposed to get ownership of these businesses.

Q        Here is the heading on an email from Josh Aaronson to Wendy Kwun that cc's Ellen Kera, Thomas Jones, Anthony Deo, do you see that heading?

A        I do, yes.

Q        Do you see here at the top of page 5 of this exhibit that you wrote to Wendy Kwun, "Good morning, Wendy, Approved.  Thank you, Josh."  Do you see that you wrote that?

A        I do, yes.

Q        Do you remember the last time you saw this email?

A        No.

Q        What was it you were approving, do you know?

A        I'm not sure.  I would have to see the...

Q        Okay.

And here is that email that she sent you that says, "Good morning,

97

Josh, Below is an email from Tom Jones, Anthony's CPA, requesting information to amend the 189 Sunrise 2021 tax return. Attached is a copy of return filed by Citrin Cooperman.   Please let me know if you approve of this request."

          A      Okay.

          Q      Is that what you were approving?

          A      It appears so, yes.

          Q      Do you have any memory of it?

          A      No, not the email for sure, no.

          Q      But at some point in time you approved these tax returns for Northshore and 189 Sunrise that happened to list the Deos as the owners of those two corporations, right?

          A      To me it was an accounting thing, so I -- I -- I -- yes, so the answer is yes.

          Q      So as an accounting thing, you approved those tax returns listing the Deos as the owners of those two

98

businesses, right?

A    Yeah, I mean, I don't have --
I don't have a right to do anything.
There were other partners in the
Northshore Motors' business, so I don't
have a right to even answer for
Northshore Motors other than I was
representing my mother-in-law.

But for 189 Sunrise, I know
that there were obligations that had to
be refilled -- fulfilled by Anthony that
were never done.

MO           MR. THOMASSON:  I move to
strike as nonresponsive.

Q    My question to you,
Mr. Aaronson --

MR. THOMASSON:  Diana, could
you read my last question to him
again, please?

(Record read.)

Q    Yes or no, Mr. Aaronson, is
that correct?

A    Yes.

Q    Thank you.

99

A       You're welcome.

Q       Do you know if you have ever seen the 2021 federal tax return for Northshore Motor Leasing LLC?

A       I don't believe so.

Q       If it was attached to those emails, would you have opened them?

A       Not necessarily, no.

Q       But would it be fair to say that you don't remember opening them?

A       Yes.

Q       So looking at it now, does this refresh your memory as to whether or not you have ever seen the first page of the 2021 US tax return for Northshore Motor leasing?

A       No, I don't remember ever opening it, no.

Q       But it's possible you opened it; is that correct?

A       It is possible.

Q       And is it fair to say that you are not an accountant?

A       Yes, fair to say.

100

Q    How would you describe your knowledge of accounting?

A    I don't know what basis you're asking off of, but I'm not an accountant.

Q    Do you have any knowledge of any accounting principles?

A    Minimal, I would say.  I don't know levels so I can't compare.  I don't know what levels you're referencing, and I'm not trying to be difficult, I don't understand the question.

Q    Okay.

Do you see the top of this page 8 of the exhibit, it's listed on the top left corner as Schedule B-1, do you see that?

A    I do, yes.

Q    Do you see in the middle of the page under Part II, it indicates that Anthony Deo is the 99 percent owner of Northshore Motor Leasing, do you see that?

101

A       I do, yes.

Q       Do you know that this is one of the tax returns you were approving in that email, do you know if that is what you were doing?

A       I don't know if the, like, specifically, like I said, I don't think I ever opened it, but so I don't know if that's what I was approving, but...

Q       Are you saying that you might have approved a tax return without looking at it?

A       I'm saying I might have approved an email without downloading the attachment, yes.

Q       Is that the same thing as the way I asked the question to you, Mr. Aaronson?

A       I don't know.

Q       Did you approve this?  Do you know if this is one of the tax returns that you approved in your email?

A       I don't know.

Q       But it could be; is that

102

right?

        A      Yes.

        Q      If this is one of the tax
returns --

                MR. SHANKS:  Objection.  You
        asked the question, I don't think
        you got an answer, Harry.

                MR. THOMASSON:  I did.

                Did he answer, Diana?

                You know what, I think he
        kind of, I think maybe it was
        squelched.

                Could you read back my last
        question again, Diana?

                (Record read.)

        Q      What is the answer to that
question, Mr. Aaronson?

        A      Yes.

        Q      Were you being honest when
you approved tax returns?

        A      I don't understand the
question.

                MR. SHANKS:  Objection as to
        form.

103

Q    Well, okay, you understand, Mr. Aaronson, that you either could have been honestly approving tax returns, or in the alternative, you could have been perpetuating some sort of a fraud.  I want to try and rule that out.  So let me ask, were you being honest in the way you approached these tax returns?

A    I still don't understand your question, and you know, I -- I -- I think I mentioned --

Q    Well, what was --

A    Go ahead.

Q    Do you believe when you indicated that you were approving, whatever you were approving in that email, that you were doing so honestly?

A    No, what I -- what I approved was Anthony Deo is on the tax return getting 100 percent and on a tax return but nothing to do with full ownership of a business, because there were still several obligations that he was going to have to finish.  So I think there are

104

different things that you're asking.

Q    I know what you're saying, Mr. Aaronson, so I'm separating those two issues, okay.  We will get to your second issue, but you just said, did you not, that you were honestly approving him as owner for these tax returns; is that right?

A    Yes.

Q    Okay, thank you.

(Defendants' Exhibit R, Business Account and Signers' Form, deemed marked for identification.)

Q    Do you have Exhibit R on your screen here, Mr. Aaronson?

A    I do, yes.

Q    I don't think I possess the ability to turn this.  I'm very sorry.  I'm willing to take suggestions.

A    If you just download it --

MR. KATAEV:  On the right side under 2 of 2 with the arrows, the little circle, you can click on that.

105

MR. THOMASSON:  Oh, I see it.  There it is.  Of course.  There we go. I got it.

MR. KATAEV:  You could also take your monitor and swivel it.

Q      Do you see here on the upper left corner of the document, Mr. Aaronson, it says, "Business Account and Signers' Form," do you see that?

A      No.

Business account, yes.

Q      Do you see down about a paragraph it says, "Name of the signer to add, Mr. David Baron," do you see that?

A      I see David's signature, yes, and his name.

Q      Do you see that he is the person getting added to a bank account here for Northshore Motor Leasing also as indicated just above it?

A      Yes.

Q      So he was getting added as of the date next to his signature.  Can you read into the record what you understand

106

that date to be?

A      11/8/18.

Q      Do you have an understanding in your mind that David Baron was already the owner of Northshore Motors on that date?

A      I'm not sure.  I believe so, yes.

Q      Okay.

Do you see a signature at the bottom of this page?

A      I do.

Q      Do you recognize that as being Sarah Deo's signature?

A      I don't exactly recognize it, but I'll go with it, yes.

Q      Okay.

If that's Sarah Deo's signature, why would she be adding David Baron as a signer only to that account in November of 2018, if you know?

A      I have no idea.

Q      If she is adding David Baron to the account, wouldn't that indicate to

107

you that she's the owner of the account?

A      No, I have no idea.

Q      But you don't have any knowledge of who the owners were yourself?  You have no firsthand knowledge yourself of who the owners were before David's death because you weren't involved with Northshore Motors, correct?

A      Correct.

Q      Is it correct that David died during or about May of 2021?

A      Correct, May 25th.

Q      If Iris Baron testified under oath that he died during or about May of 2022, would that be a mistake?

A      If that's what she said, yes. He -- he --

Q      Now, with regard to 2021, according to your email for 2021 on the tax returns and according to you for tax returns only, Anthony Deo and Sarah Deo were the 100 percent stockholders of Northshore Motors for 2021; isn't that part of what was agreed to in those

108

emails?  For tax return purposes only, but that's what they indicate, right?

A       Yes, yes, yes.

(Defendants' Exhibit S, Nassau County Police Department Case Report, deemed marked for identification.)

Q       Do you have Exhibit S on your screen, Mr. Aaronson?

A       I do.

Q       Can you see that this is a report regarding a larceny to the Nassau County Police Department?

A       Yes.

Q       Did you have occasion during late November of 2022 to speak to the police about $735,000 that was taken from an account, did you have an occasion where you spoke to the police about that?

A       I got a phone call from what I believe was a police officer, yes.

Q       And had you caused $735,000 to be taken from an account at that time?

A       Yes.

109

Q      What is it that you did to take that money?  Please walk me through your steps, please.

A      I don't remember exactly, but I believe we were able to take the money out of the account, and it was -- it was out of Sunrise, 189 Sunrise, I believe, in order to pay back all the money that we owed to the banks and consumers.

Q      Well, that's the purpose you did it, I am just asking about the mechanics.

A      Mechanics, we had access to the bank, and we withdrew the money from the bank.

Q      Who is "we"?

A      Me and my office.

Q      What do you mean when you say your office?

A      Someone who works in my office did it.  Most likely Wendy Kwun.

Q      So your memory is that you and Wendy Kwun took that money; is that right?

110

A    Correct.

Q    What account was it put in?

A    Meaning it was in 189 Sunrise's account, that's where the money was put in, and then we took it out of there, and I don't know exactly where it went, but I would imagine it would be one of the Island Auto Group accounts.

Q    So Island Auto Group was the owner of 189 Sunrise in November of 2022; is that what you're saying?

MR. SHANKS:  Objection.  He didn't say that.

MR. THOMASSON:  Well, I'm asking him.

Q    Is that what you're saying?

A    No.

Q    It's a yes-or-no question.

A    No, but the owners of Island Auto Group were owners of 189.

Q    I understand.

Who were the owners of Island Auto Group right now today?

A    Ronny Baron, the estate of

111

David Baron, myself and Marcello Scherino.

Q       How long has that been the case?

A       A little over 11 years, I believe.

Q       Would it be fair to say that in November of 2022, David Baron was definitely not an owner of 189 Sunrise and that account, would that be fair to say?

A       No, not fair to say.

Q       So David Baron was alive and well in November?

A       He, the estate of David Baron, I should say.

Q       I didn't ask you about the estate of David Baron.  I asked you about David Baron.

A       I apologize then.  David Baron was no longer alive in November of 2022.

Q       So then let's try again.

        Was it fair to say that David

112

Baron was definitely not an owner of 189 Sunrise or the 189 Sunrise bank account in November of 2022; is that correct?

A    It's fair to say.

Q    Could you repeat that name, Marcello, again?

A    Marcello.

Q    Marcello what?

A    Scherino.

Q    Is it fair to say that in November of 2022, Marcello Scherino was definitely not an owner of 189 Sunrise or the 189 Sunrise account; is that fair to say?

A    Yes, that's fair to say.

Q    Is it fair to say that in November of 2022, Ron Baron was not the owner of 189 Sunrise or any accounts for 189 Sunrise; is that fair to say?

A    Fair to say, yes.

Q    And is it also fair to say that in November of 2022, that you were not an owner of 189 Sunrise or any of 189 Sunrise's accounts; is that fair to say?

113

A       No.

MR. SHANKS:  Objection as to form, just because you compounded. You should separate them and then the question is okay.

MR. THOMASSON:  Okay, so he seemed to understand those questions before, but I'll separate them for you, Mr. Shanks.

MR. SHANKS:  Okay, thank you.

Q       Is it fair to say that you were not an accountholder for 189 Sunrise in November of 2022?

A       I don't know.  I possibly was, yes.

Q       Okay.

Do you know what credentials were utilized in November of 2022 to sign into that account when you took the money?

A       I'm not 100 percent sure, no. But I know we had access to do it.

Q       Is it possible you had access through David Baron's credentials?

114

A    I'm not sure.

Q    Is it possible that you had access through David Baron's credentials?

A    I'm not sure.

MR. SHANKS:  Objection. Asked and answered, the same question.

MR. THOMASSON:  Well, no, those were two different questions.

Q    Do you know if you ever used David Baron's electronic credentials after he died, do you know?

A    I'm not sure.  I don't believe so.

Q    Do you know if Wendy Kwun ever did, if you know?

A    I'm not sure.

Q    Is it possible --

A    I'm not sure.

Q    Okay.

Is it fair to say that in November of 2022, that Island Auto Group definitely did not own 189 Sunrise or any of its accounts; is that fair to say?

115

        A       Fair to say.  Island Auto Group was -- Island Auto Group was now paying all of 189's debts.

        Q       Well, that was based on your direction to Island Auto Group, right?

        A       But we were paying all the debts that were owed to the banks that we were responsible for.

        Q       Because you made the decision to do so, right?

        A       'Cause we were owners, yes.

        Q       Who made that decision, were you part of that decision?

        A       What decision?  I'm sorry.

        Q       The one that you're talking about to make repayments for Northshore Motors, did you make the decision to --

        A       Yes.

        Q       -- make these payments?

        A       Yes, Ron Baron, myself, we were all responsible for those decisions. We were all responsible for having to pay the debt back to a bank that we made guaranties for.

116

Q        Was there a person who was taking the reins and taking charge to clean up the closing of Northshore?

A        Yeah, it was me and my team, yes, me.

Q        Was that with your partners' knowledge, did they know that you were cleaning this up?

A        We didn't have a choice, so yes.

Q        Well, whether or not you had a choice, they all knew and authorized you to clean this up; is that fair to say?

A        Correct.

Q        When you were acting, you were acting for yourself and your partners in cleaning up Northshore Motors; is that fair to say?

A        Yes.

Q        By cleaning up I mean winding down, you wound down that business, right?

A        No, what -- well, I don't

117

know what you mean.  I know what I mean. What I mean is there were several debts in the business that were owed because of Anthony Deo, and there were cars missing because of Anthony Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Anthony Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle.  All the reasons why we needed Anthony Deo off taking over our, motor vehicle license, which he just chose to never do.  So we had obligations.

When I say winding down, I mean winding down all the problems that were created by Anthony Deo is what I'm referencing.

Q    Were there any things that you wound down that didn't have anything to do with Anthony Deo?

118

A       Anthony has his handprints and fingerprints all over this thing.

Q       Well, let me ask you, did you do anything to cancel any contracts regarding Northshore?

A       I don't know what you mean.

Q       Okay.

Did you have any contracts that you had to settle, were there financial obligations that were contractually based for Northshore Motors when you wound down Northshore Motors' affairs?

A       Yes, there were -- there were obligations, yeah.

Q       Like what?

A       Like paying off our floor plan with Ally Bank.

Q       Did you do that?

A       Yes.

Q       Who did you tell to do that?

A       My office and myself and my team.

Q       You personally were writing

119

checks to Ally Bank?

A       Island Auto Group was personally writing checks to Ally Bank.

Q       So you were directing the writing of the checks, right?

A       Correct, yes.

Q       Who would you talk to to write checks in November and after November of 2022 for Northshore Motors?

A       Wendy.

Q       Wendy Kwun?

A       Correct.

Q       Anyone else?

A       We were all aware of it.

Q       All right, but I'm not asking you who was aware of it.  I asked if there was anyone else that you directed to make payments, or was it just Wendy that you told to make payments?

A       Well, my mother-in-law was aware, because she had to make some payments and wire money in order to cover the debts.

Q       So you would inform her of

120

what she had to do, and then she did it; is that how it worked?

A    I would just let her know that, "Iris, I'm going to have to speak to your person who handles your money, and we're going to need some money to be sent."

Q    And then she would authorize you to do that and you would speak to some accountant in Florida; is that a fair way of putting it?

A    I don't know where they were located, but I would speak to somebody and say that we would need, and this was all over the course of some time because we lost well over 4 million, over $5 million because of this.

Q    So your losses were 4 to $5 million regarding Northshore Motors; is that right?

A    I believe more, I believe, but yes.

Q    It was at least 4 to $5 million; is that right?

121

A    Correct.

Q    And these are losses that you believe were caused by Anthony Deo alone; is that right?

A    Yes.

Q    Were there any other losses, other than financial, that you suffered at the hands of Anthony Deo?

A    Meaning what?

Q    I don't know.  You tell me, was it all just financial losses, is that the only type of losses that you suffered?

A    Well, I don't know what you're referencing.  It caused more stress than I ever had in my business career, and I've been in business, like we discussed earlier, since 2022, whatever it was.  And since I got in the auto business, this was by far the -- that loss of a mental loss was definitely there.

Q    Okay.

So there was mental stress

122

that you suffered as a result of all of this; is that fair to say?

A     Yes.

Q     Did Anthony Deo take any cars, other than financially, from Northshore Motors, if you know?

A     Yes.

Q     What else did he take?

A     Cars.

Q     Was there anything else that he took?

A     Yes.

Q     What else?

A     Our license -- our dealer plates that were our plates that were under our name.  Well, not under my name, but under David Baron, Brian Chabrier and Asad Khan's, that he took the plates and wouldn't return them.

Q     Do you know if they were ever turned into DMV, if you know?

A     I don't -- I'm not sure.

Q     So there was money that he took, there were cars that he took, and

123

there were plates that he took, is there anything else that you can think of now that you believe Anthony Deo was responsible for taking wrongfully from Northshore?

A     Well, he took a lot of cash, I know that.  So he took a lot of cash that supposedly was never deposited into banks.

Q     You say "supposedly," who is it that told you he took cash?

A     I don't exactly remember who, but several people told us.

Q     Did you ever see him yourself take cash?

A     No.

Q     Did you ever see him yourself take plates?

A     Yes, we were aware that he had the plates on the car, yes.

Q     So you saw yourself --

A     I didn't personally.  I didn't personally.  I think I was at that dealership maybe two or three times ever,

124

and I saw that Anthony was driving around with our dealer plates, and Anthony told me that he had our plates.

Q      You were at Northshore ever two to three times; is that correct?

A      I believe that's -- yes, it's not 100 percent correct, but it's pretty accurate that I wasn't there a lot.

Q      Do you know somebody named Frank Ventimiglia?

A      Not that I recall.

Q      So you didn't see Anthony take cash, and you didn't see Anthony take plates, did you see Anthony yourself take any cars?

A      With my own two eyes, no, but I was aware that he had the cars, yes.

Q      I'm not asking you that.  I'm just asking if you have firsthand knowledge, it's a legal thing, Mr. Aaronson, do you have any firsthand knowledge of Anthony Deo taking cars?

A      Yes.

Q      How do you have firsthand

125

knowledge that Anthony Deo took cars?

A        'Cause he drove -- I saw him driving the cars.

Q        Okay.

What cars did you see him driving that he should not have been driving?

A        I'm not sure.  A Bentley. Whatever it was, it was always a fancy car.

Q        Northshore sold high-end cars, didn't it?

A        It attempted to.

Q        So is that a yes to that, to use your term, fancy cars were sold by Northshore?

A        Yes.

Q        And from time to time do operators of dealerships operate cars from the dealership?

A        Their family members don't, so typically it would be an individual, not a child, that would bring a car to Penn State and then register a car --

126

register the car illegally under their name when it was never titled to them. So no, that's not typical in a car dealership.  That would be considered fraud.

Q    Do you have any reason to think he thought he bought a car from Northshore; do you have any knowledge of whether or not he thought so?

A    We know he did not.

Q    You know he didn't buy it, you know that because you know the paperwork was never turned in, right?

A    No, because he never paid for the car.

Q    So how many cars is it that you have firsthand knowledge of him operating that he shouldn't have been? You mentioned a Bentley, anything else?

A    A Maserati.

Q    A Maserati, that's two.

A    And he had a whole host of cars, because we know that there were cars that he purchased that were valued,

127

that he told the bank, were worth some amount of money, and then --

Q       We'll get to that, Mr. Aaronson, but I am asking you what did you see him operating that he should not have been operating?  You have mentioned a Bentley and a Maserati, anything else?

A       I don't remember, no.

Q       And as far as money, did he take money from accounts that he shouldn't have taken?

A       I don't understand the question.  I'm sorry.

Q       Did Anthony Deo take money from the accounts belonging to Northshore at any time, that you know of, whether it was authorized or unauthorized, was there money that went from those accounts to Anthony Deo, yes or no, if you know?

A       I don't know.

Q       As far as Anthony Deo's wrongdoing, you saw him operating two cars that he shouldn't have been

128

operating, and that's the only firsthand wrongdoing you know of today that you can tell me about; is that right?

A    No.

MR. SHANKS:  Objection. Again, you're characterizing.  He said there were other cars.

MR. THOMASSON:  Then he gets the chance to say no, Mr. Shanks.

MR. SHANKS:  The record speaks for itself, but don't categorize his testimony, just ask him another question.

Q    Is it fair to say, Mr. Aaronson, that the only firsthand knowledge you have told me about thus far of wrongdoing by Anthony Deo that you observed firsthand yourself was the operation of two cars; is that right?

A    No, no.

Q    Okay, tell me what else you observed firsthand that he did wrong.

A    That there were millions and millions of dollars worth of supposed

129

cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were -- significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars." I firsthand saw that the cars were not what Anthony presented the cars as.

Q    Okay.

So it was Anthony Deo that was authorized at all times to deal with the floor plan companies on behalf of Northshore Motors; is that correct?

A    He was operating the business, correct.

Q    No, I didn't ask you that. Anthony Deo, in order to rip off the floor plan and you and your partners,

130

would have had to have been the one that was dealing with the floor plan company, right?

A        I believe so, yes.

Q        So it's your testimony that Anthony Deo was authorized by Northshore to deal with the floor plan companies; is that right?

A        No.  When you say "deal," there's different definitions.  I don't -- I don't -- I don't understand.  I think, like, I disagree with your question.

Q        Well, when a car is going to get paid off with the floor plan company, who actually pushes the button on the computer to get that floor plan company paid, is it your testimony that it's Anthony Deo?

A        At the end it was -- it was Island Auto Group.

Q        Okay, before the end, who did it if it wasn't Island Auto Group?

A        Someone that, I guess, worked

131

at Northshore for Anthony -- for the dealership.

Q    For Anthony, is that what you were going to say?

A    And then I said the dealership, because that's where the person worked would be at the dealership.

Q    So what person at Northshore was responsible for paying off cars?

A    Anthony, and as Anthony being the operator of the business, he would have been responsible for it.

Q    So Anthony Deo was the owner of this business; is that what you're saying?

A    No, no.

MR. SHANKS:  The answer was operator, not owner.

MR. THOMASSON:  Yeah, I know what he said.

MR. SHANKS:  Oh, okay, okay.

Q    So you're telling me that someone other than the owner was responsible for the business?

132

A        Yes.

Q        And the person responsible for the business was Anthony Deo; is that right?

A        Yes.

Q        Did anyone else have any responsibilities at the business?

A        No.

Q        Who were the owners on the bank account?

A        I don't know.

Q        In three years with millions of losses, wouldn't you want to know who was in charge of the bank account?

A        I tried to move on from this.

Q        Uh-huh.

Do you know what the security was on those bank accounts?

A        I'm not aware.

Q        Do you know what tokens are, Mr. Aaronson, in your business?

A        I believe what you're referencing is, like, a Chase token, yes.

Q        What is a Chase token, as far

133

as you know?

          A     It's something that -- it's a code that allows you, that changes every few seconds, that allows you to log onto a bank account.

          Q     Were there tokens in place at Northshore Motors?

          A     I'm not sure.

          Q     You wouldn't know who owned them?

          A     I am not 100 percent sure who had access to that.

          Q     Do you know if Anthony Deo had a token?

          A     Don't know.

          Q     If Anthony Deo didn't have a token, wouldn't that mean that only the people with the tokens not named Anthony Deo would be approving transactions?

          A     I don't know.

          Q     Are you telling me you don't know, you know, about tokens but you don't know what they are?

          A     No, I do know what tokens

134

are, I don't know who had access to the tokens.

Q    So once a person has access to a token, then they are the people who are approving transactions at the dealership on that account, right?

A    I don't agree with that question, so no.

Q    No.

People who have the tokens don't have authority over the account; is that what you're testifying?

A    I believe that there's different access, that just because you have a token doesn't mean you have full access to anything, so I don't know who had access to what is what I'm saying.

Q    So then you don't know if Anthony Deo had access to the account since David Baron's death, right?

A    I'm not sure.

Q    Was he authorized to write checks, if you know, from the Northshore account?

135

A        I would believe so, yes.

Q        Was he on the Northshore account, do you know?

A        If he signed checks, I would hope so.

Q        Well, you can authorize someone to sign a check for you if you wanted to on an account that you own, can't you?

A        I'm not aware, so I don't know that answer.

Q        Did you ever authorize Anthony Deo to do anything at Northshore Motors?

A        I don't understand the question, I'm sorry.

        MR. SHANKS:  To do anything?

Q        Was there anything at all that you personally authorized Anthony Deo to go do since David Baron's death?

A        To run an honest business. This is something I spoke to him a few times.  When I would speak to Anthony, that's what I couldn't emphasize more,

136

meaning how we as an organization never looked for any trouble, and that was the main one -- one of the main things I always talked to Anthony about, and I mean, he knows that.

Q      Why did you speak with him about that?

A      Because I knew my father-in-law had, you know, a major problem with him.  And I'm not sure when we, you know, we just eventually heard a lot of bad things that he was, you know, convicted of bank fraud, and he was someone that we should be worried about.

Q      So this person that you had worried about you authorized to run your business, and you were only at that business two to three times; is that right?

A      Well, I learned later on when we found out there was a lot of trouble, that's when I found out about Anthony.

Q      Who told you about trouble with Anthony and David Baron?

137

A        Well, David Baron had told me just because when he told me, "You won't believe what Iris and I had to go do last night."  I said, "What did you have to do?"  and he told me, "I had to go down to Northshore," and I forget exactly why, but because Anthony did something in his eyes that was really unbalanced, and they were having discrepancies and so David had to go down there.  And I don't know if they had to remove cars or something because of something that Anthony did. In all the years I've been in the car business, I never heard of anything like that happening.

So my antennas were definitely up related to Anthony, and he was aware of that because I would constantly tell him, "Anthony," the times that I spoke to him, "just run a good, clean business, that's all we care about."

Q        And you authorized him to continue operating the business knowing

138

that he was a bad guy; is that fair to say?

A    Knowing that he had a potential to be a bad guy, yes.

Q    Well, you said you already knew that he was a bad guy, didn't you?

A    In my father's eyes he had a problem that, which eventually made my eyes feel, that there was a potential that you have to watch out for him.

Q    And then some time after finding out that he was a bad guy, David Baron, nevertheless, attempted to sell Baron Nissan to Anthony Deo, right?

A    I -- I don't know about that.

Q    And knowing, as you did, coming into Northshore Motors after the death of David Baron, you nonetheless authorized Anthony Deo to continue to operate that business, didn't you?

A    Yes.

Q    Okay, so what firsthand knowledge do you have of wrongdoing committed by Sarah Deo?

139

A       I'm not sure.  I guess she's married to Anthony.

Q       Is there any other wrongdoing by Sarah Deo, that you are aware of, that she committed against Northshore Motors?

A       I'm not 100 percent sure.  I characterize them almost together because of their relationship being husband and wife.

Q       So Sarah Deo has committed some sort of wrongdoing because she's married to Anthony Deo?

A       I'm not saying that.  That's not what I said.

Q       So I am asking you a simple question, do you, yes or no, have any knowledge today, firsthand knowledge yourself, of wrongdoing by Sarah Deo to Northshore Motors?

A       I'm not 100 percent sure.

Q       Does that mean no?

A       It means I'm not 100 percent sure.

Q       All right, then I'll rephrase

140

it.   Is there anything that you can specifically tell me that you think Sarah Deo did wrong with respect to Northshore Motors?

A       Yes.

Q       What is it you think she did wrong?

A       In the past she would lock people out of an office and not allow them in an office when they wanted entry into an office.

Q       And you observed this firsthand?

A       No.

Q       Okay, that was told to you?

A       Yes.

Q       Is there anything else that was told to you about what Sarah Deo did wrong to Northshore Motors?

A       Not that I can remember.

Q       And you are certainly not saying that she did something wrong to you, are you?

A       Not that I can remember.

141

Q        And are you saying that she did anything wrong to Island Auto Group?

A        Yes.

Q        What did she do wrong to Island Auto Group?

A        I know she helped move cars supposedly to get them out of the dealership to almost hold them, I'll call, ransom, so she was part of that, and she --

Q        All right, let's --

A        Yeah, go ahead.

Q        I was going to say with regard to that, you personally observed her moving cars?

A        No, I didn't say I personally saw her.

Q        Well, I'm only asking about what you have firsthand knowledge of, Mr. Aaronson.

A        I was -- I was told this, so I don't know.  I guess that's not firsthand knowledge.

Q        No, it's not.

142

Who told you that, that she was moving cars?

A        I don't know.  I don't remember.

Q        Uh-huh.

So do you have any firsthand knowledge of Sarah Deo doing something wrong to Island Auto Group?

A        I don't remember.

Q        Can you tell me today anything that Sarah Deo did wrong to Island Auto Group?

A        I don't remember.

Q        Do you know who the plaintiffs are in this case?

A        So I believe I knew a few of them, yes.

Q        Who are the plaintiffs in this case, Mr. Aaronson?

A        Anthony Deo, Sarah Deo, I believe you are, and I'm not sure who else.

Q        The plaintiffs are the people who bring the case, Mr. Aaronson, did you

143

know that?

A    Oh, I meant the defendants. I'm sorry, I apologize.

Q    Yeah, I'm asking you about your co-plaintiffs. You're plaintiff, aren't you?

A    I am, yes.

Q    Do you know who else are plaintiffs?

A    You can show me and I'll tell you if I, you know, know them.

Q    So off the top of your head, as we speak, is it fair to say you don't even know who the plaintiffs are?

A    I would imagine it's Ronald Baron, it's the estate of David Baron, it's Jory Baron. It -- I would imagine it's Brian Chabrier, I would imagine it's Asad Khan. You know, that's who I believe it is, and there might be more. I wouldn't be surprised.

Q    Uh-huh.

Why would you not be surprised if there were more?

144

A    'Cause Anthony caused, you know, a lot of damage to a lot of people.

Q    But you don't have any firsthand knowledge of what he did wrong, right?

A    I never said that. Of course I have firsthand knowledge. He cost my family millions of dollars. I don't know how you would even suggest that.

Q    All right, well, money was spent that you believe was lost because of Anthony Deo's actions, right, but there's no single transaction that you saw that was wrongful, right? I'm just asking about what you saw. I'm not asking you about the results, I am asking about what you saw.

A    Not correct, like, at all. Like, whatever less than correct is, it's -- it's less than correct.

Q    Okay, so did you see Anthony Deo stealing cars, other than the two you mentioned?

A    I saw -- no comment.

145

Q    Well, I'm just asking if you saw yourself -- I'll be asking everybody this question, I promise you, Mr. Aaronson, you'll get every chance through somebody else to tell us what they saw.  Were there any cars, other than those two, that you personally saw Anthony Deo take wrongfully?

A    Specific cars that I saw him take, no.

Q    Okay.

And you weren't there when he was taking money, 'cause you would have stopped him, right?

A    When he -- no, I did not see him personally take cash with him, no.

Q    You didn't see him personally take license plates, did you?

A    I know he had the license plates, so yes, I personally -- I personally saw them, because I saw he was having -- he had those license plates on his cars, and then we couldn't get those license plates back, so yes, I personally

146

saw him driving with those license plates.

Q    But that's it, you now told me everything that you personally saw him take wrongfully from Northshore, correct?

A    I believe so, yes.

Q    Now I'm asking you the same questions about Sarah Deo.  Did you see her take any cars?

A    Personally, no.

Q    Did you see her take any money wrongfully?

A    Personally, no.

Q    Did you see her take any plates wrongfully?

A    I've seen that she drove a car or had a car, I believe, was in her possession that had a plate that was ours, so yes.

Q    Okay.

What car was that?

A    I don't remember.

Q    Okay.

So she was operating a car

147

with a plate wrongfully; is that correct?

A     No comment.

Q     Okay.

Did you see her take any cash --

A     No.

Q     -- wrongfully?

A     No, not personally, no.

Q     Did you see her take anything, other than what you have already told me, that she took wrongfully from Northshore?

A     Not that I can remember.

Q     And she certainly didn't take anything from Island Auto Group, did she?

A     No, not -- no, she didn't come into our bank accounts and take money out of them personally, no.

Q     Did Anthony Deo go into Island Auto Group or any of its dealerships under that umbrella and take money?

A     Indirectly -- no, but indirectly he did, yes.

148

Q        Well, you took money from Island Auto Group to pay for perceived losses at Northshore Motors, right?

A        Yes.

Q        But that was your decision to do that, right?

A        Yes.

Q        Did Asad Khan take any money and pay any of the debts that you think were caused by Anthony Deo?

A        Not that I'm aware of, no.

Q        Did Brian Chabrier contribute money to pay for the debts you believe were caused by Anthony Deo?

A        Not that I am aware of, no.

Q        Did you take any money of your own and pay any debts that you think were caused by Anthony Deo?

A        Yes.

Q        What money did you take out of your account to pay for debts that you think were caused by Anthony Deo?

A        I am -- it wasn't out of my specific account, it was out of Island

149

Auto Group's account, which I'm an owner in.

Q     I am asking you personally, Mr. Aaronson, did you put any money towards clearing up --

A     No.

Q     -- Northshore problems caused by Anthony Deo?

A     Not out of my personal account, no.

Q     Did Iris Baron pay for any debts at Northshore that you believe were personally caused by Anthony Deo?

A     Yes.

Q     But she would have only done that on behalf of the estate of David Baron; is that right?

A     I believe so.

Q     She didn't put any money in personally herself, did she?

A     She's -- she's -- she is the estate, so I guess it's logistics.

Q     Well, it's important, though. Any money that came from Iris Baron was

150

coming from the estate?

A        I'm not sure where it came from.  I'm not sure where it came from, exactly which accounts of hers were used to pay back the debt, so I don't know.

Q        Well, if I told you that it didn't come from her personally, according to her testimony, would you have any reason to think that that would have been incorrect?

A        No.

Q        Have I ever harmed you at all, Mr. Aaronson?

A        In what capacity?  I'm sorry.

Q        In any capacity, have I ever caused you harm?

A        Yes.

Q        Okay, how did I cause you harm?

A        You know, I wanted the money that was taken, the $735,000 that was then given back to you to be held in escrow, and you chose to give it back to Anthony Deo, which caused me a lot of

151

harm.

Q      Okay, so we're going to set that issue aside.

Did I ever cause you any harm, other than that?

A      No, I never seen you before.

Q      Right.

I didn't work at Northshore, did I?

A      Not that I'm aware of.

Q      I didn't work at 189 Sunrise, that you are aware of, did I?

MR. SHANKS:  Objection as to "work," because I think you had an office there, no?

MR. THOMASSON:  At 189 Sunrise?  I'll thank you again, Mr. Shanks, to not feed your client answers.

MR. SHANKS:  I'm asking you.

MR. THOMASSON:  I never had an office in either of those buildings, if that will make you feel better.

152

Q       Mr. Aaronson, do you know if I ever had an office at Northshore?

A       I'm not aware.  I'm aware that you have a PO Box office, that's all that I am aware of.

Q       You're aware that I had an office at Northshore?

A       I'm not aware, I just answered you.

Q       You have no firsthand knowledge that I had an office at Northshore; is that correct?

A       I am not -- I don't know.

Q       Do you have any firsthand knowledge that I had an office at Northshore, yes or no?

A       Once again, I'm not aware.  I have answered you four times, I think.

Q       You don't want to answer.

Did you ever see an office of mine at Northshore?  You were there three times.

A       I don't know whose office was who.  It could have been in a car for all

153

I know.  I have no idea.

Q       But you're not aware of any office that I had there, are you?

A       I'm not aware of -- no, I'm not aware.

Q       Are you under the impression I had an office at 189 Sunrise?

A       I'm not aware.

Q       So other than the $735,000 problem, is there anything else that you believe I did that harmed you?

A       It's an open-ended question.

Q       Yes or no, is there anything you could tell me right now that I did to harm you, other than that $735,000?

A       Yes.

Q       What else did I do to harm you?

A       In my opinion, you represent someone who's caused a lot of damage to my family and to my business, and that, in my opinion, I think you've done things that are what I would consider unethical.

Q       Like what?

*Rich Moffett Court Reporting, Inc.*

154

A    Make up fabrications and make up stories.

Q    What fabrications have I made up?

A    Things -- things that I've heard in the past that -- that you might have -- that are all part of this court case.

Q    What is it you have heard that I said --

A    I don't remember.

Q    -- that was a fabrication?

A    I don't remember.

Q    So is there anything, other than the $735,000, that you can state with specificity that I've done that you know has harmed you --

A    I'd rather not comment.

Q    -- apart of winding down the affairs of 189 Sunrise, Mr. Aaronson?

A    Please explain what you mean by "winding down."

Q    Have you directed any work regarding 189 Sunrise since November of

155

2022?

A        You mean after 2022?

Q        Since November of 2022, have you done any work involving 189 Sunrise?

A        Not that I can -- not that I am aware of.  I'm not sure.

MR. SHANKS:  Harry, just a question, are you planning on running right through?  Are you planning on breaking for lunch?

MR. THOMASSON:  Well, you know, I was just thinking about that.  I'm pausing and thinking this is probably a good time.  Why don't we take until 2:15 and break for lunch?

MR. KATAEV:  Can I jump in with something?  I have a telephonic conference before Judge Cho at 2:30.  I imagine it's going to take ten minutes.

MR. SHANKS:  Maybe we could run a little more then, and when we break, we run into your --

*Rich Moffett Court Reporting, Inc.*

156

Can you go another half hour, Harry, does that work?

MR. THOMASSON:  You mean now?

MR. SHANKS:  Yes, and then we'll break at 2:00.

THE WITNESS:  Guys, if I can get two minutes to go to the men's room, please?

MR. THOMASSON:  Let's break for five minutes, then we'll go to 2, and then we'll break until 3.

MR. KATAEV:  Perfect, thank you.

MR. THOMASSON:  Okay, but we'll take five minutes now.

(Recess taken.)

Q    Mr. Aaronson, do you know at this time what happened to the DMV licenses for Northshore and 189 Sunrise?

A    I believe they were returned eventually.  I'm not sure when.

Q    Do you know who returned them?

A    I believe, you know, my

157

office.

Q        Your office did that?

A        Yes.

Q        Would that have been at your direction?

A        Yes.

Q        And who is in your office, Wendy Kwun, that's one, right?

A        Yeah, I think Wendy.  I'm not sure who else would have handled something like that.

Q        How many people do you have in your office?

A        I know a lot of dealerships, so I don't know where you're referencing.

Q        Well, I don't know what you mean when you say your office.  What do you mean by your office?

A        It would have been Wendy Kwun and whoever she would have take care of something.

Q        You're not talking about a physical office, you're talking about all of the people who do all of the work for

158

Island Auto Group, is that what you mean when you say your office?

A        Yeah, in this instance, yes.

Q        How many people would that be?

A        Roughly 12.

Q        What are their names?

A        I'm not sure.

Q        You don't know the people in your office, other than Wendy Kwun?

A        I -- I deal with Wendy pretty much.

Q        Uh-huh.

Now, do I understand correctly that DMV licenses are owned by the corporation and there is also one or more personal guaranties associated with those licenses?

A        I don't know the exact rules and regulations of -- of -- of the motor vehicle license, of what goes into it. I'm not exactly 100 percent sure.

Q        Well, do you know if the motor vehicle licenses are owned by the

159

corporation?

A       I would believe that yes, the motor vehicle licenses are the, you know, would be -- should be the owners of the business, yes.

Q       And do you know if there is a personal guaranty on those licenses?

A       It's a government document, so I would imagine there is some sort of personal guaranty that comes along with that, but I'm not 100 percent sure.

Q       Do you know if there was any kind of personal guaranty on the Northshore or 189 Sunrise businesses?

A       I would imagine it would go along with my answer I just answered, so I imagine there is, yes.

Q       And you presume it would be the owners of those businesses; is that right?

A       Yes.

Q       Do you know if the license can be guaranteed by anyone other than the owner of the business, if you know?

160

A        I don't believe so, but no, I'm not sure.

Q        And you were the one had made the decision to turn those licenses back in; is that correct?

A        Yes.

Q        Did your partners object to that decision?

A        I don't believe so, no.

Q        Did your partners know about that decision?

A        I don't remember discussing it with them or not.  I could have.  I'm not sure.  It's so long ago.

Q        Okay.

The $735,000 that you took at the end of November of 2022, do you know who obtained that money?

A        I believe Island Auto Group.

Q        No, I'm not talking about when you took it.  Would you say it is fair to say that that was money obtained by Anthony Deo, as far as you know?

MR. SHANKS:  Objection as to

161

form.  Retained, obtained by him individually?

MR. THOMASSON:  In whatever form Anthony Deo got that money, and I am sure he is going to go into this with you so you'll have an opportunity.

MR. SHANKS:  I'll let you go. I'm just trying to understand the question.

Q    In whatever form Anthony Deo took it, when you took the money, did you know and understand that it was Anthony Deo who had obtained that money?

A    Well, I don't -- I don't know under the premise that he got it, but the business got the money.

Q    Right.  I don't know.  We're going to get into that in a moment, but did you know that it was Anthony Deo who was responsible for obtaining that money in a loan from a bank, did you know that?

A    Yes.

Q    Did you know that he

162

personally guaranteed that money?

A       No, I'm not aware.

Q       Do you know now that he personally guaranteed that money?

A       No, I'm not 100 percent aware of that, no.

Q       But you know he is the one who got it, right?

A       Well, we didn't go for it, so I would assume it's Anthony at that point.

Q       Right.

Did you know that he used the tax returns that you approved to get that money, did you know that?

A       No, I did not know that.

Q       Do you know that now?

A       No, I do not know that now.

Q       Do you think the bank did anything wrong if he used those tax returns to get that money, do you think the bank did anything wrong?

A       I don't -- yes, I do think the bank did something wrong.

163

Q      What did they do wrong?

A      They didn't do their due diligence in order to give a loan.

Q      Okay, so they shouldn't have relied on those tax returns?

A      I don't know what they relied on.

Q      If they relied on those tax returns, should they have done so?

A      I can't speak for their business.

Q      Well, when you approved the tax returns, as far as you knew, were they accurate?

A      I -- I, once again, I think I mentioned I didn't know if I even looked at those particular tax returns.

Q      Do you have any reason today, yes or no, to tell me that those tax returns were inaccurate?

A      I'm not sure.

Q      But I'm asking you if you consciously know of anything right now that you can tell me, yes or no, that is

164

inaccurate in those returns?

A       I haven't -- I don't remember looking at them, so I can't speak to them if it's a yes or a no.

Q       Do you deal with Citrin Cooperman on behalf of the Island Auto Group?

A       I do, yes.

Q       Have they done a good job for Island Auto Group?

A       Yes.

Q       Are they honest in their preparation of tax returns?

A       Yes.

Q       Who would have directed Citrin Cooperman to prepare those returns?

A       I don't know that answer.  I know that I authorized them to work with Anthony on those returns.  I don't know anything that happened after that.

Q       So you authorized Citrin Cooperman to prepare those returns while working with Anthony and presumably his

165

accountant; is that right?

A    Yes.

Q    So let's go back to my wrongdoing, Mr. Aaronson.  You think that I did something with $735,000 that I shouldn't have done, right, that's one thing, yes?

A    Yes.

Q    And you think I've made one or more statements that were false in the course of this litigation; is that right?

A    Maybe you weren't aware of it, but yes, I believe, and I don't have exact specifics.

Q    Okay.

But you can't cite anything specifically today that I said that was false but you believe I did, correct?

A    Yes.

Q    Is there any other way that you can tell me that I harmed you or your co-plaintiffs, other than those two things?

A    What are the two things?

166

Q    You believe I did something wrong with respect to $735,000, and you believe that I have made materially false statements in the course of this litigation, other than those two things, is there anything else I've done to harm you or your co-plaintiffs in this case?

MR. SHANKS:  Excuse me, Mr. Thomasson, is your question limited to statements made in this lawsuit, or this one plus the one you filed, is that the question you're asking?

MR. THOMASSON:  I am asking Mr. Aaronson for anything that I have ever done to harm him that he knows of in the history of civilization on the Planet Earth, okay?

MR. SHANKS:  So it's not limited to this litigation.

MR. THOMASSON:  It's not limited to anything.  I want him to tell me all of the ways that I

167

harmed him and any of the co-plaintiffs.

Q    Are there any other things, Mr. Aaronson?

MR. SHANKS:  I was going to say something.

MR. THOMASSON:  Well, but I'm asking a question.  You can wait until I finish.

Q    Mr. Aaronson, is there anything else that you can think of, other than those two things, that you say I have done to harm you or your co-plaintiffs?

A    Yes.

Q    What else have I done to harm you and your co-plaintiffs?

A    It's a matter of an opinion, but if something is crystal clear to me and to anyone else who's involved in this case from, I'll say, my side or has heard about it, I can't see how anyone can represent someone who has caused this much damage to somebody.  So in my eyes,

168

that you have caused a lot of unnecessary damage for a very, you know, to a lot of people for someone who is a very bad person.

Q      Okay.

Is there anything else you could tell me with specificity that you know of today after three years of litigation that I have done to harm you or your co-plaintiffs?

A      No, that's all for now.

Q      Can you tell me with specificity anything that you can think of that Marc Merckling has done to harm you or your co-plaintiffs?

A      I'm not sure.

Who's Marc Merckling?

Q      I'm just asking you if you can tell me anything today, off the top of your head, do you know of anything specific today that a person named Marc Merckling has done to harm you or your co-plaintiffs?

A      I am gonna say, and I know

169

you asked me a direct question, whoever if Marc -- whoever the individual was that called me as a police officer and asked me to hand back money, I do believe that manner, I don't know if that's Marc or not, he caused me and my business partners a lot of damage, and so yes, then if that's -- I don't know if that's Marc, it might be Marc, it might be someone else, but if that's who Marc is, then yes, I believe that they did something to hurt me, yes.

Q    So there was a phone conversation between you and someone you believed was a Nassau Police Officer, right?

A    Uh-huh.

Q    Did that person identify themselves?

A    I believe they did.  It was a long time ago, and they spoke very fast. It was over -- it was probably, whatever that is now, it's probably four years, four or five years ago.

*Rich Moffett Court Reporting, Inc.*

170

Q        Uh-huh.

Do you see here on Exhibit S, Mr. Aaronson, at the top of the page in the left-hand column it says, "Reporting Officer, 9618," and then there's a name, do you see that?

A        I do, yes.

Q        And that name is -- I don't know what just happened here.  Something just came in on my screen that is right in the middle of this.

A        You can just X out of it.

Q        It's covered.  X is covered.

Do you see where it says Eric Marx, Mr. Aaronson?

A        Yes, I do.

Q        Is it possible that Eric Marx might have been the someone who called you a long time ago, is that possible?

A        Of course it's possible.

Q        If Marc Merckling is not the person who called you that day, is there anything else you can think of that Marc Merckling did to you that was wrong?

171

A      Not that I can remember.

Q      Is there anything else that Marc Merckling did to any of your co-plaintiffs that you know of today that he did wrong?

A      I'm not sure.

Q      But nothing that you could think of, is that a fair way of putting it?

A      Correct.

Q      What about Dwight Blankenship, is there anything you could tell me with specificity today that Dwight Blankenship did wrong to you or your co-plaintiffs?

A      No, not that I can remember.

Q      Is there anything that you could tell me today with specificity that Michael Laurie did wrong to you or your co-plaintiffs?

A      Not that I could remember.

Q      Is there anything that you could tell me today that you know of that Thomas Jones did wrong to you or your

172

co-plaintiffs?

A       Yes.

Q       What did Thomas Jones do that was wrong?

A       I believe he fabricated documents that were inaccurate, like changed financial statements of what, like, in order for Anthony to secure loans so to show a business did much better than it did.  Since Northshore was, you know, hemorrhaging money and in debt of 4, 5, $6 million somehow, I believe Thomas Jones was helpful in getting -- securing loans for Anthony.

Q       I don't remember the answer to this question, Mr. Aaronson.  Were you on any of the Northshore or 189 Sunrise accounts, you personally?

A       I don't remember.

Q       Do you know if money was taken out of those accounts at any time by you or any of your co-plaintiffs from those accounts?

A       I don't remember.  I remember

173

the 735, which was put right back.

Q      Why did you return the money?

A      Well, my goal was to have it put into escrow and money was really for Northshore, but somehow it wound up in a 189 Sunrise account, so the whole thing was very confusing to us.

Q      But you have already told me that it didn't belong to Island Auto Group or you, right?

A      Well, Island Auto Group was paying off all the debts so that -- no, I would say no, I'm not agreeing with your statement.

Q      So was it your view that the money taken by Anthony could be taken by Island Auto Group?

A      It could be taken by the owners of the business, yes.

Q      Because you viewed, at that time, that there was money owed by Anthony to that business, right?

A      No, it was money owed to the bank from 189 Sunrise, which I was an

*Rich Moffett Court Reporting, Inc.*

174

owner of.

Q    Okay, I understand.

Did you still consider yourself to be an owner of 189 Sunrise after you approved the tax returns that listed Anthony and Sarah as owners?

A    Yes.

Q    So then why didn't you file any tax documents since then for 189 Sunrise?

A    Well, Anthony was supposed to do certain things that was going to make him eventually to be an owner.  He had a lot to complete, which he never completed.

Q    But I am asking if you still think today that you're the owner of 189 Sunrise, how come you stopped filing tax documents?

A    I'm not sure.  I'd have to speak to my accountants.

Q    Do you know if Anthony has filed any tax documents for 189 Sunrise since --

175

A    No.

Q    -- November of 2022, if you know?

A    I'm not aware.

Q    Have you ever checked with your accountants to discuss taxes --

A    No.

Q    -- for 189 Sunrise since November of 2022?

A    No.

Q    That's because you're not the owner of it; isn't that true?

A    No, that's not true.

Q    Then why did you stop dealing with the taxes?

A    I don't know.  It's an accounting thing.  I don't -- I'm not -- not that I -- it was an accounting thing, and I don't know why.

Q    So have you gone back and revised any tax returns for 189 Sunrise since November of 2022?

A    Not that I'm aware of.

Q    Has anyone else revised any

176

tax returns for 189 Sunrise since the filing of the approved tax returns in or about October of 2022?

A      Not that I am aware of.

Q      Same questions for Northshore, have you filed any revised tax returns for Northshore since November of 2022?

A      Not that I am aware of.

Q      Has anyone else filed any revised tax returns for Northshore since you approved tax returns for Northshore in October of 2022?

A      Not -- not that I'm aware of.

Q      Have you ever heard of something called 1581 Hylan Boulevard Auto LLC?

A      Yes.

Q      What is that?

A      It's one of the entities of Island Auto Group.

Q      And what does that entity do?

A      We have a lot of different entities, so I'm not exactly sure of that

*Rich Moffett Court Reporting, Inc.*

177

specific one, but you said 1581 Hylan Auto?

Q    I said 1581 Hylan, H-Y-L-A-N, Boulevard Auto LLC.

A    So that's one of my plating companies.

Q    What does it operate?

A    I believe that's Mazda, but I'm not 100 percent sure.

Q    You believe it's what?

A    Hylan Mazda but I'm not 100 percent.  I have a lot of LLCs, all of the d/b/a's, Island Mazda or Island Volkswagon or Island whatever, so I'm not sure which one that's tied to.

Q    Did I do something wrong to 1581 Hylan Boulevard Auto LLC, that you know of today?

A    I think this goes back to my original answer is I don't -- I don't know, because I don't know how that relates to the money that was taken, the 735 and whatnot, so I don't know that answer.

178

Q    All right, but at the moment, you don't know anything specific you can tell me that I did wrong to that LLC, do you?

A    This is, once again, an opinion. It sounds like that LLC, of course, was stressed to represent Anthony Deo, so in my opinion, you damaged me. Whether I'm right or wrong, you know, that's only a few people would know that.

Q    But I'm only asking about 1581 Hylan Boulevard Auto LLC, not you.

A    I'm not sure.

Q    I'm asking do you right now know of anything that I have done to that LLC, yes or no?

A    I don't know.

Q    Do you know of anything that I have done wrong to 1580 Hylan Boulevard Auto LLC?

A    I don't know.

Q    Do you know of anything that I have done wrong to 1591 Hylan Boulevard Auto LLC?

179

A        I do not know.

Q        Do you know of anything I've done wrong to Island Auto Group that you haven't already told me?

A        I don't -- I don't know.

Q        Do you know of anything I've done wrong to 1632 Hylan Boulevard Auto LLC?

A        I don't know.

Q        Do you know of anything today I've done wrong to 1239 Hylan Boulevard Auto LLC?

A        I do not know.

Q        Do you know of anything I've done wrong to 2519 Hylan Boulevard Auto LLC?

A        Do not know.

Q        Do you know of anything I've done wrong to 76 Fisk Street Realty LLC?

A        I do not know.

Q        What is 76 Fisk Street Realty LLC to you?

A        It's a piece of property that we own.

180

Q        Where is that?

A        In New Jersey, in Jersey City.

Q        Did I ever do any work with you out of state, that you know of, Mr. Aaronson?

A        I do not know.  I don't believe so, but I do not know.

Q        Is there any work that you could tell me that you think I've done for you or any of your co-plaintiffs in New Jersey?

A        Not that I'm aware of.

Q        Have I ever done anything to harm any interests of yours in New Jersey?

A        Other than that I own the business of those, so possibly those are tied into some of the issues that we're having, so that's possible but I don't know.

Q        But you're not saying that I took money from any of these businesses, are you?

181

A    You helped take money that we believe should have been ours, yes.

Q    How did I help take money that you believe should have been yours?

A    Money that was in escrow, that we believed should have been in escrow that you chose to just release it to your client.

Q    Do you know if I told anyone on your behalf before they sent me the money that if they sent it to me I was going to give it to Anthony Deo, do you know if I told anyone that?

A    I'm not sure.

Q    Do you know if I told them that I was not going to hold it in escrow if they sent it to me, do you know that?

A    I'm not sure.

Q    Do you know whether or not there is an agreement that I violated to hold that money in escrow, are you aware of any agreement for me to hold that money in escrow?

A    I'm not sure.

182

Q        And just as you made the decision to give back those DMV licenses because you and your partners were still the guarantors on it, didn't Anthony Deo have a right as the guarantor on that loan to that money?

MR. SHANKS:  Objection. Calls for a legal conclusion.

Q        If you know, Mr. Aaronson.

A        I'm sorry, I didn't hear you.

Q        You understand that the reason you felt you could give back those DMV licenses is because you considered yourselves to be the owners of those DMV licenses as the guarantors, right?

A        We were the owners of the DMV licenses, right.

Q        So that's why you felt you could give them back even though they were in the corporate name, right?

A        Yes.

Q        So how is that different than Mr. Deo obtaining that money as the personal guarantor, shouldn't he have

183

been entitled to that money back?

A    I don't know -- I don't know the full circumstances, so I can't answer your question.

Q    Okay.

Have I done anything you could tell me I've done, that you are aware of today, to 445 Route 23 Auto LLC?

A    Similar to my last answer, I don't know how they're all tied in together in this -- in this particular case that we're talking about, so I'm not sure.

Q    So you don't think I actually took money from that business myself?

A    No, you did not.

Q    You just think that if that business was doing something with Anthony Deo, my help in some way, shape or form to Anthony Deo was part of your loss, is that basically your theory of how I'm liable to these other corporations?

A    I'm not 100 percent sure, but I could see that, yes.

184

Q       I mean, you are not aware of me ever having direct contact with any of the plaintiffs prior to the commencement of this litigation, are you?

A       No, I'm not aware.

Q       Yeah.

Is Island Auto Management LLC a holding corp., or is that the corporation for the Island Auto Group?

A       It's all tied into Island Auto Group.

Q       Is there a corporation for Island Auto Group that owns it?  I mean, Island Auto Group is the tradename, right?

A       Yup, we have separate LLCs, and then we have, I believe, we have an Island Auto Group LLC or Island Auto New York LLC.

Q       That what?

A       That all the other LLCs can roll into, but I am not an accountant, so I'm not 100 percent sure.

Q       How is Island Auto Management

185

LLC involved in this case?

A    I'm not sure.

Q    I mean isn't it a fact, Mr. Aaronson, that money was taken at your own and your partners' direction from these different corporate co-plaintiffs and you want the money to go back to those businesses, isn't that why they are plaintiffs in this case?

MR. SHANKS:  Objection as to form.

Q    Is it your position that Anthony Deo, Sarah Deo, Dwight Blankenship, Marc Merckling, Michael Laurie and Harry Thomasson did business with all of your co-plaintiffs, is that your position?

A    I'm not sure.

Q    You don't know, as you sit here now, what business, if any, that any of us did with 446 Route 23 Auto LLC; did any of us do business with that LLC, that you know of, Mr. Aaronson?

A    No, but you could have

186

impacted those -- that businesses -- those businesses through -- without even knowing that you did.

Q    Right.

So that's your position on these other businesses, you believe that there were impacts that you cannot define right now on those businesses by me and the codefendants, right?

A    Financially, yes, we -- we -- we felt that we were entitled to some money.  We were owed over $5 million by Anthony Deo, well over that, and you guys are all part of that side of the table.

MR. SHANKS:  Emanuel, what time do you have to break?

MR. THOMASSON:  Let's break for lunch now, we'll return at 3.

MR. KATAEV:  I can keep going, if you want, until 2:15, 2:20.  Whatever you want to do, I'm fine.

MR. THOMASSON:  Why don't we go to 2:15 and then we'll break

187

until 3:00, all right?

MR. SHANKS:  Okay.

Q     Are you aware of any contracts between any defendants and any plaintiffs?

A     I don't know what -- which contracts you'd be referencing, so I'm not aware.

Q     All right, let's do this, other than Sarah Deo and Anthony Deo, are there any defendants in this case, that you know of, who had any contracts with any plaintiffs, is there anyone that you can refer to right now?

A     Not that I'm aware of.

Q     So you're not aware of me having any contract with any plaintiff; is that fair to say?

A     Yes.

Q     You're not aware of any contract between Michael Laurie and any plaintiff; is that fair to say?

A     Fair to say.

Q     You are not aware of any

188

contract between Dwight Blankenship and any plaintiff; is that fair to say?

A    Fair to say.

Q    You're not aware of any contract between Marc Merckling and any plaintiff; is that fair to say?

A    Fair to say.

Q    Are you aware of any occasion that I was employed by any plaintiff?

A    Not that I'm aware of, no.

Q    Are you aware of any occasion that Marc Merckling was employed by any plaintiff?

A    I believe that, and I'm not sure exactly who, but a lot of the gentlemen that you mentioned in the past all got paid by Northshore, so I guess they were employed in some capacity.

Q    Marc Merckling?

A    I'm not sure if it's Marc or the next three names that you're going to have.

Q    But you are aware that I never worked for Northshore, right?

189

A        I don't know, you might have.

MR. SHANKS:  Objection.
Harry, is your question as an employee or as an attorney?

MR. THOMASSON:  Fair point, Russell.

Q        Are you aware whether or not I was ever employed by Northshore?

A        I'm not -- I'm not aware if you were.  You might have gotten paid for things, so I'm not aware of that.

Q        But not as an employee, right?

A        Not that I am -- no, no, not that I am aware of.

Q        But you think Marc Merckling might have been, right?

A        Might have been.

Q        What about Dwight Blankenship, do you know whether or not he was an employee?

A        I'm not sure.  He might have been.

Q        What about Michael Laurie, do

190

you know whether or not he was an employee?

A        I'm not sure.

Q        Were any K-1's ever issued, that you know of, in connection with Northshore Motors?

A        Were there -- repeat that question, please.

Q        Were there any K-1's ever issued, that you know of, for Northshore Motors, yes or no?

A        I'm not sure.

Q        As you sit here today, are you testifying that you don't know whether or not K-1's were issued at any time for Northshore?

A        I really wasn't that involved, so I'm not sure, no.

Q        Is Wendy Kwun still working for Island Management?

A        She works for Island Auto Group, yes.

Q        I'm sorry, I misspoke.  I was looking at Island Management when I said

191

that.

Does Wendy Kwun still work for Island Auto Group?

A     Yes.

Q     How long has she worked for Island Auto Group?

A     Ten years, I believe, give or take a little, you know.

Q     Do you know somebody named Melissa Beltray?

A     Yes.

Q     Who is Melissa Beltray?

A     Someone who has worked for some of -- of the businesses that my father-in-law was involved in who now works for me at a few of my dealerships.

Q     Melissa Beltray currently works for you?

A     Yes.

Q     Does Melissa Beltray charged in Nassau County with fraud, that you know of?

A     I am not -- I am not aware.

Q     You're not aware that Melissa

192

Beltray was charged with fraud in Nassau County; is that what you just testified to?

A    Yes, sir.

Q    Uh-huh.

Are you aware that Melissa Beltray was Asad Khan's girlfriend?

A    No, I'm not aware of that.

Q    Are you aware that Melissa Beltray was Brian Chabrier's girlfriend? That's a yes-or-no question, Mr. Aaronson, and I don't know what's funny about it because I've got witnesses that say she was.  So go ahead, what's the answer to that question?

MR. SHANKS:  I guess what's funny is you asked about someone else.

MR. THOMASSON:  Yes, well, then the next question is is he aware of the argument that took place in front of everyone at Northshore between Asad Kahn and Brian Chabrier when they both found

193

out that the other was dating her.

A      No, I'm not aware of that.

MR. SHANKS:  Okay.

Q      No, you're not aware of that?

A      No.

Q      You're not aware of --

A      No.

Q      Okay, I understand.

MR. THOMASSON:  All right, let's break now for lunch.  I think this would be a good time.  We'll resume at 3:00.

MR. KATAEV:  We're coming back when?

MR. THOMASSON:  3:00.

MR. KATAEV:  If I free up sooner I'll just let everybody know in the audio.

MR. THOMASSON:  Okay.

(Luncheon recess was taken at 2:11 p.m.)

194

A F T E R N O O N    S E S S I O N

(Time noted:  3:02 p.m.)

J O S H U A    A A R O N S O N,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. THOMASSON:

Q     Mr. Aaronson, you indicated that you believe that Anthony Deo took millions of dollars that he was not entitled to out of Northshore Motors, right?

A     Say it again, please.

Q     You believe that Anthony Deo

195

took millions of dollars somehow out of Northshore Motors that he was not entitled to, right?

A    Yes, he -- whether he took it or not, he lost it, and he, you know, did things that would be unethical, fraudulent, millions of dollars, yes, and not paid off customers' cars, et cetera, et cetera, yes.

Q    But all those cars are, in fact, today paid off; is that right?

A    By Island Auto Group, yes.

Q    And was there any money included in your allegation that he was responsible for more than $5 million in losses to Northshore, was any of that money taken by him?

A    I have no idea what happened with it.

Q    So as you sit here today, you cannot tell me that he took money he wasn't entitled to, you're saying he mismanaged money?

A    No, I believe that he used

196

the money that was taken from the business to live a lavish lifestyle in a multimillion dollar home that he had and drive his fancy cars and even bought me a very expensive watch to thank me for, you know, everything that he said I did for him.  So yeah, he used -- he used the money that whatever he was doing he was using the money to live whatever lifestyle he had by committing fraud to banks and whatnot and not paying off consumers' cars to go on living his life.

Q    So then it is your specific allegation that he took money he was not entitled to from Northshore, correct?

A    Yes.

Q    Do you know how he took it?

A    No.

Q    Can you tell me today of a single transaction in the Northshore bank accounts, that you are aware of, that was unauthorized?

A    I'm not sure.  I would have to go back and look at records and --

*Rich Moffett Court Reporting, Inc.*

197

Q        So after three years --

A        I've tried to forget this case as much as possible, to be honest with you.

Q        So after three years of litigation, you cannot sit here and tell me of a single transaction involving Northshore bank accounts that were unauthorized as conducted by anyone; is that correct?

A        He committed fraud against the banks to allow --

Q        That's not my question.

A        Well, no, I'm answering your question.

Q        But that's not my question. My question is:  Yes or no, can you tell me --

MR. SHANKS:  Read back the question, if it's a yes or no.

(Record read.)

Q        Yes or no?

MR. SHANKS:  Mr. Thomasson, he could answer beyond yes or no.

198

A        It's not a --

MR. THOMASSON:  Yes, he can but he should at least be saying yes or no.  I asked for a single transaction.

A        No, it is not a correct statement what you're saying, so no, what you're saying is inaccurate.

Q        So can you please tell me of a specific transaction conducted by anyone at Northshore that was unauthorized?

A        In my opinion, everything he did was unauthorized.

Q        So he was authorized to operate the business, but he had no authority over the bank account; is that right?

A        I'm not saying that.

Q        Okay, so everything he did was unauthorized while he was authorized to operate the business, is that right, because you already told us he was authorized to operate the business,

199

right?

    A    He was authorized to operate the business.

    Q    Okay, so I am asking you to tell me now of a single transaction, just one, that was unauthorized by Anthony Deo or anyone else, can you tell me one transaction at Northshore that was not authorized?

    A    As we uncovered it more and more, like I said earlier, I try to forget this every day of my life because this has only been stress and nothing to gain other than loss of millions of dollars, is that he did take cash out of the business, and he did it -- did not make it to the bank, so Anthony did everything wrong, so that's my answer, and I cannot speak specifically about one transaction, but all he did --

    Q    Okay.

    A    -- was commit fraud.

    Q    Okay.

        You're certainly not trained

200

as an attorney, are you, Mr. Aaronson?

A       No, I don't play one on TV either.

Q       Okay.

Have you ever been on TV, Mr. Aaronson?

A       Yes, I have been.

Q       For what?

A       I've been interviewed for things about the auto industry.

Q       How many times?

A       I don't know.

Q       What channels?

A       I'm not sure.

Q       So it would be fair to say that you think he took millions of dollars but you cannot provide any specificity at this time; is that correct?

A       At this time I cannot, but I know it's out there, so yes.

Q       Okay, who would know?

A       There are plenty of people that I'm sure know.

201

Q        Excellent.  Name them.

A        I don't know.

Q        At this time?

A        You know.  You know.  Be honest, you know.

Q        It's got to be on the record, and it's obvious that you don't know, right?

A        No, it's not obvious that I don't know.

Q        So then tell me the names of the people who are aware of these frauds committed by Anthony Deo.

A        There's a long line of people.

Q        Excellent.  What are their names?

A        I think he's got multiple lawsuits against him right now, so I would imagine all those people that are suing him believe he committed some sort of fraud, and he's had fraud in his past.

Q        Would it be subsequently piggybacking your lawsuit, do you know?

202

A    No, I believe it's just other people that he's gotten before me, after me, everything else. You represent someone who had nothing but trouble.

Q    When was the first time you ever spoke to Anthony Urrutia?

A    I don't remember.

Q    Was it before or after the death of David Baron?

A    I believe after, but I'm not sure. I don't remember specifically, 'cause it could have --

Q    Could it have been what?

A    It's a big industry, so I might have run into him at other points in my career, but I don't know exactly specifically when I spoke to him.

Q    At some point in time you spoke to Mr. Urrutia in this lawsuit, right?

A    Yes.

Q    You were happy to have him join this lawsuit, weren't you?

A    I wasn't happy about anything

*Rich Moffett Court Reporting, Inc.*

203

with this lawsuit.

Q     You weren't happy to have Mr. Urrutia join this lawsuit?

A     I'm not happy that someone else had happened to what happened to me, no.

Q     Except that's not what I'm asking.  What I am asking is:  Did you authorize Mr. Urrutia to join this lawsuit?

A     I know that Anthony is suing Urrutia, so I know that, so yeah, anything that could -- could happen that would prove what Anthony's harmed people throughout his career, then, yeah, of course, I would want that, because he cost my family over 5, 6 million bucks.

Q     So you were happy to have Mr. Urrutia join this lawsuit because you thought you had another person from the outside who were going to make similar allegations, right?

A     Sure.

Q     Okay.

204

So you spoke with Mr. Urrutia about this lawsuit before you joined it, right?

A      Yes, I believe so.

Q      Who said what to whom?

A      I don't understand the question.

Q      You and Mr. Urrutia had one or more conversations about this lawsuit before he joined it, right?

A      I don't remember how many conversations or when I had the conversations, but I know I had conversations with him.

Q      What is it you two discussed?

MR. SHANKS:  Objection.

MR. KATAEV:  I made an objection on common interest privilege.  I don't know if Russell joined with me on that.

MR. SHANKS:  I do.

MR. THOMASSON:  Before Tony Urrutia joined this lawsuit, you're asserting, Mr. Kataev, that his

205

conversations with Joshua Aaronson are privileged?

MR. KATAEV: Well, I think you need to clarify with him whether the conversations occurred with attorney present or without, and based on that answer, maybe we'll lift the objection or we'll continue to assert it, but based on the question that you presented, it includes any conversations with attorney present, and the common interest privilege would, therefore, apply.

Q    Mr. Aaronson, now that you have been fed that information, let's be reminded please of what my question actually was. I asked you did you and Tony Urrutia have any conversations prior to him entering this lawsuit, and you said yes; is that correct?

A    Yeah, I did say yes.

Q    So we're just --

MR. SHANKS: Harry, I think

206

if you add the words "outside of counsel," maybe it would solve the whole issue.

MR. THOMASSON:  Well, I'm about to deal with that, thank you.

Q    Mr. Aaronson, please tell me about the conversations that the two of you had alone, whether it was on the phone or in person.

A    I don't remember.  It was never in -- it was -- I don't remember. The conversations were about how Anthony Deo both did the same kind of damage, like the exact same playbook that he used on me is what he did on Tony and I.

Q    So as far as you know, Anthony Deo was on bank accounts at Superb Motors?

A    I don't know enough about Superb Motors.

Q    You don't know anything about what was going on at Superb?

A    I know there was something done wrong by Anthony that caused Anthony

207

to lose a lot of money.

Q       And what is it that he told you that Anthony did wrong?

A       I don't remember specifics, and 90 percent of those conversations or more were with our attorneys on the phone.

MR. KATAEV:  I'm sorry, I want the record to be clear the witness refers to Anthony.  We have an Anthony Deo, we have a Robert Anthony Urrutia.        Can you please say the answer with who you're referring to, for the record?

A       I'll call Tony Urrutia Tony, and I had had several conversations.  90 percent of them were with our attorney, but it was all about how Deo caused us a lot of damage and left a huge mess behind him, which then hurt our businesses tremendously.

Q       Okay.

So tell me who was on the

*Rich Moffett Court Reporting, Inc.*

208

telephone call during these conversations. It was you, Tony Urrutia, and what are the names of any attorneys that were on the call?

A    Could have been Russell Shanks, Emanuel, Jeff Ruderman.

Q    Were they at that time your attorneys?

A    Yes.

MR. KATAEV:  Objection to form and vague on the question.

Q    I am talking about before Tony Urrutia joined this lawsuit, you and your attorneys had telephone conversations with Tony Urrutia; is that right?

A    Yes.

Q    How many?

A    I don't know.

Q    And you also had one or more conversations with Tony Urrutia without attorneys, correct?

A    Yes, correct.

Q    And other than the general

209

subject of wrongdoing by Anthony Deo, you have no memory of the specifics of those conversations; is that right?

A    I have some memory of them, yes.

Q    Did you know that there was an injunction in this case?

A    Related to what?

Q    Automobiles.

A    And related to what?

Q    I am just asking if you know that there is an injunction regarding automobiles.

A    In my case?

Q    Yes.  Did you know, yes or no?

A    In my particular case I'm not aware of any injunction.

Q    Are you aware of any injunctions in another case?

A    Explain to me what injunction is, please.

Q    Okay.

       Since November of 2022, have

210

any cars that were titled to either 189 Sunrise or Northshore been sold, that you know of?

A       I believe so, yes.

Q       Were you involved in those sales?

A       No, I wasn't involved in the direct part of that sale, but the sales would happen because I would say yes, let's sell those cars.

Q       So you directed one or more people to make sales of cars belonging to one or both of those corporations since November of '22?

A       Yes.

Q       How many cars did you sell?

A       No idea.

Q       Where did the money go?

A       The money went back to pay Ally Bank and consumers that were -- that were ripped off by not paying off their payoffs for their trades.

Q       Do you have records of those transactions?

211

A        Yes.

Q        And those transactions are all related, in your mind, to wrongdoing by Anthony Deo, right?

A        Yes.

Q        You aware that there is a request for documents that haven't been responded to?

A        No, I'm not aware of that.

Q        Did anybody give you a request for documents from me?

A        Not that I am aware of.

Q        So on January 7, 2026, you have never seen a request for documents from me; is that correct?

A        I'm not aware of it.  That's what you asked.

Q        You have no memory of seeing such a request; is that a fair statement?

A        That's a fair statement.  We only lost, so I don't know what I would have to gave -- gain.  We only lost money in this.  There was no money made.  We got crushed.

212

Q       Did you know when those cars were sold since November of 2022?

A       I don't know exact specifics, no, I don't.

Q       How could you have sold those cars if you turned in the licenses?

A       I -- I don't know how that transaction happened.  I know that I paid off Ally Bank, and I have the rights to the cars, that I know.  It's my --

Q       You had the rights to the cars because they belonged --

A       Because it's my motor vehicle work, it's my dealership, it's my bank, it's my everything.

Q       And you obtained your interest in Northshore Motors when?

A       I never had interest in it. I was -- I was helping my mother-in-law out.

Q       But you were selling Northshore Motor cars since November of 2022?

A       I was helping facilitate,

213

trying to recoup any dollar we could recoup, yes.

Q    Were any of those sales after you turned back the license for Northshore Motors?

A    Excuse me?

Q    Were any of the sales of cars for Northshore Motors made after the license was turned back in?

A    I don't know.

Q    When did you order the license to be turned back in?

A    I don't have specific dates, it's a long time ago.

Q    Same questions for 189 Sunrise, Mr. Aaronson, when was the license turned in for 189 Sunrise?

A    I don't know.

Q    You were the one who gave that order, right?

A    Yeah, we would want to do it as quickly as possible.

Q    It was done pretty quickly, it was done by January or February of

214

2023, wasn't it?

        A        I don't know exactly, but if that's what you're saying, then I'll, you know, trust that you're right.

        Q        There have been some sales of cars since then, right?

        A        I don't know that.

        Q        If there were sales of cars after the license was turned back in, how would that be done?

        A        I'm not exactly sure how we did it or how we would do it, but I would imagine the paperwork would have had to have been at some point transferred.

        Q        It would have been transferred to what, an Island Management business?

        A        Potentially, yes.

        Q        And then the money that came in would be going to the Island Auto Group?                  I'm sorry, I keep mixing those two up.  I'm very sorry.

        A        No, no, no apologies needed.

        Q        It would have been Island

215

Auto Group that was then selling the cars, right?

A        Potentially, yes, if that's who we transferred them to, yes.

Q        But you don't know who you transferred them to?

A        Not 100 percent.  We sell a lot of cars, you know, so I definitely, I'm unaware of what goes on with each transaction that we do.

Q        Now, you weren't aware of any contracts between Defendants Harry Thomasson, Marc Merckling, Dwight Blankenship and Michael Laurie and any of the plaintiffs, are you aware of any contracts between any of the plaintiffs and Sarah or Anthony Deo?

MR. SHANKS:  Mr. Thomasson, I looked at the complaint during the break because I noticed when you went through the plaintiffs, a number of the plaintiffs, two of the plaintiffs, two of the plaintiffs are Northshore and

*Rich Moffett Court Reporting, Inc.*

216

Sunrise, and you didn't mention them when you were mentioning the others.  I don't know if it was intentional or not, but so to the extent you're asking about any contracts between Laurie and any of the plaintiffs that might cover, like, Northshore or Sunrise, I just wanted to be clear, and you could ask whatever you want.

MR. THOMASSON:  Now that you fed your client another answer.

MR. SHANKS:  No, no, no. What I said, you went plaintiff by plaintiff and said does this one have a claim.

MR. THOMASSON:  I didn't go plaintiff by plaintiff, I read off some corporations.  Stop feeding your client answers.

MR. SHANKS:  Oh, stop it.

BY MR. THOMASSON:

Q     Mr. Aaronson, are you aware of any contracts between the Deos and any

217

of the plaintiffs?

        A       Not that I'm aware of.

        Q       Okay.

                Who would be aware of the contracts between the Deos and any of the plaintiffs, if there are any?

        A       I don't know what contracts you're referencing.

        Q       Okay.

                I'm just trying to find out how much you know about the business, Mr. Aaronson.

                Were you involved at all in giving any directions to anyone in the Island Auto Group regarding pandemic relief funds?

        A       For Island Auto Group?

        Q       Yes.

        A       Yes.

        Q       What directions did you give?

        A       To the extent of the law that we are allowed to, you know, ask for relief that we would ask for relief.

        Q       Who did you give that

218

direction to?

A    I would imagine I spoke to my accountants, Citrin and Cooperman, about it.

Q    How about Wendy Kwun?

A    Wendy would then be part of that conversation with Citrin, and you know, that's how I think that would work. Not I think, that's how it would work.

Q    Did she ever tell you she's the pandemic relief queen?

A    No, she's never told me she's the pandemic relief queen.

Q    Is that a phrase you ever heard anybody in Island Auto Group use?

A    No.

Q    Do you think you're entitled to representation in these actions, Mr. Aaronson, do you think you're entitled to have a lawyer?

A    Of course.

Q    Do you think your partners are entitled to have a lawyer?

A    Of course.

219

Q      Do you think Anthony Deo is entitled to have a lawyer?

A      Of course.

MR. SHANKS:  Does he have a lawyer?

Is his lawyer on the call, by the way, Mr. Thomasson?

MR. THOMASSON:  I don't know. There's a whole list up here.  I don't know who's on the call.  I'm just taking a deposition, Mr. Shanks.

MR. SHANKS:  So you don't know if the defendants' counsel, other than yourself representing yourself, are on this call?

MR. THOMASSON:  I don't know. The Deos are signed in.  I don't know who's in the room with them. I haven't spoken with them about this.

MR. SHANKS:  Got you.

Q      Mr. Aaronson, are you aware that the Department of Justice convened a

220

grand jury regarding the situation?

A      In what regard?

Q      Do you know that there was a grand jury that was convened to look into this situation at Northshore or 189 Sunrise?

A      I'm not sure what exactly the question is, it's tough for me to answer.

Q      Do you know if the Department of Justice at any time was involved by you or anyone on your behalf to investigate what goes on at Northshore and 189 Sunrise?

A      Yes, I would hope that -- that someone brings Deo to justice, which he, you know, definitely deserves.

Q      Well, that's lovely, Mr. Aaronson, but my question was are you aware of any investigation that was brought through the Department of Justice to look into the Northshore and 189 Sunrise situations, yes or no?

A      I believe some government agencies are looking into Mr. Deo, yes.

*Rich Moffett Court Reporting, Inc.*

221

Q    What agencies are you aware of?

A    Federal agencies, local agencies.

Q    How are you aware of that?

A    'Cause I had a meeting with the FBI.

Q    When did you have a meeting with the FBI?

A    I don't remember exactly when.

Q    Was it before or after you were served with the complaint that the Deos brought against you?

A    I'm not sure when.  I would imagine I tried to do it as quickly as possible.

Q    Did you call the FBI to have that meeting?

A    Not directly, no.

Q    Who did?

A    I'm not sure.

Q    Did you talk to any other law enforcement, besides the FBI, about

222

Northshore and 189 Sunrise?

A       I'm not sure.  I spoke to a few different government agencies.

Q       What other agencies did you speak to besides the FBI?

A       I'm not 100 percent sure.

Q       Who would know?

A       I don't know.  My attorneys possibly would know, but I don't know.

Q       Did you ask anyone to begin criminal investigations involving Northshore and 189 Sunrise?

A       I don't know enough to know there were criminal actions done, so I would imagine that, you know, the government handled it from there.

I believe my father-in-law's name was signed to a document after he was dead that Anthony handed in, so I imagine there was a lot of fraud that has been -- been done by Anthony Deo.

Q       Did you make any allegations against me to the FBI?

A       Not that I'm aware of.

223

Q       Did you make any allegations against Dwight Blankenship to the FBI?

A       Not that I'm aware of.

Q       Did you make any allegations against Marc Merckling to the FBI?

A       Not that I'm aware of.

Q       Did you make any allegations about Michael Laurie to the FBI?

A       Not that I'm aware of.

Q       Did you make any allegations against Sarah Deo to the FBI?

A       Not that I am aware of.

Q       Did you make any allegations against Anthony Deo to the FBI?

A       Yes.

Q       So would it be fair to say that as far as crimes go in this case, you think that it's limited to Anthony Deo who committed the crimes against the plaintiffs?

A       No, definitely not.

Q       So who else committed crimes against the plaintiffs?

A       I'm not exactly sure, but I

224

feel like all the people that you just mentioned are all in cahoots to, you know, hurt businesses and call up people, like myself, that were just trying to fight for things that were rightfully theirs, and use their power to take advantage of somebody by using their, you know, their badge, let's just call it, like, by using their powers that may be to try and hurt individuals like me who are just trying to run a business and live my life.

Q    So what is it that gives you that feeling?

A    Well, when you get a phone call on something that's a civil matter that says you should return money from a police officer, you know, that kind of makes you feel like, What's going on here?  Then you speak to some other people, and they say, "He really didn't have the right to make that phone call to you."

Q    So why did you give the money

225

back?

A     Because honestly, I've been with through my life, knock on wood, without having any issues, and at that point what I instructed --

MR. SHANKS:  No conversations with counsel.

THE WITNESS:  No, no, no.

A     What I wanted was for that money to actually go back to Libertas, since they gave that money to Anthony probably under false pretences, and I would have loved to have given that money back to Libertas.

Q     Because you believe that's where he got the money from?

A     Yes.

Q     Who is involved in that transaction, do you know?

A     In terms of what?

Q     In terms of him getting the money, was that, as far as you know, between Anthony Deo and Libertas?

A     As far as I know, yes.

226

Q      And has anything happened in the last three years of litigation to suggest to you that anyone else was involved in getting that money, other than Anthony Deo and Libertas?

A      Yeah, I think there had to have been some Libertas required information that, I guess, Thomas Jones or someone else would have had to help Anthony to provide information to Libertas.  So I don't know who was involved, but I'm sure it just wasn't Anthony himself.

Q      Did you know when you approved those tax returns in September of 2022 that they were going to be filed with the taxing authorities?

A      No.

Q      Why did you approve those tax returns then if they weren't going to be used?

A      I don't know what was going to happen with them.

Q      Are you suggesting that tax

227

returns would be prepared that are false?

A    No.

Q    You didn't know if any of the tax returns were to be prepared falsely, did you?

A    That's not what I said.

Q    Would it be fair to say that whatever it was that went on in the email chain is what you understood at the time, the email chain that I showed you earlier?

A    Yes, yes.

Q    And if that email chain indicated that those tax returns were going to be filed, do you believe now that they shouldn't have been filed?

A    I am not thinking about it.

Q    Okay.

Well, I'm asking you now to think about it.  Would you rather if those tax returns had not been filed?

A    No, if -- if they had to be filed, they had to be filed.

Q    And if I were to tell you

*Rich Moffett Court Reporting, Inc.*

228

that they were filed, would you now have any objection with the fact that they were filed?

A      No.

Q      Mr. Aaronson, are you aware that those five checks for $10,000 each to 189 Sunrise, were those five people at the time the owners of 189 Sunrise?

A      Not at the time, they still are.  They still are the owners of 189 Sunrise.

Q      When those checks were transferred in February of 2021 or 2022, it was 2021, wasn't it, that those checks were written?

A      You'd have to show me again, I'm not sure.

MR. SHANKS:  Hold on, I have it here.  You have them.  February 12, '21.

Q      When those checks were written on February 12, 2021, five checks of $10,000 each, were those checks written to the people that were the then

*Rich Moffett Court Reporting, Inc.*

229

owners of 189 Sunrise?

A    I don't agree with your line of questioning.  We were the owners -- we are and were the owners of 189 Sunrise, yes, that I'll agree with.

Q    When those checks were written in February of 2021 to those five people, that would be you, Phalon, Chabrier, I think it was Jory Baron and David Baron?

A    Correct.

Q    Were you the five owners of 189 Sunrise in February of 2021?

A    Yes.

Q    Thereafter, you saw a little while ago that there was a lease that Anthony Deo entered into for 189's location, remember that lease?

A    I do, yes.

Q    Are you aware that warranties for customers were being sold at 189 Sunrise in February of 2021 by NMAC or one of its subsidiaries?

A    I'm not sure.

230

Q        Assuming for the sake of argument that NMAC was the provider of warranties for 189 Sunrise, did you know that the responsible party for paying off those warranties after that $50,000 was paid became Anthony Deo, did you know that?

A        No, I'm not aware of that.

Q        Do you know why he would become the responsible party for paying off 189 Sunrise's warranties after that money changed hands?

A        No idea.

Q        No idea?

It wasn't in connection with the sale of 189 Sunrise, Mr. Aaronson?

A        I answered the question already.

Q        Well, now I am specifically asking you.

A        I'm specifically answering.

Q        You do not know if him taking over the warranties was related to the purchase of 189 Sunrise?

231

        A       No.  How would I know that?
No.

        Q       Well, did you know that you
were no longer responsible for those
warranties?

        A       I think I went to that
business less than zero times before the
date that you're mentioning and after the
date that you're mentioning, so I really
wasn't involved in that business.

        Q       So now I'm telling you, let's
assume for the sake of argument, that
Anthony Deo did take over the warranties
at 189 Sunrise, isn't that usually taken
over by the owner of businesses?

        A       No.

        Q       No?

                Is it nonowners who paid for
those warranties; is that what your
testimony is?

                MR. SHANKS:  Objection as to
        form.  You're using the words "take
        over, pay for."

        A       Yeah, I don't know who paid

232

for.  I don't know who.

Q    Do you know what paying for means, Mr. Aaronson?

A    Yes, but I don't know who paid for them, Mr. Thomasson.

Q    Okay.

So let's assume that Anthony Deo was the person who started paying for them after he gave $50,000 to you.

A    I am not going to assume that.

Q    Well, for the sake of this question, we are allowed to ask hypotheticals, Mr. Aaronson.  So who is it that typically pays for warranties at a dealership, wouldn't that be the owner of the dealership typically?

A    Typically the owner would be paying for them, but that has nothing to do with this instance.

Q    But typically it's the owner, right?  Yes or no?

A    Or the office on behalf of the owner, yes.

233

Q      Isn't it typically the owner of the business that also pays for the lease, in your experience?

A      Typically an owner would pay for a lease that's for the building, yes. But there's all different kinds of arrangements in business, so I can't speak to this particular.

Q      Right, and you didn't have any written arrangements with Anthony Deo regarding the ownership of Northshore or 189 Sunrise, correct?

A      I'm sorry, Mr. Thomasson, say that again, please.

MR. THOMASSON:  Could you repeat that question for me please, Diana?

(Record read.)

A      Yeah, I was never an owner. I was never an owner in Northshore, so I can't speak to that, and I'm not aware of anything that was signed that sold over my ownership in 189.

Q      Well, I'm not asking you just

234

for the purpose of whether there's a writing that signs over your ownership. You said that there was some sort of agreement between you and Anthony Deo for him to obtain 189 Sunrise.  I'm asking you is that agreement in writing?

A      No, not that I am aware of.

Q      And through all of this, whether or not you were an owner of Northshore, it certainly is a big part of this litigation, have you ever seen an agreement between any of the plaintiffs and Anthony Deo regarding the ownership of Northshore Motors?

A      Not that I am aware of, no.

Q      Do you know someone named Rob Xerri?

A      Definitely sounds familiar, so but not 100 percent, but it sounds very familiar, but I don't want to say it's somebody I'm thinking of, but I'm not 100 percent.

Q      Did you at any time ask Anthony Deo to become an owner of

*Rich Moffett Court Reporting, Inc.*

235

Northshore?

A    Anthony Deo had obligations for him to take over, which would be taking off -- yeah, he could have potentially been an owner if he completed a bunch of obligations, which he never did.

Q    And did you ever ask Anthony or anyone else to become an owner yourself at Northshore?

A    I asked Anthony that we wanted nothing to do with the business anymore, and in order for him to get everything, he would have to complete certain obligations.  Other than that, I don't remember any other conversations.

Q    You kept saying that we didn't want to have anything more to do with the business, except you're also saying that you weren't an owner either.

A    I said I'm not an owner of Northshore, but I was representing my mother-in-law.

Q    But you were not an owner of

236

Northshore yourself, right?

A    Never, no.

Q    Did you ever ask anyone to become an owner of Northshore?

A    No.

Q    And if anyone were to testify that you asked someone right in front of them that you wanted to become an owner, would they be lying?

A    Yes, I would believe so, yes.

Q    I may have asked this, but I really mean it more as another preliminary question.  Other than the FBI, have you spoken to any other law enforcement regarding Northshore and/or 189 Sunrise?

A    I don't remember specifically who I spoke to within government agencies.  I think I answered it already.

Q    Did you ever speak to anybody on a state level?  The FBI is a federal law enforcement agency.  Did you ever speak to anybody on the state level?

A    I believe so, yes.  I'm not

237

sure who or when, or you know, but I believe so.

Q    Are there any active investigations, you are aware of right now, by law enforcement involving either Northshore or 189 Sunrise?

A    You'd have to speak to government agencies.

Q    No, I am just asking you if you are aware of any; yes or no?

A    I would imagine there are, yes.

Q    Who do you believe is investigating Northshore and/or 189 Sunrise right now?

A    The FBI I would almost guarantee is.

Q    Why would you guarantee that?

A    Because they asked a lot of questions and seemed to have a lot of information.

Q    Have you spoken to --

MR. SHANKS:    I am going to warn the witness at this time if

238

there is an active investigation, he's not allowed to discuss the details, if he has any.

You can ask about their existence, but I just want to set a bar here to prevent you from going somewhere where none of us should be going.

MR. THOMASSON:  And that objection is based on what privilege?

MR. SHANKS:  That objection is based upon the fact that if an agency has an ongoing investigation, that they don't want any potential witnesses to tell you, to tell anyone, what they're investigating, why and how, as long as it's an open investigation.  I don't know if it is.

MR. THOMASSON:  Okay, well, so everyone on the other side of this table doesn't know anything about it, but I can't ask about it?

239

MR. SHANKS:  You did ask about it.

MR. THOMASSON:  Well, I'm not done asking about it.  Let's see where the questioning goes, Mr. Shanks.

MR. SHANKS:  Okay.

BY MR. THOMASSON:

Q    Mr. Aaronson, when was the last time you spoke to the FBI about either Northshore or 189 Sunrise?

A    I don't remember.

Q    Was it in 2024?

A    I don't remember.

Q    Could it have been before 2024?

A    Possibly but I don't remember.

Q    Did you ever speak with the FBI in 2022?

A    I don't remember.

Q    Do you know who you spoke to?

A    I don't remember.

Q    Who would know?  Is there

240

anyone who would know, other than the FBI?

A    I'm not sure who would know.

Q    When you spoke to them, were you alone?

A    By representation.

Q    You or one or more of your lawyers spoke to the FBI about these cases?

A    I believe so, yes.

Q    Who were the lawyers that spoke with the FBI in front of you about Northshore and/or 189 Sunrise?

A    I honestly, I don't remember. There were a few lawyers there.

Q    Any of the people that are on this call?

A    I'm not 100 percent sure, but I believe so, yes.

Q    Was Mr. Kataev there?

A    I believe so.

Q    Was Mr. Shanks?

A    I'm not sure.  I don't remember but I believe so.

241

Q        Was Mr. Ruderman there?

A        I have no idea.  I don't remember.  It was a long, long time -- not a long -- whatever.  I just don't remember.

Q        Have you ever spoken to the FBI, other than regarding 189 Sunrise and Northshore?

A        No.

Q        So the only time you have ever spoken to the FBI in your life has been about 189 Sunrise and Northshore; is that right?

A        That I am aware of, yes.

Q        And you have no memory of what was discussed or who was there; is that right?

A        Well, what was discussed is things that we believed that Anthony, you know, did that harmed consumers and -- and different individuals, and you know, and my -- my family and business partners, that was what was discussed.

Q        Was there --

242

A    And we had, like, documents, specific things that were done by Anthony Deo that had his fingerprints all over them.

Q    Oh, tell me about those documents, please.

A    I don't remember them.

RQ        MR. THOMASSON:  I specifically call upon the production of documents presented on behalf of any plaintiffs to law enforcement relating to Northshore or 189 Sunrise.

MR. SHANKS:  Taken under advisement.

MR. KATAEV:  Please follow up in writing.

MR. THOMASSON:  Are you speaking on behalf of Mr. Aaronson, Mr. Kataev?

MR. KATAEV:  I'm speaking on behalf of plaintiffs, which was who your request was directed at.

243

BY MR. THOMASSON:

Q      Mr. Aaronson, do you know someone named Steve Marino?

A      Yes, I believe so.

Q      Who is Steve Marino?

A      If it's who I'm thinking of, he does IT work for different car dealers, and that's his business, if that's who it is.

Q      And does that person you're thinking of still do work for Island Auto Group?

A      He never really did any work for Island Auto Group in Staten Island, that I'm aware of.

Q      Other than Northshore and 189 Sunrise, has he done any work for any of your other businesses?

A      Yeah, I believe he just did work at a Honda dealership in the Bronx for us, and I believe he's done work at Baron Nissan.  I know he's done work at Baron Nissan.

Q      Who replaced Melissa Beltray?

244

A    Wait, Steve Marino, I'm -- I apologize, I'm thinking of an IT guy, so you might be talking about somebody else. I don't know.

Q    Your answer stands, Mr. Aaronson.

Who replaced Melissa Beltray at Northshore?

A    I don't know.  I know when I got there, Danny O'Sullivan was in the office.

Q    What about Tracy Leshius?

A    I really had nothing to do with Northshore in terms of -- I don't know when Tracy, if she was there, when she was there, so I'm not sure of that answer.

Q    Well, you were representing Iris's interests for Northshore, weren't you?

A    Yes.

Q    Did Brian Chabrier authorize you to represent his interests at Northshore?

*Rich Moffett Court Reporting, Inc.*

245

A    Brian was aware of it, so yes.

Q    What about Asad Khan, did he authorize you to represent his interests at Northshore?

A    I never really spoke to Asad about it.

Q    Was Asad involved at all after David's death at Northshore?

A    No, not that I am aware of.

Q    Did you list Northshore on any of your personal taxes at any time?

A    Not that I'm aware of.

Q    Did you list 189 Sunrise on any of your personal taxes at any time?

A    I believe so, yes.

Q    Did there come a point in time when you stopped doing that?

A    I'm not sure but I believe so.

Q    When would that have been?

A    It sounds like from what you asked me before in 2021.

Q    So you would have stopped

246

listing 189 Sunrise on your taxes after February of 2021?

A        I believe so, yes.

Q        Do you know what title washing is, Mr. Aaronson?  That's a term you've heard in the business, isn't it?

A        I'm not that familiar with it, no, because -- no.

Q        You never heard that term?

A        I've heard the term.  Of course I heard the term.  Truthfully, I feel like I know what it is, but I'm not 100 percent sure.

Q        It would be a shell game of moving the ownership of title for the purpose of selling it under one corporation when perhaps it really didn't belong to that corporation, does that go on in the business?

A        Not --

MR. KATAEV:  You seem to understand it well, Mr. Thomasson.

MR. THOMASSON:  Oh, I've learned a lot in this case,

247

Mr. Kataev, sure have.  I knew nothing in November of 2022.

Q     Mr. Aaronson, I want to ask you whether or not you have ever known anyone to engage in title washing?

MR. SHANKS:  Note my objection as to your explanation of what it was, which is kind of wishy-washy.

MR. THOMASSON:  Okay, he knows the term.

A     I don't know.  I don't know.

MR. THOMASSON:  He knows the term.

A     I've heard of the term.  I truthfully don't know what it means.

It sounds like I should be proud of that, so...

Q     Uh-huh.

A     Yeah.

Q     Yeah, uh-huh.

MR. SHANKS:  Uh-huh.

Q     Did you have any discussions at Northshore Motors between you and

248

Anthony Deo with anyone else present, Mr. Aaronson?

A    There was one time that someone else was in the room while I was meeting with Anthony.  I forget, I think he was a finance guy that worked for Anthony.

Q    Well, the finance people worked for you, didn't they?

A    Anthony was the operator of the business, so he really handled, obviously, he handled the day to day of the business, so I didn't really know anyone at the dealership.

Q    Well, you knew when Wendy Kwun was there, you know her, don't you?

A    Wendy was there not that frequently, that I am aware of.

Q    So Wendy was there, and you know that she works for you, right?

A    Wendy definitely works with me, yes.

Q    And Melissa Beltray worked for you and one or more of your

249

dealerships, right?

A    No, no.

Q    Didn't you tell me earlier she still works for you?

A    No, that's different.  Now she works for me, yes.  Melissa never, that I am aware of, Melissa never worked directly for me up until -- up until maybe a year or two ago.

Q    So a couple of years ago she began working for you?

A    Yeah, when I opened up Stream Auto Outlet.

Q    What does she do there?

A    She helps in the office.

Q    Does she pay off any deals?

A    I would think -- I would hope so.

Q    Well, salespeople don't pay off deals, do they, it's finance people who pay off deals, right?

A    Finance people typically don't pay off deals, the office pays off deals.

*Rich Moffett Court Reporting, Inc.*

250

Q    But you just said you hope Melissa Beltray pays off deals, right?

A    Yup, she's in the office, then I would hope she pays off deals when it's time to pay a car off.

Q    So she's not located at 189 Sunrise Highway?  I am not talking about the business, I am talking about the address.  What is the business there now?

A    Stream Auto Outlet.

Q    So she's not physically located at Stream Auto Outlet, she's in an Island Auto Group location?

A    No, not accurate.

Q    She's in Stream Auto Outlet's location?

A    There's -- she is involved in two Stream Auto Outlet locations.  I don't know truthfully where she sits.  I haven't been to those stores in several years.

Q    What does she do for you, is it in the finance department or in the sales department?

251

A       In the office department.

Q       What is it that the office department does?

A       Everything from motor vehicle to interest, accounts payable, accounts receivable, paying off cars.

Q       Would it be fair to say that the office's work is focused on finances?

A       The part of their -- yeah, it's part of the job.

Q       What are the other things that go on in the office that have nothing to do with finances?

A       Well, I think everything has to do with finances.  Your motor vehicle, if your motor vehicle gets ruined, that's going to eventually hurt your finances, so it's a tough question to ask.

Q       So Melissa Beltray is involved in finances for sure for Island Auto Group; is that correct?

A       Once again, that is not right.

Q       Well, she may also be

252

involved in other things, but she's certainly working on finances, isn't she?

A    Not for Island Auto Group, no.

Q    Did she work on finances for the Stream locations?

A    Yes.

Q    Okay, so she works on finances, correct?

A    Once again, sir, the answer is no.

Q    She does not work on finances?  She works on finances only for Stream, for the two Stream entities; is that right?

A    I think you might be confused at this point because I'm definitely confused.

Q    Okay.

What are the things that Melissa Beltray does for the Stream Auto Outlets?

A    I'm not exactly sure.  My business partner handles those two

253

locations, but I would imagine, I'll go out and say this, she helps on motor vehicle, paying off trades, paying off our bank from when we sell a car, she has to pay that off.  I'm sure she helps with payroll.  Things that an office helps with.

Q      Okay.

So offices pay off cars; is that what you're saying?

A      Typically.

Q      Did the office pay off cars at Northshore, if you know?

A      Not enough cars apparently.

Q      Well, but I am asking you if yes or no, the office was responsible for paying off cars at Northshore, as far as you know?

A      Anthony Deo was responsible for paying off cars at Northshore, yes.

Q      So he was sending money personally to the banks to pay off cars and floor plan to pay off cars; is that right?

254

A     Well, he definitely wasn't doing that, because if he did, I would never have lost -- my family wouldn't have lost 5, you know, 4, 5, $6 million.

Q     So it was his responsibility to physically himself pay off the lenders and the floor plan providers?

A     It was his responsibility to make sure that that happened, yes.

Q     Ah, so he didn't do it, somebody else did it but was under his direction; is that right?

A     I'm not sure.  I wasn't there.

Q     Ah, so you don't know if it was Anthony Deo that was doing the theft, do you?  If you don't know who was responsible for paying it off, who actually did it, someone else could have diverted funds; is that possible?

A     No, not possible.

Q     So who was in charge of the bank accounts with Northshore when you went in and had to investigate, what did

255

you find?

    A    I -- I can't answer your specific question, but I was told by Danny O'Sullivan that Anthony directs him when to pay off cars, when not to pay off consumer cars.  That Anthony was the person that, I would say, he is, in layman's terms, was driving, you know, the car.  He was the one that was making the decisions of how to pay off cars, when to pay off cars.

    Q    He was making those decisions, but was it Danny O'Sullivan, was it his job to then make those payments or not make those payments, was he the one that was doing it?

    A    He would be part of the people that would do it, yeah, absolutely.

    Q    Who, besides Danny O'Sullivan, was actually making the payments and not making the payments --

    A    I'm not sure.

    Q    -- as overseen by Anthony

256

Deo?

A      I'm not sure.

Q      Did, to the best of your knowledge, Wendy Kwun have to do any of that work?

A      I don't believe so, no.  The answer is no, no, that wouldn't be Wendy's job.  No, that would not be Wendy's job, no.

Q      Would Melissa Beltray be doing any of that work?

A      I don't even know that Melissa worked there.  I don't believe she did work there, but at least she didn't work there when I -- I never saw Melissa there.

Q      Although you were --

A      And I'm not dating her so I don't, you know, I wouldn't know exactly, but the -- but I don't believe Melissa was there.

Q      Do you know any of the employees that were at Northshore after David's death?

257

A    No, I know Anthony had his --
there is Anthony and Sarah.  I know Danny
O'Sullivan was there, and I know he had a
few people that were involved with the
police that would be there, but I didn't
know them, I never met them, I didn't --
I only spoke to one or two of them, like,
at the very, very end when we were trying
to find cars, and they knew where they
were located, and they helped us
facilitate by leaving us keys to go get
the cars on Anthony's direction, I guess.

Q    Would that be Marc Merckling
and Dwight Blankenship?

A    I would think so, yes.

Q    So they were helpful to you?

A    No, they were not helpful.

Q    Didn't you just say it was
helpful that they helped you to
facilitate getting back the cars?

A    No, I said at the end they
facilitated getting some cars, and trust
me, it was everything but helpful.  We
had cars splattered all over Long Island,

258

and so I -- when you lose 5, $6 million, not much you're going to say is helpful.

Q    And that 5, $6 million was lost over what period of time?  I'm not talking about when it was paid, I am talking about when the losses themselves occurred, do you know?

A    No, no idea.  No, I'm sure an accountant can figure it out, and I'm sure we can document it pretty well.

Q    Has that been done?

A    I have no idea.

Q    Well, did you direct anyone to do that work?

A    We just wanted to -- we just wanted to solve the problem.  We were -- just wanted to make --

Q    But who was doing the accounting?

A    I wasn't doing the accounting.  We just wanted to make our bank whole.  We knew we owed our bank a lot of money and Anthony wasn't going to be the one paying it.

259

Q    Could any of those losses have occurred during David's lifetime, if you know?

A    I am not sure.

Q    Could any of those losses have occurred after David's lifetime?

A    I'm not sure.

Q    So all of the losses could have occurred before David died; is that right?

A    I have no idea.

Q    But you do know that David was aware there was wrongdoing by Anthony Deo at the dealership because he told you so, right?

A    He told me that my mother-in-law and him had to go late at night in order to go get cars because they were -- Sarah was locking up titles, and I don't know exactly what happened.

I know I was very disappointed that this whole thing was happening to my mother-in-law had to deal with this, and my father-in-law was

260

upset.

Q    But you weren't involved in the dealership at that time anyway, right?

A    No.

Q    What have you done since you were involved in the dealership to find out what went wrong before you were involved in the dealership, did you do anything to investigate that?

A    No.

Q    So if maybe these differences were resolved as between Anthony and David Baron, you wouldn't know that; is that correct?

A    I don't know what happened between Anthony and my father-in-law.

Q    Okay, thank you.  I appreciate that.

MR. THOMASSON:  I have no further questions at this time.

MR. KATAEV:  Ariel, do you have any questions?

MS. RONNEBURGER:  I don't

261

have any questions.

MR. KATAEV:  Let's go off the record.

MR. SHANKS:  Actually, Emanuel, before we go off the record, I asked a question, and Mr. Thomasson was very good at evading it, is Mr. Jeffrey Benjamin on this call?

Okay, so counsel for the defendants, other than Mr. Thomasson, has not attended today.  Okay.

MR. KATAEV:  There are counsel for Libertas who are not here either.

MR. SHANKS:  Right.

I would like that in the record.  Thank you.

MR. KATAEV:  I think we can let the witness go, and if you want to talk about some housekeeping stuff.

(Time noted:  4:08 p.m.)

262

A C K N O W L E D G M E N T


STATE OF NEW YORK   )
                         :ss
COUNTY OF            )


         I, JOSHUA AARONSON, hereby certify
    that I have read the transcript of my
    testimony taken under oath in my
    deposition of January 7, 2026; that
    the transcript is a true, complete and
    correct record of my testimony, and
    that the answers on the record as
    given by me are true and correct.




                    _____
                    JOSHUA AARONSON



Signed and subscribed to before
me, this              day
of                       , 2026.


_____
Notary Public, State of New York

263

---------------I N D E X--------------------

WITNESS                    EXAMINATION BY        PAGE

JOSHUA AARONSON      MR. THOMASSON              5

MOTION:   PAGE:   99

-----------DOCUMENT REQUEST----------------

PAGE:   242    Documents on behalf of

plaintiffs to law enforcement

re Northshore or 189 Sunrise

-----------------EXHIBITS-------------------

DEFENDANTS'                              DEEMED

    A      Department of the Treasury

           Internal Revenue Service

           document                          55

    B      Northshore Assignment of

           Lease and Lease Modification    56

    C      Business Depository Certificate

           from Chase Bank                   60

    D      Check Payable to David Baron

           dated February 12, 2021          62

    E      Lease dated June 15, 2021        68

    F      Stock Sale Agreement dated

           May 17, 2021                     71

    G      Email Chain                      88

*Rich Moffett Court Reporting, Inc.*

264

-----------I N D E X(Cont'd)---------------

------------EXHIBITS (Continued)-----------

DEFENDANTS'                                    DEEMED

    R      Business Account and

           Signers' Form                       104

    S      Nassau County Police

           Department Case Report              108

*Rich Moffett Court Reporting, Inc.*

265

C E R T I F I C A T E

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NASSAU    )

I, DIANA MITCHELL, a Notary Public within and for the State of New York, do hereby certify:

That JOSHUA AARONSON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January, 2026.

                    ---------------------------
                          DIANA MITCHELL

266

CERTIFICATE

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NASSAU   )

I, Diana Mitchell, a Notary Public within and for the State of New York, do hereby certify:

That JOSHUA AARONSON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of January, 2026.

*Diana Mitchell*
----------------------
DIANA MITCHELL

## $

**$10,000** [8] - 63:10, 64:5, 64:23, 65:13, 69:4, 71:5, 228:7, 228:24
**$50,000** [2] - 230:6, 232:10
**$735,000** [9] - 108:18, 108:23, 150:22, 153:10, 153:16, 154:16, 160:17, 165:6, 166:3

## '

**'21** [1] - 228:21
**'22** [3] - 92:2, 93:7, 210:15
**'buyer** [1] - 83:16
**'company** [1] - 84:6
**'seller** [1] - 83:10

## 1

**1** [3] - 12:14, 43:12, 54:8
**100** [33] - 18:9, 22:16, 28:6, 38:20, 45:9, 64:3, 76:11, 80:23, 83:24, 85:5, 92:21, 95:14, 103:21, 107:23, 113:22, 124:8, 133:12, 139:7, 139:21, 139:23, 158:23, 159:12, 162:6, 177:10, 177:12, 183:24, 184:24, 215:8, 222:7, 234:20, 234:23, 240:19, 246:14
**10170-0002** [1] - 2:20
**104** [1] - 264:6
**108** [1] - 264:8
**10:07** [1] - 1:20
**11** [1] - 111:6
**11/8/18** [1] - 106:3
**11423-2327** [1] - 2:8
**11553** [1] - 3:11
**11576** [1] - 5:15
**11793** [1] - 3:6
**11:03** [1] - 54:22
**11:30** [2] - 54:24, 55:4
**12** [6] - 63:3, 70:16, 158:7, 228:21, 228:23, 263:20
**1239** [2] - 1:8, 179:12
**12th** [1] - 68:18
**1339** [1] - 3:18

**15** [7] - 12:18, 13:18, 71:10, 73:4, 73:11, 74:9, 263:21
**1580** [2] - 1:7, 178:20
**1581** [6] - 1:6, 176:17, 177:2, 177:4, 177:18, 178:13
**1591** [2] - 1:7, 178:24
**15th** [2] - 71:24, 92:23
**1632** [2] - 1:7, 179:8
**16th** [1] - 71:23
**17** [2] - 80:7, 263:23
**18211** [1] - 2:7
**189** [94] - 1:4, 1:17, 2:12, 63:20, 63:25, 66:13, 67:2, 67:9, 68:19, 71:7, 73:17, 73:19, 74:19, 74:24, 75:3, 75:8, 75:13, 78:2, 78:13, 88:25, 95:2, 97:4, 97:17, 98:10, 109:8, 110:4, 110:11, 110:21, 111:10, 112:2, 112:3, 112:13, 112:14, 112:19, 112:20, 112:24, 113:13, 114:24, 151:12, 151:17, 153:8, 154:21, 154:25, 155:5, 156:20, 159:15, 172:18, 173:7, 173:25, 174:5, 174:10, 174:18, 174:24, 175:9, 175:22, 176:2, 210:2, 213:16, 213:18, 220:6, 220:14, 220:22, 222:2, 222:13, 228:8, 228:9, 228:11, 229:2, 229:5, 229:14, 229:22, 230:4, 230:12, 230:17, 230:25, 231:15, 233:13, 233:24, 234:6, 236:17, 237:7, 237:15, 239:12, 240:14, 241:8, 241:13, 242:14, 243:17, 245:15, 246:2, 250:7, 263:9
**189's** [2] - 115:4, 229:18
**19107** [1] - 3:19

## 2

**2** [3] - 104:23, 156:12
**20** [3] - 15:7, 15:14, 16:11
**2001** [1] - 8:2
**2002** [1] - 8:2
**2003** [3] - 13:5, 13:9, 13:14
**2017** [2] - 34:22, 35:17
**2018** [3] - 58:25, 61:7, 106:22
**2020** [1] - 92:23
**2021** [31] - 18:14, 36:12, 63:3, 68:18, 70:16, 71:10, 71:16, 71:24, 73:4, 73:11, 73:22, 74:9, 80:7, 97:4, 99:4, 99:16, 107:12, 107:19, 107:20, 107:24, 228:14, 228:15, 228:23, 229:8, 229:14, 229:23, 245:24, 246:3, 263:20, 263:21, 263:23
**2022** [50] - 27:15, 28:21, 29:6, 29:17, 31:19, 33:7, 34:6, 39:3, 43:4, 43:9, 75:4, 75:9, 75:13, 94:5, 94:14, 94:21, 94:23, 95:5, 95:11, 107:16, 108:17, 110:11, 111:9, 111:23, 112:4, 112:12, 112:18, 112:23, 113:14, 113:19, 114:23, 119:10, 121:19, 155:2, 155:3, 155:4, 160:18, 175:3, 175:10, 175:23, 176:4, 176:9, 176:14, 209:25, 212:3, 212:24, 226:17, 228:14, 239:21, 247:3
**2023** [2] - 70:5, 214:2
**2024** [4] - 78:21, 79:18, 239:14, 239:17
**2026** [6] - 1:20, 211:14, 262:10, 262:22, 265:22, 266:22
**20th** [3] - 58:25, 265:21, 266:21
**23** [4] - 1:9, 2:18,

183:9, 185:22
**2320** [1] - 2:19
**242** [1] - 263:7
**25** [4] - 8:8, 15:12, 15:14, 61:7
**2519** [2] - 1:8, 179:16
**25th** [1] - 107:13
**2:00** [1] - 156:6
**2:11** [1] - 193:22
**2:15** [3] - 155:16, 186:21, 186:25
**2:20** [1] - 186:22
**2:23-cv-6188** [1] - 1:10
**2:30** [1] - 155:21

## 3

**3** [2] - 156:12, 186:19
**30** [1] - 10:12
**3280** [1] - 3:5
**333** [1] - 3:10
**3:00** [3] - 187:2, 193:13, 193:16
**3:02** [1] - 194:14

## 4

**4** [11] - 83:20, 84:9, 84:16, 86:16, 86:23, 87:2, 120:17, 120:19, 120:24, 172:13, 254:5
**420** [1] - 2:19
**445** [1] - 183:9
**446** [3] - 1:8, 2:17, 185:22
**49** [1] - 87:12
**4:08** [1] - 261:25

## 5

**5** [13] - 96:11, 120:17, 120:19, 120:24, 172:13, 186:13, 195:16, 203:18, 254:5, 258:2, 258:4, 263:4
**5,000** [1] - 31:2
**50,000** [1] - 30:25
**500** [1] - 3:18
**55** [2] - 5:14, 263:14
**56** [1] - 263:16
**5th** [2] - 93:7, 93:8

## 6

**6** [6] - 93:23, 172:13, 203:18, 254:5, 258:2, 258:4
**6/9/76** [1] - 8:5

**60** [2] - 87:15, 263:18
**62** [1] - 263:20
**68** [1] - 263:21

## 7

**7** [3] - 1:20, 211:14, 262:10
**71** [1] - 263:23
**735** [2] - 173:2, 177:24
**76** [4] - 1:8, 2:17, 179:20, 179:22

## 8

**8** [1] - 100:17
**88** [1] - 263:24

## 9

**90** [2] - 207:6, 207:18
**9618** [1] - 170:6
**99** [4] - 43:11, 54:7, 100:23, 263:5

## A

**a.m** [1] - 1:20
**Aaron** [1] - 91:8
**AARONSON** [7] - 1:5, 1:23, 262:7, 262:18, 263:4, 265:9, 266:9
**Aaronson** [93] - 2:14, 5:10, 5:19, 6:10, 10:25, 11:9, 16:14, 16:16, 20:14, 22:2, 23:24, 25:13, 28:21, 34:21, 35:10, 44:17, 45:6, 45:16, 48:17, 50:19, 51:12, 52:3, 53:23, 55:3, 55:10, 58:6, 64:24, 65:3, 69:20, 73:7, 88:8, 90:20, 90:23, 92:15, 94:10, 96:6, 98:17, 98:22, 101:19, 102:18, 103:3, 104:4, 104:16, 105:9, 108:10, 124:22, 127:5, 128:16, 132:22, 141:21, 142:20, 142:25, 145:5, 149:5, 150:14, 152:2, 154:21, 156:18, 165:5, 166:16, 167:5, 167:11, 170:4, 170:16, 172:17, 180:7, 182:10, 185:5, 185:24,

192:13, 194:19, 200:2, 200:7, 205:2, 205:16, 206:7, 213:17, 216:24, 217:13, 218:20, 219:24, 220:19, 228:6, 230:17, 232:4, 232:15, 239:10, 242:21, 243:3, 244:7, 246:6, 247:4, 248:3

**ability** [2] - 23:7, 104:19

**able** [4] - 6:6, 55:15, 66:17, 109:6

**Aboyoun** [4] - 81:25, 82:9, 82:14, 82:16

**Aboyoun's** [1] - 81:24

**absolutely** [1] - 255:20

**access** [12] - 40:4, 109:14, 113:23, 113:24, 114:4, 133:13, 134:2, 134:4, 134:15, 134:17, 134:18, 134:20

**according** [7] - 64:18, 86:14, 86:16, 92:19, 107:20, 107:21, 150:9

**account** [34] - 60:21, 60:23, 61:20, 62:5, 62:10, 105:12, 105:19, 106:21, 106:25, 107:2, 108:19, 108:24, 109:7, 110:3, 110:5, 111:11, 112:3, 112:14, 113:20, 132:11, 132:15, 133:6, 134:7, 134:12, 134:20, 134:25, 135:4, 135:9, 148:22, 148:25, 149:2, 149:11, 173:7, 198:18

**Account** [3] - 104:13, 105:9, 264:5

**accountant** [14] - 45:25, 46:22, 47:3, 89:10, 91:11, 91:12, 91:15, 92:12, 99:24, 100:6, 120:11, 165:2, 184:23, 258:10

**accountants** [3] - 174:22, 175:7, 218:4

**accountholder** [1] -

113:13

**accounting** [20] - 9:8, 9:10, 9:17, 9:20, 44:2, 44:22, 46:24, 47:5, 51:4, 91:18, 91:19, 91:23, 97:20, 97:23, 100:3, 100:8, 175:18, 175:19, 258:20, 258:22

**accounts** [28] - 34:17, 34:25, 35:12, 35:19, 35:22, 36:7, 40:2, 40:5, 40:9, 110:9, 112:19, 112:25, 114:25, 127:12, 127:17, 127:20, 132:19, 147:18, 150:5, 172:19, 172:22, 172:24, 196:22, 197:9, 206:18, 251:6, 254:24

**accurate** [4] - 47:18, 124:9, 163:15, 250:15

**acquire** [2] - 83:23, 86:21

**acting** [2] - 116:17, 116:18

**action** [3] - 79:16, 265:17, 266:17

**actions** [4] - 117:11, 144:13, 218:19, 222:15

**active** [2] - 237:4, 238:2

**add** [2] - 105:15, 206:2

**added** [3] - 61:16, 105:19, 105:23

**adding** [2] - 106:20, 106:24

**address** [7] - 5:12, 5:13, 62:8, 89:19, 89:21, 90:2, 250:10

**administer** [1] - 4:16

**advantage** [1] - 224:8

**advised** [1] - 28:9

**advisement** [1] - 242:17

**affairs** [2] - 118:14, 154:21

**afford** [1] - 23:6

**afternoon** [1] - 55:2

**afterwards** [1] - 76:13

**agencies** [8] - 220:25, 221:2, 221:4, 221:5, 222:4, 222:5, 236:20, 237:9

**agency** [2] - 236:23, 238:15

**ago** [14] - 10:12, 49:9, 49:20, 70:8, 79:4, 79:17, 160:15, 169:22, 169:25, 170:20, 213:15, 229:17, 249:10, 249:11

**agree** [8] - 24:9, 24:12, 24:15, 73:21, 84:23, 134:8, 229:3, 229:6

**AGREED** [3] - 4:3, 4:9, 4:14

**agreed** [1] - 107:25

**agreeing** [1] - 173:14

**Agreement** [2] - 80:7, 263:22

**agreement** [9] - 80:14, 80:18, 80:22, 83:4, 181:21, 181:23, 234:5, 234:7, 234:13

**ahead** [5] - 8:20, 76:21, 103:14, 141:13, 192:15

**ahold** [1] - 32:5

**Albany** [1] - 22:8

**alive** [2] - 111:14, 111:22

**ALIVIA** [1] - 3:24

**allegation** [2] - 195:15, 196:15

**allegations** [7] - 203:23, 222:23, 223:2, 223:5, 223:8, 223:11, 223:14

**allow** [5] - 28:11, 40:11, 67:15, 140:10, 197:13

**allowed** [3] - 217:23, 232:14, 238:3

**allows** [2] - 133:4, 133:5

**Ally** [6] - 117:12, 118:19, 119:2, 119:4, 210:21, 212:10

**almost** [3] - 139:8, 141:9, 237:17

**alone** [3] - 121:4, 206:9, 240:6

**ALSO** [1] - 3:22

**alternative** [1] - 103:5

**amend** [1] - 97:4

**Amityville** [2] - 63:22, 73:18

**amount** [3] - 63:10, 66:9, 127:3

**AND** [3] - 4:2, 4:8, 4:13

**answer** [45] - 21:20,

24:25, 25:9, 35:4, 36:2, 41:22, 52:19, 52:21, 52:24, 53:20, 71:5, 76:22, 85:3, 85:5, 94:10, 94:11, 94:15, 94:16, 97:22, 98:7, 102:8, 102:10, 102:17, 131:18, 135:12, 152:20, 159:17, 164:19, 172:16, 177:21, 177:25, 183:4, 183:10, 192:16, 197:25, 199:19, 205:8, 207:14, 216:13, 220:9, 244:6, 244:18, 252:11, 255:3, 256:8

**answered** [8] - 21:17, 25:5, 114:7, 152:10, 152:19, 159:17, 230:18, 236:20

**answering** [2] - 197:15, 230:22

**answers** [6] - 50:9, 53:10, 53:18, 151:20, 216:21, 262:13

**antennas** [1] - 137:17

**Anthony** [224] - 2:6, 18:8, 18:15, 18:21, 19:18, 29:21, 30:12, 30:22, 30:24, 31:12, 31:14, 33:2, 36:22, 39:4, 39:10, 39:14, 39:17, 39:25, 40:8, 40:14, 41:8, 41:10, 43:11, 43:17, 44:19, 45:8, 45:17, 47:2, 47:4, 49:11, 49:24, 50:25, 51:8, 51:17, 52:3, 54:6, 58:18, 59:3, 59:22, 61:15, 66:25, 67:16, 67:20, 67:23, 70:11, 70:24, 73:13, 73:22, 74:4, 74:8, 74:17, 75:16, 75:25, 76:8, 77:18, 77:25, 78:7, 79:14, 80:16, 81:6, 81:11, 81:19, 83:14, 84:13, 84:20, 86:11, 86:20, 87:16, 89:14, 90:21, 92:12, 92:20, 94:5, 94:13, 95:20, 95:25, 96:8, 98:12, 100:23, 103:20, 107:22, 117:5, 117:6, 117:11, 117:15, 117:21, 117:25,

118:2, 121:4, 121:9, 122:5, 123:4, 124:2, 124:3, 124:13, 124:14, 124:15, 124:23, 125:2, 127:16, 127:21, 127:23, 128:18, 129:10, 129:14, 129:17, 129:24, 130:7, 130:20, 131:2, 131:4, 131:11, 131:14, 132:4, 133:14, 133:17, 133:19, 134:20, 135:14, 135:20, 135:24, 136:5, 136:23, 136:25, 137:8, 137:13, 137:18, 137:20, 138:15, 138:20, 139:3, 139:13, 142:21, 144:2, 144:13, 144:22, 145:9, 147:20, 148:11, 148:15, 148:19, 148:23, 149:9, 149:14, 150:25, 160:24, 161:5, 161:12, 161:14, 161:21, 162:11, 164:21, 164:25, 172:9, 172:15, 173:17, 173:23, 174:7, 174:12, 174:23, 178:8, 181:13, 182:5, 183:19, 183:21, 185:14, 186:14, 187:11, 194:20, 194:25, 199:7, 199:18, 201:14, 202:7, 203:12, 206:13, 206:18, 206:25, 207:4, 207:11, 207:12, 207:13, 209:2, 211:5, 215:18, 219:2, 222:20, 222:22, 223:15, 223:19, 225:12, 225:24, 226:6, 226:11, 226:14, 229:18, 230:7, 231:14, 232:8, 233:11, 234:5, 234:14, 234:25, 235:9, 235:12, 241:20, 242:3, 248:2, 248:6, 248:8, 248:11, 253:20,

254:17, 255:5, 255:7, 255:25, 257:2, 257:3, 258:24, 259:14, 260:14, 260:18

**anthony** [1] - 235:3

**ANTHONY** [4] - 1:4, 1:11, 3:23, 3:23

**Anthony's** [6] - 59:25, 80:20, 87:18, 97:3, 203:15, 257:13

**anthonyd@ northshoremotors1 .com** [1] - 89:18

**anytime** [1] - 36:7

**anyway** [1] - 260:4

**apart** [1] - 154:20

**apologies** [1] - 214:24

**apologize** [5] - 17:14, 52:20, 111:21, 143:4, 244:3

**application** [1] - 55:19

**applied** [3] - 23:23, 56:5, 56:9

**apply** [1] - 205:15

**appreciate** [1] - 260:20

**approached** [1] - 103:9

**approval** [6] - 40:7, 40:20, 41:13, 47:22, 49:18, 49:22

**approve** [5] - 44:9, 50:6, 97:7, 101:21, 226:20

**Approved** [1] - 96:13

**approved** [23] - 44:15, 44:18, 45:7, 48:19, 49:10, 49:11, 49:14, 52:3, 54:6, 97:16, 97:24, 101:12, 101:15, 101:23, 102:21, 103:19, 162:15, 163:13, 174:6, 176:3, 176:13, 226:16

**approving** [15] - 43:9, 44:19, 50:3, 50:25, 52:9, 96:20, 97:10, 101:4, 101:10, 103:4, 103:16, 103:17, 104:7, 133:20, 134:6

**argument** [3] - 192:22, 230:3, 231:13

**ARIEL** [1] - 3:12

**ariel** [1] - 260:23

**arrangement** [2] - 23:17, 23:19

**arrangements** [2] -

233:8, 233:11

**arrows** [1] - 104:23

**ASAD** [1] - 1:6

**Asad** [22] - 2:15, 20:18, 22:5, 23:3, 24:20, 26:16, 26:23, 40:23, 41:16, 42:4, 42:9, 42:15, 43:5, 75:7, 122:19, 143:20, 148:9, 192:8, 192:24, 245:4, 245:7, 245:9

**aside** [1] - 151:4

**assert** [1] - 205:10

**asserting** [1] - 204:25

**Assignment** [3] - 56:13, 58:2, 263:15

**assignment** [1] - 58:7

**assist** [1] - 10:21

**associated** [2] - 22:18, 158:18

**assume** [4] - 162:11, 231:13, 232:8, 232:11

**assumed** [1] - 45:22

**assuming** [1] - 230:2

**attached** [3] - 78:19, 97:5, 99:7

**attachment** [1] - 101:16

**attempted** [2] - 125:14, 138:14

**attempting** [1] - 45:14

**attended** [1] - 261:13

**attorney** [10] - 5:21, 82:2, 82:3, 82:10, 82:21, 189:5, 200:2, 205:7, 205:13, 207:19

**attorneys** [8] - 4:3, 82:24, 207:7, 208:4, 208:9, 208:15, 208:23, 222:9

**Attorneys** [4] - 2:4, 2:12, 3:9, 3:15

**audio** [1] - 193:19

**authorities** [1] - 226:18

**authority** [7] - 40:14, 41:4, 43:4, 46:12, 46:19, 134:12, 198:18

**authorize** [7] - 46:14, 120:9, 135:7, 135:13, 203:10, 244:23, 245:5

**authorized** [19] - 4:16, 40:22, 41:9, 116:13, 127:19, 129:18, 130:7, 134:23,

135:20, 136:17, 137:24, 138:20, 164:20, 164:23, 198:16, 198:22, 198:25, 199:3, 199:10

**auto** [3] - 82:20, 121:21, 200:11

**Auto** [99] - 2:5, 2:13, 2:16, 2:18, 12:8, 12:11, 13:8, 13:20, 14:2, 14:5, 14:6, 14:7, 14:11, 14:12, 14:13, 14:21, 18:4, 19:9, 63:14, 63:17, 64:7, 69:7, 69:16, 82:22, 82:24, 88:20, 90:23, 91:15, 91:21, 110:9, 110:10, 110:21, 110:24, 114:23, 115:2, 115:3, 115:6, 117:7, 119:3, 130:22, 130:24, 141:3, 141:6, 142:9, 142:13, 147:16, 147:21, 148:3, 149:2, 158:2, 160:20, 164:7, 164:11, 173:10, 173:12, 173:18, 176:18, 176:22, 177:3, 177:5, 177:18, 178:13, 178:21, 178:25, 179:4, 179:8, 179:13, 179:16, 183:9, 184:8, 184:10, 184:12, 184:14, 184:15, 184:19, 184:25, 185:22, 190:22, 191:4, 191:7, 195:13, 214:21, 215:2, 217:16, 217:18, 218:16, 243:12, 243:15, 249:14, 250:11, 250:13, 250:14, 250:16, 250:19, 251:22, 252:4, 252:22

**AUTO** [11] - 1:4, 1:5, 1:6, 1:7, 1:7, 1:8, 1:8, 1:9, 1:17

**auto-related** [1] - 82:20

**automobiles** [2] - 209:10, 209:14

**AUTOMOTIVE** [1] -

1:14

**availability** [1] - 65:16

**Avenue** [2] - 2:7, 2:19

**aware** [117] - 16:19, 27:21, 29:6, 30:22, 34:21, 34:23, 35:17, 38:3, 42:12, 46:9, 49:9, 49:14, 60:6, 60:10, 60:11, 79:13, 81:5, 81:9, 119:15, 119:17, 119:22, 123:20, 124:18, 132:20, 135:11, 137:19, 139:5, 148:12, 148:16, 151:11, 151:13, 152:4, 152:6, 152:7, 152:9, 152:18, 153:3, 153:5, 153:6, 153:9, 155:7, 162:3, 162:6, 165:13, 175:5, 175:24, 176:5, 176:10, 176:15, 180:14, 181:22, 183:9, 184:2, 184:6, 187:4, 187:9, 187:16, 187:17, 187:21, 187:25, 188:5, 188:9, 188:11, 188:12, 188:24, 189:8, 189:10, 189:12, 189:16, 191:24, 191:25, 192:7, 192:9, 192:10, 192:22, 193:3, 193:5, 193:7, 196:22, 201:13, 209:19, 209:20, 211:7, 211:10, 211:13, 211:17, 215:12, 215:16, 216:24, 217:3, 217:5, 219:24, 220:20, 221:2, 221:6, 222:25, 223:4, 223:7, 223:10, 223:13, 228:6, 229:21, 230:9, 233:22, 234:8, 234:16, 237:5, 237:11, 241:15, 243:16, 245:2, 245:11, 245:14, 248:19, 249:8, 259:14

## B

**B-1** [1] - 100:18

**Background** [1] -

73:15

**bad** [7] - 76:3, 136:13, 138:2, 138:5, 138:7, 138:13, 168:4

**badge** [1] - 224:9

**Bank** [9] - 3:9, 60:15, 117:12, 118:19, 119:2, 119:4, 210:21, 212:10, 263:18

**BANK** [2] - 1:16, 1:17

**bank** [47] - 28:25, 29:3, 30:14, 30:20, 32:8, 34:16, 34:24, 35:11, 35:18, 35:22, 36:7, 40:2, 40:5, 40:9, 43:24, 60:21, 61:19, 66:4, 105:19, 109:15, 109:16, 112:3, 115:24, 127:2, 129:6, 129:12, 132:11, 132:15, 132:19, 133:6, 136:14, 147:18, 161:23, 162:20, 162:23, 162:25, 173:25, 196:21, 197:9, 198:18, 199:18, 206:18, 212:15, 253:5, 254:24, 258:23

**banks** [9] - 45:3, 45:19, 51:18, 109:10, 115:8, 123:10, 196:12, 197:13, 253:23

**bar** [1] - 238:7

**Barn** [1] - 14:3

**BARON** [3] - 1:5, 1:6, 1:6

**Baron** [89] - 2:14, 2:15, 2:16, 13:8, 13:12, 13:19, 14:4, 14:6, 14:7, 14:11, 19:21, 20:15, 20:18, 22:6, 23:2, 24:21, 26:16, 26:23, 33:2, 36:11, 40:23, 41:16, 42:2, 42:10, 42:23, 43:5, 63:2, 63:9, 69:3, 75:12, 75:15, 80:15, 80:17, 81:6, 81:12, 82:4, 82:7, 83:5, 84:3, 84:11, 84:12, 84:18, 85:21, 86:10, 86:11, 86:25, 87:20, 87:24, 87:25, 105:15, 106:5, 106:21, 106:24,

107:14, 110:25, 111:2, 111:9, 111:14, 111:17, 111:19, 111:20, 111:22, 112:2, 112:18, 115:21, 122:18, 136:25, 137:2, 138:14, 138:15, 138:19, 143:17, 143:18, 149:12, 149:18, 149:25, 202:10, 229:10, 229:11, 243:23, 243:24, 260:15, 263:19

**Baron's** [14] - 18:16, 39:2, 40:3, 40:20, 40:24, 42:8, 42:17, 43:3, 87:21, 113:25, 114:4, 114:12, 134:21, 135:21

**based** [9] - 10:6, 21:8, 37:14, 115:5, 118:12, 205:8, 205:10, 238:11, 238:14

**basis** [1] - 100:4

**became** [1] - 230:7

**become** [7] - 36:12, 51:6, 230:11, 234:25, 235:10, 236:5, 236:9

**began** [1] - 249:12

**begin** [1] - 222:11

**beginning** [4] - 50:14, 65:15, 68:21, 86:8

**behalf** [16] - 19:9, 40:24, 47:7, 73:10, 74:15, 77:25, 129:19, 149:17, 164:7, 181:11, 220:12, 232:24, 242:12, 242:21, 242:24, 263:7

**behind** [1] - 207:21

**belong** [2] - 173:10, 246:19

**belonged** [1] - 212:13

**belonging** [2] - 127:17, 210:13

**Below** [1] - 97:2

**below** [3] - 61:14, 75:18, 83:14

**Beltray** [14] - 191:11, 191:13, 191:18, 191:21, 192:2, 192:8, 192:11, 243:25, 244:8, 248:24, 250:3, 251:20, 252:22,

256:11

**Benjamin** [1] - 261:9

**Bentley** [3] - 125:9, 126:20, 127:8

**best** [2] - 26:10, 256:4

**better** [3] - 50:7, 151:25, 172:11

**between** [30] - 4:3, 15:14, 39:2, 41:16, 43:3, 76:8, 76:16, 77:9, 80:14, 92:22, 94:5, 94:13, 94:20, 169:15, 187:5, 187:22, 188:2, 188:6, 192:24, 215:13, 215:17, 216:7, 216:25, 217:6, 225:24, 234:5, 234:13, 247:25, 260:14, 260:18

**beyond** [2] - 25:3, 197:25

**big** [5] - 31:4, 56:25, 91:18, 202:15, 234:11

**birth** [1] - 8:3

**Blankenship** [9] - 37:25, 171:13, 171:15, 185:15, 188:2, 189:21, 215:15, 223:3, 257:15

**BLANKENSHIP** [1] - 1:12

**blood** [2] - 265:17, 266:17

**Blvd** [1] - 2:16

**BLVD** [6] - 1:6, 1:7, 1:7, 1:8

**boarding** [1] - 75:18

**bottom** [1] - 106:12

**bought** [2] - 126:8, 196:5

**Boulevard** [10] - 3:10, 176:17, 177:5, 177:18, 178:13, 178:20, 178:24, 179:8, 179:12, 179:16

**Box** [1] - 152:5

**break** [13] - 54:18, 54:20, 90:12, 155:16, 155:25, 156:6, 156:10, 156:12, 186:17, 186:18, 186:25, 193:11, 215:21

**breaking** [1] - 155:11

**Brian** [23] - 2:14,

20:17, 22:5, 23:3, 24:21, 26:16, 26:23, 40:22, 41:16, 42:4, 42:9, 42:15, 43:5, 66:10, 69:8, 75:2, 122:18, 143:19, 148:13, 192:11, 192:25, 244:23, 245:2

**BRIAN** [1] - 1:5

**bring** [3] - 38:16, 125:24, 142:25

**brings** [1] - 220:16

**Bronx** [4] - 12:13, 13:8, 14:7, 243:21

**brought** [3] - 79:2, 220:21, 221:15

**bucks** [1] - 203:18

**building** [6] - 27:17, 31:20, 31:23, 33:19, 33:21, 233:6

**Building** [1] - 3:17

**buildings** [1] - 151:24

**bunch** [2] - 54:25, 235:7

**Business** [5] - 60:14, 104:13, 105:9, 263:17, 264:5

**business** [114] - 6:25, 7:16, 7:21, 7:25, 8:7, 8:11, 8:25, 9:3, 10:13, 10:17, 10:19, 11:22, 19:3, 21:3, 25:21, 28:23, 29:9, 29:11, 29:16, 30:12, 31:6, 32:19, 34:21, 36:13, 36:20, 37:5, 37:8, 39:18, 40:17, 40:18, 42:6, 43:25, 55:24, 56:2, 63:25, 69:11, 69:14, 69:18, 69:20, 69:24, 72:10, 73:23, 74:18, 76:12, 77:4, 77:13, 77:14, 77:21, 89:22, 91:16, 95:13, 95:21, 98:6, 103:23, 105:12, 116:23, 117:4, 117:8, 121:17, 121:18, 121:21, 129:22, 131:12, 131:15, 131:25, 132:4, 132:8, 132:22, 135:22, 136:18, 136:19, 137:15, 137:22, 137:25, 138:21, 153:22, 159:6, 159:25, 161:18, 163:12, 169:7,

172:10, 173:20, 173:23, 180:19, 183:16, 183:19, 185:16, 185:21, 185:23, 196:3, 198:17, 198:23, 198:25, 199:4, 199:17, 214:18, 217:12, 224:12, 231:8, 231:11, 233:3, 233:8, 235:13, 235:20, 241:23, 243:9, 246:7, 246:20, 248:12, 248:14, 250:9, 250:10, 252:25

**businesses** [19] - 56:3, 89:5, 95:6, 95:8, 96:4, 98:2, 159:15, 159:20, 180:24, 185:9, 186:2, 186:3, 186:7, 186:9, 191:15, 207:22, 224:4, 231:16, 243:19

**but..** [2] - 72:11, 101:10

**button** [1] - 130:17

**buy** [1] - 126:12

**buyer** [3] - 83:22, 83:23, 86:20

**BUYERS** [1] - 1:12

**buying** [1] - 82:19

**BY** [9] - 2:9, 2:21, 3:12, 5:17, 194:18, 216:23, 239:9, 243:2, 263:3

### C

**cahoots** [1] - 224:3

**cancel** [1] - 118:5

**cannot** [6] - 186:8, 195:22, 197:7, 199:20, 200:18, 200:21

**capability** [2] - 35:11, 35:18

**capacity** [3] - 150:15, 150:16, 188:19

**capital** [1] - 83:24

**CAPITAL** [1] - 1:15

**car** [29] - 7:15, 7:21, 7:24, 8:6, 8:10, 8:25, 9:3, 11:21, 28:2, 28:4, 123:21, 125:11, 125:24, 125:25, 126:2, 126:4, 126:8,

126:16, 130:15, 137:14, 146:18, 146:22, 146:25, 152:25, 243:8, 250:6, 253:5, 255:10

**CAR** [1] - 1:12

**care** [4] - 11:15, 50:18, 137:22, 157:21

**career** [3] - 121:18, 202:17, 203:16

**carried** [1] - 33:18

**CARS** [2] - 1:13, 1:13

**cars** [79] - 29:3, 30:16, 30:17, 30:22, 30:24, 31:2, 43:24, 75:20, 95:23, 117:5, 122:6, 122:10, 122:25, 124:16, 124:18, 124:23, 125:2, 125:4, 125:6, 125:13, 125:16, 125:20, 126:17, 126:24, 126:25, 127:25, 128:8, 128:20, 129:2, 129:6, 129:13, 129:14, 129:15, 131:10, 137:12, 141:7, 141:16, 142:3, 144:23, 145:7, 145:10, 145:24, 146:10, 195:9, 195:11, 196:5, 196:13, 210:2, 210:11, 210:13, 210:17, 212:2, 212:7, 212:11, 212:13, 212:23, 213:8, 214:7, 214:9, 215:3, 215:9, 251:7, 253:10, 253:13, 253:15, 253:18, 253:21, 253:23, 253:24, 255:6, 255:7, 255:11, 255:12, 257:10, 257:13, 257:21, 257:23, 257:25, 259:19

**Case** [3] - 1:10, 108:7, 264:8

**case** [19] - 69:23, 111:5, 142:16, 142:20, 142:25, 154:9, 166:8, 167:22, 183:13, 185:2, 185:10, 187:12, 197:4, 209:8, 209:15,

209:18, 209:21, 223:18, 246:25
**cases** [1] - 240:10
**cash** [9] - 65:18, 123:7, 123:8, 123:12, 123:16, 124:14, 145:17, 147:6, 199:16
**cashed** [3] - 65:23, 68:3, 68:5
**categorization** [1] - 21:15
**categorize** [1] - 128:13
**categorized** [1] - 21:23
**category** [4] - 10:17, 10:19, 10:20
**caused** [19] - 27:16, 108:23, 121:4, 121:16, 144:2, 148:11, 148:15, 148:19, 148:23, 149:8, 149:14, 150:17, 150:25, 153:21, 167:24, 168:2, 169:7, 206:25, 207:20
**cc** [1] - 89:15
**cc's** [2] - 90:21, 96:7
**century** [4] - 8:16, 15:9, 15:16, 15:21
**certain** [4] - 44:24, 88:11, 174:13, 235:16
**certainly** [7] - 11:21, 93:20, 140:22, 147:15, 199:25, 234:11, 252:3
**Certificate** [2] - 60:14, 263:17
**certification** [1] - 4:6
**certify** [5] - 262:7, 265:8, 265:15, 266:8, 266:15
**cetera** [2] - 195:9, 195:10
**Chabrier** [21] - 2:14, 20:17, 22:5, 23:3, 24:21, 26:16, 26:23, 40:23, 41:17, 42:4, 42:9, 42:16, 43:5, 66:10, 75:3, 122:18, 143:19, 148:13, 192:25, 229:10, 244:23
**CHABRIER** [1] - 1:5
**Chabrier's** [1] - 192:11
**Chain** [2] - 88:5,

263:24
**chain** [5] - 88:11, 90:20, 227:10, 227:11, 227:14
**chance** [3] - 59:7, 128:10, 145:5
**changed** [3] - 12:20, 172:8, 230:13
**changes** [1] - 133:4
**channels** [1] - 200:14
**characterize** [1] - 139:8
**characterizing** [1] - 128:7
**charge** [7] - 34:16, 34:24, 35:3, 36:7, 116:3, 132:15, 254:23
**charged** [2] - 191:21, 192:2
**CHASE** [1] - 1:17
**Chase** [5] - 60:15, 60:23, 132:24, 132:25, 263:18
**Check** [2] - 62:25, 263:19
**check** [16] - 63:9, 64:5, 64:10, 64:19, 64:23, 65:6, 65:11, 65:13, 65:18, 65:22, 65:25, 66:7, 67:3, 68:25, 71:4, 135:8
**checked** [1] - 175:6
**checking** [1] - 39:21
**checks** [16] - 40:8, 40:12, 67:14, 119:2, 119:4, 119:6, 119:9, 134:24, 135:5, 228:7, 228:13, 228:15, 228:22, 228:23, 228:24, 229:7
**Chestnut** [1] - 3:18
**child** [1] - 125:24
**Cho** [1] - 155:21
**choice** [2] - 116:10, 116:13
**chose** [3] - 117:17, 150:24, 181:8
**Chrysler** [1] - 12:14
**circle** [1] - 104:24
**circumstance** [2] - 18:24, 23:19
**circumstances** [3] - 18:20, 23:17, 183:4
**cite** [1] - 165:17
**Citrin** [21] - 43:10, 45:25, 46:3, 46:6, 46:8, 46:14, 46:19, 89:10, 90:6, 90:22,

91:3, 91:12, 91:14, 91:17, 91:22, 97:6, 164:6, 164:17, 164:23, 218:4, 218:8
**City** [2] - 14:12, 180:4
**civil** [1] - 224:17
**civilization** [1] - 166:19
**claim** [1] - 216:17
**clarify** [2] - 94:9, 205:5
**Clarkstown** [1] - 6:11
**class** [3] - 9:7, 9:10, 9:20
**classes** [7] - 9:7, 9:17, 9:24, 10:5, 10:8, 10:10, 55:24
**classroom** [1] - 8:23
**clean** [3] - 116:4, 116:14, 137:22
**cleaning** [3] - 116:9, 116:19, 116:22
**clear** [6] - 20:10, 53:12, 53:14, 167:20, 207:10, 216:10
**clearing** [1] - 149:6
**click** [1] - 104:24
**client** [5] - 53:9, 151:19, 181:9, 216:13, 216:21
**close** [3] - 28:20, 29:2, 29:9
**closed** [6] - 27:15, 28:22, 29:7, 29:9, 29:16, 70:19
**closing** [1] - 116:4
**co** [21] - 74:16, 74:17, 78:9, 78:14, 143:6, 165:23, 166:8, 167:3, 167:15, 167:18, 168:11, 168:16, 168:24, 171:5, 171:16, 171:21, 172:2, 172:23, 180:12, 185:8, 185:17
**CO** [1] - 1:16
**co-plaintiffs** [21] - 74:16, 74:17, 78:9, 78:14, 143:6, 165:23, 166:8, 167:3, 167:15, 167:18, 168:11, 168:16, 168:24, 171:5, 171:16, 171:21, 172:2, 172:23, 180:12, 185:8, 185:17
**COAST** [6] - 1:13, 1:13, 1:14, 1:14,

1:15
**Coast** [9] - 72:2, 72:5, 72:13, 72:18, 72:20, 73:2, 73:10, 74:5, 77:25
**code** [1] - 133:4
**codefendants** [1] - 186:10
**collectively** [3] - 83:5, 83:10, 83:16
**college** [6] - 6:15, 6:18, 9:20, 9:23, 9:25, 10:8
**column** [1] - 170:5
**combative** [2] - 53:6, 53:8
**combined** [1] - 45:9
**coming** [3] - 138:18, 150:2, 193:14
**commencement** [1] - 184:4
**comment** [3] - 144:25, 147:3, 154:19
**commit** [1] - 199:23
**committed** [8] - 138:25, 139:6, 139:11, 197:12, 201:14, 201:22, 223:20, 223:23
**committing** [1] - 196:11
**common** [2] - 204:19, 205:13
**companies** [3] - 129:19, 130:8, 177:7
**company** [4] - 83:25, 130:3, 130:16, 130:18
**compare** [1] - 100:10
**complaint** [6] - 78:20, 78:22, 79:2, 79:14, 215:20, 221:14
**complete** [4] - 45:21, 174:15, 235:15, 262:11
**completed** [6] - 44:3, 44:6, 44:24, 95:21, 174:16, 235:6
**compounded** [1] - 113:4
**computer** [1] - 130:18
**conclusion** [2] - 77:6, 182:9
**conclusions** [1] - 50:14
**conduct** [1] - 48:15
**conducted** [2] - 197:10, 198:11
**conference** [1] - 155:20

**confused** [3] - 79:12, 252:17, 252:19
**confusing** [1] - 173:8
**connection** [2] - 190:6, 230:16
**consciously** [1] - 163:24
**consider** [2] - 153:24, 174:4
**considered** [2] - 126:5, 182:14
**constantly** [1] - 137:20
**consumer** [2] - 32:7, 255:7
**consumers** [4] - 32:24, 109:10, 210:21, 241:21
**consumers'** [1] - 196:13
**Cont'd** [1] - 3:2
**contact** [1] - 184:3
**contains** [1] - 62:5
**continue** [4] - 77:13, 137:25, 138:20, 205:10
**Continued** [1] - 264:3
**CONTINUED** [1] - 194:17
**continued** [1] - 76:12
**continuing** [1] - 77:5
**contract** [7] - 51:14, 67:9, 67:11, 187:18, 187:22, 188:2, 188:6
**contracts** [11] - 118:5, 118:9, 187:5, 187:8, 187:13, 215:13, 215:17, 216:7, 216:25, 217:6, 217:8
**contractually** [1] - 118:12
**contribute** [1] - 148:13
**control** [4] - 23:7, 35:21, 39:25, 60:4
**convened** [2] - 219:25, 220:5
**conversation** [4] - 81:11, 81:18, 169:15, 218:8
**conversations** [18] - 204:10, 204:13, 204:14, 204:15, 205:2, 205:6, 205:12, 205:20, 206:8, 206:13, 207:6, 207:18, 208:3, 208:16, 208:22, 209:4, 225:7, 235:17

convey [1] - 83:22
convicted [1] - 136:14
COONEY [1] - 3:24
Cooperman [20] - 43:10, 46:2, 46:3, 46:7, 46:8, 46:15, 46:19, 89:10, 90:6, 90:22, 91:3, 91:12, 91:14, 91:17, 91:22, 97:6, 164:7, 164:17, 164:24, 218:4
copy [1] - 97:5
corner [3] - 61:8, 100:18, 105:8
CORP [1] - 1:15
corp [1] - 184:9
Corp [2] - 58:8, 73:19
corporate [3] - 63:24, 182:21, 185:7
corporation [8] - 26:20, 62:16, 158:17, 159:2, 184:10, 184:13, 246:18, 246:19
Corporation [1] - 22:4
Corporations [1] - 73:5
corporations [4] - 97:19, 183:23, 210:14, 216:20
correct [73] - 7:7, 7:8, 7:23, 11:7, 11:18, 11:23, 15:10, 15:11, 15:17, 15:18, 15:19, 17:3, 21:9, 26:15, 27:6, 29:7, 29:17, 33:7, 33:15, 36:10, 47:8, 47:14, 54:9, 58:22, 71:8, 72:8, 73:20, 74:24, 74:25, 79:4, 87:11, 87:13, 98:23, 99:21, 107:9, 107:10, 107:11, 107:13, 110:2, 112:4, 116:16, 119:7, 119:13, 121:2, 124:6, 124:8, 129:20, 129:22, 144:19, 144:20, 144:21, 146:6, 147:2, 152:13, 160:6, 165:19, 171:11, 196:16, 197:11, 198:7, 200:20, 205:22, 208:23, 208:24, 211:16, 229:12, 233:13, 251:22, 252:10, 260:16, 262:12, 262:14

correctly [2] - 80:5, 158:16
cost [2] - 144:8, 203:18
counsel [5] - 206:3, 219:15, 225:8, 261:11, 261:16
COUNTY [3] - 262:5, 265:4, 266:4
County [7] - 6:12, 6:13, 108:6, 108:14, 191:22, 192:3, 264:7
couple [4] - 39:12, 39:14, 59:24, 249:11
course [13] - 55:25, 105:3, 120:16, 144:7, 165:12, 166:5, 170:21, 178:8, 203:17, 218:22, 218:25, 219:4, 246:12
COURT [3] - 1:2, 5:6, 5:11
court [5] - 30:7, 79:3, 79:15, 85:16, 154:8
Court [2] - 1:23, 4:19
cover [2] - 119:23, 216:8
covered [2] - 170:14
CPA [2] - 1:12, 97:3
CPA'S [1] - 1:16
created [2] - 73:3, 117:21
credentials [4] - 113:18, 113:25, 114:4, 114:12
crimes [3] - 223:18, 223:20, 223:23
criminal [2] - 222:12, 222:15
crushed [1] - 211:25
crystal [1] - 167:20
CULLEN [1] - 3:8
custody [1] - 60:4
customer [1] - 45:5
customers [5] - 30:13, 32:2, 38:16, 38:19, 229:22
customers' [4] - 29:3, 32:3, 117:13, 195:9
CYRULI [1] - 2:11

**D**

d/b/a [1] - 25:23
d/b/a's [2] - 12:10, 177:14
damage [7] - 144:3, 153:21, 167:25, 168:3, 169:8,

206:14, 207:21
damaged [1] - 178:9
Danny [5] - 244:11, 255:5, 255:14, 255:21, 257:3
date [18] - 8:3, 34:23, 58:24, 59:2, 61:6, 61:9, 64:22, 65:7, 65:9, 70:3, 71:17, 73:2, 93:6, 105:24, 106:2, 106:7, 231:9, 231:10
dated [6] - 63:2, 71:10, 80:7, 263:20, 263:21, 263:22
dates [3] - 71:23, 71:25, 213:14
dating [2] - 193:2, 256:19
DAVID [1] - 1:6
David [68] - 2:16, 18:16, 20:15, 20:18, 22:5, 23:2, 24:21, 26:16, 26:23, 36:11, 39:2, 40:3, 40:20, 40:24, 41:15, 42:2, 42:8, 42:17, 42:23, 43:3, 63:2, 63:9, 75:11, 75:15, 75:17, 76:3, 76:9, 80:14, 80:19, 82:3, 82:6, 83:4, 84:12, 84:18, 86:11, 87:21, 105:15, 106:5, 106:20, 106:24, 107:11, 111:2, 111:9, 111:14, 111:16, 111:19, 111:20, 111:21, 111:25, 113:25, 114:4, 114:12, 122:18, 134:21, 135:21, 136:25, 137:2, 137:10, 138:13, 138:19, 143:17, 149:17, 202:10, 229:11, 259:10, 259:13, 260:15, 263:19
David's [6] - 105:16, 107:8, 245:10, 256:25, 259:3, 259:7
day-to-day [1] - 40:18
dead [1] - 222:20
deal [10] - 19:9, 28:10, 45:18, 129:18, 130:8, 130:10, 158:12, 164:6, 206:6, 259:24
dealer [2] - 122:15,

124:3
dealers [1] - 243:9
dealership [38] - 12:11, 12:12, 12:14, 13:4, 13:7, 14:6, 15:23, 16:6, 16:7, 16:9, 16:13, 16:20, 16:24, 17:5, 19:10, 19:24, 20:9, 20:19, 38:17, 65:17, 75:19, 123:25, 125:21, 126:5, 131:3, 131:7, 131:8, 134:7, 141:9, 212:15, 232:17, 232:18, 243:21, 248:15, 259:15, 260:4, 260:8, 260:10
dealership's [1] - 17:5
dealerships [29] - 11:24, 12:3, 12:9, 12:10, 12:18, 12:24, 13:15, 14:9, 14:18, 15:8, 15:15, 15:20, 16:12, 16:17, 16:23, 16:25, 17:9, 17:11, 17:17, 17:24, 21:5, 51:24, 82:19, 117:10, 125:20, 147:22, 157:15, 191:17, 249:2
dealing [2] - 130:3, 175:15
dealings [1] - 82:18
deals [7] - 249:17, 249:21, 249:22, 249:24, 249:25, 250:3, 250:5
dealt [1] - 19:13
death [15] - 18:16, 39:2, 40:3, 40:20, 42:9, 42:17, 43:3, 81:14, 107:8, 134:21, 135:21, 138:19, 202:10, 245:10, 256:25
debt [3] - 115:24, 150:6, 172:13
debts [11] - 43:24, 115:4, 115:8, 117:3, 119:24, 148:10, 148:14, 148:18, 148:22, 149:13, 173:13
decision [10] - 115:10, 115:13, 115:14, 115:15, 115:18, 148:6, 160:5, 160:9, 160:12, 182:3
decisionmaking [2] - 35:11, 35:18

decisions [4] - 23:13, 115:22, 255:11, 255:14
deemed [9] - 55:8, 56:14, 60:15, 63:3, 71:10, 80:8, 88:5, 104:14, 108:7
DEEMED [2] - 263:11, 264:4
Defendant [3] - 3:4, 3:9, 3:15
defendants [4] - 143:3, 187:5, 187:12, 261:12
Defendants [2] - 1:18, 215:13
DEFENDANTS' [2] - 263:11, 264:4
defendants' [1] - 219:15
Defendants' [9] - 55:6, 56:12, 60:13, 62:25, 71:9, 80:6, 88:4, 104:12, 108:5
defer [1] - 42:4
deferring [1] - 42:10
define [1] - 186:8
definitely [14] - 41:24, 111:10, 112:2, 112:13, 114:24, 121:22, 137:18, 215:9, 220:17, 223:22, 234:19, 248:22, 252:18, 254:2
definitions [1] - 130:11
degree [7] - 6:21, 6:23, 7:7, 9:6, 10:4, 10:6, 10:14
DEO [4] - 1:11, 3:23, 3:24
Deo [162] - 18:8, 18:15, 18:21, 19:18, 29:21, 30:6, 30:10, 36:22, 38:11, 39:25, 40:15, 43:11, 43:12, 44:19, 45:8, 50:25, 51:15, 51:17, 52:4, 54:6, 54:7, 58:18, 58:19, 59:3, 61:11, 61:15, 62:3, 66:25, 67:23, 70:11, 70:25, 73:13, 73:22, 74:4, 74:8, 74:18, 77:25, 79:15, 80:16, 81:6, 81:11, 83:14, 84:13, 84:20, 86:12, 87:16, 89:14, 90:21, 92:12, 92:20, 94:5, 94:14,

*Rich Moffett Court Reporting, Inc.*

96:8, 100:23, 103:20, 107:22, 117:5, 117:6, 117:11, 117:15, 117:21, 117:25, 121:4, 121:9, 122:5, 123:4, 124:23, 125:2, 127:16, 127:21, 128:18, 129:17, 129:24, 130:7, 130:20, 131:14, 132:4, 133:14, 133:17, 133:20, 134:20, 135:14, 135:21, 138:15, 138:20, 138:25, 139:5, 139:11, 139:13, 139:19, 140:4, 140:19, 142:8, 142:12, 142:21, 144:23, 145:9, 146:9, 147:20, 148:11, 148:15, 148:19, 148:23, 149:9, 149:14, 150:25, 160:24, 161:5, 161:12, 161:15, 161:21, 178:9, 181:13, 182:5, 182:24, 183:20, 183:21, 185:14, 186:14, 187:11, 194:20, 194:25, 199:7, 201:14, 206:14, 206:18, 207:12, 207:20, 209:2, 211:5, 215:18, 219:2, 220:16, 220:25, 222:22, 223:12, 223:15, 223:20, 225:24, 226:6, 229:18, 230:7, 231:14, 232:9, 233:11, 234:5, 234:14, 234:25, 235:3, 242:4, 248:2, 253:20, 254:17, 256:2, 259:15

**Deo's** [7] - 30:18, 47:2, 49:13, 106:15, 106:19, 127:23, 144:13
**Deos** [8] - 72:10, 72:22, 97:18, 97:25, 216:25, 217:6, 219:19, 221:15
**Department** [11] - 45:12, 47:12, 55:7,

73:6, 108:6, 108:14, 219:25, 220:10, 220:21, 263:12, 264:8
**department** [4] - 250:24, 250:25, 251:2, 251:4
**deposited** [3] - 64:18, 66:4, 123:9
**deposition** [11] - 4:6, 4:14, 5:22, 48:15, 53:9, 219:12, 262:10, 265:10, 265:12, 266:10, 266:12
**Deposition** [2] - 1:19, 1:22
**Depository** [2] - 60:14, 263:17
**describe** [4] - 11:11, 39:6, 41:15, 100:2
**description** [1] - 86:7
**deserves** [1] - 220:17
**designed** [1] - 85:20
**desires** [4] - 83:21, 83:23, 86:20, 86:21
**details** [2] - 76:15, 238:4
**development** [3] - 6:24, 10:7, 10:15
**DIANA** [3] - 265:6, 265:25, 266:25
**Diana** [9] - 1:24, 25:7, 52:15, 98:18, 102:10, 102:15, 233:18, 266:6, 266:24
**died** [5] - 36:11, 107:11, 107:15, 114:13, 259:10
**difference** [2] - 76:8, 77:7
**differences** [1] - 260:13
**different** [16] - 10:8, 32:2, 44:16, 57:17, 104:2, 114:10, 130:11, 134:15, 176:24, 182:23, 185:7, 222:4, 233:7, 241:22, 243:8, 249:6
**difficult** [2] - 6:2, 100:13
**difficulties** [1] - 10:24
**diligence** [1] - 163:4
**direct** [5] - 46:6, 169:2, 184:3, 210:9, 258:14
**directed** [6] - 32:14, 119:18, 154:24,

164:16, 210:12, 242:25
**directing** [2] - 33:2, 119:5
**direction** [9] - 42:16, 47:6, 94:24, 115:6, 157:6, 185:6, 218:2, 254:13, 257:13
**directions** [2] - 217:15, 217:21
**directly** [2] - 221:21, 249:9
**directs** [1] - 255:5
**disagree** [2] - 84:25, 130:13
**disappointed** [1] - 259:23
**discrepancies** [1] - 137:10
**discuss** [2] - 175:7, 238:3
**discussed** [7] - 78:12, 81:15, 121:19, 204:16, 241:17, 241:19, 241:24
**discussing** [2] - 77:8, 160:13
**discussions** [4] - 94:3, 94:13, 94:20, 247:24
**District** [1] - 79:16
**DISTRICT** [2] - 1:2, 1:3
**diverted** [1] - 254:21
**Division** [1] - 73:4
**DLA** [1] - 1:15
**DMV** [10] - 21:2, 21:17, 21:25, 122:22, 156:19, 158:16, 182:3, 182:14, 182:15, 182:17
**DOCUMENT** [1] - 263:6
**document** [41] - 30:8, 55:8, 58:24, 59:11, 59:15, 60:7, 60:21, 61:3, 61:7, 61:8, 61:11, 61:23, 61:24, 62:19, 78:17, 78:19, 79:19, 79:25, 80:3, 80:4, 80:13, 81:22, 84:10, 84:15, 84:19, 85:4, 85:18, 85:20, 85:23, 86:2, 86:7, 86:8, 86:14, 86:19, 87:8, 105:8, 159:9, 222:19, 258:11, 263:14
**documents** [17] - 24:23, 60:3, 79:6, 94:25, 95:5, 95:12,

95:17, 172:7, 174:10, 174:20, 174:24, 211:8, 211:12, 211:15, 242:2, 242:7, 242:11
**Documents** [1] - 263:7
**Dodge** [1] - 12:14
**dollar** [2] - 196:4, 213:2
**dollars** [13] - 28:24, 29:14, 30:3, 30:11, 67:22, 128:25, 129:13, 144:9, 194:21, 195:2, 195:8, 199:16, 200:18
**done** [41] - 42:3, 98:13, 149:16, 153:23, 154:17, 155:5, 163:10, 164:10, 165:7, 166:7, 166:17, 167:14, 167:17, 168:10, 168:15, 168:23, 178:16, 178:20, 178:24, 179:4, 179:8, 179:12, 179:16, 179:20, 180:11, 180:15, 183:7, 183:8, 206:25, 213:24, 213:25, 214:11, 222:15, 222:22, 239:5, 242:3, 243:18, 243:22, 243:23, 258:12, 260:7
**down** [16] - 55:14, 58:17, 66:15, 71:21, 105:13, 116:23, 117:19, 117:20, 117:24, 118:13, 129:11, 137:6, 137:11, 154:20, 154:23
**download** [1] - 104:21
**downloading** [1] - 101:15
**dozen** [1] - 34:12
**draw** [1] - 77:5
**Drive** [5] - 5:14, 26:4, 58:10, 59:4, 60:9
**drive** [1] - 196:5
**driving** [7] - 30:18, 124:2, 125:4, 125:7, 125:8, 146:2, 255:9
**drove** [2] - 125:3, 146:17
**drugs** [1] - 5:24

**due** [3] - 48:8, 163:3
**duly** [3] - 5:3, 265:11, 266:11
**during** [11] - 15:21, 31:18, 78:21, 79:6, 79:18, 107:12, 107:15, 108:16, 208:2, 215:20, 259:3
**DWIGHT** [1] - 1:12
**Dwight** [9] - 37:25, 171:12, 171:15, 185:14, 188:2, 189:20, 215:14, 223:3, 257:15
**DYKMAN** [1] - 3:8

### E

**Earle** [1] - 3:10
**Earth** [1] - 166:19
**Eastern** [1] - 79:16
**EASTERN** [1] - 1:3
**effect** [1] - 4:17
**efficient** [1] - 117:8
**EIN** [3] - 55:20, 56:5, 59:14
**either** [14] - 27:16, 47:11, 75:12, 89:3, 89:4, 103:3, 129:2, 151:23, 200:4, 210:2, 235:21, 237:6, 239:12, 261:17
**electronic** [1] - 114:12
**Ellen** [8] - 91:2, 91:6, 91:7, 91:8, 91:9, 91:10, 91:18, 96:7
**email** [36] - 47:21, 48:2, 48:4, 48:10, 48:11, 48:18, 48:23, 49:2, 49:23, 88:11, 88:12, 88:14, 89:17, 89:19, 89:21, 90:2, 90:19, 92:14, 92:18, 93:3, 93:7, 93:23, 93:24, 96:6, 96:17, 96:24, 97:2, 97:13, 101:5, 101:15, 101:23, 103:18, 107:20, 227:9, 227:11, 227:14
**Email** [2] - 88:4, 263:24
**emailed** [1] - 51:19
**emails** [2] - 99:8, 108:2
**EMANUEL** [1] - 2:9
**Emanuel** [3] - 186:16, 208:7, 261:6
**emphasize** [1] -

135:25
**employed** [4] - 188:10, 188:13, 188:19, 189:9
**employee** [4] - 189:5, 189:13, 189:22, 190:3
**employees** [2] - 17:18, 256:24
**end** [7] - 30:7, 125:12, 130:21, 130:23, 160:18, 257:9, 257:22
**ended** [3] - 77:4, 77:8, 153:13
**enforcement** [6] - 221:25, 236:16, 236:23, 237:6, 242:13, 263:8
**engage** [1] - 247:6
**engines** [2] - 129:8
**entered** [1] - 229:18
**entering** [1] - 205:21
**entities** [3] - 176:21, 176:25, 252:15
**entitled** [10] - 183:2, 186:12, 194:22, 195:4, 195:23, 196:16, 218:18, 218:21, 218:24, 219:3
**entity** [2] - 81:3, 176:23
**entry** [1] - 140:11
**Eric** [2] - 170:15, 170:18
**escrow** [7] - 150:24, 173:5, 181:6, 181:8, 181:17, 181:22, 181:24
**ESQ** [4] - 2:9, 2:21, 3:3, 3:12
**estate** [8] - 40:24, 110:25, 111:16, 111:19, 143:17, 149:17, 149:23, 150:2
**ESTATE** [1] - 1:6
**Estate** [1] - 2:16
**et** [2] - 195:9, 195:10
**evading** [1] - 261:9
**evasive** [1] - 53:17
**eventually** [14] - 7:21, 44:23, 51:7, 51:23, 65:17, 66:16, 67:15, 77:9, 96:2, 136:12, 138:9, 156:22, 174:14, 251:18
**exact** [9] - 18:23, 18:24, 25:22, 29:18,

65:8, 158:20, 165:15, 206:15, 212:4
**exactly** [22] - 53:15, 70:2, 79:7, 92:7, 106:16, 109:5, 110:7, 123:13, 137:7, 150:5, 158:23, 176:25, 188:16, 202:17, 214:3, 214:12, 220:8, 221:11, 223:25, 252:24, 256:20, 259:21
**EXAMINATION** [3] - 5:17, 194:17, 263:3
**examined** [1] - 5:4
**example** [2] - 30:17, 30:25
**excellent** [2] - 201:2, 201:17
**except** [3] - 4:9, 203:8, 235:20
**excuse** [2] - 166:9, 213:7
**executed** [2] - 71:16, 85:22
**exhibit** [2] - 96:11, 100:17
**Exhibit** [27] - 55:6, 55:11, 55:13, 56:12, 56:17, 56:18, 56:21, 56:24, 57:12, 57:20, 57:23, 59:15, 60:13, 60:18, 62:25, 63:5, 71:9, 71:12, 80:6, 80:9, 88:4, 88:7, 104:12, 104:15, 108:5, 108:9, 170:3
**EXHIBITS** [2] - 263:10, 264:3
**exhibits** [3] - 54:19, 54:25, 57:14
**existence** [1] - 238:6
**existing** [1] - 29:11
**exists** [2] - 47:21, 48:21
**expensive** [1] - 196:6
**experience** [2] - 37:14, 233:4
**explain** [2] - 154:22, 209:22
**explanation** [1] - 247:8
**extent** [2] - 216:6, 217:22
**eyes** [5] - 124:17, 137:9, 138:8, 138:10, 167:25

# F

**fabricated** [1] - 172:6
**fabrication** [1] - 154:13
**fabrications** [2] - 154:2, 154:4
**facilitate** [3] - 212:25, 257:12, 257:21
**facilitated** [1] - 257:23
**fact** [6] - 24:16, 49:17, 185:4, 195:12, 228:3, 238:14
**fair** [61] - 11:5, 12:17, 13:11, 14:16, 14:20, 18:25, 19:6, 19:10, 19:14, 23:14, 23:15, 26:12, 68:4, 68:10, 70:4, 76:14, 76:17, 78:14, 99:10, 99:23, 99:25, 111:8, 111:11, 111:13, 111:25, 112:5, 112:11, 112:14, 112:16, 112:17, 112:20, 112:21, 112:22, 112:25, 113:12, 114:22, 114:25, 115:2, 116:14, 116:20, 120:12, 122:3, 128:15, 138:2, 143:14, 160:23, 171:9, 187:19, 187:23, 187:24, 188:3, 188:4, 188:7, 188:8, 189:6, 200:16, 211:20, 211:21, 223:17, 227:8, 251:8
**fall** [4] - 94:14, 94:21, 94:23, 95:4
**false** [5] - 165:11, 165:19, 166:4, 225:13, 227:2
**falsely** [1] - 227:5
**familiar** [8] - 26:3, 33:10, 55:20, 89:11, 90:7, 234:19, 234:21, 246:8
**family** [7] - 41:5, 125:22, 144:9, 153:22, 203:18, 241:23, 254:4
**fancy** [3] - 125:10, 125:16, 196:5
**far** [13] - 67:18, 121:21, 127:11, 127:23, 128:17, 132:25, 160:24,

163:14, 206:17, 223:18, 225:23, 225:25, 253:18
**fast** [1] - 169:22
**father** [12] - 18:11, 35:21, 69:9, 76:6, 77:19, 77:20, 81:14, 136:10, 191:16, 222:18, 259:25, 260:18
**father's** [1] - 138:8
**father-in-law** [10] - 18:11, 35:21, 69:9, 76:6, 77:19, 77:20, 136:10, 191:16, 259:25, 260:18
**father-in-law's** [2] - 81:14, 222:18
**fault** [1] - 66:23
**FBI** [21] - 221:8, 221:10, 221:19, 221:25, 222:6, 222:24, 223:3, 223:6, 223:9, 223:12, 223:15, 236:15, 236:22, 237:17, 239:11, 239:21, 240:3, 240:9, 240:13, 241:8, 241:12
**February** [12] - 63:3, 68:18, 70:16, 213:25, 228:14, 228:20, 228:23, 229:8, 229:14, 229:23, 246:3, 263:20
**fed** [2] - 205:17, 216:13
**federal** [5] - 79:3, 79:15, 99:4, 221:4, 236:22
**feed** [1] - 151:19
**feeding** [4] - 50:9, 53:9, 53:18, 216:20
**felt** [3] - 182:13, 182:19, 186:12
**few** [12] - 39:9, 39:20, 49:9, 95:24, 133:5, 135:23, 142:17, 178:11, 191:17, 222:4, 240:16, 257:5
**fight** [1] - 224:6
**figure** [1] - 258:10
**file** [5] - 27:22, 27:25, 28:3, 56:18, 174:9
**filed** [14] - 94:24, 97:5, 166:13, 174:24, 176:7, 176:11, 226:17, 227:16,

227:17, 227:22, 227:24, 228:2, 228:4
**files** [1] - 57:7
**filing** [6] - 4:5, 95:5, 95:12, 95:16, 174:19, 176:3
**fill** [1] - 9:13
**filled** [1] - 95:21
**finance** [5] - 248:7, 248:9, 249:21, 249:23, 250:24
**Finance** [2] - 45:12, 47:12
**finances** [10] - 251:9, 251:14, 251:16, 251:18, 251:21, 252:3, 252:6, 252:10, 252:14
**financial** [4] - 118:11, 121:8, 121:12, 172:8
**financially** [2] - 122:6, 186:11
**fine** [3] - 26:11, 48:12, 186:23
**fingerprints** [2] - 118:3, 242:4
**finish** [4] - 51:25, 66:22, 103:25, 167:10
**firm** [5] - 46:3, 46:24, 83:2, 91:18, 91:19
**first** [15] - 13:4, 14:5, 15:23, 20:4, 20:8, 20:15, 23:25, 53:6, 57:23, 73:14, 80:12, 86:14, 93:2, 99:15, 202:6
**firsthand** [22] - 27:2, 107:6, 124:20, 124:22, 124:25, 126:18, 128:2, 128:16, 128:19, 128:23, 129:10, 129:13, 138:23, 139:18, 140:14, 141:20, 141:24, 142:7, 144:5, 144:8, 152:11, 152:15
**FISK** [1] - 1:8
**Fisk** [3] - 2:17, 179:20, 179:22
**five** [9] - 90:17, 156:11, 156:16, 169:25, 228:7, 228:8, 228:23, 229:8, 229:13
**floor** [10] - 25:16, 118:18, 129:19, 129:25, 130:3, 130:8, 130:16,

130:18, 253:24, 254:8
**Florida** [1] - 120:11
**Flushing** [1] - 3:9
**FLUSHING** [1] - 1:16
**focused** [1] - 251:9
**folder** [1] - 33:21
**folders** [15] - 28:3, 28:11, 31:25, 32:9, 32:12, 32:15, 33:6, 33:8, 33:11, 33:12, 33:16, 33:18, 34:4, 34:5, 34:9
**follow** [2] - 41:23, 242:18
**following** [1] - 52:2
**follows** [2] - 5:5, 194:16
**force** [1] - 4:17
**forget** [4] - 137:7, 197:3, 199:13, 248:6
**Form** [3] - 104:13, 105:10, 264:6
**form** [15] - 4:10, 16:11, 44:14, 52:18, 55:18, 93:10, 102:25, 113:4, 161:2, 161:5, 161:12, 183:20, 185:12, 208:12, 231:23
**formed** [13] - 24:5, 24:7, 25:11, 26:13, 26:19, 26:24, 27:4, 27:6, 27:7, 27:9, 34:22, 35:13, 35:15
**forth** [2] - 265:11, 266:11
**four** [6] - 6:20, 7:6, 62:4, 152:19, 169:24, 169:25
**four-year** [2] - 6:20, 7:6
**Frank** [4] - 88:15, 89:8, 91:5, 124:11
**fraud** [11] - 103:6, 126:6, 136:14, 191:22, 192:2, 196:11, 197:12, 199:23, 201:23, 222:21
**frauds** [1] - 201:13
**fraudulent** [1] - 195:8
**free** [1] - 193:17
**frequently** [1] - 248:19
**front** [3] - 192:23, 236:8, 240:13
**fulfill** [1] - 43:19
**fulfilled** [1] - 98:12
**fulfilling** [1] - 39:22
**full** [7] - 5:7, 26:9,

62:15, 84:15, 103:22, 134:16, 183:4
**FUNDING** [1] - 1:16
**Funding** [3] - 3:16, 64:8, 65:6
**funds** [2] - 217:17, 254:21
**funny** [2] - 192:14, 192:18
**FURTHER** [2] - 4:8, 4:13

## G

**gain** [3] - 70:12, 199:15, 211:23
**gained** [1] - 23:25
**Gallagher** [3] - 88:15, 89:8, 91:5
**game** [1] - 246:15
**general** [5] - 10:13, 32:17, 82:20, 129:9, 208:25
**generally** [1] - 42:21
**gentlemen** [1] - 188:17
**girlfriend** [2] - 192:8, 192:11
**given** [12] - 40:15, 67:3, 67:19, 67:22, 68:18, 68:23, 69:2, 150:23, 225:14, 262:14, 265:13, 266:13
**goal** [1] - 173:4
**GOLD** [6] - 1:13, 1:13, 1:14, 1:14, 1:15
**Gold** [9] - 72:2, 72:5, 72:13, 72:18, 72:20, 73:2, 73:10, 74:5, 77:25
**gonna** [1] - 168:25
**gotta** [1] - 51:20
**government** [6] - 159:9, 220:24, 222:4, 222:17, 236:19, 237:9
**grand** [2] - 220:2, 220:5
**great** [1] - 87:6
**Group** [55] - 12:8, 19:9, 82:22, 82:24, 88:20, 90:23, 91:15, 91:21, 110:9, 110:10, 110:21, 110:24, 114:23, 115:3, 115:6, 117:7, 119:3, 130:22, 130:24, 141:3,

141:6, 142:9, 142:13, 147:16, 147:21, 148:3, 158:2, 160:20, 164:8, 164:11, 173:11, 173:12, 173:18, 176:22, 179:4, 184:10, 184:12, 184:14, 184:15, 184:19, 190:23, 191:4, 191:7, 195:13, 214:22, 215:2, 217:16, 217:18, 218:16, 243:13, 243:15, 250:14, 251:22, 252:4
**group** [1] - 89:6
**GROUP** [1] - 1:14
**Group's** [1] - 149:2
**guarantee** [2] - 237:18, 237:19
**guaranteed** [4] - 30:15, 159:24, 162:2, 162:5
**guaranteeing** [1] - 11:14
**guaranties** [3] - 11:22, 115:25, 158:18
**guarantor** [3] - 22:22, 182:6, 182:25
**guarantors** [7] - 23:6, 24:16, 58:19, 59:4, 59:18, 182:5, 182:16
**guaranty** [7] - 11:9, 11:12, 22:18, 58:21, 159:8, 159:11, 159:14
**guess** [14] - 28:25, 59:23, 66:14, 75:16, 75:19, 75:20, 130:25, 139:2, 141:23, 149:23, 188:18, 192:17, 226:9, 257:13
**Gustavo** [1] - 69:20
**guy** [6] - 138:2, 138:5, 138:7, 138:13, 244:3, 248:7
**guys** [2] - 156:7, 186:14

## H

**half** [3] - 79:4, 79:17, 156:2
**hand** [8] - 76:9, 76:10, 80:15, 80:16, 169:5, 170:5, 265:21, 266:21

**handed** [1] - 222:20
**handle** [1] - 32:20
**handled** [4] - 157:11, 222:17, 248:12, 248:13
**handles** [2] - 120:6, 252:25
**handprints** [1] - 118:2
**hands** [4] - 16:6, 48:6, 121:9, 230:13
**hands-on** [1] - 16:6
**happy** [6] - 26:8, 202:23, 202:25, 203:3, 203:5, 203:19
**harm** [14] - 150:17, 150:20, 151:2, 151:6, 153:16, 153:18, 166:7, 166:17, 167:14, 167:17, 168:10, 168:15, 168:23, 180:16
**harmed** [7] - 150:13, 153:12, 154:18, 165:22, 167:2, 203:15, 241:21
**HARRY** [2] - 1:11, 3:3
**Harry** [10] - 5:20, 34:19, 85:25, 102:8, 155:8, 156:3, 185:16, 189:4, 205:25, 215:13
**head** [2] - 143:13, 168:21
**heading** [2] - 96:5, 96:8
**hear** [2] - 41:22, 182:11
**heard** [17] - 37:18, 38:8, 72:12, 72:14, 72:16, 136:12, 137:15, 154:7, 154:10, 167:22, 176:16, 218:16, 246:7, 246:10, 246:11, 246:12, 247:16
**held** [6] - 16:16, 70:15, 70:20, 73:22, 74:18, 150:23
**help** [5] - 19:23, 32:9, 181:4, 183:20, 226:10
**helped** [5] - 32:23, 141:7, 181:2, 257:11, 257:20
**helpful** [6] - 172:14, 257:17, 257:18, 257:20, 257:24, 258:3

**helping** [4] - 19:19, 36:14, 212:20, 212:25
**helps** [4] - 249:16, 253:3, 253:6, 253:7
**hemorrhaging** [1] - 172:12
**HEREBY** [1] - 4:2
**hereby** [3] - 262:7, 265:8, 266:8
**herein** [1] - 4:4
**Hereinafter** [2] - 83:9, 84:5
**hereinafter** [1] - 83:15
**hereinbefore** [2] - 265:11, 266:11
**hereunto** [2] - 265:21, 266:21
**herself** [1] - 149:21
**high** [3] - 6:9, 7:4, 125:12
**High** [1] - 6:11
**high-end** [1] - 125:12
**Highway** [7] - 2:12, 3:5, 63:21, 64:2, 73:17, 95:2, 250:8
**HIGHWAY** [1] - 1:4
**Hillside** [2] - 14:12, 14:13
**himself** [2] - 226:14, 254:7
**history** [1] - 166:18
**hold** [6] - 55:12, 141:9, 181:17, 181:22, 181:23, 228:19
**holder** [1] - 87:25
**holding** [1] - 184:9
**home** [1] - 196:4
**Honda** [2] - 12:13, 243:21
**honest** [6] - 102:20, 103:8, 135:22, 164:13, 197:4, 201:6
**honestly** [5] - 103:4, 103:18, 104:7, 225:3, 240:15
**hope** [5] - 135:6, 220:15, 249:18, 250:2, 250:5
**host** [3] - 29:4, 45:21, 126:23
**hour** [1] - 156:2
**housekeeping** [1] - 261:23
**huge** [2] - 68:13, 207:21
**human** [4] - 6:24, 10:7, 10:10, 10:15
**human-resource-**

**type** [1] - 10:10
**hurt** [5] - 169:13, 207:22, 224:4, 224:11, 251:18
**husband** [3] - 19:23, 19:24, 139:9
**HWY** [1] - 1:17
**HYLAN** [7] - 1:6, 1:7, 1:7, 1:8, 177:4
**Hylan** [12] - 2:16, 176:17, 177:2, 177:4, 177:12, 177:18, 178:13, 178:20, 178:24, 179:8, 179:12, 179:16
**hypotheticals** [1] - 232:15
**Hyundai** [1] - 12:12

## I

**idea** [18] - 34:14, 56:11, 58:16, 78:6, 81:23, 89:24, 95:9, 106:23, 107:3, 153:2, 195:19, 210:18, 230:14, 230:15, 241:3, 258:9, 258:13, 259:12
**identification** [9] - 55:9, 56:15, 60:16, 63:4, 71:11, 80:8, 88:6, 104:14, 108:8
**identify** [2] - 55:15, 169:19
**II** [1] - 100:22
**illegally** [1] - 126:2
**imagine** [22] - 9:9, 35:20, 35:25, 68:20, 81:18, 95:18, 110:8, 143:16, 143:18, 143:19, 155:21, 159:10, 159:16, 159:18, 201:21, 214:14, 218:3, 221:17, 222:16, 222:21, 237:12, 253:2
**immediately** [1] - 31:7
**impacted** [1] - 186:2
**impacts** [1] - 186:8
**important** [1] - 149:24
**impossible** [1] - 6:2
**impression** [1] - 153:7
**IN** [2] - 265:20, 266:20
**inaccurate** [4] - 163:21, 164:2, 172:7, 198:9

**INC** [3] - 1:4, 1:13, 1:16
**Inc** [5] - 2:5, 64:2, 80:17, 84:3, 87:24
**include** [2] - 9:7, 90:21
**included** [1] - 195:15
**includes** [1] - 205:12
**including** [3] - 10:2, 13:19, 43:22
**incorporation** [1] - 27:11
**incorrect** [1] - 150:11
**incorrectly** [1] - 21:24
**indicate** [3] - 45:8, 106:25, 108:3
**indicated** [4] - 103:16, 105:21, 194:19, 227:15
**indicates** [8] - 61:15, 62:10, 64:6, 73:2, 73:16, 80:13, 86:9, 100:22
**indicating** [1] - 43:10
**indirectly** [2] - 147:24, 147:25
**individual** [2] - 125:23, 169:3
**individually** [1] - 161:3
**individuals** [3] - 23:6, 224:11, 241:22
**industry** [2] - 200:11, 202:15
**inform** [1] - 119:25
**information** [6] - 11:4, 97:3, 205:17, 226:9, 226:11, 237:22
**injunction** [4] - 209:8, 209:13, 209:19, 209:22
**injunctions** [1] - 209:21
**inspect** [1] - 28:12
**instance** [2] - 158:4, 232:21
**instruct** [1] - 35:24
**instructed** [1] - 225:6
**intending** [1] - 52:5
**intentional** [1] - 216:5
**interest** [10] - 12:4, 14:19, 15:9, 15:16, 20:16, 204:19, 205:14, 212:18, 212:19, 251:6
**interested** [2] - 265:18, 266:18
**interests** [5] - 84:20, 180:16, 244:20, 244:24, 245:5

**Internal** [2] - 55:7, 263:13
**interrupting** [1] - 53:8
**interviewed** [1] - 200:10
**investigate** [3] - 220:13, 254:25, 260:11
**investigating** [2] - 237:15, 238:19
**investigation** [4] - 220:20, 238:2, 238:16, 238:20
**investigations** [2] - 222:12, 237:5
**involved** [29] - 35:15, 36:12, 36:17, 37:4, 37:8, 37:16, 74:8, 95:7, 107:9, 167:21, 185:2, 190:19, 191:16, 210:6, 210:8, 217:14, 220:11, 225:19, 226:5, 226:13, 231:11, 245:9, 250:18, 251:21, 252:2, 257:5, 260:3, 260:8, 260:10
**involvement** [1] - 36:23
**involving** [7] - 51:3, 60:21, 89:4, 155:5, 197:8, 222:12, 237:6
**Iris** [11] - 2:15, 19:21, 40:23, 42:10, 43:4, 76:9, 107:14, 120:5, 137:4, 149:12, 149:25
**IRIS** [1] - 1:6
**Iris's** [1] - 244:20
**IRS** [2] - 45:11, 47:12
**IS** [3] - 4:2, 4:8, 4:13
**ISLAND** [1] - 1:9
**Island** [71] - 2:18, 12:8, 12:9, 14:12, 14:23, 19:9, 82:22, 82:24, 88:19, 90:23, 91:15, 91:21, 110:9, 110:10, 110:20, 110:23, 114:23, 115:2, 115:3, 115:6, 117:7, 119:3, 130:22, 130:24, 141:3, 141:6, 142:9, 142:13, 147:16, 147:21, 148:3, 148:25, 158:2, 160:20, 164:7, 164:11, 173:10, 173:12, 173:18,

176:22, 177:14, 177:15, 179:4, 184:8, 184:10, 184:11, 184:14, 184:15, 184:19, 184:25, 190:21, 190:22, 190:25, 191:4, 191:7, 195:13, 214:17, 214:21, 214:25, 217:16, 217:18, 218:16, 243:12, 243:15, 250:14, 251:21, 252:4, 257:25
**issue** [3] - 104:6, 151:4, 206:4
**issued** [3] - 190:5, 190:11, 190:16
**issues** [4] - 104:5, 117:9, 180:20, 225:5
**IT** [5] - 4:2, 4:8, 4:13, 243:8, 244:3
**items** [1] - 44:24
**itself** [1] - 128:12

## J

**J.P** [1] - 1:16
**jackets** [2] - 27:23, 27:25
**Jamaica** [2] - 2:7, 2:8
**January** [8] - 1:20, 61:7, 73:4, 211:14, 213:25, 262:10, 265:22, 266:22
**Jeep** [1] - 12:14
**Jeff** [1] - 208:7
**Jeffrey** [1] - 261:9
**Jersey** [5] - 12:15, 180:3, 180:13, 180:17
**JMW)COUNTY** [1] - 1:11
**job** [6] - 38:21, 164:10, 251:11, 255:15, 256:9, 256:10
**join** [4] - 202:24, 203:4, 203:10, 203:20
**joined** [5] - 204:3, 204:11, 204:21, 204:24, 208:14
**JONES** [2] - 1:12, 1:16
**Jones** [8] - 88:15, 92:10, 96:7, 97:2, 171:25, 172:4, 172:14, 226:9
**JORY** [1] - 1:5
**Jory** [5] - 2:14, 69:3,

69:8, 143:18, 229:10
**Joseph** [5] - 81:23, 81:25, 82:9, 82:14, 82:16
**Josh** [6] - 69:19, 90:23, 96:6, 96:13, 97:2
**Joshua** [5] - 2:14, 5:10, 64:24, 65:2, 205:2
**JOSHUA** [7] - 1:5, 1:22, 262:7, 262:18, 263:4, 265:9, 266:9
**Judge** [1] - 155:20
**judge** [2] - 53:3, 53:5
**jump** [1] - 155:18
**June** [10] - 58:25, 71:10, 71:16, 71:23, 71:24, 73:11, 73:22, 74:9, 92:23, 263:21
**jury** [2] - 220:2, 220:5
**Justice** [3] - 219:25, 220:11, 220:21
**justice** [1] - 220:16

## K

**K-1's** [3] - 190:5, 190:10, 190:16
**Kahn** [1] - 192:24
**Kataev** [3] - 204:25, 240:21, 247:2
**KATAEV** [20] - 2:9, 8:20, 104:22, 105:5, 155:18, 156:13, 186:20, 193:14, 193:17, 204:18, 205:4, 207:9, 208:11, 242:18, 242:23, 246:22, 260:23, 261:3, 261:15, 261:21
**kataev** [1] - 242:22
**keep** [3] - 12:16, 186:20, 214:22
**kept** [5] - 65:25, 68:3, 68:6, 68:7, 235:18
**Kera** [3] - 91:2, 91:6, 96:7
**keys** [1] - 257:12
**KHAN** [1] - 1:6
**Khan** [15] - 2:15, 20:18, 22:5, 24:21, 26:23, 40:23, 41:16, 42:4, 42:9, 42:15, 43:5, 75:8, 143:20, 148:9, 245:4
**Khan's** [2] - 122:19, 192:8
**Kia** [2] - 14:9, 15:5

**kind** [6] - 94:10, 102:12, 159:14, 206:14, 224:19, 247:9
**kinds** [1] - 233:7
**knock** [1] - 225:4
**knowing** [4] - 137:25, 138:4, 138:17, 186:4
**knowledge** [31] - 21:7, 27:2, 40:6, 40:10, 40:19, 41:12, 46:11, 46:13, 72:17, 100:3, 100:7, 107:5, 107:7, 116:8, 124:21, 124:23, 125:2, 126:9, 126:18, 128:17, 138:24, 139:18, 141:20, 141:24, 142:8, 144:5, 144:8, 152:12, 152:16, 256:5
**known** [2] - 10:23, 247:5
**knows** [6] - 48:10, 53:15, 136:6, 166:18, 247:12, 247:14
**Kwun** [16] - 88:15, 88:18, 96:6, 96:12, 109:22, 109:24, 114:16, 119:12, 157:9, 157:20, 158:11, 190:20, 191:3, 218:6, 248:17, 256:5

## L

**larceny** [1] - 108:13
**large** [2] - 80:3, 80:4
**last** [17] - 15:21, 25:8, 52:25, 57:4, 61:20, 62:2, 62:4, 62:9, 62:19, 83:8, 96:16, 98:19, 102:14, 137:4, 183:10, 226:3, 239:11
**late** [2] - 108:17, 259:18
**Laurie** [10] - 37:11, 37:13, 37:15, 171:20, 185:16, 187:22, 189:25, 215:15, 216:7, 223:9
**LAURIE** [1] - 1:12
**lavish** [1] - 196:3
**law** [33] - 18:11, 19:20, 21:3, 30:4, 30:15, 35:21, 36:15, 41:7,

42:14, 69:9, 75:18, 75:22, 76:6, 77:19, 77:20, 82:25, 98:9, 119:21, 136:10, 191:16, 212:20, 217:22, 221:24, 235:24, 236:15, 236:23, 237:6, 242:13, 259:18, 259:24, 259:25, 260:18, 263:8
**law's** [2] - 81:14, 222:18
**lawsuit** [13] - 166:12, 201:25, 202:20, 202:24, 203:2, 203:4, 203:11, 203:20, 204:3, 204:10, 204:24, 205:21, 208:14
**lawsuits** [1] - 201:20
**lawyer** [6] - 50:7, 218:21, 218:24, 219:3, 219:6, 219:7
**lawyers** [3] - 240:9, 240:12, 240:16
**layman's** [1] - 255:9
**learn** [1] - 20:15
**learned** [4] - 11:21, 55:23, 136:21, 246:25
**Lease** [9] - 56:13, 56:14, 56:19, 58:2, 71:9, 263:16, 263:21
**lease** [31] - 58:9, 58:14, 58:20, 59:4, 59:19, 60:2, 60:6, 60:8, 60:11, 60:12, 70:16, 70:20, 71:16, 71:17, 71:19, 73:10, 73:15, 73:16, 73:23, 74:8, 74:18, 78:2, 78:13, 79:8, 79:11, 87:25, 229:17, 229:19, 233:4, 233:6
**Leasing** [15] - 2:13, 22:4, 24:2, 24:5, 24:10, 24:11, 58:8, 60:22, 62:6, 62:11, 62:15, 62:23, 99:5, 100:24, 105:20
**LEASING** [2] - 1:5, 1:17
**leasing** [1] - 99:17
**least** [6] - 87:12, 87:21, 92:2, 120:24, 198:4, 256:15
**leave** [1] - 70:11
**leaving** [1] - 257:12
**left** [4] - 100:18, 105:8,

170:5, 207:21
**left-hand** [1] - 170:5
**legal** [5] - 26:9, 50:14, 62:16, 124:21, 182:9
**LEGAL** [1] - 2:3
**lenders** [1] - 254:7
**Leshius** [1] - 244:13
**less** [4] - 129:5, 144:20, 144:21, 231:8
**lessor** [1] - 72:3
**letters** [1] - 56:25
**level** [3] - 74:7, 236:22, 236:24
**levels** [2] - 100:10, 100:11
**Lexington** [1] - 2:19
**liable** [1] - 183:23
**Libertas** [8] - 3:15, 225:11, 225:15, 225:24, 226:6, 226:8, 226:12, 261:16
**LIBERTAS** [1] - 1:16
**LIC** [1] - 1:14
**license** [29] - 22:10, 22:12, 22:15, 22:18, 22:22, 22:24, 23:5, 23:7, 23:10, 23:13, 23:20, 23:23, 24:9, 24:17, 43:23, 117:16, 122:15, 145:19, 145:20, 145:23, 145:25, 146:2, 158:22, 159:23, 213:5, 213:10, 213:13, 213:18, 214:10
**licenses** [13] - 7:10, 156:20, 158:16, 158:19, 158:25, 159:4, 159:8, 160:5, 182:3, 182:14, 182:16, 182:18, 212:7
**life** [7] - 7:16, 7:18, 196:13, 199:13, 224:13, 225:4, 241:12
**lifestyle** [2] - 196:3, 196:11
**lifetime** [2] - 259:3, 259:7
**lift** [1] - 205:9
**likely** [3] - 93:5, 93:11, 109:22
**limited** [5] - 20:7, 166:11, 166:22, 166:24, 223:19
**line** [4] - 49:5, 64:14,

201:15, 229:3
**list** [7] - 54:6, 57:7, 57:14, 97:17, 219:10, 245:12, 245:15
**listed** [3] - 83:5, 100:17, 174:7
**listing** [2] - 97:24, 246:2
**litigation** [8] - 165:12, 166:6, 166:22, 168:10, 184:5, 197:7, 226:3, 234:12
**LITTLE** [1] - 1:16
**live** [3] - 196:3, 196:10, 224:13
**living** [1] - 196:13
**LLC** [59] - 1:4, 1:5, 1:7, 1:7, 1:8, 1:8, 1:9, 1:9, 1:13, 1:13, 1:14, 1:14, 1:15, 1:16, 1:17, 2:3, 2:5, 2:13, 2:17, 2:18, 3:16, 25:22, 60:22, 62:11, 62:15, 64:8, 65:7, 72:3, 73:3, 99:5, 176:18, 177:5, 177:18, 178:4, 178:7, 178:13, 178:17, 178:21, 178:25, 179:9, 179:13, 179:17, 179:20, 179:23, 183:9, 184:8, 184:19, 184:20, 185:2, 185:22, 185:23
**LLCs** [4] - 2:17, 177:13, 184:17, 184:22
**LLP** [4] - 1:16, 2:11, 3:8, 3:14
**loan** [3] - 161:23, 163:4, 182:7
**loans** [2] - 172:10, 172:15
**local** [1] - 221:4
**located** [7] - 63:17, 63:19, 69:11, 120:14, 250:7, 250:13, 257:11
**location** [11] - 60:9, 69:12, 69:15, 69:24, 70:6, 70:11, 70:12, 70:17, 229:19, 250:14, 250:17
**locations** [3] - 250:19, 252:7, 253:2
**lock** [1] - 140:9
**locking** [1] - 259:20

**log** [1] - 133:5
**logistics** [1] - 149:23
**look** [4] - 84:2, 196:25, 220:5, 220:22
**looked** [3] - 136:3, 163:17, 215:20
**looking** [7] - 79:8, 79:9, 99:13, 101:13, 164:4, 190:25, 220:25
**looks** [7] - 55:17, 59:21, 64:11, 73:25, 74:11, 86:18, 89:9
**lose** [2] - 207:2, 258:2
**loss** [4] - 121:22, 183:21, 199:15
**losses** [13] - 67:23, 120:19, 121:3, 121:7, 121:12, 121:13, 132:14, 148:4, 195:17, 258:7, 259:2, 259:6, 259:9
**lost** [12] - 19:22, 30:5, 68:11, 68:16, 120:17, 144:12, 195:6, 211:22, 211:23, 254:4, 254:5, 258:5
**loved** [1] - 225:14
**lovely** [1] - 220:18
**lunch** [4] - 155:11, 155:17, 186:19, 193:11
**luncheon** [1] - 193:21
**lying** [1] - 236:10

## M

**maiden** [3] - 13:12, 13:13, 56:7
**main** [3] - 38:22, 136:4
**major** [1] - 136:10
**majority** [1] - 7:17
**Mall** [8] - 13:8, 13:20, 14:5, 14:6, 14:8, 14:11, 14:13, 18:4
**MANAGEMENT** [1] - 1:9
**Management** [8] - 2:18, 64:8, 65:7, 184:8, 184:25, 190:21, 190:25, 214:17
**manner** [1] - 169:6
**Marc** [21] - 38:6, 168:15, 168:18, 168:22, 169:3, 169:6, 169:10, 169:11, 170:22,

170:24, 171:4, 185:15, 188:6, 188:13, 188:20, 188:21, 189:17, 215:14, 223:6, 257:14
**MARC** [1] - 1:12
**Marcello** [5] - 111:2, 112:7, 112:8, 112:9, 112:12
**Marino** [3] - 243:4, 243:6, 244:2
**marked** [10] - 55:9, 55:11, 56:14, 60:15, 63:3, 71:10, 80:8, 88:5, 104:14, 108:7
**marriage** [2] - 265:17, 266:17
**married** [3] - 13:9, 139:3, 139:13
**Martz** [3] - 90:5, 90:22, 91:6
**Marx** [2] - 170:16, 170:18
**Maserati** [4] - 30:19, 126:21, 126:22, 127:8
**materially** [1] - 166:4
**matter** [4] - 167:19, 224:17, 265:19, 266:19
**matters** [3] - 88:22, 88:25, 89:4
**Mazda** [3] - 177:9, 177:12, 177:14
**mean** [29] - 23:15, 27:24, 29:8, 39:7, 41:20, 66:3, 77:14, 98:3, 109:19, 116:22, 117:2, 117:3, 117:20, 118:7, 133:18, 134:16, 136:6, 139:22, 154:22, 155:3, 156:4, 157:18, 157:19, 158:2, 184:2, 184:14, 185:4, 236:13
**meaning** [5] - 86:20, 110:4, 121:10, 129:7, 136:2
**means** [9] - 17:13, 50:20, 50:22, 53:16, 54:2, 84:18, 139:23, 232:4, 247:17
**meant** [1] - 143:3
**mechanics** [2] - 109:13, 109:14
**medication** [1] - 5:25

**meet** [2] - 18:20, 19:17
**meeting** [4] - 221:7, 221:9, 221:20, 248:6
**meetings** [1] - 74:23
**Melissa** [19] - 191:11, 191:13, 191:18, 191:21, 191:25, 192:7, 192:10, 243:25, 244:8, 248:24, 249:7, 249:8, 250:3, 251:20, 252:22, 256:11, 256:14, 256:17, 256:21
**Member** [1] - 61:12
**members** [1] - 125:22
**memory** [12] - 9:16, 10:24, 78:25, 79:19, 93:24, 97:12, 99:14, 109:23, 209:3, 209:5, 211:19, 241:16
**men's** [1] - 156:8
**mental** [2] - 121:22, 121:25
**mention** [1] - 216:2
**mentioned** [9] - 14:3, 16:11, 103:12, 126:20, 127:8, 144:24, 163:17, 188:17, 224:3
**mentioning** [4] - 74:21, 216:3, 231:9, 231:10
**MERCKLING** [1] - 1:12
**Merckling** [15] - 38:6, 168:15, 168:18, 168:23, 170:22, 170:25, 171:4, 185:15, 188:6, 188:13, 188:20, 189:17, 215:14, 223:6, 257:14
**mess** [1] - 207:21
**met** [7] - 18:8, 18:15, 19:2, 19:7, 37:2, 66:16, 257:7
**Michael** [14] - 26:4, 37:11, 37:13, 37:15, 37:19, 58:9, 59:4, 60:9, 171:20, 185:15, 187:22, 189:25, 215:15, 223:9
**MICHAEL** [1] - 1:12
**middle** [4] - 61:10, 75:25, 100:21, 170:12
**might** [16] - 101:11,

101:14, 143:21, 154:7, 169:10, 170:19, 189:2, 189:11, 189:18, 189:19, 189:23, 202:16, 216:8, 244:4, 252:17
**million** [11] - 120:17, 120:18, 120:20, 120:25, 172:13, 186:13, 195:16, 203:18, 254:5, 258:2, 258:4
**millions** [19] - 28:24, 29:13, 29:14, 30:3, 30:11, 67:21, 67:22, 128:24, 128:25, 129:12, 132:13, 144:9, 194:21, 195:2, 195:8, 199:15, 200:17
**mind** [3] - 52:7, 106:5, 211:4
**mine** [1] - 152:22
**minimal** [1] - 100:9
**minutes** [6] - 49:9, 90:17, 155:22, 156:8, 156:11, 156:16
**mislead** [2] - 45:15, 47:11
**misleading** [1] - 45:11
**mismanaged** [1] - 195:24
**missing** [2] - 117:5, 129:9
**misspoke** [1] - 190:24
**mistake** [1] - 107:16
**misunderstand** [1] - 53:24
**Mitchell** [3] - 1:24, 266:6, 266:24
**MITCHELL** [3] - 265:6, 265:25, 266:25
**mixing** [1] - 214:23
**MO** [1] - 98:14
**Modification** [3] - 56:14, 58:3, 263:16
**moment** [3] - 79:11, 161:20, 178:2
**money** [108] - 17:8, 17:14, 30:5, 30:6, 30:9, 30:16, 30:20, 30:21, 32:2, 64:18, 65:20, 65:24, 66:12, 67:19, 68:3, 68:6, 68:11, 68:17, 71:6, 109:3, 109:6, 109:9, 109:15, 109:24, 110:5, 113:21,

119:23, 120:6, 120:7, 122:24, 127:3, 127:11, 127:12, 127:16, 127:20, 144:11, 145:14, 146:13, 147:19, 147:23, 148:2, 148:9, 148:14, 148:17, 148:21, 149:5, 149:20, 149:25, 150:21, 160:19, 160:23, 161:5, 161:13, 161:15, 161:18, 161:22, 162:2, 162:5, 162:16, 162:22, 169:5, 172:12, 172:21, 173:3, 173:5, 173:17, 173:22, 173:24, 177:23, 180:24, 181:2, 181:4, 181:6, 181:12, 181:22, 181:24, 182:7, 182:24, 183:2, 183:16, 185:5, 185:8, 186:13, 195:14, 195:18, 195:22, 195:24, 196:2, 196:9, 196:10, 196:15, 207:2, 210:19, 210:20, 211:23, 211:24, 214:20, 224:18, 224:25, 225:11, 225:12, 225:14, 225:17, 225:23, 226:5, 230:13, 253:22, 258:24
**monitor** [1] - 105:6
**month** [3] - 39:12, 39:15, 39:20
**months** [1] - 39:9
**MORGAN** [1] - 1:17
**morning** [4] - 5:19, 5:22, 96:12, 96:25
**most** [2] - 39:14, 109:22
**mother** [15] - 19:20, 21:3, 30:4, 30:15, 36:15, 41:7, 42:14, 75:18, 75:22, 98:9, 119:21, 212:20, 235:24, 259:18, 259:24
**mother-in-law** [15] - 19:20, 21:3, 30:4, 30:15, 36:15, 41:7,

42:14, 75:18, 75:22, 98:9, 119:21, 212:20, 235:24, 259:18, 259:24
**MOTION** [1] - 263:5
**MOTOR** [2] - 1:5, 1:17
**motor** [19] - 22:12, 22:23, 43:22, 44:25, 45:20, 51:19, 51:21, 95:23, 96:2, 117:14, 117:16, 158:21, 158:25, 159:4, 212:14, 251:5, 251:16, 251:17, 253:3
**Motor** [18] - 2:13, 22:4, 22:8, 24:2, 24:5, 24:10, 24:11, 58:8, 60:22, 62:6, 62:11, 62:15, 62:23, 99:5, 99:17, 100:24, 105:20, 212:23
**MOTORS** [6] - 1:4, 1:13, 1:14, 1:14, 1:15, 1:15
**Motors** [98] - 2:4, 20:5, 20:8, 20:11, 20:13, 20:16, 21:8, 22:11, 22:15, 24:20, 25:12, 25:16, 25:19, 25:21, 25:25, 26:2, 26:7, 26:11, 26:14, 26:17, 26:24, 27:12, 27:14, 27:20, 27:23, 28:21, 32:11, 33:6, 34:6, 34:17, 34:25, 35:12, 35:19, 36:8, 37:15, 37:17, 37:22, 38:2, 38:7, 38:12, 38:25, 40:16, 40:25, 42:3, 42:11, 42:18, 43:6, 43:12, 43:13, 51:2, 58:8, 59:5, 60:3, 60:8, 61:19, 72:3, 72:5, 72:13, 72:18, 72:21, 73:3, 73:11, 74:5, 78:2, 89:23, 94:7, 95:2, 95:17, 98:8, 106:6, 107:9, 107:24, 115:18, 116:20, 118:12, 119:10, 120:20, 122:7, 129:20, 133:8, 135:15, 138:18, 139:6, 139:20, 140:5, 140:20, 148:4, 190:7, 190:12, 194:22, 195:3, 206:19, 206:21,

212:18, 213:6, 213:9, 234:15, 247:25
**Motors'** [3] - 88:22, 98:6, 118:13
**move** [3] - 98:14, 132:16, 141:7
**moving** [3] - 141:16, 142:3, 246:16
**MR** [184] - 5:18, 8:18, 8:20, 16:10, 20:6, 20:12, 21:14, 21:19, 21:22, 23:21, 24:25, 25:5, 25:7, 28:8, 28:14, 28:17, 28:18, 28:19, 34:18, 35:2, 35:6, 35:8, 35:23, 41:19, 41:21, 44:13, 45:13, 47:24, 48:3, 48:7, 48:14, 50:5, 50:8, 50:11, 50:12, 50:13, 50:16, 52:13, 52:17, 52:23, 53:4, 53:7, 53:11, 53:13, 53:19, 53:21, 54:16, 54:21, 54:23, 55:4, 57:3, 57:6, 57:11, 57:15, 71:18, 74:3, 74:6, 76:18, 76:22, 85:12, 85:14, 85:15, 85:25, 86:4, 90:11, 90:16, 93:9, 98:14, 98:18, 102:6, 102:9, 102:24, 104:22, 105:2, 105:5, 110:13, 110:15, 113:3, 113:7, 113:11, 114:6, 114:9, 128:6, 128:9, 128:11, 131:18, 131:20, 131:22, 135:18, 151:14, 151:17, 151:21, 151:22, 155:8, 155:12, 155:18, 155:23, 156:4, 156:5, 156:10, 156:13, 156:15, 160:25, 161:4, 161:9, 166:9, 166:15, 166:21, 166:23, 167:6, 167:8, 182:8, 185:11, 186:16, 186:18, 186:20, 186:24, 187:3, 189:3, 189:6, 192:17, 192:20, 193:4, 193:10, 193:14, 193:16, 193:17, 193:20,

194:18, 197:20, 197:24, 198:3, 204:17, 204:18, 204:22, 204:23, 205:4, 205:25, 206:5, 207:9, 208:11, 215:19, 216:12, 216:14, 216:18, 216:22, 216:23, 219:5, 219:9, 219:14, 219:18, 219:23, 225:7, 228:19, 231:22, 233:16, 237:24, 238:10, 238:13, 238:22, 239:2, 239:4, 239:8, 239:9, 242:9, 242:16, 242:18, 242:20, 242:23, 243:2, 246:22, 246:24, 247:7, 247:11, 247:14, 247:23, 260:21, 260:23, 261:3, 261:5, 261:15, 261:18, 261:21, 263:4
**MS** [1] - 260:25
**multimillion** [1] - 196:4
**multiple** [1] - 201:19

## N

**N.A** [1] - 1:17
**name** [39] - 5:7, 5:9, 5:20, 13:6, 13:12, 13:13, 37:18, 38:8, 43:23, 44:25, 49:12, 49:13, 49:25, 51:21, 56:6, 56:7, 58:11, 59:24, 59:25, 62:16, 63:24, 80:19, 80:20, 81:24, 82:6, 82:8, 90:6, 90:8, 90:10, 105:17, 112:6, 122:17, 126:3, 170:6, 170:9, 182:21, 201:2, 222:19
**Name** [1] - 105:14
**named** [10] - 13:19, 37:10, 37:12, 64:23, 124:10, 133:19, 168:22, 191:10, 234:17, 243:4
**names** [9] - 12:7, 14:17, 58:22, 83:7, 158:8, 188:22, 201:12, 201:18,

208:4
**NASSAU** [2] - 265:4, 266:4
**Nassau** [6] - 108:6, 108:13, 169:16, 191:22, 192:2, 264:7
**necessarily** [1] - 99:9
**need** [4] - 54:25, 120:7, 120:15, 205:5
**needed** [4] - 8:25, 33:3, 117:15, 214:24
**needs** [1] - 54:19
**never** [41] - 44:3, 44:5, 45:2, 45:4, 45:5, 45:23, 47:19, 67:10, 68:23, 78:12, 81:17, 81:19, 98:13, 117:17, 123:9, 126:3, 126:14, 126:15, 136:2, 137:15, 144:7, 151:7, 151:22, 174:15, 188:25, 206:12, 211:15, 212:19, 218:13, 233:20, 233:21, 235:7, 236:3, 243:14, 245:7, 246:10, 249:7, 249:8, 254:4, 256:16, 257:7
**nevertheless** [1] - 138:14
**New** [21] - 1:25, 2:8, 2:20, 3:6, 3:11, 5:14, 6:13, 12:15, 45:12, 47:13, 73:5, 73:18, 79:16, 180:3, 180:13, 180:16, 184:19, 262:24, 265:7, 266:7
**new** [1] - 19:8
**NEW** [4] - 1:3, 262:4, 265:3, 266:3
**next** [5] - 82:6, 93:23, 105:24, 188:22, 192:21
**night** [3] - 75:25, 137:5, 259:19
**nine** [2] - 12:9, 85:11
**Nissan** [13] - 33:3, 80:17, 81:7, 81:12, 84:3, 84:12, 85:21, 86:10, 86:25, 87:25, 138:15, 243:23, 243:24
**NMAC** [2] - 229:23, 230:3
**none** [3] - 67:18, 117:9, 238:8

**nonetheless** [2] - 8:23, 138:19
**nonoperational** [1] - 129:7
**nonowners** [1] - 231:19
**nonresponsive** [1] - 98:15
**North** [1] - 6:11
**Northshore** [206] - 2:13, 20:5, 20:7, 20:11, 20:13, 20:16, 21:8, 22:3, 22:10, 22:15, 24:2, 24:4, 24:10, 24:11, 24:19, 25:12, 25:16, 25:19, 25:21, 25:25, 26:2, 26:7, 26:11, 26:13, 26:17, 26:24, 27:11, 27:14, 27:20, 27:23, 28:20, 29:7, 31:18, 32:11, 33:6, 34:6, 34:17, 34:25, 35:12, 35:19, 36:8, 37:15, 37:17, 37:21, 38:2, 38:7, 38:11, 38:25, 40:2, 40:15, 40:25, 41:10, 42:3, 42:10, 42:18, 43:6, 43:12, 43:13, 43:20, 44:20, 45:10, 50:4, 51:2, 56:13, 56:19, 58:8, 59:5, 60:3, 60:8, 60:22, 61:19, 62:6, 62:11, 62:15, 62:22, 64:7, 65:6, 74:23, 75:3, 75:8, 75:12, 88:22, 89:23, 94:6, 94:25, 95:10, 95:17, 97:16, 98:6, 98:8, 99:5, 99:16, 100:24, 105:20, 106:6, 107:9, 107:24, 115:17, 116:4, 116:19, 118:6, 118:12, 118:13, 119:10, 120:20, 122:7, 123:6, 124:5, 125:12, 125:17, 126:9, 127:17, 129:20, 130:7, 131:2, 131:9, 133:8, 134:24, 135:3, 135:14, 137:7, 138:18, 139:6, 139:20, 140:4, 140:20, 146:6, 147:13, 148:4, 149:8, 149:13, 151:9, 152:3, 152:8,

152:13, 152:17, 152:22, 156:20, 159:15, 172:11, 172:18, 173:6, 176:7, 176:8, 176:12, 176:13, 188:18, 188:25, 189:9, 190:7, 190:11, 190:17, 192:24, 194:22, 195:3, 195:17, 196:16, 196:21, 197:9, 198:12, 199:9, 210:3, 212:18, 212:23, 213:6, 213:9, 215:25, 216:9, 220:6, 220:13, 220:22, 222:2, 222:13, 233:12, 233:21, 234:11, 234:15, 235:2, 235:11, 235:23, 236:2, 236:5, 236:16, 237:7, 237:15, 239:12, 240:14, 241:9, 241:13, 242:14, 243:17, 244:9, 244:15, 244:20, 244:25, 245:6, 245:10, 245:12, 247:25, 253:14, 253:18, 253:21, 254:24, 256:24, 263:9, 263:15
**NORTHSHORE** [2] - 1:5, 1:17
**northshoremotors1. com** [1] - 90:3
**NOT** [1] - 3:20
**Notary** [5] - 1:24, 5:4, 262:24, 265:6, 266:6
**notation** [1] - 63:13
**note** [4] - 21:14, 35:2, 44:13, 247:7
**noted** [2] - 194:14, 261:25
**nothing** [9] - 103:22, 171:8, 199:14, 202:5, 232:20, 235:13, 244:14, 247:3, 251:14
**Notice** [1] - 1:24
**noticed** [1] - 215:21
**November** [39] - 27:15, 28:21, 29:5, 29:17, 31:19, 33:7, 34:6, 39:2, 43:3, 75:4, 75:9, 75:13,

106:22, 108:17, 110:11, 111:9, 111:15, 111:22, 112:4, 112:12, 112:18, 112:23, 113:14, 113:19, 114:23, 119:9, 119:10, 154:25, 155:4, 160:18, 175:3, 175:10, 175:23, 176:8, 209:25, 210:15, 212:3, 212:23, 247:3

**number** [15] - 12:20, 13:15, 28:13, 55:20, 56:5, 56:10, 62:19, 62:22, 83:20, 84:9, 84:16, 86:16, 86:23, 87:2, 215:23

**numbers** [1] - 12:17

**NYC** [1] - 1:12

## O

**O'Sullivan** [5] - 244:11, 255:5, 255:14, 255:22, 257:4

**Oak** [1] - 5:14

**oath** [4] - 4:17, 45:10, 107:15, 262:9

**object** [1] - 160:8

**Objection** [1] - 185:11

**objection** [32] - 8:19, 16:10, 20:6, 21:15, 35:3, 41:19, 44:14, 45:13, 47:24, 50:5, 52:17, 76:18, 93:9, 102:6, 102:24, 110:13, 113:3, 114:6, 128:6, 151:14, 160:25, 182:8, 189:3, 204:17, 204:19, 205:9, 208:11, 228:3, 231:22, 238:11, 238:13, 247:8

**objections** [1] - 4:9

**obligation** [2] - 11:16, 32:7

**obligations** [15] - 39:22, 43:19, 66:16, 66:19, 66:25, 77:17, 95:22, 98:11, 103:24, 117:18, 118:11, 118:16, 235:3, 235:7, 235:16

**observed** [4] - 128:19, 128:23, 140:13,

141:15

**obtain** [2] - 13:3, 234:6

**obtained** [7] - 13:15, 70:5, 160:19, 160:23, 161:2, 161:15, 212:17

**obtaining** [4] - 22:10, 38:18, 161:22, 182:24

**obvious** [2] - 201:8, 201:10

**obviously** [4] - 12:22, 59:7, 92:2, 248:13

**occasion** [5] - 77:8, 108:16, 108:19, 188:9, 188:12

**occasionally** [3] - 36:21, 39:5, 75:5

**occurred** [6] - 77:7, 205:6, 258:8, 259:3, 259:7, 259:10

**October** [6] - 93:7, 93:8, 93:23, 94:4, 176:4, 176:14

**OF** [14] - 1:3, 1:6, 1:6, 1:13, 1:13, 1:14, 1:14, 1:15, 262:4, 262:5, 265:3, 265:4, 266:3, 266:4

**offered** [1] - 28:11

**office** [43] - 25:13, 28:10, 32:21, 33:9, 109:18, 109:20, 109:22, 118:23, 140:10, 140:11, 140:12, 151:16, 151:23, 152:3, 152:5, 152:8, 152:12, 152:16, 152:21, 152:24, 153:4, 153:8, 157:2, 157:3, 157:8, 157:14, 157:18, 157:19, 157:24, 158:3, 158:11, 232:24, 244:12, 249:16, 249:24, 250:4, 251:2, 251:3, 251:13, 253:7, 253:13, 253:17

**office's** [1] - 251:9

**officer** [4] - 4:16, 108:22, 169:4, 224:19

**Officer** [2] - 169:16, 170:6

**offices** [1] - 253:10

**offset** [2] - 68:9, 68:12

**often** [1] - 38:24

**old** [2] - 8:8, 11:4

**older** [1] - 41:24

**once** [11] - 14:9, 26:22, 53:23, 59:25, 87:22, 134:4, 152:18, 163:16, 178:6, 251:23, 252:11

**one** [60] - 7:6, 9:13, 14:22, 17:25, 18:3, 18:5, 20:8, 32:14, 38:22, 42:22, 49:4, 55:12, 57:4, 60:7, 69:3, 76:9, 80:15, 82:23, 85:13, 86:23, 95:8, 101:3, 101:22, 102:4, 110:8, 115:16, 130:2, 136:4, 157:9, 158:17, 160:4, 162:8, 165:7, 165:10, 166:12, 176:21, 177:2, 177:6, 177:16, 199:7, 199:8, 199:20, 200:3, 204:9, 208:21, 210:12, 210:14, 213:20, 216:16, 229:24, 240:8, 246:17, 248:4, 248:25, 255:10, 255:17, 257:8, 258:25

**ones** [3] - 13:24, 22:7, 23:9

**ongoing** [1] - 238:15

**oOo** [1] - 4:21

**open** [2] - 153:13, 238:20

**open-ended** [1] - 153:13

**opened** [4] - 99:8, 99:20, 101:9, 249:13

**opening** [4] - 60:23, 61:19, 99:11, 99:19

**operate** [10] - 16:8, 29:13, 43:6, 125:20, 138:21, 177:8, 198:17, 198:23, 198:25, 199:3

**operated** [1] - 72:10

**operates** [1] - 90:2

**operating** [11] - 29:10, 30:13, 39:17, 126:19, 127:6, 127:7, 127:24, 128:2, 129:21, 137:25, 146:25

**operation** [3] - 40:15,

42:18, 128:20

**operations** [1] - 40:25

**operator** [3] - 131:12, 131:19, 248:11

**operators** [1] - 125:20

**opinion** [9] - 59:17, 76:8, 77:7, 153:20, 153:23, 167:19, 178:7, 178:9, 198:14

**opportunity** [1] - 161:8

**Order** [1] - 1:23

**order** [15] - 30:5, 32:9, 43:20, 51:22, 77:20, 85:3, 109:9, 119:23, 129:24, 163:4, 172:9, 213:12, 213:21, 235:14, 259:19

**organization** [1] - 136:2

**original** [2] - 58:9, 177:21

**outcome** [2] - 265:18, 266:18

**Outlet** [12] - 12:11, 14:13, 14:22, 63:14, 63:17, 64:7, 69:7, 69:16, 249:14, 250:11, 250:13, 250:19

**Outlet's** [1] - 250:16

**Outlets** [1] - 252:23

**outside** [2] - 203:22, 206:2

**oversee** [1] - 40:24

**overseen** [1] - 255:25

**Ovington** [1] - 3:10

**owe** [1] - 129:12

**owed** [16] - 28:24, 29:13, 30:12, 30:15, 30:19, 30:21, 31:25, 32:5, 109:10, 115:8, 117:4, 173:22, 173:24, 186:13, 258:23

**own** [24] - 11:24, 12:9, 12:11, 12:12, 12:13, 12:18, 13:22, 14:4, 14:5, 14:7, 16:7, 16:20, 16:23, 18:5, 20:3, 82:25, 114:24, 124:17, 135:9, 148:18, 179:25, 180:18, 185:6

**owned** [14] - 12:24, 14:9, 14:11, 14:12, 15:20, 17:2, 19:24, 20:5, 22:4, 24:10, 72:10, 133:10,

158:16, 158:25

**owner** [52] - 16:8, 16:18, 22:14, 43:11, 43:13, 44:10, 44:15, 50:3, 51:2, 51:6, 52:4, 52:5, 52:9, 58:15, 100:23, 104:8, 106:6, 107:2, 110:11, 111:10, 112:2, 112:13, 112:19, 112:24, 131:14, 131:19, 131:24, 149:2, 159:25, 174:2, 174:5, 174:14, 174:18, 175:13, 231:16, 232:17, 232:19, 232:22, 232:25, 233:2, 233:5, 233:20, 233:21, 234:10, 234:25, 235:6, 235:10, 235:21, 235:22, 235:25, 236:5, 236:9

**owners** [32] - 20:19, 21:4, 24:17, 26:17, 44:20, 45:9, 69:6, 69:17, 69:23, 72:18, 74:23, 97:18, 97:25, 107:5, 107:7, 110:20, 110:21, 110:23, 115:12, 132:10, 159:5, 159:20, 173:20, 174:7, 182:15, 182:17, 228:9, 228:11, 229:2, 229:4, 229:5, 229:13

**ownership** [31] - 12:4, 14:19, 15:8, 15:16, 21:8, 22:13, 23:25, 42:24, 43:20, 44:23, 45:22, 50:6, 50:20, 50:21, 51:23, 53:16, 54:2, 54:4, 67:16, 84:11, 84:20, 85:20, 86:3, 92:22, 96:3, 103:22, 233:12, 233:24, 234:3, 234:14, 246:16

**owning** [2] - 13:21, 56:2

**owns** [3] - 81:3, 89:25, 184:14

## P

**p.m** [3] - 193:22, 194:14, 261:25

**page** [21] - 57:23,

58:6, 58:18, 61:20, 62:2, 62:5, 62:10, 62:19, 71:23, 73:14, 80:13, 84:4, 86:15, 87:12, 87:15, 96:11, 99:15, 100:17, 100:22, 106:12, 170:4

**PAGE** [3] - 263:3, 263:5, 263:7

**pages** [1] - 62:4

**paid** [14] - 32:3, 126:15, 130:16, 130:19, 188:18, 189:11, 195:9, 195:12, 212:9, 230:7, 231:19, 231:25, 232:6, 258:6

**pandemic** [3] - 217:16, 218:12, 218:14

**paper** [1] - 85:8

**papers** [1] - 27:11

**paperwork** [7] - 21:2, 21:17, 21:25, 27:16, 27:20, 126:14, 214:14

**paragraph** [6] - 83:9, 83:20, 84:8, 84:16, 86:22, 105:14

**Paralegal** [1] - 3:24

**parenthetically** [2] - 83:15, 84:4

**Part** [1] - 100:22

**part** [13] - 65:16, 107:25, 115:14, 141:10, 154:8, 183:21, 186:15, 210:9, 218:7, 234:11, 251:10, 251:11, 255:18

**particular** [6] - 65:22, 87:7, 163:18, 183:12, 209:18, 233:9

**parties** [3] - 4:4, 265:16, 266:16

**partner** [6] - 41:18, 41:20, 69:20, 82:25, 91:19, 252:25

**PARTNERS** [1] - 1:15

**partners** [9] - 98:5, 116:19, 129:25, 160:8, 160:11, 169:8, 182:4, 218:23, 241:24

**partners'** [2] - 116:7, 185:6

**parts** [1] - 31:2

**party** [2] - 230:5,

230:11

**passed** [1] - 18:11

**past** [6] - 46:5, 82:11, 140:9, 154:7, 188:17, 201:23

**pausing** [1] - 155:14

**pay** [31] - 29:3, 30:4, 45:19, 109:9, 115:23, 117:12, 148:3, 148:10, 148:14, 148:18, 148:22, 149:12, 150:6, 210:20, 231:24, 233:5, 249:17, 249:20, 249:22, 249:24, 250:6, 253:6, 253:10, 253:13, 253:23, 253:24, 254:7, 255:6, 255:11, 255:12

**Payable** [2] - 63:2, 263:19

**payable** [2] - 63:9, 251:6

**paycheck** [3] - 17:20, 17:23, 18:2

**paying** [25] - 43:23, 43:24, 45:2, 45:3, 45:4, 95:22, 115:4, 115:7, 118:18, 131:10, 173:13, 196:12, 210:22, 230:5, 230:11, 232:3, 232:9, 232:20, 251:7, 253:4, 253:18, 253:21, 254:19, 258:25

**payment** [1] - 66:15

**payments** [8] - 115:20, 119:19, 119:20, 119:23, 255:16, 255:23

**payoffs** [3] - 32:25, 117:13, 210:23

**payroll** [6] - 16:21, 16:22, 17:3, 17:10, 17:13, 253:7

**pays** [5] - 232:16, 233:3, 249:24, 250:3, 250:5

**peace** [1] - 69:9

**Penn** [1] - 125:25

**Pennsylvania** [1] - 3:19

**people** [36] - 29:15, 34:4, 74:21, 88:11, 123:14, 133:19, 134:5, 134:11,

140:10, 142:24, 144:3, 157:13, 157:25, 158:5, 158:10, 168:4, 178:11, 200:24, 201:13, 201:16, 201:21, 202:3, 203:15, 210:13, 224:2, 224:4, 224:22, 228:8, 228:25, 229:9, 240:17, 248:9, 249:21, 249:23, 255:19, 257:5

**perceived** [1] - 148:3

**percent** [40] - 18:10, 22:16, 28:7, 38:20, 43:11, 43:13, 45:9, 54:7, 54:8, 64:3, 76:11, 80:23, 83:24, 85:6, 92:21, 95:14, 100:23, 103:21, 107:23, 113:22, 124:8, 133:12, 139:7, 139:21, 139:23, 158:23, 159:12, 162:6, 177:10, 177:13, 183:24, 184:24, 207:6, 207:19, 215:8, 222:7, 234:20, 234:23, 240:19, 246:14

**percentage** [1] - 80:25

**perfect** [1] - 156:13

**perhaps** [4] - 8:17, 8:22, 13:21, 246:18

**period** [1] - 258:5

**perpetuating** [1] - 103:6

**person** [20] - 19:8, 34:3, 41:17, 105:19, 116:2, 120:6, 131:8, 131:9, 132:3, 134:4, 136:16, 168:5, 168:22, 169:19, 170:23, 203:21, 206:10, 232:9, 243:11, 255:8

**personal** [19] - 11:8, 11:12, 11:22, 19:3, 22:17, 22:21, 23:5, 24:16, 58:19, 59:3, 59:18, 149:10, 158:18, 159:8, 159:11, 159:14, 182:25, 245:13, 245:16

**personally** [28] - 11:17, 29:6, 118:25,

119:4, 123:23, 123:24, 135:20, 141:15, 141:17, 145:8, 145:17, 145:18, 145:21, 145:22, 145:25, 146:5, 146:11, 146:14, 147:9, 147:19, 149:4, 149:14, 149:21, 150:8, 162:2, 162:5, 172:19, 253:23

**pertains** [1] - 73:17

**Phalon** [2] - 69:10, 229:9

**Philadelphia** [1] - 3:19

**phone** [8] - 62:18, 62:22, 108:21, 169:14, 206:10, 207:8, 224:16, 224:23

**phrase** [1] - 218:15

**physical** [1] - 157:24

**physically** [4] - 33:15, 33:18, 250:12, 254:7

**piece** [2] - 85:7, 179:24

**piggybacking** [1] - 201:25

**pimple** [1] - 68:13

**place** [2] - 133:7, 192:23

**places** [1] - 58:12

**plaintiff** [11] - 143:6, 187:18, 187:23, 188:3, 188:7, 188:10, 188:14, 216:15, 216:16, 216:19

**Plaintiff** [1] - 1:22

**plaintiffs** [45] - 74:16, 74:17, 78:9, 78:14, 142:16, 142:19, 142:24, 143:6, 143:10, 143:15, 165:23, 166:8, 167:3, 167:15, 167:18, 168:11, 168:16, 168:24, 171:5, 171:16, 171:21, 172:2, 172:23, 180:12, 184:4, 185:8, 185:10, 185:17, 187:6, 187:14, 215:16, 215:17, 215:22, 215:23, 215:24, 215:25, 216:8, 217:2, 217:7, 223:21, 223:24,

234:13, 242:13, 242:24, 263:8

**Plaintiffs** [3] - 1:10, 2:4, 2:12

**plan** [9] - 118:19, 129:19, 129:25, 130:3, 130:8, 130:16, 130:18, 253:24, 254:8

**Planet** [1] - 166:19

**planning** [2] - 155:9, 155:11

**plans** [1] - 25:16

**plate** [2] - 146:19, 147:2

**plates** [15] - 122:16, 122:19, 123:2, 123:19, 123:21, 124:3, 124:4, 124:15, 145:19, 145:21, 145:23, 145:25, 146:3, 146:16

**plating** [1] - 177:6

**play** [2] - 16:5, 200:3

**playbook** [1] - 206:15

**pledgor** [1] - 87:17

**plenty** [1] - 200:24

**plus** [1] - 166:12

**PO** [1] - 152:5

**point** [12] - 11:4, 54:24, 81:9, 86:18, 97:15, 162:12, 189:6, 202:19, 214:15, 225:6, 245:18, 252:18

**points** [1] - 202:16

**Police** [4] - 108:6, 108:14, 169:16, 264:7

**police** [6] - 108:18, 108:20, 108:22, 169:4, 224:19, 257:6

**position** [4] - 23:4, 185:13, 185:18, 186:6

**possess** [1] - 104:18

**possession** [2] - 60:4, 146:19

**possible** [17] - 93:16, 93:18, 94:19, 99:20, 99:22, 113:24, 114:3, 114:19, 170:18, 170:20, 170:21, 180:21, 197:4, 213:23, 221:18, 254:21, 254:22

**possibly** [8] - 15:2, 64:15, 69:10, 82:6,

113:15, 180:19, 222:10, 239:18
**potential** [3] - 138:5, 138:10, 238:17
**potentially** [3] - 214:19, 215:4, 235:6
**power** [1] - 224:7
**powers** [1] - 224:10
**practice** [1] - 82:25
**prefer** [1] - 26:8
**preliminary** [2] - 86:12, 236:14
**PREMIER** [1] - 1:15
**Premier** [1] - 58:7
**premise** [1] - 161:17
**premises** [2] - 58:10, 74:9
**preparation** [1] - 164:14
**prepare** [6] - 46:7, 46:9, 46:15, 46:19, 164:17, 164:24
**prepared** [9] - 43:10, 44:7, 45:16, 47:8, 47:13, 50:25, 81:21, 227:2, 227:5
**present** [6] - 9:16, 27:19, 34:22, 205:7, 205:13, 248:2
**PRESENT** [2] - 3:20, 3:22
**presented** [3] - 129:15, 205:11, 242:12
**presumably** [1] - 164:25
**presume** [1] - 159:19
**pretences** [1] - 225:13
**pretty** [4] - 124:8, 158:12, 213:24, 258:11
**prevent** [1] - 238:7
**principles** [1] - 100:8
**privilege** [3] - 204:20, 205:14, 238:12
**privileged** [1] - 205:3
**pro** [1] - 3:4
**problem** [14] - 31:8, 32:17, 32:23, 50:17, 50:18, 53:21, 68:13, 68:16, 77:4, 129:11, 136:11, 138:9, 153:11, 258:17
**problems** [5] - 31:18, 32:10, 33:13, 117:20, 149:8
**product** [1] - 11:3
**production** [1] - 242:11
**professional** [2] - 7:9,

7:12
**promise** [1] - 145:4
**promised** [3] - 39:23, 43:21, 77:18
**properly** [1] - 39:18
**property** [1] - 179:24
**proud** [1] - 247:19
**prove** [1] - 203:15
**provide** [2] - 200:18, 226:11
**provided** [1] - 46:18
**provider** [1] - 230:3
**providers** [1] - 254:8
**Public** [5] - 1:25, 5:4, 262:24, 265:7, 266:7
**pull** [1] - 55:14
**purchase** [14] - 64:6, 64:12, 65:17, 66:13, 66:17, 67:2, 67:9, 68:19, 68:22, 71:7, 81:4, 81:12, 83:23, 230:25
**purchased** [2] - 24:20, 126:25
**purchasing** [1] - 81:6
**purpose** [8] - 22:9, 63:13, 84:10, 86:9, 86:13, 109:11, 234:2, 246:17
**purposes** [4] - 51:3, 52:6, 52:9, 108:2
**pursuant** [1] - 1:23
**pushes** [1] - 130:17
**put** [9] - 19:16, 49:24, 50:13, 110:3, 110:6, 149:5, 149:20, 173:2, 173:5
**putting** [3] - 68:10, 120:12, 171:9

## Q

**queen** [2] - 218:12, 218:14
**Queens** [2] - 14:13, 14:14
**questioning** [2] - 229:4, 239:6
**questions** [16] - 5:23, 6:3, 6:6, 24:24, 48:12, 49:6, 50:15, 113:9, 114:10, 146:9, 176:6, 213:16, 237:21, 260:22, 260:24, 261:2
**quickly** [3] - 213:23, 213:24, 221:17

## R

**Rahman** [1] - 56:7
**Ram** [1] - 12:15
**ransom** [1] - 141:10
**rarely** [3] - 39:5, 39:7, 75:6
**rather** [2] - 154:19, 227:21
**Ray** [1] - 69:10
**re** [1] - 263:9
**read** [23] - 25:8, 25:10, 52:16, 59:7, 79:22, 83:19, 84:8, 84:15, 85:4, 85:17, 86:17, 92:14, 92:16, 98:19, 98:21, 102:14, 102:16, 105:25, 197:20, 197:22, 216:19, 233:19, 262:8
**realized** [2] - 31:17, 39:17
**really** [15] - 39:21, 42:19, 76:3, 137:9, 173:5, 190:18, 224:22, 231:10, 236:13, 243:14, 244:14, 245:7, 246:18, 248:12, 248:14
**REALTY** [1] - 1:8
**Realty** [5] - 2:17, 87:20, 87:24, 179:20, 179:22
**reason** [6] - 19:4, 19:17, 126:7, 150:10, 163:19, 182:13
**reasons** [1] - 117:14
**receivable** [1] - 251:7
**received** [2] - 9:6, 69:3
**Recess** [1] - 90:18
**recess** [3] - 55:5, 156:17, 193:21
**recognize** [4] - 62:18, 64:13, 106:14, 106:16
**record** [17] - 5:8, 5:12, 28:8, 83:20, 85:16, 105:25, 128:11, 201:7, 207:10, 207:16, 261:4, 261:7, 261:20, 262:12, 262:13, 265:13, 266:13
**Record** [6] - 25:10, 52:16, 98:21, 102:16, 197:22, 233:19

**records** [2] - 196:25, 210:24
**recoup** [2] - 213:2, 213:3
**refer** [1] - 187:15
**referencing** [7] - 100:12, 117:22, 121:16, 132:24, 157:16, 187:8, 217:9
**referred** [4] - 83:10, 83:16, 84:5
**referring** [8] - 16:12, 22:2, 25:20, 48:2, 48:9, 71:19, 79:7, 207:15
**refers** [1] - 207:11
**refilled** [1] - 98:12
**refresh** [1] - 99:14
**regard** [9] - 9:5, 42:7, 60:8, 66:19, 77:23, 83:13, 107:19, 141:15, 220:3
**regarding** [16] - 23:20, 42:17, 52:6, 80:16, 94:6, 108:13, 118:6, 120:20, 154:25, 209:13, 217:16, 220:2, 233:12, 234:14, 236:16, 241:8
**regardless** [1] - 85:21
**regards** [1] - 7:14
**register** [2] - 125:25, 126:2
**regular** [1] - 74:22
**regulations** [1] - 158:21
**reins** [1] - 116:3
**related** [10] - 72:21, 82:20, 87:2, 137:18, 209:9, 209:11, 211:4, 230:24, 265:16, 266:16
**relates** [1] - 177:23
**relating** [1] - 242:14
**relationship** [2] - 42:7, 139:9
**release** [1] - 181:8
**relied** [3] - 163:6, 163:7, 163:9
**relief** [5] - 217:17, 217:24, 218:12, 218:14
**remember** [86] - 9:9, 9:11, 10:4, 10:11, 10:22, 11:5, 13:6, 13:21, 14:19, 15:3, 18:7, 18:17, 18:23, 21:5, 21:10, 21:12, 27:3, 27:18, 29:20,

29:24, 31:15, 31:21, 43:8, 43:14, 46:16, 47:19, 49:19, 49:21, 65:5, 65:8, 65:10, 70:14, 74:13, 75:10, 76:5, 78:22, 80:5, 81:16, 93:21, 94:8, 94:12, 94:17, 96:16, 99:11, 99:18, 109:5, 123:13, 127:10, 140:21, 140:25, 142:5, 142:10, 142:14, 146:23, 147:14, 154:12, 154:14, 160:13, 164:3, 171:2, 171:17, 171:22, 172:16, 172:20, 172:25, 202:8, 202:12, 204:12, 206:11, 206:12, 207:5, 221:11, 229:19, 235:17, 236:18, 239:13, 239:15, 239:19, 239:22, 239:24, 240:15, 240:25, 241:4, 241:6, 242:8
**remembered** [1] - 14:22
**reminded** [1] - 205:18
**remove** [2] - 75:20, 137:12
**render** [1] - 6:2
**repayments** [1] - 115:17
**repeat** [5] - 52:11, 52:14, 112:6, 190:8, 233:17
**rephrase** [2] - 66:21, 139:25
**replaced** [2] - 243:25, 244:8
**Report** [2] - 108:7, 264:8
**report** [1] - 108:13
**REPORTER** [2] - 5:6, 5:11
**reporter** [1] - 85:16
**Reporting** [1] - 170:5
**represent** [6] - 153:20, 167:24, 178:8, 202:4, 244:24, 245:5
**representation** [2] - 218:19, 240:7
**REPRESENTATIVE** [1] - 1:6
**representative** [1] - 42:24
**Representative** [1] -

*Rich Moffett Court Reporting, Inc.*

2:15
**represented** [1] - 129:5
**representing** [4] - 98:9, 219:16, 235:23, 244:19
**REQUEST** [1] - 263:6
**request** [6] - 97:7, 211:8, 211:12, 211:15, 211:20, 242:25
**requesting** [1] - 97:3
**required** [1] - 226:8
**requirement** [1] - 9:14
**requirements** [1] - 10:3
**reserved** [1] - 4:11
**resolve** [1] - 76:4
**resolved** [8] - 76:16, 76:25, 77:9, 77:12, 77:15, 77:22, 260:14
**resource** [1] - 10:10
**respect** [4] - 48:8, 48:9, 140:4, 166:3
**respective** [1] - 4:4
**responded** [1] - 211:9
**responsibilities** [3] - 117:7, 117:12, 132:8
**responsibility** [3] - 38:16, 254:6, 254:9
**responsible** [17] - 19:8, 115:9, 115:22, 115:23, 123:5, 131:10, 131:13, 131:25, 132:3, 161:22, 195:16, 230:5, 230:11, 231:5, 253:17, 253:20, 254:19
**rest** [2] - 69:9, 85:18
**result** [1] - 122:2
**results** [1] - 144:17
**resume** [1] - 193:13
**resumed** [1] - 194:16
**retail** [2] - 10:18, 10:19
**retain** [1] - 91:22
**retained** [1] - 161:2
**return** [14] - 52:7, 92:21, 97:4, 97:5, 99:4, 99:16, 101:12, 103:20, 103:21, 108:2, 122:20, 173:3, 186:19, 224:18
**returned** [2] - 156:21, 156:23
**returns** [68] - 43:9, 44:6, 44:14, 44:18, 45:7, 45:15, 46:7,

46:9, 46:15, 46:20, 47:8, 47:13, 47:18, 47:20, 47:22, 48:20, 49:10, 49:12, 49:25, 50:3, 50:6, 50:24, 51:3, 52:4, 52:6, 52:10, 54:6, 54:13, 54:15, 94:6, 94:14, 94:21, 97:16, 97:24, 101:4, 101:22, 102:5, 102:21, 103:4, 103:9, 104:8, 107:21, 107:22, 162:15, 162:22, 163:6, 163:10, 163:14, 163:18, 163:21, 164:2, 164:14, 164:18, 164:21, 164:24, 174:6, 175:22, 176:2, 176:3, 176:8, 176:12, 176:13, 226:16, 226:21, 227:2, 227:5, 227:15, 227:22
**Revenue** [2] - 55:8, 263:13
**revised** [4] - 175:22, 175:25, 176:7, 176:12
**rid** [1] - 32:9
**rightfully** [1] - 224:6
**rights** [2] - 212:10, 212:12
**rip** [1] - 129:24
**ripped** [1] - 210:22
**Rob** [1] - 234:17
**Robert** [2] - 2:5, 207:12
**ROBERT** [2] - 1:4, 3:23
**Rockland** [3] - 6:12, 6:13, 12:12
**role** [1] - 16:5
**roll** [1] - 184:23
**Ron** [8] - 80:15, 82:4, 83:5, 84:12, 84:18, 86:11, 112:18, 115:21
**Ron's** [1] - 80:19
**Ronald** [1] - 143:16
**RONNEBURGER** [2] - 3:12, 260:25
**Ronny** [1] - 110:25
**room** [3] - 156:9, 219:20, 248:5
**ROSLYN** [1] - 1:14
**Roslyn** [1] - 5:14
**roughly** [1] - 158:7
**ROUTE** [1] - 1:9

**Route** [4] - 2:17, 12:14, 183:9, 185:22
**RQ** [1] - 242:9
**Ruderman** [2] - 208:7, 241:2
**ruined** [1] - 251:17
**Ruiz** [1] - 69:21
**rule** [1] - 103:7
**rules** [1] - 158:20
**run** [9] - 40:17, 135:22, 136:17, 137:21, 155:24, 155:25, 202:16, 224:12
**running** [2] - 30:13, 155:10
**runs** [1] - 117:8
**Russell** [3] - 189:7, 204:20, 208:6
**RUSSELL** [1] - 2:21

## S

**safe** [2] - 9:12, 9:18
**SAGE** [1] - 2:3
**sake** [3] - 230:2, 231:13, 232:13
**Sale** [2] - 80:7, 263:22
**sale** [7] - 80:14, 80:18, 80:21, 81:2, 83:4, 210:9, 230:17
**sales** [10] - 28:2, 28:4, 210:7, 210:9, 210:13, 213:4, 213:8, 214:6, 214:9, 250:25
**Sales** [1] - 2:5
**SALES** [1] - 1:4
**salesmanship** [1] - 10:21
**salespeople** [1] - 249:20
**Sarah** [34] - 38:11, 43:12, 44:19, 45:8, 49:13, 54:7, 58:18, 59:2, 59:21, 61:11, 61:21, 62:3, 79:15, 92:20, 106:15, 106:19, 107:22, 138:25, 139:5, 139:11, 139:19, 140:3, 140:19, 142:8, 142:12, 142:21, 146:9, 174:7, 185:14, 187:11, 215:18, 223:12, 257:3, 259:20
**SARAH** [2] - 1:11, 3:24

**Sarah's** [4] - 56:6, 58:11, 59:24, 64:15
**satisfy** [2] - 30:5, 32:6
**saw** [29] - 54:15, 59:23, 59:25, 93:3, 93:12, 93:13, 93:17, 96:17, 123:22, 124:2, 125:3, 127:24, 129:10, 129:13, 141:18, 144:15, 144:16, 144:18, 144:25, 145:3, 145:7, 145:8, 145:10, 145:22, 146:2, 146:5, 229:16, 256:16
**scanning** [1] - 71:21
**Schedule** [1] - 100:18
**Scherino** [3] - 111:3, 112:10, 112:12
**school** [4] - 6:10, 7:4, 7:19, 8:16
**School** [1] - 6:11
**schools** [1] - 7:3
**screen** [13] - 16:15, 56:21, 57:2, 60:17, 63:6, 64:20, 71:13, 79:12, 80:10, 88:8, 104:16, 108:10, 170:11
**Se** [1] - 3:4
**sealing** [1] - 4:5
**second** [2] - 55:12, 104:5
**seconds** [2] - 90:12, 133:5
**Secretary** [1] - 25:12
**secure** [1] - 172:9
**securing** [1] - 172:15
**security** [1] - 132:18
**see** [139] - 55:10, 55:13, 56:4, 56:6, 56:16, 56:18, 56:20, 56:23, 56:24, 57:2, 57:8, 57:11, 57:13, 57:18, 57:20, 57:22, 57:25, 58:5, 58:10, 58:11, 58:17, 58:21, 58:22, 59:2, 59:5, 59:6, 59:8, 60:17, 60:20, 60:24, 61:6, 61:9, 61:10, 61:13, 61:14, 61:17, 61:18, 62:6, 62:9, 62:12, 63:5, 63:8, 63:12, 63:14, 64:8, 64:10, 64:17, 64:24, 64:25, 66:10, 71:15, 71:17, 71:22, 71:24, 71:25, 72:2, 72:4, 72:6,

72:7, 72:25, 73:6, 73:9, 73:12, 73:14, 73:18, 73:19, 74:7, 74:10, 80:12, 80:17, 80:18, 80:19, 81:23, 82:6, 83:3, 83:6, 83:7, 83:11, 83:12, 83:17, 83:18, 84:3, 84:6, 85:6, 87:9, 87:10, 87:17, 87:18, 87:23, 88:7, 88:10, 88:16, 89:14, 89:15, 89:19, 91:3, 92:24, 92:25, 96:8, 96:10, 96:13, 96:22, 100:16, 100:19, 100:21, 100:24, 105:2, 105:7, 105:10, 105:13, 105:15, 105:16, 105:18, 106:11, 108:12, 123:15, 123:18, 124:13, 124:14, 124:15, 125:6, 127:6, 144:22, 145:16, 145:18, 146:9, 146:12, 146:15, 147:5, 147:10, 152:21, 167:23, 170:3, 170:7, 170:15, 183:25, 239:5
**seeing** [3] - 79:2, 93:24, 211:19
**seem** [1] - 246:22
**sell** [7] - 83:22, 85:6, 138:14, 210:11, 210:17, 215:8, 253:5
**seller** [3] - 83:6, 83:21, 83:24
**selling** [4] - 80:24, 212:22, 215:2, 246:17
**send** [1] - 31:13
**sending** [2] - 29:20, 253:22
**senior** [2] - 41:18, 41:20
**sent** [9] - 29:24, 31:9, 49:23, 52:24, 96:25, 120:8, 181:11, 181:12, 181:18
**sentence** [2] - 66:22, 83:8
**separate** [4] - 58:12, 113:5, 113:9, 184:17
**separating** [1] - 104:4
**September** [5] - 43:8, 78:21, 79:18, 94:4,

*Rich Moffett Court Reporting, Inc.*

226:16
**series** [1] - 90:20
**served** [5] - 78:20, 79:14, 79:19, 79:25, 221:14
**Service** [2] - 55:8, 263:13
**set** [6] - 151:3, 238:6, 265:11, 265:21, 266:11, 266:21
**settle** [1] - 118:10
**several** [10] - 12:5, 51:7, 51:17, 56:2, 92:8, 103:24, 117:3, 123:14, 207:18, 250:21
**shall** [1] - 4:11
**SHANKS** [92] - 2:11, 2:21, 16:10, 20:6, 21:14, 21:22, 23:21, 24:25, 25:5, 28:8, 28:17, 28:19, 34:18, 35:2, 35:8, 35:23, 41:19, 44:13, 45:13, 47:24, 48:7, 50:5, 50:11, 50:13, 52:17, 53:4, 53:11, 53:19, 54:21, 55:4, 57:3, 57:6, 57:11, 71:18, 74:3, 76:18, 76:22, 85:12, 85:15, 85:25, 93:9, 102:6, 102:24, 110:13, 113:3, 113:11, 114:6, 128:6, 128:11, 131:18, 131:22, 135:18, 151:14, 151:21, 155:8, 155:23, 156:5, 160:25, 161:9, 166:9, 166:21, 167:6, 182:8, 185:11, 186:16, 187:3, 189:3, 192:17, 193:4, 197:20, 197:24, 204:17, 204:22, 205:25, 215:19, 216:14, 216:22, 219:5, 219:14, 219:23, 225:7, 228:19, 231:22, 237:24, 238:13, 239:2, 239:8, 242:16, 247:7, 247:23, 261:5, 261:18
**Shanks** [8] - 28:15, 33:22, 33:24, 34:7, 35:7, 128:10, 208:7,

240:23
**shanks** [11] - 16:15, 21:21, 48:4, 48:16, 50:8, 50:17, 52:25, 113:10, 151:19, 219:13, 239:7
**shape** [1] - 183:20
**shareholder** [2] - 54:7, 54:8
**shell** [1] - 246:15
**short** [1] - 26:6
**show** [10] - 24:23, 47:25, 48:4, 48:11, 48:22, 78:23, 92:21, 143:11, 172:10, 228:17
**showed** [2] - 59:20, 227:11
**showing** [1] - 67:14
**shown** [1] - 61:23
**shows** [1] - 22:13
**side** [4] - 104:23, 167:22, 186:15, 238:23
**sign** [3] - 40:11, 113:19, 135:8
**signature** [14] - 58:6, 58:18, 62:3, 64:14, 66:6, 87:16, 87:18, 87:21, 87:23, 105:16, 105:24, 106:11, 106:15, 106:20
**signatures** [4] - 85:7, 87:8, 87:10, 87:13
**Signed** [1] - 262:21
**signed** [16] - 4:15, 4:18, 32:18, 40:8, 58:11, 58:19, 58:22, 59:24, 59:25, 61:18, 67:10, 73:10, 135:5, 219:19, 222:19, 233:23
**signer** [3] - 61:15, 105:14, 106:21
**Signers'** [3] - 104:13, 105:10, 264:6
**significantly** [1] - 129:4
**signing** [1] - 58:14
**signs** [1] - 234:3
**similar** [2] - 183:10, 203:22
**simple** [2] - 48:25, 139:16
**single** [5] - 144:14, 196:21, 197:8, 198:5, 199:6
**sit** [4] - 185:20, 190:14, 195:21,

197:7
**sits** [1] - 250:20
**situation** [2] - 220:2, 220:6
**situations** [1] - 220:23
**six** [1] - 85:11
**SMITHTOWN** [1] - 1:15
**so..** [3] - 9:15, 67:11, 247:19
**sold** [13] - 14:8, 14:10, 15:6, 81:17, 81:19, 125:12, 125:16, 210:3, 212:3, 212:6, 229:22, 233:23
**solve** [5] - 32:23, 33:3, 33:13, 206:3, 258:17
**someone** [30] - 32:15, 32:20, 37:10, 37:12, 47:7, 64:23, 90:22, 91:2, 109:21, 130:25, 131:24, 135:8, 136:15, 153:21, 167:24, 168:4, 169:11, 169:15, 170:19, 191:14, 192:18, 202:5, 203:5, 220:16, 226:10, 234:17, 236:8, 243:4, 248:5, 254:20
**something's** [1] - 77:14
**sometime** [1] - 70:5
**sometimes** [1] - 77:13
**somewhat** [1] - 36:17
**somewhere** [1] - 238:8
**son** [1] - 30:18
**sooner** [1] - 193:18
**sorry** [16] - 8:21, 16:14, 62:3, 66:22, 104:19, 115:15, 127:15, 135:17, 143:4, 150:15, 182:11, 190:24, 207:9, 214:22, 214:23, 233:14
**sort** [8] - 55:17, 66:15, 81:2, 103:6, 139:12, 159:10, 201:22, 234:4
**sounds** [10] - 8:9, 15:18, 29:19, 64:4, 70:8, 178:7, 234:19, 234:20, 245:23, 247:18
**speaking** [5] - 39:10, 76:5, 85:13, 242:21, 242:23

**speaks** [1] - 128:12
**specific** [14] - 16:13, 68:3, 68:25, 70:2, 145:10, 148:25, 168:22, 177:2, 178:3, 196:14, 198:11, 213:14, 242:3, 255:4
**specifically** [11] - 41:3, 101:8, 140:3, 165:18, 199:20, 202:12, 202:18, 230:20, 230:22, 236:18, 242:10
**specifications** [1] - 38:21
**specificity** [6] - 154:17, 168:8, 168:14, 171:14, 171:19, 200:19
**specifics** [4] - 165:15, 207:5, 209:3, 212:4
**speculation** [1] - 76:19
**spent** [1] - 144:12
**splattered** [1] - 257:25
**spoken** [5] - 219:21, 236:15, 237:23, 241:7, 241:12
**squelched** [1] - 102:13
**ss** [3] - 262:4, 265:4, 266:4
**stands** [1] - 244:6
**started** [1] - 232:9
**state** [6] - 5:7, 5:12, 154:16, 180:6, 236:22, 236:24
**STATE** [3] - 262:4, 265:3, 266:3
**State** [8] - 1:25, 45:12, 73:5, 73:6, 125:25, 262:24, 265:7, 266:7
**State's** [1] - 25:13
**statement** [5] - 21:23, 173:15, 198:8, 211:20, 211:21
**statements** [4] - 165:11, 166:5, 166:11, 172:8
**Staten** [2] - 12:9, 243:15
**STATES** [1] - 1:2
**stealing** [1] - 144:23
**steps** [1] - 109:4
**Steve** [3] - 243:4, 243:6, 244:2
**still** [15] - 13:22, 14:4, 16:15, 18:5, 103:10, 103:23, 174:4,

174:17, 182:4, 190:20, 191:3, 228:10, 228:11, 243:12, 249:5
**STIPULATED** [3] - 4:2, 4:8, 4:13
**Stock** [2] - 80:6, 263:22
**stock** [11] - 80:14, 80:18, 80:21, 83:4, 83:25, 84:11, 85:21, 86:10, 86:21, 86:24
**stockholders** [1] - 107:23
**stop** [8] - 50:10, 53:5, 53:8, 95:5, 95:16, 175:15, 216:20, 216:22
**stopped** [6] - 95:12, 95:15, 145:15, 174:19, 245:19, 245:25
**stores** [1] - 250:21
**stories** [1] - 154:3
**straightened** [1] - 76:10
**Stream** [11] - 12:10, 69:16, 249:13, 250:11, 250:13, 250:16, 250:19, 252:7, 252:15, 252:22
**STREET** [1] - 1:8
**Street** [4] - 2:17, 3:18, 179:20, 179:22
**stress** [3] - 121:17, 121:25, 199:14
**stressed** [1] - 178:8
**strike** [1] - 98:15
**stripped** [1] - 129:7
**stuff** [2] - 82:20, 261:24
**subject** [1] - 209:2
**submitted** [1] - 47:14
**subscribed** [1] - 262:21
**subsequently** [1] - 201:24
**subsidiaries** [1] - 229:24
**substance** [2] - 29:22, 33:5
**sue** [2] - 31:12, 31:14
**suffered** [3] - 121:8, 121:14, 122:2
**suggest** [2] - 144:10, 226:4
**suggesting** [1] - 226:25
**suggestions** [1] -

104:20
**suing** [2] - 201:22, 203:12
**Suite** [2] - 2:19, 3:18
**sum** [2] - 29:21, 33:5
**summary** [2] - 62:5, 62:10
**SUNRISE** [3] - 1:4, 1:13, 1:17
**Sunrise** [98] - 2:12, 3:5, 14:21, 63:14, 63:16, 63:20, 63:25, 64:7, 66:13, 67:2, 67:9, 68:19, 69:7, 71:7, 72:3, 73:3, 73:11, 73:17, 73:19, 74:19, 74:24, 75:3, 75:8, 75:13, 78:3, 78:13, 88:25, 95:2, 97:4, 97:17, 98:10, 109:8, 110:11, 111:10, 112:3, 112:13, 112:14, 112:19, 112:20, 112:24, 113:13, 114:24, 151:12, 151:18, 153:8, 154:21, 154:25, 155:5, 156:20, 159:15, 172:18, 173:7, 173:25, 174:5, 174:11, 174:19, 174:24, 175:9, 175:22, 176:2, 210:3, 213:17, 213:18, 216:2, 216:9, 220:7, 220:14, 220:23, 222:2, 222:13, 228:8, 228:9, 228:12, 229:2, 229:5, 229:14, 229:23, 230:4, 230:17, 230:25, 231:15, 233:13, 234:6, 236:17, 237:7, 237:16, 239:12, 240:14, 241:8, 241:13, 242:15, 243:18, 245:15, 246:2, 250:8, 263:9
**Sunrise's** [3] - 110:5, 112:25, 230:12
**Superb** [4] - 2:4, 206:19, 206:21, 206:23
**SUPERB** [1] - 1:4
**supplied** [1] - 25:15
**supposed** [10] - 32:4,

44:2, 44:5, 44:11, 44:22, 51:6, 68:21, 96:3, 128:25, 174:12
**supposedly** [4] - 76:2, 123:9, 123:11, 141:8
**surprised** [2] - 143:22, 143:25
**switch** [5] - 45:19, 51:17, 51:18, 51:19, 51:20
**switching** [2] - 43:22, 44:25
**swivel** [1] - 105:6
**sworn** [5] - 4:15, 4:18, 5:4, 265:11, 266:11
**SYOSSET** [1] - 1:13
**Syosset** [1] - 26:4
**Syracuse** [3] - 6:19, 7:3, 10:16

**T**

**table** [2] - 186:15, 238:24
**tax** [67] - 43:9, 44:6, 44:14, 44:18, 45:7, 45:15, 48:19, 50:5, 50:24, 51:3, 52:4, 52:6, 52:7, 52:10, 54:6, 54:12, 54:15, 55:18, 94:6, 94:14, 94:21, 94:25, 95:5, 95:12, 95:16, 97:4, 97:16, 97:24, 99:4, 99:16, 101:4, 101:12, 101:22, 102:4, 102:21, 103:4, 103:9, 103:20, 103:21, 104:8, 107:21, 108:2, 162:15, 162:21, 163:6, 163:9, 163:14, 163:18, 163:20, 164:14, 174:6, 174:10, 174:19, 174:24, 175:22, 176:2, 176:3, 176:8, 176:12, 176:13, 226:16, 226:20, 226:25, 227:5, 227:15, 227:22
**taxes** [5] - 175:7, 175:16, 245:13, 245:16, 246:2
**taxing** [1] - 226:18
**teaching** [1] - 8:24
**Team** [1] - 2:5
**team** [2] - 116:5, 118:24

**TEAM** [1] - 1:4
**telephone** [2] - 208:2, 208:15
**telephonic** [1] - 155:20
**ten** [2] - 155:22, 191:8
**term** [12] - 26:9, 55:21, 72:12, 72:16, 125:16, 246:6, 246:10, 246:11, 246:12, 247:12, 247:15, 247:16
**terms** [5] - 16:6, 225:21, 225:22, 244:15, 255:9
**testified** [5] - 5:5, 47:10, 107:14, 192:3, 194:16
**testify** [2] - 49:8, 236:7
**testifying** [3] - 45:10, 134:13, 190:15
**testimony** [10] - 21:16, 128:13, 130:6, 130:19, 150:9, 231:21, 262:9, 262:12, 265:13, 266:13
**text** [4] - 29:21, 29:25, 31:9, 31:13
**THE** [8] - 1:6, 5:6, 5:9, 5:11, 5:13, 25:4, 156:7, 225:9
**the..** [1] - 96:22
**theft** [1] - 254:17
**theirs** [1] - 224:7
**themselves** [2] - 169:20, 258:7
**then-customers** [1] - 30:13
**theory** [1] - 183:22
**thereafter** [1] - 229:16
**therefore** [3] - 23:12, 33:4, 205:15
**Theresa** [4] - 90:5, 90:9, 90:21, 91:6
**thick** [1] - 79:2
**thinking** [7] - 155:13, 155:14, 227:18, 234:22, 243:7, 243:12, 244:3
**third** [1] - 62:4
**Thomas** [7] - 88:14, 92:10, 96:7, 171:25, 172:4, 172:14, 226:9
**THOMAS** [1] - 1:12
**Thomasson** [18] - 5:20, 25:6, 28:9, 35:23, 48:7, 53:5, 71:18, 166:10, 185:16, 197:24,

215:14, 215:19, 219:8, 232:6, 233:14, 246:23, 261:8, 261:13
**THOMASSON** [77] - 1:11, 3:3, 5:18, 8:18, 20:12, 21:19, 25:7, 28:14, 28:18, 35:6, 41:21, 48:3, 48:14, 50:8, 50:12, 50:16, 52:13, 52:23, 53:7, 53:13, 53:21, 54:16, 54:23, 57:15, 74:6, 85:14, 86:4, 90:11, 90:16, 98:14, 98:18, 102:9, 105:2, 110:15, 113:7, 114:9, 128:9, 131:20, 151:17, 151:22, 155:12, 156:4, 156:10, 156:15, 161:4, 166:15, 166:23, 167:8, 186:18, 186:24, 189:6, 192:20, 193:10, 193:16, 193:20, 194:18, 198:3, 204:23, 206:5, 216:12, 216:18, 216:23, 219:9, 219:18, 233:16, 238:10, 238:22, 239:4, 239:9, 242:9, 242:20, 243:2, 246:24, 247:11, 247:14, 260:21, 263:4
**Thomasson's** [1] - 36:2
**three** [14] - 12:10, 14:8, 48:5, 85:11, 123:25, 124:6, 132:13, 136:19, 152:22, 168:9, 188:22, 197:2, 197:6, 226:3
**throughout** [1] - 203:16
**tied** [4] - 177:16, 180:20, 183:11, 184:11
**timeframe** [1] - 34:19
**timeline** [1] - 29:19
**title** [5] - 16:17, 57:25, 246:5, 246:16, 247:6
**titled** [2] - 126:3, 210:2
**titles** [1] - 259:20
**today** [32] - 5:25, 6:7,

27:5, 28:4, 37:7, 37:20, 37:24, 38:5, 93:20, 93:25, 110:24, 128:3, 139:18, 142:11, 163:19, 165:18, 168:9, 168:20, 168:22, 171:5, 171:14, 171:19, 171:24, 174:18, 177:19, 179:11, 183:9, 190:14, 195:12, 195:21, 196:20, 261:14
**together** [2] - 139:8, 183:12
**token** [6] - 132:24, 132:25, 133:15, 133:18, 134:5, 134:16
**tokens** [7] - 132:21, 133:7, 133:19, 133:23, 133:25, 134:3, 134:11
**Tom** [2] - 92:19, 97:2
**Tony** [9] - 204:23, 205:20, 206:16, 207:17, 208:3, 208:14, 208:16, 208:22
**took** [43] - 9:10, 9:13, 9:19, 9:22, 9:24, 10:7, 27:16, 31:24, 32:12, 33:6, 33:12, 33:14, 33:15, 34:4, 34:5, 109:24, 110:6, 113:20, 122:12, 122:19, 122:25, 123:2, 123:7, 123:8, 123:12, 125:2, 147:12, 148:2, 160:17, 160:22, 161:13, 180:24, 183:16, 192:22, 194:20, 195:2, 195:5, 195:22, 196:15, 196:18, 200:17
**top** [11] - 57:22, 71:22, 83:4, 84:4, 90:19, 96:10, 100:16, 100:18, 143:13, 168:20, 170:4
**topics** [1] - 9:22
**touch** [3] - 38:24, 129:3, 129:4
**touched** [1] - 129:10
**tough** [2] - 220:9, 251:19
**towards** [5] - 10:3,

68:18, 68:22, 71:6, 149:6

**track** [1] - 12:16

**Tracy** [2] - 244:13, 244:16

**trade** [1] - 45:5

**trade-ins** [1] - 45:5

**tradename** [1] - 184:15

**trades** [4] - 32:3, 32:25, 210:23, 253:4

**trained** [2] - 8:11, 199:25

**training** [2] - 7:13, 9:2

**transaction** [11] - 144:14, 196:21, 197:8, 198:6, 198:11, 199:6, 199:9, 199:21, 212:9, 215:11, 225:20

**transactions** [4] - 133:20, 134:6, 210:25, 211:3

**transcript** [3] - 53:22, 262:8, 262:11

**transfer** [3] - 67:16, 83:22, 85:20

**transferred** [5] - 214:15, 214:17, 215:5, 215:7, 228:14

**transferring** [6] - 84:11, 84:19, 86:3, 86:10, 95:23, 95:25

**Treasury** [2] - 55:7, 263:12

**tremendously** [1] - 207:23

**trial** [1] - 4:12

**tried** [4] - 12:16, 132:16, 197:3, 221:17

**trouble** [6] - 31:4, 57:16, 136:3, 136:22, 136:24, 202:5

**true** [6] - 175:13, 175:14, 262:11, 262:14, 265:13, 266:13

**trust** [2] - 214:5, 257:23

**truthfully** [3] - 246:12, 247:17, 250:20

**try** [6] - 57:16, 76:4, 103:7, 111:24, 199:12, 224:11

**trying** [9] - 47:11, 81:4, 100:12, 161:10, 213:2,

217:11, 224:5, 224:12, 257:9

**turn** [2] - 104:19, 160:5

**turned** [12] - 33:22, 33:24, 33:25, 34:7, 122:22, 126:14, 212:7, 213:5, 213:10, 213:13, 213:18, 214:10

**turns** [1] - 30:25

**TV** [2] - 200:3, 200:6

**two** [42] - 44:15, 58:12, 69:25, 70:8, 71:23, 71:25, 83:7, 85:12, 89:4, 90:12, 92:22, 94:11, 94:20, 95:6, 97:18, 97:25, 104:4, 114:10, 123:25, 124:6, 124:17, 126:22, 127:24, 128:20, 136:19, 144:23, 145:8, 156:8, 165:23, 165:25, 166:6, 167:13, 204:16, 206:8, 214:23, 215:23, 215:24, 249:10, 250:19, 252:15, 252:25, 257:8

**type** [4] - 9:2, 10:10, 94:25, 121:13

**types** [1] - 10:4

**typical** [1] - 126:4

**typically** [10] - 39:13, 125:23, 232:16, 232:18, 232:19, 232:22, 233:2, 233:5, 249:23, 253:12

## U

**UEA** [2] - 1:15, 58:7

**UEA's** [1] - 58:9

**ugly** [2] - 29:22, 31:10

**umbrella** [1] - 147:22

**unauthorized** [7] - 127:19, 196:23, 197:10, 198:13, 198:15, 198:22, 199:7

**unaware** [1] - 215:10

**unbalanced** [1] - 137:9

**uncovered** [1] - 199:11

**under** [21] - 18:20, 45:10, 49:12, 73:15,

84:3, 87:20, 100:22, 104:23, 107:14, 122:17, 122:18, 126:2, 147:22, 153:7, 161:17, 225:13, 242:16, 246:17, 254:12, 262:9

**understood** [5] - 23:20, 41:5, 41:6, 42:22, 227:10

**unethical** [2] - 153:24, 195:7

**unfortunately** [1] - 77:12

**Uniondale** [1] - 3:11

**UNITED** [1] - 1:2

**University** [3] - 6:19, 7:3, 10:16

**unless** [1] - 47:25

**unnecessary** [1] - 168:2

**up** [29] - 28:15, 30:7, 41:23, 51:25, 57:6, 75:24, 77:4, 77:8, 84:2, 116:4, 116:9, 116:14, 116:19, 116:22, 137:18, 149:6, 154:2, 154:3, 154:5, 173:6, 193:17, 214:23, 219:10, 224:4, 242:18, 249:9, 249:13, 259:20

**upload** [1] - 54:18

**upper** [2] - 61:7, 105:7

**upper-right** [1] - 61:7

**upset** [2] - 75:23, 260:2

**URRUTIA** [2] - 1:4, 3:23

**Urrutia** [17] - 2:6, 202:7, 202:20, 203:4, 203:10, 203:13, 203:20, 204:2, 204:9, 204:24, 205:20, 207:13, 207:17, 208:3, 208:14, 208:16, 208:22

**US** [1] - 99:16

**uses** [1] - 47:4

**utilized** [1] - 113:19

## V

**vague** [1] - 208:12

**value** [1] - 129:5

**valued** [1] - 126:25

**variety** [1] - 29:14

**Vehicle** [1] - 22:8

**vehicle** [19] - 22:12, 22:24, 43:22, 44:25, 45:20, 51:20, 51:21, 95:23, 96:2, 117:14, 117:16, 158:22, 158:25, 159:4, 212:14, 251:5, 251:16, 251:17, 253:4

**Ventimiglia** [1] - 124:11

**verbally** [1] - 49:18

**version** [1] - 26:7

**view** [1] - 173:16

**viewed** [1] - 173:21

**violated** [1] - 181:21

**Volkswagon** [1] - 177:15

## W

**wait** [3] - 70:10, 167:9, 244:2

**waived** [1] - 4:7

**wake** [1] - 75:24

**walk** [1] - 109:3

**Wantagh** [1] - 3:6

**wants** [1] - 76:23

**warn** [1] - 237:25

**warranties** [9] - 229:21, 230:4, 230:6, 230:12, 230:24, 231:6, 231:14, 231:20, 232:16

**washing** [2] - 246:6, 247:6

**washy** [1] - 247:10

**watch** [2] - 138:11, 196:6

**ways** [1] - 166:25

**WEIR** [1] - 3:14

**welcome** [1] - 99:2

**Wendy** [26] - 88:15, 88:18, 88:19, 96:6, 96:12, 109:22, 109:24, 114:16, 119:11, 119:12, 119:19, 157:9, 157:10, 157:20, 158:11, 158:12, 190:20, 191:3, 218:6, 218:7, 248:16, 248:18, 248:20, 248:22, 256:5

**Wendy's** [2] - 256:9, 256:10

**whatnot** [2] - 177:24,

196:12

**whereas** [1] - 83:21

**WHEREOF** [2] - 265:20, 266:20

**whole** [11] - 7:16, 29:4, 45:20, 59:6, 85:4, 126:23, 173:7, 206:4, 219:10, 258:23, 259:23

**Widener** [1] - 3:17

**wife** [2] - 75:24, 139:10

**wife's** [1] - 13:12

**willing** [2] - 85:6, 104:20

**winding** [5] - 116:22, 117:19, 117:20, 154:20, 154:23

**wire** [1] - 119:23

**wishy** [1] - 247:10

**wishy-washy** [1] - 247:10

**withdraw** [1] - 35:6

**withdrew** [1] - 109:15

**witness** [8] - 5:3, 207:11, 237:25, 261:22, 265:10, 265:14, 266:10, 266:14

**WITNESS** [8] - 5:9, 5:13, 25:4, 156:7, 225:9, 263:3, 265:20, 266:20

**witnesses** [2] - 192:14, 238:17

**wood** [1] - 225:4

**word** [9] - 20:9, 51:8, 54:2, 56:16, 56:20, 56:24, 58:21, 71:12, 73:15

**words** [2] - 206:2, 231:23

**works** [14] - 88:19, 89:9, 91:11, 91:21, 109:21, 190:22, 191:17, 191:19, 248:21, 248:22, 249:5, 249:7, 252:9, 252:14

**worried** [2] - 136:15, 136:17

**worth** [4] - 30:25, 31:2, 127:2, 128:25

**wound** [4] - 116:23, 117:24, 118:13, 173:6

**write** [2] - 119:9, 134:23

**writing** [9] - 49:22, 51:11, 67:5, 118:25,

*Rich Moffett Court Reporting, Inc.*

119:4, 119:6, 234:3, 234:7, 242:19
**written** [6] - 64:23, 228:16, 228:23, 228:25, 229:8, 233:11
**wrongdoing** [11] - 127:24, 128:3, 128:18, 138:24, 139:4, 139:12, 139:19, 165:5, 209:2, 211:4, 259:14
**wrongful** [1] - 144:15
**wrongfully** [8] - 123:5, 145:9, 146:6, 146:13, 146:16, 147:2, 147:8, 147:12
**wrote** [3] - 86:19, 96:11, 96:14

## X

**X(Cont'd** [1] - 264:2
**Xerri** [1] - 234:18

## Y

**year** [8] - 6:20, 7:6, 18:7, 18:10, 18:12, 79:3, 79:17, 249:10
**years** [21] - 8:8, 10:12, 12:21, 35:16, 48:5, 69:25, 70:8, 91:13, 92:8, 111:6, 132:13, 137:14, 168:9, 169:24, 169:25, 191:8, 197:2, 197:6, 226:3, 249:11, 250:22
**yes-or-no** [2] - 110:19, 192:12
**Yonkers** [5] - 14:2, 14:4, 14:8, 15:5, 18:4
**YORK** [4] - 1:3, 262:4, 265:3, 266:3
**York** [17] - 1:25, 2:8, 2:20, 3:6, 3:11, 5:14, 6:13, 45:12, 47:13, 73:5, 73:18, 79:17, 184:20, 262:24, 265:8, 266:8
**yourself** [18] - 14:20, 27:5, 92:15, 107:6, 107:7, 116:18, 123:15, 123:18, 123:22, 124:15, 128:19, 139:19, 145:3, 174:5, 219:16, 219:17,

235:11, 236:2
**yourselves** [1] - 182:15
**yup** [5] - 62:8, 72:6, 73:20, 184:17, 250:4

## Z

**zero** [1] - 231:8
**ZIZMOR** [1] - 2:11
**Zoom** [1] - 1:19

*Rich Moffett Court Reporting, Inc.*