1

UNITED STATES EASTERN DISTRICT
DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x

SUPERB MOTORS INC., TEAM AUTO SALES, LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING LLC, BRIAN CHABRIER, individually and derivatively as a member of NORTHSHORE MOTOR LEASING LLC, JOSHUA AARONSON, individually and derivatively as a member of 189 SUNRISE HWY AUTO, LLC, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY, LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

      Plaintiffs,

      Case No. 1:23-cv-6188

  - against -

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC, INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LIC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES LITTLE & CO., CPA'S LLP, FLUSHING BANK and LIBERTAS FUNDING, LLC,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

      Zoom Videoconference
      January 5, 2026
      10:07 a.m.

Examination Before Trial of IRIS BARON,

before Renate Reid, RPR, a Notary Public of

the State of New York.

*Rich Moffett Court Reporting, Inc.*

2

A P P E A R A N C E S:


HARRY R. THOMASSON, ESQ.
Pro Se Defendant
        3280 Sunrise Highway
        Wantagh, New York 11793


CYRULI SHANKS & ZIZMOR, LLP
Attorneys for Plaintiffs 189 Sunrise
Highway, Northshore Motor Leasing,
LLC, all Hyland Blvd Auto LLC,
76 Fisk Street Realty, LLC,
446 Route 23 Auto, LLC, Island
Auto Mgt., LLC, Brian Chabrier,
Joshua Aaronson, and Jory Baron
        420 Lexington Avenue, Suite 2320
        New York, NY 10170-0002
BY:   JEFFREY RUDERMAN, ESQ.


MILMAN LABUDA LAW GROUP, PLLC
Attorneys for Plaintiffs Superb
Motor Inc., Team Auto Sales, LLC,
and Robert Anthony Urrutia
        3000 Marcus Avenue, Suite 2320
        Lake Success, NY 11042-1073
BY:   EMANUEL KATAEV, ESQ.


WEIR, LLP
Attorneys for LIBATAS FUNDING
        The Widener Building
        1339 Chestnut Street, Suite 500
        Philadelphia, PA
BY:   JEFF CIANCIULLI, ESQ.

A P P E A R A N C E S : (Cont'd)


CULLEN & DYKMAN, LLP
Attorneys for Flushing Bank
        333 Earle Ovington Boulevard
        Uniondale, NY 11553
BY:   ARIEL RONNEBURGER, ESQ.


ALSO PRESENT:

TONY URRUTIA
Anthony DEO

4

            IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

            IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

            IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

                        - oOo -

5

THE REPORTER: All counsel participating in this deposition proceeding acknowledge that I am not present in the deposition room, and further acknowledge that in lieu of an in-person administration of the oath, it will be administered remotely. The parties and all counsel consent to this arrangement and waive any objections to this method of reporting.

Counsel, kindly voice your agreement, stating your name and agreement on the record, starting with Mr. Thomasson.

MR. THOMASSON: I am in agreement Ms. Reid.

MR. KATAEV: Emmanuel Kataev, for Plaintiffs; in agreement.

MR. RUDERMAN: Jeff Ruderman, for the witness and the other Plaintiffs; also in agreement.

MS. RONNEBURGER: Arielle Ronneburger, for Flushing Bank; in agreement.

6

I R I S   B A R O N, called as a witness,

having been first duly sworn

remotely by the Notary Public, was

examined and testified as follows:

*          *          *

EXAMINATION BY

MR. THOMASSON:

Q      Good morning, Mrs. Baron.  My name is Harry Thomasson.  I'm going to be taking your deposition this morning.

Is it okay if I refer to you as Mrs. Baron?

A      Yes, it is.

Q      Mrs. Baron, have you taken any medication or drugs of any type this morning that would impact your ability to go forward?

A      No.  But I did have a stroke a year and a half ago, and I am on blood thinners.

Q      Okay.  Has that left you compromised at all regarding your memory?

A      Absolutely not.

Q      And so, would it be fair to

7

say that there's no reason that you know of that you wouldn't be able to understand my questions this morning?

Is that true?

A     True.

Q     Okay.  Mrs. Baron, have we ever met before?

A     No.

Q     Have we ever spoken before?

A     No.

Q     When was the first time that you ever heard my name?

A     Today.

Q     Okay.  And you're aware of what this deposition involves?

MR. RUDERMAN:  Object to the form.

You can answer the question.

MR. THOMASSON:  I'll withdraw that, Jeffrey.

BY MR. THOMASSON:

Q     Withdrawn, Mrs. Baron.

Are you aware of the legal case that you're testifying regarding

*Rich Moffett Court Reporting, Inc.*

8

today?

A      Could you repeat the question, please?

Q      Sure.

Are you aware of the legal case that you're testifying in today?

A      No.

Q      Okay.  There is an action that lists you as a Plaintiff on behalf of the Estate of David Baron.

Are you aware that you're involved in that action?

A      Yes.  As of today, I am.

Q      So, would it be fair to say that prior to today, you didn't know anything about that case?

Is that true?

A      Yes.

Q      Did you authorize your name being involved in the case?

A      No.

Q      Are you the administrator or executrix on behalf of the Estate of David Baron?

A       I am the representative of the Estate of David Baron.

Q       Do you know what position it is that makes you the representative?

A       Yes.

Q       What is that called?

A       I would think that -- that -- well, I really -- no.  No is the answer.  Sorry.  I can't explain it, because I don't understand it myself.

Q       Okay.  Would it be fair to say that you are the executor of the estate?

        Would you know that?

A       Yes.

Q       You are the executor?

A       Yes.  From my lawyers, I know that.

Q       Okay.  How long have you been the executor?

A       For four years.

Q       And that would be since David died?

A       Correct.

10

Q    Was anyone else ever the executor, if you know?

A    Not to my knowledge, but I don't know that answer.

Q    Do you know if there are any legal proceedings still taking place regarding the estate?

A    No.

Q    There could be, but you just don't know?

A    Don't know.

Q    Okay.  Now, are you familiar with the term Northshore Motors?

A    Yes.

Q    When did you first learn of the existence of Northshore Motors?

A    The first time is when my husband went with -- I went with him to see Northshore Motors.  But I have to say that, in the 45 years that I have been married to my husband, I have never been involved in any of his businesses; nor before I got married, did I ever get myself involved in any of his businesses.

11

That was his and not my business.  My business is to take care of my children.

Q      Okay.  But you went to Northshore Motors; you remember that?

A      I did.  Yes, I did.  Mm-hmm.

Q      How many times were you there, do you know, roughly?

A      Maybe three.

Q      Okay.  Do you know what year the first one was?

A      No.  I do not remember.

Q      Do you know what year the last time you were there was?

A      No.  I do not remember that either.

Q      Was your husband alive for each of your three visits?

A      Yes, he was.

Q      And what was the date of his death, do you know?

A      Okay.  Let's see. May 22nd -- I think, 22nd, he died -- of 2022 --

Q      Okay.

12

A       -- or 21st there.

Q       So, it was May of '22 that he died?

A       I think so, yes.

Q       And you were not, yourself, involved in any of his businesses.

        Is that what you testified to?

A       Yes.

Q       Did you and your husband file joint tax returns?

A       He did everything.  So, he told me to sign; I signed.  So, I would say yes to that.  Not sure.

Q       Well, did you file tax returns?

A       Whatever he told me to sign; yes, we did.  So, I'm sure that it was -- I cannot answer that, because when my husband said sign something, I signed it. I never did my own taxes, so I am assuming, yes.

Q       And to the best of your knowledge, you filed joint taxes with

13

your husband; is that right?

A    Correct.

Q    Have you filed taxes since he died?

A    Yes.

Q    And just so you know, I don't mean to be disrespectful at all.  I have questions to ask, and I'm just -- at times I'm going to have to talk about his death.  I'm sorry.

A    Okay.

Q    So --

A    If I cry a little bit, that's okay too.

Q    I understand.  Yes, it is. And if you need a break, just speak up. No problem.  Anytime, okay?

If you don't understand something I'm asking you, also tell me, because I would be happy to rephrase anything if you don't understand it, okay?

A    Okay.

Q    So, you now know that there's

14

an action with your name on it in the courts of New York; is that right?

A    If you're telling me that, then, yes.

I have to tell you that when I was -- when my husband passed away, I was grieving him.  I still am.  And I had nothing to do with any of the visits, like I said.  And my son-in-law, Josh, took over everything.  So, I really don't know anything.

Q    Well -- but still -- I understand your position, that you don't understand things about the business. But not all of my questions are just going to pertain to business questions.

A    Okay.

Q    So, for example, are you familiar with the name Anthony Deo?

A    Yes.

Q    How do you know Anthony Deo?

A    I met him when I was at Northshore, or whatever it's called.  I don't remember what it's called.

15

Q       And did you ever hear the term 189 Sunrise Highway?

A       No.

Q       You're not familiar with a business with that name?

A       No.

Q       Are you familiar with any business from that address?

A       No.

Q       Okay.  Do you know where Northshore was?

A       Yes.

Q       Where was it?

A       I think it was in Jericho or Syosset.

Q       And you think you were there about three times; is that right?

A       About that.  Mm-hmm.

Q       Did you ever have any conversations with Anthony Deo?

A       Briefly -- hello, how are you.

Q       And that would have been at Northshore only?

16

A        No.  He did come to my house at one point.

Q        And that would be your house located at -- in Palm Beach Gardens, Florida?

A        Yes, that is correct; when my husband was very, very sick and he came to my house.  I was upset about that.

Q        Who made the decision for him to come to your house?

A        I -- I guess, my husband, when he called.  I guess, when -- Anthony must have called him, because he didn't know he was in Florida.  And I guess my husband said, come.  I don't know.  I wasn't -- I wasn't at that place when it happened, so I can't answer that.

Q        But you did just answer it.

         And you were under the impression that Anthony Deo called while he was already in Florida; is that right?

         MR. RUDERMAN:  Object to the editorialization.

         You can answer the question.

17

        A        I don't know.

BY MR. THOMASSON:

        Q        Do you know what the purpose of that meeting was?

        A        No.

        Q        Do you know if any documents were signed during that meeting?

        A        I do not know.  I was not in the room.

        Q        Do you know if you made any deposits of any checks related to that meeting?

        A        No.

        Q        Did you ever make any deposits, at your husband's direction, of any checks in the last eight years?

        A        Absolutely not.  As I said before, I had nothing to do with any of this business.  My husband took care of everything.

        Q        Did you have bank accounts in your own name or only jointly with your husband?

        A        I had one bank account in my

18

own name, which was when I worked.  And I kept that money.  And the rest was with my husband.

Q     So, the only deposits that would have gone into a bank account of yours would have been from your work history; is that correct?

A     That is correct.

Q     Your husband didn't give you any money to put into any of your accounts?

A     Never.  Never.

Q     Okay.  Can you tell me how many cars you and your husband have operated or owned personally since 2017?  I'm just looking for a number here.

MR. RUDERMAN:  I'll object to the form of the question.  I will allow the question, but I'm going to note that I don't see the connection to anything in this case.  But I'll give some leeway, to see where this goes.

MR. THOMASSON:  Nothing would

19

make me happier, Mr. Ruderman, if you don't know where I'm going.

BY MR. THOMASSON:

Q    Ms. Baron, how many cars have you or your husband owned, that you know of, since 2017?

A    As far as I know, I don't own any cars.  They are business cars.

Q    How many cars have you or your husband operated, that you know of, since 2017?

A    I don't remember.

Q    Well, was it more than five?

A    No.  I had one car, and my husband would have another car.  That was it.  How many cars can you drive?

Q    I don't know how many out-of-state holdings you have, ma'am.

Would you have cars in Florida, you and your husband?

A    We would take a car, and we would transfer the car from New York to Florida, and I would have a car and he would have a car.

20

Q      Did you also have any addresses that you lived at in New York since 2017?

A      I do.

Q      How many addresses do you have in New York that you've lived at since 2017?

A      One.

Q      What would be that address?

A      Six Old Wagon Lane, in Old Westbury, New York.

Q      Is that still yours?

A      It is in the process of being sold.

Q      Okay.  And you have a home in Palm Beach Gardens, Florida; is that right?

A      Correct.

Q      Is that where you are now?

A      Yes.

Q      Since 2017, do you know if you or your husband have operated a Bentley?

A      Yes.

21

Q      Do you know where that car came from?

A      No.

MR. RUDERMAN:  Object to the form.

You can answer the question.

BY MR. THOMASSON:

Q      Do you know what dealership that car came from?

MR. RUDERMAN:  Object to the form.

You can answer.

A      I don't know.

BY MR. THOMASSON:

Q      Do you know how either of you obtained that car?

MR. RUDERMAN:  Object to the form.

You can answer.

A      It was with North -- what is it called? -- Northshore -- it was with Northshore Motors, I guess.

BY MR. THOMASSON:

Q      How do you know that?

22

A       Because Anthony had Bentleys.

Q       Would your husband have been able to obtain a Bentley from anyone other than Anthony Deo, if he wanted to?

MR. RUDERMAN:  Object to the form as to what she knows about --

BY MR. THOMASSON:

Q       If you know.

A       I don't know.

Q       What business was your husband in?

A       The car business.

Q       Do you know what his position was in the car business?

A       No.

Q       He was an owner, at the very least, wasn't he?

A       Yes.  If that's what you want to say.  Mm-hmm.

Q       And do you know when that Bentley was operated by you or your husband?

A       I don't remember.

Q       Was it after 2017, if you

23

know?

          A       I don't remember.

          Q       Where is that car today?

          A       I have a car in Florida.  It never moved.

          Q       The Bentley is still in Florida?

          A       Correct.

          Q       How long have you had it?

          A       I don't remember.  I don't remember -- I -- I -- I really don't remember.  I think it was right before my husband passed away.

          Q       Did Josh Aaronson ask you to put your name on the lawsuit that we're all here for today?

          A       No.  I cannot answer that question.  I don't know.

          Q       You don't know how your name is on this lawsuit?

          A       I don't know who asked me to sign it.

          Q       Did someone, if you know?

          A       I don't remember.  I told

you, I was in bereavement.  I had -- I was in shock.  I had asked Josh to do everything for me.

Q    Did you authorize Josh to do everything for you?

A    Yes.  He is the one that has been holding me up on this, on everything.  Mm-hmm.

Q    So, you wouldn't know, yourself, whether or not I did anything to harm the Estate of David Baron, do you?

A    I don't understand that question.  I'm sorry.

Q    Well, the lawsuit against me, with your name on it, alleges that I did certain things to harm the Estate of David Baron.

Did you know that?

A    No.

Q    Okay.  Now that you know that, do you know of anything that I did to harm the Estate of David Baron?

A    I can't answer that, because

25

I don't know.

Q     So, you can answer it.

The answer is -- is, you don't know if I did anything to harm the Estate of David Baron, right?

A     Correct.  Only, I said that Josh would know everything.  I do not know anything.

Q     Okay.  And with regard to Michael Laurie, have you ever heard that name before?

A     No.  I don't even know who that is.

Q     Would it be the same answer, yes or no, that you don't know if Michael Laurie did anything to harm the Estate of David Baron?

Is that fair to say?

MR. RUDERMAN:  Mr. Thomasson, are you representing Mr. Laurie in this questioning?

MR. THOMASSON:  No.

MR. RUDERMAN:  (Inaudible) the context of your question, are

26

you representing Mr. Laurie?

You're asking about -- (cross talk)

MR. THOMASSON:  I'm not the one being deposed today, Mr. Ruderman.

MR. RUDERMAN:  No.  You are --

MR. THOMASSON:  I was asking --

MR. RUDERMAN:  You are --

MR. THOMASSON:  I was asking --

MR. RUDERMAN:  You are a pro se defendant, here taking your deposition, and you're asking about Mr. Laurie, who is not your client, and he is not here deposing.

By the way, who's Mr. Benjamin, Mr. Laurie's attorney?  Is he here today?

MR. THOMASSON:  Mr. Ruderman, I'm in the middle of a deposition here.  Are you stopping me --

MR. RUDERMAN:  I'm going to

27

object to any questions --

MR. THOMASSON:  Are you stopping me --

MR. RUDERMAN:  Yes --

MR. THOMASSON:  -- from asking --

MR. RUDERMAN:  -- any questions --

MR. THOMASSON:  -- questions?

MR. RUDERMAN:  -- any questions about anybody other than yourself.

MR. THOMASSON:  What did you say?

MR. RUDERMAN:  I'm going to object to any questions that you ask about any party that you have been disqualified from representing.

MR. THOMASSON:  Very good.  I appreciate that.  You go right ahead and object, and then the witness will answer anyway.

MR. RUDERMAN:  The witness

28

will not answer any questions -- I will object to any questions that you ask about a party that you do not represent.

Go on.

MR. THOMASSON:  Are you stopping the witness from answering?  Yes or no.

MR. RUDERMAN:  I am stopping the witness from answering any questions about a question you ask about somebody other than your pro se representation.

MR. THOMASSON:  Ms. Reid, we have to take a break at this time. I'm going to be calling chambers, because we're all going to have to get on the line to settle this. I'm not moving forward and being stopped from asking these questions.

MR. KATAEV:  Harry, the judge's individual rules offer the ability to send a Zoom link via

29

e-mail to chambers so that the judge could join the Zoom.

MR. THOMASSON:  Ms. Reid, I'm going to take a break at this time. I'm going to call chambers and get their address for the Zoom link and let them know that we're going to be needing some assistance.

THE REPORTER:  Okay.  I'll go off the record now.

(Recess taken)

(Conversation with Judge ensues via phone conference)

JUDGE WICKS:  Judge Wicks here.

MR. THOMASSON:  Good morning, Your Honor.

MR. RUDERMAN:  Good morning, Your Honor.

JUDGE WICKS:  Good morning.

MR. THOMASSON:  I'm the one that initiated this.

JUDGE WICKS:  I got it.  I've been filled in by Jacqueline, my

law clerk.

Do we have everybody on the line who is participating in the deposition?

MR. RUDERMAN:  Yes, Your Honor.

JUDGE WICKS:  Okay.  And I understand Iris Baron is being deposed?

MR. RUDERMAN:  Yes. Ms. Baron is being deposed. Correct, Your Honor.

JUDGE WICKS:  And, Mr. Thomasson, you're taking the deposition?

MR. THOMASSON:  I'm taking the deposition, Your Honor, yes.

MR. WICKS:  Okay.  Who is defending?

MR. RUDERMAN:  This is Jeffrey Ruderman, from Cyruli Shanks, and I'm defending the deposition of Ms. Baron.

JUDGE WICKS:  All right.  So,

31

Mr. Thomasson, you're asking questions.

And what's the nature of the dispute?

MR. THOMASSON:  Last time, I took the deposition of Asad Kahn, and I asked a series of questions without any objection from Cyruli Shanks.

JUDGE WICKS:  Okay.

MR. THOMASSON:  I'm going through the same process today with Mrs. Baron, who, like Mr. Kahn, doesn't know anything about the claims against me, and has --

JUDGE WICKS:  Okay.

MR. THOMASSON:  -- basically left everything in the hands of Josh Aaronson, who, like Mr. Kahn, basically said the same thing.

And then, like last week, I started asking, well, then, is it also true that you don't know anything about the claims against

32

the other codefendants, and I started listing them by name.  And Mr. Ruderman said he's not going to allow Mrs. Baron to answer those questions.

JUDGE WICKS:  Okay. Mr. Ruderman, why not?

MR. RUDERMAN:  So, Your Honor, Mr. -- I don't know exactly where Mr. Thomasson is going to end up, but he starts asking questions about parties that he was disqualified in representing.

JUDGE WICKS:  Yeah.

MR. RUDERMAN: Mr. Benjamin -- Mr. Benjamin, who has taken over the case from Mr. Thomasson, is not even on the Zoom.  He is not even attending this deposition.

JUDGE WICKS:  Okay.

MR. RUDERMAN:  And so, Mr. Thomasson is a pro se party, representing himself --

33

JUDGE WICKS:  Yeah.

MR. RUDERMAN:  -- and is now seeking to, as far as I'm concerned, represent the party he's been disqualified from representing by asking questions about whether or not the witness knows information about people who he does not represent.  And I'm objecting to his --

JUDGE WICKS:  Yeah.

MR. RUDERMAN:  -- questions about parties that he is not representing and he's disqualified from representing, especially when Mr. Benjamin isn't even attending.

JUDGE WICKS:  Okay.  But he's not asking questions as representative capacity, other than himself.

He's allowed to appear pro se, correct?

MR. RUDERMAN:  Correct.

JUDGE WICKS:  All right.  And

34

pro ses have the same rights as representative parties do, right, under Rule 30?

MR. RUDERMAN:  They do, Your Honor.  I -- typically, Your Honor -- I apologize to the Court. This is not my usual MO.  I let the attorneys ask questions.  I don't like --

JUDGE WICKS:  Yeah.

MR. RUDERMAN:  -- to object. I just feel that this is really pushing the boundaries, that the Court has issued an order, and Mr. Benjamin is not even here representing his parties.  And Mr. Thomasson appears to be representing those parties, in violation of the court order.  And that's --

MR. THOMASSON:  Can I respond?

JUDGE WICKS:  As soon as Mr. Ruderman finishes.

35

MR. THOMASSON:  I'm sorry.

JUDGE WICKS:  Let him finish first.

MR. RUDERMAN:  Thank you, Your Honor.

So, that is the nature of my objection.  And, obviously, I -- I brought it to the Court's attention, and the Court will, obviously, deal with it as the Court deems appropriate.

JUDGE WICKS:  Okay.  Sounds good.  All right.

Go ahead now, Mr. Thomasson.

MR. THOMASSON:  Harry Thomasson, Your Honor, for the court reporter's purposes.

I am -- I am alleged to be engaged in this vast criminal conspiracy with the co-defendants, and I sit here and wonder to myself what it is that I did.  I've been wondering that for two and a half years.  And I'm even admonished by

36

the Court when I say it too many times.  And the fact of the matter is, I'm not engaged in any broad criminal conspiracy.  And so far, we have -- this is -- get the same thing out of this witness:  She doesn't know anything about a criminal conspiracy.

JUDGE WICKS:  Hold on, Mr. Thomasson.  Mr. Ruderman raises a question.  Let's get to the issues here.

So, he's saying, hey, you were disqualified, and you can only represent yourself, and that's fine; but Mr. Benjamin's not here, and this is just a ruse, basically, that you're asking questions on behalf of other Defendants that you were disqualified from.

Answer that one.

MR. THOMASSON:  I just want -- I just want to know what the witness thinks we all did.  And

37

I'm -- I don't exist in a vacuum here.  They're the ones that lumped me together with these people.  And the fact of the matter is, I can't even imagine we're having this conversation.  Of course, this could lead to relevant evidence.

JUDGE WICKS:  Right.  But his question is -- it's really -- are you really circumventing the order that disqualified you from representing the other parties?  That's the question.

MR. RUDERMAN:  And, Your Honor, this is Mr. Ruderman.

The question was not -- was not what do you know -- do you know whether I communicated with Mr. Laurie, what do I have to do with Mr. Laurie?  That would be a legitimate question.  The question was, what do you know about Mr. Laurie?  I'm like, why is he asking questions about Mr. Laurie

*Rich Moffett Court Reporting, Inc.*

38

independently?

JUDGE WICKS:  Okay.  But the whys are irrelevant.  That's up to him, right?  He's entitled to ask the questions that are relevant and germane, and they certainly are, whether or not he's representing or not.  If Benjamin were sitting there defending Deo, I suspect Mr. Thomasson would still ask those questions.

There's no limitation by court order or 30(b)(6).  There's no privilege being asserted here, and it's not palpably irrelevant.  So, there's no basis to direct her not to answer on that ground.

If you do think he's violating orders -- the disqualification order, that would be a separate motion.  But the deposition, you got to proceed, and they have to answer --

MR. RUDERMAN:  Thank you,

                                                    39

Your Honor.

JUDGE WICKS:  -- all right?

All right.  Anything else,
you call back, all right?

MR. RUDERMAN:  Thank you.

JUDGE WICKS:  All right.  No
worries at all.  Happy New Year,
everybody.

MR. THOMASSON:  Thank you.
We're through, Judge.  We're going
to hang up on this call now, okay?

(End of phone conference)

MR. RUDERMAN:  Iris, you can
unmute yourself.

So, we've had an
opportunity -- Iris, this is for
your benefit.  We've had an
opportunity to speak to the judge.
The judge has directed that the
questions, at least as asked so
far, are appropriate, and
Mr. Thomasson is going to continue
with his questions, and I'll note
my objections in the future, if I

40

deem it appropriate.

So, Mr. Thomasson, feel free to either answer [sic] that question again or have it read back, or if Iris remembers it.

MR. THOMASSON:  Could you read that question back for me, Ms. Reid.

THE REPORTER:  Sure.

(Record was read back)

CONTINUED EXAMINATION

BY MR. THOMASSON:

Q    Mrs. Baron, can you hear me?

A    Yes.

Q    Okay.  So, is it fair to say, Mrs. Baron, that you also do not know of any wrongdoing that Michael Laurie committed against the Estate of David Baron?

A    I have no personal knowledge about this.  You'd have to ask Josh.

Q    That would be Josh Aaronson?

A    Correct.

Q    And would that be the same

41

answer regarding any allegations against Marc Merckling?

A    I don't know who that is.

Q    So, then, would it be fair to say that you do not know, yourself, anything about alleged wrongdoing by Marc Merckling against the Estate of David Baron?

A    Again, I don't have any personal knowledge.  You have to ask Josh Aaronson.  He took over everything, and that is what happened.  And this is who I trusted to do it.  I have nothing to do with this business.

Q    And you authorized Josh to take care of this lawsuit; is that right?

A    That is correct.

Q    And --

A    I was told that Anthony cost me millions of dollars; and if I didn't pay the bank back, I was going to be in trouble.  And from then on, Josh -- I said, please, Josh, you take over.

Q    And who is it that told you

*Rich Moffett Court Reporting, Inc.*

42

Anthony Deo cost you money?

A    Josh Aaronson.

Q    Has anyone else ever told you that?

A    I don't know at this point. Josh -- just Josh.  Josh Aaronson told me.

Q    All right.  Is there anyone else you can think of that would have told you that?

MR. RUDERMAN:  Before you answer the question, just to be clear, do not provide any information about communications you may have had with me or any other attorney.  Mr. Thomasson is not asking about whether any attorney communicated to you. Anybody other than an attorney is what he's asking.

THE WITNESS:  I'm sorry.  I didn't understand that.

MR. THOMASSON:  I'll explain it, Jeff.

43

BY MR. THOMASSON:

Q      Mrs. Baron, did anyone other than Josh Aaronson and your attorneys ever tell you that Anthony Deo cost the Estate of David Baron money --

A      No.

Q      -- that you can think of right now?  Yes or no.

A      No attorney ever said -- no. Josh is the one.

Q      Okay.  And -- now, I have to ask the questions, though, okay?

So, same question pertaining to Dwight Blankenship:  Are you aware, yourself, of any wrongdoing that Dwight Blankenship committed that cost the Estate of David Baron money?

A      I have no personal knowledge of that.  You have to ask Josh.

Q      Okay.  And, again, as with my name and Michael Laurie and Marc Merckling, is it fair to say that you're not even familiar with the name Dwight Blankenship?

*Rich Moffett Court Reporting, Inc.*

44

A    Correct.  Correct.

Q    And that's your answer for all four of us so far, right?

A    Correct.  I have no personal knowledge of this.  You have to ask Josh.

Q    And you also don't know the four of us; is that right?

A    That is correct.

Q    Okay.  Now, what about Sara Deo?

Have you ever met her?

A    Yes, I did, on a few occasions.

Q    And would those occasions have been at Northshore Motors?

A    That is correct.

Q    And would that be on each of the occasions that you were there, which was roughly three, in total?

A    Correct.

Q    Did you ever meet her outside of Northshore Motors?

A    No.

Q    Did you ever speak with her

45

outside of Northshore Motors?

A       No.

Q       And would it be fair to say that maybe it was just an introduction?

MR. RUDERMAN:  Object to the form.

You can answer.

A       (No response.)

BY MR. THOMASSON:

Q       I'll rephrase the question.

A       Okay.

Q       Mrs. Baron, did you ever have any substantive conversation with Sara Deo?

A       Not to my knowledge, no.

Q       Did you ever have a substantive conversation with Anthony Deo?

A       Wait.  What is "substantive"?

Could you just do this on laymen term and not a big word?  Whether you -- could you rephrase the question, please?

Q       Sure.  Absolutely.

46

Other than just hellos, good byes, talking about the day or lunch, did you ever have any substantive conversations on the subject of business --

A      No.

Q      -- with Sara Deo?

A      No.

Q      What about Anthony Deo?

A      No.

Q      If I were to tell you that the subject matter of Anthony Deo being at your house in Florida was the purchase by Anthony Deo of Baron Nissan®, would that be something you've heard of before today?

MR. RUDERMAN:  Object to the form.

You can answer.

A      Yes.  And I have to say that my husband, at that time, I don't even think was in his right mind, because he also wanted to buy a boat.  And shortly after Anthony did visit him, he did pass

*Rich Moffett Court Reporting, Inc.*

47

away.  He was just not himself.

BY MR. THOMASSON:

Q      So, you testified that David Baron died during May of 2022, right?

A      Correct.

Q      And would it be fair to say that Anthony Deo, in your mind, visited your home just once?

A      Yes.

Q      And would that have also been in 2022?

A      I believe so.

Q      But in any event, it would have been shortly before David died?

A      Yes.

Q      Do you know how much before David died Anthony visited?

A      I don't know.

Q      Could it have been weeks?

A      I don't remember.  I'm sorry.

Q      Last one:  Could it have been within months?

A      Could have been.

Q      You said your husband was

48

very sick before he died?

A    Yes.

Q    What was he sick with?

A    He had stage 4 melanoma cancer.

Q    Was he on medication?

A    He was.

Q    What medication was he on?

A    I'm not sure exactly.  I know he had -- not chemo --

Q    Radiation?

A    No.  Immune therapy.

Q    Was that administered by a doctor, if you know?

A    Yes.

Q    Was that in Florida or New York?

A    In Florida.  He also had a valve transplant.  He also had a pacemaker put in.  He -- we were in the hospital every three weeks.

Q    And the valve transplant, what year did that take place?

A    Same year.  All the --

49

Q      Same year that he died?

A      Yes.

Q      And was the pacemaker installed during the same year that he died?

A      Yes.

Q      Do you need a moment?

A      Yes.

Q      Take your time.

(Recess taken)

CONTINUED EXAMINATION

BY MR. THOMASSON:

Q      On the day -- if you can remember, on the day that Anthony Deo came to Palm Beach Gardens and met with you and David at the house, was there anyone else present?

MR. RUDERMAN:  Object to the form.  She didn't say she met with him.

You can answer the question.

A      Could you please repeat the question?

BY MR. THOMASSON:

50

Q      Sure.  I'm going to withdraw that question and ask you a different question.

A      Okay.

Q      Did you meet Anthony Deo the day that he came to your home?

A      I said hello.  Yes.

Q      Okay.  And did you -- and did you have lunch or prepare lunch with Anthony and David?

A      No.

Q      Was anyone else in the house that day, if you can remember?

A      My daughter was visiting me.

Q      Would that be Brooke?

A      Yes.

Q      Was anyone else present, if you can recall?

A      Not to my knowledge.

Q      Do you remember making any copies of any documents that day for David or Anthony?

A      No, I do not.

Q      Do you have a copier in the

51

house?

A     I have a printer.

Q     You can make copies on the printer, right, if you wanted?

A     Oh, at that time, no, I didn't have any, personally.  So, I don't know what happened, because the printer is in my husband's office.  I don't know. I don't -- I didn't make anything.  I didn't -- I wasn't even there when -- when they discussed -- whatever they discussed was behind the closed doors. I -- I wasn't there.

Q     So, there wouldn't have been any occasion that day that you would have been congratulating David and Anthony on anything?

A     I do not remember.  I'm sorry.  I don't remember.

Q     Have you owned any automobile dealerships in your lifetime, Mrs. Baron?

A     No.

Q     Has Josh Aaronson been involved at all in the handling of David

52

Baron's estate, if you know?

    A    He's helped me out.  I don't know if it's for David Baron estate, but he has always helped me out.

    Q    And he's your son-in-law?

    A    Yes, he is.  But he is my son.

    Q    And by that you mean he's like a son to you?

    A    Correct.

    Q    Kind of going down the checklist here, Mrs. Baron.  I don't actually think this is going to be too much longer.

    We'll probably be done by at least noon, okay?

    A    Okay.

    Q    So, you do know who Sara and Anthony Deo are, right?

    A    Right.

    Q    Do you know, yourself, whether or not they committed any harms, financially, to the Estate of David Baron?

53

A    I know that Josh told me, as I've said before, that Anthony cost me millions of dollars, and that I had to pay back the bank what Anthony did not pay cars  over, or something I don't really understand.  And I had to pay the bank the money that Anthony owed, because I would have been in trouble.  And that's what I know.  And that's it.

Q    So, then, that would be -- you only know of any potential wrongdoing involving Anthony Deo, right --

A    Correct.

Q    -- out of all of us.

And you only know it from Josh; is that right?

A    That is correct.

Q    You don't have any personal knowledge yourself of any wrongdoing, right?

A    That is correct.

Q    Do you know whether or not you ever received any money from Anthony Deo?

54

A    I personally did not receive any money from Anthony Deo.  I do not handle anything in business, as I said before.

Q    Do you know if you ever received any money from Northshore Motors?

A    Not to my knowledge, no.  I have never received any money.

Q    Okay.  Do you have any bank accounts with Chase Bank?

A    Yes, I do.

Q    How long have you had bank accounts with Chase Bank?

A    My husband dealt with all that.  I only had that one -- oh, actually, I did not have anything with Chase Bank.  I had it with Roslyn -- now it's Federal something -- Bank, which was my own money.  I never had any money in Chase at that time, that I can recall. If it was, it was with my husband.  But I never touched that money.  It wasn't --

Q    Have you had any contact with

55

law enforcement making allegations against any of the Defendants in this case?

A      No.

Q      Has anyone asked you to speak with law enforcement about this case?

A      No.

Q      Do you know whether or not law enforcement was involved by Josh or anyone, in this case?

A      I have no personal knowledge of this.

Q      Have you had any occasion, since David died, to access any of his bank accounts?

A      Can you please rephrase the question?

Q      Sure.

Have you electronically accessed any of David's bank accounts since he died?

A      Well, the estate has.  He has it in his estate.

Q      What do you mean by that?

56

A        Okay.  The estate has -- Chase has the David Baron Estate.  There is a checking book and a savings for David Baron Estate.

Q        I understand.

Do you have access to that, as the administrator?

A        Yes, I do.

Q        And money has come into those accounts; is that right?

A        Yes.

Q        And money has gone out of those accounts; is that right?

A        Yes.

Q        And is that -- is there anyone other than you that puts the money in or takes it out?

A        I -- my daughter puts money in.  I take money out to pay my lawyers for that.  Whatever the estate -- I take out money to pay for the taxes, if it's under David Baron Estate.  And that's what I do, what I have to do, what's legal; what I have to do legally.

*Rich Moffett Court Reporting, Inc.*

57

Q      Okay.  Do you know who owns Baron Nissan®?

A      Yes.

Q      Who owns Baron Nissan®?

A      Now?  I own Baron Nissan®, and so does Jory Baron.

Q      You and Jory Baron own Baron Nissan® today; is that right?

A      Correct.

Q      Is Baron Nissan® being sold?

A      It's in -- we are looking for somebody to sell it.  We're trying to sell it.

Q      Did you know that Anthony Deo claims an interest in that dealership?

A      I do not know that.

Q      Were you served a complaint that I drafted during or about September of 2024?

A      I am not aware of it.  If I did get something, I would give it to Josh to look over.  I let him handle all of this.

Q      Do you know somebody named

Brian Chabrier?

A    Yes, I do.

Q    Who is that?

A    He is the general manager of Baron Nissan®.

Q    How long have you known Brian?

A    Since I've known David.

Q    Would that be since the 1990s?

A    Yes.  Or earlier.

Q    Have you ever received any pandemic relief funds?

MR. RUDERMAN:  Are you asking her personally?

MR. THOMASSON:  Yeah.

MR. RUDERMAN:  Okay.

A    I don't even know what that is.

BY MR. THOMASSON:

Q    Okay.  And did you ever work at or for any of the dealerships that David held an interest in?

A    No.

59

Q        Are you sure about that?

A        I am positive.

        MR. THOMASSON:  I have no further questions at this time.

        MR. RUDERMAN:  Thank you.

        Anybody else have any examination of Ms. Baron?

        MS. RONNEBURGER:  No.  I have no questions.

        MR. RUDERMAN:  Okay.

        MR. KATAEV:  None from the Superb Plaintiffs.

        THE REPORTER:  Is anybody ordering a copy of this?

        MR. KATAEV:  We'll do the same thing we did before, Jeff and Ariel:  splitting three ways, one transcript?

        MR. RUDERMAN:  I want a copy.

        MR. CIANCIULLI:  Ms. Reporter, please make sure you note that I don't want a copy.  So, please don't send a transcript, and please don't send me a bill.

THE REPORTER:  Okay.  That's fine.

(Time noted is 11:31 a.m.)

61

A C K N O W L E D G E M E N T


    I, IRIS BARON, hereby certify that I

have read the transcript of my testimony

taken under oath in my deposition of

January 5, 2026; that the transcript is a

true, complete and correct record of my

testimony, and that the answers on the

record as given by me are true and

correct.




                        _____
                            IRIS BARON



Signed and subscribed to before
me, this              day
of                      ,2026.

_____
Notary Public, State of New York

62

----------------I N D E X----------------

WITNESS                    EXAMINATION BY        PAGE

IRIS BARON              MR. THOMASSON              6


DIRECTIONS:  None

RULINGS:  None

MOTIONS:  None


-------------DOCUMENT REQUEST---------------

None


------INFORMATION TO BE FURNISHED--------

None


---------------EXHIBITS--------------------

NO EXHIBITS WERE MARKED

63

                    C E R T I F I C A T E

STATE OF NEW YORK   )

                    ) ss.:

COUNTY OF NASSAU    )


          I, Renate Reid, a Notary Public

     within and for the State of New York,

     do hereby certify:

          That IRIS BARON, the witness

     whose deposition is hereinbefore set

     forth, was duly sworn by me and that

     such deposition is a true record of

     the testimony given by such witness.

          I further certify that I am not

     related to any of the parties to this

     action by blood or marriage; and that I

     am in no way interested in the outcome

     of this matter.

          IN WITNESS WHEREOF, I have

     hereunto set my hand this 15th day of

     January, 2026.


                    *Renate Reid*
                    -------------------------
                    RENATE REID

**'**

**'22** [1] - 12:3

**1**

**10170-0002** [1] - 2:12
**10:07** [1] - 1:22
**11042-1073** [1] - 2:17
**11553** [1] - 3:5
**11793** [1] - 2:5
**11:31** [1] - 60:4
**1239** [1] - 1:9
**1339** [1] - 2:21
**1580** [1] - 1:8
**1581** [1] - 1:8
**1591** [1] - 1:8
**15th** [1] - 63:21
**1632** [1] - 1:9
**189** [4] - 1:4, 1:7, 2:8, 15:3
**1990s** [1] - 58:11
**1:23-cv-6188** [1] - 1:12

**2**

**2017** [7] - 18:16, 19:7, 19:12, 20:4, 20:8, 20:22, 22:25
**2022** [3] - 11:24, 47:5, 47:12
**2024** [1] - 57:20
**2026** [4] - 1:21, 61:8, 61:20, 63:22
**21st** [1] - 12:2
**22nd** [2] - 11:23
**23** [2] - 1:10, 2:10
**2320** [2] - 2:11, 2:16
**2519** [1] - 1:9

**3**

**30** [1] - 34:4
**30(b)(6)** [1] - 38:14
**3000** [1] - 2:16
**3280** [1] - 2:5
**333** [1] - 3:5

**4**

**4** [1] - 48:5
**420** [1] - 2:11
**446** [2] - 1:10, 2:10
**45** [1] - 10:21

**5**

**5** [2] - 1:21, 61:8
**500** [1] - 2:21

**6**

**6** [1] - 62:4

**7**

**76** [2] - 1:10, 2:9

**A**

**a.m** [2] - 1:22, 60:4
**AARONSON** [1] - 1:7
**Aaronson** [9] - 2:11, 23:15, 31:20, 40:23, 41:12, 42:3, 42:7, 43:4, 51:24
**ability** [2] - 6:17, 28:25
**able** [2] - 7:3, 22:4
**absolutely** [3] - 6:24, 17:18, 45:25
**access** [2] - 55:15, 56:7
**accessed** [1] - 55:21
**account** [2] - 17:25, 18:6
**accounts** [8] - 17:22, 18:12, 54:12, 54:15, 55:16, 55:21, 56:11, 56:14
**acknowledge** [2] - 5:4, 5:6
**action** [4] - 8:9, 8:13, 14:2, 63:17
**address** [3] - 15:9, 20:10, 29:7
**addresses** [2] - 20:3, 20:6
**administer** [1] - 4:16
**administered** [2] - 5:8, 48:14
**administration** [1] - 5:7
**administrator** [2] - 8:23, 56:8
**admonished** [1] - 35:25
**ago** [1] - 6:20
**AGREED** [3] - 4:3, 4:9, 4:14
**agreement** [6] - 5:13, 5:14, 5:17, 5:19, 5:22, 5:25
**ahead** [2] - 27:23, 35:15
**alive** [1] - 11:17
**allegations** [2] - 41:2, 55:2
**alleged** [2] - 35:19, 41:7
**alleges** [1] - 24:17

**allow** [2] - 18:20, 32:5
**allowed** [1] - 33:22
**ALSO** [1] - 3:8
**AND** [3] - 4:2, 4:8, 4:13
**answer** [28] - 7:19, 9:9, 10:5, 12:20, 16:18, 16:19, 16:25, 21:7, 21:13, 21:20, 23:18, 24:25, 25:3, 25:4, 25:15, 27:24, 28:2, 32:5, 36:22, 38:18, 38:24, 40:4, 41:2, 42:13, 44:3, 45:8, 46:20, 49:22
**answering** [2] - 28:9, 28:11
**answers** [1] - 61:10
**Anthony** [32] - 2:16, 3:9, 14:20, 14:22, 15:21, 16:13, 16:21, 22:2, 22:5, 41:20, 42:2, 43:5, 45:18, 46:10, 46:13, 46:15, 46:25, 47:8, 47:18, 49:15, 50:6, 50:11, 50:23, 51:17, 52:20, 53:3, 53:5, 53:8, 53:13, 53:24, 54:3, 57:15
**ANTHONY** [2] - 1:4, 1:13
**anytime** [1] - 13:18
**anyway** [1] - 27:24
**apologize** [1] - 34:7
**appear** [1] - 33:22
**appreciate** [1] - 27:22
**appropriate** [3] - 35:12, 39:22, 40:2
**ARIEL** [1] - 3:6
**Ariel** [1] - 59:18
**Arielle** [1] - 5:23
**arrangement** [1] - 5:10
**Asad** [1] - 31:7
**asserted** [1] - 38:15
**assistance** [1] - 29:9
**assuming** [1] - 12:23
**attending** [2] - 32:20, 33:17
**attention** [1] - 35:10
**attorney** [5] - 26:21, 42:17, 42:19, 42:20, 43:10
**attorneys** [3] - 4:3, 34:9, 43:4
**Attorneys** [4] - 2:8, 2:15, 2:20, 3:4
**authorize** [2] - 8:20, 24:5

**authorized** [2] - 4:16, 41:16
**AUTO** [11] - 1:4, 1:5, 1:7, 1:8, 1:8, 1:9, 1:9, 1:10, 1:10
**Auto** [4] - 2:9, 2:10, 2:10, 2:15
**automobile** [1] - 51:21
**AUTOMOTIVE** [1] - 1:16
**Avenue** [2] - 2:11, 2:16
**aware** [6] - 7:15, 7:24, 8:6, 8:12, 43:15, 57:21

**B**

**Bank** [6] - 3:4, 5:24, 54:12, 54:15, 54:19, 54:20
**bank** [10] - 17:22, 17:25, 18:6, 41:22, 53:5, 53:8, 54:11, 54:14, 55:16, 55:21
**BANK** [1] - 1:19
**BARON** [6] - 1:8, 1:23, 61:5, 61:16, 62:4, 63:10
**Baron** [46] - 2:11, 6:9, 6:13, 6:15, 7:7, 7:23, 8:11, 8:25, 9:3, 19:5, 24:12, 24:19, 24:24, 25:6, 25:18, 30:9, 30:12, 30:24, 31:14, 32:5, 40:14, 40:17, 40:20, 41:9, 43:3, 43:6, 43:18, 45:13, 46:15, 47:5, 51:22, 52:4, 52:13, 52:25, 56:3, 56:5, 56:23, 57:3, 57:5, 57:6, 57:7, 57:8, 57:11, 58:6, 59:8
**Baron's** [1] - 52:2
**basis** [1] - 38:17
**BE** [1] - 62:14
**Beach** [3] - 16:5, 20:17, 49:16
**behalf** [3] - 8:10, 8:24, 36:20
**behind** [1] - 51:13
**benefit** [1] - 39:18
**Benjamin** [6] - 26:20, 32:17, 33:17, 34:16, 38:9
**Benjamin's** [1] - 36:17
**Bentley** [4] - 20:24, 22:4, 22:22, 23:7
**Bentleys** [1] - 22:2

**bereavement** [1] - 24:2
**best** [1] - 12:24
**between** [1] - 4:3
**big** [1] - 45:22
**bill** [1] - 59:25
**bit** [1] - 13:14
**Blankenship** [3] - 43:15, 43:17, 43:25
**BLANKENSHIP** [1] - 1:14
**blood** [2] - 6:20, 63:17
**Blvd** [1] - 2:9
**BLVD** [6] - 1:8, 1:8, 1:9, 1:9, 1:10
**boat** [1] - 46:24
**book** [1] - 56:4
**Boulevard** [1] - 3:5
**boundaries** [1] - 34:14
**break** [3] - 13:17, 28:16, 29:5
**BRIAN** [1] - 1:5
**Brian** [3] - 2:10, 58:2, 58:8
**briefly** [1] - 15:22
**broad** [1] - 36:4
**Brooke** [1] - 50:16
**brought** [1] - 35:9
**Building** [1] - 2:20
**business** [14] - 11:2, 11:3, 14:15, 14:17, 15:6, 15:9, 17:20, 19:9, 22:11, 22:13, 22:15, 41:15, 46:6, 54:4
**businesses** [3] - 10:23, 10:25, 12:7
**buy** [1] - 46:24
**BUYERS** [1] - 1:15
**BY** [20] - 2:12, 2:17, 2:22, 3:6, 6:7, 7:22, 17:3, 19:4, 21:8, 21:15, 21:24, 22:8, 40:13, 43:2, 45:10, 47:3, 49:13, 49:25, 58:21, 62:3
**byes** [1] - 46:3

**C**

**cancer** [1] - 48:6
**cannot** [2] - 12:20, 23:18
**capacity** [1] - 33:20
**CAPITAL** [1] - 1:18
**car** [13] - 19:15, 19:16, 19:22, 19:23, 19:24, 19:25, 21:2, 21:10, 21:17, 22:13, 22:15, 23:4, 23:5

*Rich Moffett Court Reporting, Inc.*

**CAR** [1] - 1:15
**care** [3] - 11:3, 17:20, 41:17
**cars** [8] - 18:15, 19:5, 19:9, 19:10, 19:17, 19:20, 53:6
**CARS** [2] - 1:15, 1:15
**case** [9] - 7:25, 8:7, 8:17, 8:21, 18:23, 32:18, 55:4, 55:7, 55:11
**Case** [1] - 1:12
**certain** [1] - 24:18
**certainly** [1] - 38:7
**certification** [1] - 4:6
**certify** [3] - 61:5, 63:9, 63:15
**CHABRIER** [1] - 1:5
**Chabrier** [2] - 2:10, 58:2
**chambers** [3] - 28:17, 29:2, 29:6
**Chase** [5] - 54:12, 54:15, 54:19, 54:22, 56:3
**checking** [1] - 56:4
**checklist** [1] - 52:13
**checks** [2] - 17:12, 17:17
**chemo** [1] - 48:11
**Chestnut** [1] - 2:21
**children** [1] - 11:3
**CIANCIULLI** [2] - 2:22, 59:21
**circumventing** [1] - 37:11
**claims** [3] - 31:16, 31:25, 57:16
**clear** [1] - 42:14
**clerk** [1] - 30:2
**client** [1] - 26:17
**closed** [1] - 51:13
**co** [1] - 35:21
**CO** [1] - 1:18
**co-defendants** [1] - 35:21
**COAST** [6] - 1:15, 1:15, 1:16, 1:16, 1:17, 1:17
**codefendants** [1] - 32:2
**committed** [3] - 40:19, 43:17, 52:23
**communicated** [2] - 37:19, 42:19
**communications** [1] - 42:15
**complaint** [1] - 57:18
**complete** [1] - 61:9
**compromised** [1] -

6:23
**concerned** [1] - 33:5
**conference** [2] - 29:14, 39:13
**congratulating** [1] - 51:17
**connection** [1] - 18:22
**consent** [1] - 5:9
**conspiracy** [3] - 35:21, 36:5, 36:9
**Cont'd** [1] - 3:2
**contact** [1] - 54:25
**context** [1] - 25:25
**continue** [1] - 39:23
**CONTINUED** [2] - 40:12, 49:12
**conversation** [4] - 29:13, 37:7, 45:14, 45:18
**conversations** [2] - 15:21, 46:5
**copier** [1] - 50:25
**copies** [2] - 50:22, 51:4
**copy** [3] - 59:15, 59:20, 59:23
**CORP** [1] - 1:18
**correct** [27] - 9:25, 13:3, 16:7, 18:8, 18:9, 20:19, 23:9, 25:7, 30:13, 33:23, 33:24, 40:24, 41:18, 44:2, 44:5, 44:9, 44:17, 44:21, 47:6, 52:11, 53:14, 53:18, 53:22, 57:10, 61:9, 61:12
**cost** [5] - 41:20, 42:2, 43:5, 43:17, 53:3
**counsel** [2] - 5:2, 5:9
**Counsel** [1] - 5:12
**COUNTY** [1] - 63:5
**course** [1] - 37:7
**Court** [6] - 4:19, 34:7, 34:15, 35:10, 35:12, 36:2
**court** [3] - 34:20, 35:18, 38:14
**Court's** [1] - 35:9
**courts** [1] - 14:3
**CPA** [1] - 1:14
**CPA'S** [1] - 1:19
**criminal** [3] - 35:20, 36:5, 36:9
**cross** [1] - 26:3
**cry** [1] - 13:14
**CULLEN** [1] - 3:4
**Cyruli** [2] - 30:22, 31:9
**CYRULI** [1] - 2:7

## D

**date** [1] - 11:20
**daughter** [2] - 50:15, 56:19
**David** [29] - 8:11, 8:25, 9:3, 9:23, 24:12, 24:19, 24:24, 25:6, 25:18, 40:19, 41:8, 43:6, 43:18, 47:4, 47:15, 47:18, 49:17, 50:11, 50:23, 51:17, 51:25, 52:4, 52:24, 55:15, 56:3, 56:5, 56:23, 58:9, 58:24
**David's** [1] - 55:21
**deal** [1] - 35:11
**dealership** [2] - 21:9, 57:16
**dealerships** [2] - 51:22, 58:23
**dealt** [1] - 54:16
**death** [2] - 11:21, 13:11
**decision** [1] - 16:10
**deem** [1] - 40:2
**deems** [1] - 35:12
**defendant** [1] - 26:15
**Defendant** [1] - 2:4
**defendants** [1] - 35:21
**Defendants** [3] - 1:20, 36:20, 55:3
**defending** [3] - 30:20, 30:23, 38:10
**DEO** [3] - 1:13, 3:9
**Deo** [23] - 14:20, 14:22, 15:21, 16:21, 22:5, 38:10, 42:2, 43:5, 44:11, 45:15, 45:19, 46:8, 46:10, 46:13, 46:15, 47:8, 49:15, 50:6, 52:20, 53:13, 53:25, 54:3, 57:15
**deposed** [3] - 26:5, 30:10, 30:12
**deposing** [1] - 26:18
**deposition** [18] - 4:6, 4:14, 5:3, 5:5, 6:11, 7:16, 26:16, 26:23, 30:5, 30:16, 30:18, 30:24, 31:7, 32:21, 38:23, 61:7, 63:11, 63:13
**deposits** [3] - 17:12, 17:16, 18:5
**derivatively** [2] - 1:6, 1:7
**died** [12] - 9:24, 11:23, 12:4, 13:5, 47:5,

47:15, 47:18, 48:2, 49:2, 49:6, 55:15, 55:22
**different** [1] - 50:3
**direct** [1] - 38:17
**directed** [1] - 39:20
**direction** [1] - 17:16
**DIRECTIONS** [1] - 62:7
**discussed** [2] - 51:12, 51:13
**dispute** [1] - 31:5
**disqualification** [1] - 38:21
**disqualified** [7] - 27:19, 32:14, 33:6, 33:15, 36:15, 36:21, 37:12
**disrespectful** [1] - 13:8
**DISTRICT** [2] - 1:2, 1:2
**DLA** [1] - 1:18
**doctor** [1] - 48:15
**DOCUMENT** [1] - 62:11
**documents** [2] - 17:7, 50:22
**dollars** [2] - 41:21, 53:4
**done** [1] - 52:16
**doors** [1] - 51:13
**down** [1] - 52:12
**drafted** [1] - 57:19
**drive** [1] - 19:17
**drugs** [1] - 6:16
**duly** [2] - 6:3, 63:12
**during** [4] - 17:8, 47:5, 49:5, 57:19
**Dwight** [3] - 43:15, 43:16, 43:24
**DWIGHT** [1] - 1:14
**DYKMAN** [1] - 3:4

## E

**e-mail** [1] - 29:2
**Earle** [1] - 3:5
**EASTERN** [1] - 1:2
**editorialization** [1] - 16:24
**effect** [1] - 4:17
**eight** [1] - 17:17
**either** [3] - 11:16, 21:16, 40:4
**electronically** [1] - 55:20
**EMANUEL** [1] - 2:17
**Emmanuel** [1] - 5:18
**end** [2] - 32:11, 39:13
**enforcement** [3] -

55:2, 55:7, 55:10
**engaged** [2] - 35:20, 36:4
**ensues** [1] - 29:14
**entitled** [1] - 38:5
**especially** [1] - 33:16
**ESQ** [5] - 2:4, 2:12, 2:17, 2:22, 3:6
**Estate** [16] - 8:11, 8:24, 9:3, 24:12, 24:18, 24:24, 25:6, 25:17, 40:19, 41:8, 43:6, 43:18, 52:24, 56:3, 56:5, 56:23
**estate** [8] - 9:14, 10:8, 52:2, 52:4, 55:23, 55:24, 56:2, 56:21
**event** [1] - 47:14
**evidence** [1] - 37:8
**exactly** [2] - 32:10, 48:10
**examination** [1] - 59:8
**Examination** [1] - 1:23
**EXAMINATION** [4] - 6:7, 40:12, 49:12, 62:3
**examined** [1] - 6:5
**example** [1] - 14:19
**except** [1] - 4:9
**executor** [4] - 9:13, 9:17, 9:21, 10:3
**executrix** [1] - 8:24
**EXHIBITS** [2] - 62:17, 62:18
**exist** [1] - 37:2
**existence** [1] - 10:17
**explain** [2] - 9:10, 42:24

## F

**fact** [2] - 36:3, 37:5
**fair** [9] - 6:25, 8:15, 9:12, 25:19, 40:16, 41:5, 43:23, 45:4, 47:7
**familiar** [5] - 10:13, 14:20, 15:5, 15:8, 43:24
**far** [5] - 19:8, 33:4, 36:5, 39:22, 44:4
**Federal** [1] - 54:20
**few** [1] - 44:13
**file** [2] - 12:11, 12:16
**filed** [2] - 12:25, 13:4
**filing** [1] - 4:5
**filled** [1] - 29:25
**financially** [1] - 52:24
**fine** [2] - 36:17, 60:3
**finish** [1] - 35:3

*Rich Moffett Court Reporting, Inc.*

finishes [1] - 34:25
first [6] - 6:3, 7:12, 10:16, 10:18, 11:11, 35:4
FISK [1] - 1:10
Fisk [1] - 2:9
five [1] - 19:14
Florida [11] - 16:6, 16:15, 16:22, 19:21, 19:24, 20:17, 23:5, 23:8, 46:14, 48:17, 48:19
Flushing [2] - 3:4, 5:24
FLUSHING [1] - 1:19
follows [1] - 6:5
force [1] - 4:17
form [10] - 4:10, 7:18, 18:19, 21:6, 21:12, 21:19, 22:7, 45:7, 46:19, 49:20
forth [1] - 63:12
forward [2] - 6:18, 28:20
four [3] - 9:22, 44:4, 44:8
free [1] - 40:3
FUNDING [2] - 1:19, 2:20
funds [1] - 58:14
FURNISHED [1] - 62:14
FURTHER [2] - 4:8, 4:13
future [1] - 39:25

**G**

Gardens [3] - 16:5, 20:17, 49:16
general [1] - 58:5
germane [1] - 38:7
given [2] - 61:11, 63:14
GOLD [6] - 1:15, 1:15, 1:16, 1:16, 1:17, 1:17
grieving [1] - 14:8
ground [1] - 38:18
GROUP [2] - 1:16, 2:14
guess [4] - 16:12, 16:13, 16:15, 21:23

**H**

half [2] - 6:20, 35:24
hand [1] - 63:21
handle [2] - 54:4, 57:23

handling [1] - 51:25
hands [1] - 31:19
hang [1] - 39:12
happier [1] - 19:2
happy [1] - 13:21
Happy [1] - 39:8
harm [5] - 24:12, 24:18, 24:24, 25:5, 25:17
harms [1] - 52:23
Harry [3] - 6:10, 28:23, 35:16
HARRY [2] - 1:13, 2:4
hear [2] - 15:2, 40:14
heard [3] - 7:13, 25:11, 46:16
held [1] - 58:24
hello [2] - 15:22, 50:8
hellos [1] - 46:2
helped [2] - 52:3, 52:5
hereby [2] - 61:5, 63:9
HEREBY [1] - 4:2
herein [1] - 4:4
hereinbefore [1] - 63:11
hereunto [1] - 63:21
Highway [3] - 2:5, 2:8, 15:3
himself [3] - 32:25, 33:21, 47:2
history [1] - 18:8
hmm [4] - 11:6, 15:19, 22:20, 24:9
hold [1] - 36:10
holding [1] - 24:8
holdings [1] - 19:19
home [3] - 20:16, 47:9, 50:7
Honor [12] - 29:18, 29:20, 30:7, 30:13, 30:18, 32:10, 34:6, 34:7, 35:6, 35:17, 37:16, 39:2
hospital [1] - 48:22
house [8] - 16:2, 16:4, 16:9, 16:11, 46:14, 49:17, 50:13, 51:2
husband [28] - 10:19, 10:22, 11:17, 12:11, 12:21, 13:2, 14:7, 16:8, 16:12, 16:16, 17:20, 17:24, 18:4, 18:10, 18:15, 19:6, 19:11, 19:16, 19:21, 20:23, 22:3, 22:12, 22:23, 23:14, 46:22, 47:25, 54:16, 54:23
husband's [2] - 17:16, 51:9
HWY [2] - 1:5, 1:7

HYLAN [6] - 1:8, 1:8, 1:9, 1:9, 1:10
Hyland [1] - 2:9

**I**

imagine [1] - 37:6
immune [1] - 48:13
impact [1] - 6:17
impression [1] - 16:21
IN [1] - 63:20
in-person [1] - 5:7
inaudible [1] - 25:24
INC [3] - 1:4, 1:15, 1:18
Inc [1] - 2:15
independently [1] - 38:2
individual [1] - 28:24
individually [2] - 1:5, 1:7
INFORMATION [1] - 62:14
information [2] - 33:9, 42:15
initiated [1] - 29:23
installed [1] - 49:5
interest [2] - 57:16, 58:24
interested [1] - 63:18
introduction [1] - 45:5
involved [7] - 8:13, 8:21, 10:23, 10:25, 12:7, 51:25, 55:10
involves [1] - 7:16
involving [1] - 53:13
IRIS [5] - 1:23, 61:5, 61:16, 62:4, 63:10
Iris [4] - 30:9, 39:14, 39:17, 40:6
irrelevant [2] - 38:4, 38:16
IS [3] - 4:2, 4:8, 4:13
Island [1] - 2:10
ISLAND [1] - 1:10
issued [1] - 34:15
issues [1] - 36:13
IT [3] - 4:2, 4:8, 4:13

**J**

Jacqueline [1] - 29:25
January [3] - 1:21, 61:8, 63:22
Jeff [3] - 5:20, 42:25, 59:17
JEFF [1] - 2:22
Jeffrey [2] - 7:21, 30:22
JEFFREY [1] - 2:12

Jericho [1] - 15:15
join [1] - 29:3
joint [2] - 12:12, 12:25
jointly [1] - 17:23
JONES [2] - 1:14, 1:18
Jory [3] - 2:11, 57:7, 57:8
JORY [1] - 1:8
Josh [25] - 14:10, 23:15, 24:3, 24:5, 25:8, 31:20, 40:22, 40:23, 41:11, 41:16, 41:23, 41:24, 42:3, 42:7, 43:4, 43:11, 43:20, 44:6, 51:24, 53:2, 53:17, 55:10, 57:23
Joshua [1] - 2:11
JOSHUA [1] - 1:6
judge [4] - 29:3, 29:15, 39:19, 39:20
Judge [2] - 29:13, 39:11
JUDGE [24] - 29:15, 29:21, 29:24, 30:8, 30:14, 30:25, 31:11, 31:17, 32:7, 32:15, 32:22, 33:2, 33:12, 33:18, 33:25, 34:11, 34:24, 35:3, 35:13, 36:10, 37:9, 38:3, 39:3, 39:7
judge's [1] - 28:24

**K**

Kahn [3] - 31:7, 31:14, 31:20
Kataev [1] - 5:18
KATAEV [5] - 2:17, 5:18, 28:23, 59:12, 59:16
kept [1] - 18:3
kind [1] - 52:12
kindly [1] - 5:12
knowledge [11] - 10:4, 12:25, 40:21, 41:11, 43:19, 44:6, 45:16, 50:20, 53:20, 54:9, 55:12
known [2] - 58:7, 58:9
knows [2] - 22:7, 33:8

**L**

LABUDA [1] - 2:14
Lake [1] - 2:17
Lane [1] - 20:11
last [5] - 11:14, 17:17, 31:6, 31:22, 47:22

LAURIE [1] - 1:14
Laurie [11] - 25:11, 25:17, 25:21, 26:2, 26:17, 37:20, 37:21, 37:24, 37:25, 40:18, 43:22
Laurie's [1] - 26:20
law [6] - 14:10, 30:2, 52:6, 55:2, 55:7, 55:10
LAW [1] - 2:14
lawsuit [4] - 23:16, 23:21, 24:16, 41:17
lawyers [2] - 9:18, 56:20
laymen [1] - 45:22
lead [1] - 37:8
learn [1] - 10:16
Leasing [1] - 2:8
LEASING [2] - 1:5, 1:6
least [3] - 22:18, 39:21, 52:17
leeway [1] - 18:23
left [2] - 6:22, 31:19
legal [4] - 7:24, 8:6, 10:7, 56:25
legally [1] - 56:25
legitimate [1] - 37:22
Lexington [1] - 2:11
LIBATAS [1] - 2:20
LIBERTAS [1] - 1:19
LIC [2] - 1:16, 1:16
lieu [1] - 5:6
lifetime [1] - 51:22
limitation [1] - 38:13
line [2] - 28:19, 30:4
link [2] - 28:25, 29:7
listing [1] - 32:3
lists [1] - 8:10
LITTLE [1] - 1:18
lived [2] - 20:3, 20:7
LLC [26] - 1:4, 1:5, 1:5, 1:6, 1:8, 1:8, 1:9, 1:9, 1:10, 1:10, 1:11, 1:15, 1:16, 1:17, 1:17, 1:19, 2:9, 2:9, 2:10, 2:10, 2:15
LLP [4] - 1:19, 2:7, 2:19, 3:4
located [1] - 16:5
look [1] - 57:23
looking [2] - 18:17, 57:12
lumped [1] - 37:3
lunch [3] - 46:3, 50:10

**M**

ma'am [1] - 19:19
mail [1] - 29:2

*Rich Moffett Court Reporting, Inc.*

**MANAGEMENT** [1] - 1:11
**manager** [1] - 58:5
**MARC** [1] - 1:14
**Marc** [3] - 41:3, 41:7, 43:22
**Marcus** [1] - 2:16
**MARKED** [1] - 62:18
**marriage** [1] - 63:17
**married** [2] - 10:22, 10:24
**matter** [4] - 36:3, 37:5, 46:13, 63:19
**mean** [3] - 13:8, 52:9, 55:25
**medication** [3] - 6:16, 48:7, 48:9
**meet** [2] - 44:22, 50:6
**meeting** [3] - 17:5, 17:8, 17:13
**melanoma** [1] - 48:5
**member** [2] - 1:6, 1:7
**memory** [1] - 6:23
**MERCKLING** [1] - 1:14
**Merckling** [3] - 41:3, 41:8, 43:23
**met** [5] - 7:8, 14:23, 44:12, 49:16, 49:20
**method** [1] - 5:11
**Mgt** [1] - 2:10
**Michael** [4] - 25:11, 25:16, 40:18, 43:22
**MICHAEL** [1] - 1:14
**middle** [1] - 26:23
**millions** [2] - 41:21, 53:4
**MILMAN** [1] - 2:14
**mind** [2] - 46:23, 47:8
**MO** [1] - 34:8
**moment** [1] - 49:8
**money** [19] - 18:3, 18:11, 42:2, 43:6, 43:18, 53:8, 53:24, 54:3, 54:7, 54:10, 54:21, 54:24, 56:10, 56:13, 56:17, 56:19, 56:20, 56:22
**months** [1] - 47:23
**morning** [7] - 6:9, 6:11, 6:17, 7:4, 29:17, 29:19, 29:21
**motion** [1] - 38:22
**MOTIONS** [1] - 62:9
**MOTOR** [2] - 1:5, 1:6
**Motor** [2] - 2:8, 2:15
**Motors** [9] - 10:14, 10:17, 10:20, 11:5, 21:23, 44:16, 44:23, 45:2, 54:8

**MOTORS** [6] - 1:4, 1:16, 1:16, 1:17, 1:17, 1:18
**moved** [1] - 23:6
**moving** [1] - 28:20
**MR** [99] - 5:16, 5:18, 5:20, 6:8, 7:17, 7:20, 7:22, 16:23, 17:3, 18:18, 18:25, 19:4, 21:5, 21:8, 21:11, 21:15, 21:18, 21:24, 22:6, 22:8, 25:20, 25:23, 25:24, 26:4, 26:7, 26:9, 26:11, 26:12, 26:14, 26:22, 26:25, 27:3, 27:5, 27:6, 27:8, 27:10, 27:11, 27:14, 27:16, 27:21, 27:25, 28:7, 28:10, 28:15, 28:23, 29:4, 29:17, 29:19, 29:22, 30:6, 30:11, 30:17, 30:19, 30:21, 31:6, 31:12, 31:18, 32:9, 32:16, 32:23, 33:3, 33:13, 33:24, 34:5, 34:12, 34:22, 35:2, 35:5, 35:16, 36:23, 37:15, 38:25, 39:6, 39:10, 39:14, 40:7, 40:13, 42:12, 42:24, 43:2, 45:6, 45:10, 46:18, 47:3, 49:13, 49:19, 49:25, 58:15, 58:17, 58:18, 58:21, 59:4, 59:6, 59:11, 59:12, 59:16, 59:20, 59:21, 62:4
**MS** [2] - 5:23, 59:9
**must** [1] - 16:14

**N**

**name** [16] - 5:13, 6:10, 7:13, 8:20, 14:2, 14:20, 15:6, 17:23, 18:2, 23:16, 23:20, 24:17, 25:12, 32:3, 43:22, 43:24
**named** [1] - 57:25
**NASSAU** [1] - 63:5
**nature** [2] - 31:4, 35:7
**need** [2] - 13:17, 49:8
**needing** [1] - 29:9
**never** [8] - 10:22, 12:22, 18:13, 23:6, 54:10, 54:21, 54:24
**New** [12] - 1:25, 2:5, 2:12, 14:3, 19:23, 20:3, 20:7, 20:12,

39:8, 48:17, 61:21, 63:8
**NEW** [2] - 1:2, 63:3
**Nissan®** [7] - 46:15, 57:3, 57:5, 57:6, 57:9, 57:11, 58:6
**NO** [1] - 62:18
**none** [1] - 59:12
**None** [5] - 62:7, 62:8, 62:9, 62:12, 62:15
**noon** [1] - 52:17
**North** [1] - 21:21
**Northshore** [14] - 2:8, 10:14, 10:17, 10:20, 11:5, 14:24, 15:12, 15:25, 21:22, 21:23, 44:16, 44:23, 45:2, 54:7
**NORTHSHORE** [2] - 1:5, 1:6
**Notary** [4] - 1:24, 6:4, 61:21, 63:7
**note** [3] - 18:21, 39:24, 59:22
**noted** [1] - 60:4
**nothing** [4] - 14:9, 17:19, 18:25, 41:14
**number** [1] - 18:17
**NY** [3] - 2:12, 2:17, 3:5
**NYC** [1] - 1:15

**O**

**oath** [3] - 4:17, 5:7, 61:7
**object** [15] - 7:17, 16:23, 18:18, 21:5, 21:11, 21:18, 22:6, 27:2, 27:17, 27:23, 28:3, 34:12, 45:6, 46:18, 49:19
**objecting** [1] - 33:11
**objection** [2] - 31:9, 35:8
**objections** [3] - 4:9, 5:11, 39:25
**obtain** [1] - 22:4
**obtained** [1] - 21:17
**obviously** [2] - 35:8, 35:11
**occasion** [2] - 51:16, 55:14
**occasions** [3] - 44:14, 44:15, 44:19
**OF** [8] - 1:2, 1:15, 1:16, 1:17, 1:17, 63:3, 63:5
**offer** [1] - 28:24
**office** [1] - 51:9
**officer** [1] - 4:16

**Old** [2] - 20:11
**once** [1] - 47:9
**one** [13] - 11:11, 16:3, 17:25, 19:15, 20:9, 24:7, 26:5, 29:22, 36:22, 43:11, 47:22, 54:17, 59:18
**ones** [1] - 37:3
**oOo** [1] - 4:21
**operated** [4] - 18:16, 19:11, 20:23, 22:22
**opportunity** [2] - 39:17, 39:19
**order** [5] - 34:15, 34:20, 37:11, 38:14, 38:21
**ordering** [1] - 59:15
**orders** [1] - 38:20
**out-of-state** [1] - 19:19
**outcome** [1] - 63:18
**outside** [2] - 44:22, 45:2
**Ovington** [1] - 3:5
**owed** [1] - 53:8
**own** [7] - 12:22, 17:23, 18:2, 19:8, 54:21, 57:6, 57:8
**owned** [3] - 18:16, 19:6, 51:21
**owner** [1] - 22:17
**owns** [2] - 57:2, 57:5

**P**

**PA** [1] - 2:21
**pacemaker** [2] - 48:21, 49:4
**PAGE** [1] - 62:3
**Palm** [3] - 16:5, 20:17, 49:16
**palpably** [1] - 38:16
**pandemic** [1] - 58:14
**participating** [2] - 5:3, 30:4
**parties** [9] - 4:4, 5:9, 32:13, 33:14, 34:3, 34:17, 34:19, 37:13, 63:16
**PARTNERS** [1] - 1:18
**party** [4] - 27:18, 28:4, 32:24, 33:5
**pass** [1] - 46:25
**passed** [2] - 14:7, 23:14
**pay** [6] - 41:22, 53:5, 53:6, 53:7, 56:20, 56:22
**people** [2] - 33:9, 37:4
**person** [1] - 5:7

**personal** [6] - 40:21, 41:11, 43:19, 44:5, 53:19, 55:12
**personally** [4] - 18:16, 51:7, 54:2, 58:16
**pertain** [1] - 14:17
**pertaining** [1] - 43:14
**Philadelphia** [1] - 2:21
**phone** [2] - 29:14, 39:13
**place** [3] - 10:7, 16:17, 48:24
**Plaintiff** [1] - 8:10
**Plaintiffs** [6] - 1:11, 2:8, 2:15, 5:19, 5:22, 59:13
**PLLC** [1] - 2:14
**point** [2] - 16:3, 42:6
**position** [3] - 9:4, 14:14, 22:14
**positive** [1] - 59:3
**potential** [1] - 53:12
**PREMIER** [1] - 1:18
**prepare** [1] - 50:10
**PRESENT** [1] - 3:8
**present** [3] - 5:5, 49:18, 50:18
**printer** [3] - 51:3, 51:5, 51:8
**privilege** [1] - 38:15
**pro** [5] - 26:14, 28:13, 32:24, 33:22, 34:2
**Pro** [1] - 2:4
**problem** [1] - 13:18
**proceed** [1] - 38:23
**proceeding** [1] - 5:4
**proceedings** [1] - 10:7
**process** [2] - 20:14, 31:13
**provide** [1] - 42:14
**Public** [4] - 1:24, 6:4, 61:21, 63:7
**purchase** [1] - 46:14
**purpose** [1] - 17:4
**purposes** [1] - 35:18
**pushing** [1] - 34:14
**put** [3] - 18:11, 23:16, 48:21
**puts** [2] - 56:17, 56:19

**Q**

**questioning** [1] - 25:22
**questions** [30] - 7:4, 13:9, 14:16, 14:17, 27:2, 27:9, 27:10, 27:12, 27:17, 28:2, 28:3, 28:12, 28:22, 31:3, 31:8, 32:6,

*Rich Moffett Court Reporting, Inc.*

32:12, 33:7, 33:13, 33:19, 34:9, 36:19, 37:25, 38:6, 38:12, 39:21, 39:24, 43:13, 59:5, 59:10

## R

**radiation** [1] - 48:12
**raises** [1] - 36:11
**read** [4] - 40:5, 40:8, 40:11, 61:6
**really** [7] - 9:9, 14:11, 23:12, 34:13, 37:10, 37:11, 53:7
**Realty** [1] - 2:9
**REALTY** [1] - 1:10
**reason** [1] - 7:2
**receive** [1] - 54:2
**received** [4] - 53:24, 54:7, 54:10, 58:13
**recess** [1] - 49:11
**Recess** [1] - 29:12
**record** [5] - 5:14, 29:11, 61:9, 61:11, 63:13
**Record** [1] - 40:11
**refer** [1] - 6:12
**regard** [1] - 25:10
**regarding** [4] - 6:23, 7:25, 10:8, 41:2
**Reid** [7] - 1:24, 5:17, 28:15, 29:4, 40:9, 63:7, 63:24
**REID** [1] - 63:25
**related** [2] - 17:12, 63:16
**relevant** [2] - 37:8, 38:6
**relief** [1] - 58:14
**remember** [17] - 11:5, 11:12, 11:15, 14:25, 19:13, 22:24, 23:3, 23:11, 23:12, 23:13, 23:25, 47:21, 49:15, 50:14, 50:21, 51:19, 51:20
**remembers** [1] - 40:6
**remotely** [2] - 5:8, 6:4
**RENATE** [1] - 63:25
**Renate** [3] - 1:24, 63:7, 63:24
**repeat** [2] - 8:3, 49:23
**rephrase** [4] - 13:21, 45:11, 45:23, 55:17
**REPORTER** [5] - 5:2, 29:10, 40:10, 59:14, 60:2
**Reporter** [1] - 59:22
**reporter's** [1] - 35:18

**reporting** [1] - 5:11
**represent** [4] - 28:5, 33:5, 33:10, 36:16
**representation** [1] - 28:14
**representative** [4] - 9:2, 9:5, 33:20, 34:3
**representing** [12] - 25:21, 26:2, 27:20, 32:14, 32:25, 33:6, 33:15, 33:16, 34:17, 34:19, 37:13, 38:8
**REQUEST** [1] - 62:11
**reserved** [1] - 4:11
**respective** [1] - 4:4
**respond** [1] - 34:23
**response** [1] - 45:9
**rest** [1] - 18:3
**returns** [2] - 12:12, 12:17
**rights** [1] - 34:2
**ROBERT** [1] - 1:4
**Robert** [1] - 2:16
**Ronneburger** [1] - 5:24
**RONNEBURGER** [3] - 3:6, 5:23, 59:9
**room** [2] - 5:5, 17:10
**ROSLYN** [1] - 1:17
**Roslyn** [1] - 54:19
**roughly** [2] - 11:8, 44:20
**Route** [1] - 2:10
**ROUTE** [1] - 1:10
**RPR** [1] - 1:24
**Ruderman** [10] - 5:20, 19:2, 26:6, 26:22, 30:22, 32:4, 32:8, 34:25, 36:11, 37:16
**RUDERMAN** [47] - 2:12, 5:20, 7:17, 16:23, 18:18, 21:5, 21:11, 21:18, 22:6, 25:20, 25:24, 26:7, 26:11, 26:14, 26:25, 27:5, 27:8, 27:11, 27:16, 27:25, 28:10, 29:19, 30:6, 30:11, 30:21, 32:9, 32:16, 32:23, 33:3, 33:13, 33:24, 34:5, 34:12, 35:5, 37:15, 38:25, 39:6, 39:14, 42:12, 45:6, 46:18, 49:19, 58:15, 58:18, 59:6, 59:11, 59:20
**Rule** [1] - 34:4
**rules** [1] - 28:24
**RULINGS** [1] - 62:8
**ruse** [1] - 36:18

## S

**Sales** [1] - 2:15
**SALES** [1] - 1:4
**Sara** [4] - 44:10, 45:14, 46:8, 52:19
**SARAH** [1] - 1:13
**savings** [1] - 56:4
**se** [4] - 26:15, 28:14, 32:24, 33:23
**Se** [1] - 2:4
**sealing** [1] - 4:5
**see** [4] - 10:20, 11:22, 18:21, 18:24
**seeking** [1] - 33:4
**sell** [2] - 57:13, 57:14
**send** [3] - 28:25, 59:24, 59:25
**separate** [1] - 38:22
**September** [1] - 57:19
**series** [1] - 31:8
**served** [1] - 57:18
**ses** [1] - 34:2
**set** [2] - 63:11, 63:21
**settle** [1] - 28:19
**shall** [1] - 4:11
**SHANKS** [1] - 2:7
**Shanks** [2] - 30:23, 31:10
**shock** [1] - 24:3
**shortly** [2] - 46:24, 47:15
**sic** [1] - 40:4
**sick** [3] - 16:8, 48:2, 48:4
**sign** [4] - 12:14, 12:18, 12:21, 23:23
**signed** [5] - 4:15, 4:18, 12:14, 12:21, 17:8
**Signed** [1] - 61:19
**sit** [1] - 35:22
**sitting** [1] - 38:9
**six** [1] - 20:11
**SMITHTOWN** [1] - 1:17
**sold** [2] - 20:15, 57:11
**someone** [1] - 23:24
**son** [4] - 14:10, 52:6, 52:8, 52:10
**son-in-law** [2] - 14:10, 52:6
**soon** [1] - 34:24
**sorry** [7] - 9:10, 13:11, 24:15, 35:2, 42:22, 47:21, 51:20
**sounds** [1] - 35:13
**splitting** [1] - 59:18
**spoken** [1] - 7:10

**ss** [1] - 63:4
**stage** [1] - 48:5
**started** [2] - 31:23, 32:3
**starting** [1] - 5:14
**starts** [1] - 32:12
**State** [3] - 1:25, 61:21, 63:8
**state** [1] - 19:19
**STATE** [1] - 63:3
**STATES** [1] - 1:2
**stating** [1] - 5:13
**still** [6] - 10:7, 14:8, 14:13, 20:13, 23:7, 38:11
**STIPULATED** [3] - 4:2, 4:8, 4:13
**stopped** [1] - 28:21
**stopping** [4] - 26:24, 27:4, 28:8, 28:10
**Street** [2] - 2:9, 2:21
**STREET** [1] - 1:10
**stroke** [1] - 6:19
**subject** [2] - 46:5, 46:13
**subscribed** [1] - 61:19
**substantive** [4] - 45:14, 45:18, 45:20, 46:4
**Success** [1] - 2:17
**Suite** [3] - 2:11, 2:16, 2:21
**SUNRISE** [3] - 1:5, 1:7, 1:16
**Sunrise** [3] - 2:5, 2:8, 15:3
**Superb** [2] - 2:15, 59:13
**SUPERB** [1] - 1:4
**suspect** [1] - 38:10
**sworn** [4] - 4:15, 4:18, 6:3, 63:12
**Syosset** [1] - 15:16
**SYOSSET** [1] - 1:15

## T

**tax** [2] - 12:12, 12:16
**taxes** [4] - 12:22, 12:25, 13:4, 56:22
**TEAM** [1] - 1:4
**Team** [1] - 2:15
**term** [3] - 10:14, 15:3, 45:22
**testified** [3] - 6:5, 12:8, 47:4
**testifying** [2] - 7:25, 8:7
**testimony** [3] - 61:6, 61:10, 63:14

**THE** [6] - 5:2, 29:10, 40:10, 42:22, 59:14, 60:2
**therapy** [1] - 48:13
**thinks** [1] - 36:25
**thinners** [1] - 6:21
**THOMAS** [1] - 1:14
**Thomasson** [16] - 5:15, 6:10, 25:20, 30:15, 31:2, 32:11, 32:19, 32:24, 34:18, 35:15, 35:17, 36:11, 38:11, 39:23, 40:3, 42:17
**THOMASSON** [49] - 1:13, 2:4, 5:16, 6:8, 7:20, 7:22, 17:3, 18:25, 19:4, 21:8, 21:15, 21:24, 22:8, 25:23, 26:4, 26:9, 26:12, 26:22, 27:3, 27:6, 27:10, 27:14, 27:21, 28:7, 28:15, 29:4, 29:17, 29:22, 30:17, 31:6, 31:12, 31:18, 34:22, 35:2, 35:16, 36:23, 39:10, 40:7, 40:13, 42:24, 43:2, 45:10, 47:3, 49:13, 49:25, 58:17, 58:21, 59:4, 62:4
**three** [6] - 11:9, 11:18, 15:18, 44:20, 48:22, 59:18
**TO** [1] - 62:14
**today** [12] - 7:14, 8:2, 8:7, 8:14, 8:16, 23:4, 23:17, 26:5, 26:21, 31:13, 46:17, 57:9
**together** [1] - 37:4
**TONY** [1] - 3:9
**took** [4] - 14:11, 17:20, 31:7, 41:12
**total** [1] - 44:20
**touched** [1] - 54:24
**transcript** [4] - 59:19, 59:24, 61:6, 61:8
**transfer** [1] - 19:23
**transplant** [2] - 48:20, 48:23
**Trial** [1] - 1:23
**trial** [1] - 4:12
**trouble** [2] - 41:23, 53:9
**true** [7] - 7:5, 7:6, 8:18, 31:24, 61:9, 61:11, 63:13
**trusted** [1] - 41:14
**trying** [1] - 57:13
**two** [1] - 35:24

**type** [1] - 6:16
**typically** [1] - 34:6

## U

**UEA** [1] - 1:18
**under** [4] - 16:20, 34:4, 56:23, 61:7
**Uniondale** [1] - 3:5
**UNITED** [1] - 1:2
**unmute** [1] - 39:15
**up** [5] - 13:17, 24:8, 32:12, 38:4, 39:12
**upset** [1] - 16:9
**URRUTIA** [2] - 1:4, 3:9
**Urrutia** [1] - 2:16
**usual** [1] - 34:8

## V

**vacuum** [1] - 37:2
**valve** [2] - 48:20, 48:23
**vast** [1] - 35:20
**via** [2] - 28:25, 29:14
**Videoconference** [1] - 1:21
**violating** [1] - 38:20
**violation** [1] - 34:20
**visit** [1] - 46:25
**visited** [2] - 47:8, 47:18
**visiting** [1] - 50:15
**visits** [2] - 11:18, 14:9
**voice** [1] - 5:12

## W

**Wagon** [1] - 20:11
**wait** [1] - 45:20
**waive** [1] - 5:10
**waived** [1] - 4:7
**Wantagh** [1] - 2:5
**ways** [1] - 59:18
**week** [1] - 31:22
**weeks** [2] - 47:20, 48:22
**WEIR** [1] - 2:19
**WERE** [1] - 62:18
**Westbury** [1] - 20:12
**WHEREOF** [1] - 63:20
**whys** [1] - 38:4
**WICKS** [25] - 29:15, 29:21, 29:24, 30:8, 30:14, 30:19, 30:25, 31:11, 31:17, 32:7, 32:15, 32:22, 33:2, 33:12, 33:18, 33:25, 34:11, 34:24, 35:3, 35:13, 36:10, 37:9,

38:3, 39:3, 39:7
**Wicks** [1] - 29:15
**Widener** [1] - 2:20
**withdraw** [2] - 7:20, 50:2
**withdrawn** [1] - 7:23
**WITNESS** [3] - 42:22, 62:3, 63:20
**witness** [11] - 5:21, 6:2, 27:24, 27:25, 28:8, 28:11, 33:8, 36:7, 36:25, 63:10, 63:14
**wonder** [1] - 35:22
**wondering** [1] - 35:24
**word** [1] - 45:22
**worries** [1] - 39:8
**wrongdoing** [5] - 40:18, 41:7, 43:16, 53:12, 53:20

## Y

**year** [7] - 6:20, 11:10, 11:13, 48:24, 48:25, 49:2, 49:5
**Year** [1] - 39:8
**years** [4] - 9:22, 10:21, 17:17, 35:25
**York** [11] - 1:25, 2:5, 2:12, 14:3, 19:23, 20:3, 20:7, 20:12, 48:18, 61:21, 63:8
**YORK** [2] - 1:2, 63:3
**yourself** [9] - 12:6, 24:11, 27:13, 36:16, 39:15, 41:6, 43:16, 52:22, 53:20

## Z

**ZIZMOR** [1] - 2:7
**Zoom** [4] - 28:25, 29:3, 29:7, 32:20
**zoom** [1] - 1:21