UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC,
ROBERT ANTHONY URRUTIA, 189 Sunrise HWY
AUTO LLC, NORTHSHORE MOTOR LEASING, LLC,
BRIAN CHABRIER, JOSHUA AARONSON, JORY
BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE
OF THE ESTATE OF DAVID BARON, 1581 HYLAN
BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC,
1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD
AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519
HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY
LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO
MANAGEMENT, LLC,

                              PLAINTIFFS,


                -against-        Case No:
                                2:23-cv-6188(JMW)


ANTHONY DEO, SARAH DEO, HARRY THOMASSON,
DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL
LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC
INC., GOLD COAST CARS OF SYOSSET LLC, GOLD
COAST CARS OF Sunrise LLC, GOLD COAST
MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST
MOTORS OF LIC LLC, GOLD COAST MOTORS OF
ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN
LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL
PARTNERS INC., JONES, LITTLE & CO., CPA'S
LLP, FLUSHING BANK, LIBERTAS FUNDING LLC,
J.P. MORGAN CHASE BANK, N.A., 189 Sunrise
HWY AUTO LLC, and NORTHSHORE MOTOR LEASING,
LLC,

                              DEFENDANTS.
----------------------------------------X
(Continues.)

**Page 2**

DATE:  March 30, 2026

TIME:  11:15 A.M

DEPOSITION of a Non-Party Witness, DANIEL O'SULLIVAN, taken by the Respective Parties, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, before Kim Draper, a Notary Public of the State of New York.

**Page 3**

A P P E A R A N C E S:

SAGE LEGAL LLC
    Attorneys for the Plaintiffs
    SUPERB MOTORS INC., TEAM AUTO SALES LLC
    And ROBERT ANTHONY URRUTIA
    18211 Jamaica Avenue
    Jamaica, New York 11423
    BY: EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
    Attorneys for the Plaintiffs
    189 Sunrise HWY AUTO LLC, NORTHSHORE
MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA
AARONSON, JORY BARON, ASAD KHAN, IRIS BARON
REPRESENTATIVE OF THE ESTATE OF DAVID
BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN
BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC,
1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD
AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK
STREET REALTY LLC, 446 ROUTE 23 AUTO LLC
and ISLAND AUTO MANAGEMENT, LLC
    420 Lexington Avenue, Suite 2320
    New York, New York 10170
    BY:  JEFFREY RUDERMAN, ESQ.

 WEIR LLP
    Attorneys for Defendant
    LIBERTAS FUNDING LLC
    1339 Chestnut Street, St 500
    Philadelphia, PA 19107
    BY: SUSAN VERBONITZ, ESQ.


    (Appearances continue.)

Page 4

MARWAHA LAW GROUP PLLC
    Attorneys for the Defendants
    ANTHONY DEO, SARAH DEO, DWIGHT
BLANKENSHIP, MARC MERCKLING, MICHAEL
LAURIE, CAR BUYERS NYC INC., GOLD COAST
CARS OF SYOSSET LLC, GOLD COAST CARS OF
Sunrise LLC, GOLD COAST MOTORS AUTOMOTIVE
GROUP LLC, GOLD COAST MOTORS OF LIC LLC,
GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST
MOTORS OF SMITHTOWN LLC,
    1539 Franklin Avenue, Suite 201
    Mineola, New York 11501
    BY:  NIPUN MARWAHA, ESQ.


HARRY R. THOMASSON, JR., ESQ.
    Attorney Pro Se for Defendant HARRY
    THOMASSON
    3280 Sunrise Highway, Suite Box 112
    Wantagh, New York 11793


CULLEN & DYKMAN, LLP
    Attorneys for the Defendant
    FLUSHING BANK
    333 Earle Ovington Boulevard
    Uniondale, New York 11553
    BY: ARIEL RONNEBURGER, ESQ.

ALSO PRESENT:
    Tony Urrutia
    Anthony Deo
    Sarah Deo
    Alivia Cooney


            *        *        *

**Page 5**

**F E D E R A L   S T I P U L A T I O N S**

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

D. O'SULLIVAN

D A N I E L   O S U L L I V A N, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. RUDERMAN:

Q.    Please state your name for the record.

A.    Daniel O'Sullivan.

Q.    What is your address?

A.    53 The Circle, Glen Head, New York 11545.

THE REPORTER: Mr. Thomasson, would you like a copy of today's transcript?

MR. THOMASSON:  I am not sure, I will let you know.

MS. RONNEBURGER: I will let you know also.

BY MR. RUDERMAN:

Q.    Good morning.

A.    Good morning.

Q.    My name is Jeff Ruderman.  I am an attorney with the firm of Cyruli, Shanks

D. O'SULLIVAN

and Zizmor.  We represent a group referred to as the Island Auto Group that are plaintiffs in a lawsuit, along with some other plaintiffs in connection with various matters including North Shore Motor Leasing and 189 Sunrise Auto.

We are here today to take your deposition pursuant to a subpoena, you did receive a subpoena from me, correct?

A.    Yes.

Q.    You're here in response to that subpoena?

A.    Correct.

Q.    Have you ever been deposed before?

A.    No.

Q.    Let me give you some of the ground rules for the deposition.  As you can see you were just sworn in, which means that everything that you say today is subject to perjury, subject to the penalty of perjury, so you have to tell the truth, you understand that?

A.    Yes.

D. O'SULLIVAN

Q.     All of my questions will be oral to you, and we need a verbal response because the court reporter can't take down and answer that might be a nod or a shrug.

A.     Yes.

Q.     I ask that you wait until I complete my question before you answer because the reporter can only take down one of us speaking at a time.

We want to make sure there's a clean record, so you wait till I finish and then you can answer the question.

A.     Okay.

Q.     During the deposition somebody might raise an objection to the question, even if they raise an objection, you're still supposed to answer the question to your best of you ability.  The objection will be for the record.

You shouldn't have anybody directing you not to answer, if they do, we'll deal with that.  Presumably any other objection is for the record, but then after the objection just answer the question to

D. O'SULLIVAN

the best of your ability.  Do you understand that?

A.    Yes.

Q.    If you don't understand any of my questions, let me know and I'll try to rephrase the question so that you do understand, okay?

A.    Yes.

Q.    If you do answer a question, I will assume you understood the question that I asked.

Is there any reason why you would not be able to answer any questions truthfully here today?

A.    No, I don't think so.

Q.    Mr. O'Sullivan, are you employed?

A.    No.

Q.    Are you retired?

A.    Yes.

Q.    When did you retire?

A.    Two years ago right after North Shore went out of business.

Q.    Was North Shore the last place

D. O'SULLIVAN

you worked at?

A.    No, I worked at Millennium Toyota, about a year and a half two years ago.

Q.    Where is that?

A.    New Hempstead.

Q.    Are the principals of Millennium Toyota in any way related --

A.    No.

Q.    You have to let me finish the question.  I know that you know the question that I'm asking, just to make a clear record.

A.    Okay.

Q.    Are the principals of Millennium Toyota, as far as you know in any way related to the Island Auto Group?

A.    No.

Q.    Do you know if they are related to Anthony or Sarah Deo?

A.    No.

Q.    Do you know who Anthony Urrutia is?

A.    No.

D. O'SULLIVAN

Q.    Are any of the managers or anyone employed Millennium Toyota anybody who used to work at North Shore Motor or Sunrise?

A.    No, but the person that did the advertising for Millennium Toyota, also did some advertising for North Shore Motors.

Q.    Just to be clear, when we talk about North Shore Motors, we are talking about North Shore Motor Leasing which was located on Michael Drive?

A.    Right.

Q.    If I mention Sunrise, I am talking about 189 Sunrise Auto, which is located on Sunrise?

A.    Right, yes.

Q.    How did you go about obtaining your last position with Toyota?

A.    I answered an ad.

Q.    So, you did not know anybody there?

A.    No.

Q.    You worked there from approximately when?

D. O'SULLIVAN

A.    A year and a half, two years.

Q.    Can you give an approximate start date, what year?

A.    It was from June or July till probably the following year and a half January.  I think that it is was a year to a year and a half.

Q.    In 2023, when you started?

A.    Correct, no, 2022, I think.

Q.    When you say you started working there after, after North Shore went out of business?

A.    Yes.

Q.    Do you know when North Shore when out of business?

A.    When we closed up the place.

Q.    Do you know what month was that was in?

A.    I honestly forgot.  I don't do you remember.

Q.    Do you remember if it was during the summer months or the spring?

A.    To be honest I really don't.

Q.    When you left Millennium

D. O'SULLIVAN

Toyota, it was cause you decided to retire?

A.    Yes.

Q.    How old are you?

A.    83.

Q.    Do you have any education after high school?

A.    One year of college.

Q.    Where was what?

A.    Nassau Community.

Q.    Do you have any certifications of any kind?

A.    Not really, no.

Q.    I do not want to go back for your entire career what you did.

But certainly you have been involved in the automobile business for a long time, correct?

A.    Correct.

Q.    When was your first job involved in the automobile business?

A.    I was 23 years old.

Q.    How did you get involved working in the automobile business at that time?

Page 14

D. O'SULLIVAN

A.    I was work at Cadillac Great Neck that eventually closed.  I somehow got a job and at Port Motors.

Q.    Where is that located?

A.    In Roslyn.

Q.    What type of dealership was that?

A.    That was a Lincoln Mercury dealership.

Q.    Approximately when --

A.    I think it was like 25 at the time.

Q.    What was your, do you know who the principals were the Lincoln Mercury?

A.    Morris Baron and Bernard Cohen.

Q.    Do you know if Morris Baron is related to David Baron?

A.    His father.

Q.    At Millennium Toyota what was your position there?

A.    I was bookkeeper, posting deals.

Q.    Your last job at North Shore, what was that position?

D. O'SULLIVAN

A.    I was at controller there.

Q.    Between working, you started your job at Lincoln Mercury in Roslyn?

A.    Yes.

Q.    Then you had a job at North Shore.

A.    Yes.

Q.    Did you have any other jobs in between those jobs?

A.    No.

Q.    You started worked for Lincoln Mercury Motors all the way until you started working for North Shore?

A.    Yes.

Q.    When you started at North Shore --

A.    Actually, Port Motors went out of the business, so David Baron had me work at North Shore when they went out of business.

Q.    You started to work at North Shore after Port Motors went out of business, right?

A.    Right.

Page 16

D. O'SULLIVAN

Q.    You started at Port Motors when were you 25?

A.    Yes.

Q.    You worked at Port Motors from --

A.    I worked there at least 40 years.

Q.    The last position -- what was your position at North Shore?

A.    I was the controller at North Shore.

Q.    What was your last position at Port Motors?

A.    Controller.

Q.    How long were you the controller at Port Motors?

A.    25 or 30 years.

Q.    For the last 25 or 30 years you were controller?

A.    Correct.

Q.    You worked at North Shore Motors as controller?

A.    Yes.

Q.    Then until they closed?

Page 17

D. O'SULLIVAN

A.    Right.

Q.    Then you went to work as a bookkeeper at Millennium Toyota?

A.    Yes.

Q.    How did you come about to become a controller over at Port Motors?

A.    I worked my way up from the bookkeeper to controller job.

Q.    Was there specific training that you achieved in order to do that?

A.    Yes, from the controller that was at Port Motors to begin with.

Q.    Did that --

A.    It was --

Q.    Let me finish.  What was his name?

A.    Teddy Westerman.

Q.    What was his name?

A.    Teddy Westerman.

Q.    He was the controller at the time that you were the bookkeeper?

A.    Correct.

Q.    At some point you received training to become the controller?

D. O'SULLIVAN

A.      Yes.

Q.      Was Mr. Westerman retiring?

A.      Yes.

Q.      Did he provide you that training?

A.      Yes, he did.

Q.      As a result of the training that he gave you became the controller at Port Motors?

A.      Yes.

Q.      You were the controller there until it closed?

A.      Correct.

Q.      Other than receiving your training from Teddy Westerman, from the time you started until the time that you left Port Motors, did you receive any additional training or additional information about the job as controller, other than just work experience?

A.      No.

Q.      Did the position of controller change, the general position of what a controller does, did it change in any way

D. O'SULLIVAN

from the time that you started until the time that it closed?

A.    No.

Q.    Was your position at North Shore Motors as the controller, was it different than the controllers position in any material way from Port Motors and --

THE REPORTER.

A.    Okay.  Mr. Ruderman there is a court reporter here taking down everything.

You are having a conversation forgetting I am here.

MR. RUDERMAN.

A.    Not a problem.

Q.    Can you describe generally what the position that you had as controller, what did you do?

A.    I was the, well, the main job was financial statement, making sure the schedules are correct, making all the posting was done, making sure all of the deals were correct, paying the taxes the sales taxes, pay all taxes, all of that stuff.

Page 20

D. O'SULLIVAN

Q.   As controller, would you also be responsible to, it would it be your job to actually pay the bills of the dealership?

A.   Well, we actually had a -- at North Shore Motors and Sunrise I actually paid the bills, until we hired a girl that helped do that.

At Port Motors we had many more people working for me, so, some of the girls were paying the bills, I wasn't paying the bills per se.

Q.   As the controller for Port Motors -- are you familiar with what a DMS system is, a dealer management system?

A.   Partially a little bit.

Q.   What is your understanding?

A.   I heard the term, not really understanding I did not really have training for it.

Q.   Do you know if Port Motors had a dealer a DMS system?

A.   I don't think so, no.

Q.   Have you ever heard the term

Page 21

                    D. O'SULLIVAN

Dealer Track?

        A.      Yes.

        Q.      Do you understand that to mean
something different than DMS?

        A.      Yeah.  Well, yes.  A Dealer
Track is an accounting system.

        Q.      Okay and --

        A.      I'm not sure what DMS is.

        Q.      So you're familiar with Dealer
Track?

        A.      Correct.

        Q.      What is your understanding as
to what Dealer Track is?

        A.      It's a software company that
does the accounting for dealerships.

        Q.      In your position as controller
at Port Motors, were you involved in the
Dealer Track system?

        A.      No, they had -- we had Reynolds
and Reynolds at Port Motors, Dealer Track
was at Sunrise.

        Q.      Okay.  So Port Motors -- are
the systems similar what they do?

        A.      Pretty similar, yes.

D. O'SULLIVAN

Q.    Using Reynolds and Reynolds at Port Motors what involvement did you have in that system, what did you do in connection with the system?

A.    I would be printing off the financial statement mostly with that.

Q.    Would you be inputting information into the --

A.    Yes, I would be putting.

Q.    You would be --

A.    Yes, I would be inputting information, yes.

Q.    What type of information would you be putting into the system?

A.    Sometimes I would do some of the deals that go into the system.  Mostly the girls would do the posting, but I would take some deals off of the system when you got paid for finance deals, I would do some of that tracking.

Q.    There were a lot of employees, I guess over at Port Motors?

A.    Yes.

Q.    And they did a lot of the --

Page 23

D. O'SULLIVAN

A.    Yes.

Q.    -- they did a number of functions that you didn't have that type of support over at when you worked for North Shore?

A.    Correct.

Q.    When you were over at Port Motors, a deal to get done, you have a lot of steps to it, correct?

A.    Correct.

Q.    It starts at the salesperson position?

A.    Right.

Q.    Certain information is put in connection with sales.  As controller at Port Motors, when did you became involved in any particular transaction, now get paperwork related to that transaction?

A.    If one of the girls was sick, at Port Motors it was much more of a management position.

At North Shore Motors it was much more of a hands on position, paying the bills, stuff like that, paying the

Page 24

D. O'SULLIVAN

taxes and stuff like that.

Q.    Can you describe generally what you did at Port Motors, just at Port Motors, what was your duties and responsibilities?

A.    It was meeting with the owners, forecasting business for the next month, setting up budgets and schedules for the coming months.

Q.    Typically you would not be putting information into the Reynolds and Reynolds system?

A.    Not on a regular basis, no.

Q.    What about getting information out of the Reynolds and Reynolds system?

A.    Yes, every day take information out of it.

Q.    What type of information would you take out on a daily basis?

A.    What I had to see to -- for the forecast for the next month.  What was going on.  How the deals were structured. If they were correct, before the customer would get the car.

D. O'SULLIVAN

Q.    What did do you with the information that you got off Reynolds and Reynolds system; would you discuss that with somebody?

A.    I would discuss it with David Baron, who was the owner.

Q.    Do you know when -- did David over the running of the operation at Port Motors?

A.    Yes, he did, when his father got a little bit older.  Otherwise, Mr. David's father was in charge.

Q.    When did David are started taking over?

A.    When Morris decided to semi retired, David took over.

Q.    How long before Port Motors closed, was it more than ten years?

A.    Yes.

Q.    Was it more than 15 years?

A.    No, about ten or 12 years.

Q.    At least ten or 12 years or the last years of Port Motors, David Baron was running the operations?

Page 26

D. O'SULLIVAN

A.    Yes.

Q.    Was he there on a regular basis?

A.    Every day.

Q.    Do you know if he had any other dealerships?

A.    Yes, Baron Nissan and a couple of used car lots, couple car dealerships in Yonkers and around the Island.

Q.    When you were at Port Motors did you see David on a regular basis?

A.    Every day.

Q.    Did you interact with them every day?

A.    Every day.

Q.    What were the general reasons you would meet with him on a regular basis?

A.    To discuss business, what was going in the business.  Discuss what was going on, how to pay the bills.

Q.    Were you involved in cash flow analysis; do you understand that?

A.    Yes.

Q.    What do you understand cash

Page 27

D. O'SULLIVAN

flow analysis to --

A.    To find out what's coming in and what's going out.

Q.    When you say what is coming in, where is money coming from in a dealership?

A.    Money comes from all of the sales, of the parts and services, the major money is from the sales of the cars.

Q.    Is that money coming in typically, as soon as the car is sold or is there some delay or?

A.    As soon as the car is sold, we would -- if it was a finance deal we would send the money to the bank, and a day or two later they would transpire the rest of the money, if it was a cash deal the person would give us a certified check and we just deposit the check.

Q.    If the person buying the car was financing that car --

A.    Yeah.

Q.    -- what would be involved in you getting the money for the car that was just sold?

Page 28

D. O'SULLIVAN

A.    I don't understand.

Q.    How would you go -- how would the dealer should go about getting paid by the lender for the car that was gonna be sold through financing?

A.    We had to Fed Ex of the paperwork to the lender.

Q.    Do you know what --

A.    Finance papers, motor vehicle, all they wanted all of the back up, who the title was registered to, all of that.  The lender wanted all that information.

Q.    Do you recall what lenders you typically worked with?

A.    So long ago now.  I don't remember.

Q.    Also you said the paperwork, when you were doing, were working at Port Motors, it was physical papers that were you sending out to the --

A.    Finance contracts, yes.

Q.    Did they have electronic means at time?

A.    Not in the beginning, at the

Page 29

D. O'SULLIVAN

end I think that we had some, yes.

Q.    What involvement did you have at all, getting to the point where the documents were already going out to the lender?

A.    I would look at the -- I would look at all of the paperwork before we sent it out to the lender.

Q.    But you weren't involved in getting any of the paperwork?

A.    No, the salesmen would bring the paperwork into the office.  Then the girls would like to check it over, that I would look at it and send it off to the finance company.

Q.    There was also a department that handled getting -- make sure insurance was taken care of?

A.    Yes.

Q.    You were getting hopefully a complete package to send to the lender?

A.    Correct.

Q.    You make sure it is accurate and complete?

Page 30

D. O'SULLIVAN

A.    Accurate and signed.

Q.    You would make sure that it got sent to the lender?

A.    Correct.

Q.    It got sent to the lender, what would happen next?

A.    They would either send us a check or say you're missing something send it to me, and then I'll -- then we'll pay you.

Q.    Your recollection, most of the time they were actually sending checks, were they sending wires towards the end of your time there or?

A.    Towards the end it was wires, in the beginning it was checks.

Q.    Now, also when cars that were purchased, Port Motors was a new vehicle franchise dealership for Lincoln Mercury, correct?

A.    Yes.

Q.    Did they also sell used cars?

A.    Yes.

Q.    They had inventory and there

Page 31

D. O'SULLIVAN

were used cars there?

A.    Yes.

Q.    Do you know how the dealership obtained it, did they borrow money, a floor plan?

A.    It was a floor plan, we would go to the auction, we had a pre-set floor plan at the auction.  If we wanted to buy a 2010 Toyota, we just but in a bid for it and they would just give us the car because we already --

Q.    For used cars?

A.    Yes.

Q.    New cars you get from the manufacturer?

A.    Correct.

Q.    Was that also pursuant to the papers for the floor plan?

A.    Yes.

Q.    Was the floor plan for new and used cars the same --

A.    Same lender, yes.

Q.    They have different plans?

A.    Correct.

Page 32

D. O'SULLIVAN

Q.    Who the lender, if you remember?

A.    It was Lincoln Mercury I think, it was --

Q.    Was it Ford Motor Credit?

A.    Yes, Ford Motor Credit, yes.

Q.    When a vehicle was purchased using the floor plan credit, when did that vehicle need to be paid off?

A.    When it was sold.

Q.    So until then, what did the dealership have to do about the money that it had borrowed?

A.    Just accrue interest.

Q.    Did it pay interest on a monthly basis?

A.    Yes, for the first 90 days Lincoln Mercury paid you interest -- interest relief.

Q.    They gave you a 90 day grace period without charging interest?

A.    Right -- no.  Wait, yes.

Q.    After that you to start paying interest?

Page 33

D. O'SULLIVAN

A.    Yes.

Q.    Interest only on a monthly basis?

A.    On the new cars, not used cars.

Q.    Was it different on the used cars?

A.    Yes, you paid interest from day one on the used cars.

Q.    When the car got sold you had to pay off the floor plan?

A.    Correct.

Q.    Do you recall how long from the date that the cars was sold you have to pay back the floor plan?

A.    The next day.

Q.    Were you involved at Port Motors with regard to making sure that the floor plan was paid off when the car was sold?

A.    Yes.

Q.    What was your involvement in that process?

A.    As soon as the car was sold and purchased and sold and we -- we got funded

Page 34

D. O'SULLIVAN

and were told to pay the car off.

Q.    If I understand your description before, it might be a few days before you got funded?

A.    Yes.

Q.    On the sale of the car?

A.    Yes.

Q.    So, would you wait until you got funded before you paid off the floor plan lender?

A.    Yes.  We sold the car on a Monday and we got paid on a Thursday, we got paid from the finance company on a Thursday, the car was paid off Thursday or Friday.

Q.    You said sometimes, if something wasn't a 100 percent when it got to the lender, they may call you up and say you're missing a document, correct?

A.    Correct.

Q.    That might delay the funding?

A.    Correct.

Q.    If the funding were delayed, would that delay the payoff to the floor

Page 35

D. O'SULLIVAN

plan lender?

A.    Yes, we wouldn't pay off the car until we got funding or got paid from the customer loans, yeah.

Q.    You worked almost your entire career at Port Motors, right?

A.    Yes.

Q.    Do you know if other dealerships worked pretty much the same way that you were working?

A.    As far as I know they all work the same way.

Q.    At Port Motors the pay off that was actually made to the floor plan, you did not physically write the checks or a wire, someone did that?

A.    Yes, we paid electronically.

Q.    Were you involved in the authorization process to get that?

A.    Yes.

Q.    How so?

A.    I would actually sometimes most -- mostly pay the car off myself, to make sure that it was paid.

Page 36

D. O'SULLIVAN

Q.    How would you go about doing that at Port Motors?

A.    Easy, electronically or send a check.

Q.    You personally would make sure that that was done?

A.    Correct.

Q.    Did you have -- what either system, what system did you have in place to make sure that all the cars are being paid off on a timely basis for the --

A.    As soon as we were paid from the floor plan or a certified checks from a customer, that car was paid off.

Q.    How did you know what cars, had you had an inventory that were on the floor plans?

A.    There is a schedule made up when you post a deal, there is a schedule made up of the cars that are due to be paid from ABC finance company.  As soon as -- then we pay the car off.

Q.    Was all of this information kept in that Reynolds and Reynolds system?

D. O'SULLIVAN

A.    Yes.

Q.    If you wanted to see how many cars we have in inventory that are still subject to floor plan financing you just go --

A.    No, there is a separate new and car and used car inventory schedule and there is a separate schedule for when a deal is posted, it goes to money due from ABC company, whatever, it would be separate schedules for what's in inventory and what is paid and due to be paid off.

Q.    Did you, was it your responsibility to look at that inventory schedule on any regular basis?

A.    Every day.

Q.    So, that's one of the things you did everyday?

A.    Yes.

Q.    What do we still have in inventory, what are we paying?

A.    Everyday.

Q.    Everyday?

A.    Yes.

Page 38

D. O'SULLIVAN

Q.    What do we have in inventory and what are we paying?

A.    Every day.

Q.    You went over that with David Baron?

A.    Correct.

Q.    Would you also get every day a schedule of deals that had closed?

A.    Yes.

Q.    Would that those show those deals that you're waiting on financing?

A.    Once a deal is posted, it comes off of the inventory schedule and goes onto the due from the finance company schedule, the amount.

Q.    So, if a car comes off of the inventory schedule because the deal has been posted?

A.    Right.

Q.    It goes onto the waiting for financing?

A.    Right.

Q.    Do you know by seeing that, that this car needs to be paid off to the

Page 39

D. O'SULLIVAN

finance company?

    A.    Yes, on the new cars inventory schedule, it shows inventory and it shows what is due to the finance company.

         Once deal is posted it comes off of the inventory schedule, what is due to the finance company on the inventory schedule stays there and then the dealership -- the other schedule goes when the deal is posted, what is due from --

    Q.    What is due to the lender?

    A.    What is due to the lender.

    Q.    Whose responsibility was to make sure, 'cause there is two parts to that transaction, right, you got money coming from in the sale, you got money that has to go out to pay the lender?

    A.    Right.

    Q.    Is it fair to say that somebody needs to look and make sure that it matches?

    A.    I did that all of time.

    Q.    Just across the board when the money got paid, you paid off the lender?

Page 40

D. O'SULLIVAN

A.    Correct.

Q.    Whose responsibility was it to make sure, why is this not, why are we not getting funded?

A.    If we were not funded in four or five days, I would find out why, what was missing, call them up, if they didn't give us a return, some piece of paperwork was missing or something.

Q.    Did you need to go to David Baron and say, we have open deals here?

A.    No.

Q.    It is just a standing order, this is what you do?

A.    Yes.

Q.    Were there any situation where you recall where you might have had to go to David Baron for a matter relating to getting paid or paying off vehicle?

A.    I had might have had to ask him why we didn't get paid, but normally, no.

Q.    These scheduled that you are referring to, were they printed every day?

A.    Yes.

Page 41

D. O'SULLIVAN

Q.    You would sit and there go over things?

A.    Yes.

Q.    What about trade vehicles that came in on a car, you are familiar with cars that come in that are traded in?

A.    The trade in car would go to the used car inventory schedule.

Q.    If someone traded in a car, that car is a used car, correct?

A.    Correct.

Q.    You are saying it was a separate schedule?

A.    Yes.

Q.    Would that be a schedule for car that you would have purchased at an auction?

A.    Yes.

Q.    You have one used car schedule, whether it was bought at auction?

A.    Well, there is a new car schedule that would show inventory and/or money due to the lender.

There was a used car schedule

Page 42

D. O'SULLIVAN

that would show inventory and if we financed it, it might -- it would show to the lender.

Q.    The floor plan?

A.    The floor plan, right.

Q.    On that schedule of used cars, whether it was financed or not financed, it would all have all the cars, whether it was purchased at an auction or whether it came in as a trade?

A.    Correct.

Q.    Were there cars that you took in as a trade that you did not keep and put onto inventory, if you know?

A.    I don't understand.

Q.    Somebody may have traded in a car and the dealership didn't want to keep it?

A.    Then they would not trade it in.

Q.    They didn't take a cars that they just wholesaled out?

A.    Yes, we did.  We didn't take a trade in we didn't want.

Page 43

D. O'SULLIVAN

Q.    If you took in a car in trade, you might get rid of shortly thereafter at wholesale and --

A.    Either retail or wholesale it out the same day, if it was a piece of junk car --

Q.    Irrespective, any cars that came in went on the inventory of schedules?

A.    Yes.

Q.    Even if it sold at auction two days later, it went on that list?

A.    Right, if we purchase the car at auction, you came in and wanted to sell us a car, I would give you a check and automatically go onto the schedule.

Q.    That schedule got all used cars, whatever source it came from?

A.    Used cars did, new cars were separate.

Q.    On that schedule was also any financing that may have been associated with the purchase of that vehicle?

A.    Yes.

Q.    Then when the car got sold with

Page 44

D. O'SULLIVAN

similarly, if that car got sold, was there a different process in paying off used cars?

A.    No.

Q.    As the new cars?

A.    Same process.

Q.    Every day are you looking at that schedule?

A.    Yes, every day.

Q.    If it was financed from a new lender you would be waiting for the money to come in before you --

A.    Correct.

Q.    If a vehicle came that was being traded in, but there was still money owed by the owner trading it in to their old finance company; how was that handled?

A.    If it was financed, if the deal was financed, we would pay the car off, pay the trade car off, as soon as we got funded and we paid the new car off at the same time.

Q.    If there was a delay in getting funded by the new lender, you would still

Page 45

D. O'SULLIVAN

wait until you got those funds before you paid off the traded in old financing?

A.    Yes.

Q.    Do you recall any situations where that's a considerably long amount of time?

A.    Very rare, very rare.

Q.    Was the process of paying off traded in vehicles, automatic, you just paid it off a day or two after you got the funding?

A.    Absolutely.

Q.    I think we started off a discussion about cash flow.  Is that part of a cash flow equation that was looked at?

A.    Yes.

Q.    How is cash flow, if you know, was it important to the owners of Port Motors?

MR. THOMASSON:  Objection.  Can you tell me which dealership we are talking about?

MR. RUDERMAN:  I said Port Motors.

Page 46

D. O'SULLIVAN

MR. THOMASSON:  Thank you.

BY MR. RUDERMAN:

Q.    The question is, how is cash flow important to the operation of Port Motors, if you understand, if you know the answer?

A.    Mr. Baron was very adamant about paying cars off right away and depositing the money.

Q.    Do you know why that was so important to him?

A.    That was just his nature, the way he was.

Q.    When you worked at Port Motors, did you report to anyone other than David Baron or his father?

A.    I reported to both of them.

Q.    You didn't report to anybody else?

A.    No.

Q.    They were your supervisors and bosses?

A.    No, when I was a controller I reported to them, when I was a bookkeeper I

Page 47

D. O'SULLIVAN

reported to Teddy Westerman.

Q.    Once you were the controller that's who you reported to?

A.    Just the two of them, yes.

Q.    If they told you to do something, would you just do that or would you question if you thought it was wrong?

A.    I would question him -- he really did not do many things wrong.

Q.    By the way, do you know why Port Motors closed?

A.    When David's father died, David and Ronnie and Michael Cohen, they were like the owners really, but David was running the place.  They decided they were going to make more money with the rent than the dealership.

Q.    Did they sell the dealership?

A.    No, they closed the dealership, they got money from Lincoln Mercury to close the dealership.  Then they got $45,000 or $50,000 a month rent.

Q.    It was no longer a Lincoln Mercury dealership?

Page 48

D. O'SULLIVAN

A.    No, not in Roslyn.  They closed it.

Q.    At that point in time when they were closing, David said what to you about your position?

A.    He said, I am closing the place I will put you someplace else.

Q.    What was the next job that you had after Port Motors closed?

A.    Put me down as North Shore.

Q.    Do you recall approximately when that was?

A.    A little bit right after they closed.

Q.    Any idea what year that might have been?

A.    I forget.

Q.    Before you started work, did you take the job at North Shore?

A.    I always did what David said.

Q.    Before you started working at North Shore did you go down to be shown the operations, what the place looks like?

A.    Yes, Brian Chabrier took me

D. O'SULLIVAN

down to North Shore where I working.

Actual before that, before I went to North Shore I actually worked in one of David's used cars places, and then from there he had me go to North Shore, because they had some problems.  The controller, Melissa wanted to leave, so he wanted me to take her place.

Q.    Do you recall approximately how long that you worked at the used car dealer?

A.    A year or a year and a half.

Q.    After that David said that Melissa was the controller at North Shore and she wanted to leave?

A.    Yes, Melissa was the controller at Best Ford, David's Ford dealership, and was the controller at North Shore and at 189 Sunrise.  It was getting a little bit too much for her, she wanted to stop. David wanted me to take her place at North Shore and Sunrise.

Q.    Again, you do not recall when that was?

Page 50

D. O'SULLIVAN

A.    A couple of years ago.

Q.    Then, so Brian Chabrier brought to you North Shore before you started working?

A.    No, David it.

Q.    David did?

A.    Brian took me to Couppauge where the used car was place was, showed me that place and then we had a meeting at Brian's office and David said I want you to go to North Shore, and leave the used car office.  We will get somebody else I want you to go to North Shore.

Q.    Brian Chabrier, where was he working at the time?

A.    He was working at Baron Nissan.

Q.    Which is located where?

A.    In Greenvale, New York.

Q.    Had you dealt with Brian before that day?

A.    I knew Brian for 20 years.

Q.    Do you know what Brian's position was at the Baron Nissan?

A.    The general manager.

Page 51

D. O'SULLIVAN

Q.    David comes to you and says it is too much for Melissa to be working at --

A.    Best Ford.

Q.    -- at Best Ford and the two used car dealerships and he asked you to step in as controller?

A.    Yes.

Q.    Did you think about it, did you say, sure David whatever you want, what did you say?

A.    I said David I don't really want to do it, but if you want me to, I will.

Q.    Were you already looking to retire at that time?

A.    No, not at all.

Q.    Did David bring you to take a look at the operation before you started?

A.    Yes.

Q.    Do you recall when that was?

A.    Not really, a couple of years ago.

Q.    You drove with David together to the dealership?

Page 52

D. O'SULLIVAN

A.    Yeah.

Q.    Do you recall that first meeting, that first time?

A.    Recall what?

Q.    Do you recall going there and walking around?

A.    Yes.

Q.    That first time that you were there, what happened, what did he show you?

A.    He introduced me to Anthony and Sarah, whatever other there people were there. Melissa was there, Anthony and Sarah. Melissa, she stayed for a while to show me you all of ropes of what they were doing there.

Q.    Did David tell you what his relationship was to North Shore?

A.    He said that he was the owner, one of the owners.

Q.    What about Sunrise, did he say anything about his relationship to Sunrise?

A.    Just one the owners.

Q.    What did he say, what was Anthony's position?

D. O'SULLIVAN

A.    I thought that he was one of the owners too.

Q.    Did he say that or you just said assumed that?

A.    I assumed that.

Q.    What about Sarah, what did you think her relationship was?

A.    She was not an owner.

Q.    When you first went there and they showed you the dealership, did they tell you what your role would you?

A.    Controller, you know, I took Melissa's place.

Q.    Did they explain to you what that position entails?

Let me back up.  My understanding from your prior testimony your job at Port Motors was much different than what you ended up having to do at North Shore and Sunrise?

A.    Yes.

Q.    Did you know when you went in that it would be much different?

A.    Yes.

Page 54

D. O'SULLIVAN

Q.    What is it that they told you you would be doing at North Shore and Sunrise; what would be your job functions?

A.    The same job, just more hands on at North Shore.  I would not have three or four girls working for me.

Q.    When they showed you the location, did they show you an office that would you be working in?

A.    Yes.

Q.    Did you have your own office?

A.    Yes and no, it was shared with somebody.

Q.    Do you remember who it was shared with?

A.    I forget the girl's name.

Q.    Do you know her job responsibilities were?

A.    She was like a biller and did some of the posting.

Q.    Do you recall your first day on the job going to North Shore?

A.    Not really, no.

Q.    When you started working at

D. O'SULLIVAN

North Shore, you worked in that office primarily?

A.    Yes.

Q.    Who else was working there at the time, you don't know have to give me every name, generally, what other positions did you see?

A.    Anthony was there, Sarah was there, Frank was the finance guy.  He was there every day.  There was three or four salesmen.  It was a receptionist.

Q.    Do you know or what would you say Anthony's role was at the store?

A.    He was the boss.

Q.    What was Sarah's role?

A.    She worked, you know, did stuff, I don't know, she did whatever she wanted to, I guess.

Q.    You are not sure what her job function was there?

A.    Not really, no.

Q.    Was there a mechanic shop?

A.    There was one mechanic, yes.

Q.    Do you remember his name?

Page 56

D. O'SULLIVAN

A.     No.

Q.     Did you have any interaction with him?

A.     I talked to him a lot, yes.

Q.     You said there was a receptionist?

A.     Yes.

Q.     That person's job was primary to answer phones or something else?

A.     No answer phone.

Q.     You said Frank?

A.     He was at finance man.

Q.     Do you recall his last name?

A.     Ventiliglia.

Q.     Had you known Frank before?

A.     No.

Q.     Did you know anyone at that dealership before you started working there?

A.     No.

Q.     When you started working there, so you had a desk?

A.     Yes.

Q.     Did you have a computer?

Page 57

D. O'SULLIVAN

A.    Yes.

Q.    Do you know what that computer was hooked into on a system basis?

A.    It was a dealer system.

Q.    Was it, in your mind their version of the Reynolds system that you had at Port Motors?

A.    It was but it wasn't as fancy as the Reynolds and Reynolds system.

Q.    So now you said you weren't -- you didn't really work with the Reynolds system so much, more just got information, correct?

A.    No, I worked the system, I new posting and stuff like that, yes.

Q.    If had you to post things in the Reynolds would you have been able to do that?

A.    Absolutely.

Q.    If you needed to pay bills, even though you didn't do that normally at Port Motors would you able do that?

A.    Absolutely, I used to do it.

Q.    You were the bookkeeper, right?

Page 58

D. O'SULLIVAN

A.    Yes.

Q.    When you came into North Shore, were you able to step in and do that or did you need some training to learn their system?

A.    I did get some training 'cause I wasn't familiar with it, but they had Dealer Track system over at used car lot. So, I knew a little bit about it.

Actually, it was a different -- I remember it was a different system in Copiapauge.

Q.    It wasn't Dealer Track but it was some other system?

A.    I think it -- yeah, I think it was another system, yes.

Q.    You said somebody did provide you --

A.    Melissa did train me a lot on Dealer Track in North Shore, yes.

Q.    So she was in the dealership with you?

A.    Correct.

Q.    For about how long?

D. O'SULLIVAN

A.    A couple of months.

Q.    After that she went back to full time she went --

A.    Back to Best Ford.

Q.    Was she available for you if you have questions afterwards?

A.    Yes.

Q.    Do you recall ever having to go to her questions?

A.    Yes.

Q.    In the Dealer Track system at North Shore, as far as you know did that contain all the financial information related to the dealership?

A.    Yes.

Q.    Would that include car sales?

A.    Correct.

Q.    Inventory?

A.    Correct.

Q.    By the way North Shore and Sunrise were only used cars, correct?

A.    Correct.

Q.    Would it include floor plan financing?

Page 60

D. O'SULLIVAN

A.    Yes.

Q.    Would it include payroll?

A.    Yes.  Payroll was done by ADP.

Q.    So pay or payroll that was handled that outside companies?

A.    They would debit our checking account like $80 or $90 a month for the fee.

Q.    And they would handle it.

A.    I call in the payroll into them they and they processed all payroll.

Q.    You were just responsible to make sure that the gross number that was needed for payroll was in the account?

A.    Correct.

Q.    Was there a separate payroll account, if you know?

A.    No.

Q.    That came out of the general operating account?

A.    Yes.

Q.    Do you know how many bank accounts North Shore had?

A.    I think two or three.

Page 61

D. O'SULLIVAN

Q.    Do you know what the differences were in those accounts?

A.    One was a main account and the others were small accounts.

Q.    Do you know why they had these other small accounts?

A.    Supposedly one was a motor vehicle account, one was a general account.

Q.    Did you use those other accounts much?

A.    A little bit.

Q.    Most of it was done in the main account?

A.    Yes.

Q.    When a sale was made for a vehicle, that was the account where the money from the sale to come into?

A.    Well, if the car was paid by cash or check or from a finance company, that would go into the main account.

Q.    To pay floor plan financing that would come out of the main account typically?

A.    That would come out of the main

Page 62

D. O'SULLIVAN

account, correct?

Q.    What about a regular bills?

A.    Main account.

Q.    Do you recall if North Shore had a floor plan finance company?

A.    Yes.

Q.    What was that company that?

A.    I forget.

Q.    If I told you can it was Ally Bank?

A.    Yes.

Q.    Do you know if there were any other floor plan finance companies that North Shore worked with?

A.    No.

Q.    What about companies that provided financing for customers, did they have relationship with any of those types of lenders?

A.    I don't know what you mean.

Q.    Let's say a customer came in and wanted to buy a car and they needed to finance it, would the dealership arrange to help him get that financing?

Page 63

D. O'SULLIVAN

A.    That was Frank's job.  We had three or four banks that he would go to. If you didn't qualify at bank one, he would go to bank number two or bank number three to get the merchant qualified.

Q.    Do you know what banks those bank were?

A.    It was Chase, it was Ally, it was a couple of others.

Q.    When you were at North Shore did you ever see any agreements between North Shore or Sunrise and Chase or Ally or any of those companies that were providing financing to customers?

A.    No.

Q.    When you were at the dealerships did you ever see any agreements between North Shore or Sunrise and Ally that provided the floor plan financing?

A.    No, were I would -- we would already be associated with Ally or Ford Motor Credit or whatever it was, I wouldn't have to see the agreement.  It was already established.

Page 64

D. O'SULLIVAN

Q.    Do you know if there was an amount, maximum amount that Ally provided floor plan --

A.    Yes.

Q.    For either Sunrise or North Shore?

A.    Yes.

Q.    Do you know what those numbers were?

A.    I think it was three or four million.

Q.    Each or combined?

A.    No, I think it was three million for the used cars, it was only used cars.

Q.    Did Sunrise have its own line with Ally?

A.    Yes.

Q.    Did North Shore have three million and Sunrise had three million?

A.    I think it was three million combined for the total of both.

Q.    Okay.

A.    Even though they were separate

D. O'SULLIVAN

lines.

Q.   What do you base that recollection on, how much the credit line was?

A.   I think they Anthony told me, I am not sure.

Q.   You never saw any documents that you can recall?

A.   No.

Q.   Do you recall a situation where there was not enough funding available to purchase new inventory?

A.   There's no new inventory at North Shore, it was used.

Q.   Additional inventory --

A.   Used cars.

Q.   Let me rephrase the question. Do you recall whether a situations where there wasn't enough room left in the floor plan to purchase additional used car inventory?

A.   Yes, there was.

Q.   Do you recall when that was?

A.   The last couple of years, it

Page 66

D. O'SULLIVAN

might have been.

Q.    In the way you described Port Motors there was an inventory list for used cars, correct?

A.    Used and new.

Q.    North Shore had only used --

A.    Correct.

Q.    Did they have a similar list?

A.    Yes, it is a schedule.

Q.    On that schedule you listed every used car?

A.    Correct.

Q.    Would that also include cars that had been traded in?

A.    Correct.

Q.    That would include cars purchased at auction, correct?

A.    Correct.

Q.    It would also include if they purchased the car privately?

A.    Correct.

Q.    Would that schedule also list for the vehicle whether there was any financing by the dealership on those cars?

Page 67

D. O'SULLIVAN

A.    Yes.

Q.    When the cars are purchased at auction, to your knowledge, they used the Ally floor plan to buy them?

A.    Yes.

Q.    What if they purchased the vehicle privately; was it also Ally?

A.    You had to give a check.  You came in and wanted to trade your car in without buying a car, we just give you a check for your car.

Q.    Would that car be financed through Ally floor plan?

A.    Yes.

Q.    You have an inventory schedule of used cars, correct?

A.    Correct.

Q.    There is a schedule of how much money is owed for these cars?

A.    Correct.

Q.    Is it on the same schedule --

A.    Yes.

Q.    -- or a different schedule?

A.    Same.

Page 68

D. O'SULLIVAN

Q.    You just have to look at one schedule to know what cars are in inventory and what was owed on those cars?

A.    Correct.

Q.    Now, you said there was also had a schedule of cars that had been posted in Port Motors?

A.    Yes.

Q.    When you say, posted, that means the deal has been done and ready, sold, paperwork is signed and waiting to get financing?

A.    Well, paperwork would be signed and then all of paperwork work would come into the office.

The office would post the deal, would show that it comes off of the inventory, which would still show that the lender we owed the money, but then now the money once the deal is posted it goes to the different schedule, to the different schedules, due to lender.

Q.    That was at Port Motors, correct?

D. O'SULLIVAN

A.    Correct -- no, both places.

Q.    There was a similar schedule also at North Shore and Sunrise?

A.    Absolutely.

Q.    Who would be the person posting the deal as you described?

A.    At North Shore I would be doing that.

Q.    For Sunrise too?

A.    Yeah.

Q.    What was the last thing, what was the thing that you needed to have in order to say, I can now post this?

A.    When we have all of paperwork done, the customer comes in and either signs the finance papers or give us a check, deal is finally done and you would post a deal.

Q.    What about if you're still waiting on motor vehicle information?

A.    No, that's all done.

Q.    Could a car be posted if the motor vehicle information is not done?

A.    I don't understand what you

D. O'SULLIVAN

mean.

Q.    As part of selling a car the dealership also take care of registering it?

A.    Correct.

Q.    If the documentation had been sent to the DMV, would that still post or were you waiting for something to happen?

A.    That would be posted but that would be separate schedule, with the -- where we have the motor vehicle waiting to get paid from New York state, motor vehicle we send the paper work off.

Q.    As soon as the person signs all the paperwork to by the car either gives you the money or signs all the financing papers, once all that happens and the motor vehicle papers were sent out, that means that the car can now be posted?

A.    Correct.

Q.    When it gets posted, it get post onto a new schedule?

A.    Correct.

Q.    What was that schedule name?

D. O'SULLIVAN

A.    It was used car schedule, it was the motor vehicle schedule, it was due from finance schedule.

Q.    When it's posted it comes off of the used car inventory schedule?

A.    The inventory comes off, but what stays there is that the floor plan is still there.

Q.    But, I'm trying to visualize it, work with me here.  You've got a schedule that has a list of cars and --

A.    Look at this way, a used car schedule has two columns one is the inventory and one is due from Ally, say financing.

Q.    Due to Ally?

A.    Yes.  One is one, one column on schedule of used cars.  There is inventory one -- the other part of it is due Ally.  Once the deal is posted, the inventory schedule comes off, the Ally stays there until it's paid off and then the other part posted goes to another schedule due from ABC company or whatever.

Page 72

D. O'SULLIVAN

Q.    In the inventory schedule, what information would be there about the vehicles you could identify?

A.    I don't understand what you mean.

Q.    In other words the make, model?

A.    Absolutely, all of that.  The amount, what kind of car it was, how much was due.

Q.    Were there stock numbers associated with each car?

A.    Absolutely.

Q.    On the inventory part of schedule, not the Ally money owed, on the inventory part would you have the type of car, correct?

A.    Yes.

Q.    Would it have the VIN?

A.    Yes.

Q.    Stock number?

A.    Yes.

Q.    Now, the car gets posted, right?

A.    Correct.

D. O'SULLIVAN

Q.    It's been sold?

A.    Yes.

Q.    It comes off of the inventory schedule, you still owe money Ally part of the schedule?

A.    Yes.

Q.    In the Ally schedule you have to identify which car is there?

A.    Correct.

Q.    That's owed money?

A.    Correct.

Q.    That also would have a VIN --

A.    All of the information, stock number, what kind of car it is would say stay there until it was paid off of Ally and the inventory and then it would disappear.

Q.    Both the inventory schedule and the money owed to Ally would have the same information about each car?

A.    Correct.

Q.    When it gets posted, it then goes in a schedule -- is it a schedule for motor vehicles?

Page 74

D. O'SULLIVAN

A.    Yes.

Q.    Somebody can look to check to make sure that what is still outstanding, whether it has come back and completed?

A.    Yes, we have to see what the what is due coming back from the state, your registration, once we get paid, that would come off.

Q.    With regard to money from the finance company, that was financing the purchase, that is due from a finance company?

A.    That is a separate schedule.

Q.    That would also have the make and model?

A.    Yes.

Q.    And the VIN?

A.    Correct.

Q.    And the stock number?

A.    Yes.

Q.    Would those scheduled, the one of the motor vehicle schedule and the -- what did you call --

A.    Used car due from lender.

Page 75

D. O'SULLIVAN

Q.   Due from lender?

A.   Yes.

Q.   Due from lender schedule and the motor vehicle --

A.   Due from finance companies.

Q.   They are due from the finance company?

A.   Right.

Q.   And the motor vehicle schedule?

A.   Right.

Q.   Were those looked at on a regular basis?

A.   Yes.

Q.   At North Shore?

A.   Yes.

Q.   And Sunrise?

A.   Yes.

Q.   How often were they reviewed?

A.   Everyday or every other day.

Q.   Who reviewed them?

A.   I did.

Q.   Do you know if anyone else at the dealership reviewed them?

A.   Anybody that printed it off.

D. O'SULLIVAN

Q.    What about Anthony, did he review them?

A.    I don't think so, I doubt it.

Q.    Did you --

A.    He didn't have to.

Q.    Why not?

A.    He would look at the used car inventory schedule all the time, yes.

Q.    He would look at the used car inventory car schedule, shows what the inventory was?

A.    Correct.

Q.    What vehicles are in the inventory?

A.    Correct.

Q.    What is owed on the vehicles?

A.    Correct.  He looked at that everyday.

Q.    But, the schedule that --

A.    He would look at the schedule, what is money due from -- money due from Ally or Chase bank that do we finance with. We would look at that and say it has been two or three days, why didn't we get paid.

Page 77

D. O'SULLIVAN

I doubt that he ever looked at the motor vehicle schedule.

Q.    Let me go through the schedules, so we are clear on the schedule.

A.    Okay.

Q.    You have the inventory schedule?

A.    Correct.

Q.    Money owed to Ally schedule?

A.    Correct.

Q.    You got the motor vehicle schedule?

A.    Right.

Q.    You got the due from financing schedule?

A.    Correct.

Q.    You said Anthony would --

A.    Also the pay off schedule for used cars that were traded in.

Q.    Traded in --

A.    That had a pay off on them, that would show, he would look at that every day.

Q.    Previously, we discussed

D. O'SULLIVAN

somebody you might come in to trade in a vehicle that was still owed money on financing, right?

A.    Right.

Q.    If North Shore or Sunrise took a car that was traded and there was still money owed to the financing company, there would be a schedule for the money that is owed to pay off?

A.    Yes.

Q.    That schedule, so there is another schedule?

A.    Right.

Q.    You said that on a daily basis, did you look at all the schedules?

A.    Yes.

Q.    You said on a daily basis Anthony would look at some of the schedules?

A.    Yes, he would look at all the schedules, but not interested in the motor vehicle schedule that much.

Q.    Was he doing that, as far as you know every day?

Page 79

D. O'SULLIVAN

A.    As far as I know.

Q.    Were these printed out?

A.    Yes.

Q.    Who print them out?

A.    I would print them out or he would.

Q.    If you printed them out, did you hand them to him, how would he get them?

A.    Yes.

Q.    Was that part of your daily duties?

A.    Yes.

Q.    Was that done in the morning?

A.    Afternoon usually, so late morning.

Q.    And if you hadn't done it then --

A.    He would ask me for it.

Q.    If you hadn't done it for some reason?

A.    He asked.

Q.    He asked you for it?

A.    Yes.

Page 80

D. O'SULLIVAN

Q.    When you gave it to him, was he in his office at that time?

A.    Yes.

Q.    Then, did he discuss with you what was on the schedule?

A.    Yes.

Q.    What was the general purpose of those discussion?

A.    He would say pay off this car pay off that car, do that.

Q.    There is two types of payoffs that you discussed?

A.    Right.

Q.    The payoff to Ally that financed the floor plan?

A.    Correct.

Q.    And the financing that was still in existence on the car that was traded in?

A.    Correct.

Q.    Can you break that down for me; pay off this, pay off that, for both of those?

A.    Yes.

Page 81

D. O'SULLIVAN

Q.    Now, in your previous job at Port Motors when a car, when a vehicle that been had been sold now received financing from the new lender, it would automatically just pay off every car within a day or two when the money came in?

A.    Correct.

Q.    Was that different at North Shore and Sunrise?

A.    Yes.

Q.    How was it different?

A.    I did not pay it off until Anthony told me to pay it off.

Q.    Did he tell you to do that or not to do that?

A.    Yes.

Q.    When did he first tell to do that, you is gonna be your instruction?

A.    Day one.

Q.    Did you tell him by last job I automatically --

A.    No.

Q.    Was this something which he said to you after something happened or did

Page 82

D. O'SULLIVAN

he say, let me tell you the way that I run my dealership or something like that?

A.    Yes, I will tell you when to pay the cars off.

Q.    When you first started working there did you have a meeting with Anthony, welcome to the dealership and let me tell you about the operation?

A.    Yes.

Q.    Was that the first day that you started work?

A.    Well, how are you, this is what we do, and then when I was working there, I will tell you when to pay the car off, pay the bills, this or that.

Q.    Did he tell you why he would decide when to pay the bills and when not to?

A.    I am not gonna ask him that.

Q.    What about regular bills, you bought toner for a copy machine, is that also something that he would say don't pay these?

A.    If it is a major bill, he would

Page 83

D. O'SULLIVAN

say hold off and I will tell you when to pay it.

Q.    Other than the paying off of cars, that we discussed, were there other major bills that the dealership had on a regular basis?

A.    The Dealer Track was like $3,000 a month, we are behind sometimes on the LILCO bill.

Q.    The what?

A.    LILCO bill.

Q.    Utility bill?

A.    Yeah.

Q.    What about warranties, did you sell used car warranties at the dealership?

A.    Yes, Frank sold warranties.

Q.    These are used car warranties, correct?

A.    Yes.

Q.    These weren't warranties that North Shore or Sunrise had to sell, they were outside companies?

A.    It was an outside vendor, right.

Page 84

D. O'SULLIVAN

Q.    Was it one company or more than one?

A.    It was a couple of them.

Q.    Do you recall the names of any of those companies?

A.    Not really.

Q.    Does the term Nissan sound familiar to you?

A.    Yes.

Q.    Did you sell any Nissan warranties?

A.    Yes.

Q.    When a warranty is sold, a customer buys a car and --

A.    Well, the warranty is usually financed in the deal.

Q.    When a customer comes to buy a car and they agreed agree to purchase an extended warranty on the car, right?

A.    Right.

Q.    There is a price that is associated with the purchase of that?

A.    It would be separate price on a finance contract, showing the warranty,

D. O'SULLIVAN

like $3,000 or something like that.  You show the car price, sales tax, a warranty, stuff like that.

Q.    If the person paying cash for the car, they just paid for that at the time?

A.    Right.

Q.    But, if they financed it, it would be the part of the financing?

A.    Yes.

Q.    How would, if you know, how would the warranty company become aware that there is now a warranty in place for this car?

A.    Frank would contact the company, ABC company, I'm selling a warranty and then you send the paperwork in, once the customers you signs the warranty, send paperwork in to get it registered.

Q.    Did you send it in or Frank or somebody else?

A.    Frank usually did.

Q.    What about the money to pay for

Page 86

D. O'SULLIVAN

the warranty; where did that money come from?

A.    That would come from the finance company, all part of the deal. They are listed separately on the finance contract or on the bill of sale.

Q.    That money would come into the general operating account, correct?

A.    Yes.

Q.    How would one keep track -- did the money that was used to purchase that warranty need to go out that warranty company?

A.    Yes.

Q.    To pay them for the warranty?

A.    Yes.

Q.    I'm presuming there was a mark up of some kind?

A.    Of course.

Q.    You wouldn't have to pay the warranty company whatever was paid, just their portion of it?

A.    It was sold for like $3,000, might have cost $1,500.

Page 87

D. O'SULLIVAN

Q.    Was that, was Frank responsible to make sure that $1,500 got paid?

A.    No.

Q.    Who paid that $1,500?

A.    I would be paying it.

Q.    Is that something that you have on a schedule somewhere?

A.    Yes.

Q.    What kind of schedule was that?

A.    A warranty schedule.  We do Nissan or whatever, Ally or whatever company.

Q.    Was that something that you saw on a daily or weekly or monthly basis?

A.    Daily, yes.

Q.    It would have a list of warranties that have been sold?

A.    Correct.

Q.    It would have a list of how much they were sold for?

A.    No, it wouldn't show what was sold, but just what is due to them.

Q.    Just the portion due to the warranty company?

Page 88

D. O'SULLIVAN

A.   Correct.

Q.   From that schedule, you would know what was paid and what has not been paid?

A.   Right.

Q.   From that list would you automatically pay that when the finance money came in?

A.   It should, yes.

Q.   It should?

A.   Correct.

Q.   Was that an item that Anthony would tell you when and when not to pay?

A.   Yes.

Q.   Did he ever give you any indication as to what his considerations were to pay something and not to pay something?

A.   No.

Q.   You never questioned him?

A.   No.

Q.   Did you ever tell David about this?

A.   No.

Page 89

D. O'SULLIVAN

Q.   Is there a reason that you did not tell David about it?

A.   I thought they were partners.

Q.   You assumed that David knew about it?

A.   Yes, but David never operated like that.

Q.   When you first started working at North Shore, was the way that North Shore and Sunrise operated when you if first started, different at any time during your work -- changed the operation?

A.   Yes, in the beginning we would like being paying everything off right away and stuff like that and later on it slowed down, we are not going to pay right now, wait a while.  In the beginning, no, it was paid off right away.

Q.   Do you recall any changes in business, whether from business was picking up, slowing down, cash flow, anything that you recognized?

A.   Well, the business slowed down and we got a little hesitate to pay some of

D. O'SULLIVAN

the things off.

Q.    Do you recall business slowing down?

A.    Yes, COVID killed us.

Q.    Specifically with regard to COVID, are you familiar with PPP loans were?

A.    Yes.

Q.    EIDL loans also?

A.    I don't know about that, we had the PPP loans.

Q.    You were involved in the PPP loans?

A.    No, I wasn't involved in getting them, I think that Anthony handled most of them.

Q.    When did you first became aware of a PPP loan?

A.    When we got the money.

Q.    Until you got money, did you know about it?

A.    I heard about it, but it was -- I wasn't involved in applying for it.

Q.    How did you hear about it?

Page 91

D. O'SULLIVAN

A.      We talked about getting money.

Q.      When you say, we?

A.      I talked to Anthony about it, he would say, did we get the money yet, no, we didn't get it yet.  It would come in the bank.

Q.      When it first came known about the PPP loans, did you ever hear Anthony talking to you about a applying for one of these loans?

A.      No, he did that.

Q.      You didn't hear about how applied?

A.      I heard about applying, yes.  I think that Josh talked to him about it, I am not sure.

Q.      Josh?

A.      Yes.

Q.      You are talking about Josh Aaronson?

A.      Yes.

Q.      So, do you know who if anybody was involved in putting together the documentation to submit for PPP loans?

Page 92

D. O'SULLIVAN

A.      No, not really, no.

Q.      Do you know if anybody came into the dealership, you know, one of the dealerships or --

A.      I don't think so.

Q.      Did you call anybody, asking you to do -- to give them schedule or documents, finances?

A.      They might have come in and asked me for some of that stuff, yes.

Q.      Do you recall who that might have been?

A.      No.

Q.      Do you know if they were accountants or attorneys?

A.      I don't think Anthony's accountant did that.  He would come in once a month and do some of the books, but I do not think he was involved in the PPP.

Q.      You knew there was gonna be an application for the PPP?

A.      Yes.

Q.      But, you were not involved in the process?

Page 93

D. O'SULLIVAN

A.    No.

Q.    Do you know how much they were looking for?

A.    No.

Q.    At some point you said that the money came in?

A.    Yes.

Q.    Do you recall how much it was more for?

A.    A couple of hundred thousand.

Q.    Do you know where that money was deposited?

A.    In the main account.

Q.    Do you know approximately when that money came in?

A.    Not really.

Q.    But, if we looked at the bank statements for that account, we should be able to see that?

A.    Oh yeah, sure.

Q.    Do you recall, do you remember that money coming in?

A.    I think so, yes.

Q.    What makes you think you

Page 94

D. O'SULLIVAN

remember?

A.     It was a large amount, it wasn't like $5,000.

Q.     Was there anything specifically with that money or it just went into the general operating?

A.     It went into the general operating.

Q.     You said that business slowed down because of COVID, was there anything else that you recall business slowed down?

A.     Not really, no, just COVID really killed it.

Q.     Is it your recollection that because of COVID slowing it down, that is when Anthony started asking to you holdback on paying certain bills?

A.     Yes.

Q.     Did business pick up at some point afterwards?

A.     A little, but not really a lot.

Q.     Did Anthony's direction to you to pay or hold bills ever change from when he first started to tell you to do that

Page 95

D. O'SULLIVAN

until the dealership closed?

A.    No.

Q.    You mentioned that Anthony's accountant, who are you referring to?

A.    I forget his name.

Q.    Tom Jones?

A.    Yes.

Q.    When did you first meet Tom Jones?

A.    When he came in to look over the books.

Q.    Do you recall approximately when that was?

A.    Not really.

Q.    Do you recall being told we have an accountant coming in?

A.    Yes.

Q.    Before he came in you knew?

A.    Yes, I didn't know him.

Q.    Was Tom Jones coming in on a regular basis?

A.    Once a month or every other month, yes.

Q.    Before he started doing that,

Page 96

D. O'SULLIVAN

was somebody else doing that?

A.      Not that I know of.

Q.      Were you told why Tom Jones was gonna be coming in?

A.      He told me it was Anthony's accountant.

Q.      Did you know why he was coming in, they didn't have one before, why do you need to be --

A.      We needed to -- everybody every dealership had an accountant come in and look at the books every month.

Q.      Maybe, my question wasn't clear.  Before Tom Jones was there a different accountant that came in every month?

A.      No, at North Shore.  At Port Motors we had an accountant at come in every month and look at books, yeah.

Q.      At North Shore, prior to Tom Jones coming in every month, you didn't have an accountant coming in every month?

A.      I don't think so, no.

Q.      Do you know why, when they

D. O'SULLIVAN

didn't have one before, suddenly Tom Jones is coming in once a month?

A.    No, I'm sure that he came in before I was there.  I am sure that he came in with Melissa.

Q.    When you say, he, you mean Tom Jones specifically?

A.    Yeah.

Q.    You believe that Tom Jones was already doing the job coming in and doing books, before you started working?

A.    As far as I know.

Q.    When you started work there, did you know already that Tom Jones was the accountant?

A.    Not until I started there, no.

Q.    When you started you saw him almost immediately?

A.    Might have been a couple of weeks, yeah.

Q.    He was there soon after you started working?

A.    Yes.

Q.    Did he introduce himself?

Page 98

D. O'SULLIVAN

A.    Of course.

Q.    What did he say about who he was and why he was there?

A.    He told me that he was Anthony's accountant looking at the books, like every accountant comes in and does the books.

Q.    Are you familiar that procedure at Port Motors?

A.    Absolutely.

Q.    At Port Motors, do you recall the accountants were at Port Motors?

A.    No, it was a long time ago, somebody from New Rochelle I think.

Q.    Helen Kara?

A.    Yes.

Q.    She would come in to --

A.    Port Motors.

Q.    If you know, what did she do every month?

A.    She would look over the things and make sure that everything was hunky dory.

Q.    As controller, did she have any

D. O'SULLIVAN

interaction with you?

A.    I just talked to her and sit with her and she tell me what is going on, why is this paid.

Q.    She asked you informational questions?

A.    Right.

Q.    Did she ever ask to you do anything?

A.    No.

Q.    Do you know if anything -- if she did anything concerning the finance statements or anything like that?

A.    No.

Q.    Is it possible that she did stuff that you did not know about regarding the finance statements and such?

A.    I doubt it, if she did something it would be in the system.

Q.    You looked --

A.    I posted the financial statement and sent it off to Lincoln Mercury every month.  Then, I sent the financial statement off to Ally every

D. O'SULLIVAN

month.

Q.    Ally, you are talking about at North Shore?

A.    Yes.

Q.    When were you at Port Motors --

A.    The Ford Motor Credit, there was a financial statement.

Q.    Ford Motors was the manufacturer, right?

A.    Yes.

Q.    Ford Motors was also the lender?

A.    Correct.

Q.    Did you send them to separate locations?

A.    No, it went to Ford Motor company, the district office.  Sometimes I would go to Ford Motor Credit, once every three or four months.

Q.    It would be same financial statement?

A.    Yes.

Q.    If there were any changed to the financial statement, you would have

                    D. O'SULLIVAN

known about it?

        A.      Of course.

        Q.      When you were at North Shore
even Sunrise, they also have similar
financial statements?

        A.      Correct.

        Q.      Do you know, do you recall what
format they used?

        A.      What do you mean?

        Q.      Dealer financial statements
form what I have seen, have a specific type
of format?

        A.      There is assets and
liabilities.  One side is assets and
liabilities, you have a second page of
sales, third page is like used cars, fourth
page, new cars and then the fifth page was
expenses.

        Q.      The one that used at Port
Motors was specifically for Ford Motors
Company?

        A.      Right.

        Q.      The one that was used at North
Shore and Sunrise, do you know what format

D. O'SULLIVAN

they used?

A.    A Dealer Track.  It had assets and liabilities on page one, sales on the second, new used car expenses on page four and whatever.

Q.    Did you look at the financial statements at North Shore, I know you said that you looked at them monthly?

A.    Yes.

Q.    Did you look at them more than monthly?

A.    No.

Q.    Did you look at the schedules?

A.    Every day.

Q.    What was on the schedules that you looked at everyday, that was the ones that we just discussed?

A.    Correct.

Q.    When you say the schedules that's what you are referring to?

A.    Correct.

Q.    Are there also accounting schedules that would be, you know, what is outstanding for, you know, for other items

Page 103

D. O'SULLIVAN

at the dealership that were not listed?

A.     There are mean different schedules, there was a schedule if for we took in a deposit from somebody, there's a deposit schedule, there is a warranty schedule, there's a used car, new car schedule, there is a used car schedule, pay off schedule, lender schedule, motor vehicle schedule.  Once a deal is posted all of the things go onto separate schedules.

Q.     It sounds like you had at least a dozen schedules?

A.     Ten or 12 schedules.

Q.     North Shore and Sunrise you looked at them every day?

A.     Yes.

Q.     If there were any changes to the schedules that would be made, you would be a aware of that?

A.     Correct.

Q.     Would you be responsible for any changes to physically put in those?

A.     I might have been, if I posted

D. O'SULLIVAN

a deal, might be, yes.

Q.    Were there other people that posted deals at North Shore and Sunrise?

A.    There were, yes.

Q.    That would be somebody, you don't post a deal until the deal is done, correct?

A.    Yes.

Q.    That would be the end of the process?

A.    Yes.

Q.    There were --

A.    There was another girl that worked at North Shore, she would do the posting sometimes, yes.

Q.    Was there a reason why sometimes she did it and you did it?

A.    Not really, no.  It was mostly her job to do.  I would say 40 percent of the time I would do it.

Q.    That was done at your computer on your desk?

A.    Yes, and her computer would be done at her desk.

D. O'SULLIVAN

Q.    Was that the one that worked in your office?

A.    Yeah, the one that worked in the office.

Q.    Tom Jones comes in and what does he do when he comes in; was his routine the same every time he came in?

A.    Yes.

Q.    He comes in, he says hello and then what else --

A.    The day before he comes in, print off all the schedules and we look and go over them.

Q.    Would the schedules be the day schedule --

A.    The end of the month schedules, he wanted schedules as of the end of the month.

Q.    So, he would come in --

A.    Say the first of the month on the 31st of the month, he was scheduled on the 31st.

Q.    He was always looking at the schedule for the last -- for the end of the

D. O'SULLIVAN

month for the month prior to coming in?

A.    Right.

Q.    You printed those and handed him the schedules?

A.    Correct.

Q.    What, if anything would he do with those schedules?

A.    Why is this not paid, why is this due, why is this missing, stuff like that.

Q.    You reviewed it and he had questions for you?

A.    Yes.

Q.    Was it your responsibility to answer those questions?

A.    Yes.

Q.    Did you always know the answer or did you have to investigate?

A.    Sometimes we had to investigate.

Q.    You would give him the answers?

A.    Right.

Q.    Did he write anything else down?

D. O'SULLIVAN

A.    I am sure that did he.

Q.    After he gave you that information what did he do next?

A.    He gave me adjusting entries to post into the books.

Q.    Did he do that in front of you?

A.    No, he would be off in the office, whatever, and at the end of the day say, these are the entries that I want you to post.

Q.    He took the schedules, he asked you questions?

A.    Right.

Q.    You gave him answers?

A.    Right.

Q.    Then, he would go into his office?

A.    Right.

Q.    He'd come back and say here are the adjustments?

A.    Yes.

Q.    Was that North Shore or Sunrise or both?

A.    He only came to North Shore.

Page 108

D. O'SULLIVAN

Q.     You had access to Sunrise records too?

A.     Right.

Q.     You gave him both?

A.     Right, he would go into the conference room.

Q.     How many offices were in North Shore building?

A.     Anthony's office, Sarah's office, Frank's office, my office, conference room, and another office.

Q.     Was somebody else in that other office?

A.     It was like an empty office.

Q.     Your recollection is that Tom Jones would go into --

A.     The conference room.

Q.     Do you know if he met with Anthony at all?

A.     Yes, every time.

Q.     In the conference room?

A.     Yes.

Q.     After he got these schedules, you told him and answered the questions, he

D. O'SULLIVAN

goes in the conference room?

A.    Yes.

Q.    Would Anthony meet in there with him?

A.    Absolutely.

Q.    Was there a usual time that they would be there?

A.    I don't know.  Ten minutes, an hour, two hours, I don't know.

Q.    Tom Jones would come out and hand you a piece of paper?

A.    Correct.

Q.    On that paper would be what?

A.    All of the adjusting entries that he wanted me to make.

Q.    Was the piece of paper --

A.    Adjusting entries.

Q.    Was it a scratch paper or a form?

A.    No, it is a form, like a general journal entry form.

Q.    It is a form specifically to --

A.    To make journal entries.

Q.    Did it have a title or a name

D. O'SULLIVAN

on it?

A.     General journal entry form. That was the name of form, yeah.

Q.     On there would be the list of entries you're supposed to make?

A.     Debits and credits to make.

Q.     Each posting, in the Dealer Track system has an account number, correct?

A.     Yes.

Q.     Would he list the account numbers?

A.     Debit ABC, credit CDY, stuff like that, debit one, two, three.  Credit four, five, six.

Q.     Did he ever tell you why he was making those adjustments?

A.     No.

Q.     Did you ever ask him why he was making those adjustments?

A.     No.

Q.     Did you ever have any suspicions as to why he was making those adjustments?

D. O'SULLIVAN

A.    A little bit.

Q.    What are your suspicions?

A.    It was a little hazy.

Q.    Give me an example of hazy?

A.    Something that I wasn't used to.

Q.    You didn't understand it or did you think there was something?

A.    I didn't understand.

Q.    Did you suspect at all that there was something improper about any of those entries?

A.    Not really.

Q.    What does that mean, not really, I'm trying to understand what are you saying here.

A.    I was not never used to entries like that, I never got there from Helen.

Q.    What type of entries were there, if you recall?

A.    Debit bank account, credit something else, like make the bank account look more than it was, stuff like that.

Q.    Would those entries make the

Page 112

D. O'SULLIVAN

dealership look like they had more money or more profitable?

A.    Yes.

Q.    Do you know what specific accounts were being adjusted?

A.    I could tell by looking at them.

Q.    As you sit here today, do you recall what any of those accounts were that were being adjusted?

A.    It might be like debit the bank account, the general account, so it looks it's inflated more and then credit the inventory, so it looks like it's lower.

Q.    Despite the fact that you had questions about them, you didn't ask?

A.    No.

Q.    Did you ever ask Anthony?

A.    No, it is above my pay grade.

Q.    This is what you were told to do and you just did it?

A.    Yeah.

Q.    Do you know whether making those adjusting entries affected the

D. O'SULLIVAN

monthly financial statements?

A.    Yes.

Q.    Positive where the dealership looked better than it actually was doing?

A.    Yes.

Q.    On a monthly basis, what did you do with those financial statements?

A.    Just put them in a file.

Q.    Did you have to provide them to anybody?

A.    Yeah, to Ally.

Q.    Ally being the finance company?

A.    Correct.

Q.    Do you know why Ally wanted to see these documents?

A.    They want to know if you are going under every month, yeah.

Q.    Did you ever speak to anyone at Ally?

A.    I spoke to them a lot, yes.

Q.    What would the reason to speak to Ally?

A.    I would call up and how come we haven't been paid for Joe Jones car.

D. O'SULLIVAN

Q.     If they were financing?

A.     Right.

Q.     Did you ever speak to anybody at Ally on the floor plan side?

A.     Yes, they would call me up and say I wanna come in April 3rd to do a floor plan, they did that every month.

Q.     Describe to me what's involved in the floor plan?

A.     He would come in and the guy would look at every car and make sure it's on the floor plan.  If it's -- if it's on the floor plan, why it's not paid off in the car wasn't there.  You would have all the cars, they would have a list of all of cars on the floor plan.  They would look, you, come in and say this car is on the floor, this car is on the floor, this car is not on the floor, where is it, this car is not on the floor where is it, because it sold, why is sold and not paid off, stuff like that.

Q.     Was it always the same person --

D. O'SULLIVAN

A.    No, always a different person.

Q.    Do you know if it was Ally or do they --

A.    It was Ally.

Q.    You have to let me finish the question, just for the reporter.  By the way, we have been going a while.  Do you need a break?

THE REPORTER:  Yes, please.

Q.    Well, let me finish this line and ask you a few more.

THE REPORTER:  Let me read what I have.

(Whereupon, the last question was read back by the reporter.)

A.    Ally would hire ABC company to come in do the floor plan check.  It wasn't an Ally employee.

Q.    Did they just go by themselves or did somebody accompany them?

A.    They went by themselves.

Q.    They would have their list?

A.    They have a list of cars all the car on floor plan, and they go off and

D. O'SULLIVAN

check every car and cross it off their list.  If there was a 100 cars to begin with and they crossed off 90 cars, at the end of the thing they would say where are these ten cars.

I would say we are waiting to get paid from this, ABC company or we are going to pay off the car today or tomorrow.

Q.     Were you their point person at the dealership?

A.     Most of the time, yes.

Q.     If they had questions about a car that wasn't there, you would be the first person they would usually go to?

A.     When they did the floor plan check, they had a 100 cars and they checked off 89 cars that are still on premises, they would give me a list of 20 cars, where are these 20 cars.  I might say, one is at the body shop, one is we are getting paid, one is someplace else, whatever, I would have to identify to them where those 20 cars are.

Q.     Were there ever times when you

D. O'SULLIVAN

really couldn't identify where those cars were?

A.    Then I would go to Anthony or Frank and say, where are the cars and they would try to look and see where they are.

Q.    Do you recall any situations when they came to do the floor plan audit the cars were not there because they had been sold, and you had received the money from the new financing --

A.    Right.

Q.    But, not yet paid it off?

A.    Right.

Q.    Did you ever have any situations like that?

A.    Yes, I would say, oh, we make a mistake, I would pay it off at that time.

Q.    You would take care of it at that time?

A.    Yes.

MR. RUDERMAN:  We can take a break now.  Five minutes.

MS. VERBONITZ:  Ten minutes please.

D. O'SULLIVAN

MR. RUDERMAN:  Off the record.

(Whereupon, a brief recess was taken.)

Q.    We were discussing the audits that were being done on a monthly basis by Ally, right?

A.    Right.

Q.    We discussed how he goes about doing the audits and questions that he may have.  If there is a car, if you could not account for the car -- withdrawn.

Were there ever any situations that you recall where you couldn't account for the car, nor did you have the money to pay it off?

A.    Not really, there was always some place that the car was going to be, we could always find out where it is.

Q.    More often than not, the situation was the car was just not there for some reason?

A.    Correct.

Q.    In the shop or --

A.    One or two might have been,

Page 119

D. O'SULLIVAN

because had it get paid off, it might have been in the body shop, it maybe could have been someplace else.

Q. Do you know whether or not Anthony Deo was compensated for his work at North Shore and Sunrise?

A. Yes.

Q. Do you know how he was compensated?

A. He was on the payroll for salary, and then he would get a commission to Car Buyers on a monthly basis.

Q. He was a salaried employee?

A. Correct.

Q. Do you know what his salary was?

A. I believe that it was $5,000 or $3,000, maybe $3,000 and then it went to $5,000.

Q. It went from $3,000 a week up to $5,000 a week?

A. I think.

Q. Do you know when that changed?

A. No, I don't remember but at the

D. O'SULLIVAN

end, he was getting $5,000 a week.

Q.    All right.  Was Sarah also a salaried employee?

A.    Yes.

Q.    What was she getting?

A.    She was getting $5,000 a week at the end.

Q.    Between the two of them, $10,000 a week.

Then Josh came in and stopped Sarah from getting her money or cut it down, whatever; when was that?

A.    Towards the end.

Q.    You mentioned that Anthony got commission to Car Buyers?

A.    Yes.

Q.    What do you mean by that?

A.    At the end of the month the financial statement was printed off, if the gross sales were $100,000, he would get, I think five percent or seven and a half percent of that figure.

Q.    Of gross sale or gross profit?

A.    The gross profit.  If it was a

Page 121

D. O'SULLIVAN

$100,000, he would get like a check made out to Car Buyers for his fee.

Q.    The bulk of the expense of a car is the actual purchase price in the inventory, right?

A.    Yes.

Q.    If you sold the car for $50,000 you maybe bought it for $40,000.

A.    Right.

Q.    In that example --

A.    He would get a percentage of $10,000.

Q.    What was his percentage?

A.    I believe it was five and it went to seven and a half.

Q.    Do you know when it changed?

A.    Later on.

Q.    Do you know who made the decision as to him getting this commission?

A.    Yeah, he told me to change it to seven and a half percent.

Q.    Do you know who said that he could even get a commission?

A.    I have no idea.  He told me his

D. O'SULLIVAN

commission was X amount and give him a check every month.

Q.    That was from the beginning when you first started?

A.    Yeah.

Q.    Did you speak to David about that?

A.    David knew he was getting that.

Q.    How do you know David knew that?

A.    David would see the checks that were written, because David or Anthony would sign the check.

Q.    This was before David passed away, correct?

A.    Correct.

Q.    Do you know when it was?

A.    I believe in May.  Last may, three years ago.

Q.    I believe it was in 2021.  I have no personal knowledge, they say it was May of 2021?

A.    So, then it is four years.  I thought that it was three years.

D. O'SULLIVAN

Q.    He had a place in Florida?

A.    Yes.

Q.    Did he travel up from Florida, did he stay there?

A.    He didn't spend a lot time in Florida, I mean like a week, not like six months, no.

Q.    Most of the time he was up in the New York area?

A.    Yes.

Q.    Do you know, while he was here, did he come -- why was here was he involved in the operation of North Shore and Sunrise?

A.    Yes and no.  He would come in have lunch; look around and then leave.  It was not really day-to-day operation, no.

Q.    Did he get, was he provided with schedules or finance statements?

A.    He never really looked at the schedules, he would look at the financial statements, yes.

Q.    When he came in, would he ask you for that or you just gave it to him?

D. O'SULLIVAN

A.    He would ask for it, give me copies of the financial statement.

Q.    How often did you think that was?

A.    He'd look at it once a month.

Q.    He would come in regularly once a month?

A.    No, probably three days a week, maybe more.  It depends on his schedule.

Q.    He was coming pretty frequently?

A.    Yes.

Q.    What was he doing when he was there?

A.    He would come in and mostly have lunch, talk to Anthony, talk about whatever they talk about and then maybe an hour then leave.

Q.    The only financial records that he looked at when he was there was the financial statements?

A.    Correct.

Q.    When you previously testified that Tom Jones would give you adjustments?

D. O'SULLIVAN

A.    Right.

Q.    That would reflected on the financial statements?

A.    Right.

Q.    If David came in, would he be seeing the financial statements before or after those adjustments?

A.    After.

Q.    Do you know if David ever looked to see bank statements or anything like that?

A.    I don't remember.

Q.    Did Tom Jones ever ask to see bank statements?

A.    Of course.

Q.    Did you provide him copies?

A.    Yeah, he had copies.

Q.    To take with him?

A.    No, he never took them, he just looked at them in the conference room.

Q.    For both dealerships?

A.    Yes.  All the schedules of all of the accounts.

Q.    Do you know if there were any

D. O'SULLIVAN

bank reconciliations done for the dealerships?

A.    Yes, he would come and do the bank records.

Q.    If he didn't take the statements, do you know how did he the bank recs?

A.    He did them in his office or somebody in his office.

Q.    Did the copies of the bank statements ever get to his office, if you know?

A.    Yes, yeah.

Q.    Tom took the bank statements with him when he left?

A.    We gave him a copy or he had access to print it off, I am not sure.

Q.    You think he may have had access to print things?

A.    I'm not sure.

Q.    It is your understanding that he copies of the bank statements --

A.    Through the bank recs.

Q.    Did you get copies of the bank

D. O'SULLIVAN

recs?

A.    Yes.

Q.    What, if anything -- was it in writing?

A.    Yes.

Q.    What, if anything did you do with them?

A.    It would be filed away.

Q.    Was that a paper file?

A.    Yes.

Q.    Did the dealership keep deal folders?

A.    Yes.

Q.    Those were paper records?

A.    Paper records, there was a deal folder for every deal that was done, every car that was sold, all the paperwork is put in the folder.

Q.    Were these documents ever uploaded into a system?

A.    No, no.

Q.    Scanned or put into --

A.    We didn't have a scanning system, no.

D. O'SULLIVAN

Q.    As far as you know they were only kept in paper?

A.    Correct.

Q.    There may have been finance documents?

A.    There is a copy of the finance contract in the statement -- in the folder, yeah.

Q.    Would there an electronic copy of that as well?

A.    Could be, yes.

Q.    If something was signed electronically?

A.    Yes.

Q.    Now, did there come a time when David stopped coming in on a regular basis?

A.    Not really, no.

Q.    You think pretty close up until he passed away he was coming in on a regular basis?

A.    Yes.

Q.    He still saw Anthony each time that he came?

A.    Yes.

D. O'SULLIVAN

Q.    Were you ever in any of those meetings?

A.    No.

Q.    Were you ever invited into any of those meetings?

A.    No.

Q.    You testified about a compensation that Sarah Deo was getting?

A.    Right.

Q.    And Anthony Deo?

A.    Right.

Q.    And then there was Car Buyers; what was that Car Buyers?

A.    That was his car company.  It was a company.

Q.    Do you know if anybody was an owner of that company?

A.    I have no idea.

Q.    How did you come about to know sending a check to Car Buyers?

A.    I didn't send it, I gave it to him every time, I printed it off.

Q.    It was made payable to Car Buyers?

D. O'SULLIVAN

A.    Yes.

Q.    Did he give you the numbers to --

A.    I would take the numbers right off the financial statement.

Q.    Was that part of your job responsibility?

A.    Right.

Q.    He would say how much it is and --

A.    Yes.  He would say give me the check.

Q.    When things were short did he say hold onto the check?

A.    The once or twice, yes.

Q.    But, other times --

A.    No.

Q.    Even though he may have told you not today pay the other bills?

A.    Yes.

Q.    Was there ever a time when he asked you not to pay his or Sarah's salary?

A.    No.

Q.    Who put in the information for

Page 131

D. O'SULLIVAN

each check that was cut from the dealership -- withdrawn.

Were the checks done manually or digitally through a computer?

A.    Through a computer.

Q.    Every check was generated by putting information into the Dealer Track system for who it was payable to, how much it is, etcetera?

A.    Correct.

Q.    Is that automatically enlisted in the general ledger?

A.    Yes.

Q.    All of those checks to Car Buyers should be at least at the time in those Dealer Track system records?

A.    Absolutely.

Q.    Did David get any money from the operation of the dealership that you are aware of?

A.    Once in a while he would get a check for $5,000 a month, every six months or something like that.

Q.    Do you know what that was for?

D. O'SULLIVAN

A.    Just a bonus check.

Q.    Who asked to you write that check?

A.    David would.

Q.    He would come in and say write me a check for $5,000 or something like that?

A.    Right.

Q.    Over your time at the dealership, can you estimate how much money in total David got?

A.    Not really.  I wasn't every month, it might be once every three or four months, stuff like that.

Q.    Never big money?

A.    Never like $50,000, no.

Q.    As far as you know was that the only money David drew out of the dealerships?

A.    As far as I know, yeah.  He wasn't on the payroll.

Q.    Do you know the name Asad Khan?

A.    Yes.

Q.    How do you know Asad Khan?

D. O'SULLIVAN

A.    He is David's partner at Best Ford, he got a check once in a while for $5,000 from North Shore.

Q.    What was your understanding of as to Asad's relationship to North Shore?

A.    I don't know.  I figured they were partners, I don't know.

Q.    What did you think his relationship was?

A.    I figured he was one of the partners or something.  If David said give him a check and Brian used to get a check once in a while.

Q.    Did you mean to say owners or something else?

A.    I don't know if they were owners or partners or what they were.

Q.    Some type of principal relationship?

A.    Yeah.

Q.    Who is the one who said to give Asad and Brian these checks?

A.    David.

Q.    Did David always do that when

Page 134

D. O'SULLIVAN

he took out money, did he have you do it for Asad and Brian?

A.    Most of the time, yes.

Q.    Similar to that the same type of money that were you talking about?

A.    Usually $5,000 or $3,000.

Q.    That was until the time that David died?

A.    Yes.

Q.    After David died --

A.    It stopped after before that.

Q.    It stopped before that?

A.    Yes.

Q.    When did it stop?

A.    Sort of like COVID when it slowed down he was not taking money out of the place.

Q.    Did tell he because business was not good?

A.    I am guessing that it was.

Q.    I don't want you to guess, but he did --

A.    He didn't say that, I am guessing.

D. O'SULLIVAN

Q.    You have no knowledge that's why he stopped?

A.    No.

Q.    Was he aware that business was slowing down?

A.    Yes.

Q.    What made you think he was aware of that?

A.    He was always thinking about how come sales -- say last year in September we sold 80 cars and this year in September we sold 50 cars.  What's going on, stuff like that.

Q.    Now, you mentioned Josh Aaronson?

A.    Yes.

Q.    Josh at some point had given directions to stop paying Sarah her salary?

A.    Right.

Q.    When did you first became aware of Josh with connection with North Shore?

A.    When David passed away.

Q.    Before that you had nothing to do with him?

Page 136

D. O'SULLIVAN

A.    No.

Q.    Do you know Wendy Kwun?

A.    Yes.

Q.    Before David passed away, did you know Wendy?

A.    No.

Q.    Did you know Jordan Baron?

A.    Yes.  Jordan worked at Baron Nissan, the son.

Q.    Do you know when you started working at North Shore and Sunrise whether he had any relationship to any of the dealerships?

A.    I don't think that he did, I never saw his name at North Shore.  Jordan or Ronnie's names.

Q.    What about at Sunrise, did you ever see any paperwork?

A.    No, Jordan and Ronnie, no.

Q.    Have you ever seen the tax returns for either one of the dealerships?

A.    Yes.

Q.    When did you see the tax returns?

Page 137

D. O'SULLIVAN

A.    When Tom would print them out and do them.

Q.    Tom Jones?

A.    Yes, Tom Jones.

Q.    He prepared tax returns?

A.    Yes.

Q.    Do you know when he prepared the tax returns?

A.    End of the year.

Q.    Did he do it every year?

A.    As far as I know.

Q.    Are you familiar with the firm Richard Wick?

A.    I recall a check to Richard Wick a couple of times, but, I don't know what they did.

Q.    What about Helen Cara?

A.    She had nothing do with North Shore, she was at Port Motors.

Q.    You actually think you saw the tax returns Tom prepared?

A.    He gave them to me, yeah.

Q.    When did he give them to you?

A.    When they were done, I never

D. O'SULLIVAN

did them.

Q.    Do you know where he got the information from to prepare the returns?

A.    I guess from the financial statements.

Q.    Did you ever look through the tax returns?

A.    No, not really, no.

Q.    Did you ever look to see whether it made a profit or loss?

A.    I knew from the financial statements, I didn't have to look at the tax returns.

Q.    You never took a look to see who is listed as the owner on the tax returns?

A.    No.

Q.    Now, at any point were you aware whether Josh Aaronson ever took any money out of any of the companies?

A.    As far as I know he never did.

Q.    What about Jordan Baron?

A.    No.

Q.    What about, do you know who

Page 139

D. O'SULLIVAN

Raymond Phelan is?

A.    No.

Q.    You never saw any money going to him?

A.    I don't know who he is.

Q.    You said Brian got money some money and David got some money?

A.    Correct.

Q.    Do you remember whether Asad ever came into the dealership?

A.    Oh yes.

Q.    How often did he come in?

A.    Maybe once a month.

Q.    What did he do when he came in?

A.    Came in, looked around, how are you doing, stuff like that.

MS. VERBONITZ:  Who did you ask?

THE WITNESS:  Asad Khan.

MS. VERBONITZ:  Thank you?

BY MR. RUDERMAN:

Q.    Did he come in by himself or with someone else?

A.    Usually by himself.

Page 140

D. O'SULLIVAN

Q.    He came on a regular basis?

A.    No, not a regular basis, he would pop in every once in a while.

Q.    When he came in, did he meet with anybody?

A.    Anthony, I think.

Q.    In Anthony's office?

A.    Yes.

Q.    Did he review any documents?

A.    Not really, no.

Q.    He didn't you ask to print out anything for him?

A.    I don't think so.

Q.    Did you ever speak to him?

A.    Sure, many times.  I knew him from Best Ford.

Q.    Did you ever talk about the business of North Shore or Sunrise?

A.    Not really, no.

Q.    Did he ever ask you about business of North Shore or Sunrise?

A.    I would say, good, we sold X amount of cars, stuff like that.

Q.    Did Anthony ever refer to

D. O'SULLIVAN

Mr. Khan at all?

A.    As what?

Q.    Did he ever mention his name in conversation?

A.    They would meet together.

Q.    Did he ever say, this is Asad --

A.    I knew him before he came in.

Q.    Did you ever see the two of them together?

A.    Sure, when Asad came in he would talk to Anthony, not me, just hello.

Q.    You weren't part of the conversation?

A.    No.

Q.    Anthony never described to you what his relationship was to Asad?

A.    No.

Q.    Or what Asad's relationship was to the business?

A.    No.

Q.    You knew Brian also?

A.    Correct.

Q.    Did Brian ever come into the

D. O'SULLIVAN

dealerships?

A.      Once in a while.

Q.      When he did come in, what did he do?

A.      Look around general stuff like that.

Q.      Did he meet with Anthony usually?

A.      Yes.

Q.      Did Anthony and Brian and you ever speak together?

A.      No.

Q.      Did Brian ever ask for any documents?

A.      Yes, he would look at the financial statements, yes.

Q.      Did he ever have any questions about the financial statements?

A.      He never asked me about it, no.

Q.      Do you know Mr. Harry Thomasson?

A.      No.

Q.      Have you ever met him?

A.      No.

D. O'SULLIVAN

Q.    Do you know who he is?

A.    No.

MR. RUDERMAN:  Let's take a break now for lunch and come back at 1:55.  Off the record.

(Whereupon, a lunch recess was taken.)

Q.    How was your lunch?

A.    Very good.

Q.    Are you familiar with the gentleman by the name of Marc Merckling?

A.    Yes.

Q.    How do you know Marc?

A.    He worked at North Shore and Sunrise.

Q.    What did he do for those dealerships?

A.    He was like a sales manager.

Q.    How do you know that's what he did?

A.    He told me his title was sales manager.

Q.    He told you that?

A.    Yeah, or Anthony told me.

D. O'SULLIVAN

Q.   Was he working there already when you started working there?

A.   Yes, I think he was, I am not sure.

Q.   When you first were introduced to him, either he or Anthony said was a sales manager?

A.   Correct.

Q.   There were salespeople there, correct?

A.   Yes.

Q.   What is your understanding of what a sales managers position entails; what do they do?

A.   He directs the sales force.

Q.   Is it your understanding that that's what he was doing there?

A.   Yes.

Q.   Do you know what his hours were?

A.   He worked different hours because he was a police officer.  He had a real job, this was his second job.

Q.   He was doing both at the same

D. O'SULLIVAN

time?

A.    Yes.

Q.    So, he was working at the dealership when he wasn't working as a police officer?

A.    Yes.

Q.    Do you know what his training or experience was in connection --

A.    He was a swat officer.

Q.    You have to let me finish the question.

THE REPORTER:  I am trying to get a clear record.  You guys are constantly cutting each other off. Here is what I have.

(Whereupon, the last question was read back by the reporter.)

Q.    Do you know what his training was as a cars sales manager?

MR. KATAEV:  He said swat officer.

MR. RUDERMAN:  Yes, but I wanna know --

A.    His training or experience as a

D. O'SULLIVAN

car sales manager?

Q. If you know?

A. I don't know. He just told me he was a sales manager.

Q. Do you know if he worked at another dealership other --

A. I have no idea.

Q. Did you see him regularly interact with the salespeople?

A. Yes.

Q. Did you see him give them direction of some kind?

A. Yes.

Q. Did they have meetings?

A. Yes.

Q. When did they have these meetings?

A. I think that it was every Monday morning.

Q. Was it held in the sales location or the conference room?

A. Sometimes in the conference room, sometimes in the showroom.

Q. Were you ever in attendance at

D. O'SULLIVAN

those meetings?

A.    No.

Q.    How did you know what was being discussed?

A.    I don't know.  Obviously, it was sales stuff being discussed.

Q.    You never heard him talk to the salespeople about sales stuff?

A.    No.

Q.    What was your relationship like with the salespeople; did you ever interact with them?

A.    Yes, we talked all the time.

Q.    Not just business?

A.    Yeah, they bring paperwork in the back office, how are you, what did you have for lunch, stuff like that.

Q.    Did they ever discuss Mr. Merckling at all?

A.    Not really, no.

Q.    What interaction did you have with Mr. Merckling?

A.    Just friendly stuff, he drank a lot of coffee, he would bring me coffee

Page 148

D. O'SULLIVAN

once in a while.

Q.    When he was working did he have an office?

A.    Yes.

Q.    Where was his office?

A.    Right off the showroom.

Q.    You previously testified about certain offices that --

A.    Right.

Q.    That were there.

A.    Right.

Q.    None of them, I do not think that you mentioned --

A.    I should say they built his office in the last six months right off the showroom.  It wasn't there in the beginning.

Q.    At some point they built an office?

A.    Correct.

Q.    Then he took that office?

A.    Yes.

Q.    Was he there by himself?

A.    Yes.

D. O'SULLIVAN

Q.    How many hours a week did he work there?

A.    It varied, depended on the schedule with Nassau County.

Q.    Was he ever there, would you would consider full time?

A.    I guess so.  I mean he worked a lot of off hours.  He would be working at night when I left, I do not really know his total hours.

Q.    Was there another sales manager?

A.    No.

Q.    Did Antony have any relationship directly with any of the salespeople that he saw?

A.    Sure, he used to talk to them all the time.

Q.    Do you know a gentleman by the name of Dwight Blankenship?

A.    Yes, he was also a swat officer.

Q.    Was Mr. Merckling still working as a officer through the entire time that

D. O'SULLIVAN

you were there or did he -- as far as you know retire, while you were there?

A.    He was working as far --  I think at the real end, he sort of retired.

Q.    Dwight Blankenship, who was he in connection with the dealership?

A.    He was probably, I would call him an assistant sales manager, he helped Marc a lot.  They were both swat officers.

Q.    Is the understanding that Dwight was also a Nassau County police officer?

A.    Yes, he was a swat officer.

Q.    What hours did he work?

A.    Depending what his work with Nassau county was.  He worked a lot at Sunrise, he worked a lot at night, stuff like that.

Q.    Did he work full time as well?

A.    I would say, yeah.

Q.    Do you know how Mr. Merckling was compensated?

A.    They both got checks made out to a company, whatever company they had.  I

D. O'SULLIVAN

forget the name of it.

Q.   How much were they compensated?

A.   It depends what Anthony said to pay them.

Q.   It was not the same every week?

A.   No.

Q.   Did they get paid weekly?

A.   Yes, sometimes every two weeks.

Q.   They would get a check made payable to the company?

A.   Correct.

Q.   Sitting here today, do you know how much that --

A.   It depends, Anthony said give them $1,500, give them a $1,000, whatever.

Q.   Were there any taxes deducted for those?

A.   No, it was made out to a corporation.

Q.   Do you know why it was made out to a corporation?

A.   So they didn't have to pay taxes.

Q.   Well, that's --

Page 152

D. O'SULLIVAN

A.    That's my personal opinion. I'm sure that they paid taxes I guess, I don't know.

Q.    As you sit here today, you do not know why they chose that as opposed to being employees?

A.    I have no idea.

Q.    Did you ever ask why they weren't paid as employees?

A.    Above my pay grade.

Q.    Other than Mr. Merckling and Mr. Blankenship was there anybody else who got paid --

A.    No.

Q.    Other than salary, I mean commissions?

A.    No, paid by check.

Q.    Paid by check through the payroll system?

A.    No.

Q.    The dealership you testified that some people would purchase a vehicle with cash or a check, right?

A.    Right.

D. O'SULLIVAN

Q.     If they gave a check for the purchase of the vehicle, where would that be deposited?

A.     In the main account.

Q.     Each dealership had its own main account?

A.     Yes.

Q.     It would be deposited in that main account?

A.     Yes.

Q.     Did customers ever pay cash?

A.     Yes.

Q.     Did customers ever make cash deposits towards a vehicle?

A.     Yes.

Q.     What was done with the cash when it came into the dealership?

A.     It would be deposited in the bank or sometimes Anthony would take the cash.

Q.     Let's break it down.  A customer comes in with a deposit, they give $2,000 cash deposit?

A.     Right.

D. O'SULLIVAN

Q.    Where does the money go?

A.    In the bank account or Anthony would take the money.

Q.    If it came in that day, I know that other people testified about a safe?

A.    Right, that's if the money came in at night.

Q.    If it came in the day, it would either go to the bank or Anthony would take it?

A.    Correct.

Q.    When it at night?

A.    It would go into the safe.

Q.    When money would come in, were cash deposits or cash purchases handled differently?

A.    What do you mean?

Q.    In other words, what you do with the money?

A.    I don't know what you mean.

Q.    If somebody gave a cash payment and it went in later at night or later in the day, you said that it might go to the safe?

D. O'SULLIVAN

A.    Correct.

Q.    Did each dealership have its own safe?

A.    Yes.

Q.    Where was the safe located in the dealership?

A.    In the back office.

Q.    Was it a key or combination?

A.    Combo.

Q.    As far as you know, who had the combination to the safes?

A.    Anthony had a combination, I had a combination, Marc and Dwight had a combination.

Q.    If the money would come in, how would the money physically get into the safe, did you need to open it?

A.    No, there was a drop box, like you can drop the money in, without opening the safe.

Q.    But, you couldn't get money out?

A.    No, you couldn't get the money out.  You had to open the safe to get money

Page 156

D. O'SULLIVAN

out.  There was a drop box type thing to put it in.

Q.    If somebody came in and bought a car for cash that was later in the day?

A.    Right.

Q.    Would that be also be deposited the same way?

A.    Yes.

Q.    Just loose bills?

A.    Yes, or maybe in a rubber band or something like that.

Q.    Was there any note to indicate this is cash that came from --

A.    No, there would be a sales contract with it, like Joe Jones came in and gave a $5,000 deposit for this.

Q.    Would that contract be in the safe or --

A.    No, with the money, wrapped in the money.

Q.    So the money would be wrapped in a contract?

A.    Right.

Q.    That would be put into the

D. O'SULLIVAN

safe?

A.    Right.

Q.    When you open up the safe you would know what that money was for?

A.    Right.

Q.    Was there paperwork was that kept so that would you know what cash came in that --

A.    That went in the safe, the paperwork would go in the folder.  Every customer would have a folder.

Q.    So, in the folder for that customer would be noted that they gave cash?

A.    X amount of cash or whatever, yes.

Q.    Would that also be recorded somewhere in the Dealer Track system?

A.    Of course.

Q.    How would that --

A.    Once you make a deposit, if I'm making a deposit, I'm gonna put like Tom Jones had -- Sam Jones had a $5,000 deposit, you enter it in the system and

D. O'SULLIVAN

then you have a record of it.

Q.    So the Dealer Track system will keep traffic of each transaction?

A.    Yes.

Q.    If someone is purchasing a vehicle and didn't finish the transaction, there would be a new transaction listed for this customer?

A.    Right.

Q.    In that, it would list what vehicle they are looking at?

A.    Right.

Q.    That money they gave as a deposit?

A.    Say if I took the $5,000 out of the safe, I would record it and say Sam Smith $5,000 deposit.

So, there would be a record of it and then I would take it to the bank and deposit, and deposit that money.

Q.    When the money first gets put into the safe, nobody is yet recording that money?

A.    No.

D. O'SULLIVAN

Q.    Against that transaction?

A.    Not until the money comes out of the safe.

Q.    Was there a regular practice as to who would open up the safe on a daily basis?

A.    I would open it or Marc or Dwight.  Anthony rarely opened it.

Q.    When it was opened, what were they supposed do with it, right then and there, what was the first step?

A.    To give the money to me in the back office to record it.

Q.    Along with the copy of a contract?

A.    Yes.

Q.    It would be your responsibility to record that cash against a particular transaction?

A.    Right.

Q.    What would be done with that cash at that time?

A.    I would usually -- if it's a large amount, say $10,000 or $15,000, I

D. O'SULLIVAN

would go right to the bank and deposit it right then and there.

Q.    Did you ever have anybody else do the deposits?

A.    Oh, well, yes, once in a while Marc or Dwight would go to the bank and make a deposit.  If it was a large amount.

Q.    Is the reason, is there a reason why would you have them do the deposit rather other than you?

A.    Well, there was no reason.  It would have been easier for them to do it immediately.

Q.    Would Anthony ever do cash deposits?

A.    Rarely.

Q.    You also stated that sometimes Anthony would take the cash?

A.    Correct.

Q.    What type of circumstances might that be?

A.    He would say give me the cash and I will take care of it.  Just record it.

D. O'SULLIVAN

Q.     Would that happen, you discussed different transactions; one where the customer comes in and everybody is still around that day?

A.     Right.

Q.     The other one is later in the day where it goes to the safe?

A.     Right.

Q.     In the situations where Anthony would take the cash in both of those times or only one or the other?

A.     One or the other.

Q.     A customer comes in and give a certain amount of cash and Anthony says, I'll take that cash?

A.     Yes.

Q.     But you would record it?

A.     Right.

Q.     You so the customer got credit for it?

A.     What would happen was, I would record that Sam Smith had a $5,000 deposit and then it would be charged against Anthony's capital account, that he took the

D. O'SULLIVAN

money.

Q.   Against his capital account?

A.   Right.

Q.   I know that we discussed the Dealer Track system --

A.   Right.

Q.   Or the Reynolds system?

A.   Yes.

Q.   There were account numbers?

A.   Right.

Q.   You would put it towards a capital account?

A.   Yes.

Q.   Do you know what number that was offhand?

A.   I don't remember.

Q.   What is your understanding as putting it in the capital account?

A.   It means, if you are a capital account, you are a owner or something like that, if you weren't an owner, you wouldn't have a capital account.

Q.   Do you know what the tax implications are of putting the money

D. O'SULLIVAN

against the capital account?

A.      Just, he would be reducing his capital into the business.  If his capital was a $100,000 in January and he took the $5,000 deposit, his capital account would be $95,000.

Q.      So it would be a return of the capital?

A.      Right.

Q.      But, it was not put in as an income?

A.      No.

Q.      Did you keep a separate journal of some of kind where all cash receipts were recorded?

A.      No.  We had a book like a notebook type thing.  You know if you came in and gave me a $5,000 deposit, the salesman would write out a receipt for the book to give to the customer to prove that he gave the $5,000 to someone.

MR. MARWAHA:  Kim, someone is waiting to get into the room.

THE REPORTER:  I see that

Page 164

D. O'SULLIVAN

counsel.  I am typing very quickly today.  I can't take the record and keep letting everyone in the room.

MR. MARWAHA:  Understood.

THE REPORTER:  Counsel, do you need to know where we were?

MR. RUDERMAN:  No, I'm good.

Q.    We were discussing this receipt book?

A.    A receipt book, yes.

Q.    Is it one of those where you write it in, it's like a duplicate that you write on it?

A.    Yes.

Q.    At any time you can open up this booklet and you'd see an imprint of each one of the cash receipts?

A.    Yes.

Q.    Whether Anthony took the cash or didn't take the cash, the money would get recorded to the credit of the customer by you, right?

A.    Yes.

Q.    There would also be a record of

D. O'SULLIVAN

that cash coming in to the receipt book?

A.    Correct.

Q.    Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank?

A.    Yeah, whenever Anthony's capital account was reduced.

Q.    Is it your testimony that if we were to look at the financial records, the financial entries that were made in the Dealer Track system, it would show all of cash that Anthony had taken?

A.    It would show a reduction of his capital account, not necessarily the cash.  I don't see how anything it could be, it wasn't a check, it had to be cash, it was a journal entry.

Q.    It was a journal entry?

A.    Right.

Q.    Did you put a note --

A.    No, it wasn't a journal entry, when I deposited the $5,000 in the bank, it would be a debit to the bank, increasing

D. O'SULLIVAN

the bank and it was a reduction of his of his -- no, I would make it -- I'm sorry make a journal -- if it was a deposit to the bank, it would be a deposit to the main account and credit to the customer.

If it was, if Anthony was taking the money, I would make a journal entry crediting the customer, reducing his capital account.

Q. Were those entries you made at the same time?

A. Yes.

Q. If we were to review the entries that you made, we should be able to correlate receipts of a customer credit for deposit and then a corresponding entry to reduce Anthony's capital accounts?

A. Correct.

Q. Is that the only way that you could track what cash he took?

A. Yeah.

Q. Now, do you know whether in fact all the cash that Anthony took was disclosed to you?

D. O'SULLIVAN

A.    I guess so, yeah.

Q.    Did you keep track to make sure that all of the receipts, cash receipts that credited a customer were properly recorded so you would see the money going --

A.    I would get the receipt.  The salesperson makes out the receipt and gets the receipt.

Q.    Every time you received cash, you would know that the customer got credit for it?

A.    Right.

Q.    Then you would either know that it was put into the bank --

A.    I would either deposit it into the bank or make it a an entry and reduce Anthony's capital account.

Q.    You kept track to make sure that -- did you check, for example, to make sure that the cash that you gave a customer credit for, that was supposed go into the bank actually made it into the bank?

A.    It didn't make it --

D. O'SULLIVAN

Q.    Once it --

A.    Oh, once it -- it was a cash deposit on the bank statement, yeah.

Q.    Did you check the bank statement to make sure that all your cash that you recorded was going -- actually made it to the bank?

A.    I did not have to, I made the deposit myself.

Q.    Were there ever situations where Mr. Blankenship or Mr. Merckling may have taken the money to make deposits but you never took track to make sure that it made it to the bank?

A.    No, every time they deposited it into bank, they gave me the deposit slip back, Marc or Dwight -- say it was a lot of money like a $20,000 deposit, they had guns, they would go to the bank with the $20,000 and come back and give me a deposit ticket that it was definitely put in.

Q.    Is it fair to say as far as you are concerned, you kept track of all the money that went into the bank and all of

D. O'SULLIVAN

money that Anthony took for himself?

A.    Yes, right.

Q.    Is there a reason why you did not tell David this was going on?

A.    I assumed they had a deal, I don't know, above my pay grade.

Q.    After David died I believe you said Josh was involved?

A.    Yes.

Q.    What was your understanding of Josh how he became involved?

A.    I think he took over, he was looking after David's interest, because he is David's son in law.  I believe that he had power of attorney from Iris, David's wife to look after her interest.

Q.    When was the first time, did you ever meet Josh?

A.    Of course.

Q.    When was the first time that you recall meeting Josh in connection with the dealership?

A.    Josh used to work at Port Motors, I know him for years.

D. O'SULLIVAN

Q.    When was the first time that you became aware he was involved in North Shore and Sunrise?

A.    Right after David died, he wasn't involved before that.

Q.    When you first became aware that he was involved, what do you recall him doing you differently to --

A.    Nothing really.

Q.    Do you recall him coming in the dealership and meeting with Anthony?

A.    Yes.

Q.    Were you part of that discussion?

A.    No.

Q.    As a result of those discussions, do you recall anything changing in the way the dealership was being operated?

A.    Not really, no.

Q.    Other than the monies before David died, other than the monies that David and Asad and Brian had taken that you testified about, was there any other money

D. O'SULLIVAN

going out to any business or person related to David that you are aware of?

A.    No.

Q.    After David died and Josh was there was in any change in --

A.    No, nobody was getting paid, no.

Q.    Are you aware of whether there was any payments made to anyone at Island Auto Group?

A.    We used to have a management fee every month.

Q.    Was that in place before David died?

A.    No.

Q.    It was after Josh took over?

A.    Correct.

Q.    Do you know how that came about?

A.    That's when Wendy came to oversee a bunch of stuff and we had to make a management fee.

Q.    How soon after David died did that happen?

Page 172

D. O'SULLIVAN

A.    I don't recall.

Q.    Were you part of that conversation or were you just told what to do?

A.    I was just told what to do.

Q.    You weren't in any meeting where they discussed what to do?

A.    No.

THE REPORTER:  Please keep your voices up.

Q.    You weren't told why were you doing anything, just now what to do?

A.    Yes.

Q.    What were you told to do?

A.    About what?

Q.    About the management fee.

A.    They told me to make out a check.

Q.    For how much?

A.    I think it was $65,000.

Q.    How often?

A.    Once a month.

Q.    This would be from one or both dealerships?

D. O'SULLIVAN

A.    No, it was from both dealerships.  I think that it was $65,000 total, 30 and 35, something like that.

Q.    Was the money written out from one or both -- split between the two?

A.    Yeah, split.

Q.    One was it for 30 and one for 35?

A.    Yes.

Q.    Who wrote out those checks out?

A.    I did.

Q.    On the computer?

A.    Right.

Q.    You would generate the check and who would sign the check?

A.    Anthony would sign the check or Josh would sign the check.

Q.    What was done with the check?

A.    It was hand delivered or mailed off to Island Auto.  Wendy might pick up -- if she was there, she might pick up the check and take it to Island Auto.

Q.    Was any difference in the way that the dealership operated before and

D. O'SULLIVAN

after Josh got involved?

A.    Yeah, he got a little more control of things, Josh did.

Q.    What about, was there any, for lack of a better term, back office work?

A.    No.

Q.    In other words, somebody not at the dealership doing work for the dealership?

A.    No.

Q.    Everything was always handled at the dealership level?

A.    Yes.

Q.    As far as you know Wendy got involved in the regular operations of dealership, after Josh got involved?

A.    She might come in and supervise a bunch stuff, but she didn't write checks or anything like that.

Q.    How often did she come in?

A.    Sometimes twice a week, sometimes three times a week.

Q.    What did she do when she was there?

D. O'SULLIVAN

A.    Just trying to see what was going on.

Q.    Did she ask questions?

A.    Of course.

Q.    Did she ask to see documents?

A.    Yes.

Q.    What did she ask to see?

A.    Look at schedules, stuff like that, financial statements and so on.

Q.    Did she ever give you any instructions?

A.    She might tell me what to do, yes.

Q.    Was she ever there when Tom Jones was there?

A.    Um, maybe once in a while, but rarely.

Q.    She did start coming in immediately or was it a while before --

A.    It was a while before she started to come in.  Josh had her come in all of the time at the end.

Q.    Did Wendy start coming in two or three times a week at the end?

D. O'SULLIVAN

A.    Yes.

Q.    If David passed away in May of 2021, our records indicate sometime in fall of 2022 is when there was a change, I believe, that you actually left in October of 2022.  When did Wendy come in, that you know of?

A.    Wendy would come in when Josh wanted her to come in, when he took control, he wanted her there to see what was going on.

Q.    But, that was at the end?

A.    That was at the end.

Q.    Do you recall any times Josh told Anthony or somebody at the dealerships that they had to reduce the amount of the inventory?

A.    Yes.

Q.    When was that?

A.    At the end, we had too many cars.

Q.    What, if anything happened as a result of that, if you know?

A.    They sold a couple of cars.

D. O'SULLIVAN

Q.    When you say, they, who is they?

A.    I think Anthony or Josh sold the cars outright, I think Anthony did.

Q.    When you say, sold outright, what does that mean?

A.    He wholesaled the cars to somebody.

Q.    Normally the vehicles would be sold retail?

A.    Normally retail, correct.

Q.    In order to reduce the inventory he sold some at wholesale?

A.    Correct.

Q.    Do you know how he would go about doing that?

A.    We had a regular couple of guys that brought wholesale cares all the time, they would be guys that would buy the cars.

Q.    Do you recall whether these vehicles were sold, whether they were sold for more or less than that they were purchased for?

A.    Some of them were sold a little

D. O'SULLIVAN

more, some were sold for a little less.

Q.    Do you recall whether there was a large loss as a result of selling the wholesale vehicles?

A.    What do you mean by a large loss?

Q.    Over a $100,000?

A.    No, four, five, six, ten maybe loss.

Q.    In total?

A.    I don't know, I did not keep track.  It was only like three or four thousand loss on a car, something like that.

Q.    You do not remember seeing any large losses?

A.    Like, $50,000 losses?

Q.    Yes.

A.    I don't recall that, no.

Q.    There were some high end cars, right?

A.    Yes.

Q.    There may have been like a Rolls Royce or a Ferrari?

D. O'SULLIVAN

A.    If the car was a $100,000, it wasn't sold for $50,000.

Q.    When the cars were sold, as far as you know at wholesale, did the dealership receive checks for those cars?

A.    Yes.

Q.    Did they ever receive cash from those cars?

A.    Sometimes there were -- there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500.  Ordinarily it would be a check.

Q.    I believe that you previously testified that Anthony would tell you which trades, the cars traded in, which to pay off and which not to pay, right?

A.    Yes.

Q.    At its height, the largest amount, do you know approximately how much you were hold not paying off?

A.    The cars?

Q.    The amounts?

D. O'SULLIVAN

A.    Might be a couple of $100,000.

Q.    That is just your recollection?

A.    Yes.

Q.    Do you recall --

A.    I would get five phone calls a day from people telling me how come you haven't sold my car yet, why haven't you paid off my car.

Q.    What would you say?

A.    I would say, we are working on it.

Q.    Did you reach out to Anthony?

A.    Of course.

Q.    You reached to you Anthony?

A.    Yes.

Q.    What, if anything did he say?

A.    I will take care of it.  I will take care of it.

Q.    Did you understand, what did that mean, he would take care of it?

A.    He told me to what to do.

Q.    So, he basically just didn't do anything at that point, right?

A.    No.

D. O'SULLIVAN

Q.    What about Ally, what was the largest amount that he told you not pay to Ally?

A.    There might be four or five, six cars.

Q.    Did there come a time where you advised Wendy about this?

A.    Yes.

Q.    When was that?

A.    Towards the end.

Q.    Why did you tell her at that time?

A.    I was getting tired of getting all these phone calls from all of these customers not paying off all of these cars.

Q.    What, if anything did you tell her?

A.    I told her what was going on.

Q.    How did she respond?

A.    I think that she told Josh and Josh came in and but the kibosh on things.

Q.    What does that means, put the kibosh on things?

A.    Like told them what to do, told

D. O'SULLIVAN

Anthony what to do.  Then, Wend started keeping track of the payoff and started making some of the payoffs.

Q.    Do you recall that there was insufficient cash in the accounts to make the payoffs that were necessary?

A.    Yes.

Q.    Do you know how short the accounts were?

A.    A couple of $100,000 short.

Q.    Do you recall whether those funds became available from Josh or Wendy?

A.    I understand that Josh put some money into the business to payoff some of cars and the trades.

Q.    Do you know how much in total he paid?

A.    No, I don't.

Q.    Did you ever have discussions with Anthony around that time, about what was going on?

A.    No.

Q.    What was your understanding about the viability of the business at that

D. O'SULLIVAN

time, in other words, did you think the dealership was going to continue, not continue; what did you think was going to happen?

A.    I did not know.  I was skeptical, but I didn't know.

Q.    What was your personal situation, did you wanna stay there, not stay there?

A.    I was thinking about leaving at the end, yes.

Q.    Can you see what on the screen?

A.    Yes, I don't have any glasses, but.

Q.    There is a series of documents that Wendy provided to me that I provided to other parties in the action.

It starts at IH 005527.  It's e-mail that was scanned from a scanner at UEA premier.com to Wendy on August 30, 2022.

Are you familiar with that e-mail from a scanner?

A.    No.

D. O'SULLIVAN

Q.    Wendy said that this e-mail came from you?

A.    From me?

Q.    That you scanned this into her?

A.    I didn't even know we had a scanner.  I didn't know that.  I scanned that to her?  Are you sure I didn't fax it?

Q.    This is what she said.  She then sends this e-mail to you and Anthony Deo; do you see that?

A.    Right.

Q.    Is that your e-mail address?

A.    Yes.

Q.    On August 30, 2022, it says, "Anthony see attached trade in payoffs checks Dan is holding"?

A.    Right.

Q.    Attached to that are documents. It starts here, these are all checks that she says are trade payoffs that you are holding?

A.    Right.

Q.    Do you recall providing these to her?

Page 185

D. O'SULLIVAN

A.     Yes.

Q.     This goes on for pages, correct?

A.     Right.

Q.     When you testified that Anthony was asking you to hold trade in payoffs; are these what you were talking about?

A.     Yes.

Q.     At some point you decided that you were going to let Wendy know because it became too much?

A.     Right.

Q.     This is what you are referring to?

A.     Right.

Q.     As a result of this, you said that Wendy became more involved?

A.     Yes.

Q.     This is dated August 30, 2022?

A.     Yes.

Q.     After that Wendy started to come more often?

A.     Correct.

Q.     Did you keep track of how much

D. O'SULLIVAN

money was in the bank account on any particular day?

A.    Yes, I could see.

Q.    You could see that?

A.    Right.

Q.    What was the reason that you want to the see how much cash was in the account on a particular day?

A.    To see if we could pay any of the trades.

Q.    It was your responsibility to actually initiate payments, correct?

A.    Yes.

Q.    So, you look and see what money do I have in the account, what money do I need to pay and figure that out?

A.    I might, say I might have a $100,000 in the bank account, the payoffs might be $200,000, I couldn't payoff the trades.

Q.    What about just regular bills, did you always check to make sure to see if there was enough cash in the account to pay off regular bills?

D. O'SULLIVAN

A.    Yes, because they were small bills.

Q.    What about Ally, was there enough money on a regular basis to pay off Ally?

A.    You mean payoff the --

Q.    No, the --

A.    The floor plan?

Q.    The floor plans?

A.    Not always, no.

MS. VERBONITZ:  Jeff, are you marking that as an exhibit?

MR. RUDERMAN:  Can we mark that as O'Sullivan Exhibit A please.

(Whereupon, O'Sullivan's Exhibit A, Series of documents, was marked as for identification as of this date by the Reporter.)

What I'm going show you next is a bank statement that was previously marked at the deposition of Anthony Deo.

It is marked as Deo 44A.  I am going to show share it now.

D. O'SULLIVAN

Q.     Mr. O'Sullivan, can you see that on the screen?

A.     Yes.

Q.     What do you recognize that to be?

A.     One of the bank accounts.

Q.     It says Chase bank, September 1, 2022 through September 30, 2022 for an account ending in 8112?

A.     Yes.

Q.     Do you recognize that?

A.     I think that was the operating account, I wouldn't swear to it, but I think it was.

Q.     For North Shore?

A.     Correct.

Q.     I'm going to draw your attention to this deposit right here, do you see that highlighted right there?

A.     Yes, $683,000.

Q.     Right.  It says it is a book transfer from 76 Fisk Street Associate.  It references, it says it's a loan from Island Auto Group.

Page 189

D. O'SULLIVAN

Do you recall a deposit of $683,000 being made from Island Auto Group to cover anything for this dealership?

A.    No, I think that Wendy did that deposit.

Q.    I didn't ask if you made it, are you aware of it?

A.    I would have saw it on the bank account, yeah, on the statement.

Q.    You testified there may have been a couple of $100,000 short or something, I'm seeing closer to $700,000.

A.    Okay.

Q.    When you refer to it, is this the type of money that you are talking about?

A.    What do you mean?

Q.    This is the type of deposits that you discuss when Wendy was putting in money to cover certain items?

A.    Right.

Q.    Is this what you recall, is just more than you recall?

A.    It is more money that I recall,

D. O'SULLIVAN

yes.

Q.     There is another one, the next day, 2519 Hylan Avenue a loan from Island Auto for $385,000?

A.     Right.

Q.     Is this again more of the deposits?

A.     Those are deposits that Wendy made, I did not make those deposits.

Q.     You did not have the money to make the deposits?

A.     Correct.

Q.     Wendy was making the deposits?

A.     Right.

Q.     Do you know how she had access to those accounts to make those deposits?

A.     All you needed is a deposit ticket and go to the bank.

Q.     These are transfers.

A.     She had access to the bank accounts.

Q.     Were you aware that she had access?

A.     Of course I was.

D. O'SULLIVAN

Q.    How were you aware that she had access to the bank?

A.    As soon as she came in.

Q.    At the end of August you became aware she had access?

A.    Yes.

Q.    Were you aware if she had accession before that?

A.    No, she never came in before that stuff.

Q.    You do not know if she did or she didn't?

A.    No.

Q.    The deposits that Wendy was making in around this time, what was your understanding that money was for?

A.    To help pay off the trades and floor plans.

Q.    Are you aware of any other reason why Wendy was depositing money into either of North Shore or Sunrise accounts?

A.    No.

Q.    You understand that the reason she had to do that was because there was

**Page 192**

D. O'SULLIVAN

insufficient money in the accounts to pay for these?

A.   Correct.

Q.   What is your understanding as to why there was insufficient money in the account?

A.   It was a lot money taken out of the business.

Q.   From whom?

A.   From Anthony.

Q.   You described taking money out, $5,000 a week in salary?

A.   Yes.

Q.   Sarah was getting $5,000 a week in salary?

A.   Right.

Q.   And he was getting seven and a half percent to --

A.   To Car Buyers.

Q.   To Car Buyers.  Is that when you said --

A.   No, it wasn't about cash --

THE REPORTER:  Please start over, I can't get a clear record.

D. O'SULLIVAN

Q.    The money that you're referring to -- he's taking a lot of money out of the business?

A.    No.  That was a regular weekly and monthly thing.  He would take out periodically a lot of cash deposits and cash CODs.

Q.    Every time a car is sold, right, the dealership is getting money for that car, correct?

A.    Yes.

Q.    You're not aware that money was not being collected by the dealer for the cars, right?

A.    Right.

Q.    Most of them were financed?

A.    Right.

Q.    When a car is sold, it owes money to Ally on one side and its getting money from the customer or the lender on the other side?

A.    Right.

Q.    You would take the money from the lender or the purchaser and pay out the

Page 194

D. O'SULLIVAN

difference of your gross profit?

A.   Right.

Q.   So, the money is coming in?

A.   Right.

Q.   But, it's not coming to pay Ally; is that what's happening?

A.   The finance money, if I get money from the finance company coming in it would be paid off.  If I'm getting $50,000 from a customer COD cash, that's not going into the business, than the car is not getting paid off.

Q.   So, for each specific transaction each car that's sold, that money that comes in is supposed go to pay specifically that money owed to the floor plan?

A.   Yes.

Q.   That was not done you are saying all of the time?

A.   Correct.

Q.   Because the money, because of what the money, why?

A.   All the finance money was paid,

D. O'SULLIVAN

if I get paid from the finance company, we can pay the car off.

If the COD was a $50,000 COD cash that we didn't get in the business, you can't pay the car off.  That builds up.

Q.    Did you keep track of the general profitability of the dealership?

A.    It was printed off on the statement.

Q.    But, those statements you said weren't verified?

A.    Correct.

Q.    Did you really understand the financial situation that the dealership was in looking at the statements?

A.    It is a little misleading, I guess.

MR. RUDERMAN:  Sharing my screen again.

This is another document.  It was marked, bate's stamp AIG-000013.

This is provided to me by Wendy and --

A.    Those are Tom Jones entries

D. O'SULLIVAN

made for the month.

MR. RUDERMAN:  I'm going to mark this as O'Sullivan's Exhibit B.

(Whereupon, O'Sullivan's Exhibit B, Document, was marked as for identification as of this date by the Reporter.)

Q.    Let me ask you the question. Do you recognize what you see on the screen?

A.    Yes.

Q.    What do you recognize that to be?

A.    Those are entries that Tom Jones had me make.

Q.    The date of these are May 29, 2022; do you see that?

A.    Yes.

Q.    Does that mean you made it on May 29th or you applied it as of May 29th?

A.    Wait a minute, May 29th, it was made on May 29th.  It was made on the 29th of the month, right.

Q.    Did you actually enter that on

                    D. O'SULLIVAN

May 29th?

        A.      Correct.

        Q.      When would Mr. Jones have been
there to give you those to make?

        A.      That day, he would give me the
entries at the end of the day that he was
there.

        Q.      At the end of the month or the
beginning of the --

        A.      Usually at the end of the
month.

        Q.      He came here according to this,
it means that he would have come in on May
29th?

        A.      Correct.

        Q.      He would have done, as he
described to you, ask for the schedules and
give you a sheet with adjusted journal
entries?

        A.      Correct.

        Q.      Based on that you would enter
these?

        A.      Correct.

        Q.      Is that your notation on the

D. O'SULLIVAN

right where it says Jones?

          A.     Correct.

          Q.     Why do you call the description Jones?

          A.     He's the one that gave me the entries.

          Q.     He didn't explain why?

          A.     No.

          Q.     There is a reference, if you take a look, it also has the date, it says JON; do you know what that is?

          A.     JON.

          Q.     Is that generated, look at the third column to the right.

          A.     That is JRN, that means journal?

          Q.     No.  The heading says reference.

          A.     Where is that?

          Q.     One, two, three, four, five, it is the sixth column?

          A.     Oh, right.

          Q.     It looks like it has a date?

          A.     Yes.

D. O'SULLIVAN

Q.    That you didn't put that in, that's generated?

A.    Right, generated.

MR. RUDERMAN:  I have another document.  It is a handwritten schedule.  We will mark this as Exhibit C.

It is several pages and bate's stamp AIG 0001274.

(Whereupon, O'Sullivan's Exhibit C, AIG 0001274, was marked as for identification as of this date by the Reporter.)

Q.    Do you recognize this document?

A.    Yes, this is a receipt.  Like a say, this, the column on the right, whoever took -- like the Ray took a cash deposit.

Q.    Tell me what this is?

A.    It is a receipt book, like a copy, like a receipt -- it's a handwritten receipt.

Q.    Previously you testified about a receipt book which would imprint where they wrote out the receipt, but this looks

D. O'SULLIVAN

like it is something different.

A.    This is a receipt from Sunrise. They took the money at Sunrise, they had a handwritten receipt like this.

North Shore had a receipt book.

Q.    I see, this was different?

A.    This is Sunrise records.

Q.    I see, okay. Who kept this record, who put the information in the system?

A.    Whoever would take the money like Ray, he was a salesman or whoever -- Ken Keisha was, whoever took it.

Q.    The last column would be the person who wrote this out and took the cash?

A.    Correct, took the cash from the customer.

Q.    By the way, some of them say cc, is that credit card?

A.    It could be a credit card, yes.

Q.    On top it says checks?

A.    Right. Check, cash or credit card.

D. O'SULLIVAN

Q.      Would this be a record of all deposits being made on cars?

A.      Correct, at Sunrise.

Q.      Some were credit card, some were check, some were cash?

A.      Correct.

Q.      There are words highlighted with purple on it, do you see that?

A.      Yes.

Q.      I'm going to represent this is a document you provided to us.  Did you put the purple on here?

A.      I don't think so, I don't remember.  I might have.

Q.      I'm also going to note that the one that have the purple, also seem to have a number at the end, an N number and an S number; do you see that, by the salesperson's name?

A.      An N or a S?

Q.      Yes.

A.      S, like this one, S-046 that's a stock number from Sunrise.

N2173 is a North Shore stock

Page 202

D. O'SULLIVAN

number.

Q.    Do you recall being asked by somebody at Island Auto to prepare and sign an affidavit in connection with a lawsuit against Mr. Deo?

A.    Do I know, no.

MR. RUDERMAN:  I'm going to show you this document.  This is an affidavit was that filed in the Nassau County clerk's office in connection with the New York state action on December 6, 2022.

I'm going to mark that as Exhibit D.

(Whereupon, O'Sullivan's Exhibit D, Affidavit, was marked as for identification as of this date by the Reporter.)

Q.    I'm going to scroll through this and ask you if you recall this?

A.    Yeah, I remember that.

Q.    You remember this?

A.    Yes.

Q.    Is that your signature?

D. O'SULLIVAN

A.    Yes, it is.

Q.    It was notarized?

A.    Yes.

Q.    In this, I will go back, in this affidavit you refer to cash deposits that are being taken and you say in your paragraph two, copies of the customer logs itemizing deposits.

"The deposits highlighted in pink were never deposited into the company accounts.  By my calculations the customer deposits which Deo failed to put into the bank exceed $230,000".

I'm going to represent to you that the document we just looked at, was document A --

A.    One the sheets.

Q.    One of the sheets.  The testimony you have been taking about, where Anthony Deo was taking cash, some of it was shown by those deposits?

A.    From Sunrise.

Q.    Some of them are reflected as to which ones were not taken?

D. O'SULLIVAN

A.    Right.

Q.    By the pink?

A.    I think that Wendy looked at them.

Q.    When you prepared this, did you prepare this affidavit or did somebody prepared it for you?

A.    I didn't prepare it, no.

Q.    Did you read the affidavit?

A.    Yes.

Q.    Did you agree with everything that you stated in the affidavit?

A.    Yes.

Q.    You swore that this information is true and correct, to the best of your knowledge?

A.    Yes.

Q.    You stand by that today?

A.    Yes.

Q.    Did you ever see a operating agreement for North Shore or Sunrise?

A.    Operating agreement for what?

Q.    Do you know what an operating agreement is?

Page 205

D. O'SULLIVAN

A.     No.

Q.     In connection with a limited liability company?

A.     No.

Q.     You never saw anything that would you understand to be called an operating agreement?

A.     No.

Q.     Are you aware that each dealership has to have a DMV license, correct?

A.     Yes.

Q.     Both North Shore and Sunrise had that license?

A.     Yes.

Q.     Do you know, during its operation, who the applicants were listed as owners for those licenses?

A.     No.

Q.     Did anybody ever tell you that Anthony Deo was not listed as the owner for these licenses?

A.     No.

Q.     Did ever anybody ever ask you

D. O'SULLIVAN

to be involved in transferring the DMV license ownership application to Mr. Deo?

A.    No.

Q.    Did Mr. Deo ever ask you to be involved in preparing the paperwork to change the ownership application for the DMW?

A.    Not that I recall.

Q.    Do you ever recall Anthony Deo asking you to send to Wendy or Josh or anybody at a Island Auto, the application to transfer the owner relationship to the DMV license?

A.    No.

Q.    Did Anthony Deo use his American Express card payments made by the dealership, as far as you recall?

A.    Yes.

Q.    Do you know approximately how much those payments were on a monthly basis?

A.    It varied.  He would charge a lot of business that I think were legitimate business, might have a lunch

D. O'SULLIVAN

meal for himself or whatever on there.

Q.    Did you book the charges when you received the American Express statements?

A.    Yes.

Q.    You applied them different accounts?

A.    Correct.

Q.    How did you decide where to charge those accounts to?

A.    It depends what it was.  I would go over it and see if it said like, Car Fax, that is legitimate that he owed Car Fax money.  He charged it on his card to the Car Fax account.

Q.    Do you recall any items on the American Express statement that were not business related?

A.    A few, but not many.

Q.    You testified about Anthony taking cash, was that consistent, the amount he was taking regularly over the course of your business there or did it fluctuate?

D. O'SULLIVAN

A.    There was no regular amount.

Q.    Did it occur more frequently at any particular time?

A.    No.  I don't know if there was a particular time.

Q.    Mr. O'Sullivan we met before, correct?

A.    Yes.

Q.    Do you recall when that was?

A.    You came to my house.

Q.    A few weeks ago?

A.    About a week or ten days ago.

Q.    We discussed some of the things that I've asked you about?

A.    Correct.

Q.    As a result of that you prepared a written statement, correct?

A.    Correct.

Q.    You read that statement?

A.    Yes, I did.

Q.    You agreed to everything that was in the statement?

A.    Yes.

Q.    You signed that?

D. O'SULLIVAN

A.    Yes.

Q.    It was notarized?

A.    Yes.

Q.    You stand by everything in the statement?

A.    Yes.

MR. RUDERMAN:  We will mark this as O'Sullivan's Exhibit E.

(Whereupon, O'Sullivan's Exhibit E, Mr. O'Sullivan's statement, was marked as for identification as of this date by the Reporter.)

I'm going to share that now.

Q.    Do you recall this statement?

A.    Yes.

Q.    You don't know have to read the whole thing.

A.    Good.  I can't see it.

Q.    You followed along with this as it a was read to you, correct?

A.    Yes.

Q.    You agreed with everything that was in there?

D. O'SULLIVAN

A.    Yes.

Q.    It was also provided to you typed, but you don't have a printer?

A.    No.

Q.    At the end there is a signature; is that yours?

A.    Yes.

Q.    I notarized your signature at that time?

A.    Yes.

MR. RUDERMAN:  Let's take a five minute break.  Off the record.

(Whereupon, a brief recess was taken.)

Subject to, only with regard to others who might question Mr. O'Sullivan at the deposition, I have no further questions.  Thank you.

MR. KATAEV:  I have no questions.

MR. THOMASSON:  I have questions.

MR. KATAEV:  Go ahead.

D. O'SULLIVAN

EXAMINATION BY

MR. THOMASSON:

Q.    Good afternoon, Mr. O'Sullivan. My name is Harry Thomasson.  I'm a party in this case and I represent myself.  I have a few questions for you this afternoon.

I was just wondering if you have taken any drugs or medication of any type that would impact your ability to answer questions truthfully today?

A.    No.

Q.    Do you have any memory deficits that you're aware of?

A.    Not really, no.

Q.    I just wanted to check, after you graduated from college you went to work for a company owned and operated by Morris Baron; is that correct?

A.    I didn't graduate from college, but the rest is correct.

Q.    Right, after your roughly one year of school, you went to had work for a company owned and operated by Morris Baron, correct?

Page 212

D. O'SULLIVAN

A.    Yes.

Q.    You knew Mr. Baron because you went to school at David Baron, didn't you?

A.    No, I did not.

Q.    You didn't know David Baron before you went to work for his father?

A.    Did not.

Q.    Did you get to know David shortly after going to work for his father?

A.    Yes, because in the summertime when he got home from school, he worked at the dealership in the summer.

Q.    That would have been that first job, would that have been the in 80s or the 90s?

A.    In the 80s, I think.

Q.    Since that time, have you always been in the car industry?

A.    Yes.

Q.    Has each of the dealerships that you worked at and for, were they all owned or operated at least to some extent by the Baron family?

A.    No, I only operated with the

D. O'SULLIVAN

Baron family at Port Motors.

At Millennium Toyota they had no interest in that place.

Q.    They had no interest in Millennium Toyota.  Other than Millennium Toyota, did they have an interest in all of the other locations you worked at?

A.    Yes.

Q.    You were at Millennium Toyota for how long?

A.    A year or a year and a half.

Q.    Out of the last, roughly 45 years of work, about 43 of them you spent working at a dealership in which the Barons held an interest?

A.    Yes.

Q.    You certainly feel like you have great loyalty to the Baron family, don't you?

MR. RUDERMAN:  Objection.

A.    Yes.

Q.    What was that answer, Mr. O'Sullivan?

A.    Yes.

Page 214

D. O'SULLIVAN

Q.   Wendy Kwun, didn't one of you train the other at some point in time?

A.   No.

Q.   You never worked with Wendy before North Shore?

A.   No.

Q.   You never knew Wendy before North Shore?

A.   No.

Q.   What is your cell phone number?

A.   My cell phone number?

Q.   Yes.

A.   What does that have to do with this?

Q.   I may be looking to see about communications.

THE WITNESS:  Do I have to answer that?

MR. RUDERMAN:  I am not your attorney.  Decide what you want.

A.   I really don't wanna give you my cell phone number.

Q.   Well, I'm asking you to please give it to me or we can call the Judge and

Page 215

D. O'SULLIVAN

the Judge will tell you to do so.

I wanna know about your communications with, with Wendy and Josh and David Baron.

A.  516-639-4345.

Q.  What carrier is that with?

A.  Verizon.

Q.  Has it always been?

A.  Yes.

Q.  How long have you had that number?

A.  I honestly don't remember.

Q.  At least most of this century?

A.  Yes.

Q.  Your home address at The Circle, how long have you lived there?

A.  Six months.

Q.  Where did you live before that?

A.  29B Hendrick Avenue in Glen Cove for seven months.

Q.  Where did you live before that?

A.  75 The Circle, Glen Head, New York for 11 years.

Q.  Now, you're at 53 The Circle,

D. O'SULLIVAN

is that right?

A.    Correct.

Q.    Is that correct?

A.    Yes.

Q.    Do you own 53 The Circle?

A.    No, I do not.

Q.    Do you have any idea how long you plan on staying there?

A.    No, I do not.

Q.    Do you have a lease?

A.    No.

Q.    Is it owned by an acquaintance of yours?

A.    Yes.

Q.    Who is that person?

A.    Geraldine Isinger.

Q.    Your wife is close friends with Iris Baron, isn't she?

A.    She's not my wife.

Q.    Is your partner a close friend of Iris Baron?

A.    They are friends, I wouldn't say close.  They play canasta together. They don't go out to dinner or anything.

D. O'SULLIVAN

Q.   You mention that David was typically at Port Motors on a daily basis, is that right?

A.   Yes.

Q.   Was he at North Shore before his death on a daily basis?

A.   Not on a everyday basis, no. Maybe two or three times a week.

Q.   When did you begin at North Shore?

A.   2021, something like that.

Q.   Was it before or after COVID?

A.   Before.

Q.   You started at North Shore before COVID?

A.   Yes.

Q.   If I were to suggest to you that the COVID pandemic began in March of 2020, would that refresh your memory as to when you started?

A.   It would be 2020, 2019 somewhere around there, yes.

Q.   You said David put you into that store?

D. O'SULLIVAN

A.    Yes.

Q.    Now, spoke about $60,000 payments being made by Anthony after Josh took over from David, right?

A.    What are you talking about payments?

Q.    Didn't you say there was about 30 or $35,000 due each month after Josh came in?

A.    Correct.  That's a management fee, yes.

Q.    That was a management fee that was being paid with respect to Josh providing or IAG providing floor plans, is that safe to say?

A.    Whatever they were doing, they would do in -- it covered everything that they did.  Everything that Tom wanted to do.

Q.    It was Anthony that told you to make those payments?

A.    Yes.

Q.    Those payments were made for North Shore out of a North Shore account,

Page 219

D. O'SULLIVAN

right?

A.    Yes.

Q.    For 189 Sunrise out of a 189 Sunrise account, is that right?

A.    Yes.

Q.    Did these accounts have any security on them, you know, positive pay or be tokens?

A.    No.

Q.    Nothing that you knew about?

A.    No.

Q.    Have you ever heard of positive pay?

A.    No, it was positive pay?

Q.    Have you ever heard of tokens on an account?

A.    No, what's tokens?

Q.    So, you weren't familiar with any security that could have been on those accounts; is that a fair way of putting it?

A.    Yes.

Q.    Who communicated for North Shore and Sunrise while you were at those two dealerships with the floor plan

D. O'SULLIVAN

companies?

A.    What do you mean by communicate?

Q.    When there was contact between the floor plan company and one of those two businesses, who would they usually speak to?

MR. RUDERMAN:  Objection to the form.

A.    They call me and make an appointment.  Call and say I'm coming January 1 to do an audit.

Q.    When there was contact between North Shore and the floor plan company, were you typically the person for North Shore that would be discussing matters with the floor plan company?

A.    What happened, what I would do, I would speak to the floor plan person that would take the list of all the cars and then he would hand me the list and say there are 20 cars missing, where are the 20 cars, out of a 100 say.

Q.    You would deal with issues like

D. O'SULLIVAN

that involving the floor plan, right?

    A.    I was doing that with myself and Frank and Anthony.

    Q.    If and when there was contact with the floor plan company for other matters, did you know who would deal with the floor plan company on behalf of those two businesses?

    A.    No.

    Q.    Did you have an understanding that David at first and then Josh secondarily after David's death were supplying floor plans to those two businesses?

    A.    No.  Ally was doing the floor plan.

    Q.    Right.  Was that being provided by or through David and Josh?

    A.    I have no idea, I don't know.

    Q.    You never saw the contract?

    A.    No.

    Q.    At some point in time, did you ask for some help as you were working at North Shore and 189 Sunrise?

D. O'SULLIVAN

MR. RUDERMAN:  Object to the form.  You can answer.

A.    What is the question again?

Q.    Did you ask anyone for help or assistance in performing your duties at any time while worked at those two businesses?

A.    I suggested it to Anthony that he hired someone, yes.

Q.    Do you know who was that?

A.    I think that her name was Rosa, I forget.  I do not remember.

Q.    Did she help?

A.    Yes.

Q.    What was it that you needed help with?

A.    Well, it was -- it's a lot of running both places, a lot of paperwork.

Q.    She helped with paperwork?

A.    Yes.

Q.    Do you know who held the lease for North Shore Motors?

A.    I forget who it was.  It was like 30 or $31,000 for rent for North Shore, but I forget who the landlord was.

D. O'SULLIVAN

Q.   Do you know who the tenant was?

A.   The tenant was North Shore.

Q.   Do you know who signed that lease for North Shore?

A.   I do not.

Q.   Same question for 189 Sunrise, at any time, did you see any lease for Sunrise?

A.   No.

Q.   Was it Anthony Deo that instructed you to make those lease payments?

A.   Yes.

Q.   Now, you made most of the cash deposits, right?

A.   Yes.

Q.   Occasionally you said Marc and Dwight made cash deposits, but you were always able to confirm that they made the deposits, right?

A.   Correct.

Q.   But, you believe that Anthony Deo took cash wrongfully from that business, is that right?

**Page 224**

D. O'SULLIVAN

A.    Yes.

Q.    Did anyone else take cash or any other money from that business that you know of was that was wrongfully taken?

A.    No.

Q.    Now, you indicate in your paperwork and in your affidavits that you believe he took $235,000, roughly, wrongfully from that business, is that right?

A.    Yeah.

MR. RUDERMAN:    Object to form. It misrepresents what's in the affidavit.

BY MR. THOMASSON:

Q.    Well, how much do you think Mr. Deo took, right now, as you sit here today, how much do you think he took in some way shape or form wrongfully from that business?

A.    I honestly don't know the total amount.

Q.    What is the amount that you do know?

Page 225

D. O'SULLIVAN

A.    I don't know.  I'd have to remember each individual thing, I do not keep copies of what he took.

Q.    Well, you've told us in affidavits that he took over $200,000, right?

Are you aware that he took over $300,000 wrongfully?

A.    I don't, no.

Q.    You don't know.  If anyone else had taken money wrongfully, would you necessarily know?

A.    Yes.

Q.    Why is that?

A.    Because who would take the money?  Nobody else that had power to take the money.

Q.    Do you know who had access to the bank accounts?

A.    What do you mean?

Q.    Do you know who the signatories were on the bank accounts?

A.    No.

Q.    Do you know who checked the

D. O'SULLIVAN

accounts and reviewed them each day?

A.    I know that Anthony could sign the checks and David could sign the checks, so I guess they had authorization.

Q.    Did Josh?

A.    I don't know.  I think he did, yes, I think that he could sign the checks, yes.

Q.    Did Wendy?

A.    No.

Q.    Did you?

A.    No.

Q.    Who else had authority that you know of, you told us Anthony, David and Josh.  Anyone else that you know of that could sign checks?

A.    Not that I know of, no.

Q.    At any time did Sarah, if you know?

A.    No, she did not have authorization.

Q.    That would be from the time you went to work there, is that right?

A.    Yes.

D. O'SULLIVAN

Q.    From the time you arrived you understood that Anthony and David Baron were the owners of North Shore Motors, is that right?

A.    Yes.

Q.    At some point in time, did you come to understand that Anthony Deo purchased an interest in 189 Sunrise Highway?

A.    No.

Q.    At any point in time did you see any tax returns that had Anthony Deo and Sarah Deo as the owners of both of those businesses?

A.    I didn't look at them, no.

Q.    Does that mean that e-mails went across your desk, but you didn't open them?

A.    No, it meant that I didn't look at the tax returns, look at them.

Q.    Did you have access to look at them if you wanted to?

A.    I guess I could have, yeah.

Q.    Where would they have been?

D. O'SULLIVAN

A.     I think Anthony had them.

Q.     Was Tom Jones working there from the time you arrived?

A.     I think he was, yes.

Q.     Who created all of the schedules that you saw on a regular basis?

A.     The computer generates the schedules.

Q.     Based upon input, right?

A.     Yes.

Q.     Who did the input on the computers for those schedules?

A.     Most of the stuff, a lot was done by me.

Q.     You could do anything with those schedules that you wanted, right?

        MR. RUDERMAN:  Object to form, you can answer.

A.     Repeat that.

Q.     You made decisions on what went into the computer for the schedules, right?

        MR. RUDERMAN:  Object to form.

A.     I objected, what happens was I posted the deals, that generated the

D. O'SULLIVAN

schedules, I didn't create schedules myself.

Q.    I understand.  But, it came from what you put into the computer, right?

A.    Yes.

Q.    Do you know if Wendy Kwun was involved at all at getting the pandemic relief loans?

A.    I don't know.

Q.    Do you know who did get pandemic relief loans for those two businesses?

A.    No, I do not.

Q.    Now, you testified that sometimes Tom Jones would have adjustments for you on the schedules, right?

A.    Yes.

Q.    When you worked at Port Motors, do you recall there being adjustments from time to time on their schedules?

A.    Yes.

Q.    So, it's not unusual for there to be adjustments when the accountants get involved for tax purposes, right?

Page 230

D. O'SULLIVAN

A.     Correct.

Q.     Sometimes you saw adjustments that you didn't completely understand, right?

A.     Yes.

Q.     Did you see any adjustments that you knew were improper?

A.     If I didn't understand them, I would not know they were improper.

Q.     I'm asking you something else. I'm asking you from what you did understand, were any adjustments improper?

A.     I don't know.  I don't recall that.

Q.     So, as you sit here today, there were no adjustments that you know were improper, is that fair to say?

A.     Yes.

Q.     You indicated you were more hands on in your work at North Shore and Sunrise then you were at Port Motors, right?

A.     Yes.

Q.     Why was that?

**Page 231**

D. O'SULLIVAN

MR. RUDERMAN:  Object to the form.  You can answer.

A.    Because I had much more help at Port Motors.

Q.    What help did you have at North Shore and 189 Sunrise?

A.    There was nobody until Anthony hired another girl.  At Port Motors I had four or five girls working for me.

Q.    Do you recall when Anthony hired another girl?

A.    When I told him it was, it getting a little bit too much.

Q.    It was getting too much for you to handle?

A.    Yes.

Q.    The amount of work you mean?

A.    Yes.

Q.    Were you able to keep up?

A.    Yes.

Q.    But, you had to catch up sometimes?

A.    What does that mean?

Q.    Did you get behind and then

D. O'SULLIVAN

have to catch up?

A.    I don't understand what you mean, catch up.

Q.    Well, did you get all of your work done on the same day that you should have had it done?

A.    Nobody does.

Q.    Sometimes you'd fall behind a little bit and then you'd have to catch up, is that right?

A.    Sometimes I might have to work a little overtime, but nobody gets everything done in eight hours.

Q.    How is it that you know Anthony Deo took cash?

A.    I gave it to him.  He asked for it.

Q.    And the cash would be given to Anthony deo and sometimes not make it into the account, is that right?

A.    Correct.

Q.    What would you do when you found out that it never a made it into the account?

D. O'SULLIVAN

A.    I would make the journal entry reducing his capital account.

Q.    Did you do that every time?

A.    Yes.

Q.    He had a capital account, he made capital contributions, is that right?

A.    I guess so, yes.

Q.    Can you tell me roughly as best you can recall what would be the percentage of cash payments on car deals on the one hand versus checks and credit cards on the other?

A.    Probably 65/35, 70/30 something like that.

Q.    That would be 70 percent checks and credit cards and 30 percent cash?

A.    Right, yes.

Q.    Did all checks and credit card receipts make it into the account?

A.    Of course.

Q.    What's that?

A.    Yes.

Q.    When you submitted financial statements to the floor plan providers, did

Page 234

D. O'SULLIVAN

you believe them to be accurate?

A.    Yes.

Q.    When cash payments came in, were you the person responsible for recording those cash payments in Dealer Track?

A.    Yes.

Q.    Did anyone else do that while you were there?

A.    Yes.

Q.    Who else did that, made recordings?

A.    The other girl in bookkeeping would do that.

Q.    Rosa?

A.    I think her name was -- I'm not sure, but I think it was Rosa, Rose.

Q.    You and Rose did that, did anyone else?

A.    No.

Q.    Do you know who provided Dealer Track to those two dealerships?

A.    Dealer Track did.

Q.    Was that software at those

Page 235

D. O'SULLIVAN

dealerships controlled by David and then Josh, or was that something controlled by Anthony, if you know?

A.    Dealer Track is a software company.  They had no ownership in the Dealer Track.

Q.    But, they had to purchase the software, right?

A.    Of course.

Q.    Who did that, do you know?

A.    I don't know, it was there when I got there.

Q.    Is there any reason that you know, other than cash payments not making it into the accounts that these two accounts that those two businesses were short?

A.    No.

Q.    That's the only reason that you know of?

A.    Yes.

Q.    To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right?

D. O'SULLIVAN

A.    I would guess so, yes.

Q.    You deducted that $200,000 plus from his capital contributions, right?

A.    Right.

Q.    Did you at any time he tell David Baron that Anthony was taking cash improperly?

A.    I don't recall, no.

Q.    Did you have any conversation with David Baron, if you can recall, about cash payments at North Shore and 189 Sunrise?

A.    No.

Q.    Do you know if Josh Aaronson tried to purchase an interest in North Shore?

A.    I have no idea.

Q.    You mentioned someone by the name of Frank Ventiliglia, did you ever work with him other than at North Shore and 189 Sunrise?

A.    No.

Q.    Did you know him well?

A.    I knew him from business there.

Page 237

D. O'SULLIVAN

Q. Did he seem to know what he was doing?

A. Yes, he seemed to be very knowledgeable.

Q. Have you spoken to him since North Shore and 189 Sunrise closed?

A. No.

Q. Didn't you work for a short time after 189 Sunrise and North Shore closed, didn't you work for a short time at Baron Nissan?

A. No.

Q. Did you ever work at Baron Nissan?

A. No.

Q. I'm sorry, I don't remember off the top of my head, I'll have to look through my notes. So please repeat the question.

A. I worked at Millennium Toyota, not Nissan.

Q. Millennium was after North Shore and 189 Sunrise?

A. Yes.

D. O'SULLIVAN

Q.    You're not there anymore?

A.    No.

Q.    Do you think you'll be working anymore?

A.    I don't think so.

Q.    Now, how long were the 60 or $65,000 payments made that you can remember, the management fee?

A.    Maybe a year, I think, maybe.

Q.    Are you familiar with something called the dealer management system or DMS?

A.    No.

Q.    When Wendy Kwun came into the dealerships after David's death did you consider other her to be someone senior to yourself?

A.    Yes.

Q.    Why is that?

A.    Because she was Josh's right hand man or woman.

Q.    Did you speak with her daily?

A.    Yes.

Q.    It was about the numbers going on at the dealership?

D. O'SULLIVAN

A.    Yes, correct.

Q.    Did you ever tell her that Anthony was taking cash that you had to reduce his capital fund contributions for?

A.    Yes.

Q.    How long after she came to work at North Shore or Sunrise, did you first tell her, if you remember?

MR. RUDERMAN:  Objection to the form.

A.    I don't recall.

Q.    Was there a time when you received a raise while you were working there?

A.    Yes.

Q.    Did you give yourself that raise?

A.    No.

Q.    Did someone tell you you could give yourself a raise?

A.    I didn't get one.  I didn't get a raise for myself, Anthony did.

Q.    That's what I'm asking you. Did you get a raise?

Page 240

D. O'SULLIVAN

A.     Yes.

Q.     Who gave you the raise?

A.     Anthony and he also gave me a reduction in pay also.

Q.     Once Wendy began doing some work at North Shore and 189 Sunrise, was she doing oversight on your work?

A.     I don't know.

Q.     Do you know if she was reviewing anything that you were responsible for preparing?

A.     She was reviewing postings, yes.

Q.     Was she doing that daily, if you know?

A.     I don't know.  I guess she did.

Q.     Did you assist an accounting firm called Richard Wit and Charles with preparing any tax returns for either of those two dealerships?

A.     Never heard of them.

Q.     Never spoke to them yourself, is that right?

A.     I've never heard of them, never

**Page 241**

D. O'SULLIVAN

spoke to them.

Q.    Did you tell me that you've never heard of positive pay?

A.    Yes.

Q.    Yes, does that mean, yes, you've heard of it or yes, you haven't heard of?

A.    I think that I have heard of it, yes.

Q.    Wasn't there some sort of approval that was required at the end of each day on the company's transactions through the accounts?

A.    What is positive pay anyway?

Q.    Well, I'll suggest to that you that it requires some sort of approval on account transactions.

Do you know if that happened?

A.    I don't know what positive pay is, I heard of it, I don't know what it is.

Q.    It was not something that you utilized; is that fair to say?

A.    Yes.

Q.    Did you maintain a security

D. O'SULLIVAN

token while you worked at either North Shore and 189 Sunrise?

A.     I don't know what a security token is.

Q.     Again, I would suggest to you it's a device that generates a random number and requires you to put that number in, in order to do certain things on a bank account?

A.     I have no idea what that is.

Q.     You're not aware of any security tokens that were needed for the accounts at those two businesses?

A.     There was a security token, yes.

Q.     There was?

A.     Yes.

Q.     Did you have one?

A.     Yes, I did.

Q.     How did that security token work?

A.     You had a dial into the number with the security code.

Q.     When would you have to do that?

D. O'SULLIVAN

A.    To log onto the system.

Q.    Is that something you would do every day?

A.    Yes.

Q.    Do you know of anyone else who logged on to the system everyday?

A.    No.

Q.    Do you know of anyone else who had a security token?

A.    I think Brian had one and I think Anthony had one.

Q.    Do you know that for a fact?

A.    I'm guessing.  I don't know for a fact.  I think they did, but I couldn't swear to it.

Q.    But, in order get into the accounts you had to have one of those tokens?

A.    I know for sure Brian had one, I'm not sure about Anthony.  I think that he did, I am not 100 percent positive.

Q.    You would need one in order to go into these accounts and do anything, right?

**Page 244**

D. O'SULLIVAN

A.    Correct.

Q.    Now, I want to be quite clear about this and I think that you already answered this.  I apologize if I'm repeating.

When you became aware of cash taken by Anthony Deo, you always subtracted it from his capital account, is that right?

A.    Yes.

Q.    So, if you always subtracted it from his capital account, was there anything about him taking the cash that, as far as the business goes is improper?

MR. RUDERMAN:  Object to the form.

A.    I don't understand what you mean.

Q.    Well, that's proper accounting isn't it, if he wants to make take some money out of his business, he can do that and then it gets subtracted from his capital account, right?

A.    Right.

Q.    So there's nothing improper

Page 245

D. O'SULLIVAN

about that you're suggesting, is it?

MR. RUDERMAN:  Object to the form.

A.    I guess not.

Q.    Most of the bank deposits you made yourself, right?

A.    Yes.

Q.    The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right?

A.    Yes.

Q.    Was that at least partially for you security purposes, since they were licensed to carry?

A.    Yes.

Q.    When they made deposits, you personally were aware that every one of them made it into the account, right?

A.    They would give me back the deposit -- copy of the deposit slip, yes.

Q.    And they did every time?

A.    Every time.

Q.    Did the floor plan company get paid every month?

D. O'SULLIVAN

A.    No, they got pay the interest every month, yes.

Q.    When payments had to be made on trade ins, who made those payments?

A.    I did.

Q.    When payments to had to be made on warranty obligations, who made those payments?

A.    I did.

Q.    Who did the daily reconciliations?

A.    Reconciliations of what?

Q.    The bank accounts for the companies?

A.    It wasn't a daily reconciliation.

Q.    How often was there a reconciliation?

A.    Tom Jones did them every month.

Q.    Was that in conjunction with you?

A.    No, he would do it at his office.

Q.    You did not give him any

D. O'SULLIVAN

information?

    A.    I gave the copies of the bank statements.

    Q.    So, the only two people responsible for the reconciliation each month, were you and Tom Jones, is that right?

            MR. RUDERMAN:  Object to the form.

    A.    No, Tom Jones did the reconciliations, I just was supplied him a copy of the statements.

    Q.    Right.  He did the reconciliations based at least in part on paperwork that you gave him, right?

    A.    He had a copy of statements from the bank.  I didn't make up any statements.

    Q.    Did he have access to Dealer Track?

    A.    I don't think so.  He must have, yes.

    Q.    Say that again.

    A.    He must have, yes.

**Page 248**

D. O'SULLIVAN

Q.    Why do you say he must have?

A.    'Cause he did the reconciliations at his office, he didn't do it at the dealership.

Q.    He would have to have those schedules to do it, right?

A.    I gave him the schedules, yes.

Q.    You inputted the information that would result in the schedules, then you gave him the schedules to do the reconciliations, correct?

A.    Yes.

MR. THOMASSON:  I have no further questions.

MS. VERBONITZ:  I do have some follow up.  Off the record.

(Whereupon, a brief recess was taken.)

EXAMINATION BY
MS. VERBONITZ:

Q.    My name is Susan Verbonitz.  I represent Libertas Funding in connection with this matter.

I have a few questions, I'm

D. O'SULLIVAN

gonna preference my questions by apologizing if they have been asked, because I didn't hear a lot of the deposition 'cause there was a lot of talking over each other.  I just wanna ask a couple of questions to clarify.

What is your understanding of Anthony Deo's ownership in the plaintiff entity, North Shore?

A.    I thought he was one of the owners.

Q.    How did you come to that understanding?

A.    He was signing the checks and he had a capital account.

Q.    You testified that when he was taking cash, you would charge his capital accounts for the money that he took?

A.    Correct.

Q.    Was this capital account as the owner of North Shore on the books of North Shore?

A.    Yes.

Q.    What is your understanding of

Page 250

D. O'SULLIVAN

Mr. Deo's spouse, Sarah's ownership interest in North Shore?

A.    As far as I know, she didn't have one.

Q.    Do you know how much of an interest Mr. Deo had in North Shore?

A.    No.

Q.    What is your understanding of Mr. Deo's ownership interest in Sunrise?

A.    I don't know how much it was.

Q.    Did you have an understanding that he had an ownership interest?

A.    Yeah, he had a capital account and could sign the checks there.

Q.    So your understanding that he was an owner is based on the fact that he had a capital count and was an authorized signer on checks?

A.    Correct.

Q.    Have you ever discussed with Mr. Deo his ownership interest in North Shore or Sunrise?

A.    No.

Q.    Do you know who the designated

**Page 251**

D. O'SULLIVAN

tax partner was for North Shore?

A.    No.

Q.    Do you know the designated tax partner responsible for taxes for Sunrise?

A.    No.

Q.    I didn't hear you?

A.    No.

Q.    Did you ever discuss with either Josh or David Baron, Anthony Deo's ownership interest in North Shore?

A.    No.

MS. VERBONITZ:  That's all I have.  Thank you.

EXAMINATION BY

MR. MARWAHA:

Q.    Good afternoon.  My name is Nipun Marwaha.  I'm the attorney for what is referred to collectively as the Deo defendants.  I do have a couple of questions for you.  If you don't understand my question, feel free to ask me, you know, tell me you don't understand the question, I'll rephrase it for you.

A.    Okay.

Page 252

D. O'SULLIVAN

Q.    I also promise not to keep you here much longer.  It's already been a long day for you, I bet.

A.    Thank you.

Q.    Can you tell me, what is a capital account?

A.    It's an owner's account.  You have a business, you put money into the business, you have a capital account.

Q.    Does that require the owner to first, is it basically that an owner put money into the business and then everything that he might take out goes through that account?

MR. RUDERMAN:  I object to the form.

A.    I always assumed that that was it, yes.

Q.    Now, I wanna take you back to a term that people were using earlier, I believe it was positive pay?

A.    Right.

Q.    You're not familiar with that, you said that you were unfamiliar with that

D. O'SULLIVAN

phrase, correct?

A.    Right.

Q.    You did handle the checks that were issued from Chase bank for the businesses, correct?

A.    Oh, right, okay, I understand now.  Yes, the positive pay is to verify that the check was good, right.

Q.    How often did you do that?

A.    When the checks came through.

Q.    Would you say it was something that had you to by 3:00 p.m. on any day that a check came through?

A.    Yes.

Q.    So you checked that daily?

A.    Yes.

Q.    Did you have special credentials to log into that and do it?

A.    I had a token to log in, yes.

Q.    Did Wendy have a token as well?

A.    I'm sorry?

Q.    We Wendy have a token as well?

A.    I don't know.

Q.    Did Wendy have a token as well,

D. O'SULLIVAN

to do that?

A.    I don't know.

Q.    Do you ever know who logged in to do that task for you when you couldn't?

A.    Did she do it, I don't know. She might have, yes.

Q.    I'm not asking for specific dates, just that she -- if that needed to be done, correct?

A.    Right.

Q.    So, that means any check that Anthony Deo would have cut for any purpose you would have had to approve, correct?

A.    No, well --

Q.    No, my apologies -- withdrawn.

Any check that went through the system, you would have to say that it was a valid check, so Chase could process it?

A.    I could do it, he could do it, I wasn't the only one.

Q.    He had his own separate credentials, correct?

A.    Yes.

Q.    Any of the checks that were

D. O'SULLIVAN

done using your credentials, you were the one that approved them, correct?

A.    Right.

Q.    You never gave your credentials to anyone else for any of these tokens, correct?

A.    No.

MR. MARWAHA:  Nothing further. Thank you.

MR. THOMASSON:  I am going to need a copy please, Kim.

MR. KATAEV:  Jeff and I are splitting.

(Whereupon, at 4:02 P.M., the Examination of this witness was concluded.)

°          °          °          °

Page 256

D. O'SULLIVAN

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____
DANIEL O'SULLIVAN

Subscribed and sworn to before me this _____ day of _____ 20____.

_____
NOTARY PUBLIC

D. O'SULLIVAN

E X H I B I T S

O'SULLIVAN'S EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Series of documents | 187 |
| Exhibit B | Document | 196 |
| Exhibit C | AIG 0001274 | 199 |
| Exhibit D | Affidavit | 202 |
| Exhibit E | Mr. O'Sullivan's statement | 209 |

(Exhibits retained by Counsel.)

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. RUDERMAN | 6 |
| MR. THOMASSON | 211 |
| MS. VERBONITZ | 248 |
| MR. MARWAHA | 251 |

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| (NONE) | |

QUESTIONS MARKED FOR RULINGS

| QUESTION | PAGE | LINE |
|---|---|---|
| (NONE) | | |

D. O'SULLIVAN

C E R T I F I C A T E

STATE OF NEW YORK:    )

COUNTY OF NEW YORK )

I, Kim Draper, a Notary Public for and within the State of New York, do hereby certify

A.

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of April 2026.

_____
Kim Draper

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Superb Motors Inc, Et Al. v. Deo, Anthony, Et Al.
DATE OF DEPOSITION: 3/30/2026
WITNESSES' NAME: Daniel  OSullivan

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
Daniel  OSullivan

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____       _____
(NOTARY PUBLIC)              MY COMMISSION EXPIRES:

**[& - 3rd]**                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**

**&**  1:18 3:9 4:15 5:17

**0**

**000013**  195:22
**0001274**  199:10 199:12 257:7
**005527**  183:19
**046**  201:23

**1**

**1**  5:17 188:9 220:13
**1,000**  151:16
**1,500**  86:25 87:3,5 151:16
**10,000**  120:10 121:13 159:25
**100**  34:18 116:3,17 220:24 243:22
**100,000**  120:21 121:2 163:5 178:8 179:2 180:2 182:11 186:19 189:12
**10170**  3:15
**11**  215:24
**112**  4:12
**11423**  3:6
**11501**  4:8
**11545**  6:13

**11553**  4:17
**11793**  4:13
**11:15**  2:4
**12**  25:22,23 103:15
**1239**  1:7 3:13
**1339**  3:19
**15**  25:21
**15,000**  159:25
**1539**  4:7
**1580**  1:6 3:12
**1581**  1:6 3:12
**1591**  1:7 3:12
**1632**  1:7 3:13
**18211**  3:6
**187**  257:5
**189**  1:4,19 3:10 7:7 11:15 49:20 219:4,4 221:25 223:7 227:9 231:7 236:12,22 237:7,10,24 240:7 242:3
**19107**  3:20
**196**  257:6
**199**  257:7
**1:55**  143:6

**2**

**2,000**  153:24
**20**  50:22 116:19,20,23 220:23,23

256:19 259:22
**20,000**  168:19 168:21
**200,000**  186:20 225:6 235:24 236:3
**201**  4:7
**2010**  31:10
**2019**  217:22
**202**  257:8
**2020**  217:20,22
**2021**  122:21,23 176:4 217:12
**2022**  12:10 176:5,7 183:22 184:15 185:20 188:9,9 196:18 202:13
**2023**  12:9
**2026**  2:3 258:22
**209**  257:9
**211**  257:14
**23**  1:8 3:14 13:22
**230,000**  203:14
**2320**  3:15
**235,000**  224:9
**248**  257:15
**25**  14:12 16:3 16:18,19
**251**  257:16
**2519**  1:7 3:13 190:4

**28598**  258:24
**29**  196:17
**29b**  215:20
**29th**  196:21,21 196:22,23,23 197:2,15
**2:23**  1:12

**3**

**3,000**  83:9 85:2 86:24 119:19 119:19,21 134:7
**3/30/2026**  259:3
**30**  2:3 5:16 16:18,19 173:4 173:8 183:21 184:15 185:20 188:9 218:9 222:24 233:17
**300,000**  225:9
**31,000**  222:24
**31st**  105:22,23
**3280**  4:12
**333**  4:17
**35**  173:4,9
**35,000**  218:9
**385,000**  190:5
**3:00**  253:13
**3rd**  114:7

**[40 - accountant]**

| 4 | 6 | a | account 60:8 |
|---|---|---|---|
| **40** 16:7 104:20 | **6** 202:13 257:13 | **a.m** 2:4 | 60:15,18,21 |
| **40,000** 121:9 | **60** 238:7 | **aaronson** 1:5 | 61:4,9,9,14,17 |
| **420** 3:15 | **60,000** 218:3 | 3:11 91:21 | 61:21,23 62:2 |
| **43** 213:14 | **6188** 1:12 | 135:16 138:20 | 62:4 86:9 |
| **446** 1:8 3:14 | **65,000** 172:21 | 236:15 | 93:14,19 110:9 |
| **44a** 187:24 | 173:3 238:8 | **abc** 36:22 | 110:12 111:22 |
| **45** 213:13 | **65/35** 233:14 | 37:11 71:25 | 111:23 112:13 |
| **45,000** 47:23 | **683,000** 188:21 | 85:17 110:14 | 112:13 118:12 |
| **4:02** 255:15 | 189:3 | 115:17 116:8 | 118:14 153:5,7 |

account 60:8
60:15,18,21
61:4,9,9,14,17
61:21,23 62:2
62:4 86:9
93:14,19 110:9
110:12 111:22
111:23 112:13
112:13 118:12
118:14 153:5,7
153:10 154:3
161:25 162:3
162:10,13,19
162:21,23
163:2,6 165:9
165:16 166:6
166:10 167:19
186:2,9,16,19
186:24 188:10
188:14 189:10
192:7 207:16
218:25 219:5
219:17 232:21
232:25 233:3,6
233:20 241:18
242:10 244:9
244:12,23
245:19 249:16
249:21 250:14
252:7,8,10,15
**accountant**
92:18 95:5,17
96:7,12,16,19
96:23 97:16

**5**

**5,000** 94:4
119:18,20,22
120:2,7 131:23
132:7 133:4
134:7 156:17
157:24 158:16
158:18 161:23
163:6,19,22
165:24 192:13
192:15
**50** 135:13
**50,000** 47:23
121:8 132:17
178:18 179:3
194:10 195:4
**500** 3:19
179:13,14
**516-639-4345**
215:6
**53** 6:12 215:25
216:6

**7**

**70** 233:16
**70/30** 233:14
**700,000** 189:13
**75** 215:23
**76** 1:8 3:13
188:23

**8**

**80** 60:8 135:12
**80s** 212:15,17
**8112** 188:10
**83** 13:5
**89** 116:18
**8th** 258:22

**9**

**90** 32:18,21
60:8 116:4
**90s** 212:16
**95,000** 163:7

**a**

**a.m** 2:4
**aaronson** 1:5
3:11 91:21
135:16 138:20
236:15
**abc** 36:22
37:11 71:25
85:17 110:14
115:17 116:8
**ability** 8:19 9:2
211:10
**able** 9:14 57:18
57:23 58:4
93:20 166:15
223:20 231:20
**above** 112:20
152:11 169:7
256:6
**absolutely**
45:13 57:20,24
69:5 72:8,13
98:11 109:6
131:18
**access** 108:2
126:18,20
190:16,21,24
191:3,6 225:19
227:22 247:20
**accession** 191:9
**accompany**
115:21

98:6,7
**accountants**
  92:16 98:13
  229:24
**accounting**
  21:7,16 102:23
  240:18 244:19
**accounts** 60:24
  61:3,5,7,11
  112:6,10
  125:24 166:18
  182:6,10 188:7
  190:17,22
  191:22 192:2
  203:12 207:8
  207:11 219:7
  219:21 225:20
  225:23 226:2
  235:16,17
  241:14 242:14
  243:18,24
  246:14 249:19
**accrue** 32:15
**accurate** 29:24
  30:2 234:2
**achieved** 17:11
**acquaintance**
  216:13
**action** 183:18
  202:13 258:18
**actual** 49:3
  121:5
**actually** 15:18
  20:4,6,7 30:13

35:15,23 49:4
58:11 113:5
137:21 167:24
168:7 176:6
186:13 196:25
**ad** 11:20
**adamant** 46:8
**additional**
  18:19,19 65:16
  65:21
**address** 6:11
  184:13 215:16
**adjusted** 112:6
  112:11 197:19
**adjusting** 107:5
  109:15,18
  112:25
**adjustments**
  107:21 110:18
  110:21,25
  124:25 125:8
  229:16,20,24
  230:3,7,13,17
**administer**
  5:11
**adp** 60:4
**advertising**
  11:7,8
**advised** 181:8
**affected** 112:25
**affidavit** 202:5
  202:10,17
  203:6 204:7,10
  204:13 224:15

257:8
**affidavits** 224:8
  225:6
**afternoon**
  79:16 211:4,7
  251:17
**ago** 9:23 10:5
  28:16 50:2
  51:23 98:14
  122:20 208:12
  208:13
**agree** 84:19
  204:12
**agreed** 5:5,20
  84:19 208:22
  209:24
**agreement**
  63:24 204:22
  204:23,25
  205:8
**agreements**
  63:12,18
**ahead** 210:25
**aig** 195:22
  199:10,12
  257:7
**al** 259:2,2
**alivia** 4:21
**ally** 62:10 63:9
  63:13,19,22
  64:3,18 67:5,8
  67:14 71:15,17
  71:20,22 72:15
  73:5,8,16,20

76:23 77:10
80:15 87:12
99:25 100:3
113:12,13,15
113:20,23
114:5 115:3,5
115:17,19
118:7 181:2,4
187:4,6 193:20
194:7 221:16
**american**
  206:17 207:4
  207:18
**amount** 38:16
  45:6 64:3,3
  72:9 94:3
  122:2 140:24
  157:16 159:25
  160:8 161:15
  176:17 179:22
  181:3 207:23
  208:2 224:23
  224:24 231:18
**amounts**
  179:25
**analysis** 26:23
  27:2
**answer** 8:5,8
  8:13,18,22,25
  9:10,14 46:7
  56:10,11
  106:16,18
  211:11 213:23
  214:19 222:3

228:19 231:3

**answered**
11:20 108:25
244:5

**answers** 106:22
107:15

**anthony** 1:4,13
3:5 4:3,20
10:21,23 52:11
52:13 55:9
65:6 76:2
77:18 78:19
81:14 82:7
88:13 90:16
91:4,9 94:17
108:20 109:4
112:19 117:4
119:6 120:15
122:13 124:17
128:23 129:11
140:7,25
141:13,17
142:8,11
143:25 144:7
151:4,15
153:20 154:3
154:10 155:13
159:9 160:15
160:19 161:10
161:15 164:20
165:14 166:7
166:24 169:2
170:12 173:17
176:16 177:4,5

179:17 180:13
180:15 182:2
182:21 184:10
184:16 185:6
187:22 192:11
203:21 205:22
206:10,16
207:21 218:4
218:21 221:4
222:8 223:11
223:23 226:3
226:15 227:3,8
227:13 228:2
231:8,11
232:15,20
235:4,24 236:7
239:4,23 240:4
243:12,21
244:8 249:9
251:10 254:13
259:2

**anthony's**
52:25 55:14
92:17 94:23
95:4 96:6 98:6
108:10 140:8
161:25 165:8
166:18 167:19

**antony** 149:15

**anybody** 8:21
11:3,21 46:19
75:25 91:23
92:3,7 113:11
114:4 129:17

140:6 152:13
160:4 205:21
205:25 206:12

**anymore** 238:2
238:5

**anyway** 241:15

**apologies**
254:16

**apologize** 244:5

**apologizing**
249:3

**appearances**
3:22

**applicants**
205:18

**application**
92:22 206:3,7
206:12

**applied** 91:14
196:21 207:7

**applying** 90:24
91:10,15

**appointment**
220:12

**approval**
241:12,17

**approve** 254:14

**approved**
255:3

**approximate**
12:3

**approximately**
11:25 14:11
48:12 49:10

93:15 95:13
179:22 206:20

**april** 114:7
258:22

**area** 123:10

**ariel** 4:18

**arrange** 62:24

**arrived** 227:2
228:4

**asad** 1:5 3:11
132:23,25
133:23 134:3
139:10,20
141:7,12,18
170:24

**asad's** 133:6
141:20

**asked** 9:12 51:6
79:23,24 92:11
99:6 107:12
130:23 132:3
142:20 202:3
208:15 232:17
249:3

**asking** 10:13
92:7 94:17
185:7 206:11
214:24 230:11
230:12 239:24
254:8

**assets** 101:14
101:15 102:3

**assist** 240:18

**assistance** 222:6

**assistant** 150:9

**associate** 188:23

**associated** 43:22 63:22 72:12 84:23

**assume** 9:11

**assumed** 53:5,6 89:5 169:6 252:18

**attached** 184:16,19

**attendance** 146:25

**attention** 188:19

**attorney** 4:11 6:25 169:16 214:21 251:18

**attorneys** 3:4,9 3:18 4:3,16 92:16

**auction** 31:8,9 41:18,21 42:10 43:11,14 66:18 67:4

**audit** 117:8 220:13

**audits** 118:5,10

**august** 183:21 184:15 185:20 191:5

**authority** 226:14

**authorization** 35:20 226:5,22

**authorized** 5:11 250:18

**auto** 1:3,4,6,6,7 1:7,7,8,8,8,19 3:5,10,12,12,12 3:13,13,13,14 3:14 7:3,7 10:18 11:15 171:11 173:21 173:23 188:25 189:3 190:5 202:4 206:12

**automatic** 45:10

**automatically** 43:16 81:5,22 88:8 131:12

**automobile** 13:17,21,24

**automotive** 1:16 4:5

**available** 59:6 65:12 182:13

**avenue** 3:6,15 4:7 190:4 215:20

**aware** 85:13 90:18 103:21 131:21 135:5,9 135:21 138:20

170:3,7 171:3 171:9 189:8 190:23 191:2,6 191:8,20 193:13 205:10 211:14 225:8 242:12 244:7 245:18

**b**

**b** 196:4,6 257:2 257:6

**back** 13:14 28:11 33:15 53:17 59:3,5 74:5,7 107:20 115:16 143:5 145:18 147:17 155:8 159:14 168:18,21 174:6 203:5 245:20 252:20

**band** 156:11

**bank** 1:18,19 4:16 27:15 60:23 62:11 63:4,5,5,8 76:23 91:7 93:18 111:22 111:23 112:12 125:11,15 126:2,5,7,11,15 126:23,24,25 153:20 154:3

154:10 158:20 160:2,7 165:5 165:7,24,25 166:2,5 167:16 167:18,24,24 168:4,5,8,15,17 168:20,25 186:2,19 187:21 188:7,8 189:9 190:19 190:21 191:3 203:14 225:20 225:23 242:9 245:6,10 246:14 247:3 247:18 253:5

**banks** 63:3,7

**baron** 1:5,5,6 3:11,11,12 14:16,17,18 15:19 25:7,24 26:8 38:6 40:12,19 46:8 46:17 50:17,24 136:8,9 138:23 211:19,24 212:3,4,6,24 213:2,19 215:5 216:19,22 227:3 236:7,11 237:12,14 251:10

**barons** 213:15

**[base - business]**                                                    Page 6

**base**  65:3
**based**  197:22
  228:10 247:15
  250:17
**basically**
  180:23 252:12
**basis**  24:14,20
  26:4,12,18
  32:17 33:4
  36:12 37:16
  57:4 75:13
  78:15,18 83:7
  87:15 95:22
  113:7 118:6
  119:13 128:17
  128:21 140:2,3
  159:7 187:5
  206:22 217:3,7
  217:8 228:7
**bate's**  195:22
  199:9
**began**  217:19
  240:6
**beginning**
  28:25 30:17
  89:14,18 122:4
  148:18 197:10
**behalf**  221:8
**believe**  97:10
  119:18 121:15
  122:19,21
  169:8,15 176:6
  179:16 223:23
  224:9 234:2

  252:22
**bernard**  14:16
**best**  8:19 9:2
  49:18 51:4,5
  59:5 133:2
  140:17 204:16
  233:9 235:23
**bet**  252:4
**better**  113:5
  174:6
**bid**  31:10
**big**  132:16
**bill**  82:25 83:10
  83:12,13 86:7
**biller**  54:20
**bills**  20:4,8,12
  20:13 23:25
  26:21 57:21
  62:3 82:16,18
  82:21 83:6
  94:18,24
  130:20 156:10
  186:22,25
  187:3
**bit**  20:17 25:12
  48:14 49:20
  58:10 61:12
  111:2 231:14
  232:10
**blankenship**
  1:14 4:4
  149:21 150:6
  152:13 168:12

**blood**  258:18
**blvd**  1:6,6,7,7,7
  1:8 3:12,12,12
  3:13,13,13
**board**  39:24
**body**  116:21
  119:3
**bonus**  132:2
**book**  163:17,21
  164:10,11
  165:2 188:22
  199:20,24
  200:6 207:3
**bookkeeper**
  14:22 17:4,9
  17:22 46:25
  57:25
**bookkeeping**
  234:14
**booklet**  164:17
**books**  92:19
  95:12 96:13,20
  97:12 98:6,8
  107:6 249:22
**borrow**  31:5
**borrowed**
  32:14
**boss**  55:15
**bosses**  46:23
**bought**  41:21
  82:22 121:9
  156:4
**boulevard**  4:17

**box**  4:12
  155:19 156:2
**break**  80:22
  115:9 117:23
  143:5 153:22
  210:13
**brian**  1:5 3:10
  48:25 50:3,8
  50:15,20,22
  133:13,23
  134:3 139:7
  141:23,25
  142:11,14
  170:24 243:11
  243:20
**brian's**  50:11
  50:23
**brief**  118:3
  210:14 248:18
**bring**  29:12
  51:18 147:16
  147:25
**brought**  50:3
  177:19
**budgets**  24:9
**building**  108:9
**builds**  195:6
**built**  148:15,19
**bulk**  121:4
**bunch**  171:22
  174:19
**business**  9:24
  12:13,16 13:17
  13:21,24 15:19

**[business - career]**                                                Page 7

15:21,24 24:8
26:19,20 89:21
89:21,24 90:3
94:10,12,20
134:19 135:5
140:19,22
141:21 147:15
163:4 171:2
182:15,25
192:9 193:4
194:12 195:5
206:24,25
207:19,24
223:25 224:4
224:10,21
236:25 244:14
244:21 252:9
252:10,13
**businesses**
220:7 221:9,15
222:7 227:15
229:13 235:17
235:25 242:14
253:6
**buy**   31:9 62:23
67:5 84:18
177:20
**buyers**   1:14 4:4
119:13 120:16
121:3 129:13
129:14,21,25
131:16 192:20
192:21

**buying**   27:20
67:11
**buys**   84:15

**c**

**c**   3:2 199:8,12
256:2 257:7
258:2,2
**cadillac**   14:2
**calculations**
203:12
**call**   34:19 40:8
60:11 74:24
92:7 113:24
114:6 150:8
198:4 214:25
220:11,12
**called**   6:2 205:7
238:12 240:19
**calls**   180:6
181:15
**canasta**   216:24
**capital**   1:17
161:25 162:3
162:13,19,20
162:23 163:2,4
163:4,6,9
165:9,16
166:10,18
167:19 233:3,6
233:7 236:4
239:5 244:9,12
244:23 249:16
249:18,21

250:14,18
252:7,10
**car**   1:14 4:4
24:25 26:9,9
27:11,13,20,21
27:24 28:5
31:11 33:10,19
33:24 34:2,7
34:12,15 35:4
35:24 36:15,23
37:8,8 38:17
38:25 41:6,8,9
41:10,11,11,17
41:20,22,25
42:18 43:2,7
43:13,15,25
44:2,20,21,22
49:11 50:9,12
51:6 58:9
59:17 61:19
62:23 65:21
66:12,21 67:10
67:11,12,13
69:23 70:3,16
70:20 71:2,6
71:13 72:9,12
72:17,23 73:9
73:15,21 74:25
76:8,10,11
78:7 80:10,11
80:19 81:3,6
82:15 83:16,18
84:15,19,20
85:3,6,15

102:5 103:7,7
103:8 113:25
114:12,15,18
114:19,19,20
115:25 116:2,9
116:14 118:11
118:12,15,18
118:21 119:13
120:16 121:3,5
121:8 127:18
129:13,14,15
129:21,24
131:15 146:2
156:5 178:14
179:2,13 180:8
180:9 192:20
192:21 193:9
193:11,19
194:12,15
195:3,6 207:14
207:15,16
212:19 233:11
**cara**   137:18
**card**   200:21,22
200:25 201:5
206:17 207:15
233:19
**cards**   233:12
233:17
**care**   29:19 70:4
117:19 160:24
180:18,19,21
**career**   13:15
35:7

**[cares - check]** Page 8

**cares** 177:19
**carrier** 215:7
**carry** 245:15
**cars** 1:15,15
4:5,5 27:9
30:18,23 31:2
31:13,15,22
33:5,5,7,9,14
36:11,16,21
37:4 39:3 41:7
42:7,9,13,22
43:8,18,19,19
44:4,6 46:9
49:5 59:22
64:15,16 65:17
66:5,14,17,25
67:3,17,20
68:3,4,7 71:12
71:19 77:20
82:5 83:5
101:17,18
114:16,17
115:24 116:3,4
116:6,17,18,19
116:20,24
117:2,5,9
135:12,13
140:24 145:20
176:22,25
177:5,8,20
178:21 179:4,6
179:9,11,12,18
179:24 181:6
181:16 182:16

193:15 201:3
220:21,23,24
**case** 1:11 211:6
259:2
**cash** 26:22,25
27:17 45:15,16
45:18 46:4
61:20 85:5
89:22 152:24
153:12,14,17
153:21,24
154:16,16,22
156:5,14 157:8
157:15,16
159:19,23
160:15,19,23
161:11,15,16
163:15 164:18
164:20,21
165:2,6,7,14,17
165:18 166:21
166:24 167:4
167:11,22
168:3,6 179:8
179:11 182:6
186:8,24
192:23 193:7,8
194:11 195:5
199:18 200:17
200:18,24
201:6 203:6,21
207:22 223:15
223:19,24
224:3 232:16

232:19 233:11
233:17 234:4,6
235:15,24
236:7,12 239:4
244:7,13
249:18
**catch** 231:22
232:2,4,10
**cause** 13:2
39:15 58:7
248:3 249:5
**cc** 200:21
**cdy** 110:14
**cell** 214:11,12
214:23
**century** 215:14
**certain** 23:15
94:18 148:9
161:15 189:21
242:9
**certainly** 13:16
213:18
**certification**
5:8
**certifications**
13:11
**certified** 27:18
36:14
**certify** 256:4,8
258:10,16
**chabrier** 1:5
3:10 48:25
50:3,15

**change** 18:24
18:25 94:24
121:21 171:6
176:5 206:7
259:5
**changed** 89:13
100:24 119:24
121:17
**changes** 89:20
103:19,24
**changing**
170:19
**charge** 25:13
206:23 207:11
249:18
**charged** 161:24
207:15
**charges** 207:3
**charging** 32:22
**charles** 240:19
**chase** 1:19 63:9
63:13 76:23
188:8 253:5
254:19
**check** 27:18,19
29:14 30:9
36:5 43:15
61:20 67:9,12
69:18 74:3
115:18 116:2
116:17 121:2
122:3,14
129:21 130:13
130:15 131:2,7

**[check - commission]**                                                    Page 9

131:23 132:2,4
132:7 133:3,13
133:13 137:15
151:10 152:18
152:19,24
153:2 165:18
167:21 168:5
172:19 173:15
173:16,17,18
173:19,23
179:15 186:23
200:24 201:6
211:16 253:9
253:14 254:12
254:17,19
**checked**  116:17
225:25 253:16
**checking**  60:7
**checks**  30:13
30:17 35:16
36:14 122:12
131:4,15
133:23 150:24
173:11 174:19
179:6 184:17
184:20 200:23
226:4,4,8,17
233:12,16,19
249:15 250:15
250:19 253:4
253:11 254:25
**chestnut**  3:19
**chose**  152:6

**circle**  6:12
215:17,23,25
216:6
**circumstances**
160:21
**civil**  2:10
**clarify**  249:7
**clean**  8:12
**clear**  10:14
11:9 77:5
96:15 145:14
192:25 244:3
**clerk's**  202:11
**close**  47:22
128:19 216:18
216:21,24
**closed**  12:17
14:3 16:25
18:13 19:3
25:19 38:9
47:12,20 48:2
48:10,15 95:2
237:7,11
**closer**  189:13
**closing**  48:5,7
**coast**  1:15,15
1:15,16,16,17
4:4,5,5,6,6,6
**cod**  194:11
195:4,4
**code**  242:24
**cods**  193:8
**coffee**  147:25
147:25

**cohen**  14:16
47:14
**collected**
193:14
**collectively**
251:19
**college**  13:8
211:17,20
**column**  71:18
198:15,22
199:17 200:15
**columns**  71:14
**combination**
155:9,12,13,14
155:15
**combined**
64:13,23
**combo**  155:10
**come**  17:6 41:7
44:13 61:18,23
61:25 68:15
74:5,9 78:2
86:2,4,8 91:6
92:10,18 96:12
96:19 98:18
105:20 107:20
109:11 113:24
114:7,11,18
115:18 123:13
123:16 124:7
124:16 126:4
128:16 129:20
132:6 135:11
139:13,23

141:25 142:4
143:5 154:15
155:16 168:21
174:18,21
175:22,22
176:7,9,10
180:7 181:7
185:23 197:14
227:8 249:13
**comes**  27:7
38:13,17 39:6
51:2 68:18
69:16 71:5,7
71:22 73:4
84:18 98:7
105:6,7,10,12
153:23 159:3
161:4,14
194:16
**coming**  24:10
27:3,5,6,10
39:17 74:7
93:23 95:17,21
96:5,8,22,23
97:3,11 106:2
124:11 128:17
128:20 165:2
170:11 175:19
175:24 194:4,6
194:9 220:12
**commission**
119:12 120:16
121:20,24
122:2 259:25

| | | | |
|---|---|---|---|
| **commissions** 152:17 | 211:24 220:6 220:15,18 221:6,8 235:6 245:24 | **confirm** 223:20 | **control** 174:4 176:11 |
| **communicate** 220:4 | **company's** 241:13 | **conjunction** 246:21 | **controlled** 235:2,3 |
| **communicated** 219:23 | **compensated** 119:6,10 150:23 151:3 | **connection** 7:5 22:5 23:16 135:22 145:9 150:7 169:22 202:5,12 205:3 248:23 | **controller** 15:2 16:11,15,17,20 16:23 17:7,9 17:12,21,25 18:9,12,20,23 18:25 19:6,17 20:2,14 21:17 23:16 46:24 47:3 49:8,15 49:17,19 51:7 53:13 98:25 |
| **communicati...** 214:17 215:4 | **compensation** 129:9 | | |
| **community** 13:10 | **complete** 8:8 29:22,25 | **consider** 149:7 238:16 | |
| **companies** 60:6 62:14,17 63:14 75:6 83:23 84:6 138:21 220:2 246:15 | **completed** 74:5 | **considerably** 45:6 | |
| | **completely** 230:4 | **considerations** 88:17 | |
| | **computer** 56:25 57:3 104:22,24 131:5,6 173:13 228:8,22 229:5 | **consistent** 207:22 | **controllers** 19:7 |
| **company** 21:15 29:16 34:14 36:22 37:11 38:15 39:2,5,8 44:18 61:20 62:6,8 71:25 74:11,13 75:8 78:8 84:2 85:13,17,17 86:5,14,22 87:13,25 100:18 101:22 113:13 115:17 116:8 129:15 129:16,18 150:25,25 151:11 194:9 195:2 203:11 205:4 211:18 | | **constantly** 145:15 | **conversation** 19:12 141:5,15 172:4 236:10 |
| | **computers** 228:13 | **contact** 85:16 220:5,14 221:5 | **cooney** 4:21 |
| | **concerned** 168:24 | **contain** 59:14 | **copiapauge** 58:13 |
| | **concerning** 99:13 | **continue** 3:22 183:3,4 | **copies** 124:3 125:17,18 126:11,23,25 203:8 225:4 247:3 |
| | **concluded** 255:17 | **continues** 1:22 | |
| | **conference** 108:7,12,18,22 109:2 125:21 146:22,23 | **contract** 84:25 86:7 128:8 156:16,18,23 159:16 221:21 | |
| | | **contracts** 28:22 | **copy** 5:14,17 6:15 82:22 126:17 128:7 128:10 159:15 199:21 245:21 247:13,17 |
| | | **contributions** 233:7 236:4 239:5 | |

255:12
**corp** 1:17
**corporation**
151:20,22
**correct** 7:10,14
12:10 13:18,19
16:21 17:23
18:14 19:21,23
21:12 23:7,10
23:11 24:24
29:23 30:5,21
31:17,25 33:12
34:20,21,23
36:8 38:7 40:2
41:11,12 42:12
44:14 57:14
58:24 59:18,20
59:22,23 60:16
62:2 66:5,8,13
66:16,18,19,22
67:17,18,21
68:5,25 69:2
70:6,21,24
72:17,25 73:10
73:12,22 74:19
76:13,16,18
77:9,11,17
80:17,21 81:8
83:19 86:9
87:19 88:2,12
100:14 101:7
102:19,22
103:22 104:8
106:6 109:13

110:10 113:14
118:23 119:15
122:16,17
124:23 128:4
131:11 139:9
141:24 144:9
144:11 148:21
151:12 154:12
155:2 160:20
165:3 166:19
171:18 177:12
177:15 185:4
185:24 186:13
188:17 190:13
192:4 193:11
194:22 195:13
197:3,16,21,24
198:3 200:18
201:4,7 204:16
205:12 207:9
208:8,16,18,19
209:22 211:19
211:21,25
216:3,4 218:11
223:22 230:2
232:22 239:2
244:2 248:12
249:20 250:20
253:2,6 254:10
254:14,23
255:3,7 256:9
**correlate**
166:16

**corresponding**
166:17
**cost** 86:25
**counsel** 5:6,17
164:2,6 257:11
**count** 250:18
**county** 149:5
150:12,17
202:11 258:5
**couple** 26:8,9
50:2 51:22
59:2 63:10
65:25 84:4
93:11 97:20
137:16 176:25
177:18 179:11
180:2 182:11
189:12 249:7
251:20
**couppauge**
50:8
**course** 86:20
98:2 101:3
125:16 157:20
169:20 175:5
180:14 190:25
207:24 233:21
235:10
**court** 1:2 5:13
8:4 19:11
**cove** 215:21
**cover** 189:4,21
**covered** 218:18

**covid** 90:5,7
94:11,13,16
134:16 217:13
217:16,19
**cpa** 1:14
**cpa's** 1:18
**create** 229:2
**created** 228:6
**credentials**
253:19 254:23
255:2,5
**credit** 32:6,7,9
63:23 65:4
100:7,19
110:14,15
111:22 112:14
161:20 164:22
166:6,16
167:12,23
200:21,22,24
201:5 233:12
233:17,19
**credited** 167:5
**crediting** 166:9
**credits** 110:7
**cross** 116:2
**crossed** 116:4
**cullen** 4:15
**customer** 24:24
35:5 36:15
62:22 69:16
84:15,18
153:23 157:12
157:14 158:9

161:4,14,20
163:21 164:22
166:6,9,16
167:5,12,22
193:21 194:11
200:19 203:8
203:12

**customers**
62:18 63:15
85:19 153:12
153:14 181:16

**cut** 120:12
131:2 254:13

**cutting** 145:15

**cv** 1:12

**cyruli** 3:9 6:25

**d**

**d** 5:2 6:1,2 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1

53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1

136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1,15,17

203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1
253:1 254:1
255:1 256:1,2
257:1,8,12
258:1

**daily** 24:20
78:15,18 79:12
87:15,16 159:6
217:3,7 238:22
240:15 246:11

246:16 253:16
**dan**  184:17
**daniel**  2:8 6:10
   256:15 259:3
   259:21
**date**  2:3 12:4
   33:14 187:19
   196:7,17
   198:11,24
   199:13 202:18
   209:13 259:3
**dated**  185:20
**dates**  254:9
**david**  1:6 3:11
   14:18 15:19
   25:6,8,14,17,24
   26:12 38:5
   40:11,19 46:16
   47:13,15 48:5
   48:21 49:14,22
   50:6,7,11 51:2
   51:10,12,18,24
   52:17 88:23
   89:3,5,7 122:7
   122:9,10,12,13
   122:15 125:6
   125:10 128:17
   131:19 132:5
   132:12,19
   133:12,24,25
   134:9,11
   135:23 136:5
   139:8 169:5,8
   170:5,23,24

171:3,5,14,24
176:3 212:4,6
212:9 215:5
217:2,24 218:5
221:12,19
226:4,15 227:3
235:2 236:7,11
251:10
**david's**  25:13
   47:13 49:5,18
   133:2 169:14
   169:15,16
   221:13 238:15
**day**  24:17 26:5
   26:13,15,16
   27:15 32:21
   33:8,16 37:17
   38:4,8 40:24
   43:6 44:8,10
   45:11 50:21
   54:22 55:11
   75:20 77:24
   78:25 81:6,20
   82:11 102:15
   103:17 105:12
   105:15 107:9
   123:18,18
   154:5,9,24
   156:5 161:5,8
   180:7 186:3,9
   190:4 197:6,7
   226:2 232:6
   241:13 243:4
   252:4 253:13

256:19 258:22
259:22
**days**  5:16 32:18
   34:4 40:7
   43:12 76:25
   124:9 208:13
**deal**  8:23 23:9
   27:14,17 36:20
   37:10 38:13,18
   39:6,11 44:19
   68:11,17,21
   69:7,18,19
   71:21 84:17
   86:5 103:10
   104:2,7,7
   127:12,16,17
   169:6 220:25
   221:7
**dealer**  20:16,23
   21:2,6,10,14,19
   21:21 28:4
   49:12 57:5
   58:9,14,21
   59:12 83:8
   101:11 102:3
   110:8 131:8,17
   157:19 158:3
   162:6 165:13
   193:14 234:6
   234:22,24
   235:5,7 238:12
   247:20
**dealership**  14:7
   14:10 20:5

27:6 30:20
31:4 32:13
39:10 42:18
45:22 47:18,19
47:20,22,25
49:18 51:25
53:11 56:19
58:22 59:15
62:24 66:25
70:4 75:24
82:3,8 83:6,16
92:4 95:2
96:12 103:2
112:2 113:4
116:11 127:12
131:2,20
132:11 139:11
145:5 146:7
150:7 152:22
153:6,18 155:3
155:7 169:23
170:12,19
173:25 174:9
174:10,13,17
179:6 183:3
189:4 193:10
195:8,15
205:11 206:18
212:13 213:15
238:25 248:5
**dealerships**
   21:16 26:7,9
   35:10 51:6
   63:18 92:5

**[dealerships - difference]** Page 14

125:22 126:3 132:20 136:14 136:22 142:2 143:18 172:25 173:3 176:16 212:21 219:25 234:23 235:2 238:15 240:21

**deals** 14:23 19:23 22:17,19 22:20 24:23 38:9,12 40:12 104:4 228:25 233:11

**dealt** 50:20

**death** 217:7 221:13 238:15

**debit** 60:7 110:14,15 111:22 112:12 165:25

**debits** 110:7

**december** 202:13

**decide** 82:18 207:10 214:21

**decided** 13:2 25:16 47:16 185:10

**decision** 121:20

**decisions** 228:21

**deducted** 151:17 236:3

**defendant** 3:18 4:11,16

**defendants** 1:21 4:3 251:20

**deficits** 211:13

**definitely** 168:22

**delay** 27:12 34:22,25 44:24

**delayed** 34:24

**delivered** 173:20

**deo** 1:13,13 4:3 4:3,20,21 10:21 119:6 129:9,11 184:11 187:23 187:24 202:6 203:13,21 205:22 206:3,5 206:10,16 223:11,24 224:18 227:8 227:13,14 232:16,20 244:8 250:7,22 251:19 254:13 259:2

**deo's** 249:9 250:2,10 251:10

**department** 29:17

**depended** 149:4

**depending** 150:16

**depends** 124:10 151:4,15 207:12

**deposed** 7:15

**deposit** 27:19 103:5,6 153:23 153:24 156:17 157:22,23,25 158:15,18,21 158:21 160:2,8 160:11 161:23 163:6,19 166:4 166:5,17 167:17 168:4 168:10,17,19 168:21 188:19 189:2,6 190:18 199:18 245:21 245:21

**deposited** 93:13 153:4,9 153:19 156:7 165:24 168:16 203:11

**depositing** 46:10 191:21

**deposition** 2:7 5:8,9,14 7:9,19 8:15 187:22 210:18 249:5

259:3

**deposits** 153:15 154:16 160:5 160:16 168:13 189:19 190:8,9 190:10,12,14 190:17 191:15 193:7 201:3 203:6,9,10,13 203:22 223:16 223:19,21 245:6,10,17

**describe** 19:16 24:3 114:9

**described** 66:3 69:7 141:17 192:12 197:18

**description** 34:4 198:4 257:4

**designated** 250:25 251:4

**desk** 56:23 104:23,25 227:18

**despite** 112:16

**device** 242:7

**dial** 242:23

**died** 47:13 134:9,11 169:8 170:5,23 171:5 171:15,24

**difference** 173:24 194:2

**[differences - eastern]**

**differences** 61:3

**different** 19:7 21:5 31:24 33:6 44:3 53:19,24 58:11 58:12 67:24 68:22,22 81:9 81:12 89:12 96:16 103:3 115:2 144:22 161:3 200:2,7 207:7

**differently** 154:17 170:9

**digitally** 131:5

**dinner** 216:25

**directing** 8:22

**direction** 94:23 146:13

**directions** 135:19

**directly** 149:16

**directs** 144:16

**disappear** 73:18

**disclosed** 166:25

**discuss** 25:4,6 26:19,20 80:5 147:19 189:20 251:9

**discussed** 77:25 80:13 83:5

102:18 118:9 147:5,7 161:3 162:5 172:8 208:14 250:21

**discussing** 118:5 164:9 220:17

**discussion** 45:15 80:9 170:15

**discussions** 170:18 182:20

**district** 1:2,2 100:18

**dla** 1:17

**dms** 20:15,23 21:5,9 238:12

**dmv** 70:8 205:11 206:2 206:14

**dmw** 206:8

**document** 34:20 195:21 196:6 199:6,15 201:12 202:9 203:16,17 257:6

**documentation** 70:7 91:25

**documents** 29:5 65:8 92:9 113:16 127:20 128:6 140:10 142:15 175:6

183:16 184:19 187:17 257:5 257:18,19

**doing** 28:19 36:2 52:16 54:3 69:8 78:24 95:25 96:2 97:11,11 113:5 118:10 124:14 139:17 144:18,25 170:9 172:13 174:9 177:17 218:17 221:3 221:16 237:3 240:6,8,15

**dory** 98:24

**doubt** 76:4 77:2 99:19

**dozen** 103:14

**drank** 147:24

**draper** 2:11 258:8,25

**draw** 188:18

**drew** 132:19

**drive** 11:12

**drop** 155:19,20 156:2

**drove** 51:24

**drugs** 211:9

**due** 36:21 37:10,13 38:15 39:5,7,11,12,13 41:24 68:23

71:3,15,17,20 71:24 72:10 74:7,12,25 75:2,4,6,7 76:22,22 77:15 87:23,24 106:10 218:9

**duly** 6:3 256:5 258:13

**duplicate** 164:13

**duties** 24:5 79:13 222:6

**dwight** 1:14 4:3 149:21 150:6 150:12 155:14 159:9 160:7 168:18 223:19 245:10

**dykman** 4:15

**e**

**e** 3:2,2 5:2,2 6:2 183:20,24 184:2,10,13 209:9,11 227:17 256:2 257:2,9,12 258:2,2

**earle** 4:17

**earlier** 252:21

**easier** 160:13

**eastern** 1:2

easy  36:4
education  13:6
effect  5:12,15
eidl  90:10
eight  232:14
either  30:8 36:9
  43:5 64:6
  69:16 70:16
  136:22 144:7
  154:10 167:15
  167:17 191:22
  240:20 242:2
  251:10
electronic
  28:23 128:10
electronically
  35:18 36:4
  128:14
emanuel  3:7
employed  9:18
  11:3
employee
  115:19 119:14
  120:4
employees
  22:22 152:7,10
empty  108:15
ended  53:20
enlisted  131:12
entails  53:16
  144:14
enter  157:25
  196:25 197:22

entire  13:15
  35:6 149:25
entity  249:10
entries  107:5
  107:10 109:15
  109:18,24
  110:6 111:13
  111:18,20,25
  112:25 165:12
  166:11,15
  195:25 196:15
  197:7,20 198:7
entry  109:22
  110:3 165:19
  165:20,23
  166:9,17
  167:18 233:2
equation  45:16
errata  259:1
esq  3:7,16,20
  4:8,11,18
established
  63:25
estate  1:6 3:11
estimate
  132:11
et  259:2,2
etcetera  131:10
eventually  14:3
everybody
  96:11 161:4
everyday  37:19
  37:23,24 75:20
  76:19 102:17

  217:8 243:7
ex  28:7
examination
  6:6 211:2
  248:20 251:15
  255:16 257:13
  258:12,14
examined  6:5
example  111:5
  121:11 167:21
exceed  203:14
except  5:21
excess  235:24
exhibit  187:13
  187:15,17
  196:4,6 199:8
  199:12 202:15
  202:17 209:9
  209:11 257:4,4
  257:5,6,7,8,9
exhibits  257:3
  257:11
existence  80:19
expense  121:4
expenses
  101:19 102:5
experience
  18:21 145:9,25
expires  259:25
explain  53:15
  198:8
express  206:17
  207:4,18

extended  84:20
extent  212:23

**f**

f  5:2 258:2
fact  112:16
  166:24 243:13
  243:15 250:17
failed  203:13
fair  39:20
  168:23 219:21
  230:18 241:23
fall  176:4 232:9
familiar  20:15
  21:10 41:6
  58:8 84:9 90:7
  98:9 137:13
  143:11 183:23
  219:19 238:11
  252:24
family  212:24
  213:2,19
fancy  57:9
far  10:17 35:12
  59:13 78:24
  79:2 97:13
  128:2 132:18
  132:21 137:12
  138:22 150:2,4
  155:11 168:23
  174:15 179:4
  206:18 244:14
  250:4

**[father - folder]** Page 17

father 14:19 25:11,13 46:17 47:13 212:7,10
fax 184:8 207:14,15,16
fed 28:7
federal 2:10
fee 60:9 121:3 171:13,23 172:17 218:12 218:13 238:9
feel 213:18 251:22
ferrari 178:25
fifth 101:18
figure 120:23 186:17
figured 133:7 133:11
file 113:9 127:10
filed 127:9 202:10
filing 5:7
finally 69:18
finance 22:20 27:14 28:10,22 29:16 34:14 36:22 38:15 39:2,5,8 44:18 55:10 56:13 61:20 62:6,14 62:24 69:17 71:4 74:11,12

75:6,7 76:23 84:25 86:5,6 88:8 99:13,18 113:13 123:20 128:5,7 194:8 194:9,25 195:2
financed 42:3,8 42:8 44:11,19 44:20 67:13 80:16 84:17 85:9 193:17
finances 92:9
financial 19:20 22:7 59:14 99:22,25 100:8 100:21,25 101:6,11 102:7 113:2,8 120:20 123:22 124:3 124:20,22 125:4,7 130:6 138:5,12 142:17,19 165:11,12 175:10 195:15 233:24
financing 27:21 28:6 37:5 38:12,22 43:22 45:3 59:25 61:22 62:18,25 63:15,20 66:25 68:13 70:17 71:16 74:11

77:15 78:4,8 80:18 81:4 85:10 114:2 117:11
find 27:3 40:7 118:19
finish 8:12 10:11 17:16 115:6,11 145:11 158:7
firm 6:25 137:13 240:19
first 6:3 13:20 32:18 52:3,4,9 53:10 54:22 81:18 82:6,11 89:9,12 90:18 91:8 94:25 95:9 105:21 116:15 122:5 135:21 144:6 158:22 159:12 169:18,21 170:2,7 212:14 221:12 239:8 252:12 256:5
fisk 1:8 3:13 188:23
five 40:7 110:16 117:23 120:22 121:15 178:9 180:6 181:5 198:21 210:13 231:10

floor 31:5,7,8 31:19,21 32:9 33:11,15,19 34:10,25 35:15 36:14,17 37:5 42:5,6 59:24 61:22 62:6,14 63:20 64:4 65:20 67:5,14 71:8 80:16 114:5,7,10,13 114:14,17,19 114:19,20,21 115:18,25 116:16 117:8 187:9,10 191:19 194:17 218:15 219:25 220:6,15,18,20 221:2,6,8,14,16 233:25 245:24
florida 123:2,4 123:7
flow 26:22 27:2 45:15,16,18 46:5 89:22
fluctuate 207:25
flushing 1:18 4:16
folder 127:17 127:19 128:8 157:11,12,13

**folders** 127:13
**follow** 248:17
**followed** 209:21
**following** 12:6
**follows** 6:5
**force** 5:15 144:16
**ford** 32:6,7 49:18,18 51:4 51:5 59:5 63:22 100:7,9 100:12,17,19 101:21 133:3 140:17
**forecast** 24:22
**forecasting** 24:8
**foregoing** 256:8
**forget** 48:18 54:17 62:9 95:6 151:2 222:12,23,25
**forgetting** 19:13
**forgot** 12:20
**form** 5:21 101:12 109:20 109:21,22,23 110:3,4 220:10 222:3 224:13 224:20 228:18 228:23 231:3

239:11 244:16 245:4 247:10 252:17
**format** 101:9 101:13,25
**forth** 258:13
**found** 232:24
**four** 40:6 54:7 55:11 63:3 64:11 100:20 102:5 110:16 122:24 132:14 178:9,13 181:5 198:21 231:10
**fourth** 101:17
**franchise** 30:20
**frank** 55:10 56:12,16 83:17 85:16,22,24 87:2 117:5 221:4 236:20
**frank's** 63:2 108:11
**franklin** 4:7
**free** 251:22
**frequently** 124:12 208:3
**friday** 34:16
**friend** 216:21
**friendly** 147:24
**friends** 216:18 216:23
**front** 107:7

**full** 59:4 149:7 150:20
**function** 55:21
**functions** 23:4 54:4
**fund** 239:5
**funded** 33:25 34:5,10 40:5,6 44:21,25
**funding** 1:18 3:19 34:22,24 35:4 45:12 65:12 248:23
**funds** 45:2 182:13
**further** 5:20 210:19 248:15 255:9 256:8 258:16

**g**

**general** 18:24 26:17 50:25 60:20 61:9 80:8 86:9 94:7 94:8 109:22 110:3 112:13 131:13 142:6 195:8
**generally** 19:16 24:3 55:7
**generate** 173:15

**generated** 131:7 198:14 199:3,4 228:25
**generates** 228:8 242:7
**gentleman** 143:12 149:20
**geraldine** 216:17
**getting** 24:15 27:24 28:4 29:4,11,18,21 40:5,20 44:24 49:20 90:16 91:2 116:21 120:2,6,7,12 121:20 122:9 129:9 171:7 181:14,14 192:15,18 193:10,20 194:10,13 229:8 231:14 231:15
**girl** 20:8 104:14 231:9 231:12 234:14
**girl's** 54:17
**girls** 20:12 22:18 23:20 29:14 54:7 231:10
**give** 7:18 12:3 27:18 31:11

40:9 43:15 55:6 67:9,11 69:17 88:16 92:8 106:22 111:5 116:19 122:2 124:2,25 130:3,12 133:12,22 137:24 146:12 151:15,16 153:23 159:13 160:23 161:14 163:21 168:21 175:11 197:5,6 197:19 214:22 214:25 239:17 239:21 245:20 246:25

**given** 135:18 232:19 256:10 258:15

**gives** 70:16

**glasses** 183:14

**glen** 6:12 215:20,23

**go** 11:18 13:14 22:17 28:3,4 31:8 36:2 37:5 39:18 40:11,18 41:2,8 43:16 48:23 49:6 50:12,14 59:9 61:21 63:3,5 77:4 86:13

100:19 103:11 105:14 107:17 108:6,17 115:20,25 116:15 117:4 154:2,10,14,24 157:11 160:2,7 167:23 168:20 177:16 190:19 194:16 203:5 207:13 210:25 216:25 243:24

**goes** 37:10 38:14,21 39:10 68:21 71:24 73:24 109:2 118:9 161:8 185:3 244:14 252:14

**going** 24:23 26:20,21 27:4 29:5 47:17 52:6 54:23 89:17 99:4 113:18 115:8 116:9 118:18 135:13 139:4 167:7 168:7 169:5 171:2 175:3 176:12 181:19 182:22 183:3,4 185:11 187:20,25 188:18 194:11

196:3 201:11 201:16 202:8 202:14,20 203:15 209:15 212:10 238:24 255:11

**gold** 1:15,15,15 1:16,16,17 4:4 4:5,5,6,6,6

**gonna** 28:5 81:19 82:20 92:21 96:5 157:23 249:2

**good** 6:22,23 134:20 140:23 143:10 164:8 209:20 211:4 251:17 253:9

**grace** 32:21

**grade** 112:20 152:11 169:7

**graduate** 211:20

**graduated** 211:17

**great** 14:2 213:19

**greenvale** 50:19

**gross** 60:14 120:21,24,24 120:25 194:2

**ground** 7:19

**group** 1:16 4:2 4:6 7:2,3 10:18 171:11 188:25 189:3

**guess** 22:23 55:19 134:22 138:5 149:8 152:3 167:2 195:18 226:5 227:24 233:8 236:2 240:17 245:5

**guessing** 134:21,25 243:14

**guns** 168:20

**guy** 55:10 114:11

**guys** 145:14 177:18,20

**h**

**h** 257:2

**half** 10:4 12:2,6 12:8 49:13 120:22 121:16 121:22 192:19 213:12

**hand** 79:9 109:12 173:20 220:22 233:12 238:21 258:22

**handed** 106:4

**handle** 60:10 231:16 253:4
**handled** 29:18 44:18 60:6 90:16 154:16 174:12
**hands** 23:24 54:5 230:21
**handwritten** 199:6,21 200:5
**happen** 30:7 70:9 161:2,22 171:25 183:5
**happened** 52:10 81:25 176:23 220:19 241:19
**happening** 194:7
**happens** 70:18 228:24
**harry** 1:13 4:11 4:11 142:21 211:5
**hazy** 111:4,5
**head** 6:12 215:23 237:18
**heading** 198:18
**hear** 90:25 91:9 91:13 249:4 251:7
**heard** 20:19,25 90:23 91:15 147:8 219:13

219:16 240:22 240:25 241:4,7 241:8,9,21
**height** 179:21
**held** 146:21 213:16 222:21
**helen** 98:16 111:19 137:18
**hello** 105:10 141:13
**help** 62:25 191:18 221:24 222:5,13,16 231:4,6
**helped** 20:9 150:9 222:19
**hempstead** 10:7
**hendrick** 215:20
**hereinbefore** 256:11 258:13
**hereunto** 258:21
**hesitate** 89:25
**high** 13:7 178:21
**highlighted** 188:20 201:8 203:10
**highway** 4:12 227:10
**hire** 115:17

**hired** 20:8 222:9 231:9,12
**hold** 83:2 94:24 130:15 179:23 185:7
**holdback** 94:17
**holding** 184:17 184:22
**home** 212:12 215:16
**honest** 12:24
**honestly** 12:20 215:13 224:22
**hooked** 57:4
**hopefully** 29:21
**hour** 109:10 124:19
**hours** 109:10 144:20,22 149:2,9,11 150:15 232:14
**house** 208:11
**hundred** 93:11
**hunky** 98:23
**hwy** 1:4,19 3:10
**hylan** 1:6,6,7,7 1:7,8 3:12,12 3:12,13,13,13 190:4

**i**

**iag** 218:15

**idea** 48:16 121:25 129:19 146:8 152:8 216:8 221:20 236:18 242:11
**identification** 187:18 196:7 199:13 202:18 209:13
**identify** 72:4 73:9 116:23 117:2
**ih** 183:19
**immediately** 97:19 160:14 175:20
**impact** 211:10
**implications** 162:25
**important** 45:19 46:5,12
**imprint** 164:17 199:24
**improper** 111:12 230:8 230:10,13,18 244:14,25
**improperly** 236:8
**include** 59:17 59:24 60:3 66:14,17,20
**including** 7:6

**[income - jmw]** Page 21

**income** 163:12
**increasing** 165:25
**indicate** 156:13 176:4 224:7
**indicated** 230:20
**indication** 88:17
**individual** 225:3
**industry** 212:19
**inflated** 112:14
**information** 18:20 22:9,13 22:14 23:15 24:12,15,17,19 25:3 28:13 36:24 57:13 59:14 69:21,24 72:3 73:14,21 107:4 130:25 131:8 138:4 200:10 204:15 247:2 248:9 257:18,19
**informational** 99:6
**initiate** 186:13
**input** 228:10 228:12
**inputted** 248:9

**inputting** 22:8 22:12
**ins** 246:5
**instructed** 223:12
**instruction** 81:19
**instructions** 175:12
**insufficient** 182:6 192:2,6
**insurance** 29:18
**interact** 26:14 146:10 147:12
**interaction** 56:3 99:2 147:22
**interest** 32:15 32:16,19,20,22 32:25 33:3,8 169:14,17 213:4,5,7,16 227:9 236:16 246:2 250:3,7 250:10,13,22 251:11
**interested** 78:22 258:19
**introduce** 97:25
**introduced** 52:11 144:6

**inventory** 30:25 36:17 37:4,8,12,15,22 38:2,14,18 39:3,4,7,8 41:9 41:23 42:2,15 43:9 59:19 65:13,14,16,22 66:4 67:16 68:3,19 71:6,7 71:15,19,21 72:2,14,16 73:4,17,19 76:9,11,12,15 77:7 112:15 121:6 176:18 177:14
**investigate** 106:19,21
**invited** 129:5
**involved** 13:17 13:21,23 21:18 23:17 26:22 27:23 29:10 33:17 35:19 90:13,15,24 91:24 92:20,24 114:9 123:13 169:9,12 170:3 170:6,8 174:2 174:16,17 185:18 206:2,6 229:8,25

**involvement** 22:3 29:3 33:22
**involving** 221:2
**iris** 1:5 3:11 169:16 216:19 216:22
**irrespective** 43:8
**isinger** 216:17
**island** 1:8 3:14 7:3 10:18 26:10 171:10 173:21,23 188:24 189:3 190:4 202:4 206:12
**issued** 253:5
**issues** 220:25
**item** 88:13
**itemizing** 203:9
**items** 102:25 189:21 207:17

**j**

**j.p.** 1:19
**jamaica** 3:6,6
**january** 12:7 163:5 220:13
**jeff** 6:24 187:12 255:13
**jeffrey** 3:16
**jmw** 1:12

**job** 13:20 14:4 14:24 15:4,6 17:9 18:20 19:19 20:3 48:9,20 53:19 54:4,5,18,23 55:20 56:9 63:2 81:2,21 97:11 104:20 130:7 144:24 144:24 212:15

**jobs** 15:9,10

**joe** 113:25 156:16

**jon** 198:12,13

**jones** 1:14,18 95:7,10,21 96:4,15,22 97:2,8,10,15 105:6 108:17 109:11 113:25 124:25 125:14 137:4,5 156:16 157:24,24 175:16 195:25 196:16 197:4 198:2,5 228:3 229:16 246:20 247:7,11

**jordan** 136:8,9 136:16,20 138:23

**jory** 1:5 3:11

**josh** 91:16,18 91:20 120:11 135:15,18,22 138:20 169:9 169:12,19,22 169:24 171:5 171:17 173:18 174:2,4,17 175:22 176:9 176:15 177:4 181:21,22 182:13,14 206:11 215:4 218:4,9,14 221:12,19 226:6,16 235:3 236:15 251:10

**josh's** 238:20

**joshua** 1:5 3:10

**journal** 109:22 109:24 110:3 163:14 165:19 165:20,23 166:4,8 197:19 198:17 233:2

**jr** 4:11

**jrn** 198:16

**judge** 5:13 214:25 215:2

**july** 12:5

**june** 12:5

**junk** 43:6 179:13

**k**

**kara** 98:16

**kataev** 3:7 145:21 210:21 210:25 255:13

**keep** 42:14,18 86:11 127:12 158:4 163:14 164:4 167:3 172:10 178:12 185:25 195:7 225:4 231:20 252:2

**keeping** 182:3

**keisha** 200:14

**ken** 200:14

**kept** 36:25 128:3 157:8 167:20 168:24 200:9

**key** 155:9

**khan** 1:5 3:11 132:23,25 139:20 141:2

**kibosh** 181:22 181:24

**killed** 90:5 94:14

**kim** 2:11 163:23 255:12 258:8,25

**kind** 13:12 72:9 73:15 86:19

87:10 146:13 163:15

**knew** 50:22 58:10 89:5 92:21 95:19 122:9,10 138:12 140:16 141:9,23 212:3 214:8 219:11 230:8 236:25

**know** 6:18,20 9:6 10:12,12 10:17,20,23 11:21 12:15,18 14:14,17 20:22 25:8 26:6 28:9 31:4 35:9,12 36:16 38:24 42:15 45:18 46:6,11 47:11 50:23 53:13,23 54:18 55:6,13 55:17,18 56:18 57:3 59:13 60:18,23 61:2 61:6 62:13,21 63:7 64:2,9 68:3 75:23 78:25 79:2 85:12 88:4 90:11,22 91:23 92:3,4,15 93:3 93:12,15 95:20 96:3,8,25

97:13,15 98:20
99:12,17 101:8
101:25 102:8
102:24,25
106:18 108:19
109:9,10 112:5
112:24 113:15
113:17 115:3
119:5,9,16,24
121:17,19,23
122:10,18
123:12 125:10
125:25 126:7
126:13 128:2
129:17,20
131:25 132:18
132:21,23,25
133:7,8,17
136:3,6,8,11
137:8,12,16
138:3,22,25
139:6 142:21
143:2,14,20
144:20 145:8
145:19,24
146:3,4,6
147:4,6 149:10
149:20 150:3
150:22 151:13
151:21 152:4,6
154:5,21
155:11 157:5,8
162:5,15,24
163:18 164:7

166:23 167:12
167:15 169:7
169:25 171:19
174:15 176:8
176:24 177:16
178:12 179:5
179:22 182:9
182:17 183:6,7
184:6,7 185:11
190:16 191:12
198:12 202:7
204:24 205:17
206:20 208:5
209:18 212:6,9
215:3 219:8
221:7,20
222:10,21
223:2,4 224:5
224:22,25
225:2,11,13,19
225:22,25
226:3,7,15,16
226:18,20
229:7,10,11
230:10,14,17
232:15 234:22
235:4,11,12,15
235:21 236:15
236:24 237:2
240:9,10,16,17
241:19,20,21
242:4 243:6,9
243:13,14,20
250:4,6,11,25

251:4,22
253:24 254:3,4
254:6
**knowledge**
67:4 122:22
135:2 204:17
235:23
**knowledgeable**
237:5
**known** 56:16
91:8 101:2
**kwun** 136:3
214:2 229:7
238:14

**l**

**l** 5:2,2 6:2,2,2
256:2
**lack** 174:6
**landlord**
222:25
**large** 94:3
159:25 160:8
178:4,6,17
245:11
**largest** 179:21
181:3
**late** 79:16
**laurie** 1:14 4:4
**law** 4:2 169:15
**lawsuit** 7:4
202:5
**learn** 58:5

**lease** 216:11
222:21 223:5,8
223:12
**leasing** 1:4,19
3:10 7:6 11:11
**leave** 49:8,16
50:12 123:17
124:19
**leaving** 183:11
**ledger** 131:13
**left** 12:25 18:18
65:20 126:16
149:10 176:6
**legal** 3:4
**legitimate**
206:25 207:14
**lender** 28:5,8
28:13 29:6,9
29:22 30:4,6
31:23 32:2
34:11,19 35:2
39:12,13,18,25
41:24 42:4
44:12,25 68:20
68:23 74:25
75:2,4 81:5
100:13 103:9
193:21,25
**lenders** 28:14
62:20
**letter** 257:4
**letting** 164:4
**level** 174:13

**lexington** 3:15
**liabilities**
  101:15,16
  102:4
**liability** 205:4
**libertas** 1:18
  3:19 248:23
**lic** 1:16 4:6
**license** 205:11
  205:15 206:3
  206:14
**licensed** 245:15
**licenses** 205:19
  205:23
**lilco** 83:10,12
**limited** 205:3
**lincoln** 14:9,15
  15:4,12 30:20
  32:4,19 47:21
  47:24 99:23
**line** 64:17 65:4
  115:11 257:22
  259:5
**lines** 65:2
**list** 43:12 66:4
  66:9,23 71:12
  87:17,20 88:7
  110:5,12
  114:16 115:23
  115:24 116:3
  116:19 158:11
  220:21,22
**listed** 66:11
  86:6 103:2

138:16 158:8
  205:18,22
**little** 1:18 20:17
  25:12 48:14
  49:20 58:10
  61:12 89:25
  94:22 111:2,4
  174:3 177:25
  178:2 195:17
  231:14 232:10
  232:13
**live** 215:19,22
**lived** 215:17
**llc** 1:3,4,4,6,6,7
  1:7,7,8,8,8,9,15
  1:15,16,16,17
  1:17,18,19,20
  3:4,5,10,10,12
  3:12,12,13,13
  3:13,14,14,14
  3:19 4:5,5,6,6,6
  4:7 259:1
**llp** 1:18 3:9,18
  4:15
**loan** 90:19
  188:24 190:4
**loans** 35:5 90:7
  90:10,12,14
  91:9,11,25
  229:9,12
**located** 11:12
  11:16 14:5
  50:18 155:6

**location** 54:9
  146:22
**locations**
  100:16 213:8
**log** 243:2
  253:19,20
**logged** 243:7
  254:4
**logs** 203:8
**long** 13:18
  16:16 25:18
  28:16 33:13
  45:6 49:11
  58:25 98:14
  213:11 215:11
  215:17 216:8
  238:7 239:7
  252:3
**longer** 47:24
  252:3
**look** 29:7,8,15
  37:15 39:21
  51:19 68:2
  71:13 74:3
  76:8,10,21,24
  77:23 78:16,19
  78:21 95:11
  96:13,20 98:22
  102:7,11,14
  105:13 111:24
  112:2 114:12
  114:17 117:6
  123:17,22
  124:6 138:7,10

138:13,15
  142:6,16
  165:11 169:17
  175:9 186:15
  198:11,14
  227:16,20,21
  227:22 237:18
**looked** 45:16
  75:12 76:18
  77:2 93:18
  99:21 102:9,17
  103:17 113:5
  123:21 124:21
  125:11,21
  139:16 203:16
  204:4
**looking** 44:8
  51:15 93:4
  98:6 105:24
  112:7 158:12
  169:14 195:16
  214:16
**looks** 48:24
  112:13,15
  198:24 199:25
**loose** 156:10
**loss** 138:11
  178:4,7,10,14
**losses** 178:17
  178:18
**lot** 22:22,25
  23:9 56:5 58:9
  58:20 94:22
  113:21 123:6

147:25 149:9 150:10,17,18 168:18 192:8 193:3,7 206:24 222:17,18 228:14 249:4,5

**lots** 26:9

**lower** 112:15

**loyalty** 213:19

**lunch** 123:17 124:17 143:5,7 143:9 147:18 206:25

**m**

**machine** 82:22

**made** 35:15 36:19,21 61:16 103:20 121:2 121:19 129:24 135:8 138:11 150:24 151:10 151:19,21 165:12 166:11 166:15 167:24 168:8,9,15 171:10 189:3,7 190:10 196:2 196:20,23,23 201:3 206:17 218:4,24 223:15,19,20 228:21 232:24 233:7 234:12

238:8 245:7,9 245:17,19 246:4,5,7,8

**mail** 183:20,24 184:2,10,13

**mailed** 173:20

**mails** 227:17

**main** 19:19 61:4,13,21,23 61:25 62:4 93:14 153:5,7 153:10 166:5

**maintain** 241:25

**major** 27:8 82:25 83:6

**make** 8:11 10:13 29:18,24 30:3 35:24 36:6,11 39:15 39:21 40:4 47:17 60:14 72:7 74:4,15 87:3 98:23 109:16,24 110:6,7 111:23 111:25 114:12 117:17 153:14 157:22 160:8 165:5,7 166:3 166:4,8 167:3 167:18,20,21 167:25 168:6 168:13,14

171:22 172:18 182:6 186:23 190:10,12,17 196:16 197:5 218:22 220:11 223:12 232:20 233:2,20 244:20 247:18

**makes** 93:25 167:9

**making** 19:20 19:21,22 33:18 110:18,21,24 112:24 157:23 182:4 190:14 191:16 235:15

**man** 56:13 238:21

**management** 1:9 3:14 20:16 23:22 171:12 171:23 172:17 218:11,13 238:9,12

**manager** 50:25 143:19,23 144:8 145:20 146:2,5 149:13 150:9

**managers** 11:2 144:14

**manually** 131:4

**manufacturer** 31:16 100:10

**marc** 1:14 4:4 143:12,14 150:10 155:14 159:8 160:7 168:18 223:18 245:10

**march** 2:3 217:19

**mark** 86:18 187:14 196:4 199:7 202:14 209:8

**marked** 187:18 187:22,24 195:22 196:6 199:12 202:17 209:12 257:21

**marking** 187:13

**marriage** 258:18

**marwaha** 4:2,8 163:23 164:5 251:16,18 255:9 257:16

**matches** 39:22

**material** 19:8

**matter** 40:19 248:24 258:20

**matters** 7:6 220:17 221:7

**maximum** 64:3

**meal** 207:2

**mean** 21:4 62:21 70:2 72:6 97:7 101:10 103:3 111:15 120:18 123:7 133:15 149:8 152:16 154:18,21 177:7 178:6 180:21 187:7 189:18 196:20 220:3 225:21 227:17 231:18 231:24 232:4 241:6 244:18

**means** 7:20 28:23 68:11 70:19 162:20 181:23 197:14 198:16 254:12

**meant** 227:20

**mechanic** 55:23 55:24

**medication** 211:9

**meet** 26:18 95:9 109:4 140:5 141:6 142:8 169:19

**meeting** 24:7 50:10 52:4 82:7 169:22 170:12 172:7

**meetings** 129:3 129:6 146:15 146:18 147:2

**melissa** 49:8,15 49:17 51:3 52:13,14 58:20 97:6

**melissa's** 53:14

**memory** 211:13 217:20

**mention** 11:14 141:4 217:2

**mentioned** 95:4 120:15 135:15 148:14 236:19

**merchant** 63:6

**merckling** 1:14 4:4 143:12 147:20,23 149:24 150:22 152:12 168:12

**mercury** 14:9 14:15 15:4,13 30:20 32:4,19 47:21,25 99:24

**met** 108:19 142:24 208:7

**michael** 1:14 4:4 11:12 47:14

**millennium** 10:3,9,17 11:3 11:7 12:25 14:20 17:4

213:3,6,6,10 237:21,23

**million** 64:12 64:15,21,21,22

**mind** 57:6

**mineola** 4:8

**minute** 196:22 210:13

**minutes** 109:9 117:23,24

**misleading** 195:17

**misrepresents** 224:14

**missing** 30:9 34:20 40:8,10 106:10 220:23

**mistake** 117:18

**model** 72:7 74:16

**monday** 34:13 146:20

**money** 27:6,7,9 27:10,15,17,24 31:5 32:13 37:10 39:16,17 39:25 41:24 44:12,16 46:10 47:17,21 61:18 67:20 68:20,21 70:17 72:15 73:5,11,20 74:10 76:22,22 77:10 78:3,8,9

81:7 85:25 86:2,8,12 88:9 90:20,21 91:2 91:5 93:7,12 93:16,23 94:6 112:2 117:10 118:15 120:12 131:19 132:11 132:16,19 134:2,6,17 138:21 139:4,7 139:8,8 154:2 154:4,7,15,20 155:16,17,20 155:22,24,25 156:20,21,22 157:5 158:14 158:21,22,24 159:3,13 162:2 162:25 164:21 165:5 166:8 167:6 168:13 168:19,25 169:2 170:25 173:5 182:15 186:2,15,16 187:5 189:16 189:21,25 190:11 191:17 191:21 192:2,6 192:8,12 193:2 193:3,10,13,20 193:21,24 194:4,8,9,16,17

194:23,24,25
200:4,12
207:15 224:4
225:12,17,18
244:21 249:19
252:9,13
**monies** 170:22
170:23
**month** 12:18
24:8,22 47:23
60:8 83:9
92:19 95:23,24
96:13,17,20,22
96:23 97:3
98:21 99:24
100:2 105:17
105:19,21,22
106:2,2 113:18
114:8 120:19
122:3 124:6,8
131:23 132:14
139:14 171:13
172:23 196:2
196:24 197:9
197:12 218:9
245:25 246:3
246:20 247:7
**monthly** 32:17
33:3 87:15
102:9,12 113:2
113:7 118:6
119:13 193:6
206:21

**months** 12:23
24:10 59:2
100:20 123:8
131:23 132:15
148:16 215:18
215:21
**morgan** 1:19
**morning** 6:22
6:23 79:15,17
146:20
**morris** 14:16
14:17 25:16
211:18,24
**motor** 1:4,19
3:10 7:6 11:4
11:11 28:10
32:6,7 61:8
63:23 69:21,24
70:12,13,18
71:3 73:25
74:23 75:5,10
77:2,12 78:22
100:7,17,19
103:9
**motors** 1:3,16
1:16,16,17,17
3:5 4:5,6,6,7
11:8,10 14:4
15:13,18,23
16:2,5,14,17,23
17:7,13 18:10
18:18 19:6,8
20:7,10,15,22
21:18,21,23

22:3,23 23:9
23:17,21,23
24:4,5 25:10
25:18,24 26:11
28:20 30:19
33:18 35:7,14
36:3 45:20,25
46:6,15 47:12
48:10 53:19
57:8,23 66:4
68:8,24 81:3
96:19 98:10,12
98:13,19 100:6
100:9,12
101:21,21
137:20 169:25
213:2 217:3
222:22 227:4
229:19 230:22
231:5,9 259:2

**n**

**n** 3:2 5:2 6:2,2
201:18,21
256:2 257:12
**n.a.** 1:19
**n2173** 201:25
**name** 6:8,24
17:17,19 54:17
55:7,25 56:14
70:25 95:6
109:25 110:4
132:23 136:16
141:4 143:12

149:21 151:2
201:20 211:5
222:11 234:17
236:20 248:22
251:17 259:2,3
**names** 84:5
136:17
**nassau** 13:10
149:5 150:12
150:17 202:11
**nature** 46:13
**necessarily**
165:16 225:13
**necessary**
182:7
**neck** 14:3
**need** 8:3 32:10
40:11 58:5
86:13 96:10
115:9 155:18
164:7 186:17
243:23 255:12
**needed** 57:21
60:15 62:23
69:13 96:11
190:18 222:15
242:13 254:9
**needs** 38:25
39:21
**never** 65:8
88:21 89:7
111:18,19
123:21 125:20
132:16,17

136:16 137:25
138:15,22
139:4 141:17
142:20 147:8
168:14 191:10
203:11 205:6
214:5,8 221:21
232:24 240:22
240:23,25,25
241:4 255:5
**new** 1:2 2:12
3:6,15,15 4:8
4:13,17 6:4,12
10:7 30:19
31:15,21 33:5
37:7 39:3
41:22 43:19
44:6,11,22,25
50:19 57:15
65:13,14 66:6
70:13,23 81:5
98:15 101:18
102:5 103:7
117:11 123:10
158:8 202:12
215:23 258:4,5
258:9 259:1
**night** 149:10
150:18 154:8
154:13,23
**nipun** 4:8
251:18
**nissan** 26:8
50:17,24 84:8

84:11 87:12
136:10 237:12
237:15,22
**nod** 8:5
**non** 2:7
**normally** 40:22
57:22 177:10
177:12
**north** 7:6 9:23
9:25 11:4,8,10
11:11 12:12,15
14:24 15:6,14
15:16,20,22
16:10,11,22
19:5 20:7 23:5
23:23 48:11,20
48:23 49:2,4,6
49:15,19,22
50:4,12,14
52:18 53:21
54:3,6,23 55:2
58:3,21 59:13
59:21 60:24
62:5,15 63:11
63:13,19 64:6
64:20 65:15
66:7 69:4,8
75:15 78:6
81:9 83:22
89:10,10 96:18
96:21 100:4
101:4,24 102:8
103:16 104:4
104:15 107:23

107:25 108:8
119:7 123:14
133:4,6 135:22
136:12,16
137:19 140:19
140:22 143:15
170:3 188:16
191:22 200:6
201:25 204:22
205:14 214:6,9
217:6,10,15
218:25,25
219:23 220:15
220:16 221:25
222:22,24
223:3,5 227:4
230:21 231:6
236:12,16,21
237:7,10,23
239:8 240:7
242:2 249:10
249:22,22
250:3,7,22
251:2,11
**northshore** 1:4
1:19 3:10
**notarized**
203:3 209:3
210:9
**notary** 2:11 6:4
256:22 258:8
259:25
**notation**
197:25

**note** 156:13
165:22 201:16
**notebook**
163:18
**noted** 157:14
**notes** 237:19
**number** 23:3
60:14 63:5,5
72:21 73:15
74:20 110:9
162:15 201:18
201:18,19,24
202:2 214:11
214:12,23
215:12 242:8,8
242:23 245:11
**numbers** 64:9
72:11 110:13
130:3,5 162:10
238:24
**nyc** 1:14 4:4

**o**

**o** 5:2 6:2 256:2
**o'sullivan** 2:8
6:1,10 7:1 8:1
9:1,17 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1

| | | | |
|---|---|---|---|
| 32:1 33:1 34:1 | 122:1 123:1 | 190:1 191:1 | 257:1 258:1 |
| 35:1 36:1 37:1 | 124:1 125:1 | 192:1 193:1 | **o'sullivan's** |
| 38:1 39:1 40:1 | 126:1 127:1 | 194:1 195:1 | 187:16 196:4,5 |
| 41:1 42:1 43:1 | 128:1 129:1 | 196:1 197:1 | 199:11 202:16 |
| 44:1 45:1 46:1 | 130:1 131:1 | 198:1 199:1 | 209:9,10,11 |
| 47:1 48:1 49:1 | 132:1 133:1 | 200:1 201:1 | 257:3,9 |
| 50:1 51:1 52:1 | 134:1 135:1 | 202:1 203:1 | **oath** 5:12 |
| 53:1 54:1 55:1 | 136:1 137:1 | 204:1 205:1 | **object** 222:2 |
| 56:1 57:1 58:1 | 138:1 139:1 | 206:1 207:1 | 224:13 228:18 |
| 59:1 60:1 61:1 | 140:1 141:1 | 208:1,7 209:1 | 228:23 231:2 |
| 62:1 63:1 64:1 | 142:1 143:1 | 210:1,18 211:1 | 244:15 245:3 |
| 65:1 66:1 67:1 | 144:1 145:1 | 211:4 212:1 | 247:9 252:16 |
| 68:1 69:1 70:1 | 146:1 147:1 | 213:1,24 214:1 | **objected** |
| 71:1 72:1 73:1 | 148:1 149:1 | 215:1 216:1 | 228:24 |
| 74:1 75:1 76:1 | 150:1 151:1 | 217:1 218:1 | **objection** 8:16 |
| 77:1 78:1 79:1 | 152:1 153:1 | 219:1 220:1 | 8:17,19,24,25 |
| 80:1 81:1 82:1 | 154:1 155:1 | 221:1 222:1 | 45:21 213:21 |
| 83:1 84:1 85:1 | 156:1 157:1 | 223:1 224:1 | 220:9 239:10 |
| 86:1 87:1 88:1 | 158:1 159:1 | 225:1 226:1 | **objections** 5:21 |
| 89:1 90:1 91:1 | 160:1 161:1 | 227:1 228:1 | **obligations** |
| 92:1 93:1 94:1 | 162:1 163:1 | 229:1 230:1 | 246:8 |
| 95:1 96:1 97:1 | 164:1 165:1 | 231:1 232:1 | **obtained** 31:5 |
| 98:1 99:1 | 166:1 167:1 | 233:1 234:1 | **obtaining** |
| 100:1 101:1 | 168:1 169:1 | 235:1 236:1 | 11:18 |
| 102:1 103:1 | 170:1 171:1 | 237:1 238:1 | **obviously** |
| 104:1 105:1 | 172:1 173:1 | 239:1 240:1 | 147:6 |
| 106:1 107:1 | 174:1 175:1 | 241:1 242:1 | **occasionally** |
| 108:1 109:1 | 176:1 177:1 | 243:1 244:1 | 223:18 |
| 110:1 111:1 | 178:1 179:1 | 245:1 246:1 | **occur** 208:3 |
| 112:1 113:1 | 180:1 181:1 | 247:1 248:1 | **october** 176:6 |
| 114:1 115:1 | 182:1 183:1 | 249:1 250:1 | **offhand** 162:16 |
| 116:1 117:1 | 184:1 185:1 | 251:1 252:1 | **office** 29:13 |
| 118:1 119:1 | 186:1 187:1,15 | 253:1 254:1 | 50:11,13 54:9 |
| 120:1 121:1 | 188:1,2 189:1 | 255:1 256:1,15 | 54:12 55:2 |

68:16,17 80:3
100:18 105:3,5
107:9,18
108:10,11,11
108:11,12,14
108:15 126:9
126:10,12
140:8 147:17
148:4,6,16,20
148:22 155:8
159:14 174:6
202:11 246:24
248:4
**officer** 144:23
145:6,10,22
149:23,25
150:13,14
**officers** 150:10
**offices** 108:8
148:9
**oh** 93:21
117:17 139:12
160:6 168:3
198:23 253:7
**okay** 8:14 9:8
10:15 19:10
21:8,23 64:24
77:6 189:14
200:9 251:25
253:7
**old** 13:4,22
44:18 45:3
**older** 25:12

**once** 38:13 39:6
47:3 68:21
70:18 71:21
74:8 85:19
92:18 95:23
97:3 100:19
103:10 124:6,7
130:16 131:22
132:14 133:3
133:14 139:14
140:4 142:3
148:2 157:22
160:6 168:2,3
172:23 175:17
240:6
**ones** 102:17
203:25
**open** 40:12
155:18,25
157:4 159:6,8
164:16 227:18
**opened** 159:9
159:10
**opening** 155:20
**operated** 89:7
89:11 170:20
173:25 211:18
211:24 212:23
212:25
**operating**
60:21 86:9
94:7,9 188:13
204:21,23,24
205:8

**operation** 25:9
46:5 51:19
82:9 89:13
123:14,18
131:20 205:18
**operations**
25:25 48:24
174:16
**opinion** 152:2
**opposed** 152:6
**oral** 8:3
**order** 17:11
40:14 69:14
177:13 242:9
243:17,23
**ordinarily**
179:14
**original** 5:9,17
**osullivan** 259:3
259:21
**outcome**
258:19
**outright** 177:5
177:6
**outside** 60:6
83:23,24
**outstanding**
74:4 102:25
**oversee** 171:22
**oversight** 240:8
**overtime**
232:13
**ovington** 4:17

**owe** 73:5
**owed** 44:17
67:20 68:4,20
72:15 73:11,20
76:17 77:10
78:3,8,10
194:17 207:14
**owes** 193:19
**own** 54:12
64:17 153:6
155:4 216:6
254:22
**owned** 211:18
211:24 212:23
216:13
**owner** 25:7
44:17 52:19
53:9 129:18
138:16 162:21
162:22 205:22
206:13 249:22
250:17 252:11
252:12
**owner's** 252:8
**owners** 24:7
45:19 47:15
52:20,23 53:3
133:15,18
205:19 227:4
227:14 249:12
**ownership**
206:3,7 235:6
249:9 250:2,10
250:13,22

**[ownership - paying]**                                              Page 31

251:11

**p**

**p**  3:2,2 5:2
**p.m.**  253:13 255:15
**pa**  3:20
**package**  29:22
**page**  101:16,17 101:18,18 102:4,5 257:4 257:13,19,22 259:5
**pages**  185:3 199:9
**paid**  20:8 22:20 28:4 32:10,19 33:8,19 34:10 34:13,14,15 35:4,18,25 36:12,13,15,21 37:13,13 38:25 39:25,25 40:20 40:22 44:22 45:3,11 61:19 70:13 71:23 73:16 74:8 76:25 85:6 86:22 87:3,5 88:4,5 89:19 99:5 106:9 113:25 114:14 114:22 116:8 116:21 117:13

119:2 151:8 152:3,10,14,18 152:19 171:7 180:9 182:18 194:10,13,25 195:2 218:14 245:25
**pandemic** 217:19 229:8 229:12
**paper**  70:14 109:12,14,17 109:19 127:10 127:15,16 128:3
**papers**  28:10 28:20 31:19 69:17 70:18,19
**paperwork** 23:19 28:8,18 29:8,11,13 40:9 68:12,14 68:15 69:15 70:16 85:18,20 127:18 136:19 147:16 157:7 157:11 206:6 222:18,19 224:8 247:16
**paragraph** 203:8
**part**  45:15 70:3 71:20,23 72:14 72:16 73:5

79:12 85:10 86:5 130:7 141:14 170:14 172:3 247:15
**partially**  20:17 245:13
**particular** 23:18 159:19 186:3,9 208:4 208:6
**parties**  2:9 5:7 183:18 258:17
**partner**  133:2 216:21 251:2,5
**partners**  1:18 89:4 133:8,12 133:18
**parts**  27:8 39:15
**party**  2:7 211:5
**passed**  122:15 128:20 135:23 136:5 176:3
**pay**  19:24 20:4 26:21 30:10 32:16 33:11,14 34:2 35:3,14 35:24 36:23 39:18 44:20,20 57:21 60:5 61:22 77:19,22 78:10 80:10,11 80:23,23 81:6 81:13,14 82:5

82:15,15,18,23 83:3 85:25 86:16,21 88:8 88:14,18,18 89:17,25 94:24 103:8 112:20 116:9 117:18 118:16 130:20 130:23 151:5 151:23 152:11 153:12 169:7 179:18,19 181:3 186:10 186:17,24 187:5 191:18 192:2 193:25 194:6,16 195:3 195:6 219:8,14 219:15 240:5 241:4,15,20 246:2 252:22 253:8
**payable**  129:24 131:9 151:11
**paying**  19:23 20:12,13 23:24 23:25 32:24 37:22 38:3 40:20 44:3 45:9 46:9 83:4 85:5 87:6 89:15 94:18 135:19 179:23 181:16

**[payment - port]**                                                      Page 32

| | | | |
|---|---|---|---|
| **payment** 154:22 | 233:10 | **pick** 94:20 173:21,22 | 116:16 117:8 187:9 194:18 |
| **payments** 171:10 186:13 206:17,21 218:4,7,22,24 223:13 233:11 234:4,6 235:15 236:12 238:8 246:4,5,7,9 | **performing** 222:6 **period** 32:22 **periodically** 193:7 **perjury** 7:22,23 **person** 11:6 27:17,20 69:6 | **picking** 89:21 **piece** 40:9 43:6 109:12,17 **pink** 203:11 204:3 **place** 9:25 12:17 36:10 | 216:9 219:25 220:6,15,18,20 221:2,6,8,17 233:25 245:24 **plans** 31:24 36:18 187:10 191:19 218:15 |
| **payoff** 34:25 80:15 182:3,15 186:20 187:7 | 70:15 85:5 114:25 115:2 116:10,15 | 47:16 48:7,24 49:9,22 50:9 50:10 53:14 | 221:14 **play** 216:24 **please** 6:8 |
| **payoffs** 80:12 182:4,7 184:16 184:21 185:7 186:19 | 171:2 200:16 216:16 220:16 220:20 234:5 **person's** 56:9 **personal** | 85:14 118:18 123:2 134:18 171:14 213:4 256:11 **places** 49:5 | 115:10 117:25 172:10 187:15 192:24 214:24 237:19 255:12 **pllc** 4:2 |
| **payroll** 60:3,4 60:5,11,12,15 60:17 119:11 132:22 152:20 | 122:22 152:2 183:8 **personally** 36:6 245:18 | 69:2 222:18 **plaintiff** 249:9 **plaintiffs** 1:10 3:4,9 7:4,5 | **plus** 236:3 **point** 17:24 29:4 48:4 93:6 94:21 116:10 |
| **penalty** 7:22 **people** 20:11 52:12 104:3 152:23 154:6 180:7 245:9 247:5 252:21 | **phelan** 139:2 **philadelphia** 3:20 **phone** 56:11 180:6 181:15 214:11,12,23 | **plan** 31:6,7,9 31:19,21 32:9 33:11,15,19 34:11 35:2,15 36:14 37:5 42:5,6 59:24 61:22 62:6,14 | 135:18 138:19 148:19 180:24 185:10 214:3 221:23 227:7 227:12 **police** 144:23 145:6 150:12 |
| **percent** 34:18 104:20 120:22 120:23 121:22 192:19 233:16 233:17 243:22 | **phones** 56:10 **phrase** 253:2 **physical** 28:20 **physically** 35:16 103:24 155:17 | 63:20 64:4 65:21 67:5,14 71:8 80:16 114:5,8,10,13 114:14,17 115:18,25 | **pop** 140:4 **port** 14:4 15:18 15:23 16:2,5 16:14,17 17:7 17:13 18:10,18 19:8 20:10,14 |
| **percentage** 121:12,14 | | | |

20:22 21:18,21
21:23 22:3,23
23:8,17,21
24:4,4 25:9,18
25:24 26:11
28:19 30:19
33:17 35:7,14
36:3 45:19,24
46:5,15 47:12
48:10 53:19
57:8,23 66:3
68:8,24 81:3
96:18 98:10,12
98:13,19 100:6
101:20 137:20
169:24 213:2
217:3 229:19
230:22 231:5,9
**portion** 86:23
87:24
**position** 11:19
14:21,25 16:9
16:10,13 18:23
18:24 19:5,7
19:17 21:17
23:13,22,24
48:6 50:24
52:25 53:16
144:14
**positions** 55:7
**positive** 113:4
219:8,13,15
241:4,15,20
243:22 252:22

253:8
**possible** 99:16
**post** 36:20
57:17 68:17
69:14,19 70:8
70:23 104:7
107:6,11
**posted** 37:10
38:13,19 39:6
39:11 68:7,10
68:21 69:23
70:10,20,22
71:5,21,24
72:23 73:23
99:22 103:10
103:25 104:4
228:25
**posting** 14:22
19:22 22:18
54:21 57:16
69:6 104:16
110:8
**postings** 240:13
**power** 169:16
225:17
**ppp** 90:7,12,13
90:19 91:9,25
92:20,22
**practice** 159:5
**pre** 31:8
**preference**
249:2
**premier** 1:17

**premier.com**
183:21
**premises**
116:18
**prepare** 138:4
202:4 204:7,9
**prepared** 137:6
137:8,22 204:6
204:8 208:18
**preparing**
206:6 240:12
240:20
**present** 4:19
**presumably**
8:23
**presuming**
86:18
**pretty** 21:25
35:10 124:11
128:19
**previous** 81:2
**previously**
77:25 124:24
148:8 179:16
187:21 199:23
**price** 84:22,24
85:3 121:5
**primarily** 55:3
**primary** 56:9
**principal**
133:19
**principals** 10:8
10:16 14:15

**print** 79:5,6
105:13 126:18
126:20 137:2
140:12
**printed** 40:24
75:25 79:3,8
106:4 120:20
129:23 195:9
**printer** 210:4
**printing** 22:6
**prior** 53:18
96:21 106:2
**privately** 66:21
67:8
**pro** 4:11
**probably** 12:6
124:9 150:8
233:14
**problem** 19:15
**problems** 49:7
**procedure** 2:11
98:9
**process** 33:23
35:20 44:3,7
45:9 92:25
104:11 254:19
**processed**
60:12
**profit** 120:24
120:25 138:11
194:2
**profitability**
195:8

**[profitable - really]**                                                    Page 34

| profitable | 227:9 | **q** | **r** |
|---|---|---|---|
| 112:3 | **purchaser** | **qualified** 63:6 | **r** 3:2 4:11 5:2 |
| **promise** 252:2 | 193:25 | **qualify** 63:4 | 256:2 258:2 |
| **proper** 244:19 | **purchases** | **question** 8:8,13 | **raise** 8:16,17 |
| **properly** 167:5 | 154:16 | 8:16,18,25 9:7 | 239:14,18,21 |
| **prove** 163:21 | **purchasing** | 9:10,11 10:12 | 239:23,25 |
| **provide** 18:5 | 158:6 | 10:13 46:4 | 240:3 |
| 58:18 113:10 | **purple** 201:9 | 47:8,9 65:18 | **random** 242:7 |
| 125:17 | 201:13,17 | 96:14 115:7,15 | **rare** 45:8,8 |
| **provided** 62:18 | **purpose** 80:8 | 145:12,17 | **rarely** 159:9 |
| 63:20 64:3 | 254:13 | 196:9 210:17 | 160:17 175:18 |
| 123:19 183:17 | **purposes** | 222:4 223:7 | **rather** 160:11 |
| 183:17 195:23 | 229:25 245:14 | 237:20 251:22 | **ray** 199:18 |
| 201:12 210:3 | **pursuant** 2:9 | 251:23 257:22 | 200:13 |
| 221:18 234:22 | 7:9 31:18 | **questioned** | **raymond** 139:2 |
| **providers** | **put** 23:15 42:14 | 88:21 | **reach** 180:13 |
| 233:25 | 48:8,11 103:24 | **questions** 8:2 | **reached** 180:15 |
| **providing** | 113:9 127:18 | 9:6,14 59:7,10 | **read** 115:13,16 |
| 63:14 184:24 | 127:23 130:25 | 99:7 106:13,16 | 145:18 204:10 |
| 218:15,15 | 156:3,25 | 107:13 108:25 | 208:20 209:18 |
| **public** 2:12 6:4 | 157:23 158:22 | 112:17 116:13 | 209:22 |
| 256:22 258:8 | 162:12 163:11 | 118:10 142:18 | **ready** 68:11 |
| 259:25 | 165:22 167:16 | 175:4 210:19 | **real** 144:24 |
| **purchase** 43:13 | 168:22 181:23 | 210:22,24 | 150:5 179:12 |
| 43:23 65:13,21 | 182:14 199:2 | 211:7,11 | **really** 12:24 |
| 74:12 84:19,23 | 200:10 201:12 | 248:15,25 | 13:13 20:19,20 |
| 86:12 121:5 | 203:13 217:24 | 249:2,7 251:21 | 47:10,15 51:12 |
| 152:23 153:3 | 229:5 242:8 | 257:21 | 51:22 54:24 |
| 235:8 236:16 | 252:9,12 | **quickly** 164:2 | 55:22 57:12 |
| **purchased** | **putting** 22:10 | **quite** 244:3 | 84:7 92:2 |
| 30:19 32:8 | 22:15 24:12 | | 93:17 94:13,14 |
| 33:25 41:17 | 91:24 131:8 | | 94:22 95:15 |
| 42:10 66:18,21 | 162:19,25 | | 104:19 111:14 |
| 67:3,7 177:24 | 189:20 219:21 | | |

**[really - referring]**

111:16 117:2
118:17 123:18
123:21 128:18
132:13 138:9
140:11,20
147:21 149:10
170:10,21
195:14 211:15
214:22
**realty** 1:8 3:14
**reason** 9:13
79:22 89:2
104:17 113:22
118:22 160:9
160:10,12
169:4 186:7
191:21,24
235:14,20
259:5
**reasons** 26:17
**recall** 28:14
33:13 40:18
45:5 48:12
49:10,24 51:21
52:3,5,6 54:22
56:14 59:9
62:5 65:9,11
65:19,24 84:5
89:20 90:3
92:12 93:9,22
94:12 95:13,16
98:12 101:8
111:21 112:10
117:7 118:14

137:15 169:22
170:8,11,18
172:2 176:15
177:21 178:3
178:20 180:5
182:5,12
184:24 189:2
189:23,24,25
202:3,21 206:9
206:10,18
207:17 208:10
209:16 229:20
230:14 231:11
233:10 236:9
236:11 239:12
**receipt** 163:20
164:9,11 165:2
167:8,9,10
199:16,20,21
199:22,24,25
200:3,5,6
**receipts** 163:15
164:18 166:16
167:4,4 233:20
**receive** 7:10
18:18 179:6,8
**received** 17:24
81:4 117:10
167:11 207:4
239:14
**receiving** 18:15
**receptionist**
55:12 56:7

**recess** 118:3
143:7 210:14
248:18
**recognize**
188:5,12
196:10,13
199:15
**recognized**
89:23
**recollection**
30:12 65:4
94:15 108:16
180:3
**reconciliation**
246:17,19
247:6
**reconciliations**
126:2 246:12
246:13 247:12
247:15 248:4
248:12
**record** 6:9 8:12
8:20,24 10:14
118:2 143:6
145:14 158:2
158:17,19
159:14,19
160:24 161:18
161:23 164:3
164:25 165:4,6
192:25 200:10
201:2 210:13
248:17 258:14

**recorded**
157:18 163:16
164:22 167:6
168:7
**recording**
158:23 234:6
**recordings**
234:13
**records** 108:3
124:20 126:5
127:15,16
131:17 165:11
176:4 200:8
**recs** 126:8,24
127:2
**reduce** 166:18
167:18 176:17
177:13 239:5
**reduced** 165:9
**reducing** 163:3
166:9 233:3
**reduction**
165:15 166:2
240:5
**refer** 140:25
189:15 203:6
**reference**
198:10,19
**references**
188:24
**referred** 7:2
251:19
**referring** 40:24
95:5 102:21

185:14 193:2
**reflected** 125:3
  203:24
**refresh** 217:20
**regard** 33:18
  74:10 90:6
  210:16
**regarding**
  99:17
**registered**
  28:12 85:21
**registering**
  70:4
**registration**
  74:8
**regular** 24:14
  26:3,12,18
  37:16 62:3
  75:13 82:21
  83:7 95:22
  128:17,21
  140:2,3 159:5
  174:16 177:18
  186:22,25
  187:5 193:5
  208:2 228:7
**regularly** 124:7
  146:9 207:23
**related** 10:9,18
  10:20 14:18
  23:19 59:15
  171:2 207:19
  258:17

**relating** 40:19
**relationship**
  52:18,22 53:8
  62:19 133:6,10
  133:20 136:13
  141:18,20
  147:11 149:16
  206:13
**relief** 32:20
  229:9,12
**remember**
  12:21,22 28:17
  32:3 54:15
  55:25 58:12
  93:22 94:2
  119:25 125:13
  139:10 162:17
  178:16 201:15
  202:22,23
  215:13 222:12
  225:3 237:17
  238:9 239:9
**rent** 47:17,23
  222:24
**repeat** 228:20
  237:19
**repeating**
  244:6
**rephrase** 9:7
  65:18 251:24
**report** 46:16,19
**reported** 46:18
  46:25 47:2,4

**reporter** 6:14
  8:4,9 19:9,11
  115:7,10,13,16
  145:13,18
  163:25 164:6
  172:10 187:19
  192:24 196:8
  199:14 202:19
  209:14
**reporting**
  259:1
**represent** 7:2
  201:11 203:15
  211:6 248:23
**representative**
  1:5 3:11
**requested**
  257:18
**require** 252:11
**required**
  241:12
**requires**
  241:17 242:8
**reserved** 5:22
**respect** 218:14
**respective** 2:9
  5:6
**respond** 181:20
**response** 7:12
  8:3
**responsibilities**
  24:6 54:19
**responsibility**
  37:15 39:14

40:3 106:15
  130:8 159:18
  186:12
**responsible**
  20:3 60:13
  87:2 103:23
  234:5 240:12
  247:6 251:5
**rest** 27:16
  211:21
**result** 18:8
  170:17 176:24
  178:4 185:17
  208:17 248:10
**retail** 43:5
  177:11,12
**retained**
  257:11
**retire** 9:22 13:2
  51:16 150:3
**retired** 9:20
  25:17 150:5
**retiring** 18:3
**return** 40:9
  163:8
**returns** 136:22
  136:25 137:6,9
  137:22 138:4,8
  138:14,17
  227:13,21
  240:20
**review** 76:3
  140:10 166:14

**reviewed**  75:19
  75:21,24
  106:12 226:2
**reviewing**
  240:11,13
**reynolds**  21:20
  21:21 22:2,2
  24:12,13,16,16
  25:3,4 36:25
  36:25 57:7,10
  57:10,12,18
  162:8
**richard**  137:14
  137:15 240:19
**rid**  43:3
**right**  9:23
  11:13,17 15:24
  15:25 17:2
  23:14 32:23
  35:7 38:20,23
  39:16,19 42:6
  43:13 46:9
  48:14 57:25
  72:24 75:9,11
  77:14 78:4,5
  78:14 80:14
  83:25 84:20,21
  85:8 88:6
  89:15,17,19
  99:8 100:10
  101:23 106:3
  106:23 107:14
  107:16,19
  108:4,6 114:3

117:12,14
118:7,8 120:3
121:6,10 125:2
125:5 129:10
129:12 130:5,9
132:9 135:20
148:7,10,12,16
152:24,25
153:25 154:7
156:6,24 157:3
157:6 158:10
158:13 159:11
159:21 160:2,3
161:6,9,19
162:4,7,11
163:10 164:23
165:21 167:14
169:3 170:5
173:14 178:22
179:19 180:24
184:12,18,23
185:5,13,16
186:6 188:19
188:20,22
189:22 190:6
190:15 192:17
193:10,15,16
193:18,23
194:3,5 196:24
198:2,15,23
199:4,17
200:24 204:2
211:22 216:2
217:4 218:5

219:2,5 221:2
221:18 223:16
223:21,25
224:11,18
225:7 226:24
227:5 228:10
228:17,22
229:5,17,25
230:5,23
232:11,21
233:7,18 235:9
235:25 236:4,5
238:20 240:24
243:25 244:9
244:23,24
245:7,11,19
247:8,14,16
248:7 252:23
253:3,7,9
254:11 255:4
**robert**  1:4 3:5
**rochelle**  98:15
**role**  53:12
  55:14,16
**rolls**  178:25
**ronneburger**
  4:18 6:19
**ronnie**  47:14
  136:20
**ronnie's**  136:17
**room**  65:20
  108:7,12,18,22
  109:2 125:21
  146:22,24

163:24 164:4
**ropes**  52:15
**rosa**  222:11
  234:16,18
**rose**  234:18,19
**roslyn**  1:17 4:6
  14:6 15:4 48:2
**roughly**  211:22
  213:13 224:9
  233:9
**route**  1:8 3:14
**routine**  105:8
**royce**  178:25
**rubber**  156:11
**ruderman**  3:16
  6:7,21,24
  19:10,14 45:24
  46:3 117:22
  118:2 139:22
  143:4 145:23
  164:8 187:14
  195:19 196:3
  199:5 202:8
  209:8 210:12
  213:21 214:20
  220:9 222:2
  224:13 228:18
  228:23 231:2
  239:10 244:15
  245:3 247:9
  252:16 257:13
**rules**  2:10 7:19
**rulings**  257:21

**run** 82:2
**running** 25:9
25:25 47:16
222:18

**s**

**s** 3:2 5:2,2 6:2
201:18,21,23
201:23 257:2
259:5
**safe** 154:6,14
154:25 155:4,6
155:18,21,25
156:19 157:2,4
157:10 158:17
158:23 159:4,6
161:8 218:16
**safes** 155:12
**sage** 3:4
**salaried** 119:14
120:4
**salary** 119:12
119:16 130:23
135:19 152:16
192:13,16
**sale** 34:7 39:17
61:16,18 86:7
120:24
**sales** 1:3 3:5
19:24 23:16
27:8,9 59:17
85:3 101:17
102:4 120:21
135:11 143:19

143:22 144:8
144:14,16
145:20 146:2,5
146:21 147:7,9
149:12 150:9
156:15
**salesman**
163:20 200:13
**salesmen** 29:12
55:12
**salespeople**
144:10 146:10
147:9,12
149:17
**salesperson**
23:12 167:9
**salesperson's**
201:20
**sam** 157:24
158:17 161:23
**sarah** 1:13 4:3
4:21 10:21
52:12,14 53:7
55:9 120:3,12
129:9 135:19
192:15 226:19
227:14
**sarah's** 55:16
108:10 130:23
250:2
**saw** 65:8 87:14
97:18 128:23
136:16 137:21
139:4 149:17

189:9 205:6
221:21 228:7
230:3
**saying** 41:13
111:17 194:21
**says** 51:2
105:10 161:15
184:15,21
188:8,22,24
198:2,11,18
200:23
**scanned** 127:23
183:20 184:5,7
**scanner** 183:20
183:24 184:7
**scanning**
127:24
**schedule** 36:19
36:20 37:8,9
37:16 38:9,14
38:15,18 39:4
39:7,9,10 41:9
41:14,16,20,23
41:25 42:7
43:16,17,21
44:9 66:10,11
66:23 67:16,19
67:22,24 68:3
68:7,22 69:3
70:11,23,25
71:2,3,4,6,12
71:14,19,22,24
72:2,15 73:5,6
73:8,19,24,24

74:14,23 75:4
75:10 76:9,11
76:20,21 77:3
77:5,8,10,13,16
77:19 78:9,12
78:13,23 80:6
87:8,10,11
88:3 92:8
103:4,6,7,8,8,9
103:9,10
105:16,25
124:10 149:5
199:7
**scheduled**
40:23 74:22
105:22
**schedules**
19:21 24:9
37:12 43:9
68:23 77:5
78:16,20,22
102:14,16,20
102:24 103:4
103:12,14,15
103:20 105:13
105:15,17,18
106:5,8 107:12
108:24 123:20
123:22 125:23
175:9 197:18
228:7,9,13,17
228:22 229:2,2
229:17,21
248:7,8,10,11

**[school - shore]** Page 39

**school** 13:7 211:23 212:4 212:12

**scratch** 109:19

**screen** 183:13 188:3 195:20 196:11

**scroll** 202:20

**se** 4:11 20:13

**sealing** 5:7

**second** 101:16 102:5 144:24

**secondarily** 221:13

**security** 219:8 219:20 241:25 242:4,13,15,21 242:24 243:10 245:14

**see** 7:20 24:21 26:12 37:3 55:8 63:12,18 63:24 74:6 93:20 113:16 117:6 122:12 125:11,14 136:19,24 138:10,15 141:10 146:9 146:12 163:25 164:17 165:17 167:6 175:2,6 175:8 176:11 183:13 184:11

184:16 186:4,5 186:8,10,15,23 188:2,20 196:10,18 200:7,9 201:9 201:19 204:21 207:13 209:20 214:16 223:8 227:13 230:7

**seeing** 38:24 125:7 178:16 189:13

**seem** 201:17 237:2

**seemed** 237:4

**seen** 101:12 136:21

**sell** 30:23 43:14 47:19 83:16,22 84:11

**selling** 70:3 85:17 178:4

**semi** 25:16

**send** 27:15 29:15,22 30:8 30:9 36:4 70:14 85:18,20 85:22 100:15 129:22 206:11

**sending** 28:21 30:13,14 129:21

**sends** 184:10

**senior** 238:16

**sent** 29:8 30:4,6 70:8,19 99:23 99:24

**separate** 37:7,9 37:11 41:14 43:20 60:17 64:25 70:11 74:14 84:24 100:15 103:11 163:14 254:22

**separately** 86:6

**september** 135:12,13 188:8,9

**series** 183:16 187:17 257:5

**service** 5:16

**services** 27:8

**set** 31:8 258:13 258:22

**setting** 24:9

**seven** 120:22 121:16,22 192:18 215:21

**several** 199:9

**shanks** 3:9 6:25

**shape** 224:20

**share** 187:25 209:15

**shared** 54:13 54:16

**sharing** 195:19

**sheet** 197:19 259:1

**sheets** 203:18 203:19

**shop** 55:23 116:21 118:24 119:3

**shore** 7:6 9:24 9:25 11:4,8,10 11:11 12:12,15 14:24 15:7,14 15:16,20,23 16:10,12,22 19:6 20:7 23:6 23:23 48:11,20 48:23 49:2,4,6 49:15,19,23 50:4,12,14 52:18 53:21 54:3,6,23 55:2 58:3,21 59:13 59:21 60:24 62:5,15 63:11 63:13,19 64:7 64:20 65:15 66:7 69:4,8 75:15 78:6 81:10 83:22 89:10,11 96:18 96:21 100:4 101:4,25 102:8 103:16 104:4 104:15 107:23 107:25 108:9

**[shore - somebody]**

119:7 123:14 133:4,6 135:22 136:12,16 137:20 140:19 140:22 143:15 170:4 188:16 191:22 200:6 201:25 204:22 205:14 214:6,9 217:6,11,15 218:25,25 219:24 220:15 220:17 221:25 222:22,25 223:3,5 227:4 230:21 231:7 236:12,17,21 237:7,10,24 239:8 240:7 242:3 249:10 249:22,23 250:3,7,23 251:2,11

**short** 130:14 182:9,11 189:12 235:18 237:9,11

**shortly** 43:3 212:10

**show** 38:11 41:23 42:2,3 52:10,15 54:9 68:18,19 77:23 85:3 87:22

165:4,13,15 187:20,25 202:9

**showed** 50:9 53:11 54:8

**showing** 84:25

**shown** 48:23 203:22

**showroom** 146:24 148:7 148:17

**shows** 39:4,4 76:11

**shrug** 8:5

**sick** 23:20

**side** 101:15 114:5 193:20 193:22

**sign** 122:14 173:16,17,18 202:4 226:3,4 226:8,17 250:15

**signatories** 225:22

**signature** 202:25 210:7,9 258:24

**signed** 5:10,12 5:15 30:2 68:12,14 128:13 208:25 223:4

**signer** 250:19

**signing** 249:15

**signs** 69:17 70:15,17 85:19

**similar** 21:24 21:25 66:9 69:3 101:5 134:5

**similarly** 44:2

**sit** 41:2 99:3 112:9 152:5 224:18 230:16

**sitting** 151:13

**situation** 40:17 65:11 118:21 183:9 195:15

**situations** 45:5 65:19 117:7,16 118:13 161:10 168:11

**six** 110:16 123:7 131:23 148:16 178:9 181:6 215:18

**sixth** 198:22

**skeptical** 183:7

**slip** 168:17 245:21

**slowed** 89:16 89:24 94:10,12 134:17

**slowing** 89:22 90:3 94:16 135:6

**small** 61:5,7 179:12 187:2

**smith** 158:18 161:23

**smithtown** 1:17 4:7

**software** 21:15 234:25 235:5,9

**sold** 27:11,13 27:25 28:6 32:11 33:10,14 33:20,24,25 34:12 43:11,25 44:2 68:12 73:2 81:4 83:17 84:14 86:24 87:18,21 87:23 114:22 114:22 117:10 121:8 127:18 135:12,13 140:23 176:25 177:4,6,11,14 177:22,22,25 178:2 179:3,4 179:11,14 180:8 193:9,19 194:15

**somebody** 8:15 25:5 39:20 42:17 50:13 54:14 58:18 74:3 78:2 85:23 96:2

**[somebody - stuff]**

98:15 103:5 104:6 108:13 115:21 126:10 154:22 156:4 174:8 176:16 177:9 202:4 204:7

**someplace** 48:8 116:22 119:4

**son** 136:10 169:15

**soon** 27:11,13 33:24 36:13,22 44:21 70:15 97:22 171:24 191:4

**sorry** 166:3 237:17 253:22

**sort** 134:16 150:5 241:11 241:17

**sound** 84:8

**sounds** 103:13

**source** 43:18

**speak** 113:19 113:22 114:4 122:7 140:15 142:12 220:7 220:20 238:22

**speaking** 8:10

**special** 253:18

**specific** 17:10 101:12 112:5 194:14 254:8

**specifically** 90:6 94:5 97:8 101:21 109:23 194:17

**specified** 256:11

**spend** 123:6

**spent** 213:14

**split** 173:6,7

**splitting** 255:14

**spoke** 113:21 218:3 240:23 241:2

**spoken** 237:6

**spouse** 250:2

**spring** 12:23

**st** 3:19

**stamp** 195:22 199:10

**stand** 204:19 209:5

**standing** 40:14

**start** 12:4 32:24 175:19 175:24 192:24

**started** 12:9,11 15:3,12,14,16 15:22 16:2 18:17 19:2 25:14 45:14 48:19,22 50:4 51:19 54:25 56:19,22 82:6 82:12 89:9,12

94:17,25 95:25 97:12,14,17,18 97:23 122:5 136:11 144:3 175:22 182:2,3 185:22 217:15 217:21

**starts** 23:12 183:19 184:20

**state** 2:12 6:4,8 70:13 74:7 202:12 258:4,9

**stated** 160:18 204:13

**statement** 19:20 22:7 99:23,25 100:8 100:22,25 120:20 124:3 128:8 130:6 168:4,6 187:21 189:10 195:10 207:18 208:18 208:20,23 209:6,12,16 257:9

**statements** 93:19 99:14,18 101:6,11 102:8 113:2,8 123:20 123:23 124:22 125:4,7,11,15 126:7,12,15,23 138:6,13

142:17,19 175:10 195:11 195:16 207:5 233:25 247:4 247:13,17,19

**states** 1:2

**stay** 73:16 123:5 183:9,10

**stayed** 52:14

**staying** 216:9

**stays** 39:9 71:8 71:22

**step** 51:7 58:4 159:12

**steps** 23:10

**stipulated** 5:5 5:20

**stock** 72:11,21 73:14 74:20 201:24,25

**stop** 49:21 134:15 135:19

**stopped** 120:11 128:17 134:12 134:13 135:3

**store** 55:14 217:25

**street** 1:8 3:14 3:19 188:23

**structured** 24:23

**stuff** 19:25 23:25 24:2 55:18 57:16

85:4 89:16
92:11 99:17
106:10 110:14
111:24 114:22
132:15 135:14
139:17 140:24
142:6 147:7,9
147:18,24
150:18 171:22
174:19 175:9
191:11 228:14

**subject** 7:22,22
37:5 210:16

**submit** 91:25

**submitted**
233:24

**subpoena** 2:9
7:9,10,13

**subscribed**
256:18 259:22

**subtracted**
244:8,11,22

**suddenly** 97:2

**suggest** 217:18
241:16 242:6

**suggested**
222:8

**suggesting**
245:2

**suite** 3:15 4:7
4:12

**summer** 12:23
212:13

**summertime**
212:11

**sunrise** 1:4,15
1:19 3:10 4:5
4:12 7:7 11:5
11:14,15,16
20:7 21:22
49:20,23 52:21
52:22 53:21
54:4 59:22
63:13,19 64:6
64:17,21 69:4
69:10 75:17
78:6 81:10
83:22 89:11
101:5,25
103:16 104:4
107:23 108:2
119:7 123:15
136:12,18
140:19,22
143:16 150:18
170:4 191:22
200:3,4,8
201:4,24
203:23 204:22
205:14 219:4,5
219:24 221:25
223:7,9 227:9
230:22 231:7
236:13,22
237:7,10,24
239:8 240:7
242:3 250:10

250:23 251:5

**superb** 1:3 3:5
259:2

**supervise**
174:18

**supervisors**
46:22

**supplied**
247:12

**supplying**
221:14

**support** 23:5

**supposed** 8:18
110:6 159:11
167:23 194:16

**supposedly**
61:8

**sure** 6:17 8:11
19:20,22 21:9
29:18,24 30:3
33:18 35:25
36:6,11 39:15
39:21 40:4
51:10 55:20
60:14 65:7
74:4 87:3
91:17 93:21
97:4,5 98:23
107:2 114:12
126:18,21
140:16 141:12
144:5 149:18
152:3 167:3,20
167:22 168:6

168:14 184:8
186:23 234:18
243:20,21

**susan** 3:20
248:22

**suspect** 111:11

**suspicions**
110:24 111:3

**swat** 145:10,21
149:22 150:10
150:14

**swear** 188:14
243:16

**swore** 204:15

**sworn** 5:10 6:3
7:20 256:5,18
258:13 259:22

**syosset** 1:15 4:5

**system** 20:16
20:16,23 21:7
21:19 22:4,5
22:15,17,19
24:13,16 25:4
36:10,10,25
57:4,5,7,10,13
57:15 58:6,9
58:12,15,17
59:12 99:20
110:9 127:21
127:25 131:9
131:17 152:20
157:19,25
158:3 162:6,8
165:13 200:11

238:12 243:2,7 254:18

**systems** 21:24

**t**

**t** 5:2,2 256:2 257:2 258:2,2

**take** 7:8 8:4,9 22:19 24:17,20 42:22,24 48:20 49:9,22 51:18 70:4 117:19,22 125:19 126:6 130:5 143:4 153:20 154:4 154:10 158:20 160:19,24 161:11,16 164:3,21 173:23 180:18 180:19,21 193:6,24 198:11 200:12 210:12 220:21 224:3 225:16 225:17 244:20 252:14,20

**taken** 2:8 29:19 118:4 143:8 165:14 168:13 170:24 192:8 203:7,25 210:15 211:9 224:5 225:12

244:8 248:19

**talk** 11:9 124:17,17,18 140:18 141:13 147:8 149:18

**talked** 56:5 91:2,4,16 99:3 147:14

**talking** 11:10 11:15 45:23 91:10,20 100:3 134:6 185:8 189:16 218:6 249:6

**task** 254:5

**tax** 85:3 136:21 136:24 137:6,9 137:22 138:8 138:14,16 162:24 227:13 227:21 229:25 240:20 251:2,4

**taxes** 19:23,24 19:24 24:2 151:17,24 152:3 251:5

**team** 1:3 3:5

**teddy** 17:18,20 18:16 47:2

**tell** 7:23 45:22 52:17 53:12 81:15,18,21 82:2,4,8,15,17 83:2 88:14,23

89:3 94:25 99:4 110:17 112:7 134:19 169:5 175:13 179:17 181:12 181:17 199:19 205:21 215:2 233:9 236:6 239:3,9,20 241:3 251:23 252:6

**telling** 180:7

**ten** 25:19,22,23 103:15 109:9 116:6 117:24 178:9 208:13

**tenant** 223:2,3

**term** 20:19,25 84:8 174:6 252:21

**testified** 6:5 124:24 129:8 148:8 152:22 154:6 170:25 179:17 185:6 189:11 199:23 207:21 229:15 249:17

**testify** 256:5

**testimony** 53:18 165:10 203:20 256:6 256:10 258:15

**thank** 46:2 139:21 210:19 251:14 252:5 255:10

**thing** 69:12,13 116:5 156:2 163:18 193:6 209:19 225:3

**things** 37:18 41:3 47:10 57:17 90:2 98:22 103:11 126:20 130:14 174:4 181:22 181:24 208:14 242:9

**think** 9:16 12:7 12:10 14:12 20:24 29:2 32:4 45:14 51:9 53:8 58:16,16 60:25 64:11,14,22 65:6 76:4 90:16 91:16 92:6,17,20 93:24,25 96:24 98:15 111:9 119:23 120:22 124:4 126:19 128:19 133:9 135:8 136:15 137:21 140:7 140:14 144:4

146:19 148:13
150:5 169:13
172:21 173:3
177:4,5 181:21
183:2,4 188:13
188:15 189:5
201:14 204:4
206:24 212:17
222:11 224:17
224:19 226:7,8
228:2,5 234:17
234:18 238:4,6
238:10 241:9
243:11,12,15
243:21 244:4
247:22

**thinking**
135:10 183:11

**third**   101:17
198:15

**thomas**   1:14

**thomasson**
1:13 4:11,12
6:14,17 45:21
46:2 142:22
210:23 211:3,5
224:16 248:14
255:11 257:14

**thought**   47:8
53:2 89:4
122:25 249:11

**thousand**   93:11
178:14

**three**   54:6
55:11 60:25
63:3,5 64:11
64:14,20,21,22
76:25 100:20
110:15 122:20
122:25 124:9
132:14 174:23
175:25 178:13
198:21 217:9

**thursday**   34:13
34:15,15

**ticket**   168:22
190:19

**till**   8:12 12:5

**time**   2:4 5:22
8:10 13:18,25
14:13 17:22
18:17,17 19:2
19:3 28:24
30:13,15 39:23
44:23 45:7
48:4 50:16
51:16 52:4,9
55:6 59:4 76:9
80:3 85:7
89:12 98:14
104:21 105:8
108:21 109:7
116:12 117:18
117:20 123:6,9
128:16,23
129:23 130:22
131:16 132:10

134:4,8 145:2
147:14 149:7
149:19,25
150:20 159:23
164:16 166:12
167:11 168:16
169:18,21
170:2 175:23
177:19 181:7
181:13 182:21
183:2 191:16
193:9 194:21
208:4,6 210:10
212:18 214:3
221:23 222:7
223:8 226:19
226:23 227:2,7
227:12 228:4
229:21,21
233:4 236:6
237:10,11
239:13 245:22
245:23 256:10

**timely**   36:12

**times**   116:25
130:17 137:16
140:16 161:11
174:23 175:25
176:15 217:9

**tired**   181:14

**title**   28:12
109:25 143:22

**today**   7:8,21
9:15 112:9

116:9 130:20
151:13 152:5
164:3 204:19
211:11 224:19
230:16

**today's**   6:15

**together**   51:24
91:24 141:6,11
142:12 216:24

**token**   242:2,5
242:15,21
243:10 253:20
253:21,23,25

**tokens**   219:9,16
219:18 242:13
243:19 255:6

**told**   34:2 47:6
54:2 62:10
65:6 81:14
95:16 96:4,6
98:5 108:25
112:21 121:21
121:25 130:19
143:22,24,25
146:4 172:4,6
172:12,15,18
176:16 180:22
181:3,19,21,25
181:25 218:21
225:5 226:15
231:13

**tom**   95:7,9,21
96:4,15,21
97:2,7,10,15

105:6 108:16 109:11 124:25 125:14 126:15 137:2,4,5,22 157:23 175:15 195:25 196:15 218:19 228:3 229:16 246:20 247:7,11

**tomorrow** 116:9

**toner** 82:22

**tony** 4:20

**took** 25:17 42:13 43:2 48:25 50:8 53:13 78:6 103:5 107:12 125:20 126:15 134:2 138:15 138:20 148:22 158:16 161:25 163:5 164:20 166:21,24 168:14 169:2 169:13 171:17 176:10 179:13 199:18,18 200:4,14,16,18 218:5 223:24 224:9,18,19 225:4,6,8 232:16 235:24 249:19

**top** 200:23 237:18

**total** 64:23 132:12 149:11 173:4 178:11 182:17 224:22

**towards** 30:14 30:16 120:14 153:15 162:12 181:11

**toyota** 10:4,9 10:17 11:3,7 11:19 13:2 14:20 17:4 31:10 213:3,6 213:7,10 237:21

**track** 21:2,7,11 21:14,19,21 58:9,14,21 59:12 83:8 86:11 102:3 110:9 131:8,17 157:19 158:3 162:6 165:13 166:21 167:3 167:20 168:14 168:24 178:13 182:3 185:25 195:7 234:7,23 234:24 235:5,7 247:21

**tracking** 22:21

**trade** 41:5,8 42:11,14,20,25 43:2 44:21 67:10 78:2 179:13 184:16 184:21 185:7 246:5

**traded** 41:7,10 42:17 44:16 45:3,10 66:15 77:20,21 78:7 80:20 179:18

**trades** 179:18 182:16 186:11 186:21 191:18

**trading** 44:17

**traffic** 158:4

**train** 58:20 214:3

**training** 17:10 17:25 18:6,8 18:16,19 20:21 58:5,7 145:8 145:19,25

**transaction** 23:18,19 39:16 158:4,7,8 159:2,20 194:15

**transactions** 161:3 241:13 241:18

**transcript** 6:16 256:9,9

**transfer** 188:23 206:13

**transferring** 206:2

**transfers** 190:20

**transpire** 27:16

**travel** 123:4

**trial** 5:22

**tried** 236:16

**true** 204:16 256:9 258:14

**truth** 7:23 256:5

**truthfully** 9:15 211:11

**try** 9:6 117:6

**trying** 71:10 111:16 145:13 175:2

**twice** 130:16 174:22

**two** 9:23 10:4 12:2 27:16 39:15 43:11 45:11 47:5 51:5 60:25 63:5 71:14 76:25 80:12 81:6 109:10 110:15 118:25 120:9 141:10 151:9 173:6 175:24 198:21

**[two - verbonitz]**                                    Page 46

203:8 217:9 219:25 220:6 221:9,14 222:7 229:12 234:23 235:16,17 240:21 242:14 247:5

**type** 14:7 22:14 23:4 24:19 72:16 101:12 111:20 133:19 134:5 156:2 160:21 163:18 189:16,19 211:10

**typed** 210:4

**types** 62:19 80:12

**typically** 24:11 27:11 28:15 61:24 217:3 220:16

**typing** 164:2

**u**

**u** 5:2 6:2

**uea** 1:17 183:21

**um** 175:17

**under** 113:18

**understand** 7:24 9:3,5,8 21:4 26:23,25 28:2 34:3

42:16 46:6 69:25 72:5 111:8,10,16 180:20 182:14 191:24 195:14 205:7 227:8 229:4 230:4,9 230:13 232:3 244:17 251:21 251:23 253:7

**understanding** 20:18,20 21:13 53:18 126:22 133:5 144:13 144:17 150:11 162:18 169:11 182:24 191:17 192:5 221:11 249:8,14,25 250:9,12,16

**understood** 9:11 164:5 227:3

**unfamiliar** 252:25

**uniondale** 4:17

**united** 1:2

**unsigned** 5:14

**unusual** 229:23

**uploaded** 127:21

**urrutia** 1:4 3:5 4:20 10:23

**use** 61:10 206:16

**used** 5:14 11:4 26:9 30:23 31:2,13,22 33:5,6,9 37:8 41:9,11,20,25 42:7 43:17,19 44:3 49:5,11 50:9,12 51:6 57:24 58:9 59:22 64:15,15 65:15,17,21 66:4,6,7,12 67:4,17 71:2,6 71:13,19 74:25 76:8,10 77:20 83:16,18 86:12 101:9,17,20,24 102:2,5 103:7 103:8 111:6,18 133:13 149:18 169:24 171:12

**using** 22:2 32:9 252:21 255:2

**usual** 109:7

**usually** 79:16 84:16 85:24 116:15 134:7 139:25 142:9 159:24 197:11 220:7

**utility** 83:13

**utilized** 241:23

**v**

**v** 6:2 259:2

**valid** 254:19

**varied** 149:4 206:23

**various** 7:5

**vehicle** 28:10 30:19 32:8,10 40:20 43:23 44:15 61:9,17 66:24 67:8 69:21,24 70:12 70:13,19 71:3 74:23 75:5,10 77:3,12 78:3 78:23 81:3 103:10 152:23 153:3,15 158:7 158:12

**vehicles** 41:5 45:10 72:4 73:25 76:14,17 177:10,22 178:5

**vendor** 83:24

**ventiliglia** 56:15 236:20

**verbal** 8:3

**verbonitz** 3:20 117:24 139:18 139:21 187:12 248:16,21,22

**[verbonitz - witness]**

251:13 257:15
**verified** 195:12
**verify** 253:8
**veritext** 259:1
**verizon** 215:8
**version** 57:7
**versus** 233:12
**viability** 182:25
**vin** 72:19 73:13
  74:18
**visualize** 71:10
**voices** 172:11

**w**

**wait** 8:7,12
  32:23 34:9
  45:2 89:18
  196:22
**waiting** 38:12
  38:21 44:12
  68:12 69:21
  70:9,12 116:7
  163:24
**waived** 5:9
**walking** 52:7
**wanna** 114:7
  145:23 183:9
  214:22 215:3
  249:6 252:20
**want** 8:11
  13:14 42:18,25
  50:11,13 51:10
  51:13,13
  107:10 113:17

134:22 186:8
214:21 244:3
**wantagh** 4:13
**wanted** 28:11
  28:13 31:9
  37:3 43:14
  49:8,9,16,21,22
  55:19 62:23
  67:10 105:18
  109:16 113:15
  176:10,11
  211:16 218:19
  227:23 228:17
**wants** 244:20
**warranties**
  83:15,16,17,18
  83:21 84:12
  87:18
**warranty** 84:14
  84:16,20,25
  85:3,13,14,18
  85:20 86:2,13
  86:13,16,22
  87:11,25 103:6
  246:8
**way** 10:9,18
  15:13 17:8
  18:25 19:8
  35:10,13 46:14
  47:11 59:21
  66:3 71:13
  82:2 89:10
  115:8 156:8
  166:20 170:19

173:24 200:20
219:21 224:20
258:19
**week** 119:21,22
  120:2,7,10
  123:7 124:9
  149:2 151:6
  174:22,23
  175:25 192:13
  192:15 208:13
  217:9
**weekly** 87:15
  151:8 193:5
**weeks** 97:21
  151:9 208:12
**weir** 3:18
**welcome** 82:8
**wend** 182:2
**wendy** 136:3,6
  171:21 173:21
  174:15 175:24
  176:7,9 181:8
  182:13 183:17
  183:21 184:2
  185:11,18,22
  189:5,20 190:9
  190:14 191:15
  191:21 195:23
  204:4 206:11
  214:2,5,8
  215:4 226:10
  229:7 238:14
  240:6 253:21
  253:23,25

**went** 9:24
  12:12 15:18,20
  15:23 17:3
  38:5 43:9,12
  49:4 53:10,23
  59:3,4 94:6,8
  100:17 115:22
  119:19,21
  121:16 154:23
  157:10 168:25
  211:17,23
  212:4,7 226:24
  227:18 228:21
  254:17
**westerman**
  17:18,20 18:3
  18:16 47:2
**whereof** 258:21
**wholesale** 43:4
  43:5 177:14,19
  178:5 179:5
**wholesaled**
  42:23 177:8
**wick** 137:14,16
**wife** 169:17
  216:18,20
**wire** 35:17
**wires** 30:14,16
**wit** 240:19
**withdrawn**
  118:12 131:3
  254:16
**witness** 2:8
  5:10,16,18 6:3

139:20 214:18 255:16 258:12 258:15,21

**witnesses'** 259:3

**woman** 238:21

**wondering** 211:8

**words** 72:7 154:19 174:8 183:2 201:8

**work** 11:4 14:2 15:19,22 17:3 18:21 35:12 48:19 57:12 68:15 70:14 71:11 82:12 89:13 97:14 119:6 149:3 150:15,16,20 169:24 174:6,9 211:17,23 212:7,10 213:14 226:24 230:21 231:18 232:6,12 236:21 237:9 237:11,14 239:7 240:7,8 242:22

**worked** 10:2,3 11:24 15:12 16:5,7,22 17:8 23:5 28:15

35:6,10 46:15 49:4,11 55:2 55:17 57:15 62:15 104:15 105:2,4 136:9 143:15 144:22 146:6 149:8 150:17,18 212:12,22 213:8 214:5 222:7 229:19 237:21 242:2

**working** 12:12 13:24 15:3,14 20:11 28:19 35:11 48:22 49:2 50:5,16 50:17 51:3 54:7,10,25 55:5 56:19,22 82:6,14 89:9 97:12,23 136:12 144:2,3 145:4,5 148:3 149:9,24 150:4 180:11 213:15 221:24 228:3 231:10 238:4 239:14

**wrapped** 156:20,22

**write** 35:16 106:24 132:3,6 163:20 164:13

164:14 174:19

**writing** 127:5

**written** 122:13 173:5 208:18

**wrong** 47:8,10

**wrongfully** 223:24 224:5 224:10,20 225:9,12

**wrote** 173:11 199:25 200:16

**x**

**x** 1:3,21 122:2 140:23 157:16 257:2,12

**y**

**yeah** 21:6 27:22 35:5 52:2 58:16 69:11 83:14 93:21 96:20 97:9,21 105:4 110:4 112:23 113:12,18 121:21 122:6 125:18 126:14 128:9 132:21 133:21 137:23 143:25 147:16 150:21 165:8 166:22 167:2 168:4 173:7 174:3 189:10

202:22 224:12 227:24 250:14

**year** 10:4 12:2 12:4,6,7,8 13:8 48:16 49:13,13 135:11,12 137:10,11 211:23 213:12 213:12 238:10

**years** 9:23 10:4 12:2 13:22 16:8,18,19 25:19,21,22,23 25:24 50:2,22 51:22 65:25 122:20,24,25 169:25 213:14 215:24

**yonkers** 26:10

**york** 1:2 2:12 3:6,15,15 4:8 4:13,17 6:4,13 50:19 70:13 123:10 202:12 215:24 258:4,5 258:9 259:1

**z**

**zizmor** 3:9 7:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.