UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HIGHWAY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

                              Plaintiffs,   Case No.
         - against -                         2:23-cv-6188
                                            (JMW)COUNTY

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

                              Defendants.
-------------------------------------------------x

                    333 Earle Ovington Boulevard
                    Uniondale, New York

                    January 8, 2026
                    10:00 a.m.

      Deposition of Plaintiff, ROBERT

   ANTHONY URRUTIA, pursuant to Court Order

   and Notice, before Diana Mitchell, a

   Notary Public of the State of New York.

*Rich Moffett Court Reporting, Inc.*

2

A P P E A R A N C E S:

SAGE LEGAL LLC

Attorneys for Plaintiffs Superb Motors,

Inc., Team Auto Sales, LLC and Robert

Anthony Urrutia

    18211 Jamaica Avenue,

    Jamaica, New York 11423-2327

BY:   EMANUEL KATAEV, ESQ.


CYRULI SHANKS & ZIZMOR LLP

Attorneys for Plaintiffs 189 Sunrise Highway

Auto LLC, Northshore Motor Leasing, LLC,

Brian Chabrier, Joshua Aaronson, Jory Baron,

Asad Khan, Iris Baron Representative of the

Estate of David Baron, all Hylan Blvd Auto

LLCs, 76 Fisk Street Realty LLC, 446 Route

23 Auto LLC and Island Auto Management, LLC

    420 Lexington Avenue, Suite 2320

    New York, New York 10170-0002

BY:   JEFFREY RUDERMAN, ESQ.

        (via Zoom)

3

A P P E A R A N C E S (Cont'd):

HARRY R. THOMASSON, ESQ.

Pro Se Defendant

        3280 Sunrise Highway

        Wantagh, New York 11793


CULLEN & DYKMAN, LLP

Attorneys for Defendant Flushing Bank

        333 Earle Ovington Boulevard

        Uniondale, New York 11553

BY:   ARIEL RONNEBURGER, ESQ.


WEIR, LLP

Attorneys for Defendant Libertas

Funding, LLC

        The Widener Building

        1339 Chestnut Street, Suite 500

        Philadelphia, Pennsylvania 19107

BY:   JEFFREY CIANCIULLI, ESQ.

            (via Zoom)


ALSO PRESENT:
        ANTHONY DEO
        SARAH DEO
        ALIVIA COONEY, Paralegal

4

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

5

R O B E R T   A N T H O N Y   U R R U T I A,
called as a witness, having been duly
sworn by a Notary Public, was examined
and testified as follows:

THE COURT REPORTER:  Please
state your full name for the
record.

THE WITNESS:  My name is
Robert Anthony Urrutia.

THE COURT REPORTER:  Please
state your address for the record.

THE WITNESS:  My address is
Estancia Del Sol, La Garita, Costa
Rica.

          *                    *                    *

EXAMINATION BY

MR. THOMASSON:

Q    Good morning, Mr. Urrutia.
My name is Harry Thomasson.  I'm taking
your deposition this morning.

Have you taken any
medications or drugs of any type that
would impact your ability to understand
my questions this morning?

*Rich Moffett Court Reporting, Inc.*

6

A       None.

Q       Is there any reason that you wouldn't be able to understand my questions this morning?

A       None.

Q       If I ask you any question that you don't understand, please let me know, I'm happy to rephrase it, all right?

A       Okay.

Q       Mr. Urrutia, where did you go to high school?

A       Emerson Junior-Senior High School in New Jersey.

Q       Did you go to college?

A       No.  I went one year but didn't finish it.

Q       Where was that one year of college?

A       Fairleigh Dickinson University.

Q       Do you have any professional licenses of any type?

A       No.

7

Q      Do you have any professional training of any type?

A      NADA School for Automotive.

Q      Do you know what that stands for, NADA?

A      National Association of Dealers, or something like that.  I don't know that.

Q      And that training consisted of what?

A      Running dealerships, fixed operations, sales.

Q      How long ago did you take that?

A      Probably 20 years ago.

Q      Was that a one-time course?

A      Yeah, takes about a week or ten days.

Q      Where did you go to take that?

A      I forgot which state it's in.

Q      But it was another state?

A      Yeah.

Q      Do you have any problems with

8

your memory at all, sir?

A    No.

Q    Please be sure to speak up so we can all hear, okay?

MS. S. DEO:  Yes, thank you.

THE WITNESS:  Sure.

Q    When did you first meet Anthony Deo?

A    I believe it was February of '22.

Q    So that would be about --

A    Nine months before.

Q    -- nine months before you entered into a contract with him?

A    Correct.  I had nothing to do with that, though.

Q    What were the circumstances under which you met Mr. Deo?

A    I was introduced to him.  I believe he was looking to get a partner in a dealership he was looking to buy or invest in.

Q    Do you know what dealership that was?

9

A      Yes, Baron Nissan.

Q      And did you two do any business over Baron Nissan?

A      No.

Q      When was the next time that you met him?

A      In November, early November.

Q      Who reached out to who in early November of '22?

A      A friend of mine, Michael Morgan, from the car business introduced me to him.  He knew I was looking for somebody to potentially run Superb Motors as I had just finished my partnership with somebody else, and I was in between whether I wanted to keep it open or -- or -- or close it, and he told me he knew somebody that was a good car guy.

Q      Why were you considering closing Superb in November of '22?

A      I initially opened to open a dealership specifically for the Caribbean community.  I had somebody that I had been doing business with for a long time

10

that had a radio station and promised, you know, to bring a lot of people in and advertise on the radio station, about $100,000, $120,000 worth of advertising, and I had worked with him while I was at Plaza, and they did bring a lot of people in.

So you know, we started off, but as time went on it, you know, wasn't doing great, and I had other dealerships that I was -- I was opening.  I did think there was a better -- there was more opportunity by expanding outside of just the Caribbean community, so you know, with the right person I thought the dealership had a lot of potential.

Q    What dealerships, in November of '22, did you have?

A    I had a Mitsubishi dealership in Connecticut, and I had a Volkswagon dealership in Freehold, New Jersey, and I was about to open a Nissan dealership in Massachusetts.

Q    Did you end up opening the

11

Massachusetts store?

A    Yes.

Q    The Mitsubishi dealership in Connecticut was in Hartford; is that right?

A    Correct.

Q    Are any of those three stores still operating?

A    No.

Q    Do you at this time have any dealership that you're operating?

A    No.

Q    How long was the store in Massachusetts open?

A    About from December of '22 until, I think, December of '24.

Q    About two years?

A    Correct.

Q    Did you and Anthony Deo do any business over the dealership in Massachusetts?

A    No.

Q    Did you and Anthony Deo do any business over the dealership in

12

Connecticut?

A       No.

Q       And did you and Anthony Deo do any business over the dealership in New Jersey?

A       No.  By that I mean you mean was he involved in any of them?

Q       Right.

A       Correct, no.

Q       Now, there were discussions about him possibly purchasing one or more of those dealerships, weren't there?

A       One, the Mitsubishi store.

Q       That would be in Connecticut?

A       Correct.

Q       Do you remember when that discussion began?

A       April of '23.

Q       Was that discussion ongoing through and including July of '23, if you know?

A       Yeah, we kept discussing it, I would say it got more serious in July of 2023.

13

Q        Now, at some point in time Sarah Deo was working at Superb, right?

A        Yes, from the beginning, as far as I know.  Well, right after she had the baby.  I'm sorry.  Probably she was involved in it December, January, so pretty much from the beginning.

Q        She had the baby.  If she had the baby in January of '23, would that help refresh your memory as to when she began?

A        No, but I mean, I can look at payroll records I'm sure.

Q        Do you think that she worked at Superb while she was still pregnant?

A        I don't know.  I -- I believe so.  I think she was running the BDC.

Q        What does that stand for?

A        Business Development Center.

Q        That was with your knowledge and approval?

A        Yes.

Q        What was Anthony Deo doing at Superb?

14

A    Initially just kind of getting things started, bringing people in.  As of February he became the general manager.

Q    That was with your knowledge and approval?

A    Yes.

Q    Do you know Dwight Blankenship?

A    I do.

Q    Who is Dwight Blankenship to you?

A    He was one of Anthony's guys, he brought him in.  As far as I knew, he was one of his security guys and was going to be helping in the dealership with logistics and whatever Anthony needed him to do.

Q    What other guys did Anthony bring in?

A    Marc Merckling, same thing. I know he brought in a couple of F&I guys, I don't remember their names, and a couple of salespeople.  One in particular

15

that I, you know, a couple of standouts, Jeremy and Kevin that I know he brought in, and but mostly I know their names because of this -- this case.

Q       Anyone else that he brought in that you can think of?

A       Not that I know their names.

Q       Okay.

Have you and I ever spoken before today?

A       No, not directly, no.

Q       And we don't know each other at all, do we?

A       No.

Q       Do you know whether or not there were any services that I provided to Superb Motors?

A       I know there's checks, so I'm sure you did.

Q       What do you know about those services?

A       I have no idea.  You know, I guess Anthony hired you, and I know he had counsel, but there's checks, so I'm

16

assuming you did something for him for Superb.

Q      Do you know that there was a lawsuit that I was involved in?

A      No.  I've heard about it through the case, but no, because I have counsel, and any lawsuit that happened in any of my dealerships my counsel would handle.

Q      So at the time that I was handling the lawsuit for Superb Motors, you didn't know about that lawsuit?

A      I'm sure I did.

Q      Okay.

Was there anything else that you know today that I did for Superb?

A      I mean, other than the checks that I saw, I don't know that you did anything for Superb, other than whatever Anthony asked you to.

Q      I agree.  By the way, to the best of my knowledge, I think I only did that one lawsuit.

When you met Anthony Deo in

17

November of 2022, what were you two discussing?

A    A partnership in -- in Superb Motors and the two dealerships that he was involved in, Northshore and Sunrise.

Q    Did those talks just take place between you and he?

A    No, it was a gentleman there, Michael Laurie, and I think Bruce Novicky was there, and maybe James as well.

Q    James who?

A    I forget.  I can't pronounce his last name, Skircoski, or something like that.

Q    Was James one of your guys or one of Anthony's guys?

A    One of my guys.

Q    You know what I mean when I say that, right?

A    Yeah, he worked for me.

Q    Right.

In other words, who brought them to the dealership is what I mean?

A    Yeah, he worked for me.

18

Q    Yeah.

A    He was the VP for the group, and Bruce was the COO for the group.

Q    Are any of those three locations of yours in Massachusetts, Connecticut and New Jersey, if you know, still operating a car dealership?

A    Yeah, the -- the Massachusetts store.

Q    Do you know who owns or is operating that store today?

A    I know it -- I remember his first name.  Jave is the guy who bought it from me.

Q    So you sold at that point?

A    Yes.

Q    Was he someone that you knew at the time that you sold it to him?

A    No.

Q    Do you know if there is a dealership still operating at the Hartford location?

A    No.  I do know there isn't.

Q    Do you know what is operating

19

at the Hartford location?

        A        No, I know the location was sold.

        Q        Do you know who it was sold to?

        A        No idea.

        Q        Are you in touch with the person who now owns that property?

        A        No, only the old owner.

        Q        Who is the old owner?

        A        Mark Crowley.

        Q        Are you still in touch with Mr. Crowley?

        A        Yes.

        Q        Why are you still in touch with Mr. Crowley?

        A        'Cause he's holding the vehicles there for me until this is all over.

        Q        How many vehicles are there?

        A        I believe 13, a total of 13.

        Q        Are they still there?

        A        Yes.

        Q        How long have they been

20

there?

A    From when we put them there back in October of '23, I believe.

Q    Did you know that we offered to have those cars sold and the money put in escrow?

A    I've never heard that offer.

Q    Okay, so --

A    I actually believe I asked for that offer and it didn't -- didn't come about, so...

Q    Since then do you know that we offered that as well?

A    No. I know you mentioned it in one of your --

Q    I'm sorry?

A    I know you mentioned in one of your letters where it was in discussions about the mediation or something, but I never heard you had made that offer to me.

MR. KATAEV:  Quick pause for two things.

Is that your phone making

21

noise?

MR. THOMASSON:  I did want to know if it is mine.

THE WITNESS:  Might be my watch.

MR. KATAEV:  Second, we have Cianciulli is counsel for Libertas, he's joining virtually.

Third, Mr. Ruderman, and, Mr. Cianciulli, do you hear both the witness and Mr. Thomasson speaking, or do we need to bring the mic closer?

MR. CIANCIULLI:  I can hear you, but I didn't hear them speaking yet.  I'll let you know if it doesn't work.

MR. RUDERMAN:  I can hear Mr. Thomasson very clearly, but I can hear Mr. Urrutia pretty well mostly.

MR. KATAEV:  Okay, so we'll leave everything alone.

Go ahead.

22

MR. THOMASSON:  I'm glad I'm not the only one who has trouble with that last name.

MR. CIANCIULLI:  Which one, mine, or the witness's name?

MR. THOMASSON:  Well, that one, too, that one, too.

MR. CIANCIULLI:  I'll just call him Tony then.

MR. THOMASSON:  Could you read back the last question, please?

(Record read.)

BY MR. THOMASSON:

Q     We initially made that offer in one of the mediations that we attended, and then we were told that there would be no further negotiations that day, so I just want to let you know that.

A     I don't know how we can reach out to that mediator, because he didn't bring that offer to me.

Q     All I can tell you is if

23

you're interested in that, let your counsel know and we'll work something out, okay?

A    I believe I have asked the court several times in our -- in our letters to the court, so I...

Q    Well, things can change, and that is something that changed, and that's something that we're able and willing to discuss.

A    All the cars, correct?

Q    What cars are you referring to?

A    The ones I have and the ones Deo has as well, right?

Q    Well, I don't know where all this is going to head.  There would be, I'm sure, an exchange of lists, and we'll figure something out.

A    Okay.

Q    Now, what security exists at the Hartford lot at this time regarding those cars?

A    Whatever -- wherever the new

24

owner is I'm sure has security or cameras, or we send somebody there all the time to go look.

Q    Do you know that or not?

A    I don't know that.  I -- I've lost control of all my stores, as you know, so you know, he's -- he's been gracious enough to let me hold the vehicles there until this is all resolved.

Q    The new owner has been gracious enough?

A    Correct.

Q    You haven't spoken to the new owner yourself?

A    No, that's through the old owner, Mark Crowley.

Q    Are those cars insured at this time?

A    Yes, they're insured by Nissan.  Cars are still on floor plan, so if they're on floor plan they're insured, and I believe we provided the certificates from NMAC that they're

25

insuring the vehicles.

Q       How long have they been on a floor plan with Nissan?

A       From September 8th and September 15th of 2023.

Q       What floor plan were they on before that?

A       Nissan.  I had to pay them off once Anthony took them off the lot, so I paid them off.  When I got them back, I put them back on it.

Q       What floor plan were they on before September of 2023?

A       Nissan.  Nissan and -- and my -- a few of them might have been on NextGear or something, I believe 13 or something might have been on NextGear, but I'd have to check the records.

Q       Do you still maintain your DMV licenses for any of your four lots?

A       No.

Q       So how can you have a floor plan at this time with Nissan?

A       The cars were floored, so

*Rich Moffett Court Reporting, Inc.*

26

Nissan kept flooring them.  It's not my floor plan, it's Nissan's.  They took the cars.  They have an interest in them, they file UCCs.  When you put them on floor plan, they hold the interest on them, and you're waiting to see what happens with this case, to see if they get back some of the -- the money.

Q    Are you being sued by Nissan at all?

A    And I'm suing -- I'm suing them as well, so...

Q    How many such lawsuits exist?

A    Just Nissan.  As far as any other lawsuits that I know, we've settled.  Anything left behind from this mess with any customers, as far as I know, I don't have any others, but there might be.  I have no idea.

Q    So you have one lawsuit going on with Nissan?

A    Yeah.  That I -- that I know about.  As you know I live in Costa Rica, so I haven't been served with anything,

27

and I haven't really heard of anything.

        Q        That lawsuit that you're speaking of with Nissan you were served with?

        A        Yes.

        Q        Where is that lawsuit?

        A        In Connecticut.  We consolidated lawsuits from all the states into one with all the attorneys agreed, and we moved it all to Connecticut.

        Q        So there was more than one lawsuit, but now they were combined into one in Connecticut?

        A        It would have been one for each state, right, for -- for...

        Q        I understand.

                 And so at some point in time Nissan was suing you in New Jersey?

        A        New Jersey.  Each of the dealerships, yes, would have been sued, but...

        Q        Were you sued in New York?

        A        No, because I -- I paid off those -- those floor plan lines.

*Rich Moffett Court Reporting, Inc.*

28

Q    So you were sued in Connecticut?

A    In Connecticut, Massachusetts and New Jersey.

Q    I see.

And those three lawsuits you have been served with and are now combined into one; is that correct?

A    Correct, yes.

Q    I understand.

Have you ever spoken with law enforcement about this situation?

A    Absolutely.

Q    Could you please tell me each agency that you spoke with?

A    Nassau County Police Department, the FBI, and I might have -- I think I even contacted the internal affairs.

Q    Internal Affairs of Nassau County?

A    Correct.

Q    Why did you contact Internal Affairs of Nassau County?

29

A    Well, there was a police officer involved.

Q    Would that be Mr. Blankenship?

A    Correct.

Q    So you went to internal affairs about Mr. Blankenship; is that right?

A    Correct.

Q    What is it you told them that he did wrong?

A    What was going on at the time he was working for Anthony Deo and what Anthony Deo did.  I don't think it went very far after that, because then I spoke to the FBI, and that's where I focused my attention.

Q    What did you tell the FBI that Mr. Blankenship did wrong?

A    Basically, to me, this is a gang, you know.  This isn't -- I am not the only one suing them.  This is three, I think, you have going on, plus you have another dealership now, so that would be

30

a fourth.

So to me, it's your business, right, and it's a gang that kind of coordinates everything, you being the facilitator.  You know you have an accounting department that creates, or an accountant, that creates fake financials, you have muscle and guys that handle logistics.  So I told them basically the operation that you were running, and that was it.

Q     Do you think that I'm the one that's running that?

A     No, I think you're the facilitator.  You're the one who handles all the legal stuff to make sure that it takes years and years before anybody is able to get any kind of justice, so I think you're part of the criminal gang, yes.

Q     Okay.

But I'll go back to my original question.  Please tell me what it is you think Mr. Blankenship did

31

wrong.

A       Well, he was, let's see, he handled the cash, he was getting 65,000 a year, even though you say he only does menial work, but he was handling the cash, moving the inventory.

When floor plan -- him and Marc would handle the floor plans.  I mean, he was involved in moving the cash and depositing it into fake bank accounts that existed, so...

Q       So you think Mr. Blankenship was stealing cash from Superb; is that right?

A       I don't think so, I'm certain there was -- there was cash stolen, and his name appears on some of the deposit slips of cash that never made it into my bank accounts, so yes, I do believe it.

Q       Were there any bank accounts that Mr. Deo opened up after he joined Superb that you didn't know he was opening?

A       Yeah, the Flushing.

32

Q       Were there any bank accounts that Mr. Deo opened up after he joined Superb that you did know he was opening?

A       Any bank accounts?

Q       Related to Superb that you did know he was opening.

A       For Superb, no, he was -- he wasn't allowed to do anything for Superb. The only thing I didn't put into the operating agreement is that he had to ask me permission to go to the bathroom. Everything else was pretty much he was not allowed to do anything but run the business as a general manager.  If he became the general manager of the store, he could choose a different general manager.

Q       When you executed those agreements, did you have an attorney that prepared them?

A       Yes.

Q       Did that attorney speak at all to Mr. Deo, if you know?

A       I don't remember but we

33

exchanged emails.

Q    Did Mr. Deo have any attorney handling those agreements, that you know of?

A    I have no idea.  I would assume he had attorneys if he owned two dealerships, right?

Q    I understand.

So Mr. Blankenship took money from Superb in the form of cash; is that right?

A    Cash, checks.

Q    So cash and checks he took for himself?

A    I don't -- I don't know.  He took for the organization that -- that you guys have.

Q    I see.

What else did he do, other than taking money, that he did wrongfully?

A    Moved cars without authorization to the lots out in Long Island.

34

Q        Okay, let's stop there.

Who would he have needed to get authorization to move cars from?

A        To that lot, from me, but I guess Anthony Deo gave him the authorization to move the cars for the grand opening.

Q        Was that Anthony Deo giving him authorization to move cars while Anthony Deo was the general manager?

A        Yes.

Q        And Anthony Deo's authorization to work as general manager consisted of him being authorized to do what?

A        To run the day-to-day operations.

Q        Do you know whether or not between November of '22 and August 1st of '23, do you know if Anthony Deo was applying for any DMV licenses?

A        Yes, at my suggestion.

Q        So you had no idea he was doing that?

35

A        Absolutely.  I -- I suggested it.

Q        What is it that you suggested to him?

A        That he get licenses.  He told me Josh Aaronson was holding the licenses hostage, and I told him, "You should get your own licenses."  At which point he asked me to get the licenses with him.  I said, "Why would you want to do that?  You're going through all of this, what if we don't work out?"  At this point I knew him for two months. "You want to find yourself in the same position?  I think you should get the license yourself."

Q        Is that what he did?

A        Yes.

Q        Do you know if he did get one?

A        Yes.  Fraudulently, from what I understand.

Q        What's that?

A        I guess fraudulently, because

36

he checked off that he wasn't a felon on it, so technically, he shouldn't have got one, but yes.

Q       I see.

But he got one, right?

A       Yes.

Q       And he kept you informed of that?

A       He told me on July 10th, I believe, as he was looking for me to get him another million and a half dollar floor plan line that miraculously that the license had come through, even though he had lied in February.

THE WITNESS:  Actually, is there a way we can check with DMV when that license actually came through?

MR. KATAEV:  We'll talk about it after.

A       Now that I think about it, it's very miraculous how the day he wanted me to sign the applications for another million and a half floor plan

37

line, he checked and they were live, so I would like to know when -- when they actually were live.

MR. KATAEV:  Objection.

Q    And what did "live" mean?

A    That all of it's on the dealership licenses that we could use.

Q    And in your experience, does it typically take longer than from February to July 10th to get those licenses?

A    It usually doesn't take that long.  It takes two months, three months.

Q    So it took about two months longer than it typically does if those licenses were available on July 10th; is that right?

A    Correct.

Q    Were you a part of that application for the DMV license?

A    Nope.  Nope.

Q    Did you ask to see any of the paperwork?

A    Nope.

38

Q    Was it okay with you that he was applying for it?

A    Sure.

Q    Were there any occasions during 2023, prior to August 1st, in which you asked him for any money?

A    I'm sorry, repeat that question.

Q    Were there any occasions during 2023, prior to August 1st of 2023, in which you asked him for any money?

A    Several times.

Q    What did you ask him for money for?

A    To put money in, 'cause he double floored some cars and he needed to put the money in because we were -- the money wasn't covered in the bank account, which was part of our deal is that anything that needed to be put into the bank, he would have to put in.

Q    Is that in writing?

A    We might have a text, but at the end of the day, he put money in

39

for -- for his own cars.  It was cars that he double floored, so I didn't ask him to put money in for me, I asked him to put money in because he floored cars on his floor plan line and on mine, and he had to pay one of them off because I paid them off originally, so...

Q     Did he have any access to your floor plan?

A     I mean, through -- through the office he had access in the sense he could buy cars, put them on my floor plan line, if that's what you're asking.

Q     Did that happen?

A     Yeah, he put many cars.

Q     But for him to do that, somebody in the office, that was one of your guys, would have been who he would have been doing it with, right?

A     Under his direction, yes.

Q     Under his direction one of your guys was the one who was actually doing the floor planning; is that right?

A     Flooring, correct.

40

Q       Who would that be?

A       Before or -- I mean, before April or after?  Before April it would been Alysia or Bruce.  After it would have been Kendra.

Q       What is Alysia's full name?

A       Alysia Cayer.

Q       C-A-Y-E-R?

A       Correct.

MR. KATAEV:  Just for the record, I think you should spell the first name.  Can you spell the first name?

THE WITNESS:  A-L-Y-S-I-A, I believe, Alysia.

Q       And she worked at Superb until about April of '23?

A       March 27th, I believe.

Q       What happened on March 27th of '23?

A       She was let go.

Q       Who fired her?

A       Bruce Novicky.

Q       For what?

41

A       We had some issues with the accounting department falling way behind, and a lot of issues between Alysia and Anthony.

So after -- after several months of battling and battling, she was let go of. A lot on Anthony's own request.

Q       Anthony requested that she be fired?

A       Oh, he -- he -- for months he was telling me the accounting department was messing up everything at Superb, and we, between buying a new store in December, taking him on as a partner and changing our deal management system, he was overwhelmed and she was falling behind, so the head butting and the fighting, she -- she was, you know, she was definitely had battles with Anthony, and the choice was made to replace her and just put office managers in all the stores rather than one central CFO.

Q       So Alysia was your CFO --

42

A    Correct.

Q    -- at Superb?

A    At all the stores.  She was the team CFO.

Q    She was just CFO at all of the stores?

MR. KATAEV:  I'm sorry, please let Mr. Thomasson ask the full question and then answer it. Just slow down.

THE WITNESS:  Okay.

Q    Alysia was the CFO for all four of your stores in March of '23?

A    Correct.

Q    And who had hired Alysia originally?

A    Bruce.

Q    Do you know when that was?

A    I think February of '22, February or March of '22.  Right around when I moved to Costa Rica.

Q    So Mr. Deo did not hire Alysia?

A    No.

43

Q      And he did not fire Alysia, correct?

A      No, no, he was -- but he did influence the decision.

Q      Because he said that there were problems in the accounting department; is that right?

A      He said it and sent a text, a very strange text, saying not to mind the text because we had already discussed it, that she was going to be let go, and he sent a very strange text telling me that, you know, not to mind his -- his email, that it was done to serve our -- our purpose or something about firing her, to which I didn't react very well to.

Q      Would that be with a text, or could it have been an email?

A      An email was sent to Alysia. A text was sent to me --

Q      Okay.

A      -- warning me that he sent the email.  Sorry.

Q      The email that was sent to

44

Alysia, had you seen it by the time you got the text from Mr. Deo?

        A       No, no, I was on vacation.

        Q       Was that email, in fact, sent to you?

        A       Yeah.

        Q       Was it sent to you at the same time it was sent to Alysia?

        A       I believe so.  I think I was copied on it.  You were copied on it as well.

        Q       Right.

        A       You and Mr. Jones, the forensic team.

        Q       Right, I understand.

        A       You don't recall?

        Q       Yes, I've seen it subsequently.  I did.

                Did you know that he included me on that because he wanted her to know that it was also going to an attorney?

        A       Oh, absolutely, which is why I got so angry when he told me that it was just because it was something to help

45

fire Alysia and not be a problem.

Q    You wouldn't have any idea when I saw that email, would you?

A    No.

Q    So --

A    I would imagine as an attorney an email like that you would look at pretty quickly.

Q    Or speak with the client about it, right?

A    One or the other.

Q    Right.

But you don't know when I saw it, do you --

A    How would I know that?

Q    -- for the first time?

A    Right.

MR. KATAEV:  Objection.

Asked and answered.

Q    Do you know how long Mr. Deo has done business with Thomas Jones?

A    I've seen, I guess, from the Libertas discovery that he -- it was right around COVID that he started to do

46

his taxes and do his accounting.

Q    Do you know when Mr. Deo first began doing any business with me?

A    I could only say I know it was before -- before March '23, but I haven't really looked that far back.  It doesn't really involve me, so...

Q    I understand.

Do you know what it is that I did for Mr. Deo prior to Mr. Deo joining Superb?

A    No.

Q    What is it that I did to harm you, Mr. Urrutia?

A    You facilitated this whole crime, as you have for the Aaronsons, as you have for the new dealership, Cherrywood or whatever, and I'm sure the one you have open now will probably end up there as well.  And now I believe there's another lawsuit with a Mr. Hakim, which was $100,000 Mr. Deo initially gave me, which I believe you represented him in that as well.  So to me, again, you

47

guys are a really well-put-together gang, and you're the facilitator.

Q      Are you saying that in these lawsuits Mr. Deo should not have counsel?

A      No, I'm saying that you -- you make it easy for him to rip people off, and then you just, you know, lie for him in court, and -- and you know, submit your motions to delay and waste as much money of the people you left practically broke behind.  I think you're just part of the gang.

Q      What I've done wrong to you is through my legal representation of Mr. Deo; is that correct?

A      I believe you have, as an officer of the court, a duty, and I believe you're just -- what you're doing is not part of that duty.  You have in many motions said stuff that I -- I'm -- I'm actually baffled at, but...

Q      Would that include my assertion that the Deos are the owners of Northshore and 189 Sunrise, do you think

48

that assertion is false?

A    I absolutely think it's false.

Q    So you have firsthand knowledge of the ownership structure at 189 Sunrise and Northshore; is that correct?

A    Well, I see how he --

Q    That's a yes-or-no question, Mr. Urrutia.

A    Do I have firsthand knowledge?  I've looked into this case because of the harm it's caused me, and I know he, Mr. Deo, can't own a dealership, especially going back to 2020 when he was still on probation, right, because you can't own a dealership without a license.

I don't know if you looked into the law.  See, I do know the law, and he can't own a dealership, and he says he owns it from 2020.  He can't.

After his probation is over he can submit an application, and he needs to be approved, but based on the

49

fact that it was wire fraud, I doubt very much he would get it.  And you have to be listed on the license.  So do I think he was an owner, no.                I also have not seen anything showing me a stock certificate, minutes, anything showing that he owns those -- those businesses.  So I mean, yeah, I think you have -- I mean, you are an attorney.

Q    So have you ever seen any of the exhibits attached to that complaint?

A    I have seen all of them.

Q    You have seen this compliant before?

A    Yes.

Q    When did you first see it?

A    I read it cover to cover.

Q    You have read it cover to cover?

A    Absolutely.

Q    The complaint that was served on you this morning?

A    Yes.

Q    So when did you first see

50

that complaint?

A    Probably a day or two after you -- you filed it.

Q    Day or two after I filed it?

A    Uh-huh.

Q    It was also left at an address for you in New Jersey, can you tell me if you ever received it there?

MR. KATAEV:  Wait, he didn't answer with an answer.  He said "Uh-huh."

Just to clarify, "Uh-huh" means what?

THE WITNESS:  Yes.

A    You served -- I believe in October I sold that house because of all of this was in July of '24, so you couldn't have served me, because I don't live there anymore.  I don't have a residence in the United States.  I had to sell my house so I could pay the bills for the damage that you've caused.

Q    So you have already seen this complaint; is that right?

51

A        Yes, cover to cover.

Q        Okay.

So then you saw Exhibit A to that complaint, which is obtaining the EIN number by Sarah Deo?

A        Yes.

Q        Did you see that?

A        Yes.  I had my general manager obtain all the EIN managers for my businesses.  That's not ownership.

Q        Okay, I didn't ask you whether or not it was ownership, I asked you if you saw Exhibit A.

A        I did.

Q        Did you see that?

A        Yes.

Q        Did you see that the Deos, in Exhibit B, held the lease for Northshore?

A        I did.

Q        Who typically holds the lease at a dealership, would it be the owner?

MR. KATAEV:  Objection.

A        Typically, but it doesn't have to be.

*Rich Moffett Court Reporting, Inc.*

52

Q       Right, but it typically is, wouldn't you say?

MR. KATAEV:  Objection. Argumentative.

A       Yes.

Q       Did you see that the Deos opened up the bank accounts --

A       I did.

Q       -- for Northshore?

Did you see that?

A       I did.

Q       You have to let me finish, okay?

A       Okay.

I did.

Q       Who typically opens up the bank accounts for a dealership, would that be the owner?

MR. KATAEV:  Objection. Relevance.

A       I had my CFO open up my bank account for the dealerships as we went forward.  I started with one dealership, and I -- and then I had my CFO open the

*Rich Moffett Court Reporting, Inc.*

53

bank accounts after that.

Q       What is it that the CFO had to show the bank to open that bank account?

A       Usually the -- the filing receipt and the EIN number.

Q       Which would be provided to your CFO by you, the owner, right?

A       Correct.

Q       Did you see the checks that were paid to purchase 189 Sunrise?

A       I did.

Q       What do you think that was for?

A       Maybe a down payment on a -- on a purchase of a dealership.

Q       But you don't have any firsthand knowledge yourself, do you?

A       I don't.

Q       Right.

        After money was paid for the purchase of Sunrise, the Sunrise lease was assigned to Anthony Deo, did you see that?

54

A        I did.

Q        What were your thoughts on Exhibit G where Josh Aaronson approved Anthony Deo as owner on tax returns?

MR. KATAEV:  Objection. Relevance.

A        That Josh was trying to get Anthony to take over the liabilities of the dealerships.

Q        Generally speaking, when you're listed as the owner on tax returns, wouldn't that make you the owner?

MR. KATAEV:  Objection. Argumentative.

A        No, absolutely not.

Q        Absolutely not?

A        No.  You -- you -- you've heard of minutes and -- and stock certificates, right, and operating agreements that switch over ownership, especially if there's one initially.  I mean, there is -- there is all that stuff as we started to do with Mr. Deo when we

55

were doing the Superb deal, right, we gave a cross purchase subject to an operating agreement.  We never exchanged stock certificates, we never signed the operating agreement, but I mean, there's a process that you go through to become the owner.  I didn't see any of that in that complaint.

Q    And have you seen any of that for anyone other than Mr. Deo since?

A    What do you mean?

Q    Well, have you seen any minutes ever regarding Northshore ownership?

A    I -- I only saw the operating agreements, the initial -- the original operating agreements, and I've seen the ones he submitted to Flushing Bank for -- for opening that account.

Q    Who showed you operating agreements for Northshore Motors?

A    Which one?  The original one or the fake one?

Q    Any.  Any operating

56

agreements for Northshore.

A        I've seen them throughout the case.  I've read every page of this case.

Q        Who showed you the operating agreements for Northshore?

A        I saw them in the original case filed by Island Auto Group.  They're a part of the exhibits.

Q        Have you seen any other operating agreements?

A        Yeah, the ones he submitted to Flushing Bank.

Q        How did you see those, did you get them from Flushing Bank?

A        Yes.

Q        Have you seen any stock certificates for Northshore Motors?

A        Only the ones that were part of this case.

Q        Did you see that the stock certificate is dated for January of 2018, and the stock book was purchased some months after that, did you see that?

A        I did see that.

57

Q       Did you find that as odd?

A       I didn't really think that much about it.  I have my own problems with my case.

Q       So you just didn't think about that?

A       No, not really.

Q       Wouldn't that suggest to you that there's something about that stock certificate that's not honest?

A       Not really.

MR. KATAEV:  Objection.  Argumentative.

A       If I get a company and I get a book with all the stock certificates, I don't immediately assign them, and you know, especially if I got the book.

Now, if I am going to sell it to somebody or I am going to make -- then you have to, right, when you finalize a deal, you do the stock certificates, you date them and you sign them.  But before that it's...

Q       But at a bare minimum, you

58

couldn't have a stock certificate signed before you obtained the stock book, wouldn't you agree?

MR. KATAEV: Objection. Argumentative.

A I haven't thought about it all that much because I never had to. As I got a book, I never really assigned stock certificates. I got the company, I got the stock certificates, and when I made some kind of transaction, I did it. You know, I -- I would then assign them and put dates on them, but I didn't think about it all that much.

Q Do you think it's lawful to backdate stock certificates?

MR. KATAEV: Objection. Assumes facts not in evidence.

A I have no idea. I have no idea if it's lawful or not. I know I haven't seen any stock certificates assigned to Anthony Deo from any of the companies.

Q Did you ask for them in

59

November of '22?

    A    Absolutely.

    Q    Did you get them?

    A    No.

    Q    And you went forward without getting them; is that right?

    A    We at the time went forward and became the general manager in expectation that he would get a license and then we would finish our deal because then we could actually run dealerships.

    Those dealerships were shuttered, shutdown, correct?  So how could I get my -- my other part of the deal, which is two dealerships that were -- supposedly were profitable and making money.

    Q    So you knew at the time you entered into the contracts that those two dealerships were shuttered?

    A    No, I found out in January -- I'm sorry.  End of December or beginning of January, I was told that he couldn't sell cars because Josh was holding the

60

license hostage.  I only found out the dealerships were shuttered through this case because he's mentioned it several times, which again brings up the point, how did you sell me or give me 25 percent of two dealerships that were shuttered?

Q    What diligence did you conduct in November of '22 looking into Mr. Deo?

A    Ran his name, but nothing came up at the time.

Q    Did you do anything else?

A    No, not really.  He came referred by a friend, and I knew he was with Baron for several years, so you know, I wasn't -- I -- I -- I learned a lot from that.  I would have gone deeper. I would have, at this point after what I been through, hired a private investigator, even if it was the Pope.

Q    Did he pay you some money in November of '22?

A    He did.

Q    How much money?

*Rich Moffett Court Reporting, Inc.*

61

A        $500,000.

Q        Did he pay you any money after November of '22?

A        No.

Q        You reviewed the tax returns that consist of Exhibit H on that complaint; is that right?

A        I saw them, I didn't review them.

Q        Did you know that those tax returns indicate as approved by Joshua Aaronson that Mr. Deo was 99 percent owner of Northshore and Sarah Deo was 1 percent owner of Northshore, did you know that?

MR. KATAEV:  Objection. Document speaks for itself.

A        I saw that's what it says, yes.

Q        When did you first see that, right after it was filed?

A        Yeah.

Q        In or about September of '24, you read every page of this complaint and

62

exhibit?

        A       Yeah.

                MR. THOMASSON:  I am going to
        mark an exhibit.  It's been marked
        as Exhibit J previously for other
        matters throughout this case
        including from that complaint.
        Mark this as Defendants' Exhibit J.
                (Defendants' Exhibit J, Email
        Chain, marked for identification.)
                MR. KATAEV:  Off the record.
                (Discussion off the record.)
        Q       If you could please take a
moment, Mr. Urrutia, and look at that
document.
                MR. KATAEV:  Let the record
        reflect that I am going to share
        Exhibit J on the screen, which is
        docket entry 12 in the state court
        action filed by Mr. Deo.
                Is this it?
                MR. THOMASSON:  Yes.
                MR. KATAEV:  Any particular
        page you want me to go to?

63

MR. THOMASSON:  I'd rather go back to the front, because I think it's in reverse order chronologically.

MR. KATAEV:  So starting on page 3 going into page 4, the email at 1:52 p.m.

A       Okay.

Q       Have you seen these emails, Mr. Urrutia?

A       Yes.

Q       Did you first see them in March of '23?

A       Yes.

Q       Did you and Anthony have any discussions about this email in March of '23?

A       Yes.

Q       What is it that you and Anthony Deo discussed in March of '23 regarding these emails?

A       This is where he sent me the text stating not to, I don't remember the exact wording, but not to be upset at the

64

email he had sent.  It was only to serve our purpose with Alysia.

And when I looked at the email, I called him and I sent him a text back and I spoke to him, and I said, "I don't like the way you're going about this.  I don't like the drama.  There's no need for this, and I didn't like even the insinuation of a forensic team."

He basically told me I didn't even really need to send any of this stuff, but yet I sent him everything the next day.

Q      All of these items were given to Mr. Deo after he sent this email?

A      Every one of them, 2,000 plus pages, and I don't know, 200 emails --

Q      And that was --

A      -- for all my dealerships, by the way.

I'm sorry.  I meant to finish that.

Q      Why did you send him information about all of your

65

dealerships?

A       To make sure that there was no doubt.  I don't even like the insinuation that anybody is doing anything wrong in regards to accounting from my dealerships.

Q       But that being said, in March of 2023, you already told us that, in fact, there were problems with the accounting at your dealerships, right? That's a yes-or-no question.

A       Yes.

Q       You've already told us that, right?

A       Yes, accounting --

Q       These documents --

MR. KATAEV:  Let him finish answering the question.

A       Yeah, the problems were we were delayed because we were on a new system and we had new stores.  Not -- not these kinds of problems.  These insinuate something completely different.

Q       How would he know what the

66

problem was if he just got there?

         A      What do you mean?

         Q      Is it -- well --

         A      He got there.

         Q      He, obviously, at this point thought that there problems in the accounting department, didn't he?

                MR. KATAEV:  Objection.

         Assumes facts not in evidence.

                You can answer.

         A      No, so he got there, he went through the changeovers of the management system with us, which delayed us getting deals into the office, everything.  It was all delays based on how much new stuff we were taking on, including him who did not make this easy in his store. He didn't send deals the way he was supposed to.  He didn't deposit money when he was supposed to, and he made it as difficult as possible for the accounting departments to actually close out a month, and we have plenty of emails and texts about it, so...

67

Q      So there were problems in the accounting department in March of 2023; is that right?

A      Yes.

Q      And Mr. Deo sent requests to look for information regarding the accounts in the accounting department pertaining to Superb, right?

A      Correct.

Q      And you were so concerned about this that you sent him documentation for all of your dealerships; is that right?

A      I wasn't concerned.  I was bothered by the way he went about it.

Q      And did you, in fact, put in writing that you were bothered by this?

A      I, yeah, actually, there's a text.  I believe it's in the record.

Q      Do you still have your texts that you exchanged with Mr. Deo?

A      They're in the record, yes, I gave all of my texts.

Q      You're saying that these

68

texts are on the record here today in this deposition someplace?

A    I was told I couldn't bring any -- any -- this was you questioning me, I couldn't bring anything, or I would have been happy to.

MR. KATAEV:  If it helps, the texts are in docket entry 38.

Q    These texts between you and Anthony Deo, you used the word "bothered."

A    Might not have been exactly that word, but I told him I didn't like what he wrote, and I didn't like the drama.

Q    What is it you don't like about these emails?

A    Do you need a forensic team to look into all this stuff?  And -- and this was to further our whatever with Alysia when he already knew she was -- she was being let go.  Why would you send this?

And again to my point, I

69

never heard anything.  Did you find anything in -- in the 2,000 plus pages, or did Mr. Jones, because I never heard anything afterwards?

Q    So I'm just curious, Mr. Urrutia, could it be that since there were problems in the accounting department he wanted to put something on the record in case it turned out that it was Ms. Cayer who was, in fact, causing problems in the accounting department, do you know if that happened?

MR. KATAEV:  Objection. Speculation.

A    Repeat that again.

Q    I'm asking you if you know whether or not he was trying to create a written record in case it turned out that Ms. Cayer was doing something wrongful herself.  Do you know if he was doing that, yes or no?

A    No.

MR. KATAEV:  Same objection.

Q    Did you ever discuss that

70

with Mr. Deo?

A       The discussion was he wanted to make sure she didn't come back at us because we let her go.  I said, "The decision is already made, why do I need anything else?"  And -- and honestly, you -- you said initially I didn't send you anything in these papers, now you said I sent you a data dump.

So I think now looking back, one thing is then, now is now, this was a seed for him to drop knowing she was leaving so he could continue to do what he did from April forward, which is take every dollar that came into Superb.  I think this was a very intentional email, just like the text was.  And it was so you could sit here and say that there was problems in the accounting department, and I'm very glad I sent you every schedule, every bank statement and every piece of paper that we had going back to the day Deo came into the business to that very day.

71

MO          MR. THOMASSON:  So I move to strike as nonresponsive.

          MR. KATAEV:  Objection.

          Please proceed.

Q     Would you agree, Mr. Urrutia, that Anthony Deo said to you, in sum and substance, that these emails were somehow to protect Superb?

          MR. KATAEV:  Objection.

     Asked and answered.

          You may answer.

A     That's not what he said in the email -- in the text.

Q     You said he made you think that it was in case Cayer came back at you, were those your words?

A     To further our -- our -- I don't remember the word.

Q     Interests?

A     Not interests.  To further our case or cause with Cayer, you know, we can look it up.

Q     But you appeared to be concerned that for some reason she might

72

proceed legally against Superb, was that your impression from what he said?

MR. KATAEV:  Objection.

Calls for the state of mind of another person.

You can answer.

A    Not my impression at all.  I was -- I was angry that he even sent it because it was unnecessary at that point.

Q    So when he told you that it was to further the cause regarding Cayer, what did you think he meant?

A    I didn't know, because a decision was already made and that's why I got angry, because the question was forensic and his team with his attorney and his accountant on it.  What -- what -- what is that?

Q    Did he ever tell you that he thought she was doing something she shouldn't be doing?

A    No, he told me she had the grosses wrong.  He told me it was 3,000 a car, and then when by the time we

73

finished the month, it was $1,200 a car. I'm, like, "Where's the money, Anthony? You been telling me all month." And that is all in the texts.

If you look at it, we sold nine cars, we sold ten cars, if you did the math throughout the month, we sold 70 cars, and then the month of -- the month it would be 40 months and the grosses would be off by $2,000, and then he told me it was her fault. As a matter of fact, in the accounting department, I think in January or February, I had to make an entry for $120,000 that I said, "Okay, you're telling me it's a mistake, we're going to set it to the side. I'm not going to hit the statement for this loss. When we find the money, we'll put it back on. I'm going to credit you the $120,000 as if it exists, even though I don't know where it could be." And you know, it never came about, never addressed again once she was gone.

Q    So Anthony Deo had full

74

access to the accounts at Superb; is that what you're saying?

A    As far as bank accounts?

Q    Yes.

A    He can see them.

Q    And did he have full access to take money out of those accounts?

A    No, he was not allowed.  Very specifically.

Q    So Anthony Deo never took any money out of the account; is that correct?

MR. KATAEV:  Objection.

A    No, he did take money out of the account, he wrote checks that he wasn't authorized to write.

Q    Was he authorized to write any checks?

A    None, and yet he did, and the funny thing is he did them in the last three weeks of July just as he knew he was leaving.  He never wrote a check before that, because then that would have sent a red flag off.

75

Q    So the August 2nd lockout he knew was coming?

A    No, he had planned.  He took my cars, he took the money.  There was nothing left at Superb.  He knew he was leaving.  He didn't know it was coming.  He knew he was leaving.

Q    That's your assumption, right?

MR. KATAEV:  Objection. Argumentative.

A    No.

Q    That's the conclusion you drew?

A    That's the conclusion 100 of 100.  If a business's entire inventory is taken out, money is stolen, he signed an ACH form that he was not authorized to do in April as well to take money to pay his debt for these other stores that had been shuttered.  I mean, any -- any reason.  I got an eight year old that would tell you he's leaving, he's up, he's out, because there's no way I'm coming back as the

76

owner and seeing that and keeping him there, right.

So I mean, any logical person would have said he's done, he's out. Plus, he was doing the grand opening in July, right, so he's got his new group of dealerships, so I'm sure...

Q      All right.

Did you know about the grand opening?

A      No.

Q      You never received any texts or anything that would say that?

A      No.

Q      And Anthony Deo was writing checks off of Superb accounts?

A      Correct.

Q      Totalling how much money?

A      About 206,000, I believe.

Q      These were checks that he wrote and signed presented against Superb accounts; is that right?

A      Correct.

Q      In order to secure these

77

accounts, did you have any security on these accounts?

A      What do you mean did I have security?

Q      Did you have Positive Pay on the account?

A      No, we didn't install Positive Pay until August 9th, when a $238,000 ACH came in for NESNA to pay some of his debt for Northshore and Sunrise, and I realized that the problem was much bigger than I even knew.

Q      Did you have a token system on those accounts?

A      Yes.

Q      Who had the tokens?

A      Anthony had a token, Bruce had a token, I had a token, and a couple of the office managers had tokens.

Q      So in order for checks that Anthony Deo wrote to be presented against the account, someone would have to approve those checks through a token, wouldn't they?

78

A       No, that is -- that is what your Positive Pay is, which wasn't installed until after Anthony left.

Q       What would the tokens be used for, as you understood it, on those accounts?

A       To log into the account, and different people had different authorizations.  If you logged in with my token, I had one authorization, somebody else with a different token had a different authorization.  There is an admin and there's everybody else.

Q       What were the different levels of authorizations, that you can recall, on those tokens?

A       View only, and you know, wires of a certain amount had to be approved by two different people, stuff like that.

Q       And what was the level of authorization on Anthony Deo's token?

A       View only.

Q       So he couldn't use his token

79

to authorize something that he was not allowed to authorize because he didn't have any authorization through the token, right?

MR. KATAEV:  Objection to form.  Argumentative.

You can answer.

A      Yeah, I didn't say he authorized anything, but he wrote checks.

Q      The checks that he wrote, where would he get those checks from, do you know?

A      The office.

Q      And who gave him the checks, do you know?

A      Kendra.

Q      And who hired Kendra?

A      I did.  Well, Bruce did.

Q      All right.

So Kendra was one of your people, right?

A      Correct.

Q      And when did Kendra tell you that Anthony was writing checks?

80

A    She didn't.  She -- she, as a general manager, if he came and said, Write or print a check, she would print a check.  Now, typically, those checks would go up to Bruce.  Bruce would sign them, and you know, in this case, she asked -- he asked her to print the checks and he signed them.

Q    When was the first check he wrote, do you know what month?

A    July.

Q    July of '23?

A    '23.

Q    When was the last check that he wrote?

A    July.

Q    Of '23 --

A    Correct.

Q    -- as he was exiting?

Do you know how many checks he wrote?

A    I can tell you a total.  I don't know exactly how many.

Q    Well, did he sign ten checks?

81

A       No, maybe more.  About 30 checks maybe.

Q       About 30 checks?

A       They're in the record, though.

Q       Uh-huh.

Kendra never told you about --

A       No.

Q       Kendra never asked you for any authorization?

A       She just cut the check.

Q       Did Bruce Novicky know about those checks?

A       Bruce Novicky knew about the checks he signed, but the checks that Deo signed, no, we don't, we don't.  You write a lot of checks in the car business.  Every time you write a check you don't call up and say, I'm writing or printing a check, I'm printing a check. The typical way the business runs, right, is a general manager who runs the operation will say, Write it, you know,

82

print this check, or make this payment. She will write -- print the check, and whoever signs then gets the check and signs them.

In this case, that would be Bruce that was allowed to sign them, but in this case, Anthony Deo signed the checks to nobody's knowledge but his own, I guess.

Q       Did you ever write checks off of Superb's account?

A       Nope.

Q       Did you ever transfer money out of Superb's accounts?

A       No.  Personally, no, but I had money transferred to -- or I authorized or told somebody to transfer money.

Q       Where were you transferring money to?

A       Different places, myself, my -- my consulting company.  To pay different bills.

Q       Did you ever utilize money

83

from Superb to go towards any of your other stores?

A       No.  I mean, to pay -- to pay a store that gave Superb money, yeah, payback, but other than that, no.

I mean, if we sold -- if we sold a car to Superb, then Superb paid the store for the car.

Q       I understand.

Now, you ended up suffering financial difficulty at all three of your other stores, right?

A       Correct.

Q       Why did you suffer financial difficulties at those stores?

A       Well, at the time this was well over 5 and a half million dollars in losses from Deo's scheme, so Nissan, when all of this happened, Nissan lowered my floor plan lines to -- that's what they do to stop you from flooring anymore cars until I pay off the demand letters that I received.  You remember those over $2 million that I had to pay, so they lower

84

your lines, so they never raise them again.

So as time went, all of a sudden, they -- they went -- we went over the lines, not for any other reason that they had been lowered, and they forgot to put them back up again.  So what happens is they send out a letter to all the manufacturers saying you're -- you're -- our lines were suspended, which based on your dealer agreement, you have 30 days to cure or you can get a termination letter.

So the number was pretty substantial because they don't do it all the time, they do it every few months. They'll run your lines to see at what percentage you're running.

They called me and told me I was millions of dollars over my line.  So we started to dump inventory, lose tons of money in inventory, and we were already very, very tight based on what Deo left behind.  I couldn't survive it.

*Rich Moffett Court Reporting, Inc.*

85

It just, at the end of the day, we figured out that they -- they made the mistake, which is why they have counterclaims.

If you read the lawsuit, I know you said that, you know, I stole $20 million, but the truth is I -- I couldn't pay the -- the floor plan line because I lost a ton of money trying to cover from -- trying to recover from this mistake that they made.

Q    When did you first hear from NMAC that there were problems with your floor plan?

A    In what sense?

Q    Any sense.

A    That caused this -- this last part or -- or back with Deo?

Q    When did NMAC first begin lowering your limits?

A    Right after I called them to tell them I had a problem with Anthony Deo, he had stolen a bunch of cars.

Q    How many cars did Anthony Deo

86

steal?

A    I mean, there's been a lot of numbers that's been thrown around. There's 104, 102, there's 92, I think there's 94, there's 89, 83, 36. A lot of different numbers that changed over time.

Q    Right now today, can you tell me how many cars Anthony Deo stole?

MR. KATAEV:  Objection to form.

A    Well, there's 43 cars we still can't figure out what happened to, and there's the 30-something cars involved in the injunction.

Q    The 30 some-odd cars involved in the injunction are known, right?

A    Yeah, so 43 cars.

Q    Forty-three cars are how many you say are currently missing; is that right?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    You have to answer verbally.

87

A        Yes.

Q        And you don't know where any of those 43 cars are; is that correct?

A        Oh, I know what happened to them.  I don't know where they are.

Q        What is it you say happened to them?

A        Well, I don't remember the exact number.  It's in the teens, I believe.  Cars wholesaled for cash by Marc Merckling to wholesalers.  There's a few other cars that we were never able to recover that were sold, and they were fraudulent deals, and I was never able to recover.  There's others I just know, but again, all this information is on the record.

Q        Did you have security at Superb?

A        Yeah, there was, yeah.  Yeah, there was a fence and an alarm.

Q        Were there cameras?

A        Yeah, I believe so.

Q        Who has those videotapes?

88

A        I'm sure the landlord does at this point.

Q        So those cameras weren't saved to computers?

A        I don't think so.  I don't -- I don't remember how they were saved.  I don't know if we had a company that monitored it or if they were, you know, recorded.

Q        Are you telling me that the videotapes from 2023 are currently missing?

MR. KATAEV:  Objection.  It assumes facts not in evidence.

A        I have no idea where they would be.

Q        You have no idea where the videotapes from Superb went?

A        Uh-huh.

MR. KATAEV:  You have to answer.

Q        Is that correct?

A        Correct.

Q        Did you still have possession

89

or the ability to see those videotapes as of August 2, 2023?

    A    Yes.

    Q    Do you recall how long after the lockout you no longer had the ability to possess those videotapes?

    MR. KATAEV:  Objection. Vague.    You could answer.

    A    No, no idea.

    Q    Could it have been weeks?

    MR. KATAEV:  Objection. Speculative.

    A    I have no idea.

    Q    Could it have been months?

    MR. KATAEV:  Same objection.

    A    I have no idea.

    MR. THOMASSON:  No, Mr. Kataev, the way the rules read, you're not supposed to be making these objections on the record. I'm curious, does this mean you're planning on not producing Mr. Urrutia again?

    MR. KATAEV:  I'll refer you

90

to Rule 30 about what you're allowed to do at depositions, and I'm not sure what you mean by producing him again.

MR. THOMASSON:  All objections are preserved until the time of trial, and it's as if you want to put these objections on the record now for the purpose of not having Mr. Urrutia show up when we have a trial.

THE WITNESS:  I will be here whenever I'm called at any point.

MR. KATAEV:  There's no question.

Q     Sure.

If I had to send you a subpoena to make sure you're here, where would I send it to, Mr. Urrutia?

A     Costa Rica or my attorney.

Q     You're authorizing your attorney now to accept a subpoena on your behalf?

MR. KATAEV:  Objection.

                                                                    91

          A      Absolutely.

          Q      Okay, thank you, I appreciate that.

                 MR. THOMASSON:  Did you get that?

                 (Record read.)

                 MR. THOMASSON:  I have Exhibit K that I am going to be showing Mr. Urrutia.

                 (Defendants' Exhibit K, Superb Motors Inc. Statement of Profit and Loss, January 1, 2023 through May 31, 2023, marked for identification.)

                 MR. KATAEV:  Off the record.

                 (Discussion off the record.)

          Q      Do you see that document, Mr. Urrutia?  I see that you're reviewing it, do you see that?

          A      Yes.

          Q      Have you ever seen this before?

          A      Yes.

          Q      When did you first see it, do

92

you know?

A     When you submitted it, or Mr. Deo submitted it, to the court back in 2023.

Q     Do you believe that this document is accurate?

A     No, it's absolutely false.

Q     Do you know where the numbers came from for this document?

A     Yes, Anthony Deo sent an email to Mr. Jones asking him to inflate the profits by $4 million.

Q     Is that email in writing?

A     Yes, it is, it's part of discovery.

Q     You're saying that Mr. Deo in that email utilized the word "inflated"?

A     He said to add, I don't remember the exact word, but can you create, create I think is the word he used, a P&L with exactly the amount he wanted added to income and exactly the amount he wanted added to the expenses.

Q     Do you know why he wanted

93

those numbers added, without any assumptions, do you know yourself why he added those numbers?

A    I don't think I need an assumption.  I mean, obviously, it's fraud.  You're saying you submitted it to the court.

Q    These numbers that you say are fraudulent, you don't know where he came up with these numbers from?

A    No, because again, Mr. Jones, who's doing the statements, had my P&L, I mean, my P&L, my journals, my trial balances, and I certainly from my business would not authorize somebody to put an extra $4 million in gross that isn't true.  So no, I have no idea why he would.

Q    Are these numbers accurate, other than as far as income goes?

MR. KATAEV:  Objection.

Q    Are any of these numbers correct, if you know?

A    Maybe some of the -- maybe

94

the advertising, the sales.  I haven't looked at those.  I looked at the total gross profit, and I saw the expenses, and it was exactly what Mr. Deo asked him to add to the P&L.  Other than I didn't -- I didn't look at every single line, but I did have an accounting firm take a look at the actual accounting in the DMS system and -- and try to figure out how an accounting firm could do this, and they couldn't figure it out either.

Q    I see.

What accounting firm was that?

A    I forget the name.  I'll -- I'll have Emanuel send it to you.

Q    So the first time that you saw this was when it was submitted in 2003 to a court; is that right?

A    Yeah, you submitted it.

MR. KATAEV:  2023.

A    '23, yes.

Q    What did I say?

A    2023.

95

You said 2003.

Q    I'm sorry.  I see.

Are you aware at all of what I know about these numbers?

MR. KATAEV:  Objection.

Q    Do you have any firsthand knowledge of what I know about these numbers?

MR. KATAEV:  Objection.

A    No, I have no idea what you would know about the numbers.

Q    Are you under the assumption, Mr. Urrutia, that I participated in the creation of this document?

MR. KATAEV:  Objection to form.

THE WITNESS:  I can answer it, right?

MR. KATAEV:  Yes.

A    I don't know how you participated, but I know you've seen my response, and I know you've seen what I have written, and this has been submitted to the court multiple times at this point

96

so -- and there's been no objection -- I mean no response to my -- what I said the truth is.  You haven't -- you haven't contested it, yet you keep submitting it as true and accurate, so all I know is, again, you're a facilitator.

Q     I see.

Did you object to the EIN number that's attached to the complaint at all, Mr. Urrutia --

MR. KATAEV:  Objection. Argumentative.

A     I don't know what you're --

Q     -- the EIN number that Sarah Deo obtained?

A     Did I object to it?

Q     Yeah, did you have a problem with that document?

A     Why?  It doesn't pertain to me.

Q     Oh, well, this doesn't have anything to do with me, Mr. Urrutia.  I never saw the document when it was first created.  I had nothing to do with its

97

creation.

A        Again, I think --

MR. KATAEV:  He didn't ask a question.  Wait for a question.

MR. THOMASSON:  I have another exhibit.

(Defendants' Exhibit L, Email Chain with attached, marked for identification.)

MR. KATAEV:  Let the record reflect document entry 14 is up on the screen.  Docket entry for the prior exhibit is 13, I believe.

Yes.

Any particular page, Mr. Thomasson?

MR. THOMASSON:  We're going to start at the beginning for this one.

MR. KATAEV:  Page 2.

Q        Did you, in April of 2023, receive this email?

A        Yes.

Q        Doesn't this email say under

98

the subject line, "Account opening information," do you see that?

A        Yes.

Q        So were you aware in April of 2023 that Mr. Deo was opening up an account at Flushing Bank?

A        He was not opening up an account for Superb.  I was opening up an account for Superb.

Q        Do you see where it says, "For corporations we will need the certificate of incorporation and filing receipt"?

A        Yes.

Q        Do you see that?

A        Uh-huh, they were already added.

Q        Did you at any time provide that information to Anthony Deo?

A        I didn't.  I believe Bruce eventually did.

Q        Was that at your direction?

A        I believe so.

Q        That was provided to Mr. Deo

99

for the purposes of opening up some account; is that right?

MR. KATAEV:  Objection to form.

A     His -- his claim is that he had somebody in his pocket in Flushing Bank, and that I was having a hard time because I was opening up a commercial account and it was taking a while, and he had somebody in his pocket that could get it done very quickly.  So if I could send him the paperwork, which the guy I was working with, Mr. Weinstein, asked me if he could share it, and I told him he could, and he sent this email saying he still hadn't sent it over, so I asked Bruce to share the filing certificate, and I believe that was it.  Maybe there's another piece of paper.  That was it.  So he could expedite the opening of the account for Superb.

Q     Was there, in fact, an account for Superb that was opened at that time?

100

A    I didn't know there was, but yes, there was by Anthony Deo.

Q    So you did want an account opened; is that right?  Yes or no?

A    For Superb.

Q    Yes.

A    For myself.

Q    And was an account for Superb opened?

A    Not authorized by me, yes.

Q    Please turn to page number 3, it's actually page 5.  Do you see that?

A    Yes.

Q    Up above there was a Jonathan Abbott that was sending an email to Bruce Novicky, do you see that?

A    I do.

Q    It says, "New store documents needed," do you see that?

A    I do.

Q    What new store was that?

A    That was for Gold Coast Motors of Syosset, I believe.

Q    Did you have any knowledge

101

then of where Gold Coast Motors of Syosset was going to be opening?

    A    I did.

    Q    Where?

    A    At the old Northshore.

    Q    That was okay with you?

    A    Yes.

    Q    You knew about it in realtime as all of this was going on, right?

    A    Yes.

    Q    Mr. Deo didn't hide any of that from you, did he?

    A    No, there was a discussion.

    Q    Were there any discussions about moving any cars to Northshore?

    A    No.

    Q    Never once in writing or verbally did you have a discussion with Mr. Anthony Deo about cars going to Northshore; is that what you're saying?

    A    Be more specific, because he was authorized to move cars to go get them fixed there, and if we opened, the second half of what would have been our

102

agreement from December, then we would have maybe moved some cars from Superb's inventory and bought other cars and kind of started to work with the inventory between the three stores, right, because the deal that we had made was Superb and two other stores, which he hadn't delivered as of that point.

So did we have discussions about moving cars, sharing inventory, yes.  Was there discussions about at this time or for this grand opening him moving cars, no, he was not authorized to move any cars, other than to service them.

And from what I know, at this point he had no mechanics there, so no, he wouldn't have had any authority to move any cars there.

Q    How do you know there were no mechanics at Northshore?

A    Because I saw the payroll records, and -- and a lot of people that were going back and forth, because he was using my employees, were telling -- told

103

me there was no mechanics at that place.

Q    How did you see the payroll records at Northshore?

A    I'll take a look.  I don't recall, but I know that -- I know there was -- oh, the mechanic, I believe, might have been on our payroll at some point, and then he was let go or something. I'll look at it.  I can't remember exactly, but I have a lot of information on this.

Q    So it could have been payroll records given to you by a mechanic that you saw?

MR. KATAEV:  Objection.

A    No, no, somebody gave me the information that there was no mechanic there as of May of '23.  He was fired.

MR. KATAEV:  Speculation with that objection.

Q    You don't know who this person is?

A    I don't recall but I'll find out.

104

Q        You don't know their name?

A        I don't remember.

Q        Did they give you records?

A        I don't remember how I found out there was no mechanic there.  It might have been one of the people that he had signed a loyalty agreement with that was now going to be working for him that told me there was no mechanic there.

Q        Would that be your only knowledge of the status of mechanics at Northshore?

A        Yeah.

Q        Someone told you there weren't any?

A        Right.

Q        On the same page that you're on, that's number 4, at this point numbered 4 at the bottom, in the middle again Jonathan Abbott is exchanging envelopes in this instance with both Bruce Novicky and you regarding setting up a line floor plan for Gold Coast, was that something that you and Anthony Deo

105

had discussed doing?

        A       Yes.

        Q       And you were going to assist in setting up a line at Gold Coast?

        A       Yes.

        Q       Did you ever set up a line floor plan at Gold Coast?

        A       No.

        Q       Was there an understanding that if you had set up a line at Gold Coast that you were going to become an owner at Gold Coast?

        A       Yes.

        Q       You agree with me now you never set up that line, right?

        A       No, we started the process. I went on vacation with my family, and getting on a plane coming back is when I got the phone call about what Mr. Deo had done, so that never materialized. Because at that point in the two weeks I was away, he had double floored in the beginning or in the middle of July, he had double floored at the end of July,

106

and by August 3rd, which you were present at for the lockout with all of the theft of cars, and obviously, I was -- wasn't going to open a line of credit or become partners with a thief, so...

Q       So you would say at this time that Gold Coast belongs to Mr. Deo and not you; is that correct?

MR. KATAEV:  Objection.

A       Well, it depends on how you want to look at it.  Legally or the way Anthony Deo seems to think that you get ownership of a dealership?

Q       I'm just asking you, Mr. Urrutia.

A       And I'm telling you how I view it.

Q       Do you consider yourself an owner of Gold Coast today?

A       No.

Q       Okay.

Now, as far as the next document here, if you could turn to the official business certificate?  When did

107

you first see this document, do you know?

A    With this paperwork, I think what is -- the date's on here, right? July 20th.

Q    So you were given this document regarding Gold Coast Motors of Syosset before the lockout; is that correct?

A    Correct, but it was -- it was part of what was required for the application.

Q    On the next page, which happens to have -- that's after the official business certificate, the next page happens to have the number 2 at the bottom.  Was Bruce Novicky your guy, so to speak?

A    Yeah, he was the chief operating officer.

Q    Are you still in touch with Mr. Novicky?

A    No.

Q    When was the last time you spoke to Mr. Novicky?

108

A        July of last year.

Q        Have you and Mr. Novicky had any falling out?

A        I mean, the business shut down, so yeah, to a certain degree we did.

Q        Did you have any arguments with Mr. Novicky?

A        No, it was pretty -- pretty clean cut.

Q        Do you believe he's upset with you?

A        He's not upset with me, I'm upset with him.

Q        What are you upset with Mr. Novicky about?

A        I feel he could have told me sooner that he was leaving.  I mean, he didn't rob me or anything, so I'm not -- I'm not upset at that.  I'm upset at, you know, the notice he gave me of leaving.

Q        In July of 2025, is that when he left you?

A        No, July of '24.

109

Q        You said last year, we're now a couple of days into the new year.

A        Oh, sorry, sorry.

Q        That's why I said that.

So in July of '24, Mr. Novicky left you.  What stores did you still have operating in July of '24?

A        All three of them, the Mitsu store, the Volkswagon store and the Nissan store.

Q        Did it hurt the operation of those stores when he left?

A        Absolutely.

Q        How?

A        There was nobody to run it.

Q        And when did those three stores close after he left?

A        We -- we did asset purchase agreements for all three of them, which took three or four months.  One closed, two did not close, and I would say they were all closed by December '24, January the latest.

Q        Did anyone else leave your

110

employ at those stores at or about the time that Mr. Novicky left?

A    James.

Q    That's the gentleman whose last name you have trouble pronouncing?

A    I can't pronounce it.  Yes, I can spell it for you.  I think I have it in my phone, if you want.

MR. THOMASSON:  I need to take a brief break for just a moment.

MR. KATAEV:  Okay.

(Recess taken.)

Q    Are you on page 2 at the bottom of Exhibit L, Mr. Urrutia?

A    I am.

MR. KATAEV:  Same exhibit?

MR. THOMASSON:  Same exhibit.

Q    Do you see here that Mr. Abbott was talking with Bruce Novicky in an email that did not also include you on this email, do you see that?

A    Yes.

Q    Did you authorize him to

111

contact and discuss floor planning lines for Gold Coast on your behalf?

A    Yeah, discuss them, yeah.

Q    That's all that was going on here.  You don't have any problem with this email, do you?

A    On July 18th I was on a plane to Europe, so that's why I wasn't copied on it, and he had authorization to talk about it and let me know what was said.

Q    Then on the next page there is an exchange again between Mr. Abbott and Bruce Novicky that you are copied on, and you were aware of this at the time, weren't you?

A    Yes.

Q    At that time were, in fact, financials of any type sent over for this, do you know?

A    I'm pretty -- I mean, I don't know, but probably, but probably.

Q    That was with your knowledge and approval, right?

A    Correct.

*Rich Moffett Court Reporting, Inc.*

112

Q      On the next page is a text, and is this the reference you made to being told on July 10th that that license had come through?

A      Correct.

Q      As a matter of fact, other than from this text, you don't know when that license was approved, do you?

A      He told me that we were alive that day, so I don't know when it was approved, no.

Q      Do you have any reason to believe it was before that day?

A      With everything that's gone on, I don't trust anything Deo says.

Q      That being said, do you have any specific knowledge that this is false?

A      No, that's what I just asked Mr. Emanuel to maybe subpoena when it was approved.

Q      The next page after that is an exchange between Bruce Novicky and Mr. Deo again regarding this same deal,

113

isn't it?

A       Yup.

Q       The next page after that is another exchange between Bruce Novicky and Anthony Deo?

A       Yup.

Q       All of this was known and authorized by you, wasn't it, for them to be communicating about this?

A       Yeah, he was the chief operating officer.

MR. KATAEV:  We're done with this exhibit?

MR. THOMASSON:  We're done with Exhibit L.

Q       There is a token system that you had at Superb for security on your accounts, right?

MR. KATAEV:  Objection. Asked and answered.

MR. THOMASSON:  It's a preliminary question, Mr. Kataev.

MR. KATAEV:  I'm not going to instruct him not to answer.

114

Go ahead.

A    It's for logging on and assignment of authority with those tokens.

Q    And it's for security, isn't it?

A    Yeah, obviously.

Q    Please be sure to keep your voice up.

A    Obviously.

Q    After the lockout, there was then a Positive Pay system that was applied, correct?

A    Correct.

Q    After the lockout, was that the first time you ever learned of the existence of Positive Pay?

A    I knew about Positive Pay in my roles as general manager in other stores, but I never applied it in -- within our stores, so I knew about Positive Pay.

Q    Until after the lockout?

A    After the lockout, correct.

115

Q      But there was also a texting system that was utilized at Superb, wasn't there?

A      I mean, we texted each other.

I don't know exactly what you're talking about.

Q      Was there a texting system that applied to the accounts at Superb?

A      I don't know.  I don't -- I don't use the system.  That's why I hire people to run stores.

Q      So as you sit here today, are you telling me that you do not know whether or not there was a texting system to secure Superb's bank accounts prior to the lockout in 2023?

A      There was -- to secure, no, there was nothing in place to secure the -- the bank accounts.  It was strictly the people that have tokens could access, and based on whatever the token, whoever -- whatever the token is, the authorizations we give people.

Q      As you sit here today, when I

116

bring up the words a texting system that applied to the accounts, you have never heard of that before today; is that correct?

A       Correct.

MR. THOMASSON:  This next Exhibit is Exhibit V.

(Defendants' Exhibit V, Text Messages, marked for identification.)

Q       Would it be fair to say that you saw this text during or about September of 2024?

A       Yes, with Jory.

Q       When it was attached to the complaint that you read from cover to cover?

A       Correct.

Q       Do you know who this person is?

A       I do now.

Q       Who is that person?

A       He worked for Mr. Deo two years before I ever met Mr. Deo.  Mr. Deo

117

hired him in February at Superb, and everybody knew him as Kevin. I only found out that he even worked for Superb when I -- I couldn't imagine where you were going with this when I first read the complaint, but then I found out all this information.

He worked for him, Deo paid him out of his Car Buyers' account. He paid him in payroll out of the -- the Northshore account, and then he hired him in February at Superb.

I never met him. I don't know who he is, and I've never spoken to him, so...

Q     Do you have any idea when he worked at Superb?

A     February of '23, I guess the end or close to the end, but I know he worked for Mr. Deo before that.

Q     And what is it you mean when you say that he worked until "the end or close to the end"?

A     Well, everybody got let go

*Rich Moffett Court Reporting, Inc.*

118

once the shutdown took place, so I don't know if he was there at the end or if he left before.  Again, I have never met him or spoken to him, so...

Q      When was the shutdown?

A      August 3rd.

Q      You closed Superb on August 3rd?

A      Oh, I'm sorry.  I apologize. The -- that was the lockout.  The shutdown, I think, was November -- no, end of October, beginning of November.

MR. KATAEV:  Of?

THE WITNESS:  Of '23.

Q      So you have never spoken with Kevin?

A      I did after -- after your complaint.

Q      When did you speak with him?

A      I don't know the month or the date.

Q      What year did you speak with him?

A      Last year.

*Rich Moffett Court Reporting, Inc.*

119

Q       Last year being 2025?

A       Correct.

Q       Who contacted who for that conversation?

A       I don't remember.  I believe I might have -- I might have -- I might have reached out to him or had somebody reach out to him.

Q       And he ended up speaking with you?

A       Briefly.

Q       How many times did you two speak?

A       Once.

Q       What is it that was discussed?

A       Whether I even ever met him.

Q       That was the discussion?

A       That was it, and what happened and why did he send this.

Q       So who said what to whom, can you tell me the conversation?

A       He told me that Anthony owed him a lot of money, and that he had done

120

this with Josh -- to him, and blamed Josh, and now he owed him a lot of money at Superb, and he had done it to him again, and it caused him a lot of financial problems.

I said, "Have I ever met you before?  Have I ever spoken to you?"  He said, "No."  I said, "Thank you, that's all I wanted to know."

Q    Did you ask him how he found out about this?

A    About what?

Q    Well, he seems to be indicating that he thinks Anthony Deo did something wrong.  How would a salesman know that, do you know?

MR. KATAEV:  Objection.

A    About Jeremy, they're friends.  Anthony Deo took his car in, didn't pay it off, floored it, so I had to pay it off, and he took $10,000 in cash from a kid, so -- and they were friends, so he didn't take that well, and I know about Jeremy because I had to pay

121

off the debt.

Q       Who is Jeremy?

A       He was a salesman.

Q       Kevin and Jeremy were salesmen?

A       I believe so.

Q       What is it you understand about this $10,000?

A       Jeremy had a car.  I'd say the car was worth $40,000, he owed 50, he couldn't afford the payment anymore. Anthony asked him for $10,000, and with the car he would pay off his -- his loan and take the car so he didn't continue having to make the big payment, and Anthony floored the car, never paid off the car and kept his $10,000.

Q       And you have firsthand knowledge of that?

A       That's what I was told.

Q       Who told you that?

A       Bruce, after he interviewed Jeremy and after we had to pay off the car.

122

Q      Do you know when Bruce interviewed Jeremy?

A      Sometime at the end of '23.

Q      Would that be before or after this text, if you know?

A      Way before.  Probably I had to pay off the car -- the records will show when I paid off the car, but I think it was maybe a month where Jeremy was -- you know, he's a kid, he didn't have the money to make the payment.  He had given $10,000 to Anthony, so it was either -- either I let him suffer and pay the car, or I ended up paying off the cars on the floor plan and helped him payoff the car, but I didn't give him back the $10,000. I couldn't help him.

Q      What floor plan did you have at Superb?

A      NMAC.  Occasionally they would use NextGear but not in the sense of it was a Superb floor plan.  I had a NextGear account that was for wholesale, so I would buy cars, put them on the

123

account, but I could move the cars to Superb, and they had cars and used those cars for retail to sell, and then I would just ship them when they were sold.  But really the -- the only floor plan line at Superb, I believe, was NMAC.

Q    Are the four dealerships we've discussed today the only dealerships you have ever had an interest in?

A    Yeah, I believe so.

Q    What was the first one you opened?

A    Volkswagen.

Q    Of New Jersey?

A    Yes.

Q    Was that roughly 25 years ago?

A    Twenty-five years ago?  No, this was 2020, during COVID.

Q    Didn't you tell me earlier that you took a dealership course 20 or 25 years ago?

A    Yeah, I was a general

124

manager.  It was a general manager course for NADA, 1992.

Q      When was the first time you worked for a dealership?

A      1992.

Q      And then sometime in the early 2000s you took a GM course because you had been getting promoted?

A      Correct.

Q      I understand.

The first dealership you ever owned or operated was in 2020?

A      Correct.

Q      And that was New Jersey?

A      New Jersey, yes.

Q      What was the next dealership that you opened?

A      Mitsubishi in Hartford.

Q      When did you open that?

A      March of '21.

Q      What was the next dealership that you opened?

A      Superb.

Q      When did you open that?

125

A       June or July of '21.

Q       And then the last one you opened was Massachusetts?

A       December of '22.

Q       I see.

Did you have any partners at Superb?

A       At Superb, Bobby Clark. Prior to -- to Anthony Deo, Bobby Clark, and I bought him out.

Q       When did you buy out Bobby Clark?

A       October of '22.

Q       So when you were dealing with Mr. Deo in November of '22, you owned Superb 100 percent?

A       Yes.

Q       So there wouldn't have been any need to disclose anyone else as a potential owner of Superb at that time because you owned it by yourself, right?

A       Correct, yes.

Q       Make sure you let me finish, okay?

126

Did you ever have any partners in New Jersey?

A        Yes.

Q        Who did you have for partners in New Jersey?

A        Orloff Sorenson.

Q        Was that the only partner you ever had in New Jersey?

A        Yes, I had -- I had an agreement with a partner, with a -- with a -- who was going to be a partner on paper.  But on paper as a partner, only one.

MR. KATAEV:  Objection to relevance on this line of questioning.

Q        That would have been the individual that you almost made a partner.  What was that person's name?

A        Alex.

Q        Alex what?

A        Alex Kikirov, K-I-K-I-R-O-V.

Q        Alex did or did not become a partner in New Jersey?

127

A        No, he did not become a partner.

Q        And the other gentleman, what was his name that did become a partner?

A        I recall Orloff Sorenson.

Q        From when to when was Orloff a partner?

A        August 2020 to March of -- March -- February or March of '21.

Q        That wasn't a very long period of time.  Did something happen?

A        He was -- he was not a car guy, and you know, he just really wasn't involved, and I, when I got my new dealership, the Mitsubishi dealership, you know, he had the Mitsubishi dealership was his originally.  He was a small partner in it, and he had a lot of debt that he had assumed from his previous partner.  So I assumed the debt, and part of that was he gave up his shares in Volkswagen and he walked away, and I paid off his debt at the Mitsubishi store.  He was retired.  He was in oil

128

before or something like that.

Q    So did he buy his way into New Jersey with you?

A    No.

MR. KATAEV:  Objection to form.

Q    So he didn't give you any money to become your partner in New Jersey?

A    No.

Q    Did you give him any money when he left the business?

A    I assumed his debt.

Q    In return for also getting the Mitsubishi dealership in Hartford?

A    Correct.

Q    Was there paperwork that reflected this?

A    Yeah, yeah.

Q    Were there any lawsuits associated with those two dealerships?

MR. KATAEV:  Objection. Relevance.

A    In what way, after, before?

129

I don't understand.

Q      Well, after Mr. Orloff and you started doing business out of New Jersey and Connecticut, did you and Mr. Orloff wind up in any litigation together?

A      No.

Q      Did you have any other partners up in Connecticut?

A      No.

Q      Did you have any partners in Massachusetts?

A      Oh, yes, actually.  Did Alex ever become a partner in that?  No. Actually, I think I'm 100 percent store owner.

Q      When you just now asked yourself out loud if Alex ever became a partner in that, would that be the same Alex --

A      Yes.

Q      -- that became a partner in New Jersey?

MR. KATAEV:  Could I take the

130

exhibit down?

MR. THOMASSON:  Yes, we can take down Exhibit V.

Q    Now, the wrongdoing, the harm that you think I have caused you is in my representation of Anthony Deo; is that correct?

A    No, it's being part of the gang.

Q    All right.

What else did I do that you have firsthand knowledge of to you, sir?

MR. KATAEV:  Objection.
Asked and answered.

A    Would you like to go through the whole case, all the different things that I believe you -- the lies you've written down?

Q    Well, not related to my representation of Anthony Deo, did I do anything else to you is what I'm trying to get at?

MR. KATAEV:  Objection to form.

131

A    Sir, the whole game plan of the gang you're with is to rip off people and commit fraud, and you're part of everything, you know, you're just one arm of it.

Q    I'm just asking you what you have knowledge of that I have done wrong to you and --

A    Your question --

Q    -- I am asking for anything other than through my representation of Mr. Deo, is there anything that I did to you at Superb, that you know of today, that you can tell me I did to you at Superb?  Did I take any cars from you, sir; are you alleging that?

A    You cost me my business by being part of the whole organization that does what you do.

Q    Through my representation of Mr. Deo; is that right?

A    Whatever part of your -- just like you have managers and general managers, you're one part of it, right?

132

So --

Q       Okay.

A       -- so Anthony or Sarah and Harry could be the brains, you got your logistics, you got your counsel that takes care of making sure, you know, this gets dragged on forever, and you break people, and then you have your accountant that lied and provides financials and stuff to banks so that they can use our corporations to steal.

So I mean, it's all together. It's not -- it's not -- I don't know.  I -- I -- I -- I don't see it as, you know, separate.  I think you are all one -- one big gang.

I mean, you have three lawsuits for the same thing within three years.  You have another one probably coming in, you have Regal House Auto or whatever it is you have open.  You just got another lawsuit for the $100,000 that he initially gave me that he never -- that he never gave back to the guy,

133

right?  And I mean, this just seems to be what you do.  I sell cars, you defraud people.  Your crew.  Your crew.

Q     So I am going to ask you some very specific questions about that, Mr. Urrutia, and I would love if you could answer them directly for me.

Prior to December of 2022, are you aware of any litigation that I was a part of that you think I was doing something wrong in prior to December of 2022?  What litigation can you tell me that I represented anyone in that I represented wrongfully?

MR. KATAEV:  Objection to form.     You could answer.

A     Well, weren't you representing him for the Island Auto Group at that point?

Q     No, I am talking about anything started in court --

A     Oh.

Q     -- associated with you and the Aaronson group.  Before that date,

134

can you tell me anything I did as an attorney that you think I did wrongfully to harm anyone, that you know of?

A    I haven't looked further back.

Q    So my wrongdoing as an attorney began with my representation of the Deos involving the first lawsuit that was commenced in December of 2022; is that right?

A    Correct.

Q    And merely by representing them you think I'm doing it wrongfully; is that your position?

MR. KATAEV:  Objection. Argumentative.

A    No.

Q    Okay.

A    I think you're -- you're doing it corruptly.

Q    You think I'm being dishonest in what I'm doing in these lawsuits?

A    Absolutely.

Q    So I have been dishonest in

135

these lawsuits.  What else am I doing wrong, other than dishonest?

A    I know most of the money that you have received through Car Buyers came from my stores, and you have received quite a bit of money.

Q    Just a moment.  I received money from Car Buyers?

A    Uh-huh.

MR. KATAEV:  Answer verbally.

Q    Is that a yes?

A    Yes.  I'm sorry.

Q    What money are you talking about?

A    Checks made out to you.

Q    From who?

A    From Car Buyers.

Q    Car Buyers wrote me checks?

A    Correct.

Q    What Car Buyers?

A    Anthony Deo's Car Buyers Company.

Q    A company --

A    Yeah.

136

Q        -- gave me checks, not Car Buyers?

A        Car Buyers.  Car Buyers is -- is the name of the company, right?

Q        Okay, you're talking about the name of the company that would have given me checks; is that right?

A        Correct, yes.

Q        And it's your position that I know where the money comes from when they give me a check; is that your position?

A        No, my position is you know exactly what they're doing, and if the money came from there, you know exactly what they're doing, then you know that the money came from me.

Q        How would I know what they're doing?  Are you saying that I'm involved in the operation of car dealerships?

A        No, I'm saying you're involved in the operation that Anthony Deo and Marc Merckling and Blankenship and Jones are all involved in, which is defrauding car dealerships and people.

137

Q      And you think there have been discussions about that?

A      I would assume there would be.

MR. KATAEV:  Objection to form.

Q      But you have no firsthand knowledge of that; is that correct?

MR. KATAEV:  Objection. Argumentative.

Q      Is that correct?

A      Correct.

Q      Thank you.

Is there anything else that you haven't already stated that you think I have been doing wrong?

A      I mean, again --

Q      Is there anything else that you haven't already told us?

A      No.

Q      I didn't have any access to your bank accounts at Superb, did I?

A      No, that -- that isn't your job, right?  You facilitate.  Somebody

*Rich Moffett Court Reporting, Inc.*

138

else handles the money.

Q     I am just asking you if I had access to your bank accounts?

A     No.  Neither did Deo technically, but...

Q     Okay.

Do you know if there was any way that the checks he wrote were approved by Bruce Novicky?

MR. KATAEV:  Objection.

A     I have no idea.  I think he signed them, though, so that alone he -- he is not allowed to do.

Q     If they were approved by Bruce Novicky, would you agree that those checks were authorized?

MR. KATAEV:  Objection. Speculation and argumentative.

A     He couldn't approve Anthony Deo signing a check, and Bruce Novicky didn't know you existed before August 3rd, and you got those checks before August 3rd, so no, Bruce Novicky would not have approved those checks.

*Rich Moffett Court Reporting, Inc.*

139

Q    But I didn't ask you whether or not Bruce Novicky would have approved those checks, I asked you if Bruce Novicky did approve those checks.  Would that mean that those checks were authorized?

MR. KATAEV:  Objection.  Speculation.  Argumentative.

Q    The way your system was setup, did Bruce Novicky have the ability to authorize checks?  Let me ask you that.

A    Bruce Novicky signed checks, that's how he approved them, by his signature.  He couldn't tell somebody that didn't have authority to sign the checks to authorize anything.  Either he signed them or they weren't approved.

Q    What authority did Bruce Novicky have in your businesses?

A    He was my chief operating officer.  I trusted him.  So he had authority to sign checks.  As a matter of fact, we went through great lengths to

140

make sure that all the checks from Superb got taken all the way to Hartford to be signed, or he took the ride all the way to Superb to sign the checks.

Q    And as chief operating officer, was Bruce Novicky above Anthony Deo?

A    Absolutely.

Q    And you trusted Bruce and you authorized Bruce to operate all four stores; is that right?

A    Correct.

Q    What is it that you claim that Marc Merckling took from Superb?

A    Cash.  He sold cars for cash that were never receipted.  He moved inventory without authority.  He manipulated floor plans.  He was listed as a general manager in the DMS system and with the audit companies.  He was part of the -- the -- the gang.

Q    I understand.

And you have firsthand knowledge of the cash that he took?

*Rich Moffett Court Reporting, Inc.*

141

A        Absolutely.

Q        Can you please tell me what cash Marc Merckling took?

A        There are certain deposit slips of cash that he took to the illegal bank accounts that he opened with Flushing that had written on them from the teller, and again, he deposited most of the money, so his handwriting is on most of the deposit slips, but it's specifically written on there who delivered the cash, and that is Marc Merckling.

Q        This was a bank account that you authorized the Superb incorporation documents to go to that bank, right?

MR. KATAEV:  Objection. Assumes facts not in evidence.

A        No, I supplied them.

Q        You supplied them yourself?

A        To David Weinstein, correct.

Q        At that bank; is that correct?

A        Yes.

142

Q    Did you at any point in time get told that the account was open?

A    No.

Q    And --

A    I found out the account was opened in August when I opened the drawer and I found a bunch of statements. I was trying at that point to open the account again, which I left off, back in April. I didn't want to open it anymore because it was taking too long and I had my accounts with Chase.

In August when I came back and all of this was going on, I said they had most of my stuff, let me try to reopen it because I didn't know what else was out there from Deo. So I called up David Weinstein again, I said, "Okay, let's reopen these bank accounts," and he started again through the whole process, and all of a sudden, I open the drawer, and there's bank statements in there already for Superb bank accounts already.

Q    And you knew that there was

143

an attempt to open the account, but you never knew that it was opened; is that right?

A    Correct, yes.

Q    Do you now know when that account was opened?

A    Yeah.

Q    When was it opened?

A    April 4, 2023.

Q    Just about at the time that an account was attempted to be opened, it was opened, is that right, according to the emails --

A    Correct.

Q    -- that were being exchanged, they were in April of 2023, right?

A    Correct.

Q    That account was, in fact, opened in April of 2023?

A    Correct.

Q    And you didn't find out about it for April, May, June, July, for approximately five months; is that right?

A    Yes.

144

Q     Have you told me everything that Marc Merckling has done wrong?

MR. KATAEV:  Objection.

A     Again, he's part of your whole organization.  I'm just -- I think I mentioned the parts that he was in charge of, but what he's done wrong, he's put me in the position I'm in, right?

Q     I'm just asking if you have told me everything, yes or no, that Marc Merckling has done wrong.

A     I believe.  I think it covers it, right?

Q     How many cars are you not able to keep track of at this point that you blame Anthony Deo for these cars disappearing?

MR. KATAEV:  Objection. Asked and answered.

A     Let me just clarify something.  Anthony Deo was running the stores.  I had run the stores for 30 years, right?  Anthony Deo ran the stores, so it's not me not keeping track

145

of him.

And you're supposed to walk into a store, hit a couple of buttons, and you get an accounting on your DMS system, and it tells you what cars should be there or shouldn't be there.

The store was just so being run into the ground and nobody cared to clean up the inventory, so it showed that there was 102 cars missing.

As we started to find cars and figure out what happened, we started to deduct numbers, and it came up that there's 43 cars that I can't figure out what happened to them.

Well, let me rephrase that. That I can't get.

There's a certain amount that I remember, 13 or 16, again, it's in the record, that I know he sold to wholesalers for cash and pocketed the money.

Q    How do you know that?

A    Because it never made it into

146

the account, and we have a -- and we have a declaration from the wholesaler.

Q      Who is the wholesaler?

A      Orgad I believe his last name is.

Q      Could you spell that, please?

A      O-R-G-A-D, I believe.

Q      And this Mr. Orgad operates his wholesaler where?

A      I think Brooklyn.

Q      What does the declaration say?

A      That everything changed after Deo got there, because he used to buy cars from us before.  After that, he started to ask for cash, and by July he knew something was up because the -- they were just dumping him into for low prices, but it had to be cash, and they didn't want to give receipts.  And I think he ended up being -- he saw that them clearing the lot, and he was invited to the grand opening where he saw all of the Superb cars.

147

Q        How many cars does Mr. Orgad indicate to you that Anthony Deo sold for cash wholesale?

A        It's in the record.  I don't know, 16, 18.  I don't remember.

Q        And is that 16 or 18 part of the 43?

A        Correct.

Q        I see.

Now, the other 59 cars, 43 and 59 add up to 102, there were 102 cars at the lockout that were alleged to have been stolen by Deo, did you know that?

A        Yes.

Q        Those other 59 cars have you accounted for, other than through Anthony Deo?

A        Yes, within the first week we accounted for 13 of them.  Before the hearing in September, we accounted for another 12, so by the time -- oh, after the hearing, I'm sorry, for another 12. We found them in shops.  We found them in different places.  I mean, by the time we

148

got to the February 20th hearing, there was 43 cars that I never was able to account for.

Q       So when on August 2, 2023, the night of the so-called lockout, when it was reported to the police that 102 cars had been stolen by Anthony Deo, you could tell us now for sure that that number was inaccurate; is that right?

A       That's right.

MR. KATAEV:  Objection.

Q       And the accurate number, in your mind now, is 43, is that correct, that are unaccounted for?

A       Oh, unaccounted for, 43, yes.

Q       Sixteen to eighteen of the forty-three cars, you believe, were sold at auction for cash?

A       Not at auction, to a wholesaler.

Q       Okay.

Do you know anything about the other roughly 25 cars?

A       It's in the record what I

149

know.  I couldn't remember it off the top of my head, but yes, we found some other information on other cars, but I can't -- it was never really able to be verified, and I would need Anthony to -- to verify some of the information.  Shows, like, the cars that were sold and out of state. I don't -- I don't remember.  It's all in the record.  We went car by car painstakingly, so...

Q    Could anyone, other than Anthony Deo, have done this?  I didn't ask you whether or not you believe somebody else had done this, I am asking you could anyone else have done this, if you know?

MR. KATAEV:  Objection. Speculation.

A    No.  Again, I've been a general manager all my life, and the way it was done and what was done, it had to be the person in charge or in control of a store.

Q    That was there, and that was

150

Bruce Novicky; is that right?

A       No, that was Anthony Deo. Bruce Novicky was in charge of the group, and he reported to Bruce Novicky, but he didn't run the day-to-day operations.

Q       Did Bruce Novicky monitor the day-to-day operations of the store?

A       If I asked him to.  If something was wrong at the store, if I thought it needed some help, like we did in March before the CFO was let go, Bruce Novicky went in and helped, but usually we would get a statement, and if the statement's numbers were not good or -- then Bruce Novicky would go in and try to help.

           But as soon as the CFO left, all of a sudden, it's, you know, Superb was doing great, so we didn't -- we didn't really pay a lot of attention, especially having a brand new store opened, and you know, with Jones's help, he was able to lull me into thinking that everything was good at Superb.

151

Q      So you were monitoring Superb's accounts, at least monthly, in 2023; is that correct?

A      Me personally?

Q      Yes.

A      No.

Q      How often were you examining your own bank accounts and records for the dealership in 2023?

A      I -- I read statements.  I don't look at the bank statements.

Q      All right, and the statements you were getting, you were getting from where?

A      I was getting them from the office manager, the accounting department.

Q      And what would that person's name be?

A      Kendra.

Q      And was Kendra the person you were getting statements from throughout 2023 at Superb?

A      Yes, she was working with

152

Mr. Jones to finalize the statements.

Q    Who hired Kendra originally? Was she one of your people or one of Anthony's?

MR. KATAEV:  Objection. Asked and answered.

A    One of my people.

Q    How often would Kendra send you statements?

A    It wasn't Kendra.  She would give them to Bruce Novicky, and Bruce Novicky would send them to me.

Q    How often would Bruce Novicky send you statements?

A    At the end of every month.

Q    Would that be every month in September of 2023 that you received statements from Bruce Novicky?

A    That's only one month.  Every month of September of '23?

Q    I'm sorry --

A    Okay.

Q    -- I misspoke.  Withdrawn. Did you receive statements

153

from Bruce Novicky for Superb Motors every month in 2023?

A    For all my other stores, yes. For Superb, after June, I believe, maybe we were able to put together one more statement, and then we -- we couldn't even put the numbers together. It was -- it was such a disaster.

Q    So as of July 1, 2023, you had seen statements for Superb Motors prepared by Kendra and given to you by Bruce Novicky for every one of the previous six months that year; is that right?

A    No, prepared by Jones with Kendra assisting. Given to Bruce Novicky and then given to me.

Q    Was the exhibit before you a profit and loss statement from Thomas Jones one of those statements?

A    No.

Q    That's not what you're talking about, is it?

A    No, that is not a factory

154

statement.

Q    Right.

A    This is a fake fraud statement submitted by Mr. Jones.

Q    I understand.

But you did receive statements from Bruce Novicky every month, January through June of 2023; is that right?

A    Correct, yes.

Q    And do you now believe that there is anything on those statements that are incorrect?

A    Everything after April is incorrect.

Q    So January, February, March and April statements you believe to be correct; is that right?

A    No, January, February and March are correct.  April, May, June, and I mean, I don't think we ever produced a July, but if there was a July, those were all incorrect.

Q    And it's your position that

155

that's because of Thomas Jones, right?

A       Correct.  Well, Thomas Jones --

MR. KATAEV:  Objection.

A       -- and Deo.

Q       But Thomas Jones was preparing these statements based on what Kendra gave him, wasn't he?

MR. KATAEV:  Objection. Assumes facts not in evidence.

A       No.  So Kendra would give him the deals, and she inputs the information, and then Thomas Jones would look at it and tell her what entries to make on the statement.  So whatever Kendra ended up with after she did all of her accounting and everything, Thomas Jones would then go in and tell her what entries to make.  And there's a couple of emails from Deo making sure to tell Thomas Jones to make sure that those statements show a profit, no matter what.

And when you go back, there's deals that cancelled that were never

156

taken out of the statements.  So they were counted as profit, meanwhile, they never existed.  There was hundreds of thousands of dollars of cash from April through July that never made one dollar into the operating account, they all went to the Flushing account.

I am sorry, I didn't mean to point at you.

The Flushing account.  Not one penny from April 1st through July -- I'm sorry, August 3rd, ever made it into the operating account, but they were accounted for in those statements as -- as profit, because they were counted as COD's, they were counted as down payments, but yet they never made it into the account.  They were pushed off into a schedule as a receivable.

And then in June he finally made the entry of 700 and something thousand dollars on the statement for Superb.

Q    And that $700,000 entry

157

you're saying is inaccurate?

        A       Well, no, it's accurate, they didn't -- didn't choose to put it in until June before...

        Q       Okay, I understand.

                Who had signatory powers on the Flushing account, do you know?

        A       Anthony Deo and maybe Sarah, I believe.

        Q       Wasn't there an occasion when you and Anthony discussed Anthony buying all of Superb?

        A       I don't -- I don't believe we ever discussed buying all of Superb.  We discussed him becoming 49 percent partner in Hartford.

        Q       And you believe that that was beginning around June; is that what you testified to?

        A       No, that began in April, and it didn't become a serious conversation until the end of June, beginning of July.

        Q       And at that time did you ask him for any money towards that purchase?

158

A        No, we -- we came up with a number of what it would cost.  He agreed. He told me he had some funding, because he put up the houses that, I guess, he's -- he was sued for renting that he told me he owned and that Michael Laurie had gotten him money from some hedge fund, a substantial amount of money, and that he wanted to buy in as -- as partner.  And you know, he gave me the whole how he was going to blow it up, and how great he was going to do and all of that stuff.

I was in the process of buying a -- a building for my dealership up in Massachusetts, and Anthony Deo said, "I have my term sheet, I'll have the money next week."  So I said, "Okay, then we're going.  You know, when I get back from my vacation, we'll talk about the terms, and we'll finalize it."  And that was the extent of the conversation.

Q        Did you at any time in July of 2023 ask Anthony Deo for money?

A        From where?  What date?  I'm

159

sorry.

Q    At any time in July of 2023, did you ask Anthony Deo for money?

A    Anthony Deo told me he was -- he was getting the money for the purchase, and I again, I told him, I believe it's in the text, that I was buying a building.  He said he would have the money to me by next week.  I said, "Are you sure?  'Cause if you do, then I won't sell stocks and whatever I need to buy the building."  And he says, "Absolutely, 100 percent."

Q    How much money was that?

A    I don't remember.  500,000, I believe.  I don't know.  I don't remember the exact amount.

Q    So you and Anthony Deo were discussing Anthony Deo giving you $500,000 in July of 2023, yes or no?

A    Yes.

Q    Did Anthony Deo give you $500,000 in November of 2022 before contracts were signed?

160

A        Yes.

Q        Did you know what the value of Superb Motors was in or about November of 2022?

A        I -- I wouldn't know.  I didn't put a value on it at that time. If the store had $450,000 worth of advertising from my previous partner, even though the statement shows a loss, that was after salaries and after I gave him 150,000 to buy him out, which is part of the statement.  I would -- I had to write down about, I don't know, 5, $600,000 worth of the inventory and pay down my NESNA advance to become partners with Anthony Deo.  So I believe I put in more than twice as much as he did to become partners.  The idea wasn't so much -- and I put $300,000 of working capital in, too.

So the 500,000 wasn't so much a value of the business.  I saw a value in him running it and making it successful, and on the two dealerships

161

that he said he had that were successful. So I really wasn't looking to value it as much as I was looking to clear the way to figure out how to become partners and grow something good together based on the fact that I thought he was a good car guy.

Q    Did you know that there were difficulties between he and Josh Aaronson?

A    Oh, yeah, absolutely.  He came crying and -- of the abuse, and you know, his pregnant wife, and you know, I felt for him, to be quite honest with you.  He's quite the con man, he's very good at it.

Q    Uh-huh.

Are you saying that his wife wasn't pregnant?

A    Oh, no, she was pregnant.  I didn't see it, I just, I remember texting her because I don't think I ever really met Sarah.  I knew she was there, we communicated via emails and texts, but I

162

never really met Sarah.

Q     So were you, for lack of a better term, an absentee owner?

A     Oh, yeah, I lived in Costa Rica.

Q     How long have you been living in Costa Rica?

A     Since March of '22, way before I met Deo.

Q     You purchased something down there, did you?

A     Yes.

Q     And you have been a resident of Costa Rica since March of 2022?

A     Correct, permanent.  Well documented with Mr. Deo.  Even before we closed our deal, and I know you -- you claim I fled there, but I -- I've lived there before I ever met Anthony Deo.

Q     Have you represented to any of the courts that you lived in New Jersey, if you know?

A     I believe, 'cause I did, I owned a house there that I had to sell to

163

cover the cost of this fraud, but yeah, I -- I did.  I'm -- I'm a resident of the United States as well, or was a resident of the United States.

Q      Were there any monies paid at Superb to Anthony Deo that were authorized?  Was he on payroll?

A      Yes.

Q      Were the payroll checks authorized?

A      Yes.

Q      Was Sarah Deo ever on payroll?

A      Yes.

Q      Were those payroll checks authorized?

A      Yes.

Q      Were there any other monies paid to them, that you know of, that were authorized?

A      Yes, he was to receive 10,000 a month in the beginning until, I don't know, February.  We changed the deal where if the store was profitable, he was

164

able to get a -- a perk car for every car that we sold, but it was only if the store was profitable.

Q    And was that modification during or about February of 2023 in writing?

A    No.

Q    That was a handshake deal between you and Mr. Deo?

A    Yeah.  I remember we hadn't closed the deal.  I'm the -- the owner, so I wrote him checks, as we agreed, and I got my money, as we agreed.  There wasn't a contract because we hadn't really finalized our -- our original agreement, right.

Q    When Anthony Deo gave you $500,000 and executed some contracts during or about November and early December of 2022, did you reveal those contracts and that purchase money to your floor plan providers?

A    Did I reveal that he was a partner?

165

Q      Yes.

A      I didn't because he wasn't yet, and I did tell him NESNA, who's part of Nissan, that we were -- we were going to become partners, because they came after.  They already knew.  They came asking because he had taken an advance in November, even though the stores were shuttered from them, and they were concerned of how he was going to pay it back.  I discussed with them that maybe I could talk to him to see how he could arrange how he would pay that loan back, because again, at this point I think that he's going to be my partner and he's actually a good guy.

They asked me not to mention it because they didn't want him to get mad, and they went behind his back to tell me about this loan, and I found out later in April he took it upon himself to sign an ACH form, unauthorized, to take the money out of the Superb account to pay back his debt, so I think they were

166

pretty aware.

Q     So since November of 2022, is it your position that Anthony Deo never became an owner of Superb, is that your position?

A     Well, if --

Q     That's a yes-or-no question.

A     Yeah, he never became a partner.

Q     Okay.

And he never owned 49 percent of Superb; is that correct?

A     He never finalized the deal, no.

Q     So from your standpoint, it's your position since November of 2022 that Anthony Deo never became a 49 percent owner; is that correct?

A     Correct.  I believe I -- sorry.

Q     Did you at any point in time ask Anthony Deo for $500,000 to help your New Jersey operation?

A     To help my New Jersey

167

operation, no.

Q    Did you ever ask him for $500,000 related in any way to your New Jersey dealership?

A    No.

Q    In November of 2022, did you have any understanding that you were going to be supplying floor plans to Anthony Deo?

A    For which, for the new stores?

Q    Yes.

A    Yeah, if he finalized the deal, yeah.

Q    Did you ever actually supply any floor plans to any of those stores, yes or no?

A    For the two, on the Northshore and Sunrise, they were closed, no.

Q    Did you, during or about November of 2022, take $800,000 from Nissan for Superb or any of your other stores?

168

A    From when?  I'm sorry.

Q    During or about November of 2022, did you take $800,000 from Nissan to assist Superb or any of your other stores?

A    I took an $850,000 working capital loan from my new store, which is Nissan, which was part of the deal when we closed, and I never took anything from -- for Superb.  On the contrary, I paid down a very -- a very big advance that I had taken a year before by over $300,000, which is part of the agreement that we had.

Q    You paid down an advance that you had gotten from Nissan?

A    NESNA it's called really.

Q    Right.

      When you got the advance from NESNA, that was before November of 2022, right?

A    Like a year before.

Q    Yes, in November of 2022?

A    In November of '22 I think I

169

still had a balance of 981,000, and for Anthony to come in, I had to pay it down to 650 as per our agreement.

Q    The $850,000 that you took, you took from what company?

A    From -- from NMAC.

Q    From NMAC?

A    Yes.

Q    Did you tell Anthony Deo about that?

A    Why would I?  He had nothing to do with it.

Q    Well, it could impact the value of one or more of your businesses, couldn't it?

MR. KATAEV:  Objection.

A    What does that have to do with Superb?

Q    I don't know.  I'm asking you did it have anything to do with --

A    No, nothing, other than -- the only thing they shared was an aggregate floor plan line that was cross-collateralized.  The loan that I

170

had for Nissan had nothing to do with Superb.

Q        The NMAC $850,000 loan was not in any cross-collateralized through Superb?

A        No, it was strictly the -- for the Nissan store in Pittsfield.

Q        Massachusetts, yes?

A        Pittsfield, Massachusetts, yes.

Q        And the Pittsfield, Massachusetts floor plan was not in any way cross-collateralized with Superb?

A        Yeah, all their stores were cross-collateralized.  That's why the damage was so bad when he screwed me up in Superb because it affected all of my stores.

Q        Your offer to get floor plans for the stores, do you know when you made that?

A        As part of our agreement, I believe it might even be in a text or an email, that I would give him $2 million,

171

which I already had with NextGear.  I would just shift that floor plan line, and I would get another floor plan line as well once we finalized the deals.

Q      Do you remember when that was?

A      Probably in November, December of 2022.

Q      So that was from the get-go you were promising floor plans to Anthony Deo; is that right?

A      Yeah.

Q      And that's because he needed floor plans?

A      He needed it because Josh Aaronson had shut the floor plan lines for Northshore and Sunrise.  Again, I thought he was open and he needed floor plan lines to sell cars.  I didn't know his debt issues with DMV.

Q      When he was asking for floor plans from you, you thought he had already had floor plans?

A      No, I knew that they were

172

Josh's. His problem was that Josh was withdrawing the floor plan lines so he couldn't get any, so he came to me to see if I could get him any. So if finalized, the deal part of my responsibility was to help him get floor plan lines for the two stores.

Q       And you knew that if you finalized the deal?

A       Yeah.

Q       Who floored vehicles with Superb, floor plans?

A       Mostly Kendra but under Deo.

Q       But it was Kendra that did most of the flooring?

A       Uh-huh.

Q       But that's not all of the flooring, so who else floored vehicles for that store, did Bruce Novicky?

A       I mean, he could, but I don't think he did. I think because Anthony was buying all the cars, he was doing all the buying for that store. Initially it was Bruce, because we were supplying

173

basically all the inventory for him.  We didn't have a buyer, so we would supply the inventory from the other stores, but it was Anthony Deo's starting in November of 2022, Anthony started to buy cars, and he had authority to just put the cars on our floor plan.

Q    Which Kendra would do for him?

A    Well, if he bought a car he had listed on as a buyer if you buy the car, and as the buyer, they automatically will put it on the floor plan.  I don't think -- I don't think -- I didn't think she had to do anything, I think it automatically goes on.  If you take cars in, then somebody has to put it on floor plan.

Q    How many cars did Anthony Deo purchase starting in November of 2022 and ending on or about the night of the lockout, how many cars did he buy, roughly, for Superb in that time, do you know?

174

A        Hundreds.  I wouldn't know exactly the number, but if --

Q        Could it have been 500?

A        I mean, he was what's -- what's that, 7 months if he was selling 40 cars a month, 300, 400 --

Q        Okay.

A        -- maybe less.

Q        So you think in the time that Anthony Deo was with Superb, which was roughly the beginning of December through the end of July; would that be fair to say?

A        Correct.

Q        So that's eight months?

A        Uh-huh.

MR. KATAEV:  Verbal.

A        Yes.

I'm sorry.

Q        In those 8 months you think he bought 3 or 400 cars; is that correct?

A        Maybe less, because we had trade-ins and he bought some cars from other stores, so a couple of hundred, I

175

would think.

Q      So he bought 2 to 300 cars; is that correct?

A      I would assume.  It sounds like it could be.

Q      Do you know how many of those cars were sold by Superb, one-way or another, to whomever?

A      No, 150 cars, 200, 250 cars.  Something.  Something like that.

Q      So most of those cars were, in fact, sold by Superb; is that right?

A      Correct.

Q      And as to those cars, do you know of anything that Anthony Deo did wrong?

A      Yeah, he bought a bunch of gray market cars.

Q      How many of those did he buy?

A      I have no idea, but it's a good amount I had to pay off afterwards.

Q      What's a good amount, a dozen?

A      I don't know, 40, 50 cars.  I

176

don't know.

Q       So 40 or 50 cars are what you call gray market cars, right?

A       Correct.

Q       What do you mean when you say "gray market"?

A       Cars are not built in the US, they're built in either Mexico or Canada.

Q       And what is it that is wrong with that?

A       The banks don't finance them. There is -- there's strictly in our dealer agreement they don't finance gray market cars.

Q       Was Anthony Deo a part of that dealer agreement?

            MR. KATAEV:  Objection.

A       No, but it's, you know, he's been doing this for a long time, he -- he should know that.

Q       And was that something you have discussed with him?

A       I did after -- after the bank started to call us and wanting us to buy

177

back those cars because they didn't finance gray market cars.  Did I discuss it before, no, it's -- any decent car guy would know that, I guess.

Q    Was there anything else about the 200 to 300 cars that Superb purchased under Anthony Deo that he did wrong with those cars?

A    I mean, other than sell them to customers, not deliver them, overbook them, yeah.

Q    Okay.

There were customers at Superb who bought a car they never got?

A    Yes.

Q    So then what happened?

A    I had to pay all -- all of it off.

Q    So they never did get those cars?

A    Yeah, there was a few of those, otherwise, that I --

Q    How many is "a few"?

A    I don't know.  Again, we have

178

it in our complaint.  We can -- I can get you those.  All you got to do is read the complaint.

Q    Was it more than ten?

A    I don't know.  I don't remember the exact number.

Q    More than 20?

A    Again, I don't -- I don't know the exact number.

Q    Could it have been more than 30?

A    I don't know the exact number.

Q    Could it have been more than 100 that didn't get delivered?

A    Oh, no, no, no, definitely -- definitely not.  That didn't get delivered, no, there was maybe --

Q    I think you said a few?

A    Yeah, maybe 10, 10 cars, 15 cars that didn't get delivered.

Q    Do you know the names of any --

A    I don't.

179

Q    -- of those people?

A    No, I have a good memory but not that good.

Q    Where are the file jackets for those cars now?

A    In storage.

Q    Are all of the records for Superb in storage?

A    I believe so.

Q    Where is that storage?

A    Hartford.

Q    Do you have records for all of your cars stored in Hartford, Connecticut?

A    Different storage places.

Q    The Superb storage place is in Hartford, Connecticut?

A    Yes.

Q    Where is the New Jersey storage?

A    I don't know.

Q    Who would know?

A    Probably in New Jersey.

Q    Who would know?

180

A       I believe -- I believe it's one of my -- one of my guys that used to handle the inventory, handle all the storage of the ROs and --

Q       Records of the dealership?

A       Correct.

Q       Who is that?

A       Frank Messina.

Q       Is Frank still on payroll with you?

A       No, the stores are closed.

Q       Do you know where the records are for the Massachusetts store?

A       Probably near Massachusetts.

Q       Who would know about that?

A       Frank Messina.

Q       What about the Hartford store, where are those records, do you know?

A       I think I just told you, in Hartford.

Q       Why didn't you leave the Superb records in New York?

A       'Cause I, at the time, I had

181

dealerships, so I moved everything to a store so I didn't have -- have to go get a storage facility.  I could move them into my dealerships.

Q    So Anthony Deo you blame for your difficulty with all of your dealerships; is that right?

A    The collapse of them, yeah.

Q    Was there any mismanagement at any of those stores?

A    Before Anthony Deo, no.

Q    Well, you said there was trouble in the accounting department at least through the end of March of 2023, right?

A    Trouble in -- in trying to take -- to finalize, catchup, not any other kinds of trouble, just overwhelming, put it that way.  We grew quickly, and we changed dealer management systems, but other than that, it wasn't mismanagement.

Q    And all three of the other stores were profitable during the whole

182

time you had them; is that right?

A    Well, not after -- not after the Deo situation.

Q    Do you allege that Anthony Deo took money that was rightfully Superb's?

A    Oh, I guarantee it.

Q    How much?

A    Let's see, 500,000 ACH money from NESNA, about 300,000 in cash, 500,000 that went into the Flushing account from customers, another 2 plus, $250,000 worth of checks from Chase. Obviously, the cars that I paid for that he claims are not mine, but in -- in total, the losses exceed 5 million, but he pocketed about 2 and a half million, but he needed to create this -- this, you know, the money in the banks so he could hide what he was stealing.

So the banks also, the bank accounts always looked healthy because he was generating fake deals to put money into the bank, so we never dropped below

183

a number that would make me uncomfortable, and while he was pocketing all the deposits and cash.

Q    How did he create fake deals?

A    How did he create fake deals?

Q    Yes, was he creating fake documents for you?

A    From what I understand, customers would come in, and you know, have an intent of buying a car, they would do the credit applications, they'd do the whole deal, then he'd tell them the car was in the shop, he'd deliver it to them.  He'd submit the deal to the bank, one week, two weeks, three weeks, the customer's calling, Well, this happened, this happened.  By the time he left, some of those cars were sitting in shops that you -- you wouldn't deliver, and customers never got the car, and I had to refund them the money, and I had to pay off the loans that the banks had put on those cars.

Q    How many cars were sitting in

184

shops undelivered when Anthony Deo left?

A       I am -- I am assuming 10, 12. I don't know the exact number.

Q       And there was nothing wrong with those cars when they were sitting in the shops?

A       No, they were in shops because there was stuff wrong with them.

Q       And you think he should have delivered those cars notwithstanding that there were things wrong with them?

A       No, but in some of those cases the customers said they didn't want the car anymore and he never cancelled the deal.  He left the loans for me to pay after he left, and the customers continued to get bills.  So as soon as I found out all of the issues that we were having with gray market cars, I paid them off.  I paid anything off that anybody called that had a problem, so...

Q       What happened to those 10 or 12 cars that were in shops?

A       We eventually picked some of

185

them up.  I believe one didn't get picked up because it had a crazy bill on it or something.  I don't remember the details of it.  But if they were in shops, for the most part, we picked them up.

Q     Was there a repair shop at Superb?

A     No.

Q     So when cars needed work at Superb, they had to be sent out; is that right?

A     Correct.

Q     Who had authority to send cars out to get work done, did Bruce Novicky?

A     No, Anthony -- I mean Bruce could have if he wanted to.

Q     If he wanted to.  Whether or not he did it...

A     Yeah.

Q     Did Anthony Deo have authority to do that?

A     Yes.

Q     Did anyone else there have

186

authority to send cars out to get the work done?

A        Just the manager.

Q        Who was the manager?

A        Really should be Anthony, but Anthony could assign that to, let's say, the other manager, Eugene Lowe.

Q        Did Eugene send any cars, if you know?

A        You got to ask Anthony.  I wasn't there.

Q        You don't know if Eugene sent any of these cars?

A        I don't.

Q        How do you know then that it was Anthony that sent those 10 or 12 cars to the shops, could it have been Eugene?

A        I don't think so, but in the February 20th hearing, I believe both Merckling and Blankenship said that they were taking cars to shops for windows, for tires, so at somebody's direction.  I don't know who it was, but mostly Anthony.

187

Q    As far as you know, Blankenship and Merckling were performing services for Superb; is that right?

A    I never said they didn't. They said it's menial.

Q    They were driving cars to and from shops; is that a fair way of putting it?

A    Yeah.

Q    Did Superb have a tow truck?

A    No.

Q    Or a flatbed?

A    We bought two flatbeds, which were part of the injunction, right, because he kept those as well.  But we bought two flatbeds to do just that, move cars in between dealerships, and instead, Anthony made it part of the pain he caused.

Q    Those two flatbeds were at Northshore, did you know that?

A    They were at Northshore, yeah, he picked them up for me.

Q    Right, and when NMAC came and

*Rich Moffett Court Reporting, Inc.*

188

wanted to do an audit at Northshore because of whatever you reported to NMAC, do you know whether or not Anthony Deo cooperated with that audit?

A    Initially I believe the first audit he did, and after that he didn't.

Q    How would you know that he did or didn't cooperate with an audit from NMAC, did you speak to somebody from NMAC?

A    Bruce, I believe, did.

Q    So Bruce told you that Anthony was not cooperating with NMAC audits; is that correct?

A    I believe that's what -- yeah, I believe he did.

Q    Bruce also told you that he did cooperate with at least one audit, right?

A    Initially, yes.

Q    Do you know how many he cooperated with?

A    I don't.

Q    Do you know if the audit took

189

place at Northshore and 189 Sunrise, if you know?

A        Both, yes.

Q        So he cooperated with at least two audits, right?

A        Uh-huh.

Q        Is that right?

A        Correct.

Q        How many do you say that he didn't cooperate with, do you know?

A        I don't know.

Q        That's not something you know?

A        No, I don't know.

Q        Okay, Bruce Novicky would know?

A        Probably, yeah.

Q        Was Bruce Novicky authorized to deal with the floor plans?

A        Yes.

Q        Was Anthony Deo authorized to floor plan cars?

A        When he bought cars, yeah.  I mean...

190

Q     Well, it would have happened automatically, you said, right, when he bought cars?

A     So if he buys it, it gets floored.  It's his authority, right.

Q     But if it's a trade-in, could he put it on the floor plan, or would somebody else have to do that?

A     I mean, it's not something a general manager usually does, that's usually given to the office, and the office does that because they have to stock it in, they have to make a folder, they have to have keys.

Q     Do you know whether or not he floor planned any cars?

A     He -- he asked Kendra to floor plan cars.

Q     What access did Anthony have to directly deal with the floor plan companies, do you know?

A     I don't know.

Q     Did he have any authorization, that you know of today, to

191

deal with the floor plan companies directly?

A    I don't know.

Q    Did you authorize him to deal with the floor plan companies directly?

A    No, it was never something that would have been part of his job.

MR. THOMASSON:  Forgive me, I have to take another quick break.

MR. KATAEV:  Before you go, we're going to stop at 1:15 for lunch, right?

MR. THOMASSON:  All right, let's just break now.

(Luncheon recess was taken at 1:05 p.m.)

192

A F T E R N O O N    S E S S I O N

(Time noted:  2:15 p.m.)

R O B E R T    A N T H O N Y    U R R U T I A,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. THOMASSON:

Q    Mr. Urrutia, you said something this morning that I am not positive about, so I have to revisit it, and I want to understand something, at some point this morning did you tell me that Superb, at least during the time

193

that Mr. Deo was there, made about $1,200 per car, did you say something about that?

A    No, it's, you know, I was just using numbers, but he would tell me that we were averaging 3,000 a car, and it had ended up being 1,200.  This is not the specific number, it's the point I'm trying to make is that if you do 50 cars at 3,000, it's 150, at 1,200, it's 70.  It's a very big difference for projections for the month, right.

Q    And it's your position that he gave you incorrect information on what the dealership was making per car; is that right?

A    Correct.

Q    Do you now know what the dealership was making per car roughly?

A    Until it closed, yeah.

Q    What was that?

A    I don't remember the exact number.  It was losing money per car.  When we bought back all the cars?  The

194

reality or what the statement was showing, because there's two very big differences, right?

Q      Well, I am just wondering, when did Anthony Deo take over operations at Superb Motors?

A      Probably right around the middle of November, but officially December 1st.

Q      Was it official from December 1st?

A      Yeah.

Q      That was per your knowledge and authorization?

A      Yes.

Q      Was he there, to the best of your knowledge, beginning December 1st through the end of July with regularity?

A      No, not every day.  He was -- he was still bouncing between that store and the other two stores.

Q      And you knew that?

A      Yes.

Q      Were the dealerships'

195

expenses being met during the time he was there?

A      What do you mean, "being met"?

Q      Was the monthly rent being paid?

A      Yeah.

Q      Were the utilities being paid?

A      Yes.

Q      Was the insurance being paid?

A      Yes.

Q      Was data processing being paid?

A      Yes.

Q      Were the floor plans being paid?

A      Yes.

Q      Was marketing being paid?

A      Marketing consisted of the radio station with the Caribbean company. I mean, we had some marketing, but the majority of it was based on the Caribbean market prior to Anthony.

196

When Anthony came in, he started to do his own marketing. He wanted to do Car Gurus, and he was fine to do all of that stuff.

Q Was the marketing being paid?

A Yes.

Q Was payroll being paid?

A Yes.

Q How much did the monthly expenses add up to?

A I don't remember. It was probably in the high -- high 100s, low 200s.

Q So give or take about $200,000 a month in overhead?

A Right, correct.

Q And it was being paid the whole time he was there?

A Yes.

Q Did he ever put money into Superb, other than the $500,000 he gave up in November?

A He put money in when he double floored cars, and then he put

197

money in again, right, for the first time, which was February, and then he put money in again in July and took it right back out.  Again, double flooring of cars, so it's really his liability.  Some he created from his other dealerships, not that it was a Superb expense, but we, because it was my floor plan, we paid off the cars and then asked him to reimburse us the money that we paid off.

Q     You made the decision to pay off cars on the floor plans?

MR. KATAEV:  Objection to form.

A     I had to, it's my floor plan.

Q     Did you pay for all of them?

A     For all the cars?

Q     Yeah, that were on floor plans.

A     Yeah, up until the very end, Superb, all the cars got paid.

Q     During that year, again, you might have told me but it's hard to keep track of everything while I'm actually

198

also concentrating on the next question, was it NMAC only for 2023 that provided floor plans for Superb?

A    For Superb itself, only NMAC. The official, but I used others, yeah.

Q    In 2023?

A    Correct.

Q    You used other floor plan providers for your other dealerships; is that right?

A    To buy -- buy more cars, and the -- really the one they say used the most was Superb, because they were used cars, so I was -- we were outpacing the sales between all the stores, again, because it was an aggregate.  So if Superb had 2 million and Volkswagen had 2 million but Volkswagen was only selling 1 million, I could use the other million at Superb.  So it was an aggregate.

I also had another line for my wholesale which I used, and it was mostly for Superb because they had the majority of the used car, you know,

199

expense.  They had more expensive cars, more cars.

Q      So other than NMAC, were there other floor plan providers that you could obtain cars on for Superb?

A      No.  Well, NextGear and NMAC, but they wouldn't have been Superb's is what I'm trying to say.  I could obtain the cars, yes, yeah.

Q      Right, but I asked you just for Superb, it was only NMAC?

A      Only NMAC, yes.

Q      How long had Superb been floor planning with NMAC?

A      Early '21, I believe.

Q      Now, during or about December of 2022, there was a review that you received from NMAC regarding the floor plan for 2022, didn't you?

A      Yeah, it was from -- it was in November actually, just before we closed on the Pittsfield.

Q      And would that have been also just before you closed with Anthony on

200

those contracts?

A      Yeah, it would have been --
it would have been in November.  Yeah,
November.

Q      Did you give him that NMAC
review before he closed on those
contracts?

A      No.

Q      Was that NMAC review
positive?

A      No, it showed I was -- had a
guide, and I had to bring everything up
to guide to be able to close on the
Pittsfield store.

Q      I see.

Who supplied the numbers to
NMAC for that review?

A      It would have been Alysia.

Q      Alysia Cayer?

A      Uh-huh.

Q      Is that right?

A      Correct.

Q      Did she supply, to the best
of your knowledge, correct numbers to

201

NMAC for that review?

        A       No, there was a lot of money that she didn't account for that was coming in as receivables.  1.4 million to be exact.  That was an ERC receivable.

        Q       Do you know if that also happened for the profit and loss statement that was produced and that we looked at earlier from Thomas Jones, do you know if Thomas Jones discovered she did that again for that statement, if you know?

        A       No, I don't know.

        Q       Did you file tax returns for Superb Motors?

        A       I did.

        Q       Were they timely filed at all times?

        A       Yes.

        Q       So there was a tax return filed for 2023, yes?

        A       Yes.

        Q       And there was a tax return filed for 2022?

202

A    Correct.

Q    Now, that would be both state and federal, right?

A    Correct.

Q    Did you ever give those tax returns to Anthony Deo?

A    Why would I?

Q    I didn't ask you that --

A    No.

Q    -- I asked you if you ever gave them to Anthony Deo.

A    No.

Q    Didn't Anthony Deo ask you for the tax returns?

A    I don't believe he did.  He asked me for financial statements.

Q    And were there discussions between you and Anthony Deo for working capital?

A    Several times.

Q    Did you ever apply to Ally for a floor plan?

A    I think when we first opened Superb I did, I applied to Ally for a

203

floor plan.

Q    That would have been somewhere in the vicinity of 2021?

A    '21, correct.

Q    Was there any time or occasion that Joshua Aaronson asked you to help him with floor plans?

A    I never spoke to Josh Aaronson about any business or knew him before August 14th of 2023.  Never met him, never spoke to him.  Just the only reason we even know each other at this point and talked is because of what happened.

Q    Who initiated the conversation on August 14th of 2023?

A    Josh called me while I was on my -- on the phone with my attorney.

Q    What attorney were you on the phone with?

A    Emanuel.

Q    As of August 14th of 2023, how long had Mr. Kataev been your attorney?

204

A    I don't know how many years. Probably, I mean, he was my labor attorney since I opened, so 2020.

Q    I see.

Have you been paying all of your own legal fees for these lawsuits?

MR. KATAEV:  Objection to relevance.

A    What I've been able to pay. I mean, I owe Mr. Kataev quite a bit of money.

Q    Has anyone else been paying your legal fees?

A    No.

Q    Do you have any expectation of anyone else paying your legal fees?

A    No.

MR. KATAEV:  Same objection for this line of questioning.

Q    Do you have any idea how many cars were sold by Superb between December 1, 2022, and July 31, 2023, do you know how many cars were sold by Superb?

A    If I looked at a statement I

205

could tell you.  It wasn't what the statement said.  There was a lot of cars that were cancelled that weren't taken off the statement, but I've done the accounting at this point, but roughly, I don't know, an average of 45 a month, so do the math for -- for those months.

What the statement says, by the way, is not what actually was sold.

Q    So when you tell me 45 a month, is that a real number that you think Superb averaged during those, what is it, 8 months?

A    No, because it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits.

Q    So the number of car deals per month at Superb during those 8 months was less than 45 a month; is that what you're saying?

A    Once you back out the unwound deals, yes.

Q    Do you know how many fewer

206

cars per month Superb actually sold?

A    On average, maybe, if you average them out, seven or eight less for the year, but the majority of that -- those unwound deals were between April and July, so those four months, the average would have been much less than what we actually showed.

Q    Well, if it was seven or eight deals that got unwound for the year --

A    No, average per month we said.

Q    Per month were unwound, but that was for the year, so on average, instead of 45 cars per month, Superb actually only sold about 38 a month; is that right?

A    Yeah, 37, 38.

Q    Do you have any idea what the average was per car that Superb was making on those, let's round it to 40 cars a month, do you have any idea what Superb was grossing on 40 cars a month?

*Rich Moffett Court Reporting, Inc.*

207

A        Including the fraud or what they were showing?

Q        I am just asking you for whatever Superb actually took in per car on average for 40 cars a month, what was Superb grossing?

A        Negative -- negative 125,000.

Q        Per car?

A        No, no, I'm sorry, divided by 38 cars.  Each car was about a negative $3,000, I guess.

Q        So Superb made no money from December 1, 2022, through and including July 31, 2023; is that correct?

A        That's correct, yes.

Q        Superb only lost money during that time; is that right?

A        Yes.

Q        So how was the $200,000 in overhead getting paid every month?

A        From cars that were being fraudulently booked through the banks and creating false profits, and you know, they started to unwind a few months

208

later.  It really all came down to April to July.                    December to March we were covering the way we normally would.  We had -- we had operating capital.  There's a guide for each store.  The manufacturer requires you to have $500,000 in working cap, and every time they do a review or an audit, which is when you're talking about, they look at your guide to see if you're within guide or out of guide, so we kind of burned through that $500,000 through March.  So the next audit was actually in March, and it said we had gone under guide.

Q     And the $500,000 that you burned through between December 1st and March, was that the $500,000 that Anthony Deo gave you?

A     No, I put in $300,000.  The $500,000 Anthony Deo gave me he lost in profits between December and February.

Q     Well, I'm not asking for that.                    Where did the money

*Rich Moffett Court Reporting, Inc.*

209

go that he gave you, did it go right into the business?

A    Yeah, well, $300,000 went in as a loan for me.  He gave it to me.  I owned the business, right, he gave it to me, and I put it back into the business as an operating capital.

Q    $300,000 it was?

A    Correct.

Q    What did you do with the other $200,000?

A    I don't remember.

Q    But you kept it for yourself?

A    Yeah, I believe -- well, I had to -- I had to write down the inventory at 6, 700,000, I don't remember the exact amount, and I had to pay down the NESNA loan, so that was another 300,000 something.  So I didn't keep it, I used it to pay down the debt of the store as agreed with Anthony for him to go into a store that wasn't carrying the overage of all the cars from COVID.  You do remember that, right, that people were

210

paying $25,000 for a $17,000 car because there was no inventory?

Well, Anthony came in, that was towards the tail end of that, I took all those hits, I took all those losses, because it wouldn't have been fair for Anthony to take them, right?  So I took the money, and I bought down all the inventory so he had a fair shot at selling cars and making money.  Does that explain it for you?

Q     Were there any legitimate deals during that time?

A     I'm sure there was.  I mean, we do have clients.

Q     Did the number of leads grow at all when Anthony and Sarah came into that business?

MR. KATAEV:  Objection. Relevance.

A     Well, they grew compared to the couple of prior months.  When -- when I was partners with Bobby Clark, we had a lot of leads coming in, because he had

211

120,000 of marketing going into radio. Most of those clients were Caribbean, of Caribbean descent, and we had a ton of calls and we had a ton of leads, more than we did after Anthony.  But the few months prior while we were, you know, negotiating how Bobby Clark would be -- get out of the business, we really weren't marketing, we really -- we really were deciding what we did with the business.

Q    Is it possible that when Sarah began working on leads for Superb, that there was an average of about 100 a month, is that possible, when they first came in?

A    It's possible.

Q    Do you know if the leads went up to $4,000 a month, if you know?

A    I have no idea.  I know he generated a lot of leads based on the way he advertised.

Q    I think I may have asked you, but again, I just can't remember --

*Rich Moffett Court Reporting, Inc.*

212

A        No worries.

Q        -- seeing the forest from the trees sometimes in the middle of these moments.  Did Anthony Deo put any money, other than the $500,000, into Superb?

MR. KATAEV:  Objection. Asked and answered.

A        As I said, to cover previous, I guess, deficiencies he created by double flooring.

Q        For whatever reason, did Anthony Deo put money into Superb, other than the 500,000?

A        So I am going to repeat myself.

Q        Is that a yes?  It's a yes-or-no question.

A        He gave us back the money that we put in for him, so no, I guess the answer is no.  He was paying me back money that we laid out for him.

Q        Well, you're talking about nets here, I'm talking about did Anthony Deo cause money to go from some account

213

that he controlled back into Superb, yes or no?

MR. KATAEV:  Objection.

Q     And then I'll ask more questions about that if the answer is yes.

MR. KATAEV:  Objection. Asked and answered.

A     So --

Q     Is that yes?

A     -- two times he put in some money, yes.

Q     Do you know how much?

A     One was 75,000, he took it right back out.  I mean within, I think, the same day, so that was one time.  And the other time, probably around the same, 70 something, if I could remember.  I'm not 100 percent sure, but I think it was, like, 70 something thousand.

Q     Did he write any checks to himself at Superb?

A     No, Northshore Motor Leasing through -- to the Flushing Bank account,

214

which was opened against a TRO, from what I found out afterwards.  So he wrote himself a check, and he would cash it through the Flushing Bank account.

Q    The Flushing Bank account that was opened you believe was opened in violation of a TRO?

A    Oh, yeah.

Q    Okay, I understand.

What TRO was that?

A    Gianelli, I believe, right? And December 14th, '22, to June of '23, and the bank accounts were open in March. That seems to fall into that timeframe.

Q    Do you possess the titles and keys to the injuncted cars?

MR. KATAEV:  Objection. Relevance.

A    I don't know.  I might.  I don't know if -- I think the ones that are leftover maybe NMAC, or they might have sent it to me.  I don't know.  They did send me titles to the ones I sold. They might have sent me some, if not all,

215

of the titles of the ones that are injuncted.

Q       So those titles are in whose name at this time?

A       Superb.

Q       Did Anthony Deo give you any tax returns in November of 2022 that showed that he was the owner of Northshore Motors?

A       No, he gave me a financial statement.

Q       Have you since seen those tax returns?

A       Yes.

Q       Did he show you any tax returns in November of 2022 that indicated he was the owner of 189 Sunrise?

A       No.

Q       Have you since seen any of those tax returns?

A       Yes.

Q       And you are aware that those tax returns were filed indicating that

216

Anthony Deo is 99 percent owner of both of those companies, did you know that?

A     I know this case well, so yes.

Q     So you spoke with the FBI and with the Nassau County Police about this case, right?

MR. KATAEV:  Objection. Asked and answered.

A     Yes.

Q     Were there any other law enforcement agencies that you spoke to besides those two?

MR. KATAEV:  Objection. Asked and answered.

A     Internal affairs.

Q     That's part of Nassau Police Department, right?

A     Then that's it.  I mean, I guess, district attorney's office.

Q     When was the last time you spoke to anybody in connection with law enforcement regarding all of this?

A     November of '24.

217

     Q     So just after the complaint sitting there was filed was the last time you spoke to law enforcement; is that right?

     A     Correct.

     Q     Have you reached out to law enforcement since then, since November of '24?

          MR. KATAEV:  Objection. Vague.

     A     As far as what?

     Q     Have you contacted law enforcement since then to discuss this case?

          MR. KATAEV:  Objection. Vague.

     A     Yes.

     Q     But you haven't spoken with them since November of '24, right?

     A     Correct, I reached out to them and communicated with them, but that's it.

     Q     You left messages or something that weren't returned; is that

218

it?

A     Oh, no, asked for more updates and gave them updates.

Q     So you have spoken with law enforcement?

A     I've communicated with them, yes.  I haven't spoken to them.  Emails.  I thought you meant came in and spoke to them.

Q     I understand.

A     I've updated them.  They don't really talk back.

Q     So you have sent information to law enforcement since November of 2024; is that right?

A     Oh, yes.

Q     But you have not heard back from law enforcement since November of '24; is that correct?

A     I've heard back from them just, "Thank you for the information."

Q     All right, just a perfunctory thank you.  There's been no substantive communications from law enforcement to

219

you since November of 2024, correct?

    A    Correct.

        MR. KATAEV:  Objection to the line of questioning.

    Q    So have you told me everything you think that Anthony Deo has done wrong to you today so far, right, that you know of?

    A    Well, the group, yes.

    Q    And you have told me everything that you think I've done wrong to you so far today; is that right?

        MR. KATAEV:  Objection to this line of questioning.

    A    We didn't get into specifics, but everything that I've gone through, yes, I think you're all responsible for it.

    Q    Are there more specifics that you think I have done wrong that you haven't already mentioned?

    A    I think it's pretty clear in the record all the things that I think the group has done.

220

Q       I'm not asking you that. Have you told me today with as much specificity as you can as to what I have done to you wrong?

MR. KATAEV:  Objection. Asked and answered.

A       You are part of the group, and you have knowingly helped them in -- and communicated and lied, and I mean, I don't know what else you want me to tell you.  You have a job -- you have a job in the organization, right?

Q       Okay.

A       And yours, you performed and everybody else has performed their job in this criminal organization that you guys run.

Q       You think I have been dishonest in the way I have conducted these cases?

A       1,000 percent.

MR. KATAEV:  Objection.

Q       Is there anything else with specificity that I have done to you

221

besides that?

                    MR. KATAEV:  Objection.
          Asked and answered.

          A        You -- you -- you helped the
group do everything that was done to me.
You have a specific role and a job, and
you've done it, and everybody else has
done their job in their role to get us
where we are today.

                    And you have done it not just
to me, you've done it to Josh, you've
done it to another dealership, and now
you have another open dealership, I'm
sure in a few months that will be the
case, and if not, I know what you put
that poor guy, the landlord, through.
You have another case with him accusing
him of stuff.  I know that the house that
you supposedly owned, you did something
to that poor lady for a half a million
dollars' worth of rent.  Not you, that
one not you specifically, but just I know
there is a lot of stuff that seems to be
-- be what's done.

222

Q    What I am trying to figure out here is are there any specifics that you know that I did outside of these legal cases to harm you?  That's all I'm asking.

A    You facilitated knowingly what -- what has been going on.

Q    And you have firsthand knowledge that I knew what Anthony Deo was doing at Superb; is that your position?

A    You were -- you were in the dealership, you had an office in my dealership that I didn't know anything about, right?

Q    Do you know when that started?

A    So you were there for the day to day.

Sometime in July.

Q    Right, about two weeks before the August 2nd lockout, I was given an office at Superb; is that what you're talking about?

223

A    Do you know when most of the damage was done?  It was all setup between April and June, and when everything was really -- the big damage was done was all in July.  You were present at that dealership when most of the damage was done on the way out the door.

Q    So during those two weeks, you had security footage of when I would be coming and going from that dealership, correct --

A    No.

Q    -- at that time?

A    I -- I -- I didn't say I had security footage.  I just said I know you were there, everybody saw you there, people, salespeople.

Q    Weren't there cameras that you said were filming on that property?

A    Yes.

        MR. KATAEV:  Objection.
    Asked and answered.

A    I said I haven't seen them.

224

Q    But you know right now that in July of 2023 there was camera footage that would have shown exactly how many times I was in and out of that office, do you still have that footage?

A    I don't have that footage.

MR. KATAEV:  Objection. Asked and answered.

Q    You don't have that footage; is that right?

A    Correct.

Q    Why is it you don't have that footage?

MR. KATAEV:  Objection.

A    I have enough testimony of what this case is about, which is stealing of the cars, moving to Northshore, emptying the lots.  I then got -- I wasn't looking for somebody who came in and broke into a car.  I knew it was going on because I had a lot of people working there who saw you, who saw what was going on, who saw the lots being emptied who can testify, every single

225

one, can testify who handled the money, who had access, who took the money to the bank.  So I need to go look at it on camera?

Q      Do you have anyone who has told you that I took money to a bank?

A      Again --

Q      That's a yes-or-no question, Mr. Urrutia.  Did anyone tell you I was taking money to a bank?

A      No, that was Marc.

Q      Did anyone tell you that I was modifying cars?

MR. KATAEV:  Can you please let him finish the answer to his question?

Q      Yes or no?

A      No.

Q      Has anyone told you that I was taking money out of your bank accounts?

A      No.

Q      You don't take the position that I was doing any of those things, do

226

you?

MR. KATAEV:  Objection.

Q    You just say I was helping Anthony Deo somehow, right?

MR. KATAEV:  Objection.

A    Again --

Q    That's a yes-or-no question as well.

A    I think I clarified this is a scheme, and you did your part in the scheme.

Q    Okay, so --

A    There are plenty of checks of my money that went to you.

Q    What's "plenty"?  How much is "plenty"?

A    I would say, I don't know, an average 10 to 15,000 a month for several months.

Q    Ten to fifteen thousand a month for several months I got from Superb Motors; that's your position?

A    Not from Superb, from Car Buyers, and every dollar that went into

227

that account came from Superb.  The money went from Superb in the Flushing Bank account and from the Flushing Bank account directly to Car Buyers and then to you and DLA Capital and everybody else.  I mean, I have the checks, they're signed, this isn't me.

Q    Do you think that I know where the money was coming from that went into Car Buyers?

MR. KATAEV:  Objection.

Q    That's a yes-or-no question. Do you think I knew --

A    Again --

Q    You don't know, do you?

A    I don't know how many times I have to --

Q    You don't know if I knew where the money was coming from from Car Buyers, do you?

A    No, I don't know.

Q    Do you know if I was doing any work for Car Buyers?

A    I don't know.  I know you

228

received a lot of money from them.

Q    And that was all prior to August 1st of 2023; is that right?

A    Yes.

Q    To the best of your knowledge, did I sell any cars at Superb?

A    No.

Q    Was I involved in any way with car sales at Superb?

A    No.

MR. THOMASSON:  I am going to take a brief break here for two minutes.  I have to speak with Mr. Deo.

MR. KATAEV:  Off the record.

(Recess taken.)

MR. THOMASSON:  I won't be much longer.

MR. KATAEV:  Take all the time you need.

BY MR. THOMASSON:

Q    Can you please tell me, Mr. Urrutia, how Michael Laurie harmed you?

229

A       Michael Laurie was there from the first day.  He probably --

Q       From the first day of what?

A       That I met Anthony Deo, first day.  And he was there, I think, at every meeting.  Maybe he missed one of the times I met Anthony, and maybe I met Anthony all in all, I don't know, seven to ten times, and he was always there.  Anthony Deo barely spoke, Laurie did 80 percent of the speaking.  He was his concierge, you know.  He advised him, and he was, like, a silent partner.

As a matter of fact, I think in several texts it said that he was the one that is going to get him the 500,000.  Michael Laurie introduced, I think, Anthony to Flushing Bank.  Michael Laurie raised the first hundred thousand.  Michael Laurie is all over the place, and actually, Michael Laurie had a lot of communications, especially in the beginning with us, as far as he was going to be helping, you know, bring this all

230

together because he had a vested interest and that he was Anthony Deo's partner, and Anthony said he didn't do anything without Michael Laurie.

Again, it surprised me because in the beginning I would -- I would have a meeting and Michael Laurie, who I didn't even know, was coming to the first meeting, would pretty much handle the whole meeting, 80 percent of it. It was me and Michael Laurie, and I'm saying, you know, "I am partnering with you, right?" Again, he held his role, I think he's part of the brains of the organization that you guys have, and I think he's -- I think he's been convicted for stuff like this before too, or at least was involved in stuff like this with the banks before. So you know, I think he's very, very involved in all of it.

Q    Have you now told me everything you know that Michael Laurie did to harm you?

231

MR. KATAEV:  Objection.

You can answer.

A       Again, it's everything that you all have done, right.

Q       I'm just asking you if there is any specific thing that you haven't yet told me, is there any specific thing that you have not yet told me that Michael Laurie did to harm you?  That's a yes-or-no question.

A       I guess I have told you everything.

Q       Is it true that you have told me everything that you can think of with regard to all of the so-called Deo defendants and the harm that they have caused you, have you told me all of that today?

MR. KATAEV:  Objection.

A       I mean, there's a lot more in the record.  I have answered the questions you have asked me.

Q       Is there any harm that any of us have caused you that you have not

232

already told us about?  That's a yes-or-no question.

A    I would say no.  I would have to go through 27 volumes that this case is to remember every single thing that I -- I know you've done.  I don't know if I mentioned all of them at this particular case.

Q    But all that you can think of you did already tell me about today; is that right?

A    What I can think of, yes.  Yes, there's probably a lot more.

MR. THOMASSON:  Okay, I have nothing else to add at this time.

MS. RONNEBURGER:  I have some questions for Mr. Urrutia.

I think it's probably easiest to share the exhibits if I do the same thing, Emanuel.

MR. KATAEV:  Are you asking me to just jump on the Zoom here?

MS. RONNEBURGER:  I am trying to do it here.

233

MR. KATAEV:  I'm happy to do it if you need me to.

Jeff Ruderman, Jeff Cianciulli, will you have any questions for the witness?

Okay, I guess not.

*          *          *

EXAMINATION BY
MS. RONNEBURGER:

Q     Good afternoon, Mr. Urrutia.

A     Good afternoon.

Q     How are you?

A     I'm good.  How are you?

Q     My name is Ariel Ronneburger. I am from the law firm Cullen & Dykman, and we represent Flushing Bank in this action.  I have a few questions to ask you today about your claims against Flushing Bank.

You had testified earlier that you were working with David Weinstein at Flushing Bank on an application for an account; is that correct?

234

A    Correct.

Q    Did you ever speak to David Weinstein about Anthony Deo?

A    I did.

Q    What did you say?

A    He asked me if he could share information with Rob Puccio for the Superb account, and I told him he could.

Q    And who is Rob Puccio, if you know?

A    He's a VP, one of the VPs, and the person that was working with Anthony Deo.

Q    At Flushing Bank?

A    Yes, at Flushing Bank.

MS. RONNEBURGER:  I am going to mark, I guess this is Defendants' Exhibit W, because you had through V, but I wasn't sure where you ended.

MR. KATAEV:  No, his exhibits were references to the exhibits in his complaint.

MS. RONNEBURGER:  Let's make

235

this Flushing 1.

(Flushing Exhibit 1, Text Messages, marked for identification.)

MR. KATAEV:  Let's proceed.

Q     Mr. Urrutia, have you ever seen this text?

A     Yes.

Q     Is it the one you were just referencing that we discussed, you said you spoke to him and --

A     Yes.

Q     Did you ever identify Anthony Deo as your partner to David Weinstein?

A     I did.

Q     Why?

A     Because we -- that was the plan from December.  We never finalized our deal, but we were working towards opening up those two stores and being partners.

Q     But according to this text message, you represented to David Weinstein of Flushing that Anthony Deo

236

was your partner?

A      And I understand that, and I don't think I said he wasn't, but he wasn't 100 percent owner of Superb, correct?

Q      Correct.

A      So I don't, if you open the account at 4951, I have no issues.  You still would have had to ask me about the majority, correct, so nobody asked me, and it was opened as 100 percent without ever asking me.  I knew nothing about this account.  I started the opening of the account with David Weinstein.

Q      So did you ever send David Weinstein any documents?

A      Everything.

Q      Did you personally send David Weinstein documents?

A      Bruce Novicky did.  I might have.  But I did have Bruce Novicky send my tax returns, my tax returns for all my businesses, all the operating agreements for all the stores.  We sent them

237

everything.

Q     Have you seen those emails?

A     Yeah, I've seen everything, including your discovery, which is substantial.

Q     You believe that you produced an operating agreement from Superb to Flushing Bank?

A     I produced, I believe, just the -- the filing receipt, and there's one other piece of paper.  Oh, the filing receipt and the EIN.

Q     What documents do you believe that you gave to David Weinstein?

A     I mean, everything he asked me for to open an account.  I don't remember exactly, because some were LLCs and some were S corporations, so they required different types of documents, but in all of those documents, the only name that appeared was mine.

Q     But you personally may not have provided him with these documents?

A     No, but I was copied on the

238

email.

MS. RONNEBURGER:  I am going to mark as Flushing 2 this document.

(Flushing Exhibit 2, Email Chain, marked for identification.)

MS. RONNEBURGER:  I just want to confirm, Flushing Exhibit 1 was produced as Superb 000497 through 498.  Flushing 2 was 000491 to 000492.

Q    Have you seen these emails, Mr. Urrutia?

A    I have.

Q    Are you copied on these emails?

A    These emails, no.

Q    What are these emails?

A    I think it was request for additional paperwork.

Q    It was sent to who?

A    To Bruce.

Q    And they are from Leslie Cusano at Flushing Bank?

239

A        Correct.

Q        A moment ago you told me you were copied on the emails between Flushing Bank where they were providing documentation; is that correct?

A        This is a request, I was copied where we actually sent the documentation, where the tax returns were attached.

RQ            MS. RONNEBURGER:  I would ask to the extent those were not produced, that you produce them.

We'll double-check, but to the extent his actual emails from his Gmail were not produced, we would ask to see them.

MR. KATAEV:  Sure.  You'll follow up in writing?

RQ            MS. RONNEBURGER:  Yes.

On Flushing 1, this text cuts off mid text.  It says, "I wanted to follow up with you in more detail about our call yesterday.  I sent you an email.  The details are

240

there.  I also wanted to tell you that you should open a," and then it stops.  We'll follow up in writing, but if you could produce the substance of that email.

MR. KATAEV:  Sure.

MS. RONNEBURGER:  Thank you.

A    For which one?

Q    It was Flushing 1.  It just cut off mid text.

MS. RONNEBURGER:  I am going to mark this as Flushing 3.  This particular document was produced as Deo 0000487 through 89.

(Flushing Exhibit 3, Email Chain, marked for identification.)

Q    I will just give you a couple of moments.

Mr. Urrutia, do you recognize this email?

A    I do.

Q    On March 30, 2023, you told Robert Deo that you had already started the process a few days ago with Dave

241

Weinstein from the bank, you know him well; is that correct?

MR. KATAEV:  You said Robert Deo.

MS. RONNEBURGER:  I'm sorry, Anthony Deo.

A       Yes, I did.

Q       That process refers to the application process we just spoke about?

A       Yeah, opening of the accounts.

Q       Did you actually complete an application, if you know?

A       I know we were very close.  I know it was taking a long time.  I chose at the end not to, but I don't know if we submitted everything.  But around then we started again in August where they were going to actually come out with the dealerships, and the day of or the day before is when I opened the drawer and found all the statements.

Q       You knew Dave Weinstein previous to this process?

*Rich Moffett Court Reporting, Inc.*

242

A    I knew -- I knew -- not before. Michael Morgan is a good friend from the car business, and he introduced me to him, and he said he was wonderful, that he had a great relationship with him, so that's where I knew him well, because Mike Morgan has a great relationship with him.

Q    But you didn't know him well personally?

A    No, no.

MS. RONNEBURGER:  I am going to turn to what Mr. Thomasson had marked as Exhibit L previously.

MR. THOMASSON:  Are we on the first page of that Exhibit?

MS. RONNEBURGER:  Yes.

Q    It's an email from Anthony Deo sent Monday, April 3, 2023, at 11:45 a.m. to Bruce Novicky and to you, Mr. Urrutia.  Do you recall this email?

A    I do.

Q    In this email it states David Weinstein didn't have any of the

243

information for Superb to send over to Rob. Previously you had testified that either you or someone on your behalf had provided information to Mr. Weinstein, correct?

A     Correct.

Q     Did this surprise you to see Mr. Deo say this?

A     It did.

Q     Did you reach out to Mr. Weinstein and ask why he didn't have this information?

A     I believe he might have sent me an email and asked me if it was okay to share again, not just a text, but I think it was also an email. And at this point, I think at some point Anthony Deo said that he knew people in the bank and had them in his pocket and could rush it because I'm going to be opening up a commercial account, takes forever, you know, they want, you know, your DNA, your everything. And he says, "Well, I know I have somebody in my pocket, the

244

underwriter and the VP.  You know I can get it done quickly."  And you know, that was a conversation.

I know at some point Bruce called me, he says, "You know Anthony says he still hasn't gotten the information."  I said, "Just send it to him."  But again, it's a filing receipt and some other pieces.  I know it was two pieces of paper.  It isn't -- I know there is a Know Your Customer, right, especially with the amounts of money we're talking about.  Going through the accounts, I mean, I didn't think that was something that was created, which is Anthony opening an account as 100 percent owner without me knowing and having full control of.

Q    Well, to that point you have stated that you didn't know Anthony was opening an account; however, did you, in response to these emails from Anthony, forward him the information he was asking for?

245

A        I didn't, but I think Bruce might have.

Q        Why was Anthony, Mr. Deo, provided with that information?

A        Because we thought he could maybe move the opening of the accounts along just because.

Q        Did you ever open an account with Flushing Bank?

A        I didn't.

Q        But you understood Mr. Deo to be working on opening an account with Flushing Bank?

A        I did.

Q        Did you ever follow up with him on that?

A        No, because I chose not to.

Q        Why?

A        So we were with Chase Bank, and at one point I was buying another dealership, and an investor came in and gave us money, and they froze the account, I mean, for, like, a few days, which in a car dealership, if you could

246

imagine.

Q       I understand.

A       So they had questions about the investor. Turned out the investor was a Chase customer, and I was upset because it caused my dealerships a lot of problems. I'm like, "Dude, we got to move another account." Because Chase, you know, is -- is -- is very strict in a lot of this stuff, and that caused a lot of issues. So that's the reason I chose to even look at another bank.

I told Mike Morgan, Mike is like, "You should try Flushing. We have a great relationship, they're phenomenal. They do all of my business." And so that's when I reached out to Dave and I said, "Listen, you know I want to open all the bank accounts." I resolved the issue with Chase, and then I chose not to open the accounts and stay with Chase.

Q       Did you convey that to Mr. Deo?

A       I don't think so.

247

Q       Did you tell him not to open an account with Flushing Bank?

A       Bruce told him we weren't opening accounts anymore.

Q       Do you know when Bruce told him that?

A       I believe, like, right at the very beginning of April.

Q       If you know, would that have been a written communication --

A       Would that be --

Q       -- or spoken, if you know?

A       I'm not 100 percent sure, but I think I have seen an email or some communication where it says don't, you know, what I told Bruce, you know, maybe even David, you know, we're not going to go forward with opening the accounts.  It might have been David actually I told that to.

Q       Did you at any point, upon learning of the opening of the Flushing account, reach out to Flushing Bank?

A       I did, the very day.

248

Q        Do you know what date about that was?

A        The 9th, August 9th, I believe.

Q        Who did you reach out to?

A        Dave Weinstein.

Q        What did he say?

A        He forwarded me everything he had on the accounts within minutes.  I called him, I told him what happened. He -- you could tell he was thrown off by it, because we were working on opening accounts, including Superb, and I was, I'm like, "You're making me go through all these circles."  Meaning, while you didn't tell me there was a Superb account opened, and he, like, stuttered.  I said, "I need everything that you have on that account."  And he did, he sent me everything.  He sent me the signature cards, he sent me the -- all of the statements.  I got them from -- I believe I have them in an email directly from him.

249

Q       If you know, did Flushing Bank take any action on those accounts after that?

A       Yeah, they started, you know. I only know what you sent in discovery what internally happened.  Within a couple of days it seemed like David was, like, you know, didn't -- I mean, obviously, it created a lot of issues for him, and all of a sudden, he didn't want to talk anymore.  But you know, after that it was all discovery.

Q       Did you reach out to Mr. Deo at that time?

A       No, I stopped talking to Deo on the 3rd, after what I saw he left behind, you know.

Q       August 3rd?

A       August 3rd is when I found out, yeah, that he had robbed us blind.

Q       2023?

A       Yeah, yeah.

Q       Do you currently have any accounts with Flushing Bank?

250

A        I don't.

MS. RONNEBURGER:  Flushing 4.

(Flushing Exhibit 4, Text Message, marked for identification.)

MS. RONNEBURGER:  Just for the record, this was produced as Superb 000122.

A        Okay.

Q        Mr. Urrutia, have you seen this text message?

A        I have.

Q        If you know, who was this text message directed to?

A        This was Anthony Deo sending it to Bruce Novicky.

Q        In this email, and I think you spoke about it before, the text, it says, "I have my personal banker ready to open the Superb accounts with Flushing Bank.  He will get me a 500,000k line, also."  Did you ever ask Mr. Deo anything about this representation?

A        That he could get the

251

500,000, no.  He might have spoken to Bruce, but not me.

Q      Did you tell him he could not open an account for Superb Motors?

A      No, I didn't.  I didn't tell him he could.

Q      Well, here he stated to Bruce Novicky, "I have my personal banker ready to open the accounts for Flushing.  He will get me a 500k line, also."

A      Okay.

Q      Did this raise any concern for you?

A      No, David Weinstein was offering me the same thing.  He told me if I wanted a $500,000 line of credit, that he could get me one.

Q      But you did not tell Mr. Deo he could not do this?

A      I didn't ask him to open a 500,000 line, nor did I open -- ask him to open a bank account.

Q      When did you first become aware of this text message, if you know?

252

A        Sometime in April probably.

Q        April 2023?

A        Yeah, Bruce -- I don't know that I saw the text as much as he called me.  Bruce called me and said, "Hey, Anthony says he's got people at the bank that can move it along, and he can get us a $500,000 line."  So I might have said, "If you can get them, then send them the," what do you call, "the receipt."  Whatever, filing receipt, the whatever, the paperwork.

Again, all of that would have been if he could get it done with David is a bank, he knows all of the information from my dealerships.  It wasn't, "Open a bank account for Anthony Deo at 100 percent ownership," you understand.  It's not -- it's not -- nowhere is it even close to being said anywhere to go ahead and open the account and be 100 percent owner.

Q        But you did not object to Mr. Deo speaking to Flushing Bank

253

directly?

A    To ask to rush the process, yes.

Q    Did you ask to be copied on those communications?

A    No.

Q    Would you generally ask to be copied on communications?

A    Bruce would normally copy me on anything important.

Q    So if Bruce, as we spoke about, would copy you on providing information to the bank, you did not ask Mr. Deo to copy you on providing information to the bank?

A    No, at that time Bruce and Anthony were really working more together than me.  I -- I got more involved towards the end of the month as we started to figure out where these dealerships were going to end up, but I mean, Bruce was my chief operating officer, and you know, anything that he thought he needed to check, he did.  But

254

some stuff, simple stuff, he didn't always communicate it until the decision was made.  Right, "Hey, we got a bank account ready to go."

"Oh, okay, open it.  Oh, you know what, don't open it," right, or, "I'm taking a $500,000 loan."

"Okay, send me the paperwork," or, "Take the loan.  Don't take the loan."

Q     Do you know if Bruce ever had any communications with Anthony Deo about the account at this time?

A     I didn't think it was to this extent, right.  It wasn't anything -- anything further than this.  It wasn't, Go ahead open it.  Go ahead take the loan, you know.

And certainly, Anthony never communicated to him or me that he did open it.  That would be the next part of it, okay.  So we're trying to open an account, Anthony has somebody that can help him move it along.  At some point,

255

"Hey, the accounts are open."  Where is that email?  Where is that text?  It never happened.

Q    Before you said you stopped opening these accounts because you resolved the issue with Chase Bank.  You may have said this.  I'm sorry.  Do you know when about you resolved that issue with Chase Bank?

A    Probably towards the very end of March.  The transaction, you know, three days again in dealerships shutting down a bank account is a little nerve-wracking, so I wanted to have almost a second option.

But then, you know, last minute it was starting to get difficult, it was starting to be a process.  I said just -- just let it go.

And -- and on top of that, we decided not to buy the dealership that we were going to buy, so I gave back the money to the investor.  I'm -- I moved on with life.

256

Q      Well, you resolved it in March 2023?

A      Yeah.

Q      This text is dated March 31st.

A      Yeah, between March and April.  There is an APA.  I was going to buy Route 22 Nissan, I have an APA.  You know, last minute I decided not to.  We were -- we were in -- in the middle of a purchase and somebody else came in with, I guess, a better offer, and I saw the opportunity to actually back out of the deal because I -- I thought we were taking on too much.

Q      And you believe it was conveyed to Anthony at this time that you no longer needed the Flushing Bank account?

A      I believe Bruce did, yes.

Q      In April or March of 2023?

A      Correct.

Q      But you still continued to provide him with information after that

257

time, or that was previous to that?

     A     No, the last information that was sent to Anthony was probably around the 2nd or the 3rd, which was that paper which -- which David already had.

     Q     That was prior to the issue being resolved with Chase?

     A     I'm sorry?

     Q     That was before the issue was resolved with Chase?

     A     I don't remember if the issue was resolved before or after.  It was around the same time.  But again, I -- I wanted a second option because, you know, I ran very large dealerships, and we always had two banks, you know, just in case.  There was -- opening up a commercial bank account is not an easy thing.

          And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio and saying, "Hey, I need to open a bank

258

account for Superb Motors," showing himself as a 100 percent CEO when he just provided you with a personal financial statement mentioning no ownership, nothing about Superb, all these other assets that don't exist, the $10 million in homes or 3 million in mortgages, and in no mention in that BFS of any -- any ownership for Superb.

But he sent one email to Rob Puccio to if he could open the account, and within a couple of days he had an account opened.  I had been working on it for over a week.

Q    Is this email you're referring to you saw in discovery, or is this something you saw previous to this action?

A    It's both.  Yeah, it is in the discovery actually.

Q    But did you see any communications between Anthony Deo and Rob Puccio during the timeframe of March 2023 to April 2023?

259

A        Yes.

Q        What were those communications?

A        Anthony Deo telling Rob Puccio that he needed the account from Superb opened, and later on he said, "I need two more accounts, a credit card account and a distribution account," which I guess they finally opened them in July, thank goodness, because if not I would have lost all my credit card money going into any bank account as well.

Q        But were you copied on any communications with Mr. Deo sending information to Flushing Bank?

A        No.  I only saw that through discovery.

Honestly, your discovery --

Q        Did you -- I'm sorry.

A        -- your discovery was phenomenal.  You sent me a lot of stuff I didn't know that could help me put a lot of this stuff together.

Q        In this text message, this is

260

something you spoke about, it says, "Bro, this guy and the credit underwriter are in my pocket.  Get me the info and 2021 taxes and I'll bring it home."  Now, I understand this was not sent to you, but if you know, who was he referring to, "this guy"?

A     I -- I -- I mean, this guy, I would understand from everything I saw in discovery, but this is an assumption, would be Rob Puccio.  I don't know who the underwriter would be, but obviously, he got a $500,000 loan, and all due respect, with all your discovery, on March 31st, at this same time you internally communicated that Anthony Deo is being sued for millions of dollars for representing that he owns another dealership.  The guy says, "I'm going to look deeper into this," which if he did, he would have known there's a TRO and that he shouldn't have been able to open bank accounts for Northshore and Sunrise, even less get a $500,000 loan in that

261

company name, and yet you did.  There was no problem, it continued.  At that point you still had $400,000 of that money sitting in the account that I'm sure you've lost at this point, you could have recouped it, but nothing, it just continued.  So obviously, he did have some really good relationships in the bank, because again, I was ready to leave Chase because with a long-standing relationship with them, they switched me off in a heartbeat because something came up that they didn't like, right, from an investor, not even me.  So it was just very...

Q    So knowing all of this, what you just said about Anthony Deo, you allowed him to communicate with the bank to open up an account on behalf of your company?

A    I didn't know that.

MR. KATAEV:  Objection.

A    I didn't find this out until after August.  I thought Anthony Deo was

262

a nice guy, honestly.  I was moving forward as soon as he got his license to go finish our deal and become partners with him.

I knew nothing about Anthony Deo's criminal activity, and please, read all my emails -- I mean my texts, which are on the record.  The guy is a sweetheart.  You meet him, you'd swear he's the nicest guy.  He's the con man charisma guy of the group, but I didn't find out Anthony Deo was who he was until he robbed me blind.

And I've been in the car business for 39 years, 30-something years, never been in court once, nothing. I ran the biggest dealerships in the Northeast, and in four months he dismantled my business and everything I ever worked for.  That's how good he is.

Now he's done it to somebody else, but I didn't find this out until after the fact, just so we're clear.

Q       When did you learn that

263

Anthony Deo made this representation that he believed that he had these people at Flushing Bank on his side?

A     In his pocket?

Q     Yes.

MR. KATAEV:  Objection.

Asked and answered.

A     Probably, again, he told it to Bruce.  Bruce called me and said, "Listen, Anthony says he can get this thing opened up," and I said, "Okay, get it done."  I mean...

Q     You didn't ask Anthony about it personally?

A     No.

Q     You didn't have any discussions with him?

A     No.  To open a bank account, no, I did not.

Q     Did you have any direct conversations with Mr. Deo about the Flushing Bank account, or was it all through Bruce?

A     It was Bruce, and again, it

264

was just help of what we had started.

MS. RONNEBURGER:  I don't have anything else.

MR. KATAEV:  I have one quick line of questioning I'd like to clear up, Mr. Urrutia.

*              *              *

EXAMINATION BY

MR. KATAEV:

Q     Mr. Urrutia, who were the only people that you know of at Flushing that could have opened the bank account?

A     Myself and Bruce.

Q     Who were the only people that worked for Flushing Bank that could have opened the bank account for Superb?

MS. RONNEBURGER:  Objection. It's speculation.

MR. KATAEV:  He can answer.

A     Honestly, I thought David Weinstein, and then Rob Puccio, it seemed like he had a higher title, right, because I think David Weinstein says Branch VP, and I think Puccio has a

265

higher title, so I assumed that he was a little bit higher.  That was it.  But I thought one of those two was going to get the account opened.

Q    Focusing on David Weinstein, did you have direct communications with him at any point about opening an account for Superb with Flushing?

A    Yes.

Q    In your communications with David Weinstein, did you tell him who owned Superb?

A    Yes.

Q    What did you tell him?

A    That I owned Superb, and then later on I told him that Deo was -- was my partner.

Q    Did you specify percentages?

A    No, but everything that -- that he had only showed me that he was 100 percent, because Deo was never on the taxes, Deo was never added to stock certificates.  There's no operating agreement.  There is nothing, other than

*Rich Moffett Court Reporting, Inc.*

266

the original cross-purchase agreement.

Q     Moving to Rob Puccio, did you have any communications with Mr. Puccio?

A     No, I never spoke to him.

Q     To your knowledge, is there anyway that Mr. Puccio could have known that you are an owner of Superb?

A     Yes, when David Weinstein sent him an email telling him that he was opening the Superb account -- that he was opening up all my other accounts and that he could help open the Superb account, but he mentioned that as a partner.  I don't remember the exact wording, but that we were -- we were partners on the Superb account.

Q     Are you referring to that as an email communication?

A     Yes, email communication.

Q     And to your knowledge and your memory, who was on that email communication?

A     It was David Weinstein and Robert Puccio.

267

Q        Were you on that email?

A        No.

Q        In that email communication, did David Weinstein tell Rob Puccio who the owners of Superb were or who the owners of Superb was?

MS. RONNEBURGER:  Objection.
If he knows.

Q        In the email that you reviewed, did David Weinstein tell Rob Puccio who the owner of Superb was or who the owners of Superb were?

A        I believe he put it almost as we were partners.  That was, if I remember the exact -- I can't tell you the exact wording, but that we were partners.

Q        Why are you saying that Flushing committed wrongdoing against you and Superb in this case?

A        Because they opened a bank account as a 100 percent owner for somebody that, other than a filing certificate that I had sent and having

268

all the -- all the evidence -- evidence that I was the owner of Superb, they opened an account without ever telling me.

Q    To your knowledge and belief, did Robert Puccio know that you were an owner of Superb?

A    100 percent.

MR. KATAEV:  I have no further questions.

MS. RONNEBURGER:  I have one question.

*              *              *

FURTHER EXAMINATION BY
MS. RONNEBURGER:

Q    In one of the documents we looked at it specifically stated that David Weinstein did not have any documents from Flushing Bank, so why do you believe that David Weinstein knew that you were an owner of Superb Motors?

A    I told him.  He had asked me about this $500,000 loan that, I guess, you guys, or Flushing Bank, was giving

269

out like candy, and I sent him my tax returns, personal, where Superb is listed.  I sent them the tax returns for Superb.  I sent them the tax returns for my other businesses, and you -- you've given them to me in discovery.

Q    But you did, as you testified, identify Mr. Deo as your partner in Superb Motors to David Weinstein in a text message; is that correct?

A    Yes.

Q    And you just stated you never clarified the percentages of ownership; is that correct?

A    It --

Q    Yes or no?

A    Yes.

MS. RONNEBURGER:  I have no further questions.

MR. THOMASSON:  I have a follow up.

*          *          *

270

FURTHER EXAMINATION BY

MR. THOMASSON:

Q       Do you know if Anthony Deo was informed at any time by anyone that you had informed Flushing Bank that he was your partner?

A       I'm sorry, I didn't understand the question.

MR. KATAEV:   Please repeat that.

Q       You told Flushing Bank that Anthony Deo was your partner, correct?

A       Yes.

Q       Do you know if Anthony Deo was told that you told Flushing Bank he was your partner?

MR. KATAEV:   Objection to form.

A       I don't know that.

Q       You don't know if he was or he wasn't?

A       If he was told?

Q       Yes.  For example, would it have been in an email that you told

271

Flushing Bank that he was your partner, was Anthony Deo on that email, if you know?

A    No, I didn't have that communication.  It was David Weinstein, and again, this was from Flushing discovery, told Puccio that I had -- I had okayed the opening of -- I don't remember the exact wording.  For Anthony to help open the account or something, that he was my partner, and he was opening up the other three accounts, and -- and after that I stopped, and the account was opened and the other ones were not, and I was never notified, nobody ever told me.

Q    And you did at that time consider Anthony Deo to be your partner?  When you told the bank that he was your partner, did you consider him to be your partner?

MR. KATAEV:  Objection.

A    I -- I thought we soon would be closing on the Sunrise and Northshore.

272

I was waiting for the license, and I went into this partnership with Anthony in good faith.  I did want him to be my partner from what I knew.

Q     So --

A     But we never did.

Q     All right, but I just want to understand, because it's not clear on the record.  I want to make sure it is.

When you told Flushing Bank that he was your partner, did you consider him to be your partner at that time?

MR. KATAEV:  Objection. Speculation.  Calls for a conclusion.

A     Not yet.

Q     Not yet?

A     Not yet.  Again, we were opening an account.

Q     When you told Flushing Bank that he was your partner, what did you mean?

A     He was -- he was, I mean,

273

that was the idea, in that he was going to be my partner, right.

Q      That he was going to be a part owner of Superb; is that right?

A      Yes.

Q      So when you told Flushing Bank that he was your partner, were you trying to suggest though Flushing Bank he was a part owner of Superb?

MR. KATAEV:  Objection.

A      No, I was just trying to use the person that he knew to see if he could help us move along the opening of the account.

Q      But he was not your partner at the time that you told Flushing Bank he was your partner?

MR. KATAEV:  Objection.

A      No, we never finalized an operating agreement.  I -- we never transferred stock certificates, and we never got operating agreements from him.

MR. THOMASSON:  I have nothing else at this time.

274

MR. KATAEV:  Jeff Ruderman, Jeff Cianciulli, any questions for the witness?  Speak now or forever hold your peace.

MR. RUDERMAN:  None for me.

MR. CIANCIULLI:  I have no questions.

MR. KATAEV:  Thank you.

(Time noted:  3:37 p.m.)

275

A C K N O W L E D G M E N T

STATE OF NEW YORK   )
                    :ss
COUNTY OF           )

          I, ROBERT ANTHONY URRUTIA, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of January 8, 2026; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

                    _____
                    ROBERT ANTHONY URRUTIA

Signed and subscribed to before
me, this            day
of                  , 2026.

_____
Notary Public, State of New York

276

----------------I N D E X--------------------

WITNESS            EXAMINATION BY              PAGE

R.A. URRUTIA   MR. THOMASSON              5, 270

                    MS. RONNEBURGER        233, 268

                    MR. KATAEV                  264

MOTION:  PAGE:   71

--------------DOCUMENT REQUEST--------------

PAGE:     239  Emails from Mr. Urrutia's

                 Gmail account

          239  Complete text from Flushing

                 Exhibit 1

-----------------EXHIBITS--------------------

DEFENDANTS'                           FOR I.D.

    J     Email Chain                      62

    K     Superb Motors Inc. Statement

          of Profit and Loss,

          January 1, 2023 through

          May 31, 2023                     91

    L     Email Chain with attached    97

    V     Text Messages                116

FLUSHING                              FOR I.D.

    1     Text Messages                235

    2     Email Chain                  238

    3     Email Chain                  240

*Rich Moffett Court Reporting, Inc.*

277

-------------I N D E X(Cont'd)---------------

-----------EXHIBITS (Continued)-------------

FLUSHING                                    FOR I.D.

    4        Text Message                        250


                (Counsel retained exhibits.)

278

C E R T I F I C A T E

STATE OF NEW YORK  )
                    ) ss.:
COUNTY OF NASSAU    )

        I, Diana Mitchell, a Notary Public within and for the State of New York, do hereby certify:

        That ROBERT ANTHONY URRUTIA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of January, 2026.

                    *Diana Mitchell*
                    ---------------------
                    DIANA MITCHELL

## $

**$1,200** [2] - 73:2, 193:2
**$10** [1] - 258:7
**$10,000** [6] - 120:22, 121:9, 121:13, 121:18, 122:13, 122:17
**$100,000** [3] - 10:5, 46:23, 132:23
**$120,000** [3] - 10:5, 73:15, 73:21
**$17,000** [1] - 210:2
**$2,000** [1] - 73:11
**$20** [1] - 85:7
**$200,000** [3] - 196:16, 207:20, 209:12
**$238,000** [1] - 77:10
**$25,000** [1] - 210:2
**$250,000** [1] - 182:14
**$3,000** [1] - 207:12
**$300,000** [5] - 160:20, 168:14, 208:21, 209:4, 209:9
**$4,000** [1] - 211:20
**$40,000** [1] - 121:11
**$400,000** [1] - 261:4
**$450,000** [1] - 160:8
**$500,000** [19] - 61:2, 159:21, 159:24, 164:19, 166:23, 167:4, 196:22, 208:8, 208:13, 208:17, 208:19, 208:22, 212:6, 251:17, 252:9, 254:8, 260:14, 260:25, 268:24
**$600,000** [1] - 160:15
**$700,000** [1] - 156:25
**$800,000** [2] - 167:23, 168:4
**$850,000** [3] - 168:7, 169:5, 170:4

## '

**'21** [5] - 124:21, 125:2, 127:10, 199:16, 203:5
**'22** [18] - 8:11, 9:10, 9:21, 10:19, 11:16, 34:20, 42:20, 42:21, 59:2, 60:9, 60:23, 61:4, 125:5, 125:14, 125:16, 162:9, 168:25, 214:13
**'23** [22] - 12:19, 12:21, 13:10, 20:4, 34:21,

40:18, 40:21, 42:14, 46:6, 63:14, 63:18, 63:21, 80:13, 80:14, 80:18, 94:23, 103:19, 117:19, 118:15, 122:4, 152:21, 214:13
**'24** [11] - 11:17, 50:18, 61:24, 108:25, 109:6, 109:8, 109:23, 216:25, 217:9, 217:20, 218:20

## 0

**0000487** [1] - 240:15
**000122** [1] - 250:9
**000491** [1] - 238:11
**000492** [1] - 238:12
**000497** [1] - 238:10

## 1

**1** [14] - 61:14, 91:13, 153:10, 198:19, 204:23, 207:14, 235:2, 235:3, 238:9, 239:21, 240:10, 276:12, 276:18, 276:23
**1,000** [1] - 220:22
**1,200** [2] - 193:8, 193:11
**1.4** [1] - 201:5
**10** [6] - 178:21, 184:3, 184:23, 186:17, 226:19
**10,000** [1] - 163:22
**100** [18] - 75:16, 75:17, 125:17, 129:16, 159:14, 178:16, 211:15, 213:20, 236:5, 236:12, 244:17, 247:14, 252:19, 252:23, 258:3, 265:22, 267:23, 268:9
**100s** [1] - 196:13
**10170-0002** [1] - 2:20
**102** [5] - 86:5, 145:11, 147:12, 148:7
**104** [1] - 86:5
**10:00** [1] - 1:21
**10th** [4] - 36:10, 37:11, 37:17, 112:4
**11423-2327** [1] - 2:8
**11553** [1] - 3:11
**116** [1] - 276:21
**11793** [1] - 3:6

**11:45** [1] - 242:20
**12** [6] - 62:20, 147:22, 147:23, 184:3, 184:24, 186:17
**120,000** [1] - 211:2
**1239** [1] - 1:8
**125,000** [1] - 207:8
**13** [6] - 19:22, 25:17, 97:14, 145:20, 147:20
**1339** [1] - 3:18
**14** [1] - 97:12
**14th** [5] - 203:11, 203:17, 203:23, 214:13, 278:21
**15** [1] - 178:21
**15,000** [1] - 226:19
**150** [2] - 175:10, 193:11
**150,000** [1] - 160:12
**1580** [1] - 1:7
**1581** [1] - 1:6
**1591** [1] - 1:7
**15th** [1] - 25:6
**16** [3] - 145:20, 147:6, 147:7
**1632** [1] - 1:7
**18** [2] - 147:6, 147:7
**18211** [1] - 2:7
**189** [8] - 1:4, 1:17, 2:12, 47:25, 48:7, 53:12, 189:2, 215:18
**18th** [1] - 111:8
**19107** [1] - 3:19
**1992** [2] - 124:3, 124:6
**1:05** [1] - 191:17
**1:15** [1] - 191:12
**1:52** [1] - 63:8
**1st** [9] - 34:20, 38:6, 38:11, 156:12, 194:10, 194:12, 194:18, 208:18, 228:4

## 2

**2** [16] - 83:24, 89:3, 97:21, 107:16, 110:15, 148:5, 170:25, 175:3, 182:13, 182:18, 198:18, 238:4, 238:6, 238:11, 276:24
**2,000** [2] - 64:17, 69:3
**20** [3] - 7:16, 123:23, 178:8
**200** [3] - 64:18, 175:10, 177:7
**2000s** [1] - 124:8

**2003** [2] - 94:20, 95:2
**200s** [1] - 196:14
**2018** [1] - 56:22
**2020** [6] - 48:16, 48:22, 123:21, 124:13, 127:9, 204:4
**2021** [2] - 203:4, 260:4
**2022** [25] - 17:2, 133:9, 133:13, 134:10, 159:24, 160:5, 162:15, 164:21, 166:3, 166:17, 167:7, 167:23, 168:4, 168:21, 168:24, 171:9, 173:6, 173:21, 199:18, 199:20, 201:25, 204:23, 207:14, 215:8, 215:17
**2023** [54] - 12:25, 25:6, 25:14, 38:6, 38:11, 65:9, 67:3, 88:12, 89:3, 91:13, 91:14, 92:5, 94:22, 94:25, 97:22, 98:6, 115:17, 143:10, 143:17, 143:20, 148:5, 151:4, 151:10, 151:24, 152:18, 153:3, 153:10, 154:9, 158:24, 159:3, 159:21, 164:6, 181:15, 198:3, 198:7, 201:22, 203:11, 203:17, 203:23, 204:23, 207:15, 224:3, 228:4, 240:23, 242:20, 249:22, 252:3, 256:3, 256:22, 258:25, 276:18, 276:19
**2024** [3] - 116:14, 218:16, 219:2
**2025** [2] - 108:23, 119:2
**2026** [4] - 1:20, 275:11, 275:23, 278:22
**206,000** [1] - 76:20
**20th** [3] - 107:5, 148:2, 186:20
**22** [1] - 256:9
**23** [2] - 1:9, 2:18
**2320** [1] - 2:19
**233** [1] - 276:5
**235** [1] - 276:23
**238** [1] - 276:24

**239** [2] - 276:9, 276:11
**240** [1] - 276:25
**25** [4] - 60:6, 123:18, 123:24, 148:24
**250** [2] - 175:10, 277:5
**2519** [1] - 1:8
**264** [1] - 276:6
**268** [1] - 276:5
**27** [1] - 232:5
**270** [1] - 276:4
**27th** [2] - 40:19, 40:20
**2:15** [1] - 192:15
**2:23-cv-6188** [1] - 1:10
**2nd** [3] - 75:2, 222:23, 257:5

## 3

**3** [8] - 63:7, 100:12, 174:22, 240:13, 240:16, 242:20, 258:8, 276:25
**3,000** [3] - 72:24, 193:7, 193:11
**30** [8] - 81:2, 81:4, 84:12, 86:16, 90:2, 144:23, 178:12, 240:23
**30-something** [2] - 86:14, 262:16
**300** [3] - 174:7, 175:3, 177:7
**300,000** [2] - 182:11, 209:20
**31** [4] - 91:14, 204:23, 207:15, 276:19
**31st** [2] - 256:6, 260:16
**3280** [1] - 3:5
**333** [2] - 1:19, 3:10
**36** [1] - 86:6
**37** [1] - 206:20
**38** [4] - 68:9, 206:18, 206:20, 207:11
**39** [1] - 262:16
**3:37** [1] - 274:10
**3rd** [10] - 106:2, 118:7, 118:9, 138:23, 138:24, 156:13, 249:17, 249:19, 249:20, 257:5

## 4

**4** [9] - 63:7, 92:13, 93:17, 104:19, 104:20, 143:10, 250:3, 250:4, 277:5
**40** [7] - 73:10, 174:7, 175:25, 176:3,

206:23, 206:25, 207:6
**400** [2] - 174:7, 174:22
**420** [1] - 2:19
**43** [9] - 86:12, 86:18, 87:4, 145:15, 147:8, 147:11, 148:3, 148:14, 148:16
**446** [2] - 1:8, 2:17
**45** [4] - 205:7, 205:11, 205:21, 206:17
**49** [3] - 157:16, 166:12, 166:18
**4951** [1] - 236:9
**498** [1] - 238:11

**5**

**5** [5] - 83:18, 100:13, 160:14, 182:17, 276:4
**50** [4] - 121:11, 175:25, 176:3, 193:10
**500** [2] - 3:18, 174:4
**500,000** [8] - 159:16, 160:22, 182:10, 182:12, 212:14, 229:17, 251:2, 251:22
**500,000k** [1] - 250:22
**500k** [1] - 251:11
**59** [3] - 147:11, 147:12, 147:16

**6**

**6** [1] - 209:17
**62** [1] - 276:15
**65,000** [1] - 31:4
**650** [1] - 169:4

**7**

**7** [1] - 174:6
**70** [4] - 73:9, 193:11, 213:19, 213:21
**700** [1] - 156:22
**700,000** [1] - 209:17
**71** [1] - 276:7
**75,000** [1] - 213:15
**76** [2] - 1:8, 2:17

**8**

**8** [5] - 1:20, 174:21, 205:14, 205:20, 275:11
**80** [2] - 229:11, 230:11
**83** [1] - 86:6

**89** [2] - 86:6, 240:15
**8th** [1] - 25:5

**9**

**91** [1] - 276:19
**92** [1] - 86:5
**94** [1] - 86:6
**97** [1] - 276:20
**981,000** [1] - 169:2
**99** [2] - 61:13, 216:2
**9th** [3] - 77:9, 248:4

**A**

**a.m** [2] - 1:21, 242:21
**AARONSON** [1] - 1:5
**Aaronson** [9] - 2:14, 35:7, 54:4, 61:13, 133:25, 161:11, 171:17, 203:7, 203:10
**Aaronsons** [1] - 46:17
**Abbott** [4] - 100:16, 104:21, 110:21, 111:13
**ability** [4] - 5:24, 89:2, 89:6, 139:11
**able** [15] - 6:4, 23:10, 30:19, 87:13, 87:15, 144:16, 148:3, 149:5, 150:24, 153:6, 164:2, 200:14, 204:10, 257:23, 260:23
**absentee** [1] - 162:4
**absolutely** [15] - 28:14, 35:2, 44:23, 48:3, 49:21, 54:17, 54:18, 59:3, 91:2, 92:8, 109:14, 134:24, 140:9, 141:2, 161:12
**Absolutely** [1] - 159:14
**abuse** [1] - 161:13
**accept** [1] - 90:23
**access** [9] - 39:9, 39:12, 74:2, 74:7, 115:22, 137:22, 138:4, 190:20, 225:3
**according** [2] - 143:13, 235:23
**Account** [1] - 98:2
**account** [101] - 38:19, 52:23, 53:5, 55:20, 74:12, 74:16, 77:7, 77:23, 78:8, 82:12, 98:7, 98:9, 98:10, 99:3, 99:10, 99:22,

99:24, 100:4, 100:9, 117:10, 117:12, 122:24, 123:2, 141:15, 142:3, 142:6, 142:9, 143:2, 143:7, 143:12, 143:19, 146:2, 148:4, 156:7, 156:8, 156:11, 156:14, 156:19, 157:8, 165:24, 182:13, 201:4, 212:25, 213:25, 214:5, 214:6, 227:2, 227:4, 227:5, 233:24, 234:9, 236:9, 236:14, 236:15, 237:17, 243:22, 244:17, 244:22, 245:9, 245:13, 245:24, 246:9, 247:3, 247:24, 248:17, 248:20, 251:5, 251:23, 252:18, 252:22, 254:5, 254:14, 254:24, 255:14, 256:20, 257:19, 258:2, 258:12, 258:14, 259:6, 259:9, 259:13, 261:5, 261:20, 263:19, 263:23, 264:13, 264:17, 265:5, 265:8, 266:11, 266:13, 266:17, 267:23, 268:4, 271:11, 271:15, 272:21, 273:15, 276:10
**accountant** [3] - 30:8, 72:18, 132:9
**accounted** [4] - 147:17, 147:20, 147:21, 156:15
**accounting** [25] - 30:7, 41:3, 41:13, 43:7, 46:2, 65:6, 65:11, 65:16, 66:8, 66:23, 67:3, 67:8, 69:8, 69:12, 70:20, 73:13, 94:8, 94:9, 94:11, 94:14, 145:5, 151:17, 155:18, 181:14, 205:6
**accounts** [54] - 31:11, 31:20, 31:21, 32:2, 32:5, 52:8, 52:18, 53:2, 67:8, 74:2, 74:4, 74:8, 76:17, 76:23, 77:2, 77:3,

77:15, 78:7, 82:15, 113:19, 115:9, 115:16, 115:20, 116:3, 137:23, 138:4, 141:7, 142:13, 142:20, 142:24, 151:3, 151:9, 182:23, 214:14, 225:22, 241:12, 244:15, 245:7, 246:20, 246:22, 247:5, 247:19, 248:10, 248:14, 249:3, 249:25, 250:21, 251:10, 255:2, 255:6, 259:8, 260:24, 266:12, 271:13
**accurate** [5] - 92:7, 93:20, 96:6, 148:13, 157:3
**accusing** [1] - 221:18
**ACH** [4] - 75:19, 77:10, 165:23, 182:10
**action** [5] - 62:21, 233:18, 249:3, 258:19, 278:17
**activity** [1] - 262:7
**actual** [2] - 94:9, 239:15
**add** [5] - 92:19, 94:6, 147:12, 196:11, 232:16
**added** [6] - 92:23, 92:24, 93:2, 93:4, 98:18, 265:23
**additional** [1] - 238:21
**address** [3] - 5:12, 5:13, 50:8
**addressed** [1] - 73:24
**admin** [1] - 78:14
**administer** [1] - 4:17
**advance** [5] - 160:16, 165:8, 168:12, 168:16, 168:20
**advertise** [1] - 10:4
**advertised** [1] - 211:23
**advertising** [3] - 10:5, 94:2, 160:9
**advised** [1] - 229:13
**affairs** [3] - 28:20, 29:8, 216:17
**Affairs** [2] - 28:21, 28:25
**affected** [1] - 170:18
**afford** [1] - 121:12
**afternoon** [2] -

233:11, 233:12
**afterwards** [3] - 69:5, 175:22, 214:3
**agencies** [1] - 216:13
**agency** [1] - 28:16
**aggregate** [3] - 169:24, 198:17, 198:21
**ago** [7] - 7:14, 7:16, 123:19, 123:20, 123:24, 239:3, 240:25
**agree** [5] - 16:22, 58:4, 71:6, 105:15, 138:16
**AGREED** [3] - 4:3, 4:9, 4:14
**agreed** [5] - 27:10, 158:3, 164:13, 164:14, 209:22
**agreement** [17] - 32:11, 55:4, 55:6, 84:12, 102:2, 104:8, 126:11, 164:17, 168:14, 169:4, 170:23, 176:14, 176:17, 237:8, 265:25, 266:2, 273:21
**agreements** [12] - 32:20, 33:4, 54:22, 55:17, 55:18, 55:22, 56:2, 56:6, 56:11, 109:20, 236:24, 273:23
**ahead** [5] - 21:25, 114:2, 252:22, 254:18
**alarm** [1] - 87:22
**Alex** [7] - 126:21, 126:22, 126:23, 126:24, 129:14, 129:19, 129:21
**alive** [1] - 112:10
**ALIVIA** [1] - 3:24
**allege** [1] - 182:5
**alleged** [1] - 147:13
**alleging** [1] - 131:17
**allowed** [8] - 32:9, 32:14, 74:9, 79:3, 82:7, 90:3, 138:14, 261:19
**Ally** [2] - 202:22, 202:25
**almost** [3] - 126:19, 255:16, 267:14
**alone** [2] - 21:24, 138:13
**ALSO** [1] - 3:23
**Alysia** [17] - 40:5,

40:8, 40:16, 41:4, 41:25, 42:13, 42:16, 42:24, 43:2, 43:20, 44:2, 44:9, 45:2, 64:3, 68:22, 200:19, 200:20

**ALYSIA** [1] - 40:15

**Alysia's** [1] - 40:7

**amount** [9] - 78:19, 92:22, 92:24, 145:19, 158:9, 159:18, 175:22, 175:23, 209:18

**amounts** [1] - 244:13

**AND** [3] - 4:2, 4:8, 4:13

**angry** [3] - 44:24, 72:9, 72:16

**answer** [20] - 42:10, 50:11, 66:11, 71:12, 72:7, 79:8, 86:25, 88:22, 89:9, 95:18, 113:25, 133:8, 133:17, 135:11, 212:21, 213:6, 225:16, 231:3, 264:20

**answered** [16] - 45:20, 71:11, 113:21, 130:15, 144:20, 152:7, 212:8, 213:9, 216:10, 216:16, 220:7, 221:4, 223:24, 224:9, 231:22, 263:8

**answering** [1] - 65:19

**answers** [1] - 275:13

**ANTHONY** [7] - 1:4, 1:11, 1:23, 3:23, 275:7, 275:19, 278:9

**Anthony** [187] - 2:6, 5:10, 8:9, 11:20, 11:24, 12:4, 13:24, 14:18, 14:20, 15:24, 16:21, 16:25, 25:10, 29:14, 29:15, 34:6, 34:9, 34:11, 34:13, 34:21, 41:5, 41:10, 41:21, 53:24, 54:5, 54:9, 58:23, 63:16, 63:21, 68:11, 71:7, 73:3, 73:25, 74:11, 76:16, 77:18, 77:22, 78:4, 78:23, 79:25, 82:8, 85:23, 85:25, 86:9, 92:11, 98:20, 100:3, 101:20, 104:25, 106:13, 113:6, 119:24, 120:15, 120:20,

121:13, 121:17, 122:13, 125:10, 130:7, 130:21, 132:4, 135:22, 136:22, 138:20, 140:7, 144:17, 144:22, 144:24, 147:3, 147:17, 148:8, 149:6, 149:13, 150:3, 157:9, 157:12, 158:16, 158:24, 159:4, 159:5, 159:19, 159:20, 159:23, 160:17, 162:20, 163:7, 164:18, 166:4, 166:18, 166:23, 167:10, 169:3, 169:10, 171:11, 172:22, 173:5, 173:6, 173:20, 174:11, 175:16, 176:16, 177:8, 181:6, 181:12, 182:5, 184:2, 185:17, 185:22, 186:6, 186:7, 186:11, 186:17, 186:25, 187:19, 188:4, 188:14, 189:22, 190:20, 194:6, 195:25, 196:2, 199:25, 202:7, 202:12, 202:14, 202:19, 208:19, 208:22, 209:22, 210:4, 210:8, 210:18, 211:6, 212:5, 212:13, 212:24, 215:7, 216:2, 219:7, 222:10, 226:5, 229:5, 229:8, 229:9, 229:11, 229:19, 230:3, 230:4, 234:4, 234:14, 235:14, 235:25, 241:7, 242:19, 243:18, 244:6, 244:17, 244:21, 244:23, 245:4, 250:16, 252:7, 252:18, 253:18, 254:13, 254:20, 254:24, 256:18, 257:4, 258:23, 259:5, 260:17, 261:18, 261:25, 262:6, 262:13, 263:2, 263:11, 263:14,

270:4, 270:13, 270:15, 271:3, 271:10, 271:19, 272:3

**Anthony's** [4] - 14:14, 17:17, 41:8, 152:5

**anyway** [1] - 266:7

**APA** [2] - 256:8, 256:9

**apologize** [1] - 118:10

**appeared** [2] - 71:24, 237:22

**application** [6] - 37:21, 48:24, 107:12, 233:24, 241:10, 241:14

**applications** [2] - 36:24, 183:12

**applied** [5] - 114:14, 114:21, 115:9, 116:3, 202:25

**apply** [1] - 202:22

**applying** [2] - 34:22, 38:3

**appreciate** [1] - 91:3

**approval** [3] - 13:22, 14:7, 111:24

**approve** [3] - 77:24, 138:20, 139:5

**approved** [13] - 48:25, 54:4, 61:12, 78:20, 112:9, 112:12, 112:22, 138:10, 138:15, 138:25, 139:3, 139:15, 139:19

**April** [30] - 12:19, 40:4, 40:18, 70:15, 75:20, 97:22, 98:5, 142:10, 143:10, 143:17, 143:20, 143:23, 154:15, 154:18, 154:21, 156:5, 156:12, 157:21, 165:22, 206:6, 208:2, 223:4, 242:20, 247:9, 252:2, 252:3, 256:8, 256:22, 258:25

**argumentative** [11] - 52:5, 54:16, 57:14, 58:6, 75:12, 79:7, 96:13, 134:17, 137:11, 138:19, 139:9

**arguments** [1] - 108:8

**Ariel** [1] - 233:15

**ARIEL** [1] - 3:12

**arm** [1] - 131:5

**arrange** [1] - 165:14

**Asad** [1] - 2:15

**ASAD** [1] - 1:6

**assertion** [2] - 47:24, 48:2

**asset** [1] - 109:19

**assets** [1] - 258:7

**assign** [3] - 57:17, 58:13, 186:7

**assigned** [3] - 53:24, 58:9, 58:23

**assignment** [1] - 114:4

**assist** [2] - 105:4, 168:5

**assisting** [1] - 153:17

**associated** [2] - 128:22, 133:24

**Association** [1] - 7:7

**assume** [3] - 33:7, 137:4, 175:5

**assumed** [4] - 127:20, 127:21, 128:14, 265:2

**assumes** [5] - 58:19, 66:10, 88:15, 141:19, 155:11

**assuming** [2] - 16:2, 184:3

**assumption** [4] - 75:9, 93:6, 95:13, 260:11

**assumptions** [1] - 93:3

**attached** [6] - 49:12, 96:10, 97:9, 116:16, 239:10, 276:20

**attempt** [1] - 143:2

**attempted** [1] - 143:12

**attended** [1] - 22:18

**attention** [2] - 29:18, 150:21

**attorney** [15] - 32:20, 32:23, 33:3, 44:22, 45:8, 49:10, 72:17, 90:21, 90:23, 134:3, 134:8, 203:19, 203:20, 203:25, 204:4

**attorney's** [1] - 216:21

**attorneys** [3] - 4:3, 27:10, 33:7

**Attorneys** [4] - 2:4, 2:12, 3:9, 3:15

**auction** [2] - 148:19, 148:20

**audit** [9] - 140:21, 188:2, 188:5, 188:7, 188:9, 188:19, 188:25, 208:9, 208:14

**audits** [2] - 188:15, 189:6

**ASAD** [1] - 1:6

**August** [26] - 34:20, 38:6, 38:11, 75:2, 77:9, 89:3, 106:2, 118:7, 118:8, 127:9, 138:22, 138:24, 142:7, 142:14, 148:5, 156:13, 203:11, 203:17, 203:23, 222:23, 228:4, 241:19, 248:4, 249:19, 249:20, 261:25

**authority** [11] - 102:18, 114:4, 139:17, 139:20, 139:24, 140:18, 173:7, 185:14, 185:23, 186:2, 190:6

**authorization** [13] - 33:24, 34:4, 34:7, 34:10, 34:14, 78:11, 78:13, 78:23, 79:4, 81:12, 111:10, 190:25, 194:15

**authorizations** [3] - 78:10, 78:16, 115:24

**authorize** [7] - 79:2, 79:3, 93:16, 110:25, 139:12, 139:18, 191:5

**authorized** [21] - 4:16, 34:15, 74:17, 74:18, 75:19, 79:10, 82:18, 100:11, 101:23, 102:14, 113:9, 138:17, 139:7, 140:11, 141:16, 163:8, 163:11, 163:17, 163:21, 189:19, 189:22

**authorizing** [1] - 90:22

**Auto** [8] - 2:5, 2:13, 2:16, 2:18, 56:8, 132:21, 133:19

**AUTO** [11] - 1:4, 1:5, 1:6, 1:7, 1:7, 1:8, 1:8, 1:9, 1:17

**automatically** [3] - 173:13, 173:17, 190:3

**AUTOMOTIVE** [1] - 1:14

**Automotive** [1] - 7:4

**available** [1] - 37:17

**Avenue** [2] - 2:7, 2:19

**average** [10] - 205:7, 206:3, 206:4, 206:8, 206:13, 206:16, 206:22, 207:6, 211:15, 226:19

**averaged** [1] - 205:13
**averaging** [1] - 193:7
**aware** [7] - 95:4, 98:5, 111:15, 133:10, 166:2, 215:24, 251:25

# B

**baby** [3] - 13:6, 13:9, 13:10
**backdate** [1] - 58:17
**bad** [1] - 170:17
**baffled** [1] - 47:22
**balance** [1] - 169:2
**balances** [1] - 93:15
**Bank** [47] - 3:9, 55:19, 56:13, 56:15, 98:7, 99:8, 213:25, 214:5, 214:6, 227:3, 227:4, 229:19, 233:17, 233:20, 233:23, 234:15, 234:16, 237:9, 238:25, 239:5, 245:10, 245:14, 245:20, 247:3, 247:24, 249:3, 249:25, 250:22, 252:25, 255:7, 255:10, 256:19, 259:16, 263:4, 263:23, 264:16, 268:20, 268:25, 270:6, 270:12, 270:16, 271:2, 272:11, 272:22, 273:8, 273:9, 273:17
**bank** [60] - 31:11, 31:20, 31:21, 32:2, 32:5, 38:19, 38:22, 52:8, 52:18, 52:22, 53:2, 53:4, 70:22, 74:4, 115:16, 115:20, 137:23, 138:4, 141:7, 141:15, 141:17, 141:23, 142:20, 142:23, 142:24, 151:9, 151:12, 176:24, 182:22, 182:25, 183:16, 214:14, 225:4, 225:7, 225:11, 225:21, 241:2, 243:19, 246:13, 246:20, 251:23, 252:7, 252:16, 252:18, 253:14, 253:16, 254:4,

255:14, 257:19, 257:25, 259:13, 260:24, 261:10, 261:19, 263:19, 264:13, 264:17, 267:22, 271:20
**BANK** [2] - 1:16, 1:17
**banker** [2] - 250:20, 251:9
**banks** [8] - 132:11, 176:12, 182:20, 182:22, 183:23, 207:23, 230:20, 257:17
**bare** [1] - 57:25
**barely** [1] - 229:11
**BARON** [3] - 1:5, 1:6, 1:6
**Baron** [6] - 2:14, 2:15, 2:16, 9:2, 9:4, 60:16
**based** [9] - 48:25, 66:16, 84:11, 84:24, 115:22, 155:8, 161:6, 195:24, 211:22
**bathroom** [1] - 32:12
**battles** [1] - 41:21
**battling** [2] - 41:7
**BDC** [1] - 13:18
**became** [8] - 14:4, 32:16, 59:9, 129:19, 129:23, 166:5, 166:9, 166:18
**become** [15] - 55:7, 105:12, 106:5, 126:24, 127:2, 127:5, 128:9, 129:15, 157:22, 160:16, 160:19, 161:5, 165:6, 251:24, 262:4
**becoming** [1] - 157:16
**before..** [1] - 157:5
**began** [6] - 12:18, 13:12, 46:4, 134:8, 157:21, 211:14
**begin** [1] - 85:20
**beginning** [14] - 13:4, 13:8, 59:23, 97:19, 105:24, 118:13, 157:19, 157:23, 163:23, 174:12, 194:18, 229:24, 230:7, 247:9
**behalf** [4] - 90:24, 111:3, 243:4, 261:20
**behind** [7] - 26:17, 41:3, 41:19, 47:12, 84:25, 165:20, 249:18

**belief** [1] - 268:6
**belongs** [1] - 106:8
**below** [1] - 182:25
**best** [4] - 16:23, 194:17, 200:24, 228:6
**better** [3] - 10:13, 162:4, 256:13
**between** [25] - 4:3, 9:16, 17:8, 34:20, 41:4, 41:15, 68:10, 102:6, 111:13, 112:24, 113:5, 161:10, 164:10, 187:18, 194:21, 198:16, 202:19, 204:22, 206:6, 208:18, 208:23, 223:4, 239:4, 256:7, 258:23
**BFS** [1] - 258:9
**big** [6] - 121:16, 132:17, 168:12, 193:12, 194:3, 223:5
**bigger** [1] - 77:13
**biggest** [1] - 262:18
**bill** [1] - 185:3
**bills** [3] - 50:22, 82:24, 184:18
**bit** [3] - 135:7, 204:11, 265:3
**blame** [2] - 144:17, 181:6
**blamed** [1] - 120:2
**Blankenship** [11] - 14:10, 14:12, 29:5, 29:8, 29:20, 30:25, 31:13, 33:10, 136:23, 186:21, 187:3
**BLANKENSHIP** [1] - 1:12
**blind** [2] - 249:21, 262:14
**blood** [1] - 278:17
**blow** [1] - 158:12
**Blvd** [1] - 2:16
**BLVD** [6] - 1:6, 1:7, 1:7, 1:8
**Bobby** [5] - 125:9, 125:10, 125:12, 210:24, 211:8
**book** [5] - 56:23, 57:16, 57:18, 58:3, 58:9
**booked** [1] - 207:23
**bothered** [3] - 67:16, 67:18, 68:12
**bottom** [3] - 104:20, 107:17, 110:16

**bought** [15] - 18:14, 102:4, 125:11, 173:11, 174:22, 174:24, 175:3, 175:18, 177:15, 187:14, 187:17, 189:24, 190:4, 193:25, 210:9
**Boulevard** [2] - 1:19, 3:10
**bouncing** [1] - 194:21
**brains** [2] - 132:5, 230:15
**Branch** [1] - 264:25
**brand** [1] - 150:22
**break** [5] - 110:11, 132:8, 191:10, 191:15, 228:13
**Brian** [1] - 2:14
**BRIAN** [1] - 1:5
**brief** [2] - 110:11, 228:13
**briefly** [1] - 119:12
**bring** [11] - 10:3, 10:7, 14:21, 21:13, 22:24, 68:4, 68:6, 116:2, 200:13, 229:25, 260:5
**bringing** [1] - 14:3
**brings** [1] - 60:5
**Bro** [1] - 260:2
**broke** [2] - 47:12, 224:21
**Brooklyn** [1] - 146:11
**brought** [5] - 14:15, 14:23, 15:3, 15:6, 17:23
**Bruce** [83] - 17:10, 18:4, 40:5, 40:24, 42:18, 77:18, 79:19, 80:6, 81:14, 81:16, 82:7, 98:21, 99:18, 100:16, 104:23, 107:17, 110:21, 111:14, 112:24, 113:5, 121:23, 122:2, 138:10, 138:16, 138:21, 138:24, 139:3, 139:4, 139:11, 139:14, 139:20, 140:7, 140:10, 140:11, 150:2, 150:4, 150:5, 150:7, 150:12, 150:16, 152:12, 152:14, 152:19, 153:2, 153:13, 153:17, 154:8, 172:20, 172:25, 185:15,

185:17, 188:12, 188:13, 188:18, 189:16, 189:19, 236:21, 236:22, 238:23, 242:21, 244:5, 245:2, 247:4, 247:6, 247:17, 250:17, 251:3, 251:8, 252:4, 252:6, 253:10, 253:12, 253:17, 253:23, 254:12, 256:21, 263:10, 263:24, 263:25, 264:14
**building** [3] - 158:15, 159:9, 159:13
**Building** [1] - 3:17
**built** [2] - 176:8, 176:9
**bunch** [3] - 85:24, 142:8, 175:18
**burned** [2] - 208:13, 208:18
**business** [33] - 9:4, 9:12, 9:25, 11:21, 11:25, 12:5, 13:20, 30:3, 32:15, 45:22, 46:4, 70:24, 81:20, 81:23, 93:16, 106:25, 107:15, 108:5, 128:13, 129:4, 131:18, 160:23, 203:10, 209:3, 209:6, 209:7, 210:19, 211:9, 211:12, 242:4, 246:17, 262:16, 262:20
**business's** [1] - 75:17
**businesses** [6] - 49:8, 51:11, 139:21, 169:15, 236:24, 269:6
**but..** [3] - 27:22, 47:22, 138:6
**butting** [1] - 41:19
**buttons** [1] - 145:4
**buy** [19] - 8:22, 39:13, 122:25, 125:12, 128:3, 146:15, 158:10, 159:13, 160:12, 173:6, 173:12, 173:23, 175:20, 176:25, 198:12, 255:22, 255:23, 256:9
**buyer** [3] - 173:3, 173:12, 173:13
**BUYERS** [1] - 1:12
**Buyers** [14] - 135:5, 135:9, 135:18,

135:19, 135:21, 135:22, 136:3, 136:4, 226:25, 227:5, 227:11, 227:21, 227:24
**Buyers'** [1] - 117:10
**buying** [9] - 41:15, 157:12, 157:15, 158:15, 159:9, 172:23, 172:24, 183:11, 245:21
**buys** [1] - 190:5
**BY** [13] - 2:9, 2:21, 3:12, 3:20, 5:17, 22:15, 192:19, 228:22, 233:9, 264:9, 268:15, 270:2, 276:3

### C

**camera** [2] - 224:3, 225:5
**cameras** [4] - 24:3, 87:23, 88:4, 223:20
**Canada** [1] - 176:9
**cancelled** [4] - 155:25, 184:15, 205:4, 205:17
**candy** [1] - 269:2
**cap** [1] - 208:8
**Capital** [1] - 227:6
**capital** [5] - 160:20, 168:8, 202:20, 208:6, 209:8
**CAPITAL** [1] - 1:15
**Car** [15] - 117:10, 135:5, 135:9, 135:18, 135:19, 135:21, 135:22, 136:2, 136:4, 196:4, 226:24, 227:5, 227:11, 227:20, 227:24
**CAR** [1] - 1:12
**car** [54] - 9:12, 9:19, 18:8, 72:25, 73:2, 81:19, 83:8, 83:9, 120:20, 121:10, 121:11, 121:14, 121:15, 121:17, 121:18, 121:25, 122:8, 122:9, 122:14, 122:16, 127:13, 136:4, 136:20, 136:25, 149:10, 161:7, 164:2, 173:11, 173:13, 177:4, 177:15, 183:11,

183:14, 183:21, 184:15, 193:3, 193:7, 193:16, 193:20, 193:24, 198:25, 205:19, 206:22, 207:5, 207:9, 207:11, 210:2, 224:21, 228:10, 242:4, 245:25, 262:15
**card** [2] - 259:8, 259:12
**cards** [1] - 248:22
**care** [1] - 132:7
**cared** [1] - 145:9
**Caribbean** [6] - 9:23, 10:15, 195:22, 195:24, 211:3, 211:4
**carrying** [1] - 209:23
**cars** [154] - 20:6, 23:12, 23:13, 23:24, 24:19, 24:22, 25:25, 26:4, 33:23, 34:4, 34:7, 34:10, 38:17, 39:2, 39:5, 39:13, 39:16, 59:25, 73:7, 73:9, 75:5, 83:22, 85:24, 85:25, 86:9, 86:12, 86:14, 86:16, 86:18, 86:19, 87:4, 87:11, 87:13, 101:16, 101:20, 101:23, 102:3, 102:4, 102:11, 102:14, 102:15, 102:19, 106:4, 122:15, 122:25, 123:2, 123:3, 123:4, 131:16, 133:3, 140:16, 144:15, 144:17, 145:6, 145:11, 145:12, 145:15, 146:16, 146:25, 147:2, 147:11, 147:12, 147:16, 148:3, 148:8, 148:18, 148:24, 149:4, 149:8, 171:20, 172:23, 173:6, 173:7, 173:17, 173:20, 173:23, 174:7, 174:22, 174:24, 175:3, 175:8, 175:10, 175:12, 175:15, 175:19, 175:25, 176:3, 176:4, 176:8, 176:15, 177:2, 177:3, 177:7, 177:9,

177:21, 178:21, 178:22, 179:6, 179:14, 182:15, 183:19, 183:24, 183:25, 184:6, 184:11, 184:20, 184:24, 185:10, 185:15, 186:2, 186:9, 186:14, 186:17, 186:22, 187:7, 187:18, 189:23, 189:24, 190:4, 190:17, 190:19, 193:10, 193:25, 196:25, 197:6, 197:10, 197:13, 197:18, 197:22, 198:12, 198:15, 199:2, 199:3, 199:6, 199:10, 204:22, 204:24, 205:3, 206:2, 206:17, 206:24, 206:25, 207:6, 207:11, 207:22, 209:24, 210:11, 214:17, 224:18, 225:14, 228:7
**CARS** [2] - 1:13, 1:13
**case** [29] - 15:5, 16:7, 26:8, 48:13, 56:4, 56:8, 56:20, 57:5, 60:4, 62:7, 69:10, 69:19, 71:16, 71:22, 80:7, 82:6, 82:8, 130:17, 216:4, 216:8, 217:15, 221:16, 221:18, 224:17, 232:5, 232:9, 257:18, 267:21
**Case** [1] - 1:10
**cases** [3] - 184:14, 220:21, 222:5
**cash** [26] - 31:4, 31:7, 31:10, 31:14, 31:17, 31:19, 33:11, 33:13, 33:14, 87:11, 120:23, 140:16, 140:25, 141:4, 141:6, 141:13, 145:22, 146:17, 146:20, 147:4, 148:19, 156:5, 182:11, 183:4, 214:4
**catchup** [1] - 181:18
**caused** [10] - 48:14, 50:23, 85:18, 120:5, 130:6, 187:20,

231:18, 231:25, 246:7, 246:11
**causing** [1] - 69:11
**Cayer** [7] - 40:8, 69:11, 69:20, 71:16, 71:22, 72:12, 200:20
**CAYER** [1] - 40:9
**Center** [1] - 13:20
**central** [1] - 41:24
**CEO** [1] - 258:3
**certain** [5] - 31:16, 78:19, 108:6, 141:5, 145:19
**certainly** [2] - 93:15, 254:20
**certificate** [9] - 49:7, 56:22, 57:11, 58:2, 98:13, 99:18, 106:25, 107:15, 267:25
**certificates** [12] - 24:25, 54:21, 55:5, 56:18, 57:16, 57:22, 58:10, 58:11, 58:17, 58:22, 265:24, 273:22
**certification** [1] - 4:6
**certify** [3] - 275:8, 278:8, 278:15
**CFO** [11] - 41:24, 41:25, 42:5, 42:6, 42:13, 52:22, 52:25, 53:3, 53:9, 150:12, 150:18
**Chabrier** [1] - 2:14
**CHABRIER** [1] - 1:5
**Chain** [8] - 62:11, 97:9, 238:7, 240:17, 276:15, 276:20, 276:24, 276:25
**change** [1] - 23:8
**changed** [5] - 23:9, 86:7, 146:14, 163:24, 181:21
**changeovers** [1] - 66:13
**changing** [1] - 41:17
**charge** [3] - 144:8, 149:23, 150:4
**charisma** [1] - 262:12
**CHASE** [1] - 1:17
**Chase** [12] - 142:13, 182:14, 245:20, 246:6, 246:9, 246:21, 246:22, 255:7, 255:10, 257:8, 257:11, 261:11
**check** [19] - 25:19, 36:17, 74:23, 80:4,

80:5, 80:10, 80:15, 81:13, 81:20, 81:22, 82:2, 82:3, 82:4, 136:12, 138:21, 214:4, 239:14, 253:25
**checked** [2] - 36:2, 37:2
**checks** [53] - 15:19, 15:25, 16:18, 33:13, 33:14, 53:11, 74:16, 74:19, 76:17, 76:21, 77:21, 77:24, 79:10, 79:11, 79:12, 79:15, 79:25, 80:5, 80:8, 80:21, 80:25, 81:3, 81:4, 81:15, 81:17, 81:19, 82:9, 82:11, 135:16, 135:19, 136:2, 136:8, 138:9, 138:17, 138:23, 138:25, 139:4, 139:5, 139:6, 139:12, 139:14, 139:18, 139:24, 140:2, 140:5, 163:10, 163:16, 164:13, 182:14, 213:22, 226:14, 227:7
**Cherrywood** [1] - 46:19
**Chestnut** [1] - 3:18
**chief** [5] - 107:19, 113:11, 139:22, 140:6, 253:23
**choice** [1] - 41:22
**choose** [2] - 32:17, 157:4
**chose** [4] - 241:16, 245:18, 246:12, 246:21
**chronologically** [1] - 63:5
**CIANCIULLI** [5] - 3:20, 21:15, 22:5, 22:9, 274:7
**Cianciulli** [4] - 21:8, 21:11, 233:5, 274:3
**circles** [1] - 248:16
**circumstances** [1] - 8:18
**claim** [3] - 99:6, 140:14, 162:19
**claims** [2] - 182:16, 233:19
**clarified** [2] - 226:10, 269:15
**clarify** [2] - 50:13, 144:21

**Clark** [5] - 125:9, 125:10, 125:13, 210:24, 211:8
**clean** [2] - 108:11, 145:10
**clear** [5] - 161:4, 219:23, 262:24, 264:7, 272:9
**clearing** [1] - 146:23
**clearly** [1] - 21:20
**client** [1] - 45:10
**clients** [2] - 210:16, 211:3
**close** [9] - 9:18, 66:23, 109:18, 109:22, 117:20, 117:24, 200:14, 241:15, 252:21
**closed** [12] - 109:21, 109:23, 118:8, 162:18, 164:12, 167:20, 168:10, 180:12, 193:21, 199:23, 199:25, 200:7
**closer** [1] - 21:14
**closing** [2] - 9:21, 271:25
**CO** [1] - 1:16
**Coast** [11] - 100:23, 101:2, 104:24, 105:5, 105:8, 105:12, 105:13, 106:8, 106:20, 107:7, 111:3
**COAST** [6] - 1:13, 1:13, 1:14, 1:14, 1:15
**COD's** [1] - 156:17
**collapse** [1] - 181:9
**collateralized** [4] - 169:25, 170:5, 170:14, 170:16
**college** [2] - 6:16, 6:20
**combined** [2] - 27:13, 28:9
**coming** [11] - 75:3, 75:7, 75:25, 105:19, 132:21, 201:5, 210:25, 223:12, 227:10, 227:20, 230:9
**commenced** [1] - 134:10
**commercial** [3] - 99:9, 243:22, 257:19
**commit** [1] - 131:4
**committed** [1] - 267:20
**communicate** [2] -

254:3, 261:19
**communicated** [6] - 161:25, 217:22, 218:7, 220:10, 254:21, 260:17
**communicating** [1] - 113:10
**communication** [7] - 247:11, 247:16, 266:19, 266:20, 266:23, 267:4, 271:6
**communications** [11] - 218:25, 229:23, 253:6, 253:9, 254:13, 258:23, 259:4, 259:15, 265:7, 265:11, 266:4
**community** [2] - 9:24, 10:15
**companies** [6] - 58:24, 140:21, 190:22, 191:2, 191:6, 216:3
**Company** [1] - 135:23
**company** [11] - 57:15, 58:10, 82:23, 88:8, 135:24, 136:5, 136:7, 169:6, 195:22, 261:2, 261:21
**compared** [1] - 210:22
**complaint** [17] - 49:12, 49:22, 50:2, 50:25, 51:5, 55:9, 61:8, 61:25, 62:8, 96:10, 116:17, 117:7, 118:19, 178:2, 178:4, 217:2, 234:24
**Complete** [1] - 276:11
**complete** [2] - 241:13, 275:12
**completely** [1] - 65:24
**compliant** [1] - 49:14
**computers** [1] - 88:5
**con** [2] - 161:16, 262:11
**concentrating** [1] - 198:2
**concern** [1] - 251:13
**concerned** [4] - 67:11, 67:15, 71:25, 165:11
**concierge** [1] - 229:13
**conclusion** [3] - 75:14, 75:16, 272:17
**conduct** [1] - 60:9
**conducted** [1] - 220:20
**confirm** [1] - 238:9
**Connecticut** [14] - 10:21, 11:5, 12:2,

12:15, 18:7, 27:8, 27:11, 27:14, 28:3, 28:4, 129:5, 129:10, 179:15, 179:18
**connection** [1] - 216:23
**consider** [4] - 106:19, 271:19, 271:21, 272:13
**considering** [1] - 9:20
**consist** [1] - 61:7
**consisted** [3] - 7:10, 34:15, 195:21
**consolidated** [1] - 27:9
**consulting** [1] - 82:23
**Cont'd** [1] - 3:2
**contact** [2] - 28:24, 111:2
**contacted** [3] - 28:19, 119:4, 217:13
**contested** [1] - 96:5
**continue** [2] - 70:14, 121:15
**continued** [4] - 184:18, 256:24, 261:3, 261:8
**Continued** [1] - 277:3
**CONTINUED** [1] - 192:18
**contract** [2] - 8:15, 164:15
**contracts** [6] - 59:20, 159:25, 164:19, 164:22, 200:2, 200:8
**contrary** [1] - 168:11
**control** [3] - 24:7, 149:23, 244:19
**controlled** [1] - 213:2
**conversation** [6] - 119:5, 119:23, 157:22, 158:22, 203:17, 244:4
**conversations** [1] - 263:22
**convey** [1] - 246:23
**conveyed** [1] - 256:18
**convicted** [1] - 230:17
**COO** [1] - 18:4
**COONEY** [1] - 3:24
**cooperate** [3] - 188:9, 188:19, 189:11
**cooperated** [3] - 188:5, 188:23, 189:5
**cooperating** [1] - 188:14
**coordinates** [1] - 30:5
**copied** [11] - 44:11, 111:9, 111:14, 237:25, 238:16,

239:4, 239:8, 253:5, 253:9, 259:14
**copy** [3] - 253:10, 253:13, 253:15
**CORP** [1] - 1:15
**corporations** [3] - 98:12, 132:12, 237:19
**correct** [118] - 8:16, 11:7, 11:19, 12:10, 12:16, 23:12, 24:14, 28:9, 28:10, 28:23, 29:6, 29:10, 37:19, 39:25, 40:10, 42:2, 42:15, 43:3, 47:16, 48:8, 53:10, 59:14, 67:10, 74:13, 76:18, 76:24, 79:23, 80:19, 83:14, 86:23, 87:4, 88:23, 88:24, 93:24, 106:9, 107:9, 107:10, 111:25, 112:6, 114:14, 114:15, 114:25, 116:5, 116:6, 116:19, 119:3, 124:10, 124:14, 125:23, 128:17, 130:8, 134:12, 135:20, 136:9, 137:9, 137:12, 137:13, 140:13, 141:22, 141:24, 143:5, 143:15, 143:18, 143:21, 147:9, 148:14, 151:4, 154:11, 154:19, 154:21, 155:3, 162:16, 166:13, 166:19, 166:20, 174:15, 174:22, 175:4, 175:14, 176:5, 180:7, 185:13, 188:15, 189:9, 193:18, 196:17, 198:8, 200:23, 200:25, 202:2, 202:5, 203:5, 207:15, 207:16, 209:10, 217:6, 217:21, 218:20, 219:2, 219:3, 223:13, 224:12, 233:25, 234:2, 236:6, 236:7, 236:11, 239:2, 239:6, 241:3, 243:6, 243:7, 256:23, 269:12, 269:16, 270:13, 275:12,

275:15
**corruptly** [1] - 134:21
**cost** [3] - 131:18, 158:3, 163:2
**Costa** [7] - 5:14, 26:24, 42:22, 90:21, 162:5, 162:8, 162:15
**counsel** [7] - 15:25, 16:8, 16:9, 21:8, 23:3, 47:5, 132:6
**Counsel** [1] - 277:8
**counted** [3] - 156:3, 156:16, 156:17
**counterclaims** [1] - 85:5
**COUNTY** [2] - 275:5, 278:4
**County** [4] - 28:17, 28:22, 28:25, 216:7
**couple** [12] - 14:23, 14:25, 15:2, 77:19, 109:3, 145:4, 155:20, 174:25, 210:23, 240:18, 249:8, 258:13
**course** [4] - 7:17, 123:23, 124:2, 124:8
**court** [11] - 23:6, 23:7, 47:9, 47:18, 62:20, 92:4, 93:8, 94:20, 95:25, 133:22, 262:17
**Court** [2] - 1:23, 4:19
**COURT** [3] - 1:2, 5:6, 5:11
**courts** [1] - 162:22
**cover** [11] - 49:18, 49:19, 49:20, 51:2, 85:10, 116:17, 116:18, 163:2, 212:9
**covered** [1] - 38:19
**covering** [1] - 208:4
**covers** [1] - 144:13
**COVID** [3] - 45:25, 123:21, 209:24
**CPA** [1] - 1:12
**CPA'S** [1] - 1:16
**crazy** [1] - 185:3
**create** [6] - 69:18, 92:21, 182:19, 183:5, 183:6
**created** [5] - 96:25, 197:7, 212:10, 244:16, 249:10
**creates** [2] - 30:7, 30:8
**creating** [2] - 183:7, 207:24
**creation** [2] - 95:15, 97:2
**credit** [7] - 73:20,

106:5, 183:12, 251:17, 259:8, 259:12, 260:3
**crew** [2] - 133:4
**crime** [1] - 46:17
**criminal** [3] - 30:20, 220:17, 262:7
**cross** [6] - 55:3, 169:25, 170:5, 170:14, 170:16, 266:2
**cross-collateralized** [4] - 169:25, 170:5, 170:14, 170:16
**cross-purchase** [1] - 266:2
**Crowley** [4] - 19:12, 19:14, 19:17, 24:18
**crying** [1] - 161:13
**Cullen** [1] - 233:16
**CULLEN** [1] - 3:8
**cure** [1] - 84:13
**curious** [2] - 69:6, 89:22
**Cusano** [1] - 238:25
**Customer** [1] - 244:12
**customer** [1] - 246:6
**customer's** [1] - 183:17
**customers** [8] - 26:18, 177:11, 177:14, 182:13, 183:10, 183:21, 184:14, 184:17
**cut** [3] - 81:13, 108:11, 240:11
**cuts** [1] - 239:21
**CYRULI** [1] - 2:11

### D

**damage** [5] - 50:23, 170:17, 223:3, 223:5, 223:8
**data** [2] - 70:10, 195:14
**date** [5] - 57:23, 118:22, 133:25, 158:25, 248:2
**date's** [1] - 107:4
**dated** [2] - 56:22, 256:5
**dates** [1] - 58:14
**Dave** [4] - 240:25, 241:24, 246:18, 248:7
**DAVID** [1] - 1:6
**David** [30] - 2:16, 141:22, 142:19, 233:22, 234:3,

235:15, 235:24, 236:15, 236:16, 236:19, 237:15, 242:24, 247:18, 247:20, 249:8, 251:15, 252:15, 257:6, 264:21, 264:24, 265:6, 265:12, 266:9, 266:24, 267:5, 267:11, 268:19, 268:21, 269:10, 271:6
**day-to-day** [3] - 34:17, 150:6, 150:8
**days** [8] - 7:19, 84:12, 109:3, 240:25, 245:24, 249:8, 255:13, 258:13
**deal** [27] - 38:20, 41:17, 55:2, 57:22, 59:11, 59:16, 102:7, 112:25, 162:18, 163:24, 164:9, 164:12, 166:14, 167:15, 168:9, 172:6, 172:10, 183:13, 183:15, 184:16, 189:20, 190:21, 191:2, 191:5, 235:20, 256:15, 262:4
**dealer** [4] - 84:12, 176:14, 176:17, 181:21
**Dealers** [1] - 7:8
**dealership** [52] - 8:22, 8:24, 9:23, 10:17, 10:20, 10:22, 10:23, 11:4, 11:12, 11:21, 11:25, 12:5, 14:17, 17:24, 18:8, 18:22, 29:25, 37:8, 46:18, 48:15, 48:18, 48:21, 51:22, 52:18, 52:24, 53:17, 106:14, 123:23, 124:5, 124:12, 124:17, 124:22, 127:16, 127:18, 128:16, 151:10, 158:15, 167:5, 180:6, 193:16, 193:20, 221:13, 221:14, 222:14, 222:15, 223:7, 223:12, 245:22, 245:25, 255:22, 260:20
**dealerships** [41] - 7:12, 10:11, 10:18,

12:13, 16:9, 17:5, 27:21, 33:8, 52:23, 54:10, 59:12, 59:13, 59:16, 59:21, 60:3, 60:7, 64:20, 65:2, 65:7, 65:11, 67:14, 76:8, 123:8, 123:10, 128:22, 136:20, 136:25, 160:25, 181:2, 181:5, 181:8, 187:18, 197:7, 198:10, 241:21, 246:7, 252:17, 253:22, 255:13, 257:16, 262:18
**dealerships'** [1] - 194:25
**dealing** [1] - 125:15
**deals** [15] - 66:15, 66:19, 87:15, 155:13, 155:25, 171:5, 182:24, 183:5, 183:6, 205:16, 205:19, 205:24, 206:6, 206:11, 210:14
**debt** [10] - 75:21, 77:11, 121:2, 127:20, 127:21, 127:24, 128:14, 165:25, 171:21, 209:21
**December** [25] - 11:16, 11:17, 13:7, 41:16, 59:23, 102:2, 109:23, 125:5, 133:9, 133:12, 134:10, 164:21, 171:9, 174:12, 194:10, 194:11, 194:18, 199:17, 204:22, 207:14, 208:3, 208:18, 208:23, 214:13, 235:19
**decent** [1] - 177:4
**decided** [2] - 255:22, 256:10
**deciding** [1] - 211:11
**decision** [5] - 43:5, 70:6, 72:15, 197:12, 254:3
**declaration** [2] - 146:3, 146:12
**deduct** [1] - 145:14
**deeper** [2] - 60:18, 260:21
**Defendant** [3] - 3:4, 3:9, 3:15
**Defendants** [1] - 1:18

**defendants** [1] - 231:17
**Defendants'** [6] - 62:9, 62:10, 91:11, 97:8, 116:9, 234:19
**DEFENDANTS'** [1] - 276:14
**deficiencies** [1] - 212:10
**definitely** [3] - 41:21, 178:17, 178:18
**defraud** [1] - 133:3
**defrauding** [1] - 136:25
**degree** [1] - 108:6
**Del** [1] - 5:14
**delay** [1] - 47:10
**delayed** [2] - 65:21, 66:14
**delays** [1] - 66:16
**deliver** [3] - 177:11, 183:14, 183:20
**delivered** [6] - 102:9, 141:13, 178:16, 178:19, 178:22, 184:11
**demand** [1] - 83:23
**Deo** [203] - 8:9, 8:19, 11:20, 11:24, 12:4, 13:3, 13:24, 16:25, 23:16, 29:14, 29:15, 31:22, 32:3, 32:24, 33:3, 34:6, 34:9, 34:11, 34:21, 42:23, 44:3, 45:21, 46:3, 46:11, 46:23, 47:5, 47:16, 48:15, 51:6, 53:24, 54:5, 54:25, 55:11, 58:23, 60:10, 61:13, 61:14, 62:21, 63:21, 64:16, 67:6, 67:22, 68:11, 70:2, 70:24, 71:7, 73:25, 74:11, 76:16, 77:22, 81:17, 82:8, 84:25, 85:19, 85:24, 85:25, 86:9, 92:4, 92:11, 92:17, 94:5, 96:16, 98:6, 98:20, 98:25, 100:3, 101:12, 101:20, 104:25, 105:20, 106:8, 106:13, 112:16, 112:25, 113:6, 116:24, 116:25, 117:9, 117:21, 120:15, 120:20, 125:10, 125:16, 130:7, 130:21, 131:13, 131:22,

136:23, 138:5, 138:21, 140:8, 142:18, 144:17, 144:22, 144:24, 146:15, 147:3, 147:14, 147:18, 148:8, 149:13, 150:3, 155:6, 155:21, 157:9, 158:16, 158:24, 159:4, 159:5, 159:19, 159:20, 159:23, 160:17, 162:10, 162:17, 162:20, 163:7, 163:13, 164:10, 164:18, 166:4, 166:18, 166:23, 167:10, 169:10, 171:12, 172:14, 173:20, 174:11, 175:16, 176:16, 177:8, 181:6, 181:12, 182:4, 182:6, 184:2, 185:22, 188:4, 189:22, 193:2, 194:6, 202:7, 202:12, 202:14, 202:19, 208:20, 208:22, 212:5, 212:13, 212:25, 215:7, 216:2, 219:7, 222:10, 226:5, 228:15, 229:5, 229:11, 231:16, 234:4, 234:14, 235:15, 235:25, 240:15, 240:24, 241:5, 241:7, 242:20, 243:9, 243:18, 245:4, 245:12, 246:24, 249:14, 249:16, 250:16, 250:23, 251:19, 252:19, 252:25, 253:15, 254:13, 258:23, 259:5, 259:15, 260:17, 261:18, 261:25, 262:13, 263:2, 263:22, 265:17, 265:22, 265:23, 269:9, 270:4, 270:13, 270:15, 271:3, 271:19
**DEO** [5] - 1:11, 3:23, 3:24, 8:6
**Deo's** [7] - 34:13, 78:23, 83:19,

135:22, 173:5, 230:3, 262:7
**Deos** [4] - 47:24, 51:18, 52:7, 134:9
**Department** [2] - 28:18, 216:19
**department** [13] - 30:7, 41:3, 41:13, 43:8, 66:8, 67:3, 67:8, 69:9, 69:12, 70:20, 73:13, 151:18, 181:14
**departments** [1] - 66:23
**deposit** [4] - 31:18, 66:20, 141:5, 141:11
**deposited** [1] - 141:9
**depositing** [1] - 31:11
**Deposition** [1] - 1:22
**deposition** [7] - 4:7, 4:14, 5:21, 68:3, 275:10, 278:10, 278:12
**depositions** [1] - 90:3
**deposits** [1] - 183:4
**descent** [1] - 211:4
**detail** [1] - 239:24
**details** [2] - 185:4, 239:25
**Development** [1] - 13:20
**DIANA** [1] - 278:25
**Diana** [3] - 1:24, 278:6, 278:24
**Dickinson** [1] - 6:21
**difference** [1] - 193:12
**differences** [1] - 194:4
**different** [15] - 32:17, 65:24, 78:9, 78:12, 78:13, 78:15, 78:20, 82:22, 82:24, 86:7, 130:17, 147:25, 179:16, 237:20
**difficult** [2] - 66:22, 255:18
**difficulties** [2] - 83:16, 161:10
**difficulty** [2] - 83:12, 181:7
**diligence** [1] - 60:8
**direct** [2] - 263:21, 265:7
**directed** [1] - 250:15
**direction** [4] - 39:21, 39:22, 98:23, 186:23
**directly** [8] - 15:12, 133:8, 190:21, 191:3, 191:6, 227:5, 248:24, 253:2
**disappearing** [1] -

144:18
**disaster** [1] - 153:9
**disclose** [1] - 125:20
**discovered** [1] - 201:11
**discovery** [14] - 45:24, 92:16, 237:5, 249:6, 249:13, 258:17, 258:21, 259:18, 259:19, 259:21, 260:11, 260:15, 269:7, 271:8
**discuss** [6] - 23:11, 69:25, 111:2, 111:4, 177:3, 217:14
**discussed** [11] - 43:11, 63:21, 105:2, 119:17, 123:9, 157:12, 157:15, 157:16, 165:12, 176:23, 235:11
**discussing** [3] - 12:23, 17:3, 159:20
**Discussion** [2] - 62:13, 91:17
**discussion** [6] - 12:18, 12:20, 70:3, 101:14, 101:19, 119:19
**discussions** [9] - 12:11, 20:20, 63:17, 101:15, 102:10, 102:12, 137:3, 202:18, 263:18
**dishonest** [4] - 134:22, 134:25, 135:3, 220:20
**dismantled** [1] - 262:20
**distribution** [1] - 259:9
**district** [1] - 216:21
**DISTRICT** [2] - 1:2, 1:3
**divided** [1] - 207:10
**DLA** [2] - 1:15, 227:6
**DMS** [3] - 94:9, 140:20, 145:5
**DMV** [5] - 25:21, 34:22, 36:17, 37:21, 171:21
**DNA** [1] - 243:23
**docket** [3] - 62:20, 68:9, 97:13
**DOCUMENT** [1] - 276:8
**document** [14] - 61:18, 62:16, 91:18, 92:7, 92:10, 95:15, 96:19, 96:24, 97:12, 106:24, 107:2,

107:7, 238:5, 240:14
**documentation** [3] - 67:13, 239:6, 239:9
**documented** [1] - 162:17
**documents** [12] - 65:17, 100:19, 141:17, 183:8, 236:17, 236:20, 237:14, 237:20, 237:21, 237:24, 268:17, 268:20
**dollar** [4] - 36:12, 70:16, 156:6, 226:25
**dollars** [5] - 83:18, 84:21, 156:5, 156:23, 260:18
**dollars'** [1] - 221:22
**done** [44] - 43:15, 45:22, 47:14, 76:5, 99:12, 105:21, 113:13, 113:15, 119:25, 120:4, 131:8, 144:3, 144:8, 144:12, 149:13, 149:15, 149:16, 149:22, 185:15, 186:3, 205:5, 219:8, 219:12, 219:21, 219:25, 220:5, 220:25, 221:6, 221:8, 221:9, 221:11, 221:12, 221:13, 221:25, 223:3, 223:6, 223:8, 231:5, 232:7, 244:3, 252:15, 262:22, 263:13
**door** [1] - 223:9
**double** [8] - 38:17, 39:3, 105:23, 105:25, 196:25, 197:5, 212:11, 239:14
**double-check** [1] - 239:14
**doubt** [2] - 49:2, 65:4
**down** [19] - 42:11, 53:16, 108:6, 130:2, 130:4, 130:19, 156:17, 160:14, 160:16, 162:11, 168:12, 168:16, 169:3, 208:2, 209:16, 209:18, 209:21, 210:9, 255:14
**dozen** [1] - 175:24
**dragged** [1] - 132:8
**drama** [2] - 64:8,

68:16
**drawer** [3] - 142:7, 142:22, 241:22
**drew** [1] - 75:15
**driving** [1] - 187:7
**drop** [1] - 70:13
**dropped** [1] - 182:25
**drugs** [1] - 5:23
**Dude** [1] - 246:8
**due** [1] - 260:14
**duly** [2] - 5:3, 278:11
**dump** [2] - 70:10, 84:22
**dumping** [1] - 146:19
**during** [19] - 38:6, 38:11, 116:13, 123:21, 164:6, 164:20, 167:22, 168:3, 181:25, 192:25, 195:2, 197:23, 199:17, 205:13, 205:20, 207:17, 210:14, 223:10, 258:24
**duty** [2] - 47:18, 47:20
**DWIGHT** [1] - 1:12
**Dwight** [2] - 14:9, 14:12
**Dykman** [1] - 233:16
**DYKMAN** [1] - 3:8

## E

**Earle** [2] - 1:19, 3:10
**early** [5] - 9:8, 9:10, 124:8, 164:20, 199:16
**easiest** [1] - 232:19
**easily** [1] - 257:23
**EASTERN** [1] - 1:3
**easy** [3] - 47:7, 66:18, 257:19
**effect** [1] - 4:18
**eight** [4] - 75:23, 174:16, 206:4, 206:11
**eighteen** [1] - 148:17
**EIN** [6] - 51:6, 51:10, 53:7, 96:9, 96:15, 237:13
**either** [6] - 94:12, 122:13, 122:14, 139:18, 176:9, 243:4
**email** [50] - 43:14, 43:19, 43:20, 43:24, 43:25, 44:5, 45:4, 45:8, 63:7, 63:17, 64:2, 64:5, 64:16, 70:17, 71:14, 92:12, 92:14, 92:18, 97:23,

97:25, 99:16, 100:16, 110:22, 110:23, 111:7, 170:25, 238:2, 239:25, 240:6, 240:21, 242:19, 242:22, 242:24, 243:15, 243:17, 247:15, 248:24, 250:18, 255:3, 258:11, 258:16, 266:10, 266:19, 266:20, 266:22, 267:2, 267:4, 267:10, 270:25, 271:3
**Email** [8] - 62:10, 97:8, 238:6, 240:16, 276:15, 276:20, 276:24, 276:25
**Emails** [1] - 276:9
**emails** [20] - 33:2, 63:10, 63:22, 64:18, 66:24, 68:18, 71:8, 143:14, 155:21, 161:25, 218:8, 237:3, 238:13, 238:17, 238:18, 238:19, 239:4, 239:15, 244:23, 262:8
**EMANUEL** [1] - 2:9
**Emanuel** [4] - 94:17, 112:21, 203:22, 232:21
**Emerson** [1] - 6:14
**employ** [1] - 110:2
**employees** [1] - 102:25
**emptied** [1] - 224:25
**emptying** [1] - 224:19
**end** [24] - 10:25, 38:25, 46:20, 59:23, 85:2, 105:25, 117:20, 117:23, 117:24, 118:3, 118:13, 122:4, 152:16, 157:23, 174:13, 181:15, 194:19, 197:21, 210:5, 241:17, 253:20, 253:22, 255:11
**ended** [7] - 83:11, 119:10, 122:15, 146:22, 155:17, 193:8, 234:21
**ending** [1] - 173:22
**enforcement** [10] - 28:13, 216:13,

216:24, 217:4, 217:8, 217:14, 218:6, 218:15, 218:19, 218:25
**entered** [2] - 8:15, 59:20
**entire** [1] - 75:17
**entries** [2] - 155:15, 155:20
**entry** [7] - 62:20, 68:9, 73:15, 97:12, 97:13, 156:22, 156:25
**envelopes** [1] - 104:22
**ERC** [1] - 201:6
**escrow** [1] - 20:7
**especially** [6] - 48:16, 54:23, 57:18, 150:22, 229:23, 244:13
**ESQ** [5] - 2:9, 2:21, 3:3, 3:12, 3:20
**Estancia** [1] - 5:14
**ESTATE** [1] - 1:6
**Estate** [1] - 2:16
**Eugene** [4] - 186:8, 186:9, 186:13, 186:18
**Europe** [1] - 111:9
**eventually** [2] - 98:22, 184:25
**evidence** [7] - 58:19, 66:10, 88:15, 141:19, 155:11, 268:2
**exact** [15] - 63:25, 87:10, 92:20, 159:18, 178:7, 178:10, 178:13, 184:4, 193:23, 201:6, 209:18, 266:15, 267:16, 267:17, 271:10
**exactly** [12] - 68:13, 80:24, 92:22, 92:23, 94:5, 103:11, 115:6, 136:14, 136:15, 174:3, 224:4, 237:18
**EXAMINATION** [7] - 5:17, 192:18, 233:9, 264:9, 268:15, 270:2, 276:3
**examined** [1] - 5:4
**examining** [1] - 151:8
**example** [1] - 270:24
**exceed** [1] - 182:17
**except** [1] - 4:9
**exchange** [4] - 23:19, 111:13, 112:24, 113:5
**exchanged** [4] - 33:2,

55:4, 67:22, 143:16
**exchanging** [1] - 104:21
**executed** [2] - 32:19, 164:19
**exhibit** [9] - 62:2, 62:5, 97:7, 97:14, 110:18, 110:19, 113:14, 130:2, 153:19
**Exhibit** [27] - 51:4, 51:14, 51:19, 54:4, 61:7, 62:6, 62:9, 62:10, 62:19, 91:9, 91:11, 97:8, 110:16, 113:16, 116:8, 116:9, 130:4, 234:19, 235:3, 238:6, 238:9, 240:16, 242:15, 242:17, 250:4, 276:12
**EXHIBITS** [2] - 276:13, 277:3
**exhibits** [6] - 49:12, 56:9, 232:20, 234:22, 234:23, 277:8
**exist** [2] - 26:14, 258:7
**existed** [3] - 31:12, 138:22, 156:4
**existence** [1] - 114:18
**exists** [2] - 23:22, 73:21
**exiting** [1] - 80:20
**expanding** [1] - 10:14
**expectation** [2] - 59:10, 204:16
**expedite** [1] - 99:21
**expense** [2] - 197:8, 199:2
**expenses** [4] - 92:24, 94:4, 195:2, 196:11
**expensive** [1] - 199:2
**experience** [1] - 37:9
**explain** [1] - 210:12
**extent** [4] - 158:22, 239:12, 239:15, 254:16
**extra** [1] - 93:17

### F

**F&I** [1] - 14:23
**facilitate** [1] - 137:25
**facilitated** [2] - 46:16, 222:7
**facilitator** [4] - 30:6, 30:16, 47:3, 96:7
**facility** [1] - 181:4

**fact** [16] - 44:5, 49:2, 65:10, 67:17, 69:11, 73:13, 99:23, 111:18, 112:7, 139:25, 143:19, 161:7, 175:13, 229:15, 257:21, 262:24
**factory** [1] - 153:25
**facts** [5] - 58:19, 66:10, 88:15, 141:19, 155:11
**fair** [5] - 116:12, 174:13, 187:8, 210:7, 210:10
**Fairleigh** [1] - 6:21
**faith** [1] - 272:4
**fake** [8] - 30:8, 31:11, 55:24, 154:4, 182:24, 183:5, 183:6, 183:7
**fall** [1] - 214:15
**falling** [3] - 41:3, 41:18, 108:4
**false** [5] - 48:2, 48:4, 92:8, 112:19, 207:24
**family** [1] - 105:18
**far** [14] - 13:5, 14:15, 26:15, 26:18, 29:16, 46:7, 74:4, 93:21, 106:23, 187:2, 217:12, 219:8, 219:13, 229:24
**fault** [1] - 73:12
**FBI** [4] - 28:18, 29:17, 29:19, 216:6
**February** [19] - 8:10, 14:4, 36:15, 37:11, 42:20, 42:21, 73:14, 117:2, 117:13, 117:19, 127:10, 148:2, 154:17, 154:20, 163:24, 164:6, 186:20, 197:3, 208:23
**federal** [1] - 202:4
**fees** [3] - 204:7, 204:14, 204:17
**felon** [1] - 36:2
**felt** [1] - 161:15
**fence** [1] - 87:22
**few** [12] - 25:16, 84:17, 87:13, 177:22, 177:24, 178:20, 207:25, 211:6, 221:15, 233:18, 240:25, 245:24
**fewer** [1] - 205:25
**fifteen** [1] - 226:21
**fighting** [1] - 41:20

**figure** [9] - 23:20, 86:13, 94:10, 94:12, 145:13, 145:15, 161:5, 222:2, 253:21
**figured** [1] - 85:3
**file** [3] - 26:5, 179:5, 201:15
**filed** [10] - 50:4, 50:5, 56:8, 61:22, 62:21, 201:18, 201:22, 201:25, 215:25, 217:3
**filing** [9] - 4:5, 53:6, 98:13, 99:18, 237:11, 237:12, 244:9, 252:12, 267:24
**filming** [1] - 223:21
**finalize** [4] - 57:21, 152:2, 158:21, 181:18
**finalized** [8] - 164:16, 166:14, 167:14, 171:5, 172:5, 172:10, 235:19, 273:20
**finally** [2] - 156:21, 259:10
**finance** [3] - 176:12, 176:14, 177:3
**financial** [6] - 83:12, 83:15, 120:6, 202:17, 215:11, 258:4
**financials** [3] - 30:8, 111:19, 132:10
**fine** [1] - 196:4
**finish** [8] - 6:18, 52:13, 59:11, 64:22, 65:18, 125:24, 225:16, 262:4
**finished** [2] - 9:15, 73:2
**fire** [2] - 43:2, 45:2
**fired** [3] - 40:23, 41:11, 103:19
**firing** [1] - 43:16
**firm** [4] - 94:8, 94:11, 94:14, 233:16
**first** [35] - 8:8, 18:14, 40:13, 40:14, 45:17, 46:4, 49:17, 49:25, 61:21, 63:13, 80:10, 85:13, 85:20, 91:25, 94:18, 96:24, 107:2, 114:17, 117:6, 123:13, 124:4, 124:12, 134:9, 147:19, 188:6, 197:2, 202:24,

211:16, 229:3, 229:4, 229:5, 229:20, 230:10, 242:17, 251:24
**firsthand** [9] - 48:5, 48:12, 53:19, 95:7, 121:19, 130:13, 137:8, 140:24, 222:9
**FISK** [1] - 1:8
**Fisk** [1] - 2:17
**five** [2] - 123:20, 143:24
**fixed** [2] - 7:12, 101:24
**flag** [1] - 74:25
**flatbed** [1] - 187:13
**flatbeds** [3] - 187:14, 187:17, 187:21
**fled** [1] - 162:19
**floor** [69] - 24:22, 24:23, 25:4, 25:7, 25:13, 25:23, 26:3, 26:6, 27:25, 31:8, 31:9, 36:13, 36:25, 39:6, 39:10, 39:13, 39:24, 83:21, 85:9, 85:15, 104:24, 105:8, 111:2, 122:16, 122:19, 122:23, 123:6, 140:19, 164:23, 167:9, 167:17, 169:24, 170:13, 170:20, 171:3, 171:4, 171:11, 171:15, 171:17, 171:19, 171:22, 171:24, 172:3, 172:7, 172:13, 173:8, 173:14, 173:18, 189:20, 189:23, 190:8, 190:17, 190:19, 190:21, 191:2, 191:6, 195:17, 197:9, 197:13, 197:16, 197:19, 198:4, 198:9, 199:5, 199:15, 199:19, 202:23, 203:2, 203:8
**floored** [12] - 25:25, 38:17, 39:3, 39:5, 105:23, 105:25, 120:21, 121:17, 172:12, 172:19, 190:6, 196:25
**flooring** [7] - 26:2, 39:25, 83:22, 172:16, 172:19, 197:5, 212:11
**Flushing** [71] - 3:9,

31:25, 55:19, 56:13, 56:15, 98:7, 99:7, 141:8, 156:8, 156:11, 157:8, 182:12, 213:25, 214:5, 214:6, 227:3, 227:4, 229:19, 233:17, 233:20, 233:23, 234:15, 234:16, 235:2, 235:3, 235:25, 237:9, 238:4, 238:6, 238:9, 238:11, 238:25, 239:5, 239:21, 240:10, 240:13, 240:16, 245:10, 245:14, 246:15, 247:3, 247:23, 247:24, 249:2, 249:25, 250:3, 250:4, 250:21, 251:10, 252:25, 256:19, 259:16, 263:4, 263:23, 264:12, 264:16, 265:9, 267:20, 268:20, 268:25, 270:6, 270:12, 270:16, 271:2, 271:7, 272:11, 272:22, 273:7, 273:9, 273:17, 276:11
**FLUSHING** [3] - 1:16, 276:22, 277:4
**focused** [1] - 29:17
**focusing** [1] - 265:6
**folder** [1] - 190:14
**follow** [5] - 239:19, 239:23, 240:4, 245:16, 269:23
**follows** [2] - 5:5, 192:17
**footage** [7] - 223:11, 223:17, 224:3, 224:6, 224:7, 224:10, 224:14
**FOR** [3] - 276:14, 276:22, 277:4
**for..** [1] - 27:16
**force** [1] - 4:18
**forensic** [4] - 44:15, 64:10, 68:19, 72:17
**forest** [1] - 212:3
**forever** [3] - 132:8, 243:22, 274:4
**forget** [2] - 17:13, 94:16
**forgive** [1] - 191:9
**forgot** [2] - 7:22, 84:7

**form** [14] - 4:10, 33:11, 75:19, 79:7, 86:11, 95:17, 99:5, 128:7, 130:25, 133:17, 137:7, 165:23, 197:15, 270:19
**forth** [2] - 102:24, 278:11
**forty** [2] - 86:19, 148:18
**forty-three** [2] - 86:19, 148:18
**forward** [7] - 52:24, 59:6, 59:8, 70:15, 244:24, 247:19, 262:3
**forwarded** [1] - 248:9
**four** [7] - 25:21, 42:14, 109:21, 123:8, 140:11, 206:7, 262:19
**fourth** [1] - 30:2
**Frank** [3] - 180:9, 180:10, 180:17
**fraud** [6] - 49:2, 93:7, 131:4, 154:4, 163:2, 207:2
**fraudulent** [2] - 87:15, 93:10
**fraudulently** [3] - 35:22, 35:25, 207:23
**Freehold** [1] - 10:22
**friend** [3] - 9:11, 60:15, 242:3
**friends** [2] - 120:20, 120:24
**front** [1] - 63:3
**froze** [1] - 245:23
**full** [6] - 5:7, 40:7, 42:10, 73:25, 74:7, 244:18
**fund** [1] - 158:8
**FUNDING** [1] - 1:16
**Funding** [1] - 3:16
**funding** [1] - 158:4
**funny** [1] - 74:21
**FURTHER** [4] - 4:8, 4:13, 268:15, 270:2

**G**

**game** [1] - 131:2
**gang** [9] - 29:22, 30:4, 30:20, 47:2, 47:13, 130:10, 131:3, 132:17, 140:22
**Garita** [1] - 5:14
**general** [17] - 14:4, 32:15, 32:16, 32:17, 34:11, 34:14, 51:9,

59:9, 80:3, 81:24, 114:20, 123:25, 124:2, 131:24, 140:20, 149:21, 190:11
**generally** [2] - 54:11, 253:8
**generated** [1] - 211:22
**generating** [1] - 182:24
**gentleman** [3] - 17:9, 110:5, 127:4
**get-go** [1] - 171:10
**Gianelli** [1] - 214:12
**given** [13] - 64:15, 103:14, 107:6, 122:12, 136:8, 153:12, 153:17, 153:18, 190:12, 222:23, 269:7, 275:14, 278:13
**glad** [2] - 22:2, 70:21
**GM** [1] - 124:8
**Gmail** [2] - 239:16, 276:10
**GOLD** [6] - 1:13, 1:13, 1:14, 1:14, 1:15
**Gold** [11] - 100:23, 101:2, 104:24, 105:5, 105:8, 105:11, 105:13, 106:8, 106:20, 107:7, 111:3
**goodness** [1] - 259:11
**gracious** [2] - 24:9, 24:13
**grand** [5] - 34:8, 76:6, 76:10, 102:13, 146:24
**gray** [6] - 175:19, 176:4, 176:7, 176:14, 177:3, 184:20
**great** [7] - 10:11, 139:25, 150:20, 158:12, 242:6, 242:8, 246:16
**grew** [2] - 181:20, 210:22
**gross** [2] - 93:17, 94:4
**grosses** [2] - 72:24, 73:11
**grossing** [2] - 206:25, 207:7
**ground** [1] - 145:9
**group** [10] - 18:3, 18:4, 76:7, 133:25, 150:4, 219:10, 219:25, 220:8, 221:6, 262:12

**GROUP** [1] - 1:14
**Group** [2] - 56:8, 133:20
**grow** [2] - 161:6, 210:17
**guarantee** [1] - 182:8
**guess** [18] - 15:24, 34:6, 35:25, 45:23, 82:10, 117:19, 158:5, 177:5, 207:12, 212:10, 212:20, 216:21, 231:12, 233:7, 234:18, 256:13, 259:10, 268:24
**guide** [7] - 200:13, 200:14, 208:6, 208:11, 208:12, 208:16
**Gurus** [1] - 196:4
**guy** [18] - 9:19, 18:14, 99:13, 107:17, 127:14, 132:25, 161:8, 165:17, 177:4, 221:17, 260:3, 260:8, 260:9, 260:20, 262:2, 262:9, 262:11, 262:12
**guys** [16] - 14:14, 14:16, 14:20, 14:24, 17:16, 17:17, 17:18, 30:9, 33:18, 39:19, 39:23, 47:2, 180:3, 220:17, 230:16, 268:25

**H**

**Hakim** [1] - 46:22
**half** [6] - 36:12, 36:25, 83:18, 101:25, 182:18, 221:21
**hand** [1] - 278:21
**handle** [6] - 16:10, 30:9, 31:9, 180:4, 230:10
**handled** [2] - 31:4, 225:2
**handles** [2] - 30:16, 138:2
**handling** [3] - 16:12, 31:6, 33:4
**handshake** [1] - 164:9
**handwriting** [1] - 141:10
**happy** [3] - 6:9, 68:7, 233:2
**hard** [2] - 99:8, 197:24
**harm** [9] - 46:14,

48:14, 130:5, 134:4, 222:5, 230:25, 231:10, 231:17, 231:24
**harmed** [1] - 228:24
**HARRY** [2] - 1:11, 3:3
**Harry** [2] - 5:20, 132:5
**Hartford** [13] - 11:5, 18:23, 19:2, 23:23, 124:19, 128:16, 140:3, 157:17, 179:12, 179:14, 179:18, 180:18, 180:22
**head** [3] - 23:18, 41:19, 149:3
**healthy** [1] - 182:23
**hear** [7] - 8:5, 21:11, 21:15, 21:16, 21:19, 21:21, 85:13
**heard** [10] - 16:6, 20:8, 20:21, 27:2, 54:20, 69:2, 69:4, 116:4, 218:18, 218:21
**hearing** [4] - 147:21, 147:23, 148:2, 186:20
**heartbeat** [1] - 261:13
**hedge** [1] - 158:8
**held** [2] - 51:19, 230:14
**help** [16] - 13:11, 44:25, 122:18, 150:11, 150:17, 150:23, 166:23, 166:25, 172:7, 203:8, 254:25, 259:23, 264:2, 266:13, 271:11, 273:14
**helped** [4] - 122:16, 150:13, 220:9, 221:5
**helping** [3] - 14:17, 226:4, 229:25
**helps** [1] - 68:8
**hereby** [2] - 275:7, 278:8
**HEREBY** [1] - 4:2
**herein** [1] - 4:4
**hereinbefore** [1] - 278:11
**hereunto** [1] - 278:21
**herself** [1] - 69:21
**hide** [2] - 101:12, 182:21
**high** [3] - 6:13, 196:13
**High** [1] - 6:14
**higher** [3] - 264:23, 265:2, 265:3
**HIGHWAY** [1] - 1:4

*Rich Moffett Court Reporting, Inc.*

**Highway** [2] - 2:12, 3:5
**himself** [5] - 33:15, 165:22, 213:23, 214:4, 258:3
**hire** [2] - 42:23, 115:11
**hired** [7] - 15:24, 42:16, 60:20, 79:18, 117:2, 117:12, 152:3
**hit** [2] - 73:18, 145:4
**hits** [1] - 210:6
**hold** [3] - 24:9, 26:6, 274:5
**holding** [3] - 19:18, 35:7, 59:25
**holds** [1] - 51:21
**home** [1] - 260:5
**homes** [1] - 258:8
**honest** [2] - 57:11, 161:15
**honestly** [4] - 70:7, 259:19, 262:2, 264:21
**hostage** [2] - 35:8, 60:2
**House** [1] - 132:21
**house** [4] - 50:17, 50:22, 162:25, 221:19
**houses** [1] - 158:5
**hundred** [2] - 174:25, 229:20
**hundreds** [2] - 156:4, 174:2
**hurt** [1] - 109:12
**HWY** [1] - 1:17
**Hylan** [1] - 2:16
**HYLAN** [6] - 1:6, 1:7, 1:7, 1:8

## I

**I..** [1] - 23:7
**I.D** [3] - 276:14, 276:22, 277:4
**idea** [24] - 15:23, 19:7, 26:20, 33:6, 34:24, 45:3, 58:20, 58:21, 88:16, 88:18, 89:10, 89:14, 89:17, 93:18, 95:11, 117:17, 138:12, 160:19, 175:21, 204:21, 206:21, 206:24, 211:21, 273:2
**identification** [8] - 62:11, 91:15, 97:10, 116:11, 235:5, 238:7, 240:17, 250:6

**identify** [2] - 235:14, 269:9
**illegal** [1] - 141:6
**imagine** [3] - 45:7, 117:5, 246:2
**immediately** [1] - 57:17
**impact** [2] - 5:24, 169:14
**important** [1] - 253:11
**impression** [2] - 72:3, 72:8
**IN** [1] - 278:20
**inaccurate** [2] - 148:10, 157:2
**Inc** [3] - 2:5, 91:12, 276:16
**INC** [3] - 1:4, 1:13, 1:16
**include** [2] - 47:23, 110:22
**included** [1] - 44:20
**including** [7] - 12:21, 62:8, 66:17, 207:2, 207:14, 237:5, 248:14
**income** [2] - 92:23, 93:21
**incorporation** [2] - 98:13, 141:16
**incorrect** [4] - 154:14, 154:16, 154:24, 193:15
**indicate** [2] - 61:12, 147:3
**indicated** [1] - 215:18
**indicating** [2] - 120:15, 215:25
**individual** [1] - 126:19
**inflate** [2] - 92:12, 205:18
**inflated** [1] - 92:18
**influence** [1] - 43:5
**info** [1] - 260:4
**information** [27] - 64:25, 67:7, 87:17, 98:3, 98:20, 103:11, 103:18, 117:8, 149:4, 149:7, 155:14, 193:15, 218:14, 218:22, 234:8, 243:2, 243:5, 243:13, 244:8, 244:24, 245:5, 252:17, 253:14, 253:16, 256:25, 257:3, 259:16
**informed** [3] - 36:8, 270:5, 270:6
**initial** [1] - 55:17

**initiated** [1] - 203:16
**injuncted** [2] - 214:17, 215:3
**injunction** [3] - 86:15, 86:17, 187:15
**inputs** [1] - 155:13
**insinuate** [1] - 65:23
**insinuation** [2] - 64:10, 65:5
**install** [1] - 77:8
**installed** [1] - 78:4
**instance** [1] - 104:22
**instead** [2] - 187:18, 206:17
**instruct** [1] - 113:25
**insurance** [1] - 195:12
**insured** [3] - 24:19, 24:21, 24:23
**insuring** [1] - 25:2
**intent** [1] - 183:11
**intentional** [1] - 70:17
**interest** [4] - 26:4, 26:6, 123:10, 230:2
**interested** [2] - 23:2, 278:18
**interests** [2] - 71:20, 71:21
**internal** [4] - 28:19, 28:21, 29:7, 216:17
**Internal** [1] - 28:24
**internally** [2] - 249:7, 260:17
**interviewed** [2] - 121:23, 122:3
**introduced** [4] - 8:20, 9:12, 229:18, 242:4
**inventory** [16] - 31:7, 75:17, 84:22, 84:23, 102:4, 102:5, 102:11, 140:18, 145:10, 160:15, 173:2, 173:4, 180:4, 209:17, 210:3, 210:10
**invest** [1] - 8:23
**investigator** [1] - 60:21
**investor** [5] - 245:22, 246:5, 255:24, 261:15
**invited** [1] - 146:24
**involve** [1] - 46:8
**involved** [16] - 12:8, 13:7, 16:5, 17:6, 29:3, 31:10, 86:15, 86:16, 127:15, 136:19, 136:22, 136:24, 228:9, 230:19, 230:21, 253:19

**involving** [1] - 134:9
**Iris** [1] - 2:15
**IRIS** [1] - 1:6
**IS** [3] - 4:2, 4:8, 4:13
**Island** [4] - 2:18, 33:25, 56:8, 133:19
**ISLAND** [1] - 1:9
**issue** [6] - 246:21, 255:7, 255:9, 257:7, 257:10, 257:12
**issues** [7] - 41:2, 41:4, 171:21, 184:19, 236:9, 246:12, 249:10
**IT** [3] - 4:2, 4:8, 4:13
**it's..** [1] - 57:24
**it..** [1] - 185:20
**items** [1] - 64:15
**itself** [2] - 61:18, 198:5

## J

**J.P** [1] - 1:16
**jackets** [1] - 179:5
**Jamaica** [2] - 2:7, 2:8
**James** [4] - 17:11, 17:12, 17:16, 110:4
**January** [15] - 1:20, 13:7, 13:10, 56:22, 59:22, 59:24, 73:14, 91:13, 109:23, 154:9, 154:17, 154:20, 275:11, 276:18, 278:22
**Jave** [1] - 18:14
**Jeff** [4] - 233:4, 274:2, 274:3
**JEFFREY** [2] - 2:21, 3:20
**Jeremy** [9] - 15:3, 120:19, 120:25, 121:3, 121:5, 121:10, 121:24, 122:3, 122:10
**Jersey** [25] - 6:15, 10:22, 12:6, 18:7, 27:19, 27:20, 28:5, 50:8, 123:16, 124:15, 124:16, 126:3, 126:6, 126:9, 126:25, 128:4, 128:10, 129:5, 129:24, 162:23, 166:24, 166:25, 167:5, 179:20, 179:24
**JMW)COUNTY** [1] - 1:11
**job** [7] - 137:25, 191:8, 220:12, 220:16,

221:7, 221:9
**joined** [2] - 31:22, 32:3
**joining** [2] - 21:9, 46:11
**Jonathan** [2] - 100:15, 104:21
**JONES** [2] - 1:12, 1:16
**Jones** [18] - 44:14, 45:22, 69:4, 92:12, 93:12, 136:24, 152:2, 153:16, 153:21, 154:5, 155:2, 155:4, 155:7, 155:14, 155:19, 155:22, 201:10, 201:11
**Jones's** [1] - 150:23
**Jory** [2] - 2:14, 116:15
**JORY** [1] - 1:5
**Josh** [12] - 35:7, 54:4, 54:8, 59:25, 120:2, 120:3, 161:10, 171:16, 172:2, 203:9, 203:18, 221:12
**Josh's** [1] - 172:2
**JOSHUA** [1] - 1:5
**Joshua** [3] - 2:14, 61:12, 203:7
**journals** [1] - 93:14
**July** [44] - 12:21, 12:24, 36:10, 37:11, 37:17, 50:18, 74:22, 76:7, 80:12, 80:13, 80:17, 105:24, 105:25, 107:5, 108:2, 108:23, 108:25, 109:6, 109:8, 111:8, 112:4, 125:2, 143:23, 146:17, 153:10, 154:23, 156:6, 156:12, 157:23, 158:23, 159:3, 159:21, 174:13, 194:19, 197:4, 204:23, 206:7, 207:15, 208:3, 222:21, 223:6, 224:3, 259:11
**jump** [1] - 232:23
**June** [11] - 125:2, 143:23, 153:5, 154:9, 154:21, 156:21, 157:5, 157:19, 157:23, 214:13, 223:4
**Junior** [1] - 6:14
**Junior-Senior** [1] -

## K

6:14
**justice** [1] - 30:19

**K-I-K-I-R-O-V** [1] - 126:23
**KATAEV** [141] - 2:9, 20:23, 21:7, 21:23, 36:20, 37:5, 40:11, 42:8, 45:19, 50:10, 51:23, 52:4, 52:20, 54:6, 54:15, 57:13, 58:5, 58:18, 61:17, 62:12, 62:17, 62:24, 63:6, 65:18, 66:9, 68:8, 69:14, 69:24, 71:4, 71:10, 72:4, 74:14, 75:11, 79:6, 86:10, 88:14, 88:21, 89:8, 89:12, 89:16, 89:25, 90:15, 90:25, 91:16, 93:22, 94:22, 95:6, 95:10, 95:16, 95:20, 96:12, 97:4, 97:11, 97:21, 99:4, 103:16, 103:20, 106:10, 110:13, 110:18, 113:13, 113:20, 113:24, 118:14, 120:18, 126:15, 128:6, 128:23, 129:25, 130:14, 130:24, 133:16, 134:16, 135:11, 137:6, 137:10, 138:11, 138:18, 139:8, 141:18, 144:4, 144:19, 148:12, 149:18, 152:6, 155:5, 155:10, 169:17, 174:18, 176:18, 191:11, 197:14, 204:8, 204:19, 210:20, 212:7, 213:4, 213:8, 214:18, 216:9, 216:15, 217:10, 217:16, 219:4, 219:14, 220:6, 220:23, 221:3, 223:23, 224:8, 224:15, 225:15, 226:3, 226:6, 227:12, 228:16, 228:20, 231:2, 231:20, 232:22, 233:2, 234:22, 235:6, 239:18, 240:7, 241:4,

261:23, 263:7, 264:5, 264:10, 264:20, 268:10, 270:10, 270:18, 271:23, 272:15, 273:11, 273:19, 274:2, 274:9, 276:6
**Kataev** [4] - 89:19, 113:23, 203:24, 204:11
**keep** [6] - 9:17, 96:5, 114:9, 144:16, 197:24, 209:20
**keeping** [2] - 76:2, 144:25
**Kendra** [21] - 40:6, 79:17, 79:18, 79:21, 79:24, 81:8, 81:11, 151:21, 151:22, 152:3, 152:9, 152:11, 153:12, 153:17, 155:9, 155:12, 155:17, 172:14, 172:15, 173:9, 190:18
**kept** [6] - 12:23, 26:2, 36:8, 121:18, 187:16, 209:14
**Kevin** [4] - 15:3, 117:3, 118:17, 121:5
**keys** [2] - 190:15, 214:17
**Khan** [1] - 2:15
**KHAN** [1] - 1:6
**kid** [2] - 120:23, 122:11
**Kikirov** [1] - 126:23
**kind** [6] - 14:2, 30:4, 30:19, 58:12, 102:4, 208:12
**kinds** [2] - 65:23, 181:19
**knowing** [3] - 70:13, 244:18, 261:17
**knowingly** [2] - 220:9, 222:7
**knowledge** [25] - 13:21, 14:6, 16:23, 48:6, 48:13, 53:19, 82:9, 95:8, 100:25, 104:12, 111:23, 112:18, 121:20, 130:13, 131:8, 137:9, 140:25, 194:14, 194:18, 200:25, 222:10, 228:7, 266:6, 266:21, 268:6
**known** [4] - 86:17, 113:8, 260:22, 266:7

## L

**knows** [2] - 252:16, 267:9

**labor** [1] - 204:3
**lack** [1] - 162:3
**lady** [1] - 221:21
**laid** [1] - 212:22
**landlord** [2] - 88:2, 221:17
**large** [1] - 257:16
**last** [19] - 17:14, 22:4, 22:12, 74:21, 80:15, 85:18, 107:24, 108:2, 109:2, 110:6, 118:25, 119:2, 125:3, 146:5, 216:22, 217:3, 255:17, 256:10, 257:3
**latest** [1] - 109:24
**LAURIE** [1] - 1:12
**Laurie** [14] - 17:10, 158:7, 228:24, 229:2, 229:11, 229:18, 229:19, 229:21, 229:22, 230:5, 230:8, 230:12, 230:24, 231:10
**law** [13] - 28:12, 48:20, 216:12, 216:23, 217:4, 217:7, 217:13, 218:5, 218:15, 218:19, 218:25, 233:16
**lawful** [2] - 58:16, 58:21
**lawsuit** [13] - 16:5, 16:8, 16:12, 16:13, 16:24, 26:21, 27:3, 27:7, 27:13, 46:22, 85:6, 132:23, 134:9
**lawsuits** [10] - 26:14, 26:16, 27:9, 28:7, 47:5, 128:21, 132:19, 134:23, 135:2, 204:7
**leads** [6] - 210:17, 210:25, 211:5, 211:14, 211:19, 211:22
**learn** [1] - 262:25
**learned** [2] - 60:17, 114:17
**learning** [1] - 247:23
**lease** [3] - 51:19, 51:21, 53:23
**LEASING** [2] - 1:5,

1:17
**Leasing** [2] - 2:13, 213:24
**least** [6] - 151:3, 181:15, 188:19, 189:6, 192:25, 230:19
**leave** [4] - 21:24, 109:25, 180:23, 261:10
**leaving** [7] - 70:14, 74:23, 75:7, 75:8, 75:24, 108:19, 108:22
**left** [22] - 26:17, 47:11, 50:7, 75:6, 78:4, 84:25, 108:24, 109:7, 109:13, 109:18, 110:3, 118:4, 128:13, 142:10, 150:18, 183:19, 184:2, 184:16, 184:17, 205:17, 217:24, 249:17
**leftover** [1] - 214:22
**legal** [6] - 30:17, 47:15, 204:7, 204:14, 204:17, 222:5
**LEGAL** [1] - 2:3
**legally** [2] - 72:2, 106:12
**legitimate** [1] - 210:13
**lengths** [1] - 139:25
**Leslie** [1] - 238:24
**less** [6] - 174:9, 174:23, 205:21, 206:4, 206:8, 260:25
**letter** [2] - 84:9, 84:14
**letters** [3] - 20:19, 23:7, 83:23
**level** [1] - 78:22
**levels** [1] - 78:16
**Lexington** [1] - 2:19
**liabilities** [1] - 54:9
**liability** [1] - 197:6
**Libertas** [3] - 3:15, 21:8, 45:24
**LIBERTAS** [1] - 1:16
**LIC** [1] - 1:14
**license** [12] - 35:17, 36:14, 36:18, 37:21, 48:18, 49:4, 59:10, 60:2, 112:4, 112:9, 262:3, 272:2
**licenses** [10] - 6:24, 25:21, 34:22, 35:6, 35:8, 35:9, 35:10, 37:8, 37:12, 37:17

**lie** [1] - 47:8
**lied** [3] - 36:15, 132:10, 220:10
**lies** [1] - 130:18
**life** [2] - 149:21, 255:25
**limits** [1] - 85:21
**line** [29] - 36:13, 37:2, 39:6, 39:14, 84:21, 85:9, 94:7, 98:2, 104:24, 105:5, 105:7, 105:11, 105:16, 106:5, 123:6, 126:16, 169:24, 171:3, 171:4, 198:22, 204:20, 219:5, 219:15, 250:22, 251:11, 251:17, 251:22, 252:9, 264:6
**lines** [11] - 27:25, 83:21, 84:2, 84:6, 84:11, 84:18, 111:2, 171:17, 171:20, 172:3, 172:7
**listed** [5] - 49:4, 54:12, 140:19, 173:12, 269:4
**Listen** [2] - 246:19, 263:11
**lists** [1] - 23:19
**litigation** [3] - 129:6, 133:10, 133:13
**LITTLE** [1] - 1:16
**live** [5] - 26:24, 37:2, 37:4, 37:6, 50:20
**lived** [3] - 162:5, 162:19, 162:22
**living** [1] - 162:7
**LLC** [29] - 1:4, 1:5, 1:7, 1:7, 1:8, 1:8, 1:9, 1:9, 1:13, 1:13, 1:14, 1:14, 1:15, 1:16, 1:17, 2:3, 2:5, 2:13, 2:17, 2:18, 3:16
**LLCs** [2] - 2:17, 237:18
**LLP** [4] - 1:16, 2:11, 3:8, 3:14
**loan** [15] - 121:14, 165:14, 165:21, 168:8, 169:25, 170:4, 209:5, 209:19, 254:8, 254:10, 254:11, 254:19, 260:14, 260:25, 268:24
**loans** [2] - 183:23, 184:16

**location** [3] - 18:23, 19:2, 19:3
**locations** [1] - 18:6
**lockout** [14] - 75:2, 89:6, 106:3, 107:8, 114:12, 114:16, 114:24, 114:25, 115:17, 118:11, 147:13, 148:6, 173:23, 222:23
**log** [1] - 78:8
**logged** [1] - 78:10
**logging** [1] - 114:3
**logical** [1] - 76:4
**logistics** [3] - 14:18, 30:10, 132:6
**long-standing** [1] - 261:11
**look** [19] - 13:13, 24:4, 45:9, 62:15, 67:7, 68:20, 71:23, 73:6, 94:7, 94:8, 103:5, 103:10, 106:12, 151:12, 155:15, 208:11, 225:4, 246:13, 260:21
**looked** [11] - 46:7, 48:13, 48:19, 64:4, 94:3, 134:5, 182:23, 201:10, 204:25, 268:18
**looking** [9] - 8:21, 8:22, 9:13, 36:11, 60:9, 70:11, 161:3, 161:4, 224:20
**lose** [1] - 84:22
**losing** [1] - 193:24
**Loss** [2] - 91:13, 276:17
**loss** [4] - 73:19, 153:20, 160:10, 201:8
**losses** [3] - 83:19, 182:17, 210:6
**lost** [6] - 24:7, 85:10, 207:17, 208:22, 259:12, 261:6
**loud** [1] - 129:19
**love** [1] - 133:7
**low** [2] - 146:19, 196:13
**Lowe** [1] - 186:8
**lower** [1] - 83:25
**lowered** [2] - 83:20, 84:7
**lowering** [1] - 85:21
**loyalty** [1] - 104:8
**lull** [1] - 150:24
**lunch** [1] - 191:13
**Luncheon** [1] - 191:16

# M

**mad** [1] - 165:20
**maintain** [1] - 25:20
**majority** [4] - 195:24, 198:25, 206:5, 236:11
**man** [2] - 161:16, 262:11
**MANAGEMENT** [1] - 1:9
**Management** [1] - 2:18
**management** [3] - 41:17, 66:13, 181:21
**manager** [20] - 14:5, 32:15, 32:16, 32:18, 34:11, 34:14, 51:10, 59:9, 80:3, 81:24, 114:20, 124:2, 140:20, 149:21, 151:17, 186:4, 186:5, 186:8, 190:11
**managers** [5] - 41:23, 51:10, 77:20, 131:24, 131:25
**manipulated** [1] - 140:19
**manufacturer** [1] - 208:7
**manufacturers** [1] - 84:10
**MARC** [1] - 1:12
**Marc** [10] - 14:22, 31:9, 87:12, 136:23, 140:15, 141:4, 141:13, 144:3, 144:11, 225:12
**March** [33] - 40:19, 40:20, 42:14, 42:21, 46:6, 63:14, 63:17, 63:21, 65:8, 67:3, 124:21, 127:9, 127:10, 150:12, 154:17, 154:21, 162:9, 162:15, 181:15, 208:4, 208:14, 208:15, 208:19, 214:14, 240:23, 255:12, 256:3, 256:5, 256:7, 256:22, 258:24, 260:16
**Mark** [1] - 24:18
**mark** [6] - 19:12, 62:5, 62:9, 234:18, 238:4, 240:13
**marked** [10] - 62:5, 62:11, 91:14, 97:9, 116:10, 235:4,

238:7, 240:17, 242:15, 250:5
**market** [7] - 175:19, 176:4, 176:7, 176:15, 177:3, 184:20, 195:25
**marketing** [7] - 195:20, 195:21, 195:23, 196:3, 196:6, 211:2, 211:10
**marriage** [1] - 278:17
**Massachusetts** [15] - 10:24, 11:2, 11:15, 11:22, 18:6, 18:10, 28:4, 125:4, 129:13, 158:16, 170:9, 170:10, 170:13, 180:14, 180:15
**materialized** [1] - 105:21
**math** [2] - 73:8, 205:8
**matter** [7] - 73:12, 112:7, 139:24, 155:23, 229:15, 257:21, 278:19
**matters** [1] - 62:7
**mean** [65] - 12:7, 13:13, 16:18, 17:19, 17:24, 31:10, 37:6, 39:11, 40:3, 49:9, 49:10, 54:24, 55:6, 55:12, 66:3, 75:22, 76:4, 77:4, 83:4, 83:7, 86:3, 89:22, 90:4, 93:6, 93:14, 96:3, 108:5, 108:19, 111:21, 115:5, 117:22, 132:13, 132:18, 133:2, 137:18, 139:6, 147:25, 154:22, 156:9, 172:21, 174:5, 176:6, 177:10, 185:17, 190:10, 195:4, 195:23, 204:3, 204:11, 210:15, 213:16, 216:20, 220:10, 227:7, 231:21, 237:16, 244:15, 245:24, 249:9, 253:23, 260:9, 262:8, 272:24, 272:25
**mean..** [2] - 189:25, 263:13
**meaning** [1] - 248:16
**means** [1] - 50:14
**meant** [3] - 64:22, 72:13, 218:9

**meanwhile** [1] - 156:3
**mechanic** [5] - 103:7, 103:14, 103:18, 104:6, 104:10
**mechanics** [4] - 102:17, 102:21, 103:2, 104:12
**mediation** [1] - 20:20
**mediations** [1] - 22:17
**mediator** [1] - 22:23
**medications** [1] - 5:23
**meet** [2] - 8:8, 262:10
**meeting** [4] - 229:7, 230:8, 230:10, 230:11
**memory** [4] - 8:2, 13:11, 179:3, 266:22
**menial** [2] - 31:6, 187:6
**mention** [2] - 165:18, 258:9
**mentioned** [7] - 20:15, 20:18, 60:4, 144:7, 219:22, 232:8, 266:14
**mentioning** [1] - 258:5
**Merckling** [10] - 14:22, 87:12, 136:23, 140:15, 141:4, 141:14, 144:3, 144:12, 186:21, 187:3
**MERCKLING** [1] - 1:12
**merely** [1] - 134:13
**mess** [1] - 26:18
**message** [6] - 235:24, 250:12, 250:15, 251:25, 259:25, 269:11
**Message** [2] - 250:5, 277:5
**messages** [1] - 217:24
**Messages** [4] - 116:10, 235:4, 276:21, 276:23
**Messina** [2] - 180:9, 180:17
**messing** [1] - 41:14
**met** [18] - 8:19, 9:7, 16:25, 116:25, 117:14, 118:4, 119:18, 120:7, 161:24, 162:2, 162:10, 162:20, 195:2, 195:5, 203:11, 229:5, 229:8
**Mexico** [1] - 176:9
**mic** [1] - 21:14
**Michael** [15] - 9:11,

17:10, 158:7, 228:24, 229:2, 229:18, 229:19, 229:21, 229:22, 230:5, 230:8, 230:12, 230:24, 231:10, 242:3
**MICHAEL** [1] - 1:12
**mid** [2] - 239:22, 240:11
**middle** [5] - 104:20, 105:24, 194:9, 212:4, 256:11
**might** [24] - 21:5, 25:16, 25:18, 26:20, 28:18, 38:24, 68:13, 71:25, 103:7, 104:7, 119:7, 170:24, 197:24, 214:20, 214:22, 214:25, 236:21, 243:14, 245:3, 247:20, 251:2, 252:9
**Mike** [3] - 242:8, 246:14
**million** [18] - 36:12, 36:25, 83:18, 83:25, 85:8, 92:13, 93:17, 170:25, 182:17, 182:18, 198:18, 198:19, 198:20, 201:5, 221:21, 258:7, 258:8
**millions** [2] - 84:21, 260:18
**mind** [4] - 43:10, 43:14, 72:5, 148:14
**mine** [6] - 9:11, 21:4, 22:6, 39:6, 182:16, 237:22
**minimum** [1] - 57:25
**minute** [2] - 255:18, 256:10
**minutes** [5] - 49:7, 54:20, 55:14, 228:14, 248:10
**miraculous** [1] - 36:23
**miraculously** [1] - 36:13
**mismanagement** [2] - 181:10, 181:23
**missed** [1] - 229:7
**missing** [3] - 86:20, 88:13, 145:11
**misspoke** [1] - 152:24
**mistake** [3] - 73:16, 85:4, 85:12
**MITCHELL** [1] - 278:25
**Mitchell** [3] - 1:24,

*Rich Moffett Court Reporting, Inc.*

278:6, 278:24
**Mitsu** [1] - 109:9
**Mitsubishi** [8] - 10:20, 11:4, 12:14, 124:19, 127:16, 127:17, 127:24, 128:16
**MO** [1] - 71:2
**modification** [1] - 164:5
**modifying** [1] - 225:14
**moment** [4] - 62:15, 110:12, 135:8, 239:3
**moments** [2] - 212:5, 240:19
**Monday** [1] - 242:20
**money** [103] - 20:6, 26:9, 33:10, 33:21, 38:7, 38:12, 38:15, 38:16, 38:18, 38:19, 38:25, 39:4, 39:5, 47:11, 53:22, 59:18, 60:22, 60:25, 61:3, 66:20, 73:3, 73:19, 74:8, 74:12, 74:15, 75:5, 75:18, 75:20, 76:19, 82:14, 82:17, 82:19, 82:21, 82:25, 83:5, 84:23, 85:10, 119:25, 120:3, 122:12, 128:9, 128:12, 135:4, 135:7, 135:9, 135:14, 136:11, 136:15, 136:17, 138:2, 141:10, 145:23, 157:25, 158:8, 158:9, 158:18, 158:24, 159:4, 159:6, 159:10, 159:15, 164:14, 164:22, 165:24, 182:6, 182:10, 182:20, 182:24, 183:22, 193:24, 196:21, 196:24, 197:2, 197:4, 197:11, 201:3, 204:12, 207:13, 207:17, 208:25, 210:9, 210:11, 212:5, 212:13, 212:19, 212:22, 212:25, 213:13, 225:2, 225:3, 225:7, 225:11, 225:21, 226:15, 227:2, 227:10, 227:20, 228:2, 244:13, 245:23, 255:24,

259:12, 261:4
**monies** [2] - 163:6, 163:19
**monitor** [1] - 150:7
**monitored** [1] - 88:9
**monitoring** [1] - 151:2
**month** [37] - 66:24, 73:2, 73:4, 73:8, 73:9, 73:10, 80:11, 118:21, 122:10, 152:16, 152:17, 152:20, 152:21, 153:3, 154:9, 163:23, 174:7, 193:13, 196:16, 205:7, 205:12, 205:20, 205:21, 206:2, 206:13, 206:15, 206:17, 206:18, 206:24, 206:25, 207:6, 207:21, 211:16, 211:20, 226:19, 226:22, 253:20
**monthly** [3] - 151:3, 195:6, 196:10
**months** [29] - 8:13, 8:14, 35:14, 37:14, 37:15, 41:7, 41:12, 56:24, 73:10, 84:17, 89:15, 109:21, 143:24, 153:14, 174:6, 174:16, 174:21, 205:8, 205:14, 205:20, 206:7, 207:25, 210:23, 211:7, 221:15, 226:20, 226:22, 262:19
**MORGAN** [1] - 1:17
**Morgan** [4] - 9:12, 242:3, 242:8, 246:14
**morning** [7] - 5:19, 5:21, 5:25, 6:5, 49:23, 192:21, 192:24
**mortgages** [1] - 258:8
**most** [11] - 135:4, 141:9, 141:11, 142:16, 172:16, 175:12, 185:6, 198:14, 211:3, 223:2, 223:7
**mostly** [5] - 15:4, 21:22, 172:14, 186:24, 198:24
**MOTION** [1] - 276:7
**motions** [2] - 47:10, 47:21
**MOTOR** [2] - 1:5, 1:17

**Motor** [2] - 2:13, 213:24
**MOTORS** [6] - 1:4, 1:13, 1:14, 1:14, 1:15, 1:15
**Motors** [23] - 2:4, 9:14, 15:18, 16:12, 17:5, 55:22, 56:18, 91:12, 100:24, 101:2, 107:7, 153:2, 153:11, 160:4, 194:7, 201:16, 215:10, 226:23, 251:5, 258:2, 268:22, 269:10, 276:16
**move** [15] - 34:4, 34:7, 34:10, 71:2, 101:23, 102:14, 102:19, 123:2, 181:4, 187:17, 245:7, 246:9, 252:8, 254:25, 273:14
**moved** [7] - 27:11, 33:23, 42:22, 102:3, 140:17, 181:2, 255:24
**moving** [8] - 31:7, 31:10, 101:16, 102:11, 102:13, 224:18, 262:2, 266:3
**MR** [180] - 5:18, 20:23, 21:3, 21:7, 21:15, 21:19, 21:23, 22:2, 22:5, 22:7, 22:9, 22:11, 22:15, 36:20, 37:5, 40:11, 42:8, 45:19, 50:10, 51:23, 52:4, 52:20, 54:6, 54:15, 57:13, 58:5, 58:18, 61:17, 62:4, 62:12, 62:17, 62:23, 62:24, 63:2, 63:6, 65:18, 66:9, 68:8, 69:14, 69:24, 71:2, 71:4, 71:10, 72:4, 74:14, 75:11, 79:6, 86:10, 88:14, 88:21, 89:8, 89:12, 89:16, 89:18, 89:25, 90:6, 90:15, 90:25, 91:5, 91:8, 91:16, 93:22, 94:22, 95:6, 95:10, 95:16, 95:20, 96:12, 97:4, 97:6, 97:11, 97:18, 97:21, 99:4, 103:16, 103:20, 106:10, 110:10, 110:13, 110:18, 110:19, 113:13,

113:15, 113:20, 113:22, 113:24, 116:7, 118:14, 120:18, 126:15, 128:6, 128:23, 129:25, 130:3, 130:14, 130:24, 133:16, 134:16, 135:11, 137:6, 137:10, 138:11, 138:18, 139:8, 141:18, 144:4, 144:19, 148:12, 149:18, 152:6, 155:5, 155:10, 169:17, 174:18, 176:18, 191:9, 191:11, 191:14, 192:19, 197:14, 204:8, 204:19, 210:20, 212:7, 213:4, 213:8, 214:18, 216:9, 216:15, 217:10, 217:16, 219:4, 219:14, 220:6, 220:23, 221:3, 223:23, 224:8, 224:15, 225:15, 226:3, 226:6, 227:12, 228:12, 228:16, 228:18, 228:20, 228:22, 231:2, 231:20, 232:15, 232:22, 233:2, 234:22, 235:6, 239:18, 240:7, 241:4, 242:16, 261:23, 263:7, 264:5, 264:10, 264:20, 268:10, 269:22, 270:3, 270:10, 270:18, 271:23, 272:15, 273:11, 273:19, 273:24, 274:2, 274:6, 274:7, 274:9, 276:4, 276:6
**MS** [24] - 8:6, 232:17, 232:24, 233:10, 234:17, 234:25, 238:3, 238:8, 239:11, 239:20, 240:8, 240:12, 241:6, 242:13, 242:18, 250:3, 250:7, 264:3, 264:18, 267:8, 268:12, 268:16, 269:20, 276:5
**multiple** [1] - 95:25

**muscle** [1] - 30:9

**N**

**N.A** [1] - 1:17
**NADA** [3] - 7:4, 7:6, 124:3
**name** [25] - 5:7, 5:9, 5:20, 17:14, 18:14, 22:4, 22:6, 31:18, 40:7, 40:13, 40:14, 60:11, 94:16, 104:2, 110:6, 126:20, 127:5, 136:5, 136:7, 146:5, 151:20, 215:5, 233:15, 237:22, 261:2
**names** [4] - 14:24, 15:4, 15:8, 178:23
**NASSAU** [1] - 278:4
**Nassau** [5] - 28:17, 28:21, 28:25, 216:7, 216:18
**National** [1] - 7:7
**near** [1] - 180:15
**need** [17] - 21:13, 64:9, 64:12, 68:19, 70:6, 93:5, 98:12, 110:10, 125:20, 149:6, 159:12, 225:4, 228:21, 233:3, 248:19, 257:25, 259:8
**needed** [14] - 14:19, 34:3, 38:17, 38:21, 100:20, 150:11, 171:14, 171:16, 171:19, 182:19, 185:10, 253:25, 256:19, 259:6
**needs** [1] - 48:25
**negative** [3] - 207:8, 207:11
**negotiating** [1] - 211:8
**negotiations** [1] - 22:19
**nerve** [1] - 255:15
**nerve-wracking** [1] - 255:15
**NESNA** [7] - 77:10, 160:16, 165:4, 168:18, 168:21, 182:11, 209:19
**nets** [1] - 212:24
**never** [71] - 20:8, 20:21, 31:19, 55:4, 55:5, 58:8, 58:9, 69:2, 69:4, 73:23, 74:11, 74:23, 76:13, 81:8, 81:11, 84:2,

87:13, 87:15, 96:24, 101:18, 105:16, 105:21, 114:21, 116:3, 117:14, 117:15, 118:4, 118:16, 121:17, 132:24, 132:25, 140:17, 143:3, 145:25, 148:3, 149:5, 155:25, 156:4, 156:6, 156:18, 162:2, 166:4, 166:9, 166:12, 166:14, 166:18, 168:10, 177:15, 177:20, 182:25, 183:21, 184:15, 187:5, 191:7, 203:9, 203:11, 203:12, 235:19, 254:20, 255:4, 262:17, 265:22, 265:23, 266:5, 269:14, 271:16, 272:7, 273:20, 273:21, 273:23

**new** [15] - 23:25, 24:12, 24:15, 41:15, 46:18, 65:21, 65:22, 66:16, 76:7, 100:22, 109:3, 127:15, 150:22, 167:11, 168:8

**New** [37] - 1:19, 1:25, 2:8, 2:20, 3:6, 3:11, 6:15, 10:22, 12:6, 18:7, 27:19, 27:20, 27:23, 28:5, 50:8, 100:19, 123:16, 124:15, 124:16, 126:3, 126:6, 126:9, 126:25, 128:4, 128:9, 129:4, 129:24, 162:22, 166:24, 166:25, 167:4, 179:20, 179:24, 180:24, 275:25, 278:7

**NEW** [3] - 1:3, 275:4, 278:3

**next** [17] - 9:6, 64:14, 106:23, 107:13, 107:15, 111:12, 112:2, 112:23, 113:4, 116:7, 124:17, 124:22, 158:18, 159:10, 198:2, 208:14, 254:22

**NextGear** [6] - 25:17, 25:18, 122:22, 122:24, 171:2, 199:7

**nice** [1] - 262:2

**nicest** [1] - 262:11

**night** [2] - 148:6, 173:22

**nine** [3] - 8:13, 8:14, 73:7

**Nissan** [26] - 9:2, 9:4, 10:23, 24:22, 25:4, 25:9, 25:15, 25:24, 26:2, 26:10, 26:15, 26:22, 27:4, 27:19, 83:19, 83:20, 109:11, 165:5, 167:24, 168:4, 168:9, 168:17, 170:2, 170:8, 256:9

**Nissan's** [1] - 26:3

**NMAC** [26] - 24:25, 85:14, 85:20, 122:21, 123:7, 169:7, 169:8, 170:4, 187:25, 188:3, 188:10, 188:11, 188:14, 198:3, 198:5, 199:4, 199:7, 199:12, 199:13, 199:15, 199:19, 200:6, 200:10, 200:18, 201:2, 214:22

**nobody** [4] - 109:16, 145:9, 236:11, 271:17

**nobody's** [1] - 82:9

**noise** [1] - 21:2

**none** [4] - 6:2, 6:6, 74:20, 274:6

**nonresponsive** [1] - 71:3

**normally** [2] - 208:5, 253:10

**Northeast** [1] - 262:19

**NORTHSHORE** [2] - 1:5, 1:17

**Northshore** [32] - 2:13, 17:6, 47:25, 48:7, 51:19, 52:10, 55:14, 55:22, 56:2, 56:6, 56:18, 61:14, 61:15, 77:11, 101:6, 101:16, 101:21, 102:21, 103:4, 104:13, 117:12, 167:20, 171:18, 187:22, 187:23, 188:2, 189:2, 213:24, 215:10,

224:19, 260:24, 271:25

**Notary** [4] - 1:25, 5:4, 275:25, 278:6

**noted** [2] - 192:15, 274:10

**nothing** [17] - 8:16, 60:11, 75:6, 96:25, 115:19, 169:12, 169:22, 170:2, 184:5, 232:16, 236:13, 258:6, 261:7, 262:6, 262:17, 265:25, 273:25

**notice** [1] - 108:22

**Notice** [1] - 1:24

**notified** [1] - 271:16

**notwithstanding** [1] - 184:11

**November** [42] - 9:8, 9:10, 9:21, 10:18, 17:2, 34:20, 59:2, 60:9, 60:23, 61:4, 118:12, 118:13, 125:16, 159:24, 160:4, 164:20, 165:9, 166:3, 166:17, 167:7, 167:23, 168:3, 168:21, 168:24, 168:25, 171:8, 173:5, 173:21, 194:9, 196:23, 199:22, 200:4, 200:5, 215:8, 215:17, 216:25, 217:8, 217:20, 218:15, 218:19, 219:2

**Novicky** [51] - 17:10, 40:24, 81:14, 81:16, 100:17, 104:23, 107:17, 107:22, 107:25, 108:3, 108:9, 108:17, 109:7, 110:3, 110:21, 111:14, 112:24, 113:5, 138:10, 138:16, 138:21, 138:24, 139:3, 139:5, 139:11, 139:14, 139:21, 140:7, 150:2, 150:4, 150:5, 150:7, 150:13, 150:16, 152:12, 152:13, 152:14, 152:19, 153:2, 153:13, 153:17,

154:8, 172:20, 185:16, 189:16, 189:19, 236:21, 236:22, 242:21, 250:17, 251:9

**nowhere** [1] - 252:21

**number** [23] - 51:6, 53:7, 84:15, 87:10, 96:10, 96:15, 100:12, 104:19, 107:16, 148:10, 148:13, 158:3, 174:3, 178:7, 178:10, 178:14, 183:2, 184:4, 193:9, 193:24, 205:12, 205:19, 210:17

**numbered** [1] - 104:20

**numbers** [18] - 86:4, 86:7, 92:9, 93:2, 93:4, 93:9, 93:11, 93:20, 93:23, 95:5, 95:9, 95:12, 145:14, 150:15, 153:8, 193:6, 200:17, 200:25

**NYC** [1] - 1:12

## O

**oath** [2] - 4:17, 275:10

**object** [3] - 96:9, 96:17, 252:24

**objection** [91] - 37:5, 45:19, 51:23, 52:4, 52:20, 54:6, 54:15, 57:13, 58:5, 58:18, 61:17, 66:9, 69:14, 69:24, 71:4, 71:10, 72:4, 74:14, 75:11, 79:6, 86:10, 88:14, 89:8, 89:12, 89:16, 90:25, 93:22, 95:6, 95:10, 95:16, 96:2, 96:12, 99:4, 103:16, 103:21, 106:10, 113:20, 120:18, 126:15, 128:6, 128:23, 130:14, 130:24, 133:16, 134:16, 137:6, 138:11, 138:18, 139:8, 141:18, 144:4, 144:19, 148:12, 149:18, 152:6, 155:5, 155:10, 169:17, 176:18, 197:14, 204:8, 204:19, 210:20, 212:7, 213:4, 213:8,

214:18, 216:9, 216:15, 217:10, 217:16, 219:4, 219:14, 220:6, 220:23, 221:3, 224:8, 224:15, 226:6, 227:12, 231:2, 231:20, 261:23, 263:7, 264:18, 267:8, 270:18, 271:23, 272:15, 273:11, 273:19

**Objection** [3] - 137:10, 223:23, 226:3

**objections** [4] - 4:9, 89:21, 90:7, 90:9

**obtain** [3] - 51:10, 199:6, 199:9

**obtained** [2] - 58:3, 96:16

**obtaining** [1] - 51:5

**obviously** [9] - 66:6, 93:6, 106:4, 114:8, 114:11, 182:15, 249:10, 260:13, 261:8

**occasion** [2] - 157:11, 203:7

**occasionally** [1] - 122:21

**occasions** [2] - 38:5, 38:10

**October** [4] - 20:4, 50:17, 118:13, 125:14

**odd** [2] - 57:2, 86:16

**OF** [12] - 1:3, 1:6, 1:6, 1:13, 1:13, 1:14, 1:14, 1:15, 275:4, 275:5, 278:3, 278:4

**offer** [7] - 20:8, 20:11, 20:22, 22:16, 22:24, 170:20, 256:13

**offered** [2] - 20:5, 20:14

**offering** [1] - 251:16

**office** [13] - 39:12, 39:18, 41:23, 66:15, 77:20, 79:14, 151:17, 190:12, 190:13, 216:21, 222:14, 222:24, 224:5

**officer** [8] - 4:16, 29:3, 47:18, 107:20, 113:12, 139:23, 140:7, 253:24

**official** [4] - 106:25,

*Rich Moffett Court Reporting, Inc.*

107:15, 194:11, 198:6
**officially** [1] - 194:9
**often** [3] - 151:8, 152:9, 152:14
**oil** [1] - 127:25
**okayed** [1] - 271:9
**old** [5] - 19:10, 19:11, 24:17, 75:23, 101:6
**once** [8] - 25:10, 73:24, 101:18, 118:2, 119:15, 171:5, 205:23, 262:17
**one** [92] - 6:17, 6:19, 7:17, 12:12, 12:14, 14:14, 14:16, 14:25, 16:24, 17:16, 17:17, 17:18, 20:16, 20:18, 22:3, 22:5, 22:8, 22:17, 26:21, 27:10, 27:12, 27:14, 27:15, 28:9, 29:23, 30:13, 30:16, 35:21, 36:4, 36:6, 39:7, 39:18, 39:22, 39:23, 41:24, 45:12, 46:20, 52:24, 54:23, 55:23, 55:24, 64:17, 70:12, 78:11, 79:21, 97:20, 104:7, 109:21, 123:13, 125:3, 126:14, 131:5, 131:25, 132:16, 132:20, 152:4, 152:8, 152:20, 153:6, 153:13, 153:21, 156:6, 156:12, 169:15, 175:8, 180:3, 183:16, 185:2, 188:19, 198:13, 213:15, 213:17, 221:23, 225:2, 229:7, 229:17, 234:12, 235:10, 237:12, 240:9, 245:21, 251:18, 258:11, 264:5, 265:4, 268:12, 268:17
**one-time** [1] - 7:17
**one-way** [1] - 175:8
**ones** [9] - 23:15, 55:19, 56:12, 56:19, 214:21, 214:24, 215:2, 271:15
**ongoing** [1] - 12:20
**oOo** [1] - 4:21
**Open** [1] - 252:18
**open** [48] - 9:17, 9:22,

10:23, 11:15, 46:20, 52:22, 52:25, 53:4, 106:5, 124:20, 124:25, 132:22, 142:3, 142:9, 142:11, 142:22, 143:2, 171:19, 214:14, 221:14, 236:8, 237:17, 240:3, 245:9, 246:19, 246:22, 247:2, 250:21, 251:5, 251:10, 251:21, 251:22, 251:23, 252:22, 254:6, 254:7, 254:18, 254:22, 254:23, 255:2, 257:23, 257:25, 258:12, 260:23, 261:20, 263:19, 266:13, 271:11
**opened** [40] - 9:22, 31:22, 32:3, 52:8, 99:24, 100:5, 100:10, 101:24, 123:14, 124:18, 124:23, 125:4, 141:7, 142:7, 143:3, 143:7, 143:9, 143:12, 143:13, 143:20, 150:23, 202:24, 204:4, 214:2, 214:7, 236:12, 241:22, 248:18, 258:14, 259:7, 259:10, 263:12, 264:13, 264:17, 265:5, 267:22, 268:4, 271:15
**opening** [40] - 10:12, 10:25, 31:24, 32:4, 32:7, 34:8, 55:20, 76:6, 76:11, 98:2, 98:6, 98:8, 98:9, 99:2, 99:9, 99:21, 101:3, 102:13, 146:24, 235:21, 236:14, 241:11, 243:21, 244:17, 244:22, 245:7, 245:13, 247:5, 247:19, 247:23, 248:13, 255:6, 257:18, 265:8, 266:11, 266:12, 271:9, 271:13, 272:21, 273:14
**opens** [1] - 52:17
**operate** [1] - 140:11

**operated** [1] - 124:13
**operates** [1] - 146:9
**operating** [31] - 11:9, 11:12, 18:8, 18:12, 18:22, 18:25, 32:11, 54:21, 55:4, 55:6, 55:16, 55:18, 55:21, 55:25, 56:5, 56:11, 107:20, 109:8, 113:12, 139:22, 140:6, 156:7, 156:14, 208:6, 209:8, 236:24, 237:8, 253:23, 265:24, 273:21, 273:23
**operation** [7] - 30:11, 81:25, 109:12, 136:20, 136:22, 166:24, 167:2
**operations** [5] - 7:13, 34:18, 150:6, 150:8, 194:6
**opportunity** [2] - 10:14, 256:14
**option** [2] - 255:16, 257:15
**Order** [1] - 1:23
**order** [3] - 63:4, 76:25, 77:21
**Orgad** [3] - 146:5, 146:9, 147:2
**ORGAD** [1] - 146:8
**organization** [6] - 33:17, 131:19, 144:6, 220:13, 220:17, 230:16
**original** [6] - 30:24, 55:17, 55:23, 56:7, 164:16, 266:2
**originally** [4] - 39:8, 42:17, 127:18, 152:3
**Orloff** [5] - 126:7, 127:6, 127:7, 129:3, 129:6
**otherwise** [1] - 177:23
**outcome** [1] - 278:18
**outpacing** [1] - 198:15
**outside** [2] - 10:14, 222:4
**overage** [1] - 209:24
**overbook** [1] - 177:11
**overhead** [2] - 196:16, 207:21
**overwhelmed** [1] - 41:18
**overwhelming** [1] - 181:20
**Ovington** [2] - 1:19, 3:10

**owe** [1] - 204:11
**owed** [3] - 119:24, 120:3, 121:11
**own** [11] - 35:9, 39:2, 41:8, 48:15, 48:18, 48:21, 57:4, 82:9, 151:9, 196:3, 204:7
**owned** [11] - 33:7, 124:13, 125:16, 125:22, 158:7, 162:25, 166:12, 209:6, 221:20, 265:13, 265:16
**owner** [39] - 19:10, 19:11, 24:2, 24:12, 24:16, 24:18, 49:5, 51:22, 52:19, 53:9, 54:5, 54:12, 54:14, 55:8, 61:14, 61:15, 76:2, 105:13, 106:20, 125:21, 129:17, 162:4, 164:12, 166:5, 166:19, 215:9, 215:18, 216:2, 236:5, 244:18, 252:23, 266:8, 267:12, 267:23, 268:3, 268:8, 268:22, 273:5, 273:10
**owners** [4] - 47:24, 267:6, 267:7, 267:13
**ownership** [10] - 48:6, 51:11, 51:13, 54:22, 55:15, 106:14, 252:19, 258:5, 258:10, 269:15
**owns** [5] - 18:11, 19:9, 48:22, 49:8, 260:19

## P

**P&L** [4] - 92:22, 93:13, 93:14, 94:6
**p.m** [4] - 63:8, 191:17, 192:15, 274:10
**page** [18] - 56:4, 61:25, 62:25, 63:7, 97:16, 97:21, 100:12, 100:13, 104:18, 107:13, 107:16, 110:15, 111:12, 112:2, 112:23, 113:4, 242:17
**PAGE** [3] - 276:3, 276:7, 276:9
**pages** [2] - 64:18, 69:3
**paid** [31] - 25:11,

27:24, 39:8, 53:12, 53:22, 83:8, 117:9, 117:11, 121:17, 122:9, 127:24, 163:6, 163:20, 168:12, 168:16, 182:15, 184:20, 184:21, 195:7, 195:10, 195:12, 195:15, 195:18, 195:20, 196:6, 196:8, 196:18, 197:9, 197:11, 197:22, 207:21
**pain** [1] - 187:19
**painstakingly** [1] - 149:11
**paper** [7] - 70:23, 99:20, 126:13, 237:12, 244:11, 257:5
**papers** [1] - 70:9
**paperwork** [7] - 37:24, 99:13, 107:3, 128:18, 238:21, 252:13, 254:10
**Paralegal** [1] - 3:24
**part** [39] - 30:20, 37:20, 38:20, 47:12, 47:20, 56:9, 56:19, 59:15, 85:19, 92:15, 107:11, 127:22, 130:9, 131:4, 131:19, 131:23, 131:25, 133:11, 140:22, 144:5, 147:7, 160:12, 165:4, 168:9, 168:14, 170:23, 172:6, 176:16, 185:6, 187:15, 187:19, 191:8, 216:18, 220:8, 226:11, 230:15, 254:22, 273:5, 273:10
**participated** [2] - 95:14, 95:22
**particular** [5] - 14:25, 62:24, 97:16, 232:9, 240:14
**parties** [2] - 4:4, 278:16
**partner** [46] - 8:21, 41:16, 126:8, 126:11, 126:12, 126:13, 126:20, 126:25, 127:3, 127:5, 127:8, 127:19, 127:21,

128:9, 129:15, 129:20, 129:23, 157:16, 158:10, 160:9, 164:25, 165:16, 166:10, 229:14, 230:3, 235:15, 236:2, 265:18, 266:14, 269:10, 270:7, 270:13, 270:17, 271:2, 271:12, 271:19, 271:21, 271:22, 272:5, 272:12, 272:13, 272:23, 273:3, 273:8, 273:16, 273:18

**partnering** [1] - 230:13

**partners** [16] - 106:6, 125:7, 126:3, 126:5, 129:10, 129:12, 160:16, 160:19, 161:5, 165:6, 210:24, 235:22, 262:4, 266:16, 267:15, 267:18

**PARTNERS** [1] - 1:15

**partnership** [3] - 9:15, 17:4, 272:3

**parts** [1] - 144:7

**pause** [1] - 20:23

**Pay** [7] - 77:6, 77:9, 78:3, 114:13, 114:18, 114:19, 114:23

**pay** [35] - 25:9, 39:7, 50:22, 60:22, 61:3, 75:20, 77:10, 82:23, 83:4, 83:23, 83:25, 85:9, 120:21, 120:22, 120:25, 121:14, 121:24, 122:8, 122:14, 150:21, 160:15, 165:11, 165:14, 165:25, 169:3, 175:22, 177:18, 183:23, 184:17, 197:12, 197:17, 204:10, 209:18, 209:21

**payback** [1] - 83:6

**paying** [6] - 122:15, 204:6, 204:13, 204:17, 210:2, 212:21

**payment** [5] - 53:16, 82:2, 121:12, 121:16, 122:12

**payments** [1] - 156:18

**payoff** [1] - 122:16

**payroll** [12] - 13:14, 102:22, 103:3, 103:8, 103:13, 117:11, 163:8, 163:10, 163:14, 163:16, 180:10, 196:8

**peace** [1] - 274:5

**Pennsylvania** [1] - 3:19

**penny** [1] - 156:12

**people** [28] - 10:3, 10:7, 14:3, 47:7, 47:11, 78:9, 78:20, 79:22, 102:23, 104:7, 115:12, 115:21, 115:24, 131:3, 132:9, 133:4, 136:25, 152:4, 152:8, 179:2, 209:25, 223:19, 224:23, 243:19, 252:7, 263:3, 264:12, 264:15

**per** [14] - 169:4, 193:3, 193:16, 193:20, 193:24, 194:14, 205:20, 206:2, 206:13, 206:15, 206:17, 206:22, 207:5, 207:9

**percent** [24] - 60:6, 61:13, 61:15, 125:17, 129:16, 157:16, 159:14, 166:12, 166:18, 213:20, 216:2, 220:22, 229:12, 230:11, 236:5, 236:12, 244:17, 247:14, 252:19, 252:23, 258:3, 265:22, 267:23, 268:9

**percentage** [1] - 84:19

**percentages** [2] - 265:19, 269:15

**performed** [2] - 220:15, 220:16

**performing** [1] - 187:3

**perfunctory** [1] - 218:23

**period** [1] - 127:12

**perk** [1] - 164:2

**permanent** [1] - 162:16

**permission** [1] - 32:12

**person** [11] - 10:16, 19:9, 72:6, 76:4, 103:23, 116:20, 116:23, 149:23, 151:22, 234:13, 273:13

**person's** [2] - 126:20, 151:19

**personal** [4] - 250:20, 251:9, 258:4, 269:3

**personally** [6] - 82:16, 151:5, 236:19, 237:23, 242:11, 263:15

**pertain** [1] - 96:20

**pertaining** [1] - 67:9

**phenomenal** [2] - 246:16, 259:22

**Philadelphia** [1] - 3:19

**phone** [5] - 20:25, 105:20, 110:9, 203:19, 203:21

**picked** [4] - 184:25, 185:2, 185:6, 187:24

**piece** [3] - 70:23, 99:20, 237:12

**pieces** [2] - 244:10, 244:11

**Pittsfield** [4] - 170:8, 170:12, 199:23, 200:15

**pittsfield** [1] - 170:10

**place** [7] - 17:8, 103:2, 115:19, 118:2, 179:17, 189:2, 229:21

**places** [3] - 82:22, 147:25, 179:16

**Plaintiff** [1] - 1:22

**Plaintiffs** [3] - 1:10, 2:4, 2:12

**plan** [51] - 24:22, 24:23, 25:4, 25:7, 25:13, 25:24, 26:3, 26:6, 27:25, 31:8, 36:13, 36:25, 39:6, 39:10, 39:13, 83:21, 85:9, 85:15, 104:24, 105:8, 122:16, 122:19, 122:23, 123:6, 131:2, 164:23, 169:24, 170:13, 171:3, 171:4, 171:17, 171:20, 172:3, 172:7, 173:8, 173:14, 173:19, 189:23, 190:8, 190:19, 190:21, 191:2, 191:6, 197:9, 197:16, 198:9,

199:5, 199:20, 202:23, 203:2, 235:19

**plane** [2] - 105:19, 111:8

**planned** [2] - 75:4, 190:17

**planning** [4] - 39:24, 89:23, 111:2, 199:15

**plans** [16] - 31:9, 140:19, 167:9, 167:17, 170:20, 171:11, 171:15, 171:23, 171:24, 172:13, 189:20, 195:17, 197:13, 197:20, 198:4, 203:8

**Plaza** [1] - 10:7

**plenty** [4] - 66:24, 226:14, 226:16, 226:17

**plus** [5] - 29:24, 64:17, 69:3, 76:6, 182:13

**pocket** [6] - 99:7, 99:11, 243:20, 243:25, 260:4, 263:5

**pocketed** [2] - 145:22, 182:18

**pocketing** [1] - 183:3

**point** [39] - 13:2, 18:16, 27:18, 35:10, 35:14, 60:5, 60:19, 66:6, 68:25, 72:10, 88:3, 90:14, 95:25, 102:9, 102:17, 103:8, 104:19, 105:22, 133:20, 142:2, 142:9, 144:16, 156:10, 165:15, 166:22, 192:24, 193:9, 203:14, 205:6, 243:18, 244:5, 244:20, 245:21, 247:22, 254:25, 261:3, 261:6, 265:8

**Police** [3] - 28:17, 216:7, 216:18

**police** [2] - 29:2, 148:7

**poor** [2] - 221:17, 221:21

**Pope** [1] - 60:21

**position** [14] - 35:16, 134:15, 136:10, 136:12, 136:13, 144:9, 154:25, 166:4, 166:6, 166:17, 193:14, 222:12, 225:24, 226:23

**Positive** [7] - 77:6, 77:9, 78:3, 114:13, 114:18, 114:19, 114:23

**positive** [2] - 192:22, 200:11

**possess** [2] - 89:7, 214:16

**possession** [1] - 88:25

**possible** [4] - 66:22, 211:13, 211:16, 211:18

**possibly** [1] - 12:12

**potential** [2] - 10:17, 125:21

**potentially** [1] - 9:14

**powers** [1] - 157:7

**practically** [1] - 47:11

**pregnant** [4] - 13:16, 161:14, 161:20, 161:21

**preliminary** [1] - 113:23

**PREMIER** [1] - 1:15

**prepared** [3] - 32:21, 153:12, 153:16

**preparing** [1] - 155:8

**present** [2] - 106:2, 223:7

**PRESENT** [1] - 3:23

**presented** [2] - 76:22, 77:22

**preserved** [1] - 90:7

**pretty** [11] - 13:8, 21:21, 32:13, 45:9, 84:15, 108:10, 111:21, 166:2, 219:23, 230:10

**previous** [7] - 127:21, 153:14, 160:9, 212:9, 241:25, 257:2, 258:18

**previously** [3] - 62:6, 242:15, 243:3

**prices** [1] - 146:20

**print** [5] - 80:4, 80:8, 82:2, 82:3

**printing** [2] - 81:22

**private** [1] - 60:20

**pro** [1] - 3:4

**probation** [2] - 48:17, 48:23

**problem** [9] - 45:2, 66:2, 77:12, 85:23, 96:18, 111:6, 172:2, 184:22, 261:3

**problems** [14] - 7:25, 43:7, 57:4, 65:10, 65:20, 65:23, 66:7,

67:2, 69:8, 69:12, 70:20, 85:14, 120:6, 246:8

**proceed** [3] - 71:5, 72:2, 235:6

**process** [10] - 55:7, 105:17, 142:21, 158:14, 240:25, 241:9, 241:10, 241:25, 253:3, 255:19

**processing** [1] - 195:14

**produce** [2] - 239:13, 240:5

**produced** [9] - 154:22, 201:9, 237:7, 237:10, 238:10, 239:13, 239:16, 240:14, 250:8

**producing** [2] - 89:23, 90:5

**professional** [2] - 6:23, 7:2

**Profit** [2] - 91:13, 276:17

**profit** [6] - 94:4, 153:20, 155:23, 156:3, 156:16, 201:8

**profitable** [4] - 59:17, 163:25, 164:4, 181:25

**profits** [4] - 92:13, 205:18, 207:24, 208:23

**projections** [1] - 193:13

**promised** [1] - 10:2

**promising** [1] - 171:11

**promoted** [1] - 124:9

**pronounce** [2] - 17:13, 110:7

**pronouncing** [1] - 110:6

**property** [2] - 19:9, 223:21

**protect** [1] - 71:9

**provide** [2] - 98:19, 256:25

**provided** [9] - 15:17, 24:24, 53:8, 98:25, 198:3, 237:24, 243:5, 245:5, 258:4

**providers** [3] - 164:23, 198:10, 199:5

**provides** [1] - 132:10

**providing** [3] - 239:5, 253:13, 253:15

**Public** [4] - 1:25, 5:4, 275:25, 278:7

**Puccio** [17] - 234:8, 234:10, 257:24, 258:12, 258:24, 259:6, 260:12, 264:22, 264:25, 266:3, 266:4, 266:7, 266:25, 267:5, 267:12, 268:7, 271:8

**purchase** [11] - 53:12, 53:17, 53:23, 55:3, 109:19, 157:25, 159:7, 164:22, 173:21, 256:12, 266:2

**purchased** [3] - 56:23, 162:11, 177:7

**purchasing** [1] - 12:12

**purpose** [3] - 43:16, 64:3, 90:10

**purposes** [1] - 99:2

**pursuant** [1] - 1:23

**pushed** [1] - 156:19

**put** [52] - 20:3, 20:6, 25:12, 26:5, 32:10, 38:16, 38:18, 38:21, 38:22, 38:25, 39:4, 39:5, 39:13, 39:16, 41:23, 47:2, 58:14, 67:17, 69:9, 73:19, 84:8, 90:9, 93:17, 122:25, 144:9, 153:6, 153:8, 157:4, 158:5, 160:7, 160:17, 160:20, 173:7, 173:14, 173:18, 181:20, 182:24, 183:24, 190:8, 196:21, 196:24, 196:25, 197:3, 208:21, 209:7, 212:5, 212:13, 212:20, 213:12, 221:16, 259:23, 267:14

**putting** [1] - 187:8

## Q

**questioning** [6] - 68:5, 126:17, 204:20, 219:5, 219:15, 264:6

**questions** [13] - 5:25, 6:5, 133:6, 213:6, 231:23, 232:18, 233:6, 233:18, 246:4, 268:11, 269:21, 274:3, 274:8

**quick** [4] - 20:23, 191:10, 257:24, 264:5

**quickly** [5] - 45:9, 99:12, 181:21, 244:3, 257:22

**quite** [4] - 135:7, 161:15, 161:16, 204:11

## R

**R.A** [1] - 276:4

**radio** [4] - 10:2, 10:4, 195:22, 211:2

**raise** [2] - 84:2, 251:13

**raised** [1] - 229:20

**ran** [4] - 60:11, 144:24, 257:16, 262:18

**rather** [2] - 41:24, 63:2

**reach** [6] - 22:22, 119:9, 243:11, 247:24, 248:6, 249:14

**reached** [5] - 9:9, 119:8, 217:7, 217:21, 246:18

**react** [1] - 43:17

**read** [15] - 22:12, 22:14, 49:18, 49:19, 56:4, 61:25, 85:6, 89:19, 91:7, 116:17, 117:6, 151:11, 178:3, 262:7, 275:8

**ready** [4] - 250:20, 251:9, 254:5, 261:10

**real** [1] - 205:12

**reality** [1] - 194:2

**realized** [1] - 77:12

**really** [30] - 27:2, 46:7, 46:8, 47:2, 57:3, 57:8, 57:12, 58:9, 60:14, 64:12, 123:6, 127:14, 149:5, 150:21, 161:3, 161:23, 162:2, 164:16, 168:18, 186:6, 197:6, 198:13, 208:2, 211:9, 211:10, 218:13, 223:5, 253:18, 261:9

**realtime** [1] - 101:9

**Realty** [1] - 2:17

**REALTY** [1] - 1:8

**reason** [8] - 6:3, 71:25, 75:22, 84:6, 112:13, 203:13, 212:12, 246:12

**receipt** [7] - 53:7, 98:14, 237:11, 237:13, 244:9,

252:11, 252:12

**receipted** [1] - 140:17

**receipts** [1] - 146:21

**receivable** [2] - 156:20, 201:6

**receivables** [1] - 201:5

**receive** [4] - 97:23, 152:25, 154:7, 163:22

**received** [9] - 50:9, 76:13, 83:24, 135:5, 135:6, 135:8, 152:18, 199:19, 228:2

**recess** [3] - 110:14, 191:16, 228:17

**recognize** [1] - 240:20

**record** [31] - 5:8, 5:12, 40:12, 62:12, 62:13, 62:17, 67:20, 67:23, 68:2, 69:10, 69:19, 81:5, 87:18, 89:21, 90:10, 91:16, 91:17, 97:11, 145:21, 147:5, 148:25, 149:10, 219:24, 228:16, 231:22, 250:8, 262:9, 272:10, 275:12, 275:14, 278:13

**Record** [2] - 22:14, 91:7

**recorded** [1] - 88:10

**records** [14] - 13:14, 25:19, 102:23, 103:4, 103:14, 104:4, 122:8, 151:9, 179:8, 179:13, 180:6, 180:13, 180:19, 180:24

**recouped** [1] - 261:7

**recover** [3] - 85:11, 87:14, 87:16

**red** [1] - 74:25

**refer** [1] - 89:25

**reference** [1] - 112:3

**references** [1] - 234:23

**referencing** [1] - 235:11

**referred** [1] - 60:15

**referring** [4] - 23:13, 258:17, 260:7, 266:18

**refers** [1] - 241:9

**reflect** [2] - 62:18, 97:12

**reflected** [1] - 128:19

**refresh** [1] - 13:11

**refund** [1] - 183:22

**Regal** [1] - 132:21

**regard** [1] - 231:16

**regarding** [10] - 23:23, 55:14, 63:22, 67:7, 72:12, 104:23, 107:7, 112:25, 199:19, 216:24

**regards** [1] - 65:6

**regularity** [1] - 194:19

**reimburse** [1] - 197:10

**related** [4] - 32:6, 130:20, 167:4, 278:16

**relationship** [4] - 242:6, 242:9, 246:16, 261:12

**relationships** [1] - 261:9

**relevance** [7] - 52:21, 54:7, 126:16, 128:24, 204:9, 210:21, 214:19

**remember** [38] - 12:17, 14:24, 18:13, 32:25, 63:24, 71:19, 83:24, 87:9, 88:7, 92:20, 103:10, 104:3, 104:5, 119:6, 145:20, 147:6, 149:2, 149:9, 159:16, 159:17, 161:22, 164:11, 171:6, 178:7, 185:4, 193:23, 196:12, 209:13, 209:17, 209:25, 211:25, 213:19, 232:6, 237:18, 257:12, 266:15, 267:16, 271:10

**rent** [2] - 195:6, 221:22

**renting** [1] - 158:6

**reopen** [2] - 142:17, 142:20

**repair** [1] - 185:7

**repeat** [4] - 38:8, 69:16, 212:15, 270:10

**rephrase** [2] - 6:9, 145:17

**replace** [1] - 41:22

**reported** [3] - 148:7, 150:5, 188:3

**REPORTER** [2] - 5:6, 5:11

**represent** [1] - 233:17

**representation** [8] - 47:15, 130:7, 130:21, 131:12,

131:21, 134:8, 250:24, 263:2
**REPRESENTATIVE** [1] - 1:6
**Representative** [1] - 2:15
**represented** [5] - 46:24, 133:14, 133:15, 162:21, 235:24
**representing** [3] - 133:19, 134:13, 260:19
**request** [3] - 41:9, 238:20, 239:7
**REQUEST** [1] - 276:8
**requested** [1] - 41:10
**requests** [1] - 67:6
**required** [2] - 107:11, 237:20
**requires** [1] - 208:7
**reserved** [1] - 4:11
**residence** [1] - 50:21
**resident** [3] - 162:14, 163:3, 163:4
**resolved** [8] - 24:11, 246:20, 255:7, 255:9, 256:2, 257:8, 257:11, 257:13
**respect** [1] - 260:15
**respective** [1] - 4:4
**response** [3] - 95:23, 96:3, 244:23
**responsibility** [1] - 172:6
**responsible** [1] - 219:18
**resumed** [1] - 192:17
**retail** [1] - 123:4
**retained** [1] - 277:8
**retired** [1] - 127:25
**return** [3] - 128:15, 201:21, 201:24
**returned** [1] - 217:25
**returns** [18] - 54:5, 54:13, 61:6, 61:12, 201:15, 202:7, 202:15, 215:8, 215:14, 215:17, 215:22, 215:25, 236:23, 239:9, 269:3, 269:4, 269:5
**reveal** [2] - 164:21, 164:24
**reverse** [1] - 63:4
**review** [7] - 61:9, 199:18, 200:7, 200:10, 200:18, 201:2, 208:9
**reviewed** [2] - 61:6,

267:11
**reviewing** [1] - 91:19
**revisit** [1] - 192:22
**Rica** [7] - 5:15, 26:24, 42:22, 90:21, 162:6, 162:8, 162:15
**ride** [1] - 140:4
**rightfully** [1] - 182:6
**rip** [2] - 47:7, 131:3
**rob** [1] - 108:20
**Rob** [12] - 234:8, 234:10, 243:3, 257:24, 258:11, 258:24, 259:5, 260:12, 264:22, 266:3, 267:5, 267:11
**robbed** [2] - 249:21, 262:14
**Robert** [6] - 2:5, 5:10, 240:24, 241:4, 266:25, 268:7
**ROBERT** [5] - 1:4, 1:22, 275:7, 275:19, 278:9
**role** [3] - 221:7, 221:9, 230:14
**roles** [1] - 114:20
**RONNEBURGER** [24] - 3:12, 232:17, 232:24, 233:10, 234:17, 234:25, 238:3, 238:8, 239:11, 239:20, 240:8, 240:12, 241:6, 242:13, 242:18, 250:3, 250:7, 264:3, 264:18, 267:8, 268:12, 268:16, 269:20, 276:5
**Ronneburger** [1] - 233:15
**ROs** [1] - 180:5
**ROSLYN** [1] - 1:14
**roughly** [6] - 123:18, 148:24, 173:24, 174:12, 193:20, 205:6
**round** [1] - 206:23
**Route** [2] - 2:17, 256:9
**ROUTE** [1] - 1:9
**RQ** [2] - 239:11, 239:20
**Ruderman** [3] - 21:10, 233:4, 274:2
**RUDERMAN** [3] - 2:21, 21:19, 274:6
**Rule** [1] - 90:2
**rules** [1] - 89:19
**run** [11] - 9:14, 32:14,

34:17, 59:12, 84:18, 109:16, 115:12, 144:23, 145:9, 150:6, 220:18
**running** [7] - 7:12, 13:18, 30:11, 30:14, 84:19, 144:22, 160:24
**runs** [2] - 81:23, 81:24
**rush** [2] - 243:20, 253:3

## S

**SAGE** [1] - 2:3
**salaries** [1] - 160:11
**Sales** [1] - 2:5
**sales** [4] - 7:13, 94:2, 198:16, 228:10
**SALES** [1] - 1:4
**salesman** [2] - 120:16, 121:4
**salesmen** [1] - 121:6
**salespeople** [2] - 14:25, 223:19
**Sarah** [11] - 13:3, 51:6, 61:14, 96:15, 132:4, 157:9, 161:24, 162:2, 163:13, 210:18, 211:14
**SARAH** [2] - 1:11, 3:24
**saved** [2] - 88:5, 88:7
**saw** [29] - 16:19, 45:4, 45:14, 51:4, 51:14, 55:16, 56:7, 61:9, 61:19, 94:4, 94:19, 96:24, 102:22, 103:15, 116:13, 146:22, 146:24, 160:23, 223:18, 224:23, 224:24, 249:17, 252:5, 256:13, 258:17, 258:18, 259:17, 260:10
**schedule** [2] - 70:22, 156:20
**scheme** [3] - 83:19, 226:11, 226:12
**school** [1] - 6:13
**School** [2] - 6:15, 7:4
**screen** [2] - 62:19, 97:13
**screwed** [1] - 170:17
**Se** [1] - 3:4
**sealing** [1] - 4:5
**second** [4] - 21:7, 101:25, 255:16, 257:15

**secure** [4] - 76:25, 115:16, 115:18, 115:19
**security** [10] - 14:16, 23:22, 24:2, 77:2, 77:5, 87:19, 113:18, 114:6, 223:11, 223:17
**see** [60] - 26:7, 26:8, 28:6, 31:3, 33:19, 36:5, 37:23, 48:9, 48:20, 49:17, 49:25, 51:8, 51:16, 51:18, 52:7, 52:11, 53:11, 53:24, 55:8, 56:14, 56:21, 56:24, 56:25, 61:21, 63:13, 74:6, 84:18, 89:2, 91:18, 91:19, 91:20, 91:25, 94:13, 95:3, 96:8, 98:3, 98:11, 98:16, 100:13, 100:17, 100:20, 103:3, 107:2, 110:20, 110:23, 125:6, 132:15, 147:10, 161:22, 165:13, 172:4, 182:10, 200:16, 204:5, 208:11, 239:17, 243:8, 257:22, 258:22, 273:13
**seed** [1] - 70:13
**seeing** [2] - 76:2, 212:3
**sell** [11] - 50:22, 57:19, 59:25, 60:6, 123:4, 133:3, 159:12, 162:25, 171:20, 177:10, 228:7
**selling** [3] - 174:6, 198:19, 210:11
**send** [26] - 24:3, 64:12, 64:24, 66:19, 68:23, 70:8, 84:9, 90:18, 90:20, 94:17, 99:12, 119:21, 152:9, 152:13, 152:15, 185:14, 186:2, 186:9, 214:24, 236:16, 236:19, 236:22, 243:2, 244:8, 252:10, 254:9
**sending** [4] - 100:16, 250:16, 257:24, 259:15
**Senior** [1] - 6:14
**sense** [4] - 39:12, 85:16, 85:17, 122:22

**sent** [49] - 43:9, 43:13, 43:20, 43:21, 43:23, 43:25, 44:5, 44:8, 44:9, 63:23, 64:2, 64:5, 64:13, 64:16, 67:6, 67:12, 70:10, 70:21, 72:9, 74:25, 92:11, 99:16, 99:17, 111:19, 185:11, 186:13, 186:17, 214:23, 214:25, 218:14, 236:25, 238:22, 239:8, 239:25, 242:20, 243:14, 248:20, 248:21, 248:22, 249:6, 257:4, 258:11, 259:22, 260:6, 266:10, 267:25, 269:2, 269:4, 269:5
**separate** [1] - 132:16
**September** [8] - 25:5, 25:6, 25:14, 61:24, 116:14, 147:21, 152:18, 152:21
**serious** [2] - 12:24, 157:22
**serve** [2] - 43:15, 64:2
**served** [6] - 26:25, 27:4, 28:8, 49:22, 50:16, 50:19
**service** [1] - 102:15
**services** [3] - 15:17, 15:22, 187:4
**set** [6] - 73:17, 105:7, 105:11, 105:16, 278:11, 278:21
**setting** [2] - 104:23, 105:5
**settled** [1] - 26:17
**setup** [2] - 139:11, 223:3
**seven** [3] - 206:4, 206:10, 229:9
**several** [9] - 23:6, 38:13, 41:6, 60:4, 60:16, 202:21, 226:19, 226:22, 229:16
**shall** [1] - 4:11
**SHANKS** [1] - 2:11
**share** [6] - 62:18, 99:15, 99:18, 232:20, 234:7, 243:16
**shared** [1] - 169:23
**shares** [1] - 127:23
**sharing** [1] - 102:11
**sheet** [1] - 158:17

shift [1] - 171:3
ship [1] - 123:5
shop [2] - 183:14, 185:7
shops [10] - 147:24, 183:20, 184:2, 184:7, 184:8, 184:24, 185:5, 186:18, 186:22, 187:8
shot [1] - 210:10
show [5] - 53:4, 90:11, 122:9, 155:23, 215:16
showed [7] - 55:21, 56:5, 145:10, 200:12, 206:9, 215:9, 265:21
showing [6] - 49:6, 49:7, 91:10, 194:3, 207:3, 258:2
shown [1] - 224:4
shows [2] - 149:7, 160:10
shut [2] - 108:5, 171:17
shutdown [4] - 59:14, 118:2, 118:6, 118:12
shuttered [6] - 59:14, 59:21, 60:3, 60:7, 75:22, 165:10
shutting [1] - 255:13
side [2] - 73:17, 263:4
sign [9] - 36:24, 57:23, 80:6, 80:25, 82:7, 139:17, 139:24, 140:5, 165:23
signatory [1] - 157:7
signature [2] - 139:16, 248:21
signed [17] - 4:15, 4:18, 55:5, 58:2, 75:18, 76:22, 80:9, 81:17, 81:18, 82:8, 104:8, 138:13, 139:14, 139:19, 140:4, 159:25, 227:8
Signed [1] - 275:22
signing [1] - 138:21
signs [2] - 82:4, 82:5
silent [1] - 229:14
simple [1] - 254:2
single [3] - 94:7, 224:25, 232:6
sit [3] - 70:19, 115:13, 115:25
sitting [5] - 183:19, 183:25, 184:6, 217:3, 261:5
situation [2] - 28:13,

182:4
six [1] - 153:14
sixteen [1] - 148:17
Skircoski [1] - 17:14
slips [3] - 31:19, 141:6, 141:11
slow [1] - 42:11
small [1] - 127:19
SMITHTOWN [1] - 1:15
so-called [2] - 148:6, 231:16
so.. [11] - 20:12, 26:13, 31:12, 39:8, 46:8, 66:25, 106:6, 117:16, 118:5, 149:11, 184:22
Sol [1] - 5:14
sold [27] - 18:16, 18:19, 19:4, 19:5, 20:6, 50:17, 73:6, 73:7, 73:8, 83:7, 83:8, 87:14, 123:5, 140:16, 145:21, 147:3, 148:18, 149:8, 164:3, 175:8, 175:13, 204:22, 204:24, 205:10, 206:2, 206:18, 214:24
some-odd [1] - 86:16
someone [4] - 18:18, 77:23, 104:15, 243:4
someplace [1] - 68:3
sometime [4] - 122:4, 124:7, 222:21, 252:2
sometimes [1] - 212:4
somewhere [1] - 203:4
soon [4] - 150:18, 184:18, 262:3, 271:24
sooner [1] - 108:19
Sorenson [2] - 126:7, 127:6
sorry [26] - 13:6, 20:17, 38:8, 42:8, 43:24, 59:23, 64:22, 95:3, 109:4, 118:10, 135:13, 147:23, 152:22, 156:9, 156:13, 159:2, 166:21, 168:2, 174:20, 207:10, 241:6, 255:8, 257:9, 259:20, 270:8
sounds [1] - 175:5
speaking [7] - 21:13, 21:17, 27:4, 54:11, 119:10, 229:12,

252:25
speaks [1] - 61:18
specific [7] - 101:22, 112:18, 133:6, 193:9, 221:7, 231:7, 231:8
specifically [5] - 9:23, 74:10, 141:12, 221:23, 268:18
specificity [2] - 220:4, 220:25
specifics [3] - 219:16, 219:20, 222:3
specify [1] - 265:19
speculation [7] - 69:15, 103:20, 138:19, 139:9, 149:19, 264:19, 272:16
speculative [1] - 89:13
spell [4] - 40:12, 40:13, 110:8, 146:7
spoken [12] - 15:10, 24:15, 28:12, 117:15, 118:5, 118:16, 120:8, 217:19, 218:5, 218:8, 247:13, 251:2
ss [2] - 275:4, 278:4
stand [1] - 13:19
standing [1] - 261:11
standouts [1] - 15:2
standpoint [1] - 166:16
stands [1] - 7:5
start [1] - 97:19
started [25] - 10:9, 14:3, 45:25, 52:24, 54:25, 84:22, 102:5, 105:17, 129:4, 133:22, 142:21, 145:12, 145:13, 146:17, 173:6, 176:25, 196:3, 207:25, 222:18, 236:14, 240:24, 241:19, 249:5, 253:21, 264:2
starting [5] - 63:6, 173:5, 173:21, 255:18, 255:19
State [3] - 1:25, 275:25, 278:7
STATE [2] - 275:4, 278:3
state [9] - 5:7, 5:12, 7:22, 7:23, 27:16, 62:20, 72:5, 149:8, 202:3
statement [23] - 70:22,

73:18, 91:12, 150:14, 153:7, 153:20, 154:2, 154:5, 155:16, 156:23, 160:10, 160:13, 194:2, 201:9, 201:12, 204:25, 205:3, 205:5, 205:9, 205:18, 215:12, 258:5, 276:16
statement's [1] - 150:15
statements [24] - 93:13, 142:8, 142:23, 151:11, 151:12, 151:13, 151:23, 152:2, 152:10, 152:15, 152:19, 152:25, 153:11, 153:21, 154:8, 154:13, 154:18, 155:8, 155:23, 156:2, 156:15, 202:17, 241:23, 248:23
STATES [1] - 1:2
states [2] - 27:9, 242:24
States [3] - 50:21, 163:4, 163:5
stating [1] - 63:24
station [3] - 10:2, 10:4, 195:22
status [1] - 104:12
stay [1] - 246:22
steal [2] - 86:2, 132:12
stealing [3] - 31:14, 182:21, 224:18
still [24] - 11:9, 13:16, 18:8, 18:22, 19:13, 19:16, 19:23, 24:22, 25:20, 48:17, 67:21, 86:13, 88:25, 99:17, 107:21, 109:8, 169:2, 180:10, 194:21, 224:6, 236:10, 244:7, 256:24, 261:4
STIPULATED [3] - 4:2, 4:8, 4:13
stock [18] - 49:6, 54:20, 55:5, 56:17, 56:21, 56:23, 57:10, 57:16, 57:22, 58:2, 58:3, 58:10, 58:11, 58:17, 58:22, 190:14, 265:23, 273:22
stocks [1] - 159:12

stole [2] - 85:7, 86:9
stolen [5] - 31:17, 75:18, 85:24, 147:14, 148:8
stop [3] - 34:2, 83:22, 191:12
stopped [3] - 249:16, 255:5, 271:14
stops [1] - 240:4
storage [8] - 179:7, 179:9, 179:11, 179:16, 179:17, 179:21, 180:5, 181:4
store [38] - 11:2, 11:14, 12:14, 18:10, 18:12, 32:16, 41:15, 66:18, 83:5, 83:9, 100:19, 100:22, 109:10, 109:11, 127:25, 129:16, 145:4, 145:8, 149:24, 150:8, 150:10, 150:22, 160:8, 163:25, 164:4, 168:8, 170:8, 172:20, 172:24, 180:14, 180:19, 181:3, 194:21, 200:15, 208:7, 209:22, 209:23
stored [1] - 179:14
stores [44] - 11:8, 24:7, 41:24, 42:4, 42:7, 42:14, 65:22, 75:21, 83:3, 83:13, 83:16, 102:6, 102:8, 109:7, 109:13, 109:18, 110:2, 114:21, 114:22, 115:12, 135:6, 140:12, 144:23, 144:25, 153:4, 165:9, 167:12, 167:17, 167:25, 168:6, 170:15, 170:19, 170:21, 172:8, 173:4, 174:25, 180:12, 181:11, 181:25, 194:22, 198:16, 235:21, 236:25
strange [2] - 43:10, 43:13
STREET [1] - 1:8
Street [2] - 2:17, 3:18
strict [1] - 246:10
strictly [3] - 115:21, 170:7, 176:13
strike [1] - 71:3
structure [1] - 48:6

**stuff** [21] - 30:17, 47:21, 54:24, 64:13, 66:17, 68:20, 78:20, 132:11, 142:16, 158:13, 184:9, 196:5, 221:19, 221:24, 230:18, 230:19, 246:11, 254:2, 259:22, 259:24
**stuttered** [1] - 248:18
**subject** [2] - 55:3, 98:2
**submit** [3] - 47:9, 48:24, 183:15
**submitted** [10] - 55:19, 56:12, 92:3, 92:4, 93:7, 94:19, 94:21, 95:24, 154:5, 241:18
**submitting** [1] - 96:5
**subpoena** [3] - 90:19, 90:23, 112:21
**subscribed** [1] - 275:22
**subsequently** [1] - 44:19
**substance** [2] - 71:8, 240:6
**substantial** [3] - 84:16, 158:9, 237:6
**substantive** [1] - 218:24
**successful** [2] - 160:25, 161:2
**sudden** [4] - 84:5, 142:22, 150:19, 249:11
**sued** [6] - 26:10, 27:21, 27:23, 28:2, 158:6, 260:18
**suffer** [2] - 83:15, 122:14
**suffering** [1] - 83:11
**suggest** [2] - 57:9, 273:9
**suggested** [2] - 35:2, 35:4
**suggestion** [1] - 34:23
**suing** [4] - 26:12, 27:19, 29:23
**Suite** [2] - 2:19, 3:18
**sum** [1] - 71:7
**Sunrise** [15] - 2:12, 3:5, 17:6, 47:25, 48:7, 53:12, 53:23, 77:12, 167:20, 171:18, 189:2, 215:19, 260:24, 271:25

**SUNRISE** [3] - 1:4, 1:13, 1:17
**Superb** [187] - 2:4, 9:14, 9:21, 13:3, 13:16, 13:25, 15:18, 16:3, 16:12, 16:17, 16:20, 17:4, 31:14, 31:23, 32:4, 32:6, 32:8, 32:9, 33:11, 40:17, 41:14, 42:3, 46:12, 55:2, 67:9, 70:16, 71:9, 72:2, 74:2, 75:6, 76:17, 76:22, 83:2, 83:5, 83:8, 87:20, 88:19, 91:12, 98:9, 98:10, 99:22, 99:24, 100:6, 100:9, 102:7, 113:18, 115:3, 115:9, 117:2, 117:4, 117:13, 117:18, 118:8, 120:4, 122:20, 122:23, 123:3, 123:7, 124:24, 125:8, 125:9, 125:17, 125:21, 131:14, 131:16, 137:23, 140:2, 140:5, 140:15, 141:16, 142:24, 146:25, 150:19, 150:25, 151:24, 153:2, 153:5, 153:11, 156:24, 157:13, 157:15, 160:4, 163:7, 165:24, 166:5, 166:13, 167:24, 168:5, 168:11, 169:19, 170:3, 170:6, 170:14, 170:18, 172:13, 173:24, 174:11, 175:8, 175:13, 177:7, 177:15, 179:9, 179:17, 180:24, 185:8, 185:11, 187:4, 187:11, 192:25, 194:7, 196:22, 197:8, 197:22, 198:4, 198:5, 198:14, 198:18, 198:21, 198:24, 199:6, 199:12, 199:14, 201:16, 202:25, 204:22, 204:24, 205:13, 205:20, 206:2, 206:17, 206:22, 206:25,

207:5, 207:7, 207:13, 207:17, 211:14, 212:6, 212:13, 213:2, 213:23, 215:6, 222:11, 222:24, 226:23, 226:24, 227:2, 227:3, 228:7, 228:10, 234:9, 236:5, 237:8, 238:10, 243:2, 248:14, 248:17, 250:9, 250:21, 251:5, 258:2, 258:6, 258:10, 259:7, 264:17, 265:9, 265:13, 265:16, 266:8, 266:11, 266:13, 266:17, 267:6, 267:7, 267:12, 267:13, 267:21, 268:3, 268:8, 268:22, 269:3, 269:5, 269:10, 273:5, 273:10, 276:16
**SUPERB** [1] - 1:4
**Superb's** [7] - 82:12, 82:15, 102:3, 115:16, 151:3, 182:7, 199:8
**supplied** [3] - 141:20, 141:21, 200:17
**supply** [3] - 167:16, 173:3, 200:24
**supplying** [2] - 167:9, 172:25
**supposed** [5] - 66:20, 66:21, 89:20, 145:3, 205:16
**supposedly** [2] - 59:17, 221:20
**sure..** [1] - 76:8
**surprise** [1] - 243:8
**surprised** [2] - 230:6, 257:22
**survive** [1] - 84:25
**suspended** [1] - 84:11
**swear** [1] - 262:10
**sweetheart** [1] - 262:10
**switch** [1] - 54:22
**switched** [1] - 261:12
**sworn** [4] - 4:15, 4:19, 5:4, 278:11
**Syosset** [3] - 100:24, 101:3, 107:8
**SYOSSET** [1] - 1:13
**system** [15] - 41:17, 65:22, 66:14, 77:14,

94:10, 113:17, 114:13, 115:3, 115:8, 115:11, 115:15, 116:2, 139:10, 140:20, 145:6
**systems** [1] - 181:22

---

### T

**tail** [1] - 210:5
**talks** [1] - 17:7
**tax** [20] - 54:5, 54:12, 61:6, 61:11, 201:15, 201:21, 201:24, 202:6, 202:15, 215:8, 215:13, 215:16, 215:22, 215:25, 236:23, 239:9, 269:2, 269:4, 269:5
**taxes** [3] - 46:2, 260:5, 265:23
**TEAM** [1] - 1:4
**team** [5] - 42:5, 44:15, 64:10, 68:19, 72:17
**Team** [1] - 2:5
**technically** [2] - 36:3, 138:6
**teens** [1] - 87:10
**teller** [1] - 141:9
**ten** [6] - 7:19, 73:7, 80:25, 178:5, 226:21, 229:10
**term** [2] - 158:17, 162:4
**termination** [1] - 84:13
**terms** [1] - 158:21
**testified** [6] - 5:5, 157:20, 192:17, 233:21, 243:3, 269:9
**testify** [2] - 224:25, 225:2
**testimony** [4] - 224:16, 275:9, 275:13, 278:13
**Text** [6] - 116:9, 235:3, 250:4, 276:21, 276:23, 277:5
**text** [36] - 38:24, 43:9, 43:10, 43:11, 43:13, 43:18, 43:21, 44:3, 63:24, 64:5, 67:20, 70:18, 71:14, 112:2, 112:8, 116:13, 122:6, 159:8, 170:24, 235:8, 235:23, 239:21, 239:22, 240:11,

243:16, 250:12, 250:15, 250:19, 251:25, 252:5, 255:3, 256:5, 257:24, 259:25, 269:11, 276:11
**texted** [1] - 115:5
**texting** [5] - 115:2, 115:8, 115:15, 116:2, 161:22
**texts** [11] - 66:25, 67:21, 67:24, 68:2, 68:9, 68:10, 73:5, 76:13, 161:25, 229:16, 262:8
**THE** [14] - 1:6, 5:6, 5:9, 5:11, 5:13, 8:7, 21:5, 36:16, 40:15, 42:12, 50:15, 90:13, 95:18, 118:15
**theft** [1] - 106:3
**thief** [1] - 106:6
**thinking** [1] - 150:24
**thinks** [1] - 120:15
**third** [1] - 21:10
**Thomas** [10] - 45:22, 153:20, 155:2, 155:3, 155:7, 155:14, 155:18, 155:22, 201:10, 201:11
**THOMAS** [1] - 1:12
**Thomasson** [6] - 5:20, 21:12, 21:20, 42:9, 97:17, 242:14
**THOMASSON** [36] - 1:11, 3:3, 5:18, 21:3, 22:2, 22:7, 22:11, 22:15, 62:4, 62:23, 63:2, 71:2, 89:18, 90:6, 91:5, 91:8, 97:6, 97:18, 110:10, 110:19, 113:15, 113:22, 116:7, 130:3, 191:9, 191:14, 192:19, 228:12, 228:18, 228:22, 232:15, 242:16, 269:22, 270:3, 273:24, 276:4
**thoughts** [1] - 54:3
**thousand** [4] - 156:23, 213:21, 226:21, 229:20
**thousands** [1] - 156:5
**three** [20] - 11:8, 18:5, 28:7, 29:23, 37:14, 74:22, 83:12, 86:19, 102:6, 109:9, 109:17, 109:20,

*Rich Moffett Court Reporting, Inc.*

109:21, 132:18, 132:19, 148:18, 181:24, 183:16, 255:13, 271:13
**throughout** [4] - 56:3, 62:7, 73:8, 151:23
**thrown** [2] - 86:4, 248:12
**tight** [1] - 84:24
**timeframe** [2] - 214:15, 258:24
**timely** [1] - 201:18
**tires** [1] - 186:23
**title** [2] - 264:23, 265:2
**titles** [4] - 214:16, 214:24, 215:2, 215:4
**today** [19] - 15:11, 16:17, 18:12, 68:2, 86:8, 106:20, 115:13, 115:25, 116:4, 123:9, 131:14, 190:25, 219:8, 219:13, 220:3, 221:10, 231:19, 232:11, 233:19
**together** [9] - 47:2, 129:7, 132:13, 153:6, 153:8, 161:6, 230:2, 253:18, 259:24
**token** [13] - 77:14, 77:18, 77:19, 77:24, 78:11, 78:12, 78:23, 78:25, 79:4, 113:17, 115:23
**tokens** [6] - 77:17, 77:20, 78:5, 78:17, 114:5, 115:21
**ton** [3] - 85:10, 211:4, 211:5
**tons** [1] - 84:22
**Tony** [1] - 22:10
**took** [35] - 25:10, 26:3, 33:10, 33:14, 33:17, 37:15, 74:11, 75:4, 75:5, 109:21, 118:2, 120:20, 120:22, 123:23, 124:8, 140:4, 140:15, 140:25, 141:4, 141:6, 165:22, 168:7, 168:10, 169:5, 169:6, 182:6, 188:25, 197:4, 207:5, 210:5, 210:6, 210:8, 213:15, 225:3, 225:7
**top** [2] - 149:2, 255:21
**total** [4] - 19:22,

80:23, 94:3, 182:17
**totalling** [1] - 76:19
**touch** [4] - 19:8, 19:13, 19:16, 107:21
**tow** [1] - 187:11
**towards** [6] - 83:2, 157:25, 210:5, 235:20, 253:20, 255:11
**track** [3] - 144:16, 144:25, 197:25
**trade** [2] - 174:24, 190:7
**trade-in** [1] - 190:7
**trade-ins** [1] - 174:24
**training** [2] - 7:3, 7:10
**transaction** [2] - 58:12, 255:12
**transcript** [2] - 275:9, 275:11
**transfer** [2] - 82:14, 82:18
**transferred** [2] - 82:17, 273:22
**transferring** [1] - 82:20
**trees** [1] - 212:4
**trial** [4] - 4:12, 90:8, 90:12, 93:14
**TRO** [4] - 214:2, 214:8, 214:11, 260:22
**trouble** [5] - 22:3, 110:6, 181:14, 181:17, 181:19
**truck** [1] - 187:11
**true** [6] - 93:18, 96:6, 231:14, 275:12, 275:14, 278:13
**trust** [1] - 112:16
**trusted** [2] - 139:23, 140:10
**truth** [2] - 85:8, 96:4
**try** [4] - 94:10, 142:16, 150:16, 246:15
**trying** [14] - 54:8, 69:18, 85:10, 85:11, 130:22, 142:9, 181:17, 193:10, 199:9, 222:2, 232:24, 254:23, 273:9, 273:12
**turn** [3] - 100:12, 106:24, 242:14
**turned** [3] - 69:10, 69:19, 246:5
**twenty** [1] - 123:20
**twenty-five** [1] - 123:20
**twice** [1] - 160:18

**two** [41] - 9:3, 11:18, 17:2, 17:5, 20:24, 33:7, 35:14, 37:14, 37:15, 50:3, 50:5, 59:16, 59:20, 60:7, 78:20, 102:8, 105:22, 109:22, 116:24, 119:13, 128:22, 160:25, 167:19, 172:7, 183:16, 187:14, 187:17, 187:21, 189:6, 194:3, 194:22, 213:12, 216:14, 222:22, 223:10, 228:13, 235:21, 244:10, 257:17, 259:8, 265:4
**type** [4] - 5:23, 6:24, 7:3, 111:19
**types** [1] - 237:20
**typical** [1] - 81:23
**typically** [7] - 37:10, 37:16, 51:21, 51:24, 52:2, 52:17, 80:5

## U

**UCCs** [1] - 26:5
**UEA** [1] - 1:15
**unaccounted** [2] - 148:15, 148:16
**unauthorized** [1] - 165:23
**uncomfortable** [1] - 183:3
**undelivered** [1] - 184:2
**under** [9] - 8:19, 39:21, 39:22, 95:13, 97:25, 172:14, 177:8, 208:15, 275:9
**understood** [2] - 78:6, 245:12
**underwriter** [3] - 244:2, 260:3, 260:13
**Uniondale** [2] - 1:19, 3:11
**UNITED** [1] - 1:2
**United** [3] - 50:21, 163:4, 163:5
**University** [1] - 6:22
**unnecessary** [1] - 72:10
**unwind** [1] - 207:25
**unwound** [5] - 205:16, 205:23, 206:6, 206:11, 206:15
**up** [75] - 8:4, 10:25, 31:22, 32:3, 41:14,

46:21, 52:8, 52:17, 52:22, 60:5, 60:12, 71:23, 75:24, 80:6, 81:21, 83:11, 84:8, 90:11, 93:11, 97:12, 98:6, 98:8, 98:9, 99:2, 99:9, 100:15, 104:24, 105:5, 105:7, 105:11, 105:16, 114:10, 116:2, 119:10, 122:15, 127:22, 129:6, 129:10, 142:18, 145:10, 145:14, 146:18, 146:22, 147:12, 155:17, 158:2, 158:5, 158:12, 158:16, 170:17, 185:2, 185:3, 185:6, 187:24, 193:8, 196:11, 196:23, 197:21, 200:13, 211:20, 235:21, 239:19, 239:23, 240:4, 243:21, 245:16, 253:22, 257:18, 261:14, 261:20, 263:12, 264:7, 266:12, 269:23, 271:13
**updated** [1] - 218:12
**updates** [2] - 218:4
**upset** [8] - 63:25, 108:12, 108:14, 108:15, 108:16, 108:21, 246:6
**Urrutia** [34] - 2:6, 5:10, 5:19, 6:12, 21:21, 46:15, 48:11, 62:15, 63:11, 69:7, 71:6, 89:24, 90:11, 90:20, 91:10, 91:19, 95:14, 96:11, 96:23, 106:16, 110:16, 133:7, 192:20, 225:10, 228:24, 232:18, 233:11, 235:7, 238:14, 240:20, 242:22, 250:11, 264:7, 264:11
**URRUTIA** [6] - 1:4, 1:23, 275:7, 275:19, 276:4, 278:9
**Urrutia's** [1] - 276:9
**US** [1] - 176:8
**utilities** [1] - 195:9
**utilize** [1] - 82:25
**utilized** [2] - 92:18,

115:3

## V

**vacation** [3] - 44:4, 105:18, 158:20
**vague** [3] - 89:9, 217:11, 217:17
**value** [6] - 160:3, 160:7, 160:23, 161:3, 169:15
**vehicles** [6] - 19:19, 19:21, 24:10, 25:2, 172:12, 172:19
**verbal** [1] - 174:18
**verbally** [3] - 86:25, 101:19, 135:11
**verified** [1] - 149:5
**verify** [1] - 149:6
**very..** [1] - 261:16
**vested** [1] - 230:2
**via** [3] - 2:22, 3:21, 161:25
**vicinity** [1] - 203:4
**videotapes** [5] - 87:25, 88:12, 88:19, 89:2, 89:7
**view** [3] - 78:18, 78:24, 106:18
**violation** [1] - 214:8
**virtually** [1] - 21:9
**voice** [1] - 114:10
**Volkswagen** [4] - 123:15, 127:23, 198:18, 198:19
**Volkswagon** [2] - 10:21, 109:10
**volumes** [1] - 232:5
**VP** [4] - 18:3, 234:12, 244:2, 264:25
**VPs** [1] - 234:12

## W

**wait** [2] - 50:10, 97:5
**waiting** [2] - 26:7, 272:2
**waived** [1] - 4:7
**walk** [1] - 145:3
**walked** [1] - 127:23
**Wantagh** [1] - 3:6
**warning** [1] - 43:23
**waste** [1] - 47:10
**watch** [1] - 21:6
**week** [6] - 7:18, 147:19, 158:18, 159:10, 183:16, 258:15
**weeks** [7] - 74:22, 89:11, 105:22,

183:16, 222:22, 223:10
**Weinstein** [30] - 99:14, 141:22, 142:19, 233:23, 234:4, 235:15, 235:25, 236:15, 236:17, 236:20, 237:15, 241:2, 241:24, 242:25, 243:5, 243:12, 248:7, 251:15, 264:22, 264:24, 265:6, 265:12, 266:9, 266:24, 267:5, 267:11, 268:19, 268:21, 269:11, 271:6
**WEIR** [1] - 3:14
**well-put-together** [1] - 47:2
**WHEREOF** [1] - 278:20
**whole** [11] - 46:16, 130:17, 131:2, 131:19, 142:21, 144:6, 158:11, 181:25, 183:13, 196:19, 230:11
**wholesale** [3] - 122:24, 147:4, 198:23
**wholesaled** [1] - 87:11
**wholesaler** [4] - 146:3, 146:4, 146:10, 148:21
**wholesalers** [2] - 87:12, 145:22
**Widener** [1] - 3:17
**wife** [2] - 161:14, 161:19
**willing** [1] - 23:11
**wind** [1] - 129:6
**windows** [1] - 186:22
**wire** [1] - 49:2
**wires** [1] - 78:19
**withdrawing** [1] - 172:3
**withdrawn** [1] - 152:24
**witness** [6] - 5:3, 21:12, 233:6, 274:4, 278:10, 278:14
**WITNESS** [13] - 5:9, 5:13, 8:7, 21:5, 36:16, 40:15, 42:12, 50:15, 90:13, 95:18, 118:15, 276:3, 278:20
**witness's** [1] - 22:6

**wonderful** [1] - 242:5
**wondering** [1] - 194:5
**word** [6] - 68:11, 68:14, 71:19, 92:18, 92:20, 92:21
**wording** [4] - 63:25, 266:15, 267:17, 271:10
**words** [3] - 17:23, 71:17, 116:2
**worries** [1] - 212:2
**worth** [6] - 10:5, 121:11, 160:8, 160:15, 182:14, 221:22
**wracking** [1] - 255:15
**write** [9] - 74:17, 74:18, 81:19, 81:20, 82:3, 82:11, 160:14, 209:16, 213:22
**Write** [2] - 80:4, 81:25
**writing** [10] - 38:23, 67:18, 76:16, 79:25, 81:21, 92:14, 101:18, 164:7, 239:19, 240:5
**written** [6] - 69:19, 95:24, 130:19, 141:8, 141:12, 247:11
**wrongdoing** [3] - 130:5, 134:7, 267:20
**wrongful** [1] - 69:20
**wrongfully** [4] - 33:22, 133:15, 134:3, 134:14
**wrote** [14] - 68:15, 74:16, 74:23, 76:22, 77:22, 79:10, 79:11, 80:11, 80:16, 80:22, 135:19, 138:9, 164:13, 214:3

**X**

**X(Cont'd** [1] - 277:2

**Y**

**year** [17] - 6:17, 6:19, 31:5, 75:23, 108:2, 109:2, 109:3, 118:23, 118:25, 119:2, 153:14, 168:13, 168:23, 197:23, 206:5, 206:12, 206:16
**years** [14] - 7:16, 11:18, 30:18, 60:16, 116:25, 123:18,

123:20, 123:24, 132:20, 144:24, 204:2, 262:16, 262:17
**yes-or-no** [9] - 48:10, 65:12, 166:8, 212:18, 225:9, 226:8, 227:13, 231:11, 232:3
**yesterday** [1] - 239:24
**YORK** [3] - 1:3, 275:4, 278:3
**York** [11] - 1:19, 1:25, 2:8, 2:20, 3:6, 3:11, 27:23, 180:24, 275:25, 278:8
**yourself** [10] - 24:16, 35:15, 35:17, 53:19, 93:3, 106:19, 125:22, 129:19, 141:21, 209:14
**yup** [2] - 113:3, 113:7

**Z**

**ZIZMOR** [1] - 2:11
**Zoom** [3] - 2:22, 3:21, 232:23

*Rich Moffett Court Reporting, Inc.*