UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC

Defendants.

-----------------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' COMBINED STATEMENTS OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Superb Motors Inc. ("Superb"), Team Auto Sales LLC ("Team"), Robert Anthony Urrutia ("Urrutia") (Superb, Team, and Urrutia collectively hereinafter the "Superb Plaintiffs"), and Plaintiffs 189 Sunrise Hwy Auto LLC ("Sunrise"), Northshore Motor Leasing, LLC ("Northshore"), Brian Chabrier, ("Chabrier") Joshua Aaronson ("Aaronson"), Jory Baron ("Jory"), Asad Khan ("Khan"), Iris Baron as Representative of the Estate of David Baron ("Iris"), 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively "IAG Plaintiffs") (Superb Plaintiffs and IAG Plaintiffs collectively hereinafter the "Plaintiffs"), by their respective attorneys Sage Legal LLC and Cyruli Shanks & Zizmor LLP, hereby respectfully submit this response (and counterstatement of facts) to the Defendants' Statements of Undisputed Material Facts Pursuant to Local Civil Rule ("LCR") 56.1 in Support of their letter motions for a pre-motion conference regarding their Motions for Summary Judgment (hereinafter "CSMF") with their objections thereto pursuant to Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") as well as the Federal Rules of Evidence ("FRE").

Plaintiffs respectfully make a blanket objection to all purported statements of fact that are represented solely as the limited knowledge of a particular witness being deposed without regard to the universe of evidence establishing a contrary fact. Such "statements" of fact do not satisfy the requirements of a LCR 56.1 Statement to provide purported undisputed facts and the basis therefor.

2

## RESPONSES TO DEFENDANTS' STATEMENTS

## DEO DEFENDANTS WITH THOMASSON

Anthony Deo and Sara Deo are not the owners of Northshore Motor Leasing, LLC, and 189 Sunrise Hwy Auto LLC

A. As to "Northshore Motor Leasing, LLC"

1.  During and after 2016, Sara and Anthony Deo (hereinafter, the "Deos") owned and operated a business known as UEA Premier Motors Corporation (hereinafter, "UEA").  Verified Complaint, *Deo, et al. v. Baron, et al.*, Nassau (NY) Supreme Court Index # 615683/2024, ¶ 43; *see, also*, Amended Complaint, same action, *at* ¶ 39.  The Amended Complaint in the Nassau action was originally filed in the EDNY after removal; the EDNY case number is 24-cv-06903, although the case was eventually remanded back to Nassau Supreme Court under the original Nassau (NY) Supreme Court index number, 615683/2024.  The Verified Complaint is hereinafter referred to as "VC"; the Amended Complaint is hereinafter referred to as "AC".

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that the Deos owned UEA, but add that the New York State Department of Vehicles ("DMV") revoked UEA's dealership license as a result of the Deos' engagement in fraud.  See Declaration of Jeffrey C. Ruderman, Esq. ("Ruderman Decl.") ¶ X.  (DMV records)**

2.  At all relevant times, UEA was a used automobile dealership owned and operated by the Deos at and from 180 Michael Drive, Syosset, New York.  *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs**

3

further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that the Deos owned UEA, but add that the New York State Department of Vehicles ("DMV") revoked UEA's dealership license as a result of the Deos' engagement in fraud.  See Ruderman Decl. ¶ X. (DMV records)

3.      Until 2018, the Deos had met only one (1) of the individual Plaintiffs herein (David Baron) and did not conduct any business with any of the individual Plaintiffs herein. *Id. at* ¶ 44 (VC); and *at* ¶ 40 (AC).

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny knowledge or information sufficient to form a belief as to the truth of this purported fact.

4.      During or about the fall of 2017, the Deos decided that it was necessary to expand and/or increase their Floor Plan in order to expand and/or increase their profitability at the 180 Michael Drive dealership/location. *Id. at* ¶ 45 (VC); and *at* ¶ 41 (AC).

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny these purported facts and add that the Deos formed Northshore Motor Leasing LLC because UEA was shut down by the DMV due to their fraud. See Ruderman Decl. ¶ X; Deo Dep. 2/12/26 at 459:19-23, 461:3-462:3, 505:12-25. (DMV records).

5.      On or about November 1, 2017, the Deos filed papers with the New York Secretary of State's Office to incorporate and duly form NorthShore as the first step in expanding/increasing profitability. *Id. at* ¶ 46 (VC); and *at* ¶ 42 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that the Deos filed any such papers, and deny the reasoning for the Deos' doing so. <u>Deo Dep 2/12/26</u> 459:19-23, 461:3-462:20, 505:12-25; <u>See</u> <u>Ruderman</u> <u>Decl.</u> ¶ X (DMV records) (Formation Docs).**

6.      Within one (1) week of forming NorthShore, Sara Deo applied for and was given an Employer Identification Number (hereinafter, "EIN number") from the Internal Revenue Service/IRS for NorthShore. *Id. at* ¶ 47 (VC); and *at* ¶ 43 (AC).

**Response: Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admit that Sara applied for the EIN number, but deny to the extent this implies authorization or ownership by S. Deo over Northshore. <u>See</u> <u>Ruderman</u> <u>Decl.</u> ¶ X.**

7.      Attached to both the VC and AC as Exhibit A are true and accurate copies of the notices provided to Sara Deo of the EIN number from the IRS for their new corporation, NorthShore. *See* VC/AC *at* Exhibit A.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs**

also object on the grounds that there is no evidentiary foundation for the SS-4. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that Sara applied for the EIN number, but deny to the extent this implies authorization or ownership by S. Deo.  See Ruderman Decl. ¶ X.

8.       The Deos had the UEA lease assigned to NorthShore after its incorporation.  VC *at* ¶ 49; and AC *at* ¶ 45.

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the lease assignment. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that the lease at 180 Michael Drive was assigned to Northshore by UEA, but deny to the extent this implies authorization or ownership by the Deos, given the fraud underlying same.  See Ruderman Decl. ¶ X.

9.       Attached to both the VC and AC as Exhibit B are true and accurate copies of the assignment of the UEA lease to NorthShore by the Deos with the agreement of the landlord at 180 Michael Drive, Syosset, New York.  *See* Exhibit B to VC and AC.

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the lease assignment. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that the lease at

**180 Michael Drive was assigned to Northshore by UEA, but deny to the extent this implies authorization or ownership by the Deos, given the fraud underlying same.  See Ruderman Decl. ¶ X.**

10.     Attached to both the VC and AC as Exhibit U is a true and accurate copy of the receipt for the corporate book for NorthShore obtained by Anthony Deo during June, 2018, the same month as the assignment of the UEA lease to NorthShore, *supra at ¶ 9.*  VC *at ¶ 50; AC at ¶ 46; Id. at* Exhibit U.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the corporate book.  See Fed. R. Civ. P. 56(c)(4).  Notwithstanding the foregoing objections, Plaintiffs deny that this is the corporate book as a limited liability company in New York requires no corporate book, further deny in that a purported corporate book is not a unique item in that anyone or multiple parties can purchase a corporate book for the same entity, and deny to the extent this implies authorization or ownership by the Deos. See Ruderman Decl. ¶ X.**

11.     Attached to both the VC and AC as Exhibit C are true and accurate copies of Chase Bank account records for the bank account opened by Sara Deo on behalf of their (the Deos) then new company, NorthShore.  *Id. at ¶ 51 (VC); Id. at ¶ 47 (AC).*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the bank records. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that Sara opened**

the bank account for Northshore, but deny to the extent this implies authorization or ownership by the Deos during the period of time in question. **See Ruderman Decl. ¶ X.**

12.     Sara Deo was required to present proof of ownership of NorthShore to open the Chase Bank account. *Id. at* ¶ 51 (VC); *Id. at* ¶ 47 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the bank records. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny. See Ruderman Decl. ¶ X. (Flushing Documents as example)**

13.     After forming the company, obtaining an EIN, obtaining the corporate book, and opening the bank account(s) for NorthShore through Chase Bank, the Deos (together) commenced operations of NorthShore Motors at 180 Michael Drive, Syosset, New York, during 2018. *Id. at* ¶ 52 (VC); *Id. at* ¶ 48 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny as Deo (and to a lesser extent, Sara) was responsible for managing the day-to-day operations of Northshore prior to and irrespective of participating in its entity formation, EIN obtaining, corporate book obtaining, and bank account opening at some point in 2018. See Plaintiffs' LCR 56.1 Statement of Material Facts ("SMF") ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 84, 89, 90.**

14.     As part of the plan to expand and increase profitability in the automobile sales business from 180 Michael Drive, Syosset, New York, the Deos accepted an offer from David

Baron. *Id. at* ¶ 53 (VC); *Id. at* ¶ 49 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny.  See Deo Dep 2/12/26 459:19-23, 461:3, Ruderman Decl. (DMV records); SMF ¶ 84.**

15.    Specifically, David Baron offered to provide two main types of assistance to the Deos: 1) Baron offered to provide a "floor plan" for the Deos and NorthShore for a fee; this floor plan would be provided by and through the umbrella of Island Auto Group and would be personally guaranteed by David Baron, and 2) if they accepted the floor plan offer, he would also provide his own Accountants to the Deos at no additional cost to the Deos. *Id. at* ¶ 61 (VC); *Id. at* ¶ 57 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny and further add that Deos formed Northshore because UEA was shut down by the DMV due to their fraud.  See SMF ¶ 26, 30, 31; see also Ruderman Decl. ¶ X.**

16.    In 2018, Anthony Deo and Sara Deo were both still new to the used car dealership business and inexperienced in both operations and floor plans. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny. Deo Dep. 2/12/26 450:10-451:5; see also Ruderman Decl. ¶ X (Universal Exotic Auto and UEA.**

17.    In 2018, David Baron was older and more experienced than the Deos in the operation of automobile dealerships. *Id.*

9

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs admit, but deny that this fact is relevant or material.**

18.    In 2018, David Baron was much wealthier than the Deos. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs admit, but deny that this fact is relevant or material.**

19.    The Baron/Aaronson family's extensive automobile dealership holdings over the years include more than twenty (20) automobile dealerships. *Id. at* ¶ 55 (VC); *Id. at* ¶ 51 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny that they held more than twenty (20) dealerships at any one time, and also deny that this fact is relevant or material. Aaronson Dep. 11:24-15:18.**

20.    The offer from David Baron to provide a bigger Floor Plan with less interest to the Deos and NorthShore was accepted by the Deos. *Id. at* ¶ 61, 64, 79, 80 (VC); *Id. at* 57, 60, 75, 76 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny, and further object that this**

**purported fact is not relevant or material. <u>See</u> <u>SMF</u> ¶¶ 29, 32, 33, 34, 36, 37, 39, 41, 48, 49, 50, 84, 89, 90. P**

21.     The offer from David Baron to provide accounting services for NorthShore was accepted by the Deos. *Id. at* ¶ 65, 80 (VC); *Id. at* 61, 76 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs deny, and further object that this purported fact is not relevant or material. <u>See</u> <u>SMF</u> ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 84, 89-90.**

22.     After NorthShore commenced operations in 2018, and in response to a request by David Baron, Sara Deo agreed to and did in fact put one or more Baron partners including David Baron on to NorthShore's Chase Bank account as signatories, only.  *Id. at* Exhibit R (VC and AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the bank records. <u>See</u> Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny, except to the extent that we admit David Baron and other members became a signatory on the account. <u>Chabrier Dep.</u> 61:10-19, 80:4-6; <u>Kwun Decl.</u> ¶ X.**

23.     Since NorthShore did not commence business until 2018, no income tax returns or K-1s needed to be filed for NorthShore, and none were, until sometime in 2019.  *Id. at* ¶ 86 (VC); *Id. at* ¶ 82 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit that the first tax return filed was the 2018 tax return.**

24.    However, no tax documents were given to the Deos for NorthShore's first two years of work, so the Deos kept asking both the individual Plaintiffs in this action as well as Plaintiffs' longtime employees, Melissa Beltre, Wendy Kwun and Daniel O'Sullivan, for K-1s, but none were forthcoming to the Deos.  *Id. at* ¶ 86-89 (VC); *Id. at* ¶ 82-85 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that any documents were asked for, or that Deo was entitled to any documents. See SMF ¶¶  29, 32-34, 36-37, 39, 41, 48-50, 84, 89-90.**

25.    The Deos eventually had their own accountant, Thomas Jones, prepare and file returns with K-1s for themselves on behalf of NorthShore as owners thereof.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit.**

B.  As to "189 Sunrise Hwy Auto LLC"

26.    During or about the end of 2020, David Baron proposed and arranged for the Deos to buy 189 Sunrise Hwy Auto LLC, a smaller used car business than NorthShore located at 189

Sunrise Highway, Amityville, Suffolk County, New York.  VC *at* ¶ 104; AC *at* ¶ 100.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit only to the extent that the parties had an agreement in principle, but deny that: (i) the agreement was completed; (ii) the purchase price and interest were not conveyed by either party to each other; and (iii) any conditions precedent were met. See SMF ¶¶ 74-83, 89-90.**

27.     During February 2021, the Deos arranged to purchase 189 Sunrise and paid fifty thousand dollars ($50,000.00) therefore.  *Id. at* ¶ 105 (VC); *Id. at* ¶ 101 (AC).

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny. The purchase price exceeded $50,000.00, and such payments were not made. See SMF ¶¶ 74-83, 89-90.**

28.     Attached to both the VC and AC as Exhibit D are true and accurate copies of the money paid by Anthony Deo for the purchase of 189 Sunrise Hwy Auto LLC (hereinafter, "189 Sunrise").

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the payment records. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny. Any payments**

**made were *toward* the purchase, not <u>for</u> the purchase; and the balance of the purchase price was not made nor were conditions precedent met. See <u>SMF</u> ¶¶ 74-83, 89-90.**

29.     After purchasing the business known as 189 Sunrise, the Deos entered into a lease with the landlord/owner of the property. VC *at* ¶ 106; AC *at* ¶ 102.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny. The Deos did not make this purchase, nor did they meet any conditions precedent. Further, Plaintiffs deny that the Deos entered into a lease. <u>See</u> <u>SMF</u> ¶¶ 74-83, 89-90.**

30.     After purchasing the business known as 189 Sunrise, the Anthony Deo took over control and operation of the business. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admit only to the extent that Deo took over control and operation as a manager, but deny that Deo was an owner. <u>See</u> <u>SMF</u> ¶¶ 74-83, 86, 89-90, 102-110.**

31.     Attached to both the VC and AC as Exhibit E is a true and accurate copy of the lease entered into by Anthony Deo at the property/business located at and known as 189 Sunrise in Amityville, New York. VC and AC *at* Exhibit E.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. <u>See</u> Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs**

**also object on the grounds that there is no evidentiary foundation for the lease agreement.**
**See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these**
**purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that any**
**documents establish that the Deos entered into a lease. See SMF ¶¶ 74-83, 86, 89-90, 102-**
**110.**

32.     After entering into the lease attached to the complaints as Exhibit E, the Deos made every payment thereon until after the business was shuttered by Plaintiffs. VC *at* ¶ 106; AC *at* ¶ 102.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by**
**admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs**
**also object on the grounds that there is no evidentiary foundation for the lease agreement.**
**See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these**
**purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that any**
**documents establish that there was a lease in Deo's name, and that any payments were made**
**by him. See SMF ¶¶ 74-83, 86, 102-110.**

33.     The Deos made every payment on the lease for NorthShore since the assignment in 2018 that the Deos entered into for NorthShore's location in Syosset. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by**
**admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs**
**also object on the grounds that there is no evidentiary foundation for the lease agreement.**
**See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these**
**purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that any**
**documents establish that there was a lease in Deo's name, and that any payments were made**

**by him; Northshore made payments for the lease. See SMF ¶¶ 74-83, 86, 102-110; see also Ruderman Decl. ¶ X.**

34. After purchasing the business known as 189 Sunrise and taking over same, Anthony Deo took over the NESNA warranty contracts from the Plaintiffs for that business. VC *at* ¶ 265-267; AC *at* ¶ 264-266.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that Deo took over the contracts and deny that the documents establish that Deo took over any contracts. See SMF ¶¶ 74-83, 86, 102-110; see also Ruderman Decl. ¶ X.**

35. Anthony Deo also took over the warranty contracts for NorthShore as supplied by NESNA. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that Deo took over the contracts and deny that the documents establish that Deo took over any contracts. See SMF ¶¶ 74-83, 86, 102-110; see also Ruderman Decl. ¶ X.**

36. Attached to both the VC and AC as Exhibit X are true and accurate copies of several contracts by and between NESNA on the one hand, and Anthony Deo both personally (as Guarantor) and on behalf of 189 Sunrise (since the Deos' purchase in February 2021) and NorthShore. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the warranty agreements. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that any contracts were entered into by Deo personally. See SMF ¶¶ 74-83, 86, 102-110; see also Ruderman Decl. ¶ X.**

37. Exhibit X to the two complaints provide irrefutable proof that Nissan, NMAC, NESNA and the Plaintiffs all knew that Anthony Deo was the true party in interest in 189 Sunrise and NorthShore, as it was he, Deo, that was entering into contracts and personally guaranteeing same on behalf of 189 Sunrise and NorthShore for warranties from Nissan. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the warranty agreements. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that these documents establish the knowledge of any third party, the attached documents solely list Deo as the Chief Operating Officer of Northshore and Sunrise, and certain documents are dated after Northshore and Sunrise ceased operations. See Ruderman Decl. ¶ X.**

38. The contracts attached to the Deos' two complaints at Exhibit X were, at all relevant times, also in the possession, custody and control of the Plaintiffs, who approved Anthony Deo's assumption of those contracts. *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the warranty agreements. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny. The contracts themselves are not an assignment of any kind. See Ruderman Decl. ¶ X.**

39.     The Plaintiffs *necessarily* had to approve the contracts attached to the Deos' two complaints as Exhibit X: These contracts include monies owed by the Plaintiffs from warranties sold at 189 Sunrise prior to the sale of 189 Sunrise to the Deos in February 2021.  *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the warranty agreements. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny.  See Ruderman Decl. ¶ X.**

40.     Plaintiffs *required* Anthony Deo to assume the 189 Sunrise warranty contracts in connection with the purchase of 189 Sunrise as a *precondition* to letting Deo purchase 189 Sunrise in February 2021.  *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the warranty agreements. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and**

**materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny.  See Ruderman Decl. ¶ X.**

C. As to "Tax Returns and Ownership of NorthShore [*sic*] and 189 Sunrise

41. The Deos periodically demanded tax documents from the Plaintiffs before and after David Baron's death.  VC *at* ¶ 120; AC *at* ¶ 116.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny.  See Ruderman Decl. ¶ X; see also SMF ¶¶ 36, 37.**

42. In June 2021, the Deos filed their own tax returns for NorthShore for tax year 2020. AC *at* ¶ 118.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny, as the Deos did not file any tax returns until October 2022, a month prior to the IAG Plaintiffs' lawsuit against the Deos in the Supreme Court of the State of New York, Nassau County.  See Ruderman Decl. ¶ X. (Emails)**

43. Unbeknownst to the Deos, in September 2021, Plaintiffs also filed tax returns for NorthShore for tax year 2020. *Id. at* ¶ 119.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding**

the foregoing objections, Plaintiffs deny, except admit that Plaintiffs filed tax returns for Northshore for the year 2020.

44. True and accurate copies of the inconsistent tax filings in June and September 2021, for NorthShore are attached to the AC as Exhibit Z.

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny and further deny that the exhibit supports the statement. Plaintiffs also objects to the responsiveness of Exhibit Z.

45. After the parties discovered the inconsistent, multiple tax filings attached to the Amended Complaint as Exhibit Z, the Deos were invited by the Plaintiffs to utilize Plaintiffs 2022 accountants, Citrin Cooperman, to prepare and file tax returns listing the Deos as owners of both NorthShore and 189 Sunrise. AC at ¶ 121.

Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny that the Deos were invited to use Plaintiffs' accountants or that the documents establish that there were multiple tax filings that were either inconsistent or involved the Deos. See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X.

20

43.     Attached to both the VC and the AC as Exhibit G are true and accurate copies of the emails reflecting the communications over tax returns in the fall of 2022 by and between Wendy Kwun, Joshua Aaronson, Anthony Deo, accountants for the Plaintiffs at Citrin Cooperman, and the accountant for Anthony Deo, Thomas Jones. VC *at* ¶ 123; AC *at* ¶ 122.[1]

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit only that these communications concern the filing of tax returns, which are not dispositive of ownership.**

44.     Attached to both the VC and the AC as Exhibit H are the tax returns "approved" by Joshua Aaronson in the emails attached to the VC and the AC as Exhibit G.  VC *at* ¶ 124; AC *at* ¶ 123.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson approved the tax return referenced.  Aaronson Dep. 49:8-16, 101:11-24.**

45.     Joshua Aaronson, with the full authority of the co-Plaintiffs (Aaronson Transcript *at* pp. 116, lines 2-21), honestly approved Anthony Deo as owner of 189 Sunrise and NorthShore

---

[1] The numbering hereinafter reflects the error in the Deo Defendants' submission.

in the emails attached to the VC and AC as Exhibit G for the tax returns attached to the VC and AC as Exhibit H.  Aaronson Transcript *at* pp. 104, lines 5-11

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson approved Deo as the owner of 189 Sunrise and Northshore, which was subject to further conditions Deo never met.  See Aaronson Dep. 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24.**

46.    Joshua Aaronson authorized Plaintiffs' accountants, Citrin Cooperman, to prepare the tax returns attached as Exhibit H that indicate the Deos are the sole owners (99% by Anthony Deo, 1% by Sara Deo) of 189 Sunrise and NorthShore. Aaronson Transcript, pp. 164, line 23-pp. 165, line 3.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson authorized any particular tax return, and furth adds that actual ownership was subject to additional conditions Deo did not meet.  See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24.**

47.     Joshua Aaronson does not object that the tax returns in Exhibit H to the VC and the AC were filed by the Deos ("if they had to be filed, they had to be filed").  Aaronson Transcript pp. 227, line 20-pp. 228, line 5.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson took any position with regard to the particular tax return annexed, and further adds that ownership was subject to further conditions Deo never met. See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24.**

D.  As to "Plaintiffs' Admissions in Depositions"

1.     As to "Joshua Aaronson"

48.     Joshua Aaronson ("JA") has spent a quarter of a century working in the car business. Aaronson Transcript pp. 7, line 24-pp. 8, line 2.

**Response: Admit. Plaintiffs object to the relevance or materiality of this fact.**

49.     JA has owned 20-25 automobile dealerships in his career. Aaronson Transcript pp. 12, line 3-pp. 15, line 17; also, pp. 21, lines 7-13.

**Response: Admit only that Aaronson has had interests in dealerships owned and/or sold during his career.  Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

50.     JA currently owns in excess of twenty (20) automobile dealerships.  JA Transcript, pp. 12, lines 3-19, and pp. 13, line 18-pp. 14, line 23.

**Response: Admit only that Aaronson owns interests in various dealerships.  Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

51.    JA does not know who owns NorthShore.  JA Transcript pp. 21, line 7-pp. 24, line 24; also *at* pp. 107, lines 4-10.

**Response: Deny. Aaronson Dep. 20:14-19. Plaintiffs object to the relevance or materiality of this fact.**

52.    There are no written agreements between any Plaintiff and the Deos regarding ownership of 189 Sunrise and NorthShore.  JA Transcript, pp. 233, line 10-pp. 234, line 16.

**Response: Admit.**

53.    JA has no knowledge of who controlled NorthShore bank accounts.  JA Transcript, pp. 36, lines 6-10; also *at* pp. 132, lines 10-12.

**Response: Admit only that Aaronson had no personal knowledge, as that information was the purview of the controller of his companies. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

54.    JA has no knowledge of security on NorthShore Bank accounts.  JA Transcript, pp. 132, lines 18-20.

**Response: Admit only that Aaronson had no personal knowledge, as that information was the purview of the controller of his companies. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

55.    Anthony Deo was responsible for NorthShore business.  JA Transcript, pp. 132, lines 3-6.

**Response: Admit only that Deo was responsible for all management and operation of Northshore. Plaintiff objects to the extent that this is vague. See SMF ¶¶ 84, 86, 107-110.**

56.     No one else beyond Anthony Deo had responsibilities running NorthShore.  JA Transcript, pp. 132, lines 7-9.

**Response: Admit only that Deo was responsible for all management and operation of Northshore. See SMF ¶¶ 84, 86, 107-110. Plaintiffs objects to the extent that this asserted fact is vague.**

57.     Anthony Deo had authority to write checks at NorthShore.  JA Transcript, pp. 134, line 19-pp.135, line 2; *see also* pp. 39, line 24-pp. 40, line 13.

**Response: Deny. Aaronson had no personal knowledge, as that information was the purview of the controller of his companies. See Aaronson Decl. ¶ X.**

58.     Sara Deo brought customers to NorthShore.  JA Transcript, pp. 38, lines 10-23.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact, as well as due to vagueness and lack of specificity.**

59.     Plaintiffs assert that there are additional ownership conditions beyond just the income tax returns as approved at Exhibits G and H to the VC and AC, but that such conditions are not in writing.  JA Transcript, pp. 50, line 24-pp. 51, line 24.

**Response: Admit only that the filing of the tax returns did not satisfy all of the conditions necessary in order for ownership transfer to take place to the Deos. Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24.**

60.     Sara Deo opened Chase Bank account(s) for NorthShore.  JA Transcript, pp. 60, line 17-pp. 62, line 17.

**Response: Deny. Aaronson had no personal knowledge, as that information was the purview of the controller of his companies. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

61.    The 189 Sunrise checks/money utilized by Anthony Deo to purchase 189 Sunrise as attached to the VC and AC at Exhibit D were all kept by the Plaintiffs, including JA and his partners.  JA Transcript, pp. 68, line 17-pp. 69, line 2.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the payment records. See Fed. R. Civ. P. 56(c)(4).  Notwithstanding the foregoing objections, Plaintiffs deny that monies paid toward the purchase of 189 Sunrise satisfied the entire purchase price. See SMF ¶¶ 74-83.**

62.    Anthony Deo held the lease attached to the VC and AC at Exhibit E for 189 Sunrise. JA Transcript, pp. 73, line 14-pp. 74, line 2.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the payment records. See Fed. R. Civ. P. 56(c)(4).  Notwithstanding the foregoing objections, Plaintiffs deny as the document does not support the statement.  See Ruderman Decl. ¶ X.**

63.    Only the Deos had contracted with any Plaintiffs, but none of the other Deo Defendants contracted with Plaintiffs.  JA Transcript, pp. 187, line 10-pp. 188, line 8.

**Response: Deny on the grounds that the "other" Deo Defendants were agents of the Deos. See SMF ¶¶ 755-756, 796.  Plaintiffs object to the relevance or materiality of this fact, as well as on the grounds the asserted fact is vague and indecipherable.**

64.    JA is not aware of the contracts between the Deos and any Plaintiffs.  JA Transcript, pp. 217, line 24-pp. 218, line 3.

**Response: Admit only that there were no written agreements between the Deos and any Plaintiffs, and any other agreements were executory.  See Ruderman Decl. ¶ X. Plaintiffs object to the relevance or materiality of this fact.**

26

65.     The owner of a dealership typically is responsible/pays for warranty contracts such as those entered by Anthony Deo for 189 Sunrise and NorthShore attached to the VC and AC as Exhibit X.  JA Transcript, pp. 232, lines 13-25.

**Response: Admit only that a dealership itself is responsible for repayment of warranty contracts. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

66.     The owner of dealerships typically pays for the lease, and Anthony Deo was the lessee after paying for 189 Sunrise on February 21, 2021.  JA Transcript, pp. 233, lines 2-6.

**Response: Deny. See Aaronson Decl. ¶ X; see also SMF ¶¶ 74-83.  Plaintiffs object to the relevance or materiality of this fact.**

67.     JA had full authority of his Plaintiff partners for his work at NorthShore after David Baron's death.  JA Transcript, pp. 116, lines 2-21.

**Response: Admit only that Aaronson had the authority of certain parties to act on their behalf concerning clearing up the problems caused by Deo, but deny that Aaronson did work at Northshore. See Aaronson Decl. ¶ X; see also Aaronson Dep. 116:2-117:22.  Plaintiffs object to the relevance or materiality of this fact given the clear dictates of the relevant operating agreement, the New York Limited Liability Company Law, and the fact that Deo never satisfied conditions precedent to complete the intended purchase.  SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 84, 89-90.**

68.     JA did nothing to investigate losses at NorthShore that arose prior to David Baron's death.  JA Transcript, pp. 260, lines 7-12.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

69.     Dan O'Sullivan paid off cars for 189 Sunrise and NorthShore.  JA Transcript, pp. 254, line 23-pp. 255, line 24.

**Response: Admit only that Deo was responsible for directing O'Sullivan to pay off cars.  See Aaronson Dep. 253:16-255:20.  O'Sullivan Dep 81:9-82:5. Plaintiffs object to the relevance or materiality of this fact.**

70.     If there were losses at NorthShore, they could have occurred during David Baron's lifetime and resolved during David Baron's lifetime.  JA Transcript, pp. 258, line 19-pp. 260, line 18.

**Response: Admit only that Aaronson has no knowledge with regard to any losses that occurred prior to David Baron's death, and that Northshore's tax returns filed during David Baron's lifetime showed profits.  See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X. Plaintiffs object to the relevance or materiality of this fact.**

71.     JA does not know when losses occurred at NorthShore/189 Sunrise. *Id.*

**Response: Deny, as Aaronson was aware of all of the losses that arose as a result of Deo's actions became evident in the fall of 2022, and that Northshore's tax returns filed during David Baron's lifetime showed profits.  See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X; SMF ¶¶ 208-211.  Plaintiffs object to the relevance or materiality of this fact.**

72.     JA does not know whether or not David Baron and Anthony Deo agreed on anything to clear up losses at 189 Sunrise/NorthShore.  *Id.*

**Response: Admit only that Aaronson was not aware of any losses between Baron and Deo, prior to Baron's death, but was aware of the losses which became evident in the fall of 2022. See SMF ¶¶ 208-211.  Plaintiffs object to the relevance or materiality of this fact.**

73.     JA does not know Harry Thomasson.  JA Transcript, pp. 37, lines 2-9.

28

**Response: Admit only that Aaronson did not know of Thomasson prior to November of 2022. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

74.     JA does not know if Harry Thomasson was involved in NorthShore business.  *Id.*; also pp. 189, lines 8-16.

**Response: Admit only that Aaronson did not know of Thomasson's involvement prior to November of 2022. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

75.     JA does not know Marc Merckling.  JA Transcript, pp. 37, lines 10-23; *see also*, pp. 38, lines 5-9.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

76.     JA does not know if Marc Merckling was involved in NorthShore business. *Id.*

**Response: Deny. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance or materiality of this fact.**

77.     JA does not know Dwight Blankenship.  JA Transcript, pp. 37, line 24-pp. 38, line 4.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

78.     JA does not know if Dwight Blankenship was involved in NorthShore business. *Id.*

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

79.     JA does not know Michael Laurie.  JA Transcript, pp. 37, lines 10-23.

**Response: Admit. Plaintiffs object to the relevance or materiality of this fact.**

80.     JA does not know if Michael Laurie was involved in NorthShore business. *Id.*

**Response: Admit. Plaintiffs object to the relevance or materiality of this fact.**

81.     JA has no firsthand knowledge of Anthony Deo wrongfully taking any cars, cash, or license plates from 189 Sunrise and NorthShore.  JA Transcript, pp. 124, lines 13-17.

**Response: Admit only that Aaronson did not see these actions taken, but is aware that all of these actions occurred under the exclusive control and management of Deo. See SMF ¶¶ 84-88, 107-117, 124-125, 139-220.**

82.     JA has no firsthand knowledge of wrongdoing by Sara Deo at NorthShore.  JA Transcript, pp. 138, line 23-pp. 142, line 10; *see also* pp. 146, line 8-pp. 147, line 19.

**Response: Admit only that Aaronson did not see these actions taken, but is aware that all of these actions occurred under the exclusive control and management of Deo. See SMF ¶¶ 84-88, 107-117, 124-125, 139-220.**

83.     Plaintiffs did not lose any money individually for NorthShore debts.  JA Transcript, pp. 148, line 9-pp. 150, line 12.

**Response: Admit only that Aaronson was a personal guarantor and arranged for payment from entities in which he held an interest, to cover the losses caused by Deo. See SMF ¶¶ 210.**

84.     JA does not know of actionable harm caused to Plaintiffs by Harry Thomasson.  JA Transcript, pp. 150, line 13-pp. 154, line 19; pp. 165, line 4-pp. 168, line 12; pp. 178, line 12-pp. 184, line 6.

**Response: Deny. Aaronson was aware of Thomasson's involvement in taking $735,000 of the Libertas funds. Aaronson Dep. 150:19-151:2.**

85.     JA does not know of wrongdoing by Marc Merckling.  JA Transcript, pp. 170, line 22-pp. 171, line 11.

**Response: Admit only that Aaronson did not personally see the actions of Merckling, but understood that he was under the control of Deo when Deo committed all of his wrongful actions. See SMF ¶¶ 755-756, 796; see also Aaronson Decl. ¶ X.**

86.    Dwight Blankenship did nothing wrong to the Plaintiffs that JA could identify.  JA Transcript, pp. 171, lines 12-17.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

87.    Michael Laurie did nothing wrong to the Plaintiffs that JA could identify.  JA Transcript, pp. 171, lines 18-22.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

88.    Plaintiffs' claims against the individual Defendants other than Anthony Deo are derivative from merely their association with Anthony Deo. JA Transcript, pp. 186, lines 6-15.

**Response: Deny and deny that the testimony supports the statement, and objects to the term "derivative"; they were actively involved in the wrongdoing and orchestrated the wrongful actions alleged.  See SMF ¶¶ 755-756, 796.**

89.    JA does not know any specifics about money missing due to Anthony Deo's actions.  JA Transcript, pp. 194, line 25-pp. 195, line 20; pp. 196, lines 14-19; pp. 200, line 16-pp. 201, line 3.

**Response: Deny. Northshore and Sunrise were deficient millions of dollars, which had to be satisfied by Plaintiffs to the floor plan lender, customers, and other dealership creditors, due to guarantees by their principals. See SMF ¶¶ 131-132, 139, 144, 186, 203-216.**

90.    JA knows about an FBI investigation because he spoke with the FBI about this case. JA Transcript, pp. 221, lines 7-8.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

31

91.    JA did not make any criminal allegations to the FBI against Harry Thomasson, Marc Merckling, Dwight Blankenship, Michael Laurie, or Sara Deo.  JA Transcript, pp. 222, line 23-pp. 223, line 13.

**Response: Admit.  Plaintiffs object to the relevance or materiality of this fact.**

92.    JA approved Exhibit H to the VC and AC indicating the Deos as owners of 189 Sunrise and NorthShore (Anthony Deo 99%; Sara Deo 1%) on those tax returns.  JA Transcript, pp. 43, lines 8-15.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny. See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X.**

93.    JA was not trying to mislead taxing authorities by approving Exhibit H to the VC and AC (the tax returns indicating the Deos' ownership of 189 Sunrise and NorthShore). JA Transcript, pp. 45, lines 6-17.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny approving any particular tax return, and any approvals given concerning filings were not intended to mislead any tax authorities, as Aaronson had relied on Deo's representations**

32

**that he would perform all of the necessary conditions which he agreed to perform, but which he ultimately did not satisfy. See Aaronson Dep. 43:8-44:8, 44:17-45:5, 45:17-24, 51:14-24**

94.    The accountants at Citrin Cooperman who prepared the tax returns attached to the VC and AC as Exhibit H were authorized by JA to prepare those returns.  JA Transcript, pp. 45, line 25-pp. 46, line 25; also pp. 164, line 23-pp. 165, line 3.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson authorized any particular tax return, and actual ownership was subject to conditions precent Deo did not meet. See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51:14-24.**

95.    The accountants at Citrin Cooperman who prepared the tax returns attached to the VC and AC as Exhibit H were accountants utilized by JA and the Island Auto Group.  *Id.*

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit only that Citrin Cooperman are accountants that are used by Aaronson and Island Auto Group.  See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X.**

96.     JA opened a business in 2023 called Stream Auto Outlet at the location of the former 189 Sunrise business he closed months earlier.  JA Transcript, pp. 69, line 11-pp. 70, line 9.

**Response: Admit only that Aaronson opened Stream Auto Outlet at the address of 189 Sunrise in 2023. See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

97.     JA approved the tax returns attached to the VC and AC as Exhibit H.  JA Transcript, pp. 96, line 24-pp. 98, line 24.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson authorized any particular tax return, and actual ownership was subject to additional conditions Deo did not meet. See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51:14-24.**

98.     JA "honestly" approved Anthony Deo as owner of 189 Sunrise and NorthShore. JA Transcript, pp. 104, lines 6-11

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit only that**

34

**Aaronson approved the filing of tax returns, and that actual ownership was subject to additional conditions Deo did not satisfy.  See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51:14-24.**

99.    JA stopped filing tax documents for 189 Sunrise after Anthony Deo provided checks attached to the VC and AC as Exhibit D to purchase 189 Sunrise in February 2021.  JA Transcript, pp. 174, line 2-pp. 175, line 20.

**Response: Admit only that Aaronson no longer filed tax returns for 189 Sunrise at some point in time.  See Aaronson Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

100.    Plaintiffs never revised any tax returns for 189 Sunrise or NorthShore since the tax returns attached to the VC and AC were approved by JA.  JA Transcript, pp. 175, line 21-pp. 176, line 15.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns or emails.  See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny that Aaronson approved any particular tax returns, and was not involved in any amendments to those returns. See Aaronson Decl. ¶ X.**

101.    JA stopped listing 189 Sunrise on his personal tax returns after Anthony Deo paid the money (Sunrise purchase checks) set forth in Exhibit D attached to the VC and AC.  JA Transcript, pp. 245, line 15-pp. 246, line 4.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the payment records, tax returns, or emails. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs deny. Aaronson listed 189 Sunrise on his personal tax return in 2021. See Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X.**

102.    JA authenticates the emails in which he approved the tax returns listing Sara Deo and Anthony Deo as owners of NorthShore and 189 Sunrise, but he does not remember the discussions over tax returns leading up to the production of those returns by Citrin Cooperman, IAG's accountants.  JA Transcript, pp. 88, line 7-pp. 94, line 17.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs also object on the grounds that there is no evidentiary foundation for the payment records, tax returns, or emails. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admits only that the emails referenced are accurate.**

2.    As to "Iris Baron"

103.    Iris Baron (hereinafter, "IB") does not know Harry Thomasson.  IB Transcript, pp. 7, lines 7-14.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

104.    IB never heard the name Harry Thomasson prior to her deposition on January 5, 2026. *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

105.    IB has no knowledge of any harm caused by Harry Thomasson to the Estate of David Baron.  IB Transcript, pp. 24, line 16-pp. 25, line 9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

106.    IB has no knowledge of wrongdoing by Michael Laurie against Plaintiffs. IB Transcript, pp. 40, lines 16-22.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

107.    IB has no knowledge of wrongdoing by Marc Merckling against Plaintiffs. IB Transcript, pp. 40, line 25-pp. 41, line 15.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

108.    The only reason Iris Baron knows of the allegations in this case against Anthony Deo is because Josh Aaronson, her son-in-law, told her so.  IB Transcript, pp. 41, line 20-pp. 43, line 11; also pp. 52, line 22-pp. 53, line 22.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

109.    IB has no knowledge of wrongdoing by Dwight Blankenship, Harry Thomasson, Marc Merckling, or Michael Laurie.  IB Transcript, pp. 43, line 14-pp. 44, line 9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

110.    IB has no 1st hand knowledge of wrongdoing by the Deos except for what she was told by her son-in-law Josh Aaronson.  IB Transcript, pp. 53, lines 11-22.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

111.    IB has nothing to do with NorthShore's business.  IB Transcript, pp. 41, lines 14-15.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

112.   IB did not authorize the use of her name in this lawsuit.  IB Transcript, pp. 8, lines 9-22.

**Response: Admit only that she is not named as an individual plaintiff, and only a representative on behalf of the estate of David Baron, and authorized Aaronson to take the actions necessary to prosecute the claims.  Iris Baron Dep. 41:16-18.  Plaintiffs object to the relevance and materiality of these purported facts.**

3.   As to "Jory Baron"

113.   Jory Baron (hereinafter, "JB") received a Bachelor of Science degree in business management from Hofstra University.  JB Transcript, pp. 7, line 18-pp. 8, line 4.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

114.   JB took the National Automotive Dealer Association training.  JB Transcript, pp. 8, line 5-pp. 9, line 19.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

115.   JB has worked at various automobile dealerships including Rockland Hyundai, Yonkers Auto Mall, Baron Nissan, and Baron Honda.  JB Transcript, pp. 9, line 20-pp. 10, line 3.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

116.   JB has no 1st hand knowledge of wrongdoing against him by Harry Thomasson ("I was given information…it was passed on to me.")  JB Transcript, pp. 25, line 20-pp. 26, line 3.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

117.   JB has no knowledge of Harry Thomasson's involvement in car sales.  JB Transcript, pp. 27, lines 5-6.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

118.    JB knows that Harry Thomasson was not involved in car sales at 189 Sunrise and NorthShore.  JB Transcript, pp. 30, lines 6-10.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

119.    JB has no knowledge of wrongdoing by Harry Thomasson involving Floor Plans. JB Transcript, pp. 27, line 15-pp. 30, line 5.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

120.    JB has no knowledge that Harry Thomasson took money from 189 Sunrise. JB Transcript, pp. 30, lines 11-14.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

121.    JB has no knowledge of Harry Thomasson's communication(s) with Anthony Deo.  JB Transcript, pp. 31, lines 5-11.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

122.    JB has no knowledge of any wrongs Harry Thomasson committed against NorthShore.  JB Transcript, pp. 31, line 12-pp. 32, line 4.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

123.    JB does not know Marc Merckling.  JB Transcript, pp. 32, lines 5-9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

124.    JB does not know Dwight Blankenship.  JB Transcript, pp. 32, lines 21-25.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

125.    JB cannot say what, if anything, Dwight Blankenship did to wrong or harm 189 Sunrise or NorthShore.  JB Transcript, pp. 33, lines 2-6.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

126.    JB does not know Michael Laurie.  JB Transcript, pp. 33, lines 7-9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

127. JB has no knowledge of wrongdoing by Michael Laurie. JB Transcript, pp. 33, lines 10-15.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

128. JB says that Sara Deo did nothing wrong to 189 Sunrise or NorthShore. JB Transcript, pp. 34, lines 8-12.

**Response: Admit only that J. Baron is not aware of specific actions that S. Deo committed, except to the extent that she is part of the cohort implementing the wrongful plans. <u>J. Baron Decl.</u> ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

129. JB has no knowledge of Sara Deo's day-to-day activities at 189 Sunrise and/or NorthShore. JB Transcript, pp. 36, lines 10-23.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

130. JB possesses no writing regarding the February 21, 2021 transaction involving 189 Sunrise as set forth in the VC and AC as Exhibit D. JB Transcript, pp. 54, lines 8-19.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

131. Baron Nissan was fined $250,000.00 by the New York State Attorney General regarding improprieties involving lease buyouts. JB Transcript, pp. 52, lines 16-21.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts as it deals with a non-party to this case.**

4. <u>As to "Asad Khan"</u>

132. Asad Khan (hereinafter, "AK") has worked in automobile dealerships for 32 years. AK Transcript, pp. 14, lines 5-6.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

133.    AK has been involved in three or four Consumer Affairs cases over the years working at automobile dealerships.  AK Transcript, pp. 12, line 17-pp. 14, line 12.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

134.    AK has been involved in at least one lawsuit prior to the instant action.  AK Transcript, pp. 14, lines 13-17.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

135.    AK never met Harry Thomasson.  AK Transcript, pp. 8, lines 24-25.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

136.    AK never knew the name Harry Thomasson prior to his deposition on December 22, 2025. AK Transcript, pp. 9, lines 2-8.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

137.    AK's first conversation, ever, with Harry Thomasson was his deposition on December 22, 2025.  AK Transcript, pp. 81, line 14-pp. 82, line 6.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

138.    Harry Thomasson did nothing at NorthShore.  AK Transcript, pp. 34, line 20-pp. 35, line 5.

**Response: Admits only that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs.  Khan Decl. ¶ X.**

139.    Harry Thomasson had "nothing to do with NorthShore." AK Transcript, pp. 35, lines 2-5.

**Response: Admit only that the information concerns regular dealership operations and that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs. Khan Decl. ¶ X.**

140. Harry Thomasson did not steal from NorthShore. AK Transcript, pp. 35, lines 6-21.

**Response: Admits only that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs. Khan Decl. ¶ X.**

141. Harry Thomasson did not steal from Asad Khan. *Id.*

**Response: Admits only that Thomasson did not steal from Khan personally. Khan Decl. ¶ X.**

142. AK does not recognize the name Michael Laurie. AK Transcript, pp. 52, lines 10-24; also pp. 80, lines 13-19.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

143. AK does not recognize the name Dwight Blankenship. AK Transcript, pp. 52, line 25-pp. 53, line 7; also pp. 80, lines 8-12.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

144. AK knows that Sara Deo and Anthony Deo "made peace with David Baron" over NorthShore disputes. AK Transcript, pp. 59, lines 22-23.

**Response: Admit only that they continue to do business together and that the issue addressed was prior to 2020. Khan Decl. ¶ X.**

145. AK does not know Marc Merckling. AK Transcript, pp. 72, lines 17-21.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

146. AK does not know NorthShore's accountant Tom Jones. AK Transcript, pp. 72, lines 22-23.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

147. AK does not know anything about the Gold Coast Defendants in this action. AK Transcript, pp. 72, line 24-pp. 73, line 6.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

148.    AK does not know anything about Defendant DLA Capital.   AK Transcript, pp. 73, lines 7-9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

149.    AK has no knowledge of thefts from NorthShore.  AK Transcript, pp. 95, lines 17-24; also pp. 115, line 11-pp. 116, line 25.

**Response: Admits only that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs. Khan Decl. ¶ X.**

150.    AK authorized Josh Aaronson to make all decisions for him regarding NorthShore. AK Transcript, pp. 33, lines 14-20; also pp. 49, lines 11-17.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

151.    AK and Brian Chabrier authorized and approved Josh Aaronson making all decisions for them at NorthShore. AK Transcript, pp. 155, line 23-pp. 156, line 23.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

152.    One or more representatives from "AFC (Ally Financial) and NextGear" disparaged Anthony Deo to AK.  AK Transcript, pp. 101, line 25-pp. 103, line 25.

**Response: Admit only that certain representatives discussed Deo with Khan. Khan Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

153.    AK has no knowledge of nor any involvement in 189 Sunrise.  AK Transcript, pp. 38, lines 13-23.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

154.    AK has no knowledge of the corporate co-Plaintiffs.  AK Transcript, pp. 39, line 4-pp. 40, line 3; also pp. 71, line 18-pp. 72, line 16.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

155.    AK has no idea where the files, computers, videos, or phone system are from NorthShore. AK Transcript, pp. 50, lines 9-23.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

156.    AK has no knowledge of the whereabouts of NorthShore's checks, account records, billing records, telephone records, or video files.  AK Transcript, pp. 159, line 21-pp. 160, line 16.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

157.    AK has received no money from NorthShore since 2019.  AK Transcript, pp. 67, lines 12-22.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

158.    AK knew of the Baron Nissan sale to Anthony Deo as set forth in the VC and AC at Exhibit F. AK Transcript, pp. 108, line 16-pp. 109, line 8.

**Response: Admit only that Khan was aware of discussions. <u>Khan</u> <u>Decl.</u> ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

159.    Only owners go on dealership bank accounts.  AK Transcript, pp. 128, lines 5-8.

**Response: Admit only that such testimony is limited to Khan's own knowledge of banking transactions. <u>Khan</u> <u>Decl.</u> ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

160.    Tokens are security on commercial bank accounts such as NorthShore's accounts. AK Transcript, pp. 149, line 20-pp. 151, line 4.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

161.    NorthShore's accounts utilized tokens. *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

162.    Anthony Deo did not have a token for the NorthShore accounts.  *Id.*

**Response: Admits only that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs. Khan Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

163.    AK "watched" NorthShore's bank accounts with "his" controllers, Melissa Beltre and Dan O'Sullivan. AK Transcript, pp. 29, lines 11-22.

**Response: Admit only that Melissa Beltre was the controller at that time. Khan Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

164.    NorthShore was only on AK's tax returns through 2019.  AK Transcript, pp. 27, lines 16-22.

**Response: Deny. See Ruderman Decl. ¶ X (Tax Return).**

165.    AK has not put NorthShore on his own tax returns since 2019.  AK Transcript, pp. 67, line 23-pp. 68, line 18.

**Response: Deny. See Ruderman Decl. ¶ X (Tax Return).**

166.    AK last received any money from NorthShore in 2019. *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

167.    AK never received any money from 189 Sunrise or Superb Motors. AK Transcript, pp. 68, lines 19-24.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

168.    AK never received any money from the within co-Plaintiffs.  AK Transcript, pp. 69, lines 2-21; also pp. 71, lines 5-7.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

169.    Josh Aaronson utilized a Power of Attorney from David Baron after David Baron died.  AK Transcript, pp. 157, line 10-pp. 158, line 15.

**Response: Admits only that Khan's information is limited to Khan's own knowledge, and not the knowledge of other Plaintiffs.  <u>Khan</u> <u>Decl.</u> ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

5.    <u>As to "Dan O'Sullivan"</u>

170.    Daniel O'Sullivan (hereinafter, "DO") worked in automobile dealerships for 45 years. DO Transcript, pp. 213, lines 13-25.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

171.    DO worked in Baron family dealerships for 43 out of his 45 years working in automobile dealerships. *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

172.    DO has "great loyalty" to the Baron family.  *Id.*

**Response: Admit only that O'Sullivan admitted to loyalty when an employee of Baron. <u>O'Sullivan Dep. 213:13-25.</u>  Plaintiffs object to the relevance and materiality of these purported facts.**

173.    DO took the job as controller at NorthShore at the behest of David Baron.  DO Transcript, pp. 48, lines 4-21.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

174.    DO always did what David Baron said to do.  *Id.*

**Response: Admit only that O'Sullivan agreed to work at Northshore because David Baron asked him to. <u>O'Sullivan Dep. 48:4-21.</u>  Plaintiffs object to the relevance and materiality of these purported facts.**

175.    David Baron worked as a controller at an automobile dealership owned by David Baron known as Port Motors. DO Transcript, pp. 217, lines 2-9.

**Response: Deny that the statement is supported by the testimony. <u>O'Sullivan Dep. 217:2-9.</u>**

176.    David Baron worked daily at the dealership he owned known as Port Motors.  *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

177.    David Baron did not work at NorthShore on a daily basis.  *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

178.    DO was the controller at NorthShore.  DO Transcript, pp. 16, lines 22-24.

**Response: Admit that O'Sullivan was only controller for a certain period of time. <u>O'Sullivan Dep. 16:22-24, 49:323</u>  Plaintiffs object to the relevance and materiality of these purported facts.**

179.    DO was responsible for paying the bills at NorthShore.   DO Transcript, pp. 20, lines 2-9.

**Response: Admit only that O'Sullivan was responsible to pay the bills as directed by Deo. <u>O'Sullivan Dep.</u> 89:2-20, 179:16-20. Plaintiffs object to the relevance and materiality of these purported facts.**

180.    Controllers at NorthShore and 189 Sunrise were responsible for doing the financial statements for the dealerships.  DO Transcript, pp. 19, lines 16-25.

**Response: Deny that the statement is supported by the testimony. O'Sullivan did not testify that he was "doing" the financial statements. <u>O'Sullivan Dep.</u> 19:16-25.  Plaintiffs object to the extent this is vague, and also object to the relevance and materiality of these purported facts.**

181. Controllers at NorthShore and 189 Sunrise make sure that the financial statements are correct. *Id.*

**Response: Deny that the statement is supported by the testimony. O'Sullivan did not testify about making sure the financial statements are correct. O'Sullivan Dep. 19:16-25. Plaintiffs object to the relevance and materiality of these purported facts.**

182. Controllers at NorthShore and 189 Sunrise do all postings to the dealerships' software/Dealer Track systems. *Id.*

**Response: Deny, as Deo directed postings and other employees did postings. O'Sullivan Dep. 54:18-21, 104:3-5; see also Ruderman Decl. ¶ X; SMF ¶¶ 810, 883.**

183. Controllers at NorthShore and 189 Sunrise make sure all deals are correct. *Id.*

**Response: Deny that the statement is supported by the testimony. O'Sullivan did not testify that controllers at NorthShore and 189 Sunrise make sure all deals are correct, only that the schedules are correct. O'Sullivan Dep. 19:16-25.**

184. Controllers at NorthShore and 189 Sunrise pay all taxes. *Id.*

**Response: Admit only that O'Sullivan paid bills as directed by Deo and Plaintiff objects to the extent this is vague. O'Sullivan Dep. 89:2-20, 179:16-20.**

185. While controller for 189 Sunrise and NorthShore, DO paid all bills and all taxes. DO Transcript, pp. 23, line 23-pp. 24, line 2.

**Response: Admit only that O'Sullivan paid bills as directed by Deo and Plaintiff objects to the extent this is vague. O'Sullivan Dep. 89:2-20, 179:16-20.**

186. DO thought Anthony Deo was an owner of NorthShore from the time he started working there. DO Transcript, pp. 52, line 24-pp. 53, line 3; also pp. 55, lines 13-15 (Anthony Deo "was the boss").

48

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

187. NorthShore's and 189 Sunrise's Dealer Track software allowed DO to access and input all financial information for the two dealerships. DO Transcript, pp. 59, line 12-pp. 60, line 2.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

188. The financial information that DO could access and did input into the Dealer Track system includes all car sales and inventory and floor plan financing. *Id.*

**Response: Admit only that O'Sullivan had broad access to input information into the Dealer Track system for the dealership operations and others also input information into the system. O'Sullivan Dep. 54:18-21, 104:3-5.**

189. DO accessed and input into the Dealer Track system all used car information at the two dealerships. DO Transcript, pp. 66, lines 7-22.

**Response: Admit only to the extent that O'Sullivan input certain used car information for the two dealerships and others also input information into the system. O'Sullivan Dep. 54:18-21, 104:3-5.**

190. The schedule of used cars at both dealerships included how much money is owed on each used car. DO Transcript, pp. 67, lines 19-25.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

191. DO created the schedules for NorthShore and 189 Sunrise on the Dealer Track system by posting all deals on the Dealer Track system. DO Transcript, pp. 69, lines 3-11.

**Response: Admit only that O'Sullivan was involved in posting information in the Dealer Track system to create the schedules and others also input information into the system. O'Sullivan Dep. 54:18-21, 104:3-5.**

49

192.    When a deal was done agreeing to sell a car at NorthShore and 189 Sunrise, DO posted the deal to 3 schedules for each dealership.  DO Transcript, pp. 70, line 22-pp. 71, line 4.

**Response: Admit only that O'Sullivan input information into the Dealer Track system concerning the sale of cars at Northshore and Sunrise and others also input information into the system. O'Sullivan Dep. 54:18-21, 104:3-5.**

193.    The three schedules where DO posted car deals at the two dealerships were the used car schedule, the motor vehicle schedule, and the due from finance schedule.  *Id.*

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

194.    DO did, in fact, post every used car sale at the two dealerships to the used car schedule, the motor vehicle schedule, and the due from finance schedule. *Id.*

**Response: Deny, as the statement is not supported by the testimony. Plaintiffs object to relevance and materiality of these purported facts.**

195.    Schedules for both dealerships were reviewed every day or every other day by DO.  DO Transcript, pp. 75, lines 10-22; pp. 78, lines 15-17; pp. 102, lines 14-19; also pp. 103, lines 13-18.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

196.    Business slowed down at the two dealerships due to Covid (DO: "Covid killed us").  DO Transcript, pp. 90, lines 3-5.

**Response: Admit, but Plaintiffs object to relevance and materiality, given that Sunrise and Northshore closed due to the wrongdoings committed by Deo and his Enterprise. For example, Deo took money, cars, plates, and cash. Aaronson Dep. 122:24-123:14 ("[...] he took a lot of cash that supposedly was never deposited into banks. [...]"); Chabrier Dep. 155:24-156:6 ("According to my comptroller at the time, Danny questioned why there were large**

50

sums of cash that never made it to the bank account that I found out later. So Anthony had taken that money that never made it into the Northshore bank accounts"); 156:20-22 ("Danny told me that he had given Anthony cash and it didn't get deposited in the bank"); 157:6-21 ("[Danny] told us when he still worked there. When he was questioned where some cash was. [...] It was a large sum of money. I don't recall the exact amount"); Deo II Dep. 46:16-47:19; 47:25-48:7; 50:4-9; 50:13-22; 56:66-17; 51:2-25 (over $1.2 million in deposits over one and a half weeks); 52:2-7 ("Q. Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that? A. Yes"); 52:8-54:9 (Deo maintains this was to cover deficiencies created by Aaronson); Deo Dep. 613:3-12 ("Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to pay off the floor plan lender in a timely fashion? A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was"); 94:19-95:11 (wire transfer for $173,000 for Deo's house at Hunting Lane); 142:4-19 ("Q. What about the $173,000 that was paid to the landlord or the owner of the property on Hunting. Was that also for business purpose? A. What does that have to do with the Libertas money? Q. Well, you got $723,000, correct? A. Yes. Q. In the account. You used $500,000 of that to pay to Tony Urrutia's company, correct? A. Yes. Q. Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct? A. I wired the money, yes"); O'Sullivan Dep. 203:5-204:2 (in an affidavit, O'Sullivan estimated that the customer deposits which Deo failed to put into the bank exceed $230,000); 232:19-22 ("Q. And the cash would be given to Deo [*sic*] and sometimes not make it into the

51

account, is that right? A. Correct"); **235:14-22; 239:3-6.** Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. **Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24** ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); **206:15-20** (instead of 45 cars per month, Superb sold 37 or 38). Thomasson played an instrumental role in wire fraud between Aaronson and Deo. **Thomasson Dep. 113:10-114:15** (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); **108:17-20** ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); **115:2-15** (Thomasson wired these funds to Deo); **117:2-6** ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); **123:15-19** (wire from Aaronson into Thomasson's IOLA account was $735,000); **Deo II Dep. 90:10-91:2** ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); **91:3-17** ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); **141:2-12** ("Q. We previously showed

the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); 271:18-272:4 ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation.  I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account.  And your ex-business partner who just left took it? I was stunned.  I couldn't believe it actually"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. Thomasson Dep. 123:20-25 ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes"). Jones notes that he is "not aware" of whether or not the way accounting was done for Northshore to Car Buyers was the proper way. Jones Dep. 218:10-17. For each car sold, money owed to the floor plan was not paid each time. O'Sullivan Dep. 194:14-22. There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2 ("the business slowed down and we got a little hesitate [*sic*] to pay some of the things off"). Cars were sold at a loss, which affected the profitability of the dealership. Deo II Dep. 48:8-14. Deo sold cars at a deficiency, creating debt owed to Ally. Deo II Dep. 53:3-9; O'Sullivan Dep. 178:9-20 ("[...] I did not keep track. It was only like three or four thousand loss on a car, something like that. [...]"). Merckling received three cars through Northshore and Sunrise, through his relationship with Deo. Merckling Dep. 63:11-18. Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6. Deo stole

hundreds of thousands of dollars from the dealerships.  O'Sullivan Dep. 235:23-236:2 ("Q. To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right? A. I would guess so, yes"). In addition to stealing money from Northshore, Deo stole cars and dealer plates.  Aaronson Dep. 122:5-20; 128:24-129:15 ("there were millions and millions of dollars worth of supposed cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were – significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars."  I firsthand saw that the cars were not what Anthony presented the cars as"). Aaaronson believes that Deo cost Northshore motors at least four to five million dollars.  Aaronson Dep. 120:17-121:6; 144:8-9 ("He cost my family millions of dollars"); 186:12-15; 253:22-254:5; Deo II Dep. 178:12-21 (some point paid off by Northshore); 179:6-9 (Northshore paid Ally for the floor plan for a particular vehicle); 180:17-19; 181:3-6 ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know"). "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle.  All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do.  So we had obligations. When I say winding down, I mean winding down all the problems that

54

were created by Deo is what I'm referencing." **Aaronson Dep. 117:3-22; 117:23-118:3** ("[...] Anthony has his handprints and fingerprints all over this thing"); **Aaronson Dep. 67:21-23** ("millions and millions and millions of dollars were given back because of losses because of Deo"); **30:11-31:8** ("There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank. There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it. And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000. It turns out the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was something not right that was going on at that business, so we immediately knew that we were going to have a problem"); **68:11** ("A lot of money was lost"); **194:25-195:10** (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); **195:25-196:13; 196:14-17** ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); **199:12-23; 200:16-22.** For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. **Merckling Dep. 305:7-16.** Northshore has been closed for about three years, since early 2023. **Chabrier Dep. 35:18-21; 79:15-18; 159:3-11** ("[...] They are not in business anymore, so there's that"). It's "[b]een a while" since Chabrier last received income from Northshore. **Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23** ("[...] after David passed we nosedived. [...]").

197.    Nothing but Covid caused business to slow down at 189 Sunrise and NorthShore. DO Transcript, pp. 94, lines 10-14.

**Response: Deny. Sunrise and Northshore closed due to the wrongdoings committed by Deo and his Enterprise. For example, Deo continued to take $5,000.00 per week in salary plus commission despite the claimed slow-down in the business due to COVID-19. O'Sullivan Dep. 119:2-121:24, reducing resources necessary to operate the business; Deo took money, cars, plates, and cash. Aaronson Dep. 122:24-123:14 ("[...] he took a lot of cash that supposedly was never deposited into banks. [...]"); Chabrier Dep. 155:24-156:6 ("According to my comptroller at the time, Danny questioned why there were large sums of cash that never made it to the bank account that I found out later. So Anthony had taken that money that never made it into the Northshore bank accounts"); 156:20-22 ("Danny told me that he had given Anthony cash and it didn't get deposited in the bank"); 157:6-21 ("[Danny] told us when he still worked there. When he was questioned where some cash was. [...] It was a large sum of money. I don't recall the exact amount"); Deo II Dep. 46:16-47:19; 47:25-48:7; 50:4-9; 50:13-22; 56:66-17; 51:2-25 (over $1.2 million in deposits over one and a half weeks); 52:2-7 ("Q. Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that? A. Yes"); 52:8-54:9 (Deo maintains this was to cover deficiencies created by Aaronson); Deo Dep. 613:3-12 ("Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to pay off the floor plan lender in a timely fashion? A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was"); 94:19-95:11 (wire**

transfer for $173,000 for Deo's house at Hunting Lane); 142:4-19 ("Q. What about the $173,000 that was paid to the landlord or the owner of the property on Hunting. Was that also for business purpose? A. What does that have to do with the Libertas money? Q. Well, you got $723,000, correct? A. Yes. Q. In the account. You used $500,000 of that to pay to Tony Urrutia's company, correct? A. Yes. Q. Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct? A. I wired the money, yes"); O'Sullivan Dep. 203:5-204:2 (in an affidavit, O'Sullivan estimated that the customer deposits which Deo failed to put into the bank exceed $230,000); 232:19-22 ("Q. And the cash would be given to Deo [*sic*] and sometimes not make it into the account, is that right? A. Correct"); 235:14-22; 239:3-6. Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24 ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); 206:15-20 (instead of 45 cars per month, Superb sold 37 or 38). Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); 123:15-19 (wire from Aaronson into Thomasson's IOLA account was $735,000); Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr.

Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes.  He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); **91:3-17** ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); **141:2-12** ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); **271:18-272:4** ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation.  I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account. And your ex-business partner who just left took it? I was stunned.  I couldn't believe it actually"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. **Thomasson Dep. 123:20-25** ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes"). Jones notes that he is "not aware" of whether or not the way accounting was done for Northshore to Car Buyers was the proper way. **Jones Dep. 218:10-17.** For each car sold, money owed to the floor plan was not paid each time. **O'Sullivan Dep. 194:14-22.** There came a time when Northshore and/or Sunrise

were having financial difficulties and were unable to meet their monthly obligations. **Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2 ("the business slowed down and we got a little hesitate [*sic*] to pay some of the things off"). Cars were sold at a loss, which affected the profitability of the dealership. Deo II Dep. 48:8-14. Deo sold cars at a deficiency, creating debt owed to Ally. Deo II Dep. 53:3-9; O'Sullivan Dep. 178:9-20 ("[...] I did not keep track. It was only like three or four thousand loss on a car, something like that. [...]"). Merckling received three cars through Northshore and Sunrise, through his relationship with Deo. Merckling Dep. 63:11-18. Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6. Deo stole hundreds of thousands of dollars from the dealerships. O'Sullivan Dep. 235:23-236:2 ("Q. To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right? A. I would guess so, yes"). In addition to stealing money from Northshore, Deo stole cars and dealer plates. Aaronson Dep. 122:5-20; 128:24-129:15 ("there were millions and millions of dollars worth of supposed cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were – significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars." I firsthand saw that the cars were not what Anthony presented the cars as"). Aaaronson believes that Deo cost Northshore motors at least four to five million dollars. Aaronson Dep. 120:17-121:6; 144:8-9 ("He cost my family millions of dollars"); 186:12-15; 253:22-254:5; Deo II Dep. 178:12-21 (some point paid off by Northshore); 179:6-9 (Northshore paid Ally for the floor plan for a particular vehicle); 180:17-19; 181:3-6 ("Q.**

59

It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know"). "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle.  All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do.  So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." **Aaronson Dep. 117:3-22; 117:23-118:3** ("[...] Anthony has his handprints and fingerprints all over this thing"); **Aaronson Dep. 67:21-23** ("millions and millions and millions of dollars were given back because of losses because of Deo"); **30:11-31:8** ("There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank.  There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it. And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000.  It turns out the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was something not right that was going on at that business, so we immediately knew that we were going to have a problem"); **68:11** ("A lot of money was lost"); **194:25-195:10** (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); **195:25-196:13; 196:14-17** ("Q.

60

**[...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); 199:12-23; 200:16-22. For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. Merckling Dep. 305:7-16. Northshore has been closed for about three years, since early 2023. Chabrier Dep. 35:18-21; 79:15-18; 159:3-11 ("[...] They are not in business anymore, so there's that"). It's "[b]een a while" since Chabrier last received income from Northshore. Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23 ("[...] after David passed we nosedived. [...]").**

198.    Tom Jones was Anthony Deo's accountant.  DO Transcript, pp. 95, line 21-pp. 98, line 8.

**Response: Admit that Tom Jones was the accountant engaged by Deo.  Plaintiffs object to relevance and materiality of these purported facts.**

199.    Tom Jones came into the dealerships every month or two.  *Id.*

**Response: Deny that Jones came into the dealerships every two months; Jones worked with Deo to make adjustments to financial records monthly. Jones Dep. 23:3-25, 25:6-14, 26:4-20, 63:25-64:16, 92:3-15, 119:16-120:11.**

200.    No accountants other than Tom Jones came into the two dealerships.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

201.    DO gave Tom Jones bank statements for the two dealerships.  DO Transcript, pp. 125, lines 14-24.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

202.    Tom Jones did the bank reconciliations for both dealerships each month. DO Transcript, pp. 125, line 25-pp. 127, line 11.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

61

203.     Floor plan providers/lenders came into the two dealerships every month to review all cars and make sure all cars are on the floor plans.  DO Transcript, pp. 114, lines 4-23.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

204.     Floor plan providers/lenders came into the two dealerships every month to review all car payoffs.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

205.     DO was responsible for arranging the floor plan audits.   DO Transcript, pp. 116, lines 10-24.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

206.     No cars were ever missing from the monthly audits.  DO Transcript, pp. 118, line 5-pp. 119, line 4.

**Response: Admit only that DO testified that missing vehicles were ultimately accounted for. O'Sullivan Dep. 118:5-119:4.    Plaintiffs object to relevance and materiality of these purported facts.**

207.     DO paid off cars for NorthShore and 189 Sunrise.  DO Transcript, pp. 117, lines 7-21.

**Response: Admit only that DO testified at the citation listed that he would arrange to pay off any unpaid floorplan obligation for sold vehicles that were discovered during a floorplan audit.  O'Sullivan Dep. 117:7-21. Plaintiffs object to relevance and materiality of these purported facts.**

208.     David Baron had an arms' length relationship with NorthShore.  DO Transcript, pp. 123, lines 12-18.

**Response: Can neither admit nor deny as the statement is vague, constitutes a legal conclusion, and the testimony does not support the statement.**

209.    David Baron was not involved in the day to day operation of NorthShore or 189 Sunrise.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

210.    David Baron knew what the Deos' salary and commissions were at the two dealerships.  DO Transcript, pp. 119, line 2-pp. 122, line 14.

**Response: Plaintiffs object on the grounds that the witness cannot know the state of mind of another person, who in this case is deceased.  Plaintiffs further object to relevance and materiality of these purported facts.  Notwithstanding and subject to the foregoing objections, Plaintiffs admit.**

211.    David Baron came into NorthShore 3 times per week.  DO Transcript, pp. 124, lines 2-23.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

212.    When David Baron came to NorthShore, he would spend an hour or two at the dealership.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

213.    When David Baron came to NorthShore, he would talk to Anthony Deo and have lunch.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

214.    David Baron would look at financial records 1 time per month.  *Id.*

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

215. The two dealerships did not scan files, they only kept hard copies of all papers. DO Transcript, pp. 127, line 12-pp. 128, line 4.

**Response: Admit only to the extent that the testimony at the citation refers to vehicle sale deal folders. O'Sullivan Dep. 127:12-128:4. Plaintiffs object to relevance and materiality of these purported facts.**

216. All checks were created through the computer, only, so that there would be transparency for checks at the two dealerships. DO Transcript, pp. 131, lines 4-18.

**Response: Admit only to the extent that the testimony at the citation only addresses the checks being generated by a computer, but not the statement's conclusion. O'Sullivan Dep. 131:4-18. Plaintiffs object to relevance and materiality of these purported facts.**

217. David Baron only took money from the dealerships in small amounts every 3 or 4 months and only in small amounts when he did take money. DO Transcript, pp. 131, line 19-pp. 132, line 22.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

218. David Baron never took salary from either 189 Sunrise or NorthShore. *Id.*

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

219. Anthony and Sara Deo were each paid $5,000.00 per week. DO Transcript, pp. 119, line 2-pp. 121, line 24.

**Response: Admit and clarify that testimony at the citation states that the payments were made as salary. Plaintiffs object to relevance and materiality of these purported facts.**

220. Anthony Deo was also paid a commission each month from 189 Sunrise and NorthShore to his company known as Car Buyers. *Id.*

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

221.    David Baron knew that Anthony Deo and Sara Deo were getting paid $5,000.00 each per week.  DO Transcript, pp. 122, lines 4-14.

**Response: Plaintiffs object on the grounds that the witness cannot know the state of mind of another person, who in this case is deceased.  Plaintiffs further object to relevance and materiality of these purported facts.  Notwithstanding and subject to the foregoing objections, Plaintiffs admit.**

222.    David Baron knew about the commissions paid to Anthony Deo each month to Car Buyers.  *Id.*

**Response: Plaintiffs object on the grounds that the witness cannot know the state of mind of another person, who in this case is deceased.  Plaintiffs further object to relevance and materiality of these purported facts.  Notwithstanding and subject to the foregoing objections, Plaintiffs admit.**

223.    Asad Khan and Brian Chabrier also got checks from the two dealerships "once in a while." DO Transcript, pp. 132, line 23-pp. 133, line 14.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

224.    Asad Khan's, Brian Chabrier's, and David Baron's checks stopped when Covid struck.  DO Transcript, pp. 133, line 22-pp. 134, line 18.

**Response: Admit to the correlation in time, but deny causation.  <u>Khan Decl ¶ X; see also Chabrier Decl. ¶ X.</u>**

225.    Jory Baron had nothing to do with NorthShore or 189 Sunrise. DO Transcript, pp. 136, lines 8-20.

**Response: Deny. At all relevant times, J. Baron was and still is an owner and holder of a one-third (1/3) percent membership interest in Sunrise. J. Baron Dep. 10:13-16; see also SMF ¶¶ 74-83, 86, 102-110.**

226.     Josh Aaronson, Jory Baron, and Raymond Phelan never took money out of 189 Sunrise or NorthShore.  DO Transcript, pp. 138, line 19-pp. 139, line 6.

**Response: Admit, but note that the cited testimony is nonresponsive regarding Raymond Phelan.   Plaintiffs object to relevance and materiality of these purported facts.**

227.     Asad Khan rarely came into the dealerships.  DO Transcript, pp. 139, line 10-pp. 140, line 20.

**Response: Deny. O'Sullivan testified that Khan came into the dealerships "[m]aybe once a month." O'Sullivan Dep. 139:10-14.  Plaintiffs object to relevance and materiality of these purported facts.**

228.     Asad Khan did nothing at 189 Sunrise or NorthShore. *Id.*

**Response: Deny. Khan would look around, meet with Deo in Deo's office, and would ask O'Sullivan about the business of Northshore and Sunrise. O'Sullivan Dep. 139:10-140:24.**

229.     Asad Khan did not see documents when he came to the two dealerships.  *Id.*

**Response: Admit, to the extent of O'Sullivan's knowledge.  Plaintiffs object to relevance and materiality of these purported facts.**

230.     Brian Chabrier rarely came into the two dealerships.  DO Transcript, pp. 141, line 23-pp. 142, line 7.

**Response: Admit, to the extent of O'Sullivan's knowledge  and to the extent that coming into the dealerships "[o]nce in a while" is "rarely." O'Sullivan Dep. 141:25-142:3.   Plaintiffs object to relevance and materiality of these purported facts.**

231.    Customers would pay cash for cars sometimes.  DO Transcript, pp. 153, line 14-pp. 154, line 4.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

232.    When customers paid cash for a car at the two dealerships, that cash would either be deposited into the dealership's account, or given to Anthony Deo. DO Transcript, pp. 153, line 14-pp. 154, line 4.

**Response: Admit.**

233.    When cash was deposited into the dealerships' safes, it would be wrapped in the deal contract for identification of the cash payment on that deal.  DO Transcript, pp. 156, line 4-pp. 157, line 20.

**Response: Admit.**

234.    When cash was paid on a deal, the deal folder/jacket would be noted.  *Id.*

**Response: Admit.**

235.    When cash was paid on a deal, it would also be recorded in the Dealer Track software for 189 Sunrise and NorthShore.  *Id.*

**Response: Admit.**

236.    DO, Marc Merckling, or Dwight Blankenship removed cash from the safes, but not Anthony Deo.   DO Transcript, pp. 159, lines 5-9.

**Response: Deny, and note that O'Sullivan, Merckling, and Blankenship's participation in this process was part of the racketeering schemes directed by Deo. The Enterprise worked together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. <u>Sara. Dep. 260:22-261:12; Blankenship Dep.</u>**

**178:5-8** (there was a safe in the back office at Sunrise); **179:3-180:6** (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access). Thereafter, the controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. **Deo II Dep. 182:2-5; 182:17-18** ("Q. Who had access to those safes? A. The controllers, managers, myself"); **183;14-23; Merckling Dep. 111:11-13** ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); **O'Sullivan Dep. 245:9-12** ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes"); **Deo II Dep. 182:25-183:9** (controllers were primarily responsible for taking the money out of the safe). Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. **Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19.** Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. **Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18.** Merckling was involved in stealing cash deposits, among other tasks. **Merckling Dep. 135:5-7** ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); **131:19-24** ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); **Chabrier Dep. 158:15-17** ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself. **O'Sullivan Dep. 160:18-25** ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would

say give me the cash and I will take care of it. Just record it"); <u>161:10-162:4; 165:4-9</u> ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); <u>179:10-14</u> ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

237.   DO was responsible for keeping track of cash at the two dealerships.   DO Transcript, pp. 159, line 18-pp. 160, line 8.

**Response: Admit, but note that O'Sullivan was not solely responsible for same. O'Sullivan, Merckling, and Blankenship's participation in this process was part of the racketeering schemes directed by Deo. The Enterprise worked together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. <u>Sara. Dep. 260:22-261:12</u>; <u>Blankenship Dep. 178:5-8</u> (there was a safe in the back office at Sunrise); <u>179:3-180:6</u> (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access). Thereafter, the controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. <u>Deo II Dep. 182:2-5; 182:17-18</u> ("Q. Who had access to those safes? A. The controllers, managers, myself"); <u>183;14-23</u>; <u>Merckling Dep. 111:11-13</u> ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); <u>O'Sullivan Dep. 245:9-12</u> ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes"); <u>Deo II Dep. 182:25-183:9</u> (controllers were primarily responsible for taking the money out of the safe).**

**Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").**

238. DO made cash deposits at the banks for the two dealerships. *Id.*

**Response: Admit, but note that O'Sullivan was not solely responsible for same. O'Sullivan, Merckling, and Blankenship's participation in this process was part of the racketeering schemes directed by Deo. The Enterprise worked together to deposit cash from the safe after**

it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. Sara. Dep. 260:22-261:12; Blankenship Dep. 178:5-8 (there was a safe in the back office at Sunrise); 179:3-180:6 (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access). Thereafter, the controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. Deo II Dep. 182:2-5; 182:17-18 ("Q. Who had access to those safes? A. The controllers, managers, myself"); 183;14-23; Merckling Dep. 111:11-13 ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); O'Sullivan Dep. 245:9-12 ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes"); Deo II Dep. 182:25-183:9 (controllers were primarily responsible for taking the money out of the safe). Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task?  I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so"). Deo

71

**misappropriated cash deposits for himself.  O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").**

239.    Marc Merckling and Dwight Blankenship would also make cash deposits for the two dealerships, but only if it was a large deposit.  *Id.*

**Response: Admit that Merckling and Blankenship made cash deposits, but deny that it was only for large deposits.  O'Sullivan, Merckling, and Blankenship's participation in this process was part of the racketeering schemes directed by Deo. The Enterprise worked together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. Sara. Dep. 260:22-261:12; Blankenship Dep. 178:5-8 (there was a safe in the back office at Sunrise); 179:3-180:6 (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access). Thereafter, the controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. Deo II Dep. 182:2-5; 182:17-18 ("Q. Who had access to those safes? A. The controllers, managers, myself"); 183;14-23; Merckling Dep. 111:11-13 ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); O'Sullivan Dep.**

**245:9-12** ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes"); **Deo II Dep. 182:25-183:9** (controllers were primarily responsible for taking the money out of the safe). Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. **Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19.** Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. **Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18.** Merckling was involved in stealing cash deposits, among other tasks. **Merckling Dep. 135:5-7** ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); **131:19-24** ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task?  I -- I don't know about any task, but if he asked me to help him out with something, I would"); **Chabrier Dep. 158:15-17** ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself.  **O'Sullivan Dep. 160:18-25** ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); **161:10-162:4; 165:4-9** ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); **179:10-14** ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

240.     When Anthony Deo took cash out of the dealerships, DO would make a record of that cash.  DO Transcript, pp. 160, line 15-pp. 161, line 19.

73

**Response: Admit only to the extent of O'Sullivan's personal knowledge.**

241.   When Anthony Deo took cash out of the two dealerships, DO would make a corresponding deduction from Anthony Deo's capital account for that dealership. DO Transcript, pp. 161, line 20-pp. 162, line 4.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner. See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

242.   Having a capital account at an automobile dealership means that you are an owner of the dealership. DO Transcript, pp. 162, lines 18-23.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner. See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

243.   Anthony Deo had a capital account for each dealership as far as DO knew. DO Transcript, pp. 162, line 18-pp. 163, line 10.

**Response: Deny. The cited testimony does not contain this alleged fact. See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

244.   The record of any cash that was not deposited into the accounts at 189 Sunrise and NorthShore is the deductions from Anthony Deo's capital accounts. DO Transcript, pp. 165, line 4-pp. 166, line 19.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner. See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

245.   When DO deducted cash taken by Anthony Deo from his capital account, it reduced the amount of Anthony Deo's investment in the two businesses by that amount. DO Transcript, pp. 162, line 24-pp. 163, line 10.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner.  See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

246.   All cash taken from the two dealerships by Anthony Deo was disclosed to DO. DO Transcript, pp. 166, line 23-pp. 167, line 2.

**Response: Admit, to the extent of O'Sullivan's personal knowledge, which he himself seemingly doubts. O'Sullivan Dep. 166:23-167:2 ("Q. Now, do you know whether in fact all the cash that Anthony took was disclosed to you? A. I guess so, yeah").**

247.   All cash paid at the two dealerships was either credited to that customer's deal and deposited into dealership accounts, or, if taken by Anthony Deo, DO would make the corresponding deduction from Anthony Deo's capital account.  DO Transcript, pp. 167, lines 11-19.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, Deo was not an owner, and that many accounting entries reveal missing customer deposits.  See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

248.   All cash at the two dealerships was accounted for by DO in one of several ways. DO Transcript, pp. 167, line 11-pp. 169, line 3.

**Response: Admit, to the extent of O'Sullivan's personal knowledge, and to the extent that representations by Deo, Merckling, and/or Blankenship were accurate (which they were not).**

**Plaintiffs otherwise deny as many accounting entries reveal missing customer deposits.  See Kwun Decl. X.**

249.    The ways that DO accounted for all cash paid to the two dealerships were 1) DO deposited that cash into dealership accounts himself (pp. 168, lines 5-10); 2) DO personally confirmed each deposit receipt when Marc Merckling or Dwight Blankenship made large deposits (pp. 168, lines 11-22); or 3) DO would make a corresponding deduction from Anthony Deo's capital account (pp. 167, lines 11-19).

**Response: Admit, but note that two out of three of these methods required relying upon representations by Deo, Merckling, and/or Blankenship, and that such representations were fraudulent and many accounting entries reveal missing customer deposits.  See Kwun Decl. X.**

250.    All cash at 189 Sunrise and NorthShore was tracked and recorded by DO personally.  DO Transcript, pp. 168, line 23-pp. 169, line 3.

**Response: Admit, to the extent of O'Sullivan's personal knowledge, and to the extent that representations by Deo, Merckling, and/or Blankenship were accurate (which they were not), as many accounting entries reveal missing customer deposits.  See Kwun Decl. X.**

251.    DO applied Anthony Deo's American Express card payments to/from each dealership's accounts.  DO Transcript, pp. 206, line 16-pp. 207, line 20.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

252.    There was a "management fee" paid at Anthony Deo's direction by DO to the Plaintiffs for providing floor plans to 189 Sunrise and NorthShore. DO Transcript, pp. 218, line 3-pp. 219, line 6.

**Response: Deny. The testimony cited was that there was a management fee and it was for "Whatever they were doing, they would do in -- it covered everything that they did." Plaintiffs object to relevance and materiality of these purported facts.**

253.    The "management" fee for 189 Sunrise and NorthShore was in the amount of $60,000-$65,000 per month. *Id.*

**Response: Deny. The testimony cited by Defendants reveals that management fees were $30,000.00 or $35,000.00 monthly. Kwun Dep. 200:13-19 Plaintiffs object to relevance and materiality of these purported facts.**

254.    All cash deposits made by Marc Merckling and Dwight Blankenship were always actually deposited into the dealership accounts. DO Transcript, pp. 223, lines 15-22.

**Response: Deny. Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of**

circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

255. DO knows that all cash deposits made by Marc Merckling and Dwight Blankenship were actually deposited into dealership accounts because he confirmed the deposits himself. *Id.* **Response: Deny. Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not**

make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

256.    When Anthony Deo took cash from the dealerships, DO knew because he gave the cash to Anthony Deo.  DO Transcript, pp. 232, lines 15-18.

**Response: Deny. Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task?  I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself.  O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were**

79

like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

257.    When cash was not put into dealership accounts after being given to Anthony Deo by DO, DO would "always" make a deduction from Anthony Deo's capital account, "every time." DO Transcript, pp. 232, line 19-pp. 233, line 5.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner.  See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

258.    Although cash was taken by Anthony Deo from the two dealerships, it was entirely deducted from Anthony Deo's capital account by DO.  DO Transcript, pp. 235, line 23-pp. 236, line 5.

**Response: Admit only to the extent of O'Sullivan's personal knowledge, but deny that there exists a capital account for Deo as capital accounts only exist for owners, and Deo was not an owner.  See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

259.    DO did not discuss the cash taken by Anthony Deo with David Baron.  DO Transcript, pp. 236, lines 6-14.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

260.    DO never told David Baron that Anthony Deo did anything improper at the dealerships. *Id.*

**Response: Deny. This is an overstatement of the cited testimony. O'Sullivan Dep. 236:6-14 ("Q. Did you at any time he tell [*sic*] David Baron that Anthony was taking cash improperly? A. I don't recall, no. Q. Did you have any conversation with David Baron, if you can recall,**

80

**about cash payments at North Shore and 189 Sunrise? A. No").  Plaintiffs object to relevance and materiality of these purported facts.**

261.    There is no reason for shortfalls in the two dealerships except for the $65,000.00 monthly management fee paid to the Plaintiffs for providing the floor plans and cash taken by Anthony Deo.  DO Transcript, pp. 238, lines 7-10.

**Response: Deny. There is no testimony that the management fee was solely for providing the floor plans. And deny that was the only shortfall. Deo continued to take $5,000.00 per week in salary plus commission despite the claimed slow-down in the business due to COVID-19. O'Sullivan Dep. 119:2-121:24. Deo and his Enterprise were responsible for damages in several forms. For example, Deo took money, cars, plates, and cash. Aaronson Dep. 122:24-123:14 ("[...] he took a lot of cash that supposedly was never deposited into banks. [...]"); Chabrier Dep. 155:24-156:6 ("According to my comptroller at the time, Danny questioned why there were large sums of cash that never made it to the bank account that I found out later. So Anthony had taken that money that never made it into the Northshore bank accounts"); 156:20-22 ("Danny told me that he had given Anthony cash and it didn't get deposited in the bank"); 157:6-21 ("[Danny] told us when he still worked there. When he was questioned where some cash was. [...] It was a large sum of money. I don't recall the exact amount"); Deo II Dep. 46:16-47:19; 47:25-48:7; 50:4-9; 50:13-22; 56:66-17; 51:2-25 (over $1.2 million in deposits over one and a half weeks); 52:2-7 ("Q. Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time.  Do you see that? A. Yes"); 52:8-54:9 (Deo maintains this was to cover deficiencies created by Aaronson); Deo Dep. 613:3-12 ("Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to**

81

pay off the floor plan lender in a timely fashion? A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was"); 94:19-95:11 (wire transfer for $173,000 for Deo's house at Hunting Lane); 142:4-19 ("Q. What about the $173,000 that was paid to the landlord or the owner of the property on Hunting.  Was that also for business purpose? A. What does that have to do with the Libertas money? Q. Well, you got $723,000, correct? A. Yes. Q. In the account.  You used $500,000 of that to pay to Tony Urrutia's company, correct? A. Yes. Q. Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct? A. I wired the money, yes"); O'Sullivan Dep. 203:5-204:2 (in an affidavit, O'Sullivan estimated that the customer deposits which Deo failed to put into the bank exceed $230,000); 232:19-22 ("Q. And the cash would be given to Deo [*sic*] and sometimes not make it into the account, is that right? A. Correct"); 235:14-22; 239:3-6. Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24 ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); 206:15-20 (instead of 45 cars per month, Superb sold 37 or 38). Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer,

82

correct? A. As far as I know, yeah"); <u>123:15-19</u> (wire from Aaronson into Thomasson's IOLA account was $735,000); <u>Deo II Dep. 90:10-91:2</u> ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); <u>91:3-17</u> ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); <u>141:2-12</u> ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); <u>271:18-272:4</u> ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account. And your ex-business partner who just left took it? I was stunned. I couldn't believe it actually"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. <u>Thomasson Dep. 123:20-25</u> ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that

83

sounds correct, yes"). Jones notes that he is "not aware" of whether or not the way accounting was done for Northshore to Car Buyers was the proper way. Jones Dep. 218:10-17. For each car sold, money owed to the floor plan was not paid each time. O'Sullivan Dep. 194:14-22. There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2 ("the business slowed down and we got a little hesitate [*sic*] to pay some of the things off"). Cars were sold at a loss, which affected the profitability of the dealership. Deo II Dep. 48:8-14. Deo sold cars at a deficiency, creating debt owed to Ally. Deo II Dep. 53:3-9; O'Sullivan Dep. 178:9-20 ("[...] I did not keep track. It was only like three or four thousand loss on a car, something like that. [...]"). Merckling received three cars through Northshore and Sunrise, through his relationship with Deo. Merckling Dep. 63:11-18. Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6. Deo stole hundreds of thousands of dollars from the dealerships. O'Sullivan Dep. 235:23-236:2 ("Q. To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right? A. I would guess so, yes"). In addition to stealing money from Northshore, Deo stole cars and dealer plates. Aaronson Dep. 122:5-20; 128:24-129:15 ("there were millions and millions of dollars worth of supposed cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were – significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars."  I firsthand saw that the cars were not what Anthony presented the cars as"). Aaaronson believes that Deo

cost Northshore motors at least four to five million dollars. **Aaronson Dep. 120:17-121:6; 144:8-9** ("He cost my family millions of dollars"); **186:12-15; 253:22-254:5; Deo II Dep. 178:12-21** (some point paid off by Northshore); **179:6-9** (Northshore paid Ally for the floor plan for a particular vehicle); **180:17-19; 181:3-6** ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know"). "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle.  All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do.  So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." **Aaronson Dep. 117:3-22; 117:23-118:3** ("[...] Anthony has his handprints and fingerprints all over this thing"); **Aaronson Dep. 67:21-23** ("millions and millions and millions of dollars were given back because of losses because of Deo"); **30:11-31:8** ("There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank.  There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it. And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000.  It turns out the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was

something not right that was going on at that business, so we immediately knew that we were going to have a problem"); **68:11** ("A lot of money was lost"); **194:25-195:10** (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); **195:25-196:13; 196:14-17** ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); **199:12-23; 200:16-22.** For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. **Merckling Dep. 305:7-16.** Northshore has been closed for about three years, since early 2023. **Chabrier Dep. 35:18-21; 79:15-18; 159:3-11** ("[...] They are not in business anymore, so there's that"). It's "[b]een a while" since Chabrier last received income from Northshore. **Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23** ("[...] after David passed we nosedived. [...]").

262.    The deduction of cash from Anthony Deo's capital account for cash taken from the businesses by Anthony Deo is "proper accounting."  DO Transcript, pp. 244, line 7-pp. 245, line 5.

**Response: Deny. The testimony is an opinion not a fact, and O'Sullivan was not deposed as an expert, was not qualified as an expert, nor did he establish his education or experience to provide such an opinion. To the extent that it was generally "proper accounting", it was not proper in this instance as Deo was not an owner and had no capital account.  See Kwun Decl. X; see also SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

263.    There was nothing improper about Anthony Deo taking cash from the dealerships as far as the controller (DO) for those two dealerships knows. *Id.*

**Response: Deny.  Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's**

accounts. **Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19.** Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. **Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18.** Merckling was involved in stealing cash deposits, among other tasks. **Merckling Dep. 135:5-7** ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); **131:19-24** ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task?  I -- I don't know about any task, but if he asked me to help him out with something, I would"); **Chabrier Dep. 158:15-17** ("Danny told me Marc was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself.  **O'Sullivan Dep. 160:18-25** ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); **161:10-162:4; 165:4-9** ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); **179:10-14** ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500"); **see also SMF ¶¶ 29, 32, 33, 34, 36, 37, 39, 41,48, 49, 50, 74-84.**

264.    The reason Marc Merckling and Dwight Blankenship made occasional large cash deposits for the two dealerships was because they were policemen who were licensed to carry guns.  DO Transcript, pp. 245, lines 6-16.

**Response: Deny.  O'Sullivan, Merckling, and Blankenship's participation in this process was part of the racketeering schemes directed by Deo. The Enterprise worked**

together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. Sara. Dep. 260:22-261:12; Blankenship Dep. 178:5-8 (there was a safe in the back office at Sunrise); 179:3-180:6 (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access). Thereafter, the controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. Deo II Dep. 182:2-5; 182:17-18 ("Q. Who had access to those safes? A. The controllers, managers, myself"); 183;14-23; Merckling Dep. 111:11-13 ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); O'Sullivan Dep. 245:9-12 ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes"); Deo II Dep. 182:25-183:9 (controllers were primarily responsible for taking the money out of the safe). Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X; O'Sullivan Dep. 153:17-158:5, 159:5-161:19. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task?  I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc

88

**was the one that brought the money to the bank so"). Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").**

265.    Marc Merckling and Dwight Blankenship were paid whatever Anthony Deo said to pay them. DO Transcript, pp. 151, lines 3-16.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

266.    DO got back the deposit slips made by Marc Merckling and Dwight Blankenship "every time." DO Transcript, pp. 245, lines 17-23.

**Response: Admit, to the extent of O'Sullivan's personal knowledge. Plaintiffs object to relevance and materiality of these purported facts.**

267.    Positive Pay was on the accounts at 189 Sunrise and NorthShore, which caused all checks to be verified daily. DO Transcript, pp. 252, line 20-pp. 253, line 17.

**Response: Admit only to the extent that the testimony limits the verification process involved. Plaintiffs object to relevance and materiality of these purported facts.**

268.    DO also verified all checks from the two dealerships' accounts daily. *Id.*

**Response: Admit only to the extent that the testimony limits the verification process involved. Plaintiffs object to relevance and materiality of these purported facts.**

269.    DO saw the two dealerships' tax returns.  DO Transcript, pp. 136, line 21-pp. 137, line 12.

**Response: Admit only that O'Sullivan testified that he saw tax returns prepared by Tom Jones, but there is no evidence that Tom Jones had prepared any such tax returns at that time.  Plaintiffs object to relevance and materiality of these purported facts.**

270.    The two dealerships' tax returns seen by DO were prepared by the Deos' accountant, Tom Jones. DO Transcript, pp. 137, lines 21-25.

**Response: Admit only that O'Sullivan testified that he saw tax returns prepared by Tom Jones, but there is no evidence that Tom Jones had prepared any such tax returns at that time.  Plaintiffs object to relevance and materiality of these purported facts.**

271.    DO has no knowledge of Harry Thomasson and never met him.  DO Transcript, pp. 142, line 21-pp. 143, line 3.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

272.    DO met with Plaintiffs' attorney, Mr. Ruderman, at Mr. Ruderman's house before the deposition of DO.  DO Transcript, pp. 208, lines 7-19.

**Response: Admit that they met, but the testimony was that the meeting took place at O'Sullivan's house.  See Ruderman Decl. ¶ X. Plaintiffs object to relevance and materiality of these purported facts.**

273.    While privately meeting with Plaintiffs' attorney, Mr. Ruderman, at Mr. Ruderman's house before the deposition, DO filled out a handwritten statement at Mr. Ruderman's request. *Id.*

**Response: Admit, but the testimony was that the meeting took place at O'Sullivan's house, and except that the cited testimony does not specify that the statement was handwritten. See Ruderman Decl. ¶ X. Plaintiffs object to relevance and materiality of these purported facts.**

274. Mr. Ruderman is not DO's attorney. *Id.*

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

6. As to "Brian Chabrier"

275. Brian Chabrier (hereinafter, "BC") took automobile dealer training classes through Nissan. BC Transcript, pp. 10, lines 2-14.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

276. BC met Josh Aaronson around the year 2000. BC Transcript, pp. 11, lines 8-10.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

277. Josh Aaronson is BC's partner in automobile dealerships. BC Transcript, pp. 11, line 11-pp. 12, line 7.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

278. BC has been an owner of at least 3 automobile dealerships. BC Transcript, pp. 12, line 20-pp. 13, line 4.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

279. When BC visited 189 Sunrise's and NorthShore's dealerships, he was not there long, merely walked around and spoke to a few employees, occasionally signed checks, then left. BC Transcript, pp. 16, line 12-pp. 17, line 10.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

280. BC has no knowledge of how anyone was put on 189 Sunrise's and NorthShore's bank accounts. BC Transcript, pp. 19, line 22-pp. 20, line 24.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

281.    When a person is the only person on a dealership bank account (e.g., Sara Deo when she opened NorthShore's bank account(s) at Exhibit C to VC and AC), she is the owner of that account.  BC Transcript, pp. 21, line 11-pp. 23, line 12.

**Response: Admit only that it was Chabrier's vague understanding.  Plaintiffs object to relevance and materiality of these purported facts.**

282.    David Baron was BC's boss.  BC Transcript, pp. 30, lines 14-21.

**Response: Deny. Chabrier testified that D. Baron was his partner in Northshore and 189 Sunrise, but was his boss at Baron Nissan. <u>Chabrier</u> <u>Dep.</u> 32:3-8.  Plaintiffs object to relevance and materiality of these purported facts.**

283.    BC does not remember details involving income tax returns for 189 Sunrise and NorthShore.  BC Transcript, pp. 32, line 24-pp. 35, line 21.

**Response: Deny. Chabrier testified about certain details.   <u>Chabrier</u> <u>Dep. 32:24-35:21.</u> Plaintiffs object to relevance and materiality of these purported facts.**

284.    BC authorized Josh Aaronson for all day-to-day operations of 189 Sunrise and NorthShore. BC Transcript, pp. 37, line 3-pp.38, line 15.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

285.    BC does not know of any written contract involving the purchase of 189 Sunrise by Anthony Deo as reflected in Exhibit D to the VC and the AC. BC Transcript, pp. 38, line 22-pp. 39, line 4.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

286.    BC did not see a written contract involving the purchase of 189 Sunrise by Anthony Deo as reflected in Exhibit D to the VC and the AC.  *Id.*

92

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

287.    BC does not recall the Deos' 600 page complaint.  BC Transcript, pp. 44, lines 16-21.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

288.    Joshua Aaronson is the head of the IAG Group.  BC Transcript, pp. 45, line 12-pp. 46, line 9.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

289.    BC does not know Thomas Jones, Anthony Deo's accountant for the two dealerships.  BC Transcript, pp. 46, lines 14-23.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

290.    BC believes that Harry Thomasson wrongfully took $730,000 from him, but as of the date of his deposition on January 9, 2026, he could not say who obtained that loan nor who guaranteed it.  BC Transcript, pp. 47, lines 3-14.

**Response: Deny that Chabrier could not say who obtained the loan; Chabrier testified that Northshore, and Deo, had obtained the loan. Chabrier Dep. 47:3-14;127:2-15.  Plaintiffs object to relevance and materiality of these purported facts.**

291.    As of January 9, 2026, BC does not know that Anthony Deo obtained and guaranteed a loan from Libertas in the amount of $735,000.00.  BC Transcript, pp. 52, line 15-pp. 53, line 19.

**Response: Deny. Chabrier testified that Deo had obtained the loan. Chabrier Dep. 127:2-15. Plaintiffs object to relevance and materiality of these purported facts.  Plaintiffs object to this purported fact on the grounds that it constitutes a legal conclusion as to Deo's alleged guaranty of the loan.**

93

292.    BC found out from Josh Aaronson that Anthony Deo obtained the Libertas loan. BC Transcript, pp. 127, lines 2-15.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

293.    The DMV license to sell cars at NorthShore was in the name of NorthShore.  BC Transcript, pp. 47, lines 15-19.

**Response: Admit.  See SMF ¶ 39; see also Chabrier Decl. ¶ X; Chabrier Dep. 48:14-22.**

294.    BC has "no problem" with Josh Aaronson approving the tax returns listing the Deos as owners of 189 Sunrise and NorthShore as attached to the VC and the AC at Exhibits G and H.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs deny.  See Chabrier Decl. ¶ X.  Plaintiffs object to relevance and materiality of these purported facts.**

295.    189 Sunrise and NorthShore had tokens for security on the 189 Sunrise and NorthShore bank accounts. BC Transcript, pp. 64, line 12-pp. 65, line 14.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

296.    Only BC and Josh Aaronson had the tokens necessary to access 189 Sunrise's and NorthShore's bank accounts.  BC Transcript, pp. 59, line 17-pp. 60, line 14.

**Response: Admit only as to Chabrier's knowledge. Chabrier, Deo, O'Sullivan and Kwun all had tokens. See Kwun Dep. 204:10-18.  Plaintiffs object to relevance and materiality of these purported facts.**

297.    BC looked at 189 Sunrise's and NorthShore's bank accounts and checks daily. BC Transcript, pp. 60, line 22-pp. 61, line 24.

94

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

298.    BC does not know if the Deos were on the 189 Sunrise and NorthShore bank accounts.  BC Transcript, pp. 62, lines 4-20.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

299.    BC does not know if the Deos signed checks on the 189 Sunrise and NorthShore bank accounts.  *Id.*

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

300.    BC and his partners took money from the 189 Sunrise and NorthShore bank accounts.   BC Transcript, pp. 62, line 21-pp. 63, line 18.

**Response: Admit, and note that they were authorized to do same.  <u>Chabrier Dep.  59:17-60:14.</u>  Plaintiffs object to relevance and materiality of these purported facts.**

301.    BC ceased receiving K-1's for NorthShore and 189 Sunrise after the tax returns in Exhibit H to the VC and the AC were approved by Josh Aaronson in Exhibit G to the VC and the AC.  BC Transcript, pp. 72, line 8-pp. 73, line 21.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

302.    BC stopped receiving K-1's for NorthShore and 189 Sunrise after the tax returns in Exhibit H to the VC and the AC were approved by Josh Aaronson in Exhibit G to the VC and the AC because BC stopped being the owner of those businesses on the tax returns and Anthony Deo was the new owner of those businesses on the tax returns.  *Id.*

**Response: Admit only as to Chabrier's knowledge.  Plaintiffs object to relevance and materiality of these purported facts.**

303.    Anthony Deo had day-to-day control over 189 Sunrise and NorthShore. BC Transcript, pp. 76, lines 18-20.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

304.    BC's only allegation of harm to him by Harry Thomasson involves Thomasson's return of the $735,000.00 Anthony Deo obtained in a loan from Libertas back to him.  BC Transcript, pp. 59, lines 2-10.

**Response: Admit, but add that Plaintiffs have alleged far greater harm caused by Thomasson's conduct.  See, e.g., SMF ¶ 796.**

305.    BC has no other allegations of harm to him by Harry Thomasson other than the return of the loan money to Anthony Deo.  *Id.*

**Response: Deny. Other than this conversion, Thomasson aided and abetted conversion, breach of fiduciary duty, and breach of duty of loyalty through a variety of actions. As a result of same, a variety of damages have been incurred. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); 123:15-19 (wire from Aaronson into Thomasson's IOLA account was $735,000); Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes.  He wired it to me. Q. When he wired it**

to you, did it go to you personally or some other entity? A. I think it went to this account"); **91:3-17** ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); **141:2-12** ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); **271:18-272:4** ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account. And your ex-business partner who just left took it? I was stunned. I couldn't believe it actually"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. **Thomasson Dep. 123:20-25** ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes"). There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. **Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2** ("the business slowed down and we got a little hesitate [*sic*] to pay some of the things off"). Aaaronson believes that Deo cost Northshore motors at least four to five million dollars. **Aaronson Dep. 120:17-121:6; 144:8-9** ("He cost my family millions of dollars"); **186:12-15; 253:22-254:5; Deo II Dep. 178:12-21** (some point paid off by Northshore); **179:6-9**

97

(Northshore paid Ally for the floor plan for a particular vehicle); <u>180:17-19</u>; <u>181:3-6</u> ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know"). "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle. All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do. So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." <u>Aaronson Dep. 117:3-22; 117:23-118:3</u> ("[...] Anthony has his handprints and fingerprints all over this thing"); <u>Aaronson Dep. 67:21-23</u> ("millions and millions and millions of dollars were given back because of losses because of Deo"); <u>68:11</u> ("A lot of money was lost"); <u>194:25-195:10</u> (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); <u>195:25-196:13; 196:14-17</u> ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); <u>199:12-23; 200:16-22.</u> For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. <u>Merckling Dep. 305:7-16.</u> Northshore has been closed for about three years, since early 2023. <u>Chabrier Dep. 35:18-21; 79:15-18; 159:3-11</u> ("[...] They are not in business anymore, so there's that"). It's "[b]een a while" since Chabrier last received income from Northshore. <u>Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23</u> ("[...] after David passed we nosedived. [...]").

306.    BC cannot give any reason to not trust the accuracy of the tax returns provided as Exhibit H in the VC and AC. BC Transcript, pp. 154, lines 6-10.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs also object on the grounds that there is no evidentiary foundation for the tax returns. See Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit only as to Chabrier's knowledge but the record offers no testimony concerning Chabrier's general or specific knowledge about the returns.**

307.    Wendy Kwun is the controller for IAG.  BC Transcript, pp. 42, line 16-pp. 43, line 2.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

7.      As to "Wendy Kwun"

308.    Wendy Kwun (hereinafter, "WK") is a controller at automobile dealerships for at least twenty (20) years.  WK Transcript, pp. 61, lines 12-20.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

309.    WK's first year working in an automobile dealership was 1986.  WK Transcript, pp. 12, lines 12-14.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

310.    WK first worked at an automobile dealership owned at least in part by the Baron family in the 1990's at Baron Auto Mall.  WK Transcript, pp. 14, lines 5-23; also pp. 16, line 25-pp. 17, line 4.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

311.    WK also worked at the Baron-owned Baron Daewoo dealership.  WK Transcript, pp. 17, lines 5-24.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

312.    WK also worked at the Baron-owned Brooklyn Dodge dealership.  WK Transcript, pp. 18, line 9-pp. 19, line 9.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

313.    WK has worked for the Baron family non-stop since about 2015 when she started working at Island Hyundai.  WK Transcript, pp. 27, line 6-pp. 28, line 5.

**Response: Admit.  Plaintiffs object to relevance and materiality of these purported facts.**

314.    WK also worked for an accountant, Ellen Kera, the same person on the tax approval email chain attached to the VC and the AC as Exhibit G.  WK Transcript, pp. 20, line 23-pp. 22, line 2.

**Response: Admit only that Kwun worked for Ellen Kera. There is no testimony by Kwun concerning the identity of those in the email chain referenced.   Plaintiffs object to relevance and materiality of these purported facts.**

315.    Wendy Kwun went to help 189 Sunrise and NorthShore in the summer of 2021.  WK Transcript, pp. 68, line 25-pp. 70, line 8.

**Response: Admit that Kwun's help, as testified, was limited to helping with training on their operating system and title processing work.  Plaintiffs object to relevance and materiality of these purported facts.**

316.    WK went to help 189 Sunrise and NorthShore during the summer of 2021 because the controller at 189 Sunrise and NorthShore was having trouble with the operating system.  *Id.*

100

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

317. When WK went to help with the operating system at NorthShore and 189 Sunrise, the controller was Dan O'Sullivant [*sic*] for those two dealerships. WK Transcript, pp. 62, line 24-pp. 63, line 6; also pp. 83, lines 6-18.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

318. Dan O'Sullivan needed help with the computer system and processes at 189 Sunrise and NorthShore. WK Transcript, pp. 83, line 19-pp. 84, line 14.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

319. WK does not know if Dan O'Sullivan wrongfully took money out of 189 Sunrise and NorthShore bank accounts. WK Transcript, pp. 84, lines 15-18.

**Response: Admit, to the extent of Kwun's personal knowledge, but nor is there testimony direct or implied that O'Sullivan did take money. <u>Kwun Decl. ¶ X.</u>**

320. WK knows that Thomas Jones was the accountant at 189 Sunrise and NorthShore during her time helping those two dealerships. WK Transcript, pp. 89, lines 12-24.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

321. WK knows that the accounts at 189 Sunrise and NorthShore had security called Positive Pay on those accounts. WK Transcript, pp. 99, lines 20-24.

**Response: Admit. Plaintiffs object to relevance and materiality of these purported facts.**

322. WK knew about the email chain including Josh Aaronson's approval of the tax returns as set forth in the VC and AC at Exhibits G and H. WK Transcript, pp. 108, line 12-pp. 109, line 4.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. <u>See</u> Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and**

**materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny in that the testimony offered in the citation merely notes that Kwun connected the accountants.**

323.    WK "connected the accountants" to each other for the email chain attached to the VC and AC as Exhibit G.  *Id.*

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. <u>See</u> Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny in that the testimony offered in the citation merely notes that Kwun connected the accountants.**

324.    WK is aware that Josh Aaronson approved the tax returns attached to the VC and AC as Exhibit H.  WK Transcript, pp. 111, lines 3-14.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. <u>See</u> Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs deny in that the testimony offered in the citation merely notes that Kwun connected the accountants.**

325.    WK agrees that the tax returns attached to the VC and AC as Exhibit H list the Deos as owners of 189 Sunrise and NorthShore.  WK Transcript, pp. 112, lines 12-18.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. <u>See</u> Fed. R. Civ. P. 56(c)(4).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections, Plaintiffs admit, but note that the tax returns were not meant to confer ownership or establish**

**ownership in that the tax returns were part of a larger incomplete transaction. See Kwun Dep. 110:12-18, 114:24-115:13, 130:8-23, 18:3-5; Aaronson Dep. 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24.**

326.    WK knows that Josh Aaronson approved the tax returns for 189 Sunrise and NorthShore attached to the VC and the AC as Exhibit H. WK Transcript, pp. 126, lines 9-11.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admit the testimony which was limited to Kwun's understanding of facts.**

327.    WK knows that K-1's indicate ownership.  WK Transcript, pp. 133, lines 9-21.

**Response: Plaintiffs object on the grounds that there is no evidentiary foundation for the tax returns and emails. See Fed. R. Civ. P. 56(c)(4). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admit, but note that Kwun is not an accountant.**

328.    When WK worked at 189 Sunrise and NorthShore in 2021 and 2022, Josh Aaronson was her boss.  WK Transcript, pp. 118, lines 10-13.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

329.    WK took the $735,000.00 on her own decision after Anthony Deo obtained the loan from Libertas.  WK Transcript, pp. 145, lines 2-13.

**Response: Deny that Anthony Deo obtained a loan from Libertas. Northshore obtained a loan from Libertas. See Ruderman Decl. ¶ X (Libertas Agreement).**

330.    WK "does not know" why she moved the $735,000.00 to an IAG account after Anthony Deo obtained that money from Libertas. WK Transcript, pp. 148, lines 15-18.

**Response: Deny.  Kwun moved the money to gain control of it while she explored its source. See Kwun Dep. 148:2-23.**

331.    WK has no first-hand knowledge of the reasons why 189 Sunrise and NorthShore accounts had shortfalls even after spending over a year working on those accounts from 2021-2022.  WK Transcript, pp. 217, lines 15-19.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

332.    But WK did know about the $60-65,000.00 payments to IAG for supplying, *inter alia,* the floor plans to 189 Sunrise and NorthShore. WK Transcript, pp. 199, line 23-pp. 200, line 12.

**Response: Admit only that Kwun was aware of the payments but there is no testimony that the management fee was solely for providing the floor plans.  See Kwun Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

333.    WK has no knowledge of Anthony Deo taking cash from 189 Sunrise or NorthShore.  WK Transcript, pp. 218, line 23-pp. 219, line 2.

**Response: Admit that Kwun had no personal knowledge.  Plaintiffs object to the relevance and materiality of these purported facts.**

334.    WK has no memory of Anthony Deo doing anything improper regarding 189 Sunrise and NorthShore accounts.  WK Transcript, pp. 220, lines 3-8.

**Response: Deny in that the testimony was that Kwun was not aware of any *particular* improper transaction.**

335.    The "shortfalls" in 189 Sunrise and NorthShore accounts took place in August, 2022, after WK was working there for over a year on various financial matters including the bank accounts.  WK Transcript, pp. 224, lines 15-24.

**Response: Deny in that Kwun testified that the shortfalls did not come to light until August, 2022 in that the checks that would have revealed the shortfalls earlier were held, and not issued for payment for many months.**

336. The monthly fees in the amount of $60-65,000.00 were paid by the Deos. WK Transcript, pp. 227, line 24-pp. 229, line 17.

**Response: Deny in that Northshore and Sunrise paid the monthly fees. See Kwun Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

337. The monthly fees in the amount of $60-65,000.00 were paid by the Deos to Island Chrysler Jeep Dodge. *Id.*

**Response: Deny in that Northshore and Sunrise paid the monthly fees, but admit they were paid to Island Chrysler Jeep Dodge. See Kwun Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

338. Kwun has access to 189 Sunrise and NorthShore bank accounts since the summer of 2021. WK Transcript, pp. 78, lines 9-21.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

8. As to "Robert Anthony Urrutia"

339. Robert Anthony Urrutia (hereinafter, "TU") has over twenty years of experience with training in the automobile dealership industry. TU Transcript, pp. 7, lines 2-24.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

340. TU owned a total of four (4) dealerships: Plaintiff Superb Motors, a Volkswagen dealership in New Jersey, a Mitsubishi dealership in Hartford, Connecticut, and a Nissan dealership in Massachusetts. TU Transcript, pp. 10, lines 18-24.

**Response: Admit, except that the cited testimony does not reference Superb. Plaintiffs object to the relevance and materiality of these purported facts.**

341.    Bruce Novicky was hired by TU's to be COO for Team Auto/the four dealerships. TU Transcript, pp. 107, lines 13-20.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

342.    Anthony Deo was not involved in TU's dealerships in New Jersey, Connecticut, or Massachusetts. TU Transcript, pp. 11, line 20-pp. 12, line 10.

**Response: Deny, as all four (4) dealerships were cross-collateralized. <u>Urrutia Decl. ¶ X.</u>**

343.    TU doesn't know Harry Thomasson and never spoke to Harry Thomasson prior to TU's deposition on January 8, 2026. TU Transcript, pp. 15, lines 10-15.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

344.    TU knows Harry Thomasson performed some legal service(s) for Superb Motors (because "there's checks" to Harry Thomasson), but as of January 8, 2026, he does not know what Harry Thomasson did for Superb Motors. TU Transcript, pp. 15, line 16-pp. 16, line 3.

**Response: Admit, to the extent of Urrutia's personal knowledge. Thomasson works for the Deos. <u>Thomasson Dep. 124:18-125:4</u> ("Q. What is your agreement with Mr. Deo in connection with the legal services you performed for him in general? A. Well, I had through November of 2022 I served as outside counsel when they needed something. What that meant was if and when they needed me they would contact me and let me know and we would -- I would take care of whatever it was. I believe there was billing up until November of 2022."); <u>125:12-15; 125:24-126:2; 131:5-9</u> ("Q. When did you stop keeping track of the time that you spent on the cases you work on for him? A. For sure when I became salaried."); <u>131:16-132:11; 151:10-18; 179:10-180:4</u> ("he said at that time that he would want me to represent of**

[*sic*] all of the dealerships. That was when we reached a financial agreement. And I said to him, I am gonna need an office in New York […] [a]nd he said, well why don't you just take an office in one of the dealerships down here," and they decided on Superb); <u>313:16-316:17; 319:9-19</u> ("Q. […] Back when you were representing them, were you getting a weekly salary for some period of time? A. I still represent Deos in matters outside of this case. Q. So, you're getting a salary now from the Deos for other matters? A. Yes. Q. How much, you are getting a $1,000 a week; is that what you said? A. Yes."); <u>Blankenship Dep. 133:16-134:3</u> ("Q. Mr. Thomasson had an office at Superb, correct? A. Yes. […]"). Thomasson exchanged emails (at least two communications) with Flushing Bank. <u>Patrovic Dep. 46:6-16; 49:3-51:2.</u> Deo otherwise directed Thomasson to get involved in a myriad of matters, none of which Thomasson maintains he ever questioned. <u>Thomasson Dep. 271:7-23</u> ("Deo told me money was stolen, it's coming back, I want you to get involved. This is the name of the guy you've gotta converse with. I believe that I conversed with Russell Shanks via e-mail only. That's my memory. Q. You don't know why Mr. Deo wanted you to go through an attorney when essentially your instructions were as soon as you got the money to get it to him? A. That's correct. Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all"); <u>47:21-48:3</u> ("I have represented Northshore, 189 Sunrise and Superb […] in court cases involving allegations by customers. I have also represented those dealerships or at least Northshore and 189 Sunrise with regard to consumer affairs complaints"); <u>150:2-19</u> ("[...] As far as I can recall, I think that we prevailed on just about every single one of the matters that I handled"); <u>85:3-8; 85:17-86:3; 87:8-88:18; 105:6-25; 113:10-114:15</u> (Aaronson returned funds to Thomasson's IOLA

account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]"); 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835; 160:9-19; 173:2-21 (Thomasson spoke to Deo, Merckling, and police); 177:17-22 (Thomasson advised the Enterprise to leave the dealership); 200:20-201:6 (Thomasson was present for an audit at Northshore in order to comply with the floor plan agreement that Nissan had with Superb); 203:19-204:10 ("once I became involved and the federal court became involved, I cooperated, you may remember, in returning almost all of the vehicles that were at Northshore [...] I didn't know much about vehicles. I didn't know who owned what vehicle. I wasn't asking who owned what vehicle. All I know is if you wanted to pick up the phone and call me and say we've got have some vehicles at Northshore can you help us get them back, I would have done so"); 226:25-227:10; 270:7-10 ("[...] I was asked to have the funds pass through me and I said, sure"); 149:13-25 (Thomasson urged the court, in all capital letters, to make a decision as soon as possible, because the Enterprise was "hurt terribly by what was going on and were losing their businesses and leases at those businesses and it was a problem"); 101:21-102:5 (Thomasson "had a conversation with somebody at Ally").

345.    Harry Thomasson handled one (1) lawsuit for Superb, which TU learned through this action.  TU Transcript, pp. 16, lines 4-24.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

346.    Harry Thomasson's work for Anthony Deo before Anthony Deo's involvement with Superb [on or about December 1, 2022] "doesn't really involve" TU. TU Transcript, pp. 46, lines 3-9.

**Response: Deny.  Thomasson played an instrumental role while Deo worked at Northshore and Sunrise in helping Deo fraudulently obtain funds used to purchase an interest in Superb. See SMF ¶ 894.**

347.    TU's allegations against Harry Thomasson consist of Thomasson's work for Anthony Deo as an attorney since TU disagrees with how Thomasson has handled Deo's attorney work.  TU Transcript, pp. 46, line 14-pp. 47, line 3.

**Response: Admit, but note that Thomasson's attorney work involved "facilitat[ing] this whole crime," i.e., aiding and abetting conversion, breach of fiduciary duty, and breach of duty of loyalty through a variety of actions. As a result of same, a variety of damages have been incurred. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); 123:15-19 (wire from Aaronson into Thomasson's IOLA account was $735,000); Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account,**

109

as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes.  He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); 91:3-17 ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); 141:2-12 ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); 271:18-272:4 ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation.  I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account.  And your ex-business partner who just left took it? I was stunned.  I couldn't believe it actually"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. Thomasson Dep. 123:20-25 ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes"). There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2 ("the business slowed down and we got a little hesitate [sic] to pay some of the things off"). Aaaronson believes that Deo cost Northshore motors at least four to five million dollars. Aaronson Dep. 120:17-121:6; 144:8-9 ("He cost

110

my family millions of dollars"); **186:12-15; 253:22-254:5; Deo II Dep. 178:12-21** (some point paid off by Northshore); **179:6-9** (Northshore paid Ally for the floor plan for a particular vehicle); **180:17-19; 181:3-6** ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know"). "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle.  All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do.  So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." **Aaronson Dep. 117:3-22; 117:23-118:3** ("[...] Anthony has his handprints and fingerprints all over this thing"); **Aaronson Dep. 67:21-23** ("millions and millions and millions of dollars were given back because of losses because of Deo"); **68:11** ("A lot of money was lost"); **194:25-195:10** (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); **195:25-196:13; 196:14-17** ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); **199:12-23; 200:16-22.** For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. **Merckling Dep. 305:7-16.** Northshore has been closed for about three years, since early 2023. **Chabrier Dep. 35:18-21; 79:15-18; 159:3-11** ("[...] They are not in business anymore, so there's that"). It's "[b]een a while" since Chabrier last received income from Northshore. **Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23** ("[...] after David passed we nosedived. [...]").

348.    TU says that Anthony Deo should have an attorney for the lawsuits involving Anthony Deo.  TU Transcript, pp. 47, lines 4-6.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

349.    Harry Thomasson's "wrongdoing" began with his representation of Anthony Deo in the Josh Aaronson lawsuit in December 2022.  TU Transcript, pp. 133, line 5-pp. 134, line 12.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

350.    Harry Thomasson is not involved in the operation of car dealerships.  TU Transcript, pp. 136, line 18-pp. 137, line 13.

**Response: Admit, but note that Urrutia further testified that Thomasson is "involved in the operation that Anthony Deo and Marc Merckling and Blankenship and Jones are all involved in, which is defrauding car dealerships and people." Urrutia Dep. 136:18-25.**

351.    Harry Thomasson never handled any money involving Superb accounts. TU Transcript, pp. 225, lines 6-12.

**Response: Deny. The testimony Defendants cite is more limited than this alleged fact implies ("Did anyone tell you I was taking money to a bank? A. No"). Urrutia Dep. 225:10-12. Moreover, Thomasson did handle money involving Superb accounts. For example, Thomasson even wrote a letter to Flushing Bank persuading them to give Deo said funds. Thomasson Dep. 144:25-145:4; FLUSHING3835; SMF ¶ 894.**

352.    Harry Thomasson never dealt with any Superb vehicles.  TU Transcript, pp. 225, lines 13-19; also pp. 228, lines 6-11.

**Response: Deny.  SMF ¶¶ 677, 686-688.**

353.    Harry Thomasson never took any money from Superb bank accounts. TU Transcript, pp. 225, lines 20-23.

**Response: Deny.  SMF ¶¶ 677, 686-688.**

354.    TU has no knowledge of whether or not Harry Thomasson knew of Anthony Deo's source(s) of funds. TU Transcript, pp. 227, lines 19-22.

**Response: Admit, to the extent of Urrutia's personal knowledge. Plaintiffs object to the relevance and materiality of these purported facts.**

355.    TU does not know that Harry Thomasson performed legal services for Anthony Deo's business known as Car Buyers.  TU Transcript, pp. 227, lines 23-25.

**Response: Admit, to the extent of Urrutia's personal knowledge. However, note that Thomasson transferred Libertas funds from his escrow account to the Car Buyers account. Deo II Dep. 91:3-17 ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); 141:2-12 ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"). Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. Thomasson Dep. 123:20-25 ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes"). Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6.  Plaintiffs object to the relevance and materiality of these purported facts.**

356.    There are no other accusations that TU thinks Harry Thomasson did wrong to TU or Superb. TU Transcript, pp. 137, line 15-pp. 138, line 6.

**Response: Deny. SMF ¶¶ 677, 686-688. Plaintiffs further object that this is vague.**

357.    TU's allegations about conversations between Harry Thomasson, Marc Merckling, and Dwight Blankenship are just assumptions and without any direct knowledge by TU.  TU Transcript, pp. 136, line 18-pp. 137, line 13.

**Response: Deny. SMF ¶¶ 677, 686-688; Thomasson Dep. 124:18-125:4 ("Q. What is your agreement with Mr. Deo in connection with the legal services you performed for him in general? A. Well, I had through November of 2022 I served as outside counsel when they needed something.  What that meant was if and when they needed me they would contact me and let me know and we would -- I would take care of whatever it was.  I believe there was billing up until November of 2022."); 125:12-15; 125:24-126:2; 131:5-9 ("Q. When did you stop keeping track of the time that you spent on the cases you work on for him? A. For sure when I became salaried."); 131:16-132:11; 151:10-18; 179:10-180:4 ("he said at that time that he would want me to represent of [*sic*] all of the dealerships. That was when we reached a financial agreement. And I said to him, I am gonna need an office in New York […] [a]nd he said, well why don't you just take an office in one of the dealerships down here," and they decided on Superb); 313:16-316:17; 319:9-19 ("Q. […] Back when you were representing them, were you getting a weekly salary for some period of time? A. I still represent Deos in matters outside of this case. Q. So, you're getting a salary now from the Deos for other matters? A. Yes. Q. How much, you are getting a $1,000 a week; is that what you said? A. Yes."); Blankenship Dep. 133:16-134:3 ("Q. Mr. Thomasson had an office at Superb, correct? A. Yes. […]"). Thomasson exchanged emails (at least two communications) with**

Flushing Bank. Patrovic Dep. 46:6-16; 49:3-51:2. Deo otherwise directed Thomasson to get involved in a myriad of matters, none of which Thomasson maintains he ever questioned. Thomasson Dep. 271:7-23 ("Deo told me money was stolen, it's coming back, I want you to get involved. This is the name of the guy you've gotta converse with. I believe that I conversed with Russell Shanks via e-mail only. That's my memory. Q. You don't know why Mr. Deo wanted you to go through an attorney when essentially your instructions were as soon as you got the money to get it to him? A. That's correct. Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all"); 47:21-48:3 ("I have represented Northshore, 189 Sunrise and Superb […] in court cases involving allegations by customers. I have also represented those dealerships or at least Northshore and 189 Sunrise with regard to consumer affairs complaints"); 150:2-19 ("[...] As far as I can recall, I think that we prevailed on just about every single one of the matters that I handled"); 85:3-8; 85:17-86:3; 87:8-88:18; 105:6-25; 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]"); 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835; 160:9-19; 173:2-21 (Thomasson spoke to Deo, Merckling, and police); 177:17-22 (Thomasson advised the Enterprise to leave the dealership); 200:20-201:6 (Thomasson was present for an audit at Northshore in order to comply with the floor plan agreement that Nissan had with Superb);

115

**203:19-204:10** ("once I became involved and the federal court became involved, I cooperated, you may remember, in returning almost all of the vehicles that were at Northshore [...] I didn't know much about vehicles. I didn't know who owned what vehicle. I wasn't asking who owned what vehicle. All I know is if you wanted to pick up the phone and call me and say we've got have some vehicles at Northshore can you help us get them back, I would have done so"); **226:25-227:10; 270:7-10** ("[...] I was asked to have the funds pass through me and I said, sure"); **149:13-25** (Thomasson urged the court, in all capital letters, to make a decision as soon as possible, because the Enterprise was "hurt terribly by what was going on and were losing their businesses and leases at those businesses and it was a problem"); **101:21-102:5** (Thomasson "had a conversation with somebody at Ally").

358.    Dwight Blankenship had permission to move Superb vehicles.  TU Transcript, pp. 33, line 20-pp. 34, line 18.

**Response: Deny. Although Deo gave Blankenship permission for same, moving cars to the lots in Long Island would have required authorization by Urrutia. Urrutia Dep. 33:20-34:18.**

359.    TU does not know as of January 8, 2026 if Dwight Blankenship took cash or checks for himself from Superb Motors.  TU Transcript, pp. 33, lines 10-16.

**Response: Deny. Blankenship took cash from Superb. Urrutia Dep. 30:24-31:12 (Blankenship was involved in making cash deposits and moving inventory. "[...] there was cash stolen, and his name appears on some of the deposit slips of cash that never made it into my bank accounts, so yes, I do believe it"); 33:10-13 (Blankenship stole cash and checks from Superb).**

360. TU claims Michael Laurie "played his role" in harming TU/Superb, but has no other causes of action against Laurie that he knew of by January 8, 2026, the date of his deposition. TU Transcript, pp. 228, line 23-pp. 231, line 13.

**Response: Plaintiffs object to this purported fact to the extent it calls for a legal conclusion. Notwithstanding and subject to the foregoing objection, Plaintiffs deny. SMF ¶¶ 235-239, 262, 273, 323, 377, 381, 550, 595, 646, 647, 656, 678, 682, 683, 693, 694, 731, 732, 758, 763, 764, 766, 770, 814, 816-825, 850-852, 878-882, 940-942, 948.**

361. The deposition transcript contains all of the allegations that TU can make against the Deo Defendants. TU Transcript, pp. 231, line 14-pp. 232, line 4.

**Response: Admit, to the extent of Urrutia's personal knowledge. Plaintiffs object to the relevance and materiality of these purported facts.**

362. There is a text from Anthony Deo to Bruce Novicky (Superb 000122) that indicates Deo was opening Flushing bank accounts for Superb, and that there was also a $500,000.00 loan available to Superb. TU Transcript, pp. 250, line 3-24.

**Response: Admit only the text existed, not that a Superb loan was actually available. Puccio Decl. ¶¶ X; Buccino Dep. 192:24-193:5. Plaintiffs further add that Novicky informed Deo that Novicky and Urrutia were handling the opening of the accounts, and that any account opened with Flushing would have Urrutia as the sole signer in accordance with the Shareholders' Agreement with Superb. Novicky Decl. ¶ X; Urrutia Decl. ¶ X; SMF ¶¶ 625-638.**

363. TU never told Anthony Deo not to open the Flushing accounts (Superb 000122). TU Transcript, pp. 251, lines 4-7.

**Response: Deny. <u>Urrutia Dep. 251:4-7</u> ("Q. Did you tell him he could not open an account for Superb Motors? A. No, I didn't. I didn't tell him he could"); <u>Novicky Decl. ¶ X</u>; <u>Urrutia Decl. ¶ X</u>; <u>SMF</u> ¶¶ 625-638.**

364.    TU knew Anthony Deo was opening the Flushing accounts before they were opened (from Bruce Novicky), or immediately thereafter in April, 2023.  TU Transcript, pp. 251, line 24-pp. 254, line 19.

**Response: Deny.  Urrutia knew documents and the account opening process were discussed, not that he authorized Deo as 100% owner or knew the account actually opened in that manner. <u>Novicky Decl. ¶ X</u>; <u>Urrutia Decl. ¶ X</u>; <u>SMF</u> ¶¶ 625-638.**

365.    TU's knowledge of the Flushing accounts came from TU speaking with Bruce Novicky, TU's Team Auto COO.  TU Transcript, pp. 263, line 21-pp. 264, line 2.

**Response: Deny.  <u>Novicky Decl. ¶ X</u>; <u>Urrutia Decl. ¶ X</u>; <u>SMF</u> ¶¶ 625-638.  Plaintiffs object to the relevance and materiality of these purported facts.**

366.    TU told Flushing bank that AD was his partner, but never clarified the percentages of that partnership to Flushing.  TU Transcript, pp. 269, lines 8-19.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

367.    TU did not perform due diligence on 189 Sunrise or NorthShore before contracting with Anthony Deo, he just "ran Anthony's name."  TU Transcript, pp. 60, lines 8-21.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

368.    Anthony Deo had no authority or ability to take money out of Superb's bank accounts.   TU Transcript, pp. 73, line 25-pp. 74, line 10.

**Response: Admit. <u>Urrutia Dep. 74:7-10</u> ("Q. And did he have full access to take money out of those accounts? A. No, he was not allowed. Very specifically"); <u>SMF</u> ¶¶ 344-350.**

369.    Anthony Deo had authority to run all day-to-day operations of Superb Motors. TU Transcript, pp. 34, lines 13-18.

**Response: Admit.**

370.    TU had a token system on Superb's bank accounts for security.  TU Transcript, pp. 77, lines 14-16.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

371.    There were different levels of security on the token system.  TU Transcript, pp. 78, lines 15-21.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

372.    The different levels of security on the token system for Superb's accounts included "view only" and two different people needed to authorize wires.  *Id.*

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

373.    Anthony Deo's token was for view only.  TU Transcript, pp. 78, lines 22-24.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

374.    Since Anthony Deo's token was for view only, he could not and did not authorize anything on Superb accounts.  TU Transcript, pp. 78, line 25-pp. 79, line 10.

**Response: Deny.  SMF ¶¶ 384-589, 624-658.**

375.    Checks were given to Anthony Deo to sign by Kendra in the accounting department at Superb.  TU Transcript, pp. 79, lines 11-23.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

376.    Kendra was hired by either TU or TU's Team Auto COO, Bruce Novicky.  *Id.*

**Response: Admit, but add that Kendra took direction from Deo.  Kernizant Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

119

377. TU does not know whether his COO, Bruce Novicky, gave Anthony Deo authority to sign checks. TU Transcript, pp. 138, lines 8-12.

**Response: Admit, to the extent of Urrutia's personal knowledge. Otherwise Deny as Deo did not have authority to sign checks. Urrutia Decl. ¶ X; ECF 11 ¶ 127; ECF 11-6; ECF 11-16.**

378. TU caused money to be transferred out of Superb accounts for his own purposes. TU Transcript, pp. 82, lines 14-24.

**Response: Admit, but note that this was authorized. Urrutia Decl. ¶ X; ECF 11 ¶ 127; ECF 11-6; ECF 11-16.**

379. TU lost his three stores in New Jersey (VW), Connecticut (Mitsubishi), and Massachusetts (Nissan) due to mistakes by the floor plan providers to those dealerships, NMAC. TU Transcript, pp. 83, line 15-pp. 85, line 12.

**Response: Deny. Urrutia Decl. ¶ X.**

380. TU's accusations of car theft by Anthony Deo have changed from 104, to 102, to 92, to 89, to 83, to 36, to 43, to the "teens." TU Transcript, pp. 85, line 25-pp. 87, line 18.

**Response: Admit. The cars that were missing initially totaled 102 vehicles. Urrutia Decl. ¶ X; ECF 112 ¶ 5; SMF ¶¶ 598, 614-621.**

381. The accusation of over 100 cars stolen by Anthony Deo made to the Nassau (NY) Police Department on the night of the LockOut was false. TU Transcript, pp. 148, lines 5-11.

**Response: Deny. The accusation was true according to Urrutia's personal knowledge at the time; Urrutia's deposition merely clarifies that he later learned the number of cars stolen to be different. Urrutia Decl. ¶ X; ECF 112 ¶ 5; SMF ¶¶ 598, 614-621.**

382. TU never saved Superb's videotape of the Superb lot and dealership after bringing this lawsuit and then closing Superb. TU Transcript, pp. 87, line 19-pp. 89, line 4.

120

**Response: Admit.   Urrutia Dep. 87:19-89:15. Plaintiffs object to the relevance and materiality of these purported facts.**

383.    TU never saved the video that would have shown what cars were on the Superb lot on the night of the LockOut (August 3, 2023) *id.*, although TU could still view the videotape on the night of the LockOut. TU Transcript, pp. 88, line 25-pp. 89, line 4.

**Response: Admit.   Urrutia Dep. 87:19-89:15. Plaintiffs object to the relevance and materiality of these purported facts.**

384.    TU did not save and does not have video of the Superb lot in the month leading up to the LockOut.  TU Transcript, pp. 224, lines 2-12.

**Response: Admit.   Urrutia Dep. 87:19-89:15. Plaintiffs object to the relevance and materiality of these purported facts.**

385.    TU closed Superb at the end of October or beginning of November, 2023, 2 or more months after commencing this lawsuit, and nearly 3 or more months after the LockOut when the litigation hold would apply.  TU Transcript, pp. 118, lines 8-13.

**Response: Plaintiffs object to the extent this purported statement of fact calls for a legal conclusion.  Plaintiffs otherwise admit that Superb shut down at some point in time after this lawsuit was commenced.  Urrutia Decl. ¶ X; Urrutia Dep. 87:19-89:15.**

386.    TU authorized Team Auto's COO, Bruce Novicky, to supply Anthony Deo with Superb's certificate of incorporation and filing receipt when Anthony Deo was opening an account with Flushing Bank. TU Transcript, pp. 97, line 22-pp. 98, line 24.

**Response: Admit, but note that this was for the purpose of expediting opening an account for Superb with Urrutia as the signer, not for Deo as "100% owner." Urrutia Dep. 99:6-22; Urrutia Decl. ¶ X.**

121

387.    TU knew of the bank account getting opened at Flushing Bank in April of 2023 and supplied the documents for that.  TU Transcript, pp. 141, line 15-pp. 143, line 21.

**Response: Deny.  SMF ¶¶ 625-638.**

388.    TU knew that Anthony Deo was opening a dealership known as Gold Coast Motors of Syosset.  TU Transcript, pp. 100, line 15-pp. 101, line 14.

**Response: Admit, but add that Gold Coast Motors of Syosset was supposed to have been a replacement for Northshore, of which Urrutia was entitled to 25% of pursuant to the Cross-Purchase Agreement, which Deo never delivered.  Urrutia Decl. ¶ X.**

389.    TU admits that he knew Superb vehicles were moved at times to NorthShore.  TU Transcript, pp. 101, line 18-pp. 102, line 12.

**Response: Admit, but denies that Deo was authorized to move over 100 vehicles without accounting for them in the general ledger, only certain vehicles for repairs and similar issues. Urrutia Decl. ¶ X.**

390.    TU was going to be an owner of Gold Coast Motors of Syosset if he set up a floor plan for Gold Coast Motors of Syosset.   TU Transcript, pp. 105, line 10-pp. 106, line 21.

**Response: Deny, as there was no condition of providing a floor plan line of credit in exchange for Urrutia's intended membership interest in Gold Coast Motors of Syosset, which was supposed to be a replacement for Northshore.  Urrutia Decl. ¶ X.**

391.    TU never set up a floor plan for Gold Coast Motors of Syosset.  *Id.*

**Response: Admit, because Deo never delivered a 25% membership interest in Gold Coast Motors of Syosset to Urrutia.  Urrutia Decl. ¶ X.**

392.    TU does not know if Anthony Deo could or did deal directly with floor plan provider(s) at Superb.  TU Transcript, pp. 190, line 16-pp. 191, line 8.

**Response: Admit, but note that Urrutia also said "No, [dealing with floor plan companies directly] was never something that would have been part of his job." Urrutia Dep. 191:5-8. Plaintiffs object to the relevance and materiality of these purported facts.**

393.    TU does not know if Anthony Deo could put cars on or off of floor plans at Superb. *Id.*

**Response: Deny, as the testimony does not support the purported statement of fact.  Deo did place cars on and off floor plans at Superb as a regular part of his duties and as part of his general scheme to defraud the Plaintiffs in this case.  SMF ¶¶ 24, 105, 110-112, 114-115, 118, 121, 124-125, 205, 208, 388-476, 579.**

394.    The emails regarding Anthony Deo's concerns over the accounting department at Superb attached to the VC and AC as Exhibit L were known in real time to TU.  TU Transcript, pp. 112-113.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

395.    TU authorized Bruce Novicky to deal with the issues in the emails attached to the VC and AC as Exhibit L.  *Id.*

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

396.    TU never knew until this lawsuit that there was a texting system on Superb accounts for added security.  TU Transcript, pp. 115, line 8-pp. 116, line 6.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

397.    TU now claims that the original "deal" with Anthony Deo as reflected in the agreements attached to the VC and AC as Exhibits I-1 (cross purchase agreement) and I-2 (shareholders agreement) were never finalized.  TU Transcript, pp. 163, line 19-pp. 164, line 17.

**Response: Admit. <u>618608/2023 NYSCEF 134</u> (On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that: (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place Urrutia back in the position he was in now that the Cross-Purchase Agreement has been voided).**

398.    TU now claims Anthony Deo never became a 49% owner of Superb.   TU Transcript, pp. 166, lines 3-20.

**Response: Admit. <u>618608/2023 NYSCEF 134</u> (On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that: (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place Urrutia back in the position he was in now that the Cross-Purchase Agreement has been voided).**

399.    The harm supposedly caused by Anthony Deo to TU's other (non-Superb) three stores was indirect because TU had cross collateralized those stores, leading to these damages being consequential, if any.  TU Transcript, pp. 170, lines 12-19.

**Response: Admit. <u>Urrutia Decl. ¶ X; ECF 18-1 (filed under seal); ECF 220-13 (listing Urrutia as guarantor).</u>**

400.    TU discussed with Anthony Deo his concerns over Deo's purchase of "gray market" cars only after the cars were purchased and the floor plan provider(s) complained to TU. TU Transcript, pp. 175, line 3-pp. 177, line 5.

**Response: Admit. Urrutia Decl. ¶ X; ECF 38 ¶ 37.**

401.    The value of overhead per month during the months in 2023 when Anthony Deo was in charge of day-to-day operations and making payments at Superb is $200,000.00 per month. *Id.*

**Response: Deny, as this fact is not within the cited testimony. Urrutia Dep. 196:15-17; Urrutia Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

402.    All overhead at Superb was paid by Anthony Deo during his time at Superb.  TU Transcript, pp. 194, line 25-pp. 196, line 20.

**Response: Deny. Urrutia Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

403.    Anthony Deo told TU about his differences with Josh Aaronson and did not hide those differences from TU.  TU Transcript, pp. 35, lines 4-19.

**Response: Deny, as Deo did not inform Urrutia of the exact details of the dispute, nor about the allegations in the lawsuit filed by Aaronson and others against Deo.  Urrutia Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

404.    TU suggested to Anthony Deo that he get his own DMV dealer license(s) since Anthony Deo "was going through all of this" with Josh Aaronson.  *Id.*

**Response: Admit, but note that this does not mean Urrutia authorized Deo to do so by fraudulent means.  Urrutia Dep. 35:20-36:7;  Aaronson Decl. ¶  X;  Deo Dep.  452:7-10;**

**Ruderman Decl. ¶ X; ECF 385-3; Urrutia Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

405.    TU knew from his discussions with Anthony Deo about the trouble between Deo and Josh Aaronson before Sara Deo gave birth in January 2023 (while she was still pregnant). TU Transcript, pp. 161, lines 9-16.

**Response: Deny, as Deo did not inform Urrutia of the exact details of the dispute, nor about the allegations in the lawsuit filed by Aaronson and others against Deo.  Urrutia Decl. ¶ X. Plaintiffs object to the relevance and materiality of these purported facts.**

406.    When Bruce Novicky left TU's employ in July 2024, it hurt TU's then 3 remaining stores (New Jersey, Connecticut, and Massachusetts).  TU Transcript, pp. 109, lines 6-16.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

407.    And when someone else named "James" also quit, those dealerships were also hurt more. TU Transcript, pp. 109, line 25-pp. 110, line 9.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

408.    While TU told Flushing Bank in April of 2023 that Anthony Deo was his partner, TU indicated in his deposition on January 8, 2026 that he meant to tell Flushing that Anthony Deo "was going to be" TU's partner.   TU Transcript, pp. 272, line 11-pp. 273, line 23.

**Response: Admit, but object to relevance and materiality, given that this representation remains merely hypothetical, that this would only have occurred because Urrutia "was just trying to use the person that he knew to see if he could help us move along the opening of the account," and that this agreement was never finalized.  Urrutia Dep. 272:11-273:23; 618608/2023 NYSCEF 134 (On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C.**

**("Justice Murphy") granted Urrutia summary judgment against Deo, finding that: (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place Urrutia back in the position he was in now that the Cross-Purchase Agreement has been voided). Plaintiffs object to the relevance and materiality of these purported facts.**

409.    TU was an "absentee owner" of Superb. TU Transcript, pp. 162, lines 3-9.

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

## FLUSHING BANK

A. As to "The Parties"

1.    Flushing Bank is a chartered bank organized under the laws of the State of New York. Answer to Third Amended Complaint, at ¶ 48, attached to the Declaration of Ariel E. Ronneburger, dated June 1, 2026 (the "Ronneburger Dec."), as Exhibit A.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs are without sufficient knowledge or information to admit or deny this fact. Plaintiffs object to the relevance and materiality of these purported facts.**

2.    Superb Motors, Inc. is a corporation duly organized under the laws of New York State. Third Amended Complaint, at ¶ 28, attached to the Ronneburger Dec, as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs admit.**

127

3.      Northshore Motor Leading LLC is a limited liability corporation organized under the laws of the New York State. Third Amended Complaint, at ¶ 9, attached to the Ronneburger Dec., as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs admit.**

4.      189 Sunrise Hwy Auto LLC is a limited liability corporation organized under the laws of New York State. Third Amended Complaint, at ¶ 10, attached to the Ronneburger Dec., as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs admit.**

5.      Robert Anthony Urrutia ("Urrutia") is an individual residing in Costa Rica. Third Amended Complaint, at ¶ 27, attached to the Ronneburger Dec., as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

6.      Anthony Deo ("Deo") is an individual residing in New York State. Third Amended Complaint, at ¶ 30, attached to the Ronneburger Dec., as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).**

**Notwithstanding and without waiving the foregoing objections, Plaintiffs admit. Plaintiffs object to the relevance and materiality of these purported facts.**

7. Sara Deo is an individual residing in New York State. Third Amended Complaint, at ¶ 30, attached to the Ronneburger Dec., as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding and without waiving the foregoing objections, Plaintiffs admit. Plaintiffs object to the relevance and materiality of these purported facts.**

B. As to "Superb Motors, Inc."

8. On March 24, 2023, at approximately 1:40 PM, Lesley Cusano, a Business Specialist at Flushing Bank sent an email to Michael Morgan at Allied Management and David Weinstein of Flushing Bank with the subject "New Business Account Paperwork Requirements." In that email, it stated that to open an account for a corporation, the following documents were needed: (1) Certificate of Incorporation; (2) Filing Receipt; and (3) EIN Tax ID Number. FLUSHING01378-FLUSHING01379, attached to the Ronneburger Dec., as Exhibit C.

**Response: Admit, but add that Flushing knew or should have known that Deo was not 100% owner of Superb because Urrutia provided documentation to Flushing establishing that he had an ownership interest in Superb and that the certificate of incorporation was sent for the purpose of expediting opening an account for Superb with Urrutia as the signer, not for Deo as "100% owner." See SMF ¶¶ 625-642; Urrutia Dep. 99:6-22; Urrutia Decl. ¶ X.**

9. On March 24, 2023, at approximately 11:48 AM, Michael Morgan forwarded the email referenced in paragraph 8 to Urrutia, and on March 24, 2023 at approximately 7:29 PM,

Urrutia forwarded this email to Bruce Novicky. FLUSHING01378, attached to the Ronneburger Dec., as Exhibit C.

**Response: Admit, but add that Flushing knew or should have known that Deo was not 100% owner of Superb because Urrutia provided documentation to Flushing establishing that he had an ownership interest in Superb.  See SMF ¶¶ 625-642.**

10.    On March 28, 2023 at approximately 10:16 AM (the "March 28, 2023 Novicky Email"), Bruce Novicky sent an email to Lesley Cusano attaching a number of documents and stated "I am helping gather all of the documents you need to switch our Chase accounts over." FLUSHING01378, attached to the Ronneburger Dec., as Exhibit C.

**Response: Admit, but add that Flushing knew or should have known that Deo was not 100% owner of Superb because Urrutia provided documentation to Flushing establishing that he had an ownership interest in Superb.  See SMF ¶¶ 625-642.**

11.    The March 28, 2023 Novicky Email attached documents regarding a number of entities. The documents regarding Superb Motors Inc. which were attached to this email were: (1) a letter dated March 2, 2021 from the IRS to Superb Motors Inc. c/o Robert Clarke providing a federal Employer Identification Number; and (2) an Online Filling Receipt from the New York State Department Division of Corporations and State Records. These documents are silent as to ownership interests in Superb Motors Inc. FLUSHING01395-FLUSHING01397; FLUSHING01398, attached to the Ronneburger Dec., as Exhibit D.

**Response: Admit, but add that Flushing knew or should have known that Deo was not 100% owner of Superb because Urrutia provided documentation to Flushing establishing that he had an ownership interest in Superb, including tax returns.  See SMF ¶¶ 625-642; see also Urrutia Decl. ¶ X.**

130

12.    On March 30, 2023 at approximately 10:43 AM, Urrutia sent David Weinstein an email attaching tax returns for several entities, including the 2021 Tax Returns for Superb Motors Inc. The 2021 Tax Return for Superb Motors listed Roberto Urrutia as 60% owner of Superb Motors Inc. and Robert Clarke as 40% owner. FLUSHING01522-FLUSHING01523; FLUSHING01669-FLUSHING01748, attached to the Ronneburger Dec., as Exhibits E and F, respectively.

**Response: Admit, but add that Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

13.    On March 30, 2023 at approximately 11:27 AM, David Weinstein forwarded the documents sent by Tony Urrutia, including the 2021 Superb Motors Inc. Tax Returns, to Lesley Cusano. FLUSHING02052-FLUSHING02053, FLUSHING02199, FLUSHING02265, attached to the Ronneburger Dec., as Exhibit G.

**Response: Admit.**

14.    Ultimately, Urrutia did not open any accounts at Flushing Bank. Transcript of Deposition of Robert Anthony Urrutia ("Urrutia Tr."), at 245:9-11, attached to the Ronneburger Dec., as Exhibit H.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

15.    Because the accounts Urrutia discussed with David Weinstein were never opened, the documents Urrutia (or those acting on behalf of Urrutia) provided to Flushing Bank were never uploaded to a central repository, Synergy, but rather remained in the email inboxes of the

131

individuals who received the documents. Transcript of Deposition of Michael Buccino ("Buccino Tr."), at 176:19-180:9, attached to the Ronneburger Dec, as Exhibit I.

**Response: Admit, but add that the individuals at Flushing who received the documents in their email inboxes informed the individuals who opened the bank account for Superb with Deo listed as 100% owner that Urrutia was an owner of Superb, and that Weinstein is a corporate officer of Flushing Bank whose knowledge is imputed to Flushing Bank. See SMF ¶¶ 625-642; see also Urrutia Decl. ¶ X.**

16.    Urrutia described Deo as a "partner" to David Weinstein but never discussed ownership interests in Superb Motors Inc. with Mr. Weinstein. Urrutia Tr., at 265:15-266:2, 269:14-19, attached to the Ronneburger Dec., as Exhibit H.

**Response: Deny.  See SMF ¶¶ 625-642; see also Urrutia Decl. ¶ X.  Plaintiffs object to the relevance and materiality of these purported facts.**

17.    Urrutia never had any conversations with Flushing Bank regarding Northshore Motors LLC or 189 Sunrise Hwy Auto LLC. FLUSHING01378; FLUSHING01522-FLUSHING01523, attached to the Ronneburger Dec., as Exhibits C and E, respectively.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

18.    On March 31, 2023, at approximately 11:48 AM, Robert Puccio of Flushing Bank sent Anthony Deo an email with the Subject "Rob – Puccio – Account Opening Information" (the "March 31, 2023 Puccio Email"). FLUSHING03998-FLUSHING03999, marked as Exhibit 36 during the Deo of Anthony Deo. The Anthony Deo Deposition Transcript ("Deo Tr.") is attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb.  SMF ¶¶ 631-633.  Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s**

132

**David and I understand I will only be opening the joint venture you have with your partner."**
**Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio**
**opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership**
**"to match the credit application," and never requested Urrutia's ownership information.**
**Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X. Last, but not least, Flushing**
**learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or**
**about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100%**
**owner approximately five (5) days later. Kataev Decl. ¶ X.**

19.     In the March 31, 2023 Puccio Email, Mr. Puccio asked Deo to "[p]lease provide me with the information requested for Superb." FLUSHING03998-FLUSHING03999, marked as Exhibit 36 during the Deo Deposition, and attached to the Ronneburger Dec., as Exhibit K; Deo Tr. 413:5-414:11, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-**
**633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s**
**David and I understand I will only be opening the joint venture you have with your partner."**
**Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio**
**opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership**
**"to match the credit application," and never requested Urrutia's ownership information.**
**Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X. Last, but not least, Flushing**
**learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or**
**about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100%**
**owner approximately five (5) days later. Kataev Decl. ¶ X.**

133

20.    In the March 31, 2023 Puccio Email, Mr. Puccio requested Ownership information in the form of "Full name, SSN, Title, Percentage of Ownership and ID for Each Owner." FLUSHING03998-FLUSHING03999, marked as Exhibit 36 during the Deo Deposition, and attached to the Ronneburger Dec., as Exhibit K.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X. Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later. Kataev Decl. ¶ X.**

21.    In the March 31, 2023 Puccio Email, Mr. Puccio also requested "Legal Documentation." For LLCs, Mr. Puccio stated "we will need the articles of organization, operating agreement, and filing receipt." For corporations, Mr. Puccio stated that "we will need the certificate of incorporation and filing receipt." FLUSHING03998-FLUSHING03999, marked as Exhibit 36 during the Deo Deposition, and attached to the Ronneburger Dec., as Exhibit K; Deo Tr. 413:5-414:11, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner."**

**Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Moreover, Urrutia sent the certificate of incorporation for the purpose of expediting opening an account for Superb with Urrutia as the signer, not for Deo as "100% owner."  Urrutia Dep. 99:6-22; Urrutia Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

22.      Also on March 31, 2023, Deo sent a text message to Bruce Novicky stating: "Hey. I have my personal banker ready to open the Superb accounts with flushing bank [sic]. He will get me a $500k line also" and "Bro. This guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home." Deo Tr. 303:6-305:21, and Exhibit 25 to the Deo Tr.; SUPERB000122, attached to the Ronneburger Dec., as Exhibit L.

**Response: Admit.**

23.      Deo testified that "in [his] pocket" was "a figure of speech" by which he meant he "knew" Mr. Puccio. Deo Tr. 305:8-306:9. He also testified that he did not bribe any bank official, and that there is "no way" he could know the credit underwriter. Deo Tr. 306:22-307:3; Deo Tr. dated February 13, 2026, at 198:20-199:8, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit that Deo testified as such.  Plaintiffs object to the relevance and materiality of these purported facts.**

24.    On April 3, 2023, at approximately 11:18 AM, Anthony Deo responded to the March 31, 2023 Puccio Email by stating "Good Morning Rob, Can you please tell me what information you received from David Weinstein so that I can push this process along?" FLUSHING03998-FLUSHING03999; marked as Exhibit 36 during the Deo Deposition, and attached to the Ronneburger Dec., as Exhibit K.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb.  SMF ¶¶ 631-633.  Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

25.    In response to Deo's inquiry regarding information that Mr. Puccio had received from Mr. Weinstein, Mr. Puccio responded, "I have not received anything. From my understanding he will be opening accounts for your partners [sic] other ventures, new car dealerships in CT, NY and NJ. As David and I understand I will only be opening the joint venture you have with your partner which will be located in Great Neck." FLUSHING03998-FLUSHING03999; marked as Exhibit 36 during the Deo Deposition, and attached to the Ronneburger Dec., as Exhibit K.

**Response: Admit, and add that Puccio knew Urrutia was an owner of Superb.  SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s**

David and I understand I will only be opening the joint venture you have with your partner." **Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X. Urrutia clarified that Deo was a future partner given Deo's inability to fulfill the terms of his agreement with Urrutia. Urrutia Dep. 272:11-273:2. Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later. Kataev Decl. ¶ X.**

26.     On April 3, 2023 at 11:45 AM, Deo forwarded the March 31, 2023 Puccio email to Bruce Novicky and Urrutia  and stated "Dave Weinstein didn't have any of the information for Superb to send over to Rob." He also asked, "Can you please help me in gathering the information needed so I can get this done ASAP?" and "All I need is the formation documentation." He then copied the portion of the March 31, 2023 Puccio Email which stated: "For corporations, we will need the certificate of incorporation and filing receipt." Deo Tr. dated February 13, 2026, at 195:6-197:5; FLUSHING05918-FLUSHING05919, attached to the Ronneburger Dec. as Exhibits J and M, respectively.

**Response: Deny, as Urrutia sent Weinstein all the information for Superb, and Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 630-633.  Moreover, Urrutia sent the certificate of incorporation for the purpose of expediting opening an account for Superb with Urrutia as the signer, not for Deo as "100% owner." Urrutia Dep. 99:6-22; Urrutia Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning**

137

**disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

27.    By email dated April 3, 2023 at 3:37 PM, Urrutia forwarded the Certificate of Incorporation of Superb Motors Inc., to Deo. Deo Transcript dated February 13, 2026, 197:6-198:6; FLUSHING05953- FLUSHING05956, attached to the Ronneburger Dec. as Exhibits J and N, respectively.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb.  SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Moreover, Urrutia sent the certificate of incorporation for the purpose of expediting opening an account for Superb with Urrutia as the signer, not for Deo as "100% owner." Urrutia Dep. 99:6-22; Urrutia Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

28.    On or about April 4, 2023, Deo submitted a Certification of Beneficial Owner(s) to Flushing Bank in connection with an account application for Superb Motors, Inc., listing himself as 100% owner of Superb Motors, Inc. Deo Tr., 202:25-204:13; FLUSHING04586-FLUSHING04589, attached to the Ronneburger Dec. as Exhibits J and O, respectively.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X. Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later. Kataev Decl. ¶ X.**

29.     Deo also signed a Resolution of Authority in connection with an account application for Superb Motors, Inc. This Resolution of Authority listed Deo as the person "authorized to endorse for collection, deposit, or negotiation, any and all checks, drafts, notes, bills of exchange, certificates of deposit, and orders for the payment or transfer of money between account at Bank and other Banks, either belonging to or coming into the possession of the Entity." Deo Tr. dated February 13, 2026, at 203:10-204:23; FLUSHING 04590, attached to the Ronneburger Dec., as Exhibits J and O, respectively.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information.**

139

**Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

30.     This Resolution of Authority signed by Deo also listed him as the person with the "authority to instruct Bank to close the account, to give instructions by means other than the signing of any item with respect to account transactions such as those initiated via electronic debit, payment, wire transfer, or other withdrawal of funds by computer, electronic or technologic means, and is further authorized to sign and implement for and in the name and on behalf of the Entity." Deo Tr. dated February 13, 2026, at 203:10-204:23; FLUSHING 04590, attached to the Ronneburger Dec., as Exhibits J and O, respectively.

**Response: Admit, but add that Puccio knew Urrutia was an owner of Superb.  SMF ¶¶ 631-633.  Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

140

31.    Deo testified that the representation made to Flushing Bank that he was 100% owner of Superb was "agreed upon by Tony [Urrutia] and [himself]." Deo Tr. 310:8-12; Deo Tr. dated February 13, 2026, at 201:8-13, attached to the Ronneburger Dec. as Exhibit J.

**Response: Admit that Deo testified as such, but deny that there was any such agreement. ECF 11-6; see also Urrutia Decl. ¶ X.**

32.    Deo further testified that Urrutia told him to submit a bank application listing himself as 100% owner of Superb Motors Inc. Deo Tr. 311:14-17; Deo Tr. dated February 13, 2026, 201:8-13, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit that Deo testified as such, but deny that there was any such agreement. ECF 11-6; see also Urrutia Decl. ¶ X.**

33.    Deo testified that he did not recall ever discussing the ownership of Superb with Mr. Puccio. Deo Tr. 316:11-14; Deo Tr. dated February 13, 2026, 200:24-201:7, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit Deo testified as such, but add that Puccio knew Urrutia was an owner of Superb. SMF ¶¶ 631-633. Plaintiffs object to the relevance and materiality of these purported facts. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.**

34.    A checking account was opened for Superb Motors Inc. in or about April 2023. Deo Tr. 318:2-4, attached to the Ronneburger Dec., as Exhibit J.

141

**Response: Admit, but add that Flushing knew or should have known that Deo was not authorized to do so.  SMF ¶¶ 625-642.**

C. As to "Northshore Motor Leasing LLC & 189 Sunrise Hwy Auto LLC

35.    Deo contacted Mr. Puccio of Flushing Bank in August 2022 regarding opening lines of credit for Northshore Motors LLC and 189 Sunrise Highway LLC. Deo Tr. 181:222 [*sic*]-183:17; FLUSHING00015-FLUSHING00016, attached to the Ronneburger Dec., as Exhibits J and P, respectively.

**Response: Admit but note that this loan was obtained through Deo's fraudulent representations of ownership of entities which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

36.    Deo met Mr. Puccio through Michael Laurie. Deo Tr. 184:5-7, attached to the Ronneburger Dec., as Exhibit J.

**Response: Admit but add that Laurie was complicit in Deo's fraud.  Urrutia Decl. ¶ X.**

37.    Mr. Puccio conducted a site visit of Northshore Motors LLC on or about August 18, 2022, and met with Deo. Deo Tr. 184:10-185:11; FLUSHING00008, attached to the Ronneburger Dec., as Exhibits J and Q, respectively.

**Response: Admit but note that the loan was obtained through Deo's fraudulent representations of ownership of entities which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

38.     On August 19, 2022, Mr. Puccio advised Deo that in order to apply for the line of credit, he would need to upload: (1) Two years of federal tax returns with all schedules for the business; (2) Two years of federal tax returns for Deo; and (3) a copy of Deo's driver's license. FLUSHING00008, attached to the Ronneburger Dec. as Exhibit Q.

**Response: Admit but note that this loan was obtained through Deo's fraudulent representations of ownership of entities which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

39.     On August 23, 2022, Deo advised Mr. Puccio he had uploaded the documents needed to apply for lines of credit for Northshore Motors LLC and 189 Sunrise Highway LLC. Deo Tr. 189:12-22; FLUSHING00015-FLUSHING00016, attached to the Ronneburger Dec. as Exhibits J and P, respectively.

**Response: Admit but note that this loan was obtained through Deo's fraudulent representations of ownership of entities which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

40.     Also on August 23, 2022, Mr. Puccio sent an email to Deo that advised, in part, that he needed 2020 and 2021 tax returns for Northshore Motor Leasing LLC, and that he understood Deo's accountant was in the process of filing them. Deo Tr. 191:12-19; FLUSHING00015-FLUSHING00016, attached to the Ronneburger Dec. as Exhibits J and P, respectively.

143

**Response: Admit but note that this loan was obtained through Deo's fraudulent representations of ownership of entities which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

41.     On February 27, 2023, Deo emailed a number of documents to Mr. Puccio (the "February 27, 2023 Deo Email") stated that they were the documents needed to open new accounts for Northshore Motor Leasing and 189 Sunrise Highway Auto LLC. Deo Tr. 225:10-226:15; FLUSHING00105-FLUSHING00136, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit but note that this loan was obtained through Deo's fraudulent representations of ownership of entities which Flushing knew or should have known about, see SMF ¶¶ 270-301, and which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

42.     Attached to the February 27, 2023 Deo Email was a document entitled "Operating Agreement for Northshore Motor Leasing LLC." This document is dated June 15, 2020 and lists Deo as 99% owner of Northshore Motor Leasing LLC and his wife Sara as 1% owner. Deo Tr. 232:21-235:1; FLUSHING00116-FLUSHING00122, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit, but note that this operating agreement is fraudulent which Flushing knew or should have known about. See SMF ¶¶ 32-35, 70, 71, 270-301.**

144

43.     Attached to the February 27, 2023 Email was an IRS Schedule K-1 which listed Deo as 99% owner of 189 Sunrise Hwy Auto LLC. Deo Tr. 236:23-237, Exhibit 13 to Deo Tr.; Deo Tr. dated February 13, 2026, 212:25-213:18; FLUSHING00123, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit, but note that this IRS Schedule K-1 did not confer or establish ownership of Sunrise by the Deos and was fraudulent which Flushing knew or should have known about.  See SMF ¶¶ 74-83, 89-90, 270-301.**

44.     Attached to the February 27, 2023 Email was an IRS Schedule K-1 which listed Sara Rahman as 1% owner of Northshore Motor Leasing LLC. Deo Tr. dated February 13, 2026, at 212:13-18, FLUSHING00124, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit, but note that this IRS Schedule K-1 but note that this IRS Schedule K-1 is did not confer or establish ownership of Northshore by the Deos and was fraudulent which Flushing knew or should have known about. See SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84, 270-301.**

45.     Attached to the February 27, 2023 Email was a document entitled "Operating Agreement for 189 Sunrise Hwy Auto LLC." This document is dated February 15, 2021 and lists Deo as 99% owner of Northshore Motor Leasing LLC and his wife Sara as 1% owner. Deo Tr. 239:6-239:13; FLUSHING000130-FLUSHING000134, attached to the Ronneburger Dec. as Exhibits J and R, respectively.. [*sic*]

**Response: Admit, but note that this operating agreement is fraudulent which Flushing knew or should have known about. See SMF ¶¶ 32-35, 70, 71, 270-301.**

46.     Attached to the February 27, 2023 Email was an IRS Schedule K-1 which listed Deo as 99% owner of 189 Sunrise Hwy Auto LLC. Deo Tr. 225:10-226:15, 236:23-237:7, Deo Tr. February 13, 2026, at 213:19-214:7; FLUSHING00127, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit, but note that this IRS Schedule K-1 did not confer or establish ownership of Sunrise by the Deos, and was fraudulent which Flushing knew or should have known about.  See SMF ¶¶ 74-83, 89-90.**

47.     Attached to the February 27, 2023 Email was an IRS Schedule K-1 which listed Sara Rahman as 1% owner of 189 Sunrise Hwy Auto LLC. Deo Tr. dated February 13, 2026, at 214:5-22; FLUSHING00127, attached to the Ronneburger Dec. as Exhibits J and R, respectively.

**Response: Admit, but note that this IRS Schedule K-1 did not confer or establish ownership of Sunrise by the Deos, and was fraudulent which Flushing knew or should have known about. See SMF ¶¶ 74-83, 89-90, 270-301.**

48.     In connection with his application for loans for Northshore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC, Deo also provided an Affidavit of Thomas Jones CPA, in the matter of *Brian Chabrier v. Anthony Deo* (Supreme Court of Nassau County Index No. 617224/2022). Buccino Tr. 123:12-125:15; FLUSHING04041-FLUSHING04046 (marked as Exhibit 17 during the Buccino Deposition), attached to the Ronneburger Dec., as Exhibits I and S, respectively.

**Response: Admit, but note that this loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–**

146

**22. Plaintiffs further note that Jones is a member of the Enterprise. <u>Deo Dep. 591:12-22;</u> <u>592:14-16</u> (Deo hired CPA Tom Jones to perform accounting services for Northshore, in or around 2020. "the CPA for Northshore prior to 2020 was David's RWC. But then we had those incidents, and I needed to have my own"); <u>593:12-22; Jones Dep. 228:8-13</u> ("He needed monthly accounting services to review the financial statements and the general ledger and the schedules. […] It was to go over the operations"); <u>56:6-10</u> ("Q. You were hired? A. Yes. Q. Anthony told that you he wanted to engage your services? A. Yes"); <u>Chabrier Dep. 46:14-16</u> ("Q. Do you know anyone by the name of Thomas Jones? A. Personally, no, I don't"). Jones also performed accounting services for Sunrise. <u>Jones Dep. 34:18-35:10.</u> In addition, Jones performed accounting services for other Deo entities, including Northshore, Car Buyers NYC Inc., and Gold Coast Cars of Syosset LLC. <u>Jones Dep. 34:18-35:10; Sara Dep.</u> <u>98:19-99:3</u> ([…] Q. And whose CPA is [Jones]? A. I believe, ours. […]"); <u>Jones Dep. 225:22-226:21.</u> Jones performed monthly reconciliations for the company bank accounts, after O'Sullivan provided him with a copy of the statements. <u>O'Sullivan Dep. 235:14-22; 246:11-247:9; Deo Dep. 594:5-595:17; 596:4-8</u> (Deo is "sure" there were monthly meetings with he and Jones to review the financial records of Northshore); <u>Jones Dep. 206:9-22.</u> Deo asked Jones to create a profit and loss statement for Superb, year to date January 1, 2023 through May 31, 2023. <u>Jones Dep. 302:19-24.</u> Information was supplied by Jones to Libertas. <u>Manzueta Dep. 109:9-14.</u> Jones worked together with Deo and Thomasson to provide a document to Puccio at Flushing Bank proving Deo's ownership. <u>Deo II Dep. 217:15-219:16.</u> Jones prepared other documents for Deo as well. <u>Jones Dep. 145:4-9</u> ("Q. Do you recall whether Mr. Deo asked you or your firm to prepare a personal statement for him in connection with any financing? A. I do know that he needed a personal financial statement,**

that we did"). Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. **Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24** ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); **206:15-20** (instead of 45 cars per month, Superb sold 37 or 38).

49.     Thomas Jones CPA served as an accountant to the Deos, as well as Northshore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC. FLUSHING04043-FLUSHING04045, attached to the Ronneburger Dec. as Exhibit S.

**Response: Admit, and note that Jones is a member of the Enterprise. Deo Dep. 591:12-22; 592:14-16 (Deo hired CPA Tom Jones to perform accounting services for Northshore, in or around 2020. "the CPA for Northshore prior to 2020 was David's RWC. But then we had those incidents, and I needed to have my own"); 593:12-22; Jones Dep. 228:8-13 ("He needed monthly accounting services to review the financial statements and the general ledger and the schedules. […] It was to go over the operations"); 56:6-10 ("Q. You were hired? A. Yes. Q. Anthony told that you he wanted to engage your services? A. Yes"); Chabrier Dep. 46:14-16 ("Q. Do you know anyone by the name of Thomas Jones? A. Personally, no, I don't"). Jones also performed accounting services for Sunrise. Jones Dep. 34:18-35:10. In addition, Jones performed accounting services for other Deo entities, including Northshore, Car Buyers NYC Inc., and Gold Coast Cars of Syosset LLC. Jones Dep. 34:18-35:10; Sara Dep. 98:19-99:3 ([…] Q. And whose CPA is [Jones]? A. I believe, ours. […]"); Jones Dep. 225:22-226:21. Jones performed monthly reconciliations for the company bank accounts, after O'Sullivan provided him with a copy of the statements. O'Sullivan Dep. 235:14-22; 246:11-247:9; Deo Dep. 594:5-595:17; 596:4-8 (Deo is "sure"**

**there were monthly meetings with he and Jones to review the financial records of Northshore); <u>Jones Dep. 206:9-22.</u> Deo asked Jones to create a profit and loss statement for Superb, year to date January 1, 2023 through May 31, 2023. <u>Jones Dep. 302:19-24.</u> Information was supplied by Jones to Libertas. <u>Manzueta Dep. 109:9-14.</u> Jones worked together with Deo and Thomasson to provide a document to Puccio at Flushing Bank proving Deo's ownership. <u>Deo II Dep. 217:15-219:16.</u> Jones prepared other documents for Deo as well. <u>Jones Dep. 145:4-9</u> ("Q. Do you recall whether Mr. Deo asked you or your firm to prepare a personal statement for him in connection with any financing? A. I do know that he needed a personal financial statement, that we did"). Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. <u>Aaronson Dep. 171:23-172:15</u>; <u>Urrutia Dep. 204:21-205:24</u> ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); <u>206:15-20</u> (instead of 45 cars per month, Superb sold 37 or 38).**

50.    The Jones Affidavit was provided to Flushing Bank, and states that plaintiff Joshua Aaronson and Wendy Kwun, Controller for the Island Auto Groups, made the request to amend the tax returns of Northshore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC to reflect Anthony Deo as 99% owner of these entitles [*sic*] and Sara Deo as 1% owner of these entities. According to the Jones Affidavit, these ownership interests were also confirmed by the accounting firm of Citrin Cooperman. FLUSHING04043-FLUSHING04045; *see also* Jones000001-000005, attached to the Ronneburger Dec., as Exhibits S and T, respectively.

**Response: Admit, but note that this loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about,**

149

see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22. Plaintiffs further note that Aaronson also testified as to his own lack of authorization, as well as to Deo's failure to fulfill his related obligations. Aaaronson Dep. 97:23-98:13 ("So as an accounting thing, you approved those tax returns listing the Deos as the owners of those two businesses, right? A. Yeah, I mean, I don't have [...] a right to do anything. There were other partners in the Northshore Motors' business, so I don't have a right to even answer for Northshore Motors other than I was representing my mother-in-law. But for 189 Sunrise, I know that there were obligations that had to be refilled -- fulfilled by Anthony that were never done"); see also Aaronson Decl. ¶ X.

51.     The tax returns listing Deo as a 99% owner of Northshore Motors Leasing LLC and 189 Sunrise Hwy Auto LLC, which were submitted to Flushing Bank in order to demonstrate Deo's ownership in these entities, were approved by plaintiff Joshua Aaronson. Transcript of Deposition of Joshua Aaronson, at 97:15-22, attached to the Ronneburger Dec. as Exhibit U.

Response: Admit, but note that Aaronson also testified as to his own lack of authorization, as well as to Deo's failure to fulfill his related obligations. Aaaronson Dep. 97:23-98:13 ("So as an accounting thing, you approved those tax returns listing the Deos as the owners of those two businesses, right? A. Yeah, I mean, I don't have [...] a right to do anything. There were other partners in the Northshore Motors' business, so I don't have a right to even answer for Northshore Motors other than I was representing my mother-in-law. But for 189 Sunrise, I know that there were obligations that had to be refilled -- fulfilled by Anthony that were never done"); see also Aaronson Decl. ¶ X.

150

52.     Deo also signed Certifications of Beneficial Owner(s) identifying himself as having 99% Ownership in both Northshore Motor Leasing LLC and 189 Sunrise Hwy Auto LLC. FLUSHING07186-FLUSHING07187; FLUSHING07244-FLUSHING07245, attached to the Ronneburger Dec., as Exhibits V and W, respectively.

**Response: Admit, but note that this representation was fraudulent. Aaronson Decl. ¶ X. Plaintiffs further note that this loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

53.     Deo signed Resolutions of Authority for both Northshore Motors LLC and 189 Sunrise Hwy Auto LLC, listing himself  [*sic*] as the person "authorized to endorse for collection, deposit, or negotiation, any and all checks, drafts, notes, bills of exchange, certificates of deposit, and orders for the payment or transfer of money between account at Bank and other Banks, either belonging to or coming into the possession of the Entity." Deo Tr. 332:10-334:22, 348:2-349:9; FLUSHING07185; FLUSHING07243, attached to the Ronneburger Dec., as Exhibits J, V, and W, respectively.

**Response: Admit, but note that these representations were fraudulent. Aaronson Decl. ¶ X. Plaintiffs further note that this loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

54.    The Resolutions of Authority signed by Deo on behalf of Northshore Motors Leasing LLC and 189 Sunrise Hwy Auto LLC also listed him as the person "authorized to act on behalf of the [Entities] to borrow money and obtain credit for the [Entities]." Deo Tr. 332:10-334:22, 348:2-349:9; FLUSHING07185; FLUSHING07243, attached to the Ronneburger Dec., as Exhibits J, V, and W, respectively.

**Response: Admit, but note that this representation was fraudulent. Aaronson Decl. ¶ X. Plaintiffs further note that this loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

55.    Flushing Bank opened a checking account for 189 Sunrise Hwy Auto in March 2023. FLUSHING07210-FLUSHING07211, attached to the Ronneburger Dec., as Exhibit X.

**Response: Admit but note that the bank account was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

56.    Flushing Bank opened a checking account for Northshore Motor Leasing LLC in March 2023. FLUSHING07269-FLUSHING07270, attached to the Ronneburger Dec., as Exhibit Y.

**Response: Admit but note that the bank account was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

57.     Northshore Motors Leasing LLC also obtained a loan in the amount of $500,000.00 from Flushing Bank in March 2023. Buccino Tr. 192:24-193:5, attached to the Ronneburger Dec., as Exhibit I.

**Response: Admit but note that the loan was obtained through Deo's fraudulent representations of ownership of entities, which Flushing knew or should have known about, see SMF ¶¶ 270-301, which Justice Murphy found Deo did not own free and clear. Murphy Decision, NYSCEF Doc. No. 134. This constitutes a separate predicate act of bank fraud under 18 U.S.C. § 1344. Laurie facilitated all three Flushing transactions. Laurie Dep. 84:19–22.**

D.  "Urrutia Contacts Flushing Bank in August 2023"

58.     Urrutia contacted Flushing Bank in August 2023 to complain that he was the majority shareholder of Superb Motors Inc. and that the Superb Motors account had been opened without his authority. Buccino Tr. 233:16-21, attached to the Ronneburger Dec., as Exhibit I.

**Response: Admit.**

59.     Upon receiving Urrutia's complaint, Flushing Bank put the accounts on hold. Buccino Tr. 239:21-25, attached to the Ronneburger Dec. as Exhibit I.

**Response: Admit.**

60.     On August 17, 2023, at approximately 10:03 AM, Mr. Puccio sent an email to Deo asking him for a copy of the Superb Motors Operating Agreement. Mr. Puccio also asked Deo to confirm his "ownership % in Superb Motors." Because "there is a claim you are not authorized to establish accounts for the company." Deo Tr. dated February 13, 2026, 207:6-208:21; FLUSHING05917, attached to the Ronneburger Dec., as Exhibits J and Z, respectively.

**Response: Admit.**

61.     On August 17, 2023, at approximately 12:09 PM, Deo responded that "[i]n November 2022 I bought 50% of Superb Motors. Subsequently, I purchased the full 100% in Feb 2023 and our lawyers have been working on a contract that's [sic] states that amount." Deo Tr. dated February 13, 2026, 207:6-208:21; FLUSHING05917, attached to the Ronneburger Dec., as Exhibits J and Z, respectively.

**Response: Admit that Deo responded in this manner, but deny that Deo's statements are true, as Deo never bought a fifty percent (50%) interest in Superb, and never purchased "the full" one hundred percent (100%) interest in Superb, and Flushing knew or should have known that these representations were false and fraudulent. ECF 11-6; see also Urrutia Decl. ¶ X; SMF ¶¶ 631-633. Moreover, Puccio's own email confirms actual knowledge: Puccio wrote to Deo, "[a]s David and I understand I will only be opening the joint venture you have with your partner." Deo Dep. 420:23–25. Despite describing the account as a joint venture with a partner, Puccio opened the account listing Deo as 100% sole owner, directed Deo to certify 100% ownership "to match the credit application," and never requested Urrutia's ownership information. Urrutia Decl. ¶ X; ECF No. 518-13 at 2; Kataev Decl. ¶ X.  Last, but not least, Flushing learned about the IAG Plaintiffs' lawsuit against Deo concerning disputed**

**ownership on or about March 30, 2023 but nonetheless permitted Deo to open an account for Superb as 100% owner approximately five (5) days later.  Kataev Decl. ¶ X.**

E. "Procedural History of this Litigation"

62.    Plaintiffs filed the Initial Complaint on August 17, 2023. In the Initial Complaint, Plaintiffs alleged only claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and state and common law claims against Flushing Bank, as well as a cause of action for violation of the Defend Trade Secrets Act ("DTSA").  ECF No. 1.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections,  Plaintiffs admit.**

63.    On September 26, 2023, Flushing Bank filed a letter requesting a pre-motion conference, setting forth its intent to file a motion to dismiss the Initial Complaint. In that letter, Flushing Bank set forth its position that Appellants had failed to state claims under RICO against Flushing Bank. ECF No. 52.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

64.    Plaintiffs opposed the request for a pre-motion conference, indicating their intention to file an amended complaint. ECF No. 60.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

65.    The First Amended Complaint was filed on October 13, 2023. ECF No. 65.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

66.    In the First Amended Complaint, Plaintiffs removed the DTSA claims against the Bank but added and elaborated on various allegations, including additional claims for a violation

of Uniform Commercial Code § 3-419, conversion, negligence, and a claim for unauthorized payment against Flushing Bank. ECF. No. 65.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

67.    Flushing Bank then filed another pre-motion conference letter on October 26, 2023, notifying the Court of its intention to file a motion to dismiss the First Amended Complaint. ECF No. 73.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

68.    In accordance with the schedule set forth by the Court, Flushing Bank served its motion to dismiss the First Amended Complaint on November 13, 2023. ECF No. 175.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

69.    On December 11, 2023, Plaintiffs served their opposition to Flushing Bank's motion to dismiss and sought to amend the pleadings once again. ECF No. 179.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

70.    On or about February 9, 2024, the Deo Defendants, Jones, Little & Co., CPAs, Libertas Funding LLC, and JPMorgan Chase Bank, N.A., all served their own motions to dismiss the First Amended Complaint. ECF Nos. 164, 168, 176, 177.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

71.    In response, on March 29, 2024, Plaintiffs filed a Second Cross-Motion to Amend seeking leave to amend the Complaint, attaching a Proposed Third Amended Complaint. The parties timely filed their replies to their motions to dismiss. ECF Nos. 181, 182, 183.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

72.    On March 21, 2025, the District Court issued the Motions to Dismiss Order on the various parties' motions to dismiss. The Motions to Dismiss Order granted Flushing Bank's

motion to dismiss plaintiffs' claims against Flushing Bank, except for one cause of action under Uniform Commercial Code Article 4-A-204(1). *See* Motions to Dismiss Order. ECF No. 230.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

73.     The Motions to Dismiss Order also dismissed the matter entirely as to JPMorgan Chase Bank, N.A. and Thomas Jones, CPA, and Jones, Little & Co., CPA's LLP, and made several findings as to the claims made against the Deo Defendants and Libertas. ECF No. 230.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

74.     Ultimately, the Opinion and Order required Plaintiffs to file a Third Amended Complaint in accordance with the Court's holdings set forth therein.  ECF No. 230.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

75.     Appellants filed their Third Amended Complaint on August 8, 2025, and Flushing Bank timely filed its Answer on October 27, 2025. ECF Nos. 316, 330.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

76.     The Third Amended Complaint contains twenty-eight causes of action and includes several amended causes of action under RICO asserted against the Deo Defendants, and one cause of action against Flushing Bank, alleging a violation of Uniform Commercial Code Article 4-A-204(1). ECF No. 316.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

## LIBERTAS

A. As to "The Parties Relevant to Libertas's Motion"

1.     Libertas Funding LLC ("Libertas") is limited liability company organized under the laws of the State of Connecticut and authorized to conduct business in the State of New York. TAC, ¶47 (Doc. 316).

157

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections,  Plaintiffs admit.**

2.      Northshore is a limited liability corporation organized under the laws of the New York State. TAC, at ¶ 9, [*sic*]

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections,  Plaintiffs admit.**

3.      Superb Motors, Inc. is a corporation duly organized under the laws of New York State. TAC, at ¶ 28, attached to the Ronneburger Dec, as Exhibit B.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections,  Plaintiffs admit.**

4.      Anthony Deo ("Deo") is an individual residing in New York State. TAC, at ¶ 30.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2).  Plaintiffs further object to the relevance and materiality of these purported facts.  Notwithstanding the foregoing objections,  Plaintiffs admit.**

5.      Sara Deo is an individual residing in New York State.  TAC, at ¶ 30.

158

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56. See Fed. R. Civ. P. 56(c)(1) and (2). Plaintiffs further object to the relevance and materiality of these purported facts. Notwithstanding the foregoing objections, Plaintiffs admit.**

B. As to "Procedural History and Sole Claim Against Libertas"[2]

6.    On August 17, 2023, Plaintiffs filed their Complaint (ECF No. 1) and on October 13, 2023, filed a First Amended Complaint (ECF No. 65), raising fifty-two (52) causes of action – only three (3) of which were asserted against Libertas - (1) First Cause of Action – RICO under 18 U.S.C. §1962 (as to all Defendants); (2) Second Cause of Action – conspiracy under 18 U.S.C. §1962(d) (as to all Defendants); and (3) Third Cause of Action – permanent injunction, as to Libertas's enforcement of it rights under a certain Agreement of Sale of Future Receipts (the "Sale Agreement").

**Response: Admit, but note that Permanent Injunction was Plaintiffs' Thirteenth Cause of Action in their First Amended Complaint, and that this is not the operative pleading. See ECF Docket Entry 316. Plaintiffs object to the relevance and materiality of these purported facts.**

7.    On April 2, 2024, Libertas filed a motion to dismiss all claims asserted against Libertas in the First Amended Complaint (ECF No. 164).

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

8.    On May 14, 2024, Plaintiffs filed a cross-motion for leave to amend their complaint. (ECF Nos. 178 and 181).

**Response: Admit. Plaintiffs object to the relevance and materiality of these purported facts.**

---

[2] Libertas erroneously labeled this subsection "C".

9.     On March 21, 2025, the Court issued an Order and Opinion that addressed several motions to dismiss and motions to amend.  (ECF No. 230).  As to the claims asserted against Libertas, the Court held that the Complaint failed to establish a RICO claim against Libertas and dismissed the RICO claim.  The Court found that Plaintiffs failed to demonstrate the required elements to obtain a permanent injunction against Libertas and dismissed that claim.  (ECF No. 230).

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

10.     Upon consideration of Plaintiffs' Motion for Reconsideration (ECF Nos. 240-241), by Order dated August 1, 2025 (ECF No. 314), the Court permitted Plaintiffs to file an amendment, consistent with the rulings in the Court's Order and the March 21, 2025 Order.  (*See* ECF No. 314).

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

11.     On August 8, 2025, Plaintiffs filed the Third Amended Complaint ("TAC").  (ECF No. 316).  As a Tenth Cause of Action, Plaintiffs Northshore and Sunrise asserted a new claim for Declaratory Judgment, claiming that the Libertas Sale Agreement was executed by Defendant Anthony Deo ("Deo") without authority, and seeking a determination of Libertas's rights under the Sale Agreement.  (ECF No. 316).

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

12.     On December 29, 2025, Libertas filed an Answer to the TAC.

**Response: Admit.  Plaintiffs object to the relevance and materiality of these purported facts.**

C.     As to "Undisputed Facts"

13.     On or about November 15, 2022, Libertas and Northshore entered into an Agreement for Sale of Future Receipts under the terms of which Libertas agreed to purchase, and

160

Northshore agreed to sell $997,000 of its future receivables for the purchase price of $735,000. TAC, ¶323.  Exhibit 22, Deo Dep. 1/12/25. Deposition transcript of Anthony Deo ("Deo Tr." January 12, 2026, 281:3, 282:15-283:9.

**Response: Deny. Deo was not authorized to enter into the Libertas Agreement on behalf of Northshore. Aaronson Decl. ¶ X; Murphy Decision, NYSCEF Doc. No. 134 (finding as a matter of law that Deo misrepresented 100% ownership of Northshore and Sunrise free and clear of any liens, and that the Libertas agreement itself was the encumbrance that breached those representations).**

14.     The purchase price was paid by Libertas and $735,000 was wired and deposited into an account titled to and maintained by Sunrise.  TAC, ¶¶333, 335; Deo Tr. Dated February 13, 2026, 90:9-16.

**Response: Plaintiffs object on the grounds that this purported fact is not supported by admissible evidence as required by Rule 56.  See Fed. R. Civ. P. 56(c)(1) and (2). Notwithstanding the foregoing objections, Plaintiffs admit, but deny that Deo was uthorized to enter into the Libertas Agreement on behalf of Northshore. Aaronson Decl. ¶ X; Murphy Decision, NYSCEF Doc. No. 134 (finding as a matter of law that Deo misrepresented 100% ownership of Northshore and Sunrise free and clear of any liens, and that the Libertas agreement itself was the encumbrance that breached those representations).**

15.     Northshore's 2021 tax returns reflect that Deo held a 99% limited member interest in Northshore and his wife, Sara Rahman, held a 1% limited member interest.  A redacted copy of the 2021 tax return (LIB001215-LIB01230) is attached as Exhibit C.

**Response: Admit, but note that this IRS Schedule K-1 did not confer or establish ownership of Sunrise by the Deos.  See SMF ¶¶ 29, 32-34, 36-37, 39, 41, 48-50, 74-84.**

16. Sunrise's 2021 tax returns reflect that Deo held a 99% limited member interest in Northshore and his wife, Sara Rahman, held a 1% limited member interest. A redacted copy of the 2021 tax return (LIB001215-LIB01230) is attached as Exhibit D.

**Response: Admit, but note that this IRS Schedule K-1 did not confer or establish ownership of Sunrise by the Deos. See SMF ¶¶ 74-83, 89-90.**

17. Joshua Aaronson, who is alleged to hold a one-third (1/3) percent membership interest in Sunrise (TAC, ¶61), reviewed and approved the tax returns as prepared reflecting Deo's ownership interest and authority to act on behalf of Northshore and Sunrise. Deposition transcript of Joshua Aaronson, 95:4-96:4, 97:15-22, a copy of which portion is attached as Exhibit E.

**Response: Deny. Defendant omits to highlight the critical portion of the record it cites, in which Aaronson states that he stopped filing tax documents (for Northshore) because he "had an understanding with Anthony that he was going to take over the business if he [...] completed some obligations, [...]." In other words, Aaronson approved the tax returns under the expectation that Deo had properly and accurately completed his obligations; which Deo did not. See Aaronson Dep. 49:8-16, 101:11-24; 43:8-44:8, 44:17-45:5, 45:17-24, 51: 14-24. Aaronson Decl. ¶ X.**

18. Deo executed documents which were submitted to Flushing Bank in which Deo was listed as an owner of Northshore and/or Sunrise. *See* Declaration of Declaration of Ariel Ronneburger, ECF 518, and exhibits attached thereto. (ECF 518-18, 518-22, 518-23).

**Response: Admit, but note that the documents Deo submitted were fraudulent, and Flushing knew or should have known this See SMF ¶¶ 270-301 Aaronson Decl. ¶ X.**

19. Based upon documents submitted to Libertas, Libertas entered into the Agreement for Sale of Future Receipts.

**Response: Admit, but note that the documents Deo submitted were fraudulent, and Libertas knew or should have known this, as Libertas' own underwriting requirements provided that the Deos had filed personal tax returns and those returns, if filed, would have established that the Deo did not list the K-1s from Northshore or Sunrise on their personal returns. Although Libertas made the filing of the personal tax returns a condition to the approval of the loan, and specifically arranged for the Deos' accountant to provide them, the accountant did not provide them, yet Libertas approved and funded the loan.  Aaronson Decl. ¶ X; see also Ruderman Decl. ¶ X.**

Dated: Jamaica, New York
      June 30, 2026

**SAGE LEGAL LLC**
  */s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Plaintiffs*
*Superb Motors Inc.,*
*Team Auto Sales LLC, and*
*Robert Anthony Urrutia*

Dated: New York, New York
      June 30, 2026

**CYRULI SHANKS & ZIZMOR LLP**
     /s
Jeffrey Ruderman, Esq.
420 Lexington Avenue, Suite 2320
New York, NY 10170-0002
(212) 661-6800 (office)
(347) 379-4622 (direct dial)
(212) 661-5350 (facsimile)
jruderman@cszlaw.com

*Attorneys for Remaining Plaintiffs*

**VIA ECF**
All counsel of record