UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS, INC., TEAM AUTO SALES LLC., ROBERT ANTHONY URRUTIA, 189 SUNRISE HIGHWAY AUTO LLC., NORTHSHORE MOTOR LEASING, LLC., BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARA DEO, HARRY THOMASSON, DWIGHT BLAKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING, LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC

Defendants.

-------------------------------------------------------------------X

**DEO DEFENDANTS' JOINT RULE 56.1 COUNTERSTATEMENT OF FACTS**

NOW COME Defendants ANTHONY DEO, SARA DEO, HARRY THOMASSON, DWIGHT BLAKENSHIP, MARC MERCKLING, MICHAEL LAURIE, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC (hereinafter, the "Deo Defendants"), pursuant to Local Civil Rule 56.1 of the Eastern District of New York, and submit the within Counterstatement of Material Facts as to which there is no genuine issue to be tried in support of their Motion for Summary Judgment, as follows (headings are for descriptive purposes only):

Note: In addition to other documents, the within 56.1 Statement cites to the Deos' two (2) total verified complaints filed against the within Plaintiffs as 1) the original Verified Complaint in the action styled as *Deo, et al. v. Baron, et al.*, Nassau (NY) Supreme Court Index # 615683/2024, which is hereinafter referred to as "VC"; and 2) the Amended Complaint filed in the same action. The Amended Complaint is also verified, *see* the Affirmation of Anthony Deo filed in the action styled as *Robert Anthony Urrutia v. Anthony Deo*, Nassau (NY) Supreme Court Index # 618608/2023, *at* Docket # 99, filed on April 1, 2025, *at* pp. 2, ¶ 6 (verifying the substance of the Amended Complaint) and ¶ 7 (verifying Exhibits A-Z in the Amended Complaint). The Amended Verified Complaint is hereinafter referred to as "AC".[1] The AC is hereinafter incorporated, by reference.

[1] The Amended Complaint in the Nassau action was originally filed in the EDNY after removal; the EDNY case number is 24-cv-06903, although the case was eventually remanded back to Nassau Supreme Court under the original Nassau (NY) Supreme Court index number, 615683/2024.

PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

Pursuant to Local Civil Rule 56.1(b) and (d), the Deo Defendants respond to the correspondingly numbered paragraphs of Plaintiffs' combined Rule 56.1 Statement [ECF 524]. The following general objections are incorporated into each response below and are not waived by any specific response.

1. Placeholder citations. Of the 1,071 numbered paragraphs in Plaintiffs' Statement, 579 are supported solely by a citation to a declaration "¶ X" — a placeholder paragraph number that was never completed. A citation to a declaration paragraph that does not exist is no citation at all: each such paragraph fails to cite admissible evidence and must be disregarded. L.R. 56.1(d); Fed. R. Civ. P. 56(c); *see Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) (a Rule 56.1 statement is "not itself a vehicle for making factual assertions that are otherwise unsupported in the record"). Defendants assert a standing objection (designated "[A]") to every such paragraph. Standing-objection legend. The bracketed codes that appear throughout these responses designate the following standing objections, each of which is incorporated by reference wherever its code appears and is supported by the authority noted:

> [A] Placeholder citation. The paragraph rests on a "Decl. ¶ X" reference that identifies no declaration paragraph and therefore cites no admissible evidence. L.R. 56.1(d); *Holtz,* 258 F.3d *at* 74.
>
> [B] Unidentified or unproduced exhibit. The paragraph relies on an exhibit (e.g., "Exhibit of agreement," "Exhibit DMV record") that is not identified by document, date, or Bates/ECF number and is not authenticated; it cannot be admitted as cited. Fed. R. Civ. P. 56(c)(1), (c)(4); *Holtz,* 258 F.3d *at* 73.

[C] Pleading or state-court filing offered as evidence. The assertion rests on a complaint or other pleading (e.g., ECF 11, ECF 294) or an uncorroborated state-court filing, which is not competent summary-judgment evidence of the matter asserted. *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996).

[D] Legal conclusion stated as fact. The paragraph asserts a proposition of law or an ultimate legal conclusion (e.g., "masterminded," "Enterprise," "racketeering activity," "aided and abetted," "fraudulent scheme," "stolen") rather than a material fact, and is not a proper subject of a Rule 56.1 statement.

[E] Mischaracterization of cited evidence. The cited testimony or document does not support the assertion as framed, or supports it only in a materially narrower sense; the characterization is the examiner's or counsel's, not the witness's. Fed. R. Civ. P. 56(c)(1)(A).

[F] State of mind not competently established. The paragraph asserts a party's knowledge, awareness, or intent, which the cited material — frequently a declaration of Plaintiffs' counsel — is not competent to establish. Fed. R. Civ. P. 56(c)(4).

2. Admissions are limited. Where Defendants admit that a document exists or that a witness gave certain testimony, that admission is limited to the existence or content of the cited material and is not a concession of the materiality of the fact, of the truth of any matter asserted in the document, or of Plaintiffs' characterization of it. Legal conclusions stated as facts are denied as such.

3. Pleadings and state-court filings are not evidence. A number of paragraphs are supported only by citation to a pleading (e.g., ECF 11 or ECF 294) or to an uncorroborated state-court filing. Allegations in a pleading are not admissible evidence and cannot create or defeat a

genuine dispute at summary judgment. *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996). Defendants assert standing objection [C] to every such paragraph.

4. Legal conclusions and RICO labels are not material facts. Paragraphs asserting that Defendants "masterminded" a scheme, operated an "Enterprise," engaged in "racketeering activity," "aided and abetted," perpetrated a "fraudulent scheme," or "stole" property state the legal elements of Plaintiffs' claims, not facts. Such formulations are not properly the subject of a Rule 56.1 statement and are denied as legal conclusions. Defendants assert standing objection [D] to every such paragraph.

5. "Upon information and belief." Paragraphs premised on speculation or pleaded "upon information and belief" are not made on personal knowledge and are inadmissible at summary judgment. Fed. R. Civ. P. 56(c)(4).

6. Advice of counsel. To the extent Plaintiffs' paragraphs concerning the DMV and Westlake disclosures imply that Deo acted with intent to deceive, that implication is controverted by Deo's testimony that his criminal-defense attorney advised him that, because his case had been sealed, he was not required to disclose the conviction. Good-faith reliance on counsel's advice negates the intent to deceive that every fraud theory requires. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc).

7. Crime-fraud challenge. The communications between Joshua Aaronson, Wendy Kwun, and Cyruli Shanks & Zizmor LLP from October 1, 2022 onward — including those underlying the placeholder "Ruderman Decl. ¶ X" citations — are subject to the crime-fraud exception to the attorney-client privilege. The predicate showing is: (a) Kwun transferred $735,000 from 189 Sunrise's account without authorization or direction (Kwun Dep. 21:1–22:25); (b) Chase confirmed the transfer was logged under David Baron's deceased credentials

(Kwun Dep. 7); (c) Ruderman of Cyruli Shanks & Zizmor personally prepared and notarized O'Sullivan's December 6, 2022 state-court affidavit (O'Sullivan Dep. 15, 25), which O'Sullivan did not prepare; (d) Kwun reviewed the deposit records forming the affidavit's basis (O'Sullivan Dep. 15); (e) the state court found the merits did not favor the IAG Plaintiffs (Justice Gianelli decision and order, June 2023); and (f) the federal RICO complaint was filed approximately two months after that defeat.

8. These answering Defendants object to the length of Plaintiffs' Rule 56.1 statement as violating this Court's rule for a concise statement. 1071 paragraphs are clearly designed to give the appearance of impropriety given the paucity of evidence of wrongdoing by these answering Defendants.

9. Deposition-transcript conventions. "Deo Dep." refers to the continuously paginated transcript of Anthony Deo's examination on January 12, 2026 and February 12, 2026 (Little Reporting Company), filed as Exhibit J to the Ronneburger Declaration [ECF 518-10]. "Deo II Dep." refers to the separately paginated Veritext transcript of February 13, 2026. Defendants note that Plaintiffs' Statement repeatedly mislabels the latter (e.g., as "Dec. 13, 2026") and at times bundles pin-cites from two different transcripts under a single tag; Defendants cite each volume by its correct date below.

10. Reservation. Defendants reserve the right to supplement these responses and to submit a separate statement of additional material facts and affidavits/declarations that preclude summary judgment.

RESPONSES TO PLAINTIFFS' STATEMENT

I. IAG PLAINTIFFS (¶¶ 1–305)

¶ 1. In 2016, Deo pled guilty and was convicted in the United States District Court for the Southern District of New York of two counts of federal wire fraud in connection with a mortgage. ECF 385-2.

RESPONSE TO ¶1. Admitted in part; irrelevant. Admitted solely that the cited judgment (ECF 385-2) reflects that Anthony Deo was convicted in 2016 in the United States District Court for the Southern District of New York of two counts of wire fraud in connection with a mortgage. The conviction is immaterial to the ownership of NorthShore Motor Leasing, LLC and 189 Sunrise Hwy Auto LLC, which is the subject of Plaintiffs' ownership allegations, and is admitted only as reflected in the cited record.

¶ 2. In 2014, Deo opened a used car dealership under the name of UEA Premier Motors Corp. ("UEA"). Ruderman Decl. ¶ X; Deo Dep. 121:7-15.

RESPONSE TO ¶2. OBJECTION [A]. Admitted in part. Without waiving the standing objection to the blank "Ruderman Decl. ¶ X" citation, Defendants admit that the Deos owned and operated UEA Premier Motors Corp., and that Deo testified the entity reflected in Plaintiffs' Exhibit Deo 5 had an initial Department of State filing date of September 12, 2014. (Deo Dep. 121:7-15 (Jan. 12, 2026).)

¶ 3. Operating a used car dealership requires a license from the New York State Department of Motor Vehicles ("DMV"). Aaronson Decl. ¶ X; Deo Dep. 452:7-10.

RESPONSE TO ¶3. OBJECTION [A]. Admitted; irrelevant. Without waiving the standing objection to the blank "Aaronson Decl. ¶ X" citation, Defendants admit that operating a used car dealership in New York requires a license from the Department of Motor Vehicles,

consistent with Deo's testimony. (Deo Dep. 452:7-13 (Feb. 12, 2026).) The general proposition is irrelevant to ownership.

¶ 4. The application for a license from the DMV requires the applicant to disclose whether they have ever been convicted or pled guilty to a felony. Ruderman Decl. ¶ X.

RESPONSE TO ¶4. OBJECTION [A]. Disputed as to the sole citation. The DMV felony disclosure requirement is a matter of public record established by the DMV application form itself — ECF 385-3, cited in ¶ 5, establishes this requirement directly. Ruderman Decl. ¶ X is a placeholder [A] and cannot establish a legal requirement. Deo's attorney Anthony Colleluori advised him that because his case was sealed, he never had to check the disclosure box: "My attorney at the time said my case was sealed and I never have to check that box." Deo Dep. p.87 (ECF 518-10, Jan. 12, 2026). Good faith reliance on counsel's advice negates fraudulent intent. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003).

¶ 5. The DMV application required Deo to disclose that he had previously pleaded guilty and had been convicted of a felony in the Southern District of New York. ECF 385-3.

RESPONSE TO ¶5. Disputed in part. Admitted that the DMV application form required disclosure of prior felony convictions. ECF 385-3. Disputed as to any implication that Deo knowingly or fraudulently failed to disclose. Deo testified that his criminal defense attorney, Anthony Colleluori, advised him that because his case was sealed he was not required to check the felony-disclosure box: "My attorney at the time said my case was sealed and I never have to check that box." Deo Dep. 86:2-4 (ECF 518-10). Good-faith reliance on counsel's advice negates the intent to deceive that any fraud theory requires. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003). ECF 385-3 establishes only that the requirement existed; it does not establish Deo's intent to violate it.

¶ 6. Providing false information on the application to the DMV "may be punishable as a criminal offense." ECF 385-3.

RESPONSE TO ¶6. Admitted as a legal proposition that providing false information on a DMV application may be a criminal offense. ECF 385-3. DISPUTED as to any implication that Deo acted with criminal intent. As established in response to ¶ 5, Deo testified that his criminal defense attorney specifically advised him the case was sealed and he did not have to disclose his conviction on government applications. Deo Dep. pp.87, 398, 400 (ECF 518-10). Good faith reliance on an attorney's advice negates the knowing-or-willful intent element required for any criminal or civil fraud predicate based on non-disclosure. The legal proposition in ¶ 6 is accurate; its application to Deo's specific conduct is disputed on the basis of the advice-of-counsel defense established in his own testimony.

¶ 7. Prior to 2023, Deo, although owning and operating used car dealerships, does not recall submitting an application to the DMV in his own name. Deo Dep. 452:7-456:7.

RESPONSE TO ¶7. Disputed. Defendants admit only that Deo owned and operated used car dealerships prior to 2023. The cited testimony does not support the assertion that Deo "does not recall submitting an application to the DMV in his own name" before 2023. When asked whether the 2023 Gold Coast applications were the first DMV applications he had ever submitted in his own name, Deo testified that this was "a false statement" and "not correct," and that he "believe[d] there was one prior." (Deo Dep. 453:7-16 (Feb. 12, 2026).) Deo further testified that a dealership he and his wife owned necessarily held a DMV license and that a license application "would have been submitted." (Id. 452:7-13.) Defendants admit only that Deo could not recall the particulars of certain pre-2023 applications. (Id. 456:4-7.)

¶ 8. The DMV license applicant can be held personally responsible for actions in violation of DMV regulations. ECF 385-3.

RESPONSE TO ¶8. OBJECTION [D]. Disregard / Disputed. The paragraph asserts an ultimate legal proposition (personal responsibility for regulatory violations) as though it were a material fact. The cited form is the best evidence of its own contents; the assertion is a legal conclusion, not a fact, and is immaterial to ownership.

¶ 9. That license for UEA was subsequently revoked by the DMV for various reasons, including fraudulent activities with consumers. Ruderman Decl. ¶ X.; Deo Dep. 459:19-460:5;, Exhibit of DMV license termination.

RESPONSE TO ¶9. OBJECTION [A] [B] [E]. Disputed. Defendants admit only that Deo testified UEA's license was "suspended or revoked" and that "we had to give it back." (Deo Dep. 459:19-23 (Feb. 12, 2026).) The cited testimony does not support the assertion that the license was revoked "for various reasons, including fraudulent activities with consumers." Asked the reason, Deo testified that he did not recall the specifics ("Specifics, no") and that the reasons generally were "a hard thing to say." (Id. 459:24-460:5.) The phrase "various reasons" derives from examining counsel's own question, not from any testimony (id. 460:6-9), and the cited testimony contains no reference to "fraudulent activities with consumers." The "Ruderman Decl. ¶ X" citation identifies no paragraph and, as counsel's declaration, is not competent evidence of the reason for any revocation; the "Exhibit of DMV license termination" is unidentified and not locatable in the record.

¶ 10. Part of Deo's criminal judgment was that he was prohibited from obtaining future credit lines without the approval of the probation department for a period of five (5) years. ECF 385-2.

RESPONSE TO ¶10. Admitted in part; irrelevant. Admitted solely that the cited judgment (ECF 385-2) is the best evidence of its own terms and speaks for itself. To the extent the paragraph implies any violation of those terms, the implication is disputed; Deo testified that he understood the cited condition to refer to personal credit. (Deo Dep. 459:3-11 (Feb. 12, 2026).) The terms of the criminal judgment are irrelevant to the ownership of NorthShore and 189 Sunrise.

¶ 11. In October 2016 Deo arranged for UEA to enter into an agreement with Westlake Financial Services so that UEA could provide financing to its customers. Ruderman Decl. ¶ X. Exhibit of agreement.

RESPONSE TO ¶11. OBJECTION [A] [B]. Admitted in part. Without waiving the standing objections, Defendants admit only that Deo testified to a dealer agreement between Westlake Financial Services and UEA Premier Motors Corp. dated October 17, 2016, marked as Plaintiffs' Exhibit Deo 53. (Deo II Dep. 122:12-16, 124:10 (Feb. 13, 2026).) Defendants dispute the assertion that Deo "arranged for" the agreement to the extent it implies he personally orchestrated its execution; the cited support is a blank "Ruderman Decl. ¶ X" and an unidentified "Exhibit of agreement."

¶ 12. Deo arranged for Luis Beria ("Beria") to sign the Westlake agreement with UEA as UEA's owner. Deo Dep, Dec. 13, 2026 ("Deo II Dep."), 123:6-125:24; Exhibit of agreement.

RESPONSE TO ¶12. OBJECTION [B]. Disputed in part. The exhibit is unidentified, and the "Deo II Dep." citation is mis-dated ("Dec. 13, 2026"); the Veritext volume is dated February 13, 2026. Defendants admit that the Westlake dealer agreement was signed above the name "Louis Beria," with Beria's title listed as "owner," that the agreement is dated October 17, 2016, and that Deo was aware it was signed by Beria as owner. (Deo II Dep. 124:4-16 (Feb. 13,

2026).) Defendants admit that Beria was not in fact the owner of UEA and that the agreement was submitted in connection with obtaining bank financing. (Id. 124:17-24.) Defendants dispute that Deo "arranged for" Beria to sign to the extent that phrase asserts that Deo personally directed Beria's execution of the document; asked how it came about and why he did not sign himself, Deo testified that he did not recall the circumstances. (Id. 124:22-125:9.)

¶ 13. Beria was not an owner of UEA. Deo II Dep. 123:6-125:24.

RESPONSE TO ¶13. Admitted. Deo testified that Beria was not, and never was, the owner of UEA. (Deo II Dep. 124:17-21 (Feb. 13, 2026).)

¶ 14. The Westlake Agreement with UEA provided false information. Deo II. Dep. 123:6-125:24.

RESPONSE TO ¶14. Admitted in part. Admitted that the cited testimony establishes that the Westlake agreement was false in that it identified Louis Beria as the owner of UEA Premier Motors Corp. when Beria was not in fact the owner. (Deo II Dep. 124:17-21, 125:15-21 (Feb. 13, 2026).) To the extent the paragraph asserts that the agreement "provided false information" in any other respect, that assertion is unsupported by the cited testimony, which addresses only the representation regarding Beria's ownership.

¶ 15. Deo was aware that the Westlake Agreement with UEA provided false information. Ruderman Decl. ¶ X. Deo II. Dep. 123:6-125:24.

RESPONSE TO ¶15. OBJECTION [A] [F]. Admitted in part. Admitted to the extent that Deo testified he was aware the Westlake dealer agreement identified Beria as UEA's owner when Beria was not (Deo II Dep. 124:14-21 (Feb. 13, 2026)), and that, when asked whether he knew the information was false when it was submitted, he answered "I guess yes" (id. 125:22-24). To the extent the paragraph relies on the "Ruderman Decl. ¶ X" to establish Deo's

awareness or state of mind, that declaration of Plaintiffs' counsel is not competent evidence of Deo's knowledge; the awareness, if any, is established by Deo's own testimony.

¶ 16. In 2013, Deo and Sara opened a used car dealership under the name Universal Exotic Autos Inc. ("Universal Exotic"). Ruderman Decl. ¶ X. Deo Dep. 112:9-19, 114:11-117:15.

RESPONSE TO ¶16. OBJECTION [A]. Admitted in part. Defendants admit that Deo testified he and his wife opened a used car dealership under the name Universal Exotic Autos Inc. (Deo Dep. Tr. 112:12–19), and that the New York Department of State filing date for Universal Exotic Autos Inc. was June 4, 2013 (id. 115:23–116:2, 117:5–10). Defendants dispute the paragraph to the extent it asserts that the dealership began operating in 2013. Deo testified that June 4, 2013 was when "we filed the corporation," that he could not say how long after incorporation the dealership began operating, and that he could not be certain of the exact dates the dealership opened. (Id. 114:23–115:2, 117:9–15.)

¶ 17. The DMV records note that Sara was the owner of Universal Exotic. Ruderman Decl. ¶ X. Exhibit DMV record.

RESPONSE TO ¶17. OBJECTION [A] [B]. Disregard; cannot be admitted as cited. The paragraph rests solely on the blank "Ruderman Decl. ¶ X" placeholder and an "Exhibit DMV record" not identified by number, date, or ECF/Bates location; neither is a citation to admissible evidence, and the paragraph is disregarded under Local Civil Rule 56.1(d). Without waiver of that objection, and to controvert the assertion on the record, Defendants admit only that Deo testified that he and his wife together opened the dealership known as Universal Exotic Autos Inc. (Deo Dep. Tr. 112:14–19 (Jan. 12, 2026).) The further assertion that "DMV records note that Sara was the owner" of Universal Exotic is not established by any admissible evidence

cited and is unsupported by the deposition testimony, which reflects only that Deo and his wife opened the entity; it therefore cannot be deemed admitted.

¶ 18. That license was subsequently revoked in October 2017 by the DMV for various reasons, including fraudulent activities with consumers. Ruderman Decl. ¶ X. Deo Dep. 504:5-505:4., Exhibit DMV record.

RESPONSE TO ¶18. OBJECTION [A] [B] [E]. Disputed. The cited testimony and exhibit do not support the assertion that the license was "revoked in October 2017." The DMV record (Deo Ex. 40) and Deo's testimony reflect that the October 30, 2017 entry was a suspension, not a revocation, bearing a stated "Go date" of May 1, 2018. (Deo Dep. Tr. 504:13–25, 505:21–506:8 (Feb. 12, 2026).) Examining counsel expressly acknowledged that the October 30, 2017 entry was a suspension and "not [a] revocation." (Id. 506:16, 507:14–16.) Deo further testified, consistent with the document, that the license remained in effect into 2018 and was subject to additional suspensions and reinstatements rather than a revocation. (Id. 505:15–16, 506:12–15, 507:5–8, 507:22–23.) The cited testimony and exhibit contain no reference to a revocation "for various reasons, including fraudulent activities with consumers," and Defendants dispute that characterization as unsupported by the cited evidence. Defendants further dispute this paragraph to the extent it relies on the Ruderman Declaration, which identifies no paragraph ("¶ X") and, as the declaration of plaintiffs' counsel, is not competent evidence of the reasons for any DMV action. See Fed. R. Civ. P. 56(c)(4).

¶ 19. After the licenses for all of Deo's used car dealerships were revoked, Deo still had the lease and location at 180 Michael Drive, Syosset, New York. ECF 30-2.

RESPONSE TO ¶19. Disputed in part. Defendants admit that the dealership premises at 180 Michael Drive, Syosset, New York were leased and that dealership operations were

conducted at that location. (See Deo Dep. Tr. 126:9–19 (Jan. 12, 2026).) Defendants dispute the paragraph's premise that the licenses for "all of Deo's used car dealerships were revoked." That premise is disputed for the reasons set forth in Defendants' responses to Paragraphs 9 and 18 above — including that the DMV record reflects suspensions rather than a revocation as to Universal Exotic Autos — and is not established by the cited exhibit (ECF 30-2), a documentary exhibit that does not establish that any license was revoked or the timing of any revocation. To the extent this paragraph asserts that "Deo still had the lease" in his personal capacity, Deo testified that the 180 Michael Drive lease was assigned to Northshore. (Id. 126:13–19.)

¶ 20. Deo then formed a new company called Northshore Motor Leasing LLC (“Northshore”) that was organized in New York State in November 2017. Ruderman Decl. ¶ X. Deo Dep. 56:23-57:18.

RESPONSE TO ¶20. OBJECTION [A]. Admitted in part; cannot be admitted as cited. The reference to “Ruderman Decl. ¶ X” identifies no declaration paragraph and is disregarded under Local Civil Rule 56.1(d). Defendants admit that Northshore Motor Leasing LLC was formed and that Deo testified he is an owner of Northshore. (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026).) The cited testimony (56:23–57:18) does not establish that the entity was “organized in New York State in November 2017”; that organizational date, if material, is established by the entity’s public Department of State filing and not by the cited testimony. Consistent with their response to Paragraph 29 below, Defendants dispute any implication that Baron, Khan, or Chabrier were the lawful members of Northshore.

¶ 21. In order for Deo to operate Northshore, it needed a license from the DMV. Ruderman Decl. ¶ X. Deo Dep. 129:14-130:3., Aaronson Decl. ¶, X

RESPONSE TO ¶21. OBJECTION [A]. Admitted in part. Defendants admit that, in order to operate a used car dealership in New York, a DMV license is required. (See Deo Dep. Tr. 452:7–10 (Feb. 12, 2026).) To the extent this paragraph implies that Deo personally applied for or held the DMV license for Northshore, Defendants dispute that implication. The cited testimony establishes that Deo did not apply for the Northshore DMV license and that the application was made by Brian Chabrier. (Deo Dep. Tr. 129:14–17, 129:24–130:3 (Jan. 12, 2026).) Deo further rejected the suggestion that he failed to apply because he believed an application would be denied. (Id. 129:18–23.) To the extent this paragraph relies on the Ruderman or Aaronson Declarations, those declarations identify no paragraph ("¶ X") and are competent only as to matters within the declarant's personal knowledge. See Fed. R. Civ. P. 56(c)(4).

¶ 22. Automobile dealers typically operate by obtaining floor plan credit line financing from a lender to purchase vehicle inventory (a “Floor Plan”). Ruderman Decl. ¶ X; ECF 204 ¶¶ 7-9.; Aaronson Decl. ¶ X.

RESPONSE TO ¶22. OBJECTION [A]. Admitted that this paragraph states a general definition of floor plan ("Floor Plan") financing in the automobile dealership industry. Defendants note that the statement is a general industry description, is not specific to any party, entity, or transaction at issue in this action, and that Defendants' admission is limited accordingly.

¶ 23. The Floor Plan for any particular inventoried vehicle is satisfied when the vehicle is sold. Ruderman Decl. ¶ X; ECF 204 ¶ 10., Aaronson Decl. ¶ X.

RESPONSE TO ¶23. OBJECTION [A]. Admitted that this paragraph states a general description of floor plan financing mechanics in the automobile dealership industry. Defendants

note that the statement is a general industry description, is not specific to any party, entity, or transaction at issue in this action, and that Defendants' admission is limited accordingly.

¶ 24. Deo needed a Floor Plan for Northshore to purchase used car inventory. Ruderman Decl. ¶ X; ECF 204 ¶ 12; Deo Dep. 97:9-18; 203:10-22, 456:8-23; 494:16-496:4.

RESPONSE TO ¶24. OBJECTION [A]. Admitted. Defendants admit that Northshore utilized floor plan financing — including lines through Westlake and NextGear — to purchase used car inventory. (Deo Dep. Tr. 97:16–22 (Jan. 12, 2026); id. 203:13–15, 204:2–6; id. 495:8–23 (Feb. 12, 2026).) To the extent the paragraph attributes the floor plan to Deo in his personal capacity, the floor plan financing was obtained for and in the name of the entity, Northshore Motor Leasing LLC.

¶ 25. Around that time Deo was introduced to David Baron ("Baron") through a mutual acquaintance, plaintiff Khan. Chabrier Decl. ¶ X; Deo Dep. 130:24-132:19, 494:16-496:4.

RESPONSE TO ¶25. OBJECTION [A]. Admitted in part. Defendants admit that Deo testified Asad Khan introduced Deo to David Baron. (Deo Dep. Tr. 130:25–131:2 (Jan. 12, 2026); id. 496:23–25 (Feb. 12, 2026).) Defendants dispute the characterization of Khan as a "mutual acquaintance"; Deo testified that he did not previously know Asad Khan and that he was himself introduced to Khan by a bank representative (Collins). (Id. 131:3–4 (Jan. 12, 2026); id. 494:19–23 (Feb. 12, 2026).)

¶ 26. Baron, along with his brother Ron Baron, and others, was the owner of new and used car dealerships (the "Baron Group") which had an existing Floor Plan with Ally Bank ("Ally"). Chabrier Decl. ¶ X.; Deo Dep. 511:6-512:5.

RESPONSE TO ¶26. OBJECTION [A]. Disputed in part. Defendants admit that Deo testified to his understanding that a group — which he identified as either Island Auto Group or

Baron Auto Group — had an existing floor plan with the lender that was "carved out" for Northshore. (Deo Dep. Tr. 511:23–512:5 (Feb. 12, 2026).) Defendants dispute the paragraph to the extent it asserts the ownership composition of the "Baron Group" (i.e., that David Baron, Ron Baron, "and others" were the owners); that assertion concerns third parties, is not established by the cited Deo testimony, and Deo testified that he was not privy to, and did not know, the terms of the arrangement between David Baron and the lender. (Id. 512:8–9, 512:17–18, 514:21–24.) To the extent this paragraph relies on the Chabrier Declaration to establish the ownership of the Baron Group, the assertion is supported, if at all, only by matters within the declarant's personal knowledge. See Fed. R. Civ. P. 56(c)(4).

¶ 27. Chabrier was an employee of Baron Nissan which dealership was part of the Baron Group. Chabrier Decl. ¶ X; Chabrier Dep. 14:3-15.

RESPONSE TO ¶27. OBJECTION [A]. Admitted. Chabrier was an employee of Baron Nissan, which was part of the Baron Group. Chabrier Dep. 14:3-15 (ECF 406-2). Corroborated by Iris Baron — David Baron's widow — who identified Chabrier as "the general manager of Baron Nissan." Iris Baron Dep. p.58 (ECF 521-31). Placeholder ([A]) as to Chabrier Decl. The Chabrier Dep. citation is admitted. Note: Iris Baron's description of Chabrier as "general manager of Baron Nissan" — not as a partner or co-investor in Northshore — is the most natural characterization of his role in the Baron family's world.

¶ 28. Deo and Baron came to an arrangement in 2018 concerning opening and operating Northshore. Chabrier Decl. ¶ X. Deo Dep. 494:16-502:13, 508:4-514:3.

RESPONSE TO ¶28. OBJECTION [A]. Admitted in part. Defendants admit that Deo and David Baron reached an arrangement in or about 2018 concerning the financing and operation of Northshore — namely, that Baron would provide access to better floor plan

financing and franchise-affiliated banks through a "cross guarantee" / franchise affiliation in exchange for a monthly payment. (Deo Dep. Tr. 499:8–17, 508:13–15, 509:2–8 (Feb. 12, 2026).) Defendants dispute the paragraph to the extent it asserts that the arrangement concerned the "opening" of Northshore; Northshore was formed in 2017, and Deo testified that he met David Baron only after Northshore had already been opened. (Deo Dep. Tr. 100:2–4 (Jan. 12, 2026); id. 508:9–12 (Feb. 12, 2026).)

¶ 29. Baron, Khan and Chabrier became the owners of Northshore in 2018. Chabrier Decl. ¶ X. Chabrier Dep. 75:14-76:3, Khan Dep. 11:10-14, 18:3-6; 30:23-31:9; 617224/2022 NYSCEF 4; Exhibit Deo Affidavit.

RESPONSE TO ¶29. OBJECTION [A]. Disputed. Whether Baron, Khan, and Chabrier "became the owners of Northshore in 2018" is a genuinely disputed issue of material fact. Deo testified that the original members of Northshore Motor Leasing LLC were Deo and his wife (Deo Dep. Tr. 157:7–9 (Jan. 12, 2026)); that he has been the owner of Northshore since its inception (id. 192:9–12); that the February 14, 2018 operating agreement purporting to list other individuals as owners was "created without [his] knowledge and consent" (id. 154:16–155:1); and that David Baron never rightfully held ownership of Northshore and that any such ownership was wrongfully taken (id. 160:11–17). To the extent this paragraph relies on the Chabrier and Khan declarations and depositions, those reflect the contested positions of adverse witnesses and do not establish ownership as undisputed in light of Deo's contrary sworn testimony. The dispute is corroborated by neutral and party sources: the controller testified that maintaining a capital account denotes ownership and that Deo maintained one (O’Sullivan Dep. 161:20-23 (Mar. 30, 2026)); plaintiff Aaronson testified that the entities’ tax returns showed “Anthony Deo and Sarah ... 100 percent ownership between the two of them” (Aaronson Dep. 92:12-22 (Jan. 7, 2026));

and the sworn Jones affidavit read into the Flushing Bank record states that returns were to be amended “to reflect the Deo’s ownership of the two companies” (Buccino Dep. 126:7-16 (Feb. 26, 2026)). O'Sullivan — the controller who maintained Northshore's books — testified: 'I thought he was one of the owners... he had a capital account.' O'Sullivan Dep. p.16. O'Sullivan maintained Deo's capital account on Northshore's books throughout. Id.

p.9. Aaronson approved 2021 tax returns listing Deo as 99% owner. Aaronson Dep. p.44. The 'Chabrier Decl. ¶ X' citation is a placeholder ([A]).

¶ 30. Baron arranged for Ally to provide Northshore with a Floor Plan. Chabrier Decl. ¶ X; Deo Dep. 494:16-502:13, 508:4-514:3.

RESPONSE TO ¶30. OBJECTION [A]. Admitted. Defendants admit that David Baron arranged for and provided Northshore access to floor plan financing through Ally, consistent with Deo's testimony that Baron "said he was going to provide a floor plan, and he did," and that the floor plan was extended through the Baron group's relationship with the lender. (Deo Dep. Tr. 515:20–21, 516:20–22 (Feb. 12, 2026); see id. 511:25–512:5.) Defendants further note that Deo testified he was not privy to, and did not know, the terms of the arrangement between David Baron and Ally. (Id. 512:17–18, 514:21–24.)

¶ 31. Northshore was to purchase its used car inventory using the Ally Floor Plan. Chabrier Decl. ¶ X; Deo Dep. 494:16-502:13, 508:4-514:3.

RESPONSE TO ¶31. OBJECTION [A]. Admitted. Defendants admit that the Ally floor plan was to be used by Northshore to purchase used car inventory, consistent with Deo's testimony that floor plan financing is used to purchase vehicles and that Northshore purchased vehicles using its floor plan line. (Deo Dep. Tr. 513:16–19 (Feb. 12, 2026); see id. 511:25–512:12.)

¶ 32. Northshore has an operating agreement dated and entered into on February 14, 2018 signed by Baron, Khan and Chabrier (the "Northshore Operating Agreement"). Chabrier Decl. ¶ X.; 617224/2022 NYSCEF 4.

RESPONSE TO ¶32. OBJECTION [A]. Denied in all respects. The February 14, 2018 operating agreement exists as a document. Whether it accurately reflects any arrangement the Deos were party to is the contested issue. Deo testified under oath: Q: Having reviewed the entire document, at least giving it a cursory review, do you recognize the document? A: I saw this document in the Judge Gianelli's case. Q: And what is your understanding about this operating agreement? A: This operating agreement was created without my knowledge and consent. Deo Dep. pp.153-154 (ECF 518-10, Jan. 12, 2026). Deo further testified that when Northshore opened, there was no operating agreement: "When we opened it, no." Deo Dep. p.152. Before this document existed, the members of Northshore in Deo's understanding were "my wife and myself." Deo Dep. p.157. David Baron never rightfully had ownership: "To your knowledge, David Baron never had any ownership over Northshore Motor Leasing LLC, correct? A: Not rightfully." Deo Dep. p.160. Placeholder [A] as to Chabrier Decl. ¶ X.

¶ 33. The 2018 Northshore Operating Agreement lists Baron, Khan and Chabrier as the sole members. Chabrier Decl. ¶ X; 617224/2022 NYSCEF 4.

RESPONSE TO ¶33. OBJECTION [A]. Admitted in part. Defendants admit that the February 14, 2018 operating agreement lists Baron, Khan, and Chabrier as the sole members. Defendants dispute this paragraph to the extent it implies or assumes that this listing validly or legitimately reflects the actual membership or ownership of Northshore Motor Leasing LLC. As set forth in Defendants' responses to Paragraphs 29 and 32, Deo testified that the operating agreement was created without his knowledge and consent, that the original members of

Northshore were Deo and his wife, and that any ownership by Baron, Khan, or Chabrier was wrongful. (Deo Dep. Tr. 154:16–155:1, 157:7–9, 160:11–17 (Jan. 12, 2026).)

¶ 34. Until March 2023 there was no operating agreement listing Deo as a member of Northshore. Chabrier Decl. ¶ X. Deo Dep. 152:19-155:11, 157:6-12; 617224/2022 NYSCEF 4.

RESPONSE TO ¶34. OBJECTION [A]. Disputed. ECF 524 ¶ 34 asserts that "until March 2023 there was no operating agreement listing Deo as a member." This framing requires careful correction. The February 2018 operating agreement was created without Deo's knowledge. Deo first saw it in Judge Gianelli's state court proceedings in 2022 — four years after it was supposedly created. "This operating agreement was created without my knowledge and consent." Deo Dep. pp.153-154 (ECF 518-10). Before that document existed, Deo understood Northshore's members to be "my wife and myself." Deo Dep. p.157. David Baron never rightfully held ownership: "Not rightfully." Deo Dep. p.160. The absence of a Deo-inclusive operating agreement does not establish non-ownership. Deo never signed or agreed to any arrangement excluding himself. Ownership is established by conduct, capital account maintenance, tax filings, and operational control — not by a document created unilaterally without Deo's knowledge. Aaronson approved 2021 tax returns listing Deo as 99% owner. Aaronson Dep. p.44 (ECF 404-1). O'Sullivan maintained Deo's capital account on the books of both Northshore and Sunrise and understood Deo to be an owner. O'Sullivan Dep. pp.9, 16 (ECF 478-1). Chabrier confirmed Deo ran all operations from Day One. Chabrier Dep. pp.24-25 (ECF 406-2). Placeholder [A] as to Chabrier Decl. ¶ X.

¶ 35. In March 2023 there are two contemporaneous operating agreement listing Deo as a member of Northshore, one listing Deo as the 100% owner and one listing Deo as the 99%

owner and Sara as the 1% owner. Ruderman Decl. ¶ X.; Deo Dep. 232:21-236:22, 240:17-244:3; FLUSHING8508-FLUSHING8513; Exhibit Operating Agreement.

RESPONSE TO ¶35. OBJECTION [A]. Admitted that in March 2023 there were two operating agreements listing Deo as a member of Northshore — one as 100% owner, one as 99% owner (Sara 1%). Deo Dep. 232:21-236:22, 240:17-244:3 (ECF 518-10). Critical context Plaintiffs omit: Deo created this operating agreement himself — from an online template, without an attorney, without Thomasson's help. When asked who created it: "Me. Q: You did it yourself? A: Yes. Q: You didn't use an attorney? A: No. Q: Where did you obtain this operating agreement template? A: Online." Deo Dep. pp.232-233 (ECF 518-10). The 99%/1% split between Deo and Sara came from Citrin Cooperman's advice that an LLC cannot be 100% owned by one person: "Because it's an LLC, it can't be a hundred percent... Citrin Cooperman. It's in that email chain." Deo Dep. p.232 (ECF 518-10). The March 2023 operating agreement lists June 15, 2020 as the commencement of Deo's ownership interest. Deo Dep. p.232. Placeholder [A] as to Ruderman Decl. ¶ X.

¶ 36. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been listed as an owner or member of Northshore. Ruderman Decl. ¶ X. Deo Dep. 550:25-552:25, Feb. 13, 2026, 86:19-87:19.

RESPONSE TO ¶36. OBJECTION [A]. Disputed as to implication. Admitted there is no written communication prior to October 2022 in which Deo explicitly raises concern about not being listed as a member. Disputed that this absence proves non-ownership. Deo did not raise written concerns about the operating agreement because he did not know the operating agreement existed — it was created without his knowledge. Deo Dep. pp.153-154 (ECF 518-10). A person cannot complain in writing about a document he has never seen. Deo's first knowledge

of the February 14, 2018 operating agreement came through Judge Gianelli's state court proceedings in 2022. *Id*. The absence of prior written objection is fully explained by the absence of prior knowledge. Placeholder [A] as to Ruderman Decl.

¶ 37. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been provided with information necessary for him to file taxes in 2018, 2019 or 2020 listing him as an owner or member of Northshore. Ruderman Decl. ¶ X; Deo Dep. 550:25-552:25, Feb. 13, 2026, 86:19-87:19.

RESPONSE TO ¶37. OBJECTION [A]. Disputed in part. Deo Defendants admit that, at his deposition, Anthony Deo was unable to identify a specific written communication, prior to October 2022, in which he raised the issue that he had not been provided with the information necessary to file tax returns for 2018, 2019, or 2020, and testified that any such writings "may" exist but that he could not confirm or locate them. (Deo Dep. 86:19–87:19, Feb. 13, 2026.) Deo Defendants dispute the paragraph to the extent it asserts as an affirmative fact that "there is no written communication" of that nature: the cited testimony establishes only that Anthony Deo could not recall or locate such a writing, not that none exists, and that he produced the documents responsive to the parties' demands. (*Id*.) Deo Defendants further dispute the paragraph as immaterial. Anthony Deo testified that he repeatedly demanded K-1s, was told they were forthcoming, and was assured the matter would be "rectified," such that he did not believe he needed to prepare the returns independently. (Deo Dep. 550:25–552:25, Feb. 12, 2026.) Whether that concern was reduced to writing before or after October 2022 neither establishes nor negates ownership or any element of Plaintiffs' claims. The supporting "Ruderman Decl. ¶ X" identifies no paragraph and cannot be admitted as cited.

¶ 38. In 2018 it was agreed that Chabrier would submit Northshore's application to the DMV on behalf of Northshore as an owner of Northshore. Chabrier Decl. ¶ X.; Chabrier Dep. 48:14-22.

RESPONSE TO ¶38. OBJECTION [A]. Disputed. Deo testified: "What was the reason you didn't apply for a DMV license with Northshore Motors Leasing LLC? A: Because Brian did." Deo Dep. p.130 (ECF 518-10, Jan. 12, 2026). Deo further testified: "We submitted it with Brian because he would get us the plate program because of his other affiliations. " Deo Dep. p.473 (ECF 518-10, Feb. 12, 2026). Placeholder [A] as to Chabrier Decl. ¶ X. Response: Admitted. Chabrier submitted the Northshore DMV application listing himself as owner. Chabrier Dep. 48:14-22 (ECF 406-2). Placeholder [A] as to Chabrier Decl. ¶ X.

¶ 39. Chabrier submitted the Northshore DMV application listing himself as owner. Chabrier Decl. ¶ X; Chabrier Dep. 48:14-22.

RESPONSE TO ¶39. OBJECTION [A]. Admitted in part; disputed in part. Disregarding the blank "Chabrier Decl. ¶ X" (Local Civil Rule 56.1(d)), admitted that Chabrier testified the Northshore DMV license is in his name and has only ever been in his name. (Chabrier Dep. 48:14–21 (Jan. 9, 2026).) Defendants dispute that this established Chabrier as a member or equity owner of Northshore, for the reasons stated in response to ¶ 38.

¶ 40. The Northshore DMV application was approved by the DMV. Chabrier Decl. ¶ X. Exhibit License.

RESPONSE TO ¶40. OBJECTION [A]. Disregard. The blank "Chabrier Decl. ¶ X" placeholder and the unidentified "Exhibit License" are disregarded (L.R. 56.1(d)). Defendants admit only that NorthShore obtained a New York DMV dealer license in 2018. The identity of the person designated as the DMV license applicant is a regulatory licensing formality that does

not establish equity ownership of NorthShore Motor Leasing LLC; as set forth in Defendants' Responses to ¶¶ 42-43, a DMV applicant designation neither confers nor reflects membership in the LLC. The paragraph is immaterial to the ownership dispute. [A].

¶ 41. Northshore began operations in 2018 under the license which had been obtained with Chabrier as the owner applicant. Chabrier Decl. ¶ X.; Deo Dep. 129:18-130:19, 472:23-476:6.

RESPONSE TO ¶41. OBJECTION [A]. Admitted in part. Deo Defendants admit that NorthShore commenced operations in 2018 and that the New York DMV dealer-license application for NorthShore was submitted by Brian Chabrier, not by Anthony Deo, who testified that he did not personally submit a DMV application for NorthShore. (Deo Dep. 129:18–130:3, Jan. 12, 2026; 473:2–12, 475:20–24, Feb. 12, 2026.) To the extent ¶41 characterizes Brian Chabrier as the "owner applicant," the cited Deo testimony establishes that Chabrier was the applicant but does not itself establish the capacity in which he applied; that characterization rests on "Chabrier Decl. ¶ X," which identifies no paragraph and cannot be admitted or disputed as cited.

¶ 42. If a license applicant is no longer associated with the licensed dealership, the DMV license applicant must be changed to the new owner. Aaronson Decl. ¶ X; Kwun Decl. ¶ X, Deo II Dep. 110:25-111:6, 483:18-484:11.

RESPONSE TO ¶42. OBJECTION [A]. Disputed. ¶42 asserts a legal conclusion regarding New York DMV licensing requirements rather than a material fact, and it is not supported by the cited evidence. The cited Deo testimony does not establish the asserted rule: Anthony Deo testified only that a license applicant generally would have "an ownership interest... or an agreement, it depends," and that license-holding and ownership "don't always go

hand in hand," such that a dealership license may be "held by those who were not owners of the dealership." (Little Reporting Tr. 483:18–484:11, Feb. 12, 2026.) The remaining cited testimony concerns the parties' October–November 2022 effort to transfer the NorthShore and Sunrise DMV licenses to Anthony Deo, not any DMV regulatory requirement. (Veritext Tr. 110:25–111:6, Feb. 13, 2026.) The critical context: Deo testified that Wendy Kwun was working with him on applying to transfer the Northshore and 189 Sunrise licenses — but "she stopped the paperwork, I guess Josh told her to." Deo Dep. p.454 (ECF 518-10). Aaronson is referenced elsewhere as "holding the DMV licenses hostage" — Deo Dep. p.265 (reference to Ruderman's question about Deo's statement to Urrutia that Aaronson was "holding the DMV licenses hostage"). Whether the license was never transferred because Deo did not pursue it — or because Aaronson actively blocked it — is a disputed material fact. The supporting "Aaronson Decl. ¶ X" and "Kwun Decl. ¶ X" identify no paragraphs, and neither Joshua Aaronson nor Wendy Kwun is shown to be competent to testify to DMV regulatory requirements. The citations cannot be admitted as cited.

¶ 43. Changing an existing DMV license applicant to a new owner requires a DMV change of owner application, which must be approved by the DMV. Chabrier Decl. ¶ X; Aaronson Decl. ¶ X; Kwun Decl. ¶ X; Deo II Dep. 110:25-113:25, 483:18-484:11.

RESPONSE TO ¶43. OBJECTION [A]. Disputed. Like ¶42, ¶43 states a legal conclusion concerning New York DMV procedures rather than a material fact, and it is not supported by the cited evidence. Anthony Deo, a lay witness, was neither asked about nor testified to the DMV's regulatory requirements for a change-of-owner application or its approval. The cited testimony instead concerns the parties' October–November 2022 effort to transfer the NorthShore and Sunrise licenses to Anthony Deo — paperwork he received, had his controller

assist with, and signed (Veritext Tr. 110:25–113:25, Feb. 13, 2026) — together with his testimony that license-holding and ownership "don't always go hand in hand" (Little Reporting Tr. 483:18–484:11, Feb. 12, 2026). The DMV change of owner process was initiated — Kwun was working with Deo on the transfer — but was stopped when Aaronson directed Kwun to stop the paperwork. Deo Dep. p.454 (ECF 518-10). The failure to complete the DMV license transfer was not Deo's fault or inaction — it was the result of Aaronson's interference with the process. The supporting "Chabrier Decl. ¶ X," "Aaronson Decl. ¶ X," and "Kwun Decl. ¶ X" identify no paragraphs, and none of those declarants is shown competent to state DMV regulatory requirements. The asserted procedure is in any event immaterial to ownership, which Deo Defendants establish through the parties' tax filings and Anthony Deo's operational control rather than through DMV licensure. The citations cannot be admitted as cited.

¶ 44. From 2018 through May 2021 Baron would regularly come to the Northshore dealership to check on its operations. Chabrier Decl. ¶ X; O'Sullivan Dep. 122:7-14, 123:12-124:19.

RESPONSE TO ¶44. OBJECTION [A]. Admitted in part. Disregarding the blank "Chabrier Decl. ¶ X" (L.R. 56.1(d)), admitted that O'Sullivan testified David Baron came to the Northshore dealership during the relevant period. (O'Sullivan Dep. 122:7–14, 123:12–124:19 (Mar. 30, 2026).) Consistent with Defendants' response to ¶ 45, O'Sullivan testified Baron's involvement was "not really day-to-day," that Baron would "mostly have lunch, talk to Anthony … then leave," and reviewed financials about once a month; the paragraph is admitted in that limited sense.

¶ 45. During that same period of time Baron, Khan, and Chabrier would each come to the Northshore dealership occasionally and receive a payment recorded as a shareholder draw. Chabrier Decl. ¶ X. O'Sullivan Dep. 132:3-134:10.

RESPONSE TO ¶45. OBJECTION [A]. Disputed as to characterization. Placeholder ([A]) as to Chabrier Decl. ¶ X. Disputed as to the characterization "shareholder draw" — Deo testified the $15,000 per month payment to Baron was for services: "the number I think we agreed to was 15,000 a month going to him. Q: What was he going to obtain for you for that $15,000 a month? A: The better floor plan and the banks." Deo Dep. (ECF 518-10, Jan. 12, 2026). After Baron died, the payment was increased to $60,000 per month to Aaronson: "what happened after David died is the $15,000 a month was then increased to $60,000 a month to Josh. So he made changes and we abided by it." Deo Dep. (ECF 518-10, Feb. 12, 2026). A shareholder draw does not quadruple when the shareholder dies and a different person takes over — the payments were compensation for floor plan and banking access, not ownership distributions. O'Sullivan confirmed Baron's visits were not operational oversight: "He would come in have lunch; look around and then leave. It was not really day-to-day operation, no." O'Sullivan Dep. 123:16-18 (ECF 478-1). Interestingly, the monthly payments ($15,000 per month during David Baron's lifetime, and $60,000 per month after he died for about a year), when added together, accounts for most, if not more, of the money that the Plaintiffs allege was missing from NorthShore and 189 Sunrise, notwithstanding that those businesses belong to the Deos.

¶ 46. Deo was aware of these payments being made to Baron, Khan and Chabrier. Chabrier Decl. ¶ X; Exhibit Schedule.

RESPONSE TO ¶46. OBJECTION [A] [F]. Admitted in part. Deo testified he was aware of and agreed to the $15,000 per month payment to Baron: "the number I think we agreed to was 15,000 a month going to him... for the better floor plan and the banks." Deo Dep. (ECF 518-10, Jan. 12, 2026). Disputed as to the characterization that these were "shareholder draws" — Deo describes them as service payments for floor plan and banking access, not ownership distributions. O'Sullivan confirmed it was Baron who directed the payments to Khan and Chabrier: "Who is the one who said to give Asad and Brian these checks? A: David." O'Sullivan Dep. 133:18- 20 (ECF 478-1). O'Sullivan also did not know whether Baron, Khan, and Chabrier were "owners or partners or what they were." O'Sullivan Dep. 133:12-14 (ECF 478-1). Placeholder ([A]) as to Chabrier Decl. ¶ X. Exhibit Schedule not produced with ECF 524.

¶ 47. As owners of Northshore, Baron, Khan and Chabrier were entitled to its profits. Chabrier Decl. ¶ X; Jones Dep. 33:18-24.

RESPONSE TO ¶47. OBJECTION [A]. Disputed. The characterization "as owners" embeds the central contested legal conclusion in this case — [D]. Chabrier Decl. ¶ X is a placeholder ([A]). Deo testified the $15,000 per month payment to Baron was not a profit distribution but compensation for services — securing "the better floor plan and the banks." Deo Dep. (ECF 518-10, Jan. 12, 2026). O'Sullivan, who wrote the checks at Baron's direction, did not know whether Baron, Khan, and Chabrier were "owners or partners or what they were." O'Sullivan Dep. 133:12-14 (ECF 478-1). Payments for floor plan access are not "profits" — they are service fees. Whether Baron, Khan, and Chabrier held any ownership interest entitling them to profit distributions is the central disputed fact in this litigation.

¶ 48. Northshore filed tax returns for 2018, 2019 and 2020. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶48. OBJECTION [A]. Disregard. The blank "Chabrier Decl. ¶ X" placeholder and the unidentified "Exhibit Tax Returns" are disregarded (L.R. 56.1(d)). Defendants admit only that NorthShore filed tax returns for 2018, 2019, and 2020. The bare fact of filing does not establish the disputed question of ownership: the sworn Jones affidavit states the returns were to be amended "to reflect the Deo's ownership of the two companies" (Buccino Dep. 126:7-16 (Feb. 26, 2026); see Aaronson Dep. 92:12-22 (Jan. 7, 2026)), and the amended 2020 NorthShore return reflects Anthony Deo (99%) and Sara Deo (1%) as the members (see Response to ¶ 49). [A].

¶ 49. In each of the tax returns for 2018, 2019 and 2020 the members of Northshore were listed as Baron, Khan and Chabrier. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶49. OBJECTION [A] [B]. Disputed. The cited "Exhibit Tax Returns" is not identified by document, date, or Bates/ECF number, and "Chabrier Decl. ¶ X" identifies no paragraph (L.R. 56.1(d)); the assertion must be disregarded. The paragraph is in any event affirmatively controverted: Deo testified that he and Sara were the members of Northshore (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026)); Aaronson admitted the Deos held themselves out as owners on the tax returns (Aaronson Dep. 92:12–22 (Jan. 7, 2026)); the sworn Jones affidavit read into the Flushing Bank record states that one or more returns were to be amended "to reflect the Deo's ownership of the two companies" (Buccino Dep. 126:7-16 (Feb. 26, 2026)); and the amended 2020 Northshore return reflects Anthony Deo (99%) and Sara Deo (1%) as the members.

¶ 50. In each of the tax returns for 2018, 2019 and 2020 Baron, Khan and Chabrier each received a K-1. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶50. OBJECTION [A] [B]. Disputed. As with ¶ 49, the cited "Exhibit Tax Returns" is unidentified and "Chabrier Decl. ¶ X" identifies no paragraph (L.R. 56.1(d)). To the extent the paragraph asserts that the K-1s establish Baron, Khan, and Chabrier as the true members to the exclusion of the Deos, it is disputed: Deo testified that he and Sara were the members of Northshore (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026)); Aaronson admitted the Deos held themselves out as owners on the tax returns (Aaronson Dep. 92:12–22 (Jan. 7, 2026)); the sworn Jones affidavit read into the Flushing Bank record states that returns were to be amended "to reflect the Deo's ownership of the two companies" (Buccino Dep. 126:7-16 (Feb. 26, 2026)); and the amended 2020 Northshore return reflects Anthony Deo (99%) and Sara Deo (1%) as the members. Once the conflicting tax return filings were known to each side, Plaintiffs immediately instructed their accountants at Citrin to prepare the returns (ultimately "approved" by Josh Aaronson) listing the Deos as owners of the two businesses.

¶ 51. The K-1's for Northshore would equally divide any profit or losses of Northshore between Baron, Khan and Chabrier. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶51. OBJECTION [A]. Disputed in part; cannot be admitted as cited. As with ¶¶49–50, the cited "Exhibit Tax Returns" is not identified by document or Bates number and "Chabrier Decl. ¶ X" identifies no paragraph, so ¶51 cannot be admitted as cited. Subject to that objection, Deo Defendants do not dispute that, for the years and periods in which Baron, Khan, and Chabrier were members, the NorthShore K-1s allocated profits and losses equally among them. Deo Defendants dispute ¶51 as materially incomplete as to the 2020 tax year: the amended 2020 return reflects the membership interests of Anthony Deo (99%) and Sara Deo (1%) as of June 15, 2020, after which profits and losses were allocated to the Deos rather than equally among Baron, Khan, and Chabrier. Deo Defendants further dispute the existence or

contents of any separate 2018 and 2019 returns to the extent the record does not establish that such returns were filed or known to the Deos.

¶ 52. The K-1's to Baron, Khan and Chabrier from Northshore for each year showed a profit. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶52. OBJECTION [A]. Disputed in part; cannot be admitted as cited. As with ¶¶49–51, the cited "Exhibit Tax Returns" is not identified by document or Bates number and "Chabrier Decl. ¶ X" identifies no paragraph; ¶52 cannot be admitted as cited. Without the identified returns, Deo Defendants cannot admit that the K-1s "for each year showed a profit." Subject to and without waiving the foregoing, any K-1s issued to Baron, Khan, and Chabrier reflected NorthShore's results only for the periods in which they were members — that is, through the transfer of the membership interests to the Deos as of June 15, 2020 — and ¶52 is immaterial to ownership. Deo Defendants dispute any implication regarding NorthShore's financial performance after that transfer. Deo Defendants further dispute the existence or contents of any separate 2018 and 2019 returns to the extent the record does not establish that such returns were filed.

¶ 53. The Profit on a K-1 would only be apportioned to one who is listed as an owner of Northshore. Chabrier Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶53. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶53 states a conclusion of tax law rather than a material fact, and it is not supported by competent evidence: "Chabrier Decl. ¶ X" identifies no paragraph, Brian Chabrier is not shown competent to opine on the legal significance of K-1 allocations, and the "Exhibit Tax Returns" is not identified by document or Bates number. ¶53 cannot be admitted as cited. Subject to and without waiving that objection, to the extent the asserted proposition is accepted — that profit

apportioned on a K-1 reflects ownership — it establishes the Deos' ownership of NorthShore: the amended 2020 return and the returns for subsequent years apportion NorthShore's profits to Anthony Deo (99%) and Sara Deo (1%), with Baron, Khan, and Chabrier apportioned 0% as of the June 15, 2020 transfer, and those returns were approved by Joshua Aaronson on behalf of Plaintiffs. (Ex. G.)

¶ 54. Baron, Khan and Chabrier would have had to pay income tax on any income shown on their Northshore K-1. Chabrier Decl. ¶ X; Jones Dep. 38:17-39:8.

RESPONSE TO ¶54. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶54 states a general conclusion of tax law rather than a material fact. It is supported by "Jones Dep. 38:17–39:8," and by "Chabrier Decl. ¶ X," which identifies no paragraph; ¶54 cannot be admitted as cited. Subject to and without waiving that objection: ¶54 asserts only a hypothetical tax obligation ("would have had to pay"), not that Baron, Khan, or Chabrier in fact paid any such tax. Any such obligation would apply only for the periods in which they were alleged members of NorthShore consistent with Asad Khan's testimony that NorthShore appeared on his tax returns only through 2019 (Khan Dep. 27 (Dec. 22, 2025)), and Brian Chabrier's testimony that he ceased receiving NorthShore K-1s after the returns approved by Joshua Aaronson (Chabrier Dep. 72–73 (Jan. 9, 2026)). The corresponding obligation as to NorthShore's income thereafter fell on the Deos, and Anthony Deo testified that he filed and paid the tax on NorthShore's income as its owner. (Deo II Dep. 88:14–21 (Feb. 13, 2026).)

¶ 55. Aaronson is the son-in-law of Baron, and Baron's wife, Iris. Aaronson Decl. ¶ X.

RESPONSE TO ¶55. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson is Baron's son-in-law; immaterial. [A].

¶ 56. Aaronson had been involved in Baron's automobile dealership businesses and then had gone out on his own with his own dealership operations. Aaronson Decl. ¶ X.

RESPONSE TO ¶56. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Immaterial background concerning Aaronson's dealerships. [A].

¶ 57. Aronson, along with other principles, own and operate various dealerships. Aaronson Decl. ¶ X.

RESPONSE TO ¶57. Admitted.

¶ 58. The dealership group headed by Aaronson is referred to as the Island Auto Group ("IAG"). Aaronson Decl. ¶ X.

RESPONSE TO ¶58. Admitted.

¶ 59. These dealerships are managed under the IAG banner. Aaronson Decl. ¶ X.

RESPONSE TO ¶59. Admitted that there are dealerships under the IAG banner.

¶ 60. David Baron and Ron Baron had ownership interest in some of the IAG dealerships. Aaronson Decl. ¶ X.

RESPONSE TO ¶60. Admitted that the Barons have ownership interests in some dealerships.

¶ 61. Because of relationships between Aaronson, Baron and Ron Baron and their common ownership of the some of the dealerships, they had certain cross financial arrangements. Aaronson Decl. ¶ X.

RESPONSE TO ¶61. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Immaterial background concerning the relationships among Aaronson and the Barons. [A].

¶ 62. One of these arrangements was that all of the dealerships used Ally for their Floor Plan. Aaronson Decl. ¶ X.

RESPONSE TO ¶62. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that the dealerships used Ally for floor plan; immaterial, and consistent with the cross-financing context Defendants rely upon. [A].

¶ 63. Having this cross financial arrangement between the Baron Group and IAG also required certain cross collateral and cross guarantees with Ally. Aaronson Decl. ¶ X.

RESPONSE TO ¶63. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted, as Defendants affirmatively rely, that the Baron Group/IAG arrangement required cross-collateral and cross-guaranties — the same cross-guaranty structure underlying Deo's later transactions. [A].

¶ 64. The cross guarantees made certain of the IAG members personally liable for the Ally financing. Aaronson Decl. ¶ X; Exhibit Guaranty.

RESPONSE TO ¶64. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that the cross-guaranties made certain IAG members personally liable to Ally; immaterial. [A]. Any document in support hereof speaks for itself.

¶ 65. Each dealership in managed by a local manager and its financial operations are handled by a local controller. Aaronson Decl. ¶ X.

RESPONSE TO ¶65. OBJECTION [A]. Disputed in part; immaterial. ¶65 is a generic assertion that does not reference NorthShore, 189 Sunrise, or any party, and is supported only by "Aaronson Decl. ¶ X," which identifies no paragraph; it cannot be admitted as cited and is immaterial as stated. To the extent ¶65 is offered to imply that Anthony Deo was merely a "local manager" of NorthShore rather than its owner, that implication is disputed. The presence of a local manager and a controller is not inconsistent with ownership, and the controller of NorthShore testified that Anthony Deo "was the boss" of the dealership (O'Sullivan Dep. 54:13–15, Mar. 30, 2026) and maintained a capital account in the business, which the controller understood to signify ownership — "if you weren't an owner, you wouldn't have a capital account" (O'Sullivan Dep. 161:20–23, Mar. 30, 2026).

¶ 66. Each dealership's financial operations is subject to central oversight by Island Auto management located in Staten Island. Aaronson Decl. ¶ X.

RESPONSE TO ¶66. OBJECTION [A]. Disputed in part; immaterial. ¶66 is supported only by "Aaronson Decl. ¶ X," which identifies no paragraph, and is immaterial as stated: financial oversight by Island Auto Management does not establish ownership of NorthShore or 189 Sunrise since February, 2021. To the extent ¶66 is offered to imply that such oversight rendered Island Auto Management — rather than the Deos — the owner of NorthShore, or that Anthony Deo was a mere manager rather than an owner, that implication is disputed. The Deos' ownership of NorthShore is established by the parties' tax filings and by Anthony Deo's capital account in the business, which the dealership's controller understood to denote ownership. (O'Sullivan Dep. 161:20–23, Mar. 30, 2026.)

¶ 67. Aaronson, along with other managers or members, controls the IAG Plaintiffs. Aaronson Decl. ¶ X.

RESPONSE TO ¶67. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶67 is supported only by "Aaronson Decl. ¶ X," which identifies no paragraph, and cannot be admitted as cited. Deo Defendants do not dispute that Joshua Aaronson, together with others, controls the Island Auto Group entities. Deo Defendants dispute ¶67 to the extent the defined term "IAG Plaintiffs" is construed to include NorthShore Motor Leasing, LLC and 189 Sunrise Hwy Auto LLC: those entities are owned by Anthony Deo and Sara Deo and are not controlled by Joshua Aaronson, as established by the parties' tax filings and by Anthony Deo's capital account and operational control. (See Deo Defendants' 56.1 §§ A–C.)

¶ 68. Aaronson and Baron have an ownership interest in Sunrise along with Chabrier, Raymond Phalen ("Phalen") and Jory. Aaronson Decl. ¶ X; 617224/2022 NYSCEF 28.

RESPONSE TO ¶68. OBJECTION [A]. Disputed. ¶68 asserts that Joshua Aaronson, David Baron, Brian Chabrier, Raymond Phalen, and Jory Baron presently "have an ownership interest" in 189 Sunrise. The documentary record refutes that present-tense assertion. The amended 2021 Form 1065 for 189 Sunrise Hwy Auto LLC reflects that Raymond Phalen, Joshua Aaronson, Jory Baron, David Baron, and Brian Chabrier each held a 20% interest at the beginning of 2021 and a 0% interest at year-end, while Anthony Deo held 99% and Sara Deo 1% at year-end; the return states it was amended because "the percentages of partners' shares were incorrect." Anthony and Sara Deo purchased 189 Sunrise in February 2021, and the transfer of the membership interests to the Deos was approved by Joshua Aaronson on behalf of the Island Auto Group plaintiffs. (189 Sunrise Hwy Auto LLC 2021 amended Form 1065, Schedules K-1 & Statement 1; Oct. 2022 email chain among Jones, Citrin Cooperman, Aaronson, and Kwun — Aaronson "Approved.") To the extent ¶68 rests on "Aaronson Decl. ¶ X," which identifies no paragraph, it cannot be admitted as cited.

¶ 69. Sunrise was a used car dealership located at 189 Sunrise, Amityville, New York formed in 2014. Aaronson Decl. ¶ X.

RESPONSE TO ¶69. Admitted.

¶ 70. Sunrise has an operating agreement dated and entered into on July 3, 2014 signed by Baron, Joshua Aaronson, Jory Baron and Raymond Phelan. Aaronson Decl. ¶ X; 617224/2022 NYSCEF 28.

RESPONSE TO ¶70. OBJECTION [A]. Disputed in part. The cited document (NYSCEF 28) speaks for itself; Defendants deny the paragraph to the extent it asserts any fact beyond the document's contents. The assertion is immaterial to the claims and defenses presented on the parties' cross-motions, and is not established as undisputed by admissible evidence.

¶ 71. The 2014 operating agreement for Sunrise list Baron, Joshua Aaronson, Jory Baron and Raymond Phelan as the sole members. Aaronson Decl. ¶ X; 617224/2022 NYSCEF 28.

RESPONSE TO ¶71. OBJECTION [A]. Disputed in part. The cited document (NYSCEF 28) speaks for itself; Defendants deny the paragraph to the extent it asserts any fact beyond the document's contents. To the extent the paragraph asserts the ownership or membership of the entities at issue, it is disputed; see Defendants' responses to ¶¶ 26, 29, 32–34 and 49, establishing that Anthony Deo and Sara Deo were the members of Northshore Motor Leasing LLC and that any membership attributed to Baron, Khan, or Chabrier is disputed. The sworn record establishes the contrary: Deo testified that he and Sara were the members of Northshore Motor Leasing LLC (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026)), and plaintiff Aaronson confirmed Deo and Sara held themselves out as owners on the entities' tax returns (Aaronson Dep. 92:19–22 (Jan. 7, 2026)), the amended 2020 return reflecting Anthony Deo (99%) and Sara Deo (1%); and Flushing

Bank's Rule 30(b)(6) witness — a neutral institutional party — testified that the bank opened the account with Deo as "the whole sole owner" of Northshore and "was proper in its understanding of Mr. Deo's ownership" (Buccino Dep. 241:23–25, 192:8–11 (Feb. 26, 2026)), and that the returns were amended to reflect "the Deo's ownership of the two companies" (id. 126:7–16); and to the extent plaintiff Khan claims Northshore ownership, that claim rests on the contested "paperwork … under my name" that Deo testified was created without his consent, and Khan admitted he could not prove ownership to police because "David had" the documents (Khan Dep. 21:6–22, 27:18–28:9 (Dec. 22, 2025)).

¶ 72. Prior to 2018, Chabrier became an additional, equal member in Sunrise. Chabrier Decl. ¶ X; Chabrier Dep. 75:17-76:3.

RESPONSE TO ¶72. OBJECTION [A]. Disputed; cannot be admitted as cited. The blank "Chabrier Decl. ¶ X" is disregarded (Local Civil Rule 56.1(d)). The cited testimony (Chabrier Dep. 75:17–76:3 (Jan. 9, 2026)) addresses the membership of 189 Sunrise Hwy Auto LLC — which Chabrier identified as including Raymond Phalen, Jory Baron, and Joshua Aaronson — and Chabrier testified that 189 Sunrise was formed "late '17, early '18." (Id. 75:14–16.) The cited testimony does not establish that Chabrier "became an additional, equal member" of Sunrise "prior to 2018," and to the extent the paragraph asserts lawful equity ownership it is disputed, consistent with Defendants' responses to ¶¶ 29 and 32–34, in which Deo testified that he and Sara were the members of Northshore Motor Leasing LLC and that any membership attributed to Baron, Khan, or Chabrier was created without his knowledge or consent.

¶ 73. The DMV license owner applicants for Sunrise were Aaronson and Jory. Aaronson Decl. ¶ X.

RESPONSE TO ¶73. OBJECTION [A]. Disregard. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted that the DMV license applicants for Sunrise were Aaronson and Jory — confirming, as Defendants rely, that the DMV-applicant role is distinct from ownership (just as Chabrier was Northshore's applicant while others owned it). [A].

¶ 74. In February 2021 Deo and Baron negotiated for Deo to purchase Sunrise from its then current members, Baron, Aaronson, Chabrier, Jory and Phalen. Aaronson Decl. ¶ X; 615683/2024 NYSCEF 7.

RESPONSE TO ¶74. OBJECTION [A]. Admitted, with correction of the citation. Deo Defendants admit that, in February 2021, Anthony Deo negotiated to purchase, and did purchase, the business known as 189 Sunrise (Sunrise Auto Outlet) from its then-members — David Baron, Joshua Aaronson, Brian Chabrier, Jory Baron, and Raymond Phalen — for $50,000, paid by five checks of $10,000 each, dated February 12, 2021, each bearing the memo "Purchase of Sunrise Auto Outlet." Deo Defendants note that the supporting citation is misattributed: NYSCEF Doc. No. 7 in Index No. 615683/2024 (Exhibit F) is the Stock Sale Agreement for Baron Nissan, Inc. — a separate transaction by which Anthony Deo acquired a 49% interest in Baron Nissan — and does not document the 189 Sunrise purchase, which is reflected at NYSCEF Doc. No. 5 (Exhibit D). The supporting "Aaronson Decl. ¶ X" identifies no paragraph.

¶ 75. Although unsigned, the terms of the agreement were in writing and required Deo to pay each member $10,000.00 down and to pay each member an additional $3,000.00 per month until Deo could cross guarantee Sunrise with a franchise automotive dealership. Aaronson Decl. ¶ X. Deo Dep. 96:22-98:19; 615683/2024 NYSCEF 7.

RESPONSE TO ¶75. OBJECTION [A]. Disputed. ¶75 mischaracterizes both the structure of the 189 Sunrise purchase and the nature of the monthly payments, and its terms are not supported by the cited evidence. The cited "Deo Dep. 96:22–98:19" does not address the terms of the 189 Sunrise purchase; it concerns Anthony Deo's understanding of floor-plan financing and the period of his probation. (Deo Dep. 96:22–98:19, Jan. 12, 2026.) NYSCEF Doc. No. 7 in Index No. 615683/2024 is the Baron Nissan transaction bundle and contains neither the asserted "$3,000 per month" payment nor any "cross guarantee" term. "Aaronson Decl. ¶ X" identifies no paragraph. The agreement described in ¶75 is, by Plaintiffs' own admission, "unsigned," and no writing reflecting the asserted terms has been identified. Subject to and without waiving the foregoing, Deo Defendants state that Anthony Deo paid $10,000 to each of the five members (NYSCEF Doc. No. 5), and that those payments — totaling $50,000 — constituted the full purchase price for 189 Sunrise, not a "down payment." Any $3,000 monthly payments were consideration for the members' provision of floor-plan financing as a service, not installment payments on the purchase price, and continued only until Anthony Deo obtained independent floor-plan financing for 189 Sunrise. Consistent with a completed purchase, the amended 2021 Form 1065 for 189 Sunrise reduced each of the five members to 0% ownership and reflects a single $3,000 distribution to each of them for the entire 2021 tax year.

¶ 76. Deo paid each Sunrise member $10,000.00. Aaronson Decl. ¶ X; Deo Dep. 99:3-6, 99:23-100:3; 615683/2024 NYSCEF 7 and 64.

RESPONSE TO ¶76. OBJECTION [A]. Admitted, with correction of the citations. Deo Defendants admit that Anthony Deo paid $10,000 to each of the five members of 189 Sunrise — David Baron, Joshua Aaronson, Brian Chabrier, Jory Baron, and Raymond Phalen — as documented by the five checks at NYSCEF Doc. No. 5 (Exhibit D), each dated February 12,

2021 and bearing the memo "Purchase of Sunrise Auto Outlet." Deo Defendants state, as set forth in response to ¶75, that these payments together constituted the full purchase price for 189 Sunrise. Deo Defendants note that the supporting citations are inapposite: "Deo Dep. 99:3-6" and "99:23-100:3" concern when Anthony Deo first met or worked with David Baron, not any payment to the Sunrise members; and NYSCEF Doc. No. 7 in Index No. 615683/2024 is the Baron Nissan transaction. The proof of these payments is NYSCEF Doc. No. 5. "Aaronson Decl. ¶ X" identifies no paragraph.

¶ 77. Deo did not pay each Sunrise member $3,000.00 per month thereafter. Aaronson Decl. ¶ X.

RESPONSE TO ¶77. OBJECTION [A]. Disputed ¶ 77's assertion that payments were never made is therefore contradicted by Deo, O'Sullivan, and Kwun — all of whom confirm payments were made. The obligation changed in form after David's death and Josh's restructuring — not because Deo stopped paying, but because Aaronson unilaterally doubled the fee and pulled the Baron Nissan deal that would have extinguished the obligation (but kept the Baron Nissan payment by Deo). How Aaronson distributed the monthly payments among the remaining Sunrise members — if at all — was never disclosed to Deo. What Deo paid was directed to Island Chrysler Jeep Dodge, an Aaronson-controlled IAG entity: Kwun confirmed "those payments were made payable to Island Chrysler Jeep Dodge" beginning shortly after Baron's death and potentially for up to a year. Kwun Dep. 229:15-22 (ECF 478-2). If the other Sunrise members — Jory Baron, Chabrier, Phalen — did not receive their respective shares from those payments, that is a dispute between them and Aaronson, not a default by Deo. Deo made the payments every month to the entity Aaronson designated. What Aaronson did with those

funds internally is Aaronson's obligation to account for — not evidence that Deo failed to pay. [A]

¶ 78. Deo was never able to cross guarantee Sunrise with a franchise automotive dealership. Aaronson Decl. ¶ X.

RESPONSE TO ¶78. OBJECTION [A]. Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). The cross-guarantee with a franchise dealership was the contractual exit point from the monthly-fee obligation, and Deo was on the path to satisfying it through the Baron Nissan purchase. Deo Dep. (ECF 518-10).

¶ 79. There was no operating agreement for Sunrise listing Deo as an owner of Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶79. OBJECTION [A]. Disputed in part; immaterial. ¶79 is supported solely by "Aaronson Decl. ¶ X," which identifies no paragraph and establishes no foundation for Joshua Aaronson's knowledge of the existence or non-existence of operating agreements for 189 Sunrise; it cannot be admitted as cited. The assertion is also immaterial. The absence of an operating agreement does not establish the absence of ownership: Anthony Deo's ownership of 189 Sunrise is established by the February 2021 purchase (NYSCEF Doc. No. 5) and the amended 2021 Form 1065 listing Anthony Deo at 99% and Sara Deo at 1%, with each former member reduced to 0% — returns the Island Auto Group plaintiffs, through Joshua Aaronson, approved. To the extent ¶79 asserts as an affirmative fact that no such operating agreement exists, Deo Defendants are presently unable to admit that negative as cited.

¶ 80. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not being listed as an owner or member of Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶80. OBJECTION [A]. Disputed; immaterial, and internally inconsistent. This paragraph is supported solely by "Aaronson Decl. ¶ X," which identifies no paragraph and establishes no foundation; it cannot be admitted as cited. The assertion is also immaterial and premised on a faulty timeline. Anthony Deo purchased 189 Sunrise in February 2021 (NYSCEF Doc. No. 5), and the amended 2021 Form 1065 lists Anthony Deo as a 99% owner and Sara Deo as a 1% owner, with each former member reduced to 0%. There would have been no occasion, prior to October 2022, for Anthony Deo to raise in writing a concern that he "has not be[en] listed as an owner or member of Sunrise," because the Deos' ownership of 189 Sunrise was not in dispute until the parties discovered that each side submitted tax returns for the same entities (189 Sunrise and NorthShore) listing different owners during those tax years (2020-2022). To the extent the paragraph asserts as an affirmative fact that "there is no written communication" of that nature, the cited evidence establishes no such negative, and the Deo Defendants cannot admit it as cited.

¶ 81. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been provided with information necessary for him to file taxes listing him as an owner or member of Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶81. OBJECTION [A]. Disputed; immaterial, and premised on a faulty timeline. ¶81 is supported solely by "Aaronson Decl. ¶ X," which identifies no paragraph and establishes no foundation; it cannot be admitted as cited. The assertion is also immaterial. Anthony Deo purchased 189 Sunrise in February 2021 (NYSCEF Doc. No. 5), and the amended 2021 Form 1065 lists Anthony Deo as a 99% owner and Sara Deo as a 1% owner, with each former member reduced to 0%. There would have been no occasion, prior to October 2022, for Anthony Deo to raise in writing a concern that he had not been provided information necessary

to file taxes as an owner of 189 Sunrise, because the Deos' ownership of 189 Sunrise was not in dispute during that period and was reflected in the parties' tax filings. To the extent ¶81 asserts as an affirmative fact that "there is no written communication" of that nature, the cited evidence establishes no such negative, and Deo Defendants cannot admit it as cited.

¶ 82. Sunrise filed tax returns for 2018, 2019 and 2020. Aaronson Decl. ¶ X. Exhibit Tax Returns.

RESPONSE TO ¶82. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶82 is supported by "Aaronson Decl. ¶ X," which identifies no paragraph, and by an "Exhibit Tax Returns" not identified by document or Bates number; ¶82 cannot be admitted as cited. Without the identified returns, Deo Defendants are unable to admit that 189 Sunrise filed returns for 2018, 2019, and 2020, or who filed them. Deo Defendants do not dispute that 189 Sunrise was an operating business prior to the Deos' February 2021 purchase. To the extent ¶82 is offered to bear on the Deos' ownership, it is immaterial: any returns for 2018–2020 would pre-date the Deos' February 2021 purchase of 189 Sunrise and concern the period of the prior members' ownership, not the Deos'.

¶ 83. In each of the tax returns for 2018, 2019 and 2020 the members of Sunrise were listed as Baron, Aaronson, Jory, Chabrier and Phalen. Aaronson Decl. ¶ X. Exhibit Tax Returns.

Deo Assumes the Obligations as Manager of Northshore and Sunrise

RESPONSE TO ¶83. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶83 is supported by "Aaronson Decl. ¶ X," which identifies no paragraph, and by an "Exhibit Tax Returns" not identified by document or Bates number; it cannot be admitted as cited. Without the identified returns, Deo Defendants are unable to admit what the 2018, 2019, and 2020 returns listed. Subject to that objection, Deo Defendants do not dispute that, for the periods

prior to the Deos' February 2021 purchase, the members of 189 Sunrise were Baron, Aaronson, Jory Baron, Chabrier, and Phalen. Deo Defendants dispute ¶83 to the extent it implies those persons remained the members thereafter: the amended 2021 Form 1065 reduced each of them to 0% and lists Anthony Deo (99%) and Sara Deo (1%) as the members following the purchase. ¶83 is immaterial to the Deos' ownership, which post-dates and arises from the February 2021 purchase.

¶ 84. In 2018, Deo was engaged by Northshore as its manager. Chabrier Decl. ¶ X; Chabrier Dep. 76:18-21, 77:25-78:19.

RESPONSE TO ¶84. OBJECTION [A]. Disputed. ¶84 characterizes Anthony Deo as having been "engaged… as [NorthShore's] manager," implying an employment or agency relationship excluding ownership. The cited testimony does not support that characterization. Brian Chabrier testified that Anthony Deo had "the day-to-day operations of Northshore," that "he was the general manager," and that his responsibilities included "selling cars, buying cars, [and] hiring employees." (Chabrier Dep. 76:18–21, 78:7–12, Jan. 9, 2026.) Chabrier did not testify that Anthony Deo was "engaged," hired, or employed by anyone; that word does not appear in the cited testimony. Deo Defendants admit that Anthony Deo ran the day-to-day operations of NorthShore, including hiring its employees and directing the purchase and sale of its inventory, and dispute the characterization that he did so as a non-owner manager. The controller of NorthShore testified that Anthony Deo "was the boss" (O'Sullivan Dep. 54:13–15, Mar. 30, 2026) and maintained a capital account denoting ownership (O'Sullivan Dep. 161:20–23, Mar. 30, 2026). An owner who runs his own dealership and hires its staff is not a mere manager. "Chabrier Decl. ¶ X" identifies no paragraph.

¶ 85. Sara was engaged to work in Northshore beginning in 2018. Chabrier Decl. ¶ X.

RESPONSE TO ¶85. OBJECTION [A]. Disputed in part; cannot be admitted as cited. ¶85 is supported solely by "Chabrier Decl. ¶ X," which identifies no paragraph and is foundationless; it cannot be admitted as cited. Deo Defendants do not dispute that Sara Deo worked at NorthShore beginning in 2018. Deo Defendants dispute the characterization "engaged to work," to the extent it implies that Sara Deo was hired as an employee by a third party rather than working in a business she co-owned with Anthony Deo. Sara Deo is a 1% owner of NorthShore as reflected in the parties' tax filings, and her work in the business is consistent with that ownership.

¶ 86. In 2021, Deo was engaged by Sunrise as its manager. Chabrier Decl. ¶ X; Chabrier Dep. 84:14-25.

RESPONSE TO ¶86. OBJECTION [A]. Disputed. ¶86 asserts that "[i]n 2021, Deo was engaged by Sunrise as its manager." The cited testimony does not support that assertion. At Chabrier Dep. 84:14–25, when asked whether Anthony Deo "was also the manager of [189 Sunrise]," Brian Chabrier did not assent; he answered, "At what point?" The word "engaged," and the 2018 timeframe, appear in the cited passage only because Plaintiffs' counsel was reading an allegation from a complaint ("it's alleged in the Complaint that… at paragraph 114, that in 2018 Deo was engaged by Northshore and Sunrise…"); they are not the witness's testimony. ¶86 also misstates the cited testimony's content, which concerns a 2018 allegation as to both NorthShore and Sunrise, not a 2021 engagement as to Sunrise. "Chabrier Decl. ¶ X" identifies no paragraph. Deo Defendants admit only that Anthony Deo operated 189 Sunrise following his February 2021 purchase, and dispute the characterization that he did so as a non-owner manager; his ownership is established by the purchase (NYSCEF Doc. No. 5) and the amended 2021 Form 1065 listing him at 99%.

¶ 87. Sara was engaged to work in Northshore beginning in 2021. Chabrier Decl. ¶ X.

RESPONSE TO ¶87. OBJECTION [A]. Disputed; ¶ 87 directly contradicts ¶ 85 within ECF 524 itself. ¶ 85 asserts Sara was "engaged to work in Northshore beginning in 2018." ¶ 87 asserts she was "engaged to work in Northshore beginning in 2021." Both rely solely on Chabrier Decl. ¶ X — a placeholder declaration that cannot establish either date. Plaintiffs' own 56.1 statement is internally inconsistent on the date Sara began. Both paragraphs must be disregarded. Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001). The premise is wrong regardless of the date. Sara was never "engaged to work" at Northshore — she was a co-owner and member. Deo confirmed: "My wife and I were owners and we were at the store... every responsibility that an owner would have." Deo Dep. (ECF 518-10, Feb. 12, 2026). The Northshore LLC had two members — Anthony and Sara Deo. Deo Dep. (ECF 518-10, Feb. 12, 2026) ("Two members you and your wife, right? A: Yes."). The 2021 operating agreement listed Sara as 1% member. Sara opened the Northshore entity, its EIN is associated with her social security number, and she opened the bank accounts. She was never hired and never had an employment agreement. 2021 as the start date is also factually wrong on its own terms — Sara was at Northshore from the day it opened in 2018 per Deo's own testimony, not 2021. O'Sullivan, who was present from approximately 2019-2020, confirmed Sara was there working: "She did whatever she wanted to, I guess." O'Sullivan Dep. (ECF 478-1). An employee does not do whatever she wants — an owner does. [A]

¶ 88. Deo was solely in charge of all of the operations of Northshore and Sunrise through August 2022. Chabrier Decl. ¶ X; Exhibit Deo Affidavit.

RESPONSE TO ¶88. OBJECTION [A]. Admitted in part; disputed in part. Deo Defendants admit that Anthony Deo was in charge of the day-to-day operations of NorthShore,

and of 189 Sunrise following the February 2021 purchase. This is consistent with the cited Chabrier deposition testimony that Anthony Deo had "the day-to-day operations of Northshore," was "the general manager," and was responsible for "selling cars, buying cars, [and] hiring employees." (Chabrier Dep. 76:18–21, 78:7–12, Jan. 9, 2026.) Deo Defendants dispute the implication that Anthony Deo's operational control establishes that he was a non-owner manager: such control is consistent with, and evidence of, ownership. (O'Sullivan Dep. 54:13–15; 161:20–23, Mar. 30, 2026.) To the extent ¶88 is supported by "Exhibit Deo Affidavit," that exhibit is not identified by document or Bates number, and "Chabrier Decl. ¶ X" identifies no paragraph; the precise temporal scope ("through August 2022") cannot be confirmed as cited.

¶ 89. Members of limited liability companies cannot be paid a salary. Jones Dep. 33:14-17.

RESPONSE TO ¶89. OBJECTION [D]. Disputed; cannot be admitted as cited. ¶89 asserts a proposition of law — that members of a limited liability company “cannot be paid a salary” — not a material fact, and it is not a proper statement under Local Civil Rule 56.1. The proposition is in any event immaterial: an owner’s receipt of salary does not negate ownership. The controller of NorthShore and 189 Sunrise testified that both Anthony Deo and Sara Deo were paid salary by the dealerships (O’Sullivan Dep. 119:5–120:8 (Mar. 30, 2026)), and that the controller understood a capital account to denote ownership — “if you weren’t an owner, you wouldn’t have a capital account” (id. 161:20–23). The Deos’ ownership of NorthShore and 189 Sunrise rests on the parties’ tax filings reflecting a 99%/1% allocation to Anthony and Sara Deo, not on whether their compensation was characterized as salary.

¶ 90. As an employee of Northshore and Sunrise, both Deo and Sara were paid a salary by Northshore and Sunrise. Chabrier Decl. ¶ X. O’Sullivan Dep. 119:9-120:10.

RESPONSE TO ¶90. OBJECTION [A]. Admitted in part; disputed in part. Defendants admit that the controller, Daniel O'Sullivan, testified that Anthony Deo and Sara Deo each received salary compensation from NorthShore and 189 Sunrise — specifically, that Deo was "on the payroll for salary" and that both Deo and Sara were, at the end, paid approximately $5,000 per week. (O'Sullivan Dep. 119:5-120:8 (Mar. 30, 2026).) Defendants dispute the paragraph to the extent the label "as an employee" is offered to imply that Deo and Sara were not owners of NorthShore and 189 Sunrise. An owner's receipt of salary compensation does not negate ownership. The same controller testified that Anthony Deo maintained a capital account at the dealerships, and that maintaining a capital account denotes ownership: "if you are a capital account, you are a[n] owner … if you weren't an owner, you wouldn't have a capital account." (O'Sullivan Dep. 161:20-23 (Mar. 30, 2026); see also id. 54:13-15 (Deo "was the boss").) Sara Deo's 1% ownership interest rests on the parties' tax filings reflecting a 99%/1% allocation between Anthony Deo and Sara Deo, not on any witness's lay perception of her day-to-day role. The "Chabrier Decl. ¶ X" citation identifies no paragraph and supplies no admissible evidence. L.R. 56.1(d). The Deos' receipt of salary is, in any event, immaterial to the question of ownership, except, as here, where the large amounts of money paid to the Deos reflect ownership, and not mere employment.

¶ 91. As an employee of Northshore and Sunrise, Deo also paid a percentage of gross sales to Car Buyers. Chabrier Decl. ¶ X; O'Sullivan Dep. 119:5-121:3

RESPONSE TO ¶91. OBJECTION [A]. Disputed in part; cannot be admitted as cited. Defendants admit that O'Sullivan testified that, in addition to salary, Anthony Deo received a monthly commission that was paid by the dealerships to Car Buyers NYC Inc. (Deo's company) by check. (O'Sullivan Dep. 119:11-13, 120:15-121:3 (Mar. 30, 2026).) The paragraph cannot be

admitted as cited insofar as it asserts that the commission was a percentage of "gross sales": the cited testimony states that the figure was a percentage of gross profit, not gross sales, and O'Sullivan expressly drew that distinction. (Id. 120:24-25; see id. 121:4-16.) Defendants further dispute the paragraph to the extent the label "as an employee" is offered to imply that Deo was not an owner of NorthShore and 189 Sunrise. An owner's receipt of profit-based compensation through a management company is consistent with, not contrary to, ownership; the same controller testified that Deo maintained a capital account at the dealerships, which denotes ownership. (Id. 161:20-23.) The "Chabrier Decl. ¶ X" citation identifies no paragraph and supplies no admissible evidence. L.R. 56.1(d). The arrangement is in any event immaterial to the question of ownership, except to the extent that money was paid to an owner's separate corporation, as Car Buyers was and is to the Deos.

¶ 92. Deo was the sole shareholder of Car Buyers. Deo Dep. 357:8-358:2; Deo II Dep. 89:18-22.

RESPONSE TO ¶92. Admitted in part; cannot be admitted as cited. Defendants admit that Anthony Deo testified that Car Buyers NYC Inc. is one of his companies. (Deo II Dep. 89:20-22 (Feb. 13, 2026).) To the extent the paragraph asserts that Deo was the "sole shareholder" of Car Buyers, that characterization cannot be admitted as cited: the cited testimony at Deo Dep. 357:8-358:2 (Jan. 12, 2026) does not address the shareholding of Car Buyers but concerns the nature of the company's consulting business and whether Deo was its only consultant — a question to which Deo testified, "I don't recall" (id. 357:21-358:2) — and the cited Deo II Dep. testimony establishes only that Car Buyers is "one of [Deo's] companies." The ownership of Car Buyers, a separate entity, is in any event immaterial to the ownership of NorthShore and 189 Sunrise.

¶ 93. David Baron died on May 25, 2021. Deo Dep. 171:3-5.

RESPONSE TO ¶93. Admitted. Admitted that Deo testified David Baron died on May 25, 2021. (Deo Dep. Tr. 171:3–5 (Jan. 12, 2026).)

¶ 94. Before Baron died, the individual management and accounting for Northshore and Sunrise were handled at the dealership level at its location through a dealership management system ("DMS") that was licensed by the Baron Group to operate all their other managed dealerships. Kwun Decl. ¶ X.; O'Sullvan Dep. 59:12-60:16.

RESPONSE TO ¶94. OBJECTION [A]. Admitted in part; cannot be admitted as cited. Defendants admit that O'Sullivan testified that NorthShore used a Dealer Track dealership management system that contained the dealership's financial information, including car sales, inventory, and floor plan financing. (O'Sullivan Dep. 59:12-60:2 (Mar. 30, 2026).) The paragraph cannot be admitted as cited in two respects. First, the assertion that the system "was licensed by the Baron Group to operate all their other managed dealerships" finds no support in the cited testimony, which says nothing about who licensed the system or about any "other managed dealerships" of the Baron Group; the only other citation, "Kwun Decl. ¶ X," identifies no paragraph and supplies no admissible evidence (L.R. 56.1(d)). Second, the cited testimony reflects that payroll was processed by an outside company, ADP, rather than entirely "at the dealership level." (O'Sullivan Dep. 60:3-12.) To the extent the paragraph implies that the use of a Baron-affiliated management system establishes Baron Group ownership or control of NorthShore and 189 Sunrise, that implication is disputed and immaterial; the recordkeeping platform a dealership uses does not bear on ownership, which rests on the Deos' purchase and the tax filings reflecting Anthony Deo 99% and Sara Deo 1%. Disputed that this was "handled at

the dealership level" without any involvement from IAG — Aaronson's controller Kwun regularly reviewed financials.

¶ 95. The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership including keeping track of inventory, sales, financing and all financial records and recordkeeping. Kwun Decl. ¶ X; O'Sullvan Dep. 59:12-60:16.

RESPONSE TO ¶95. OBJECTION [A]. Admitted. Kwun Decl. ¶ X is a pure placeholder ([A]). O'Sullivan Dep. 59:12- 60:16 is a real produced citation — and Defendants admit what it establishes. O'Sullivan confirmed the DealerTrack DMS at Northshore contained all financial information related to the dealership — car sales, inventory, floor plan financing, and payroll. "In the Dealer Track system at North Shore, as far as you know did that contain all the financial information related to the dealership? A: Yes. Q: Would that include car sales? A: Correct. Q: Inventory? A: Correct. Q: Would it include floor plan financing? A: Yes." O'Sullivan Dep. 59:12-60:3 (ECF 478-1). Admitted that the DMS was comprehensive. Disputed to the extent ¶ 95 implies that DMS entries by Deo constituted fraudulent representations — that characterization is a legal conclusion ([D]) addressed at ¶¶ 116-118. The comprehensiveness of the DMS also means that IAG, through Kwun's monitoring, had full access to all financial information at all times — negating any claim of hidden fraud.

¶ 96. Northshore hired Daniel O'Sullivan ("O'Sullivan") as its controller in or around 2019. Chabrier Decl. ¶ X; O'Sullvan Dep. 217:15-218:2.

RESPONSE TO ¶96. OBJECTION [A]. Disputed in part; cannot be admitted as cited. Defendants admit that Daniel O'Sullivan served as the controller for NorthShore. Defendants dispute the paragraph as cited in two respects. First, as to timing, the cited testimony does not

establish that O'Sullivan was retained "in or around 2019": O'Sullivan first testified that he began at NorthShore in "2021, something like that," and only after examining counsel suggested that the COVID-19 pandemic began in March 2020 did he revise his estimate to "2020, 2019 somewhere around there." (O'Sullivan Dep. 217:10-23 (Mar. 30, 2026).) The witness's recollection of the year was thus equivocal. Second, the cited testimony does not support the assertion that "NorthShore hired" O'Sullivan; O'Sullivan testified that David Baron placed him at NorthShore — "David put [him] into that store" (id. 217:24-218:2) — that when Port Motors closed Baron told him "I will put you someplace else" and "[p]ut me down as North Shore," and that O'Sullivan "always did what David said" (id. 48:4-21), Brian Chabrier having shown him the operations (id. 48:25). O'Sullivan further testified that he spent approximately 43 of his 45 years working at dealerships in which the Barons held an interest and that he had "great loyalty to the Baron family." (Id. 213:13-22.) That the Baron side installed NorthShore's controller bears on the Baron/IAG side's control of the dealership's financial function, not on the ownership of NorthShore, and does not establish that the Baron Group owned NorthShore or negate the Deos' ownership. The "Chabrier Decl. ¶ X" citation identifies no paragraph and supplies no admissible evidence. L.R. 56.1(d).

Disputed in part. Placeholder ([A]) as to Chabrier Decl. ¶ X. O'Sullivan Dep. 217:15-218:2 is a real produced citation. Admitted that O'Sullivan worked as controller at Northshore beginning around 2019-2020 — O'Sullivan himself was uncertain: "When did you begin at North Shore? A: 2021, something like that. Q: Was it before or after COVID? A: Before... It would be 2020, 2019 somewhere around there, yes." O'Sullivan Dep. 217:15-22 (ECF 478-1). The year 2019 in ¶ 96 is therefore approximate. Disputed as to "Northshore hired." O'Sullivan was not Northshore's independent hire — he was brought in through the IAG structure. Kwun confirmed O'Sullivan

was associated with Island Auto Group throughout: "Was Dan O'Sullivan in the Island Auto Group when you went to work there? A: I don't remember. Q: Has Dan O'Sullivan worked anywhere other than North Shore or 189 Sunrise that you know of through the Island Auto Group?" Kwun Dep. (ECF 478-2). Kwun further confirmed O'Sullivan was still working with IAG after Northshore closed. Kwun Dep. (ECF 478-2). An employee of Northshore would not continue working with IAG after Northshore ceased operations — O'Sullivan's continuity with IAG confirms his true employer was IAG, not Northshore. At Northshore, O'Sullivan reported to Anthony Deo: "What would you say Anthony's role was at the store? A: He was the boss." O'Sullivan Dep. (ECF 478-1). The controller's own identification of Deo as "the boss" is further evidence of Deo's owner-operator status, not employment.

¶ 97. Sunrise hired O'Sullivan as its controller in or around 2021. Chabrier Decl. ¶ X; O'Sullvan Dep. 48:22-50:1.

RESPONSE TO ¶97. OBJECTION [A]. Disputed in part; cannot be admitted as cited. Defendants admit that Daniel O'Sullivan served as the controller for 189 Sunrise (as well as for NorthShore), having taken over from the prior controller, Melissa. Defendants dispute the paragraph as cited. First, the cited testimony does not support the assertion that "Sunrise hired" O'Sullivan; O'Sullivan testified that David Baron placed him in the controller role — that "David wanted [him] to take [Melissa's] place at North Shore and Sunrise" (O'Sullivan Dep. 49:22-23 (Mar. 30, 2026)) — and, when asked whether Brian Chabrier brought him in, corrected that "No, David [did]," and that "David said I want you to go to North Shore" (id. 50:3-14). O'Sullivan further testified that the prior controller, Melissa, had simultaneously served as controller at Best Ford (David Baron's Ford dealership), NorthShore, and 189 Sunrise (id. 49:17-20), reflecting that the Baron side staffed the controller function across its dealerships. Second,

the cited testimony does not establish that the change occurred “in or around 2021”; O’Sullivan testified that he did not recall when it occurred and estimated only “a couple of years ago” (id. 49:24-50:2), and his testimony that he assumed the controller role for NorthShore and 189 Sunrise at the same time cannot be reconciled with Plaintiffs’ assertion in ¶ 96 that he was retained for NorthShore “in or around 2019.” That the Baron side installed and staffed the controller function bears on the Baron/IAG side’s control of the financial function, not on ownership; it does not establish Baron Group ownership of 189 Sunrise or negate the Deos’ ownership, 189 Sunrise having been purchased by the Deos in February 2021. The “Chabrier Decl. ¶ X” citation identifies no paragraph and supplies no admissible evidence. L.R. 56.1(d). Disputed. Placeholder ([A]) as to Chabrier Decl. ¶ X. O'Sullivan Dep. 48:22- 50:1 is a real produced citation — but the testimony at those pages directly contradicts ¶ 97's assertion that "Sunrise hired" O'Sullivan. O'Sullivan testified it was David Baron who placed him at Northshore and Sunrise — not Northshore or Sunrise that hired him: "He said, I am closing the place, I will put you someplace else... Put me down as North Shore." O'Sullivan Dep. 48:7-13 (ECF 478-1). "I always did what David said." O'Sullivan Dep. 48:20 (ECF 478-1). "David said I want you to go to North Shore... We will get somebody else, I want you to go to North Shore." O'Sullivan Dep. 50:12-15 (ECF 478-1). The meeting at which O'Sullivan was directed to Northshore was held at Chabrier's office at Baron Nissan. O'Sullivan Dep.50:5-16 (ECF 478-1). O'Sullivan was David Baron's controller, moved from Port Motors to Northshore at Baron's direction — consistent with the floor plan arrangement under which Baron provided not only the floor plan but also the controller. Kwun confirmed O'Sullivan continued working with IAG after Northshore closed. Kwun Dep. (ECF 478-2). O'Sullivan was IAG's controller placed at Northshore — not Northshore's or Sunrise's independent hire.

¶ 98. In performing his function as controller for Northshore and Sunrise, O'Sullivan took his orders solely from Deo. Chabrier Decl. ¶ X; O'Sullvan Dep. 223:11-14, 232:15-18.

RESPONSE TO ¶98. OBJECTION [A]. Disputed in part; cannot be admitted as cited. Defendants admit only that Deo, as the operator of the dealerships, gave O'Sullivan certain operational directions — specifically, O'Sullivan testified that Deo instructed him to make the lease payments (O'Sullivan Dep. 223:11-14 (Mar. 30, 2026)) and that Deo would, at times, ask him for cash, which O'Sullivan provided (id. 232:15-18). The cited testimony does not support the assertion that O'Sullivan took his orders "solely" from Deo. O'Sullivan testified that he "always did what David [Baron] said" (id. 48:21) and that David Baron — not Deo — placed him at the dealerships (see Responses to ¶¶ 96–97; id. 217:24-218:2, 49:22-23), and the cited passages concern only discrete instructions, not the entirety of O'Sullivan's direction. That Deo, as operator, directed the controller on operational matters is consistent with his role running the dealerships and does not bear on ownership. The "Chabrier Decl. ¶ X" citation identifies no paragraph and supplies no admissible evidence. L.R. 56.1(d).

Disputed as to the characterization "solely from Deo." Admitted that Deo directed O'Sullivan on operational matters including lease payments (O'Sullivan Dep. 223:11-14) and that O'Sullivan gave cash to Deo when asked (O'Sullivan Dep. 232:15-18) (ECF 478-1). The cited pages also reflect facts more significant than ¶ 98 discloses (Deo's capital-account draws).

¶ 99. After Baron's death, his estate was being handled by his wife, Iris. Aaronson Decl. ¶ X; Iris Dep. 13:25-14:12.

RESPONSE TO ¶99. OBJECTION [A]. Admitted in part; immaterial. Without waiving the standing objection to the blank "Aaronson Decl. ¶ X" citation (L.R. 56.1(d)), Defendants do not dispute that Iris Baron is the representative of the Estate of David Baron (Iris Dep. 9:1-9

(Jan. 5, 2026)), though she testified that her son-in-law Joshua Aaronson "took over everything" (id. 14:9-11). The administration of the Baron estate is immaterial to the ownership of NorthShore and 189 Sunrise.

¶ 100. Iris was never involved in Baron's automobile businesses. Iris Dep. 10:16-11:3.

RESPONSE TO ¶100. Admitted; immaterial. Admitted that Iris Baron testified she was never "involved in any of [her husband's] businesses" (Iris Dep. 10:16-11:3 (Jan. 5, 2026)). The point confirms Iris Baron's lack of personal knowledge of the matters at issue: she testified she has "no personal knowledge" of any wrongdoing by Deo and knows of it only because "Josh told me" (id. 53:1-22) — inadmissible hearsay.

¶ 101. Iris requested that Aaronson assist her in dealing with Northshore and Sunrise. Iris Dep. 13:25-14:12, 23:15-24:9; Aaronson Dep. 19:6-20:3, 40:22-41:14.

RESPONSE TO ¶101. Admitted in part. Defendants admit, based on the cited testimony of Joshua Aaronson, that following David Baron's death Aaronson assisted his mother-in-law, Iris Baron, in dealing with NorthShore: Aaronson testified that he met Deo because "I was helping my mother-in-law out" (Aaronson Dep. 19:16-20), and that he was "authorized by [Iris] to work with Anthony on Northshore" with her "knowledge and approval" (id. 41:9-14). Iris confirmed she "asked Josh to do everything" for her and authorized him to do so (Iris Dep. 23:15-24:9 (Jan. 5, 2026)). That the IAG side, through Aaronson, assumed the post-Baron role of dealing with NorthShore and 189 Sunrise is not disputed and is consistent with Defendants' position that the IAG side controlled the dealerships' financial relationship; it does not bear on ownership.

¶ 102. In or around June 2021 Aaronson agreed and met with Deo concerning the operations of Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶102. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation, which identifies no paragraph and supplies no admissible evidence; it must be disregarded. L.R. 56.1(d). To the extent a response is required, Defendants admit only that, following David Baron's death, Aaronson assumed a role dealing with NorthShore and 189 Sunrise on behalf of the IAG side (see Response to ¶ 101); the existence, date ("in or around June 2021"), and content of any specific "agree[ment]" or meeting are not established by any cited admissible evidence and are disputed.

¶ 103. It was agreed that Deo would continue to be solely in charge of all of the operations of Northshore and Sunrise and receive a salary. Aaronson Decl. ¶ X.

RESPONSE TO ¶103. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is disputed in any event. Defendants admit only that Deo operated NorthShore and 189 Sunrise, consistent with his ownership of those entities; the assertion that "it was agreed" Deo would be "solely in charge of all" operations rests on no admissible evidence, and Deo's receipt of a salary does not negate ownership (see Response to ¶ 90).

Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). The "agreed... salaried manager" characterization is contradicted by Aaronson's own testimony that there was a deal for Deo to obtain ownership and that he was "not misleading the IRS" when he approved 2021 tax returns listing Deo and Sara as 100% owners of Northshore. Aaronson Dep. 44-45 (ECF 404-1). Aaronson also confirmed Deo was given authority "to run the business... with my knowledge and approval" (Aaronson Dep. 40-41), and O'Sullivan maintained a capital account for Deo reflecting owner draws, not salary (O'Sullivan Dep. 233.

¶ 104. By Deo accepting the obligation to be solely in charge of all of the operations of Northshore and Sunrise he agreed to accurately report financial information of Northshore and Sunrise and to make appropriate vehicle inventory purchases. Aaronson Decl. ¶ X.

RESPONSE TO ¶104. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank “Aaronson Decl. ¶ X” citation and must be disregarded. L.R. 56.1(d). It is further objectionable and disputed because it asserts the existence of legal “obligation[s]” and “agree[ments]” — to “accurately report financial information” and “make appropriate vehicle inventory purchases” — that state the elements of Plaintiffs’ claims as though they were undisputed facts. These are improper legal conclusions unsupported by any admissible evidence.

¶ 105. Northshore, Sunrise and the IAG Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Northshore and Sunrise incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with Ally to use the Floor Plan. Aaronson Decl. ¶ X.

RESPONSE TO ¶105. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank “Aaronson Decl. ¶ X” citation and must be disregarded. L.R. 56.1(d). It is further objectionable and disputed because it asserts the IAG Plaintiffs’ “reasonable[] reli[ance]” and state of mind — elements of Plaintiffs’ misrepresentation theory — as fact, without any admissible evidentiary support. Reliance and another party’s state of mind are not established on this record and are not proper subjects for a statement of undisputed material fact.

Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). "Reasonably relied" is a fraud reliance element and a legal conclusion ([D]). The reliance theory fails because Deo did not submit financial information into the DMS — O'Sullivan did. Deo Dep. (ECF 518-10) ("That's a controller's forte").

¶ 106. Therefore, Aaronson permitted the IAG Plaintiffs to continue to provide and guarantee the Ally Floor Plan of Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶106. OBJECTION [A]. Disregard; disputed in part. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted that Aaronson permitted the IAG Plaintiffs to continue providing and guaranteeing the Ally floor plan — he was the decision-maker with full information. Disputed as to any inference that this permission was induced by fraud or misrepresentation by Deo. The "therefore" in ¶ 106 implies Aaronson's permission flowed from his reliance on Deo's financial representations. But as established at ¶ 105: Deo did not make those representations — O'Sullivan posted the financials to Ally. O'Sullivan Dep. 99:22-100:5 (ECF 478-1). Kwun monitored the DMS with full access. ECF 524 ¶ 119. O'Sullivan communicated with Ally directly. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Aaronson's decision to continue the floor plan was made with complete information through his own monitoring apparatus — IAG-placed controller (O'Sullivan), IAGcontroller monitoring (Kwun), and direct financial reporting to Aaronson through that chain.O'Sullivan Dep. 176:3-14 (ECF 478-1) ("when he took control, he wanted her there to see what was going on"). A party with full real-time visibility into the business it is monitoring cannot claim it was defrauded by misrepresentations it had the tools to detect and did detect.

¶ 107. As Northshore's and Sunrise's manager, Deo handled all operations of Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶107. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is disputed in any event. The predicate "As Northshore's and Sunrise's manager" states a legal characterization that assumes the disputed "manager, not owner" premise, not a fact. Defendants

admit only that Deo handled the day-to-day operations of NorthShore and 189 Sunrise — consistent with his ownership and operation of the dealerships, and as Aaronson himself acknowledged in testifying that Deo had authority "to run the day-to-day business" (Aaronson Dep. 40:14-18) — while disputing the "manager" label. Ownership rests on the Deos' purchase and the tax filings reflecting Anthony Deo 99% and Sara Deo 1%.

Disputed. "As Northshore's and Sunrise's manager" is the central contested legal conclusion ([D]); Aaronson Decl. ¶ X is a placeholder ([A]). Admitted that Deo handled operational matters — Chabrier confirmed "from the day we opened" (Chabrier Dep. 76-78), and Aaronson confirmed Deo ran"the day-to-day business... with my knowledge and approval" (Aaronson Dep. 40-41) (ECF 404-1; 406-2) — which reflects owner-operator authority, not employment.

¶ 108. As Northshore and Sunrise's manager, Deo was charged with the obligation and expectation that actions made concerning Northshore and Sunrise would be made for their benefit. Aaronson Decl. ¶ X.

RESPONSE TO ¶108. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is further objectionable and disputed because it asserts a legal "obligation and expectation" — in substance, a fiduciary-type duty owed by Deo — predicated on the disputed "manager" characterization. That is an improper legal conclusion unsupported by admissible evidence.

¶ 109. As Northshore and Sunrise's manager, Aaronson allowed Deo to handle the day-to-day operations of Northshore and Sunrise, including vehicle inventory purchases, and all aspects of financial reporting on behalf of Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶109. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is

disputed in any event. Defendants admit only that Deo handled the day-to-day operations of NorthShore and 189 Sunrise (consistent with his ownership and operation of the dealerships; Aaronson Dep. 40:14-18), and dispute the “as manager” characterization. Defendants further dispute the assertion that Deo handled “all aspects of financial reporting”: the dealerships’ financial statements, postings, reconciliations, and bill and tax payments were performed by the controller, O’Sullivan — a Baron-installed controller — not by Deo (see Responses to ¶¶ 96–98). Ownership rests on the Deos’ purchase and the tax filings reflecting Anthony Deo 99% and Sara Deo 1%.

Disputed. "As Northshore and Sunrise's manager" is a [D] legal conclusion — the central contested characterization in this case. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted in substance that Deo handled day-to-day operations and vehicle inventory purchases — Aaronson himself confirmed this under oath: "What authority was Anthony Deo given in the operation of Northshore Motors? A: To run the business, to run the day-today business. Q: Was that with your knowledge and approval after David Baron's death? A: Yes." Aaronson Dep. 40:22-41:14 (ECF 404-1). Disputed as to "Aaronson allowed" and "financial reporting." The word "allowed" implies Aaronson held superior authority over Deo's business — but Aaronson was a floor plan provider, not Deo's employer or superior. He provided banking and floor plan access for a monthly fee. Deo did not need Aaronson's permission to run his own business — he needed his floor plan. Aaronson's leverage was economic, not organizational. Disputed also as to "financial reporting" — Deo did not handle financial reporting. O'Sullivan posted monthly financial statements to Ally and communicated with the floor plan company. O'Sullivan Dep. 99:22-100:5, 219:15-220:15 (ECF 478-1). Deo confirmed financial processing was the controller's role:"The controller absolutely does... That's a controller's forte." Deo Dep. (ECF

518-10). The assertion that Deo handled "all aspects of financial reporting" is factually wrong — and it is the predicate on which Plaintiffs' wire fraud theory rests.

¶ 110. As Northshore and Sunrise's manager, Aaronson allowed Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶110. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). To the extent a response is required, Defendants admit only that Deo, in operating the dealerships, used floor plan financing to purchase inventory (see Response to ¶ 121), and dispute the "as manager" characterization. Ownership rests on the Deos' purchase and the tax filings.

¶ 111. As Northshore and Sunrise's manager, Northshore, Sunrise and the IAG Plaintiffs relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ X

RESPONSE TO ¶111. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is further disputed because it asserts the "rel[iance]" and state of mind of NorthShore, Sunrise, and the IAG Plaintiffs — elements of Plaintiffs' misrepresentation theory — as fact, predicated on the disputed "manager" characterization and unsupported by any admissible evidence. Reliance and another party's state of mind are improper subjects for a statement of undisputed material fact (see Response to ¶ 105).

Disputed. ¶ 111 is ¶ 110 recycled with a reliance element added. The same two false premises govern and are fully addressed at ¶¶ 109-110. First — Deo did not do "financial reporting."

O'Sullivan posted monthly financial statements to Ally and communicated with the floor plan company. O'Sullivan Dep. 99:22- 100:5, 219:15-220:15 (ECF 478-1). Deo confirmed: "The controller absolutely does... That's a controller's forte." Deo Dep. (ECF 518-10). IAG cannot have relied on "Deo's financial reporting" when Deo did not produce financial reports. Second — Deo did not deal directly with Ally. O'Sullivan was Ally's contact at Northshore. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Deo had no direct Ally relationship. There is no admissible deposition testimony establishing Deo communicated with Ally directly. Third — "relied upon" is a fraud reliance element — [D] not established by a placeholder declaration. Active monitoring by Kwun defeats blind reliance: "when he took control, he wanted her there to see what was going on." O'Sullivan Dep. 176:3-14 (ECF 478- 1). Aaronson Decl. ¶ X is a pure placeholder ([A]). "As manager" is [D]. This paragraph rests on three legal conclusions embedded as fact — none supported by admissible evidence.

¶ 112. As Northshore and Sunrise's manager, Northshore, Sunrise and the IAG Plaintiffs relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise and with respect to audits conducted by Ally. Aaronson Decl. ¶ X

RESPONSE TO ¶112. OBJECTION [A]. Disregard; disputed. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). It is disputed for the reasons stated in the Response to ¶ 111: it asserts the IAG side's reliance and state of mind, predicated on the disputed "manager" characterization, without any admissible evidentiary support.

Disputed. ¶ 112 is ¶¶ 110-111 recycled — now substituting "vehicle inventory purchases" for "financial reporting" as the thing IAG allegedly relied upon. The same three defeats apply. First — "As manager" is [D]. Aaronson Decl. ¶ X is a pure placeholder ([A]). The central ownership question remains unresolved. Gianelli Order at 6. Second — Deo did not deal directly with Ally. O'Sullivan was Ally's contact. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). No admissible deposition testimony establishes Deo communicated with Ally directly. The Ally audits referenced in ¶ 112 were conducted with O'Sullivan — Ally called O'Sullivan to schedule them. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Third — reliance on "appropriateness of vehicle inventory purchases" is [D] and factually defeated. Ally conducted independent physical audits of vehicle inventory — O'Sullivan confirmed Ally representatives came to the dealership. O'Sullivan Dep. 219:15- 220:15 (ECF 478-1). O'Sullivan posted monthly financial statements to Ally every month. O'Sullivan Dep. 99:22-100:5 (ECF 478-1). A floor plan lender that physically audits inventory and receives monthly financials is not relying on the dealership operator's representations about purchase "appropriateness" — it is verifying independently. Independent verification negates reliance. This paragraph rests entirely on a placeholder declaration ([A]) and three embedded legal conclusions ([D]) with no admissible evidentiary support.

¶ 113. By accepting the position as manager of Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise. Aaronson Decl. ¶X

RESPONSE TO ¶113. OBJECTION [A]. Disregard; disputed. Disputed. ¶ 113 is ¶¶ 107-112 recycled — now framing the "manager" label as a contractual acceptance of financial reporting obligations. The same defeats apply. First — "By accepting the position as manager" is [D]. Aaronson Decl. ¶ X is a pure placeholder ([A]). Deo never accepted a "manager position"

— he purchased Sunrise in February 2021 and had operated Northshore as owner-operator since 2018. Aaronson confirmed there was "a deal" for Deo to get ownership. Aaronson Dep. pp.44-45 (ECF 404- 1). A purchaser does not "accept a position" — he acquires an interest. Second — Deo never had a financial reporting obligation because he never did financial reporting. O'Sullivan posted monthly financial statements to Ally every month. O'Sullivan Dep. 99:22-100:5 (ECF 478-1). O'Sullivan communicated with the floor plan company. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Deo confirmed: "The controller absolutely does... That's a controller's forte." Deo Dep. (ECF 518-10). You cannot "accept an obligation to accurately report financial information" for a function you never performed. Third — "accepted the obligation" is a [D] contractual conclusion not established by a placeholder declaration. No written employment agreement, management contract, or operating agreement produced by Plaintiffs contains such an obligation. The signed Sunrise purchase agreement — withheld by Chabrier in his safe — establishes the actual terms of Deo's relationship with Sunrise. Deo Dep. pp.98-100 (ECF 518-10, Feb.12-13, 2026).

¶ 114. By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise. Aaronson Decl. ¶ X

RESPONSE TO ¶114. OBJECTION [A]. Disregard; disputed. ¶ 114 is ¶¶ 110-113 recycled again — now framing the false premise of Deo "dealing directly with Ally" as the trigger for accepting financial reporting obligations. Aaronson Decl. ¶ X is a pure placeholder ([A]). The entire premise is false. Deo did not deal directly with Ally. O'Sullivan was Ally's contact for audits and communications. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). O'Sullivan

posted monthly financial statements to Ally. O'Sullivan Dep. 99:22-100:5 (ECF 478-1). Deo confirmed financial processing was the controller's function. Deo Dep. (ECF 518-10) ("The controller absolutely does... That's a controller's forte."). A contractual obligation cannot flow from accepting a "right" that was never exercised. If Deo never dealt directly with Ally — and the deposition record establishes he did not — then the premise of ¶ 114 fails entirely and the obligation Plaintiffs seek to impose from it fails with it. This is a [D] legal conclusion built on a factually false foundation, supported only by a [A] placeholder declaration.

¶ 115. By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory. Aaronson Decl. ¶ X

RESPONSE TO ¶115. OBJECTION [A]. Disregard; Disputed. ¶ 115 is ¶ 114 with one word substituted — "accurately report financial information" replaced by "make appropriate vehicle inventory purchases and track inventory." The same false premise governs. Aaronson Decl. ¶ X is a pure placeholder ([A]). The Ally premise remains false. Deo did not deal directly with Ally. O'Sullivan Dep. 219:15- 220:15 (ECF 478-1). A contractual obligation cannot flow from accepting a right that was never exercised. See response to ¶ 114. Inventory tracking was also O'Sullivan's function. O'Sullivan confirmed the DealerTrack DMS contained all inventory information and he was responsible for recording transactions. O'Sullivan Dep. 59:12-60:3 (ECF 478-1). Ally itself conducted independent physical inventory audits. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). The obligation to "track inventory" resided with the controller — not with Deo. This paragraph is the ninth iteration of the same legal conclusion across ¶¶ 107-115 — each time substituting a different alleged obligation while resting on the same [A] placeholder and the

same false Ally premise. The Court should disregard the entire series as unsupported by admissible evidence. Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001).

¶ 116. Each time that Deo entered financial information into the DMS system, by doing so, he represented to Northshore, Sunrise, the IAG Plaintiffs and Ally that such financial information was true and accurate. Aaronson Decl. ¶ X.

RESPONSE TO ¶116. OBJECTION [A]. Disregard; Disputed. Aaronson Decl. ¶ X is a placeholder ([A]), and the premise is contradicted by the record: Deo did not enter financial information into the DMS — that was the controller's function. Deo Dep. (ECF 518-10) ("That's a controller's forte"); O'Sullivan confirmed he entered data and posted monthly statements (O'Sullivan Dep. as set forth in section 5 of the Deos Joint 56.1 Statement. That Deo's DMS entries were "fraudulent representations" is a legal conclusion ([D]) resting on a false premise.

¶ 117. Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to Northshore, Sunrise, the IAG Plaintiffs and Ally that such vehicle inventory purchase was appropriate. Aaronson Decl. ¶ X.

RESPONSE TO ¶117. OBJECTION [A]. Disregard; Disputed. ¶ 117 is ¶ 116 recycled — substituting "purchased a vehicle" for "entered financial information into the DMS" as the representation mechanism. Aaronson Decl. ¶ X is a pure placeholder ([A]). Purchasing a vehicle is not a representation to Ally. The legal proposition that buying a car for inventory constitutes an implied representation to the floor plan lender about the purchase's "appropriateness" is a [D] legal conclusion — not a factual assertion about conduct. No case law or contract provision is cited establishing that vehicle purchases carry implied representations of this type. Ally independently verified through physical audits. O'Sullivan confirmed Ally representatives came to the dealership to conduct independent inventory audits — Ally counted the cars itself.

O'Sullivan Dep. 219:15-220:15 (ECF 478-1). A floor plan lender that physically audits inventory does not rely on the borrower's implied representations about purchase appropriateness — it verifies independently. Independent verification negates implied reliance. This is the eleventh iteration of the ¶¶ 107-116 series, supported only by a

¶ 118. The IAG Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Northshore and Sunrise incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by Ally. Aaronson Decl. ¶ X.

RESPONSE TO ¶118. OBJECTION [A]. Disregard; Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). "Reasonably relied" is a fraud reliance element ([D]). The reliance theory fails because the underlying representations are disputed — Deo did not enter financial information into the DMS; O'Sullivan did (O'Sullivan Dep. 99-100).

¶ 119. In order for Aaronson to assist Iris in dealing with Northshore and Sunrise, he had the controller of IAG, Wendy Kwun ("Kwun"), was given access to the DMS system at Northshore and Sunrise t. Aaronson Decl. ¶ X.

RESPONSE TO ¶119. OBJECTION [A]. Disregard; Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). ¶ 119 as filed is a garbled sentence and cannot establish an undisputed fact. On the substance, disputed as to the framing of O'Sullivan's and Kwun's roles; Kwun's actual position is addressed by her own testimony.

¶ 120. When Northshore and Sunrise were experiencing cash flow issues, Aaronson asked Kwun to monitor the cash flow and provide assistance in the administrative aspects of closing out sales and registrations faster to generate quicker funding by a customer's financing company. Aaronson Decl. ¶ X.

RESPONSE TO ¶120. OBJECTION [A]. Disregard; Admitted that Aaronson asked Kwun to monitor cash flow and assist with administrative aspects. Disputed as to the characterization "experiencing cash flow issues" as if those issues arose from Deo's misconduct — the cash flow problems were caused in material part byAaronson's own actions: doubling the monthly management fee from $15,000 to $30,000 per entity, cutting Sara's salary, and reducing the floor plan lines after Deo kept asking about completing the Baron Nissan deal. Deo Dep.p.581 (ECF 518-10, Feb. 12, 2026).

Kwun confirmed O'Sullivan reported to her under the instructions of the general managers. Kwun Dep. p.72 (ECF 478-2). O'Sullivan was already her embedded reporter inside Northshore before she increased her physical presence in August 2022. O'Sullivan Dep. 185:18-24 (ECF 478-1). The cash flow "monitoring" was not reactive assistance — it was the escalation of a surveillance relationship that had existed since IAG placed O'Sullivan at Northshore. Aaronson Decl. ¶ X is a pure placeholder ([A]).

¶ 121. Deo arranged for Northshore and Sunrise to purchase used vehicle inventory using the Ally Floor Plan. Aaronson Decl. ¶ X; Deo II Dep. 70:12-25, 178:2-16.

RESPONSE TO ¶121. OBJECTION [A]. Admitted in part; cannot be admitted as cited. Without waiving the standing objection to the blank “Aaronson Decl. ¶ X” citation (L.R. 56.1(d)), Defendants admit that Deo, in operating NorthShore, used floor plan financing to purchase used vehicle inventory: Deo testified that NorthShore’s cars were purchased “some” with floor plan money and “some” with cash (Deo II Dep. 70:19-22 (Feb. 13, 2026)), and that a vehicle purchased by NorthShore with floor plan financing was later paid off by NorthShore (id. 178:6-16). The paragraph cannot be admitted as cited in two respects: the cited testimony refers to “floor plan” financing generally and does not identify the lender as “Ally,” and it reflects that

some inventory was purchased with cash rather than the floor plan (id. 70:21-22). Deo's use of available floor plan financing to purchase inventory is consistent with his operation of the dealership and is immaterial to ownership.

¶ 122. Ally maintained a lien on all vehicles purchased using the Floor Plan. Aaronson Decl. ¶ X.

RESPONSE TO ¶122. OBJECTION [A]. Disregard; admitted in part; immaterial. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). To the extent a response is required, Defendants do not dispute, as a general matter of floor plan financing, that a floor plan lender such as Ally maintains a lien or security interest on the vehicles it finances. The point is immaterial to ownership.

¶ 123. When a vehicle was sold, within days Ally was to be repaid the amount borrowed to purchase that vehicle, plus accrued interest, in order to release the lien or security interest Ally placed on the vehicle. Aaronson Decl. ¶ X.

RESPONSE TO ¶123. OBJECTION [A]. Disregard; admitted in part; immaterial. The paragraph rests solely on the blank "Aaronson Decl. ¶ X" citation and must be disregarded. L.R. 56.1(d). To the extent a response is required, Defendants do not dispute, as a general description of floor plan financing, that upon the sale of a floored vehicle the lender is to be repaid the amount advanced plus accrued interest in order to release its lien or security interest. The point is immaterial to ownership.

Admitted as a standard floor plan term. When a vehicle was sold, the floor plan advance for that vehicle was to be repaid to Ally to release the lien. Aaronson Decl. ¶ X is a pure placeholder ([A]) but the proposition itself reflects standard floor plan mechanics.

Note: the obligation to "curtail" — repayAlly for sold vehicles — was tracked and administered by O'Sullivan as controller, not by Deo. O'Sullivan Dep. 99:22-100:5 (ECF 478-1). O'Sullivan communicated with Ally on floor plan matters. O'Sullivan Dep. 219:15- 220:15 (ECF 478-1). The administrative mechanics of floor plan repayment were the controller's function.

¶ 124. As Northshore's and Sunrise's manager Deo dealt directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶124. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo was an owner of Northshore and Sunrise (see Defendants' Responses to ¶¶ 226, 239), not a mere "manager" or employee, and the asserted obligations state legal conclusions, denied. Disputed. "As Northshore's and Sunrise's manager" is [D]. Aaronson Decl. ¶ X is a pure placeholder ([A]). ¶ 124 is a recycled version of ¶¶ 110-115 — same false Ally premise, now restated. See responses to ¶¶ 110-115. Deo did not deal directly with Ally. O'Sullivan was Ally's contact — Ally called O'Sullivan to schedule audits, O'Sullivan spoke with the floor plan representative, and O'Sullivan posted monthly financials to Ally. O'Sullivan Dep. 219:15-220:15; 99:22-100:5 (ECF 478-1). Deo confirmed financial processing was the controller's function. Deo Dep. (ECF 518-10) ("The controller absolutely does... That's a controller's forte."). No admissible deposition testimony establishes Deo communicated directly with Ally on floor plan matters.

¶ 125. As Northshore's and Sunrise's manager Deo was responsible for assuring that Ally was timely repaid for all sold vehicles purchased using the Floor Plan. Aaronson Decl. ¶ X.

Deo Falsified Financial Statements at Northshore & Sunrise with his Accountants

RESPONSE TO ¶125. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Aaronson Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo was an owner of Northshore and Sunrise (see Defendants’ Responses to ¶¶ 226, 239), not a mere “manager” or employee, and the asserted obligations state legal conclusions, denied. Timely repayment was effected through the controller; The unwinding of cancelled deals and the associated floor-plan payoffs were controller functions in which Deo did not personally participate (Deo Dep. Tr. 137:10-19 (Jan. 12, 2026)). [A]. Disputed. "As Northshore's and Sunrise's manager" is [D]. Aaronson Decl. ¶ X is a pure placeholder ([A]). ¶ 125 is ¶ 124 recycled — same false premise, now framed as a repayment responsibility. The obligation to ensure timely floor plan repayment resided with the controller — not Deo. O'Sullivan tracked sold vehicles, managed floor plan curtailments, and communicated with Ally on repayment matters. O'Sullivan Dep. 219:15-220:15; 99:22-100:5 (ECF 478-1). O'Sullivan confirmed Deo never participated in the unwinding process — "That's a controller's forte." Deo Dep. (ECF 518-10). Furthermore, when floor plan repayment problems arose, O'Sullivan reported them to Kwun — not the other way around. O'Sullivan Dep. 181:2-182:16; 185:18-24 (ECF 478-1). If Deo were responsible for assuring Ally was timely repaid, the reporting chain would have run through Deo. Instead it ran through O'Sullivan to Kwun to Aaronson — an IAG internal chain that bypassed Deo entirely. That chain reveals who was actually responsible for the floor plan relationship: IAG, through its embedded controller reporting to its own controller.

¶ 126. In order for IAG Plaintiffs and Ally to continue to provide the Floor Plan to Northshore and Sunrise, Northshore and Sunrise were required to provide IAG Plaintiffs and Ally monthly financial reports. Aaronson Decl. ¶ X.

RESPONSE TO ¶126. OBJECTION [A]. Admitted that monthly financial statements were required to be provided to IAG Plaintiffs and Ally to maintain the floor plan. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted — and this admission is affirmative evidence for Defendants. O'Sullivan confirmed he was the one who posted monthly financial statements and sent them to Ally: "I posted the financial statement and sent it off to Lincoln Mercury every month. Then, I sent the financial statement off to Ally every month." O'Sullivan Dep. 99:22-100:5 (ECF 478- 1). Deo confirmed: "Wendy and Dan supplied Ally with the monthly financials." Deo Dep. 582:21-583:12 (ECF 518-10, Feb. 12, 2026). — cited by Plaintiffs themselves at ECF 524 ¶ 876. The entity that provided monthly financials to Ally was therefore O'Sullivan and Kwun — not Deo. This directly contradicts ¶¶ 116-118's assertion that "each time Deo entered financial information into the DMS, he represented to... Ally." Deo did not enter the DMS. Deo did not supplyAlly with financials. IAG's own embedded personnel did both.

¶ 127. Deo engaged the services of Thomas Jones, CPA ("Jones") on behalf of Northshore and Sunrise to work on their monthly financial reporting. Aaronson Decl. ¶ X.; Jones Dep. 55:3- 8.

RESPONSE TO ¶127. OBJECTION [A]. Disputed; cannot be admitted as cited. The paragraph's reliance on a blank "Decl. ¶ X" placeholder is defective and is disregarded under Local Civil Rule 56.1(d). Defendants cannot admit the paragraph as cited: the cited testimony (Jones Dep. 55:3- 8) is from a deposition that is not part of the present record and therefore cannot be admitted as cited. The assertion is immaterial to the claims and defenses presented on the parties' cross-motions, and is not established as undisputed by admissible evidence. Disputed. Admitted that Deo engaged Jones to work on monthly financial reporting for Northshore and Sunrise. Aaronson Dep. p.44 (ECF 404- 1) (Aaronson was aware of Jones's work). Placeholder ([A]) as to Aaronson Decl. ¶ X. Disputed as to the characterization "on behalf

of Northshore and Sunrise" — O'Sullivan confirmed Jones only came to Northshore, not Sunrise. O'Sullivan Dep. 109:22-25 (ECF 478- 1).

¶ 128. Deo engaged the services of Jones at least as early as August 2021. Aaronson Decl. ¶ X; Jones Dep. 73:24-74:8.

RESPONSE TO ¶128. Admitted.

¶ 129. Each month Jones and Deo would decide on adjustments to the financial records of Northshore and Sunrise. Aaronson Decl. ¶ X; Jones Dep. 23:3-25, 25:6-14, 26:4-20, 63:25-64:16, 92:3-15, 119:16-120:11.

RESPONSE TO ¶129. OBJECTION [A]. Disputed as to characterization. Placeholder ([A]) as to Aaronson Decl. ¶ X. O'Sullivan's testimony describes the process: Jones would come to Northshore, meet with Deo in the conference room, then give O'Sullivan a piece of paper with adjusting entries to post: "Tom Jones would come out and hand you a piece of paper? A: Correct. Q: On that paper would be what? A: All of the adjusting entries that he wanted me to make." O'Sullivan Dep. 108:12-17 (ECF 478-1). Critically, O'Sullivan testified that Jones only came to Northshore — not Sunrise: "Was that North Shore or Sunrise or both? A: He only came to North Shore." O'Sullivan Dep. 109:22-25 (ECF 478-1). The assertion that Jones and Deo decided on adjustments for "Northshore and Sunrise" is therefore disputed as to Sunrise — O'Sullivan confirms Jones was only present at Northshore.

¶ 130. After Jones and Deo decided on adjustments to the financial records of Northshore and Sunrise, Jones would have O'Sullivan enter those adjustments into Northshore's and Sunrise's DMS system. Aaronson Decl. ¶ X. O'Sullivan Dep. 105:6-112:20.

RESPONSE TO ¶130. OBJECTION [A]. Disputed in part; cannot be admitted as cited. The blank "Aaronson Decl. ¶ X" is disregarded (L.R. 56.1(d)). Admitted only that O'Sullivan

testified he entered adjustments into the DMS system. (O’Sullivan Dep. 105:6–112:20 (Mar. 30, 2026).) Defendants dispute that “Jones and Deo decided on” the adjustments; O’Sullivan attributed the adjusting entries to the accountant, testifying “Those are Tom Jones entries.” (Id. 194:25; see id. 246:11-18.) Disputed as to characterization. Aaronson Decl. ¶ X is a placeholder ([A]). O'Sullivan Dep. 105-112 (ECF 478-1) confirms the actual chain of custody: Jones reviewed schedules monthly with O'Sullivan, met with Deo, then handed O'Sullivan the journal entries — i.e., the adjustments ran through Jones (the outside accountant) and O'Sullivan, not Deo alone.

¶ 131. Deo and Jones made adjustments to Northshore’s and Sunrise’s monthly financial information every month between at least August 2021 through October 2022. Aaronson Decl. ¶ X; Jones Dep. 23:3-25, 25:6-14, 26:4-20, 63:25-64:16, 92:3-15, 119:16-120:11.

RESPONSE TO ¶131. OBJECTION [A]. Disputed. Placeholder ([A]) as to Aaronson Decl. ¶ X. O'Sullivan's testimony — which is produced and which ECF 524 ¶ 130 itself cites — describes the monthly adjustment process: Jones came in at end of month, reviewed schedules with O'Sullivan, met with Anthony in the conference room "every time," and then handed O'Sullivan a general journal entry form with adjusting entries to post into the books. O'Sullivan Dep. 105:6-112:20 (ECF 478-1). O'Sullivan testified Jones never explained why he was making those adjustments: "Did he ever tell you why he was making those adjustments? A: No." O'Sullivan Dep. 110:18-20 (ECF 478-1). Disputed as to "Northshore and Sunrise" — O'Sullivan confirmed Jones only came to Northshore: "Was that North Shore or Sunrise or both? A: He only came to North Shore." O'Sullivan Dep. 109:22-25 (ECF 478-1). The time period "August 2021 through October 2022" is also disputed — Deo testified he met Jones in 2020, predating the August 2021 start date. Deo Dep. p.464 (ECF 518-10).

¶ 132. Many of those adjustments had the effect of making Northshore and Sunrise appear more profitable on a monthly basis than they actually were. Kwun Decl. ¶ X.

RESPONSE TO ¶132. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The controller testified that Thomas Jones, CPA — "Anthony's accountant" — came in monthly to review the books, as every dealership had an accountant do (O'Sullivan Dep. 94:4-95:24 (Mar. 30, 2026)); the monthly adjustments were the accountant's entries — "Those are Tom Jones entries," the controller testified (id. 194:25) — not fabrications by Deo. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Made Northshore and Sunrise appear more profitable than they actually were" is a [D] legal conclusion about the effect of the adjustments — not a factual assertion established by admissible evidence. No accounting expert opinion is cited. This paragraph exposes the fundamental problem with Kwun's role in ECF 524. Kwun is the sole citation for the proposition that adjustments falsified profitability. But Kwun was monitoring the DMS with full access. ECF 524 ¶ 119. Kwun was receiving O'Sullivan's realtime reports. O'Sullivan Dep. 181:2-182:16 (ECF 478-1). Kwun supplied Ally with the monthly financials herself. Deo Dep. 582:21-583:12 (ECF 518-10, Feb. 12, 2026). If adjustments were making the financials appear false, Kwun — who was reviewing those financials, monitoring the DMS, and sending the results to Ally — either detected the falsification or did not. If she detected it, she and Aaronson knew and chose to continue the floor plan — negating reliance. If she did not detect it, her monitoring was ineffective — negating the premise that IAG had a reliable oversight apparatus. Either way, Kwun's own declaration cannot establish that adjustments falsified profitability without confronting what Kwun herself knew, when she knew

it, and what she did with that knowledge. Those questions have never been answered in ECF 524 — because answering them would destroy the reliance theory.

¶ 133. The IAG Plaintiffs and Ally were unaware that Deo and Jones made adjustments to the monthly Northshore and Sunrise financial statements that had the effect of making Northshore and Sunrise appear more profitable on a monthly basis than they actually were. Aaronson Decl. ¶ X.

RESPONSE TO ¶133. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The IAG Plaintiffs' asserted unawareness is unsupported; The controller testified that Thomas Jones, CPA — "Anthony's accountant" — came in monthly to review the books, as every dealership had an accountant do (O'Sullivan Dep. 94:4-95:24 (Mar. 30, 2026)); the monthly adjustments were the accountant's entries — "Those are Tom Jones entries," the controller testified (id. 194:25) — not fabrications by Deo. [A]. Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). The assertion that IAG and Ally were"unaware" of adjustments is contradicted by the record: Aaronson arranged for Kwun to have full DMS access (ECF 524 ¶ 119) and she monitored cash flow (ECF 524 ¶ 120). If the monthly statements were visible to Kwun, IAG cannot claim unawareness.

¶ 134. The monthly financial statements were provided to the IAG Plaintiffs and Ally as required for the floor plan financing for Northshore and Sunrise to continue. Aaronson Decl. ¶ X.
RESPONSE TO ¶134. OBJECTION [A]. Disputed. ¶ 134 is ¶ 126 recycled. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted that monthly financial statements were provided to IAG Plaintiffs and Ally as required. See response to ¶ 126. Disputed as to who provided them — O'Sullivan confirmed he posted monthly financial statements and sent them to Ally every month.

O'Sullivan Dep. 99:22-100:5 (ECF 478-1). Deo confirmed "Wendy and Dan supplied Ally with the monthly financials." Deo Dep. 582:21-583:12 (ECF 518-10, Feb. 12, 2026) — cited by Plaintiffs at ECF 524 ¶ 876. The monthly statements were provided by O'Sullivan and Kwun — not by Deo. Disputed as to any implication that the statements were false or misleading. That characterization requires expert accounting testimony not supplied by a [A] placeholder. The financial statements were prepared by Jones, posted by O'Sullivan, reviewed by Kwun, and transmitted to Ally by Kwun. If those statements were inaccurate, the chain of responsibility runs through IAG's own personnel — not Deo.

¶ 135. The monthly financial statements were provided to the IAG Plaintiffs and Ally to induce the IAG Plaintiffs and Ally to continue to provide the Floor Plan financing for Northshore and Sunrise. Aaronson Decl. ¶ X. Deo Manipulates Used Vehicle Purchases

RESPONSE TO ¶135. OBJECTION [A]. Disputed. ¶ 135 is ¶¶ 126 and 134 recycled — now adding "to induce" as a fraudulent intent element. Aaronson Decl. ¶ X is a pure placeholder ([A]). "Provided to induce" is a [D] fraudulent intent conclusion not established by a placeholder declaration. The monthly financial statements were provided as a contractual requirement of the floor plan — not to induce anything. O'Sullivan confirmed this was his routine monthly function: "I posted the financial statement and sent it off to... Ally every month." O'Sullivan Dep. 99:22-100:5 (ECF 478-1). Deo confirmed "Wendy and Dan supplied Ally with the monthly financials." Deo Dep. 582:21-583:12 (ECF 518-10, Feb. 12, 2026) — cited by Plaintiffs at ECF 524 ¶ 876. The fraudulent intent element fails for a separate reason — the person who transmitted the financials to Ally was Kwun, IAG's own representative. A party cannot be "induced" by its own agent's transmissions. Ally received the financials from Kwun — Aaronson's right hand. O'Sullivan Dep. 238:19-21 (ECF 478-1). If Kwun transmitted financials to Ally that induced

Ally to continue the floor plan, the inducement came from IAG's own personnel — not from Deo. Fraudulent inducement requires that the defendant made the representation. Here the representation was made by IAG's own controller to IAG's floor plan provider. That is not fraud by Deo — it is IAG's own conduct.

¶ 136. Because Deo operated Northshore and Sunrise for his personal benefit rather than the benefit of Northshore and Sunrise and its members, Northshore and Sunrise were without sufficient capital to purchase quality used vehicle inventory. Kwun Decl. ¶ X.

RESPONSE TO ¶136. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "For his personal benefit" is conclusory; The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw, and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A][E].

¶ 137. Purchasing quality used vehicle inventory required an investment of capital as Ally financed the purchase of non-auction used vehicles at the rate of eighty (80%) of the wholesale book value of such vehicle in very good condition. Kwun Decl. ¶ X.

RESPONSE TO ¶137. OBJECTION [A]. Disputed as to the sole citation. Kwun Decl. ¶ X is a pure placeholder ([A]). Admitted as a general floor plan proposition that Ally financed non-auction used vehicle purchases at 80% of wholesale book value in very good condition. This is standard floor plan mechanics. Disputed to the extent ¶ 137 implies Deo was concealing vehicle condition from Ally. Ally conducted independent physical inventory audits — its representatives came to the dealership, inspected vehicles, and reviewed the inventory list with O'Sullivan. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). A floor plan lender that physically

audits vehicle inventory is not relying solely on the borrower's representations about vehicle condition.

¶ 138. In so doing, Ally, Northshore, Sunrise and the IAG Plaintiffs reasonably expected that Northshore and Sunrise would cover the balance of the purchase price not covered by the Ally Floor Plan. Aaronson Decl. ¶ X.

RESPONSE TO ¶138. OBJECTION [A]. Disregard. The citation relies on a blank “Kwun Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Asserts the lenders’ expectation; immaterial and unsupported. [A].

¶ 139. It was discovered in 2022 that Deo had been purchasing used vehicle inventory for Northshore and Sunrise that were in poor and damaged condition. Aaronson Decl. ¶ X.

RESPONSE TO ¶139. OBJECTION [A]. Disputed as to characterization and the sole citation. Aaronson Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo was "purchasing used vehicle inventory in poor and damaged condition" as a scheme is a [D] legal conclusion not established by admissible evidence. No produced deposition testimony from a witness with personal knowledge of specific vehicle conditions is cited. Disputed as to "discovered in 2022" — Ally conducted regular physical inventory audits throughout the period. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). If vehicle condition was observable during those audits, it was not "discovered" only in 2022 — Ally had the means to observe it throughout. The characterization of "discovery" implies prior concealment that Ally's own audit process contradicts.

¶ 140. Deo did not advise Ally, Northshore, Sunrise or the IAG Plaintiffs that he was purchasing used vehicle inventory in poor and damaged condition. Aaronson Decl. ¶ X.

RESPONSE TO ¶140. OBJECTION [A]. Disputed as to characterization and the sole citation. Aaronson Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo had an

obligation to "advise" Ally about vehicle condition is a [D] legal conclusion about a disclosure duty not established by any cited contract, regulation, or agreement. Furthermore, Ally conducted independent physical inventory audits at the dealership. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Vehicle condition is observable on inspection. A lender that physically inspects vehicles cannot claim it was uninformed about their condition — its own auditors observed the vehicles. The assertion that Deo failed to advise Ally of something Ally's own auditors could see is not a cognizable fraud theory.

¶ 141. Because the vehicles were in poor and damaged condition, Deo was able to arrange for Northshore and Sunrise to purchase the vehicles for less than the amount Ally would finance for eighty (80%) percent of the purchase of the same vehicle had it been in very good condition. Kwun Decl. ¶ X.

RESPONSE TO ¶141. OBJECTION [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The theory that Deo purchased damaged vehicles below book value to pocket the Ally overfunding is a fraud allegation — [D] — not established by admissible deposition testimony from a produced transcript. No produced deposition witness establishes: (1) the condition of any specific vehicle at the time of purchase; (2) that Ally funded above the actual purchase price for specific vehicles; or (3) that any such differential was "retained by Deo" rather than used in dealership operations. Kwun's declaration cannot establish specific vehicle conditions she did not personally inspect.

¶ 142. By so doing, Ally funded the purchases at eighty (80%) of the wholesale book value of each such vehicle as if they been in very good condition. Kwun Decl. ¶ X.

RESPONSE TO ¶142. OBJECTION [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that "Ally funded the purchases at 80% of wholesale book value

as if they had been in very good condition" requires Kwun to have personal knowledge of each vehicle's actual condition and Ally's funding decision for each vehicle — knowledge she cannot establish through a placeholder declaration. Ally had its own underwriting process and its own auditors who inspected vehicles. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). IfAlly funded vehicles at 80% of book value in very good condition despite observable damage, that reflects Ally's own underwriting judgment — not Deo's concealment.

¶ 143. The amount Ally funded to Northshore and Sunrise was in excess of the purchase price of the vehicles. Kwun Decl. ¶ X.

RESPONSE TO ¶143. OBJECTION [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that "the amount Ally funded was in excess of the purchase price" is a specific financial claim requiring vehicle-by-vehicle documentation — not a placeholder declaration. Kwun's deposition was produced but no specific vehicle transaction is established by deposition testimony.

¶ 144. The excess funds funded by Ally were then part of the Northshore and Sunrise funds then taken by Deo, leaving Northshore, Sunrise or the IAG Plaintiffs subject to repay Ally the fully funded amount if the vehicle did not sell for at least the Floor Plan funding amount. Kwun Decl. ¶ X.

RESPONSE TO ¶144. OBJECTION [A] [E]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that "excess funds were taken by Deo" is a theft allegation — a [D] legal conclusion requiring admissible evidence of (1) the excess amount for each vehicle, (2) that the funds were taken by Deo rather than applied to dealership operations, and (3) that Deo had no authority to draw on those funds. As established throughout this counter-statement, Deo had a capital account maintained by O'Sullivan. When cash was taken, O'Sullivan recorded it as

a reduction to Deo's capital account — owner draw accounting, not theft recording. O'Sullivan Dep. 233:2-4 (ECF 478-1). The "taken by Deo" characterization contradicts O'Sullivan's own accounting treatment at the time.

¶ 145. Had Northshore, Sunrise, the IAG Plaintiffs or Ally been aware of the true nature of these transactions, they would not have approved of the purchases or financing. Aaronson Decl. ¶ X.

RESPONSE TO ¶145. OBJECTION [A]. Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). "Would not have approved" is a [D] hypothetical reliance conclusion. The entire ¶¶ 137-145 damaged vehicle series rests solely on placeholder declarations — Kwun Decl. ¶ X and Aaronson Decl. ¶ X — with no produced deposition testimony establishing vehicle conditions, Ally funding decisions, or the differential amounts alleged. Furthermore, Ally conducted independent physical audits of inventory. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). A floor plan lender that physically inspects vehicles and independently determines funding amounts cannot claim it would not have approved purchases it had already independently verified and funded. The "would not have approved" assertion is incompatible with Ally's own audit and funding process.¶ 146. [R]Response: Disputed. Kwun Decl. ¶ X is a placeholder ([A]). The ¶¶ 146-167 series consists of recycled "examples" supported solely by Kwun Decl. ¶ X placeholders, with no produced deposition citation establishing the specific vehicle transactions alleged — inadmissible at summary judgment.

¶ 146. Deo committed this practice on a regular basis, some examples provided herein. Kwun Decl. ¶ X.

RESPONSE TO ¶146. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a "practice" occurred "on a regular basis" is conclusory. [A].

¶ 147. Example 1: On December 21, 2021 Deo arranged for Northshore to purchase a 2017 Audi for $31,000.00 from Herold Motor Cars. Kwun Decl. ¶ X.

RESPONSE TO ¶147. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course inventory purchase, immaterial to ownership. [A].
Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Example 1 — the December 21, 2021 Herold Motor Cars Audi transaction — is addressed comprehensively at

¶ 148. The wholesale book value of this vehicle in very good condition was $39,571.87. Kwun Decl. ¶ X.

RESPONSE TO ¶148. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A vehicle's "book value in very good condition" versus its actual condition is a contested valuation/business judgment, unsupported by competent evidence. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The book value assertion of$39,571.87 is supported only by a placeholder. Kwun has no established personal knowledge of the vehicle's condition or book value at the time of purchase.

¶ 149. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ X.

RESPONSE TO ¶149. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That the price “reflected” damaged condition is a conclusory characterization, unsupported. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "The price paid reflected the poor and damaged condition" is a [D] legal conclusion about vehicle condition not established by any produced deposition testimony from a witness who inspected this specific vehicle. Ally independently audited inventory and could assess vehicle conditions. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). See response to ¶ 146.

¶ 150. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ X.

RESPONSE TO ¶150. OBJECTION [A]. Disregard. The citation relies on a blank “Kwun Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of an electronic funding request, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo requested by interstate electronic communication forAlly to fund the purchase" is the wire fraud predicate for this transaction — a [D] legal conclusion supported only by a placeholder. No produced deposition testimony establishes Deo personally transmitted any electronic communication to Ally for this specific vehicle. O'Sullivan communicated with Ally on floor plan matters. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). See response to ¶ 146.

¶ 151. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle’s poor and damaged condition. Kwun Decl. ¶ X.

RESPONSE TO ¶151. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Kwun Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo made no representation as to a vehicle’s condition when placing it on the floor plan; the condition of inventory is a business judgment, and flooring/valuation were controller

functions. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The duty to "advise" Ally of vehicle condition is a [D] legal conclusion about a disclosure obligation not established by any cited contract or regulation. Ally independently inspected vehicles. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). See response to ¶ 146.

¶ 152. As such, Ally funded the purchase for $31,657.50, eighty (80%) percent of the book value. Kwun Decl. ¶ X.

RESPONSE TO ¶152. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of the funding amount, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The specific funding amount of $31,657.50 is supported only by a placeholder. Ally's funding decisions were made through its own underwriting process. See response to ¶ 146.

¶ 153. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ X.

RESPONSE TO ¶153. OBJECTION [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo retained the difference between the funding amount and the purchase price" is a [D] theft allegation. O'Sullivan recorded cash as reductions to Deo's capital account — owner draw accounting, not theft. O'Sullivan Dep. 233:2-4 (ECF 478-1). See response to ¶ 146.

¶ 154. Example 2: On January 25, 2022 Deo arranged for Northshore to purchase a 2019 Mercedes Benz for $34,000.00 from Herold Motor Cars. Kwun Decl. ¶ X.

RESPONSE TO ¶154. OBJECTION [A]. Denied. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course inventory purchase, immaterial to ownership. [A]. Disputed. Kwun Decl. ¶ X is

a pure placeholder ([A]). Example 2 — the January 25, 2022 Mercedes Benz transaction from Herold Motor Cars — is addressed comprehensively at ¶ 146. No produced deposition testimony establishes any specific detail of this transaction. See response to ¶ 146.

¶ 155. The wholesale book value of this vehicle in very good condition was $44,128.12. Kwun Decl. ¶ X.

RESPONSE TO ¶155. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A vehicle's "book value in very good condition" versus its actual condition is a contested valuation/business judgment, unsupported by competent evidence. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The book value of $44,128.12 is supported only by a placeholder. See response to ¶ 146.

¶ 156. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ X.

RESPONSE TO ¶156. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the price "reflected" damaged condition is a conclusory characterization, unsupported. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶ 149 — "price reflected poor and damaged condition" is a [D] legal conclusion not established by produced deposition testimony from a witness with personal knowledge of this specific vehicle. See response to ¶ 146.

¶ 157. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ X.

RESPONSE TO ¶157. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of an electronic funding request, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶ 150 — wire fraud predicate unsupported by produced deposition testimony. Deo did not communicate directly with Ally.O'Sullivan Dep. 219:15-220:15 (ECF 478-1). See response to

¶ 158. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition. Kwun Decl. ¶ X.

RESPONSE TO ¶158. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo made no representation as to a vehicle's condition when placing it on the floor plan; the condition of inventory is a business judgment, and flooring/valuation were controller functions. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶ 151. See response to ¶ 146.

¶ 159. As such, Ally funded the purchase for $35,302.50, eighty (80%) percent of the book value. Kwun Decl. ¶ X.

RESPONSE TO ¶159. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of the funding amount, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The funding amount of $35,302.50 is supported only by a placeholder. See response to ¶ 146.

¶ 160. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ X.

RESPONSE TO ¶160. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph itself states the difference was retained "for the benefit of the Plan" — not for Deo personally — and The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw, and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶ 153 — theft allegation contradicted by O'Sullivan's capital account treatment. O'Sullivan Dep. 233:2-4 (ECF 478-1). See response to ¶ 146.

¶ 161. Example 3: On January 25, 2022 Deo arranged for Northshore to purchase a 2016 Jaguar for $27,000.00 from Herold Motor Cars. Kwun Decl. ¶ X.

RESPONSE TO ¶161. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course inventory purchase, immaterial to ownership. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Example 3 — the January 25, 2022 Jaguar transaction from Herold Motor Cars — is addressed comprehensively at ¶ 146. No produced deposition testimony establishes any specific detail of this transaction. See response to ¶ 146.

¶ 162. The wholesale book value of this vehicle in very good condition was $36,365.62. Kwun Decl. ¶ X.

RESPONSE TO ¶162. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A vehicle's "book value in very good condition" versus its actual condition is a

contested valuation/business judgment, unsupported by competent evidence. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The book value of $36,365.62 is supported only by a placeholder. See response to ¶ 146.

¶ 163. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ X.

RESPONSE TO ¶163. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the price "reflected" damaged condition is a conclusory characterization, unsupported. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶¶ 149, 156. See response to ¶ 146.

¶ 164. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ X.

RESPONSE TO ¶164. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of an electronic funding request, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶¶ 150, 157 — wire fraud predicate unsupported by produced deposition testimony establishing Deo communicated directly with Ally. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). See response to ¶ 146.

¶ 165. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition. Kwun Decl. ¶ X.

RESPONSE TO ¶165. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo made no representation as to a vehicle's condition when placing it on the floor

plan; the condition of inventory is a business judgment, and flooring/valuation were controller functions. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶¶ 151, 158. See response to ¶ 146.

¶ 166. As such, Ally funded the purchase for $29,092.50, eighty (80%) percent of the book value. Kwun Decl. ¶ X.

RESPONSE TO ¶166. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of the funding amount, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The funding amount of $29,092.50 is supported only by a placeholder. See response to ¶ 146.

¶ 167. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ X.

RESPONSE TO ¶167. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph itself states the difference was retained "for the benefit of the Plan" — not for Deo personally — and The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw, and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Same basis as ¶¶ 153, 160 — theft allegation contradicted by O'Sullivan's capital account treatment. O'Sullivan Dep. 233:2-4 (ECF 478-1).See response to ¶ 146.

¶ 168. Deo arranged to finance certain motor vehicles twice, wrongfully taking the improperly obtained funds. Kwun Decl. ¶ X.

RESPONSE TO ¶168. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Wrongfully taking" is conclusory; any double-financing, where it occurred, was an operational error corrected by repayment (as ¶¶ 177, 186 reflect IAG ultimately paid). [A][E].Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo arranged to finance certain motor vehicles twice, wrongfully taking the improperly obtained funds" is a [D] fraud and theft allegation not established by any produced deposition citation. No produced witness with personal knowledge of specific double-financing transactions is cited. The Kwun transcript — while produced — is not cited at specific pages establishing this assertion.

¶ 169. For example, on April 30, 2022 Deo arranged for Sunrise to sell a 2017 Mercedes Benz to Marlon and Monique Harris ("Harris") for $27,765.00. Kwun Decl. ¶ X.

RESPONSE TO ¶169. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course inventory purchase, immaterial to ownership. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The Harris transaction is the first of the "double-financing" examples addressed comprehensively at ¶ 168. No produced deposition citation establishes the specific transaction details alleged. See response to ¶ 146.

¶ 170. Harris paid $3,000.00 down and financed the balance, including fees and taxes, with a lender, Santander Consumer USA ("Santander"). Kwun Decl. ¶ X.

RESPONSE TO ¶170. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary-course down payment and financing of a sale, immaterial. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The financing details are supported only by a placeholder. See responses to ¶¶ 146, 168.

¶ 171. Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ X.

RESPONSE TO ¶171. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of an electronic funding request, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo requested by interstate electronic communication for Santander to fund the purchase" is the wire fraud predicate for this transaction — a [D] legal conclusion supported only by a placeholder. No produced deposition testimony establishes Deo personally transmitted any electronic communication to Santander for this specific transaction. See response to ¶ 146.

¶ 172. Santander paid Sunrise financed proceeds of $25,875.00. Kwun Decl. ¶ X.

RESPONSE TO ¶172. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, immaterial. [A].Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The funding amount of $25,875.00 is supported only by a placeholder. See response to ¶ 146.

¶ 173. Deo failed to deliver the vehicle to Harris and Harris canceled the purchase and loan. Kwun Decl. ¶ X.

RESPONSE TO ¶173. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A non-delivery followed by customer cancellation is an operational/logistics matter;

The unwinding of cancelled deals and the associated floor-plan payoffs were controller functions in which Deo did not personally participate (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo failed to deliver the vehicle to Harris" is a factual assertion not established by any produced deposition testimony from a witness with personal knowledge of this specific transaction. See responses to ¶¶ 146, 168.

¶ 174. Deo then transferred the vehicle to Northshore, which then sold it to Bay Motors, Inc. for $30,136.00. Kwun Decl. ¶ X.

RESPONSE TO ¶174. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The transfer between Northshore and Sunrise — both Deo's entities — and resale is an inter-company matter, not theft. [A].

¶ 175. Santander demanded the return of the proceeds from the canceled sale. Kwun Decl. ¶ X.

RESPONSE TO ¶175. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the lender demanded a return of proceeds is immaterial and unsupported as cited. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Santander demanded return of proceeds is supported only by a placeholder. See responses to ¶¶ 146, 168.

¶ 176. Deo did not return the proceeds to Santander. Kwun Decl. ¶ X.

RESPONSE TO ¶176. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The non-return of proceeds is attributable to a cash shortage, not a refusal by Deo. A non-delivery/cancellation is an operational matter; The unwinding of cancelled deals and the

associated floor-plan payoffs were controller functions in which Deo did not personally participate (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A]. The controller testified that the trade payoffs went unmade because the accounts were short of cash (“a couple of $100,000 short”) during the period Aaronson took over, when Wendy Kwun (IAG’s controller) took over making the payoffs and Aaronson put money in (O’Sullivan Dep. 181:2-16 (Mar. 30, 2026)). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo did not return the proceeds to Santander" is a factual assertion supported only by a placeholder. No produced deposition testimony with personal knowledge of this specific transaction is cited. See responses to ¶¶ 146, 168.

¶ 177. Aaronson became aware of the Santander demand in November 2022, and arranged for IAM to pay Santander the full amount due, which by that time was $32,294.42. Aaronson Decl. ¶ X.

RESPONSE TO ¶177. OBJECTION [A]. Disregard. The citation relies on a blank “Kwun Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson arranged for IAG to pay Santander — confirming IAG’s control and funding of the dealerships. [A].

¶ 178. On or about April 4, 2022 Deo arranged for Northshore to sell a 2013 Audi to Reid (“Reid”) for a price in excess $25,000.00. Kwun Decl. ¶ X.

RESPONSE TO ¶178. OBJECTION [A]. Disregard. The citation relies on a blank “Kwun Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course inventory purchase, immaterial to ownership. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The Reid transaction is addressed on the same basis as ¶¶

169-177. No produced deposition citation establishes the specific transaction details alleged. See responses to ¶¶ 146, 168.

¶ 179. Reid financed the balance, including fees and taxes, with a lender, Santander. Kwun Decl. ¶ X.

RESPONSE TO ¶179. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary-course financing of a sale, immaterial. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). See response to ¶ 178.

¶ 180. Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ X.

RESPONSE TO ¶180. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of an electronic funding request, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo requested by interstate electronic communication for Santander to fund the purchase" is the wire fraud predicate for this transaction — [D], supported only by a placeholder. See responses to ¶¶ 146, 150, 157, 164, 171.

¶ 181. Santander paid Northshore financed proceeds of $24,024.58. Kwun Decl. ¶ X.

RESPONSE TO ¶181. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, immaterial. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The funding amount of $24,024.58 is supported only by a placeholder. See response to ¶ 178.

¶ 182. Deo failed to deliver the vehicle to Reid and the transaction and loan was canceled. Kwun Decl. ¶ X.

RESPONSE TO ¶182. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A non-delivery/cancellation is an operational matter; The unwinding of cancelled deals and the associated floor-plan payoffs were controller functions in which Deo did not personally participate (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo failed to deliver the vehicle to Reid" is not established by produced deposition testimony. See response to ¶ 178.

¶ 183. Deo then transferred the vehicle to Sunrise, which then sold it to Rashawn Newsome for $26,090.00. Kwun Decl. ¶ X.

RESPONSE TO ¶183. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The transfer between Northshore and Sunrise — both Deo's entities — and resale is an inter-company matter, not theft. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo transferred the vehicle to Sunrise and sold to Newsome for $26,090.00 is supported only by a placeholder. See response to ¶ 178.

¶ 184. Santander demanded the return of the proceeds from the canceled sale. Kwun Decl. ¶ X.

RESPONSE TO ¶184. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the lender demanded a return of proceeds is immaterial and unsupported. [A].

Disputed. "Kwun Decl." without a paragraph number — the citation is incomplete and therefore inadmissible at summary judgment. Even if complete, Kwun Decl. is a pure placeholder ([A]).See response to ¶ 178.

¶ 185. Deo did not return the proceeds to Santander. Kwun Decl. ¶ X.

RESPONSE TO ¶185. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The non-return of proceeds is attributable to a cash shortage, not a refusal by Deo. The controller testified that the trade payoffs went unmade because the accounts were short of cash ("a couple of $100,000 short") during the period Aaronson took over, when Wendy Kwun (IAG's controller) took over making the payoffs and Aaronson put money in (O'Sullivan Dep. 181:2-16 (Mar. 30, 2026)). [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). See response to ¶ 178.

¶ 186. Aaronson became aware of the Santander demand in October 2022, and arranged for IAG to fund Northshore to pay Santander the full amount due, which by that time was $26,453.29. Aaronson Decl. ¶ X.

RESPONSE TO ¶186. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson arranged for IAG to fund the Santander payment — confirming IAG's control and funding. [A].

¶ 187. An inspection by IAG Plaintiffs as well as an audit by Ally of the floor planned vehicles revealed that several vehicles could not be located. Aaronson Decl. ¶ X.

RESPONSE TO ¶187. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded

(L.R. 56.1(d)). That an audit "revealed" missing/absent vehicles is unsupported as cited and, where vehicles were in transit or being unwound, reflects ordinary auction logistics. [A].

Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted that IAG conducted an inspection and Ally conducted an audit that revealed missing vehicles — Ally's physical inventory audits are confirmed by O'Sullivan. O'Sullivan Dep. 219:15-220:15 (ECF 478-1). Disputed as to any implication that missing or damaged vehicles resulted from Deo's misconduct as opposed to normal dealership operations or IAG's own failure to monitor consistently over the preceding months.

¶ 188. That audit also revealed that several vehicles were damaged. Aaronson Decl. ¶ X.

Deo Fails to Cause Northshore and Sunrise to Pay Off Existing Loans on Vehicle Trade-Ins

RESPONSE TO ¶188. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That vehicles were "damaged" is a contested valuation/condition characterization, unsupported. [A].

Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). Admitted that Ally's audit revealed damaged vehicles. Disputed as to any implication that this resulted from Deo's concealment — Ally's auditors physically inspected vehicles and assessed condition through their own process. O'Sullivan Dep.219:15-220:15 (ECF 478-1).

¶ 189. Northshore and Sunrise each accepted customer trade-ins of vehicles to be used toward their purchase (the "Trade-ins" or "trade-in"). Aaronson Decl. ¶ X.

RESPONSE TO ¶189. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Northshore and Sunrise accepted trade-ins is ordinary course and immaterial. [A].

¶ 190. Trade-ins with existing loan or lease balances were required to be timely satisfied by Northshore or Sunrise in accordance with their respective dealer agreements. Aaronson Decl. ¶ X.

RESPONSE TO ¶190. OBJECTION [A]. Disregard. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of trade-in payoff obligations, immaterial. [A].

¶ 191. As Northshore's and Sunrise's manager Deo was responsible for assuring that the existing loan or lease for each vehicle traded in by a customer was timely paid off. Aaronson Decl. ¶ X.

RESPONSE TO ¶191. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Aaronson Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo was an owner of Northshore and Sunrise (see Defendants' Responses to ¶¶ 226, 239), not a mere "manager" or employee, and the asserted obligations state legal conclusions, denied. Paying off prior loans on traded-in vehicles was the controller's function, not the operator's: Anthony Deo testified that ensuring the controller pays off prior loans on a trade-in is "the controller's job" (Deo Dep. 136:3-15 (Jan. 12, 2026)). The controller further testified that the trade payoffs went unmade because the accounts were short of cash ("a couple of $100,000 short") during the period Aaronson took over, when Wendy Kwun (IAG's controller) took over making the payoffs and Aaronson put money in (O'Sullivan Dep. 181:2-16 (Mar. 30, 2026)). [A].

Disputed. "As Northshore's and Sunrise's manager" is [D]. Aaronson Decl. ¶ X is a pure placeholder ([A]). The trade payoff obligation was an operational function handled by the controller — not solely by Deo. O'Sullivan tracked and managed trade payoff checks. O'Sullivan

Dep. 82:17-83:14 (ECF 478-1). Deo directed O'Sullivan on payment timing — but payment execution and tracking were O'Sullivan's controller functions.

¶ 192. Over the course of his management of Northshore and Sunrise, Deo directed O'Sullvan to hold onto checks that had been issued by Northshore and Sunrise to pay off the existing loans of vehicles traded in. O'Sullivan Dep. 82:17-83:14, 87:10-89:8.

RESPONSE TO ¶192. OBJECTION [A]. Admitted in part; disputed in part. The blank "Aaronson Decl. ¶ X" is disregarded (L.R. 56.1(d)). Admitted that O'Sullivan testified Deo at times directed him to hold checks. (O'Sullivan Dep. 82:17–83:14, 87:10–89:8 (Mar. 30, 2026).) Defendants admit that O'Sullivan so testified, and admit that, as the operator, Deo gave the instruction. Defendants dispute any implication of wrongful intent or conversion: O'Sullivan testified that he "always did what David [Baron] said" and that Baron placed the controllers, and the trade and floor-plan obligations were ultimately satisfied. The instruction reflected the dealerships' cash position, not a conversion.

Admitted in substance that Deo directed O'Sullivan to hold trade payoff checks. O'Sullivan Dep. 82:17-83:14, 87:10-89:8 (ECF 478-1). Disputed as to implication of fraud. O'Sullivan confirmed the holdback was caused by insufficient funds due to COVID slowing the business: "Is it your recollection that because of COVID slowing it down, that is when Anthony started asking you to holdback on paying certain bills? A: Yes." O'Sullivan Dep. 94:15-95:3 (ECF 478-1). Managing payment timing due to cash flow constraints is a business decision, not a fraud. Kwun and Aaronson were informed of this situation — O'Sullivan reported to Kwun, Kwun reported to Aaronson, and Aaronson lent money to cover. O'Sullivan Dep. 181:2-182:16 (ECF 478-1). A cash flow problem known to and managed by all parties is not a concealed fraud.

¶ 193. Deo did so because there was insufficient funds to pay those checks. O'Sullivan Dep. 94:15-95:3, 186:7-21.

RESPONSE TO ¶193. Admitted in part. Admitted that O'Sullivan testified there were times of insufficient funds to pay certain checks. (O'Sullivan Dep. 94:15–95:3, 186:7–21 (Mar. 30, 2026).) The paragraph reflects the dealerships' cash position and is immaterial to ownership. Admitted. O'Sullivan confirmed insufficient funds caused the trade payoff holdback: "because of COVID slowing it down, that is when Anthony started asking you to holdback on paying certain bills? A: Yes... Did Anthony's direction to you to pay or hold bills ever change from when he first started to tell you to do that until the dealership closed? A: No." O'Sullivan Dep. 94:15-95:3 (ECF 478-1). This is a cash flow management response to COVID-driven business slowdown — not concealed misconduct.

¶ 194. The prior owners of these traded-in vehicles remained liable to make payments on the debt despite no longer having ownership or control of the vehicle. O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16, 184:2-185:19.

RESPONSE TO ¶194. OBJECTION [A]. Disputed in part. The blank placeholder is disregarded (L.R. 56.1(d)). Admitted only that O'Sullivan testified some prior owners of traded-in vehicles remained liable on the underlying debt for a period. (O'Sullivan Dep. 44:15–45:13, 179:16–180:25 (Mar. 30, 2026).) Defendants dispute the paragraph to the extent it asserts wrongdoing; the trade obligations were ultimately satisfied, and plaintiff Joshua Aaronson testified that he allowed Deo to sign checks and that Deo was authorized "to run the day-to-day business" (Aaronson Dep. 39:6–40:18 (Jan. 7, 2026)).

Admitted that trade-in customers whose payoffs were delayed remained liable on their original financing. O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16, 184:2-

185:19 (ECF 478-1). This is the harm to customers resulting from the cash flow problem — a problem known to IAG through O'Sullivan's reports to Kwun. O'Sullivan Dep. 181:2-182:16 (ECF 478-1).

¶ 195. Many customers were reaching out to O'Sullivan complaining that their loans for their traded in vehicles had not been paid by Northshore and Sunrise. O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16.

RESPONSE TO ¶195. OBJECTION [A]. Admitted in part. Disregarding the placeholder (L.R. 56.1(d)), admitted that O'Sullivan testified some customers contacted him about unpaid trade-in loans. (O'Sullivan Dep. 77:15–24, 179:16–180:25 (Mar. 30, 2026).) Immaterial to ownership; the obligations were ultimately satisfied.

Admitted. O'Sullivan confirmed customers contacted him about unpaid trade payoffs.O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16 (ECF 478-1). Critically, O'Sullivan reported this situation to Kwun on August 30, 2022. O'Sullivan Dep. 183:16-185:19 (ECF 478-1). Kwun then sent an email to Anthony and O'Sullivan saying "Anthony see attached trade in payoffs checks Dan is holding." The customer complaints were known to Kwun — IAG's representative — who then communicated with Deo about them directly.

¶ 196. On August 30, 2022 O'Sullivan notified Kwun that Deo had asked O'Sullivan to hold a total of over $1,100,000.00 of trade payoff checks. O'Sullivan Dep. 183:16-185:19.

RESPONSE TO ¶196. Admitted in part. Admitted that O'Sullivan testified he notified Kwun on or about August 30, 2022 regarding trade payoffs Deo had asked him to hold. (O'Sullivan Dep. 183:16–185:19 (Mar. 30, 2026).) The dollar amount and characterization are subject to the documentary record; the trade obligations were ultimately satisfied.

Admitted. O'Sullivan notified Kwun on August 30, 2022 about the held trade payoff checks. O'Sullivan Dep. 183:16-185:19 (ECF 478-1). This is the triggering event for Kwun's increased involvement. Notably, Kwun's response was to send an email to both O'Sullivan and Anthony Deo — "Anthony see attached trade in payoffs checks Dan is holding" — confirming IAG was managing this situation in coordination with Deo, not discovering fraud perpetrated against it.

¶ 197. The trade payoff checks represented over fifty-five (55) sale transactions over a period of nine (9) months. Kwun Decl., Exhibit Email.

RESPONSE TO ¶197. OBJECTION [F]. Disputed. The paragraph is not supported by a citation to admissible evidence sufficient to establish it as undisputed under Local Civil Rule 56.1(d). To the extent the paragraph asserts any person’s knowledge, awareness, reliance, intent, or understanding as fact, that assertion concerns a state of mind not establishable on the cited record and is denied. The record affirmatively contradicts this: the obligations were ultimately satisfied — Aaronson conceded the cars are “today paid off … By [IAG]” (Aaronson Dep. 194:25–195:13 (Jan. 7, 2026)), and Urrutia testified he “paid off those … floor plan lines” (Urrutia Dep. 27:5–10 (Jan. 8, 2026)).

Disputed as to the sole citation. Kwun Decl. ¶ X is a placeholder ([A]). Exhibit Email not produced with ECF 524. The 55 transaction figure and nine-month period are not established by admissible deposition testimony — the number cited is from the unproduced Exhibit Email. Admitted however that the August 30, 2022 O'Sullivan notification to Kwun is established by produced deposition testimony. O'Sullivan Dep. 183:16-185:19 (ECF 478-1).

¶ 198. There had been insufficient funds in the Northshore and Sunrise bank account during that period of time to cover the trade payoff checks. Kwun Decl. ¶ X; O’Sullivan Dep. 94:15-95:3, 186:7-21.

RESPONSE TO ¶198. Admitted in part. Admitted that O'Sullivan testified there were insufficient funds in the accounts at the relevant time to cover the trade payoff checks. (O'Sullivan Dep. 94:15–95:3, 186:7–21 (Mar. 30, 2026).) Immaterial to ownership; the obligations were ultimately satisfied.

Admitted. O'Sullivan's testimony directly supports the insufficient funds assertion. O'Sullivan Dep. 94:15-95:3, 186:7-21 (ECF 478-1).

¶ 199. There was insufficient funds in the Northshore and Sunrise bank account at that time to cover the trade payoff checks. O'Sullivan Dep. 94:15-95:3, 186:7-21.

RESPONSE TO ¶199. Admitted in part. Admitted that O'Sullivan so testified as to insufficient funds at that time. (O'Sullivan Dep. 94:15–95:3, 186:7–21 (Mar. 30, 2026).) Immaterial; the obligations were ultimately satisfied.

Admitted. Same basis as ¶ 198. O'Sullivan Dep. 94:15-95:3, 186:7-21 (ECF 478-1).

¶ 200. When O'Sullivan informed Kwun about the unpaid trade payoffs, she informed Aaronson. O'Sullivan Dep. 176:3-14, 181:2:182:16.

RESPONSE TO ¶200. Disputed; cannot be admitted as cited. The cited testimony does not support the assertion and in fact contradicts it: at the pages cited the controller testified that the payoffs went unmade because the accounts were short of cash ("a couple of $100,000 short"), that Wendy Kwun (IAG's controller) "started keeping track of the payoff and started making some of the payoffs," that Aaronson "put some money into the business to payoff some of [the] cars and the trades," and that he did not discuss the matter with Deo (O'Sullivan Dep. 181:2-182:16 (Mar. 30, 2026)). To the extent the paragraph reflects that O'Sullivan informed Kwun and Aaronson — i.e., that IAG was informed of and assumed responsibility for the payoffs — that is consistent with Defendants' position.

Admitted. O'Sullivan told Kwun about the unpaid trade payoffs, and Kwun informed Aaronson. O'Sullivan Dep. 176:3-14, 181:2-182:16 (ECF 478-1). This paragraph establishes the reporting chain — O'Sullivan -> Kwun -> Aaronson — confirming IAG had full knowledge of the cash flow problems through its own embedded personnel before taking any action. The August 30, 2022 date is the formal notification; the underlying situation was building throughout the year and observable through the monitoring apparatus IAG had in place.

¶ 201. Deo's direction to O'Sullivan for Northshore and Sunrise not to pay off the loans on the Trade-ins had potential criminal liability, civil liability, and loss of the DMV Licenses for the DMV license applicants, Chabrier, Aaronson, and Jory. Kwun Decl. ¶ X.

RESPONSE TO ¶201. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Potential criminal liability" is speculative and conclusory; the premise that Deo "direct[ed]" non-payment is contradicted by the controller's testimony (see Defendants' Response to ¶ 206). [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The legal conclusion that holding trade payoff checks created "criminal liability" and "DMV license risk" is a [D] legal conclusion not established by admissible deposition testimony. Admitted that delayed trade payoffs had potential regulatory consequences — but the cause was insufficient funds due to COVID-driven business slowdown, not intentional fraud. O'Sullivan Dep. 94:15-95:3 (ECF 478-1). Aaronson was informed through Kwun and chose to lend money to resolve the situation. O'Sullivan Dep. 181:2-182:16 (ECF 478-1).

¶ 202. Deo’s direction to O'Sullivan for Northshore and Sunrise not to pay off the loans on the Trade-ins affected Chabrier’s, Aaronson’s and Jory’s ability to obtain a DMV License for any other dealership facility. Kwun Decl. ¶ X.

RESPONSE TO ¶202. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same; the “direction” premise is contradicted by the record (¶ 206). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Disputed as to characterization — the trade payoff problem affected DMV license standing because Chabrier, Aaronson, and Jory were still listed as DMV license applicants. That is itself a consequence ofAaronson blocking the DMV license transfer to Deo. Deo Dep. p.454 (ECF 518-10) (Kwun stopped the paperwork on Josh's direction). IfAaronson had allowed the DMV transfer to proceed, the license applicants would have been Deo — not Chabrier, Aaronson, and Jory. The DMV exposure they faced was a consequence of their own refusal to transfer the license.

¶ 203. In order to avert the consequences of Deo’s failure to pay off the loans on Trade-ins, Aaronson arranged for various IAG entities to loan Northshore and Sunrise the funds necessary to satisfy these outstanding obligations. Aaronson Decl. ¶ X; Kwun Decl. ¶ X.

RESPONSE TO ¶203. OBJECTION [A] [F]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). That IAG loaned funds reflects IAG’s control of and funding for the dealerships; the asserted purpose and Deo’s “failure” are conclusory. [A][F]. Disputed as to characterization and citations. Aaronson Decl. ¶ X is a pure placeholder ([A]). The O'Sullivan Dep. 175:15-176:2 citation is a real produced citation. O'Sullivan confirmed that Kwun's involvement increased after the trade payoff issue: "when he [Aaronson] took control, he

wanted her there to see what was going on." O'Sullivan Dep. 176:3-14 (ECF 478-1). This confirms Aaronson's active oversight — inconsistent with any claim that IAG was unaware of operational issues.

¶ 204. Those funds were never repaid by Deo. Aaronson Decl. ¶ X; Kwun Decl. ¶ X.

RESPONSE TO ¶204. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Never repaid" is unsupported; inter-company funding among entities IAG controlled is a contribution/accounting matter, not theft. [A]. Disputed as to characterization and citations. Aaronson Decl. ¶ X is a pure placeholder ([A]).The O'Sullivan Dep. 176:3-14 citation is a real produced citation. Admitted that Kwun monitored Northshore and Sunrise accounting and reporting after August 2022. O'Sullivan Dep. 176:3-14 (ECF 478-1). Kwun's monitoring role is evidence that IAG was not relying on Deo's unverified representations — they were actively checking.

¶ 205. During the spring and summer of 2022 Deo sold vehicles subject to Floor Plan financing by Ally without paying off the Floor Plan to Ally for those sold vehicles. Kwun Decl. ¶ X.

RESPONSE TO ¶205. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The premise that Deo withheld floor-plan payoffs is contradicted by the controller's cash-shortage testimony (¶ 206). [A]. Disputed as to characterization and citations. Aaronson Decl. ¶ X is a pure placeholder ([A]). The O'Sullivan Dep. 186:7-21 citation is a real produced citation. Admitted that there were floor plan vehicles sold without the floor plan payment being made due to insufficient funds. O'Sullivan Dep. 186:7-21 (ECF 478-1). Disputed as to

characterization that this was intentional — O'Sullivan testified the cause was COVIDrelated cash flow shortfalls: "I might have $100,000 in the bank account, the payoffs might be $200,000, I couldn't payoff the trades." Id.

¶ 206. Deo did so by instructing O'Sullivan not to make the payments. O'Sullivan Dep. 181:2-182:16.

RESPONSE TO ¶206. Disputed; cannot be admitted as cited. The cited testimony does not support the assertion and in fact contradicts it: at the pages cited the controller testified that the payoffs went unmade because the accounts were short of cash ("a couple of $100,000 short"), that Wendy Kwun (IAG's controller) "started keeping track of the payoff and started making some of the payoffs," that Aaronson "put some money into the business to payoff some of [the] cars and the trades," and that he did not discuss the matter with Deo (O'Sullivan Dep. 181:2-182:16 (Mar. 30, 2026)). The assertion that Deo "instruct[ed] O'Sullivan not to make the payments" is therefore unsupported by, and contrary to, the very testimony cited.
Disputed as to the cited testimony. O'Sullivan Dep. 181:2-182:16 is cited but those pages address O'Sullivan informing Kwun about the unpaid trade payoffs — not Deo instructing O'Sullivan not to make Ally floor plan payments. The citation does not support the paragraph's assertion. No produced deposition testimony establishes Deo specifically instructed O'Sullivan to withhold Ally floor plan payments as distinct from general cash flow management decisions.

¶ 207. This created a deficiency toward repayment of the Floor Plan made by Ally to purchase each such vehicle. Kwun Decl. ¶ X.

RESPONSE TO ¶207. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Deficiency" is conclusory and is contradicted by the cash-

shortage testimony (¶ 206). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that selling a vehicle without immediately paying Ally "created a deficiency" is a legal characterization of the floor plan obligation. O'Sullivan confirmed the cause was insufficient cash flow: "I might have $100,000 in the bank account, the payoffs might be $200,000, I couldn't payoff the trades." O'Sullivan Dep. 186:7-21 (ECF 478-1). A cash flow shortfall is not the same as a deliberate "deficiency."

¶ 208. Aaronson became aware in September 2022 and October 2022 that Deo had withheld payments to payoff the Ally Floor Plan. Aaronson Decl. ¶ X.

RESPONSE TO ¶208. OBJECTION [A]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). That Deo “withheld” payments is contradicted by the record (¶ 206). [A]. Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). The assertion that Aaronson "became aware in September and October 2022" must be viewed against O'Sullivan's testimony that Kwun was already monitoring the finances regularly — "when he took control, he wanted her there to see what was going on." O'Sullivan Dep. 176:3-14 (ECF 478-1). Aaronson's awareness was continuous, not a September 2022 discovery.

¶ 209. There were insufficient funds in the Northshore and Sunrise bank accounts to repay Ally for the Floor Plan. Kwun Decl. ¶ X.

RESPONSE TO ¶209. OBJECTION [A]. Disregard. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only, consistent with the controller’s testimony, that the accounts lacked sufficient funds — a cash shortage during IAG’s control, not a diversion by Deo (¶ 206). [A].

¶ 210. As guarantor, Aaronson arranged for various IAG Plaintiffs to pay Ally over $4,000,000.00 to satisfy Northshore's and Sunrise's Floor Plan deficiency. Aaronson Decl. ¶ X, Kwun Decl.

RESPONSE TO ¶210. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The $4,000,000 figure is unsupported; IAG's payments as guarantor are a contribution/damages matter reserved for trial. [A]. Disputed. Aaronson Decl. ¶ X and Kwun Decl. ¶ X are both pure placeholders ([A]). Disputed as to the amount ($4,000,000) — not established by any admissible deposition testimony from a produced transcript. Admitted in substance that Aaronson arranged for IAG entities to contribute funds to address the floor plan deficiency — consistent with Aaronson's admission that he "would have loved to have given that money back to Libertas." Aaronson Dep. p.225 (ECF 404-1).

¶ 211. Deo has never accounted for all of the funds missing from Northshore and Sunrise that should have been available to pay off the trade-in vehicles and the floor planned vehicles. Aaronson Decl. ¶ X; Kwun Decl. Deo Failed to Pay Warranty Companies and Vendors, and Failed to Account for Dealer and Other License Plates

RESPONSE TO ¶211. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Funds missing" assumes its conclusion; The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw, and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A]. Disputed. Aaronson Decl. ¶ X and Kwun Decl. (incomplete citation) are pure placeholders ([A]). "Deo has never accounted for all of the

funds missing" is a [D] accounting conclusion requiring expert testimony — not established by placeholder declarations. Furthermore, O'Sullivan maintained Deo's capital account and recorded cash withdrawals as reductions to that account. O'Sullivan Dep. 233:2-4 (ECF 478-1). If O'Sullivan — IAG's embedded controller reporting to Kwun — could not identify the total amount taken, O'Sullivan Dep. 224:15-17 (ECF 478-1) ("I honestly don't know the total amount"), then the "missing funds" assertion is not established by the evidence IAG itself produced. The controller who maintained the books cannot account for what is "missing" — because what he recorded was owner draws, not theft.

¶ 212. Deo arranged for Northshore and Sunrise to sell third-party warranty providers' extended warranties to consumers. Kwun Decl. ¶ X.

RESPONSE TO ¶212. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Unsupported as cited. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Admitted that Northshore and Sunrise sold extended warranties to consumers — this is a standard automotive dealership practice. O'Sullivan confirmed warranty-related accounting. O'Sullivan Dep. pp.9-16 (ECF 478-1). Disputed as to any implication that this was improper.

¶ 213. Deo did not use the funds received by these customers to pay the third-party providers for these warranties. Kwun Decl. ¶ X.

RESPONSE TO ¶213. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Unsupported as cited. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo "did not use funds received to pay third-party providers" is a serious allegation supported only by an inadmissible placeholder. No produced deposition testimony establishes the specific warranty payment failure asserted.

¶ 214. Northshore and Sunrise had issued warranties to consumers and collected the fees but Deo failed to pay $100,748.11 due to the warranty companies, which would have resulted in the voiding of the warranties for which consumers have paid. Kwun Decl. ¶ X.

RESPONSE TO ¶214. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The $100,748.11 warranty figure is unsupported by competent evidence. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The specific dollar amount ($100,748.11) is not established by any admissible deposition testimony. Kwun's declaration is a placeholder. Disputed as to the characterization that this failure would have left consumers without coverage — without the underlying warranty agreements, this legal consequence cannot be established as undisputed fact.

¶ 215. As Northshore's and Sunrise's manager Deo was responsible for assuring that the customer-purchased warranties for each vehicle were paid to the warranty company. Kwun Decl. ¶ X.

RESPONSE TO ¶215. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The "manager…responsible" characterization states a legal conclusion; Deo was an owner of Northshore/Sunrise (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)),

and warranty administration was an operational/controller function. [A]. Disputed. "As Northshore's and Sunrise's manager" — [D] legal conclusion. Aaronson Decl. ¶ X and Kwun Decl. ¶ X are both pure placeholders ([A]). The assertion that Deo was "responsible for assuring" warranty payments embeds a contractual obligation without citing the actual warranty agreements.

¶ 216. Aaronson arranged for IAG entities to pay for the unpaid warranties. Kwun Decl. ¶ X. Deo Takes and Uses Dealership Assets for His Own Purposes

RESPONSE TO ¶216. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). IAG's payment reflects its control and funding of the dealerships. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Admitted in substance that IAG entities arranged to pay for unpaid warranties — this is consistent with Aaronson's general practice of addressing Northshore and Sunrise financial shortfalls. Disputed as to amount and as to characterization that these payments constitute damages attributable to Deo.

¶ 217. Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ X.; O'Sullivan Dep. 153:17-158:5, 159:5-161:19.

RESPONSE TO ¶217. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Took hundreds of thousands" is conclusory; The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw, and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A]. Disputed as to characterization.

O'Sullivan testified that cash from customers would go to the bank account "or sometimes Anthony would take the cash." O'Sullivan Dep. 153:17-158:5 (ECF 478-1). O'Sullivan further described the complete accounting system: all cash was recorded in the DealerTrack system and in customer folders — "Once you make a deposit, if I'm making a deposit, I'm gonna put like Sam Jones had a $5,000 deposit, you enter it in the system and then you have a record of it." O'Sullivan Dep. 157:19-158:4 (ECF 478-1). The characterization that Deo "took" cash "rather than deposit" implies misappropriation — but O'Sullivan also testified that Deo's cash withdrawals were recorded as capital account reductions, the standard accounting treatment for owner draws: "Was there anything about him taking the cash that, as far as the business goes, is improper? A: I guess not." O'Sullivan Dep. p.9 (ECF 478-1). Placeholder ([A]) as to Kwun Decl. ¶ X. Critical credibility point: O'Sullivan confirmed under oath that he did not prepare his own affidavit: "When you prepared this, did you prepare this affidavit or did somebody prepare it for you? A: I didn't prepare it, no." O'Sullivan Dep. 204:7-9 (ECF 478-1). Wendy Kwun — IAG's own controller who was monitoring Northshore's finances and supplying Ally with monthly financials — reviewed the highlighted exhibits. O'Sullivan Dep. 204:3-5 (ECF 478- 1). The O'Sullivan affidavit is effectively a Kwun-authored document submitted under O'Sullivan's signature — not independent third-party testimony.

¶ 218. Deo failed to terminate and return over $240,000.00 of lender financing for consumers who canceled their purchases. Kwun Decl. ¶ X.

RESPONSE TO ¶218. OBJECTION [A]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The $240,000 figure is unsupported; cancelled-deal financing is unwound by the controller (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo "failed to terminate and return over $240,000 of lender financing for consumers who canceled purchases" is a serious allegation supported only by an inadmissible placeholder. No produced deposition testimony establishes this specific factual assertion.

¶ 219. Deo took those loan proceeds for his own benefit. Kwun Decl. ¶ X.

RESPONSE TO ¶219. OBJECTION [A]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). “For his own benefit” is conclusory; The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo’s capital account as an owner’s draw, and that holding a capital account reflects ownership (O’Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). "Deo took those loan proceeds for his own benefit" — legal characterization of misappropriation — [D]. No produced deposition testimony establishes this assertion. This is the most serious allegation in ¶¶ 218-219 and it rests solely on an inadmissible placeholder declaration.

¶ 220. Deo’s son continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG’s consent. Kwun Decl. ¶ X. Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain The Libertas Funds and Converts the Libertas Funds

RESPONSE TO ¶220. OBJECTION [A]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The assertion concerning a vehicle driven by Deo’s son rests on a placeholder, and the valuation and “without consent” characterization are unsupported. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo's son drives a Maserati "paid for by IAG, without IAG's consent" is disputed in full — no admissible deposition testimony from a produced transcript establishes this assertion. Disputed also as to "without IAG's consent" — consent is a legal conclusion ([D]).

¶ 221. Due to the financial deficiencies in Northshore and Sunrise discovered in September and October 2022, Aaronson arranged for Ally to put a hold on any further Floor Plan financing for Northshore and Sunrise. Aaronson Decl. ¶ X.

RESPONSE TO ¶221. OBJECTION [A]. Disregard. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Ally took action in response to account deficiencies; the cause is disputed (¶ 206). [A].

¶ 222. In or around October 2022, Aaronson demanded that Deo repay the IAG Plaintiffs for all of the losses the IAG Plaintiffs covered arising from Deo’s actions. Aaronson Decl. ¶ X.

RESPONSE TO ¶222. OBJECTION [A]. Disregard. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson sought repayment of losses IAG covered — a contribution/damages matter. [A]. Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). Disputed as to characterization — the demand to "repay losses arising from Deo's actions" characterizes the cause of losses as Deo's fault. The losses were caused by COVID-related cash flow problems. O'Sullivan Dep. 94:15-95:3 (ECF 478-1).The negotiation that followed was about an ownership restructuring, not a loss recovery.¶ 226 was a formality, not a substantive ownership event. Aaronson chose option (b) under oath: "Are you testifying under oath that you were misleading the IRS? A: No, I was not. Anthony and I had the deal that

he was going to get ownership." Aaronson Dep. pp.44-45 (ECF 404-1). ¶ 226's framing is irreconcilable with that sworn testimony. [AR]Response: Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). ¶ 226 is internally contradictory: it admits Aaronson "allowed Deo to file the 2021 taxes listing himself and Sara as owners" while asserting he "would not and could not allow the actual transfer of ownership." If Aaronson authorized tax returns representing the Deos as owners to the IRS (and testified he was "not misleading the IRS," Aaronson Dep. 44-45), he cannot simultaneously maintain the Deos were never owners.

¶ 223. Deo promised that he would make good on all of the losses. Aaronson Decl. ¶ X.

RESPONSE TO ¶223. OBJECTION [A]. Disregard; disputed. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). That Deo “promised” to make good is unsupported as cited. [A].

¶ 224. As part of Deo resolving all of the deficiencies funded by the IAG Plaintiffs, in October and November 2022, Aaronson and Deo were negotiating a transfer of the ownership in Northshore and Sunrise, and transfer of the DMV license applicant to Deo, in exchange for Deo’s repayment of the losses incurred by the IAG Plaintiffs and obtaining a new Floor Plan line. Aaronson Decl. ¶ X.

RESPONSE TO ¶224. OBJECTION [A]. Disregard. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson and Deo negotiated regarding the deficiencies and a transfer of ownership — confirming an ownership relationship, not employment. [A].

¶ 225. In anticipation of Deo's completion of, and as one of the conditions to transfer of ownership, Aaronson agreed to Deo's filing of 2021 tax returns for Northshore and Sunrise listing Deo and Sara as owners. Aaronson Decl. ¶ X.

RESPONSE TO ¶225. OBJECTION [A]. Disregard. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Aaronson agreed to Deo's filing of 2021 taxes — which, as ¶ 226 concedes, listed Deo and Sara as owners of Northshore and Sunrise. [A].

¶ 226. Even though Aaronson had allowed Deo to file the 2021 taxes listing himself and Sara as owners of Northshore and Sunrise, Aaronson would not and could allow the actual transfer of ownership to take place until the DMV license ownership transfer was approved as Chabrier, Aaronson and Jory could not permit Deo to continue to operate Northshore and Sunrise while they were still listed as owner with the DMV and continued to be personally liable for Deo's actions as the dealership operator. Aaronson Decl. ¶ X.

RESPONSE TO ¶226. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). The paragraph concedes that Aaronson allowed Deo to file 2021 taxes listing Deo and Sara as owners of Northshore and Sunrise — a concession of ownership consistent with the K-1s. Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo with a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)); ownership is, at a minimum, genuinely disputed. [A].

¶ 227. Deo agreed to move forward with the exchange under the terms laid out by the IAG Plaintiffs. Aaronson Decl. ¶ X.

RESPONSE TO ¶227. OBJECTION [A]. Disregard. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that the parties discussed terms for an exchange. [A].

¶ 228. Deo was sent the DMV application to transfer the Northshore and Sunrise DMV license to list Deo as the owner. Aaronson Decl. ¶ X; Kwun Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶228. OBJECTION [A]. Disregard. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Admitted only that a DMV application to transfer the license to list Deo as owner was sent — again confirming the parties treated Deo as the intended owner. [A].Disputed. Aaronson Decl. ¶ X and Kwun Decl. ¶ X are pure placeholders ([A]). Exhibit Email not produced with ECF 524. Disputed as to what DMV application was sent and the terms under which it was sent — no admissible evidence establishes the specific DMV application described.

¶ 229. Deo did not return a signed DMV application to transfer the Northshore and Sunrise license to list Deo as the owner. Aaronson Decl. ¶ X; Kwun Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶229. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Whether a signed application was "returned" is unsupported as cited. [A].

Disputed. Aaronson Decl. ¶ X and Kwun Decl. ¶ X are pure placeholders ([A]). Exhibit Email not produced with ECF 524. Admitted that the DMV transfer application was not completed — but the reason is critical and directly contradicted by produced testimony: Kwun stopped the

DMV transfer paperwork at Josh Aaronson's direction. Deo Dep. p.454 (ECF 518-10) ("She stopped the paperwork, I guess Josh told her to."). The unsigned DMV application cannot be attributed to Deo's default when it was Aaronson's own representative who stopped the process.

¶ 230. Deo did not satisfy any of his obligations to repay the losses incurred by the IAG Plaintiffs, or obtain a new floor plan line. Aaronson Decl. ¶ X.

RESPONSE TO ¶230. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Did not satisfy any obligations" is conclusory and disputed. [A]. Disputed. Aaronson Decl. ¶ X is a pure placeholder ([A]). The assertion that Deo "did not satisfy any of his obligations" is a [D] legal conclusion about contractual performance not established by admissible deposition testimony. Disputed as to substance: the floor plan obligation Aaronson claims Deo failed to satisfy was itself created byAaronson's post-Baron restructuring — doubling the monthly fee from $15,000 to $30,000 per entity, pulling the Baron Nissan deal that would have given Deo his own floor plan, and blocking the DMV transfer. Deo Dep. pp.454, 581 (ECF 518-10, Feb. 12, 2026). Deo paid the monthly fees consistently — confirmed by O'Sullivan and Kwun. O'Sullivan Dep. 218:8-219:5 (ECF 478-1); Kwun Dep. 229:15-22 (ECF 478-2). The obligations Aaronson claims were not satisfied are either: (1) conditions Aaronson himself prevented from occurring, or (2) amounts whose satisfaction is disputed by the record.

¶ 231. Because Deo did not sign and return the application to transfer the Northshore and Sunrise license to Deo as the owner, did not satisfy his obligation to repay the losses incurred by the IAG Plaintiffs, or obtain a new floor plan line, Deo did not complete the transfer agreement and the ownership of Northshore and Sunrise was not effectuated. Aaronson Decl. ¶ X.

RESPONSE TO ¶231. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). A conclusory recital built on the foregoing placeholders. [A]. Disputed. Aaronson Decl. ¶ X is a placeholder ([A]). ¶ 231 relies on three "unsatisfied conditions" to argue ownership "was not effectuated," but each was satisfied or prevented by Aaronson himself — e.g., Kwun stopped the DMV transfer at Josh Aaronson's direction ("she stopped the paperwork, I guess Josh told her to"). Deo Dep. 454 (ECF 518-10).

¶ 232. In November 2022, Deo and other Deo Defendants began negotiation with the Superb Plaintiffs to buy into certain of the Superb Plaintiffs' automobile dealership business, offering to pay $500,000.00 plus a percentage of the ownership Deo represented to have in both Northshore and Sunrise. ECF 11 ¶¶ 10-19, 13-14.

RESPONSE TO ¶232. Disregard. Immaterial narrative concerning the commencement of the Superb negotiations.

¶ 233. Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit for the Deo Defendants' investment in Superb, which bounced due to insufficient funds. ECF 11 ¶ 24; ECF 11-2.

RESPONSE TO ¶233. Disputed in part. Admitted only that Deo issued a $100,000 check dated November 14, 2022 as a deposit (see Defendants' Response to ¶ 326).

¶ 234. Deo then applied for financing with Libertas for Northshore and Sunrise. Ruderman Decl. ¶ X; Exhibit Libertas Agreement.

RESPONSE TO ¶234. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Admitted only that Deo applied for financing with Libertas for Northshore and Sunrise. [A].

¶ 235. Deo was introduced to Libertas by Laurie. Ruderman Decl. ¶ X; Laurie Dep. 84:18- 86:8, 103:21:-104:2.

RESPONSE TO ¶235. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted, on the cited testimony, that Laurie introduced Deo to Libertas (Laurie Dep. 84:18-86:8 (2026)); immaterial. [A].

¶ 236. Libertas operates out of its offices in Connecticut. Ruderman Decl. ¶ X; Patrovic Dep. 7:12-14; Libertas Agreement.

RESPONSE TO ¶236. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Libertas operates from Connecticut is immaterial. [A].

¶ 237. Laurie facilitated Deo providing the information to Libertas. Ruderman Decl. ¶ X; Laurie Dep. 119:17-120:2.

RESPONSE TO ¶237. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Laurie facilitated the information exchange is immaterial. [A].

¶ 238. Deo and Libertas entered into an agreement on behalf of Northshore and Sunrise in which Northshore sold $997,500.00 of its future receipts (the "Future Receipts") to Libertas for the purchase price of $750,000.00 less a $15,000.00 funding fee (the "Libertas Funds"). Ruderman Decl. ¶ X; Exhibit Libertas Agreement.

RESPONSE TO ¶238. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo entered the Libertas agreement on behalf of Northshore/Sunrise — confirming his authority to act for those entities. [A].

¶ 239. Deo made such agreement despite not having ownership of Northshore and Sunrise. Ruderman Decl. ¶ X.

RESPONSE TO ¶239. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Deo acted "despite not having ownership" is false. Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo with a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)); ownership is, at a minimum, genuinely disputed. [A].Disputed. Ruderman Decl. ¶ X is a pure placeholder ([A]). "Despite not having ownership" is the central contested legal question in this case — a [D] legal conclusion that cannot be stated as undisputed fact. Gianelli Order at 6 ("unresolved material questions concerning the parties' ownership and licensing"). The assertion directly contradicts Aaronson's own deposition testimony. Aaronson approved 2021 tax returns listing Deo as 99-100% owner of Northshore and Sunrise and testified under oath he was"not misleading the IRS" when he did so: "Anthony and I had the deal that he was going to get ownership." Aaronson Dep. pp.44-45 (ECF 404-1). If Deo "had no ownership" when he entered the Libertas agreement, then Aaronson lied to the IRS when he approved those returns. Aaronson chose under oath to say he was not lying to the IRS — which means Deo had ownership. ¶ 239 cannot survive Aaronson's own IRS admission.

¶ 240. In the application to Libertas, Deo represented to Libertas that the financing would be used for investment in Northshore. Ruderman Decl. ¶ X; ECF 410 ¶¶ 5-6; Exhibit Libertas Agreement.

RESPONSE TO ¶240. OBJECTION [A]. Disregard. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo represented the financing would be used for Northshore — consistent with the funds being for Northshore’s benefit. [A]. Disputed. Placeholder ([A]) as to Ruderman Decl. ¶ X. ECF 410 ¶¶ 5-6 is the Ruderman declaration — counsel's own declaration submitted in prior motion practice, not independent evidence. Exhibit Libertas Agreement is not produced as an authenticated exhibit with ECF 524. Disputed further on the merits: the Libertas financing was obtained on behalf of both Northshore and 189 Sunrise jointly — not "for investment in Northshore" alone. Kwun Dep. p.17 (ECF 478-2) (Kwun transferred $735,000 from 189 Sunrise's account — confirming Sunrise was a party to the transaction). The characterization that the financing was "for investment in Northshore" is therefore incomplete and disputed.

¶ 241. The documentation and communication between Deo and Libertas were made by electronic means. Ruderman Decl. ¶ X; Exhibit Libertas Agreement.

RESPONSE TO ¶241. OBJECTION [A]. Disregard. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of electronic documentation, immaterial. [A].

¶ 242. Libertas approved the financing of $750,000.00 and wired the Libertas Funds of $735,000.00 to Sunrise’s account in New York on November 18, 2022 after deducting a $15,000.00 origination fee. Ruderman Decl. ¶ X; ECF 410 ¶ 7; ECF 410-1; Exhibit Libertas

Agreement. Despite His Obligation to Safeguard the Libertas Funds, Thomasson Aids and Abets Deo's Conversion by Disbursing the Libertas Funds to Deo

RESPONSE TO ¶242. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Libertas wired $735,000 to Sunrise's account. [A].

Admitted in part. Admitted that Libertas wired $735,000 to 189 Sunrise's Chase account on November 18, 2022 — Kwun confirmed the transfer. Kwun Dep. 17 (ECF 478-2). Placeholder ([A]) as to Ruderman Decl. ¶ X; ECF 410/410-1 are counsel's prior declaration, not independent evidence. Disputed as to completeness — ¶ 242 describes only the first of two November 18 transactions (the second being Kwun's $735,000 transfer out using David Baron's credentials).

¶ 243. On November 18, 2022, the IAG Plaintiffs became aware of the Libertas Agreement and took reasonable steps to ensure that Deo would not abscond with the Libertas Funds, by withdrawing and safeguarding the Libertas Funds. Ruderman Decl. ¶ X; Kwun Decl. ¶ X.

RESPONSE TO ¶243. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Reasonable steps" is conclusory; what followed was Aaronson's diversion of the funds (see Defendants' Responses to ¶¶ 341, 1009). [A]. Disputed. ECF 524 ¶ 243 characterizes Kwun's transfer of the Libertas funds as a reasonable step to safeguard them. The cited witness's own testimony does not support that characterization: Kwun testified she moved the funds on her own that morning, without discussion, and could not explain why. "A: That was my decision for that morning. I don't know why I did it. Q: You're telling us now that you did this without any discussion whatsoever with Josh Aaronson; is that right? A: That is correct." Kwun Dep. (ECF

478-2) The "safeguard" characterization is disputed as unsupported by the testimony ¶ 243 relies upon.

¶ 244. That same day, Aaronson directed his attorney, Russell Shanks ("Shanks"), to overnight a letter to Libertas advising that Deo had no ownership in Northshore and that they should reach out to Shanks immediately. Ruderman Decl. ¶ X; Exhibit Letter

RESPONSE TO ¶244. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That counsel's letter "advis[ed] that Deo had no ownership" is the disputed assertion of a party, not an established fact; Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo with a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)); ownership is, at a minimum, genuinely disputed. [A]. Disputed in part. Admitted only that Shanks sent a letter to Libertas on or about November 18, 2022 stating Deo had no ownership in Northshore. Disputed as to the characterization: the letter issued the same morning as the $735,000 transfer and roughly two months after Aaronson approved tax returns listing Deo as 99% owner (Aaronson Dep. 44), and the state court later found ownership presented "unresolved material questions" (Gianelli Order at 6).

¶ 245. That letter was emailed to Deo that same day. Ruderman Decl. ¶ X.

RESPONSE TO ¶245. OBJECTION [A]. Disputed. Ruderman Decl. ¶ X is a pure placeholder ([A]). The assertion that the Shanks letter "was emailed to Deo that same day" — November 18, 2022 — is disputed. The Shanks letter was sent to Libertas on the same morning Kwun transferred the $735,000 from 189 Sunrise using David Baron's deceased credentials. Kwun Dep. p.8 (ECF 478-2). Whether and when Deo received a copy of the Shanks letter is not

established by the placeholder citation. .¶ 248 asserts Detective Marx "threatened to have Aaronson arrested" and that this constitutes Hobbs Act extortion. The sole citation is Ruderman Decl. ¶ X — a pure placeholder ([A]).

¶ 246. Deo hired Merckling, a retired Nassau County police officer with no prior automobile dealership experience, to work at Northshore around the end of 2020 or the beginning of 2021. Jones Dep. 215:13-21; Merckling Dep. 60:13-22; 61:2-8; Deo Dep. 131:24-132:6.

RESPONSE TO ¶246. Admitted. To the extent it implies wrongdoing, it is denied.

¶ 247. On November 18, 2022 Merckling accompanied Deo to the Nassau County police department, Second Precinct, and filed a criminal complaint with Detective Eric Marx (“Marx”) alleging that Aaronson stole the Libertas Funds. Merckling Dep. 98:15-102:10, 57:24-58:16.

RESPONSE TO ¶247. Disputed in part. Admitted only that a criminal complaint was filed concerning the taking of the Libertas funds; the implication of impropriety is denied. Deo was entitled to report that Aaronson took $735,000 from the Sunrise account (see ¶¶ 341, 1009).

¶ 248. Despite the fact that the issue of the Libertas Funds was a civil matter, Marx threatened to have Aaronson arrested if the Libertas Funds were not immediately turned over to Sunrise. Ruderman Decl. ¶ X.

RESPONSE TO ¶248. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether the matter was “civil” states a legal conclusion; the asserted threat by a detective is unsupported as cited and immaterial to Deo’s ownership. [A].

¶ 249. Thomasson claimed to be the attorney for Northshore, Sunrise, and Deo. Ruderman Decl. ¶ X.

RESPONSE TO ¶249. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Thomasson claimed to represent Northshore, Sunrise, and Deo for certain purposes. [A].

¶ 250. Thomasson was aware that the Libertas Funds were paid by Libertas to Northshore (and deposited in Sunrise's account) for the purported sale of the Future Receipts. Ruderman Decl. ¶ X; Exhibit Letter and Agreement.

RESPONSE TO ¶250. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Thomasson's "awareness" asserts state of mind and is not established as cited, and there is no evidence he ever knew of any loans before such loans were applied for and obtained by Deo. [A][F].

¶ 251. Thomasson was aware that there was a dispute among IAG Plaintiffs, Deo, and Libertas concerning Deo's right to have acted on Northshore's behalf with respect to the sale of the Future Receipts. Ruderman Decl. ¶ X; Exhibit Letter.

RESPONSE TO ¶251. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same; state of mind, unsupported. [A][F].Disputed. Ruderman Decl. ¶ X is a placeholder ([A]), and the exhibit is not produced with ECF 524. The assertion characterizes the knowledge of Thomasson — Defendants' own counsel — and is not established by admissible evidence. Defendants do not concede any waiver of privilege as to their counsel. There is no evidence Thomasson had any knowledge of the Aaronson Plaintiffs before Wendy Kwun took $735,000.00 from Anthony Deo in November, 2022.

¶ 252. Thomasson was aware that there was a dispute concerning the rights to the Libertas Funds. Ruderman Decl. ¶ X; Exhibit Letter.

RESPONSE TO ¶252. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same; state of mind, unsupported. [A][F]. There is no evidence Thomasson had any knowledge of the Aaronson Plaintiffs before Wendy Kwun took $735,000.00 from Anthony Deo in November, 2022. There is also no evidence that Thomasson knew anything of the issues raised by the Aaronson Plaintiffs prior to their filing and serving their state lawsuit against the Deos in December, 2022.

¶ 253. As a direct result of the threats by Detective Marx, Aaronson agreed to place the Libertas Funds into Thomasson’s attorney trust account to hold in escrow for safekeeping pending resolution of the parties’ dispute, rather than turn over the Libertas Funds to Deo, who was not the rightful owner of the Libertas Funds. Ruderman Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶253. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The placement of the funds into escrow was arranged by Aaronson’s counsel (Shanks), as ¶ 254 reflects; the “threats” premise is unsupported. [A]. Disputed. Aaronson did not return the funds as a result of "threats" — his own testimony establishes a voluntary return based on his own assessment that he wanted the money to go back to Libertas. Aaronson Dep. 225 (ECF 404-1). The "threats by Detective Marx" characterization ([D]) is disputed; Marx conducted an independent investigation of a $735,000 transfer made using a deceased person's credentials. At all relevant times, Deo was and is the rightful owner of these funds, and there is no evidence in this case of any escrow agreement regarding the Libertas funds. To the contrary,

Thomasson informed Aaronson's attorney, Russell Shanks, in an email, that he would not be told what to do with these funds if and when they were turned back over to him on Anthony Deo's behalf.

¶ 254. On November 18, 2022 Shanks emailed Thomasson agreeing to wire the Libertas Funds to Thomasson's trust account asking him to place the Libertas Funds in his escrow account Ruderman Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶254. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Shanks (Aaronson's counsel) emailed Thomasson agreeing to wire the funds to escrow — confirming it was the IAG side that directed the escrow arrangement. [A]. Further, Shanks never asked anything of Thomasson regarding the return of the stolen funds; Shanks told Thomasson to put the funds into escrow, and Thomasson then informed Shanks in writing that he would not be told what to do with those funds if returned.

¶ 255. In response, that same day, Thomasson provided Shanks with the wiring instructions. ECF 410-2.

RESPONSE TO ¶255. Disregard. The assertion rests on a pleading/record citation (ECF 410-2) that is not competent summary-judgment evidence of the matter asserted (L.R. 56.1(d)). No escrow agreement was ever reached between Shanks and Thomasson, no such writing exists.

¶ 256. After the wire transmitting the Libertas Funds to Thomasson's trust account had been sent on November 21, 2022, Thomasson advised that he would not hold the Libertas Funds in escrow. Ruderman Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶256. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Immaterial as cited. [A]. It is also a factually incorrect statement: In fact, the wire was delayed, and before any funds were received by Thomasson, he told Shanks in writing that Thomasson would not be told what to do with the money if and when it was returned.

¶ 257. Thomasson immediately disbursed all but $12,000.00 of the Libertas Funds to Car Buyers, an entity solely owned and controlled by Deo. Ruderman Decl. ¶ X; ECF 410 ¶ 9; ECF 410-3; Thomasson Dep. 123:15-124:17.

RESPONSE TO ¶257. OBJECTION [A]. Admitted in part. ECF 524 ¶ 895 reveals what Thomasson testified at pages 123-124: "When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A: As best I can recall that sounds correct." ECF 524 ¶ 895 (quoting Thomasson Dep. 123:20-25). Admitted that Thomasson wired approximately $723,000 to Car Buyers and retained $12,000 as various attorneys' fees. Placeholder ([A]) as to Ruderman Decl. ¶ X. ECF 410 ¶ 9 and ECF 410-3 are the Ruderman declaration and its exhibit — counsel's own prior declaration, not independent evidence. Disputed as to the framing "the Libertas Funds." ECF 524 ¶ 894 acknowledges that the funds wired to Thomasson's IOLA came from Aaronson:" Aaronson returned funds to Thomasson's IOLA account." The original $735,000 Libertas wire went to 189 Sunrise's Chase account on November 18 and was the same day transferred to Baron Nissan. Kwun Dep. p.8 (ECF 478-2). The funds Thomasson received on November 21 came from a separate Aaronson entity — Island GCM Chrysler — not from the original Libertas wire. The characterization that Thomasson disbursed "the Libertas Funds" conflates two distinct transactions.

¶ 258. Thomasson retained the $12,000.00 as attorneys' fees. Ruderman Decl. ¶ X; ECF 410 ¶ 9; ECF 410-3; Thomasson Dep. 123:15-124:17.

RESPONSE TO ¶258. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Immaterial that counsel retained a fee. [A]. Otherwise, it is admitted that $12,000.00 was retained for various attorney fees due and owing to Thomasson at that time.

¶ 259. Deo did not use any of the Libertas Funds for the benefit of Northshore. Ruderman Decl. ¶ X; ECF 410 ¶¶ 11-13, 17-19.

RESPONSE TO ¶259. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified the financing was intended for the benefit of Northshore and Sunrise, including to secure a cross-guaranty enabling floor-plan and banking for those entities (see Defendants' Responses to ¶¶ 296, 1046). [A]. Disputed. Placeholder ([A]) as to Ruderman Decl. ¶ X. ECF 410 ¶¶ 11-13, 17-19 is the Ruderman declaration — counsel's own prior declaration, not independent evidence. Disputed on the merits: the $500,000 paid to the Superb Plaintiffs was not a mere investment unrelated to Northshore — Deo testified it was specifically to obtain a cross-guarantee for Northshore and 189 Sunrise: "That $500,000 was part of the payment for the cross purchase agreement and it wasn't just an investment into Superb Motors — it was so that I could get a cross guaranty from my companies, Northshore Motors and 189 Sunrise." Deo Dep. (ECF 518-10, Feb. 12, 2026). A payment made to obtain a cross-guarantee for Northshore is a direct benefit to Northshore — the cross-guarantee was the very condition Aaronson required for the ownership transfer. ECF 524 ¶¶ 75, 226. Furthermore, the original Libertas wire went to 189 Sunrise's account and was transferred to Baron Nissan the same day — Kwun Dep. p.8 (ECF 478-2) — meaning the funds Thomasson disbursed on November 21 came from a separate Aaronson entity, not the original Libertas wire. The premise of ¶ 259 is therefore

disputed on multiple grounds, and conveniently ignores the fact that by the time the funds were returned to Deo, the Aaronson Plaintiffs had already closed, shuttered, ruined, and took all needed documents, software, video, computers, and files from both businesses.

¶ 260. On the very next day, November 22, 2022, Deo paid $200,000.00 of his investment to the Superb Plaintiffs using the Libertas Funds. Ruderman Decl. ¶ X; ECF 410 ¶ 12; ECF 410- 3.

RESPONSE TO ¶260. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo paid $200,000 toward his Superb investment; that this confirms he purchased an ownership interest is Defendants' position. The "Libertas Funds" tracing is disputed. [A]. Admitted that a $200,000 wire was made on November 22, 2022 to Urrutia's account as part of the $500,000 cross purchase investment in Superb. Deo confirmed: "I gave Tony $500,000, yes. Q: Where did you get those funds? A: I took a loan." Deo Dep. (ECF 518-10, Feb. 12, 2026). Deo further confirmed the $723,000 from Thomasson went into Car Buyers and then $500,000 of that went to Superb. Id. Placeholder ([A]) as to Ruderman Decl. ¶ X. ECF 410 ¶ 12 and ECF 410-3 are the Ruderman declaration and its exhibit — counsel's own prior declaration, not independent evidence. Disputed as to the characterization "Libertas Funds" — as established at ¶¶ 242 and 257, the funds Thomasson disbursed on November 21 came from a separate Aaronson entity, not the original November 18 Libertas wire. Kwun Dep. p.8 (ECF 478-2).

¶ 261. On November 29, 2022, Deo paid the other $300,000.00 of his investment to the Superb Plaintiffs using the Libertas Funds. Ruderman Decl. ¶ X; ECF 410 ¶ 12; ECF 410-3.

RESPONSE TO ¶261. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo paid the $300,000 balance of his investment; tracing disputed. [A].

¶ 262. Deo also paid $15,000.00 to DLA Capital Partners Inc, which was essentially to Laurie. Ruderman Decl. ¶ X; ECF 410 ¶ 16; ECF 410-3.

RESPONSE TO ¶262. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $15,000 payment's characterization is unsupported as cited. [A].

¶ 263. Deo also paid $213,000.00 to Jun Wang and Associates ("Wang") towards the purchase of the residence he was renting at 3 Hunting Lane, Old Westbury, NY 11568. Ruderman Decl. ¶ X; ECF 410 ¶ 17; ECF 410-3.

RESPONSE TO ¶263. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $213,000 payment toward a residence is disputed and, in any event, immaterial to ownership of the dealerships. [A].

¶ 264. Deo never closed on the purchase of the house and did not pay rent. Ruderman Decl. ¶ X; Deo II Dep. 77:22-80:15; 612890/2025 NYSCEF

RESPONSE TO ¶264. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The cited testimony concerns a contested real-estate transaction; whether Deo "never closed" and "did not pay rent" is disputed (Deo testified to a contract and a unique titling situation, Deo II Dep. 78:7-25 (Feb. 13, 2026)). [A].

¶ 265. Wang brought an action against Deo and obtained a warrant of eviction. 612890/2025 NYSCEF 30.

RESPONSE TO ¶265. OBJECTION [C]. Disputed. The assertion rests on a pleading/record citation (NYSCEF 30) that is not competent summary-judgment evidence of the matter asserted (L.R. 56.1(d)). The cited filing speaks for itself.

¶ 266. Deo then commenced an action against Wang in New York Supreme Court, Nassau County seeking to restrain Wang from evicting Deo, alleging various wrongdoing by the Wang. 612890/2025 NYSCEF 2.

RESPONSE TO ¶266. OBJECTION [C]. Disputed. The assertion rests on a pleading/record citation (the state-court filing) that is not competent summary-judgment evidence of the matter asserted (L.R. 56.1(d)). The cited filing speaks for itself.

¶ 267. That action by Deo was dismissed shortly thereafter by the Nassau County Supreme Court. 612890/2025 NYSCEF 72.

RESPONSE TO ¶267. OBJECTION [C]. Disputed. The assertion rests on a pleading/record citation (NYSCEF 72) that is not competent summary-judgment evidence of the matter asserted (L.R. 56.1(d)). The cited order speaks for itself; the matter is addressed by counsel.

¶ 268. On or about November 25, 2022 Libertas withdrew $19,791.70 from Sunrise's account without authorization. Kwun Decl. ¶ X.

RESPONSE TO ¶268. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). "Without authorization" is a conclusion; a lender's withdrawal under its agreement is not Deo's act. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Libertas withdrew $19,791.70 from Sunrise's account "without authorization" is disputed — the withdrawal may have been authorized under the Libertas financing agreement. "Without authorization" is a legal conclusion ([D]) not established by an inadmissible placeholder declaration.

¶ 269. Libertas has continued to try to withdraw funds from Sunrise’s account. Kwun Decl. ¶ X. Deo Further Encumbers and Diverts Northshore’s Assets

RESPONSE TO ¶269. OBJECTION [A]. Disregard. The citation relies on blank “Aaronson Decl. ¶ X” and/or “Kwun Decl. ¶ X” placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). Immaterial as cited. [A].

Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). The assertion that Libertas "continued to try to withdraw funds" is disputed in full. No admissible deposition testimony supports this assertion.

¶ 270. In January 2022, the IAG Plaintiffs obtained a temporary restraining order, restraining Deo from obtaining any financing against Northshore or pledging any assets of Northshore or selling any assets of Northshore (the “TRO”). 617224/2022 NYSCEF 42.

RESPONSE TO ¶270. OBJECTION [C]. Disputed. The cited order (TRO) speaks for itself; its terms, scope, and effect state legal conclusions reserved to the Court and addressed by counsel. Disputed. 617224/2022 NYSCEF 42 is a state court filing from a separate proceeding — not produced with ECF 524 as an exhibit authenticated for use in this federal action. State court filings from separate proceedings require authentication and are merely self serving at summary judgment. Disputed as to the date — ¶ 270 states "January 2022." The case was filed in August 2023. The TRO in connection with the Flushing loan allegations (¶¶ 273-301) could not have been obtained in January 2022 — Northshore was still operating at that time and the

Flushing loan was obtained in early 2023. The "January 2022" date appears to be a drafting error; the TRO was presumably obtained in January 2023. Disputed as to validity — the TRO was obtained through material misrepresentation. The state court that issued the TRO was presented with Plaintiffs' assertion that Deo had "no ownership" in Northshore. That assertion was made while Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo as 99-100% owner and had testified under oath he was "not misleading the IRS" when he did so. Aaronson Dep. pp.44-45 (ECF 404-1).

¶ 271. Deo was aware of this TRO. Thomasson Dep. 135:3-139:23.

RESPONSE TO ¶271. OBJECTION [F]. Disputed. That Deo "was aware" of the TRO asserts state of mind, which is not established on the cited record. The order speaks for itself. As established at ¶ 270, the TRO was obtained through material misrepresentation: Plaintiffs asserted Deo had "no ownership" in Northshore while Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo as 99-100% owner and had confirmed under oath he was "not misleading the IRS." Aaronson Dep. pp.44-45 (ECF 404-1). A TRO obtained through misrepresentation is voidable — awareness of a voidable TRO does not establish culpable violation of it. As soon as the state Court (Gianelli, J.) was provided with the relevant evidence and tax returns as approved by Josh Aaronson, the Court ruled that the Aaronson Plaintiffs had no likelihood of success on the merits of their case; in response, the Aaronson Plaintiffs moved their litigation to this Federal Court.

¶ 272. Thomason was aware of this TRO. Ruderman Decl. ¶ X; Thomasson Dep. 135:3-139:23.

RESPONSE TO ¶272. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded

(L.R. 56.1(d)). Thomasson's "awareness" asserts state of mind and is not established on the cited record. [A][F]. Placeholder ([A]) as to Ruderman Decl. ¶ X. Disputed as to legal significance — same basis as ¶ 271. Thomasson's awareness of the TRO is not culpable if the TRO was voidably obtained. The TRO was obtained while Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo as owner and had confirmed under oath he was "not misleading the IRS." Aaronson Dep. pp.44-45 (ECF 404- 1). Thomasson acted as attorney for Deo in the legitimate exercise of his client's ownership rights — advising a client who was the confirmed 99-100% owner per his own 2021 tax returns about financing options for his own business is not aiding and abetting a TRO violation. It is also beyond dispute that the issue Plaintiffs raise in this paragraph was never raised by the Plaintiffs to the Judge who issued the TRO (Gianelli, J.).

¶ 273. In early 2023, Deo, working with Laurie and Laurie's connections at Flushing, sought to obtain a secured loan for Northshore secured by Northshore's assets. Ruderman Decl. ¶ X. Laurie Dep. 118:11-119:22.

RESPONSE TO ¶273. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo sought a secured loan for Northshore from Flushing; the surrounding characterizations are denied. [A].

¶ 274. Deo had no authority to obtain loans for Northshore. Aaronson Decl. ¶ X. RESPONSE TO ¶274. OBJECTION [A]. Disregard; disputed. The citation relies on blank "Aaronson Decl. ¶ X" and/or "Kwun Decl. ¶ X" placeholders, which establish nothing and must be disregarded (L.R. 56.1(d)). That Deo "had no authority" to obtain loans for Northshore is contradicted by his ownership. Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo with a 99% interest in Northshore

— a return “approved by Josh Aaronson” — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)); the Deos are the owners of these two corporations.

¶ 275. Obtaining such a loan was prohibited by the TRO. Ruderman Decl. ¶ X; 617224/2022 NYSCEF 42.

RESPONSE TO ¶275. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether the loan was “prohibited by the TRO” states a legal conclusion reserved to the Court, and the Plaintiffs here never brought the issue to that Court, which dissolved the TRO when presented with the tax returns as approved by Josh Aaronson. Ruderman Decl. ¶ X is a pure placeholder ([A]). The 617224/2022 NYSCEF 42 citation is a state court filing from a separate proceeding not produced with ECF 524 as an authenticated exhibit. Disputed as to validity — same basis as ¶¶ 270-272. The TRO that allegedly prohibited the Flushing loan was itself obtained through material misrepresentation: Plaintiffs asserted Deo had "no ownership" in Northshore while Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo as 99-100% owner and confirmed under oath he was "not misleading the IRS." Aaronson Dep. pp.44-45 (ECF 404-1). A TRO obtained through misrepresentation of material facts is voidable — the Flushing loan cannot be characterized as a prohibited act under a TRO that was voidably obtained. Disputed as to scope — the precise terms of the TRO are established by the TRO document itself, not by a placeholder declaration. Whether the Flushing loan fell within the TRO's specific prohibitions is a legal conclusion ([D]) that cannot be established by Ruderman Decl. ¶ X. Disputed as to authority — if Deo was the 99-100% owner of Northshore per the 2021 tax returns Aaronson approved, he had the authority as owner to obtain financing for his own

business. The TRO's prohibition was premised on Deo having no ownership — a premise Aaronson's own IRS admission defeats.

¶ 276. Deo, falsely claiming to be the sole owner of Northshore, arranged to borrow funds from Flushing. Ruderman Decl. ¶ X.

RESPONSE TO ¶276. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Deo was "falsely claiming" sole ownership is contradicted by the record; Deo represented and warranted he was the owner, and the K-1s created and supplied by the Plaintiffs in conjunction with their accountants at Citrin Cooperman were reasonably relied upon by the Deos and their lenders. Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo with a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)); ownership of these businesses rests with the Deos.

¶ 277. Thomason was informed by Deo in February or March of 2023 that he sought financing for Northshore from Flushing in violation of the TRO. Ruderman Decl. ¶ X; Thomasson Dep.

RESPONSE TO ¶277. OBJECTION [A] [D]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "In violation of the TRO" states a legal conclusion; the order speaks for itself. [A][D].

Disputed. Ruderman Decl. ¶ X is a pure placeholder ([A]). This paragraph must be disregarded at summary judgment. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Disputed as to the characterization "in violation of the TRO." Same basis as ¶¶ 270-276. The TRO was voidably

obtained through material misrepresentation of Deo's ownership — Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo and Sara as 100% owners and confirmed under oath he was "not misleading the IRS." Aaronson Dep. pp.44-45 (ECF 404-1). Financing that Deo sought for his own business — as the 99% owner with Sara holding the remaining 1% as his spouse, together constituting unified 100% marital ownership — cannot be characterized as a TRO violation when the TRO itself was obtained by misrepresenting that ownership to the state court. Thomasson's informing of a client's attorney-client communication is privileged. The assertion that "Thomasson was informed by Deo" about the Flushing financing is attorney client privileged communication. Thomasson was Deo's attorney. Deo telling his attorney about financing he was seeking for his own business is a protected communication — not an admission of wrongdoing. In addition, this is merely a conclusion, and there is no basis in the record to find that Thomasson knew beforehand of any financing obtained by the Deos at any time from any lender.

¶ 278. Deo and Thomasson were aware that Ally still held a blanket lien on all assets of Northshore in February of 2023. Ruderman Decl. ¶ X; Thomasson Dep, 304:3-21.

RESPONSE TO ¶278. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank “Ruderman Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted awareness of a lien states state of mind; unsupported as cited. [A][F]. There is no basis in the record that establishes when Thomasson or Deo learned of any financing lien; and all such liens were, in fact, ultimately released.

¶ 279. In order for Flushing to approve the loan to Northshore they required the lien by Ally to be removed. Ruderman Decl. ¶ X.

RESPONSE TO ¶279. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a lender's lien-release requirement, immaterial. [A].

¶ 280. Because the IAG Plaintiffs had paid off all of the deficiencies due to Ally by Deo's actions, Ally no longer had assets to protect with the lien. Ruderman Decl. ¶ X.

RESPONSE TO ¶280. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That IAG had "paid off all of the deficiencies" is unsupported by competent evidence; in any event it confirms IAG, not Deo, controlled the Ally relationship. [A]. There is no evidence presented or in the record as to the Deo Defendants' knowledge of any monies paid at any time by the Plaintiffs regarding these two corporations at issue.

¶ 281. Thomason then facilitated the removal of Ally's lien in order to assist Deo in obtaining a loan for Northshore from Flushing in violation of the TRO. Ruderman Decl. ¶ X. Thomasson Dep. 304:3-21.

RESPONSE TO ¶281. OBJECTION [A] [D] [F]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)); Disputed. "In violation of the TRO" is a legal conclusion ([D]); Ruderman Decl. ¶ X is a placeholder ([A]). The premise fails because, as developed at ¶¶ 270-276, the TRO was voidably obtained through misrepresentation of Deo's ownership — Plaintiffs' counsel knew Aaronson had approved 2021 tax returns listing Deo as 99-100% owner and testified he was "not misleading the IRS." Aaronson Dep. 44-45 (ECF 404-1). ¶ 281 recycles ¶¶ 272-279. This statement also assumes discussions/knowledge of the reason for obtaining the lien release, which does not exist in the record.

¶ 282. Flushing also became aware of the lawsuit by plaintiffs against Deo at the time they were providing the financing to Northshore in March 2023. Ruderman Decl. ¶ X; Exhibit Email.

RESPONSE TO ¶282. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Flushing's asserted awareness is unsupported as cited. [A]. The Deo Defendants specifically by reference adopt and cite Flushing's response to this statement.

¶ 283. In order to assist Deo in his loan application for Northshore and for funding from Flushing, Thomasson provided assurance by letter to Flushing that despite the lawsuit Flushing should provide financing to Northshore and Deo. Ruderman Decl. ¶ X; Thomasson Dep. 143:9-145:21; FLUSHING3835.

RESPONSE TO ¶283. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Thomasson's asserted assurances and Flushing's asserted awareness state of mind and are unsupported as cited. [A][F]. At the time of the referenced letter, the financing was already completed.

¶ 284. In the application for Flushing, Deo submitted a December 31, 2022 profit and loss statement. Ruderman Decl. ¶ X. Deo Dep. Feb. 13, 2026, 60:3-18; Exhibit P&L.

RESPONSE TO ¶284. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only, on the cited testimony, that Deo submitted a December 31, 2022 profit-and-loss statement to Flushing (Deo II Dep. 59:2-8 (Feb. 13, 2026)). [A].

¶ 285. That profit and loss statement contained false information. Kwun Decl. ¶ X.; Exhibit Financial Statement.

RESPONSE TO ¶285. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Kwun Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the statement "contained false information" is conclusory and unsupported. Deo testified that he "didn't prepare P and L's," that Mr. Jones (the CPA) prepared them, and that the statement was "provided to" him (Deo II Dep. 59:9-18, 60:14-18 (Feb. 13, 2026)) — the financials were prepared by the accountant, not fabricated by Deo. [A]. Disputed. Kwun Decl. ¶ X is a pure placeholder ([A]). Exhibit Financial Statement not produced with ECF 524. "Contained false information" is a [D] fraud allegation not established by a placeholder declaration. No accounting expert opinion is cited. No produced deposition testimony with personal knowledge of the December 31, 2022 P&L establishes specific false entries. As established at ¶ 132: Kwun monitored the DMS with full access, received O'Sullivan's real-time reports, and supplied Ally with monthly financials. Deo Dep. 582:21-583:12 (ECF 518-10); O'Sullivan Dep. 219:15-220:15 (ECF 478-1). If the December 31, 2022 P&L was based on DMS data that Kwun had been monitoring throughout 2022, the assertion that it "contained false information" — made by Kwun through a placeholder declaration — requires Kwun to explain what she knew about the DMS data she was monitoring and why she did not detect the alleged falsity in real time. Those questions remain unanswered in ECF 524 and Kwun's declaration cannot establish falsity without confronting them. O'Sullivan's affidavit — which underlies much of the financial misconduct narrative — was not prepared by O'Sullivan. O'Sullivan Dep. 204:7-9 (ECF 478-1). Wendy Kwun reviewed the highlighted exhibits. O'Sullivan Dep. 204:3-5 (ECF 478-1). A declaration about the P&L's accuracy made by the same person who prepared the

underlying affidavit and monitored the DMS throughout the period is not independent evidence of falsity.

¶ 286. In connection with that application for Flushing, Deo submitted the October 2022 Northshore financial statement. Ruderman Decl. ¶ X. Deo Dep Feb. 13, 2026, 38:2-20, Exhibit Financial Statement.

RESPONSE TO ¶286. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo submitted an October 2022 Northshore financial statement. [A].

¶ 287. That October 2022 financial statement was false. Ruderman Decl. ¶ X. KWUN Decl., Exhibit Financial Statement.

RESPONSE TO ¶287. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "False" is conclusory and unsupported as cited; Deo testified he "didn't prepare" the financial statements, which were prepared by the controller (O'Sullivan), Kwun, and Jones and provided to him (Deo II Dep. 37:17-38:22 (Feb. 13, 2026)). [A].

¶ 288. In connection with the loan from Flushing, Deo submitted a personal financial statement. Ruderman Decl. ¶ X. Deo Dep. Feb. 13, 2026, 65:3-12, Exhibit Personal Financial Statement.

RESPONSE TO ¶288. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo submitted a personal financial statement. [A].

¶ 289. Deo was aware that Flushing was relying upon the accuracy of his personal financial statement and the other financial information in order to approve the loan. Deo Dep, Feb. 13, 2026, 67:24-68:10.

RESPONSE TO ¶289. OBJECTION [F]. Disputed. That Flushing "was relying upon the accuracy" of the financials and that Deo "was aware" of that reliance "in order to" approve the loan asserts a third party's reliance and Deo's state of mind, neither establishable on the cited record. The cited testimony shows only that Deo understood the financials were provided to assist Flushing in assessing Northshore's creditworthiness (Deo II Dep. 67:24-68:10 (Feb. 13, 2026)); Flushing's reliance and underwriting decision were its own. [F].

¶ 290. On that personal financial statement Deo represented that he personally owned a property in the Bronx located at 3011 Matthews Avenue. Deo Dep, Feb. 13, 2026, 73:10-74:7, Exhibit Personal Financial Statement.

RESPONSE TO ¶290. Disputed in part. Admitted only that Deo's personal financial statement listed a Bronx property; the significance is disputed (see ¶ 291).

¶ 291. Deo did not own that property in the Bronx and he knew he did not own the property. Deo Dep, Feb. 13, 2026, 74:3-10.

RESPONSE TO ¶291. OBJECTION [C] [F]. Disputed. Contradicted by Deo's own cited testimony: Deo testified he did own the property — "Not in title, but I did" — and "disagree[d]" that the representation was inaccurate (Deo II Dep. 74:11-18 (Feb. 13, 2026)). The asserted knowledge of non-ownership is thus genuinely disputed. [C][F].

¶ 292. The Bronx property had belonged to Deo's father and his father sued him for forging a deed transferring the Brox property to a company formed by Sara. Deo Dep, Feb. 13, 2026, 74:3-10., 81:19-83:4, Exhibit Court Order.

RESPONSE TO ¶292. Disputed. The asserted forgery and the related family litigation are the subject of a separate proceeding; the cited court order speaks for itself, and the characterization is denied.

¶ 293. The Court found in favor of Deo's father, and expunged the forged deed. Deo Dep, Feb. 13, 2026, 74:3-10., 81:19-83:4; Exhibit Court Order.

RESPONSE TO ¶293. Disputed. The cited 2006 Bronx County Supreme Court order speaks for itself; its findings concern a separate, decades-old proceeding and do not establish the present matters asserted.

¶ 294. On the personal financial statement, Deo represented that he personally owned the property in Old Westbury located at 3 Hunting Lane. Dep, Feb. 13, 2026, 77:22-78:6, Exhibit Personal Financial Statement.

RESPONSE TO ¶294. Disputed in part. Admitted only that Deo's personal financial statement listed the Old Westbury property; the significance is disputed (see ¶ 295).

¶ 295. Deo did not own that property in Old Westbury and knew he did not own it. Dep, Feb. 13, 2026, 78:7-79:17.

RESPONSE TO ¶295. OBJECTION [C] [F]. Disputed. Contradicted by Deo's own cited testimony: Deo testified "I believe I did" own the property and that there was "a contract" and a unique titling situation in which title had not yet transferred (Deo II Dep. 78:7-25 (Feb. 13, 2026)). The asserted knowledge of non-ownership is genuinely disputed. [C][F].

¶ 296. In the loan application to Flushing, Deo represented that the funds for the loan would be used to help the operations of Northshore. Deo II Dep. 151:23-153:18; Ruderman Decl. ¶ X; Bank Statements.

RESPONSE TO ¶296. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted, on the cited testimony, that Deo represented to Flushing that the loan funds would be used to help Northshore's operations. [A]. Admitted that Deo represented in the Flushing application that funds would be used to help operations of Northshore. Deo II Dep. 151:23-153:18 (ECF 518-10). Ruderman Decl. ¶ X is a pure placeholder ([A]). Bank Statements not produced with ECF 524. Disputed as to any implication that this representation was false. As established at ¶ 284, the Flushing loan was legitimate independent financing by the 99% owner of Northshore after IAG destroyed the floor plan relationship on November 18, 2022. Using loan proceeds to fund Northshore's operations — including the contractual Car Buyers commission structure — is consistent with that representation. Car Buyers NYC Inc. received monthly commissions from Northshore throughout the dealership's operation — O'Sullivan confirmed Deo "would get, I think five percent or seven and a half percent" of gross profit paid to Car Buyers monthly. O'Sullivan Dep. 119:9-120:10 (ECF 478-1). This was the established compensation structure for Deo as owner-operator. Transfers from Northshore to Car Buyers following the Flushing loan were consistent with this established structure — not a diversion of loan proceeds. When asked about specific Car Buyers transfers, Deo acknowledged them: "In particular I don't know." Deo Dep. (ECF 518-10, Feb. 13, 2026.) That is not an admission of wrongful diversion — it is an owner-operator who does not recall the particulars of every transfer between his own entities operating in the normal course. Further, it is specifically asserted that the funds were used, at least in part, to help NorthShore and 189 Sunrise.

¶ 297. Flushing approved the loan and in March 2023 funded the $500,000.00 into a bank account for Northshore opened at Flushing. Ruderman Decl. ¶ X; Exhibit Loan Agreement.

RESPONSE TO ¶297. OBJECTION [A]. Disregard. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Flushing funded $500,000 into a Northshore account. [A].

¶ 298. By May 2023 Deo transferred almost $400,000.00 of those funds to his account at Car Buyers. Ruderman Decl. ¶ X; Exhibit Bank Statements.

RESPONSE TO ¶298. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Ruderman Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted transfers and their characterization are disputed; Deo testified the financing was intended for the benefit of Northshore and Sunrise, including to secure a cross-guaranty enabling floor-plan and banking for those entities (see Defendants' Responses to ¶¶ 296, 1046). [A].

Disputed. Ruderman Decl. ¶ X is a placeholder ([A]); bank-statement exhibit not produced with ECF 524, and the specific $400,000 figure is not established by produced testimony. Disputed as to the characterization of any Car Buyers transfer as a diversion of loan proceeds — Car Buyers received monthly commissions from Northshore throughout operations as Deo's established owner-operator compensation. O'Sullivan Dep. as set forth in Section 5 of the Deos Joint Rule 56.1 Statement.

¶ 299. Deo did not use any of the funds lent by Flushing for the benefit of Northshore. Ruderman Decl. ¶ X; Deo II Dep. 158:6-13; Exhibit Bank Statements.

RESPONSE TO ¶299. Disputed; cannot be admitted as cited. The cited testimony does not support the assertion: Deo testified only that he did not know how much of the Flushing funds was used for Northshore's operations (Deo II Dep. 158:6-13 (Feb. 13, 2026)) — which does not establish that none was. Deo represented and intended the funds for Northshore's

benefit (¶ 296). Deo testified the financing was intended for the benefit of Northshore and Sunrise, including to secure a cross-guaranty enabling floor-plan and banking for those entities (see Defendants' Responses to ¶¶ 296, 1046).

¶ 300. Deo granted Flushing a UCC-lien on all of Northshore's assets without authorization. Ruderman Decl. ¶ X; Exhibit UCC-1.

RESPONSE TO ¶300. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Without authorization" is a conclusion, denied. The UCC-1 reflects a lender's security interest in connection with a loan to Northshore, an entity of which Deo is an owner (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)). [A].

Disputed. The "without authorization" element is disputed and unsupported. Ruderman Decl. ¶X is a placeholder ([A]), and Exhibit UCC-1 was not produced with ECF 524. Authorization to pledge Northshore's assets flows from ownership: Deo was the 99% owner of Northshore, confirmed by the 2021 tax returns Aaronson approved and by Aaronson's testimony that he was "not misleading the IRS" in approving them. Aaronson Dep. 45 (ECF 404-1). An owner has authority to grant a security interest in his own company's assets. ¶ 300's "without authorization" assertion therefore rests on the disputed "no ownership" premise and is not established.

¶ 301. Obtaining a loan and providing a lien in favor of Flushing against the assets of Northshore was a violation of the terms of the Supreme Court TRO. Ruderman Decl. ¶ X. Exhibit TRO.

RESPONSE TO ¶301. OBJECTION [A]. Denied. Only Judge Gianelli can make this determination, and Plaintiffs never brought the issue before her; instead, they brought their case to this Court after Judge Gianelli ruled against them in her June 1, 2023 decision and order.

¶ 302. The Deo Defendants used the Flushing loan proceeds to invest in the Deo13. Defendant's new automobile dealerships. Urrutia Decl. ¶ X.

RESPONSE TO ¶302. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That loan proceeds were "invested" in other dealerships is unsupported and, in any event, irrelevant. [A].

¶ 303. As of late June 2023, Deo's operations at Northshore completely ceased. ECF 157- 15 ¶¶ 5-10.

RESPONSE TO ¶303. Admitted that the operation ceased before that date.

¶ 304. On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that: (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place me back in the position I was now that the Cross-Purchase Agreement has been voided. 618608/2023 NYSCEF 134.

RESPONSE TO ¶304. The cited state-court order (NYSCEF 134) speaks for itself.

¶ 305. This Court found that Justice Murphy's decision was entitled to res judicata effect. ECF 505. Superb Plaintiffs

RESPONSE TO ¶305. Admitted that this Court found Justice Murphy's decision entitled to res judicata effect per ECF 505.

## II. SUPERB PLAINTIFFS (¶¶ 306–1071)

¶ 306. Urrutia began his automotive career in 1992 and have since managed some of the most successful dealership groups in the Northeast. ECF 294 ¶ 8.

RESPONSE TO ¶306. Denied. The assertion rests on a pleading (ECF 294), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). Urrutia's career background is irrelevant and unproven here.

¶ 307. In 2020, during the height of the pandemic, Urrutia acquired his first dealership. ECF 294 ¶ 9.

RESPONSE TO ¶307. Irrelevant. The assertion rests on a pleading (ECF 294), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)).

¶ 308. After opening his first dealership in 2020, Urrutia quickly transformed it from an underperforming location into one of the top-performing dealerships in the Northeast. ECF 294 ¶ 11.

RESPONSE TO ¶308. Irrelevant. The assertion rests on a pleading (ECF 294), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). A self-serving characterization that is unproven here.

¶ 309. Urrutia was the President of Superb and a member of Team. ECF 11 ¶ 1.

RESPONSE TO ¶309. Admitted.

¶ 310. In March 2022, Urrutia moved to Costa Rica and primarily lives there. ECF 251 ¶ 10 n. 2.

RESPONSE TO ¶310. The Deo Defendants cannot admit or deny this allegation. That Urrutia resides in Costa Rica is irrelevant except as it bears on his absence from day-to-day operations as an admitted absentee owner.

¶ 311. Superb is a corporation with its place of business at 215 Northern Boulevard, Great Neck, NY. 618608/2023 NYSCEF 78 ¶¶ 3-4; 618608/2023 NYSCEF 79 and 80.

RESPONSE TO ¶311. Admitted.

¶ 312. Plaintiff Superb first opened in or about 2021. 618608/2023 NYSCEF 78 ¶ 3.

RESPONSE TO ¶312. Admitted.

¶ 313. In June 2021, Urrutia launched Superb with Bobby Clarke ("Clarke") who is of Caribbean descent and a co-owner of a Caribbean radio station employee Urrutia hired at a prior dealership he managed. ECF 294 ¶ 12.

RESPONSE TO ¶313. The Deo Defendants cannot admit or deny this assertion.

¶ 314. In late 2022, Clarke chose to exit Superb after losing advertising revenue from competing dealerships due to our agreement not to allow other dealerships to advertise to our Caribbean audience. ECF 294 ¶ 17.

RESPONSE TO ¶314. The Deo Defendants cannot admit or deny this assertion.

¶ 315. At that point, Urrutia was faced with the decision to either close the used car operations at Superb or bring in a new operator who could expand its market reach. ECF 294 ¶ 20.

RESPONSE TO ¶315. The Deo Defendants cannot admit or deny this assertion.

¶ 316. By then, Urrutia had already expanded to two (2) franchise dealerships, had Superb operating, and was in the process of closing on a third franchise with Nissan as a minority dealer. ECF 294 ¶ 21.

RESPONSE TO ¶316. The Deo Defendants cannot admit or deny this assertion.

¶ 317. Plaintiff Team is and was a limited liability company duly with its principal place of business in New Jersey. Urrutia Decl. ¶ X; 618608/2023 NYSCEF 78 ¶¶ 1.

RESPONSE TO ¶317. The Deo Defendants cannot admit or deny this assertion.

¶ 318. Team first opened in or about November 2020. Urrutia Decl. ¶ X.

RESPONSE TO ¶318. The Deo Defendants cannot admit or deny this assertion.

¶ 319. At all times relevant, since its inception in June 2021, Urrutia was the President and majority or sole shareholder of Superb. 618608/2023 NYSCEF 78 ¶¶ 2-6.

RESPONSE TO ¶319. The Deo Defendants cannot admit or deny this assertion.

¶ 320. In addition to Superb, Urrutia owned Volkswagen of Freehold, Team-Mitsubishi Hartford, and Team Nissan of Pittsfield Massachusetts. ECF 11 ¶ 2.

RESPONSE TO ¶320. The Deo Defendants cannot admit or deny this assertion.

¶ 321. Urrutia is also the sole member of Team, which is an automobile wholesaler that owns thirteen (13) vehicles that the Deo Defendants have absconded with and failed to return until this Court required them to return them to the Superb Plaintiffs. ECF 11 ¶¶ 2, 193; ECF 112 ¶ 44; ECF 157-1 ¶ 77; ECF 258 ¶ 24.

RESPONSE TO ¶321. The Deo Defendants cannot admit or deny this assertion, except that to assert the Deo Defendants "absconded" with thirteen vehicles is conclusory and denied.

¶ 322. Urrutia met with Deo in November 2022, having been previously introduced through a mutual friend in the automobile industry, at which time Deo held himself out to be qualified to run an automobile dealership and sought to enter into a partnership with Urrutia at Superb. ECF 11 ¶¶ 10-19.

RESPONSE TO ¶322. Admitted.

¶ 323. During this meeting, Laurie was present, and dominated the conversation, speaking roughly eighty percent (80%) of the time, despite his supposed role as "advisor, financier, and unofficial partner" of Deo. ECF 11 ¶¶ 13-14; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶323. Disregard. Immaterial narrative concerning Mr. Laurie's role at a meeting; unsupported.

¶ 324. Urrutia and Deo entered into a Cross-Purchase Agreement (the "Cross Purchase Agreement") dated as of December 1, 2022, in which Deo would pay Urrutia $500,000.00 and issue him a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for Deo obtaining a forty-nine percent (49%) interest in Superb. ECF 11 ¶¶ 20-23; ECF 11-1.

RESPONSE TO ¶324. Disputed in part. Admitted that Urrutia and Deo entered into a Cross-Purchase Agreement dated December 1, 2022, under which Deo would pay for an interest — a fact confirming Deo acquired an ownership interest, not employment. The document speaks for itself.

¶ 325. Prior to entering into and included in the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia that, among other things, he: (i) is the sole owner of Northshore and Sunrise, respectively; (ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively; (iii) has not made any representation or warranty that constitutes an untrue statement of a material fact or omits to state a material fact necessary to make it not misleading; and (iv) has no pending or threatened suit, action, bankruptcy, or administrative proceeding, or other arbitration or proceeding, which could adversely affect the ability of Deo to perform any of his obligations, including Deo's obligation to convey the units of Northshore and Sunrise free and clear of all liens and encumbrances. ECF 11-1.

RESPONSE TO ¶325. Disregard. The asserted pre-contract representations are characterized; the agreement speaks for itself.

¶ 326. Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit on the foregoing agreement in furtherance of his schemes to defraud. ECF 11 ¶ 24; ECF 11-2.

RESPONSE TO ¶326. OBJECTION [E]. Disputed. Admitted only that Deo issued a $100,000 check dated November 14, 2022 as a deposit. Any pejorative implication is denied. [E].

¶ 327. However, this check bounced the following day due to being returned for insufficient funds. ECF 11 ¶ 24; ECF 11-2.

RESPONSE TO ¶327. Disputed. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). Admitted only that a check was returned; the reason and significance are disputed (see ¶ 328).

¶ 328. On November 16, 2022, Deo reached out to explain that he had deposited a bank check to cover his payment to me and did not understand why the check bounced; he even shared a screenshot displaying the funds he deposited were in a "hold" status. ECF 11 ¶ 25; ECF 11-3.

RESPONSE TO ¶328. Disputed in part. Admitted that Deo communicated that he had deposited a bank check intended to cover the payment. The balance is immaterial.

¶ 329. By November 17, 2022, Urrutia had taken the necessary steps to move forward with our partnership by reducing the inventory to market value and absorbing the November 2022 losses. Urrutia Decl. ¶ X; ECF 38 ¶¶ 22.

RESPONSE TO ¶329. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Urrutia's asserted preparatory steps are immaterial. [A].

¶ 330. Deo clarified that his inability to immediately provide the agreed-upon $500,000.00 investment in Superb was a direct result of his problems with Aaronson. ECF 11 ¶¶ 27-28, 30.

RESPONSE TO ¶330. Disregard. Immaterial narrative; the cited explanation is unsupported as competent evidence.

¶ 331. On November 23, 2022, in order to induce Urrutia to make this deal with him, Deo provided Urrutia with financial statements showing that Northshore and Sunrise were profitable; Urrutia later learned that these statements were false. 618608/2023 NYSCEF 78 ¶ 20.

RESPONSE TO ¶331. OBJECTION [C] [F]. Disputed. The assertion rests on a state-court affidavit (618608/2023 NYSCEF 78 ¶ 20), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). That Deo provided financial statements "in order to induce" asserts intent; denied as characterized. The statements were prepared by Deo's accountants, not fabricated by Deo: Deo testified that he does not prepare such statements and that his accountant (Jones) and controller generally prepared them (Deo II Dep. 59:14-18 (Feb. 13, 2026)). [C][F].

¶ 332. Urrutia later learned the truth was that Deo had no ownership interest in Northshore or Sunrise, obtained $735,000.00 from Libertas Funding LLC (which would be repaid, with interest, from the future receivables of Northshore and/or Sunrise), and misappropriated those funds for himself. ECF 11 ¶¶ 32 n. 4, 38.

RESPONSE TO ¶332. OBJECTION [E]. Disputed. That Deo "had no ownership interest in Northshore or Sunrise" is the central disputed issue, and it is false. This is contradicted by the record: Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo as holding a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)). Ownership of Northshore and Sunrise is, at a minimum, genuinely disputed and cannot be resolved against Deo on summary judgment. The disposition of the $735,000 in Libertas

funds is separately addressed: it was Aaronson who moved those funds (see Defendants' Responses to ¶¶ 340-341, 1009). [E].

Disputed. The ownership of Northshore and Sunrise is the central contested legal issue. Deo testified he is an owner (Deo Dep. p.55); O'Sullivan maintained his capital account (O'Sullivan Dep. pp.9, 16); Aaronson approved 2021 tax returns listing Deo as 99% owner (Aaronson Dep. p.44). The deposition citation reflects a named Plaintiff's testimony, not an undisputed fact.

¶ 333. What's worse, despite Aaronson proving he was entitled to those funds, he was nonetheless threatened with arrest by a detective if he did not turn the funds over to Deo. 617224/2022 NYSCEF 32.

RESPONSE TO ¶333. OBJECTION [C]. Disputed. The assertion rests on a state-court filing (617224/2022 NYSCEF 32), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)); the cited filing speaks for itself. That Aaronson was "entitled to those funds" is contradicted by the record: Aaronson took approximately $735,000 out of the 189 Sunrise account and had it transferred into a Baron Nissan account — a separate entity — to satisfy a debt he claimed Deo owed him personally (Chabrier Dep. 134-135 (Jan. 9, 2026); Kwun Dep. 145 (Mar. 5, 2026)), a self-interested diversion rather than an established entitlement (see Defendants' Response to ¶ 1009). [C].

¶ 334. This is detailed in Aaronson's affidavit in a state court action filed by Aaronson and others against Deo last December, which I only recently learned of. Id.

RESPONSE TO ¶334. OBJECTION [C]. Disregard. Refers to an affidavit in a separate state-court action; the document speaks for itself and is not competent evidence of the matters asserted here. [C].

¶ 335. As it turns out, Deo employs a retired and active police officer – Dwight Blankenship and Marc Merckling – and Urrutia believes Deo was able to exercise undue influence through his relationships with these officers to force Aaronson to turn these funds over. Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-15, 95-3.

RESPONSE TO ¶335. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion that Deo "was able to" obtain official action through retained officers is speculative and conclusory; "Urrutia believes" is not competent evidence and is also speculative and conveniently conclusory. [A].

¶ 336. Similarly, despite aggressively seeking the arrest of Deo since August 3, 2023 when Urrutia uncovered his fraudulent scheme and providing a mountain of evidence to support my allegations, to this day, Deo has not yet been arrested for his crimes. Urrutia Decl. ¶ X.

RESPONSE TO ¶336. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Fraudulent scheme" is conclusory; that Deo was not arrested reflects the exercise of prosecutorial discretion, not proof of the assertion; this statement is speculative, conclusory, and constitutes hearsay. [A][E].

¶ 337. In contrast, as discussed further infra, despite the Superb Plaintiffs' presentation of innumerable evidence of Deo's criminal wrongdoing at Superb, the Nassau County Police Department repeatedly informed the Superb Plaintiffs that it was a civil matter. Urrutia Decl. ¶ X.

RESPONSE TO ¶337. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). "Criminal wrongdoing" is a conclusory characterization, denied; these assertions are both speculative and hearsay. [A].

¶ 338. Urrutia also learned, as set forth in detail herein, that Thomasson assisted Deo in stealing these funds by utilizing his attorney escrow account. ECF 11 ¶ 29.

RESPONSE TO ¶338. Disregard; disputed. That Thomasson "assisted Deo in stealing" funds is conclusory and is contradicted by the record: the Libertas funds were taken by Aaronson, not Deo (see Defendants' Responses to ¶¶ 341, 1009). This assertion is speculative, conclusory, and constitutes extreme hearsay.

¶ 339. Due to Thomasson's direct participation in the perpetuation of Deo's fraudulent scheme, unbeknownst to Urrutia, Thomasson enabled Deo to pay Urrutia funds which were fraudulently obtained from Libertas. Id.; Urrutia Decl. ¶ X.

RESPONSE TO ¶339. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Fraudulent scheme" and Thomasson's "direct participation" are conclusory; the underlying premise (theft by Deo) is denied. [A][E]. Moreover, this assertion assumes facts not in evidence, namely, whether or not Thomasson had knowledge of Deo's and Urrutia's business beforehand, which he denies.

¶ 340. Indeed, on November 21, 2022, $735,000.00 was wired into Thomasson's escrow account due to Blankenship's and Merckling's intervention with the NCPD in making Aaronson believe that he would be arrested if he did not turn over the $735,000.00 fraudulently obtained from Libertas. Urrutia Decl. ¶ X.

RESPONSE TO ¶340. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Admitted only that $735,000 was wired into an escrow account on or about November 21, 2022; the characterization of the surrounding conduct is conclusory and denied. [A][E]. The funds were in all respects lawfully obtained, and the Deo Defendants deny that Thomasson had anything to do with either obtaining those funds from Libertas or knowing beforehand anything about Deo's and Urrutia's business involving Superb.

¶ 341. Deo then wired Urrutia $500,000.00 in two (2) separate wires of $300,000.00 on November 22, 2022, and $200,000.00 on November 29, 2022, both of which were issued from Car Buyers NYC Inc. despite the fact those funds obviously came from Thomasson's escrow account. ECF 11 ¶ 32; ECF 11-5; Urrutia Decl. ¶ X.

RESPONSE TO ¶341. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo wired Urrutia $500,000 in two wires — a payment confirming Deo purchased an ownership interest in Superb. The "stolen funds" premise is denied. [A].

¶ 342. Having paid for his shares of Superb with these stolen funds, on December 1, 2022, Deo executed the Cross-Purchase Agreement. ECF 11 ¶ 33; ECF 11-1; ECF 11-5.

RESPONSE TO ¶342. Disputed in part. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). Admitted that on December 1, 2022 Deo executed the Cross-Purchase Agreement — confirming he acquired an ownership interest. The "stolen funds" and "scheme" characterizations are denied.

¶ 343. Deo thus invested in Superb in furtherance of his scheme to defraud. *Id*. b. Deo has limited powers as a minority shareholder of Superb

RESPONSE TO ¶343. OBJECTION [C] [E]. Disputed. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R.

Civ. P. 56(c)). "In furtherance of his scheme to defraud" is conclusory and denied. The paragraph concedes Deo "invested in Superb," confirming an ownership interest. [C][E].

¶ 344. A few weeks later, Deo executed a Shareholders' Agreement. ECF 11 ¶¶ 40-43; ECF 11-6; ECF 11-7; ECF 11-8.

RESPONSE TO ¶344. Admitted. Admitted that, weeks later, Deo executed a Shareholders' Agreement — a fact confirming Deo is a shareholder of Superb. The document speaks for itself.

¶ 345. The Shareholders' Agreement provides that Urrutia holds a fifty-one percent (51%) interest in Superb while Deo owns a forty-nine percent (49%) interest in Superb. ECF 11-6.

RESPONSE TO ¶345. Admitted. Admitted that the Shareholders' Agreement provides Deo a 49% interest in Superb. A party holding a 49% interest under a shareholders' agreement is an owner, not an employee.

¶ 346. The Shareholders' Agreement provides that Urrutia is the President, and that he, alone, and independent of any other shareholders, directors, and officers may exercise: (i) the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires; and (ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided, it being expressly agreed, that this power does not include the right to terminate a Shareholder. ECF 11-6.

RESPONSE TO ¶346. Disputed in part. The Shareholders' Agreement speaks for itself as to Urrutia's role; characterizations beyond its text are denied.

¶ 347. It similarly provides that all actions requiring shareholder consent require the written consent of least a majority of the voting shares; crucially, this includes the granting of

any mortgage, lien, or other security interest in the assets of Superb or any loans or guarantees by Superb. ECF 11-6.

RESPONSE TO ¶347. Disputed in part. The Shareholders' Agreement speaks for itself as to voting and consent provisions.

¶ 348. The Shareholders' Agreement restricts the right to sell the stock of Superb only by a majority of the voting stock of Superb, i.e., by written consent of Urrutia as majority shareholder.

RESPONSE TO ¶348. OBJECTION [C]. Disputed in part. The Shareholders' Agreement speaks for itself; admitted only to the extent it accurately quotes the document. [C].

¶ 349. It provides that, among other responsibilities, Urrutia has: (i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors; (ii) capitalization of the Corporation; (iii) establishment of policies and standards for services provided by Superb, as well as supervision and complete authority over Superb's activities; (iv) review and final approval of financing arrangements with lending institutions to be utilized by Superb in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles; and (v) supervision and complete control of the accounting department of Superb, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by Superb. ECF 11-6.

RESPONSE TO ¶349. Disputed in part. The Shareholders' Agreement speaks for itself as to Urrutia's enumerated responsibilities.

¶ 350. In contrast, Deo's only responsibilities under the Shareholders' Agreement were to propose an individual who will serve as the General Manager of the day-to-day operations of Superb, whom Urrutia had final authority to approve or reject. ECF 11 ¶ 41; ECF 11-6.

RESPONSE TO ¶350. Disputed. Defendants dispute the characterization of Deo as a mere "employee" or "general manager": Deo was a party to the Cross-Purchase Agreement and the Shareholders' Agreement as a 49% shareholder of Superb (see ¶¶ 344-345), not an employee, and the cited agreements speak for themselves. The Shareholders' Agreement speaks for itself; it does not provide that Deo's "only" responsibility was as described, and Deo's status as a 49% shareholder is not that of an employee.

¶ 351. As Deo did not propose any individual, he served as General Manager of Superb. ECF 11 ¶ 41; 618608/2023 NYSCEF 78 ¶¶ 35-37.

RESPONSE TO ¶351. OBJECTION [C]. Disputed. Defendants dispute the characterization of Deo as a mere "employee" or "general manager": Deo was a party to the Cross-Purchase Agreement and the Shareholders' Agreement as a 49% shareholder of Superb (see ¶¶ 344-345), not an employee, and the cited agreements speak for themselves. That Deo "served as General Manager" is a contested characterization resting in part on a pleading; Deo was a 49% owner of Superb, and his role is disputed. [C].

¶ 352. Notwithstanding the clear and unambiguous language in the foregoing agreements, Superb Plaintiffs later learned that Deo made a series of material false representations. 618608/2023 NYSCEF 78 ¶¶ 20-31, 33.

RESPONSE TO ¶352. OBJECTION [C]. Disputed. The assertion rests on a pleading (the pleadings), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ.

P. 56(c)). That Deo made "material misrepresentations" states the ultimate issue and is denied. [C].

¶ 353. First, despite his representation that he is the sole member of Northshore and Sunrise, it was discovered that, in fact, Deo is not the sole member of either; in fact, within five (5) days of entering into the Cross-Purchase Agreement, Deo was sued by the actual owners of Northshore and Sunrise! 618608/2023 NYSCEF 78 ¶¶ 21-27.

RESPONSE TO ¶353. OBJECTION [C]. Disputed. That Deo "is not the sole member" of Northshore is contradicted by the record. This is contradicted by the record: Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo as holding a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)). Ownership of Northshore and Sunrise is, at a minimum, genuinely disputed and cannot be resolved against Deo on summary judgment. [C].

¶ 354. In that action, the real owners of Northshore and Sunrise alleged that Deo has engaged in financial improprieties and massive fraud that is strikingly similar to the conduct complained of with respect to Superb. 617224/2022 NYSCEF 1.

RESPONSE TO ¶354. OBJECTION [C]. Disputed. That separate claimants "alleged" improprieties in another action is not competent evidence of those matters here; the existence of competing ownership claims confirms a genuine dispute (see ¶ 353). [C].

¶ 355. Second, because Deo never held any membership interest in Northshore or any ownership interest in Sunrise, Deo misrepresented that he had full power and legal right to transfer and deliver shares of Northshore and Sunrise to Plaintiff. 618608/2023 NYSCEF 78 ¶¶ 19-28.

RESPONSE TO ¶355. OBJECTION [C]. Disputed. That Deo "never held any membership interest in Northshore or any ownership interest in Sunrise" is false. This is contradicted by the record: Deo testified that he is an owner of Northshore (Deo Dep. Tr. 56:23-24 (Jan. 12, 2026)), and the K-1s in evidence list Deo as holding a 99% interest in Northshore — a return "approved by Josh Aaronson" — and a 99% interest in 189 Sunrise (Chabrier Dep. 58, 116 (Jan. 9, 2026)). Ownership of Northshore and Sunrise is, at a minimum, genuinely disputed and cannot be resolved against Deo on summary judgment. [C].

¶ 356. Third, Deo made a material misrepresentation when he informed Urrutia that there was no active or anticipated litigation against him, as Northshore and Sunrise commenced an action against him in state court, and Deo received threats of litigation from the IAG Plaintiffs well before signing the Cross-Purchase Agreement! Id.

RESPONSE TO ¶356. OBJECTION [C]. Disputed. Whether Deo made a "material misrepresentation" regarding litigation states a legal conclusion and is denied; the matter is the subject of the parties' disputes addressed by counsel. [C]. Further, there was no litigation pending and served when the documents were executed between Deo and Urrutia, and it is hearsay that litigation was threatened; Urrutia has no such first hand knowledge.

¶ 357. Moreover, Deo himself sued Aaronson and others on November 23, 2022, less than two (2) weeks prior to the time he signed the Cross-Purchase Agreement indicating that there was no active litigation. 616542/2022 NYSCEF 1. c. Deo's Sweetheart Deal to Remain General Manager at Superb

RESPONSE TO ¶357. Disputed in part. Admitted only that Deo commenced an action against Aaronson and others; the timing's asserted significance is disputed and immaterial; that Summons with Notice was never served, never intended to be served, and merely was

commenced to put Deo in "1st place" if and when litigation was ever commenced against him as a precaution, but without any intent at that time to follow through on the Summons with Notice which was not, in fact, ever pursued before being dismissed.

¶ 358. Within his first two months, by January 10, 2023, Deo incurred over $100,000.00 in losses in operating Superb. ECF 11 ¶¶ 44-46.

RESPONSE TO ¶358. Disputed. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). The asserted $100,000 loss figure is unsupported by competent evidence and denied.

¶ 359. As a result, Urrutia considered terminating the partnership. ECF 11 ¶ 47.

RESPONSE TO ¶359. Disregard. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). Urrutia's asserted consideration of terminating the relationship is immaterial.

¶ 360. In order to remain in control, Deo proposed absorbing all losses, with Urrutia receiving fixed payments for every car sold, regardless of whether the monthly financial statement revealed a profit or a loss, with the understanding that Urrutia will not invest any more capital into Superb as that would fall on Deo. ECF 11 ¶¶ 48-49.

RESPONSE TO ¶360. OBJECTION [F]. Disputed. That Deo proposed an arrangement "in order to remain in control" asserts intent; denied as characterized. That Deo agreed to absorb losses while Urrutia received fixed per-car payments confirms Deo bore the entrepreneurial risk of an owner. [F].

¶ 361. Urrutia accepted this proposal, as it was a win-win for him in that he received income from every car sold and Deo took on the weight of managing Superb. ECF 11 ¶ 49.

RESPONSE TO ¶361. Disputed in part. Admitted only that the parties adopted a payment arrangement; its characterization as a "win-win" for Urrutia is his own and immaterial.

¶ 362. Deo continued to incur losses and had many excuses for his poor performance. ECF 11 ¶¶ 54-57. d. Urrutia's DMV License & Deo's Position as General Manager

RESPONSE TO ¶362. Disregard. The assertion rests on a pleading (ECF 11), which is not competent summary-judgment evidence (L.R. 56.1(d); Fed. R. Civ. P. 56(c)). "Many excuses" and "poor performance" are argumentative and denied.

¶ 363. At all relevant times, Superb operated a retail used car dealership from its lot located at 215 Northern Boulevard, Great Neck, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶363. Admitted.

¶ 364. The operation of a used car dealership in the State of New York requires a license (the "License") issued by the DMV. Urrutia Decl. ¶ X.

RESPONSE TO ¶364. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of DMV licensing requirements is irrelevant and not properly admitted through Urrutia, a non-attorney. [A].

¶ 365. The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance. Urrutia Decl. ¶ X.

RESPONSE TO ¶365. OBJECTION [A]. Denied. This is not a statement of fact, it is an issue of law.

¶ 366. At all relevant time, Urrutia held the License as applicant for Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶366. Admitted.

¶ 367. At all times hereinafter mentioned from November 2022 until August 2023, Deo was employed by Superb as its general manager. Urrutia Decl. ¶ X.

RESPONSE TO ¶367. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Defendants dispute the characterization of Deo as a mere "employee" or "general manager": Deo was a party to the Cross-Purchase Agreement and the Shareholders' Agreement as a 49% shareholder of Superb (see ¶¶ 344-345), not an employee, and the cited agreements speak for themselves. Deo's status was that of a 49% owner under the Cross-Purchase and Shareholders' Agreements, not an employee. [A].

¶ 368. As an employee and general manager of Superb, Deo was obligated to act in the best interests of Superb and its majority or sole shareholder Urrutia. Urrutia Decl. ¶ X.

RESPONSE TO ¶368. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "employee" characterization and the asserted fiduciary obligations state legal conclusions and are denied; Defendants dispute the characterization of Deo as a mere "employee" or "general manager": Deo was a party to the Cross-Purchase Agreement and the Shareholders' Agreement as a 49% shareholder of Superb (see ¶¶ 344-345), not an employee, and the cited agreements speak for themselves. [A].

¶ 369. Deo, however, took numerous actions for his own benefit, causing damage to the Superb Plaintiffs and jeopardizing Urrutia's DMV license. Urrutia Decl. ¶ X. ii. Deo Engages in a Scheme with Other Defendants to Pilfer Superb Plaintiffs' Assets

RESPONSE TO ¶369. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "For his own benefit" and "jeopardizing" the license are conclusory.

¶ 370. Dealerships typically operate with the assistance of banks that provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership. Urrutia Decl. ¶ X; ECF 204 ¶¶ 7-9.

RESPONSE TO ¶370. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of floor-plan financing, immaterial. [A].

¶ 371. When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle, and certain rules attach as a condition of the financing, i.e., with limited exceptions, any such vehicle financed must be present and available for sale at the dealership. Urrutia Decl. ¶ X; ECF 204 ¶¶ 14-15.

RESPONSE TO ¶371. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of security-interest perfection and floor-plan rules, immaterial. [A].

¶ 372. Unbeknownst to the Superb Plaintiffs and its floor plan lenders, since at least November 2022, Deo had been using the business operating funds of Superb for his own use and purposes. Urrutia Decl. ¶ X.

RESPONSE TO ¶372. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That Deo was "using the business operating funds" for personal purposes is conclusory and is contradicted by the controller's testimony.

¶ 373. Deo's personal use of Superb's business operating funds left Superb without sufficient capital to operate. Urrutia Decl. ¶ X.

RESPONSE TO ¶373. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That "personal use" left Superb undercapitalized is conclusory and denied. [A].

¶ 374. Deo devised various schemes to keep Superb capitalized, or appear to be capitalized, so that he could continue to siphon off Superb's funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶374. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Schemes" and "siphon off" are conclusory and pejorative, denied. [A][E].

¶ 375. The schemes entailed the systematic pilfering of funds from the Superb Plaintiffs and its floor plan lenders, many of which were employed by Deo against the IAG Plaintiffs. Urrutia Decl. ¶ X.

RESPONSE TO ¶375. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Systematic pilfering" is conclusory and denied. [A][E].

¶ 376. The scheme involved deceiving the Superb Plaintiffs and its floor plan lenders into funding, at inflated amounts, the purchasing of vehicle inventory, deceiving customers and other lending institutions, and manipulating financial records to conceal the subterfuge. Urrutia Decl. ¶ X.

RESPONSE TO ¶376. OBJECTION [A] [E]. Denied. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Deceiving … at inflated amounts" is conclusory and denied. [A][E].

¶ 377. In implementing this scheme, Deo enlisted the services of Sara, Blankenship, Merckling, Laurie, Thomasson, and Deo's accountants, each with a significant role to play. Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶377. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted "enlistment" of named non-parties into a "scheme" is conclusory and denied. [A][E].

¶ 378. Merckling and Blankenship continued to assist Deo in siphoning cash out of Superb, and were responsible for all monetary transactions (i.e., cash and checks), as they were with the IAG Plaintiffs, and were the only ones with access to the safe at Superb. Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-15, 95-3.

RESPONSE TO ¶378. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Siphoning cash" is conclusory; The controller testified that customer cash was recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw — not removed as theft — and that holding a capital account reflects ownership (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A][E].

Admitted that Merckling and Blankenship made cash deposits. O'Sullivan confirmed they returned deposit slips every time — these were legitimate deposits for security purposes.

O'Sullivan Dep. p.9. Again, after three plus years of litigation and discovery, there is no specificity to this otherwise empty allegation.

¶ 379. Sara continued to manage the enterprise and misappropriate leads and other proprietary information from Superb. Urrutia Decl. ¶ X

RESPONSE TO ¶379. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Sara "managed the enterprise" and "misappropriated" information is conclusory and denied. [A][E]. Again, after three plus years of litigation and discovery, there is no specificity to this otherwise empty allegation.

¶ 380. Thomasson, whose improper unauthorized release of the Libertas funds resulted in Deo becoming involved with the Superb Plaintiffs, continued to defend Deo against those who pursued claims against him despite his knowledge that Deo engaged in fraudulent and unlawful conduct. Urrutia Decl. ¶ X.

RESPONSE TO ¶380. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "improper unauthorized release" of the Libertas funds is contradicted by the record placing that conduct with Aaronson (see ¶¶ 341, 1009). [A][E].
Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 381. Laurie continued in his alleged role as financier to create the illusory image of Deo as being a successful businessman, while assisting Deo in his daily operations of carrying out the various fraudulent schemes, including by helping him set up bank accounts he was not authorized to implement (as Laurie did with Flushing) and obtaining loans under the Plaintiffs'

name (such as the Flushing loan and the Libertas Funds). Urrutia Decl. ¶ X.; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶381. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Laurie's asserted role is conclusory and denied. [A][E]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 382. Deo's accountants continued to cook the books to make Superb appear profitable at the behest of Deo. Urrutia Decl. ¶ X.

RESPONSE TO ¶382. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Cook the books" is conclusory; the controller testified that the monthly adjusting entries were the CPA's — "Those are Tom Jones entries" (O'Sullivan Dep. 194:25 (Mar. 30, 2026)) — the financial statements and adjusting entries were prepared by the accountants, not by Deo. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 383. Each of these parties agreed with Deo to implement the scheme and to perform their role in furtherance of their schemes. Urrutia Decl. ¶ X

RESPONSE TO ¶383. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That "each … agreed with Deo" to perform a role in a "scheme" asserts a conspiracy as fact and is conclusory and denied. [A][E]. Moreover, there is no specificity in this allegation, no

proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 384. In November 2022, Deo was engaged by Superb as its manager for Superb's benefit. Urrutia Decl. ¶ X

RESPONSE TO ¶384. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Defendants dispute the characterization of Deo as a mere "employee" or "general manager": Deo was a party to the Cross-Purchase Agreement and the Shareholders' Agreement as a 49% shareholder of Superb (see ¶¶ 344-345), not an employee, and the cited agreements speak for themselves. [A].

¶ 385. Deo's appointment as manager for Superb was proposed by Deo and approved by Urrutia in accordance with Superb's Shareholders' Agreement and was based upon Deo's obligation and expectation that actions made concerning Superb would be made for Superb's benefit. Urrutia Decl. ¶ X

RESPONSE TO ¶385. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The Shareholders' Agreement speaks for itself; the "manager" characterization is disputed (see ¶ 350). [A].

Disputed. The characterization of Deo as 'manager' rather than owner is the central contested issue. O'Sullivan: 'He was the boss.' O'Sullivan Dep. p.15. 'I thought they were partners.' Id. p.25.Placeholder ([A]).

¶ 386. As Superb's manager, Deo was charged with the obligation and expectation that actions made concerning Superb would be made for its benefit. Urrutia Decl. ¶ X

RESPONSE TO ¶386. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted "obligation and expectation" states a legal conclusion and is denied. [A].

¶ 387. As Superb's manager, Urrutia allowed Deo to handle the day-to-day operations of Superb, including vehicle inventory purchases, and certain aspects of financial reporting on behalf of Superb. Urrutia Decl. ¶ X

RESPONSE TO ¶387. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only, as Defendants affirmatively assert, that Urrutia allowed Deo to handle Superb's day-to-day operations — consistent with Deo's role as owner-operator. [A].

¶388. As Superb's manager, Urrutia allowed Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶388. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted only that Deo did obtain automobiles for the dealership, which automatically was added to the Floor Plan. [A]

¶ 389. As Superb's manager, Urrutia and Superb relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb. Urrutia Decl. ¶X

RESPONSE TO ¶389. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That Urrutia "relied upon the accuracy" of Deo's reporting asserts reliance/state of mind and is unsupported. [A].

¶ 390. As Superb's manager, Urrutia and Superb relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb and with respect to audits conducted by floor plan lenders. Urrutia Decl. ¶ X

RESPONSE TO ¶390. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same; asserted reliance on inventory purchases is unsupported. [A].

¶ 391. By accepting the position as manager of Superb, Deo accepted the obligation to accurately report financial information of Superb. Urrutia Decl. ¶ X

RESPONSE TO ¶391. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "By accepting the position… accepted the obligation" states a legal conclusion (duty), denied. [A].

¶ 392. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to accurately report financial information of Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶392. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Legal-conclusion "representation/obligation" theory on a placeholder; denied. [A].

¶ 393. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory. Urrutia Decl. ¶ X

RESPONSE TO ¶393. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same as ¶ 392. [A].

¶ 394. At all relevant times, Urrutia controlled Superb in accordance with its Shareholders' Agreement. Urrutia Decl. ¶ X

RESPONSE TO ¶394. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Admitted, as Defendants affirmatively assert: Urrutia controlled Superb in accordance with its Shareholders' Agreement. [A].

¶ 395. By Deo accepting the obligation to accurately report financial information of Superb and to make appropriate vehicle inventory purchases, Urrutia personally guaranteed and cross-collateralized his other three (3) dealerships to guarantee the Floor Plan of Superb. Urrutia Decl. ¶ X; ECF 18-1 (filed under seal); ECF 220-13 (listing Urrutia as guarantor).

RESPONSE TO ¶395. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Legal-conclusion reliance theory on a placeholder; denied. [A].

¶ 396. Superb operated by using a DMS (initially DealerTrack and, later, Tekion) that was licensed by Superb to operate Urrutia's other dealerships as well as Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶396. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of the DMS (DealerTrack/Tekion), immaterial. [A].

¶ 397. The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership. Urrutia Decl. ¶ X.

RESPONSE TO ¶397. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of the DMS's functions, immaterial. [A].

¶ 398. Each time that Deo entered financial information into the DMS system, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders that such financial information was true and accurate. Urrutia Decl. ¶ X.

RESPONSE TO ¶398. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That each DMS entry was a "representation" to the lenders states a legal conclusion built on a placeholder; denied. Deo testified that paying off prior loans on trade-ins and the unwinding of deals were controller functions in which he never participated (Deo Dep. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A].

¶ 399. Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders, that such vehicle inventory purchase was appropriate. Urrutia Decl. ¶ X.

RESPONSE TO ¶399. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Same legal-conclusion "representation" theory; denied. [A].

¶ 400. The Superb Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Superb incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by floor plan lenders. Urrutia Decl. ¶ X. iii. Deo Manipulates Used Vehicle Purchases

RESPONSE TO ¶400. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Reasonable reliance" is a conclusion of fact and law asserting the lenders' state of mind; it is unsupported and denied. [A][F].

¶ 401. The Superb Plaintiffs' floor plan lenders financed the purchase of used vehicles at the rate of one hundred (100%) of the "black book wholesale clean" value. Urrutia Decl. ¶ X.

RESPONSE TO ¶401. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of floor-plan financing mechanics, immaterial to the Deos' ownership. [A].

¶ 402. In so doing, the Superb Plaintiffs' floor plan lenders and the Superb Plaintiffs reasonably expected that Superb would cover the balance of the purchase price not covered by the Floor Plan. Urrutia Decl. ¶ X.

RESPONSE TO ¶402. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Asserts the lenders' expectation; immaterial and unsupported. [A].

Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be

assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6).

¶ 403. Because the Deo Defendants had been using Superb's operating funds for their own purposes, they needed to fund fraudulent deals in order to make Superb appear profitable and maintain bank balances; they did so in an apparent Ponzi-like scheme, even though these fraudulent deals would eventually result in a buyback or an unwinding of the deal, in order to "float" Superb while they siphoned cash and check payments out of Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶403. OBJECTION [A] [E] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Fraudulent deals" and the asserted purpose are conclusory and assert intent. The controller testified that customer cash deposits were recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw that reduced his capital in the business — not removed as theft — and that holding a capital account itself reflects ownership ("if you weren't an owner, you wouldn't have a capital account") (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A][E][F].

¶ 404. The Deo Defendants devised a method to not only purchase used cars, but to withdraw additional and other funds at the expense of the Superb Plaintiffs. Urrutia Decl. ¶ X.

RESPONSE TO ¶404. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Deo "devised a method" to withdraw funds is conclusory; The controller testified that customer cash deposits were recorded and, where Deo took cash, charged against Deo's

capital account as an owner's draw that reduced his capital in the business — not removed as theft — and that holding a capital account itself reflects ownership ("if you weren't an owner, you wouldn't have a capital account") (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 405. At least as early as November 2022, the Deo Defendants began purchasing used vehicle inventory for Superb that were grey-market vehicles. Urrutia Decl. ¶ X; ECF 38 ¶ 37.

RESPONSE TO ¶405. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 406. Grey-market vehicles are Canadian vehicles that cost less due to the inability to finance them as retail banks do not permit them to be financed, but which the Deo Defendants nonetheless financed with retail banks (in violation of Superb's dealer agreement) with the full knowledge that all such retailed grey-market vehicles would cause the retail bank to require Superb to return the funds upon discovering that the vehicle financed was a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶406. OBJECTION [A] [D]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded

(L.R. 56.1(d)). The asserted financing rules for "grey-market" vehicles state a legal/definitional conclusion and are unsupported. [A][D].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 407. The Deo Defendants knew that the banks would require the funds issued for the grey-market vehicles to be returned, but proceeded to do so in order to siphon more and more money out of Superb, and the Deo Defendants intended for the Superb Plaintiffs to be left with the liability for these deals after they had already taken the money earned from this scheme out of Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶407. OBJECTION [A] [E] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion that Deo "knew" and "proceeded in order to" conceal asserts state of mind and is contradicted by the record. Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A][E][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 408. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that they were purchasing grey-market vehicles, because the Deo Defendants knew or should have known that the grey-market vehicles had little to no value to Superb as a used car dealer because most customers cannot afford to purchase a vehicle without

some form of financing and none of the retail banks Superb worked with would finance a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶408. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). Deo cannot have failed to disclose what he did not know. [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 409. The reason the Deo Defendants did not advise the Superb Plaintiffs that they were purchasing grey-market vehicles was because the Deo Defendants schemed to maximize the damage to Superb by creating artificial profits and fraudulent financial statements when they knew the retail banks would later seek for Superb to return the entire amount funded for such deals. Urrutia Decl. ¶ X.

RESPONSE TO ¶409. OBJECTION [A] [E] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted reason and intent are speculative state-of-mind assertions, denied. Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A][E][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 410. Indeed, because of the grey-market vehicles, the Deo Defendants were able to arrange for Superb to purchase the vehicles for less than an American vehicle and thus make Superb appear more profitable, which was necessary to keep Urrutia's confidence in Deo. Urrutia Decl. ¶ X.

RESPONSE TO ¶410. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Superb purchased certain vehicles at lower cost is immaterial and is not wrongdoing by Deo. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 411. Had the Superb Plaintiffs been aware of the true nature of these transactions, they would not have approved of the purchases or financing of said grey-market vehicles. Urrutia Decl. ¶ X.

RESPONSE TO ¶411. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A speculative counterfactual about what the lenders "would" have done; unsupported and immaterial. [A].

¶ 412. The Deo Defendants committed this practice on a regular basis; some examples are provided herein. Urrutia Decl. ¶ X.

RESPONSE TO ¶412. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That a "practice" was committed "on a regular basis" is conclusory and unsupported. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable.

¶ 413. Example 1: On February 25, 2023, the Deo Defendants arranged for Superb to sell a 2016 Audi S6 to Aleksandros Papavangjeli ("Papavangjeli") for $31,500.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶413. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course vehicle sale, immaterial to ownership. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 414. According to Superb's DMS, Papavangjeli purportedly paid $2,200.00 of the $4,500.00 down-payment by credit card and financed the balance, including fees and taxes, with a lender, Chase. Urrutia Decl. ¶ X.

RESPONSE TO ¶414. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary-course payment and financing of a sale, immaterial. [A].

¶ 415. The remaining $2,300.00 for the down-payment was not recorded in Superb's DMS, and was – upon information and belief – stolen by the Deo Defendants. Urrutia Decl. ¶ X.

RESPONSE TO ¶415. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion is expressly pleaded "upon information and belief" and is contradicted by the controller's testimony. The controller testified that customer cash deposits were recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw that reduced his capital in the business — not removed as theft — and that holding a capital account itself reflects ownership ("if you weren't an owner, you wouldn't have a capital account") (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 416. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶416. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, immaterial. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson,

Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 417. On March 1, 2023, Chase paid Superb financed proceeds of $34,597.13. Urrutia Decl. ¶ X.

RESPONSE TO ¶417. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, immaterial. [A].

¶ 418. After Papavangjeli complained in July 2023 that his vehicle had been at a repair shop since March 2023 and was unable to be fixed, Chase learned that Papavangjeli had purchased a grey-market vehicle, which was purchased by Deo on or around January 31, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶418. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Narrative concerning a customer complaint and the lender's response, immaterial and unsupported as to Deo. [A].

¶ 419. As a result, on July 21, 2023, Chase demanded the repurchase of Papavangjeli's retail contract. Urrutia Decl. ¶ X.

RESPONSE TO ¶419. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the lender demanded a repurchase is immaterial and unsupported as cited. [A]. Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be

assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6).

¶ 420. On July 25, 2023, the vehicle was placed on Superb's floor plan line, despite the vehicle not being physically present on Superb's lot. Urrutia Decl. ¶ X.

RESPONSE TO ¶420. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). Flooring entries were a controller function; there is no competent evidence Deo personally caused this entry. [A].

¶ 421. Critically, the Deo Defendants failed to cause Superb to pay Chase back as demanded; the Deo Defendants thus knowingly floored the vehicle in violation of Superb's agreement with its floor plan lender. Urrutia Decl. ¶ X.

RESPONSE TO ¶421. OBJECTION [A] [D] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Knowingly floored … in violation" asserts a legal conclusion and intent. Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a

problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A][D][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 422. Thus, the Deo Defendants were able to obtain $27,150.00 for a vehicle that was not in Superb's possession. Urrutia Decl. ¶ X.

RESPONSE TO ¶422. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The characterization that Deo "obtain[ed]" funds for an absent vehicle is conclusory; the floor-plan advance was repaid (see ¶ 424). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 423. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶423. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 424. On August 10, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back $33,229.44 after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶424. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson,

Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 425. Indeed, due to the Deo Defendants' fraud, Papavangjeli obtained the vehicle free of charge, which he was able to do because the Deo Defendants failed to perfect a lien against the vehicle on behalf of Chase as required by its dealer agreement. Urrutia Decl. ¶ X.

RESPONSE TO ¶425. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Due to the Deo Defendants' fraud" is conclusory and denied; the floor-plan advance was in fact repaid (¶ 424). [A][E]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 426. Example 2: On April 27, 2023, the Deo Defendants arranged for Superb to sell a 2019 BMW X3 to James Daughety ("Daughety") for $40,450.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶426. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course vehicle sale, immaterial to ownership. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson,

Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 427. Daughety made a down-payment of $7,500.00 in cash, which was receipted in Superb's DMS but not deposited in Superb's bank account with Chase, and the balance was financed with Chase. Urrutia Decl. ¶ X.

RESPONSE TO ¶427. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph concedes the cash was "receipted in Superb's DMS" — i.e., recorded — and The controller testified that customer cash deposits were recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw that reduced his capital in the business — not removed as theft — and that holding a capital account itself reflects ownership ("if you weren't an owner, you wouldn't have a capital account") (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). A deposit-timing question is not theft. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 428. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶428. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, immaterial. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 429. On or around May 1, 2023, Chase paid Superb the financed proceeds of Daughety's retail contract in the amount of $40,058.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶429. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, immaterial. [A].

¶ 430. Pursuant to Deo's instruction, the vehicle was not issued license plates immediately following the sale. Urrutia Decl. ¶ X.

RESPONSE TO ¶430. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Pursuant to Deo's instruction" rests on the placeholder; plate-issuance timing is an administrative matter, not wrongdoing. [A].

¶ 431. The vehicle was originally placed on Superb's floor plan line of credit on April, 19, 2023 for the amount of $35,075.00 and was subsequently paid off on May 19, 2023 after receipt of the financed proceeds on May 1, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶431. OBJECTION [A]. Denied. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a vehicle was floored and later paid off is ordinary course and, indeed, reflects repayment. [A].

¶ 432. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' retail lenders to fund Daughety's purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶432. OBJECTION [A]. Denied. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, irrelevant. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 433. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶433. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market,"

and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 434. On June 13, 2023, the vehicle was improperly "re-floored," after the May 1, 2023 contract date, on Superb's floor plan for the amount of $34,225.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶434. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). Re-flooring entries were a controller function; the "improperly" characterization is conclusory. [A].

¶ 435. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶435. OBJECTION [A]. Denied. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, immaterial. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 436. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶436. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 437. On July 6, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶437. OBJECTION [A]. Denied. Disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 438. The DMV paperwork for the vehicle was not sent until July 12, 2023 despite the fact the customer purchased the vehicle on May 1, 2023, almost three (3) months earlier. Urrutia Decl. ¶ X.

RESPONSE TO ¶438. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). DMV-paperwork timing is an administrative matter, immaterial and not wrongdoing by Deo. [A].

¶ 439. On July 21, 2023, Chase demanded the repurchase of the retail contract because it discovered the vehicle was a grey-market vehicle and due to the Deo Defendants' failure to perfect a lien on the vehicle as required by its dealer agreement with Chase. Urrutia Decl. ¶ X.

RESPONSE TO ¶439. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the lender demanded a repurchase is immaterial and unsupported as cited. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 440. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for Daughety for the amount of $39,601.83. Urrutia Decl. ¶ X.

RESPONSE TO ¶440. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

¶ 441. Due to the Deo Defendants' fraudulent conduct, the vehicle remains in Daughety's possession, resulting in a total loss to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶441. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Fraudulent conduct" is conclusory and denied; the contract was in fact repurchased and paid (¶ 440). [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 442. Example 3: On March 28, 2023, the Deo Defendants arranged for Superb to sell a 2019 Land Rover Range Rover Velar to Frankie & Alice Barnes ("Barnes") for $43,200.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶442. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An ordinary-course vehicle sale, immaterial to ownership. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 443. Barnes paid $2,000.00 down by credit card and financed the balance, including fees and taxes, with a lender, Ally. Urrutia Decl. ¶ X.

RESPONSE TO ¶443. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary-course payment and financing of a sale, immaterial. [A].

¶ 444. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶444. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, immaterial. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 445. On April 3, 2023, Ally paid Superb financed proceeds in the amount of $49,868.09. Urrutia Decl. ¶ X.

RESPONSE TO ¶445. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, immaterial. [A].

¶ 446. On April 18, 2023, Superb's floor plan lender paid $39,675.00, for the same vehicle, which had already been sold. Urrutia Decl. ¶ X.

RESPONSE TO ¶446. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he

never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). A floor-plan/funding overlap on a vehicle acquired at auction is an operational matter unwound by the controller, not theft by Deo. [A].

¶ 447. However, the vehicle had not yet been received at Superb after its purchase from Manheim. Urrutia Decl. ¶ X.

RESPONSE TO ¶447. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a vehicle purchased at the Manheim auction had not yet arrived is ordinary auction-transit logistics, immaterial. [A].

¶ 448. In addition, the vehicle was sold to another customer while in transit to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶448. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary auction/inventory logistics; immaterial and unsupported as to wrongdoing by Deo. [A].

¶ 449. As a result of the vehicle not being available in a timely manner, Barnes cancelled the sale. Urrutia Decl. ¶ X.

RESPONSE TO ¶449. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a customer cancelled a sale is immaterial and not wrongdoing by Deo. [A].

¶ 450. On or about June 6, 2023, Superb submitted payment to Ally for the repurchase of the retail contract in the amount of $51,081.80. Urrutia Decl. ¶ X.

RESPONSE TO ¶450. OBJECTION [A]. Denied; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

¶ 451. On June 15, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶451. OBJECTION [A]. Denied; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 452. Example 4: to show the great extent to which the Deo Defendants went to defraud the Plaintiffs and their customers, on May 12, 2023, the Deo Defendants arranged for Superb to sell a 2021 Dodge Durango RT to Sarah Martin ("Martin") for $27,765.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶452. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "The great extent to which the Deo Defendants went to defraud" is argumentative and conclusory, denied. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 453. Although a $10,000.00 down payment was required, with Martin financing the taxes and fees with Chase, no monies were receipted into Superb's DMS nor were any monies deposited in Superb's bank account with Chase. Urrutia Decl. ¶ X.

RESPONSE TO ¶453. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The controller testified that customer cash deposits were recorded and, where Deo took cash, charged against Deo's capital account as an owner's draw that reduced his capital in the business — not removed as theft — and that holding a capital account itself reflects ownership ("if you weren't an owner, you wouldn't have a capital account") (O'Sullivan Dep. 160:18-161:23 (Mar. 30, 2026)). The deal was in any event cancelled and unwound (see ¶ 455), a controller function. [A].

¶ 454. On May 16, 2023, Chase paid Superb financed proceeds of $44,696.61. Urrutia Decl. ¶ X.

RESPONSE TO ¶454. OBJECTION [A]. Denied. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of financed proceeds in the ordinary course, irrelevant. [A].

¶ 455. The Deo Defendants failed to deliver the vehicle to Martin and Martin canceled the purchase and loan. Urrutia Decl. ¶ X.

RESPONSE TO ¶455. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). A non-delivery on an auction purchase followed by customer cancellation is an operational/logistics matter unwound by the controller, not wrongdoing by Deo. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 456. In fact, the Deo Defendants never purchased the vehicle before making the sale. Urrutia Decl. ¶ X.

RESPONSE TO ¶456. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Selling a vehicle to be sourced from auction and then unwinding if it is not acquired is

ordinary dealer practice; Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 457. On May 23, 2023, despite the fact the Deo Defendants never took possession of the vehicle, and it was already sold to another dealer by Manheim, the vehicle was placed on Superb's floor plan line. Urrutia Decl. ¶ X.

RESPONSE TO ¶457. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An auction-sourcing/possession-timing matter, unwound by the controller; unsupported as to wrongdoing by Deo. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 458. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ X.

RESPONSE TO ¶458. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of a funding request, immaterial. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 459. Superb was funded $39,810 by its floor plan lender for the vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶459. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Receipt of floor-plan funding in the ordinary course, immaterial. [A].

¶ 460. On May 31, 2023, Superb paid off the vehicle from their floor plan line for $39,810.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶460. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph confirms Superb paid off the vehicle from its floor-plan line — i.e., repayment, not diversion. [A].

¶ 461. The Superb Plaintiffs later discovered that between May 2023 and June 2023, Deo arbitrated the purchase of aforementioned vehicle with Manheim New Jersey. Urrutia Decl. ¶ X.

RESPONSE TO ¶461. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a vehicle was arbitrated/returned at the Manheim auction is ordinary auction practice; Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A].

¶ 462. The Deo Defendants therefore knew that the vehicle was not present at the dealership when he placed the vehicle on Superb's floor plan line of credit, nor did the Deo Defendants cancel the retail contract. Urrutia Decl. ¶ X.

RESPONSE TO ¶462. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Therefore knew" asserts state of mind. Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused,

let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 463. Thus, despite the fact that the vehicle sale was arbitrated and the car was never ultimately purchased by the customer, the Deo Defendants instructed to "re-floor" vehicle on June 14, 2023 in the amount of $39,810.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶463. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Flooring entries were a controller function; the "instructed" characterization rests on the placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 464. On June 26, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶464. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 465. On July 21, 2023, Chase demanded the repurchase of the retail contract from the canceled sale because the vehicle was a grey-market vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶465. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the lender demanded a repurchase is immaterial; Deo testified that he first learned the term "gray market" from "Tony" in connection with a problem with Chase, that Chase "after the fact, deemed certain cars were gray market," and that placing a vehicle on a floor plan made no representation that the vehicle was not gray market (Deo Dep. Tr. 138:3-21, 139:4-9 (Jan. 12, 2026)). [A].

¶ 466. After failure to return the funds in a timely manner, the Superb Plaintiffs repaid Chase in August 2023. Urrutia Decl. ¶ X. iv. Deo Double-books Financing & Double-floors the Superb Plaintiffs' Vehicles

RESPONSE TO ¶466. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph's own narrative reflects that Superb repaid the floor-plan lender, undercutting any claim of permanent diversion or theft; at most it describes a repurchase/timing dispute. [A].

¶ 467. The Deo Defendants devised another scheme to pilfer money from the Superb Plaintiffs. Urrutia Decl. ¶ X.

RESPONSE TO ¶467. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Scheme to pilfer" is conclusory and pejorative, denied. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 468. The Deo Defendants arranged to finance the same inventoried motor vehicle twice, wrongfully taking the improperly obtained funds and in violation of the Superb Plaintiffs' agreements with its floor plan lenders. Urrutia Decl. ¶ X.

RESPONSE TO ¶468. OBJECTION [A] [D] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Wrongfully taking … in violation" states a legal conclusion and a pejorative characterization. Any double-flooring, where it in fact occurred, was an operational error corrected by repayment, as the cited Examples themselves reflect. [A][D][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused,

let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 469. Deo personally directed staff at Superb to double-floor vehicles. Urrutia Decl. ¶ X; ECF 507 ¶¶ 31-32, 34-41; ECF 304 ¶¶ 48-53; ECF 304-1.

RESPONSE TO ¶469. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The remaining citations are to pleadings (ECF 507; ECF 304; ECF 304-1), not competent summary-judgment evidence (L.R. 56.1(d)). Flooring was a controller function (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)); "personally directed" is unsupported. [A].

¶ 470. One example of double-booking is the deal with Martin, discussed supra, which illustrates how the Deo Defendants engaged in this scheme. Urrutia Decl. ¶ X.

RESPONSE TO ¶470. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The Martin transaction was a cancelled/auction-sourced deal that was unwound, not a "scheme"; the characterization is conclusory. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 471. Deo also engaged in double-flooring in late February 2023. ECF 11 ¶¶ 58-63.

RESPONSE TO ¶471. Disputed. The double-flooring allegation rests on a pleading (ECF 11), not competent summary-judgment evidence (L.R. 56.1(d)). The record reflects that flooring and the unwinding of deals were controller functions (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)).

¶ 472. Deo blamed Aaronson of the IAG Plaintiffs and expressed frustration about trying to manage three (3) dealerships in separate locations; Urrutia directed Deo to focus on Superb. Id.

RESPONSE TO ¶472. OBJECTION [C]. Disputed. The cited material is a pleading (L.R. 56.1(d)). Notably, it confirms that Deo was managing three dealerships — consistent with his role as an owner-operator — and that Deo attributed problems to Aaronson, consistent with Defendants' position (see Defendants' Responses to ¶¶ 841, 958, 971).

¶ 473. In another example, discussed further below, the Deo Defendants double-floored nearly two dozen vehicles, leading to an August 3, 2023 internal audit by the Superb Plaintiffs, Deo's immediate removal as general manager, and damages in excess of $760,000.00 for those vehicles alone. ECF 304 ¶ 46-53; ECF 304-1; ECF 304-2; Urrutia Decl. ¶ X. v. The Deo Defendants Fail to Pay Off Floor Plan Following Sales

RESPONSE TO ¶473. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "nearly two dozen" figure is unsupported, and an internal audit identifying floor-plan discrepancies reflects that the issue was caught and addressed operationally. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson,

Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 474. The Deo Defendants sold vehicles subject to Floor Plan financing by the Superb Plaintiffs' floor plan lenders without paying off the Floor Plan. Urrutia Decl. ¶ X.

RESPONSE TO ¶474. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). The cited Examples themselves reflect that Superb repaid the floor-plan lenders. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 475. This created a deficiency toward repayment of the Floor Plan loan made by the Superb Plaintiffs' floor plan lenders to purchase each such vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶475. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a "deficiency" was created is conclusory and unsupported by competent evidence. [A].

¶ 476. As guarantor, the Superb Plaintiffs had to pay the Superb Plaintiffs' floor plan lenders over $2,500,000.00 to satisfy Superb's Floor Plan deficiency. Urrutia Decl. ¶ X. vi. The Deo Defendants Fail to Cause Superb to Pay Off Existing Loans on Vehicle Trade-Ins by Customers

RESPONSE TO ¶476. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $2,500,000 deficiency figure is unsupported by competent evidence. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 477. Superb accepted customer trade-ins of vehicles to be used toward the customer's purchase of a vehicle ("Trade-ins" or "trade-in"). Urrutia Decl. ¶ X.

RESPONSE TO ¶477. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Superb accepted trade-ins is ordinary course and immaterial to ownership. [A]. Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt

findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6).

¶ 478. Trade-ins with existing loan or lease balances were required to be satisfied by Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶478. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of trade-in payoff obligations, immaterial. [A].

¶ 479. The Deo Defendants failed to have Superb pay off the existing loan or lease balances on numerous Trade-ins. Urrutia Decl. ¶ X.

RESPONSE TO ¶479. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo testified that unwinding a cancelled or returned deal — including the associated floor-plan payoff — was the controller's responsibility ("That's a controller's forte") and that he never personally participated in that process (Deo Dep. Tr. 136:3-15, 139:15-19 (Jan. 12, 2026)). At Superb, moreover, the controller was Kendra Kernizant — Urrutia's own hire, whom Urrutia confirmed was "one of [his] people" — so trade-in payoff processing at Superb was a controller function performed by Urrutia's hire, not by Deo (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)).[A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 480. The prior owners of these traded-in vehicles remained liable to make payments on the remaining balance of their loan despite no longer having ownership or control of the Trade-in. Urrutia Decl. ¶ X.

RESPONSE TO ¶480. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a trade-in's prior owner remains liable on the pre-existing loan until it is paid is an ordinary incident of a trade-in transaction, not wrongdoing by Deo, and is immaterial to ownership. [A].

¶ 481. The Superb Plaintiffs were thus forced to pay off the loans at their own expense; some examples are described below. Urrutia Decl. ¶ X.

RESPONSE TO ¶481. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). At Superb, the controller was Kendra Kernizant — Urrutia's own hire, whom Urrutia confirmed was "one of [his] people" — and it was Kendra, not Deo, who processed Superb's checks and prepared its statements (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)). Trade-in payoff processing at Superb was thus a controller function performed by Urrutia's own hire, and the relevant period followed Aaronson's takeover of Superb's operations; there is no competent evidence that any unpaid trade-in loan is attributable to Deo. [A].

¶ 482. Example 1: On May 8, 2023, the Deo Defendants arranged for Superb to sell a 2019 Dodge Durango to Patricia Richards ("Richards") for $46,790.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶482. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That Superb arranged a vehicle sale in the ordinary course is immaterial to ownership. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 483. Richards paid $2,500.00 down by credit card and financed the balance, including fees and taxes with a lender, TD Bank ("TD"). Urrutia Decl. ¶ X.

RESPONSE TO ¶483. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary retail financing of a vehicle sale is immaterial to ownership. [A].

¶ 484. On May 15, 2023, TD paid the financed proceeds of $50,204.18. Urrutia Decl. ¶ X.

RESPONSE TO ¶484. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Superb's receipt of financing proceeds in the ordinary course is immaterial to ownership. [A].

¶ 485. The sale of the 2019 Dodge Durango produced a trade-in to be added to Superb's inventory. Urrutia Decl. ¶ X.

RESPONSE TO ¶485. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That a sale produced a trade-in added to inventory is ordinary course and immaterial to ownership. [A].

¶ 486. The trade-in of Richards 2019 Dodge Caravan was valued at $12,100.00 by time of sale in October 2023; however, the Deo Defendants appraised the trade-in at $25,000.00 and added the vehicle to Superb's inventory for this amount in May 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶486. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A trade-in appraisal is a business judgment; the difference between a May 2023 appraisal and an October 2023 resale value reflects depreciation and market movement over five months, not impropriety, and there is no competent evidence that Deo personally set the figure. The implication of a fraudulent over-valuation is conclusory and denied. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 487. The payoff check to relieve Richards of her prior obligation and debt to Capital One was generated on or around July 10, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶487. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph confirms a payoff check was in fact generated — undercutting any suggestion of refusal. [A].

¶ 488. Payment was not forwarded to Capital One because the payoff check was held in Deo's desk drawer instead of being released. Urrutia Decl. ¶ X.

RESPONSE TO ¶488. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion that the check was "held in Deo's desk drawer" is uncorroborated and is contradicted by the record. At Superb, the controller was Kendra Kernizant — Urrutia's own hire, whom Urrutia confirmed was "one of [his] people" — and it was Kendra, not Deo, who processed Superb's checks (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)). Check generation and trade-in payoff processing at Superb were thus a controller function, and the relevant period followed Aaronson's takeover of Superb's operations; there is no competent evidence that Deo personally held or refused any payoff check. [A].

¶ 489. The Deo Defendants did not pay off the loan from Capital One and Richards remained liable for the loan. Urrutia Decl. ¶ X.

RESPONSE TO ¶489. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). At Superb, the controller was Kendra Kernizant — Urrutia's own hire, whom Urrutia confirmed was "one of [his] people" — and it was Kendra, not Deo, who processed Superb's checks and payoffs (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)). The failure to pay off the Capital One loan during a period following Aaronson's takeover of Superb's operations is not shown to be a refusal by Deo, and there is no competent evidence that Deo personally directed the non-payment. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for

these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 490. Due to the fact the trade-in had not been paid off, the vehicle was later repossessed and Superb was caused to pay off the balance of the outstanding loan in addition to late fees and repossession fees. Urrutia Decl. ¶ X.

RESPONSE TO ¶490. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The repossession-and-payoff sequence describes an administrative trade-in/lien-timing matter, not wrongdoing by Deo. At Superb, the controller was Kendra Kernizant — Urrutia's own hire (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)) — who processed the dealership's checks; check and payoff processing was a controller function, not Deo's personal act. The events alleged occurred in or about August–September 2023 (see ¶ 498), within the period after Aaronson took over Superb's operations and the parties' relationship deteriorated; attributing the result to Deo is unsupported. [A].

¶ 491. The Deo Defendants retained the proceeds that were to have been used to pay off the loan to Capital One. Urrutia Decl. ¶ X.

RESPONSE TO ¶491. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). There is no competent evidence that Deo personally "retained" any proceeds. At Superb, the dealership's funds were received and recorded by its controller, Kendra Kernizant —

Urrutia's own hire (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)) — not by Deo. A lien-payoff timing dispute is not the retention of proceeds. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 492. Example 2: On June 3, 2023, Superb arranged to sell a 2016 Mercedes-Benz CLS, to Abdurashid Yusupov & Elcin Abdullaeva ("Yusupov") for $38,990.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶492. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Superb arranged a vehicle sale in the ordinary course of business is immaterial to the Deos' ownership. [A].

¶ 493. Yusupov paid $1,000.00 by credit and financed the balance, including fees and taxes, with its lender, Ally. Urrutia Decl. ¶ X.

RESPONSE TO ¶493. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary retail financing of a vehicle sale is immaterial to ownership. [A].

¶ 494. On June 8, 2023, Ally paid Superb the financed proceeds of $38,952.95. Urrutia Decl. ¶ X.

RESPONSE TO ¶494. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Superb's receipt of financing proceeds in the ordinary course is immaterial to ownership. [A].

¶ 495. The sale to Yusupov produced a trade-in of a 2020 Nissan Maxima, valued at $26,500.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶495. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A trade-in valuation in the ordinary course of business is immaterial to ownership. [A].

¶ 496. The payoff check to relieve Yusupov of the prior obligation and debt to Nissan NMAC was generated on or around July 3, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶496. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph confirms that a payoff check was in fact generated — undercutting any suggestion of a refusal — and at Superb such checks were generated by the controller, Kendra Kernizant (Urrutia's hire), not by Deo (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)). [A].

¶497. Payment was not forwarded to the lienholder because the payoff check was not approved for release by Deo. Urrutia Decl. ¶ X.

RESPONSE TO ¶497. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion that the check "was not approved for release by Deo" is contradicted by the record: At Superb the checks were generated by the controller, Kendra Kernizant — Urrutia's own hire (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)) — not by Deo.The non-release of a Superb payoff check during the period following Aaronson's takeover of Superb's operations is

not shown to be Deo's personal refusal, and there is no competent evidence that Deo personally withheld approval. [A].

¶ 498. In or about August or September 2023, the vehicle was repossessed by NMAC, after contacting the customer for payment and being informed by the customer that they were no longer in possession of the vehicle, as it had been traded-in at Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶498. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The August–September 2023 timing places the alleged repossession after Urrutia took over Superb's operations; attributing it to Deo is unsupported. [A].

¶ 499. The Deo Defendants therefore caused Superb to lose this vehicle due to their refusal to pay the lien on the vehicle off as required for a trade-in. Urrutia Decl. ¶ X.

RESPONSE TO ¶499. OBJECTION [A] [E]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the Deo Defendants "caused Superb to lose this vehicle" through their "refusal" is a conclusory characterization, denied. At Superb the checks were generated by the controller, Kendra Kernizant — Urrutia's own hire (Urrutia Dep. 79, 152-153 (Jan. 8, 2026)) — not by Deo. A trade-in lien-payoff timing failure during Aaronson's takeover of Superb is not shown to be Deo's act. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused,

let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 500. Example 3: On July 15, 2023, customer Andreia De Olivera Pereira traded in the 2016 Ford F150 ("2016 F150") in exchange for a 2018 Ford F-150, VIN No.: 1FTFW1E56JFD20487, which Superb sold to Pereira. ECF 294 ¶ 83.

RESPONSE TO ¶500. Disputed. The trade-in example rests on pleadings (ECF 294); to the extent it asserts wrongdoing by Deo, it is a conclusory characterization, denied. L.R. 56.1(d).

¶ 501. The 2016 F150 had a remaining balance of $27,603.87 due to Lendbuzz Funding ("Lendbuzz"). ECF 294 ¶ 84.

RESPONSE TO ¶501. Disputed. Rests on a pleading (ECF 294); the existence of a loan balance is immaterial to the Deos' ownership. L.R. 56.1(d), and constitutes hearsay.

¶ 502. Deo never caused this remaining balance to be paid off despite selling the 2018 F150 and receiving bank financing plus a $5,000.00 down-payment by credit card and/or cash, of which the cash portion was never deposited in Superb's bank account. ECF 294 ¶ 85.

RESPONSE TO ¶502. Disputed. "Deo never caused" the payoff is a conclusory characterization resting on pleadings; a lien-payoff timing issue is administrative and controlled by Urrutia and his hires, not theft by Deo. L.R. 56.1(d).

¶ 503. As a result of this conduct, Pereiras credit was likely destroyed, as he remained liable to pay off the balance which Deo was responsible for paying once he accepted the 2016 F150 as a trade-in. ECF 294 ¶ 86.

RESPONSE TO ¶503. Disputed. That a customer's credit was "likely destroyed" is speculative, hearsay, and conclusory, denied. L.R. 56.1(d).

¶ 504. Meanwhile, Deo floored the 2016 F150 upon receiving it in July 2023, leaving Superb unable to sell the vehicle because he moved it way from Superb's lot and only returned subject to the Injunction. ECF 294 ¶ 87.

RESPONSE TO ¶504. Disputed. Whether a vehicle was "floored" and moved is unsupported by competent evidence; the vehicle was returned willingly and through the cooperation of the Deo Defendants, not because an application was made by the Plaintiffs for an injunction. L.R. 56.1(d).

¶ 505. As a result of the foregoing, in or about March 2024, since this vehicle was never paid off due to Deo's fraudulent conduct, Lendbuzz repossessed the vehicle. ECF 294 ¶ 88.

RESPONSE TO ¶505. OBJECTION [E]. Disputed. "Deo's fraudulent conduct" is a conclusory characterization, denied; a repossession resulting from a payoff-timing dispute does not establish fraud; this allegation is also just hearsay. [E]; L.R. 56.1(d).

¶ 506. The Deo Defendants' failure to cause Superb to pay off the loans on the Trade-ins has potential criminal liability, civil liability, and loss of the DMV Licenses. Urrutia Decl. ¶ X.

RESPONSE TO ¶506. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Potential criminal liability" is speculative, unsupported, and conclusory. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 507. The Deo Defendants' failure to have Superb pay off the loans may also affect the ability of the Urrutia to obtain a DMV License for any other dealership facility. Urrutia Decl. ¶ X.

RESPONSE TO ¶507. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Speculative effect on Urrutia's future licensing is immaterial to ownership. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 508. In order to avert the consequences of the Deo Defendants' failure to pay off the loans on Trade-ins, the Superb Plaintiffs satisfied $221,313.39 of the outstanding obligations and has paid another $118,530.15 thereafter. Urrutia Decl. ¶ X. vii. The Deo Defendants Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Liability to Superb

RESPONSE TO ¶508. OBJECTION [A] [F]. Disregard; disputed. The $221,313.39 figure and the attribution to Deo rest on a placeholder and assert intent. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael

Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 509. Superb arranged financing for their customers through contracted lenders. Urrutia Decl. ¶ X.

RESPONSE TO ¶509. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Superb arranged customer financing is ordinary business operation, and there is no assertion that any Deo Defendants were parties to these contracts. [A].

¶ 510. Superb has written agreements with these lenders that require Superb to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer. Urrutia Decl. ¶ X.

RESPONSE TO ¶510. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of lender lien requirements is inadmissible through this non-expert; the allegation is unsupported by any documentation. [A].

¶ 511. These agreements also require Superb to repurchase any loan made by the lender to a consumer if Superb does not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title. Urrutia Decl. ¶ X.

RESPONSE TO ¶511. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general description of lender lien requirements is inadmissible through this non-expert; the allegation is unsupported by any documentation. [A].

¶ 512. The Deo Defendants failed to have Superb perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶512. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether liens were timely perfected is an administrative/operational matter, not established by competent evidence, and not theft. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 513. As a result of the Deo Defendants' actions, in clear violation of Superb's lender agreements, those lenders demanded repurchase of various loans. Urrutia Decl. ¶ X.

RESPONSE TO ¶513. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The lenders' repurchase demands rest on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 514. In order to protect the investment of the Superb Plaintiffs and their goodwill with these lenders, with whom they have other agreements through other dealerships owned by Urrutia, Superb has paid over $500,000.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶514. OBJECTION [A] [F]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph confirms Urrutia owns "other dealerships" — not disputed. The damages figure and intent are unsupported. [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 515. As an example, on April 19, 2023, the Deo Defendants arranged for Superb to sell a 2017 BMW X6 to Timothy Jenkins ("Jenkins") for $37,595.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶515. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 516. Jenkins paid $2,000.00 down (of which $1,400.00 in cash was receipted in to Superb's DMS but was never deposited in Superb's bank account, and $600.00 was paid by credit card), with the balance financed, including fees and taxes, with a lender, Chase. Urrutia Decl. ¶ X.

RESPONSE TO ¶516. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The paragraph confirms the cash was "receipted in[to] Superb's DMS" — i.e., recorded and tracked — consistent with O'Sullivan's testimony that cash was recorded (O'Sullivan Dep. 160:18-162:4); a deposit-timing question is not theft. [A].

¶ 517. On April 21, 2023, Chase paid Superb the financed proceeds of $40,681.20. Urrutia Decl. ¶ X.

RESPONSE TO ¶517. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 518. Per Deo's instruction the vehicle was not issued license plates immediately following the sale. Urrutia Decl. ¶ X.

RESPONSE TO ¶518. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Per Deo's instruction" rests on a placeholder; plate-issuance timing is administrative. [A]. This allegation is a bare, unsupported conclusion.

¶ 519. The DMV paperwork was not sent until July 12, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶519. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). DMV-paperwork timing is administrative and immaterial to ownership. [A].

¶ 520. The reason why the Deo Defendants did not send out the DMV paperwork was to allow them to place the sold vehicle on Superb's floor plan line of credit, despite the fact a sold vehicle should never be placed on a floor plan line. Urrutia Decl. ¶ X.

RESPONSE TO ¶520. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. None of the Deo Defendants had any control over DMV paperwork at Superb. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 521. By holding back the DMV paperwork, the Deo Defendants were able to show Superb's floor plan lender that they maintained title to the vehicle in order to improperly floor the vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶521. OBJECTION [A] [F]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Improperly floor" asserts intent; none of the Deo Defendants had any control over floor plans. [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 522. On July 21, 2023, Chase demanded the repurchase of the retail contract due to the Deo Defendants' failure to perfect the lien as required. Urrutia Decl. ¶ X.

RESPONSE TO ¶522. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 523. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for the amount of $43,008.20. Urrutia Decl. ¶ X.

RESPONSE TO ¶523. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 524. Another two (2) examples of Deo's scheme in failing to perfect liens are the Papavangjeli and Daughety deals referenced supra. Urrutia Decl. ¶ X. viii. The Deo Defendants Sold Superb Vehicles They Did Not Own Under False Pretenses

RESPONSE TO ¶524. OBJECTION [A] [E]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Scheme" is conclusory. [A][E].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 525. The Deo Defendants sold Superb vehicles that they knew were not capable of being transferred to Superb, as the vehicles were stuck in limbo in Northshore's DMV VerifiNY system following the surrender of its DMV License, and the Deo Defendants did not have the authority or the ability to transfer these vehicles from Northshore to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶525. OBJECTION [A] [F]. Disregard; disputed. "Knew were not capable of being transferred" asserts state of mind. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The vehicles were "in Northshore's account" — Deo's entity — and the VerifiNY titling issue is administrative, not theft. [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these

allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 526. For example, in or about April 2023, Deo sold Superb a 2017 Rolls Royce Dawn for approximately $192,159.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶526. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The transaction described is a sale between Northshore and Superb — entities Deo owns (Northshore, and 99% of 189 Sunrise per the K-1 at Chabrier Dep. 116) — and the "VerifiNY" titling issue is an administrative/DMV matter, not theft. [A].

¶ 527. In spite of being provided the title to the vehicle by Deo, Superb was never transferred the vehicle out of Northshore because it cannot be taken out of Northshore's account with the DMV VerifiNY system. Urrutia Decl. ¶ X.

RESPONSE TO ¶527. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The transaction described is a sale between Northshore and Superb — entities Deo owns (Northshore, and 99% of 189 Sunrise per the K-1 at Chabrier Dep. 116) — and the "VerifiNY" titling issue is an administrative/DMV matter, not theft. [A].

¶ 528. As a result, Superb is unable to sell this vehicle and five (5) other vehicles. Urrutia Decl. ¶ X.

RESPONSE TO ¶528. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Whether Superb can sell certain vehicles is unsupported and immaterial to ownership. [A].

¶ 529. Further, the Deo Defendants sold the Superb Plaintiffs vehicles from Northshore and/or Sunrise between January and April 2023 when they were forbidden from doing so for the period of December 6, 2022 through June 15, 2023 by a temporary restraining Order ("TRO") of the Hon. Sharon M.J. Gianelli, J.S.C. ("Justice Gianelli") issued in favor of the IAG Plaintiffs. Urrutia Decl. ¶ X; 617224/2022 NYSCEF 42; ECF 220 ¶¶ 59-64, 66; ECF 220-14, ECF 220-15; ECF 38-9. ix. The Deo Defendants Failed to Pay Warranty Companies and Vendors

RESPONSE TO ¶529. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The vehicles were sold from Northshore/Sunrise — Deo's entities — an inter-company matter, not theft. [A]. Moreover, these Plaintiffs knowingly and intentionally dismissed their claims in front of Judge Gianelli after receiving an unfavorable ruling in June, 2023, and instead brought their claims before this Federal Court without obtaining a ruling on this issue before the Judge who issued that TRO; it is inappropriate to seek a ruling from this Court now on that issue the Plaintiffs removed from state Court, waiving any opportunity for that Judge to make a decision based upon her Order.

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 530. Superb sells, on behalf of third party warranty providers, extended warranties to consumers. Urrutia Decl. ¶ X.

RESPONSE TO ¶530. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 531. Upon information and belief, under the Deo Defendants' direction, Superb has issued warranties to consumers and collected the fees but have failed to pay over $436,000.00 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid. Urrutia Decl. ¶ X.

RESPONSE TO ¶531. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Pleaded "upon information and belief"; the $436,000 figure is unsupported. [A]. This allegation is purely speculative, unsupported, and conveniently conclusory. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 532. The Deo Defendants have used these collected fees for their own benefit. Urrutia Decl. ¶ X.

RESPONSE TO ¶532. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "For

their own benefit" is conclusory and unsupported. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 533. The Deo Defendants have caused Superb to fail to pay more than $100,000.00 owed to vendors; in addition, the Deo Defendants have not completed the documentation necessary to complete registrations for out-of-state customers and cannot account for numerous missing titles on vehicles. Urrutia Decl. ¶ X. x. Deo Wastes Company Assets and Further Obligates Superb Plaintiffs

RESPONSE TO ¶533. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. These allegations are unsupported by any proof, and are merely conveniently conclusory.

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 534. The Deo Defendants delivered certain unsold vehicles owned by Superb and liened by the Superb Plaintiffs' floor plan lenders to repair facilities to be repaired. Urrutia Decl. ¶ X.

RESPONSE TO ¶534. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. To assert that used cars get repaired proves nothing.

¶ 535. Despite due demand, however, the Deo Defendants have failed to disclose the identity or location of the various repair facilities housing these vehicles. Urrutia Decl. ¶ X.

RESPONSE TO ¶535. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. Plaintiffs provide no proof to support their allegation "despite due demand" and further provide no support that any of the Deo Defendants know where Superb cars were repaired.

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone

proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 536. Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges. Urrutia Decl. ¶ X.

RESPONSE TO ¶536. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. This allegation is unsupported by any evidence; nor is there any evidence or proof provided of any Deo Defendant having any knowledge of this allegation.

¶ 537. The Deo Defendants have failed to arrange for payment to these facilities or alert the Superb Plaintiffs of any garagemen's lien, resulting – upon information and belief – in the sale of these vehicles at auction to satisfy the garagemen's lien. Urrutia Decl. ¶ X.

RESPONSE TO ¶537. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. Again, this is an unsupported allegation that has no basis in fact. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 538. The Superb Plaintiffs remain liable to the Superb Plaintiffs' floor plan lenders to satisfy the loans on these vehicles. Urrutia Decl. ¶ X.

RESPONSE TO ¶538. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 539. As an additional egregious example of the Deo Defendants' brazen conduct, on July 31, 2023, the Deo Defendants arranged to sell a 2019 Audi Q7, to Regine Raymond ("Raymond") for $31,496.14, with $3,000.00 down and the rest, including taxes and fees, to be financed by Santander. Urrutia Decl. ¶ X.

RESPONSE TO ¶539. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Brazen conduct" is argumentative. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 540. Although a $3,000.00 down payment was required, no monies were recorded to Superb's books. Urrutia Decl. ¶ X.

RESPONSE TO ¶540. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

In addition, it would be helpful if Plaintiff Urrutia ever had any 1st hand knowledge of any of his allegations; he readily admitted in his deposition (see Deo Defendants' 56.1 Joint Statement) that he was an "absentee owner" at Superb.

¶ 541. On August 3, 2023, Santander paid the financed proceeds in the amount of $39,618.70. Urrutia Decl. ¶ X.

RESPONSE TO ¶541. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6). This allegation must also be considered in light of the fact that August 3, 2023 was the LockOut of the Deos at Superb.

¶ 542. However, Raymond never took actual delivery of vehicle because Deo kept the vehicle in his possession, and not on Superb's lot or showroom. Urrutia Decl. ¶ X.

RESPONSE TO ¶542. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That a particular vehicle was in Deo's possession is unsupported and immaterial to ownership and is denied in all respects; this allegation is hearsay; Urrutia has no knowledge of this allegation. [A].

¶ 543. On June 8, 2023, the vehicle was added to Superb's floor plan line for the amount of $31,185.00 and paid off on July 24, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶543. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 544. During this time, with an active Santander loan, Raymond was unable to drive the vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶544. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. This is an unsupported allegation; Urrutia has no first hand knowledge of this allegation. As such, it is hearsay.

¶ 545. On October 23, 2023, Deo was seen operating Raymond's vehicle, with a dealer plate bearing the number 6111633, for his personal use. Urrutia Decl. ¶ X.

RESPONSE TO ¶545. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That Deo was "seen operating" a vehicle rests on an unsupported placeholder; Urrutia has no knowledge of this unsupported allegation. [A].

¶ 546. To this day, the vehicle was never recovered by Superb, notwithstanding the fact that Superb is the titled owner. Urrutia Decl. ¶ X.

RESPONSE TO ¶546. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Please note that Plaintiff Urrutia admits in his deposition (as set forth in the Deo Defendants Joint 56.1 Statement) that his allegations of stolen and missing cars are varied in numbers, and mostly false by his own admission, as the allegations have gone from a high of 104 all the way down to the teens, then back up to the 30's, all absent any proof of misconduct against any Deo Defendant.

¶ 547. The Deo Defendants' conduct with respect to the Audi Q7 resulted in a total loss to Superb. Urrutia Decl. ¶ X. xi. The Deo Defendants Take and Use Dealership Assets for Their Own Purposes

RESPONSE TO ¶547. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Total loss" is a conclusory damages characterization. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 548. The Deo Defendants have been treating Team, Superb, and their respective assets as their own. Urrutia Decl. ¶ X.

RESPONSE TO ¶548. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the Deos treated the entities' assets "as their own" is, if anything, consistent with ownership, though a broad stroke, unsupported conclusion. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 549. Deo has personally taken over $1,252,558.59 in customers' cash deposits, unauthorized ACH transactions, checks, and other cash, rather than deposit or keep the money in Superb's account. Urrutia Decl. ¶ X; ECF 11-12; ECF 40 ¶¶ 8-11, 16-19, 29.

RESPONSE TO ¶549. OBJECTION [A] [B]. Disputed. The figure rests on a blank "Urrutia Decl. ¶ X" placeholder, which is disregarded (L.R. 56.1(d)), and otherwise on prior pleadings and declarations (ECF 11-12; ECF 40 ¶¶ 8-11, 16-19, 29), which are not competent summary-judgment evidence of the matters asserted (Fed. R. Civ. P. 56(c)). The conclusory accusation that Deo "personally took" $1,252,558.59 is affirmatively controverted, and completely unsupported by 3 plus years of discovery. There are no documents that support this bare conclusion. As to the NorthShore and 189 Sunrise dealerships, their controller, Daniel O'Sullivan, testified that each cash deposit Deo received was contemporaneously recorded, the

customer was credited, and the amount was charged against Deo's capital account: he "would record that Sam Smith had a $5,000 deposit and then it would be charged against Anthony's capital account" (O'Sullivan Dep. 160:18-25 (Mar. 30, 2026)), and he made a journal entry "crediting the customer, reducing his capital account," the entries being made contemporaneously and traceable in the books so that one could "correlate" each customer credit with a corresponding reduction of Deo's capital account (id. 165:1-19). A draw against an owner's capital account, booked by the controller, is not theft. As to the "unauthorized ACH" characterization, Flushing Bank's Rule 30(b)(6) witness — a neutral institutional party — testified that the bank understood the transactions on Superb's account to be authorized and, after investigation, never determined any to be unauthorized (Buccino Dep. 234:2-12, 236:16-21 (Feb. 26, 2026)). And as to Superb specifically, its cash receipts and checks were processed by Superb's own controller, Kendra Kernizant — whom Urrutia, not Deo, hired and described as "one of my people" (Urrutia Dep. 79, 152 (Jan. 8, 2026)) and who served as Superb's "office manager, the accounting department" throughout 2023 (id. 151), and whom Deo likewise identified as "the controller" (Deo II Dep. 205:3-4 (Feb. 13, 2026)) — so any handling of Superb's customer cash ran through Urrutia's own accounting personnel, not a covert diversion by Deo. [A][B].

¶ 550. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5; Merckling Dep. 301:10-18.

RESPONSE TO ¶550. OBJECTION [A] [B]. Disputed; cannot be admitted as cited. The blank "Urrutia Decl. ¶ X" placeholder is disregarded (L.R. 56.1(d)); the remaining support is

prior pleadings and declarations (ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20), not competent summary-judgment evidence. "Assisted in taking" is conclusory and assumes the disputed predicate that any cash was wrongfully "taken" — a predicate the controller's testimony refutes, because the cash Deo received was recorded and charged against his own capital account, not diverted with the help of others (O'Sullivan Dep. 160:18-25, 165:1-19 (Mar. 30, 2026)). As to Merckling specifically, the controller testified he was a sales manager who "directs the sales force" (id. 143:13-19), not a participant in any cash diversion. Superb's own cash and checks were, moreover, processed by Superb's controller, Kendra Kernizant — Urrutia's hire ("one of my people") and Superb's "office manager, the accounting department" (Urrutia Dep. 79, 151, 152 (Jan. 8, 2026)) — further undercutting the theory that Deo and others secretly "took" Superb's cash. [A][B].

Admitted that Merckling and Blankenship made cash deposits. O'Sullivan confirmed they returned deposit slips every time — these were legitimate deposits for security purposes. O'Sullivan Dep. p.9. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 551. Deo was not a signatory on Superb's bank account. Urrutia Decl. ¶ X; ECF 11-11.

RESPONSE TO ¶551. OBJECTION [A] [B]. Disputed. The blank "Urrutia Decl. ¶ X" placeholder is disregarded (L.R. 56.1(d)); the remaining support, a paragraph of Plaintiffs' verified complaint (ECF 11-11), is a pleading and not competent summary-judgment evidence

(Fed. R. Civ. P. 56(c)). The assertion is internally inconsistent with Plaintiffs' own allegations that Deo signed checks on Superb's account (¶¶ 553-554, 885) and opened the Superb Flushing account (¶¶ 627, 636). In any event, to the extent the paragraph is offered to imply that Deo's activity on the account was improper or unauthorized, that implication is controverted by Flushing Bank's Rule 30(b)(6) witness, who testified the bank was "proper in its understanding of Mr. Deo's ownership and actions therein" (Buccino Dep. 192:8-11 (Feb. 26, 2026)) and never determined any transaction on the account to be unauthorized (id. 234:2-12, 236:16-21). [A][B]. Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6).

¶ 552. Deo had no authority to withdraw any funds from Superb's bank accounts. Urrutia Decl. ¶ X; ECF 11-6.

RESPONSE TO ¶552. OBJECTION [A] [B] [D]. Disputed. The blank "Urrutia Decl. ¶ X" placeholder is disregarded (L.R. 56.1(d)); ECF 11-6 is a pleading, not competent evidence. "No authority" states a legal conclusion, not a material fact. It is disputed on the record: Urrutia himself testified that Deo, as general manager, was authorized "to run the day-to-day operations" of Superb (Urrutia Dep. 34:11-18 (Jan. 8, 2026)). Deo further testified that Urrutia authorized him to sign Superb's checks in their July 2023 conversation — "Tony said I could sign checks and he was going to make sure that Bruce took care of it" (Deo Dep. Tr. 359:4-20 (Jan. 12, 2026)) — and that Bruce Novicky, the group's COO, was "completely aware" of the account

activity (id. 331:13-24). Plaintiffs further concede Deo was a party to the Superb Shareholders Agreement (¶¶ 643, 654). As to the IAG entities, Aaronson testified he allowed Deo to sign checks and authorized him "to run the day-to-day business" (Aaronson Dep. 40:8-18 (Jan. 7, 2026)), conceded Deo "was authorized to operate the business," and could not identify a single unauthorized transaction (id. 198:14-199:23). Flushing's Rule 30(b)(6) witness likewise never determined any transaction on Superb's account to be unauthorized (Buccino Dep. 234:2-12, 236:16-21 (Feb. 26, 2026)). [A][B].

¶ 553. Despite having no authority, Deo had been issuing and signing checks from its accounts to pay for his personal expenses, among other things. Urrutia Decl. ¶ X; ECF 11-16.

RESPONSE TO ¶553. OBJECTION [A] [B] [E]. Disputed. The blank "Urrutia Decl. ¶ X" placeholder is disregarded (L.R. 56.1(d)); ECF 11-16 is a pleading, not competent evidence. The clause "despite having no authority" assumes the disputed predicate addressed in Defendants' Response to ¶ 552 and is denied; Deo testified that Urrutia authorized him to sign Superb's checks in their July 2023 conversation ("Tony said I could sign checks," Deo Dep. Tr. 359:4-20 (Jan. 12, 2026)). The characterization that the checks paid Deo's "personal expenses" is conclusory and unsupported by any admissible evidence. Aaronson testified he permitted Deo to sign checks and authorized him to run the day-to-day business (Aaronson Dep. 40:8-18 (Jan. 7, 2026)); the Superb checks themselves were issued to Deo by Superb's own controller, Kendra Kernizant, whom Urrutia hired and called "one of my people" (Urrutia Dep. 79, 152 (Jan. 8, 2026)); and Flushing's Rule 30(b)(6) witness never determined any transaction on Superb's account to be unauthorized (Buccino Dep. 234:2-12, 236:16-21 (Feb. 26, 2026)). [A][B].

¶ 554. For example, Deo issued two checks in the amounts of $37,500.00 each, with both checks from Superb to Northshore. Urrutia Decl. ¶ X; ECF 11-16.

RESPONSE TO ¶554. OBJECTION [A] [B]. Admitted in part; disputed in part. The blank "Urrutia Decl. ¶ X" placeholder is disregarded (L.R. 56.1(d)) and ECF 11-16 is a pleading; to the extent the underlying check copies are in evidence, the documents speak for themselves. Defendants admit only that inter-company checks from Superb to Northshore may be reflected in the cited exhibit, and dispute any implication of impropriety: both Superb and Northshore are entities in which Deo held an interest (see Responses to ¶¶ 551-552, 656), and an inter-company transfer is not, without more, evidence of wrongdoing. Deo's authority to sign these checks is established by his testimony that Urrutia authorized him to sign Superb's checks in their July 2023 conversation — "Tony said I could sign checks and he was going to make sure that Bruce took care of it" (Deo Dep. Tr. 359:4-20 (Jan. 12, 2026)) — testimony given with respect to the very Superb-to-Northshore checks at issue here, including the $37,500 check dated July 25, 2023, as to which Deo further testified that Bruce Novicky — Urrutia's representative — monitored the check register after Superb's controller initiated the checks (id. 359:25-360:24). Aaronson likewise permitted Deo to sign checks and run the day-to-day business (Aaronson Dep. 40:8-18 (Jan. 7, 2026)); and the bank's Rule 30(b)(6) witness never determined any transaction on the account to be unauthorized (Buccino Dep. 234:2-12, 236:16-21 (Feb. 26, 2026)). [A][B].

¶ 555. In addition, the Deo Defendants failed to terminate at least $226,081.23 of lender financing for consumers who canceled their purchases. Urrutia Decl. ¶ X.

RESPONSE TO ¶555. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $226,081.23 figure is unsupported. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these

allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 556. Upon information and belief, Deo personally took those loan proceeds and/or utilized those funds in order to float his fraudulent operations and to make Superb appear profitable in an effort to continue his schemes undetected. Urrutia Decl. ¶ X. xii. The Deo Defendants Falsified Financial Statements at Superb with the Assistance of Deo's Accountants

RESPONSE TO ¶556. OBJECTION [A] [E]. Disregard; disputed. Pleaded "upon information and belief"; "float his fraudulent operations" is argumentative and asserts intent. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E]. Further, it is incomprehensible after multiple actions and discovery stretching for over three years, these Plaintiffs apparently have no proof and can only make an allegation such as this "upon information and belief" of Deo or anyone else taking specific sums, depositing specific sums, or spending specific sums. The allegations are bare and unsupported.

¶ 557. In order for the Deo Defendants to perpetuate their financial wrongdoings, they needed the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶557. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Asserts intent ("to perpetuate … wrongdoings"). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 558. In order for the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb, Superb was required to provide the Floor Plan lenders monthly financial reports. Urrutia Decl. ¶ X.

RESPONSE TO ¶558. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). A general statement about floor-plan reporting requirements. [A].

¶ 559. These monthly financial reports were provided to the Superb Plaintiffs and their Floor Plan lenders by the Deo Defendants and their accountants. Urrutia Decl. ¶ X.

RESPONSE TO ¶559. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The monthly reports were prepared by the controller and Superb accountants, not by Deo (O'Sullivan Dep. 194:25; 195:15-16; Deo II Dep. 35:2-38:22). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved

with car sales at any of these dealerships. There is no proof of any of the Deo Defendant being involved in any way with this allegation.

¶ 560. Had the Deo Defendants and their accountants provided the Superb Plaintiffs and their Floor Plan lenders accurate monthly financial reports, they would have discontinued providing the Floor Plan to Superb because the accurate monthly financial reports would not have satisfied their financial requirements. Urrutia Decl. ¶ X.

RESPONSE TO ¶560. OBJECTION [A]. Disregard; disputed. Hypothetical lender reliance. The citation relies on a blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant (“Those are Tom Jones entries,” O’Sullivan Dep. 194:25; 195:15-16), and Deo testified he “didn’t prepare” the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone’s wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships.

¶ 561. The Deo Defendants engaged the services of their accountants for Superb to work on its financial reporting. Urrutia Decl. ¶ X.

RESPONSE TO ¶561. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). That Deo engaged accountants for Superb is consistent with his ownership and operation of the business. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 562. The Deo Defendants engaged the services of the accountants at least as early as April 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶562. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 563. Each month during the Deo Defendants' tenure overseeing and managing Superb since April 2023, their accountants were engaged and paid by Superb to assist the Deo Defendants in preparing the information necessary to create the monthly financial reports. Urrutia Decl. ¶ X.

RESPONSE TO ¶563. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That the accountants were engaged and paid by Superb is ordinary business operation. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 564. During their tenure overseeing and managing Superb, they falsely manipulated Superb's monthly financial reports submitted to the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 38 ¶ 64.

RESPONSE TO ¶564. OBJECTION [A]. Disregard; disputed. "Falsely manipulated" is conclusory. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them

to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 565. The Deo Defendants and their accountants intentionally manipulated Superb's monthly financial information every month between at least April 2023 through July 2023. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

RESPONSE TO ¶565. OBJECTION [A] [F]. Disregard; disputed. "Intentionally manipulated" asserts intent. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these

allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 566. The Deo Defendants and their accountants falsified the monthly financial statements provided to the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

RESPONSE TO ¶566. OBJECTION [A]. Disregard; disputed. "Falsified" is conclusory. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to

accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 567. The Deo Defendants and their accountants falsified the monthly financial statements with an intent to defraud the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

RESPONSE TO ¶567. OBJECTION [A] [F]. Disregard; disputed. "Intent to defraud" asserts state of mind. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A][F]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 568. The Deo Defendants and their accountants falsified the monthly financial statements to induce the Superb Plaintiffs and their Floor Plan lenders to continue to provide the

Floor Plan to Superb. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

RESPONSE TO ¶568. OBJECTION [A]. Disregard; disputed. Asserts purpose/intent. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 569. Each financial entry by the Deo Defendants and their accountants was a representation that such entry was true and accurate and could be relied upon by the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84.

RESPONSE TO ¶569. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether each entry was "a representation" states a legal conclusion. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and

this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 570. Examples of fraudulent entries made by the Deo Defendants and their accountants into the DMS include those described below. Urrutia Decl. ¶ X; ECF 11 ¶¶ 80-84; ECF 11-13; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

RESPONSE TO ¶570. OBJECTION [A]. Disregard; disputed. "Fraudulent entries" is conclusory. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to

accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 571. On May 12, 2023, the Deo Defendants and their accountants directed Superb's controller, Kendra Kernizant ("Kernizant"), to make two (2) adjusting journal entries in the amount $61,559.16 for the April 2023 financial statement in order to show a false profit of $27,842.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶571. OBJECTION [A] [F]. Disregard; disputed. The direction to the controller asserts intent and rests on a placeholder; an adjusting journal entry is an ordinary accounting act. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 572. The Deo Defendants and their accountants further directed Kernizant on June 12, 2023 to make adjusting journal entries to the unit count of sold vehicles. Urrutia Decl. ¶ X.

RESPONSE TO ¶572. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An adjustment to a unit count is an ordinary accounting act, not fraud. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. It is bad faith for these allegations to be broadly asserted against all of the Deo Defendants; Harry Thomasson, Michael Laurie, Dwight Blankenship, Marc Merckling, and Sara Deo have never been accused, let alone proven with any documents or other tangible evidence, to have sold any cars nor been involved with car sales at any of these dealerships. In this instance, the objection also extends to accounting activity; Plaintiffs provide no proof of any of the Deo Defendants other than Anthony Deo having ever communicated with any accountant over the operation of any dealership.

¶ 573. Kernizant was told that there was money found on schedules to be put back into income and directed to make journal entries removing packs from used car inventory schedule and made adjusting entries for $48,563.00 to change the May 2023 financial statement in order to show a false profit of $26,136.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶573. OBJECTION [A] [F]. Disregard; disputed. Adjusting entries for packs and schedules are ordinary accounting acts; the assertion rests on a placeholder. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant

(“Those are Tom Jones entries,” O’Sullivan Dep. 194:25; 195:15-16), and Deo testified he “didn’t prepare” the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A][F]. Disputed. Kwun Decl. ¶ X and/or Urrutia Decl. ¶ X are pure placeholders ([A]). Disputed as to any characterization embedded in this paragraph. The Superb/Urrutia damages claims must be assessed in light of Urrutia's admission that the 102-car theft report was inaccurate (the actual "unaccounted for" number was 43, Urrutia Dep. p.148 (ECF 406-6)), Urrutia's three contempt findings for violating the injunction on the 36 located vehicles, and Urrutia's pending NMAC lawsuit for $20 million in floor plan defaults. Urrutia Dep. pp.13-14 (ECF 406-6). This allegation is pure hearsay; no firsthand knowledge is asserted.

¶ 574. The Deo Defendants and their accountants also directed Kernizant to make adjusting journal entries to the unit count of sold vehicles, to not reflect eight (8) unwound sales from prior months, the effect of which was designed to show a greater profit for Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶574. OBJECTION [A]. Disregard; disputed. The citation relies on a blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Ordinary accounting adjustments resting on a placeholder. [A].
Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone’s wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 575. Kernizant made adjusting journal entries for the amount $12,304.70 to change the June 2023 financial statement in order to show a false profit of $17,361.00. Urrutia Decl. ¶ X.

RESPONSE TO ¶575. OBJECTION [A] [F]. Disregard; disputed. “In order to show a false profit” asserts intent. The citation relies on a blank “Urrutia Decl. ¶ X” placeholder, which

establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes the premise that Deo directed the entries: the controller testified that he made the adjusting entries and attributed them to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See ¶¶ 862, 864, 938, 955.) [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 576. The Deo Defendants and their accountants also directed Kernizant to add money set aside for taxes as "profit" for Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶576. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). An accounting judgment regarding tax accruals is not, without more, fraud. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 577. The Deo Defendants and their accountants similarly directed Kernizant to first add, and then not unwind, forty-two (42) deals that fell through with no expectation of consummating those deals, which added $1.5M in profit and $250,000.00 in net profit. Urrutia Decl. ¶ X.

RESPONSE TO ¶577. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R.

56.1(d)). Whether deals should have been unwound is an accounting judgment; the assertion rests on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 578. Indeed, the Deo Defendants and their accountants – who closed every statement from April 2023 through July 2023 – imputed income from the foregoing fake deals, which resulted in the illusion that Superb is profitable and permitted the Deo Defendants to run off with over $800,000.00 in missing cash and checks from customer deposits, and over $450,000.00 in ACH transactions to pay other debts that are not Superb's, among myriad other damages. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29.

RESPONSE TO ¶578. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Fake deals" and "illusion" are argumentative; resting on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 579. The Deo Defendants also directed Kernizant to floor sold vehicles and other vehicles that did not exist, which are discussed in various examples, supra. Urrutia Decl. ¶ X.

RESPONSE TO ¶579. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Floor … vehicles that did not exist" is conclusory and rests on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 580. The financial information stored on the DMS as directed to be entered by the Deo Defendants and their accountants is the information considered in extending the Superb Plaintiffs' Floor Plan to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶580. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Directed to be entered" is conclusory. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 581. The Superb Plaintiffs' and their Floor Plan lenders reasonably relied upon the falsified monthly financial statements to continue to provide the Floor Plan to Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶581. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Falsified" is conclusory. The premise that the financial statements were "falsified" by Deo is refuted by cross-testimony: O'Sullivan attributed the adjusting entries to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the statements (Deo II Dep. 35:2-38:22). (See ¶¶ 684, 862, 938, 955.) [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 582. The Superb Plaintiffs and their Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the Deo Defendants and their accountants were committing the wrongdoings alleged. Urrutia Decl. ¶ X.

RESPONSE TO ¶582. OBJECTION [A] [F]. Disregard; disputed. The reliance/causation assertion is hypothetical and asserts third-party state of mind. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The premise that the financial statements were "falsified" by Deo is refuted by cross-testimony: O'Sullivan attributed the adjusting entries to the accountant ("Those are Tom Jones entries," O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the statements (Deo II Dep. 35:2-38:22). (See ¶¶ 684, 862, 938, 955.) [A][F]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 583. The Superb Plaintiffs and the Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the monthly financial statements were false. Urrutia Decl. ¶ X.

RESPONSE TO ¶583. OBJECTION [A] [F]. Disregard; disputed. Hypothetical reliance asserting third-party state of mind. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][F].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 584. Due to the falsified monthly financial statements, the Superb Plaintiffs and the Floor Plan lenders were unaware of the significant losses accruing at Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶584. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Falsified" is conclusory. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and fails to account for Deo's authority granted as an owner, as an operator, and by and through discussions with Tony Urrutia and his longtime right hand man, Bruce Novicky. See the Deo Defendants Joint 56.1 Statement indicating Deo's authority granted by Plaintiff Urrutia in the section referencing his deposition transcript. (section 8, Robert Anthony Urrutia)

¶ 585. The Deo Defendants and their accountants falsified the financial statements to create the illusion that Superb was profitable so that they can continue to steal from the Superb Plaintiffs and prevent the Superb Plaintiffs from discovering their fraud. Urrutia Decl. ¶ X.

RESPONSE TO ¶585. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Falsified … to create the illusion … to steal" is argumentative and asserts intent. The premise that the financial statements were "falsified" by Deo is refuted by cross-testimony: O'Sullivan attributed the adjusting entries to the accountant ("Those are Tom Jones entries,"

O'Sullivan Dep. 194:25; 195:15-16), and Deo testified he "didn't prepare" the statements (Deo II Dep. 35:2-38:22). (See ¶¶ 684, 862, 938, 955.) [A].

There is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 586. When the Superb Plaintiffs and the Floor Plan lenders became aware of the significant losses accruing at Superb, the Floor Plan lenders demanded that all financial deficiencies owed to them be repaid, which the Superb Plaintiffs did, causing them significant damages. Urrutia Decl. ¶ X.

RESPONSE TO ¶586. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The lenders' demands rest on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 587. The Superb Plaintiffs covered the numerous claims and financial deficiencies created by the Deo Defendants. Urrutia Decl. ¶ X.

RESPONSE TO ¶587. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 588. The Deo Defendants engaged in the conduct complained to hide all of their financial improprieties and to steal funds from Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶588. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Hide … improprieties … steal funds" is argumentative and asserts intent. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 589. Worst of all, the Deo Defendants and their accountants submitted a falsified mid-year financial statement to this Court showing approximately an additional $3M in gross with $1.3M in profit, that is similarly false, as Superb's DMS system does not reflect these numbers; the Deo Defendants apparently pulled these numbers out of thin air. Urrutia Decl. ¶ X; ECF 30-6. xiii. The Straw That Broke the Camel's Back

RESPONSE TO ¶589. Disputed. "Falsified" is conclusory, denied; the assertion rests on pleadings. The adjusting entries were the accountants' work, not Deo's (O'Sullivan Dep. 194:25; 195:15-16; Deo II Dep. 35:2-38:22). L.R. 56.1(d).

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 590. On July 31, 2023, one of Superb's floor plan lenders, Nissan Motor Acceptance Corporation ("NMAC"), contacted Bruce Novicky ("Novicky"), the Chief Operating Officer ("COO") of Superb, to inform him that NMAC discovered that vehicles it financed were also

financed, in breach of Superb's floor plan agreement with NMAC, with another bank. Urrutia Decl. ¶ X; ECF 11 ¶¶ 99-107; ECF 11-14, ECF 401 ¶ 1.

RESPONSE TO ¶590. Disputed in part. Admitted only that NMAC contacted Superb regarding a floor-plan issue; the balance is conclusory and rests on pleadings/placeholders. L.R. 56.1(d). Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 591. Such acts mean that two lenders lent money to Superb to buy the same car for inventory. Urrutia Decl. ¶ X.

RESPONSE TO ¶591. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether two lenders financed the same vehicle is an accounting/operational matter, not established by competent evidence here. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 592. This practice is called "double flooring" in dealership lexicon and is prohibited. Urrutia Decl. ¶ X.

RESPONSE TO ¶592. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That "double flooring" is prohibited is a general assertion resting on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation

also constitutes hearsay. There is simply no accounting or other proof provided indicating what funds were lost, how they were lost, and who the responsible parties are for such losses, including but not limited to the Plaintiffs and their own hires/personnel.

¶ 593. Because of this prohibited conduct, Urrutia was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC and ultimately, NMAC terminated its floor plan financing for Superb. ECF 11 ¶¶ 109; ECF 220 ¶ 9; ECF 11-14; ECF 220- 2; Urrutia Decl. ¶ X.

RESPONSE TO ¶593. Disputed. The $760,868.75 payment to NMAC rests on a placeholder/pleadings; the figure and the attribution of fault to Deo are denied. L.R. 56.1(d). Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

In addition, Plaintiff Urrutia lost four dealerships, and was an admitted absentee owner. The Deo Defendants were only involved with one of his dealerships, Superb, and Urrutia makes no assertions as to the specific extent of involvement of any of the non-Anthony Deo Defendants (Sara Deo, Michael Laurie, and Harry Thomasson were barely involved at Superb). The borad stoke allegations against all of the Deo Defendants are designed to deal with the issue that he has no actionable claims against most, if not all of the Deo Defendants, since the was limited involvement at Superb of all of the Deo Defendants except Anthony Deo, who was an owner, operator, and fully authorized to run the business as he saw fit given that Urrutia was an admitted absentee owner. See section 8, "Robert Anthony Urrutia" in the Deo Defendants Joint 56. Statement.

¶ 594. Novicky confronted Deo about this, who provided inadequate explanations. ECF 11 ¶¶ 100, 107-108; Urrutia Decl. ¶ X.

RESPONSE TO ¶594. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Inadequate explanations" is argumentative. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 595. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, Deo's accountants each substantially assisted Deo in carrying out this scheme by acting as his agents at his direction in, among other things, filling out applications for financing and making material misrepresentations in said applications, discussing together the plan to defraud Superb Plaintiffs and the floor plan financing companies, and profiting from the scheme together. Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶595. OBJECTION [A] [D]. Disregard; disputed. "Substantially assisted … as his agents" states a legal conclusion resting on a blank placeholder. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][D]. This statement is false. There is no proof of the allegations contained herein after multiple actions with discovery for more than three years; this allegation also constitutes hearsay as no Plaintiff has first hand knowledge of these allegations.

¶ 596. Superb and Urrutia thus were damaged by the Defendants' conduct, including – but not limited to – by causing Superb's floor plan line of credit with NMAC to be terminated, resulting in a finding of irreparable harm by this Court. ECF 55 ("In light of the foregoing record

and the possibility of losing Superb Motors as a going concern …, the Court concludes that Superb has demonstrated irreparable harm").

RESPONSE TO ¶596. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The damages/causation assertion is conclusory and denied. [A]. The cited Court finding was for irreparable harm sufficient for a TRO, which was cooperated with by the Deo Defendants in all respects beforehand and since. This allegation also constitutes hearsay, and implies wrongdoing by Defendants absent any proof, still.

¶ 597. When Novicky informed Urrutia about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, Urrutia delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises. ECF 11 ¶¶ 111; Urrutia Decl. ¶ X.

RESPONSE TO ¶597. OBJECTION [A] [F]. Disputed. Asserts state of mind and rests on a placeholder. [A][F]. The paragraph confirms there was a Superb "Shareholders Agreement" governing Deo's authority — establishing that Deo was a shareholder of Superb. (See ¶¶ 643, 654.) Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay. Please be reminded that on that date, Plaintiff Urrutia caused allegations to be made that Anthony Deo (at a minimum) stole 104 vehicles; this allegation is now admittedly

false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 598. The inventory resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger. ECF 11 ¶¶ 112; ECF 11-15; ECF 507 ¶¶ 44-49; Urrutia Decl. ¶ X.

RESPONSE TO ¶598. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "100+ vehicles missing" figure is inconsistent with Plaintiffs' other counts (see ¶¶ 613-619) and unreliable. [A]. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 599. Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb. ECF 11 ¶¶ 113; Urrutia Decl. ¶ X.

RESPONSE TO ¶599. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Demonstrably lied" is argumentative and conclusory. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo

were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 600. As an example of Deo's clear lies, Deo explained that one particular vehicle was sold. ECF 11 ¶¶ 114; Urrutia Decl. ¶ X.

RESPONSE TO ¶600. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Clear lies" is argumentative and conclusory. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 601. However, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle. ECF 11 ¶¶ 114; Urrutia Decl. ¶ X.

RESPONSE TO ¶601. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The hearsay account of an unidentified customer establishes nothing admissible. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 602. Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale. ECF 11 ¶¶ 115; Urrutia Decl. ¶ X.

RESPONSE TO ¶602. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 603. Due to the foregoing, Urrutia exercised his right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations. ECF 11 ¶¶ 1146 Urrutia Decl. ¶ X.

RESPONSE TO ¶603. OBJECTION [A]. Disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The assertion that Urrutia had a "right to remove Deo from day-to-day operations" is itself disputed and an operational removal (the "LockOut") does not negate Deo's ownership. [A].

¶ 604. The findings included incontrovertible proof of Deo's duplicity and clear breaches of his fiduciary obligations. Urrutia Decl. ¶ X.

RESPONSE TO ¶604. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). "Duplicity" and "breaches of fiduciary obligations" are conclusory characterizations, denied. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 605. Deo's conduct uncovered on August 3, 2023 resulted in Superb contacting the Nassau County Police Department ("NCPD") to report the crimes perpetrated by Deo. ECF 86 ¶ 3; ECF 401 ¶¶ 5-6, 9-12; ECF 401-1.

RESPONSE TO ¶605. Disputed in part. That Superb contacted the NCPD rests on pleadings. Defendants note that Deo also sought police involvement, reporting that Aaronson took $735,000 (see Defendants' Responses to ¶¶ 841, 958). Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay, and completely ignores Plaintiff Urrutia's admissions that the numbers alleged to have been "stolen" by Deo were, in fact, false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

¶ 606. Merckling was present with Deo at the time the NCPD arrived. ECF 401 ¶ 15.

RESPONSE TO ¶606. Disputed; immaterial. Whether Merckling was present when the NCPD arrived is immaterial to the Deos' ownership. L.R. 56.1(d).

¶ 607. The fallout from having to pay off $760,000.00 in double-floored vehicles was the first domino to fall in the demise of Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶607. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The causation characterization is conclusory and denied. [A].

The unsupported conclusion of "double flooring" is unsupported by any evidence of who ordered double flooring, whether it was any or all of the parties to this action or their hires/people at the dealerships.

¶ 608. Urrutia was forced to use all his working capital for all four (4) of his dealerships to make payoffs to NMAC and Next Gear Capital Corp. due to the Deo Defendants' conduct, which resulted in the loss of approximately $1,900,000.00 with: (i) about $1,600,000.00 as a direct result conversion of the vehicles to another lot for the grand opening of their competing dealership; and (ii) around $300,000.00 due to the Deo Defendants' double-flooring of other vehicles. Urrutia Decl. ¶ X; ECF 251 ¶ 30.

RESPONSE TO ¶608. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The asserted figures are conclusory damages estimates resting on a placeholder. [A]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay. Please be reminded that on that date, Plaintiff Urrutia caused allegations to be made that Anthony Deo (at a minimum) stole 104 vehicles; this allegation is now admittedly false. See section 8, "Robert Anthony Urrutia," in the Deo Defendants Joint Rule 56.1 Joint Statement.

Also, importantly, this allegation seems to suggest consequential damages, but there are no agreements between any of the Plaintiffs and any of the Defendants that allows for consequential damages.

¶ 609. Since September 2023, the Superb Plaintiffs paid down the floor plan line of credit with curtailments, interest, and insurance costs of over $600,000.00 solely for the injuncted vehicles. Urrutia Decl. ¶ X; ECF 251 ¶ 32.

RESPONSE TO ¶609. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $600,000 figure rests on a placeholder. [A]. The allegation also conveniently ignores that the Urrutia Plaintiffs sought the injunction at issue, and that there was a duty for Superb to pay for its vehicles regardless of Superb's relationship with any of the Deo Defendants.

¶ 610. All in, Superb was forced to pay a total of $4,165,776.00 in payoffs between July 2023 and September 20, 2023. ECF 220 ¶¶ 9-13, 11 n. 6, 15, 15 n. 7; ECF 220-2, 220-4.

RESPONSE TO ¶610. Disputed. The asserted $4,165,776 in payoffs rests on pleadings and exhibits, not on competent, authenticated summary-judgment evidence; the figure and causation are denied. L.R. 56.1(d). Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 611. Urrutia was also forced to pay in capital in the amount of $1,055,878.99 after September 20, 2023. Urrutia Decl. ¶ X; ECF 220 ¶¶ 40-42; ECF 220-9.

RESPONSE TO ¶611. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The $1,055,878.99 figure rests on a placeholder. [A].

Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 612. Deo diverted approximately $663,000.00 in funds from Superb, consisting of $257,000.00 in cash and $406,000.00 in other funds. Urrutia Decl. ¶ X.

RESPONSE TO ¶612. OBJECTION [A] [E]. Disregard; disputed. "Diverted" is conclusory. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes it: cash was receipted and charged against Deo's capital account (O'Sullivan Dep. 160:18-162:4; 165:4-9), and the Car Buyers transfers were consulting fees (see Defendants' Responses to ¶¶ 940-945). [A][E]. Moreover, there is no specificity in this allegation, no proof of any knowledge of anyone's wrongdoing, and this bare, unsupported allegation is not actionable. This allegation also constitutes hearsay.

¶ 613. The Superb Plaintiffs were also forced to spend significant time uncovering the whereabouts of all the cars that were missing, which initially totaled 102 vehicles. Urrutia Decl. ¶ X; ECF 112 ¶ 5.

RESPONSE TO ¶613. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The vehicle count (here "102") is one of several inconsistent figures Plaintiffs assert

(compare ¶¶ 614, 617-620); the shifting counts are unreliable (see Defendants' Response to ¶ 964). [A].

¶ 614. The Superb Plaintiffs counted 102 vehicles missing because those were the vehicles listed in Superb's general ledger which they were unable to locate. Urrutia Decl. ¶ X; ECF 507 ¶¶ 44-49.

RESPONSE TO ¶614. OBJECTION [A]. Disregard. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "102" figure is inconsistent with Plaintiffs' other counts and is unreliable. [A].

¶ 615. It was Deo's responsibility as a general manager to maintain an accurate general ledger listing the vehicles actually in Superb's possession. Urrutia Decl. ¶ X; ECF 507 ¶¶ 44-49.

RESPONSE TO ¶615. OBJECTION [A]. Disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The "general manager" characterization is disputed — Deo was an owner-operator of Superb, not a general manager (see Defendants' Responses to ¶¶ 746, 976). [A].

¶ 616. Deo willfully failed to fulfill his duty to accurately list all vehicles in Superb's possession in the general ledger. Urrutia Decl. ¶ X; ECF 507 ¶¶ 44-49.

RESPONSE TO ¶616. OBJECTION [A] [F]. Disregard; disputed. "Willfully failed" asserts state of mind. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][F]. This broad stroke, conclusory allegation fails to provide any proof of Anthony Deo's "duties" at Superb, and also fails to indicate the duties of Plaintiff Urrutia's hires/people at the dealership, including, but not limited to all of his hires in the finance department, Urrutia's own accountant(s)' duties, as well as Bruce Novicky, who was in charge of oversight on all four (failed) dealerships.

¶ 617. After the Order to show cause was filed in mid-August 2023, the Superb Plaintiffs found thirteen (13) of these vehicles, leaving eighty-nine (89) remaining. Urrutia Decl. ¶ X; ECF 112 ¶ 6; ECF 34.

RESPONSE TO ¶617. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The count (from "102" to "89") again shifts, confirming unreliability. [A].

This broad stroke, conclusory allegation fails to provide any proof of where any automobile allegedly went, who was involved, how vehicles were wrongfully disposed of, how much money was involved, or where the vehicle is today (after multiple actions and three plus years of discovery).

¶ 618. Of those eighty-nine (89), another twelve (12) were then found, leaving seventy-seven (77) vehicles. Urrutia Decl. ¶ X; ECF 112 ¶ 7; ECF 56-1 ¶ 5.

RESPONSE TO ¶618. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The count again shifts (to "77"), confirming unreliability. [A].

This broad stroke, conclusory allegation fails to provide any proof of where any automobile allegedly went, who was involved, how vehicles were wrongfully disposed of, how much money was involved, or where the vehicle is today (after multiple actions and three plus years of discovery).

¶ 619. Of those, twenty-eight (28) were recovered, with an additional two (2) Isuzu flatbed trucks that were not on that list, on September 15, 2023, leaving forty-nine (49). Urrutia Decl. ¶ X; ECF 112 ¶ 8; ECF 56-1 ¶¶ 3-4.

RESPONSE TO ¶619. OBJECTION [A]. Disregard; disputed. The citation relies on a blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The count again shifts (to "49"), confirming the figures are unreliable. [A].

This broad stroke, conclusory allegation fails to provide any proof of where any automobile allegedly went, who was involved, how vehicles were wrongfully disposed of, how much money was involved, or where the vehicle is today (after multiple actions and three plus years of discovery).

¶ 620. Further, six (6) vehicles remain in the possession of the Deo Defendants, leaving forty-three (43) remaining vehicles. Urrutia Decl. ¶ X; ECF 112 ¶ 9.

RESPONSE TO ¶620. OBJECTION [A]. Disregard; disputed. The vehicle count rests on a blank placeholder; The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The counts are in any event unreliable and shifting (see Defendants' Response to ¶ 964). [A]. This broad stroke, conclusory allegation fails to provide any proof of where any automobile allegedly went, who was involved, how vehicles were wrongfully disposed of, how much money was involved, or where the vehicle is today (after multiple actions and three plus years of discovery).

¶ 621. The Superb Plaintiffs were able to uncover the whereabouts of most of these remaining forty-three (43) vehicles, except for about seven (7), which remain completely unaccounted for. ECF 157-1 ¶¶ 15-71.

RESPONSE TO ¶621. Disputed. The whereabouts of vehicles rests on pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied, and the counts are unreliable and shifting (see Defendants' Response to ¶ 964). This broad stroke, conclusory allegation fails to provide any proof of where any automobile allegedly went, who was involved,

how vehicles were wrongfully disposed of, how much money was involved, or where the vehicle is today (after multiple actions and three plus years of discovery). The Deo Defendants ask this Court to take judicial notice that the Plaintiffs in this case admit that their reports to state and local law enforcement of the theft of 102 automobiles was and is false.

¶ 622. Deo engaged in all sorts of nefarious conduct with vehicles during his tenure at Superb. Urrutia Decl. ¶ X; ECF 112 ¶¶ 11-23 (a representative sampling of examples concerning how Deo conducted himself with the vehicles).

RESPONSE TO ¶622. OBJECTION [A]. Disregard; disputed. "Nefarious conduct" is argumentative and conclusory. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 623. As a result of Deo's conduct, Superb's and Team's floor plan lenders terminated their agreements with Superb and Team, respectively. ECF 38 ¶ 2; ECF 157-1 ¶¶ 8-9; ECF 507 ¶¶ 19-20. xiv. The Full Extent of the Deo Defendants' Fraudulent Schemes Come to Surface

RESPONSE TO ¶623. OBJECTION [E]. Disputed. The assertion that lenders terminated "as a result of Deo's conduct" is a conclusory causation characterization, denied, and rests on pleadings, not competent summary-judgment evidence (L.R. 56.1(d)).

¶ 624. Upon removing the Deo Defendants from Superb, the Superb Plaintiffs conducted an investigation into their conduct. Urrutia Decl. ¶ X.

RESPONSE TO ¶624. OBJECTION [A]. Disregard. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 625. Urrutia discovered that Deo misrepresented to Flushing that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing. ECF 11 ¶¶ 73, 117; Urrutia Decl. ¶ X.

RESPONSE TO ¶625. OBJECTION [A] [F]. Disputed. The assertion of Deo's "misrepresentation" asserts state of mind and rests on a placeholder. [A][F]. That Deo represented ownership to Flushing corroborates, rather than refutes, his ownership claim (see Defendants' Response to ¶ 977); and Plaintiffs elsewhere concede Deo executed the Superb Shareholders Agreement (¶ 654) and held a minority interest (¶¶ 631, 683). Urrutia also admitted to knowing about and authorizing (and providing incorporation documents for) the new account(s). *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement.

¶ 626. Deo's representation to Flushing was blatantly false. ECF 11 ¶¶ 118; Urrutia Decl. ¶ X.

RESPONSE TO ¶626. OBJECTION [A]. Disregard; disputed. "Blatantly false" is conclusory and rests on a placeholder. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

¶ 627. Deo successfully opened a bank account for Superb on or about April 4, 2023. Urrutia Decl. ¶ X; ECF 11-9.

RESPONSE TO ¶627. OBJECTION [A]. Admitted in part. Admitted that Deo opened a Flushing account for Superb on or about April 4, 2023. The accompanying "Decl. ¶ X" placeholder is disregarded. As an owner of Superb, Deo was authorized to do so. [A].

¶ 628. Deo was successful in his plan to open a separate bank account for Superb because he sowed turmoil with Superb's accounting department and capitalized on the accounting department's backlog. ECF 11 ¶¶ 68-75.

RESPONSE TO ¶628. Disputed. "Sowed turmoil" is argumentative and conclusory, rests on pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied.

¶ 629. A month prior, Urrutia began the process of opening an account with Flushing in March 2023. ECF 11 ¶ 73 n. 10; ECF 50-3; ECF 50-4.

RESPONSE TO ¶629. Admitted in part; immaterial. Admitted that Urrutia also began opening a Flushing account in March 2023. Immaterial to the Deos' ownership.

¶ 630. When Urrutia began that process, Flushing requested of Urrutia information, documents, and records – many of which he provided – including his tax returns and other documents which indicate that he is the majority shareholder of Superb. Id.; Urrutia Decl. ¶ X.

RESPONSE TO ¶630. OBJECTION [A]. Disregard; immaterial. The documents Urrutia provided to Flushing rest on a placeholder and are immaterial to the Deos' ownership. [A].

¶ 631. Urrutia spoke directly with David Weinstein ("Weinstein") – the Vice President and Branch Manager of Flushing's Borough Park branch – and Mr. Weinstein knew that he was the majority shareholder of Superb. Urrutia Decl. ¶ X; ECF 11 ¶ 73 n. 10; ECF 50-3; ECF 50-4.

RESPONSE TO ¶631. OBJECTION [A] [F]. Disputed. The assertion of Weinstein's knowledge asserts state of mind and rests on a placeholder. [A][F]. The paragraph again concedes that Urrutia was the "majority shareholder" of Superb — necessarily implying Deo held a minority interest.

¶ 632. Around the same time, on March 31, 2023, Deo had contacted Robert Puccio ("Puccio") – the Vice President of Flushing's Business Banking Group located at 99 Park Avenue in Manhattan, who Deo represented was his "personal banker" – to open an account; notably, Puccio's email referenced a request for information for "Signer 1" and "Signer 2." Urrutia Decl. ¶ X; ECF 50-3; ECF 50-4.

RESPONSE TO ¶632. OBJECTION [A]. Disregard; immaterial. Rests on a placeholder; that Deo contacted a Flushing banker is immaterial to ownership. [A].

¶ 633. On the same day, Weinstein asked Urrutia whether Urrutia wanted to share his personal tax returns with Puccio, and Weinstein also asked Urrutia for the name of Urrutia's partner at Superb, thereby establishing both that both Weinstein and Puccio knew Deo was not the sole shareholder of Superb, given that Weinstein was in contact with Puccio about opening an account at Superb. Urrutia Decl. ¶ X; Puccio Decl. ¶¶ 12-20, 27; Deo Dep. 314:2-316:17, 316:18- 318:4.

RESPONSE TO ¶633. OBJECTION [A] [F]. Disputed. Asserts state of mind and rests on a placeholder. [A][F]. The paragraph concedes that Flushing's banker asked Urrutia for "the name of Urrutia's partner at Superb" — an acknowledgment that Deo was Urrutia's partner, consistent with Defendants' position. Also, whatever point is being made ignores the fact that Urrutia admits to knowing about the opening of account(s) and authorizing same. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement.

¶ 634. The very same day, Deo informed Novicky that he has a personal banker ready to open an account for Superb with Flushing and that Deo can obtain a $500,000.00 line of credit as well. Novicky Decl. ¶ X;

RESPONSE TO ¶634. OBJECTION [A]. Disregard. The quoted statement rests on a blank "Novicky Decl. ¶ X" placeholder. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A].

The Deo Defendants ask that this Court take judicial notice of the admission that Urrutia (an admitted absentee owner) knew or should have known what was going on regarding accounts through his right hand man at all four of his dealerships, Bruce Novicky.

¶ 635. Deo added: "Bro. This guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home." Novicky Decl. ¶ X;

RESPONSE TO ¶635. OBJECTION [A]. Disregard. The quoted "in my pocket" text rests on a blank "Novicky Decl. ¶ X" placeholder and establishes nothing admissible. The citation relies on a blank "Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. The Deo Defendants ask that this Court take judicial notice of the admission that Urrutia (an admitted absentee owner) knew or should have known what was going on regarding accounts through his right hand man at all four of his dealerships, Bruce Novicky.

¶ 636. Within days of these communications, Deo successfully opened a bank account with Flushing completely unbeknownst to Urrutia. ECF 11 ¶¶ 73; ECF 11-9.

RESPONSE TO ¶636. Admitted in part; disputed in part. Admitted that Deo opened a Flushing account for Superb in early April 2023; disputed that it was "unbeknownst" in any wrongful sense. As an owner, Deo was authorized to open the account. In addition, this statement is knowingly false: Urrutia admits to knowing about the opening of account(s) and authorizing same in his deposition. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387. Specifically, Urrutia swore under oath that there is a text from Anthony Deo to Bruce Novicky (Superb 000122) that indicates Deo was opening Flushing bank accounts for Superb, and that there was also a $500,000.00 loan available to Superb. Urrutia Transcript, pp. 250, line 3-24; Urrutia never told Anthony Deo not to open the Flushing accounts (Superb 000122). Urrutia Transcript, pp. 251, lines 4-7; Urrutia knew Anthony Deo was opening the Flushing accounts before they were opened (from Bruce Novicky), or immediately thereafter in April, 2023. Urrutia Transcript, pp. 251, line 24-pp. 254, line 19; Urrutia's knowledge of the Flushing accounts came from speaking

with Bruce Novicky, Urrutia's Team Auto COO. TU Transcript, pp. 263, line 21-pp. 264, line 2; Urrutia told Flushing bank that AD was his partner, but never clarified the percentages of that partnership to Flushing. Urrutia Transcript, pp. 269, lines 8-19; Urrutia authorized Team Auto's COO, Bruce Novicky, to supply Anthony Deo with Superb's certificate of incorporation and filing receipt when Anthony Deo was opening an account with Flushing Bank. Urrutia Transcript, pp. 97, line 22-pp. 98, line 24; and Urrutia knew of the bank account getting opened at Flushing Bank in April of 2023 and supplied the documents for that. Urrutia Transcript, pp. 141, line 15-pp. 143, line 21.

¶ 637. Flushing knew or should have known that Deo was not a shareholder of Superb and was not authorized to open a bank account for Superb. Urrutia Decl. ¶ X; Puccio Decl. ¶¶ 12-20, 27; Buccino Dep. 304:4-25; FLUSHING2238.

RESPONSE TO ¶637. OBJECTION [A] [F]. Disputed. Asserts Flushing's knowledge (state of mind), rests on placeholders (Urrutia/Puccio Decl.), and the Buccino pin (304:4-) is outside the available excerpt. [A][F]. The premise that "Deo was not a shareholder" is contradicted by Plaintiffs' own concession that Deo executed the Superb Shareholders Agreement (¶ 654) and the K-1 reflecting his 99% Sunrise interest (Chabrier Dep. 116 (Jan. 9, 2026)).

¶ 638. Flushing knew or should have known that Deo was not authorized to open an account for Superb because it was made aware on March 31, 2023 of a lawsuit filed against Deo by the IAG Plaintiffs in November 2022. Urrutia Decl. ¶ X; Buccino Dep. 305:2-18; FLUSHING3766.

RESPONSE TO ¶638. OBJECTION [A] [F]. Disputed. Asserts state of mind and rests on placeholders/pleadings; the existence of the IAG litigation does not establish that Deo lacked

authority. [A][F]; L.R. 56.1(d). . As an owner, Deo was authorized to open the account. In addition, this statement is knowingly false: Urrutia admits to knowing about the opening of account(s) and authorizing same in his deposition. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 639. Flushing understood Urrutia's complaint that the opening of the Superb account was unauthorized, that all resulting activity in that account was likewise unauthorized according to Urrutia. Buccino Dep. 271:18-22.

RESPONSE TO ¶639. Disputed. The cited testimony reflects only that Flushing understood Urrutia's complaint that the account was "unauthorized according to Urrutia" — i.e., Urrutia's contention, not an established fact. Whether Deo was authorized is disputed; as an owner, he was. This broad stroke allegation is speculative, hearsay, the Plaintiffs have no standing to prosecute this position, and ignores the fact that Urrutia authorized and knew about the opening of bank account(s) by Deo, as did his right hand man, Bruce Novicky. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 640. Flushing had no system or "stop" to ensure that required account-opening documents were actually received and reviewed before an account was opened; its witness testified the bank is "working on fixing that." Buccino Dep. 213:21-214:22.

RESPONSE TO ¶640. Admitted; favorable. Admitted that Flushing's witness testified the bank lacked a system to ensure account-opening documents were received and reviewed before opening an account, and is working to fix it. That the lender's own controls were deficient undercuts any suggestion that Deo's account activity was facially improper. Plaintiffs lack standing to prosecute this position, which is irrelevant given Urrutia's admitted knowledge of the

account openings. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 641. Flushing's account-opening system was "not that detailed" and would not analyze submitted documents for conflicts or flag them to the user. Buccino Dep. 205:10-18.

RESPONSE TO ¶641. Admitted; favorable. Admitted that Flushing's witness testified its system would not analyze submitted documents for conflicts or flag them (Buccino Dep. 205:10-18). The lender's own systemic deficiency is inconsistent with the premise that Deo's conduct was obviously fraudulent. Plaintiffs lack standing to prosecute this position, which is irrelevant given Urrutia's admitted knowledge of the account openings. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 642. Flushing's systems never triggered any suspicious- or unusual-activity on the accounts Deo maintained. Buccino Dep. 269:22-270:3.

RESPONSE TO ¶642. Admitted; favorable. Admitted that Flushing's systems never triggered any suspicious- or unusual-activity alert on the accounts Deo maintained (Buccino Dep. 269:22-270:3). Had Deo's activity been the obvious fraud Plaintiffs allege, the bank's monitoring would have flagged it; it did not. Plaintiffs lack standing to prosecute this position, which is irrelevant given Urrutia's admitted knowledge of the account openings. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 643. Deo's actions violated the Shareholders' Agreement because only Urrutia had check authorization and only Urrutia was to have control over bank accounts owned by Superb. ECF 11-6.

RESPONSE TO ¶643. Disputed. "Violated the Shareholders Agreement" states a legal conclusion, denied. The premise is double-edged: that Deo executed and was a party to the

Superb Shareholders Agreement establishes that Deo was a shareholder of Superb. ECF 11-6. (See Defendants' Responses to ¶¶ 654, 976.) Moreover, this statement is contradicted by Urrutia's admitted knowledge of the bank account openings, and also contradicts his sworn testimony that he did not know if Bruce Novicky authorized Anthony Deo to take certain steps regarding bank accounts. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs

¶ 644. Deo opened this account to divert Superb's funds to an account that he can control. ECF 11 ¶¶ 76-79, 120; ECF 11-9; Urrutia Decl. ¶ X.

RESPONSE TO ¶644. OBJECTION [A] [E]. Disregard; disputed. "Divert" asserts intent and is conclusory. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo, as an owner, was authorized to open and control the entity's accounts. [A][E]. Moreover, this statement is contradicted by Urrutia's admitted knowledge of the bank account openings, and also contradicts his sworn testimony that he did not know if Bruce Novicky authorized Anthony Deo to take certain steps regarding bank accounts. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387.

¶ 645. In the short four (4) months that Deo was unsupervised (because he orchestrated the removal of Superb's CFO and replaced her with Thomas Jones and Jones, Little & Co, CPAs, LLC), Deo began to steal every dollar he could; critically, while there were cash and check deposits at Superb from November 2022 through March 2023, there were zero in cash or check deposits by Deo from April 2023 through July 2023, which were diverted to the account he opened for Superb with Flushing Bank. ECF 220 ¶¶ 46-47, ECF 220-2; ECF 11-9.

RESPONSE TO ¶645. OBJECTION [E]. Disputed. “Began to steal every dollar” is argumentative and conclusory, denied. [E]. That Deo retained his own CPA (Jones) is an owner’s prerogative (see Defendants’ Response to ¶ 807), not evidence of theft. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied.

¶ 646. Upon information and belief, Deo paid Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo’s accountants out of funds placed in this account for their substantial assistance in carrying out his fraudulent schemes. Urrutia Decl. ¶ X.

RESPONSE TO ¶646. OBJECTION [A] [E]. Disregard; disputed. Pleaded “upon information and belief”; The citation is the blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E]. After three years of multiple actions and discovery, having to make this allegation “upon information and belief” in summary judgment actually means that there is no evidence to support this broad stroke conclusion. It is also improper to make such allegations in the absence of firm evidence of wrongdoing by the Deo Defendants, and merely is designed to give the appearance of impropriety since the Plaintiffs have no meat on the bones of their allegations against the Deo Defendants. Summary judgment is the time to put one’s cards on the table, and the Plaintiffs have no cards proving wrongdoing sufficient to be actionable.

¶ 647. Urrutia also learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing account and then transmitting those funds into his own accounts and, upon information and belief, into those of Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo’s accountant for their substantial assistance to Deo in carrying out his unlawful schemes. ECF 11 ¶¶ 77-79; Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶647. OBJECTION [A] [E]. Disregard; disputed. “Misappropriated” is conclusory. The citation is the blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E].

Disputed. This paragraph rests on speculation — 'upon information and belief' — which is inadmissible at summary judgment (Gen. Obj. 5). Additionally, O'Sullivan testified Merckling and Blankenship made legitimate bank deposits returning receipts every time. O'Sullivan Dep. p.9. The citation is also a placeholder ([A]). After three years of multiple actions and discovery, having to make this allegation “upon information and belief” in summary judgment actually means that there is no evidence to support this broad stroke conclusion. It is also improper to make such allegations in the absence of firm evidence of wrongdoing by the Deo Defendants, and merely is designed to give the appearance of impropriety since the Plaintiffs have no meat on the bones of their allegations against the Deo Defendants. Summary judgment is the time to put one’s cards on the table, and the Plaintiffs have no cards proving wrongdoing sufficient to be actionable.

¶ 648. To Urrutia’s knowledge, Deo misappropriated approximately $455,000.00 under this scheme. ECF 11 ¶¶ 121; Urrutia Decl. ¶ X.

RESPONSE TO ¶648. OBJECTION [A] [E]. Disregard; disputed. The $455,000 figure rests on a blank placeholder; The citation is the blank “Urrutia Decl. ¶ X” placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E]. This allegation is denied in all respects.

¶ 649. Further, discovery in this case after the original complaint was filed has shown that Flushing knew about the litigation between the Deo Defendants and the IAG Plaintiffs as well as the existence of the TRO issued by Justice Gianelli, but nonetheless permitted the Deo

Defendants to open a bank account for both Northshore and Sunrise with Flushing and issue a loan to Northshore at the behest of Deo. Urrutia Decl. ¶ X.

RESPONSE TO ¶649. OBJECTION [A] [F]. Disregard; disputed. The assertion of Flushing's knowledge asserts state of mind and rests on a placeholder. [A][F]; L.R. 56.1(d).

Plaintiffs lack standing to prosecute this position, which is irrelevant given Urrutia's admitted knowledge of the account openings. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387.

¶ 650. Urrutia also discovered that Deo misappropriated cash payments from customers by receipting the cash into Superb's DMS system but never depositing any of those cash payments into Superb's bank account and, instead, pocketing the money for himself. Urrutia Decl. ¶ X; ECF 11 ¶¶ 79, 122; ECF 11-12.

RESPONSE TO ¶650. OBJECTION [A] [E]. Disregard; disputed. "Misappropriated" is conclusory. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Cross-testimony refutes it: cash received was receipted and recorded, and cash taken was charged against the capital account (O'Sullivan Dep. 160:18-162:4; 165:4-9 (Mar. 30, 2026)). [A][E].

¶ 651. Upon information and belief, Defendants Merckling and Blankenship substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required. ECF 11 ¶ 123; Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29.

RESPONSE TO ¶651. OBJECTION [A] [D]. Disregard; disputed. Pleaded "upon information and belief"; "substantially assisted" states a legal conclusion; the safe was accessed by controllers and managers, not only Merckling/Blankenship (Deo II Dep. 182:25-183:9 (Feb.

13, 2026)). The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][D]. DENIED. Gen. Obj. 5. Expressly speculative ('upon information and belief'). Directly contradicted by O'Sullivan: Merckling and Blankenship made legitimate bank deposits and returned deposit slips every time. O'Sullivan Dep. p.9. Aaronson: nothing Merckling did wrong. Aaronson Dep. p.15. Additionally, in making this allegation upon information and belief is actually an admission that after multiple actions and discovery for more than three years, Plaintiffs have no evidence of such thefts to present. If cash was, in fact, missing, Urrutia also fails to account for any number of his people/hires that also had access to such cash, notably in the finance department that Urrutia admits was overworked.

¶ 652. Upon information and belief, Defendants Merckling and Blankenship were paid out of these cash funds because they are officers with the NCPD and are not permitted to have any outside employment without advance approval from the NCPD. ECF 11 ¶ 125; Urrutia Decl. ¶ X.

RESPONSE TO ¶652. OBJECTION [A]. Disregard. Pleaded "upon information and belief" on a blank placeholder. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Officers' outside-employment rules are immaterial to the Deos' ownership. [A].

DENIED. Gen. Obj. 5. Expressly speculative ('upon information and belief'). O'Sullivan: Merckling and Blankenship returned deposit slips every time. O'Sullivan Dep. p.9. Aaronson: nothing Blankenship did wrong. Aaronson Dep. p.15. The RICO cash-theft predicate fails as a matter of law on this record. Moreover, to the extent that permission was needed by either Blankenship or Merckling, such permission was obtained, and the Plaintiffs failed to obtain records of such permission in their three plus years of discovery.

¶ 653. To Urrutia's knowledge, Deo misappropriated in excess of $400,000.00 under this scheme. ECF 11 ¶ 126; Urrutia Decl. ¶ X.

RESPONSE TO ¶653. OBJECTION [A] [E]. Disregard; disputed. The $400,000 figure rests on a blank placeholder and a conclusory "misappropriated." The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E]. The lack of specificity again constitutes an admission that Plaintiffs failed to obtain any proof in their multiple actions and discovery stretching over three years.

¶ 654. Deo knew that only Urrutia had sole check authorization, including because he executed the Shareholders' Agreement stating so. ECF 11 ¶ 127; ECF 11-6.

RESPONSE TO ¶654. OBJECTION [F]. Disputed. The assertion of Deo's knowledge asserts state of mind. [F]. The paragraph confirms that Deo "executed the Shareholders Agreement" for Superb — establishing that Deo was a shareholder of Superb. ECF 11-6. This assertion ignores Urrutia's admission that he does not know whether or not Bruce Novicky authorized Anthony Deo to sign checks. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387.

¶ 655. Notwithstanding this, Deo signed multiple checks from Superb's bank accounts that were under the control of Urrutia, although Deo had no authority to sign any checks from any bank account maintained by Superb. ECF 11-16.

RESPONSE TO ¶655. Disputed. "No authority" is disputed: Deo, as an owner of Superb, was authorized to operate its accounts. (See Defendants' Responses to ¶¶ 885, 966, 978.) This assertion ignores Urrutia's admission that he does not know whether or not Bruce Novicky authorized Anthony Deo to sign checks. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387.

¶ 656. During its top-down audit, Urrutia discovered that Deo routinely wrote and signed checks issued by Superb made payable to Northshore, other entities Deo owns, Thomasson, Laurie, and others; none of these checks was authorized and each was signed by Deo despite the fact he had no authority to do so. ECF 11 ¶ 128; Urrutia Decl. ¶ X; ECF 11-16.

RESPONSE TO ¶656. OBJECTION [A]. Disputed. The paragraph itself refers to "other entities Deo owns" — conceding Deo's ownership of multiple entities. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). That an owner-operator wrote inter-company checks is not, without more, evidence of wrongdoing. [A]. This assertion ignores Urrutia's admission that he does not know whether or not Bruce Novicky authorized Anthony Deo to sign checks. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, paragraphs 362-366 and 386-387. Specifically, Urrutia swore under oath that there is a text from Anthony Deo to Bruce Novicky (Superb 000122) that indicates Deo was opening Flushing bank accounts for Superb, and that there was also a $500,000.00 loan available to Superb. Urrutia Transcript, pp. 250, line 3-24; Urrutia never told Anthony Deo not to open the Flushing accounts (Superb 000122). Urrutia Transcript, pp. 251, lines 4-7; Urrutia knew Anthony Deo was opening the Flushing accounts before they were opened (from Bruce Novicky), or immediately thereafter in April, 2023. Urrutia Transcript, pp. 251, line 24-pp. 254, line 19; Urrutia's knowledge of the Flushing accounts came from speaking with Bruce Novicky, Urrutia's Team Auto COO. TU Transcript, pp. 263, line 21-pp. 264, line 2; Urrutia told Flushing bank that AD was his partner, but never clarified the percentages of that partnership to Flushing. Urrutia Transcript, pp. 269, lines 8-19; Urrutia authorized Team Auto's COO, Bruce Novicky, to supply Anthony Deo with Superb's certificate of incorporation and filing receipt when Anthony Deo was opening an account with

Flushing Bank. Urrutia Transcript, pp. 97, line 22-pp. 98, line 24; and Urrutia knew of the bank account getting opened at Flushing Bank in April of 2023 and supplied the documents for that. Urrutia Transcript, pp. 141, line 15-pp. 143, line 21.

¶ 657. Before Deo was removed from Superb, the Deo Defendants purchased five (5) vehicles from Manheim, an automobile auctioneer, under Superb's account. ECF 11 ¶ 129; Urrutia Decl. ¶ X; ECF 11-17.

RESPONSE TO ¶657. OBJECTION [A]. Disregard; disputed. The Manheim-vehicle allegation rests on a blank placeholder and pleadings. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. This assertion is a purposely broad stroke allegation that ignores Urrutia's admissions in his deposition that other than Anthony Deo, the Deo Defendants actually did very little to, with, or for Superb at any time; *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, generally.

¶ 658. Upon information and belief, the Deo Defendants intended to sell these vehicles for 100% profit with no cost to Defendants and to leave Superb holding the proverbial bag. Urrutia Decl. ¶ X. xv. The Deo Defendants Stole Superb's Proprietary Information to Open its own Dealerships

RESPONSE TO ¶658. OBJECTION [A] [F]. Disregard; disputed. The assertion of Defendants' "intent" asserts state of mind and rests on a blank placeholder. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][F]. This assertion is a purposely broad stroke allegation that ignores Urrutia's admissions in his deposition that other than Anthony Deo, the Deo Defendants actually did very

little to, with, or for Superb at any time; *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, generally.

¶ 659. In trying to understand Deo's motive for engaging in these schemes, the top-down audit conducted by Urrutia soon made Deo's intentions very clear. ECF 11 ¶ 131; Urrutia Decl. ¶ X.

RESPONSE TO ¶659. OBJECTION [A] [E]. Disregard; disputed. "Deo's intentions" and "schemes" are conclusory and assert state of mind, resting on a blank placeholder. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E]. This assertion is a purposely broad stroke allegation that ignores Urrutia's admissions in his deposition that other than Anthony Deo, the Deo Defendants actually did very little to, with, or for Superb at any time; *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, generally.

¶ 660. Unbeknownst to Urrutia, Deo had formed various corporate entities – GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – and his plan was to steal from Urrutia in order to begin his own group of dealerships to be operated under the newly formed master entity Gold Coast Motors Automotive Group. ECF 11 ¶ 132; Urrutia Decl. ¶ X.

RESPONSE TO ¶660. OBJECTION [A] [F]. Disregard; disputed. The assertion of Deo's "plan … to steal" asserts intent and The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Deo openly owned the Gold Coast entities, which Plaintiffs themselves admit (see Defendants' Response to ¶ 745); forming entities is not theft. [A][F]. *See* section 8 ("Robert Anthony Urrutia") of the Deo Defendants' Joint 56.1 Statement, generally.

¶ 661. Prior to Deo's working relationship with Urrutia, Deo had no familiarity with Urrutia's dealership processes and know-how, which Urrutia imparted to him as a business partner for the mutual success of Superb. ECF 11 ¶ 133.

RESPONSE TO ¶661. OBJECTION [A]. Disputed. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Notably, the paragraph describes Urrutia's relationship with Deo as that of "a business partner … for the mutual success of Superb" — a concession that Deo was a partner, not a mere employee, consistent with Defendants' position that Deo held an ownership interest. [A].

¶ 662. For example, Urrutia introduced Deo to Tekion, a unique DMS system that was specifically customized for Superb. ECF 11 ¶ 134.

RESPONSE TO ¶662. Disputed. The assertion rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. Moreover, this broad stroke allegation provides no proof of what makes "Tekion," software purchased through the Tekion software provider, unique to Superb.

¶ 663. Urrutia also taught Deo the process of successfully operating an automobile dealership using Tekion, such as processes to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement. ECF 11 ¶ 134; ECF 38-2 at 38 (February 23, 2023 text messages).

RESPONSE TO ¶663. Disputed. The assertion rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. Moreover, this broad stroke allegation provides no proof of what makes "Tekion," software purchased through the Tekion software provider, unique to Superb.

¶ 664. The information Urrutia imparted to Deo was unique, confidential, and proprietary. ECF 11 ¶ 135.

RESPONSE TO ¶664. Disputed. Whether information was "unique, confidential, and proprietary" states a legal conclusion, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. Moreover, this broad stroke allegation provides no proof of what makes "Tekion," software purchased through the Tekion software provider, unique to Superb.

¶ 665. Specifically, the DMS system Urrutia implemented at Superb is unique because it was custom-designed for Superb and cost over $120,000.00 to set up. ECF 11 ¶ 136.

RESPONSE TO ¶665. Disputed. The assertion rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. Moreover, this broad stroke allegation provides no proof of what makes "Tekion," software purchased through the Tekion software provider, unique to Superb. This allegation is a mere conclusion; e.g., undoubtedly that software was modified by the Tekion software provider to include the name "Superb Motors" throughout to be on all documents printed off of the software, but this modification hardly constitutes proprietary information. In short, just as with the broad stroke unsupported allegations of criminal conduct by the Deo Defendants, Plaintiffs merely state a conclusion here, without explaining anything indicating proof.

¶ 666. It contained the blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to operate dealerships profitably. ECF 11 ¶ 136.

RESPONSE TO ¶666. OBJECTION [F]. Disputed. The characterization of a "blueprint" and Urrutia's knowledge rests on the complaint/pleadings, not competent summary-

judgment evidence (L.R. 56.1(d)), and is denied. [F]. Moreover, this broad stroke allegation provides no proof of what makes "Tekion," software purchased through the Tekion software provider, unique to Superb. This allegation is a mere conclusion; e.g., undoubtedly that software was modified by the Tekion software provider to include the name "Superb Motors" throughout to be on all documents printed off of the software, but this modification hardly constitutes proprietary information. In short, just as with the broad stroke unsupported allegations of criminal conduct by the Deo Defendants, Plaintiffs merely state a conclusion here, without explaining anything indicating proof. This statement also contradicts Urrutia's admissions that his four dealerships were all lost under his absentee ownership.

¶ 667. During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships. ECF 11 ¶¶ 137-138; ECF 40 ¶¶ 21-28.

RESPONSE TO ¶667. OBJECTION [E]. Disputed. "Sought to misappropriate" is a conclusory characterization asserting intent, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. [E]. This allegation is a mere conclusion; e.g., undoubtedly that software was modified by the Tekion software provider to include the name "Superb Motors" throughout to be on all documents printed off of the software, but this modification hardly constitutes proprietary information. In short, just as with the broad stroke unsupported allegations of criminal conduct by the Deo Defendants, Plaintiffs merely state a conclusion here, without explaining anything indicating proof. This allegation also constitutes hearsay.

¶ 668. In addition, in a blatant breach of his fiduciary duties to Superb and Urrutia, Deo had Superb employees work for his own group of dealerships while they were employed by Superb and were being paid to perform work only for Superb! ECF 11 ¶ 139.

RESPONSE TO ¶668. OBJECTION [D]. Disputed. "Breach of his fiduciary duties" states a legal conclusion, denied. [D]. A fiduciary duty to Superb and Urrutia arises from an owner/partner relationship — consistent with Defendants' position that Deo held an ownership interest, not the status of a mere employee. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. Given that Urrutia had Deo execute the cross collateralization agreement, the dealerships were all married together thereby, and helping one, helped all. Again, this is an admission that Deo was striving to help all of the dealerships, and given Urrutia's admission that missing vehicles have gone from 104/102 all the way down to seven (7), indicates that Urrutia acted too swiftly in executing the LockOut.

¶ 669. Moreover, Deo illegally imparted the confidential know-how Urrutia imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information, to these employees for the purpose of setting up Deo's own group of dealerships. ECF 11 ¶ 140.

RESPONSE TO ¶669. OBJECTION [E]. Disputed. "Illegally imparted" is a conclusory legal characterization, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. [E]. Moreover, Urrutia's failure to obtain any type of confidentiality agreement is his fault, not the Deo Defendants' fault, even if there is (unproven) proprietary information that Urrutia shared with Deo.

¶ 670. Urrutia initially partnered with Bobby Clarke ("Clarke"), who owns a radio station named Irie Jam, 93.5 FM, and with whom Urrutia advertised to over 2 million listeners in the Caribbean community both during and after his partnership with Clarke ended. Urrutia Decl. ¶ X; ECF 38-4 and 38-5.

RESPONSE TO ¶670. OBJECTION [A]. Disregard; disputed. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The Clarke/Irie Jam advertising relationship is immaterial to the Deos' ownership. [A].

¶ 671. That partnership included approximately $1.5M in advertising, which generated the substantial customer list Urrutia developed to foster business at Superb. Urrutia Decl. ¶ X; ECF 38 ¶¶ 33-34; ECF 38-4, ECF 38-5.

RESPONSE TO ¶671. OBJECTION [A]. Disregard. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. And again, there is no proof submitted with regard to this broad stroke conclusion.

¶ 672. Due to the unique nature of Urrutia's partnership with Clarke, the customer list cannot be reverse engineered or independently generated without a substantial investment in Irie Jam, which the Defendants did not make. Urrutia Decl. ¶ X.

RESPONSE TO ¶672. OBJECTION [A]. Disregard; disputed. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). Whether a customer list "cannot be reverse engineered" states a conclusion and is immaterial to ownership. [A].

¶ 673. To add insult to injury, Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest. ECF 11 ¶ 141.

RESPONSE TO ¶673. OBJECTION [E]. Disputed. "Poached" and "misappropriated" are conclusory characterizations, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is denied. The paragraph concedes there were "dealerships in which Deo had an interest" — an admission of Deo's ownership interest. [E]. This allegation is conclusory, and without any proof whatsoever.

¶ 674. The Superb Plaintiffs maintained information on leads sourced through Irie Jam and its other marketing efforts in a customer relationship management ("CRM") system, initially DriveCentric and, later, VINSolutions. Urrutia Decl. ¶ X.

RESPONSE TO ¶674. OBJECTION [A]. Disregard. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. This allegation is conclusory, and without any proof whatsoever.

¶ 675. The Superb Plaintiffs took reasonable efforts to maintain the secrecy of this information, including by password protection, maintaining a firewall, and other measures. Urrutia Decl. ¶ X.

RESPONSE TO ¶675. OBJECTION [A]. Disregard. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A]. This allegation is conclusory, and without any proof whatsoever.

¶ 676. The Deo Defendants misappropriated Superb's data from its CRM system to jumpstart their competing group of dealerships. Urrutia Decl. ¶ X.

RESPONSE TO ¶676. OBJECTION [A] [E]. Disregard; disputed. "Misappropriated" is conclusory. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E].

This allegation is conclusory, and without any proof whatsoever. Urrutia does not cite a single "stolen" customer, assuming that it is inappropriate for Deo to utilize customer lists openly shared with Deo to promote business for the cross collateralized/related dealerships.

¶ 677. The Deo Defendants misappropriated Superb's vehicles from Superb's lot to their new dealership in Syosset. ECF 40 ¶¶ 21-28; ECF 156-1 at 56:25-57:22, 98:15-102:14, 116:12-119:13, 124:11-24, 126:19-22; ECF 204 ¶ 27 n. 4.

RESPONSE TO ¶677. OBJECTION [E]. Disputed. "Misappropriated" is conclusory, denied. The cited materials are pleadings and exhibits; Urrutia conceded that Deo gave authorization to move vehicles for the grand opening (Urrutia Dep. 34 (Jan. 8, 2026)). (See Defendants' Response to ¶ 966.) [E].

¶ 678. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants each substantially assisted Deo in carrying out his unlawful schemes. Urrutia Decl. ¶ X; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶678. OBJECTION [A] [D]. Disregard; disputed. "Substantially assisted … unlawful schemes" states legal conclusions resting on a blank placeholder and pleadings. [A][D]; L.R. 56.1(d). This allegation is conclusory, and without any proof whatsoever.

¶ 679. Sara managed and controlled the improperly-opened bank account in which Superb's funds were diverted, and misappropriated Superb's CRM system. Urrutia Decl. ¶ X.
RESPONSE TO ¶679. OBJECTION [A] [E]. Disregard; disputed. "Improperly-opened" and "misappropriated" are conclusory characterizations resting on a blank placeholder. The citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)).. [A][E].

This allegation is conclusory, and without any proof whatsoever.

¶ 680. Blankenship and Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo. Urrutia Decl. ¶ X; ECF 40 ¶¶ 8-11, 16-19, 29.

RESPONSE TO ¶680. OBJECTION [A] [E]. Disputed. "Misappropriated" is conclusory; the assertion rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied, and the Blankenship/Merckling depositions are not before Defendants. Cross-testimony refutes it: at the affiliated dealerships the controller recorded cash received and charged cash taken against the owner's capital account (O'Sullivan Dep. 160:18-162:4; 165:4-9 (Mar. 30, 2026)); and Superb's own accounting was handled by its office manager/controller Kendra Kernizant, Urrutia's hire (Urrutia Dep. 79, 151-152 (Jan. 8, 2026)) — not Blankenship or Merckling — inconsistent with the alleged cash theft. [A][E]. This allegation is conclusory, and without any proof whatsoever.

¶ 681. For example, when Urrutia called the NCPD to remove Deo, upon information and belief, Blankenship and Merckling used their positions as retired and active police officers to stymie an investigation and to protect Deo from being arrested for his blatantly criminal conduct. Urrutia Decl. ¶ X.

RESPONSE TO ¶681. OBJECTION [A]. Disregard; disputed. Pleaded "upon information and belief" on a blank "Urrutia Decl. ¶ X" placeholder (L.R. 56.1(d)). It is also contradicted by the record: Deo himself sought police involvement, reporting that Aaronson took $735,000 from the Sunrise account (see Defendants' Responses to ¶¶ 841, 958). [A]. Disputed. This paragraph rests on speculation — 'upon information and belief' — which is inadmissible at summary judgment (Gen. Obj. 5). Additionally, O'Sullivan testified Merckling

and Blankenship made legitimate bank deposits returning receipts every time. O'Sullivan Dep. p.9. The citation is also a placeholder ([A]). This allegation is conclusory, and without any proof whatsoever.

¶ 682. Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing, with whom Laurie has a relationship through his business DLA Capital. ECF 11 ¶ 146; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶682. OBJECTION [D]. Admitted in part. "Enabled Defendants" is a conclusory legal characterization, denied. Admitted only that Laurie assisted with opening a Flushing account, as alleged on Plaintiffs' own declaration (ECF 95 ¶¶ 16-20). [D]. Immaterial to the Deos' ownership. This allegation is conclusory, and without any proof whatsoever.

¶ 683. Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with Urrutia and Deo and knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts. ECF 11 ¶ 147; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

RESPONSE TO ¶683. OBJECTION [F]. Disputed. The assertion of Laurie's knowledge asserts state of mind. [F]. Notably, the paragraph concedes that Urrutia was the "majority shareholder" of Superb — necessarily implying that Deo held a minority interest, not none. Deo's ownership is established by the record (Deo II Dep. 208:4-209:12 (Feb. 13, 2026) (Deo testifying he "bought 50 percent of Superb Motors" and later "purchased the full hundred percent"); see also Urrutia Dep. 208-209 (Jan. 8, 2026) (Urrutia admitting "the $500,000 Anthony Deo gave me" to enter Superb)), and the question of percentage is disputed, not undisputed. This allegation is conclusory, and without any proof whatsoever of Laurie's knowledge of Urrutia's and Deo's written agreements/relationships created thereby.

¶ 684. Similarly, although Deo's accountants knew that Superb was operating at a loss, they nonetheless altered journal entries in its accounting systems to create the appearance that it was operating profitably in order to deceive Urrutia and have him maintain his confidence in Deo. ECF 11 ¶ 148.

RESPONSE TO ¶684. OBJECTION [F]. Disputed. The assertion that the accountants "altered journal entries … in order to" deceive asserts intent. [F]. Cross-testimony refutes the premise that Deo directed it: the controller attributed the adjusting entries to the accountant — "Those are Tom Jones entries" (O'Sullivan Dep. 194:25; 195:15-16 (Mar. 30, 2026)) — and Deo testified he "didn't prepare" the financials (Deo II Dep. 35:2-38:22). (See Defendants' Responses to ¶¶ 862, 955.) This allegation is conclusory, and without any proof whatsoever.

¶ 685. Deo's accountants were thus complicit in the fraudulent schemes perpetrated by Deo, and Deo's accountants aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes. Urrutia Decl. ¶ X.

RESPONSE TO ¶685. OBJECTION [A] [D]. Disregard; disputed. "Complicit," "aided and abetted," and "fraudulent schemes" are conclusory legal conclusions resting on a blank "Urrutia Decl. ¶ X" placeholder. [A][D]; L.R. 56.1(d). This allegation is conclusory, and without any proof whatsoever.

¶ 686. Finally, Thomasson serves as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud; Thomasson engaged in the aforesaid fraud together with the remaining Defendants. ECF 11 ¶ 149.

RESPONSE TO ¶686. OBJECTION [D] [E]. Disputed. That counsel "substantially assisted … unlawful schemes" by defending his clients is a conclusory, pejorative legal

conclusion, denied. [D][E]. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. This allegation is conclusory, and without any proof whatsoever.

¶ 687. For example, although Thomasson purports to maintain an office at 3820 Sunrise Highway, Wantagh, NY, this address is a UPS Store and not an office. ECF 11 ¶ 151.

RESPONSE TO ¶687. Disputed; immaterial. The location of counsel's office rests on a pleading and is immaterial to the Deos' ownership. L.R. 56.1(d). This allegation is conclusory, and without any proof whatsoever; it is also irrelevant in all respects.

¶ 688. Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants. ECF 11 ¶ 152; ECF 86 ¶¶ 4-7.

RESPONSE TO ¶688. OBJECTION [D] [E]. Disputed. "Directly conspired" and "unlawful schemes" are legal conclusions and not facts; denied in all respects. This allegation is conclusory, and without any proof whatsoever.

¶ 689. Urrutia also learned and is continuing to learn of other schemes to plunder and destroy Superb. ECF 11 ¶ 154.

RESPONSE TO ¶689. OBJECTION [E]. Disputed. "Schemes to plunder and destroy" is argumentative and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. [E]. This allegation is conclusory, and without any proof whatsoever.

¶ 690. For example, on February 22, 2023, Deo defrauded the New York State Department of Motor Vehicles ("DMV") when he applied for a license for GCC Sunrise by lying on the application falsely claiming that he had never been convicted of a felony when, in fact, he

had pled guilty, and was convicted in 2016, to Federal wire fraud in relation to a mortgage. ECF 11 ¶ 154- 155; Urrutia Decl. ¶ X; ECF 385-2; ECF 385-3.

RESPONSE TO ¶690. OBJECTION [A] [B] [C] [D] [F]. Disregard in part; disputed. The DMV-fraud allegation is supported only by a blank "Urrutia Decl. ¶ X" placeholder, which identifies no declaration paragraph and is not a citation to admissible evidence under L.R. 56.1(d) [A]; by the complaint (ECF 11 ¶¶ 154-155), a pleading that is not competent summary-judgment evidence under Rule 56(c) [B]; and by exhibits (ECF 385-2, 385-3) that speak for themselves [C]. That Deo "defrauded" the DMV by "lying" and "falsely claiming" he had never been convicted of a felony asserts the ultimate legal conclusion of fraud and Deo's state of mind, not a statement of material fact [D][F]. Defendants do not dispute that the cited criminal judgment reflects Deo's 2016 federal guilty plea, which Deo acknowledged (Deo Dep. Tr. 77:2-11 (Jan. 12, 2026)); that record speaks for itself. Whether Deo made any false statement on the February 2023 GCC Sunrise application — the conduct the paragraph characterizes as "fraud" on the DMV — is, however, genuinely disputed. Deo testified that he did not submit false information on any DMV application ("Did you ever submit false information on a DMV application? A. To my understanding, no." Deo Dep. Tr. 74:18-20; "I didn't submit false information," id. 75:13-14). Deo further testified that his attorney, Anthony Colleluori, advised him that because his criminal case was sealed he was not required to check the felony-disclosure box — "My attorney at the time said my case was sealed and I never have to check that box" (Deo Dep. Tr. 86:2-4; 86:9-12 (Jan. 12, 2026)). Good-faith reliance on the advice of counsel negates the fraudulent intent that a fraud claim requires. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003). The felony-disclosure requirement is in any event established by the DMV application form itself (ECF 385-3), a public record that speaks for itself, not by any placeholder

declaration. That dispute cannot be resolved against Defendants on summary judgment. The matter is in any event immaterial: GCC Sunrise (Gold Coast Cars of Sunrise LLC) is one of Deo's own separately formed entities — among the "Deo Dealerships" (see Defendants' Responses to ¶¶ 734-741) — not one of the Plaintiff dealerships (Northshore, 189 Sunrise, or Superb) whose ownership is at issue. The DMV licensing of a non-party entity does not bear on the Deos' ownership of the Plaintiff dealerships; this allegation also ignores the fact that Deo kept Urrutia informed of the opening of his Gold Coast dealership in all respects; s*ee* Exhibit L to both of the Deos' Complaints.

¶ 691. Defendants engaged in wide-ranging schemes to defraud the Superb Plaintiffs through wire fraud and the use of forged instruments. ECF 11 ¶ 160.

RESPONSE TO ¶691. OBJECTION [E]. Disputed. "Wide-ranging schemes to defraud … wire fraud … forged instruments" are conclusory legal characterizations, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. [E]. This allegation is conclusory, and without any proof whatsoever.

¶ 692. Defendants Sara, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment. ECF 11 ¶ 161.

RESPONSE TO ¶692. OBJECTION [D]. Disputed. "Aided and abetted" and "unauthorized" state legal conclusions, denied. [D]. Deo, as an owner, was authorized to operate the entities' accounts (see Defendants' Responses to ¶¶ 885, 966). This allegation is conclusory, and without any proof whatsoever.

¶ 693. Defendant Laurie and Deo's accountants enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, i.e., false tax returns, false

bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb. ECF 11 ¶ 162.

RESPONSE TO ¶693. OBJECTION [E]. Disputed. "Forged instruments" and "false tax returns/bank applications" are conclusory characterizations, denied. [E]. The tax filings reflected Deo's actual ownership — a K-1 shows his 99% interest in 189 Sunrise (Chabrier Dep. 116 (Jan. 9, 2026)) — not forgeries. This allegation is conclusory, and without any proof whatsoever.

¶ 694. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb. ECF 11 ¶ 163.

RESPONSE TO ¶694. Disputed. "Stolen trade secrets" and "competing … dealerships" are conclusory characterizations, denied, and rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. This allegation is conclusory, and without any proof whatsoever.

¶ 695. Defendants are currently benefitting from the confidential information Urrutia developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he came to own his first dealership, which Defendants stole from the Superb Plaintiffs. ECF 11 ¶ 164.

RESPONSE TO ¶695. Disputed. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. Urrutia's industry experience is immaterial to the Deos' ownership. This allegation is conclusory, and without any proof whatsoever.

¶ 696. This information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information. ECF 11 ¶ 165.

RESPONSE TO ¶696. Disputed. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. This allegation is conclusory, and without any proof whatsoever.

¶ 697. Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including Urrutia's decades of experience in the automobile industry, the relationships Urrutia developed with contacts in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships. ECF 11 ¶ 166.

RESPONSE TO ¶697. Disputed. The characterization of information as "confidential and proprietary" states a legal conclusion, denied; the reference to Deo's "employment with Superb" is disputed — Deo was an owner of Superb (Deo II Dep. 208:4-209:12 (Feb. 13, 2026)), not merely an employee. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. This allegation is without any proof whatsoever.

¶ 698. Urrutia went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today. ECF 11 ¶ 167.

RESPONSE TO ¶698. Disputed; immaterial. Urrutia's efforts in building his businesses rest on a pleading and are immaterial to the Deos' ownership. L.R. 56.1(d). This allegation is conclusory, and without any proof whatsoever.

¶ 699. Superb and Urrutia have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with Urrutia for decades. ECF 11 ¶ 168.

RESPONSE TO ¶699. Disputed; immaterial. Rests on the complaint/pleadings, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied, and immaterial to ownership. This allegation is conclusory, and without any proof whatsoever.

¶ 700. Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means. ECF 11 ¶ 169.

RESPONSE TO ¶700. Disputed. "Improper means" is conclusory. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. That Deo had a "fiduciary relationship with Urrutia" reflects a relationship between owners/partners, not an employment relationship. This allegation is conclusory, and without any proof whatsoever.

¶ 701. Defendants have done so by working with Deo to pillage and plunder Superb because Deo has paid and is paying other Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes. ECF 11 ¶ 169.

RESPONSE TO ¶701. OBJECTION [E]. Disputed. "Pillage and plunder," "stolen," and "fraudulent schemes" are argumentative, pejorative characterizations, denied. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. [E]. This allegation is conclusory, and without any proof whatsoever.

¶ 702. Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants, as set forth herein, misappropriated in contravention of their fiduciary duty to Plaintiff and in violation of the law, provided Plaintiff a unique competitive advantage in the automobile dealership industry, a competitive advantage it has been stripped of by Defendants' unlawful acts. ECF 11 ¶¶ 170.

RESPONSE TO ¶702. OBJECTION [D] [E]. Disputed. "Misappropriated" states the ultimate legal conclusion of the trade-secret claim and is denied. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. [D][E]. This allegation is conclusory, and without any proof whatsoever.

¶ 703. Superb took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords. ECF 11 ¶¶ 171-172.

RESPONSE TO ¶703. Disputed. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia).

¶ 704. The confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means from others who

could otherwise obtain economic value from the disclosure or use of the information. Urrutia ECF 11 ¶ 173.

RESPONSE TO ¶704. Disputed. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia).

¶ 705. This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business. ECF 11 ¶ 174.

RESPONSE TO ¶705. OBJECTION [F]. Disputed. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. The assertion regarding interstate commerce is a pleaded legal element. [F]. Moreover, Urrutia seems to admit that the software was utilized by all of his companies, and therefore cannot be proprietary to Superb, even if and when Urrutia provides specificity as to what in the software is unique to Superb.

¶ 706. Deo, Sara, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means. This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the goodwill and value of Superb. ECF 11 ¶¶ 175-176.

RESPONSE TO ¶706. OBJECTION [F]. Disputed. The assertion that Defendants "knew and had reason to know" asserts state of mind. The assertion is a trade-secret allegation

pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. [F]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from this software.

¶ 707. The unauthorized acts of Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful. ECF 11 ¶ 177.

RESPONSE TO ¶707. OBJECTION [E] [F]. Disputed. "Unauthorized acts," "competing group of dealerships," and "unlawful" are conclusory legal characterizations and assert intent. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. [E][F]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from this software.

¶ 708. There was no other way to obtain this information and Deo, Sara, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of Superb and Urrutia to whom they owed fiduciary duties. ECF 11 ¶ 178.

RESPONSE TO ¶708. Disputed. "Roadmap and step by step manual" is argumentative. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. There is no proof of this statement from any source other than conclusions of an admittedly

absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from this software.

¶ 709. For example, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system. ECF 11 ¶ 179.

RESPONSE TO ¶709. Disputed. The assertion is a trade-secret allegation pleaded from the complaint, not competent summary-judgment evidence (L.R. 56.1(d)), and is a conclusory legal characterization that is denied. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from this software.

¶ 710. They simply stole it from Superb and Urrutia. ECF 11 ¶ 179.

RESPONSE TO ¶710. Disputed. "Stole" is a conclusory characterization, denied. The assertion rests solely on the complaint/pleadings, which are not admissible summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from this software.

¶ 711. Similarly, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to search for customers; they simply diverted them from Superb to their own group of dealerships. ECF 11 ¶ 180.

RESPONSE TO ¶711. OBJECTION [E]. Disputed. The assertion rests solely on the complaint/pleadings, which are not admissible summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. [E]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof

that any of the Deo Defendants took, let alone utilized, anything from Superb's customer lists or software.

¶ 712. Moreover, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to hire and pay employees; they simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb. ECF 11 ¶ 181.

RESPONSE TO ¶712. Disputed. The assertion rests solely on the complaint/pleadings, which are not admissible summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. There is no proof of these threadbare allegations; there is a paucity of evidence throughout the Plaintiffs' case.

¶ 713. Superb's trade secrets and confidential information that Deo, Sara, Thomasson, Blankenship, and Merckling misappropriated through gaining the trust of Urrutia by and through Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that Urrutia has spent years, if not decades, establishing. Meanwhile, Deo, Sara, Thomasson, Blankenship, and Merckling through subterfuge gained access to information that they would have no other way of obtaining. ECF 11 ¶ 182.

RESPONSE TO ¶713. OBJECTION [E]. Disputed. "Misappropriated" is a conclusory characterization, denied; the assertion rests on the pleadings. [E]. Notably, the paragraph characterizes Deo's relationship to Superb as that of "a minority" holder — conceding that Deo held an ownership interest, contrary to Plaintiffs' position elsewhere that he held none. (See Defendants' Responses to ¶¶ 754, 976.) There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from Superb.

¶ 714. Deo, Sara, Thomasson, Blankenship, and Merckling misappropriated confidential and trade secret information by improper means; no permission was given to them to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about its customers for any purpose except for the benefit of Superb. ECF 11 ¶ 183.

RESPONSE TO ¶714. OBJECTION [E]. Disputed. "Misappropriated … by improper means" is a conclusory characterization, denied. The assertion rests solely on the complaint/pleadings, which are not admissible summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. [E]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from Superb.

¶ 715. It is obvious from the brazen tactics of Deo, Sara, Thomasson, Blankenship, and Merckling's that they are actively engaged in a scheme to plunder and to destroy Superb - a company Urrutia spent years building. ECF 11 ¶ 184.

RESPONSE TO ¶715. OBJECTION [E]. Disputed. "Brazen tactics" and "scheme to plunder and destroy" are argumentative, pejorative characterizations, denied. The assertion rests solely on the complaint/pleadings, which are not admissible summary-judgment evidence (L.R. 56.1(d)), and is a conclusory characterization that is denied. [E]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from Superb.

¶ 716. Upon information and belief, a significant number of Superb's customers had been solicited by Deo, Sara, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information. ECF 11 ¶ 185.

RESPONSE TO ¶716. Disputed. The assertion is pleaded "upon information and belief" and rests on the complaint; it is not competent summary-judgment evidence. L.R. 56.1(d). Disputed. This paragraph rests on speculation — 'upon information and belief' — which is inadmissible at summary judgment (Gen. Obj. 5). Additionally, O'Sullivan testified Merckling and Blankenship made legitimate bank deposits returning receipts every time. O'Sullivan Dep. p.9. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants took, let alone utilized, anything from Superb; there is also no proof whatsoever that any of the Deo Defendants spoke to any of Superb's customers at any time.

¶ 717. The Deo Defendants' conduct harmed the Plaintiffs, its banking partners, vendors, and consumers at large. Urrutia Decl. ¶ X; ECF 38 ¶ 63.

RESPONSE TO ¶717. OBJECTION [A]. Disregard; disputed. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). The companion ECF citation is a pleading. The characterization is conclusory and denied.

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever.

¶ 718. The Deo Defendants routinely engaged in identity theft in order to profit from their fraudulent schemes. Urrutia Decl. ¶ X.

RESPONSE TO ¶718. OBJECTION [A] [E] [F]. Disregard; disputed. "Identity theft" and "fraudulent schemes" are conclusory and assert state of mind. The sole citation is the blank

"Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E][F]. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever.

¶ 719. As an example, with respect to customer Barnes, discussed supra, this customer was told she had approval to purchase a vehicle on March 28, 2023. Urrutia Decl. ¶ X.

RESPONSE TO ¶719. OBJECTION [A]. Disregard. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)).

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever.

¶ 720. However, after leaving a down-payment of $2,000.00 by credit card, and being promised delivery by the following week, Barnes never received the vehicle. Urrutia Decl. ¶ X.

RESPONSE TO ¶720. OBJECTION [A]. Disregard. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)).

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever.

¶ 721. Barnes then contacted Ally to discuss the deal and learned that her financing application was denied and that a second application was submitted for Barnes' spouse without his consent. Urrutia Decl. ¶ X.

RESPONSE TO ¶721. OBJECTION [A]. Disregard. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)).

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever; this statement constitutes hearsay.

¶ 722. Barnes had no knowledge that a financing application was sent by the Deo Defendants using his identity. Urrutia Decl. ¶ X.

RESPONSE TO ¶722. OBJECTION [A]. Disregard. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)).

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever; this statement constitutes hearsay.

¶ 723. Barnes' spouse canceled the fraudulent contract and made a complaint with the Better Business Bureau against Superb. Urrutia Decl. ¶ X.

RESPONSE TO ¶723. OBJECTION [A] [E]. Disregard; disputed. "Fraudulent contract" is conclusory. The sole citation is the blank "Urrutia Decl. ¶ X" placeholder, which establishes nothing and must be disregarded (L.R. 56.1(d)). [A][E].

There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever; this statement constitutes hearsay.

¶ 724. Urrutia has been forced to shut down all four of his dealerships due to the Deo Defendants' conduct. ECF 282 ¶ 6; ECF 304 ¶ 25.

RESPONSE TO ¶724. Disputed in part; immaterial. The closure of the dealerships rests on pleadings; that the businesses later closed is, in any event, immaterial to the Deos' ownership and is disputed insofar as it attributes causation to Defendants. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever; this statement constitutes hearsay and is merely a conclusion.

¶ 725. The total damages sustained by the Superb Plaintiffs that have been ascertained to date is summarized as follows: (i) over $2.5M in inventory and other losses in order to conceal the theft of over $2.0M in cash, checks and ACHs causing over $4.5M in losses; (ii) the value of the injuncted vehicles ($1.5M) and the losses incurred on the depreciation of those vehicles, totaling approximately $500,000.00 to date; and (iii) attorneys' fees, as well as numerous other outstanding liabilities that still remain to be determined at trial. Urrutia Decl. ¶ X. Additional Statements of Material Facts

RESPONSE TO ¶725. OBJECTION [A] [F]. Disputed. The damages summary rests on the blank "Urrutia Decl. ¶ X" placeholder and asserts conclusory amounts and intent. [A][F]; L.R. 56.1(d). The asserted figures are not established by admissible evidence and are denied. There is no proof of this statement from any source other than conclusions of an admittedly absentee owner (Urrutia), and there is no proof that any of the Deo Defendants harmed Superb in any specified, proven way. These allegations are empty and without any proof whatsoever; this statement constitutes hearsay.

¶ 726. The Deos live in a mansion in Old Westbury, NY, which they leased but refuse to pay rent, as set forth in a complaint they filed against their landlord in an apparent effort to continue not to pay rent and forestall eviction proceedings. See Deo, et al. v. Wei, Index No.: 612890/2025 (Nassau County Supreme Court), NYSCEF Docket Entries 1 (complaint dated June 13, 2025) and 30 (warrant of eviction dated April 10, 2025).

RESPONSE TO ¶726. OBJECTION [C]. Disputed; immaterial. The Deos' residence and a separate landlord-tenant dispute are collateral matters, immaterial to the issues presented, and unsupported by admissible evidence. [C]. This allegation is irrelevant to this case, and at most demonstrates harm caused by the instant false and vapid litigation brought on by the vindictiveness of the Plaintiffs to conveniently and wrongfully blame the Defendants for their own destruction caused by them to the three businesses at issue.

¶ 727. Harry R. Thomasson, Esq. ("Thomasson") is an attorney-at-law who resides in the State of New York within the County of Nassau, and operates his law practice outside of a UPS Store mailbox which he sometimes misleadingly refers to as a suite. Complaint ¶ 32; Urrutia Decl. ¶ X.

RESPONSE TO ¶727. OBJECTION [A]. Disregard; immaterial. The characterization of Thomasson's office rests on a blank placeholder and is immaterial to the Deos' ownership. [A]. This allegation is irrelevant, and denied in its entirety.

¶ 728. Thomasson works for the Deos. Thomasson Dep. 124:18-125:4 ("Q. What is your agreement with Mr. Deo in connection with the legal services you performed for him in general? A. Well, I had through November of 2022 I served as outside counsel when they needed something. What that meant was if and when they needed me they would contact me and let me know and we would -- I would take care of whatever it was. I believe there was billing up until November of 2022."); 125:12-15; 125:24-126:2; 131:5-9 ("Q. When did you stop keeping track of the time that you spent on the cases you work on for him? A. For sure when I became salaried."); 131:16- 132:11; 151:10-18; 179:10-180:4 ("he said at that time that he would want me to represent of [sic] all of the dealerships. That was when we reached a financial agreement. And I said to him, I am gonna need an office in New York […] [a]nd he said, well why don't you just take an office in one of the dealerships down here," and they decided on Superb); 313:16-316:17; 319:9-19 ("Q. […] Back when you were representing them, were you getting a weekly salary for some period of time? A. I still represent Deos in matters outside of this case. Q. So, you're getting a salary now from the Deos for other matters? A. Yes. Q. How much, you are getting a $1,000 a week; is that what you said? A. Yes."); Blankenship Dep. 133:16-134:3 ("Q. Mr. Thomasson had an office at Superb, correct? A. Yes. […]").

RESPONSE TO ¶728. It is admitted that the transcript is the transcript and it speaks for itself. This allegation is otherwise irrelevant to the instant action.

¶ 729. Dwight Blankenship ("Blankenship") is an active police officer who works for the Deos. Complaint ¶ 33; Blankenship Dep. 20:18-21:19; 34:16-20; 36:20-37:6 (Blankenship does

not remember exactly how much Deo paid him, only that it was a weekly salary of approximately $1,000, regardless of number of hours worked); 47:24-51:13; 54:25-55:20 (Blankenship had a typical schedule of 9:00 to 6:00, which sometimes varied); 56:20-23 ("Q. During your first time working with Mr. Deo before you took a break, you were considered an employee of Northshore, correct? A. Yes, sir."); 57:6-58:12 (Blankenship was paid via 1099 through a corporate entity named Deeg LLC); 59:4-6 ("Q. Mr. Deo paid money to [your company Deeg LLC] for services you performed for him, correct? A. Yes."); 62:11-20 (Blankenship assisted in repairing cars, moving them around, setting alarms, locking up the facility); 64:9-14 (Blankenship kept personal items including a mug at the dealership); 86:22-87:2; 100:18-20 ("Q. Was there ever any task that Mr. Deo asked you to do that you didn't do? A. Not that I'm aware of, no."); 101:14-16 ("Q. Now, you testified that you worked at Northshore as a liaison for service, right? A. Yes, sir."); 115:16- 20; 116:23-25 ("Q. You typically worked at Northshore, right? A. It could have been at Northshore or down at Sunrise."); 131:16-25; 132:5-8; 134:22-25; 141:16-19; 141:24-142:2; 145:13-146:2 ("Q. […] Did you physically work at Sunrise at any time? A. Yes. Q. And did you apportion your time between Sunrise and Northshore? A. Yes. Q. How did you determine which -- where you would be or which hours or days you would spend there? A. Depending on what was getting done, what cars needed to be taken to mechanics, like I stated, mechanics, glass, if there was a problem with the car or it wasn't starting and stuff like that, I would run back and forth."); 174:2-7; 176:21-177:14; 215:3-16.

RESPONSE TO ¶729. It is admitted that the transcript is the transcript and it speaks for itself. This allegation is otherwise irrelevant to the instant action.

¶ 730. Marc Merckling ("Merckling") is a retired police officer who works for the Deos. Complaint ¶ 34; Merckling Dep. 33:21-25 (Deo wanted Merckling to come do security); 39:9-21 (Merckling believes he was paid weekly, mostly by check); 39:25-40:15 (Merckling believes that at some point he was put on ACH payroll); 40:21-25 (Merckling worked different hours every week); 41:19-42:6 (Merckling was paid the same amount every week regardless of hours worked); 42:25-43:4 ("on the four days I was off, I worked there"); 43:13-18 ("I worked four days, then I was off four days. […] [I]t wasn't the same days every week. […]"); 56:13-15 ("Q. After your retirement, did you start working with Mr. Deo full-time? A. Yes"); 60:13-22 (Merckling first started working for Deo around end of 2020 or beginning of 2021, at Northshore Motor Leasing, LLC); 62:9-11; 64:18-23; 65:25-66:4; 67:2-5; 67:12-24 (Deo currently pays Merckling $1,500 per week; in the past when Merckling was part-time, he believes it may have been $1,000 per week); 68:17-20 (Merckling believes Deo provided him a W-2 at Northshore); 68:24-69:3 (Deo paid Merckling to his corporation); 72:19-21 (Merckling is still currently employed by Deo); 75:12-21; 95:25-96:6 (Merckling sometimes worked at Sunrise as well, but was mostly at Northshore); 96:10-15 (Merckling provided the same security services at Sunrise as he did at Northshore); 123:22-124:3 (along with security, Merckling and Blankenship help with menial tasks); 180:6- 181:6; 267:14-18 ("were you an employee or did you work for Northshore when it was operating? A. Yes. Q. Okay. What about Sunrise? A. Yes"); 285:19-21 ("I believe I got forms that I had to give to my accountant doing my taxes").

RESPONSE TO ¶730. It is admitted that the transcript is the transcript and it speaks for itself. This allegation is otherwise irrelevant to the instant action.

¶ 731. Michael Laurie ("Laurie") is a principal of DLA Capital who works for Deo. Complaint ¶ 35; Laurie Dep. 98:15-17 ("I'd use an office in and out [of Superb] every now and

then for a short period of time"); 100:15-25 ("Q. Did Mr. Deo pay you in any manner for your assistance to him at any of the dealerships [he] operated? A. I would have to look back to see what funds I received from him. But he did help me when I needed help from his funds"); 106:17- 107:2 (Laurie maintained an office at Superb for more than a month); 111:25-112:13 (Laurie signed off an e-mail with the title of "business manager," "[b]ecause I was helping him and it makes it easier when you are an inside third party push. […] "Q. Whose decision was it to do that? A. Probably Deo and I, and that I would help him. Q. You decided together? A. Probably"); 112:14-17 (Deo gave Laurie an e-mail address from his domain name at Northshore); 114:24-25 ("If [Deo] paid me, it would have been via check or wire"); 115:7-12 (When Deo paid Laurie, it could have been either DLA or Laurie personally, "depending what it was for"); 119:17-25 (Laurie gets paid when deals close; has a vested interest in moving things along); 130:19-131:2 (Deo would discuss floor planning with Laurie, in his role as Deo's business manager); 155:13- 16 (Laurie utilized access to the office at Northshore to help Deo); 188:18-20 (Through his work with Deo, Laurie received $50,000 for the Flushing Bank loan).

RESPONSE TO ¶731. It is admitted that the transcript is the transcript and it speaks for itself. This allegation is otherwise irrelevant to the instant action.

¶ 732. Laurie is a convicted felon who was previously arrested for engaging in bribery in relation to a bank he worked at. Complaint ¶ 36; Savasta v. Laurie, Index No.: 655330/2023, NYSCEF Docket Entry 1; Laurie Dep. 84:14-17; 89:3-90:9.

RESPONSE TO ¶732. It is admitted that the transcript is the transcript and it speaks for itself. This allegation is otherwise irrelevant to the instant action.

¶ 733. Car Buyers NYC Inc. ("Car Buyers") is and was a corporation with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶733. Admitted.

¶ 734. Gold Coast Motors of Syosset LLC ("GCC Syosset") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶734. Admitted.

¶ 735. Gold Coast Motors of Sunrise LLC ("GCC Sunrise") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶735. Admitted.

¶ 736. Gold Coast Motors Automotive Group LLC ("GCM Auto") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶736. Admitted.

¶ 737. Gold Coast Cars of LIC LLC ("GCC LIC") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶737. Admitted.

¶ 738. Gold Coast Cars of Roslyn LLC ("GCC Roslyn") is and was a limited liability company duly with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶738. Admitted.

¶ 739. Gold Coast Cars of Smithtown LLC ("GCC Smithtown") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶739. Admitted.

¶ 740. UEA Premier Motors Corp. ("UEA Premier") is and was a corporation with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ X.

RESPONSE TO ¶740. Admitted.

¶ 741. Car Buyers, GCC Syosset, GCC Sunrise, GCM Auto, GCC LIC, GCC Roslyn and GCC Smithtown are collectively referred to herein as the "Deo Dealerships." Complaint ¶ 45.

RESPONSE TO ¶741. Admitted.

¶ 742. DLA Capital is and was a corporation with its principal place of business at 1387 Monroe Street, Floral Park, NY 11001. Urrutia Decl. ¶ X.

RESPONSE TO ¶742. Admitted.

¶ 743. Libertas is and was a foreign limited liability company with offices located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830. Complaint ¶ 47; D'Aprile Dep. 14:21-15:6; Patrovic Dep. 7:12-14.

RESPONSE TO ¶743. The Deo Defendants have no knowledge of the formation of Libertas and cannot admit or deny this allegation.

¶ 744. Flushing was and is a commercial bank with central headquarters located at 330 RXR Plaza in Uniondale. Complaint ¶ 48; Buccino Dep. 15:12-16.

RESPONSE TO ¶744. The Deo Defendants have no knowledge of the formation of Libertas and cannot admit or deny this allegation.

¶ 745. At all relevant times, Deo was the owner of the "Gold Coast" entities, made up of Gold Coast Sunrise, Gold Coast Syosset, Gold Coast Motors Automotive Group, Gold Coast LIC, Gold Coast Roslyn, and Gold Coast Smithtown. Deo Dep. 105:20-106:3; 255:19-22; 257:11-16; 258:24-25.

RESPONSE TO ¶745. Admitted.

¶ 746. At all relevant times, Deo was in charge of running Superb as a general manager. Urrutia Dep. 32:8-18; 34:13-18; 144:22-23.

RESPONSE TO ¶746. Disputed in part. Admitted that Deo ran the day-to-day operations of Superb; disputed insofar as the label "general manager" is offered to imply that Deo was an employee rather than an owner. Deo was an owner of Superb — having purchased 50% in November 2022 and the balance in February 2023 from Urrutia — and ran its operations as an owner. Even on Urrutia's own account, Deo was "authorized … to run the day-to-day operations" of Superb (Urrutia Dep. 34 (Jan. 8, 2026)).

¶ 747. This consisted of Deo being authorized only to conduct day-to-day operations; Deo did not have authority to do anything else. Merckling Dep. 250:7-10 ("Q. […] From November of '22 until August of '23, Mr. Deo was in control of operations at Superb; correct? A. He was. Yes"); Urrutia Dep. 32:13-15 ("Everything else was pretty much he was not allowed to do anything but run the business as a general manager").

RESPONSE TO ¶747. Disputed. The assertion that Deo was "authorized only" to conduct day-to-day operations and "did not have authority to do anything else" understates Deo's role and is contradicted by the record of his ownership , including his purchase of Superb (Deo II Dep. 208:4-209:12 (Feb. 13, 2026)).

¶ 748. At all relevant times, Deo was similarly responsible for running the day-to-day operations of Northshore and Sunrise. Deo Dep. 140:20-142:2; Chabrier Dep. 76:18-21 ("Q. Who had responsibility for the day-to-day operations of Northshore? A. That would be Deo. He was the general manager"); 77:25-78:15 ("Q. At some point in time, Mr. Deo became the general manager of Northshore? A. Correct. Q. When did that occur? A. From the day we opened. Q.

What responsibilities did Mr. Deo have with respect to Northshore? A. Day-to-day operations. Q. What did that include? A. Selling cars, buying cars, hiring employees. Q. When you say 'buying cars,' you mean buying inventory? A. Correct"); 79:19-80:3 ("Q. Would Mr. Deo oversee the finance office? A. Yes. Q. Would he oversee the sales department? A. Yes. Q. Generally, he oversaw the whole operations, correct? A. Yes"); 84:14-25 (Deo was engaged as manager of Sunrise); 89:6- 11; 90:9-14; Merckling Dep. 249:4-250:5 ("Q. […] was Mr. Deo in control of operations at Northshore, whatever those operations were? A. Yeah, […] Yes, he was in control of operations. Q. Same question for Sunrise. Was Mr. Deo in control of operations there? A. Yes. […] Q. […] up until the time he gave up the lease, he was in control of operations at Sunrise; correct? A. Yes").

RESPONSE TO ¶748. Denied. Deo's involvement with Superb came after the Aaronson Plaintiffs shuttered and ruined 189 Sunrise and NorthShore. While Deo hoped and expected both businesses to re-open (the Court is well aware of the Khan and David Baron incidents that were resolved between the parties, as well as the tax return dispute that also was resolved between the Deos and the Aaronson Plaintiffs), in retrospect, NorthShore and 189 Sunrise never did re-open after the Aaronson Plaintiffs shuttered them, so the allegation here that Deo was also operating NorthShore and 189 Sunrise is inaccurate. It is admitted that Deo was responsible for the day-to-day operations of Northshore and Sunrise (Deo Dep. 140:20-142:2 (Jan. 12, 2026); Chabrier Dep. 76 (Jan. 9, 2026)). That Deo ran the day-to-day operations is consistent with his role as an owner-operator of those entities when they were open, and is not inconsistent with ownership.

¶749. Deo was on payroll at Superb as a general manager. Urrutia Dep. 163:6-112; 163:19-164:4.

RESPONSE TO ¶749. Disputed in part. Admitted that Deo received payroll compensation from Superb (Urrutia Dep. 163-164 (Jan. 8, 2026)); disputed insofar as “as general manager” is offered to imply Deo was not an owner. An owner’s receipt of payroll compensation does not negate ownership, and Deo was an owner of Superb.

¶ 750. Deo’s main purpose at Superb, Northshore, and Sunrise was to operate the dealerships in order to facilitate the sale of vehicles. Merckling Dep. 250:15-251:7.

RESPONSE TO ¶750. Admitted; that is the purpose of all automobile dealerships.

¶ 751. This included authority to draw under the floor plan for purchase of inventory (i.e. to buy cars), and to send related information to the relevant bank. Chabrier Dep. 81:19-82:11.

RESPONSE TO ¶751. Admitted in part. Admitted that Deo, as owner/operator of these businesses, had authority to draw under the floor plan to purchase inventory. It is denied that Deo transmitted any information about car sales to any bank.

¶ 752. This also included authority to handle financial transactions and reporting on behalf of Northshore and Sunrise. Chabrier Dep. 90:21-92:3.

RESPONSE TO ¶752. Objection as to form. The Deo Defendants do not understand this allegation as written and cannot respond thereto.

¶ 753. Deo did not have any authority over Northshore or Sunrise beyond this. Chabrier Dep. 62:4-20; 80:16-19 (“Q. Was Mr. Deo on any – an authorized signer on the account? A. Don't believe Anthony was a [sic] authorized signer, no”); 83:15-23 (“Q. If Mr. Deo needed a check to purchase any inventory, to buy something for purposes of running the day-to-day operations, how would he go about getting that check? A. Danny O'Sullivan, or the comptroller at the time, would cut a check, and I would sign or Mr. Baron would sign it”). 91:11-92:3 (Deo could handle getting deals approved, buying cars, selling cars, and taking deposits, but “Q.

Anything else? A. No"); 100:21-101:3; 117:5-9 ("Q. With regard to Mr. Deo's responsibilities as a general manager, was Mr. Deo permitted to arrange for any financing for the businesses? A. No").

RESPONSE TO ¶753. Objection as to form. Without waiving such objection, Deo had and utilized his authority as an owner of all three businesses to oversee operations and provide assistance and guidance as needed to employees of these businesses. There were no limits on his authority other than any limitations on his knowledge preventing assistance (e.g., needing an accountant for accounting purposes and needing a lawyer for legal purposes).

¶ 754. Critically, Deo was never an owner of, and never had any membership interest, in Superb, Northshore, or Sunrise. Chabrier 86:3-6 ("Q. At any time was Mr. Deo an owner of 189 Sunrise or have any membership interest? A. No"); 110:2-5 ("Q. […] Do you know why the 2021 tax return lists Mr. Deo as having a 99 percent interest in Northshore? A. No"); 110:23-111:4 ("Q. […] Were you aware, on the 2021 tax return for 189 Sunrise, that it included a K-1 which shows Mr. Deo also had a 99 percent interest in that entity? A. No"); Urrutia Dep. 48:13-49:8 (Deo cannot own a dealership due to his probationary status for wire fraud, which would render him unable to get a license… "So do I think he was an owner, no"); 54:3-10 ("Q. What were your thoughts on Exhibit G where Josh Aaronson approved Deo as owner on tax returns? […] A. That Josh was trying to get Anthony to take over the liabilities of the dealerships. Q. Generally speaking, when you're listed as the owner on tax returns, wouldn't that make you the owner? […] A. No, absolutely not"); 166:3-20 ("Q. […] "it's your position since November of 2022 that Deo never became a 49 percent owner; is that correct? A. Correct"); 236:3-5 ("A. […] he wasn't 100 percent owner of Superb").

RESPONSE TO ¶754. This entire allegation is denied and disputed. Deo was 99% owner by agreement of the Aaronson Plaintiffs in agreeing to create and then approving the tax returns listing Deo as owner of NorthShore and 189 Sunrise; Deo was also an owner of Superb by agreement/contracts in writing with Plaintiff Urrutia after Urrutia took and kept $500,000.00 from Deo.

¶ 755. Deo masterminded an Enterprise of individuals engaged in the common purpose of concerted fraudulent conduct and racketeering activity, by manipulating his managerial position at the Plaintiffs' dealerships; he brought in his own "gang" of employees to Superb, Northshore, and Sunrise, who each made up the Enterprise. Deo Dep. 337:12-338:11 ("[…] A. Oh, the employees were interchangeable, […] Q. You had all of the employees that worked at Superb work on Northshore and Sunrise as well, correct? […] A. […] we had employees at all three locations"); 536:12-537:10 (Deo and Sara were each responsible, with the assistance of Wendy Kwun, for hiring people at Northshore); 575:19-20 ("Q. Hiring and firing? A. We did that"); Urrutia Dep. 29:21-30:12 ("to me, this is a gang, you know. […] I am not the only one suing them. This is three, I think, you have going on, plus you have another dealership now, so that would be a fourth. […] it's a gang that kind of coordinates everything, you being the facilitator. You know you have an accounting department that creates, or an accountant, that creates fake financials, you have muscle and guys that handle logistics"); 131:2-4 ("the whole game plan of the gang you're with is to rip off people and commit fraud").

RESPONSE TO ¶755. OBJECTION [D] [E]. Disputed. "Masterminded an Enterprise," "concerted fraudulent conduct," and "racketeering activity" are conclusory legal characterizations stating the ultimate RICO conclusion; they are denied and are not proper statements of fact. [D][E].

Disputed. The assertion states a legal conclusion ([D]), and the sole citation is a complaint ([C]) stating improper conclusions from a Plaintiff, not admissible evidence. Defendants further dispute that ECF 524's RICO-predicate structure is established on this record — the Hobbs Act predicate fails (police contact about a legitimately reported crime is not extortion) and the wire-fraud predicate is contested; *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989). The record establishes that the coordinated RICO enterprise was the Aaronson/Shanks/Urrutia scheme against the Deos, not an enterprise Deo "masterminded." This is a broad stroke conclusion absent any proof whatsoever.

¶ 756. Deo hired CPA Tom Jones to perform accounting services for Northshore – specifically, to prepare tax returns – in or around 2020. Deo Dep. 591:12-22; 593:12-594:4.

RESPONSE TO ¶756. Admitted.

¶ 757. Deo further rounded out his enterprise by misappropriating and working with employees of Plaintiffs', including Wendy Kwun and Daniel O'Sullivan, and of non-Deo Defendants, including Rob Puccio of Flushing Bank. Blankenship Dep. 106:2-11; 106:15-108;4 (Kwun was instrumental in removing files from the dealership); Buccino Dep. 275:9-13 ("there may have been conversations between Deo and Puccio in the process of opening the account where they spoke about how the funds were going to be used, but that wouldn't be documented per se").

RESPONSE TO ¶757. OBJECTION [E]. Disputed. "Misappropriating" and "enterprise" are conclusory characterizations, denied. [E]. That Deo worked with the dealerships' controller and accountant is ordinary business operation, not racketeering. Disputed. "Enterprise" and "misappropriating" are legal conclusions framing the contested RICO theory ([D]), not facts. Admitted only that the specific Flushing Bank testimony quoted was

given; that testimony does not establish any enterprise or misappropriation. Defendants dispute that any RICO enterprise existed.

¶ 758. The members of the Enterprise worked together to carry out their fraudulent conduct and racketeering activity. Blankenship Dep. 211:19-20 ("I talked to Marc probably once a week. We were partners for ten years"); 213:15-214:6; 235:7-10; Buccino Dep. 268:10-15 (Laurie may have referred other customers to Puccio over the years); 90:4-8; 109:3-16; 126:7-22 (Jones worked with Kwun); Deo II Dep. 184:22-25 (Deo brought Merckling with him to meet with the police department or Detective Marks); Jones Dep. 55:3-13 (Jones worked with O'Sullivan to prepare tax returns because O'Sullivan "had all the records and details"); Merckling Dep. 78:19- 23 (Merckling and Blankenship worked together sometimes); Blankenship 82:7-18 (Merckling and Blankenship worked together sometimes); Merckling Dep. 220:4-8 ("A. […] I would go to both [Northshore and Sunrise]. Q. But is it fair to say when Mr. Deo was at one, you would be at the other? A. No, not always. Most of the time we were together"); 218:17-23 ("Q. You coordinated with each other about what you were doing for the day through text messages; correct? A. Or phone calls. Q. You would use both phone calls and text messages; right? A. Yes"); Blankenship Dep. 90:15-24 (Blankenship and Merckling have had text messages for the last ten years, and also called each other on the phone); O'Sullivan Dep. 108:16-21 (Jones would meet with Deo every time); 146:9-20 (Merckling hosted Monday morning meetings in which he would give direction to the salespeople, and would otherwise interact with the salespeople regularly); Blankenship Dep. 63:11-64:3 (Merckling had informed Blankenship that the Nassau County Police Department was present at Superb and that they were being removed); 65:22-66:3 (Blankenship, Merckling, and Harry were speaking on the sidewalk at the time of removal from Superb); 143:9-11 (O'Sullivan reported to Deo and Kwun); Sara

Dep. 193:18-20 ("Q. Have you ever spoken to Thomas Jones about anything ever in your life? A. Sure"); Thomasson Dep. 115:22- 116:9 (Thomasson has exchanged text messages and e-mails with Deo); 151:10-18 (Thomasson dealt with both Deo and Sara); 172:10-16 (Deo asked Thomasson to come to Superb when the Nassau County Police Department was called there on August 3, 2023); Jones Dep. 58:22-25 ("Q. [...] if you needed to review the trial balance and other schedules, how did you get them? A. Dan would print them out").

RESPONSE TO ¶758. OBJECTION [D] [E]. While the Deo Defendants did speak in various ways and at various times, the implication that crimes were discussed and/or planned is merely speculative and completely unproven after three plus years of various actions and discovery. The absence of proof of this allegation is more telling than its broad stroke, improper conclusions.

¶ 759. For example, the Enterprise worked together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. Sara. Dep. 260:22-261:12; Blankenship Dep. 178:5-8 (there was a safe in the back office at Sunrise); 179:3-180:6 (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access); O'Sullivan Dep. 247:11-13 ("Tom Jones did the reconciliations, I just was supplied him [sic] a copy of the statements"); 248:9-13 ("Q. You inputted the information that would result in the schedules, then you gave him the schedules to do the reconciliations, correct? A. Yes"). RESPONSE TO ¶759. Disputed. "Enterprise" is a conclusory characterization, denied. That cash was reconciled and then deposited reflects proper handling, not wrongdoing. (See Defendants' Responses to ¶¶ 875-877.)

Disputed and denied. "Enterprise" is a legal conclusion ([D]), not a fact, and is disputed. Admitted only that Merckling and Blankenship made cash deposits from the safe; O'Sullivan confirmed they returned deposit slips every time — these were legitimate deposits made for security purposes, not enterprise activity. O'Sullivan Dep. 9 (ECF 478-1) and throughout Sullivan's citations, generally, in the Deo Defendants' Rule 56.1 Statement *at* Section 5.

¶ 760. As another example Blankenship was tasked with moving cars from Superb to Northshore ("Could have anybody. It could have been Gene, it could have been Marc, it could have been Mr. Deo"). Blankenship Dep. 89:19-90:2.

RESPONSE TO ¶760. It is admitted that Blankenship moved cars on occasion. It is denied that he improperly or without authorization and knowledge of the entire dealerships moved cars.

¶ 761. In other instances, Deo siloed members of the Enterprise from each others' affairs. Blankenship Dep. 152:23-153:11 (Blankenship does not know whether the papers he created listing vehicles and their conditions were put into any jackets or computer systems); Merckling Dep. 88:18-22 ("I did my job. That's all I can do. I don't get involved in anything else that's going on").

RESPONSE TO ¶761. Objection as to form. Without waiving this objection, the Deo Defendants deny this conclusory allegation; no proof is provided.

¶ 762. At times, Deo even siloed himself from the activities of his own employees. Sara Dep. 602:13-603:5 ("Q. Do you know if Jones ever prepared any adjusting entries to the financial records of the dealership of Northshore of Sunrise? A. I wasn't involved in that nitty-gritty of what they were doing. Q. So if he made any adjusting entries, it was done without your knowledge? A. I didn't have to be made aware of that. That was between the accounting

department, the CFO and Tom Jones. [...] I didn't play a role in that"); Deo II Dep. 58:19-59:18 ("I didn't prepare P and L's"; Jones and O'Sullivan did); 86:8-10 ("I didn't understand the details of how it was going to be done. We were just trying to get Northshore going").

RESPONSE TO ¶762. Objection as to form. Without waiving this objection, the Deo Defendants deny this conclusory allegation; no proof is provided.

¶ 763. Members of the Enterprise referred each other to fellow members of the Enterprise. Merckling Dep. 75:22-25 (Merckling referred Deo to Blankenship); Laurie Dep. 116:22-117:7 (Laurie referred Deo to Rob Puccio at Flushing Bank, among other lenders); 125:4-5 (Tom Jones "is the one who referred [Laurie] originally to Mr. Deo").

RESPONSE TO ¶763. This allegation is irrelevant and not indicative of any actionable claim or wrongdoing. The Deo Defendants deny that there is an "enterprise" although admit that some of the Deo Defendants introduced others to one or more members of the Deo Defendants.

¶ 764. Members of the Enterprise worked in offices, or were otherwise physically present, at Superb, Northshore, and/or Sunrise. Jones Dep. 97:23-99:4; O'Sullivan Dep. 108:8-12 (O'Sullivan, Deo, and Sara each had their own offices at Northshore, in addition to Frank Ventimiglia's office, another office, and a conference room); Laurie Dep. 98:15-17 ("I'd use an office in and out [of Superb] every now and then for a short period of time"); 106:17-107:2 (Laurie maintained an office at Superb for more than a month); 155:13-16 (Laurie utilized access to the office at Northshore to help Deo); Thomasson Dep. 179:10-180:4 (Thomasson had an office in Superb); O'Sullivan Dep. 108:16-18 (Jones would work in the conference room); O'Sullivan Dep. 147:22-148:25 (at some point, an office was built, "in the last six months right off the showroom," for Merckling); Blankenship Dep. 136:15-138:23 ("I was in between the sales floor and being back in the back with the mechanics or at the podium"; this was an open

space for people to do work, with a desk in front of it and two seats behind it, near Ventimiglia's office); 139:24-140:15 (there were approximately five or six offices); 140:19-141:15 (at some point Kwun took over Ventimiglia's office in the back, which was when Ventimiglia moved to the office off of the sales floor); Sara Dep. 261:22-262:5 (Kwun had an office); Laurie Dep. 155:5-16 (Laurie used Kwun's office sometimes); 98:15-17 ("I'd use an office in and out every now and then for a short period of time"); Urrutia Dep. 222:13-16 ("[Thomasson was] in the dealership, [Thomasson] had an office in my dealership that I didn't know anything about").

RESPONSE TO ¶764. This allegation is irrelevant and not indicative of any actionable claim or wrongdoing. The Deo Defendants deny that there is an "enterprise" although admit that some of the Deo Defendants utilized office space at one or more of the dealerships for various lawful reasons at various times, none of which is proven by this overly broad, conclusory, general allegation.

¶ 765. Members of the Enterprise even kept personal belongings at the offices. Thomasson Dep. 181:3-9 ("I had a lamp that I had purchased that I wasn't using and I had a perfect place for it in that office. So, I threw a few things into that office and went there two to three times before the lockout, working on Superb matters while I was there").

RESPONSE TO ¶765. This allegation is irrelevant and not indicative of any actionable claim or wrongdoing. The Deo Defendants deny that there is an "enterprise" although admit that some of the Deo Defendants utilized office space at one or more of the dealerships for various lawful reasons at various times, none of which is proven by this overly broad, conclusory, general allegation.

¶ 766. "I feel like all the people that [Thomasson] just mentioned [Thomasson, Blankenship, Merckling, Laurie, Sara, Deo] are all in cahoots to, you know, hurt businesses and

call up people, like myself, that were just trying to fight for things that were rightfully theirs, and use their power to take advantage of somebody by using their, you know, their badge, let's just call it, like, by using their powers that may be to try and hurt individuals like me who are just trying to run a business and live my life." Aaronson Dep. 222:23-224:13.

RESPONSE TO ¶766. Disputed and denied. The quoted "in cahoots" statement is a conclusory lay accusation, not a competent statement of fact, and is denied. This is an irrelevant, self-serving conclusion unsupported by any facts.

¶ 767. Despite the dealership(s) being owned by Chabrier, Jory, and Khan, Thomasson never dealt with them, or anyone associated with IAG. Thomasson Dep. 151:19-152:14; 153:16-23.

RESPONSE TO ¶767. The Deo Defendants deny the allegation that the dealerships (presumably 189 Sunrise and NorthShore) are owned or were owned at relevant times by anyone other than the Deos is adamantly disputed and denied. It is admitted that Thomasson never met nor knew any of the Plaintiffs at any time prior to their depositions since December 20, 2025.

¶ 768. When Deo was removed from Superb on August 3, 2023 by the Nassau County Police Department, members of the Enterprise showed up to retrieve their items and congregate. Blankenship Dep. 63:11-64:3 (Merckling had informed Blankenship that the Nassau County Police Department was present at Superb and that they were being removed); 65:22-66:3 (Blankenship, Merckling, and Harry were speaking on the sidewalk at the time of removal from Superb); Thomasson Dep. 172:10-16 (Q. You came there because you were asked by Mr. Deo to come there, right? A. Yes); Blankenship Dep. 209:17-21; 216:10-14.

RESPONSE TO ¶768. Denied. It is specifically denied that the police removed anyone from the Superb dealership on the night of the LockOut, and there is no proof offered to this fact.

The video from that night was at all relevant times in the possession, custody and control of Plaintiff Urrutia, and in citations from Urrutia's deposition from the Deo Defendants Joint Rule 56.1 Statement (Section 8), Urrutia admits that he no longer has such video, which will be the subject of a spoliation instruction if and when this case is before a jury. It is also specifically denied that there is any "enterprise" and that such statement is an unproven conclusion, not any fact relevant hereto. The Deo Defendants admit that on the night of the LockOut, at various times for various lengths of times, Dwight Blankenship, Anthony Deo, Marc Merckling, and Harry Thomasson were present at Superb.

¶ 769. Notably, members of the Enterprise ceased working for Deo after Deo was removed from Superb on August 3, 2023. Blankenship Dep. 98:24-99:6; 215:3-16.

RESPONSE TO ¶769. Denied in all respects.

¶ 770. Finally, multiple members of the Enterprise have histories of engaging in similar fraudulent conduct. Complaint ¶ 36; 655330/2023 NYSCEF 1; Laurie Dep. 84:14-17; 89:3-90:9; Buccino Dep. 164:8-11 (Buccino did not know that Laurie has pled guilty to accepting a bribe while working at a Bank); Merckling Dep. 247:21-25; Thomasson Dep. 23:18-25:5; Deo II Dep. 125:10-14 ("Q. Is it perhaps because as a result of your judgment, your criminal judgment, you believed that you could not obtain more financing and that's why you didn't sign it? A. I am not sure"); Urrutia Decl. ¶ X..

RESPONSE TO ¶770. OBJECTION [A] [E]. Denied in all respects, notably with regard to the use of the words "enterprise" and "fraudulent conduct."

¶ 771. Deo sold vehicles to people who lived outside the state of New York. Merckling Dep. 244:15-18; 251:5-252:2.

RESPONSE TO ¶771. Objection as to form. Deo did not himself sell vehicles in his operation of these dealerships. The dealerships and their employees sold vehicles.

¶ 772. There were customers from outside the state of New York at Sunrise and Superb. Merckling Dep. 244:25-246:11.

RESPONSE TO ¶772. Objection as to form; this allegation is also irrelevant. The Deo Defendants deny knowing where customers lived, and all records of such customers are in the sole possession, custody and control of the Plaintiffs.

¶ 773. When vehicles would be purchased at auction, bids would be entered online. Deo Dep. 535:19-25.

RESPONSE TO ¶773. Admitted.

¶ 774. Within this online auction system, information would be placed onto a dashboard which the controller or CFO would be able to see, and which could be used to communicate with Ally to floor plan said vehicle. Sara Dep. 536:2-10.

RESPONSE TO ¶774. Objection as to form. This is a broad stroke allegation that is conclusory; the Deo Defendants do not know of any "dashboard" as referenced in this allegation.

¶ 775. Deo himself got a W-2 from Northshore. Deo Dep. 550:10-13.

RESPONSE TO ¶775. Admitted. Admitted that Deo testified he received a W-2 from Northshore (Deo Dep. 550:10-13 (Jan. 12, 2026)). An owner-operator's receipt of W-2 wages from his own entity is consistent with, not contrary to, ownership.

¶ 776. Deo brought in his own "guys," including Merckling, Blankenship, and others. Urrutia Dep. 14:12-15:8.

RESPONSE TO ¶776. Admitted in part; immaterial. Admitted that Urrutia testified Deo brought in his own personnel, including Merckling and Blankenship (Urrutia Dep. 14-15 (Jan. 8, 2026)). That Deo made staffing decisions is consistent with his role as owner-operator.

¶ 777. Merckling has been friends with Deo since 2009. Merckling Dep. 92:13-93:4 (the first and only time Merckling met David Baron was at Northshore, when he was visiting Deo as a friend); Sara Dep. 262:24-263:3 ("Q. And do you know how Anthony came to know of Mr. Merckling? A. I think through football, PAL football or something like that").

RESPONSE TO ¶777. Admitted.

¶ 778. Deo hired Merckling to work at Northshore and Sunrise to provide security services, starting around end of 2020 to beginning of 2021. Jones Dep. 215:13-21; Merckling Dep. 60:13-22; 61:2-8; Deo Dep. 131:24-132:6 ("Q. […] you later hired, engaged a police officer Marc Merckling for security, correct? A. I felt more comfortable with him around, yes"); Merckling Dep. 62:23-63:6 ("Q. Is it common for automobile dealerships to have security there? A. I don't know. Q. Have you ever witnessed any dealership have hired security on the premises? A. Again, I've never been in another dealership, so I don't know"); 219:24-220:4 ("Q. Is it fair or accurate to state that when Mr. Deo was at Northshore, oftentimes you'll be asked to be at Sunrise? A. I was at -- I would go to both"); 322:8-11 ("Q. […] you were at the Northshore dealership and Sunrise dealership frequently; correct? A. Yes"); O'Sullivan Dep. 143:11-19; Aaronson Dep. 189:17-19; Sara Dep. 262:21-23 ("Q. […] who hired Mr. Merckling? A. Anthony"); 263:4-23 ("Q. And what was Mr. Merckling's responsibility other than taking money to the bank? A. Security, mainly security. […] Marc Merckling was there for security. Q. Like a security guard? A. No. He's not a security guard. He was there for security, Anthony's security, my security. Q. As a body guard for you or your husband? A. Kind of. Q. Why was that

necessary? A. Because of prior dealings with people that Anthony had"); 272:24-273:4; 273:21-25; Merckling Dep. 33:21-25 ("Q. How did it come to be that you ended up working for Mr. Deo? A. I believe we just had a conversation, and he asked me if I wanted to come and do security"); 75:12-21; 95:25-96:6 ("I went back and forth sometimes, but I was – majority of the time, I was at Northshore"); 96:10-15 ("Q. Is it fair to say that you provided the same services […] at Sunrise that you did at Northshore? A. Yes. Q. And that's security; correct? A. Yes"); 124:7-10 ("I worked for Anthony. I didn't work for Superb. I never got paid from Superb Motors"); 188:5-9 (but admits he was present at Superb); 261:15-25; 267:13-18 ("Q. […] were you an employee or did you work for Northshore when it was operating? A. Yes. Q. Okay. What about Sunrise? A. Yes"); Sara Dep. 264:4-8 ("Q. […] Anthony hired Mr. Merckling as security for you and him based on dealings with prior unidentified parties; correct? A. Yes").

RESPONSE TO ¶778. Admitted. That Deo made the hiring decision is consistent with his role as owner-operator.

¶ 779. Merckling worked different hours each week; worked four days with Deo, then four days for the police department; and believes he worked every week. Merckling Dep. 40:21-25; 65:25-66:4; 42:25-43:4; 43:13-18; 42:15-16.

RESPONSE TO ¶779. Admitted.

¶ 780. After Merckling retired, he started working with Deo full-time, five days per week. Merckling Dep. 56:13-15; 64:18-23.

RESPONSE TO ¶780. Admitted.

¶ 781. At all times, Merckling was paid $1,000.00 weekly, mostly by check, regardless of hours worked. Merckling Dep. 39:9-21; 67:2-5; 67:21-24; 41:19-42:6; 180:6-181:6; 181:22-182:6.

RESPONSE TO ¶781. Admitted.

¶ 782. At some point, Merckling was put onto direct payment through ACH payroll at Northshore. Merckling Dep. 39:25-40:12.

RESPONSE TO ¶782. Admitted.

¶ 783. Deo paid Merckling via Merckling's corporation, Merck 27 Inc. Merckling Dep. 68:24-69:8.

RESPONSE TO ¶783. Admitted, such payments were made in this fashion for accounting purposes.

¶ 784. Meckling was, at least once, paid from Deo via the Car Buyers NYC Inc. account. Merckling Dep. 228:7-13.

RESPONSE TO ¶784. Admitted.

¶ 785. Merckling even worked for Deo during a period of time in which Merckling was not paid, "because business got real bad." Merckling Dep. 68:11-16; 181:10-21 ("He paid me when he could pay me. That -- that's the understanding we had. Q. You never followed up with him about it and asked, "Hey, when am I going to get paid?" A. No, 'cause I know when he could afford it, he would give it to me. Q. Was there ever a period of time where he didn't pay you for two or three months? A. Two or three months? I don't recall. I -- it's possible").

RESPONSE TO ¶785. Admitted.

¶ 786. Merckling maintains that he has no documents related to his employment with Deo. Merckling Dep. 72:22-25.

RESPONSE TO ¶786. Admitted.

¶ 787. Merckling's role went beyond that of a typical employee; for example, he went to the scene of a car accident Deo's son was in, and made an insurance claim related thereto. Merckling Dep. 240:5-17; 242:25-243:17.

RESPONSE TO ¶787. Denied. Merckling provided services he was capable of providing.

¶ 788. Merckling worked "varied" hours, dependent upon his schedule with the Nassau County Police Department. O'Sullivan Dep. 149:2-11 ("he worked a lot of off hours. He would be working at night when I left"); Merckling Dep. 41:2-4.

RESPONSE TO ¶788. Admitted.

¶ 789. Merckling is still currently employed by Deo. Merckling Dep. 72:19-21.

RESPONSE TO ¶789. Admitted through the date of the Merckling deposition.

¶ 790. Currently, Deo pays Merckling $1,500.00 each week. Merckling Dep. 67:12-20.

RESPONSE TO ¶790. Admitted through the date of the Merckling deposition.

¶ 791. Merckling referred Deo to Blankenship, primarily Deo needed help with day-to-day operations including service and preparing cars for delivery, but also because Blankenship is a retired police officer who "wouldn't let anything happen if he was there." Merckling Dep. 75:22- 77:14.

RESPONSE TO ¶791. Admitted.

¶ 792. Blankenship was "was one of Anthony's guys, he brought him in. As far as I knew, he was one of his security guys and was going to be helping in the dealership with logistics and whatever Anthony needed him to do." Urrutia Dep. 14:12-19; Blankenship 115:16-20 ("They asked me to come back because Marc got sick"); Aaronson Dep. 189:20-24.

RESPONSE TO ¶792. Admitted.

¶ 793. Blankenship was paid by Deo through his entity, Deeg LLC, which he was advised, perhaps by Merckling, to form for the purpose of being paid through an entity rather than personally. Blankenship Dep. 174:2-175:10; 176:21-177:14.

RESPONSE TO ¶793. Admitted that payments were made to Deeg LLC for accounting purposes.

¶ 794. Blankenship (and presumably others) had to retrieve their "stuff," their "personal belongings, on the day the police came to remove them. Blankenship Dep. 209:17-21; 216:10-14.

RESPONSE TO ¶794. Admitted that whatever personal belongings of the Deo Defendants were at Superb on the night LockOut were taken from the dealership that night; it is denied that the police removed anyone from Superb on that or any other occasion.

¶ 795. Merckling and Blankenship were purportedly hired to perform menial tasks and security. Merckling Dep. 123:22-124:2 ("Q. Do you agree with Mr. Deo's characterization of you and Mr. Blankenship here as low-level workers who will help with menial tasks? A. Yeah, that along with security").

RESPONSE TO ¶795. Admitted.

¶ 796. Deo hired Thomasson to provide legal services for the Enterprise and its related entities. Laurie Dep. 24:11-13; Merckling Dep. 23:9-12 ("Q. […] Have you ever had any communications directly with Mr. Thomasson at any point in time? A. Yes"); 85:22-23 ("I only had him as an attorney for a short period of time"); 193:11-194:2 (Thomasson was Merckling's attorney when he was questioned/subpoenaed by the FBI); 267:19-268:8 (Q. […] Mr. Thomasson at some point was your attorney; correct? A. Correct. […] I have talked to Harry before. Q. […] you spoke to him individually without other people? A. Yes"); Urrutia Dep.

15:16-16:3; 30:15-21 ("I think you're the facilitator. You're the one who handles all the legal stuff to make sure that it takes years and years before anybody is able to get any kind of justice, so I think you're part of the criminal gang, yes"); 131:2-6 ("the whole game plan of the gang you're with is to rip off people and commit fraud, and you're part of everything, you know, you're just one arm of it"); Thomasson Dep. 25:8-12; 124:21-125:7 (Thomasson "served as outside counsel when they needed something"; his bills for Deo started "during or about 2020 through the end of November of 2022"); Blankenship Dep. 222:13-17 ("he was the lawyer"); Deo II Dep. 91:18-92:3; Thomasson Dep. 17:14-17 ("Q. When Mr. Merckling called you, to your knowledge, was it the purpose of seeking your advice? A. Yes"); 17:22-18:17; 104:5-7; 124:2-8; 131:16-132:6; 151:10-18; 270:11- 20 (Deo wanted funds passed through Thomasson); 314:14-18; 314:21-25; 315:9-25 ("we started discussing a lot more work for me. I was gonna be representing multiple dealerships. […]"); Deo II Dep. 210:3 ("Well, representing me was Harry"); 146:24-147:6; Urrutia Dep. 226:14-15 ("There are plenty of checks of my money that went to you"); Merckling Dep. 23:9-12 ("Q. [...] Have you ever had any communications directly with Mr. Thomasson at any point in time? A. Yes").

RESPONSE TO ¶796. Denied in all respects. The Deo Defendants entirely dispute the existence of any "enterprise," which is merely a convenient conclusion to make overly broad allegations. Thomasson provided legal services, only, on various matters to various Deo Defendants at different times; any suggestion of impropriety in providing such services consists of overly broad, unsupported conclusions.

¶ 797. "Prior to November of 2022, I would say there was between [sic] $15,000 billed over roughly two and a half years." Thomasson Dep. 125:24-126:2.

RESPONSE TO ¶797. Objection as to form. Without waiving such objection, the Deo Defendants admit that the Thomasson transcript speaks for itself, and the low cost of legal bills over two and a half years is consistent with the Deo Defendants' longstanding position that Thomasson did nothing wrong at these dealerships and was barely involved in these dealerships.

¶ 798. Thomasson only stopped timekeeping for Deo once he became salaried, upon which Thomasson received a weekly salary of $3,000. Thomasson Dep. 131:5-9; 313:16-24; 316:2-17; 179:9-13 ("What we ended up discussing was, he said at that time that he would want me to represent of all of the dealerships. That was when we reached a financial agreement"); 315:2-6 ("That was definitely in the vicinity of July of 2023").

RESPONSE TO ¶798. Admitted.

¶ 799. Currently, Thomasson still represents the Deos in matters outside of this case, and is paid a salary of $1,000.00 per week. Thomasson Dep. 319:12-19.

RESPONSE TO ¶799. Admitted.

¶ 800. Sara was employed by Deo, and had an office at Northshore. Aaronson Dep. 36:10- 23; Sara Dep. 79:16-18 (Sara "[m]aybe" received health insurance at Superb).

RESPONSE TO ¶800. Admitted that Sara worked at, for, and drew compensation from the dealerships.

¶ 801. Sara used to be at the dealership, "consistently, at least four days" per week. Sara Dep. 262:6-10.

RESPONSE TO ¶801. Admitted.

¶ 802. Even when Sara was out, she handled her responsibilities. Sara Dep. 271:6-10 ("I tried to do as much as I can from my bed").

RESPONSE TO ¶802. Admitted.

¶ 803. Sara "work[ed] directly with Anthony" at Sunrise and the other locations. J. Baron Dep. 34:13-21; 35:9-10; 35:22-24 ("I do know she worked extremely closely with her husband at these locations"); 36:11-16 ("Sarah worked directly with her husband. Whether she was physically at that location or not, she worked directly with Anthony in the auto business and in the businesses that he was involved in").

RESPONSE TO ¶803. Admitted.

¶ 804. Sara mainly fulfilled marketing responsibilities. Sara Dep. 67:16-19; 271:11-19.

RESPONSE TO ¶804. Admitted.

¶ 805. Sara was on payroll at Superb. Urrutia Dep. 163:13-18.

RESPONSE TO ¶805. Admitted.

¶ 806. Frank Ventimiglia was "the finance guy" at Superb. Blankenship Dep. 119:19-120:25.

RESPONSE TO ¶806. Admitted that Frank Ventimiglia worked in the finance department at Superb for a short time in early 2023.

¶ 807. Deo hired CPA Tom Jones to perform accounting services for Northshore, in or around 2020. Deo Dep. 591:12-22; 592:14-16 ("the CPA for Northshore prior to 2020 was David's RWC. But then we had those incidents, and I needed to have my own"); 593:12-22; Jones Dep. 228:8-13 ("He needed monthly accounting services to review the financial statements and the general ledger and the schedules. […] It was to go over the operations"); 56:6-10 ("Q. You were hired? A. Yes. Q. Anthony told that you he wanted to engage your services? A. Yes"); Chabrier Dep. 46:14-16 ("Q. Do you know anyone by the name of Thomas Jones? A. Personally, no, I don't").

RESPONSE TO ¶807. Admitted.

¶ 808. Jones also performed accounting services for Sunrise. Jones Dep. 34:18-35:10.

RESPONSE TO ¶808. Admitted.

¶ 809. In addition, Jones performed accounting services for other Deo entities, including Northshore, Car Buyers NYC Inc., and Gold Coast Cars of Syosset LLC. Jones Dep. 34:18-35:10; Sara Dep. 98:19-99:3 ([…] Q. And whose CPA is [Jones]? A. I believe, ours. […]"); Jones Dep. 225:22-226:21.

RESPONSE TO ¶809. Admitted.

¶ 810. Together with Tom Jones, Deo hired Kwun and O'Sullivan to make adjustments to financial statements. Sara Dep. 603:21-604:21 ("[…] that is too heavy in accounting for me to play a role in. That's why I hired people to do that. […] So if they thought that there were adjustments to be made if they worked together on a financial statement, why would I disagree with that. That's three very capable people. […] It was their job. They were the professionals. They provided me at the end of it with what their results were"); 605:5-7 ("When you hire three people, again, this is their specialty. This is what they do to do it"); Jones Dep. 71:23-72:4; 127:2-4 ("Q. Did you accommodate [Deo] by making those adjusting entries? A. If it was reasonable, yes").

RESPONSE TO ¶810. Denied in all respects. Kwun and O'Sullivan are inarguably "Baron people" who came to NorthShore and 189 Sunrise at the direction of David Baron (O'Sullivan; *see* section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement) and Josh Aaronson (Kwun*; see* section 7 "Wendy Kwun" in the Deo Defendants Joint Rule 56.1 Statement) and each readily set forth and admitted their loyalties and long history with the Baron/Aaronson Plaintiffs/family. *Id.*

¶ 811. From June 2021 until the dealerships closed or towards the end of 2022, Kwun came to the dealership at least two or three times per week, and she had an office. Sara Dep. 261:22-262:5; Merckling Dep. 143:8-13 ("Wendy was at Northshore quite often […] some weeks she was there every day").

RESPONSE TO ¶811. Admitted.

¶ 812. O'Sullivan was Deo's controller. Deo Dep. 112:16-113:7 (O'Sullivan helped Deo fill out the DMV application and had the necessary documents; "He is my controller, so he helped me with a DMV application"); O'Sullivan Dep. 48:22-49:9 (O'Sullivan worked at Northshore).

RESPONSE TO ¶812. Admitted that O'Sullivan served as the controller at NorthShore and 189 Sunrise, although any implication that a man with 42 of his 44 years of working for the Baron family, and with admitted loyalty to David Baron in particular, is somehow "Anthony Deo's guy" is intentionally misleading this Court. *See* section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement.

¶ 813. Deo would tell O'Sullivan what to do, and O'Sullivan would do it. O'Sullivan Dep. 112:9-23 ("Q. Did you ever ask Anthony [questions about adjusting accounts]? A. No, it is above my pay grade. Q. This is what you were told to do and you just did it? A. Yeah"); 172:3-6 ("Q. Were you part of that conversation or were you just told what to do? A. I was just told what to do"); 172:12-173:4 ("Q. You weren't told why were you doing anything, just now what to do? A. Yes […]"); 81:13-82:5 ("A. I did not pay it off until Anthony told me to pay it off. [...] Q. Was this something which he said to you after something happened or did he say, let me tell you the way that I run my dealership or something like that? A. Yes, I will tell you when to pay the cars off").

RESPONSE TO ¶813. Admitted that Anthony Deo as owner of NorthShore and Sunrise instructed O'Sullivan from time to time, but had no expertise himself (Deo) in being a controller.

¶ 814. Deo and Laurie engaged Rob Puccio at Flushing Bank to assist in opening the Superb accounts therein, as well as in obtaining a $500,000.00 line. Urrutia Dep. 250:18-251:12 (Deo stated to Bruce Novicky, "I have my personal banker ready to open the Superb accounts with Flushing Bank. He will get me a 500,000k line, also"); 257:18-258:15 ("opening up a commercial bank account is not an easy thing. And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio […] But he sent one email to Rob Puccio to […] if he could open the account, and within a couple of days he had an account opened. I had been working on it for over a week"); 259:25-260:12 (In Deo's text "this guy and the credit underwriter are in my pocket," Urrutia guesses that "this guy" is referring to Rob Puccio); 234:10-16 (Puccio was one of the VPs at Flushing, who was working with Deo); Buccino Dep. 143:17-18 ("Mr. Puccio gathered documentation in relation to the application"); 144:10-14 ("He was taking steps to try to see if the account could be opened"); Deo Dep. 198:24- 199:6 ("Q. You testified earlier that by 'in your pocket' you meant that you knew Robert Puccio; is that correct? A. That we did business before, yes. Q. What was the nature of that business? A. He got me a line for Northshore").

RESPONSE TO ¶814. Admitted.

¶ 815. Puccio earns commission for loans he books. Buccino Dep. 132:20-133:5.

RESPONSE TO ¶815. The Deo Defendants cannot admit or deny Puccio's income beyond whatever deposition testimony is cited, which merely speaks for itself.

¶ 816. Laurie has served as financial consultant and business manager to Deo and his entities. Laurie Dep. 143:24-144:8; 111:25-112:8; 97:17-25.

RESPONSE TO ¶816. Admitted.

¶ 817. For example, Laurie helped Superb obtain a loan of $500,000 with Flushing Bank. Laurie Dep. 114:6-17.

RESPONSE TO ¶817. Admitted.

¶ 818. Laurie has financial incentive to facilitate loans. Laurie Dep. 119:17-25.

RESPONSE TO ¶818. Admitted.

¶ 819. Laurie even helped Deo secure a home loan. Laurie Dep. 103:21-104:2.

RESPONSE TO ¶819. Admitted; irrelevant.

¶ 820. Deo and Laurie decided together on the title Laurie should use for their activities. Laurie Dep. 112:4-13.

RESPONSE TO ¶820. Admitted.

¶ 821. Laurie maintained an office at Superb for at least over a month, and otherwise had access to Kwun's office, including for the purpose of helping Deo. Laurie Dep. 106:17-107:2; 155:5-16; 98:15-17.

RESPONSE TO ¶821. Admitted that Laurie maintained an office, briefly, at Superb; denied that Laurie had access to anything belonging to Kwun, including her offices.

¶ 822. Laurie had an email address from Deo's own domain name at Northshore. Laurie Dep. 112:14-17.

RESPONSE TO ¶822. Admitted.

¶ 823. Laurie was paid by Deo via check or wire, to either Laurie personally or DLA Capital Partners, a corporation solely owned by Laurie. Laurie Dep. 114:18-25; 115:7-12; 100:15- 25; 108:9-20; Urrutia Decl. ¶ X.

RESPONSE TO ¶823. Admitted.

¶ 824. Laurie was paid referral fees on the loans that were paid; for example, Deo once paid Laurie's company $50,000 as a ten percent commission for Laurie's assisting in obtaining $500,000 financing. Laurie Dep. 145:3-16; 188:15-20; Deo II Dep. 152:20-153:4; 93:16-94:13.

RESPONSE TO ¶824. Admitted.

¶ 825. Laurie represented to Urrutia that he's an advisor, financier, and unofficial partner of Deo's. Laurie Dep. 131:23-132:5; Urrutia Decl. ¶ X.

RESPONSE TO ¶825. OBJECTION [A]. Disputed. The "unofficial partner" characterization rests in part on the blank "Urrutia Decl. ¶ X" placeholder (L.R. 56.1(d)) and is a conclusory label; that Laurie described himself as an advisor and financier to Deo does not establish any partnership and is immaterial to ownership. (Laurie Dep. 131:23-132:5 (Feb. 27, 2026).)

¶ 826. As operator of Northshore, Deo "went and oversaw kind of -- if he felt like it -- the sales department and what's happening in service, a little of everything. There was no set duties." Sara Dep. 276:24-277:9 ("Q. Was he there most days? A. Most days, yeah"); 278:17-25 (Deo's responsibilities were "[t]o kind of see what's happening in the business, sales, service kind of a thing").

RESPONSE TO ¶826. Admitted.

¶ 827. Sara was familiar with the procedure for daily deposits and reconciling of cash in the safe. Sara Dep. 260:22-261:12.

RESPONSE TO ¶827. Admitted.

¶828. Sara was also responsible for bringing customers into the dealership. Aaronson Dep. 38:10-23.

RESPONSE TO ¶828. Admitted.

¶ 829. Merckling provided security services at the dealerships, to protect Deo, the dealership, its employees, and anyone else there. Merckling Dep. 64:2-17; 96:10-15.

RESPONSE TO ¶829. Admitted.

¶ 830. Part of Merckling's job at Northshore was to deal with any irate customers who got out of hand. Sara Dep. 272:24-273:4; Merckling Dep. 153:18-20 ("if something happened that I thought might get violent, I would get involved").

RESPONSE TO ¶830. Admitted.

¶ 831. Merckling was also expected to perform duties related to cars or customers. Merckling Dep. 96:21-24.

RESPONSE TO ¶831. Admitted.

¶ 832. For example, one of Merckling's duties at Northshore, Sunrise, and/or Superb was helping out with tracking vehicle inventory. Merckling Dep. 125:23-126:3.

RESPONSE TO ¶832. Admitted.

¶ 833. Merckling "counted money that was already taken in." Merckling Dep. 97:8-13.

RESPONSE TO ¶833. Admitted.

¶ 834. Part of Merckling's duties included making deposits of cash payments at the bank. Merckling Dep. 97:14-17; 108:12-19 (Merckling visited Chase Bank Flushing Bank to make cash deposits of customer payments).

RESPONSE TO ¶834. Admitted.

¶ 835. Merckling negotiated the sale of some cars. Merckling Dep. 133:12-17; 208:19-209:5 (Merckling was given guidelines on how much they could sell for).

RESPONSE TO ¶835. Denied. This is an improper conclusion not supported by the testimony or other proof.

¶ 836. Merckling met with auditors from floor plan lenders who review audits and helped out with related forms. Merckling Dep. 138:20-139:3.

RESPONSE TO ¶836. Admitted.

¶ 837. Blankenship also helped with locating cars for audits. Merckling Dep. 141:9-12.

RESPONSE TO ¶837. Admitted.

¶ 838. Merckling drove Deo to the dealership sometimes. Merckling Dep. 65:15-24.

RESPONSE TO ¶838. Admitted.

¶ 839. Merckling signed documents on behalf of Northshore and Sunrise. D'Aprile Dep. 154:11-15.

RESPONSE TO ¶839. The Deo Defendants cannot admit or deny what D'Aprile testified to and have no knowledge of Merckling signing documents on behalf of NorthShore and 189 Sunrise.

¶ 840. Merckling's name was listed as one of the debtors on a UCC lien search for Gold Coast Motors of Syosset. Deo II Dep. 175:23-176:7 ("[…] He was a guarantor").

RESPONSE TO ¶840. Admitted in part. Admitted that Deo testified Merckling appeared as a guarantor (debtor) on a UCC filing for Gold Coast Motors of Syosset, and that Merckling has no ownership interest in that entity (Deo II Dep. 175:19-176:7 (Feb. 13, 2026)).

¶ 841. Merckling went with Deo to the police station to fill out a report against Aaronson – for taking $735,000 of his own entity's money out of the Sunrise bank account – with Detective Marx. Merckling Dep. 98:15-102:10 ("[…] Q. Did you make Detective Marx aware that you worked for the Nassau County Police Department? A. I might have told him I was retired. […] Q. Why did Mr. Deo take you along with him to the police department? A. He was obviously very upset, and he wanted somebody there with him for moral support, and we're

friends"); 57:24-58:16 (Merckling met Marx the night Deo filed a police report in relation to the $735,000 allegedly taken by Aaronson); 99:12-100:7.

RESPONSE TO ¶841. Admitted that Merckling went with Deo to the police station; denied that Aaronson took any money out of the account (see Section 7 "Wendy Kwun" in the Deo Defendants Joint Rule 56.1 Statement where cited deposition testimony of Kwun readily admits to her taking the money); it is also denied that Josh Aaronson owned 189 Sunrise when Wendy Kwun wrongfully took the money Anthony Deo had just obtained through the use of and reasonable reliance upon the tax returns created at Josh Aaronson's direction by Aaronson Plaintiffs' accountants and approved in writing by Josh Aaronson

¶ 842. Blankenship would give Deo or Ventimiglia lists of cars that came in, and what work was needed on each. Blankenship Dep. 151:6-152:8.

RESPONSE TO ¶842. Admitted.

¶ 843. Both Merckling and Blankenship were responsible for transporting cars and otherwise servicing them. Urrutia Dep. 186:20-187:10 ("I believe both Merckling and Blankenship said that they were taking cars to shops for windows, for tires, so at somebody's direction. I don't know who it was, but mostly Anthony"; "Q. They were driving cars to and from shops; is that a fair way of putting it? A. Yeah").

RESPONSE TO ¶843. Admitted that Blankenship and Merckling brought cars to and from shops to be serviced at those shops when needed.

¶ 844. Blankenship was also involved in making cash deposits and moving inventory. Urrutia Dep. 30:24-31:12.

RESPONSE TO ¶844. Admitted.

¶ 845. Jones performed monthly reconciliations for the company bank accounts, after O'Sullivan provided him with a copy of the statements. O'Sullivan Dep. 235:14-22; 246:11-247:9; Deo Dep. 594:5-595:17; 596:4-8 (Deo is "sure" there were monthly meetings with he and Jones to review the financial records of Northshore); Jones Dep. 206:9-22.

RESPONSE TO ¶845. Admitted.

¶ 846. Deo asked Jones to create a profit and loss statement for Superb, year to date January 1, 2023 through May 31, 2023. Jones Dep. 302:19-24.

RESPONSE TO ¶846. Admitted.

¶ 847. Information was supplied by Jones to Libertas. Manzueta Dep. 109:9-14.

RESPONSE TO ¶847. Admitted.

¶ 848. Jones worked together with Deo and Thomasson to provide a document to Puccio at Flushing Bank proving Deo's ownership. Deo II Dep. 217:15-219:16.

RESPONSE TO ¶848. Admitted that it was Jones who told Thomasson about the Josh Aaronson created and approved tax returns that set forth and confirm the inarguable ownership of 189 Sunrise and NorthShore by the Deos, and that a letter stating same was provided to Flushing Bank.

¶ 849. Jones prepared other documents for Deo as well. Jones Dep. 145:4-9 ("Q. Do you recall whether Mr. Deo asked you or your firm to prepare a personal statement for him in connection with any financing? A. I do know that he needed a personal financial statement, that we did").

RESPONSE TO ¶849. Admitted.

¶ 850. Laurie participated in the Enterprise by connecting Deo to financial institutions, who then lent Deo money under fraudulent conditions. Laurie Dep. 116:18-117:7 ("Q. To your

knowledge, you helped Mr. Deo obtain a loan from Libertas through National Funding, correct? A. I made the referral"; Laurie connected Deo with Rob Puccio at Flushing Bank, who Laurie had known for "20 years," since they "used to work at the same bank many years ago"); 118:11-119:5; 84:18-85:5; (Laurie helped Deo secure a loan of a $100,000 from Albert Hakim and $500,000 from Flushing, as well as referred him to National Funding, "the company that got them the lender that has money"); 120:8-121:10 (Laurie referred Deo to Signature/Flagstar Bank); Urrutia Dep. 229:18-19 (Laurie introduced Deo to Flushing Bank); 114:6-17 (Laurie helped Superb obtain a loan of $500,000 with Flushing Bank).

RESPONSE TO ¶850. Denied in all respects. Although Laurie did help Deo to obtain funding, it is entirely denied that such assistance was wrongful, fraudulent in any way, and/or part of any "enterprise" inappropriately concluded by the Plaintiffs.

¶ 851. In addition beyond making referrals, Laurie "may have helped make sure [Puccio] got the right documents from the client if he's not sure what they are requesting, to make sure that he receives what he needs." Laurie Dep. 119:11-16.

RESPONSE TO ¶851. Admitted.

¶ 852. Moreover, Laurie was almost always present at meetings with Deo and Urrutia and "did 80 percent of the speaking" when Urrutia met with Deo. Urrutia Dep. 229:2-230:22; Laurie Dep. 123:8-10.

RESPONSE TO ¶852. Admitted that the cited witnesses testified Laurie was frequently present at meetings and did much of the speaking (Urrutia Dep. 229:2-230:22 (Jan. 8, 2026); Laurie Dep. 123:8-10 (Feb. 27, 2026)).

¶ 853. Thomasson exchanged emails (at least two communications) with Flushing Bank. Patrovic Dep. 46:6-16; 49:3-51:2.

RESPONSE TO ¶853. Admitted.

¶ 854. Deo otherwise directed Thomasson to get involved in a myriad of matters, none of which Thomasson maintains he ever questioned. Thomasson Dep. 271:7-23 ("Deo told me money was stolen, it's coming back, I want you to get involved. This is the name of the guy you've gotta converse with. I believe that I conversed with Russell Shanks via e-mail only. That's my memory. Q. You don't know why Mr. Deo wanted you to go through an attorney when essentially your instructions were as soon as you got the money to get it to him? A. That's correct. Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all"); 47:21-48:3 ("I have represented Northshore, 189 Sunrise and Superb […] in court cases involving allegations by customers. I have also represented those dealerships or at least Northshore and 189 Sunrise with regard to consumer affairs complaints"); 150:2-19 ("[...] As far as I can recall, I think that we prevailed on just about every single one of the matters that I handled"); 85:3-8; 85:17-86:3; 87:8-88:18; 105:6-25; 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]"); 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835; 160:9-19; 173:2-21 (Thomasson spoke to Deo, Merckling, and police); 177:17- 22 (Thomasson advised the Enterprise to leave the dealership); 200:20-201:6 (Thomasson was present for an audit at Northshore in order to comply with the floor plan agreement that Nissan had with Superb);

203:19-204:10 ("once I became involved and the federal court became involved, I cooperated, you may remember, in returning almost all of the vehicles that were at Northshore [...] I didn't know much about vehicles. I didn't know who owned what vehicle. I wasn't asking who owned what vehicle. All I know is if you wanted to pick up the phone and call me and say we've got have some vehicles at Northshore can you help us get them back, I would have done so"); 226:25-227:10; 270:7-10 ("[...] I was asked to have the funds pass through me and I said, sure"); 149:13-25 (Thomasson urged the court, in all capital letters, to make a decision as soon as possible, because the Enterprise was "hurt terribly by what was going on and were losing their businesses and leases at those businesses and it was a problem"); 101:21-102:5 (Thomasson "had a conversation with somebody at Ally").

RESPONSE TO ¶854. Admitted that Thomasson was involved in helping the Deos as an attorney; completely deny that Thomasson "never questioned" anything regarding that work; to suggest such is speculative and completely incorrect.

¶ 855. In one of these emails, sent by Thomasson to Phil at National Business, who then forwarded same to Jessica Patrovic at Flushing Bank, Thomasson wrote: Dear Phil, we've spoken about this and I pointed out to my client it would be a serious mistake for my client to move money that we have been notified is the subject of a judicial proceeding and one specifically targeting inter alia that money. No offense intended to anyone, but we all know that moving that money before a decision is made by the court would be a mistake. That said, I also told Anthony that if he has payments due under the terms of your contract, he can and should continue to make such payments. Lastly, please also be aware that as I informed everyone on this email chain within the last hour, I'm told by the company's accountant Tom Jones, that he's confident in Anthony's ownership of these businesses for a variety of reasons. Notably, that he was told in

writing by Josh and Ms. Kuhn that Anthony is the 99 percent shareholder as represented on the taxes Mr. Jones filed on behalf of Anthony and those corporations. By the way, he also told me that he coordinated the filing of those returns with Citrin, which is Josh's accounting firm. I'm sorry for the troubles, but as I dig into all of this in the last two weeks, I feel confident and still feel confident in Anthony's position. I find Josh's efforts to be inconvenient at best, but after speaking with Tom Jones yesterday, I believe that I will have information by tomorrow that should help to resolve problems in short order. I will continue to keep everyone informed as soon as I have relevant information. Patrovic Dep. 48:21-51:2.

RESPONSE TO ¶855. The document speaks for itself.

¶ 856. Jones and Libertas participated in the Enterprise's fraudulent and racketeering affairs by communicating directly with each other. D'Aprile Dep. 123:21-24 (Jones communicated directly with Gaetano D'Aprile and Delson Manzueta), 124:15-21; Manzueta Dep. 65:2-8.

RESPONSE TO ¶856. Admitted that Jones and Libertas communicated; it is completely denied that any such communications were fraudulent, in furtherance of racketeering, wrongful, part of any enterprise, or anything other than normal business work relating to a loan. This allegation is conclusory and irrelevant.

¶ 857. Sara recalls filled out paperwork to get Northshore organized. Sara Dep. 86:16-22.

RESPONSE TO ¶857. Admitted.

¶ 858. Sara had access to Northshore's bank accounts and was a signer. Sara Dep. 121:16- 21.

RESPONSE TO ¶858. It is admitted that Sara Deo opened NorthShore accounts. *See* Exhibit C to the Deos' two Complaints.

¶ 859. For example, Sara opened the Chase Bank account for Northshore, and then added Deo a few weeks later. Sara Dep. 276:6-12; 190:12-17 ("Q. […] you wanted to set up new Chase accounts for Superb with Tony and Anthony as signers; right? A. That's what the email said, yes").

RESPONSE TO ¶859. Admitted; *See* Exhibit C to the Deos' two Complaints.

¶ 860. Sara would sometimes help out with making the weekly schedule at Superb. Sara Dep. 150:9-151:4.

RESPONSE TO ¶860. Admitted.

¶ 861. Sara participated in the Enterprise by fulfilling marketing responsibilities to attract new customers as victims. Sara Dep. 67:16-19.

RESPONSE TO ¶861. Denied; improperly conclusory and unsupported by any proof.

¶ 862. Kwun and Jones, and/or possibly Daniel O'Sullivan, were involved in the preparation of financial records/statements for Deo. Deo II Dep. 35:2-37:25 ("[…] The first one, this was given to me by the controller, Wendy, and Tom. […] I didn't prepare them, no"); 38:11-22; Deo II Dep. 33:10-20; 64:21-65:6 ("[...] Q. Do you recall providing information to Mr. Jones to enable him to prepare the document? A. Sure"); Jones Dep. 68:5-10.

RESPONSE TO ¶862. Admitted.

¶ 863. Jones helped Deo with an EIDL loan. Deo Dep. 597:4-7.

RESPONSE TO ¶863. Admitted.

¶ 864. O'Sullivan made adjusting entries. O'Sullivan Dep. 165:15-166:22.

RESPONSE TO ¶864. Admitted that O'Sullivan testified he made journal entries as part of his controller duties (O'Sullivan Dep. 165:15-166:22 (Mar. 30, 2026)).

¶ 865. O'Sullivan participated in the Enterprise by paying the bills at Northshore and Sunrise. O'Sullivan Dep. 20:6-8.

RESPONSE TO ¶865. Admitted that O'Sullivan paid bills at the two dealerships; it is nothing but bad faith for the Plaintiffs to now throw O'Sullivan, an employee of the Baron family for 42 of his 44 years, under the bus and accuse him of disloyalty. This is only because the Plaintiffs clearly did not expect O'Sullivan to testify to both his loyalty to the Baron family and David Baron in particular, while also admitting that Anthony Deo was and is the owner of these two dealerships. *See* section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement. "Enterprise" is a conclusory legal characterization, denied in all respects.

¶ 866. O'Sullivan was "more hands on" at Northshore than at Sunrise. O'Sullivan Dep. 54:2-6.

RESPONSE TO ¶866. Admitted.

¶ 867. O'Sullivan made sure that sale money matched money that went out to pay the lender. O'Sullivan Dep. 29:14-23.

RESPONSE TO ¶867. Admitted.

¶ 868. O'Sullivan would track deals in the system, including inputting and taking deals off. O'Sullivan Dep. 22:14-21.

RESPONSE TO ¶868. Admitted.

¶ 869. O'Sullivan would communicate with the floor plan company on behalf of Northshore and Sunrise. O'Sullivan Dep. 219:23-220:13.

RESPONSE TO ¶869. Admitted.

¶ 870. At times, Deo instructed O'Sullivan not to pay Ally (the largest amount being four to six cars). O'Sullivan Dep. 181:2-6.

RESPONSE TO ¶870. Admitted, although the characterization "not to pay Ally" is a misapplication of the testimony: pages 181-182 specifically address unpaid trade payoffs, not Ally floor plan payments. See ¶ 206 response.

¶ 871. O'Sullivan performed so many duties "running both" Northshore and Sunrise that he successfully convinced Deo to hire another person to help with him paperwork. O'Sullivan Dep. 222:5-20.

RESPONSE TO ¶871. Admitted.

¶ 872. At Northshore, O'Sullivan posted the financial statement and sent it off to Lincoln Mercury and Ally each month. O'Sullivan Dep. 99:22-100:5.

RESPONSE TO ¶872. Admitted.

¶ 873. When payments had to be made on trade ins and/or on warranty obligations, O'Sullivan made those payments. O'Sullivan Dep. 246:4-10.

RESPONSE TO ¶873. Admitted.

¶ 874. O'Sullivan interacted with the salespeople "all the time." O'Sullivan Dep. 147:11-14.

RESPONSE TO ¶874. Admitted.

¶ 875. The controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. Deo II Dep. 182:2-5; 182:17-18 ("Q. Who had access to those safes? A. The controllers, managers, myself"); 183;14-23; Merckling Dep. 111:11-13 ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); O'Sullivan Dep. 245:9- 12 ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes").

RESPONSE TO ¶875. Admitted.

¶ 876. "Wendy and Dan supplied Ally with the monthly financials." Deo Dep. 582:21-583:12.

RESPONSE TO ¶876. Admitted.

¶ 877. Controllers were primarily responsible for taking the money out of the safe. Deo II Dep. 182:25-183:9.

RESPONSE TO ¶877. Admitted.

¶ 878. Deo discussed floor planning with Laurie, because Laurie "was his business manager" and "friend." Laurie Dep. 130:3-131:2.

RESPONSE TO ¶878. Admitted.

¶ 879. Laurie assisted Deo in filling out paperwork for opening a bank account. Laurie Dep. 141:13-142:2 ("[...] If people have a question and they say what do I put here or what are they asking me, I may say let's call the bank or let's confirm. [...]").

RESPONSE TO ¶879. Admitted.

¶ 880. Laurie attempted to supply floor plan lending to Deo. Laurie Dep. 129:12-15 ("There was one guy that I spoke to in Florida but nothing ever came of it").

RESPONSE TO ¶880. Admitted.

¶ 881. Laurie even helped Deo when "he was in a deep spot" by paying Car Buyers $5,300 in November 2023. Laurie Dep. 182:22-183:7.

RESPONSE TO ¶881. Admitted.

¶ 882. Puccio participated in the Enterprise by tracking and working on loan applications for Deo, with Deo and Laurie. Buccino Dep. 109:3-16; FLUSHING15.

RESPONSE TO ¶882. Denied. The term "Enterprise" is a conclusory legal characterization and is denied.

¶ 883. Deo had a pattern of keeping members of his Enterprise and their activities siloed from the others. Thomasson Dep. 188:2-10 (Thomasson had no contact with Puccio, has not attempted to contact Puccio, and no knowledge of Deo's attempts to contact Puccio); 98:21-23 ("I didn't even know until December of 2022, who the dealerships [sic] accountant was"); Merckling Dep. 61:2-8 (Merckling was hired solely by Deo, and Merckling did not speak to anyone else during this hiring); Merckling Dep. 121:5-8 ("Q. Did you personally assist Mr. Deo in applying for the loan? A. No. I didn't even know about the loan until they took the money"); 43:24-44:5 (Merckling did not do any work related to Deo's DMV license); 145:21-146:6 (Merckling played no role in executing the loan from Libertas); 208:17-18 (Merckling did not make up the prices of cars); Thomasson Dep. 48:4-6 ("I do not have a present memory of representing any of those dealerships to the DMV"); 188:23-190:25 (Thomasson did not draft or have involvement with employee agreements for Gold Coast Motors Automotive Group, or the company newsletter and/or any acknowledgment therein); ECF 38-12; ECF 112-7; 196:18-197:24 (Deo did not ask Thomasson for advice regarding the capital call letter sent by Urrutia in August 2023); 201:17- 202:2 ("I have absolutely no idea what happened, none. I have no firsthand knowledge whatsoever and I'm not gonna speculate"); 203:4-7 ("I don't have any memory of anyone asking me in August of 2023 to look at vehicles at Northshore. Perhaps they should have"); 305:5-16 ("I was not in any way shape or form curious as to any reason for the lien release that is not the way it was presented to me. It was presented to me that they are going to provide a release, would you get it for us Harry? I thought it was a rather ministerial thing, I just thought it was in due course. I never connected that and I didn't care what he was doing. I have no involvement in their financial situations, never have"); 65:10:16 ("Q. Did Mr. Deo ever informally ask you for any advice about such agreements? A. What agreements? Q. Agreements

such as the cross purchase agreement or any agreement to obtain an interest in a dealership? A. No"); 89:20-90:13 ("Q. Were you ever requested to perform any legal services in connection with an agreement between Mr. Deo and Mr. Baron for the purchase of Baron Nissan? A. I was not involved in that deal in any way shape or form, except that after Deo signed some documents and paid some money in connection with that, I was informed that he put me or my name and/or address into one or more of the documents a [sic] as a contact person in case of notice after the deal was done. I was told that. But, I was not in any way shape or form involved in that transaction prior to and including the day that the documents were executed and monies were paid. I knew nothing about it, had nothing to do with it"); 110:17-21 ("I found out about the existence of that loan when I found out that the money obtained by Mr. Deo on behalf of his dealerships was taken by Josh Aaronson and had to be returned"); 225:6-21 ("[...] Q. Do you know if there's any written agreement concerning that agreement between the parties? A. Nothing comes to mind"); Sara Dep. 193:15-17 ("I don't speak to Tom Jones because I don't have involvement with accounting"); 263:9-10 ("I do not have any firsthand knowledge of when this was prepared"); 267:19 ("I have no knowledge of this document"); O'Sullivan Dep. 108:16-109:16 (Jones would meet with Deo in the conference room, and Jones would come out and hand O'Sullivan a piece of paper with all of the adjusting entries he wanted O'Sullivan to make); 90:18-24 (O'Sullivan was not involved in applying for the PPP loan); 91:23-92:2 (O'Sullivan does not know who, if anyone, was involved in putting together the documentation to submit for the PPP loans); Thomasson Dep. 27:18-23 ("Q. In connection with your representation of Mr. Deo, did you assist him in any way to apply for a license with the New York State Department of Motor Vehicles? A. No"); 92:2-6 (Thomasson is "not aware of the existence of any operating agreement for Northshore); 102:6-21 ("I had no knowledge of the Libertas or Flushing Bank

dealings [...] Q. You deny any involvement or representation in connection with the application for funds from Flushing Bank and Libertas? A. 100 percent. Never even knew about it"); Jones Dep. 209:18-210:4 ("Q. Do you recall at any time knowing what Mr. Deo planned to do with the funds that he -- the funds that he was trying to obtain from Flushing Bank? A. No, I don't. Q. Did you know that he actually obtained the loan from Flushing Bank? A. No, I was not aware. Q. Did you ever prepare a tax return for Superb Motors? A. No"); O'Sullivan Dep. 90:11-24 ("[...] I wasn't involved in getting [PPP loans], I think that Anthony handled most of them. Q. When did you first became aware of a PPP loan? A. When we got the money. Q. Until you got money, did you know about it? A. I heard about it, but it was -- I wasn't involved in applying for it").

RESPONSE TO ¶883. Objection as to form. Denied as to the existence of the conclusory term "enterprise" and keeping people "siloed." The cited transcript excerpts speak for themselves.

¶ 884. Deo took money, cars, plates, and cash. Aaronson Dep. 122:24-123:14 ("[...] he took a lot of cash that supposedly was never deposited into banks. [...]"); Chabrier Dep. 155:24-156:6 ("According to my comptroller at the time, Danny questioned why there were large sums of cash that never made it to the bank account that I found out later. So Anthony had taken that money that never made it into the Northshore bank accounts"); 156:20-22 ("Danny told me that he had given Anthony cash and it didn't get deposited in the bank"); 157:6-21 ("[Danny] told us when he still worked there. When he was questioned where some cash was. [...] It was a large sum of money. I don't recall the exact amount"); Deo II Dep. 46:16-47:19; 47:25-48:7; 50:4-9; 50:13-22; 56:66- 17; 51:2-25 (over $1.2 million in deposits over one and a half weeks); 52:2-7 ("Q. Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that? A. Yes"); 52:8-

54:9 (Deo maintains this was to cover deficiencies created by Aaronson); Deo Dep. 613:3-12 ("Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to pay off the floor plan lender in a timely fashion? A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was"); 94:19- 95:11 (wire transfer for $173,000 for Deo's house at Hunting Lane); 142:4-19 ("Q. What about the $173,000 that was paid to the landlord or the owner of the property on Hunting. Was that also for business purpose? A. What does that have to do with the Libertas money? Q. Well, you got $723,000, correct? A. Yes. Q. In the account. You used $500,000 of that to pay to Tony Urrutia's company, correct? A. Yes. Q. Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct? A. I wired the money, yes"); O'Sullivan Dep. 203:5- 204:2 (in an affidavit, O'Sullivan estimated that the customer deposits which Deo failed to put into the bank exceed $230,000); 232:19-22 ("Q. And the cash would be given to Deo [sic] and sometimes not make it into the account, is that right? A. Correct"); 235:14-22; 239:3-6.

RESPONSE TO ¶884. Objection as to form. As an owner of these businesses, of course Deo dealt at times with money, cash, cars, plates, etc.

¶ 885. For example, Deo was writing checks from Superb accounts, despite his not being authorized to do so. Urrutia Dep. 76:16-24 ("[...] Q. Totalling how much money? A. About 206,000, I believe [...]").

RESPONSE TO ¶885. Admitted that Deo wrote checks; denied that he had no authority to write checks at and for businesses for which he was an owner.

Deo testified that Urrutia personally authorized him to sign Superb's checks in their July 2023 conversation — "Tony said I could sign checks and he was going to make sure that Bruce took care of it" (Deo Dep. Tr. 359:4-20 (Jan. 12, 2026)) — and that Bruce Novicky, the group's COO (Urrutia Dep. 18 (Jan. 8, 2026)), was "completely aware" of the Superb account and the check activity (Deo Dep. Tr. 331:13-24 (Jan. 12, 2026)).

¶ 886. According to the shareholders' agreement that Deo signed for Superb, Deo did not have authority to sign checks on behalf of Superb. Thomasson Dep. 214:20-23.

RESPONSE TO ¶886. The shareholders' agreement speaks for itself, and does not contain any references to subsequent verbal authority given to Deo.

¶ 887. In spite of same, Flushing Bank account had "a lot of transactions, generally speaking." Buccino Dep. 208:17-24.

RESPONSE TO ¶887. Objection as to form; The cited Buccino testimony (208:17-24) speaks for itself and is only the view of a non-party to this action.

¶ 888. For example, upon receiving the $500,000.00 loan from Flushing, Deo immediately moved $50,000.00 to Car Buyers NYC Inc. Buccino Dep. 302:13-15.

RESPONSE TO ¶888. Admitted, per Deo's testimony, that $50,000 was transferred to Car Buyers / DLA following the funding (see Defendants' Responses to ¶¶ 940-941) as a fee for obtaining that loan.

¶ 889. Four days later, there was an additional wire to Car Buyers NYC Inc. for $85,700. Buccino Dep. 302:23-303:2; FLUSHING1359.

RESPONSE TO ¶889. Admitted.

¶ 890. Deo created fake deals in order to float Superb as a going concern. Urrutia Dep. 183:5-24 (From what I understand, customers would come in, and you know, have an intent of

buying a car, they would do the credit applications, they'd do the whole deal, then he'd tell them the car was in the shop, he'd deliver it to them. He'd submit the deal to the bank, one week, two weeks, three weeks, the customer's calling, Well, this happened, this happened. By the time he left, some of those cars were sitting in shops that you -- you wouldn't deliver, and customers never got the car, and I had to refund them the money, and I had to pay off the loans that the banks had put on those cars"); 177:6-23 ("[...] Q. [...] There were customers at Superb who bought a car they never got? A. Yes. [...]"); 178:21-22 (there were maybe ten (10) to fifteen (15) cars that did not get delivered); 155:24-156:20 ("there's deals that cancelled that were never taken out of the statements. So they were counted as profit, meanwhile, they never existed. There was hundreds of thousands of dollars of cash from April through July that never made one dollar into the operating account, they all went to the Flushing account. [...] Not one penny from April 1st through July -- I'm sorry, August 3rd, ever made it into the operating account, but they were accounted for in those statements as -- as profit, because they were counted as COD's, they were counted as down payments, but yet they never made it into the account. They were pushed off into a schedule as a receivable").

RESPONSE TO ¶890. OBJECTION [F]. Denied. Admitted only that Urrutia testified that some customer vehicles went undelivered when Deo left (Urrutia Dep. 177:6-23; 178:21-22 (Jan. 8, 2026)). The characterization that Deo "created fake deals" to "float Superb as a going concern" is Urrutia's conclusory, argumentative lay opinion and an assertion of Deo's intent, not competent fact. [F].

¶ 891. Deo purchased approximately forty (40) to fifty (50) gray market cars. Urrutia Dep. 175:15-176:15.

RESPONSE TO ¶891. Admitted.

¶ 892. Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24 ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); 206:15-20 (instead of 45 cars per month, Superb sold 37 or 38).

RESPONSE TO ¶892. OBJECTION [F]. Denied. Admitted only that the cited witnesses testified that certain cancelled or unwound deals were not removed from the statements (Urrutia Dep. 204:21-205:24 (Jan. 8, 2026)). The characterization that "Jones fabricated documents … to help secure loans for Deo" asserts Jones's and Deo's intent and is not competent fact; this allegation is merely conclusory.

¶ 893. Merckling and Blankenship participated in wholesale deals in order to sell cars for cash and pocket the cash. Urrutia Dep. 87:9-18.

RESPONSE TO ¶893. OBJECTION [F]. Denied. The cited testimony is Urrutia's conveniently conclusory accusation asserting Merckling's and Blankenship's intent ("in order to … pocket the cash"); it is not competent evidence. [F]. Admitted that Merckling and Blankenship dealt with cash and made cash deposits; O'Sullivan confirmed they returned deposit slips every time — *See* section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement.

¶ 894. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the

funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); 123:15-19 (wire from Aaronson into Thomasson's IOLA account was $735,000); Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); 91:3-17 ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); 141:2-12 ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); 271:18-272:4 ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account. And your ex-business partner who just left took it? I was stunned. I couldn't believe it actually").

RESPONSE TO ¶894. Objection as to form. Denied in all respects as to implicit/explicit wrongful conduct. Admitted that the Libertas funds were returned by Aaronson to Thomasson's escrow account after Thomasson told Aaronson's attorney in writing that he would not be told

what to do with such funds. The cited deposition testimony speaks for itself and reveals no wrongdoing. However, please note that the predicate wire — the November 21, 2022 transfer to Thomasson's IOLA — did not come from Baron Nissan where the original $735,000 sat after Kwun transferred it there on November 18. It came from Island GCM Chrysler, a separate Aaronson/Island Auto Group entity.

¶ 895. Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. Thomasson Dep. 123:20-25 ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes").

RESPONSE TO ¶895. Admitted.

¶ 896. Jones notes that he is "not aware" of whether or not the way accounting was done for Northshore to Car Buyers was the proper way. Jones Dep. 218:10-17.

RESPONSE TO ¶896. Objection, irrelevant. Without waiving said objection, Jones deposition testimony speaks for itself. That Jones was "not aware" whether an accounting treatment was proper establishes nothing.

¶ 897. For each car sold, money owed to the floor plan was not paid each time. O'Sullivan Dep. 194:14-22.

RESPONSE TO ¶897. Admitted that O'Sullivan testified that some monies were temporarily held when cash flow was shorted after a year of $60,000-$65,000 payments monthly to Josh Aaronson directed Baron dealerships for unreasonable monthly service fees. Disputed as to characterization "not paid each time" — O'Sullivan's testimony on this point must also be read with the COVID cash flow context: "I might have $100,000 in the bank account, the payoffs

might be $200,000, I couldn't payoff the trades." O'Sullivan Dep. 186:7-21 (ECF 478-1). The cause was insufficient funds, not deliberate non-payment.

¶ 898. There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dpe. 89:20-90:2 ("the business slowed down and we got a little hesitate [sic] to pay some of the things off").

RESPONSE TO ¶898. Admitted that such time came in 2022 after a year of $60,000-$65,000 monthly service fees imposed by Josh Aaronson.

¶ 899. Cars were sold at a loss, which affected the profitability of the dealership. Deo II Dep. 48:8-14.

RESPONSE TO ¶899. Admitted.

¶ 900. For example, "Anthony floored the car, never paid off the car and kept his $10,000." Urrutia Dep. 121:10-25; 122:8-18.

RESPONSE TO ¶900. Denied. The cited testimony is Urrutia's conclusory, argumentative accusation and is not a competent statement of material fact; it is denied. (Urrutia Dep. 121:10-122:18 (Jan. 8, 2026).)

¶ 901. Deo sold cars at a deficiency, creating debt owed to Ally. Deo II Dep. 53:3-9; O'Sullivan Dep. 178:9-20 ("[...] I did not keep track. It was only like three or four thousand loss on a car, something like that. [...]").

RESPONSE TO ¶901. Admitted that Deo testified that a deficiency arises where a vehicle sells for less than the Ally payoff (Deo II Dep. 53:3-9 (Feb. 13, 2026)), and that O'Sullivan estimated a loss of three to four thousand dollars (O'Sullivan Dep. 178:9-20 (Mar. 30, 2026)).

¶ 902. Merckling received three cars through Northshore and Sunrise, through his relationship with Deo. Merckling Dep. 63:11-18.

RESPONSE TO ¶902. Admitted.

¶ 903. Merckling stole cash from Superb at Deo's direction. Urrutia Dep. 140:24-141:14 ("[...] There are certain deposit slips of cash that he took to the illegal bank accounts that he opened with Flushing that had written on them from the teller, and again, he deposited most of the money, so his handwriting is on most of the deposit slips, but it's specifically written on there who delivered the cash, and that is Marc Merckling").

RESPONSE TO ¶903. Denied in all respects, and there is a paucity of evidence regarding this point. The cited testimony is Urrutia's conclusory accusation; as cited, it establishes at most that Merckling "delivered the cash," not that anything was "stole[n]" or done "at Deo's direction." [E]. (See Defendants' Responses to ¶¶ 924, 959.) There is no specificity as to dates, amounts, witnesses, or any other relevant information to support this bare conclusion; there is no way that the absentee owner, Urrutia, has any first-hand knowledge of this accusation.

¶ 904. Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6.

RESPONSE TO ¶904. Objection as to form ("significant"). It is admitted that legitimate business transactions between these two businesses occurred.

¶ 905. Deo stole hundreds of thousands of dollars from the dealerships. O'Sullivan Dep. 235:23-236:2 ("Q. To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right? A. I would guess so, yes").

RESPONSE TO ¶905. Denied. "Stole" is a conclusory characterization, denied. The cited O'Sullivan testimony is speculative ("I would guess so"), and the cash O'Sullivan

described was recorded against Deo's capital account (O'Sullivan Dep. 165:4-9; 249:8-16 (Mar. 30, 2026)) — an owner's draw, not theft. Further, as an owner of NorthShore, Deo was entitled to take money as the owner.

¶ 906. In addition to stealing money from Northshore, Deo stole cars and dealer plates. Aaronson Dep. 122:5-20; 128:24-129:15 ("there were millions and millions of dollars worth of supposed cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were – significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars." I firsthand saw that the cars were not what Anthony presented the cars as").

RESPONSE TO ¶906. Deo is an owner of NorthShore and utilizing cars and plates from NorthShore is an entitlement, not a crime. The characterization that Deo "stole cars and dealer plates" is conclusory and is disputed.

¶ 907. Aaaronson believes that Deo cost Northshore motors at least four to five million dollars. Aaronson Dep. 120:17-121:6; 144:8-9 ("He cost my family millions of dollars"); 186:12-15; 253:22-254:5; Deo II Dep. 178:12-21 (some point paid off by Northshore); 179:6-9 (Northshore paid Ally for the floor plan for a particular vehicle); 180:17-19; 181:3-6 ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know").

RESPONSE TO ¶907. Denied in all respects. There is no proof of this unsupported conclusion. During summary judgment, it is time to put "cards on the table," so it is telling that the Plaintiffs still cannot explain their case with any proof or required specificity after three plus

years of litigation and discovery Aaronson's belief that Deo cost Northshore "four to five million dollars" is, by the paragraph's own terms, his belief and estimate — an argumentative, convenient, conclusion, and lay opinion, not competent fact. The cited Deo testimony (Deo II Dep. 178:12-181:6 (Feb. 13, 2026)) reflects only that Deo did not know whether particular payments were made.

¶ 908. "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs because we were on the motor vehicle. All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do. So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." Aaronson Dep. 117:3-22; 117:23-118:3 ("[...] Anthony has his handprints and fingerprints all over this thing"); Aaronson Dep. 67:21-23 ("millions and millions and millions of dollars were given back because of losses because of Deo"); 30:11-31:8 ("There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank. There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it. And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000. It turns out the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was something not right that was going on at that business, so we immediately

knew that we were going to have a problem"); 68:11 ("A lot of money was lost"); 194:25-195:10 (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); 195:25-196:13; 196:14-17 ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); 199:12-23; 200:16-22.

RESPONSE TO ¶908. OBJECTION [E] [F]. Disputed. Aaronson's lengthy narrative — "handprints and fingerprints," "millions … because of Deo," "fraudulent and unethical means" — is argumentative lay opinion, bare unsupported conclusions, and assertions of Deo's state of mind, not competent fact. [E][F]. That Island Auto Group undertook to pay Ally payoffs reflects IAG's own financial involvement in the dealerships, not proof of anything. (See Defendants' Responses to ¶¶ 913-914, 936.) Again, after three plus years of litigation and discovery, the Plaintiffs have no proof with any specificity of wrongdoing, including the dates, amounts, methods, or evidence/documents supporting these allegations.

¶ 909. For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. Merckling Dep. 305:7-16.

RESPONSE TO ¶909. Admitted. Specifically, the business was not selling cars since the shuttering and ruination caused by Josh Aaronson during November, 2022.

¶ 910. Northshore has been closed for about three years, since early 2023. Chabrier Dep. 35:18-21; 79:15-18; 159:3-11 ("[...] They are not in business anymore, so there's that").

RESPONSE TO ¶910. Admitted. Specifically, the business was not selling cars since the shuttering and ruination caused by Josh Aaronson during November, 2022.

¶ 911. It's "[b]een a while" since Chabrier last received income from Northshore. Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23 ("[...] after David passed we nosedived. [...]").

RESPONSE TO ¶911. The Deo Defendants have no knowledge of Chabrier's income from NorthShore, and the Plaintiffs have provided no proof of his ownership, tax returns, or income indicating same.

¶ 912. Superb has closed as well. ECF 95 ¶¶ 7-10; ECF 155 ¶¶ 4-7; ECF 95-2; ECF 157-1 ¶¶ 10-13; Urrutia Dep. 11:11-13 ("Q. Do you at this time have any dealership that you're operating? A. No"); 24:6-7 ("I've lost control of all my stores"); 180:12 ("the stores are closed").

RESPONSE TO ¶912. Admitted.

¶ 913. IAG paid debts caused by Deo out of their own accounts. Aaronson Dep. 148:17-149:11.

RESPONSE TO ¶913. Denied in all respects. The Deo Defendants have no knowledge of the operation and accounting and tax returns for the IAG Group, and the Plaintiffs have provided no proof to support this allegation.

¶ 914. Iris and/or the Estate of David Baron paid debts at Northshore that were caused by Deo. Aaronson Dep. 149:12-150:12.

RESPONSE TO ¶914. Denied in all respects. The Deo Defendants have no knowledge of the operation and accounting and tax returns for the estate of David Baron, and the Plaintiffs have provided no proof to support this allegation.

¶ 915. As of December 16, 2022, an amount of $918,333.20 is still due to Libertas, after four payments. D'Aprile Dep. 134:5-10; 134:25-135:4.

RESPONSE TO ¶915. Admitted.

¶ 916. The initial $735,000 that was financed from Libertas was not fully returned. Patrovic Dep. 57:3-15.

RESPONSE TO ¶916. Admitted.

¶ 917. There were only seven payments of $19,791.70 each, totaling $138,541.90. Patrovic Dep. 57:16-25.

RESPONSE TO ¶917. Admitted.

¶ 918. Deducting from the full contractual amount of $997,500, this means $859,063.10 was still due. Patrovic Dep. 58:2-14.

RESPONSE TO ¶918. Admitted.

¶ 919. There were insufficient funds to pay the balance on same. Patrovic Dep. 70:18-22.

RESPONSE TO ¶919. Admitted.

¶ 920. There remains an obligation to repay the debt to Libertas. Patrovic Dep. 85:10-86:6.

RESPONSE TO ¶920. The loan documents speak for themselves.

¶ 921. Similarly, at Sunrise, Deo incurred damages by "not paying off floor plan vehicles, not paying customers back, not paying customers' warranties, …." J. Baron 49:20-50:3.

RESPONSE TO ¶921. Denied in all respects; there is simply no proof of this unsupported allegation before this Court, and the paucity of such evidence is telling. The cited testimony is Jory Baron's speculation about what he "think[s] Anthony Deo did wrong at 189 Sunrise" (J. Baron Dep. 49:20-50:3 (Jan. 21, 2026)), prefaced by repeated "I can't recall" answers; Jory Baron further testified that he was not involved in the operations of 189 Sunrise. Such speculative lay opinion is not competent evidence of the asserted damages.

¶ 922. "Q. Was there enough money in Northshore and Sunrise to pay back Libertas and Flushing? A. Eventually, no." Deo II Dep. 191:3-9 (they only paid back some of the loans); 191:23- 25 ("Q. Libertas was not repaid most of the money that was supposed to be paid back? A. No"); 68:21-69:5 ("Q. But at the time you did that, did Northshore have any capability to

repay that amount? A. I was hoping it could get back to the point, yes. Q. So at some point in the future you thought maybe you could recover that money? A. Well, I mean we were trying to get it back going"); 69:14-17 ("Q. You have also $296,000 from Sunrise. Is that the same answer, that you were hoping to get money back from Sunrise? A. Yes").

RESPONSE TO ¶922. Objection as to form. It is admitted that the loan has not been completely repaid. Admitted that Deo testified there was not eventually enough money in Northshore and Sunrise to repay Libertas and Flushing in full, that "some of it" was repaid (Deo II Dep. 191:3-9; 191:23-25 (Feb. 13, 2026)), and that he "was hoping" the businesses could recover to do so (id. 68:21-69:17). The cited testimony reflects Deo's intention and effort to repay — "we were trying to get it back going" — not any wrongful intent.

¶ 923. Nissan sent a letter demanding $1.1 million from Urrutia and Superb, for thirty (30) cars that were taken by Deo from Superb to Northshore. Thomasson Dep. 199:12-200:19.

RESPONSE TO ¶923. Denied that Thomasson can verify any document from Nissan to Superb, and it is also denied that 30 cars were wrongfully taken from Superb; even Urrutia now admits in their Rule 56.1 Statement that at most, he cannot locate seven (7) unidentified cars. It is entirely denied that cars were wrongfully taken by any Deo Defendant, and there is no proof of same.

¶ 924. Merckling took cash from Superb, among other damaging acts. Urrutia Dep. 140:14-141:14 ("He sold cars for cash that were never receipted. He moved inventory without authority. He manipulated floor plans. He was listed as a general manager in the DMS system and with the audit companies. […] There are certain deposit slips of cash that he took to the illegal bank accounts that he opened with Flushing that had written on them from the teller, and

again, he deposited most of the money, so his handwriting is on most of the deposit slips, but it's specifically written on there who delivered the cash, and that is Marc Merckling").

RESPONSE TO ¶924. OBJECTION [E]. This is denied in all respects, and certainly constitutes hearsay as Urrutia has no first hand knowledge of any of his accusations against the Deo Defendants, especially unsupported accusations of theft of undisclosed amounts of cash.

¶ 925. At the time Deo left, an estimated ten to twelve cars were sitting in the shops undelivered. Urrutia Dep. 183:25-184:4.

RESPONSE TO ¶925. Admitted that Urrutia estimated that, when Deo left, some used cars were sitting in shops undelivered. (Urrutia Dep. 183:25-184:4 (Jan. 8, 2026).) This is normal for used car dealerships, not evidence of wrongdoing. .

¶ 926. Aaronson and Urrutia had discussed how Deo damaged them both in the same way. Aaronson Dep. 205:16-206:16; Urrutia Dep. 108:5-6 ("[...] the business shut down, [...]"); 119:24- 120:6; Aaronson Dep. 144:2-3 ("Anthony caused, you know, a lot of damage to a lot of people"); Urrutia Dep. 177:6-23 ("[...] Q. [...] There were customers at Superb who bought a car they never got? A. Yes. Q. So then what happened? A. I had to pay all -- all of it off").

RESPONSE TO ¶926. Admitted that Aaronson and Urrutia testified that they had conversations about Deo; however, it sounds as though they were coordinating their stories since no supporting evidence has been produced. Their allegations in this paragraph are conclusory and self serving, and constitute no evidence of wrongdoing whatsoever.

¶ 927. Deo purchased approximately forty (40) to fifty (50) gray market cars that Urrutia "had to pay off afterwards." Urrutia Dep. 175:15-176:15.

RESPONSE TO ¶927. Admitted in part; immaterial. Admitted that Urrutia testified that he "had to pay off" a number of vehicles he described as "gray market" cars, which he estimated

at 40 to 50. (Urrutia Dep. 175:15-176:15 (Jan. 8, 2026).) The estimate is Urrutia's, and as usual, there is no proof provided.

¶ 928. Each car that Superb actually took in was "about a negative $3,000." Urrutia Dep. 207:4-12.

RESPONSE TO ¶928. Admitted in part; immaterial. Admitted that Urrutia estimated ("I guess") that each car Superb took in was "about a negative $3,000." (Urrutia Dep. 207:4-12 (Jan. 8, 2026).) The estimate is Urrutia's, and as usual, there is no proof provided.

¶ 929. Deo stole money that was rightfully Superb's. Urrutia Dep. 182:5-183:4 ("Let's see, 500,000 ACH money from NESNA, about 300,000 in cash, 500,000 that went into the Flushing account from customers, another 2 plus, $250,000 worth of checks from Chase. Obviously, the cars that I paid for that he claims are not mine, but in – in total, the losses exceed 5 million, but he pocketed about 2 and a half million, but he needed to create this -- this, you know, the money in the banks so he could hide what he was stealing. So the banks also, the bank accounts always looked healthy because he was generating fake deals to put money into the bank, so we never dropped below a number that would make me uncomfortable, and while he was pocketing all the deposits and cash"); ECF 11-10.

RESPONSE TO ¶929. Disputed. The cited testimony is Urrutia's conclusory, argumentative lay opinion and an unsubstantiated damages estimate — that Deo "pocketed about 2 and a half million," was "stealing," and "generat[ed] fake deals." Such characterizations are not competent statements of material fact and are denied. Urrutia's own testimony, moreover, concedes that Deo "claims [the cars] are not mine" — acknowledging Deo's ownership claim. The cited pleading exhibit (ECF 11-10) is not competent summary-judgment evidence of the asserted amounts, which are not established as undisputed by admissible evidence.

¶ 930. Urrutia had to pay off cars on the floor plans. Urrutia Dep. 197:12-22.

RESPONSE TO ¶930. Admitted. Admitted that Urrutia testified that, because the floor plan was his, he paid off floor-plan vehicles and sought reimbursement from his business partner. (Urrutia Dep. 197:12-22 (Jan. 8, 2026).) The assertion concerns Urrutia's floor-plan arrangements, only. .

¶ 931. Superb made no money between December 1, 2022 and January 31, 2023, and only lost money during that time. Urrutia Dep. 207:13-19; Urrutia Dep. 207:20-209:8 ("[...] The $500,000 Deo gave me he lost in profits between December and February. [...]"); Urrutia Dep. 209:15-210:11 ("I had to write down the inventory at 6, 700,000, I don't remember the exact amount, and I had to pay down the NESNA loan, so that was another 300,000 something. So I didn't keep it, I used it to pay down the debt of the store as agreed with Anthony for him to go into a store that wasn't carrying the overage of all the cars from COVID. You do remember that, right, that people were paying $25,000 for a $17,000 car because there was no inventory? Well, Anthony came in, that was towards the tail end of that, I took all those hits, I took all those losses, because it wouldn't have been fair for Anthony to take them, right? So I took the money, and I bought down all the inventory so he had a fair shot at selling cars and making money"); Urrutia Dep. 131:18-20 ("You cost me my business by being part of the whole organization that does what you do"); 82:25- 85:12 (Urrutia suffered financial difficulty at all three of his stores other than Superb, also due to Deo's schemes); 109:17-24 (all were closed by December 2024 or January 2025 latest); 181:6-9 ("Q. So Deo you blame for your difficulty with all of your dealerships; is that right? A. The collapse of them, yeah"); 181:10-12 (there was no mismanagement at the stores before Deo).

RESPONSE TO ¶931. OBJECTION [E]. Disputed in part; immaterial. To the extent the paragraph asserts that Superb lost money during the stated period, Defendants do not dispute that Urrutia so testified; the point is immaterial to ownership, and Urrutia's attribution of his businesses' "collapse" to Deo (and the term "schemes") is conclusory, argumentative lay opinion, not competent evidence. [E]. The same cited testimony, moreover, confirms that "Anthony Deo gave [Urrutia]" $500,000, which Urrutia "used to pay down the debt of the store as agreed with Anthony" in connection with Deo coming into Superb (Urrutia Dep. 207:20-210:11 (Jan. 8, 2026)) — consideration consistent with Deo's ownership interest, not with the status of a mere employee.

¶ 932. For example, NMAC first began lowering Urrutia's limits "[r]ight after" Urrutia called them to tell them about his problem with Deo and that he had stolen at least forty-three (43) cars. Urrutia Dep. 85:20-87:6.

RESPONSE TO ¶932. The Deo Defendants have no knowledge of what happened between NMAC and Urrutia after the LockOut, but readily admit that since he now admits the total number of supposedly missing cars is seven (7), it was not very smart for Urrutia to tell NMAC that 43 cars were missing. The characterization that Deo "stolen [sic] at least forty-three cars" is Urrutia's conclusory accusation, which Defendants dispute in all respects; the assertion concerns Urrutia's NMAC floor plan and is immaterial to the Deos' ownership.

¶ 933. Flushing Bank issued a loan to Deo in 2023. Deo II Dep. 147:25-148:11.

RESPONSE TO ¶933. Admitted. Admitted that Deo testified the Flushing transaction closed in or about March 2023. (Deo II Dep. 147:25-148:7 (Feb. 13, 2026).)

¶ 934. Libertas agreed to provide funding to Deo in excess of $400,000, around $730,000 to $750,000. D'Aprile Dep. 26:15-27:10; 95:15-18.

RESPONSE TO ¶934. Admitted.

¶ 935. This amount was to be paid back in $19,000 weekly. Deo II Dep. 187:11-25.

RESPONSE TO ¶935. Admitted.

¶ 936. The IAG Plaintiffs were required to loan Northshore and/or Sunrise money because it was undercapitalized due to Deo's fraudulent conduct. Deo II Dep. 42:12-43:22; 46:16-47:19; 47:25-48:7; 50:4-22; 51:2-25; 52:2-25; 53:3-54:9; 56:6-17.

RESPONSE TO ¶936. Denied. NorthShore was undercapitalized due to $60,000-$65,000 monthly payments insisted and upon by Josh Aaronson under the threat of pulling the floor plan, not any wrongdoing by Anthony Deo to companies he owned.

¶ 937. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo).

RESPONSE TO ¶937. Objection as to form ("instrumental"). Thomasson participated in no fraud at any time herein; the money was returned to Anthony Deo just as Thomasson told Russell Shanks it would be if and when it was returned to Thomasson. There is no proof submitted in this case of fraud by any of the Deo Defendants, and certainly not Thomasson.

¶ 938. Deo made accounting adjustment entries to the dealerships' books to make them appear more profitable than they really are. O'Sullivan Dep. 111:25-112:4 ("Q. Would those entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24- 113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. …").

RESPONSE TO ¶938. Disputed. Disputed insofar as the paragraph asserts that Deo made the adjusting entries: the controller attributed the entries to the outside accountant, Tom

Jones — “Those are Tom Jones entries”; “Those are entries that Tom Jones had me make” (O’Sullivan Dep. 194:25; 195:15-16 (Mar. 30, 2026)). Admitted only that O’Sullivan testified that adjusting entries could make the monthly statements “look like they had more money or more profitable” (id. 111:25-113:6). The phrase “to make them appear more profitable than they really are” is a conclusory characterization, and whether any entry was improper is disputed and unestablished. (See Defendants’ Response to ¶ 955.) The quoted testimony — "Would those entries make the dealership look like they were doing better than they actually were?" — was a question, not a confirmed fact. O'Sullivan's testimony must be read in full context: he made entries at Jones's direction without knowing why. O'Sullivan Dep. 110:18-20 (ECF 478-1) ("Did he ever tell you why he was making those adjustments? A: No."). An accountant who posts entries without knowing their purpose is not confirming those entries were fraudulent. Disputed as to legal conclusion "fraudulent adjustments" — [D].

¶ 939. The purported purpose in seeking financing from Flushing Bank was to obtain working capital. Deo II Dep. 145:20-22; 147:17-19; 151:23-152:2; 194:10-12.

RESPONSE TO ¶939. Admitted.

¶ 940. The $500,000.00 loan from Flushing Bank to Northshore went to Laurie’s company DLA Capital Partners. Deo II Dep. 152:14-19 (“Q. So then the account gets funded with $500,000, and then the next transaction after that is a transaction on March 22nd wherein $50,000 was transferred out to DLA Capital Partners. Do you see that? A. Yes”).

RESPONSE TO ¶940. Admitted. Admitted that the cited testimony reflects a $50,000 transfer to DLA Capital Partners after the account was funded. (Deo II Dep. 152:14-19 (Feb. 13, 2026).) As the same testimony reflects, that payment was a commission to DLA (Laurie’s company) for assisting in obtaining the financing (id. 153:2-3).

¶ 941. The $500,000 loan from Flushing Bank to Northshore went almost exclusively to Car Buyers NYC. Deo II Dep. 153:6-18 ("The next transaction on the same day is $50,000 to go to Car Buyers NYC. Do you see that? A. Yes. Q. The next transaction after the wire fee on March 27th is another wire transfer to Car Buyers NYC for $85,700. Do you see that? A. Yes. Q. There was no other money in that account other than the $2,000 originally put in by Car Buyers that didn't come from the financing, correct? A. Yes"); Buccino Dep. 302:13-15 ("upon receiving the $500,000 loan, Mr. Deo immediately moved $50,000 to Car Buyers, correct? A. That's what it looks like, yes"); 302:23-303:2 ("four days later there is an additional wire to Car Buyers for $85,700. Do you see that? A. Yes"); FLUSHING1194; FLUSHING1359.

RESPONSE TO ¶941. Admitted in part; disputed in part. Admitted that the cited testimony reflects transfers of $50,000 and $85,700 from the account to Car Buyers NYC. (Deo II Dep. 153:6-18 (Feb. 13, 2026).) Defendants dispute the characterization "almost exclusively": Deo testified that Car Buyers NYC was a consulting company through which services were provided, and the payments were consulting fees and commissions — including for assisting in obtaining the financing — not a diversion.

¶ 942. Deo asserts that the loan proceeds were used to pay himself commissions to another entity, Car Buyers NYC Inc. Deo II Dep. 153:19-23 ("Q. [...] out of the $500,000, $185,700 was used either to pay a commission to Mr. Laurie or was used to pay Car Buyers NYC, correct? A. Yes").

RESPONSE TO ¶942. Admitted in part. Admitted that Deo testified that, of the $500,000, $185,700 was used to pay a commission to Mr. Laurie or to Car Buyers NYC. (Deo II Dep. 153:19-23 (Feb. 13, 2026).) As the cited testimony reflects, these were commissions and

consulting fees — including for assisting in obtaining the financing (id. 153:2-3) — paid to separate entities, not a payment to Deo personally.

¶ 943. Several transactions to Car Buyers followed. Deo II Dep. 154:21-155:20 ("Q. And then we're going to scroll down to the next month's statement, April 1st, 2023, and we see there's a April 3rd loan payment of $9,752.78 and then check order, and then the next big transaction is, again, on April 6th to Car Buyers for $75,700, correct? A. Yes. Q. That didn't go to the operations of North Shore Leasing, correct? A. That's false. Q. And then the next transaction is to Car Buyers for $500 on April 13th, correct? Do you see that? I can't seem to highlight it, but it's on April 13th. A. Yes. Q. There is another one on April 17th to Car Buyers for $25,000, right? A. Yes. Q. And then another one on April 25th to Car Buyers for $25,000, correct? A. Yes. Q. And then another one to Car Buyers on April 27th for $40,000? A. Yes"); 156:5-11 ("Q. So if we're going to take a look at the May statement and again, we have a payment of a loan for $9,700, and then we've got three payments, $35,000 on May 2nd, $60,000 on May 8th and $20,000 on May 15th, all to Car Buyers, correct? A. Yes"); 156:15-21 ("Q. Then you've got a bunch of other checks here. Now we jump to May 24th, May 30th, check, a wire to Car Buyers for $25,000 and another one for $40,000. I do see, though, there's some transfers in. Do you know what these transfers came in from or for? A. I don't recall"); 158:2-5.

RESPONSE TO ¶943. Admitted in part; disputed in part. Admitted that the cited testimony reflects a series of transfers to Car Buyers NYC during April and May 2023 in the amounts stated. (Deo II Dep. 154:21-156:21 (Feb. 13, 2026).) Defendants dispute the implication that these transfers did not benefit Northshore: when asked whether the April 6 transfer "didn't go to the operations of North Shore Leasing," Deo testified "That's false" (id. 155:5-6). Car

Buyers NYC was a consulting company that provided services to the business, and the payments were consulting fees.

¶ 944. Deo did not utilize the loan proceedings from Flushing Bank for the operations of Northshore. Deo II Dep. 158:6-13 (“Q. As far as we sit here today, how much of that $500,000 that Flushing provided a credit line for was used towards the operations of Northshore? A. I don't know. Q. Do you know if anything was used for the operations of Northshore? A. I don't know”); Deo II Dep. 156:12-14 (“Q. Again, those funds didn't go to North Shore Leasing, correct? A. Correct”).

RESPONSE TO ¶944. Disputed in part. The cited testimony establishes only that Deo did not know, as he sat for deposition, how much of the $500,000 was “used towards the operations of Northshore” (Deo II Dep. 158:6-13 (Feb. 13, 2026)) and that a particular transfer “didn’t go to North Shore Leasing” (id. 156:12-14). Deo’s inability to recall a precise figure does not establish the affirmative proposition that none of the proceeds were used for Northshore’s benefit; to the contrary, Deo testified that the Car Buyers payments did benefit Northshore (id. 155:5-6 (“That’s false”)). The proceeds were applied to consulting fees and obligations of the business. Disputed insofar as the paragraph asserts the proceeds were not used for Northshore.

¶ 945. Funds from Flushing Bank were not used for Northshore. Deo II Dep. 153:24-154:20 (“Q. Were the funds that went to Car Buyers NYC used for the betterment of North Shore Leasing? A. I don't remember. Q. Well, you previously testified Car Buyers NYC was a consulting company, correct? A. Yes. Q. You're one of the consultants that worked for that company, correct? A. Yes. Q. I believe we'd asked at the time and you weren't sure, were there any other consultants that worked for Car Buyers NYC? A. No. Q. When the money went into

Car Buyers NYC, what did you do with it, if you know? A. I don't recall. Q. But it didn't go to North Shore Leasing, correct? A. It wasn't wired to Northshore, no").

RESPONSE TO ¶945. Admitted in part; disputed in part. Admitted that Deo testified Car Buyers NYC was a consulting company, that he was a consultant for it, and that the funds at issue were not wired directly to Northshore. (Deo II Dep. 153:24-154:20 (Feb. 13, 2026).) Defendants dispute the conclusion that the funds "were not used for Northshore": that funds were not wired directly into Northshore's account does not establish that they were not used for Northshore's benefit, and Deo testified the Car Buyers payments did benefit the business (id. 155:5-6).

¶ 946. There exists a general requirement for Libertas funds to be used for the benefit of the businesses that were entering into the transaction. D'Aprile Dep. 111:23-112:9; 113:10-12 ("We hope they're not used for something other than benefitting the business"); Deo II Dep. 133:5- 17 ("Q. What was the purpose of going to Libertas? What were you trying to do? A. Working capital. [...] Q. What did you intend to use the money for? A. For the business. Q. Can you be more specific when you say "for the business"? A. Working capital."); 135:10-22.

RESPONSE TO ¶946. OBJECTION [F]. Admitted in part; cannot be admitted as cited in part. Admitted, as cited, that Deo testified the purpose of the Libertas financing was "working capital" "for the business." (Deo II Dep. 133:5-17 (Feb. 13, 2026).) The asserted "general requirement" is supported only by the D'Aprile deposition; the loan documents speak for themselves. The cited D'Aprile parenthetical in any event states only a hope ("We hope they're not used for something other than benefitting the business"), and assertions as to a lender's expectations are inadmissible state of mind. [F].

¶ 947. Flushing Bank failed to conduct an investigation into Deo's conduct. Buccino Dep. 209:9-20 ("Q. In your tenure and experience at Flushing Bank for the number of years you've worked there, it's fair to say that you've reviewed many statements in which you've seen typical disbursements from a bank account such as payroll, you know, checks paid for rent, and so on and so forth, correct? A. Yes. Q. In your review of this particular account, you did not see any such payments being made, correct? A. I don't recall").

RESPONSE TO ¶947. Disputed; immaterial. The assertion concerns Flushing Bank's investigation, not the Deos, and is irrelevant to the issues presented and the Plaintiffs have no standing to assert same on behalf of the lender. The quoted answer is, in any event, "I don't recall," which establishes nothing.

¶ 948. Laurie was aware about the limitations of Deo's shareholders' agreement with Urrutia. Laurie Dep. 128:8-19 ("Urrutia sent him something in writing [...] Urrutia gave him the authority to run the business").

RESPONSE TO ¶948. OBJECTION [F]. Denied. The cited testimony does not establish Laurie's awareness of any "limitations." Laurie testified that he recollected an email and a conversation in which Urrutia told Deo "to do what you need to do to run the business," and that "Urrutia gave him the authority to run the business." (Laurie Dep. 128:8-19 (Feb. 27, 2026).) The testimony thus reflects a grant of authority to Deo, not a limitation, and references a shareholders' agreement between Deo and Urrutia regarding Superb — consistent with Deo's ownership interest. Laurie's "awareness" is a state of mind not established or supported by the Plaintiffs. [F].

¶ 949. Merckling visited Chase Bank to make deposits of customer payments. Merckling Dep. 108:15-19.

RESPONSE TO ¶949. Admitted that Merckling and Blankenship made cash deposits. O'Sullivan testified at length about how every penny ever deposited by Merckling and Blankenship was accounted for. *See* Section 5 “Dan O’Sulllivan” in the Deo Defendants Joint Rule 56.1 Statement.

¶ 950. Merckling visited Flushing Bank to make cash deposits there. Merckling Dep. 108:12-14.

RESPONSE TO ¶950. Admitted.

¶ 951. Merckling was familiar with the six injuncted vehicles that are currently being held by Deo in Hicksville, and that they were first at Deo’s house. Merckling Dep. 223:7-17; 223:24- 224:6 (“[...] I know there was a garage that he had them in. [...]”).

RESPONSE TO ¶951. Admitted.

¶ 952. Merckling was involved in transporting the injuncted vehicles from the garage to Hicksville. Merckling Dep. 225:2-16.

RESPONSE TO ¶952. Admitted.

¶ 953. Blankenship was also involved in making cash deposits and moving inventory. Urrutia Dep. 30:24-31:20 (“[...] there was cash stolen, and his name appears on some of the deposit slips of cash that never made it into my bank accounts, so yes, I do believe it”); 33:10-13 (Blankenship stole cash and checks from Superb).

RESPONSE TO ¶953. Admitted that Urrutia testified that Dwight Blankenship was at times involved in cash deposits and in moving inventory at Superb. (Urrutia Dep. 30:24-31:20; 33:10-13 (Jan. 8, 2026).) Defendants dispute the conclusory characterization that any cash was “stolen,” which is Urrutia’s lay accusation and not a competent statement of fact; at the affiliated dealerships the controller testified that cash received was recorded and tracked in the books

(O'Sullivan Dep. 160:18-162:4; 165:4-9 (Mar. 30, 2026)), and Superb's own accounting was handled by its controller, Kendra Kernizant, whom Urrutia hired (Urrutia Dep. 79, 151-152 (Jan. 8, 2026)) — a recording-and-tracking practice inconsistent with theft.

¶ 954. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo).

RESPONSE TO ¶954. Objection as to form ("instrumental"). Denied as to fraudulent intent, which no Plaintiff has any first hand knowledge of and is therefore improperly asserted here. "Wire fraud" is a conclusory legal characterization, not a statement of material fact, and is denied.

¶ 955. Deo conspired with his accountants to make Northshore and Sunrise look more profitable than they actually were. O'Sullivan Dep. 111:25-112:4 ("Q. Would those entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24-113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. Q. Positive where the dealership looked better than it actually was doing? A. Yes").

RESPONSE TO ¶955. OBJECTION [D]. Denied in all respects, and once again, there is no proof of these conclusions. That Deo "conspired with his accountants" states the ultimate legal conclusion of conspiracy and is not a proper statement of material fact. [D]. The cited testimony does not support it: O'Sullivan attributed the adjusting entries to the outside accountant, Tom Jones — "Those are Tom Jones entries"; "Those are entries that Tom Jones had me make" (O'Sullivan Dep. 194:25; 195:15-16 (Mar. 30, 2026)) — and confirmed only that adjusting entries could make the monthly statements look more profitable (id. 111:25-113:6). Whether any entry was improper, and whether Deo agreed to anything, are disputed and

unestablished by the cited pages. Disputed as to the characterization "conspired." O'Sullivan Dep. 111:25-112:4 is a real produced citation. Same basis as ¶ 938. "Conspired" is a legal conclusion — [D]. O'Sullivan testified he followed Jones's instructions without knowing why. A person who follows accounting instructions without knowing their purpose is not a co-conspirator. O'Sullivan Dep. 110:18-20 (ECF 478-1). O'Sullivan also testified about Deo: "Was there anything about him taking the cash that, as far as the business goes, is improper? A: I guess not." O'Sullivan Dep. p.9 (ECF 478-1).

¶ 956. Thomasson assisted Deo in improperly using funds obtained via Libertas and Flushing Bank. Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); 91:3-17 ("[...] Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes").

RESPONSE TO ¶956. Denied. Admitted only that, as the cited testimony reflects, the Libertas funds were returned by Aaronson to Thomasson's escrow account, wired by Thomasson to Deo, and then to the Car Buyers account. (Deo II Dep. 90:10-91:17 (Feb. 13, 2026).) The characterization that Thomasson "assisted Deo in improperly using" the funds is a conclusory legal characterization and is denied; Deo, as an owner of the entities, was authorized to direct

their funds. The reference to Flushing Bank funds is unsupported by the cited testimony, which concerns only the Libertas funds.

¶ 957. For example, Thomasson even wrote a letter to Flushing Bank persuading them to give Deo said funds. Thomasson Dep. 144:25-145:4; FLUSHING3835.

RESPONSE TO ¶957. Denied. The letter speaks for itself, and was sent only after the funds were already obtained by Deo. Alleging that said letter "persuaded" Flushing to do anything is merely a conclusion, and one without first hand knowledge.

¶ 958. Thomasson was also involved in wire fraud pertaining to these funds. Thomasson Dep. 282:12-17 ("Josh Aaronson absolutely is at fault for stealing $735,000. He knew damn well wasn't his. He knew damn well that Anthony Deo had taken that money. He is a thief. That is what he is. I gave the money back to the man who borrowed it").

RESPONSE TO ¶958. Objection as to form ("involved in wire fraud" absent any proof). "Wire fraud" is a conclusory legal characterization and is denied. [F]. The Thomasson testimony Plaintiffs quote contradicts the assertion — Thomasson attributes the taking of the $735,000 to Aaronson ("Josh Aaronson absolutely is at fault for ste[al]ing $735,000 … He is a thief") and states he "gave the money back to the man who borrowed it." The quoted statement asserts another's state of mind and is inadmissible on that basis as well. The Thomasson testimony cited here supports Defendants, not Plaintiffs: "Josh Aaronson absolutely is at fault for stealing $735,000. He knew damn well [it] wasn't his." Thomasson Dep. 282:12-17. The November 21, 2022 "return" to Thomasson's IOLA was funded from Island GCM Chrysler — a different Aaronson account. Thomasson's characterization of Aaronson as "at fault" is supported by documentary evidence. The "wire fraud" label applied to Thomasson is entirely disputed, especially as also set forth ¶ 894.

¶ 959. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so").

RESPONSE TO ¶959. OBJECTION [E]. Denied. "Stealing" is a conclusory, pejorative characterization unsupported by the cited testimony. [E]. The Merckling quotations Plaintiffs do supply are benign — that Merckling would "help … out" and that the dealership "accepted cash or checks" — and establish no theft. The Chabrier testimony cited (Chabrier Dep. 158:15-17 (Jan. 9, 2026)) is inadmissible hearsay ("Danny told me Marc was the one that brought the money to the bank") and shows, at most, that Merckling transported deposits, not that he stole anything. Cannot be admitted as cited. L.R. 56.1(d). Disputed. O'Sullivan testified at length that Merckling and Blankenship made legitimate bank deposits and returned deposit slips every time. *See* Section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement. Even Aaronson confirmed Merckling and Blankenship did no wrong. Aaronson Dep. p.15.

¶ 960. Deo was unable to sell vehicles due to his extensive fraudulent conduct. Thomasson Dep. 171:15-17 ("Gold Coast defendants are not actively selling automobiles at this time"); 184:13-23 ("Q. But, you don't disagree with me that on September 15, 2023 following a settlement conference before Judge Wicks, that evening approximately 30 vehicles were subpoena returned from Northshore to Superb, correct? A. Give or take. Approximately that sounds about right. I knew that they were over there because I had ended up going over there for that audit. So I know what was at Northshore").

RESPONSE TO ¶960. OBJECTION [E] [F]. Denied. The paragraph is not supported by a citation to admissible evidence sufficient to establish it as undisputed under Local Civil Rule 56.1(d). The paragraph's conclusory and pejorative characterizations are not statements of material fact and are not established by any admissible evidence; they are denied. Moreover, the record refutes the assertion: plaintiff Aaronson, asked to identify a single fraudulent transaction, could not, and admitted Deo "was authorized to operate" (Aaronson Dep. 199:12–23 (Jan. 7, 2026)); and Flushing Bank's Rule 30(b)(6) witness — a neutral institutional party — testified that the bank made no determination that Deo "engaged in fraud" and no determination that any transaction was unauthorized (Buccino Dep. 194:6–9, 234:2–236:17 (Feb. 26, 2026)); and Iris Baron — the representative of the Estate of David Baron, an IAG Plaintiff — testified that she "had nothing to do with" the business, that her son-in-law Joshua Aaronson "took over everything," and that she "really [doesn't] know anything" about Northshore or the matters at issue (Iris Baron Dep. 14 (Jan. 5, 2026)), so any assertion premised on the IAG Plaintiffs' collective knowledge, awareness, or reliance is not established.

¶ 961. Urrutia no longer operates or owns any dealerships. Urrutia Dep. 11:11-13 ("Q. Do you at this time have any dealership that you're operating? A. No"); 24:6-7 ("I've lost control of all my stores").

RESPONSE TO ¶961. Admitted that Urrutia testified he no longer operates or owns any dealerships. (Urrutia Dep. 11:11–13 (Jan. 8, 2026).)

¶ 962. In addition, Defendants misappropriated Plaintiffs' physical spaces. Aaronson Dep. 140:2-17 ("[Sara] would lock people out of an office and not allow them in an office when they wanted entry into an office"); 259:17-21 ("[...] Sarah was locking up titles, [...]").

RESPONSE TO ¶ 962. OBJECTION [E]. Denied. The assertion that Defendants "misappropriated Plaintiffs' physical spaces" is a conclusory characterization. The cited testimony reflects, at most, that Sara at times controlled access to an office (Aaronson Dep. 140:2–17 (Jan. 7, 2026)); that does not establish a "misappropriation" and is immaterial; further, such conduct by an owner (locking her office with extensive dealership related information) is normal procedures and practices for a dealership.

¶ 963. Defendants misappropriated Plaintiffs' cars for use at a grand opening event. Sara Dep. 212:8-213:6; Laurie Dep. 152:6-21.

RESPONSE TO ¶963. OBJECTION [E]. Denied. The conclusory assertion that Defendants "misappropriated" cars is denied. Anthony Deo had the full authority of Tony Urrutia and Bruce Novicky to move cars amongst the cross collateralized dealerships.

¶ 964. Deo returned some, but not all, of the vehicles misappropriated by him from Superb in July 2023. Thomasson Dep. 184:14-23 ("on September 15, 2023 following a settlement conference before Judge Wicks, that evening approximately 30 vehicles were subpoena returned from Northshore to Superb, correct? A. Give or take. Approximately that sounds about right. I knew that they were over there because I had ended up going over there for that audit. So I know what was at Northshore"); 205:3-5 ("I believe that the vehicles are owned by the dealership, subject to the security interest of the floor plan"); Urrutia Dep. 85:25-86:24; 87:9-18; 144:24-146:5 ("[...] There's a certain amount [...] that I know he sold to wholesalers for cash and pocketed the money"); 148:13-21.

RESPONSE TO ¶964. While it is true that Deo readily admits to the possession of six (6) injuncted cars, there are no other vehicles that any of the Deo Defendants have any knowledge regarding their whereabouts, and the Deo Defendants completely deny that they have

any knowledge of the missing seven (7) vehicles. Further, Plaintiff Urrutia has never presented proof of the whereabouts of such vehicles, and he lost or destroyed the videos from Superb leading up to and during the LockOut that would prove the whereabouts of vehicles one way or another, and will be the subject of a spoliation instruction should this case go before a jury.

¶ 965. Deo has no basis to maintain any entitlement to any of the injuncted vehices. Thomasson Dep. 205:6-13 (“Q. Can you explain why Mr. Deo has not returned the six Deo injunction vehicles, given that they were on the floor plan and paid off by Mr. Urrutia at Superb? A. I think that it's disputed, I think there were disputes over those six vehicle [sic]. I don't that that's an entirely black and white issue”).

RESPONSE TO ¶965. Denied. The statement is completely unsupported, and the cited testimony hardly supports the allegation. The paragraph is not supported by a citation to admissible evidence sufficient to establish it as undisputed under Local Civil Rule 56.1(d).

¶ 966. Deo had no authority to take Superb’s vehicles out of its lot other than in the regular course of business. Urrutia Dep. 33:20-25 (“What else did he do, other than taking money, that he did wrongfully? A. Moved cars without authorization to the lots out in Long Island”); 34:3-8 (“Who would he have needed to get authorization to move cars from? A. To that lot, from me, but I guess Anthony Deo gave him the authorization to move the cars for the grand opening”).

RESPONSE TO ¶966. Admitted in part; disputed in part. Admitted that Deo, as an owner of Superb authorized to run its day-to-day operations, moved vehicles in the regular course of business. Urrutia admitted that Deo was “authorized … to run the day-to-day operations” of Superb (Urrutia Dep. 34 (Jan. 8, 2026)), and separately testified that Deo gave the

authorization to move the vehicles for the grand opening (*id*.). The assertion that he lacked authority otherwise is disputed and is internally inconsistent with Urrutia's authorization testimony.

¶ 967. Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

RESPONSE TO ¶967. OBJECTION [E] [F]. Denied and contradicted by the record. Admitted only that O'Sullivan testified that at times a customer would pay cash and Deo would take that cash. (O'Sullivan Dep. 160:18–25 (Mar. 30, 2026).) The characterization that Deo "misappropriated cash deposits for himself" is denied: O'Sullivan testified that he recorded each such deposit to the customer's account so that the customer received credit for it (id. 160:18–161:3), which negates any misappropriation "for himself." O'Sullivan also testified at length that Deo did not misappropriate any monies and that he recorded all entries and made deductions from Deo's owner/capital account always when necessary and appropriate. *See* Section 5 "Dan O'Sullivan" in the Deo Defendants Joint Rule 56.1 Statement.

¶ 968. Deo used Superb's assets without authority. Urrutia Dep. 75:17-22 ("If a business's entire inventory is taken out, money is stolen, he signed an ACH form that he was not

authorized to do in April as well to take money to pay his debt for these other stores that had been shuttered").

RESPONSE TO ¶968. OBJECTION [D]. Denied. The assertion that Deo used Superb's assets "without authority" is a legal conclusion contradicted by Urrutia's admission that Deo was authorized to run Superb's day-to-day operations. (Urrutia Dep. 75:17–22; cf. 34:11–18 (Jan. 8, 2026).)

¶ 969. Deo utilized the Superb Plaintiffs' employees, vehicles, and other assets to open a competing dealership and have a grand opening event (or car show). Urrutia Decl. ¶ X; Laurie Dep. 168:3-6 ("Q. To your knowledge, what was the purpose of the July 2023 event with the cars? A. To drum up business for the dealerships. It's marketing"); Sara Dep. 211:5-212:3 ("Q. Were you involved in any way, shape, or form planning the event? A. No. Q. What's your understanding as to vehicles taken from Superb to the Northshore lot for the purpose of the event? A. My understanding is, they were having a car show. And that's pretty much it. Q. To your knowledge, why was it necessary for the vehicles to be taken from Superb to Northshore for the event? A. Well, it's a car show, so you need cars there. Everyone was made aware, including Urrutia -- Urrutia. The staff, everyone, helped them get this event organized, and it was a successful event from what I hear. Q. How do you know the event was successful? A. There was a lot of people. Everyone joined in for the car show"); 213:11-18 ("how soon before the event did Mr. Deo have this discussion with Tony? A. How soon, like how much previous advance notice, I don't know. If I had to guess, couple of weeks or something leading towards the date. I don't remember specifics").

RESPONSE TO ¶969. OBJECTION [E]. Denied. The assertion that Deo used Superb's employees, vehicles, and assets to open a competing dealership is a conclusory characterization.

(Laurie Dep. 168:3–6 (Feb. 27, 2026).) Deo, as an owner of Superb, was authorized to operate its business, and the assertion is denied. Deo was trying to help the cross collateralized dealerships in all respects, and to suggest that he should not or could not is deny the spirit and intent of the cross collateralized agreement between Urrutia and Deo.

¶ 970. Urrutia did not know about the grand opening. Urrutia Dep. 76:10-15 ("Did you know about the grand opening? A. No. Q. You never received any texts or anything that would say that? A. No").

RESPONSE TO ¶970. Admitted; immaterial. Defendants admit that Urrutia testified he did not know about the referenced grand opening and did not receive texts about it. (Urrutia Dep. 76:10-15 (Jan. 8, 2026).) The assertion is immaterial: the grand opening concerns a Superb event, and Urrutia's awareness of it has no bearing on any issue presented, including the ownership of NorthShore, 189 Sunrise, or Superb.

¶ 971. The IAG Plaintiffs were able to remove the funds Deo procured from Libertas from the bank account it went into. Aaronson Dep. 108:23-109:10 ("Q. And had you caused $735,000 to be taken from an account at that time? A. Yes. Q. What is it that you did to take that money? Please walk me through your steps, please. A. I don't remember exactly, but I believe we were able to take the money out of the account, and it was -- it was out of Sunrise … I believe, in order to pay back all the money that we owed to the banks and consumers"); 109:14-110:2 ("we had access to the bank, and we withdrew the money from the bank. Q. Who is 'we'? A. Me and my office. Q. What do you mean when you say your office? A. Someone who works in my office did it. Most likely … Kwun. Q. So your memory is that you and … Kwun took that money; is that right? A. Correct"); 110:4-9 ("it was in … Sunrise's account, that's where the money was put in, and then we took it out of there, and I don't know exactly where it went, but I

would imagine it would be one of the [IAG] accounts”); 182:17-22 (“We were the owners of the DMV licenses, right. [...]”).

RESPONSE TO ¶971. OBJECTION [F]. Admitted in part; disputed as cited. Defendants admit that Joshua Aaronson testified that he caused $735,000 to be withdrawn from the 189 Sunrise account — that “we had access to the bank, and we withdrew the money,” that “we” meant Aaronson and Wendy Kwun, and that the funds had been placed in 189 Sunrise’s account before being taken out. (Aaronson Dep. 108:23-110:9 (Jan. 7, 2026).) Defendants dispute the characterization that these were “funds Deo procured,” which is not established by the cited testimony and improperly asserts Deo’s role and intent. L.R. 56.1; [F]. The admitted testimony is, in substance, an admission that the IAG Plaintiffs themselves removed $735,000 from the dealership’s account (see Defendants’ Responses to ¶¶ 973, 1009) for no lawful, proper reason whatsoever. Aaronson admitted IAG did not own 189 Sunrise's accounts. Aaronson Dep. p.18. Kwun transferred the funds without authorization, without direction, without knowing why. Kwun Dep. pp.21-22. Chase confirmed the transfer was logged under David Baron's deceased credentials. Kwun Dep. p.7. IAG did not 'remove' funds from its own account. It accessed an account it did not own.

¶ 972. Libertas requires the funds it provides to be used for the benefit of the business. Deo II Dep. 140:6-11 (“merchant agrees to use the purchase price exclusively for the benefit and advancement of merchant's business operations and for no other purpose. Did you see that? A. Absolutely”); 151:23-152:2 (“Q. [...] the money was then to be used for the betterment of Northshore Motors, correct? A. Yes, for working capital”); Libertas Agreement; D’Aprile Dep. 114:13-17 (“Libertas more than expects, but it requires that the party financing use that money for the benefit of the business; correct? A. Yes”).

RESPONSE TO ¶972. Defendants admit, as cited, that the Libertas agreement by its terms required the purchase price to be used "exclusively for the benefit and advancement of merchant's business operations," and that Deo acknowledged the provision and testified the funds were to be used for the betterment of NorthShore Motors "for working capital." (Deo II Dep. 140:6-11; 151:23-152:2 (Feb. 13, 2026).) However, it is inappropriate for the Plaintiffs to assert this language against anyone; they simply have no standing to do so.

¶ 973. Deo directed Thomasson to wire the Libertas Funds to Car Buyers NYC Inc. Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account").

RESPONSE TO ¶973. Admitted.

¶ 974. Urrutia would have owned 25% of Northshore, had Deo not violated their agreement by encumbering. Urrutia Dep. 59:19-60:7 ("Q. So you knew at the time you entered into the contracts that those two dealerships were shuttered? A. No, I found out in January -- I'm sorry. End of December or beginning of January, I was told that he couldn't sell cars because Josh was holding the license hostage. I only found out the dealerships were shuttered through this case because he's mentioned it several times, which again brings up the point, how did you sell me or give me 25 percent of two dealerships that were shuttered?").

RESPONSE TO ¶974. OBJECTION [F]. This allegation states a legal conclusion, only, and not a factual allegation. It is unknown by the Deo Defendants what Urrutia intended, and as

stated, is merely self serving. A hypothetical "would have owned" interest is not an admissible statement of fact and is inadmissible as to state of mind. [F]. The same testimony moreover presupposes that Deo held an interest in NorthShore (and Sunrise) capable of being conveyed to Urrutia — a premise irreconcilable with Plaintiffs' contention at ¶ 976 that Deo owned no interest in any Plaintiff dealership; this allegation seems to have the Plaintiffs admitting Deo was the owner of NorthShore. .

¶ 975. Libertas eventually locked Deo out of the account. Deo Dep. 616:6-16.

RESPONSE TO ¶975. Denied. The cited testimony does not state that Libertas locked Deo out of any account. Deo testified that, following the dispute over the Libertas funds, he approached Chase to have others removed from the account but "we got kicked off of the account" himself. (Deo Dep. 616:6-16 (Jan. 12, 2026).) The lock-out described is from a Chase bank account and is not attributed to Libertas.

¶ 976. Deo and/or Sara were not the owner(s) of any Plaintiff dealerships. Urrutia Dep. 48:13-49:10; 125:15-23 ("Q. [...] when you were dealing with Mr. Deo in November of '22, you owned Superb 100 percent? A. Yes. Q. [...] you owned it by yourself, right? A. Correct, yes"); 166:3-20; Aaronson Dep. 21:25-22:13 (DMV paperwork shows that Northshore is owned by Khan, Chabrier, and David Baron); 110:23-111:7 ("Who were the owners of Island Auto Group right now today? A. Ronny Baron, the estate of David Baron, myself and Marcello Scherino. Q. How long has that been the case? A. A little over 11 years, I believe"); 234:12-16 ("have you ever seen an agreement between any of the plaintiffs and Deo regarding the ownership of Northshore Motors? A. Not that I am aware of, no"); J. Baron Dep. 16:3-11 ("Q. Do you know if Deo has a claim of ownership at Baron Nissan? A. I am aware that that is his claim. Q. Was the buyer informed of that claim? A. The buyer did not need to be informed of that claim because it

is a false claim"); Chabrier Dep. 21:9-10 (Sara was not an owner of Northshore); 85:17-86:6 (Deo was never an owner or member of Sunrise); Deo II Dep. 69:9-13; 208:22-209:7 (Deo has no documents showing that he purchased 100% of Superb); Sara Dep. 197:18-198:6 (Sara had no stock certificates listing her membership interest in Northshore, Sunrise, and/or Superb); Sara Dep. 246:11-25 (despite Sara's claim that she and Deo own all of Northshore and Sunrise, she does not think this is reflected in any documentation with the DMV); Jones Dep. 77:11-25 (Jones did not ever see any paperwork concerning Deo's ownership of Sunrise); 271:17-272:3 ("Q. [...] Deo disclosed to you that he had no interest in Superb at that time, correct? A. Correct"); FLUSHING189.

RESPONSE TO ¶976. OBJECTION [F]. Denied. This paragraph states a legal conclusion, one that the Deo Defendants have fought from day 1 of this endless litigation. Defendants dispute the conclusion that Deo and Sara owned no interest in any Plaintiff dealership. As to Superb, Deo testified that he purchased 50% of Superb Motors in November 2022 and the full 100% in February 2023 from Urrutia, pursuant to a verbal agreement intended to be reduced to a written contract, and that he made escalating monthly payments toward that purchase (from approximately $10,000 to over $40,000 per month). (Deo II Dep. 208:22-209:12 (Feb. 13, 2026).) Urrutia confirmed that he owned Superb 100% as of November 2022 — the predicate for that very purchase. (Urrutia Dep. 125:15-23 (Jan. 8, 2026).) The ownership of Northshore and Sunrise is a contested legal issue. Deo testified he is an owner (Deo Dep. p.55); O'Sullivan maintained his capital account (O'Sullivan Dep. pp.9, 16); Aaronson approved tax returns listing Deo as 99% owner (Aaronson Dep. p.44). Additional proof of ownership of NorthShore and 189 Sunrise includes, but is not limited to, Deo's monthly payments toward the Superb purchase (Deo II Dep. 209:8-12), O'Sullivan's testimony that Deo was understood to be

an owner because “he had a capital account and could sign the checks” (O’Sullivan Dep. 249:8-16 (Mar. 30, 2026)), and Deo’s testimony that he “should have” listed his Superb interest on the referenced schedule — an assertion of, not a disclaimer of, that interest (Deo II Dep. 69:9-13). As to 189 Sunrise, although Chabrier testified that Deo was not an owner (Chabrier Dep. 85:17-86:6 (Jan. 9, 2026)), the same witness was shown a K-1 for Anthony Deo reflecting that Deo reports a 99% interest in 189 Sunrise (id. 116) — documentary evidence of ownership that contradicts both the paragraph and Chabrier’s own testimony. As to Jory Baron, he acknowledged that Deo’s ownership claim exists — “I am aware that that is his claim” — though he deemed it “false” (J. Baron Dep. 16:3-11 (Jan. 21, 2026)); his characterization of the claim as “false” is conclusory opinion, not competent evidence, and the cited testimony concerns Baron Nissan, which is not among the Plaintiff dealerships at issue. The allegations in this assertion are disputed entirely.

¶ 977. In spite of same, Deo and Sara represented themselves as 100% owners on tax returns, on other documents, and to members of the Enterprise. Aaronson Dep. 92:19-22; Chabrier Dep. 116:20-25 (K-1 shows that Deo has a 99% interest in Sunrise); 130:2-7 (in 2022 tax returns, Deo reported himself as having a 99% interest in Northshore); Deo II Dep. 84:22-85:8 (“wouldn't this indicate that Mr. Baron had the right to be listed as the owner of Northshore? A. For purposes of the floor plan and banks, as you indicated yesterday, when they provided those applications to banks. Q. So only with regard to the banks he would be listed as the owner, but for all other purposes, it wouldn't be? A. It shouldn't be. That was my understanding at that point”); 169:18- 170:9; 170:16-19 (“Q. So you have no idea why you have two operating agreements both given to Flushing Bank in connection with this transaction? A. I don't remember the circumstance”); FLUSHING8508; 202:17-24 (“Q. By submitting this

application, you represented to Flushing Bank that you were a hundred percent owner of Superb? A. Yes"); 215:19-216:8 (says Deo is 100% owner of Northshore); 217:15-219:16 (affirmation provided by Jones to Flushing Bank to show ownership); Sara Dep. 46:14-18 ("We own, not manage"); 67:12-15; 83:23-84:10 (Sara claims that the operating agreement identifying David Baron, Chabrier, and Khan as members of Northshore is fake); 191:3-192:2; Jones Dep. 135:6-9 ("you had prepared the 2019, 2020, tax returns for Anthony and Sarah Deo, right? A. Right"); 173:19-21; 339:17-20 (Deo represented to Jones that Deo and S.Deo were the members of Northshore); Manzueta Dep. 101:14-16 ("The tax returns from Tax Guard did confirm the 99-percent ownership"); Merckling Dep. 151:14-19 ("Q. What is the basis for your knowledge or belief that Mr. Deo was the owner of Superb? A. He was the only one there and he told me he was the owner. That's the only knowledge that I have"); O'Sullivan Dep. 205:21-24 ("Q. Did anybody ever tell you that Deo was not listed as the owner for these licenses? A. No"); 249:8-16 (O'Sullivan thought that Deo was an owner of Northshore because "[h]e was signing the checks and he had a capital account"); Urrutia Dep. 215:7-216:5; Manzueta Dep. 57:16-20 ("we assumed because … he had 99 percent ownership that he had written authority to [sic] on behalf of that legal entity"); FLUSHING0168; FLUSHING4043.

RESPONSE TO ¶977. Defendants admit that Deo represented himself to Flushing Bank as a 99% or 100% owner of NorthShore and as the 100% owner of Superb in connection with credit applications (Deo II Dep. 202:17-24; 215:19-216:8; 169:18-170:9 (Feb. 13, 2026)), and that an email from Deo's accountant reflected Deo and Sara reporting 100% ownership of NorthShore between them on the Josh Aaronson produced and approved tax returns (Aaronson Dep. 92:19-22 (Jan. 7, 2026)). Consistent with that, O'Sullivan testified that no one ever told him Deo was not the listed owner (O'Sullivan Dep. 205:21-24 (Mar. 30, 2026)), and that he

understood Deo to be an owner based on Deo's capital account and check-signing authority (id. 249:8-16). Defendants dispute the paragraph insofar as the prefatory phrase "[i]n spite of" assumes the contested legal conclusion that Deo and Sara were not owners. Deo's consistent representation of ownership corroborates, rather than contradicts, his ownership claim. Deo further testified that any listing of David Baron as owner was "for purposes of the floor plan and banks," and "shouldn't be" for other purposes (Deo II Dep. 84:22-85:8). As to Chabrier, the testimony Plaintiffs cite confirms that a K-1 for Anthony Deo reflects a 99% interest in 189 Sunrise (Chabrier Dep. 116 (Jan. 9, 2026)) — corroborating, rather than undercutting, Deo's ownership. The term "Enterprise" is a conclusory legal characterization and is denied.

¶ 978. Similarly, Deo did not have authority to write checks on behalf of Superb. Thomasson Dep. 214:20-23.

RESPONSE TO ¶978. Whatever was written between the parties to that agreement was contradicted by the verbal discussions between Anthony Deo, Tony Urrutia, and Bruce Novicky. Thomasson has no standing to state the relationship between Deo and Superb/Urrutia, and the assertions contradict Urrutia's broad grant of authority to Deo to run Superb, and the fact that Urrutia admits to being an absentee owner of Superb. The assertion is in any event immaterial, as authority to write checks on behalf of an entity is distinct from ownership of it. Moreover, Deo testified that Urrutia orally authorized him to sign Superb's checks in their July 2023 conversation — "Tony said I could sign checks and he was going to make sure that Bruce took care of it" (Deo Dep. Tr. 359:4-20 (Jan. 12, 2026)) — so whether any written agreement restricted that authority presents, at most, a disputed issue of fact.

¶ 979. Deo knew his application with Westlake was false when he submitted it. Deo II Dep. 125:15-24 ("Q. Is this information that was provided to Westlake Services for your

company on your behalf false in that it stated that Beria was the owner? A. Well, he wasn't the owner. Q. So it was false, correct? A. Yes. Q. You knew that it was false when it was submitted, correct? A. I guess yes").

RESPONSE TO ¶979. OBJECTION [F]. Admitted, although the matter concerns a Westlake/Beria application that predates any event relevant to this lawsuit and involves a company that has not operated since at least 2018..

¶ 980. Deo knew that his personal financial statement was inaccurate when he submitted it. Jones Dep. 275:11-20 ("Q. … My question is, if there are in fact no mortgages, is this statement inaccurate? [...] A. I mean in general, yes, it would be").

RESPONSE TO ¶980. OBJECTION [F]. Denied. The cited testimony is a hypothetical posed to Jones — that "if there are in fact no mortgages," the statement "in general … would be" inaccurate (Jones Dep. 275:11–20, as quoted). It establishes nothing about Deo's knowledge or state of mind; Jones did not testify that Deo's statement was in fact inaccurate, much less that Deo "knew" it. "Knew" (scienter) is a conclusory assertion unsupported by the cited testimony.

¶ 981. Deo provided Jones false numbers to use on financial statements. Jones Dep. 302:25-303:12; 316:14-16.

RESPONSE TO ¶981. OBJECTION [E]. Disputed; cannot be admitted as cited. "False" is a conclusory legal conclusion. The quoted excerpts do not establish that Deo provided "false" numbers. Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11). Denied.

¶ 982. Specifically, Deo had Jones make adjusting entries which increased profits. Jones Dep. 127:2-4 ("Q. Did you accommodate [Deo] by making those adjusting entries? A. If it was reasonable, yes").

RESPONSE TO ¶982. OBJECTION [E]. Denied. The cited testimony reflects that Jones, the accountant, made adjusting entries only "[i]f it was reasonable" (Jones Dep. 127:2–4, as quoted) — an exercise of his professional judgment, not fabrication. That an operator asks his accountant about adjusting entries, which the accountant makes only if reasonable, is ordinary accounting; the entries were reversed at year-end (see Defendants' Response to ¶ 991). The Jones deposition is not before Defendants and is addressed as quoted.

¶ 983. Deo provided financial records to Flushing Bank in order to obtain financing from same for Northshore. Deo II Dep. 24:6-11.

RESPONSE TO ¶983. Admitted that Deo testified he provided financial records to Flushing Bank in connection with seeking financing for Northshore. (Deo II Dep. 24:6–11 (Feb. 13, 2026).)

¶ 984. Deo's personal financial statement contained false representations. Deo II Dep. 25:5-26:2 ("Q. That says profit before income tax $76,130. Do you see that? A. Yes. Q. Was that number accurate as the profit for Northshore for that month? A. I don't know. I don't remember. I'm sorry. Yeah, I specifically don't remember. [...] Q. To the right of that is the year to date indicating that the profit before income tax for Northshore through October 2022 was $372,037. Do you see that? A. Yes. Q. So again, when presented to Flushing, the representation was made that that was the accurate profit before income tax at that time for Northshore, correct? A. Yes, the year to date"); 31:7-11 ("Q. Yet with regard to the deficiency and unable to pay its debts, you're showing that in October of 2022 you represented to Flushing Bank that it made a profit of

$76,130, correct? A. Well, that's what it says here"); 36:2-37:6 ("Do you see how much the gross is showing? A. Yes. Q. How much is that showing on the new one? A. Minus $279,289. Q. What is it showing in the one that you provided to Flushing Bank? A. $172,888. Q. That's a positive number, 172, correct? A. Yes. [...] Q. Let's go to the bottom line here. We have a profit. The last profit before income tax. Here it's showing a negative $375,048. Do you see that? A. Yes. Q. And the one you presented to Flushing showed a positive of over $70,000, correct? A. That was the correct one, yes"); FLUSHING8560.

RESPONSE TO ¶984. OBJECTION [E]. Disputed. Denied. The cited testimony does not establish that the statement contained "false representations"; to the contrary, Deo maintained that the statement he provided to Flushing was accurate. Confronted with a different version showing a loss, Deo testified that the statement he presented to Flushing — showing a profit — "was the correct one" (Deo II Dep. 37:3–9 (Feb. 13, 2026)), and disputed the contrary figures presented to him ("I don't know why your numbers are [different]," id. 36:18–21). Deo's "I don't know" / "I don't remember" answers as to specific monthly figures (id. 25:5–26:2) reflect a lack of recollection, not knowledge of falsity. The statements were prepared by the controllers and the accountant, not fabricated by Deo. Whether the figures Deo provided to Flushing, or the contrary version, are accurate is a genuine dispute of material fact; Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11). (Defendants note the cited testimony concerns Northshore's profit-and-loss statement, not a "personal financial statement.")

¶ 985. Deo borrowed funds from Flushing Bank by falsely representing himself as sole owner of Northshore. Buccino Dep. 257:3-7; 266:17-20 ("I recall a conversation about

documents that were given to David Weinstein by Tony Urrutia that the documents were inconsistent. I don't recall specifically what those documents were"); 218:14-23 ("Q. … the documentation on file for the LLC was also complete and satisfactory to give the authority to the accounts, correct? A. Yes. Q. And that is referring to Northshore based on the fact that Mr. Deo provided an operating agreement listing himself originally initially as 99-percent owner and then amended it to list himself as 100-percent owner, correct? A. Based on the entire documentation, yes").

RESPONSE TO ¶985. OBJECTION [E]. Disputed. "Falsely" is a conclusory legal conclusion and is refuted by the cited testimony. Buccino testified that the documentation on file for Northshore was "complete and satisfactory to give the authority to the accounts," based on Deo's operating agreement reflecting his ownership (Buccino Dep. 218:14–23, as quoted). Deo's ownership of Northshore is supported by his testimony, the amended 2020 return reflecting Anthony Deo (99%) and Sara Deo (1%), and Aaronson's admission that the Deos held themselves out as owners on the tax returns (Aaronson Dep. 92:19–22 (Jan. 7, 2026)). Any discrepancy between a 99% and a 100% representation — both reflecting Deo's ownership — was resolved by the bank through "further dialogue" (see Response to ¶ 1039), and Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 986. Notably, Deo had submitted a document on behalf of Northshore allegedly signed by David Baron – despite David Baron having passed away by then. Jones Dep. 174:14-175:13.

RESPONSE TO ¶986. OBJECTION [E]. Disputed; cannot be admitted as cited. The assertion that a document was "allegedly signed by David Baron" concerns the authenticity of a

document, which speaks for itself; the cited testimony does not establish that Deo created or submitted that document, or did so with knowledge of any defect. The word "allegedly" reflects the unproven nature of the assertion, which is denied as cited.

¶ 987. In other document(s) to Flushing Bank, Deo listed the annual revenue or budget for 2022 as $17 million and $8 million, despite the account not ultimately seeing these numbers. Buccino Dep. 298:12-20; Kataev Decl. ¶ X.

RESPONSE TO ¶987. OBJECTION [A] [E]. Denied. The "Kataev Decl. ¶ X" citation identifies no paragraph and is disregarded under Local Civil Rule 56.1(d). A revenue or budget figure stated in a loan application is a projection; that an account did not ultimately reach a projected figure does not establish a misrepresentation. Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 988. Moreover, Flushing Bank had noted to Deo that the operating agreement showing 99% ownership does not match his credit application showing 100% ownership. Buccino Dep. 324:23-325:11; 99:11-16.

RESPONSE TO ¶988. Admitted in part; clarified. Admitted that Flushing Bank noted to Deo a discrepancy between an operating agreement showing 99% ownership and a credit application showing 100% ownership. As addressed in Defendants' Response to ¶ 1039, that discrepancy gave rise to no concern that Deo was untruthful because "[f]urther dialogue satisfied this situation" (Buccino Dep. 325:4–11, as quoted); both figures reflect Deo's ownership of Northshore. A discrepancy the bank itself resolved does not establish falsity or fraud.

¶ 989. Deo's profit and loss statement was not accurate. Deo II Dep. 58:19-59:18; FLUSHING162.

RESPONSE TO ¶989. OBJECTION [E]. Disputed; cannot be admitted as cited. The cited testimony concerns the Flushing line of credit and the Puccio correspondence (Deo II Dep. 58:19–59:18 (Feb. 13, 2026)) and does not establish, as a blanket matter, that Deo's profit-and-loss statement "was not accurate." The accuracy of the profit-and-loss figures is genuinely disputed, and Deo maintained that the statement he provided to Flushing was accurate (see Defendants' Response to ¶ 984). The conclusory assertion is denied as cited.

¶ 990. Similarly, a letter from Thomasson dated March 31, 2023 falsely "gave [Flushing Bank] confidence in the representations from Mr. Deo regarding his ownership of the businesses." Buccino Dep. 306:9-307:7; 309:4-8 ("Q. This was enough for you to -- for Flushing Bank to accept this representation and no longer have any concerns? A. I believe we also received something from the accountant, generally speaking, yes"); 65:15-22 ("[...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate"); Urrutia Dep. 134:22-24 ("Q. You think I'm being dishonest in what I'm doing in these lawsuits? A. Absolutely"); FLUSHING3835; Buccino Dep. 205:5-9 ("Q. It's fair to say that when you looked at the information produced by Mr. Weinstein, you understood that there was an issue with the documents produced by Mr. Deo, correct? A. Yes").

RESPONSE TO ¶990. OBJECTION [E]. Denied. The word "falsely" is a conclusory, argumentative characterization the cited testimony does not support. Buccino did not testify the Thomasson letter was false; he testified it gave the bank confidence in Deo's ownership representations, that the bank "also received something from the accountant" (Buccino Dep.

309:4–8, as quoted), and that the letter "generally said that the dispute was a normal business dispute … and that Mr. Deo's ownership presentation was still valid and legitimate" (id. 65:15–22, as quoted). Buccino further testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11) and that whether the representations were true or false is for "the Court [to] determine" (id. 257:13–19). Urrutia's opinion that Deo is "dishonest" (Urrutia Dep. 134:22–24 (Jan. 8, 2026)) is argumentative and not competent proof of falsity. See Defendants' Response to ¶ 1059. Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 991. O'Sullivan and Jones prepared adjusting entries that made the dealership look like it was doing better financially than it actually was. O'Sullivan Dep. 111:25-112:4 ("Q. Would those [adjusting] entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24-113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. Q. Positive where the dealership looked better than it actually was doing? A. Yes"); Deo Dep. 603:21 ("An adjustment can mean anything"); Jones Dep. 23:7-25; 26:12-15; 58:22-25; 132:4-133:8 ("Q. Would that mean that if you just printed out the financial statements for the year, it would artificially show that the dealership was $1.4 million to the better than it actually was? A. On a monthly basis, but at year end we would write it off. Q. You would write that off at the end of the year? A. Correct. Q. Each month it wouldn't show that, though? A. Potentially not, yes. Q. Each month, these financial statements are being presented by Anthony to Ally to get floor plan financing, correct? A. As far as I know, they are, yes. Q. So, each month would not necessarily reflect that each month it was accruing at the time end of the year $1.4 million in expenses which weren't being shown to Ally? [...] A. Again, I don't know what was in that account, but that could be."); 165:9-19; 167:8-169:2.

RESPONSE TO ¶991. OBJECTION [A]. Admitted in part; disputed in part. Admitted that O'Sullivan testified certain adjusting entries could make the monthly financial statements appear more favorable (O'Sullivan Dep. 111:25–112:4, 112:24–113:6 (Mar. 30, 2026)). Defendants dispute the implication of fabrication: the adjusting entries were the accountant's ordinary work — "Tom Jones entries" (O'Sullivan Dep. 194 (Mar. 30, 2026)) — and were "writ[ten] off … at the end of the year," so that the year-end financials were accurate (Jones Dep. 132:4–133:8, as quoted). As Deo testified, "[a]n adjustment can mean anything" (Deo Dep. Tr. 603:21 (Feb. 12, 2026)), and monthly accrual adjustments later reversed at year-end are ordinary accounting, not falsification. The independent lenders, moreover, conducted their own due diligence and were satisfied (see Responses to ¶¶ 1005–1006), and Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)). The Jones deposition is not before Defendants and is addressed as quoted. Disputed as to O'Sullivan's role. O'Sullivan posted entries Jones gave him without knowing their purpose: 'He never told you why? A: No. Did you suspect something improper? A: Not really.' O'Sullivan Dep. p.10. O'Sullivan's ministerial execution of Jones's instructions — without knowledge of their purpose — does not constitute participation in a falsification scheme.

¶ 992. For example, in documents provided to Libertas, financial records were fabricated to show more operating profit in one month than for the whole year. D'Aprile Dep. 175:10-21.

RESPONSE TO ¶992. OBJECTION [E]. Disputed. "Fabricated" is a conclusory legal conclusion. As quoted, the cited matter reflects the monthly accrual adjusting entries that were reversed at year-end — a monthly accrual can exceed the annual net precisely because it is written off at year-end (see Defendants' Response to ¶ 991) — not fabrication. The D'Aprile deposition is not within the materials presently before Defendants and is addressed as quoted.

Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 993. Similarly, Deo requested that Jones inflate profit and loss statements to appear more profitable. Urrutia Dep. 92:6-93:18; 94:3-12; 155:20-23 ("there's a couple of emails from Deo making sure to tell Thomas Jones to make sure that those statements show a profit, no matter what"); Jones Dep. 296:6-11 ("Q. [...] what, if anything, stopped Mr. Deo from telling Ms. Kernizant directly to make these changes? A. I don't know if there is anything that would"); 301:12-17 ("Q. At the end of this e-mail, before he thanks you, Mr. Deo asked for your help to close out the statements today showing a profit. He says that this is an absolute must, correct? A. That's what it says, yes").

RESPONSE TO ¶993. OBJECTION [E]. Denied. The assertion that Deo "requested that Jones inflate" the statements is a conclusory characterization. Admitted only that Deo communicated with his accountant about completing the profit-and-loss statements; the cited testimony reflects that Deo asked Jones to "close out the statements … showing a profit" (Jones Dep. 301:12–17, as quoted). Asking one's accountant to complete statements that reflect a profit is not, without more, a request to falsify them; the accountant prepared the statements in his professional judgment, and the adjusting entries were the accountant's ordinary work — "Tom Jones entries" (O'Sullivan Dep. 194 (Mar. 30, 2026)) — and were "writ[ten] off … at the end of the year," so that the year-end financials were accurate (Jones Dep. 132:4–133:8, as quoted). Urrutia's characterization that Deo told Jones to show a profit "no matter what" (Urrutia Dep. 155:20–23 (Jan. 8, 2026)) is his interpretation of emails, and Jones's speculation that nothing "would" stop Deo from instructing the bookkeeper (Jones Dep. 296:6–11, as quoted) establishes

nothing. Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 994. Deo used a myriad of excuses to explain missing funds. Urrutia Dep. 72:20-73:24.

RESPONSE TO ¶994. OBJECTION [E]. Objection to form. "A myriad of excuses" is argumentative and reflects Urrutia's opinion (Urrutia Dep. 72:20–73:24 (Jan. 8, 2026)), not a statement of material fact. The conclusory characterization is denied; as usual, there is no evidence that supports this bare conclusion.

¶ 995. To the extent that Merckling and Blankenship did not themselves sign deposit slips, Deo forged their signatures when depositing cash. Merckling Dep. 337:5-13 (at Flushing Bank); 337:21-24; 338:12-19; 339:18-22.

RESPONSE TO ¶995. OBJECTION [E]. Disputed. "Forged" is a conclusory and serious accusation unsupported by admissible evidence before Defendants. Cash was recorded against the customer accounts and tracked by the controllers (O'Sullivan Dep. 158:13–21, 167:16–168:5 (Mar. 30, 2026); Kwun Dep. 32:13–25 (Mar. 5, 2026)). No competent evidence establishes forgery by Deo, and the assertion is denied. Admitted that Merckling and Blankenship made cash deposits. O'Sullivan confirmed they returned deposit slips every time — these were legitimate deposits for security purposes. O'Sullivan Dep. p.9.

¶ 996. Deo improperly backdated operating agreements to serve his purposes. Thomasson 255:19-25 ("Would it be illegal for Mr. Deo to have dated this document in June of 2020, when in fact he prepared it in June of 2023? A. That is speculative. I don't know that he did or he didn't. All I can tell you is it speaks for itself").

RESPONSE TO ¶996. OBJECTION [C] [E]. Denied. The cited testimony refutes the assertion. Asked whether Deo backdated the operating agreement, Thomasson testified: "That is

speculative. I don't know that he did or he didn't. All I can tell you is it speaks for itself" (Thomasson Dep. 255:19–25, as quoted). A witness's express disclaimer of knowledge does not establish backdating; the document speaks for itself. "Improperly backdated" is conclusory and is denied.

¶ 997. Libertas' funding was to be used for the benefit of Northshore, not to purchase another business. Patrovic Dep. 87:8-12 ("the money is supposed to be, is expected to be used for the benefit of the business itself; correct? A. Yes"); 87:24-88:12 ("Q. [...] had Libertas known that the $735,000 would've been taken by Mr. Deo and used for him personally to buy into some other business, do you think Libertas would have financed this transaction? [...] A. [...] I'm not sure. [...]").

RESPONSE TO ¶997. OBJECTION [E]. Denied. The premise — that Deo used the Libertas funds "to purchase another business" rather than for Northshore's benefit — is squarely controverted by Deo's testimony that the acquisition was a means of benefiting Northshore and Sunrise. Deo testified that the payment to Urrutia's company was made to obtain a cross-guaranty for the benefit of his own entities: "Tony had a franchise, it was supposed to cross guaranty Northshore Motors and 189 Sunrise," and he confirmed "that money was okay to use for that purpose because of the cross guaranty" (Deo II Dep. 141 (Feb. 13, 2026)). Deo likewise testified that the $500,000 "was part of the payment for the cross purchase agreement … it was so that I could get a cross guaranty from my companies, Northshore Motors and 189 Sunrise" (Deo Dep. Tr. 447:17-21 (Feb. 12, 2026)). Acquiring a cross-guaranty from Urrutia's franchised dealership — to enable floor-plan financing and banking for Northshore and Sunrise — was thus undertaken for the benefit of those entities, not as a personal diversion. This is consistent with Deo's testimony that his intention was to use the Libertas funds for the business of Northshore

and Sunrise (Deo Dep. Tr. 140:17–22 (Jan. 12, 2026); see Response to ¶ 1046). The hypothetical that the $735,000 was "taken by Mr. Deo and used for him personally" is, moreover, controverted by the record that Aaronson diverted the $735,000 to a Baron Nissan account (see Defendants' Response to ¶ 1009). The conclusory premise is denied.

¶ 998. Jones acknowledged the problems with Deo's false statements in his personal financial statement. Jones Dep. 279:6-10 ("Q. [...] is it fair to say that if the statement contained in the personal financial statement is outright false, that that's a problem? A. Okay, I'll say it's a problem").

RESPONSE TO ¶998. OBJECTION [E]. Disputed. The cited testimony is an abstract hypothetical: Jones agreed only that "if" a personal financial statement "is outright false," "that's a problem" (Jones Dep. 279:6–10, as quoted). He did not testify that Deo's statement was false, or "acknowledge" any problem with Deo's statement. The conclusory assertion that the statement was "false" is unestablished; Deo testified his financial document was accurate (Deo II Dep. 25:10–14 (Feb. 13, 2026)).

¶ 999. Jones explained discrepancies in amounts as "not material," and merely matching exactly what Deo asked for. Jones Dep. 307:15-308:8; 309:18-21.

RESPONSE TO ¶999. OBJECTION [E]. Disputed. As quoted, Jones characterized the discrepancies as "not material" — the accountant's professional judgment that they were immaterial — which undercuts rather than supports a fraud theory. That statements were prepared to match what the client requested reflects ordinary client instruction to an accountant, not falsification. Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 1000. David Baron of the IAG Plaintiffs relied on the accuracy of the financial statements after they were prepared by Deo and his accountants. O'Sullivan Dep. 125:6-9 ("Q. If David came in, would he be seeing the financial statements before or after those adjustments? A. After").

RESPONSE TO ¶1000. OBJECTION [F]. Disputed. David Baron's purported "relian[ce]" and state of mind are not established by competent evidence: David Baron is deceased and did not testify. The cited O'Sullivan testimony that David "[saw] the financial statements … [a]fter" adjustments (O'Sullivan Dep. 125:6–9 (Mar. 30, 2026)) establishes only that he saw them, not that he relied on them. The adjusting entries, moreover, were the accountant's ordinary work — "Tom Jones entries" (id. 194) — not Deo's. The conclusory assertion of reliance is denied.

¶ 1001. These falsified tax returns and other documents were necessary in order to obtain approval for loans with Libertas and Flushing Bank. Manzueta Dep. 27:22-28:7; Patrovic Dep. 23:17-23 ("Q. [...] So does the entity in which you are considering financing have to have a certain level of profitability in order for the financing to proceed? A. It's pretty nuanced. It's on a deal-by- deal basis"); 20:3-14 ("It's revenue-based Financing. [...] We are underwriting based on the business's sales. We're generally looking at minimum, the last three months of -- of their sales. And we are funding essentially based on what we assume will be their future sales based on [...] how we underwrote that"); Deo II Dep. 67:24-68:10 ("Q. [...] So you're trying to obtain a loan for Northshore based upon these financial records, correct? A. Yes. Q. That's the purpose of giving this to Flushing, to say you should lend Northshore money and I'm giving you information about financials to enable you, to assist you to consider whether we're a good credit risk or not, correct? A. Yes"); 160:2-7 (Deo did not have an operating agreement for Northshore

prior to that time); 164:21-165:12; Jones Dep. 278:16-279:5 ("[...] Q. The banks and other institutions that issue credit, rely on these documents to determine whether a person is worthy of receiving credit, right? A. On certain documents, yes").

RESPONSE TO ¶1001. OBJECTION [E]. Disputed. "Falsified" is a conclusory legal conclusion, not a statement of fact. The cited Deo testimony reflects only that Deo sought the financing based on the entities' financial records (Deo II Dep. 67:24–68:10 (Feb. 13, 2026)) — the ordinary purpose of a loan application. The independent lenders confirmed Deo's ownership: Libertas confirmed Deo's 99% ownership of Northshore through IRS Tax Guard data (Manzueta Dep. 58:4–22, 101:14–16, as quoted). Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 1002. Deo's stated purpose for the Libertas loan was to obtain working capital. Deo II Dep. 133:5-7.

RESPONSE TO ¶1002. Admitted.

¶ 1003. Flushing Bank was aware that the dealerships Deo operated were not profitable. Buccino Dep. 287:2-7 ("there is a subsequent email about an hour and a half later from Mr. Puccio stating that Sunrise does not qualify because they need to see -- the bank needs to see two years of consecutive profitability on the tax return. Do you see that? A. Yes"); 109:22-110:14 ("Q. Now Mr. Puccio writes later on that same day, he says 'Due to the 2019 and 2020 loss for 189 Sunrise, that entity will not qualify.' Do you know what he's referring to? A. Specifically, no. Q. He says, 'We will need to see two years consecutive profitability on the tax return.' And would it be fair to say that the taxers would need to show some sort of profit in order to qualify for the loan? A. That seems fair, yes. [...]").

RESPONSE TO ¶1003. Admitted in part; clarified. Admitted that Flushing Bank reviewed the tax returns and was aware that 189 Sunrise showed losses for 2019 and 2020 such that it did not qualify on that basis. (Buccino Dep. 287:2–7, 109:22–110:14, as quoted.) This confirms that Flushing conducted its own due diligence and was aware of the entities' financial condition — undercutting any suggestion that Deo concealed it — and that the bank made an independent, informed lending decision (Northshore qualifying, Sunrise not). The fact is immaterial to the ownership of Northshore and Sunrise at issue.

¶ 1004. Jones was willing to aid Deo in his fraud. Jones Dep. 299:14-18 ("Q. If Mr. Deo asked you to help and produce a financial statement that shows a profit, what would you do or say? A. If there was a legitimate way to do it, then I would look to do it").

RESPONSE TO ¶1004. OBJECTION [E]. Disputed. The cited testimony refutes the assertion. Asked what he would do if Deo requested a financial statement showing a profit, Jones answered that he would help only "[i]f there was a legitimate way to do it" (Jones Dep. 299:14–18, as quoted). A willingness to act only legitimately is the opposite of a willingness to aid fraud. "Fraud" is a conclusory legal conclusion, the premise of which is disputed.

¶ 1005. By virtue of Flushing Bank's extensive financing process, and Deo's obtaining of a loan, the Plaintiff dealerships were lead to believe that the dealerships were doing better financially than they actually were. Buccino Dep. 38:20-23 ("Q. Do you know if there is any investigation to verify the financial reporting that's provided by a customer? A. I know we do investigations"); 40:16-22 ("We have a credit center within the business banking department that does review fabrications of applicants" with "probably 20 to 30" employees); 58:13-16 ("The business banking department would review the totality of the application and all of its investigations in determining whether or not it would move forward"); 192:12-15 ("Q. I

understand that your position is then Flushing Bank acted appropriately based on the information available to it, correct? A. Yes”).

RESPONSE TO ¶1005. OBJECTION [E]. Disputed. The assertion is a conclusory and speculative reliance theory — that the dealerships were “led to believe” they were financially healthier than they were because a loan issued. The cited testimony describes Flushing Bank’s investigation process (Buccino Dep. 38:20–23, 40:16–22, 58:13–16, as quoted) and the witness’s view that the bank “acted appropriately based on the information available to it” (id. 192:12–15 (Feb. 26, 2026)) — not that any plaintiff was “led to believe” anything. A lender’s extension of credit after due diligence is not a representation to the borrower about the borrower’s own financial health. The matter is immaterial; Flushing Bank’s neutral Rule 30(b)(6) witness made no determination that Deo “engaged in fraud” (Buccino Dep. 194:6–9 (Feb. 26, 2026)).

¶ 1006. By virtue of Libertas’ extensive financing process, and Deo’s obtaining of a loan, the Plaintiff dealerships were lead to believe that the dealerships were doing better financially than they actually were. D’Aprile Dep. 24:3-7 (“I'm an underwriter. I [...] analyze company's fundamentals and make a decision on what the company could afford in a transaction of lending”); 27:11-14 (“Q. [...] Mr. Manzueta, the supervisor, who worked with you on that transaction? Yes. He was”); 33:25-34:10 (“[...] we analyze all the bank statements, all the financials, all proof of ownerships, everything that is provided to us to make a decision on the dollar amount, the terms, and -- and then we send out the approval to the ISO and then the ISO speaks to the client to see if that will -- if he takes the terms and conditions); 35:4-9 (“Q. So as part of your job in processing these requests, do you have to go through that checklist and make sure that all of the items on the checklist are satisfied? A. Always”); 35:17-20 (“we ask for paperwork, and if the paperwork comes and it clears and everything checks out, that's how you

check it off”); 38:13-14 (“we can fund based on our guidelines”); 42:4-5 (“I review everything that is presented to me”); 47:5-24; 50:23- 51:4 (“Q. And would it be your responsibility to then look at the tax return provided and the tax return that was filed and compare and make sure that they match? A. Yes”); 52:17-22 (“Q. And would you always be looking for the P&L and balance sheet [...] of the year prior to the application as well as the year of the application to date? A. We try. Yes”); 53:25-54:12 (“when you get the financial information, what is it that you are looking for in those financials? A. How healthy the company is. Q. And can you explain to me what you mean by "how healthy the company is"? A. If they're losing money or making money or breaking even. Q. And how would you go about making that determination? A. By looking at the numbers, at the financials”); 55:23-25 (“how long have you been working in the finance-related business? A. Since November of 2014”); 56:8-9 (“We look at everything as a whole”); 57:15-20 (“If Libertas became aware in that the financial information provided was not accurate, would Libertas proceed with the funding of that transaction? A. No”); 57:24-58:8; 60:12-20 (“Q. You said 12 months of bank statements? What is it you are looking for in those bank statements? A. Mostly, it's cash flow, how cash is being used, how much funds they have in their account in the beginning of the month, throughout the month, at the end of the month, if they have other financing in there”); 62:13-19 (“Would you then determine when refinancing a two-way car dealership what their gross profit was? A. Yes. By looking at their dealership financial statements at that period of time”); 69:19-25 (“Q. Does it conduct a credit search, a credit search for the guarantor? A. Yes. Q. Is there a minimum credit score that Libertas looks at with regard to a guarantor? A. Yes”); 72:24-73:8 (“I review tax returns to make sure that the client is an owner of the entity and I review the tax returns to make sure that the numbers are profitable and I review the tax returns to make sure that the numbers that we have that were provided match the

numbers with the Tax Guards we get in real-time IRS tax data. I am not a CPA"); 73:19-74:2 ("Q. [...] does Libertas ensure that when it sees a K-1 on a partnership tax return proving that it's the owner that they also ensure that the owner who claims to be the owner filed his personal tax return showing ownership of that entity? A. Yes"); 89:11-90:4 ("Q. Once you completed your funding and the contract is signed, do you have any further involvement in the transaction? A. Yes. We conduct an interview with the client"); 94:9-22 (Libertas reviewed records, including tax returns and financial records, for both Northshore and Sunrise); 108:19- 109:11 ("Under the Libertas guidelines, we were able to justify that the company would be able to handle those payment, those weekly payments. [...] Q. So you're saying here that as financial analyst, you reviewed all the financial records of both of these dealerships and you determined that [...] over the course of a year, these dealerships could satisfy all of their regular monthly financial obligations and still have enough free cash flow to pay almost a million dollars back in the course of one year to Libertas? Is that your testimony? A. Yes"); 139:3-5 ("Q. And part of the review would be to see the cash flows, monies coming in and monies going out; correct? A. Yes"); 139:6- 16; 142:9-12 ("you felt satisfied at the end of the interview with the responses of Mr. Deo? A. We felt satisfied. Yes"); 143:5-11 ("in looking at the profitability, you would want to ensure that the monies that are coming in to the dealership are from revenue, not from some other source; correct? A. Correct"); 145:9-12 ("[...] We have people that review it"); 168:19-23 ("Is it your understanding that in fact you did have all of the other financial statements that you required? A. If I remember correctly, yes"); 169:7-11 ("Q. So in reviewing this document, what specifically on the document would you be paying attention to? A. Everything is being paid attention to"); 186:23-187:2 ("[...] Just to make sure that you have all your ducks in a row"); 188:22-25 ("you would look at the deposits for the different banks to determine how much

income was coming in? A. Correct"); 199:25-200:3 ("Q. [...] you would've reviewed the entire tax return? A. We would've. Yes"); 203:23-204:5 ("Q. And is your practice to check and verify any of the information that's contained on this tax return? A. Yes. Q. And did you in fact check and verify the information on the tax return? A. I must have"); 221:4-7 ("Does Libertas do anything other than provide financing to corporations? A. No"); 221:15-222:10 (certain transactions triggered the use of Tax Guard); 225:5- 9; 225:20-226:5; 226:25-227:4 ("would you have obtained all documentation for at least some of those three years? A. Yes"); 227:16-17; 231:21-232:4; 232:12-16 ("You have no current memory of having seen Tax Guard be incorrect on determining ownership of a corporation; do you? A. No"); 234:17-235:5; 237:21-238:19; Manzueta Dep. 37:6-23; 39:17-40:19; 41:4-25; 42:2-8 ("[...] we have metrics and guidelines with regards to what the [re]payment would be. [...]"); 43:18-44:7; 44:22-45:6; 48:23-49:6 ("When we reviewed it, [...] we do look for any anomalies. We look for, you know, transfers. We look for anything [...] that seems out of place when it comes to the actual accounts. On this one in particular, if memory serves me correctly, there was nothing that was really out of place"); 58:4-7 ("Because of the – the wages and income transcripts, it confirmed the fact that he owned 99 percent of the business."); 58:11-22 ("[...] what Tax Guard does, is pull tax returns in addition to wage and income on the personal tax returns. It would be able to provide that information. When we had the Tax Guards, it provided the wage and income transcripts, which confirmed 99 percent, which was what was showing on the tax returns on the K-1 statement"); 77:13-20 ("You're concerned about the financial viability, future financial viability of this entity; correct? A. That's correct. Q. All right. Because without it, Libertas is not getting paid; correct? A. Yeah. That's also correct"); 93:3-12 ("give or take, we see about 2,000. Our approval rate is about 25 percent. Our funded ratio is somewhere in the ballpark of about 5 to 10 percent. So if you're

doing the ratios, you know, 2100 over 12 months, I mean, you're looking at, you know, 24,000 files. You do about 5 percent of that. That's how much we fund, how many clients we fund on an annual basis"); 101:14-16 ("The tax returns from Tax Guard did confirm the 99-percent ownership"); 110:5-13 ("did you confirm that both entities were owned by the principal applying for the funding? A. Through Tax Guard. That's correct. Through the income transcript indicated that it was on 99 percent. Q. You also pulled a credit report for Mr. Deo; correct? A. That's correct"); Patrovic Dep. 12:20-13:4 ("Q. [...] So what is your relationship to Libertas? A. I handle all of our post-funding operations. So I oversee our general servicing and our collections teams and processes. Q. And how long have you been in that position? A. Nine years"); 13:13-16 ("since November of 2022 you've been performing pretty much the same function for Libertas? A. Yes"); 14:20-25 ("Q. Do you know when Libertas began operating? A. September, 2016. Q. And do you recall when you started working there? A. December, 2016"); 16:7-25.

RESPONSE TO ¶1006. OBJECTION [E]. Disputed. The same speculative reliance theory fails as to Libertas, and the cited testimony cuts the other way. It establishes that Libertas — an independent lender — conducted extensive underwriting and independently confirmed Deo's 99% ownership of Northshore through IRS Tax Guard data (Manzueta Dep. 58:4–22, 101:14–16, 110:5–13, as quoted), reviewed the financial records, was "satisfied" with Deo (D'Aprile Dep. 142:9–12, as quoted), and determined the dealerships could service the financing (id. 108:19–109:11, as quoted). A lender's extension of credit after due diligence is not a representation to the borrower about its financial health. The independent confirmation of Deo's ownership undercuts Plaintiffs' ownership theory.

¶ 1007. Moreover, Plaintiffs justifiably relied on the expertise of members of Deo's Enterprise. Jones Dep. 143:12-16 ("Q. Has your firm ever provided or prepared profit and loss

statements for clients in connection with obtaining financing? A. Yes"); 152:3-12 ("What is an independent accounts compilation report? A. That's just a summary of the assets and liabilities of a company or a person based on their information they give us. Q. Is this something that you prepared for other clients throughout the years? A. Yes").

RESPONSE TO ¶1007. OBJECTION [E]. Disputed. "Enterprise" and "justifiably relied" are conclusory legal characterizations (RICO terms), not statements of material fact. The cited Jones testimony reflects only that his accounting firm prepared profit-and-loss statements and compilation reports for clients in the ordinary course (Jones Dep. 143:12–16, 152:3–12, as quoted) — ordinary accounting services, not a racketeering "Enterprise." The premise is disputed.

¶ 1008. Deo's fraudulent conduct caused Plaintiffs damage. Aaronson Dep. 199:12-23 ("[...] all he did [...] was commit fraud").

RESPONSE TO ¶1008. OBJECTION [E]. Disputed; contradicted by the record. "Deo's fraudulent conduct" and resulting "damage" are conclusory legal conclusions, and the cited testimony refutes them. In the very passage cited, Aaronson — asked to identify a fraudulent transaction — could not, and admitted that Deo "was authorized to operate" (Aaronson Dep. 199:12–23 (Jan. 7, 2026)). Flushing Bank's neutral Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)), and plaintiff Urrutia conceded Deo was "authorized … to run the day-to-day operations" (Urrutia Dep. 34:11–18 (Jan. 8, 2026)). The conclusory assertion of "fraud" and causation of "damage" is denied and at a minimum genuinely disputed.

¶ 1009. Aaronson appropriately removed the $735,000.00 wrongfully obtained by Deo from Libertas because he was a signer on the bank account and was a member of Northshore.

Chabrier Dep. 134:11-135:5 ("Q. Josh had authority to take that money out of the account, did he not? A. Yes. Q. Do you know why he put it into another account? A. Because I believe Anthony owed him money. Cars weren't paid off and he took his money. [...] Anthony owed him money for payoffs and stuff like that. Q. Are you saying Josh took the 735,000 because Anthony Deo owed Josh money? A. He owed for payoffs and stuff").

RESPONSE TO ¶1009. OBJECTION [E]. Disputed. "Appropriately removed" and "wrongfully obtained by Deo" are conclusory characterizations of a contested $735,000 dispute, and the cited and related testimony controverts both. By the cited testimony, Aaronson did not "appropriately remove" the funds to protect the entities. He took approximately $735,000 out of the Northshore and 189 Sunrise accounts and moved it into a Baron Nissan account — a separate entity with which Aaronson is associated (Kwun Dep. 144–145 (Mar. 5, 2026)) — because, in Chabrier's words, "Anthony Deo owed Josh money" for "[c]ars that weren't paid off" (Chabrier Dep. 134:11–135:7 (Jan. 9, 2026)). That is, Aaronson took the entities' funds to satisfy a debt allegedly owed to him personally and diverted them to a different entity. None of the other purported members of Northshore had prior knowledge of, or authorized, Aaronson's taking. Chabrier testified that the transfer was not "discussed beforehand," that he "wasn't in that conversation," and that he "found out after the money was taken" (Chabrier Dep. 67:5–12); plaintiff Khan testified he had "no idea" Aaronson took the $735,000 and that Aaronson never told him (Khan Dep. 132:20–133:13 (Dec. 22, 2025)); and Iris Baron, the representative of the Estate of David Baron, disclaimed all knowledge of the business and of this action (Iris Baron Dep. 8–10, 14 (Jan. 5, 2026)). An unauthorized, self-interested diversion of the entities' funds to a separate entity to satisfy a personal debt — made without the prior knowledge or authorization of the other purported members — is not an "appropriate" removal; at a minimum, whether

Aaronson's taking was authorized or proper is genuinely disputed. The premise that the funds were "wrongfully obtained by Deo" is likewise disputed: Deo took the Libertas loan with authorization (Chabrier Dep. 147:3–5; 17:25–18:9), and the funds were Northshore's, obtained for the benefit of the business (Deo II Dep. 133:5–7, 140:17–22 (Feb. 13, 2026)). Aaronson's asserted Northshore membership is itself disputed. Aaronson admitted IAG did not own 189 Sunrise's accounts. Aaronson Dep. p.18. Kwun transferred the funds without authorization and without knowing why. Kwun Dep. pp.21-22. Chase confirmed the transfer was logged under David Baron's deceased credentials. Kwun Dep. p.7. Being a check signer does not authorize electronic transfer of $735,000 using a deceased person's bank token.

¶ 1010. Deo was funded with a $500,000.00 loan to Northshore. Chabrier Dep. 147:3-5 ("Anthony took a loan out in Northshore's name, which is mine, and got authorization"); Deo II Dep. 210:24-211:12 ("Q. Now, you also previously testified that you sought to open accounts for Northshore and 189 Sunrise at Flushing Bank; is that correct? A. Yes. Q. Did you also seek to take out a loan for either entity at Flushing Bank? A. Yes. Q. Which one? A. Northshore. Q. Did you ultimately receive that loan? A. Yes"); Buccino Dep. 287:8-10 ("Q. Based on this email, is it fair to say that only North Shore's application went through? A. That's what it would seem like, yes"); 54:22-24 ("Q. In connection with the approval of the loan, do you know if that loan was funded? A. I'm fairly certain it was, yes"); Buccino Dep. 54:18-21 ("Do you know how much he was approved for? A. I believe it was $500,000, but I may be mistaken"); 54:22-24 ("Q. In connection with the approval of the loan, do you know if that loan was funded? A. I'm fairly certain it was, yes"); 124:13-24 ("this letter was provided to … Puccio in connection with the financing sought by … Deo for Northshore …, correct, as far as you know? A. Yes. Q. And as a result of this letter and … the other affidavit it was the decision of Flushing … to proceed with

the financing despite the … lawsuit? A. As a result of this letter the other letter and the totality of the application, yes").

RESPONSE TO ¶1010. Admitted in part. Admitted that Northshore obtained a $500,000 loan from Flushing Bank by and through Anthony Deo. (Deo II Dep. 210:24–211:12 (Feb. 13, 2026).) Defendants note the financing was authorized: Chabrier admitted that "Anthony took a loan out in Northshore's name … and got authorization" (Chabrier Dep. 147:3–5 (Jan. 9, 2026)), consistent with Deo's role as the day-to-day operator Chabrier installed (id. 17:25–18:9). As Buccino confirmed, this was Northshore's loan and "not Mr. Deo's personal loan" (Buccino Dep. 193:4–5 (Feb. 26, 2026)). The loan was authorized entity financing for the benefit of the business.

¶ 1011. Flushing Bank's approval process did not rely on Puccio, whose work necessarily had to be reviewed by another employee at the bank. Buccino Dep. 51:18-21 ("the approval process, though, would not be in the hands of Mr. Puccio as a business banker, correct? A. No").

RESPONSE TO ¶1011. Disputed in part; irrelevant. Admitted only that Buccino testified the loan-approval process did not rest with Puccio, the business banker, alone (Buccino Dep. 51:18–21 (Feb. 26, 2026), as quoted). The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. To the extent relevant, that the approval went through the bank's institutional review rather than Puccio alone undercuts any suggestion that Deo procured the loan through Puccio. In addition, Plaintiffs have no standing to assert this allegation on behalf of the lenders.

¶ 1012. Flushing Bank remains inconclusive regarding whether the transactions at issue in Superb's account were authorized. Buccino Dep. 233:22-234:13 ("Q. How come to this date that Flushing Bank has not made a determination as to whether the transactions at issue in the Superb account were authorized or not? A. We're going to let the court do that. Q. Does Flushing Bank have a position on the subject? A. No"); 236:18-237:13 ("Q. And did you later determine that they were unauthorized? A. We have not made any such determinations. Q. Are you aware of any rules or law that requires a bank to make a determination as to whether a transaction is authorized upon a complaint that it was not? A. No. Q. Based on your review of the Uniform Commercial Code, is Flushing Bank under any obligation to make this kind of determination based on a customer complaint? [...] A. We have no claims about specific transactions. Q. When Mr. Urrutia contacted Flushing Bank in August of 2023, did that not constitute a claim that the transactions were not authorized? A. Arguably").

RESPONSE TO ¶1012. Admitted; clarified. Admitted that Flushing Bank has made no determination whether the transactions in the Superb account were authorized and is "going to let the court" decide (Buccino Dep. 233:22–234:13, 236:18–237:13 (Feb. 26, 2026)). Far from aiding Plaintiffs, this confirms a genuine dispute: the bank, having reviewed the matter, declined to find the transactions unauthorized and has "no position on the subject." The matter concerns the Superb account and is immaterial to the ownership of Northshore and Sunrise at issue; the Plaintiffs have no standing to contradict the lender on these allegations.

¶ 1013. One of the documents Flushing Bank seeks from the corporate entity is the operating agreement or the shareholders agreement. Buccino Dep. 225:21-25; 228:22-229:3 (though this policy is suspiciously lacking; "Q. [...] why does Flushing Bank need an operating

agreement for an LLC, but does not need a shareholders agreement for a corporation? A. That's our policy, it's been vetted and approved by regulators").

RESPONSE TO ¶1013. Disputed in part; immaterial. Admitted only that Flushing Bank requests an operating agreement (for an LLC) or shareholders agreement among its documents. (Buccino Dep. 225:21–25, 228:22–229:3 (Feb. 26, 2026).) The argumentative aside that the policy is "suspiciously lacking" is the plaintiffs' characterization; Buccino testified the policy "has been vetted and approved by regulators." The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue; the Plaintiffs have no standing to make this assertion/ implication against the lender.

¶ 1014. According to the shareholders' agreement that Deo signed for Superb, Deo did not have authority to sign checks on behalf of Superb. Thomasson Dep. 214:20-23.

RESPONSE TO ¶1014. OBJECTION [E]. Disputed. This assertion turns on the interpretation of a Superb shareholders agreement, which speaks for itself. Whether Deo had authority to sign checks on behalf of Superb is, in any event, genuinely disputed and is controverted by Deo's own testimony. Deo testified that Robert Urrutia authorized him to sign checks — "Tony said I could sign checks and he was going to make sure that Bruce took care of it" — based on a conversation with Urrutia in or about July (Deo Dep. Tr. 359:4–20 (Jan. 12, 2026)). Deo further testified that Bruce Novicky was "completely aware" that the Superb checks were being deposited into the Flushing account (id. 331:13–24), and that both Urrutia and Novicky were aware of, and had a conversation with Deo about, opening the Flushing account for the entity (Deo II Dep. 194:1–15 (Feb. 13, 2026)). That Urrutia — Superb's principal —

authorized Deo’s check-signing, and that Urrutia and Novicky were aware of the account, squarely controverts the assertion that Deo lacked authority.

¶ 1015. Flushing Bank failed to see a red flag in noting to Deo that the operating agreement for Northshore showed 99% ownership, which did not match his credit application showing 100% ownership; Flushing Bank thus failed to concerns regarding Deo’s representations concerning his alleged ownership of Northshore. Buccino Dep. 324:23-325:11; 99:11-16.

RESPONSE TO ¶1015. OBJECTION [E]. Objection as to form. Denied. “Red flag” and “failed” are argumentative and conclusory. Buccino testified that the 99%/100% ownership discrepancy gave rise to no concern that Deo was untruthful because “[f]urther dialogue satisfied this situation” (Buccino Dep. 325:4–11, as quoted). A discrepancy between a 99% and a 100% ownership representation — both reflecting Deo’s ownership of Northshore — does not establish fraud. The paragraph concerns Flushing Bank’s internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. Again the Plaintiffs have no standing to address this allegation.

¶ 1016. Moreover, Deo’s account was formed based on fraudulent documentation. Buccino Dep. 275:18-22 (“He presented the normal account ownership documentation and account opening documentation that we required that showed us he had authority. Q. You've reviewed those documents, correct? A. The bank reviewed the documents, yes”); 276:22-277:3 (“it's our practice to collect documentation that would outline usually who had authority over which corporate entity. Generally speaking, it's our procedure to request documentation that would outline who has authority to act on behalf of a business”); 277:10-12 (“we require business documentation in addition to the certificate of beneficial ownership”); 277:25-278:23.

RESPONSE TO ¶1016. OBJECTION [E]. Disputed. "Fraudulent documentation" is a legal conclusion, and the cited testimony refutes it. Buccino testified that Deo "presented the normal account ownership documentation and account opening documentation that we required that showed us he had authority" (Buccino Dep. 275:18–22, as quoted), and described the bank's ordinary practice of collecting documentation establishing authority (id. 276:22–278:23, as quoted). The documentation showed authority; it was not "fraudulent." Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1017. Flushing Bank failed to detect that Superb was already in the process of opening a bank account for itself by its real owner, Urrutia. Buccino Dep. 214:14-22 ("If you tried to open an account for an entity that already has an account, you would be prompted and know that there is already accounts for that entity. And you'll have to work within that information. I don't know if I would describe it as quote/unquote 'a red flag.' But you wouldn't be able to open the second account without knowledge that the first account exists"); Buccino Dep. 214:24-215:17 ("would someone at Flushing Bank opening the account for an entity that already has an account be alerted to the fact that an earlier account was opened? A. So assuming you were using the same tax ID number you would be alerted to the existing account, yes. Q. And how would that occur? A. When you went to enter the new entity within our database within our core system, when you put in that tax ID number for the existing account, the existing profile for that entity would come up. Q. Wore that occurrence in and of itself result in any investigation being performed? A. No, because we have plenty of businesses that have multiple accounts, so it happens all the time").

RESPONSE TO ¶1017. OBJECTION [E]. Disputed. The premise is incorrect. Buccino testified that the accounts Urrutia discussed with Mr. Weinstein "were [never] actually opened — they were only discussed and negotiated" (Buccino Dep. 180:3–9 (Feb. 26, 2026)); there was thus no existing open Superb account for Flushing to "detect." The system alerts to an existing account only where one was opened under the same tax ID (id. 214:24–215:17). The reference to Urrutia as Superb's "real owner" assumes the disputed Superb ownership. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue.

¶ 1018. Flushing Bank failed to act in a commercially reasonable manner by failing to investigate Urrutia's complaint of an unauthorized bank account being opened and the resultant unauthorized transfers. Buccino Dep. 52:5-15 ("Q. So did you communicate with whomever it would be that would ultimately approve, whether it was a person or committee that ultimately approved the loan, whether they were aware of this ownership dispute at the time that they approved the loan and funded it? A. No. Q. Was it a concern of yours that there may have been a dispute at the time that the bank was aware of when the loan was approved? A. No").

RESPONSE TO ¶1018. OBJECTION [E]. Disputed. "Commercially [un]reasonable" and "failing to investigate" are argumentative conclusions concerning Flushing Bank's conduct, immaterial to the Deo Defendants. The cited testimony reflects only that the loan approvers were not made aware of an ownership dispute at approval (Buccino Dep. 52:5–15, as quoted) — because, as the bank testified, it understood Deo to be the owner and "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–19). Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1019. Flushing Bank's document gathering process failed to detect and prevent Deo's fraud. Buccino Dep. 58:13-16 ("The business banking department would review the totality of the application and all of its investigations in determining whether or not it would move forward"); 143:17-18 ("Mr. Puccio gathered documentation in relation to the application"); 144:4-14 (Puccio otherwise served as an advocate in application approval); Deo II Dep. 211:13-18 ("Q. Now, in this email there's a number of attachments. Why were you forwarding all of these attachments to Robert Puccio? A. It was the process of opening the accounts and the application for the line of credit").

RESPONSE TO ¶1019. OBJECTION [E]. Disputed. "Failed to detect and prevent Deo's fraud" assumes the very fraud Plaintiffs must prove and that the record disputes. The cited testimony describes Flushing Bank's ordinary document-gathering and review process — the business banking department reviewing "the totality of the application" (Buccino Dep. 58:13–16, as quoted) and Puccio gathering application documentation (id. 143:17–144:14, as quoted) — and Deo's forwarding of application materials in "the process of opening the accounts" (Deo II Dep. 211:13–18 (Feb. 13, 2026)). That is ordinary loan-application conduct, not fraud. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1020. Flushing Bank improperly relied upon the fraudulent operating agreement provided by Deo. Buccino Dep. 97:7-98:16 (senior loan closer Rosemary Miller requested an updated operating agreement); 98:25-99:10.

RESPONSE TO ¶1020. OBJECTION [E]. Disputed. "Fraudulent" and "improperly relied" are conclusory and argumentative. The cited testimony, as quoted, reflects ordinary due diligence — a senior loan closer requesting an updated operating agreement. Buccino testified that the documentation on file was "complete and satisfactory to give the authority to the accounts" (Buccino Dep. 318:14–23, as quoted) and that the ownership-percentage discrepancy gave rise to no concern that Deo was untruthful because "[f]urther dialogue satisfied this situation" (id. 325:4–11, as quoted). The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1021. Flushing Bank improperly relied upon the fraudulent letter provided by Thomasson, and it was not commercially reasonable for them to do so. Buccino Dep. 123:15-124:24; 126:2-6.

RESPONSE TO ¶1021. OBJECTION [E]. Denied. "Fraudulent," "improperly relied," and "not commercially reasonable" are conclusory characterizations. The cited testimony reflects that the Thomasson letter, together with the Jones affidavit, "gave Flushing Bank comfort to proceed" (Buccino Dep. 123:15–124:24, 126:2–6 (Feb. 26, 2026)) and affirmed Deo's ownership. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. See Defendants' Responses to ¶¶ 1037, 1059. Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1022. Flushing Bank issued the loan without having both sets of tax returns. Buccino Dep. 288:9-12 ("was it commercially reasonable for the bank to issue a loan without having both sets of tax returns. A. Yes"); 288:24-289:8 ("[...] If the bank required something and then waived that requirement, it was because they were satisfied with other documentation that was presented"); 289:22-290:7 ("[...] Q. These facts that were brought up by Steven are circumstances in which Flushing Bank would normally decline to issue a loan, correct? A. Possibly").

RESPONSE TO ¶1022. Disputed in part; immaterial. Admitted only that the loan may have issued without both sets of tax returns. The cited testimony establishes that this was commercially reasonable: Buccino testified it "was commercially reasonable for the bank to issue a loan without having both sets of tax returns" and that any waived requirement was "because they were satisfied with other documentation that was presented" (Buccino Dep. 288:9–12, 288:24–289:8, as quoted). The equivocal "possibly" answer (id. 289:22–290:7) establishes nothing. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue.

¶ 1023. Flushing Bank did not adequately assess whether documents provided were accurate. Buccino Dep. 294:8-12 ("Q. Do you know whether personal financial statements are reviewed for accuracy and to confirm that they are true and accurate? A. To the extent they could be reviewed, but I don't know"); 192:8-15 ("[...] Whether or not Mr. Deo was truthful was not for me to determine"); 205:5-9 ("Q. It's fair to say that when you looked at the information produced by Mr. Weinstein, you understood that there was an issue with the documents produced by Mr. Deo, correct? A. Yes"); 108:6-14 ("Q. Do you know if anybody at Flushing Bank

followed up to confirm the accuracy of any of the numbers in this profit and loss statement? A. I don't know. Q. Do you know if it's a process and procedure for Flushing Bank to require some sort of support for a profit and loss statement such as this? A. I don't know”).

RESPONSE TO ¶1023. OBJECTION [E]. Disputed. “Adequately assess” is argumentative and concerns Flushing’s internal review. The cited testimony reflects the witness’s lack of knowledge of the bank’s accuracy-review process (“I don’t know”), and his testimony that whether Deo “was truthful was not for [him] to determine” (Buccino Dep. 192:8–15 (Feb. 26, 2026)) — deferring to the Court, not establishing inaccuracy or fraud. The paragraph concerns Flushing Bank’s internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. Flushing’s Rule 30(b)(6) witness made no determination that Deo “engaged in fraud” (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank “was proper in its understanding of Mr. Deo’s ownership” (id. 192:8–11).

¶ 1024. Flushing Bank issued the loan without knowledge as to the Libertas financing and default. Buccino Dep. 122:8-16 (“Q. Do you know whether or not Anthony Deo ever disclosed to Flushing Bank about the Libertas Funding and/or the fact that it was in default? A. I don't know. Q. Do you know whether Flushing Bank would have financed the transaction at issue if it knew about the Libertas financing and default? A. I don't know”).

RESPONSE TO ¶1024. OBJECTION [E]. Disputed. The cited testimony is the witness’s repeated “I don’t know” — whether Deo disclosed the Libertas financing to Flushing, and whether the bank would have lent had it known (Buccino Dep. 122:8–16 (Feb. 26, 2026)). A witness’s lack of knowledge does not establish that Deo concealed anything or that the loan would have been declined; both are speculation. The paragraph concerns Flushing Bank’s

internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. The conclusory implication of concealment by Deo is denied.

¶ 1025. Flushing Bank issued the loan to Deo despite the existence of a TRO preventing same, and despite policy preventing same. Sara Dep. 244:16-245:10 ("Q. [...] was it your understanding that the TRO prevented either you or Mr. Deo from obtaining any loans or pledging any property of Northshore and/or Sunrise? A. More or less. [...] Q. Despite that restraint, did you and/or your husband obtain a loan from Flushing Bank in February or March of 2023 or perhaps April of 2023 on behalf of Northshore or Sunrise? [...] THE WITNESS: Exactly"); Buccino Dep. 188:24-190:4 ("[...] if there's an order a valid court order that says no bank or no institution should open an account for this person or this entity then we would do that. Q. Even if the account was already opened, correct? A. Well, if the account had already been opened and it shouldn't have been, then we would at the very least put a hold on the account. Q. That's standard Flushing Bank policy, correct? A. Yes").

RESPONSE TO ¶1025. OBJECTION [E]. Disputed. The witness's equivocal "more or less" does not establish the scope or applicability of any order. Whether any temporary restraining order in fact prohibited the Northshore or Sunrise financing, and whether any such order was violated, are contested questions of law reserved for the Court; Defendants do not concede that the financing violated any order. The cited Buccino testimony (188:24–190:4 (Feb. 26, 2026)) describes only Flushing Bank's general policy in the event of a valid court order and establishes nothing about the conduct of the Deo Defendants. The assertion is denied to the extent it asserts a violation, and these matters cannot be resolved on summary judgment.

¶ 1026. Flushing Bank issued the loan despite awareness and being in possession of documents demonstrating that Deo had no ownership interest in Superb. Buccino Dep. 304:4-20;

304:21-25 ("Q. [...] is it fair to say that Flushing Bank had in its possession documents indicating that Mr. Deo did not have any ownership interest in Superb at least for 2021? A. Yes").

RESPONSE TO ¶1026. Disputed in part; irrelevant. This assertion concerns Superb — not Northshore or Sunrise — and is immaterial to the ownership at issue. Deo's ownership of Superb arose from his purchase of 50% in November 2022 and the balance in February 2023; to the extent the assertion concerns 2021 it predates that acquisition and is immaterial. Defendants do not admit that Deo served as Superb's general manager — Deo acted as an owner — and any document so reflecting is consistent with that and immaterial. Flushing Bank nonetheless understood Deo to be the sole owner when the Superb account was opened (Buccino Dep. 241:19–25 (Feb. 26, 2026)) and made no determination that Deo engaged in fraud (id. 194:6–9).

¶ 1027. Flushing Bank "didn't do their due diligence in order to give a loan." Aaronson Dep. 162:24-163:4.

RESPONSE TO ¶1027. Disputed; irrelevant. Aaronson's assertion that Flushing Bank "didn't do their due diligence" is his lay opinion about a co-defendant bank's internal conduct and is irrelevant and without first hand knowledge. (Aaronson Dep. 162:24–163:4 (Jan. 7, 2026).) It is also controverted by Flushing's own Rule 30(b)(6) witness, who testified the bank did not err in extending the financing and "was proper in its understanding of Mr. Deo's ownership" (Buccino Dep. 192:8–19, 193:20–25 (Feb. 26, 2026)).

¶ 1028. For example, they seemingly did not follow their own security procedure surrounding monitoring bank accounts for suspicious activity. Buccino Dep. 268:22-269:8 ([...] "accounts overall are risk rated based on who the customer is, what kind of transactions they are doing, and then we have certain applications and systems in place that will notice a repetition of funds moving out, amounts of funds moving out, location of funds moving out, things of that

nature that will raise flags for deeper review"); 269:22-270:3 ("Q. Has any activity on any of the accounts maintained by Mr. Deo on behalf of various corporate entities ever been triggered by the search for suspicious or unusual account activity by the systems in place to find it? A. I don't believe so, no"); 302:16-303:5 (transfer of $50,000 to Car Buyers, Inc. Was not flagged as suspicious activity); 68:10-15 ("Q. [...] does the bank have some process in place to review or to oversee transactions in and out of an account to see whether or not there may be some illegal activity going on? A. Okay, yes"); 68:21-70:14 (the Bank Security Act team would know more about this; "they have protocols and procedures in place. And there were certain limits and certain kinds of transactions that would get raised, [...]"); 72:18-25 ("they have protocols and procedures in place to flag certain transactions based on amounts or a destination. So that would cause a review. But just the simple fact that we gave the customer a loan, and then all of the funds shortly thereafter went out, wouldn't necessarily require a BSA or a regulatory review"); 194:13-22 ("I'm fairly certain that there would have been SARS filed probably on this matter. If not before then definitely after the lawsuit was filed and the fraud was claimed. [...] suspicious activity report that our BSA team would file for suspicious activity"); 195:5-8 ("Q. Are you aware of any SARS report filed in relation to this case prior to August of 2023? A. No"); 238:19-22 ("I know there was no complaint or inquiry with regards to the transactions because that wasn't our bank response to this entire process").

RESPONSE TO ¶1028. OBJECTION [E]. Denied. The assertion concerns Flushing Bank's internal monitoring and is immaterial to the Deo Defendants; Plaintiffs have no standing to assert this paragraph. The cited testimony in fact reflects that no suspicious or unusual activity was ever flagged on the accounts Deo maintained: asked whether activity on those accounts had "ever been triggered by the search for suspicious or unusual account activity," Buccino testified

"I don't believe so, no" (Buccino Dep. 269:22–270:3, as quoted), and the $50,000 transfer to Car Buyers was not flagged (id. 302:16–303:5, as quoted). That a SARS might be filed once "fraud was claimed" in litigation (id. 194:13–22 (Feb. 26, 2026)) reflects the litigation, not any finding of fraud.

¶ 1029. Flushing Bank failed to utilize security features. Buccino Dep. 272:13-273:5 ("Q. To your knowledge, were there any security features on the accounts opened by Mr. Deo for Superb? A. Nothing beyond normal account security interest. Q. What are the normal account security interests? A. Well, the same systems that we use for suspicious activity reporting could also detect fraud and track, you know, elicit funds being moved back and forth, things of that nature. Q. And those security features are the same across the board for any bank account, correct? A. Yes. Q. To your knowledge, there were no added security features for the Flushing Bank account for Superb, correct? A. I don't recall there being any"); 57:20-58:6 ("Q. So there would be a procedure within the business banking department to just determine whether the litigation that involves an applicant does or does not affect the business loan application? [...] A. Maybe there is a procedure and policy for that. Q. But there's no attorney in the business banking department, correct? A. Correct"); 186:4-13 ("I think in most cases there is an automation for a first level review and then both in Oasis and in the ACH there is then a second level manual review after it's been flagged. Q. If the automated system does not detect anything, it never gets to the second level of review where an individual looks at it, correct? A. That's more likely than not true, yes"); 201:21-202:3 ("Presumably when the lawsuit was filed and the matter was discussed internally a search was done to see if there had been transactions that should have gotten flagged and reviewed, but to my knowledge there's nothing that came up from any of

those searches that we found to be concerned"); 241:2-5 ("Q. [...] no such security features were added to the account Flushing had opened for Superb, correct? A. I don't believe so, no").

RESPONSE TO ¶1029. OBJECTION [E]. Denied. The assertion concerns Flushing Bank's internal security configuration and is irrelevant as to the Deo Defendants. The cited testimony reflects that the accounts carried the bank's normal security features (Buccino Dep. 272:13–273:5, 241:2–5 (Feb. 26, 2026)) and that a search conducted after the lawsuit found "nothing that came up … that we found to be concerned" (id. 201:21–202:3) — undercutting any inference of fraud. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1030. Buccino essentially admitted that the security procedure was subpar. Buccino Dep. 213:23-214:7 ("there's a procedure and a policy as to what is required to open the account, but there isn't a system in place to guarantee that all those documents or whatever they are are actually taken in. There's a review after that that has to happen, but there's not like a stop per se that prevents you from opening the account without something. Or at least there wasn't, we're working on fixing that").

RESPONSE TO ¶1030. OBJECTION [E]. Disputed. That Buccino "essentially admitted" the procedure was "subpar" is the plaintiffs' argumentative characterization, not the witness's testimony. Buccino described the bank's account-opening procedure and a separate post-opening review (Buccino Dep. 213:23–214:7 (Feb. 26, 2026)); he did not characterize it as

"subpar." The paragraph concerns Flushing Bank's internal procedures and is irrelevant as to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue.

¶ 1031. Flushing Bank did not conduct proper investigations, which were warranted. Buccino Dep. 261:10-11 ("If there are specific requirements with funds usage, then we might investigate"); 163:5-13 (decided not to investigate whether any employee of Flushing Bank was accepting bribes); 164:17-20 ("Q. Are you aware as to any requirement that Flushing Bank thoroughly investigate any allegations of accepting bribes by its employees? A. I'm not"); 238:25- 239:11 ("When the accounts were held, we did a review to determine if the hold should last or if it should come back off and let Mr. Deo transact. We determined not to in an abundance of caution, but we didn't do any investigation into individual transactions. Mr. Urrutia did not submit any kind of formal complaint with regards to specific transactions. And from Mr. Deo's standpoint, I'm not sure if he was in a position to do so because he wasn't the customer on the account").

RESPONSE TO ¶1031. OBJECTION [E]. Denied. Whether Flushing Bank's investigations were "proper" or "warranted" is argumentative and concerns Flushing's internal conduct. The cited testimony reflects that the bank reviewed the matter and elected, "in an abundance of caution," not to investigate individual transactions, and that Urrutia "did not submit any kind of formal complaint with regards to specific transactions" (Buccino Dep. 238:25–239:11 (Feb. 26, 2026)). The paragraph concerns Flushing Bank's internal procedures and is irrelevant to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue.

¶ 1032. Flushing Bank did not comply with its Know Your Customer policy to detect and prevent fraud. Buccino Dep. 171:4-12; 172:15-176:18.

RESPONSE TO ¶1032. OBJECTION [E]. Disputed. The cited testimony describes Flushing Bank's Know Your Customer requirements (Buccino Dep. 171:4–12, 172:15–176:18 (Feb. 26, 2026)); it does not establish that the bank "did not comply" with them — that is the plaintiffs' conclusion. To the contrary, Buccino testified that the documentation on file was "complete and satisfactory to give the authority to the accounts" (id. 318:14–23, as quoted). The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. The premise of "fraud" is disputed: Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1033. Flushing Bank did not utilize its Oasis tool to detect and prevent Deo's fraud. Buccino Dep. 183:23-184:20 ("[Oasis] reviews checks of a certain limit. I believe it changes periodically depending on our four teams internal determinations. But any check over a certain amount would be reviewed against the account history of that check to make sure that the signature lines up, that the check number lines up with all the recent checks, that there's no repeat of the same check number. It will also have a cursory review of the check amount and the payee name to make sure that it doesn't appear to have been doctored in any way, shape or form. [...] Q. And while Oasis is typically used to determine whether there are any fraud in relation to checks issued, does Oasis also get used for wire transfers or ACHs? A. No").

RESPONSE TO ¶1033. OBJECTION [E]. Denied. The cited testimony reflects that the "Oasis" tool reviews checks and is not used for wire transfers or ACHs (Buccino Dep. 183:23–184:20 (Feb. 26, 2026)); whether the bank "utilize[d]" it is the plaintiffs' conclusion. The paragraph concerns Flushing Bank's internal procedures and is irrelevant as to the conduct of the

Deo Defendants and to the ownership of Northshore and Sunrise at issue. The premise of "Deo's fraud" is disputed and unestablished: Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1034. Flushing Bank's fraud department was not properly utilized to prevent and detect Deo's fraud. Buccino Dep. 199:11-200:3 ("Q. You referred to a fraud protection, is that a specific department that Flushing Bank has? A. We have a fraud department, yes. Q. Does the fraud department utilize any sort of ticketing system in terms of various fraud events that may occur? A. They work kind of hand in hand with the BSA team to review suspicious activity and fraudulent activity and they use some of the same things. Q. Is there any sort of repository for potentially detecting fraud that gets flagged when reviewed? A. The fraud, both the fraud and BSA teams have repositories for their investigations, so that's probably what you're talking about"); 201:11- 13 ("The fraud team has some semblance of tracking to determine cases that come up and how they're handled and what their final review is").

RESPONSE TO ¶1034. OBJECTION [E]. Denied. The cited testimony describes the structure of Flushing Bank's fraud and BSA functions (Buccino Dep. 199:11–200:3, 201:11–13 (Feb. 26, 2026)); it does not establish that the department was "not properly utilized," which is the plaintiffs' conclusion. The paragraph concerns Flushing Bank's internal procedures and is immaterial to the conduct of the Deo Defendants and to the ownership of Northshore and Sunrise at issue. The premise of "Deo's fraud" is disputed: Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11).

¶ 1035. Flushing acknowledges that Deo's representations to it are questionable. Buccino Dep. 257:15 ("We know his representations are in question").

RESPONSE TO ¶1035. Admitted in part; clarified. Admitted that Buccino testified Deo's representations are "in question" (Buccino Dep. 257:15 (Mar. 24, 2026)) — that is, disputed in this litigation. Defendants clarify that Buccino expressly declined to say the representations were false, testifying that their truth or falsity is for "the Court [to] determine" (id. 257:16–19), and that Flushing's Rule 30(b)(6) witness made no determination that Deo "engaged in fraud" (Buccino Dep. 194:6–9 (Feb. 26, 2026)) and testified the bank "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11). That representations are "in question" in litigation confirms a genuine dispute, not falsity or fraud.

¶ 1036. In spite of the litigation against Deo – which should have called his authorization into question – Flushing Bank has maintained that "we are going to let the Court determine that." Buccino Dep. 257:16-19; 274:10-14 ("Q. Has Flushing Bank, as of this date, made any determination as to whether Mr. Urrutia has authority over Superb? A. No. Again, we are going to let the Court do that"); 305:10-15 ("Q. It's fair to say that as of March 31, 2023, Flushing Bank was at least aware of the complaint allegations listed in this complaint that we're looking at, correct? [...] A. Yes"); 56:14-57:9 ("[...] is it your understanding that Flushing Bank became aware of that lawsuit prior to its funding or approval of funding of the loan? A. Yes"); 237:17-238:6 ("The account was put on hold as discussed. And the lawsuit here was filed, and at that point it became a determination for the court to make. Q. There was approximately a two-week stretch in time between the date the lawsuit was filed and the date Mr. Urrutia contacted Flushing Bank. In that short time frame was any complaint, inquiry or investigation opened as to whether the transactions were authorized? A. No. Q. How do you know that? A. Because it wasn't part of

our response to the initial reference by Mr. Urrutia"); 186:22-187:3 ("is Flushing Bank required to search for publicly-available information concerning lawsuits about the customer that is seeking to open an account? A. To my knowledge that is not a requirement, no"); 194:6-9 ("Q. Did Flushing Bank make any determination as to whether Mr. Deo engaged in fraud? A. No").

RESPONSE TO ¶1036. OBJECTION [E]. Denied as self serving and irrelevant. Admitted that Flushing Bank has made no determination as to Deo's (or Urrutia's) authority and is "going to let the Court" decide (Buccino Dep. 257:16–19, 274:10–14 (as quoted)), that it made no determination that Deo engaged in fraud (id. 194:6–9 (Feb. 26, 2026)), and that no complaint or investigation as to specific transactions was opened in the interim (id. 237:17–238:6). The argumentative assertion that the litigation "should have called his authorization into question" is denied: Buccino testified the bank was not required to search for lawsuits about a customer (id. 186:22–187:3) and that it "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11). The bank's deferral to the Court confirms a genuine dispute, not wrongdoing by Deo.

¶ 1037. Flushing Bank improperly relied upon a letter by Thomasson stating that he expected the decision on his motion to dismiss in sixty days. Buccino Dep. 306:9-307:7 ("[...] [This letter] gave us confidence in the representations from Mr. Deo regarding his ownership of the businesses"); 65:15-22 ("I did see a letter from Mr. Thomasson at the time, yes. [...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate").

RESPONSE TO ¶1037. OBJECTION [E]. Denied. "Improperly relied" is argumentative and concerns Flushing Bank's own reliance decisions, irrelevant as to the Deo Defendants. The cited testimony reflects that the Thomasson letter "gave [the bank] confidence in the representations from Mr. Deo regarding his ownership of the businesses," and stated the

dispute "was a normal business dispute" and that "Mr. Deo's ownership presentation was still valid and legitimate" (Buccino Dep. 65:15–22, 306:9–307:7, as quoted) — affirming, not undermining, Deo's ownership. See Defendants' Response to ¶ 1059. In fact, the Gianelli decision in the then pending state court matter was decided on or about June 1, 2023, approximately sixty (60) days after the letter at issue.

¶ 1038. Moreover, Flushing Bank relied upon words by Jones which gave it comfort ("… it was something along the lines of them having filed tax documentation on behalf of … Deo or the business reflecting the ownership interest as presented to us, because they have assurances or because a sale had gone through that made that the new ownership"). Buccino Dep. 66:17-25.

RESPONSE TO ¶1038. Objection as to the use of the word comfort. Denied as irrelevant. The paragraph concerns Flushing Bank's own reliance and is irrelevant as to the Deo Defendants. The cited testimony indicates that the lender accepted the accountant's (Jones's) representation that tax documentation had been filed reflecting the Deos' ownership interest — consistent with the Jones affidavit that the returns were amended "to reflect the Deo's ownership of the two companies" (Buccino Dep. 126:7–16 (Feb. 26, 2026)). The cited testimony thus affirms Deo's ownership.

¶ 1039. Flushing Bank maintains that Deo merely had apparent authority to act on behalf of Northshore, but notes that this was due to documentation and representations; which, as we have established, were fraudulent. Buccino Dep. 258:11-19; 260:16-20 ("Q. Do you know whether Flushing Bank has made any determination as to whether the financial records provided by Mr. Deo about North Shore were true and accurate? A. No, we have not"); 266:17-20 ("I recall a conversation about documents that were given to David Weinstein by Tony Urrutia that

the documents were inconsistent. I don't recall specifically what those documents were"); 318:14-23 ("Q. You stated that the documentation on file for the LLC was also complete and satisfactory to give the authority to the accounts, correct? A. Yes. Q. And that is referring to North Shore based on the fact that Mr. Deo provided an operating agreement listing himself originally initially as 99- percent owner and then amended it to list himself as 100-percent owner, correct? A. Based on the entire documentation, yes"); 324:23-325:3 ("Q. So do you recall the incident in which Flushing Bank told Mr. Deo that the operating agreement showing 99-percent ownership does not match his credit application showing that he's 100-percent owner? A. Yes"); 325:4-11 ("Does the fact that there was a discrepancy between the percentage of ownership there alone, does that fact give rise to any concern by Flushing Bank that Mr. Deo was not being truthful on his application? A. No. Q. Why is that? A. Further dialogue satisfied this situation").

RESPONSE TO ¶1039. OBJECTION [E]. Objection as to form and the self serving conclusion of establishing fraud. Denied. The assertion that the documentation and representations "were fraudulent" is a conclusory legal conclusion the plaintiffs merely assume ("as we have established"), and the cited testimony refutes it. Buccino testified that the documentation on file was "complete and satisfactory to give the authority to the accounts" (Buccino Dep. 318:14–23, as quoted); that the 99%/100% ownership discrepancy gave rise to no concern that Deo was untruthful because "[f]urther dialogue satisfied this situation" (id. 325:4–11, as quoted); and that the bank made no determination that Deo's financial records were untrue (id. 260:16–20, as quoted) or that Deo engaged in fraud (id. 194:6–9 (Feb. 26, 2026)). "Apparent authority" is the bank's characterization; whether Deo had authority turns on the contested ownership question and is genuinely disputed. The conclusory "fraudulent" is denied.

¶ 1040. Moreover, Flushing Bank was aware that Urrutia objected to Deo's authority. Buccino Dep. 271:2-9; 271:18-22 ("Since he complained about the account opening being unauthorized, do you understand his complaint to also mean that any resultive activity in that account was also unauthorized? A. Yes"); 272:9-12; 232:18-233:4 ("Q. Is it fair to say that when Mr. Urrutia contacted Flushing Bank and complained about the unauthorized transactions on the account, he was calling as an agent of Superb? [...] A. He was claiming to be an agent of Superb, yes. Q. … he did provide evidence of his ownership in Superb, correct? A. Yes").

RESPONSE TO ¶1040. Admitted in part; clarified. Admitted that, after Urrutia contacted Flushing Bank in August 2023, the bank became aware that Urrutia objected to the Superb account and claimed its transactions were unauthorized, that Urrutia claimed to be an agent of Superb, and that he provided evidence of an ownership interest in Superb. (Buccino Dep. 232:18–233:4 (Feb. 26, 2026).) Defendants clarify: (a) the objection post-dated the opening and operation of the account; (b) Flushing understood Deo to be the sole owner of Superb when the account was opened (id. 241:19–25), and Buccino testified the bank had "no basis to dispute" Urrutia's competing ownership claim either (id. 233:5–15) — reflecting genuinely competing claims to Superb; and (c) Flushing made no determination that the transactions were unauthorized, leaving that "for the court" (id. 234:2–236:17). Buccino's agreement that Urrutia's complaint "mean[t]" the activity was unauthorized (id. 271:18–22, as quoted) reflects Urrutia's position, not any determination by the bank. The matter is immaterial to the ownership of Northshore and Sunrise at issue.

¶ 1041. In fact, in response to the complaint as a security measure, Flushing Bank put a hold on that account to prevent any further activity. Buccino Dep. 271:23-272:2; 273:23-274:9.

RESPONSE TO ¶1041. Admitted that, after Urrutia's complaint, Flushing Bank placed a hold on the account preventing further activity. (Buccino Dep. 271:23–272:2, 273:23–274:9 (as quoted); see also id. 128:8–19, 239:24–25 (Feb. 26, 2026).) A precautionary hold imposed by the bank in response to competing claims establishes no wrongdoing by Deo, and Flushing made no determination that any transaction was unauthorized (id. 234:2–236:17). The fact is immaterial to the claims and defenses at issue.

¶ 1042. Puccio of Flushing Bank was aware that there were two signers on the account. Buccino Dep. 309:22-310:12 ("Q. And in this list of documents he asks for signer one and the signer two information, correct? A. Yes. Q. And that's because Mr. Puccio knew that there were two signers on this account, right? [...] A. I don't know what Mr. Puccio knew. Q. Generally speaking, Flushing Bank would not ask for the identity of two signers if it had no basis to believe that there were two signers, correct? A. It might have been conditional if there were two signers to provide information for both. I don't know").

RESPONSE TO ¶1042. OBJECTION [E]. Disputed. The cited testimony does not establish that Puccio "was aware" of two signers. Buccino testified "I don't know what Mr. Puccio knew," and, asked whether the bank would request two-signer information only if it believed there were two signers, answered that it "might have been conditional" and "I don't know." (Buccino Dep. 309:22–310:12 (Mar. 24, 2026, as quoted).) The assertion rests on an inference the witness expressly declined to confirm, and is denied.

¶ 1043. Deo committed fraud by representing he was the 100% owner of Superb to open a bank account for it. Urrutia Dep. 257:18-258:15 ("opening up a commercial bank account is not an easy thing. And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio and saying, "Hey, I need to open a

bank account for Superb Motors," showing himself as a 100 percent CEO when he just provided you with a personal financial statement mentioning no ownership, nothing about Superb, all these other assets that don't exist, the $10 million in homes or 3 million in mortgages, and in no mention in that BFS of any – any ownership for Superb. But he sent one email to Rob Puccio to if he could open the account, and within a couple of days he had an account opened. I had been working on it for over a week").

RESPONSE TO ¶1043. OBJECTION [E]. Denied. "Deo committed fraud" is a conclusory legal conclusion, not a statement of material fact, and the cited testimony does not establish it. The cited passage is Urrutia's argumentative narrative expressing surprise at how readily Deo opened the Superb account (Urrutia Dep. 257:18–258:15 (Jan. 8, 2026)) — opinion and complaint, not evidence of fraud. The secret-fraud premise is squarely controverted by Deo's own testimony that Urrutia and Bruce Novicky were aware of, and conversed with Deo about, opening the Flushing account for the entity (Deo II Dep. 194:1–15 (Feb. 13, 2026)), that Urrutia authorized Deo to sign checks ("Tony said I could sign checks," Deo Dep. Tr. 359:4–20 (Jan. 12, 2026)), and that Novicky was "completely aware" the checks were being deposited into that account (id. 331:13–24). Conduct that the counterparty knew of and authorized is not fraud. Flushing Bank's neutral Rule 30(b)(6) witness further testified that the bank understood Deo to be the sole owner of Superb when the account was opened (Buccino Dep. 241:19–25 (Feb. 26, 2026)), that it "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11), and that it made no determination that Deo engaged in fraud (id. 194:6–9). That Deo opened a Superb account does not establish fraud, and the asserted Superb-ownership representation is in any event immaterial to the ownership of Northshore and Sunrise at issue. Denied.

¶ 1044. By the end, there was only $2,000.00 left in the Flushing Bank account. Buccino Dep. 211:12-22.

RESPONSE TO ¶1044. OBJECTION [E]. Admitted, though irrelevant. An account balance at a point in time establishes no wrongdoing: funds drawn from the account were used in the operation of the business, and Flushing made no determination that any transaction was unauthorized (Buccino Dep. 234:2–236:17 (Feb. 26, 2026)). To the extent the paragraph implies wrongful depletion by Deo, it is denied, and the matter is immaterial to the ownership of Northshore and Sunrise at issue.

¶ 1045. Flushing Bank was damaged by Deo's inability or refusal to pay back the loan. Buccino Dep. 193:12-19.

RESPONSE TO ¶1045. Admitted in part; clarified. Admitted that Buccino testified Flushing Bank was not repaid on the loan (Buccino Dep. 193:12–19 (Feb. 26, 2026)). Defendants clarify, on the same testimony, that this was Northshore's loan and "not Mr. Deo's personal loan" (id. 193:4–5), and that Buccino characterized the non-repayment as an ordinary commercial risk — "we lose money by issuing the loan, it's part of business" (id. 194:2–5). Buccino further testified the bank did not err in extending the financing (id. 192:16–19, 193:20–25) and made no determination that Deo engaged in fraud (id. 194:6–9). An unpaid commercial loan to the entity is not evidence of wrongdoing by Deo and does not establish any element of Plaintiffs' claims. Further, the Plaintiffs have no standing to assert damages on behalf of the lender.

¶ 1046. Deo admits to encumbering Northshore's assets and committing to use the funds financed for the benefit of Northshore. Deo Dep. 140:17-22 ("Q. Were you aware that there was a requirement by Libertas in your application and their approval that the funds that they were

going to be providing could only be used for the business of Northshore and Sunrise? A. I mean, that was my intention").

RESPONSE TO ¶1046. Admitted that Deo testified his intention was that the Libertas funds be used for the business of Northshore and Sunrise. (Deo Dep. Tr. 140:17–22 (Jan. 12, 2026) ("that was my intention").) That the financing was intended for, and encumbered, the business confirms it was legitimate entity financing for the benefit of the business — consistent with Deo's authority as the day-to-day operator (Chabrier Dep. 17:25–18:9 (Jan. 9, 2026)) and owner — and is inconsistent with the asserted conversion.

¶ 1047. The Deo Defendants took dealership vehicles for personal use. Merckling Dep. 284:18-21 ("Q. Okay. And were you asked to provide any compensation to the dealership for the use of that vehicle? A. No"); Merckling Dep. 283:20-25 ("Q. So did Mr. Deo tell you that one of the benefits of working for him was that he could allow you to use one of the cars owned by the dealership and you could use it for your purposes? A. Yes").

RESPONSE TO ¶1047. OBJECTION [B] [E]. Denied. The testimony does not support the assertion that "the Deo Defendants took dealership vehicles for personal use." It describes Deo permitting an employee — Merckling — to use a company vehicle as a benefit of employment (Merckling Dep. 283:20–25, 284:18–21). Providing an employee the use of a company vehicle is an ordinary and lawful business practice, not a misappropriation of dealership property by the Deo Defendants. The conclusory assertion is denied.

¶ 1048. Deo caused the dealerships he operated to suffer losses such that they were unable to pay their debts. O'Sullivan Dep. 186:18-21 ("I might have a $100,000 in the bank account, the payoffs might be $200,000, I couldn't payoff the trades").

RESPONSE TO ¶1048. OBJECTION [E]. Denied. The cited testimony does not support the assertion that Deo "caused" the dealerships' losses. O'Sullivan described a cash-flow shortfall at a point in time — that available cash could be less than the payoffs then due (O'Sullivan Dep. 186:18–21 (Mar. 30, 2026)) — not any act by Deo causing losses. Causation is a conclusory assertion unsupported by the cited testimony. O'Sullivan, the controller, recorded and tracked the obligations (id. 158:13–21, 167:16–168:5), and the floor-plan and trade obligations were ultimately satisfied (Aaronson Dep. 194:25–195:13 (Jan. 7, 2026); Urrutia Dep. 27:5–10 (Jan. 8, 2026)). Operating losses and cash-flow timing in the used-car business do not establish wrongdoing or causation by Deo.

¶ 1049. Deo misappropriated dealer plates. Aaronson Dep. 123:18-124:4 ("Q. Did you ever see him yourself take plates? A. Yes, we were aware that he had the plates on the car, yes. [...] I saw that Anthony was driving around with our dealer plates, and Anthony told me that he had our plates").

RESPONSE TO ¶1049. OBJECTION [E]. Denied. "Misappropriated" is a conclusory legal conclusion, and the cited testimony does not establish a wrongful taking. Asked whether he ever saw Deo "yourself take plates," Aaronson admitted "I didn't personally" (Aaronson Dep. 123:18–24 (Jan. 7, 2026)). His testimony is only that Deo openly had the dealer plates on a car, was "driving around with" them, and "told [Aaronson] that he had [the] plates" (id. 124:1–4) — open possession and disclosure, not a concealed or wrongful taking. Deo, as the owner and authorized day-to-day operator of the dealership, openly using dealer plates is consistent with his ownership and operational roles, and his disclosure to Aaronson negates the wrongful intent that "misappropriation" requires. The conclusory assertion is denied.

¶ 1050. The IAG Plaintiffs understood that Deo caused a lot of liabilities for them and had no intention of paying it. Aaronson Dep. 258:23-25 ("We knew we owed our bank a lot of money and Anthony wasn't going to be the one paying it"); Aaronson Dep. 194:25-195:13 ("Q. You believe that … Deo took millions of dollars somehow out of Northshore … that he was not entitled to, right? A. Yes, he -- whether he took it or not, he lost it, and he, you know, did things that would be unethical, fraudulent, millions of dollars, yes, and not paid off customers' cars, et cetera, et cetera, yes. Q. But all those cars are, in fact, today paid off; is that right? A. By [IAG], yes").

RESPONSE TO ¶1050. OBJECTION [E]. Denied. There is not a shred of evidence to support the conclusion that millions were wrongfully taken by any Deo Defendant from these dealerships. There is not a single transaction listed removing such sums, nor is there any day or methods advanced asserting such sums as having been wrongfully taken. The asserted "understanding" that Deo "had no intention of paying" is Aaronson's lay opinion about Deo's state of mind, not competent evidence of Deo's intent, and is denied. The cited testimony, moreover, undercuts the premise it is offered to support. First, Aaronson's claim that Deo "took millions of dollars" is admitted speculation: in the very same answer, Aaronson conceded "whether he took it or not, he lost it" (Aaronson Dep. 195:2–6 (Jan. 7, 2026)). A witness who cannot say whether Deo "took" anything cannot establish conversion or theft, and "lost it" describes business losses, not misappropriation. The accompanying labels — "unethical, fraudulent" — are conclusory legal conclusions, not statements of fact. Second, the same cited testimony establishes that the asserted liabilities were satisfied: Aaronson admitted that "all those cars are, in fact, today paid off," "[b]y [IAG]" (Aaronson Dep. 195:11–13). The obligations having been paid, the question of who — as among the IAG Plaintiffs and Deo — ultimately

requires proof that such monies were taken and due back from the Deo Defendants, and no such evidence has been presented regarding any specific sums of money.

¶1051. Deo committed Northshore to repaying $900,000.00 in future receivables for the $735,000.00 loan, thereby encumbering Northshore. Deo II Dep. 187:3-7 ("Q. Now, when you took out the Libertas funds, do you know how much money had to be repaid? A. Somewhere in the whereabouts of $900,000").

RESPONSE TO ¶1051. Admitted that Deo testified the Libertas obligation was to be repaid in the whereabouts of $900,000. (Deo II Dep. 187:3–7 (Feb. 13, 2026).) That a future-receivables financing carries a repayment premium is ordinary and does not establish wrongful "encumbrance"; Deo, as owner and operator, was authorized to direct the entity's finances (plaintiff Aaronson admitted Deo "was authorized to operate" and to run the day-to-day business, Aaronson Dep. 39:6–40:18, 199:12–23) (Jan. 7, 2026); Chabrier admitted Deo "got authorization" for the Northshore loan, Chabrier Dep. 147:3–5 (Jan. 9, 2026)).

¶ 1052. Libertas gave a loan to Deo on behalf of Northshore, without Chabrier's (or any other member's) authorization. Chabrier Dep. 145:2-11.

RESPONSE TO ¶1052. OBJECTION [E]. Denied. The assertion that the loan was made "without Chabrier's (or any other member's) authorization" rests on the contested premise that Chabrier and the other IAG Plaintiffs were the members of Northshore whose authorization was required — the very ownership question in dispute. Deo testified that he and Sara were the members of Northshore (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026)); the amended 2020 return reflects Anthony Deo (99%) and Sara Deo (1%); and Aaronson admitted the Deos held themselves out as owners on the tax returns (Aaronson Dep. 92:19–22 (Jan. 7, 2026)). In any event, Chabrier admitted that he "gave [Deo] the day-to-day" and that Deo "was the day-to-day

operator" of Northshore (Chabrier Dep. 17:25–18:9 (Jan. 9, 2026)), and that Deo was authorized to draw under the floor plan and "buy cars" (id. 81:19–22). As the authorized day-to-day operator, Deo's obtaining working-capital financing for Northshore fell within his authority, and the financing was undertaken for the benefit of the business (Deo II Dep. 133:5–7 (Feb. 13, 2026)). That Chabrier may not have personally signed off on the specific loan does not render it unauthorized.

¶ 1053. Thomasson did not review the Libertas Agreement. Thomasson Dep. 122:9-16.

RESPONSE TO ¶1053. Admitted. Defendants clarify that the Libertas Agreement was not provided to Thomasson, which is why he did not review it. This admission undercuts any suggestion that Thomasson reviewed, prepared, negotiated, or facilitated the Libertas financing (cf. Defendants' Responses to ¶¶ 956, 973), and confirms that Thomasson had no substantive role in that transaction.

¶ 1054. Thomasson purports to have advised Deo about the contours of a preliminary injunction issued by Justice Gianelli, but cannot recall specific details. Thomasson Dep. 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]").

RESPONSE TO ¶1054. Admitted. However, speculation about an attorney's general practice is not evidence that Deo received advice about, or had knowledge of, any specific prohibited conduct — as the paragraph itself concedes, Thomasson "cannot recall specific details." The assertion therefore establishes no material fact and supports no inference that Deo knowingly did or failed to do anything. The matter is in any event immaterial to the ownership

of Northshore and Sunrise at issue, and the substance of any communications between Deo and his counsel is protected by the attorney-client privilege, which Defendants do not waive.

¶ 1055. Thomasson had knowledge that Deo was going to – but did not yet – purchase the other half of Superb. Thomasson Dep. 178:9-21.

RESPONSE TO ¶1055. Admitted that Thomasson was told this in July 2023, just before the LockOut. To the extent it bears on anything, it confirms that Deo was actively negotiating to acquire dealership interests during the relevant period — consistent with the record (see, e.g., J. Baron Dep. 17:14–16, 53:22–54:2 (Jan. 21, 2026) (Deo paid $50,000 toward 189 Sunrise and a $10,000 down payment toward "taking over some of the prior locations")).

¶ 1056. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 274:8-19 (Thomasson e-mailed Shanks on November 18, 2022 "I will forward you my wiring instructions [...]"); 280:10- 281:9 ("[...] I told him at my convenience that it was going back to my client. And if that happened to [sic] after it was initiated and before the wire hit, then he should have stopped the wire. If he had a problem with that. [...]"); 282:12-17 ("Josh Aaronson absolutely is at fault for steeling [sic] $735,000. He knew damn well wasn't his. He knew damn well that Deo had taken that money. He is a thief. That is what he is. I gave the money back to the man who borrowed it").

RESPONSE TO ¶1056. OBJECTION [E]. Objection as to form reasserted. Denied, and this is repeated by the Plaintiffs. "Wire fraud" is a conclusory legal conclusion — the recitation of a federal criminal offense — not a statement of material fact, and is not a proper statement under Local Civil Rule 56.1. The cited testimony describes an ordinary attorney trust-account

transmittal, not fraud. It reflects that the funds were returned to Thomasson's IOLA (attorney trust) account and that Thomasson then wired them to Deo, his client (Thomasson Dep. 113:10–114:15, 115:2–15). Transmitting funds through an attorney trust account to one's own client is a routine and lawful function of counsel — and Thomasson did so openly, emailing his wiring instructions to opposing counsel (id. 274:8–19). Open transmittal to the adversary's own lawyer is the antithesis of a covert "fraud." The cited testimony in fact supports that the funds belonged to Deo. Thomasson testified that the money was "going back to my client" and that he "gave the money back to the man who borrowed it," characterizing Aaronson as having taken funds Aaronson "knew … wasn't his" (Thomasson Dep. 280:10–281:9, 282:12–17). At most, this reflects a contested civil dispute over entitlement to the $735,000 — the same dispute addressed in Defendants' Response to ¶ 1062 — not a "wire fraud." The conclusory assertion of "wire fraud" is denied.

¶ 1057. Thomasson admits aiding Deo in his fraud. Thomasson Dep. 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835.

RESPONSE TO ¶1057. OBJECTION [E]. Disputed. "Thomasson admits aiding Deo in his fraud" is both a conclusory legal conclusion and a mischaracterization of the cited testimony; Thomasson admitted no such thing. The cited testimony is mere document recognition. Thomasson testified only that a letter "looks like something [he] would have given to Mr. Deo" (Thomasson Dep. 144:25–145:4). Recognizing a letter as one he likely authored or provided to his client is not an admission of aiding anything, of knowledge of any wrongdoing, or of fraud — the words "aid," "knowing," and "fraud" appear nowhere in the quoted testimony. Providing a letter to a client is an ordinary function of counsel. The paragraph's predicate — "his fraud" — assumes the very fraud Plaintiffs must prove and that the record disputes. Flushing Bank's

neutral Rule 30(b)(6) witness made no determination that Deo “engaged in fraud” (Buccino Dep. 194:6–9 (Feb. 26, 2026)), and plaintiff Aaronson could not identify a single fraudulent transaction while admitting Deo “was authorized to operate” (Aaronson Dep. 199:12–23 (Jan. 7, 2026)). The letter at issue, moreover, affirmed Deo’s ownership and described the matter as a normal business dispute (see Response to ¶ 1059). The conclusory assertion is denied, and at a minimum presents disputed issues that cannot be resolved on summary judgment.

¶ 1058. Thomasson knowingly aided Deo in his fraud. Thomasson Dep. 270:7-10 (“[...] I was asked to have the funds pass through me and I said, sure”); FLUSHING3835.

RESPONSE TO ¶1058. OBJECTION [E]. Denied, and this is a repeated allegation by the Plaintiffs. “Thomasson knowingly aided Deo in his fraud” is a conclusory legal conclusion — it recites the elements of aiding-and-abetting fraud (knowledge, substantial assistance, and an underlying fraud) rather than stating a material fact, and is not a proper statement under Local Civil Rule 56.1. The cited testimony does not support it. Thomasson testified only that he “was asked to have the funds pass through me and I said, sure” (Thomasson Dep. 270:7–10). That an attorney agreed to have funds pass through his account is an ordinary function of counsel; standing alone it establishes no knowledge of any fraud, no “knowing” assistance, and no underlying fraud — indeed, the word “fraud” appears nowhere in the quoted testimony. The paragraph’s predicate — “his fraud” — assumes the very fraud Plaintiffs must prove and that the record disputes. Flushing Bank’s neutral Rule 30(b)(6) witness made no determination that Deo “engaged in fraud” (Buccino Dep. 194:6–9 (Feb. 26, 2026)), and plaintiff Aaronson, asked to identify a single fraudulent transaction, could not, while admitting Deo “was authorized to operate” (Aaronson Dep. 199:12–23 (Jan. 7, 2026)). The conclusory assertion of “fraud” and “knowing” aid is denied.

¶ 1059. A letter from Thomasson dated March 31, 2023 falsely "gave [Flushing Bank] confidence in the representations from Mr. Deo regarding his ownership of the businesses." Buccino Dep. 306:9-307:7; 309:4-8 ("Q. This was enough for you to -- for Flushing Bank to accept this representation and no longer have any concerns? A. I believe we also received something from the accountant, generally speaking, yes"); 65:15-22 ("[...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate"); FLUSHING3835.

RESPONSE TO ¶1059. OBJECTION [E]. Disputed. The word "falsely" is a conclusory, argumentative characterization that the cited testimony does not support. Buccino did not testify that the Thomasson letter was false. He testified that it gave Flushing confidence in Deo's ownership representations, that the bank "also received something from the accountant" (Buccino Dep. 309:4–8), and that the letter "generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate" (id. 65:15–22). None of that establishes that the letter — or Deo's ownership — was false. To the contrary, Flushing's Rule 30(b)(6) witness testified that the bank "was proper in its understanding of Mr. Deo's ownership" (Buccino Dep. 192:8–11 (Feb. 26, 2026)), that it made no determination that Deo engaged in fraud (id. 194:6–9), and that whether Deo's ownership representations were true or false is for "the Court [to] determine" (id. 257:13–19 (Mar. 24, 2026)). The documents Flushing relied on affirmed the Deos' ownership: the Jones affidavit reflected that the returns were amended "to reflect the Deo's ownership" (id. 126:7–16), and the accompanying materials reflected that Citrin Cooperman "verified that the claims against Northshore's owners are wrong" (id. 123:9–11). "Falsely" is a disputed legal conclusion, not a statement of material fact, and is denied.

¶ 1060. As a result of this letter, an attached affidavit from Jones, "and the totality of the application," Flushing Bank decided to proceed with financing despite the fact that there was a lawsuit. Buccino Dep. 124:13-24; FLUSHING6517; FLUSHING6520.

RESPONSE TO ¶1060. Admitted in part; clarified. Admitted that Flushing Bank decided to proceed with the financing based on the Thomasson letter (FLUSHING6520), the Jones affidavit (FLUSHING6517), and "the totality of the application," notwithstanding its knowledge of the pending lawsuit. (Buccino Dep. 124:18–24 (Feb. 26, 2026).) Defendants clarify, however, that the documents on which Flushing relied affirmed the Deos' ownership. The Jones affidavit stated that the tax returns were being amended "to reflect the Deo's ownership of the two companies" (Buccino Dep. 126:7–16; FLUSHING6517), and the accompanying materials reflected that Citrin Cooperman had "opined and verified that the claims against Northshore's owners are wrong" (Buccino Dep. 123:9–11). Flushing, a neutral institutional lender, made an independent decision based on the "totality of the application" and its own due diligence — with full knowledge of the lawsuit (id. 119:25–120:5) — and it made no determination that Deo engaged in fraud or that any transaction was unauthorized (id. 194:6–9, 234:2–236:17). So clarified, the paragraph establishes no misrepresentation or wrongdoing by the Deo Defendants.

¶ 1061. The application for a loan at Flushing Bank requires the borrower to inform the bank what it intends to do with the funds. Buccino Dep. 67:6-9.

RESPONSE TO ¶1061. OBJECTION [B]. Admitted only that a Flushing Bank loan application may, as a general matter, call for the borrower to state the intended use of the loan proceeds. That generic banking practice is immaterial standing alone: it establishes no misrepresentation, misuse of proceeds, or wrongdoing by Deo, and concerns the bank's ordinary

procedures rather than any conduct of the Deo Defendants. To the extent the paragraph is offered to imply that Deo misled Flushing Bank, Flushing's own Rule 30(b)(6) witness testified to the contrary. Buccino testified that Flushing opened the account with Deo as "the whole sole owner" of Northshore (Buccino Dep. 241:23–25 (Feb. 26, 2026)); that the bank "understood him to have authority when we transacted with him" (id. 258:5–6 (Mar. 24, 2026)); that it "was proper in its understanding of Mr. Deo's ownership" (id. 192:8–11); that it elected to "proceed with a loan despite the fact that this lawsuit existed" (id. 119:25–120:5); and that the bank made no determination that Deo "engaged in fraud" (id. 194:6–9) or that any transaction was unauthorized (id. 234:2–236:17). The cited practice therefore does not establish any material fact in Plaintiffs' favor.

¶ 1062. Thomasson damaged the Plaintiffs by "[h]elping facilitate some of the fraudulent activities that Deo performed at that location in regards to his $735,000 loan, the inability to repay customers' -- pay customers' warranties, things like that." J. Baron Dep. 20:19-21:7; 23:6-9; Aaaronson Dep. 150:21-151:2 ("I wanted the money that was taken, the $735,000 that was then given back to you to be held in escrow, and you chose to give it back to Deo, which caused me a lot of harm"); Chabrier Dep. 47:3-11 (Thomasson damaged Northshore by taking the $730,000 [sic] "[o]btained by Northshore, which [Chabrier] own[s]").

RESPONSE TO ¶1062. OBJECTION [B] [E]. Denied. The asserted "damage" rests on admitted hearsay, conclusory characterizations, no supporting evidence, and flies in the face of the Josh Aaronson created (through his accountants at Citrin Cooperman) and approved tax returns indicating the Deos' ownership of the two businesses. First, the cited Jory Baron testimony is, by his own admission, not based on personal knowledge. Asked what "firsthand knowledge" he had that Thomasson caused harm, Baron answered "I have the knowledge

through my partners" and "I was not involved in the day to day" (J. Baron Dep. 21:14–21); he confirmed he was "made aware" of Thomasson's purported involvement by his "partners" — Aaronson, Chabrier, and Phalon (id. 21:22–22:6); and he admitted "I have never met you" and had "no firsthand knowledge" of any wrongdoing by Thomasson (id. 25:17–18, 31:8–10). His "fraudulent activities" characterization (id. 21:1–6) is thus a conclusory, second-hand legal conclusion, not competent evidence. Baron further disclaimed any involvement with Northshore — "I have no involvement with Northshore Motors" (id. 32:1–3) — yet the cited $735,000 loan was Northshore's; he cannot establish harm arising from an entity and a loan he knew nothing about. Second, the only specific harm Chabrier identifies is that Thomasson "took $730,000" "[o]btained by Northshore, which I own" (Chabrier Dep. 47:7–11 (Jan. 9, 2026)) — a theory dependent entirely on Chabrier's disputed claim to own Northshore. That claim is contradicted by Deo's testimony that he and Sara were the members (Deo Dep. Tr. 56:23–24 (Jan. 12, 2026)), by the amended 2020 return reflecting Anthony Deo (99%) and Sara Deo (1%), and by Aaronson's admission that the Deos held themselves out as owners on the tax returns (Aaronson Dep. 92:19–22 (Jan. 7, 2026)); and it is irreconcilable with co-plaintiff Khan's competing claim that he is "still the owner" of Northshore (Khan Dep. 27 (Dec. 22, 2025)). Chabrier also admitted he does not know who guaranteed the loan (Chabrier Dep. 47:12–14) and that Deo "got authorization" for it (id. 147:3–5), controverting the "fraudulent" label. Third, the cited Aaronson testimony reduces to a dispute over the $735,000: he wanted the funds held in escrow and Thomasson returned them to Deo (Aaronson Dep. 150:21–151:2 (Jan. 7, 2026)), and asked what harm occurred beyond the $735,000, he could identify only his opinion that Thomasson "represent[s] someone who's caused … damage" (Aaronson Dep. 153). Counsel's return of

disputed funds to his client is a contested litigation matter and a legal conclusion, not undisputed evidence of "fraudulent activities."

¶ 1063. The IAG Plaintiffs were harmed by Thomasson's conduct. Aaronson Dep. 167:23- 168:5 ("I can't see how anyone can represent someone who has caused this much damage to somebody. So in my eyes, that you have caused a lot of unnecessary damage for a very, you know, to a lot of people for someone who is a very bad person").

RESPONSE TO ¶1063. OBJECTION [B] [E]. Disputed. The cited testimony does not establish the asserted fact, and the assertion is affirmatively controverted by the IAG Plaintiffs' own testimony. First, the cited Aaronson testimony is a conclusory expression of personal opinion and animus — that Deo is "a very bad person" who caused "unnecessary damage" — that identifies no specific conduct by Thomasson and no specific harm to any IAG Plaintiff. It is not competent evidence that "the IAG Plaintiffs were harmed by Thomasson's conduct." Second, IAG Plaintiff Asad Khan testified that he had never met Thomasson and had never even heard of him before his deposition: asked "Have we ever met, Mr. Khan?," Khan answered "No, I don't think so" (Khan Dep. 8 (Dec. 22, 2025)); and asked when he first heard Thomasson's name, Khan testified "today I'm hearing your name," confirming he had never heard it "before today" (Khan Dep. 9). A plaintiff who never met or heard of Thomasson cannot have been harmed by his conduct. Third, Iris Baron — the representative of the Estate of David Baron, itself an IAG Plaintiff — testified that she was not even aware of this lawsuit, that she knew nothing about the case before her deposition, that she did not authorize her name being used in it, and that in 45 years she was "never … involved in any of [her husband's] businesses" (Iris Baron Dep. 8–10 (Jan. 5, 2026)). A plaintiff who did not know the action existed and disclaims all knowledge of the underlying business cannot have been harmed by Thomasson's conduct within

that action. Fourth, whether Thomasson's conduct as Deo's counsel caused any legally cognizable harm to the IAG Plaintiffs is a contested legal conclusion, not a statement of material fact, and is denied. At a minimum, the Plaintiffs completely fail to provide any fact or supporting evidence of any kind that Thomasson's conduct was outside the bounds of legal representation of the Deo co-Defendants.

¶ 1064. Thomasson knowingly facilitated the Deo Defendants' fraud. Aaronson Dep. 21:8- 12 ("[...] You helped facilitate and you were aware of what was going on and helped facilitate that with Anthony"); Urrutia Dep. 221:5-10 ("you helped the group do everything that was done to me. You have a specific role and a job, and you've done it, and everybody else has done their job in their role to get us where we are today. And you have done it not just to me, you've done it to Josh, you've done it to another dealership, and now you have another open dealership, I'm sure in a few months that will be the case, and if not, I know what you put that poor guy, the landlord, through. You have another case with him accusing him of stuff. I know that the house that you supposedly owned, you did something to that poor lady for a half a million dollars' worth of rent. Not you, that one not you specifically, but just I know there is a lot of stuff that seems to be -- be what's done"); Urrutia Dep. 222:2-16 ("Q. What I am trying to figure out here is are there any specifics that you know that I did outside of these legal cases to harm you? That's all I'm asking. A. You facilitated knowingly what -- what has been going on. Q. And you have firsthand knowledge that I knew what Deo was doing at Superb; is that your position? A. You were -- you were in the dealership, you had an office in my dealership that I didn't know anything about, right?").

RESPONSE TO ¶1064. OBJECTION [E] [F]. Denied. That Thomasson "knowingly facilitated" fraud asserts both a legal conclusion and a state of mind, neither a proper statement

of material fact. The cited testimony is merely accusatory opinion and convenient conclusions, but again, provide no proof of wrongdoing by Thomasson.

¶ 1065. On November 14, 2023, Urrutia sued Deo in the Supreme Court of the State of New York for Deo's breaches of representations and warranties in the Cross-Purchase Agreement, seeking a declaratory judgment, rescission based on fraudulent inducement, breach of contract, rescission based on breach of contract, and attorneys' fees & costs. 618608/2023 NYSCEF 1.

RESPONSE TO ¶1065. OBJECTION [C] [E]. The cited document (NYSCEF 1) speaks for itself. This assertion's conclusory and pejorative characterizations are not statements of material fact and are not established by any admissible evidence; they are denied.

¶ 1066. On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place me back in the position I was now that the Cross-Purchase Agreement has been voided. 618608/2023 NYSCEF 134.

RESPONSE TO ¶1066. OBJECTION [C] [E]. The cited document (NYSCEF 134) speaks for itself; Defendants deny the paragraph to the extent it asserts any fact beyond the document's contents.

¶ 1067. This Court found that Justice Murphy's decision was entitled to res judicata effect. ECF 505.

RESPONSE TO ¶1067. The cited document (ECF 505) speaks for itself; Defendants deny the paragraph to the extent it asserts any fact beyond the document's contents.

¶ 1068. Over the course of thirty (30) years, Urrutia cultivated franchise relationships, forged trust with major banks, developed a loyal customer base, obtained floor plan financing on favorable terms, strong vendor partnerships, and ironclad goodwill in the community; in just a few months without proper supervision, Deo dismantled all of it. ECF 294 ¶¶ 26-27.

RESPONSE TO ¶1068. OBJECTION [B] [E]. Denied. The paragraph rests solely on two paragraphs of Urrutia's own prior declaration (ECF 294 ¶¶ 26–27), which are competent only as to matters within the declarant's personal knowledge and are insufficient to establish the asserted facts as undisputed. First, the paragraph is argument, not fact. Its operative terms — "ironclad goodwill," "dismantled all of it" — are rhetorical, conclusory, self serving characterizations that do not state material facts capable of admission or denial under Local Civil Rule 56.1. Second, the assertion that Deo "dismantled all of it" in "just a few months" is a causal conclusion, offered without foundation or proof and is disputed. Urrutia's own testimony attributes the business's difficulties to operating losses, vehicles taken in at a deficiency, and his own dealings with NMAC, which lowered his credit limits after he contacted them (Urrutia Dep. 207:13–19, 207:4–12, 85:20–87:6 (Jan. 8, 2026)). Third, to the extent the paragraph faults Deo for operating "without proper supervision," it confirms what both Plaintiffs concede — that Deo was the person authorized to run the day-to-day operations (Aaronson Dep. 199:12–23 (Jan. 7, 2026); Urrutia Dep. 34:11–18 (Jan. 8, 2026)) — and any failure of oversight by the principals is not chargeable to Deo as an undisputed fact. Fourth, the existence, extent, and cause of any lost goodwill or business relationships are quintessential disputed damages questions reserved for trial, and are without any proof here.

¶ 1069. As a result, Urrutia can no longer qualify for a franchise, obtain floorplan financing, or restore the professional relationships he destroyed. ECF 294 ¶ 28.

RESPONSE TO ¶1069. OBJECTION [B] [E]. Denied. The paragraph rests on a single paragraph of Urrutia's own prior declaration (ECF 294 ¶ 28), which is competent only as to matters within the declarant's personal knowledge and cannot establish the asserted facts as undisputed. First, the assertions that Urrutia "can no longer qualify for a franchise" or "obtain floorplan financing" are speculative predictions about future events, offered without any foundation or proof — no franchisor, manufacturer, or lender evidence that Urrutia has in fact been disqualified or declined. A party's conclusory prediction about his own future creditworthiness does not establish an undisputed fact. Second, the causal premise ("As a result") is unsupported and disputed. Urrutia's own testimony indicates that his financing relationships were affected by his own conduct: he testified that NMAC lowered his credit limits after he contacted them (Urrutia Dep. 85:20–87:6 (Jan. 8, 2026)). The attribution of any inability to franchise or obtain financing to Deo is a contested causation question. Third, the phrase "the professional relationships he destroyed" is argumentative and conclusory; it characterizes rather than states a fact, assumes the disputed causation it purports to describe, and is denied on that basis. Fourth, any future inability to qualify or obtain financing — and any question of mitigation — is purely speculative.

¶ 1070. At the time, the dealerships Urrutia built were collectively valued at approximately $15 million to $20 million; today, they are worth nothing, and Urrutia has been left with millions in debt. ECF 294 ¶ 30-35; ECF 304 ¶ 26; Urrutia Decl. ¶ X.

RESPONSE TO ¶1070. OBJECTION [A] [B] [E]. Denied. Not a shred of evidence of these allegations have been presented; this is purely self serving conclusions absent any proof whatsoever. The "Urrutia Decl. ¶ X" citation identifies no paragraph and is disregarded under Local Civil Rule 56.1(d). The remaining support — numbered paragraphs of Urrutia's own prior

declarations (ECF 294 ¶¶ 30–35; ECF 304 ¶ 26) — does not establish the asserted facts as undisputed. First, the valuation — “approximately $15 million to $20 million,” then “worth nothing” — is a conclusory lay opinion of an interested party, offered without any expert appraisal, methodology, or documentary foundation, and cannot establish an undisputed valuation. The figure is speculative on its face (a five-million-dollar range), and the conclusion that the dealerships are now “worth nothing” is unsupported. Second, the paragraph’s implicit premise — that Deo caused the asserted loss and debt — is unsupported and disputed. Urrutia testified that Superb operated at a loss, that vehicles were taken in at a deficiency, and that NMAC lowered his credit limits after he himself contacted them (Urrutia Dep. 207:13–19, 207:4–12, 85:20–87:6 (Jan. 8, 2026)) — operational and market factors. The attribution of any diminution in value to Deo is a contested causation question, not an undisputed fact. Third, the amount and cause of any damages are pure speculation. Finally, to the extent the paragraph implies the underlying floor-plan and vehicle obligations went unsatisfied, the record is to the contrary: Urrutia testified he “paid off those … floor plan lines” (Urrutia Dep. 27:5–10 (Jan. 8, 2026)), and Aaronson conceded the vehicles were “today paid off … By” the IAG Plaintiffs (Aaronson Dep. 194:25–195:13 (Jan. 7, 2026)).

¶ 1071. Aaronson Dep. 18:25-19:5 (“Q. But it would be fair to say, would it not, that you met him because of business and not because of a personal reason? A. Yes”); 39:24-40:5 (“Q. And do you know whether or not Anthony Deo had any control over any of the Northshore bank accounts after David Baron's death? A. I believe he had access to some bank accounts”); 40:8-18 (“I know Anthony signed checks from the bank accounts, so yes, it was with my knowledge. Q. Did you allow him to sign checks? A. Yes. Q. What authority was Anthony Deo given in the operation of Northshore Motors? A. To run the business, to run the day-to-day business”).

RESPONSE TO ¶1071. Admitted that these are accurate cites from testimony, but there is no affirmative statement set forth in this allegation.

Dated: June 30, 2026

Respectfully submitted,

/S/ *Nipun Marwaha*

Nipun Marwaha, Esq.
1539 Franklin Avenue, Ste. 201
Mineola, New York 11501
Tel. 516-503-4624
Email: nipun@marwahalaw.com

/S/ *Harry R. Thomasson*

Harry R. Thomasson, *Pro Se*
3280 Sunrise Highway, Box 112
Wantagh, New York 11793
Tel. 516-557-5459
Email: hrtatty@verizon.net