# In the Matter of

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS INC., et al.

v.

DEO, et al.

## Examination of Dwight Blankenship

*Wednesday, February 18, 2026*

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHS-ORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC AND ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

Case No.:
2:23-cv-6188 (JMW)

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, AND NORTHSHORE MOTOR LEASING, LLC,

Defendants.
-----------------------------------------X

February 18, 2026
10:05 a.m.

(C A P T I O N C O N T I N U E D)

(C O N T I N U E D C A P T I O N)

Examination Before Trial of Defendant, DWIGHT BLANKENSHIP, held pursuant to Order, held via Zoom conference, before Ruthayn Shalom, a shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

SAGE LEGAL LLC
Attorneys for Plaintiffs
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA
18211 Jamaica Avenue
Jamaica, New York 11423
BY: EMANUEL KATAEV, ESQ.
Emanuel@sagelegal.nyc

CYRULI SHANKS & ZIZMOR, LLP
Attorneys for Plaintiffs
189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC
420 Lexington Avenue, Suite 2320
New York, New York 10170
BY: JEFFREY RUDERMAN, ESQ.
Jruderman@cszlaw.com

HARRY R. THOMASSON, JR.
Attorneys for Defendant
3280 Sunrise Highway, Suite Box 112
Wantagh, New York 11793
BY: HARRY R. THOMASSON, JR., ESQ.
Hrtatty@verizon.net

CULLEN AND DYKMAN LLP
Attorneys for Defendant
FLUSHING BANK
333 Earle Ovington Boulevard
Second Floor
Uniondale, New York 11553
BY: ARIEL E. RONNEBURGER, ESQ.
Aronneburger@cullenllp.com

A P P E A R A N C E S: (Continued)

WEIR LLP
Attorneys for Defendant
LIBERTAS FUNDING LLC,
1339 Chestnut Street, Suite 500
Philadelphia, Pennsylvania 19107
BY: JEFFREY S. CIANCIULLI, ESQ.
Jcianciulli@weirlawllp.com

ALSO PRESENT:

Anthony Deo

Anthony Urrutia

Dwight Blankenship - Witness pro se

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for trial.

D. Blankenship

D W I G H T B L A N K E N S H I P,

a Defendant, having been first duly sworn by Ruthayn Shalom, a Notary Public of the State of New York, and stating his address as 63 Pentmoor Drive, Mastic, New York 11950, was examined and testified as follows:

EXAMINATION BY
MR. KATAEV:

Q Good morning, Mr. Blankenship -- Officer Blankenship. How are you today?
A Good.
Q My name is Emanuel Kataev. I'm the attorney representing the Superb plaintiffs; are you familiar with them?
A Yes.
Q For the record, your attorney is not here with you today, correct?
A Correct.
Q And you voluntarily waived his appearance; is that right?
A Yes.
Q So I'll be referring to the Superb plaintiffs as follows; Superb Motors, Inc. as Superb, okay?

D. Blankenship

A Okay.
Q Team Auto Sales, LLC as Team?
A Okay.
Q And Robert Anthony Urrutia as just Tony, okay?
A Yes.
Q I'll be asking you, and you'll be answering questions today about yourself, Superb, Team, Tony, Island Auto Group, Anthony Deo, our claims against you and your gang, and other related subjects; do you understand?
MR. THOMASSON: Objection.
Q You can answer the question.
MR. THOMASSON: Objection.
Q Do you need me to repeat the question?
A Go ahead.
Q I'll be asking you and you'll be answering questions today about yourself, Superb, Team, Tony, Island Auto Group, Anthony Deo and our claims against you and your gang and other related --
MR. THOMASSON: Objection. Stop doing that, Emanuel.
MR. KATAEV: Are you instructing the witness not to answer?

D. Blankenship

MR. THOMASSON: I'm instructing you to stop saying that. You're talking to a member of the Nassau police force. Stop that.

MR. KATAEV: You have no authority to instruct me to do anything, Mr. Thomasson. I suggest you stand down and let the witness answer the question.

MR. THOMASSON: I'm instructing you to ask proper questions. That's what I'm instructing you.

MR. KATAEV: You have no authority to instruct me to do anything. If you instruct me to do anything again, I'm calling Judge Wicks and I'm going to have you sanctioned. Stand down.

MR. THOMASSON: Feel free.

BY MR. KATAEV:

Q Mr. Blankenship, can you answer the question?

A There is no gang, if that's what you're referring to. I belong to no gang.

Q I'm asking you if you understand that that's what I'll be asking questions about today.

A I will not answer that because there is no

gang.

Q I'll be asking you and you will be answering questions today about yourself, Superb, Team, Tony and Island Auto Group and Anthony Deo, our claims against you and the other defendants and other related subjects; do you understand that?

A Yes.

Q Good. Your testimony today is subject to the same oath and same penalty of perjury as if you were testifying in court; do you understand that?

A Yes.

Q Have you ever been deposed before?

A Through my career probably, yes.

Q When you refer to your career, are you referring to actual courtroom testimony as opposed to deposition?

A Courtroom testimony.

Q Is it fair to say that you have experienced testifying in court but you have never participated in a deposition before?

A Not that I can recall, yes.

Q I'm going to go over some of the ground rules for the deposition since it's a little bit different than a courtroom, okay?

D. Blankenship

A Yes.

Q First, keep your voice loud and clear for the court reporter as you have been doing. Second, please answer in words; no body gestures and no mumbling, okay?

A Yes.

Q Third, allow me to complete my question before you answer and I will give you the same courtesy, okay?

A Yes.

Q Four, if you don't understand the question that I posed to you, tell me and I will rephrase it. However, if you answer, I will assume that you understood the question; do you understand that?

A Yes.

Q Fifth, we are looking for your best recollection of events today. We are going to go over events that occurred over the course of four to five years. While I don't want you to guess at answers, even if your memory is not crystal clear, I'm still entitled to your best recollection. Do you understand that?

A Yes.

Q You can take a break and use the bathroom,

or for any other purpose to take a break at any time except if there is a question pending, I would like you for answer it; do you understand that?

A Yes.

Q Do you understand all of these ground rules?

A Yes.

Q Is there any reason you can't participate in today's deposition and provide truthful answers to questions?

A No.

Q Have you consumed any drugs, alcohol or medications within the past 24 hours that will affect your ability to testify truthfully?

A No.

Q Is there any reason you can think of as to why you cannot give truthful answers today?

A No.

Q Do you go by any names other than Dwight Blankenship?

A No.

Q Did you prepare for today's deposition in any way?

A No.

D. Blankenship

Q Did you review any documents in preparation for the deposition?
A No.
Q Did you have any discussions with any attorneys about today's deposition?
A The only one was with Jeff telling me when the deposition was.
Q Prior to Mr. Benjamin being your counsel there was Mr. Levine, correct?
A I think so. I don't know.
Q You never met with Mr. Levine, Brian Levine?
A Not that I can recall or remember, no.
Q Prior to Mr. Levine, Harry Thomasson on this deposition was your attorney, correct?
A On the -- yes.
Q Did you have any discussions with him prior to today's deposition?
A No.
Q Do you recall why it was that Mr. Thomasson ceased being your attorney of record and then Mr. Levine and then later Mr. Benjamin stepped in?
A I was told he was named in the lawsuit.

D. Blankenship

Q Who told you that?

A I don't recall who exactly said it. It was one of us said it and that's why we seeked outside counsel.

Q Okay. To your knowledge and recollection today, have you ever paid Mr. Thomasson directly for any legal services he provided to you in this case?

A No.

Q To your knowledge, who is paying or who has paid Mr. Thomasson for his legal services provide in this case?

A I believe Mr. Deo has.

Q When Mr. Levine stepped in, did you contribute anything towards those legal fees?

A No.

Q What about Mr. Benjamin?

A No.

Q Do you have any knowledge as to how the financial relationship works with Mr. Thomasson?

A No.

Q You have never seen any legal bills presented with hourly charges or anything like that, have you?

A No.

D. Blankenship

Q Have you ever seen a signed retainer agreement?
A No.
Q Did you ever sign a retainer agreement with Mr. Thomasson?
A Not that I recall. I don't know.
Q What about Mr. Levine?
A No.
Q What about Mr. Benjamin?
A No.
Q Setting aside the legal relationship, you have had communications directly with Mr. Thomasson, haven't you?
A I've met him a few times, hello and goodbye.
Q Have you ever exchanged text messages with Mr. Thomasson?
A Not that I can recall.
Q Have you ever exchanged emails with Mr. Thomasson?
A Not that I recall, no.
Q Did you speak to anyone other than any attorney about today's deposition?
A No.

D. Blankenship

Q Outside of this deposition, have you ever looked at any documents in this case about this case?
A Not that I recall, no.
Q Did you ever read the complaint from this case?
A I don't believe so.
Q Where do you currently reside?
A 63 Pentmoor Drive.
Q Where is that?
A Mastic, New York.
Q Do you rent or own?
A Own.
Q How long has that been?
A Twenty-two, 23 years approximately.
Q Who do you live with?
A My wife, my kids.
Q What is your date of birth?
A 5/21/73.
Q What email addresses do you use?
A It's Deeg@700@hotmail.
Q Do you have any Google email addresses or Gmail addresses?
A Not that I recall, no. I have a work one,

D. Blankenship

that's just for work stuff.
Q When you refer to work, are you referring to your employment with the Nassau County Police Department?
A Yes.
Q Did you ever have a work email outside of the Nassau County Police Department?
A I have Deeg.
Q Did you ever have any email address with Northshore Motors or Sunrise?
A I might have had one, yes, with them.
Q Have you ever been arrested?
A No.
Q Have you ever been convicted of any crime?
A No.
Q Have you ever cooperated with the FBI or any other federal agency?
A Through the course of my duties probably, yes.
Q Any such cooperation in relation to this case?
A No.
Q Are you familiar with the name Louis Varia?

D. Blankenship

A No.

Q Do you know an individual named Marc Merckling?

A Yes.

Q Who is he?

A He's my partner in Nassau County.

Q You two are assigned to each other?

A We were.

Q You're no longer assigned to each other because he retired, correct?

A Correct.

Q When is it that he retired?

A It's probably three, four, five years ago.

Q Who are you currently assigned to?

A I'm in the training unit now.

Q You're no longer doing patrol, for lack of a better word?

A I haven't done patrol in 20 years. I was in the SWAT team. I'm now training.

Q Understood. When you were in the SWAT team, what is the proper terminology for the work you did?

A SWAT work, I did -- we executed search warrants.

D. Blankenship

Q Is it fair to say that it was an on-call assignment?

A It's 40 hours. Four days on, four days off.

Q There came a point in time where you were offered the ability to do part-time work for Mr. Deo?

A Correct.

Q How did that come to be?

A Marc asked me if I was looking for extra work. I applied.

Q When Marc asked you and you applied, what happened next?

A I started working at Northshore Motors.

Q Who did you speak to prior to starting to work?

A Where and who -- I don't know -- can you rephrase? I don't understand.

Q Did Marc offer you the job and tell you how much you were going to be paid and tell you the work you were going to be doing?

A No. I met with Mr. Deo.

Q Tell me about that conversation?

A He asked me what I knew about cars and

stuff like that, and I told him what I actually do because Marc was there, Marc brought me in, I was Marc's partner and then I started doing their service and stuff for them; oil changes, brakes and stuff like that.

Q You told them about your experience working on cars?

A Yes.

Q Is that the type of work you ended up doing for Mr. Deo when you worked for him?

A A lot of it, yeah.

Q Is it fair to say that you were sort of in a mechanic position there?

A I was the head of the mechanics. I kind of got the parts and stuff for them and made sure that if it went out to any place or if it had to go to the windshield guy and stuff like that.

Q I'm going to read you an excerpt of something Mr. Thomasson said at a court conference. I'm going to read it word for word from the transcript. After I'm done reading it, I would like to ask you some questions about it, okay?

A Okay.

Q "He was in the real estate business,

D. Blankenship

Your Honor, and got a slap on the wrist for what ended up being cooperation with the feds and for his own protection, he took the deal they offered. We'll make it look like you're a big part of this to protect your life going forward because we are not able or willing to provide you protection for the rest of your life. That's why the man has two police officers around him."

A Okay.

Q Do you have any knowledge about any of this?

A That statement, no.

Q Were you around Mr. Deo in order to protect him because the federal government couldn't protect him?

A I knew nothing about that.

Q Did Mr. Deo ask you for any security or protection services?

A No, sir.

Q Are you familiar with the fact that Mr. Deo applied for a DMV license?

A I don't know anything about that. I'm assuming he had one with doing the cars and stuff.

Q Fair to say you had nothing to do with an

D. Blankenship

application, correct?

A What location?

Q With his application for a DMV license?

A No.

Q So I understand, the only work you did for Mr. Deo was serving as a mechanic?

A I was not a mechanic, I just told you that. I got the parts and stuff. I was like an intermediary between the mechanics and going to get parts and stuff like that for them.

Q Was that the sole extent of your duties or you did more?

A I did a little more. I walked around. If clients came in and they were having a problem with their car, I found out what was going on to talk to the mechanics to see what they could do.

Q What else?

A Pretty much it.

Q Are you aware that Mr. Deo is a convicted felon?

A I did not know.

Q Have you ever been a part to any other lawsuit as either a defendant or a plaintiff other than this case?

D. Blankenship

A With Northshore or Superb and all of that?
Q No. You personally?
A Me personally as a defendant, yes.
Q Can you describe those lawsuits or lawsuit for me?
A I was -- we were serving a search warrant and a shooting happened and I was named one of the defendants because I was on the stack going into the search warrant.
Q Is it fair to say there was some sort of a claim, a civil rights claims made by the subject of that search?
A It wasn't civil rights. I think it was just civil.
Q It was the person that was the target of that search that sued you?
A No. It was a secondary person that was inside the house.
Q Understood.
Do you know what the status of that lawsuit currently is?
A I believe the County settled with the person.
Q You didn't provide any testimony?

D. Blankenship

A No.

MR. KATAEV: Can I have the last question and answer read back, please?

(Whereupon, the referred-to question and answer was read back by the reporter.)

Q Other than that lawsuit, were there any other lawsuits that you were a party to?

A Not that I can recall.

Q Do you know when that lawsuit was filed, the one that you told me about?

A Early '10, '11, '12. Back in that timeframe somewhere, approximately in there.

Q Do you remember if it was federal court or state court?

A Federal.

Q Do you remember the plaintiff's name in that case?

A No, I do not.

Q Are you aware of the -- withdrawn.

Are you aware of other existing lawsuits pending against Mr. Deo?

A No, I'm not.

Q Are you currently still working for Mr. Deo?

D. Blankenship

A No, I'm not.
Q When did you last work for Mr. Deo?
A August -- it was in the timeframe of August. I don't remember what year it was. Twenty-one, '22, in that timeframe there. It was August.
Q Was there anything that happened in August that led you to not working there anymore?
A They were locked out of the business.
Q I'll represent to you that that occurred in August of 2023. Does that refresh your recollection as to when?
A Okay, it was '23. I wasn't sure of the year.
Q No problem. So if I understand correctly, after Mr. Deo was removed from the dealership on Northern Boulevard at Superb, you stopped working for him?
A I stopped working for them, yes.
Q Was that your decision, his decision or something else?
A Mutual.
Q What did you two say to each other about it?

D. Blankenship

A I actually got a letter from Superb that my services were no longer needed and I was on vacation at the time, so I didn't get it until I got back.

Q Understood. Where did you go on vacation?

A We went on a cruise. I don't remember. We went to the Bahamas.

Q That letter that you received, who was it signed by?

A It was Superb management.

Q Do you still have a copy of that letter?

A No, I don't.

Q What did you do with it?

A Got rid of it.

Q Why?

A I don't know. I just wasn't keeping it. I don't know.

Q When did you become aware of this lawsuit?

A I'm not sure of the date.

Q Was it also in August?

A It was some time after that.

Q I'll represent to you the lawsuit for this case was filed on August 17, 2023.

A Okay.

D. Blankenship

Q Do you recall how long after the lawsuit was filed that you first heard about it?
A No, I don't remember.
Q You referenced Superb management. Did you see that Superb management was a separate company? Like Superb Management, Inc. or something like that?
A I don't remember.
Q You have nothing to do with Mr. Deo's new operations at New South Road in Hicksville, correct?
A Yes.
Q Are you aware that he's currently operating a dealership out of there?
A I knew they had started something there.
Q How did you know that?
A Because in conversation with Marc.
Q You maintain contact with Mr. Merckling?
A Yes. We have been together for ten years, yes.
Q Does the name Jiying Wei ring any bells for you? J-I-Y-I-N-G W-E-I.
A No, sir.
Q If I told you that was the landlord for Mr. Deo's residence, does that refresh your recollection?

D. Blankenship

A No, sir.

Q Are you familiar with any issues that Mr. Deo had with his home and his landlord at his residence in Old Westbury?

A No, sir.

Q Have you ever been to Mr. Deo's residence at the Old Westbury address?

A Once or twice.

Q What was the reason you would go there?

A When we were working together, I picked him up.

Q Are you familiar with Cherrywood Auto?

A No, sir.

Q Do you have any knowledge of Mr. Deo working at Cherrywood Auto?

A Not that I'm aware of, no.

Q It's not something you discussed with Mr. Merckling?

A No. Not really, no.

Q What about Albert Hakim, does that name ring any bells for you?

A No, sir.

Q When did you first begin working for the Nassau County Police Department?

D. Blankenship

A It was January of 2004.
Q Are you still employed by the Nassau County Police Department?
A Yes, sir.
Q Have you had any discipline with the Nassau County Police Department in your entire career?
A I had two 360s.
Q Can you explain what a 360 is for the record?
A Complaints from a motorist.
Q Understood. If I understand correctly, 360s are complaints made by people that you pulled over; is that right?
A Yes, sir.
Q Do you know what the status of those complaints are or how they were resolved?
A One was unfounded and the other one -- I don't remember what they did with the very first one because that was back in 2008, '09, '10, somewhere around in there.
Q Are you familiar with what the patrol guide is?
A Yes.

D. Blankenship

Q Do you have a copy of the patrol guide?
A With me, no.
Q In general, in your possession, custody and control?
A It's in the computer.
Q I'm going to ask you to preserve that and I'll follow up with your attorney in writing and ask you to produce a copy of that patrol guide.

(Counsel Request.)

BY MR. KATAEV:
Q Does the patrol guide contain any information about outside employment and authorization to do so?
A Yes.
Q Did you seek authorization in accordance to the patrol guide to work for Mr. Deo?
A Yes.
Q What was the result of your request?
A I was allowed to work off-duty employment.
Q Do you have documents in your possession about those requests and that authorization?
A I think I do, yes.
Q We are going to ask you to hold on to those and we will follow up in writing with your

D. Blankenship

attorney to produce that, okay?

A Yes.

(Counsel Request.)

BY MR. KATAEV:

Q What was your first position held at the Nassau County Police Department?

A Police officer.

Q How long were you a police officer for?

A I'll still a police officer.

Q When, if ever, did your duties at the Nassau County police department change?

A I don't understand the question. I have always been a police officer.

Q My understanding is that you're currently doing SWAT training, correct?

A I went to the SWAT team in 2007. I believe it was March some time of 2007.

Q Okay. Compared to your duties when you first started to when you first went to SWAT in 2007, can you explain the differences in your duties?

A I was in patrol, answered 911 calls when I first started and then I went to the SWAT team where we did plainclothes work and served search warrants.

D. Blankenship

Q After you started in SWAT in 2007, did your duties change in any way since then?

A I do most of the training now. I'm still available for the SWAT work, but I do the training for the guys.

Q When did that change occur?

A Probably three or four years ago now.

Q Would it be fair to say it was shortly after August 2023?

A No, it was before that. About maybe a year, year-and-a-half before that. Some time in that timeframe.

Q Okay. Going back to when you first started working for Mr. Deo, do you remember what month and year you started performing work?

A I believe it was February. I don't know the exact year. It was right around January/February.

Q Do you recall whether you worked for Mr. Deo for more than a year or a few months?

A It was probably six or eight months and then I left for a little while and then I came back and worked about four or five months for him.

Q Okay. So when you first start working for

D. Blankenship

him before you left for a little while, that was not at the Northern Boulevard location at Superb, correct?

A Correct.

Q You additionally worked for him at 180 Michael Drive and/or 189 Sunrise Highway, correct?

A Correct.

Q And then what was the reason you ended up taking a break for a few months?

A It was too much.

Q Between managing your job as a police officer and --

A I just had no time to be home.

Q Can you tell me before you took the break what the hours were like between being a police officer --

A Rephrase, please.

Q Can you tell me what the hours were like before you took the break, the initial stint with him, what were your hours as a police officer and what were your hours with him at Northshore and Sunrise?

A We worked four days on and four days off,

D. Blankenship

so I was there on my days off.

Q After working four days, the remaining three days you would work for Mr. Deo, correct?

A Yes.

Q That would include Saturdays and Sundays?

A If need be, yes.

Q And then day-to-day, what were the hours like?

A Probably like nine o'clock to five o'clock dealing with the service end of it and all of that, so it was day tours usually.

Q And then what conversation did you have with Mr. Deo about stopping because you didn't have any time?

A My boys were getting older, they were getting in sports with school and lacrosse teams and stuff, and I was just starting to miss their games and I wasn't in for that.

Q You said this directly to Mr. Deo?

A We had a conversation.

Q How did that conversation go?

A We parted ways.

Q Was he okay with your request? Did he disagree with your request?

D. Blankenship

A He okayed it.
Q He wasn't upset with your request to stop working, correct?
A I couldn't answer if he was upset or not.
Q What were the circumstances upon which you came back to work for him?
A Marc was having a surgery and needed someone to fill in.
Q What was the nature of the surgery?
A He had something wrong with his stomach or something like that.
Q You don't know anything further than it was something about his stomach?
A Stomach, gastro, something like that.
Q When you stepped in to assist in Mr. Merckling's place, were you your duties different than what they were before when you were at Northshore and Sunrise?
A No.
Q Going back to before the break, how did you know whether you were going to work at Northshore or Sunrise on any given day?
A The mechanics were at Northshore. It was mostly at Northshore in the back.

D. Blankenship

Q What circumstances, if any, gave rise to you going to Sunrise?

A If I had to go down there to get a car or one of the glass places was down there, we used the glass place down there, one of the cars had to get over to the glass place, I had to make sure the appointment was done, which car, when it came back to make sure the work was done.

Q Prior to your break, did you ever go to the bank to make any deposits?

A I'm sure I did probably two or three times.

Q It wasn't a new thing for you to make deposits when you came back in Mr. Merckling's place, correct?

A Which place is that, sir?

Q Mr. Merckling was out for surgery and you stepped in to help, right?

A Yes.

Q It was not a new thing for you at that point to go make bank deposits, correct?

A No, if I had to.

Q You did them before the break and after the break, correct?

D. Blankenship

A You're breaking up. Rephrase. You broke up.

Q You did the deposits before the break and after the break, correct?

A You froze.

I probably did. Can you rephrase because you were breaking up when you were asking question?

Q Sure. Sure.

You were doing deposits before the break and after the break, correct?

A I probably did, in total, maybe three to five deposits.

Q Ever?

A Yes.

Q Do you remember how many before and how many after?

A No, sir.

Q What did Mr. Deo pay you?

A It was -- I would have to look back to refresh my memory with that.

Q Was it an hourly rate or a weekly salary?

A It was a weekly salary.

Q You don't remember the amount?

D. Blankenship

A No, sir. About a $1,000. I don't remember the exact amount.

Q That was regardless of the number of hours you worked?

A The weekly, yes.

Q Were there any gaps in your employment with the Nassau County Police Department?

A No.

Q Have you ever worked with an individual named Detective Marx?

A Who?

Q Detective Marx, M-A-R-X.

A M-A-R-X. Did I work with him, no.

Q Do you know who he is?

A I know who he is.

Q How do you know who he is?

A He's a detective on my job.

Q Have you worked with him on other matters at the police department?

A Not that I can recall, no.

Q Are you familiar with his relationship to this case, if at all?

A No.

Q Are you aware of any issue that Mr. Deo

D. Blankenship

had concerning $735,000 that was taken from a bank account?

A I'm aware of it. I wasn't working for him at the time.

Q How did you become aware of it?

A I guess somebody said something.

MR. THOMASSON: Don't guess.

MR. KATAEV: Excuse me. You're not allowed to instruct the witness. You don't represent him.

MR. THOMASSON: I will instruct the witness as I deem fit, and he said he was guessing and I'm reminding him that nobody here wants him guessing.

MR. KATAEV: Okay. I'm reaching out to the court. Go off the record.

(Whereupon, an off-the-record discussion was held.)

MR. THOMASSON: No, I don't agree to go off the record.

MR. KATAEV: Okay, we can remain on. I have prepared an email to Judge Wicks. I'm getting the Zoom link to include it in case he wishes to join. Mr. Thomasson, you're on that email. If I don't get an email back in

two minutes, I'll call the court.

Madame Court Reporter, if you could be kind enough to read back the record if necessary.

MR. CIANCIULLI: Any interest in continuing on while we wait?

MR. KATAEV: No, because I'm going to get further instructions that are improper.

Who asked, by the way? I didn't see.

MR. CIANCIULLI: That was Jeff Cianciulli. I was just making a polite suggestion.

MR. KATAEV: I have no problem.

What was the last question and answer?

(Whereupon, the referred-to question and answer was read back by the reporter.)

THE COURT CLERK: What is it that, Mr. Kataev, according to you that Mr. Thomasson as giving an instruction? What instruction was he giving to the witness?

MR. KATAEV: Don't guess.

THE COURT CLERK: That's it?

MR. KATAEV: I'm telling him that he's disqualified as counsel and he can't make his instructions. His attorney, Jeffrey Benjamin, has waived his appearance. He's chosen to

D. Blankenship

proceed without an attorney. Mr. Thomasson can't step in his place, he's disqualified.

THE COURT CLERK: Mr. Benjamin is not there and Blankenship is there alone?

MR. KATAEV: That's correct.

THE COURT CLERK: Mr. Thomasson, what is your position on this?

MR. THOMASSON: Mr. Blankenship started an answer with, I guess, and I quickly said, don't guess. That's as much a reaction as any lawyer could ever possibly give, and it has been given a dozen or more times in the last six weeks or more, or two months of depositions by various attorneys at various times in all of our depositions. That's as common and as harmless a matter as can be and this is absolutely a waste of not only our time, but the court's time dealing with this.

MR. KATAEV: Except the difference is --

THE COURT CLERK: The other attorneys that have said don't use the language, don't guess or I guess in other depositions, have they done that to their client or to someone like here who does not have counsel?

MR. THOMASSON: We have had a number of those instructions at various times. I think all of the lead attorneys in this case have had instructed other parties, not their own, not to guess.

I know Mr. Ruderman has and I believe Mr. Kataev has in depositions of the Deo defendants, and I was just saying the same thing to a witness who started an answer with, I guess. I just said don't do that, don't guess.

MR. RUDERMAN: This is Mr. Ruderman. Since Mr. Thomasson brought me into this, I don't know the context of what he's saying, I said don't guess. I may have instructed -- I don't know what he's specifically referring to.

I can imagine that I may have asked a question to a witness who may have said, I guess. And I, as the questioner, have said, don't guess. That's my prerogative as the one asking the question to direct the witness what I'm asking for.

I don't recall any situation in which a non-questioning attorney or an attorney not

D. Blankenship

representing the witness has instructed a witness to say don't guess. That's not their place. That's our position. Thank you.

MR. KATAEV: More importantly, he's been disqualified and he interrupted him mid-sentence while he's answering questions, which counts as coaching, and I told him to stop and he refused to do so and said, I will continue to instruct him. So I would like a ruling from the court that he's not allowed to instruct the witness to do anything. He doesn't represent the witness.

THE COURT CLERK: Is there any other party that wants to add their position referring to Flushing Bank and Libertas?

MR. CIANCIULLI: Nothing to add for Libertas. Thank you.

THE COURT CLERK: Thank you. Let me see if the judge is available.

MR. KATAEV: Thank you.

THE COURT: Who do we have?

MR. KATAEV: We have Emanuel Kataev and Jeffrey Ruderman for the Plaintiffs; the Court Reporter, Ruthayn Shalom; Mr. Thomasson for

himself; Mr. Cianciulli for Libertas; Mr. Deo observing; Mr. Urrutia observing; Ariel Ronneburger for Flushing; and two of my paralegals.

THE COURT: Okay, so what's the issue?

MR. KATAEV: We are on the record.

Your Honor, I'm questioning the witness. Mr. Benjamin, Mr. Blankenship's attorney, has waived his appearance. He's here without his attorney.

I asked him a question about how he knows about a conversation. He started his answer with, I guess, and was immediately interrupted by Mr. Thomasson with an instruction not to guess. Mr. Thomasson is disqualified from representing this witness.

MR. THOMASSON: Good morning, Your Honor. This is Harry Thomasson. Your Honor, first off, I don't agree that I interrupted him. I believe I said it after he gave his answer, but in any event we have all done this throughout these depositions over the last two months. This is nothing. This is a kerfuffle, to use the Court's term. He started talking and said,

D. Blankenship

I guess, and I said, don't guess.

THE COURT: The only thing you can object to is form. You're not representing anybody, you're representing yourself. Anybody in that deposition can object to the form of the question, that's it. You can't coach a witness and tell them not to guess.

That's for the questioner to follow up and determine whether they're guessing, whether there is basis for their response. It's not for any of you lawyers, you or anybody else, to tell a witness not to guess. There should be nothing other than form or objection and you're not representing anybody.

MR. THOMASSON: Two things, Your Honor. Number one, it was reflexive as much as anything, Judge.

THE COURT: Okay. I take that as true.

MR. THOMASSON: And number two, I have only been in a million depositions and I want to say, I still reserve the right to object regarding privilege this morning whenever that comes up, which undoubtedly will.

THE COURT: Everybody has that right. You

don't waive that right. I can give you case citations on it. There is case after case of "Don't guess," is coaching a witness. Can't do it.

MR. THOMASSON: Fair enough, Judge. I never faced the issue.

THE COURT: Keep your reflexes in check.

MR. RUDERMAN: Your Honor, this is Jeff Ruderman. I want to -- because Mr. Thomasson wants the right to assert privilege. I believe that it's an unresolved issue as to whether or not Mr. Thomasson can assert the privilege of the witness.

He can -- as you previously mentioned, he can assert his privilege, Mr. Thomasson's privilege. If a witness is going to disclose a matter that might divulge the objecting party's privilege.

THE COURT: The client has that choice, not the lawyer.

MR. RUDERMAN: That's exactly it. Mr. Thomasson, if he's going to say Mr. Blankenship, you can't answer that question because it's going to waive your privilege, he

has no right to --

THE COURT: Agreed.

MR. RUDERMAN: Thank you, Your Honor. I wanted to clear that with Mr. Thomasson so we don't have to call you back.

MR. THOMASSON: I'll still make the objection and I guess Mr. Blankenship will make the decision whether or not he's going to waive the privilege.

THE COURT: You can note objection on the record, but you can't direct him not to answer. He's not your client and the privilege lies with him, and the fact that he's sitting there at a deposition unrepresented, even though he's got a lawyer that has filed an appearance, that's at his risk.

MR. THOMASSON: I understand, Your Honor, but if there is attorney/client privilege from when I represented Mr. Blankenship, I'm not allowed to assert that?

THE COURT: Who holds the privilege?

MR. THOMASSON: I think the attorney/client privilege rests with the client.

D. Blankenship

THE COURT: Correct. So they get to choose whether they waive it, not waive it, talk, not talk. You can note on the record that it's privileged, but that's about as far as you can go.

MR. THOMASSON: Fair enough, Judge.

THE COURT: All right, gentlemen.

MR. KATAEV: Thank you.

MR. RUDERMAN: Thank you.

BY MR. KATAEV:

Q Mr. Blankenship, you testified that you became aware of a dispute concerning $735,000 and my question is: How did you become aware of it?

A I don't remember who actually said it.

Q Can you tell me the universe of people who could have possibly told you?

A It's probably when we were at the car place and it was said in passing. I don't remember who.

Q When you say, the car place, what place are you referring to?

A Probably at Northshore.

Q Now regarding that $735,000, are you aware of any lawsuit that was filed against Mr. Deo by

D. Blankenship
Island Auto Group in state court?
A No, sir.
Q Are you aware of any hearing that was held on May 31st of 2024, I believe it was?
A Not that I'm aware of, sir.
Q Let me ask you this: You are aware of this lawsuit in federal court, right?
A Yes.
Q Did you know generally speaking that before this lawsuit in federal court, that Island Auto Group sued Mr. Deo in state court?
A Not that I'm aware of, sir.
Q Okay. Other than Mr. Deo in connection with you first becoming employed at Northshore and Sunrise, did you speak to anybody else about holding a position at Northshore and Sunrise?
A I don't believe so.
Q Do you recall working with Ms. Sarah Deo while working at Northshore and Sunrise?
A Yes.
Q Did you take direction from her?
A Yes, sir.
Q What type of direction did she give you?
A Just asked me what was going on in the

D. Blankenship

back, parts, stuff like that.

Q Anything else?

A Not that I'm aware of, sir.

Q Okay. The $1,000 a week, you received that solely by check?

A Yes, sir.

Q Had you ever received any cash payments from Mr. Deo?

A No, sir.

Q When you came back after you first break, do you recall whether you were paid from a different entity?

A Yes, sir.

Q What entity was that?

A Superb.

Q Your testimony today is you were paid $1,000 a week from Superb?

A Approximately, yes.

Q Why do you say approximately?

A Because I think it was about $1,000. I don't remember.

Q When you came back after the first break, did you work exclusively at Superb?

A Yes, except for when we used the mechanics

D. Blankenship

over at Northshore to get a car fixed.

Q How would it work then, where would you be?

A I would be at Superb, if we had to get car over to the mechanics, they were getting them parts to fix the cars.

Q Did Mr. Deo ever instruct you, I want you, for example, at Sunrise today because I'm at Northshore or I want you at Northshore today because I'm at Superb?

A If my work led me there because of what was going on, yes, I was down at both.

Q Did he ever specifically instruct you to be at one location because he could not be there?

A Not that I'm aware of, no.

Q Did you decide --

A I may have started my day off there because I knew I had something going on with cars and stuff like that, and then going up to Northshore or back and forth.

Q So is it fair to say that when you woke up, you decided where to go for the day or you were always told every day where to go?

A Depended on what was going on, where we

D. Blankenship

had cars that needed parts either to move to -- up to Northshore to the mechanics or back to Sunrise, that they had to go to the glass place or another outside mechanic that we used.

Q Fair to say you report essentially to Mr. Deo and Mrs. Deo?

A Yes.

Q Was there anyone else that you reported to?

A It could have been one of the front end managers. If he needed something done on a car he would tell me what's going on and I'd do it.

Q What were some of those managers' names to your recollection?

A Gene at Superb.

Q Eugene Lowe?

A I don't know that that's his last name but Eugene, yes.

Q Anyone else other than Mr. Lowe?

A Sometimes some of the salespeople, if they needed something fixed on a car, they would tell me, hey, can you get this fixed.

Q It was common knowledge among all of the people you work with that you were a police officer,

correct?

A Yes.

Q That's because you told them that you were a police officer, correct?

A Correct.

Q In the course of performing your duties at any of these dealerships, did there come times where there were irate customers?

A Sometimes if they didn't get their car fixed or if it broke down after, yes.

Q Did those irate customers get loud with or aggressive with Mr. Deo?

A I don't believe they really talked to him.

Q Did they speak to anyone else at the dealership?

A They could have went to their person that sold the car to, to Gene or myself. We would try to resolve the problem.

Q Were those situations that you would commonly step in for?

A Sometimes.

Q Were you called over to do that?

A No, but if I knew it was a part problem or the car broke.

D. Blankenship

Q How would it come to your attention if there was an irate customer present?

A Gene would call me, you know, there is a problem with a car, can you come up and talk to this customer and get it resolved.

Q Going back to the incident with the $735,000, are you aware that Mr. Deo went to the police precinct to file a formal complaint against Mr. Aaronson?

A No, I did not know at that time.

Q When you say, at that time, did you come to know about it later?

A Yes.

Q How did you come to know about it later?

A Like I said, I don't know who said it but it was said that money was missing and they made a complaint.

Q Is it fair to say you learned about this stuff in August of 2023 when Mr. Deo was removed from the dealership?

A It's possible.

Q Fair to say more likely than not that Mr. Merckling told you this?

A It's possible, yes.

D. Blankenship

Q The only other person that you could think of that would tell you was Mr. Deo himself, correct?
A It's possible, yes.
Q Other than Mr. Deo and Mr. Merckling, is there anyone else you believe would tell you this information?
A I don't know.
Q Are you aware that Mr. Merckling accompanied Mr. Deo to the police precinct to file a police report about the $735,000 taken by Mr. Aaronson?
A I did not know.
Q In the course of performing your duties as a Nassau County police officer, did it come to your attention within the precinct that this criminal complaint was made?
A No. I don't work in that precinct.
Q Where do you physically work?
A I work in Bellmore. It's a facility, it's the highway building.
Q Is that a facility that you worked at since 2007 or only since you started doing training?
A Since 2007.
Q Okay. You previously testified that your

schedule was typically 9:00 to 6:00, a day tour as you referred to it; do you recall that testimony?

A At the car place?

Q Yes.

A Yes.

Q Did there come times when your schedule would change from day to day or week to week?

A Possibly, yes.

Q Did you ever have to come in earlier than 9:00 or stay later than 5:00 or 6:00?

A You're breaking up again, sir.

Q Can you hear me now?

A Yes.

Q Did there ever come a time when you had to work earlier than 9:00 or stay later than 5:00 or 6:00?

A Yes. Sometimes when the cars came in off the transporter, we tried to meet the transporter there.

Q Other than working for the Nassau County Police Department and Mr. Deo, did you ever work for anyone else?

A No, sir.

Q How many hours did you work on average

D. Blankenship

when you worked for Mr. Deo on a weekly basis?
A Unsure.
Q Assuming you worked a full day tour, quote/unquote, as you referred to it for three days a week, that would be at least 24 hours, right?
A I don't -- we work four on, four off, so if it was my four days off, it could have been -- we rotate our schedule so it could have been I was off Monday, Tuesday, Wednesday, Thursday.
Q Going back to the discussions we were having about Detective Marx, did you ever have any conversations with Detective Marx about the $735,000 complaint that Mr. Deo made?
A No, sir.
Q Did you ever have any discussions with any member of the Nassau County Police Department regarding that complaint?
A No, sir.
Q During your first time working with Mr. Deo before you took a break, you were considered an employee of Northshore, correct?
A Yes, sir.
Q During your second time working with Mr. Deo after the break, you were considered an

D. Blankenship

employee of Superb, correct?

A Yes, sir.

Q Did Mr. Deo pay you personally to your name or -- withdrawn.

Did Mr. Deo pay you personally to your name as a W2 employee?

A No.

Q How did he pay you?

A I believe it was -- they call it a 1099 or an entity.

Q Okay. Did you open up a corporate entity in order to get paid?

A Yes, sir.

Q What was the name of the entity?

A Deeg, D-E-E-G, was the entity.

Q Was it just D-E-E-G Inc. or something else?

A I think D-E-E-G -- I don't know if it was an entity or an LLC.

Q I'll represent to you that corporate records indicate that you first opened up this entity on February 26 of 2021, and that it's registered to 63 Pentmoor Drive in Mastic, New York.

Does that refresh your recollection?

A Yes.

Q So is it fair to say you opened up this entity at the time you first start working for Mr. Deo?

A Correct.

Q If you did open this up on February 26, 2021, is it fair to say that's when you first started working with him?

A Yes, I told you that in February.

Q February of 2021, right?

A Yes.

Q Is it fair to say that the payments you received to Deeg LLC were solely those payments from Mr. Deo?

A No, it was the company.

Q I'm going to rephrase the question.

Other than Mr. Deo, did this company have any other customers or any source of income?

A I don't know.

Q Deeg LLC is your company, correct?

A Are you talking about mine?

Q Yes.

A I thought you were asking about Northshore. I don't know. Yes, that was me.

D. Blankenship

Q Deeg LLC is your company, right?
A Yes.
Q Mr. Deo paid money to that company for the services you performed for him, correct?
A Yes.
Q My question is: Other than Mr. Deo, did that company receive any money from anybody else ever?
A No.
Q It's fair to say that if any money came into Deeg LLC, that was money from Mr. Deo, correct?
A Correct. It would come in from Northshore, yes.
MR. KATAEV: We are going to call for the production of statements from Deeg LLC and we will follow up in writing.
(Counsel Request.)
BY MR. KATAEV:
Q Now, Deeg LLC remains an active entity, correct?
A I haven't used it.
Q Do you know if you filed at the time a tax return for anything like that?
A I think it was for that one year.

D. Blankenship

Q Do you recall ever signing a declaration in relation to this case?

A I don't understand the question.

MR. KATAEV: Can I have that read back, please?

(Whereupon, the referred to question was read back by the reporter.)

BY MR. KATAEV:

Q Do you understand the question?

A No. A declaration in what? I don't understand what you're referring to as a declaration.

Q I'll represent to you that a declaration is a document submitted to court under penalty of perjury with a statement. In this case, the statement coming from you. Do you recall submitting a statement from you to the judge in this case?

A I do not recall.

Q Do you recall opposing a motion by me and Mr. Ruderman to disqualify Mr. Thomasson and submitting a sworn declaration explaining why that should not happen?

A I don't have any knowledge of that.

Q Okay. I'll place up on the screen what I

D. Blankenship

will refer to as Blankenship Exhibit 1. I'll give you an opportunity to read it in full and I'm going to ask you some questions about it, okay?

A Okay.

(Blankenship Exhibit 1, Marked for Identification.)

BY MR. KATAEV:

Q Do you see it?

A No, I do not.

MR. KATAEV: Let's go off the record.

(Whereupon, an off-the-record discussion was held.)

MR. KATAEV: I was joining from a computer that should allow me to share.

Q Do you see this?

A No. I still have a blank screen.

Q Starting from the top on page one, I will represent to you that this is the caption of the case and this is the bottom of the first page. Let me know when you're done reading it and I'll scroll down.

A Okay. Scroll down. Scroll down. Scroll down, please.

Q Let the record reflect, I'm on the bottom of page two.

A Too far.

D. Blankenship

Q Sorry. Let the record reflect, I scrolled up a little bit.
A Scroll down, please. Scroll down. Scroll down. Scroll down. Scroll down. Okay.
Q Is that your signature on this document?
A Yes.
Q Do you recall this document now that you've read it?
A Yes.
Q Now, in the declaration, you refer to assisting Mr. Deo with his business interests. I'm quoting the term, business interests.
Do you recall reading that?
A Yes.
Q To your knowledge, what did Mr. Deo's business interests mean?
A For me, it was repairing the cars, moving the cars around. I had to set the alarms, lock up the facility.
Q In this declaration, you refer to the events on August 3rd, 2023 where Mr. Deo was removed from the dealership, correct?
A Yes.
Q You were present at the dealership on that

D. Blankenship

day, correct?
A I was at Northshore and then I came after.
Q When you say, after, what do you mean after; in relation to what?
A They were already removed from the business.
Q Were you already planning to go to Superb or were you called there?
A I don't recall.
Q When you were on your way to Superb from Northshore on that day, were you aware that the Nassau County Police Department was already there?
A They were there, yes.
Q You were aware of that, right?
A They were there, yes.
Q On your way to Superb from Northshore, you were already aware that they were present, correct?
A Yes.
Q Who told you that?
A I don't recall. Probably Marc.
Q What, if anything, do you remember being told about what is going on at Superb before you got to Superb?
A That they removed him from the business

D. Blankenship

and we had to get some of the stuff out of the business.

Q What stuff did you need to get out of the business?

A I believe at that time it was personal items that we had left there.

Q Such as what?

A I had my mug and stuff like that had to come out. I grabbed it and threw it in my car and I left.

Q Other than your mug, was there anything else?

A Just personal items. No.

Q Back at Northshore, when you worked there since 2021, did you have an office there?

A We had a computer there that we used, yes.

Q A station?

A A station, yes.

Q It was like a standing station?

A The one that we had had one desk right in front right there.

Q Was that in an open area?

A Yes. It was in the open area right to the back wall.

D. Blankenship

Q That's at Northshore, correct?

A Yes.

Q What about at Superb, did you have your own office there?

A We had on open area with a counter.

Q A podium?

A A counter, podium.

Q It was the center podium?

A No. That's where Gene and all of those guys were.

Q Where was your station in relation to the podium?

A Right by the back door where we used to bring cars in.

Q The back door, meaning you had to go through the parking lot entrance and make a right?

A You came in the double doors. It was to the left side.

Q That's where you primarily worked?

A Yes.

Q When you arrived, what did you observe?

A I believe I met Harry, Marc and Anthony on the sidewalk at that time.

Q And those were the first individuals that

you spoke to?

A Yes.

Q What did you all three say to each other?

MR. THOMASSON: Objection. That was my work product that I was engaged in at that time as I was trying to figure out what was going on, and I don't waive that privilege.

MR. KATAEV: You may answer the question.

MR. THOMASSON: I'm instructing the witness not to discuss what it was that he discussed with me, if anything.

MR. RUDERMAN: Mr. Thomasson, that's not your privilege.

MR. THOMASSON: Work product is my privilege.

MR. RUDERMAN: You have no privilege as an attorney, it doesn't exist. If you insist that you have a privilege, we are going to have to go back to the judge. You have no privilege with the client. Only the client has the privilege.

MR. THOMASSON: I said it is my work product that I was doing that night, Mr. Ruderman. I was trying to find out and

D. Blankenship

figure out what was going on.

MR. RUDERMAN: You have no privilege in your work product, only the client does. Then we will go back to the judge.

MR. THOMASSON: Go back to the judge. I don't agree to go off the record.

MR. KATAEV: You have a fundamental misunderstanding of what work product is. It's a writing. What work product? Were you there with a pen and a pad, Mr. Thomasson?

MR. THOMASSON: I don't know if I was taking notes or not, but I was trying to figure out what was going on in anticipation of whatever was coming next.

MR. KATAEV: In other words, you have no work product because there is nothing in writing.

MR. THOMASSON: That's your conclusion, but I'm instructing the witness not to discuss what it is that he and I discussed that night, if anything. I don't even know if we did because I was in the middle of trying to figure out what was going on in anticipation of litigation.

MR. RUDERMAN: Are you reaching out to the court?

MR. KATAEV: As we speak.

MR. RUDERMAN: Can we take a break?

(Whereupon, a short recess was taken.)

(Whereupon, a call was placed to the Court.)

MR. KATAEV: If it helps, we can read back the testimony that led to the objection.

THE COURT CLERK: Let me hear your position.

MR. KATAEV: Sure. Mr. Blankenship testified about coming to the dealership on August 3rd, the night that Mr. Deo was removed from the dealership.

He stated that he met on the sidewalk with Messrs. Deo, Merckling and Mr. Thomasson, and I asked him, what did all three of you discuss. Mr. Thomasson objects -- what did all three of you discuss, and Mr. Thomasson objects on the basis of privilege and instructs the witness not to answer.

THE COURT CLERK: Mr. Thomasson, can you hear me?

MR. THOMASSON: Yes, I can hear you.

D. Blankenship

THE COURT CLERK: What's your position on this?

MR. THOMASSON: Specifically the objection was not quite as Mr. Kataev just characterized it. It was not just some general privilege objection.

I specifically said that I was there that night working in anticipation of what was to come, which I'm sure was going to be litigation given what was going on that night, and it's my work product privilege, what it was I was doing and discussing with those men that night.

It's not as though we were discussing the ballgame. I was working. I was working in anticipation of litigation and I'm also concerned about if I give an inch, these attorneys are going to take a mile, and I'm very concerned about cracking doors and if they get one potentially privileged conversation penetrated, are they then going to say that they can have, you know, penetration on all conversations with my clients.

Everything I did with these people was strictly professional and never outside of the

D. Blankenship

bounds of what attorneys discuss with clients, so I don't know why they would get a chance to discuss what it was that was taking place on that sidewalk when we all had a common interest and I was working in anticipation of litigation.

THE COURT CLERK: Before you continue, Mr. Kataev, it sounds very similar to the pending motion to compel regarding Mr. Merckling. So we are going to also ask that you provide a brief by tomorrow on this and we will discuss this at the March 2nd oral arguments.

MR. KATAEV: Understood.

MR. THOMASSON: I'm sorry, Ms. Fink, you want what by tomorrow?

THE COURT CLERK: A letter brief on this issue. It doesn't have to be by 5:00 p.m. It could be by end of day.

MR. THOMASSON: Should we handle it the same way as the last time, Ms. Fink, when you wanted everyone to file simultaneously at five o'clock?

THE COURT CLERK: No, it's okay. By end

of day is fine. We will just handle it at the March 2nd oral arguments with similar issues.

MR. THOMASSON: Okay.

THE COURT CLERK: Anything else?

MR. KATAEV: Just to confirm, end of day simultaneously.

THE COURT CLERK: No, just any time end of day tomorrow, a letter brief on your position.

MR. KATAEV: Understood.

MR. THOMASSON: But in the meantime, Ms. Fink, the witness is not answering the questions about what happened that night, right? It's to be decided?

THE COURT CLERK: Yes.

MR. THOMASSON: Thank you.

THE COURT CLERK: You can continue on with other questioning.

MR. KATAEV: Okay.

THE COURT CLERK: Thank you, bye.

BY MR. KATAEV:

Q Mr. Blankenship, are you ready?

A Yes, sir.

Q On that day on August 3rd when you arrived, did you have any understanding or concern

that you were going to be brought into this lawsuit?

A No.

Q On that day, did you seek legal advice from anybody?

A I didn't think I was getting involved in a case.

Q In other words, you did not seek legal advice from anybody, correct?

A No.

Q In connection with your conversations with Mr. Thomasson, Merckling and Deo, you were not looking for any legal advice, right?

A In what? I don't understand.

Q At all, for anything.

A I don't understand, "At all, anything." I don't understand that.

Q I'll rephrase. I'm going to set the scene, okay?

You arrive from Northshore to Superb after Mr. Deo was already removed from the dealership, correct?

A Yes.

Q When you arrived, Mr. Thomasson and Mr. Deo and Mr. Merckling were standing on the

D. Blankenship

sidewalk outside of the dealership, correct?
A Yes.
Q You approached them and had a conversation, which will be the subject of a ruling on March 2nd, but during that conversation, without saying what happened during the conversation, you did not seek legal advice from Mr. Thomasson about anything at all, correct?
A I didn't say anything.
Q Okay. Did you seek legal advice from Mr. Thomasson about anything?
A I didn't know I needed it.
Q In other words, you did not ask for legal advice?
A No.
Q After Mr. Deo was removed from the dealership, did you learn about the allegations levied by Mr. Urrutia against Mr. Deo?
A Just what I have been shown in the court papers.
Q When were you first shown those court papers?
A I guess after I was named in it.
Q Some time after August 17th of 2023,

correct?

A Yes.

Q Do you recall who showed it to you?

A No, I don't recall.

Q After you reviewed those papers, were there any red flags that went off in your mind about Mr. Deo?

MR. THOMASSON: Objection to form. Can you rephrase that?

MR. KATAEV: I'm not rephrasing. He can answer as asked.

A Can you repeat that, please?

MR. KATAEV: Read it back.

(Whereupon, the referred to question was read back by the reporter.)

MR. THOMASSON: Objection as to form. Can you rephrase that, please?

MR. KATAEV: I'm not rephrasing it. Please answer as asked.

MR. THOMASSON: I'm asking the witness not to answer this question as asked. I'm asking you to rephrase the question. It's an objection as to form.

MR. RUDERMAN: An objection as to form

means you just object as to form. You cannot direct the witness not to answer based on objection to form.

You going to make us call the judge again?

MR. KATAEV: I'm going to call the judge. I'm not going to put up with this.

Mr. Thomasson, final opportunity.

MR. THOMASSON: You can answer the question, Mr. Blankenship, if you understand it.

MR. KATAEV: Not if you understand it. Don't coach him. You can answer the question. Please answer the question.

A Repeat the question, please.

MR. KATAEV: Read it back, please.

(Whereupon, the referred to question was read back by the reporter.)

A Not that I'm aware of, no.

Q After this incident occurred, did Mr. Deo offer you any more opportunities to work for him?

A No.

MR. THOMASSON: Read that question again, Emanuel. I didn't understand you.

MR. KATAEV: The question was whether he

was offered any more opportunities to work for him.

MR. THOMASSON: Okay, thank you.

BY MR. KATAEV:

Q Had Mr. Deo offered you an opportunity to work, to do more work for him, would have you taken it?

MR. THOMASSON: Objection. You can answer.

A At service, yes, I would work for him.

Q In your declaration, you had listed a bunch of duties that you did for Mr. Deo, correct?

A Yes.

Q You didn't identify within that declaration that you also made bank deposits for him, correct?

A It wasn't a part of my daily duties.

Q You didn't identify it, correct?

A No.

Q Did you ever observe Mr. Thomasson present at Northshore when you worked there before you worked at Superb?

A Yes.

Q How often would Mr. Thomasson be present

D. Blankenship

at Northshore?

A I couldn't tell you. I wasn't there ail the time.

Q How many times did you see him there while you worked there?

A Three or four times that I remember.

Q To your knowledge and recollection, how long were -- how long was Mr. Thomasson present at the premises each time he came?

A I don't know.

Q In the course of your life, have you had the occasion where you retained an attorney for one reason or another, correct?

A Yes.

Q In the course of you retaining attorneys for various reasons in your life, would the attorneys come to you or would you go to the attorney's office?

A In that filing, we had to go to the County and the attorneys met us there.

Q Other than that, did you go to the attorney's office?

A No, sir.

Q You declared in this document that you are

D. Blankenship

aware of Harry's experience and knowledge of the Long Island automobile industry generally. Do you recall that?

A That's what I was told, yes.

Q What is your understanding of Mr. Thommason's experience and knowledge of the Long Island automobile industry?

A That he's an attorney for it.

Q Your basis for saying that he has knowledge and experience is because he represents Mr. Deo?

A Yes.

Q Do you have any knowledge as to whether Mr. Thomasson ever represented any other dealership?

A I'm unaware of that.

Q Going back to Northshore and the premises at 180 Michael Drive in Syosset, are you aware that the premises was surrendered by Mr. Deo to the landlord?

A He doesn't have it anymore, I know that.

Q Did you know the circumstances under which that occurred?

A No.

Q When did you learn that he doesn't have it

D. Blankenship

anymore?
A Some time after we closed, I would assume.
Q When did you close?
A August of '23, you said.
Q Yes. That's when Mr. Deo was removed from Superb. Are you saying that he closed at the same time?
A That's the last I know.
Q During the course of your employment with Northshore and Superb, you were directed to make cash deposits at various banks, correct?
A I made two or three deposits, yes.
Q Which bank did you make those deposits at or which banks?
A I don't recall what banks they were.
Q Do you recall ever making deposits at Chase Bank?
A It's possible, yes.
Q Do you recall making deposits at Flushing?
A It's possible, yes.
Q Do you recall making deposits at Signature Bank?
A I don't recall that one, no.
Q To the extent you did make any deposits at

D. Blankenship

Chase Bank, did you go to one branch -- withdrawn.

To the extent you made any deposits at Chase Bank, do you recall always going to the same branch or going to different branches?

A I think it was one branch that I went to.

Q Do you remember which one?

A No. No, I don't.

Q What about Flushing Bank, did you go to just one branch all the time or multiple branches?

A I don't remember. I think it was in Nassau. I'm trying to think where that one was. I don't recall the address of that branch.

Q Was that branch closer to Northshore or Superb or something else?

A It was like five, ten minutes away from what I remember.

Q From where?

A From when I did it the time at Northshore -- at Superb.

Q Okay. It was closer to the Great Neck/Little Neck area?

A Yes.

Q And the few deposits that you did make they consisted solely of cash deposits, correct?

D. Blankenship

A I'll be honest, I don't know. There was cash and checks. I didn't look at it. The deposit slip was done, I handed it to the teller, got the receipt and brought it back.

Q Who, to your knowledge, filled out the deposit slip?

A I believe the girls in the back room.

Q To your knowledge and recollection, who handed you the slip and the cash?

A Probably one of the girls or Gene coming out with it. I'm 90 percent sure it was the girls in the back room that handed us the deposits to make.

Q Who asked you to go make the deposit?

A They did.

Q The girls?

A Yes.

Q Or Gene?

A Yes.

Q Did Mr. Deo ever ask you to make the deposits?

A Not that I believe so, no.

Q Did Mr. Merckling ever ask you to make the deposits?

D. Blankenship

A He wasn't there when I was at Superb.
Q To your knowledge, when you were at Superb, did Mr. Merckling return to work after the surgery?
A Yes. About a few months later, yes.
Q When Mr. Merckling did return to work, did you work together at the same location or at different location?
A I was back and forth to both.
Q When you were at one, was Mr. Merckling ever with you at the same one?
A Yes.
Q Was there ever a decision made that if you were at one location, Mr. Merckling should be at the other?
A No, because I was moving back and forth with the cars.
Q To your knowledge and understanding is, it fair to state that Mr. Merckling was in charge of all cash payments?
A I have no idea.
Q Would it surprise you to learn that Mr. Lowe testified that Mr. Merckling was responsible for all cash payments, that he was in

D. Blankenship

charge of the cash generally?
A I didn't handle the cash.
Q I understand. My question is: Did you understand it to be the case that Mr. Merckling was responsible for all the cash?
A No, he wasn't.
Q How do you know that?
A Because he wasn't there some of the days so Gene had to have been handling the cash also.
Q Besides Eugene Lowe, was there anyone else responsible for handling cash?
A I assume when they sold a car, the salesman took the cash in and handed it over to Mr. Gene.
Q Are you familiar with the process of receipting in cash?
A Taking -- making a receipt for the cash that you're taking in, yes.
Q Have you ever done that?
A I don't recall.
Q Repeat that?
A I don't believe so.
Q Do you know what, if any, program is utilized to receipt in cash?

D. Blankenship

A No.
Q Are you familiar with the dealership management system called Tekion?
A I know it was a system they used, yes.
Q Is it fair to say you used that system in connection with the servicing and repair of vehicles?
A The service end of it, yes.
Q You are familiar with the fact that that same system was used to receipt in cash, right?
A I didn't do anything with that.
Q Understanding that you didn't handle the task of receipting the cash, did you understand that Tekion was used to receipt in cash?
A I'm sure they had some sort of checks and balance with that.
Q Other than using Tekion to receipt in cash, are you aware of any other system utilized by Mr. Deo to handle cash payments?
A I'm not aware of that.
Q There has been testimony throughout this case about Mr. Merckling having authority to sell vehicles wholesale to various wholesalers.
Are you familiar with that?

D. Blankenship

A Yes.
Q Did you have any involvement in selling vehicles wholesale to wholesalers?
A No.
Q Did Mr. Merckling ever provide you any cash that a wholesaler paid for vehicles that were purchased wholesale?
A No.
Q Are you familiar with the name David Baron?
A Yes.
Q How do you know him?
A He was one of the Barons in the car business.
Q Did you ever meet him personally?
A No.
Q Are you aware of any business relationship between Mr. David Baron and Mr. Deo?
A Say that again, sir.
Q Are you familiar with any business relationship between Mr. David Baron and Mr. Deo?
A I believe he had the floor plan for Northshore.
Q What do you mean by floor plan?

D. Blankenship

A When they buy cars, they put it on a floor plan.

Q What is your understanding of what a floor plan is?

A It's how they hold the cars at the dealership.

Q Are you aware that a floor plan is a line of credit used to purchase automobiles?

A It's something like that. I didn't understand -- I knew they put them on the floor plan.

Q Going back to the issue about the $735,000, do you know what the ultimate disposition of that money was? In other words, do you know ultimately what happened with the money?

A I thought it was still tied up in court.

Q Do you have any knowledge that the funds were placed into the escrow account of Mr. Thomasson; did you know about that?

A No.

Q When you were asked to come back and work at Superb instead of Northshore, what, if anything, were you told about Superb?

A A new dealership, they needed help with

D. Blankenship

getting the cars in and serviced.

Q When you were told it was a new dealership, Mr. Deo told you that?

A Yes. Either Marc or Mr. Deo, yes.

Q And were there any representations made by Mr. Deo as to who the owner of Superb was?

A I don't know.

Q Have you ever met Mr. Urrutia?

A I believe one time in passing, said hello and that was it.

Q What was your understanding at that time as to Mr. Urrutia's role at Superb?

A He had the floor plan.

Q Other than that?

A I couldn't speak to it.

Q You didn't know about the ownership interest composition, how much, who owns and what, nothing like that?

A No, sir.

Q Did Mr. Deo represent to you that he was the owner of Superb?

A Yes.

Q The sole owner?

A You said -- I don't know. I met Mr. --

D. Blankenship

who is the other gentleman's name?

Q Novicki or Urrutia?

A I can't think of his name. You just said his name and I can't think of it.

Q Is it Tony Urrutia?

A Tony Urrutia.

Q What were you going to say?

A That they were involved in the business.

Q Did there come a time when there was a grand opening or a car show at Northshore?

A A grand opening at Northshore? No, Northshore was open.

Q July 21st, does that refresh your recollection moving the vehicles from Superb there?

A Yes.

Q Tell me what you know generally about what that event was and why it was taking place.

A They were having a car show at Northshore.

Q Why were they having a car show at Northshore?

A I guess to bolster advertising to -- for the dealerships.

Q You were present at the car show?

A I stopped in, yes.

D. Blankenship

Q In preparation for the car show, you were asked to perform certain tasks?
A Yes.
Q One of those tasks was to deliver vehicles kept on Superb's lot to the Northshore lot?
A Yes.
Q How many of those cars did you personally transport?
A One or two.
Q Who else was involved in moving the vehicles over?
A I'm sure we had the porters doing it.
Q How many porters were there?
A Two or three.
Q Were all of the vehicle driven there or were some other means used to transport?
A Drove them.
Q Who gave you the direction to move the cars over from Superb to Northshore?
A I don't recall.
Q Who could it have been out of the universe of all the people who could have given you --
A Could have anybody. It could have been Gene, it could have been Marc, it could have been

D. Blankenship

Mr. Deo. I don't recall the exact conversation.

Q In the course of performing your duties for Superb and/or Northshore, did you communicate with people that worked there by text?

A No.

Q Do you have any text messages with Mr. Deo?

A Not that I recall, no.

Q Do you have any text messages with Sarah Deo?

A Not that I recall, no.

Q Do you have any text messages with Gene?

A Not that I recall, no.

Q What about Mr. Merckling?

A We have had text messages for the last ten years.

Q Do you have any text messages with Mr. Merckling about Mr. Deo and/or Superb?

A No.

Q Why is that?

A Maybe -- I'm trying to think. We called each other on the phone. I didn't think we really texted each other.

Q Was there any specific instructions given

D. Blankenship

by anybody not to text about the goings-on at Superb?

A No.

Q Do you recall a change being made in terms of the bank in which deposits were being made at some point at Superb?

A No.

Q Do you recall going to one particular bank for a period of time and no longer going to that bank and going to a new bank instead?

A No.

Q Tell me what you know about the safe that was held at Superb.

A It was in the back room with the girls.

Q How did it work in terms of the safe? Can you give me a play-by-play in the day of a life at Superb in relation to that safe?

A It was in the back room with the girls.

Q To your knowledge, do you know how money got into the safe?

A No.

Q To your knowledge, do you know how money got out of the safe?

A No.

D. Blankenship

Q Do you know who had authority over the safe?
A The girls in the back.
Q What about Mr. Merckling, did he have authority over the safe?
A Not that I'm aware of. It's possible.
Q What about you, did you have authority over the safe?
A No.
Q On August 3rd, are you aware that a criminal complaint was filed against Mr. Deo by Mr. Urrutia?
A No.
Q Did you ever have any discussions with any personnel at the Nassau County Police Department about that criminal complaint?
A No.
Q Did anybody at the Nassau County Police Department reach out to you about that criminal complaint?
A No.
Q After you arrived on August 3rd and after you spoke with Messrs. Thomasson, Deo and Merckling, what happened next?

D. Blankenship

A We went home.

Q Did you interact with any of the police officers present on that day?

A No.

Q In fact, you left before you could be seen, correct?

A Not that -- there was no cops there when I got there.

Q Who else was present when you arrived?

A I told you, Mr. Deo, Mr. Thomasson, and Mr. Merckling.

Q You didn't go inside the dealership?

A That night, no, not that I recall.

Q How did you retrieve your mug?

A It was brought out -- no, we actually did. We helped Thomasson move some of his stuff out and they had already grabbed my stuff.

Q When you helped Mr. Thomasson move his stuff, what stuff was being removed?

A Personal items.

Q Do you remember any of them?

A No, I don't.

Q Do you remember Mr. Thomasson leaving with a lamp?

D. Blankenship

A Yes.
Q Other than the lamp, do you recall any other items?
A His briefcase, or he had his briefcase with him.
Q To your knowledge and recollection, did Mr. Thomasson have boxes?
A Not that I remember, no.
Q Boxes of files?
A Not that I remember, no.
Q Are you familiar with a duty of loyalty form for Gold Coast Motors?
A No.
Q Did you ever sign any duty of loyalty -- a document acknowledging your duty of loyalty to Gold Coast Motors?
A No, I don't.
Q Are you aware that Mr. Deo submitted a sworn declaration declaring that part of your duties were to provide security as a policeman?
A No.
Q Did you ever provide security for Mr. Deo at any dealership?
A We locked up the place, we turned the

alarm on.

Q One of your duties at Superb was tracking vehicle inventory, correct?

A When they were going out to get -- if they went to an outside mechanic or the glass place tracking them where they were, yes.

Q How did you manage inventory?

A We wrote down the VIN numbers and we had a whiteboard in the podium area where the vehicles were.

Q Did you ever take any pictures of the whiteboard?

A No.

Q Using your phone?

A No.

Q You also used a Google spreadsheet to track inventory; is that right?

A Possibly, yes.

Q To your knowledge, who was responsible for managing that Google spreadsheet?

A It was me if they went out to the mechanic and stuff like that, besides the whiteboard to show we did the work on it to show it was completed.

Q Did you update only the spreadsheet or did

D. Blankenship

you use Tekion to update the status of the vehicle as well?

A You froze for a second. Can you repeat that?

Q Yes. Did you update solely the spreadsheet or did you also update Tekion to reflect any work done on any vehicles?

A I don't recall if I did the -- did anything in Tekion with that.

Q To your knowledge, who created the spreadsheet?

A Mr. Merckling.

Q How were you able to access the spreadsheet? What login information did you use to access it?

A I don't think there was a login. It was -- I'm not tech savvy, but it was on the computer.

Q Did you have to click a link to open it?

A I think it was a little box, a tab that was on the computer.

Q When you clicked the tab, did you notice on the top right corner who you were signed in as?

A No, sir.

D. Blankenship

Q Were you responsible for handling any audits by floor plan lenders coming to fetch the vehicles?

A When they came, we had to show them it was out at the glass place or at the mechanics. I believe one time I had to take the auditor over to the mechanic to show him the car that was being worked on.

Q Was that a one-off incident or did that happen frequently?

A Once or twice it happened where we had to physically -- they had to physically touch the car.

Q You would drive over with the auditor?

A Yes.

Q Other than those one-off instances, did you have any other responsibilities or duties concerning audits?

A No.

Q Are you aware of the fact that Tekion had the ability to log a vehicle's location in the dealership management system?

A No.

Q Did anyone in particular give you instructions to only use the Google spreadsheet to

D. Blankenship

manage the location of the vehicle and not Tekion?
A No.
Q When you arrived at Superb on August 3rd, to your knowledge and recollection, how many vehicles were located on the lot?
A I don't know.
Q The car show was on July 21st, correct?
A Yes. I don't know the exact date, but if you're telling me that's the date, yes.
Q At the time that you were tasked with moving vehicles from Superb to Northshore for the car show, were you given any direction at the same time about returning the vehicles to Superb?
A Yes. They were pretty sure the porters brought them back.
Q When?
A I'm not sure of the exact date.
Q Do you know how soon after the car show?
A Within a day or two of bringing it all back.
Q All of them?
A Yes, the cars that they brought there.
Q You never performed any work for Mr. Deo after he was removed from the dealership on

D. Blankenship

August 3rd on 2023?
A Correct.
Q You were never called back in September of 2023, correct?
A No, sir.
Q Are you aware of a settlement conference that took place on September 15, 2023 before Judge Wicks?
A We got called to court to testify to the court proceeding. I was there in -- I don't know the exact date but yes.
Q I believe you're referring to February 20, 2024.
A Oh, is that -- that's the only time I remember going back.
Q You're not aware of the September 15, 2023 settlement conference, correct?
A No, sir.
Q Are you aware that following that settlement conference, the parties on both side agreed that certain vehicles would be returned? Did you ever hear anything about that from Mr. Merckling or anyone else?
A I had nothing to do with that.

D. Blankenship

Q You did not personally return any of the cars after the car show, correct?
A I might have.
Q You don't remember?
A No, sir.
Q Fair to say that generally speaking, you would perform any work that Mr. Deo asked you to do?
A What do you many by, any work?
Q Was there ever any work that Mr. Deo gave you that you did not do?
A With the cars?
Q Anything.
A Are you asking if I went over and mowed his lawn, no.
Q I didn't ask you that, and I don't know if he ever asked you to do that.
Was there ever any task that Mr. Deo asked you to do that you didn't do?
A Not that I'm aware of, no.
MR. KATAEV: This is good time for a five-minute break. Come back at 12:30.
(Whereupon, a short recess was taken.)
BY MR. KATAEV:
Q Mr. Blankenship, during any of our breaks,

D. Blankenship

did you have any conversations with anyone about your testimony?

A No.

Q Are you familiar with the application called the vAuto, one word?

A Not -- no.

Q Are you aware that Superb had vAuto in place to track inventory and its location?

A No, sir.

Q Did you ever receive any direction from anyone to use or how to use vAuto at Superb?

A No, sir.

Q Now, you testified that you worked at Northshore as a liaison for service, right?

A Yes, sir.

Q You specifically testified that you're not a mechanic yourself, right?

A Yes, sir.

Q That's because Northshore had its own mechanic?

A Yes, sir.

Q Who was that mechanic, what was his name?

A Joe.

Q Do you remember his last name?

D. Blankenship

A No, sir.
Q Did you ever exchange any text messages with Joe?
A It's possible.
Q I would like for you to please look through your phone and we will follow up in writing with a request, and we will ask you to produce screen shots or a compilation of all your text messages with Joe the mechanic.
A Okay.

(Counsel Request.)

BY MR. KATAEV:
Q Joe did not work at Northshore or Superb through August, did he?
A I don't know. Joe was there -- I don't know the date when he stopped working there.
Q On the day that you went to Superb where Mr. Deo was removed from the dealership, Joe was not working as a mechanic, correct?
A He was -- I don't know if he was there then.
Q What was -- what is your understanding as to the circumstances upon which Joe the mechanic no longer worked at Northshore/Superb?

D. Blankenship

A I don't know.
Q Is it fair to say you found out he was no longer working there when you arrived at Northshore one day and he was no longer there?
A Because I was gone and I'm trying to think. He stopped -- I can't -- I don't know the exact date he stopped working there.
Q If I represented to you that it was in or about May of 2023, would that refresh your recollection?
A About that timeframe, yes.
Q Okay. Now, at the time that Joe was working as a mechanic, is it fair to say that Northshore, the only activity going on there was repairs?
A At Northshore?
Q Yes.
A Yes. We had -- it was Joe was the main guy and we had a few other guys that filled in, but yes.
Q All the people were doing service and repairs, nothing more, correct?
A Yes, sir.
Q There were no salespeople present at

D. Blankenship

Northshore at that time, right?

A Not that I can recall, no.

Q After Joe the mechanic was no longer working there, there was no activity at Northshore at all, correct?

A We had a few mechanics that came in to do work at that time.

Q After Joe?

A I think we had one or two guys but they didn't last long.

Q Do you remember the names of any of the people?

A No, sir.

Q Do you remember how long each of them worked there?

A I don't remember the exact dates, no.

Q Do you remember the period of time; for example, the first one that came after Joe worked for two weeks, the second one that came after Joe worked for three days, anything like that?

A It's something like that in that timeframe, yes.

Q To your knowledge, what was the reason those guys didn't last long?

D. Blankenship

A I don't know.
Q Wasn't it your job to serve as liaison for the repair team and service team?
A I don't know if they got better offers or what. They just decided to leave.
Q It's your understanding that Mr. Deo was not the one to terminate them?
A I have no idea.
Q Is it fair to say after those sporadic mechanics came and went, there was no activity at all at Northshore, correct?
A Not that I recall, no.
Q So going back, to orient you as to the timeframe in or about November of 2022, do you recall any issues that Mr. Deo had with Mr. Aaronson and Island Auto Group removing all the files from the offices of Northshore?
A Yes. They took the boxes out.
Q Tell me, generally speaking, what is your understanding as to what transpired and why?
A I don't know why they were removing the boxes. I can't think of the lady's name.
Q Wendy?
A Yes.

D. Blankenship

Q Tell me about Wendy.
A She worked in the back room at Northshore.
Q Okay. What about her?
A She worked with -- I think the -- I can't remember the old gentleman's name. Dan, I believe.
Q Daniel O'Sullivan?
A Yes. I think that's his last name.
Q What about Wendy and Dan do you want to tell us?
A They worked in the back room.
Q We were discussing how Mr. Aaronson removed all the files from Northshore, right?
A Yes.
Q My question is -- in light of my questions about that, you brought up Wendy and Dan. My question is: What is the relationship?
A Dan was -- he was like the -- I think they called it a controller spot.
Q Okay. What does Dan's title as controller and Wendy's role working the back have to do with what I'm discussing with you?
A I know Wendy removed the files. That's what you asked me.
Q How do you know that Wendy removed them?

D. Blankenship

A I saw her taking them out.
Q Did she take out all the boxes?
A I guess. I would assume she took the files out.
Q Did you physically witness her taking them out?
A She was in the front of the building with her car open and taking them, yes.
Q I'm sorry, repeat that.
A She was taking them out, yes.
Q Was there anyone else with her?
A I don't recall.
Q Did you take any action to stop her from taking the files?
A No, sir.
Q Why was that?
A I didn't know anything about it.
Q What is your understanding as to the reason why Wendy took those files out?
A I don't know.
Q Did you ask any questions about it with anyone that you worked with at Northshore?
A Did I ask any questions, no. They were the old files.

D. Blankenship

Q That didn't seem odd to you that that was happening?

A I had nothing to do with it.

Q Throughout this case, your former attorney, Mr. Thomasson, has claimed that the removal of these files has hindered the operations of Northshore.

Are you familiar with that?

A I do not know.

Q I'm presenting to you what will be marked as Blankenship 2, I believe.

(Blankenship Exhibit 2, Marked for Identification.)

BY MR. KATAEV:

Q I'll represent to you this is a state court complaint filed by Mr. Deo against my clients, Island Auto Group and a bunch of others. This is on page 36.

The complaint bears Index Number 615683 of 2024 filed on September 4, 2024. I want to direct your attention, Mr. Blankenship, to paragraph 128. Kindly read it and let me know when you're done.

(Witness perusing document.)

A Okay.

D. Blankenship

Q Do you remember this occurring?
A I remember her taking files out.
Q Do you recall that vehicles were removed from the dealership in or about --
A I don't remember if there were any vehicles removed.
Q -- in or about November of 2022?
Do you recall that, as a result of the allegations that you read about here, that Mr. Deo was hindered in his operations?
A They took the files and stuff that I knew.
Q Are you telling me you're not aware of any inability to operate as a dealership after November of 2022?
A I don't recall, no.
Q To your knowledge, are these allegations false?
A No. They took all the files and stuff out of the building.
Q The allegations in this paragraph that I showed you discuss the fact that the Deos were locked out of all the software required to run Sunrise; do you know anything about that?
A I didn't have -- I didn't go into

D. Blankenship

software.

Q Did they ever tell you they were locked out of the software at Sunrise?

A I don't recall.

Q Do you recall after November of 2022 that Sunrise was not operating in its normal course?

A Yes.

Q What changed after November of 2022 with respect to Sunrise? What happened before and what was the result after?

A They started closing up, they couldn't operate, there weren't getting cars.

Q What about at Northshore, was it the same thing?

A Yes, sir.

Q Is that when you ended up taking a break?

A Right around that time, yes.

Q It was more the case that they were hindered in their operations than your need to take time off for your family, correct?

A No, because I was getting burnt out.

Q But these events happened in November of 2022, and then you decided I need to take time off and spend time with your family, correct?

D. Blankenship

A Correct.
Q Is it fair to say that after November of 2022, the dealership never -- Northshore and Sunrise never operated the same way again?
A I guess so. I don't know.
Q Other than the service and repairs that were done until May of 2024, right?
A Yes.
Q There were no service or repairs being done at Sunrise, right?
A No. Outside mechanics, if we used them, if it was easier to get to the outside mechanic or the glass place down there, that's when we used those.
Q Do you recall if vehicles were present on the dealership lot at Sunrise after November of 2022?
A I don't recall.
Q Same question for Northshore?
A There were cars there, yes.
Q Not as many though, right?
A I don't believe so, no.
Q Does the name Justice Gianelli ring a bell to you?

D. Blankenship

A I don't know who that is.
Q Are you aware of the existence of any temporary restraining order issued by Nassau County Supreme Court by and through the Honorable Sharon M.J. Gianelli?
A I don't know.
Q Did you ever go to Nassau County Supreme Court with Mr. Deo for any court appearance?
A No.
Q Did Mr. Deo relay to you any conversations that he had with Mr. Urrutia?
A No.
Q Is it fair to say that a car show was a grand opening for Northshore since it hadn't been operating?
A I don't know. I know they were having a car show.
Q Do you know anyone named Robert Puccio? P-U-C-C-I-O.
A No.
Q Have you ever met Mr. Puccio?
A Not that I'm aware of.
Q Do you recall any banking representative from Flushing Bank visiting Superb, Northshore

and/or Sunrise?

MS. RONNEBURGER: Objection to form.

Q You can answer.

A No.

Q You were never present when any banking representative from Flushing Bank visited any of the dealerships, correct?

A Correct. I might have been in the building, but I was never in the room or anything. I was never introduced to any of them.

Q Do you recall any instance in which a banking representative from Flushing Bank visited any of the dealerships?

A No.

Q Did Mr. Deo ever tell you he has anyone in his pocket?

A No.

Q What would that term mean to you?

A That he knows somebody.

Q Do you know an individual named Nathan Newell? N-E-W-E-L-L.

A No.

Q What about Ron Das? D-A-S.

A No.

D. Blankenship

Q Do you know that individual?

A No.

MR. RUDERMAN: Mr. Kataev, it looks like you froze again.

(Luncheon recess: 12:52 p.m.)

***

(Afternoon session: 1:31 p.m.)

D W I G H T B L A N K E N S H I P, resumed, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION BY

MR. KATAEV (Continued):

BY MR. KATAEV:

Q I'm going to move on to a different topic.

Mr. Blankenship, what was your understanding as to why the operations were hindered on or about November 2022 with respect to Northshore?

A We weren't getting cars and stuff in, we couldn't purchase cars.

Q And do you have an understanding as to why you couldn't purchase cars anymore, why Mr. Deo

D. Blankenship

couldn't purchase cars anymore?

A No.

Q Did you come to understand there was a dispute between Mr. Deo and the owner of Island Auto Group?

A Yes.

Q In light of the fact that this dispute arose such that operations at Northshore and Sunrise were hindered, did that raise any red flags for you in connection with Mr. Deo?

MR. THOMASSON: Objection.

A No.

Q That's precisely why you continued to -- withdrawn.

That's precisely why you took the opportunity to work with Mr. Deo again later on, correct?

A Yes. They asked me to come back because Marc got sick.

Q I'm going to present to you what will be marked as Blankenship 3.

(Blankenship Exhibit 3, Marked for Identification.)

BY MR. KATAEV:

Q Can you see that?

D. Blankenship

A Yes.
Q This is part of a production of documents from Flushing Bank. This particular document that we are looking at is Bates-stamped Flushing 7212.
Do you recognize what this document is?
A It's a deposit ticket.
Q On the bottom left, it has your name and driver's license number on it, correct?
A Yes.
Q On this particular day, April 10, 2022, you did take $5,500 in cash and deposit it in Flushing Bank's -- in a Flushing Bank account, correct?
A Correct.
Q This deposit ticket says that it's for 189 Sunrise Highway, correct?
A Yes, it does.
Q To your knowledge, did you receive these funds at Sunrise?
A I don't know where.
Q You typically worked at Northshore, right?
A It could have been at Northshore or down at Sunrise.

D. Blankenship

Q Sometimes you received cash to be deposited at Northshore but would deposit it at Sunrise and vice versa, correct?

A Wherever the cash ticket was done.

Q To your knowledge and recollection, did you ever receive cash at Northshore and you were directed to deposit it into a Sunrise bank account?

A Whatever the ticket was, that's where I deposited the money.

Q I understand that the ticket says 189 Sunrise Highway.

My question is: Where did you receive the cash? Was it at Northshore or was it at Sunrise or somewhere else?

A I don't recall.

Q I'm referring back to this exhibit which I'm placing back up on the screen.

What portion, if any, of this deposit slip contains your handwriting?

A I don't know if any of it does. I know that's not the way I capitalize my name. I didn't put that on there.

Q Not in terms of your name, is it fair to say that that's what the teller wrote down?

D. Blankenship

A Probably, yes.

Q As for 189 Sunrise Highway and the date and the amount and their account number, do you know who, if anyone, wrote that?

A I don't know who wrote it. I don't remember.

Q But it wasn't you, was it?

A I don't think so.

Q Did you count the money before going to the bank?

A I got the slip and I take it over there.

Q You wouldn't count it, would you?

A No, sir. I mean, I wasn't responsible for that. It was done and I take it over to the bank.

Q I'm showing you Blankenship 4.

(Blankenship Exhibit 4, Marked for Identification.)

BY MR. KATAEV:

Q I'll represent to you this is a document that's been filed in the federal case.

Do you recognize this document?

A I know it's a Gold Coast Motor Group.

Q If refers to a company newsletter, right?

A Yes.

Q Are you familiar with whether there is

D. Blankenship

more than one company newsletter?

A I didn't know there was this newsletter.

Q Does this logo look familiar to you?

A Yes.

Q How do you know this logo?

A That's the Gold Coast Motor logo.

Q I'm referring to page two of this document. It says Gold Coast Motor's executive roles, right?

A Okay.

Q It says the fiduciary duties of the corporate officers are duty of care, duty of loyalty and duty of good faith. That's what it says?

A Yes.

Q Does this document look familiar to you?

A Like I said, I didn't know there was even a newsletter.

Q Referring to page three of the agreement. I'm going to represent that there are various individuals here that are part of the case, such as Mr. Deo listed as president, Mrs. Deo listed as vice president, Mr. Laurie as the CFO, Frank Ventimiglia as the COO, and your partner, Mr. Merckling as the chief security officer; do you

see that?
A Yes, sir.
Q Do you know Frank Ventimiglia?
A He was the finance guy at Northshore and Sunrise.
Q Superb?
A Superb, sorry. Yes.
Q What is your understanding as to Mr. Ventimiglia's employment with Superb and/or Northshore?
A He was the finance guy.
Q Was he the finance guy all the way until the end or did he leave before Mr. Deo ceased operation of Superb?
A He left. He was at Superb for a while and then left.
Q What were the circumstances upon which he left?
A I don't know.
Q He was working at Superb and one day he wasn't working there anymore?
A Yes.
Q You never came to learn of the reason why?
A No, he took another job. I don't know.

D. Blankenship

Q Going onto page four, there is a chief administrative officer, chief marketing officer and general manager by Ron Das, Efaz Deo, and Eugene Lowe respectively, right?

A Yes.

Q That's Gene, that's who you have been referring to as Gene, correct?

A Yes, sir.

Q Bottom half of the page, you're listed together with Mr. Vasquez as an operations manager, and Mr. Vasquez as a sales manager, right?

A Yes.

Q Does this refresh your recollection as to receiving this newsletter at some point?

A I don't know if I ever received a newsletter.

Q Do you recall any meetings that discussed the duty of loyalty and duty of good faith and all that stuff?

A Not that I recall, no.

Q You never signed this document, correct?

A I don't know if I did.

Q Do you recall any meeting in which any of these individuals that we just looked at were asked

to sign these documents?

A I can't testify to if they did or did not.

Q I'm asking you, do you recall if there was ever any meeting where someone was asked to sign these documents?

A Not that I'm aware of or remember, no.

Q Part of your duties at Northshore and/or Superb, were you ever responsible for placing a vehicle on floor plan line of credit?

A No.

Q To your knowledge, who were the responding officers on August 3rd, 2023 at Superb?

A Gene was probably the guy that was doing all the floor planning.

MR. KATAEV: Read back the question, Madame Court Reporter.

(Whereupon, the referred to question was read back by the reporter.)

BY MR. KATAEV:

Q Mr. Blankenship, I'm sorry, that wasn't responsive to my question. I'll rephrase the question.

On August 3rd, 2023, Nassau County Police Department came and responded to a complaint

by Mr. Urrutia, correct?

A Yes.

Q To your knowledge, who were the responding officers from the Nassau County Police Department on that day?

A I have no idea.

Q You didn't recognize anybody when you went there?

A No.

Q You didn't speak to anyone, correct?

A No, sir.

Q Do you use Instagram, Mr. Blankenship?

A No.

Q I'm going to share with you Blankenship Exhibit 5.

(Blankenship Exhibit 5, Marked for Identification.)

BY MR. KATAEV:

Q I'll represent to you it's an Instagram post made by Gold Coast Motors. I'll zoom in and give you an opportunity to read it.

(Witness perusing document.)

Did you have a chance to read it from top to bottom?

A Yes, sir.

D. Blankenship

Q This is the July 21st car show that we have been discussing, right?

A Yes.

Q It says here, A grand opening you don't want to miss, right?

A Yes.

Q When I asked you if it's a grand opening, you corrected me and said it's a car show. Why is that?

A Because it was a car show.

Q To your knowledge, why does this say, grand opening?

A Nobody was selling anything or doing anything. It was a car show.

Q There is a reference here to Team Exit. Do you see that?

A Yes.

Q What does that mean to you?

A I think that's the car club.

Q What car club?

A The car club that helped them put this together.

Q Tell me more about this car club, who is it, who does it consist it?

D. Blankenship

A I have no idea. I didn't deal with them.
Q You're familiar with the car club being Team Exit?
A I think it's a car club.
Q You testified that you drove at least a couple of vehicles over there, right?
A Yes.
Q Which vehicles were those?
A I don't remember.
Q When you worked at Superb, were you provided a demo vehicle?
A Yes.
Q What was the make and model of that demo?
A I'm trying to think. I had an F150, a blue F150, I had a Chevy Silverado.
Q Also a pickup truck, right?
A Yes.
Q Were those the vehicles that you drove over or were they different vehicles?
A No, they were different vehicles.
Q You never saw this Instagram post prior to today, correct?
A No, sir.
Q I'm going to show you what will be marked

as Blankenship 6.

(Blankenship Exhibit 6, Marked for Identification.)

BY MR. KATAEV:

Q And I'll represent to you that it's a declaration by an individual named Nethanel Ordad; does that name sound familiar to you? N-E-T-H-A-N-E-L O-R-D-A-D.

A No, sir.

MR. KATAEV: I'll also represent for the record that this is ECF document 340 in this case.

Q Mr. Blankenship, if I told you that Nethanel Ordad is Nate, one of the wholesalers from LNF, does that ring a bell as to who that is?

A He was one of the wholesalers, yes.

Q He was present at Superb from time to time, correct?

A Yes.

Q I pointed the screen to page two where the allegations begin or -- withdrawn.

Where the averments begin from his declaration. I would like you to read it and let me know when I can scroll down.

(Witness perusing document.)

D. Blankenship

A Okay, scroll down.

Q Before I do that, I have some questions about these statements by Mr. Ordad.

Do you know Alex?

A Personally, no.

Q Have you ever met him?

A I met him once or twice.

Q Scrolling down to the top of paragraph eight where we ended last.

A Okay.

Q Are you done reading through 12?

A Yes.

Q Did you ever hear in the dealership that individuals referred to Merckling as the moneyman?

A No.

Q Is it true that Mr. Merckling was responsible for the cash at the dealership?

A According to this, he sold the cars to the -- taken as trade-ins. He was in charge of that.

Q Do you have any knowledge as to the dealings and instructions that he was given by Mr. Deo for wholesaling cars?

A No.

D. Blankenship

Q Do you have any knowledge as to whether there was an instruction that the wholesale vehicles could only be sold for cash?
A No.
Q Going to the top of page three, starting off at paragraph 13. Let me know when you're done.
(Witness perusing document.)
A Okay. Scroll down.
Q Going down to paragraph 18.
A Okay.
Q In relation to the statements made in paragraph 20, did you ever have anything to do with getting titles over for vehicles sold to wholesalers?
A No.
Q Do you have any knowledge as to whether ultimately Mr. Merckling or Mr. Deo provided those titles to Mr. Ordad?
A I don't know.
Q Did you finish reading paragraph 22?
A Yes.
Q Let the record reflect I moved to page four. Showing paragraph numbers 23 to 30.
A Okay.

D. Blankenship

Q In Mr. Ordad's averment, he noticed that there were only ten or 15 vehicles left on the lot of Superb as of late July 2023, correct?

A That's what he states.

Q Do you have any reason to dispute what he stated?

A I think there were more cars there. Did he go into the basement in the underground?

Q I don't think -- I wouldn't know. I would think that as an outsider, he probably wouldn't because this is referring to just the lot because he refers to the lot.

So referring to just the lot and not the vehicles underground, is it fair to state that there were only ten or 15 vehicles left on the lot?

A I don't think so.

Q Do you know how many vehicles the lot can hold?

A Forty, 50, just the lot. Right around that number.

Q If I told you 80, would that be outside the realm of possibility?

A I guess if you pack them in there.

Q You didn't find it odd that Superb had no

D. Blankenship

vehicles on it from late July to early August?

A I don't understand your question, sir.

Q I'll withdraw it and rephrase.

Did you find it odd there were substantially less vehicles on the lot at Superb from late July of '23 until early August?

A The only time we moved some of the cars over was to Northshore and then they came back, as far as I knew, so I don't understand the questioning, sir.

Q You didn't personally return any of the vehicles, did you?

A I might have. I know after that in August I did go on vacation but I think all the cars were returned.

Q I'll represent to you they weren't because I was in court on September 15, 2023 securing the return, but that's your testimony.

Do you have any recollection of Mr. Merckling seeking to wholesale all those vehicles that you saw in the declaration for 50 to $60,000 in cash?

A No.

Q You weren't involved in any of that?

D. Blankenship

A No.
Q I'm trying to see if I can skip some exhibits so we can move faster.
Do you have any knowledge or recollection of an individual named Alysia Cayer? A-L-Y-S-I-A C-A-Y-E-R.
A Not that I recall, no.
Q If I told you that individual was the chief financial officer at Superb, does that ring any bells?
A I don't remember her.
Q Okay. Do you know what the term, double foreign, means?
A No.
Q Your testimony is that you no longer performed any work for Mr. Deo after August 3rd of 2023?
A Yes, because I believe that's when I went on vacation and when I got back, I got the letter from Superb.
Q What did the letter say in sum and substance?
A No longer use of services or something to that effect.

D. Blankenship

Q You didn't receive a phonecall from someone such as Marc or Mr. Deo discussing this?
A No, because I was away.
Q Do you know if that letter came from Mr. Deo or Mr. Urrutia or someone else?
A It came from Superb. I don't remember who it was on the bottom of the letter.
Q In the course of performing your duties as it relates to deposits, did you ever go to Bank of America?
A I don't know.
Q Do you know an individual named Darmeshwar Bissoon also know as Kevin? D-A-R-M-E-S-H-W-A-R, last name B-I-S-S-O-O-N.
A Kevin was a salesman, yes.
Q And to your knowledge, did Mr. Deo hire Kevin?
A I believe he worked at Superb.
Q To your knowledge, did Kevin also work at Northshore?
A I know he was at Superb.
Q You don't remember if he was at Northshore prior to Superb?
A Prior to, I don't think so, no.

D. Blankenship

Q Are you aware of any threat made by Kevin to Mr. Deo?
A I heard about the -- he made a threat after.
Q Who did you hear it from?
A That he threatened him.
Q Who did you hear that from?
A Marc or one of the guys told me.
Q What was the conversation you had in sum and substance?
A That he made a threat to him, that he threatened him.
Q Do you remember the nature of the threat?
A I do not.
Q Mr. Thomasson had an office at Superb, correct?
A Yes.
Q To your knowledge, when did Mr. Thomasson first have an office there?
A I don't know.
Q In relation to August 3rd, 2023, how long before that did he, quote/unquote, move in?
A I don't know the exact date.
Q Was he there for weeks, months, days?

A He was there for a few weeks that I can definitely remember.
Q Did you ever see the text message in which Kevin threatened Mr. Deo?
A No.
MR. KATAEV: Let's go off the record. It's 2:05. We will come back at 2:10.
(Whereupon, an off-the-record discussion was held.)
BY MR. KATAEV:
Q You testified, Mr. Blankenship, that you don't personally know Detective Marx, right?
A Yes.
Q To your knowledge, did Mr. Merckling know Detective Marx?
A To my knowledge, no.
Q And just so I'm clear, you deny being hired to protect Mr. Deo in any way, correct?
A Yes. We didn't do security and all that stuff. The most security we did was set the alarms and make sure the place was locked up.
Q Okay. And the $1,000 a week or so that you were paid, to your knowledge, was that net or gross?
A Should be gross.

D. Blankenship

Q And last, Mr. Deo testified at his deposition that he hired you and Mr. Merckling because his life was in danger because there were men with guns coming after him.

Do you have any knowledge of that?

A No, sir.

MR. KATAEV: All right, subject to reopening this deposition based on the rulings made by Judge Wicks, I have no further questions for you and I want to thank you for your time today.

MR. THOMASSON: Housekeeping matter before Mr. Ruderman begins, I want to let you know, Mr. Ruderman, I do have some questions. I don't think it's exceptionally long, but it could be up to a half-hour and I want to make sure time is left for me to do that.

MR. RUDERMAN: I don't anticipate going to the end of the day. I want to ask, Ariel, do you have any questions.

MS. RONNEBURGER: I don't believe I have any questions.

MR. THOMASSON: Jeff, what about you?

MR. CIANCIULLI: Not that I'm aware of at

this point, no.

EXAMINATION BY
MR. RUDERMAN:

Q Good afternoon, Mr. Blankenship. My name is Jeffrey Ruderman. I'm an attorney from the firm of Cyruli Shanks & Zizmor and we represent, as we described as the IAG plaintiffs in this matter.

And just as Mr. Kataev did, I'm going to ask you some questions. If you could continue to provide answers, as you have before, to the best of your ability.

Do you understand that?

A Yes, sir.

Q When you worked at Northshore Motors, did you have a specific location where you generally sat or stood?

A I was in between the sales floor and being back in the back with the mechanics or at the podium.

Q When you say, the sales floor, was that on the same level as all the other offices at Northshore?

A They were back behind the other door.

Q When you say, they, are you referring to

D. Blankenship

the offices or the sales floor?

A The offices. The sales floor was open.

Q There was one open area with the sales floor and there were individual offices but located on the same level as the sales floor, correct?

A Yes.

Q What was located on the sales floor?

A The salesmen.

Q Do they have desks, cubicles?

A Desks, one office where the -- Frank did the -- what do you call it, financial whatever.

Q So did the salespeople's desks, they were open desks, they didn't have closed cubicles, right?

A On one side where we had the -- in front of the podium, we had the guy who moved the cars around, the porters. The porters had their own cubicle because they kept some of the tools in there, and there was one other cubicle, then it was the podium and then Frank's office.

Q When you were in the sales floor, was that because you were waiting to do something, that's where you would stay when you weren't actively doing some other type of service?

A I would check in and see what's going on

D. Blankenship

and then go back and deal with, you know, if we had to order parts or cars that came in.

Q When you say, a podium, was that like a lecturn, something like that where somebody would stand behind it?

A I don't know what a lecturn is, but it had a desk in front of it and there were two seats behind it.

Q Who, if anybody, would be seated at that podium?

A At that time it would be -- if Frank wasn't in his office he would come out there, I was sitting there, Marc was there.

Q That was nobody's designated location when they performed their work?

A No.

Q So it was just an open space that people might go to and do some work there?

A Yes.

Q If those people weren't there, then the podium would be left empty?

A Yes.

Q Was there a computer terminal at the podium?

D. Blankenship

A Yes, there was.

Q When you used the computer, where was that computer located at Northshore?

A We had the one desk right on the side of -- in the back of Northshore and I had another one at the mechanics' bay that I used.

Q Were there other people that used that same computer?

A Repeat your question.

Q Do you know if anybody else used those same computers at Northshore?

A Yes.

Q Do you recall ever coming into the location and the computer was not -- required a login of some kind when you got there?

A I think we had a login or we would click on the Northshore logo and it would come up.

Q You don't recall or -- you had to put in some sort of a code to gain access to the computer?

A I don't recall.

Q And so when you were standing in the sales floor -- withdrawn.

You said there were offices that were also on that same level. How many offices were

there?

A Approximately five or six.

Q Were they all generally occupied?

A In the back room behind that other place, yes, I think that's where Dan was, Mr. Deo, the other girl that did the licenses, not the licenses, the plates.

Q Do you know who else occupied any of those offices?

A I think Mr. Ventimiglia actually went back there at one point in time to do the FNI, Sarah had an office back there.

Q Was that everybody?

A I believe so.

Q Did all of these people come in, as far as you know, on a regular basis pretty much every day?

A I think so, yes.

Q And you mentioned Wendy. Do you remember a Wendy?

A Yes.

Q Where did Wendy work if she came in?

A At that point in time she took over Frank's office in the back.

Q When you say at that point in time, what

point in time was that?
A When Wendy came to Northshore.
Q Do you mean if she came in on a particular day, Frank would not work in that office and she'd work in that office?
A No. She took that office.
Q She took over that office?
A Yes.
Q And Frank went to work at the other office, which you said was off the sales floor?
A Yes.
Q When did that happen approximately?
A I don't know the exact date. I know when she got there, she got that office.
Q I believe you testified you started to work at Northshore somewhere in the late winter, early spring of 2021; is that correct?
A Yes, sir.
Q So do you recall whether it was in the first year or so of you being there?
A No, I think it was later. I'm trying -- I don't know the exact date.
Q You stopped working somewhere around November or December of 2022 at Northshore, correct?

D. Blankenship

A Yes.

Q Can you recall about how long before you stopped working there that she began working there?

A It was probably three or four months approximate, right in there.

Q Somewhere around end of August, early September, something like that?

A I think she might have been there for the summer, part of the summer.

Q Do you know how many hours a day she was there?

A No, I don't.

Q Do you know how many days a week she was there?

A No, I don't.

Q Would you have known how many days a week she was working there?

A No, because I wasn't there all the time.

Q So would you know -- do you know if every day you were there, she was there?

A Yes, I guess so. I don't know for sure because I didn't see her all the time. I didn't go into the back.

Q Do you know what her position was at

D. Blankenship

Northshore?

A I think she worked with Dan with the controller.

Q Do you know whether she had a title?

A No, I don't.

Q Do you know who she reported to?

A No, I don't.

Q Do you know who Dan reported to?

A Dan, to Mr. Deo, and to -- what was her name, Wendy.

Q Did you have any interaction with Wendy other than a greeting or something like that?

A No, sir.

Q Did she ever come over to you and ask you any questions?

A Not that I recall, no.

Q Do you recall whether you had to go over to her and ask her any questions?

A Not that I recall, no.

Q Do you know whether or not she and Dan, that you could see, had any interactions with each other?

A I have no idea. They were in the back offices.

D. Blankenship

Q Do you know whether she and Anthony Deo had any interactions?
A They were in the back offices.
Q Do you know whether she and Sarah Deo had any interactions?
A Again in the back offices.
Q When you were -- I know there is some testimony you had with regard to Superb and I want to try and see if I can distinguish this to make it clear.
I know you testified about an inventory list of some kind created by Mr. Merckling, correct?
A Uh-hum.
Q Have you to answer verbally?
A Yes.
Q And that inventory list was on, as far as I understand, a Google sheet like a spreadsheet?
A Yes, a spreadsheet. I don't know if it was Google or not but it was on a spreadsheet.
Q Do you know whether a similar spreadsheet was employed at Northshore and Sunrise?
A Again, we had a white board that we would write everything down where the cars were going and

D. Blankenship

stuff like that, so that's what we kind of used and we tried to bring that over to Superb.
Q When was that spreadsheet that you referred to, when was that first implemented?
A I think when we were at Superb.
Q To the best of your recollection, Northshore and Sunrise did not use this type of a spreadsheet?
A Not that I recall.
Q How many cars do you know were on -- withdrawn.
Did you physically work at Sunrise at any time?
A Yes.
Q And did you apportion your time between Sunrise and Northshore?
A Yes.
Q How did you determine which -- where you would be or which hours or days you would spend there?
A Depending on what was getting done, what cars needed to be taken to mechanics, like I stated, mechanics, glass, if there was a problem with the car or it wasn't starting and stuff like that, I

D. Blankenship

would run back and forth.

Q You were -- Sunrise did not have its own mechanic shop, correct?

A No, sir.

Q Cars were either serviced at the Northshore mechanics' shop or at an outside facility, correct?

A Yes, sir.

Q So when you were at Sunrise then, that would only be for a particular purpose to go and bring cars to or take cars back that needed servicing?

A Servicing or if I had the porter down there, make sure he was taking the cars back and forth, getting an inspection or anything like that, yes.

Q You wouldn't typically just hang out at Sunrise because there was nothing to do there?

A If I started down there and there was nothing for me to do at Northshore, I would stay there.

Q If you started at Sunrise because they needed some work for you to do and there was no need for you to go back to Northshore, you would stay at

D. Blankenship

Sunrise?

A Yes.

Q What would you do at Sunrise then if there was no reason for you to be at Northshore or Sunrise?

A Check on cars, check on completion of cars. There was still a lot to do because we had a lot of cars in and out.

Q What type of mechanic services were performed in house at the Northshore facility?

A Pretty much whatever Joe could handle. Struts, brakes, oil changes, he would tell us if the car was going to pass inspection, to do tires on it. Sometimes the bearings if Joe had time to do it, if not, we would send it out to another mechanic shop.

Q Do you know if Joe was ASC certified?

A I think so, yes.

Q Did Northshore or Joe perform any body work at the Northshore location?

A No. We didn't do body work.

Q What about nonmetal work, if a car was missing a mirror that needed to be replaced or needed a grill that was just buying a new piece and installing it?

D. Blankenship

A We could do that, yes.

Q About how many cars did Northshore have during -- when it was fully operating on its lot at any particular time?

A I don't know a number.

Q Would you say it was more than 100?

A No. It was not more than 100. I don't think it had the room for the facility there.

Q Was it more than 50?

A Yes, it was more than 50. I think in the back, we could put cars in the back with the showroom. It was more than 50.

Q Would you see the vehicles when they were first delivered to Northshore?

A When they first came, Joe and I would go over it and we would write a list for each vehicle if it needed anything. We would write a list out so we knew where it had to go.

Q When the cars came in, were they -- withdrawn.

Do you know if the cars were purchased primarily at auction or private purchases or something else?

A I believe they were auctioned because we

D. Blankenship

had the transporter bringing them in.

Q Did Northshore have its own transporter vehicle?

A No.

Q The vehicles came in by a transporter to location?

A Yes.

Q Did they come in always to Northshore or be sent out to Sunrise?

A Yes. We would bring them there first because we would look at them and see what they needed.

Q If they were supposed to ultimately go to Sunrise, did the transporter wait or did you have them unload it and reload it onto another transporter?

A No. We would run the porters back and forth to bring them down there.

Q When vehicles came in, it was your responsibility to check the condition of the vehicle?

A Yes. Myself and Joe drive it, make sure what was going on with it, anything like that, yes.

Q How did you keep a record as to what, if

D. Blankenship

anything, the vehicle needed?

A We would write it down on a piece of paper and it either got serviced. Once it was done, it was checked off.

Q Do you know what a deal folder is?

A No.

Q Do you know whether or not there was a physical folder of some kind that was maintained at the dealership for each vehicle that they purchased?

A They had jackets, yes.

Q So in the jacket -- did you have access to the jacket?

A No, I didn't touch those.

Q When a vehicle first comes in, how do you know what vehicle that is? In other words, the information about it, is there a sheet that you got saying, here's a 2010 Audi A4 or you would look at it and that's how you knew what the car is?

A I looked at the car, sir.

Q Did you get a purchase list saying, here are the ten cars that we purchased and here they are?

A Whatever was dropped off, we would deal with.

D. Blankenship

Q How would somebody know whether all the vehicles that were purchased were now delivered?
A I assume they checked them off.
Q You weren't involved in that?
A He would ask me what cars came in and I would give him a list of what cars came in and that was it?
Q Who are you referring to?
A Either Marc or Frank or one of them, these are the cars that came in off the transport and we are working on them.
Q The piece of paper, did you have a form of some kind where it had information on it, you check off boxes or fill in information?
A No.
Q You have a blank piece of paper?
A If we were checking them in and we would write out a piece of paper stating what it needed. If it needed tires or if it needed transmission work or engine work.
Q That would be on a plain piece of paper?
A No. There was a --
Q A form?
A We started using a form at that point.

D. Blankenship

Q What type of information would -- was the form blank and you would fill in everything about the car or did it come prefilled with the type of vehicle?

A No, I would fill it in on each car that came in at that point. It was a 2010 Silverado and what it needed.

Q The vehicle would be offloaded and you or Joe would do an inspection of the vehicle?

A Yes, sir.

Q Would you test drive the vehicle?

A Joe would.

Q Would he bring the vehicle in to put it up on the lift to look underneath it?

A Yes.

Q Anything visual that you could see that required --

A If it had a dent or a scratch, I would mark that and let them know. I don't know if it happened in the transporter or they bought it that way, but I would try to list all of that.

Q The paper that you created listing whatever condition the vehicle was in, what did you do with that paper?

D. Blankenship

A It would get put in the basket and I don't know what it did after that.
Q You don't know if it made it into the -- I don't know what term you used for the folder?
A A jacket.
Q Do you know if it made it into the jacket?
A I don't know.
Q Do you know if the information on there ever got input into any computer system?
A I don't know.
Q When Joe would do the work on it, did he keep track of the cost and expenses associated with repairing or servicing any one of those vehicles?
A We would attach -- if it went to an outside vendor, we would attach what they charged us to that slip and it would go in.
Q What about if he did the work in house and he had to buy parts?
A We had a running parts list. We would call a parts warehouse.
Q When vehicles came in, did you -- what percentage of vehicles that came in would you say required some kind of service when they first came in?

D. Blankenship

A I don't know. Some cars needed more, some cars, wiper blades or whatever. I would physically touch every car and try to go through it with Joe.

Q Let's differentiate, like, a maintenance type items; wiper blades, brakes, tires, those might be maintenance items?

A Yes.

Q You understand the distinction I'm trying to draw here between something missing a part or it needs something repaired; do you understand the distinction I'm drawing here?

A Yeah. If it had to go out to -- are you talking also alignments and stuff like that?

Q No. I'm talking more like parts missing from the vehicle, if something's broken, something cracked?

A A piece of molding is broken and stuff and needed to be replaced, yes.

Q What percentage of the cars that came in would it be more than 50 percent or less than 50 percent that had those types of items, more not maintenance items?

A I would say less than 50 percent, right around there. A few things I would notice and we

D. Blankenship

would deal with or we were told okay, it's not a big deal, it's still a used car, this is used car stuff.

Q Just a little shy of 50 percent would require those type items?

A There about, yes.

Q Being at the dealership on a regular basis, you would see the salespeople selling vehicles?

A Yes.

Q You would see customers coming in looking at vehicles?

A Yes.

Q Did you ever meet Josh Aaronson?

A I met Mr. Josh Aaronson in passing maybe two or three times.

Q Approximately when were those times?

A At Northshore.

Q Did he come, do you recall, by himself or with somebody else?

A I don't recall.

Q Were you introduced to Mr. Aaronson?

A Once, twice, yes.

Q Who introduced you?

A I don't know if it was Marc or Anthony.

D. Blankenship

Q Do you recall approximately when those times were that you were introduced to him?

A When I was at Northshore.

Q Do you recall a timeframe? Was it '21, '22, beginning, end of the year, any ideas?

A Probably into '21 at some point in time.

Q Did you -- what, if anything, did you see Mr. Aaronson do when he was there?

A They went into the back rooms.

Q You weren't involved in those conversations, correct?

A No.

Q He came in, spoke to somebody in the back room and then left?

A As far as I know, yes.

Q What about somebody by the name of Marcello; did you ever meet anybody named Marcello?

A No, sir.

Q Have you ever heard the name Marcello?

A Not that I recall, no.

Q Did there ever come a time that you recall when vehicles were being taken off the lot that were not being either sold to customers or brought to Sunrise or being out for repair?

D. Blankenship

A I don't understand the question, sir.
Q Let me break it down.
Vehicles were purchased and brought into inventory, correct?
A Yes.
Q They would be on the lot?
A Yes.
Q Vehicles would go off the lot if a customer purchased the vehicle, right?
A Yes.
Q They would be off the lot if you brought it to a repair facility?
A Yes.
Q It would be off the lot if you brought it to Sunrise?
A Yes. It would be on that lot.
Q Do you recall from the Northshore lot any other reason that you can think of why vehicles would leave the Northshore lot except for those three I just delineated?
A Not that I recall, no.
Q Do you recall any capacity that numerous vehicles were off the lot not because of one of those three reasons?

D. Blankenship

A Except for the time when they took the cars, I guess, back to either Mr. Josh or whatever, yes, that was the only thing that happened to them.

Q That was at the end, right, around November 2022?

A Yes.

Q They pretty much took all the vehicles?

A Yes.

Q Other than that, the vehicles stayed on the lot until they were sold to a customer, brought to Sunrise, or brought to a repair facility as far as you recall?

A Yes.

Q Did you ever -- were you ever involved in -- I think we used the term floor planning a vehicle at Northshore or Sunrise?

A No, sir.

Q Did you know how to access the system to floor plan a vehicle?

A No.

Q Now you testified that when you were at Superb, you had used a demo vehicle, I think you mentioned two pickups.

A Yes, sir.

D. Blankenship

Q Did you ever have use of a demo vehicle at Northshore or Sunrise?
A Yes.
Q What vehicle or vehicles did you have use of?
A Again I had a few pickups, I had a white Ford F150 at one point, I'm trying to think of the cars that I had. I had a Dodge Ram truck, it was a dually. I kind of stuck to the pickup trucks if they offered them.
Q Did Northshore or Sunrise typically purchase pickups for resale?
A Every once in a while.
Q How did it come about that you ended up with the demo, driving those pickup trucks as a demo at Northshore or Sunrise?
A That's what they gave me.
Q Did you say to somebody at the dealership, I would like to have a demo for use or did they say, hey, would you like a demo for use?
A They asked me if I want a demo.
Q Do you recall who asked you that?
A Probably Anthony or Marc.
Q Did you ask them why they were offering

you that vehicle?
A No, sir.
Q Don't look a gift horse, right?
When you used the vehicle, did you use it only for dealership business or did you use it as a personal vehicle, too?
A No. Back and forth to the dealership.
Q You never used it to go food shopping or to take your kids someplace?
A Possibly.
Q Did you have another vehicle for your own use?
A Yes. I have two other vehicles, yes.
Q Did you service your own personal vehicles at Northshore or Sunrise?
A Not that I remember, no.
Q You testified earlier that Wendy removed a bunch of boxes from Northshore, correct?
A Yes.
Q Do you know what was in those boxes?
A Files.
Q Do you know what type of files?
A No. They were files.
Q Do you remember there being any

D. Blankenship

interaction between Wendy and anybody else while she was taking these boxes?
A Not that I'm aware of, no.
Q Do you know if there was any discussions about why she was taking the boxes?
A No, sir.
Q Do you recall any objections by anybody about her taking any the boxes?
A I wasn't privy to that.
Q You didn't hear anything or see anything about why she suddenly took all these boxes, correct?
A No, sir.
Q Do you know about how many boxes she took?
A Eight, ten boxes.
Q You said she was putting them in her car, right?
A Yes.
Q Did she physically carry these boxes out? Did somebody help her? Did she have a cart?
A I think there was a cart and we put them on the cart and walked them out to her car.
Q Who is we?
A I was probably helping out.

D. Blankenship

Q Did she ask you to help out?
A I wasn't going to let a lady do that.
Q Did she tell you to carry these boxes?
A No. She was coming out of the back rooms and she had all the boxes.
Q And you said, can I help you?
A Yes.
Q And she said, sure, and you got a dolly for her to bring the boxes out?
A Yes.
Q Mr. Deo never raised any objections saying, don't help her or don't let her take the boxes?
A No.
Q Do you know whether he knew at that time that she was taking these boxes out?
A I can't testify to that.
Q Do you know if he was there at the time she took these boxes out?
A I'm pretty sure he was, yes.
Q Do you know if Mr. Ventimiglia was there at the time she took these boxes out?
A I would assume so, yes, sir.
Q Now, in your affidavit or declaration I

believe Mr. Kataev showed you earlier that you submitted in connection with the motion to disqualify Mr. Thomasson; do you remember looking at that declaration?

A Yes, sir.

Q In there, you stated that Mr. Thomasson is not involved in any wrongful activity and I believe you said that you'd know the difference between an attorney that does, an attorney that deals with fraud and criminal activity; do you recall stating that in there?

A I don't remember seeing that, sir. Do you want to show that to me again?

MR. RUDERMAN: Emanuel, can you please pull up that declaration from earlier, specifically the paragraph I think towards the end.

MR. KATAEV: I'm sharing. This is the Blankenship declaration. What paragraph do you want?

MR. RUDERMAN: I think it was towards the end.

BY MR. RUDERMAN:

Q Mr. Blankenship, can you see what is on

the screen right now, paragraph nine?

A Yes, sir.

Q So as I scroll down in the middle of that paragraph talking about Mr. Thomasson is, I find such accusations repugnant and perjurious and of no respect. I'm a trained police officer who would know the difference between an honest attorney and one engaged in criminal and/or fraudulent activity; do you see that?

A Yes, sir.

Q So had you ever actually been engaged with an attorney -- dealt with an attorney who was engaged in criminal and fraudulent activity?

A No, sir.

Q What was the basis for you saying you would know the difference between an honest attorney and one who would engage in criminal or fraudulent activity?

A Is he breaking the law?

Q I'm asking you what were you defining as -- you said you would know the difference between an honest attorney and one engaged in criminal and fraudulent activity. What did you mean by that?

A He's represented me and he's done

D. Blankenship

everything he's done. I don't understand the question.

Q Would you know whether an attorney had engaged in fraudulent activity despite the fact he may have represented you adequately?

A If he lied or anything like that, I would know.

Q If he didn't lie that you knew about, that would mean you would not be able to tell the difference between him and any other attorney?

A That's not what I'm saying.

Q I'm trying to understand. You said you would know the difference.

A If I've spoken with him and he's doing the right thing, he's doing the right thing by me.

Q The claim is not that -- the reason why Mr. Thomasson was sought to be disqualified was not because he did something wrong to you, but the allegation is he did something wrong to my clients, right?

A I have no privy to that.

Q Right. So when you say you would know the difference between an honest attorney and one who may have engaged in activity defrauding my client,

how would you know the difference between one who did or did not engage in fraudulent activity with my client?

A As far as me seeing him and dealing with him, that's what I'm talking about.

Q He never engaged in wrongful activity with you; is that a fair statement?

A Yes.

Q So the basis for your statement is that you would know the difference because he didn't lie or cheat or do anything bad to you?

A Yes.

Q As you sit here today, you have no idea what Mr. Thomasson did or did not do as it relates to my client?

A No.

MR. RUDERMAN: You can take that down.

Q When you -- you previously -- you were questioned a few times about the car show they had at Superb on July 21st of 2023?

A Yes.

Q So a car show -- I'm old fashioned. To me, a car show has got classic cars or hard-to-find cars, especially European cars. That's what I think

D. Blankenship

of as a car show.

Was there something special about this car show? They were hard to find or some special vehicles?

A All of these kids had worked up cars, nothing that I'm into, like the Nissans and stuff like that.

Q There were cars that were brought to Northshore that were privately owned cars that people hot-rodded them, as you might want to refer to it?

A Yes.

Q In addition to that, there were also cars that had been taken from the Superb lot and had been brought there, correct?

A Yes.

Q Were they part of the car show or they were just there?

A People could come into the showroom and the back lot where we had the cars positioned and they could walk around and look at them.

Q Amongst the cars that were there for the car show, the dealership also had a lot of other cars that were available for display, correct?

D. Blankenship

A They were looking at them, yes.
Q Did they have pricing on the individual cars?
A No, not that I'm aware of.
Q If they had a question about a car, was there anybody they could speak to about the car?
A I don't know if any of the salesmen were there.
Q Now, where was the safe that was located at Northshore?
A In the back offices.
Q Was there more than one safe?
A No.
Q Do you know in whose office it was maintained?
A I think it was Mr. Deo's office against the wall when you went right in, it was one of the ones you put it in, you turn it and it drops into the safe.
Q About how big was the safe?
A Three by four.
Q Three feet by four feet?
A Yes. It's an approximate.
Q Was it sitting on the floor or on a shelf?

D. Blankenship

A It was on the floor by the T.V.

Q If I'm understanding your testimony correctly you could put money in the safe without opening it, but you needed to open it to take money out of the safe?

A Yes.

Q Anybody could put money into the safe, as far as you could see?

A Yes.

Q Who had access, as far as you know, to go into Mr. Deo's office to put money into that safe?

A The salesmen. I guess -- I would assume Mr. Ventimiglia. Anybody that was dealing with it.

Q Did you ever physically see anybody put money into that safe?

A I would say yes.

Q Do you know if money was put into the safe where it was recorded that money was going into that safe?

A I have no idea.

Q Was there -- when you saw money put into the safe, was there a rubber band around it?

A Yes. There was a rubber band, a piece of paper. I'm assuming it was the receipt for it and

D. Blankenship

it went into the safe.
Q So it wasn't just somebody dropping loose bills in there?
A No.
Q Each package you could see was somehow receipted, there was a piece of paper with a rubber band and cash about that money being deposited?
A Yes.
Q Do you know who maintained the record as to how much money was in the safe at any particular time?
A I assume it was Dan.
Q Do you know where he maintained that record?
A No, I don't.
Q Did you ever see that record?
A No.
Q Do you know if it was maintained electronically or on a piece of paper?
A I would assume it was electronically. Dan had the computer in front of him.
Q Was it a dial safe or a key safe or something else?
A I don't remember.

D. Blankenship

Q You didn't have either a combination or a key to open the safe?
A No, sir.
Q Do you know who did have access to be able to open up the safe?
A I would assume it was Dan.
Q How about Mr. Merckling?
A It's possible. I don't know.
Q How about Mr. Deo?
A Possible.
Q Did you ever see anybody take money out of the safe?
A No.
Q Was money taken out of the safe at any particular frequency?
A I mean, as owning a business, I assume they didn't wait until they had a ton of money in there and did deposits because I did deposits -- I said I did the deposits, but I assume it's not left in there.
Q To your recollection -- you were there not every day, but do you recall every day you were there money was being taken out the safe to be deposited?

D. Blankenship

A I can't answer that.

Q I know you testified that you maybe three times or so made cash deposits yourself?

A Cash and checks.

Q That was at Northshore?

A Northshore or at Superb. I did it once or twice when I was at Superb.

Q Whose responsibility was it, though, not yours, to regularly make the cash deposits?

A Dan.

Q He would physically go to the bank?

A Yes. He was the only one that could do it that I knew of.

Q When you say, could do it, could do what?

A To count the money and make the deposit.

Q You were able to do it, right, to bring the money to the bank?

A I would get the deposit after it was on a deposit slip and take it to the bank.

Q My question is: Who besides you actually took the money from the store and brought it to the bank?

A Dan did it, I believe Marc did it once or twice. I think that was it, though.

D. Blankenship

Q As far as you know, it was primarily Dan who was the person that brought the money to the bank to be deposited?
A Yes.
Q You know this because of what?
A Because he said he was making a bank run.
Q That's what you -- do you know that there was a cash or a check deposit or you don't know?
A I don't know.
Q When you say he was making a bank run, you had no idea whether he was depositing a check or cash?
A No.
Q This was not done every day because you said -- you said you didn't see a deposit being done everyday?
A I couldn't speak to the fact of when he did it.
Q But it wasn't Mr. Deo who regularly made these cash deposits, correct?
A I don't think so, no.
Q It wasn't Mr. Merckling who regularly made these cash deposits?
A Not as far as I know, no.

D. Blankenship

Q You said that when your company, Deeg LLC, that's your company, correct?
A Yes, sir.
Q That was the company that was paid by Mr. Deo for the services you performed?
A Yes.
Q Is there a reason why you formed this company?
A I had it. I don't know.
Q Is there a reason why you didn't personally take the checks and deposit them into your own personal bank account?
A Because it was easier to do it that way.
Q It's easier to open up a separate account, it's easier to file separate tax returns then to take a check and deposit it into the account you already had?
A Because I was getting it as a gross and I was responsible for the taxes on it.
Q Was it your understanding that having a company, rather than you doing it personally, would mean some difference in the way that your taxes had to be paid?
A Yes.

D. Blankenship

Q Who gave you that advice?

A I don't know if it was Marc. I don't remember. I don't recall who.

Q That was based upon advice you were given by somebody?

A Yes.

Q It wasn't something you came upon on your own?

A No.

Q When you -- do you file a certain tax return for Deeg LLC?

A I have to, yes.

Q Were there any other members or owners of Deeg LLC?

A No. Me and my wife.

Q I'm asking, besides you, was your wife also a member?

A I don't know if I signed it totally or if she signed part of it.

Q I'm not asking about signing. I'm asking who owned it.

A I owned it.

Q Did you own it 100 percent's?

A Yes.

D. Blankenship

Q Is your testimony that you, as the 100 percent owner of Deeg LLC, file a separate tax return for Deeg LLC?

A I believe so.

Q Who formed Deeg LLC?

A I think I did it on the computer.

Q When it asked you on the computer whether you were forming this as a corporation or a multi-party or an individual LLC, do you recall how you answered that question to get your tax ID number?

A Do not recall.

MR. RUDERMAN: I'm going to call for the production of tax returns for Deeg LLC, and we'll follow that up in writing.

(Counsel Request.)

BY MR. RUDERMAN:

Q I believe you testified that Deeg was only operating from -- withdrawn.

Did you open Deeg LLC from the very first payment you received from Mr. Deo?

A Yes.

Q That would be somewhere in February or March of 2021, correct?

D. Blankenship

A Yes.

Q And then you stopped working completely for Mr. Deo around August of '23, correct?

A I worked for Superb at that time.

Q You stopped working with Mr. Deo around that time?

A August, yes.

Q Would it be fair to say that all the money that came into Deeg came in somewhere between early 2021 and August 2023?

A Yes, but I left for a while.

Q Right. The beginning and the end?

A Yes.

Q Now, did Mr. Deo ever tell you why he wanted to -- was the decision to pay you as a 1099 rather than an employee, your decision or Mr. Deo's or somebody else's?

A I don't recall.

Q When he first hired you, did you ever have that discussion?

A I didn't need insurance and stuff like that because I was working, it was part time.

Q Did you understand that, as an employee, you might benefit from some tax basis if you were

D. Blankenship

not paid as an individual?
A I don't understand, sir.
Q I'll withdrawn the question.
Was there a safe at Sunrise as well?
A Yes.
Q Where was that safe located?
A That was in the back room in the office.
Q How many offices -- was there more than one office at Sunrise?
A There was the sales floor and two offices.
Q Did anybody regularly work in either one of those offices?
A The finance guy or girl and the salesmen.
Q Is that sales M-E-N multiple or a salesman, one salesman?
A Multiple.
Q The salespeople worked in one office together?
A It was one open floor and they had the office in the back and then the FNI office.
Q There was one sales floor where the salespeople worked and there was two separate offices; one where the FNI person worked and there was another office?

D. Blankenship

A Yes, and there was the back part of it.
Q The safe was kept where?
A In the back office.
Q Was that also a safe where anybody could put money in and not get money out?
A Yes.
Q It was the same idea?
A Same concept.
Q Did you ever see anybody put money into the safe?
A I'm sure the salesmen and the FNI put money into it.
Q Did you ever see anybody put money into it?
A Yes. The salesmen and the FNI.
Q Was it also similar with a rubber band and paper?
A Yes.
Q Do you know who, if anybody, had access to take money out of that safe?
A I believe Dan came down a bunch of times to pick up. If there was a large amount of money, he would take care of it.
Q Do you know if Mr. Merckling had access to

open the safe?

A I believe so, sir.

Q Do you know if Mr. Deo had access to the safe?

A I would say yes.

Q Do you recall generally how the business was operating Northshore and Sunrise before it completely shut down, but to the last couple of months of the operations of Northshore and Sunrise in 2022?

A I don't understand what you're asking.

Q Do you recall the business -- how the business was operating towards the end of 2022 in October or November of 2022?

A Still selling cars. I don't understand.

Q Let me rephrase.

I think you testified that at the time you weren't really purchasing cars?

A We were still trying to sell cars, but we weren't purchasing at this magnitude we were before.

Q Did you deal with -- you testified about you dealing with customers who complained about any problems they were physically having with the cars, correct?

D. Blankenship

A Yes.
Q Did you ever have customers come to you to complain the car never got delivered to them?
A I didn't handle that. That was more the FNI and the sales people.
Q Did they ever come to you and say, that's not me, speak to so and so?
A Yes.
Q Did you ever have any customers come to you and say, I traded in a car but the loan didn't get paid off?
A I didn't handle the money.
Q Do you recall any customers coming to you and you said, not me, speak to so and so?
A I don't recall.
Q You mentioned Mr. Thomasson at some point had an office at Superb, correct?
A Yes.
Q Did he ever have an office at Northshore or Sunrise?
A I don't think we had an office space for him. Not that I recall.
MR. RUDERMAN: Let's take five minutes now. 3:15 come back on.

D. Blankenship

(Whereupon, a short recess was taken.)

BY MR. RUDERMAN:

Q Mr. Blankenship, you testified about a couple of F150s that you drove. I think one of them was owned by Northshore, correct?

A Yes.

Q What year was that vehicle; do you remember?

A I don't remember.

Q When you finished driving the vehicles -- the demo vehicles for Northshore, what, if anything, did you do with them?

A They were probably sold.

Q You returned them back to the dealership and you believe that they were ultimately sold?

A Yes.

Q You also mentioned you talked about two specific vehicles at Superb, there was an F150 and I think a Silverado perhaps?

A Yes, sir.

Q What year F150 was that; do you know?

A I don't remember, sir.

Q Do you know with those two vehicles, the Silverado and F150, what happened to those vehicles?

D. Blankenship

A They were sold.
Q You're pretty confident about that answer, you're pretty sure they were sold?
A Yes.
Q It was -- it wasn't -- the F150 wasn't repossessed, as far as you know, correct?
A As far as I know, sir, no.
Q Have you ever heard of a company called Lendbuzz?
A No, sir.
Q Now, were you ever familiar with whether Northshore or Sunrise opened up an account at Flag Star Bank?
A I don't know, sir.
Q How about if they ever opened up an account at Signature Bank?
A I don't know, sir.
Q Do you know anything about whether Northshore or Sunrise ever opened up an account at Flushing Bank?
A I don't know.
Q Did you ever make any deposits for any entity at Flushing Bank?
A I believe Flushing was one of them, yes.

D. Blankenship

Q Did you do that for Superb or did you do that for Northshore and Sunrise?
A I think it was Superb at that time.
Q Do you know when that bank account for Flushing was opened?
A No, sir.
Q Do you know who else, if anyone, at the dealership knew about the Flushing account that was opened at Superb?
A I have no idea.
Q Who directed you -- who gave you the deposits to deposit into Flushing Bank?
A It could have been one of the girls in the back room, Gene. They handed me the deposit slip and said, this has to get to the bank.
Q Do you know who decided which account the money was supposed to be deposited to?
A No.
Q You were told, here's the bank, here's the deposit slip, go to it?
A Yes, sir.
Q And did you -- do you have a recollection of whether -- those deposits, which we were discussing, were those always cash or checks or a

combination?

A Combination.

Q I believe that earlier today Mr. Kataev showed you an exhibit of a deposit into a Sunrise account, correct?

A Yes.

Q That was the Flushing account, correct?

A I believe so, sir.

MR. RUDERMAN: I have no further questions at this time, subject again to the court's rulings with regard to some of the objections raised. Thank you for your time, Mr. Blankenship. I think Mr. Thomasson may have some questions now.

MR. THOMASSON: I want to be sure that Jeff and Ariel don't have any questions.

MR. CIANCIULLI: Nothing for me.

MS. RONNEBURGER: I don't have any questions.

BY MR. THOMASSON:

Q Good afternoon, Mr. Blankenship. This is Harry Thomasson. I have my camera off only because I recently had some surgery. I'm still dealing with some issues involving my throat.

D. Blankenship

Mr. Blankenship, I won't take much of your time. I just wanted to check on a few things.
A Yes, sir.
Q You know the declaration that you were shown a couple of times today, your declaration that was submitted in connection with the Plaintiffs' motion to disqualify me as your attorney; do you remember that declaration?
A Yes, sir.
Q Do you know if that declaration was intended at any point in time to list everything you ever did at these dealerships; do you know if that was the intent of that declaration?
MR. KATAEV: Objection.
Q If you know.
A I don't know.
Q Is it possible that you may have been told at some point in time about my experience as an attorney and perhaps you don't recall it; is that possible?
MR. KATAEV: Objection.
Q You can answer, Mr. Blankenship.
A Yes, sir.
Q Prior to the night of the lockout on or

about August 3rd, 2023 at Superb, had you and I ever had any conversation?

A We greeted a handful of times; hello, goodbye.

Q Had we ever had a substantive conversation prior to that night?

A I don't believe so, sir.

Q Have we ever socialized, you and I?

A No, sir.

Q How many times roughly in your memory have you and I ever had a substantive conversation?

A If -- once or twice.

Q On the night of the lockout, do you recall that you were accused, along with Mr. Merckling and/or Mr. Deo, of stealing 102 cars by Mr. Novicki; do you remember that that's why the police were there that night?

MR. KATAEV: Objection. Assumes facts not in evidence.

Q Mr. Blankenship, do you know why the police were there that night?

A I found out Anthony was removed.

Q Did you ever become aware that there were accusations that night of criminal wrongdoing?

A Yes.

Q And do you have any memory of agreeing to hire me that night in connection with those criminal accusations?

MR. KATAEV: Objection.

Q That's a yes-or-no question. Do you have a memory of that, Mr. Blankenship?

A That night, I don't think so. I don't think we talked about that, but later yes.

Q Is it possible that we had a conversation that night that you're not recalling now?

MR. KATAEV: Objection.

MR. RUDERMAN: Form.

Q Is that possible, Mr. Blankenship?

A Yes.

Q I'm just looking at my notes, Mr. Blankenship.

MR. KATAEV: Are those your notes from August 3rd, Mr. Thomasson?

MR. THOMASSON: No. Just from this deposition, Mr. Kataev.

BY MR. THOMASSON:

Q Mr. Blankenship, were there cameras at Superb Motors while you worked there?

D. Blankenship

A Yes.
Q Where were the cameras located, to the best of your memory?
A I think they were all over.
Q Were they inside the dealership?
A I think they were inside and outside.
Q They were outside the dealership on the parking lot?
A Yes.
Q If Mr. Urrutia wanted to make accusations about how many cars were in the lot that night, he would have the pictures that would be able to allow him to do so; is that right?
MR. KATAEV: Objection. Argumentative.
Q Is that right, Mr. Blankenship?
A I guess so, yes.
Q Are you aware of any crimes that you ever committed against any of these plaintiffs?
A No.
Q Are you aware of any crimes that any of the codefendants, the so-called Deo codefendants, have committed against any of these plaintiffs?
A No.
Q Has anyone ever told you -- withdrawn.

D. Blankenship

Have any of the Deo codefendants ever told you about any crimes that were committed against any of these plaintiffs?

A No.

Q From your experiences at Northshore and 189 Sunrise, would it be fair to say that you became familiar with the personnel who worked there?

A Yes.

Q Did I ever work at either of those two locations?

A No. You came in and out. Like I said, the times I was there, I met you maybe three or four times, saying hello and goodbye.

Q You never saw me at 189 Sunrise, did you?

A I don't believe so, no.

Q I didn't work at either of those two dealerships, did I?

A No, sir.

Q If I understood your answer to a question by, I think it was Mr. Ruderman, I certainly didn't have an office in either of those two dealerships, did I?

A Not that I can recall, no.

Q Remember the document that you were shown

involving the Gold Coast officers and managers; do you remember that document today?

A Yes, sir.

Q Do you know if that was just a proposed document or not, if you know?

A I don't know.

Q You said that someone gave you advice on setting up Deeg LLC, didn't you?

A Yes.

Q Is it possible that the person who gave you advice on setting that up was an accountant?

A Possible.

Q Over the last five or six years since you first started at Northshore Motors, did you have as an accountant, someone named Tom Jones?

A No, I don't know who that is.

MR. KATAEV: Objection to prior question. Not the one for Tom Jones. The preceding one.

Q You don't -- did you just say that you don't know who Tom Jones is?

A I don't recognize the name.

Q Have you ever heard of Jones & Little?

A No, sir.

Q In the handful of conversations you and I

ever had, were they limited to the subject of business or were there other things that we discussed?

A I would assume they would just be business. I don't know you personally.

Q It was strictly on the subject of my representation of you?

A Yes.

MR. THOMASSON: I have no other questions at this time.

MR. KATAEV: I have no further question.

MR. RUDERMAN: I have no further questions.

MR. THOMASSON: Thank you, Mr. Blankenship. You probably don't have to stay on the line. We still have some matters that the attorneys want and need to discuss.

A I'm done?

MR. RUDERMAN: Thank you for your time.

A Thank you.

MR. CIANCIULLI: I am not ordering it.

MS. RONNEBURGER: I don't think I'm going to order a copy.

MR. THOMASSON: At this time, I'm not

D. Blankenship

ordering one either. I have your name and I may do so down the road.

(Time noted: 3:31 p.m.)

_________________________

DWIGHT BLANKENSHIP

Subscribed and sworn to before me this _____ day of ______________ 2026.

______________________________, Notary Public.

D. Blankenship

INDEX

WITNESS

DWIGHT BLANKENSHIP


| EXAMINATION BY | PAGE |
|---|---|
| MR. KATAEV | 6 |
| MR. RUDERMAN | 136 |

| COUNSEL REQUESTS | PAGE |
|---|---|
| Patrol guide | 29 |
| Off-duty employment documents | 30 |
| Deeg LLC statements | 59 |
| Screen shots | 102 |
| Deeg tax returns | 176 |


EXHIBITS


| BLANKENSHIP | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Case Caption | 61 |
| Exhibit 2 | Complaint | 108 |
| Exhibit 3 | Flushing 7212 | 115 |
| Exhibit 4 | Company newsletter | 118 |
| Exhibit 5 | Instagram post | 123 |
| Exhibit 6 | Nethanel Ordad declaration | 126 |


Attorney Kataev has retained all exhibits.

C E R T I F I C A T I O N

STATE OF NEW YORK )
) ss.:
COUNTY OF QUEENS )

I, RUTHAYN SHALOM, a Court Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of March, 2026.

Ruthayn Shalom

RUTHAYN SHALOM

ERRATA SHEET

NAME OF CASE: SUPERB et al v DEO et al.
DATE OF DEPOSITION: February 18, 2026
NAME OF DEPONENT: Dwight Blankenship

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |
| ____ | ________ | ______________________ | __________________ |

____________________________
DWIGHT BLANKENSHIP

Subscribed and sworn to before me
this _____ day of ____________, 2026
_________________________, Notary Public.

____________________________
MY COMMISSION EXPIRES:

A
**A-L-Y-S-I-A** 131:7
**a.m** 1:22
**A4** 150:18
**Aaronson** 1:4 3:10 53:10 54:12 105:16 106:12 155:14,15 155:22 156:9
**ability** 11:15 18:7 97:21 136:12
**able** 20:7 96:14 165:10 171:5 172:17 189:13
**absolutely** 40:17
**access** 96:14,16 139:20 150:12 158:19 169:11 171:5 179:20,25 180:4
**accompanied** 54:10
**account** 38:3 86:19 116:14 117:8 118:4 174:13,15,17 183:13,17,20 184:5 184:9,17 185:6,8
**accountant** 191:12 191:16
**accusations** 164:6 187:25 188:5 189:11
**accused** 187:15
**acknowledging** 94:16
**action** 107:14 195:17
**active** 59:20
**actively** 137:23
**activity** 103:15 104:5 105:11 163:8,11 164:9,14,19,24 165:5,25 166:3,7
**actual** 9:16
**add** 42:15,17
**addition** 167:14
**additionally** 32:6
**address** 6:5 16:10 27:8 80:13
**addresses** 15:21,23 15:24
**adequately** 165:6
**administrative** 121:3
**advertising** 88:22
**advice** 72:4,9,13 73:8 73:11,15 175:2,5 191:8,12
**affect** 11:15
**affidavit** 162:25
**afternoon** 114:9 136:5 185:22
**against-** 1:12
**agency** 16:18
**aggressive** 52:13
**ago** 17:14 31:8
**agree** 38:19 43:20 67:7
**agreed** 5:2,7,11 46:3 99:22
**agreeing** 188:3
**agreement** 14:3,5 119:19
**ahead** 7:17
**ail** 77:3
**al** 196:4,4
**alarm** 95:2
**alarms** 62:19 134:20
**Albert** 27:21
**alcohol** 11:13
**Alex** 127:5
**alignments** 154:14
**allegation** 165:20
**allegations** 73:18 109:10,17,21 126:21
**allow** 10:8 61:13 189:13
**allowed** 29:20 38:10 42:11 46:21
**Alysia** 131:6
**America** 132:11
**amount** 36:25 37:3 118:4 179:23
**and/or** 32:7 90:4,19 113:2 120:10 122:8 164:9 187:16
**answer** 7:14,25 8:8 8:19,25 10:5,9,14 11:4 23:4,5 34:5 39:13,14 40:10 41:10 43:13,21 45:24 46:12 66:9 68:22 74:12,20,22 75:3,9,13,14 76:10 113:4 144:16 172:2 183:3 186:23 190:20
**answered** 30:23 176:11
**answering** 7:9,18 9:4 42:7 71:12
**answers** 10:21 11:10 11:18 136:11
**Anthony** 1:3,13 3:4 4:8,9 7:5,10,20 9:5 65:23 144:2 155:25 159:24 187:23
**anticipate** 135:19
**anticipation** 67:14,24 69:9,16 70:6
**anybody** 44:4,5,12,15 48:16 59:8 72:5,9 89:24 91:2 92:19 123:8 138:10 139:11 156:18 161:2,8 168:7 169:8 169:14,15 171:12 178:12 179:5,10,14 179:20
**anymore** 24:9 78:21 79:2 114:25 115:2 120:22
**appearance** 6:20 39:25 43:10 46:16 112:9
**application** 21:2,4 101:5
**applied** 18:12,13 20:22
**appointment** 35:8
**apportion** 145:16
**approached** 73:4
**approximate** 142:6 168:24
**approximately** 15:16 23:13 49:19,20 140:3 141:13 155:17 156:2
**April** 116:12
**area** 64:23,24 65:6 80:22 95:10 137:4
**Argumentative** 189:15
**arguments** 70:14 71:3
**Ariel** 3:24 43:3 135:20 185:17
**Aronneburger@cu...** 3:24
**arose** 115:9
**arrested** 16:13
**arrive** 72:20
**arrived** 65:22 71:25 72:24 92:23 93:10 98:4 103:4
**ASAD** 1:4
**ASC** 147:17
**aside** 14:12
**asked** 18:11,13,25 39:9 41:18 43:12 48:25 68:18 74:12 74:20,22 81:15 86:22 89:3 100:8,17 100:19 106:24 115:19 121:25 122:5 124:8 159:22 159:23 176:8
**asking** 7:8,18 8:23,24 9:3 36:8 41:22,23 58:24 74:21,22 100:14 122:4 164:21 175:17,21 175:21 180:12
**assert** 45:11,13,16

46:21
**assigned** 17:8,10,15
**assignment** 18:3
**assist** 34:16
**assisting** 62:12
**associated** 153:13
**assume** 10:14 79:3 83:13 107:4 151:4 162:24 169:13 170:13,21 171:7,17 171:20 192:5
**Assumes** 187:19
**assuming** 20:24 56:4 169:25
**attach** 153:15,16
**attention** 53:2 54:16 108:21
**attorney** 6:14,17 12:16,22 14:24 29:8 30:2 39:24 40:2 41:25,25 43:9,11 66:18 77:13 78:9 108:6 136:6 163:10 163:10 164:8,13,13 164:17,23 165:4,11 165:24 186:8,20 194:23
**attorney's** 77:19,23
**attorney/client** 46:19 46:24
**attorneys** 3:3,8,17,21 4:3 5:3 12:6 40:15 40:21 41:4 69:18 70:2 77:16,18,21 192:18
**auction** 148:23
**auctioned** 148:25
**Audi** 150:18
**auditor** 97:7,14
**audits** 97:3,18
**August** 24:4,5,7,8,12 25:21,24 31:10 53:20 62:22 68:14 71:24 73:25 79:5 92:11,23 98:4 99:2 102:15 122:13,24 130:2,7,14 131:17 133:22 142:7 177:4 177:8,11 187:2 188:20
**authority** 8:5,12 84:23 92:2,6,8
**authorization** 29:14 29:16,22
**Auto** 1:3,3,5,6,6,6,6,7 1:7,7,18 3:4,9,10,11 3:11,11,12,12,13,13 7:3,10,20 9:5 27:13 27:16 48:2,12 105:17 108:17 115:5
**automobile** 78:3,8
**automobiles** 86:9
**AUTOMOTIVE** 1:15
**available** 31:5 42:20 167:25
**Avenue** 3:5,14
**average** 55:25
**averment** 129:2
**averments** 126:22
**aware** 21:20 23:20,21 25:19 26:12 27:17 37:25 38:4,6 47:13 47:14,24 48:4,6,7 48:13 49:4 50:16 53:8 54:9 63:12,15 63:18 75:19 78:2,18 84:19,21 85:18 86:8 92:7,11 94:19 97:20 99:7,17,20 100:20 101:8 109:13 112:3 112:23 122:7 133:2 135:25 161:4 168:5 187:24 189:18,21

**B**

**B** 6:2 114:11 194:15
**B-I-S-S-O-O-N** 132:15
**back** 23:4,6,12 25:5 28:21 31:14,23 34:7 34:21,25 35:8,15 36:21 38:25 39:4,15 46:6 49:2,11,23 50:21 51:3 53:7 56:11 60:5,7 64:15 64:25 65:14,16 66:20 67:5,6 68:8 74:14,15 75:16,17 78:17 81:5,8,13 82:10,17 86:13,22 91:15,19 92:4 98:16 98:21 99:4,16 100:22 105:14 106:3,11,21 115:19 117:17,18 122:16 122:18 130:9 131:20 134:8 136:19,19,24 138:2 139:6 140:5,11,13 140:24 142:24 143:24 144:4,7 146:2,12,15,25 148:12,12 149:18 156:10,14 158:3 160:8 162:5 167:21 168:12 178:8,21 179:2,4 181:25 182:15 184:15
**bad** 166:12
**Bahamas** 25:8
**balance** 84:17
**ballgame** 69:15
**band** 169:23,24 170:8 179:17
**bank** 1:18,18 3:22 35:11,22 38:2 42:16 76:16 79:14,18,23 80:2,4,9 91:6,9,11 91:11 112:25 113:7 113:13 116:4,14 117:8 118:11,15 132:10 172:12,18 172:20,23 173:4,7 173:11 174:13 183:14,17,21,24 184:5,13,16,20
**Bank's** 116:14
**banking** 112:24 113:6,13
**banks** 79:12,15,16
**Baron** 1:4,5,5 3:10 85:11,19,22
**Barons** 85:14
**based** 75:3 135:9 175:5
**basement** 129:9
**basis** 44:11 56:2 68:21 78:10 140:17 155:8 164:16 166:10 177:25
**basket** 153:2
**Bates-stamped** 116:5
**bathroom** 10:25
**bay** 139:7
**bearings** 147:15
**bears** 108:19
**becoming** 48:15
**began** 142:4
**beginning** 156:6 177:13
**begins** 135:14
**believe** 13:13 15:8 22:23 30:18 31:17 41:7 43:21 45:11 48:5,18 52:14 54:6 57:10 64:6 65:23 81:8,23 83:23 85:23 87:10 97:7 99:13 106:6 108:12 111:23 131:19 132:19 135:22 140:15 141:16 148:25 163:2,8 172:24 176:5,19 179:22 180:3 182:16 183:25 185:4,9 187:8 190:16

**bell** 111:24 126:15
**Bellmore** 54:20
**bells** 26:20 27:22 131:11
**belong** 8:22
**benefit** 177:25
**Benjamin** 12:9,23 13:17 14:10 39:24 40:4 43:9
**best** 10:17,22 136:11 145:7 189:4
**better** 17:18 105:5
**big** 20:5 155:2 168:21
**bills** 13:22 170:4
**birth** 15:19
**Bissoon** 132:14
**bit** 9:24 62:3
**blades** 154:3,6
**blank** 61:15 151:17 152:3
**Blankenship** 1:14 2:4 4:10 6:1,10,11 7:1 8:1,19 9:1 10:1 11:1 11:21 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1,5,9 41:1 42:1 43:1 44:1 45:1,24 46:1,8,20 47:1,12 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 61:2,6 62:1 63:1 64:1 65:1 66:1 67:1 68:1,12 69:1 70:1 71:1,22 72:1 73:1 74:1 75:1,10 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1,25 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1,12,13,21 109:1 110:1 111:1 112:1 113:1 114:1 114:18 115:1,22,23 116:1 117:1 118:1 118:16,17 119:1 120:1 121:1 122:1 122:21 123:1,13,15 123:17 124:1 125:1 126:1,2,3,13 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1,11 135:1 136:1,5 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,20,25 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1,4 183:1 184:1 185:1 185:14,22 186:1,2 186:23 187:1,21 188:1,8,15,18,24 189:1,16 190:1 191:1 192:1,16 193:1,10 194:1,5,16 196:5,18
**Blankenship's** 43:9
**blood** 195:18
**blue** 125:16
**BLVD** 1:5,5,6,6,6,7 3:10,10,11,11,12,12
**board** 144:24
**body** 10:5 147:19,21
**bolster** 88:22
**bottom** 61:18,23 116:9 121:10 123:24 132:8
**bought** 152:21
**Boulevard** 3:22 24:18 32:3
**bounds** 70:2
**box** 3:18 96:21
**boxes** 94:8,10 105:19 105:23 107:3 151:15 160:19,21 161:3,6,9,12,15,16 161:20 162:4,6,10 162:14,17,20,23
**boys** 33:16
**brakes** 19:5 147:13 154:6
**branch** 80:2,5,6,10 80:13,14
**branches** 80:5,10
**break** 10:25 11:2 32:11,16,21 34:21 35:10,24,25 36:4,5 36:12,12 49:11,23 56:21,25 68:5 100:22 110:17 157:3
**breaking** 36:2,8 55:12 164:20
**breaks** 100:25
**Brian** 1:4 3:9 12:12
**brief** 70:12,18 71:9
**briefcase** 94:5,5
**bring** 65:15 145:3 146:12 149:11,19 152:14 162:10 172:17
**bringing** 98:20 149:2
**broke** 36:2 52:11,25
**broken** 154:16,18
**brought** 19:3 41:14 72:2 81:5 93:16 98:16,23 106:16 156:24 157:4,12,15 158:11,12 167:9,16 172:22 173:3
**building** 54:21 107:8 109:20 113:10
**bunch** 76:13 108:17 160:19 179:22
**burnt** 110:22
**business** 19:25 24:10 62:12,13,17 63:7,25 64:3,5 85:15,18,21 88:9 160:6 171:17 180:7,13,14 192:3,6
**buy** 86:2 153:19
**BUYERS** 1:14
**buying** 147:24
**bye** 71:20

**C**

**C** 1:25,25 2:1,1 3:2 4:2 195:2,2
**C-A-Y-E-R** 131:7
**call** 39:2 46:6 53:4 57:10 59:15 68:7 75:5,6 137:12 153:21 176:14
**called** 52:23 63:9 84:4 90:22 99:4,10 101:6 106:19 183:9
**calling** 8:14
**calls** 30:23
**camera** 185:23
**cameras** 188:24 189:3
**capacity** 157:23
**CAPITAL** 1:17
**capitalize** 117:22
**caption** 61:17 194:18
**car** 1:14 21:16 35:4,8 47:18,21 50:2,5 51:12,22 52:10,18

52:25 53:5 55:4 64:10 83:13 85:14 88:11,19,20,24 89:2 97:8,13 98:8,13,19 100:3 107:9 112:14 112:18 124:2,9,11 124:15,20,21,22,24 125:3,5 145:25 147:14,22 150:19 150:20 152:4,6 154:4 155:3,3 161:17,23 166:20 166:23,24 167:2,4 167:18,24 168:6,7 181:4,11
**care** 119:13 179:24
**career** 9:14,15 28:8
**carry** 161:20 162:4
**cars** 1:15,15 18:25 19:8 20:24 35:6 50:7,19 51:2 55:18 62:18,19 65:15 82:18 86:2,6 87:2 89:8,20 98:23 100:3 100:12 110:13 111:21 114:22,23 114:25 115:2 127:19,24 129:8 130:8,15 137:16 138:3 144:25 145:11,23 146:6,12 146:12,15 147:7,8,9 148:3,12,20,22 150:22 151:6,7,11 154:2,3,20 158:3 159:9 166:24,25,25 167:6,9,10,14,21,23 167:25 168:4 180:16,19,20,24 187:16 189:12
**cart** 161:21,22,23
**case** 1:11 13:8,12 15:3,4,7 16:22 21:25 23:18 25:24 37:23 38:23 41:4 45:2,3,3 60:3,16,18 61:18 72:7 83:5 84:23 108:5 110:19 118:20 119:21 126:12 194:18 196:4
**cash** 49:8 79:12 80:25 81:3,10 82:21 82:25 83:2,3,6,10 83:12,14,17,18,25 84:11,14,15,19,20 85:7 116:13 117:2,5 117:7,14 127:18 128:4 130:23 170:8 172:4,5,10 173:9,13 173:21,24 184:25
**Cayer** 131:6
**ceased** 12:22 120:14
**center** 65:9
**certain** 89:3 99:22 175:11
**certainly** 190:21
**certified** 147:17
**certify** 195:10,16
**CFO** 119:23
**CHABRIER** 1:4 3:9
**chance** 70:3 123:23
**change** 30:12 31:3,7 55:8 91:5 196:5
**changed** 110:9
**changes** 19:5 147:13
**characterized** 69:5
**charge** 82:20 83:2 127:20
**charged** 153:16
**charges** 13:23
**Chase** 1:18 79:18 80:2,4
**cheat** 166:12
**check** 45:8 49:6 137:25 147:7,7 149:21 151:14 173:9,12 174:17 186:3
**checked** 150:5 151:4
**checking** 151:18
**checks** 81:3 84:16 172:5 174:12 184:25
**Cherrywood** 27:13 27:16
**Chestnut** 4:4
**Chevy** 125:16
**chief** 119:25 121:2,3 131:10
**choice** 45:20
**choose** 47:3
**chosen** 39:25
**Cianciulli** 4:5 39:5 39:10,10 42:17 43:2 135:25 185:18 192:22
**circumstances** 34:6 35:2 78:22 102:24 120:18
**citations** 45:3
**civil** 22:12,14,15
**claim** 22:12 165:17
**claimed** 108:6
**claims** 7:11,20 9:6 22:12
**classic** 166:24
**clear** 10:3,21 46:5 134:17 144:11
**CLERK** 39:16,21 40:4,7,21 42:14,19 68:10,23 69:2 70:8 70:18,25 71:5,8,15 71:17,20
**click** 96:20 139:17
**clicked** 96:23
**client** 40:24 45:20 46:13,25 66:21,21 67:4 165:25 166:4 166:16
**clients** 21:15 69:23 70:2 108:16 165:20
**close** 79:4
**closed** 79:3,7 137:14
**closer** 80:14,21
**closing** 110:12
**club** 124:20,21,22,24 125:3,5
**coach** 44:7 75:13
**coaching** 42:8 45:4
**Coast** 1:15,15,15,16 1:16,16 94:13,17 118:22 119:7,9 123:20 191:2
**code** 139:20
**codefendants** 189:22 189:22 190:2
**combination** 171:2 185:2,3
**come** 18:10 52:8 53:2 53:5,12,15 54:15 55:7,10,15 59:13 64:10 69:10 77:18 86:22 88:10 100:22 115:4,19 134:8 138:13 139:18 140:16 143:15 149:9 152:4 155:19 156:22 159:15 167:20 181:3,7,10 181:25
**comes** 44:24 150:15
**coming** 60:17 67:15 68:13 81:11 97:3 135:5 139:14 155:11 162:5 181:14
**COMMISSION** 196:23
**committed** 189:19,23 190:3
**common** 40:16 51:24 70:5
**commonly** 52:21
**communicate** 90:4
**communications** 14:13
**company** 26:6 58:16 58:18,21 59:2,4,8 118:23 119:2 174:2

174:3,5,9,22 183:9 194:19
**Compared** 30:19
**compel** 70:10
**compilation** 102:9
**complain** 181:4
**complained** 180:23
**complaint** 15:6 53:9 53:18 54:17 56:14 56:18 92:12,17,21 108:16,19 122:25 194:18
**complaints** 28:12,14 28:18
**complete** 10:8
**completed** 95:24
**completely** 177:3 180:9
**completion** 147:7
**composition** 87:18
**computer** 29:6 61:12 64:17 96:19,22 138:24 139:3,4,9,15 139:20 153:10 170:22 176:7,8
**computers** 139:12
**concept** 179:9
**concern** 71:25
**concerned** 69:17,19
**concerning** 38:2 47:13 97:18
**conclusion** 67:19
**condition** 149:21 152:24
**conference** 2:5 19:20 99:7,18,21
**confident** 183:3
**confirm** 71:6
**connection** 48:14 72:11 84:7 115:11 163:3 186:7 188:4
**considered** 56:21,25
**consist** 124:25
**consisted** 80:25
**consumed** 11:13
**contact** 26:17
**contain** 29:12
**contains** 117:20
**context** 41:15
**continue** 42:10 70:8 71:17 136:10
**continued** 4:2 114:15 115:14
**continuing** 39:6
**contribute** 13:15
**control** 29:5
**controller** 106:19,20 143:4
**conversation** 18:24 26:16 33:13,21,22 43:13 69:20 73:5,6 73:7 90:2 133:10 187:3,6,12 188:11
**conversations** 56:13 69:23 72:11 101:2 112:11 156:12 191:25
**convicted** 16:15 21:20
**COO** 119:24
**cooperated** 16:17
**cooperation** 16:21 20:3
**cops** 93:8
**copy** 25:12 29:2,9 192:24
**corner** 96:24
**CORP** 1:17
**corporate** 57:12,21 119:13
**corporation** 176:9
**correct** 6:18,19 12:10 12:16 17:11,12 18:9 21:2 26:10 30:16 32:4,5,8,9 33:4 34:4 35:16,22,25 36:5,12 40:6 47:2 52:2,5,6 54:3 56:22 57:2 58:6,21 59:5,12,13 59:21 62:23 63:2,18 65:2 72:9,22 73:2,9 74:2 76:13,17,19 77:14 79:12 80:25 93:7 95:4 98:8 99:3 99:5,18 100:3 102:20 103:23 104:6 105:12 110:21,25 111:2 113:8,9 115:18 116:10,15,16,18 117:4 121:8,22 123:2,11 125:23 126:18 129:4 133:17 134:18 137:6 141:18,25 144:14 146:4,8 156:12 157:5 160:19 161:13 167:16,25 173:21 174:3 176:25 177:4 180:25 181:18 182:6 183:7 185:6,8
**corrected** 124:9
**correctly** 24:16 28:13 169:4
**cost** 153:13
**counsel** 12:9 13:5 29:10 30:4 39:23 40:25 59:18 102:12 176:17 194:10
**count** 118:10,13 172:16
**counter** 65:6,8
**counts** 42:8
**County** 16:4,8 17:7 22:23 27:25 28:4,7 30:7,12 37:8 54:15 55:21 56:17 63:13 77:20 92:16,19 112:4,8 122:24 123:5 195:6
**couple** 125:7 180:9 182:5 186:6
**course** 10:19 16:19 52:7 54:14 77:12,16 79:10 90:3 110:7 132:9
**court** 1:1 9:11,20 10:4 19:20 23:14,15 38:17 39:2,3,16,21 40:4,7,21 42:11,14 42:19,22,24 43:6 44:3,19,25 45:8,20 46:3,11,22 47:2,8 48:2,8,11,12 60:15 68:3,7,10,23 69:2 70:8,18,25 71:5,8 71:15,17,20 73:20 73:22 86:17 99:10 99:11 108:16 112:5 112:9,9 122:17 130:18 195:8
**court's** 40:18 43:25 185:11
**courtesy** 10:10
**courtroom** 9:16,18 9:25
**CPA** 1:14
**CPA'S** 1:17
**cracked** 154:17
**cracking** 69:19
**created** 96:11 144:13 152:23
**credit** 86:9 122:10
**crime** 16:15
**crimes** 189:18,21 190:3
**criminal** 54:16 92:12 92:17,20 163:11 164:9,14,18,23 187:25 188:4
**cruise** 25:7
**crystal** 10:21
**cubicle** 137:18,19
**cubicles** 137:10,14
**CULLEN** 3:21
**currently** 15:9 17:15 22:22 23:24 26:12 30:15
**custody** 29:4

**customer** 53:3,6 157:10 158:11
**customers** 52:9,12 58:19 155:11 156:24 180:23 181:3,10,14
**Cyruli** 3:8 136:7

**D**

**D** 1:25 2:1 6:1,2 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 114:11 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1,2
**D-A-R-M-E-S-H-...** 132:14
**D-A-S** 113:24
**D-E-E-G** 57:16,17,19
**daily** 76:18
**Dan** 106:6,9,16,18 140:6 143:3,9,10,21 170:13,21 171:7 172:11,24 173:2 179:22
**Dan's** 106:20
**danger** 135:4
**Daniel** 106:7
**Darmeshwar** 132:13
**Das** 113:24 121:4
**date** 15:19 25:20 98:9 98:10,18 99:12 102:17 103:8 118:3 133:24 141:14,23 196:4
**dates** 104:17
**David** 1:5 85:10,19 85:22
**day** 33:12 34:23 50:18,23,24 55:2,8 55:8 56:4 63:2,12 70:20 71:2,6,9,24 72:4 91:17 93:4 98:20 102:18 103:5 116:12 120:21 123:6 135:20 140:17 141:5 142:11,21 171:23 171:23 173:15 193:12 195:21 196:20
**day-to-day** 33:8
**days** 18:4,4 32:25,25 33:2,3,4 56:5,8 83:9 104:21 133:25 142:14,17 145:20
**deal** 20:4 125:2 138:2 150:6,24 155:2,3 180:22
**dealership** 24:17 26:13 52:16 53:21 62:23,25 68:13,15 72:22 73:2,18 78:15 84:3 86:7,25 87:4 93:13 94:24 97:22 98:25 102:19 109:5 109:14 111:4,17 127:14,18 150:10 155:7 159:19 160:6 160:8 167:24 182:15 184:9 189:6 189:8
**dealerships** 52:8 88:23 113:8,14 186:13 190:18,22
**dealing** 33:11 40:19 166:5 169:14 180:23 185:24
**dealings** 127:23
**deals** 163:10
**dealt** 164:13
**December** 141:25
**decide** 50:17
**decided** 50:23 71:14 105:6 110:24 184:17
**decision** 24:21,21 46:9 82:14 177:16 177:17
**declaration** 60:2,11 60:13,14,22 62:11 62:21 76:12,16 94:20 126:6,23 130:22 162:25 163:5,16,20 186:5,6 186:9,11,14 194:21
**declared** 77:25
**declaring** 94:20
**Deeg** 16:9 57:16 58:14,21 59:2,12,16 59:20 174:2 175:12 175:15 176:3,4,6,15 176:19,21 177:10 191:9 194:12,13
**Deeg@700@hotmail** 15:22
**deem** 38:13
**defendant** 2:3 3:17 3:21 4:3 6:3 21:24 22:4
**defendants** 1:20 9:6 22:9 41:9
**defining** 164:21
**definitely** 134:3
**defrauding** 165:25
**delineated** 157:21
**deliver** 89:5
**delivered** 148:15 151:3 181:4
**demo** 125:12,14 158:23 159:2,16,16 159:20,21,22 182:12
**dent** 152:19
**deny** 134:17
**Deo** 1:13,13 4:8 7:10 7:20 9:5 13:13 18:8 18:23 19:11 20:14 20:18,22 21:7,20 23:22,25 24:3,17

27:4,15 29:17 31:15 31:21 33:4,14,20 36:20 37:25 41:8 43:2 47:25 48:12,14 48:19 49:9 50:8 51:7,7 52:13 53:8 53:20 54:3,5,10 55:22 56:2,14,21,25 57:4,6 58:5,15,18 59:4,7,12 62:12,22 68:14,17 72:12,21 72:25 73:17,19 74:8 75:20 76:6,13 78:12 78:19 79:6 81:21 84:20 85:19,22 87:4 87:5,7,21 90:2,8,11 90:19 92:12,24 93:11 94:19,23 98:24 100:8,10,18 102:19 105:7,16 108:16 109:11 112:9,11 113:16 114:25 115:5,11,17 119:22,22 120:14 121:4 127:24 128:18 131:17 132:3,6,17 133:3 134:5,18 135:2 140:6 143:10 144:2 144:5 162:12 171:10 173:20 174:6 176:22 177:4 177:6,15 180:4 187:16 189:22 190:2 196:4
**Deo's** 26:9,24 27:7 62:16 168:17 169:12 177:17
**Deos** 109:22
**department** 16:5,8 27:25 28:4,7 30:7 30:12 37:8,20 55:22 56:17 63:13 92:16 92:20 122:25 123:5
**Depended** 50:25
**Depending** 145:22
**DEPONENT** 196:5
**deposed** 9:13
**deposit** 81:3,7,15 116:8,13,17 117:3,8 117:19 172:16,19 172:20 173:9,16 174:12,17 184:13 184:15,21 185:5
**deposited** 117:3,10 170:8 171:25 173:4 184:18
**depositing** 173:12
**deposition** 9:17,21,24 11:10,23 12:3,6,8 12:16,19 14:24 15:2 44:6 46:15 135:3,9 188:22 195:11 196:4
**depositions** 40:14,16 40:23 41:8 43:23 44:21
**deposits** 35:11,15,22 36:4,11,14 76:16 79:12,13,14,17,20 79:22,25 80:3,24,25 81:13,22,25 91:6 132:10 171:19,19 171:20 172:4,10 173:21,24 183:23 184:13,24
**describe** 22:5
**described** 136:8
**DESCRIPTION** 194:16
**designated** 138:15
**desk** 64:21 138:8 139:5
**desks** 137:10,11,13 137:14
**despite** 165:5
**detective** 37:11,13,18 56:12,13 134:12,15
**determine** 44:10 145:19
**dial** 170:23
**difference** 40:20 163:9 164:8,17,22 165:11,14,24 166:2 166:11 174:23
**differences** 30:21
**different** 9:25 34:18 49:12 80:5 82:9 114:17 125:20,21
**differentiate** 154:5
**direct** 41:22 46:12 75:3 108:21
**directed** 79:11 117:8 184:12
**direction** 48:22,24 89:19 98:13 101:11
**directly** 13:7 14:13 33:20
**disagree** 33:25
**discipline** 28:6
**disclose** 45:17
**discuss** 66:11 67:20 68:18,20 70:2,4,13 109:22 192:18
**discussed** 27:18 66:12 67:21 121:18 192:4
**discussing** 69:13,14 106:12,22 124:3 132:3 184:25
**discussion** 38:18 61:11 134:9 177:21
**discussions** 12:5,18 56:11,16 92:15 161:5
**display** 167:25
**disposition** 86:14
**dispute** 47:13 115:5,8 129:6
**disqualified** 39:23 40:3 42:6 43:16 165:18
**disqualify** 60:21 163:4 186:8
**distinction** 154:9,12
**distinguish** 144:10
**DISTRICT** 1:1,1
**divulge** 45:18
**DLA** 1:17
**DMV** 20:22 21:4
**document** 60:15 62:6 62:8 77:25 94:16 108:24 116:4,6 118:19,21 119:9,16 121:22 123:22 126:11,25 128:8 190:25 191:3,6
**documents** 12:2 15:3 29:21 116:3 122:2,6 194:11
**Dodge** 159:9
**doing** 7:22 10:4 17:17 18:22 19:4,11 20:24 30:16 36:11 54:23 66:24 69:12 89:13 103:22 122:14 124:14 137:23 165:15,16 174:22
**dolly** 162:9
**door** 65:14,16 136:24
**doors** 65:18 69:19
**double** 65:18 131:13
**dozen** 40:13
**draw** 154:10
**drawing** 154:12
**drive** 6:5 15:10 32:7 57:24 78:18 97:14 149:23 152:12
**driven** 89:16
**driver's** 116:10
**driving** 159:16 182:11
**dropped** 150:24
**dropping** 170:3
**drops** 168:19
**drove** 89:18 125:6,19 182:5
**drugs** 11:13
**dually** 159:10

**duly** 6:3 114:12 195:12
**duties** 16:19 21:12 30:11,19,22 31:3 34:17 52:7 54:14 76:13,18 90:3 94:20 95:3 97:17 119:12 122:8 132:9
**duty** 94:12,15,16 119:13,13,14 121:19,19
**Dwight** 1:13 2:4 4:10 11:20 193:10 194:5 196:5,18
**DYKMAN** 3:21

**E**

**E** 1:25 2:1 3:2,2,24 4:2,2 6:2 114:11 194:2,15 195:2
**Earle** 3:22
**earlier** 55:10,16 160:18 163:2,16 185:4
**early** 23:12 130:2,7 141:18 142:7 177:10
**easier** 111:13 174:14 174:15,16
**EASTERN** 1:1
**ECF** 126:11
**Efaz** 121:4
**effect** 131:25
**eight** 31:22 127:10 161:16
**either** 21:24 51:2 87:5 146:6 150:4 151:10 156:24 158:3 171:2 178:12 190:10,17,22 193:2
**electronically** 170:20 170:21
**else's** 177:18
**email** 15:21,23 16:7 16:10 38:22,25,25
**emails** 14:20
**Emanuel** 3:6 6:13 7:23 42:23 75:24 163:15
**Emanuel@sageleg...** 3:6
**employed** 28:3 48:15 144:23
**employee** 56:22 57:2 57:7 177:17,24
**employment** 16:4 29:13,20 37:7 79:10 120:10 194:11
**empty** 138:22
**ended** 19:10 20:3 32:10 110:17 127:10 159:15
**engage** 164:18 166:3
**engaged** 66:6 164:9 164:12,14,23 165:5 165:25 166:7
**engine** 151:21
**entire** 28:7
**entitled** 10:22
**entity** 49:13,15 57:11 57:12,15,16,20,23 58:4 59:20 183:24
**entrance** 65:17
**ERRATA** 196:2
**escrow** 86:19
**especially** 166:25
**ESQ** 3:6,15,19,24 4:5
**essentially** 51:6
**estate** 1:5 19:25
**et** 196:4,4
**Eugene** 51:17,19 83:11 121:4
**European** 166:25
**event** 43:22 88:18
**events** 10:18,19 62:22 110:23
**everybody** 44:25 140:14
**everyday** 173:17
**evidence** 187:20
**exact** 31:18 37:3 90:2 98:9,18 99:12 103:8 104:17 133:24 141:14,23
**exactly** 13:3 45:22
**examination** 2:3 5:4 5:8 6:8 114:14 136:3 194:7
**examined** 6:6 114:12
**example** 50:9 104:19
**exceptionally** 135:16
**excerpt** 19:19
**exchange** 102:3
**exchanged** 14:17,20
**exclusively** 49:24
**Excuse** 38:9
**executed** 17:24
**executive** 119:9
**exhibit** 61:2,6 108:13 115:23 117:17 118:17 123:16,17 126:3 185:5 194:18 194:18,19,19,20,20
**exhibits** 131:4 194:23
**exist** 66:18
**existence** 112:3
**existing** 23:21
**Exit** 124:16 125:4
**expenses** 153:13
**experience** 19:7 78:2 78:7,11 186:19
**experienced** 9:20
**experiences** 190:6
**EXPIRES** 196:23
**explain** 28:10 30:21
**explaining** 60:22
**extent** 21:12 79:25 80:3
**extra** 18:11

**F**

**F** 195:2
**F150** 125:15,16 159:8 182:19,22,25 183:6
**F150s** 182:5
**faced** 45:7
**facility** 54:20,22 62:20 146:8 147:11 148:9 157:13 158:12
**fact** 20:21 46:14 84:10 93:6 97:20 109:22 115:8 165:5 173:18
**facts** 187:19
**fair** 9:19 18:2 19:13 20:25 22:11 31:9 45:6 47:7 50:22 51:6 53:19,23 58:3 58:8,13 59:11 82:20 84:6 100:7 103:3,14 105:10 111:3 112:14 117:24 129:15 166:8 177:9 190:7
**faith** 119:14 121:19
**false** 109:18
**familiar** 6:15 16:24 20:21 27:3,13 28:23 37:22 83:16 84:3,10 84:25 85:10,21 94:12 101:5 108:9 118:25 119:4,16 125:3 126:7 183:12 190:8
**family** 110:21,25
**far** 47:5 61:25 130:10 140:16 144:18 156:16 158:12 166:5 169:9,11 173:2,25 183:7,8
**fashioned** 166:23
**faster** 131:4
**FBI** 16:17
**February** 1:21 31:17 57:23 58:7,10,11 99:13 176:24 196:4
**federal** 16:18 20:15 23:14,16 48:8,11 118:20

**feds** 20:3
**Feel** 8:17
**fees** 13:15
**feet** 168:23,23
**felon** 21:21
**fetch** 97:3
**fiduciary** 119:12
**Fifth** 10:17
**figure** 66:7 67:2,13 67:23
**file** 53:9 54:10 70:23 174:16 175:11 176:3
**filed** 23:10 25:24 26:3 46:16 47:25 59:23 92:12 108:16 108:20 118:20
**files** 94:10 105:17 106:13,23 107:5,15 107:20,25 108:7 109:3,12,19 160:22 160:23,24
**filing** 5:8 77:20
**fill** 34:9 151:15 152:3 152:6
**filled** 81:6 103:20
**final** 75:8
**finance** 120:5,12,13 178:14
**financial** 13:20 131:10 137:12
**find** 66:25 129:25 130:5 164:5 167:4
**fine** 71:2
**finish** 128:21
**finished** 182:11
**Fink** 70:16,22 71:12
**firm** 136:6
**first** 6:3 10:3 26:3 27:24 28:20 30:6,20 30:20,24 31:14,25 43:19 48:15 49:11 49:23 56:20 57:22 58:4,8 61:18 65:25 73:22 104:19 133:20 141:21 145:5 148:15,16 149:11 150:15 153:24 176:22 177:20 191:15
**FISK** 1:7 3:12
**fit** 38:13
**five** 10:20 17:14 31:24 33:10 36:14 70:24 80:16 140:3 181:24 191:14
**five-minute** 100:22
**fix** 50:7
**fixed** 50:2 51:22,23 52:11
**Flag** 183:13
**flags** 74:7 115:10
**floor** 3:23 85:23,25 86:2,4,8,11 87:14 97:3 122:10,15 136:18,21 137:2,3,5 137:6,8,21 139:23 141:11 158:16,20 168:25 169:2 178:11,20,22
**Flushing** 1:18 3:22 42:16 43:4 79:20 80:9 112:25 113:7 113:13 116:4,5,14 116:14 183:21,24 183:25 184:6,9,13 185:8 194:19
**FNI** 140:12 178:21 178:24 179:12,16 181:6
**folder** 150:6,9 153:5
**follow** 29:8,25 44:9 59:17 102:7 176:16
**following** 99:20
**follows** 6:7,24 114:13
**food** 160:9
**force** 8:4
**Ford** 159:8
**foreign** 131:14
**form** 5:12 44:4,6,14 74:9,17,24,25 75:2 75:4 94:13 113:3 151:13,24,25 152:3 188:14
**formal** 53:9
**formed** 174:8 176:6
**former** 108:5
**forming** 176:9
**forth** 50:21 82:10,17 146:2,16 149:19 160:8 195:12
**Forty** 129:20
**forward** 20:6
**found** 21:16 103:3 187:23
**four** 10:12,19 17:14 18:4,4 31:8,24 32:25,25 33:3 56:7 56:7,8 77:7 121:2 128:24 142:5 168:22,23 190:13
**Frank** 119:23 120:4 137:11 138:12 141:5,10 151:10
**Frank's** 137:20 140:24
**fraud** 163:11
**fraudulent** 164:9,14 164:18,24 165:5 166:3
**free** 8:17
**frequency** 171:16
**frequently** 97:11
**front** 51:11 64:22 107:8 137:15 138:8 170:22
**froze** 36:6 96:4 114:5
**full** 56:4 61:3
**fully** 148:4
**fundamental** 67:8
**FUNDING** 1:18 4:4
**funds** 86:18 116:21
**further** 5:7,11 34:13 39:8 114:13 135:10 185:10 192:12,13 195:16

**G**

**G** 6:2 114:11
**gain** 139:20
**games** 33:18
**gang** 7:11,21 8:21,22 9:2
**gaps** 37:7
**gastro** 34:15
**Gene** 51:16 52:18 53:4 65:10 81:11,19 83:10,15 89:25 90:13 121:7,8 122:14 184:15
**general** 29:4 69:6 121:4
**generally** 48:10 78:3 83:2 88:17 100:7 105:20 136:16 140:4 180:7
**gentleman's** 88:2 106:6
**gentlemen** 47:8
**gestures** 10:5
**getting** 33:16,17 38:23 50:6 72:6 87:2 110:13,22 114:22 128:14 145:22 146:16 174:19
**Gianelli** 111:24 112:6
**gift** 160:4
**girl** 140:7 178:14
**girls** 81:8,11,12,17 91:15,19 92:4 184:14
**give** 10:9 11:18 40:12 45:2 48:24 61:2 69:17 91:17 97:24 123:21 151:7
**given** 34:23 40:12 69:11 89:23 90:25 98:13 127:23 175:5 195:14

**giving** 39:18,19
**glass** 35:5,6,7 51:4 95:6 97:6 111:14 145:24
**Gmail** 15:24
**go** 7:17 9:23 10:18 11:20 19:17 25:6 27:10 33:22 35:4,10 35:22 38:17,19 47:6 50:23,24 51:4 61:10 63:8 65:16 66:20 67:5,6,7 77:18,20 77:22 80:2,9 81:15 93:13 109:25 112:8 129:9 130:15 132:10 134:7 138:2 138:19 142:23 143:18 146:11,25 148:16,19 149:14 153:17 154:4,13 157:9 160:9 169:11 172:12 184:21
**going** 8:15 9:23 10:18 18:21,22 19:19,21 20:6 21:10,16 22:9 29:7,24 31:14 34:21 34:22 35:3 39:7 45:17,23,25 46:9 48:25 50:13,19,20 50:25 51:13 53:7 56:11 58:17 59:15 61:3 63:23 66:7,19 67:2,14,24 69:10,11 69:18,21 70:11 72:2 72:18 75:5,6,7 78:17 80:4,5 86:13 88:8 91:9,10,11 95:5 99:16 103:15 105:14 114:17 115:21 118:10 119:20 121:2 123:15 125:25 128:6,10 135:19 136:9 137:25 144:25 147:14 149:24 162:3 169:19 176:14 192:23
**goings-on** 91:2
**Gold** 1:14,15,15,16 1:16,16 94:13,16 118:22 119:7,9 123:20 191:2
**good** 6:10,12 9:9 43:18 100:21 119:14 121:19 136:5 185:22
**goodbye** 14:16 187:5 190:14
**Google** 15:23 95:17 95:21 97:25 144:19 144:21
**government** 20:15
**grabbed** 64:10 93:18
**grand** 88:11,12 112:15 124:5,8,13
**Great** 80:21
**greeted** 187:4
**greeting** 143:13
**grill** 147:24
**gross** 134:24,25 174:19
**ground** 9:23 11:6
**Group** 1:15 7:10,20 9:5 48:2,12 105:17 108:17 115:6 118:22
**guess** 10:20 38:7,8 39:20 40:10,11,22 40:23 41:6,11,12,16 41:20,21 42:3 43:14 43:16 44:2,2,8,13 45:4 46:8 73:24 88:22 107:4 111:6 129:24 142:22 158:3 169:13 189:17
**guessing** 38:14,15 44:10
**guide** 28:24 29:2,9,12 29:17 194:11
**guns** 135:5
**guy** 19:18 103:20 120:5,12,13 122:14 137:16 178:14
**guys** 31:6 65:11 103:20 104:10,25 133:9

**H**

**H** 6:2,2 114:11,11 194:15
**Hakim** 27:21
**half** 121:10
**half-hour** 135:17
**hand** 195:21
**handed** 81:4,10,13 83:14 184:15
**handful** 187:4 191:25
**handle** 70:21 71:2 83:3 84:13,20 147:12 181:5,13
**handling** 83:10,12 97:2
**handwriting** 117:20
**hang** 146:18
**happen** 60:23 97:11 141:13
**happened** 18:14 22:8 24:8 71:13 73:7 86:16 92:25 97:12 110:10,23 152:21 158:4 182:25
**happening** 108:3
**hard** 167:4
**hard-to-find** 166:24
**harmless** 40:16
**Harry** 1:13 3:17,19 12:15 43:19 65:23 185:23
**Harry's** 78:2
**head** 19:15
**hear** 55:13 68:10,24 68:25 99:23 127:14 133:6,8 161:11
**heard** 26:3 133:4 156:20 183:9 191:23
**hearing** 48:4
**held** 2:4,5 30:6 38:18 48:4 61:11 91:14 134:9
**hello** 14:15 87:10 187:4 190:14
**help** 35:19 86:25 161:21 162:2,7,13
**helped** 93:17,19 124:22
**helping** 161:25
**helps** 68:8
**hereinbefore** 195:12
**hereto** 5:4
**hereunto** 195:20
**hey** 51:23 159:21
**Hicksville** 26:10
**highway** 3:18 32:7 54:21 116:18 117:12 118:3
**hindered** 108:7 109:11 110:20 114:19 115:10
**hire** 132:17 188:4
**hired** 134:18 135:3 177:20
**hold** 29:24 86:6 129:19
**holding** 48:16
**holds** 46:22
**home** 27:4 32:15 93:2
**honest** 81:2 164:8,17 164:23 165:24
**Honor** 20:2 43:8,18 43:19 44:16 45:9 46:4,18
**Honorable** 112:5
**horse** 160:4
**hot-rodded** 167:11
**hourly** 13:23 36:23
**hours** 11:14 18:4 32:17,20,22,23 33:8

37:4 55:25 56:6 142:11 145:20
**house** 22:19 147:11 153:18
**Housekeeping** 135:13
**Hrtatty@verizon.n...** 3:19
**HWY** 1:3,18 3:9
**HYLAN** 1:5,5,6,6,6,7 3:10,10,11,11,11,12

**I**

**IAG** 136:8
**ID** 176:11
**idea** 82:22 105:9 123:7 125:2 143:24 166:14 169:21 173:12 179:8 184:11
**ideas** 156:6
**Identification** 61:6 108:13 115:23 118:17 123:17 126:3
**identify** 76:15,19
**imagine** 41:18
**immediately** 43:14
**implemented** 145:5
**importantly** 42:5
**improper** 39:8
**inability** 109:14
**inch** 69:17
**incident** 53:7 75:20 97:10
**include** 33:6 38:23
**income** 58:19
**Index** 108:19
**indicate** 57:22
**individual** 17:3 37:10 113:21 114:2 126:6 131:6,9 132:13 137:5 168:3 176:10 178:2
**individuals** 65:25
119:21 121:25 127:15
**industry** 78:3,8
**information** 29:13 54:7 96:15 150:17 151:14,15 152:2 153:9
**initial** 32:21
**input** 153:10
**inside** 22:19 93:13 189:6,7
**insist** 66:18
**inspection** 146:16 147:14 152:10
**Instagram** 123:13,19 125:22 194:20
**installing** 147:25
**instance** 113:12
**instances** 97:16
**instruct** 8:6,13,13 38:10,12 42:10,12 50:8,14
**instructed** 41:5,16 42:2
**instructing** 7:24 8:2 8:9,10 66:10 67:20
**instruction** 39:18,18 43:15 128:3
**instructions** 39:8,24 41:3 90:25 97:25 127:23
**instructs** 68:21
**insurance** 177:22
**intended** 186:12
**intent** 186:14
**interact** 93:3
**interaction** 143:12 161:2
**interactions** 143:22 144:3,6
**interest** 39:5 70:5 87:18
**interested** 195:19
**interests** 62:12,13,17
**intermediary** 21:10
**interrupted** 42:6 43:14,20
**introduced** 113:11 155:22,24 156:3
**inventory** 95:4,8,18 101:9 144:13,18 157:5
**involved** 72:6 88:9 89:11 130:25 151:5 156:11 158:15 163:8
**involvement** 85:3
**involving** 185:25 191:2
**irate** 52:9,12 53:3
**IRIS** 1:4
**Island** 1:7 3:13 7:10 7:20 9:5 48:2,11 78:3,8 105:17 108:17 115:5
**issue** 37:25 43:6 45:7 45:12 70:19 86:13
**issued** 112:4
**issues** 27:3 71:3 105:16 185:25
**items** 64:7,14 93:21 94:4 154:6,7,22,23 155:5

**J**

**J-I-Y-I-N-G** 26:21
**J.P** 1:18
**jacket** 150:12,13 153:6,7
**jackets** 150:11
**Jamaica** 3:5,5
**January** 28:2
**January/February** 31:19
**Jcianciulli@weirla...** 4:6
**Jeff** 12:7 39:10 45:9 135:24 185:17
**Jeffrey** 3:15 4:5 39:24 42:24 136:6
**Jiying** 26:20
**JMW** 1:11
**job** 18:20 32:13 37:18 105:3 120:25
**Joe** 101:24 102:4,10 102:14,16,19,24 103:13,19 104:4,9 104:19,20 147:12 147:15,17,19 148:16 149:23 152:10,13 153:12 154:4
**join** 38:24
**joining** 61:12
**Jones** 1:14,17 191:16 191:19,21,23
**JORY** 1:4 3:10
**Josh** 155:14,15 158:3
**JOSHUA** 1:4 3:10
**JR** 3:17,19
**Jruderman@cszla...** 3:15
**judge** 8:14 38:22 42:20 44:18 45:6 47:7 60:18 66:20 67:5,6 75:5,6 99:9 135:10
**July** 88:14 98:8 124:2 129:4 130:2,7 166:21
**Justice** 111:24

**K**

**K** 6:2 114:11
**Kataev** 3:6 6:9,13 7:24 8:5,12,18 23:3 29:11 30:5 38:9,16 38:21 39:7,12,17,20 39:22 40:6,20 41:8 42:5,21,23,23 43:7 47:9,11 59:15,19 60:5,9 61:7,10,12 66:9 67:8,16 68:4,8 68:12 69:5 70:9,15 71:6,10,19,21 74:11

74:14,19 75:6,12,16 75:25 76:5 100:21 100:24 102:13 108:14 114:4,15,16 115:24 118:18 122:16,20 123:18 126:4,10 134:7,10 135:8 136:9 163:2 163:19 185:4 186:15,22 187:19 188:6,13,19,22 189:15 191:18 192:12 194:8,23
**keep** 10:3 45:8 149:25 153:13
**keeping** 25:17
**kept** 89:6 137:18 179:3
**kerfuffle** 43:24
**Kevin** 132:14,16,18 132:20 133:2 134:5
**key** 170:23 171:3
**KHAN** 1:4
**kids** 15:18 160:10 167:6
**kind** 19:15 39:4 139:16 144:13 145:2 150:9 151:14 153:24 159:10
**Kindly** 108:22
**knew** 18:25 20:17 26:14 50:19 52:24 86:11 109:12 130:10 148:19 150:19 162:16 165:9 172:14 184:9
**know** 12:11 14:7 17:3 18:18 20:23 21:22 22:21 23:10 25:17 25:18 26:15 28:17 31:17 34:13,22 37:15,16,17 41:7,15 41:17 48:10 51:18 53:4,11,13,15,16 54:8,13 57:19 58:20 58:25 59:23 61:19 67:12,22 69:22 70:3 73:13 77:11 78:21 78:22 79:9 81:2 83:8,24 84:5 85:13 86:14,15,20 87:8,17 87:25 88:17 91:13 91:20,23 92:2 98:7 98:9,19 99:11 100:16 102:16,17 102:21 103:2,7 105:2,5,22 106:23 106:25 107:18,21 108:10,22 109:24 111:6 112:2,7,17,17 112:19 113:21 114:2 116:22 117:21,21 118:4,6 118:22 119:3,6,17 120:4,20,25 121:16 121:23 126:24 127:5 128:7,20 129:10,18 130:14 131:13 132:5,12,13 132:14,22 133:21 133:24 134:12,14 135:14 138:2,7 139:11 140:9,17 141:14,14,23 142:11,14,20,20,22 142:25 143:5,7,9,21 144:2,5,8,12,20,22 145:11 147:17 148:6,22 150:6,8,16 151:2 152:20,20 153:3,4,5,7,8,9,11 154:2 155:25 156:16 158:19 160:21,23 161:5,15 162:16,19,22 163:9 164:8,17,22 165:4,8 165:14,23 166:2,11 168:8,15 169:11,18 170:10,14,19 171:5 171:9 172:3 173:2,6 173:8,9,10,25 174:10 175:3,19 179:20,25 180:4 182:22,24 183:7,8 183:15,18,19,22 184:5,8,17 186:5,11 186:13,16,17 187:21 191:5,6,7,17 191:21 192:6
**knowledge** 13:6,10 13:19 20:11 27:15 51:24 60:24 62:16 77:8 78:2,7,11,14 81:6,9 82:3,19 86:18 91:20,23 94:7 95:20 96:11 98:5 104:24 109:17 116:20 117:6 122:12 123:4 124:12 127:22 128:2,17 131:5 132:17,20 133:19 134:14,16,23 135:6
**known** 142:17
**knows** 43:12 113:20

**L**

**L** 6:2 114:11
**lack** 17:17
**lacrosse** 33:17
**lady** 162:3
**lady's** 105:23
**lamp** 93:25 94:3
**landlord** 26:23 27:4 78:20
**language** 40:22
**large** 179:23
**late** 129:4 130:2,7 141:17
**Laurie** 1:14 119:23
**law** 164:20
**lawn** 100:15
**lawsuit** 12:25 21:24 22:5,22 23:7,10 25:19,23 26:2 47:25 48:8,11 72:2
**lawsuits** 22:5 23:8,22
**lawyer** 40:11 45:21 46:16
**lawyers** 44:12
**lead** 41:4
**learn** 73:18 78:25 82:23 120:24
**learned** 53:19
**LEASING** 1:4,19 3:9
**leave** 105:6 120:14 157:20
**leaving** 93:24
**lecturn** 138:5,7
**led** 24:9 50:12 68:9
**left** 31:23 32:2 64:7 64:11 65:19 93:6 116:9 120:16,17,19 129:3,16 135:18 138:22 156:15 171:20 177:12
**legal** 3:3 13:8,11,15 13:22 14:12 72:4,8 72:13 73:8,11,14
**Lendbuzz** 183:10
**lenders** 97:3
**Let's** 61:10 134:7 154:5 181:24
**letter** 25:2,9,12 70:18 71:9 131:20,22 132:5,8
**level** 136:22 137:6 139:25
**levied** 73:19
**Levine** 12:10,12,13 12:15,23 13:14 14:8
**Lexington** 3:14
**liaison** 101:15 105:3
**Libertas** 1:18 4:4 42:16,18 43:2
**LIC** 1:16
**license** 20:22 21:4 116:10
**licenses** 140:7,7
**lie** 165:9 166:11

**lied** 165:7
**lies** 46:13
**life** 20:6,8 77:12,17 91:17 135:4
**lift** 152:15
**light** 106:15 115:8
**limited** 192:2
**line** 86:8 122:10 192:17
**LINE(S)** 196:5
**link** 38:23 96:20
**list** 144:13,18 148:17 148:18 150:21 151:7 152:22 153:20 186:12
**listed** 76:12 119:22 119:22 121:10
**listing** 152:23
**litigation** 67:25 69:10 69:16 70:7
**little** 1:17 9:24 21:14 31:23 32:2 62:3 96:21 155:4 191:23
**live** 15:17
**LLC** 1:3,3,4,5,6,6,6,6 1:7,7,7,8,15,15,16 1:16,16,17,18,19,19 3:3,4,9,9,10,11,11 3:11,12,12,12,13,13 4:4 7:3 57:20 58:14 58:21 59:2,12,16,20 174:2 175:12,15 176:3,4,6,10,15,21 191:9 194:12
**LLP** 1:18 3:8,21 4:3
**LNF** 126:15
**loan** 181:11
**located** 98:6 137:5,8 139:4 168:10 178:7 189:3
**location** 21:3 32:3 50:15 82:8,9,15 97:21 98:2 101:9 136:16 138:15 139:15 147:20
149:7
**locations** 190:11
**lock** 62:19
**locked** 24:10 94:25 109:23 110:3 134:21
**lockout** 186:25 187:14
**log** 97:21
**login** 96:15,17 139:16 139:17
**logo** 119:4,6,7 139:18
**long** 15:15 26:2 30:9 77:9,9 78:3,8 104:11,15,25 133:22 135:16 142:3
**longer** 17:10,17 25:3 91:10 102:25 103:4 103:5 104:4 131:16 131:24
**look** 20:5 36:21 81:3 102:6 119:4,16 149:12 150:18 152:15 160:4 167:22
**looked** 15:3 121:25 150:20
**looking** 10:17 18:11 72:13 116:5 155:11 163:4 168:2 188:17
**looks** 114:4
**loose** 170:3
**lot** 19:12 65:17 89:6,6 98:6 111:17 129:3 129:12,13,14,16,18 129:20 130:6 147:8 147:9 148:4 156:23 157:7,9,12,15,17,18 157:20,24 158:11 167:15,21,24 189:9 189:12
**loud** 10:3 52:12
**Louis** 16:24
**Lowe** 51:17,20 82:24
83:11 121:5
**loyalty** 94:12,15,16 119:13 121:19
**Luncheon** 114:7

**M**

**M-A-R-X** 37:13,14
**M-E-N** 178:15
**M.J** 112:6
**Madame** 39:3 122:17
**magnitude** 180:21
**main** 103:19
**maintain** 26:17
**maintained** 150:9 168:16 170:10,14 170:19
**maintenance** 154:5,7 154:23
**making** 39:11 79:17 79:20,22 83:18 173:7,11
**man** 20:8
**manage** 95:8 98:2
**management** 1:7 3:13 25:11 26:5,6,7 84:4 97:22
**manager** 121:4,11,12
**managers** 51:12 191:2
**managers'** 51:14
**managing** 32:13 95:21
**Marc** 1:14 17:3 18:11 18:13,20 19:3,3 26:16 34:8 63:21 65:23 87:5 89:25 115:20 132:3 133:9 138:14 151:10 155:25 159:24 172:24 175:3
**Marc's** 19:4
**Marcello** 156:18,18 156:20
**March** 30:18 70:13 71:3 73:6 176:25
195:21
**mark** 152:20
**marked** 61:6 108:11 108:13 115:22,23 118:17 123:17 125:25 126:3
**marketing** 121:3
**marriage** 195:18
**Marx** 37:11,13 56:12 56:13 134:12,15
**Mastic** 6:6 15:12 57:24
**matter** 40:17 45:18 135:13 136:8 195:19
**matters** 37:19 192:17
**mean** 62:17 63:4 85:25 113:19 118:14 124:19 141:4 164:24 165:10 171:17 174:23
**meaning** 65:16
**means** 75:2 89:17 131:14
**mechanic** 19:14 21:7 21:8 51:5 95:6,22 97:8 101:18,21,23 102:10,20,24 103:14 104:4 111:13 146:4 147:10,16
**mechanics** 19:15 21:10,17 34:24 49:25 50:6 51:3 97:6 104:7 105:11 111:12 136:19 145:23,24
**mechanics'** 139:7 146:7
**medications** 11:14
**meet** 55:19 85:16 155:14 156:18
**meeting** 121:24 122:5
**meetings** 121:18

**member** 8:3 56:17 175:18
**members** 175:14
**memory** 10:21 36:22 187:11 188:3,8 189:4
**men** 69:13 135:5
**mentioned** 45:15 140:19 158:24 181:17 182:18
**Merckling** 1:14 17:4 26:17 27:19 35:18 53:24 54:5,9 68:17 70:11 72:12,25 81:24 82:4,7,11,15 82:20,24 83:5 84:23 85:6 90:15,19 92:5 92:24 93:12 96:13 99:23 119:25 127:15,17 128:18 130:21 134:14 135:3 144:14 171:8 173:23 179:25 187:15
**Merckling's** 34:17 35:15
**message** 134:4
**messages** 14:17 90:7 90:10,13,16,18 102:3,10
**Messrs** 68:17 92:24
**met** 12:12 14:15 18:23 65:23 68:16 77:21 87:9,25 112:22 127:7,8 155:15 190:13
**Michael** 1:14 32:7 78:18
**mid-sentence** 42:7
**middle** 67:23 164:4
**mile** 69:18
**million** 44:21
**mind** 74:7
**mine** 58:22
**minutes** 39:2 80:16 181:24
**mirror** 147:23
**missing** 53:17 147:23 154:10,15
**misunderstanding** 67:9
**model** 125:14
**molding** 154:18
**Monday** 56:10
**money** 53:17 59:4,8 59:11,12 86:15,16 91:20,23 117:10 118:10 169:4,5,8,12 169:16,18,19,22 170:8,11 171:12,15 171:18,24 172:16 172:18,22 173:3 177:9 179:6,6,10,13 179:14,21,23 181:13 184:18
**moneyman** 127:15
**month** 31:16
**months** 31:21,22,24 32:11 40:14 43:23 82:6 133:25 142:5 180:10
**MORGAN** 1:18
**morning** 6:10 43:18 44:23
**motion** 60:20 70:10 163:3 186:8
**Motor** 1:4,19 3:9 118:22 119:7
**Motor's** 119:9
**motorist** 28:12
**Motors** 1:3,15,16,16 1:16,17 3:4 6:24 16:11 18:15 94:13 94:17 123:20 136:15 188:25 191:15
**move** 51:2 89:19 93:17,19 114:17 131:4 133:23
**moved** 128:23 130:8 137:16
**moving** 62:18 82:17 88:15 89:11 98:12
**mowed** 100:14
**mug** 64:9,12 93:15
**multi-party** 176:10
**multiple** 80:10 178:15,17
**mumbling** 10:6
**Mutual** 24:23

**N**

**N** 1:25,25,25 2:1,1,1 3:2 4:2 6:2,2 114:11 114:11 194:2 195:2
**N-E-T-H-A-N-E-L** 126:8
**N-E-W-E-L-L** 113:22
**N.A** 1:18
**name** 6:13 16:24 23:17 26:20 27:21 51:18 57:5,7,15 85:10 88:2,4,5 101:23,25 105:23 106:6,8 111:24 116:9 117:22,24 126:7 132:15 136:5 143:11 156:17,20 191:22 193:2 196:4 196:5
**named** 12:25 17:3 22:8 37:11 73:24 112:19 113:21 126:6 131:6 132:13 156:18 191:16
**names** 11:20 51:14 104:12
**Nassau** 8:4 16:4,8 17:7 27:25 28:3,7 30:7,12 37:8 54:15 55:21 56:17 63:13 80:12 92:16,19 112:4,8 122:24 123:5
**Nate** 126:14
**Nathan** 113:21
**nature** 34:10 133:14
**necessary** 39:4
**Neck** 80:22
**Neck/Little** 80:22
**need** 7:16 33:7 64:4 110:20,24 146:24 177:22 192:18
**needed** 25:3 34:8 51:2,12,22 73:13 86:25 145:23 146:12,24 147:23 147:24 148:18 149:13 150:2 151:19,20,20 152:8 154:2,19 169:5
**needs** 154:11
**net** 134:23
**Nethanel** 126:6,14 194:20
**never** 9:20 12:12 13:22 45:7 69:25 98:24 99:4 111:4,5 113:6,10,11 120:24 121:22 125:22 160:9 162:12 166:7 181:4 190:15
**new** 1:1 2:7 3:5,14,14 3:18,23 6:4,6 15:12 26:9,10 35:14,21 57:24 86:25 87:3 91:11 147:24 195:4 195:10
**Newell** 113:22
**newsletter** 118:23 119:2,3,18 121:15 121:17 194:19
**night** 66:24 67:21 68:14 69:9,11,13 71:13 93:14 186:25 187:7,14,18,22,25 188:4,9,12 189:12
**nine** 33:10 164:2
**Nissans** 167:7

**nobody's** 138:15
**non-questioning** 41:25
**nonmetal** 147:22
**normal** 110:7
**Northern** 24:18 32:3
**NORTHS-ORE** 1:4
**Northshore** 1:19 3:9 16:11 18:15 22:2 32:23 34:19,23,24 34:25 47:23 48:15 48:17,20 50:2,10,10 50:20 51:3 56:22 58:25 59:14 63:3,12 63:17 64:15 65:2 72:20 76:22 77:2 78:17 79:11 80:14 80:20 85:24 86:23 88:11,12,13,19,21 89:6,20 90:4 98:12 101:15,20 102:14 103:4,15,17 104:2,5 105:12,18 106:3,13 107:23 108:8 110:14 111:4,20 112:15,25 114:21 115:9 116:23,24 117:3,7,14 120:5,11 122:8 130:9 132:21 132:23 136:15,23 139:4,6,12,18 141:3 141:17,25 143:2 144:23 145:8,17 146:7,21,25 147:5 147:11,19,20 148:3 148:15 149:3,9 155:18 156:4 157:18,20 158:17 159:3,12,17 160:16 160:19 167:10 168:11 172:6,7 180:8,10 181:20 182:6,12 183:13,20 184:3 190:6 191:15
**Northshore/Superb** 102:25
**Notary** 2:6 5:5 6:4 193:14 195:9 196:20
**note** 46:11 47:4
**noted** 193:5
**notes** 67:13 188:17 188:19
**notice** 96:23 154:25
**noticed** 129:2
**November** 105:15 109:8,14 110:6,9,23 111:3,17 114:20 141:25 158:6 180:15
**Novicki** 88:3 187:16
**number** 37:4 41:2 44:17,20 108:20 116:10 118:4 129:21 148:6 176:12
**numbers** 95:9 128:24
**numerous** 157:23
**NYC** 1:14

**O**

**O** 1:25,25 2:1,1 195:2
**o'clock** 33:10,10 70:24
**O'Sullivan** 106:7
**O-R-D-A-D** 126:8
**oath** 9:10
**object** 44:3,6,22 75:2
**objecting** 45:18
**objection** 7:13,15,22 44:14 46:8,11 66:5 68:9 69:4,7 74:9,17 74:24,25 75:4 76:9 113:3 115:12 186:15,22 187:19 188:6,13 189:15 191:18
**objections** 5:12 161:8 162:12 185:12
**objects** 68:19,20
**observe** 65:22 76:21
**observing** 43:3,3
**occasion** 77:13
**occupied** 140:4,9
**occur** 31:7
**occurred** 10:19 24:11 75:20 78:23
**occurring** 109:2
**October** 180:15
**odd** 108:2 129:25 130:5
**off-duty** 29:20 194:11
**off-the-record** 38:18 61:11 134:9
**offer** 18:20 75:21
**offered** 18:7 20:4 76:2,6 159:11
**offering** 159:25
**offers** 105:5
**office** 64:16 65:5 77:19,23 133:16,20 137:11,20 138:13 140:13,24 141:5,6,7 141:8,11,15 168:15 168:17 169:12 178:8,10,18,21,21 178:25 179:4 181:18,20,22 190:22
**officer** 6:11 30:8,9,10 30:14 32:14,18,22 51:25 52:5 54:15 119:25 121:3,3 131:10 164:7
**officers** 20:9 93:4 119:13 122:13 123:5 191:2
**offices** 105:18 136:22 137:2,3,5 139:24,25 140:10 143:25 144:4,7 168:12 178:9,11,13,24
**offloaded** 152:9
**Oh** 99:15
**oil** 19:5 147:13
**okay** 6:25 7:2,4,6 9:25 10:6,10 13:6 19:23,24 20:10 24:14 25:25 30:2,19 31:14,25 33:24 38:16,21 43:6 44:19 48:14 49:5 54:25 57:12 60:25 61:4,5 61:21 62:5 70:25 71:4,19 72:19 73:11 76:4 80:21 102:11 103:13 106:4,20 108:25 119:11 127:2,11 128:9,11 128:25 131:13 134:22 155:2
**okayed** 34:2
**old** 27:5,8 106:6 107:25 166:23
**older** 33:16
**on-call** 18:2
**once** 27:9 97:12 127:8 150:4 155:23 159:14 172:7,24 187:13
**one-off** 97:10,16
**ones** 168:19
**open** 57:12 58:7 64:23,24 65:6 88:13 96:20 107:9 137:3,4 137:14 138:18 169:5 171:3,6 174:15 176:21 178:20 180:2
**opened** 57:22 58:3 183:13,16,20 184:6 184:10
**opening** 88:11,12 112:15 124:5,8,13 169:5
**operate** 109:14 110:13
**operated** 111:5
**operating** 26:13

110:7 112:16 148:4 176:20 180:8,14
**operation** 120:15
**operations** 26:10 108:7 109:11 110:20 114:19 115:9 121:11 180:10
**opportunities** 75:21 76:2
**opportunity** 61:3 75:8 76:6 115:17 123:21
**opposed** 9:16
**opposing** 60:20
**oral** 70:13 71:3
**Ordad** 126:6,14 127:4 128:19 194:20
**Ordad's** 129:2
**order** 2:4 20:14 57:13 112:4 138:3 192:24
**ordering** 192:22 193:2
**orient** 105:14
**outcome** 195:19
**outside** 13:5 15:2 16:7 29:13 51:5 69:25 73:2 95:6 111:12,13 129:22 146:7 153:16 189:7 189:8
**outsider** 129:11
**Ovington** 3:22
**owned** 167:10 175:22 175:23 182:6
**owner** 87:7,22,24 115:5 176:3
**owners** 175:14
**ownership** 87:17
**owning** 171:17
**owns** 87:18

**P**

**P** 1:25 2:1 3:2,2 4:2,2 6:2 114:11
**P-U-C-C-I-O** 112:20
**p.m** 70:19 114:7,9 193:5
**pack** 129:24
**package** 170:6
**pad** 67:11
**page** 61:16,18,24 108:18 119:8,19 121:2,10 126:20 128:6,23 194:7,10 194:16 196:5
**paid** 13:7,11 18:21 49:12,17 57:13 59:4 85:7 134:23 174:5 174:24 178:2 181:12
**paper** 150:3 151:13 151:17,19,22 152:23,25 169:25 170:7,20 179:18
**papers** 73:21,23 74:6
**paragraph** 108:22 109:21 127:9 128:7 128:10,13,21,24 163:17,20 164:2,5
**paralegals** 43:5
**parking** 65:17 189:9
**part** 20:5 21:23 52:24 76:18 94:20 116:3 119:21 122:8 142:10 154:10 167:18 175:20 177:23 179:2
**part-time** 18:7
**parted** 33:23
**participate** 11:9
**participated** 9:21
**particular** 91:9 97:24 116:4,12 141:4 146:11 148:5 170:11 171:16
**parties** 5:4 41:5 99:21 195:17
**partner** 17:7 19:4 119:24
**PARTNERS** 1:17
**parts** 19:16 21:9,11 49:2 50:6 51:2 138:3 153:19,20,21 154:15
**party** 23:8 42:14
**party's** 45:18
**pass** 147:14
**passing** 47:19 87:10 155:15
**patrol** 17:17,19 28:23 29:2,9,12,17 30:23 194:11
**pay** 36:20 57:4,6,9 177:16
**paying** 13:10
**payment** 176:22
**payments** 49:8 58:13 58:14 82:21,25 84:20
**pen** 67:11
**penalty** 9:10 60:15
**pending** 11:3 23:22 70:10
**penetrated** 69:21
**penetration** 69:22
**Pennsylvania** 4:5
**Pentmoor** 6:5 15:10 57:24
**people** 28:14 47:16 51:25 69:24 89:23 90:5 103:22 104:13 138:18,21 139:8 140:16 167:11,20 181:6
**percent** 81:12 154:21 154:22,24 155:4 176:3
**percent's** 175:24
**percentage** 153:23 154:20
**perform** 89:3 100:8 147:19
**performed** 59:5 98:24 131:17 138:16 147:11 174:6
**performing** 31:16 52:7 54:14 90:3 132:9
**period** 91:10 104:18
**perjurious** 164:6
**perjury** 9:10 60:16
**person** 22:16,18,24 52:17 54:2 173:3 178:24 191:11
**personal** 64:6,14 93:21 160:7,15 174:13
**personally** 22:3,4 57:4,6 85:16 89:8 100:2 127:6 130:12 134:12 174:12,22 192:6
**personnel** 92:16 190:8
**perusing** 108:24 123:22 126:25 128:8
**Philadelphia** 4:5
**phone** 90:23 95:15 102:7
**phonecall** 132:2
**physical** 150:9
**physically** 54:19 97:13,13 107:6 145:13 154:3 161:20 169:15 172:12 180:24
**pick** 179:23
**picked** 27:11
**pickup** 125:17 159:10,16
**pickups** 158:24 159:7 159:13
**pictures** 95:12 189:13
**piece** 147:24 150:3

151:13,17,19,22 154:18 169:24 170:7,20
**place** 19:17 34:17 35:6,7,16,17 40:3 42:4 47:19,21,21 51:4 55:4 60:25 70:4 88:18 94:25 95:6 97:6 99:8 101:9 111:14 134:21 140:5
**placed** 68:7 86:19
**places** 35:5
**placing** 117:18 122:9
**plain** 151:22
**plainclothes** 30:25
**plaintiff** 21:24
**plaintiff's** 23:17
**plaintiffs** 1:9 3:3,8 6:14,24 42:24 136:8 189:19,23 190:4
**Plaintiffs'** 186:7
**plan** 85:23,25 86:3,5 86:8,12 87:14 97:3 122:10 158:20
**planning** 63:8 122:15 158:16
**plates** 140:8
**play-by-play** 91:17
**please** 10:5 23:4 32:19 60:6 61:22 62:4 74:13,18,20 75:14,15,16 102:6 163:15
**pocket** 113:17
**podium** 65:7,8,9,13 95:10 136:20 137:16,20 138:4,11 138:22,25
**point** 18:6 35:22 91:7 121:15 136:2 140:12,23,25 141:2 151:25 152:7 156:7 159:8 181:17 186:12,19
**pointed** 126:20
**police** 8:4 16:4,8 20:9 27:25 28:4,7 30:7,8 30:9,10,12,14 32:13 32:17,22 37:8,20 51:25 52:5 53:9 54:10,11,15 55:22 56:17 63:13 92:16 92:19 93:3 122:25 123:5 164:7 187:17 187:22
**policeman** 94:21
**polite** 39:11
**porter** 146:14
**porters** 89:13,14 98:15 137:17,17 149:18
**portion** 117:19
**posed** 10:13
**position** 19:14 30:6 40:8 42:4,15 48:17 68:11 69:2 71:9 142:25
**positioned** 167:21
**possession** 29:4,21
**possibility** 129:23
**possible** 53:22,25 54:4 79:19,21 92:7 102:5 171:9,11 186:18,21 188:11 188:15 191:11,13
**possibly** 40:12 47:17 55:9 95:19 160:11
**post** 123:20 125:22 194:20
**potentially** 69:20
**preceding** 191:19
**precinct** 53:9 54:10 54:16,18
**precisely** 115:14,16
**prefilled** 152:4
**PREMIER** 1:17
**premises** 77:10 78:17 78:19
**preparation** 12:3 89:2
**prepare** 11:23
**prepared** 38:22
**prerogative** 41:21
**present** 4:7 53:3 62:25 63:18 76:21 76:25 77:9 88:24 93:4,10 103:25 111:16 113:6 115:21 126:17
**presented** 13:23
**presenting** 108:11
**preserve** 29:7
**president** 119:22,23
**pretty** 21:19 98:15 140:17 147:12 158:8 162:21 183:3 183:4
**previously** 45:15 54:25 114:12 166:19
**pricing** 168:3
**primarily** 65:20 148:23 173:2
**prior** 12:9,15,19 18:16 35:10 125:22 132:24,25 186:25 187:7 191:18
**private** 148:23
**privately** 167:10
**privilege** 44:23 45:11 45:13,16,17,19,25 46:10,13,19,22,24 66:8,14,16,17,19,20 66:22 67:3 68:21 69:6,12
**privileged** 47:5 69:20
**privy** 161:10 165:22
**pro** 4:10
**probably** 9:14 16:19 17:14 31:8,22 33:10 35:12 36:7,13 47:18 47:23 63:21 81:11 118:2 122:14 129:11 142:5 156:7 159:24 161:25 182:14 192:16
**problem** 21:15 24:16 39:12 52:19,24 53:5 145:24
**problems** 180:24
**proceed** 40:2
**proceeding** 99:11
**process** 83:16
**produce** 29:9 30:2 102:8
**product** 66:6,15,24 67:4,9,10,17 69:12
**production** 59:16 116:3 176:15
**professional** 69:25
**program** 83:24
**proper** 8:10 17:22
**proposed** 191:5
**protect** 20:6,15,16 134:18
**protection** 20:4,7,19
**provide** 11:10 13:12 20:7 22:25 70:12 85:6 94:21,23 136:11
**provided** 13:8 125:12 128:18
**Public** 2:6 5:5 6:4 193:14 195:9 196:20
**Puccio** 112:19,22
**pull** 163:16
**pulled** 28:14
**purchase** 86:9 114:23 114:25 115:2 150:21 159:13
**purchased** 85:8 148:23 150:10,22 151:3 157:4,10
**purchases** 148:23
**purchasing** 180:19 180:21
**purpose** 11:2 146:11
**pursuant** 2:4

**put** 75:7 86:2,11 117:23 124:22 139:19 148:12 152:14 153:2 161:22 168:19 169:4,8,12,15,18,22 179:6,10,12,14
**putting** 161:17

**Q**

**QUEENS** 195:6
**question** 7:14,16 8:8 8:20 10:8,12,15 11:3 23:3,5 30:13 36:9 39:13,14 41:19 41:22 43:12 44:7 45:24 47:14 58:17 59:7 60:4,7,10 66:9 74:15,22,23 75:10 75:13,14,15,17,23 75:25 83:4 106:15 106:17 111:20 117:13 122:16,18 122:22,23 130:3 139:10 157:2 165:3 168:6 172:21 176:11 178:4 188:7 190:20 191:18 192:12
**questioned** 166:20
**questioner** 41:20 44:9
**questioning** 43:8 71:18 130:11
**questions** 5:12 7:9,19 8:10,24 9:4 11:11 19:23 42:7 61:4 71:13 106:15 107:22,24 127:3 135:11,15,21,23 136:10 143:16,19 185:10,15,17,20 192:10,14
**quickly** 40:10
**quite** 69:5
**quote/unquote** 56:5 133:23
**quoting** 62:13

**R**

**R** 3:2,17,19 4:2 195:2
**raise** 115:10
**raised** 162:12 185:13
**Ram** 159:9
**rate** 36:23
**reach** 92:20
**reaching** 38:16 68:2
**reaction** 40:11
**read** 15:6 19:19,21 23:4,6 39:4,15 60:5 60:7 61:3 62:9 68:8 74:14,15 75:16,17 75:23 108:22 109:10 122:16,18 123:21,23 126:23
**reading** 19:22 61:19 62:14 127:12 128:21
**ready** 71:22
**real** 19:25
**really** 27:20 52:14 90:23 180:19
**realm** 129:23
**REALTY** 1:7 3:12
**reason** 11:9,17 27:10 32:10 77:14 104:24 107:20 120:24 129:6 147:5 157:19 165:17 174:8,11 196:5
**reasons** 77:17 157:25
**recall** 9:22 12:14,21 13:3 14:7,19,22 15:5,25 23:9 26:2 31:20 37:21 41:24 48:19 49:12 55:3 60:2,17,19,20 62:8 62:14 63:10,21 74:4 74:5 78:4 79:16,17 79:20,22,24 80:4,13 83:21 89:21 90:2,9 90:12,14 91:5,9 93:14 94:3 96:9 104:3 105:13,16 107:13 109:4,9,16 110:5,6 111:16,19 112:24 113:12 117:16 121:18,21 121:24 122:4 131:8 139:14,19,21 141:20 142:3 143:17,18,20 145:10 155:19,21 156:2,5,21,22 157:18,22,23 158:13 159:23 161:8 163:11 171:23 175:4 176:10,13 177:19 180:7,13 181:14,16 181:23 186:20 187:14 190:24
**recalling** 188:12
**receipt** 81:5 83:18,25 84:11,15,18 169:25
**receipted** 170:7
**receipting** 83:17 84:14
**receive** 59:8 101:11 116:20 117:7,14 132:2
**received** 25:9 49:5,8 58:14 117:2 121:16 176:22
**receiving** 121:15
**recess** 68:6 100:23 114:7 182:2
**recognize** 116:6 118:21 123:8 191:22
**recollection** 10:18,22 13:6 24:13 26:25 51:15 57:25 77:8 81:9 88:15 94:7 98:5 103:11 117:6 121:14 130:20 131:6 145:7 171:22 184:23
**record** 6:17 12:22 28:11 38:17,20 39:4 43:7 46:12 47:4 61:10,23 62:2 67:7 126:11 128:23 134:7 149:25 170:10,15,17 195:14
**recorded** 169:19
**records** 57:22
**red** 74:7 115:10
**refer** 9:15 16:3 61:2 62:11,21 167:11
**reference** 124:16
**referenced** 26:5
**referred** 55:3 56:5 60:7 74:15 75:17 122:18 127:15 145:5
**referred-to** 23:5 39:14
**referring** 6:23 8:22 9:16 16:3 41:17 42:15 47:22 60:12 99:13 117:17 119:8 119:19 121:8 129:12,14 136:25 151:9
**refers** 118:23 129:13
**reflect** 61:23 62:2 96:7 128:23
**reflexes** 45:8
**reflexive** 44:17
**refresh** 24:12 26:24 36:22 57:25 88:14 103:10 121:14
**refused** 42:9
**regard** 144:9 185:12
**regarding** 44:23 47:24 56:18 70:10
**regardless** 37:4
**registered** 57:24

**regular** 140:17 155:7
**regularly** 172:10 173:20,23 178:12
**related** 7:11,21 9:7 195:17
**relates** 132:10 166:15
**relation** 16:21 60:3 63:5 65:12 91:18 128:12 133:22
**relationship** 13:20 14:12 37:22 85:18 85:22 106:17
**relay** 112:11
**reload** 149:16
**remain** 38:21
**remaining** 33:3
**remains** 59:20
**remember** 12:14 23:14,17 24:5 25:7 26:4,8 28:20 31:15 36:17,25 37:3 47:15 47:19 49:22 63:22 77:7 80:7,11,17 93:22,24 94:9,11 99:16 100:5 101:25 104:12,15,17,18 106:6 109:2,3,6 118:7 122:7 125:10 131:12 132:7,23 133:14 134:3 140:19 160:17,25 163:4,13 170:25 175:4 182:9,10,23 186:9 187:17 190:25 191:3
**reminding** 38:14
**removal** 108:7
**removed** 24:17 53:20 62:22 63:6,25 68:14 72:21 73:17 79:6 93:20 98:25 102:19 106:13,23,25 109:4 109:7 160:18 187:23
**removing** 105:17,22
**rent** 15:13
**reopening** 135:9
**repair** 84:7 105:4 156:25 157:13 158:12
**repaired** 154:11
**repairing** 62:18 153:14
**repairs** 103:16,23 111:7,10
**repeat** 7:16 74:13 75:15 83:22 96:4 107:10 139:10
**rephrase** 10:13 18:19 32:19 36:2,7 58:17 72:18 74:10,18,23 122:22 130:4 180:17
**rephrasing** 74:11,19
**replaced** 147:23 154:19
**report** 51:6 54:11
**reported** 51:9 143:7 143:9
**reporter** 2:6 10:4 23:6 39:3,15 42:25 60:8 74:16 75:18 122:17,19 195:8
**repossessed** 183:7
**represent** 24:11 25:23 38:11 42:13 57:21 60:14 61:17 87:21 108:15 118:19 119:20 123:19 126:5,10 130:17 136:7
**representation** 192:8
**representations** 87:6
**representative** 1:5 112:24 113:7,13
**represented** 46:20 78:15 103:9 164:25 165:6
**representing** 6:14 42:2 43:17 44:4,5 44:15
**represents** 78:11
**repugnant** 164:6
**request** 29:10,19 30:4 33:24,25 34:3 59:18 102:8,12 176:17
**requests** 29:22 194:10
**require** 155:5
**required** 109:23 139:15 152:18 153:24
**resale** 159:13
**reserve** 44:22
**reserved** 5:13
**reside** 15:9
**residence** 26:24 27:5 27:7
**resolve** 52:19
**resolved** 28:18 53:6
**respect** 110:10 114:20 164:7
**respective** 5:3
**respectively** 121:5
**responded** 122:25
**responding** 122:12 123:4
**response** 44:11
**responsibilities** 97:17
**responsibility** 149:21 172:9
**responsible** 82:25 83:6,12 95:20 97:2 118:14 122:9 127:18 174:20
**responsive** 122:22
**rest** 20:8
**restraining** 112:4
**rests** 46:24
**result** 29:19 109:9 110:11
**resumed** 114:11
**retained** 77:13 194:23
**retainer** 14:2,5
**retaining** 77:16
**retired** 17:11,13
**retrieve** 93:15
**return** 59:24 82:4,7 100:2 130:12,19 175:12 176:4
**returned** 99:22 130:16 182:15
**returning** 98:14
**returns** 174:16 176:15 194:13
**review** 12:2
**reviewed** 74:6
**rid** 25:15
**right** 6:21 28:15 31:18 35:19 44:22 44:25 45:2,11 46:2 47:8 48:8 56:6 58:11 59:2 63:15 64:21,22,24 65:14 65:17 71:14 72:13 84:11 95:18 96:24 101:15,18 104:2 106:13 110:18 111:8,11,22 116:23 118:23 119:10 121:5,12 124:3,6 125:7,17 129:20 134:12 135:8 137:14 139:5 142:6 154:24 157:10 158:5 160:4 161:18 164:2 165:16,16,21 165:23 168:18 172:17 177:13 189:14,16
**rights** 22:12,14
**ring** 26:20 27:22 111:24 126:15 131:10
**rise** 35:2
**risk** 46:17
**road** 26:10 193:3
**Robert** 1:3 3:4 7:5

112:19
**role** 87:13 106:21
**roles** 119:10
**Ron** 113:24 121:4
**Ronneburger** 3:24 43:4 113:3 135:22 185:19 192:23
**room** 81:8,13 91:15 91:19 106:3,11 113:10 140:5 148:9 156:15 178:8 184:15
**rooms** 156:10 162:5
**ROSLYN** 1:16
**rotate** 56:9
**roughly** 187:11
**ROUTE** 1:7 3:13
**rubber** 169:23,24 170:7 179:17
**Ruderman** 3:15 41:7 41:13,13 42:24 45:9 45:10,22 46:4 47:10 60:21 66:13,17,25 67:3 68:2,5 74:25 114:4 135:14,15,19 136:4,6 163:15,22 163:24 166:18 176:14,18 181:24 182:3 185:10 188:14 190:21 192:13,20 194:8
**rules** 9:24 11:7
**ruling** 42:11 73:5
**rulings** 135:9 185:12
**run** 109:23 146:2 149:18 173:7,11
**running** 153:20
**Ruthayn** 2:5 6:3 42:25 195:8,25

**S**

**S** 3:2 4:2,5 6:2 114:11 194:15
**safe** 91:13,16,18,21 91:24 92:3,6,9 168:10,13,20,21 169:4,6,8,12,16,18 169:20,23 170:2,11 170:23,23 171:3,6 171:13,15,24 178:5 178:7 179:3,5,11,21 180:2,5
**SAGE** 3:3
**salary** 36:23,24
**sales** 1:3 3:4 7:3 121:12 136:18,21 137:2,3,4,6,8,21 139:22 141:11 178:11,15,22 181:6
**salesman** 83:14 132:16 178:16,16
**salesmen** 137:9 168:8 169:13 178:14 179:12,16
**salespeople** 51:21 103:25 155:8 178:18,23
**salespeople's** 137:13
**sanctioned** 8:15
**Sarah** 1:13 48:19 90:10 140:12 144:5
**sat** 136:16
**Saturdays** 33:6
**savvy** 96:18
**saw** 107:2 125:22 130:22 169:22 190:15
**saying** 8:3 41:9,15 73:7 78:10 79:7 150:18,21 162:13 164:16 165:12 190:14
**says** 116:17 117:11 119:9,12,14 124:5
**scene** 72:19
**schedule** 55:2,7 56:9
**school** 33:17
**scratch** 152:19
**screen** 60:25 61:15 102:9 117:18 126:20 164:2 194:12
**scroll** 61:19,21,21,21 62:4,4,4,5,5 126:24 127:2 128:9 164:4
**scrolled** 62:2
**Scrolling** 127:9
**se** 4:10
**sealing** 5:8
**search** 17:24 22:7,10 22:13,17 30:25
**seated** 138:10
**seats** 138:8
**second** 3:23 10:4 56:24 96:4 104:20
**secondary** 22:18
**securing** 130:18
**security** 20:18 94:21 94:23 119:25 134:19,20
**see** 21:17 26:6 39:9 42:19 61:8,14 77:5 115:25 120:2 124:17 131:3 134:4 137:25 142:23 143:22 144:10 148:14 149:12 152:17 155:8,11 156:8 161:11 163:25 164:10 169:9,15 170:6,17 171:12 173:16 179:10,14
**seeing** 163:13 166:5
**seek** 29:16 72:4,8 73:8,11
**seeked** 13:4
**seeking** 130:21
**seen** 13:22 14:2 93:7
**sell** 84:23 180:20
**selling** 85:3 124:14 155:8 180:16
**send** 147:16
**sent** 149:10
**separate** 26:6 174:15 174:16 176:3 178:23
**September** 99:4,8,17 108:20 130:18 142:8
**serve** 105:3
**served** 30:25
**service** 19:5 33:11 76:11 84:9 101:15 103:22 105:4 111:7 111:10 137:24 153:24 160:15
**serviced** 87:2 146:6 150:4
**services** 13:8,11 20:19 25:3 59:5 131:24 147:10 174:6
**servicing** 84:7 146:13 146:14 153:14
**serving** 21:7 22:7
**session** 114:9
**set** 62:19 72:18 134:20 195:12,21
**setting** 14:12 191:9 191:12
**settled** 22:23
**settlement** 99:7,18,21
**Shalom** 2:6 6:4 42:25 195:8,25
**Shanks** 3:8 136:7
**share** 61:13 123:15
**sharing** 163:19
**Sharon** 112:5
**she'd** 141:5
**sheet** 144:19 150:17 196:2
**shelf** 168:25
**shooting** 22:8
**shop** 146:4,7 147:16
**shopping** 160:9
**short** 68:6 100:23 182:2
**shorthand** 2:6
**shortly** 31:9

**shots** 102:9 194:12
**show** 88:11,19,20,24 89:2 95:23,24 97:5 97:8 98:8,13,19 100:3 112:14,18 124:2,9,11,15 125:25 163:14 166:20,23,24 167:2 167:4,18,24
**showed** 74:4 109:22 163:2 185:5
**showing** 118:16 128:24
**shown** 73:20,22 186:6 190:25
**showroom** 148:13 167:20
**shut** 180:9
**shy** 155:4
**sick** 115:20
**side** 65:19 99:21 137:15 139:5
**sidewalk** 65:24 68:16 70:5 73:2
**sign** 14:5 94:15 122:2 122:5
**signature** 62:6 79:22 183:17
**signed** 14:2 25:10 96:24 121:22 175:19,20
**signing** 60:2 175:21
**Silverado** 125:16 152:7 182:20,25
**similar** 70:9 71:3 144:22 179:17
**simultaneously** 70:23 71:7
**sir** 20:20 26:22 27:2,6 27:14,23 28:5,16 35:17 36:19 37:2 48:3,6,13,23 49:4,7 49:10,14 55:12,24 56:15,19,23 57:3,14 71:23 77:24 85:20 87:20 96:25 99:6,19 100:6 101:10,13,16 101:19,22 102:2 103:24 104:14 107:16 110:16 118:14 120:3 121:9 123:12,25 125:24 126:9 130:3,11 135:7 136:14 141:19 143:14 146:5,9 150:20 152:11 156:19 157:2 158:18,25 160:3 161:7,14 162:24 163:6,13 164:3,11,15 171:4 174:4 178:3 180:3 182:21,23 183:8,11 183:15,18 184:7,22 185:9 186:4,10,24 187:8,10 190:19 191:4,24
**sit** 166:14
**sitting** 46:14 138:14 168:25
**situation** 41:24
**situations** 52:20
**six** 31:22 40:13 140:3 191:14
**skip** 131:3
**slap** 20:2
**slip** 81:4,7,10 117:20 118:12 153:17 172:20 184:15,21
**SMITHTOWN** 1:17
**so-called** 189:22
**socialized** 187:9
**software** 109:23 110:2,4
**sold** 52:18 83:13 127:19 128:4,14 156:24 158:11 182:14,16 183:2,4
**sole** 21:12 87:24
**solely** 49:6 58:14 80:25 96:6
**somebody** 38:7 113:20 138:5 151:2 155:20 156:14,17 159:19 161:21 170:3 175:6 177:18
**someplace** 160:10
**something's** 154:16
**soon** 98:19
**sorry** 62:2 70:16 107:10 120:8 122:21
**sort** 19:13 22:11 84:16 139:20
**sought** 165:18
**sound** 126:7
**sounds** 70:9
**source** 58:19
**South** 26:10
**space** 138:18 181:22
**speak** 14:23 18:16 48:16 52:15 68:4 87:16 123:11 168:7 173:18 181:8,15
**speaking** 48:10 100:7 105:20
**special** 167:3,5
**specific** 90:25 136:16 182:19
**specifically** 41:17 50:14 69:4,8 101:17 163:17
**spend** 110:25 145:20
**spoke** 66:2 92:24 156:14
**spoken** 165:15
**sporadic** 105:10
**sports** 33:17
**spot** 106:19
**spreadsheet** 95:17,21 95:25 96:7,12,15 97:25 144:19,20,21 144:22 145:4,9
**spring** 141:18
**ss** 195:5
**stack** 22:9
**stand** 8:7,15 138:6
**standing** 64:20 72:25 139:22
**Star** 183:14
**start** 31:25 58:4
**started** 18:15 19:4 26:14 30:20,24 31:2 31:15,16 40:9 41:10 43:13,25 50:18 54:23 58:9 110:12 141:16 146:20,23 151:25 191:15
**starting** 18:16 33:18 61:16 128:6 145:25
**state** 2:7 6:4 23:15 48:2,12 82:20 108:15 129:15 195:4,9
**stated** 68:16 129:7 145:23 163:7
**statement** 20:13 60:16,17,18 166:8 166:10
**statements** 59:16 127:4 128:12 194:12
**states** 1:1 129:5
**stating** 6:5 151:19 163:11
**station** 64:18,19,20 65:12
**status** 22:21 28:17 96:2
**stay** 55:11,16 137:23 146:21,25 192:17
**stayed** 158:10
**stealing** 187:16
**step** 40:3 52:21
**stepped** 12:24 13:14 34:16 35:19
**stint** 32:21
**STIPULATED** 5:2,7 5:11
**stomach** 34:11,14,15

**stood** 136:17
**stop** 7:22 8:3,4 34:3 42:9 107:14
**stopped** 24:18,20 88:25 102:17 103:7 103:8 141:24 142:4 177:3,6
**stopping** 33:14
**store** 172:22
**Street** 1:7 3:12 4:4
**strictly** 69:25 192:7
**Struts** 147:13
**stuck** 159:10
**stuff** 16:2 19:2,5,6,16 19:18 20:24 21:9,11 33:18 49:2 50:20 53:20 64:2,4,9 93:17,18,20,20 95:23 109:12,19 114:22 121:20 134:20 145:2,25 154:14,18 155:3 167:7 177:22
**subject** 9:9 22:12 73:5 135:8 185:11 192:2,7
**subjects** 7:12 9:7
**submitted** 60:15 94:19 163:3 186:7
**submitting** 60:17,22
**Subscribed** 193:12 196:19
**substance** 131:23 133:11
**substantially** 130:6
**substantive** 187:6,12
**suddenly** 161:12
**sued** 22:17 48:12
**suggest** 8:7
**suggestion** 39:11
**Suite** 3:14,18 4:4
**sum** 131:22 133:10
**summer** 142:10,10
**Sundays** 33:6
**Sunrise** 1:3,15,18 3:9 3:18 16:11 32:7,24 34:19,23 35:3 48:16 48:17,20 50:9 51:3 109:24 110:4,7,10 111:4,11,17 113:2 115:9 116:18,21,25 117:4,8,12,15 118:3 120:6 144:23 145:8 145:13,17 146:3,10 146:19,23 147:2,4,6 149:10,15 156:25 157:16 158:12,17 159:3,12,17 160:16 178:5,10 180:8,10 181:21 183:13,20 184:3 185:5 190:7 190:15
**Superb** 1:3 3:4 6:14 6:23,24,25 7:9,19 9:4 22:2 24:18 25:2 25:11 26:5,6,7 32:3 49:16,18,24 50:5,11 51:16 57:2 63:8,11 63:17,23,24 65:4 72:20 76:23 79:7,11 80:15,20 82:2,4 86:23,24 87:7,13,22 88:15 89:20 90:4,19 91:3,7,14,18 95:3 98:4,12,14 101:8,12 102:14,18 112:25 120:7,8,10,15,16,21 122:9,13 125:11 126:17 129:4,25 130:6 131:10,21 132:7,19,22,24 133:16 144:9 145:3 145:6 158:23 166:21 167:15 172:7,8 177:5 181:18 182:19 184:2,4,10 187:2 188:25 196:4
**Superb's** 89:6
**supposed** 149:14 184:18
**Supreme** 112:5,8
**sure** 19:16 24:14 25:20 35:7,9,12 36:10,10 68:12 69:10 81:12 84:16 89:13 98:15,18 134:21 135:18 142:22 146:15 149:23 162:9,21 179:12 183:4 185:16
**surgery** 34:8,10 35:18 82:5 185:24
**surprise** 82:23
**surrendered** 78:19
**SWAT** 17:20,21,24 30:16,17,20,24 31:2 31:5
**sworn** 5:5 6:3 60:22 94:20 114:12 193:12 195:12 196:19
**Syosset** 1:15 78:18
**system** 84:4,5,6,11,19 97:22 153:10 158:19

**T**

**T** 1:25,25 2:1,1 6:2 114:11 194:15 195:2,2
**T.V** 169:2
**tab** 96:21,23
**take** 10:25 11:2 44:19 48:22 68:5 69:18 95:12 97:7 107:3,14 110:20,24 116:13 118:12,15 146:12 160:10 162:13 166:18 169:5 171:12 172:20 174:12,17 179:21 179:24 181:24 186:2
**taken** 38:2 54:11 68:6 76:7 100:23 127:20 145:23 156:23 167:15 171:15,24 182:2
**talk** 21:16 47:4,4 53:5
**talked** 52:14 182:18 188:10
**talking** 8:3 43:25 58:22 154:14,15 164:5 166:6
**target** 22:16
**task** 84:14 100:18
**tasked** 98:11
**tasks** 89:3,5
**tax** 59:23 174:16 175:11 176:3,11,15 177:25 194:13
**taxes** 174:20,23
**team** 1:3 3:4 7:3,3,10 7:19 9:5 17:20,22 30:17,24 105:4,4 124:16 125:4
**teams** 33:17
**tech** 96:18
**Tekion** 84:4,15,18 96:2,7,10 97:20 98:2
**tell** 10:13 18:20,21,24 32:16,20 44:8,13 47:16 51:13,22 54:3 54:6 77:3 88:17 91:13 105:20 106:2 106:10 110:3 113:16 124:24 147:13 162:4 165:10 177:15
**teller** 81:4 117:25
**telling** 12:7 39:22 98:10 109:13
**temporary** 112:4
**ten** 26:18 80:16 90:17 129:3,16 150:22 161:16

**term** 43:25 62:13 113:19 131:13 153:5 158:16
**terminal** 138:24
**terminate** 105:8
**terminology** 17:22
**terms** 91:5,16 117:24
**test** 152:12
**testified** 6:6 47:12 54:25 68:13 82:24 101:14,17 114:13 125:6 134:11 135:2 141:16 144:12 158:22 160:18 172:3 176:19 180:18,22 182:4
**testify** 11:15 99:10 122:3 162:18
**testifying** 9:11,20
**testimony** 9:9,16,18 22:25 49:17 55:3 68:9 84:22 101:3 130:19 131:16 144:9 169:3 176:2 195:14
**text** 14:17 90:5,7,10 90:13,16,18 91:2 102:3,9 134:4
**texted** 90:24
**thank** 42:4,18,19,21 46:4 47:9,10 71:16 71:20 76:4 135:11 185:13 192:15,20 192:21
**thing** 35:14,21 41:10 44:3 110:15 158:4 165:16,16
**things** 44:16 154:25 186:3 192:3
**think** 11:17 12:11 22:14 29:23 41:3 46:23 49:21 54:2 57:19 59:25 72:6 80:6,11,12 88:4,5 90:22,23 96:17,21 103:7 104:10 105:23 106:5,8,18 118:9 124:20 125:5 125:15 129:8,10,11 129:17 130:15 132:25 135:16 139:17 140:6,11,18 141:22 142:9 143:3 145:6 147:18 148:9 148:11 157:19 158:16,23 159:8 161:22 163:17,22 166:25 168:17 172:25 173:22 176:7 180:18 181:22 182:5,20 184:4 185:14 188:9 188:10 189:5,7 190:21 192:23
**Third** 10:8
**THOMAS** 1:14
**Thomasson** 1:13 3:17 3:19 7:13,15,22 8:2 8:6,9,17 12:15,22 13:7,11,20 14:6,13 14:18,21 19:20 38:8 38:12,19,24 39:17 40:2,7,9 41:2,14 42:25 43:15,16,18 43:19 44:16,20 45:6 45:10,13,23 46:5,7 46:18,23 47:7 60:21 66:5,10,13,15,23 67:6,11,12,19 68:17 68:19,20,23,25 69:4 70:16,21 71:4,11,16 72:12,24 73:8,12 74:9,17,21 75:8,9 75:23 76:4,9,21,25 77:9 78:15 86:20 92:24 93:11,17,19 93:24 94:8 108:6 115:12 133:16,19 135:13,24 163:4,7 164:5 165:18 166:15 181:17 185:14,16,21,23 188:20,21,23 192:10,15,25
**Thomasson's** 45:16
**Thommason's** 78:7
**thought** 58:24 86:17
**threat** 133:2,4,12,14
**threatened** 133:7,13 134:5
**three** 17:14 31:8 33:4 35:12 36:13 56:5 66:4 68:18,19 77:7 79:13 89:15 104:21 119:19 128:6 142:5 155:16 157:21,25 168:22,23 172:3 190:13
**threw** 64:10
**throat** 185:25
**Thursday** 56:10
**ticket** 116:8,17 117:5 117:9,11
**tied** 86:17
**time** 11:2 18:6 25:4 25:22 30:18 31:12 32:15 33:15 38:5 40:18,19 53:11,12 55:15 56:20,24 58:4 59:23 64:6 65:24 66:6 70:22 71:8 73:25 77:4,10 79:3 79:8 80:10,19 87:10 87:12 88:10 91:10 97:7 98:11,14 99:15 100:21 103:13 104:2,8,18 110:18 110:21,24,25 126:17,18 130:8 135:12,18 138:12 140:12,23,25 141:2 142:19,23 145:14 145:16 147:15 148:5 156:7,22 158:2 162:16,19,23 170:12 177:5,7,23 180:19 184:4 185:11,13 186:3,12 186:19 192:11,20 192:25 193:5
**timeframe** 23:13 24:4,6 31:13 103:12 104:23 105:15 156:5
**times** 14:15 35:13 40:13,15 41:3 52:8 55:7 77:5,7 155:16 155:17 156:3 166:20 172:4 179:22 186:6 187:4 187:11 190:13,14
**tires** 147:14 151:20 154:6
**title** 106:20 143:5
**titles** 128:14,19
**today** 6:11,18 7:9,19 8:24 9:4,9 10:18 11:18 13:7 49:17 50:9,10 125:23 135:12 166:14 185:4 186:6 191:3
**today's** 11:10,23 12:6 12:19 14:24
**told** 12:25 13:2 19:2 19:7 21:8 23:11 26:23 42:8 47:17 50:24 52:4 53:24 58:10 63:20,23 78:5 86:24 87:3,4 93:11 126:13 129:22 131:9 133:9 155:2 184:20 186:18 189:25 190:3
**Tom** 191:16,19,21
**tomorrow** 70:12,17 71:9
**ton** 171:18
**Tony** 7:5,10,19 9:5 88:6,7
**tools** 137:18

**top** 61:16 96:24 123:24 127:9 128:6
**topic** 114:17
**total** 36:13
**totally** 175:19
**touch** 97:13 150:14 154:4
**tour** 55:2 56:4
**tours** 33:12
**track** 95:18 101:9 153:13
**tracking** 95:3,7
**trade-ins** 127:20
**traded** 181:11
**trained** 164:7
**training** 17:16,20 30:16 31:4,5 54:23
**transcript** 19:22 195:13
**transmission** 151:20
**transpired** 105:21
**transport** 89:9,17 151:11
**transporter** 55:19,19 149:2,3,6,15,17 152:21
**trial** 2:3 5:13
**tried** 55:19 145:3
**truck** 125:17 159:9
**trucks** 159:10,16
**true** 44:19 127:17 195:14
**truthful** 11:10,18
**truthfully** 11:15
**try** 52:18 144:10 152:22 154:4
**trying** 66:7,25 67:13 67:23 80:12 90:22 103:6 125:15 131:3 141:22 154:9 159:8 165:13 180:20
**Tuesday** 56:10
**turn** 168:19
**turned** 94:25
**Twenty-one** 24:6
**Twenty-two** 15:16
**twice** 27:9 97:12 127:8 155:23 172:8 172:25 187:13
**two** 17:8 20:8 24:24 28:9 35:12 39:2 40:14 43:4,23 44:16 44:20 61:24 79:13 89:10,15 98:20 104:10,20 119:8 126:20 138:8 155:16 158:24 160:14 178:11,23 182:18,24 190:10 190:17,22
**type** 19:10 48:24 137:24 145:8 147:10 152:2,4 154:6 155:5 160:23
**types** 154:22
**typically** 55:2 116:23 146:18 159:12

**U**

**U** 1:25 2:1
**UEA** 1:17
**Uh-hum** 144:15
**ultimate** 86:14
**ultimately** 86:16 128:18 149:14 182:16
**unaware** 78:16
**underground** 129:9 129:15
**underneath** 152:15
**understand** 7:12 8:23 9:7,11 10:12,15,23 11:4,6 18:19 21:6 24:16 28:13 30:13 46:18 60:4,10,12 72:14,16,17 75:10 75:12,24 83:4,5 84:14 86:11 115:4 117:11 130:3,10 136:13 144:19 154:9,11 157:2 165:2,13 177:24 178:3 180:12,16
**understanding** 30:15 71:25 78:6 82:19 84:13 86:4 87:12 102:23 105:7,21 107:19 114:19,24 120:9 169:3 174:21
**understood** 10:15 17:21 22:20 25:6 28:13 70:15 71:10 190:20
**undoubtedly** 44:24
**unfounded** 28:19
**Uniondale** 3:23
**unit** 17:16
**UNITED** 1:1
**universe** 47:16 89:22
**unload** 149:16
**unrepresented** 46:15
**unresolved** 45:12
**Unsure** 56:3
**update** 95:25 96:2,6 96:7
**upset** 34:3,5
**Urrutia** 1:3 3:4 4:9 7:5 43:3 73:19 87:9 88:3,6,7 92:13 112:12 123:2 132:6 189:11
**Urrutia's** 87:13
**use** 10:25 15:21 40:22 43:24 96:2,15 97:25 101:12,12 123:13 131:24 145:8 159:2,5,20,21 160:6,6,13
**usually** 33:12
**utilized** 83:25 84:19

**V**

**v** 196:4
**vacation** 25:4,6 130:15 131:20
**Varia** 16:25
**various** 40:14,15 41:3 77:17 79:12 84:24 119:20
**Vasquez** 121:11,12
**vAuto** 101:6,8,12
**vehicle** 89:16 95:4 96:2 98:2 122:10 125:12 148:17 149:4,22 150:2,10 150:15,16 152:5,9 152:10,12,14,24 154:16 157:10 158:17,20,23 159:2 159:5 160:2,5,7,12 182:8
**vehicle's** 97:21
**vehicles** 84:8,24 85:4 85:7 88:15 89:5,12 95:10 96:8 97:4 98:6,12,14 99:22 109:4,7 111:16 125:7,9,19,20,21 128:3,14 129:3,15 129:16,18 130:2,6 130:13,22 148:14 149:6,20 151:3 153:14,22,23 155:9 155:12 156:23 157:4,9,19,24 158:8 158:10 159:5 160:14,15 167:5 182:11,12,19,24,25
**vendor** 153:16
**Ventimiglia** 119:24 120:4 140:11 162:22 169:14
**Ventimiglia's** 120:10
**verbally** 144:16
**versa** 117:4
**vice** 117:4 119:23
**VIN** 95:9
**visited** 113:7,13
**visiting** 112:25
**visual** 152:17

**voice** 10:3
**voluntarily** 6:20

**W**

**W** 6:2 114:11
**W-E-I** 26:21
**W2** 57:7
**wait** 39:6 149:15 171:18
**waiting** 137:22
**waive** 45:2,25 46:9 47:3,3 66:8
**waived** 5:9 6:20 39:25 43:10
**walk** 167:22
**walked** 21:14 161:23
**wall** 64:25 168:18
**want** 10:20 44:21 45:10 50:8,10 70:17 106:9 108:21 124:6 135:11,14,17,20 144:9 159:22 163:14,21 167:11 185:16 192:18
**Wantagh** 3:18
**wanted** 46:5 70:23 177:16 186:3 189:11
**wants** 38:15 42:15 45:11
**warehouse** 153:21
**warrant** 22:7,10
**warrants** 17:25 30:25
**wasn't** 22:14 24:14 25:17 33:19 34:3 35:14 38:4 76:18 77:3 82:2 83:7,9 105:3 118:8,14 120:22 122:21 138:13 142:19 145:25 161:10 162:3 170:3 173:20 173:23 175:8 183:6 183:6
**waste** 40:18
**way** 11:24 31:3 39:9 63:11,17 70:22 111:5 117:22 120:13 134:18 152:22 174:14,23 195:18
**ways** 33:23
**we'll** 20:5 176:16
**Wednesday** 56:10
**week** 49:5,18 55:8,8 56:6 134:22 142:14 142:17
**weekly** 36:23,24 37:6 56:2
**weeks** 40:13 104:20 133:25 134:2
**Wei** 26:20
**WEIR** 4:3
**Wendy** 105:24 106:2 106:9,16,23,25 107:20 140:19,20 140:22 141:3 143:11,12 160:18 161:2
**Wendy's** 106:21
**went** 19:17 25:7,8 30:17,20,24 52:17 53:8 74:7 80:6 93:2 95:6,22 100:14 102:18 105:11 123:8 131:19 140:11 141:10 153:15 156:10 168:18 170:2
**weren't** 110:13 114:22 130:17,25 137:23 138:21 151:5 156:11 180:19,21
**Westbury** 27:5,8
**WHEREOF** 195:20
**white** 144:24 159:7
**whiteboard** 95:10,13 95:23
**wholesale** 84:24 85:4 85:8 128:3 130:21
**wholesaler** 85:7
**wholesalers** 84:24 85:4 126:14,16 128:15
**wholesaling** 127:24
**Wicks** 8:14 38:22 99:9 135:10
**wife** 15:18 175:16,17
**willing** 20:7
**windshield** 19:18
**winter** 141:17
**wiper** 154:3,6
**wishes** 38:24
**withdraw** 130:4
**withdrawn** 23:20 57:5 80:2 115:15 126:21 139:23 145:12 148:21 176:20 178:4 189:25
**witness** 4:10 7:25 8:7 38:10,13 39:19 41:10,19,22 42:2,3 42:12,13 43:8,17 44:7,13 45:4,14,17 66:11 67:20 68:21 71:12 74:21 75:3 107:6 108:24 123:22 126:25 128:8 194:4 195:11 195:15,20
**woke** 50:22
**word** 17:18 19:21,21 101:6
**words** 10:5 67:16 72:8 73:14 86:15 150:16
**work** 15:25 16:2,3,7 17:22,24 18:7,12,17 18:22 19:10 21:6 24:3 29:17,20 30:25 31:5,16 33:4 34:7 34:22 35:9 37:14 49:24 50:3,12 51:25 54:18,19,20 55:16 55:22,25 56:7 66:6 66:15,23 67:4,9,10 67:17 69:12 75:21 76:2,7,7,11 82:4,7,8 86:22 91:16 95:24 96:8 98:24 100:8,9 100:10 102:14 104:8 115:17 131:17 132:20 138:16,19 140:22 141:5,6,10,17 145:13 146:24 147:20,21,22 151:20,21 153:12 153:18 178:12 190:10,17
**worked** 19:11 31:20 31:24 32:6,25 37:5 37:10,19 54:22 56:2 56:4 64:15 65:20 76:22,23 77:6 90:5 97:9 101:14 102:25 104:16,19,21 106:3 106:5,11 107:23 116:23 125:11 132:19 136:15 143:3 167:6 177:5 178:18,23,24 188:25 190:8
**working** 18:15 19:8 23:24 24:9,18,20 27:11,16,24 31:15 31:25 33:3 34:4 38:4 48:19,20 55:21 56:20,24 58:4,9 69:9,15,15 70:6 102:17,20 103:4,8 103:14 104:5 106:21 120:21,22 141:24 142:4,4,18 151:12 177:3,6,23
**works** 13:20
**wouldn't** 118:13 129:10,11 146:18

**wrist** 20:2
**write** 144:25 148:17 148:18 150:3 151:19
**writing** 29:8,25 59:17 67:10,18 102:7 176:16
**wrong** 34:11 165:19 165:20
**wrongdoing** 187:25
**wrongful** 163:8 166:7
**wrote** 95:9 117:25 118:5,6

**X**
**X** 1:2,20 194:2,15

**Y**
**yeah** 19:12 154:13
**year** 24:5,15 31:12,16 31:18,21 59:25 141:21 156:6 182:8 182:22
**year-and-a-half** 31:12
**years** 10:20 15:16 17:14,19 26:18 31:8 90:17 191:14
**yes-or-no** 188:7
**York** 1:1 2:7 3:5,14 3:14,18,23 6:4,6 15:12 57:24 195:4 195:10

**Z**
**Zizmor** 3:8 136:7
**zoom** 2:5 38:23 123:20

**0**
**09** 28:21

**1**
**1** 61:2,6 194:18
**1,000** 37:2 49:5,18,21 134:22
**1:31** 114:9
**10** 23:12 28:21 116:12
**10:05** 1:22
**100** 148:7,8 175:24 176:3
**10170** 3:14
**102** 187:16 194:12
**108** 194:18
**1099** 57:10 177:16
**11** 23:12
**112** 3:18
**11423** 3:5
**115** 194:19
**11553** 3:23
**11793** 3:18
**118** 194:19
**11950** 6:6
**12** 23:12 127:12
**12:30** 100:22
**12:52** 114:7
**123** 194:20
**1239** 1:6 3:11
**126** 194:20
**128** 108:22
**13** 128:7
**1339** 4:4
**136** 194:8
**15** 99:8,17 129:3,16 130:18
**1580** 1:5 3:10
**1581** 1:5 3:10
**1591** 1:6 3:11
**1632** 1:6 3:11
**17** 25:24
**176** 194:13
**17th** 73:25
**18** 1:21 128:10 196:4
**180** 32:7 78:18
**18211** 3:5
**189** 1:3,18 3:9 32:7 116:17 117:12 118:3 190:7,15
**19107** 4:5

**2**
**2** 108:12,13 194:18
**2:05** 134:8
**2:10** 134:8
**2:23-cv-6188** 1:11
**20** 17:19 99:13 128:13
**2004** 28:2
**2007** 30:17,18,21 31:2 54:23,24
**2008** 28:21
**2010** 150:18 152:7
**2021** 57:23 58:8,11 64:16 141:18 176:25 177:11
**2022** 105:15 109:8,15 110:6,9,24 111:4,18 114:20 116:12 141:25 158:6 180:11,14,15
**2023** 24:12 25:24 31:10 53:20 62:22 73:25 99:2,5,8,17 103:10 122:13,24 129:4 130:18 131:18 133:22 166:21 177:11 187:2
**2024** 48:5 99:14 108:20,20 111:8
**2026** 1:21 193:13 195:21 196:4,20
**21** 156:5,7
**21st** 88:14 98:8 124:2 166:21
**22** 24:6 128:21 156:6
**23** 1:7 3:13 15:16 24:14 79:5 128:24 130:7 177:4
**2320** 3:14
**24** 11:14 56:6
**2519** 1:6 3:12
**26** 57:23 58:7
**29** 194:11
**2nd** 70:13 71:3 73:6

**3**
**3** 115:22,23 194:19
**3:15** 181:25
**3:31** 193:5
**30** 128:24 194:11
**31st** 48:5
**3280** 3:18
**333** 3:22
**340** 126:11
**36** 108:18
**360** 28:10
**360s** 28:9,14
**3rd** 62:22 68:14 71:24 92:11,23 98:4 99:2 122:13,24 131:17 133:22 187:2 188:20

**4**
**4** 108:20 118:16,17 194:19
**40** 18:4
**420** 3:14
**446** 1:7 3:13

**5**
**5** 123:16,17 194:20
**5,500** 116:13
**5/21/73** 15:20
**5:00** 55:11,16 70:19
**50** 129:20 130:22 148:10,11,13 154:21,22,24 155:4
**500** 4:4
**59** 194:12
**5th** 195:21

**6**
**6** 126:2,3 194:8,20
**6:00** 55:2,11,17
**60,000** 130:23
**61** 194:18
**615683** 108:20
**63** 6:5 15:10 57:24

**7**
**7212** 116:5 194:19
**735,000** 38:2 47:13 47:24 53:8 54:11 56:13 86:14
**76** 1:7 3:12

**8**
**80** 129:22

**9**
**9:00** 55:2,11,16
**90** 81:12
**911** 30:23

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS INC., et al.

v.

DEO, et al.

## Continued Examination of Dwight Blankenship

*Thursday, March 26, 2026*

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - -

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiff,     Index No.

v.     2:23-CV-6188(JMW)

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOAL COAST MOTORS AUTOMOTIVE GROUP,

(Caption continued)

LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE BIT & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A.189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

\- - -

March 26, 2026

\- - -

CONTINUED DEPOSITION of DWIGHT W. BLANKENSHIP, held remotely via Zoom teleconference, commencing at 11:00 a.m. EST, on the above date, before Marie Foley, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

Little Reporting Company

\- - -

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF PLAINTIFFS SUPERB MOTORS INC., TEAM AUTO SALES LLC and ROBERT ANTHONY URRUTIA:

SAGE LEGAL LLC
BY: EMANUEL KATAEV , ESQUIRE
11821 Jamaica Avenue
Jamaica, New York 11423
EMAIL: emanuel@sagelegal.nyc

ON BEHALF OF PLAINTIFFS 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC:

CYRULI SHANKS & ZIZMOR, LLP
BY: JEFFREY RUDERMAN, ESQUIRE
420 Lexington Avenue, Suite 2320
New York, New York 10170
EMAIL: jruderman@cszlaw.com

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF DEFENDANTS ANTHONY DEO and SARAH DEO DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOAL COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC:

MARWAHA LAW GROUP PLLC
BY: NIPUN MARWAHA, ESQUIRE
1539 Franklin Avenue, Suite 201
Mineola, New York 11501
EMAIL: Nipun@marwahlaw.com

DEFENDANT PRO SE
HARRY R. THOMASSON, JR.
3280 Sunrise Highway, Suite Box 112
Wantagh, New York 11793
EMAIL: hrtatty@verizon.net

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF DEFENDANT FLUSHING BANK:
CULLEN AND DYKMAN LLP
BY: ARIEL E. RONNEBURGER, ESQUIRE
333 Earle Ovington Boulevard
Second Floor
Uniondale, New York 11553
EMAIL: aronneburger@cullenllp.com

ON BEHALF OF DEFENDANT LIBERTAS FUNDING LLC:
WEIR LLP
BY: SUSAN VERBONITZ, ESQUIRE
1339 Chestnut Street, Suite 500
Philadelphia, Pennsylvania 19107
EMAIL: sverbonitz@weirlawllp.com

ALSO PRESENT:
Anthony Deo

- - -

TRANSCRIPT INDEX

PAGE

APPEARANCES........................ 199 - 201

EXAMINATION OF DWIGHT W. BLANKENSHIP:

BY: MR. KATAEV................... 205

SIGNATURE PAGE.................... 260

ERRATA........................... 261

REPORTER'S CERTIFICATE............ 262

- - -

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page Line

- -none- -

REQUEST FOR PRODUCTION OF DOCUMENTS

Page Line

- -none- -

STIPULATIONS

Page Line

203 4

QUESTIONS MARKED

Page Line

- -none- -

D. Blankenship

- - -

11:07 a.m. EST

- - -

THE STENOGRAPHER: If I could ask you to raise your right hand, please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: I do.

THE STENOGRAPHER: Thank you.

- - -

DWIGHT W. BLANKENSHIP, the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. KATAEV:

Q. State your name for the record.
A. Dwight Blankenship.
Q. What is your current address?
A. 63 Pentmoor Drive, Mastic, New

York 11590.

Q. Welcome back, Mr. Blankenship. And thank you for coming in today.

How are you doing?

A. Good.

Q. Okay.

Do you know the reason why you're back for a deposition today?

A. I do not.

Q. Are you aware that following your deposition, the plaintiffs in this case filed a motion related to objections made by Mr. Thomasson concerning questions we asked of you related to your conversations with him and others about this case?

A. Okay.

Q. Are you aware that we made that motion?

A. No. I didn't know -- I knew you have a certain amount of time and we didn't fill the whole time. That's why I thought you were calling me back.

Q. Okay.

D. Blankenship

So you're not aware that we filed any motion, correct?

A. No, sir.

Q. Okay.

I'll represent to you that plaintiffs filed a motion concerning objections raised about attorney/client privilege, and following that motion, it was argued by both sides the judge in this case issued decision, and the decision basically said in sum and substance we're entitled to ask you questions about your conversations.

Okay?

A. Okay.

Q. So, my question is based on that representation, have you reviewed a copy of that order?

A. I haven't seen any orders.

Q. Did anyone tell you about that order and --

A. I knew there was objections made and stuff like that, but I didn't physically see anything, no.

D. Blankenship

Q. Okay.

I'm going to ask you a question, but I need to qualify it, so just give me a second to get the whole question on the record, okay.

Did anybody tell you --

MR. RUDERMAN: Was the witness sworn in?

THE STENOGRAPHER: Yes.

MR. RUDERMAN: I came in a second late. So I may have missed that.

BY MR. KATAEV:

Q. Did anybody tell you about the existence of Judge Wicks' order? And in answering that question, if an attorney that represents you told you, I don't want you to tell me what you two discussed. I only want you to tell me whether someone told you about the existence of the order if it was an attorney.

A. I don't understand the question.

Q. Did anybody tell you that Judge Wicks issued an order about I didn't

D. Blankenship

remember deposition?

A. Not that I'm aware of, no.

Q. All right.

So, on August 3rd of 2023, you physically came to the Superb dealership at 215 Northern Boulevard in Great Neck, correct?

A. Yes.

Q. And you came there because someone informed you that the police were called and were present at the dealership, correct?

A. I wasn't there when the police were there.

Q. Okay.

But the reason why you ended up coming there that day was because you learned that the police were there?

A. Yeah, we had to get our stuff out of it, our personal belongings.

Q. Okay.

Who informed you that the police came and you had to get your stuff?

A. I don't recall who actually

D. Blankenship

called me.

Q. But you do recall that it was a phone call, a phone conversation?

A. Yeah, it was probably a phone.

Q. Do you recall whether Mr. Thomasson called you?

A. I don't recall who it was.

Q. In general in your entire life, has Mr. Thomasson ever called you on the phone?

A. I wouldn't be able to recall if he's called me or not called me.

Q. Have you ever spoken to Mr. Thomasson on the phone yourself?

A. I don't recall if I did or not.

Q. In between the date of your deposition on February 18th and today's date March 26, did you have any conversations with Mr. Thomasson at all?

A. No.

Q. Same question for Mr. Deo.

A. Me?

Or, I don't know who you're talking to. Are you asking Mr. Deo or me?

D. Blankenship

MR. KATAEV: I'll rephrase.

I'm not asking Mr. Deo any questions. He is physically present here, but I'm only asking you questions today.

THE WITNESS: Okay.

MR. KATAEV: I'll rephrase the question.

BY MR. KATAEV:

Q. In between the date of your initial deposition on February 18th and today's date March 26th, have you had any conversations with Mr. Deo?

A. About the case, no.

Q. Okay.

How about conversations not about the case?

A. I talked to Marc probably once a week. We were partners for ten years.

Q. Okay.

A. He's the only one --

Q. But you didn't have any conversations with Mr. Deo in that timeframe?

D. Blankenship

A. Not about the case, no.
Q. When was the last conversation you had with Mr. Deo?
A. I believe I was talking to Marc and he said hello and how's the family.
Q. Okay.
So if I understand you correctly, you were on the phone with Mr. Merckling and Mr. Deo happened to be there and simply said hello to you?
A. Yeah.
Q. Other than that, did you have any other conversation with Mr. Deo in between February 18th and March 26th?
A. No.
Q. Going back to August 3rd, 2023.
When you arrived at the dealership, am I correct in understanding that you observed Mr. Thomasson, Mr. Merckling, and Mr. Deo standing on the sidewalk?
A. Yes.
Q. When you approached them, what did you say to them, and what did they say

to you?
A. I was getting our stuff. I believe Mr. Thomasson was putting his stuff into his car at that time, and that was it. We were just standing there.
Q. You didn't have any questions about why you were taking your stuff?
A. I was told that they -- they removed us from the building.
Q. When were you told this?
A. Probably when I walked up.
Q. So try to reenact the scene for me.
You walked up on August 3rd to the dealership. They were standing on the sidewalk.
What did they say to you, and what did you say to them?
A. I probably said hello. I don't remember the specific conversation two-and-a-half years ago. They told me we were removed. I believe at that point I grabbed my personal stuff. Mr. Harry was putting his stuff in his car, and he said,

D. Blankenship

You guys might as well go home and I'll handle this tomorrow.

Q. Mr. Thomasson said, I'll handle this tomorrow?

A. Yes.

Q. Did you ask any questions about why you're taking all your stuff out?

A. I was told we were removed from the business.

Q. Did you ask why?

A. Not really. I -- the two partners, I guess, got into a fight.

Q. Is that what you're guessing, or is that what you were told?

A. That's what I was -- I -- I didn't get involved with any of that.

Q. How did you feel about the fact that you were being removed from the dealership?

A. I -- there was nothing I could say. What was I going to say? We were removed.

The one partner's standing on outside of the building. What am I going

D. Blankenship

to say?

Q. Well, did you have questions about your job and whether you were going to continue working for him?

A. Well, I went on vacation the next week, and when I got back, there was a letter on my desk that I was separated from Superb.

Q. And to this day, you don't know if that came from Mr. Deo or Mr. Urrutia or someone else, right?

A. It same from Superb Management.

Q. So you don't know whether it was from Mr. Deo, Urrutia, or someone else?

A. No.

Q. Did you observe Mr. Deo's demeanor on August 3rd standing outside the dealership?

A. I'm sure he wasn't happy, but I didn't ask him, you know, questions and stuff. I grabbed my stuff and I went home.

Q. What did Mr. Deo say about the situation?

D. Blankenship

A. I don't recall Mr. Deo say anything when Harry said we should just go home.

Q. Is it fair to say Harry advised you to go home?

A. I guess, yeah. I mean, what, was I going to stand out there all night?

Q. What belongings did you take?

A. I believe I had a coffee mug in the -- inside that I took that was mine.

Q. Other than that --

A. A to-go cup. You know, like a thermal cup, whatever it was.

Q. Other than that, nothing else?

A. I didn't have anything other than that, no.

Q. What about papers?

A. I didn't take any papers.

Q. Were there any loose ends in terms of the tasks that you had to do on August 3rd?

A. No, not that I -- because, like I said, I went on vacation. By the time I got back from vacation, there was the

D. Blankenship

letter sent to my house.

Q. In relation to August 3rd, how soon after that date did you go on vacation?

A. I believe it was -- I got to look. August 3rd was what day on -- can I look at my phone and just see -- go back to --

Q. I'll tell you it was a Friday, from memory.

A. It was a Friday?

I think I was going on a cruise Saturday. I think I went on a cruise with my family the week after.

Q. So it's fair to say you left the following day?

A. I think it was, yeah, Saturday.

Q. And you returned back on Saturday or Sunday the following week?

A. It was a week-long cruise, seven days. So it was probably Saturday or Sunday.

Q. During the time that you were standing outside with Mr. Deo, Thomasson,

D. Blankenship

and Merckling, was there any discussion about a lawsuit?

A. I wasn't part of it, any discussion with that.

Q. Same question, was there any discussion about a criminal complaint?

A. I -- again, not that I can recall. I wasn't involved in any discussion with that.

Q. Did the conversation end outside, or did you walk into the dealership together?

A. I didn't go back into the dealership.

Q. How did you retrieve your belongings?

A. I believe they had brought them out to me, Marc -- Marc or one of them had it out there.

Q. So someone brought it out for you?

A. Yes.

Q. Who left first from the conversation outside?

D. Blankenship

A. I don't recall.

Q. Do you recall whether you left simultaneously?

A. I don't recall.

Q. But you do recall you did not go back into the dealership?

A. I'm -- yeah, I didn't go back in.

Q. What did you do after you left?

A. I went home.

Q. When you returned from vacation, prior to the time you received the termination letter, did you have any conversations with Mr. Thomasson, Mr. Deo, or Mr. Merckling, whether together or separate?

A. I was out of the country.

Q. Okay.

Does being out of the country mean you can't speak to anyone?

A. I didn't talk to anybody. I was on vacation. I didn't talk to them and -- while I was on vacation, no.

Q. Was your cell phone working even

D. Blankenship

though you were away?

A. I'm sure it was working. I didn't talk to them.

Q. They didn't call you while you were on vacation?

A. No.

Q. And you --

A. Not that I -- not that I can recall, no.

Q. And you didn't call them?

A. No.

Q. So when you returned back from vacation before you received the termination letter, did you have any conversations with them after you returned?

A. I called Merckling --

MR. THOMASSON: Objection.

Mr. Kataev, that order which is in front of me is as clear as a bell. It says, and I quote: In accordance with this order, plaintiffs may re-depose Merckling and Blankenship as to the communications on August 3rd.

D. Blankenship

That's what it says. Why are we talking about communications later in August?

MR. KATAEV: I'm writing to Judge Wicks because you don't understand that your role here is not to object on behalf of the witness.

I'm going to also move for sanctions against you because you're not getting it, and it's really frustrating.

MR. THOMASSON: You go right ahead. Let's get him on the phone. I want to talk to him.

Madam Stenographer, I want to be sure that you have the ability to read to the judge the exchange I just had with Mr. Kataev.

(Pause.)

MR. KATAEV: I'm going to try to move on to some other topics.

BY MR. KATAEV:

Q. Do you recall when you formally retained Mr. Thomasson as your attorney?

D. Blankenship

A. No, I don't.

Q. Can you try to recall based on some outside event? For example, after being served with the lawsuit in this case.

A. I -- I don't remember when -- when we got served or anything like that. I don't remember. I know we got the paperwork. I don't remember when it was.

Q. Okay.

I understand that you don't remember the date, but my question is did you retain Mr. Thomasson as your attorney before you got served with the lawsuit or after?

A. He was the -- he was the lawyer.

MR. KATAEV: I'm going to try to call the Court again.

(Pause.)

MR. KATAEV: Mr. Thomasson, just to confirm, are you instructing Mr. Blankenship not to answer my question?

MR. THOMASSON: I'm not instructing him on anything.

D. Blankenship

I'm asking you we have a very direct order that limits your questions to August 3rd, and I was asking you why you're going beyond that.

MR. KATAEV: Okay. So since you're not instructing him to answer, Madam Court Reporter, could you have that question read back, please, so he can answer it?

MR. THOMASSON: I want to speak to the judge before this continues.

You're going outside the bounds of his order, and I would like to speak to the judge about it.

MR. KATAEV: Are you instructing the witness not to answer the question?

MR. THOMASSON: I'm instructing you to limit yourself to what the court order says.

MR. KATAEV: You can't struck me.

MR. THOMASSON: The court order

D. Blankenship

is very clear, Mr. Kataev.

MR. KATAEV: You can't instruct me.

MR. THOMASSON: We're here to talk about August 3rd, 2023, period.

MR. KATAEV: You are not authorized to instruct me to do anything.

Madam Court Reporter --

MR. THOMASSON: There's a court order. Don't try and play games an violate it in a deposition.

MR. KATAEV: Madam Court Reporter, could you please read back the question that was objected to so that the witness can answer it?

(The requested portion of the record was read back by the court reporter.)

MR. THOMASSON: Objection. It's beyond the scope of the court order.

BY MR. KATAEV:

Q. You may answer the question.

A. I'll hold off on answering the

D. Blankenship

question.

Q. I'm sorry?

A. I -- I don't understand the -- I don't -- before I got my termination letter, after I got -- I -- I don't understand.

Q. Okay. I'll explain it to you.

You came back from vacation a week after August 4th, on or about August 11th, correct?

A. 11th, 12th, yes.

Q. Okay.

When you returned, before you came into possession of the termination letter, did you have any conversations with Mr. Thomasson, Mr. Deo, or Mr. Merckling, whether together or separate?

A. No.

Q. When was the next time that you spoke to either Mr. Deo, Mr. Thomasson, or Mr. Merckling after your return?

A. Probably when I got home when I saw all the mail on the table and I saw the -- I opened up the letter, I called --

D. Blankenship

I probably called Marc.

Q. The termination letter?

A. Yes.

Q. Okay.

So what do you recall about your conversation with Marc about you received the termination letter?

A. I said I got a termination letter from Supreme, Superb.

Q. Okay.

And what did he say in response?

A. I just told him I got terminated from them.

I don't remember the whole conversation.

Q. Did he tell you whether he also got terminated?

A. I don't recall.

Q. Do you recall discussing the lawsuit on that date?

A. I don't recall discussing a lawsuit.

Q. Do you remember whether the lawsuit was filed as of that date?

D. Blankenship

MR. THOMASSON: Objection.

Mr. Kataev, I just reached chambers, and I've been instructed that we are to all call back in at 11:45 this morning and that this is not to continue until we reach the judge.

MR. KATAEV: So --

MR. THOMASSON: Until we call in at 11:45, excuse me.

MR. KATAEV: Who did you reach?

MR. THOMASSON: I didn't even get who it was. He said that he's got to reach out to the judge because he's not there at the moment, and he asked us all to call back in at 11:45.

MR. KATAEV: Jeff, do you want to take a break for ten minutes?

MR. RUDERMAN: Whatever you want.

MR. KATAEV: Okay. We can wait ten minutes.

We'll go off the record.

(Recess taken.)

D. Blankenship

MR. KATAEV: Madam Court Reporter, we'd like to order an expedited of today's transcript.

THE STENOGRAPHER: Sure.

When would you like it?

MR. KATAEV: By tomorrow should be fine.

Mr. Ruderman and I will split that.

(Recess taken.)

MR. KATAEV: So, we set aside time from 11 to 1:30 today to complete the depositions of Misters Blankenship and Merckling, and Mr. Thomasson has once again improperly objected to questions, despite the fact that he's been disqualified, has repeatedly been ordered by the court not to do this.

So I'm giving Mr. Thomasson an option because this is our meet-and-confer on the subject. Mr. Thomasson, you can either not instruct the witness not to respond and stop making objections improperly

D. Blankenship

let me finish the deposition.

You can later make any motion or application related to the proprietary of the questions and deal with it that way.

Or if you refuse to do so, I will stop the deposition. I'm going to make a motion under Rule 37(b) of the Federal Rules of Civil Procedure that deal with sanctions for violating discovery orders. There are several orders directing you not to do exactly what you're doing today. I'm going to ask for sanctions in the form of attorney's fees for our prep time. I'm going to ask that you be fully responsible to pay for the next court-ordered deposition of Mr. Blankenship or Mr. Merckling. I believe I'm going to prevail on that.

How would you like to handle this?

MR. THOMASSON: I don't care how you proceed.

D. Blankenship

I want to speak to the Court about objections that I have of you going beyond the scope of the Court's order.

That's all I'm doing, Mr. Kataev. Let's not make a mountain out of a molehill.

MR. KATAEV: I understand that that's your position, but the effect of your desire is for the deposition not to proceed.

So I want you to understand that I'm going to make this motion over the weekend, and I'm going to prevail on it because the judge has ordered twice now, at least twice, that you can't do exactly what you're doing.

MR. THOMASSON: He said that I could interpose objections but I couldn't direct anyone to answer or not answer. I have not done that this morning, if you were paying attention.

I have an objection that you're going beyond the scope of a federal

D. Blankenship

court order, and you are in violation of a federal court order with your questioning this morning.

MR. RUDERMAN: So my understanding then is that you're objecting to going beyond the scope. You put that on the record.

Mr. Kataev will continue with his deposition, and you are free to make any motion after the deposition is over to the Court against Mr. Kataev for going beyond the scope.

MR. THOMASSON: No.

MR. RUDERMAN: Are you directing --

MR. THOMASSON: We have a procedure -- I don't care what you say, Mr. Ruderman, is my position. I care what I say is my position --

MR. RUDERMAN: Are you stopping the deposition or not?

MR. THOMASSON: -- and my position is quite simple.

MR. RUDERMAN: Are you stopping

D. Blankenship

the deposition?

MR. THOMASSON: I want to speak to --

MR. RUDERMAN: I don't care what you want to do.

MR. THOMASSON: I want to speak to the judge --

MR. RUDERMAN: You're welcome to call the judge.

MR. THOMASSON: -- before we proceed.

MR. RUDERMAN: Well, we disagree with that. So we'll continue with the deposition.

MR. THOMASSON: Very good.

MR. RUDERMAN: Just continue, Emmanuel.

MR. THOMASSON: You just got told to wait til 12:30.

Isn't that what you just said?

MR. RUDERMAN: No, no. We have to wait to the judge until 12:30. We are not told to wait on the deposition.

D. Blankenship

Emmanuel, continue with the deposition.

MR. KATAEV: Frankly, I put in an email, Mr. Thomasson, to the Court that you stated an instruction was given by the Court not to proceed with the deposition because, frankly, I just don't believe that that's the case.

So I have trouble accepting that representation.

MR. THOMASSON: I was specifically asked if my objection was going to relate to whether or not the deposition could continue, and when I said yes, my objection is to the deposition continuing beyond the court order, I was told please call in at 11:45 and we'll straighten it out then.

MR. RUDERMAN: That's not a direction not to continue the deposition.

MR. THOMASSON: So I just want

D. Blankenship

you to understand that that's how I understood what we were told, that we had to wait until 11:45 to do it. And at that moment, it was about 11:33. So, and now they're telling us to call in at 12:30.

I object to this deposition proceeding with my pending objection to you asking questions beyond the scope of a court order.

MR. KATAEV: Okay. So you're not --

MR. THOMASSON: You'll proceed as you want to, Mr. Kataev. I don't get leveraged by anybody, okay. You do what you want.

MR. KATAEV: Okay. You'll be dealing with that order and I'll be --

MR. THOMASSON: We'll deal with that order if and when the Court makes a ruling on this at 12:30.

MR. KATAEV: Okay.

MR. RUDERMAN: Emanuel, are you going to proceed with the deposition

D. Blankenship

or not?

MR. KATAEV: I'm going to proceed.

BY MR. KATAEV:

Q. Okay.

So, Mr. Blankenship, after you got the termination letter, you testified that you spoke to Mr. Merckling, correct?

A. Yes.

MR. THOMASSON: Objection.

That is beyond the scope of this court order, Mr. Kataev, and I want to talk to the judge right now before this question is answered. I want to talk to the judge.

MR. KATAEV: Are you instructing the witness not to answer?

MR. THOMASSON: I want to talk to the judge, and I want this deposition to stop until we do. You're going beyond the scope which says one thing, you're allowed to ask about one thing: communications on August 3rd, 2023. That's the court

order.

MR. KATAEV: Okay.

I don't think your argument is going to fare very well.

MR. THOMASSON: Good. I don't care what you think, period.

MR. RUDERMAN: Are you directing the witness not to answer the question?

MR. THOMASSON: I only care what the judge says. That's the only thing that matters to me.

MR. RUDERMAN: Are you directing the witness not to answer the question, yes or no?

MR. THOMASSON: I am not doing anything.

MR. RUDERMAN: Then fine.

BY MR. KATAEV:

Q. Then, Mr. Blankenship, you are in a deposition, and you are required by the court rules to answer the question as put before you.

MR. THOMASSON: And this

D. Blankenship

deposition is currently interrupted with an objection that requires a ruling by the Court, and I have to wait with that objection pending when the Court has instructed us to call in at 12:30.

MR. RUDERMAN: I don't see the connection there.

MR. THOMASSON: Okay. Well, I'm sorry you don't. I do.

MR. RUDERMAN: Well, then you have your opportunity.

You've raised your objection. We move forward and then you can raise it to the judge.

MR. THOMASSON: Well, it is what it is.

MR. RUDERMAN: Right. You raised your objection. It's on the record.

MR. THOMASSON: Mr. Blankenship, we have an opportunity to speak with the judge at 12:30 about my objection.

You're willing to make whatever

D. Blankenship

decision you make about proceeding at this time, but at this time, I want a ruling from the Court because there's a court order that you're unaware of that limits this deposition to one topic on one day.

MR. KATAEV: Could we read back the last question, please?

(The requested portion of the record was read back by the court reporter.)

MR. THOMASSON: Was there an objection?

(The requested portion of the record was read back by the court reporter.)

BY MR. KATAEV:

Q. You can answer the question.

A. I called Marc.

Q. And when you spoke to Marc, it was just you and Marc and no one else on the line, correct?

MR. THOMASSON: Objection; beyond the scope.

D. Blankenship

This is uncalled for, Mr. Kataev.

BY MR. KATAEV:

Q. You can answer the question.

A. Yeah, I believe it was just Marc on the phone.

Q. And during that conversation, what did you two discuss? What did he say to you, and what did you say to him?

A. I don't recall the whole conversation. I just told him I got a letter from Supreme, Superb that I was let go.

Q. What did he say in response?

MR. THOMASSON: Objection.

This is beyond the scope.

BY MR. KATAEV:

Q. You can answer.

A. I don't recall what Marc had stated to me.

Q. How did the conversation end?

A. Talk to you later. I just got home from vacation.

MR. THOMASSON: Objection.

D. Blankenship

BY MR. KATAEV:

Q. Marc Merckling was also on vacation?

A. No, I just --

MR. THOMASSON: Objection.

BY MR. KATAEV:

Q. Go ahead.

A. I just got home from vacation.

Q. Following your conversation with Mr. Merckling, did you have any conversations with Mr. Deo or Mr. Thomasson?

MR. THOMASSON: Objection; beyond the scope.

BY MR. KATAEV:

Q. You can answer.

A. I don't recall.

Q. When was the first time you spoke to either Mr. Deo, Mr. Thomasson, or Mr. Merckling about the lawsuit that was filed against you?

MR. THOMASSON: Objection; beyond the scope.

This is inappropriate, Mr.

D. Blankenship

Kataev. I'll be the one moving for sanctions. This is inappropriate.

MR. KATAEV: I invite you to read Rule 30 because I think you're in violation of it numerous times.

MR. THOMASSON: I think we have a court order that overrides that, Mr. Kataev. I think it's clear as bell.

(Reading) In accordance with this court order, plaintiffs may re-depose Merckling and Blankenship as to the communications on August 3rd, 2023.

That's what it says.

MR. KATAEV: I'm aware of your argument, and I don't think that you're going to prevail in that argument.

MR. THOMASSON: I don't care what you think.

MR. KATAEV: Okay.

MR. THOMASSON: We need to speak to the judge.

MR. KATAEV: The judge is not

available until 12:30, so we're going to --

MR. THOMASSON: I'm calling in again.

(Nipun Marwaha joined the Zoom teleconference.)

MR. KATAEV: All right.

Here we go. We have Mr. Marwaha joining us. He is the actual lawyer for Mr. Blankenship.

Perhaps we can make some headway here.

MR. THOMASSON: I would like to take a five-minute break and have the stenographer put me and Mr. Marwaha into a separate breakout room.

MR. KATAEV: We're not doing that. I'm not wasting time with you doing that.

MR. THOMASSON: I don't care. You take these breaks in every deposition, Mr. Kataev. I'm taking mine for the first time.

I need a five-minute break to

D. Blankenship

speak with the gentleman who just joined this deposition.

MR. KATAEV: You can take a five-minute break.

We're proceeding with the deposition, and Mr. Marwaha is here representing the defendant. So you can speak to him --

MR. THOMASSON: Mr. Marwaha, do you have any objection to this proceeding before you and I speak?

MR. MARWAHA: Hold on a second. Hold on.

Let's relax for a moment because I just walked into what sounds like a fire show here.

Emanuel, from what I saw in the emails, apparently we have to call in to the Court at 12:30?

MR. KATAEV: That's correct.

The problem is we have one more witness to go and we're stopping at 1:30, as you know. So I'd like to meet with the Mr. Marwaha now and see

D. Blankenship

if we can resolve this since you're the actual attorney for this witness.

MR. MARWAHA: Okay.

So that being said --

MR. KATAEV: I'm going to tell you the plaintiffs' position. Mr. Ruderman will add anything. We'll then hear Mr. Thomasson with his position.

Let's try to meet and confer to see if we can resolve this because what's going to happen, Mr. Marwaha, is I'm going to file a motion under Rule 37(b) for violation of court orders. Mr. Thomasson insists on making objections, stopping the deposition from proceeding when he's not able to do that because he's been disqualified, and there's numerous court orders to that effect.

I'm going to be making this motion seeking attorney's fees for today's deposition, for making the motion, to pay for the transcript

today, to pay for the next deposition.

I really want to avoid doing that. I'd like to be able to ask my questions and move on.

So, his objection is basically that this -- that my questions are beyond the scope of the Court's order.

MR. THOMASSON: I'll state my own objections, thank you, Mr. Kataev. I'll let him know what --

MR. MARWAHA: All right.

MR. THOMASSON: -- my position is. You let him know what yours is.

MR. MARWAHA: All right.

MR. KATAEV: Okay. In order to state my position, I have to let him explain what yours is so that it's logical. I know that that's something you're capable of doing based on your writing --

MR. MARWAHA: Guys, stop, stop.

Emanuel.

Harry, stop interrupting.

Emanuel, no need for pot shots.

D. Blankenship

MR. KATAEV: Okay.

MR. MARWAHA: I'm coming into this case to represent my clients. I'm not coming into this to be a referee to people that want to be, you know, zealous but forget the courteous half. So both of you calm the frick down.

MR. KATAEV: Okay.

So, his position is that it's beyond the scope. Our position is that because we were stopped from completing the deposition last time based on improper objections that were overruled, we were prevented from proceeding further into asking more questions about topics that we were going to ask about.

In addition, Mr. Blankenship was deposed for approximately five, five-and-a-half, maybe six hours, so we're entitled to the additional hour to finish it up. So we'd like to be able to ask him questions about his

D. Blankenship

conversations.

If there's an objection to privilege, since you're here as counsel, you can raise those objections to privilege and we can deal with it, but Mr. Thomasson can't raise those objections. So we'd like to proceed with that understanding.

Jeff, do you have anything?

MR. RUDERMAN: No, I think you laid it out.

MR. KATAEV: Okay.

MR. THOMASSON: Nipun.

MR. MARWAHA: Yes, Harry.

MR. THOMASSON: We have a court order that says the following: In accordance with this order, plaintiffs may re-depose Merckling and Blankenship as to the communications on August 3rd, 2023.

Now, Mr. Kataev fails to tell you that at the end of one or both of the depositions with Merckling and Blankenship, he specifically said that

D. Blankenship

he was done subject to the motion to compel that resulted in this order. So this order says very clearly that this deposition is limited to the subject of the communications on August 3rd, 2023.

We've now discussed the rest of August, what happened after the lawsuit was brought later in August, Mr. Blankenship's trip later in August, his communications with Merckling and Deo later in August. He's asking about communications with me and when I was retained later in August or September, and we're covering a whole broad range of topics when we have a court order that says that they're limited to the communications on August 3rd. So I'm objecting to these questions as being beyond the scope.

MR. RUDERMAN: I can speak to that.

MR. MARWAHA: Yes.

D. Blankenship

MR. RUDERMAN: I can speak to that if you want some clarification on that, if you don't mind.

MR. MARWAHA: Mr. Ruderman, is that, in sum and substance, a correct recitation of the order? Because I don't have the --

MR. RUDERMAN: He's reading the order.

MR. THOMASSON: I just read it.

MR. RUDERMAN: But if you don't read the content of the order, in other words what was the problem that brought us to that point was that the deposition -- any conversations, any communications, any discussions we wanted to ask from August 3rd forward were stopped because, at that time, Mr. Thomasson objected saying at that point in time, he became my client, all right.

So any communications -- any questions we had about August 3rd moving forward were stopped. So

D. Blankenship

August 3rd was the date which questions were being asked. So the only issue at the time which we brought to the Court's attention was we were stopped from asking questions on August 3rd. However -- so, the order was limited to August 3rd only to the extent that was the issue that brought it to the Court's attention.

However, once the Court's decision was, and if you read the Court's full decision, what they said there really wasn't a time when the Court could really determine that Mr. Thomasson either became an attorney for Mr. Blankenship or Mr. Merckling until he made an appearance in court. So there's no indication that there was any -- there was an attorney/client representation until that date. But we were stopped at August 3rd.

So we're just following up on conversations between the parties from

D. Blankenship

August 3rd going forward and obviously communications with Mr. Thomasson until there was a representation by Mr. Thomasson when the questions would stop.

And by the way, we didn't finish in our time. When we said we had no further, that's because we were stopped at a date in time. The world stopped on August 3rd.

So, you want to take just the final word of the judge's order and take it out of context, we can do that, but the judge knows that we had -- that he did not find that Mr. Thomasson represented him until he made an appearance. So we can do lot of motions. I think it's a whole lot of nothing because these are just communications that Mr. Blankenship had with the other parties for about another two or three weeks, and then at that point in time, I believe Mr. Thomasson made an appearance in

D. Blankenship

court, you know, in a filing, so.

MR. THOMASSON: That's a wonderful explanation, Nipun. But the fact of the matter is they wrapped up those depositions saying, We're all done except for whatever happens with the motion to compel. And the motion to compel resulted in, as to Merckling and Blankenship, an order that says this deposition is limited to the communications on August 3rd, 2023. That's what it says. It's a federal court order. That's what this is supposed to be about, and they want to go further, and I'm waiting for a ruling from the Court which they told us we can't have it til 12:30. I don't think we should be proceeding until then. But I can't instruct the client not to answer since he's not my client. So I think we should wait for the Court to rule, but it's up to you as their attorney as to what we're going to do for the next half-hour.

D. Blankenship

MR. KATAEV: Okay. I'll make a suggestion.

We can pause Mr. Blankenship for now. We could call Mr. Merckling in. I'll start with him. We'll go for 30 minutes, get to the heart of the substance of what you submit is proper to ask, even though it was not proper for you to raise the objection in the first place, and at 12:30 we'll have the conversation, we'll bring Mr. Blankenship back in, finish him up and then we'll bring Mr. Merckling back in and finish him up.

How does that sound?

MR. MARWAHA: One moment.

MR. THOMASSON: I object to that.

MR. MARWAHA: Okay. Hold on.

What is your objection to that, Harry?

MR. THOMASSON: I have no objection to Merckling coming in for the next half-hour and discussing the

D. Blankenship

events of August 3rd, 2023.

MR. KATAEV: But just to be clear, you're stating an objection preemptively now that Mr. Merckling should not be asked anything other than that, correct?

MR. THOMASSON: I object to anybody asking questions beyond the scope of the court order. It's in a court order.

MR. MARWAHA: Okay.

MR. THOMASSON: I don't care what the lovely background of that court order is. It's a court order.

MR. MARWAHA: Okay. So the crux of the -- I'm directing this question to Mr. Kataev and Mr. Ruderman and anyone else on the plaintiffs' side. The issue is whether or not August 3rd is a hard deadline, a hard wall that you guys can't cross for attorney/client privilege, correct?

MR. RUDERMAN: Well, no, no, no. The Court determined that there was no

D. Blankenship

attorney/client privilege past that date.

MR. MARWAHA: Yes.

So we're running up with that.

MR. RUDERMAN: Right. I don't think there's any -- the order says that the Court could not determine that Mr. Thomasson represented either of these parties until he made a filing with the court. So it's well past August 3rd.

The question is whether we can ask questions -- is what Mr. Thomasson is saying is that despite the fact that there was no curt ordered -- Court found representation. We still can't ask any questions because we ended our deposition and since the Court said we could only ask on August 3rd, we're stopped at that date.

Now, whether, in fact, the judge understood that we wanted to go forward or not, we're going to make that motion even if the Court tells us

D. Blankenship

no because that's what the order says specifically. We're going to explain to the Court what I just explained, and the judge is going to say I didn't recall that you didn't follow up your questions. Had we known that, I might have put it in the order. So we can file motions an all that stuff, or we can get it done in the next half-hour, 45 minutes, move on to the next phase of our lives, but again --

MR. THOMASSON: But you ended those depositions by saying --

MR. MARWAHA: Harry, Harry --

MR. THOMASSON: Wait a minute, Nipun.

They ended the depositions by saying they were done except for their motions to compel.

MR. RUDERMAN: And the motion to compel has to do with what happened on August 3rd until the date of your representation.

MR. THOMASSON: I don't care

D. Blankenship

what date -- it's in the order.

MR. KATAEV: Let's bring Mr. Merckling in.

Mr. Blankenship, if you'd be kind enough to step out.

MR. MARWAHA: Yeah, so one second.

Mr. Blankenship, I know we haven't had too much time to really chat, but obviously you know of me through Anthony as well.

Are you okay to take, I guess, about what I would imagine is about an hour break and come back around 1?

THE WITNESS: Yeah, it's just getting -- I have to be at work later in the evening. Let me see if I can --

MR. MARWAHA: No. So, no, you don't have to worry about that because no matter what, anything that we do today is ending at exactly 1:30.

MR. KATAEV: Yes.

THE WITNESS: Yeah, that's fine.

D. Blankenship

That's fine then.

MR. MARWAHA: Okay. Perfect.

Then if you wouldn't mind.

THE WITNESS: Okay.

So I can switch out and leave?

MR. MARWAHA: Yeah, you can switch out. Yeah, we'll contact you when we want you to log back in.

THE WITNESS: Okay. Thank you.

(Deposition adjourned at approximately 12:04 p.m. EST.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

A C K N O W L E D G M E N T

STATE OF )
:ss
COUNTY OF )

I, DWIGHT W. BLANKENSHIP, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of March 26, 2026; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____________________________
DWIGHT W. BLANKENSHIP

Signed and subscribed to before me this
_________ day of _______________, 20__.

______________________________________
Notary Public, State of

E R R A T A

PAGE/LINE/ CHANGE / REASON

_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________

C E R T I F I C A T E

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, DWIGHT W. BLANKENSHIP, was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Marie Foley
COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: March 27, 2026

**A**

**a.m** 198:19 205:3
**AARONSON** 197:8 199:15
**ability** 221:17 262:15
**able** 210:12 244:19 245:4 246:25
**accepting** 233:11
**accurate** 259:19
**action** 262:18,21
**actual** 242:10 244:3
**add** 244:8
**addition** 246:20
**additional** 246:23
**address** 205:24
**adjourned** 258:11
**advised** 216:5
**affirm** 205:8
**ago** 213:22
**AGREED** 203:5,11 203:15
**ahead** 221:14 240:8
**allowed** 235:23
**amount** 206:22
**answer** 204:4 222:23 223:8,11,18 224:17 224:24 230:21,22 235:18 236:9,15,23 238:19 239:5,19 240:17 252:21
**answered** 235:15
**answering** 208:17 224:25
**answers** 260:13
**Anthony** 197:6,19 199:6 200:4 201:22 257:12
**anybody** 208:7,15,24 219:22 234:16 254:9
**apparently** 243:19
**appearance** 250:18 251:18,25
**APPEARANCES** 199:2 200:2 201:2 202:5
**application** 229:4
**approached** 212:24
**appropriate** 259:7
**approximately** 246:21 258:12
**argued** 207:10
**argument** 236:4 241:17,19
**ARIEL** 201:6
**aronneburger@cu...** 201:10
**arrived** 212:18
**ASAD** 197:9
**aside** 228:12
**asked** 206:15 227:16 233:14 250:3 254:6
**asking** 210:25 211:3 211:5 223:2,5 234:10 246:17 248:14 250:6 254:9
**attached** 259:12
**attention** 230:23 250:5,10
**attorney** 208:17,22 221:25 222:14 244:3 250:17 252:24 259:15 262:17,20
**attorney's** 229:16 244:23
**attorney/client** 207:8 250:21 254:23 255:2
**August** 209:5 212:17 213:15 215:18 216:22 217:3,7 220:25 221:4 223:4 224:6 225:10,10 235:25 241:13 247:21 248:7,9,10 248:12,13,16,20 249:18,24 250:2,7,8 250:23 251:2,11 252:12 254:2,20 255:12,20 256:23
**authorized** 224:8
**AUTO** 197:5,7,11,12 197:12,13,14,14,16 197:16 198:9 199:5 199:14,16,16,16,17 199:17,17,18,19
**AUTOMOTIVE** 197:24 200:8
**available** 242:2
**Avenue** 199:9,22 200:14
**avoid** 245:3
**aware** 206:11,19 207:2 209:3 241:16

**B**

**back** 206:3,9,24 212:17 215:7 216:25 217:8,19 218:14 219:7,8 220:13 223:10 224:15,19 225:9 227:5,17 238:8,11 238:16 253:13,14 257:15 258:9
**background** 254:14
**BANK** 198:7,8 201:4
**BARON** 197:9,9,11 199:15
**based** 207:17 222:3 245:20 246:15
**basically** 207:12 245:6
**behalf** 199:4,14 200:4 201:4,13 221:8
**believe** 212:5 213:4 213:23 216:10 217:6 218:18 229:21 233:9 239:6 251:24
**bell** 220:21 241:9
**belongings** 209:21 216:9 218:17
**best** 262:15
**beyond** 223:5 224:22 230:4,25 231:7,13 233:18 234:10 235:12,22 238:25 239:17 240:15,24 245:8 246:12 248:22 254:9
**BIT** 198:6
**Blankenship** 197:20 198:17 200:5 202:6 205:1,15,23 206:1,3 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1,24 221:1 222:1,23 223:1 224:1 225:1 226:1 227:1 228:1 228:14 229:1,20 230:1 231:1 232:1 233:1 234:1 235:1,7 236:1,21 237:1,22 238:1 239:1 240:1 241:1,12 242:1,11 243:1 244:1 245:1 246:1,20 247:1,20 247:25 248:1 249:1 250:1,17 251:1,21 252:1,10 253:1,4,13 254:1 255:1 256:1 257:1,5,9 258:1 260:8,18 262:8
**Blankenship's** 248:11
**BLVD** 197:11,12,12 197:13,14,14 199:16,16,16,17,17 199:17
**Boulevard** 201:7 209:7
**bounds** 223:14
**Box** 200:22
**break** 227:19 242:15

242:25 243:5 257:15
**breakout** 242:17
**breaks** 242:22
**BRIAN** 197:8 199:15
**bring** 253:12,14 257:3
**broad** 248:17
**brought** 218:18,21 248:10 249:15 250:5,10
**building** 213:10 214:25
**business** 214:10
**BUYERS** 197:22

**C**

**C** 260:2 262:2,2
**call** 210:4 220:5,11 222:19 227:5,10,17 232:10 233:19 234:6 237:6 243:19 253:5
**called** 209:12 210:2,7 210:10,13,13 220:18 225:25 226:2 238:20
**calling** 206:24 242:4
**calm** 246:8
**capable** 245:20
**CAPITAL** 198:5
**Caption** 197:25
**car** 197:22 213:5,25
**care** 229:24 231:18 231:20 232:5 236:7 236:11 241:20 242:21 254:13 256:25
**carefully** 259:5
**CARS** 197:22,23 200:6,7
**case** 206:13,17 207:11 211:15,18 212:2 222:6 233:10 246:4
**cell** 219:25
**certain** 206:22
**CERTIFICATE** 202:10
**certification** 203:7
**Certified** 198:21 262:4,23
**certify** 260:9 262:6 262:11,16
**CHABRIER** 197:8 199:15
**chambers** 227:4
**CHANGE** 261:3
**CHASE** 198:8
**chat** 257:11
**Chestnut** 201:16
**Civil** 229:10
**clarification** 249:3
**clear** 220:21 224:2 241:9 254:4
**clearly** 248:4
**client** 249:21 252:21 252:22
**clients** 246:4
**COAST** 197:22,23 197:24 198:2,3,3 200:6,7,8,9,10,10
**coffee** 216:10
**come** 257:15
**coming** 206:4 209:18 246:3,5 253:24
**commencement** 262:7
**commencing** 198:18
**communications** 220:25 221:3 235:24 241:13 247:20 248:6,12,14 248:20 249:17,23 251:3,21 252:12
**Company** 198:24
**compel** 248:3 252:8,9 256:20,22
**complaint** 218:7
**complete** 228:13
260:12
**completing** 246:14
**concerning** 206:14 207:7
**confer** 244:11
**confirm** 222:22
**connection** 237:9
**contact** 258:8
**content** 249:13
**context** 251:14
**continue** 215:5 227:7 231:9 232:14,17 233:2,16,23
**continued** 197:25 198:16
**continues** 223:13
**continuing** 233:18
**conversation** 210:4 212:3,14 213:21 218:11,25 226:7,16 239:8,12,22 240:10 253:12
**conversations** 206:16 207:14 210:20 211:14,17,24 219:15 220:16 225:16 240:12 247:2 249:16 250:25
**copy** 207:18
**CORP** 198:5
**correct** 207:3 209:8 209:13 212:19 225:11 235:9 238:23 243:21 249:6 254:7,23 260:15
**corrections** 259:6,8
**correctly** 212:9
**counsel** 203:6 247:5 262:18,20
**country** 219:18,20
**COUNTY** 260:6
**court** 197:2 203:18 222:19 223:9,22,25
224:10,11,14,19,22 228:2,19 230:2 231:2,3,12 233:5,7 233:18 234:11,21 235:13,25 236:23 237:4,6 238:4,5,11 238:16 241:8,11 243:20 244:15,21 247:16 248:18 250:15,19 252:2,14 252:17,23 254:10 254:11,15,15,25 255:8,11,17,20,25 256:4 259:20 262:22
**Court's** 230:4 245:8 250:5,10,11,13
**court-ordered** 229:19
**courteous** 246:7
**covering** 248:17
**CPA** 197:21
**CPA'S** 198:6
**criminal** 218:7
**cross** 254:22
**cruise** 217:13,14,21
**crux** 254:16
**CULLEN** 201:5
**cup** 216:13,14
**current** 205:24
**currently** 237:2
**curt** 255:16
**CYRULI** 199:20

**D**

**D** 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1

235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 260:2
**date** 198:19 210:17 210:19 211:11,13 217:4 222:13 226:21,25 250:2,22 251:10 255:3,21 256:23 257:2 259:11 262:14
**Dated** 262:24
**DAVID** 197:10
**day** 209:18 215:10 217:7,17 238:7 260:21
**days** 217:22 259:16
**deadline** 254:21
**deal** 229:5,11 234:20 247:7
**dealership** 209:6,12 212:19 213:16 214:20 215:19 218:13,15 219:7
**dealing** 234:19
**decision** 207:11,11 238:2 250:12,13
**deemed** 259:19
**defendant** 200:20 201:4,13 243:8
**Defendants** 198:11 200:4
**demeanor** 215:18
**Deo** 197:19,19 200:4 200:5 201:22 210:22,25 211:3,14 211:24 212:4,10,14 212:21 215:11,15 215:24 216:2 217:25 219:15 225:17,21 240:12 240:20 248:13
**Deo's** 215:17
**deposed** 246:21
**deposing** 259:15
**deposition** 198:16 204:2 206:9,12 209:2 210:18 211:12 224:13 229:2,8,19 230:11 231:10,11,22 232:2 232:15,25 233:3,8 233:16,18,24 234:8 234:25 235:21 236:22 237:2 238:6 242:23 243:3,7 244:18,24 245:2 246:14 248:5 249:16 252:11 255:19 258:11 259:4,12,16,18 260:11
**depositions** 228:14 247:24 252:6 256:14,18
**desire** 230:11
**desk** 215:8
**despite** 228:17 255:15
**determine** 250:15 255:8
**determined** 254:25
**direct** 223:3 230:21
**directing** 229:13 231:16 236:8,14 254:17
**direction** 204:4 233:23
**disagree** 232:13
**discovery** 229:12
**discuss** 239:9
**discussed** 208:19 248:8
**discussing** 226:20,22 253:25
**discussion** 218:2,5,7 218:10
**discussions** 249:17
**disqualified** 228:18 244:20
**DISTRICT** 197:2,3
**DLA** 198:5
**DOCUMENTS** 204:9
**doing** 206:5 229:14 230:6,18 236:17 242:18,20 245:3,20 259:10
**Drive** 205:25
**duly** 205:16 262:8
**Dwight** 197:20 198:17 200:5 202:6 205:15,23 260:8,18 262:7
**DYKMAN** 201:5

**E**

**E** 201:6 260:2,2 261:2 262:2,2
**Earle** 201:7
**EASTERN** 197:3
**effect** 203:17 230:10 244:21
**either** 225:21 228:23 240:20 250:16 255:9
**email** 199:11,24 200:16,24 201:10 201:18 233:5
**emails** 243:19
**Emanuel** 199:8 234:24 243:18 245:23,25
**emanuel@sagelega...** 199:11
**Emmanuel** 232:18 233:2
**employee** 262:17,19
**ended** 209:17 255:19 256:13,18
**ends** 216:20
**entire** 210:9
**entitled** 207:13 246:23
**errata** 202:9 259:8 259:11,14
**ESQUIRE** 199:8,21 200:13 201:6,15
**EST** 198:19 205:3 258:12
**ESTATE** 197:10
**evening** 257:18
**event** 222:4
**events** 254:2
**exactly** 229:13 230:18 257:23
**examination** 202:6 203:8,15 205:20 262:7
**examined** 205:18
**example** 222:4
**exchange** 221:18
**excuse** 227:11
**existence** 208:16,21
**expedited** 228:4
**explain** 225:8 245:18 256:3
**explained** 256:4
**explanation** 252:4
**extent** 250:9

**F**

**F** 262:2
**fact** 214:18 228:17 252:5 255:15,22
**fail** 259:17
**fails** 247:22
**fair** 216:5 217:16
**family** 212:6 217:15
**fare** 236:5
**February** 210:18 211:12 212:15
**federal** 203:2 229:10 230:25 231:3 252:13

**feel** 214:18
**fees** 229:16 244:23
**fight** 214:13
**file** 244:14 256:9
**filed** 206:13 207:3,7 226:25 240:22
**filing** 203:7 252:2 255:11
**fill** 206:23
**final** 251:13
**financially** 262:21
**find** 251:16
**fine** 228:8 236:19 257:25 258:2
**finish** 229:2 246:24 251:7 253:13,15
**fire** 243:17
**first** 205:16 218:24 240:19 242:24 253:11
**FISK** 197:15 199:18
**five** 246:21
**five-and-a-half** 246:22
**five-minute** 242:15 242:25 243:5
**Floor** 201:8
**FLUSHING** 198:7 201:4
**Foley** 198:20 262:3
**follow** 256:6
**following** 206:11 207:9 217:17,20 240:10 247:17 250:24
**follows** 205:19
**force** 203:17
**foregoing** 262:11
**forget** 246:7
**form** 203:12 229:15
**formally** 221:24
**forth** 262:14
**forward** 237:15 249:18,25 251:2 255:24
**found** 255:17
**Franklin** 200:14
**frankly** 233:4,8
**free** 231:10
**frick** 246:8
**Friday** 217:10,12
**front** 220:21
**frustrating** 221:12
**full** 250:13
**fully** 229:17
**FUNDING** 198:7 201:13
**further** 203:10,14 246:17 251:9 252:16 262:11,16

**G**

**G** 260:2
**games** 224:12
**general** 210:9
**gentleman** 243:2
**getting** 213:3 221:11 257:17
**give** 205:9 208:4
**given** 233:7 260:14
**giving** 228:20
**go** 214:2 216:3,6 217:4,8 218:14 219:6,8 221:13 227:24 239:14 240:8 242:9 243:23 252:16 253:6 255:23
**GOAL** 197:24 200:8
**going** 208:3 212:17 214:22,25 215:4 216:8 217:13 221:9 221:21 222:18 223:5,14 229:8,14 229:17,21 230:4,14 230:15,25 231:7,13 233:15 234:25 235:3,22 236:5 241:18 242:2 244:6 244:13,14,22 246:19 251:2 252:25 255:24 256:3,5
**GOLD** 197:22,23 198:2,2,3 200:6,7,9 200:9,10
**good** 206:6 232:16 236:6
**grabbed** 213:24 215:22
**Great** 209:7
**GROUP** 197:24 200:8,12
**guess** 214:13 216:7 257:13
**guessing** 214:14
**guys** 214:2 245:22 254:22

**H**

**half** 246:8
**half-hour** 252:25 253:25 256:10
**hand** 205:6
**handle** 214:3,4 229:22
**happen** 244:13
**happened** 212:10 248:9 256:22
**happens** 252:7
**happy** 215:20
**hard** 254:21,21
**Harry** 197:19 200:21 213:24 216:3,5 245:24 247:15 253:22 256:15,15
**headway** 242:12
**hear** 244:9
**heart** 253:7
**held** 198:17
**hello** 212:6,11 213:20
**hereinbefore** 262:14
**hereto** 203:5
**Highway** 200:22
**hold** 224:25 243:13 243:14 253:20
**home** 214:2 215:23 216:4,6 219:11 225:23 239:24 240:9
**hour** 246:23 257:15
**hours** 246:22
**house** 217:2
**how's** 212:6
**hrtatty@verizon.net** 200:24
**HWY** 197:6 198:8 199:14
**HYLAN** 197:11,12 197:12,13,13,14 199:16,16,16,17,17 199:17

**I**

**imagine** 257:14
**imperative** 259:13
**improper** 246:15
**improperly** 228:16 228:25
**inappropriate** 240:25 241:3
**Index** 197:17 202:3 204:2
**indication** 250:19
**informed** 209:11,23
**initial** 211:12
**inside** 216:11
**insists** 244:16
**instruct** 224:3,8 228:24 252:20
**instructed** 227:4 237:6
**instructing** 222:22,25 223:8,17,20 235:17
**instruction** 233:6
**INSTRUCTIONS** 259:2
**interested** 262:21
**interpose** 230:20
**interrupted** 237:2

**interrupting** 245:24
**invite** 241:4
**involved** 214:17 218:9
**IRIS** 197:9
**ISLAND** 197:16 199:19
**issue** 250:4,9 254:20
**issued** 207:11 208:25

J

**J.P** 198:7
**Jamaica** 199:9,10
**Jeff** 227:18 247:10
**JEFFREY** 199:21
**job** 215:4
**joined** 242:6 243:3
**joining** 242:10
**JONES** 197:21 198:6
**JORY** 197:8 199:15
**JOSHUA** 197:8 199:15
**JR** 200:21
**jruderman@cszla...** 199:24
**judge** 207:10 208:16 208:24 221:6,18 223:13,16 227:8,15 230:16 232:8,10,23 235:14,16,20 236:12 237:16,24 241:24,25 251:15 255:22 256:5
**judge's** 251:13

K

**K** 260:2
**Kataev** 199:8 202:7 205:21 208:14 211:2,8,10 220:20 221:5,19,21,23 222:18,21 223:7,17 223:23 224:2,3,7,14 224:23 227:3,9,12 227:18,22 228:2,7 228:12 230:7,9 231:9,13 233:4 234:12,15,18,23 235:3,5,13,17 236:3 236:20 238:8,18 239:3,4,18 240:2,7 240:16 241:2,4,9,16 241:22,25 242:8,18 242:23 243:4,21 244:6 245:10,16 246:2,10 247:13,22 253:2 254:3,18 257:3,24
**KHAN** 197:9
**kind** 257:6
**knew** 206:21 207:23
**know** 206:8,21 210:24 215:10,14 215:21 216:13 222:9 243:24 245:11,14,19 246:7 252:2 257:9,11
**known** 256:7
**knows** 251:15

L

**L** 260:2
**laid** 247:12
**late** 208:12
**LAURIE** 197:21 200:6
**LAW** 200:12
**lawsuit** 218:3 222:5 222:15 226:21,23 226:25 240:21 248:10
**lawyer** 222:17 242:10
**learned** 209:19
**LEASING** 197:7 198:9 199:15
**leave** 258:6
**left** 217:16 218:24 219:3,10
**LEGAL** 199:7
**Let's** 221:14 230:7 243:15 244:11 257:3
**letter** 215:8 217:2 219:14 220:15 225:6,16,25 226:3,8 226:10 235:8 239:13
**leveraged** 234:16
**Lexington** 199:22
**LIBERTAS** 198:7 201:13
**LIC** 198:2 200:9
**life** 210:9
**limit** 223:21
**limited** 248:5,19 250:8 252:11
**limits** 223:3 238:6
**line** 204:5,10,15,20 238:23
**Little** 198:6,24
**lives** 256:12
**LLC** 197:5,7,7,11,12 197:13,13,14,14,15 197:16,16,23,24 198:2,2,3,4,7,9,10 199:5,7,14,15,16,16 199:16,17,17,18,18 199:18,19 200:7,8,9 200:9,10,11 201:13
**LLP** 198:6 199:20 201:5,14
**log** 258:9
**logical** 245:19
**look** 217:7,8
**loose** 216:20
**lot** 251:18,19
**lovely** 254:14

M

**M** 260:2
**Madam** 221:16 223:9 224:10,14 228:2
**mail** 225:24
**making** 228:25 244:17,22,24
**Management** 197:16 199:19 215:13
**Marc** 197:20 200:5 211:19 212:5 218:19,19 226:2,7 238:20,21,22 239:6 239:20 240:3
**March** 198:13 210:19 211:13 212:15 260:11 262:24
**Marie** 198:20 262:3
**MARKED** 204:19
**Marwaha** 200:12,13 242:6,9,16 243:7,10 243:13,25 244:4,13 245:12,15,22 246:3 247:15 248:25 249:5 253:17,20 254:12,16 255:4 256:15 257:7,20 258:3,7
**Mastic** 205:25
**matter** 252:5 257:22
**matters** 236:13
**mean** 216:7 219:21
**meet** 243:25 244:11
**meet-and-confer** 228:22
**memory** 217:11
**Merckling** 197:20 200:6 212:10,21 218:2 219:16 220:18,24 225:18 225:22 228:15 229:20 235:9 240:3 240:11,21 241:12 247:19,24 248:13 250:18 252:9 253:5 253:14,24 254:5 257:4
**Merit** 198:20 262:3 262:23
**MICHAEL** 197:21 200:6
**mind** 249:4 258:4

**mine** 216:11 242:24
**Mineola** 200:15
**minute** 256:16
**minutes** 227:19,23 253:7 256:11
**missed** 208:12
**Misters** 228:14
**molehill** 230:8
**moment** 227:16 234:5 243:15 253:17
**MORGAN** 198:8
**morning** 227:6 230:23 231:4
**motion** 206:13,20 207:3,7,9 229:3,9 230:14 231:11 244:14,23,25 248:2 252:8,8 255:25 256:21
**motions** 251:19 256:9 256:20
**MOTOR** 197:7 198:9 199:15
**MOTORS** 197:5,24 198:2,3,4,5 199:4 200:8,9,10,11
**mountain** 230:7
**move** 221:9,22 237:15 245:5 256:11
**moving** 241:2 249:25
**mug** 216:10

**N**

**N** 260:2,2
**N.A.189** 198:8
**name** 205:22
**necessary** 259:5
**Neck** 209:7
**need** 208:4 241:23 242:25 245:25
**neither** 262:16,19
**New** 197:3 199:10,23 199:23 200:15,23 201:9 205:18,25 262:5
**night** 216:8
**Nipun** 200:13 242:6 247:14 252:4 256:17
**Nipun@marwahla...** 200:16
**none-** 204:6,11,21
**Northern** 209:7
**NORTHSHORE** 197:7 198:9 199:14
**Notary** 198:21 203:16 205:17 260:24 262:5,24
**numerous** 241:6 244:20
**NYC** 197:22

**O**

**O** 260:2
**oath** 260:10
**object** 221:8 234:8 253:18 254:8
**objected** 224:16 228:16 249:20
**objecting** 231:7 248:21
**objection** 220:19 224:21 227:2 230:24 233:14,17 234:9 235:11 237:3 237:5,14,20,24 238:14,24 239:16 239:25 240:6,14,23 243:11 245:6 247:3 253:10,21,24 254:4
**objections** 203:11 206:13 207:8,23 228:25 230:3,20 244:17 245:10 246:15 247:6,8
**observe** 215:17
**observed** 212:20
**obviously** 251:2 257:11
**okay** 206:7,18,25 207:5,15,16 208:2,6 209:16,22 211:7,16 211:21 212:7 219:19 222:11 223:7 225:8,13 226:5,11 227:22 234:12,16,18,23 235:6 236:3 237:10 241:22 244:4 245:16 246:2,10 247:13 253:2,20 254:12,16 257:13 258:3,5,10
**once** 211:19 228:16 250:11
**opened** 225:25
**opportunity** 237:13 237:23
**option** 228:21
**order** 207:19,22 208:16,21,25 220:20,23 223:3,15 223:22,25 224:12 224:22 228:3 230:5 231:2,3 233:19 234:11,19,21 235:13 236:2 238:5 241:8,11 245:8,16 247:17,18 248:3,4 248:18 249:7,10,13 250:8 251:13 252:10,14 254:10 254:11,15,15 255:7 256:2,8 257:2
**ordered** 228:19 230:16 255:16
**orders** 207:20 229:12 229:13 244:16,21
**original** 259:14
**outside** 214:25 215:18 217:25 218:12,25 222:4 223:14
**overrides** 241:8
**overruled** 246:16
**Ovington** 201:7

**P**

**p.m** 258:12
**Page** 202:4,8 204:5 204:10,15,20
**PAGE/LINE/** 261:3
**papers** 216:18,19
**paperwork** 222:10
**part** 218:4
**parties** 203:5 250:25 251:22 255:10 262:18
**partner's** 214:24
**partners** 198:5 211:20 214:13
**pause** 221:20 222:20 253:4
**pay** 229:18 244:25 245:2
**paying** 230:23
**pending** 234:9 237:5
**Pennsylvania** 201:17
**Pentmoor** 205:25
**people** 246:6
**Perfect** 258:3
**period** 224:6 236:7
**personal** 209:21 213:24
**phase** 256:11
**Philadelphia** 201:17
**phone** 210:4,4,5,11 210:15 212:9 217:8 219:25 221:14 239:7
**physically** 207:25 209:6 211:4
**place** 253:11 262:14
**Plaintiff** 197:17
**plaintiffs** 199:4,14 206:12 207:7 220:23 241:11 247:18

**plaintiffs'** 244:7 254:19
**play** 224:12
**please** 205:7 223:10 224:15 233:19 238:9 259:4,10
**PLLC** 200:12
**point** 213:23 249:15 249:21 251:24
**police** 209:11,14,19 209:23
**portion** 224:18 238:10,15
**position** 230:10 231:19,20,24 244:7 244:10 245:13,17 246:11,12
**possession** 225:15
**pot** 245:25
**preemptively** 254:5
**PREMIER** 198:4
**prep** 229:16
**present** 201:21 209:12 211:4
**prevail** 229:21 230:15 241:18
**prevented** 246:16
**prior** 219:13 262:6
**privilege** 207:9 247:4 247:6 254:23 255:2
**PRO** 200:20
**probably** 210:5 211:19 213:12,20 217:22 225:23 226:2
**problem** 243:22 249:14
**procedure** 229:10 231:18
**proceed** 229:25 230:12 232:12 233:7 234:14,25 235:4 247:9
**proceeding** 234:9 238:2 243:6,12 244:18 246:17 252:19
**PRODUCTION** 204:9
**proper** 253:8,9
**proprietary** 229:4
**Public** 198:22 203:16 205:17 260:24 262:5,24
**put** 231:8 233:4 236:24 242:16 256:8
**putting** 213:4,25

**Q**

**qualify** 208:4
**question** 203:12 207:17 208:3,5,17 208:23 210:22 211:9 218:6 222:13 222:23 223:10,19 224:16,24 225:2 235:15 236:10,16 236:23 238:9,19 239:5 254:17 255:13
**questioning** 231:4
**questions** 204:19 206:14 207:13 211:4,6 213:7 214:7 215:3,21 223:4 228:17 229:5 234:10 245:5,7 246:18,25 248:21 249:24 250:3,6 251:5 254:9 255:14 255:18 256:7
**quite** 231:24
**quote** 220:22

**R**

**R** 200:21 261:2,2 262:2
**raise** 205:6 237:15 247:5,8 253:10
**raised** 207:8 237:14 237:20
**range** 248:17
**re-depose** 220:24 241:12 247:19
**reach** 227:7,12,15
**reached** 227:3
**read** 221:17 223:10 224:15,19 238:8,11 238:16 241:5 249:11,13 250:12 259:4 260:9
**reading** 241:10 249:9
**really** 214:12 221:11 245:3 250:14,15 257:10
**Realtime** 198:21 262:4,23
**REALTY** 197:15 199:18
**reason** 206:8 209:17 259:7 261:3
**recall** 209:25 210:3,6 210:8,12,16 216:2 218:9 219:2,3,5,6 220:10 221:24 222:3 226:6,19,20 226:22 239:11,20 240:18 256:6
**receipt** 259:16
**received** 219:13 220:14 226:7
**Recess** 227:25 228:11
**recitation** 249:7
**record** 205:22 208:6 224:19 227:24 231:8 237:21 238:11,16 260:12 260:14
**reenact** 213:13
**referee** 246:6
**refuse** 229:7
**Registered** 198:20 262:3,23
**relate** 233:15
**related** 206:13,15 229:4
**relation** 217:3
**relative** 262:17,19
**relax** 243:15
**remember** 209:2 213:21 222:7,9,10 222:13 226:15,24
**REMOTE** 199:2 200:2 201:2
**remotely** 198:17 262:8
**removed** 213:10,23 214:9,19,23
**repeatedly** 228:18
**rephrase** 211:2,8
**reporter** 198:20,21 223:9 224:10,15,20 228:3 238:12,17 262:4,4,22,23,23
**REPORTER'S** 202:10
**Reporting** 198:24
**represent** 207:6 246:4
**representation** 207:18 233:12 250:21 251:4 255:17 256:24
**REPRESENTATI...** 197:10
**represented** 251:17 255:9
**representing** 243:8
**represents** 208:18
**REQUEST** 204:9
**requested** 224:18 238:10,15
**required** 236:22
**requires** 237:3
**reserved** 203:12
**resolve** 244:2,12
**respective** 203:6
**respond** 228:24
**response** 226:12

239:15
**responsible** 229:18
**rest** 248:8
**resulted** 248:3 252:9
**retain** 222:14
**retained** 221:25 248:15
**retrieve** 218:16
**return** 225:22 259:13
**returned** 217:19 219:12 220:13,17 225:14
**reviewed** 207:18
**right** 205:6 209:4 215:12 221:13 235:14 237:19 242:8 245:12,15 249:22 255:6
**ROBERT** 197:6 199:6
**role** 221:7
**RONNEBURGER** 201:6
**room** 242:17
**ROSLYN** 198:3 200:10
**ROUTE** 197:15 199:18
**Ruderman** 199:21 208:8,11 227:20 228:9 231:5,15,19 231:21,25 232:5,9 232:13,17,22 233:22 234:24 236:8,14,19 237:8 237:12,19 244:8 247:11 248:23 249:2,5,9,12 254:18 254:24 255:6 256:21
**rule** 229:9 241:5 244:15 252:23
**rules** 229:10 236:23
**ruling** 234:22 237:4 238:4 252:17
**running** 255:5

**S**

**SAGE** 199:7
**SALES** 197:5 199:5
**sanctions** 221:10 229:11,15 241:3
**SARAH** 197:19 200:5
**Saturday** 217:14,18 217:20,22
**saw** 225:24,24 243:18
**saying** 249:20 252:6 255:15 256:14,19
**says** 220:22 221:2 223:22 235:23 236:12 241:15 247:17 248:4,18 252:10,13 255:7 256:2
**scene** 213:13
**scope** 224:22 230:4 230:25 231:7,13 234:11 235:12,22 238:25 239:17 240:15,24 245:8 246:12 248:22 254:10
**SE** 200:20
**sealing** 203:7
**second** 201:8 208:5 208:12 243:13 257:8
**see** 207:25 217:8 237:8 243:25 244:12 257:18
**seeking** 244:23
**seen** 207:20
**sent** 217:2
**separate** 219:17 225:18 242:17
**separated** 215:8
**September** 248:16
**served** 222:5,8,15
**set** 228:12 262:14
**seven** 217:21
**SHANKS** 199:20
**sheet** 259:8,11,14
**shots** 245:25
**show** 243:17
**side** 254:19
**sides** 207:10
**sidewalk** 212:22 213:17
**sign** 259:10
**SIGNATURE** 202:8
**signed** 203:16,17 260:20
**simple** 231:24
**simply** 212:11
**simultaneously** 219:4
**sir** 207:4
**situation** 215:25
**six** 246:22
**SMITHTOWN** 198:4 200:11
**soon** 217:4
**sorry** 225:3 237:11
**sound** 253:16
**sounds** 243:16
**space** 259:7
**speak** 219:21 223:12 223:16 230:2 232:3 232:7 237:23 241:23 243:2,9,12 248:23 249:2
**specific** 213:21
**specifically** 233:14 247:25 256:3
**split** 228:9
**spoke** 225:21 235:9 238:21 240:20
**spoken** 210:14
**ss** 260:5
**stand** 216:8
**standing** 212:21 213:6,16 214:24 215:18 217:25
**start** 253:6
**state** 205:17,22 245:9 245:17 259:6 260:4 260:24 262:5
**stated** 233:6 239:21
**STATES** 197:2
**stating** 254:4
**stenographer** 205:5 205:13 208:10 221:16 228:5 242:16
**stenographically** 262:13
**step** 257:6
**STIPULATED** 203:4 203:10,14
**STIPULATIONS** 203:2 204:14
**stop** 228:25 229:8 235:21 245:22,22 245:24 251:6
**stopped** 246:13 249:19,25 250:6,22 251:10,11 255:21
**stopping** 231:21,25 243:23 244:17
**straighten** 233:20
**Street** 197:15 199:18 201:16
**struck** 223:23
**stuff** 207:24 209:20 209:24 213:3,5,8,24 213:25 214:8 215:22,22 256:9
**subject** 228:22 248:2 248:6
**submit** 253:8
**subscribed** 260:20
**substance** 207:12 249:6 253:8
**suggestion** 253:3
**Suite** 199:22 200:14 200:22 201:16
**sum** 207:12 249:6
**Sunday** 217:20,23
**Sunrise** 197:6,23 198:8 199:14 200:7

200:22
**Superb** 197:5 199:4 209:6 215:9,13 226:10 239:13
**SUPPORT** 204:2
**supposed** 252:15
**Supreme** 226:10 239:13
**sure** 215:20 220:3 221:17 228:5
**SUSAN** 201:15
**sverbonitz@weirla...** 201:18
**swear** 205:8
**switch** 258:6,8
**sworn** 203:18 205:16 208:9 262:8
**SYOSSET** 197:23 200:7

**T**

**T** 260:2 261:2 262:2 262:2
**table** 225:24
**take** 216:9,19 227:19 242:15,22 243:4 251:12,14 257:13
**taken** 227:25 228:11 260:10 262:13
**talk** 219:22,23 220:4 221:15 224:6 235:14,16,19 239:23
**talked** 211:19
**talking** 210:25 212:5 221:3
**tasks** 216:21
**TEAM** 197:5 199:5
**TECHNOLOGY** 199:2 200:2 201:2
**teleconference** 198:18 242:7
**tell** 207:21 208:7,15 208:19,20,24 217:10 226:17
244:6 247:22
**telling** 234:6
**tells** 255:25
**ten** 211:20 227:19,23
**terminated** 226:13 226:18
**termination** 219:14 220:15 225:5,15 226:3,8,9 235:8
**terms** 216:21
**testified** 205:18 235:8
**testify** 262:9
**testimony** 205:9 260:10,13 262:12
**thank** 205:13 206:4 245:10 258:10
**thermal** 216:14
**thing** 235:23,24 236:12
**think** 217:13,14,18 236:4,7 241:5,7,9 241:17,21 247:11 251:19 252:19,22 255:7
**thirty** 259:15
**THOMAS** 197:21
**Thomasson** 197:19 200:21 206:14 210:7,10,15,20 212:20 213:4 214:4 217:25 219:15 220:19 221:13,25 222:14,21,24 223:12,20,25 224:5 224:11,21 225:17 225:21 227:2,10,13 228:15,20,23 229:24 230:19 231:14,17,23 232:3 232:7,11,16,19 233:5,13,25 234:14 234:20 235:11,19 236:6,11,17,25 237:10,17,22 238:13,24 239:16
239:25 240:6,13,14 240:20,23 241:7,20 241:23 242:4,14,21 243:10 244:9,16 245:9,13 247:7,14 247:16 249:11,20 250:16 251:3,5,17 251:25 252:3 253:18,23 254:8,13 255:9,14 256:13,16 256:25
**thought** 206:24
**three** 251:23
**time** 203:13 206:22 206:23 213:5 216:24 217:24 219:13 225:20 228:13 229:16 238:3,3 240:19 242:19,24 246:14 249:19,21 250:4,14 251:8,10,24 257:10 262:13
**timeframe** 211:25
**times** 241:6
**to-go** 216:13
**today** 205:11 206:4,9 211:6 228:13 229:14 245:2 257:23
**today's** 210:18 211:13 228:4 244:24
**told** 208:18,21 213:9 213:11,22 214:9,15 226:13 232:20,24 233:19 234:3 239:12 252:17
**tomorrow** 214:3,5 228:7
**topic** 238:7
**topics** 221:22 246:18 248:17
**transcript** 202:3 228:4 244:25
259:17,18 260:9,12 262:12
**trial** 203:13
**trip** 248:11
**trouble** 233:11
**true** 260:12,14
**truth** 205:9,10,11 262:9,9,10
**try** 213:13 221:21 222:3,18 224:12 244:11
**twice** 230:16,17
**two** 208:19 214:12 239:9 251:23
**two-and-a-half** 213:22

**U**

**UEA** 198:4
**unaware** 238:5
**uncalled** 239:2
**understand** 208:23 212:8 221:7 222:12 225:4,7 230:9,13 234:2
**understanding** 212:19 231:6 247:9
**understood** 234:3 255:23
**Uniondale** 201:9
**UNITED** 197:2
**Urrutia** 197:6 199:6 215:11,15

**V**

**v** 197:18
**vacation** 215:6 216:24,25 217:5 219:12,23,24 220:6 220:14 225:9 239:24 240:4,9
**verbatim** 262:12
**VERBONITZ** 201:15
**violate** 224:13

**violating** 229:11
**violation** 231:2 241:6 244:15

**W**

**W** 198:17 202:6 205:15 260:2,8,18 262:7
**wait** 227:22 232:20 232:23,24 234:4 237:5 252:22 256:16
**waiting** 252:16
**waived** 203:9
**walk** 218:12
**walked** 213:12,15 243:16
**wall** 254:21
**want** 208:18,20 221:15,16 223:12 227:18,21 230:2,13 232:3,6,7 233:25 234:15,17 235:13 235:15,19,20 238:3 245:3 246:6 249:3 251:12 252:15 258:9
**Wantagh** 200:23
**wanted** 249:18 255:23
**wasn't** 209:14 215:20 218:4,9 250:14
**wasting** 242:19
**way** 229:6 251:7
**we'll** 227:24 232:14 233:20 234:20 244:8 253:6,11,12 253:14 258:8
**we're** 207:12 224:5 242:2,18 243:6,23 246:23 248:16 250:24 252:6,24 255:5,21,24 256:3
**We've** 248:8
**week** 211:20 215:7 217:15,20 225:10
**week-long** 217:21
**weekend** 230:15
**weeks** 251:23
**WEIR** 201:14
**welcome** 206:3 232:9
**went** 215:6,22 216:24 217:14 219:11
**Wicks** 208:25 221:6
**Wicks'** 208:16
**willing** 237:25
**witness** 204:4 205:12 205:15 208:8 211:7 221:8 223:18 224:17 228:24 235:18 236:9,15 243:23 244:3 257:16,25 258:5,10 259:2
**wonderful** 252:4
**word** 251:13
**words** 249:14
**work** 257:17
**working** 215:5 219:25 220:3
**world** 251:10
**worry** 257:21
**wouldn't** 210:12 258:4
**wrapped** 252:5
**writing** 221:5 245:21

**X**

**Y**

**yeah** 209:20 210:5 212:12 216:7 217:18 219:8 239:6 257:7,16,25 258:7,8
**years** 211:20 213:22
**York** 197:3 199:10 199:23,23 200:15 200:23 201:9 205:18 206:2 262:5

**Z**

**zealous** 246:7
**ZIZMOR** 199:20
**Zoom** 198:18 199:2 200:2 201:2 242:6

**0**

**1**

**1** 257:15
**1:30** 228:13 243:24 257:23
**10170** 199:23
**11** 228:13
**11:00** 198:19
**11:07** 205:3
**11:33** 234:5
**11:45** 227:6,11,17 233:20 234:4
**112** 200:22
**11423** 199:10
**11501** 200:15
**11553** 201:9
**11590** 206:2
**11793** 200:23
**11821** 199:9
**11th** 225:11,12
**12:04** 258:12
**12:30** 232:20,23 234:7,22 237:7,24 242:2 243:20 252:18 253:11
**1239** 197:13 199:17
**12th** 225:12
**1339** 201:16
**1539** 200:14
**1580** 197:11 199:16
**1581** 197:11 199:15
**1591** 197:12 199:16
**1632** 197:13 199:17
**189** 197:6 199:14
**18th** 210:18 211:12 212:15
**19107** 201:17
**199** 202:5

**2**

**2:23-CV-6188(JM...** 197:18
**20** 260:21
**201** 200:14 202:5
**2023** 209:5 212:17 224:6 235:25 241:14 247:21 248:7 252:12 254:2
**2026** 198:13 260:11 262:24
**203** 204:16
**205** 202:7
**215** 209:7
**23** 197:15 199:18
**2320** 199:22
**2519** 197:14 199:17
**26** 198:13 210:19 260:11
**260** 202:8
**261** 202:9
**262** 202:10
**26th** 211:13 212:15
**27** 262:24

**3**

**30** 241:5 253:6 259:15
**3280** 200:22
**333** 201:7
**37(b)** 229:9 244:15
**3rd** 209:5 212:17 213:15 215:18 216:22 217:3,7 220:25 223:4 224:6 235:25 241:13 247:21 248:7,20 249:18,24 250:2,7,8 250:23 251:2,11 252:12 254:2,20 255:12,21 256:23

**4**

**4** 204:16
**420** 199:22

**446** 197:15
**45** 256:11
**4th** 225:10

**5**

**500** 201:16

**6**

**63** 205:25

**7**

**76** 197:15 199:18

**8**

**9**