UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

PLAINTIFFS,

-against-

Case No.: 2:23-cv-6188(JMW)

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

DEFENDANTS.
---------------------------------------------X

DATE: March 25, 2026
TIME: 10:10 A.M

DEPOSITION of a Non-Party Witness, THOMAS JONES CPA.

DATE: March 25, 2026

TIME: 10:10 A.M

DEPOSITION of a Non-Party Witness, THOMAS JONES CPA, taken by the Plaintiffs, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, before Kim Draper, a Notary Public of the State of New York.

A P P E A R A N C E S:

SAGE LEGAL LLC
Attorneys for the Plaintiffs
SUPERB MOTORS INC., TEAM AUTO SALES LLC
And ROBERT ANTHONY URRUTIA
18211 Jamaica Avenue
Jamaica, New York 11423
BY: EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
Attorneys for the Plaintiffs
189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC
420 Lexington Avenue, Suite 2320
New York, New York 10170
BY: JEFFREY RUDERMAN, ESQ.

WEIR LLP
Attorneys for Defendant
LIBERTAS FUNDING LLC
1339 Chestnut Street, St 500
Philadelphia, PA 19107
BY: SUSAN VERBONITZ, ESQ.

(Appearances continue.)

THE LINDEN LAW GROUP, P.C.
Attorneys for the Defendants
ANTHONY DEO, SARAH DEO, DWIGHT
BLANKENSHIP, MARC MERCKLING, MICHAEL
LAURIE, CAR BUYERS NYC INC., GOLD COAST
CARS OF SYOSSET LLC, GOLD COAST CARS OF
SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE
GROUP LLC, GOLD COAST MOTORS OF LIC LLC,
GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST
MOTORS OF SMITHTOWN LLC,
250 Park Avenue, 7th Floor
New York, New York 10017
BY: NOT PRESENT

HARRY R. THOMASSON, JR., ESQ.
Attorney Pro Se for Defendant HARRY
THOMASSON
3280 Sunrise Highway, Suite Box 112
Wantagh, New York 11793
NOT PRESENT

CULLEN & DYKMAN, LLP
Attorneys for the Defendant
FLUSHING BANK
333 Earle Ovington Boulevard
Uniondale, New York 11553
BY: MICHAEL WEISS, ESQ.

MILBER, MAKRIS, PLOUSADIS & SEIDEN, LLP
Attorneys for the Non-Party Witness
THOMAS JONES
1000 Woodbury Road
Woodbury, New York 11797
BY: JOHN LENTINELLO, ESQ.

ALSO PRESENT:
Tony Urrutia

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

T. JONES

T H O M A S  J O N E S, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. RUDERMAN:

Q. Please state your name for the record.

A. Thomas Jones CPA.

Q. What is your address?

A. 106 Widgeon Court, Great River, New York 11739.

Q. Good morning, Mr. Jones.

A. Good morning.

Q. Thank you for coming here today. I know it's by subpoena and I know that this is the worst time of the year for you to be here, but the court is putting deadlines.

Have you ever been deposed before?

A. Yes.

Q. What type of matter were you deposed before?

T. JONES

A. It was another person in the car business on a tax issue years ago, many years ago.

Q. Who was -- was this an IRS investigation of some kind?

A. No, it was the client that was suing me over something.

Q. Was that a malpractice action?

A. No, sales tax. The sales tax filing.

Q. You or your company were the defendant in that action?

A. Yes.

Q. What was the name of the plaintiff in that action?

A. Charles Shallow.

Q. Did that matter end up getting resolved?

A. Yes.

Q. Was it like settled or was there some -- was it -- did it go to trial?

A. No, it was settled.

Q. How long ago was that?

A. I don't recall. It was at

least ten years ago, I would think at this point.

Q. That's the only other time you were deposed?

A. Yes. Correct.

Q. So it's been a while, so I'm gonna give you some instructions to make sure that we're all clear as to what the expectations are on both sides here with the deposition.

A. Okay.

Q. As you can see there's a court reporter that's virtual here and taking down everything that's being said and that you have agreed that you're testifying under oath; do you understand that?

A. Yes.

Q. Do you understand that the testimony you give under oath has the same import of perjury as it would be if you were in a court; do you understand that?

A. Yes.

Q. The court reporter can only take down one of us speaking at a time, so

T. JONES

I ask that you wait till I finish my question and I will do the same courtesy to wait, until you finish your answer before we talk, as she can't take both of us speaking at the same time; do you understand that?

A. Yes.

Q. Also the court reporter cannot properly note a gesture or a nod, so all of your answers need to be verbal; do you understand that?

A. Yes.

Q. Also, if I ask you a question and you don't understand the question, please let me know and I will try to rephrase it so you do understand; does that make sense?

A. Yes.

Q. It does. If you answer a question I will assume that you understood the question that I asked; does that make sense to you?

A. Yes.

Q. If you need to take a break at

any time during the deposition, please let me know, to use the men's room or any other reason, just if there's a question pending I ask that you answer that question first and then we'll take a break to accommodate you; do you understand that?

A. Yes.

Q. Is there any reason why you would not be able to give truthful and accurate testimony here today?

A. No, there is not.

Q. Did you prepare in any way for today's deposition?

A. If you can clarify that, prepare in what way?

Q. Let's break it down, if it's easier for you. Did you meet with anybody to prepare for today's deposition, don't tell me what you discussed just tell me, did you meet with anybody to prepare for today's deposition whether in person, on the phone or virtually?

A. I just met with my attorney John on the telephone.

T. JONES

Q. When was that?

A. Yesterday.

Q. Without telling me what was discussed, about how long did you spend on the phone with John?

A. 30 to 45 minutes.

Q. Did you ever meet or speak to John previously before yesterday to prepare for today's deposition?

MR. LENTINELLO: Note my objection, but you can answer.

A. Yes, over the phone.

Q. When was that?

A. I don't recall the dates.

Q. Was it more than one time?

A. I don't recall if it was more than one time.

Q. Did you review any documents in preparation for today's deposition?

A. I did not.

Q. Have you at any point during this litigation that you're aware of reviewed any documents in connection with the litigation?

T. JONES

A. When we were subpoenaed to send records to, I guess you guys, I had put the records together for that.

Q. How did you go about looking through your files to determine what records you would be producing?

A. Well, we have paper files, and we have electronic files, and I went through both to get the request of the documents that were in the subpoena.

Q. Now, do you maintain, you're familiar with the matter here concerns North Shore Motor Leasing, correct?

A. Yes.

Q. And 189 Sunrise Highway Auto, correct?

A. Correct.

Q. Anthony and Sarah Deo?

A. Correct?

Q. There are some other parties as well.

Do you know do you know Mark Merckling?

A. I do.

T. JONES

Q. Do you know Dwight Blankenship?

A. I do not know that name.

Q. Do you know Michael Laurie?

A. I do know of him.

Q. Did you review your files, physical files with regard to all of these entities or individuals that I just discussed?

A. I don't recall specifically those individuals, but if it was in the record request in the subpoena then it would have been in there.

Q. Did you maintain physical files for each client that you have in your firm?

A. No.

Q. Did you maintain physical files, let me back up was North Shore Motor Leasing a client of your firm?

A. Yes.

Q. By the way, what is the name of your firm?

A. Jones Little and Company, CPA LLP.

Q. How long have you been

T. JONES

associated with that firm?

A. 36 years.

Q. What is your relationship to the firm?

A. I'm the managing member.

Q. Are there other members of the firm?

A. Yes.

Q. What are their names?

A. Roy Little, Cathleen Hallway and Lee Ann Poe.

Q. They are all CPAs?

A. Yes.

Q. They are all members of your company; is that a limited liability partnership?

A. Yes.

Q. So they're all members of the partnership?

A. Correct.

Q. Are there any -- are there any employees of the partnership?

A. Yes.

Q. How many people work at the

T. JONES

firm?

A. In total about 20 to 25, depending on the time of the year.

Q. Of those people how many are CPA professionals?

A. I believe it's four.

Q. Is that including you and the other four, the other three members or is that in addition to?

A. In addition.

Q. So there's four members and then four nonmember CPAs?

A. Three to four, yes.

Q. The rest of the people are support?

A. Well, they're accounting staff and also administrative staff.

Q. What is the business, can you describe the business of Jones and Little?

A. It's an accounting firm that does any type of services that are requested by clients, as long as we do them or are familiar with them for accounting, for taxes, sales tax, payroll tax, income

T. JONES

tax, corporate tax.
Q. In addition to doing taxes, does the firm do audits?
A. Yes, we do audits for the financial statements.
Q. In addition to audits of tax, is there anything else that the firm does on a regular basis?
A. Some valuations of businesses.
Q. I'm assuming you graduated from college?
A. Yes.
Q. Where did you graduate?
A. Sienna.
Q. When did you graduate?
A. 1983.
Q. What degree did you graduate with?
A. A bachelor's degree.
Q. Bachelor's degree in what?
A. Business or accounting, I'm sorry. Accounting.
Q. You graduated with an accounting degree?

T. JONES

A. Yes.
Q. When you graduated in 1983, did you begin working as an accountant?
A. I did.
Q. Where was your first position?
A. A firm called Copeland, and Valsky (phonetic).
Q. Where was that located?
A. Started in Miller Place and moved to Port Jefferson, New York.
Q. What was your position there?
A. I started as a staff accountant, ended up as a senior accountant.
Q. How long were you there?
A. Seven years.
Q. That makes approximately to 1989?
A. Yes.
Q. In 1989, what did you do for employment?
A. We started this firm.
Q. Did you start the firm with the other three members?

A. Roy Little I started with and another CPA was with us, who is no longer with the firm.

Q. Since 1989 you've worked exclusively for your own firm?

A. Yes.

Q. Do you have you any graduate degrees?

A. I do not.

Q. Do you have any certifications?

A. CPA license.

Q. When did you obtain your CPA license?

A. 1989.

Q. Is that license current?

A. Yes, it is.

Q. Do you know whether you have any complaints that were raised against you to the licensing bureau?

MR. LENTINELLO: Note my objection. You can answer.

A. No, I do not.

Q. No, you're not aware of any, is that what you're saying?

T. JONES

A. Correct.

Q. Now, does your firm specialize in any particular businesses in its accounting?

A. We don't specialize in anything, but we have concentrations in the auto industry, we have con concentrations in yellow book audits for fire districts.

That's the bulk of what we have in the way of concentrations.

Q. So, the incidents that we're talking about today go back to, I believe around 2020 through 2023.

My questions will generally refer to that period of time, if I ask you questions about certain items. Please, if they're -- if the information you're giving me, if the information you are giving me, if you do not recall exactly what it was back then let me know. If don't remember exactly at that time, we can discuss whether it currently is and whether you think there was any changes. That's the period of time which we'll be discussing;

T. JONES

do you understand that?
A. Yes.
Q. What, how many automobile customers dealership customers did Jones and Little have?
A. At that time or presently?
Q. Again so I'll, well, if it's easier for you, we'll just say how many right now?
A. Seven.
Q. Other than the North Shore, other than North Shore or Sunrise or any other dealership associated with Mr. Deo, other than those, how many other auto dealerships were you working with around 2020 to 2023?
A. It still would have been in the seven range at that time.
Q. Are these dealerships new car, used car or some combination?
A. All of them presently are full service new used service parts.
Q. These are all franchised motor vehicle dealerships that also have a used

T. JONES

car department?

A. Correct.

Q. What is the name of those dealerships?

A. There's Smithtown Toyota, Smithtown Kia, there is Generation Kia, Generation GMC, there's World Auto Group, Nutley Kia, Centerreach Hyundai. Then, I have a used -- New York 112 is a used car lot.

Q. Were all of these dealerships your clients in around 2020 to 2023?

A. Two of them were not.

Q. Which ones were not?

A. Nutley and the used car New York 112.

Q. Putting aside the Deo related dealerships, did you have other clients that were you clients then that are no longer your clients?

A. No, I don't believe so.

Q. Do all of dealerships that you do work with require the same services or does each dealership have different

T. JONES

services that you perform for them?

A. Each dealership has different services.

Q. If you can explain to me, if you know why do some dealerships have certain services or other dealerships other than -- different services than the other dealerships?

A. A few of the dealers that I have now wanted to see me quarterly and then I have some of that want to see me monthly.

Q. For these dealerships, do you provide tax services to them?

A. Yes.

Q. That would include preparing annual tax returns, correct?

A. Correct.

Q. Then quarterly filings, sales tax, payroll tax, et cetera and so forth?

A. No, the dealerships have their own payroll companies, whether it's ADP or Paychecks or one of those services. I do the sales tax for three of the dealerships,

T. JONES

the other ones do their own.

Q. So, in addition to providing tax services, what other services do you provide for your clients, automobile clients?

A. We review the trial balance and schedules, whether it's monthly for some of these clients or quarterly for the other ones, and offer suggestions on adjustments to be done. Discuss other things that are going on with the dealership.

Q. The adjustments that are made, can you explain to me what type of adjustments you might make to a dealership books after looking at the trial balance and the schedules?

A. Going through the schedules, if we see some say, for example, warranty receivables that are on the schedule for more than say 120 days, we ask if those are still due and owed from the factory. If they can't find that it is due then it's our suggestion to either write it off or something like that.

T. JONES

Q. So you're looking to see whether the way that items are recorded on the company's books still are an appropriate way to continue to record them?

A. Actually, we're looking to see if the books are accurate.

Q. The information that's put into the records that you review, the trial balance and the schedules, you don't -- your firm puts those -- puts that information into the dealer system, correct?

A. That's correct.

Q. Do you -- are you familiar with the various dealer DMS systems, are you familiar with that term?

A. Yes.

Q. Dealer management systems?

A. Yeah.

Q. To do all of your clients use the same DMS system, if you know?

A. I do know that, they do not.

Q. Are you ever personally, I don't wanna say you, your firm actually

T. JONES

involved in putting entries or key strokes, if you will, into the DMS system of your client?

A. We are not.

Q. So if you make a suggestion or an adjustment or any changes, how would you go about getting that implemented at the dealership?

A. We either would -- some dealers we write up an entry and give it to them to put it in. Other ones we tell them what it is and they write up the entry and put it in.

Q. When you say you give it to them, is there some methodology which you give them that information?

A. It's on the voucher sheet it's called.

Q. Who creates that voucher sheet?

A. As I said, there's times that I do, no one else in my firm deals with the dealerships, and in some instances the controller or office manager would write up the journal entry.

T. JONES

Q. I think my question may not have been clear.

You call it a voucher sheet, is that a specific document or is that just the term you're using?

A. Well, it's in the industry. It is a journal entry sheet, they call it a voucher sheet.

Q. Is that a paper document?

A. Yes, it is.

Q. You would hand write in the suggested adjustments that would be done on that voucher sheet?

A. With some dealers, yes.

Q. Would you give that to, is there typically one person at the dealership that you would be dealing with for these types of adjustments?

A. Yes.

Q. Who would that be?

A. The controller or office manager.

Q. Do you keep records of the voucher sheets?

T. JONES

A. Yes.

Q. This is a paper, so would you make a copy of it and then take it back to your office or how else how would you make a keep a record of it?

A. Normally, yes, I would make a copy of it and have it in the file.

Q. How long do you typically maintain those records?

A. Normally seven years.

Q. You said there are situations where you would verbally tell that to the controller, would they then fill out the data sheet based on what you told them, then you get a copy of that voucher sheet?

A. Well, they would fill it out based on what they've investigated to see whether something should be written off or not.

Q. Then, if they filled out a sheet based on your oral recommendation, would you get a copy of that voucher sheet?

A. Not normally.

Q. The only time you would have a

T. JONES

copy of the voucher sheet is if you prepared it and handed it to them?

A. That's correct.

Q. Okay. Do you know whether -- do you know whether in fact they've implemented the change that you put on the voucher sheet?

A. I would not know it until I looked at the file, dealer financial statement.

Q. If you went in, for example, quarterly to the customer, would you know the next time that you go in there, the next quarter that you look or would you have to -- or you wouldn't know it until you'd see the end of your financial statements?

A. The quarterly ones would be the next time I would go in, because they already send the dealer statement to the factory prior to me coming in to review the trial balance and the schedules.

Q. When you come in to review the trial balance and schedules, they've

T. JONES

already submitted the financial statements to the manufacturer?

A. Just the ones I saw quarterly.

Q. What about now, that's with regard to the manufacturer, what about to any of the floor plan financing that they have, do you know if that financial statement is also submitted to that entity?

A. If it's required then I know that it gets sent.

Q. Now, I think I was previously asking you about physical files that you keep in the office, so these vouchers sheets that you have, would they be brought back to the office and put into a file, digital file or physical file or digitized, or what would happen to them?

A. When I take them back they're in a physical file.

Q. Do you at some point upload them onto a server or do they stay in a physical file?

A. They stay in a physical file.

Q. So, if you had these voucher

T. JONES

sheets, then they would stay in that file physically for seven years as you said, correct?

A. Correct.

Q. Now, when you, generally speaking, in an automobile dealership, when a car is sold, the sale price is recorded as a revenue item, correct?

A. Correct.

Q. What would be, above the line item for a gross profit, what would come off the cost of goods sold?

A. Would be the cost of the vehicle and in general some dealerships put what's called PACK into the cost of the vehicle.

Q. The PACK. Could you spell that?

A. P-A-C-K?

Q. Do you know what is typically included in a PACK?

A. It's normally a dollar number that's added to the cost basis to lower the gross profit on the car so that the sales

T. JONES

people are not paid on the full gross profit.

Q. Do you know what items are included in the PACK?

A. It's made up by each dealership.

Q. So, it's just a dollar number it's not associated with an actual expense?

A. A lot of times they factor in what they wanna, for lack of better words, keep as house profit, as opposed to having the salesmen get paid on it.

Q. It has to be at some point a legitimate expense, doesn't it?

A. No. What they do is after they book that, then they move that number, that profit into another account, miscellaneous income or something like that.

It's not -- it's a -- it's a cost that's in the DMS system. But not an actual cost on the car. So it's more for commission calculations.

Q. For tax reporting purposes, it's not on the P&L at all?

T. JONES

A. Yes, it is. Yes, it is.
Q. It's deducted from the gross, from the revenue item?
A. Right, it's deducted on the gross profit and then added as miscellaneous income or other income.
Q. So, it's removed from one location and put someplace else?
A. Yes.
Q. The bottom line, the net profit includes that amount?
A. That's correct.
Q. Now, what about sales commissions, that they're not part of the cost of goods sold, correct, that's an after line item?
A. That's correct.
Q. Now, in an LLC do owners, are owners permitted to have salaries?
A. Well, if they are filing as an S corporation, then they can.
Q. When an LLC is formed, you can choose to designate it as a corporation or as a partnership or if there's only one

T. JONES

member then it's a sole proprietorship, is that accurate?

A. That is correct, but a sole proprietor can elect to file as an S-corp.

Q. If an LLC elects to be treated as an S-corp, would it file an 1120-S tax return?

A. Yes.

Q. If it files a 1065 tax return, that would be a partnership tax return, right?

A. Correct.

Q. So, if an LLC designates itself as a partnership filing a 1065, can the owners draw a salary, as salary?

A. Not normally.

Q. Any money that they take out from the dealership for their regular, you know, on a regular basis for a living, would typically be recorded how in the dealership books?

A. Either a distribution or a guaranteed payment.

Q. On what schedule would that be

T. JONES

recorded?

A. The guaranteed payment is recorded on the K-1. And the distribution is also recorded on the K-1 on a different line.

Q. Are you currently performing any accounting services for any dealership related to Anthony Deo?

A. The only thing we have filed are extensions each year, and also just filed the zero tax return after the extension period is over.

Q. You lost me on the last one. You filed extensions, then you filed a zero tax return; what does that mean?

A. Zero activity tax return.

Q. What entities currently do you currently perform some sort of accounting services for, that are related to Anthony or Sarah Deo?

A. North Shore Motors, 189 Sunrise Highway, North Shore Auto Outlet, Car Buyers Inc, and I believe there's one other one, but I don't what that is.

T. JONES

Q. Is it a Gold Coast entity?
A. Gold Coast, yes. Sorry, Gold Coast of Syosset. I think there's Gold Coast of --
Q. Sunrise?
A. Sunrise. Thanks.
Q. Those are all current clients of the firm, correct?
A. Yes.
Q. In addition to doing tax services for them, do you perform any other services for them, currently?
A. Currently, we do the same thing with their personal returns.
Q. You also prepare the personal tax returns for Anthony and Sarah Deo?
A. We have prepared extensions, but not their personal returns.
Q. When was the last actual tax return, that you filed for Anthony and Sarah Deo?
A. That I don't recall the exact date.
Q. Do you recall approximately

T. JONES

when the last actual tax that they filed?

A. I'd actually be guessing, 'cause I have not prepared one in a few years.

Q. When was the last time that you can recall preparing one for them, forget about the year you were preparing it for, but the last time you actually remember preparing one?

A. I really don't know if it would be the 2021 year or the 2022 year, I am guessing.

Q. When you file extensions for tax returns, that does not permit you to also put off payments for the taxes, correct?

A. Correct.

Q. When you file a tax return, an extension for a tax return, you are supposed to put down the amount of income that would be subject to tax for that year, to the best of your ability at that time the?

A. Not income, you don't know put

T. JONES

on an extension.

Q. For either for New York or for federal, you don't put down what the projected income amount is?

A. Not income amount, no.

Q. What information do you put down on an extension?

A. The estimated tax number.

Q. Do you know whether any estimated tax numbers were put down for any -- for any year that you filed for Anthony and Sarah Deo?

A. They were zero.

Q. For every year that you can recall?

A. That I can recall, yeah.

Q. Do you believe that you have filed extensions, I don't know from the beginning -- currently, at least through the current year, 2024, 2025 are not due yet, right, for 2024, do you know if you filed an extension for Anthony and Sarah Deo?

A. I did.

T. JONES

Q. That would have showed a zero?

A. Correct.

Q. Going back further than that, as far as you can recall they were always zeros?

A. Not all of them were zeros. But, I don't recall which ones were and which ones were not.

Q. You do recall the actually filing an actual tax return for Anthony and Sarah Deo?

A. Yes.

Q. By the way, do you know if they filed jointly?

A. They were filing jointly, yes.

Q. Do you recall whether in any of those tax returns that were filed, they paid any income tax?

A. That, I don't recall.

Q. You don't recall the paying of tax or you don't recall whether they did it or they didn't?

A. Well, I wouldn't know if they paid the tax.

T. JONES

Q. When you prepared the returns did you file them as well?

A. We filed them for them.

Q. In the returns that you filed for them, do you recall whether the tax return required them to pay any income tax?

A. I know I have had tax returns that required them to pay tax.

Q. Whether they paid the tax or not you have no idea?

A. Correct.

Q. You have records of all of these tax returns and extensions that were filed, correct?

A. Yes.

Q. When you did your search in the subpoena, did you look to see whether you had any of those records?

A. In the subpoena, if it was requested, we got whatever the records were that we did have in their possession and put them in.

Q. What about for all the different dealerships, do you recall

T. JONES

whether you searched your records to see whether you had any documents related to tax filings for any of these other entities?

A. Yes, 'cause I believe that was also in the subpoena.

Q. You believe you produced of all of the tax returns that were requested, if they were requested?

A. If they were requested then we submitted -- we supplied everything that we had that was requested.

MR. RUDERMAN: So, I'm going to note that I don't recall receiving numerous documents reflecting what you said you have, as opposed to what was requested.

I'm going to follow up this up in writing, but to the extent that any documents that were requested that have not been produced, I'm gonna ask you to do another search and provide those to your counsel to turn them over.

Q. Do you understand that?
A. Yes.

MR. LENTINELLO: Taken under advisement.

Also, I just have a question for counsel.

I know that technically the Deo defendants are not represented by counsel right now.

MR. RUDERMAN: Well they are represented by counsel. They are just not here.

MR. LENTINELLO: I apologize you are right.

I just wanna make sure because for their personal returns, I don't wanna go awry with any 7216 issues.

We would need consent from the Deo defendants to produce their personal returns.

That's the only item, we could ask questions on it. I haven't have not objected because I think that all of your questions are valid so far,

T. JONES

but for any details of that we need the Deo's defendants personal consent to produce their personal returns.

26-USC-7216, that's a requirement an on all accountants.

MR. RUDERMAN: Well, I mean, we produced -- we served the subpoena, there's been no objection to the subpoena, as far as I'm aware.

To the extent that they don't provide the consent, we would have to seek an order to compel them to provide the consent.

MR. KATAEV: This is Emanuel Kataev. I wanna make two statements.

Number one, there is a confidentiality stipulation and order in place, that should waive any concerns.

As far as compliance with the consent requirement, I guess, you would have to seek relief from the court or reach out to the Deo defendants directly, by and through

T. JONES

their counsel.

MR. LENTINELLO: Understood. I appreciate that, I just wanted to the make that clear for the record.

BY MR. RUDERMAN:

Q. When you prepared the extensions for the Deos showing zero tax, what was the information that you had, you relied upon in order to prepare those extensions?

A. The client telling me that they didn't have income for the year.

Q. Are all of the entities that you described, I don't wanna make a list of them, you're familiar with the ones you just went through, you prepared the returns for -- excuse me.

Were any of those dealerships, did any of them show any profit for tax purposes?

A. For what periods?

Q. Let's start with the last -- the most current period for 2024.

A. I didn't have any information

T. JONES

so I filed a zero return.

Q. Do you know which of these dealerships are currently operating?

A. I do not know, I do not.

Q. Do you know if any of them are currently operating?

A. I do not.

Q. When you say they're clients of yours, if they're not operating and you're preparing extensions for zeros, exactly what do you for them as a CPA?

A. For the last few years that's all I have done for them is file extensions.

Q. Do you know go into wherever these dealerships might be located?

A. I do not.

Q. Do you meet with the Deos, with regard to these matters?

A. I do not.

Q. Do they come into your office at all?

A. No, they don't. Normally it's a phone call when we do the extensions.

T. JONES

Q. So, you haven't seen any books and records for any of these dealerships for years?

A. Correct.

Q. Do you recall whether at any point any of these dealerships showed net income for tax purposes?

A. I don't recall if there was net income or net losses.

Q. Now, are all of these dealerships, as far as you know, LLCs in which the Deos are members?

A. Yes.

Q. Are all of them as far as you know LLCs in which the Deos are members?

A. A few of those ones that I gave you the names of are S corporations.

Q. I know that you mentioned Car Buyers, that's Car Buyers, NYC, Inc, right?

A. Yes.

Q. As far as you know, are the Deos, one or both the sole shareholders of that S-corp?

A. Yes.

T. JONES

Q. Were any of those other entities that you're aware of corporations?

A. I believe North Shore Auto Outlet is.

Q. To the best of your knowledge, are the Deos the sole shareholders of that as well?

A. Yes.

Q. Whether it is an S-corp or an LLC as a partnership, in either case, there would be a K-1 issued from the return, correct?

A. That's correct.

Q. All right. So, any income from any of these dealerships, the tax return for each one of these dealerships would only list what the net income was or net loss at the bottom, but no tax would be payable in connection with the filing of that return or was required to be paid, correct?

A. Correct, except the New York state.

Q. The franchise tax that would

T. JONES

have to be paid?
A. Correct.
Q. The K-1s would then get applied as part of personal return of the shareholders or members of that company?
A. That's correct.
Q. The income or loss from each K-1 would then be listed on the individual returns, correct?
A. That's correct.
Q. If there was -- then you would add or subtract those numbers to come up with the bottom line for whether there was a net profit or net loss from all these dealerships combined; is that a fair statement?
A. Yes.
Q. Can you offset a loss against a profit from any dealership or are there qualifications as to whether they're passive or active, et cetera, and so forth, I'm not gonna get to all the weeds, but if you can give me a little bit of information on that?

T. JONES

A. They need basis in the individual LLC to be able to take any loss. As you said, if it's passive then you have to -- can only put the passive loss against passive income.

And if it's operating then you have enough basis you can put the loss against the income.

Q. So sitting here today, do you know whether or not any of the net K-1s after adding and subtracting each years K-1s for any dealership, whether the Deos would have a net income or net loss for any particular year?

A. I don't recall. I have to look at the actual returns.

Q. Now, when did you first meet Anthony and Sarah Deo?

A. I don't know the year. I am just not sure if it was 2019 or 2020.

Q. By the way, I should have given you this instruction, I apologize, if you haven't -- if I ask you a question and you can approximate the answer, but you don't

know exactly, it is fair to tell me that you don't know exactly, but I do want the best recollection that you have, let me know approximately, you know, give me the answer for the approximation that you were able to give me.

Okay, so in this situation, you know, sometime around what year that you met them?

A. I would think that it was 2019 or 2020.

Q. What were the circumstances that you first met them?

A. It was to handle the operations or the accounting for the operations at the North Shore Motors.

Q. How did you get introduced to them, if you recall?

A. It was through a mutual contact Frank Ventimiglia.

Q. How do you know Mr. Ventimiglia?

A. He had worked at a dealership that I had many years ago.

T. JONES

Q. What was the name of that dealership?

A. Heustead Chevrolet.

Q. Do you know how it came about that Mr. Ventimiglia introduced you to the Deos?

A. The Deos were looking for an accountant that was familiar with the car industry.

Q. Did they have an accountant at that time, if you know?

A. I don't recall.

Q. Do you recall first meeting them?

A. I don't.

Q. When is the first recollection that you have of actually meeting them?

A. I do recall meeting them at North Shore Motors in Syosset.

Q. Do you recall what year that was?

A. As I said, I believe that it was in the 2019 or 2020 year.

Q. At that time, what, if anything

T. JONES

did you discuss as to why they wanted to meet with you?

A. They discussed that they were going to be running the operations at North Shore Motors and they needed an accountant that was familiar with the car business.

Q. What did they say their relationship was to North Shore Motors?

A. At the time they told me that they were the owners, that the paperwork was being done for them to be the owners.

Q. Did you ask them for any documentation at that time?

A. I didn't at the time because the paperwork wasn't completed yet.

Q. When you said that the paperwork wasn't complete, what did you understand that to mean?

A. It would have been the transfer of the shares of ownership of the LLC.

Q. Did you understand that somebody else had ownership and it was being transferred to Anthony and Sarah Deo?

A. Yes.

T. JONES

Q. Is that what they told you?
A. Yes.
Q. Who did they say had the ownership at the time?
A. I believe it was Josh Aaronson and I know there was Brian Chabrier, I think his name was pronounced.
I think there was one other person if I recall, but I'm guessing.
Q. When they said the paper was being transferred, did they explain to you what their relationship was to the dealership and before its transferred; what was their connection to it?
A. They were operating it.
Q. Do you know if they had some management agreement or some other -- what was their arrangement, if you understood?
A. I do not know.
Q. Do you know what their compensation was at that time?
A. I don't know what it was or how it was calculated.
Q. You first meet with the Deos,

T. JONES

they want you to become, they are interviewing here for the -- to be the accountant for North Shore Motors, correct?

A. Correct.

Q. Did you meet with both of them, by the way or just Anthony?

A. Just Anthony.

Q. You went into the operation, you walked -- you went into the dealership itself?

A. I did.

Q. Do you recall how many employees were working there at that time?

A. No, I didn't see everybody.

Q. Do you recall if the lot was full of used car inventory?

A. The lot had cars in it, but I don't know which ones were owned by the dealership and which ones were at other businesses, unrelated to them at that parking lot.

Q. There were other businesses that operated out that facility?

A. Not that building, but they had

T. JONES

a shared parking lot.

Q. Was there a mechanic shop as far as you know at that location?

A. I believe there was in the back, but I had not seen it.

Q. Did Anthony introduce you to anybody else at the dealership when you were there?

A. The controller.

Q. Do you recall what his or her name was?

A. It was a gentleman. I'm trying to remember what his name was. I don't -- I just don't recall. Dan, it was Dan.

Q. Dan O'Sullivan?

A. Yes.

Q. When you first went in there Dan O'Sullivan was working there as the controller?

A. Correct.

Q. Did Anthony introduce you at that time?

A. I don't know if it was that time or if it was the next time I was in

T. JONES

there.

Q. What services specifically did Anthony say he was gonna be asking you to perform?

A. To review the statements and the schedules and trial balance on a monthly basis and to prepare tax returns.

Q. What did you understand your relationship would be with Dan O'Sullivan?

A. I would be working with him more because he is the one that had all the records and details.

Q. You previously described some work that you do at other dealerships and working with the controllers and such, did you expect your business relationship with North Shore to be different than the other business operations, or pretty much the same routine that you do with other dealers?

A. Pretty much the same.

Q. After that first meeting, what next happened in connection with whether you were hired or not to perform accounting

T. JONES

services?

A. I'm just trying to think if it was the next month or the following month that I went in to look at the month end.

Q. You were hired?

A. Yes.

Q. Anthony told that you he wanted to engage your services?

A. Yes.

Q. Do you know whether he needed anybody else's authority in order to do that?

A. I do not.

Q. What did you understand the relationship, if any, between the operation of the dealership and those other individuals, for example, Josh you mentioned and Brian at that time?

A. Well, I just knew Anthony was the operator. Again, eventually was getting the paperwork that was gonna show him as the owner.

Q. When you first got retained by Anthony, was there some sort of a written

T. JONES

engagement letter?

A. I don't recall if we did an engagement letter, but I have to check my files.

Q. Do you have engagement letters with your other clients?

A. With some of them, yes.

Q. Is it typical to have an engagement letter with the client as a CPA firm?

A. In most instances.

Q. Is there a reason why you did not -- if you did not have an engagement letter, would there be a reason why you would not have an engagement letter for North Shore?

A. Not in particular.

Q. You said that you went in there to look at what, the monthly trial balance that first time?

A. Not the first time, but when I went in subsequent to that.

Q. After you were retained, you went in to look at the trial balance of the

T. JONES

dealership, correct?

A. Correct.

Q. Were you asked to look at anything else or did you need to look at anything else?

A. The schedules.

Q. What schedules, you don't have to give me every single one, but typically, what type of schedules were you looking at?

A. New vehicles, used vehicles, receivables, payables.

Q. What was the purpose of you looking at the trial balance and schedules?

A. It's to make sure that the financials, the dealer financial statements are accurate as they can be.

Q. Do you know what type of DMS system North Shore was using?

A. No, I don't recall what they had at the time.

Q. Do you recall if you needed to review the trial balance and other schedules, how did you get them?

A. Dan would print them out.

T. JONES

Q. Would you specifically say Dan, I need X, Y, Z and he would print it out for you?

A. I would say that I need the trial balance and all the schedules.

Q. Then, he would print them out for you?

A. Correct.

Q. When you got them, what would you do with them?

A. I would review them to see if there was anything that seemed to be not in the right spot or not on the right schedule.

Again, offer or ask them or ask him to see what that was or if it belonged there or not and he would investigate it.

Q. When you looked to see whether there were things which might need some sort of adjustment, was that simply based upon your own experience in the industry, you look at certain numbers and you have questions about them?

A. Yes.

T. JONES

Q. Did you speak to Anthony about these trial balances or schedules?

A. Not until we -- I had gotten the answers from Dan, as to what might need to be changed or updated or adjusted.

Q. When you looked at some items on the trial balance or schedules that you thought require some investigation, what would you ask Dan; how do you go, you know, to investigate what exactly, if you can give me an example?

A. Well, let's go back to the warranty receivable schedule, if something was on that there was a credit balance instead of a debit balance, I circle which ones for him to look at and then he would take the schedule and look at it.

Q. What type of information would he -- would he report back to you that would help you make a -- help you make your recommendation?

A. That would depend on what the item was and where he got the information.

Q. For example, what question

T. JONES

would you ask him, would you say, here circle this and he'll say, yeah, that's warranty information, you're saying, well is it X or, you know, what is it you're you asking him to check into that he would then answer your question?

A. To see if it's still a receivable that would linked from the factory.

Q. You had specific questions saying there are certain items on here, I wanna know if they're still viable, and they should be recorded the way they're currently being reported, generally speaking; is that a fair statement?

A. Yes.

Q. Then after Dan came back to you with an answer, would you then speak to Anthony about, okay, here's what I found, and here's my thoughts?

A. Yes.

Q. After doing that, he would say yes to some or no to some, whatever may be with regards to your recommendations?

T. JONES

A. Yes.

Q. Would you prepare one of those voucher sheets you discussed and have Dan implement that?

A. I believe I did for them and they would put them in, and then Dan would put it in.

Q. These voucher sheets, did you, as you said, keep copies of them?

A. Yes. Any that I did prepare, I have copies in the file.

Q. It's been less than seven years, so you should still have copies of all those voucher sheets?

A. Correct.

Q. Would it be fair to say that all adjustments that you recommended that were approved, would be contained on these voucher sheets that you have in your office?

A. No, because there would be some that I told Dan, he just made the adjustments itself with an entry.

Q. So, would it be -- would it be

T. JONES

fair to say that most of them would have been done in writing with vouchers, that there were some that weren't in writing?

A. I'd say some of them, not most of them. I'd say some of them.

Q. Let me make it clear.

A. I would say some of them.

Q. Some of them are oral or some are vouchers?

A. Some are vouchers.

Q. Most of them are oral?

A. Not most of them, it would vary month to month.

Q. As you sit here today, are you able to give me a breakdown to say on a percentage basis, how many would have been in writing on a voucher sheet and how many would have been oral?

A. No.

Q. To the extent they were in writing, you would have voucher sheets for them?

A. That's correct.

Q. Now, I mean, Dan didn't decide

T. JONES

which he would or wouldn't do, right, once Anthony made the decision, he would just implement whatever Anthony decided was the adjustment that would be made?

A. I don't know if he decided on any prior to any adjustments, prior to me seeing it.

Q. No, afterwards. I'm talking about afterwards.

If you and Anthony discussed the adjustments, and then Anthony said okay, we're gonna make these adjustments the direction was given to Dan to implement those adjustments as far as you know?

A. That's correct.

Q. Now, were you familiar -- what we just described as a situation when you first went in, would it be fair to say that was pretty much what you did on a regular basis for the company?

A. Yes.

Q. Ultimately, Anthony was involved in the 189 Sunrise Highway dealership as well, correct?

T. JONES

A. That's correct.

Q. Did you do the same services, the same way and everything else for Sunrise as you did for North Shore?

A. Yes.

Q. All right. Was Dan the controller for Sunrise as well?

A. Yes.

Q. Did you ever look at the bank statements of the dealership?

A. No, I don't recall looking at them.

Q. Other than seeing the monthly trial balance, again, I'm not talking about doing the tax returns, so let's put that separately.

Did you go in monthly or quarterly to North Shore and then when you added 189 Sunrise Highway to 189 Sunrise Highway?

A. I went monthly.

Q. On a monthly basis, other than looking at the trial balances and schedules, all the schedules on a monthly

T. JONES

basis, did you ever look at any other documents at the dealership?

A. I don't recall looking at anything else 'cause that's mainly what I did there.

Q. Now, at the end of the year, do you recall the first tax return that you did for North Shore?

A. I don't recall the year.

Q. In the dealer system there are, what you described previously, financial statements that are provided to the manufacturer, correct?

A. Yes.

Q. Those are on like a standard form that the manufacturer has, right?

A. That's correct.

Q. Each manufacturer is a little bit different, but they're pretty much very similar, right?

A. Yes.

Q. Do you know what the format was for North Shore, in other words, did they have -- because it's a used car dealership,

T. JONES

they're not a franchise dealer, do you know what format they used?

A. I don't remember what the format was, which franchise that it mirrored.

Q. Did you look at the monthly financial statements each month that you were there?

A. Yes.

Q. When you said the trial balance, that's something other than the trial balance, correct?

A. That is correct.

Q. Would you look at the financial statements as part of your monthly review?

A. Yes.

Q. What would be the purpose for you looking at the monthly financial statement?

A. Again to make sure that it's accurate, wherever it had to go, whether the factory or the floor plan provider.

Q. Is that something that you do for all of your clients or is that

T. JONES

something specifically Anthony asked you to do?

A. No, all of the auto dealers.

Q. When you look at the financial statements, what would you be taking particular notice of, if anything, at North Shore.

A. To make sure it's as accurate as it's able to be.

Q. As part of that, your adjustments, if you felt that something was inaccurate, that would be by looking at the schedule looking at the trial balance and then the adjustments that you recommend would make their way to the financial statement; is that correct?

A. Correct.

Q. By making those adjustments that you believed you were making the financial statement more accurate to what the reality is from an accounting perspective?

A. Correct.

Q. Now, were you familiar -- so

T. JONES

sitting here today, do you have a recollection of on a monthly basis whether the dealership was showing that it was profitable or not?

A. I don't recall exactly much each month, but there were some profitable months and there were some months with losses.

Q. I mean, you have a number of car dealerships that you represent, correct?

A. Correct.

Q. Are you able to look over an average in saying whether the North Shore operation was more or less profitable than the average client that you had for other dealerships?

A. It is not really the same thing because the other ones are full service franchises.

Q. Other than, I believe that you said you currently have one used car dealership. In your years of experience, did you have other use car dealerships that

T. JONES

you represented?

A. A few here and there, but mainly they really new car dealers.

Q. Would it be fair to say that you would not feel comfortable giving an opinion as to profitability generally speaking of used car dealerships?

A. Correct. Standalone dealerships.

Q. Standalone dealers -- standalone used car, right, just to be clear for the rest of the world, you're talking about used car dealerships?

A. Yes.

Q. Now, during your period of time reviewing the books and records of the dealerships, do you recall any monies ever being paid, well, are you familiar with the Island Auto Group?

A. I am familiar with them.

Q. Were you familiar with them, were you familiar with them before this lawsuit?

A. No.

T. JONES

Q. Would it be fair to say that you became familiar with them as a result of the lawsuit?

A. Yes.

Q. Do you recall Anthony ever talking to you about the Island Auto Group?

A. Yes.

Q. When was the first time that recall him talking to you about it?

A. I don't recall when that was.

Q. That was after the lawsuit?

A. No, previous to that.

Q. So, you weren't familiar with them prior to the lawsuit?

A. I'm sorry, yes.

Q. Let's just clarify. Have you ever heard of Island Auto Group prior to the lawsuit?

A. Yes.

Q. How did you become aware of the Island Auto Group?

A. There was, there was Island Auto Group's controller that was coming in to assist North Shore Motors when Dan

T. JONES

O'Sullivan was, I guess, ending his time there. Wendy was her name. That's when I got to know who the Island Auto Group was.

Q. Do you recall -- do you recall approximately when that was, timeframe?

A. I'd be guessing again if it was the 2022 year, maybe, I don't recall the exact year.

Q. You didn't know who Island Auto Group or Wendy was until the time around the time when Dan was kind of stepping away from his job?

A. Well, I knew about the Island Auto Group in general, only because in the industry you know different names, yeah, that's when I got a little more familiar with it when Wendy was there.

Q. Did you ever know the connection of any kind between the Island Auto Group and North Shore or Anthony Deo, prior to that period of time?

A. Just that Josh Aaronson was involved and he was the owner of Island Auto Group.

T. JONES

Q. But, you didn't know what their involvement was at that time?

A. Correct.

Q. When you did find out, when was the first found out what the relationship was between the Island Auto Group -- let me just define the Island Auto Group.

I'm talking about their dealerships, their ownerships --

THE REPORTER: I'm sorry counsel, you have to take a breath in between, I can't take down everything thing.

Could you please start the question over again?

MR. RUDERMAN: Sure.

THE REPORTER: Thank you.

Q. When I refer to the Island Auto Group, I'm referring to the dealerships, the individuals who own or operate the dealerships, so to be broad with regard to what that means.

When was the first time that you became aware of the relationship

T. JONES

between the Island Auto Group or any of the individuals related to it and North Shore and Anthony Deo?

A. Again, I don't recall the actual year, but I'd guessing again, if it was the 2021 year, potentially, I just don't recall the year.

Q. In what context do you recall when you first became aware?

A. I believe it was related to the funding where Josh was putting money into North Shore.

Q. When you say, putting money into North Shore, I mean, let me, I mean, in this lawsuit, Island Auto, Josh and various other plaintiffs are alleging that they needed to put a lot of money into the dealership, the North Shore dealership and Sunrise accounts to cover a lot of obligations that were not satisfied by North Shore and Sunrise.

You understand that?

A. Yes.

Q. Are you saying that the first

T. JONES

time you really became aware of their involvement was around the time that they were putting in those monies?

A. Yes.

Q. So, I'm gonna represent to you that you pursuant to the documents which have been provided in the claims in the lawsuit that took place somewhere around September, beginning around September of 2022.

With that in mind, does that refresh your recollection with regard to your knowledge of Island Auto's involvement with North Shore?

A. I mean, that's the time, again, I don't know the year. You are telling me it's 2022, it must have been sometime in that period that I got a little more familiar with them.

Q. When you first met Anthony and he talked about there was gonna be a transfer, did he ever mention prior to -- let's jump ahead in October of 2022.

There were some e-mail

T. JONES

exchanges that you had with Wendy and some other accountants about the North Shore and Sunrise tax returns being filed with Anthony and Sarah as the owners, correct?

A. Correct, if that's the year in the e-mails that you have, then that's correct.

Q. It is. I could show them to you as we go, just to confirm things.

Prior to that exchange that you had in October of 2022, and that first time that Anthony mentioned that he's waiting for transfer stuff, did Anthony discuss with you about this supposed transfer of his ownership of North Shore to him?

A. It was discussed, but I don't recall what was discussed with it.

Q. You believe he mentioned it, again, but you don't really know what it was in context with?

A. Yes.

Q. Did he ever ask you to reach out to anybody to facilitate, again prior October of 2022, to facilitate a transfer

T. JONES

of the ownership of the dealership?

A. I don't recall he would ever ask me for that, 'cause that's a legal service that we don't provide.

Q. When did you first become aware of Anthony's relationship to 189 Sunrise Highway dealership?

A. Would be around the same time as North Shore Motors.

Q. What was your understanding as to Anthony's relationship to 189 Sunrise Highway?

A. That he was also the owner -- going to be the owner of 189 Sunrise Highway.

Q. Did he explain to you how he was going to become the owner of 189 Sunrise Highway?

A. He just said that it was the same situation as North Shore Motors.

Q. Did you ever see any paperwork concerning his ownership of 189 Sunrise Highway?

A. I did not.

T. JONES

Q. Did you ever ask for any paperwork about that?

A. I don't recall if I asked for the paperwork or not.

Q. Did Anthony ever tell you that he became the owner of 189 Sunrise Highway, that you can recall?

A. Yes, he did.

Q. Do you recall when he told you that?

A. I do not recall when that was.

Q. Do you know the circumstances of how he became the owner of 189 Sunrise Highway?

A. No, I don't.

Q. Now, do you recall, when you looked at the -- you previously testified about the capital accounts or capital ownership of an LLC, correct?

A. Correct.

Q. All right. Now, would that show up on the dealer financial statements in the DMS system?

A. Yes.

T. JONES

Q. Do you recall ever seeing on the DMS system of either North Shore or Sunrise Highway any capital account in favor of Anthony or Sarah Deo?

A. I don't recall.

Q. Okay. If it was there, it should know somehow show up on that DMS system somewhere?

A. Yes.

Q. Would it have the names of the person or would it just say capital accounts or something like that?

A. Most I usually recommend having the names, but, I don't recall whether that DMS system had it.

Q. If there was a transfer of ownership from an LLC, where one member or were several members owned it, transferred it to some other members would, how would that be shown in the capital accounts in the DMS system?

A. The capital accounts normally get transferred to the new owner.

Q. Dollar for dollar?

T. JONES

A. Unless there's some sort of other agreement that goes on with it, yes.

MR. RUDERMAN: It is now 11:26. Do you need a break?

THE REPORTER: The reporter needs a break.

MR. RUDERMAN: Five minutes. Off the record.

(Whereupon, a brief recess was taken.)

THE REPORTER: The time is 11:36.

Q. Were you ever involved in reviewing the cash flow of either North Shore or Sunrise?

A. Not that I recall.

Q. Were you asked to do anything, to take a look at the cash flow?

A. I don't believe so.

Q. Are you familiar with who the floor plan lender was for North Shore and Sunrise?

A. Yes.

Q. Who was that.

T. JONES

A. Ally.

Q. Did you ever see any agreements or documents about Ally?

A. I did not.

Q. Do you know how much the credit line for each dealership was with Ally?

A. I don't recall.

Q. What was your understanding as to the arrangement between North Shore Sunrise and Ally?

A. Can you clarify that?

Q. You know, the terms of their financing arrangement?

A. That, I don't know.

Q. You are familiar with dealerships in general, you understand that floor plan financing, they all have some date by which a floor plan vehicle must be paid off after its been sold, correct?

A. Correct.

Q. Would you know offhand what Ally's requirements are?

A. I don't.

Q. Were you ever, during your

T. JONES

period of time doing work at North Shore and Sunrise, do you recall ever being involved in issues with regard to Ally payoffs?

A. I didn't get involved in payoffs.

Q. Did you know whether in fact payoffs are being made on a regular basis?

A. That, I don't know.

Q. Are you familiar with, you know, working in these in these dealerships, that vehicles that are traded in from customers may sometimes still have financing that needs to be paid off; do you understand that?

A. Yes.

Q. What is your understanding as the dealerships obligation with regard to that when that happens?

A. Most dealers usually pay it off when they take the car in.

Q. Do you know, is there some line item on some whether the financial statements or some schedules which would

T. JONES

indicate that obligation when a car is traded in?

A. If at the end month, if there was still funds owed on a vehicle, then it would show up on the vehicle lien payoff line.

Q. Is that on the dealer financial statement, there's some vehicle lien payoff line that is on the -- that's on that statement?

A. Yes.

Q. Does that only relate to trades which are being paid off or also floor plan financing that is not yet paid off?

A. Floor plan financing is on different line.

Q. Floor plan financing is for more of a long term obligation as opposed to the trade payoffs, correct?

A. No, that's short term.

Q. But, they're recorded differently, though?

A. Yes.

Q. When you would look at the

T. JONES

financial statements on a monthly basis for the dealership, did you look at the net lien -- that lien obligation at the end of each month for trade payoffs?

A. If there was a balance due at that date, at the end of the month, then, yes.

Q. Do you know how that would be recorded as being owed, how it gets recorded?

A. As a payable.

Q. So, would that be recorded at the time of the transaction typically or some other time?

A. Normally, it's at the time of the sale.

Q. If a check were written from the dealership to pay off the trade, but it had not yet been cashed, would be that be listed as already paid on the financial statements or would that still be listed as outstanding?

A. It would be shown as paid.

Q. If at the end of the month the

T. JONES

dealer owed ten payoffs, if they issued checks for ten payoffs, whether those checks were clear or not, it would be listed as paid?

A. Correct.

Q. But, you're familiar with bank reconciliations, correct?

A. Yes.

Q. Did you do the bank reconciliations for North Shore?

A. No.

Q. Did you do the bank reconciliations for Sunrise?

A. No.

Q. On a bank reconciliation, typically, checks that were written that are still outstanding, should be listed on the bank reconciliation to reconcile the books that are kept by the dealership and the books that the -- and the amount that the bank has as to the account, correct?

A. Correct.

Q. If you wrote out ten checks at the end of the month which has not yet been

T. JONES

cashed while the financial statement would say that there's not money owed the bank reconciliation would show that those checks are still outstanding?

A. Correct.

Q. Do you recall any situation that you ever saw at North Shore or Sunrise where there were significant outstanding trade payoffs which were not being paid off on a timely basis?

A. No, I don't recall.

Q. Was it something that you might have seen if you looked at the books and records?

A. Not necessarily 'cause I didn't do the bank recs.

Q. Do you know who did do the bank recs?

A. I do not, I believe that it was Dan, but that would be -- I'm just guessing.

Q. Is it something that you would you typically want to have looked at?

A. Bank reconciliations, we

T. JONES

normally look at the end of the year.

Q. Do you recall looking at -- in connection with the tax return or at the end of the year just to see what was going on?

A. Well, at the end of the year because that is what goes on the tax return.

Q. Now, when you had started to do work at North Shore there was a already an accounting firm that was doing tax returns?

A. Yes.

Q. Do you remember who that was?

A. I do not.

Q. Did you see that tax return when you first came in?

A. I don't know if when I first came in, but eventually I did see that tax return.

Q. Were you involved in any way in the preparation of that tax return?

A. Which you tax return?

Q. The tax run that you saw that, you did not prepare?

T. JONES

A. No.

Q. So, if you weren't preparing the tax return would you have been looking at the end year financial records of the dealership?

A. For that year end that I didn't do the return?

Q. Yes.

A. No.

Q. You just do your monthly stuff, not worry about the year end stuff, that's somebody else's responsibility?

A. No, that's not true. If it was the year end, we would give of we do the end year 1231 financial. Then whoever would prepare it, would make other adjustments from there.

MR. RUDERMAN: Off the record, the time is 11:44.

(Whereupon, an off-the-record discussion was held.)

The time is 11:45.

Q. If you weren't preparing the tax returns for a particular year, what

T. JONES

would be the reason you would be looking at year end financial records?

A. To see if we have a more accurate financial statement to give to whoever is preparing it.

Q. Do you recall whether you had any communications with whomever it was that's preparing the tax returns?

A. I don't remember any.

Q. Do you recall whether you did any year end adjustments for -- if you weren't preparing the tax returns?

A. I don't remember.

Q. Okay. You're familiar with the term the 13 month statement?

A. Yes.

Q. Do you recall doing any 13 month statements for North Shore or Sunrise for years you did not prepare tax returns?

A. I don't remember.

Q. Would you have records with regard to all of this?

A. If you did, I would have records in my file.

T. JONES

Q. Other than, perhaps those vouchers for the adjustments, if you weren't preparing the tax returns, what records would you typically have for the dealership, that you were going to on a monthly basis?

A. Normally would be the trial balance and the dealer statement.

Q. You would keep those in your files whether you made adjustments or not?

A. Yes.

Q. Would those show, like, the items you circled that you wanted to be investigated?

A. No, those were on the schedules.

Q. Would the schedules show the items that you circled?

A. The schedules would, but I don't -- I never keep schedules.

Q. You only kept the trial balance, though, from a monthly basis?

A. Correct.

Q. Other than vouchers that you

T. JONES

may have provided and other than the trial balance that you looked at on a monthly basis, would you have any other -- presuming you didn't do the tax return, would you have any other records from the dealership in your files?

A. I don't think so. I potentially could have a page or two and from a schedule, but I don't recall.

Q. Were you aware that the financial statements, the monthly financial statements were being provided to Ally, in connection with its floor plan financing?

A. Yes, I know he sent them to them.

Q. Do you know how he sent them, you mean Anthony, right?

A. I'm sorry, yes, Anthony. I did not know how he sent them.

Q. But, were the financial statements he was sending or do you know if it was before or after the adjustments that he agreed to make?

A. I really don't know what he was

T. JONES

sending them.

Q. However he sent them, you weren't copied on any communications about sending them?

A. No.

Q. Did you keep copies of those financial statements that you got on a monthly basis?

A. Yes.

Q. Do you have copies from before and after the adjustments?

A. Most months I have only after. I may have one or two of them that might be before, but I'm not sure.

Q. Do you know what the credit limit was from Ally for each dealership?

A. You asked me that and do not recall.

Q. Do you know whether there was ever, did Anthony ever complain to you that there was it an issue with regard to somebody telling me him at Island Auto that he needed to reduce the amount of those credit loans?

T. JONES

A. I don't recall.

Q. Were you ever aware of any incidents, you know, of Anthony or somebody at Sunrise or North Shore, purposely withholding payments for various obligations because of cash flow issues?

A. I was not aware of.

Q. Now, you mentioned that one of the companies that you've represented is Car Buyers NYC, correct?

A. Yes.

Q. Do you know what that entity does?

A. I don't recall what exactly it was doing at that time.

Q. I can represent to you that Mr. Deo testified that it is a consulting company that he has, of which he's the only consultant; does that refresh your recollection?

A. It could be. I don't -- I really don't remember.

Q. Do you recall whether Car Buyers showed any income, as far back as

T. JONES

you can remember?

A. Again, I don't recall.

Q. Do you recall whether North Shore or Sunrise ever paid any money to Car Buyers?

A. I don't remember how the money, how the income or the money got into those accounts.

Q. Well, do you recall that -- do you recall whether -- do you know whether Sarah Deo worked at either North Shore or Sunrise?

A. Yes, I know that she was there at North Shore.

Q. Do you know what she did there, what her job functions were?

A. No, I don't remember what her functions were.

Q. I mean, how would you describe Anthony's functions at either North Shore Sunrise?

A. As far as I know he was the operator.

Q. Do you know if they received a

T. JONES

a salary at either North Shore or Sunrise?

A. I don't remember.

Q. Do you know whether in fact they received any compensation in any way shape or form from the operations of either dealership?

A. I know that they received compensation, I just don't know what form it was in.

Q. Was that something that would have shown up on the dealer financial statements?

A. It would have been one of the accounts, yes.

Q. What account would that show up?

A. I'm pretty sure it was on the supervision. Supervision compensation, but I'm not really sure.

Q. Were you aware of any commission based income that either entity or Sarah had in connection with the operation of either the dealerships?

A. No, I don't know.

T. JONES

Q. Do you know if the dealership operated any cash operations?

A. That, I don't know.

Q. Are you familiar with in general whether dealerships, in general, have any cash operations?

A. Yes, I know in general they have cash operations.

Q. So sitting here today, you don't recall whether North Shore or Sunrise had any cash operations?

A. I don't remember any in particular.

Q. Were you ever told about cash coming in and how it was handled?

A. I was not.

Q. Was that a concern that you have in advising the dealership as to, you know, how to treat cash and how to handle cash?

MR. LENTINELLO: Note my objection. You can answer.

A. If it comes up in the normal course of conversation with the dealer,

T. JONES

then, yes. But, most controllers or office managers know how to handle cash and record it.

Q. What is the proper way to handle cash that comes in on a transaction?

A. The same way as a check, where it goes in the bank.

Q. Then if it goes -- if it goes in the bank and it's -- the money is taken in, it needs to be recorded as a revenue item, correct?

A. Yes.

Q. Okay. If it's for a deposit on a car, on the purchase of a car it has to be a revenue, correct?

A. Correct.

Q. All right. Were you aware whether there was a safe in either one of the dealerships?

A. I do not know specifically if there was.

Q. In the physical layout of North Shore, can you describe what was in that building?

T. JONES

A. There was the used car showroom. There was an area to work on the cars. There was the office.

Q. Was there one office or was multiple offices?

A. No, multiple offices.

Q. When you say used car showroom, where did the salesmen sit?

A. They sat around the walls of the used car showroom.

Q. Was there anybody who else who worked in there other than the salespeople as far as you know?

A. I have no idea.

Q. Do you know where Dan O'Sullivan's office was?

A. Yes.

Q. Was it its own separate closed office?

A. Yes.

Q. Was there anybody else working in that room with him?

A. Not in that room.

Q. Anthony have his own office?

T. JONES

A. Yes.

Q. What about Sarah?

A. Yes.

Q. Was there at least three separate offices?

A. Correct.

Q. Any other offices that you're aware of?

A. And a conference room.

Q. Do you know who worked in that other office?

A. I do not.

Q. Was Frank working there when you were there?

A. Yes.

Q. What was his position?

A. He was the general manager.

Q. Did he work in an office or did he work on the floor?

A. He was originally in an office, but then he was moved out to the podium on the floor.

Q. Do you know if there was a computer at the podium?

T. JONES

A. I do not know specifically, but I would imagine that there was a computer.

Q. Do you know if the -- you said, I think, that you said you'd never saw the bank statements for either dealership; is that correct?

A. I may have seen bank statements, I didn't do the bank recs.

Q. Do you know whether the -- do you know which bank -- which bank the dealerships dealt with?

A. I don't recall that.

Q. Do you recall whether any of the banks that the dealership dealt with had some sort of protection mechanism, like a positive pay or token system?

A. I'm not aware of what they had.

Q. Did you ever speak to Anthony Deo about this lawsuit?

A. I spoke to him when I -- when I first got it, and then subsequently, no.

Q. When you first got it, what was the sum and substance of your conversation or conversations with him?

T. JONES

A. Just the conversation as to what was going on.

Q. What did he tell you?

A. I don't recall what we had a conversation, but it was brief because I know better than to speak when parties are involved, so.

Q. So, did Anthony ever discuss with you about the licensing for the dealerships?

A. I don't remember, not that I recall.

Q. Are you familiar with a company called Libertas Funding?

A. I am not.

Q. Are you aware that Anthony on behalf of North Shore and Sunrise sought financing for Libertas?

A. I don't recall that.

Q. Do you recall Libertas reaching out to you for tax returns for Anthony and Sarah?

A. I don't remember that.

Q. Are you familiar with Flushing

Bank?

A. I'm familiar with the bank.

Q. Are you familiar with any financing that Anthony sought in connection for North Shore or Sunrise with Flushing Bank?

A. I don't remember that.

Q. Are you aware whether Anthony used American Express card to pay for certain items which were charged to North Shore or Sunrise?

A. I do know that the American Express card was used.

Q. Were you involved in the accounting of how the American Express card charges were applied to either dealership?

A. No, I was not.

Q. You did not review the American Express card to see whether certain items were properly charged to the dealership and some of them may have been personal along those lines?

A. I reviewed it, just to -- just to see if they were going to the expense

T. JONES

accounts that they needed to go.
Q. Did you look at that on a monthly basis?
A. Not on a monthly basis periodically.
Q. So how often would you be looking at the American Express statements?
A. If I had a question on it, on an expense that did not seem it was in the right spot and it was paid through American Express, then I would see a copy of the activity on the American Express.
Q. That would be looking at something on the schedule, you saw something that didn't look appropriate, you wanted to know the backup?
A. On the schedule or the trial balance.
Q. That would be the first thing you'd say, I see something here which doesn't look right, where did this come from?
A. Correct or is something missing.

T. JONES

Q. All right. So you wouldn't be looking at the American express statement and then saying here's where I think things should go?

A. Absolutely not.

Q. If you saw something on the schedule or the trial balance, Dan might say, well, I got that number off of American Express statements, and you say let me see the statement, then you would follow up from there?

A. Yes, but he would normally give -- print out the activity as opposed to the actual statement. The activity in the DMS system is what he would print out as to where things were posted based on the American Express statement. So, I very rarely that I can even recall seeing the American Express statement.

Q. On the activity that he would print out it would state on there somewhere that the posting came from the American Express statement?

A. Yes.

T. JONES

Q. But, you would never investigate whether it was an appropriate charge or not an appropriate charge in the first instance, would you?

A. No, not necessarily.

Q. Were you ever involved in obtaining any COVID relief loans, PPP, EIDL loans for either North Shore or Sunrise?

A. I was not involved in it outside of trying to get it but, there was trying to get, I believe it was the second round of PPP, but there was not -- I wasn't able to assist them because we didn't have the code or the e-mail address was, I think David Baron's e-mail address, so it wasn't able to access the second round of the PPP funding.

Q. How far did you get as far as you can recall, what did you do in connection with it?

A. The only thing that I did was just prepare the information based off of the previous years tax returns and gave it to Anthony to apply for it.

T. JONES

Q. So, you never personally submitted anything to the government on behalf of either North Shore or Sunrise?
A. No, I don't believe so. I don't remember doing that.
Q. What type of documents did you prepare for him?
A. There was basically an input sheet that would have the information from the previous years tax returns.
Q. So, in order to have done that you would had to have had the prior years tax returns?
A. Yes.
Q. If you applied for something in 2022, would you have been 2021 tax returns?
A. Well, it wouldn't have been 2022.
Q. It would have been the 2020 returns?
A. Yes, or 2019.
Q. Do you recall getting copies of those returns to assist in preparing for any of these forms you needed to complete?

T. JONES

A. I don't remember if I got copies, but I saw them.
Q. Do you recall how you came to see them?
A. I don't remember, but it would have had to come from Anthony.
Q. I mean, you didn't get it from a Josh Aronson or Brian you mentioned or Wendy or anybody like that?
A. No, I don't recall getting it from anybody else.
Q. You're saying that you believe those efforts ultimately came to nothing because the e-mail address was David Barons?
A. I remember that, yes.
Q. Did you ever meet David Baron?
A. I did not.
Q. You know that he had passed away, right?
A. I do.
Q. Were you aware of him prior to him passing away?
A. Yes, just in the conversation

T. JONES

with Anthony about the dealership.

Q. Did there come a time when you became aware that North Shore and/or Sunrise were having financial difficulties, were not able to meet their monthly obligations?

A. I don't remember when that was.

Q. Do you recall a time?

A. Yes.

Q. What was your understanding as to what the cause of that was, what was happening?

A. I don't remember what it was.

Q. Did you understand that there obligations to Ally that had not been paid off?

A. Again, I don't remember what was that.

Q. Who did you hear it from, if anybody?

A. Anthony.

Q. What, if anything do you recall Anthony telling you about it?

A. I don't recall.

T. JONES

Q. Do you recall Anthony saying that it was because of something that Island Auto did or Josh did or Wendy did?

A. No, I don't recall.

Q. You don't recall him blaming anybody else for any financial difficulties?

A. Not that I remember.

Q. Do you recall that there were deficits and they were unable to -- that there were deficits and they were having trouble making certain payments?

A. I do recall that, yes.

Q. Do you recall how much money was needed in order to satisfy these obligations?

A. No, I don't remember.

Q. I mean, you testified earlier that Josh had, I've forgotten the term that you used, pumped money in, invest -- put money in, whatever it may be; what is your recollection about that?

A. I just know that my -- as I said the only thing that I remember was him

T. JONES

putting money in.

Q. You don't know how much money he put in?

A. I don't remember.

MR. RUDERMAN: I'm going to share my screen. Showing you a document I believe that was previously marked of as Deo Exhibit 44A.

This is a bank statement for North Shore Motor Leasing at Chase Bank with account number ending in 8112, for the month of September of 2022.

Q. Do you see that?

A. I see that.

Q. Have you ever seen this bank statement before that you can recall?

A. I don't remember seeing it.

Q. I'm gonna draw your attention down to the middle of this page right here on September 15th.

Do you see the first entry on September 15th?

T. JONES

A. I do.

Q. It says, it's a book transfer from 76 Fisk Street Realty. It's references, it says loan from Island Auto Group and the amount of $683,318.95; do you see that?

A. I see that.

Q. Were you familiar at the time as to how much money was be being put into this bank account from the Island Auto Group?

A. I don't recall what that was.

Q. Did you have any conversations with Anthony about why this money needed to be put in?

A. Just 'cause the only thing I did have a conversation was that it needed to pay expenses, that was the extent of it.

Q. All right. I'm gonna draw your attention on September 16th, the next day.

Another book transfer credit from 2519 Hylan Boulevard Auto LLC, referenced as a loan from Island Auto Group, in the amount of $385,597.10; do

T. JONES

you see that?

A. I do.

Q. Same questioning, any discussions about Anthony or you know about this particular transaction?

A. No, discussion about anything in particular.

Q. All right. This took place in 2022, right, we saw this bank statement.

Now, did you prepare the 2022 bank statement or excuse me, tax return from North Shore?

A. I don't remember if I did. I don't remember the last one that I did.

Q. If it was done, as far as you know, would it have been done by you and not somebody else?

A. If I did it, it was done by me.

Q. I know that you said you prepared tax returns and you prepared extensions.

Do you recall that there are years since 2021, that you did not either prepare a tax return or an extension for a

T. JONES

of these entities?

A. Can you say that again?

Q. Are you aware of any years from 2021 through today, where you did not either prepare a tax return or an extension for these entities?

A. No, I don't.

Q. If this amount was provided, what would you record this as, on the books and records of the dealership?

A. It would be recorded as a loan from Island Auto Group or Josh or something like that.

Q. But sitting here today, you have you no idea where or how this was recorded on the books and records of the dealership?

A. That's correct.

Q. Do you recall whether you saw any of these bank statements, any of the numbers or amounts that were on there?

A. My feeling would be no, 'cause I didn't see this one, so if there are ones after it, I certainly didn't see them.

T. JONES

MR. RUDERMAN: I'm gonna show you another document. This is a document that is called bank reconciliation at the top, it says period June 2021.

It says the client is Sunrise Auto Outlet. It is three pages long.

I'm going to mark it for identification as Jones Exhibit A.

Have we been using letters and numbers, can't remember.

(Whereupon, Jones Exhibit A, Bank reconciliation, was marked as for identification as of this date by the Reporter.)

Q. So, Jones A, and this is the -- I'm going to ask if you have ever seen this document before?

A. I don't recall seeing it, but it definitely looks like our bank reconciliations.

Q. You recognize the format?

A. Yes.

Q. This is typically what your

T. JONES

bank reconciliation format looks like?
A. Yes.
Q. Is it possible that your firm prepared this?
A. Yes, possible.
Q. Because previously you testified that you didn't do any bank reconciliations?
A. I don't recall any.
Q. If the bank reconciliations were typically done, was that done by you or someone else in your firm?
A. Someone else in my firm.
Q. Would that be a CPA or one of the other accountant?
A. One of the other accountants.
Q. So, it is possible that this came from your firm, you just don't have a recollection of it?
A. Correct.
Q. If your firm did that would it be something that -- withdrawn.
If bank reconciliations are done by somebody in your firm, do you

T. JONES

typically review them as well?

A. I do look at them, yes.

Q. So, if this were to be done by -- if this had been done by your firm, most you likely you did review it at the time?

A. Yes.

Q. But sitting here today you have no -- you don't recall?

A. I don't, no.

MR. RUDERMAN: Again, we're gonna follow up with all the documents and check out the subpoena.

To the extent that you have any bank reconciliations for either of these dealerships, I would call for their production as well as being responsive to the subpoena.

Q. Would the bank reconciliations also be kept for a period of seven years?

A. Yes.

Q. Would they be kept in a physical file for the dealership, typically, in your firm or somewhere else?

A. They could be electronic.

T. JONES

Q. Did you maintain an electronic file for Sunrise and for North Shore?

A. Yes.

Q. Is that a server that's kept in your office or is that on some offsite location?

A. The server is here.

Q. All right. Is it the same server that you have -- have you used the same service as 2020?

A. Yes.

Q. The way you maintain your files, is there a digital file with the name of Sunrise, and a digital file with the name of North Shore on it?

A. Yes.

Q. Would all records relating to those dealerships be kept in the digital file?

A. Not all records, some are in the paper files.

Q. It would either be in the paper file with those company's names or a digital fill with those company's names on

T. JONES

it?

A. Yes.

Q. You said that you reviewed all of those files in connection with the response to the subpoena, correct?

A. That I recall, yes.

Q. You did not produce or you didn't even recall that they were bank reconciliations?

A. No, I didn't remember.

Q. Does that mean that you did not see them when you looked in your file or you don't know recall whether they were there?

A. I don't remember.

MR. RUDERMAN: Off the record at 12:17.

(Whereupon, an off-the-record discussion was held.)

Back on the record, 12:18.

Q. I'm showing a document tell me if you can see this document?

A. I can?

MR. RUDERMAN: It says, North

T. JONES

Shore Motor Leasing document inquiry. It has a date of 3/8/24.

I'm gonna mark this as Jones Exhibit B.

These are, I believe journal entries from 5/29/22.

(Whereupon, Jones Exhibit B, Journal entries 5/29/22, was marked as for identification as of this date by the Reporter.)

Q. Mr. Jones, do you recognize what this document is?

A. I just know it's just from the DMS system.

Q. Did you ever see a printout of the adjustments that were done by Mr. O'Sullivan on a monthly basis, that you know you worked out with Anthony?

A. Can you be more specific?

Q. Sure. You testified about how you would make certain recommendations with regard to adjustments. Then Anthony would approve certain adjustments, you'd ask Dan to input those adjustments, did you ever

T. JONES

see the result of a printout of the adjustments that he made for a particular month?

A. No, I don't recall ever seeing the printout.

Q. I believe that you did testify you'd see the maybe the financial statement, the dealer statement afterwards, but not a printout of the adjustments?

A. That's correct.

Q. This was provided to us by Wendy you mentioned before, as to the adjustments, these are the dates that they were done for May 29, 2022.

Mr. O'Sullivan put them in and noting that these are all adjustments that you asked him to do, having your name on here.

I'm trying to figure out why you did those adjustments. Are you able to -- if I give you an entry, are you able to tell me what the basis is for any particular adjustment?

A. I possibly could.

T. JONES

MS. VERBONITZ: I'm sorry, can I interrupt, what is this document?

MR. RUDERMAN: It's a listing of adjusting entries.

Q. We have here, for example, this line item here I am highlighting.

It says under, control it says Jones, it looks like it is for a $100,000. There is an account is 2511 and 2512. Then it seems to go negative a $100,000 or minus, and then $100,000.

Would you be able to tell by looking at that, what those adjustments were for, why it was put in there?

A. I'd be guessing.

Q. If you knew what the account number would be that be helpful to you?

Well, let me ask you, sitting here today, do you know what account 2511 and 2512 are?

A. No, I don't remember what those were.

Q. Let me see if I -- I think I have. This is just a printout, this is the

T. JONES

trial balance just listing all the various accounts.

A. Uh-huh.

Q. 2511, is listed as notes payable long term debt. And 2512 is loans due Anthony Deo, okay?

A. Okay.

Q. Looking back at this adjusting entry, you moved or there was a change of $100,000 from loans to loans Anthony Deo for $100,000; any idea why that would have been done?

A. Usual reason, again, I'm just guessing without looking at the detail is that it was just posted to the wrong account and moved to the loan for Anthony.

Q. Would this be, so I understand the negatives and the positives, does this means that it was originally posted as a loan in account 2511, and by the negative you're removing it from the posting in 2511 and putting it in 2512?

A. The other way around.

Q. So, it was a loan that was in

T. JONES

the 2512 account, it was removed from that account and put into the 2511 account?

A. Right, because loans coming in would have been a credit balance.

Q. Since this is a loan coming in, would you know -- would you have known at the time where this $100,000 was coming from?

A. I would not have known, I would have asked.

Q. Do you know why it would be, why it was not properly in the loan account for Anthony Deo, but properly in the other account?

A. It's where Dan posted it.

Q. You don't know, sitting here today, you don't know why it was posted one way and why it should be another way?

A. I do not.

Q. You've got another bunch of 4700, you've got a bunch of numbers here in the account 4700. All of these numbers, it's all the same number, $43,095 back and forth and back and forth between account

T. JONES

3710 and 4700.

Let's see what they are. So 3710 is sales, wholesale.

And the other one is 4700, that is for some reason not listed here.

You don't know what 4700 would be, would you?

A. I'm gonna just say, typically in the industry it is the cost of sales for the used cars, which would be a mis-posting that was done.

Now, I will also tell you on May 29th, I didn't go in until after month was over, so these are dated May 29th, I don't even know if I did these.

Q. Well, is the date that's on here, do you know whether that's the date that it was posted or that's the date that it's posted as of?

A. That's normally the date it is posted in the DMS systems.

Q. And you know for every month -- well, you always went -- you always went in after the month, correct?

T. JONES

A. That's correct.

Q. In May, so you would be looking at the May numbers in June?

A. That's correct.

Q. All right. When you asked them to make those adjustments, they would be done at the time that you asked me to do the adjustments?

A. They would be dated, the day I gave it to him, but posted back into the month of May.

Q. All of these adjustments would have been based upon your review of the transactions, and what you believed showed inaccuracies in the recording of these transactions?

MR. LENTINELLO: Object --

A. Any that I either wrote up or discussed with Dan, yes.

MR. LENTINELLO: Note my objection to form to the form.

BY MR. RUDERMAN:

Q. Do you recall any time where Anthony Deo asked to you make adjustments

T. JONES

or discuss making adjustments, which would show that the dealership was actually more profitable than it was?

A. I don't recall specifics.

Q. Was there something general where he wanted that to happen?

A. There were a few times when I did have some of those conversations.

Q. What the context of -- what brought those about?

A. I recall one being the warranty program that he had set up, that he had got financing, but not financing, I'm sorry, that's the wrong word.

He had gotten a warranty program where he would get money in upfront, then would take it into income as the warranties were sold.

Q. So, what did he -- what did he want to try to do?

A. He would -- he would just pick up a little bit more on, more than what the warranties that were sold and reduce the amount for the next month.

T. JONES

Q. Did you accommodate him by making those adjusting entries?

A. If it was reasonable, yes, if it was not then, no.

Q. Other than for warranties, were there any other circumstances in which he asked you to make adjustments, which would show the dealership as more profitable?

A. I don't remember.

Q. Did you make any other adjustments during your tenure there, other than those that you just discussed, where the monthly financial statements were changed to show the dealership as more profitable than it actually was?

MR. LENTINELLO: Note my objection to form. But, you can answer Tom.

A. I didn't make adjustments to show it more profitable, the adjustments I did make is if there were, for instance, two payments to a vendor in month that they didn't belong in that month, I would then adjust one of those payments out, so that

T. JONES

it showed what the month -- more accurate of what the months expenses were.

Q. Did you adjust anything to put certain expenses into some sort of a balance sheet item, rather than an income or expense item which would show the dealership as more profitable?

A. Well, that's what I was just telling you that I did, is if it was a vendor being paid more than what the month should have been, I would move it to a prepaid item and then we'd write it off at the end of the year.

MR. LENTINELLO: Ms. Draper, please note my objection to form to the last question. Thank you.

BY MR. RUDERMAN:

Q. Do you recall what the prepaid account was, the number?

A. No, I don't recall.

Q. I've got here, this is from the trial balance, you have an account called 1550, which is prepaid expenses; do you see that?

T. JONES

A. I don't see anything.
Q. Oh, I'm sorry. I forgot to share. That's my mistake.
A. Don't see anything.
MS. VERBONITZ: Are you gonna mark this?
MR. RUDERMAN: Yes. We are gonna mark this.
I'm gonna mark this as Jones Exhibit C.
(Whereupon, Jones Exhibit C, Trial balance for 2021, was marked as for identification as of this date by the Reporter.)
This is a trial balance for the year of 2021.
Q. If you can see it, let's go up towards the middle, scroll up.
Can you see the account 1550 on the left hand side?
A. Yes.
Q. There's a prepaid expense totals?
A. Yes.

T. JONES

Q. Is that the account you're referring to?

A. Yes or 1550 W.

Q. Year end write off totals. What do those two accounts mean, could you explain them to me?

A. Those accounts will normally of house either expenses that were prepaid for the month or for a quarter or they could also be items that were found from previous years that would need to be adjusted out and not recorded in the current month but would be written off at the end of the year, because they may not have been written off in a previous month.

Q. Each month an item might be put into the prepaid expense account for that particular month?

A. Could be, yes.

Q. Would the next month, would you back that out because now that it is appropriately expensed that following month, for example?

A. Only if it was an expense for

T. JONES

the next month. If it was an expense recorded from the previous month, we would put if in the year end write off account to do expenses at the end of the year.

Q. On a month to month basis, you would be looking at the prepaid expense account to see whether there were any items in there which, should be reversed back out and applied to an expense item for that particular month rather than held in this, I'm gonna call it an expense account?

A. Correct.

Q. This is a trial balance at the end of the year for 2021 for example. It's showing, if I'm reading this correctly just over $1.4 million in prepaid expenses; do you see that?

A. Yes.

Q. Would that mean that at the end of the year, there was $1.4 million which write were items that had been put into expenses but not listed on the financial records as an expense?

A. In general, that's what it

T. JONES

would mean. I would have to look at that to see what was in there.

Q. Would that mean that if you just printed out the financial statements for the year, it would artificially show that the dealership was $1.4 million to the better than it actually was?

A. On a monthly basis, but at year end we would write it off.

Q. You would write that off at the end of the year?

A. Correct.

Q. Each month it wouldn't show that, though?

A. Potentially not, yes.

Q. Each month, these financial statements are being presented by Anthony to Ally to get floor plan financing, correct?

A. As far as I know, they are, yes.

Q. So, each month would not necessarily reflect that each month it was accruing at the time end of the year $1.4

T. JONES

million in expenses which weren't being shown to Ally?

MR. LENTINELLO: Note my objection to form. You can answer, if you can.

A. Again, I don't know what was in that account, but that could be.

Q. Now, you testified that you did not recall Libertas or Libertas Funding. Are you able to see that on the screen?

A. Yeah.

MR. RUDERMAN: This is a video that was provided to us by Libertas Funding in connection with financing that Mr. Deo got for North Shore and Sunrise.

I believe that it starts at about a minute in.

MS. VERBONITZ: Can you please identify it for the record?

MR. RUDERMAN: Sure. It's a video provided to us by Libertas Funding.

In connection with financing

that Mr. Deo obtained for Sunrise and for North Shore.

MS. VERBONITZ: I just object to your characterization of "financing".

MR. RUDERMAN: Okay.

(Whereupon, a video was played.)

Q. Before we go further, that is you Mr. Jones, isn't it?

A. That is.

Q. Now, that you see this, does this refresh your recollection?

A. No, I have no recall of having a meeting.

(Whereupon, a video was played.)

Q. Mr. Jones, we played the whole video. I didn't wanna take parts and pieces of it. I wanted you to see the whole thing.

Sitting here now, having seen the whole video; any recollection of this?

A. I actually don't recall having

T. JONES

having this, but obviously I did.

Again, I don't -- I also don't recall the company name I either.

Q. Now, in your conversation you said that you had prepared the 2019, 2020, tax returns for Anthony and Sarah Deo, right?

A. Right.

Q. As you sit here today, is that accurate?

A. If I said it, it must be.

Q. You have no independent recollection, but you're just saying that if you said it must be true?

A. Correct.

Q. What about the 2021, you said you were working on it, do you know if that was ever completed?

A. Again, I believe it was, but I don't recall.

Q. Do you believe that it was filed?

A. I believe that it was.

Q. Do you recall whether there was

T. JONES

a 2022 return that was completed and filed?
A. That, I don't recall.
Q. You don't recall that it was, or you just don't have a recollection, yes or no?
A. I don't have a recollection yes or no.
Q. You also said that you were going to send them proof of the electronic filing; do you know if that was ever done?
A. I don't recall if we sent the actual proof.
Q. Now, do you recall Anthony Deo coming to you at some point in November of 2022 stating that he was getting some kind of financing for the dealerships?
A. I don't remember.
Q. Then, you wouldn't remember why he said that he wanted financing, I guess?
A. Well, I do recall having conversations about financing and floor plans in different ways, but I don't recall having the conversation specifically.
Q. Do you recall having any

T. JONES

conversations with Anthony about replacing the floor plan financing that they had with Ally at any point in time?

A. Yes.

Q. When did you have those conversations?

A. I don't remember the year, but it was with Valley Bank.

Q. Do you know why he was trying to replace the Ally floor plan financing?

A. He was looking to see if he could get better terms.

Q. So, he didn't say that it was anything that Josh Aaronson had done or somebody else had done that he wanted to try and replace it?

A. No, the conversations were always with better terms.

Q. Did he ask you to assist in trying to replace that financing?

A. With Valley Bank he did, because I have contact there.

Q. What, if anything did you do to assist them in that regard?

T. JONES

A. We had a meeting with two or three people from Valley Bank.
Q. Do you have any recollection as to when that time frame may have been?
A. No, I don't recall the date.
Q. Did you personally go in with Anthony into Valley Bank?
A. They came to North Shore Motors.
Q. Was it one or more meetings?
A. One.
Q. Who was it from Valley Bank that was coming?
A. I believe it was Jim Coyley at the time and Constantine -- I'm not gonna spell -- say his last name 'cause it's a very long Greek last name. I think those were the two gentlemen that were there.
Q. How do you spell Mr. Coyley's last name?
A. C-O-Y-L-E-Y.
Q. You there at the dealership with the two gentlemen and Anthony?
A. Yes.

T. JONES

Q. How much time did you spend there?

A. I don't recall if it was an hour or just under an hour.

Q. Did they review any documents when they were there, that you can recall?

A. I don't believe they reviewed anything when we were there.

Q. Was there any follow up after -- how did the meeting end?

A. It ended with them thinking about it, but ultimately they don't do standalone used car floor plan financing, it has to be tied to a new car dealer.

Q. Did it really never get passed that initial meeting?

A. Correct.

Q. Were there any other possible financing -- floor plan financing sources that you were aware of that Anthony was exploring?

A. I don't remember.

Q. Do you recall Anthony ever needing or speaking financing for any other

T. JONES

purpose, not just working, but any other financing for the dealerships?

A. I don't remember.

Q. Did Anthony ever ask you to prepare any financial records or provide them with financial records in connection with any -- for any purpose whatsoever?

A. That, I don't remember.

Q. Did you have access, other than at the dealership, did you have access to the dealers, either dealers DMS system?

A. No.

Q. If you wanted to get any financial records from the DMS system, you'd have to go there and ask Dan or somebody to print it out for you?

A. Yes.

Q. Were you familiar with any efforts by Anthony to obtain any financing from Flushing Bank?

A. I don't -- I really don't recall.

MR. RUDERMAN: I'm going share my screen. Show a document.

T. JONES

If I didn't do it before, I wanna mark that video as Jones D, Exhibit D.

(Whereupon, Jones Exhibit D, Video from Libertas Funding, was marked as for identification as of this date by the Reporter.)

I'm going to mark this as Jones Exhibit E.

It is an e-mail chain dated March 7, 2023. Two e-mails on this page. It's a two page document. On the first page there's two e-mails March 2nd and March 7th.

It is between Robert Puccio and Stephen Codispodo both from Flushing Bank.

(Whereupon, Jones Exhibit E, E-mails, was marked as for identification as of this date by the Reporter.)

Q. Mr. Jones, have you ever met or heard of or any communications with either of these gentlemen?

T. JONES

A. I don't remember.

Q. In this e-mail from Mr. Puccio to Mr. Codispodo on March 7, 2023.

"Please see attached full year 2022 P&L for North Shore Motor. Once approved I will get 4506-C and open the DDA."

Are you familiar with what a 4506-C is?

A. An IRS form.

Q. Do you know which one it is?

A. To get a copy of the tax return that was filed.

Q. It says, "please see the attached full year 2022 P&L for North Shore".

I'm gonna scroll down to the second page. This is the document that's attached entitled North Shore Motor Leasing, LLC, profit and loss statement for the year ending 12/31/2022".

Do you recognize this document?

A. I don't recall seeing it, but.

Q. Do you recall whether it is

T. JONES

something that you or your firm might have prepared?

A. I don't know if we would have, 'cause it's not in the normal format that we prepare it.

Q. Well, if you prepared a P&L for North Shore how would it be different?

A. Well, normally we wouldn't have all of those dollar signs just to start with.

Q. Has your firm ever provided or prepared profit and loss statements for clients in connection with obtaining financing?

A. Yes.

Q. In order to do that, what is it you look at?

A. Normally, the deal statement.

Q. It would be, let's say it was a year end, would you look at the year end dealer statements?

A. Normally that would be the case, yes.

Q. Would you include, would that

T. JONES

include of non-cash flow items, for example, depreciation?
A. Normally it would, yes.
Q. There would be a separate line, before and after depreciation, correct?
A. Yes.
Q. Sitting here today, do you have you any idea whether this document accurately reflects what the net profit after tax was for North Shore for the year of December 31, 2022?
A. No, I don't.
Q. Now, Mr. Deo testified that this document was prepared and provided by you.
Do you have any -- do you doubt that statement or are you not able to confirm that statement?
A. I'm not able to confirm the statement 'cause I just don't recall.
Q. If you had prepared it, would it be something in your records?
A. Yes.
Q. In reviewing your records you

T. JONES

don't recall seeing this?

A. No, I don't recall.

Q. Do you recall whether Mr. Deo asked you or your firm to prepare a personal statement for him in connection with any financing?

A. I do know that he needed a personal financial statement, that we did.

Q. Do you recall why he needed that financial statement, personal financial statement?

A. No, I don't recall.

Q. Do you recall when he asked you to prepare that?

A. I don't remember the year.

Q. What do you remember about that?

A. I just remember preparing it.

Q. Did you charge him for that?

A. I believe I did.

Q. I do not think that I asked the question.

I'm assuming that you or your firm got paid for the services that were

T. JONES

performed by North Shore and Sunrise, correct?

A. Well, we still have outstanding money owed to us.

Q. You got paid some money but you're still owed money?

A. Yes.

Q. What was the arrangement, how much were you supposed to get paid for what services?

A. Well, I was doing the monthly review of the books and records and then the tax return.

Q. How much was charged for those services?

A. That, I don't recall.

Q. Do you charge based on an hourly rate or a flat rate or something else?

A. We charge based on an hourly rate, but we take the whole year and usually divide it by 12 and have a monthly retainer number.

Q. Is that retainer money, would

T. JONES

that have been billed monthly?

A. Yes, if it was on retainer, yes.

Q. Do you recall whether North Shore and Sunrise were billed monthly for the services you were performing?

A. I know they were billed monthly, I just don't know if it was retainer or whether it was for the hours, hourly time that I was there.

Q. What was your hourly rate at that time?

A. At that time I believe was $250 an hour?

Q. Do you recall how much money you were paid, the company was paid by North Shore and Sunrise?

A. I don't recall.

Q. Do you know how much money is currently outstanding from them?

A. It roughly about $12,000.

Q. Are you being paid or is the firm being paid for the other services performed for the other dealerships?

T. JONES

A. For which other dealerships?

Q. For the other companies that you say you filed either tax returns or extensions, are you being paid for those services for Deo?

A. Both for Deo, we have been paid for some but we have outstanding money due on them also.

Q. In total, are you able to give me an approximation as to how much money your firm has earned from the Deos through themselves or all the entities in which they had engaged you?

A. No, I don't have that number handy.

Q. Would it be over $50,000?

A. I don't know.

Q. How much money is owed in total from the Deos and all of their other entities, approximately?

A. I believe it's about $15,000 or $16,000.

Q. Have you made any efforts to try and collect on those past due balances?

T. JONES

A. We have. We've -- I sent out statements out periodically and try as best we can to get something, but there's no money apparently, so.

Q. So, I'm assuming your firm is in the business of making money?

A. Yes, we are.

Q. Is there a reason why you continue to perform services for the Deos and their entities when they owe you money?

A. Well, the only thing we're doing is filing extensions which takes very little time.

Again, I guess, because I'm just trying so they, they don't get penalized.

Q. You're doing it kind of as a favor?

A. Not as a favor, just because it doesn't cost a lot. It's just something I do, not just them but other clients I've done it for.

Q. Would you say that you have a personal relationship with the Deos?

T. JONES

A. No.

Q. It's just a business relationship?

A. Yes.

Q. Never you have ever gone to dinner with them on a social basis?

A. I have not.

Q. Have you been invited to any of their social functions?

A. I have not.

Q. Have you ever invited them to any of your social functions?

A. I have not.

Q. Outside of your business, did you ever attend any functions together in the industry or something like that?

A. No.

MR. RUDERMAN: I'm going to show you another document. Can you see the document?

MS. VERBONITZ: Yes.

A. Yes.

MR. RUDERMAN: It is titled Anthony Deo statement of financial

T. JONES

condition March 1, 2023.

On the top left-hand side it has JL & Co.

Q. Do you see that?

A. Yes.

MR. RUDERMAN: This is marked, bate's stamped as Flushing 00187.

I'm gonna mark this is as Jones Exhibit F.

(Whereupon, Jones Exhibit F, FLUSHING 00187, was marked as for identification as of this date by the Reporter.)

Q. Is that your firm's insignia?

A. Yes.

Q. I'm going to the second page. Again it has an insignia there. It says on the top, Thomas Jones CPA, Roy Little CPA, Cathleen -- it is a little hard to read the other names there.

This is to your firm's letterhead, correct?

A. Yes, it is.

Q. It is called an independent

T. JONES

accounts compilation report.

What is an independent accounts compilation report?

A. That's just a summary of the assets and liabilities of a company or a person based on their information they give us.

Q. Is this something that you prepared for other clients throughout the years?

A. Yes.

Q. You have here a paragraph about what you've done here.

It states that, it says, "Anthony Deo is responsible for the accompanying statement of financial condition as of March 1, 2023 in accordance with the accounting principles generally accepted in the United States of America".

What do you mean by, "Anthony's responsible for"?

A. Well, we take no responsibility for a compilation, 'cause we're taking basically there -- this is stated in the

T. JONES

industry, we take the clients information and put it in a financial statement format.

Q. It says further down, "we did not audit or review the financial statements, nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by Anthony Deo. We do not express an opinion, a conclusion, nor provide any assurance on this personal financial statement".

So essentially, you're saying we don't stand behind this document at all; is that a fair statement?

A. In the industry, that's what it means, yes.

Q. What's the purpose of providing a document from a CPA that essentially says we're not verifying, we're not saying that anything here is true or accurate?

MR. LENTINELLO: Note my objection. You can answer, if you can.

A. Yeah, I mean, it's just really what normally somebody who's looking for

T. JONES

the financial statement asks for.

Q. Now, if you know any information in the financial statement is not accurate, are you required to disclose that?

A. We're not required to disclose anything. He admitted all disclosures.

Q. What about, are you comfortable in providing this document if you knew that the information here was not correct?

A. Again, it's there -- it's coming from the client. So we're putting it on the format of financial statements.

Q. I understand that. My question is if you knew that the information that he's putting on this statement providing for financing was not accurate, did you have any obligations under your professional codes not to put it on the statement, even though you're not standing behind it?

A. I don't know if that's completely an accurate statement. I'd have to look at the code.

T. JONES

Q. Well, did you know when this document was provided to you, excuse me, when you prepared this document, did you know that any of the information on here, whether it was inaccurate?

A. I actually don't --

Q. Not accurate --

A. I'm sorry to talk over you. I thought that you were finished.

Q. When I realized it's inaccurate, I wanna make sure that the phrasing was proper. So, it was easier to say not accurate?

A. Okay. I'm really not sure. Again, I'd have to look at the records.

Q. You did say that you prepared in November 2022 you said that you prepared the personal tax returns of Anthony and Sarah Deo, correct, that's what it said on the video?

A. I believe that's when they were prepared, but again, I'm not -- I don't recall when we finally did finish it.

Q. You stated in November of 2022

T. JONES

to Libertas Funding that you had already prepared and filed the 2019 and 2020 tax returns, correct?

A. Oh, I'm sorry, yes.

Q. You said you were working on the 2021, you don't remember whether it was finished, you don't remember it was filed, but you did say you did the 2019 and 2020, correct?

A. Yes.

Q. On a personal tax return if you own a home, you can deduct the -- under certain circumstances you conduct the interest expense related to a mortgage on the property, correct?

A. Correct.

Q. You can also deduct real estate taxes related to the property, subject to limitations, correct?

A. Correct?

Q. All right. Do you recall whether either of those tax returns showed any properties on there for which they were deducting interest or mortgage, interest on

T. JONES

mortgages or real estate taxes?

A. I don't recall.

Q. I'm going bring you down to the statement itself. Which says, Anthony Deo statement of financial condition dated March 1, 2023. He lists the assets.

One of the assets that's listed is listed as a residence in the Bronx for $1,280,000; do you see that?

A. I do.

Q. It also says there is a mortgage for $479,000; do you see that?

A. I do.

Q. Mr. Deo, at his deposition actually testified that he didn't actually own that property at that time, it was owned by his father.

He claims some rights to it, but he admitted that the deed to the property was not in his name.

Do you recall whether when you did his tax return, whether he listed the Bronx residents on his tax return?

A. I don't recall.

T. JONES

Q. If in fact it was not on the tax return, yet it's on here, would that indicate to you that you knew this information was not accurate when you prepared it?

MR. LENTINELLO: Note my objection to the form. You can answer it if you can.

A. I wouldn't know because he could have -- he could've acquired the property or -- after the fact or not give me the information for his tax return.

Q. Same thing for property in Old Westbury, that he said he owns that was worth $5,295,000 and there was a mortgage of $2.25 million. He also admitted that that one he was in contract to buy but actually hadn't closed on the property.

So, when you prepared this did you take note that his tax return didn't list that property on his tax return, but he listed it here as having owned it?

MR. LENTINELLO: Note my objection to the form. You can

T. JONES

answer, if you can.

A. I don't recall.

Q. Now, he also listed some values on the properties as closely held entities. For Gold Coast Motors of Syosset $250,000. Gold Coast Motors of Sunrise of $200,000. North Shore Motors $650,000. Sunrise Auto Outlet of $180,000.

Do you have any idea how he came up with those valuations?

A. I don't remember.

Q. Do you know if you assisted him in any way to come up with those valuations?

A. I don't remember.

MS. VERBONITZ: What was that exhibit?

MR. RUDERMAN: Jones Exhibit E, that was the e-mail with the profit and loss statement.

MS. VERBONITZ: Thank you.

MR. RUDERMAN: I am now showing you a document. On the top it says Ford Motor Company dealer financial

T. JONES

statement 2022.

On the bottom is -- it's a multiple page document.

The bottom of the first page is bate's stamped FLUSHING 08560.

I'm gonna mark that as Jones Exhibit G.

(Whereupon, Jones Exhibit G, FLUSHING 08560, was marked as for identification as of this date by the Reporter.)

Q. Have you ever seen this document before?

A. It looks like the dealer statement for October 31, 2022.

Q. You are familiar with the format, right, this is what they looked like?

A. Yes.

Q. Now, this one says Ford Motor Company. Remember I asked you earlier today whether you knew what dealership format they used.

Does this refresh your

T. JONES

recollection that he used a Ford format or not?

A. Yes.

Q. At Mr. Deo's deposition he was asked about this document. He said he got this document from you and from Wendy with regard to him having access to it.

I asked him if the information here was accurate, he said, yes. I said do you know, he said because it was prepared by Tom and by Wendy. I'm just letting you know, that was his testimony.

Do you have any recollection as to whether the document shown right here was true and accurate?

A. I don't recall, I'd have to look at it.

Q. Is there any information on here, you previously testified that you made some adjustments on a monthly basis at the dealership and that would be reflected in the financial statements, correct?

I don't know if you heard my question or not?

T. JONES

A. No, you can restate it just to be sure.

MR. RUDERMAN: Ms. Draper, can you read back that question?

THE REPORTER: Yes.

(Whereupon, the last question was read back by the reporter.)

A. Correct.

Q. This financial statement was presented to Flushing Bank as part of Mr. Deo's application for financing for North Shore, which he obtained a $500,000 loan in March and April of 2023.

He said that he obtained this document, through channels and that he knew it was accurate.

Now, I'm gonna draw your attention to the bottom of the first page.

You familiar with this last box on the first page, right?

A. Yes.

Q. What does this box represent, what are the numbers supposed to be reflecting in this box?

T. JONES

A. The first column is the monthly activity for the dealership summarized. And the second one is year to date.

Q. In this one under line -- again, hard to read, but I believe it's line 57 second from the bottom, there's an operating profit and then two lines below that, it says profit before income tax.

You're familiar with these, these types of lines, these types of items, correct?

A. Correct.

Q. What is the difference, 'cause I can't really read, what would be those deductions between those two lines?

A. You meant $4,954?

Q. Yes.

A. Yes.

Q. What does that represent, if you know?

A. That is other income and other deductions netted that are not part of the operating profit.

Q. According to this document, for

T. JONES

the month of October of 2022 North Shore had a profit before tax of $76,130. Would you agree that that's what this document states?

A. That's what it states, yes.

Q. Year to date it states $372,037 was the profit before tax for the year up through the end of October of 2022; that's what it states?

A. That's what it states.

Q. Sitting here today, do you know whether that information is accurate or not?

A. I do not.

Q. Okay. Have you ever seen this particular document before that?

A. That, I don't know.

Q. Did you assist Mr. Deo in any way shape or form to prepare or give him financial records that he could use for any financing?

A. That, I don't remember.

Q. We know he did come to you to prepare the personal financial statement,

T. JONES

right, we have your compilation you gave, right?

A. Yes.

Q. But, you don't recall whether there were any other records that he asked you to assist him on?

A. No, I don't recall.

Q. Do you know if there's any way to make changes to the documents on the financial statement in the DMS system?

A. Yes, there is.

Q. How would one go about doing that?

A. He can open up -- what's called opening up the month and go back in and make adjustments to it, printout a financial and then delete those entries and it does not affect the next month.

Q. You have no knowledge about whether that was ever done in connection with this statement, correct?

A. I don't.

MR. RUDERMAN: Let me bring up another document here.

We are gonna have this marked as Jones Exhibit H, that is what we are up to.

This is a dealer financial statement also dated October 22nd, for North Shore Motor Leasing.

I'm gonna represent to you this is marked as IAG-002563.

The other one was a document that Flushing Bank had. This is a document that our client had in its DMS system, which it printed out and saying that this is what it shows in the same month in the DMS system.

You can see it's the same Ford Motor Company.

(Whereupon, Jones Exhibit H, IAG-002563, was marked as for identification as of this date by the Reporter.)

Q. Do you recall ever seeing this document before?

A. No, I don't recall.

Q. Now certainly it's a lot

T. JONES

clearer to see than the other one, for whatever reason, right, but I'm gonna draw your attention to the same box on the bottom of the first page.

We're gonna look at those same numbers we just looked at here. As we can see the last one showed a profit for the month of about $71,000 and a profit for the year of over $300,000, yet this document is showing a loss for the month of about $3,700 and a loss for the year of about $79,000. Would you agree that's what it says?

A. I can't see.

Q. Can you see the entire document now?

A. Yes.

Q. We see the bottom line showing a loss of about $3,700 for the month and a loss of $79,000 for the year; do you agree that that's what it states?

A. No, it says a loss of $375,000 --

Q. I'm sorry.

T. JONES

A. -- for the month.

Q. So, there is no pennies there $375 --

A. Correct.

Q. It says a loss of $79,000 for the year?

A. That's correct.

Q. That would mean that up until that point it's showing -- it was showing, if you have a loss of 375 for the month and a loss of $79,000 for the year, that month wiped out a lot of profit that was shown in the financial statements previously?

A. That's what this shows.

Q. Any idea how these -- why these two financial statements are different?

A. I don't know. I don't recall seeing, you know, seeing them.

Q. You weren't involved in any way in making any changes or revisions to any financial statements in connection with these documents produced to Flushing Bank?

A. I don't believe so, I don't recall. I don't recall October of 2022

T. JONES

financials.

MR. RUDERMAN: I'm going show you a document. It states disaster loan assistance.

I'm gonna mark that as Jones Exhibit I.

It says, Disaster Loan Assistance COVID-19 income injury disaster loan application.

It has an application number. The date is November 30, 2023 for 189 Sunrise Auto LLC.

(Whereupon, Jones Exhibit I, Disaster Loan Assistance COVID-19 income injury disaster loan application, was marked as for identification as of this date by the Reporter.)

Q. Do you recognize this document?

A. I recognize it, yes.

Q. You've seen this one before?

A. Yes.

Q. How did you come about seeing this document before?

T. JONES

A. I know that I seen copies of it. I think that I testified before that it was the PPP money, but it may have been this EIDL loan as opposed to the PPP that I saw the application.

Q. Do you recall -- so, when you previously testified about you had some involvement trying to obtain the financing, is this the application you believe that you were involved?

A. I believe so. I'm not -- I know that it was one, but I just don't recall which one.

Q. I'm gonna scroll down on here. Is there anything in here that would refresh your recollection about it?

A. No.

Q. Does have your name and your firm's information on here.

A. Okay.

Q. Would this about an electronically filed by you?

A. It would have been attempted to, yes.

T. JONES

Q. Your recollection is that it did not move forward because there an e-mail issue?

A. That's correct.

Q. Who did that e-mail, e-mail issue come up, what was the problem?

A. I believe how it worked and again, I'm only -- this is in general with the EIDL loans, I think this -- it had to be the same, I think that it had to be the same e-mail address that requested the first round of the EIDL loans.

Q. So, your understanding here is that you believe that the e-mail address that originally applied was through David Baron's e-mail, and then when you tried to submit this at a later date, it was rejected because it was not David Baron's e-mail?

A. Correct, yes.

Q. Did you make any efforts to somehow follow up and try and get that resolved?

A. I don't recall doing anything.

T. JONES

MR. RUDERMAN: This is another document entitled, Disaster Loan Assistance, same heading, same date, different application number.

This one on the second page says North Shore Motor Leasing on it.

We will mark this was Jones Exhibit J.

(Whereupon, Jones Exhibit J, Disaster Loan Assistance COVID-19 income injury disaster loan application for North Shore, was marked as for identification as of this date by the Reporter.)

Q. This is for North Shore.

A. Okay.

Q. This is from North Shore. I'm gonna scroll down and show you again on the third page. It has your firm's name and information on here?

A. Yes.

Q. Do you recall trying to get these loans for both entities?

A. Yes.

T. JONES

Q. The information that you got on here came from where; the financial information, the ownership information, where did you get that from, if you know?

A. Well, the financial information came from, I believe it was the 2019 tax returns. If you scroll up further, yes.

Q. You would have see the 2019 tax returns, and that's where you got the information from on this?

A. Or I could have taken it from the original EIDL application, if I didn't see the tax return from that period.

Q. Do you recall if you had the original EIDL loan application?

A. I do remember seeing it, but I don't recall if I have it.

Q. In this application under owner it lists Anthony Deo as the owner, but it says 50 percent ownership. Do you see that?

A. I do.

Q. Do you know where the information came from as Anthony Deo as 50

T. JONES

percent?

A. I don't recall where that was from.

Q. When I scroll down, this would have been submitted electronically?

A. Yes, if it was able to.

Q. Was this something you would have submitted, Anthony Deo or somebody else would have submitted electronically?

A. I don't know. Actually, I don't recall whether we submitted -- we tried submitting them or the client did.

Q. When I scroll down further on page five of this document it has the business name North Shore, and the name of the signer being David Baron.

A. Uh-huh.

Q. Do you know whether David Baron submitted this document?

A. I don't know. No, that is wrong, he had passed by then.

Q. At the very top here, you can see, I can make it bigger if you need to see it.

T. JONES

The date of this is May 26, 2021. I believe he died the day before.

A. Okay.

Q. Or the week before, but I think that it was the day before.

A. Okay.

Q. Any reason why -- do you know how this was submitted for a loan with David Baron's name on it, after he had died?

A. That, I don't know why it would have it on there.

MS. VERBONITZ: Jeff, can I just ask a question?

MR. RUDERMAN: Sure.

MS. VERBONITZ: Mr. Jones, do you know if that loan was received by the company?

THE WITNESS: I don't believe it was, but I don't recall.

MR. RUDERMAN: It is now 1:30. I have still have a bit to go.

Let's take a lunch break. We can reconvene at 2:00. Off the

T. JONES

record.

(Whereupon, a 30 minute recess was taken.)

Back on the record a at 2:02.

I am going to share my screen. I have a six page document which is a series of e-mails, a chain of e-mails.

It was filed -- this particular copy comes from the Nassau County clerk filing on March 10, 2023.

Case index number 617224 of 2022. The e-mails are with Mr. Jones and various other parties in e-mails October of 2022.

Q. Mr. Jones what I wanna do is, I just wanna see if it -- a little bit all over the place. There's not that much. It's a few pages. I'm just gonna scroll through them. I just want you to look through them so I can ask you some questions.

A. Okay.

Q. Tell me you're done, and I'll

T. JONES

move on to the next e-mail. Again, they may be a little out of order. Some may be before a certain date or after, but this is the way I have it, okay?

A. Okay. I think the bottom of that is cut off.

Q. I think it goes on to the next -- I think it's the bottom -- at the top of this page here.

A. Okay. Okay.

Q. It says, good morning with the approved, came from Josh Aaronson on the bottom of that page.

A. Okay.

Q. Move on?

A. Yes. Okay.

Q. Have you had an opportunity to review that e-mail string?

A. Yes.

Q. Do you have a recollection of the e-mail string?

A. I do.

Q. What was going on that led to that, to your recollection, that led to

T. JONES

that string of e-mails?

A. To file the tax return for the 2020 return to reflect ownership for the Deos.

Q. Do you know what precipitated this sudden decision do to move in that direction?

A. Can you clarify that? I'm not really understanding the question.

Q. Well, you had testified earlier about when you first started back in 2020 or so, where Anthony told you that he was going to get the company transferred to him. This is a few years later, and there's decisions being made here with regard to amending the returns, filing new returns.

Just wanting to understand, what your recollection is at the time why suddenly this was happening?

A. Well, the returns needed to be prepared and the Deos were not listed on the 2020 tax return, when they had stated that they were owners since the 2020 year.

T. JONES

Q. Again, my question is, why did this happen now, why in October of 2022, why not in July or why not in 2021; is there something that you are aware of that suddenly this was effectuated?

A. Not that I'm aware of, just that the tax returns had filed by September 15th.

Q. You don't recall any communications or correspondence, whether from Anthony or from other parties about how the problems that had become a apparent with the dealership over the prior month or two, precipitated this decision?

A. No, I have no recollection of that.

Q. You did testify that you were aware that there was significant monies that were being put into the dealership by Josh or his group around this time?

A. I didn't know the time frame, but yes, I knew about it. I didn't know the exact year.

Q. I showed you the bank

T. JONES

statements from September showing those monies going in.

It's the month before when those monies were going in, right?

A. Correct.

Q. You are not ware of any connection between the two incidents that you can recall?

A. I am not.

Q. What was your understanding as to -- withdrawn.

Was there, your understanding a transfer of ownership or a change of ownership, exactly what was -- what was happening here from a technical standpoint?

A. I know it was a change of ownership. I don't know how it was handled, but it was a change of ownership.

Q. Have you been a CPA a long time, have you ever dealt with various clients that have had bought, sold, changed ownership of their entities; whether dealerships or otherwise?

A. Yes.

T. JONES

Q. There's usually some sort of a contract or some sort of written agreement, where there's a transfer?

A. There usually is.

Q. There are certain documents which support that transfer, correct?

A. In general, yes.

Q. Other than filing the tax returns, did you see any of the other typical transfer documents you would normally see in the transfer of ownership of one owner to another in a LLC?

A. I don't see the document transfers on every transaction that happens with clients like that.

Q. Okay. So you don't really -- so your role is sometimes limited you're just said, you do something -- withdrawn.

Your role is somewhat limited in connection with the transfers; you're not involved in all aspects of that, correct?

A. That's correct.

Q. In connection with this

T. JONES

agreement for the tax returns to be amended or are now filed under Anthony and Sarah Deo, you don't know what, if any, other agreements there may have been associated with this, between the Josh and the other parties and Anthony and Sarah Deo?

A. That's correct.

Q. Were you aware that as part of the transfer of the dealerships the license to the Department of Motor Vehicles would need to show a change of ownership?

A. Yes.

Q. Were you aware of whether that change ownership was ever prepared or submitted?

A. No, I have no idea.

Q. Are you a part or party to any of the communications between Josh or his group and Anthony and his group as to what needed to be done in order to fully complete the transfer of ownership?

A. No, I don't recall ever being involved in those conversations.

Q. From a legal point of view are

T. JONES

you -- do you feel that you are competent to testify that the change in ownership and this tax return meant that Anthony and Sarah Deo were now the owners, for all legal purposes of this dealership as a result of these tax return filings?

A. Yes, based on the e-mail conversations.

Q. Based on the e-mail communications they were permitted to file showing that they were the owners?

A. Correct.

Q. But, I'm asking in fact that means from a legal standpoint, they were in fact the owners for all legal purposes?

A. How would I know -- if they're from a legal standpoint.

Q. No, do you feel --

A. I'm sorry?

Q. Let me back up. My question was, do you feel competent to testify that that is what the answer is, and you said yes.

So now I'm trying -- now you

T. JONES

seem to maybe misunderstood my question.

A. Yeah.

Q. I'm not asking you if the tax returns state that they have the owners, I am asking you, do you feel competent that you can testify that as a result of this they are in fact for all legal purposes, the owners of these entities?

MR. LENTINELLO: Note my objection. You can answer, if you can.

A. Getting back the what you -- from a legal standpoint, I took what my client tells me, which is normal in practice and told me that this is what their ownership was. That's how I do the tax return.

So, from a tax standpoint, yes, I believe after that this reflects they were the owners.

Q. But limited, to a tax standpoint in your position as a CPA?

A. Yes, correct.

Q. So, there was a 2020 return

T. JONES

that had been filed already, correct, for North Shore?

A. Yes.

Q. The plan was to amend the 2020 return to reflect that for part of that year Anthony and Sarah were the owners of North Shore, correct?

A. Correct.

Q. Was that in fact done?

A. To my recollection, yes.

Q. Now, do you recall this is a 1065 partnership return, correct?

A. That's correct.

Q. So, Each member of the LLC gets a K-1, correct?

A. That's correct.

MR. RUDERMAN: Let me open this up here.

Q. Do you see that document?

MS. VERBONITZ: Jeff did you mark those e-mails?

MR. RUDERMAN: No, thank you. Those e-mails will be Jones Exhibit K.

T. JONES

(Whereupon, Jones Exhibit K, E-mails from October of 2022, was marked as for identification as of this date by the Reporter. )

This is a 2020 tax return. Jones Exhibit L.

This is 1065 partnership return for the year 2020 for North Shore Motor Leasing.

(Whereupon, Jones Exhibit L, 1065 partnership return for the year 2020 for North Shore Motor Leasing, was marked as for identification as of this date by the Reporter.)

Q. Do you recall seeing this document before?

A. I don't recall.

Q. Do you recall seeing -- do you recall seeing a 2020 return, you don't recall if this is it?

A. Yes.

Q. I'm going to scroll down and I'm going to go to this page here.

This is called schedule B-2

T. JONES

where it lists the partners. This is, by the way, it's an un-redacted version of it, I have the redacted, I will provide the redacted version with the Security Social numbers redacted. This is what I had available.

Anyway, David Baron, Asad Khan, and Brian Chabrier are listed as the partners here; do you see that?

A. I do.

Q. Is that your recollection as to what the status of the ownership of the company prior to the transfer you talked about?

A. Yes.

Q. Now if I scroll down further, there are K-1s, right, here is a K-1 for David Baron showing a one-third interest and income of $34,604; do you see that?

A. Yes.

Q. We have them here. Okay. We've got one for Asad Khan, also one-third interest the same $34,605; do you see that?

A. Yes.

T. JONES

Q. The last one is for Brian Chabrier again, income of $34,604, correct?

A. Correct.

Q. So now, if everything was done appropriately these K-1s would have been provided to each one of these members and they would attach that to their personal 1040 income tax return, correct?

MR. LENTINELLO: Note my objection.

A. They should be, but they're not attached.

Q. Oh, they're is a schedule of some kind on the tax return which would refer to the K-1?

A. Correct.

Q. All right. In that schedule would also refer to this -- the business income from the -- from the K-1, correct?

A. Correct.

Q. That amount would be taxable income on a tax return, correct?

A. That's correct.

Q. All right. So, they should be

T. JONES

for the year 2020. Putting aside whether there were any things they could offset it against. They should have paid income tax on the $34,000 and change on their personal tax return for the year 2020.

A. I can't talk about somebody else's tax returns.

Q. But, typically this would be reported on their tax return as taxable income, which may be subject to tax?

A. Oh, that's correct.

Q. Okay. When you -- when you amended the return, to provide that Sarah and Anthony Deo were now owners in June of 2020, then there should be an amended K-1 for each one of them changing the income based upon the -- withdrawn.

Let me ask you the question. When you do an amendment where there's a part year ownership, do you then amend the K-1s to reflect some portion of the taxable income?

A. Yes.

Q. Do you know if that was done?

T. JONES

A. I believe it was for the 2020 year.

Q. Would that be done for -- like any other basis, would you just break it up on a monthly basis and prorate it that way?

A. Unless we had other information, it generally is broken out by the days of ownership in a year.

Q. That would mean that somewhere more than half of this would've been attributable to Sarah and Anthony Deo on their tax return then?

A. Correct.

Q. This would be the 2020 return, correct?

A. Correct.

Q. Which you did prepare after amending the return as you told Libertas in that video?

A. Correct.

Q. So this -- so that income from these K-1s would have been listed on their 2020 personal income tax return?

A. If it was done as an allocation

T. JONES

based on days.

Q. Do you have any reason to believe it was done in any other fashion?

A. I don't recall how it was done.

Q. Okay. Do you know whether in fact the Deos paid any income tax on this attributable income for 2020?

A. I don't recall.

Q. Okay. Do you know if, if the -- if the prior owners who may have paid income tax are entitled to request a refund on the amended return?

A. Again, that's based on their own personal tax return. I don't know what it would be.

Q. But, typically speaking would one be permitted to go back and request a refund of that portion which is now attributable on an amended return to a different individual?

A. If there -- in general if their income was lower on the amended K-1, they could file an amended return to have any taxes paid be refunded if it was lower.

T. JONES

Q. These are e-mails in March of 2022 and the first one is from Anthony Deo.

So, this is a string of e-mails so I'm gonna show you the e-mails. I believe that it goes from the top to the bottom.

Mr. Jones, I'm gonna ask you to read through it. I'll scroll down when you get a chance to review what this e-mail is.

A. Okay.

Q. Do you recall this string of e-mails?

A. I do.

Q. What was this, what was going on here?

A. Filing for the SBA funding, for the EIDL loan.

Q. This was in March of 2022?

A. Yes.

Q. Anthony is saying, I received this morning. Wendy writes, "this is great news we are out of the black hole let's e-mail the SBA the two items they requested". Then asked you about the

T. JONES

filing of the 2019 tax returns.
What was going on here, what is the black hole; do you know what she was referring to?
A. I don't know what she was referring to.
Q. So, remember previously you testified about an application that was submitted. You thought that it, it could not go any further because it, because you didn't have -- you didn't have David Baron's e-mail address?
A. Yes.
Q. I asked you if there was anything that could be done about that. I don't think you were sure. Does this refresh your recollection?
A. Not really. I don't know if this was the same application because it says that there is two different confirmation numbers.
Q. There is an application. Let me see if I can find the number before.
I can tell you the application

T. JONES

number we looked at previously is not this application number.

Do you know what this application number was for, what it's referencing?

A. I just know it's the disaster -- you know, the economic injury disaster loan. The EIDL.

Q. So they're asking for information in order to continue the processing of it it looks like.

Do you know if any of that information was provided?

A. I believe I did upload the tax return that they were looking for.

Q. What, if anything happened as a result of doing that, do you know?

A. I have no idea.

Q. Okay. So you don't know if any money was ever received in connection with this application?

A. I don't know.

MR. RUDERMAN: I have another e-mail dated June 8, 2022. It is

T. JONES

also bate's numbered from the last time.

This is Bates number IAG 005479. I'm gonna mark that as Exhibit N.

(Whereupon, Jones Exhibit N, E-mails, was marked as for identification as of this date by the Reporter.)

Q. This e-mail is from, sorry, you're not on the e-mail, but it's from e-mails from Anthony Deo to Wendy dated June 8, 2022.

It says, "good morning, Wendy. I have a couple of things that I wanted to run by you".

Then the third bullet item, he says, "I sat with another controller yesterday her name is Janet. She is currently in Huntington Kia, Tom Jones gave us her information".

Do you know who he's referring to here?

A. Yes, I do.

T. JONES

Q. What was that?

A. He was looking for someone to take over for Dan as the controller because from my understanding he was leaving.

Q. So, he asked you if you knew anybody that could take over the position?

A. He just asked if I knew anybody that was looking.

Q. Do you know what, if anything happened as a result of this?

A. I just know that a meeting took place and that she wanted too much money.

Q. She was ultimately, she was not hired?

A. Correct.

Q. By the way, do you know her last name?

A. I do know it, but I cannot think of it at the moment. If it comes to me while we're sitting here I'll just interrupt you.

MR. RUDERMAN: We will leave a blank for Janet's last name.

________________________.

T. JONES

A. I certainly can find out after if it's something that needs to be the record, I can definitely get it and send it.

Q. Okay. That'll be fine. Thank you.

MR. LENTINELLO: When you review the transcript after this, they're leaving a blank, you'll just fill that in at that point.

MR. RUDERMAN: I am going to share another e-mail from Wendy to Anthony Deo.

Jones Exhibit O. October 11, 2022 e-mail. It has a bate's stamp number on it. It is IAG 005637.

(Whereupon, Jones Exhibit O, E-mail, was marked as for identification as of this date by the Reporter.)

Q. I am going to go back here if you could, there's an attachment in one of these e-mails, so you can read through this e-mail, and we'll look at the attachment.

T. JONES

A. Okay.

Q. I'm ask some questions.

A. Okay.

Q. Do you see this?

A. Yes.

Q. Let me know when you are ready to answer questions.

A. Okay.

Q. All right. So in the e-mail, Wendy is asking you questions about account -- I can't recall, let me see the account number, schedule 1550 and American Express and then she attaches this to you. What does this mean to you?

A. Those are payments towards American Express that were posted to the account 1550.

Q. Do you remember what account 1550 is?

A. I believe it's prepaid. I'm, sorry, prepaid expenses.

Q. Do you know why she is asking about this American Express, why it is being posted to prepaid?

T. JONES

A. I don't recall why she was asking in particular.

Q. Who would have posted them to prepaid?

A. Those would have been posted by Dan.

Q. Do you know who would have directed him to post them to prepaid?

A. I don't.

Q. You do not know what these expenses are for, correct?

A. I don't.

Q. These are different American Express charges over different months?

A. Yes, correct.

Q. Are you sure that these weren't adjustments that were made and now reflecting being made on those dates?

A. Yes, because the -- if you look at say, for instance, all the ones that say EFT, those are payments.

Q. Those are payments being made. Okay. When you would get to the dealership on a monthly basis, you would have seen

T. JONES

these items are prepaid, correct?

A. Correct.

Q. This would be something typically, you would say, Dan, why is there $30,000 on February 4th for American Express for prepaid, and I think you even testified that you might ask those types of questions?

A. Correct.

Q. Then Dan would investigate and tell you some information about it and then you would tell them whether to leave it or recommend an adjustment?

A. Correct.

Q. Let's say on February 4th Dan put in this American Express $30,000 payment as prepaid, and you did an adjustment in March as a result of that, this is printed out, this is showing from January through October of 2022.

Would it no longer show up like this anymore?

A. I don't understand the question. I'm sorry.

T. JONES

Q. Well, let me -- let me try to break it down this way.

This is a summary of the account 1550, correct?

A. Correct.

Q. Okay. If we went into this account summary in February of 2022, then we would see that entry for $30,000 to pay American Express going to this account, the prepaid, right?

A. Correct.

Q. Now, you would come in in March and review. If it was your recommendation to move that out of the prepaid and to some other account and it was done, then in April if you would go back into this account 1550 this item would no longer show up in this account, correct?

A. Correct, it could still show up if the full amount was not moved.

Q. Right, but if he made the adjustment, taking it from prepaid to some other item, it would not know show up in this account anymore, and it would show up

T. JONES

in whatever other account it's now applied?

A. Correct.

Q. So, would it be fair to say then that the fact that it's still showing up in the 1550 account in October of 2022, there was no adjustment that was implemented moving that out of the prepaid as of October of 2022?

A. As of October of 2022?

Q. That is the date of this report?

A. 'Cause there is that adjustment that's on it showing on May 29, 2022, kind of the one that we were discussing before, that is taking up a numbers out of that.

Q. I'm glad that you pointed that out. So I'm trying to understand this.

So would the entry stay there irrespective of what happened afterwards you just would make changes to the account overall?

A. Yes, yes. I'm unclear -- until it cleared the entire amounts out.

Q. When you had -- and again I'm

T. JONES

not saying this is what happened 'cause none of us remember. I'm just really -- you have on May 29th an adjustment removing almost $95,000 from the prepaid account; is that my understanding correct?

A. Your understanding that's the entry. The fact is, like I said that is when it's dated May 29, I am not doing that entry 'cause I'm not there at the dealership.

Q. I understand that. The entry on May 29th where it says minus about $95,000 that was put in, that is taking some of the items, some of the total -- excuse me, some of the total, and the prepaid expense out of that account and putting it into a different account?

A. That's correct.

Q. But the entries that existed already would not change?

A. Correct, they would not change.

Q. So, let's say it was an exact, let's say the entry on February 4th for $30,000, let's say an adjusting entry would

T. JONES

say we now wanna take that complete $30,000 and put it someplace else. All right.

Would that entry then disappear from February 4th or still stay there, but you'd show a later date now a negative $30,000?

A. If it was a $30,000 credit to move it somewhere, it would normally in most DMS systems, both of those transactions would eventually go away.

Q. Looking at this in the situation that I described, you wouldn't even see the $30,000 in and out anymore if it was literally in and out?

A. At year end, each month you would still see it in the month, but at the end of the year if it would close out in most DMS systems.

Q. I see. You don't remember what happened as a result of that communication with Wendy about the question that she had?

A. Which question was that?

Q. She said that she wanted to discuss with you that account. Do you

T. JONES

remember what she wanted to discuss with you about that?

A. No, I don't recall.

MR. RUDERMAN: This is another e-mail. It is dated August 30, 2022 between Wendy and Dan O'Sullivan and Anthony Deo.

It begins on bate's stamp AIG 00527. It is a very short e-mail with a long attachment.

Q. Do you recall ever seeing this e-mail on August 30th in and around that time?

A. No.

Q. It says in here Wendy is sending to Anthony and Dan. "Anthony, see attached the trade in payoff checks Dan is holding".

Do you have any idea what she's talking about?

A. I do know in general what payoff checks are, they are paying off on trades that they took in on a sale.

Q. Do you know -- do you know

T. JONES

whether in fact Anthony or North Shore Holding, excuse me, whether it was holding on to any trade payoffs for any period of time?

A. I don't know of any.

Q. If I scroll down there's an attachment here. I can go through pages, but if I told you that on August 30th Wendy became aware that Anthony had Dan hold approximately one million dollars in trade payoffs, over the course of the last six to eight months that had not been paid; were you aware of that?

A. I was not.

Q. Would there be something in the books that would reflect that?

A. The only place that it would be would be an un cashed outstanding checks.

Q. That would be a bank reconciliation, typically, right?

A. Yes.

Q. Any other place other than that?

A. No, typically that's where it

T. JONES

would be.

Q. Do you know any reason why Anthony may have asked Dan not to make a million dollars in trade payoffs?

A. No, I have no idea why.

Q. In your knowledge in the industry is that something that is appropriate for a dealership to do?

A. Not normally, no.

MR. RUDERMAN: Another e-mail, I'm going to mark this as Jones Exhibit Q.

Two e-mails dated March 13 and March 14, 2023.

This is an e-mail, the first one is from Robert Puccio to Thomas Clemmons and Steven Codispodo. All of Flushing Bank. The subject is North Shore Motor Leasing enumerated LLC 500M application.

Then another e-mail from Mr. Puccio.

(Whereupon, Jones Exhibit Q, Two e-mails, was marked as for

T. JONES

identification as of this date by the Reporter.)

Q. In the e-mail from Mr. Puccio to Tom and Stephen.

"Good morning, crazy weekend. Attached you will find a PFS and CPA prepared network statement for Anthony Deo owner of North Shore Motors". We already being looked at that docket.

Then he writes, "as I spoke with Tom briefly about last the funds from the LOC are going to be used primarily for, "small and cosmetic" improvements to the showroom at the dealership. These improvements are to things like flooring, lighting, windows, et cetera. They may also look to make improvements to their auto repairs division, Gold Coast Motors of Syosset which currently is a pass through entity to North Shore with not much activity. They do not do a lot of auto repairs currently. They would also use the LOC for other growth opportunities which would need to be financed short term".

T. JONES

Did I read that correctly?

A. It looks like it.

Q. Now, the e-mail here is indicating that you had a conversation with Mr. Puccio in around March 13, 2023; do you recall any such conversation?

A. I don't recall that. Are you sure it's not the Tom that's on this?

Q. Well, he's sending it to Tom, and he's then referencing the CPA prepared net worth statement, and then he says as I spoke with Tom briefly about what they're gonna do with the money.

A. It's to Tom and Stephen. I have no recollection of having a conversation with him on anything.

Q. Do you recall at any time knowing what Mr. Deo planned to do with the funds that he -- the funds that he was trying to obtain from Flushing Bank?

A. No, I don't.

Q. Did you know that he actually obtained the loan from Flushing Bank?

A. No, I was not aware.

T. JONES

Q. Did you ever prepare a tax return for Superb Motors?

A. No.

Q. When you prepared -- did you ever look through the books and records of North Shore Motors in 2023?

A. I don't recall if it was. I believe so, but I don't recall specifically the last time that I was there.

Q. What type of system were they using in 2023?

A. The DMS system?

Q. Do you know whether in 2023, whether North Shore was still using the same DMS system that had it had used previously when he was operating in 2022, 2021, etc?

A. I don't recall if they changed DMS systems.

Q. Well, I mean, Dan was no longer there, right, Dan O'Sullivan was not there anymore, right?

A. I don't recall when he left.

Q. Well, I'm talking about the

T. JONES

years. I'm just wanna make sure, if you wanna differentiate between the time of the filing of the tax return, was there a difference in the operation of North Shore or Sunrise prior to your filing of those tax returns in October or so of 2022, before and after?

A. Repeat that please, if you could.

Q. Was there a difference that you were aware of in the operation of North Shore and Sunrise before filing those returns and after filing those returns?

MR. LENTINELLO: Note my objection to form. But, you can answer, if you can.

A. I don't recall when Dan was not there any longer. That's when it changed how operations were being done, as far as I recall.

Q. Put aside the date. Your recollection is that things changed when Dan was no longer working there?

A. I believe so.

T. JONES

Q. How was it different before when he was working there to when he was no longer working there?

A. I don't know how the daily operations were. I'm just talking about -- I know there was a change. I have no idea you how the daily operations changed.

Q. So what changes were you aware of, what changes were you aware of before Dan -- when Dan was there to when he was no longer there?

A. Dan was there and then he wasn't.

Q. How did it manifest itself with you going in there other than Dan was there and then he wasn't there?

A. I would still go in monthly and then I would speak with Wendy on the month end.

Q. Were you still speaking with Wendy on the month end in 2023?

A. I don't recall the years.

Q. Did there come a time when you were no longer speaking to Wendy at the

month end?

A. That, I don't recall. But I wasn't doing it. I wasn't speaking to it, so.

Q. Well, did there come a time when you stopped going in to do the monthly reviews?

A. Yes.

Q. Do you know approximately when that started, when you stopped doing that?

A. I believe it was 2023, I am not sure.

Q. Were you ever aware that there was a lawsuit filed by various Island Auto individuals and entities in which a restraining order was obtained prohibiting Anthony from operating North Shore?

A. I did at some point, after the fact not I guess when it happened.

Q. Are you familiar with a gentleman by the name of Harry Thomasson?

A. I am.

Q. How do you know Mr. Thomasson?

A. He's attorney that I dealt with

T. JONES

with another client years ago.

Q. He was representing a different client in a different matter at some other time?

A. Yes.

Q. When was the first time you became aware of other than that situation?

A. When he was representing the Deos.

Q. When was that approximately?

A. I don't recall.

Q. Do you know it was before or after this lawsuit?

A. I don't recall.

Q. Did you speak to Mr. Thomasson at all?

A. I believe I spoke to him once, if I recall. I just don't know when it was.

Q. But it was in relation to his involvement with Deo and not that other matter?

A. Correct.

Q. You don't know remember what

your conversation was about?
A. No, I don't.
Q. Do you know it was in person or on the phone or something else?
A. Telephone.
Q. Do you know if you called you or you called him?
A. He called me.
Q. Do you remember what he asked you?
A. No.
Q. You said you, you knew who Marc Merckling was, I believe, correct?
A. Correct.
Q. To your understanding who is Marc Merckling?
A. He is someone that worked at North Shore Motors.
Q. Do you know what he did there?
A. Sales from what I remember.
Q. What is the basis for your belief that he did sales?
A. 'Cause I remember him being on the floor.

T. JONES

Q. Just because of his location?
A. Yes.
Q. Do you know if he was on payroll for North Shore or Sunrise?
A. I don't recall whether he was on payroll or not.
Q. If I told you he had testified that he had a company, I forget the name Merck something, that he was being paid to a company. It's like a 1099; does that refresh your recollection at all?
A. I know that he was getting paid that way, but, I don't know if he was on payroll also.
Q. So you -- but, you do know that he did receive money, not as an inventor?
A. Yes.
Q. Do you know how much he was getting paid?
A. I do not.
Q. Do you know why he was getting paid as a 1099, what was the reason for doing that?
A. That, I don't know.

T. JONES

Q. Were you aware that Car Buyers was getting paid significant amounts of monies out of North Shore?

A. I knew they were getting paid from North Shore. I didn't know the dollar amount.

Q. Do you know what they were getting paid out of North Shore for?

A. No, I do not.

Q. Was North Shore obligated to provide a 1099 to Car Buyers in connection with the payments that were made?

A. They why were not.

Q. Why not?

A. Because they're a corporation.

Q. 'Cause Car Buyers is a corporation?

A. Correct.

Q. Do you know if Car Buyers reflected on its tax return all the income that it received from North Shore?

A. I don't recall.

Q. Do you have other clients without divulging any particular client,

T. JONES

that have separate entities from which they shift money from their dealership to other entities that they own?

MR. LENTINELLO: Note my objection to the form. You can answer if you can.

A. I do have clients that do that in different industries.

Q. Is that from an accounting perspective, is that acceptable?

A. If it's done the proper way, yes.

Q. Do you know whether or not the way it was done for North Shore to Car Buyers was done the proper way?

A. I'm not aware.

MR. RUDERMAN: If you can give me a minute, I may be done. Off the record.

(Whereupon, a brief recess was taken.)

Q. I just wanna double check. Mr. Jones, just a couple of more questions.

A. Okay.

T. JONES

Q. Mr. Jones, when you communicated with Mr. Deo, did you ever have any written communications, texts e-mails or other type of written communications?

A. Yes.

Q. How did you mostly communicate, if it was one over the other?

A. More phone calls than e-mails than texts.

Q. Have you done any thorough search through your texts and your e-mails to see all communications you've had with Mr. Deo?

A. Yes, when they were in the subpoena I'd gone through them.

MR. RUDERMAN: What I'm going to do is, I'm going to, this is to you, but it's also to your attorney.

We believe that whether through the original production or subpoena, in either case, pretty much all your files relating to all of these dealerships; Car Buyers, North Shore

T. JONES

Motors, all the entities the Deos themselves every document you have relating to them, whether it's maintained physically or in digital format should have been produced to us.

I'm going to again make that request again, to the extent that it's not been produced, because I believe there's a lot of testimony of documents that you have, which have not been produced.

We'll make that request now on the record, and we'll follow that up in writing.

With that Mr. Jones, thank you. I don't know have any further questions.

THE WITNESS: Thank you.

MR. KATAEV: Let's take five minutes. Off the record.

(Whereupon, a brief recess was taken.)

EXAMINATION BY

T. JONES

MR. KATAEV:

Q. I realize that you have been asked a lot questions. I apologize in advance. It will be easier if you wanna state that you previously answered, to just restate the same answer, so we can plug along and finish as quickly as possible.

Sometimes if I'm asking a question previously answered, I'm using it to build the foundation to my next question. Please don't get frustrated if I do ask the same questions.

A. All right.

Q. I'm the attorney for Superb Motors, Inc, Team Auto Sales LLC and Robert Urrutia.

Are you aware of that?

A. I'm aware of them.

Q. Have you ever been deposed before?

A. Yes.

Q. Was that in connection is Hustedt Chevrolet?

A. Yes.

T. JONES

Q. Hustedt Chevrolet previously sued your accounting firm for accountant's malpractice, correct?

MR. LENTINELLO: Objection to the form.

A. Correct.

Q. Other than that dealership, have there been any other client, whether it is a dealership or not that has sued your accounting firm for accountant's malpractice?

A. Not that I'm aware of.

Q. I know Mr. Ruderman went over some ground rules, but I'm just going to tell you two important ones; if you don't understand the question, tell me, I will rephrase it.

If you answer the question I will assume you understood it; do you understand that?

A. Yes.

Q. Also we're looking for your best recollection of events today. I know that a lot of things you didn't remember.

T. JONES

While I don't want you to guess at any answers even if your remember memory is not crystal clear, I'm still entitled to your best recollection; do you understand that?

A. Yes.

Q. What was the result of the Hustedt case?

A. It was settled.

Q. Do you know if that settlement was confidential?

A. I believe it was. But, I don't recall.

Q. How long ago was it?

A. I think it was ten years ago, or so.

Q. Are you aware that Mr. Deo previously had a dealership called Universal Exotic Auto?

A. I wasn't aware of that.

Q. Have you never performed any services for Universal Exotic Auto?

A. No.

Q. What about UEA Premier Corp?

T. JONES

A. Say that again, please.

Q. UEA Premier Corp?

A. I have no recollection of that.

Q. What was the first dealership that you performed services for in connection with Mr. Deo?

A. It would be North Shore Motors.

Q. When you were first introduced to Mr. Deo that was by Mr. Thomasson, right?

A. No, Frank Ventimiglia.

Q. When you were you first introduced to Mr. Deo by Mr. Ventimiglia, did you prepare an engagement letter?

A. I don't recall if I did.

Q. Are you aware that the production of documents we received from your attorneys did not contain any engagement letters?

A. That could be, I may not have prepared one.

Q. Since there's no engagement letter, fair to say that the scope of work for your engagement with North Shore was

T. JONES

unlimited to anything that Mr. Deo would ask for?

MR. LENTINELLO: Objection to the form. You can answer if you can.

A. No, that would not be the case.

Q. How are you able to tell what the scope of work is for Mr. Deo at North Shore?

A. There was a conversation that we had based on what he needed on a monthly basis and tax returns.

Q. A verbal conversation?

A. Correct.

Q. At any time that your accounting firm retained North Shore as a client, did it simultaneously retain Sunrise as a client?

MR. LENTINELLO: Note my objection to form.

A. I believe so.

Q. At the time that your accounting firm retained North Shore and Sunrise as a client, did it simultaneously or within a short time frame, let's say one

T. JONES

or two months, retain any other corporate entities managed, controlled and/or operated by Mr. Deo?

MR. LENTINELLO: Note my objection to the form.

Counsel you said the firm retained them it would be the clients would have been retained the accounting firm.

MR. KATAEV: Okay. Was that qualification.

MR. LENTINELLO: Can you answer Tom. If you can.

A. I don't recall when I started working with the other companies that the Deos had.

Q. Can you tell me whether you know for a fact that those other companies came after North Shore and Sunrise?

A. Yes.

Q. You remember that initially it was just North Shore and Sunrise?

A. Correct?

Q. What can you tell me about how

T. JONES

it seemed to be that you started performing accounting services in relation to Superb Motors?

A. I was again, contacted by Anthony Deo.

Q. When he contacted you, what did he say to you and what did you say to him?

A. I just recall that he was going to be operating the -- or overseeing the operations at the dealership at Superb Motors.

Q. He told you that?

A. Yes.

Q. When he first connected with you about Superb what, if anything, did Mr. Deo saying about any ownership interest in Superb?

A. I don't recall him talking about any ownership.

Q. Did you ask him?

A. I don't recall if I did.

Q. Is it fair to say that it would be your general practice to ask such a question?

T. JONES

A. I don't know if it would be a general practice.

Q. When he reached out to you about Superb and told you that he would be operating that dealership, what services, if any, did he tell you he needed from you?

A. He needed monthly accounting services to review the financial statements and the general ledger and the schedules.

Q. Did he tell you why?

A. It was to go over the operations.

Q. When these engagements are sought for a dealership that has a going concern, is it fair to say that you sometimes need to work with the prior accountant to figure out what's what?

A. Not normally, no.

Q. What if you have you questions you can't find answers to?

A. Then we may have to contact them, but it's not normally in the course of an engagement.

Q. Do you recall whether you had

T. JONES

any such issues in preparing, in performing any services related to Superb?

A. I don't recall.

Q. Are you familiar with who was doing the accounting work for Superb prior to you stepping in?

A. No, I don't remember who that was.

Q. Are you aware of any CFO or chief financial officer that was responsible for putting books together for accountants?

A. No, I don't recall.

Q. Did Mr. Deo ever discuss with you the existence of a prior CFO that he found was not adequate?

A. I really don't recall that conversation.

Q. Does the name Alysia Cayer ring a bell to you?

A. No.

Q. In performing services for Mr. Deo at his various of corporate entities that he owned, operated and or

managed, did you rely on any support staff within your accounting firm to assist in performing the services?

A. I don't recall if I had anyone doing anything during the course of the time that I was handling the accounting side of it for them.

Let me change that. Let me change that. They would have input in doing tax returns into the system, into the computer system and then I would reveal it.

Q. So you utilized that for data entry?

A. For the most part, yes.

Q. What about communications with the customer?

A. Very rarely, if any.

Q. Who, if anyone, would have communicated with Mr. Deo about the accounting services your accounting firm would perform or any of his entities that he owned, operated and/or managed?

A. I would be the only one that would have a conversation on that.

T. JONES

Q. In what ways if any was your engagement with North Shore limited?

MR. LENTINELLO: Can I have that question read back?

MR. KATAEV: I will just repeat it.

Q. In what ways, if any was your engagement, your accounting firms engagement with North Shore limited?

MR. LENTINELLO: Note my objection. You can answer Tom, if you can.

A. Okay.

Q. I'm referring to scope of work for my question.

A. Okay. I don't know how it's limited, short of the fact that if I don't do the services, I say I can't do them.

Q. Is it fair to say that the engagement was open ended in the sense that if Mr. Deo asked you for something related to accounting work that you could perform, you would perform it?

A. Possibly, yes.

T. JONES

Q. For example your review of the monthlies did not involve preparation of employment tax returns, correct, quarterly employment tax returns?

A. That's correct. I believe that they had a payroll service.

Q. But, assuming hypothetically that Mr. Deo would come to you and say, hey Mr. Jones, would you be kind enough to start doing the quarterly employment returns, your firm would do that work, correct?

A. We could do it, whether I would do it or not is a different story.

Q. What, if any, reason would there be for your accounting firm not to do the work?

A. It would be more the client, I would tell them what the fee would be.

Q. Assuming that the fee is acceptable, you would not refuse the work?

A. We may not, no. In general, I can't tell you that's the case, in general, we normally would do it.

T. JONES

Q. What is your recollection as to the amount that you charged to do the monthly reports?

A. I don't recall.

Q. What was the structure of the compensation; in other words, was it a flat monthly fee, was it hourly, was it something else?

A. Well, what I stated before is that if we did it on a monthly retainer, I would calculate what it would be for the entire year and divide it by 12, but if it was not on a monthly retainer, then it would be hourly.

Q. To your recollection, did you have a monthly retainer with Mr. Deo for his entities or did you have an hourly arrangement?

A. I just don't recall.

MR. KATAEV: To the extent that the Island Auto Group plaintiffs did not call for the production of this, the Superb plaintiffs call for the production of all invoices and

T. JONES

details supporting the charges to be produced.

We'll follow up in writing to your counsel.

Q. In what ways, if any, was your accounting firms and/or your engagement with Sunrise limited?

A. Would have been the same way as North Shore.

Q. Same question for Superb?

A. Correct.

Q. In what ways did your engagement with North Shore, Sunrise and Superb differ from your other engagements with other customers?

A. Other dealerships sometimes want me to do sales tax. Other dealerships want me to do -- they needed audits done.

Q. You never performed any sales tax work for North Shore, Sunrise, or Superb, correct?

A. That's correct. I don't recall doing any.

Q. You were never requested to

T. JONES

perform any audit related work for any of those three entities, correct?

A. Correct.

Q. Do you recall whether there was any request by Mr. Deo for you to perform a forensic audit of Superb related dealerships finances?

A. I don't recall if that was the term that was used.

Q. Do you know what I'm referring to?

A. A forensic audit?

Q. Yes.

A. Yes.

Q. Are you aware of any such audit being requested by Mr. Deo in relation to Superb?

A. I don't recall him using the term.

Q. Do you recall any request by Mr. Deo to review any specific financials of Superb and related dealerships?

A. Yes, I reviewed some of the year end before he start at Superb.

T. JONES

Q. What about after that?

A. I reviewed for a few months, three or four months after that.

Q. For the financial statement?

A. The dealer statements.

Q. Outside of the review before he started and outside of the monthly financial statements that you performed work on, do you recall any other requests by Mr. Deo to conduct any sort of forensic or audit or examination of financial records?

A. I don't recall that, no.

Q. Is it fair to say that you and your accounting firm did not perform any work related to Team Auto Sales LLC?

A. I don't believe so, I don't even know that name.

Q. Are you aware of the fact that Mr. Urrutia previously owned the three other dealerships; namely Volkswagon of Freehold, Team Mitsubishi Hartford and Team Nissan of Pittfield?

A. I do not know what dealerships

T. JONES

he owned.

Q. Is it fair to say that you and your accounting firm did not perform work for any of those three forgoing dealerships, correct?

A. That's correct.

Q. Are you familiar with the name Nick or Nicholas Cherkis?

A. Yes.

Q. How do you know him?

A. He's a CPA in the car industry.

Q. Have you had the opportunity to work with him in the past?

A. I have not worked with him, I've taken over dealerships that he had as clients.

Q. Taking over dealerships that he had as clients, did you have an opportunity to observe and/or evaluate his work?

A. I didn't really look at back information when I took over the dealerships unless there was something in particular that we were looking at.

Q. Do you recall ever observing

T. JONES

that any work that Mr. Cherkis performed that was unsatisfactory?

A. Not that I know of.

Q. Have you ever spoken with him?

A. I have spoken with him on a couple of occasions with the dealership I took over.

Q. Were any of those dealerships the dealerships at issue here, Superb North Shore, Sunrise?

A. No.

Q. I know that we discussed this briefly with Mr. Ruderman, but were you involved in any way shape or form with the application for paycheck protection program loans, PPP loans for North Shore, Sunrise Superb?

A. I think it was just the EIDL loans. I don't think it was the PPP money.

Q. For the EIDL, was your engagement limited to the second wave of the EIDL loans, not the first?

A. Correct.

Q. So, it's fair to say you did

T. JONES

not prepare any paperwork in connection with PPP loans?

A. Right, correct. Sorry, I don't recall doing anything with PPP, but.

Q. You are correcting your answer from a definitive no to I don't specifically recall doing?

A. Yes.

Q. In performing the work related to the second wave of EIDL loans, was it required of you to ascertain the equity makeup of the corporate entity?

A. Yes.

Q. To your recollection, what did you learn about the ownership of the corporate entity as far as the EIDL?

A. It was that Anthony Deo was the owner in the 2020 year.

Q. 100 percent owner?

A. Yes.

Q. Of North Shore?

A. Of North Shore, yes.

Q. But you were unable to obtain that loan?

T. JONES

A. I believe so.
Q. The reason you were unable to obtain it was because there was a prior initial EIDL loan obtained with a different owner?
A. That's what I recall and a different e-mail address.
Q. You listed in that EIDL application that you were paid $200, correct?
A. Correct.
Q. Was that a flat fee?
A. It's actually the lowest amount that the EIDL would the accept.
Q. Why was it that you were looking to put the lowest amount?
A. Because it really doesn't take a lot of time to fill out, when most of the information was repetitive from the previous EIDL.
Q. Did you actually charge Mr. Deo less than $200?
A. I don't recall what I charged.
Q. But, that would be reflected in

T. JONES

your invoices, correct?

A. Correct.

Q. In the course of performing services you did for Mr. Deo's dealerships that he owned operated and/or managed at North Shore, Sunrise, or Superb, did you ever come across anything called a cross purchase agreement?

A. I don't recall.

Q. Did Mr. Deo ever discuss with you the fact that he sold 25 percent of his interest in North Shore and Sunrise to Mr. Urrutia in exchange for 49 percent interest in Superb?

A. I don't recall that.

Q. Is it fair to say that in your line of work you are typically involved in forming corporate entities?

A. Is that the end of question? I'm sorry, I thought you were gonna continue.

No, we do not form corporate entities. That's you guys work and we don't tread on the legal work.

T. JONES

Q. Are you aware that many accountants and CPAs do perform that kind of work?

A. I do.

Q. Is there any specific reason why your accounting firm does not perform that kind of work?

A. Again, we never did it, and it's legal in nature. Therefore we stay away from doing anything that's not related to accounting.

Q. What about in relation to the sale of stock or a membership interest in a corporation or LLC, does your accounting firm provide services related to the preparation of stock certificates and related items to evidence a transfer of any such interest?

A. No, we don't do anything like that.

Q. Does your accounting firm have sample operating agreements and/or shareholder agreements that it provides to its customers?

T. JONES

A. No.

Q. How do you go about ascertaining a shareholder interest percentage or a membership interest percentage in a corporation or limited liability company?

A. How do we get that from a client?

Q. How do you go about ascertaining the percentage?

A. From a client?

Q. Yeah.

A. We would normally take what the client tells us and their representation and that's what we would use.

Q. Are you aware of any professional standard in the accounting world that requires an accountant to do more than just accept the clients word for it?

MR. LENTINELLO: Note my objection. You can answer if you can.

A. I don't know if there is one.

T. JONES

Q. Have you ever performed any accounting work in connection with a dealership being sold or bought?

A. Yes.

Q. What is typically involved in performing accounting work following the sale of a dealership?

A. It depends how it's -- how the purchase is. If its' an asset purchase then it is taking from the closing document and putting the information onto the DMS system or giving it to the controller to put it on the DMS system.

If it is a stock transaction, it's merely changing the tax return filings.

Q. Has Mr. Deo ever presented with any such agreement in connection with the request for services to be performed following the sale or purchase of any dealership that he worked with?

A. I don't recall seeing anything.

Q. When you say you don't recall, you mean, you don't recall one way or the

T. JONES

other, it could have been or it could not have not been?

A. I'm gonna say, no. More definitely that I am aware of you anything that I've done in the way of that type of paperwork.

Q. To the best of your recollection, did Mr. Deo ever ask you to perform any services in connection with his purchase or sale of any dealership that he owned operated and/or controlled?

A. Prior to the sale?

Q. At any point?

A. No.

Q. After the sale, during the sale, before the sale?

A. The only thing after the sale is the tax returns for the ownership percentages.

Q. You don't recall performing any such work?

A. On North Shore and Sunrise, I did.

Q. Okay. That's in connection

T. JONES

with those e-mails that we reviewed with Josh Aaronson, correct?

A. Correct.

Q. Other than that was there anything else?

A. No, not that I recall.

Q. You don't know recall performing any such work related to Superb, do you?

A. No, I didn't do any work for the Superb in that respect.

Q. You testified earlier that most of your communications with Mr. Deo were verbally over the phone, correct?

A. Correct.

Q. Did you have any virtual meeting with him?

A. I'm gonna say, no. I don't ever recall having a virtual meeting with him.

Q. Would you have telephone conversations with Mr. Deo in connection with the services you performed for the dealerships that he owned, operated and/or

T. JONES

managed, how long would those conversations typically last?

A. I don't know, they varied.

Q. Would any of those conversations last for an hour or more?

A. No, never.

Q. Would any of those conversations last for half an hour to an hour?

A. My recollection would be that they would be under 15 minutes.

Q. Can you give me a general sense of what he would say to you and you would say to him and any of those conversations?

A. I don't recall those.

Q. If I recall your testimony from earlier with Mr. Ruderman, is it fair to say that you did not review bank statements in connection with the services that you performed at North Shore, Sunrise and/or Superb?

A. I don't recall seeing them at -- let me step back.

North Shore and Sunrise, I

T. JONES

don't recall seeing them, but Superb I never looked at that activity.

Q. How were you able to perform your accounting duties without looking at the bank statements?

A. They have in house controller, and they had somebody that was overseeing the in house controller. That is not our function as an accountant.

Q. Who was it to your recollection, that was overseeing the in-house controller?

A. Kendra was the controller in Superb. I believe the woman's name was EJ, but I'm not sure. She was the one that was overseeing, I believe all of his dealerships.

Q. EJ?

A. Correct. I believe so, yes.

Q. Is it fair to say that any entries in the bank statements were posted in the dealership management system and you relied on the reports from the dealership management system?

T. JONES

A. Yes. Well, all entries should be in the system.

Q. Did you have electronic access to the dealership management -- sorry, to the dealership management system at Superb?

A. No.

Q. How would you receive the information from the DMS at Superb?

A. I would get the -- when I was there, I would have a printout from Kendra. Then if I was not there, I would get an e-mail from her normally.

Q. You visited Superb?

A. Yes.

Q. How many times did you visit Superb?

A. I wanna say it was three or four times.

Q. Once a month or each month's financial statement?

A. Yes.

Q. Who long would your meeting with Superb last?

A. I don't recall how long they

T. JONES

were. I'd be guessing, but I don't wanna guess.

Q. When you came to Superb to meet with individuals at Superb to perform the monthly services for the financial statement, who did you meet with?

A. Kendra and then Anthony.

Q. You met with them separately?

A. Yes.

Q. Okay. And you met with Kendra first?

A. Yes.

Q. Then you would meet with Anthony?

A. Yes.

Q. What did your conversation and activity focus on while you were with Kendra?

A. It was the schedules and trial balance for the month.

Q. What was your discussions and activity involve with Mr. Deo, when you met with him thereafter?

A. It would be reviewing the

T. JONES

operation.

Q. At the time that you met Mr. Deo did you also discuss payments for your services?

A. Yes.

Q. At the time that you would meet with Mr. Deo at the dealership, did Mr. Deo offer you and/or pay you in cash?

A. No.

Q. At the time that you met with Mr. Deo at the dealership did Mr. Deo provide you with any signed checks?

A. He may have given me a check while I was there, but rarely it was that way. It was more I would bill after I was there.

Q. When Kendra will meet with you, she will provide you with what you referred to as a trial balance, correct?

A. Correct.

Q. That trial balance was an accurate representation of the dealerships cash flow and sales, correct?

A. I don't know if it was

T. JONES

completely accurate. It was what was put in by the people at Superb.

MR. KATAEV: Let's go off the record.

(Whereupon, a brief recess was taken.)

I'm going to present to you what will be marked as Jones Exhibit 1.

It is an e-mail chain, ECF docket entry 35-5.

(Whereupon, Jones Exhibit 1, E-mail, was marked as for identification as of this date by the Reporter.)

Q. I'm scrolling to the bottom of the e-mail chain. March 21, 2023 at 1:52 p.m. from Mr. Deo to individuals at Superb including you Mr. Jones.

Can you take a look and read this let me know when you're done.

A. Okay.

Q. Do you recall receiving this e-mail?

T. JONES

A. I don't.

Q. Did you have any conversations with Mr. Deo about a forensic audit in March of 2023 of Superb and its related dealerships?

A. As I said, he may call it a forensic audit, but we did not do a forensic audit.

Q. Regardless of what he called it, did you have you any conversations with him about his inquiry into the financials at Superb and the related dealerships?

A. Yes, I reviewed year end of 2022 and I believe of possibly the first couple months of 2023, that's only year end of 2022.

Q. Referring to this e-mail, he's asking for bank statement and reconciliations for November of 2022 through February of 2023, correct?

A. That's what it says.

Q. This e-mail is consistent with your recollection of what you were asked to review, right?

T. JONES

A. Correct.

Q. I think the issue that I have is, you previously testified that your review of these financials were prior to his stepping in to manage Superb; am I wrong on that?

A. No, I understood him that he was coming aboard in whatever period this was.

Q. Did you have knowledge at the time in March of 2023 Mr. Deo started working at Superb in November of 2022?

A. No, I didn't.

Q. The e-mail does say it, doesn't it?

A. The e-mail says it, yes.

Q. That was not your understanding?

A. That was not my understanding.

Q. When you say you were asked to review these financials, it was not before you came on in November of 2022, it was in March of 2023, correct?

A. Yes.

T. JONES

Q. You did not review any of Superb's financials at the end of 2022 or in the fourth quarter of 2022, correct?

A. I don't recall doing any of that, no.

Q. In November, in mid November of 2022, at the time that Mr. Deo himself said that he first came onboard with Superb, you were still performing accounting services for North Shore and Sunrise, weren't you?

A. Yes.

Q. At the time that you were performing and your accounting firm was performing those accounting services for North Shore and Sunrise, Mr. Deo as far as you can recall did not tell you about the fact that he started working at Superb, correct?

A. That's correct.

Q. So I think to disconnect has been, in terms of your testimony, that you believed of he only started working Superb in or about March of 2023?

A. That's what I recall.

T. JONES

Q. Your testimony that you were asked to review the financials prior to him coming on board, is that based on your own memory, your conversations with Mr. Deo or something else?

A. My memory.

Q. What, if any, conversations do you recall having with Mr. Deo in or about March of 2023, in relation to this request?

A. I don't recall really having any conversations.

Q. Did Mr. Deo inform you about any suspicion that he had that Ms. Cayer, Alicia in this e-mail was engaging in some sort of improprieties?

A. The only thing that I do recall was that he had told me that the schedules needed to be looked at and cleaned up.

Q. What specifically about the schedules needed to be cleaned up, to the best of your recollection?

A. That things were not being entered in the proper spots.

Q. To your knowledge, and

T. JONES

recollection how did Mr. Deo know whether accounting entries were being made on the proper spots?

MR. LENTINELLO: Note my objection.

A. I don't know.

Q. What did Mr. Deo tell you about the accounting entries that made you believe that he understood something was wrong with those entries?

A. There was nothing that he said to me outside of the fact that needed to look at the schedules because the entries -- there was some entries that didn't belong. He didn't go into specifics.

MS. VERBONITZ: May I ask a question just to clarify something Emanuel?

MR. KATAEV: It's not in normal order of things, but instead of cooperation, feel free.

MS. VERBONITZ: I just wanna ask what schedules the witness is referring to? He is talking about

schedules.

Can I ask what you are referring to by schedules?

THE WITNESS: Yes, that's the accounting schedules from the DMS systems.

MS. VERBONITZ: Thank you.

BY MR. KATAEV:

Q. Such as the trial balance, correct?

A. The trial balances and the schedules. Schedules are -- each individual account that's on the trial balance may have a schedule.

Q. So, the schedule is a more detailed document than the trial balance?

A. Correct.

Q. For a specific accounting code in the trial balance?

A. Correct.

Q. At the end of this e-mail, Mr. Deo says, "I have included Thomas Jones and Harry Thomasson in this e-mail. They are part of my forensic team". Do you see

T. JONES

that?

A. I see that.

Q. Did Mr. Deo specifically ask you to review these schedules to determine whether there have been any financial improprieties?

A. He asked me to review the schedules. I don't recall if he asked because of improprieties.

Q. In reviewing the schedules. Did you come upon any evidence of improprieties or financial improprieties that have gone on at Superb?

A. I gave him, I recall that I gave him some things that I did come across that gave me some concern.

Q. What were those things?

A. I don't recall. One thing that I do recall was something with sales tax payable account was very large or -- I remember there were various accounts that were a concern which I listed out for him.

Q. When you worked on the monthly financials, you relied upon the trial

T. JONES

balance and the schedules to do your work and complete the financial statements, correct?

A. I'm not completing financial statements. The financial statements are the dealerships financial statements not mine.

Q. What was your role in connection with the monthly financials?

A. It was just to review them prior to having Anthony look at them.

Q. When you reviewed them, what specifically were you doing; were you cross referencing to make sure that everything balanced or something else?

A. We were checking the figures to the schedules, on the trial balance and then that's in turn what's produced is the dealer statement.

Q. Is it fair to say that you were cross referencing what was prepared as the monthly financial statement, against the trial balance and the schedule to confirm that they match?

T. JONES

A. Well, it's all produced by the same DMS system, so they would they all would match.

Q. Can you explain in more detail what specifically you were doing in reviewing both the trial balance and the schedules on one side and the monthly financial statement on the other side, what was the interrelationship between the two in connection with your specific duties?

A. Well, as I said once the schedules are looked at and any adjustments made to them that's -- then the trial balance is updated.

The trial balance is what's used electronically for the DMS system to prepare the dealer statements.

Q. At the time that you first spoke to Mr. Deo about this assignment in March of 2023, what was your understanding as to who owned Superb for how much percent?

A. At the time I know he was not an owner. But said that eventually he

T. JONES

would be a part owner of Superb.

Q. Did he tell you any reason why?

A. Not that I recall.

Q. When he told you that eventually he would become a part owner, do you have an understanding as to what that percentage was?

A. I don't recall.

Q. Do you recall whether it was half, more than half, less than half?

A. I don't recall.

Q. Do you have any recollection as to whether he would be a majority shareholder?

A. I don't recall.

Q. Do you recall in response to this inquiry whether you specifically received the financial information sought?

A. I do recall receiving some financial information. I don't know if it was everything on the requested list there.

Q. Isn't it true that in response to this e-mail he received somewhere close to 200 e-mails with attachments containing

all the requested information?

A. I don't recall.

Q. Do you recall receiving approximately 200 e-mails from a Toshiba scanner/copier?

A. I don't recall where they came from.

MR. KATAEV: Let's look at Jones Exhibit 2.

(Whereupon, Jones Exhibit 2, E-mail, was marked as for identification as of this date by the Reporter.)

Q. This is an e-mail between yourself and Mr. Deo. I don't have any bate's stamp on it, but I'm gonna start from the bottom and when work our way up.

A. Okay.

Q. Did you have an opportunity to read this first e-mail?

A. You bounced around, but I did read it.

Q. I'm going to scroll up to the next e-mail. These e-mails are dated

T. JONES

January 24, 2023?
A. Okay.
Q. Based on your review of this e-mail, does this refresh your recollection as to your review of financials of Superb?
A. Yes.
Q. So, it's fair to say based on this e-mail that the March 2023 assignment is different from the February 2023 assignment?
A. Right 'cause this was looking at the year end, 12/31/22 financial statement.
Q. Based on your review of this e-mail and our earlier review of the March 2023 e-mail, do you have a better understanding as to what the subsequent assignment was for on March 2023?
A. No.
Q. This e-mail is what you were referring to when you said that Mr. Deo was coming on board to Superb and wanted to look at the financials, right?
A. Correct.

T. JONES

Q. The March of 2023 e-mail was not that, that was something else, right?

A. I don't -- I don't know if that's the case. As far as I recall it was all related.

Q. Did Mr. Deo ever tell you that Alicia Cayer was fired over this e-mail we looked at?

A. No.

Q. In this e-mail, you previously recalled that the only thing that you thought was wrong was the sales tax. That's discussed in this e-mail, correct?

A. That is correct, but that's not what I said. I said I gave a list of some things that I had concerns with and one of them I recalled was sales tax.

Q. The items that you enumerated to Mr. Deo that you had concerns with, did not equate to a finding by you that there were any financial improprieties at Superb, correct?

A. Correct.

Q. If I understand your testimony

T. JONES

from earlier, you never actually filed any tax return for Mr. Deo personally, correct?

A. That is not true.

Q. When you filed a tax return for Mr. Deo personally, did you have any 1099s from mortgagees containing mortgage interest?

A. I don't recall. If I can say, they would be 1098, just to clarify the record.

Q. You're correct. Thank you for that.

To your knowledge and recollection when you received all of the financial information requested from the March 2023 e-mail, did you review all of them?

A. I don't recall what I received or what I reviewed.

Q. Do you recall, referring back to Jones Exhibit 1, reviewing bank statements from November of 2022 through January of 2023 from Chase for these four accounts?

T. JONES

A. I don't recall.

Q. Do you recall reviewing the schedule of lien payoffs for the same period?

A. I don't recall.

Q. Same question for these three items?

A. I don't recall.

Q. Is it fair to say that at a minimum you received what was requested by Mr. Deo?

A. I don't recall what I received. Sorry, from that March e-mail, correct?

Q. That's what I meant.

A. Okay.

Q. Do you recall Mr. Deo ever stating anything to the effect of there was a data dump and it was impossible to review any of this information?

A. I don't recall.

MR. KATAEV: Please mark Jones Exhibit 3.

A five page document, bate's stamp Flushing 185 to Flushing 189.

T. JONES

(Whereupon, Jones Exhibit 3, Flushing 185 to 189, was marked as for identification as of this date by the Reporter.)

Q. I know you discussed this, I have some grandular questions.

A. Okay.

Q. You refer to the fact that, "this company states that the financial condition, being made in accordance with accounting principles generally accepted in the United States of America", right?

A. Yes.

Q. That refers to, GAAP, Generally Accepted Accounting Principles, right?

A. Correct.

Q. Can you describe in your own words what the generally accepted accounting principles are in relation to financial statements?

MR. LENTINELLO: Note my objection. You can answer, if you can.

A. I don't know. I don't -- I'm

T. JONES

not able to articulate that.

Q. This report states that you have performed a compilation engagement, right?

A. Correct.

Q. The term compilation engagement means that you prepared a statement based on information provided by Mr. Deo, correct?

A. That's correct.

Q. You state in here that you didn't review or audit this because that wasn't the engagement, your engagement was to provide a report based on information provided and compiled, right?

A. Correct.

Q. What information did Mr. Deo provide to support the numbers in this personal financial statement?

A. He gave me the fair market value and the loan balances of what's on the financial statement.

Q. He didn't provide any actual statements, correct?

T. JONES

A. That's correct.

Q. He only provided a written e-mail, for example, stating that this house has this balance and this value, correct?

A. I don't recall if it was an e-mail or handwritten, but yes.

Q. In the final paragraph of the report, right before your signature or your firm's signature, you state that "Anthony Deo was elected to omit substantially all the disclosures required by accounting principles generally accepted in the United States of America", correct?

A. Correct.

Q. Can you describe what those disclosures are or would be?

A. They are normally just more detail on the assets and liabilities that are on the body of the financial statement.

Q. Such as the underlying documents supporting?

A. No, not underlying documents.

Q. Give me an example of a

T. JONES

document that would fall within the definition of a disclosure, as records in this sentence?

A. Documents are disclosures, disclosures of footnotes that we as accountants put together, that says that the -- for instance, an example would be that the value of the house was determined by real estate sales in the area and based on market conditions there is a certain format that we use in the accounting profession, that details what each asset would have or each liability would have as a footnote. Those are the disclosures we're talking about.

Q. Referring to Flushing 189, the actual statement of financial condition.

Under closely held entities, Superb Motors is not listed as a closely held entity or listed as an asset of Mr. Deos, correct?

A. Correct.

Q. That means that Mr. Deo disclosed to you that he had no interest in

T. JONES

Superb at that time, correct?

A. Correct.

Q. The entities that are listed here were provided directly by Mr. Deo, correct?

A. Correct.

Q. He provided you that in some form of writing, correct?

A. I believe they were in writing, for the most part.

Q. Do you know or recall whether the information he provided you in order to make the statement of financial condition was contained in a single document or multiple documents?

A. I don't recall.

MR. KATAEV: The Superb plaintiffs will call for the production of all documentation provided by Mr. Deo in connection with the preparation of the statement of financial condition.

We'll follow up in reading.

Q. For the notes receivable in

T. JONES

North Shore and Sunrise, did Mr. Deo provide you with any promissory notes?

A. We're not required to get promissory notes.

Q. I'm not asking if it's required, I'm asking if you did provide it?

A. No, not that I recall.

Q. Did Mr. Deo provide you with any evidence that either of these entities owe these sums to him personally?

A. Not that I recall.

Q. Prior to Mr. Deo providing you information to make the statement of financial condition, did he ask you for advice as to how to prepare a statement of financial condition?

A. No.

Q. How did Mr. Deo know to provide you the information that he provided?

A. I told him I needed fair market value of all assets, and balances of all liabilities.

Q. When you told him that, did he ask you for advice as to what you meant by

T. JONES

it?

A. No.

Q. For the cash in bank, did Mr. Deo provide you with any statements supporting, bank statements, financial statements supporting that he had this much money in the accounts?

A. No.

Q. For the real estate entries, did Mr. Deo provide you with copies of any deeds to any of these properties?

A. No.

Q. For the mortgage payables listed here, did Mr. Deo provide you with any mortgage statements evidencing these are the amounts owed for these residences?

A. No.

Q. Other than a hand written or electronically submitted statement by Mr. Deo, did he provide you with any documentation supporting any of the numbers in there?

A. Not that I recall.

Q. Is it fair to say that if in

T. JONES

fact Mr. Deo does not have any mortgages and he doesn't deduct any mortgage interest from his tax return, that this statement of financial condition is inaccurate?

MR. LENTINELLO: Just note my objection to the form. You can answer, if you can.

A. I can't answer that, I got the representation from him.

Q. I understand that he represented to you that he has those mortgages.

My question is, if there are in fact no mortgages, is this statement inaccurate?

MR. LENTINELLO: Note my objection.

A. I mean in general, yes, it would be.

Q. Same question, but instead of inaccurate, fraudulent?

MR. LENTINELLO: Note my objection. Calls for speculation. Objection to the form. You can

T. JONES

answer, if you can.

A. No, I can't answer that. I have no idea whether it would rise to the level of fraud or not.

Q. Why is that, you don't know what fraud is?

MR. LENTINELLO: Objection.

A. That is not something that I get involved in, knowing the fraud levels or not.

Q. I am asking you not as an accountant, I'm asking you as a layperson that goes about everyday life, dealing with life situations.

If in fact, there are no mortgages that this individual is paying, none, is that statement fraudulent?

A. I don't know. I can't answer that. That's a legal -- that's a legal item that I can't answer.

Q. It's a common sense question, if --

MR. LENTINELLO: Objection to the form. It calls for a legal

T. JONES

conclusion.

THE REPORTER: One at a time please.

A. I have no common sense. Go ahead.

Q. As an individual who is confronted with the fact that there are no mortgage statements that Mr. Deo has, does it strike you as a fraudulent statement, and I'm not condoning it to you, you provided a statement that says all you do is compile all the information.

I'm asking in relation to Mr. Deo, was it fraudulent of Mr. Deo to submit the statement when there are in fact no mortgages held by him?

MR. LENTINELLO: Note my objection. You can answer it. It calls for a legal conclusion and possibly facts not in evidence.

But, if you know you can answer, Mr. Jones.

A. I don't know. As I said it's the same way -- a different way of asking

T. JONES

the question previous. I am not in a position to determine what is fraud and what is not.

Q. Let me ask you this, also come sense question.

What is the purpose of a statement of financial condition?

A. It's to list the assets and liabilities of an individual, in this case an individual.

Q. Okay. Did Mr. Deo tell you why he needed this personal financial statement?

A. I don't recall that.

Q. What are common purposes for obtaining personal financial statements?

A. Well, it's for banks and lending institutions and life insurance. There's a number of different reasons why.

Q. Generally speaking, it's to obtain some form of credit, correct?

A. For the most part, yes.

Q. The banks and other institutions that issue credit, rely on

T. JONES

these documents to determine whether a person is worthy of receiving credit, right?

A. On certain documents, yes.

Q. So, is it fair to say that if the statement contained in the personal financial statement is outright false, that that's a problem?

A. Okay, I'll say it's a problem.

Q. You're not willing to say it's fraudulent, but you are willing to say it's a problem?

A. Correct.

Q. I should have videotaped this deposition.

To your knowledge, do the generally accepted accounting principles require you to not submit personal financial statements that are on their face inaccurate?

MR. LENTINELLO: Note my objection to the form.

Can you repeat that one. It was like a double negative.

T. JONES

MR. KATAEV: Read it back.

(Whereupon, the last question was read back by the reporter.)

A. Depending on the level of service it would be.

MR. KATAEV: What number we're up?

THE REPORTER: Five.

MR. KATAEV: Jones Exhibit 5.

It is a document produced by the Deo defendants in discovery bate's stamp, DEO 1198 to 1199.

It is also available at ECF docket entry 241-1.

(Whereupon, Jones Exhibit 5, DEO 1198 to 1199, was marked as for identification as of this date by the Reporter.)

Q. I will give you an opportunity to read it from the bottom.

A. Okay.

Q. Does this document -- sorry, does this e-mail chain dated the May 1 and May 2 of 2023 refresh your recollection as

T. JONES

to when you first began working on monthly financial statements for Superb?

A. Yes, I would say that it was April.

Q. Because you were engaged in early May, you started working on the April financial statement, correct?

A. That's correct.

Q. Prior to this date you did not work on any monthly financial statements for Superb, correct?

A. Not that I recall, correct.

Q. But you did, prior to May 1, 2023 perform other services for Superb, correct?

A. I would say it wasn't for Superb, as it was for Deo.

Q. When you first got engaged for this work did you prepare any engagement letter for Superb?

A. I do not recall preparing an engagement letter for Superb.

Q. The initial e-mail from Mr. Deo to yourself and Ms. Kernizant, he says,

T. JONES

"please give him all that he needs so that we can get this done correctly and effectively", correct?

A. Correct.

Q. When Mr. Deo refers to all that you need he's referring to the trial balance and the schedules, correct?

A. That's correct.

Q. Other than the trial balance and schedules there was nothing else that you needed in order to review the monthly financial statement, correct?

A. Correct.

Q. Do you recall submitting a declaration in connection with this lawsuit?

A. Yes.

Q. You're viewing it now, correct?

A. I am.

MR. KATAEV: This is Jones Exhibit 6. Which is ECF entry docket 170.

(Whereupon, Jones Exhibit 6, ECF docket 170, was marked as for

T. JONES

identification as of this date by the Reporter.)

Q. I want to focus your attention on paragraph three on the highlighted section. Do you see the reference to cleaning of schedules?

A. Yes.

Q. Can you describe what that means, cleaning of schedules?

A. That's an industry term to go through the schedules and make sure that entries are in the proper accounts and/or schedules.

Q. How do you go about doing that?

A. We review the schedules and if something does not look correct or looks like it belongs somewhere else, it's given to the -- I normally will look at it give to the controller to look at and investigate whether it's in the right spot or not.

Q. In paragraph five you refer to Mr. Deo that he was the managing principal of Superb, correct?

T. JONES

A. Right.

Q. He did not state here that he was a shareholder or owner, correct?

A. Correct.

Q. In performing the work that you were doing at the time with the monthly financial statements you would have known whether he was an owner or not, correct?

A. That's not correct.

Q. Why is that?

A. How I would have known?

Q. I'm asking you.

A. In reviewing the monthly financial statements it doesn't list the shareholders or partners or anything like that.

Q. Are there accounting entries for payments to shareholders or members?

A. If they were.

Q. Potentially something that you could have learned, if there were such entries?

A. Possibly.

Q. At the end of paragraph five

T. JONES

you refer to your engagement with Superb as limited, correct?
A. Correct.
Q. It's your testimony that it was limited to only reviewing the monthly financials and nothing more?
A. For the most part, yes, it was reviewing the monthly schedules and trial balances.
Q. Isn't it true that prior to your engagement to do the monthly financial statement and review, you had performed other work in connection with Superb?
A. Well, it was reviewing financial statements and schedules and whatnot.
Q. In Paragraph seven you refer to correcting the cash because it was showing an overdrawn credit balance and correcting the sales tax payable account which was too high and pulled things from the journal; do you see that?
A. Yes.
Q. How did you determine that

T. JONES

these items needed to be corrected?
A. Again, looking at the trial balance, schedules and dealer statement.
Q. When you corrected the cash to be fix the overdrawn credit balance, would that correction result in that increase or decrease in profit?
A. Well, I didn't correct the cash, it was given to them to correct it.
Q. Assuming that they corrected it based on your advice and recommendations, would them doing so increase or decrease the profit?
A. It may not affect the profit at all, it might just increase -- it might increase the cash account to not show that it's overdrawn.
Q. What about this correction of the sales tax payable account, would that result in a net increase or net decrease in profit?
A. It may not result in anything, either way. 'Cause that's on the balance sheet and that could just be a mis posting

T. JONES

to another balance sheet account.

MR. KATAEV: Let's look at Jones Exhibit 7.

Which is ECF docket 170-6.

(Whereupon, Jones Exhibit 7, ECF docket 107-6, was marked as for identification as of this date by the Reporter.)

Q. These are invoices submitted by your accounting firm to Superb.

Is this document familiar to you, Mr. Jones?

A. Yes, it's one of our invoices.

Q. Based on your review of this document, is it your understanding that Mr. Deo was on a monthly retainer or hourly retainer with respect to the engagement with Superb?

A. Hourly.

Q. How do you know that?

A. Because otherwise it would say retainer for the month of April 2023.

Q. This invoice does not list the amount hours that you spent, right?

T. JONES

A. No.

Q. It doesn't list what your hourly rate is, right?

A. Correct.

Q. Based on your review of this document, as well as your knowledge and experience with your accounting firm, can you tell me what your hourly rate was and how many hours you spent on this?

A. I believe that it was $250 an hour then. It would have been a three or four hours.

Q. I'm terrible at math I placed a calculator on the screen and I got 3.6 hours, is that your understanding of how much time that you spent with the description of work?

A. Correct.

Q. Referring you to page three of this document. It's a preceding invoice for $2,400. Can you explain why this invoice is substantially more than the subsequent invoice?

A. The only reason would be if I

T. JONES

spent more time going through the schedules. I spent more time at the dealership.

Q. This invoice also contains work beyond the review of the monthly financials, correct?

A. Correct.

Q. Specifically it contains the financial statement that was requested, right?

A. Yes.

Q. It says May of 2023, but I believe the financial statement was March of 2023.

Do you recall whether this was an error and it should have been March or whether you prepared a separate statement in May?

A. I would think it would have been for May. Again, I don't recall which you're talking about for March.

Q. Well, the personal financial statement that we looked at.

A. Oh, I'm sorry. This is related

T. JONES

to Superb Motors.

Q. Oh, you're saying that would have been billed directly to Deo, not to Superb?

A. Correct.

Q. In order to properly review the monthly financial statement, can you explain how you used trial balance and accompanying schedules to do your work?

A. Well, the schedules -- the schedule totals are what's on the trial balance, the month and numbers. We there go through the schedules to get the detail as to what makes up that account.

Q. Showing you May 2023 financial statement for a Superb.

A. Okay.

Q. Does this look familiar to you?

A. I know that's the statement or the format that was used.

Q. It does identify Superb at the top, correct?

A. Correct.

Q. Its says May 21, 2023, right?

T. JONES

A. Correct.

Q. On the bottom of the first page it says generated June 13, 2023, right?

A. Correct.

Q. To your knowledge, is that generally the time frame in which the monthly statements were completed?

A. Yes, they normally have to be done by the 15th of the month.

MR. KATAEV: By the way, this exhibit is Jones Exhibit 8.

It is bate's stamped at Jones 71 through 80.

(Whereupon, Jones Exhibit 8, JONES 71 to 80, was marked as for identification as of this date by the Reporter.)

Q. The second page of this exhibit contains the trial balance, right?

A. That's correct.

Q. This is what was printed out and given to you in order to help you review the monthly financials, right?

A. Correct.

T. JONES

Q. In connection with your work on this statement, you had asked Ms. Kernizant to adjust entries, correct?

A. I believe I did, yes.

MR. KATAEV: Showing you Jones Exhibit 10.

(Whereupon, Jones Exhibit 10, E-mail, was marked as for identification as of this date by the Reporter.)

It is single page e-mail between yourself and Ms. Kernizant dated May 12, 2023.

Q. Please read it and let me know when you are done.

A. Okay.

Q. In this e-mail chain you ask Kendra to make an adjustment to general journal voucher by debiting account 1451 in the amount of $50,055, correct?

A. Correct.

Q. And to credit that against used car retail sales costs, right?

A. Correct.

T. JONES

Q. Do you recall why specifically you asked her to do that?

A. I don't recall specifically this entry or this reasoning why.

Q. The net effect of making this entry increases the gross profit, correct?

A. Correct.

Q. To your knowledge and recollection, does the basis for making this entry come from your direct review or at the request of Mr. Deo?

A. These are done after conversations with the owners or the principals.

Q. As far as you can recall, it was Mr. Deo that asked you to make this entry?

A. I don't recall specifically, but that's the normal course in the dealership.

Q. Is it that you find a reason to make that entry and make a recommendation that Mr. Deo approves, or does Mr. Deo himself tell you, I would like to make this

T. JONES

change?

A. In this instance, I don't recall what caused it.

Q. To your knowledge and recollection, did Mr. Deo provide you any specific instructions to increase the profit on the monthly statements?

A. Not in particular, no.

Q. Did you ever have any conversations with Mr. Deo where he specifically asked to you increase the profit of any particular monthly financial statement and/or ask you to find ways how to do that?

A. I don't recall those conversations.

Q. In preparing these monthly financials, did you ever have any discussions with Mr. Urrutia?

A. Well, first of all, I don't prepare the financials that the dealership does and the controller does, and the owner or the principal. I had no conversations with Mr. Urrutia.

T. JONES

Q. In reviewing these monthly financial statements, you never had any conversations with Mr. Urrutia, correct?

A. Correct.

Q. Were you aware of Mr. Urrutia's existence?

A. Yes.

Q. What was your understanding as to what his role was at Superb?

A. I understood him to be the owner.

Q. The sole owner, correct?

A. As far as I knew he was the majority owner. I didn't know if there were any other partners involved.

Q. In this e-mail you're directing the controller what to change, based on your conversations with Mr. Deo, correct?

A. Correct.

Q. Is it fair to say that of when you made this request to Ms. Kernizant to make these changes, you did so at the behest and or direction of Mr. Deo?

MR. LENTINELLO: Note my

T. JONES

objection to the form. You can answer.

A. I don't recall if it was or if it was not.

Q. Well, let me ask you this, what, if anything, stopped Mr. Deo from telling Ms. Kernizant directly to make these changes?

A. I don't know if there is anything that would.

Q. To your knowledge, Mr. Deo was fully capable of himself communicating these directions to Ms. Kernizant, correct?

A. Correct.

Q. To your knowledge, what, if any, reason was there for Mr. Deo to ask you to ask Ms. Kernizant to make these changes?

A. I don't know what the reason was.

Q. Was it within the scope of your engagement to send e-mails like this to the Ms. Kernizant?

A. At times it could be.

T. JONES

Q. As you sit here today, can you explain why making this adjustment to the journal entries is considered proper?

A. In this specific instance, I can't.

Q. I'm gonna take you down to page two of the financial statement, which is located at Jones 77.

A. Okay.

Q. I wanna point your attention to the middle of the page where it says total vehicle and departments, $9,499,945; do you see that?

A. Yes.

Q. This amount is the amount of revenue that Superb has, year to date from January 1, 2023 to May 31, 2023, correct?

A. Correct.

Q. Focusing your attention on the same line all the way to the left, where it says month to date sales, the amount $1,210,058 that is the monthly revenue for May of 2023 for Superb, correct?

A. That's what it shows, yes.

T. JONES

Q. You produced this document, correct?

A. That's incorrect.

Q. Your attorneys produced this document on your accounting firm's behalf?

A. Oh, I'm sorry.

MR. LENTINELLO: Tom, I think that he's asking if you created the document.

We produced it, it has our bate's stamp, but he's asking if you created it.

A. I did not create it.

Q. My question was not created. My question was produced.

A. Then the answer would be yes.

Q. Just for the record, produce, when I say produce, I mean provide in discovery to us.

In other words this was a document that was in your firm's possession at the time you made document requests, correct?

A. I would think that is the case,

yes.

Q. Is it fair to say that the trial balance that accompanies this statement contains all of the information supporting these numbers in this statement?

A. If that is the final trial balance, then, yes, if it is not the final trial balance, then no.

Q. Did Mr. Deo ever specifically ask you to ensure that the monthly financial statement shows a profit?

A. Not that I recall.

Q. If Mr. Deo asked you to help and produce a financial statement that shows a profit, what would you do or say?

A. If there was a legitimate way to do it, then I would look to do it.

MR. KATAEV: Showing you Jones Exhibit 11.

It's an e-mail chain, multiple e-mail chains, bate's stamped Jones 269 through 275. As well as an accompanying attachment.

(Whereupon, Jones Exhibit 11,

T. JONES

JONES 269 to 275 e-mail chains was marked as for identification as of this date by the Reporter.)

Q. Please read this first e-mail dated June 14, 2023 between yourself and Mr. Deo and let me know when you're done.

A. Okay.

Q. First, do you recall reviewing any documents in connection with an audit done by Nissan Motor Corporation in or around June of 2023?

A. I don't recall it being an audit.

Q. In this e-mail Mr. Deo refers you to information Bruce sent to him, after Nissan, in his words looked at all the stores, correct?

A. Correct.

Q. What, if anything do you recall about reviewing anything Mr. Deo sent you that Bruce sent to him?

A. I don't recall.

Q. Do you know who Bruce is?

A. I don't recall who he is.

T. JONES

Q. I will represent to you just to refresh your recollection that Bruce Novicky was the chief operating officer at Superb and the related dealerships; does that refresh your recollection?

A. No, because I never met him.

Q. You never communicated with him either, correct?

A. Not that I'm aware of. I don't recall communicating with him.

Q. At the end of this e-mail, before he thanks you, Mr. Deo asked for your help to close out the statements today showing a profit. He says that this is an absolute must, correct?

A. That's what it says, yes.

Q. What, if anything, did Mr. Deo tell you about why it was an absolute must to show a profit?

A. I don't recall.

Q. Did you have any conversations with Mr. Deo after receiving this e-mail?

A. I'm sure that I did with the -- with the month end, but I don't recall the

conversation.

Q. Referring you to the second page Jones 270. This is a single page e-mail chain dated July 6, 2023. In the initial e-mail Mr. Deo sends you a scan of documents; do you see that?

A. Yes.

Q. Do you have any recollection as to what it is that he scanned to you?

A. No, not without seeing it.

Q. Referring you to Jones 271, another e-mail chain dated July 5, 2023 between yourself and Mr. Deo with the subject, Superb P&L.

Please read this e-mail and let me know when you're done.

A. Okay.

Q. In this e-mail Mr. Deo is asking you to, create, I emphasize that word, a profit and loss statement for Superb, year to date January 1, 2023 through May 31, 2023, correct?

A. Correct.

Q. He provides you these numbers

T. JONES

of gross sales $13,400,000, right?
A. Right.
Q. He also provides you the net income amount of $1,332,948, correct?
A. Correct.
Q. We just looked at the June 14, 2023 financial statement for May, right?
A. Yes.
Q. That financial statement shows $9.4 million in revenue, right?
A. Correct.
Q. How, to your knowledge, did Mr. Deo ask you to create a profit and loss increasing that revenue by four million dollars?
A. As a recall it was to see what the operations would have been while he was in there for a full five month period, so we could see how it would -- how it would be operating, compared to what it did do January to May.
Q. Your testimony is that these are projections?
A. Not projections. It was a,

T. JONES

what if scenario, for lack of better words.

Q. What was the variable?

A. That he was operating and overseeing the operations from January to May.

Q. Wasn't he already operating in January through May?

A. That's what the e-mails say, but I wasn't aware of that.

Q. His start with Superb was in November of 2022. You did see that e-mail, right?

A. I saw that e-mail, but I was not aware of that.

Q. In response to this e-mail you did create a profit and loss statement, right?

A. Yes, based off of his numbers.

Q. That profit and loss statement doesn't contain any cover letter, like you had with the statement of financial condition, correct?

A. Correct?

Q. The profit and loss statement

T. JONES

doesn't contain any disclosure that this is based on some sort of a projection about whether he was running the operation for the full five month period, correct?

A. Correct.

Q. Mr. Deo ends this e-mail with, "is this something we could do quickly pleaseeee"; do you see that?

A. I see it.

Q. Is it fair to say that Mr. Deo communicated with you, with not a high level of formality?

A. At times.

Q. Mr. Deo was friendly with you, correct?

A. As I am with all of my clients.

Q. Going to Jones 272. The following afternoon you provided Mr. Deo with the profit and loss and balance sheet that he requested, correct?

A. Correct.

Q. It took you approximately 26 hours to get him what he needed?

A. That's what it looks like.

T. JONES

Q. At the time that you were asked to prepare this profit and loss statement, to your knowledge, were these numbers true and accurate?

A. These numbers were from him, as to what he felt, I guess, the operations would be from January to May if he was operating it with him in there for the five months.

Q. That's what he told you?

A. Correct.

Q. Do you have anything in writing from Mr. Deo telling you this?

A. I do not.

Q. Other than this specific e-mail, there is no other writing about this subject, correct?

A. Not that I'm aware of, no.

Q. Are you aware that you submitted this profit and loss statement to the court in your declaration?

A. I believe so.

Q. In your declaration, you represented that this profit and loss

T. JONES

statement was true and accurate, correct?

A. From the information I got from him it was true and accurate, yes. Not that it's true and accurate to operations.

Q. You have no basis to believe that these numbers are true and accurate other than Mr. Deo's say so, correct?

A. That's correct.

Q. How did you go about creating the profit and loss statement to provide for sales of $13,400,808?

A. Anthony Deo gave me the numbers in the previous e-mail.

Q. The number that Mr. Deo gave you was $13,400,000 equal, wasn't it?

A. It was even.

Q. The number here for sales is $13,400,808, there is a $808 difference, isn't there?

A. There is.

Q. Where did that difference come from?

A. I don't recall why it would be different by that amount.

T. JONES

Q. Would not your file contain information about that?

A. Not in particular, no. It's not material.

Q. The amount of $808 is not material?

A. Right, it is not material.

Q. Four million dollars is material, right?

A. Four million is material, yes.

Q. But you can't say whether it's fraud, right?

A. I can't say what's fraud?

Q. To your knowledge where did these operating expenses come from?

A. They were a percentage of the gross sales number for the most part, based off of the May financial statements.

Q. If I'm understanding you correctly, you built a ratio of the expenses between the $9.4 million number and the $13.4 million number?

A. No, we took the percentages that were on the May 31 statement year to

T. JONES

date, and applied them against the gross number that's on the top of this financial statement.

Q. I see. I see. So for all of these operating expenses as they related to the $9.4 million revenue number, you took the percentages and applied that percentage to the $13.4 million?

A. Right, I will not say all of them, it would be some of them.

Q. Who decided which expenses got that ratio and which didn't?

A. The auto industry because it's mainly the ones that are affected by sales; which would be compensation, policy, you know, things of that nature.

Q. That income number however, matches exactly to what Mr. Deo asked you for, correct?

A. Correct.

Q. You didn't audit this financial statement, correct?

A. Actually, I think there is normally a disclosure at the bottom of a

T. JONES

lot of these financials. I don't know if it's on there or not.

Yeah, we didn't -- we didn't do any auditing, compilation, review, nothing.

Q. Am I understanding you correctly that this was not a compilation engagement?

A. It is not.

Q. What kind of engagement is this?

A. It's a forecast of what it would have been.

Q. Referring to the balance sheet at Jones 274. It doesn't say forecast, does it?

A. No.

Q. Referring to the statement of profit and loss at Jones 273, it doesn't say forecast on it, does it?

A. Correct.

Q. In your e-mail Jones 272 to Mr. Deo, you don't say that this is a forecast, correct?

A. Correct.

T. JONES

Q. You only say, here are the May 2023 reports per the information you provided to me, correct?

A. Correct.

Q. At the time that you gave this profit and loss statement or balance sheet you knew that the numbers in here were not the true numbers based on your completion of -- based on your review of the May 2023 financial statement, correct?

A. Correct.

Q. What was the basis of your projections to increase the revenue from $9.4 million to $13.4 million?

A. Anthony Deo's e-mail.

Q. Did he give you an explanation as to why the forecast would be $13.4 instead of $9.4?

A. I already responded to that, in saying that it would have been what he estimated the numbers to be if he was operating it for the full five month period, instead of just from March or April on.

T. JONES

Q. Yes, you did answer that question.

I'm asking more mechanically. Did he provide you with any sort of mathematics to support his estimates?

A. Oh, no, sorry, he did not.

Q. Assuming that Mr. Deo could not provide justification for the extra four million dollars in revenue, this financial statement is considered fraudulent, correct?

MR. LENTINELLO: Note my objection. You can answer, if you can. Also, it calls for a legal conclusion, but you can answer if you can.

A. I wouldn't consider it fraudulent if it's a statement that he wanted to see what the numbers were if he was operating it for a five month period.

Q. Isn't it incumbent upon you as an accountant following generally accepted accounting principles, to include that this is a forecast?

T. JONES

MR. LENTINELLO: Note my objection. Answer if you can.

A. No, it is not 'cause it was not a financial statement that we were issuing.

Q. What was it?

A. It was a financial statement that Anthony Deo requested.

MR. KATAEV: We will call this Jones Exhibit 13.

(Whereupon, Jones Exhibit 13, General journal voucher, was marked as for identification as of this date by the Reporter.)

Q. Earlier today with Mr. Ruderman you were referring to a general journal voucher, correct?

A. Yes.

Q. This is an example of such a general journal voucher, right?

A. That's correct.

Q. Generally speaking with respect to dealerships such as North Shore, Sunrise and/or Superb, you would fill these out, correct?

T. JONES

A. For the most part, yes.

Q. In fact this general journal voucher is dated July 14, 2023 and it is signed by you, correct?

A. Correct.

Q. Zooming in at the top, there is a debit to 1470 and a credit to 4520 in the amount of $13,352, correct?

A. Correct.

Q. There's a description that says to record PAC as income, correct?

A. Correct.

Q. PAC is a dealership term, correct?

A. Yes.

Q. Some people in the dealership world refer to PAC as an acronym, PAC, protection against commission, correct?

A. Correct.

Q. It's design to account for the cost of overhead and selling vehicles, correct?

A. Correct.

Q. Such as a fixed cost, such as

T. JONES

rent, utilities, and so on and so forth, right?

A. Yes.

Q. The net effect of making this adjusting entry, resulted in an increase in the profit, correct?

A. Yes.

Q. Now, there's a subsequent debit and credit immediately underneath under the one that we just reviewed, right?

A. Right.

Q. That's to debit 1451 and credit 4500 in the amount of $132,550, correct?

A. Correct.

Q. The account numbers listed here are the account numbers in the trial balance that we previously looked at right, right?

A. Yes.

Q. Referring back to that exhibit. Looking at Jones 76, 1470 and 1451 are listed together, correct?

A. Yes.

Q. 1470 is titled equity PAC and

T. JONES

1451 is titled used PAC, correct?

A. Correct.

Q. Referring to the credit accounts 4500 and 4520. They are listed at Jones 74 as used car retail cost, and used car wholesale SA respectively, correct?

A. Correct.

Q. Similar to what we just discussed for 1470 and 4520, the net effect of these adjusting entries 1451 and 4500 will increase the profit, correct?

A. Correct.

Q. Together, this is approximately $145,000 in an increase in profit, correct?

A. Correct.

Q. After those two entries that we just discussed, there's a group of four adjusting entries, sorry, five, two of which that don't have any corresponding credit accounts, correct?

A. Correct 'cause it's in the totals on the other side.

Q. There's a note in the middle, like there is with the other two to record

T. JONES

PAC as income?
A. Right.
Q. Can you explain what you wrote here, F/SADJ and then PAGE L or 1?
A. It is financial statement adjustment page one.
Q. What is that in reference to?
A. That's in reference to the first page of the dealer statement.
Q. Do you mean the monthly financial statement?
A. Yes.
Q. These account numbers are also listed in the financial statement, the monthly financial statement, correct?
A. Correct.
Q. To your knowledge, did these adjusting entries also result in an increase in profit?
A. No, it did not. They are all balance sheet items.
Q. How do you know that?
A. Because of the account numbers. And the balance sheet is on page one only.

T. JONES

Q. Based on your knowledge and recollection, focusing your attention on the first two adjusting entries which you testified did increase the profit, how was this adjusting entry proper?

A. Normally what you do is, in general terms you tie the PAC item in the accounts 1470 and 1451 to the number of vehicles and inventory.

As I stated previously they had a lot of problems in Superb's accounts and schedules. Most of the time what we do with these type of entries are making sure that the PAC number in those tie to the safe amount that would be in inventory, number of units.

Q. Do you have any documentation supporting your contention that there was a mismatch in the number of vehicles?

A. Just the schedule of June 30th.

Q. Would there be more than one schedule that you reviewed or only the one?

A. The PAC could be in two separate schedules, I just don't recall if

T. JONES

it's two separate or just in one.

Q. So what you're saying is there's one schedule for 1470, potentially, and one schedule for 1451, potentially, right?

A. Correct.

Q. Is it fair to say that you reviewed only one schedule for each of those entries, not more than one schedule, in other words if they're together, there was only one, if they're separate it was one and one and nothing more than that, correct?

A. To get this entry or all schedules?

Q. To justify your basis for making the adjusting entry?

A. I would have looked at the inventory schedule also.

Q. But, there wouldn't be more than one schedule for each type of account, would there?

A. No, no. It's all one -- each schedule, each account has one schedule.

T. JONES

Q. So if someone wanted to verify whether you had a proper basis to make this adjusting entry, they would have to review the schedule for 1470, 1451 if they are separate and inventory schedule, correct?

A. Yes.

Q. Did you come up with the decision to make these adjusting entries or did Mr. Deo?

A. I came up with -- normally I -- in normal practice and again I don't recall what happened here, but I would come up with this is how -- this is what is the account should be at June 30th. And here is what the difference is.

Q. When you showed it to him, did he specifically direct you to go ahead and make the adjusting entry or did you automatically do it?

A. I don't recall if he directed me, but normally it's the owner or the principal that directs me.

Q. Focusing your attention to the second entry for financial statement and

T. JONES

adjustments to page one, is a $726,502 debit to account 1650, correct?

A. Correct.

Q. That's around a large sum, isn't it?

A. It is.

Q. Do you know what 1660 is, account wise?

A. I don't recall.

Q. Let's go back to the trial balance and see if we can find it.

A. We can absolutely find it.

Q. On Jones 76 we see 1610 to 1620. Is it fair to say from a review of this trial balance that 1660 does not appear in the trial balance?

A. That's correct. It would have it was posted to the wrong account and had to be adjusted out of there and put to a liability account.

Q. This was the second financial statement that you were doing, correct?

A. Third.

Q. After doing three financial

T. JONES

statements what would cause you to miss over $700,000 in an account?

A. It's not causing anything to miss, what it is the -- is each account had to be looked at with the volume of the entries that were in there that were wrong from the beginning of the year, investigated and see whether they belong somewhere or don't belong somewhere. We just don't make entries to get rid of things until it's reviewed and adjusted.

But, if you have a large credit in a balance sheet account something's wrong.

Q. I'm referring you to Jones 71 and the actual dealer financial statement. I'm pointing your attention to prepaid expenses 1660?

A. Yes.

Q. It says prepaid other, correct?

A. Correct.

Q. That amount is zero in the main financial statement, correct?

A. Correct.

T. JONES

MR. KATAEV: Referring to you to Jones 12, the June 2023 financial statement for Superb.

Bate's stamp Jones 63 through Jones 64.

Q. This financial statement at 1660 shows negative $726,502, correct?

A. Correct.

Q. What is your explanation for why there's a debit of $726,502 in the prepaid other account on the financial statement?

A. It's actually a credit.

Q. What is your explanation for that credit amount; where is that from?

A. I'd have to look at it, but as I said most of the accounts needed to be looked at because there were wrong entries in a lot of the accounts.

Q. As you sit here today, you can't explain why this entry was made, correct?

A. Not unless I look at it, no.

MR. KATAEV: What we'll do is

T. JONES

offer you an opportunity to answer that question by submitting a post deposition interrogatory.

We'll submit that to your attorneys in writing. We'll work with your attorneys to get that done.

Q. Is it fair to say based on your testimony that you were working on reviewing some monthly financial statements, taking over in the middle of the year that this was the net effect of the adjusting entries?

A. I'm not clear on what you're asking.

Q. Is it fair to say that this large amount in the prepaid other account in the June 2023 financial statement is the net effect of making all of the adjusting entries?

A. No, I can't say that, that could be just was posted to that account incorrectly. It wasn't reviewed yet by the employees at Superb to see where it belonged on the statement.

T. JONES

Q. This June 2023 monthly statement was generated on July 13, 2023, correct?

A. I can't see the date, but I'll say, yes. I see it.

Q. At the bottom of Jones 63, that's the date, right?

A. Right.

Q. To your knowledge and recollection, for each statement that you prepared when it was completed, who was it sent to?

A. I don't know who it was sent to.

Q. Did you ever communicate directly with Mr. Urrutia in providing these statements?

A. I did not.

Q. How did you receive these statements to review them?

A. If I was physically there at the dealership that would have been printed out. If I wasn't there it would have been scanned and e-mailed to me.

T. JONES

Q. Are you familiar with what the term, unwinding a deal means?

A. Yes.

Q. Can you explain it?

A. If you can have a deal and you -- and it doesn't go through as it was, whether for various reasons, whether the funding didn't go through or a check bounced from the customer, then you unwind the deal, so that you don't show it as a deal in the month.

Q. What?

A. In a month.

Q. When you unwind a deal that decreases the profit, correct?

A. As long as it showed a profit in the deal.

Q. Assuming that the deal in of itself showed a profit, it would have the effect of decreasing profit if you unwind it, right?

A. That's correct.

Q. Are you aware of the fact that of there were numerous deals with Superb

T. JONES

that had to be unwound that were ultimately not unwound?

A. No, I was not aware.

Q. As part of your engagement with Superb, how would you have learned about deals that had to be unwound?

A. Unless someone told me about it I would have no idea about it.

Q. Do you have any knowledge or recollection about the audit conducted by Nissan Motor Acceptance Corporation in February of 2023?

A. Not that I recall.

Q. Do you recall Mr. Deo providing you information about that audit?

A. I don't recall.

Q. Do you recall whether Nissan made a finding that Superb passed that audit?

A. No, I don't recall.

Q. Do you recall the contrary, that Nissan made a finding that Superb did not pass the audit?

A. I don't recall.

T. JONES

Q. For each of the monthly financial statements you worked on, you worked with Kendra Kernizant and Mr. Deo, respectively to review them, correct?

A. Correct.

Q. If a dealership in general fails to unwind the deal with respect to the accounting entries, that would show a false profit, assuming that the deal itself is profitable in the first place, correct?

A. It would, yes.

Q. Can you explain what it means to create manual journal voucher that has to be posted to the 13th month?

A. It would be similar to the one we just saw that would be posted after December year end, sorry, after the December month end statement was finalized. This 13th entries would be posted, so that that would the 13th statement, which is normally what's used for the tax return.

Q. When a manual journal voucher is posted to the 13th month that also results in an increase in profit, right?

T. JONES

A. Well, it could be an increase in profit or a decrease.
Q. Depending on the entries?
A. Yes.
Q. The scope of your engagement for review of monthly financial statements was solely for April, May and June of 2023, correct?
A. Correct.
Q. To your knowledge why is it that you did not perform any review of the monthly financial statement for July of 2023?
A. I believe at that time Anthony told me that he was not there any longer.
Q. What, if anything, did he tell you about why he was not there any longer?
A. I don't recall why he said he wasn't there in particular.
Q. How did you come to learn about the fact that he was not there any longer in the first place?
A. He had told me that -- wait, let me back up. I contacted him about the

T. JONES

month end for July, I believe. That's when he told me that he wasn't there.

Q. You contacted him via e-mail, correct?

A. I don't know if it was e-mail or if there was a phone call.

MR. KATAEV: To the extent that you did contact him via e-mail or a text message, we're going to call for the production of any correspondence between yourself and Mr. Deo.

We'll follow up in writing.

Q. In connection with the work that you performed for Superb, other than working with Mr. Deo and Ms. Kernizant did you work with anyone else at Superb?

A. Not that I recall.

Q. In the course of performing the services, the accounting services for Superb, did you exchanged text messages with Ms. Kernizant?

A. I believe I did, but I can't be sure.

MR. KATAEV: I'm gonna call for

the production of all text messages exchanged with Ms. Kernizant and yourself.

We'll follow up in writing.

Q. In or about August of 2023 did Mr. Deo speak to you about Capital Paul letter that he received?

A. I don't recall that.

Q. Are you familiar with the business named Gold Coast Motors of Syosset or Gold Coast motors of Sunrise?

A. Yes.

Q. What about Regal Auto Haus; are you familiar with that name?

A. Say that again, what's that name again?

Q. Regal Auto Haus?

A. No, I'm not familiar with that.

Q. Are you currently performing any accounting services for Mr. Deo at Gold Coast Motors of Sunrise or Syosset?

A. The only thing would be extensions as I stated earlier today.

Q. You don't know do any work

T. JONES

related to monthly financial statements there?

A. No.

Q. Do you know why?

A. Because he hasn't paid me.

Q. Has he asked you to perform services in connection with Gold Coast Motors of Sunrise or Syosset?

A. No, he has not.

Q. Do you know who Aashish Udayaan is?

A. No, that name does not sound familiar at all.

Q. This is an e-mail chain from yourself and Ms. Kernizant dated July 6, 2023, correct?

A. Yes.

Q. In this e-mail you tell Kendra that the journal entry sheet you gave her was not entered, right?

A. Correct.

Q. How do you know that based on review of the monthly financial statement draft?

T. JONES

A. Yes.

Q. Then there's a reference to the entry to remove unwound sales on five other deals, doesn't seem to be included, right?

A. Correct.

Q. Are you stating here that you sought to remove the unwound sales, such that it would decrease the profit?

A. It wasn't me, that entry was not mine.

Q. Whose entry was it?

A. That was someone at the dealership, whether it was Kendra or whoever it was.

Q. Was it Mr. Deo?

A. I have no idea if it was.

Q. Well, you only worked with Mr. Deo or Ms. Kernizant on these statements, right?

A. Correct.

Q. If it's not one of them, who else could it be?

A. Well, first of all, I don't know who it was, only because it wasn't an

entry of mine.

MR. KATAEV: Showing you Jones Exhibit 15.

(Whereupon, Jones Exhibit 15, April 2023 financial statement, was marked as for identification as of this date by the Reporter.)

Q. This is the April 2023 financial statement, correct?

A. Correct.

Q. This was the first financial statement that you reviewed, correct?

A. 2023, yes.

Q. Is it fair to say in connection those unwound sales entries, you asked that a journal entry be made to remove the unwound sales from the statement, and to post the negative entries to a separate account that you would review later?

A. No, it was says that the entry was not made for the unwound sales, not I directed.

Q. If you did direct Ms. Kernizant to remove the unwound entries and to post

the negative entries to a separate account you would review later, that would have the result of increasing profit, correct?

A. Potentially, yes.

MR. KATAEV: I have one more exhibit. I want to speak to my client. Off the record.

(Whereupon, a brief recess was taken.)

Thank you for your time. I have no further questions.

MR. LENTINELLO: Susan, do you have any questions?

MS. VERBONITZ: I have a few questions.

EXAMINATION BY
MS. VERBONITZ:

Q. I do have a few questions.

A. Okay.

Q. Mr. Jones, my name is Susan Verbonitz. I represent Libertas. I just have a couple of questions, because prior counsel basically covered everything.

A. Okay.

T. JONES

MS. VERBONITZ: I'm going mark this, I will continue with the exhibits after yours Jeff.

MR. RUDERMAN: I was at Q.

MS. VERBONITZ: This will be Jones Exhibit R.

(Whereupon, Jones Exhibit R, Form 8821, was marked as for identification as of this date by the Reporter.)

Q. Can you see this document?

A. Yes.

MS. VERBONITZ: We'll mark this as Jones Exhibit R.

This is a tax information authorization and it is a form 8821.

Q. Mr. Jones, are you familiar with this form?

A. Yes.

Q. This is for North Shore Motor Leasing. I'm gonna scroll down to the bottom and the signature is Anthony Deo. It is dated the 11/15/22.

Have you seen this document

T. JONES

before?

A. I have not.

MS. VERBONITZ: I'll mark this Jones Exhibit S.

(Whereupon, Jones Exhibit S, Tax return for North Shore for 2021, was marked as for identification as of this date by the Reporter.)

Q. Can you see this document?

A. Yes.

Q. This is the tax return for North Shore for the year 2021, Jones Little and company. That's your company, correct?

A. That's correct.

Q. Did you prepare the 2021 tax return for North Shore Motors?

A. Yes.

Q. I'm going to go quickly to the K-1s. Do you see it says schedule B-1. Information on partners owning 50 percent or more?

A. Yes.

Q. There's nothing there, correct?

A. No, it's at the bottom. Keep

T. JONES

going.

Q. This is individuals, part two says individuals owning 50 percent or more and Anthony Deo is listed, correct?

A. Correct.

Q. He is listed as having a 99 percent interest in North Shore?

A. Yes.

Q. Now, the first K-1 is for Anthony Deo; do you see that?

A. Yeah.

Q. What I've redacted from this document for purposes of marking it is the EIN of North Shore Motor Leasing and the Social Security number for Anthony Deo.

A. Okay.

Q. This is the K-1 on the 2021 tax returns, it shows it is a K-1 for Anthony Deo. It shows that he has 99 percent interest in North Shore, correct?

A. That's correct.

Q. If you go down to the second K-1 it says partner number two is Sarah Ramrahm?

T. JONES

A. Correct.

Q. That's Mr. Deo's spouse, correct?

A. Correct.

Q. It says she has one percent in North Shore Motor Leasing, correct?

A. Yes.

Q. Did you prepare these K-1s?

A. Yes.

Q. Where did you get the information on the K-1s?

A. The dollar numbers or the information?

Q. Let me ask you the question again. It is confusing.

From whom did you get information that Anthony and Sarah were the members of North Shore Motor Leasing?

A. From Anthony Deo.

Q. On the K-1s, the numbers that are listed on the K-1s for the ordinary business income and distributions, from where did you get those numbers?

A. That's from the dealer

T. JONES

statement at 12/31/21.

Q. The dealer's financial statement?

A. Yes.

Q. Were those dealer financial statements reviewed by you in order to come up with these numbers?

A. They were not reviewed.

Q. Oh, I'm sorry. I don't mean reviewed in an accounting sense, I mean looked at for purposes of getting the information for the K-1s?

A. Yes, thank you.

Q. Yes?

A. Yes.

Q. Other than Mr. Deo telling you that he had a 99 percent and that Sarah had a one percent interest, did you do any independent investigation to determine who the members of North Shore Motor Leasing LLC were at the time?

A. At the time, no. That was a representation by the Deos and the previous e-mail that was in earlier -- regarding the

T. JONES

tax returns for 2020 and 2021.

Q. In order to do the tax returns for 2020 and 2021, did the financial statements, that is the North Shore Motor financial statements have any indication that anyone other than the Deos had a membership interest in the company?

A. No, dealer statements don't show that.

Q. It doesn't give names, does it?

A. Correct.

Q. Does the dealer statement, have without providing names, does it have the listed capital?

A. In part, yes.

Q. In total, correct?

A. Yes.

Q. Again, we were looking at Anthony Deo's statement on the left hand side, underneath the percentage interest, you see where it has $5,245,759?

A. Yes.

Q. What does that represent?

A. That's recourse that the

T. JONES

business has.

Q. What is the $4,763,849 number represent?

A. That's the end of the year. The other is the beginning of the year.

Q. Underneath that has the beginning capital account of $125,475; do you see that?

A. I see.

Q. Where is that number derived from?

A. The previous years tax return.

Q. The current year net income the $107,156 is that separate from the financial statements?

A. No, that's from the K-1, if you take the first line less line 12.

Q. Okay. I got it. Then, it has the ending capital account 16694 that's a matter of calculation, is it not?

A. Yes, it is.

Q. Your answers would be the same for Sarah regarding numbers?

A. Yes, it is based on a

T. JONES

percentage of ownership.

Q. Because hers is one percent the numbers are substantially less, correct?

A. Yes.

Q. All of the information that, not only as to ownership interest in North Shore, but the information that's contained on the financial statements, was that provided to you by Mr. Deo?

A. It was provided by the dealer statements.

Q. From whom did you obtain dealer statements, in order to get these numbers?

A. That's from North Shore Motors.

Q. Who in particular at North Shore Motors?

A. The controller which would have been Dan O'Sullivan would have given me the financial statement.

Q. That was Dan O'Sullivan at the time in 2020 and 2021?

A. I think so, I forget when he left.

T. JONES

MS. VERBONITZ: That's all I have, thank you.

(Whereupon, at 5:49 P.M., the Examination of this witness was concluded.)

° ° ° °

E X H I B I T S

JONES EXHIBITS

| EXHIBIT LETTER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| EXH A | Bank reconciliation | 114 |
| EXH B | Journal entries 5/29/22 | 119 |
| EXH C | Trial balance for 2021 | 129 |
| EXH D | Video from Libertas Funding | 141 |
| EXH E | E-mails | 141 |
| EXH F | FLUSHING 00187 | 151 |
| EXH G | FLUSHING 08560 | 160 |
| EXH H | IAG-002563 | 166 |
| EXH I | Disaster Loan Assistance COVID-19 loan application | 169 |
| EXH J | Disaster Loan Assistance COVID-19 loan application for North Shore | 172 |
| EXH K | E-mails from October of 2022 | 186 |
| EXH L | 1065 partnership return for the year 2020 for North Shore Motor Leasing | 186 |
| EXH N | E-mails | 195 |
| EXH O | E-mail | 197 |
| EXH Q | Two e-mails | 207 |
| EXH R | Form 8821 | 336 |
| EXH S | Tax return for North Shore for 2021 | 337 |

| | | |
|---|---|---|
| EXH 1 | E-mail | 252 |
| EXH 2 | E-mail | 263 |
| EXH 3 | Flushing 185 to 189 | 268 |
| EXH 5 | DEO 1198 to 1199 | 280 |
| EXH 6 | ECF docket 170 | 282 |
| EXH 7 | ECF docket 107-6 | 287 |
| EXH 8 | JONES 71 to 80 | 291 |
| EXH 10 | E-mail | 292 |
| EXH 11 | ONES 269 to 275 e-mail chains | 300 |
| EXH 13 | General journal voucher | 313 |
| EXH 15 | April 2023 financial statement | 334 |


(Exhibits retained by Counsel.)

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. RUDERMAN | 6 |
| MR. KATAEV | 221 |
| MS. VERBONITZ | 335 |

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| Any documents that were requested that have not been produced | 40 |
| Bank reconciliations for either of these dealerships | 116 |
| Blank for Janet's last name | 196 |
| All your files relating to all of these dealerships; Car Buyers, North Shore Motors, all the entities the Deos themselves, every document you have relating to them, whether it's maintained physically or in digital format should have been produced | 219 |
| Superb plaintiffs call for the production of all invoices and details supporting the charges to be produced | 233 |
| Superb plaintiffs will call for the production of all documentation provided by Mr. Deo in connection with the preparation of the statement of financial condition | 272 |
| Offer you an opportunity to answer that question by submitting a post deposition interrogatory | 324 |
| Production of any correspondence between yourself and Mr. Deo | 330 |
| Production of all text messages exchanged with Ms. Kernizant and yourself | 331 |

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, Kim Draper, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of April 2026.



___________________________

Kim Draper

SUPERB MOTORS INC., et al.
vs. ANTHONY DEO, et al.
3/25/2026 - THOMAS JONES CPA

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________
PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________
PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________
PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________
PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________
PAGE_____ LINE_____ CHANGE_________________
__________________________________________
REASON____________________________________

_________________________ _______________
THOMAS JONES CPA Date

SUPERB MOTORS INC., et al.
vs. ANTHONY DEO, et al.
3/25/2026 - THOMAS JONES CPA

ACKNOWLEDGEMENT OF DEPONENT

I, THOMAS JONES CPA, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_________________________ _______________
THOMAS JONES CPA Date
*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 1:18 3:9 4:15 4:19 5:17 151:4

**0**

**00187** 151:8,12 345:10
**002563** 166:9 166:19 345:12
**00527** 205:10
**005479** 195:5
**005637** 197:17
**08560** 160:6,10 345:11

**1**

**1** 5:17 34:4,5 46:12 47:9 151:2 152:18 157:7 185:16 187:18 188:16 188:20 189:16 191:23 252:10 252:13 266:22 280:24 281:14 297:18 302:22 317:5 337:20 338:10,18,19 338:24 342:17 346:3
**1,210,058** 297:23
**1,280,000** 157:10
**1,332,948** 303:5
**1.4** 131:17,21 132:7,25
**10** 176:12 292:7,8 346:10
**100** 239:20
**100,000** 121:9 121:11,12 122:11,12 123:8
**1000** 4:21
**10017** 4:8
**10170** 3:15
**1040** 188:9
**106** 6:12
**1065** 33:10,15 185:13 186:8 186:12 345:18
**107,156** 342:15
**107-6** 287:7 346:8
**1098** 266:10
**1099** 216:11,23 217:12
**1099s** 266:6
**10:10** 1:22 2:4
**11** 197:15 299:20,25 346:11
**11/15/22** 336:24
**112** 4:12 21:10 21:17
**1120** 33:7
**114** 345:5
**11423** 3:6
**11553** 4:17
**116** 347:6
**11739** 6:13
**11793** 4:12
**11797** 4:21
**119** 345:6
**1198** 280:13,17 346:6
**1199** 280:13,17 346:6
**11:26** 80:4
**11:36** 80:13
**11:44** 88:20
**11:45** 88:23
**12** 146:23 233:13 292:14 323:3 342:18
**12,000** 147:22
**12/31/2022** 142:22
**12/31/21** 340:2
**12/31/22** 264:13
**120** 23:21
**1231** 88:16
**1239** 1:7 3:13
**125,475** 342:8
**129** 345:7
**12:17** 118:18
**12:18** 118:21
**13** 89:16,18 207:14 209:6 291:4 313:10 313:11 325:3 346:12
**13,352** 314:9
**13,400,000** 303:2 307:16
**13,400,808** 307:12,19
**13.4** 308:23 309:9 311:15 311:18
**132,550** 315:14
**1339** 3:19
**13th** 328:15,20 328:21,24
**14** 207:15 300:6 303:7 314:4
**141** 345:8,9
**145,000** 316:15
**1451** 292:20 315:13,22 316:2,11 318:9 319:5 320:5
**1470** 314:8 315:22,25 316:10 318:9 319:4 320:5
**15** 247:12 334:4,5 346:13

**15,000** 148:22
**151** 345:10
**1550** 128:24 129:20 130:4 198:13,18,20 201:5,18 202:6
**1580** 1:6 3:12
**1581** 1:6 3:12
**1591** 1:7 3:12
**15th** 110:23,25 179:9 291:10
**16,000** 148:23
**160** 345:11
**1610** 321:14
**1620** 321:15
**1632** 1:7 3:13
**1650** 321:3
**166** 345:12
**1660** 321:8,16 322:19 323:8
**16694** 342:20
**169** 345:13
**16th** 111:21
**170** 282:23,25 346:7
**170-6** 287:5
**172** 345:15
**180,000** 159:9
**18211** 3:6
**185** 267:25 268:3 346:5
**186** 345:17,18
**189** 1:4,19 3:10 12:16 34:22 64:24 65:20,20 77:7,12,15,18 77:23 78:7,14 169:12 267:25 268:3 271:17 346:5
**19** 169:9,15 172:11 345:14 345:15
**19107** 3:20
**195** 345:20
**196** 347:8
**197** 345:21
**1983** 16:17 17:3
**1989** 17:19,21 18:5,15
**1:30** 175:22
**1s** 47:4 48:11 48:13 187:18 188:6 189:22 190:23 337:20 339:9,12,21,22 340:13
**1st** 348:21

**2**

**2** 186:25 263:10,11 280:25 346:4
**2,400** 288:22
**2.25** 158:17
**20** 15:3 350:17
**200** 240:10,23 262:25 263:5
**200,000** 159:7
**2019** 48:21 49:11 50:24 106:22 135:6 156:3,9 173:7 173:9 193:2
**2020** 19:14 20:17 21:13 48:21 49:12 50:24 106:20 117:11 135:6 156:3,9 178:4 178:12,24,25 184:25 185:5 186:6,9,13,20 189:2,6,16 190:2,15,24 191:8 239:19 341:2,4 343:22 345:19
**2021** 36:12 74:7 106:17 112:24 113:5 114:6 129:13 129:17 131:15 135:17 156:7 175:3 179:4 210:18 337:7 337:13,16 338:18 341:2,4 343:22 345:7 345:24
**2022** 36:12 72:8 75:11,18 75:24 76:12,25 106:17,19 110:15 112:10 112:11 120:15 136:2,16 142:6 142:16 144:12 155:18,25 160:2,16 164:2 164:9 168:25 176:14,16 179:3 186:3 192:3,19 194:25 195:14 197:16 200:21 201:8 202:6,9 202:10,14 205:6 210:17 211:7 253:15 253:17,20 254:13,23 255:3,4,8 266:23 304:12 345:17
**2023** 19:14 20:17 21:13 141:12 142:4 151:2 152:18 157:7 162:14 169:12 176:12 207:15 209:6 210:7,12,14 212:22 213:12

252:18 253:5 253:16,21 254:12,24 255:24 256:10 261:21 264:2,9 264:10,17,19 265:2 266:17 266:24 280:25 281:15 287:23 289:13,15 290:16,25 291:4 292:14 297:18,18,24 300:6,12 302:5 302:13,22,23 303:8 311:3,10 314:4 323:3 324:18 325:2,3 327:13 329:8 329:14 331:6 332:17 334:6,9 334:14 346:13
**2024** 37:21,22 43:24
**2025** 37:21
**2026** 1:22 2:3 348:21
**207** 345:22
**21** 252:18 290:25
**219** 347:9
**221** 346:20
**22nd** 166:6
**23** 1:8 3:14
**2320** 3:15
**233** 347:13
**24** 264:2
**241-1** 280:15
**25** 1:22 2:3 15:3 241:12
**250** 4:7 147:14 288:11
**250,000** 159:6
**2511** 121:10,20 122:5,21,22 123:3
**2512** 121:10,21 122:6,23 123:2
**2519** 1:7 3:13 111:23
**252** 346:3
**26** 42:5 175:2 305:23
**263** 346:4
**268** 346:5
**269** 299:23 300:2 346:11
**270** 302:4
**271** 302:12
**272** 305:18 310:22 347:16
**273** 310:19
**274** 310:15
**275** 299:23 300:2 346:11
**280** 346:6
**282** 346:7
**28598** 348:23
**287** 346:8
**29** 120:15 202:14 203:9
**291** 346:9
**292** 346:10
**29th** 124:14,15 203:4,13
**2:00** 175:25
**2:02** 176:5
**2:23** 1:12
**2nd** 141:15

**3**

**3** 267:23 268:2 346:5
**3,700** 167:12,20
**3.6** 288:15
**3/25/2026** 349:2 350:2
**3/8/24** 119:3
**30** 5:16 11:7 169:12 176:3 205:6
**30,000** 200:6,17 201:9 203:25 204:2,7,8,14
**300** 346:11
**300,000** 167:10
**30th** 205:13 206:9 318:21 320:15
**31** 144:12 160:16 297:18 302:23 308:25
**313** 346:12
**324** 347:19
**3280** 4:12
**330** 347:21
**331** 347:22
**333** 4:16
**334** 346:13
**335** 346:21
**336** 345:23
**337** 345:24
**34,000** 189:5
**34,604** 187:20 188:3
**34,605** 187:24
**35-5** 252:12
**36** 14:3
**3710** 124:2,4
**372,037** 164:7
**375** 168:4,11
**375,000** 167:23
**385,597.10** 111:25

**4**

**4,763,849** 342:3
**4,954** 163:17
**40** 347:5
**420** 3:15
**43,095** 123:24
**446** 1:8 3:14

**44a** 110:10
**45** 11:7
**4500** 315:14 316:5,11
**4506** 142:7,10
**4520** 314:8 316:5,10
**4700** 123:22,23 124:2,5,7
**479,000** 157:13
**49** 241:14
**4th** 200:6,16 203:24 204:5

**5**

**5** 280:10,16 302:13 346:6
**5,245,759** 341:22
**5,295,000** 158:16
**5/29/22** 119:7,9 345:6
**50** 173:21,25 337:21 338:4
**50,000** 148:17
**50,055** 292:21
**500** 3:19
**500,000** 162:13
**500m** 207:21
**57** 163:7
**5:49** 344:4

**6**

**6** 282:22,24 302:5 332:16 346:7,19
**617224** 176:13
**6188** 1:12
**63** 323:5 325:7
**64** 323:6
**650,000** 159:8
**683,318.95** 111:6

**7**

**7** 141:12 142:4 287:4,6 346:8
**700,000** 322:3
**71** 291:14,16 322:16 346:9
**71,000** 167:9
**7216** 41:18 42:5
**726,502** 321:2 323:8,11
**74** 316:6
**76** 1:8 3:13 111:4 315:22 321:14
**76,130** 164:3
**77** 297:9
**79,000** 167:13 167:21 168:6 168:12
**7th** 4:7 141:15

**8**

**8** 194:25 195:14 291:12 291:15 346:9
**80** 291:14,16 346:9
**808** 307:19 308:6
**8112** 110:14
**8821** 336:9,17 345:23

**9**

**9,499,945** 297:13
**9.4** 303:11 308:22 309:7 311:15,19
**95,000** 203:5,14
**99** 338:7,20 340:18

**a**

**a.m** 1:22 2:4
**aaronson** 1:5 3:11 52:6 72:23 137:15 177:13 246:3
**aashish** 332:11
**ability** 36:23
**able** 10:10 48:3 49:7 63:16 68:10 69:14 105:14,17 108:6 120:21 120:22 121:13 133:11 144:18 144:20 148:10 174:7 225:7 248:4 269:2
**aboard** 254:9
**above** 30:11
**absolute** 301:16,19
**absolutely** 104:6 321:13
**accept** 240:15 243:20
**acceptable** 218:11 232:22
**acceptance** 327:12
**accepted** 152:20 268:12 268:16,19 270:14 279:18 312:23
**access** 105:17 140:10,11 161:8 249:4
**accommodate** 10:6 127:2
**accompanies** 299:4
**accompanying** 152:17 290:10 299:24

**accordance** 152:18 268:11
**account** 31:18 79:4 85:22 95:16 110:13 111:11 121:10 121:17,20 122:17,21 123:2,3,3,13,15 123:23,25 128:20,23 129:20 130:2 130:18 131:4,8 131:12 133:8 198:11,12,18 198:19 201:5,8 201:10,16,18 201:19,25 202:2,6,21 203:5,17,18 204:25 258:14 259:21 285:21 286:17,20 287:2 290:15 292:20 314:21 315:16,17 317:14,24 319:22,25 320:15 321:3,9 321:19,21 322:3,5,14 323:12 324:17 324:22 334:20 335:2 342:8,20
**accountant** 17:4,14,15 50:9,11 51:6 53:4 115:16 228:18 243:19 248:10 276:13 312:23
**accountant's** 222:3,11
**accountants** 42:6 76:3 115:17 229:13 242:3 271:7
**accounting** 15:17,21,24 16:22,23,25 19:5 34:8,19 49:16 55:25 68:22 87:12 102:16 152:19 218:10 222:3 222:11 225:16 225:23 226:10 227:3 228:8 229:6 230:3,7 230:21,21 231:9,23 232:17 234:7 236:16 237:4 242:7,12,15,22 243:18 244:3,7 248:5 255:10 255:14,15 257:3,9 258:6 258:19 268:12 268:16,20 270:13 271:12 279:18 284:18 287:11 288:8 298:6 312:24 328:9 330:20 331:21 340:11
**accounts** 74:20 78:19 79:13,21 79:23 94:9 95:15 103:2 122:3 130:6,8 152:2,3 259:22 266:25 274:8 283:13 316:5 316:21 318:9 318:12 323:18 323:20
**accruing** 132:25
**accuracy** 153:7
**accurate** 10:11 24:7 33:3 58:17 67:22 68:9,21 89:5 128:2 135:11 153:20 154:5 154:18,24 155:8,14 158:5 161:10,16 162:17 164:13 251:23 252:2 306:5 307:2,4 307:5,7
**accurately** 144:10
**acknowledge...** 350:3
**acquired** 158:11
**acronym** 314:18
**action** 7:9,13 7:16 348:17
**active** 47:22
**activity** 34:17 103:13 104:14 104:15,21 163:3 208:22 248:3 250:18 250:23
**actual** 31:9,22 35:20 36:2 38:11 48:17 74:6 104:15 136:13 269:24 271:18 322:17
**actually** 24:6 24:25 36:3,9 38:10 50:18 126:3 127:16 132:8 134:25 155:7 157:16 157:16 158:19 174:11 209:23 240:14,22 266:2 309:24

323:14
**add** 47:13
**added** 30:24 32:6 65:20
**adding** 48:12
**addition** 15:10 15:11 16:3,7 23:3 35:11
**additions** 350:6
**address** 6:11 105:15,16 107:15 171:12 171:15 193:13 240:8
**adequate** 229:17
**adjust** 127:25 128:4 292:4
**adjusted** 60:6 130:12 321:20 322:12
**adjusting** 121:5 122:9 127:3 203:25 315:6 316:11,19 317:19 318:4,6 319:18 320:4,9 320:19 324:13 324:19
**adjustment** 25:7 59:21 64:5 120:24 200:14,19 201:23 202:7 202:13 203:4 292:19 297:3 317:7
**adjustments** 23:10,13,15 26:13,19 62:18 62:24 64:7,12 64:13,15 68:12 68:15,19 88:18 89:12 90:3,11 91:23 92:12 119:17,23,24 119:25 120:3 120:10,14,17 120:21 121:14 125:7,9,13,25 126:2 127:8,12 127:20,21 161:21 165:17 199:18 261:13 321:2
**administer** 5:11
**administrative** 15:18
**admitted** 154:8 157:20 158:17
**adp** 22:23
**advance** 221:5
**advice** 273:16 273:25 286:12
**advisement** 41:5
**advising** 96:19
**affect** 165:19 286:15
**affected** 309:15
**afternoon** 305:19
**ago** 7:3,4,24 8:2 49:25 214:2 223:15 223:16
**agree** 164:4 167:13,21
**agreed** 5:5,20 8:16 91:24
**agreement** 52:18 80:3 181:3 182:2 241:9 244:19
**agreements** 81:3 182:5 242:23,24
**ahead** 75:24 277:6 320:18
**aig** 205:9
**al** 349:1,1 350:1,1
**alicia** 256:15 265:8
**alleging** 74:17
**allocation** 190:25
**ally** 81:2,4,7,11 82:4 91:13 92:17 108:16 132:19 133:3 137:4,11
**ally's** 81:23
**alysia** 229:20
**amend** 185:5 189:21
**amended** 182:2 189:14,16 191:13,20,23 191:24
**amending** 178:17 190:19
**amendment** 189:20
**america** 152:20 268:13 270:15
**american** 102:10,13,16 102:19 103:8 103:11,13 104:3,10,18,20 104:23 198:13 198:17,24 199:14 200:6 200:17 201:10
**amount** 32:12 36:21 37:5,6 85:21 92:24 111:6,25 113:9 126:25 188:22 201:21 217:7 233:3 240:14 240:17 287:25 292:21 297:16

297:16,22 303:5 307:25 308:6 314:9 315:14 318:16 322:23 323:16 324:17
**amounts** 113:22 202:24 217:3 274:17
**ann** 14:12
**annual** 22:18
**answer** 9:4,20 10:5 11:12 18:22 48:25 49:6 61:7,19 96:23 127:19 133:5 153:22 158:9 159:2 183:23 184:11 198:8 211:17 218:7 221:7 222:19 225:5 226:13 231:12 239:6 243:23 268:23 275:8,9 276:2,3,19,21 277:19,23 296:3 298:17 312:2,14,16 313:3 324:2 347:19
**answered** 221:6,10
**answers** 9:11 60:5 223:3 228:21 342:23
**anthony** 1:4,13 3:5 4:3 12:19 34:9,20 35:17 35:21 37:12,23 38:11 48:19 51:24 53:7,8 54:7,22 55:4 56:8,20,25 60:2 61:20 64:3,4,11,12,23 68:2 71:6 72:21 74:4 75:21 76:5,13 76:14 78:6 79:5 91:18,19 92:21 93:4 98:25 100:19 101:9,17,22 102:5,9 105:25 107:7 108:2,22 108:24 109:2 111:15 112:5 119:19,23 122:7,11,17 123:14 125:25 132:18 135:7 136:14 137:2 138:8,24 139:21,24 140:5,20 150:25 152:16 153:9 155:19 157:5 173:20 173:25 174:9 178:13 179:12 182:3,7,20 183:4 185:7 189:15 190:12 192:3,21 195:13 197:14 205:8,17,17 206:2,10 207:4 208:8 213:18 227:6 239:18 250:8,15 260:12 270:11 307:13 311:16 313:8 329:15 336:23 338:5 338:11,16,19 339:18,20 341:20 349:1 350:1
**anthony's** 77:7 77:12 94:21 152:21
**anybody** 10:18 10:21 54:8 56:12 76:24 98:12,22 107:10,12 108:21 109:7 196:7,8
**anymore** 200:23 201:25 204:14 210:23
**anyway** 187:8
**apologize** 41:14 48:23 221:4
**apparent** 179:13
**apparently** 149:5
**appear** 321:17
**appearances** 3:22
**appended** 350:8
**application** 162:12 169:10 169:11,17 170:6,10 172:5 172:13 173:13 173:16,19 193:9,20,23,25 194:3,5,22 207:21 238:16 240:10 345:14 345:15
**applied** 47:4 102:17 106:16 131:10 171:16 202:2 309:2,8
**apply** 105:25
**appreciate** 43:4
**appropriate** 24:5 103:16 105:3,4 207:9

**appropriately** 130:23 188:6
**approve** 119:24
**approved** 62:19 142:7 177:13
**approves** 293:24
**approximate** 48:25
**approximately** 17:18 35:25 49:5 72:6 148:21 206:11 213:10 214:11 263:5 305:23 316:14
**approximation** 49:6 148:11
**april** 162:14 201:17 281:5,7 287:23 311:24 329:8 334:6,9 346:13 348:21
**area** 98:3 271:10
**aronson** 107:9
**arrangement** 52:19 81:10,14 146:9 233:19
**articulate** 269:2
**artificially** 132:6
**asad** 1:5 3:11 187:8,23
**ascertain** 239:12
**ascertaining** 243:4,11
**aside** 21:18 189:2 211:22
**asked** 9:22 58:4 68:2 78:4 80:18 92:18 120:18 123:11 125:6,8,25 127:8 145:5,14 145:22 160:22 161:6,9 165:6 192:25 193:15 196:6,8 207:4 215:10 221:4 231:22 253:24 254:21 256:3 259:8,9 292:3 293:3,17 294:12 299:14 301:13 306:2 309:19 332:7 334:16
**asking** 29:13 55:4 61:6 183:14 184:4,6 194:10 198:11 198:23 199:3 221:9 253:19 273:6,7 276:12 276:13 277:14 277:25 284:13 298:9,12 302:20 312:4 324:15
**asks** 154:2
**aspects** 181:22
**asset** 244:10 271:13,21
**assets** 152:6 157:7,8 270:20 273:22 278:9
**assignment** 261:20 264:9 264:11,19
**assist** 71:25 105:14 106:24 137:20,25 164:19 165:7 230:3
**assistance** 169:5,9,15 172:4,11 345:13,15
**assisted** 159:13
**associated** 14:2 20:14 31:9 182:5
**assume** 9:21 222:20
**assuming** 16:11 145:24 149:6 232:8,21 286:11 312:8 326:19 328:10
**assurance** 153:10
**attach** 188:8
**attached** 142:5 142:16,20 188:13 205:18 208:7
**attaches** 198:14
**attachment** 197:23,25 205:11 206:8 299:24
**attachments** 262:25
**attempted** 170:24
**attend** 150:16
**attention** 110:21 111:21 162:19 167:4 283:4 297:11 297:20 318:3 320:24 322:18
**attorney** 4:11 10:24 213:25 219:20 221:15
**attorneys** 3:4,9 3:18 4:3,15,20 224:19 298:5 324:6,7
**attributable** 190:12 191:8 191:20

Case 2:23-cv-06188-JMW Document 543-4 Filed 09/04/26 Page 359 of 427 PageID #: 19306



**audit** 153:5 235:2,7,13,16 236:12 253:4,8 253:9 269:13 300:10,14 309:22 327:11 327:16,20,24
**auditing** 310:5
**audits** 16:4,5,7 19:9 234:19
**august** 205:6 205:13 206:9 331:6
**authority** 56:12
**authorization** 336:17
**authorized** 5:11
**auto** 1:3,4,6,6,7 1:7,7,8,8,8,19 3:5,10,12,12,12 3:13,13,13,14 3:14 12:16 19:8 20:15 21:8 34:23 46:4 68:4 70:20 71:7,18 71:22,24 72:4 72:10,15,21,25 73:7,8,19 74:2 74:16 92:23 109:4 111:5,11 111:23,24 113:13 114:8 159:8 169:13 208:19,22 213:15 221:16 223:20,23 233:22 236:17 309:14 331:14 331:18
**auto's** 75:14
**automatically** 320:20
**automobile** 20:4 23:5 30:7
**automotive** 1:16 4:5
**available** 187:7 280:14
**avenue** 3:6,15 4:7
**average** 69:15 69:17
**aware** 11:23 18:24 42:10 46:3 71:21 73:25 74:10 75:2 77:6 91:11 93:3,8 95:21 97:18 99:9 100:18 101:17 102:9 107:23 108:4 113:4 139:21 179:5,7,19 182:9,14 206:10,14 209:25 211:12 212:9,10 213:14 214:8 217:2 218:17 221:18,19 222:13 223:18 223:21 224:17 229:10 235:16 236:20 242:2 243:17 245:5 295:6 301:10 304:10,15 306:19,20 326:24 327:4
**awry** 41:18

**b**

**b** 119:5,8 186:25 337:20 345:2,6
**bachelor's** 16:20,21
**back** 13:18 19:13,21 27:4 29:16,19 38:4 54:6 60:13,20 61:18 93:25 118:21 122:9 123:24,25 125:11 130:22 131:9 162:5,8 165:16 176:5 178:12 183:21 184:13 191:18 197:22 201:17 231:5 237:21 247:24 266:21 280:2,4 315:21 321:11 329:25
**backup** 103:17
**balance** 23:7,16 24:10 28:23,25 55:7 57:20,25 58:14,23 59:6 60:8,15,16 65:15 67:12,13 68:14 84:6 90:9,23 91:3 103:19 104:8 122:2 123:5 128:6,23 129:13,16 131:14 250:21 251:20,22 258:10,15,17 258:20 260:2 260:18,24 261:7,15,16 270:5 282:8,10 285:20 286:4,6 286:24 287:2 290:9,13 291:20 299:4,8 299:9 305:20 310:14 311:7 315:18 317:22 317:25 321:12 321:16,17

322:14 345:7
**balanced** 260:16
**balances** 60:3 65:24 148:25 258:12 269:22 273:22 285:10
**bank** 1:18,19 4:16 65:10 85:7,10,13,16 85:19,22 86:3 86:17,18,25 97:8,10 100:6 100:8,9,11,11 102:2,3,7 110:11,13,18 111:11 112:10 112:12 113:21 114:4,14,21 115:2,8,11,24 116:15,19 118:9 137:9,22 138:3,8,13 140:21 141:18 162:11 166:11 168:23 179:25 206:20 207:19 209:21,24 247:19 248:6 248:22 253:19 266:22 274:4,6 345:5 347:6
**banks** 100:15 278:18,24
**baron** 1:5,5,6 3:11,11,12 107:18 174:17 174:19 187:8 187:19
**baron's** 105:16 171:17,19 175:10 193:13
**barons** 107:16
**based** 27:15,18 27:22 59:21 95:22 104:17 105:23 125:14 146:18,21 152:7 183:8,10 189:18 191:2 191:14 225:11 256:4 264:4,8 264:15 269:8 269:15 271:10 286:12 287:15 288:6 295:18 304:19 305:3 308:18 311:9 311:10 318:2 324:8 332:23 342:25
**basically** 106:9 152:25 335:24
**basis** 16:9 30:24 33:20 48:2,8 55:8 63:17 64:21 65:23 66:2 69:3 82:9 84:2 86:11 90:7,23 91:4 92:9 103:4,5 119:18 120:23 131:6 132:9 150:7 161:21 190:5,6 199:25 215:22 225:12 293:10 307:6 311:13 319:17 320:3
**bate's** 151:8 160:6 195:2 197:16 205:9 263:17 267:24 280:13 291:13 298:12 299:22 323:5
**bates** 195:4
**began** 281:2
**beginning** 37:20 75:10 322:8 342:6,8
**begins** 205:9
**behalf** 101:18 106:4 298:6
**behest** 295:24
**belief** 215:23
**believe** 15:7 19:13 21:22 34:24 37:18 40:6,8 46:4 50:23 52:6 54:5 62:6 69:22 74:11 76:19 80:20 86:20 105:12 106:5 107:13 110:8 119:6 120:7 133:18 135:20,22,24 138:15 139:8 145:21 147:14 148:22 155:22 163:6 168:24 170:10,12 171:8,15 173:7 175:3,20 184:20 190:2 191:4 192:6 194:15 198:21 210:9 211:25 213:12 214:18 215:14 219:21 220:11 223:13 225:21 232:6 236:18 240:2 248:15,17,20 253:15 257:10 272:10 288:11 289:14 292:5 306:23 307:6 329:15 330:2 330:23
**believed** 68:20 125:15 255:23
**bell** 229:21

**belong** 127:24 257:16 322:9 322:10
**belonged** 59:17 324:25
**belongs** 283:18
**best** 36:23 46:6 49:4 149:3 222:24 223:5 245:8 256:22
**better** 31:11 101:7 132:8 137:13,19 264:17 304:2
**beyond** 289:6
**bigger** 174:24
**bill** 251:16
**billed** 147:2,6,8 290:4
**bit** 47:24 66:20 126:23 175:23 176:18
**black** 192:23 193:4
**blaming** 109:6
**blank** 196:24 197:10 347:8
**blankenship** 1:14 4:4 13:2
**blood** 348:17
**blvd** 1:6,6,7,7,7 1:8 3:12,12,12 3:13,13,13
**board** 256:4 264:23
**body** 270:21
**book** 19:9 31:17 111:3,22
**books** 23:16 24:4,7 33:22 45:2 70:17 85:20,21 86:14 113:10,17 146:13 206:17 210:6 229:12
**bottom** 32:11 46:19 47:14 160:3,5 162:19 163:7 167:5,19 177:6,9,14 192:7 252:17 263:18 280:21 291:3 309:25 325:7 336:23 337:25
**bought** 180:22 244:4
**boulevard** 4:16 111:23
**bounced** 263:22 326:10
**box** 4:12 162:20,23,25 167:4
**break** 9:25 10:6 10:17 80:5,7 175:24 190:5 201:3
**breakdown** 63:16
**breath** 73:12
**brian** 1:5 3:10 52:7 56:19 107:9 187:9 188:2
**brief** 80:10 101:6 218:21 220:23 252:6 335:9
**briefly** 208:12 209:13 238:14
**bring** 157:4 165:24
**broad** 73:22
**broken** 190:8
**bronx** 157:9,24
**brought** 29:15 126:11
**bruce** 300:16 300:22,24 301:3
**build** 221:11
**building** 53:25 97:25
**built** 308:21
**bulk** 19:10
**bullet** 195:18
**bunch** 123:21 123:22
**bureau** 18:20
**business** 7:3 15:19,20 16:22 51:7 55:17,19 149:7 150:3,15 174:16 188:19 331:11 339:23 342:2
**businesses** 16:10 19:4 53:21,23
**buy** 158:18
**buyers** 1:14 4:4 34:24 45:20,20 93:11,25 94:6 217:2,12,17,20 218:16 219:25 347:9

**c**

**c** 3:2 30:20 129:11,12 138:22 142:7 142:10 345:7 348:2,2
**calculate** 233:12
**calculated** 52:24
**calculation** 342:21
**calculations** 31:23
**calculator** 288:15

**call** 26:4,8 44:25 116:16 131:12 233:23 233:24 253:7 272:19 313:9 330:7,10,25 347:13,16
**called** 6:2 17:7 25:19 30:16 101:15 114:4 128:23 151:25 165:15 186:25 215:7,8,9 223:19 241:8 253:10
**calls** 219:10 275:24 276:25 277:20 312:15
**capable** 296:13
**capital** 1:17 78:19,19 79:4 79:12,21,23 331:7 341:15 342:8,20
**car** 1:14 4:4 7:3 20:20,21 21:2 21:10,16 30:8 30:25 31:22 34:23 45:19,20 50:9 51:7 53:17 66:25 69:11,23,25 70:4,8,12,14 82:22 83:2 93:11,24 94:5 97:15,15 98:2 98:8,11 139:14 139:15 217:2 217:12,17,20 218:15 219:25 237:12 292:24 316:6,7 347:9
**card** 102:10,14 102:16,20
**cars** 1:15,15 4:5,5 53:18 98:4 124:11
**case** 1:11 46:11 143:24 176:13 219:23 223:9 225:6 232:24 265:5 278:10 298:25
**cash** 80:15,19 93:7 96:3,7,9 96:12,15,20,21 97:3,6 144:2 251:9,24 274:4 285:19 286:5 286:10,17
**cashed** 84:20 86:2 206:19
**cathleen** 14:11 151:20
**cause** 36:4 40:6 66:5 77:4 86:16 108:12 111:17 113:23 138:17 143:5 144:21 152:24 163:14 202:13 203:2,10 215:24 217:17 264:12 286:24 313:4 316:22 322:2
**caused** 294:4
**causing** 322:4
**cayer** 229:20 256:14 265:8
**centerreach** 21:9
**certain** 19:17 22:7 59:23 61:12 102:11 102:20 109:13 119:22,24 128:5 156:14 177:4 181:6 271:11 279:5
**certainly** 113:25 166:25 197:2
**certificates** 242:17
**certification** 5:8
**certifications** 18:11
**certify** 348:10 348:15
**cetera** 22:21 47:22 208:17
**cfo** 229:10,16
**chabrier** 1:5 3:10 52:7 187:9 188:3
**chain** 141:11 176:8 252:11 252:18 280:24 292:18 299:21 302:5,13 332:15
**chains** 299:22 300:2 346:11
**chance** 192:10
**change** 28:7 122:10 180:14 180:17,19 182:12,15 183:3 189:5 203:21,22 212:7 230:9,10 294:2 295:18 349:4,7,10,13 349:16,19
**changed** 60:6 127:15 180:22 210:19 211:19 211:23 212:8
**changes** 19:24 25:7 165:10 168:21 202:21 212:9,10 295:23 296:9

296:19 350:7
**changing** 189:17 244:16
**channels** 162:16
**characterizati...** 134:5
**charge** 105:4,4 145:20 146:18 146:21 240:22
**charged** 102:11 102:21 146:15 233:3 240:24
**charges** 102:17 199:15 234:2 347:14
**charles** 7:17
**chase** 1:19 110:12 266:24
**check** 57:4 61:6 84:18 97:7 116:13 218:23 251:14 326:9
**checking** 260:17
**checks** 85:3,4 85:17,24 86:4 205:18,23 206:19 251:13
**cherkis** 237:9 238:2
**chestnut** 3:19
**chevrolet** 50:4 221:24 222:2
**chief** 229:11 301:4
**choose** 32:24
**circle** 60:16 61:3
**circled** 90:14 90:19
**circumstances** 49:13 78:13 127:7 156:14
**civil** 2:10
**claims** 75:8 157:19
**clarify** 10:15 71:17 81:12 178:9 257:18 266:10
**cleaned** 256:19 256:21
**cleaning** 283:7 283:10
**clear** 8:9 26:3 43:5 63:7 70:13 85:4 223:4 324:14
**cleared** 202:24
**clearer** 167:2
**clemmons** 207:18
**clerk** 176:12
**client** 7:7 13:15 13:19 25:4 43:12 57:10 69:17 114:7 154:13 166:12 174:13 184:15 214:2,4 217:25 222:9 225:17 225:18,24 232:19 243:9 243:12,15 335:8
**clients** 15:23 21:13,19,20,21 23:5,6,9 24:21 35:8 44:9 57:7 67:25 143:14 149:22 152:10 153:2 180:22 181:16 217:24 218:8 226:8 237:17,19 243:20 305:17
**close** 204:18 262:24 301:14
**closed** 98:19 158:19
**closely** 159:5 271:19,20
**closing** 244:11
**coast** 1:15,15 1:15,16,16,17 4:4,5,5,6,6,6 35:2,3,4,5 159:6,7 208:19 331:11,12,22 332:8
**code** 105:15 154:25 258:19
**codes** 154:20
**codispodo** 141:17 142:4 207:18
**collect** 148:25
**college** 16:12
**column** 163:2
**combination** 20:21
**combined** 47:16
**come** 28:24 30:12 44:22 47:13 103:22 107:7 108:3 159:14 164:24 169:24 171:7 201:13 212:24 213:6 232:9 241:8 259:12 259:16 278:5 293:11 307:22 308:16 320:8 320:13 329:21 340:7
**comes** 96:24 97:6 176:11 196:20
**comfortable** 70:6 154:9
**coming** 6:16 28:22 71:24

96:16 123:4,6 123:8 136:15 138:14 154:13 254:9 256:4 264:23
**commission** 31:23 95:22 314:19
**commissions** 32:15
**common** 276:22 277:5 278:16
**communicate** 219:8 325:16
**communicated** 219:3 230:20 301:8 305:12
**communicating** 296:13 301:11
**communication** 204:21
**communicati...** 89:8 92:4 141:24 179:11 182:19 183:11 219:4,6,14 230:16 246:14
**companies** 22:23 93:10 148:3 226:16 226:19
**company** 7:12 13:23 14:16 47:6 64:21 93:19 101:14 135:4 147:17 152:6 159:25 160:22 166:17 175:19 178:14 187:14 216:9 216:11 243:7 268:10 337:14 337:14 341:8
**company's** 24:4 117:24,25
**compared** 303:21
**compel** 42:13
**compensation** 52:22 95:5,9 95:19 233:7 309:16
**competent** 183:2,22 184:6
**compilation** 152:2,4,24 165:2 269:4,7 310:5,7
**compile** 277:13
**compiled** 269:16
**complain** 92:21
**complaints** 18:19
**complete** 51:18 106:25 182:22 204:2 260:3 350:9
**completed** 51:16 135:19 136:2 291:8 325:12
**completely** 154:24 252:2
**completeness** 153:8
**completing** 260:5
**completion** 311:9
**compliance** 42:21
**computer** 99:25 100:3 230:12
**con** 19:8
**concentrations** 19:7,8,11
**concern** 96:18 228:16 259:17 259:23
**concerning** 77:23
**concerns** 12:13 42:20 265:17 265:20
**concluded** 344:6
**conclusion** 153:10 277:2 277:20 312:16
**condition** 151:2 152:18 157:6 268:11 271:18 272:14,23 273:15,17 275:5 278:8 304:23 347:18
**conditions** 271:11
**condoning** 277:11
**conduct** 156:14 236:11
**conducted** 327:11
**conference** 99:10
**confidential** 223:12
**confidentiality** 42:18
**confirm** 76:10 144:19,20 260:24
**confirmation** 193:22
**confronted** 277:8
**confusing** 339:16
**connected** 227:15
**connection** 11:24 46:20

52:15 55:24 72:20 87:4 91:14 95:23 102:5 105:21 118:5 133:15 133:25 140:7 143:14 145:6 165:21 168:22 180:8 181:21 181:25 194:21 217:12 221:23 224:7 239:2 244:3,19 245:10,25 246:23 247:20 260:10 261:11 272:21 282:16 285:14 292:2 300:10 330:14 332:8 334:15 347:17
**consent** 41:19 42:3,12,14,22
**consider** 312:18
**considered** 297:4 312:11
**consistent** 253:23
**constantine** 138:16
**consultant** 93:20
**consulting** 93:18
**contact** 49:20 137:23 228:22 330:9
**contacted** 227:5,7 329:25 330:4
**contain** 224:19 304:21 305:2 308:2
**contained** 62:19 272:15 279:7 343:8
**containing** 262:25 266:7
**contains** 289:5 289:9 291:20 299:5
**contention** 318:19
**context** 74:9 76:21 126:10
**continue** 3:22 24:5 149:10 194:11 241:22 336:3
**contract** 158:18 181:3
**contrary** 327:22
**control** 121:8
**controlled** 226:3 245:12
**controller** 25:24 26:22 27:14 54:10,20 65:8 71:24 195:19 196:4 244:13 248:7,9 248:13,14 283:20 294:23 295:18 343:18
**controllers** 55:16 97:2
**conversation** 96:25 100:24 101:2,6 107:25 111:18 135:5 136:24 209:5,7 209:17 215:2 225:10,13 229:19 230:25 250:17 302:2
**conversations** 100:25 111:14 126:9 136:22 137:2,7,18 182:24 183:9 246:23 247:2,6 247:9,15 253:3 253:11 256:5,8 256:12 293:14 294:11,17,24 295:4,19 301:22
**cooperation** 257:22
**copeland** 17:7
**copied** 92:4
**copier** 263:6
**copies** 62:10,12 62:14 92:7,11 106:23 107:3 170:2 274:11
**copy** 5:14,17 27:4,8,16,23 28:2 103:12 142:13 176:11
**corp** 1:17 33:5 33:7 45:24 46:10 223:25 224:3
**corporate** 16:2 226:2 229:24 239:13,17 241:19,23
**corporation** 32:22,24 217:16,18 242:15 243:6 300:11 327:12
**corporations** 45:18 46:3
**correct** 8:6 12:14,17,18,20 14:21 19:2 21:3 22:18,19 24:13,14 28:4 30:4,5,9,10 32:13,16,18 33:4,13 35:9

36:17,18 38:3
39:12,15 45:5
46:13,14,22,23
47:3,7,10,11
53:4,5 54:21
58:2,3 59:9
62:16 63:24
64:16,25 65:2
66:14,18 67:13
67:14 68:17,18
68:24 69:12,13
70:9 73:4 76:5
76:6,8 78:20
78:21 81:20,21
83:20 85:6,8
85:22,23 86:6
90:24 93:11
97:12,16,17
99:7 100:7
103:24 113:19
115:21 118:6
120:11 124:25
125:2,5 131:13
132:13,20
135:16 139:18
144:6 146:3
151:23 154:11
155:20 156:4
156:10,16,17
156:20,21
161:23 162:9
163:12,13
165:22 168:5,8
171:5,21 180:6
181:7,23,24
182:8 183:13
184:24 185:2,8
185:9,13,14,16
185:17 188:3,4
188:9,17,20,21
188:23,24
189:12 190:14
190:16,17,21
196:16 199:12
199:16 200:2,3
200:10,15
201:5,6,12,19
201:20 202:3
203:6,19,22
214:24 215:14
215:15 217:19
222:4,7 225:14
226:24 232:4,6
232:13 234:12
234:22,23
235:3,4 237:6
237:7 238:24
239:4 240:11
240:12 241:2,3
246:3,4,15,16
248:20 251:20
251:21,24
253:21 254:2
254:24 255:4
255:19,20
258:11,18,21
260:4 264:25
265:14,15,23
265:24 266:3
266:12 267:14
268:17 269:6
269:10,11,17
269:25 270:2,6
270:15,16
271:22,23
272:2,3,6,7,9
278:22 279:14
281:8,9,12,13
281:16 282:4,5
282:8,9,13,14
282:19 283:17
283:25 284:4,5
284:9,10 285:3
285:4 286:9,10
288:5,19 289:7
289:8 290:6,23
290:24 291:2,5
291:21,25
292:4,21,22,25
293:7,8 295:4
295:5,13,19,20
296:14,15
297:18,19,24
298:3,24
300:18,19
301:9,16
302:23,24
303:5,6,12
304:23,24
305:5,6,16,21
305:22 306:12
306:18 307:2,8
307:9 309:20
309:21,23
310:21,24,25
311:4,5,11,12
312:12 313:17
313:21,25
314:5,6,9,10,12
314:13,15,19
314:20,23,24
315:7,14,15,23
316:2,3,7,8,12
316:13,15,16
316:21,22
317:16,17
319:7,14 320:6
321:3,4,18,23
322:21,22,24
322:25 323:8,9
323:23 325:4
326:16,23
328:5,6,11
329:9,10 330:5
332:17,22
333:6,21
334:10,11,13
335:4 337:14
337:15,24
338:5,6,21,22
339:2,4,5,7
341:12,17
343:4 350:9

**corrected** 286:2
286:5,11

**correcting** 239:6 285:19 285:20
**correction** 286:7,19
**corrections** 350:6
**correctly** 131:16 209:2 282:3 308:21 310:7
**corresponden...** 179:11 330:11 347:21
**corresponding** 316:20
**cosmetic** 208:14
**cost** 30:13,14 30:16,24 31:21 31:22 32:16 124:10 149:21 314:22,25 316:6
**costs** 292:24
**could've** 158:11
**counsel** 5:6,17 40:24 41:7,10 41:12 43:2 73:12 226:7 234:5 335:24 346:15
**county** 176:11 348:5
**couple** 195:16 218:24 238:7 253:16 335:23
**course** 96:25 206:12 228:23 230:6 241:4 293:20 330:19
**court** 1:2 5:13 6:12,19 8:13 8:22,24 9:9 42:24 306:22
**courtesy** 9:3
**cover** 74:20 304:21
**covered** 335:24
**covid** 105:8 169:9,15 172:11 345:14 345:15
**coyley** 138:15
**coyley's** 138:20
**cpa** 1:14,25 2:8 6:10 13:23 15:6 18:3,12 18:13 44:12 57:10 115:15 151:19,19 153:18 180:20 184:23 208:7 209:11 237:12 349:2,24 350:2 350:4,13
**cpa's** 1:18
**cpas** 14:13 15:13 242:3
**crazy** 208:6
**create** 298:14 302:20 303:14 304:17 328:14
**created** 298:9 298:13,15
**creates** 25:20
**creating** 307:10
**credit** 60:15 81:6 92:16,25 111:22 123:5 204:8 278:22 278:25 279:3 285:20 286:6 292:23 314:8 315:10,13 316:4,21 322:13 323:14 323:16
**cross** 241:8 260:14,22
**crystal** 223:4
**cullen** 4:15
**current** 18:16 35:8 37:21 43:24 130:13 342:14
**currently** 19:23 34:7,18,19 35:13,14 37:20 44:4,7 61:15 69:23 147:21 195:21 208:20 208:23 331:20
**customer** 28:13 230:17 326:10
**customers** 20:5 20:5 82:14 234:16 242:25
**cut** 177:7
**cv** 1:12
**cyruli** 3:9

**d**

**d** 5:2 141:3,4,5 345:8 346:17
**daily** 212:5,8
**dan** 54:15,15 54:16,19 55:10 58:25 59:2 60:5,10 61:18 62:4,7,23 63:25 64:14 65:7 71:25 72:12 86:21 98:16 104:8 119:24 123:16 125:20 140:16 196:4 199:7 200:5,11,16 205:7,17,18 206:10 207:4 210:21,22 211:18,24 212:11,11,13

212:16 343:19 343:21
**data** 27:15 230:13 267:19
**date** 1:22 2:3 35:24 81:19 84:7 114:15 119:3,10 124:17,18,19 124:21 129:14 138:6 141:8,21 151:13 160:11 163:4 164:7 166:20 169:12 169:18 171:18 172:4,15 175:2 177:4 186:5,15 195:9 197:20 202:11 204:6 208:2 211:22 252:15 263:13 268:4 280:18 281:10 283:2 287:8 291:17 292:10 297:17 297:22 300:4 302:22 309:2 313:13 325:5,8 334:8 336:10 337:9 349:24 350:13
**dated** 124:15 125:10 141:11 157:6 166:6 194:25 195:13 203:9 205:6 207:14 263:25 280:24 292:14 300:6 302:5,13 314:4 332:16 336:24
**dates** 11:15 120:14 199:19
**david** 1:6 3:11 105:16 107:15 107:18 171:16 171:19 174:17 174:19 175:10 187:8,19 193:12
**day** 111:21 125:10 175:3,6 348:21 350:17
**days** 5:16 23:21 190:9 191:2
**dda** 142:8
**deadlines** 6:20
**deal** 143:19 326:3,6,11,12 326:15,18,19 328:8,10
**dealer** 24:12,16 24:19 28:10,21 58:16 66:11 67:2 78:23 83:8 85:2 90:9 95:12 96:25 120:9 139:15 143:22 159:25 160:15 166:5 236:6 260:20 261:18 286:4 317:10 322:17 339:25 340:6 341:9,13 343:11,13
**dealer's** 340:3
**dealers** 22:10 25:10 26:15 55:21 68:4 70:4,11 82:21 140:12,12
**dealership** 20:5 20:14 21:25 22:3 23:12,15 25:9 26:18 30:7 31:7 33:19,22 34:8 47:20 48:13 49:24 50:3 52:14 53:10,20 54:8 56:17 58:2 64:25 65:11 66:3,25 69:4,24 74:19 74:19 77:2,8 81:7 84:3,19 85:20 88:6 90:6 91:7 92:17 95:7 96:2,19 100:6 100:15 102:17 102:21 108:2 113:11,18 116:23 126:3 127:9,15 128:8 132:7 138:23 140:11 160:23 161:22 163:3 179:14,20 183:6 199:24 203:11 207:9 208:15 218:3 222:8,10 223:19 224:5 227:11 228:6 228:15 238:7 244:4,8,22 245:11 248:23 248:24 249:5,6 251:8,12 289:4 293:21 294:22 314:14,17 325:23 328:7 333:14
**dealerships** 20:16,20,25 21:5,12,19,23 22:6,7,9,14,22 22:25 25:23 30:15 39:25 43:19 44:4,17 45:3,7,12 46:16,17 47:16 55:15 69:11,18 69:25 70:8,10

70:14,18 73:10 73:20,22 81:17 82:13,19 95:24 96:6 97:20 100:12 101:11 116:16 117:19 136:17 140:3 147:25 148:2 180:24 182:10 219:25 234:17 234:18 235:8 235:23 236:22 236:25 237:6 237:16,18,23 238:9,10 241:5 246:25 248:18 251:23 253:6 253:13 260:7 301:5 313:23 347:7,9
**dealing** 26:18 276:14
**deals** 25:22 326:25 327:7 333:5
**dealt** 100:12,15 180:21 213:25
**debit** 60:16 314:8 315:9,13 321:3 323:11
**debiting** 292:20
**debt** 122:6
**december** 144:12 328:18 328:19
**decide** 63:25
**decided** 64:4,6 309:12
**decision** 64:3 178:7 179:15 320:9
**decisions** 178:16
**declaration** 282:16 306:22 306:24
**declare** 350:4
**decrease** 286:8 286:13,21 329:3 333:9
**decreases** 326:16
**decreasing** 326:21
**deduct** 156:13 156:18 275:3
**deducted** 32:3 32:5
**deducting** 156:25
**deductions** 163:16,23
**deed** 157:20
**deeds** 274:12
**deemed** 350:7
**defendant** 3:18 4:11,15 7:13
**defendants** 1:21 4:3 41:9 41:20 42:3,25 280:12
**deficits** 109:11 109:12
**define** 73:8
**definitely** 114:21 197:4 245:5
**definition** 271:3
**definitive** 239:7
**degree** 16:18 16:20,21,25
**degrees** 18:9
**delete** 165:18
**deo** 1:13,13 4:3 4:3 12:19 20:14 21:18 34:9,21 35:17 35:22 37:13,24 38:12 41:8,20 42:24 48:19 51:24 72:21 74:4 79:5 93:18 94:12 100:20 110:9 122:7,11 123:14 125:25 133:16 134:2 135:7 136:14 144:14 145:4 148:6,7 150:25 152:16 153:9 155:20 157:5 157:15 164:19 173:20,25 174:9 182:4,7 183:5 189:15 190:12 192:3 195:13 197:14 205:8 208:8 209:19 214:22 219:3,15 223:18 224:7 224:10,14 225:2,8 226:4 227:6,17 229:15,24 230:20 231:22 232:9 233:17 235:6,17,22 236:11 239:18 240:22 241:11 244:18 245:9 246:14,23 250:23 251:4,8 251:8,12,12 252:19 253:4 254:12 255:8 255:16 256:5,9 256:13 257:2,8 258:23 259:4 261:20 263:16 264:22 265:7 265:20 266:3,6 267:12,17

269:9,18 270:12 271:24 272:5,21 273:2 273:9,13,19 274:5,11,15,21 275:2 277:9,15 277:15 278:12 280:12,13,17 281:18,24 282:6 283:24 287:17 290:4 293:12,17,24 293:24 294:6 294:11 295:19 295:24 296:7 296:12,17 299:10,14 300:7,15,21 301:13,18,23 302:6,14,19 303:14 305:7 305:11,15,19 306:14 307:13 307:15 309:19 310:23 312:8 313:8 320:10 327:15 328:4 330:12,16 331:7,21 333:16,19 336:23 338:5 338:11,16,20 339:20 340:17 343:10 346:6 347:17,21 349:1 350:1

**deo's** 42:3 161:5 162:12 241:5 307:8 311:16 339:3 341:20

**deos** 43:8 44:19 45:13,16,23 46:7 48:13 50:7,8 52:25 148:12,20 149:10,25 178:5,23 191:7 214:10 220:2 226:17 271:22 340:24 341:7 347:10

**department** 21:2 182:11

**departments** 297:13

**depend** 60:23

**depending** 15:4 280:5 329:4

**depends** 244:9

**deponent** 350:3

**deposed** 6:21 6:25 8:5 221:20

**deposit** 97:14

**deposition** 1:24 2:7 5:8,9,14 8:11 10:2,14 10:19,22 11:10 11:20 157:15 161:5 279:16 324:4 347:20

**depreciation** 144:3,6

**derived** 342:11

**describe** 15:20 94:20 97:24 268:18 270:17 283:9

**described** 43:15 55:14 64:18 66:12 204:13

**description** 288:18 314:11 345:4

**design** 314:21

**designate** 32:24

**designates** 33:14

**detail** 122:15 261:5 270:20 290:14

**detailed** 258:17

**details** 42:2 55:13 234:2 271:13 347:14

**determine** 12:6 259:5 278:3 279:2 285:25 340:20

**determined** 271:9

**died** 175:3,11

**differ** 234:15

**difference** 163:14 211:5 211:11 307:19 307:22 320:16

**different** 21:25 22:3,8 34:5 39:25 55:18 66:20 72:16 83:17 136:23 143:8 168:17 172:5 191:21 193:21 199:14 199:15 203:18 212:2 214:3,4 218:9 232:15 240:5,8 264:10 277:25 278:20 307:25

**differentiate** 211:3

**differently** 83:23

**difficulties** 108:5 109:8

**digital** 29:17 117:14,15,19 117:25 220:5 347:12

**digitized** 29:17

**dinner** 150:7
**direct** 293:11 320:18 334:24
**directed** 199:9 320:21 334:23
**directing** 295:17
**direction** 64:14 178:8 295:24
**directions** 296:14
**directly** 42:25 272:5 290:4 296:8 325:17
**directs** 320:23
**disappear** 204:4
**disaster** 169:4 169:8,10,15,16 172:3,11,12 194:7,8 345:13 345:15
**disclose** 154:5,7
**disclosed** 271:25
**disclosure** 271:3 305:2 309:25
**disclosures** 154:8 270:13 270:18 271:5,6 271:15
**disconnect** 255:21
**discovery** 280:12 298:20
**discuss** 19:22 23:11 51:2 76:14 101:9 126:2 204:25 205:2 229:15 241:11 251:4
**discussed** 10:20 11:5 13:9 51:4 62:4 64:11 76:17,18 125:20 127:13 238:13 265:14 268:6 316:10 316:18
**discussing** 19:25 202:15
**discussion** 88:22 112:7 118:20
**discussions** 112:5 250:22 294:20
**distribution** 33:23 34:4
**distributions** 339:23
**district** 1:2,2
**districts** 19:9
**divide** 146:23 233:13
**division** 208:19
**divulging** 217:25
**dla** 1:17
**dms** 24:16,22 25:3 31:21 58:18 78:24 79:3,8,16,22 104:15 119:15 124:22 140:12 140:15 165:11 166:13,15 204:10,19 210:13,16,20 244:12,14 249:9 258:6 261:3,17
**docket** 208:10 252:12 280:15 282:22,25 287:5,7 346:7 346:8
**document** 26:5 26:10 110:8 114:3,4,19 118:22,23 119:2,13 121:3 140:25 141:13 142:19,23 144:9,15 150:20,21 153:13,18 154:10 155:3,4 159:24 160:4 160:14 161:6,7 161:15 162:16 163:25 164:4 164:17 165:25 166:10,12,23 167:10,16 169:4,20,25 172:3 174:15 174:20 176:7 181:14 185:20 186:17 220:3 244:11 258:17 267:24 271:2 272:15 280:11 280:23 287:12 287:16 288:7 288:21 298:2,6 298:10,22,23 336:12,25 337:10 338:14 347:11
**documentation** 51:14 272:20 274:22 318:18 347:16
**documents** 11:19,24 12:11 40:3,16,21 66:3 75:7 81:4 106:7 116:13 139:6 165:10 168:23 181:6 181:11 220:12 224:18 270:23 270:24 271:5

272:16 279:2,5 300:10 302:7 347:3,4,5
**doing** 16:3 35:11 61:23 65:16 82:2 87:12 89:18 93:16 106:6 146:12 149:13 149:18 165:13 171:25 194:18 203:9 213:4,11 216:24 229:6 230:6,11 232:11 234:24 239:5,8 242:11 255:5 260:14 261:6 283:15 284:7 286:13 321:23,25
**dollar** 30:23 31:8 79:25,25 143:10 217:6 339:13
**dollars** 206:11 207:5 303:16 308:9 312:10
**double** 218:23 279:25
**doubt** 144:17
**draft** 332:25
**draper** 2:11 128:15 162:4 348:8,24
**draw** 33:16 110:21 111:20 162:18 167:3
**due** 23:22,23 37:21 84:6 122:7 148:8,25
**duly** 6:3 348:12
**dump** 267:19
**duties** 248:5 261:11
**dwight** 1:14 4:3 13:2
**dykman** 4:15

**e**

**e** 3:2,2 5:2,2 6:2 75:25 76:7 105:15,16 107:15 138:22 141:10,11,12 141:14,19,20 142:3 159:19 159:20 171:4,6 171:6,12,15,17 171:20 176:8,9 176:14,15 177:2,19,22 178:2 183:8,10 185:22,24 186:3 192:2,4 192:5,10,13,24 193:13 194:25 195:8,11,12,13 197:13,16,19 197:24,25 198:10 205:6 205:10,13 207:11,14,16 207:22,25 208:4 209:4 219:5,10,13 240:8 246:2 249:13 252:11 252:14,18,25 253:18,23 254:15,17 256:15 258:22 258:24 262:24 262:25 263:5 263:12,15,21 263:25,25 264:5,9,16,17 264:21 265:2,8 265:11,14 266:17 267:14 270:4,8 280:24 281:24 292:9 292:12,18 295:17 296:23 299:21,22 300:2,5,15 301:12,23 302:5,6,13,16 302:19 304:9 304:12,14,16 305:7 306:17 307:14 310:22 311:16 325:25 330:4,6,9 332:15,19 340:25 345:2,9 345:9,17,20,21 345:22 346:3,4 346:10,11,17 348:2,2 349:3 349:3,3
**earle** 4:16
**earlier** 109:19 160:22 178:11 246:13 247:18 264:16 266:2 313:15 331:24 340:25
**early** 281:7
**earned** 148:12
**easier** 10:18 20:9 155:13 221:5
**eastern** 1:2
**ecf** 252:11 280:14 282:22 282:25 287:5,7 346:7,8
**economic** 194:8
**effect** 5:12,15 267:18 293:6 315:5 316:10 324:12,19 326:21
**effectively** 282:4

**effectuated** 179:6
**efforts** 107:14 140:20 148:24 171:22
**eft** 199:22
**eidl** 105:8 170:5 171:10 171:13 173:13 173:16 192:18 194:9 238:19 238:21,23 239:11,17 240:5,9,15,21
**eight** 206:13
**ein** 338:15
**either** 23:24 25:10 33:23 37:3 46:11 79:3 80:15 94:12,21 95:2 95:6,22,24 97:19 100:6 102:17 105:9 106:4 112:24 113:6 116:15 117:23 125:19 130:9 135:4 140:12 141:24 148:4 156:23 219:23 273:10 286:24 301:9 347:6
**ej** 248:15,19
**elect** 33:5
**elected** 270:12
**electronic** 12:9 116:25 117:2 136:10 249:4
**electronically** 170:23 174:6 174:10 261:17 274:20
**elects** 33:6
**else's** 56:12 88:13 189:8
**emanuel** 3:7 42:15 257:19
**emphasize** 302:20
**employees** 14:23 53:14 324:24
**employment** 17:22 232:4,5 232:11
**ended** 17:14 139:12 231:21
**ends** 305:7
**engage** 56:9
**engaged** 148:14 281:6,19
**engagement** 57:2,4,6,10,14 57:16 224:15 224:20,23,25 228:24 231:3,9 231:10,21 234:7,14 238:22 269:4,7 269:14,14 281:20,23 285:2,12 287:18 296:23 310:8,10 327:5 329:6
**engagements** 228:14 234:15
**engaging** 256:15
**ensure** 299:11
**entered** 256:24 332:21
**entire** 167:16 202:24 233:13
**entities** 13:8 34:18 40:5 43:14 46:3 113:2,7 148:13 148:21 149:11 159:5 172:24 180:23 184:9 213:16 218:2,4 220:2 226:3 229:25 230:22 233:18 235:3 241:19,24 271:19 272:4 273:10 347:10
**entitled** 142:20 172:3 191:12 223:4
**entity** 29:9 35:2 93:13 95:22 208:21 239:13 239:17 271:21
**entries** 25:2 119:7,9 121:5 127:3 165:18 203:20 248:22 249:2 257:3,9 257:11,14,15 274:10 283:13 284:18,23 292:4 297:4 316:11,17,19 317:19 318:4 318:14 319:10 320:9 322:7,11 323:19 324:13 324:20 328:9 328:20 329:4 334:16,19,25 335:2 345:6
**entry** 25:11,13 25:25 26:8 62:24 110:24 120:22 122:10 201:9 202:19 203:8,10,12,24 203:25 204:4 230:14 252:12 280:15 282:22 293:5,7,11,18 293:23 315:6

318:6 319:15 319:18 320:4 320:19,25 323:22 332:20 333:4,10,12 334:2,17,21
**enumerated** 207:20 265:19
**equal** 307:16
**equate** 265:21
**equity** 239:12 315:25
**errata** 350:8
**error** 289:17
**esq** 3:7,16,20 4:10,17,22
**essentially** 153:12,18
**estate** 1:6 3:11 156:18 157:2 271:10 274:10
**estimated** 37:9 37:11 311:22
**estimates** 312:6
**et** 22:21 47:22 208:17 349:1,1 350:1,1
**evaluate** 237:20
**events** 222:24
**eventually** 56:21 87:19 204:11 261:25 262:6
**everybody** 53:15
**everyday** 276:14
**evidence** 242:18 259:12 273:10 277:21
**evidencing** 274:16
**exact** 35:23 72:9 179:24 203:23
**exactly** 19:20 19:22 44:11 49:2,3 60:11 69:6 93:15 180:15 309:19
**examination** 6:6 220:25 236:12 335:17 344:5 346:18 348:11,13
**examined** 6:5
**example** 23:19 28:12 56:18 60:12,25 121:6 130:24 131:15 144:3 232:2 270:4,25 271:8 313:19
**except** 5:21 46:23
**exchange** 76:11 241:14
**exchanged** 330:21 331:3 347:23
**exchanges** 76:2
**exclusively** 18:6
**excuse** 43:18 112:12 155:3 203:16 206:3
**exh** 345:5,6,7,8 345:9,10,11,12 345:13,15,17 345:18,20,21 345:22,23,24 346:3,4,5,6,7,8 346:9,10,11,12 346:13
**exhibit** 110:9 114:10,13 119:5,8 129:11 129:12 141:4,5 141:10,19 151:10,11 159:18,19 160:8,9 166:3 166:18 169:7 169:14 172:9 172:10 185:24 186:2,7,11 195:6,7 197:15 197:18 207:13 207:24 252:9 252:13 263:10 263:11 266:22 267:23 268:2 280:10,16 282:22,24 287:4,6 291:12 291:12,15,19 292:7,8 299:20 299:25 313:10 313:11 315:21 334:4,5 335:7 336:7,8,15 337:5,6 345:4 345:4
**exhibits** 336:4 345:3 346:15
**existed** 203:20
**existence** 229:16 295:7
**exotic** 223:20 223:23
**expect** 55:17
**expectations** 8:10
**expense** 31:9 31:15 102:25 103:10 128:7 129:23 130:18 130:25 131:2,7 131:10,12,24 156:15 203:17
**expensed** 130:23
**expenses** 111:19 128:3,5 128:24 130:9

131:5,17,23 133:2 198:22 199:12 308:16 308:22 309:6 309:12 322:19
**experience** 59:22 69:24 288:8
**explain** 22:5 23:14 52:12 77:17 130:7 261:5 288:22 290:9 297:3 317:4 323:22 326:5 328:13
**explanation** 311:17 323:10 323:15
**exploring** 139:22
**express** 102:10 102:14,16,20 103:8,12,13 104:3,10,18,20 104:24 153:9 198:13,17,24 199:15 200:7 200:17 201:10
**extension** 34:13 36:20 37:2,8 37:23 112:25 113:6
**extensions** 34:11,15 35:18 36:14 37:19 39:14 43:8,11 44:11,15,25 112:22 148:5 149:13 331:24
**extent** 40:20 42:11 63:21 111:19 116:14 220:9 233:21 330:8
**extra** 312:9

**f**

**f** 5:2 151:10,11 317:5 345:10 348:2
**face** 279:20
**facilitate** 76:24 76:25
**facility** 53:24
**fact** 28:6 82:8 95:4 158:2,12 183:14,16 184:8 185:10 191:7 202:5 203:8 206:2 213:20 226:19 231:18 236:20 241:12 255:18 257:13 268:9 275:2,15 276:16 277:8 277:16 314:3 326:24 329:22
**factor** 31:10
**factory** 23:22 28:22 61:10 67:23
**facts** 277:21
**fails** 328:8
**fair** 47:16 49:2 61:16 62:17 63:2 64:19 70:5 71:2 153:14 202:4 224:24 227:23 228:16 231:20 236:15 237:3 238:25 241:17 247:18 248:21 260:21 264:8 267:10 269:21 273:21 274:25 279:6 295:21 299:3 305:11 319:8 321:15 324:8,16 334:15
**fall** 271:2
**false** 279:8 328:10
**familiar** 12:13 15:24 24:15,17 43:16 50:9 51:7 64:17 68:25 70:19,21 70:22,23 71:3 71:14 72:17 75:20 80:21 81:16 82:11 85:7 89:15 96:5 101:14,25 102:3,4 111:9 140:19 142:9 160:17 162:20 163:10 213:21 229:5 237:8 287:12 290:19 326:2 331:10 331:15,19 332:14 336:18
**far** 38:5 41:25 42:10,21 45:12 45:15,22 54:4 64:15 93:25 94:23 98:14 105:19,19 112:16 132:21 211:20 239:17 255:16 265:5 293:16 295:14
**fashion** 191:4
**father** 157:18
**favor** 79:5 149:19,20
**february** 200:6 200:16 201:8 203:24 204:5 253:21 264:10 327:13
**federal** 2:10 37:4

**fee** 232:20,21 233:8 240:13
**feel** 70:6 183:2 183:19,22 184:6 257:22
**feeling** 113:23
**felt** 68:12 306:7
**figure** 120:20 228:18
**figures** 260:17
**file** 27:8 28:10 29:16,17,17,20 29:23,24 30:2 33:5,7 36:14 36:19 39:3 44:14 62:12 89:25 116:23 117:3,14,15,20 117:24 118:13 178:3 183:11 191:24 308:2
**filed** 34:10,12 34:15,15 35:21 36:2 37:12,19 37:23 38:15,18 39:4,5,15 44:2 76:4 135:23 136:2 142:14 148:4 156:3,8 170:23 176:10 179:8 182:3 185:2 213:15 266:2,5
**files** 12:6,8,9 13:6,7,14,18 29:13 33:10 57:5 90:11 91:7 117:14,22 118:5 219:24 347:9
**filing** 5:7 7:11 32:21 33:15 38:11,16 46:20 136:11 149:13 176:12 178:17 181:9 192:17 193:2 211:4,6 211:13,14
**filings** 22:20 40:4 183:7 244:17
**fill** 27:14,17 117:25 197:11 240:19 313:24
**filled** 27:21
**final** 270:9 299:7,8
**finalized** 328:19
**finally** 155:24
**financed** 208:25
**finances** 235:8
**financial** 16:6 28:10,17 29:2 29:8 58:16 66:12 67:8,15 67:19 68:5,16 68:21 78:23 82:24 83:8 84:2,21 86:2 88:5,16 89:3,5 91:12,12,21 92:8 95:12 108:5 109:7 120:8 127:14 131:23 132:5 132:17 140:6,7 140:15 145:9 145:11,12 150:25 152:17 153:3,5,11 154:2,4,14 157:6 159:25 161:23 162:10 164:21,25 165:11,18 166:5 168:14 168:17,22 173:3,6 228:9 229:11 236:5,9 236:12 249:21 250:6 259:6,13 260:3,5,6,7,23 261:9 262:19 262:21 264:13 265:22 266:16 268:10,21 269:20,23 270:21 271:18 272:14,23 273:15,17 274:6 275:5 278:8,13,17 279:8,20 281:3 281:8,11 282:13 284:8 284:15 285:12 285:16 289:10 289:14,23 290:8,16 294:13 295:3 297:8 299:12 299:15 303:8 303:10 304:22 308:19 309:3 309:22 311:11 312:10 313:5,7 317:6,12,15,16 320:25 321:22 321:25 322:17 322:24 323:3,7 323:12 324:10 324:18 328:3 329:7,13 332:2 332:24 334:6 334:10,12 340:3,6 341:4 341:6 342:16 343:9,20 346:13 347:18
**financials** 58:16 169:2 235:22 253:12 254:5,22 255:3

256:3 259:25 260:10 264:6 264:24 285:7 289:7 291:24 294:19,22 310:2
**financing** 29:7 81:14,18 82:15 83:15,16,18 91:14 101:19 102:5 126:14 126:14 132:19 133:15,25 134:6 136:17 136:20,22 137:3,11,21 139:14,20,20 139:25 140:3 140:20 143:15 145:7 154:18 162:12 164:22 170:9
**find** 23:23 73:5 193:24 197:2 208:7 228:21 293:22 294:14 321:12,13
**finding** 265:21 327:19,23
**fine** 197:6
**finish** 9:2,4 155:24 221:8
**finished** 155:10 156:8
**fire** 19:9
**fired** 265:8
**firm** 13:15,19 13:22 14:2,5,8 15:2,21 16:4,8 17:7,23,24 18:4,6 19:3 24:11,25 25:22 35:9 57:11 87:12 115:4,13 115:14,19,22 115:25 116:5 116:24 143:2 143:12 145:5 145:25 147:24 148:12 149:6 222:3,11 225:16,23 226:7,10 230:3 230:21 232:12 232:17 236:16 237:4 242:7,16 242:22 255:14 287:11 288:8
**firm's** 151:15 151:22 170:20 172:20 270:11 298:6,22
**firms** 231:9 234:7
**first** 6:3 10:5 17:6 48:18 49:14 50:14,17 52:25 54:18 55:23 56:24 57:21,22 64:19 66:8 71:9 73:6 73:24 74:10,25 75:21 76:12 77:6 87:17,18 100:22,23 103:20 105:5 110:24 141:14 160:5 162:19 162:21 163:2 167:5 171:13 178:12 192:3 207:16 214:7 224:5,9,13 227:15 238:23 250:12 253:15 255:9 261:19 263:21 281:2 281:19 291:3 294:21 300:5,9 317:10 318:4 328:11 329:23 333:24 334:12 338:10 342:18
**fisk** 1:8 3:13 111:4
**five** 80:8 174:15 220:21 267:24 280:9 283:23 284:25 303:19 305:5 306:9 311:23 312:21 316:19 333:4
**fix** 286:6
**fixed** 314:25
**flat** 146:19 233:7 240:13
**floor** 4:7 29:7 67:23 80:22 81:18,19 83:14 83:16,18 91:14 99:20,23 132:19 136:22 137:3,11 139:14,20 215:25
**flooring** 208:16
**flow** 80:15,19 93:7 144:2 251:24
**flushing** 1:18 4:16 101:25 102:6 140:21 141:17 151:8 151:12 160:6 160:10 162:11 166:11 168:23 207:19 209:21 209:24 267:25 267:25 268:3 271:17 345:10 345:11 346:5
**focus** 250:18 283:4
**focusing** 297:20 318:3

320:24
**follow** 40:19 104:12 116:12 139:10 171:23 220:15 234:4 272:24 330:13 331:5
**following** 56:4 130:23 244:7 244:21 305:19 312:23
**follows** 6:5
**footnote** 271:15
**footnotes** 271:6
**force** 5:15
**ford** 159:25 160:21 161:2 166:16
**forecast** 310:12 310:15,20,23 311:18 312:25
**foregoing** 350:5
**forensic** 235:7 235:13 236:11 253:4,8,9 258:25
**forget** 36:7 216:9 343:23
**forgoing** 237:5
**forgot** 129:3
**forgotten** 109:20
**form** 5:21 66:17 95:6,9 125:22,22 127:18 128:16 133:5 142:11 158:8,25 164:20 211:16 218:6 222:6 225:5,20 226:6 238:15 241:23 272:9 275:7,25 276:25 278:22 279:23 296:2 336:9,17,19 345:23
**formality** 305:13
**format** 66:23 67:3,5 114:23 115:2 143:5 153:3 154:14 160:18,24 161:2 220:6 271:12 290:21 347:12
**formed** 32:23
**forming** 241:19
**forms** 106:25
**forth** 22:21 47:22 123:25 123:25 315:2 348:12
**forward** 171:3
**found** 61:20 73:6 130:11 229:17
**foundation** 221:11
**four** 15:7,9,12 15:13,14 236:4 249:19 266:24 288:13 303:15 308:9,11 312:9 316:18
**fourth** 255:4
**frame** 138:5 179:22 225:25 291:7
**franchise** 46:25 67:2,5
**franchised** 20:24
**franchises** 69:21
**frank** 49:21 99:14 224:12
**fraud** 276:5,7 276:10 278:3 308:13,14
**fraudulent** 275:22 276:18 277:10,15 279:12 312:11 312:19
**free** 257:22
**freehold** 236:23
**friendly** 305:15
**frustrated** 221:12
**full** 20:22 31:2 53:17 69:20 142:5,16 201:21 303:19 305:5 311:23
**fully** 182:21 296:13
**function** 248:10
**functions** 94:17 94:19,21 150:10,13,16
**funding** 1:18 3:19 74:12 101:15 105:18 133:10,15,24 141:6 156:2 192:17 326:9 345:8
**funds** 83:5 208:12 209:20 209:20
**further** 5:20 38:4 134:10 153:4 173:8 174:14 187:17 193:11 220:18 335:12 348:15

**g**

**g** 160:8,9 345:11
**gaap** 268:15
**general** 30:15 72:15 81:17 96:6,6,8 99:18 126:6 131:25 171:9 181:8 191:22 205:22 227:24 228:3 228:10 232:23 232:24 247:13 275:19 292:19 313:12,16,20 314:3 318:8 328:7 346:12
**generally** 19:15 30:6 61:15 70:7 152:19 190:8 268:12 268:15,19 270:14 278:21 279:18 291:7 312:23 313:22
**generated** 291:4 325:3
**generation** 21:7,8
**gentleman** 54:13 213:22
**gentlemen** 138:19,24
141:25
**gesture** 9:10
**getting** 7:18 25:8 56:22 106:23 107:11 136:16 184:13 216:13,20,22 217:3,5,9 340:12
**give** 8:8,20 10:10 25:11,15 25:17 26:16 47:24 49:5,7 58:9 60:12 63:16 88:15 89:5 104:13 120:22 148:10 152:7 158:12 164:20 218:18 247:13 270:25 280:20 282:2 283:19 311:17 341:11
**given** 48:22 64:14 251:14 283:18 286:10 291:23 343:19 348:14 350:10
**giving** 19:18,19 70:6 244:13
**glad** 202:17
**gmc** 21:8
**go** 7:22 12:5 19:13 25:8 28:14,20 41:18 44:16 60:10,13 65:18 67:22 76:10 103:2 104:5 121:11 124:14 129:18 134:10 138:7 140:16 165:13 165:16 175:23 186:24 191:18 193:11 197:22 201:17 204:11 206:8 212:18 228:12 243:3 243:10 252:4 257:16 277:5 283:11,15 290:14 307:10 320:18 321:11 326:7,9 337:19 338:23
**goes** 80:3 87:8 97:8,9,9 177:8 192:6 276:14
**going** 23:12,18 38:4 40:14,19 51:5 77:15,18 87:5 90:6 101:3 102:25 110:6 114:9,18 136:10 140:24 141:9 150:19 151:17 157:4 169:3 176:6 177:24 178:14 180:3,5 186:23 186:24 192:15 193:3 197:12 197:22 201:10 207:12 208:13 212:16 213:7 219:18,19 220:8 222:15 227:9 228:15 252:8 263:24 289:2 305:18 330:10 336:2 337:19 338:2
**gold** 1:15,15,15 1:16,16,17 4:4 4:5,5,6,6,6 35:2 35:3,3,4 159:6 159:7 208:19 331:11,12,21 332:8
**gonna** 8:8 40:23 47:23 55:4 56:22 64:13 75:6,22 110:21 111:20 114:2 116:12 119:4 124:9 129:6,9,10 131:12 138:16 142:18 151:9 160:7 162:18 166:2,8 167:3 167:6 169:6

170:15 172:19 176:20 192:5,8 195:5 209:14 241:21 245:4 246:19 263:17 297:7 330:25 336:22
**good** 6:14,15 177:12 195:15 208:6
**goods** 30:13 32:16
**gotten** 60:4 126:16
**government** 106:3
**graduate** 16:14 16:16,18 18:8
**graduated** 16:11,24 17:3
**grandular** 268:7
**great** 6:12 192:22
**greek** 138:18
**gross** 30:12,25 31:2 32:3,6 293:7 303:2 308:18 309:2
**ground** 222:15
**group** 1:16 4:2 4:6 21:8 70:20 71:7,18,22 72:4,11,15,21 72:25 73:7,8 73:20 74:2 111:6,12,25 113:13 179:21 182:20,20 233:22 316:18
**group's** 71:24
**growth** 208:24
**guaranteed** 33:24 34:3
**guess** 12:3 42:22 72:2 136:20 149:15 213:20 223:2 250:3 306:7
**guessing** 36:3 36:13 52:10 72:7 74:6 86:22 121:16 122:15 250:2
**guys** 12:3 241:24

**h**

**h** 6:2 166:3,18 345:2,12 349:3
**half** 190:11 247:9 262:11 262:11,11
**hallway** 14:11
**hand** 26:12 129:21 151:3 274:19 341:20 348:21
**handed** 28:3
**handle** 49:15 96:20 97:3,6
**handled** 96:16 180:19
**handling** 230:7
**handwritten** 270:8
**handy** 148:16
**happen** 29:18 126:7 179:3
**happened** 55:24 194:17 196:11 202:20 203:2 204:21 213:20 320:13
**happening** 108:13 178:21 180:16
**happens** 82:20 181:15
**hard** 151:20 163:6
**harry** 1:13 4:10 4:11 213:22 258:24
**hartford** 236:23
**haus** 331:14,18
**he'll** 61:3
**heading** 172:4
**hear** 108:20
**heard** 71:18 141:24 161:24
**held** 88:22 118:20 131:11 159:5 271:19 271:21 277:17
**help** 60:21,21 291:23 299:14 301:14
**helpful** 121:18
**hereinbefore** 348:12
**hereto** 350:8
**hereunto** 348:20
**heustead** 50:4
**hey** 232:9
**high** 285:22 305:12
**highlighted** 283:5
**highlighting** 121:7
**highway** 4:12 12:16 34:23 64:24 65:20,21 77:8,13,16,19 77:24 78:7,15 79:4
**hired** 55:25 56:6 196:15
**hold** 206:10
**holding** 205:19 206:3,3
**hole** 192:23 193:4

**home** 156:13
**hour** 139:5,5 147:15 247:6,9 247:10 288:12
**hourly** 146:19 146:21 147:11 147:12 233:8 233:15,18 287:17,20 288:4,9
**hours** 147:10 287:25 288:10 288:13,16 305:24
**house** 31:12 130:9 248:7,9 248:13 270:5 271:9
**huh** 122:4 174:18
**huntington** 195:21
**hustedt** 221:24 222:2 223:9
**hwy** 1:4,19 3:10
**hylan** 1:6,6,7,7 1:7,8 3:12,12 3:12,13,13,13 111:23
**hypothetically** 232:8
**hyundai** 21:9

**i**

**iag** 166:9,19 195:4 197:17 345:12
**idea** 39:11 98:15 113:16 122:12 144:9 159:10 168:16 182:17 194:19 205:20 207:6 212:7 276:4 327:9 333:17
**identification** 114:10,15 119:10 129:14 141:7,21 151:13 160:11 166:20 169:18 172:14 186:4 186:14 195:9 197:20 208:2 252:15 263:13 268:4 280:18 283:2 287:8 291:17 292:10 300:3 313:13 334:7 336:10 337:8
**identify** 133:21 290:22
**imagine** 100:3
**immediately** 315:10
**implement** 62:5 64:4,14
**implemented** 25:8 28:7 202:8
**import** 8:21
**important** 222:16
**impossible** 267:19
**improprieties** 256:16 259:7 259:10,13,13 265:22
**improvements** 208:14,16,18
**inaccuracies** 125:16
**inaccurate** 68:13 155:6,12 275:5,16,22 279:21
**incidents** 19:12 93:4 180:8
**include** 22:17 143:25 144:2 312:24
**included** 30:22 31:5 258:23 333:5
**includes** 32:12
**including** 15:8 252:20
**income** 15:25 31:19 32:7,7 36:21,25 37:5 37:6 38:19 39:7 43:13 45:8,10 46:15 46:18 47:8 48:6,9,14 93:25 94:8 95:22 126:18 128:6 163:9,22 169:9,16 172:12 187:20 188:3,9,20,23 189:4,11,17,23 190:22,24 191:7,8,12,23 217:21 303:5 309:18 314:12 317:2 339:23 342:14
**incorrect** 298:4
**incorrectly** 324:23
**increase** 286:7 286:13,16,17 286:21 294:7 294:12 311:14 315:6 316:12 316:15 317:20 318:5 328:25 329:2
**increases** 293:7

**increasing** 303:15 335:4
**incumbent** 312:22
**independent** 135:13 151:25 152:3 340:20
**index** 176:13
**indicate** 83:2 158:4
**indicating** 209:5
**indication** 341:6
**individual** 47:9 48:3 191:21 258:14 276:17 277:7 278:10 278:11
**individuals** 13:8,11 56:18 73:21 74:3 213:16 250:5 252:19 338:3,4
**industries** 218:9
**industry** 19:8 26:7 50:10 59:22 72:16 124:10 150:17 153:2,15 207:8 237:12 283:11 309:14
**inform** 256:13
**information** 19:18,19 24:8 24:12 25:17 37:7 43:9,25 47:24 60:19,24 61:4 105:23 106:10 152:7 153:2,8 154:4 154:11,16 155:5 158:5,13 161:9,19 164:13 170:20 172:21 173:2,4 173:4,6,11,25 190:8 194:11 194:14 195:22 200:12 237:22 240:20 244:12 249:9 262:19 262:21 263:2 266:16 267:20 269:9,15,18 272:13 273:14 273:20 277:13 299:5 300:16 307:3 308:3 311:3 327:16 336:16 337:21 339:12,14,18 340:13 343:6,8 347:3,4
**initial** 139:17 240:5 281:24 302:6
**initially** 226:22
**injury** 169:9,16 172:12 194:8
**input** 106:9 119:25 230:10
**inquiry** 119:2 253:12 262:18
**insignia** 151:15 151:18
**instance** 105:5 127:22 199:21 271:8 294:3 297:5
**instances** 25:23 57:12
**institutions** 278:19,25
**instruction** 48:23
**instructions** 8:8 294:7
**insurance** 278:19
**interest** 156:15 156:25,25 187:19,24 227:17 241:13 241:15 242:14 242:19 243:4,5 266:8 271:25 275:3 338:8,21 340:19 341:8 341:21 343:7
**interested** 348:18
**interrelations...** 261:10
**interrogatory** 324:4 347:20
**interrupt** 121:3 196:22
**interviewing** 53:3
**introduce** 54:7 54:22
**introduced** 49:18 50:6 224:9,14
**inventor** 216:17
**inventory** 53:17 318:10 318:16 319:20 320:6
**invest** 109:21
**investigate** 59:18 60:11 105:3 200:11 283:21
**investigated** 27:18 90:15 322:9
**investigation** 7:6 60:9 340:20
**invited** 150:9 150:12

**invoice** 287:24 288:21,23,24 289:5
**invoices** 233:25 241:2 287:10 287:14 347:14
**involve** 232:3 250:23
**involved** 25:2 64:24 72:24 80:14 82:4,6 87:21 101:8 102:15 105:7 105:10 168:20 170:11 181:22 182:24 238:15 241:18 244:6 276:10 295:16
**involvement** 73:3 75:3,14 170:9 214:22
**iris** 1:5 3:11
**irrespective** 202:20
**irs** 7:5 142:11
**island** 1:8 3:14 70:20 71:7,18 71:22,23 72:4 72:10,14,20,24 73:7,8,19 74:2 74:16 75:14 92:23 109:4 111:5,11,24 113:13 213:15 233:22
**issue** 7:3 92:22 171:4,7 238:10 254:3 278:25
**issued** 46:12 85:2
**issues** 41:18 82:4 93:7 229:2
**issuing** 313:5
**item** 30:9,12 32:4,17 41:22 60:24 82:24 97:12 121:7 128:6,7,13 130:17 131:10 195:18 201:18 201:24 276:21 318:8
**items** 19:17 24:3 31:4 60:7 61:12 90:14,19 102:11,20 130:11 131:8 131:22 144:2 163:11 192:24 200:2 203:15 242:18 265:19 267:8 286:2 317:22

**j**

**j** 6:2 172:9,10 345:15
**j.p.** 1:19
**jamaica** 3:6,6
**janet** 195:20
**janet's** 196:24 347:8
**january** 200:21 264:2 266:24 297:18 302:22 303:22 304:5,8 306:8
**jeff** 175:14 185:21 336:4
**jefferson** 17:11
**jeffrey** 3:16
**jim** 138:15
**jl** 151:4
**jmw** 1:12
**job** 72:13 94:17
**john** 4:22 10:25 11:6,9
**jointly** 38:15 38:16
**jones** 1:14,18 1:25 2:8 4:20 6:1,10,14 7:1 8:1 9:1 10:1 11:1 12:1 13:1 13:23 14:1 15:1,20 16:1 17:1 18:1 19:1 20:1,5 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1,10,13,17 115:1 116:1 117:1 118:1 119:1,4,8,12

120:1 121:1,9
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1,10
129:12 130:1
131:1 132:1
133:1 134:1,11
134:19 135:1
136:1 137:1
138:1 139:1
140:1 141:1,3
141:5,9,19,23
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1,9
151:11,19
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1,19
160:1,7,9
161:1 162:1
163:1 164:1
165:1 166:1,3
166:18 167:1
168:1 169:1,6
169:14 170:1
171:1 172:1,8
172:10 173:1
174:1 175:1,17
176:1,14,17
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1,24 186:1
186:2,7,11
187:1 188:1
189:1 190:1
191:1 192:1,8
193:1 194:1
195:1,7,21
196:1 197:1,15
197:18 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1,12,24
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1,24 219:1
219:2 220:1,17
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1,10
233:1 234:1
235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1,9
252:13,20
253:1 254:1
255:1 256:1
257:1 258:1,23
259:1 260:1
261:1 262:1
263:1,10,11
264:1 265:1
266:1,22 267:1
267:22 268:1,2
269:1 270:1
271:1 272:1
273:1 274:1
275:1 276:1
277:1,23 278:1
279:1 280:1,10
280:16 281:1
282:1,21,24
283:1 284:1
285:1 286:1
287:1,4,6,13
288:1 289:1
290:1 291:1,12
291:13,15,16
292:1,6,8
293:1 294:1
295:1 296:1
297:1,9 298:1
299:1,19,22,25
300:1,2 301:1
302:1,4,12
303:1 304:1
305:1,18 306:1
307:1 308:1
309:1 310:1,15
310:19,22
311:1 312:1
313:1,10,11
314:1 315:1,22
316:1,6 317:1
318:1 319:1
320:1 321:1,14
322:1,16 323:1
323:3,5,6
324:1 325:1,7
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1,3,5
335:1,21 336:1
336:7,8,15,18
337:1,5,6,13
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:3
346:9 349:2,24
350:2,4,13
**jory** 1:5 3:11

**josh** 52:6 56:18 72:23 74:12,16 107:9 109:4,20 113:13 137:15 177:13 179:21 182:6,19 246:3
**joshua** 1:5 3:10
**journal** 25:25 26:8 119:6,9 285:22 292:20 297:4 313:12 313:16,20 314:3 328:14 328:23 332:20 334:17 345:6 346:12
**jr** 4:10
**judge** 5:13
**july** 179:4 302:5,13 314:4 325:3 329:13 330:2 332:16
**jump** 75:24
**june** 114:6 125:4 189:15 194:25 195:14 291:4 300:6,12 303:7 318:21 320:15 323:3 324:18 325:2 329:8
**justification** 312:9
**justify** 319:17

**k**

**k** 30:20 34:4,5 46:12 47:4,9 48:11,13 185:16,25 186:2 187:18 187:18 188:6 188:16,20 189:16,22 190:23 191:23 337:20 338:10 338:18,19,24 339:9,12,21,22 340:13 342:17 345:17
**kataev** 3:7 42:15,16 220:21 221:2 226:11 231:6 233:21 252:4 257:20 258:9 263:9 267:22 272:18 280:2,7 280:10 282:21 287:3 291:11 292:6 299:19 313:9 323:2,25 330:8,25 334:3 335:6 346:20
**keep** 26:24 27:6 29:14 31:12 62:10 90:10,21 92:7 337:25
**kendra** 248:14 249:11 250:8 250:11,19 251:18 292:19 328:4 332:19 333:14
**kept** 85:20 90:22 116:20 116:22 117:5 117:19
**kernizant** 281:25 292:3 292:13 295:22 296:8,14,18,24 328:4 330:16 330:22 331:3 332:16 333:19 334:24 347:23
**key** 25:2
**khan** 1:5 3:11 187:8,23
**kia** 21:7,7,9 195:21
**kim** 2:11 348:8 348:24
**kind** 7:6 72:12 72:20 136:16 149:18 188:15 202:14 232:10 242:3,8 310:10
**knew** 56:20 72:14 121:17 154:10,16 158:4 160:23 162:16 179:23 196:6,8 215:13 217:5 295:14 311:8
**know** 6:17,17 9:16 10:3 12:23,23 13:2 13:3,4,5 18:18 19:21 22:6 24:22,23 28:5 28:6,9,13,16 29:8,10 30:21 31:4 33:20 36:11,25 37:10 37:19,22 38:14 38:24 39:8 41:8 44:3,5,6 44:16 45:12,16 45:19,22 48:11 48:20 49:2,3,5 49:5,9,22 50:5 50:12 52:7,17 52:20,21,23 53:19 54:4,24 56:11 58:18 60:10 61:5,13 64:6,15 66:23 67:2 72:4,10 72:16,19 73:2 75:17 76:20 78:13 79:8 81:6,13,15,22 82:8,10,12,23

84:9 86:18 87:18 91:15,17 91:20,22,25 92:16,20 93:4 93:13 94:11,14 94:16,23,25 95:4,8,9,25 96:2,4,8,20 97:3,21 98:14 98:16 99:11,24 100:2,4,10,11 101:7 102:13 103:17 107:20 109:24 110:3 112:5,17,20 118:14 119:14 119:19 121:20 123:7,12,17,18 124:7,16,18,23 132:21 133:7 135:18 136:11 137:10 142:12 143:4 145:8 147:8,9,20 148:18 154:3 154:23 155:2,5 158:10 159:13 161:11,13,24 163:21 164:12 164:18,24 165:9 168:18 168:19 170:2 170:13 173:5 173:24 174:11 174:19,21 175:8,12,18 178:6 179:22 179:23 180:17 180:18 182:4 183:17 189:25 191:6,10,15 193:4,6,19 194:4,7,8,13,18 194:20,23 195:23 196:10 196:12,17,19 198:7,23 199:8 199:11 201:24 205:22,25,25 206:6 207:3 209:23 210:14 212:5,7 213:10 213:24 214:13 214:19,25 215:4,7,20 216:4,13,14,16 216:19,22,25 217:6,8,20 218:14 220:18 222:14,24 223:11 226:19 228:2 231:17 235:11 236:19 236:25 237:11 238:4,13 243:25 246:8 247:4 251:25 252:22 257:2,7 261:24 262:21 265:4 268:6,25 272:12 273:19 276:6,19 277:22,24 287:21 290:20 292:15 295:15 296:10,20 300:7,24 302:17 309:17 310:2 317:23 321:8 325:14 330:6 331:25 332:5,11,23 333:25

**knowing** 209:19 276:10

**knowledge** 46:6 75:14 165:20 207:7 254:11 256:25 266:14 279:17 288:7 291:6 293:9 294:5 296:12,16 303:13 306:4 308:15 317:18 318:2 325:10 327:10 329:11

**known** 123:7 123:10 284:8 284:12

**l**

**l** 5:2,2 138:22 186:7,11 317:5 345:18

**lack** 31:11 304:2

**large** 259:21 321:5 322:13 324:17

**laurie** 1:14 4:4 13:4

**law** 4:2

**lawsuit** 70:24 71:4,12,15,19 74:16 75:9 100:20 213:15 214:14 282:17

**layout** 97:23

**layperson** 276:13

**learn** 239:16 329:21

**learned** 284:22 327:6

**leasing** 1:4,19 3:10 12:14 13:19 110:12 119:2 142:21 166:7 172:7 186:10,13 207:20 336:22 338:15 339:7 339:19 340:21

345:19
**leave** 196:23 200:13
**leaving** 196:5 197:10
**led** 177:24,25
**ledger** 228:10
**lee** 14:12
**left** 129:21 151:3 210:24 297:21 341:20 343:24
**legal** 3:4 77:4 182:25 183:6 183:15,16,18 184:8,14 241:25 242:10 276:20,20,25 277:20 312:15
**legitimate** 31:15 299:17
**lender** 80:22
**lending** 278:19
**lentinello** 4:22 11:11 18:21 41:4,14 43:3 96:22 125:18 125:21 127:17 128:15 133:4 153:21 158:7 158:24 184:10 188:10 197:8 211:15 218:5 222:5 225:4,19 226:5,13 231:4 231:11 243:22 257:5 268:22 275:6,17,23 276:8,24 277:18 279:22 295:25 298:8 312:13 313:2 335:13
**letter** 57:2,4,10 57:15,16 224:15,24 281:21,23 304:21 331:8 345:4
**letterhead** 151:23
**letters** 57:6 114:11 224:20
**letting** 161:12
**level** 276:5 280:5 305:13
**levels** 276:10
**lexington** 3:15
**liabilities** 152:6 270:20 273:23 278:10
**liability** 14:16 243:7 271:14 321:21
**libertas** 1:18 3:19 101:15,19 101:21 133:10 133:10,14,23 141:6 156:2 190:19 335:22 345:8
**lic** 1:16 4:6
**license** 18:12 18:14,16 182:10
**licensing** 18:20 101:10
**lien** 83:6,9 84:4 84:4 267:4
**life** 276:14,15 278:19
**lighting** 208:17
**likely** 116:6
**limit** 92:17
**limitations** 156:20
**limited** 14:16 181:18,20 184:22 231:3 231:10,18 234:8 238:22 243:6 285:3,6
**linden** 4:2
**line** 30:11 32:11,17 34:6 47:14 81:7 82:23 83:7,10 83:17 121:7 144:5 163:5,7 167:19 241:18 297:21 342:18 342:18 349:4,7 349:10,13,16 349:19
**lines** 102:23 163:8,11,16
**linked** 61:9
**list** 43:15 46:18 158:22 262:22 265:16 278:9 284:15 287:24 288:3
**listed** 47:9 84:21,22 85:5 85:18 122:5 124:6 131:23 157:8,9,23 158:23 159:4 178:23 187:9 190:23 240:9 259:23 271:20 271:21 272:4 274:15 315:16 315:23 316:5 317:15 338:5,7 339:22 341:15
**listing** 121:4 122:2
**lists** 157:7 173:20 187:2
**literally** 204:15
**litigation** 11:23 11:25
**little** 1:18 13:23 14:11 15:20 18:2 20:6

47:24 66:19 72:17 75:19 126:23 149:14 151:19,20 176:18 177:3 337:13
**living** 33:20
**llc** 1:3,4,4,6,6,7 1:7,7,8,8,8,9,15 1:15,16,16,17 1:17,18,19,20 3:4,5,10,10,12 3:12,12,13,13 3:13,14,14,14 3:19 4:5,5,6,6,6 4:7 32:19,23 33:6,14 46:11 48:3 51:21 78:20 79:18 111:23 142:21 169:13 181:13 185:15 207:21 221:16 236:17 242:15 340:22
**llcs** 45:12,16
**llp** 1:18 3:9,18 4:15,19 13:24
**loan** 111:5,24 113:12 122:17 122:21,25 123:6,13 162:13 169:5,8 169:10,15,16 170:5 172:3,11 172:12 173:16 175:9,18 192:18 194:9 209:24 239:25 240:5 269:22 345:13,14,15 345:15
**loans** 92:25 105:8,9 122:6 122:11,11 123:4 171:10 171:13 172:24 238:17,17,20 238:23 239:3 239:11
**loc** 208:13,24
**located** 17:9 44:17 297:9
**location** 32:9 54:4 117:7 216:2
**long** 7:24 11:5 13:25 15:23 17:16 27:9 83:19 114:8 122:6 138:18 180:20 205:11 223:15 247:2 249:23,25 326:17
**longer** 18:3 21:21 200:22 201:18 210:21 211:19,24 212:4,12,25 329:16,18,22
**look** 28:15 39:18 48:16 56:5 57:20,25 58:4,5 59:23 60:17,18 65:10 66:2 67:7,15 68:5 69:14 80:19 83:25 84:3 87:2 103:3,16,22 116:3 132:2 143:18,21 154:25 155:16 161:18 167:6 176:21 197:25 199:20 208:18 210:6 237:21 252:21 257:14 260:12 263:9 264:24 283:17 283:19,20 287:3 290:19 299:18 323:17 323:24
**looked** 28:10 59:19 60:7 78:18 86:14,24 91:3 118:13 160:18 167:7 194:2 208:10 248:3 256:19 261:13 265:9 289:24 300:17 303:7 315:18 319:19 322:6 323:19 340:12
**looking** 12:5 23:16 24:2,6 50:8 58:10,14 65:12,24 66:4 67:19 68:13,14 87:3 88:4 89:2 103:8,14 104:3 121:14 122:9 122:15 125:3 131:7 137:12 153:25 194:16 196:3,9 204:12 222:23 237:24 240:17 248:5 264:12 286:3 315:22 341:19
**looks** 114:21 115:2 121:9 160:15 194:12 209:3 283:17 305:25
**loss** 46:19 47:8 47:15,19 48:3 48:5,8,14 142:21 143:13 159:21 167:11 167:12,20,21 167:23 168:6 168:11,12 302:21 303:14

304:17,20,25
305:20 306:3
306:21,25
307:11 310:19
311:7
**losses** 45:10
69:9
**lost** 34:14
**lot** 21:11 31:10
53:16,18,22
54:2 74:18,20
149:21 166:25
168:13 208:22
220:11 221:4
222:25 240:19
310:2 318:12
323:20
**lower** 30:24
191:23,25
**lowest** 240:14
240:17
**lunch** 175:24

**m**

**m** 6:2
**made** 23:13
31:6 62:23
64:3,5 82:9
90:11 120:3
148:24 161:21
178:16 199:18
199:19,23
201:22 217:13
257:3,9 261:14
268:11 295:22
298:23 323:22
327:19,23
334:17,22
350:6
**mail** 75:25
105:15,16
107:15 141:11
142:3 159:20
171:4,6,6,12,15
171:17,20
177:2,19,22
183:8,10
192:10,24
193:13 194:25
195:11,12
197:13,16,19
197:25 198:10
205:6,10,13
207:11,16,22
208:4 209:4
240:8 249:13
252:11,14,18
252:25 253:18
253:23 254:15
254:17 256:15
258:22,24
262:24 263:12
263:15,21,25
264:5,9,16,17
264:21 265:2,8
265:11,14
266:17 267:14
270:4,8 280:24
281:24 292:9
292:12,18
295:17 299:21
299:22 300:2,5
300:15 301:12
301:23 302:5,6
302:13,16,19
304:12,14,16
305:7 306:17
307:14 310:22
311:16 330:4,6
330:9 332:15
332:19 340:25
345:21 346:3,4
346:10,11
**mailed** 325:25
**mails** 76:7
141:12,14,20
176:8,9,14,15
178:2 185:22
185:24 186:3
192:2,4,5,13
195:8,13
197:24 207:14
207:25 219:5
219:10,13
246:2 262:25
263:5,25
296:23 304:9
345:9,17,20,22
**main** 322:23
**maintain** 12:12
13:14,17 27:10
117:2,13
**maintained**
220:5 347:11
**majority**
262:14 295:15
**make** 8:8 9:18
9:22 23:15
25:6 27:4,5,7
41:16 42:16
43:5,15 58:15
60:21,21 63:7
64:13 67:21
68:9,16 88:17
91:24 119:22
125:7,25 127:8
127:11,20,22
155:12 165:10
165:17 171:22
174:24 202:21
207:4 208:18
211:2 220:8,14
260:15 272:14
273:14 283:12
292:19 293:17
293:23,23,25
295:23 296:8
296:18 320:3,9
320:19 322:11
**makes** 17:18
290:15
**makeup** 239:13
**making** 68:19
68:20 109:13
126:2 127:3
149:7 168:21

Case 2:23-cv-06188-JMW Document 543-4 Filed 09/04/26 Page 390 of 427 PageID #: 19337



293:6,10 297:3 315:5 318:14 319:18 324:19
**makris** 4:19
**malpractice** 7:9 222:4,12
**manage** 254:6
**managed** 226:3 230:2,23 241:6 247:2
**management** 1:9 3:14 24:19 52:18 248:23 248:25 249:5,6
**manager** 25:24 26:23 99:18
**managers** 97:3
**managing** 14:6 283:24
**manifest** 212:15
**manual** 328:14 328:23
**manufacturer** 29:3,6 66:14 66:17,19
**marc** 1:14 4:4 215:13,17
**march** 1:22 2:3 141:12,15,15 142:4 151:2 152:18 157:7 162:14 176:12 192:2,19 200:19 201:13 207:14,15 209:6 252:18 253:5 254:12 254:24 255:24 256:10 261:21 264:9,16,19 265:2 266:17 267:14 289:14 289:17,22 311:24
**mark** 12:23 114:9 119:4 129:7,9,10 141:3,9 151:9 160:7 169:6 172:8 185:22 195:5 207:12 267:22 336:2 336:14 337:4
**marked** 110:9 114:14 119:9 129:13 141:7 141:20 151:7 151:12 160:10 166:2,9,19 169:17 172:14 186:4,14 195:8 197:19 207:25 252:9,14 263:12 268:3 280:17 282:25 287:7 291:16 292:9 300:3 313:12 334:7 336:9 337:8
**market** 269:21 271:11 273:21
**marking** 338:14
**marriage** 348:17
**match** 260:25 261:4
**matches** 309:19
**material** 308:5 308:7,8,10,11
**math** 288:14
**mathematics** 312:6
**matter** 6:24 7:18 12:13 214:4,23 342:21 348:19
**matters** 44:20
**mean** 34:16 42:7 51:19 63:25 69:10 74:15,15 75:16 91:18 94:20 107:8 109:19 118:12 130:6 131:20 132:2,4 152:21 153:24 168:9 190:10 198:15 210:21 244:25 275:19 298:19 317:11 340:10,11
**means** 73:23 122:20 153:16 183:15 269:8 271:24 283:10 326:3 328:13
**meant** 163:17 183:4 267:15 273:25
**mechanic** 54:3
**mechanically** 312:4
**mechanism** 100:16
**meet** 10:18,21 11:8 44:19 48:18 51:3 52:25 53:6 107:18 108:6 250:4,7,14 251:7,18
**meeting** 50:14 50:18,19 55:23 134:16 138:2 139:11,17 196:12 246:18 246:20 249:23
**meetings** 138:11
**member** 14:6 33:2 79:18 185:15
**members** 14:7 14:15,19 15:9

15:12 17:25 45:13,16 47:6 79:19,20 188:7 284:19 339:19 340:21
**membership** 242:14 243:5 341:8
**memory** 223:3 256:5,7
**men's** 10:3
**mention** 75:23
**mentioned** 45:19 56:19 76:13,19 93:9 107:9 120:13
**merck** 216:10
**merckling** 1:14 4:4 12:24 215:14,17
**merely** 244:16
**message** 330:10
**messages** 330:21 331:2 347:22
**met** 10:24 49:10,14 75:21 141:23 250:9 250:11,23 251:3,11 301:7
**methodology** 25:16
**michael** 1:14 4:4,17 13:4
**mid** 255:7
**middle** 110:22 129:19 297:12 316:24 324:11
**milber** 4:19
**miller** 17:10
**million** 131:17 131:21 132:7 133:2 158:17 206:11 207:5 303:11,15 308:9,11,22,23 309:7,9 311:15 311:15 312:10
**mind** 75:12
**mine** 260:8 333:11 334:2
**minimum** 267:11
**minus** 121:12 203:13
**minute** 133:19 176:3 218:19
**minutes** 11:7 80:8 220:22 247:12
**mirrored** 67:6
**mis** 124:11 286:25
**miscellaneous** 31:18 32:7
**mismatch** 318:20
**missing** 103:25
**mistake** 129:4
**misunderstood** 184:2
**mitsubishi** 236:23
**moment** 196:20
**money** 33:18 74:12,14,18 86:3 94:5,7,8 97:10 109:15 109:21,22 110:2,3 111:10 111:15 126:17 146:5,6,7,25 147:16,20 148:8,11,19 149:5,7,11 170:4 194:21 196:13 209:14 216:17 218:3 238:20 274:8
**monies** 70:18 75:4 179:19 180:3,5 217:4
**month** 56:4,4,5 63:14,14 67:8 69:7 83:4 84:5 84:7,25 85:25 89:16,19 110:14 120:4 124:14,23,25 125:12 126:25 127:23,24 128:2,11 130:10,13,16 130:17,19,21 130:24 131:2,3 131:6,6,11 132:14,17,23 132:24 164:2 165:16,19 166:15 167:9 167:11,20 168:2,11,12 179:14 180:4 204:16,17 212:19,22 213:2 249:20 250:21 287:23 290:13 291:10 297:22 301:25 303:19 305:5 311:23 312:21 326:12,14 328:15,19,24 330:2
**month's** 249:20
**monthlies** 232:3
**monthly** 22:13 23:8 55:8 57:20 65:14,18 65:22,23,25 67:7,16,19 69:3 84:2 88:11 90:7,23 91:3,12 92:9

103:4,5 108:6 119:18 127:14 132:9 146:12 146:23 147:2,6 147:9 161:21 163:2 190:6 199:25 212:18 213:7 225:11 228:8 233:4,8 233:11,14,17 236:8 250:6 259:24 260:10 260:23 261:8 281:2,11 282:12 284:7 284:14 285:6,9 285:12 287:17 289:6 290:8 291:8,24 294:8 294:13,18 295:2 297:23 299:11 317:11 317:16 324:10 325:2 328:2 329:7,13 332:2 332:24
**months** 69:8,8 92:13 128:3 199:15 206:13 226:2 236:3,4 253:16 306:10
**morgan** 1:19
**morning** 6:14 6:15 177:12 192:22 195:15 208:6
**mortgage** 156:15,25 157:13 158:16 266:7 274:14 274:16 275:3 277:9
**mortgagees** 266:7
**mortgages** 157:2 275:2,13 275:15 276:17 277:17
**motor** 1:4,19 3:10 12:14 13:18 20:24 110:12 119:2 142:6,20 159:25 160:21 166:7,17 172:7 182:11 186:10 186:13 207:20 300:11 327:12 336:21 338:15 339:7,19 340:21 341:5 345:19
**motors** 1:3,16 1:16,16,17,17 3:5 4:5,6,6,7 34:22 49:17 50:20 51:6,9 53:4 71:25 77:10,21 138:10 159:6,7 159:8 208:9,19 210:3,7 215:19 220:2 221:16 224:8 227:4,12 271:20 290:2 331:11,12,22 332:9 337:17 343:15,17 347:10 349:1 350:1
**move** 31:17 128:12 171:3 177:2,16 178:7 201:15 204:9
**moved** 17:11 99:22 122:10 122:17 201:21
**moving** 202:8
**multiple** 98:6,7 160:4 272:16 299:21
**mutual** 49:20

**n**

**n** 3:2 5:2 6:2 195:6,7 345:20 346:17
**n.a.** 1:19
**name** 6:8 7:15 13:3,21 21:4 50:2 52:8 54:12,14 72:3 117:15,16 120:18 135:4 138:17,18,21 157:21 170:19 172:20 174:16 174:16 175:10 195:20 196:18 196:24 213:22 216:9 229:20 236:19 237:8 248:15 331:15 331:17 332:13 335:21 347:8
**named** 331:11
**names** 14:10 45:18 72:16 79:11,15 117:24,25 151:21 341:11 341:14
**nassau** 176:11
**nature** 242:10 309:17
**necessarily** 86:16 105:6 132:24
**necessary** 350:7
**need** 9:11,25 41:19 42:2 48:2 58:5 59:3 59:5,20 60:5 80:5 130:12 174:24 182:12

208:25 228:17
282:7
**needed** 51:6
56:11 58:22
74:18 92:24
103:2 106:25
109:16 111:15
111:18 145:8
145:10 178:22
182:21 225:11
228:7,8 234:19
256:19,21
257:13 273:21
278:13 282:12
286:2 305:24
323:18
**needing** 139:25
**needs** 80:7
82:15 97:11
197:3 282:2
**negative**
121:11 122:21
204:6 279:25
323:8 334:19
335:2
**negatives**
122:19
**net** 32:11 45:7
45:9,10 46:18
46:18 47:15,15
48:11,14,14
84:3 144:10
209:12 286:21
286:21 293:6
303:4 315:5
316:10 324:12
324:19 342:14
**netted** 163:23
**network** 208:8
**never** 90:21
100:5 105:2
106:2 139:16
150:6 223:22
234:20,25
242:9 247:7
248:3 266:2
295:3 301:7,8
**new** 1:2 2:12
3:6,15,15 4:8,8
4:12,17,21 6:4
6:13 17:11
20:20,23 21:10
21:16 37:3
46:23 58:11
70:4 79:24
139:15 178:17
348:4,5,9
**news** 192:23
**nicholas** 237:9
**nick** 237:9
**nissan** 236:24
300:11,17
327:12,18,23
**nod** 9:10
**non** 1:24 2:7
4:20 144:2
**nonmember**
15:13
**normal** 96:24
143:5 184:15
257:20 293:20
320:12
**normally** 27:7
27:11,24 30:23
33:17 44:24
79:23 84:16
87:2 90:8
104:13 124:21
130:8 143:9,19
143:23 144:4
153:25 181:12
204:9 207:10
228:19,23
232:25 243:14
249:13 270:19
283:19 291:9
309:25 318:7
320:11,22
328:22
**north** 12:14
13:18 20:12,13
34:22,23 46:4
49:17 50:20
51:5,9 53:4
55:18 57:17
58:19 65:5,19
66:9,24 68:7
69:15 71:25
72:21 74:3,13
74:15,19,22
75:15 76:3,16
77:10,21 79:3
80:15,22 81:10
82:2 85:11
86:8 87:11
89:19 93:5
94:4,12,15,21
95:2 96:11
97:23 101:18
102:6,11 105:9
106:4 108:4
110:12 112:13
117:3,16
118:25 133:16
134:3 138:9
142:6,16,20
143:8 144:11
146:2 147:5,18
159:8 162:12
164:2 166:7
172:7,13,16,18
174:16 185:3,8
186:9,13 206:2
207:20 208:9
208:21 210:7
210:15 211:5
211:12 213:18
215:19 216:5
217:4,6,9,11,22
218:15 219:25
224:8,25 225:8
225:16,23
226:20,23
231:3,10
234:10,14,21
238:10,17

239:22,23 241:7,13 245:23 247:21 247:25 255:11 255:16 273:2 313:23 336:21 337:7,13,17 338:8,15,21 339:7,19 340:21 341:5 343:7,15,16 345:16,19,24 347:10
**northshore** 1:4 1:19 3:10
**notary** 2:11 6:4 348:8 350:14 350:21
**note** 9:10 11:11 18:21 40:15 96:22 125:21 127:17 128:16 133:4 153:21 158:7,21,24 184:10 188:10 211:15 218:5 225:19 226:5 231:11 243:22 257:5 268:22 275:6,17,23 277:18 279:22 295:25 312:13 313:2 316:24
**noted** 350:7
**notes** 122:5 272:25 273:3,5
**notice** 68:7
**noting** 120:17
**november** 136:15 155:18 155:25 169:12 253:20 254:13 254:23 255:7,7 266:23 304:12
**novicky** 301:4
**number** 30:23 31:8,17 37:9 42:17 69:10 104:9 110:13 121:18 123:24 128:20 146:24 148:15 169:11 172:5 176:13 193:24 194:2,3 194:5 195:4 197:17 198:13 278:20 280:7 307:15,18 308:18,22,23 309:3,7,18 318:9,15,17,20 338:16,24 342:3,11
**numbered** 195:2
**numbers** 37:11 47:13 59:23 113:22 114:12 123:22,23 125:4 162:24 167:7 187:6 193:22 202:16 269:19 274:22 290:13 299:6 302:25 304:19 306:4,6 307:7 307:13 311:8,9 311:22 312:20 315:16,17 317:14,24 339:13,21,24 340:8 342:24 343:4,14
**numerous** 40:16 326:25
**nutley** 21:9,16
**nyc** 1:14 4:4 45:20 93:11

**o**

**o** 5:2 6:2,2 138:22 197:15 197:18 345:21
**o'sullivan** 54:16,19 55:10 72:2 119:18 120:16 205:7 210:22 343:19 343:21
**o'sullivan's** 98:17
**oath** 5:12 8:17 8:20
**object** 125:18 134:4
**objected** 41:24
**objection** 11:12 18:22 42:9 96:23 125:22 127:18 128:16 133:5 153:22 158:8,25 184:11 188:11 211:16 218:6 222:5 225:4,20 226:6 231:12 243:23 257:6 268:23 275:7 275:18,24,25 276:8,24 277:19 279:23 296:2 312:14 313:3
**objections** 5:21
**obligated** 217:11
**obligation** 82:19 83:2,19 84:4
**obligations** 74:21 93:7 108:7,16 109:17 154:19
**observe** 237:20

**observing** 237:25
**obtain** 18:13 140:20 170:9 209:21 239:24 240:4 278:22 343:13
**obtained** 134:2 162:13,15 209:24 213:17 240:5
**obtaining** 105:8 143:14 278:17
**obviously** 135:2
**occasions** 238:7
**october** 75:24 76:12,25 160:16 164:2,9 166:6 168:25 176:16 179:3 186:3 197:15 200:21 202:6,9 202:10 211:7 345:17
**offer** 23:10 59:16 251:9 324:2 347:19
**offhand** 81:22
**office** 25:24 26:22 27:5 29:14,16 44:22 62:21 97:2 98:4,5,17,20,25 99:12,19,21 117:6
**officer** 229:11 301:4
**offices** 98:6,7 99:6,8
**offset** 47:19 189:3
**offsite** 117:6
**oh** 129:3 156:5 188:14 189:12 289:25 290:3 298:7 312:7 340:10
**okay** 8:12 28:5 49:8 61:20 64:13 79:7 89:15 97:14 122:7,8 134:7 155:15 164:16 170:21 172:17 175:4,7 176:24 177:5,6,11,11 177:15,17 181:17 187:22 189:13 191:6 191:10 192:11 194:20 197:6 198:2,4,9 199:24 201:7 218:25 226:11 231:14,17 245:25 250:11 252:23 263:19 264:3 267:16 268:8 278:12 279:10 280:22 290:18 292:17 297:10 300:8 302:18 335:20 335:25 338:17 342:19
**old** 158:14
**omit** 270:12
**onboard** 255:9
**once** 64:2 142:6 214:18 249:20 261:12
**ones** 21:15 23:2 23:10 25:12 28:19 29:4 38:8,9 43:16 45:17 53:19,20 60:17 69:20 113:24 199:21 222:16 309:15 346:11
**open** 142:7 165:15 185:18 231:21
**opening** 165:16
**operate** 73:21
**operated** 53:24 96:3 226:4 229:25 230:23 241:6 245:12 246:25
**operating** 44:4 44:7,10 48:7 52:16 163:8,24 210:17 213:18 227:10 228:6 242:23 301:4 303:21 304:4,7 306:9 308:16 309:6 311:23 312:21
**operation** 53:9 56:16 69:16 95:24 211:5,12 251:2 305:4
**operations** 49:15,16 51:5 55:19 95:6 96:3,7,9,12 211:20 212:6,8 227:11 228:13 303:18 304:5 306:7 307:5
**operator** 56:21 94:24
**opinion** 70:7 153:9
**opportunities** 208:24
**opportunity** 177:18 237:13 237:19 263:20 280:20 324:2 347:19

**opposed** 31:12 40:17 83:19 104:14 170:5
**oral** 27:22 63:9 63:12,19
**order** 42:13,18 43:10 56:12 106:12 109:16 143:17 177:3 182:21 194:11 213:17 257:21 272:13 282:12 290:7 291:23 340:7 341:3 343:14
**ordinary** 339:22
**original** 5:9,17 173:13,16 219:22
**originally** 99:21 122:20 171:16
**outcome** 348:18
**outlet** 34:23 46:5 114:8 159:9
**outright** 279:8
**outside** 105:11 150:15 236:7,8 257:13
**outstanding** 84:23 85:18 86:5,9 146:4 147:21 148:8 206:19
**overall** 202:22
**overdrawn** 285:20 286:6 286:18
**overhead** 314:22
**overseeing** 227:10 248:8 248:12,17 304:5
**ovington** 4:16
**owe** 149:11 273:11
**owed** 23:22 83:5 84:10 85:2 86:3 146:5,7 148:19 274:17
**own** 18:6 22:23 23:2 59:22 73:21 98:19,25 156:13 157:17 191:15 218:4 256:4 268:18
**owned** 53:19 79:19 157:18 158:23 229:25 230:23 236:21 237:2 241:6 245:12 246:25 261:22
**owner** 56:23 72:24 77:14,15 77:18 78:7,14 79:24 173:19 173:20 181:13 208:9 239:19 239:20 240:6 261:25 262:2,6 284:4,9 294:23 295:12,13,15 320:22
**owners** 32:19 32:20 33:16 51:11,12 76:5 178:25 183:5 183:12,16 184:5,9,21 185:7 189:15 191:11 293:14
**ownership** 51:21,23 52:5 76:16 77:2,23 78:20 79:18 173:4,21 178:4 180:14,15,18 180:19,23 181:12 182:12 182:15,22 183:3 184:17 187:13 189:21 190:9 227:17 227:20 239:16 245:19 343:2,7
**ownerships** 73:10
**owning** 337:21 338:4
**owns** 158:15

**p**

**p** 3:2,2 5:2 30:20
**p&l** 31:25 142:6,16 143:7 302:15
**p.c.** 4:2
**p.m.** 252:19 344:4
**pa** 3:20
**pac** 314:12,14 314:18,18 315:25 316:2 317:2 318:8,15 318:24
**pack** 30:16,18 30:22 31:5
**page** 91:9 110:22 141:13 141:13,14 142:19 151:17 160:4,5 162:19 162:21 167:5 172:6,20 174:15 176:7 177:10,14 186:24 267:24 288:20 291:3

291:19 292:12 297:7,12 302:4 302:4 317:5,7 317:10,25 321:2 345:4 346:18 347:4 349:4,7,10,13 349:16,19
**pages** 114:8 176:20 206:8
**paid** 31:2,13 38:19,25 39:10 46:21 47:2 70:19 81:20 82:15 83:14,15 84:21,24 85:5 86:10 94:5 103:11 108:16 128:11 145:25 146:6,10 147:17,17,23 147:24 148:5,7 189:4 191:7,11 191:25 206:13 216:10,13,20 216:23 217:3,5 217:9 240:10 332:6
**paper** 12:8 26:10 27:3 52:11 117:22 117:23
**paperwork** 51:11,16,18 56:22 77:22 78:3,5 239:2 245:7
**paragraph** 152:13 270:9 283:5,23 284:25 285:18
**park** 4:7
**parking** 53:22 54:2
**part** 32:15 47:5 67:16 68:11 162:11 163:23 182:9,18 185:6 189:21 230:15 258:25 262:2,6 272:11 278:23 285:8 308:18 314:2 327:5 338:3 341:16
**particular** 19:4 48:15 57:18 68:7 88:25 96:14 112:6,8 120:3,24 130:19 131:11 164:17 176:10 199:3 217:25 237:24 294:9 294:13 308:4 329:20 343:16
**parties** 5:7 12:21 101:7 176:15 179:12 182:7 348:16
**partner** 338:24
**partners** 1:18 187:2,10 284:16 295:16 337:21
**partnership** 14:17,20,23 32:25 33:11,15 46:11 185:13 186:8,12 345:18
**parts** 20:23 134:20
**party** 1:24 2:7 4:20 182:18
**pass** 208:20 327:24
**passed** 107:20 139:16 174:22 327:19
**passing** 107:24
**passive** 47:22 48:4,5,6
**past** 148:25 237:14
**paul** 331:7
**pay** 39:7,9 82:21 84:19 100:17 102:10 111:19 201:9 251:9
**payable** 46:20 84:12 122:6 259:21 285:21 286:20
**payables** 58:12 274:14
**paycheck** 238:16
**paychecks** 22:24
**paying** 38:21 205:23 276:17
**payment** 33:24 34:3 200:18
**payments** 36:16 93:6 109:13 127:23 127:25 198:16 199:22,23 217:13 251:4 284:19
**payoff** 83:6,9 205:18,23
**payoffs** 82:5,7 82:9 83:20 84:5 85:2,3 86:10 206:4,12 207:5 267:4
**payroll** 15:25 22:21,23 216:5 216:7,15 232:7
**penalized** 149:17
**pending** 10:4
**pennies** 168:3

**people** 14:25 15:5,15 31:2 138:3 252:3 314:17
**percent** 173:21 174:2 239:20 241:12,14 261:23 337:21 338:4,8,20 339:6 340:18 340:19 343:3
**percentage** 63:17 243:5,6 243:11 262:8 308:17 309:8 341:21 343:2
**percentages** 245:20 308:24 309:8
**perform** 22:2 34:19 35:12 55:5,25 149:10 153:6 230:22 231:23,24 235:2,6 236:16 237:4 242:3,7 245:10 248:4 250:5 281:15 329:12 332:7
**performed** 146:2 147:25 223:22 224:6 234:20 236:9 238:2 244:2,20 246:24 247:21 269:4 285:13 330:15
**performing** 34:7 147:7 227:2 229:2,23 230:4 239:10 241:4 244:7 245:21 246:9 255:10,14,15 284:6 330:19 331:20
**period** 19:16,25 34:13 43:24 70:16 72:22 75:19 82:2 114:6 116:20 173:14 206:4 254:9 267:5 303:19 305:5 311:24 312:21
**periodically** 103:6 149:3
**periods** 43:22
**perjury** 8:21
**permit** 36:15
**permitted** 32:20 183:11 191:18
**person** 7:2 10:22 26:17 52:10 79:12 152:7 215:4 279:3
**personal** 35:15 35:16,19 41:17 41:21 42:3,4 47:5 102:22 145:6,9,11 149:25 153:11 155:19 156:12 164:25 188:8 189:5 190:24 191:15 269:20 278:13,17 279:7,19 289:23
**personally** 24:24 106:2 138:7 266:3,6 273:11
**perspective** 68:23 218:11
**pfs** 208:7
**philadelphia** 3:20
**phone** 10:23 11:6,13 44:25 215:5 219:10 246:15 330:7
**phonetic** 17:8
**phrasing** 155:13
**physical** 13:7 13:14,17 29:13 29:17,20,23,24 97:23 116:23
**physically** 30:3 220:5 325:22 347:11
**pick** 126:22
**pieces** 134:21
**pittfield** 236:24
**place** 17:10 42:19 75:9 112:9 176:19 196:13 206:18 206:23 328:11 329:23
**placed** 288:14
**plaintiff** 7:16
**plaintiffs** 1:10 2:9 3:4,9 74:17 233:22,24 272:19 347:13 347:16
**plan** 29:7 67:23 80:22 81:18,19 83:14,16,18 91:14 132:19 137:3,11 139:14,20 185:5
**planned** 209:19
**plans** 136:23
**played** 134:9 134:18,19
**please** 6:8 9:16 10:2 19:17 73:15 128:16 133:20 142:5

142:15 211:9 221:12 224:2 267:22 277:4 282:2 292:15 300:5 302:16
**pleaseeee** 305:9
**plousadis** 4:19
**plug** 221:7
**podium** 99:22 99:25
**poe** 14:12
**point** 8:3 11:22 29:21 31:14 45:7 136:15 137:4 168:10 182:25 197:11 213:19 245:14 297:11
**pointed** 202:17
**pointing** 322:18
**policy** 309:16
**port** 17:11
**portion** 189:22 191:19
**position** 17:6 17:12 99:17 184:23 196:7 278:3
**positive** 100:17
**positives** 122:19
**possession** 39:22 298:22
**possible** 115:4 115:6,18 139:19 221:8
**possibly** 120:25 231:25 253:15 277:21 284:24
**post** 199:9 324:3 334:19 334:25 347:19
**posted** 104:17 122:16,20 123:16,18 124:19,20,22 125:11 198:17 198:25 199:4,6 248:22 321:19 324:22 328:15 328:17,20,24
**posting** 104:23 122:22 124:11 286:25
**potentially** 74:7 91:9 132:16 284:21 319:4,5 335:5
**ppp** 105:8,13 105:17 170:4,5 238:17,20 239:3,5
**practice** 184:16 227:24 228:3 320:12
**preceding** 288:21
**precipitated** 178:6 179:15
**premier** 1:17 223:25 224:3
**prepaid** 128:13 128:19,24 129:23 130:9 130:18 131:7 131:17 198:21 198:22,25 199:5,9 200:2 200:7,18 201:11,15,23 202:8 203:5,17 322:18,21 323:12 324:17
**preparation** 11:20 87:22 232:3 242:17 272:22 347:17
**prepare** 10:13 10:16,19,21 11:9 35:16 43:10 55:8 62:3,11 87:25 88:17 89:20 105:23 106:8 112:11,25 113:6 140:6 143:6 145:5,15 164:20,25 190:18 210:2 224:15 239:2 261:18 273:16 281:20 294:22 306:3 337:16 339:9
**prepared** 28:3 35:18 36:4 39:2 43:7,17 112:21,21 115:5 135:6 143:3,7,13 144:15,22 152:10 155:4 155:17,18,23 156:3 158:6,20 161:11 178:23 182:15 208:8 209:11 210:5 224:22 260:22 269:8 289:18 325:12
**preparing** 22:17 36:7,8 36:10 44:11 88:3,24 89:6,9 89:13 90:4 106:24 145:19 229:2 281:22 294:18
**present** 4:8,13 4:23 252:8
**presented** 132:18 162:11 244:18
**presently** 20:7 20:22

**presuming** 91:5
**pretty** 55:19,22 64:20 66:20 95:18 219:23
**previous** 71:13 105:24 106:11 130:11,16 131:3 240:21 278:2 307:14 340:24 342:13
**previously** 11:9 29:12 55:14 66:12 78:18 110:9 115:7 161:20 168:14 170:8 193:8 194:2 210:17 221:6,10 222:2 223:19 236:21 254:4 265:11 315:18 318:11
**price** 30:8
**primarily** 208:13
**principal** 283:24 294:24 320:23
**principals** 293:15
**principles** 152:19 268:12 268:16,20 270:14 279:18 312:24
**print** 58:25 59:3,7 104:14 104:16,22 140:17
**printed** 132:5 166:13 200:20 291:22 325:23
**printout** 119:16 120:2,6 120:10 121:25 165:17 249:11
**prior** 28:22 64:7,7 71:15 71:18 72:22 75:23 76:11,24 106:13 107:23 179:14 187:14 191:11 211:6 228:17 229:6 229:16 240:4 245:13 254:5 256:3 260:12 273:13 281:10 281:14 285:11 335:23
**pro** 4:11
**problem** 171:7 279:9,10,13
**problems** 179:13 318:12
**procedure** 2:10
**procedures** 153:7
**processing** 194:12
**produce** 41:20 42:4 118:8 298:18,19 299:15
**produced** 40:8 40:22 42:8 168:23 220:6 220:10,13 234:3 260:19 261:2 280:11 298:2,5,11,16 347:5,12,15
**producing** 12:7
**production** 116:17 219:22 224:18 233:23 233:25 272:20 330:11 331:2 347:14,16,21 347:22
**profession** 271:13
**professional** 154:20 243:18
**professionals** 15:6
**profit** 30:12,25 31:3,12,18 32:6,11 43:20 47:15,20 142:21 143:13 144:10 159:20 163:8,9,24 164:3,8 167:8 167:9 168:13 286:8,14,15,22 293:7 294:8,13 299:12,16 301:15,20 302:21 303:14 304:17,20,25 305:20 306:3 306:21,25 307:11 310:19 311:7 315:7 316:12,15 317:20 318:5 326:16,17,20 326:21 328:10 328:25 329:3 333:9 335:4
**profitability** 70:7
**profitable** 69:5 69:7,16 126:4 127:9,16,21 128:8 328:11
**program** 126:13,17 238:16
**prohibiting** 213:17
**projected** 37:5
**projection** 305:3

**projections** 303:24,25 311:14
**promissory** 273:3,5
**pronounced** 52:8
**proof** 136:10 136:13
**proper** 97:5 155:13 218:12 218:16 256:24 257:4 283:13 297:4 318:6 320:3
**properly** 9:10 102:21 123:13 123:14 290:7
**properties** 156:24 159:5 274:12
**property** 156:16,19 157:17,21 158:12,14,19 158:22
**proprietor** 33:5
**proprietorship** 33:2
**prorate** 190:6
**protection** 100:16 238:16 314:19
**provide** 22:15 23:5 40:24 42:12,14 77:5 140:6 153:10 187:4 189:14 217:12 242:16 251:13,19 269:15,19,24 273:3,7,9,19 274:5,11,15,21 294:6 298:19 307:11 312:5,9
**provided** 66:13 75:8 91:2,13 113:9 120:12 133:14,23 143:12 144:15 153:8 155:3 188:7 194:14 269:9,16 270:3 272:5,8,13,21 273:20 277:12 305:19 311:4 343:10,11 347:17
**provider** 67:23
**provides** 242:24 302:25 303:4
**providing** 23:3 153:17 154:10 154:17 273:13 325:17 327:15 341:14
**public** 2:11 6:4 348:8 350:21
**puccio** 141:16 142:3 207:17 207:23 208:4 209:6
**pulled** 285:22
**pumped** 109:21
**purchase** 97:15 241:9 244:10 244:10,21 245:11
**purpose** 58:13 67:18 140:2,8 153:17 278:7
**purposely** 93:5
**purposes** 31:24 43:21 45:8 183:6,16 184:8 278:16 338:14 340:12
**pursuant** 2:9 75:7
**put** 12:3 24:8 25:12,13 28:7 29:16 30:15 32:9 36:16,21 36:25 37:4,7 37:11 39:23 48:5,8 62:7,8 65:16 74:18 109:21 110:4 111:10,16 120:16 121:15 123:3 128:4 130:17 131:4 131:22 153:3 154:20 179:20 200:17 203:14 204:3 211:22 240:17 244:14 252:2 271:7 321:20
**puts** 24:11,11
**putting** 6:19 21:18 25:2 74:12,14 75:4 110:2 122:23 154:13,17 189:2 203:18 229:12 244:12

**q**

**qualification** 226:12
**qualifications** 47:21
**quarter** 28:15 130:10 255:4
**quarterly** 22:11,20 23:9 28:13,19 29:4 65:19 232:4,11
**question** 9:3,14 9:15,21,22 10:4,5 26:2 41:6 48:24 60:25 61:7

73:16 103:9 128:17 145:23 154:15 161:25 162:5,7 175:15 178:10 179:2 183:21 184:2 189:19 200:25 204:22,23 221:10,12 222:17,19 227:25 231:5 231:16 234:11 241:20 257:18 267:7 275:14 275:21 276:22 278:2,6 280:3 298:15,16 312:3 324:3 339:15 347:19
**questioning** 112:4
**questions** 19:15 19:17 41:23,25 59:24 61:11 176:23 198:3,8 198:11 200:9 218:24 220:19 221:4,13 228:20 268:7 335:12,14,16 335:19,23
**quickly** 221:8 305:8 337:19

**r**

**r** 3:2 4:10 5:2 336:7,8,15 345:23 348:2 349:3,3
**raised** 18:19
**ramrahm** 338:25
**range** 20:19
**rarely** 104:19 230:18 251:15
**rate** 146:19,19 146:22 147:12 288:4,9
**rather** 128:6 131:11
**ratio** 308:21 309:13
**reach** 42:24 76:23
**reached** 228:4
**reaching** 101:21
**read** 151:20 162:5,8 163:6 163:15 192:9 197:24 209:2 231:5 252:21 263:21,23 280:2,4,21 292:15 300:5 302:16 350:5
**reading** 131:16 272:24
**ready** 198:7
**real** 156:18 157:2 271:10 274:10
**reality** 68:22
**realize** 221:3
**realized** 155:11
**really** 36:11 69:19 70:4 75:2 76:20 91:25 93:23 95:20 139:16 140:22 153:24 155:15 163:15 178:10 181:17 193:19 203:3 229:18 237:21 240:18 256:11
**realty** 1:8 3:14 111:4
**reason** 10:4,9 57:13,15 89:2 122:14 124:6 149:9 167:3 175:8 191:3 207:3 216:23 232:16 240:3 242:6 262:3 288:25 293:22 296:17,20 349:6,9,12,15 349:18,21
**reasonable** 127:4
**reasoning** 293:5
**reasons** 278:20 326:8
**recall** 7:25 11:15,17 13:10 19:20 35:23,25 36:7 37:16,17 38:5,8,10,17,20 38:21,22 39:6 39:25 40:15 45:6,9 48:16 49:19 50:13,14 50:19,21 52:10 53:13,16 54:11 54:15 57:3 58:20,22 65:12 66:4,8,10 69:6 70:18 71:6,10 71:11 72:5,5,8 74:5,8,9 76:18 77:3 78:4,8,10 78:12,17 79:2 79:6,15 80:17 81:8 82:3 86:7 86:12 87:3 89:7,11,18 91:10 92:19 93:2,15,24 94:3,4,10,11 96:11 100:13 100:14 101:5

101:13,20,21
104:19 105:20
106:23 107:4
107:11 108:9
108:23,25
109:2,5,6,10,14
109:15 110:19
111:13 112:23
113:20 114:20
115:10 116:9
118:7,9,14
120:5 125:24
126:5,12
128:19,21
133:10 134:15
134:25 135:4
135:21,25
136:3,4,12,14
136:21,23,25
138:6 139:4,7
139:24 140:23
142:24,25
144:21 145:2,3
145:4,10,13,14
146:17 147:5
147:16,19
155:24 156:22
157:3,22,25
159:3 161:17
165:5,8 166:22
166:24 168:18
168:25,25
170:7,14
171:25 172:23
173:15,18
174:3,12
175:21 179:10
180:9 182:23
185:12 186:16
186:18,19,20
186:21 191:5,9
192:12 198:12
199:2 205:4,12
209:7,8,18
210:8,9,19,24
211:18,21
212:23 213:3
214:12,15,19
216:6 217:23
223:14 224:16
226:15 227:9
227:19,22
228:25 229:4
229:14,18
230:5 233:5,20
234:23 235:5,9
235:19,21
236:10,14
237:25 239:5,8
240:7,24
241:10,16
244:23,24,25
245:21 246:7,8
246:20 247:16
247:17,23
248:2 249:25
252:24 255:5
255:17,25
256:9,11,17
259:9,15,19,20
262:4,9,10,12
262:16,17,20
263:3,4,7
265:5 266:9,19
266:21 267:2,3
267:6,9,13,17
267:21 270:7
272:12,17
273:8,12
274:24 278:15
281:13,22
282:15 289:16
289:21 293:2,4
293:16,19
294:4,16 296:4
299:13 300:9
300:13,20,23
300:25 301:11
301:21,25
303:17 307:24
318:25 320:12
320:21 321:10
327:14,15,17
327:18,21,22
327:25 329:19
330:18 331:9

**recalled** 265:12
265:18

**receivable**
60:14 61:9
272:25

**receivables**
23:20 58:12

**receive** 216:17
249:8 325:20

**received** 94:25
95:5,8 175:18
192:21 194:21
217:22 224:18
262:19,24
266:15,19
267:11,13
331:8

**receiving** 40:15
252:24 262:20
263:4 279:3
301:23

**recess** 80:10
176:3 218:21
220:23 252:6
335:9

**recognize**
114:23 119:12
142:23 169:20
169:21

**recollection**
49:4 50:17
69:3 75:13
93:21 109:23
115:20 134:14
134:24 135:14
136:5,7 138:4
161:2,14
170:17 171:2
177:21,25

178:20 179:16 185:11 187:12 193:18 209:16 211:23 216:12 222:24 223:5 224:4 233:2,16 239:15 245:9 247:11 248:12 253:24 256:22 257:2 262:13 264:5 266:15 280:25 293:10 294:6 301:3,6 302:9 318:3 325:11 327:11
**recommend** 68:15 79:14 200:14
**recommendat...** 27:22 60:22 201:14 293:23
**recommendat...** 61:25 119:22 286:12
**recommended** 62:18
**reconcile** 85:19
**reconciliation** 85:16,19 86:4 114:5,14 115:2 206:21 345:5
**reconciliations** 85:8,11,14 86:25 114:22 115:9,11,24 116:15,19 118:10 253:20 347:6
**reconvene** 175:25
**record** 6:9 13:12 24:5 27:6 43:5 80:9 88:19,21 97:3 113:10 118:17 118:19,21 133:21 176:2,5 197:4 218:20 220:15,22 252:5 266:11 298:18 314:12 316:25 335:8 348:13
**recorded** 24:3 30:8 33:21 34:2,4,5 61:14 83:22 84:10,11 84:13 97:11 113:12,17 130:13 131:3
**recording** 125:16
**records** 12:3,4 12:7 24:9 26:24 27:10 39:13,19,21 40:2 45:3 55:13 70:17 86:15 88:5 89:3,22,25 90:5 91:6 113:11,17 117:18,21 131:24 140:6,7 140:15 144:23 144:25 146:13 155:16 164:21 165:6 210:6 236:13 271:3
**recourse** 341:25
**recs** 86:17,19 100:9
**redacted** 187:3 187:4,5,6 338:13
**reduce** 92:24 126:24
**refer** 19:16 73:19 188:16 188:19 268:9 283:23 285:2 285:18 314:18
**reference** 283:6 317:8,9 333:3
**referenced** 111:24
**references** 111:5
**referencing** 194:6 209:11 260:15,22
**referred** 251:19
**referring** 73:20 130:3 193:5,7 195:23 231:15 235:11 253:18 257:25 258:4 264:22 266:21 271:17 282:7 288:20 302:3 302:12 310:14 310:18 313:16 315:21 316:4 322:16 323:2
**refers** 268:15 282:6 300:15
**reflect** 132:24 178:4 185:6 189:22 206:17
**reflected** 161:22 217:21 240:25
**reflecting** 40:16 162:25 199:19
**reflects** 144:10 184:20
**refresh** 75:13 93:20 134:14 160:25 170:17 193:18 216:12 264:5 280:25 301:3,6
**refund** 191:12 191:19

**refunded** 191:25
**refuse** 232:22
**regal** 331:14,18
**regard** 13:7 29:6 44:20 73:22 75:13 82:4,19 89:23 92:22 119:23 137:25 161:8 178:17
**regarding** 340:25 342:24
**regardless** 253:10
**regards** 61:25
**regular** 16:9 33:19,20 64:20 82:9
**rejected** 171:19
**relate** 83:13
**related** 21:18 34:9,20 40:3 74:3,11 156:15 156:19 229:3 231:22 235:2,7 235:23 236:17 239:10 242:11 242:16,18 246:9 253:5,13 265:6 289:25 301:5 309:6 332:2 348:16
**relating** 117:18 219:24 220:4 347:9,11
**relation** 214:21 227:3 235:17 242:13 256:10 268:20 277:14
**relationship** 14:4 51:9 52:13 55:10,17 56:16 73:6,25 77:7,12 149:25 150:4
**relied** 43:10 248:24 259:25
**relief** 42:23 105:8
**rely** 230:2 278:25
**remember** 19:21 36:9 54:14 67:4 87:14 89:10,14 89:21 93:23 94:2,7,18 95:3 96:13 101:12 101:24 102:8 106:6 107:2,6 107:17 108:8 108:14,18 109:9,18,25 110:5,20 112:14,15 114:12 118:11 118:16 121:22 127:10 136:18 136:19 137:8 139:23 140:4,9 142:2 145:16 145:17,19 156:7,8 159:12 159:16 160:22 164:23 173:17 193:8 198:19 203:3 204:20 205:2 214:25 215:10,21,24 222:25 223:3 226:22 229:8 259:22
**remove** 333:4,8 334:17,25
**removed** 32:8 123:2
**removing** 122:22 203:4
**rent** 315:2
**repairs** 208:19 208:23
**repeat** 211:9 231:6 279:24
**repetitive** 240:20
**rephrase** 9:17 222:18
**replace** 137:11 137:17,21
**replacing** 137:2
**report** 60:20 152:2,4 202:12 269:3,15 270:10
**reported** 61:15 189:10
**reporter** 8:14 8:24 9:9 73:11 73:18 80:6,6 80:12 114:16 119:11 129:15 141:8,22 151:14 160:12 162:6,8 166:21 169:19 172:15 186:5,15 195:10 197:21 208:3 252:16 263:14 268:5 277:3 280:4,9 280:19 283:3 287:9 291:18 292:11 300:4 313:14 334:8 336:11 337:9
**reporting** 31:24
**reports** 233:4 248:24 311:3
**represent** 69:11 75:6 93:17 162:23 163:20 166:8

301:2 335:22 341:24 342:4
**representation** 243:15 251:23 275:10 340:24
**representative** 1:5 3:11
**represented** 41:9,12 70:2 93:10 275:12 306:25
**representing** 214:3,9
**request** 12:10 13:12 191:12 191:18 220:9 220:14 235:6 235:21 244:20 256:10 293:12 295:22
**requested** 15:23 39:21 40:9,10,11,13 40:18,21 171:12 192:25 234:25 235:17 262:22 263:2 266:16 267:11 289:10 305:21 313:8 347:3,5
**requests** 236:10 298:23
**require** 21:24 60:9 279:19
**required** 29:10 39:7,9 46:21 153:6 154:5,7 239:12 270:13 273:4,7 350:14
**requirement** 42:6,22
**requirements** 81:23
**requires** 243:19
**reserved** 5:22
**residence** 157:9
**residences** 274:17
**residents** 157:24
**resolved** 7:19 171:24
**respect** 246:12 287:18 313:22 328:8
**respective** 5:6
**respectively** 316:7 328:5
**responded** 311:20
**response** 118:6 262:17,23 304:16
**responsibility** 88:13 152:23
**responsible** 152:16,22
229:12
**responsive** 116:18
**rest** 15:15 70:13
**restate** 162:2 221:7
**restraining** 213:17
**result** 71:3 120:2 183:7 184:7 194:18 196:11 200:19 204:21 223:8 286:7,21,23 317:19 335:4
**resulted** 315:6
**results** 328:25
**retail** 292:24 316:6
**retain** 225:17 226:2
**retained** 56:24 57:24 225:16 225:23 226:8,9 346:15
**retainer** 146:24 146:25 147:3 147:10 233:11 233:14,17 287:17,18,23
**return** 33:8,10 33:11 34:12,16 34:17 35:21
36:19,20 38:11 39:7 44:2 46:12,16,21 47:5 66:8 87:4 87:9,16,20,22 87:23 88:4,8 91:5 112:12,25 113:6 136:2 142:13 146:14 156:12 157:23 157:24 158:3 158:13,21,22 173:14 178:3,4 178:24 183:4,7 184:18,25 185:6,13 186:6 186:8,12,20 188:9,15,23 189:6,10,14 190:13,15,19 190:24 191:13 191:15,20,24 194:16 210:3 211:4 217:21 244:16 266:3,5 275:4 328:22 337:7,12,17 342:13 345:18 345:24
**returns** 22:18 35:15,17,19 36:15 38:18 39:2,5,8,14 40:9 41:17,21

42:4 43:17 47:10 48:17 55:8 65:16 76:4 87:12 88:25 89:9,13 89:20 90:4 101:22 105:24 106:11,14,17 106:21,24 112:21 135:7 148:4 155:19 156:4,23 173:8 173:10 178:17 178:18,22 179:8 181:10 182:2 184:5 189:8 193:2 211:7,14,14 225:12 230:11 232:4,5,12 245:19 338:19 341:2,3
**reveal** 230:12
**revenue** 30:9 32:4 97:11,16 297:17,23 303:11,15 309:7 311:14 312:10
**reversed** 131:9
**review** 11:19 13:6 23:7 24:9 28:22,24 55:6 58:23 59:12 67:16 102:19 116:2,6 125:14 139:6 146:13 153:5 177:19 192:10 197:9 201:14 228:9 232:2 235:22 236:7 247:19 253:25 254:5 254:22 255:2 256:3 259:5,8 260:11 264:4,6 264:15,16 266:17 267:19 269:13 282:12 283:16 285:13 287:15 288:6 289:6 290:7 291:24 293:11 310:5 311:10 320:4 321:15 325:21 328:5 329:7,12 332:24 334:20 335:3
**reviewed** 11:24 102:24 118:4 139:8 235:24 236:3 246:2 253:14 260:13 266:20 315:11 318:23 319:9 322:12 324:23 334:13 340:7,9 340:11
**reviewing** 70:17 80:15 144:25 250:25 259:11 261:7 266:22 267:3 284:14 285:6,9 285:15 295:2 300:9,21 324:10
**reviews** 213:8
**revisions** 168:21
**rid** 322:11
**right** 20:10 32:5 33:12 37:22 41:10,15 45:20 46:15 59:14,14 64:2 65:7 66:17,21 70:12 78:22 91:18 97:18 103:11,22 104:2 107:21 110:22 111:20 112:9,10 117:9 123:4 125:6 135:8,9 156:22 160:18 161:15 162:21 165:2,3 167:3 180:5 187:18 188:18 188:25 198:10 201:11,22 204:3 206:21 210:22,23 221:14 224:11 239:4 253:25 264:12,24 265:3 268:13 268:16 269:5 269:16 270:10 279:4 283:21 284:2 287:25 288:4 289:11 290:25 291:4 291:20,24 292:24 303:2,3 303:8,11 304:13,18 308:8,10,13 309:10 313:20 315:3,11,12,18 315:19 317:3 319:6 325:8,9 326:22 328:25 332:21 333:5 333:20
**rights** 157:19
**ring** 229:20
**rise** 276:4
**river** 6:12
**road** 4:21
**robert** 1:4 3:5 141:16 207:17 221:16
**role** 181:18,20 260:9 295:10

**room** 10:3 98:23,24 99:10
**roslyn** 1:17 4:6
**roughly** 147:22
**round** 105:13 105:17 171:13
**route** 1:8 3:14
**routine** 55:20
**roy** 14:11 18:2 151:19
**ruderman** 3:16 6:7 40:14 41:11 42:7 43:6 73:17 80:4,8 88:19 110:6 114:2 116:11 118:17 118:25 121:4 125:23 128:18 129:8 133:13 133:22 134:7 140:24 150:19 150:24 151:7 159:19,23 162:4 165:24 169:3 172:2 175:16,22 185:18,23 194:24 196:23 197:12 205:5 207:11 218:18 219:18 222:14 238:14 247:18 313:15 336:5 346:19
**rules** 2:10 222:15
**run** 87:24 195:17
**running** 51:5 305:4

**s**

**s** 3:2 5:2,2 6:2,2 32:22 33:5,7,7 45:18,24 46:10 337:5,6 345:2 345:24 349:3
**sa** 316:7
**sadj** 317:5
**safe** 97:19 318:16
**sage** 3:4
**salaries** 32:20
**salary** 33:16,16 95:2
**sale** 30:8 84:17 205:24 242:14 244:8,21 245:11,13,16 245:17,17,18
**sales** 1:3 3:5 7:10,10 15:25 22:20,25 30:25 32:14 124:4,10 215:21,23 221:16 234:18 234:20 236:17 251:24 259:20 265:13,18 271:10 285:21 286:20 292:24 297:22 303:2 307:12,18 308:18 309:15 333:4,8 334:16 334:18,22
**salesmen** 31:13 98:9
**salespeople** 98:13
**sample** 242:23
**sarah** 1:13 4:3 12:19 34:21 35:17,22 37:13 37:23 38:12 48:19 51:24 76:5 79:5 94:12 95:23 99:3 101:23 135:7 155:20 182:3,7 183:5 185:7 189:14 190:12 338:24 339:18 340:18 342:24
**sat** 98:10 195:19
**satisfied** 74:21
**satisfy** 109:16
**saw** 29:4 86:8 87:24 100:5 103:15 104:7 107:3 112:10 113:20 170:6 304:14 328:17
**saying** 18:25 61:4,12 69:15 74:25 104:4 107:13 109:2 135:14 153:12 153:19 166:14 192:21 203:2 227:17 290:3 311:21 319:3
**says** 111:3,5 114:5,7 118:25 121:8,8 142:15 151:18 152:15 153:4,18 157:5 157:12 159:24 160:21 163:9 167:14,23 168:6 169:8 172:7 173:21 177:12 193:21 195:15,19 203:13 205:16 209:12 253:22 254:17 258:23 271:7 277:12 281:25 289:13 290:25 291:4 297:12,22 301:15,17 314:11 322:21

334:21 337:20 338:4,24 339:6
**sba** 192:17,24
**scan** 302:6
**scanned** 302:10 325:25
**scanner** 263:6
**scenario** 304:2
**schedule** 23:20 33:25 59:15 60:14,18 68:14 91:10 103:15 103:18 104:8 186:25 188:14 188:18 198:13 258:15,16 260:24 267:4 290:12 318:21 318:23 319:4,5 319:9,10,20,22 319:25,25 320:5,6 337:20
**schedules** 23:8 23:17,18 24:10 28:23,25 55:7 58:7,8,10,14,24 59:6 60:3,8 65:25,25 82:25 90:17,18,20,21 228:10 250:20 256:18,21 257:14,24 258:2,4,6,13,13 259:5,9,11 260:2,18 261:8 261:13 282:8 282:11 283:7 283:10,12,14 283:16 285:9 285:16 286:4 289:3 290:10 290:11,14 318:13,25 319:16
**scope** 224:24 225:8 231:15 296:22 329:6
**screen** 110:7 133:11 140:25 176:6 288:15
**scroll** 129:19 142:18 170:15 172:19 173:8 174:5,14 176:20 186:23 187:17 192:9 206:7 263:24 336:22
**scrolling** 252:17
**se** 4:11
**sealing** 5:7
**search** 39:17 40:23 219:13
**searched** 40:2
**second** 105:12 105:17 142:19 151:17 163:4,7 172:6 238:22 239:11 291:19 302:3 320:25 321:22 338:23
**section** 283:6
**security** 187:5 338:16
**see** 8:13 22:11 22:12 23:19 24:2,6 27:18 28:17 39:18 40:2 53:15 59:12,17,19 61:8 77:22 81:3 87:5,16 87:19 89:4 102:20,25 103:12,21 104:11 107:5 110:16,17,24 111:7,8 112:2 113:24,25 118:13,23 119:16 120:2,8 121:24 124:3 128:24 129:2,5 129:18,20 131:8,18 132:3 133:11 134:13 134:21 137:12 142:5,15 150:21 151:5 157:10,13 166:16 167:2,8 167:15,16,19 173:9,14,21 174:24,25 176:18 181:10 181:12,14 185:20 187:10 187:20,24 193:24 198:5 198:12 201:9 204:14,17,20 205:17 219:14 258:25 259:3 283:6 285:23 297:14 302:7 303:17,20 304:12 305:9 305:10 309:5,5 312:20 321:12 321:14 322:9 324:24 325:5,6 336:12 337:10 337:20 338:11 341:22 342:9 342:10
**seeing** 64:8 65:14 79:2 104:19 110:20 114:20 120:5 142:24 145:2 166:22 168:19 168:19 169:24 173:17 186:16 186:19,20 205:12 244:23

247:23 248:2 302:11
**seek** 42:13,23
**seem** 103:10 184:2 333:5
**seemed** 59:13 227:2
**seems** 121:11
**seen** 45:2 54:6 86:14 100:8 110:18 114:18 134:23 160:13 164:16 169:22 170:2 199:25 336:25
**seiden** 4:19
**selling** 314:22
**send** 12:2 28:21 136:10 197:4 296:23
**sending** 91:22 92:2,5 205:17 209:10
**sends** 302:6
**senior** 17:14
**sense** 9:18,23 231:21 247:13 276:22 277:5 278:6 340:11
**sent** 29:11 91:15,17,20 92:3 136:12 149:2 300:16 300:21,22
325:13,14
**sentence** 271:4
**separate** 98:19 99:6 144:5 218:2 289:18 318:25 319:2 319:12 320:6 334:19 335:2 342:15
**separately** 65:17 250:9
**september** 75:10,10 110:14,23,25 111:21 179:8 180:2
**series** 176:8
**served** 42:8
**server** 29:22 117:5,8,10
**service** 5:16 20:23,23 69:20 77:5 117:11 232:7 280:6
**services** 15:22 21:24 22:2,4,7 22:8,15,24 23:4,4 34:8,20 35:12,13 55:3 56:2,9 65:3 145:25 146:11 146:16 147:7 147:24 148:6 149:10 223:23
224:6 227:3 228:6,9 229:3 229:23 230:4 230:21 231:19 241:5 242:16 244:20 245:10 246:24 247:20 250:6 251:5 255:10,15 281:15 330:20 330:20 331:21 332:8
**set** 126:13 348:12,21
**settled** 7:21,23 223:10
**settlement** 223:11
**seven** 17:17 20:11,19 27:11 30:3 62:13 116:20 285:18
**several** 79:19
**shallow** 7:17
**shanks** 3:9
**shape** 95:6 164:20 238:15
**share** 110:7 129:4 140:24 176:6 197:13
**shared** 54:2
**shareholder** 242:24 243:4 262:15 284:4
**shareholders** 45:23 46:7 47:6 284:16,19
**shares** 51:21
**sheet** 25:18,20 26:4,8,9,14 27:15,16,22,23 28:2,8 63:18 106:10 128:6 286:25 287:2 305:20 310:14 311:7 317:22 317:25 322:14 332:20
**sheets** 26:25 29:15 30:2 62:4,9,15,20 63:22
**shift** 218:3
**shop** 54:3
**shore** 12:14 13:18 20:12,13 34:22,23 46:4 49:17 50:20 51:6,9 53:4 55:18 57:17 58:19 65:5,19 66:9,24 68:8 69:15 71:25 72:21 74:3,13 74:15,19,22 75:15 76:3,16 77:10,21 79:3 80:16,22 81:10

82:2 85:11
86:8 87:11
89:19 93:5
94:5,12,15,21
95:2 96:11
97:24 101:18
102:6,12 105:9
106:4 108:4
110:12 112:13
117:3,16 119:2
133:16 134:3
138:9 142:6,17
142:20 143:8
144:11 146:2
147:6,18 159:8
162:13 164:2
166:7 172:7,13
172:16,18
174:16 185:3,8
186:9,13 206:2
207:20 208:9
208:21 210:7
210:15 211:5
211:13 213:18
215:19 216:5
217:4,6,9,11,22
218:15 219:25
224:8,25 225:9
225:16,23
226:20,23
231:3,10
234:10,14,21
238:11,17
239:22,23
241:7,13
245:23 247:21
247:25 255:11
255:16 273:2
313:23 336:21
337:7,13,17
338:8,15,21
339:7,19
340:21 341:5
343:8,15,17
345:16,19,24
347:10
**short** 83:21
205:10 208:25
225:25 231:18
**show** 43:20
56:22 76:9
78:23 79:8
83:6 86:4
90:13,18 95:16
114:2 126:3
127:9,15,21
128:7 132:6,14
140:25 150:20
169:3 172:19
182:12 192:5
200:22 201:18
201:20,24,25
204:6 286:17
301:20 326:11
328:9 341:10
**showed** 38:2
45:7 93:25
125:15 128:2
156:23 167:8
179:25 320:17
326:17,20
**showing** 43:8
69:4 110:7
118:22 131:16
159:23 167:11
167:19 168:10
168:10 180:2
183:12 187:19
200:20 202:5
202:14 285:19
290:16 292:6
299:19 301:15
334:3
**shown** 79:21
84:24 95:12
133:3 161:15
168:13
**showroom** 98:3
98:8,11 208:15
**shows** 166:14
168:15 297:25
299:12,16
303:10 323:8
338:19,20
**side** 129:21
151:3 230:8
261:8,9 316:23
341:21
**sides** 8:10
**sienna** 16:15
**signature**
270:10,11
336:23 348:23
**signed** 5:10,12
5:15 251:13
314:5
**signer** 174:17
**significant** 86:9
179:19 217:3
**signs** 143:10
**similar** 66:21
316:9 328:16
**simply** 59:21
**simultaneously**
225:17,24
**single** 58:9
272:15 292:12
302:4
**sit** 63:15 98:9
135:10 297:2
323:21
**sitting** 48:10
69:2 96:10
113:15 116:8
121:19 123:17
134:23 144:8
164:12 196:21
**situation** 49:8
64:18 77:21
86:7 204:13
214:8
**situations**
27:12 276:15
**six** 176:7
206:12

**small** 208:14
**smithtown** 1:17 4:7 21:6,7
**social** 150:7,10 150:13 187:5 338:16
**sold** 30:8,13 32:16 81:20 126:19,24 180:22 241:12 244:4
**sole** 33:2,4 45:23 46:7 295:13
**solely** 329:8
**somebody** 51:23 88:13 92:23 93:4 112:18 115:25 137:16 140:17 153:25 174:9 189:7 248:8
**someplace** 32:9 204:3
**something's** 322:14
**somewhat** 181:20
**sorry** 16:23 35:3 71:16 73:11 91:19 121:2 126:14 129:3 155:9 156:5 167:25 183:20 195:11 198:22 200:25 239:4 241:21 249:5 267:14 280:23 289:25 298:7 312:7 316:19 328:18 340:10
**sort** 34:19 56:25 59:21 80:2 100:16 128:5 181:2,3 236:11 256:16 305:3 312:5
**sought** 101:18 102:5 228:15 262:19 333:8
**sound** 332:13
**sources** 139:20
**speak** 11:8 60:2 61:19 100:19 101:7 212:19 214:16 331:7 335:7
**speaking** 8:25 9:6 30:7 61:16 70:8 139:25 191:17 212:21 212:25 213:4 278:21 313:22
**specialize** 19:3 19:6
**specific** 26:5 61:11 119:20 235:22 242:6 258:19 261:11 294:7 297:5 306:16
**specifically** 13:10 55:3 59:2 68:2 97:21 100:2 136:24 210:9 239:8 256:20 259:4 260:14 261:6 262:18 289:9 293:2,4 293:19 294:12 299:10 320:18
**specifics** 126:5 257:16
**speculation** 275:24
**spell** 30:18 138:17,20
**spend** 11:5 139:2
**spent** 287:25 288:10,17 289:2,3
**spoke** 100:21 208:11 209:13 214:18 261:20
**spoken** 238:5,6
**spot** 59:14 103:11 283:21
**spots** 256:24 257:4
**spouse** 339:3
**ss** 348:4
**st** 3:19
**staff** 15:17,18 17:13 230:2
**stamp** 197:16 205:9 263:17 267:25 280:13 298:12 323:5
**stamped** 151:8 160:6 291:13 299:22
**stand** 153:13
**standalone** 70:9,11,12 139:14
**standard** 66:16 243:18
**standing** 154:21
**standpoint** 180:16 183:15 183:18 184:14 184:19,23
**start** 17:24 43:23 73:15 143:10 232:11 235:25 263:17 304:11
**started** 17:10 17:13,23 18:2 87:10 178:12 213:11 226:15 227:2 236:8

254:12 255:18 255:23 281:7
**starts** 133:18
**state** 2:12 6:4,8 46:24 104:22 184:5 221:6 269:12 270:11 284:3 348:4,9
**stated** 152:25 155:25 178:24 233:10 318:11 331:24
**statement** 28:11,21 29:9 47:17 61:16 67:20 68:17,21 83:9,11 86:2 89:5,16 90:9 104:3,11,15,18 104:20,24 110:11,19 112:10,12 120:9,9 142:21 143:19 144:18 144:19,21 145:6,9,11,12 150:25 152:17 153:3,11,14 154:2,4,17,21 154:24 157:5,6 159:21 160:2 160:16 162:10 164:25 165:11 165:22 166:6 208:8 209:12 236:5 249:21 250:7 253:19 260:20,23 261:9 264:14 269:8,20,23 270:21 271:18 272:14,22 273:14,16 274:20 275:4 275:15 276:18 277:10,12,16 278:8,14 279:7 279:8 281:8 282:13 285:13 286:4 289:10 289:14,18,24 290:8,17,20 292:3 294:14 297:8 299:5,6 299:12,15 302:21 303:8 303:10 304:17 304:20,22,25 306:3,21 307:2 307:11 308:25 309:4,23 310:18 311:7 311:11 312:11 312:19 313:5,7 317:6,10,12,15 317:16 320:25 321:23 322:17 322:24 323:4,7 323:13 324:18 324:25 325:3 325:11 328:19 328:21 329:13 332:24 334:6 334:10,13,18 340:2,4 341:13 341:20 343:20 346:14 347:18
**statements** 16:6 28:18 29:2 42:16 55:6 58:16 65:11 66:13 67:8,16 68:6 78:23 82:25 84:2,22 89:19 91:12,13,22 92:8 95:13 100:6,9 103:8 104:10 113:21 127:14 132:5 132:18 143:13 143:22 149:3 153:6 154:14 161:23 168:14 168:17,22 180:2 228:9 236:6,9 247:19 248:6,22 260:3 260:6,6,7 261:18 266:23 268:21 269:25 274:5,6,7,16 277:9 278:17 279:20 281:3 281:11 284:8 284:15 285:16 291:8 294:8 295:3 301:14 308:19 322:2 324:11 325:18 325:21 328:3 329:7 332:2 333:19 340:7 341:5,6,9 342:16 343:9 343:12,14
**states** 1:2 152:15,20 164:5,6,7,10,11 167:22 169:4 268:10,13 269:3 270:15
**stating** 136:16 267:18 270:4 333:7
**status** 187:13
**stay** 29:22,24 30:2 202:19 204:5 242:10
**step** 247:24
**stephen** 141:17 208:5 209:15
**stepping** 72:12 229:7 254:6
**steven** 207:18

**stipulated** 5:5 5:20
**stipulation** 42:18
**stock** 242:14,17 244:15
**stopped** 213:7 213:11 296:7
**stores** 300:18
**story** 232:15
**street** 1:8 3:14 3:19 111:4
**strike** 277:10
**string** 177:19 177:22 178:2 192:4,12
**strokes** 25:2
**structure** 233:6
**stuff** 76:14 88:11,12
**subject** 36:22 156:19 189:11 207:19 302:15 306:18
**submit** 171:18 277:15 279:19 324:5
**submitted** 29:2 29:9 40:12 106:3 174:6,9 174:10,12,20 175:9 182:16 193:10 274:20 287:10 306:21
**submitting** 174:13 282:15 324:3 347:19
**subpoena** 2:9 6:17 12:11 13:12 39:18,20 40:7 42:8,10 116:13,18 118:6 219:17 219:22
**subpoenaed** 12:2
**subscribed** 350:16
**subsequent** 57:23 264:18 288:24 315:9
**subsequently** 100:22
**substance** 100:24
**substantially** 270:12 288:23 343:4
**subtract** 47:13
**subtracting** 48:12
**sudden** 178:7
**suddenly** 178:21 179:6
**sued** 222:3,10
**suggested** 26:13
**suggestion** 23:24 25:6
**suggestions** 23:10
**suing** 7:8
**suite** 3:15 4:12
**sum** 100:24 321:5
**summarized** 163:3
**summary** 152:5 201:4,8
**sums** 273:11
**sunrise** 1:4,15 1:19 3:10 4:5 4:12 12:16 20:13 34:22 35:6,7 64:24 65:5,8,20,20 74:20,22 76:4 77:7,12,15,19 77:23 78:7,14 79:4 80:16,23 81:11 82:3 85:14 86:8 89:19 93:5 94:5,13,22 95:2 96:11 101:18 102:6 102:12 105:9 106:4 108:5 114:7 117:3,15 133:17 134:2 146:2 147:6,18 159:7,8 169:13 211:6,13 216:5 225:18,24 226:20,23 234:8,14,21 238:11,17 241:7,13 245:23 247:21 247:25 255:11 255:16 273:2 313:23 331:12 331:22 332:9
**superb** 1:3 3:5 210:3 221:15 227:3,11,16,18 228:5 229:3,6 233:24 234:11 234:15,22 235:7,18,23,25 238:10,18 241:7,15 246:9 246:12 247:22 248:2,15 249:6 249:9,14,17,24 250:4,5 252:3 252:19 253:5 253:13 254:6 254:13 255:9 255:18,23 259:14 261:22 262:2 264:6,23 265:22 271:20 272:2,18 281:3 281:12,15,18

281:21,23 283:25 285:2 285:14 287:11 287:19 290:2,5 290:17,22 295:10 297:17 297:24 301:5 302:15,22 304:11 313:24 323:4 324:24 326:25 327:6 327:19,23 330:15,17,21 347:13,16 349:1 350:1
**superb's** 255:3 318:12
**supervision** 95:19,19
**supplied** 40:12
**support** 15:16 181:7 230:2 269:19 312:6
**supporting** 234:2 270:23 274:6,7,22 299:6 318:19 347:14
**supposed** 36:21 76:15 146:10 162:24
**sure** 8:9 41:16 48:21 58:15 67:21 68:9 73:17 92:15 95:18,20 119:21 133:22 155:12,15 162:3 175:16 193:17 199:17 209:9 211:2 213:13 248:16 260:15 283:12 301:24 318:14 330:24
**susan** 3:20 335:13,21
**suspicion** 256:14
**sworn** 5:10 6:3 348:12 350:16
**syosset** 1:15 4:5 35:4 50:20 159:6 208:20 331:11,22 332:9
**system** 24:12 24:22 25:3 31:21 58:19 66:11 78:24 79:3,9,16,22 100:17 104:16 119:15 140:12 140:15 165:11 166:13,15 210:11,13,16 230:11,12 244:13,14 248:23,25 249:3,6 261:3 261:17
**systems** 24:16 24:19 124:22 204:10,19 210:20 258:7

**t**

**t** 5:2,2 6:1,2 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1

Case 2:23-cv-06188-JMW Document 543-4 Filed 09/04/26 Page 416 of 427 PageID #: 19363




154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1 207:1
208:1 209:1
210:1 211:1
212:1 213:1
214:1 215:1
216:1 217:1
218:1 219:1
220:1 221:1
222:1 223:1
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1
248:1 249:1
250:1 251:1
252:1 253:1
254:1 255:1
256:1 257:1
258:1 259:1
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1 273:1
274:1 275:1
276:1 277:1
278:1 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1
330:1 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:2
348:2,2 349:3
349:3

**take** 8:25 9:5 9:25 10:6 27:4 29:19 33:18 48:3 60:18 73:12,13 80:19 82:22 126:18 134:20 146:22 152:23 153:2 158:21 175:24 196:4,7 204:2 220:21 240:18 243:14 252:21 297:7 342:18

**taken** 2:8 41:4 80:11 97:10 173:12 176:4 218:22 220:24 237:16 252:7 335:10

**takes** 149:13

**talk** 9:5 155:9 189:7

**talked** 75:22 187:14

**talking** 19:13 64:9 65:15 70:14 71:7,10 73:9 205:21 210:25 212:6 227:19 257:25 271:16 289:22

**tax** 7:3,10,10 15:25,25 16:2 16:2,7 22:15 22:18,21,21,25 23:4 31:24 33:7,10,11 34:12,16,17

Case 2:23-cv-06188-JMW Document 543-4 Filed 09/04/26 Page 417 of 427 PageID #: 19364



35:11,17,20 36:2,15,19,20 36:22 37:9,11 38:11,18,19,22 38:25 39:6,7,8 39:9,10,14 40:4,9 43:8,20 45:8 46:16,19 46:25 55:8 65:16 66:8 76:4 87:4,8,12 87:16,19,22,23 87:24 88:4,25 89:9,13,20 90:4 91:5 101:22 105:24 106:11,14,17 112:12,21,25 113:6 135:7 142:13 144:11 146:14 148:4 155:19 156:3 156:12,23 157:23,24 158:3,13,21,22 163:9 164:3,8 173:7,9,14 178:3,24 179:8 181:9 182:2 183:4,7 184:4 184:18,19,22 186:6 188:9,15 188:23 189:4,6 189:8,10,11 190:13,24 191:7,12,15 193:2 194:15 210:2 211:4,7 217:21 225:12 230:11 232:4,5 234:18,21 244:16 245:19 259:20 265:13 265:18 266:3,5 275:4 285:21 286:20 328:22 336:16 337:7 337:12,16 338:18 341:2,3 342:13 345:24

**taxable** 188:22 189:10,22

**taxes** 15:25 16:3 36:16 156:19 157:2 191:25

**team** 1:3 3:5 221:16 236:17 236:23,23 258:25

**technical** 180:16

**technically** 41:8

**telephone** 10:25 215:6 246:22

**tell** 10:20,20 25:12 27:13 49:2 78:6 101:4 118:22 120:23 121:13 124:13 176:25 193:25 200:12 200:13 222:16 222:17 225:7 226:18,25 228:7,11 232:20,24 255:17 257:8 262:3 265:7 278:12 288:9 293:25 301:19 329:17 332:19

**telling** 11:4 43:12 75:17 92:23 108:24 128:10 296:8 306:14 340:17

**tells** 184:15 243:15

**ten** 8:2 85:2,3 85:24 223:16

**tenure** 127:12

**term** 24:17 26:6 83:19,21 89:16 109:20 122:6 208:25 235:10,20 269:7 283:11 314:14 326:3

**terms** 81:13 137:13,19 255:22 318:8

**terrible** 288:14

**testified** 6:5 78:18 93:18 109:19 115:8 119:21 133:9 144:14 157:16 161:20 170:3,8 178:11 193:9 200:8 216:8 246:13 254:4 318:5

**testify** 120:7 179:18 183:3 183:22 184:7

**testifying** 8:16

**testimony** 8:20 10:11 161:13 220:11 247:17 255:22 256:2 265:25 285:5 303:23 324:9 348:14 350:10

**text** 330:10,21 331:2 347:22

**texts** 219:4,11 219:13

**thank** 6:16 73:18 128:17 159:22 185:23 197:6 220:17 220:20 258:8

266:12 335:11 340:14 344:3
**thanks** 35:7 301:13
**thing** 34:10 35:14 69:19 73:14 103:20 105:22 109:25 111:17 134:22 149:12 158:14 245:18 256:17 259:19 265:12 331:23
**things** 23:11 59:20 76:10 104:4,17 189:3 195:16 208:16 211:23 222:25 256:23 257:21 259:16,18 265:17 285:22 309:17 322:12
**think** 8:2 19:24 26:2 29:12 35:4 41:24 49:11 52:8,9 56:3 91:8 100:5 104:4 105:15 121:24 138:18 145:22 170:3 171:10 171:11 175:5 177:6,8,9 193:17 196:20 200:7 223:16 238:19,20 254:3 255:21 289:20 298:8 298:25 309:24 343:23
**thinking** 139:12
**third** 172:20 187:19,23 195:18 321:24
**thomas** 1:14,25 2:8 4:20 6:10 151:19 207:17 258:23 349:2 349:24 350:2,4 350:13
**thomasson** 1:13 4:10,11 213:22,24 214:16 224:10 258:24
**thorough** 219:12
**thought** 60:9 155:10 193:10 241:21 265:13
**thoughts** 61:21
**three** 15:9,14 17:25 22:25 99:5 114:8 138:3 235:3 236:4,21 237:5 249:18 267:7 283:5 288:12 288:20 321:25
**tie** 318:8,15
**tied** 139:15
**till** 9:2
**time** 1:22 2:4 5:22 6:18 8:4 8:25 9:6 10:2 11:16,18 15:4 19:16,22,25 20:7,19 27:25 28:14,20 36:6 36:9,23 50:12 50:25 51:10,14 51:15 52:5,22 53:14 54:23,25 54:25 56:19 57:21,22 58:21 70:16 71:9 72:2,11,12,22 73:3,24 75:2,3 75:16 76:12 77:9 80:12 82:2 84:14,15 84:16 88:20,23 93:16 108:3,9 111:9 116:6 123:8 125:8,24 132:25 137:4 138:5,16 139:2 147:11,13,14 149:14 157:17 178:20 179:21 179:22 180:21 195:3 205:14 206:5 209:18 210:10 211:3 212:24 213:6 214:5,7 225:15 225:22,25 230:7 240:19 251:3,7,11 254:12 255:8 255:13 261:19 261:24 272:2 277:3 284:7 288:17 289:2,3 291:7 298:23 306:2 311:6 318:13 329:15 335:11 340:22 340:23 343:22
**timeframe** 72:6
**timely** 86:11
**times** 25:21 31:10 126:8 249:16,19 296:25 305:14
**titled** 150:24 315:25 316:2
**today** 6:17 10:11 19:13 48:10 63:15 69:2 96:10 113:5,15 116:8 121:20 123:18 135:10 144:8 160:23 164:12

222:24 297:2 301:14 313:15 323:21 331:24
**today's** 10:14 10:19,22 11:10 11:20
**together** 12:4 150:16 229:12 271:7 315:23 316:14 319:11
**token** 100:17
**told** 27:15 51:10 52:2 56:8 62:23 78:10 96:15 178:13 184:16 190:19 206:9 216:8 227:13 228:5 256:18 262:5 273:21 273:24 306:11 327:8 329:16 329:24 330:3
**tom** 127:19 161:12 195:21 208:5,12 209:9 209:10,13,15 226:14 231:12 298:8
**tony** 4:24
**took** 75:9 112:9 184:14 196:12 205:24 237:22 238:8 305:23 308:24 309:7
**top** 114:5 151:3 151:19 159:24 174:23 177:9 192:6 290:23 309:3 314:7
**toshiba** 263:5
**total** 15:3 148:10,19 203:15,16 297:12 341:17
**totals** 129:24 130:5 290:12 316:23
**towards** 129:19 198:16
**toyota** 21:6
**trade** 83:20 84:5,19 86:10 205:18 206:4 206:11 207:5
**traded** 82:13 83:3
**trades** 83:13 205:24
**transaction** 84:14 97:6 112:6 181:15 244:15
**transactions** 125:15,17 204:11
**transcript** 197:9 350:5,10
**transfer** 51:20 75:23 76:14,15 76:25 79:17 111:3,22 180:14 181:4,7 181:11,12 182:10,22 187:14 242:18
**transferred** 51:24 52:12,14 79:19,24 178:14
**transfers** 181:15,21
**tread** 241:25
**treat** 96:20
**treated** 33:6
**trial** 5:22 7:22 23:7,16 24:9 28:23,25 55:7 57:20,25 58:14 58:23 59:6 60:3,8 65:15 65:24 67:11,13 68:14 90:8,22 91:2 103:18 104:8 122:2 128:23 129:13 129:16 131:14 250:20 251:20 251:22 258:10 258:12,14,17 258:20 259:25 260:18,24 261:7,14,16 282:7,10 285:9 286:3 290:9,12 291:20 299:4,7 299:9 315:17 321:11,16,17 345:7
**tried** 171:17 174:13
**trouble** 109:13
**true** 88:14 135:15 153:20 161:16 262:23 266:4 285:11 306:4 307:2,4 307:5,7 311:9 348:13 350:9
**truthful** 10:10
**try** 9:16 126:21 137:17 148:25 149:3 171:23 201:2
**trying** 54:13 56:3 105:11,12 120:20 137:10 137:21 149:16 170:9 172:23 183:25 202:18 209:21
**turn** 40:25 260:19
**two** 21:14 42:16 91:9 92:14 127:23

130:6 138:2,19 138:24 141:12 141:13,14 163:8,16 168:17 179:15 180:8 192:24 193:21 207:14 207:25 222:16 226:2 261:10 297:8 316:17 316:19,25 318:4,24 319:2 338:3,24 345:22
**type** 6:24 15:22 23:14 58:10,18 60:19 106:7 210:11 219:5 245:6 318:14 319:22
**types** 26:19 163:11,11 200:8
**typical** 57:9 181:11
**typically** 26:17 27:9 30:21 33:21 58:9 84:14 85:17 86:24 90:5 114:25 115:12 116:2,24 124:9 189:9 191:17 200:5 206:21 206:25 241:18 244:6 247:3

**u**

**u** 5:2
**udayaan** 332:11
**uea** 1:17 223:25 224:3
**uh** 122:4 174:18
**ultimately** 64:23 107:14 139:13 196:14 327:2
**un** 187:3 206:19
**unable** 109:11 239:24 240:3
**unclear** 202:23
**under** 8:17,20 41:4 121:8 139:5 154:19 156:13 163:5 173:19 182:3 247:12 271:19 315:10
**underlying** 270:22,24
**underneath** 315:10 341:21 342:7
**understand** 8:17,19,22 9:7 9:12,15,17 10:7 20:2 41:2 51:19,22 55:9 56:15 74:23 81:17 82:16 108:15 122:18 154:15 178:19 200:24 202:18 203:12 222:17 222:21 223:5 265:25 275:11
**understanding** 77:11 81:9 82:18 108:11 171:14 178:10 180:11,13 196:5 203:6,7 215:16 254:19 254:20 261:21 262:7 264:18 287:16 288:16 295:9 308:20 310:6
**understood** 9:21 43:3 52:19 222:20 254:8 257:10 295:11
**uniondale** 4:17
**united** 1:2 152:20 268:13 270:14
**units** 318:17
**universal** 223:20,23
**unlimited** 225:2
**unrelated** 53:21
**unsatisfactory** 238:3
**unsigned** 5:14
**unwind** 326:10 326:15,21 328:8
**unwinding** 326:3
**unwound** 327:2 327:3,7 333:4 333:8 334:16 334:18,22,25
**updated** 60:6 261:15
**upfront** 126:18
**upload** 29:21 194:15
**urrutia** 1:4 3:5 4:24 221:17 236:21 241:14 294:20,25 295:4 325:17
**urrutia's** 295:6
**usc** 42:5
**use** 10:3 24:21 69:25 164:21 208:23 243:16 271:12

**used** 5:14 20:21 20:23,25 21:10 21:10,16 53:17 58:11 66:25 67:3 69:23 70:8,12,14 98:2,8,11 102:10,14 109:21 117:10 124:11 139:14 160:24 161:2 208:13 210:16 235:10 261:17 290:9,21 292:23 316:2,6 316:6 328:22
**using** 26:6 58:19 114:11 210:12,15 221:10 235:19
**usual** 122:14
**usually** 79:14 82:21 146:23 181:2,5
**utilities** 315:2
**utilized** 230:13

**v**

**valid** 41:25
**valley** 137:9,22 138:3,8,13
**valsky** 17:8
**valuations** 16:10 159:11 159:15
**value** 269:22 270:5 271:9 273:22
**values** 159:4
**variable** 304:3
**varied** 247:4
**various** 24:16 74:17 93:6 122:2 176:15 180:21 213:15 229:24 259:22 326:8
**vary** 63:13
**vehicle** 20:25 30:15,17 81:19 83:5,6,9 297:13
**vehicles** 58:11 58:11 82:13 182:11 314:22 318:10,20
**vendor** 127:23 128:11
**ventimiglia** 49:21,23 50:6 224:12,14
**verbal** 9:11 225:13
**verbally** 27:13 246:15
**verbonitz** 3:20 121:2 129:6 133:20 134:4 150:22 159:17 159:22 175:14 175:17 185:21 257:17,23 258:8 335:15 335:18,22 336:2,6,14 337:4 344:2 346:21
**verify** 153:7 320:2
**verifying** 153:19
**version** 187:3,5
**viable** 61:13
**video** 133:13 133:23 134:8 134:17,20,24 141:3,6 155:21 190:20 345:8
**videotaped** 279:15
**view** 182:25
**viewing** 282:19
**virtual** 8:14 246:17,20
**virtually** 10:23
**visit** 249:16
**visited** 249:14
**volkswagon** 236:22
**volume** 322:6
**voucher** 25:18 25:20 26:4,9 26:14,25 27:16 27:23 28:2,8 29:25 62:4,9 62:15,20 63:18 63:22 292:20 313:12,17,20 314:4 328:14 328:23 346:12
**vouchers** 29:14 63:3,10,11 90:3,25
**vs** 349:1 350:1

**w**

**w** 130:4
**wait** 9:2,4 329:24
**waiting** 76:13
**waive** 42:19
**waived** 5:9
**walked** 53:10
**walls** 98:10
**wanna** 24:25 31:11 41:16,18 42:16 43:15 61:13 134:20 141:3 155:12 176:17,18 204:2 211:2,3 218:23 221:5 249:18 250:2 257:23 297:11
**want** 22:12 49:3 53:2

86:24 126:21 176:21 223:2 234:18,19 283:4 335:7
**wantagh** 4:12
**wanted** 22:11 43:4 51:2 56:8 90:14 103:17 126:7 134:21 136:20 137:16 140:14 195:16 196:13 204:24 205:2 264:23 312:20 320:2
**wanting** 178:19
**ware** 180:7
**warranties** 126:19,24 127:6
**warranty** 23:19 60:14 61:4 126:12,16
**wave** 238:22 239:11
**way** 10:13,16 13:21 19:11 24:3,5 38:14 48:22 53:7 61:14 65:4 68:16 87:21 95:5 97:5,7 117:13 122:24 123:19,19 159:14 164:20 165:9 168:20 177:5 187:3 190:6 196:17 201:3 216:14 218:12,15,16 234:9 238:15 244:25 245:6 251:16 263:18 277:25,25 286:24 291:11 297:21 299:17 348:18
**ways** 136:23 231:2,8 234:6 234:13 294:14
**we've** 149:2 187:23
**weeds** 47:23
**week** 175:5
**weekend** 208:6
**weir** 3:18
**weiss** 4:17
**wendy** 72:3,11 72:18 76:2 107:10 109:4 120:13 161:7 161:12 192:22 195:13,15 197:13 198:11 204:22 205:7 205:16 206:9 212:19,22,25
**went** 12:9 28:12 43:17 53:9,10 54:18 56:5 57:19,23 57:25 64:19 65:22 124:24 124:24 201:7 222:14
**westbury** 158:15
**whatnot** 285:17
**whatsoever** 140:8
**whereof** 348:20
**wholesale** 124:4 316:7
**widgeon** 6:12
**willing** 279:11 279:12
**windows** 208:17
**wiped** 168:13
**wise** 321:9
**withdrawn** 115:23 180:12 181:19 189:18
**withholding** 93:6
**witness** 1:25 2:8 4:20 5:10 5:16,18 6:3 175:20 220:20 257:24 258:5 344:5 348:11 348:14,20
**woman's** 248:15
**woodbury** 4:21 4:21
**word** 126:15 243:20 302:21
**words** 31:11 66:24 233:7 268:19 298:21 300:17 304:2 319:11
**work** 14:25 21:24 55:15 82:2 87:11 98:3 99:19,20 224:24 225:8 228:17 229:6 231:15,23 232:12,18,22 234:21 235:2 236:10,17 237:4,14,20 238:2 239:10 241:18,24,25 242:4,8 244:3 244:7 245:22 246:9,11 260:2 263:18 281:11 281:20 284:6 285:14 288:18 289:5 290:10 292:2 324:6 330:14,17 331:25

**worked** 18:5 49:24 94:12 98:13 99:11 119:19 171:8 215:18 237:15 244:22 259:24 328:3,4 333:18
**working** 17:4 20:16 53:14 54:19 55:11,16 82:12 98:22 99:14 135:18 140:2 156:6 211:24 212:3,4 226:16 254:13 255:18,23 281:2,7 324:9 330:16
**world** 21:8 70:13 243:19 314:18
**worry** 88:12
**worst** 6:18
**worth** 158:16 209:12
**worthy** 279:3
**would've** 190:11
**write** 23:24 25:11,13,24 26:12 128:13 130:5 131:4,22 132:10,11
**writes** 192:22 208:11
**writing** 40:20 63:3,4,18,22 220:16 234:4 272:9,10 306:13,17 324:6 330:13 331:5
**written** 27:19 56:25 84:18 85:17 130:14 130:16 181:3 219:4,5 270:3 274:19
**wrong** 122:16 126:15 174:22 254:7 257:11 265:13 321:19 322:7,15 323:19
**wrote** 85:24 125:19 317:4

**x**

**x** 1:3,21 59:3 61:5 345:2 346:17

**y**

**y** 59:3 138:22 138:22
**yeah** 24:20 37:17 61:3 72:16 133:12 153:24 184:3 243:13 310:4 338:12
**year** 6:18 15:4 34:11 36:8,12 36:12,22 37:12 37:15,21 43:13 48:15,20 49:9 50:21,24 66:7 66:10 72:8,9 74:6,7,8 75:17 76:6 87:2,5,7 88:5,7,12,15,16 88:25 89:3,12 128:14 129:17 130:5,15 131:4 131:5,15,21 132:6,9,12,25 137:8 142:5,16 142:22 143:21 143:21 144:11 145:16 146:22 163:4 164:7,8 167:10,12,21 168:7,12 178:25 179:24 185:7 186:9,12 189:2,6,21 190:3,9 204:16 204:18 233:13 235:25 239:19 253:14,16 264:13 297:17 302:22 308:25 322:8 324:12 328:18 337:13 342:5,6,14 345:19
**years** 7:3,4 8:2 14:3 17:17 27:11 30:3 36:5 44:13 45:4 48:12 49:25 62:14 69:24 89:20 105:24 106:11 106:13 112:24 113:4 116:20 130:12 152:11 178:15 211:2 212:23 214:2 223:16 342:13
**yellow** 19:9
**yesterday** 11:3 11:9 195:20
**york** 1:2 2:12 3:6,15,15 4:8,8 4:12,17,21 6:4 6:13 17:11 21:10,17 37:3 46:23 348:4,5 348:9

**z**

**z** 59:3
**zero** 34:12,15 34:17 37:14 38:2 43:8 44:2

322:23
**zeros** 38:6,7 44:11
**zizmor** 3:9
**zooming** 314:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.