UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

___________________________________

SUPERB MOTORS INC.; TEAM AUTO SALES LLC; ROBERT ANTHONY URRUTIA; 189 SUNRISE HWY AUTO LLC; NORTHSHORE MOTOR LEASING, LLC; BRIAN CHABRIER, Individually and Derivatively as a Member of NORTHSHORE MOTOR LEASING, LLC; JOSHUA AARONSON, Individually and Derivatively as a Member of 189 SUNRISE HWY AUTO, LLC; JORY BARON; 1581 HYLAN BLVD AUTO LLC; 1580 HYLAN BLVD AUTO LLC; 1591 HYLAN BLVD AUTO LLC; 1632 HYLAN BLVD AUTO LLC; 1239 HYLAN BLVD AUTO LLC; 2519 HYLAN BLVD AUTO LLC; 76 FISK STREET REALTY LLC; 446 ROUTE 23 AUTO LLC; and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

v.

Case No. 2:23-cv-6188 (JMW)

ANTHONY DEO; SARAH DEO; HARRY

________________________________

THOMASSON; DWIGHT BLANKENSHIP; MARC MERCKLING; MICHAEL LAURIE; THOMAS JONES, CPA; CAR BUYERS NYC INC.; GOLD COAST CARS OF SYOSSET LLC; GOLD COAST CARS OF SUNRISE LLC; GOLD COAST MOTORS AUTOMOTIVE GROUP LLC; GOLD COAST MOTORS OF LIC LLC; GOLD COAST MOTORS OF ROSLYN LLC; GOLD COAST MOTORS OF SMITHTOWN LLC; UEA PREMIER MOTORS CORP.; DLA CAPITAL PARTNERS INC.; JONES, LITTLE & CO., CPA'S LLP; FLUSHING BANK; LIBERTAS FUNDING LLC; and J.P. MORGAN CHASE BANK, N.A.,

Defendants.

________________________________

DEPOSITION OF MARC LOUIS MERCKLING

DATE: Monday, January 26, 2026

TIME: 9:10 a.m.

LOCATION: Remote Proceeding
Deer Park, NY 11729

REPORTED BY: Carol Christman

JOB NO.: 7813025

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SUPERB MOTORS INC., TEAM AUTO SALES LLC, AND ROBERT ANTHONY URRUTIA:

EMANUEL KATAEV, ESQUIRE (by videoconference)
Sage Legal LLC
18211 Jamaica Avenue
Jamaica, NY 11423
emanuel@sagelegal.nyc
(718) 412-2421

ON BEHALF OF PLAINTIFFS BRIAN CHABRIER, JOSHUA AARONSON, 189 SUNRISE HWY AUTO LLC, JORY BARON, NORTHSHORE MOTOR LEASING, LLC, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, AND ISLAND AUTO MANAGEMENT, LLC:

JEFFREY RUDERMAN, ESQUIRE (by videoconference)
Cyruli Shanks & Zizmor LLP
420 Lexington Avenue, Suite 2320
New York, NY 10170
jruderman@cszlaw.com
(212) 661-6800

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT HARRY THOMASSON:

HARRY R. THOMASSON, ESQUIRE, PRO SE

ON BEHALF OF DEFENDANT FLUSHING BANK:

ARIEL E. RONNEBURGER, ESQUIRE (by videoconference)
Cullen and Dykman, LLP
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, NY 11553
aronneburger@cullenanddykman.com
(516) 357-3748

ON BEHALF OF DEFENDANT LIBERTAS FUNDING LLC:

JEFFREY S. CIANCIULLI, ESQUIRE (by videoconference)
Weir LLP
1330 Avenue of the Americas, 23rd Floor
New York, NY 10019
jcianciulli@weirlawllp.com
(917) 475-8885

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

Anthony Deo, Defendant (by videoconference)

Robert Anthony Urrutia, Plaintiff (by videoconference)

Alivia Cooney, Paralegal, Sage Legal (by videoconference)

Jacqueline Fink, Esquire, United States District Court Eastern District of New York (by videoconference)

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Kataev | 13 |
| By Mr. Ruderman | 253 |
| By Ms. Ronneburger | 335 |
| By Mr. Thomasson | 340 |
| By Mr. Cianciulli | 347 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Merckling: | | |
| Exhibit 1 | Hearing Transcript | 38 |
| Exhibit 2 | Court Filing by Harry Thomasson | 47 |
| Exhibit 3 | Marc Merckling Declaration | 73 |
| Exhibit 4 | Opinion and Order | 102 |
| Exhibit 5 | Anthony Deo Declaration | 123 |
| Exhibit 6 | Memorandum of Law | 132 |
| Exhibit 7 | Tekion Screenshots | 136 |
| Exhibit 8 | Audit Details | 139 |
| Exhibit 9 | Plaintiff's Third Amended Complaint | 141 |
| Exhibit 10 | Anthony Deo Complaint | 160 |
| Exhibit 11 | Deposit Slips | 170 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Merckling: | | |
| Exhibit 12 | Gold Coast Motors Company Newsletter | 184 |
| Exhibit 13 | Thomasson Letter Dated 8/11/2023 | 190 |
| Exhibit 14 | Instagram Post | 198 |
| Exhibit 15 | Nethanel Orgad Declaration | 202 |
| Exhibit 16 | Email Chain Dated 6/21/23 | 215 |
| Exhibit 17 | Bank of America Document Compilation | 227 |
| Exhibit 18 | Complaint | 231 |
| Exhibit 19 | Text Screenshot | 234 |
| Exhibit 20 | Affidavit of Daniel O'Sullivan | 296 |
| Exhibit 21 | Libertas Agreement | 318 |
| Exhibit 22 | Photographs of Vehicles | 332 |

I N F O R M A T I O N R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | All Payments from Deo to Merckling | 40 |
| 2 | Written Request for Authorization | 60 |

I N F O R M A T I O N R E Q U E S T E D (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 3 | Check Payments from any Wholesaler for Payments Made on Vehicles | 135 |
| 4 | Document from FBI | 194 |
| 5 | Communications with any Defendants | 218 |

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 81 | 7 |
| 83 | 8 |
| 237 | 9 |
| 269 | 19 |

M. MERCKLING

THE REPORTER: Good morning. My name is Carol Christman. I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:10 a.m.

This is the deposition of Marc Merckling taken in the matter of Superb Motors Inc., Team Auto Sales LLC, et al., against Anthony Deo, Sarah Deo, et al., on Monday, January 26, 2026, via Zoom videoconference, with the witness located in his residence, address being 259 East 4th Street, Deer Park, New York.

I am a notary authorized to take acknowledgments and administer oaths in New York. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted

M. MERCKLING

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, and we can begin with Plaintiff counsels then Defense counsels please.

MR. KATAEV: Jeff, go ahead.

MR. RUDERMAN: For all Plaintiffs except for Mr. Urrutia, Superb, and Team Auto. Jeffrey Ruderman from Cyruli Shanks, representing all the plaintiffs.

I did receive an email, by the way, Carol, from Jeff. I forgot his name. Anyway, he represents Libertas Funding. He said he'll be about ten minutes late but to start without him.

So he may just pop in at some point. You may -- hopefully, you have his information.

M. MERCKLING

THE REPORTER: Thank you very much.

MR. KATAEV: Emanuel Kataev with Sage Legal LLC, for the Plaintiffs Robert Anthony Urrutia, Superb Motors Inc., and Team Auto Sales LLC.

THE REPORTER: And do we have defense counsels on the line?

MR. THOMASSON: Harry Thomasson, pro se.

MS. RONNEBURGER: Ariel Ronneburger from Cullen and Dykman, for Flushing Bank.

THE REPORTER: Thank you very much. Hearing no objection, I will now swear in the witness.

Mr. Merckling, please raise your right hand.

WHEREUPON,

MARC LOUIS MERCKLING,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you very much. You may lower your hand.

Counselor, please go ahead.

EXAMINATION

BY MR. KATAEV:

Q Okay. We note for the record that Mr. Benjamin wrote to us yesterday stating that he will not be able to join the deposition and that he has authorized his client to appear for this deposition without counsel.

Mr. Merckling, am I correct about that?

A Yes.

Q Mr. Merckling, my name is Emanuel Kataev as you may remember. I'm the attorney for Plaintiffs Superb Motors Inc., Team Auto Sales LLC, and Robert Anthony Urrutia.

From here on in I'll be referring to Superb Motors Inc. as Superb unless otherwise stated. Do you understand that?

A Yes.

Q I'll be referring to Team Auto Sales LLC as Team unless otherwise stated;

okay?

A Okay.

Q And I'll be referring to Mr. Robert Anthony Urrutia as Tony unless otherwise stated; okay?

A Okay.

Q I will be asking you and you'll be answering questions today about yourself, Superb, Team, Tony, Island Auto Group, Anthony Deo, our claims against you and your gang and other related subjects. Do you understand that?

A Yes.

MR. RUDERMAN: Objection. Gang? Come on, guy.

BY MR. KATAEV:

Q Your testimony today is subject to the same oath and same penalty of perjury as if you were testifying in court. Do you understand that?

A Yes.

Q Have you ever been deposed before?

A No.

M. MERCKLING

Q I'm going to go over some of the ground rules of depositions just to make sure we have an easy, effective deposition that hopefully will not take longer than needed to be completed.

First, keep your voice loud and clear for the court reporter as you've been doing; okay?

A Yes.

Q Second, answer in words please. No body gestures. No mumbling. No, "Uh-huh, hmm-mm." I need a yes or no for the record; okay?

A Yes.

Q Third, allow me to complete my question as you've been doing before you answer, and I will give you the same courtesy. This way the court reporter can write down everything both of us say; okay?

A Yes.

Q If you don't understand the question, tell me and I will rephrase it. If you answer it, I will assume that you

M. MERCKLING

understood the question. Do you understand that?

A Yes.

Q We're looking for your best recollection of events today. We're covering events that occurred over the last four years.

While I don't want you to guess at answers, even if your memory is not crystal clear, I am still entitled to your best recollection. Do you understand that?

A Yes.

Q Finally, you can take a break at any time for any reason except if there's a question pending. I ask that you answer that question before we take a break. Do you understand that?

A Yes.

Q Do you understand all of these ground rules?

A Yes.

Q Is there any reason you cannot participate in today's deposition and

provide truthful answers to questions?
A No.
Q Have you consumed any drugs, alcohol, or medications within the past 24 hours that will affect your ability to testify truthfully?
A No.
Q Is there any reason you can think of as to why you cannot provide truthful answers to questions today?
A No.
Q Are there any other names that you go by other than Marc Merckling?
A No.
Q Middle name?
A Louis.
Q You testified that you've never been deposed before, but you have testified in court before; correct?
A Yes.
Q How many times have you testified in court before?
A I don't remember. I don't know the exact number.

M. MERCKLING

Q Prior to testifying in court -- withdrawn. Presumably, you've testified in court before in connection with your career; correct?

A Yes.

Q And what is your career?

A Right now, I'm retired.

Q Prior to your retirement, what was your career?

A Police officer.

Q Is it fair to say that the only testimony you've had in court was solely as a police officer and in no other way?

A Yes.

Q Prior to testifying in court as a police officer, you met with the prosecutor to prepare; correct?

A Can you say that again?

THE REPORTER: Can you repeat the end of the question?

MR. KATAEV: Sure.

BY MR. KATAEV:

Q Prior to testifying in court as a police officer, you met with the

prosecutor to prepare; correct?
A Yes.
Q And is it fair to say that anytime you've ever testified in court before you met with the prosecutor to prepare?
A I don't think it was every time.
Q Okay. And can you give me a roundabout total of the number of times you've testified in court as a police officer, approximately?
A I really don't have a number. Probably 10 to 20 times.
Q Okay. And how long is your career as a police officer?
A Twenty-five years. Just shy of 25 years actually.
Q Okay. When was the last time you testified in court?
A It was a long time ago. I don't -- I don't remember exactly when. Probably 15 years ago.
Q Okay. And then after that, in February of 2024, you testified in court

in this case; correct?
A Yes, I did.
Q After February of 2024, did you ever testify in court again?
A No.
Q Did you prepare for today's deposition?
A No.
Q Did you speak to anyone in advance of the deposition to discuss it?
A No.
Q Did you review any documents in preparation for today's deposition?
A No.
Q Did you speak with Mr. Thomasson prior to today's deposition about this deposition?
A No.
Q Did you speak to Mr. Benjamin about today's deposition?
A Yes.
Q When was the last time you spoke to Mr. Benjamin about the deposition?
A Last night.

M. MERCKLING

Q Was that your only conversation with him?

A Yes.

Q How long did that conversation last?

A I'm sorry?

Q How long did that conversation last?

A Maybe two minutes, three minutes.

Q What format was it in? By phone?

A Yes.

Q Do you recall submitting a declaration in opposition to a motion to disqualify Mr. Thomasson?

A I don't understand the question.

Q Do you know what a declaration is?

A No.

Q I'll represent to you that a declaration is a sworn statement made under penalty of perjury to submit to the Court. Do you recall completing a

declaration?

A I don't recall.

Q Okay. Are you aware of the fact that Mr. Thomasson has been disqualified from representing you in this case?

A Yes, I do.

Q Okay. Prior to the time that Mr. Thomasson was disqualified, did you pay Mr. Thomasson any attorney's fees out of your own pocket?

A No.

Q What is your understanding as to how the fees to Mr. Thomasson were paid for defending this case?

A I don't know.

Q Did you ever have any discussions with Mr. Deo about how Mr. Thomasson was getting paid as an attorney in this case?

A I don't believe so.

Q To your knowledge, is Mr. Thomasson on salary with Mr. Deo?

A No idea.

Q To your knowledge, have you ever

seen any attorney's fees bills from Mr. Thomasson to Mr. Deo?
A No.
Q To your knowledge, have you ever seen a signed retainer agreement between Mr. Thomasson and Mr. Deo?
A Did I ever see it? No.
Q Okay. Have you ever had any communications directly with Mr. Thomasson at any point in time?
A Yes.
Q Have you ever communicated directly with Mr. Thomasson via text message?
A I'm not sure. I don't remember.
Q Have you ever communicated -- go ahead. I'm sorry.
A I said I don't remember.
Q Okay. Have you ever communicated directly with Mr. Thomasson via email?
A I don't believe so.
Q Are you aware of the existence of any group text messages between

M. MERCKLING

yourself, Mr. Thomasson, and anyone else involved in the case?

A No.

Q Are you stating unequivocally there are no such messages or you don't --

A I don't -- I don't know.

Q To the best of your memory, when was the last time you ever received a text from or sent a text to Mr. Thomasson?

A I don't know if I did or not.

Q Same question for email?

A Don't know.

Q Did you speak to anyone other than Mr. Benjamin about today's deposition?

A No.

Q Have you looked at any documents in general that concern your case? I'm sorry. Withdrawn. Have you looked at any documents at all outside of the deposition that concern this case?

A No.

Q Have you ever read or reviewed the complaint or complaints in this case?

M. MERCKLING

A No.
Q You testified earlier that you are testifying from 259 East 4th Street, in Deer Park; correct?
A Yes.
Q And you own that real property; correct?
A Yes.
Q And is it fair to say that this address is in the Dix Hills area?
A It's in Deer Park.
Q How far is Deer Park from Dix Hills?
A Five, 10 miles maybe. Well, it depends on what part of -- it depends on what part of Dix Hills.
Q Fair enough. Do you recall that Mr. Deo used to live in Dix Hills?
A Yes.
Q And he lived about five to six miles away from your house; right?
A I don't know the exact mileage, but somewhere in that vicinity.
Q Okay. Who do you live with at

M. MERCKLING

your home in Deer Park?
A My family.
Q Who does your family consist of?
A Wife, son, daughter.
Q Okay. And what is your date of birth?
A All of them?
Q No. Your date of birth?
A Oh, 3/26/70.
Q And what email addresses do you use? All personal email addresses as well?
A I'm sorry?
Q What email addresses do you use including personal email addresses?
A merck2700@gmail.com, merck27@optonline.net, and merck17@optonline.net.
Q Other than those email addresses, do you have any other email addresses that you just don't remember right now?
A Not that I know of.
Q Okay. And other than the Gmail

M. MERCKLING

address you just gave, is there any other email address you use with Google?

A No.

Q Have you ever had an email address at Northshore Motor?

A I don't remember. I believe I used the same Gmail address.

Q What about at Sunrise?

A Same thing.

Q And did you ever have any email address with Superb?

A No.

Q Have you ever been arrested before, Mr. Merckling?

A No.

Q Have you ever been convicted of any crime?

A No.

Q Have you ever cooperated with the Federal Bureau of Investigation or any other federal agency in connection with your work?

A Can you rephrase that question?

Q Have you ever cooperated with

the Federal Bureau of Investigation or any other federal agency in connection with your work?

A Well, I was on the SWAT team, so we did inter-agency things with a lot of agencies. I don't know which ones.

Q When you worked in interagency situations, did you get to work with specific special agents in charge of the FBI?

A No.

Q And you said interagency. What agencies is it that you worked with?

A It was multiple ones. I don't remember exactly which ones. Secret Service was one. I don't remember exactly which ones.

Q Do you recall if the FBI was ever one of them?

A I don't recall.

Q How long ago was the last time you worked an inter-agency assignment?

A I don't -- I don't know the exact dates. It was a long time ago.

M. MERCKLING

Q More than ten years ago?

A Probably. Maybe -- maybe less than ten years.

THE REPORTER: I'm sorry to interrupt. Let me take us off the record for just a moment. There's someone in the waiting room.

We're off the record at 9:27.

(Off the record.)

THE REPORTER: We are now back on the record at 9:28 a.m.

Mr. Kataev, please go ahead.

MR. KATAEV: May I have the last question and answer read back please?

THE REPORTER: Yes. Just a moment.

(The reporter repeated the record as requested.)

BY MR. KATAEV:

Q With law enforcement and the federal government in any capacity?

A You -- you broke up at the beginning of that question. Can you repeat it?

Q Have you ever made any deal with

law enforcement in any federal agency?

A What kind of deal?

Q Any type of agreement?

A No.

Q Now, the address that you're currently at, where you reside; how long have you lived there?

A Twenty-one years.

Q And when did you first meet Anthony Deo?

A About seventeen years ago.

Q And how do you remember that?

A Meeting him?

Q No. How do you remember that it was 17 years ago?

A Because my son and his son were on --

THE REPORTER: It looks like our witness --

THE WITNESS: At the time, and he's now 22.

MR. KATAEV: I'll redirect him.

BY MR. KATAEV:

Q Mr. Merckling, you cut out in

the middle of your answer. The first part we heard before it cut off was, "My son and his son." Can you repeat your answer please?

A My son and Anthony's son played PAL football together when my son was five years old, which I coached that team. That's how I met him.

Q And do you still coach that team?

A No, I do not.

Q When did you stop coaching that team?

A I think I -- I think I coached it for four years, five years maybe.

Q And during the time that your son and Mr. Deo's son were in the PAL, did you come to work with him at that time while you were both doing the PAL?

A No.

Q Is it fair to say that you first met Mr. Deo in or about 2009?

A If that was 17 years ago, yeah, somewhere around there.

M. MERCKLING

Q I'll represent to you that 2026 minus 17 is 2009.

A I'm sorry?

Q I'll represent to you that 2026 minus 17 years is 2009.

A Okay.

Q So is it fair to say that you knew Mr. Deo at the time that he was first arrested by the federal government?

A I didn't know he was arrested by the federal government.

Q He never told you that he was arrested in 2010?

A No.

Q Are you aware of the federal criminal proceedings that were pending against him since 2010?

A I do not.

Q He never told you about that?

A Nope.

Q Did he ever tell you in the course of any discussions with him between 2010 and 2016 that there were men with guns threatening his life?

M. MERCKLING

A Yes.
Q What can you tell me about that?
A Exactly what you just said.
Q Did he tell you who those men with guns are?
A No.
Q Did he tell you why there was a threat on his life?
A No.
Q Do you know who Louis Berrios is?
A I do not.
Q When was it that you first started working for Mr. Deo?
A I believe it was the end of 2020, the beginning of '21. Somewhere in that timeframe.
Q How did that come about?
A What do you mean, come about?
Q How did it come to be that you ended up working for Mr. Deo?
A I believe we just had a conversation, and he asked me if I wanted to come and do security.

Q Is it fair to say that he initiated the conversation?
A I -- I wouldn't say he really initiated. I -- I believe we were out to dinner, and it just came up. I -- I don't --
Q And when you were --
A Go ahead.
Q Go ahead. I'm sorry.
A I don't remember exactly how it came up.
Q When you were out to dinner and this topic was raised, was it just you and him at dinner or was anyone else present?
A Just me and him.
Q Do you remember where you went to dinner?
A I don't -- I don't remember which restaurant.
Q Ever since meeting Mr. Deo, do you frequently go out to dinner with him?
A Occasionally.
Q Do you recall a telephonic hearing held before Judge Merchant in this

case on September 14, 2023?

A I'm sorry. I didn't understand the question.

Q Do you recall a telephonic hearing that took place before Judge Merchant in September -- on September 14, 2023?

A What's a telephonic meeting? I -- I don't know what you're asking.

Q I'll withdraw the question. I want to read to you some statements made by Mr. Thomasson at a telephone conference in front of a federal judge that was previously assigned to this case.

A One of our --

Q Before I read this --

THE REPORTER: Can you repeat what you said?

THE WITNESS: I'm sorry.

MR. KATAEV: Before I read this to you --

THE WITNESS: Yeah. I -- I -- the -- your -- it's either my phone or your phone was breaking up. I didn't hear anything

you said.

BY MR. KATAEV:

Q I'll repeat it. Do you know who Judge Orelia E. Merchant is?

A I don't.

Q Are you aware of the fact that Judge Merchant was assigned to this case before Judge Wicks became designated as the judge for all purposes?

A The only judge I remember is Judge Wicks.

Q Okay. I'll represent to you that the following statements were made by Mr. Thomasson at a hearing, by phone, in front of Judge Merchant on September 14, 2023. And I'm quoting.

"He was in the real estate business, your Honor, and got a slap on the wrist for what ended up being cooperation with the feds."

"And for his own protection, he took the deal they offered. We'll make it look like you're a big part of this to protect your life going forward because we

are not able or willing to provide you protection for the rest of your life."

"That's why the man has two police officers around him. And Urrutia was told and Aaronson was told, and now the --"

A You're -- you're breaking up.

Q Okay. I'm going to put it up on the screen.

MR. RUDERMAN: For the record, by the way, I could hear the question clearly on my end.

Carol, are you able to hear clearly?

THE REPORTER: Yes, I was able to hear.

MR. RUDERMAN: Okay. And Mr. Merckling had frozen earlier. I'm just a little concerned that his connection may not be solid.

THE REPORTER: I know we were in the middle of a question. Would you like me to take us off the record to get this figured out?

MR. KATAEV: No.

M. MERCKLING

THE REPORTER: Okay.

MR. KATAEV: No, no. I'm just going to present it to him as an exhibit instead of reading it then. Give me one second.

BY MR. KATAEV:

Q Mr. Merckling, I'm placing up on the screen what will be marked as -- I'm sorry. Merckling 1. It's a transcript bearing ECF docket entry 154-1, and I'm pointing you to page 82.

Can you please read the selected text, and tell me when you're done?

(Merckling Exhibit 1 was marked for identification.)

A Okay. I read it.

Q Is this your understanding as to why you were hired by Mr. Deo to provide security for him?

A I have no idea. We never discussed it.

Q Mr. Deo never discussed this with you; correct?

A He -- the only thing he said to me is that he got threatened. That was

it.

Q Did Mr. Deo tell you who threatened him?

A No.

Q Did Mr. Deo tell you why he was threatened?

A No.

Q When Mr. Deo first offered you a job doing security for him, what were the terms of compensation that were discussed?

A I don't remember the exact amount.

Q Do you remember if it was an hourly thing, a salary thing, something else?

A I believe it was a weekly thing, but I really don't remember.

Q And what method of payment was that done in every week?

A Mostly by check, and I don't --

Q Do you recall --

A Go ahead. I'm sorry.

Q Finish. You believe what?

A And then I believe at some point

I was put onto direct payment.

Q Through payroll?

A Yes.

Q And that was at Northshore?

A Yes.

Q So it's fair to say that every single weekly payment you received was by some form of check or ACH; correct?

A Check or what?

Q ACH payroll?

A Yes.

Q You've never been paid in cash by Mr. Deo; correct?

A No.

MR. KATAEV: We're going to call for the production of all payments from Mr. Deo to Mr. Merckling. We'll follow up in writing.

BY MR. KATAEV:

Q Now, how many hours a week do you estimate you worked for Mr. Deo providing security ever since you first started doing that for him?

A Well, every week was different.

M. MERCKLING

So I could only be there when I -- when I wasn't working for the Nassau County Police Department.

Q How did you keep track of when you were working for him and when you weren't?

A I'm sorry?

Q How did you keep track of when you were working for him and when you weren't?

A I didn't. I -- I went there when I wasn't working for the police department.

Q Okay. And then when did -- when and how did you or Mr. Deo reconcile the hours you worked so you could figure out how much to get paid?

A I said I wasn't paid by the hour.

Q Okay. So are you saying you got paid the same amount every week regardless of the number of hours you worked?

A Sometimes it was more hours, sometimes it was less. So yeah, I believe

M. MERCKLING

it was just a weekly salary.

Q Okay. And the pay was the same regardless if it was more or less; correct?

A Yes.

Q Were there situations or circumstances in which you worked no hours for Mr. Deo that week and you still got paid a salary?

A No.

Q So if you didn't do any work at all for the week, you wouldn't get paid; correct?

A No. There wasn't a week I believe that I didn't work.

Q I see. So you've worked for him every week ever since you started; correct?

A No, not every week since we started.

Q How did it work? How did it work with the schedule while you were working at Nassau County PD?

A Well, I worked four days. I was

M. MERCKLING

off for four days for the police department. So on the four days I was off, I worked there.

Q Okay. And can you describe to me, was it a rotating weekly thing, or was it just four days on, four days off ad infinitum?

A Repeat the end of that. I'm sorry.

Q Was it just four days on, four days off ad infinitum, like on and on?

A It went, I worked four days, then I was off four days. I worked four days and I was off for four days. It just -- so it wasn't the same days every week. It actually moved it a day up a week.

Q I see. Is that a schedule that is common amongst other Nassau County police employees?

A Yes. Not all, but it is -- it is one of the tours that we work.

Q Understood. In the course of your employment with Mr. Deo, did you ever

M. MERCKLING

do any work related to a DMV license for him?

A No. Not that -- not that I remember. No.

Q And Mr. Deo, when he lived close to you, he lived at 4 Darius Court in Huntington Station; correct?

A Yes, Dix Hills.

Q Okay. And you recall that that was his address when you were neighbors; correct?

A Yes.

Q To your knowledge, did Mr. Deo rent or own that property?

A I believe he owned it.

Q What is your basis for the belief that he owned it?

A Because he was there for a long time. I didn't think he was renting. I mean we never had a discussion about it.

Q So you have no independent knowledge as to whether he rents or owns it; correct?

A Correct.

M. MERCKLING

Q What knowledge, if any, do you have about that property being the subject of the federal criminal prosecution against him?
A None.
Q He never discussed it with you?
A No.
Q Have you ever been a party to any other lawsuit as either a defendant or a plaintiff other than this case?
A Car accident when I was 18, if that counts.
Q Other than that?
A No.
Q But other than that, nothing; right?
A No.
Q What was the result of that lawsuit when you were 18?
A Result meaning I got hurt.
Q What happened with that case? How did it end up getting resolved?
A I won the case.
Q Did it go to trial?

M. MERCKLING

A No.
Q Settled?
A Yes.
Q Do you currently work at 108-122 New South Road in Hicksville?
A Yes.
Q And what is that address?
A I'm sorry?
Q What is that address?
A 108 New South Road.
Q I'm saying what is located at that address?
A It's an office building that we do car sales.
Q And what is your role there?
A Security. Same thing.
Q Are you aware of any death threats made by the landlord there to Mr. Deo?
A No. There -- not that I know there was any death threats to Anthony.
Q I'm going to place up on the screen what'll be marked as Merckling 2.
//

M. MERCKLING

(Merckling Exhibit 2 was marked for identification.)

I'll represent to you, Mr. Merckling, that this is a document filed by Mr. Thomasson on June 27, 2025, in a lawsuit between Mr. Deo and his landlord at the dealership.

Please take the opportunity to read this. Let me know when I can scroll down.

A I'm sorry. It keeps moving. It's just taking me -- yeah. Okay.

Q I'm going to scroll down so you can finish reading.

A Okay. Done.

Q Let the record reflect that I scrolled down to page 2. Sorry; 3. We're at the ending of the letter.

A I'm finished.

Q Are you aware of this incident?

A Yes, I am.

Q What is the reason that the landlord engaged in this conduct to your knowledge?

M. MERCKLING

A I don't know why. I didn't speak to the landlord about it.

Q Is it fair to infer that the reason why the landlord would engage in such conduct is because Mr. Deo is not paying the rent at that property?

A I would have no idea.

Q You have no knowledge as to whether Mr. Deo is paying rent; correct?

A I do not know.

Q Were you present when Mr. Udayan and Pramod were attacked by these individuals?

A I was not.

Q And where were you?

A I don't recall, but I wasn't there.

Q Are you -- withdrawn. Are you aware of any criminal prosecution against these individuals?

A No, I'm not.

Q Were you involved in speaking to the Nassau County Police Department about this incident?

A I spoke to them I believe the next day after the incident or a couple days after when they came back.

Q And when you say they came back, the they is the Nassau County Police Department; correct?

A Yes, along with the -- the people who had the -- I -- I can't remember their names, but whoever had the -- the knife and the hammer.

Q Do you know whether those individuals were arrested?

A I believe one of them was. I'm not sure if they both were.

Q And who do you recall speaking to from the Nassau County Police Department about this incident?

A It was a female police officer. I don't know her name.

Q Just give me one second. Are you aware of any similar incidents occurring with respect to death threats made to Anthony Deo at his residence where he lives?

A Not that I recall.

MR. THOMASSON: Can I please request that we make a five-minute break here?

MR. KATAEV: Sure.

THE REPORTER: Off the record at 9:56 a.m.

(Off the record.)

THE REPORTER: We are back on the record at 10:01 a.m.

Mr. Kataev, please go ahead.

BY MR. KATAEV:

Q Mr. Merckling, we just took a break for approximately five minutes; correct?

A Yes.

Q During the break, did you have any discussions with Mr. Thomasson about your testimony?

A No.

Q What is your phone number, Mr. Merckling?

A (516) 250-5626.

Q And what carrier do you use?

A Verizon.

M. MERCKLING

Q Are you familiar with an establishment called Cherrywood Auto Sales & Service?

A Yes.

Q And you're familiar with that dealership because Mr. Deo worked there; correct?

A Yes.

Q Mr. Deo worked at that dealership from May of 2024 until September of 2024; correct?

A I don't know how long he worked there.

Q What do you recall about how long he worked there?

A I went there with him a few times. That's all I know.

Q How many times did you go with him?

A I don't recall.

Q The few times that you went with Mr. Deo to Cherrywood, were there any incidents?

A No.

M. MERCKLING

Q To your knowledge, did Mr. Deo go to Cherrywood without you?
A Yes, I'm sure he did.
Q And why are you sure that he did?
A Because he was there before I ever went with him.
Q What was the reason you first went with him there?
A Just went down there with him to take a --
Q You cut out. Can you repeat your answer please?
A Oh, I'm sorry. I just went down there with him to see how -- how he was doing. That's all. I was not working for him at the time.
Q So when you went with him, there was not any performance of your services for him?
A No.
Q You went there just as friends?
A Yes.
Q Was that the case for all the

times you visited Cherrywood?

A I believe so.

Q Do you know a gentleman named Albert Hakim?

A Does not sound familiar.

Q If I tell you that Mr. Hakim was an individual who loaned Mr. Deo a hundred thousand dollars, does that refresh your recollection?

A No.

Q You never met Mr. Hakim?

A I don't believe so. The name does not sound familiar.

Q You first began working for the Nassau County Police Department in October of 1997; correct?

A Yes.

Q What was your initial title and role at the NCPD when you first started there?

A Police officer.

Q How long were you a police officer before your title changed?

A My title never changed. I was

always a police officer.
Q Did you ever apply for any type of promotion within the police department?
A I applied for a different responsibility, a different unit.
Q And what unit was that?
A Bureau of Special Operations.
Q I'm sorry. Can you repeat that?
A Bureau of Special Operations. BSO.
Q And when did you first apply for a position in that unit?
A I believe it was in 2012.
Q What prompted you to make that application?
A I wanted a change.
Q Were you required to take any exams in order to move to that unit?
A Written exams? No.
Q Was there a physical exam?
A Yes.
Q How long was that exam?
A How long was the exam?
Q Yes.

A The physical exam?
Q Yes.
A I don't -- I don't know how long it was. It was all different things.
Q Prior to your BSO, what were your job duties and responsibilities as a police officer?
A Patrol.
Q In a car or on foot?
A Car. We don't have foot patrols in Nassau County.
Q After your move to the BSO, what were your job duties and responsibilities?
A It was the SWAT team, so we handled any -- anything that needed to be done of us. Want me to list every responsibility?
Q I don't want every responsibility, but I want a general understanding of typical day-to-day stuff.
A We were special weapons and tactics, so we were there to protect the police officers in case something happened or in case they got into a situation that

they couldn't control.

Q And your schedule, four days on, four days off; was that at BSO, or was that the same when you were a police officer?

A It -- my schedule was always four days on, four days off.

Q And when did you retire?

A April of '22. April 7th.

Q Did you have a retirement party?

A Not really.

Q After your retirement, did you start working with Mr. Deo full-time?

A Yes.

Q Is it fair to say that prior to working with Mr. Deo, you did a lot of overtime at the Nassau County Police Department?

A Some, not a lot.

Q What do you characterize as some? In a whole year, how much would you earn in overtime if you worked some overtime?

A How much in overtime? I -- I

don't recall how much I made in overtime.

Q Would it be fair to say that in 2020, you earned about $39,000 in overtime?

A I don't remember.

Q Do you have any reason to dispute that sum?

A Absolutely not.

Q Did you ever have any disciplinary issues while working at the Nassau County Police Department?

A No.

Q Were there ever any gaps in your career at the Nassau County Police Department? In other words, any times that you were absent from the department for a period of more than a week?

A For what reason besides maybe being sick?

Q Any reason other than vacation?

A Not that I know of unless I was sick for a couple days. That's about it.

Q Have you ever worked with Detective Marx at Nassau County Police

Department?

A No.

Q Do you know who that is?

A I do now.

Q How do you know who that is?

A Because I met him the night that Anthony had to go there to file a report.

Q And that was in relation to the $735,000 that Joshua Aaronson took; correct?

A Yes.

Q Prior to that incident, you never met with or spoke to Detective Marx; correct?

A Correct.

Q Is it fair to say that as a result of you working for Mr. Deo during your last year at the Nassau County Police Department, you worked less and less overtime?

MR. THOMASSON: Objection. Objection as to form. Less and less overtime where, Mr. Kataev?

//

M. MERCKLING

BY MR. KATAEV:

Q At the Nassau County Police Department?

A Can you repeat?

Q Yes. Is it fair to say that as a result of working with Mr. Deo, you worked less and less overtime at the Nassau County Police Department over the years?

A One had nothing to do with the other.

Q Are you aware of an internal document at the Nassau County Police Department called the guide or patrol book or something like that?

A Patrol guide, yeah. Yes.

Q And did you consult the patrol guide prior to taking employment with Mr. Deo?

A Yes, I did, and I also got authorization from the job.

Q And you prepared an application in order to be able to get authorization?

A It's a written letter that you

have to submit, and it gets approved or disproved.

Q And you recall submitting that letter and receiving approval; correct?

A Yes.

MR. KATAEV: Okay. We're going to call for the production of the written request, authorization, or any other related documents. We'll follow up in writing.

BY MR. KATAEV:

Q Is it fair to say that when you first started working for Mr. Deo, you started working at Northshore Motor Leasing, LLC?

A Yes.

Q And to your knowledge and recollection, when were you first hired to do so?

A End of 2020, beginning of '21. Somewhere in that area.

Q Did anyone other than Mr. Deo speak to you about the position?

A I don't understand the question.

M. MERCKLING

Q Was there anyone other than Mr. Deo who was involved in hiring you at the dealership?

A No.

Q He was the only person you spoke to; correct?

A Yes.

Q After you retired, you turned in your shield and your gun; correct?

A I turned in my shield. I got a retired shield back. And no, I did not turn in my gun.

Q Why was that?

A Because it's my gun.

Q And you have a license?

A I do.

Q Just to complete my question, you have a license to carry and conceal?

A Yes.

Q When was the last time you renewed that license?

A I believe it gets renewed every two years or every four years. I don't know. It's not up for renewal yet.

M. MERCKLING

Q Did you complete any paperwork when you were first hired at Northshore?

A I don't recall.

Q Do you remember completing an I-9 form or a W-4 tax form?

A I really don't remember what forms I filled out.

Q What was your job title when you were hired at Northshore?

A I didn't have one.

Q Is it fair to say you reported only to Mr. Deo?

A I -- what do you mean by reported?

Q Who did you take direction from?

A I didn't really take direction. I was there doing basically security. And if he needed anything else during the course of the day, I could help out. But I was there doing security. I know my job.

Q Is it common for automobile dealerships to have security there?

A I don't know.

M. MERCKLING

Q Have you ever witnessed any dealership have hired security on the premises?

A Again, I've never been in another dealership, so I don't know.

Q What car do you drive?

A Right now? I have a few different cars.

Q Which ones are they?

A I have a black BMW, a black Durango, and a black Infiniti. I'm sorry. Audi.

Q Did you get those cars through your relationship with Mr. Deo?

A Two of them I -- one of them I purchased through Northshore. One of them I purchased through I believe Sunrise.

Q What about the third one?

A The other one through the dealership. It was through a different dealership. Dodge, I believe.

Q Where?

A West Islip, I believe it is. Atlantic Dodge.

M. MERCKLING

Q You said you do security and you know your job. Can you describe what it is that you did for purposes of security at the dealership?

A On security, I made sure nothing bad happened.

Q Was your job solely to protect Mr. Deo, or was it to protect the dealership and its employees as a whole?

A I would say anybody there.

Q If both another individual that worked for the dealership and Mr. Deo were in harm's way, would you prioritize one over the other?

A I can't answer that question. Depends on the situation.

Q After you retired and you started working full-time for Mr. Deo, what was your schedule?

A I believe when I first started, it was five days a week. I don't remember the hours.

Q Did your day start by going to the dealership in Hicksville, or did you

M. MERCKLING

meet Mr. Deo at his home?

A When -- when are you speaking about? Hicksville was only the last year or so.

Q Ever since you retired is what I'm speaking about.

A Okay, but you said Hicksville.

Q Well, isn't the new dealership in Hicksville?

A The new dealership's in Hicksville, yes.

Q I'll rephrase.

A And you said since I retired.

Q Ever since you retired, does your day start at Mr. Deo's home or elsewhere?

A Both. Sometimes I -- sometimes I pick him up at his house. Sometimes I meet him at the dealership.

Q And how does that get decided on a daily basis?

A If he didn't feel like driving, he would ask me to pick him up.

Q Is it fair to say that your

M. MERCKLING

schedule changes frequently, week to week or even day to day?

A More or less.

Q When you were still employed as a police officer in Nassau County Police Department and you were working for Mr. Deo, did you work anywhere else?

A No.

Q Now that you're working solely for Mr. Deo, are you working for anyone else?

A No.

Q After you retired from the Nassau County Police Department, did you apply for and receive a pension?

A Yes.

Q And you're still currently receiving that pension; correct?

A Yes.

Q After you started working for Mr. Deo full-time, did your compensation change in any manner?

A What do you mean by compensation?

M. MERCKLING

Q How much you were paid; did it change because you started working full-time?

A I don't believe so.

Q What is the amount --

A I don't remember.

Q What is the amount of the weekly payment Mr. Deo makes to you?

A You -- you broke up. I'm sorry. Can you repeat that?

Q What is the amount of the weekly payment that Mr. Deo makes to you?

A Currently?

Q Currently.

A Currently?

Q Yeah.

A Or then?

Q Currently.

A 1,500 a week.

Q And in the past when you were just part-time?

A I believe it was a thousand a week. I don't remember.

Q Is Mr. Deo current in his

obligations to you?
A I'm sorry?
Q Is Mr. Deo current in his obligations to you?
A What do you mean current in his obligations?
Q Has he made all his payments on time?
A Yes.
Q Were there ever any instances in which you were not paid on time?
A Well, there was a period of time where I didn't get paid, but that was just an agreement between me and him because business got real bad.
Q Did Mr. Deo ever provide you a W-2?
A Yes, I believe in -- from when I -- we were in Northshore.
Q Did he ever provide you with a 1099?
A I don't remember.
Q When Mr. Deo paid you, he paid you directly to your personal name;

correct?
A No, to my corporation.
Q That's Merck 27 Inc.; correct?
A Yes.
Q And you incorporated that business in December of 2020; correct?
A I believe so.
Q Is it fair to say that you incorporated that business in December of 2020 for the sole purpose of receiving payments from Mr. Deo?
A No. I -- I set it up because I was also planning on retiring and doing -- going into other work.
Q Ever since you retired, have you ever gone into any other work?
A I have.
Q I'm sorry. I didn't hear you.
A I have.
Q Who else have you worked for?
A Oh, I did private investigative work. I work for myself.
Q You advertise?
A No, I do not.

M. MERCKLING

Q Is it fair to say that the private investigative work you've done is solely by word of mouth?

A I didn't hear what you said.

Q Is it fair to say that private investigative work you've done is solely by word of mouth?

A More or less word of mouth, yeah.

Q Have you ever been engaged by Mr. Deo or anyone else to conduct private investigative services related to Mr. Urrutia?

A No.

Q What about anyone at Island Auto Group?

A No.

Q What about the attorneys for Island Auto Group?

A No.

Q What about the attorneys for Mr. Urrutia?

A No.

Q If you could give me a ratio in

M. MERCKLING

terms of revenue that you received from Mr. Deo compared to other private investigative work you do, what would that ratio be, roundabout?

A It didn't do any private investigative work for Anthony Deo.

Q I'll rephrase the question because I think you misunderstood.

If you take on the one hand the work you did for Mr. Deo that you currently receive money for, for security services and the work that you did for other customers doing private investigative services, what would be the ratio?

Is it 50/50? Is it 90, Mr. Deo, 10% private investigative?

A Well, I was -- I was only doing the private investigating work when I didn't work for Anthony.

Q And when was that?

A I believe it was in '23. I -- I don't really remember.

Q And why was there a period of

M. MERCKLING

time in '23 when you were not doing any work for Mr. Deo?

A Because his dealerships got closed down.

Q And his dealerships -- you're referring to Northshore and Sunrise; correct?

A Yes, and Superb.

Q When was it in 2023 that all three dealerships got closed down?

A I don't remember the date.

Q Well, it had to have been after August of 2023; correct?

A If you say so. I don't remember the date. I'm not good with remembering dates.

Q Okay. We'll get back to that. And you're still currently employed by Mr. Deo; correct?

A I am now, yes.

Q Do you have any documents related to your engagement or employment with Mr. Deo?

A No.

M. MERCKLING

Q When you performed private investigative services, did you rely on connections in the Nassau County Police Department to help you in your work?

A No.

MR. KATAEV: Give me a second to pull up an exhibit.

Madam Court Reporter, are we up to three or four?

THE REPORTER: Yes, three.

BY MR. KATAEV:

Q Mr. Merckling, I'm placing up on the screen what will be marked as Merckling 3.

(Merckling Exhibit 3 was marked for identification.)

I'll represent to you that this is a declaration by you dated on or about November 6, 2023, bearing ECF docket entry 92. I'm scrolling down to the bottom of the first page. Do you see that?

A What -- what is this document?

Q I'm representing to you that it's a declaration that you signed. Are

you familiar with it based on the screen and what I'm showing you at the bottom of the first page?

A I -- can I see the top again to see what it says?

Q Yes. It's a caption. Let the record reflect I scrolled up.

A Okay.

Q Do you remember a document like this?

A I don't really remember it, but I mean it has my name on it.

Q Scrolling to the bottom of page 4.

A I --

Q Do you recognize your signature on it?

A I do.

Q And it's dated October 30, 2023; correct?

A Yes.

Q Do you recall meeting with Mr. Thomasson about this declaration in person?

M. MERCKLING

A I don't remember the meeting, but I mean, like I said, that's my signature.

Q Can you read paragraph 2 and tell me when you're done please?

A Oh boy. I think I lost you. Oh, there we go. I'm sorry. Read what?

Q Paragraph 2, and tell me when you're done.

A Okay. I'm done.

Q Okay. You say over here that you did part-time work for Mr. Deo and his business interests. Do you see that?

A Yes.

Q What did you mean when you said his business interests?

A The dealerships.

Q Solely the dealerships or something else?

A Solely the dealerships.

Q You also say that you introduced Mr. Deo to Dwight Blankenship. Do you see that?

A Yes.

M. MERCKLING

Q When did you first introduce Mr. Blankenship to Mr. Deo?

A I don't remember.

Q Was it when you were still working at Northshore?

A I believe so.

Q You say here that Mr. Deo was looking for extra help at the dealership with all the day-to-day tasks needed at the dealership; right?

A Yes.

Q What extra help was that?

A With service, and prepping cars, and stuff like that.

Q Did Mr. Blankenship also provide security services?

A Well, he is a retired police officer, so -- I mean he's still an active police officer.

Q And why is -- why does that matter?

A Well, I'm sure he wouldn't let anything happen if he was there being that he's a police officer.

M. MERCKLING

Q But it's your testimony that Mr. Blankenship's primary duty was preparing cars and working with cars?

A He did -- he did a lot with the service. Yeah.

Q And there's a reference here to day-to-day tasks. Do you see that?

A Day-to-day tasks, yeah, needed at the dealership.

Q What were those tasks?

A Again, service to vehicles, prepping cars for delivery; stuff like that.

Q Did you ever apply for a license to work as a private investigator in the state of New York?

A I did. I am a licensed private investigator.

Q Sorry. Repeat that?

A I am a licensed New York State private investigator.

Q And do you have a license in your individual name, or the company name, or both?

A I believe it's in my personal name.
Q Do you know your UID number offhand?
A I can get it.
Q If you need to go somewhere to get it, I don't --
A No. I have it right here.
Q I'm ready when you are.
A Hold on one second. Do you want the ID number?
Q Please?
A 11000220038, I believe it is. One sec. It's not that easy to read.
Q Other than you, has anyone else worked for or at Merck 27 Inc.?
A No.
Q Is it fair to say that Mr. Blankenship would work for Mr. Deo when you were unable to?
A Well, we worked there together sometimes also.
Q Who would decide when and whether you would work together or

M. MERCKLING

separately?

A Well, we would -- when I was working, he would work when -- when we were off of work when I was still a police officer.

And when I retired, I was there all the time. And he came in when he didn't have his police duties.

Q Do you know whether Mr. Blankenship applied for authorization, according to the patrol guide, to work with Mr. Deo?

A Yes, he did.

Q Did you help him with that?

A No. He did it on his own.

Q How do you know that he did it?

A Because he told me he did.

Q I want you to look at paragraph 3. Read it and tell me when you're done please.

A Okay.

Q In the declaration you -- is it fair to say you are minimizing the tasks that you perform for Mr. Deo?

A Well, my main concern -- my main objective was security.

Q This declaration doesn't say that your main objective was security; correct?

MR. THOMASSON: Objection. The document speaks for itself.

BY MR. KATAEV:

Q You can answer.

A Peace of mind is basically security, in my opinion, so.

Q Referring to paragraph 6, please read that. Let me know when you're done. If you want to read in between, let me know. I'll scroll up.

A Okay.

Q You said that you first spoke with Mr. Thomasson on August 3, 2023; correct?

A Other than hi and goodbye.

BY MR. KATAEV:

Q What did you speak about with Mr. Thomasson on August 3, 2023?

A About being locked out of the

business.

MR. THOMASSON: Objection. That is absolutely privileged, Mr. Kataev.

MR. KATAEV: Are you instructing him not to answer the question?

MR. THOMASSON: I am instructing him not to answer any questions that involve our conversations on and after August 3, 2023.

MR. KATAEV: And you're instructing him not to answer to preserve his privilege?

MR. THOMASSON: Those conversations were absolutely attorney-client privileged conversations between me and Marc Merckling.

That would be every conversation we ever had after the night of the lockout at Superb, including the night of that lockout.

That was the first conversation I ever had with him, and it was strictly business. There was nothing else I ever discussed with him.

M. MERCKLING

MR. KATAEV: I understood that. But my question is, are you instructing him not to answer in order to preserve his privilege?

MR. THOMASSON: Yes.

BY MR. KATAEV:

Q We'll mark this for a ruling, and we'll deal with it after the deposition.

BY MR. KATAEV:

Q Okay. Let's look at paragraph 8. Please read it. Let me know when you're done.

A Done.

Q Okay. You say that you're aware of Mr. Thomasson's experience and knowledge of the Long Island automobile industry generally; right?

A Yes.

Q What knowledge do you have about Mr. Thomasson's experience and knowledge of the Long Island automobile industry?

MR. THOMASSON: Objection. If there is knowledge that he has other than from

M. MERCKLING

our conversations, the witness can answer the question.

But if his only knowledge of my experience and knowledge of the Long Island automobile industry generally came from our conversations, then that is privileged, and I am instructing the witness not to answer.

MR. RUDERMAN: I'd like to go on the record with regard to Mr. Thomasson's objection.

Not every communication with counsel is privileged communication. So if the testimony concerns Mr. Thomasson's advising about his particular qualifications to represent the party, that is not a privileged communication.

So Mr. Thomasson, is that what you're objecting to?

MR. THOMASSON: I am objecting to any conversations being explored as between Marc Merckling and me because I've only discussed business with him and our conversations are privileged.

MR. RUDERMAN: Again, I'm going to repeat what I said, and please talk to my question, not what you want to say.

Are you instructing not to divulge any communications about what you told him are your qualifications to represent to a -- in the automobile industry?

Is that the communication you are saying is a privileged communication?

MR. THOMASSON: I am instructing the witness not to answer any questions about conversations he has had with me because our conversations -- I believe every single one of them is privileged.

MR. RUDERMAN: Okay. Irrespective of what was discussed, every communication you had with Mr. Merckling -- it's your position is a privileged communication. Is that clear?

MR. THOMASSON: Yes.

MR. RUDERMAN: Okay. I would also request it be marked for a ruling.

Mr. Kataev, you can -- I'm sorry to budge in, but you can continue with

whatever you wanted to say.

MR. KATAEV: All right. We'll deal with it later. Maybe during lunch, we'll reach out to the judge.

MR. RUDERMAN: Yeah.

MR. KATAEV: Madam Court Reporter, please mark this line of questioning for a potential read back later on today.

THE REPORTER: I will do that.

MR. KATAEV: Let me know when you're ready. And let me know when you're ready to proceed.

THE REPORTER: Just a moment. All right. Go ahead. Thank you.

BY MR. KATAEV:

Q Do you believe that Mr. Thomasson is a good attorney?

A Are you asking me this question?

Q I am.

A I don't know if he is or not. I never -- I only had him as an attorney for a short period of time.

Q When you first started working at Northshore, you worked out of the

M. MERCKLING

location at the address 180 Michael Drive, in Syosset, New York; correct?

A Correct.

Q That's where Northshore operated from; right?

A Yes.

Q Did Northshore ever operate from anywhere else?

A I have no idea. That's where I worked out of.

Q Did you have an office at Northshore at 180 Michael Drive, in Syosset?

A Yes.

Q Where was your office in relation to Mr. Deo's office?

A It was in the front of the store, near the salespeople.

Q Are you in possession of any diagrams or floor plan layouts of the building where Northshore operated from?

A No.

Q Are you familiar with the fact that the premises at 180 Michael Drive was

M. MERCKLING

surrendered to the landlord by Mr. Deo?

A I would imagine so.

Q And why is it that you imagine so?

A Because we're not there anymore. We had to clean everything out of there.

Q Were you physically involved in cleaning everything out of the premises at 180 Michael Drive, in Syosset?

A I helped.

Q Was Mr. Blankenship there with you?

A I don't recall.

Q What did Mr. Deo tell you, if anything, about why you were leaving from that premises?

A I don't remember the conversation that we had about why.

Q Did you ever ask him why are we leaving?

A No, 'cause we weren't doing business from what I could see.

Q Do you know why Northshore was no longer doing business?

A I don't.

THE REPORTER: Mr. Merckling, you froze. Could you please repeat your answer?

THE WITNESS: I said I don't.

BY MR. KATAEV:

Q And you never asked; correct?

A I'm sorry.

Q And you never asked; correct?

A No, not that I remember.

Q Is that a directive of Mr. Deo's that you don't ask him any questions, or you just don't ask by nature?

A I don't ask by nature. If something's needed to be said to me, they'll say it.

Q You weren't at all curious as to why you were leaving from there?

A I did my job. That's all I can do. I don't get involved in anything else that's going on.

Q Have you ever been to a dealership called Baron Nissan?

A I believe I was there once. I

M. MERCKLING

don't -- maybe once. Yeah, no, I was there. I know I was there once. I believe that was the only time.

Q And when you went there the one time that you recall, you were there with Mr. Deo; correct?

A No, I don't think I was there with Anthony. I went there to -- I believe I had to go there to pick up paperwork or something from them. I don't --

Q Do you remember who you met with on the day you went there?

A The reason I was there for. Can you repeat? You broke up. I'm sorry.

Q Why don't you just repeat the last thing you said because it wasn't clear?

A I said I don't remember why I was actually there. I believe I had to pick up paperwork for something.

Q Okay. And my question was, do you remember who you met with at Baron Nissan to pick up paperwork?

A Yes. It was -- oh, what's his name? Brian something. Chabrier, I believe his name is. Brian Chabrier.

Q Good memory. Yes, that's his name. What is it that you picked up from Brian that day?

A I have no idea.

Q Was it paperwork?

A Yeah, I believe it was paperwork.

Q Was the paperwork in an envelope or was it just given to you?

A I don't remember.

Q Are you aware of or familiar with any dispute over Baron Nissan?

A I was told that there was one.

Q What is your understanding as to what the dispute is?

A That Anthony bought it and they didn't give it to him.

Q And how do you know that?

A A conversation I had with Anthony.

Q Other than that conversation

M. MERCKLING

with Anthony about Baron Nissan, is there anything else you know about Baron Nissan?

A Other than it's a car dealership? No, not really.

Q Do you know what relationship, if any, there is between Baron Nissan, Northshore, and Sunrise?

A I don't.

Q Do you know who David Baron is?

A I met -- I believe I met David once before I even worked at the dealership.

Q And what were the circumstances of that meeting?

A It wasn't a meeting. It was the introduction. Hello. Goodbye.

Q Were you there with Mr. Deo or by yourself?

A I was there to see Anthony, and he introduced me to them, and I left.

Q When was that?

A I don't remember.

Q You were there to pick something up from Mr. Deo?

M. MERCKLING

A No. I was probably there visiting him.

Q Repeat that.

A I was there -- I believe I was there visiting him. I don't believe I actually worked there at that time when I met David.

Q I see. Is it fair to say that you and Mr. Deo were friends since 2009?

A You broke up. I'm sorry. Can you repeat that?

Q Is it fair to say that you and Mr. Deo consider yourselves friends since 2009?

A I would say so.

Q So at the time that you first met David Baron, you were just visiting Mr. Deo as a friend?

A I believe that's when it was, yes.

Q And do you remember where it was?

A It was in Northshore.

Q Is that the only time you

remember ever meeting David Baron?
A That's the only time I remember, yes.
Q Are you aware of the fact that there was one instance where Mr. Deo flew to Florida to see Mr. Baron?
A I did know that, yes.
Q Were you there with him?
A In Florida?
Q Yes.
A No.
Q And how do you know that Mr. Deo went to visit Mr. Baron in Florida?
A Because he told me he -- that's where he was going.
Q Do you know why Mr. Deo flew to Florida to meet with Mr. Baron?
A Again, same conversation. Supposedly he was going there to buy Nissan -- Baron Nissan.
Q I see. Other than the time you met Mr. Baron at Northshore and the discussion you had with Mr. Deo about visiting Florida to speak to Mr. Baron,

what other information do you know about Mr. Baron?

A That he passed away.

Q Do you know an individual named Frank Ventimiglia?

A Yes.

Q How do you know him?

A He was a finance guy at Northshore.

Q He worked there?

A I'm sorry?

Q He worked at Northshore?

A Yes.

Q And was he still working there when Northshore was shut down or ceased operations?

A I don't remember when he was there and wasn't. I know he was there. I don't remember when he left.

Q Is Mr. Ventimiglia currently working with Mr. Deo at the new dealership?

A I've never seen him there, so I'm going to say no.

M. MERCKLING

Q Do you recall seeing Mr. Ventimiglia working at Superb?
A I believe he was there, yes.
Q Did you ever have any conversations with Mr. Ventimiglia at all?
A Yes.
Q What did you and Mr. Ventimiglia discuss in general?
A Honestly, Mets baseball.
Q Other than that, nothing else?
A Not really. Just normal conversations.
Q Have you ever been present for any conversations between Mr. Ventimiglia and Mr. Deo?
A I don't know. Nothing of relevance. I mean, I'm sure we were all in the same room together.
Q Are you aware -- withdrawn. Do you have any knowledge about whether Mr. Ventimiglia referred Mr. Thomasson to Mr. Deo?
A I did not know that.
Q While working at Northshore, you

also worked at Sunrise at the same time; correct?

A Well, I went back and forth sometimes, but I was -- majority of the time, I was at Northshore.

Q Did you also have an office at Sunrise like you did at Northshore?

A No.

Q Is it fair to say that you provided the same services that you -- at Sunrise that you did at Northshore?

A Yes.

Q And that's security; correct?

A Yes.

Q And that's also any tasks related to cars or customers that you were asked to do; correct?

A I -- I'm sorry. I didn't hear that.

Q And that's also any duties related to cars or customers that you were asked to do; correct?

A Yes.

Q One of your duties also included

M. MERCKLING

cash management; correct?

A Cash management? No.

Q Isn't it true that it was your role to accept any cash payments and you were the only person authorized to do so?

A Absolutely not.

Q Isn't it true that it was your duty to accept cash payments and you were one of the people authorized to do so?

A I didn't accept any cash payments. I counted money that was already taken in.

Q Isn't it true that your -- part of your duties were to make deposits of cash payments at the bank?

A Yes.

Q Isn't it true that you were one of the only people authorized to make those cash deposits?

A No. There were other people. There was other people also.

Q Who else was authorized to make cash deposits?

A Whoever was -- what I would

M. MERCKLING

imagine. Only one that made --

Q You broke out. Can you repeat the answer, please?

A I said that I wasn't the only one that made bank deposits.

Q And my question is, who else was there that made the bank deposits?

A I don't remember, but there was other people; management, accounting people.

Q Were you ever paid by Mr. Deo in cash?

A No. No.

Q I want to direct your attention back to the incident with the $735,000 taken by Mr. Aaronson. Do you remember that incident?

A I do.

Q What do you know about that incident in general?

A I know that Anthony applied for a loan from a -- from the bank -- from a bank. When he got the loan, Josh Aaronson or somebody in his group took the money

M. MERCKLING

out of the account, and then Anthony got it back.

Q How did Anthony go about getting it back?

A He went to the police station.

Q Did he go to the police station by himself?

A I went with him.

Q Was it just you and him?

A Yes.

Q And who, if anyone, did you meet at the police station when you first got there?

A When I -- when we first got there, we got directed to the detective division.

Q Okay. The people at the front desk did not take any information from you?

A I don't believe so, but I don't -- I don't recall.

Q Is that standard protocol; when you come in to report a crime -- a financial crime, you get reported directly

to the detective division?

A Sometimes yes. You speak to a detective. They take the reports.

Q Normally the front desk takes the report; no?

A That's not always true.

Q Okay. Who met you from the detective department when you got directed there?

A Who met me? Is that what you asked?

Q Yeah. Yeah.

A We met with Detective Marx.

Q And what did Mr. -- I'm sorry. Withdrawn. What did you say that says Detective Marx -- withdrawn.

What did you and/or Mr. Deo say to Detective Marx, and what did Detective Marx say to you both?

A I don't remember the entire conversation that Anthony had with him.

Q What do you recall about the conversation?

A That he told him that -- Anthony

M. MERCKLING

told Detective Marx that Josh Aaronson stole 700 and whatever thousand dollars from his bank account.

Q What, if anything, did you say during that conversation?

A I didn't say anything.

Q Was that the first time you met Detective Marx?

A Yes.

Q Did you make Detective Marx aware that you worked for the Nassau County Police Department?

A I might have told him I was retired.

Q Did you have your retired badge with you during that meeting?

A I don't remember.

Q After Mr. Deo told Detective Marx what happened, what happened next?

A I'm sorry. Can you repeat that?

Q After Detective Marx -- oh, I'm sorry. After Mr. Deo told Detective Marx what happened, what happened next?

A I -- I believe he filled out a

report about it.

Q Did you assist him in completing the report?

A No.

Q Why did Mr. Deo take you along with him to the police department?

A He was obviously very upset, and he wanted somebody there with him for moral support, and we're friends.

Q I'm going to show you Deo 4.

THE REPORTER: Merckling 4?

MR. KATAEV: I'm sorry.

THE WITNESS: I'm sorry? Oh.

MR. KATAEV: She was correcting my taxonomy of the exhibits.

BY MR. KATAEV:

Q Presenting to you what will be marked as Merckling 4, the opinion and order by the Honorable James Wicks, United States Magistrate Judge. The document Bears ECF docket entry 230.

(Merckling Exhibit 4 was marked for identification.)

Mr. Merckling, are you familiar

with this 121-page document?
A Not that I can recall. I don't think I've ever seen this.
Q I'll represent to you that this is a decision by the judge in our case on all of the defendants' motions to dismiss.
Based on that representation, do you recall ever reading this document or otherwise seeing it?
A No, I don't. I don't remember ever seeing that.
Q Without telling me any conversations you've had with any attorneys, do you know whether you were made aware of the existence of this order?
A I don't know what that order is.
Q Focusing your attention on page 11 of this decision. I'll represent to you that these are facts summarized from our complaint against you and others in this case.
And I would like for you to read the last paragraph of page 11 going into page 12. So let me know when you're ready

for me to scroll.
A Okay.
Q Let the record reflect that I'm moving down to page 12.
A I -- I'm sorry. I lost the document.
Q I'm going to stop sharing and reshare. If you go back into the Zoom, you'll be able to see it.
A Yeah, I -- that's what I'm trying to do. Okay. Hold on. I got it.
Q All done?
A Yes.
Q I want to focus your attention to the facts assumed true from the complaint about you and Mr. Blankenship pressuring the Nassau County Police Department to arrest Aaronson.
A It's an outright lie.
Q To your knowledge, does Officer Blankenship know Detective Marx?
A Dwight Blankenship wasn't even there that night.
Q But my question is, do you know

M. MERCKLING

whether Officer Blankenship knows Detective Marx?

A I do not know.

Q Are you aware that as a result of the criminal complaint Mr. Deo filed, that Detective Marx called Mr. Aaronson and repeatedly threatened that he would be arrested first and asked questions later about who owned the funds.

A That's something you would have to take up with Detective Marx.

Q Are you aware of that happening?

A I know he had a conversation with him. I didn't hear it.

Q How do you know that Detective Marx had a conversation with Mr. Aaronson?

A I knew he was calling him to have a conversation with him, but I wasn't privy to that -- to that conversation.

Q Prior to the time Detective Marx had a conversation with Mr. Aaronson, did you speak to Detective Marx about what he would say to Mr. Aaronson?

A No.

M. MERCKLING

Q Is it standard protocol for a detective to threaten someone with arrest over the phone unless they return the funds?

A Again, you're making accusations to something I can't answer.

Q Have you ever observed another detective threaten somebody over the phone that they would be arrested unless they do something?

A I've -- I know detectives do tell people that they can be arrested if they -- if they did something wrong.

Q How many times has that ever happened in your career as a police officer?

A I don't know. How could you ask me that type of question?

Q I'm asking based on your knowledge and memory today. What do you remember or know about those kind of incidents occurring?

A I don't know. I've -- I've heard it. I've heard it before. I've

heard it before.

Q Have you ever threatened anybody?

A No. I'm not a detective.

THE REPORTER: Please wait until the question's done.

THE WITNESS: I'm sorry. I thought the question was done. My phone froze again.

MR. KATAEV: Okay.

THE WITNESS: I'm sorry. I can't hear anything that's being said.

THE REPORTER: Would you like me to take us off the record for a moment and see if there's any tech issues?

MR. KATAEV: I think it's just sharing the screen at the same time as speaking. Sometimes it does that, so I think we're okay. Let me just get to the next question.

BY MR. KATAEV:

Q Okay. Placing back the same exhibit on the screen. I'm referring you to pages 15 to 16, starting with the last

M. MERCKLING

paragraph 15. Please read it. Let me know when you're done.

A Okay.

Q Scrolling down to the top of page 16.

A Okay.

Q Were you involved in assisting Mr. Deo to open an account for Superb with Flushing Bank?

A No.

Q But you did visit Flushing Bank to make cash deposits there; correct?

A I did go to Flushing Bank, yes.

Q Prior to the time that you went to Flushing Bank to make deposits there, you previously went to Chase Bank to make deposits of customer payments; correct?

A Yes.

Q Who told you to stop going to Chase and go to Flushing instead?

A I don't think we ever stopped going to Chase. I think we -- it was both accounts from what I remember.

Q I'll represent to you that

there's not a single cash or check deposit that went into the Chase account after the Flushing account was opened.

Can you tell me any information that would prove me wrong?

A I -- I misremembered then. I thought we were still using both. I -- again, I had no knowledge of bank accounts.

Q But someone had to have told you, here's a cash deposit or here's a check deposit. Take it to Flushing Bank for a deposit instead of Chase Bank; right?

A I'm sure somebody did 'cause I got a deposit slip and was told to bring it there.

Q So at work generally, did you have deposit slips at the dealership pre-filled and went to the bank with the slip and the cash or check deposit?

A Yes.

Q So to your knowledge and memory, did anyone tell you this deposit goes to

M. MERCKLING

Flushing or from now on all deposits go to Flushing?

A I don't remember ever having that conversation. I was told to bring money and checks and deposit it into this account. That's it.

Q Did you ever question why you stopped going to Chase and went to Flushing instead?

A No. Why would I?

Q How far was Chase Bank from Superb when you made deposits for Superb?

A I believe Chase was maybe a half a mile away.

Q Down the block driving, a few minutes away; right?

A Yeah. Yes.

Q By that old restaurant? I think it was Anthony's Coal Fired Pizza or something.

A I don't remember.

Q How far was Flushing Bank in relation to Superb?

A Not much further. Just on a

M. MERCKLING

different road. I believe it was on Great Neck or Little Neck Road. One of those. I don't remember. They were both in the vicinity.

Q Scrolling down further on page 16, focusing on the highlighted portion; please read it. Let me know when you're done.

A Another lie. Go ahead.

Q You had access to the safe at Superb; correct?

A So did a lot of people.

Q Other than you, who else had access to the safe at Superb?

A Any of the girls that worked in the back office, the managers. There was quite a few people had access to that safe.

Q Do you know the name of the girls who worked at the office?

A I don't remember.

Q Do you know the name of the managers who had access to the safe?

A Well, there was a couple of guys

there. I don't -- one guy was Gene, I believe was his name. Andy, maybe. I -- I don't remember names.

Q When you say, you're referring to Eugene Lowe; correct?

A Yes. Yes, that was his name.

Q L-O-W-E. What about Andy?

A I don't remember Andy's -- I don't remember Andy's last name.

Q Do you remember what his role was at the dealership?

A I believe he was a manager, but I don't -- I really don't know.

Q Do you recall if Andy --

A Before -- I'd say he was there before we even got there. So everybody basically had the combination to that safe. We didn't install that safe.

Q Do you remember the role that Andy played -- I'm sorry. Withdrawn. Do you remember whether Andy previously worked at Northshore?

A He was there before I got there.

Q At Superb only; correct?

M. MERCKLING

A Oh, I'm sorry. Yes, at Superb. No, he didn't work for Northshore. I misheard the question.

Q Okay. Referring to the bottom portion of page 16, please read where I highlight. Let me know when you're done.

A Another lie, but go ahead.

Q Do you recall an incident on August 3rd of 2023, when Nassau County Police Department arrived at the dealership at Superb?

A I do.

Q What were the names of officers that arrived from Nassau County Police Department?

A No idea.

Q The officers that arrived; did you know them prior to seeing them that day?

A I don't believe so.

Q You were present when they arrived; correct?

A Yes.

Q You were there for the day or

M. MERCKLING

you were called there by Mr. Deo?

A I was there for the day.

Q What do you recall happening prior to the time the police were called?

A Prior to the time the police were called, it was just -- from what I remember, it was just a regular day.

Q Who, if anyone, was present that day that normally wasn't present?

A I don't remember. Oh, what is his name? Oh God, I can't remember his name. He's one of Tony's guys.

Q Are you referring to Mr. Bruce Novicky?

A Thank you. Yes.

Q What do you remember about him?

A I know he was there.

Q Were you present for any conversations between Mr. Novicky and Mr. Deo?

A No.

Q What is your understanding as to why the police were called?

A I really didn't know except that

M. MERCKLING

they were locking Anthony out of the dealership, and they wanted the police there to make sure that there was no problems.

Q On that day, on August 3rd, to your memory, how many vehicles were present at Superb?

A How many -- I'm sorry? How many what?

Q Vehicles were present at Superb?

A I have no idea. It was a full lot. I don't know how many vehicles were there.

Q Isn't it true that a week or two prior to August 3rd, there was an event at Northshore?

A An event? What kind of event?

Q A grand opening event?

A I don't think we ever had a grand opening event. There was a car show.

Q Do you recall that car show taking place on or about July 21st?

A Yes. Yes.

Q And in preparation for that car show, most of the vehicles from superb were moved to Northshore; correct?
A No. There was some that was moved. Not -- not most.
Q To the best of your memory, how many vehicles were left on the lot at Superb on August 3rd?
A Again, I -- from what I remember, it was a full lot.
Q Are you saying that after the vehicles were moved to Northshore for the car event that the vehicles were brought back?
A I believe most of them were brought back, if not all of them. I don't remember though.
Q Prior to the car event, were you physically involved in moving any of the vehicles over from superb to Northshore?
A I don't believe I physically moved any of them.
Q Prior to the car event on July 21st, did you direct other individuals

M. MERCKLING

about which cars to take to Northshore from Superb?

A Only if we were doing service on them. We did have a mechanic there.

Q What was the name of the mechanic that worked at Northshore?

A Joe, but I don't remember his last name.

Q Does he still work for Mr. Deo?

A No.

Q He's not at the new dealership in Hicksville?

A No.

Q Did there come a time when Joe stopped working as a mechanic at Northshore?

A Yes.

Q And that was prior to Northshore's closure?

A Yes, I believe so.

Q Joe was not working as a mechanic at Northshore since in or about May of 2023; correct?

A I don't remember when he left

M. MERCKLING

there.

Q But there was a period of time when Joe was not working as a mechanic at Northshore; correct?

A Yes.

Q At least a month or two; correct?

A I -- again, I don't remember how long it was or when it was.

Q Did there come a time when you were asked to make deposits at Flushing Bank at Northshore or Sunrise with checks from Superb?

A I don't understand the question.

Q I'll withdraw and ask a different way. Normally when you were asked to make check deposits, those checks were from customers; correct?

A I would imagine so. I really didn't look at them or study them, you know. I just made deposits.

Q Do you recall a time when other than customer check payments, there were also checks from Superb that you deposited

at Flushing for Northshore or Sunrise?
A I have no idea.
Q Your testimony is you would not look at who the checks were from. You would just deposit them; correct?
A Yeah. Who were -- they were from or where they were going didn't concern me.
Q Did Mr. Deo ever tell you where certain checks were from?
A No.
Q It's 11:30. You want to take a five-minute break?
A Sure.
THE REPORTER: I'll take us off the record at 11:27 a.m.
(Off the record.)
THE REPORTER: We are back on the record at 11:33 a.m. Go ahead please.
BY MR. KATAEV:
Q Welcome back, Mr. Merckling. During our break, did you discuss your testimony with anyone?
A No.

M. MERCKLING

Q You testified earlier about the incident leading up to Mr. Deo's police report about Mr. Aaronson was in relation to an application that Mr. Deo made for financing; correct?

A I -- I -- can you repeat that? I'm sorry.

Q The incident -- withdrawn. You testified previously about Mr. Deo making a police report about money that was taken; correct?

A Yes.

Q And the money that was taken was given by a bank that had provided financing; correct?

A If you say so. I would imagine so.

Q I'm just reminding you what you testified about. As I recall, you said that Mr. Deo applied for financing.

A I said he applied for a loan. I didn't know from where.

Q Okay. So as you recall, you testified that Mr. Deo applied for a loan

and that's where the money came from; correct?

A Yes.

Q Did you personally assist Mr. Deo in applying for the loan?

A No. I didn't even know about the loan until they took the money.

Q Focusing back on the incident on August 3rd. When the police arrived, what if any, conversations did you have with any of the officers?

A Well, what conversation I had with them? They were there.

Q Did you speak with them?

A I'm sure I did. I don't remember the contents of a conversation.

Q During the time that you spoke to them, did you identify yourself as a retired police officer?

A I may have. I don't remember.

Q During the time that you spoke with them, did you tell them that Mr. Deo did not engage in any wrongdoing?

A Again, I don't remember the

M. MERCKLING

conversation I had with them.

Q During the time that you were speaking with them, did the officers ask you any questions about what happened?

A Again, I don't remember the conversation I had with the police officers that day.

Q But you do recall having some discussion with them; correct?

A I remember them being there. I just don't -- I'm sure I had a conversation with them. I just don't remember what it was.

Q Do you know what double flooring is?

A I'm sorry. You -- you -- I'm sorry. I think because you're breaking up again. I -- I don't know if it's me or you.

Q I'll repeat it. That's okay. Do you know what the term double flooring means?

A Double flooring? No.

Q Do you have any knowledge about

how dealerships work and operate?

A Not really. Very, very little.

Q What knowledge do you have about floor plan lending?

A That a bank gives you basically like a credit line to be able to obtain cars and sell them.

Q I'm going to show you Deo 5. Sorry. Merckling 5.

(Merckling Exhibit 5 was marked for identification.)

I'll represent to you, Mr. Merckling, that this is a declaration by Anthony Deo, in this case, dated September 11, 2023, bearing ECF docket entry 30.

I'm going to refer you to paragraph 53 and ask you to read the following highlighted portion. Let me know when you're done.

A Okay.

Q Do you agree with Mr. Deo's characterization of you and Mr. Blankenship here as low-level workers who will help with menial tasks?

M. MERCKLING

A Yeah, that along with security. Yeah.

Q But Mr. Deo's statement after that that you never worked for Superb is not true; correct?

A I worked for Anthony. I didn't work for Superb. I never got paid from Superb Motors.

Q And then the final statement that's highlighted that neither of you had anything to do with the money or operation of Superb or any other dealerships ever. That's not true; correct?

A It basically is true except that we made bank deposits.

Q At least as to that statement, you agree with me that you have nothing to do with money or operations --

A I'm sorry?

Q At least with that statement, that neither of you have anything to do with the money or operations of Superb. You agree with me that statement is not true because you've made deposits for

M. MERCKLING

Superb; correct?

MR. THOMASSON: Objection, argumentative.

THE WITNESS: Yeah, it's ridiculous. I had nothing to do with any money. I had nothing to do with money except for depositing it into a bank account. That's it.

BY MR. KATAEV:

Q In light of your admission that you made cash deposits, this statement is not true; correct?

MR. THOMASSON: Objection, argumentative.

BY MR. KATAEV:

Q You can answer the question.

A I believe it is true. I didn't have any authorization to do anything with money. I was -- I took the money from the dealership and deposited it into a bank account. That's it.

Q Okay. One of your other duties while working at Northshore, Sunrise, and/or Superb was tracking vehicle

M. MERCKLING

inventory; correct?

A I helped out with it.

Q In order for you to help out with tracking vehicle inventory, you had access to a Google spreadsheet with a list of cars; correct?

A Yes.

Q That Google spreadsheet listed all the vehicles and which physical location they were at? Northshore, Sunrise, Superb, or elsewhere; correct?

A I lost everything. Can you repeat that question if you're there? Oh, okay. You're back. No, I'm sorry. I lost everything. Yeah, I didn't hear anything said.

MR. KATAEV: Madam Court Reporter, would you be kind enough to read the question back?

THE REPORTER: Yes. Just a moment please.

(The reporter repeated the record as requested.)

THE WITNESS: I don't remember

M. MERCKLING

exactly what was on the spreadsheet, but it did have a list of cars. I -- I wouldn't say -- I don't know if it was updated or if it was accurate at all times.

BY MR. KATAEV:

Q But the general purpose of the spreadsheet was to track the locations; right?

A It was to keep track of the vehicles.

Q And from time to time, although you were not the person primarily responsible for it, you were responsible for updating the inventory when you were asked to do so; correct?

A If I was asked to update it, I would try to.

Q You also utilized spreadsheets --

A But again, I wasn't there every day. I never really was.

Q Understood. You also used the spreadsheets to show representatives of

M. MERCKLING

banks and/or floor plan lenders during audits; correct?

A No. That was an internal spreadsheet that we used to try to keep track of cars.

Q Your testimony right now is you never used the spreadsheet to show auditors where the locations were or at least utilize the spreadsheet to tell them where it was without showing them the spreadsheet?

A We may have utilized it to find out where the car was if it wasn't at where we were at the time, but it wasn't something we would show to anybody from an audit 'cause, like I said, again, it wasn't updated.

Q Understood. Are you familiar with the dealership management system called Tekion?

A No.

Q You never used it?

A I don't believe so. Again, I didn't do too much of that type of stuff.

M. MERCKLING

Q At the office you had at Northshore, did you have a computer there?

A At Northshore, yes.

Q In Superb, did you have your own computer there?

A We -- I utilized a computer that was at the -- a desk on the side.

Q Okay. Was that also close to Mr. Deo?

A It wasn't right next to him. It was halfway across the store.

Q Okay. Where was your station that you worked out of on the computer in relation to the podium?

A If you walked in the back door, that computer was right to the left, and the podium was directly ahead, probably about 25 feet.

Q Okay. And where did Mr. Deo work when you worked at Superb? Was it at the podium or elsewhere?

A He had an office that was to the -- basically to the right of the -- the back doors when you came in. But

there was space in between where cars were.

Q When you did work relating to vehicle inventory, you never used Tekion to track the vehicles; correct?

A Not that I remember. Like I said, I didn't really sign into any programs 'cause I don't know how to use them.

Q Okay. Now, in relation to vehicle inventory, one of your other jobs is to direct others about where to take vehicles; correct?

A Direct others? No. I mean, we had mechanics that we would tell porters where to bring the car to get fixed if it needed to be fixed.

Q Madam Court Reporter, do you need him to repeat that?

THE REPORTER: No. I caught it.

THE WITNESS: All right.

BY MR. KATAEV:

Q Okay. It was a little unclear to me, but I got the gist. I wanted to

M. MERCKLING

make sure she got it. Okay.

Isn't it true that when vehicles needed servicing, you would be the one to tell someone such as a porter, "Hey, take this vehicle to Northshore or elsewhere for repairs?"

A I did sometimes. I wasn't the only one who did it. Whoever was dealing with that customer and that car would do it.

Q Who else would be responsible for doing work such as that?

A Everybody. If the salespeople that were there, the manager, Gene, whoever was informed that this car had an issue and it needed to go to a certain mechanic that we would use.

Q Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform?

A Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would.

Q Are you aware of a motion that I

M. MERCKLING

filed on behalf of the Superb plaintiffs arguing that Mr. Deo and his attorneys engaged in perjury?

A No.

Q Do you know what I'm referring to when I refer to the Superb plaintiffs?

A The Superb plaintiffs? Yes.

Q I'll represent to you, I think you know who they are.

A Yes.

Q I'm placing up on the screen what will be marked as Merckling 6.

(Merckling Exhibit 6 was marked for identification.)

I'll represent to you that this is a memorandum of law submitted by me bearing ECF docket entry 323. And I'm going to highlight this section of page 13 and ask you to read it.

And I'll represent to you that it summarizes some facts from other exhibits. Please let me know when you're done.

A I'm done.

M. MERCKLING

Q Are you familiar with the name Nethanel Orgad?

A No, I'm not. Oh no, I am. I apologize. I am. He was a -- what the hell are they called? Like a wholesaler for cars.

Q Okay. And do you recall working with him?

A I do remember us -- him buying some cars from us.

Q And is it fair to say that you were primarily responsible for negotiating with him the sale of some cars that you sold to him?

A I wouldn't say primarily. I did do some with him.

Q Is it fair to say that you were given parameters within which you would be willing to sell certain cars that you executed on?

A I'm sorry. Can you repeat that?

Q Is it fair to say that you were given some parameters within which you could sell vehicles to him?

M. MERCKLING

A Well, I was told how much we owed on the car and that we had to get that much money.

Q Regardless of who you worked for, isn't it true that you worked at Superb after November of 2022?

A I was there, but again, like I never really worked for Superb.

Q And as early as November 2022, you had sold cars wholesale to Mr. Orgad; correct?

A I don't remember the dates, so I don't know when that was.

Q It's true that Mr. Deo directed you to only accept cash in payments for the wholesale cars to be sold; correct?

A That's not true.

Q Are you telling me that you've accepted check payments?

A No, that's not true. I believe we did, yes.

Q You did accept check payments from Mr. Orgad? Is that your testimony?

A I'm sorry?

Q You did accept --

A I -- you -- you broke up. I believe -- I believe we did accept checks from him also. It wasn't just cash. It was any wholesaler. We accepted cash or checks.

Q Did you have any records of checks received from wholesalers while you did work at Superb?

A No. Everything went through -- I'm sorry?

Q Go ahead. Everything went through where?

A Everything went through whatever system they used 'cause receipts were generated for any car that was sold.

MR. KATAEV: Plaintiffs are going to call for the production of any check payments from any wholesaler including Mr. Orgad for payments made on vehicles. We'll follow up in writing.

BY MR. KATAEV:

Q Do you know the name of Mr. Orgad's wholesale company?

M. MERCKLING

A I do not.

Q If I told you that his wholesale company was called L&F, would that refresh your recollection?

A I don't recall the name of it.

Q You testified previously that you really had no title at Superb; correct?

A Correct.

Q But isn't it true that you were titled as an assistant general manager?

A Not to my knowledge.

Q Presenting to you what will be marked as Merckling 7.

(Merckling Exhibit 7 was marked for identification.)

I placed up on the screen a screenshot from the Tekion system and a document that's bearing ECF docket entry 324-2. Have you ever seen a screen like this on a computer at Superb?

A I do not believe so. If I -- if I did, I don't remember.

Q The date on this document is

M. MERCKLING

January 14, 2023; correct?
A Where does it say the date?
Q Top right.
A January 14, 2023. 11:33 a.m.
Q And it says that this entry was created by Mr. Deo; correct?
A I'm sorry. I can't hear you.
Q It says that this entry was created by Mr. Deo; correct?
A Yes.
Q And it says that the role that was added was assistant GM; correct?
A That's what it says.
Q And when you scroll to the bottom, your name and information appears; correct?
A Hold on one second. It says my phone number and my name, yeah.
Q And on the bottom there's your email address too; correct?
A Mercks, yes.
Q Now, this email address is underneath a title called login ID. Do you see that?

M. MERCKLING

A Yes.

Q Do you recall being given a login username and password to login to Tekion?

A I do not remember that.

Q Is it fair to say based on this document that your title was assistant general manager?

A Again, I never had a title, so I don't know why that was put in there, but I never had a title.

Q We heard, again, I never had a title, so I don't know what was put in there, but I never had a title. Is that what you said?

A I said I don't know why it was put in there, but I never had a title at Superb Motors.

Q Okay. And is it fair to say that you deny meeting with auditors from the floor plan lenders who review audits about where vehicles were?

A I never denied that.

Q So you did do it; right?

M. MERCKLING

A I never denied that. I helped out with forms, yes.

Q Okay. I'm going to present to you what will be marked as Merckling 8.

(Merckling Exhibit 8 was marked for identification.)

I'll represent to you that this is a screenshot from AiM Auditors; A-I-M. Are you familiar with AiM?

A No.

Q I'm sorry. I didn't hear.

A No, I'm not.

Q Is your information listed here in this document?

A Yes, it is.

Q And the title that you --

A I don't -- I don't know what Group LLC Team Auto is next to my name.

Q I'll represent to you that it's Team Auto Group LLC. It's like a last name, first name. So that relates to Team Auto.

A Okay.

Q And the title listed here in

this screenshot is GM, which is general manager; correct?

A Yes.

Q And for this email address, we have your merck2700@gmail.com listed; right?

A Yes.

Q Is there any reason why you use the Gmail address here and the Optonline address in another document we looked at?

A I have no idea why. Maybe because Merck 27 -- oh, I'm sorry. Excuse me. Merck17 was a personal email, and maybe that's when I set up Merck2700 for business. I really don't know why.

Q Is it fair to say that the Gmail account you created was opened more recently than your Optonline email address?

A Yes, it was.

Q And when you say that you opened up the Gmail for business, is that the automobile dealership business that you worked in or --

M. MERCKLING

A It was for my -- when I set up -- I believe I opened that when I set up my corporation.

Q Okay. Do you recall being set up as an individual authorized to deal with audits?

A No, I don't.

Q Mr. Blankenship also deal with audits?

A Yes. If he was around, he would help us locate cars.

Q And what about Eugene Lowe?

A Well, Eugene was the general manager, so he also did it. He was the one who was mainly dealing with the -- the floor plan and the audits.

MR. KATAEV: We're up to 10 or 9?

THE REPORTER: Nine.

MR. KATAEV: Placing up on the screen what will be marked as Merckling 9.

(Merckling Exhibit 9 was marked for identification.)

BY MR. KATAEV:

Q I'll represent to you, Mr.

Merckling, that this is Plaintiff's third amended complaint, bearing ECF docket entry 316. Have you ever read this complaint?

A I don't know. I don't believe so.

Q I would like for you to read paragraphs 245 to 247. Let me know when you need me to scroll.

A Okay. 245 and what?

Q 246 and 247. But I'll need to scroll when you're ready.

A More lies. Go ahead.

Q Isn't it true that you and Mr. Blankenship handled all cash for Northshore, Sunrise, and Superb?

A Absolutely not.

Q Who else was responsible for handling cash while you worked only at Northshore and Sunrise before Superb?

A There was Dan O'Sullivan, Wendy Quan, I think her name was. She was there. I didn't really handle much cash at Northshore or Sunrise. Dan O'Sullivan

M. MERCKLING

did most of that. He was the controller.

Q Isn't it true that Wendy works primarily out of Staten Island?

A I didn't hear what you said.

Q Isn't it true that Wendy works primarily out of Staten Island?

A Wendy was at Northshore quite often.

Q When did you -- withdrawn. How often did you observe Wendy at Northshore?

A Some weeks she was there every day.

Q Do you know why she was there every day?

A No idea.

Q I'd like for you to read from paragraph 338.

A 338; is that what you said? 338? I'm sorry. Did you say 338? Did I lose sound?

THE REPORTER: Can you hear us okay, Mr. Merckling?

THE WITNESS: I can hear you, but I couldn't hear him.

THE REPORTER: Mr. Kataev, if you're speaking, we can't hear you. Mr. Kataev, can you hear us at all?

I'm not getting a response, so I'm going to take us off the record at 12:07 p.m.

(Off the record.)

THE REPORTER: We are back on the record at 12:08 p.m. Go ahead please.

BY MR. KATAEV:

Q We're going down to 350, so let me know when you're ready for me to scroll.

A So it's 338 to 350; correct?

Q Correct.

A Can you scroll up? I can only get to 342. Or scroll down.

Q I want to ask you something. I want to ask you something before I go further.

A Okay.

Q You were aware that Mr. Deo applied for a loan with Libertas in order to buy into the -- to Superb; correct?

M. MERCKLING

A I was not.

Q Your testimony is that -- what'd you say?

A I'm sorry?

Q Go ahead. Finish what you were saying.

A I said I was -- I knew nothing about that loan.

Q Your testimony today is that Mr. Deo told you that he applied for the loan, but he didn't tell you why he applied. Is that right?

A Correct.

Q Let me know when you're done with 333.

A What? Three, three -- 343, you said?

Q Yeah, so I could scroll down.

A That absolute joke.

Q You knew that the loan obtained from Libertas was based on Northshore's assets; correct?

A I did not.

Q You played no role in executing

that loan; correct?

A Nothing at all. I didn't know about the loan until I was told that it got stolen. That's when I found out about it.

Q To your knowledge, were the funds received from the loan owned by Northshore or by Mr. Deo personally?

A I have no idea.

Q Okay. I scrolled down so you could read 344 to 347. I'm sorry. Did you say you were done?

A Not yet. Okay. I'm done.

MR. KATAEV: Let the record reflect I scrolled down so that the witness can finish reading 348 to 350.

THE WITNESS: Unbelievable. I'm done.

BY MR. KATAEV:

Q Okay. Do you have any written communications between yourself and Detective Marx by text, email, or otherwise?

A No.

M. MERCKLING

Q Was the only time that you ever spoke to Detective Marx on the day that you went to the precinct with Mr. Deo?

A I believe he came to talk to Anthony one other time at Northshore, but I'm not a hundred percent sure. I believe he did.

Q And the basis of your belief is that you were present when this happened?

A Yes. I saw him come in, but I don't remember why or when it was, but it was after --

Q How soon after Mr. Deo and you visited the precinct, did Detective Marx visit Mr. Deo?

A I -- again, I don't remember when it was. I just remember him coming into the dealership one day. I don't remember.

Q Was it days, weeks, months? I'm sorry. Let me ask the question again.

A I -- again, I --

Q I appreciate that you anticipate the question I'm going to ask, but just to

M. MERCKLING

have a clear record, I would like to ask the question again and for you to answer it after I'm done.

A It's not -- I'm sorry. It's not that I'm anticipating it. Your -- it's either mine or your phone. It keeps stopping. So I -- I'm thinking that you're done. That's why I'm answering.

Q Okay. Do you recall whether it was days, weeks, or months after you and Mr. Deo first visited the precinct?

A I don't recall when it was. I don't remember when it was.

Q Were you physically present in the room with Detective Marx and Mr. Deo when he came to visit Mr. Deo at Northshore?

A I -- again, I remember him coming into the dealership, but I don't remember if he -- if they went into an office. I don't -- I don't really -- I just remember he came to the dealership one day at a later date. That's all I remember.

M. MERCKLING

Q How long did the meeting last between Mr. Deo and Detective Marx?

A It -- it wasn't long. Again, and I don't -- I'm not even sure if he talked to Anthony. I remember seeing him at the dealership.

I don't remember why, but that just came to mind that he came into the dealership at a later date. I believe he spoke to Anthony about it, but I don't know.

Q Did you -- withdrawn. Were you part of the conversation between them?

A No.

Q After Detective Marx left, did you speak with Anthony Deo about what he discussed with Detective Marx?

A Again, I don't recall. I just remember he came into the dealership. I don't remember what it was for.

Q You don't know whether it was in relation to the complaint that Mr. Deo filed against Mr. Aaronson or something else; correct?

M. MERCKLING

A Again, I wasn't privy to that information. I mean to that conversation. I don't remember.

Q And you did not ask --

A I just don't remember.

Q And you did not ask what the conversation was about; correct?

A Again, I don't remember.

Q Are you aware, reading paragraph 383 and 384 -- are you aware that Mr. Aaronson caused the $735,000 to be wired to Mr. Thomasson's escrow account?

A I -- I didn't know where the money went back to if that's what you're asking me.

Q Okay. Are you aware that part of those funds were used by Mr. Deo to send Urrutia $500,000 in order to buy into Superb?

A Again, I don't know anything else about this loan.

Q Are you familiar with the company Car Buyers NYC Inc.?

A I'm sorry. Can you repeat that

M. MERCKLING

again? You broke up.

Q Are you familiar with the company called Car Buyers NYC Inc.?

A I don't believe so.

Q Do you recall receiving any payments from Car Buyers NYC Inc.?

A Myself, me? No.

Q Do you have any knowledge as to whether Mr. Deo had authority to sign checks at Superb?

A I have no idea. I would imagine so. He was the owner.

Q What is the basis for your knowledge or belief that Mr. Deo was the owner of Superb?

A He was the only one there and he told me he was the owner. That's the only knowledge that I have.

Q Trying to cut through some of the questions in the complaint. Were there instances at Northshore, Sunrise, or Superb with irate customers angry at Mr. Deo?

A Angry at Mr. Deo?

M. MERCKLING

Q Yeah.

A I mean, we had angry customers. I don't remember who they were angry at. Probably the finance guy, but I don't really remember.

Q How often was it the case that there were angry customers at Northshore, Sunrise, and/or Superb?

A Again, you broke up. I'm sorry. Can you repeat that?

MR. KATAEV: Can we have it read back please?

THE REPORTER: Yes. Just a moment.

THE WITNESS: I can't hear.

MR. KATAEV: Okay. You're doing fine.

THE REPORTER: I'll read back the question. Just a moment please.

(The reporter repeated the record as requested.)

THE REPORTER: Did you hear the readback, Mr. Merckling?

THE WITNESS: Yes, I did. Oh, I'm sorry. I didn't know if I should answer

M. MERCKLING

yet.

BY MR. KATAEV:

Q Yeah, please answer.

A It wasn't that frequently.

Q Would it happen once a week?

A No. Maybe once a month.

Q Every --

A A month.

Q Okay. Did it ever happen more often than once a month?

A I -- I don't remember.

Q Is it fair to say that one of the reasons you were present was because sometimes there will be angry customers and you would need to be there?

A Oh, again, I would get involved if they got -- if something happened that I thought it might get violent, I would get involved.

Q And these incidents that occurred on or about once a month; they were always with different customers?

A I don't remember if any of the same customers came back more than once,

but not usually.

Q Is it fair to say that at the end of July, Mr. Deo was planning to operate Sunrise and Northshore as reopened dealerships?

A At the end of July when? I -- I don't know.

Q 2023?

A I have no idea.

Q Give me a second. Okay. Let's go off the record for a second.

THE REPORTER: Off the record at 12:23 p.m.

(Off the record.)

THE REPORTER: We are now back on the record at 12:37 p.m. Go ahead please.

MR. KATAEV: This is Emanuel Kataev speaking on behalf of the Superb plaintiffs together with the remaining plaintiffs.

We're just going to place some off-the-record discussions on the record concerning depositions and scheduling.

First, the plaintiffs note that once

again, Mr. Benjamin is not here to represent the Deo defendants.

Second, we have offered for Mr. Deo to appear tomorrow virtually in lieu of Mr. Thomasson who has had numerous health issues.

And we also offered to have Mr. Laurie appear virtually tomorrow in place of Mr. Thomasson if Mr. Deo cannot make it.

Mr. Laurie's deposition is currently scheduled for Thursday. But if he goes tomorrow, we are prepared to have Mr. Deo in person at Flushing Bank's office on Thursday starting at 9:00 a.m., stopping at 4 p.m. due to counsel for Flushing Bank's scheduling issues and concerns which we need not detail here.

Finally, as long as Mr. Deo is deposed and completes his deposition either tomorrow, Tuesday, or Thursday, we are prepared to proceed with Sarah Deo's deposition on Friday, virtually.

MR. THOMASSON: Didn't we also agree

M. MERCKLING

that I am not going tomorrow since it won't be in person?

MR. KATAEV: We can agree that you will not have to appear in person tomorrow so long as we can replace your deposition either with Mr. Laurie or Mr. Deo virtually.

If we cannot have anyone else appear, we maintain that you should appear in person. And if you cannot appear in person, then we need to substitute someone else.

MR. THOMASSON: Okay. Well, I have no knowledge at this late date of who can be substituted tomorrow, and I am just telling you again -- let's not ignore that I made the statement.

I cannot physically appear tomorrow in person, and I'm happy to proceed virtually.

MR. KATAEV: Okay. Plaintiffs object to proceeding virtually for your deposition, Mr. Thomasson. Please find out about their availability as we've been

offering you this since last week.

We're going to -- subject to anyone else's comments on scheduling, we're going to proceed with Mr. Merckling's deposition.

MR. THOMASSON: No. As a matter of fact, that's not a true statement, Mr. Kataev. Last Friday, you offered to substitute Sarah Deo for Tuesday. I found out that that was not going to be possible.

Now I'm finding out only since yesterday that Mr. Ruderman is requesting Mr. Deo for tomorrow, and I haven't checked on that.

And I'm finding out also that you'll substitute Michael Laurie for tomorrow, and I'm only finding that out today.

So let's at least be accurate that it's only the last 24 hours that there's anybody that, you know, might be available for tomorrow, pending finding out whether they actually are, for substitution purposes.

M. MERCKLING

I don't know who can and can't be substituted. It's unrelated to whether or not I can physically show up.

MR. KATAEV: Okay. Well, please find out, and we'll talk about it after the deposition.

MR. THOMASSON: Okay.

MR. KATAEV: All right. We're still on the record. We're going to proceed with Mr. Merckling's deposition.

BY MR. KATAEV:

Q Mr. Merckling, are you prepared to proceed?

A Yes.

Q When Mr. Deo left Northshore and Sunrise dealerships, was it your understanding that there was a dispute between himself and Mr. Aaronson?

A I don't know what -- I didn't know what was the cause of leaving the dealerships. Did I lose everybody?

Q No. I'm here. The incident with the criminal complaint about the $735,000 occurred in November of 2022;

correct?

A Again, I'm not good with dates. If you say that's when it is.

Q After that incident, Mr. Deo continued to utilize Northshore as a space to work from; correct?

A We were at Superb more than Northshore. He -- he still had the building, but they weren't doing anything out of it except mechanic stuff.

Q Okay. And then after the mechanic no longer worked for Northshore, there was no activity at all at Northshore; correct?

A I don't believe there was any activity there.

Q After Mr. Deo went to work at Superb, vehicles were not being sold out of Northshore; correct?

A As far as I know, there wasn't any.

Q Are you aware of an allegation by Mr. Deo and/or Mr. Thomasson that certain DMV files and other documents were

taken from Northshore's office by Island Auto Group?

A I have no idea.

Q When you physically went to Northshore where you had an office, did you ever observe that certain files and other documentation was missing?

A I wouldn't know.

MR. KATAEV: I'll present to you what will be marked as Deo 13; is it?

THE REPORTER: We're up to Merckling 10.

MR. KATAEV: Oh, I'm sorry. Merckling 10. Thank you.

(Merckling Exhibit 10 was marked for identification.)

BY MR. KATAEV:

Q I'm showing you the first page. I'll represent to you that this is a lawsuit filed by Mr. Deo against Island Auto Group, Superb, and others. Are you familiar with this lawsuit?

A I don't believe so. I didn't really lead any lawsuits.

M. MERCKLING

Q Focusing your attention on paragraph 120. Please read that and let me know when you're done.

A 120, all right. Hold on. I'm done.

Q All done?

A Yes.

Q Based on reading this, do you have any recollection of all the books, records, and automobiles being taken out of Northshore and Sunrise such that the Deos could not operate at Northshore or Sunrise anymore?

A Well, I know they came and took the cars. I don't know anything about books and -- and paperwork.

Q Okay. After the cars were taken, is it fair to say that Northshore and Sunrise never operated as a customer-facing dealership anymore?

A No, I don't believe it did.

Q And notwithstanding the car event, the Deos did not operate Northshore and Sunrise again even after the car

M. MERCKLING

event; correct? Operate out of Northshore and Sunrise again?

A Not that I remember.

Q Do you know anything about a lawsuit filed by Island Auto Group in December of 2022, shortly after this event?

A I don't.

Q Do you recall the name Justice Gianelli?

A Who?

Q Justice Gianelli, a judge of the Supreme Court?

A No.

Q Are you familiar with what a TRO is or a temporary restraining order?

A I know what a restraining order is.

Q The restraining order that you're familiar with is one in which a person is not allowed to come near or within the vicinity of another person; correct?

A Yes.

M. MERCKLING

Q Are you familiar with the fact that temporary restraining orders can also consist of orders by a judge to do or not do something unrelated to being around somebody else?

A Again, I don't -- I know what a restraining order is as it refers to the police department.

Q Okay. Are you aware of the existence of any temporary restraining order prohibiting Mr. Deo from operating Northshore or Sunrise?

A No.

Q Mr. Deo never told you anything about such temporary restraining order; did he?

A No.

Q But isn't it true that you went with Mr. Deo to court in relation to a lawsuit filed by Joshua Aaronson and Island Auto Group against him?

A Yes.

Q So you were aware that there was a lawsuit filed by Island Auto Group and

Joshua Aaronson against Deo; right?
A Well, it was something to do with injuncted cars. That's all I know about it.
Q What did Mr. Deo tell you about this lawsuit filed by the Island Auto Group plaintiffs against him?
A Can you repeat that? I don't know what you're asking.
Q What, if anything, did Mr. Deo tell you about that lawsuit filed by Island Auto Group against him?
A It was just something to do with cars. That's all I know.
Q And how do you know that?
A Because he told me it's something to do with cars.
Q Were you aware that when Mr. Deo started working with Mr. Urrutia at Superb that part of their deal was that Mr. Deo would give Mr. Urrutia 25% interest in both Northshore and Superb?
A I have no knowledge of any deals between Tony and Anthony.

M. MERCKLING

Q Were you ever present for any conversations between Tony and Anthony?

A No.

Q Did Mr. Deo ever tell you about his conversations with Tony?

A No.

Q Did Mr. Deo ever tell you that he has to focus on Superb as of February 2023, and will not be doing anything in relation to Northshore and Sunrise as of February 2023?

A I have no idea what you're going to ask.

Q To the best of your memory and recollection, since February 2023, is it fair to say that you were primarily at Superb and did not visit Northshore or Sunrise?

A I did go to -- if again -- I -- dates I'm not good with. I know when we were at Superb, we were still using a mechanic shop that was in Northshore. That's all I know.

Q When you were using the mechanic

M. MERCKLING

shop at Northshore, was that the only activity going on at Northshore?

A Yeah. Yes.

Q Other than bringing vehicles over from Superb to be serviced at Northshore, were you responsible for bringing any parts over or anything like that?

A I don't believe so. Parts usually got delivered.

Q After that car event, did Mr. Deo start working out of Northshore or Sunrise again?

A I don't remember.

Q What was the reason, if any, that Mr. Deo did a car event but then did not work out of Northshore or Sunrise?

A You'd have to ask him that.

Q Did you ever meet -- well, what is your knowledge about it, if any?

A Knowledge of what? They had a car show. That was it. They had a car show. I don't know why. It wasn't my concern.

M. MERCKLING

Q Were you present at the car event?

A I was. I stopped by.

Q You stopped by as a guest or you were working security?

A I was there for a little while. I don't remember what capacity I was there as.

Q You were invited by Mr. Deo to attend?

A Again, I was there for a little while. I don't remember.

Q Do you remember if you were invited, or how did you find out about it?

A I just said I don't.

Q How many people were present when you got there?

A There -- there was quite a lot of people there. I don't know a number.

Q There were a lot of vehicles there; correct?

A Outside vehicles, yeah, like customer vehicles. People that were showing up for the car show. Whatever you

M. MERCKLING

want to call it.

Q Do you know if any sales were made that day?

A There was no sales going on. It was a car show outside.

Q Did you ever visit Flushing Bank with Mr. Deo?

A I don't believe so.

Q Did anyone from Flushing Bank ever visit Mr. Deo at any of the dealerships?

A I have no idea.

Q Do you know the name Robert Puccio?

A Robert what?

Q Puccio, P-U-C-C-I-O.

A I don't believe so.

Q You never met him?

A I don't believe so.

Q You know an individual named Nathan Newell, N-E-W-E-L-L?

A Isn't that the wholesale guy that you asked me about before, or is that --

M. MERCKLING

Q No. That's Nethanel Orgad. This is Nathan Newell.

A No. Sorry. Don't know that person.

Q What if I told you he's from NESNA? Would that refresh your recollection?

A From where?

Q NESNA, N-E-S-N-A.

A What's that?

Q NESNA is an arm of Nissan that deals with warranties.

A No idea.

Q Did you have anything to do with warranties when you worked at Northshore, Sunrise, or Superb?

A No.

Q Do you recall ever meeting Nathan Newell?

A I have no idea who that is.

Q Okay. What about Ron Das? Does that name ring a bell?

A Rob what?

Q Ron Das, D-A-S.

M. MERCKLING

A Ron Das? I -- I don't recall. I don't know.

Q Give me a second. From time to time, Mr. Deo would have Zoom meetings with different individuals; correct?

A I have no idea.

Q Were you ever present or witness Mr. Deo in a Zoom meeting?

A No.

Q All right. Give me a sec. All right. Presenting to you what will be marked as Merckling 11.

(Merckling Exhibit 11 was marked for identification.)

I'll represent to you that these are deposit slips.

A These are what?

Q Deposit slips.

A Okay.

Q Let me see if I can rotate them for you.

A I can rotate my phone.

Q Do you see this deposit slip dated April 10, 2023?

M. MERCKLING

A Yes. No. April? Yes, '23. Yes.

Q Is this your handwriting?

A No.

Q Do you know whose handwriting it is?

A No idea.

Q Didn't you testify earlier that you would have these deposit slips at the dealership before going to the bank?

A Yes.

Q So who filled it out?

A I don't know. Well, that's not my handwriting.

Q Did you ever fill out the deposit slips?

A I -- I have filled out deposit slips, yes.

Q But you haven't filled out every deposit slip?

A No.

Q Let me get these organized for you. Okay.

MR. THOMASSON: It's one o'clock, Mr.

Kataev.

MR. KATAEV: I'll finish this exhibit, then we'll go for lunch.

MR. THOMASSON: Okay.

MR. KATAEV: I'm just trying to find that one exhibit. Give me one second. You know what; we could go for lunch now.

THE REPORTER: I'll take us off the record at 1:01 p.m.

(Off the record.)

THE REPORTER: Now that we have everyone back, I can take us back on the record at 1:33 p.m. Go ahead please.

BY MR. KATAEV:

Q Okay. Mr. Merckling, we just took a half-hour break for lunch; correct?

A Yes.

Q During the half hour break for lunch, did you discuss your testimony with anybody?

A No.

Q Placing up on the screen a compilation of documents received from Flushing Bank related to an account held

by Northshore Motor Leasing LLC. Do you see that?

A The non-personal signature card.

Q On this document it has Northshore Motor Leasing, LLC and Anthony Deo; right?

A It says non-personal signature card, Northshore Motor Leasing, the address.

Q And on the bottom in the middle is Anthony Deo's name; correct?

A Yes.

Q Focusing your attention on page 60 of this document. Do you recognize this as a $10,000 deposit slip?

THE REPORTER: Is this still Exhibit 11?

MR. KATAEV: I don't remember.

THE REPORTER: This is the last one before the break?

MR. KATAEV: Yeah.

THE REPORTER: Okay. Eleven. Thank you.

THE WITNESS: That's what it looks

like.

BY MR. KATAEV:

Q And this cash deposit slip is for $10,000; correct?

A That's what it says here.

Q That handwriting; is it yours?

A It doesn't look like my handwriting, but it -- that's my phone number and social security number. That doesn't look like my handwriting.

Q The handwriting with the phone number and social security number is different from the handwriting with the amount from the branch and banker; correct?

A Looks different, yeah. That looks like my handwriting with the phone number and the social security number.

Q Okay. That was going to be my question; was that your handwriting? And you're saying it is; correct?

A Yeah, but not where it says the date and the amount. That's not my handwriting.

M. MERCKLING

Q Okay. Do you recall making a deposit of $10,000 in cash at Flushing for Northshore?

A I don't recall, to be honest with you.

Q Then I scrolled up to the page before, and it's the front of --

A Again, I didn't write that; the top. I never write out my middle name, so I know that's not me.

Q Okay. What about the handwriting where it says, "For," and the date?

A Where is that?

Q Right here; "For Northshore Motor," with a date crossed out, and then date.

A Can you Zoom in on -- I apologize. Can you lower that a little bit maybe? That doesn't -- that's better. Thank you.

No. Again, that doesn't look like my handwriting where it says -- now zoom in please.

M. MERCKLING

Q What about the amounts?
A I don't know about the $10,000, if that was me or not.
Q And the account number?
A What is the account number?
Q It's redacted with -- except for the last four digits.
A Oh, okay. Again, I don't -- I don't believe that's my handwriting. I don't know.
Q I'm presenting you with a copy of a check on page 58 of the compilation of documents. And this is a check from Northshore to your company; correct?
A Yes.
Q Okay. You received the check from Northshore in the middle of July in 2023; correct?
A I would imagine so if it says -- I mean, that's my company, so.
Q Do you know why you received this particular check for this particular amount in mid-July of 2023?
A I do not.

M. MERCKLING

Q And you testified that you retired in April of '23; correct?

A April of '22.

Q April of '22. And after you retired in April of '22, you worked full-time for Mr. Deo; correct?

A Yes.

Q And if I recall your testimony correctly, you testified that you were paid $1,500 per week for the services you performed; correct?

A No. I said that's what I got now. I didn't say that then because it wasn't -- it wasn't always the same amount. Some weeks I didn't get paid at all. Some weeks it was more.

Q When did it change from 1,000 a week to 1,500 a week?

A I don't recall. I don't remember when it changed amounts.

Q Based on what you're seeing in front of you, is it fair to say that this check is for two weeks of work?

A It's possible. I really don't

M. MERCKLING

know.

Q Did you keep track of whether you were properly paid for all of your compensation?

A Again, I got compensated when business was doing better than worse. I didn't always get paid, so -- and I know he tried to make up for it in some weeks, so that might have been what it is.

Q But you don't specifically recall; correct?

A No, I don't.

Q And is this your handwriting, or Mr. Deo's, or someone else's?

A It's not my handwriting.

Q Did Mr. Deo always pay you out of Northshore?

A I don't remember. I didn't really look at the checks to be honest with you. I just put them -- deposited it or cashed it.

Q And when you deposited this check or any check that you received from Mr. Deo, which bank did you deposit at?

M. MERCKLING

A Citibank.

Q I'm showing you page 57, which has a check from Superb Motors to Northshore. Do you see that?

A Yes.

Q To your knowledge, why was Superb issuing checks to Northshore?

A I have no idea.

Q Do you recall whether you took this check to be deposited in Northshore?

A Again, I don't remember.

Q Focusing your attention on page 49 of this exhibit. This is another check that you received from Northshore dated June 26, 2023; correct?

A Yes.

Q And to your knowledge, why was the payment for $3,000?

A Again, I don't remember why the numbers varied or what the reason behind it was.

Q Looking at page 41 of this exhibit. This is another check made out to your company from Northshore; correct?

M. MERCKLING

A Yes.

Q And this one's dated May 12th of '23; correct?

A Yes.

Q Now, from what we've seen so far, at least as it relates to this account, you're being paid monthly at somewhere between 2 to 3,000 a month; right?

A Two to 3,000 a month? I -- again, I don't remember what I was getting paid at the time.

Q Well, I'm referring to what we've looked at so far; right? The first check we saw was in July for 2,000; right?

A Right.

Q And then the second check that we saw was in June for 3,000; correct?

A Yes.

Q And now we're looking at a check in May for 2,000; is that right?

A Yes.

Q So is it fair to say that you were only paid once per month, or were you

M. MERCKLING

being paid in other ways throughout the month?

A No. I only got paid by checks. And again, depending on how business was doing, we -- it -- it varied.

Q Did you have conversations with Mr. Deo about when you would be getting paid?

A He paid me when he could pay me. That -- that's the understanding we had.

Q You never followed up with him about it and asked, "Hey, when am I going to get paid?"

A No, 'cause I know when he could afford it, he would give it to me.

Q Was there ever a period of time where he didn't pay you for two or three months?

A Two or three months? I don't recall. I -- it's possible.

Q Did Mr. Deo ever pay you in sums larger than 2 to 3,000 at a time?

A I believe 3,000 was probably the highest, but I -- again, I don't remember.

M. MERCKLING

Q And your testimony today is in between these payments -- monthly payments of May, June, and July, you didn't receive any cash; correct?

A No.

Q Focusing your attention on page 39 of this exhibit. Do you see this check from Northshore to Parmeshwar Bissoon?

A Yes, I see.

Q And who is Parmeshwar Bissoon?

A I'm not a hundred percent sure, but I believe he was the salesperson at Superb. But we -- we didn't call him by that name. He had a different name. A nickname sort of, I think, if it's the same person.

Q His name was Kevin; right?

A I'm sorry?

Q His name was Kevin; right?

A That's who -- that's what we called him, yes; Kevin.

Q And Kevin worked at Northshore as a salesperson as well; correct?

A He -- he was at -- he was at

M. MERCKLING

Northshore before Superb, yes.

Q Do you remember when?

A I don't.

Q Showing you page 34 of this exhibit. Zenia Cleaning, Z-E-N-I-A; do you see that?

A Okay. I see it.

Q To your knowledge, who or what is Zenia Cleaning?

A I'm not sure, but I believe it was the cleaning company that used to come to the dealerships.

Q At Superb?

A Yes, I believe so.

Q How often?

A I don't know. Again, I -- I didn't write the checks.

Q Do you recall signing any documents about your duties towards Gold Coast Motors?

A No.

Q Showing you what will be marked as Deo -- I'm sorry. Marked Merckling 12.

//

(Merckling Exhibit 12 was marked
for identification.)

Are you familiar with this company newsletter?

A It looks like -- it looks like the logo from Gold Coast that they used.

Q I'll represent for the record that this is an exhibit with ECF docket entry 38-12.

Mr. Merckling, currently at the Hicksville location where Mr. Deo's operating from. That dealership is named Regal Autohaus; correct? H-A-U-S.

A It -- I believe it's Gold Coast doing business as Regal. I'm not sure.

Q Is this logo being used at Regal Autohaus?

A We don't really have the logo on anything, so I -- I don't know.

Q Did you observe customers physically coming to Regal Autohaus?

A Have I? Yes.

Q Without me going further than the cover of this page, do you recall now

what I'm talking about concerning duty of loyalty documents?
A I don't.
Q Looking at the second page of this document, do you have any recollection as to what this document is?
A I -- I honestly don't remember this document.
Q Looking at the third page, at the bottom, with the title, chief security officer, and your name. Does this refresh your recollection as to what this document is about?
A I -- I vaguely remember something like this. I don't remember when it was from.
Q Do you know who drafted this?
A I don't.
Q Frank Ventimiglia is listed as the chief operating officer; correct?
A Sorry. It's not letting me zoom in. Chief -- chief operating officer.
Q He is listed as that; correct?
A Yeah. That's what it says on

this document.

Q Was Mr. Ventimiglia still working at Superb in June of '23?

A I -- I don't -- again, I don't remember dates. I know Frank did work at Superb.

Q On the fourth page, Ron Das is listed as the chief administrative officer; correct?

MR. THOMASSON: That's not on the screen, Mr. Kataev. Oh yes, it is. I'm sorry. I'm sorry. Withdrawn.

BY MR. KATAEV:

Q Do you see it, Mr. Merckling?

A I do.

Q Does this refresh your recollection as to who Ron Das is or was?

A No. I really don't remember who that is.

Q Would it refresh your recollection if I told you that Mr. Das used to work at NESNA?

A Used to work where?

Q At NESNA, N-E-S-N-A.

M. MERCKLING

A Again, I don't know what NESNA is. I have no idea.

Q Earlier today you were talking about an individual named Andy. Do you recall that?

A Yes.

Q On the bottom of this page, page 4, there's a sales manager listed as Andy Vasquez. Do you see that?

A Andy Vasquez. That must have been his last name.

Q Yeah, I was going to ask, is that the individual's last name that we were discussing earlier?

A I believe so.

Q Referring to page 9 of this document. Do you recall signing this?

A Yes. That's my signature, so I must have.

Q What was the reason for you signing this document?

A I -- I really don't remember, but I guess it was just a -- basically a list of duties that everybody would be

doing.

Q Weren't you already working at Superb since '22?

A I really didn't work for Superb. I never got -- I never got a check from Superb.

Q I didn't say for. I said at.

A I was there, yeah. But I -- I don't know what -- I don't know what the -- I don't remember why this document was brought up, or made up, or anything like that.

Q Who gave it to you?

A Again, I don't remember.

Q Did Mr. Thomasson give it to you to sign?

A Mr. who?

Q Thomasson?

A I don't believe so.

Q You don't remember who gave you this document?

A I don't.

Q You would agree with me that it's an important document; no?

M. MERCKLING

A If you say so. I don't believe it is. It's a list of duties for people. I don't know. I knew what I had to do. I can't answer for anybody else.

Q Well, you agreed that you would be loyal to Gold Coast Motors, didn't you, by signing it?

A It's saying that I --

MR. THOMASSON: Objection. Objection. The document speaks for itself.

BY MR. KATAEV:

Q You can answer.

A It's telling people what to do. I -- I don't know. I didn't need that information. I know what I have to do.

Q So you signed it?

A Yes.

Q Is that because you were asked to sign it?

A I -- I would imagine I was asked to sign it. I don't remember by who.

Q Showing you Merckling 13.

//

(Merckling Exhibit 13 was marked for identification.)

It was a letter from Mr. Thomasson to me at my prior firm. This document bears ECF docket entry 12-2. Are you familiar with this document?

A I don't believe. I don't believe.

Q Focusing your attention to the last sentence of paragraph 3. Can you read that and let me know when you're done?

A I don't know what this is in reference to.

Q I'll represent to you that it's in reference to the August 3, 2023, incident where the police were called. I'll also represent to you that this letter is dated August 11th of 2023.

A Okay.

Q In this letter, Mr. Thomasson says that Mr. Deo was allowed to leave without any criminal recourse; correct?

A That's what it says.

M. MERCKLING

Q Is that your understanding of what happened that day?
A This is referring to the day that we got locked out of Superb?
Q On August 3rd, yes.
A Yeah. He -- Anthony left without any police recourse. He didn't do anything wrong.
Q And to your knowledge, Mr. Deo is not currently under any criminal investigation; is he?
A Not that I know of.
Q Not with the Nassau County Police Department; correct?
A Again, not that I know of.
Q And not with any law -- other law enforcement agency; correct?
A Not that I know of.
Q Were you ever made aware of any investigation by any federal law enforcement agency?
A Aware of an investigation to who? Myself or to Anthony?
Q Mr. Deo?

M. MERCKLING

A I know that the FBI came to Hicksville one day and spoke to him, but I don't know about what.

Q You were not present for that conversation.

A I don't believe I was present for that conversation. I was in the building, but I don't believe I was present for the conversation.

Q Who was present with Mr. Deo other than the FBI?

A I don't remember.

Q Isn't it true that you were subpoenaed by the Grand Jury to be a witness?

A I'm sorry. You broke up. I didn't hear what you said.

Q Isn't it true that you were subpoenaed to be a witness in front of the Grand Jury?

A Yes, I did.

Q But you never went to testify before the Grand Jury; correct?

A Correct.

M. MERCKLING

Q Now, when did you receive the subpoena?

A I don't remember the date.

Q When you received the subpoena to testify, what did you do?

A I contacted Harry.

Q Other than contacting Mr. Thomasson, did you speak to anyone else?

A No.

Q Did you ever have a one-on-one conversation with the FBI?

A Yes.

Q And what did they say to you and what did you say to them?

A They came and they asked me some questions. I didn't answer the questions, and they gave me the subpoena.

Q Why is it that you refused to answer the questions?

A Because I wouldn't answer questions to anybody without my lawyer present.

Q Your attorney was Mr. Thomasson at least at that time?

M. MERCKLING

A At that point, yes.

Q Did they ask you to have a conversation with your attorney present?

A I'm sorry?

Q Did they ask you to have a conversation with you and your attorney present?

A No. When I told them I needed my attorney present, they handed me the subpoena and left.

Q And who, if you remember, were the individuals that came to see you?

A I don't remember the agents' names.

Q Did they leave you any contact information?

A Not that I remember.

Q Are you still in possession of the document they left with you?

A I believe I gave it to Harry at the time. I don't have the document.

MR. KATAEV: We're going to call for the production of that document. We'll follow up in writing.

M. MERCKLING

BY MR. KATAEV:

Q After that incident, did you ever speak with any federal agent again?

A No.

Q To your knowledge, what happened with that?

A I have no idea.

Q Are you familiar with two Isuzu flatbed trucks?

A Am I familiar with what? I'm sorry.

Q Two Isuzu flatbed trucks?

A There was two Isuzu flatbed trucks that were at Northshore at one point, but I believe we turned them over to -- I believe Urrutia or somebody representing him.

Q That was in the middle of September of 2023; correct?

A Again, I don't know dates.

Q Were you present with Mr. Deo when there was a settlement conference in front of Judge Wicks early on in the case about returning the vehicles?

M. MERCKLING

A Yes. I believe that's the one I was at.

Q Shortly after that settlement conference, either the same day or a day later, a bunch of vehicles held at Northshore were returned to Superb; correct?

A I'm not understanding what you're asking.

Q Shortly after that settlement conference, within a day, many vehicles that were at Northshore were returned to Superb; correct?

A I don't -- I -- I'm getting confused with the conferences. I don't believe I was at that conference, but yes, we did return vehicles to Superb.

Q Okay. And you were present at Northshore when those vehicles were being returned; correct?

A Yes, I was.

Q And who else was there on the day that the vehicles were being returned?

A I don't remember who else was

there. I know I was. I'm sure there was a few other people there.

Q Do you remember if Mr. Blankenship was there?

A I don't believe Dwight was there.

Q And what about Mr. Deo? Do you recall?

A I'm sorry?

Q And what about Mr. Deo? Do you remember if he was there?

A I really don't remember who was there. I know I was there 'cause I gave him the keys to the cars.

Q Are you on Instagram, Mr. Merckling?

A I have an Instagram account, but I don't -- I don't go on it often.

Q Do you follow Gold Coast Motors?

A I don't know if I do or not. Again, I don't really go on social media.

Q I'm showing you what will be marked as Deo 14, I believe.

//

M. MERCKLING

(Merckling Exhibit 14 was marked for identification.)

THE REPORTER: Yes.

BY MR. KATAEV:

Q I'll represent to you this is an Instagram post from Gold Coast Motors. Do you see that?

A I see it.

Q Now, in this Instagram post, at the top center, the Gold Coast Motors logo is there; correct?

A Yes.

Q That's the same logo we saw on those duty of loyalty documents; correct?

A I'm sorry. You broke up. Can you repeat that?

Q That's the same logo that we saw on the duty of loyalty documents we previously looked at; correct?

A Looks like the same.

Q Now, at the top left, it says that this is a permitted car show; correct?

A That's what it says.

M. MERCKLING

Q Were you involved in helping to obtain the permit for the car show?

A No.

Q At the top right, the phrase two-step battle is written. Do you see that?

A I see it.

Q To your knowledge, what does that mean?

A No idea.

Q And it does say Friday night auto show; right?

A That's what it says, yeah.

Q That's consistent with your testimony that this was a car show; right?

A That's -- yeah, I said it was a car show.

Q And in the middle, on the bottom, it says team exit. Do you see that?

A Yes.

Q What does that mean to you; team exit?

A I have no idea. This is the

M. MERCKLING

first time I've even seen that.

Q Now, on the bottom in the comment section, there's a reference to a grand opening you don't want to miss. Do you see that?

A I see it.

Q Is it fair to say, at least based on this document, that the event was a grand opening?

A I'm sorry. You broke up. I -- I'm not going to talk about something I had nothing to do with. I have no idea.

Q I'm just asking you, based on this document, is it fair to say that this was a grand opening event?

A Again, I'm not going to say anything about something I don't have any knowledge of. If you believe that, then you believe that.

Q Are you saying you don't know?

A I don't know. I don't -- we weren't having a grand opening. We weren't opening that -- anything that I knew of.

M. MERCKLING

Q What is your understanding of what you were doing there?

A It was a car show.

Q What was the purpose of doing the car show to your knowledge?

A I have no idea. I didn't have anything to do with it as far as setting it up or anything like that.

Q Showing you what will be marked as Deo 14, I hope.

A Merckling 14?

Q Thank you. Merckling 14. I always forget that.

THE REPORTER: It's 15.

MR. THOMASSON: Wait a minute. Exhibit 13 was my 8/11/23 letter. Then we just had this car show social media ad. Now we have something else. Isn't this document you're showing us now Exhibit 15?

THE REPORTER: That's what I have as well.

BY MR. KATAEV:

Q Presenting to you what will be electronically marked as Merckling 15.

(Merckling Exhibit 15 was marked for identification.)

I'll represent to you that it's a declaration of a Nethanel Orgad, ECF docket entry 40. Have you ever seen this document before?

A I don't believe so.

Q But you know who Mr. Orgad is; right?

A I'm sorry?

Q You know who Mr. Orgad is; right?

A I have no idea who Mr. Orgad is.

Q This is the individual we discussed earlier with the wholesaling of vehicles.

A Oh, Nate. Nethanel, I believe.

Q Yes, that's correct. Do you recall who that is now?

A I -- yeah. Nate -- I -- the wholesaler, Nate; I know who that -- I've met him before. Yes.

Q I'll represent to you that this declaration is from Nate, the wholesaler;

okay?

A Okay.

Q I want you to read the entire page here, paragraph 1 through 12. Let me know when you're done. Do you need me to zoom in?

A Yeah. I can't zoom in.

Q Let the record reflect that I did a full-page zoom. And you can read paragraph 4, and tell me when to scroll down.

A All right. Can you move down?

Q Let the record reflect that paragraphs 5 through 10 are visible on the screen now.

A You can move down.

Q Actually, I want to ask you some questions here before I move down.

A Go ahead.

Q Do you dispute this sworn statement by Nate that Mr. Deo always demanded cash and that cash had to be paid to you?

A Again, I never demanded cash for

M. MERCKLING

anything and I, again, wasn't the only one that dealt with him, so -- and I never heard of -- I'm sorry.

Q Go ahead and finish. You never heard of what?

A I never heard of anything being demanded in cash.

Q Okay. But setting that aside, isn't it true that Mr. Orgad paid you in cash for cars that were wholesale?

A There were cars paid me -- to me in cash for wholesale, yes.

Q And isn't it true that you were known by everybody at the dealership as the money man?

A This is the first time I'm ever hearing that.

Q Are you familiar with the fact that Nate would frequently follow up to receive receipts for cars that he paid for?

A I -- I always assumed he got all his receipts from Gene who would get them off of Tekion when we told them that he

M. MERCKLING

bought a car or that he sold us a car, either way.

Again, I didn't -- I couldn't -- I didn't use the computers to do receipts.

Q I scrolled down so you could read paragraph 11 and 12. Please read it. Let me know when you're done. And I'm sorry I interrupted you. You can finish what you were saying.

A That's a lie. I would never say that. That's not my words.

Q So what you're referring to now that you say is a lie is this statement -- sworn statement in paragraph 11 that when Nate demanded a receipt, you pointed to your temple and said, "The receipt is up here."

You deny ever saying that; correct?

A Yeah. Yes, I do. I don't remember saying that.

Q You're saying -- by saying this, you're saying that Nate is a liar in this sworn statement by him; correct?

M. MERCKLING

A I'm not saying anything. I'm just saying I don't ever remember making that statement. And any receipt that had to be printed up would go through one of the managers.

I didn't print out receipts. Everything went through their system for all cars that were sold.

Q Isn't it true that in order for a receipt to be issued, you specifically had to approve it?

A I'm sorry?

Q Isn't it true that in order for a receipt to be given to Nate, you specifically had to approve it?

A Absolutely not. Why would I have to approve a receipt? If he bought a car, he would get a receipt.

Q What reason, if any, would Nate have to make up the statement that he -- the sworn statement that he made in paragraph 11?

A You'd have to ask him.

Q You can think of no reason why

Nate would make that up; correct?

A No, I can't.

MR. THOMASSON: Objection. Calls for speculation.

BY MR. KATAEV:

Q Did you finish reading 12 so I can scroll down?

A Okay.

Q Let the record reflect that paragraphs 13 through 15 are currently displayed. Please read it and let me know when you're done.

A Okay.

Q Do you recall in relation to paragraph 15, you having to come over to the office manager to confirm that Nate paid so he could receive a title?

A I don't recall that.

Q Do you deny that that occurred?

A I don't remember.

Q Referring to paragraph 16. Do you recall selling numerous vehicles at a wholesale price for all of them?

A No, I don't remember that at

M. MERCKLING

all.

Q Based on your knowledge and experience working at dealerships in 2020, how much did these cars cost the dealership at the time?

A I have no idea.

Q Isn't it true that you were told, in relation to selling the vehicles wholesale, what the lowest number is that you could sell them for?

A Can you repeat that?

Q Isn't it true that before you could sell a vehicle wholesale, you were given parameters of the lowest number you could sell it for?

A I didn't make up the prices of cars. I had nothing to do with that.

Q Right. And I'm asking you, weren't you told by someone this is the lowest you could sell these for?

A I don't know if I was told this is the lowest you can sell them for. I was told what we paid for them and that we can't lose money on them.

M. MERCKLING

But I had -- again, I wasn't in control of how much I could give a wholesaler a car for. I had no -- I had no authorization to make that.

Q Do you recall how much these vehicles cost?

A No.

Q Based on your knowledge and experience working in dealerships since 2020, what is your best estimate of how much these vehicles would cost?

A I have no idea. Depends on the car. I have no idea how much it would be worth.

Q You mean the condition?

A The condition. The mileage. I have -- I have no idea what they would be worth.

Q Have you ever sold a whole bunch of cars like this in one shot or attempted to?

A No, not that I remember.

Q But do you recall having a discussion with Nate about these cars?

M. MERCKLING

A I do not.

Q I'm showing you paragraph 17 through 22. Please read it and let me know when you're done.

A Okay. I'm done.

Q Do you recall Nate negotiating you down to $50,000 from your ask of 60 for these cars?

A No, I do not.

Q Do you recall demanding that any payment for these vehicles be made only in cash?

A I do not remember that either.

Q Do you recall repeatedly texting and/or calling Nate to make the deal?

A No.

Q In reference to Nate's complaint that he's still waiting on two titles for prior deals he made with you and Mr. Deo, do you know whether he ultimately received those titles?

A No idea.

Q At the bottom, in paragraph 22, Mr. Orgad talks about the car event that

we've been discussing; right? Yes?
A Yes, I see it.
Q And do you have any knowledge as to --
MR. THOMASSON: Objection. How do we know that this is the same car event?
MR. KATAEV: Please don't make speaking objections. Look at Rule 30 and make it based on Rule 30.
MR. THOMASSON: I don't want to confuse the witness either. I don't know that this is the same car event. I don't know anything about these car events, and I don't know how many there were.
MR. KATAEV: All right. You got to stop speaking objections. I'm not going to tolerate it.
BY MR. KATAEV:
Q Mr. Merckling, do you see the reference to the car event in paragraph 22?
A It was a car event at 180 Michael Drive, Syosset. Yeah.
Q Were you the individual who

invited Mr. Orgad to attend?

A I doubt it.

Q Do you know whether Mr. Deo invited Mr. Orgad to attend?

A I'm sorry?

Q Do you know if Mr. Deo invited Mr. Orgad to attend?

A You'd have to ask him. I have no idea.

Q Let the record reflect I scrolled down to paragraph 23 so that the witness can read 23 through 27 on page 4. Please read and let me know when you're done.

A Okay.

Q You're done reading?

A Yes.

Q Now, in paragraph 23, Mr. Orgad says there are only 10 to 15 vehicles left at Superb; correct?

A That's what he said.

Q Are you saying that he is lying?

A Again, I don't remember exactly how many cars there were, but I'm pretty

sure there was a lot more than ten. We had ten cars inside the building.

Q You testified earlier that the lot was full on August 3rd; correct?

A Yes, I believe it was. I don't think that that many cars were taken from Superb to Northshore.

Q And that's based on your memory?

A That's based on my memory, yes.

Q You agree with me though that observation made by Mr. Orgad on paragraph 23 diverges from your recollection; right?

A That's what he's saying.

Q Do you dispute that you had to confirm that Nate paid for the vehicle before he could get a title or a receipt?

A Again, I didn't handle the receipts or the titles.

Q I agree with you. Someone else had to give him the receipt and the title; right?

A Right.

Q But he's saying he wasn't being given the receipt or the title until --

M. MERCKLING

A I don't know -- sorry. Continue.

Q He's saying he would not receive a receipt or a title until it was confirmed paid by you. And my question is, do you dispute that?

MR. THOMASSON: Objection.

You can answer.

THE WITNESS: Can you repeat the question?

MR. KATAEV: Read it back please?

THE REPORTER: Just a moment please and I'll read it back.

(The reporter repeated the record as requested.)

THE WITNESS: Yes. It could have been confirmed by anybody. It could have been confirmed by Gene, or Andy, or anybody else that -- all the girls that worked in the back office.

BY MR. KATAEV:

Q Even if it was paid in cash?

A If it was paid in cash, I would've let Gene know to make a receipt

M. MERCKLING

for the cash.

Q And if Gene failed to do so, the only way to confirm that it was paid is through you; correct?

A If I was the one who collected the cash from him, yes. But I'm, again, not the only one that did that.

Q Understood. Do you recall an incident with a stolen vehicle that was recovered at Superb?

A A stolen vehicle that was recovered at Superb?

Q Yeah, in June of 2023?

A I don't recall that.

Q Presenting to you Deo 16 -- I'm sorry. Merckling 16.

(Merckling Exhibit 16 was marked for identification.)

It's a two-page email chain bearing ECF docket entry 112-4. Starting from the bottom of the email chain, please read it, and let me know when you're done.

MR. THOMASSON: Emanuel, what's that ECF cite again please?

MR. KATAEV: 112-4.
THE WITNESS: Can you not move it?
MR. KATAEV: Yeah. All right. There you go.
THE WITNESS: Okay.
BY MR. KATAEV:
Q Do you know who Matthew Cohayne at the district attorney's office is?
A I don't.
Q Have you ever spoken to him?
A I don't believe so.
Q I'm scrolling up to the next part of the email chain.
A Okay.
Q I'm highlighting the email. Let me know when you're done.
A I -- all I can see is, "Hi."
Q Do you see, "Great news?"
A Now I can. Okay. Hold on.
Q So there's an email from Bruce responding to the email from James Simonetti; correct?
A Can't read it. Hold on one second. Okay.

M. MERCKLING

Q And I'm scrolling to the top, the last part of the email chain. Please read it. Let me know when you're done.

A Okay.

Q Do you recall reaching out to the Nassau detective to recover the vehicle that was stolen?

A I really don't recall if I did or didn't.

Q Was it a normal thing for Mr. Deo to get you involved anytime the Nassau County Police Department was involved?

MR. THOMASSON: Objection.

You can answer.

THE WITNESS: To get me involved with the police? If it was something that I could take care of, I would do it. Making a phone call to a DA for a stolen car isn't something that's, you know, hard to do.

BY MR. KATAEV:

Q Well, it was a call to the Nassau County Police Department detective; right? Not the district attorney?

M. MERCKLING

A Oh, I don't know. If that's what it says. I thought it was to the DA or a DA.

Q Give me a second. I'm just seeing if I could skip this exhibit. Now, in the course of you performing your duties for Mr. Deo, you would receive direction from him to do certain things like picking you up from home or where to be for the day; correct?

A No. I would probably ask him if he wanted me to pick him up on the way to Superb because it was on the way from my house. But he -- it's not like he gave me direction to do it.

Q You coordinated with each other about what you were doing for the day through text messages; correct?

A Or phone calls.

Q You would use both phone calls and text messages; right?

A Yes.

MR. KATAEV: We're going to call for the production of all communications

M. MERCKLING

between yourself, Mr. Deo, and any other of the individual defendants. We will follow up in writing.

BY MR. KATAEV:

Q Now, between operating Northshore, Sunrise, and/or Superb at different times, it was obviously not possible for Mr. Deo to be at all three places at once when all three of them were operating; correct?

A I don't believe all three of them were operating at once.

Q Well, at least before November of 2022, Northshore and Sunrise were operating at the same time; weren't they?

A Northshore and Sunrise were, yes.

Q So when Mr. Deo was at Northshore, he couldn't be at Sunrise; correct?

A Can't be in two places at once. Yeah.

Q Is it fair or accurate to state that when Mr. Deo was at Northshore,

M. MERCKLING

oftentimes you'll be asked to be at Sunrise?

A I was at -- I would go to both.

Q But is it fair to say when Mr. Deo was at one, you would be at the other?

A No, not always. Most of the time we were together.

Q There were circumstances in which when Mr. Deo was at Northshore, you would be at Sunrise; correct?

A There were times, yes.

Q And there were other circumstances in which when Mr. Deo would be at Sunrise, you would be at Northshore; correct?

A There might have been. I don't -- I don't recall that. I know I've been to Northshore without him. I mean, I'm sorry. I've been to Sunrise without him.

Q The decision about whether you would be at either Northshore or Sunrise with Mr. Deo or without him was Mr. Deo's decision; correct?

M. MERCKLING

A It was what?

Q It was Mr. Deo's decision; correct?

A Oh, it depended on what was going on at each dealership on that particular day. If there was something that I needed to do down at Sunrise, I would go to Sunrise.

Q Well, Mr. Deo was the one that decided whether you needed to do something at Sunrise, for example; correct?

A No. It was a discussion. He -- he wouldn't make a decision. We would talk about it and figure out where the best place for me to be would be.

Q Okay. Are you saying you had an equal say in where you should be for the day?

A A discussion. I'm not going to put a number on it; equal or not equal. We had a discussion on where he -- where we wanted to be for the day or where I was needed for the day. Sometimes it was just for a couple of hours.

M. MERCKLING

Q And then later on when Mr. Deo was operating Superb, if Mr. Deo wasn't there, you would be there; correct?

A No, not necessarily. I wasn't in Superb every day.

Q On the days that you were at Superb, if Mr. Deo was not there, you would be there; correct?

A Are you asking me if I was ever there when he wasn't?

Q Correct.

A I -- I don't remember.

Q On the days that you were there when Mr. Deo was not there --

A I just said I don't -- I don't -- I just answered you. I don't remember if there was days I was there when he wasn't. That's what I answered.

Q Okay. I understand. I have a different question. On any day in which you were present at Superb when Mr. Deo was not, is it fair to say that you were the top person in charge?

A No.

M. MERCKLING

Q Are you familiar with the six injuncted vehicles that are currently being held in the possession of Mr. Deo?

A I'm sorry. You have to repeat that. My phone fell.

Q No problem. Are you familiar with the six injuncted vehicles that are currently being held by Mr. Deo?

A Yes.

Q Where are those vehicles now?

A In Hicksville.

Q Where were they prior to being in Hicksville?

A Prior to them being in Hicksville, I believe they were at his house.

Q Are you -- withdrawn. Do you have any knowledge as to whether the vehicles were ever stored at LuxSport?

A I'm not sure what LuxSport is.

Q L-U-X-S-P-O-R-T?

A Yeah, I'm not sure what that is.

Q Were you ever involved in moving the injuncted vehicles being held by Deo

M. MERCKLING

to a storage facility for vehicles called LuxSport?

A I know there was a garage that he had them in. If that was LuxSport, I don't know.

Q Where was LuxSport to your knowledge, or where was the garage?

A I don't remember. I know it was off the -- it was off a service road. I think I was there once. I don't remember what town it was in though.

Q Were you responsible for having the vehicles moved there?

A No.

Q Do you know how the vehicles got there?

A Got there? No, I don't. I -- I know how they got moved from there to Hicksville, by a -- company.

THE REPORTER: I'm sorry. You cut out, Mr. Merckling. The last thing I heard was, "I know how they got moved there from Hicksville." What did you say after that?

M. MERCKLING

THE WITNESS: No. I -- I said I know how they got moved from there to Hicksville.

BY MR. KATAEV:

Q You were involved in that; correct?

A That part, yes.

Q And how were they transported from the garage to Hicksville?

A By a transport truck.

Q Were you the only person present on the day that they were moved from the garage to Hicksville?

A Was I the only -- no. There was other people there.

Q I'm going to rephrase my question. Were you the only other person -- withdrawn. Were you the only person present other than the transport company individuals and the garage individuals?

A No. There were other people there.

Q Such as who?

M. MERCKLING

A I believe Anthony was there for a little while. I believe a guy -- Aashish and Ben might have been there. I -- I don't remember exactly who was there.

Q What is Ben's role at Regal Autohaus?

A Sales.

Q What is Aashish's role at Regal Autohaus?

A Sales.

Q Are you -- withdrawn. Do you have any knowledge as to Aashish's serving as a guarantor for a floor plan line of credit?

A I do not.

Q Do you know when Mr. Deo first met Ben Pramod?

A I -- I'm sorry. You're breaking up. You have to repeat that.

Q Do you know when Mr. Deo first met Ben Pramod?

A I do not.

Q Do you know when Mr. Deo first

M. MERCKLING

met Aashish?

A I do not.

Q I'm just pulling up the next exhibit. Have you ever heard of the company Audio DX NYC LLC?

A Repeat that name.

Q Audio DX NYC LLC.

A Audio -- no, I've never heard of that.

Q What about DEEG LLC?

A DEEG?

Q Correct.

A I'm not sure whose that is either. It might be Dwight, but I'm not sure.

Q Okay. I'm going to share with you Deo 17. I'm sorry. Merckling 17.

(Merckling Exhibit 17 was marked for identification.)

I'll represent to you, Mr. Merckling, that this is a production of documents from Bank of America pursuant to a subpoena for all statements at Bank of America for Car Buyers NYC Inc., and that

M. MERCKLING

this is page 7 of 10 of the January 2023 statement for Car Buyers.

Do you see check number 1078 on the bottom right here?

A Yes, I see it.

Q This was a payment from Mr. Deo to your company from Car Buyers; correct?

A Yeah, that's what it looks like.

Q Now, why was it that Mr. Deo paid you from the Car Buyers account?

A You have to ask him. I have no idea.

Q You didn't ask any questions? You just accepted the check wherever it came from; correct?

A Exactly.

Q You weren't performing any separate work for Car Buyers in order to receive this payment; correct?

A I didn't even -- I don't ever even remember hearing a name Car Buyers.

Q Are you aware of any pool table that Mr. Deo purchased for the dealership, or for his home, or elsewhere?

M. MERCKLING

A A pool table? No, I have no idea.

Q Referring to page 26 of the same compilation of documents, and focusing your attention on check number 1086. This is a check to Parmeshwar Bissoon, AKA Kevin; correct?

A That's what it says, yes.

Q And it's dated January 14, 2023; correct?

A Yes.

Q Is it fair to say based on the existence of this check that Mr. Deo was paying Kevin from Car Buyers?

A Again, you're going to have to ask Mr. Deo that. I'm -- I -- I don't know why he wrote checks from there. I have no idea.

Q Does it strike you as suspicious that Mr. Deo was making these payments from Car Buyers when he operated Northshore, Sunrise, and Superb?

A Again, I have no idea what Car Buyers even is, so I'm not going to speak

about it.

Q Have you ever heard of J&H Auto Consulting LLC?

A Not that I can remember.

Q Is it fair to say that any payment made by Mr. Deo to you went into the Merck 27 account at Citibank?

A I believe so, yes.

Q Are you aware of any allegations of a death threat by Kevin to Mr. Deo?

A I -- I vaguely remember something happening either through a text message or something with them, but I'm not sure.

Q Other than the text message, are you aware of any contact between Kevin and Mr. Deo?

A No.

Q Did Mr. Deo --

A Except for when they worked together. I'm sorry.

Q Okay. Fair enough. The text message that you're referring to was sent by Kevin after he had stopped working for

Mr. Deo; correct?
A Again, I never saw the text message or anything, so I really don't know.
Q Mr. Deo never showed you the text message?
A I don't believe so. He may have, but I don't remember.
Q Did Mr. Deo ever ask you to come with him to the police to report the threat?
A I don't believe so.
Q To your knowledge, did Kevin make this threat at the direction of anyone?
A Again, I don't even remember what the text message was. I -- I don't know.
Q Hang on. Okay. Merckling 18 is ECF docket entry 1 from index number 615683/2024.
(Merckling Exhibit 18 was marked for identification.)
MR. THOMASSON: What is this

document, Mr. Kataev?
MR. KATAEV: Your complaint in state court against Mr. Baron.
MR. THOMASSON: Got it. Got it.
BY MR. KATAEV:
Q Please read paragraph 317. Let me know when you're done.
A Okay.
Q Now, if I read this correctly, it says that my client, Mr. Urrutia, arranged for Kevin to make this death threat to Anthony Deo. Am I reading that correctly?
MR. THOMASSON: Objection. It doesn't say that.
BY MR. KATAEV:
Q You can answer the question.
A I don't know what it's saying. I didn't say it. Why -- I have no comment on that.
Q Did Mr. Deo ever share with you that Kevin threatened him?
A I believe he said something.
MR. THOMASSON: Objection.

THE WITNESS: I believe he said something about Kevin -- a text message from Kevin. I -- I don't know. I don't really remember.

BY MR. KATAEV:

Q Do you have any knowledge that Mr. Urrutia directed Kevin to do this?

A How would I have any knowledge of that?

Q I'm asking you if you know. Do you know?

A No.

Q Did Mr. Deo tell you how he knows or believes that Mr. Urrutia directed Kevin to engage in this conduct?

A No, he never told me anything about that.

Q Did Mr. Deo ask you to protect him from Kevin in light of this text message?

A I don't remember those words being said.

Q Did Mr. Deo engage you as a private investigator to investigate

M. MERCKLING

whether Mr. Urrutia had anything to do with Kevin's text message?

A I believe I answered that question already that he never hired me as a private investigator at all.

Q Do you have any knowledge that Urrutia ever spoke to Kevin?

A I have no knowledge.

Q Do you have any knowledge as to whether Urrutia ever even met Kevin?

A I have no knowledge.

Q Showing you what I believe to be Merckling 19, docket entry 24 of the same lawsuit.

(Merckling Exhibit 19 was marked for identification.)

Please read it and let me know when you're done.

A Okay. And that is what?

Q I'll represent to you that this is a text message from Kevin to who I believe to be Anthony Deo.

A Okay.

Q Do you recall ever reviewing

this text message?

A No, I don't remember ever reading that.

Q Anthony Deo never showed it to you; correct?

A Not that I remember.

Q Is there any indication in this message that Mr. Urrutia is in any way involved?

MR. THOMASSON: Objection. Document speaks for itself.

You can answer.

THE WITNESS: It doesn't state anything about Urrutia.

BY MR. KATAEV:

Q You have no evidence or knowledge that Mr. Urrutia is in any way involved in this message; correct?

A Me personally? No.

Q Are you aware of any evidence or knowledge by Mr. Deo or anyone else as to whether Mr. Urrutia is involved in connection with this message?

A I do not have any information

about it.

Q This text message was sent in or about November of 2023; correct?

A That's what the date says, yes.

Q Have you ever spoken to Bissoon ever since he left Superb?

A No.

Q There's a reference here to Jeremy. Do you know who that is?

A I'm not sure who Jeremy is. He might have been one of the salespeople at Superb. I -- I don't know.

Q Do you have any idea what he's talking about leaving -- withdrawn. Do you have any idea what Kevin is talking about concerning leaving Jeremy with 10,000 left?

A I have no idea what that means.

Q Are you aware of any dealings between Mr. Deo and Jeremy concerning a vehicle?

A I don't.

BY MR. KATAEV:

Q Do you have any knowledge about

M. MERCKLING

where Mr. Urrutia lives?
A Do I have any knowledge?
Q Yeah.
A I believe Costa Rica or something like that I was told. I don't know.
Q Who told you that?
MR. THOMASSON: Objection. If that was something you got from any lawyer, do not disclose conversations with lawyers.
THE WITNESS: I heard it someplace. I don't know from where.
MR. RUDERMAN: That is not -- would not be considered a privileged communication. I would object to any direction not to answer that question.
MR. KATAEV: Yeah, we note our objection.
MR. THOMASSON: My objection stands, and there's not enough basis to prove that it isn't a privileged conversation either.
But for right now, until and unless something else occurs, I'm directing him not to discuss conversations he's had with

M. MERCKLING

any attorney.

MR. KATAEV: Yeah. We're just going to forewarn you, Mr. Thomasson, that you're putting yourself front and center of a sanctions motion.

You were recently warned by Judge Wicks that you're not authorized to represent or make arguments on behalf of these individuals.

You can't instruct him not to answer. That's our position, and that's what we're going to be discussing with the judge later. So I implore you --

MR. THOMASSON: We can do that whenever you want, Mr. Kataev. I'm imploring you not to ask him questions with regard to conversations with lawyers. I don't think it's proper.

MR. KATAEV: Okay. We're marking it for a ruling, and this will be part of the testimony that will be read back when we call Judge Wicks. I'll give the court -- I'll give the court reporter a note.

MR. RUDERMAN: I want to note for the

record --

THE REPORTER: One at a time, please.

MR. RUDERMAN: I would like to note for the record again that Mr. Benjamin and Mr. Merckling decided and agreed that Mr. Merckling would appear today without representation and has no counsel here today through his own choosing and that of his counsel.

MR. KATAEV: Let's give the court reporter an opportunity to mark this line of questioning for a read back later to the extent the judge wants it.

THE REPORTER: Just a moment, please. Okay. Thank you.

BY MR. KATAEV:

Q Without divulging to me how you know, do you have any knowledge as to how long Mr. Urrutia has lived in Costa Rica?

A I do not. And just to clarify something, I believe it was Mr. Urrutia himself that told me he lived in Costa Rica.

Q When did you first meet Mr.

M. MERCKLING

Urrutia?

A I only met him a couple of times at Superb. When? I don't remember dates.

Q Do you recall an incident in which Mr. Deo's son was involved in an accident with a Lamborghini?

A Yes.

Q Mr. Deo asked you to go to the scene of the accident to protect his son; correct?

A To protect his son? No. To make sure his son was okay, 'cause I could get there faster than him.

Q And you did in fact go to the scene of the accident; correct?

A Yes, I did.

Q And the Nassau County Police Department responded to the scene of that accident; correct?

A Yes.

Q Was it a serious accident?

A No. Cars got damaged but nobody got hurt. I don't know what you consider serious.

Q What was the major and extent of the damage to both vehicles?
A I don't know.
Q Do you know where the Lamborghini came from?
A I don't know.
Q Did you ever drive that vehicle?
A No. Actually, I believe I drove it once because it needed brakes.
Q Before or after --
A Or tires or something. It was some sort of a service thing that the car needed.
Q Was it before or after the accident with Mr. Deo's son?
A No. Before. Before.
Q After the accident, what happened to the vehicle?
A I don't know. It got taken someplace. I'm not sure where.
Q Was it towed?
A It had to have been.
Q The damage was that bad?
A The car was -- the car wasn't

drivable.

Q What happened, to your knowledge?

A I don't know. I know he had an accident in a parking lot.

Q Of the gym; correct?

A Yes, it was in a gym -- a gym parking lot.

Q That's the Life Time in Garden City; right?

A No.

Q Or was it Life Time in Syosset?

A I believe it was in Syosset, Life Time, if I'm not mistaken. I don't really remember. I don't think it was Garden City though.

Q Was the vehicle towed by the Nassau County Police Department or was it a private tow?

A I don't remember.

Q Do you remember where the vehicle got towed?

A I don't.

Q Were you responsible for

obtaining a copy of the accident report?
A I believe I talked to the insurance company about it.
Q You made an insurance claim; correct?
A I believe so, yeah. I believe I -- I believe I spoke to the insurance company about the -- I think they -- I'm sorry?
Q Go ahead. You think they what?
A I didn't hear what you said.
Q I wanted you to finish. You think they what?
A I believe the insurance company called Superb, and I spoke to them, but I -- I don't really remember.
Q You never saw that vehicle again after that accident; right?
A After the accident? No.
Q To your knowledge, you don't know whether that vehicle was repaired or not; right?
A I have no idea.
Q Do you have any knowledge about

M. MERCKLING

the insurance company making any payments to Mr. Deo?

A I have no idea.

Q When did Mr. Deo begin operating Regal Autohaus?

A I don't know. I don't have a date. I -- I don't know.

Q During the course of time that Mr. Deo was at Northshore, he sold vehicles outside of the State of New York; correct?

A What do you mean, sold them outside of New York? What does that mean?

Q Mr. Deo sold vehicles to people that lived outside the state of New York; correct?

A I'm sure he did.

Q And similarly, during the time he was at Northshore, Mr. Deo purchased vehicles outside the state of New York; correct?

A I don't know where he purchased the cars from.

Q Same question for Sunrise. Do

M. MERCKLING

you know if he sold vehicles outside -- to people outside of the state of New York?

A Well, I know there were customers from outside New York. I don't know what cars were sold to who and -- or where he bought them from.

Q Okay. But you know that there were customers outside the State of New York at Sunrise; right?

A I'm sure there was. I don't have any proof of that, but I'm sure there was.

Q Same question for Superb. Did customers outside of New York purchase vehicles at Superb?

A We had a lot of customers from everywhere. I'm sure there was, but I don't know which were or weren't. I don't have any --

Q Do you have any knowledge as to -- go ahead.

A So I -- I have no knowledge of them. I didn't get involved in sales.

Q Okay. But based on your

M. MERCKLING

observations, you observed that certain people came from outside the state; right?

A Yes.

Q You saw people come up with plates from outside of the state of New York, for example; right?

A What do you mean, come up with plates? On their cars that they drove up in? I'm sure there was. I don't remember.

Q Okay. To your knowledge, did Sunrise ever purchase vehicles outside of the state of New York?

A I have no idea. I -- I really -- I didn't get involved in the purchasing or selling of cars.

Q What about at Superb? Do you know whether vehicles were purchased outside the state of New York?

A I don't know.

Q How many lawsuits are you aware of, as you sit here today, against Mr. Deo?

A How many lawsuits am I aware of?

M. MERCKLING

I -- I know there's obviously this one, and I believe there's one that he's suing back. I -- I don't know.

Q Are you aware of the lawsuit by Mr. Deo's landlord at Old Westbury?

A No. I --

Q He never told you about it? We didn't get the verbal on that.

A No.

Q Are you aware of a lawsuit filed by the owner of Cherrywood against Mr. Deo?

A No idea.

Q He never told you about it?

A Nope.

Q Are you aware of the lawsuit filed by Mr. Hakim against Mr. Deo?

A Again, I don't even know who Mr. Hakim is.

Q I'll represent to you that Mr. Hakim claims that he gave Mr. Deo a hundred-thousand-dollar loan that Mr. Deo never repaid.

A I have no knowledge of it.

M. MERCKLING

Q Mr. Deo never told you about the lawsuit by Mr. Hakim; right?

A No.

Q Does it strike you as odd that there are so many lawsuits against Mr. Deo based on our discussion?

MR. THOMASSON: Objection.

BY MR. KATAEV:

Q You can answer.

A I don't know how many lawsuits are against him. I just told you that. Well, I don't know what they're about. I don't know nothing about them. I don't have an opinion.

Q Is it fair to say that Mr. Deo maintained control of Northshore up until it stopped operating?

A Well, I know he was paying the lease on the building.

Q But to your knowledge, was he -- to your knowledge was he maintaining of Northshore?

A Again, he was paying the lease, but the only thing that was going on there

was mechanic work as far as I know. I don't know what you're asking.

Q To your knowledge, was Mr. Deo in control of operations at Northshore, whatever those operations were?

A Yeah, if you want to consider the mechanic work operations.

Q Yes. And I'm also referring to prior to the time that it stopped operating as a dealership.

A Yes, he was in control of operations.

Q Same question for Sunrise. Was Mr. Deo in control of operations there?

A Yes.

Q Up until the time he gave up the lease; right?

A Well, if he gave up the lease, he wouldn't have been there anymore; correct?

Q Right.

A So then I'm sure he wasn't in charge of operations if he didn't have a lease there.

M. MERCKLING

Q My question is, up until the time he gave up the lease, he was in control of operations at Sunrise; correct?

A Yes.

Q And same question for Superb. From November of '22 until August of '23, Mr. Deo was in control of operations at Superb; correct?

A He was. Yes.

Q And is it fair to say that Deo primarily worked on having cars be sold from Northshore, Sunrise, and/or Superb?

A I don't understand the question.

Q During the time that Mr. Deo was operating Sunrise, Northshore, and/or Superb, one of his primary duties was selling vehicles; right?

A Well, he wasn't a salesperson.

Q But the main purpose of what he was doing was to sell vehicles; right? Operating the dealership in order to facilitate the sale of vehicles.

A Well, he controlled operations.

Q And the whole purpose of

operations was to sell vehicles; correct?
A Well, that's the purpose of a dealership.
Q Okay. And I'm asking you to confirm that that was his primary goal?
A To sell cars, yes.
Q Okay. And he did that for people in the state of New York and outside the state of New York; correct?
A He -- it was to customers that came in. I don't know where they were from.
Q But you know at least some were outside the state of New York; correct?
THE REPORTER: I didn't catch an answer if there was one.
MR. KATAEV: Yeah, I didn't hear it either.
THE WITNESS: What was the question? I'm sorry.
MR. KATAEV: Read it back please.
THE REPORTER: Just a moment.
(The reporter repeated the record as requested.)

M. MERCKLING

THE WITNESS: I believe so.

BY MR. KATAEV:

Q Okay. Now, whatever amount of cars were -- that were taken from Superb to Northshore for the car show. You don't dispute that those cars did belong to Superb; right?

A Again, I don't know who the cars belong to.

Q Well, up until the time they were moved to Northshore, they were always on Superb's lot; weren't they?

A I believe so, but they were on their lot and then moved there.

Q Based on the fact that they were always on the lot until they were moved, is it fair to make the inference that they belong to Superb?

A Again, I don't know how the car industry works or who owns what. You'd have to ask them.

Q Who's them?

A Either Anthony, or Tony, or whoever else is claiming to be an owner.

M. MERCKLING

MR. KATAEV: And we can take a ten-minute break. I'm pretty sure I'm done, but --

THE REPORTER: I'll take us -- I'll take us off the record at 3:20 p.m. for ten minutes.

(Off the record.)

THE REPORTER: We are back on the record at 3:31 p.m. Go ahead, please.

MR. RUDERMAN: Emanuel, did we call the --

MR. KATAEV: Yeah. For the record, this is counsel for the Superb plaintiffs. I have no further questions of the witness. Thank you, Mr. Merckling, for your time today.

And my colleague, Mr. Ruderman, has questions for you as well as counsel for Flushing Bank.

EXAMINATION

BY MR. RUDERMAN:

Q Good afternoon, Mr. Merckling. My name is Jeff Ruderman. I'm an attorney from the firm of Cyruli Shanks, and our

firm represents the other plaintiffs other than the ones that Mr. Kataev represents.

I'm going to ask you a few questions today. You're already familiar with the instructions, so just continue with the same instructions given by Mr. Kataev that you already know.

I will try my best not to repeat the same questions that he asked, but I may be doing some follow-ups and have some additional questions as well.

Now, you had testified that you were in the police -- you worked for the police department for almost 25 years; correct?

A Yes.

Q Okay. And what was the reason you retired?

A It was time.

Q Had you achieved your full pay pension capabilities at the time you retired?

A I could have gotten a little bit more. Every year you stay, you get like

M. MERCKLING

one-sixtieth, but for me it wasn't worth sticking around for that.

Q And you said that at some period of time you switched over to the SWAT team; is that correct?

A Correct.

Q And about how long before you retired had you done that?

A I started in BSO in 2012 or 2013. I don't remember exactly when.

Q So for approximately ten years or so you were in the SWAT team?

A Yes.

Q Okay. And as part of the SWAT team, you have special tactical training specifically with regard to concerns of those who want to cause great danger to others; correct?

A Yes.

Q And as part of that, you -- in order to -- and you say you're there to protect police officers. That's one of your major jobs; correct?

A Yes.

M. MERCKLING

Q And in order to protect those police officers, you need as much information as possible about the area which you are about to approach; correct?

A Depends really. If we got to go, you got to go.

Q No, I'm saying but it's better to have more information than less. Is that a fair statement?

A Yes.

Q Okay. And you'd also want to know about how many people you might be encountering when you reach that situation; correct?

A It really did not --

Q I'm sorry. You were frozen for a second. If you could just repeat your answer.

A I said it doesn't really matter. We handle every job or assignment the same way. That's how we're trained.

Q Understood. But are you telling me that you'd rather not know how many going in as opposed to knowing how many

people you're going to be facing?

A Most of the time, yes. Because when you listen to what other people say, a lot of times it's not what's really there. So you don't want to get bogged down on something that may not or may be.

Q So you don't really care about information. You're just going to face whatever you're going to face?

A Exactly.

Q Okay. And is that the way you generally approach being a police officer and a SWAT team member?

A Rephrase. Ask that again.

Q Is that generally the way that you approach being a police officer or a SWAT team member that you didn't really try to get as much information as possible in order to achieve your task? You just do whatever things --

A We -- we do our job. That's -- that's it.

Q I understand you do your job. My point is not whether you do your job.

M. MERCKLING

I'm sure you did.

My point is whether or not as an officer and a SWAT team member, you would rather have more information about what you're facing than less information about what you're facing?

A It depends on the information, to be honest with you. I -- I'm not saying that in a negative way. But, you know, we could be doing a warrant on a house, and they'll tell us that the layout of the house is one way, and it's not.

So we handle our position the way we have to handle it.

Q So if I would rephrase it to say, you'd much rather have accurate information than no information --

A Well, of course. Of course.

Q All right. And if you have accurate information, you're better prepared as to how to address whatever situation is in front of you.

A Again, it depends on the situation, but yes, good information is

M. MERCKLING

valuable.

Q Less accurate information -- yes. Okay. Fair enough.

So now you testified that Mr. Deo told you at some point in time that it was in fear of some people that were trying to harm him; correct?

A Correct.

Q All right. And again, I don't recall exactly when that was. Can you --

A I don't know who it was.

Q No, no, not who. When. When he told you.

A It was before I started there.

Q Okay. I believe we established somewhere around 2009 when you were assigned to the scene?

A No. I didn't start there until '20 -- the end of 2020.

Q Okay. I don't know if I'm cutting off, Mr. --

A You -- you are cutting off. I don't know if it's you or me.

Q All right. So, because I may be

M. MERCKLING

cutting off a little bit because of your connection, please pause a moment just to make sure that I'm complete with my question because you are only hearing half of it and then we're talking over each other.

And that's -- it's just the reporter just can't take down our information that way.

A Okay.

Q All right. So I believe we established that you met Mr. Deo somewhere around 2009 when your sons were both playing soccer; correct?

A Football.

Q Football. I apologize. So, and is it around that time that he first informed you that there were people that he were -- that he was in fear of?

A No. That didn't happen till much later.

Q Okay. Approximately when did it happen that you became aware of that?

A It was probably around the time

M. MERCKLING

that I started working at Northshore, somewhere around 2020, 2021.

Q Okay. And he didn't offer information to you about who those people were; correct?

A No.

Q He didn't offer information about why those people were after him?

A No.

Q But he did try to engage you to help protect him; correct?

A I'm sorry. You broke up that time. Please say that again.

Q He engaged you to provide protective service for him?

A Like I said earlier, we had -- we were just out to dinner, and he brought it up to me and asked me if I wanted to work when I wasn't in the police -- when I wasn't working for the police department.

Q But to provide him personal protection though; correct?

A Yes. And for the dealership. Sorry.

M. MERCKLING

Q Understood. Okay. And when he came to you and said he needed personal protection, did you ask -- you didn't ask him how many people were after him?

A No.

Q You didn't ask him whether these people would be -- typically be armed?

A I believe he told me that they were armed.

Q Okay. And you didn't ask him whether these people were US nationals or some other -- or part of a gang or anything along those lines?

A No.

Q You didn't think any of that was necessary if you were going to provide protection for him that his life was in danger?

A No.

Q Did you seriously at that time think his life was in danger?

A That's what he told me. I can only go by on what he told me.

Q I understand that's what he told

you. Did you believe that you thought his life -- that you believed his life was seriously in danger?

A If he told me that people with guns came into his dealership, then yes, I do believe that.

Q So is that what he told you, that some people with guns came into his dealership?

A Yes.

Q Okay. I don't believe he's testified about that before. So when did this incident happen that people with guns --

A I don't know.

Q Okay. And do you know which dealership they came into?

A Not sure.

Q And do you know what -- do you know why they came into his dealership?

A I don't.

Q Did he say they were there just to rob the dealership or some other reason?

A I don't remember what reasoning he gave, if any.

Q So, but it was definitely -- and were these people after him specifically or for some other reason as far as you know?

A I don't know.

Q And then if they came in with guns and they were after him, how did he escape tragedy?

A Again, I didn't really get that deep into it with him.

Q But you just thought, you know what; sounds real. Sounds like his life is in danger. He must need my security services based upon what he told you?

A Exactly.

Q And having been a police officer for almost 20 years at that time -- over 20 years at that time?

A Exactly.

Q And then weren't you fearful that during the many hours when you were not protecting him, that his life was in

danger?

A I always worried about it but, you know, I can't be with somebody 24 hours a day.

Q Well, did you suggest to him if his life is truly in danger, he needs to have 24-hour protection?

A If he's in his own house, I believe he's pretty safe.

Q Well, you only were working four days with him straight then four days off of with him; correct?

A Yes.

Q Okay. So during the four days you weren't working for him, wasn't his life in danger?

A It could have been.

Q Weren't you concerned --

A Somebody -- somebody's phone is freezing. I don't know if it's mine or yours.

Q I believe it's yours just because the other people are not freezing. So I apologize if that's what it is.

M. MERCKLING

So my question was, if you're so fearful that his life is in danger, what did you do, if anything, to protect him during the four days when you were not with him?

A Oh, there wasn't much I can do 'cause I was still working for the police department. He understood that.

Q Do you know what efforts he took to protect himself during those four years -- four days a week when you were not there to protect him?

A I don't.

Q Okay. And do you know what -- by the way, do you know how long before he brought this issue -- issue up to you had that situation arrived where somebody came into his dealership with guns?

A I don't know when that was.

Q Okay. But you never asked any of those questions; right?

A No.

Q Now, you say you never worked -- you were never employed or worked for

Superb; correct?
A I was never -- I was never employed by Superb.
Q Okay. Well, did you work for Superb?
A I -- I was in the dealership, but I didn't work for Superb.
Q Okay. Did you ever work for Car Buyers?
A I -- again, I don't even know what Car Buyers is.
Q Okay. Did you ever work for -- were you an employee or did you work for Northshore when it was operating?
A Yes.
Q Okay. What about Sunrise?
A Yes.
Q Okay. So now, you know, Mr. Thomasson at some point was your attorney; correct?
A Correct.
Q All right. And did you ever have conversations with Mr. Thomasson as an attorney outside of the earshot of Mr.

Deo?

A I -- I may have. I don't -- I don't know. I have talked to Harry before.

Q Oh, you spoke -- but you spoke to him individually without other people?

A Yes.

Q Okay. And during any of those conversations, did you ever discuss Superb or Car Buyers with Mr. Thomasson?

A I don't recall. Again, Car Buyers; I don't know what that is, so I know that wasn't an issue. And I'm -- I may have spoken to him about Superb.

Q Okay. So what did you discuss with Mr. Thomasson about Superb when Mr. Deo was not there?

MR. THOMASSON: Objection. That's absolutely privileged.

MR. RUDERMAN: Why is it privileged, Harry?

MR. THOMASSON: I'm not being deposed here, Mr. Ruderman.

MR. RUDERMAN: Well, then you're --

M. MERCKLING

MR. THOMASSON: My private -- let me finish my statement.

MR. RUDERMAN: Go ahead.

MR. THOMASSON: My private conversations with Marc Merckling are privileged.

MR. RUDERMAN: He just testified that he did not work for Superb, he did not work for Car Buyers, and Mr. Deo was not part of the conversation.

So you cannot protect Superb's protection right now because he was not an employee of Superb. So whose protection are you asking about?

MR. THOMASSON: Again, my conversations with Marc Merckling about the facts of these cases are privileged, and I am instructing the client not to answer questions about private conversations between me and Marc Merckling.

MR. RUDERMAN: Okay. So Emanuel, this will be another issue we bring up before Judge Wicks.

M. MERCKLING

MR. KATAEV: Can we have the court reporter mark it please before we continue?

THE REPORTER: Just a moment.

MR. THOMASSON: And just to be clear for the record, I believe it is both attorney-client privileged. I also believe it is attorney work product privileged.

THE REPORTER: Go ahead, Mr. Ruderman.

MR. RUDERMAN: Thank you.

BY MR. RUDERMAN:

Q Mr. Merckling, you testified that you accompanied Mr. Deo when he went to the Nassau County detective, Detective Marx; correct?

A Yes.

Q Okay. And when Mr. Deo -- where was Mr. Deo when he first became aware that the money had been taken out of the account, if you know?

A I don't know. I wasn't with him.

M. MERCKLING

Q Okay. So how did it come about that you accompanied him to the detective?

A He called me and said that they stole money from him and he needs to go to the police department to fill out a report. And he asked me to take a ride with him.

Q And you previously testified you believe he called you because he wanted moral support. Is that your testimony?

A I said I went with him for moral support.

Q Okay. Was his wife not capable of providing him moral support?

MR. THOMASSON: Objection.

THE WITNESS: Come on. Let's -- let's be real here.

BY MR. RUDERMAN:

Q You can answer the question.

A I don't know what his wife was doing.

Q Okay. So and you're saying it is not possible that he called you to accompany him to the Nassau County Police

M. MERCKLING

Department because you were a retired police officer? That's not a possibility?

A Anything's a possibility.

Q Isn't it more likely than not the reason he wanted you there was because you were a retired police officer?

MR. THOMASSON: Objection. Calls for speculation.

BY MR. RUDERMAN:

Q You can answer the question.

A It's whatever he said it was.

Q And what did he say?

A It has nothing to do with that I was a retired police officer. There's nothing I can do about a -- a case that he's bringing before a detective.

Q You're telling me as a retired police officer meeting with an existing police officer, you hold no greater regard to that detective than somebody coming in off the street?

A Absolutely not.

Q Okay. And so he brought you along just to provide moral support as far

M. MERCKLING

as you know; correct?

A Yes.

Q And how long were you in the room with Mr. Deo and Detective Marx?

A I don't remember how long we were there for. I was in and out of the room.

Q So you weren't there the entire time he was speaking?

A No.

Q Okay. Did you help him in any way fill out any part of the police report?

A No.

Q And were you aware of what the dispute was between Mr. Deo and the Island Auto people at the time concerning the money?

A I don't understand what you're asking.

Q Do you have any -- at the time, did you have any reason to understand why Mr. Aaronson may have arranged to take that money out of the account?

M. MERCKLING

A I have no idea.

Q Did you ask?

A No.

Q Did Detective Marx ask that question as far as you know?

A I don't know.

Q Did Mr. Deo offer any explanation to Mr. Marx as to why Mr. Aaronson might have taken the money?

A I don't know. You'd have to ask them.

Q When Detective Marx was there, did he inquire as to how it's possible that some complete stranger might take $735,000 out of Mr. Deo's account?

A Again, I don't remember that -- I don't remember the conversation that he had with Detective Marx, but I'm sure he didn't tell him it was a complete stranger.

Q Okay. So what relationship were you aware of that he did explain to Detective Marx?

A I'm not.

M. MERCKLING

Q So would Detective Marx, being a detective, have asked in your --

A I --

Q Let me finish my question. In your knowledge in the police -- as a police officer for almost 25 years, would you ask the question of somebody claiming that someone took $735,000 out of your account, how they came about to have a relationship that they could do such a thing?

A I'm sure he did.

Q But you weren't there to hear that question?

A No.

Q And you didn't hear Mr. Deo explain the answer to that?

A No.

Q Okay. And in your experience as a police officer, have you ever heard police officers say that certain issues between particular parties are civil matters, not really criminal matters in --

A Of course.

M. MERCKLING

Q Okay. And would that happen if two partners, for example, owned a business together and one was claiming the other was stealing money from the other?

MR. THOMASSON: Objection.

You can answer if you know.

THE WITNESS: Repeat the question.

BY MR. RUDERMAN:

Q In your experience as a police officer, would it be uncommon for two partners who have a dispute and one claims the other's been stealing money from the other, that the police department would say, this is a civil matter, and you need to go to court about that?

MR. THOMASSON: Objection.

THE WITNESS: Depends on the circumstances.

BY MR. RUDERMAN:

Q Right. So there are circumstances where the police would say -- step back and say, "This is not a criminal matter, or at least not for now. It's a civil matter. You need to go to

the court." Correct?

A There are civil matters and there are criminal matters. Yes.

Q All right. And do you recall Detective Marx in any way investigating whether the dispute between Mr. Deo and Mr. Aaronson might be a civil matter?

MR. THOMASSON: Objection.

You can answer if you know.

THE WITNESS: I have no idea. From what I was under the impression, it was a criminal matter, not a civil matter.

BY MR. RUDERMAN:

Q And what was the basis for your impression?

A Because they stole $735,000. That's grand larceny.

Q Okay. Well, you say stole, so let's back up a little bit. If Mr. Aaronson had legitimate access to a bank account in which he claims ownership in the entity, would that be a criminal matter or a civil matter?

MR. THOMASSON: Objection. He's not

qualified. He's not a lawyer. That's inappropriate.

MR. RUDERMAN: He's the police officer who arrests people for these things. He just testified as to what his criminal --

MR. THOMASSON: No, he was not. He was a retired police officer who has no expertise in the law.

MR. RUDERMAN: Harry, he can answer the question. He can answer. Harry, he can -- you noted your objection. He can answer the question.

BY MR. RUDERMAN:

Q Mr. Merckling, as a police officer, when one party claims I own half the business, I have a right to access this account, it's my money and the other party says no.

In your experience, would that be something which the police would assume would be a grand larceny or perhaps more of a civil dispute?

A As an open-ended question, not

M. MERCKLING

referring to this, it could be either or.
Q Okay. And so in your experience, would you say, I'm just going to arrest the guy and deal with it later, rather than say, why don't we --
A I wouldn't make that decision.
Q Okay. So who --
MR. KATAEV: Let him finish.
BY MR. RUDERMAN:
Q Who would make that decision?
A The detective.
Q They have the absolute right to say, just come on in and I'm going to arrest you, rather than ask the person to come in with his attorney to have a discussion?
A They collect the facts -- their facts, and they make that determination.
Q Well, don't they have to get facts from both sides?
A No.
Q So they can --
A You don't need -- you don't need both sides of a complaint to make an

M. MERCKLING

arrest.

Q They can make the arrest, but wouldn't they typically try and get most of the facts before they make an arrest?

MR. THOMASSON: Objection.

THE WITNESS: Again, I don't know how detectives determine who they're going to arrest and who they don't. I'm not a detective.

BY MR. RUDERMAN:

Q Would you agree with me that making a false arrest is a bad idea?

A Making a false arrest is not a good idea.

Q Okay. Now, you mentioned that you were -- have three vehicles, two of them which you purchased through Northshore or Sunrise; correct?

A Yes.

Q Okay. Do you have -- are these -- were you -- did you ever drive a car provided by Northshore or Sunrise that had dealer plates on it?

A Breaking up.

Q I'm sorry. I'm going to -- have you ever --

A I'm sorry. You're breaking up.

Q Can you hear me now? Can you hear me now?

A No. Now I can.

Q Okay. Have you ever driven a car that was from Northshore or Sunrise that had dealer plates on it?

A Yes, I did.

Q Okay. And what were -- can you describe that circumstances of that?

A What do you mean, circumstances?

Q Well, how did it come about that you were driving a car that had dealer plates on it?

MR. THOMASSON: You mean from one dealership to the other?

THE WITNESS: I -- yeah, I'm not following the question.

BY MR. RUDERMAN:

Q I asked you if you ever drove cars that had dealer plates on them, and I said, how did that come about that you

drove cars with dealer plates?
And you can just explain to me how it came about that you -- for whatever reason that you drove cars that had dealer plates on them.
A I drove a lot of cars with -- with dealer plates on it, either around due to business reasons or personal reasons.
Q So, and when I talk about driving, I don't mean transporting it from, let's say, Sunrise to Northshore and back.
I'm talking about using it outside of the dealerships. Did you do that? Did you drive those cars?
A Yes, I did.
Q Okay. And did you only conduct dealer business with those vehicles?
A Well, when I was working is when I would drive the --
Q You're --
A Are we frozen again?
Q You're frozen again.

M. MERCKLING

MR. THOMASSON: Okay. Now you're not.

BY MR. RUDERMAN:

Q I'm sorry. Can you repeat your answer because I couldn't hear you?

A Can you repeat the question?

Q The question was, other than driving between the dealerships with a car with dealer plates, what other occasions did you have to drive cars with dealer plates?

A I drove a car with dealer plates quite often.

Q And what was the purpose of driving a car with dealer plates quite often?

A What was the reason? To drive a car.

Q So did Mr. Deo tell you that one of the benefits of working for him was that he could allow you to use one of the cars owned by the dealership and you could use it for your purposes?

A Yes.

M. MERCKLING

Q And about how long did you have the use of a dealership car for your personal purposes?

A When I was working there.

Q You mean during the period of time you were working there?

A Yes.

Q Okay. So you started in around 2020, and you said Northshore stopped around the end of 2022.

So at least for those year and a half, two years, or something like that, you drove -- you were able to drive a dealership vehicle car?

A Not all the time, but yes, I did have permission.

Q Okay. And were you asked to provide any compensation to the dealership for the use of that vehicle?

A No.

Q Now, you say you were -- for all of your services you performed, you did it under your corporation, Merck 27; correct?

A Yes.

M. MERCKLING

Q Okay. Are you a shareholder of Merck 27?

A A sole owner.

Q Okay. You were the only owner of Merck 27?

A Yes.

Q Okay. And you were the only officer of Merck 27?

A Yes.

Q And when you were -- when Mr. Deo arranged for payments to Merck 27, all of those checks -- withdrawn.

When you were -- when Merck 27 was paid, did Merck 27 receive some notification at the end of the year about how much money it had been paid for that period of time?

A Yeah. I believe I got forms that I had to give to my accountant doing my taxes.

Q Are you familiar with the term 1099?

A I believe that's what I fill out, but I'm not sure what it is. My

M. MERCKLING

accountant handles that.

Q And all of the -- and as far as you know, all of the income that was paid to Merck 27 during the year was covered --

A Frozen again. I'm sorry. You're froze. I didn't hear anything you said.

Q I'll try that again. And did you compare --

A Frozen again.

Q Okay. Can you hear me now?

A Now I can hear you.

Q Did you compare the numbers on your 1099 to confirm that all of the income that was paid to Merck 27 was captured in that 1099?

A Again, my accountant would do all of that.

Q Well, your accountant would -- how would the accountant know how much money you were paid over the course of the year?

A Because I gave him my bank statements.

Q Okay. So every check was deposited into your Merck 27 bank account; correct?
A Yes.
Q Where did you bank with Merck --
A Citibank.
Q Now, when did you start -- when did you first become aware that --
A Frozen.
Q Can you hear me now?
A Now I can hear you.
Q When did you first become aware that Mr. Deo was transferring over his operations from the Northshore to the -- frozen again.
A Sorry. You have to start over again.
Q Okay. When did you first become aware that Mr. Deo was transferring over his operations from operating under Northshore and Sunrise to now operating under Superb?
A I don't know when that happened.
Q Do you recall what year it might

M. MERCKLING

have been?

A I'm sorry?

Q Do you recall what year it might have been?

A I -- again, I'm very bad with dates. I really don't know.

Q Did Mr. Deo ever discuss with you the basis for his dispute with the Island Auto people, including Josh Aaronson and the Barons, et cetera?

A No.

Q Did he ever discuss with you the fact that there was a dispute as to ownership of the Northshore, and Sunrise, and the Baron Nissan dealership?

A I knew that there was some sort of a dispute with Nissan, but I don't know any particulars on it.

Q Okay. And did you know that there was a dispute with regard to Northshore and Sunrise?

A I didn't know that.

Q You didn't know that until some particular -- until when?

M. MERCKLING

A I didn't know that until it started with the -- the court cases, that there was any sort of dispute between them.

Q So Mr. Deo never kept you abreast as to the disputes he was having with Josh Aaronson, and the Barons, and the other parties?

A No.

Q And did you ever have any dealings with Josh Aaronson?

A I met him a couple of times, but I never had any real conversations with the man.

Q Other than some small pleasantries. That was about your only conversation; right?

A Exactly.

Q And I think you mentioned you had one interaction with Brian Chabrier at the Baron Nissan, correct, where you got some papers?

A That -- I had one interaction with him at Baron Nissan. I also seen him

M. MERCKLING

a couple of times at Northshore.

Q Okay. And did you interact with him at all when he was there at Northshore?

A Again, just hello and goodbye.

Q Do you know what relationship, if any, he had to Northshore or Sunrise?

A No, I do not.

Q You never spoke to him about any of that?

A No.

Q What about Jory Baron? Do you know who Jory Baron is?

A Never met him or her. Is that a her or him? I'm sorry.

Q It's a him.

A Okay. I apologize. I don't know.

Q Okay. And I believe you mentioned you did have some interaction with David Baron; correct?

A Again, same thing. Just I was introduced to him and, hello, goodbye. That's it. That was before I even worked

for Northshore.

Q And you testified earlier that there was some conversation with Mr. Deo saying that they were not giving him the dealership, I believe was your testimony, but I --

A Nissan.

Q Okay. It was Nissan that they were talking about?

A Yes.

Q Did he give any other information besides just saying they didn't give him the dealership?

A No. I know he went down to Florida, and they were supposed to do the deal there and they did the deal, but I don't really know it.

Then when he came back from Florida, something happened. I don't know what, but he never wound up taking possession of the dealership.

Q Do you know what the, quote-unquote, the deal was?

A No idea.

M. MERCKLING

Q Did you ever see any documents in connection with that?

A No.

Q Now, when you were at Northshore and at Sunrise, there were customers that gave cash deposits or maybe purchased vehicles in cash occasionally. Are you aware of that?

A Yes.

Q Okay. And when cash came into the dealership, where was it kept initially?

A I would imagine in the safe.

Q Okay. Was there a safe at each dealership?

A Yes.

Q Where was the safe located in each dealership?

A In one of the offices.

Q Do you know whose office it was or it was kept?

A The one safe was in the -- not the controller's office. It was in the middle offices in Northshore. And the one

M. MERCKLING

in Sunrise was in the back office on the right.

Q And were these like a -- was this a freestanding safe, or a closet safe, or something else?

A Freestanding.

Q And were these -- did they have a key, or did they have a combination, or something else?

A I believe they both had combinations.

Q And did you have the combination to both of those safes when you were working there?

A I did.

Q And do you know if anybody else had the combinations?

A Yes. Other people did have the combinations.

Q Do you know who else had the combinations at --

A I don't know.

Q Let me just finish the -- at Northshore and Sunrise. Okay. The answer

M. MERCKLING

is you don't know?

A I don't know. Sorry.

Q All right. And when cash would come in, how would it make its way into the safe if you know?

A In Northshore and Sunrise it would be whoever collected the money. I didn't really do much of -- I didn't count the money and even do that many bank drops in Northshore or Sunrise. There was occasionally, but it wasn't all the time.

Q And do you know how the cash receipts were recorded by the dealerships at Northshore and Sunrise?

A They were, I believe, put into the deal, and there was also a written part of it. I'm really not sure.

Q Did you ever see the written -- a written ledger, a written schedule --

A There was --

Q Let me just finish. A written ledger, a written schedule which listed all the cash receipts?

A There was a receipt book. I

know that much.

Q And receipt book; would that be something where a customer would -- it would like may be in duplicate or triplicate, and they'd get a receipt?

They'd get their one physical receipt, and it would be something kept at the dealership, or is it something else?

A No. I believe it was where you could write it out that the customer would get a receipt and then one receipt would stay with the dealership, I believe.

MR. RUDERMAN: I'm sorry. Emanuel, something came through from the Court. Did you see that?

MR. KATAEV: It has nothing to do with this deposition. We may proceed.

MR. RUDERMAN: Oh, okay. Sorry. Okay. If you can just give me a second here.

I apologize. Give me a second. I'm going to share my screen. I have screen sharing capability here. Just make sure this -- okay. Let's see. Okay. Let me

see if I can make this larger.
All right. Can everybody see the document here; The Supreme Court of Nassau -- The Supreme Court of the State of New York?
MR. KATAEV: Yes.
BY MR. RUDERMAN:
Q Mr. Merckling, can you see this?
A Yes.
MR. RUDERMAN: Okay. I'm going to mark this, Carol, whatever we're up to.
THE REPORTER: Twenty.
(Merckling Exhibit 20 was marked for identification.)
MR. RUDERMAN: Thank you.
BY MR. RUDERMAN:
Q Mr. Merckling, I'm going to represent to you that this was an affidavit that was signed and sworn to by Daniel O'Sullivan in connection -- in connection with an original lawsuit filed in the Supreme Court of Nassau County against Mr. Deo and others.
Do you know who Mr. O'Sullivan

M. MERCKLING

was in connection with Northshore or Sunrise?

A Yes. He was the controller.

Q Okay. And do you know how many days of the week Mr. O'Sullivan was working at the dealership?

A I believe five, but I'm not sure.

Q Do you know if he physically -- was he the controller over both Northshore and Sunrise or only one if you know?

A I don't know.

Q Okay. Where was he usually physically located though?

A In Northshore.

Q Okay. And in Mr. O'Sullivan's affidavit, I'm going to draw your attention to -- it's on the second page, paragraph 2.

And if you can read the -- just paragraph 2 over here. Do you see that?

A Yes.

Q Okay. If you can just read that to yourself.

M. MERCKLING

A Just paragraph two?

Q Just paragraph two.

A Okay.

Q All right. You had an opportunity to read it?

A Yes.

Q Okay. In this affidavit, in this paragraph 2, Mr. O'Sullivan is swearing that significant amounts of customer deposits -- he's referring to cash deposits -- were listed in the logs, but were not deposited into the bank by Mr. Deo. Did you see that? Did you read that?

A Again, the money was put into the safe. After that, I -- again, I didn't do most of the bank drops in Northshore. It was Dan.

Q Okay. So what he writes -- what he testifies to here in his affidavit -- he says -- second sentence.

"When cash came in, Marc Merckling, Mr. Deo's friend, who I believe has the title of manager, would give the

cash to Anthony Deo." Did you see that?

A I didn't give cash to anybody. Like I said, I put it in the safe. What happened from there, I don't know.

Q My question is, did you see that?

A No.

Q No. Did you see what I just read to you?

A Oh, I saw, yes. What you just read to me, yes.

Q Okay. Right. Okay. So now Mr. Sullivan is saying that when the cash came in, you gave it to Mr. Deo. Do you see that?

A I do.

Q Okay. Do you disagree with that statement?

A Yes.

Q Okay. So when cash would come in, who took the cash? Who, if anyone, took the cash out of the safe if you know?

A I believe it was Dan.

Q Okay. And what would -- what

did Dan do with the cash if you know?

A I have no idea. I would assume put it in the bank.

Q Okay. Well, did Dan make trips to the bank as far as you know?

A Yes. I know he did.

Q And what's the basis for your knowledge?

A Because he would tell me, "I'm going to the bank."

Q Okay. Do you know if he deposited the cash, or checks, or something else?

A I -- I never accompanied him to the bank, so I don't know.

Q Do you know if Mr. Deo ever took cash to the bank?

A I don't know.

Q Did you ever accompany anybody who was depositing cash into the bank?

A No.

Q Okay. It was your job to be security for the dealership; that's correct?

M. MERCKLING

A Yes.

Q All right. So people are walking out with perhaps tens of thousands of dollars, walking down the street, out of the dealership, all perhaps on a daily basis; right?

A I don't know how much happened on a daily basis.

Q But as security, you were never asked to accompany anybody to the bank to make sure the cash made it there safely?

A I -- I made some bank deposits from there, but again, Dan normally did it. He would just leave during his lunch or at the end of the day and make deposits. I wasn't asked to do that all the time.

Q You don't know whether his deposits were cash, or checks, or anything else?

A I don't know.

Q Do you know when Gold Coast started operating as a -- under that name as a dealership?

M. MERCKLING

A I don't know.
Q Did you ever work at a dealership called Gold Coast?
A Well, it's -- I -- I don't really know how this works, but it's Gold Coast doing business as Regal Auto, and I was -- I'm in Hicksville. I know that's what they're doing.
Q So that's the dealership currently operating as Hicksville, has a name, Gold Coast doing business as; correct?
A Yes.
Q Okay. Do you know if prior to Hicksville, if any other dealership was being operated under Gold Coast name?
A I'm not sure.
Q And you had just been receiving funds from Northshore that were shown to you by Mr. Kataev, May, June, and July of 2023, from Northshore Motor; correct?
A I believe that's where it was from.
Q Okay. Was Northshore Motor

M. MERCKLING

operating at that particular time?

A I'm not sure.

Q You had previously testified that at some point the vehicles at Northshore Motor were returned, or I won't say returned. Were delivered to Josh Aaronson or his -- or Island Auto people; correct?

A Yes.

Q Okay. And I believe you testified that was somewhere around November of 2022?

A Yes.

Q Okay. So between November of 2022 and July of 2023, did Northshore ever have its own vehicles again at its dealership?

A I don't know.

Q Well, were you working at Northshore during that period of time?

A Again, I -- I'm very bad with dates. I don't remember timeframes.

Q Okay. Well, was there ever a period of time where you were not working

there for a period of four or five or six months at a time?

A I don't -- I don't know. I really don't know.

Q Well, you do recall you testified earlier that maybe a week would go by when you wouldn't work. You can't remember a gap of many months where you weren't working?

A Well, it's not that I wasn't working, but I might not have been there.

Q Well, where else would you have been?

A At Superb.

Q So, at some point you were working over at the -- where was the Superb location?

A Great Neck.

Q And when the Superb location was operating, was Northshore operating or Sunrise operating at the same time?

A I don't believe so, but like I said before, we did have a mechanic shop still in Northshore.

M. MERCKLING

Q And there was also testimony about a car show at the Northshore location somewhere in July 2023; correct?

A I believe that's what the date was.

Q So would it be fair to say that for several months prior to that car show in July of 2023, Northshore was not operating?

A Again, except for fixing cars.

Q So it wasn't -- as far as you recall, for a number of months prior to July of 2023, Northshore was not selling cars. There were only fixing cars?

A That's what I recall, yes.

Q And the cars they were fixing; were these vehicles that had previously been sold by Northshore or something else?

A No. It was more cars that were being ready to be sold from Superb.

Q So was Northshore's mechanic shop being used to service vehicles that were being sold by Superb. Is that what you're --

A Yes.

Q And so Northshore did not have vehicles in its showroom or its lot for sale at that particular time?

A No.

MR. KATAEV: Jeff?

MR. RUDERMAN: Yes.

MR. KATAEV: Jacqueline Fink would like to join us on a call.

MR. RUDERMAN: Okay.

MR. KATAEV: I'm going to give her the Zoom instructions to dial in.

MR. RUDERMAN: Sure.

THE REPORTER: Would you like me to take us off the record for a moment?

MR. KATAEV: Up to Jeff.

MR. RUDERMAN: No, no. This should be on the record I think, and we should let the Court know that we're on the record as well.

MR. KATAEV: Yeah. So, I'm going to send the phone number to join in for the Zoom. And when Ms. Fink joins, Madam Court Reporter, we'll need you to read

back those lines of questioning that we marked; okay?

THE REPORTER: I'd like to take us off the record at this point then so I can get set up.

MR. RUDERMAN: Yep.

MR. KATAEV: Let's do that when she joins. I don't know when she'll join. We're going to proceed with the deposition.

MR. RUDERMAN: Okay. How will you know that she's about to join?

MR. KATAEV: I have to send her the instructions first, and then she'll announce herself, and we'll go off record.

THE WITNESS: Is it possible to take a five-minute break?

MR. RUDERMAN: Sure.

MR. KATAEV: Yeah. It's 4:17. Let's come back at 4:23. I'll send the info for now.

THE REPORTER: Okay. Off the record at 4:17 p.m.

(Off the record.)

THE REPORTER: We are back on the record at 4:22 p.m. Go ahead please.

THE COURT: Hi. This is Jacqueline Fink.

THE REPORTER: I'm sorry. Can you repeat yourself please, Ms. Fink?

THE COURT: Say that one more time.

MR. KATAEV: We didn't hear what you said, Madam Court Reporter. What did you say?

THE REPORTER: I believe that she fell off the call. I'm not sure. And Mr. Ruderman, you're muted.

MR. KATAEV: Yeah, she's off the call.

MR. RUDERMAN: Okay. Yeah, she dropped. Hopefully, she'll dial back in again.

MR. THOMASSON: Who is it that's calling in? This is someone from Judge Wicks' chambers?

MR. KATAEV: Correct. Ms. Fink. Jacqueline Fink.

Do we want to continue the

questioning until she gets back?

THE REPORTER: She just came back into the room.

THE COURT: Hi. I'm back.

MR. KATAEV: Hi, Ms. Fink. You have Emanuel Kataev here with Mr. Ruderman. What we'd like to do in terms of proceeding is to have three selections of the transcript read back, which the court reporter has teed up, knowing that we'll have the Court on, and then we'd like to present our arguments.

THE COURT: Okay. Thank you.

MR. RUDERMAN: Are we back on the record?

THE REPORTER: We have been back on the record.

MR. RUDERMAN: Okay.

Good afternoon, Ms. Fink. My name is Jeff Ruderman. I'm from Cyruli Shanks and we represent the other plaintiffs besides Mr. Kataev.

We have the deposition of one of the defendants, Marc Merckling. He's

represented by Jeffrey Benjamin and the Linden Law Firm in this matter.

I'm going to note for the Court that Mr. Benjamin was notified of today's deposition. He emailed us yesterday stating that he is stuck in Florida. By the way, this is a remote deposition.

He's stuck in Florida, and said he spoke to Mr. Merckling, and he and Mr. Merckling agreed that he would not be represented today in the deposition.

So Mr. Merckling does not have an attorney representing him here today. Mr. Thomasson who is pro se is appearing pro se here.

And what we have is our three questions which Mr. Thomasson has noted objection, claiming attorney-client privilege.

And although he does not represent Mr. Merckling, has directed Mr. Merckling not to answer these questions. And that's what we're here for.

THE COURT: Okay. So let me just

recap. So Mr. Thomasson is objecting on behalf of the defendant that's being deposed today?

MR. RUDERMAN: I suppose so and directing Mr. Merckling not to answer the question. Not just objecting, but directing him not to answer the questions.

MR. THOMASSON: And Ms. Fink, this is Harry Thomasson. Just to be a little more complete, I have two objections to what they're asking about.

They're asking for private conversations between me and Marc Merckling that were attorney-client privileged conversations and/or part of my investigative work into these cases involving all of these plaintiffs and all of these defendants.

And I object on both bases.

MR. KATAEV: Ms. Fink, if it's okay, would you like to have the testimony?

MR. RUDERMAN: If that's okay, we'll ask the --

THE COURT: That's fine. So just the

last part of Mr. Thomasson got cut off. So when he said that he's objecting, after that, I couldn't hear the rest.

MR. THOMASSON: I said so -- I very briefly finished by saying, so I am objecting on the basis of both attorney-client privilege and attorney work product.

THE COURT: Okay. Thank you.

MR. RUDERMAN: So, Carol, if you could read back the questions please, one at a time.

THE REPORTER: Yes. Just a moment, please. Bear with me, and if everyone could stay quiet while I'm getting this teed up, otherwise I'll keep taking notes.

(The reporter repeated the record as requested.)

THE REPORTER: That is the read back of the first objection. Would you like me to do the second one as -- the next as well?

THE COURT: That's fine with me. Thank you.

M. MERCKLING

THE REPORTER: Thank you very much. Bear with me. I will pull up that second one and read it back for everyone.

(The reporter repeated the record as requested.)

THE REPORTER: That was the -- the second. I will tee up the third one now. Bear with me one more time. I appreciate it.

(The reporter repeated the record as requested.)

MR. RUDERMAN: As to who did he -- who did Mr. Merckling work for, and then the question. Otherwise, it's out of context.

THE REPORTER: Understood. Just a moment. Actually, it appears that we have lost our court connection. She dropped on the call.

MR. RUDERMAN: Oh, okay.

MR. KATAEV: Let's wait for her. Must have been hard -- hit hard by the cell phone.

THE REPORTER: We're currently still

on the record. I'm just going to take us off the record at 4:33 p.m. while we wait for Ms. Fink.

(Off the record.)

THE REPORTER: We are back on the record at 4:41 p.m. Go ahead, please.

MR. RUDERMAN: Thank you.

BY MR. RUDERMAN:

Q All right. Mr. Merckling, I'm going to pull up a document, and I'm going to share my screen. It's kind of small. Let me see if I can make it larger. Okay. All right.

Mr. Merckling, can you see what's on the screen?

A Yeah. I got to zoom in on it though.

Q Okay. Can you see it now?

A Yes.

Q Okay. You see it says the word Libertas on that.

A Yes.

Q And you were previously asked questions by Mr. Kataev about an agreement

M. MERCKLING

with Libertas. I believe your testimony is you really don't know anything about it pretty much?

A Yes.

Q So I'm just going to scroll down on this agreement. And I'm going to represent to you, this was the agreement that was provided to us by Libertas, so it's in their files.

And it has a few signature pages and some addendums. And on one of the addendums, which is page -- it is Bates stamped LIB 15. Can you see this page here that I have? It says November 15, 2022, on it.

A Yes.

Q This is a document that was signed -- what we were told was signed by Docusign, which is an online ability to have documents executed.

And you can clearly see what looks like your name on there. Do you see your name twice?

A I see my name, yes. Spelled it

wrong. You spelled it wrong, but I see my name.

Q And I didn't put it there. That's the way it's done.

A I'm just saying.

Q Yeah, no, I agree. And then above it is a signature. That's not your signature; correct?

A No.

Q You recognize that signature?

A I believe that's Anthony's, but I can't be a hundred percent sure.

Q Do you know how your name ended up on this document?

A I have no idea. Is my name anywhere else on the document?

Q I don't recall seeing it anywhere else. So I'm -- that's why I'm asking you. Do you know why your name is on here?

A No idea. Maybe some sort of a computer glitch or something. I -- I really don't know. And like I said, that's not the correct spelling of my name

either.

Q Did you provide your name to anybody at Libertas as far as you know?

A No.

Q Did anybody at Libertas or on behalf of Libertas ask you to provide information?

A No.

Q Did you -- is it possible that this document was pulled up on your computer?

A On my computer?

Q Yes. The computer you were using in November of 2022?

A I don't know. I have no idea.

Q But as you sit here today, you don't know why your name is there, and you don't know anything about it?

A Not at all.

MR. RUDERMAN: I'm sorry. I forgot to mark whatever this document number is if you could --

THE WITNESS: Never seen this before.

THE REPORTER: This would've been

M. MERCKLING

Exhibit 21.

(Merckling Exhibit 21 was marked for identification.)

MR. RUDERMAN: That's what I thought. Okay. Thank you.

BY MR. RUDERMAN:

Q Okay. Mr. Merckling, you did testify that you were making deposits at Flushing -- some cash deposits at Flushing Bank for Superb; correct?

A Yes.

Q Okay. Now it is noted that some of those deposits were made at -- not at the same -- not at the same branch, but different Flushing branches. Do you recall making deposits at more than one branch?

A I -- honestly, I don't recall.

Q Can you think of any reason why you would've made a deposit at different branches?

A No, unless I was on my way someplace else and that was the newest bank. I -- I really don't know.

M. MERCKLING

MR. RUDERMAN: Well, when you made the -- I'm sorry. Can you hold for just one second?

MR. KATAEV: Before you begin again, Jeff --

MR. RUDERMAN: Yeah.

MR. KATAEV: We have an email back from Ms. Fink. She's asking what the third question was. I could just type it in.

MR. RUDERMAN: If, Carol, you're able to read it and then manual -- 'cause you don't want me typing this.

MR. KATAEV: Yep.

MR. RUDERMAN: This will take a week, but he can type it.

MR. KATAEV: I'll type it.

THE REPORTER: Should I take us off the record?

MR. RUDERMAN: Please do that. Yes.

THE REPORTER: Yeah. Okay. Off the record at 4:46 p.m.

(Off the record.)

THE REPORTER: We are back on the

record at 4:51 p.m. Go ahead please, Mr. Ruderman.

BY MR. RUDERMAN:

Q Mr. Merckling, do you know if Mr. Deo ever worked at the computer device that you had at Northshore or when you were there?

A I don't know.

Q Did you have a login for that computer where only you could gain access to it?

A I don't believe so.

Q So anybody could have accessed your computer at Northshore when you were there?

A I believe so, yeah. I didn't really keep anything on it.

Q But as far as you know though, Mr. Deo had his own computer that he had in an office and he worked mostly out of that location?

A Yes.

Q Now, you also testified that you were aware of some sort of a text from Mr.

M. MERCKLING

Bissoon known as Kevin to Mr. Deo about wanting to -- about popping him. Do you recall seeing that?

A I don't. Like I said, I don't know if I -- I just saw it now, yeah. I don't know if Anthony ever showed it to me.

Q Okay. So previously you testified that Mr. Deo hired you because he was concerned for his life. That's what he said. He thought somebody was after him; correct?

A Yes.

Q But did he ever come to you and say, "I'm really afraid Mr. Bissoon is going to pop me, kill me, or cause me damage, and I need you to protect me."

A I -- again, I don't remember the conversation I had with Anthony about Kevin.

Q Okay. I mean, do you know Mr. Deo pretty well at that point in time? If you really thought -- if you thought he thought he was in danger, do you think he

M. MERCKLING

would've come to you to ask you to help him?

A I don't -- I don't know what he thought about the text message. I -- again, I didn't have that much of a conversation with him.

Q You were on the -- you were at the Northshore dealership and Sunrise dealership frequently; correct?

A Yes.

Q And do you recall that in November -- October -- November 2022, when those vehicles that were remaining were returned -- or again, when the vehicles were turned over to Island Auto.

Do you remember the condition of those vehicles?

A What do you mean, the condition of the vehicles?

Q Well, the physical condition?

A I think they were all in pretty good shape. I don't remember anything standing out that it wasn't. They ran. If they picked them up then they -- I

think they all ran.

Q Well, I mean, this is a pretty high-end used car dealership; correct?

MR. THOMASSON: Objection.

You can answer.

THE WITNESS: To an -- to an extent. I mean, we did have cars that weren't high-end.

BY MR. RUDERMAN:

Q It was quite a lot of cars you sold; BMWs, Mercedes, Audis. And that was a large part of the stock; correct?

A Yeah, it was part of it.

Q Okay. And these vehicles were purchased -- Mr. Deo, as far as you know, was heavily involved in the purchase of vehicles; correct?

A I believe so.

Q Okay. And the purpose, as you testified earlier, was to then resell these vehicles; correct?

A Yes.

Q Okay. And would you say that the vehicles that were being purchased by

M. MERCKLING

Mr. Deo were ready for resale when they were -- appeared on the lot?

A Which vehicles are we talking about?

Q The vehicles at Northshore, when they were purchased by Mr. Deo or through Mr. Deo, that when they came into the dealership, they were in pretty much good shape to go out or pretty close in good shape to go out for resale?

A Well, depends. Every one of their cars have to be put through a shop just to make sure there was nothing wrong with it before we sold the cars. I mean, some cars had issues just like any other used car.

Q Right. But visually, the cars looked good. They may have had some mechanical issues needed to be corrected; right?

A Some of them had body damage too though. So it's not like you got a brand-new car. A lot of these cars were, you know, five, six years old.

M. MERCKLING

Q So as a car dealership selling BMWs, Mercedes, and higher-end vehicles, you're sometimes just buying cars with body damage?

A Yeah. Cars came with body damage.

Q So these are cars that if they have body damage, they've been in an accident; correct?

A That's not necessarily true.

Q So how much body damage are we talking? We're talking about a ding on the door or something more substantial?

A Dings, little dents; stuff like that. They weren't perfect cars. They were used cars.

Q Okay. So something which is very minor, minor issues of the vehicle that just needed a little buffing out or a little dent repair just to --

A Some -- some of them needed body work that we sent to a body shop.

Q When you say body work, so more substantial than just a little dent or

M. MERCKLING

something like that?

A Well, dents need to go to a body shop too to get fixed.

Q Do you understand the distinction between a little ding and what I'm talking about as something requiring major body repair? Do you understand what --

A I don't know what you consider major. A -- a bumper being replaced, to me, isn't major. Chassis damage or something like that would be major.

Q Well, replacing a fender; would you consider that major?

A No.

Q So is there -- well, what if it costs -- was there a dollar limit? I mean, how much does it cost to replace a bumper, by the way? Any idea?

A I have no idea.

Q What if it cost $5,000 to replace a bumper? Would that be something --

A I doubt it's $5,000 to replace a

M. MERCKLING

bumper.

Q When was the last time you were in a body shop, Mr. Merckling, or had a car repaired at a body shop?

A About a year and a half ago.

Q Okay. And I'm going to ask you, do you know any repair that was done at Northshore that costs -- at a body shop that costs less than $5,000?

A Of course.

Q Tell me what type of repairs you are personally aware of that costs less than $5,000?

A Yeah. Body damage on cars isn't that expensive when you're paying wholesale, not retail. You know, we got good deals on fixing the cars. So they -- yes, cars came in with body damage. Cracked windshields.

Q So Mr. Deo was specifically going out looking for vehicles that --

A I didn't say that.

Q Let me finish my question. So Mr. Deo was -- let's say not looking. Mr.

Deo managed to purchase many vehicles that had some type of damage to them so he could get a good deal and then buy them and fix them up.

Was that his MO? Was that his business model?

MR. THOMASSON: Objection.

If you know.

THE WITNESS: You'd have to ask him.

You'd have to ask him. I don't know.

BY MR. RUDERMAN:

Q Well, you just said that he bought a lot of cars that had damage.

A I did not say he bought a lot of cars. Don't put words in my mouth, Counselor.

Q Okay. So what percentage of the vehicles did you say that came in that required some type of body work?

A I don't know.

Q All right. As you sit here today, no idea?

A I have no idea.

Q I'm going to show you some --

M. MERCKLING

bring up another document. I'm going to share my screen. Okay. Can you see the document I'm showing in front of you, Mr. Merckling? Do you see that?

A Yes.

Q Okay. So I'm going to represent -- I'm going to ask you if you recognize any of these vehicles being the vehicles that were returned -- or excuse me -- the vehicles that were turned over to Island Auto around November -- October, November of 2022?

A I don't remember.

Q Do you recall seeing vehicles in a condition that you see right here in front of you?

A I don't recall which vehicles had what scar when we got them. Some of them were actually trade-in cars that we took as a trade-in at a low price.

So I -- I can't -- I have no idea what cars you're talking about.

Q Do you recall how many cars were in the lot or in a condition similar to

this?
A No, I do not.
Q Do you know -- would you consider this minor or major?
A It depends on if there was any mechanical damage done underneath it.
Q So assuming there's no mechanical damages, would you consider this minor or major?
A It'd be moderate.
Q How about this vehicle here? Do you recall seeing the condition of this vehicle?
A I don't know what vehicle that is.
Q So do you recall seeing vehicles in conditions similar to this with the interior --
A Oh, it's got a bag over the seat. I don't know what you're showing me.
Q Did vehicles have bags over the seats?
A It could be a cover after you

clean the seats. I don't know why that's there.

Q How about this vehicle here? Do you see this?

A It's missing two grills.

Q And it's also missing lights over here. You see on the left and the right, you see the light hanging down. Do you consider this minor or major?

A It's really not major.

Q Okay. What about this car here; the seats?

A Leather work. That's not major.

Q How about this one over here missing these grills over here?

A That grill is cheap. That's not an expensive part.

Q Okay. And what about this one here?

A Again, that's just another grill.

Q And what about -- this is the one we showed before. It looks like this body panel doesn't even match.

A Again, that might have been a trade-in car that we took. I don't remember us getting cars from being brought in that way.

Q How about this one with the mirrors held on by tape?

A Again, it could be a trade-in vehicle.

Q Okay. So now having seen these vehicles, would you say these are typical or not typical of the vehicles that when they came into the dealership?

A When they came into the dealership? No, that's -- that's not typical. They had -- I mean some of them had -- again, like some of them had body work that needed body work or mechanical work, and we fixed it before we sold them.

THE REPORTER: Are we going to be marking that as Exhibit 22?

MR. RUDERMAN: Yes, please. I apologize. Thank you.

(Merckling Exhibit 22 was marked for identification.)

M. MERCKLING

MR. RUDERMAN: If you can just -- why don't we go off the record for five minutes, and I'll come back on?

THE REPORTER: Off the record at 5:03 p.m.

(Off the record.)

THE REPORTER: We are back on the record at 5:06 p.m. Go ahead, please.

BY MR. RUDERMAN:

Q Mr. Merckling, in your experience working at various used car dealerships for the last six years or so, have you ever heard the term gray market vehicles?

A Gray market? No.

Q Gray market. You never heard that term before?

A No.

Q Have you ever heard about anybody purchasing vehicles that were manufactured in Canada?

A I don't know anything about Canada cars.

Q Have you -- are you familiar

M. MERCKLING

with purchasing vehicles that are only supposed to be sold in Canada?

A I don't know anything about that.

MR. RUDERMAN: Okay. I have no further questions for Mr. Merckling. Thank you.

I believe that there may be another attorney or two has a question. If you could just hold -- or if you just hold for a second.

I got an email from my court reporter. They're very confused about tomorrow, and I just want to make sure that they're clear. I don't want to mess that up. So if you could just hold on for a second.

THE REPORTER: Would you like me to take us off the record?

MR. RUDERMAN: Please, yes.

THE REPORTER: Off the record at 5:08 p.m.

(Off the record.)

THE REPORTER: We are back on the

M. MERCKLING

record at 5:09 p.m. Go ahead, please.

EXAMINATION

BY MS. RONNEBURGER:

Q Okay. Hi, Mr. Merckling. My name is Ariel Ronneburger. I'm from the firm of Cullen & Dykman, and we represent Defendant Flushing Bank in this matter.

I just have a few questions for you. It should go pretty quickly.

MS. RONNEBURGER: If I could just ask Mr. Kataev to share what was previously marked as Merckling 11.

MR. KATAEV: Let the record reflect that I'm sharing Merckling 11, Bates stamped Flushing 7301.

MS. RONNEBURGER: Okay. I think if you go up, there was one that had his -- that one. Yes. Thank you. Okay.

BY MS. RONNEBURGER:

Q Hi, Mr. Merckling. You testified that you sometimes deposit checks and cash at Flushing Bank on behalf of Superb Motors. Is that correct?

A Yes.

M. MERCKLING

Q And did you also do that on behalf of Northshore Motor?

A Sometimes.

MS. RONNEBURGER: Okay. I'm sharing -- let the record reflect I'm sharing what has been marked as Merckling 11.

And can you just scroll down so I can see the Bates stamp number?

MR. KATAEV: Flushing 7300.

BY MS. RONNEBURGER:

Q Yeah. Okay. So this is previously reduced as Flushing 3700. Is this the typical kind of deposit slips you took to Flushing Bank?

A I'm sorry. I -- you froze or I froze.

Q That's okay.

A I didn't get anything.

Q Is this the kind of deposit slip that you typically took to Flushing Bank?

A It looks like it. I'm not a hundred percent sure, but it definitely looks like it.

M. MERCKLING

Q And did you normally fill these out yourself or did someone else do it?

A It was both.

Q Okay. Do you see where it says Marc Louis Merckling on this?

A Yes.

Q You testified previously that you believe that this isn't your handwriting; correct?

A That's not my signature.

Q Okay. Do you know whose it is?

A No idea.

Q When you visited the bank, did you typically go to a bank teller to make these deposits?

A Yes.

Q Do you know if the bank teller asks for your ID?

A I believe they always did.

Q Do you recall if the bank teller wrote your name here?

A It's possible. I -- again, I know that's not my signature.

MS. RONNEBURGER: Okay. And Mr.

Kataev, can you move down to where we saw his social security number?

MR. KATAEV: Let the record reflect that I'm at Flushing 7301.

MS. RONNEBURGER: Okay. Thank you.

BY MS. RONNEBURGER:

Q You testified, Mr. Merckling, that this is your phone number and social security number; correct?

A Yes.

Q And you believe that the phone number and social security number here are written in your handwriting?

A I -- I'm not sure to be -- I -- I know before I testified that I did, but now that I'm looking at it again, I don't make my sixes like that. I don't make my nines like that. So I don't know.

Q Do you know why this is written here?

A I don't.

Q Do you recall somebody asking you for this information or asking you to write it?

M. MERCKLING

A I know when -- sometimes when you do do bank drops, they did ask for your social security number. I don't really remember anybody asking me for my phone number, but they may have.

But I have been asked for my social security number when I was making some bank deposits.

Q Do you recall if the bank teller at Flushing Bank asked you for your phone number or social security number?

A I don't remember.

Q Is it possible that they asked you to write it here?

A It's possible, but like I said, I don't believe -- looking at that again, I don't believe that that's my handwriting on -- for my social security number.

And it's definitely not my handwriting above it with the date and the amount.

Q But you don't recall if somebody from the bank asked you to write it there?

A I don't.

M. MERCKLING

Q Is it possible that they did?

MR. KATAEV: Objection to form.

THE WITNESS: I -- I -- anything's possible. I don't know.

MS. RONNEBURGER: Okay. I have no further questions.

EXAMINATION

BY MR. THOMASSON:

Q Good afternoon, Mr. Merckling. My name is Harry Thomasson. I just have a few questions for you. Do you remember when you and I first spoke?

A The first time we ever had a conversation?

Q Yes.

A Yes.

Q When was that?

A The night -- I believe it was the night that we got locked out of Superb.

Q And to the best of your knowledge, that was our first conversation ever?

A I believe that was the first

M. MERCKLING

conversation I ever had with you, yes.
Q And have our conversations since then ever been about anything other than these cases?
A Besides hello and goodbye? I mean, cordial greetings maybe.
Q But other than that, any substantive conversation we've ever had has been work between you and I?
A Yes.
Q Have you ever performed any private investigative services for me?
A No, I have not.
Q Have I ever paid you any money for anything?
A No.
Q Have you ever paid me any money for anything?
A No.
Q Have you and I ever exchanged money for any purpose that you can recall?
A No.
Q Have you ever stolen money from the plaintiffs?

M. MERCKLING

A No.

Q Have you ever stolen money from anyone?

A No.

Q Have you ever stolen cars from any of these plaintiffs?

A No.

Q Have you ever stolen cars from anyone?

A No.

Q In your experience in dealing at car dealerships, is cash a common part of car dealerships?

A It got pretty -- it's pretty frequent. I'm sorry. Did you say something that we got blocked out?

Q No, no, no. You answered. I was just looking at my notes.

Is there any reason you would know who was on bank accounts at these dealerships? And I'm speaking about Northshore, 189 Sunrise, and Superb.

MR. KATAEV: Objection to form.

THE WITNESS: Not at all.

M. MERCKLING

BY MR. THOMASSON:

Q I'm sorry. What was the answer?

A Not at all.

Q You didn't sell any cars yourself, did you, at these dealerships?

A No.

MR. KATAEV: Objection.

BY MR. THOMASSON:

Q Did you do any buying for these dealerships?

A No.

Q Did you ever withdraw money from any of the accounts for these dealerships that you know of?

A No, I did not.

Q Did you ever write any checks at any of these dealerships?

A No.

Q Let me break that down. You didn't write any checks for Northshore Motor; did you?

A Not that I can recall. I never wrote any checks.

Q And you wouldn't have written

M. MERCKLING

any checks at 189 Sunrise; would you?
A No.
Q Did you write any checks at Superb Motors?
A No.
Q You're not an accountant; are you?
A No.
Q You were never acting as a controller at any of these companies; were you?
A No.
Q Do you recall who the controllers were during your time at Northshore?
A I'm sorry. Can you repeat that? You broke up.
Q Sure. Do you recall who any of the controllers were during your time at Northshore?
A I'm sorry, Mr. Thomasson. I -- you broke up again. I didn't hear the question.
Q No problem. Do you recall any

M. MERCKLING

of the controllers' names who were there while you were at Northshore?

A Yeah. Dan O'Sullivan.

Q Was there -- did Wendy Quan work there at Northshore at all?

MR. KATAEV: Object.

THE WITNESS: I don't know what she was doing but she was there. What she was doing there -- I'm not sure what her title or anything is.

BY MR. THOMASSON:

Q Okay. Now, do you know whether Dan O'Sullivan was put in place by Anthony Deo or someone else?

A Oh, I have no idea.

Q What about Wendy Quan? Do you know who it is she worked for?

A I thought she worked for Nissan, but I -- I really don't know.

Q Okay. Did you deal with any of the controllers at Superb?

A I believe the controller from Superb was at their other dealership, Mitsubishi. I really had no dealings with

them.

Q At times you participated in audits that were taking place at one or more of these three dealerships?

A Yeah. I helped out if they needed it.

Q And what would helping out at an audit consist of?

A Basically finding the cars that the auditor is looking for.

Q You mean physically looking for it and saying, "There it is?"

A Yes.

MR. KATAEV: Objection.

BY MR. THOMASSON:

Q And who would be the auditors that you're referring to? I don't mean by name, but what company would they be working for if you know?

A I don't know what the name of the company was that they worked for.

Q All right. But would auditors be in some way related to the floor plan?

A I would imagine so. I mean,

that's what we're checking the cars for would be the floor plan.

Q Okay. Have you ever worked for a floor plan company?

A No.

Q Was your testimony today truthful?

A Yes.

MR. THOMASSON: I have no further questions.

MR. CIANCIULLI: Just like to ask hopefully one question if that's okay.

EXAMINATION

BY MR. CIANCIULLI:

Q Mr. Merckling, my name is Jeff Cianciulli, and I represent the defendant Libertas Funding.

Mr. Merckling, did you play any role whatsoever in the transaction by which Northshore and Sunrise obtained financing or funding from Libertas Funding?

A No, I did not.

MR. CIANCIULLI: No further

questions.

THE REPORTER: All right. If that is everything, before we go, Mr. Ruderman, would you like to order an original and one copy of today's transcript?

MR. RUDERMAN: Yep. Emanuel, we're --

MR. KATAEV: We're splitting it.

MR. RUDERMAN: We're splitting that one.

THE REPORTER: Okay. Mr. Kataev and Mr. Ruderman will be splitting one. Thank you very much.

Ms. Ronneburger, would you like to order a copy of today's transcript?

MS. RONNEBURGER: Yes, please.

THE REPORTER: Thank you very much.

Mr. Thomasson, would you like to order a copy of today's transcript?

MR. THOMASSON: Yes. Just one.

THE REPORTER: Thank you very much.

And Mr. Cianciulli, would you like to order a copy of today's transcript?

MR. CIANCIULLI: No, thank you.

M. MERCKLING

THE REPORTER: All right. We are now off the record at 5:22 p.m.

(Signature waived.)

(Whereupon, at 5:22 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, CAROL CHRISTMAN, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



CAROL CHRISTMAN

Notary Public in and for the

State of New York

CERTIFICATE OF TRANSCRIBER

I, ERIC BAKER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ERIC BAKER

**&**

**&** 2:14 4:20 51:4 335:7

**1**

**1** 7:12 8:22 38:9,14 203:5 231:21
**1,000** 177:18
**1,500** 67:20 177:11,19
**10** 7:23 19:14 25:15 71:18 141:18 160:13 160:15,16 170:25 203:15 212:20 228:2
**10,000** 173:16 174:5 175:3 176:3 236:18
**10019** 5:19
**10170** 4:22
**102** 7:16
**1078** 228:4
**108** 46:11
**108-122** 46:5
**1086** 229:6
**1099** 68:22 285:23 286:15 286:17
**10:01** 50:10
**11** 7:24 103:19 103:24 123:16 170:13,14 173:18 205:7 205:15 206:23 335:13,15 336:8
**11000220038** 78:14
**112-4** 215:21 216:2
**11423** 4:7
**11553** 5:10
**11729** 3:5
**11:27** 119:17
**11:30** 119:13
**11:33** 119:20 137:5
**11th** 190:20
**12** 8:4 103:25 104:5 183:24 184:2 203:5 205:7 207:7
**12-2** 190:6
**120** 161:3,5
**121** 103:2
**123** 7:17
**1239** 1:18 4:15
**12:07** 144:7
**12:08** 144:10
**12:23** 154:14
**12:37** 154:17
**12th** 180:3
**13** 7:3 8:6 132:19 160:11 189:24 190:2 201:17 207:11 231:23
**132** 7:18
**1330** 5:18
**135** 9:5
**136** 7:19
**139** 7:20
**14** 8:8 35:2,7 36:16 137:2,5 197:24 198:2 201:11,12,13 229:10
**141** 7:22
**15** 8:9 19:23 107:25 108:2 201:15,20,25 202:2 207:11 207:16 212:20 315:14,15
**154-1** 38:10
**1580** 1:15 4:14
**1581** 1:14 4:13
**1591** 1:16 4:14
**16** 8:10 107:25 108:6 111:7 113:6 207:22 215:16,17,18
**160** 7:23
**1632** 1:17 4:15
**17** 8:11 30:16 31:24 32:3,6 210:3 227:18 227:18,19
**170** 7:24
**18** 8:13 45:12 45:20 231:20
**180** 86:2,13,25 87:10 211:23
**18211** 4:6
**184** 8:5
**189** 1:6,13 4:12 342:23 344:2
**19** 8:14 9:15 234:14,16
**190** 8:7
**194** 9:6
**198** 8:8
**1997** 53:17
**1:01** 172:10
**1:33** 172:14

**2**

**2** 7:13 8:24 46:24 47:2,18 68:18 75:5,9 180:9 181:23 297:20,22 298:9
**2,000** 180:16,22
**20** 8:15 19:14 259:20 264:20 264:21 296:14
**2009** 31:23 32:3,6 92:10 92:15 259:17 260:14
**2010** 32:14,18 32:24

**2012** 54:14 255:10
**2013** 255:11
**2016** 32:24
**202** 8:9
**2020** 33:17 57:4 60:21 69:7,11 208:4 209:11 259:20 261:3 284:10
**2021** 261:3
**2022** 134:7,10 158:25 162:7 219:15 284:11 303:13,16 315:16 317:15 322:13 329:13
**2023** 35:2,8 36:17 72:10,14 73:20 74:20 80:19,24 81:10 113:10 117:24 123:16 137:2,5 154:9 165:10 165:12,16 170:25 176:19 176:24 179:16 190:17,20 195:20 215:14 228:2 229:10 236:4 302:22 303:16 305:4,9 305:14
**2024** 19:25 20:4 51:11,12
**2025** 47:6
**2026** 3:2 10:11 32:2,5
**21** 8:17 33:17 60:21 318:2,3
**212** 4:24
**215** 8:10
**218** 9:8
**21st** 115:24 116:25
**22** 8:18 30:22 56:10 177:4,5 177:6 188:4 210:4,24 211:22 250:7 332:21,24
**227** 8:12
**23** 1:21 4:17 71:23 72:2 171:2 177:3 180:4 186:4 212:12,13,19 213:13 250:7
**230** 102:22
**231** 8:13
**2320** 4:21
**234** 8:14
**237** 9:14
**23rd** 5:18
**24** 17:5 157:21 234:14 265:4,8
**245** 142:9,11
**246** 142:12
**247** 142:9,12
**25** 19:18 129:19 164:22 254:15 275:7
**250-5626** 50:23
**2519** 1:19 4:16
**253** 7:4
**259** 10:13 25:4
**26** 3:2 10:11 179:16 229:4
**269** 9:15
**27** 47:6 69:4 78:17 140:13 212:13 230:8 284:24 285:3,6 285:9,12,14,15 286:5,16 287:3
**296** 8:16
**2:23** 1:25
**2nd** 5:9

**3**

**3** 7:15 9:3 47:18 73:15,16 79:20 80:19,24 81:9 190:11,17
**3,000** 179:19 180:9,11,19 181:23,24
**3/26/70** 26:10
**30** 74:20 123:16 211:9 211:10
**30183** 350:16
**316** 142:4
**317** 232:7
**318** 8:17
**323** 132:18
**324-2** 136:21
**332** 8:18
**333** 5:9 145:16
**335** 7:5
**338** 143:18,19 143:20,20 144:15
**34** 183:5
**340** 7:6
**342** 144:18
**343** 145:17
**344** 146:12
**347** 7:7 146:12
**348** 146:17
**350** 144:12,15 146:17
**35442** 351:13
**357-3748** 5:12
**3700** 336:14
**38** 7:12
**38-12** 184:10
**383** 150:11
**384** 150:11
**39** 182:8
**39,000** 57:4
**3:20** 253:6
**3:31** 253:10

**3rd** 113:10 115:6,16 116:9 121:10 191:6 213:5

**4**

**4** 7:16 9:6 44:7 62:6 74:15 102:11,12,19 102:23 155:17 187:9 203:11 212:13
**40** 8:23 202:6
**41** 179:23
**412-2421** 4:9
**420** 4:21
**446** 1:20 4:17
**47** 7:14
**475-8885** 5:21
**49** 179:14
**4:17** 307:20,24
**4:22** 308:3
**4:23** 307:21
**4:33** 314:3
**4:41** 314:7
**4:46** 319:23
**4:51** 320:2
**4th** 10:14 25:4

**5**

**5** 7:17 9:7 123:9,10,11 203:15
**5,000** 326:22,25 327:10,14
**50,000** 210:8
**50/50** 71:17
**500,000** 150:19
**516** 5:12 50:23
**53** 123:18
**57** 179:3
**58** 176:13
**5:03** 333:6
**5:06** 333:9
**5:08** 334:23
**5:09** 335:2
**5:22** 349:3,5

**6**

**6** 7:18 73:20 80:13 132:13 132:14
**6/21/23** 8:10
**60** 8:25 173:15 210:8
**615683/2024** 231:22
**6188** 1:25
**661-6800** 4:24

**7**

**7** 7:19 9:12 136:15,16 228:2
**700** 101:3
**718** 4:9
**73** 7:15
**7300** 336:11
**7301** 335:16 338:5
**735,000** 58:10 98:16 150:12 158:25 274:16 275:9 277:17
**76** 1:19 4:16
**7813025** 3:7
**7th** 56:10

**8**

**8** 7:20 9:13 82:13 139:5,6
**8/11/2023** 8:7
**8/11/23** 201:17
**81** 9:12
**82** 38:11
**83** 9:13

**9**

**9** 7:21 9:14 62:6 141:18,21 141:22 187:17
**90** 71:17
**917** 5:21
**92** 73:21
**9:00** 155:16
**9:10** 3:3 10:6
**9:27** 29:9
**9:28** 29:12
**9:56** 50:7

**a**

**a.m.** 3:3 10:6 29:12 50:7,10 119:17,20 137:5 155:16
**aaronson** 1:11 4:12 37:6 58:10 98:17,24 101:2 104:19 105:7,17,22,24 120:4 149:24 150:12 158:19 163:21 164:2 273:24 274:10 277:8,21 288:11 289:8 289:12 303:8
**aashish** 226:4 227:2
**aashish's** 226:10,14
**ability** 17:6 315:20 350:9 351:6
**able** 13:7 37:2 37:14,15 59:24 104:10 123:7 284:14 319:12
**above** 316:8 339:21
**abreast** 289:7
**absent** 10:19 57:17
**absolute** 145:20 279:13
**absolutely** 57:9 81:4,15 97:7 142:18 206:17 268:20 272:23

**accept** 97:5,9 97:11 134:16 134:23 135:2,4
**accepted** 134:20 135:6 228:15
**access** 111:11 111:15,18,24 126:6 277:21 278:18 320:11
**accessed** 320:14
**accident** 45:12 240:7,10,16,20 240:22 241:16 241:18 242:6 243:2,19,20 325:10
**accompanied** 270:16 271:3 300:15
**accompany** 271:25 300:20 301:11
**account** 99:2 101:4 108:9 109:3,4 110:7 125:8,22 140:18 150:13 172:25 176:5,6 180:8 197:18 228:11 230:8 270:23 273:25 274:16 275:10 277:22 278:19 287:3
**accountant** 285:20 286:2 286:18,20,21 344:7
**accounting** 98:10
**accounts** 108:24 109:10 342:21 343:14
**accurate** 127:5 157:20 219:24 258:17,21 259:3 350:8 351:5
**accusations** 106:6
**ach** 40:9,11
**achieve** 257:20
**achieved** 254:21
**acknowledg...** 10:16
**acting** 344:10
**action** 350:11 350:15 351:8 351:11
**active** 76:19
**activity** 159:14 159:17 166:3
**actually** 19:18 43:17 89:21 92:7 157:24 203:18 241:9 313:18 329:20
**ad** 43:7,12 201:18
**added** 137:13
**addendums** 315:12,13
**additional** 254:12
**additionally** 10:19
**address** 10:13 25:11 27:2,3,6 27:8,12 30:6 44:11 46:8,10 46:13 86:2 137:21,23 140:5,10,11,20 173:10 258:22
**addresses** 26:11,12,15,16 26:21,22
**administer** 10:16
**administrative** 186:9
**admission** 125:11
**advance** 20:11
**advertise** 69:24
**advising** 83:16
**affect** 17:6
**affidavit** 8:15 296:20 297:18 298:8,21
**afford** 181:16
**afraid** 321:16
**afternoon** 253:23 309:20 340:10
**agencies** 28:7 28:14
**agency** 27:22 28:3,6,23 30:2 191:18,22
**agent** 195:4
**agents** 28:10 194:14
**ago** 19:21,23 28:22,25 29:2 30:12,16 31:24 327:6
**agree** 10:17,22 123:22 124:18 124:24 155:25 156:4 188:24 213:11,20 280:12 316:7
**agreed** 189:6 239:6 310:11
**agreement** 8:17 23:6 30:4 68:15 314:25 315:7,8
**ahead** 11:13 13:2 23:18 29:13 34:9,10 39:23 50:11

85:15 111:10 113:8 119:20 129:18 135:13 142:14 144:10 145:6 154:17 172:14 203:20 204:5 243:11 245:22 253:10 269:4 270:11 308:3 314:7 320:2 333:9 335:2
**aim** 139:9,10
**aka** 229:7
**al** 10:9,10
**albert** 53:5
**alcohol** 17:5
**alivia** 6:6
**allegation** 159:23
**allegations** 230:10
**allow** 15:16 283:22
**allowed** 162:22 190:23
**amended** 7:21 142:3
**america** 8:11 227:23,25
**americas** 5:18
**amount** 39:13 41:22 67:6,8 67:12 174:15 174:24 176:24 177:16 252:4 339:22
**amounts** 176:2 177:21 298:10
**andy** 112:3,8 112:15,21,22 187:5,9,11 214:19
**andy's** 112:9 112:10
**angry** 151:23 151:25 152:3,4 152:8 153:15
**announce** 307:16
**answer** 9:10 15:11,18,25 16:17 29:15 31:2,4 52:14 64:16 80:10 81:6,8,12 82:4 83:2,9 84:12 88:5 98:4 106:7 125:17 148:3 152:25 153:4 189:5,14 193:17,20,21 214:9 217:15 232:18 235:13 237:17 238:11 248:10 251:17 256:19 269:20 271:20 272:11 275:18 276:7 277:10 278:11 278:12,14 283:6 293:25 310:23 311:6,8 323:6 343:3
**answered** 222:17,19 234:4 342:18
**answering** 14:9 148:9
**answers** 16:10 17:2,11
**anthony** 1:5,25 4:3 6:3,4 7:17 7:23 10:10 12:5 13:18 14:5,11 30:11 46:22 49:24 58:8 71:7,21 89:9 90:20,24 91:2,20 98:22 99:2,4 100:22 100:25 115:2 123:15 124:7 147:6 149:6,11 149:17 164:25 165:3 173:6,12 191:7,24 226:2 232:13 234:23 235:5 252:24 299:2 321:7,20 345:14
**anthony's** 31:6 110:20 316:12
**anticipate** 147:24
**anticipating** 148:6
**anybody** 64:11 107:4 128:16 157:22 172:21 189:5 193:22 214:18,20 293:17 299:3 300:20 301:11 317:4,6 320:14 333:21 339:5
**anymore** 87:6 161:14,21 249:20
**anything's** 272:4 340:4
**anytime** 19:5 217:12
**anyway** 11:20
**apologize** 133:5 175:20 260:17 265:25 290:18 295:22 332:23
**appear** 13:9 155:5,9 156:5 156:9,10,11,19 239:7
**appeared** 324:3
**appearing** 310:15

**appears** 137:16 313:18
**applicable** 11:2
**application** 54:16 59:23 120:5
**applied** 54:5 79:11 98:22 120:21,22,25 144:24 145:11 145:12
**apply** 54:3,12 66:16 77:15
**applying** 121:6
**appreciate** 147:24 313:9
**approach** 256:5 257:13 257:17
**approval** 60:5
**approve** 206:12 206:16,18
**approved** 60:2
**approximately** 19:12 50:14 255:12 260:23
**april** 56:10,10 170:25 171:2 177:3,4,5,6
**area** 25:11 60:22 256:4
**arguing** 132:3
**argumentative** 125:4,15
**arguments** 238:9 309:13
**ariel** 5:6 12:11 335:6
**arm** 169:12
**armed** 262:8,10
**aronneburger** 5:11
**arranged** 232:12 273:24 285:12
**arrest** 104:19 106:3 279:5,15 280:2,3,5,9,13 280:14
**arrested** 27:14 32:10,11,14 49:13 105:9 106:10,13
**arrests** 278:5
**arrived** 113:11 113:15,18,23 121:10 266:18
**aside** 204:9
**asked** 33:24 88:8,10 96:18 96:23 100:12 105:9 118:12 118:18 127:17 127:18 131:23 168:24 181:13 189:20,22 193:16 220:2 240:9 254:10 261:19 266:21 271:7 275:3 281:23 284:18 301:11,17 314:24 339:7 339:11,14,24
**asking** 14:8 35:10 85:19 106:20 150:16 164:10 196:10 200:14 208:19 222:10 233:11 249:3 251:5 269:15 273:21 311:12,13 316:20 319:9 338:23,24 339:5
**asks** 337:19
**assets** 145:23
**assigned** 10:4 35:15 36:8 259:18
**assignment** 28:23 256:21
**assist** 102:3 121:5
**assistant** 136:12 137:13 138:8
**assisting** 108:8
**assume** 15:25 278:22 300:3
**assumed** 104:16 204:23
**assuming** 330:8
**atlantic** 63:25
**attacked** 48:13
**attempted** 209:21
**attend** 167:11 212:2,5,8
**attendance** 11:9
**attention** 98:15 103:18 104:15 161:2 173:14 179:13 182:7 190:10 229:6 297:19
**attorney** 13:16 22:19 81:15 85:18,22 193:24 194:4,7 194:10 217:25 238:2 253:24 267:21,25 270:8,9 279:16 310:14,19 311:15 312:7,8 334:10 350:13 351:9
**attorney's** 22:10 23:2 216:9
**attorneys** 70:19 70:22 103:15

132:3
**audi** 63:13
**audio** 227:6,8,9 350:7 351:3
**audis** 323:12
**audit** 7:20 128:17 346:9
**auditor** 346:11
**auditors** 128:9 138:21 139:9 346:17,23
**audits** 128:3 138:22 141:7 141:10,17 346:4
**august** 72:14 80:19,24 81:9 113:10 115:6 115:16 116:9 121:10 190:17 190:20 191:6 213:5 250:7
**authority** 151:10
**authorization** 8:25 59:22,24 60:9 79:11 125:19 209:5
**authorized** 10:15 13:8 97:6,10,19,23 141:6 238:8
**auto** 1:4,6,14 1:15,16,17,17 1:18,19,21,22 4:3,12,13,14,14 4:15,15,16,17 4:17 10:9 11:16 12:6 13:17,24 14:10 51:3 70:16,20 139:19,21,23 160:3,22 162:6 163:22,25 164:7,13 199:13 230:3 273:18 288:10 302:7 303:8 322:16 329:12
**autohaus** 184:14,18,22 226:8,11 244:6
**automobile** 62:23 82:18,23 83:6 84:8 140:24
**automobiles** 161:11
**automotive** 2:8
**availability** 156:25
**available** 157:22
**avenue** 4:6,21 5:18
**aware** 22:4 23:24 32:16 36:7 46:18 47:21 48:20 49:22 59:13 82:16 90:15 93:5 95:20 101:12 103:16 105:5,13 131:25 144:23 150:10,11,17 159:23 163:10 163:24 164:19 191:20,23 228:23 230:10 230:17 235:21 236:20 246:22 246:25 247:5 247:11,17 260:24 270:21 273:16 274:23 287:9,13,20 292:9 320:25 327:13

**b**

**b** 7:9 8:1
**back** 29:11,15 49:4,5 50:9 61:12 72:18 85:9 96:4 98:16 99:3,5 104:9 107:23 111:17 116:15 116:17 119:19 119:22 121:9 126:15,20 129:16,25 144:9 150:15 152:12,18 153:25 154:16 172:13,13 214:12,14,21 238:22 239:13 247:4 251:22 253:9 276:23 277:20 282:14 291:19 293:2 307:2,21 308:2 308:18 309:2,3 309:5,10,15,17 312:12,20 313:4 314:6 319:8,25 333:4 333:8 334:25
**bad** 64:7 68:16 241:24 280:13 288:6 303:22
**badge** 101:16
**bag** 330:20
**bags** 330:23
**baker** 351:2,14
**bank** 2:15,16 5:5 8:11 12:12 97:16 98:6,8 98:23,24 101:4 108:10,12,14 108:16,17 109:9,13,14,21 110:12,23 118:13 120:15

123:6 124:16 125:8,21 168:7 168:10 171:11 172:25 178:25 227:23,24 253:20 277:21 286:24 287:3,6 294:10 298:13 298:18 300:4,6 300:11,16,18 300:21 301:11 301:13 318:11 318:25 335:8 335:23 336:16 336:22 337:14 337:15,18,21 339:3,9,10,11 339:24 342:21
**bank's** 155:15 155:18
**banker** 174:15
**banks** 128:2
**baron** 1:14 4:12 88:24 89:24 90:16 91:2,3,7,10 92:18 93:2,7 93:14,18,21,23 93:25 94:3 232:4 288:16 289:22,25 290:13,14,22
**barons** 288:11 289:8
**baseball** 95:10
**based** 74:2 103:8 106:20 138:7 145:22 161:9 177:22 200:9,14 208:3 209:9 211:10 213:9,10 229:13 245:25 248:7 252:16 264:17
**bases** 311:20
**basically** 62:18 80:11 112:18 123:6 124:15 129:24 187:24 346:10
**basis** 44:17 65:22 147:9 151:14 237:21 277:15 288:9 300:8 301:7,9 312:7
**bates** 315:13 335:15 336:10
**battle** 199:6
**bear** 312:15 313:3,9
**bearing** 38:10 73:20 123:16 132:18 136:20 142:3 215:21
**bears** 102:22 190:6
**began** 53:15
**beginning** 29:23 33:17 60:21
**behalf** 4:2,11 5:2,5,14 132:2 154:19 238:9 311:3 317:7 335:23 336:3
**belief** 44:18 147:9 151:15
**believe** 22:21 23:23 27:7 33:16,23 34:5 39:17,24,25 41:25 42:16 44:16 49:2,14 53:3,13 54:14 61:23 63:18,22 63:24 64:21 67:5,23 68:19 69:8 71:23 76:7 78:2,14 84:14 85:17 88:25 89:4,10 89:21 90:4,10 91:11 92:5,6 92:20 95:4 99:21 101:25 110:14 111:2 112:3,13 113:21 116:16 116:22 117:21 125:18 128:24 134:21 135:4,4 136:23 141:3 142:6 147:5,7 149:10 151:5 159:16 160:24 161:22 166:10 168:9,18,20 176:10 181:24 182:13 183:11 183:15 184:15 187:16 188:20 189:2 190:8,9 192:7,9 194:21 195:16,17 196:2,17 197:6 197:24 200:19 200:20 202:8 202:18 213:6 216:12 219:12 223:16 226:2,3 230:9 231:8,13 232:24 233:2 234:4,13,23 237:5 239:22 241:9 242:14 243:3,7,7,8,15 247:3 252:2,14 259:16 260:12 262:9 263:2,7 263:12 265:10 265:23 270:7,9 271:10 285:19 285:24 290:20 291:6 293:11

294:16 295:10 295:13 297:8 298:24 299:24 302:23 303:11 304:23 305:5 308:12 315:2 316:12 320:13 320:17 323:19 334:9 337:9,20 338:12 339:17 339:18 340:19 340:25 345:23
**believed** 263:3
**believes** 233:15
**bell** 169:23
**belong** 252:7 252:10,19
**ben** 226:4,19 226:23
**ben's** 226:7
**benefits** 283:21
**benjamin** 13:6 20:20,24 24:15 155:2 239:5 310:2,5
**berrios** 33:11
**best** 16:5,12 24:8 116:7 165:15 209:11 221:16 254:9 340:22 350:9 351:5
**better** 175:21 178:7 256:8
258:21
**big** 36:24
**bills** 23:2
**birth** 26:7,9
**bissoon** 182:9 182:11 229:7 236:6 321:2,16
**bit** 175:21 254:24 260:2 277:20
**black** 63:11,11 63:12
**blankenship** 2:2 75:23 76:3 76:16 78:20 79:11 87:12 104:17,22,23 105:2 123:24 141:9 142:16 197:5
**blankenship's** 77:3
**block** 110:16
**blocked** 342:17
**blvd** 1:15,16,16 1:17,18,19 4:13,14,14,15 4:15,16
**bmw** 63:11
**bmws** 323:12 325:3
**body** 15:12 324:22 325:5,6 325:9,12,22,23
325:24 326:3,8 327:4,5,9,15,19 328:20 331:25 332:17,18
**bogged** 257:6
**book** 59:15 294:25 295:3
**books** 161:10 161:17
**bottom** 73:21 74:3,14 113:5 137:16,20 173:11 185:11 187:8 199:20 200:3 210:24 215:22 228:5
**bought** 90:20 205:2 206:18 245:7 328:14 328:15
**boulevard** 5:9
**boy** 75:7
**brakes** 241:10
**branch** 174:15 318:15,18
**branches** 318:16,22
**brand** 324:23
**break** 16:15,18 50:4,14,17 119:14,23 172:17,19 173:21 253:3 307:18 343:20
**breaking** 35:25 37:8 122:18 226:20 280:25 281:4
**brian** 1:8 4:11 90:3,4,7 289:21
**briefly** 312:6
**bring** 109:17 110:5 130:17 269:24 329:2
**bringing** 166:5 166:8 272:17
**broke** 29:22 67:10 89:16 92:11 98:3 135:3 151:2 152:10 192:17 198:16 200:11 261:13 344:18 344:23
**brought** 116:14 116:17 188:12 261:18 266:17 272:24 332:5
**bruce** 114:14 216:21
**bso** 54:11 55:6 55:13 56:4 255:10
**budge** 84:25
**buffing** 325:20
**building** 46:14 86:22 159:10

192:9 213:3 248:20
**bumper** 326:11 326:20,23 327:2
**bunch** 196:6 209:20
**bureau** 27:21 28:2 54:8,10
**business** 36:19 68:16 69:7,10 75:14,17 81:2 81:24 83:24 87:23,25 140:16,23,24 178:7 181:5 184:16 276:4 278:18 282:9 282:20 302:7 302:12 328:7
**buy** 93:20 144:25 150:19 328:4
**buyers** 2:4 150:24 151:4,7 227:25 228:3,8 228:11,19,22 229:15,22,25 267:10,12 268:11,13 269:10
**buying** 133:10 325:4 343:10

**c**

**c** 4:1 5:1 6:1 168:17,17
**call** 40:16 60:8 135:19 168:2 182:14 194:23 217:19,23 218:24 238:23 253:11 306:10 308:13,16 313:20
**called** 12:20 51:3 59:15 88:24 105:7 114:2,5,7,24 128:21 133:6 136:4 137:24 151:4 182:22 190:18 224:2 243:16 271:4 271:10,24 302:4
**calling** 105:18 210:16 308:21
**calls** 207:4 218:20,21 272:8
**canada** 333:22 333:24 334:3
**capabilities** 254:22
**capability** 295:24
**capable** 271:14
**capacity** 29:21 167:8
**capital** 2:13
**caption** 74:7
**captured** 286:17
**car** 2:4 45:12 46:15 55:10,11 63:7 91:4 115:21,23 116:2,14,19,24 128:14 130:17 131:10,16 134:3 135:17 150:24 151:4,7 161:23,25 166:12,17,23 166:23 167:2 167:25 168:6 198:23 199:3 199:16,18 201:4,6,18 205:2,2 206:19 209:4,14 210:25 211:7 211:13,14,21 211:23 217:19 227:25 228:3,8 228:11,19,22 229:15,22,24 241:13,25,25 252:6,20 267:9 267:12 268:11 268:12 269:10 280:23 281:9 281:16 283:9 283:13,16,19 284:3,15 305:3 305:8 323:4 324:17,24 325:2 327:5 331:12 332:3 333:12 342:13 342:14
**card** 173:4,9
**care** 217:18 257:8
**career** 18:5,7 18:10 19:16 57:15 106:16
**carol** 3:6 10:3 11:19 37:14 296:12 312:11 319:12 350:2 350:17
**carrier** 50:24
**carry** 61:19
**cars** 2:5,6 63:9 63:14 76:14 77:4,4,13 96:17,22 117:2 123:8 126:7 127:3 128:6 130:2 133:7,11 133:14,20 134:11,17 141:12 161:16

161:18 164:4 164:15,18 197:15 204:11 204:12,21 206:9 208:5,18 209:21,25 210:9 212:25 213:3,7 240:23 244:24 245:6 246:9,17 250:12 251:7 252:5,7,9 281:24 282:2,5 282:7,17 283:11,23 305:11,15,15 305:17,20 323:8,11 324:13,15,16 324:18,24 325:4,6,8,16,17 327:15,18,19 328:14,16 329:20,23,24 332:4 333:24 342:6,9 343:5 346:10 347:2
**case** 1:24 20:2 22:6,15,20 24:3,19,22,25 35:2,15 36:8 45:11,22,24 52:25 55:24,25 103:6,22 123:15 152:7 195:24 272:16
**cases** 269:18 289:3 311:17 341:5
**cash** 40:13 97:2 97:3,5,9,11,16 97:20,24 98:13 108:13 109:2 109:12,22 125:12 134:16 135:5,6 142:16 142:20,24 174:4 175:3 182:5 203:23 203:23,25 204:8,11,13 210:13 214:23 214:24 215:2,7 292:7,8,11 294:4,13,24 298:12,23 299:2,3,14,21 299:22,23 300:2,13,18,21 301:12,20 318:10 335:23 342:13
**cashed** 178:22
**catch** 251:16
**caught** 130:21
**cause** 87:22 109:16 128:17 130:9 135:16 158:21 181:15 197:14 240:13 255:18 266:8 319:13 321:17
**caused** 150:12
**ceased** 94:16
**cell** 313:24
**center** 198:11 238:5
**certain** 119:11 131:17 133:20 159:25 160:7 218:9 246:2 275:22
**certificate** 350:1 351:1
**certified** 10:22
**certify** 350:3 351:2
**cetera** 288:11
**chabrier** 1:8 4:11 90:3,4 289:21
**chain** 8:10 215:20,22 216:14 217:3
**chambers** 308:22
**change** 54:17 66:23 67:3 177:18
**changed** 53:24 53:25 177:21
**changes** 66:2
**characterizati...** 123:23
**characterize** 56:21
**charge** 28:10 222:24 249:24
**chase** 2:16 108:17,21,23 109:3,14 110:9 110:12,14
**chassis** 326:12
**cheap** 331:17
**check** 9:3 39:21 40:9,10 109:2 109:13,22 118:18,24 134:20,23 135:19 176:13 176:14,17,23 177:24 178:24 178:24 179:4 179:11,14,24 180:16,18,21 182:8 188:6 228:4,15 229:6 229:7,14 287:2
**checked** 157:16
**checking** 347:2
**checks** 110:6 118:13,18,25 119:5,11 135:4 135:7,9 151:11 178:20 179:8

181:4 183:18 229:18 285:13 300:13 301:20 335:23 343:17 343:21,24 344:2,4
**cherrywood** 51:3,23 52:3 53:2 247:12
**chief** 185:11,21 185:23,23 186:9
**choosing** 239:9
**christman** 3:6 10:3 350:2,17
**cianciulli** 5:15 7:7 347:12,15 347:17,25 348:23,25
**circumstances** 42:8 91:14 220:9,14 276:19,22 281:13,14
**cite** 215:25
**citibank** 179:2 230:8 287:7
**city** 242:11,17
**civil** 275:23 276:15,25 277:3,8,13,24 278:24
**claim** 243:5
**claiming** 252:25 275:8 276:4 310:19
**claims** 14:11 247:22 276:12 277:22 278:17
**clarify** 239:21
**clean** 87:7 331:2
**cleaning** 87:9 183:6,10,12
**clear** 15:8 16:11 84:20 89:19 148:2 270:6 334:16
**clearly** 37:12 37:14 315:22
**client** 13:9 81:15 232:11 269:19 270:8 310:19 311:15 312:8
**close** 44:6 129:9 324:10
**closed** 72:5,11
**closet** 293:5
**closure** 117:20
**coach** 31:10
**coached** 31:8 31:15
**coaching** 31:13
**coal** 110:20
**coast** 2:5,6,7,8 2:9,10 8:4
183:21 184:7 184:15 189:7 197:20 198:7 198:11 301:23 302:4,7,12,17
**cohayne** 216:8
**colleague** 253:18
**collect** 279:18
**collected** 215:6 294:8
**combination** 112:18 293:9 293:13
**combinations** 293:12,18,20 293:22
**come** 14:16 31:19 33:19,20 33:21,25 99:24 117:15 118:11 147:11 162:22 183:12 207:16 231:10 246:5,8 271:2,17 279:14,16 281:15,25 294:5 299:21 307:21 321:15 322:2 333:4
**coming** 147:18 148:20 184:22 272:21
**comment** 200:4 232:20
**comments** 157:4
**common** 43:20 62:23 342:13
**communicated** 23:13,17,21
**communication** 83:13,14,18 84:9,10,17,19 237:16
**communicati...** 9:7 23:10 84:6 146:22 218:25
**companies** 344:11
**company** 8:4 77:24 135:25 136:4 150:24 151:4 176:15 176:21 179:25 183:12 184:5 224:20 225:21 227:6 228:8 243:4,9,15 244:2 346:19 346:22 347:5
**compare** 286:10,14
**compared** 71:3
**compensated** 178:6

**compensation** 39:11 66:22,25 178:5 284:19
**compilation** 8:12 172:24 176:13 229:5
**complaint** 7:22 7:23 8:13 24:25 103:21 104:17 105:6 142:3,5 149:23 151:21 158:24 210:18 232:3 279:25
**complaints** 24:25
**complete** 15:16 61:18 62:2 260:4 274:15 274:20 311:11
**completed** 15:6
**completes** 155:21
**completing** 21:25 62:5 102:3
**computer** 129:3,6,7,14,17 136:22 316:23 317:12,13,14 320:6,11,15,20
**computers** 205:5
**conceal** 61:19
**concern** 24:19 24:22 80:2 119:9 166:25
**concerned** 37:19 265:19 321:11
**concerning** 154:24 185:2 236:17,21 273:18
**concerns** 83:15 155:18 255:17
**concluded** 349:6
**condition** 209:16,17 322:17,19,21 329:16,25 330:13
**conditions** 330:18
**conduct** 47:24 48:6 70:12 233:16 282:19
**conference** 35:13 195:23 196:5,12,17
**conferences** 196:16
**confirm** 207:17 213:16 215:4 251:6 286:15
**confirmed** 214:6,18,19
**confuse** 211:12
**confused** 196:16 334:14
**connection** 18:4 27:22 28:3 37:19 235:24 260:3 292:3 296:21 296:22 297:2 313:19
**connections** 73:4
**consider** 92:14 240:24 249:7 326:10,15 330:5,9 331:10
**considered** 237:15
**consist** 26:4 163:4 346:9
**consistent** 199:15
**constitute** 11:6
**consult** 59:18
**consulting** 230:4
**consumed** 17:4
**cont'd** 5:1 6:1 8:1 9:1
**contact** 194:16 230:17
**contacted** 193:7
**contacting** 193:8
**contents** 121:17
**context** 313:16
**continue** 84:25 214:3 254:6 270:4 308:25
**continued** 159:6
**control** 56:2 209:3 248:17 249:5,12,15 250:4,8
**controlled** 250:24
**controller** 143:2 297:4,11 344:11 345:23
**controller's** 292:24
**controllers** 344:15,20 345:2,22
**conversation** 21:2,5,8 33:24 34:3 81:18,22 87:19 90:23,25 93:19 100:22 100:24 101:6 105:14,17,19 105:20,22

110:5 121:13 121:17 122:2,7 122:13 149:14 150:3,8 192:6 192:8,10 193:12 194:4,7 237:22 269:11 274:18 289:18 291:4 321:20 322:7 340:15 340:23 341:2,9
**conversations** 81:9,14,16 83:2,7,22,25 84:13,14 95:6 95:13,15 103:14 114:20 121:11 165:3,6 181:7 237:11 237:25 238:18 267:24 268:10 269:6,17,21 289:14 311:14 311:16 341:3
**convicted** 27:17
**cooney** 6:6
**cooperated** 27:20,25
**cooperation** 36:21
**coordinated** 218:17
**copy** 176:12 243:2 348:6,16 348:20,24
**cordial** 341:7
**corp** 2:12
**corporation** 69:3 141:4 284:24
**correct** 13:11 17:20 18:5,18 19:2 20:2 25:5 25:8 38:23 40:9,14 42:5 42:14,19 44:8 44:12,24,25 48:10 49:7 50:15 51:8,12 53:17 58:11,15 58:16 60:5 61:7,10 66:19 69:2,4,7 72:8 72:14,20 74:21 80:6,20 86:3,4 88:8,10 89:7 96:3,14,18,23 97:2 108:13,18 111:12 112:6 112:25 113:23 116:4 117:24 118:5,8,19 119:6 120:6,12 120:16 121:3 122:10 124:6 124:14 125:2 125:13 126:2,7 126:12 127:17 128:3 130:6,14 134:12,17 136:9,10 137:2 137:7,10,13,17 137:21 140:3 144:15,16,25 145:14,23 146:2 149:25 150:8 159:2,7 159:15,20 162:2,24 167:22 170:6 172:17 173:12 174:5,16,22 176:15,19 177:3,7,12 178:12 179:16 179:25 180:4 180:19 182:5 182:24 184:14 185:21,24 186:10 190:24 191:15,18 192:24,25 195:20 196:8 196:14,21 198:12,15,20 198:24 202:19 205:20,25 207:2 212:21 213:5 215:5 216:23 218:11 218:19 219:11 219:21 220:11 220:16,25 221:4,12 222:4 222:9,12 225:7 227:13 228:8 228:16,20 229:8,11 231:2 235:6,19 236:4 240:11,16,20 242:7 243:6 244:12,17,22 249:21 250:4,9 251:2,10,15 254:16 255:6,7 255:19,24 256:5,15 259:8 259:9 260:15 261:6,12,23 265:13 267:2 267:21,22 270:18 273:2 277:2 280:19 284:24 287:4 289:22 290:22 300:25 302:13 302:22 303:9 305:4 308:23 316:9,25 318:11 321:13 322:10 323:4 323:13,18,22 325:10 335:24 337:10 338:10

**corrected** 324:20
**correcting** 102:15
**correctly** 177:10 232:10 232:14
**cost** 208:5 209:7,12 326:19,22
**costa** 237:5 239:20,23
**costs** 326:18 327:9,10,13
**counsel** 13:10 83:13 155:17 239:8,10 253:14,19 350:10,13 351:6,9
**counselor** 13:2 328:17
**counsels** 11:11 11:11 12:8
**count** 294:9
**counted** 97:12
**counts** 45:13
**county** 41:3 42:24 43:20 48:24 49:6,17 53:16 55:12 56:18 57:12,15 57:25 58:19 59:3,9,14 66:6 66:15 73:4 101:13 104:18 113:10,15 191:14 217:13 217:24 240:18 242:19 270:17 271:25 296:23
**couple** 49:3 57:23 111:25 221:25 240:3 289:13 290:2
**course** 32:23 43:24 62:20 218:7 244:9 258:19,19 275:25 286:22 327:11
**court** 1:1 6:9 7:13 14:21 15:8,19 17:20 17:23 18:2,4 18:13,16,24 19:5,11,20,25 20:5 21:25 44:7 73:9 85:7 126:18 130:19 162:14 163:20 232:4 238:23 238:24 239:11 270:2 276:16 277:2 289:3 295:15 296:4,5 296:23 306:20 306:25 308:4,8 308:10 309:5 309:10,12,14 310:4,25 311:25 312:10 312:24 313:19 334:13
**courtesy** 15:19
**cover** 184:25 330:25
**covered** 286:5
**covering** 16:7
**cpa** 2:4
**cpa's** 2:14
**cracked** 327:20
**created** 137:7 137:10 140:18
**credit** 123:7 226:16
**crime** 27:18 99:24,25
**criminal** 32:17 45:4 48:20 105:6 158:24 190:24 191:11 275:24 276:24 277:4,13,23 278:7
**crossed** 175:17
**crystal** 16:11
**cszlaw.com** 4:23
**cullen** 5:8 12:12 335:7
**cullenanddyk...** 5:11
**curious** 88:18
**current** 67:25 68:4,6
**currently** 30:7 46:5 66:18 67:14,15,16,19 71:12 72:19 94:21 155:12 184:11 191:11 207:11 223:3,9 302:11 313:25
**customer** 108:18 118:24 131:10 161:20 167:24 295:4 295:11 298:11
**customers** 71:14 96:17,22 118:19 151:23 152:3,8 153:15 153:23,25 184:21 245:5,9 245:15,17 251:11 292:6
**cut** 30:25 31:3 52:13 151:20 224:21 312:2
**cutting** 259:22 259:23 260:2
**cv** 1:25
**cyruli** 4:20 11:16 253:25

309:21

d

**d** 7:1 8:20 9:1 169:25
**da** 217:19 218:3,4
**daily** 65:22 301:6,9
**damage** 241:3 241:24 321:18 324:22 325:5,7 325:9,12 326:12 327:15 327:19 328:3 328:14 330:7
**damaged** 240:23
**damages** 330:9
**dan** 142:22,25 298:19 299:24 300:2,5 301:14 345:4,14
**danger** 255:18 262:19,22 263:4 264:16 265:2,7,17 266:3 321:25
**daniel** 8:15 296:21
**darius** 44:7
**das** 169:22,25 170:2 186:8,18 186:22
**date** 3:2 26:6,9 72:12,16 136:25 137:3 148:24 149:10 156:15 174:24 175:14,17,18 193:4 236:5 244:8 305:5 339:21
**dated** 8:6,10 73:19 74:20 123:15 170:25 179:15 180:3 190:20 229:10
**dates** 28:25 72:17 134:13 159:3 165:21 186:6 195:21 240:4 288:7 303:23
**daughter** 26:5
**david** 91:10,11 92:8,18 93:2 290:22
**day** 43:17 49:3 55:21,21 62:20 64:24 65:16 66:3,3 76:10 76:10 77:8,8,9 77:9 89:14 90:7 113:20,25 114:3,8,10 115:6 122:8 127:23 143:13 143:15 147:3 147:19 148:24 168:4 191:3,4 192:3 196:5,5 196:12,24 218:11,18 221:7,19,23,24 222:6,21 225:13 265:5 301:16
**days** 42:25 43:2 43:3,7,7,11,12 43:13,14,15,15 43:16 49:4 56:3,4,8,8 57:23 64:22 147:21 148:11 222:7,14,18 265:12,12,15 266:5,12 297:6
**deal** 29:25 30:3 36:23 82:9 85:3 141:6,9 164:21 210:16 279:5 291:17 291:17,24 294:17 328:4 345:21
**dealer** 280:24 281:10,16,24 282:2,5,8,20 283:10,11,13 283:16
**dealership** 47:8 51:7,11 61:4 63:3,6,21,22 64:5,10,13,25 65:9,20 76:9 76:11 77:10 88:24 91:5,13 94:23 109:20 112:12 113:12 115:3 117:12 125:21 128:20 140:24 147:19 148:20,23 149:7,10,20 161:21 171:11 184:13 204:15 208:6 221:6 228:24 249:11 250:22 251:4 261:24 263:6 263:10,18,21 263:24 266:19 267:7 281:19 283:23 284:3 284:15,19 288:16 291:6 291:14,22 292:12,16,19 295:9,13 297:7 300:24 301:6 301:25 302:4 302:10,16 303:18 322:9 322:10 323:4

324:9 325:2 332:13,15 345:24
**dealership's** 65:11
**dealerships** 62:24 72:4,6 72:11 75:18,19 75:21 123:2 124:13 154:6 158:17,22 168:12 183:13 208:4 209:10 282:16 283:9 294:14 333:13 342:13,14,22 343:6,11,14,18 346:5
**dealing** 131:9 141:16 342:12
**dealings** 236:20 289:12 345:25
**deals** 164:24 169:13 210:20 327:18
**dealt** 204:3
**death** 46:18,22 49:23 230:11 232:12
**december** 69:7 69:10 162:7
**decide** 78:24
**decided** 65:21 221:11 239:6
**decision** 103:6 103:19 220:22 220:25 221:3 221:14 279:7 279:11
**declaration** 7:15,17 8:9 21:16,19,23 22:2 73:19,25 74:24 79:23 80:4 123:14 202:5,25
**deeg** 227:11,12
**deep** 264:13
**deer** 3:5 10:14 25:5,12,13 26:2
**defendant** 5:2,5 5:14 6:3 45:10 311:3 335:8 347:17
**defendants** 2:18 9:8 103:7 155:3 219:3 309:25 311:19
**defending** 22:15
**defense** 11:11 12:7
**definitely** 264:4 336:24 339:20
**delivered** 166:11 303:7
**delivery** 77:13
**demanded** 203:23,25 204:8 205:16
**demanding** 210:11
**denied** 138:24 139:2
**dent** 325:21,25
**dents** 325:15 326:3
**deny** 138:21 205:19 207:20
**deo** 1:25,25 6:3 7:17,23 8:22 10:10,10 14:11 22:18,23 23:3 23:7 25:19 30:11 31:23 32:9 33:15,22 34:21 38:18,22 39:3,6,9 40:14 40:18,22 41:16 42:9 43:25 44:6,14 46:20 47:7 48:6,10 49:24 51:7,10 51:23 52:2 53:8 56:14,17 58:18 59:7,20 60:14,23 61:3 62:13 63:15 64:9,13,19 65:2 66:8,11 66:22 67:9,13 67:25 68:4,17 68:24 69:12 70:12 71:3,7 71:11,17 72:3 72:20,24 75:13 75:23 76:3,8 78:20 79:13,25 87:2,15 89:7 91:18,25 92:10 92:14,19 93:6 93:13,17,24 94:22 95:16,23 98:12 100:18 101:19,23 102:6,11 105:6 108:9 114:2,21 117:10 119:10 120:5,10,21,25 121:6,23 123:9 123:15 129:10 129:20 131:21 132:3 134:15 137:7,10 144:23 145:11 146:9 147:4,14 147:16 148:12 148:16,17 149:3,17,23 150:18 151:10 151:15,24,25 154:4 155:3,4 155:10,14,20 156:7 157:10

157:15 158:16 159:5,18,24 160:11,21 163:12,15,20 164:2,6,11,19 164:21 165:5,8 166:13,17 167:10 168:8 168:11 170:5,9 173:7 177:7 178:17,25 181:8,22 183:24 190:23 191:10,25 192:11 195:22 197:8,11,24 201:11 203:22 210:20 212:4,7 215:16 217:12 218:8 219:2,9 219:19,25 220:6,10,14,24 221:10 222:2,3 222:8,15,22 223:4,9,25 226:18,22,25 227:18 228:7 228:10,24 229:14,17,21 230:7,11,18,20 231:2,6,10 232:13,22 233:14,19,24 234:23 235:5 235:22 236:21 240:9 244:3,5 244:10,15,20 246:24 247:13 247:18,22,23 248:2,6,16 249:4,15 250:8 250:11,15 259:6 260:13 268:2,18 269:10 270:16 270:20,21 273:5,17 274:8 275:17 277:7 283:20 285:12 287:14,20 288:8 289:6 291:4 296:24 298:14 299:2 299:15 300:17 320:6,20 321:2 321:10,23 323:16 324:2,7 324:8 327:21 327:25 328:2 345:15

**deo's** 31:18 65:16 86:17 88:12 120:3 123:22 124:4 155:23 173:12 178:15 184:12 220:24 221:3 240:6 241:16 247:6 274:16 298:24

**deos** 161:13,24

**department** 41:4,14 43:3 48:24 49:7,18 53:16 54:4 56:19 57:12,16 57:17 58:2,20 59:4,9,15 66:7 66:15 73:5 100:9 101:13 102:7 104:19 113:11,16 163:9 191:15 217:13,24 240:19 242:19 254:15 261:21 266:9 271:6 272:2 276:14

**depended** 221:5

**depending** 181:5

**depends** 25:16 25:16 64:17 209:13 256:6 258:8,24 276:18 324:12 330:6

**deposed** 14:23 17:19 155:21 268:23 311:4

**deposit** 7:24 109:2,12,13,14 109:17,20,22 109:25 110:6 119:6 170:17 170:19,24 171:10,17,18 171:21 173:16 174:4 175:3 178:25 318:21 335:22 336:15 336:21

**deposited** 118:25 125:21 178:21,23 179:11 287:3 298:13 300:13

**depositing** 125:8 300:21

**deposition** 3:1 10:7 11:4 13:8 13:9 15:4 16:25 20:8,11 20:14,17,18,21 20:24 24:16,21 82:10 155:12 155:21,24 156:6,24 157:6 158:7,11 295:18 307:11 309:24 310:6,8 310:12 350:1

**depositions** 15:3 154:24

**deposits** 97:15 97:20,24 98:6 98:8 108:13,16 108:18 110:2 110:13 118:12 118:18,22 124:16,25 125:12 292:7 298:11,12 301:13,17,20 318:9,10,14,17 337:16 339:9
**derivatively** 1:9,12
**describe** 43:5 64:3 281:13
**description** 7:10 8:2,21 9:2
**designated** 36:9
**desk** 99:19 100:5 129:8
**detail** 155:19
**details** 7:20
**detective** 57:25 58:14 99:16 100:2,4,9,14,17 100:19,19 101:2,9,11,19 101:22,23 104:22 105:3,7 105:12,16,21 105:23 106:3,9 107:5 146:23 147:3,15 148:16 149:3 149:16,18 217:7,24 270:17,17 271:3 272:17 272:21 273:5 274:5,13,19,24 275:2,3 277:6 279:12 280:10
**detectives** 106:12 280:8
**determination** 279:19
**determine** 280:8
**device** 320:6
**diagrams** 86:21
**dial** 306:13 308:18
**different** 40:25 54:5,6 55:5 63:9,21 111:2 118:17 153:23 170:6 174:14 174:17 182:15 219:8 222:21 318:16,21
**digital** 350:7 351:3
**digits** 176:8
**ding** 325:13 326:6
**dings** 325:15
**dinner** 34:6,13 34:15,18,22 261:18
**direct** 40:2 98:15 116:25 130:13,15
**directed** 99:16 100:9 134:15 233:8,16 310:22
**directing** 237:24 311:6,8
**direction** 62:16 62:17 218:9,16 231:15 237:17
**directive** 88:12
**directly** 23:10 23:14,21 68:25 99:25 129:18
**disagree** 299:18
**disciplinary** 57:11
**disclose** 237:11
**discuss** 20:11 95:9 119:23 172:20 237:25 268:10,16 288:8,13
**discussed** 38:21 38:22 39:11 45:7 81:25 83:24 84:17 149:18 202:16
**discussing** 187:15 211:2 238:13
**discussion** 44:21 93:24 122:10 209:25 221:13,20,22 248:7 279:17
**discussions** 22:18 32:23 50:18 154:23
**dismiss** 103:7
**displayed** 207:12
**disproved** 60:3
**dispute** 57:8 90:16,19 158:18 203:21 213:15 214:7 252:7 273:17 276:12 277:7 278:24 288:9 288:14,18,21 289:4
**disputes** 289:7
**disqualified** 22:5,9
**disqualify** 21:17
**distinction** 326:6
**district** 1:1,2 6:9,9 216:9

217:25
**diverges** 213:13
**division** 99:17 100:2
**divulge** 84:5
**divulging** 239:18
**dix** 25:11,13,17 25:19 44:9
**dla** 2:12
**dmv** 44:2 159:25
**docket** 38:10 73:20 102:22 123:16 132:18 136:20 142:3 184:9 190:6 202:6 215:21 231:21 234:14
**document** 8:11 9:6 47:5 59:14 73:23 74:10 80:8 102:21 103:2,9 104:7 136:20,25 138:8 139:15 140:11 173:5 173:15 185:6,7 185:9,13 186:2 187:18,22 188:11,22,25 189:11 190:6,7 194:20,22,24 200:9,15 201:20 202:7 232:2 235:11 296:4 314:11 315:18 316:15 316:17 317:11 317:22 329:2,4
**documentation** 160:8
**documents** 20:13 24:18,21 60:10 72:22 159:25 172:24 176:14 183:20 185:3 198:15 198:19 227:23 229:5 292:2 315:21
**docusign** 315:20
**dodge** 63:22,25
**doing** 15:9,17 31:20 39:10 40:24 52:17 62:18,21 69:14 71:14,19 72:2 87:22,25 117:4 131:13 152:16 159:10 165:10 178:7 181:6 184:16 188:2 201:3,5 218:18 250:21 254:11 258:11 271:22 285:20 302:7,9 302:12 345:9 345:10
**dollar** 247:23 326:18
**dollars** 53:9 101:3 301:5
**door** 129:16 325:14
**doors** 129:25
**double** 122:15 122:22,24
**doubt** 212:3 326:25
**drafted** 185:18
**draw** 297:18
**drivable** 242:2
**drive** 63:7 86:2 86:13,25 87:10 211:24 241:8 280:22 282:17 282:22 283:11 283:18 284:14
**driven** 281:8
**driving** 65:23 110:16 281:16 282:12 283:9 283:16
**dropped** 308:18 313:19
**drops** 294:10 298:18 339:3
**drove** 241:9 246:9 281:23 282:2,5,7 283:13 284:14
**drugs** 17:4
**due** 155:17 282:9
**duly** 12:21 350:5
**duplicate** 295:5
**durango** 63:12
**duties** 55:7,14 79:9 96:21,25 97:15 125:23 183:20 187:25 189:3 218:8 250:17
**duty** 77:3 97:9 185:2 198:15 198:19
**dwight** 2:2 75:23 104:23 197:6 227:15
**dx** 227:6,8
**dykman** 5:8 12:12 335:7

**e**

**e** 4:1,1 5:1,1,6 6:1,1 7:1,9 8:1 8:20,20,20 9:1 9:1,1 36:5 112:8 168:22 168:22 169:10 183:6 186:25

**earle** 5:9
**earlier** 25:3 37:18 120:2 171:9 187:4,15 202:16 213:4 261:17 291:3 304:7 323:21
**early** 134:10 195:24
**earn** 56:23
**earned** 57:4
**earshot** 267:25
**east** 10:13 25:4
**eastern** 1:2 6:9
**easy** 15:4 78:15
**ecf** 38:10 73:20 102:22 123:16 132:18 136:20 142:3 184:9 190:6 202:5 215:21,25 231:21
**effective** 15:4
**efforts** 266:10
**either** 35:24 45:10 148:7 155:22 156:7 196:5 205:3 210:14 211:12 220:23 227:15 230:13 237:22 251:19 252:24 279:2 282:8 317:2
**electronically** 201:25
**eleven** 173:23
**else's** 157:4 178:15
**email** 8:10 11:18 23:22 24:12 26:11,12 26:15,16,20,21 27:3,5,11 137:21,23 140:5,14,19 146:23 215:20 215:22 216:14 216:16,21,22 217:3 319:8 334:13
**emailed** 310:6
**emanuel** 4:4,8 12:3 13:15 154:18 215:24 253:11 269:23 295:14 309:7 348:7
**employed** 66:5 72:19 266:25 267:4 350:10 350:13 351:7,9
**employee** 267:14 269:14 350:12 351:9
**employees** 43:21 64:10
**employment** 43:25 59:19 72:23
**encountering** 256:14
**ended** 33:22 36:20 278:25 316:14
**enforcement** 29:20 30:2 191:18,22
**engage** 48:5 121:24 233:16 233:24 261:11
**engaged** 47:24 70:11 132:4 261:15
**engagement** 72:23
**entire** 100:21 203:4 273:9
**entitled** 16:11
**entity** 277:23
**entry** 38:10 73:20 102:22 123:16 132:18 136:20 137:6,9 142:4 184:10 190:6 202:6 215:21 231:21 234:14
**envelope** 90:12
**equal** 221:18 221:21,21
**eric** 351:2,14
**es** 350:4
**escape** 264:11
**escrow** 150:13
**esquire** 4:4,19 5:3,6,15 6:8
**established** 259:16 260:13
**establishment** 51:3
**estate** 36:18
**estimate** 40:22 209:11
**et** 10:9,10 288:11
**eugene** 112:6 141:13,14
**event** 115:16,18 115:18,19,21 116:14,19,24 161:24 162:2,8 166:12,17 167:3 200:9,16 210:25 211:7 211:13,21,23
**events** 16:6,7 211:14
**everybody** 112:17 131:14 158:22 187:25 204:15 296:3
**evidence** 235:17,21

**evidentiary** 11:3
**exact** 17:25 25:23 28:25 39:12
**exactly** 19:22 28:16,17 33:4 34:11 127:2 212:24 226:5 228:17 255:11 257:11 259:11 264:18,22 289:19
**exam** 54:21,23 54:24 55:2
**examination** 7:2 13:3 253:21 335:3 340:8 347:14
**examined** 12:23
**example** 221:12 246:7 276:3
**exams** 54:19,20
**except** 11:15 16:16 114:25 124:15 125:7 159:11 176:7 230:21 305:11
**exchanged** 341:21
**excuse** 140:13 329:10
**executed** 133:21 315:21
**executing** 145:25
**exhibit** 7:12,13 7:15,16,17,18 7:19,20,21,23 7:24 8:4,6,8,9 8:10,11,13,14 8:15,17,18 38:4,14 47:2 73:8,16 102:23 107:24 123:11 132:14 136:16 139:6 141:22 160:16 170:14 172:4,7 173:17 179:14,24 182:8 183:6 184:2,9 190:2 198:2 201:17 201:20 202:2 215:18 218:6 227:5,19 231:23 234:16 296:14 318:2,3 332:21,24
**exhibits** 102:16 132:23
**existence** 23:24 103:16 163:11 229:14
**existing** 272:19
**exit** 199:20,24
**expensive** 327:16 331:18
**experience** 82:17,22 83:5 208:4 209:10 275:20 276:10 278:21 279:4 333:12 342:12
**expertise** 278:10
**explain** 274:23 275:18 282:3
**explanation** 274:9
**explored** 83:22
**extent** 239:14 241:2 323:7
**extra** 76:9,13

**f**

**f** 8:20 9:1
**face** 257:9,10
**facilitate** 250:23
**facility** 224:2
**facing** 161:21 257:2 258:6,7
**fact** 22:4 36:7 86:24 93:5 157:8 163:2 204:19 240:15 252:16 288:14
**facts** 103:20 104:16 132:22 269:18 279:18 279:19,21 280:5
**failed** 215:3
**fair** 18:12 19:4 25:10,18 31:22 32:8 34:2 40:7 48:4 56:16 57:3 58:17 59:6 60:13 62:12 65:25 69:9 70:2,6 78:19 79:24 92:9,13 96:10 131:19 133:12 133:18,23 138:7,20 140:17 153:13 154:3 161:19 165:17 177:23 180:24 200:8 200:15 219:24 220:5 222:23 229:13 230:6 230:23 248:16 250:11 252:18 256:10 259:4 305:7
**false** 280:13,14
**familiar** 51:2,6 53:6,14 74:2 86:24 90:15

102:25 128:19 133:2 139:10 150:23 151:3 160:23 162:16 162:21 163:2 184:4 190:7 195:9,11 204:19 223:2,7 254:5 285:22 333:25
**family** 26:3,4
**far** 25:13 110:12,23 159:21 180:7 180:15 201:8 249:2 264:6 272:25 274:6 286:3 300:6 305:12 317:4 320:19 323:16
**faster** 240:14
**fbi** 9:6 28:11,19 192:2,12 193:12
**fear** 259:7 260:20
**fearful** 264:23 266:3
**february** 19:25 20:4 165:9,12 165:16
**federal** 27:21 27:22 28:2,3 29:21 30:2
32:10,12,16 35:14 45:4 191:21 195:4
**feds** 36:21
**feel** 65:23
**fees** 22:10,14 23:2
**feet** 129:19
**fell** 223:6 308:13
**female** 49:19
**fender** 326:14
**figure** 41:17 221:15
**figured** 37:24
**file** 58:8
**filed** 47:5 105:6 132:2 149:24 160:21 162:6 163:21,25 164:7,12 247:11,18 296:22
**files** 159:25 160:7 315:10
**filing** 7:13
**fill** 171:16 271:6 273:13 285:24 337:2
**filled** 62:8 101:25 109:21 171:13,18,20
**final** 124:10
**finally** 16:15 155:20
**finance** 94:9 152:5
**financial** 99:25
**financially** 350:14 351:10
**financing** 120:6 120:16,21 347:22
**find** 128:13 156:24 158:5 167:15 172:6
**finding** 157:13 157:17,19,23 346:10
**fine** 152:17 311:25 312:24
**finish** 39:24 47:15 145:6 146:17 172:3 204:5 205:9 207:7 243:13 269:3 275:5 279:9 293:24 294:22 327:24
**finished** 47:20 312:6
**fink** 6:8 306:9 306:24 308:5,7 308:23,24 309:6,20 311:9 311:21 314:4 319:9
**fired** 110:20
**firm** 190:5 253:25 254:2 310:3 335:7
**first** 12:20 15:7 30:10 31:2,22 32:9 33:14 39:9 40:23 52:9 53:15,20 54:12 60:14,19 62:3 64:21 73:22 74:4 76:2 80:18 81:22 85:24 92:17 99:13,15 101:8 105:9 139:22 148:12 154:25 160:19 180:15 200:2 204:17 226:18 226:22,25 239:25 260:18 270:21 287:9 287:13,19 307:15 312:21 340:13,14,23 340:25
**fisk** 1:20 4:16
**five** 19:17 25:15,21 31:7 31:16 50:4,14 64:22 119:14 297:8 304:2 307:18 324:25

Case 2:23-cv-06188-JMW Document 543-10 Filed 09/04/26 Page 375 of 515 PageID #: 20712




333:3
**fix** 328:5
**fixed** 130:17,18 326:4 332:19
**fixing** 305:11 305:15,17 327:18
**flatbed** 195:10 195:13,14
**flew** 93:6,17
**floor** 5:9,18 86:21 123:5 128:2 138:22 141:17 226:15 346:24 347:3,5
**flooring** 122:15 122:22,24
**florida** 93:7,10 93:14,18,25 291:16,20 310:7,9
**flushing** 2:15 5:5 12:12 108:10,12,14 108:16,21 109:4,13 110:2 110:3,10,23 118:12 119:2 155:15,17 168:7,10 172:25 175:3 253:20 318:10 318:10,16 335:8,16,23
336:11,14,16 336:22 338:5 339:11
**focus** 104:15 165:9
**focusing** 103:18 111:7 121:9 161:2 173:14 179:13 182:7 190:10 229:5
**follow** 40:18 60:10 135:22 194:25 197:20 204:20 219:4 254:11
**followed** 181:12
**following** 36:14 123:19 281:21
**follows** 12:23
**foot** 55:10,11
**football** 31:7 260:16,17
**foregoing** 350:3,4 351:4
**forewarn** 238:4
**forget** 201:14
**forgot** 11:19 317:21
**form** 40:9 58:23 62:6,6 340:3 342:24
**format** 21:12
**forms** 62:8 139:3 285:19
**forth** 96:4
**forward** 36:25
**found** 146:5 157:10
**four** 16:8 31:16 42:25 43:2,3,7 43:7,11,11,13 43:14,14,15 56:3,4,8,8 61:24 73:10 176:8 265:11 265:12,15 266:5,11,12 304:2
**fourth** 186:8
**frank** 94:6 185:20 186:6
**freestanding** 293:5,7
**freezing** 265:21 265:24
**frequent** 342:16
**frequently** 34:22 66:2 153:5 204:20 322:10
**friday** 155:24 157:9 199:12
**friend** 92:19 298:24
**friends** 52:23 92:10,14 102:10
**front** 35:14 36:16 86:18 99:18 100:5 175:8 177:23 192:20 195:24 238:5 258:23 329:4,17
**froze** 88:4 107:9 286:7 336:17,18
**frozen** 37:18 256:17 282:24 282:25 286:6 286:11 287:10 287:16
**full** 56:14 64:19 66:22 67:3 115:12 116:11 177:6 203:10 213:5 254:21
**funding** 2:15 5:14 11:20 347:18,22,23
**funds** 105:10 106:5 146:8 150:18 302:20
**further** 110:25 111:6 144:21 184:24 253:15 334:7 340:7 347:10,25

350:12 351:8

g

**gain** 320:11
**gang** 14:12,15 262:13
**gap** 304:9
**gaps** 57:14
**garage** 224:4,8 225:10,14,21
**garden** 242:10 242:17
**gene** 112:2 131:15 204:24 214:19,25 215:3
**general** 24:19 55:20 95:9 98:21 127:8 136:12 138:9 140:2 141:14
**generally** 82:19 83:6 109:19 257:13,16
**generated** 135:17
**gentleman** 53:4
**gestures** 15:12
**getting** 22:19 45:23 99:4 144:5 180:12 181:8 196:15 312:16 332:4
**gianelli** 162:11 162:13
**girls** 111:16,21 214:20
**gist** 130:25
**give** 15:18 19:9 38:5 49:21 70:25 73:7 90:21 154:11 164:22 170:4 170:11 172:7 181:16 188:16 209:3 213:21 218:5 238:23 238:24 239:11 285:20 291:12 291:14 295:20 295:22 298:25 299:3 306:12
**given** 90:13 120:15 133:19 133:24 138:3 206:15 208:15 213:25 254:7
**gives** 123:6
**giving** 291:5
**glitch** 316:23
**gm** 137:13 140:2
**gmail** 26:25 27:8 140:10,17 140:23
**gmail.com** 26:17 140:6
**go** 11:13 13:2 15:2 17:14 23:17 29:13 34:9,10,22 39:23 45:25 50:11 51:19 52:3 58:8 75:8 78:7 83:10 85:15 89:10 99:4,7 104:9 108:14,21 110:2 111:10 113:8 119:20 131:17 135:13 142:14 144:10 144:20 145:6 154:12,17 165:20 172:4,8 172:14 197:19 197:22 203:20 204:5 206:5 216:5 220:4 221:9 240:9,15 243:11 245:22 253:10 256:7,7 262:24 269:4 270:11 271:5 276:16,25 304:8 307:16 308:3 314:7 320:2 324:10 324:11 326:3 333:3,9 335:2 335:10,18 337:15 348:4
**goal** 251:6
**god** 114:12
**goes** 109:25 155:13
**going** 15:2 36:25 37:9 38:3 40:16 46:23 47:14 60:7 64:24 69:15 84:2 88:22 93:16,20 94:25 102:11 103:24 104:8 108:20,23 110:9 119:8 123:9,17 132:19 135:18 139:4 144:6,12 147:25 154:22 156:2 157:3,4 157:11 158:10 165:13 166:3 168:5 171:11 174:20 181:13 184:24 187:13 194:23 200:12 200:17 211:17 218:24 221:6 221:20 225:17 227:17 229:16 229:25 238:3 238:13 248:25 254:4 256:25

257:2,9,10 262:17 279:4 279:14 280:8 281:2 295:23 296:11,18 297:18 300:11 306:12,22 307:10 310:4 314:2,11,11 315:6,7 321:17 327:7,22 328:25 329:2,7 329:8 332:20
**gold** 2:5,6,7,8,9 2:10 8:4 183:20 184:7 184:15 189:7 197:20 198:7 198:11 301:23 302:4,6,12,17
**good** 10:2 72:16 85:18 90:5 159:3 165:21 253:23 258:25 280:15 309:20 322:23 324:9,10,19 327:18 328:4 340:10
**goodbye** 80:21 91:17 290:6,24 341:6
**google** 27:3 126:6,9
**gotten** 254:24
**government** 29:21 32:10,12
**grand** 115:19 115:21 192:15 192:21,24 200:5,10,16,23 277:18 278:23
**gray** 333:14,16 333:17
**great** 111:2 216:19 255:18 304:19
**greater** 272:20
**greetings** 341:7
**grill** 331:17,22
**grills** 331:6,16
**ground** 15:3 16:22
**group** 2:8 14:11 23:25 70:17,20 98:25 139:19,21 160:3,22 162:6 163:22,25 164:8,13
**guarantor** 226:15
**guess** 16:9 187:24
**guest** 167:5
**guide** 59:15,17 59:19 79:12
**gun** 61:10,13 61:15
**guns** 32:25 33:6 263:6,9 263:15 264:10 266:19
**guy** 14:16 94:9 112:2 152:5 168:23 226:3 279:5
**guys** 111:25 114:13
**gym** 242:7,8,8

**h**

**h** 7:9 8:1 184:14
**hakim** 53:5,7 53:12 247:18 247:20,22 248:3
**half** 110:14 172:17,19 260:5 278:17 284:13 327:6
**halfway** 129:12
**hammer** 49:11
**hand** 12:17,25 71:10
**handed** 194:10
**handle** 142:24 213:18 256:21 258:14,15
**handled** 55:16 142:16
**handles** 286:2
**handling** 142:20
**handwriting** 171:4,6,15 174:7,9,11,12 174:14,18,21 174:25 175:13 175:24 176:10 178:14,16 337:10 338:14 339:18,21
**hang** 231:20
**hanging** 331:9
**happen** 76:24 153:6,10 260:21,24 263:14 276:2
**happened** 45:22 55:24 64:7 101:20,20 101:24,24 106:16 122:5 147:10 153:18 191:3 195:6 241:19 242:3 287:24 291:20 299:5 301:8
**happening** 105:13 114:4 230:13

**happy** 156:20
**hard** 217:20 313:23,23
**harm** 259:8
**harm's** 64:14
**harry** 1:25 5:2 5:3 7:13 12:9 193:7 194:21 268:4,22 278:11,12 311:10 340:11
**he'll** 11:21
**health** 155:6
**hear** 35:25 37:12,14,16 69:19 70:5 96:19 105:15 107:13 126:16 137:8 139:12 143:5,22,24,25 144:3,4 152:15 152:22 192:18 243:12 251:18 275:14,17 281:5,6 283:6 286:7,12,13 287:11,12 308:9 312:4 344:23
**heard** 31:3 106:25,25 107:2 138:13 204:4,6,7 224:23 227:5,9 230:3 237:12 275:21 333:14 333:17,20
**hearing** 7:12 12:14 34:25 35:6 36:15 204:18 228:22 260:5
**heavily** 323:17
**held** 34:25 172:25 196:6 223:4,9,25 332:7
**hell** 133:6
**hello** 91:17 290:6,24 341:6
**help** 62:20 73:5 76:9,13 79:15 123:25 126:4 131:23 141:12 261:12 273:12 322:2
**helped** 87:11 126:3 139:2 346:6
**helping** 199:2 346:8
**hereto** 350:13 351:10
**hey** 131:5 181:13
**hi** 80:21 216:18 308:4 309:5,6 335:5,21
**hicksville** 46:6 64:25 65:4,8 65:10,12 117:13 184:12 192:3 223:12 223:14,16 224:20,24 225:4,10,14 302:8,11,16
**high** 323:4,9
**higher** 325:3
**highest** 181:25
**highlight** 113:7 132:19
**highlighted** 111:7 123:19 124:11
**highlighting** 216:16
**hills** 25:11,14 25:17,19 44:9
**hired** 38:18 60:19 62:3,10 63:3 234:5 321:10
**hiring** 61:3
**hit** 313:23
**hmm** 15:13
**hold** 78:11 104:12 137:18 161:5 216:20 216:24 272:20 319:3 334:11 334:11,17
**home** 26:2 65:2 65:16 218:10 228:25
**honest** 175:5 178:20 258:9
**honestly** 95:10 185:8 318:19
**honor** 36:19
**honorable** 102:20
**hope** 201:11
**hopefully** 11:24 15:5 308:18 347:13
**hour** 41:20 172:17,19 265:8
**hourly** 39:15
**hours** 17:6 40:21 41:17,23 41:24 42:8 64:23 157:21 221:25 264:24 265:5
**house** 25:22 65:19 218:15 223:17 258:12 258:13 265:9
**huh** 15:13
**hundred** 53:8 147:7 182:12 247:23 316:13 336:24

**huntington** 44:8
**hurt** 45:21 240:24
**hwy** 1:6,13 4:12
**hylan** 1:15,15 1:16,17,18,19 4:13,14,14,15 4:15,16

**i**

**idea** 22:24 38:20 48:8 86:10 90:8 113:17 115:12 119:3 140:12 143:16 146:10 151:12 154:10 160:4 165:13 168:13 169:14 169:21 170:7 171:8 179:9 187:3 195:8 199:11,25 200:13 201:7 202:14 208:7 209:13,14,18 210:23 212:10 228:13 229:3 229:19,24 236:14,16,19 243:24 244:4 246:15 247:14 274:2 277:11 280:13,15 291:25 300:3 316:16,22 317:16 326:20 326:21 328:23 328:24 329:23 337:13 345:16
**identification** 38:15 47:3 73:17 102:24 123:12 132:15 136:17 139:7 141:23 160:17 170:15 184:3 190:3 198:3 202:3 215:19 227:20 231:24 234:17 296:15 318:4 332:25
**identify** 11:9 121:19
**ignore** 156:17
**imagine** 87:3,4 98:2 118:20 120:17 151:12 176:20 189:22 292:14 346:25
**implore** 238:14
**imploring** 238:17
**important** 188:25
**impression** 277:12,16
**inappropriate** 278:3
**incident** 47:21 48:25 49:3,18 58:13 98:16,18 98:21 113:9 120:3,9 121:9 158:23 159:5 190:18 195:3 215:10 240:5 263:14
**incidents** 49:22 51:24 106:23 153:21
**included** 96:25
**including** 26:16 81:20 135:20 288:10
**income** 286:4 286:16
**incorporated** 69:6,10
**independent** 44:22
**index** 231:21
**indication** 235:8
**individual** 53:8 64:12 77:24 94:5 141:6 168:21 187:5 202:15 211:25 219:3
**individual's** 187:14
**individually** 1:9,12 268:7
**individuals** 48:14,21 49:13 116:25 170:6 194:13 225:21 225:22 238:10
**industry** 82:19 82:23 83:6 84:8 252:21
**infer** 48:4
**inference** 252:18
**infiniti** 63:12
**infinitum** 43:8 43:12
**info** 307:21
**information** 11:25 94:2 99:19 109:5 137:16 139:14 150:3 189:17 194:17 235:25 256:4,9 257:9 257:19 258:5,6 258:8,18,18,21 258:25 259:3 260:10 261:5,8 291:13 317:8 338:24

**informed** 131:16 260:19
**initial** 53:19
**initially** 292:13
**initiated** 34:3,5
**injuncted** 164:4 223:3,8 223:25
**inquire** 274:14
**inside** 213:3
**instagram** 8:8 197:16,18 198:7,10
**install** 112:19
**instance** 93:6
**instances** 68:11 151:22
**instruct** 238:11
**instructed** 9:10
**instructing** 81:5,7,11 82:3 83:8 84:5,11 269:19
**instructions** 254:6,7 306:13 307:15
**insurance** 243:4,5,8,15 244:2
**intended** 10:25
**inter** 28:6,23
**interact** 290:3
**interaction** 289:21,24 290:21
**interagency** 28:8,13
**interest** 164:22
**interested** 350:14 351:11
**interests** 75:14 75:17
**interior** 330:19
**internal** 59:13 128:4
**interrupt** 29:6
**interrupted** 205:9
**introduce** 76:2
**introduced** 75:22 91:21 290:24
**introduction** 91:17
**inventory** 126:2,5 127:16 130:5,12
**investigate** 233:25
**investigating** 71:20 277:6
**investigation** 27:21 28:2 191:12,21,23
**investigative** 69:22 70:3,7 70:13 71:4,7 71:15,18 73:3 311:17 341:13
**investigator** 77:16,19,22 233:25 234:6
**invited** 167:10 167:15 212:2,5 212:7
**involve** 81:8
**involved** 24:3 48:23 61:3 87:8 88:21 108:8 116:20 153:17,20 199:2 217:12 217:13,16 223:24 225:6 235:10,19,23 240:6 245:24 246:16 323:17
**involving** 311:18
**irate** 151:23
**irrespective** 84:16
**island** 1:21 4:17 14:10 70:16,20 82:18 82:23 83:6 143:4,7 160:2 160:21 162:6 163:22,25 164:7,13 273:17 288:10 303:8 322:16 329:12
**islip** 63:24
**issue** 131:17 266:17,17 268:14 269:24
**issued** 206:11
**issues** 57:11 107:16 155:7 155:18 275:22 324:16,20 325:19
**issuing** 179:8
**isuzu** 195:9,13 195:14
**it'd** 330:11

**j**

**j&h** 230:3
**j.p.** 2:16
**jacqueline** 6:8 306:9 308:4,24
**jamaica** 4:6,7
**james** 102:20 216:22
**january** 3:2 10:11 137:2,5 228:2 229:10
**jcianciulli** 5:20
**jeff** 11:13,19 253:24 306:7 306:17 309:21 319:6 347:16
**jeffrey** 4:19 5:15 11:16

310:2
**jeremy** 236:10 236:11,17,21
**jmw** 1:25
**job** 3:7 39:10 55:7,14 59:22 62:9,22 64:3,8 88:20 256:21 257:22,24,25 300:23
**jobs** 130:12 255:24
**joe** 117:8,15,22 118:4
**join** 13:7 306:10,23 307:9,13
**joins** 306:24 307:9
**joke** 145:20
**jones** 2:4,13
**jory** 1:14 4:12 290:13,14
**josh** 98:24 101:2 288:10 289:8,12 303:7
**joshua** 1:11 4:11 58:10 163:21 164:2
**jruderman** 4:23
**judge** 34:25 35:6,14 36:5,8 36:9,10,11,12 36:16 85:5 102:21 103:6 162:13 163:4 195:24 238:7 238:13,23 239:14 269:25 308:21
**july** 115:24 116:24 154:4,7 176:18,24 180:16 182:4 302:21 303:16 305:4,9,14
**june** 47:6 179:16 180:19 182:4 186:4 215:14 302:21
**jury** 192:15,21 192:24
**justice** 162:10 162:13

**k**

**kataev** 4:4 7:3 11:13 12:3,3 13:4,15 14:17 18:22,23 29:13 29:14,19 30:23 30:24 35:21 36:3 37:25 38:3,6 40:16 40:20 50:5,11 50:12 58:24 59:2 60:7,12 73:7,12 80:9 80:22 81:4,5 81:11 82:2,7 82:11 84:24 85:3,7,11,16 88:7 102:13,15 102:17 107:11 107:17,22 119:21 125:10 125:16 126:18 127:7 130:23 135:18,23 141:18,20,24 144:2,3,11 146:15,20 152:12,16 153:3 154:18 154:18 156:4 156:22 157:9 158:5,9,12 160:10,14,18 172:2,3,6,15 173:19,22 174:3 186:12 186:14 189:13 194:23 195:2 198:5 201:23 207:6 211:8,16 211:19 214:12 214:22 216:2,4 216:7 217:22 218:24 219:5 225:5 232:2,3 232:6,17 233:6 235:16 236:24 237:18 238:3 238:16,20 239:11,17 248:9 251:18 251:22 252:3 253:2,13 254:3 254:8 270:2 279:9 295:17 296:7 302:21 306:7,9,12,17 306:22 307:8 307:14,20 308:9,15,23 309:6,7,23 311:21 313:22 314:25 319:5,8 319:15,18 335:12,14 336:11 338:2,4 340:3 342:24 343:8 345:7 346:15 348:9 348:12
**keep** 15:7 41:5 41:9 127:11 128:5 178:3 312:17 320:18
**keeps** 47:12 148:7
**kept** 289:6 292:12,22 295:8

**kevin** 182:18 182:20,22,23 229:8,15 230:11,17,25 231:14 232:12 232:23 233:3,4 233:8,16,20 234:8,11,22 236:16 321:2 321:21
**kevin's** 234:3
**key** 293:9
**keys** 197:15
**kill** 321:17
**kind** 30:3 106:22 115:18 126:19 314:12 336:15,21
**knew** 32:9 105:18 145:8 145:21 189:4 200:25 288:17
**knife** 49:11
**know** 17:24 21:19 22:16 24:7,11,13 25:23 26:24 28:7,24 32:11 33:11 35:10 36:4 37:21 46:21 47:10 48:2,11 49:12 49:20 51:13,18 53:4 55:4 57:22 58:4,6 61:25 62:21,25 63:6 64:3 78:4 79:10,17 80:14 80:16 82:13 85:11,12,21 87:24 89:3 90:22 91:3,6 91:10 93:8,13 93:17 94:2,5,8 94:19 95:17,24 98:20,22 103:15,17,25 104:22,25 105:4,14,16 106:12,18,22 106:24 108:3 111:8,20,23 112:14 113:7 113:19 114:18 114:25 115:13 118:22 120:23 121:7 122:15 122:19,22 123:20 127:4 130:9 131:22 132:6,10,23 134:14 135:24 138:11,14,17 139:18 140:16 142:6,9 143:14 144:13 145:15 146:3 149:12 149:22 150:14 150:21 152:25 154:8 157:22 158:2,20,21 159:21 160:9 161:4,15,16 162:5,18 163:7 164:4,10,15,16 165:21,24 166:24 167:20 168:3,14,21 169:4 170:3 171:6,14 172:8 175:11 176:3 176:11,22 178:2,8 181:15 183:17 184:20 185:18 186:6 187:2 188:10 188:10 189:4 189:16,17 190:12,14 191:13,16,19 192:2,4 195:21 197:2,14,21 200:21,22 202:9,12,22 203:6 205:8 207:12 208:22 210:5,21 211:7 211:12,14,15 212:4,7,14 214:2,25 215:23 216:8 216:17 217:4 217:20 218:2 220:18 224:4,6 224:9,16,19,23 225:2 226:18 226:22,25 229:18 231:5 231:19 232:8 232:19 233:4 233:11,12 234:18 236:10 236:13 237:7 237:13 239:19 240:24 241:4,5 241:7,20 242:5 242:5 243:22 244:7,8,23 245:2,4,6,8,19 246:19,21 247:2,4,19 248:11,13,14 248:19 249:2,3 251:12,14 252:9,20 254:8 256:13,24 258:11 259:12 259:21,24 263:16,17,20 263:21 264:7,8 264:14 265:4 265:21 266:10 266:15,16,20 267:11,19 268:4,13,14 270:23,24

271:21 273:2 274:6,7,11 276:7 277:10 280:7 286:4,21 287:24 288:7 288:18,20,23 288:24 289:2 290:7,14,19 291:15,18,20 291:23 292:21 293:17,21,23 294:2,3,6,13 295:2 296:25 297:5,10,12,13 299:5,23 300:2 300:6,7,12,16 300:17,19 301:8,19,22,23 302:2,6,8,15 303:19 304:4,5 306:20 307:9 307:13 315:3 316:14,20,24 317:4,16,18,19 318:25 320:5,9 320:19 321:6,7 321:22 322:4 323:16 324:25 326:10 327:8 327:17 328:9 328:11,21 330:4,15,21 331:2 333:23 334:4 337:12 337:18,24 338:16,19,20 339:2 340:5 342:21 343:15 345:8,13,18,20 346:20,21

**knowing** 256:25 309:11

**knowledge** 22:22,25 23:5 44:14,23 45:2 47:25 48:9 52:2 60:18 82:18,21,22,25 83:4,5 95:21 104:21 106:21 109:9,24 122:25 123:4 136:13 146:7 151:9,15,19 156:15 164:24 166:21,22 179:7,18 183:9 191:10 195:6 199:9 200:19 201:6 208:3 209:9 211:4 223:19 224:8 226:14 231:14 233:7,9 234:7 234:9,10,12 235:18,22 236:25 237:3 239:19 242:4 243:21,25 245:21,23 246:12 247:25 248:21,22 249:4 275:6 300:9 340:23 350:9 351:6

**known** 204:15 321:2

**knows** 105:2 233:15

**l**

**l** 112:8 168:22 168:22 223:22

**l&f** 136:4

**lamborghini** 240:7 241:6

**landlord** 46:19 47:7,24 48:3,5 87:2 247:6

**larceny** 277:18 278:23

**large** 323:13

**larger** 181:23 296:2 314:13

**late** 11:21 156:15

**laurie** 2:3 155:9 156:7 157:18

**laurie's** 155:12

**law** 7:18 29:20 30:2 132:17 191:17,18,21 278:10 310:3

**laws** 11:3

**lawsuit** 45:10 45:20 47:7 160:21,23 162:6 163:21 163:25 164:7 164:12 234:15 247:5,11,17 248:3 296:22

**lawsuits** 160:25 246:22,25 248:6,11

**lawyer** 193:22 237:10 278:2

**lawyers** 237:11 238:18

**layout** 258:12

**layouts** 86:21

**lead** 160:25

**leading** 120:3

**lease** 248:20,24 249:18,19,25 250:3

**leasing** 1:7,11 4:13 60:16 173:2,6,9

**leather** 331:14

**leave** 190:23 194:16 301:15

**leaving** 87:16 87:21 88:19 158:21 236:15 236:17

**ledger** 294:20 294:23
**left** 91:21 94:20 116:8 117:25 129:17 149:16 158:16 191:7 194:11,20 198:22 212:20 236:7,18 331:8
**legal** 4:5 6:6 12:4
**legitimate** 277:21
**lenders** 128:2 138:22
**lending** 123:5
**letter** 8:6 47:19 59:25 60:5 190:4,20,22 201:17
**letting** 185:22
**level** 123:24
**lexington** 4:21
**liar** 205:24
**lib** 315:14
**libertas** 2:15 5:14 8:17 11:20 144:24 145:22 314:22 315:2,9 317:4 317:6,7 347:18 347:22
**lic** 2:9
**license** 44:2 61:16,19,22 77:15,23
**licensed** 77:18 77:21
**lie** 104:20 111:10 113:8 205:11,14
**lies** 142:14
**lieu** 155:5
**life** 32:25 33:9 36:25 37:3 242:10,13,15 262:18,22 263:3,3 264:15 264:25 265:7 265:17 266:3 321:11
**light** 125:11 233:20 331:9
**lights** 331:7
**likely** 272:5
**limit** 326:18
**linden** 310:3
**line** 9:11 12:8 85:8 123:7 226:15 239:12
**lines** 262:14 307:2
**list** 55:17 126:6 127:3 187:25 189:3
**listed** 126:9 139:14,25 140:6 185:20 185:24 186:9 187:9 294:23 298:12
**listen** 257:4
**little** 2:14 37:19 111:3 123:3 130:24 167:7 167:12 175:20 226:3 254:24 260:2 277:20 311:10 325:15 325:20,21,25 326:6
**live** 25:19,25
**lived** 25:21 30:8 44:6,7 239:20,23 244:16
**lives** 49:25 237:2
**llc** 1:5,7,8,11,14 1:15,16,17,18 1:18,19,20,21 1:22 2:6,7,8,9 2:10,11,16 4:3 4:5,12,13,14,14 4:15,15,16,16 4:17,17,18 5:14 10:9 12:4 12:6 13:17,25 60:16 139:19 139:21 173:2,6 227:6,8,11 230:4
**llp** 2:14 4:20 5:8,17
**loan** 98:23,24 120:22,25 121:6,8 144:24 145:9,11,21 146:2,4,8 150:22 247:23
**loaned** 53:8
**locate** 141:12
**located** 10:12 46:12 292:18 297:15
**location** 3:4 86:2 126:11 184:12 304:18 304:20 305:4 320:22
**locations** 127:9 128:9
**locked** 80:25 191:5 340:20
**locking** 115:2
**lockout** 81:19 81:21
**login** 137:24 138:4,4 320:10
**logo** 184:7,17 184:19 198:11 198:14,18
**logs** 298:12
**long** 19:15,21 21:5,8 28:22

28:25 30:7 44:19 51:13,16 53:23 54:23,24 55:4 82:18,23 83:5 118:10 149:2,4 155:20 156:6 239:20 255:8 266:16 273:4,6 284:2
**longer** 15:5 87:25 159:13
**look** 36:24 79:19 82:12 118:21 119:5 174:8,11 175:23 178:20 211:9
**looked** 24:18 24:20 140:11 180:15 198:20 324:19
**looking** 16:5 76:9 179:23 180:21 185:5 185:10 327:22 327:25 338:17 339:17 342:19 346:11,12
**looks** 30:19 173:25 174:17 174:18 184:6,6 198:21 228:9 315:23 331:24 336:23,25
**lose** 143:21 158:22 208:25
**lost** 75:7 104:6 126:13,16 313:19
**lot** 28:6 56:17 56:20 77:5 111:13 115:13 116:8,11 167:19,21 213:2,5 242:6 242:9 245:17 252:13,15,17 257:5 282:7 306:4 323:11 324:3,24 328:14,15 329:25
**loud** 15:7
**louis** 3:1 12:19 17:17 33:11 337:6
**low** 123:24 329:21
**lowe** 112:6 141:13
**lower** 12:25 175:20
**lowest** 208:10 208:15,21,23
**loyal** 189:7
**loyalty** 185:3 198:15,19
**lunch** 85:4 172:4,8,17,20 301:15
**luxsport** 223:20,21 224:3,5,7
**lying** 212:23

**m**

**m** 8:20 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1,9 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1

| | | | |
|---|---|---|---|
| 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 | 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 | 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1<br>**madam** 73:9 85:7 126:18 130:19 306:24 308:10 | **made** 9:4 21:23 29:25 35:12 36:14 46:19 49:24 57:2 64:6 68:8 98:2 98:6,8 103:16 110:13 118:22 120:5 124:16 124:25 125:12 135:21 156:18 168:4 179:24 188:12 191:20 206:22 210:12 210:20 213:12 230:7 243:5 301:12,13 318:14,21 319:2<br>**magistrate** 102:21<br>**main** 80:2,2,5 250:20<br>**maintain** 156:10<br>**maintained** 248:17<br>**maintaining** 248:22<br>**major** 241:2 255:24 326:8 326:11,12,13 326:15 330:5 330:10 331:10 331:11,14 |

**majority** 96:5
**make** 15:3 36:23 50:4 54:15 97:15,19 97:23 101:11 108:13,16,17 115:4 118:12 118:18 131:2 155:10 178:9 206:21 207:2 208:17 209:5 210:16 211:8 211:10 214:25 221:14 231:15 232:12 238:9 240:13 252:18 260:4 279:7,11 279:19,25 280:3,5 294:5 295:24 296:2 300:5 301:12 301:16 314:13 324:14 334:15 337:15 338:18 338:18
**makes** 67:9,13
**making** 106:6 120:10 175:2 206:3 217:18 229:21 244:2 280:13,14 318:9,17 339:8
**man** 37:4 204:16 289:15
**managed** 328:2
**management** 1:22 4:18 97:2 97:3 98:10 128:20
**manager** 112:13 131:15 136:12 138:9 140:3 141:15 187:9 207:17 298:25
**managers** 111:17,24 206:6
**manner** 11:4 66:23
**manual** 319:13
**manufactured** 333:22
**marc** 2:3 3:1 7:15 10:7 12:19 17:14 81:16 83:23 269:6,17,21 298:23 309:25 311:14 337:6
**mark** 82:8 85:8 239:12 270:3 296:12 317:22
**marked** 38:8 38:14 46:24 47:2 73:14,16 84:23 102:19 102:23 123:11 132:13,14 136:15,16 139:5,6 141:21 141:22 160:11 160:16 170:13 170:14 183:23 183:24 184:2 190:2 197:24 198:2 201:10 201:25 202:2 215:18 227:19 231:23 234:16 296:14 307:3 318:3 332:24 335:13 336:7
**market** 333:14 333:16,17
**marking** 238:20 332:21
**marx** 57:25 58:14 100:14 100:17,19,20 101:2,9,11,20 101:22,23 104:22 105:3,7 105:12,17,21 105:23 146:23 147:3,15 148:16 149:3 149:16,18 270:18 273:5 274:5,9,13,19 274:24 275:2 277:6
**match** 331:25
**matter** 10:8 76:22 157:7 256:20 276:15 276:24,25 277:8,13,13,24 277:24 310:3 335:8
**matters** 275:24 275:24 277:3,4
**matthew** 216:8
**mean** 33:20 44:21 62:14 66:24 68:6 74:13 75:3,16 76:19 95:18 130:15 150:3 152:3 176:21 199:10,23 209:16 220:19 244:13,14 246:8 281:14 281:18 282:12 284:6 321:22 322:19 323:3,8 324:15 326:19 332:16 341:7 346:12,18,25
**meaning** 45:21
**means** 11:5 122:23 236:19
**mechanic** 117:5 117:7,16,23 118:4 131:18

159:11,13 165:23,25 249:2,8 304:24 305:22
**mechanical** 324:20 330:7,9 332:18
**mechanics** 130:16
**media** 197:22 201:18
**medications** 17:5
**meet** 30:10 65:2,20 93:18 99:12 166:20 239:25
**meeting** 30:14 34:21 35:9 74:23 75:2 91:15,16 93:2 101:17 138:21 149:2 169:19 170:9 272:19
**meetings** 170:5
**member** 1:10 1:13 257:14,18 258:4
**memorandum** 7:18 132:17
**memory** 16:10 24:8 90:5 106:21 109:24 115:7 116:7 165:15 213:9 213:10
**men** 32:24 33:5
**menial** 123:25
**mentioned** 280:16 289:20 290:21
**mercedes** 323:12 325:3
**merchant** 34:25 35:7 36:5,8,16
**merck** 69:4 78:17 140:13 230:8 284:24 285:3,6,9,12,14 285:15 286:5 286:16 287:3,6
**merck17** 26:19 140:14
**merck27** 26:18
**merck2700** 26:17 140:6,15
**merckling** 2:3 3:1 7:11,15 8:3 8:23 10:1,8 11:1 12:1,16 12:19 13:1,11 13:14 14:1 15:1 16:1 17:1 17:14 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 27:15 28:1 29:1 30:1,25 31:1 32:1 33:1 34:1 35:1 36:1 37:1,18 38:1,7 38:9,14 39:1 40:1,18 41:1 42:1 43:1 44:1 45:1 46:1,24 47:1,2,5 48:1 49:1 50:1,13 50:22 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,13,15,16 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1,17 82:1 83:1,23 84:1,18 85:1 86:1 87:1 88:1 88:3 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1,12,19,23 102:25 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,22 120:1 121:1 122:1 123:1,10 123:11,14 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1,13,14 133:1 134:1 135:1 136:1,15 136:16 137:1 138:1 139:1,5 139:6 140:1 141:1,21,22 142:1,2 143:1 143:23 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1,23 153:1 154:1 155:1 156:1 157:1 158:1,13 159:1 160:1,12 160:15,16 161:1 162:1 163:1 164:1

165:1 166:1 167:1 168:1 169:1 170:1,13 170:14 171:1 172:1,16 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1,24 184:1,2,11 185:1 186:1,15 187:1 188:1 189:1,24 190:1 190:2 191:1 192:1 193:1 194:1 195:1 196:1 197:1,17 198:1,2 199:1 200:1 201:1,12 201:13,25 202:1,2 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1,20 212:1 213:1 214:1 215:1,17 215:18 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1,22 225:1 226:1 227:1,18,19,22 228:1 229:1 230:1 231:1,20 231:23 232:1 233:1 234:1,14 234:16 235:1 236:1 237:1 238:1 239:1,6 239:7 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1,16,23 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1,6 269:17,22 270:1,15 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1,16 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1,9,14,18 297:1 298:1,24 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1,25 310:1 310:10,11,13 310:22,22 311:1,6,15 312:1 313:1,14 314:1,10,15 315:1 316:1 317:1 318:1,3 318:8 319:1 320:1,5 321:1 322:1 323:1 324:1 325:1 326:1 327:1,4 328:1 329:1,5 330:1 331:1 332:1,24 333:1 333:11 334:1,7 335:1,5,13,15 335:21 336:1,7 337:1,6 338:1 338:8 339:1 340:1,10 341:1 342:1 343:1 344:1 345:1 346:1 347:1,16 347:19 348:1 349:1

**merckling's** 157:5 158:11

**mercks** 137:22

**mess** 334:16

**message** 23:15 230:14,16,24 231:4,7,18 233:3,21 234:3 234:22 235:2,9 235:19,24 236:3 322:5

**messages** 23:25 24:6 218:19,22

**met** 18:17,25 19:6 31:9,23 53:12 58:7,14 89:13,24 91:11 91:11 92:8,18 93:23 100:8,11 100:14 101:8 168:19 202:23 226:19,23 227:2 234:11 240:3 260:13 289:13 290:15

**method** 39:19

**mets** 95:10

**michael** 2:3 86:2,13,25 87:10 157:18

211:24
**mid** 176:24
**middle** 17:16 31:2 37:22 173:11 175:10 176:18 195:19 199:19 292:25
**mile** 110:15
**mileage** 25:23 209:17
**miles** 25:15,22
**mind** 80:11 149:9
**mine** 148:7 265:21
**minimizing** 79:24
**minor** 325:19 325:19 330:5 330:10 331:10
**minus** 32:3,6
**minute** 50:4 119:14 201:16 253:3 307:18
**minutes** 11:21 21:10,11 50:14 110:17 253:7 333:4
**mirrors** 332:7
**misheard** 113:4
**misremember...** 109:7
**missing** 160:8 331:6,7,16
**mistaken** 242:15
**misunderstood** 71:9
**mitsubishi** 345:25
**mm** 15:13
**mo** 328:6
**model** 328:7
**moderate** 330:11
**moment** 29:7 29:16 85:14 107:15 126:21 152:14,19 214:13 239:15 251:23 260:3 270:5 306:16 312:14 313:18
**monday** 3:2 10:11
**money** 71:12 97:12 98:25 110:6 120:11 120:14 121:2,8 124:12,19,23 125:6,7,20,20 134:4 150:15 204:16 208:25 270:22 271:5 273:19,25 274:10 276:5 276:13 278:19 285:17 286:22 294:8,10 298:16 341:15 341:18,22,24 342:3 343:13
**month** 118:7 153:7,9,11,22 180:9,11,25 181:3
**monthly** 180:8 182:3
**months** 147:21 148:11 181:19 181:20 304:3,9 305:8,13
**moral** 102:10 271:11,12,15 272:25
**morgan** 2:16
**morning** 10:2
**motion** 21:16 131:25 238:6
**motions** 103:7
**motor** 1:7,10 4:13 27:6 60:15 173:2,6 173:9 175:17 302:22,25 303:6 336:3 343:22
**motors** 1:4 2:7 2:9,10,11,12 4:2 8:4 10:9 12:5 13:16,20 124:9 138:19 179:4 183:21 189:7 197:20 198:7,11 335:24 344:5
**mouth** 70:4,8,9 328:16
**move** 54:19 55:13 203:13 203:17,19 216:3 338:2
**moved** 43:17 116:4,6,13,23 224:14,19,23 225:3,13 252:12,15,17
**moving** 47:12 104:5 116:20 223:24
**multiple** 28:15
**mumbling** 15:12
**muted** 308:14

**n**

**n** 4:1 5:1 6:1 7:1 8:20,20 9:1 9:1 168:22 169:10,10 183:6 186:25 186:25
**n.a.** 2:17
**name** 10:2 11:19 13:14 17:16 49:20

53:13 68:25 74:13 77:24,24 78:3 90:3,4,6 111:20,23 112:3,7,10 114:12,13 117:6,9 133:2 135:24 136:6 137:16,19 139:19,22,22 142:23 162:10 168:14 169:23 173:12 175:10 182:15,15,18 182:20 185:12 187:12,14 227:7 228:22 253:24 301:24 302:12,17 309:20 315:23 315:24,25 316:3,14,16,20 316:25 317:3 317:18 335:6 337:22 340:11 346:19,21 347:16
**named** 53:4 94:5 168:21 184:13 187:5
**names** 17:13 49:10 112:4 113:14 194:15 345:2
**nassau** 41:3 42:24 43:20 48:24 49:6,17 53:16 55:12 56:18 57:12,15 57:25 58:19 59:3,9,14 66:6 66:15 73:4 101:12 104:18 113:10,15 191:14 217:7 217:12,24 240:18 242:19 270:17 271:25 296:5,23
**nate** 202:18,21 202:22,25 203:22 204:20 205:16,24 206:15,20 207:2,17 209:25 210:7 210:16 213:16
**nate's** 210:18
**nathan** 168:22 169:3,20
**nationals** 262:12
**nature** 88:14 88:15
**ncpd** 53:20
**near** 86:19 162:22
**necessarily** 222:5 325:11
**necessary** 262:17
**neck** 111:3,3 304:19
**need** 15:13 78:7 130:20 142:10 142:12 153:16 155:19 156:12 189:16 203:6 256:3 264:16 276:15,25 279:24,24 306:25 321:18 326:3
**needed** 15:6 55:16 62:19 76:10 77:9 88:16 130:18 131:4,17 194:9 221:8,11,24 241:10,14 262:3 324:20 325:20,22 332:18 346:7
**needs** 265:7 271:5
**negative** 258:10
**negotiating** 133:13 210:7
**neighbors** 44:11
**neither** 124:11 124:22 350:10 351:6
**nesna** 169:7,10 169:12 186:23 186:25 187:2
**nethanel** 8:9 133:3 169:2 202:5,18
**never** 17:18 32:13,20 38:20 38:22 40:13 44:21 45:7 53:12,25 58:14 63:5 85:22 88:8,10 94:24 124:5,8 127:23 128:8,23 130:5 134:9 138:10 138:12,13,15 138:18,24 139:2 161:20 163:15 168:19 175:10 181:12 188:6,6 192:23 203:25 204:3,5 204:7 205:11 227:9 231:3,6 233:17 234:5 235:5 243:18 247:8,15,24 248:2 266:21 266:24,25 267:3,3 289:6

289:14 290:10 290:15 291:21 300:15 301:10 317:24 333:17 343:23 344:10
**new** 1:2 4:22 5:19 6:9 10:14 10:17 46:6,11 65:9,11 77:17 77:21 86:3 94:22 117:12 244:11,14,16 244:21 245:3,5 245:9,15 246:6 246:14,20 251:9,10,15 296:6 324:24 350:19
**newell** 168:22 169:3,20
**newest** 318:24
**news** 216:19
**newsletter** 8:5 184:5
**nickname** 182:16
**night** 20:25 58:7 81:19,20 104:24 199:12 340:19,20
**nine** 141:19
**nines** 338:19
**nissan** 88:24 89:25 90:16 91:2,3,7 93:21 93:21 169:12 288:16,18 289:22,25 291:8,9 345:19
**non** 173:4,8
**nope** 32:21 247:16
**normal** 95:12 217:11
**normally** 100:5 114:10 118:17 301:14 337:2
**northshore** 1:7 1:10 4:13 27:6 40:5 60:15 62:3,10 63:17 68:20 72:7 76:6 85:25 86:5,8,13,22 87:24 91:8 92:24 93:23 94:10,13,16 95:25 96:6,8 96:12 112:23 113:3 115:17 116:4,13,21 117:2,7,17,23 118:5,13 119:2 125:24 126:11 129:3,4 131:6 142:17,21,25 143:8,11 146:9 147:6 148:18 151:22 152:8 154:5 158:16 159:6,9,13,15 159:20 160:6 161:12,13,19 161:24 162:2 163:13 164:23 165:11,18,23 166:2,3,7,13,18 169:16 173:2,6 173:9 175:4,16 176:15,18 178:18 179:5,8 179:11,15,25 182:9,23 183:2 195:15 196:7 196:13,20 213:8 219:7,15 219:17,20,25 220:10,15,19 220:23 229:23 244:10,20 248:17,23 249:5 250:13 250:16 252:6 252:12 261:2 267:15 280:19 280:23 281:9 282:13 284:10 287:15,22 288:15,22 290:2,5,8 291:2 292:5,25 293:25 294:7 294:11,15 297:2,11,16 298:19 302:20 302:22,25 303:6,16,21 304:21,25 305:3,9,14,19 306:3 320:7,15 322:9 324:6 327:9 336:3 342:23 343:21 344:16,21 345:3,6 347:21
**northshore's** 117:20 145:22 160:2 305:22
**notary** 10:15 350:18
**note** 13:5 154:25 237:18 238:24,25 239:4 310:4
**noted** 278:13 310:18 318:13
**notes** 312:17 342:19
**notification** 285:16
**notified** 310:5
**notwithstandi...** 161:23
**november** 73:20 134:7,10 158:25 219:14

236:4 250:7 303:13,15 315:15 317:15 322:13,13 329:12,13
**novicky** 114:15 114:20
**number** 17:25 19:10,13 41:23 50:21 78:4,12 137:19 167:20 174:10,10,13 174:13,19,19 176:5,6 208:10 208:15 221:21 228:4 229:6 231:21 305:13 306:23 317:22 336:10 338:3,9 338:10,13,13 339:4,6,8,12,12 339:19
**numbers** 179:21 286:14
**numerous** 155:6 207:23
**ny** 3:5 4:7,22 5:10,19
**nyc** 2:5 150:24 151:4,7 227:6 227:8,25

**o**

**o** 8:20,20 9:1,1 112:8 168:17 223:22
**o'clock** 171:25
**o'sullivan** 8:16 142:22,25 296:21,25 297:6 298:9 345:4,14
**o'sullivan's** 297:17
**oath** 14:19
**oaths** 10:16
**object** 156:22 237:16 311:20 345:7
**objecting** 83:20 83:21 311:2,7 312:3,7
**objection** 10:19 12:14 14:15 58:22,22 80:7 81:3 82:24 83:12 125:3,14 189:10,11 207:4 211:6 214:8 217:14 232:15,25 235:11 237:9 237:19,20 248:8 268:19 271:16 272:8 276:6,17 277:9 277:25 278:13 280:6 310:19 312:21 323:5 328:8 340:3 342:24 343:8 346:15
**objections** 211:9,17 311:11
**objective** 80:3 80:5
**obligations** 68:2,5,7
**observation** 213:12
**observations** 246:2
**observe** 143:11 160:7 184:21
**observed** 106:8 246:2
**obtain** 123:7 199:3
**obtained** 145:21 347:21
**obtaining** 243:2
**obviously** 102:8 219:8 247:2
**occasionally** 34:23 292:8 294:12
**occasions** 283:10
**occurred** 16:7 153:22 158:25 207:20
**occurring** 49:23 106:23
**occurs** 237:24
**october** 53:16 74:20 322:13 329:12
**odd** 248:5
**offer** 261:4,8 274:8
**offered** 36:23 39:9 155:4,8 157:9
**offering** 157:2
**offhand** 78:5
**office** 46:14 86:12,16,17 96:7 111:17,21 129:2,23 148:22 155:15 160:2,6 207:17 214:21 216:9 292:21,24 293:2 320:21
**officer** 18:11,14 18:17,25 19:12 19:16 49:19 53:22,24 54:2 55:8 56:6 66:6 76:19,20,25

79:6 104:21 105:2 106:17 121:20 185:12 185:21,23 186:10 257:13 257:17 258:4 264:19 272:3,7 272:15,19,20 275:7,21 276:11 278:5,9 278:17 285:9 350:1,2
**officers** 37:5 55:24 113:14 113:18 121:12 122:4,8 255:23 256:3 275:22
**offices** 292:20 292:25
**oftentimes** 220:2
**oh** 26:10 52:15 69:22 75:7,8 90:2 101:22 102:14 113:2 114:11,12 126:14 133:4 140:13 152:24 153:17 160:14 176:9 186:12 202:18 218:2 221:5 266:7 268:6 295:19 299:11 313:21 330:20 345:16
**okay** 13:5 14:2 14:3,6,7 15:9 15:14,21 19:9 19:15,19,24 22:4,8 23:9,20 25:25 26:6,25 32:7 36:13 37:9,17 38:2 38:16 41:15,21 42:3 43:5 44:10 47:13,16 60:7 65:8 72:18 74:9 75:11,12 79:22 80:17 82:12,16 84:16,22 89:23 99:18 100:8 104:3,12 107:11,20,23 108:4,7 113:5 120:24 122:21 123:21 125:23 126:15 129:9 129:13,20 130:11,24 131:2 133:8 138:20 139:4 139:24 141:5 142:11 143:22 144:22 146:11 146:14,21 148:10 150:17 152:16 153:10 154:11 156:14 156:22 158:5,8 159:12 161:18 163:10 169:22 170:20 171:24 172:5,16 173:23 174:20 175:2,12 176:9 176:17 183:8 190:21 196:19 203:2,3 204:9 207:9,14 210:6 212:16 216:6 216:15,20,25 217:5 221:17 222:20 227:17 230:23 231:20 232:9 234:20 234:24 238:20 239:16 240:13 245:8,25 246:12 251:5,8 252:4 254:18 255:15 256:12 257:12 259:4 259:16,21 260:11,23 261:4 262:2,11 263:12,17 265:15 266:15 266:21 267:5,9 267:13,17,19 268:9,16 269:23 270:20 271:2,14,23 272:24 273:12 274:22 275:20 276:2 277:19 279:3,8 280:16 280:21 281:8 281:12 282:19 283:2 284:9,18 285:2,5,8 286:12 287:2 287:19 288:20 290:3,18,20 291:9 292:11 292:15 293:25 295:19,20,25 295:25 296:11 297:5,14,17,24 298:4,8,20 299:13,13,18 299:21,25 300:5,12,23 302:15,25 303:11,15,24 306:11 307:3 307:12,23 308:17 309:14 309:19 310:25 311:21,23 312:10 313:21 314:13,19,21 318:6,8,13 319:22 321:9 321:22 323:15 323:20,24

325:18 327:7 328:18 329:3,7 331:12,19 332:10 334:6 335:5,17,19 336:5,13,19 337:5,12,25 338:6 340:6 345:13,21 347:4,13 348:12
**old** 31:8 110:19 247:6 324:25
**once** 88:25 89:2 89:3 91:12 153:6,7,11,22 153:25 154:25 180:25 219:10 219:13,22 224:11 241:10
**one's** 180:3
**ones** 28:7,15,16 28:18 63:10 254:3
**online** 315:20
**open** 108:9 278:25
**opened** 109:4 140:18,22 141:3
**opening** 115:19 115:21 200:5 200:10,16,23 200:24
**operate** 86:8 123:2 154:5 161:13,24 162:2
**operated** 86:5 86:22 161:20 229:22 302:17
**operating** 163:12 184:13 185:21,23 219:6,11,13,16 222:3 244:5 248:18 249:11 250:16,22 267:15 287:21 287:22 301:24 302:11 303:2 304:21,21,22 305:10
**operation** 124:12
**operations** 54:8 54:10 94:17 124:19,23 249:5,6,8,13,15 249:24 250:4,8 250:24 251:2 287:15,21
**opinion** 7:16 80:12 102:19 248:15
**opportunity** 47:9 239:12 298:6
**opposed** 256:25
**opposition** 21:16
**optonline** 140:10,19
**optonline.net** 26:18
**optonline.net.** 26:19
**order** 7:16 54:19 59:24 82:4 102:20 103:16,17 126:4 144:24 150:19 162:17 162:18,20 163:8,12,16 206:10,14 228:19 250:22 255:22 256:2 257:20 348:5 348:16,20,24
**orders** 163:3,4
**orelia** 36:5
**orgad** 8:9 133:3 134:11 134:24 135:21 169:2 202:5,9 202:12,14 204:10 210:25 212:2,5,8,19 213:12
**orgad's** 135:25
**organized** 171:23
**original** 296:22 348:5
**outcome** 350:14 351:11
**outright** 104:20
**outside** 24:21 167:23 168:6 244:11,14,16 244:21 245:2,3 245:5,9,15 246:3,6,13,20 251:10,15 267:25 282:16
**overtime** 56:18 56:23,24,25 57:2,5 58:21 58:23 59:8
**ovington** 5:9
**owed** 134:3
**own** 22:11 25:7 36:22 44:15 79:16 129:5 239:9 265:9 278:17 303:17 320:20
**owned** 44:16 44:18 105:10 146:8 276:3 283:23
**owner** 151:13 151:16,18 247:12 252:25

285:4,5
**ownership** 277:22 288:15
**owns** 44:23 252:21

**p**

**p** 4:1,1 5:1,1 6:1,1 168:17 223:22
**p.m.** 144:7,10 154:14,17 155:17 172:10 172:14 253:6 253:10 307:24 308:3 314:3,7 319:23 320:2 333:6,9 334:23 335:2 349:3,5
**page** 7:2,10 8:2 8:21 9:2,11 38:11 47:18 73:22 74:4,14 103:2,18,24,25 104:5 108:6 111:6 113:6 132:19 160:19 173:14 175:7 176:13 179:3 179:13,23 182:7 183:5 184:25 185:5 185:10 186:8 187:8,8,17 203:5,10 212:13 215:20 228:2 229:4 297:19 315:13 315:14
**pages** 107:25 315:11
**paid** 22:14,19 40:13 41:18,19 41:22 42:10,13 67:2 68:12,14 68:24,24 98:12 124:8 177:11 177:16 178:4,8 180:8,13,25 181:2,4,9,10,14 203:23 204:10 204:12,21 207:18 208:24 213:16 214:6 214:23,24 215:4 228:11 285:15,17 286:4,16,22 341:15,18
**pal** 31:7,18,20
**panel** 331:25
**papers** 289:23
**paperwork** 62:2 89:11,22 89:25 90:9,11 90:12 161:17
**paragraph** 75:5,9 79:20 80:13 82:12 103:24 108:2 123:18 143:18 150:10 161:3 190:11 203:5 203:11 205:7 205:15 206:23 207:16,22 210:3,24 211:21 212:12 212:19 213:12 232:7 297:20 297:22 298:2,3 298:9
**paragraphs** 142:9 203:15 207:11
**paralegal** 6:6
**parameters** 133:19,24 208:15
**park** 3:5 10:14 25:5,12,13 26:2
**parking** 242:6 242:9
**parmeshwar** 182:9,11 229:7
**part** 25:16,17 31:2 36:24 67:22 75:13 97:14 149:14 150:17 164:21 216:14 217:3 225:8 238:21 255:15,21 262:13 269:11 273:13 294:18 311:16 312:2 323:13,14 331:18 342:13
**participate** 16:25
**participated** 346:3
**particular** 83:16 176:23 176:23 221:7 275:23 288:25 303:2 306:5
**particulars** 288:19
**parties** 10:17 10:21 275:23 289:9 350:11 350:13 351:7 351:10
**partners** 2:13 276:3,12
**parts** 166:8,10
**party** 45:9 56:11 83:17 278:17,20
**passed** 94:4
**password** 138:4
**past** 17:5 67:21

**patrol** 55:9 59:15,17,18 79:12
**patrols** 55:11
**pause** 260:3
**pay** 22:10 42:3 178:17 181:10 181:18,22 254:21
**paying** 48:7,10 229:15 248:19 248:24 327:16
**payment** 39:19 40:2,8 67:9,13 179:19 210:12 228:7,20 230:7
**payments** 8:22 9:3,4 40:17 68:8 69:12 97:5,9,12,16 108:18 118:24 134:16,20,23 135:20,21 151:7 182:3,3 229:21 244:2 285:12
**payroll** 40:3,11
**pd** 42:24
**peace** 80:11
**penalty** 14:19 21:24
**pending** 16:17 32:17 157:23
**pension** 66:16 66:19 254:22
**people** 49:9 97:10,19,21,22 98:10,11 99:18 106:13 111:13 111:18 167:17 167:20,24 189:3,15 197:3 225:16,23 244:15 245:3 246:3,5 251:9 256:13 257:2,4 259:7 260:19 261:5,9 262:5 262:8,12 263:5 263:9,14 264:5 265:24 268:7 273:18 278:5 288:10 293:19 301:3 303:8
**percent** 147:7 182:12 316:13 336:24
**percentage** 328:18
**perfect** 325:16
**perform** 79:25 131:21
**performance** 52:20
**performed** 73:2 131:20 177:12 284:23 341:12
**performing** 218:7 228:18
**period** 57:18 68:13 71:25 85:23 118:3 181:17 255:4 284:6 285:18 303:21,25 304:2
**perjury** 14:20 21:24 132:4
**permission** 284:17
**permit** 199:3
**permitted** 10:25 198:23
**person** 61:6 74:25 97:6 127:14 155:15 156:3,5,11,12 156:20 162:22 162:23 169:5 182:17 222:24 225:12,19,20 279:15
**personal** 26:12 26:16 68:25 78:2 140:14 173:4,8 261:22 262:3 282:9 284:4
**personally** 121:5 146:9 235:20 327:13
**phone** 21:13 35:24,24 36:15 50:21 106:4,9 107:9 137:19 148:7 170:23 174:9,12,18 217:19 218:20 218:21 223:6 265:20 306:23 313:24 338:9 338:12 339:6 339:11
**photographs** 8:18
**phrase** 199:5
**physical** 54:21 55:2 126:10 295:7 322:21
**physically** 87:8 116:20,22 148:15 156:19 158:4 160:5 184:22 297:10 297:15 346:12
**pick** 65:19,24 89:10,22,25 91:24 218:13
**picked** 90:6 322:25
**picking** 218:10
**pizza** 110:20
**place** 35:6 46:23 115:24 154:22 155:9

221:16 345:14 346:4
**placed** 136:18
**places** 219:10 219:22
**placing** 38:7 73:13 107:23 132:12 141:20 172:23
**plaintiff** 6:4 11:11 45:11
**plaintiff's** 7:21 142:2
**plaintiffs** 1:23 4:2,11 11:14 11:17 12:4 13:16 132:2,7 132:8 135:18 154:20,21,25 156:22 164:8 253:14 254:2 309:22 311:18 341:25 342:7
**plan** 86:21 123:5 128:2 138:22 141:17 226:15 346:24 347:3,5
**planning** 69:14 154:4
**plates** 246:6,9 280:24 281:10 281:17,24 282:2,6,8
283:10,12,13 283:16
**play** 347:19
**played** 31:6 112:21 145:25
**playing** 260:15
**pleasantries** 289:17
**please** 11:9,12 12:16 13:2 15:11 29:13,15 31:5 38:12 47:9 50:3,11 52:14 75:6 78:13 79:21 80:13 82:13 84:3 85:8 88:4 98:4 107:6 108:2 111:8 113:6 119:20 126:22 132:23 144:10 152:13 152:19 153:4 154:17 156:24 158:5 161:3 172:14 175:25 205:7 207:12 210:4 211:8 212:14 214:12 214:13 215:22 215:25 217:3 232:7 234:18 239:3,15 251:22 253:10
260:3 261:14 270:3 308:3,7 312:12,15 314:7 319:21 320:2 332:22 333:9 334:21 335:2 348:17
**pocket** 22:11
**podium** 129:15 129:18,22
**point** 11:23 23:11 39:25 194:2 195:16 257:25 258:3 259:6 267:20 303:5 304:16 307:5 321:23
**pointed** 205:16
**pointing** 38:11
**police** 18:11,14 18:17,25 19:11 19:16 37:5 41:4,13 43:2 43:21 48:24 49:6,17,19 53:16,22,23 54:2,4 55:8,24 56:5,18 57:12 57:15,25 58:19 59:3,9,14 66:6 66:6,15 73:4 76:18,20,25 79:5,9 99:6,7 99:13 101:13
102:7 104:18 106:16 113:11 113:15 114:5,6 114:24 115:3 120:3,11 121:10,20 122:7 163:9 190:18 191:8 191:15 217:13 217:17,24 231:11 240:18 242:19 254:14 254:15 255:23 256:3 257:13 257:17 261:20 261:21 264:19 266:8 271:6,25 272:3,7,15,19 272:20 273:13 275:6,7,21,22 276:10,14,22 278:4,9,16,22
**pool** 228:23 229:2
**pop** 11:23 321:17
**popping** 321:3
**porter** 131:5
**porters** 130:16
**portion** 111:7 113:6 123:19
**position** 54:13 60:24 84:19 238:12 258:14

**possession** 86:20 194:19 223:4 291:22
**possibility** 272:3,4
**possible** 157:12 177:25 181:21 219:9 256:4 257:19 271:24 274:14 307:17 317:10 337:23 339:14,16 340:2,5
**post** 8:8 198:7 198:10
**potential** 85:9
**pramod** 48:13 226:19,23
**pre** 109:20
**precinct** 147:4 147:15 148:12
**premier** 2:12
**premises** 63:4 86:25 87:9,17
**preparation** 20:14 116:2
**prepare** 18:18 19:2,7 20:7
**prepared** 59:23 155:14,23 158:13 258:22 351:3
**preparing** 77:3
**prepping** 76:14 77:13
**present** 6:2 34:15 38:4 48:12 95:14 113:22 114:9 114:10,19 115:8,11 139:4 147:10 148:15 153:14 160:10 165:2 167:2,17 170:8 192:5,7 192:10,11 193:23 194:4,8 194:10 195:22 196:19 222:22 225:12,20 309:13
**presenting** 102:18 136:14 170:12 176:12 201:24 215:16
**preserve** 81:12 82:4
**pressuring** 104:18
**presumably** 18:3
**pretty** 131:20 212:25 253:3 265:10 315:4 321:23 322:22 323:3 324:9,10 335:10 342:15 342:15
**previously** 35:15 108:17 112:22 120:10 136:7 198:20 271:9 303:4 305:18 314:24 321:9 335:12 336:14 337:8
**price** 207:24 329:21
**prices** 208:17
**primarily** 127:14 133:13 133:16 143:4,7 165:17 250:12
**primary** 77:3 250:17 251:6
**print** 206:7
**printed** 206:5
**prior** 18:2,9,16 18:24 20:17 22:8 55:6 56:16 58:13 59:19 105:21 108:15 113:19 114:5,6 115:16 116:19,24 117:19 190:5 210:20 223:13 223:15 249:10 302:15 305:8 305:13 350:4
**prioritize** 64:14
**private** 69:22 70:3,6,12 71:3 71:6,14,18,20 73:2 77:16,18 77:22 233:25 234:6 242:20 269:2,5,20 311:13 341:13
**privilege** 81:13 82:5 310:20 312:8
**privileged** 81:4 81:15 83:8,14 83:18,25 84:10 84:15,19 237:15,22 268:20,21 269:7,18 270:8 270:10 311:16
**privy** 105:20 150:2
**pro** 5:3 12:9 310:15,15
**probably** 19:14 19:23 29:3 92:2 129:18 152:5 181:24 218:12 260:25
**problem** 223:7 344:25
**problems** 115:5
**procedural** 11:2

**proceed** 85:13 155:23 156:20 157:5 158:10 158:14 295:18 307:10
**proceeding** 3:4 10:5,24 156:23 309:9 349:6 351:4
**proceedings** 32:17 350:3,4 350:5,8 351:5
**produced** 10:23
**product** 270:9 312:9
**production** 40:17 60:8 135:19 194:24 218:25 227:22
**programs** 130:9
**prohibiting** 163:12
**promotion** 54:4
**prompted** 54:15
**proof** 245:12
**proper** 238:19
**properly** 178:4
**property** 25:7 44:15 45:3 48:7
**prosecution** 45:4 48:20
**prosecutor** 18:18 19:2,6
**protect** 36:25 55:23 64:8,9 233:19 240:10 240:12 255:23 256:2 261:12 266:4,11,13 269:12 321:18
**protecting** 264:25
**protection** 36:22 37:3 261:23 262:4 262:18 265:8 269:13,14
**protective** 261:16
**protocol** 99:23 106:2
**prove** 109:6 237:21
**provide** 17:2,10 37:2 38:18 68:17,21 76:16 261:15,22 262:17 272:25 284:19 317:3,7
**provided** 96:11 120:15 280:23 315:9
**providing** 40:23 271:15
**public** 350:18
**puccio** 168:15 168:17
**pull** 73:7 313:3 314:11
**pulled** 317:11
**pulling** 227:4
**purchase** 245:15 246:13 323:17 328:2
**purchased** 63:17,18 228:24 244:20 244:23 246:19 280:18 292:7 323:16,25 324:7
**purchasing** 246:17 333:21 334:2
**purpose** 69:11 127:8 201:5 250:20,25 251:3 283:15 323:20 341:22
**purposes** 36:10 64:4 157:25 283:24 284:4
**pursuant** 227:23
**put** 37:9 40:2 138:11,14,18 178:21 221:21 294:16 298:16 299:4 300:4 316:4 324:13 328:16 345:14
**putting** 238:5

**q**

**qualifications** 83:17 84:7
**qualified** 278:2 350:7
**quan** 142:23 345:5,17
**question** 15:17 15:24 16:2,17 16:18 18:21 21:18 24:12 27:24 29:15,23 35:4,11 37:12 37:22 60:25 61:18 64:16 71:8 81:6 82:3 83:3 84:4 85:19 89:23 98:7 104:25 106:19 107:9 107:21 110:8 113:4 118:15 125:17 126:14 126:20 147:22 147:25 148:3 152:19 174:21 214:6,11

222:21 225:18 232:18 234:5 237:17 244:25 245:14 249:14 250:2,6,14 251:20 260:5 266:2 271:20 272:11 274:6 275:5,8,15 276:8 278:12 278:14,25 281:21 283:7,8 299:6 311:7 313:15 319:10 327:24 334:10 344:24 347:13
**question's** 107:7
**questioning** 85:8 239:13 307:2 309:2
**questions** 9:10 14:9 17:2,11 81:8 84:12 88:13 105:9 122:5 151:21 193:17,17,20 193:22 203:19 228:14 238:17 253:15,19 254:5,10,12 266:22 269:20 310:18,23 311:8 312:12 314:25 334:7 335:9 340:7,12 347:11 348:2
**quickly** 335:10
**quiet** 312:16
**quite** 111:18 143:8 167:19 283:14,16 323:11
**quote** 291:23
**quoting** 36:17

**r**

**r** 4:1 5:1,3 6:1 8:20,20 9:1,1 223:22
**raise** 12:16
**raised** 34:14
**ran** 322:24 323:2
**rather** 256:24 258:5,17 279:6 279:15
**ratio** 70:25 71:5,16
**reach** 85:5 256:14
**reaching** 217:6
**read** 24:24 29:15 35:12,17 35:21 38:12,16 47:10 75:5,8 78:15 79:20 80:14,15 82:13 85:9 103:23 108:2 111:8 113:6 123:18 126:19 132:20 142:4,8 143:17 146:12 152:12 152:18 161:3 190:12 203:4 203:10 205:7,7 207:12 210:4 212:13,14 214:12,14 215:23 216:24 217:4 232:7,10 234:18 238:22 239:13 251:22 297:21,24 298:6,14 299:10,12 306:25 309:10 312:12,20 313:4 319:13
**readback** 152:23
**reading** 38:5 47:15 103:9 146:17 150:10 161:9 207:7 212:17 232:13 235:4
**ready** 78:10 85:12,12 103:25 142:13 144:13 305:21 324:2
**real** 25:7 36:18 68:16 264:15 271:18 289:14
**really** 19:13 34:4 39:18 56:12 62:7,17 71:24 74:12 91:5 95:12 112:14 114:25 118:20 123:3 127:23 130:8 134:9 136:8 140:16 142:24 148:22 152:6 160:25 177:25 178:20 184:19 186:19 187:23 188:5 197:13 197:22 217:9 231:4 233:5 242:16 243:17 246:16 256:6 256:16,20 257:5,8,18 264:12 275:24 288:7 291:18 294:9,18 302:6 304:5 315:3 316:24 318:25 320:18 321:16 321:24 331:11 339:5 345:20 345:25

**realty** 1:20 4:16
**reason** 16:16 16:24 17:9 47:23 48:5 52:9 57:7,19 57:21 89:15 140:9 166:16 179:21 187:21 206:20,25 254:18 263:25 264:6 272:6 273:23 282:5 283:18 318:20 342:20
**reasoning** 264:2
**reasons** 153:14 282:9,10
**recall** 21:15,25 22:3 25:18 28:19,21 34:24 35:5 39:22 44:10 48:17 49:16 50:2 51:15,21 57:2 60:4 62:4 74:23 87:14 89:6 95:2 99:22 100:23 103:3,9 112:15 113:9 114:4 115:23 118:23 120:20,24 122:9 133:8 136:6 138:3 141:5 148:10 148:13 149:19 151:6 162:10 169:19 170:2 175:2,5 177:9 177:20 178:12 179:10 181:21 183:19 184:25 187:6,18 197:9 202:20 207:15 207:19,23 209:6,24 210:7 210:11,15 215:9,15 217:6 217:9 220:18 234:25 240:5 259:11 268:12 277:5 287:25 288:4 304:6 305:13,16 316:18 318:17 318:19 321:4 322:12 329:15 329:18,24 330:13,17 337:21 338:23 339:10,23 341:22 343:23 344:14,19,25
**recap** 311:2
**receipt** 205:16 205:17 206:4 206:11,15,18 206:19 213:17 213:21,25 214:5,25 294:25 295:3,6 295:8,12,12
**receipts** 135:16 204:21,24 205:5 206:7 213:19 294:14 294:24
**receive** 11:18 66:16 71:12 182:4 193:2 204:21 207:18 214:4 218:8 228:20 285:15
**received** 24:9 40:8 71:2 135:9 146:8 172:24 176:17 176:22 178:24 179:15 193:5 210:21
**receiving** 60:5 66:19 69:11 151:6 302:19
**recently** 140:19 238:7
**recognize** 74:17 173:15 316:11 329:9
**recollection** 16:6,12 53:10 60:19 136:5 161:10 165:16 169:8 185:7,13 186:18,22 213:13
**reconcile** 41:16
**record** 10:4,5 10:20 11:10 13:5 15:14 29:6,9,10,12,18 37:11,23 47:17 50:6,8,10 74:8 83:11 104:4 107:15 119:17 119:18,20 126:24 144:6,8 144:10 146:15 148:2 152:21 154:12,13,15 154:17,23,23 158:10 172:10 172:11,14 184:8 203:9,14 207:10 212:11 214:16 239:2,5 251:25 253:6,8 253:10,13 270:7 306:16 306:19,21 307:5,16,23,25 308:3 309:16 309:18 312:19 313:6,12 314:2 314:3,5,7 319:20,23,24

320:2 333:3,5 333:7,9 334:20 334:22,24 335:2,14 336:6 338:4 349:3 350:9 351:5
**recorded** 11:4 294:14 350:6
**recording** 10:23 350:8 351:3
**records** 135:8 161:11
**recourse** 190:24 191:8
**recover** 217:7
**recovered** 215:11,13
**redacted** 176:7
**redirect** 30:23
**reduced** 336:14 350:6
**refer** 123:17 132:7
**reference** 77:7 190:15,17 200:4 210:18 211:21 236:9
**referred** 95:22
**referring** 13:20 13:24 14:4 72:7 80:13 107:24 112:5 113:5 114:14 132:6 180:14 187:17 191:4 205:13 207:22 229:4 230:24 249:9 279:2 298:11 346:18
**refers** 163:8
**reflect** 47:17 74:8 104:4 146:15 203:9 203:14 207:10 212:11 335:14 336:6 338:4
**refresh** 53:9 136:4 169:7 185:12 186:17 186:21
**refused** 193:19
**regal** 184:14,16 184:17,22 226:7,10 244:6 302:7
**regard** 83:11 238:18 255:17 272:20 288:21
**regardless** 41:22 42:4 134:5
**regular** 114:8
**related** 14:12 44:2 60:10 70:13 72:23 96:17,22 172:25 346:24 350:10 351:7
**relates** 139:22 180:7
**relating** 130:4
**relation** 58:9 86:17 110:24 120:4 129:15 130:11 149:23 163:20 165:11 207:15 208:9
**relationship** 63:15 91:6 274:22 275:11 290:7
**relative** 350:12 351:9
**relevance** 95:18
**rely** 73:3
**remaining** 154:20 322:14
**remember** 13:15 17:24 19:22 23:16,19 26:22 27:7 28:16,17 30:13 30:15 34:11,17 34:19 36:11 39:12,14,18 44:5 49:10 57:6 62:5,7 64:22 67:7,24 68:23 71:24 72:12,15 74:10 74:12 75:2 76:4 87:18 88:11 89:13,20 89:24 90:14 91:23 92:22 93:2,3 94:18 94:20 98:9,17 100:21 101:18 103:11 106:22 108:24 110:4 110:22 111:4 111:22 112:4,9 112:10,11,20 112:22 114:8 114:11,12,17 116:11,18 117:8,25 118:9 121:17,21,25 122:6,11,14 126:25 130:7 133:10 134:13 136:24 138:6 147:12,17,18 147:20 148:14 148:19,21,23 148:25 149:6,8 149:20,21 150:4,6,9 152:4,6 153:12 153:24 162:4 166:15 167:8 167:13,14 173:19 177:21 178:19 179:12

179:20 180:12 181:25 183:3 185:8,15,16 186:6,19 187:23 188:11 188:15,21 189:23 192:13 193:4 194:12 194:14,18 196:25 197:4 197:12,13 205:22 206:3 207:21,25 209:23 210:14 212:24 222:13 222:18 224:9 224:11 226:5 228:22 230:5 230:12 231:9 231:17 233:5 233:22 235:3,7 240:4 242:16 242:21,22 243:17 246:11 255:11 264:2 273:6 274:17 274:18 303:23 304:9 321:19 322:17,23 329:14 332:4 339:5,13 340:12

**remembering** 72:16

**reminding** 120:19

**remote** 3:4 310:8

**remotely** 10:18

**renewal** 61:25

**renewed** 61:22 61:23

**rent** 44:15 48:7 48:10

**renting** 44:20

**rents** 44:23

**reopened** 154:5

**repaid** 247:24

**repair** 325:21 326:8 327:8

**repaired** 243:22 327:5

**repairs** 131:7 327:12

**repeat** 18:20 29:24 31:4 35:18 36:4 43:9 52:13 54:9 59:5 67:11 77:20 84:3 88:4 89:16,17 92:4 92:12 98:3 101:21 120:7 122:21 126:14 130:20 133:22 150:25 152:11 164:9 198:17 208:12 214:10 223:5 226:21 227:7 254:9 256:18 276:8 283:5,7 308:7 344:17

**repeated** 29:17 126:23 152:20 214:15 251:24 312:18 313:5 313:11

**repeatedly** 105:8 210:15

**rephrase** 15:24 27:24 65:13 71:8 225:17 257:15 258:16

**replace** 156:6 326:19,23,25

**replaced** 326:11

**replacing** 326:14

**report** 58:8 99:24 100:6 102:2,4 120:4 120:11 231:11 243:2 271:7 273:14

**reported** 3:6 62:12,15 99:25

**reporter** 10:2,3 12:2,7,13,24 15:8,19 18:20 29:5,11,16,17 30:19 35:18 37:15,21 38:2 50:6,9 73:9,11 85:7,10,14 88:3 102:12 107:6,14 119:16,19 126:18,21,23 130:19,21 141:19 143:22 144:2,9 152:14 152:18,20,22 154:13,16 160:12 172:9 172:12 173:17 173:20,23 198:4 201:15 201:21 214:13 214:15 224:21 238:24 239:3 239:12,15 251:16,23,24 253:5,9 260:9 270:3,5,11 296:13 306:15 306:25 307:4 307:23 308:2,6 308:10,12 309:3,11,17 312:14,18,20 313:2,5,7,11,17 313:25 314:6 317:25 319:19

319:22,25 332:20 333:5,8 334:14,19,22 334:25 348:3 348:12,18,22 349:2
**reports** 100:4
**represent** 21:22 32:2,5 36:13 47:4 73:18 83:17 84:7 103:5,19 108:25 123:13 132:9,16,21 139:8,20 141:25 155:3 160:20 170:16 184:8 190:16 190:19 198:6 202:4,24 227:21 234:21 238:9 247:21 296:19 309:22 310:21 315:8 329:8 335:7 347:17
**representation** 103:8 239:8
**representatives** 127:25
**represented** 310:2,12
**representing** 11:17 22:6 73:24 195:18 310:14
**represents** 11:20 254:2,3
**request** 8:24 50:3 60:9 84:23
**requested** 29:18 126:24 152:21 214:16 251:25 312:19 313:6,12
**requesting** 157:14
**required** 54:18 328:20
**requiring** 326:7
**resale** 324:2,11
**resell** 323:21
**reshare** 104:9
**reside** 30:7
**residence** 10:13 49:24
**resolved** 45:23
**respect** 49:23
**responded** 240:19
**responding** 216:22
**response** 144:5
**responsibilities** 55:7,14
**responsibility** 54:6 55:18,20
**responsible** 127:15,15 131:12 133:13 142:19 166:7 224:13 242:25
**rest** 37:3 312:4
**restaurant** 34:20 110:19
**restraining** 162:17,18,20 163:3,8,11,16
**result** 45:19,21 58:18 59:7 105:5
**retail** 327:17
**retainer** 23:6
**retire** 56:9
**retired** 18:8 61:9,12 64:18 65:6,14,15 66:14 69:16 76:18 79:7 101:15,16 121:20 177:3,6 254:19,23 255:9 272:2,7 272:15,18 278:9
**retirement** 18:9 56:11,13
**retiring** 69:14
**return** 106:4 196:18
**returned** 196:7 196:13,21,24 303:6,7 322:15 329:10
**returning** 195:25
**revenue** 71:2
**review** 20:13 138:22
**reviewed** 24:24
**reviewing** 234:25
**rica** 237:5 239:20,24
**ride** 271:7
**ridiculous** 125:5
**right** 12:17 18:8 25:22 26:23 45:17 63:8 76:11 78:9 82:19 85:3,15 86:6 109:15 110:17 127:10 128:7 129:11,17,24 130:22 137:4 138:25 140:7 145:13 158:9 161:5 164:2 170:11,12 173:7 175:16

180:10,15,16 180:17,22 182:18,20 199:5,13,16 202:10,13 203:13 208:19 211:2,16 213:13,22,23 216:4 217:25 218:22 228:5 237:23 242:11 243:19,23 245:10 246:3,7 248:3 249:18 249:22 250:18 250:21 252:8 258:20 259:10 259:25 260:12 266:22 267:23 269:13 276:21 277:5 278:18 279:13 289:18 293:3 294:4 296:3 298:5 299:13 301:3,7 314:10,14 324:18,21 328:22 329:16 331:9 346:23 348:3 349:2

**ring** 169:23

**road** 46:6,11 111:2,3 224:10

**rob** 169:24 263:24

**robert** 1:5 4:3 6:4 12:4 13:17 14:5 168:14,16

**role** 46:16 53:20 97:5 112:11,20 137:12 145:25 226:7,10 347:20

**ron** 169:22,25 170:2 186:8,18

**ronneburger** 5:6 7:5 12:11 12:11 335:4,6 335:11,17,20 336:5,12 337:25 338:6,7 340:6 348:15 348:17

**room** 29:8 95:19 148:16 273:5,8 309:4

**roslyn** 2:10

**rotate** 170:21 170:23

**rotating** 43:6

**roundabout** 19:10 71:5

**route** 1:21 4:17

**ruderman** 4:19 7:4 11:14,16 14:15 37:11,17 83:10 84:2,16 84:22 85:6 157:14 237:14 238:25 239:4 253:11,18,22 253:24 268:21 268:24,25 269:4,8,23 270:12,13,14 271:19 272:10 276:9,20 277:14 278:4 278:11,15 279:10 280:11 281:22 283:4 295:14,19 296:8,11,16,17 306:8,11,14,18 307:7,12,19 308:14,17 309:7,15,19,21 311:5,23 312:11 313:13 313:21 314:8,9 317:21 318:5,7 319:2,7,12,16 319:21 320:3,4 323:10 328:12 332:22 333:2 333:10 334:6 334:21 348:4,7 348:10,13

**rule** 211:9,10

**rules** 11:3 15:3 16:22

**ruling** 82:8 84:23 238:21

**s**

**s** 4:1 5:1,15 6:1 7:9 8:1,20 9:1 169:10,25 184:14 186:25 223:22

**safe** 111:11,15 111:19,24 112:19,19 265:10 292:14 292:15,18,23 293:5,6 294:6 298:17 299:4 299:23

**safely** 301:12

**safes** 293:14

**sage** 4:5 6:6 12:3

**sagelegal.nyc** 4:8

**salary** 22:23 39:15 42:2,10

**sale** 133:14 250:23 306:5

**sales** 1:5 4:3 10:9 12:6 13:17,25 46:15 51:3 168:3,5 187:9 226:9,12

245:24
**salespeople** 86:19 131:14 236:12
**salesperson** 182:13,24 250:19
**sanctions** 238:6
**sarah** 1:25 10:10 155:23 157:10
**saw** 147:11 180:16,19 198:14,18 231:3 243:18 246:5 299:11 321:6 338:2
**saying** 41:21 46:12 84:10 116:12 145:7 174:22 189:9 200:21 205:10 205:19,22,23 205:23,24 206:2,3 212:23 213:14,24 214:4 221:17 232:19 256:8 258:10 271:23 291:5,13 299:14 312:6 316:6 346:13
**says** 74:6 100:16 137:6,9 137:12,14,18 173:8 174:6,23 175:13,24 176:20 185:25 190:23,25 198:22,25 199:14,20 212:20 218:3 229:9 232:11 236:5 278:20 298:22 314:21 315:15 337:5
**scar** 329:19
**scene** 240:10,16 240:19 259:18
**schedule** 42:23 43:19 56:3,7 64:20 66:2 294:20,23
**scheduled** 155:13
**scheduling** 154:24 155:18 157:4
**screen** 37:10 38:8 46:24 73:14 74:2 107:18,24 132:12 136:18 136:21 141:20 172:23 186:12 203:16 295:23 295:23 314:12 314:16 329:3
**screenshot** 8:14 136:19 139:9 140:2
**screenshots** 7:19
**scroll** 47:10,14 80:16 104:2 137:15 142:10 142:13 144:14 144:17,18 145:19 203:11 207:8 315:6 336:9
**scrolled** 47:18 74:8 146:11,16 175:7 205:6 212:12
**scrolling** 73:21 74:14 108:5 111:6 216:13 217:2
**se** 5:3 12:10 310:15,16
**seat** 330:21
**seats** 330:24 331:2,13
**sec** 78:15 170:11
**second** 15:11 38:5 49:21 73:7 78:11 137:18 154:11 154:12 155:4 170:4 172:7 180:18 185:5 216:25 218:5 256:18 295:20 295:22 297:19 298:22 312:22 313:3,8 319:4 334:12,18
**secret** 28:16
**section** 132:19 200:4
**security** 33:25 38:19 39:10 40:23 46:17 62:18,21,24 63:3 64:2,4,6 71:12 76:17 80:3,5,12 96:14 124:2 167:6 174:10 174:13,19 185:11 264:16 300:24 301:10 338:3,10,13 339:4,8,12,19
**see** 23:8 42:17 43:19 52:16 73:22 74:5,6 75:14,23 77:8 87:23 91:20 92:9 93:7,22 104:10 107:16 137:25 170:21 170:24 173:3 179:5 182:8,10

183:7,8 186:15 187:10 194:13 198:8,9 199:6 199:8,20 200:6 200:7 211:3,20 216:18,19 228:4,6 292:2 294:19 295:16 295:25 296:2,3 296:9 297:22 298:14 299:2,6 299:9,15 314:13,15,19 314:21 315:14 315:22,23,25 316:2 329:3,5 329:16 331:5,8 331:9 336:10 337:5
**seeing** 95:2 103:10,12 113:19 149:6 177:22 218:6 316:18 321:4 329:15 330:13 330:17
**seen** 23:2,6 94:24 103:4 136:21 180:6 200:2 202:6 289:25 317:24 332:10
**selected** 38:12
**selections** 309:9
**sell** 123:8 133:20,25 208:11,14,16 208:21,23 250:21 251:2,7 343:5
**selling** 207:23 208:9 246:17 250:18 305:14 325:2
**send** 150:19 306:23 307:14 307:21
**sent** 24:10 230:24 236:3 325:23
**sentence** 190:11 298:22
**separate** 228:19
**separately** 79:2
**september** 35:2 35:7,7 36:16 51:12 123:15 195:20
**serious** 240:22 240:25
**seriously** 262:21 263:4
**service** 28:17 51:4 76:14 77:6,12 117:4 224:10 241:13 261:16 305:23
**serviced** 166:6
**services** 52:20 70:13 71:13,15 73:3 76:17 96:11 177:11 264:17 284:23 341:13
**servicing** 131:4
**serving** 226:14
**set** 69:13 140:15 141:2,3 141:5 307:6
**setting** 201:8 204:9
**settled** 46:3
**settlement** 195:23 196:4 196:11
**seventeen** 30:12
**several** 305:8
**shanks** 4:20 11:17 253:25 309:21
**shape** 322:23 324:10,11
**share** 227:17 232:22 295:23 314:12 329:3 335:12
**shareholder** 285:2
**sharing** 104:8 107:18 295:24 335:15 336:6,7
**she'll** 307:9,15 308:18
**shield** 61:10,11 61:12
**shop** 165:23 166:2 304:24 305:23 324:13 325:23 326:4 327:4,5,9
**short** 85:23
**shortly** 162:7 196:4,11
**shot** 209:21
**show** 102:11 115:22,23 116:3 123:9 127:25 128:8 128:16 158:4 166:23,24 167:25 168:6 198:23 199:3 199:13,16,18 201:4,6,18 252:6 305:3,8 328:25
**showed** 231:6 235:5 321:7 331:24
**showing** 74:3 128:11 160:19 167:25 179:3

183:5,23 189:24 197:23 201:10,20 210:3 234:13 329:4 330:21
**shown** 302:20
**showroom** 306:4
**shut** 94:16
**shy** 19:17
**sick** 57:20,23
**side** 129:8
**sides** 279:21,25
**sign** 130:8 151:10 188:17 189:21,23
**signature** 74:17 75:4 173:4,8 187:19 315:11 316:8,9,11 337:11,24 349:4 350:16 351:13
**signed** 23:6 73:25 189:18 296:20 315:19 315:19
**significant** 298:10
**signing** 183:19 187:18,22 189:8
**similar** 49:22 329:25 330:18
**similarly** 244:19
**simonetti** 216:23
**single** 40:8 84:15 109:2
**sit** 246:23 317:17 328:22
**situation** 55:25 64:17 256:15 258:23,25 266:18
**situations** 28:9 42:7
**six** 25:21 223:2 223:8 304:2 324:25 333:13
**sixes** 338:18
**sixtieth** 255:2
**skills** 350:9 351:6
**skip** 218:6
**slap** 36:19
**slip** 109:17,21 170:24 171:21 173:16 174:4 336:21
**slips** 7:24 109:20 170:17 170:19 171:10 171:17,19 336:15
**small** 289:16 314:12
**smithtown** 2:11
**soccer** 260:15
**social** 174:10 174:13,19 197:22 201:18 338:3,9,13 339:4,8,12,19
**sold** 133:15 134:11,17 135:17 159:19 205:2 206:9 209:20 244:10 244:13,15 245:2,6 250:12 305:19,21,24 323:12 324:15 332:19 334:3
**sole** 69:11 285:4
**solely** 18:13 64:8 66:10 70:4,7 75:19 75:21
**solid** 37:20
**somebody** 98:25 102:9 106:9 109:16 163:6 195:17 265:4,20 266:18 272:21 275:8 321:12 338:23 339:23
**somebody's** 265:20
**someplace** 237:12 241:21 318:24
**something's** 88:16
**son** 26:5 30:17 30:17 31:3,4,6 31:6,7,18,18 240:6,10,12,13 241:16
**sons** 260:14
**soon** 147:14
**sorry** 21:7 23:18 24:20 26:14 29:5 32:4 34:10 35:3,20 38:9 39:23 41:8 43:10 46:9 47:12,18 52:15 54:9 63:12 67:10 68:3 69:19 75:8 77:20 84:24 88:9 89:16 92:11 94:12 96:19 100:15 101:21,23 102:13,14 104:6 107:8,12 112:21 113:2 115:9 120:8 122:17,18 123:10 124:20

126:15 133:22 134:25 135:12 137:8 139:12 140:13 143:20 145:5 146:12 147:22 148:5 150:25 152:10 152:25 160:14 169:4 182:19 183:24 185:22 186:13,13 192:17 194:5 195:12 197:10 198:16 200:11 202:11 204:4 205:9 206:13 212:6 214:2 215:17 220:20 223:5 224:21 226:20 227:18 230:22 243:10 251:21 256:17 261:13,25 281:2,4 283:5 286:6 287:17 288:3 290:16 294:3 295:14 295:19 308:6 317:21 319:3 336:17 342:16 343:3 344:17 344:22
**sort** 182:16 241:13 288:17 289:4 316:22 320:25
**sound** 53:6,14 143:21
**sounds** 264:15 264:15
**south** 46:6,11
**space** 130:2 159:6
**speak** 20:10,16 20:20 24:14 48:3 60:24 80:23 93:25 100:3 105:23 121:15 149:17 193:9 195:4 229:25
**speaking** 48:23 49:16 65:3,7 107:19 122:4 144:3 154:19 211:9,17 273:10 342:22
**speaks** 80:8 189:11 235:12
**special** 28:10 54:8,10 55:22 255:16
**specific** 28:10
**specifically** 178:11 206:11 206:16 255:17 264:5 327:21
**speculation** 207:5 272:9
**spelled** 315:25 316:2
**spelling** 316:25
**splitting** 348:9 348:10,13
**spoke** 20:23 49:2 58:14 61:6 80:18 121:18,22 147:3 149:11 192:3 234:8 243:8,16 268:6 268:6 290:10 310:10 340:13
**spoken** 216:11 236:6 268:15
**spreadsheet** 126:6,9 127:2 127:9 128:5,8 128:10,12
**spreadsheets** 127:21,25
**stamp** 336:10
**stamped** 315:14 335:16
**standard** 99:23 106:2
**standing** 322:24
**stands** 237:20
**start** 11:22 56:14 64:24 65:16 166:13 259:19 287:8 287:17
**started** 33:15 40:24 42:18,21 53:20 60:14,15 64:19,21 66:21 67:3 85:24 164:20 255:10 259:15 261:2 284:9 289:3 301:24
**starting** 107:25 155:16 215:21
**state** 77:17,21 219:24 232:3 235:14 244:11 244:16,21 245:3,9 246:3 246:6,14,20 251:9,10,15 296:5 350:19
**stated** 13:21,25 14:6
**statement** 21:23 124:4,10 124:17,21,24 125:12 156:18 157:8 203:22 205:14,15,25 206:4,21,22 228:3 256:10 269:3 299:19

**statements** 35:12 36:14 227:24 286:25
**staten** 143:4,7
**states** 1:1 6:8 102:21
**stating** 13:7 24:5 310:7
**station** 44:8 99:6,7,13 129:13
**stay** 254:25 295:13 312:16
**stealing** 276:5 276:13
**stenographic** 11:5
**step** 199:6 276:23
**sticking** 255:3
**stipulation** 11:7
**stock** 323:13
**stole** 101:3 271:5 277:17 277:19
**stolen** 146:5 215:10,12 217:8,19 341:24 342:3,6 342:9
**stop** 31:13 104:8 108:20 211:17
**stopped** 108:22 110:9 117:16 167:4,5 230:25 248:18 249:10 284:10
**stopping** 148:8 155:16
**storage** 224:2
**store** 86:19 129:12
**stored** 223:20
**straight** 265:12
**stranger** 274:15,21
**street** 1:20 4:16 10:14 25:4 272:22 301:5
**strictly** 81:23
**strike** 229:20 248:5
**stuck** 310:7,9
**study** 118:21
**stuff** 55:21 76:15 77:13 128:25 159:11 325:15
**subject** 14:18 45:3 157:3
**subjects** 14:12
**submit** 21:24 60:2
**submitted** 132:17
**submitting** 21:15 60:4
**subpoena** 193:3,5,18 194:11 227:24
**subpoenaed** 192:15,20
**substantial** 325:14,25
**substantive** 341:9
**substitute** 156:12 157:10 157:18
**substituted** 156:16 158:3
**substitution** 157:24
**suggest** 265:6
**suing** 247:3
**suite** 4:21
**sullivan** 299:14
**sum** 57:8
**summarized** 103:20
**summarizes** 132:22
**sums** 181:22
**sunrise** 1:6,13 2:7 4:12 27:9 63:18 72:7 91:8 96:2,8,12 118:13 119:2 125:24 126:12 142:17,21,25 151:22 152:9 154:5 158:17 161:12,14,20 161:25 162:3 163:13 165:11 165:19 166:14 166:18 169:17 219:7,15,17,20 220:3,11,15,20 220:23 221:8,9 221:12 229:23 244:25 245:10 246:13 249:14 250:4,13,16 267:17 280:19 280:23 281:9 282:13 287:22 288:15,22 290:8 292:6 293:2,25 294:7 294:11,15 297:3,12 304:22 322:9 342:23 344:2 347:21
**superb** 1:4 4:2 10:8 11:15 12:5 13:16,20 13:20 14:10 27:12 72:9 81:20 95:3 108:9 110:13 110:13,24

111:12,15 112:25 113:2 113:12 115:8 115:11 116:3,9 116:21 117:3 118:14,25 124:5,8,9,13,23 125:2,25 126:12 129:5 129:21 132:2,7 132:8 134:7,9 135:10 136:8 136:22 138:19 142:17,21 144:25 150:20 151:11,16,23 152:9 154:19 159:8,19 160:22 164:20 164:23 165:9 165:18,22 166:6 169:17 179:4,8 182:14 183:2,14 186:4 186:7 188:4,5 188:7 191:5 196:7,14,18 212:21 213:8 215:11,13 218:14 219:7 222:3,6,8,22 229:23 236:7 236:13 240:4 243:16 245:14 245:16 246:18 250:6,9,13,17 252:5,8,19 253:14 267:2,4 267:6,8 268:10 268:15,17 269:9,14 287:23 304:15 304:18,20 305:21,24 318:11 335:24 340:21 342:23 344:5 345:22 345:24

**superb's** 252:13 269:12

**support** 102:10 271:11,13,15 272:25

**suppose** 311:5

**supposed** 291:16 334:3

**supposedly** 93:20

**supreme** 162:14 296:4,5 296:23

**sure** 15:4 18:22 23:16 49:15 50:5 52:4,5 64:6 76:23 95:18 109:16 115:4 119:15 121:16 122:12 131:2 147:7 149:5 182:12 183:11 184:16 197:2 213:2 223:21,23 227:14,16 230:15 236:11 240:13 241:21 244:18 245:11 245:12,18 246:10 249:23 253:3 258:2 260:4 263:19 274:19 275:13 285:25 294:18 295:24 297:9 301:12 302:18 303:3 306:14 307:19 308:13 316:13 324:14 334:15 336:24 338:15 344:19 345:10

**surrendered** 87:2

**suspicious** 229:20

**swat** 28:5 55:15 255:5,13,15 257:14,18 258:4

**swear** 10:17 12:14

**swearing** 298:10

**switched** 255:5

**sworn** 10:20 12:21 21:23 203:21 205:15 205:25 206:22 296:20 350:5

**syosset** 2:6 86:3 86:14 87:10 211:24 242:13 242:14

**system** 128:20 135:16 136:19 206:8

**t**

**t** 7:9 8:1,20,20 9:1,1 223:22

**table** 228:23 229:2

**tactical** 255:16

**tactics** 55:23

**take** 10:4,15 15:5 16:15,18 29:6 37:23 47:9 52:12 54:18 62:16,17 71:10 99:19 100:4 102:6 105:12 107:15 109:13 117:2 119:13,16 130:13 131:5

144:6 172:9,13 217:18 253:2,5 253:6 260:9 271:7 273:24 274:15 306:16 307:4,17 314:2 319:16,19 334:20
**taken** 10:8 97:13 98:17 120:12,14 160:2 161:11 161:19 213:7 241:20 252:5 270:22 274:10 350:3,11 351:8
**takes** 100:5
**talk** 84:3 147:5 158:6 200:12 221:15 282:11
**talked** 149:6 243:3 268:4
**talking** 185:2 187:4 236:15 236:16 260:6 282:15 291:10 324:4 325:13 325:13 326:7 329:23
**talks** 210:25
**tape** 332:7
**task** 131:20,22 131:23 257:20
**tasks** 76:10 77:8,9,11 79:24 96:16 123:25
**tax** 62:6
**taxes** 285:21
**taxonomy** 102:16
**team** 1:4 4:2 10:9 11:15 12:6 13:17,24 13:25 14:10 28:5 31:8,11 31:14 55:15 139:19,21,22 199:20,23 255:6,13,16 257:14,18 258:4
**tech** 107:16
**tee** 313:8
**teed** 309:11 312:17
**tekion** 7:19 128:21 130:5 136:19 138:5 204:25
**telephone** 35:13
**telephonic** 34:24 35:5,9
**tell** 12:21 15:24 32:22 33:3,5,8 38:13 39:3,6 53:7 75:6,9 79:20 87:15 106:13 109:5 109:25 119:10 121:23 128:10 130:16 131:5 145:12 164:6 164:12 165:5,8 203:11 233:14 258:12 274:20 283:20 300:10 327:12
**teller** 337:15,18 337:21 339:10
**telling** 103:13 134:19 156:17 189:15 256:23 272:18
**temple** 205:17
**temporary** 162:17 163:3 163:11,16
**ten** 11:21 29:2 29:4 213:2,3 253:2,7 255:12
**tens** 301:4
**term** 122:22 285:22 333:14 333:18
**terms** 39:11 71:2 309:8
**testified** 12:23 17:18,20,23 18:3 19:5,11 19:20,25 25:3 120:2,10,20,25 136:7 177:2,10 213:4 254:13 259:5 263:13 269:8 270:15 271:9 278:6 291:3 303:4,12 304:7 320:24 321:10 323:21 335:22 337:8 338:8,16
**testifies** 298:21
**testify** 17:7 20:5 171:9 192:23 193:6 318:9
**testifying** 14:20 18:2,16,24 25:4 350:5
**testimony** 14:18 18:13 50:19 77:2 83:15 119:4,24 128:7 134:24 145:3,10 172:20 177:9 182:2 199:16 238:22 271:11 291:6 305:2 311:22 315:2 347:7
**text** 8:14 23:14 23:25 24:9,10

38:13 146:23 218:19,22 230:13,16,23 231:3,7,18 233:3,20 234:3 234:22 235:2 236:3 320:25 322:5
**texting** 210:15
**thank** 12:2,13 12:24 85:15 114:16 160:15 173:23 175:22 201:13 239:16 253:16 270:13 296:16 309:14 312:10,25 313:2 314:8 318:6 332:23 334:8 335:19 338:6 348:13 348:18,22,25
**thing** 27:10 38:24 39:15,15 39:17 43:6 46:17 89:18 217:11 224:22 241:13 248:25 275:12 290:23
**things** 28:6 55:5 218:9 257:21 278:6
**think** 17:10 19:8 31:15,15 44:20 71:9 75:7 89:8 103:4 107:17 107:20 108:22 108:23 110:19 115:20 122:18 132:9 142:23 182:16 206:25 213:7 224:11 238:19 242:16 243:9,11,14 262:16,22 289:20 306:19 318:20 321:25 322:22 323:2 335:17
**thinking** 148:8
**third** 7:21 15:16 63:19 142:2 185:10 313:8 319:10
**thomas** 2:4
**thomasson** 2:2 5:2,3 7:6,14 8:6 12:9,9 20:16 21:17 22:5,9,10,14,19 22:23 23:3,7 23:10,14,21 24:2,10 35:13 36:15 47:6 50:3,18 58:22 74:24 80:7,19 80:24 81:3,7 81:14 82:6,24 83:19,21 84:11 84:21 85:18 95:22 125:3,14 155:6,10,25 156:14,24 157:7 158:8 159:24 171:25 172:5 186:11 188:16,19 189:10 190:5 190:22 193:9 193:24 201:16 207:4 211:6,11 214:8 215:24 217:14 231:25 232:5,15,25 235:11 237:9 237:20 238:4 238:15 248:8 267:20,24 268:11,17,19 268:23 269:2,5 269:16 270:6 271:16 272:8 276:6,17 277:9 277:25 278:8 280:6 281:18 283:2 308:20 310:15,18 311:2,9,10 312:2,5 323:5 328:8 340:9,11 343:2,9 344:22 345:12 346:16 347:10 348:19 348:21
**thomasson's** 82:17,22 83:11 83:15 150:13
**thought** 107:8 109:8 153:19 218:3 263:2 264:14 318:5 321:12,24,24 321:25 322:5 345:19
**thousand** 53:9 67:23 101:3 247:23
**thousands** 301:4
**threat** 33:9 230:11 231:12 231:15 232:13
**threaten** 106:3 106:9
**threatened** 38:25 39:4,7 105:8 107:3 232:23
**threatening** 32:25
**threats** 46:19 46:22 49:23
**three** 21:10 72:11 73:10,11 145:17,17

181:18,20 219:9,10,12 280:17 309:9 310:17 346:5
**thursday** 155:13,16,22
**till** 260:21
**time** 3:3 11:8 16:16 19:8,19 19:21 20:23 22:8 23:11 24:9 28:22,25 30:21 31:17,19 32:9 44:20 52:18 56:14 61:21 64:19 66:22 67:4,22 68:9,12,13 72:2 75:13 79:8 85:23 89:4,6 92:7,17 92:25 93:3,22 96:2,6 101:8 105:21 107:18 108:15 114:5,6 117:15 118:3 118:11,23 121:18,22 122:3 127:13 127:13 128:15 147:2,6 170:4 170:5 177:7 180:13 181:17 181:23 193:25 194:22 200:2 204:17 208:6 219:16 220:8 239:3 242:10 242:13,15 244:9,19 249:10,17 250:3,15 252:11 253:17 254:20,22 255:5 257:3 259:6 260:18 260:25 261:14 262:21 264:20 264:21 273:10 273:18,22 284:7,16 285:18 294:12 301:18 303:2 303:21,25 304:3,22 306:5 308:8 312:13 313:9 321:23 327:3 340:14 344:15,20
**timeframe** 33:18
**timeframes** 303:23
**times** 17:22 19:10,14 51:18 51:19,22 53:2 57:16 106:15 127:6 219:8 220:12 240:3 257:5 289:13 290:2 346:3
**tires** 241:12
**title** 53:19,24 53:25 62:9 136:8 137:24 138:8,10,12,14 138:15,18 139:17,25 185:11 207:18 213:17,21,25 214:5 298:25 345:10
**titled** 136:12
**titles** 210:19,22 213:19
**today** 14:9,18 16:6 17:11 85:9 106:21 145:10 157:19 182:2 187:4 239:7,9 246:23 253:17 254:5 310:12,14 311:4 317:17 328:23 347:7
**today's** 16:25 20:7,14,17,21 24:15 310:5 348:6,16,20,24
**together** 31:7 78:22,25 95:19 154:20 220:8 230:22 276:4
**told** 32:13,20 37:6,6 79:18 84:6 90:17 93:15 100:25 101:2,14,19,23 108:20 109:11 109:17 110:5 134:2 136:3 145:11 146:4 151:18 163:15 164:17 169:6 186:22 194:9 204:25 208:9 208:20,22,24 233:17 237:6,8 239:23 247:8 247:15 248:2 248:12 259:6 259:14 262:9 262:23,24,25 263:5,8 264:17 315:19
**tolerate** 211:18
**tomorrow** 155:5,9,14,22 156:2,5,16,19 157:15,18,23 334:15
**tony** 14:5,10 164:25 165:3,6 252:24
**tony's** 114:13

**took** 35:6 36:23 50:13 58:10 98:25 121:8 125:20 161:15 172:17 179:10 266:10 275:9 299:22,23 300:17 329:21 332:3 336:16 336:22
**top** 74:5 108:5 137:4 175:10 198:11,22 199:5 217:2 222:24
**topic** 34:14
**total** 19:10
**tours** 43:23
**tow** 242:20
**towards** 183:20
**towed** 241:22 242:18,23
**town** 224:12
**track** 41:5,9 127:9,11 128:6 130:6 178:3
**tracking** 125:25 126:5
**trade** 329:20,21 332:3,8
**tragedy** 264:11
**trained** 256:22
**training** 255:16
**transaction** 347:20
**transcriber** 351:1
**transcript** 7:12 10:22 38:9 309:10 348:6 348:16,20,24 351:3,4
**transcriptionist** 350:7
**transferring** 287:14,20
**transport** 225:11,20
**transported** 225:9
**transporting** 282:12
**trial** 45:25
**tried** 178:9
**triplicate** 295:6
**trips** 300:5
**tro** 162:16
**truck** 225:11
**trucks** 195:10 195:13,15
**true** 97:4,8,14 97:18 100:7 104:16 115:15 124:6,14,15,25 125:13,18 131:3 134:6,15 134:18,21 136:11 142:15 143:3,6 157:8 163:19 192:14 192:19 204:10 204:14 206:10 206:14 208:8 208:13 325:11 350:8 351:4
**truly** 265:7
**truth** 12:21,22 12:22
**truthful** 17:2 17:11 347:8
**truthfully** 17:7
**try** 127:19 128:5 254:9 257:19 261:11 280:4 286:9
**trying** 104:12 151:20 172:6 259:8
**tuesday** 155:22 157:10
**turn** 61:13
**turned** 61:9,11 195:16 322:16 329:11
**twenty** 19:17 30:9 296:13
**twice** 315:24
**two** 21:10 37:4 61:24 63:16 115:15 118:7 177:24 180:11 181:18,20 195:9,13,14 199:6 210:19 215:20 219:22 276:3,11 280:17 284:13 298:2,3 311:11 331:6 334:10
**type** 30:4 54:3 106:19 128:25 319:10,17,18 327:12 328:3 328:20
**typewriting** 350:6
**typical** 55:21 332:11,12,16 336:15
**typically** 262:8 280:4 336:22 337:15
**typing** 319:14

**u**

**u** 8:20 9:1 168:17 184:14 223:22
**udayan** 48:12
**uea** 2:11
**uh** 15:12
**uid** 78:4
**ultimately** 210:21

**unable** 78:21
**unbelievable** 146:18
**unclear** 130:24
**uncommon** 276:11
**under** 11:2 21:24 191:11 277:12 284:24 287:21,23 301:24 302:17
**underneath** 137:24 330:7
**understand** 10:21 13:22 14:13,21 15:23 16:3,12,19,21 21:18 35:3 60:25 118:15 222:20 250:14 257:24 262:25 273:20,23 326:5,8
**understanding** 22:13 38:17 55:21 90:18 114:23 158:18 181:11 191:2 196:9 201:2
**understood** 16:2 43:24 82:2 127:24 128:19 215:9 256:23 262:2 266:9 313:17
**unequivocally** 24:5
**uniondale** 5:10
**unit** 54:6,7,13 54:19
**united** 1:1 6:8 102:20
**unquote** 291:24
**unrelated** 158:3 163:5
**update** 127:18
**updated** 127:5 128:18
**updating** 127:16
**ups** 254:11
**upset** 102:8
**urrutia** 1:6 4:3 6:4 11:15 12:5 13:18 14:5 37:5 70:14,23 150:19 164:20 164:22 195:17 232:11 233:8 233:15 234:2,8 234:11 235:9 235:15,18,23 237:2 239:20 239:22 240:2
**use** 26:12,15 27:3 50:24 130:9 131:18 140:9 205:5 218:21 283:22 283:24 284:3 284:20
**used** 25:19 27:8 127:24 128:5,8 128:23 130:5 135:16 150:18 183:12 184:7 184:17 186:23 186:24 305:23 323:4 324:17 325:17 333:12
**username** 138:4
**uses** 10:25
**using** 109:8 165:22,25 282:15 317:15
**usually** 154:2 166:11 297:14
**utilize** 128:10 159:6
**utilized** 127:20 128:13 129:7

**v**

**v** 1:24
**vacation** 57:21
**vaguely** 185:15 230:12
**valuable** 259:2
**varied** 179:21 181:6
**various** 333:12
**vasquez** 187:10 187:11
**vehicle** 125:25 126:5 130:5,12 131:6 208:14 213:16 215:10 215:12 217:8 236:22 241:8 241:19 242:18 242:23 243:18 243:22 284:15 284:20 325:19 330:12,14,15 331:4 332:9
**vehicles** 8:18 9:5 77:12 115:7,11,13 116:3,8,13,14 116:21 126:10 127:12 130:6 130:14 131:3 133:25 135:21 138:23 159:19 166:5 167:21 167:23,24 195:25 196:6 196:12,18,20 196:24 202:17 207:23 208:9 209:7,12 210:12 212:20 223:3,8,11,20 223:25 224:2

224:14,16 241:3 244:11 244:15,21 245:2,16 246:13,19 250:18,21,23 251:2 280:17 282:20 292:8 303:5,17 305:18,23 306:4 322:14 322:15,18,20 323:15,18,22 323:25 324:4,6 325:3 327:22 328:2,19 329:9 329:10,11,15 329:18 330:17 330:23 332:11 332:12 333:15 333:21 334:2
**ventimiglia** 94:6,21 95:3,6 95:8,15,22 185:20 186:3
**verbal** 247:9
**veritext** 10:4
**verizon** 50:25
**vicinity** 25:24 111:5 162:23
**videoconfere...** 4:4,19 5:7,16 6:3,5,7,10 10:12
**violent** 153:19
**virtually** 155:5 155:9,24 156:8 156:21,23
**visible** 203:15
**visit** 93:14 108:12 147:16 148:17 165:18 168:7,11
**visited** 53:2 147:15 148:12 337:14
**visiting** 92:3,6 92:18 93:25
**visually** 324:18
**voice** 15:7

**w**

**w** 62:6 68:18 112:8 168:22
**wait** 107:6 201:16 313:22 314:3
**waiting** 29:8 210:19
**waived** 349:4
**walked** 129:16
**walking** 301:4 301:5
**want** 16:9 35:12 55:17,19 55:20 78:11 79:19 80:15 84:4 98:15 104:15 119:13 144:19,20 168:2 200:5 203:4,18 211:11 238:16 238:25 249:7 255:18 256:12 257:6 308:25 319:14 334:15 334:16
**wanted** 33:24 54:17 85:2 102:9 115:3 130:25 218:13 221:23 243:13 261:19 271:10 272:6
**wanting** 321:3
**wants** 239:14
**warned** 238:7
**warrant** 258:11
**warranties** 169:13,16
**way** 11:18 15:19 18:14 37:12 64:14 118:17 205:3 215:4 218:13 218:14 235:9 235:18 256:22 257:12,16 258:10,13,15 260:10 266:16 273:13 277:6 294:5 310:8 316:5 318:23 326:20 332:5 346:24
**ways** 181:2
**we've** 156:25 180:6,15 211:2 341:9
**weapons** 55:22
**week** 39:20 40:21,25 41:22 42:9,13,15,18 42:20 43:17,18 57:18 64:22 66:2,2 67:20 67:24 115:15 153:6 157:2 177:11,19,19 266:12 297:6 304:7 319:16
**weekly** 39:17 40:8 42:2 43:6 67:8,12
**weeks** 143:12 147:21 148:11 177:16,17,24 178:9
**weir** 5:17
**weirlawllp.co...** 5:20
**welcome** 119:22
**wendy** 142:22 143:3,6,8,11

345:5,17
**went** 34:17 41:12 43:13 51:17,22 52:8 52:10,11,15,19 52:23 89:5,9 89:14 93:14 96:4 99:6,9 108:15,17 109:3,21 110:9 135:11,13,15 147:4 148:21 150:15 159:18 160:5 163:19 192:23 206:8 230:7 270:16 271:12 291:15
**west** 63:24
**westbury** 247:6
**what'd** 145:3
**whatsoever** 347:20
**wholesale** 134:11,17 135:25 136:3 168:23 204:11 204:13 207:24 208:10,14 327:17
**wholesaler** 9:4 133:6 135:6,20 202:22,25 209:4
**wholesalers** 135:9
**wholesaling** 202:16
**wicks** 36:9,12 102:20 195:24 238:8,23 269:25 308:22
**wife** 26:5 271:14,21
**willing** 37:2 133:20
**windshields** 327:20
**wired** 150:12
**withdraw** 35:11 118:16 343:13
**withdrawn** 18:3 24:20 48:19 95:20 100:16,17 112:21 120:9 143:10 149:13 186:13 223:18 225:19 226:13 236:15 285:13
**witness** 10:12 10:18,20,21 12:15,20 30:20 30:21 35:20,23 83:2,9 84:12 88:6 102:14 107:8,12 125:5 126:25 130:22 143:24 146:16 146:18 152:15 152:24 170:8 173:25 192:16 192:20 211:12 212:13 214:10 214:17 216:3,6 217:16 225:2 233:2 235:14 237:12 251:20 252:2 253:16 271:17 276:8 276:18 277:11 280:7 281:20 307:17 317:24 323:7 328:10 340:4 342:25 345:8 350:4
**witnessed** 63:2
**won** 45:24
**word** 70:4,8,9 314:21
**words** 15:11 57:16 205:12 233:22 328:16
**work** 27:23 28:4,9 31:19 42:12,16,22,23 43:23 44:2 46:5 66:8 69:15,17,23,23 70:3,7 71:4,7 71:11,13,20,21 72:3 73:5 75:13 77:16 78:20,25 79:4 79:5,12 109:19 113:3 117:10 123:2 124:8 129:21 130:4 131:13 135:10 159:7,18 166:18 177:24 186:6,23,24 188:5 228:19 249:2,8 261:20 267:5,8,9,13,14 269:9,10 270:9 302:3 304:8 311:17 312:8 313:14 325:23 325:24 328:20 331:14 332:18 332:18,19 341:10 345:5
**worked** 28:8,14 28:23 40:22 41:17,23 42:8 42:17,25 43:4 43:13,14 51:7 51:10,13,16 56:23 57:24 58:20 59:8 64:13 69:21 78:17,22 85:25 86:11 91:12 92:7 94:11,13

96:2 101:12 111:16,21 112:23 117:7 124:5,7 129:14 129:21 134:5,6 134:9 140:25 142:20 159:13 169:16 177:6 182:23 214:21 230:21 250:12 254:14 266:24 266:25 290:25 320:6,21 345:18,19 346:22 347:4

**workers** 123:24

**working** 33:15 33:22 41:3,6 41:10,13 42:24 52:17 53:15 56:14,17 57:11 58:18 59:7 60:14,15 64:19 66:7,10,11,21 67:3 76:6 77:4 79:4 85:24 94:15,22 95:3 95:25 117:16 117:22 118:4 125:24 133:8 164:20 166:13 167:6 186:4 188:3 208:4 209:10 230:25 261:2,21 265:11,16 266:8 282:21 283:21 284:5,7 293:15 297:7 303:20,25 304:10,12,17 333:12 346:20

**works** 143:3,6 252:21 302:6

**worried** 265:3

**worse** 178:7

**worth** 209:15 209:19 255:2

**would've** 214:25 317:25 318:21 322:2

**wound** 291:21

**wrist** 36:20

**write** 15:20 175:9,10 183:18 295:11 338:25 339:15 339:24 343:17 343:21 344:4

**writes** 298:20

**writing** 40:19 60:11 135:22 194:25 219:4

**written** 8:24 11:6 54:20 59:25 60:8 146:21 199:6 294:17,19,20 294:20,22,23 338:14,20 343:25

**wrong** 106:14 109:6 191:9 316:2,2 324:14

**wrongdoing** 121:24

**wrote** 13:6 229:18 337:22 343:24

**x**

**x** 7:1,9 8:1 223:22

**y**

**yeah** 31:24 35:23 41:25 47:13 59:17 67:17 70:10 77:6,9 85:6 89:2 90:10 100:13,13 104:11 110:18 119:7 124:2,3 125:5 126:16 137:19 145:19 152:2 153:4 166:4 167:23 173:22 174:17 174:23 185:25 187:13 188:9 191:7 199:14 199:17 202:21 203:8 205:21 211:24 215:14 216:4 219:23 223:23 228:9 237:4,18 238:3 243:7 249:7 251:18 253:13 281:20 285:19 306:22 307:20 308:15,17 314:17 316:7 319:7,22 320:17 321:6 323:14 325:6 327:15 336:13 345:4 346:6

**year** 56:22 58:19 65:4 254:25 284:12 285:16 286:5 286:23 287:25 288:4 327:6

**years** 16:8 19:17,18,23 29:2,4 30:9,12 30:16 31:8,16 31:16,24 32:6 59:10 61:24,24 254:15 255:12 264:20,21 266:12 275:7 284:13 324:25 333:13

Case 2:23-cv-06188-JMW Document 543-10 Filed 09/04/26 Page 421 of 515 PageID #: 20758



**yep** 307:7 319:15 348:7
**yesterday** 13:6 157:14 310:6
**york** 1:2 4:22 5:19 6:9 10:14 10:17 77:17,21 86:3 244:11,14 244:16,21 245:3,5,10,15 246:7,14,20 251:9,10,15 296:6 350:19

**z**

**z** 183:6
**zenia** 183:6,10
**zizmor** 4:20
**zoom** 10:11 104:9 170:5,9 175:19,25 185:22 203:7,8 203:10 306:13 306:24 314:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# In the Matter of

Case No. 2:23-cv-6188 (JMW)

SUPERB MOTORS INC., et al.

v.

DEO, et al.

## Continued Examination of Marc Merckling

*Thursday, March 26, 2026*

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - -

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiff,

Index No. 2:23-CV-6188(JMW)

v.

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOAL COAST MOTORS AUTOMOTIVE GROUP,

(Caption continued)

LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE BIT & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A.189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

\- - -

March 26, 2026

\- - -

CONTINUED DEPOSITION of MARC MERCKLING, held remotely via Zoom teleconference, commencing at 12:00 p.m. EST, on the above date, before Marie Foley, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

Little Reporting Company

\- - -

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF PLAINTIFFS SUPERB MOTORS INC., TEAM AUTO SALES LLC and ROBERT ANTHONY URRUTIA:

SAGE LEGAL LLC
BY: EMANUEL KATAEV , ESQUIRE
11821 Jamaica Avenue
Jamaica, New York 11423
EMAIL: emanuel@sagelegal.nyc

ON BEHALF OF PLAINTIFFS 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, ROUTE 23 AUTO LLC, and ISLAND AUTO MANAGEMENT, LLC:

CYRULI SHANKS & ZIZMOR, LLP
BY: JEFFREY RUDERMAN, ESQUIRE
420 Lexington Avenue, Suite 2320
New York, New York 10170
EMAIL: jruderman@cszlaw.com

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF DEFENDANTS ANTHONY DEO and SARAH DEO DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOAL COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC:

MARWAHA LAW GROUP PLLC
BY: NIPUN MARWAHA, ESQUIRE
1539 Franklin Avenue, Suite 201
Mineola, New York 11501
EMAIL: Nipun@marwahlaw.com

DEFENDANT PRO SE
HARRY R. THOMASSON, JR.
3280 Sunrise Highway, Suite Box 112
Wantagh, New York 11793
EMAIL: hrtatty@verizon.net

ALL APPEARANCES VIA REMOTE ZOOM TECHNOLOGY:

ON BEHALF OF DEFENDANT FLUSHING BANK:
CULLEN AND DYKMAN LLP
BY: ARIEL E. RONNEBURGER, ESQUIRE
333 Earle Ovington Boulevard
Second Floor
Uniondale, New York 11553
EMAIL: aronneburger@cullenllp.com

ON BEHALF OF DEFENDANT LIBERTAS FUNDING LLC:
WEIR LLP
BY: SUSAN VERBONITZ, ESQUIRE
1339 Chestnut Street, Suite 500
Philadelphia, Pennsylvania 19107
EMAIL: sverbonitz@weirlawllp.com

ALSO PRESENT:
Anthony Deo

- - -

TRANSCRIPT INDEX


PAGE

APPEARANCES........................ 354 - 357

EXAMINATION OF MARC MERCKLING:

BY: MR. KATAEV................... 360

SIGNATURE PAGE.................... 427

ERRATA............................ 428

REPORTER'S CERTIFICATE............ 429


- - -

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page Line

- -none- -

REQUEST FOR PRODUCTION OF DOCUMENTS

Page Line

- -none- -

STIPULATIONS

Page Line

358 4

QUESTIONS MARKED

Page Line

- -none- -

\- - -

12:07 p.m. EST

\- - -

THE STENOGRAPHER: If I could ask you to raise your right hand, please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: Yes, I do.

THE STENOGRAPHER: Thank you.

\- - -

MARC MERCKLING, the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. KATAEV:

Q. State your name for the record.
A. Marc Merckling.
Q. What is your current address?
A. 259 East 4th Street, Deer Park,

M. Merckling

New York 11729.

Q. Good afternoon, Mr. Merckling.

Do you have an understanding as to why you're back to testify today?

A. I believe because of the questions that were objected to, but...

Q. Without disclosing any attorney/client communications, can you explain how you came to learn about that?

MR. MARWAHA: Objection.

A. You said that --

MR. MARWAHA: Hold on.

Just as to the fact that that's implicitly admitting to attorney/client conversation.

MR. RUDERMAN: He can disclose that he found out information as a result of a conversation with his attorney.

MR. KATAEV: He just can't disclose what was said.

MR. MARWAHA: All right.

MR. KATAEV: And I think his answer was starting to explain it was

M. Merckling

something I told him.

So let's let him finish.

MR. MARWAHA: Okay.

A. You said you had the right -- when it was objected to, you said you were going to speak to the judge and you might call me back to ask me those questions.

Q. Understood.

So, based on my representation to you during the last deposition and the fact that you're back, you have inferred that that's the reason why you're back, correct?

A. Yes.

Q. Okay.

A. Correct.

Q. Without telling me anything that any attorney has told you, did you have discussions with any attorney about any court order issued by Judge Wicks in relation to this issue?

A. No, I didn't.

Q. Are you aware that the plaintiffs in this case filed a motion

M. Merckling

dealing with those objections that were raised at the first deposition?

A. I don't know that.

Q. You haven't seen a copy of it, right?

A. No.

Q. Okay.

And same question for the resulting order, you are not aware of the existence of any order directing you to return for your deposition, correct?

A. No. I was told that I had to come back on.

Q. Okay. So let's go back in time to August 3rd of 2023.

Were you working at Superb on that day?

A. I was.

Q. What time did you get there?

A. I'm not sure what time I got there.

Q. What was the normal time that you would get there on a Friday when you worked?

M. Merckling

A. There really wasn't a normal time. It was whenever I got there.

Q. Is it fair to say that you were present there during the day?

A. I was present there during the day, yes.

Q. Okay.

And did there come a time when Mr. Bruce Novicki came to the dealership?

A. Yes.

Q. And were you present for any conversation that occurred between Mr. Novicki and Mr. Deo?

A. No, I wasn't.

Q. Did you observe Mr. Novicki and Mr. Deo having conversations with each other?

A. I -- I don't recall. I believe they went into his office, but I don't remember.

Q. Okay.

At some point, you learned that the Nassau County Police Department arrived at the dealership, correct?

M. Merckling

A. Yes.
Q. You were present at the time that they arrived, correct?
A. Yes.
Q. Before they arrived, did you know that the police were called?
A. No.
Q. Mr. Deo did not tell you that Mr. Novicki called the police?
A. I don't remember him telling me that they called the police. I know we were standing outside when the police showed up.
Q. And why was it that you were standing outside when they showed up?
A. Because they had a locksmith there changing the locks.
Q. So before the police arrived, the locksmith already arrived, correct?
A. Yes.
Q. And when you were standing outside, you were with Mr. Deo alone, correct?
A. I believe so. I don't think

anybody else was there.
Q. At some point subsequent to the time that you were standing with Mr. Deo alone, Mr. Thomasson arrived, correct? In other words --
A. I believe Harry showed up much later. He wasn't there when they were changing the locks or anything like that.
Q. Understood. That was my question.
Were you alone with Mr. Deo outside just you two, or was Mr. Thomasson there with you at the same time?
A. During when?
Q. When you first stepped outside the dealership.
A. It was me and Anthony.
Q. What did you and Mr. Deo discuss outside --
MR. KATAEV: Withdrawn.
Let's go back.
Q. Before you stepped outside, what did you and Mr. Deo discuss with each other, if anything?

M. Merckling

A. I don't remember. I mean, I'm sure he said we're being locked out, they're changing the locks, but I don't remember the conversations.

Q. Do you remember what your response was when he informed you about the fact that the locksmith came?

A. I don't.

I remember at some point me asking how can they change the locks if you're the owner.

Q. And what did Mr. Deo say in response to that?

A. I don't -- I don't remember. I think he -- he probably said, I don't know. But I -- I don't remember the conversation.

Q. Was Mr. Deo angry?

A. Upset.

Q. Do you recall having any other conversations with Mr. Deo inside of the dealership before stepping outside concerning this incident?

A. I -- I don't recall.

M. Merckling

Q. Do you recall whether you stepped outside with Mr. Deo at the same time?

A. I don't know. I don't remember.

Q. Prior to you stepping outside with Mr. Deo or prior to you stepping outside in general, did you gather any of your belongings?

A. I don't believe I had any belongings there, but I don't remember.

Q. Do you recall assisting Mr. Deo with his belongings, if any?

A. I -- I really don't remember if we took anything out of the office.

Q. Okay.

Do you recall whether you took any of Mr. Blankenship's belongings out of the office?

A. No. I don't think Dwight had anything there either.

Q. Do you remember Mr. Blankenship having a coffee mug?

A. No.

Q. You remember that you personally

M. Merckling

did not take any of his belongings outside of the dealership.

A. Any of whose belongings?

Q. Mr. Blankenship's.

A. Not that I remember.

Q. Did you assist Mr. Thomasson with getting any of his belongings out of the dealership?

A. Yes, I did.

Q. He asked you for help?

A. Yes, he did.

Q. Same question for Mr. Deo.

A. I don't remember if I took anything out of the office that belonged to Anthony.

Q. Understood.

When you stepped outside of the dealership with Mr. Deo once the locksmith came, what, if anything, were you two discussing between each other at that time?

A. I believe that's the same question.

I don't remember.

M. Merckling

Q. Did Mr. Deo ask you to do anything to help him with this problem?

A. No. We were just standing there trying to figure out what was going on.

Q. And the police had not arrived yet, right?

A. No.

Q. To your knowledge and recollection, did Mr. Deo inform you that the police were on the way?

A. I don't remember.

Q. When you were standing outside the dealership after the locksmith came, were you aware that the police were on the way?

A. I'm sorry, you broke up. Can you repeat that?

Q. When you were standing outside of the dealership after the locksmith came, were you aware that the police were on the way?

A. I don't know if it's my phone or it's your speaking, but the last part keeps cutting out.

MR. MARWAHA: Also I'm going to object to asked and answered on that, not because you had to repeat it twice, but I believe this is the same question you asked him earlier in the beginning about, you know, when did you find out the police were coming.

MR. KATAEV: Understood.

I'll ask it again anyway.

BY MR. KATAEV:

Q. Were you aware when you were standing outside of the dealership after the locksmith came that the police were on the way?

A. I believe when they showed up.

Q. So you only became aware about the police being present at the moment that they showed up. You were not anticipating their arrival, correct?

A. Yeah, I don't remember being aware that the police were coming til they actually showed up.

Q. Okay.

So before the police arrived,

M. Merckling

what, if anything, did you and Mr. Deo discuss outside?

A. It's the same question --

MR. MARWAHA: Objection.

BY MR. KATAEV:

Q. I'm just confirming.

A. I don't recall the conversation.

Q. Okay. I understand.

After the police arrived, what did you and Mr. Deo discuss, if anything?

A. I don't recall the conversations that we had that day.

Q. Did Mr. Deo ask you to speak to the police?

A. No. Nobody asked me to speak to anybody.

Q. Did you speak to the police?

A. I said hello to them.

Q. Other than saying hello, did you speak to the police about the substance of why they were there?

A. The police what? You broke up.

MR. KATAEV: Read it back, please.

M. Merckling

(The requested portion of the record was read back by the court reporter.)

A. I don't recall if I spoke to them about anything.

Q. Okay.

At some point in time, Mr. Thomasson came, correct?

A. Yes.

Q. And the reason Mr. Thomasson came was because Mr. Deo called him, right?

A. I -- I -- again, you're breaking up. I don't know if it's my connection or yours, but I'm getting every other word.

Q. I'll try again.

The reason why Mr. Thomasson came to the dealership is because Mr. Deo called him, correct?

MR. MARWAHA: Objection to speculation.

A. Yeah, I don't know.

Q. Did you call Mr. Thomasson to come over?

M. Merckling

A. No.

Q. Did Mr. Thomasson regularly come over at that time to the dealership?

A. I -- you have to repeat it.

Q. Okay.

Did Mr. Thomasson --

A. Is it me breaking up or is it you?

Q. I think it's me because you can't hear me. I hear you well.

MR. RUDERMAN: No, I hear you fine, and I think every other person attending can hear you fine.

THE WITNESS: Just give me one second. Let me try to change my Wi-Fi.

MR. KATAEV: Sure, go ahead.

MS. VERBONITZ: I can hear. It's fine.

(Pause.)

THE WITNESS: Let's try this. Go ahead.

MR. KATAEV: Read it back, please.

M. Merckling
(The requested portion of the record was read back by the court reporter.)
A. Did he regularly come to the dealership at that time?
No. Harry wasn't there that often.
Q. Okay.
And it was Friday evening when the police arrived, right?
A. I don't remember what time it was.
Q. Well, was it still light outside when they arrived?
A. It was still light out, yes.
Q. Okay.
Is it fair to say that they arrived some time between 3 and 6 p.m.?
A. I don't know.
Q. When Mr. Thomasson did arrive, what did he say to you and Mr. Deo, and what did you say to them?
A. I don't remember the conversations. I know he asked me if I

M. Merckling

can help him move some stuff out of an office.

Q. Other than that, do you recall discussing anything else between the three of you?

A. I don't remember the exact conversations that we had.

I do remember Harry saying that he's going to look into seeing if this is legal what they're doing and that he's our lawyer and if we have any questions we can call him, but that's about the only thing I remember from that.

Q. Did you ever sign any contract with Mr. Thomasson for him to serve as your attorney, or a retainer agreement?

MR. THOMASSON: Objection; beyond the scope.

MR. MARWAHA: I'm going to join in that objection just for the record.

BY MR. KATAEV:

Q. You can answer.

A. I don't remember if I signed anything with him.

M. Merckling

Q. Okay.

And I believe we covered this, but just for the record, you didn't make any payments to Mr. Thomasson in August of 2023, did you?

A. No, I did not.

Q. At the time that Mr. Thomasson arrived, when he approached you and Mr. Deo, did the three of you remain together for the duration of your discussion, or did there come a time when Mr. Deo and Mr. Thomasson went to speak one-on-one?

A. I don't remember. But like I said, I was carrying some stuff out for Harry, so I'm sure there was times when I wasn't with them.

Q. On that evening, correct?

A. Yes.

Q. Were there any discussions about a lawsuit?

A. I don't remember.

Q. Were there any discussions about concerns based on the police being present?

M. Merckling

A. I don't -- again, I don't remember the conversations.

Q. You don't remember anything at all?

A. I remember being there and I remember helping Harry carry some stuff out, but as far as the conversation, I can't remember what the conversations were about.

Q. Was there any discussion in general about next steps to be taken as a result of being locked out?

A. Not that I recall.

Like I said, I know Harry said he's our lawyer and he's going to look into it. That's the only thing I remember about that besides being locked out.

Q. When Mr. Thomasson was present, before he took any of his belongings out, did he have anything in his possession when he was speaking with you?

A. In his possession? I don't -- I don't remember.

Q. Did he have a notepad or a pen,

for example?

MR. MARWAHA: Object to relevance on this.

But obviously you can answer.

A. I -- I don't recall if he did or didn't.

Q. At the time that Mr. Thomasson arrived on the evening of August 3rd, 2023 and met with you and Mr. Deo, did you observe at any point in time that Mr. Thomasson took any notes?

A. I -- I don't remember. I don't know if he did or didn't.

Q. There came a point in time after Mr. Thomasson arrived that Mr. Blankenship arrived, correct?

A. Yes.

Q. How soon after Mr. Thomasson arrived did Mr. Blankenship arrive?

A. I don't know. I believe Harry arrived and then Dwight arrived a little bit after he did. I don't -- I don't remember the timeline.

Q. Do you think it was somewhere

M. Merckling

between five and ten minutes or ten and 20 minutes?

A. I don't know.

Q. How long were you standing outside before Mr. Thomasson arrived, approximately?

A. For a while.

Q. More than 20 minutes?

A. Yeah, it was more than ten minutes.

Q. And the timeframe within which Mr. Blankenship arrived after Mr. Thomasson arrived was less than the time you spent waiting for Mr. Thomasson to arrive, correct?

A. I wasn't waiting for Mr. Thomasson to arrive. We were standing outside.

I don't recall when and who showed up at what time.

Q. Do you at least recall whether Mr. Thomasson arrived first and then Mr. Blankenship arrived?

A. I believe he did, but I'm not a

hundred percent sure.

Q. When Mr. Blankenship arrived, what did he say to the three of you, and what did you say to him?

A. I -- I don't remember what he said.

Q. What was the reason that he came?

A. Again, I don't know. I don't remember why. I don't remember the times.

I -- he may have even called Dwight. I don't remember.

Q. You don't recall whether you called him?

A. I don't.

Q. Following --

MR. MARWAHA: Emanuel, sorry. Just so you're not mid-question, I just need to speak with my client briefly.

Marc.

THE WITNESS: Yes.

MR. MARWAHA: Obviously answer fully, truthfully, but if you do not

recall, do not make any guesses. We want to make an accurate and truthful record for the court. So if you do not recall, you do not recall. If you recall some portion of it, then you recall some portion of it. Just answer Mr. Kataev's questions truthfully and to the best of your ability. Don't guess.

THE WITNESS: Okay.

MR. KATAEV: And I'll piggyback off of that instruction. While I don't want you to guess at any answers, I'm still entitled to your best recollection whatever you remember.

THE WITNESS: Correct.

MR. KATAEV: It's 12:27. I think now is a good time to stop to call the court to argue these objections that were improperly made.

I'm going to, I guess, call on my cell phone and bring it closer to the mic.

M. Merckling

MR. MARWAHA: So, Marc, we're going to just pause for a little bit and bring you back in.

THE WITNESS: So should I shut off?

MR. MARWAHA: Yes.

MR. KATAEV: We'll call you back in.

THE WITNESS: Okay. You just let me know when.

(Witness exits the Zoom conference.)

MR. KATAEV: Off the record.

(Discussion held off the record.)

(Call initiated with Magistrate Judge Wicks' chambers; Eric Russo, deputy.)

MR. RUSSO: Counsel, can you hear Ms. Fink, Judge Wicks' law clerk?

MR. KATAEV: Yes.

MR. THOMASSON: Yes.

MR. RUSSO: All right. Thank you.

M. Merckling

THE CLERK: Thank you.

Okay. So who do we have on the line?

MR. KATAEV: We are in a Zoom. My phone has been connected to the Zoom.

You have Emanuel Kataev and Mr. Ruderman for the plaintiff. You have Mr. Thomasson, pro se, Ms. Verbonitz for Libertas, Mr. Marwaha for the Deo defendants, Ms. Ronneburger for Flushing, and then the principals' plaintiff, Mr. Urrutia and then Mr. Deo are on, as well as the court reporter.

And this is being transcribed unless Ms. Fink does not want that to happen.

THE CLERK: No, that's fine. Thank you.

And then who's being deposed?

MR. KATAEV: We're deposing currently Mr. Merckling. However, we took him out of turn because we were

M. Merckling

deposing Mr. Blankenship. And I have asked questions of Mr. Blankenship concerning conversations consistent with this Court's order at docket entry 429.

At the time that I was asking him questions, Mr. Marwaha was not present, only Mr. Thomasson was. And Mr. Thomasson objected and, while stating that he did not instruct the witness not to answer, stated that he wants the Court to rule on this before the deposition proceeds, effectively stopping the deposition.

We submit that this is improper. Mr. Marwaha was not here. We're entitled to ask our questions.

Mr. Thomasson's position is that the order only permitted us to ask about conversations on August 3rd, 2023 and nothing more. However, we object to that reading. First, it doesn't explicitly say that. It's an implied statement.

M. Merckling

Second, it follows that we were stopped from asking any further questions and that actually we would ask these follow-up questions.

And finally, we had at least one more hour of testimonial time left for Mr. Blankenship, and we would have been entitled to use that time.

So for all those reasons, we -- first of all, we submit that it was improper for Mr. Thomasson to raise those objections and stop the deposition from proceeding. We're contemplating motion practice on that subject.

Second, we believe that the objections should be overruled because on the merits we're entitled to ask questions about their conversations with each other.

THE CLERK: And then the questions that were being asked about the conversations, is it as of a specific date or just a general

M. Merckling

question?

MR. KATAEV: By way of brief background, there were questions about the August 3rd conversations. Mr. Blankenship testified that he subsequently left on vacation for a week and upon his return, there were additional conversations that we asked him about, and when we asked about those conversations that happened the week after August 3rd, Mr. Thomasson made his objections and effectively stopped the deposition.

THE CLERK: Okay.

And then, Mr. Thomasson, if you can just state your position, please.

MR. THOMASSON: I didn't stop anything. In fact, after I made my objection, there were more questions that took place over my objections and the witness answered.

Mr. Marwaha did end up joining us once this dispute began.

And my objection is this: The

M. Merckling

Court's order says, and I quote, one sentence: In accordance with this order, plaintiffs may redepose Merckling and Blankenship as to the communications on August 3rd. That's what it says.

So, when they started asking questions about events later in August and September, I objected and said -- and merely said to Mr. Kataev, I object. The court order says what it says, and I read that sentence, and I asked him, Why are you going beyond that scope? Why are you asking these other questions?

It's also important for the Court to know that at the end of their depositions previously, they said that they were done subject to the motion to compel and whatever the Court would rule on the motion to compel.

Well, the Court ruled that they could ask further questions regarding communications on August 3rd. I don't

M. Merckling

know why we have a lot of questions about all sorts of other subjects.

Not only are they threatening me over making objections, although they thankfully admit that I didn't instruct the witness not to answer, and I don't know why they're also saying that they now want to reconsider this order. It's well beyond that date. The order says they're limited in this deposition to the communications on August 3rd. So I objected, and want the Court to tell us whether or not they can ask other questions.

MR. KATAEV: And I believe I covered plaintiffs' position with it, but if Mr. Ruderman has anything to add.

MR. RUDERMAN: I do, if I may be heard.

THE CLERK: Of course.

MR. RUDERMAN: The objection that brought us to the motion which is

M. Merckling

heard by the Court was the objection to the testimony -- to the discussions on August 3rd, and that's what the Court was addressing. The Court was addressing that specific objection. And that is all we could argue before the Court because that was the only motion that existed.

However, that stopped us in time because at that time, Mr. Thomasson's position was, On August 3rd I became their attorney. And the only issue before the Court was whether Mr. Thomasson was, in fact, the attorney at that time. The Court found, No, I don't see any evidence that he was their attorney, or at least he hasn't established it, and there's nothing to indicate until he made his appearance in September that he was actually acting as their attorney. So the Court could only rule on the August 3rd date. So the Court ruled and our deposition in time

M. Merckling

was stopped on August 3rd. So we can't ask what happened on August 4th because Mr. Thomasson's position was that was the end of it. So we had no further questions because we were stopped at that time from proceeding.

So when the Court ruled, all they were ruling on was an objection about August 3rd. That doesn't mean that we cannot ask questions or should not be able to ask questions after August 3rd now that the Court has established as of record there's no attorney/client relationship until September and his appearance.

So I think reading the order out of context, it was not that we were limited and we could only ask these questions. The Court was only giving an order on the objection that was before it. It was not giving a further guidance "and by the way, you can't ask any other questions."

So I think reading this out of

M. Merckling

context and understanding what happened is a misreading of the Court's intentions when it drafted the order.

MR. THOMASSON: And I need to respond to that, if I may.

THE CLERK: Sure.

MR. THOMASSON: Okay.

That is absolute pure nonsense because in their very same motion, please be reminded they asked for all communications in the history of civilization with the Deos and me. It couldn't have been more broad if their life depended upon it.

And -- and --

THE CLERK: Mr. Thomasson, before you continue, I think what you're referring to is the crime fraud exception between you and --

MR. THOMASSON: But my only point about that is, just so you understand, Mr. Ruderman brought whatever motion he brought, and if it

M. Merckling

was limited to August 3rd and they wanted it to be broader than that, then he should have asked for something broader than that. They closed the depositions and said that they were subject to the motion to compel only.

We come back on the motion to compel, and we have an order that says this deposition is on the subject of, and I quote, the communications on August 3rd, unquote.

They got their way. They brought a motion. It was allowed. They're allowed to discuss August 3rd, but this "let's put it into a different context" stuff is not. The court order is the court order, and that's what we're here to discuss. If they want to bring a motion to reconsider, their time has run out.

THE CLERK: Okay.

And so, Mr. Thomasson, it's your position that if the plaintiffs are

M. Merckling

going to be asking any of the other defendants further questions after August 3rd that there is an attorney/client privilege that was established?

MR. THOMASSON: Well, no.

To be exact here, this is only limited to Merckling and Blankenship. And we're here, they're asking questions about August 3rd. When they ask about August 3rd, I've not had a single solitary objection.

I mean, this is a very narrow issue here. We're talking about whether or not the Court's order --

THE CLERK: Right. But, Mr. Thomasson, my question is if they ask questions after August 3rd, lets a just say August 4th, 5th, 6th, and, you know, the week after, as Mr. Kataev represented, do you have enough to establish that there was an attorney/client privilege at that time?

M. Merckling

MR. THOMASSON: I do not believe that I do, but my point has nothing to do with that. My point is asking beyond the communications beyond August 3rd is beyond the scope of what they are allowed to ask about these two witnesses.

THE CLERK: Right. But what's your objection then? Is it based on attorney/client privilege?

MR. THOMASSON: It's based on --

THE CLERK: After August 3rd?

MR. THOMASSON: There's no question that in September I file a notice of appearance on their behalf. There's no question about that.

So, they clearly want to ask questions in this deposition about what took place between August 3rd for roughly a month thereafter.

My position is it's beyond the scope of the Court's order. They closed their depositions subject only to their motions to compel, and this

M. Merckling

Court ordered they can ask about August 3rd and the communications on that date.

What took place in the month in the in between I think is irrelevant for the -- it has nothing to do with my objection at the moment, which is that what took place for a month or so after August 3rd is -- is beyond the scope of what they're allowed to ask in these reconvened depositions.

And it's a red herring to bring up that they didn't use all the time the first time because the fact of the matter is they closed those depositions, we're allowed to ask about anything, and closed them subject to the motion to compel and their motion was as to August 3rd. If they wanted more, they should have brought more. If they wanted to reconsider that order, they should have brought a motion to reconsider it, or maybe they did, I don't

M. Merckling

remember. But the fact of the matter is here we are and they're asking beyond the scope of what the Court clearly limited this deposition to.

THE CLERK: Okay. Give me one second. Let me just see if the judge is available.

So stand by, please.

MR. KATAEV: I'm sorry, just one quick final point.

All of these arguments being raised are improper because he's been disqualified as their counsel. That's just another point that I want to raise.

THE CLERK: Okay.

Is there anyone else that would like to add to this?

MS. VERBONITZ: No.

MR. MARWAHA: If I may, Ms. Fink, my name is Nipun Marwaha. I was the attorney that put in a notice of appearance for all Deo defendants about two days ago, I think, at this

M. Merckling

point. I am getting myself up to speed on the Judge's order as we speak because originally I was just relying for today on the previous attorney's representations that no attorney would be necessary for this 30-minute quick deposition.

But for the purposes of protecting my clients' rights in the event that Mr. Thomasson has a valid objection, I would be raising that properly on behalf of the Deo defendants. But obviously I'm not -- you know, that's not a hill I'm dying on at the moment, but I'm getting up to speed so I can properly address this issue.

THE CLERK: Okay. Thank you.

And I know just mentioned 30 minutes, but is there 30 minutes left of the deposition, or is it an hour?

MR. KATAEV: What we did, Ms. Fink, is we agreed to start at 11 and finish at 1:30 to give ourselves

M. Merckling

enough time. We merely anticipated taking 30 minutes to an hour. Unfortunately, because of Mr. Thomasson's improper objections, we have been diverting from that timeline, but we are working to complete everything subject to the ruling.

THE CLERK: Okay. Thank you.

MR. THOMASSON: And my last comment is simply this. It is a thousand percent improper for Mr. Kataev to say that I cannot make an objection. This Court already ruled on that. I am entirely allowed to make objections.

THE CLERK: Agreed.

Okay. Thank you.

Okay. Let me just see if the judge is available.

MR. KATAEV: Thank you, Ms. Fink.

THE CLERK: Thank you.

(Pause.)

M. Merckling

THE CLERK: Can everyone still hear me?

MR. KATAEV: Yes.

THE CLERK: Sorry for the hold.

So, I spoke with Judge Wicks. We're going to need about 15 minutes. We just want to review the prior motions and the transcript.

Is there any way that you guys could sit tight and call us back the same way you did previously at 1:15?

MR. KATAEV: Is it okay if we remain on the line?

THE CLERK: For 20 minutes?

MR. KATAEV: Yes. It will be easier than getting -- it was technologically difficult.

MR. RUSSO: This is Eric. I can stay on the line and you can call back in.

THE CLERK: That works for me.

MR. KATAEV: Also, Ms. Fink, if I may just briefly, I believe a few of my colleagues have a hard cutoff at

1:30, just so the Court is aware, because they had to hop on other court appearances as well.

THE CLERK: If we can get on earlier, we will.

MR. MARWAHA: Off the record.

(Recess taken.)

MR. RUSSO: Counsel, this is Eric, the judge's deputy.

Are you all on the line?

MR. KATAEV: Yes.

MR. RUSSO: Is the court reporter there?

THE STENOGRAPHER: Yes.

MR. RUSSO: Hold on. I will merge the judge in to the call.

(Pause.)

MR. THOMASSON: Reminder, everyone, I'm the one that asked for the court involvement. I'll be happy to explain why we're here.

(Magistrate Judge James M. Wicks joined the teleconference.)

MR. RUSSO: Judge, are you on

M. Merckling

the line?

THE COURT: I am on the line.

Okay. Good afternoon, everyone.

Are we on the record?

MR. KATAEV: Yes.

MR. MARWAHA: Yes, Your Honor.

THE COURT: The court reporter is taking down what we're going to discuss?

THE STENOGRAPHER: Yes, your Honor.

THE COURT: Okay.

So, I understand an issue has arisen on the deposition of Mr. Merckling and Mr. Thomasson.

MR. THOMASSON: Yes, your Honor. This is Harry Thomasson. I asked for court involvement to get a ruling.

THE COURT: Okay.

What is the question for the ruling?

MR. THOMASSON: My issue is this, your Honor. The Court's order says that they were allowed to

redepose Merckling and Blankenship as to the communications on August 3rd. They're going beyond that scope --

THE COURT: That is correct.

MR. THOMASSON: They're going beyond that scope inarguably.

I had to object on a number of questions on this basis. When they continued to ask questions, I said I wanted a ruling from the Court because they're going well beyond communications of August 3rd.

THE COURT: All right.

Who's going to speak on behalf of plaintiff?

MR. KATAEV: Good afternoon, your Honor. Emanuel Kataev here, Sage Legal on behalf of the plaintiffs.

As an initial matter, Mr. Thomasson's objections were improper. As this Court has --

THE COURT: Why is that?

MR. KATAEV: -- numerous times ruled -- because he objected and then

stopped the deposition from proceeding.

MR. THOMASSON: No, I didn't.

MR. KATAEV: I asked him whether he wanted to instruct the witness not to answer and he --

THE COURT: Okay. Let's back up.

The deposition, as I ruled, was limited to the conversations on August 3rd. That's the questions that were posed at the last deposition. No one said you stopped the deposition. You should have continued with the deposition at that time. And the ruling is very clear that the deposition continued only with respect to those conversations that were inquired about privilege was raised, and I ruled on it.

So that's it. That's the limit of the deposition. Can't go beyond it.

What else?

M. Merckling

MR. KATAEV: Judge, may I be heard on this point?

THE COURT: Pardon?

MR. KATAEV: May I be heard on this point?

We did continue the deposition.

THE COURT: Of course.

MR. KATAEV: We did continue the deposition after those objections.

THE COURT: Yeah.

MR. KATAEV: And we finished with about an hour of testimonial time left.

It follows that because that objection was raised and was not ruled on until after the deposition, that we had subsequent questions to ask.

The order does say that we --

THE COURT: But did you ask these witnesses at the last session questions that privilege was invoked or raised and you preserved it for a ruling?

MR. KATAEV: We didn't ask the

questions because it didn't make sense to keep asking questions --

THE COURT: Why not?

MR. KATAEV: Because it didn't make sense --

THE COURT: That's what you have to do. That's how you make a record.

The only issue that was presented to me was this date surrounding August 3rd. That's it and that's what I ruled on. Nobody raised any other.

And you shouldn't have stopped the deposition. You should have continued, and if you had other issues, other areas that privilege was being raised or questions, they should have been part of the application that was before me. Otherwise we could be doing this every -- you'll ask questions and then I'll do a ruling and you'll have them back for questions more and this will never end.

M. Merckling

So that's the ruling, and it's very clear that the deposition was limited to communications between Mr. Thomasson and these witnesses surrounding August 3rd. That's it.

MR. THOMASSON: Your Honor, could I add one point?

THE COURT: Who is speaking?

MR. THOMASSON: Harry Thomasson, your Honor.

May I add one point?

THE COURT: Go ahead, Mr. Thomasson.

MR. THOMASSON: In response to what Mr. Kataev said, it's really not proper for him to put that the way he did. They wrapped up those depositions by saying we're done subject to the motion to compel, and then they brought a motion to compel.

THE COURT: Okay. Well, that confirms what I just said.

MR. THOMASSON: And then they brought a motion to compel for all

communications with the Deos but just limited communications with Merckling and Blankenship. It should have been broader if that's what they wanted.

THE COURT: I know. I just ruled, didn't I?

MR. THOMASSON: Yes.

MR. KATAEV: Your Honor, this is --

THE COURT: That's it.

Anything else, gentlemen?

MR. KATAEV: Yes. As I was trying to say, it was our understanding, your Honor, that because he raised those objections with respect to that question, he would raise the same objections as to the other questions. So we wanted a ruling on this and then to proceed. That was our understanding of what happened.

THE COURT: Okay. But you ended the deposition. That was your choice. Nobody directed you to. You should

M. Merckling

have continued. You move on. You preserve objections. You raise them. You call me for a ruling and, as I generally do, direct the parties to continue in other areas. And that could have led to other privilege objections. You could have raised those, but you didn't give us a briefing on other communications or questions to witnesses about other dates or areas or time frames. That's it. You briefed it.

MR. RUDERMAN: Your Honor, this is Mr. Ruderman. May I be heard just for a moment?

THE COURT: I'm sorry, who is this?

MR. RUDERMAN: I'm Jeffrey Ruderman for the Island Auto plaintiffs. May I just be heard on this?

THE COURT: Okay. Mr. Ruderman.

MR. RUDERMAN: There are lot of Jeffs. Unfortunately I'm one of them.

M. Merckling

But it's Mr. Ruderman (different pronunciation).

THE COURT: That's okay. That's not unfortunate.

MR. RUDERMAN: So, I just want to be clear that the issue we're talking about is really a date in time which stopped the world for our purposes of deposition.

THE COURT: Yes.

MR. RUDERMAN: And that date was August 3rd.

So, we did actually continue in the earlier deposition, went everywhere around that that we possibly could, but at that point --

THE COURT: Okay.

MR. RUDERMAN: -- Mr. Thomasson had objected stating, At that date, I became their attorney. And that stops everything going forward.

So every communication going forward was no longer available for us to question about and that was made

M. Merckling

clear from that objection. So when we were speaking --

THE COURT: Okay. None of this appears in the motion that was before me, none of it.

MR. RUDERMAN: Well, your Honor, I --

THE COURT: I appreciate what you're saying.

MR. RUDERMAN: Perhaps it was our misunderstanding, but we believed that once the Court -- the Court's ruling is the Court's ruling. I understand that.

We understood that to mean --

THE COURT: Listen, just because I concluded in the ruling that there was not an attorney/client privilege as of August 3rd doesn't mean it couldn't have been formed later. But that wasn't before me. I've got no evidence, no proof, no arguments on dates subsequent to August 3 from either side.

M. Merckling

MR. RUDERMAN: Understood, your Honor.

And from what we could read from the Court's decision, it wasn't until the filing on September 3rd that the Court indicated that there's any proof as to when that relationship started. So it was our understanding that the Court's ruling from the August 3rd was okay, you have free rein up until the date of that filing, and that is really what we thought we were arguing before the Court in the initial stages. Obviously we do not control how your Honor perceives our arguments or you ruling you did. Your ruling is clear as to what it said, but we believed that it was our understanding that once the Court would rule as to when that date happened, when are you the attorney, that we would be permitted to pursue it until that date.

And, frankly, your Honor, if

M. Merckling

perhaps we misunderstood how the Court was interpreting our argument or the way we presented it, you know, we would -- we feel that it would be proper now, now that the Court has heard when the client/attorney relationship began on September when it was filed, that we're trying to avoid also, your Honor, another motion to the Court to say well, now that there was no attorney/client privilege and we closed it based on this information, we would seek -- and, your Honor, it would take probably a half-hour, 40 minutes to ask just questions about that one-month period of time. Obviously the Court will, you know, address our motion should we make that. We're just hoping that the Court might expand its ruling and understanding to avoid that potential situation.

MR. THOMASSON: I object, your Honor, on basis that this is yet

M. Merckling

another bite of the apple that they're seeking that's improper. They're basically seeking to ask the questions now that they should have asked then.

And it's so ironic, your Honor, that they're telling me that because I made an objection on the basis of privilege then that they stopped dead in their tracks and didn't ask another question. Yet today when I make an objection on the basis that it's clearly beyond the scope of this Court's order for them to proceed until we get a ruling, they just kept going. So they --

THE COURT: I got it, Mr. Thomasson. The deposition's over.

All right. Anything further?

MR. MARWAHA: Briefly, your Honor. This is Nipun Marwaha, replacement counsel for Jeffrey Benjamin for all Deo defendants. I just wanted to note my appearance before you.

M. Merckling

THE COURT: Welcome.

MR. MARWAHA: I'm very happy to be here. It sounds like a fun case.

To that end, your Honor, I just wanted to point out that I would be joining in Mr. Thomasson's objection that he made prior to me entering the call just for the purposes of now there's an issue of whether or not he -- at least the plaintiff has brought up whether or not he can properly object on behalf of the Deo defendants. So I am making that objection on their behalf as well.

THE COURT: Okay. Fair enough.

The order was clear, that it was reopened for those purpose only. And if counsel made a choice not to explore other areas that would trigger privilege objections, that's their choice. It's the course that needs to be chartered.

So the deposition is over.

Which deposition is being taken

M. Merckling

right now?

MR. MARWAHA: We are currently doing Merckling and Blankenship both. We just switched between the two once we hit the objection, your Honor.

THE COURT: Okay.

Well, ask about that timeframe around that date and that's it.

MR. KATAEV: Thank you, your Honor.

MR. MARWAHA: Thank you, your Honor.

THE COURT: What I'd like is that portion of the transcript should be uploaded to ECF.

MR. KATAEV: We ordered an expedited, so we will upload it. We expect to receive it by tomorrow evening.

THE COURT: Very well. Thank you.

MR. KATAEV: Thank you, your Honor.

THE COURT: Have a great

weekend.

(Call concluded with the Court.)

MR. RUDERMAN: Emanuel, I don't remember, were you still in the middle of Mr. Merckling's questions?

MR. KATAEV: It's 1:25.

Let's take two, three minutes. I want to confer with Mr. Ruderman. We may be done.

(Recess taken.)

MR. KATAEV: We're going to conclude for today. We don't have any further questions.

Do you want the witnesses to come back so we could tell them, or will you tell them yourselves?

MR. MARWAHA: So just as a point of clarification, just because now we got a ruling from the judge on when it ends it ends. I'm going to presume you're not reserving anything, not counting any possible motions that you might file, but as far as right now you're not reserving any other time to

M. Merckling

call them back? Because, we're what, in the last 20-ish minutes.

MR. KATAEV: Based on the ruling, subject to any motions on the ruling, no, we don't have any further questions at the moment.

MR. THOMASSON: Are we on the record, Marie?

THE STENOGRAPHER: Yes.

MR. THOMASSON: Thank you.

MR. KATAEV: Anyone else have anything to say? And/or are we bringing the witnesses back?

MR. MARWAHA: We don't need to bring them back. We'll let them know.

MR. RUDERMAN: Do we have any further information about Mr. Laurie's continued deposition?

MR. MARWAHA: I think that's going to be -- we're going to see what Ariel's schedule and everyone else is on when we can put that in.

We had discussed doing that tomorrow, but I think Mr. Kataev has a

deposition.

MR. KATAEV: My deposition is confirmed to proceed tomorrow.

MR. THOMASSON: In this case, Emanuel?

MR. KATAEV: No, a different case.

MR. THOMASSON: Okay.

MS. VERBONITZ: So Laurie is off then tomorrow?

MR. KATAEV: No one is going to proceed tomorrow with any deposition.

MR. RUDERMAN: Right. So the only one that's scheduled right now is Monday's deposition and there's --

MR. MARWAHA: Sorry, I disconnected there for a moment.

MR. RUDERMAN: I said the only deposition that is currently scheduled is Monday's deposition.

MS. VERBONITZ: Who's on Monday, Jeff?

MR. RUDERMAN: Dan O'Sullivan.

MR. KATAEV: How long do you

M. Merckling

think that deposition will be?

MR. RUDERMAN: I'll probably be two, three hours or so, subject to everyone els's questions.

MR. KATAEV: Why don't we slot in Laurie for Monday afternoon then?

MR. THOMASSON: I'm going to have a lot more this time from Dan O'Sullivan. So I'm hearing we're going to be well into the afternoon before Mr. Ruderman and I alone are done.

MR. RUDERMAN: All right.

So, I think someone was putting together a letter to the Court.

MR. KATAEV: Yes.

Nipun, if I don't get the letter today, I'm just going to file my own letter. We met and conferred already.

MR. MARWAHA: I think that you spoke with Harry about the extension, correct?

MR. KATAEV: No, I don't believe we did. He was hospitalized.

M. Merckling

MR. MARWAHA: Okay. So then I'm getting a different game of telephone here.

My understanding was that you and Harry spoke about the possible standings for the discovery deadline.

So, Harry, do you want to chime in on that?

MR. THOMASSON: No. To be exact, I became aware of everyone's position on our side of the coin this morning learning that, and if somebody is seeking an extension in time, we will agree to seek an extension up to but not exceeding two more weeks.

MR. KATAEV: Okay. But are you putting together the letter as we requested, or are we doing our own letter?

MR. THOMASSON: I don't know anything about that, Emanuel. I've got a lot of catching up to do from the last week.

MR. MARWAHA: If you could do

M. Merckling

that, Emanuel, that would be great. Because I'm also literally just trying to catch up.

I read this order just now while sitting in my car hopping on this call that I wasn't even supposed to be on. So it's probably better since you know the history of all the adjournments that have already been requested and the reasoning why we need more time.

MR. KATAEV: Okay. I'm not going to waste time sharing the letter with anybody. We met and conferred. I'm submitting my own letter setting forth the position that two more weeks is all you're willing to consent to.

MR. THOMASSON: Are you asking for more than that?

MR. KATAEV: I'll discuss it with Jeff. I didn't have that in mind, but I think -- I don't think two weeks is sufficient, but maybe it is. Let's see.

MR. THOMASSON: Okay. I can't

agree to anything beyond that.

MR. KATAEV: Okay. Yeah, I understood that.

MR. MARWAHA: Do we have a date for Sarah as well?

Do we know whether or not the 31st works for you, Emanuel?

MR. RUDERMAN: No, the 31st does not work for him.

And I've got very limited dates because that Wednesday night starts Passover.

MR. MARWAHA: Yes, okay.

MR. RUDERMAN: So I'm out and I don't come into the office on Thursday or Friday. So I'm out the 2nd and the 3rd. I'm out again on Wednesday the 8th and Thursday the 9th.

MR. MARWAHA: I wish I could be paid as much as you to not work Thursdays and Fridays.

MR. RUDERMAN: Let's put it this way, nothing is free, as we know, in our profession. Everything comes with

M. Merckling

a cost.

So, if you can provide, like, three dates for Sarah Deo.

MR. MARWAHA: Yeah. So I'll get her every available date over the next this two-week window that we're asking for, and then if you guys want to ask for more time than that and the judge grants it, I'll get that as well.

MR. RUDERMAN: And Laurie. He's got four hours and two minutes left. So if you could get dates for those two, if you could do that before we send the letter out, it would be helpful. If we could send the letter out with a date that everybody's agreed upon.

MR. MARWAHA: Okay. I will talk to Sarah, and I will try to get in touch with Laurie.

THE STENOGRAPHER: Other than Emanuel and Jeff, is anyone else ordering the transcript at this time?

MS. VERBONITZ: I am not.

M. Merckling

MR. MARWAHA: No, not at this time.

THE STENOGRAPHER: Mr. Thomasson, I didn't hear you.

MR. THOMASSON: No.

THE STENOGRAPHER: Okay. Thank you.

(Deposition adjourned at approximately 1:34 p.m. EST)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

A C K N O W L E D G M E N T

STATE OF )
:ss
COUNTY OF )

I, MARC MERCKLING, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of March 26, 2026; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

____________________________
MARC MERCKLING

Signed and subscribed to before me this _________ day of _______________, 20__.

_____________________________________
Notary Public, State of

E R R A T A

PAGE/LINE/ CHANGE / REASON

_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________
_____/_____/___________________/______________________

C E R T I F I C A T E

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, MARC MERCKLING, was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Marie Foley
_______________________________
COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: March 27, 2026

**A**

**AARONSON** 352:8 354:15
**ability** 382:10 429:15
**able** 391:12
**absolute** 392:10
**accurate** 382:3 426:19
**acting** 390:22
**action** 429:18,21
**add** 389:20 397:19 407:8,12
**additional** 387:9
**address** 360:24 398:17 413:19
**addressing** 390:5,6
**adjourned** 425:9
**adjournments** 422:9
**admit** 389:6
**admitting** 361:15
**affirm** 360:8
**afternoon** 361:3 402:4 403:17 420:7 420:11
**ago** 397:25
**agree** 421:15 423:2
**agreed** 358:5,11,15 398:24 399:18 424:18
**agreement** 376:17
**ahead** 374:18,23 407:13
**allowed** 393:15,16 395:7 396:11,17 399:16 402:25
**And/or** 418:13
**angry** 367:19
**answer** 359:4 361:25 376:23 379:5 381:24 382:8 385:12 389:7 404:7
**answered** 371:3 387:22
**answers** 382:15 427:13
**Anthony** 352:6,19 354:6 355:4 356:22 366:18 369:16
**anticipated** 399:2
**anticipating** 371:20
**anybody** 366:2 372:17 422:14
**anyway** 371:10
**appearance** 390:21 391:16 395:16 397:24 414:24
**appearances** 354:2 355:2 356:2 357:5 401:4
**appears** 411:5
**apple** 414:2
**application** 406:19
**appreciate** 411:9
**approached** 377:9
**appropriate** 426:7
**approximately** 380:7 425:10
**areas** 406:17 409:6 409:12 415:20
**argue** 382:21 390:7
**arguing** 412:13
**argument** 413:3
**arguments** 397:12 411:23 412:16
**ARIEL** 356:6
**Ariel's** 418:22
**arisen** 402:15
**aronneburger@cu...** 356:10
**arrival** 371:20
**arrive** 375:21 379:20 380:16,18
**arrived** 364:25 365:4 365:6,19,20 366:5 370:6 371:25 372:10 375:11,15 375:19 377:9 379:9 379:16,17,20,22,22 380:6,13,14,23,24 381:3
**ASAD** 352:9
**asked** 369:11 371:3,6 372:16 375:25 385:3 386:23 387:9 387:10 388:14 392:12 393:4 401:20 402:18 404:5 414:5
**asking** 367:11 385:7 386:3 388:8,15 394:2,10 395:4 397:3 406:3 422:18 424:7
**assist** 369:7
**assisting** 368:12
**attached** 426:12
**attending** 374:14
**attorney** 361:20 362:19,20 376:17 390:13,16,18,23 397:23 398:6 410:21 412:22 426:15 429:17,20
**attorney's** 398:5
**attorney/client** 361:9 361:16 391:15 394:5,24 395:11 411:19 413:12
**August** 363:16 377:5 379:9 385:21 387:5 387:12 388:6,9,25 389:13 390:4,12,24 391:2,3,10,13 393:2 393:13,16 394:4,11 394:12,19,20 395:6 395:13,20 396:3,10 396:20 403:3,13 404:11 406:11 407:6 410:13 411:20,24 412:10
**Auto** 352:5,7,11,12 352:12,13,14,14,16 352:16 353:9 354:5 354:14,16,16,16,17 354:17,17,18,19 409:20
**AUTOMOTIVE** 352:24 355:8
**available** 397:8 399:21 410:24 424:6
**Avenue** 354:9,22 355:14
**avoid** 413:10,22
**aware** 362:24 363:10 370:15,21 371:12 371:17,22 401:2 421:11

**B**

**back** 361:5 362:8,12 362:13 363:14,15 366:22 372:24 373:3 374:24 375:3 383:4,8 393:9 400:11,20 404:8 406:23 417:16 418:2,14,16
**background** 387:4
**BANK** 353:7,8 356:4
**BARON** 352:9,9,11 354:15
**based** 362:10 377:24 395:10,12 413:13 418:4
**basically** 414:4
**basis** 403:9 413:25 414:8,12
**began** 387:24 413:8
**beginning** 371:7
**behalf** 354:4,14 355:4 356:4,13 395:16 398:13 403:15,19 415:13 415:15
**believe** 361:6 364:19 365:25 366:7 368:10 369:23 371:5,16 377:3 379:21 380:25

386:17 389:17 395:2 400:24 420:24
**believed** 411:12 412:19
**belonged** 369:15
**belongings** 368:9,11 368:13,18 369:2,4,8 378:20
**Benjamin** 414:23
**best** 382:9,16 429:15
**better** 422:8
**beyond** 376:19 388:14 389:11 395:5,5,6,22 396:10 397:4 403:4,7,12 404:23 414:13 423:2
**bit** 353:6 379:23 383:3
**bite** 414:2
**Blankenship** 352:20 355:5 368:22 379:16,20 380:13 380:24 381:3 385:2 385:3 386:8 387:6 388:5 394:9 403:2 408:4 416:4
**Blankenship's** 368:18 369:5
**BLVD** 352:11,12,12 352:13,14,14 354:16,16,16,17,17 354:17
**Boulevard** 356:7
**Box** 355:22
**breaking** 373:14 374:8
**BRIAN** 352:8 354:15
**brief** 387:3
**briefed** 409:13
**briefing** 409:10
**briefly** 381:21 400:24 414:20
**bring** 382:24 383:4 393:21 396:13 418:16
**bringing** 418:14
**broad** 392:15
**broader** 393:3,5 408:5
**broke** 370:17 372:23
**brought** 389:25 392:24,25 393:15 396:22,24 407:21 407:25 415:12
**Bruce** 364:10
**BUYERS** 352:22

**C**

**C** 427:2 429:2,2
**call** 362:8 373:24 376:13 382:21,23 383:8,17 400:11,20 401:17 409:4 415:9 417:3 418:2 422:6
**called** 365:7,10,12 373:12,20 381:12 381:15
**CAPITAL** 353:5
**Caption** 352:25
**car** 352:22 422:6
**carefully** 426:5
**carry** 378:7
**carrying** 377:15
**CARS** 352:22,23 355:6,7
**case** 362:25 415:4 419:5,8
**catch** 422:4
**catching** 421:23
**cell** 382:24
**CERTIFICATE** 357:10
**certification** 358:7
**Certified** 353:20 429:4,23
**certify** 427:8 429:6 429:11,16
**CHABRIER** 352:8 354:15
**chambers** 383:18
**change** 367:11 374:16 428:3
**changing** 365:18 366:9 367:4
**chartered** 415:23
**CHASE** 353:8
**Chestnut** 356:16
**chime** 421:8
**choice** 408:24 415:19 415:22
**civilization** 392:14
**clarification** 417:19
**clear** 404:17 407:3 410:7 411:2 412:18 415:17
**clearly** 395:18 397:5 414:13
**clerk** 383:21 384:2 384:20 386:22 387:15 389:23 392:8,18 393:23 394:17 395:9,13 397:6,17 398:19 399:10,18,24 400:2 400:5,15,22 401:5
**client** 381:20
**client/attorney** 413:7
**clients'** 398:10
**closed** 393:6 395:24 396:16,18 413:13
**closer** 382:24
**COAST** 352:22,23 352:24 353:2,3,3 355:6,7,8,9,10,10
**coffee** 368:23
**coin** 421:12
**colleagues** 400:25
**come** 363:14 364:9 373:25 374:3 375:5 377:12 393:9 417:16 423:16
**comes** 423:25
**coming** 371:8,22
**commencement** 429:7
**commencing** 353:18
**comment** 399:12
**communication** 410:23
**communications** 361:9 388:6,25 389:13 392:13 393:12 395:5 396:3 403:3,13 407:4 408:2,3 409:10
**Company** 353:23
**compel** 388:21,22 393:8,10 395:25 396:19 407:20,21 407:25
**complete** 399:8 427:12
**concerning** 367:24 385:4
**concerns** 377:24
**conclude** 417:13
**concluded** 411:18 417:3
**confer** 417:9
**conference** 383:13
**conferred** 420:20 422:14
**confirmed** 419:4
**confirming** 372:7
**confirms** 407:23
**connected** 384:6
**connection** 373:15
**consent** 422:17
**consistent** 385:4
**contemplating** 386:15
**context** 391:18 392:2 393:18
**continue** 392:19 405:7,9 409:6 410:14
**continued** 352:25 353:16 403:10

404:15,18 406:16 409:2 418:19
**contract** 376:15
**control** 412:15
**conversation** 361:16 361:19 364:13 367:18 372:8 378:8
**conversations** 364:17 367:5,22 372:12 375:25 376:8 378:3 378:9 385:4,21 386:20,24 387:5,9 387:11 404:11,19
**copy** 363:5
**CORP** 353:5
**correct** 362:14,17 363:12 364:25 365:4,20,24 366:5 371:20 373:9,20 377:18 379:17 380:16 382:18 403:5 420:23 427:15
**corrections** 426:6,8
**cost** 424:2
**counsel** 358:6 383:20 397:14 401:9 414:22 415:19 429:18,20
**counting** 417:23
**County** 364:24 427:6
**course** 389:23 405:8 415:22
**court** 352:2 358:18 362:21 373:3 375:3 382:4,21 384:15 385:13 388:12,18 388:21,23 389:14 390:2,5,5,8,14,16 390:23,25 391:8,13 391:20 393:19,19 396:2 397:4 399:15 401:2,3,13,21 402:3 402:8,8,13,19,20 403:5,11,14,22,23 404:8 405:4,8,11,20 406:4,7 407:9,13,22 408:6,11,23 409:17 409:23 410:4,11,18 411:4,9,13,17 412:7 412:14,20 413:2,6 413:11,18,21 414:17 415:2,16 416:7,14,21,25 417:3 420:16 426:20 429:22
**Court's** 385:5 388:2 392:4 394:16 395:23 402:24 411:13,14 412:5,10 414:14
**covered** 377:3 389:18
**CPA** 352:21
**CPA'S** 353:6
**crime** 392:20
**CULLEN** 356:5
**current** 360:24
**currently** 384:24 416:3 419:20
**cutoff** 400:25
**cutting** 370:25
**CYRULI** 354:20

**D**

**D** 427:2
**Dan** 419:24 420:9
**date** 353:19 386:25 389:11 390:24 396:4 406:10 410:8 410:12,20 412:12 412:21,24 416:9 423:5 424:6,17 426:11 429:14
**Dated** 429:24
**dates** 409:12 411:24 423:11 424:4,13
**DAVID** 352:10
**day** 363:18 364:5,7 372:13 427:21
**days** 397:25 426:16
**dead** 414:9
**deadline** 421:7
**dealership** 364:10,25 366:17 367:23 369:3,9,19 370:14 370:20 371:13 373:19 374:4 375:6
**dealing** 363:2
**decision** 412:5
**deemed** 426:19
**Deer** 360:25
**DEFENDANT** 355:20 356:4,13
**defendants** 353:11 355:4 384:12 394:3 397:24 398:14 414:23 415:14
**Deo** 352:19,19 355:4 355:5 356:22 364:14,17 365:9,23 366:4,12,19,24 367:13,19,22 368:3 368:7,12 369:13,19 370:2,10 372:2,11 372:14 373:12,19 375:22 377:10,12 379:10 384:11,15 397:24 398:13 414:23 415:13 424:4
**Deos** 392:14 408:2
**Department** 364:24
**depended** 392:16
**deposed** 384:22
**deposing** 384:23 385:2 426:15
**deposition** 353:16 359:2 362:11 363:3 363:12 385:14,15 386:14 387:14 389:12 390:25 393:11 395:19 397:5 398:8,22 402:15 404:2,10,13 404:14,16,18,23 405:7,10,17 406:15 407:3 408:24 410:10,15 415:24 415:25 418:19 419:2,3,13,16,20,21 420:2 425:9 426:4 426:12,16,18 427:11
**deposition's** 414:18
**depositions** 388:19 393:6 395:24 396:12,17 407:19
**deputy** 383:19 401:10
**different** 393:18 410:2 419:7 421:3
**difficult** 400:18
**direct** 409:5
**directed** 408:25
**directing** 363:11
**DIRECTION** 359:4
**disclose** 361:17,22
**disclosing** 361:8
**disconnected** 419:18
**discovery** 421:7
**discuss** 366:19,24 372:3,11 393:16,20 402:10 422:20
**discussed** 418:24
**discussing** 369:21 376:5
**discussion** 377:11 378:11 383:15
**discussions** 362:20 377:20,23 390:3
**dispute** 387:24
**disqualified** 397:14
**DISTRICT** 352:2,3
**diverting** 399:6
**DLA** 353:5
**docket** 385:5
**DOCUMENTS** 359:9
**doing** 376:11 406:21 416:4 418:24

421:19 426:10
**drafted** 392:4
**duly** 360:16 429:8
**duration** 377:11
**Dwight** 352:20 355:5 368:20 379:22 381:13
**dying** 398:15
**DYKMAN** 356:5

**E**

**E** 356:6 427:2,2 428:2 429:2,2
**Earle** 356:7
**earlier** 371:6 401:6 410:15
**easier** 400:17
**East** 360:25
**EASTERN** 352:3
**ECF** 416:16
**effect** 358:17
**effectively** 385:14 387:13
**either** 368:21 411:25
**els's** 420:5
**EMAIL** 354:11,24 355:16,24 356:10 356:18
**Emanuel** 354:8 381:18 384:8 403:18 417:4 419:6 421:22 422:2 423:8 424:23
**emanuel@sagelega...** 354:11
**employee** 429:17,19
**ended** 408:23
**ends** 417:21,21
**entering** 415:8
**entirely** 399:16
**entitled** 382:15 385:18 386:9,19
**entry** 385:6
**Eric** 383:18 400:19 401:10
**errata** 357:9 426:8 426:11,14
**ESQUIRE** 354:8,21 355:13 356:6,15
**EST** 353:18 360:3 425:10
**establish** 394:23
**established** 390:19 391:14 394:6
**ESTATE** 352:10
**evening** 375:10 377:18 379:9 416:20
**event** 398:11
**events** 388:9
**everybody's** 424:17
**everyone's** 421:11
**evidence** 390:17 411:23
**exact** 376:7 394:8 421:11
**examination** 357:6 358:8,15 360:20 429:7
**examined** 360:18
**example** 379:2
**exceeding** 421:16
**exception** 392:21
**existed** 390:9
**existence** 363:11
**exits** 383:12
**expand** 413:21
**expect** 416:19
**expedited** 416:18
**explain** 361:10,25 401:22
**explicitly** 385:24
**explore** 415:20
**extension** 420:22 421:14,15

**F**

**F** 429:2
**fact** 361:14 362:12 367:8 387:19 390:15 396:15 397:2
**fail** 426:17
**fair** 364:4 375:18 415:16
**far** 378:8 417:24
**FEDERAL** 358:2
**feel** 413:5
**figure** 370:5
**file** 395:15 417:24 420:19
**filed** 362:25 413:9
**filing** 358:7 412:6,12
**final** 397:11
**finally** 386:6
**financially** 429:21
**find** 371:8
**fine** 374:13,14,20 384:20
**finish** 362:3 398:25
**finished** 405:12
**Fink** 383:21 384:18 397:22 398:24 399:23 400:23
**first** 360:16 363:3 366:16 380:23 385:23 386:11 396:15
**FISK** 352:15 354:18
**five** 380:2
**Floor** 356:8
**Flushing** 353:7 356:4 384:13
**Foley** 353:19 429:3
**follow-up** 386:5
**Following** 381:17
**follows** 360:19 386:2 405:15
**force** 358:17
**foregoing** 429:11
**form** 358:12
**formed** 411:21
**forth** 422:16 429:14
**forward** 410:22,24
**found** 361:18 390:17
**four** 424:12
**frames** 409:12
**Franklin** 355:14
**frankly** 412:25
**fraud** 392:20
**free** 412:11 423:24
**Friday** 363:24 375:10 423:17
**Fridays** 423:22
**fully** 381:25
**fun** 415:4
**FUNDING** 353:7 356:13
**further** 358:10,14 386:3 388:24 391:6 391:23 394:3 414:19 417:14 418:6,18 429:11,16

**G**

**G** 427:2
**game** 421:3
**gather** 368:8
**general** 368:8 378:12 386:25
**generally** 409:5
**gentlemen** 408:12
**getting** 369:8 373:16 398:2,16 400:17 421:3
**give** 360:9 374:15 397:6 398:25 409:9
**given** 427:14
**giving** 391:20,22
**go** 363:15 366:22 374:18,23 404:23 407:13
**GOAL** 352:24 355:8
**going** 362:7 370:5 371:2 376:10,20 378:16 382:23 383:3 388:14 394:2 400:7 402:9 403:4,6 403:12,15 410:22 410:23 414:16

417:12,21 418:21 418:21 419:12 420:8,11,19 422:13
**GOLD** 352:22,23 353:2,2,3 355:6,7,9 355:9,10
**good** 361:3 382:20 402:4 403:17
**grants** 424:10
**great** 416:25 422:2
**GROUP** 352:24 355:8,12
**guess** 382:10,14,23
**guesses** 382:2
**guidance** 391:23
**guys** 400:10 424:8

**H**

**half-hour** 413:16
**hand** 360:6
**happen** 384:19
**happened** 387:11 391:3 392:3 408:22 412:21
**happy** 401:21 415:3
**hard** 400:25
**Harry** 352:19 355:21 366:7 375:7 376:9 377:16 378:7,15 379:21 402:18 407:10 420:22 421:6,8
**hear** 374:11,11,12,14 374:19 383:21 400:3 425:5
**heard** 389:22 390:2 405:3,5 409:15,21 413:7
**hearing** 420:10
**held** 353:17 383:15
**hello** 372:19,20
**help** 369:11 370:3 376:2
**helpful** 424:16
**helping** 378:7
**hereinbefore** 429:14
**hereto** 358:5
**herring** 396:13
**Highway** 355:22
**hill** 398:15
**history** 392:13 422:9
**hit** 416:6
**hold** 361:13 400:5 401:16
**Honor** 402:7,12,17 402:24 403:18 407:7,11 408:9,15 409:14 411:7 412:3 412:16,25 413:10 413:15,25 414:6,21 415:5 416:6,11,13 416:24
**hop** 401:3
**hoping** 413:20
**hopping** 422:6
**hospitalized** 420:25
**hour** 386:7 398:22 399:3 405:13
**hours** 420:4 424:12
**hrtatty@verizon.net** 355:24
**hundred** 381:2
**HWY** 352:6 353:8 354:14
**HYLAN** 352:11,12 352:12,13,13,14 354:16,16,16,17,17 354:17

**I**

**imperative** 426:13
**implicitly** 361:15
**implied** 385:25
**important** 388:17
**improper** 385:16 386:12 397:13 399:5,13 403:22 414:3
**improperly** 382:22
**inarguably** 403:7
**incident** 367:24
**Index** 352:17 357:3 359:2
**indicate** 390:20
**indicated** 412:7
**inferred** 362:12
**inform** 370:10
**information** 361:18 413:14 418:18
**informed** 367:7
**initial** 403:20 412:14
**initiated** 383:17
**inquired** 404:20
**inside** 367:22
**instruct** 385:11 389:7 404:6
**instruction** 382:13
**INSTRUCTIONS** 426:2
**intentions** 392:4
**interested** 429:21
**interpreting** 413:3
**invoked** 405:22
**involvement** 401:21 402:19
**IRIS** 352:9
**ironic** 414:6
**irrelevant** 396:6
**Island** 352:16 354:19 409:20
**issue** 362:22 390:13 394:15 398:18 402:14,23 406:9 410:7 415:10
**issued** 362:21
**issues** 406:17

**J**

**J.P** 353:7
**Jamaica** 354:9,10
**James** 401:23
**Jeff** 419:23 422:21 424:23
**Jeffrey** 354:21 409:19 414:22
**Jeffs** 409:25
**join** 376:20
**joined** 401:24
**joining** 387:23 415:7
**JONES** 352:21 353:6
**JORY** 352:8 354:15
**JOSHUA** 352:8 354:15
**JR** 355:21
**jruderman@cszla...** 354:24
**judge** 362:7,21 383:18,21 397:7 399:21 400:6 401:17,23,25 405:2 417:20 424:9
**judge's** 398:3 401:10

**K**

**K** 427:2
**Kataev** 354:8 357:7 360:21 361:21,24 366:21 371:9,11 372:6,24 374:18,24 376:22 382:12,19 383:8,14,22 384:5,8 384:23 387:3 388:11 389:17 394:22 397:10 398:23 399:14,22 400:4,13,16,23 401:12 402:6 403:17,18,24 404:5 405:2,5,9,12,25 406:5 407:16 408:9 408:13 416:10,17 416:23 417:7,12 418:4,12,25 419:3,7 419:12,25 420:6,17 420:24 421:17 422:12,20 423:3
**Kataev's** 382:8
**keep** 406:3
**keeps** 370:25
**kept** 414:15

**KHAN** 352:9
**know** 363:4 365:7,12 367:17 368:5 370:23 371:7 373:15,23 375:20 375:25 378:15 379:14,21 380:4 381:10 383:11 388:18 389:2,8 394:21 398:15,20 408:6 413:4,19 418:16 421:21 422:8 423:7,24
**knowledge** 370:9

**L**

**L** 427:2
**Laurie** 352:21 355:6 419:10 420:7 424:11,21
**Laurie's** 418:18
**law** 355:12 383:21
**lawsuit** 377:21
**lawyer** 376:12 378:16
**learn** 361:10
**learned** 364:23
**learning** 421:13
**LEASING** 352:7 353:9 354:15
**led** 409:7
**left** 386:7 387:7 398:21 405:14 424:12
**legal** 354:7 376:11 403:19
**let's** 362:3 363:15 366:22 374:22 393:17 404:8 417:8 422:24 423:23
**letter** 420:16,18,20 421:18,20 422:13 422:15 424:15,16
**Lexington** 354:22
**Libertas** 353:7 356:13 384:11
**LIC** 353:2 355:9
**life** 392:16
**light** 375:14,16
**limit** 404:22
**limited** 389:12 391:19 393:2 394:9 397:5 404:11 407:4 408:3 423:11
**line** 359:5,10,15,20 384:4 400:14,20 401:11 402:2,3
**Listen** 411:17
**literally** 422:3
**little** 353:6,23 379:22 383:3
**LLC** 352:5,7,7,11,12 352:13,13,14,14,15 352:16,16,23,24 353:2,2,3,4,7,9,10 354:5,7,14,15,16,16 354:16,17,17,18,18 354:18,19 355:7,8,9 355:9,10,11 356:13
**LLP** 353:6 354:20 356:5,14
**locked** 367:3 378:13 378:18
**locks** 365:18 366:9 367:4,11
**locksmith** 365:17,20 367:8 369:19 370:14,20 371:14
**long** 380:5 419:25
**longer** 410:24
**look** 376:10 378:16
**lot** 389:2 409:24 420:9 421:23

**M**

**M** 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 401:23 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 427:2
**Magistrate** 383:17 401:23
**making** 389:5 415:14
**MANAGEMENT** 352:16 354:19
**Marc** 352:20 353:17 355:5 357:6 360:15 381:22 383:2 427:8 427:18 429:7
**March** 353:13 427:11 429:24
**Marie** 353:19 418:9 429:3
**MARKED** 359:19
**Marwaha** 355:12,13 361:11,13,23 362:4 371:2 372:5 373:21 376:20 379:3 381:18,24 383:2,7 384:11 385:8,17 387:23 397:21,22 401:7 402:7 414:20 414:21 415:3 416:3 416:12 417:18 418:15,20 419:17 420:21 421:2,25 423:5,14,20 424:5 424:19 425:2
**matter** 396:16 397:2 403:20
**mean** 367:2 391:10 394:14 411:16,20
**mentioned** 398:20
**Merckling** 352:20

353:17 355:6 357:6 360:1,15,23 361:1,3 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1,24 385:1 386:1 387:1 388:1,5 389:1 390:1 391:1 392:1 393:1 394:1,9 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 402:16 403:1,2 404:1 405:1 406:1 407:1 408:1,3 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1,4 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 427:8,18 429:8
**Merckling's** 417:6
**merely** 388:11 399:2
**merge** 401:17
**Merit** 353:20 429:3 429:23
**merits** 386:19
**met** 379:10 420:20 422:14
**mic** 382:25
**MICHAEL** 352:21 355:6
**mid-question** 381:19

**middle** 417:5
**mind** 422:22
**Mineola** 355:15
**minutes** 380:2,3,9,11 398:21,21 399:3 400:7,15 413:16 417:8 418:3 424:12
**misreading** 392:3
**misunderstanding** 411:12
**misunderstood** 413:2
**moment** 371:18 396:8 398:16 409:16 418:7 419:18
**Monday** 419:22 420:7
**Monday's** 419:16,21
**month** 395:21 396:5 396:9
**MORGAN** 353:8
**morning** 421:13
**motion** 362:25 386:15 388:20,22 389:25 390:9 392:11,25 393:7,9 393:15,21 396:19 396:20,24 407:20 407:21,25 411:5 413:10,19
**motions** 395:25 400:9 417:23 418:5
**MOTOR** 352:7 353:9 354:15
**MOTORS** 352:5,24 353:2,3,4,5 354:4 355:8,9,10,11
**move** 376:2 409:2
**mug** 368:23

**N**

**N** 427:2,2
**N.A.189** 353:8
**name** 360:22 397:22
**narrow** 394:14
**Nassau** 364:24
**necessary** 398:7 426:5
**need** 381:20 392:6 400:7 418:15 422:11
**needs** 415:22
**neither** 429:16,19
**never** 406:24
**New** 352:3 354:10,23 354:23 355:15,23 356:9 360:18 361:2 429:5
**night** 423:12
**Nipun** 355:13 397:22 414:21 420:18
**Nipun@marwahla...** 355:16
**none-** 359:6,11,21
**nonsense** 392:10
**normal** 363:23 364:2
**NORTHSHORE** 352:7 353:9 354:14
**Notary** 353:21 358:16 360:17 427:24 429:5,24
**note** 414:24
**notepad** 378:25
**notes** 379:12
**notice** 395:16 397:23
**Novicki** 364:10,14,16 365:10
**number** 403:8
**numerous** 403:24
**NYC** 352:22

**O**

**O** 427:2
**O'Sullivan** 419:24 420:10
**oath** 427:10
**object** 371:3 379:3 385:23 388:12 403:8 413:24 415:13
**objected** 361:7 362:6 385:10 388:10 389:14 403:25 410:20
**objection** 361:11 372:5 373:21 376:18,21 387:20 387:25 389:24 390:2,6 391:9,21 394:13 395:10 396:8 398:12 399:15 405:16 411:2 414:8,12 415:7,15 416:6
**objections** 358:11 363:2 382:22 386:13,18 387:13 387:21 389:5 399:5 399:17 403:21 405:10 408:16,18 409:3,8 415:21
**observe** 364:16 379:11
**obviously** 379:5 381:24 398:14 412:15 413:18
**occurred** 364:13
**office** 364:20 368:15 368:19 369:15 376:3 423:16
**okay** 362:4,16 363:8 363:15 364:8,22 368:16 371:24 372:9 373:7 374:6 375:9,17 377:2 382:11 383:10 384:3 387:15 392:9 393:23 397:6,17 398:19 399:10,19 399:20 400:13 402:4,13,20 404:8 407:22 408:23 409:23 410:4,18 411:4 412:11 415:16 416:7 419:9 421:2,17 422:12,25 423:3,14 424:19 425:7
**once** 369:19 387:24 411:13 412:20 416:5
**one-month** 413:17
**one-on-one** 377:13
**order** 362:21 363:10 363:11 385:5,20 388:2,4,12 389:10 389:11 391:17,21 392:5 393:10,19,19 394:16 395:23 396:23 398:3 402:24 405:19 414:14 415:17 422:5
**ordered** 396:2 416:17
**ordering** 424:24
**original** 426:14
**originally** 398:4
**outside** 365:13,16,23 366:13,16,20,23 367:23 368:3,6,8 369:2,18 370:13,19 371:13 372:3 375:14 380:6,19
**overruled** 386:18
**Ovington** 356:7
**owner** 367:12

**P**

**p.m** 353:18 360:3 375:19 425:10
**Page** 357:4,8 359:5 359:10,15,20
**PAGE/LINE/** 428:3
**paid** 423:21
**Pardon** 405:4
**Park** 360:25
**part** 370:24 406:19
**parties** 358:5 409:5 429:18
**PARTNERS** 353:5

**Passover** 423:13
**pause** 374:21 383:3 399:25 401:18
**payments** 377:5
**pen** 378:25
**Pennsylvania** 356:17
**perceives** 412:16
**percent** 381:2 399:13
**period** 413:17
**permitted** 385:20 412:23
**person** 374:13
**personally** 368:25
**Philadelphia** 356:17
**phone** 370:23 382:24 384:6
**piggyback** 382:12
**place** 387:21 395:20 396:5,9 429:14
**plaintiff** 352:17 384:9,14 403:16 415:11
**plaintiffs** 354:4,14 362:25 388:4 393:25 403:19 409:21
**plaintiffs'** 389:18
**please** 360:7 372:25 374:25 387:17 392:12 397:9 426:4 426:10
**PLLC** 355:12
**point** 364:23 366:3 367:10 373:8 379:11,15 392:23 395:3,4 397:11,15 398:2 405:3,6 407:8 407:12 410:17 415:6 417:18
**police** 364:24 365:7 365:10,12,13,19 370:6,11,15,21 371:8,14,18,22,25 372:10,15,18,21,23 375:11 377:24
**portion** 373:2 375:2 382:6,7 416:15
**posed** 404:13
**position** 385:19 387:17 389:18 390:12 391:4 393:25 395:22 421:12 422:16
**possession** 378:21,23
**possible** 417:23 421:6
**possibly** 410:17
**potential** 413:22
**practice** 386:15
**PREMIER** 353:4
**present** 356:21 364:5 364:6,12 365:3 371:18 377:25 378:19 385:9
**presented** 406:10 413:4
**preserve** 409:3
**preserved** 405:23
**presume** 417:21
**previous** 398:5
**previously** 388:19 400:12
**principals'** 384:13
**prior** 368:6,7 400:8 415:8 429:6
**privilege** 394:5,24 395:11 404:20 405:22 406:17 409:7 411:19 413:12 414:9 415:21
**pro** 355:20 384:10
**probably** 367:16 413:15 420:3 422:8
**problem** 370:3
**proceed** 408:20 414:14 419:4,13
**proceeding** 386:14 391:7 404:3
**proceeds** 385:14
**PRODUCTION** 359:9
**profession** 423:25
**pronunciation** 410:3
**proof** 411:23 412:7
**proper** 407:17 413:6
**properly** 398:13,17 415:13
**protecting** 398:10
**provide** 424:3
**Public** 353:21 358:16 360:17 427:24 429:5,24
**pure** 392:10
**purpose** 415:18
**purposes** 398:9 410:10 415:9
**pursue** 412:23
**put** 393:17 397:23 407:17 418:23 423:23
**putting** 420:15 421:18

**Q**

**question** 358:12 363:9 366:11 369:13,24 371:6 372:4 387:2 394:18 395:15,17 402:21 408:17 410:25 414:11
**questions** 359:19 361:7 362:8 376:12 382:8 385:3,8,18 386:4,5,20,23 387:4 387:20 388:9,16,24 389:2,16 391:6,11 391:12,20,24 394:3 394:11,19 395:19 403:9,10 404:12 405:18,22 406:2,3 406:18,22,24 408:19 409:11 413:17 414:4 417:6 417:14 418:7 420:5
**quick** 397:11 398:7
**quote** 388:2 393:12

**R**

**R** 355:21 428:2,2 429:2
**raise** 360:6 386:12 397:16 408:18 409:3
**raised** 363:3 397:13 404:20 405:16,23 406:12,18 408:16 409:8
**raising** 398:12
**read** 372:24 373:3 374:24 375:3 388:13 412:4 422:5 426:4 427:9
**reading** 385:23 391:17,25
**really** 364:2 368:14 407:16 410:8 412:13
**Realtime** 353:21 429:4,23
**REALTY** 352:15 354:18
**reason** 362:13 373:11 373:18 381:8 426:7 428:3
**reasoning** 422:11
**reasons** 386:10
**recall** 364:19 367:21 367:25 368:2,12,17 372:8,12 373:5 376:4 378:14 379:6 380:20,22 381:14 382:2,5,5,6,7
**receipt** 426:16
**receive** 416:19
**Recess** 401:8 417:11
**recollection** 370:10 382:16
**reconsider** 389:10 393:22 396:23,24

**reconvened** 396:12
**record** 360:22 373:3 375:3 376:21 377:4 382:4 383:14,16 391:14 401:7 402:5 406:8 418:9 427:12 427:14
**red** 396:13
**redepose** 388:4 403:2
**referring** 392:20
**regarding** 388:24
**Registered** 353:20 429:3,23
**regularly** 374:3 375:5
**rein** 412:11
**relation** 362:22
**relationship** 391:15 412:8 413:8
**relative** 429:17,19
**relevance** 379:4
**relying** 398:4
**remain** 377:10 400:14
**remember** 364:21 365:11 367:2,5,6,10 367:15,17 368:5,11 368:14,22,25 369:6 369:14,25 370:12 371:21 375:12,24 376:7,9,14,24 377:14,22 378:3,4,6 378:7,9,17,24 379:13,24 381:6,11 381:11,13 382:17 397:2 417:5
**reminded** 392:12
**Reminder** 401:19
**REMOTE** 354:2 355:2 356:2
**remotely** 353:17 429:8
**reopened** 415:18
**repeat** 370:18 371:4 374:5
**replacement** 414:22
**reporter** 353:20,21 373:4 375:4 384:16 401:14 402:8 429:4 429:4,22,23,23
**REPORTER'S** 357:10
**Reporting** 353:23
**representation** 362:10
**representations** 398:6
**REPRESENTATI...** 352:10
**represented** 394:22
**REQUEST** 359:9
**requested** 373:2 375:2 421:19 422:10
**reserved** 358:12
**reserving** 417:22,25
**respect** 404:18 408:17
**respective** 358:6
**respond** 392:7
**response** 367:7,14 407:15
**result** 361:19 378:13
**resulting** 363:10
**retainer** 376:17
**return** 363:12 387:8 426:13
**review** 400:8
**right** 360:6 361:23 362:5 363:6 370:7 373:13 375:11 383:24 394:17 395:9 403:14 414:19 416:2 417:24 419:14,15 420:14
**rights** 398:10
**ROBERT** 352:6 354:6
**Ronneburger** 356:6 384:12
**ROSLYN** 353:3 355:10
**roughly** 395:21
**ROUTE** 352:15 354:18
**Ruderman** 354:21 361:17 374:12 384:9 389:19,21,24 392:24 409:14,15 409:19,20,23,24 410:2,6,12,19 411:7 411:11 412:2 417:4 417:9 418:17 419:14,19,24 420:3 420:12,14 423:9,15 423:23 424:11
**rule** 385:13 388:22 390:24 412:20
**ruled** 388:23 390:25 391:8 399:15 403:25 404:10,21 405:16 406:12 408:7
**ruling** 391:9 399:9 402:19,22 403:11 404:17 405:24 406:22 407:2 408:20 409:4 411:14,14,18 412:10,17,17 413:21 414:15 417:20 418:5,6
**run** 393:22
**Russo** 383:18,20,24 400:19 401:9,13,16 401:25

**S**

**Sage** 354:7 403:18
**SALES** 352:5 354:5
**Sarah** 352:19 355:5 423:6 424:4,20
**saying** 372:20 376:9 389:9 407:19 411:10
**says** 388:2,7,12,13 389:11 393:10 402:25
**schedule** 418:22
**scheduled** 419:15,20
**scope** 376:19 388:15 395:6,23 396:11 397:4 403:4,7 414:13
**se** 355:20 384:10
**sealing** 358:7
**second** 356:8 374:16 386:2,17 397:7
**see** 390:17 397:7 399:20 418:21 422:24
**seeing** 376:10
**seek** 413:14 421:15
**seeking** 414:3,4 421:14
**seen** 363:5
**send** 424:15,16
**sense** 406:2,6
**sentence** 388:3,13
**September** 388:10 390:21 391:16 395:15 412:6 413:8
**serve** 376:16
**session** 405:21
**set** 429:14
**setting** 422:15
**SHANKS** 354:20
**sharing** 422:13
**sheet** 426:8,11,14
**showed** 365:14,16 366:7 371:16,19,23 380:21
**shut** 383:5
**side** 411:25 421:12
**sign** 376:15 426:10
**SIGNATURE** 357:8
**signed** 358:16,17 376:24 427:20
**simply** 399:12

**single** 394:13
**sit** 400:11
**sitting** 422:6
**situation** 413:23
**slot** 420:6
**SMITHTOWN** 353:4 355:11
**solitary** 394:13
**somebody** 421:13
**soon** 379:19
**sorry** 370:17 381:18 397:10 400:5 409:17 419:17
**sorts** 389:3
**sounds** 415:4
**space** 426:7
**speak** 362:7 372:14 372:16,18,21 377:13 381:20 398:3 403:15
**speaking** 370:24 378:22 407:9 411:3
**specific** 386:25 390:6
**speculation** 373:22
**speed** 398:3,17
**spent** 380:15
**spoke** 373:5 400:6 420:22 421:6
**ss** 427:5
**stages** 412:15
**stand** 397:9
**standing** 365:13,16 365:22 366:4 370:4 370:13,19 371:13 380:5,18
**standings** 421:7
**start** 398:24
**started** 388:8 412:8
**starting** 361:25
**starts** 423:12
**state** 360:17,22 387:17 426:6 427:4 427:24 429:5
**stated** 385:12
**statement** 385:25
**STATES** 352:2
**stating** 385:11 410:20
**stay** 400:20
**STENOGRAPHER** 360:5,13 401:15 402:11 418:10 424:22 425:4,7
**stenographically** 429:13
**stepped** 366:16,23 368:3 369:18
**stepping** 367:23 368:6,7
**steps** 378:12
**STIPULATED** 358:4 358:10,14
**STIPULATIONS** 358:2 359:14
**stop** 382:20 386:13 387:18
**stopped** 386:3 387:14 390:10 391:2,7 404:2,14 406:14 410:9 414:9
**stopping** 385:15
**stops** 410:21
**Street** 352:15 354:18 356:16 360:25
**stuff** 376:2 377:15 378:7 393:18
**subject** 386:16 388:20 393:7,11 395:24 396:19 399:8 407:20 418:5 420:4
**subjects** 389:3
**submit** 385:16 386:11
**submitting** 422:15
**subscribed** 427:20
**subsequent** 366:3 405:18 411:24
**subsequently** 387:7
**substance** 372:21
**sufficient** 422:23
**Suite** 354:22 355:14 355:22 356:16
**Sunrise** 352:6,23 353:8 354:14 355:7 355:22
**Superb** 352:5 354:4 363:17
**SUPPORT** 359:2
**supposed** 422:7
**sure** 363:21 367:3 374:18 377:16 381:2 392:8
**surrounding** 406:11 407:6
**SUSAN** 356:15
**sverbonitz@weirla...** 356:18
**swear** 360:8
**switched** 416:5
**sworn** 358:18 360:16 429:8
**SYOSSET** 352:23 355:7

**T**

**T** 427:2 428:2 429:2 429:2
**take** 369:2 413:15 417:8
**taken** 378:12 401:8 415:25 417:11 427:10 429:13
**talk** 424:19
**talking** 394:15 410:8
**TEAM** 352:5 354:5
**technologically** 400:18
**TECHNOLOGY** 354:2 355:2 356:2
**teleconference** 353:18 401:24
**telephone** 421:3
**tell** 365:9 389:14 417:16,17
**telling** 362:18 365:11 414:7
**ten** 380:2,2,10
**testified** 360:18 387:6
**testify** 361:5 429:9
**testimonial** 386:7 405:13
**testimony** 360:9 390:3 427:10,13 429:12
**Thank** 360:13 383:24 384:2,21 398:19 399:10,19,22,24 416:10,12,21,23 418:11 425:7
**thankfully** 389:6
**thing** 376:13 378:17
**think** 361:24 365:25 367:16 368:20 374:10,13 379:25 382:20 391:17,25 392:19 396:6 397:25 418:20,25 420:2,15,21 422:22 422:22
**thirty** 426:15
**THOMAS** 352:21
**Thomasson** 352:19 355:21 366:5,13 369:7 373:9,11,18 373:24 374:3,7 375:21 376:16,18 377:5,8,13 378:19 379:8,12,16,19 380:6,14,15,18,23 383:23 384:10 385:9,10 386:12 387:12,16,18 390:15 392:6,9,18 392:22 393:24 394:7,18 395:2,12 395:14 398:11 399:11 401:19 402:16,17,18,23 403:6 404:4 407:5,7 407:10,10,14,15,24

408:8 410:19 413:24 414:18 418:8,11 419:5,9 420:8 421:10,21 422:18,25 425:5,6
**Thomasson's** 385:19 390:11 391:4 399:5 403:21 415:7
**thought** 412:13
**thousand** 399:13
**threatening** 389:4
**three** 376:5 377:10 381:4 417:8 420:4 424:4
**Thursday** 423:16,19
**Thursdays** 423:22
**tight** 400:11
**time** 358:13 363:15 363:20,21,23 364:3 364:9 365:3 366:4 366:14 368:4 369:22 373:8 374:4 375:6,12,19 377:8 377:12 379:8,11,15 380:15,21 382:20 385:7 386:7,9 390:10,11,16,25 391:7 393:22 394:25 396:14,15 399:2 404:16 405:13 409:12 410:8 413:18 417:25 420:9 421:14 422:11,13 424:9,24 425:3 429:13
**timeframe** 380:12 416:8
**timeline** 379:24 399:7
**times** 377:16 381:11 403:24
**today** 360:11 361:5 398:5 414:11 417:13 420:19
**told** 362:2,19 363:13
**tomorrow** 416:19 418:25 419:4,11,13
**touch** 424:21
**tracks** 414:10
**transcribed** 384:17
**transcript** 357:3 400:9 416:15 424:24 426:17,18 427:9,12 429:12
**trial** 358:13
**trigger** 415:20
**true** 427:12,14
**truth** 360:9,10,11 429:9,9,10
**truthful** 382:3
**truthfully** 381:25 382:9
**try** 373:17 374:16,22 424:20
**trying** 370:5 408:14 413:9 422:3
**turn** 384:25
**twice** 371:5
**two** 366:13 369:20 395:8 397:25 416:5 417:8 420:4 421:16 422:16,22 424:12 424:14
**two-week** 424:7

**U**

**UEA** 353:4
**understand** 372:9 392:24 402:14 411:15
**understanding** 361:4 392:2 408:15,21 412:9,19 413:22 421:5
**understood** 362:9 366:10 369:17 371:9 411:16 412:2 423:4
**unfortunate** 410:5
**Unfortunately** 399:4 409:25
**Uniondale** 356:9
**UNITED** 352:2
**unquote** 393:13
**upload** 416:18
**uploaded** 416:16
**Upset** 367:20
**Urrutia** 352:6 354:6 384:14
**use** 386:9 396:14

**V**

**v** 352:18
**vacation** 387:7
**valid** 398:11
**verbatim** 429:12
**Verbonitz** 356:15 374:19 384:10 397:20 419:10,22 424:25

**W**

**W** 427:2
**waiting** 380:15,17
**waived** 358:9
**want** 382:3,14 384:18 389:9,14 393:21 395:18 397:15 400:8 410:6 417:9 417:15 421:8 424:8
**Wantagh** 355:23
**wanted** 393:3 396:21 396:22 403:11 404:6 408:5,19 414:24 415:6
**wants** 385:13
**wasn't** 364:2,15 366:8 375:7 377:17 380:17 411:22 412:5 422:7
**waste** 422:13
**way** 370:11,16,22 371:15 387:3 391:23 393:14
400:10,12 407:17 413:4 423:24
**We'll** 383:8 418:16
**we're** 367:3 383:2 384:23 385:17 386:14,19 393:20 394:10,15 396:17 400:7 401:22 402:9 407:19 410:7 413:9 413:20 417:12 418:2,21 420:10 424:7
**Wednesday** 423:12 423:18
**week** 387:8,12 394:21 421:24
**weekend** 417:2
**weeks** 421:16 422:16 422:23
**WEIR** 356:14
**Welcome** 415:2
**went** 364:20 377:13 410:15
**Wi-Fi** 374:17
**Wicks** 362:21 400:6 401:23
**Wicks'** 383:18,21
**willing** 422:17
**window** 424:7
**wish** 423:20
**Withdrawn** 366:21
**witness** 359:4 360:12 360:15 374:15,22 381:23 382:11,18 383:5,10,12 385:12 387:22 389:7 404:6 426:2
**witnesses** 395:8 405:21 407:5 409:11 417:15 418:14
**word** 373:16
**words** 366:6
**work** 423:10,21
**worked** 363:25

**working** 363:17 399:7
**works** 400:22 423:8
**world** 410:9
**wrapped** 407:18

X

Y

**Yeah** 371:21 373:23 380:10 405:11 423:3 424:5
**York** 352:3 354:10 354:23,23 355:15 355:23 356:9 360:18 361:2 429:5

Z

**ZIZMOR** 354:20
**Zoom** 353:17 354:2 355:2 356:2 383:12 384:5,7

0

1

**1:15** 400:12
**1:25** 417:7
**1:30** 398:25 401:2
**1:34** 425:10
**10170** 354:23
**11** 398:24
**112** 355:22
**11423** 354:10
**11501** 355:15
**11553** 356:9
**11729** 361:2
**11793** 355:23
**11821** 354:9
**12:00** 353:18
**12:07** 360:3
**12:27** 382:19
**1239** 352:13 354:17
**1339** 356:16
**15** 400:7
**1539** 355:14
**1580** 352:11 354:16
**1581** 352:11 354:15
**1591** 352:12 354:16
**1632** 352:13 354:17
**189** 352:6 354:14
**19107** 356:17

2

**2:23-CV-6188(JM...** 352:18
**20** 380:2,9 400:15 427:21
**20-ish** 418:3
**201** 355:14
**2023** 363:16 377:6 379:9 385:22
**2026** 353:13 427:11 429:24
**23** 352:15 354:18
**2320** 354:22
**2519** 352:14 354:17
**259** 360:25
**26** 353:13 427:11
**27** 429:24
**2nd** 423:17

3

**3** 375:19 411:24
**30** 398:20,21 399:3 426:15
**30-minute** 398:7
**31st** 423:8,9
**3280** 355:22
**333** 356:7
**354** 357:5
**357** 357:5
**358** 359:16
**360** 357:7
**3rd** 363:16 379:9 385:21 387:5,12 388:6,25 389:13 390:4,12,24 391:2 391:10,13 393:2,13 393:16 394:4,11,12 394:19 395:6,13,20 396:3,10,20 403:3 403:13 404:12 406:11 407:6 410:13 411:20 412:6,10 423:18

4

**4** 359:16
**40** 413:16
**420** 354:22
**427** 357:8
**428** 357:9
**429** 357:10 385:6
**446** 352:15
**4th** 360:25 391:3 394:20

5

**500** 356:16
**5th** 394:20

6

**6** 375:19
**6th** 394:20

7

**76** 352:15 354:18

8

**8th** 423:19

9

**9th** 423:19