UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

___________________________________

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

v.

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS

Case No. 23-cv-6188 (JMW)

NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING LLC,

Defendants.

________________________________

DEPOSITION OF JESSICA MARIE PATROVIC

DATE: Friday, January 30, 2026

TIME: 10:10 a.m.

LOCATION: Remote Proceeding
411 West Putnam Avenue, Suite 220
Greenwich, CT 06830

REPORTED BY: Katheleen Fernandez Cruz

JOB NO.: 7873397

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SUPERB MOTORS INC., TEAM AUTO SALES LLC, AND ROBERT ANTHONY URRUTIA:

EMANUEL KATAEV, ESQUIRE (by videoconference)
Sage Legal
18211 Jamaica Avenue
Jamaica, NY 11423
emanuel@sagelegal.nyc
(718) 412-2421

ON BEHALF OF PLAINTIFFS 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, ISLAND AUTO MANAGEMENT, LLC, ASAD KHAN, IRIS BARON, 189 SUNRISE HWY AUTO LLC, AND NORTHSHORE MOTOR LEASING LLC:

JEFFREY RUDERMAN, ESQUIRE (by videoconference)
Cyruli Shanks & Zizmor LLP
420 Lexington Avenue, Suite 2320
New York, NY 10170
jruderman@cszlaw.com
(212) 661-6800 ext. 205

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT HARRY THOMASSON:

HARRY THOMASSON, PRO SE, ESQUIRE (by videoconference)
Harry Thomasson Esq
3280 Sunrise Highway
Wantagh, NY 11793
hrtatty@verizon.net

ON BEHALF OF DEFENDANT FLUSHING BANK:

MICHAEL WEISS, ESQUIRE (by videoconference)
Cullen and Dykman LLP
333 Earle Ovington Boulevard
Uniondale, NY 11553
mweiss@cullenllp.com
(516) 357-3700

ON BEHALF OF DEFENDANT LIBERTAS FUNDING LLC:

JEFFREY CIANCULLI, ESQUIRE (by videoconference)
Weir LLP
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107
jcianciulli@weirpartners.com
(215) 665-8181

ALSO PRESENT:

Robert Urrutia, Plaintiff (by videoconference)
Anthony Deo, Defendant (by videoconference)
Alivia Cooney, Paralegal, Sage Legal (by videoconference)

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Ruderman | 12 |
| By Mr. Thomasson | 93 |


E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | (None marked.) | |

D O C U M E N T S R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Slack Communications Related to Northshore, Sunrise and Deo | 33 |
| 2 | All Notes Electronically Stored by Libertas in Connection with Northshore, Sunrise or Deo | 34 |
| 3 | All Communications of Libertas With Mr. Deo and Mr. Thomasson or Concerning Mr. Thomasson or Phil Fernandes Concerning the Account for Mr. Deo, Northshore or Sunrise | 42 |

I N F O R M A T I O N R E Q U E S T E D

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Full Account Numbers | 49 |

J. PATROVIC

THE REPORTER: Good morning everyone. My name is Katheleen Fernandez Cruz. I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 10:10 a.m. Eastern Standard Time.

This is the deposition of Jessica Marie Patrovic taken in the matter of Superb Motors, Inc., et al., against Anthony Deo, et al., on Friday, January 30, 2026, by remote proceeding. Witness located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830.

I am a notary authorized to take acknowledgments and administer oaths in New York. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

Additionally, counselors have agreed to do the usual federal court stipulations for this deposition.

All right. At this time will counselors in attendance please identify yourselves for the record, beginning with Plaintiff's counsel?

MR. RUDERMAN: Good morning, Jeffrey Ruderman, Cyruli Shanks & Zizmor, on behalf of all plaintiffs, except for Superb, Urrutia, and Team.

MR. CIANCULLI: Jeffrey Cianculli appearing on behalf of Libertas Funding and the deponent.

MR. THOMASSON: Harry Thomasson appearing pro se.

MR. WEISS: Michael Weiss, Cullen and Dykman LLP, appearing on behalf of

Flushing Bank.

THE REPORTER: All right.

MR. CIANCULLI: That's it for counsel.

MR. RUDERMAN: No Emanuel?

MR. CIANCULLI: He's not on.

MR. RUDERMAN: Oh, he's not on? All right. I know he's actually was traveling and so he may have spotty service, but you know, we'll just continue. So we'll just go on and he may be in and out; okay?

THE REPORTER: So for the record, Mr. Emanuel Kataev is also here and he is a defense counsel; correct?

MR. RUDERMAN: Yes. Right. He represents all the other defendants.

MR. CIANCULLI: Plaintiffs.

MR. RUDERMAN: All other plaintiffs, I apologize.

THE REPORTER: All right. Thank you very much.

Okay. At this time I'm going to go ahead and administer the oath to the witness.

J. PATROVIC

Ms. Patrovic, please raise your right hand.

WHEREUPON,

JESSICA M. PATROVIC,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you very much.

Mr. Ruderman, you may continue.

MR. RUDERMAN: Thank you.

EXAMINATION

BY MR. RUDERMAN:

Q Good morning, Ms. Patrovic; correct?

A Yes.

Q Okay. Great. I am an attorney. My name is Jeff Ruderman. I'm an attorney at the firm of Cyruli Shanks & Zizmor. We represent a number of the plaintiffs in this action. We're here today to take your deposition in connection with a lawsuit in which one of the defendants is Libertas Funding. Do you understand that?

A Yes.

J. PATROVIC

Q Okay. And you'll excuse me, I have a persistent cough over the last month, so if I cough, I apologize. I'll try to keep it down. And have you ever been deposed before?

A Yes.

Q Okay. So you may know the ground rules, but I'm just going to put them on the record, make sure it's all very clear. So you were just sworn in. You understand you are answering under oath and that the testimony you're giving today is considered the same as if you were in testifying in court today?

A Yes.

Q Okay. And all answers that you give today need to be verbal because the court reporter cannot take down nods or shrugs or gestures. Do you understand that?

A Yes.

Q And also I ask that you wait until I finish asking my question. I'll grant you the same courtesy in your answer

J. PATROVIC

because the reporter cannot take down both of us speaking at the same time. Do you understand that?

A Yes.

Q Great. Is there any reason why you would not be able to give truthful and accurate testimony to the best of your ability today?

A Nope.

Q Okay. All right. Ms. Patrovic, what is your relationship to -- well, let me back up. When I say Libertas, I'm referring to Libertas Funding LLC. Do you understand that?

A Yes.

Q As far as you know, is that the proper designation name of the entity?

A Yes.

Q Okay. All right. So what is your relationship to Libertas?

A I handle all of our post-funding operations. So I oversee our general servicing and our collections teams and processes.

J. PATROVIC

Q And how long have you been in that position?

A Nine years.

Q Over the past nine years, have you had the same position or has it changed?

A I mean, I was the -- the first one nine years ago, so I built the team and I've always been head -- head of this because I was the only one originally.

Q Okay. So would it be fair to say that since November of 2022 you've been performing pretty much the same function for Libertas?

A Yes.

Q And can you tell me just what your post high school education is?

A Sure. I went to SUNY Stony Brook. I got my bachelor's in political science and psychology.

Q And do you have any postgraduate degrees?

A Nope.

Q Do you have any certifications

J. PATROVIC

of any kind?

A Nope.

Q Okay. And prior to your working for Libertas, were you employed by somebody else?

A Yeah, I worked for both AT&T and -- and Yelp.

Q And when you first came to Libertas, what were you hired to do? What was the purpose of them hiring you?

A Libertas was a young company. They were underwriting and funding -- funding transactions and they had no one to service the accounts after they funded. So I was hired to create process around that and service and collect on our first accounts with the goal to ultimately build a team.

Q Do you know when Libertas began operating?

A September, 2016.

Q And do you recall when you started working there?

A December, 2016.

J. PATROVIC

Q And you said you had been previously deposed. Were those depositions in connection with your position at Libertas?

A Yes.

Q And were they related generally to Libertas' efforts to collect on --

A Yes.

Q Okay. Other than --

THE REPORTER: I'm sorry, I missed the last part of that question.

BY MR. RUDERMAN:

Q Were they related to efforts by Libertas to collection on various obligations?

A Yes.

MR. RUDERMAN: She said yes.

THE REPORTER: Thank you.

BY MR. RUDERMAN:

Q Other than actions in which Libertas was trying to collect those obligations, have you ever been deposed?

A No.

Q Okay. Have you ever testified

J. PATROVIC

in court before?

A No.

Q Okay. Now, could you describe generally what the business model of Libertas is?

A Sure. We -- we have leads that generally come in from -- from third parties, independent sales organizations. Libertas processes those applications internally, we underwrite our -- our underwriters make a credit decision if we want to move forward or if we decline the file because it doesn't fit into our parameters.

If we do decide to fund the file, we -- we put out an offer. That offer is relayed to the merchant, usually by that independent sales organization, the ISO. They work with them to collect documents. We get them on -- on our merchant interview call where we learn more about their business. And if -- if all agrees by all parties, then we -- we fund the transaction.

J. PATROVIC

Q And you say you get leads. Where do these leads typically come from if you know?

A Independent sales organizations. They do their own marketing.

Q Are you aware that there were two other Libertas witnesses that previously deposed?

A Yes.

Q Okay. And do you know them personally in your business?

A Yes.

Q Okay. And I believe either one or both of them referred to these ISOs as a broker. Would that be a fair description?

A Yeah. Yep.

Q Okay. And so Libertas has relationships with these various ISOs?

A Yes.

Q And would it be fair to say that the ISOs have other financing institutions which they have relationships with as well?

J. PATROVIC
A Yes.
Q Okay. Does Libertas provide information to these brokers so that they understand the type of financing and the parameters of financing that you do if you know?
A Yes.
Q Okay. So what are the parameters of the financing that Libertas does if you know?
A I mean, you -- in terms of our -- our terms or in terms of who we're funding or what -- sorry, what do you mean by parameters?
Q Sure. Actually, and I should have given you this instruction, I apologize. If I do ask a question that you don't understand the question or you need clarification, please let me know.
So I'll rephrase the question so it's clearer to you, but if you do answer a question that I ask, we'll assume, I will assume that you understood the question. Do you understand that?

J. PATROVIC

A Yes.
Q Okay. So I will try and clarify the question with parameters. Does Libertas have financial parameters in the sense, in one sense of the max, the minimum and maximum amount that you are willing to finance?
A Yes.
Q Okay. What is the range for financing by Libertas?
A I'm actually not involved in that -- in that part of our process.
Q Do you know the answer to that question?
A No, I don't.
Q Okay. But you know there is a range though?
A Yeah, of course.
Q Okay. And how would you describe the type of financing? In other words, is it asset-based lending? Is it credit-based lending?
A -- sorry.
Q So give me your best words for

J. PATROVIC

it.

A Sorry. It's revenue-based financing.

Q And could you describe generally what that means?

A Sure. We are underwriting based on the business's sales. We're generally looking at minimum, the last three months of -- of their sales. And we are funding essentially based on what we assume will be their future sales based on -- based on how we underwrote that. We're purchasing their future receivables at a discount.

Q And are you familiar with the term of factoring or the business of factoring?

A Yes.

Q Would you consider Libertas similar to a factor?

A No.

Q Okay. And do you know what the distinction is between the two?

A I mean, we're not -- we're not getting invoices to factor. We're -- it's

J. PATROVIC

a one-time funding.

Q Okay. So based on the underwriting, a set specific amount of money would be financed. In return for that there would -- excuse me. And you would be purchasing then future receivables against that amount that's financed?

A Yes.

Q And as part of that, does Libertas take some sort of a security interest on those receivables?

A It -- it's really just the future receivables.

Q Do you understand what I meant by when I say a security interest in the receivables?

A It's unsecure.

Q Okay. So as far as you know, there's no -- let me back up. Do you understand what the difference is between a secured position and an unsecured position in this context?

A No.

J. PATROVIC

Q Okay. Are you familiar with the term UCC-1 financing statements?

A Oh yeah.

Q Okay. If I were to tell you that a UCC financing is a way to secure an obligation, does that refresh your recollection as to what --

A Yes.

Q Okay.

A Yes.

Q So knowing that, does Libertas, does it secure its positions with regards to these purchases as far as you know?

A Yes.

Q Okay. And do you know if it will secure it only if it's in a first lien position or second or something else?

A We generally will file UCC regardless.

Q Okay. So even if there's already a lien on the assets which you are seeking to secure, you might still lend on that financing; correct?

A Correct.

J. PATROVIC

Q Not lend --

A Fund.

Q Okay, fund. Okay. I apologize if I go to the word lend. Let's clarify. You do not consider your transactions to be lending; correct?

A Correct.

Q Right. And is financing an appropriate term to be used?

A Yes. Use financing.

Q Now, as you call it, revenue-based financing. Does profitability come into the picture as far as you know with regard to the financing?

A Yes.

Q All right. So does the entity in which you are considering financing have to have a certain level of profitability in order for the financing to proceed?

A It's pretty nuanced. It's on a deal-by-deal basis.

Q Okay. Are you involved in that process at all?

J. PATROVIC

A I'm not at all.

Q Okay. After the fact, after the transaction has been placed, are you ever involved in the process of re-looking at the decisions that were made in connection with the financing?

A I'm -- when I'm reviewing it, yeah. When I -- when I review files.

Q Okay.

A I'm not involved in credit decisions.

Q Oh. And are you familiar with the parameters in the sense of how much Libertas would finance based upon certain revenue stream or receivables?

A General knowledge.

Q Okay. But you're not involved in that process either; correct?

A No, not at all.

Q And through the process of an applicant to Libertas until the time it's actually financed, money goes out the door from Libertas to the client, are you involved in any of that process at all?

A No.

Q Okay. So you would not know any information about that procedure, that client decisions, if any of those things during any of that period of time?

A Correct.

Q Okay. So when would be the first time that -- let me back that up. How many employees are in -- what do you call your department by the way?

A Just customer service.

Q Okay. How many --

A They're all -- they're all cross-trained collections and customer service.

Q Okay. So all customer service representatives are also collection representatives?

A Yes.

Q Okay.

A In -- in some capacity.

Q Okay. Including yourself?

A Yes.

Q All Right. And how many

J. PATROVIC

customer, I'll call them customer service representatives. How many are there at Libertas now?

A Including myself, six.

Q And do you know how many there were -- withdrawn. Has that number changed since around November, 2022?

A Definitely. It was either four or five.

Q Okay. And how many -- withdrawn. Is each customer service representative assigned a certain number of accounts?

A No.

Q Is there any specific way in which accounts are divided up among the various customer service representatives?

A No, we don't -- it's not account based. It's -- it -- it's -- we have a process where one person is doing initial reach out and then things escalate. Also, depending on deal size. We have more senior reps working on larger deals.

Q When you say larger deals, is

J. PATROVIC

there a specific dollar cutoff or how do you designate what's a larger deal?

A It's honestly kind of just how we determine it in our system based on percent paid in, balance, how many positions they may have.

Q Are these decisions made solely by you or is there some committee that discusses them together?

A It's collaborative with my team.

Q And when a particular account is assigned to a particular customer service representative, does that customer service representative stay with that account until the matter's resolved?

A No.

Q So it can switch to other customer service representatives at any particular time?

A Correct. If it -- if it's pretty cut and dry, "Hi, you missed a -- you missed a payment." "Can we make this up?" "Yes." Then it generally will stay with a junior person. If -- if it gets a

J. PATROVIC

little bit more complicated than that, then it will generally get escalated to more senior people.

Q Are any of your customer service representatives attorneys?

A No.

Q Okay. Does Libertas have any in-house attorneys?

A Yes.

Q How many attorneys does it have?

A At least four.

Q And generally, do you know what these attorneys, what their roles and responsibilities are in connection with Libertas?

A Yeah. One is our CEO, sorry, one is our prior CEO, he's now vice chairman. Our head of compliance, our in-house counsel, I believe our CFO.

Q So are their functions though, they may be attorneys, are any of their functions to act as an attorney? Other than the compliance person, are the other rep --

J. PATROVIC

A Our in-house counsel.

Q Their in-house counsel. Do any of them deal with the collection efforts concerning clients of Libertas?

A They will for certain escalations, but for the most part, no.

Q So if a decision is made to engage an attorney, an outside counsel, is that decision made -- withdrawn. Who makes that decision to --

A Typically me.

Q Okay. And do you make that decision on your own or with others?

A It depends on -- on the -- the deal, but sometimes by myself, sometimes with others.

Q And what considerations do you take into account when deciding whether to put a matter into collection?

A I mean, it's heavily based on -- on our client communication cooperation. If -- if a merchant is in touch with us and working with us in terms of providing information that we're requesting, and I

J. PATROVIC

mean, we probably won't send that out to legal.

It's -- it's generally if -- if a merchant becomes unresponsive, stops payments and there's not really a clear set plan going forward, then at that point we'll usually escalate it to outside counsel.

Q And do you have a set list of outside attorneys that you typically refer these matters to?

A Yes.

Q And in New York, do you have a specific list of attorneys that you generally refer them to?

A Yes.

Q And do they cover the same territories or do you have, like, different territories that are covered by different attorneys?

A We have two different attorneys. There's not really a system in terms of who gets what. We -- we just send -- send to them both so that there's -- there's

J. PATROVIC

just more variety in terms of collections.

Q And what are the two law firms that you use for collections in New York?

A Faskowitz Law Firm and Empire Recovery Group.

Q Empire Recovery Group are attorneys?

A Yes.

Q Okay. And who is your main contact with at Faskowitz?

A David Epstein.

Q Now, do you know what percentage of Libertas financing goes into default?

A I -- I don't.

Q Are you able to give me a fair estimate as to what percentage goes into default?

A I would say five percent.

Q And to be clear, so we understand. When I say default, that means that they're not making payments and they're not, for lack of a better term, working with you to make that right. Do you understand what I'm saying?

J. PATROVIC

A Okay. So yeah, we have different definitions of default.

Q Okay. So let's be clear what -- your definition of default is more important than mine. You tell me.

A Mine is when we consider it written off after we send it to an attorney and we -- we assume that that attorney is not able to collect either. I -- I think -- does your default definition mean when we send it to an attorney?

Q Well, let's just work with the same -- forget about what mine is.

A Okay.

Q Let's make sure we understand what your definition is. So when I say a default, in your mind that meant, "We're not getting paid and that's it. We sent it to an attorney. We don't expect to ever see this money again." That's what you've considered default?

A Correct.

Q Okay. So what about a situation

J. PATROVIC

where the customer is not paying, you're not hearing from them, they don't have payment arrangements where they're going to make it up, but you haven't written it off yet? About what percentage go into that category? What would you call that category?

A I'd say about 15 percent.

Q What do you describe that as in your business?

A It's -- it's pending default.

Q Okay. And what percentage would you say are not yet there? They missed some payments, but they're working something out with you?

A About ten percent.

Q Now, what situation arises that would first send a customer account to your department?

A Typically it's we receive a daily returns report from our bank. All of our accounts are on auto debit. So it's we get this returns report that shows any payments that did not clear, that

J. PATROVIC

flags us that the payments did not clear. Alternatively, it would be if a customer proactively reaches out before that happens.

Q So every day your bank, in which the funds get automatically deposited, sends you a return report; correct?

A Correct.

Q Okay. And what would be on that return report that would let you know that a payment that was supposed to come in did not come in?

A It's the deal name, deal ID and the return code and the amount.

Q So for example, if you had a hundred accounts that you're getting payments on, it wouldn't just list the ones the money came in, you'd have to figure out what's not there, it would specifically say which ones did not come in?

A Correct. It's a -- it's a list of only the ones with return codes.

Q Okay. So a return code is one

J. PATROVIC

in which the ACH was not satisfied for that first required date?

A Correct. They're NACHA return codes.

Q And if an ACH was supposed to be collected on a particular day and it doesn't come in that day, does the system automatically then try again at a later time?

A No.

Q Okay. So if you get a return code on a particular day, who gets that -- withdraw. Who gets that return report on a daily basis?

A Our entire customer service team, the underwriting team and some members of upper management.

Q Okay. So even those that worked on underwriting and processing the financing would know on the day, that day, that a deal that they had approved didn't make that payment when they were supposed to?

A Theoretically. We have

J. PATROVIC

thousands of accounts, so it's I think a formality that this goes to a lot of people. I'm not sure that everyone's looking at this every day.

Q So whose responsibility at Libertas is it to make sure that they look at this every day to act on it if necessary?

A Myself and my team.

Q Okay. So right now would be the six of you?

A Yes.

Q Okay. And is it divvyed up in any way or everybody's looking at the entire report?

A It's a shared document, so we all kind of work on it together. It's -- a lot of the accounts on there are repeat accounts. There's more repeat accounts than new accounts typically. They're accounts that we're already working on.

So it's, again, accounts that are new we have our most junior person generally just sending out an email and --

J. PATROVIC

and a call as a initial -- initial reach out. And then from there it just gets escalated through the team.

Q And do you have a physical meeting where you all sit together around a table and have this --

A We all sit together on the floor.

Q Okay. So, but is there a regular meeting that you would have on a daily basis where you would gather to discuss the return report?

A Not -- not in like a conference room in that -- in that capacity. I mean we're on -- we're all on the same Slack channel. We're very communicative within our -- our Slack, like our instant message client and we all sit together. So it's pretty verbal and it's a shared document so we can comment on the document as well.

Q So is this just kind of done throughout the day? Somebody as you have an opportunity, you send the message to the rest of the team and say, "Hey, I

J. PATROVIC

noticed that, you know, Company A didn't make its payment today. Who's going to follow up on it," or something else? Or if you want, can you describe the process a little bit better than I am?

A No, it's -- I'm saying we don't have a physical meeting in a conference room, but we have a shared channel within Slack, our instant message client. And we kind of set up our day based on -- based on that within that Slack channel.

Q Are the communications in the Slack channel, are they available for recall, like an email?

A They would be, yeah.

Q And do you know what the company's, what Libertas's document retention policies with regard to internal communications?

A It's generally two years.

Q Okay. So after two years, what would happen, if you know, to the information?

A I -- either gets archived or

J. PATROVIC

destroyed. I'm -- I'm not sure.

Q Okay. So would you know if communications about an account from November, December of 2022 would still be in your Slack account?

A No, because we started the channel in 2023.

Q Okay. When you say 2023, would be January,2023 or sometime else in the year?

A I -- I'm not sure.

Q Okay. Prior to 2023, how did you communicate with regard to these return reports?

A I mean, I believe we were remote during COVID at the time. I -- I'm not -- I'm not sure if we were in office or not, but during COVID we'd have a call every morning. After COVID, once we were in the office it was like four people and we all sit together, so we just discuss it in the morning.

Q So prior to having the Slack communication, everything was done

J. PATROVIC

verbally on the phone?

A Yes.

Q Some sort of conference call? Okay. Did you ever do Zoom calls?

A Not for this, no.

Q Okay. Were the conversations that you had recorded conversations?

A No.

MR. RUDERMAN: Okay. Okay. I'm going to call for the production of any Slack -- I'm not that technologically savvy, so whatever it's called, the Slack --

MR. KATAEV: Communications.

MR. RUDERMAN: Slack communications, thank you. To the extent that they relate in any way to the account for Northshore and Sunrise in this matter.

MR. KATAEV: Or Deo.

MR. RUDERMAN: Or Deo, right. Correct.

BY MR. RUDERMAN:

Q Now, were there any written notes whether kept electronically or

physically with regard to accounts that were on the return report?

A Probably.

Q And where would those notes have been kept?

A On the account where we log log notes.

Q So is there an electronic database of some kind for all of the information for all of your accounts?

A Yes.

Q Okay. And is typically all of the information about every account stored on that database as far as you know?

A Yes.

Q And that would include the notes not only from your department, but from the underwriting department and the intake department, whatever it may be?

A Yes.

MR. RUDERMAN: Okay. I'm going to call for the production of all notes that are electronically stored by Libertas in connection with, again, Northshore,

J. PATROVIC

Sunrise or Deo.

//

BY MR. RUDERMAN:

Q And, okay. Now when a return report comes in and based upon your various communications, who goes about and decides or how is it -- withdrawn. How is it decided, "Okay. This is one that we need to follow up on and designate somebody to follow up on that"?

A I mean, we're following up pretty much every day just until we figure out what the next step is.

Q Okay. So if you receive a return report that shows an account that did not make its payment that day, there's no waiting for something else? That is an indication somebody needs to follow up on that account; correct?

A Yeah, we contact all of those accounts every day.

Q Okay. And would you continue to reach out to those accounts every day until -- withdrawn. Would you just

J. PATROVIC

continue to reach out to those accounts every day?

A It -- it depends on -- on the transaction and -- and the balance and the return code.

Q So explain to me what the variables are, how that all works.

A Sure. If we have a -- a deal that's 90 percent paid and their balance is $5,000 and they miss a payment because of insufficient funds, we'll probably call them. And then if we can't reach them, we'll just rerun the payment.

We're -- we're not really pursuing that -- that kind of an account the same as an account with a $500,000 balance that's 20 percent paid in and has blocked our payments. That kind of account we're going to have more of an aggressive strategy and yes, we're probably going to contact every day.

Q What percentage of your accounts have declined or unable to process the payment within the first six months?

J. PATROVIC

A I -- I don't have the answer for that.

Q Would you be able to give a fair estimate?

A Honestly, no. I -- I don't -- I don't really -- I have no idea.

Q Okay. Are you able to say whether that's a relatively rare occurrence or something or some other way to describe it?

A I mean, I'd say it's under 25 percent, but we can put it there. It -- it really depends. I mean, it -- it's also circumstantial. We had a massive snowstorm across the country last week, so we saw a much higher return rate because of that.

And we called companies and they just said, "Hey, can you forgive this one? We were closed." So that, you know, between holidays we see -- we see an uptick in returns. It -- it's pretty circumstantial. I wouldn't say it's that rare.

J. PATROVIC

Q What would you say the percentages of accounts that fail to make the fifth payment that it's due?

A Under five percent.

Q Okay. And in your experience, what is the typical, if there is, frequency of payments under the various financing you do?

A I think the majority are on weekly.

Q And do you know over, is there also a typical timeframe over which the financing needs to be repaid?

A It's typically 12 months.

Q So that's your model. It's mostly is trying to do a 12-month repayment period with weekly payments?

A Correct.

Q Okay. And now, are you familiar -- withdrawn. In preparation for today's deposition other than speaking to an attorney, Mr. Cianculli or any other outside counsel, did you speak to anybody else about your deposition today?

A No.

Q Okay. Did you review any documents in preparation for today's deposition?

A I -- I reviewed our contract and payment history and -- and emails sent.

Q Email sent to whom?

A Harry Thomasson. And then also our external counsel, David Epstein.

Q And when did you have communications with Harry Thomasson?

A Looks like December of 2022.

Q How many communications did you have with Mr. Thomasson in December, 2022?

A Not many. I see two on here.

Q And do you know how it came about that you had these communications with Mr. Thomasson?

A We were notified by Russell J. Shanks, both us and Harry Thomasson on December 6, '22, that they will be presenting in the Supreme Court of New York Nassau County in order to show cause restraining Anthony Deo from taking any

J. PATROVIC

actions on behalf of Northshore Motor Leasing and Sunrise Highway Auto and restraining Harry Thomasson from releasing 735 to Deo or anyone on his behalf and restraining us from taking action to collect for Northshore Motor Leasing.

Q And did Mr. Thomasson then reach out to you in connection with that?

A Yes.

Q Do you know what he said?

A Yeah, that the money has to remain in escrow.

Q Mr. Thomasson said the money has to remain in escrow?

A It seems -- "It would be a serious mistake for my client to move money that we have been notified is the subject of a judicial proceeding."

Q That's Mr. Thomasson writing to you?

A It's to someone named Phil. I'm not sure who Phil is, but we were on the email.

Q So Mr. Thomasson wrote to

somebody named Phil. Are you able to see Phil's email address?

A Give me one second. Oh, Phil is -- Phil is one of -- is the broker at National Business Capital.

Q National Business Capital.

MR. RUDERMAN: By the way, just note for the record, I believe, and correct me if I'm wrong, Ms. Patrovic has a computer screen in front of her and she's actually looking live at some emails that she's able to access on her computer.

Q Is that correct; Ms. Patrovic?

A That's correct.

Q Okay. So Phil, do you know, so are you able to tell Phil's last name from the email?

A P. Fernandes, F-E-R-N-A-N-D-E-S at, looks like @national.biz.

Q Okay. So in this email Mr. Thomasson is writing, is he writing to you and copying Phil or vice versa or is he writing to both of you?

A I think it was to Phil and Phil

forwarded it.

Q Okay. So Mr. Thomasson is writing an email to Phil at National Business and Phil forwarded the email. And in the email that Mr. Thomasson wrote to Phil, could you give me those exact words that he says?

A I'm not sure what the original email was, but "Dear Phil, we've spoken about this and I pointed out to my client it would be a serious mistake for my client to move money that we have been notified is the subject of a judicial proceeding and one specifically targeting inter alia that money.

No offense intended to anyone, but we all know that moving that money before a decision is made by the court would be a mistake. That said, I also told Anthony that if he has payments due under the terms of your contract, he can and should continue to make such payments.

Lastly, please also be aware that as I informed everyone on this email

chain within the last hour, I'm told by the company's accountant Tom Jones, that he's confident in Anthony's ownership of these businesses for a variety of reasons.

Notably, that he was told in writing by Josh and Ms. Kuhn that Anthony is the 99 percent shareholder as represented on the taxes Mr. Jones filed on behalf of Anthony and those corporations.

By the way, he also told me that he coordinated the filing of those returns with Citrin, which is Josh's accounting firm. I'm sorry for the troubles, but as I dig into all of this in the last two weeks, I feel confident and still feel confident in Anthony's position.

I find Josh's efforts to be inconvenient at best, but after speaking with Tom Jones yesterday, I believe that I will have information by tomorrow that should help to resolve problems in short order. I will continue to keep everyone informed as soon as I have relevant

J. PATROVIC

information."

Q Okay. Thank you for that.

MR. RUDERMAN: Madam Reporter, were you able to get that? She spoke pretty quickly.

THE REPORTER: Yes, I did.

MR. RUDERMAN: Okay. Great. Very good.

So I don't forget, I will be recalling for the production of all communications that Libertas has if they have any with Mr. Deo, but certainly and obviously with Mr. Thomasson or concerning Mr. Thomasson or Phil Fernandes concerning the account for Mr. Deo, Northshore or Sunrise.

BY MR. RUDERMAN:

Q Now, in that email that you have, that's the full? There's no further chain in that particular email?

A I'm -- I'm looking through the chain now. Yeah.

Q Thank you.

A Our CEO replied, "I don't

J. PATROVIC

understand. We provided the money, just send it back. It seems pretty simple to me."

Q And who's he sending that email to?

A It's Harry. Phil is copied.

Q Okay. And that's Harry, Mr. Thomasson. Did he respond to -- oh sorry, who's your CEO?

A Sorry. It was our prior CEO Randy Saluck.

Q Okay. So Mr. Saluck wrote to Mr. Thomasson to send the money back if there's a dispute pretty much; correct?

A Yes.

Q Okay. And Mr. Thomasson responded to that?

A Yes.

Q What did he say?

A He said, "No order to show cause has been signed yet, as best as I can tell. I'm calling the judge this afternoon. I'm in Albany on an appeal and will be back tomorrow late."

J. PATROVIC

Q Any further communications that you see in that context?

A We then included Anthony. I think Anthony spoke to Randy Saluck not on a recorded line, and said that he would provide a new bank account for the other entity we have on the contract.

Randy followed up with Harry copied. "Anthony, what is the holdup? You said you were going to pay us. We need the account to pull from."

Q What was the date of that email?

A December 14, 2022.

Q And when you say Anthony, is that Mr. Deo?

A Correct.

Q What email address is he using on that, if you can see?

A Yeah, sorry, it's cut off for some reason. Anthonyd@northshoremotors1.com.

Q Okay. All right. Any other further communications on that email chain?

J. PATROVIC

A He replied with the bank information. That's really --

Q Do you know what bank account?

A Yeah, it was BOA and it was for I think 198. Sorry, one second.

MR. CIANCULLI: You want just the last four?

BY MR. RUDERMAN:

Q Just the last four of the account number.

A Okay. 9486.

Q And does it say what account that was? In other words, what was the name of the account?

A 189 Sunrise Auto LLC. Sunrise Highway Auto LLC.

Q And are you familiar with the name of Michael Laurie, L-A-U-R-I-E?

A No.

Q Okay. Did you see his name on any of the emails?

A No.

Q Okay. So on this entire email chain that you've had, you've mentioned

Mr. Fernandes, Mr. Saluck, Mr. Thomasson, Mr. Deo, are there any other parties on any of these emails that you know of that you could see?

A No.

Q Okay. And is that the entire extent that you are aware of with regards to communications with Mr. Thomasson about this account? That one email chain that you're viewing?

A Yeah, I'm searching one more time, give me a second. Okay. I have another email chain started by Russell Shanks.

Q Okay.

A It's from December 20, 2022. It says, "As you know --

Q I just going to say, is anybody else on that email other than Mr. Shanks?

A Yes, it's --

Q I'm sorry, who's the email to? I apologize. Who's --

A This one is to Harry and me.

Q Okay.

J. PATROVIC

A "As you know, the return date on our order to show cause is currently set for January 9, 2023. However, I'll be out of state from January 6th to January 11th. As such, I will intend on contacting the court tomorrow and asking it to put the matter on for January 12, 2023, or any day thereafter that is acceptable to the court. Please advise if you consent to the same."

I replied, "We consent. Please include our attorney, David Epstein, copied here on all communication. Thank you." To which Harry responded, "It can be done for the 18th, 20th, 26th or 27th of January on consent with papers due from me two days before. Do any of these dates work for you? January is busy for me."

Russell responded, "All but the 20th work for me. I will reach out to the court. Thank you." Yeah. Then our attorney responded, "Russell, please let me know when you can discuss this matter." And then that's when that email chain

ends.

Q So as far as you know, was that money, the 730 -- withdrawn. My understanding is that the amount that was financed was 750,000 of which Libertas takes a, I guess a funding fee of 15,000 and they net fund 735,000. Is that your understanding?

A Yes.

Q Okay. And that initial money that was financed, I know there have been some payments, but that money though was not returned; correct?

A Correct.

Q All right. There were some subsequent, there were some payments that were made against it; correct?

A Correct.

Q All right. Do you know how many payments were made?

A There were seven payments of 19,791.70.

Q Okay. And?

A The total on that is 138,541.90.

J. PATROVIC

Q So what is the amount that you show on your records is still due on that for that count?

A I mean the full contractual amount would be 859,063.10.

Q The initial, the amount that was supposed to be repaid, correct me if I'm wrong, is 997,500; is that correct?

A Yes.

Q All right. So if you deduct the payments you received, you came up with $859,063.10?

A Correct.

Q Okay. Now what accounts did those payments come from? Bank accounts, if you know?

A The first one was from an account ending in 95 -- sorry, still going through this. The first one was from an account ending in 9899.

Q 9899.

MR. RUDERMAN: Tony, you got to mute yourself.

MR. DEO: Oh, there you --

J. PATROVIC

BY MR. RUDERMAN:

Q And do you know what bank that was from?

A Chase.

Q Okay.

A The second one --

Q Do you know the name of the holder of that account?

A It should be Northshore Motor Leasing LLC.

Q Are you sure?

A I'm -- I'm double checking now. That's what it should be.

MR. RUDERMAN: Okay.

While Ms. Patrovic is looking, Mr. Cianculli, we do have a stipulation of confidentiality in connection with this matter. So I'm going to ask that she provide all of the account numbers in full for each account that made payments, not just the last four digits.

And we all agree that that is under the confidentiality order that's been signed by the judge.

J. PATROVIC

MR. CIANCULLI: Understand.

MR. RUDERMAN: Okay.

BY MR. RUDERMAN:

Q So Ms. Patrovic, when you get a chance, if you could provide the full account numbers for any of the accounts that you are referencing today?

A Sure. Yep. So this one is Sunrise Auto.

MR. CIANCULLI: The accounts from which these seven payments were made.

THE WITNESS: Correct. Yes.

MR. RUDERMAN: Yes.

And let me just make a note here. I'm also going to want to know the account where the money was deposited, so I don't forget, but yes, go ahead.

MR. CIANCULLI: We know that don't we?

MR. RUDERMAN: I just want to confirm that she has the same information.

THE WITNESS: Okay. The money was deposited and the first payment was debited from the same account. It's Chase

J. PATROVIC

Bank, Sunrise Auto Outlet.

BY MR. RUDERMAN:

Q Right.

A 700139899.

Q Okay. Right. That was the first. And so the first payment came out of that account; correct?

A Yes.

Q Okay. And do you know the date of that first payment?

A 11/25.

Q '22; correct?

A No, I'm showing the first payment was, oh yeah, sorry, 2022. Yeah.

Q Okay. And was that when the first payment was supposed to come out as far as you know?

A Yes.

Q Okay. And when was the next payment supposed to come out then?

A 12/2/22.

Q All right. And when did the next payment come out?

A 12/2/22.

J. PATROVIC

Q And did it come out of that same account or from some other account?

A It came out of a Signature Bank account, 189 Sunrise Hwy Auto, LLC. And the account number on that is 1504779528.

Q Okay. And do you know how it came about that the account where the money came out of was changed?

A I'm sorry, say it again, please.

Q Do you know how it came about that the second payment was drawn from a different account than the original one? Do you understand my question?

A Yeah. Yes. So I'm just reading the notes. The -- the broker emailed us and said that they had spoken to the merchant and requested that we pull from this account.

Q And is that Mr. Fernandes again?

A That's someone named Joe. I think probably Joe Camberato, who is also at the broker.

Q That same National Business broker? Okay.

J. PATROVIC

MR. RUDERMAN: And I think I asked for it, but if I didn't, again, all communications, email or of any kind with National Business or any of its representatives concerning the account for Northshore, Sunrise or Deo.

BY MR. RUDERMAN:

Q All right. So Joe writes and says that he spoke to the customer and he wants the payments now to come out of the signature account; correct?

A Yes.

Q Okay. And that second payment went through?

A On 12/2 it went through, yes.

Q Okay. And then when was the next payment due?

A The next payment would've been due 12/9.

Q Okay.

A When we were emailed by Russell Shanks, we -- we paused that payment. We weren't sure what was happening. However, we spoke with the merchant, Anthony Deo,

he provided a new third account from Bank of America. That one, the account number is 483082609486.

So we changed it to that account and debited that payment on 12 -- we actually debited two payments on 12/16. That would be the one for 12/9 and then the regular scheduled one for 12/16. Both of those cleared.

Q And was that also a 189 Sunrise account or some other company if you know?

A Yeah, it was -- it was a BOA 189 Sunrise account.

Q Okay. All right. So far we've got three accounts that the monies have been taken from and we have four payments that were made; correct? That we've discussed --

A Correct.

Q All right. What about after that?

A After that the account stayed unchanged, it continued to be that Bank of America account ending in 9486 and

J. PATROVIC

payments were cleared January 13th, January 20th and January 27th.

Q Okay. All right. And by the way, each payment was exact, was how much? It was the same amount; correct? For each payment?

A Yep. Exactly 19,791.70.

Q Okay. That was the last payment you received on this account was January 27th for that amount; correct?

A Yes.

Q All right. And was the account then set up to automatically --

A Yeah.

Q -- ACH every week at that account; correct? At Bank of America?

A Yes.

THE REPORTER: I'm sorry. To automatically, what was the rest?

MR. CIANCULLI: Debit.

MR. RUDERMAN: Debit that account.

THE REPORTER: Thank you.

BY MR. RUDERMAN:

Q Okay. Now in your experience do

J. PATROVIC

you recall any other situations where clients have called up and said switch this account, that account, you know, two or three switches as to what account to draw the money from? Is that something you find common in your experience?

A I would not say it's common.

Q Okay. Did this raise, for lack of a better term, any red flags with regard to the fact that they kept switching the accounts?

A I mean, I think a red flag was already raised when we received emails from Russell Shanks and Harry Thomasson. I -- I don't think changing the account twice, the original funding account to a new account, that is fairly common. That is not out of the ordinary.

To then get a third account after we were contacted that there were issues with Northshore Motors, to then get a different account from a different entity, that in this situation would not be that out of the ordinary.

J. PATROVIC

Q And did you ever have, as far as you know, an ACH authorization to withdraw funds from Northshore for any Northshore account?

A Yes.

Q You did? Do you know what account number was authorized?

A Yes, it was the Chase Bank. 623778112.

Q So 623778112?

A Yes.

Q Okay. And when did you get authorization from that one?

A So our -- our contract had this -- the 9899 account on it. But we have a blanket authorization in our contract to debit from any receivables accounts for any entities on the -- on the contract.

Q When you say a blanket, so is that -- withdrawn. I believe that the other Libertas employees talked about a power of attorney that you had. Is that what you're referring to or is it actually

J. PATROVIC

another authorization that's signed in blank that allows you to pursue that?

A In -- in the contract itself, we have a page that says, "Libertas Funding LLC Electric Fund Transfer Authorization." There's that account listed and it says, "You irrevocably authorize us, which includes for the purpose of this authorization our agents, service providers, successors and assigns to take delivery of each weekly delivery amount by initiating an electric fund transfer via the Automated Clearinghouse network or similar network and ACH from the business deposit account specified below, any substitute account you later specify or any other account containing your future receipts. Collectively, the account on or after the date the associated future receipts were created."

Q So that meant in your understanding that you could choose a different bank account to withdraw the funds from if it was specified in your

contract?
A Yeah, that's what this page states.
Q Okay. Did Libertas ever attempt to withdraw funds from any other accounts other than the three accounts it actually got money from?
A Nope.
Q Okay. So it did never try to withdraw funds from the Chase account at Northshore that you just referred to?
A We were never directed to. So I don't believe we were. No.
Q When you say directed to, you mean by Mr. Deo or by National Business?
A Both.
Q Okay. Based upon what you just read to me, was it not the discretion of Libertas to decide if they wanted to draw against the different accounts?
A It -- it is our discretion and there was no reason to do that.
Q Well, after not receiving -- let's back up a little bit. What was the

J. PATROVIC

first payment after the January 27th payment that was made? What was the next payment that was due?

A It was February 3rd.

Q Okay. And the February 3rd payment did not come in; correct?

A Correct.

Q Okay. But there was an attempt?

A Correct.

Q So that would've shown up on those returns that you had?

A That's correct.

Q Okay. And that attempt was at the Bank of America account ending in 9486?

A Correct.

Q All right. And when it comes back, would it tell you whether it's blocked? There's no money? I mean, what does it say if you know?

A Insufficient funds.

Q All right. So you would've received a report on that day stating that the money did not come in because there

J. PATROVIC

were insufficient funds?

A It takes three business days, so we received it on the -- it's a 2/3 payment. We received it on 2/6.

Q Okay. And when you received it on 2/6, what, if anything, was the next step that was done in connection with that account?

A Looks like we -- we just continued to debit from that account even though it was returning insufficient funds. We sent it out to our attorney.

Q Okay. So when you say continue to debit, so you instructed your servicer to just try to collect and keep hitting that account?

A No, it was on auto debit, so it was just never turned off.

Q Okay. And would that auto debit just happen weekly or was it more frequently now?

A It was auto debit, it was weekly and it was on the days specified according to the contract.

J. PATROVIC

Q Okay. Is that still going on or was that turned off at some point in time?

A That was turned off 3/17.

Q Of 2022?

A No, 2023.

Q Okay. So for another -- I'm sorry, I apologize. 2023. So for another month and a half, the debits kept trying to debit that account; correct?

A Correct. They were returning due to insufficient funds.

Q Okay.

A So sometimes when that happens, we just rerun. If they were blocked or the account was closed, we would've just turned them off.

Q Okay. And according to the records, there's no indication that Libertas ever tried to debit any other account except for that account 9486 after March 17, 2023?

A Correct.

Q Okay. Now, when the monies did not go through on that February 6, 2023;

J. PATROVIC

all right? Do you have any independent recollection as to what was done at that time?

A Sorry, on what date?

Q So you testified that the first payment that was not made at all or made up was February 6, 2023. And you knew about that, excuse me, February, I think February 3rd, but takes three days for you to get that. In either case it was around that date.

Do you have an independent recollection as to what, if anything was done when that monies did not come in for that paid period?

A No, at that point our -- our attorney, David Epstein, was working on this externally.

Q Okay. And I'm going to ask you, you've reviewed various communications and notes in connection with this account in preparation of today's deposition; correct?

A Correct.

J. PATROVIC

Q Did reading these notes refresh your recollection or is everything you're saying here today based upon what you reviewed?

A I mean, both. There -- there wasn't all that much to recall. Our -- our attorney worked on most of this. I have no notes between -- between December 16th and 7/26 or 7/10, which is from our attorney.

Q So when you say December 16, 2022 through September of 2023?

A No, July of 2023.

Q All right. So for that period of time, you really don't have any internal notes as to what was done other than the fact that it was being handled by your attorney?

A Yeah, once we escalate this to outside counsel, we're generally not working it internally.

Q Okay. Now, who makes the decision as to whether or not to commence suit for collection?

J. PATROVIC

A It's generally me. For accounts like this that are a bit more complicated, like when we're contacted by third-party attorneys, it would be our general counsel.

Oh, at the time it was our CEO and general counsel. At this point it's -- he's our vice chairman now, but he's still involved in some of the complex decisions.

Q And would you have been involved in those conversations?

A Yes.

Q Do you recall being involved in the conversations about this account?

A Yes.

Q Okay. Was a decision made at some point as to whether or not suit should or should not be commenced for collection on this account?

A Yes.

Q Okay. And what was the decision?

A I mean, we sent this to our -- our external counsel to just kind of start

J. PATROVIC

getting on top of when we initially received emails from Russell Shanks and Harry Thomasson, payments were clearing still.

So we just continued to debit internally and no suit was filed because they were clearing payments. Once they started returning payments, we notified our attorney and then at that point he -- he proceeded

Q And when you say he proceeded, what --

A Filed suit.

Q So is it your understanding that a lawsuit has been commenced by Libertas to try and collect on this?

A He -- he would be the one to commence the lawsuit.

Q Do you know if he did commence the lawsuit?

A I'm -- I'm checking now.

Q Okay.

MR. CIANCULLI: Mr. Ruderman, I think we can probably stipulate that, I think

the only claim that Libertas filed was by way of counterclaim in the state court.

MR. RUDERMAN: Yeah.

MR. CIANCULLI: If that helps to stipulate to that. I don't believe that there's been any other lawsuit affirmatively filed at this point --

THE WITNESS: Yeah that's --

MR. CIANCULLI: -- by Libertas.

MR. RUDERMAN: Okay. I mean, I'd like the witness to do the best that she can to answer the question.

MR. CIANCULLI: Yeah, we're getting a little close to, like, what they talked about with counsel. Let's try to stay away from that.

MR. RUDERMAN: I'll --

THE WITNESS: Yep. I just -- I just searched NYCOURTS. We never filed for the collections purpose.

BY MR. RUDERMAN:

Q Now my brief review of the NYCOURTS, I -- I believe there's well over 800 lawsuits that Libertas has over the

J. PATROVIC

last several years filed; correct? Is that summary?

A That -- that sounds correct.

Q Okay. And does Libertas typically have a position to commence lawsuits for those accounts that are in default?

A Yeah, our -- our external counsel files them on our behalf.

Q Okay. And do you know sitting here today as to why no action was commenced to pursue a lawsuit against either Northshore or Sunrise or Mr. Deo on this account?

MR. CIANCULLI: Objection.

You can answer.

THE WITNESS: Sorry?

BY MR. RUDERMAN:

Q Do you know why no lawsuit has commenced on collection against Northshore, Sunrise or Mr. Deo on this account?

A I'd consider this account an anomaly.

J. PATROVIC

Q In what way?

A We don't get emails like the ones we get from Russell Shanks or Harry Thomasson ever in my nine years.

Q So the fact that it's an anomaly, is that the reason as far as you know as to why no lawsuit for collection was made?

MR. CIANCULLI: Objection.

BY MR. RUDERMAN:

Q Do you know if Libertas believes it's still entitled to payments on this account?

A I think we are entitled to at least the principal amount funded that we never received back.

Q Do you know if Libertas intends on pursuing any claim against Mr. Deo, Northshore Funding or 189 Sunrise to collect on this account?

MR. CIANCULLI: Objection.

THE WITNESS: I don't know.

BY MR. RUDERMAN:

Q Okay. And if a decision were

being made --

THE REPORTER: I'm so sorry. I missed that answer.

MR. RUDERMAN: She said, "I don't know."

THE REPORTER: Okay. Thank you.

BY MR. RUDERMAN:

Q And if a decision were to be made to either yes, pursue it or not pursue it, whose decision would that be if you know?

A It would be mine and Randy Saluck's.

Q Okay.

MR. WEISS: Sorry, do you mind if I take a quick restroom break?

MR. RUDERMAN: Oh yeah, sure. I apologize. We've been going for a little while. Yeah. Why don't we take five minutes, come back? We can go back at 11:25?

MR. WEISS: Thank you.

MR. RUDERMAN: All right.

THE REPORTER: Time is 11:19. Off

the record.

(Off the record.)

THE REPORTER: We are back on the record at 11:28 a.m.

You may continue.

MR. RUDERMAN: Thank you.

BY MR. RUDERMAN:

Q Ms. Patrovic, we've now had a few minute break. Did you communicate with anybody during this break?

A No.

Q Okay. Now, are you aware of the allegations that are contained in the lawsuits currently pending with Libertas concerning generally all the allegations?

A Not completely, no.

Q Okay. Are you aware that there are allegations that Mr. Deo committed fraud in connection with his applications to Libertas?

A Yes.

Q Do you know if there was any internal investigation by Libertas as to whether or not there may have been fraud

J. PATROVIC

in connection with his application?

A If there were, it would've been by the underwriting team, not my team.

Q Okay. So as you sit here today, you don't know if there was any investigation about that?

A I'm -- I'm sure there was.

Q Okay. And would you have been told what the result of that investigation would be?

A I -- probably.

Q Okay. And so do you know what the results of that fraud investigation were?

A I -- I mean, I don't think that they found anything outside of the ordinary.

Q Okay. Now, in the agreement there's a provision, I can pull it up if I need to, but I think you're pretty familiar with the agreement?

A Yes.

Q Okay. If you're not, we can pull to the agreement, but that says if

J. PATROVIC

the company goes out of business than under certain terms and conditions, there's no longer further obligation to repay the amount, something like that. Could you --

A Yeah.

Q Okay.

A Correct.

Q And may I presume that means if the company legitimately just goes out of business, it just stops operating; is that correct?

A Correct.

Q Okay. Do you know whether or not in this, whether that scenario you believe is the -- withdrawn. Do you know whether or not it is Libertas's position that that provision applies in this particular circumstance?

MR. CIANCULLI: Objection.

You can answer

BY MR. RUDERMAN:

Q And I'll rephrase if you don't understand.

J. PATROVIC

A I mean, that would apply to any contract.

Q Well, hold on, let me try and rephrase it. Is it Libertas's position that the company, Northshore Funding, I'm sorry not Northshore Funding, Northshore Motor and 189 Sunrise -- let me back up. Let me do it this way.

Do you know as you sit here today, whether Northshore Motor is still an operating business?

A I don't know.

Q Do you know if 189 Sunrise is an operating business?

A I don't know.

Q Okay. Do you know whether Libertas has taken any position to see whether or not the provision within the contract which says a business that is no longer operating is no longer obligated for the repayment?

A At that point, it would be external counsel, David Epstein.

Q Okay.

J. PATROVIC

A Once we escalate it to outside counsel, he -- he's the one kind of handling that.

Q Okay. So it would be up to him to decide whether or not that provision in the contract would be applicable?

A Correct. Well, if -- if they're closed or not.

Q Okay. Well, is there a difference between a company that closes because, for example, the owner took all the money out of the company or a business that closed down because it wasn't making money and is no longer have funds?

A I think yeah, I mean there's a difference.

Q Okay. So in a situation where a company closes because it wasn't making money, went out of business, in that situation, that provision would apply in your understanding; correct?

A Yes.

Q Okay. But if the owner of the company just decides, "I'm going to take

all the money out of the company, close it down," you believe that there would still be an obligation to repay the debt to Libertas; correct?

A Yes.

Q Okay. And also in the contract, it's the expectation, actually the obligation, that when the monies are financed to the borrower, excuse me, to the --

A Client.

Q Merchant. Merchant. That money's going to be used to promote the business which is financing those monies; correct?

A Yes.

Q Okay. It's not the intention or your understanding that when this money's financed, the merchant is to take that money and use it to buy some other asset unrelated to the business?

MR. THOMASSON: Objection.

BY MR. RUDERMAN:

Q You can answer the question.

J. PATROVIC

A I mean, unless otherwise specified, there -- there are occasions where that is the case.

Q Right. So if the money is specifically taken saying we're going to be using this money to buy something outside of the business, otherwise the money is supposed to be, is expected to be used for the benefit of the business itself; correct?

A Yes.

Q Right. I mean, you have, Libertas has a vested interest in this business continuing to operate; correct?

A That's correct.

Q And when it's financing, it's really stripping a lot of asset value from the company that you don't want to be taking out of the company because it won't have the money to repay the debt that it owes to you; correct?

A Correct.

Q Okay. Had you known, excuse me, had Libertas known that the $735,000

J. PATROVIC

would've been taken by Mr. Deo and used for him personally to buy into some other business, do you think Libertas would have financed this transaction?

MR. THOMASSON: Objection.

BY MR. RUDERMAN:

Q You can answer.

A I'm -- I'm not sure.

Q Okay. Is that because --

A I'm not involved in underwriting.

Q Fair enough. And if in fact that exclusion for a business going out of business -- withdrawn. There's a personal guarantee on this transaction; correct?

A I believe so.

Q Okay. And that's a pretty standard practice for Libertas in these types of deals?

A Yes.

Q Okay. And Mr. Deo is the one who personally guaranteed it; correct?

A Yes.

Q Okay. Is it your understanding

that Mr. Deo is still personally liable for the obligation to Libertas?

MR. CIANCULLI: Objection.

You can answer.

THE WITNESS: Yes.

BY MR. RUDERMAN:

Q Okay. And do you know if any efforts have been made against Mr. Deo to collect on any of these obligations to Libertas?

A That would be our -- our external counsel, David Epstein, handling that.

Q Okay. So as you sit here today -- okay. You don't know is what you're saying?

A Correct.

Q And the decision as to whether or not to pursue a claim against Mr. Deo would be handled by outside counsel Mr. Epstein?

A His advice, yeah.

Q Okay. It would be based on whether he advised to do so or not?

J. PATROVIC

A Correct.

Q Okay. And, but at this point in time, you have not given the instruction to start an action against Mr. Deo; correct?

A Based on my notes, no.

MR. RUDERMAN: I'm just checking my notes. We're almost done. I just want to make sure that I'm --

Well, thank you very much, Ms. Patrovic. I don't have any further questions, but I have to open this up to see if any other party or counsel wishes to ask you any questions. Thank you.

MR. KATAEV: For the Superb plaintiffs, no further questions. Thank you.

MR. THOMASSON: Mr. Cianculli, I think you are ahead of me in order if you have any. I know you don't, but --

MR. CIANCULLI: Yeah, I will not, I will not. I think you're up, Harry, if you want to ask questions, I think you are next in line.

J. PATROVIC

MR. THOMASSON: I have a few.

MR. CIANCULLI: Okay.

EXAMINATION

BY MR. THOMASSON:

Q Ms. Patrovic?

A Yes.

Q Is that right; Ms. Patrovic?

A It's Patrovic, it's fine.

Q Patrovic, I'm sorry.
Ms. Patrovic, you spoke about, it seemed, if I understood you correctly, three different levels of difficulties that people get into with repayments of funding at Libertas.

You seem to indicate that there's a group that goes into default and you said that was a guesstimate of about five percent and then you talked about roughly ten percent that do some sort of workouts, although that might be my conclusion.

And you talked about 15 percent that are pending troubles. I'm wondering, are those three separate groups or are

J. PATROVIC

some of them a subset of like the 15 percent of people who are almost in trouble?

MR. KATAEV: Objection to form. Compound.

BY MR. THOMASSON:

Q Do you understand the question, Ms. Patrovic?

A Yes.

Q Go ahead. Explain that to me if you would.

A They're -- they're three separate buckets essentially. I view them as a pipeline. Deals that are in, for the sake of this, we can use the terms late, paused and default. Deals that are currently they're working with us, they're on workout plans, we call late.

Deals that are on paused. Those are pending default. That means that we've worked them internally to the best we could. At this point we've sent them to outside counsel. And then the last -- the last bucket, default, is if we've

determined that outside counsel can't collect in the near future. So right now they're all separate, but accounts move from one to the other.

Q Do you know if this was a case that internally Libertas considers to be at this point a default?

A Yes.

Q Okay. And during your time with Libertas, you said you've been with them for about nine years; is that right?

A Correct.

Q What was the smallest funding that you became aware of by Libertas?

A A small, probably 5,000.

Q $5,000? Okay. And do you know what the largest funding was that you've become aware of since you've been at Libertas?

MR. CIANCULLI: Objection.

You can answer if you know.

THE WITNESS: It's probably around 10 million.

//

J. PATROVIC

BY MR. THOMASSON:

Q Okay. So this particular funding -- withdrawn. You consider this to be a $750,000 funding, not withstanding that only 735,000 was actually delivered; right?

A Correct.

Q And $750,000, how would you categorize that in your experience at Libertas?

MR. RUDERMAN: Object to form.

MR. CIANCULLI: Yeah, objection.

BY MR. THOMASSON:

Q If you have any way of describing it, small, medium, and large for example, how would you describe it?

A On 11/17/2022, that's considered large.

Q That was a large loan?

A Yes. A large MCA.

Q That was large funding?

A Yes.

Q Okay. And you don't know Anthony Deo personally; do you?

J. PATROVIC

A No.

Q And you and I have never spoken except I think you indicated you might have been on some email chain with me; right?

A Yes.

Q With respect to the email chains that you saw that contained my name, you said something that I didn't fully understand. You used the word escrow while talking about one of my emails, but then I thought you read it and I didn't hear the word escrow.

So I'm wondering when you used the word escrow with respect to my emails, was that your conclusion or a quote from something I said?

MR. KATAEV: Objection.

THE WITNESS: It -- the word escrow is not in your email.

BY MR. THOMASSON:

Q Okay. So when you used the word escrow in this deposition, that was your term and your conclusion; is that right?

J. PATROVIC

A Yes.

Q Okay. Did you read us the entire email that I sent when you read that to us?

A The one from 12/8? Yes, I did. That was the full email there.

Q Were there any other emails in which I communicated with Libertas and said anything affirmative other than just being on the chain?

A Not that I could find. I -- I'm not sure if you had sent any directly to Randy, but those are the ones in my notes.

MR. CIANCULLI: To be clear, Mr. Thomasson, that email was not to Libertas, but it was to someone named Phil.

MR. THOMASSON: Okay. Right.

BY MR. THOMASSON:

Q And forgive me, in the moment, I'm not remembering who Phil is. Ms. Patrovic, do you know who Phil is?

A Yes. He's someone at the broker company, National Business Capital.

Q Okay. And did it appear to you that I was responding to something Phil had reached me about?

A Yes.

Q Okay. When you speak about this case being an anomaly, do you mean that it's unusual for Libertas to be involved in funding that then becomes the subject of an order to show cause? Is that what you mean?

A Yes.

Q Mr. Ruderman was asking you about the merchant and the merchant's use of money obtained through funding from Libertas. I'm curious, after funding is provided to the merchant by Libertas, whose decision is it as to how they use that money?

MR. RUDERMAN: Objection. Form.

You can answer.

THE WITNESS: Our underwriting team.

BY MR. THOMASSON:

Q Okay. Now, my question goes to after the funding has been provided, not

J. PATROVIC

whether or not it's going to be provided. I'm asking you once the money has been provided, whose decision on behalf of the merchant is it as to how the merchant uses the money?

A The merchant.

Q And in this particular instance is or has Libertas ever been concerned about how the money was used?

A Yes.

Q Okay. And what is it you found out?

A There are over 10,000 accounts. I'm -- I'm not -- I'm not sure.

Q Okay. So you would like it to be utilized for the business; is that a fair summation?

A That's correct.

Q Okay. And it's the merchant's decision as to how they use it for the business; right?

A Yes.

Q And as you sit here today, do you consider that Anthony Deo obtained

this funding from Libertas wrongfully, if you know?

A I'm able to view the transcripts of my underwriting team, I'm sure who you already spoke to of what Anthony Deo said he was going to use the funds for. From what I understand, they were not used for -- for those things. That's -- that's all I can say with that.

Q Okay. And with regard to the funding itself, are you aware that after their depositions, the underwriting team indicates that they still would've funded this deal? Do you know that that happened?

A I don't.

MR. RUDERMAN: Object to the form of the question as to whether it's accurately reporting back, but you can answer the question.

THE WITNESS: The -- I -- I've have -- I didn't speak to them after their depositions.

BY MR. THOMASSON:

J. PATROVIC

Q Okay. And as you sit here today, is there anything about this transaction that you believe has indicated to you that Libertas should not have funded this transaction, at least as of the date of the funding?

MR. CIANCULLI: Objection.

You can answer.

THE WITNESS: I'm -- I'm not an underwriter, but I trust my underwriting team.

MR. THOMASSON: Okay. I have no further questions.

MR. CIANCULLI: Jeff, you're finished still I assume?

MR. RUDERMAN: I have no further questions.

MR. CIANCULLI: Okay.

Michael, I assume you're not asking any questions?

MR. WEISS: Yes, that's correct. I have no questions.

MR. CIANCULLI: Jess, I think you're done.

J. PATROVIC

Everybody agree?

MR. RUDERMAN: I'm good. Ms. Patrovic, thank you very much for your time.

THE WITNESS: Thanks.

THE REPORTER: I'm going to go ahead and close out and --

MR. CIANCULLI: Thank you. You can log off.

All right. Anything else we need to talk about now before I --

THE REPORTER: Let me just --

MR. CIANCULLI: -- deal with other fires?

MR. RUDERMAN: -- but I do want to ask the reporter, we needed an expedited rough transcript for Monday, please.

THE REPORTER: For Monday? Okay. I'll have someone reach out.

MR. RUDERMAN: Yes.

THE REPORTER: And then let me see. Mr. Ruderman.

MR. KATAEV: -- splitting that.

THE REPORTER: I'm sorry, Mr. Kataev,

J. PATROVIC

I missed that.

MR. RUDERMAN: Yeah, I'm splitting that with Mr. Kataev.

THE REPORTER: Okay. And that is the expedited as well as the original transcript?

MR. RUDERMAN: Yeah. Right, correct. Yes.

THE REPORTER: Okay. And if there are any remaining counsel that are ordering a copy, please let me know now.

MR. KATAEV: I also confirm that's correct.

MR. CIANCULLI: I am not ordering a transcript.

THE REPORTER: Okay. All right. So I will assume no one else is through that silence. Okay. I don't believe there's anything further. Time is 11:48 a.m. We are off the record.

(Whereupon, at 11:48 a.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, KATHELEEN FERNANDEZ CRUZ, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



KATHELEEN FERNANDEZ CRUZ
Notary Public in and for the
State of New York

CERTIFICATE OF TRANSCRIBER

I, HEATHER BROWN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Heather Brown

HEATHER BROWN

A C K N O W L E D G E M E N T

I, Jessica M. Patrovic, certify that I have read the transcript of my testimony taken under oath on January 30, 2026, and that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

________________________
JESSICA M. PATROVIC

Signed and subscribed to
before me, this day
of , 20 .
_________________________
Notary Public

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Superb Motors Inc, Et Al. v. Deo, Anthony, Et Al.
DATE OF DEPOSITION: 1/30/2026
WITNESS' NAME: Jessica M. Patrovic

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_______________________
Jessica M. Patrovic

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

_______________________
(NOTARY PUBLIC)

_______________________
MY COMMISSION EXPIRES:

**&**

**&** 2:10 3:21 8:16 10:19

**0**

**06830** 2:22 7:14

**1**

**1** 6:12,25 18:1 22:3
**1/30/2026** 106:3
**10** 18:10 93:23
**10,000** 98:14
**10170** 3:23
**10:10** 2:19 7:6
**11** 18:11
**11/17/2022** 94:18
**11/25** 61:12
**11423** 3:7
**11553** 4:14
**11793** 4:7
**11:19** 80:25
**11:25** 80:22
**11:28** 81:5
**11:48** 102:20 102:23
**11th** 56:5
**12** 6:3 18:12 45:15,17 56:8 64:6
**12/16** 64:7,9
**12/2** 63:16
**12/2/22** 61:22 61:25
**12/8** 96:6
**12/9** 63:20 64:8
**1239** 1:15 3:15
**13** 18:13
**1339** 4:21
**138,541.90.** 57:25
**13th** 65:2
**14** 18:14 53:14
**15** 18:15 33:9 91:23 92:2
**15,000** 57:7
**1504779528** 62:6
**1580** 1:12 3:13
**1581** 1:11 3:13
**1591** 1:13 3:14
**16** 18:16 74:12
**1632** 1:14 3:14
**16th** 74:10
**17** 18:17 72:22
**18** 18:18
**18211** 3:6
**189** 1:6 2:13 3:11,18 54:16 62:5 64:11,13 79:20 84:8,14
**18th** 56:16
**19** 18:19
**19,791.70.** 57:23 65:8
**19107** 4:22
**198** 54:6

**2**

**2** 6:14 18:2
**2/3** 71:4
**2/6** 71:5,7
**20** 18:20 43:18 55:17 105:20 106:22
**2016** 14:22,25
**2022** 13:13 26:8 39:5 46:13,15 53:14 55:17 61:15 72:5 74:13
**2023** 39:8,9,10 39:13 56:4,8 72:6,8,22,25 73:8 74:13,14
**2026** 2:18 7:12 105:8
**205** 3:25
**20th** 56:16,21 65:3
**21** 18:21
**212** 3:25
**215** 4:24
**22** 18:22 46:22 61:13
**220** 2:21 7:14
**23** 1:7,17 3:17 18:23
**2320** 3:22
**24** 18:24
**25** 18:25 44:12
**2519** 1:15 3:15
**26th** 56:16
**27th** 56:16 65:3 65:11 70:2
**29587** 103:19

**3**

**3** 6:17 18:3
**3/17** 72:4
**30** 2:18 7:12 105:7
**3280** 4:6
**33** 6:13
**333** 4:13
**34** 6:16
**35596** 104:15
**357-3700** 4:16
**3rd** 70:5,6 73:10

**4**

**4** 18:4
**411** 2:21 7:13
**412-2421** 3:9
**42** 6:21
**420** 3:22
**446** 1:17 3:16
**483082609486** 64:4

**49** 6:25

**5**

**5** 18:5
**5,000** 43:11 93:16,17
**500** 4:21
**500,000** 43:17
**516** 4:16

**6**

**6** 18:6 46:22 72:25 73:8
**6188** 1:7
**623778112** 67:10,11
**661-6800** 3:25
**665-8181** 4:24
**6th** 56:5

**7**

**7** 18:7
**7/10** 74:10
**7/26** 74:10
**700139899** 61:5
**718** 3:9
**730** 57:4
**735** 47:5
**735,000** 57:8 87:25 94:6
**750,000** 57:6 94:5,9
**76** 1:16 3:16
**7873397** 2:24

**8**

**8** 18:8
**800** 77:25
**859,063.10** 58:13
**859,063.10.** 58:6

**9**

**9** 18:9 56:4
**90** 43:10
**93** 6:4
**9486** 54:12 64:25 70:16 72:21
**95** 58:19
**9899** 58:21,22 67:16
**99** 50:8
**997,500** 58:9

**a**

**a.m.** 2:19 7:6 81:5 102:20,23
**aaronson** 1:9 3:13
**ability** 12:9 103:9 104:6
**able** 12:7 31:16 32:10 44:4,8 48:2,13,17 51:5 99:4
**absent** 7:19
**acceptable** 56:9
**access** 48:13
**account** 6:20 6:25 26:19 27:12,15 29:19 33:19 39:4,6 40:18 41:7,14 42:16,20 43:16 43:17,20 51:16 53:7,12 54:4 54:11,13,15 55:10 58:19,21 59:9,20,21 60:7,16,25 61:8 62:3,3,5,6 62:8,13,19 63:6,12 64:2,3 64:5,12,14,23 64:25 65:10,13 65:17,22 66:4 66:4,5,16,17,18 66:20,23 67:5 67:8,16 68:7 68:16,17,18,19 68:24 69:11 70:15 71:9,11 71:17 72:10,16 72:21,21 73:22 75:15,20 78:15 78:23,24 79:14 79:21
**accountant** 50:3
**accounting** 50:14
**accounts** 14:15 14:18 26:14,17 33:23 34:17 36:2,19,20,20 36:21,22,23 41:2,11 42:22 42:24 43:2,23 45:3 58:15,16 60:7,11 64:16 66:12 67:19 69:6,7,21 75:2 78:7 93:4 98:14
**accurate** 12:8 103:8 104:5
**accurately** 99:19
**ach** 35:2,6 65:16 67:3 68:15
**acknowledg...** 7:16
**act** 28:23 36:8
**action** 10:21 47:6 78:12 90:5 103:11,15 104:8,11
**actions** 15:21 47:2
**actually** 9:9 18:16 19:12 24:23 48:12

64:7 67:25 69:7 86:8 94:6
**additionally** 7:19 8:8
**address** 48:3 53:18
**administer** 7:16 9:24
**advice** 89:23
**advise** 56:10
**advised** 89:25
**affirmative** 96:10
**affirmatively** 77:8
**afternoon** 52:24
**agents** 68:10
**aggressive** 43:21
**ago** 13:9
**agree** 7:17,22 59:23 101:2
**agreed** 8:8
**agreement** 82:19,22,25
**agrees** 16:24
**ahead** 9:24 60:18 90:20 92:11 101:7
**al** 7:10,11 106:2,2
**albany** 52:24
**alia** 49:16
**alivia** 5:4
**allegations** 81:14,16,19
**allows** 68:3
**alternatively** 34:3
**america** 64:3 64:25 65:17 70:15
**amount** 19:7 21:4,8 34:15 57:5 58:2,6,7 65:6,11 68:12 79:16 83:5
**anomaly** 78:25 79:7 97:7
**answer** 11:25 18:22 19:14 44:2 77:13 78:17 80:4 83:22 86:25 88:8 89:5 93:22 97:21 99:20 100:9
**answered** 105:10
**answering** 11:12
**answers** 11:17 105:12
**anthony** 1:5,22 3:3 5:3 7:11 46:25 49:21 50:7,10 53:4,5 53:10,15 63:25 94:25 98:25 99:6 106:2
**anthony's** 50:4 50:18
**anthonyd** 53:22
**anybody** 45:24 55:19 81:11
**apologize** 9:20 11:4 18:18 23:4 55:23 72:8 80:19
**appeal** 52:24
**appear** 97:2
**appearing** 8:20 8:23,25
**applicable** 8:2 85:7
**applicant** 24:22
**application** 82:2
**applications** 16:10 81:20
**applies** 83:19
**apply** 84:2 85:21
**appropriate** 23:10
**approved** 35:22
**archived** 38:25
**arises** 33:18
**arrangements** 33:4
**asad** 1:9 3:18
**asked** 63:2 105:10
**asking** 11:24 56:7 97:13 98:3 100:20
**asset** 19:22 86:21 87:18
**assets** 22:22
**assigned** 7:4 26:13 27:13
**assigns** 68:11
**associated** 68:20
**assume** 18:23 18:24 20:11 32:9 100:16,20 102:18
**at&t** 14:7
**attempt** 69:5 70:9,14
**attendance** 8:12
**attorney** 10:17 10:18 28:23 29:9 32:9,10 32:13,21 45:23 56:13,23 67:24 71:13 73:18 74:8,11,19 76:10 103:13

104:9
**attorneys** 28:6 28:9,11,14,22 30:11,15,21,22 31:8 75:5
**audio** 103:7 104:3
**authorization** 67:3,14,17 68:2,6,10
**authorize** 68:8
**authorized** 7:15 67:8
**auto** 1:4,6,12 1:13,13,14,15 1:16,18,18 2:13 3:3,11,13 3:14,14,15,15 3:16,17,17,18 33:23 47:3 54:16,17 60:10 61:2 62:5 71:18,20,23
**automated** 68:14
**automatically** 34:7 35:9 65:14,20
**automotive** 2:4
**available** 38:14
**avenue** 2:21 3:6 3:22 7:13
**aware** 17:7 49:24 55:8
81:13,18 93:15 93:19 99:12

**b**

**b** 6:6
**bachelor's** 13:20
**back** 12:13 21:21 25:9 52:3,14,25 69:25 70:19 79:17 80:21,21 81:4 84:8 99:20
**balance** 27:6 43:5,10,18
**bank** 2:11,12 4:10 9:2 33:22 34:6 53:7 54:2 54:4 58:16 59:3 61:2 62:4 64:2,24 65:17 67:9 68:24 70:15
**baron** 1:9,10 1:11 3:13,18
**based** 19:22,23 20:3,7,11,12,12 21:3 23:13 24:15 26:20 27:5 29:21 38:11,11 42:6 69:18 74:4 89:24 90:7
**basis** 23:23 35:15 37:12
**began** 14:20
**beginning** 8:13
**behalf** 3:2,11 4:2,10,18 8:17 8:20,25 47:2,5 50:10 78:10 98:4
**believe** 17:14 28:20 39:16 48:9 50:21 67:22 69:14 77:6,24 83:17 86:3 88:17 100:4 102:19
**believes** 79:12
**benefit** 87:10
**best** 12:8 19:25 50:20 52:22 77:12 92:22 103:9 104:5
**better** 31:23 38:6 66:10
**bit** 28:2 38:6 69:25 75:3
**blank** 68:3
**blankenship** 1:23
**blanket** 67:17 67:21
**blocked** 43:19 70:20 72:15
**blvd** 1:12,12,13 1:14,15,16 3:13,14,14,15 3:15,16
**boa** 54:5 64:13
**borrower** 86:10
**boulevard** 4:13
**break** 80:17 81:10,11
**brian** 1:8 3:12
**brief** 77:23
**broker** 17:16 48:5 62:16,23 62:25 96:24
**brokers** 18:4
**brook** 13:20
**brown** 104:2 104:15
**bucket** 92:25
**buckets** 92:14
**build** 14:18
**built** 13:9
**business** 16:5 16:23 17:12 20:16 33:11 48:6,7 49:5 62:24 63:5 68:15 69:16 71:3 83:2,12 84:12,15,20 85:13,20 86:15 86:22 87:8,10 87:15 88:4,14

88:15 96:25 98:17,22
**business's** 20:8
**businesses** 50:5
**busy** 56:19
**buy** 86:21 87:7 88:3
**buyers** 1:25

**c**

**c** 3:1 4:1 6:10 105:2
**call** 16:22 23:12 25:11 26:2 33:7 37:2 39:19 40:4,11 41:23 43:12 92:19
**called** 10:6 40:13 44:19 66:3
**calling** 52:23
**calls** 40:5
**camberato** 62:22
**capacity** 25:22 37:15
**capital** 2:9 48:6 48:7 96:25
**car** 1:25
**cars** 2:1,2
**case** 1:6 73:11 87:4 93:6 97:7 106:2
**categorize** 94:10
**category** 33:7,8
**cause** 46:24 52:21 56:3 97:10
**ceo** 28:17,18 51:25 52:10,11 75:7
**certain** 23:19 24:15 26:13 29:6 83:3
**certainly** 51:13
**certificate** 103:1 104:1
**certifications** 13:25
**certified** 7:22
**certify** 103:4 104:2 105:5
**cfo** 28:20
**chabrier** 1:8 3:12
**chain** 50:2 51:21,23 53:25 54:25 55:10,14 56:25 95:5 96:11
**chains** 95:8
**chairman** 28:19 75:9
**chance** 60:6
**change** 106:5
**changed** 13:7 26:8 62:9 64:5
**changing** 66:16
**channel** 37:17 38:9,12,14 39:8
**chase** 2:12 59:5 60:25 67:9 69:11
**checking** 59:13 76:22 90:8
**chestnut** 4:21
**choose** 68:23
**cianculli** 4:19 8:19,19 9:4,7 9:18 45:23 54:7 59:17 60:2,11,19 65:21 76:24 77:5,10,14 78:16 79:10,22 83:21 89:4 90:19,22 91:3 93:21 94:13 96:15 100:8,15 100:19,24 101:9,14 102:15
**circumstance** 83:20
**circumstantial** 44:15,24
**citrin** 50:14
**claim** 77:2 79:19 89:20
**clarification** 18:20
**clarify** 19:3 23:5
**clear** 11:11 30:6 31:20 32:4 33:25 34:2 96:15
**cleared** 64:10 65:2
**clearer** 18:22
**clearing** 76:4,8
**clearinghouse** 68:14
**client** 24:24 25:5 29:22 37:19 38:10 47:17 49:11,13 86:12
**clients** 29:5 66:3
**close** 77:15 86:2 101:8
**closed** 44:21 72:16 85:9,14
**closes** 85:11,19
**coast** 2:1,2,3,4 2:5,6
**code** 34:15,25 35:13 43:6
**codes** 34:24 35:5

**collaborative** 27:11
**collect** 14:17 15:8,22 16:20 32:10 47:7 71:16 76:17 79:21 89:10 93:3
**collected** 35:7
**collection** 15:15 25:18 29:4,20 74:25 75:20 78:21 79:8
**collections** 12:24 25:15 31:2,4 77:21
**collectively** 68:19
**come** 16:8 17:3 23:13 34:12,13 34:21 35:8 58:16 61:17,21 61:24 62:2 63:11 70:7,25 73:15 80:21
**comes** 42:6 70:18
**commence** 74:24 76:19,20 78:6
**commenced** 75:19 76:16 78:13,21
**comment** 37:21
**commission** 106:25
**committed** 81:19
**committee** 27:9
**common** 66:7,8 66:18
**communicate** 39:14 81:10
**communicated** 96:9
**communication** 29:22 39:25 56:14
**communicati...** 6:12,17 38:13 38:20 39:4 40:15,16 42:7 46:12,14,18 51:12 53:2,24 55:9 63:4 73:21
**communicative** 37:17
**companies** 44:19
**company** 14:12 38:2 64:12 83:2,11 84:6 85:11,13,19,25 86:2 87:19,20 96:25
**company's** 38:18 50:3
**complete** 105:9
**completely** 81:17
**complex** 75:10
**compliance** 28:19,24
**complicated** 28:2 75:3
**compound** 92:6
**computer** 48:11,13
**concerned** 98:9
**concerning** 6:19,20 29:5 51:14,15 63:6 81:16
**concluded** 102:24
**conclusion** 91:22 95:17,25
**conditions** 83:3
**conference** 37:14 38:8 40:4
**confident** 50:4 50:17,18
**confidentiality** 59:18,24
**confirm** 60:21 102:13
**connecticut** 7:14
**connection** 6:15 10:22 15:4 24:6 28:15 41:25 47:9 59:18 71:8 73:22 81:20 82:2
**consent** 56:10 56:12,17
**consider** 20:19 23:6 32:7 78:24 94:4 98:25
**considerations** 29:18
**considered** 11:14 32:23 94:18
**considering** 23:18
**considers** 93:7
**constitute** 8:6
**cont'd** 4:1
**contact** 31:11 42:21 43:22
**contacted** 66:21 75:4
**contacting** 56:6
**contained** 81:14 95:9
**containing** 68:18
**context** 21:24 53:3

**continue** 9:11 10:10 42:23 43:2 49:23 50:24 71:14 81:6
**continued** 64:24 71:11 76:6
**continuing** 87:15
**contract** 46:6 49:22 53:8 67:15,18,20 68:4 69:2 71:25 84:3,20 85:7 86:7
**contractual** 58:5
**conversations** 40:7,8 75:12 75:15
**cooney** 5:4
**cooperation** 29:22
**coordinated** 50:13
**copied** 52:7 53:10 56:14
**copy** 102:12
**copying** 48:23
**corp** 2:8
**corporations** 50:11
**correct** 9:15 10:15 22:24,25 23:7,8 24:19 25:7 27:21 32:24 34:8,9 34:23 35:4 40:22 42:20 45:19 48:10,14 48:15 52:15 53:17 57:14,15 57:18,19 58:8 58:9,14 60:13 61:8,13 63:12 64:18,20 65:6 65:11,17 70:7 70:8,10,13,17 72:10,11,23 73:24,25 78:2 78:4 83:9,13 83:14 85:8,22 86:5,16 87:11 87:15,16,22,23 88:16,23 89:18 90:2,6 93:13 94:8 98:19 100:22 102:8 102:14 105:9 105:13
**correctly** 91:12
**cough** 11:3,4
**counsel** 8:14 9:5,15 28:20 29:2,3,9 30:9 45:24 46:10 74:21 75:6,8 75:25 77:16 78:10 84:24 85:3 89:13,21 90:14 92:24 93:2 102:11 103:10,13 104:6,9
**counselors** 8:8 8:12
**count** 58:4
**counterclaim** 77:3
**country** 44:16
**county** 46:24
**course** 19:19
**court** 1:1 8:9 11:15,19 16:2 46:23 49:19 56:7,10,22 77:3
**courtesy** 11:25
**cover** 30:18
**covered** 30:20
**covid** 39:17,19 39:20
**cpa** 1:25
**cpa's** 2:10
**create** 14:16
**created** 68:21
**credit** 16:12 19:23 24:11
**cross** 25:15
**cruz** 2:23 7:3 103:2,20
**cszlaw.com** 3:24
**ct** 2:22
**cullen** 4:12 8:24
**cullenllp.com** 4:15
**curious** 97:16
**currently** 56:3 81:15 92:18
**customer** 25:12 25:15,17 26:2 26:2,12,18 27:13,14,19 28:5 33:2,19 34:3 35:16 63:10
**cut** 27:22 53:20
**cutoff** 27:2
**cv** 1:7
**cyruli** 3:21 8:16 10:19


## d


**d** 6:1,10,10,23 48:19 105:2
**daily** 33:22 35:15 37:12
**database** 41:10 41:15
**date** 2:18 35:3 53:13 56:2

61:10 68:20 73:5,12 100:7 106:3
**dates** 56:18
**david** 1:11 31:12 46:10 56:13 73:18 84:24 89:13
**day** 34:6 35:7,8 35:13,21,21 36:5,8 37:23 38:11 42:13,17 42:22,24 43:3 43:22 56:8 70:24 105:19 106:22
**days** 56:18 71:3 71:24 73:10
**deal** 23:23,23 26:23 27:3 29:4,16 34:14 34:14 35:22 43:9 99:15 101:14
**deals** 26:24,25 88:20 92:15,17 92:20
**dear** 49:10
**debit** 33:23 65:21,22 67:18 71:11,15,18,20 71:23 72:10,20 76:6
**debited** 60:25 64:6,7
**debits** 72:9
**debt** 86:4 87:21
**december** 14:25 39:5 46:13,15,22 53:14 55:17 74:9,12
**decide** 16:16 69:20 85:6
**decided** 42:9
**decides** 42:8 85:25
**deciding** 29:19
**decision** 16:12 29:8,10,11,14 49:19 74:24 75:17,23 79:25 80:9,11 89:19 97:18 98:4,21
**decisions** 24:6 24:12 25:5 27:8 75:10
**decline** 16:13
**declined** 43:24
**deduct** 58:11
**default** 31:14 31:18,21 32:3 32:5,11,19,23 33:12 78:8 91:17 92:17,21 92:25 93:8
**defendant** 4:2 4:10,18 5:3
**defendants** 2:15 9:17 10:23
**defense** 9:15
**definitely** 26:9
**definition** 32:5 32:12,18
**definitions** 32:3
**degrees** 13:23
**delivered** 94:6
**delivery** 68:12 68:12
**deo** 1:22,22 5:3 6:13,16,18,21 7:11 40:20,21 42:2 46:25 47:5 51:13,16 53:16 55:3 58:25 63:7,25 69:16 78:14,22 79:19 81:19 88:2,22 89:2,9 89:20 90:5 94:25 98:25 99:6 106:2
**department** 25:11 33:20 41:18,19,20
**depending** 26:23
**depends** 29:15 43:4 44:14
**deponent** 8:21
**deposed** 11:6 15:3,23 17:9
**deposit** 68:16
**deposited** 34:7 60:17,24
**deposition** 2:17 7:8 8:4,10 10:22 45:22,25 46:5 73:23 95:24 103:1 105:11 106:3
**depositions** 15:4 99:13,24
**describe** 16:4 19:21 20:5 33:10 38:5 44:11 94:17
**describing** 94:16
**description** 6:7 6:11,24 17:17
**designate** 27:3 42:10
**designation** 12:18
**destroyed** 39:2
**determine** 27:5
**determined** 93:2
**difference** 21:22 85:11,17
**different** 30:20 30:21,22 32:3

62:13 66:23,23 68:24 69:21 91:13
**difficulties** 91:13
**dig** 50:16
**digital** 103:7 104:3
**digits** 59:22
**directed** 69:13 69:15
**directly** 96:13
**discount** 20:14
**discretion** 69:19,22
**discuss** 37:13 39:22 56:24
**discussed** 64:19
**discusses** 27:10
**dispute** 52:15
**distinction** 20:23
**district** 1:1,2
**divided** 26:17
**divvyed** 36:14
**dla** 2:8
**document** 36:17 37:20,21 38:18
**documents** 16:21 46:4
**doing** 26:21
**dollar** 27:2
**door** 24:23
**double** 59:13
**draw** 66:6 69:20
**drawn** 62:12
**dry** 27:22
**due** 45:4 49:21 56:17 58:3 63:18,20 70:4 72:12
**duly** 10:6 103:5
**dwight** 1:23
**dykman** 4:12 8:25

**e**

**e** 3:1,1 4:1,1 6:1 6:6,10,10,10,10 6:23,23,23 48:19,19 54:19 105:2,2,2
**earle** 4:13
**eastern** 1:2 7:6
**education** 13:18
**efforts** 15:8,14 29:4 50:19 89:9
**either** 17:14 24:19 26:9 32:10 38:25 73:11 78:14 80:10
**electric** 68:6,13
**electronic** 41:9
**electronically** 6:14 40:25 41:24
**email** 36:25 38:15 46:8 47:24 48:3,18 48:21 49:4,5,6 49:10,25 51:19 51:21 52:5 53:13,18,24 54:24 55:10,14 55:20,22 56:25 63:4 95:5,8,21 96:4,7,16
**emailed** 62:16 63:22
**emails** 46:7 48:12 54:22 55:4 66:14 76:3 79:3 95:12,16 96:8
**emanuel** 3:4,8 9:6,14
**empire** 31:5,7
**employed** 14:5 103:10,13 104:7,9
**employee** 103:12 104:9
**employees** 25:10 67:23
**ends** 57:2
**engage** 29:9
**entire** 35:16 36:16 54:24 55:7 96:4
**entities** 67:19
**entitled** 79:13 79:15
**entity** 12:18 23:17 53:8 66:24
**epstein** 31:12 46:10 56:13 73:18 84:24 89:13,22
**errata** 106:1
**es** 103:4
**escalate** 26:22 30:8 74:20 85:2
**escalated** 28:3 37:4
**escalations** 29:7
**escrow** 47:13 47:15 95:11,14 95:16,21,24
**esq** 4:5
**esquire** 3:4,20 4:3,11,19
**essentially** 20:11 92:14
**estate** 1:11

Case 2:23-cv-06188-JMW Document 543-11 Filed 09/04/26 Page 116 of 136 PageID #: 20968



**estimate** 31:17 44:5
**et** 7:10,11 106:2,2
**everybody** 101:2
**everybody's** 36:15
**everyone's** 36:4
**evidentiary** 8:3
**exact** 49:7 65:5
**exactly** 65:8
**examination** 6:2 10:12 91:4
**examined** 10:8
**example** 34:16 85:12 94:17
**except** 8:17 72:21 95:4
**exclusion** 88:14
**excuse** 11:2 21:6 73:9 86:10 87:24
**expect** 32:21
**expectation** 86:8
**expected** 87:9
**expedited** 101:17 102:6
**experience** 45:6 65:25 66:7 94:10
**expires** 106:25
**explain** 43:7 92:11
**ext** 3:25
**extent** 40:17 55:8
**external** 46:10 75:25 78:9 84:24 89:13
**externally** 73:19

**f**

**f** 6:23 48:19
**fact** 24:3 66:11 74:18 79:6 88:13
**factor** 20:20,25
**factoring** 20:16 20:17
**fail** 45:3
**fair** 13:12 17:16,22 31:16 44:4 88:13 98:18
**fairly** 66:18
**familiar** 20:15 22:2 24:13 45:21 54:18 82:22
**far** 12:17 21:20 22:14 23:14 41:15 57:3 61:18 64:15 67:2 79:7
**faskowitz** 31:5 31:11
**february** 70:5,6 72:25 73:8,9 73:10
**federal** 8:9
**fee** 57:7
**feel** 50:17,17
**fernandes** 6:20 48:19 51:15 55:2 62:20
**fernandez** 2:23 7:3 103:2,20
**fifth** 45:4
**figure** 34:20 42:13
**file** 16:14,17 22:19
**filed** 50:9 76:7 76:14 77:2,8 77:20 78:2
**files** 24:9 78:10
**filing** 50:13
**finance** 19:8 24:15
**financed** 21:5,9 24:23 57:6,12 86:10,20 88:5
**financial** 19:5
**financially** 103:14 104:10
**financing** 17:23 18:5,6,10 19:11,21 20:4 22:3,6,24 23:9 23:11,13,15,18 23:20 24:7 31:14 35:21 45:9,14 86:15 87:17
**find** 50:19 66:7 96:12
**fine** 91:9
**finish** 11:24
**finished** 100:15
**fires** 101:15
**firm** 10:19 31:5 50:15
**firms** 31:3
**first** 10:6 13:8 14:9,17 22:17 25:9 33:19 35:3 43:25 58:18,20 60:24 61:7,7,11,14,17 70:2 73:6
**fisk** 1:16 3:16
**fit** 16:14
**five** 26:10 31:19 45:5 80:20 91:19
**flag** 66:13
**flags** 34:2 66:10
**floor** 37:9
**flushing** 2:10 4:10 9:2

**follow** 38:4 42:10,11,19
**followed** 53:9
**following** 42:12
**follows** 10:8
**foregoing** 103:3,4 104:4
**forget** 32:15 51:10 60:18
**forgive** 44:20 96:21
**form** 92:5 94:12 97:20 99:18
**formality** 36:3
**forward** 16:13 30:7
**forwarded** 49:2 49:5
**found** 82:17 98:12
**four** 26:9 28:12 39:21 54:8,10 59:22 64:17
**fraud** 81:20,25 82:14
**frequency** 45:8
**frequently** 71:22
**friday** 2:18 7:11
**front** 48:11
**full** 6:25 51:20 58:5 59:20 60:6 96:7
**fully** 95:10
**function** 13:15
**functions** 28:21 28:23
**fund** 16:16,25 23:3,4 57:8 68:6,13
**funded** 14:15 79:16 99:14 100:6
**funding** 2:11 4:18 8:20 10:24 12:14,22 14:13,14 18:13 20:10 21:2 57:7 66:17 68:5 79:20 84:6,7 91:14 93:14,18 94:4 94:5,22 97:9 97:15,16,25 99:2,12 100:7
**funds** 34:7 43:12 67:4 68:25 69:6,11 70:22 71:2,13 72:12 85:15 99:7
**further** 51:20 53:2,24 83:4 90:12,17 100:14,17 102:20 103:12 104:8
**future** 20:12,14 21:7,15 68:18 68:20 93:3

**g**

**g** 105:2
**gather** 37:12
**general** 12:23 24:17 75:5,8
**generally** 15:7 16:5,8 20:5,8 22:19 27:24 28:3,13 30:4 30:16 36:25 38:21 74:21 75:2 81:16
**gestures** 11:20
**getting** 20:25 32:20 34:17 76:2 77:14
**give** 11:18 12:7 19:25 31:16 44:4 48:4 49:7 55:13
**given** 18:17 90:4 105:12
**giving** 11:13
**go** 9:12,23 23:5 33:6 60:18 72:25 80:21 92:11 101:7
**goal** 14:18
**goes** 24:23 31:14,17 36:3 42:7 83:2,11 91:17 97:24
**going** 9:23 11:9 30:7 33:4 38:3 40:11 41:22 43:20,22 53:11 55:19 58:19 59:19 60:16 72:2 73:20 80:19 85:25 86:14 87:6 88:14 98:2 99:7 101:7
**gold** 2:1,2,3,4,5 2:6
**good** 7:2 8:15 10:14 51:9 101:3
**grant** 11:25
**great** 10:17 12:6 51:8
**greenwich** 2:22 7:14
**ground** 11:9
**group** 2:4 31:6 31:7 91:17
**groups** 91:25
**guarantee** 88:16
**guaranteed** 88:23

**guess** 57:7
**guesstimate** 91:18

**h**

**h** 6:6
**half** 72:9
**hand** 10:3
**handle** 12:22
**handled** 74:18 89:21
**handling** 85:4 89:13
**happen** 38:23 71:21
**happened** 99:16
**happening** 63:24
**happens** 34:5 72:14
**harry** 1:22 4:2 4:3,5 8:22 46:9 46:12,21 47:4 52:7,8 53:9 55:24 56:15 66:15 76:4 79:4 90:23
**head** 13:10,10 28:19
**hear** 95:14
**hearing** 33:3
**heather** 104:2 104:15
**heavily** 29:21
**help** 50:23
**helps** 77:5
**hereto** 103:13 104:10
**hey** 37:25 44:20
**hi** 27:22
**high** 13:18
**higher** 44:17
**highway** 4:6 47:3 54:17
**hired** 14:10,16
**hiring** 14:11
**history** 46:7
**hitting** 71:16
**hold** 84:4
**holder** 59:9
**holdup** 53:10
**holidays** 44:22
**honestly** 27:4 44:6
**hour** 50:2
**house** 28:9,20 29:2,3
**hrtatty** 4:8
**hundred** 34:17
**hwy** 1:6 2:13 3:11,18 62:5
**hylan** 1:11,12 1:13,14,15,16 3:13,14,14,15 3:15,16

**i**

**idea** 44:7
**identify** 8:12
**important** 32:6
**include** 41:17 56:13
**included** 53:4
**includes** 68:9
**including** 25:23 26:5
**inconvenient** 50:20
**independent** 16:9,19 17:5 73:2,13
**indicate** 91:16
**indicated** 95:4 100:4
**indicates** 99:14
**indication** 42:19 72:19
**information** 18:4 25:4 29:25 38:24 41:11,14 50:22 51:2 54:3 60:22
**informed** 49:25 50:25
**initial** 26:21 37:2,2 57:11 58:7
**initially** 76:2
**initiating** 68:13
**instance** 98:8
**instant** 37:18 38:10
**institutions** 17:23
**instructed** 71:15
**instruction** 18:17 90:4
**insufficient** 43:12 70:22 71:2,12 72:12
**intake** 41:19
**intend** 56:6
**intended** 7:25 49:17
**intends** 79:18
**intention** 86:18
**inter** 49:16
**interest** 21:13 21:17 87:14
**interested** 103:14 104:11
**internal** 38:19 74:17 81:24
**internally** 16:11 74:22 76:7 92:22 93:7
**interview** 16:22
**investigation** 81:24 82:7,10

82:14
**invoices** 20:25
**involved** 19:12 23:24 24:5,11 24:18,25 75:10 75:11,14 88:11 97:8
**iris** 1:10 3:18
**irrevocably** 68:8
**island** 1:18 3:17
**iso** 16:20
**isos** 17:15,20 17:23
**issues** 66:22

**j**

**j** 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,20 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1
**j.p.** 2:12
**jamaica** 3:6,7
**january** 2:18 7:11 39:10 56:4,5,5,8,17 56:19 65:2,3,3 65:10 70:2 105:7
**jcianciulli** 4:23
**jeff** 10:18 100:15
**jeffrey** 3:20 4:19 8:15,19
**jess** 100:24
**jessica** 2:17 7:8 10:5 105:5,15 106:3,21
**jmw** 1:7
**job** 2:24
**joe** 62:21,22 63:9
**jones** 1:25 2:9 50:3,9,21
**jory** 1:9 3:13
**josh** 50:7
**josh's** 50:14,19
**joshua** 1:8 3:12
**jruderman** 3:24
**judge** 52:23 59:25
**judicial** 47:19 49:14
**july** 74:14
**junior** 27:25 36:24

**k**

**k** 105:2
**kataev** 3:4 9:14 40:15,20 90:16 92:5 95:19 101:24,25 102:4,13
**katheleen** 2:23 7:3 103:2,20
**keep** 11:5 50:24 71:16
**kept** 40:25 41:6 66:11 72:9
**khan** 1:9 3:18
**kind** 14:2 27:4 36:18 37:22 38:11 41:10 43:16,19 63:4 75:25 85:3
**knew** 73:8
**know** 9:9,11 11:8 12:17 14:20 17:4,11 18:7,11,20 19:14,17 20:22 21:20 22:14,16 23:14 25:3 26:6 28:13 31:13 34:11 35:21 38:2,17 38:23 39:3 41:15 44:21 45:12 46:17 47:11 48:16 49:18 54:4 55:4,18 56:2 56:24 57:3,12 57:20 58:17 59:3,8 60:16 60:19 61:10,18 62:7,11 64:12 66:4 67:3,7 70:21 76:20 78:11,20 79:8 79:12,18,23 80:6,12 81:23 82:6,13 83:15

83:17 84:10,13 84:14,16,17 89:8,16 90:21 93:6,17,22 94:24 96:23 99:3,15 102:12
**knowing** 22:12
**knowledge** 24:17 103:9 104:6
**known** 87:24 87:25
**kuhn** 50:7

**l**

**l** 54:19 105:2
**lack** 31:23 66:9
**large** 94:16,19 94:20,21,22
**larger** 26:24,25 27:3
**largest** 93:18
**lastly** 49:24
**late** 52:25 92:16,19
**laurie** 1:24 54:19
**law** 31:3,5
**laws** 8:3
**lawsuit** 10:23 76:16,19,21 77:7 78:13,20 79:8
**lawsuits** 77:25 78:7 81:15
**leads** 16:7 17:2 17:3
**learn** 16:22
**leasing** 1:7 2:14 3:12,19 47:3,7 59:11
**legal** 3:5 5:4 30:3
**legitimately** 83:11
**lend** 22:23 23:2 23:5
**lending** 19:22 19:23 23:7
**level** 23:19
**levels** 91:13
**lexington** 3:22
**liable** 89:2
**libertas** 2:11 4:18 6:15,17 8:20 10:24 12:13,14,21 13:15 14:5,10 14:12,20 15:5 15:8,15,22 16:6,10 17:8 17:19 18:3,10 19:5,11 20:19 21:12 22:12 24:15,22,24 26:4 28:8,16 29:5 31:14 36:7 41:24 51:12 57:6 67:23 68:5 69:5,20 72:20 76:16 77:2,10 77:25 78:5 79:12,18 81:15 81:21,24 84:18 86:5 87:14,25 88:4,19 89:3 89:11 91:15 93:7,11,15,20 94:11 96:9,17 97:8,16,17 98:9 99:2 100:5
**libertas's** 38:18 83:18 84:5
**lic** 2:5
**lien** 22:18,22
**line** 53:6 90:25 106:5
**list** 30:10,15 34:18,23
**listed** 68:7
**little** 2:10 28:2 38:6 69:25 77:15 80:19
**live** 48:12
**llc** 1:5,7,8,12,13 1:14,14,15,16 1:17,18,19 2:2 2:3,4,5,6,7,11 2:13,14 3:3,11 3:12,13,14,14 3:15,15,16,16 3:17,17,18,19 4:18 12:14 54:16,17 59:11 62:5 68:6 106:1
**llp** 2:10 3:21 4:12,20 8:25
**loan** 94:20
**located** 7:13
**location** 2:20
**log** 41:7,7 101:10
**long** 13:2
**longer** 83:4 84:21,21 85:15
**look** 36:7
**looking** 20:9 24:5 36:5,15 48:12 51:22 59:16
**looks** 46:13 48:20 71:10
**lot** 36:3,19 87:18

**m**

**m** 6:10,23 10:5 105:2,5,15 106:3,21
**madam** 51:4
**made** 24:6 27:8 29:8,10 49:19

57:18,21 59:21 60:12 64:18 70:3 73:7,7 75:17 79:9 80:2,10 89:9
**main** 31:10
**majority** 45:10
**make** 11:10 16:12 27:23 29:13 31:24 32:17 33:5 35:23 36:7 38:3 42:17 45:3 49:23 60:15 90:10
**makes** 29:11 74:23
**making** 31:22 85:14,19
**management** 1:19 3:17 35:18
**manner** 8:4
**marc** 1:24
**march** 72:22
**marie** 2:17 7:9
**marked** 6:8
**marketing** 17:6
**massive** 44:15
**matter** 7:9 29:20 40:19 56:8,24 59:19
**matter's** 27:16
**matters** 30:12
**max** 19:6
**maximum** 19:7
**mca** 94:21
**mean** 13:8 18:12,14 20:24 29:21 30:2 32:12 37:15 39:16 42:12 44:12,14 58:5 66:13 69:16 70:20 74:6 75:24 77:11 82:16 84:2 85:16 87:2,13 97:7,11
**means** 8:5 20:6 31:22 83:10 92:21
**meant** 21:16 32:19 68:22
**medium** 94:16
**meeting** 37:6 37:11 38:8
**members** 35:18
**mentioned** 54:25
**merchant** 16:18,22 29:23 30:5 62:18 63:25 86:13,13 86:20 97:14,17 98:5,5,7
**merchant's** 97:14 98:20
**merckling** 1:24
**message** 37:18 37:24 38:10
**michael** 1:24 4:11 8:24 54:19 100:20
**million** 93:24
**mind** 32:19 80:16
**mine** 32:6,7,15 80:13
**minimum** 19:7 20:9
**minute** 81:10
**minutes** 80:21
**missed** 15:11 27:22,23 33:14 80:4 102:2
**mistake** 47:17 49:12,20
**model** 16:5 45:16
**moment** 96:21
**monday** 101:18 101:19
**money** 21:5 24:23 32:22 34:19 47:12,14 47:18 49:13,16 49:18 52:2,14 57:4,11,13 60:17,23 62:9 66:6 69:8 70:20,25 85:13 85:15,20 86:2 86:21 87:5,7,9 87:21 97:15,19 98:3,6,10
**money's** 86:14 86:19
**monies** 64:16 72:24 73:15 86:9,15
**month** 11:4 45:17 72:9
**months** 20:9 43:25 45:15
**morgan** 2:12
**morning** 7:2 8:15 10:14 39:20,23
**motor** 1:7 2:14 3:12,19 47:2,7 59:10 84:8,11
**motors** 1:4 2:3 2:5,6,7,8 3:2 7:10 66:22 106:2
**move** 16:13 47:17 49:13 93:4
**moving** 49:18
**mute** 58:23
**mweiss** 4:15

**n**

**n** 3:1 4:1 6:1,10 6:23,23 48:19 48:19 105:2,2
**n.a.** 2:12
**nacha** 35:4
**name** 7:3 10:18 12:18 34:14 48:17 54:15,19 54:21 59:8 95:9 106:2,3
**named** 47:22 48:2 62:21 96:17
**nassau** 46:24
**national** 48:6,7 49:4 62:24 63:5 69:16 96:25
**national.biz.** 48:20
**near** 93:3
**necessary** 36:9
**need** 11:18 18:20 42:10 53:11 82:21 101:11
**needed** 101:17
**needs** 42:19 45:14
**neither** 103:10 104:6
**net** 57:8
**network** 68:14 68:15
**never** 69:10,13 71:19 77:20 79:17 95:3
**new** 1:2 3:23 7:17 30:14 31:4 36:21,24 46:23 53:7 64:2 66:18 103:21 106:1
**nine** 13:4,5,9 79:5 93:12
**nods** 11:19
**nope** 12:10 13:24 14:3 69:9
**northshore** 1:7 2:14 3:12,19 6:13,16,21 40:18 41:25 47:2,7 51:16 59:10 63:7 66:22 67:4,4 69:12 78:14,22 79:20 84:6,7,7 84:11
**northshorem...** 53:22
**notably** 50:6
**notary** 7:15 103:20 105:22 106:25
**note** 48:9 60:15
**notes** 6:14 40:25 41:5,8 41:17,23 62:16 73:22 74:2,9 74:17 90:7,9 96:14
**noticed** 38:2
**notified** 46:20 47:18 49:14 76:9
**november** 13:13 26:8 39:5
**nuanced** 23:22
**number** 10:20 26:7,13 54:11 62:6 64:3 67:8
**numbers** 6:25 59:20 60:7
**ny** 3:7,23 4:7 4:14
**nyc** 2:1
**nycourts** 77:20 77:24

**o**

**o** 6:10,23,23 105:2
**oath** 9:24 11:13 105:7
**oaths** 7:16
**object** 94:12 99:18
**objection** 7:19 78:16 79:10,22 83:21 86:23 88:6 89:4 92:5 93:21 94:13 95:19 97:20 100:8
**obligated** 84:21
**obligation** 22:7 83:4 86:4,9 89:3
**obligations** 15:16,23 89:10
**obtained** 97:15 98:25
**obviously** 51:14
**occasions** 87:3
**occurrence** 44:10
**offense** 49:17
**offer** 16:17,18
**office** 39:18,21
**officer** 103:1,2
**oh** 9:8 22:4 24:13 48:4 52:9 58:25 61:15 75:7 80:18
**okay** 9:12,23 10:17 11:2,8 11:17 12:11,20 13:12 14:4 15:10,25 16:4

17:11,14,19 18:3,9 19:3,10 19:17,20 20:22 21:3,20 22:2,5 22:10,16,21 23:4,4,24 24:3 24:10,18 25:3 25:8,13,17,21 25:23 26:11 28:8 29:13 31:10 32:2,4 32:16,25 33:13 34:10,25 35:12 35:19 36:11,14 37:10 38:22 39:3,9,13 40:5 40:7,10,10 41:13,22 42:5 42:9,15,23 44:8 45:6,20 46:3 48:16,21 49:3 51:3,8 52:8,13,17 53:23 54:12,21 54:24 55:7,13 55:16,25 57:11 57:24 58:15 59:6,15 60:3 60:23 61:6,10 61:16,20 62:7 62:25 63:14,17 63:21 64:15 65:4,9,25 66:9 67:13 69:5,10 69:18 70:6,9 70:14 71:6,14 71:20 72:2,7 72:13,18,24 73:20 74:23 75:17,22 76:23 77:11 78:5,11 79:25 80:7,15 81:13,18 82:5 82:9,13,19,24 83:8,15 84:17 84:25 85:5,10 85:18,24 86:7 86:18 87:24 88:10,18,22,25 89:8,15,16,24 90:3 91:3 93:10,17 94:3 94:24 95:23 96:3,19 97:2,6 97:24 98:12,16 98:20 99:11 100:2,13,19 101:19 102:5 102:10,17,19

**once** 39:20 74:20 76:8 85:2 98:3

**ones** 34:19,21 34:24 79:4 96:14

**open** 90:13

**operate** 87:15

**operating** 14:21 83:12 84:12,15,21

**operations** 12:23

**opportunity** 37:24

**order** 23:20 46:24 50:24 52:21 56:3 59:24 90:20 97:10

**ordering** 102:12,15

**ordinary** 66:19 66:25 82:18

**organization** 16:19

**organizations** 16:9 17:5

**original** 49:9 62:13 66:17 102:6

**originally** 13:11

**outcome** 103:14 104:11

**outlet** 61:2

**outside** 29:9 30:8,11 45:24 74:21 82:17 85:2 87:8 89:21 92:24 93:2

**oversee** 12:23

**ovington** 4:13

**owes** 87:22

**own** 17:6 29:14

**owner** 85:12,24

**ownership** 50:4

**p**

**p** 3:1,1 4:1,1 48:19

**pa** 4:22

**page** 6:2,7,11 6:24 68:5 69:3 106:5

**paid** 27:6 32:20 43:10,18 73:16

**papers** 56:17

**paralegal** 5:4

**parameters** 16:15 18:6,10 18:15 19:4,5 24:14

**part** 15:12 19:13 21:11 29:7

**particular** 27:12,13,20 35:7,13 51:21 83:20 94:3 98:8

**parties** 7:17,21 16:9,24 55:3 103:11,13 104:7,10

**partners** 2:9
**party** 75:4 90:14
**past** 13:5
**patrovic** 2:17 7:1,9 8:1 9:1 10:1,2,5,14 11:1 12:1,11 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 48:10,14 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1,16 60:1,5 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 81:9 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,12 91:1,6 91:8,9,10,11 92:1,9 93:1 94:1 95:1 96:1 96:23 97:1 98:1 99:1 100:1 101:1,4 102:1 105:5,15 106:3,21
**paused** 63:23 92:17,20
**pay** 53:11
**paying** 33:2
**payment** 27:23 33:4 34:12 35:23 38:3 42:17 43:11,14 43:25 45:4 46:7 60:24 61:7,11,15,17 61:21,24 62:12 63:14,18,19,23 64:6 65:5,7,9 70:2,3,4,7 71:5 73:7
**payments** 30:6 31:22 33:15,25 34:2,18 43:19 45:8,18 49:21 49:23 57:13,17 57:21,22 58:12 58:16 59:21 60:12 63:11 64:7,17 65:2 76:4,8,9 79:13
**pending** 33:12 81:15 91:24 92:21
**people** 28:4 36:4 39:21 91:14 92:3
**percent** 27:6 31:19 33:9,17 43:10,18 44:13 45:5 50:8 91:19,20,23 92:3
**percentage** 31:13,17 33:6 33:13 43:23
**percentages** 45:3
**performing** 13:14
**period** 25:6 45:18 73:16 74:15
**permitted** 7:25
**persistent** 11:3
**person** 26:21 27:25 28:24 36:24
**personal** 88:15
**personally** 17:12 88:3,23 89:2 94:25
**phil** 6:19 47:22 47:23 48:2,4,5 48:16,23,25,25 49:4,5,7,10 51:15 52:7 96:18,22,23 97:3
**phil's** 48:3,17
**philadelphia** 4:22
**phone** 40:2
**physical** 37:5 38:8
**physically** 41:2
**picture** 23:14
**pipeline** 92:15
**placed** 24:4
**plaintiff** 5:2
**plaintiff's** 8:14
**plaintiffs** 1:20 3:2,11 8:17 9:18,19 10:20 90:17
**plan** 30:7
**plans** 92:19
**please** 8:12 10:2 18:20 49:24 56:10,12 56:23 62:10 101:18 102:12
**point** 30:7 72:3 73:17 75:8,18 76:10 77:8 84:23 90:3

92:23 93:8
**pointed** 49:11
**policies** 38:19
**political** 13:20
**position** 13:3,6 15:5 21:23,24 22:18 50:18 78:6 83:18 84:5,18
**positions** 22:13 27:7
**post** 12:22 13:18
**postgraduate** 13:22
**power** 67:24
**practice** 88:19
**premier** 2:8
**preparation** 45:21 46:4 73:23
**prepared** 104:3
**present** 5:1
**presenting** 46:23
**presume** 83:10
**pretty** 13:14 23:22 27:22 37:20 42:13 44:23 51:5 52:3,15 82:21 88:18
**previously** 15:3 17:9
**principal** 79:16
**prior** 14:4 28:18 39:13,24 52:11 103:5
**pro** 4:3 8:23
**proactively** 34:4
**probably** 30:2 41:4 43:12,22 62:22 76:25 82:12 93:16,23
**problems** 50:23
**procedural** 8:2
**procedure** 25:4
**proceed** 23:21
**proceeded** 76:11,12
**proceeding** 2:20 7:5,12,24 47:19 49:15 102:24 104:4
**proceedings** 103:3,4,5,8 104:5
**process** 14:16 19:13 23:25 24:5,19,21,25 26:21 38:5 43:24
**processes** 12:25 16:10
**processing** 35:20
**produced** 7:23
**production** 40:11 41:23 51:11
**profitability** 23:13,20
**promote** 86:14
**proper** 12:18
**provide** 18:3 53:7 59:20 60:6
**provided** 52:2 64:2 97:17,25 98:2,4
**providers** 68:11
**providing** 29:24
**provision** 82:20 83:19 84:19 85:6,21
**psychology** 13:21
**public** 103:20 105:22 106:25
**pull** 53:12 62:18 82:20,25
**purchases** 22:14
**purchasing** 20:13 21:7
**purpose** 14:11 68:9 77:21
**pursue** 68:3 78:13 80:10,11 89:20
**pursuing** 43:16 79:19
**put** 11:9 16:17 29:20 44:13 56:7
**putnam** 2:21 7:13

**q**

**qualified** 103:7
**question** 11:24 15:12 18:18,19 18:21,23,25 19:4,15 62:14 77:13 86:25 92:8 97:24 99:19,21
**questions** 90:13 90:15,17,24 100:14,18,21 100:23
**quick** 80:17
**quickly** 51:6
**quote** 95:17

**r**

**r** 3:1 4:1 6:10 6:23,23 48:19 54:19
**raise** 10:2 66:9
**raised** 66:14

**randy** 52:12 53:5,9 80:13 96:14
**range** 19:10,18
**rare** 44:9,25
**rate** 44:17
**reach** 26:22 37:2 42:24 43:2,13 47:8 56:21 101:20
**reached** 97:4
**reaches** 34:4
**read** 69:19 95:13 96:3,4 105:6
**reading** 62:15 74:2
**really** 21:14 30:6,23 43:15 44:7,14 54:3 74:16 87:18
**realty** 1:17 3:16
**reason** 12:6 53:21 69:23 79:7 106:5
**reasons** 50:5
**recall** 14:23 38:15 66:2 74:7 75:14
**recalling** 51:11
**receipts** 68:19 68:21
**receivables** 20:14 21:8,13 21:15,18 24:16 67:18
**receive** 33:21 42:15
**received** 58:12 65:10 66:14 70:24 71:4,5,6 76:3 79:17
**receiving** 69:24
**recollection** 22:8 73:3,14 74:3
**record** 7:5,6,20 8:13 9:13 11:10 48:9 81:2,3,5 102:21 103:9 104:5 105:9,12
**recorded** 8:4 40:8 53:6 103:6
**recording** 7:23 103:8 104:3
**records** 58:3 72:19
**recovery** 31:6,7
**red** 66:10,13
**reduced** 103:6
**refer** 30:11,16
**referencing** 60:8
**referred** 17:15 69:12
**referring** 12:14 67:25
**refresh** 22:7 74:2
**regard** 23:15 38:19 39:14 41:2 66:11 99:11
**regardless** 22:20
**regards** 22:13 55:8
**regular** 37:11 64:9
**relate** 40:17
**related** 6:12 15:7,14 103:10 104:7
**relationship** 12:12,21
**relationships** 17:20,24
**relative** 103:12 104:9
**relatively** 44:9
**relayed** 16:18
**releasing** 47:4
**relevant** 50:25
**remain** 47:13 47:15
**remaining** 102:11
**remembering** 96:22
**remote** 2:20 7:12 39:16
**remotely** 7:18
**rep** 28:25
**repaid** 45:14 58:8
**repay** 83:5 86:4 87:21
**repayment** 45:18 84:22
**repayments** 91:14
**repeat** 36:19,20
**rephrase** 18:21 83:24 84:5
**replied** 51:25 54:2 56:12
**report** 33:22,24 34:8,11 35:14 36:16 37:13 41:3 42:6,16 70:24
**reported** 2:23
**reporter** 7:2,4 9:3,13,21 10:9 11:19 12:2 15:11,19 51:4 51:7 65:19,23 80:3,7,25 81:4 101:7,13,17,19 101:22,25 102:5,10,17
**reporting** 99:20 106:1

**reports** 39:15
**represent** 10:20
**representative** 1:10 26:13 27:14,15
**representatives** 25:18,19 26:3 26:18 27:19 28:6 63:6
**represented** 50:9
**represents** 9:17
**reps** 26:24
**requested** 62:18
**requesting** 29:25
**required** 35:3
**rerun** 43:14 72:15
**resolve** 50:23
**resolved** 27:16
**respect** 95:8,16
**respond** 52:9
**responded** 52:18 56:15,20 56:23
**responding** 97:3
**responsibilities** 28:15
**responsibility** 36:6
**rest** 37:25 65:20
**restraining** 46:25 47:4,6
**restroom** 80:17
**result** 82:10
**results** 82:14
**retention** 38:19
**return** 21:5 34:8,11,15,24 34:25 35:4,12 35:14 37:13 39:15 41:3 42:5,16 43:6 44:17 56:2
**returned** 57:14
**returning** 71:12 72:11 76:9
**returns** 33:22 33:24 44:23 50:13 70:12
**revenue** 20:3 23:12 24:16
**review** 24:9 46:3 77:23
**reviewed** 46:6 73:21 74:5
**reviewing** 24:8
**right** 8:11 9:3,9 9:16,21 10:2 12:11,20 23:9 23:17 25:25 31:24 36:11 40:21 53:23 57:16,20 58:11 61:4,6,23 63:9 64:15,21 65:4 65:13 70:18,23 73:2 74:15 80:24 87:5,13 91:8 93:3,12 94:7 95:6,25 96:19 98:22 101:11 102:8 102:17
**robert** 1:5 3:3 5:2
**roles** 28:14
**room** 37:15 38:9
**roslyn** 2:6
**rough** 101:17
**roughly** 91:20
**route** 1:17 3:17
**ruderman** 3:20 6:3 8:15,16 9:6 9:8,16,19 10:10,11,13,18 15:13,18,20 40:10,16,21,23 41:22 42:4 48:8 51:4,8,18 54:9 58:23 59:2,15 60:3,4 60:14,21 61:3 63:2,8 65:22 65:24 76:24 77:4,11,18,22 78:19 79:11,24 80:5,8,18,24 81:7,8 83:23 86:24 88:7 89:7 90:8 94:12 97:13,20 99:18 100:17 101:3,16,21,23 102:3,8
**rules** 8:3 11:9
**russell** 46:20 55:14 56:20,23 63:22 66:15 76:3 79:4

**s**

**s** 3:1 4:1 6:6,10 6:10,23 48:19 106:5
**sage** 3:5 5:4
**sagelegal.nyc** 3:8
**sake** 92:16
**sales** 1:5 3:3 16:9,19 17:5 20:8,10,12
**saluck** 52:12,13 53:5 55:2
**saluck's** 80:14
**sarah** 1:22
**satisfied** 35:2
**savvy** 40:13

**saw** 44:17 95:9
**saying** 31:25 38:7 74:4 87:6 89:17
**says** 49:8 55:18 63:10 68:5,7 82:25 84:20
**scenario** 83:16
**scheduled** 64:9
**school** 13:18
**science** 13:21
**screen** 48:11
**se** 4:3 8:23
**searched** 77:20
**searching** 55:12
**second** 22:18 48:4 54:6 55:13 59:7 62:12 63:14
**secure** 22:6,13 22:17,23
**secured** 21:23
**security** 21:12 21:17
**see** 32:22 44:22 44:22 46:16 48:2 53:3,19 54:21 55:5 84:18 90:14 101:22
**seeking** 22:23
**seem** 91:16
**seemed** 91:11
**seems** 47:16 52:3
**send** 30:2,24,24 32:8,12 33:19 37:24 52:3,14
**sending** 36:25 52:5
**sends** 34:8
**senior** 26:24 28:4
**sense** 19:6,6 24:14
**sent** 32:20 46:7 46:8 71:13 75:24 92:23 96:4,13
**separate** 91:25 92:14 93:4
**september** 14:22 74:13
**serious** 47:17 49:12
**service** 9:10 14:15,17 25:12 25:16,17 26:2 26:12,18 27:13 27:14,19 28:5 35:16 68:10
**servicer** 71:15
**servicing** 12:24
**set** 21:4 30:7,10 38:11 56:3 65:14
**seven** 57:22 60:12
**several** 78:2
**shanks** 3:21 8:16 10:19 46:21 55:15,20 63:23 66:15 76:3 79:4
**shared** 36:17 37:20 38:9
**shareholder** 50:8
**sheet** 106:1
**short** 50:23
**show** 46:24 52:21 56:3 58:3 97:10
**showing** 61:14
**shown** 70:11
**shows** 33:24 42:16
**shrugs** 11:20
**signature** 62:4 63:12 103:19 104:15
**signed** 52:22 59:25 68:2 105:18
**silence** 102:19
**similar** 20:20 68:15
**simple** 52:3
**sit** 37:6,8,19 39:22 82:5 84:10 89:15 98:24 100:2
**sitting** 78:11
**situation** 32:25 33:18 66:24 85:18,21
**situations** 66:2
**six** 26:5 36:12 43:25
**size** 26:23
**skills** 103:9 104:6
**slack** 6:12 37:16,18 38:10 38:12,14 39:6 39:24 40:12,14 40:16
**small** 93:16 94:16
**smallest** 93:14
**smithtown** 2:7
**snowstorm** 44:16
**solely** 27:8
**somebody** 14:6 37:23 42:11,19 48:2
**soon** 50:25
**sorry** 15:11 18:14 19:24 20:3 28:17 50:15 52:10,11 53:20 54:6 55:22 58:19

61:15 62:10 65:19 72:8 73:5 78:18 80:3,16 84:7 91:10 101:25
**sort** 21:12 40:4 91:20
**sounds** 78:4
**speak** 45:24 97:6 99:23
**speaking** 12:3 45:22 50:20
**specific** 21:4 26:16 27:2 30:15
**specifically** 34:21 49:15 87:6
**specified** 68:16 68:25 71:24 87:3
**specify** 68:17
**splitting** 101:24 102:3
**spoke** 51:5 53:5 63:10,25 91:11 99:6
**spoken** 49:10 62:17 95:3
**spotty** 9:10
**standard** 7:7 88:19
**start** 75:25 90:5
**started** 14:24 39:7 55:14 76:9
**state** 56:5 77:3 103:21
**statements** 22:3
**states** 1:1 69:4
**stating** 70:24
**stay** 27:15,24 77:16
**stayed** 64:23
**stenographic** 8:5
**step** 42:14 71:8
**stipulate** 76:25 77:6
**stipulation** 8:7 59:17
**stipulations** 8:9
**stony** 13:19
**stops** 30:5 83:12
**stored** 6:15 41:14,24
**strategy** 43:21
**stream** 24:16
**street** 1:17 3:16 4:21
**stripping** 87:18
**subject** 47:19 49:14 97:9
**subscribed** 105:18 106:22
**subsequent** 57:17
**subset** 92:2
**substitute** 68:17
**successors** 68:11
**suit** 74:25 75:18 76:7,14
**suite** 2:21 3:22 4:21 7:13
**summary** 78:3
**summation** 98:18
**sunrise** 1:6 2:3 2:13 3:11,18 4:6 6:13,16,21 40:19 42:2 47:3 51:17 54:16,16 60:10 61:2 62:5 63:7 64:11,14 78:14 78:22 79:20 84:8,14
**suny** 13:19
**superb** 1:4 3:2 7:10 8:18 90:16 106:2
**supposed** 34:12 35:6,23 58:8 61:17,21 87:9
**supreme** 46:23
**sure** 11:10 13:19 16:7 18:16 20:7 32:17 36:4,7 39:2,12,18 43:9 47:23 49:9 59:12 60:9 63:24 80:18 82:8 88:9 90:10 96:13 98:15 99:5
**swear** 7:17
**switch** 27:18 66:3
**switches** 66:5
**switching** 66:12
**sworn** 7:20 10:6 11:11 103:5 106:22
**syosset** 2:2
**system** 27:5 30:23 35:8

**t**

**t** 6:6,10,10,23 6:23 105:2
**table** 37:7
**take** 7:4,15 10:21 11:19 12:2 21:12 29:19 68:11 80:17,20 85:25 86:20

**taken** 7:9 64:17 84:18 87:6 88:2 103:3,11 104:8 105:7
**takes** 57:7 71:3 73:10
**talk** 101:12
**talked** 67:23 77:15 91:19,23
**talking** 95:12
**targeting** 49:15
**taxes** 50:9
**team** 1:4 3:2 8:18 13:9 14:19 27:11 35:17,17 36:10 37:4,25 82:4,4 97:22 99:5,13 100:12
**teams** 12:24
**technologically** 40:12
**tell** 10:7 13:17 22:5 32:6 48:17 52:23 70:19
**ten** 33:17 91:20
**term** 20:16 22:3 23:10 31:23 66:10 95:25
**terms** 18:12,13 18:13 29:24 30:23 31:2 49:22 83:3 92:16
**territories** 30:19,20
**testified** 10:8 15:25 73:6
**testifying** 11:15 103:5
**testimony** 11:13 12:8 105:7
**thank** 9:21 10:9 10:11 15:19 40:17 51:3,24 56:14,22 65:23 80:7,23 81:7 90:11,15,17 101:4,9
**thanks** 101:6
**theoretically** 35:25
**things** 25:5 26:22 99:9
**think** 32:11 36:2 45:10 48:25 53:5 54:6 62:22 63:2 66:13,16 73:9 76:24,25 79:15 82:16,21 85:16 88:4 90:20,23,24 95:4 100:24
**third** 16:8 64:2 66:20 75:4
**thomas** 1:25
**thomasson** 1:23 4:2,3,5 6:4,18,19 8:22 8:22 46:9,12 46:15,19,21 47:4,8,14,20,25 48:22 49:3,6 51:14,15 52:9 52:14,17 55:2 55:9 66:15 76:4 79:5 86:23 88:6 90:19 91:2,5 92:7 94:2,14 95:22 96:16,19 96:20 97:23 99:25 100:13
**thought** 95:13
**thousands** 36:2
**three** 20:9 64:16 66:5 69:7 71:3 73:10 91:12,25 92:13
**time** 2:19 7:7 8:11 9:23 12:3 21:2 24:22 25:6,9 27:20 35:10 39:17 55:13 72:3 73:4 74:16 75:7 80:25 90:4 93:10 101:5 102:20
**timeframe** 45:13
**today** 10:21 11:14,15,18 12:9 38:3 45:25 60:8 74:4 78:12 82:5 84:11 89:16 98:24 100:3
**today's** 45:22 46:4 73:23
**together** 27:10 36:18 37:6,8 37:19 39:22
**told** 49:21 50:2 50:6,12 82:10
**tom** 50:3,21
**tomorrow** 50:22 52:25 56:7
**tony** 58:23
**took** 85:12
**top** 76:2
**total** 57:25
**touch** 29:23
**trained** 25:15
**transaction** 16:25 24:4 43:5 88:5,16 100:4,6

**transactions** 14:14 23:6
**transcriber** 104:1
**transcript** 7:22 101:18 102:7 102:16 104:3,4 105:6,8
**transcriptionist** 103:7
**transcripts** 99:4
**transfer** 68:6 68:13
**traveling** 9:9
**tried** 72:20
**trouble** 92:4
**troubles** 50:15 91:24
**true** 103:8 104:4 105:9,13
**trust** 100:11
**truth** 10:7,7,8
**truthful** 12:7
**try** 11:5 19:3 35:9 69:10 71:16 76:17 77:16 84:4
**trying** 15:22 45:17 72:9
**turned** 71:19 72:3,4,17
**twice** 66:17
**two** 17:8 20:23 30:22 31:3 38:21,22 46:16 50:16 56:18 64:7 66:4
**type** 18:5 19:21
**types** 88:20
**typewriting** 103:6
**typical** 45:7,13
**typically** 17:3 29:12 30:11 33:21 36:21 41:13 45:15 78:6

**u**

**u** 6:10,10,23 54:19
**ucc** 22:3,6,19
**uea** 2:7
**ultimately** 14:18
**unable** 43:24
**unchanged** 64:24
**under** 8:2 11:12 44:12 45:5,8 49:22 59:23 83:3 105:7
**understand** 7:21 10:24 11:12,20 12:4 12:15 18:5,19 18:25 21:16,22 31:21,25 32:17 52:2 60:2 62:14 83:25 92:8 95:11 99:8
**understanding** 57:5,9 68:23 76:15 85:22 86:19 88:25
**understood** 18:24 91:12
**underwrite** 16:11
**underwriter** 100:11
**underwriters** 16:12
**underwriting** 14:13 20:7 21:4 35:17,20 41:19 82:4 88:12 97:22 99:5,13 100:11
**underwrote** 20:13
**uniondale** 4:14
**united** 1:1
**unrelated** 86:22
**unresponsive** 30:5
**unsecure** 21:19
**unsecured** 21:23
**unusual** 97:8
**upper** 35:18
**uptick** 44:23
**urrutia** 1:6 3:3 5:2 8:18
**use** 23:11 31:4 86:21 92:16 97:14,18 98:21 99:7
**used** 23:10 86:14 87:10 88:2 95:11,15 95:23 98:10 99:8
**uses** 7:25 98:5
**using** 53:18 87:7
**usual** 8:9
**usually** 16:18 30:8
**utilized** 98:17

**v**

**v** 1:21 106:2
**value** 87:18
**variables** 43:8
**variety** 31:2 50:5
**various** 15:15 17:20 26:18 42:7 45:8

73:21
**verbal** 11:18 37:20
**verbally** 40:2
**veritext** 7:4 106:1
**verizon.net** 4:8
**versa** 48:23
**vested** 87:14
**vice** 28:18 48:23 75:9
**videoconfere...** 3:4,20 4:4,11 4:19 5:2,3,5
**view** 92:14 99:4
**viewing** 55:11

**w**

**w** 105:2
**wait** 11:23
**waiting** 42:18
**want** 16:13 38:5 54:7 60:16,21 87:19 90:9,24 101:16
**wantagh** 4:7
**wanted** 69:20
**wants** 63:11
**way** 22:6 25:11 26:16 36:15 40:18 44:10 48:8 50:12 65:5 77:3 79:2 84:9 94:15
**we've** 49:10 64:15,18 80:19 81:9 92:22,23 92:25
**week** 44:16 65:16
**weekly** 45:11 45:18 68:12 71:21,23
**weeks** 50:17
**weir** 4:20
**weirpartners....** 4:23
**weiss** 4:11 8:24 8:24 80:16,23 100:22
**went** 13:19 63:15,16 85:20
**west** 2:21 7:13
**willing** 19:8
**wishes** 90:14
**withdraw** 35:14 67:3 68:24 69:6,11
**withdrawn** 26:7,12 29:10 42:8,25 45:21 57:4 67:22 83:17 88:15 94:4
**withstanding** 94:5
**witness** 7:12,18 7:20,21 9:25 10:6 60:13,23 77:9,12,19 78:18 79:23 89:6 93:23 95:20 97:22 99:22 100:10 101:6 103:4
**witnesses** 17:8
**witness'** 106:3
**wondering** 91:24 95:15
**word** 23:5 95:11,14,16,20 95:23
**words** 19:22,25 49:8 54:14
**work** 16:20 32:14 36:18 56:19,21
**worked** 14:7 35:19 74:8 92:22
**working** 14:4 14:24 26:24 29:24 31:24 33:15 36:22 73:18 74:22 92:18
**workout** 92:19
**workouts** 91:21
**works** 43:8
**would've** 63:19 70:11,23 72:16 82:3 88:2
99:14
**writes** 63:9
**writing** 47:20 48:22,22,24 49:4 50:7
**written** 8:6 32:8 33:5 40:24
**wrong** 48:10 58:9
**wrongfully** 99:2
**wrote** 47:25 49:6 52:13

**x**

**x** 6:1,6

**y**

**yeah** 14:7 17:18 19:19 22:4 24:9 28:17 32:2 38:16 42:21 47:12 51:23 53:20 54:5 55:12 56:22 61:15,15 62:15 64:13 65:15 69:3 74:20 77:4,9,14 78:9 80:18,20 83:7 85:16 89:23 90:22 94:13 102:3,8

**year** 39:11
**years** 13:4,5,9 38:21,22 78:2 79:5 93:12
**yelp** 14:8
**yep** 17:18 60:9 65:8 77:19
**yesterday** 50:21
**york** 1:2 3:23 7:17 30:14 31:4 46:24 103:21 106:1
**young** 14:12

**z**

**zizmor** 3:21 8:16 10:19
**zoom** 40:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.