CONFIDENTIAL LETTER OF INTENT

July 5, 2024

Tean Auto Group, LLC
Dba VW of Freehold
c/o Tony Urrutia
4360 US-9,
Freehold, New Jersey 07728

Tony:

This letter of intent ("LOI"), when signed and returned as hereinafter provided, will evidence the intent of [redacted] (collectively "Purchaser"), to purchase certain assets related to Tony Urrutia's VW dealership, Team Auto Group, LLC dba Volkswagen of Freehold (the "Seller") located at 4360 US-9, Freehold, New Jersey 07728 ("Dealership"), upon and subject to the following basic terms and conditions, which, with other mutually acceptable provisions, shall be included in the definitive agreement (the "Definitive Agreement"), to be negotiated, prepared and signed by the Purchaser and Seller.

1. **Dealership Blue Sky and all Purchased Assets:** $5,500,000.00 (the breakdown of Blue Sky and Assets to be determined by the parties).

2. **Purchased Assets:** Purchaser shall buy from Seller and Seller shall sell to Purchaser all of the Dealership's assets owned and/or utilized in connection with the subject business ("The Purchased Assets") located at 4360 US-9, Freehold, New Jersey 07728. The Purchased Assets include the following:

   a. **New Vehicle Inventory:** All new unregistered current model year vehicles and thereafter with less than 250 miles on the odometer. The price to be paid for the motor vehicles shall be net factory invoice price, subject to the usual and customary adjustments, including without limitation, holdback, advertising, floorplan allowance, repairs, rebates and the like.

   b. **Used and Demonstrator vehicles:** Shall be negotiated between the Purchaser and Seller.

   c. **Parts and Accessories:** All new VW parts and accessories (current catalog, useable, returnable, non-obsolete, unopened, undamaged, parts and accessories bearing a parts and accessories catalogue number reflecting sales activity in the 12-month period preceding closing). The purchase price of the Parts shall be the current price in the Manufacturers current price book as of the Closing Date. The cost of the physical inventory will be split evenly by Seller and Purchaser.

   d. **Other:** All (i) special tools, machinery and equipment and other brand special equipment of the Dealership, (ii) leasehold improvements, (iii) signs owned by

Seller, and (iv) all other physical assets used by dealership, other than those specifically excluded by Seller, shall be included in the purchase price referred to in this section.

e. **Work in Process:** The value of all labor for repair order (customer, warranty, insurance)(the WIP) as of the Closing Date. The purchase price of the WIP shall be determined on Seller's cost for the associated labor as of the Closing Date.

f. **Other Tangible Assets:** All of the Dealership's customer lists (sales and service), sales and service files, repair orders, logs and similar records in Seller's possession at Closing.

3. **Excluded Assets:**
   a. Cash, cash equivalents, bank deposits;
   b. motor vehicles not purchased by Purchaser pursuant to the Definitive Agreement; and
   c. Seller's personal property.

4. **Deposit:** Upon execution of the Definitive Agreement, the Purchaser shall deposit into a mutually agreed upon escrow account the sum of $300,000.

5. **Closing:** The consummation of the purchase and sale ("the Closing") will occur within 10 days of the satisfaction of all Contingencies.

6. **Due Diligence Period:** Purchaser will have thirty (30) business days following the execution of the Definitive Agreement to conduct and approve the findings concerning due diligence, with the right to conduct such inspections and examinations as it deems reasonably necessary (i) to determine whether it intends to purchase the Assets, including but not limited to, corporate records, legal matters, regulatory matters, tax matters, and status of contractual commitments and relationships with suppliers, distributors, and customers (financial due diligence), and (ii) to obtain, at Purchaser's discretion satisfactory property condition and environmental audit, investigation and inspections, including (A) roof, electrical, mechanical, plumbing, sewer/septic, HVAC systems, insect infestation and radon, and (B) any and all testing and soil sampling of the dealership facility and real estate (premises due diligence). Purchaser shall be afforded one (1) fifteen (15) day extension of the Due Diligence Period provided Purchaser is proceeding diligently and exercising good faith and bona fide efforts and the request is made in writing prior to expiration of the Due Diligence Period.

7. **Contingencies:** Purchaser's obligation to purchase shall be contingent upon the following:

a. 75 days to receive Franchise approval from Manufacturers, without the requirement of facility improvement, expansion, repair, modification, or other unsatisfactory condition. Purchaser shall be afforded one (1) fifteen (15) day extension of the franchise approval period provided Purchaser is proceeding diligently and exercising good faith and bona fide efforts and the request is made in writing prior to expiration of the franchise approval period.

b. Assignment and assumption of Dealership leases by Purchaser from Seller upon terms reasonably satisfactory to Purchaser, and the release of Seller and affiliate Seller guarantors to the Dealership leases upon terms reasonably satisfactory to Seller. To the extent that any of the Dealership Leases require the guaranty of a Seller affiliate, such as a personal guaranty of the Seller's principal(s), Purchaser will provide a similar guaranty.

8. **Lease:** Seller will assign, and Purchaser will assume the post-closing rights and obligations of the lessee under the lease for the Dealership Premises.

9. **Other Matters:** Seller acknowledges to Purchaser the existence of a financial assistance agreement and ancillary documents transaction with Volkswagen of America Inc.; however, that transaction, to the extent that it remains in effect, shall be binding only upon the Seller and shall remain the obligation of Seller.

10. **Confidentiality**: Neither Seller nor Purchaser shall divulge or communicate any of the particular terms of this LOI to any third party. Notwithstanding the foregoing, Purchaser may seek advice and communicate with professional agents, financial advisors, Institutional lenders, government officials, attorneys, motor vehicle franchisors, building contractors and such consultants Purchaser deems necessary regarding any Inspection or due diligence Items.

11. **Non-Binding LOI**: It is understood that this LOI ls Intended to be, and shall be construed as a non-binding Letter of Intent, and that the actual purchase and sale of the Dealership shall be subject to a Definitive Agreement containing customary terms and conditions consistent with the terms set for the herein.

12. **No Shop:** Seller, its principals, agents and assigns agree they will not, directly or indirectly, sell, offer for sale, solicit or entertain or accept any offers to purchase, or negotiate in any manner, the sale of the assets or stock of the subject dealership or assumption, assignment or sublet of the Premises upon which the dealership is located, until the date forty-five (45) days after the later of date of this agreement or the date this letter is signed by Seller. Any extension of said expiration date shall be in writing signed by Seller and Purchaser.

13. **Expiration:** This LOI shall be valid for 5 business days from the date hereof.

Kindly acknowledge your approval and acceptance of these understandings by your signing below.

We look forward to concluding this transaction with you.

Respectfully,

[redacted]

**APPROVAL AND ACCEPTANCE**

The Undersigned approve and accept the understandings outlined in this Letter of Intent this ____ day of July, 2024.

Team Auto Group, LLC dba Volkswagen of Freehold

By:________________________________
Tony Urrutia, Authorized Signature

# ASSET PURCHASE AGREEMENT

**THIS AGREEMENT**, made this 26th day of July, 2024 by and between:

**TEAM AUTO GROUP, LLC dba Volkswagen of Freehold,** a New Jersey Limited Liability Company with company with offices at 4360 Route 9, Freehold, New Jersey 07728 (hereinafter collectively referred to as "SELLER");

AND

[redacted] (hereinafter referred to as "BUYER").

---

## DEFINITIONS:

For purposes of this Agreement, the following terms shall have the meanings set forth below:

1. **"BUYER" shall** mean [redacted]
2. **"Closing"** shall mean 10 days after the satisfaction or waiver of the Contingencies
3. **"DEP"** shall mean New Jersey Department of Environmental Protection.
4. **"Escrowee"** shall mean [redacted]
5. **"Franchisor"** shall mean Volkswagen of America, Inc.
6. **"IRS"** shall mean the Internal Revenue Service.
7. **"Lease"** shall mean that certain sublease agreement by and between Ray Catena Motor Cars LLC ("Landlord") and Seller, dated August 1, 2020, ("Lease Commencement Date") and that First Addendum to Lease, dated June 22, 2023, heretofore provided to and received by BUYER, subject to that certain Master Lease Agreements between 4360-4380 Route 9 Realty LLC and Route 9 Investments LLC ("Master Landlord") and Ray Catena Motor Cars LLC, as Tenant, heretofore ("Master Lease").
8. **"OEM"** shall mean Volkswagen.
9. **"Premises or Property"** shall mean 4360 Route 9, Freehold, New Jersey 07728.
10. **"SELLER"** shall mean Team Auto Group, LLC dba Volkswagen of Freehold.
11. **"SELLER Principal"** shall mean Robert Anthony Urrutia.
12. **"State"** shall mean the State of New Jersey.

## W I T N E S S E T H:

**WHEREAS**, SELLER is the owner and operator of a certain motor vehicle dealership establishment which conducts business at the Premises is duly franchised for the sale of Franchisor branded motor vehicles, parts and accessories, and is licensed by the State to conduct business at the Premises; and

**WHEREAS**, SELLER is desirous of selling and conveying its business enterprise and certain of the personal property used in connection therewith; and

**WHEREAS**, BUYER is desirous of acquiring said assets; and

**WHEREAS**, the parties have reached an understanding with respect to the terms and considerations of the foregoing and are desirous of memorializing the same herein;

**NOW, THEREFORE**, in consideration of the terms, covenants and conditions hereinafter set forth, the parties hereto agree as follows:

**1. <u>SUBJECT MATTER; EXCLUDED ASSETS</u>**. SELLER agrees to sell and transfer to BUYER, and BUYER agrees to purchase and acquire from SELLER, at Closing, the following assets, free and clear of all leases, liens, security interest, taxes, and encumbrances:

(a) <u>Operating Assets</u>. All of SELLER's right, title and interest in and to its motor vehicle dealership business presently located at the Premises, including, without limitation, the furniture, fixtures, tools, factory-brand special tools and equipment, and machinery and equipment (inclusive of all essential tools and equipment required by Franchisor for the proper operation of a dealership franchised by Franchisor to the extent in SELLER's possession at Closing, subject to Section 7(h) of this Agreement); computer and related equipment (inclusive of hardware and software); lifts; compressors; front-end alignment equipment; supplies; signs; telephone equipment; lease rights, leaseholds, and leasehold improvements; physical customer lists, files, and records (sales, lease, parts and service), repair orders, logs and similar records in SELLER's possession, and computer-generated customer files and dealership records in digital format in a form that is readily available and accessible form; trade names; catalogs, brochures and announcement materials; sales, service, parts and warranties manuals; display cases and cabinets; inventory and personnel records; its rights to use the URLs *drivevolkswagenfreehold.com* and *vwoffreehold.com*; websites, names and designs, and e-mail addresses, phone numbers, and intellectual property; and such other assets owned by SELLER and utilized in the operation of said business (all in operable condition); motor vehicle franchise rights under the SELLER's Dealer Sales and Service Agreements with Franchisor; and all rights to use SELLER's existing telephone numbers and facsimile numbers (collectively hereinafter referred to as the "Operating Assets" or "Business"). Any asset utilized in the proper operation of the Business is included in this transfer for the purchase price listed below in Section 2(a), unless specifically set forth as being excluded in this Agreement or otherwise addressed herein. SELLER does not have a list of its furniture, fixtures, and equipment ("FF&E"). BUYER shall be entitled to visit the Premises on one of the first three (3) Sundays following the date hereof with a SELLER representative to prepare a list of the FF&E, which, if prepared and approved by the parties, shall be more particularly set forth on **<u>EXHIBIT "A"</u>** and inserted therein.

(b) <u>Motor Vehicle Inventory</u>.

(i) SELLER's inventory of all new, unused, never registered, current and later model year OEM motor vehicles with less than two hundred fifty (250) miles on the odometer with unreported retail delivery cards (or its equivalent) for each and SELLER's inventory of current and later model OEM demonstrator motor vehicles;

(ii) Upon delivery to the Premises, any and all new, never registered OEM motor vehicles consigned and invoiced to SELLER by OEM, and not received by SELLER

prior to Closing. SELLER shall forthwith on demand of BUYER execute and deliver assignments of the statements of origin for such motor vehicles so purchased;

(iii) SELLER's inventory of loaner vehicles placed into loan car service ("Loaner Cars");

(iv) SELLER's inventory of used cars, company-owned, service and parts vehicles, and other motor vehicles not otherwise described in subparagraphs 1(b)(i), (ii), and (iii) ("Other Motor Vehicle Inventory"), but only to the extent the parties agree with respect to a purchase price for any such motor vehicle.

(v) Notwithstanding anything contained in subparagraph (b) to the contrary, it is expressly understood and agreed that in the event that a vehicle required to be purchased hereunder is or has been damaged in excess of FIVE-HUNDRED DOLLARS ($500.00) (in the aggregate), or said damage (irrespective of the cost to repair) involves frame damage or damage of the kind and/or nature required to be disclosed to a customer (pursuant to relevant State or Federal laws), or any such motor vehicle has been reported as "sold" to the applicable manufacturer, or said vehicle has a vehicle history report (i.e. Carfax or Autocheck) bearing an indication the vehicle was involved in any accident, BUYER shall not be obligated to purchase such vehicle(s) from SELLER.

(c) Parts and Accessories Inventories. SELLER's inventory of OEM Parts and Accessories and Non-OEM Parts and Accessories as more specifically set forth in paragraph 4 hereof.

(d) Excluded Assets. Any other vehicle of SELLER, including but not limited to the Other Motor Vehicle Inventory, may be purchased by the BUYER subject to the BUYER and SELLER agreeing on a mutually acceptable price. SELLER shall, no later than ten (10) days prior to the Closing Date, provide BUYER a list of SELLER'S Other Vehicles for BUYER to consider purchasing, including make, model and vehicle identification number, mileage and purchase price. SELLER is under no obligation to sell, and BUYER is under no obligation to purchase any Other Vehicles. A list of SELLER'S Other Vehicles being purchased by BUYER, including make, model and serial number, and purchase price, shall be attached as a schedule to the Bill of Sale at Closing. Also excluded are SELLER's OEM factory receivables, accounts receivable, and cash on hand and in banks and cash equivalents and bank deposits, SELLER Principal and employees' personal property, and that certain Seller program involving providing a certain limited powertrain service warranty to qualified existing customers who have purchased or leased new and used motor vehicles. Subject to Section 16 of this Agreement, it is understood and agreed that BUYER is not assuming any debt, liability, contract, agreement, obligation, or covenant of SELLER, and SELLER shall indemnify and hold BUYER harmless from and against any claims asserted by any lessor, owner, Franchisor, distributor, customers, vendors, or otherwise relating to same, which claim is based on facts arising from prior to the Closing Date.

**2. AGGREGATE PURCHASE PRICE; CONSIDERATION**. The purchase price to be paid for the assets to be conveyed hereunder is as follows ("Purchase Price"):

(a) With respect to the Operating Assets to be conveyed pursuant to subparagraph #1(a) hereof, BUYER shall pay to SELLER the sum of FOUR MILLION DOLLARS ($4,000,000.00), as hereinafter provided.

(b) (i) With respect to the new and demonstrator motor vehicle inventory described in subparagraphs #1(b)(i) and (ii) hereof: The sum equal to the factory net invoice price for each said motor vehicle, less: (A) all factory holdbacks paid or payable to SELLER; (B) all leftover/carryover allowances; (C) any and all factory rebates, discounts, allowances and/or credits with respect to each said vehicle that have been received by, or to be paid and/or to be credited to SELLER, prior to, at, or after Closing; (D) one half of any floor plan interest allowance paid or payable to SELLER; (E) one half of any applicable payments or credits relating to supplemental floor plan assistance program paid or payable to SELLER; (F) dealer/franchisor program, contest and incentive payments, rebates or credits, payments or credits, or marketing allowances paid or payable to SELLER, including final pay monies; (G) any preparation allowances for any vehicles not prepared by SELLER prior to the date of Closing for which SELLER has been paid or amounts are payable; (H) the net cost to effectuate unrepaired damage thereto, if any, including, without limitation, the cost to repair physical damage and/or the cost to repair any missing equipment, accessories, or other items which such vehicle should be equipped with pursuant to the manufacturer's invoice. Any swapped vehicles shall be valued as if the vehicle was acquired directly by SELLER from a Manufacturer.

(ii) With respect to the Loaner Car motor vehicle inventory described in subparagraph #1(b)(iii) hereof: the BUYER shall assume each Loaner Car lease with regard to each said unit.

(iii) With respect to the Other Motor Vehicle Inventory described in subparagraph 1(b)(iv) hereof, only to the extent that the BUYER and SELLER agree to the purchase price for any such motor vehicle

(c) With respect to the OEM Parts and Accessories and Non-OEM Parts and Accessories as described in paragraph #1(c): see paragraph #4.

3. **PAYMENT; DEPOSIT; ADDITIONAL.**

(a) The aggregate Purchase Price (subject to adjustment as provided herein) shall be paid and satisfied as follows:

(i) The sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), which has been previously paid by BUYER, receipt of which is hereby acknowledged by SELLER (the “Deposit”); and

(ii) The balance of the Purchase Price, as adjusted in accordance with this Agreement, shall be paid by BUYER at Closing by wired funds to SELLER in accordance with SELLER’S written instructions given to BUYER prior to Closing.

(b) The Purchase Price shall be allocated in the manner set forth on **EXHIBIT "B"**, attached hereto and made a part hereof. The parties warrant and represent that said allocations

were a prime subject matter of their negotiations and that they believe that these allocations truly reflect the economic value of the respective interests to be conveyed hereunder. The Parties further warrant and represent that they shall not at any time, directly or indirectly, expressly or impliedly, take any action, with the taxing authorities or otherwise, inconsistent with the allocations outlined herein. At Closing, the parties shall complete and execute Internal Revenue Service ("IRS") Asset Acquisition Statements under Section 1060 of the Internal Revenue Code of 1986, as amended (IRS Form 8594), consistent with the allocation set forth on **EXHIBIT "B"**, and each covenants and agrees to file said form with their respective IRS income tax return for their respective tax periods covering the date of Closing.

(c) In the event of BUYER's failure to close after applicable notice and applicable period to cure in accordance with the terms hereof, SELLER's sole and exclusive remedies shall be limited to the following: the payment of the Deposit to Seller. Said sum shall be considered as liquidated damages (and not as a penalty) for SELLER's withdrawal of the business from the market, as reimbursement for any and all expenses incurred in connection with this transaction, and as full compensation for any and all claims of damages or other remedies by virtue of BUYER's breach. Upon payment of the Deposit to SELLER, this transaction shall be terminated, and the parties shall have no further liability to each other hereunder, each party being deemed fully released from the other with respect to their obligations under this Agreement.

(d) In the event of SELLER's default under this Agreement which remains uncured after applicable notice and applicable period to cure, if any, and its subsequent failure to close in accordance with the terms hereof, then BUYER may: (i) terminate this Agreement by giving written notice thereof to SELLER, whereupon the Deposit paid hereunder, shall be promptly returned to BUYER and upon payment and delivery, this transaction shall be terminated and the parties shall have no further liability to each other hereunder, each party being deemed fully released from the other with respect to their obligations under this Agreement; (ii) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement; or (iii) BUYER's may pursue the right to seek specific performance.

(e) If the other party does not object to the Claiming Party's written demand for the release of the deposit within said ten (10) day period referenced in subsection (f) below, then Escrowee shall promptly disburse the Deposit to the Claiming Party.

(f) In the event there is a dispute as to either party's failure to close or SELLER's default in accordance with the terms hereof, the party seeking payment of the Deposit (the "Claiming Party") shall make written demand for the Deposit on the Escrowee and the other party. If the other party objects to this demand in writing to the Escrowee within ten (10) days of the Claiming Party's written demand, then the Escrowee, upon notice to the parties, shall either (i) retain the Deposit , or, (ii) at its option, upon written notice to the SELLER and BUYER, avail itself of any procedure authorized by law to transfer the Deposit into a court of competent jurisdiction to await determination, or an accord and mutual agreement of SELLER and BUYER, with respect to the disposition of the Deposit . In the event the Deposit is deposited with a court of competent jurisdiction, the Escrowee shall have no further obligation under this Agreement.

g) Miscellaneous Deposit Provisions:

i. In the event of a dispute as to whether a breach by either party has occurred, the successful party shall be entitled to any and all expenses, including reasonable attorney's fees and costs incurred in connection herewith.

ii. Nothing herein contained shall be deemed to obligate the Escrowee to deliver any cash, instruments, documents or any other property referred to herein, unless the same shall have first been received by the Escrowee pursuant to this Escrow Agreement.

iii. BUYER and SELLER, jointly and severally, will reimburse and indemnify the Escrowee (including its officers, agents and employees) for, and hold it harmless against, any loss, liability or expense, including but not limited to counsel fees, incurred without bad faith or willful misconduct on the part of the Escrowee arising out of or in conjunction with its acceptance of, or the performance of, its duties and obligations under this Escrow Agreement as well as the costs and expenses of defending against any claim or liability arising out of or relating to this Escrow Agreement. There shall be included in the loss, liability or expense which the Escrowee is indemnified hereunder all sums which the Escrowee may pay in settlement of any claim.

iv. The Escrowee may assume, and shall be fully protected in assuming, that any certificate, document, instrument or communication received by it under this Escrow Agreement is from the party purporting to send it and is genuine in all respects, is consistent with the terms of this Escrow Agreement or any related document established hereunder, and does not violate any law or administrative rule or regulation and that any person giving such communication has been duly authorized to do so.

v. The Escrowee shall assume, and shall be fully protected in assuming, that any funds it receives under this Agreement are from the party purporting to send it, regardless from what account those funds came from.

vi. The Escrowee shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act of law, or for anything which it may do or refrain from doing in connection herewith, except its own willful misconduct.

vii. Escrowee or any member of its firm shall be permitted to represent SELLER in any dispute between the parties whether or not Escrowee is in possession of the Deposit and continues to act as Escrowee.

viii. The Escrowee is acting under this Agreement as a stakeholder only.

ix. No term or provision of this Agreement is intended to create, nor shall any such term or provision be deemed to have created, any joint venture, partnership or attorney-client relationship between or among the Escrowee and any of BUYER or SELLER.

x. BUYER hereby acknowledges that SELLER has been represented by the Escrowee in connection with the negotiation and entry into of the Purchase Agreement and waives any conflict of interest and irrevocably authorizes and directs the Escrowee to carry out the terms and provisions of this Agreement, without regard to any such representation and irrespective of the impact upon BUYER or SELLER.

xi. SELLER further acknowledges and agrees that the Escrowee may represent SELLER in connection with any and all legal matters, whether related to this Escrow Agreement, the Escrowed Funds, Interpleader or otherwise.

xii. The agreements set forth in this Section shall survive the termination of this Escrow Agreement and the payment of all amounts hereunder.

xiii. The Escrowee shall have the unilateral right to resign upon written notice to the other parties hereto. In the event of such resignation, SELLER shall appoint a successor escrow agent hereunder by delivering to the Escrowee a written notice of such appointment. Upon receipt of such notice, the Escrowee shall deliver to the designated successor escrow agent all money and other property held hereunder and shall thereupon be released and discharged from any and all further responsibilities whatsoever under this Agreement. If no such successor escrow agent shall have been designated by the date specified in the Escrowee's notice, all obligations of the Escrowee hereunder shall nevertheless cease and terminate upon the Escrowee's deposit of the Deposit into a court of a competent jurisdiction.

**4. <u>PARTS AND ACCESSORIES</u>**. The Purchase Price set forth in Paragraph #2(a) shall be further adjusted as follows:

(a) <u>OEM Parts and Accessories</u>. The BUYER shall purchase all of SELLER's inventory at Closing of OEM Parts and Accessories (as hereinafter defined). The term OEM Parts and Accessories, as used herein, shall mean new, OEM, non-obsolete, useable, merchantable, current, original factory-packaged (except in the instance of multiple-pack-aged items or items which are not susceptible to packaging), unopened, undamaged, and listed as returnable (<u>i.e.</u>, eligible for return to the Franchisor for full value in the regular course of business in Franchisor's current parts and accessories catalog) ("OEM Parts and Accessories"). BUYER shall have no obligation to purchase any OEM Parts and Accessories bearing a parts and accessories catalogue number that does not reflect sales activity in the twelve (12) month period prior to Closing, or any OEM Parts and Accessories that was not originally purchased directly from OEM by SELLER. At Closing, SELLER shall assign to BUYER its termination rights to return the OEM Parts and Accessories, if any and to the extent assignable, to OEM pursuant to its Dealer Sales and Service Agreement.

(b) <u>Non-OEM Parts and Accessories</u>. The BUYER shall purchase all of SELLER's inventory at Closing of Non-OEM Parts and Accessories (as hereinafter defined) including but not limited to gas, grease, oil, brake pads, wiper blades, etc. The term Non-OEM Parts and Accessories, as used herein, shall mean new, non-OEM, non-obsolete, never used, merchantable, current, original factory-packaged (except in the instance of multiple-packaged items or items which are not susceptible to packaging), unopened, unmarked and undamaged up to $15,000.00 ("Non-OEM Parts and Accessories"). Any Non-OEM Parts and Accessories over $15,000.00 shall be retained by the SELLER unless the SELLER and BUYER agree on a disposition of those Non-OEM Parts and Accessories over $15,000.00 at or prior to Closing, (e.g., ownership, purchase price).

(c) At Closing, SELLER shall assign to BUYER its rights to return the Non-OEM Parts and Accessories, to the extent assignable or returnable.

(d) The parties shall collectively retain the services of an inventory company to conduct an analysis of the SELLER'S OEM Parts and Accessories and Non-OEM Parts and

Accessories (collectively, the "Parts and Accessories Inventory"), the cost of which shall be shared equally.

**5.** **OUTSTANDING SALES CONTRACTS AND ORDERS**. The parties understand that there may be, on the date of Closing, outstanding sales and contracts and/or orders ("Contracts and/or Orders") between SELLER and third-party purchasers for the sale or lease of new OEM motor vehicles. For the purpose of arranging for the proper fulfillment of the Contracts and/or Orders and all deposits paid on account thereof, the parties have agreed that SELLER shall assign all right, title, and interest in and to the Contracts and/or Orders to BUYER at Closing, provided, however, that the Contracts and/or Orders represent arms-length sales of ordered new, current-model year motor vehicles and previous-model year motor vehicles to third party purchasers unrelated to SELLER Principal and, provided further, that SELLER shall deliver to BUYER, at Closing, all deposits paid on account thereof and documentation that the vehicle was timely ordered in the ordinary course of SELLER's Business. BUYER agrees to perform the Contracts and/or Orders in place and instead of SELLER. BUYER shall indemnify and hold SELLER harmless from any claims relating to or arising from BUYER'S performance of the Contracts and/or Orders. SELLER shall indemnify and hold BUYER harmless from any claim and all monetary loss as a result of an improper appraisal of any trade-in vehicle not consistent with used car guidebook prices in connection with any such Contract and/or Order, or any irregularity therein (including reasonable attorneys' fees and costs). In the event that BUYER reasonably determines that a trade-in vehicle was not properly appraised in accordance with customary practices, BUYER has the right to require SELLER to purchase the vehicle for the appraised amount. BUYER shall have the right, prior to Closing, to review and reasonably approve or reject any Contract and/or Order that will not realize a profit reasonably consistent with SELLER's present practices. SELLER agrees not to contract to sell motor vehicles in industry-wide short supply to other than valid third-party purchasers in arms-length transactions.

**6.** **WORK-IN-PROCESS.** BUYER shall reimburse SELLER on the Closing date for SELLER's net direct cost of completed labor and parts installed, or materials used, or in process of installation on any uncompleted repair orders (Customer, warranty, and insurance) in process for less than seventy-five (75) days (unless the reason a vehicle remains in process for a longer time due to parts unavailability or OEM backorder) and in SELLER's possession on the Closing date. Said uncompleted repair orders shall become the property of BUYER. BUYER shall complete such repair work and shall be entitled to collect the entire proceeds covering such repair work from the customers of SELLER.

**7.** **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER**. SELLER and SELLER Principal, jointly and severally, represents and warrants to BUYER that:

(a) **Organization.** SELLER is duly organized and existing in good standing under the laws of the State, is duly authorized to carry on its Business aforementioned, that all necessary corporate action to authorize the execution of this Agreement and to consummate the transactions contemplated therein have been taken, and that this Agreement constitutes the valid binding obligation of SELLER enforceable in accordance with its terms.

(b) **Title to Assets.** SELLER shall, at Closing, have good and marketable title to all of the assets and property to be sold, transferred, and assigned to BUYER pursuant to

this Agreement, or a valid leasehold interest, free and clear of all liens and encumbrances, except vehicle floor plan financing to be satisfied at Closing, and those obligations of SELLER that are to be assumed by BUYER as per section 16 of this Agreement .

(c) **Litigation.** Except as provided in Schedule 7(c), there is no material litigation, injunction, judgments or insolvency proceedings pending or threatened against SELLER or SELLER Principal.

(d) **Taxes.** All returns, reports and other forms related to Taxes (as defined herein) required to be filed on or before the date of Closing with respect to the Business or the assets which are the subject matter of this Agreement have been filed, or will be filed on or before the Closing date, in accordance with all applicable laws (after taking into account extensions duly obtained) and, to the best of SELLER's knowledge, no penalties or other charges are due or will become due with respect to the late filing of any such return, report or form. All such returns, reports and other forms are or will be accurate and complete in all material respects and properly reflect the Taxes due for the periods covered thereby. All Taxes due and payable with respect to the Business, as shown on such returns, reports and other forms have been paid, adequately provided for in reserves, or properly protested or will be so paid, reserved for or protested by SELLER by the Closing date. All Taxes required to be withheld or collected by SELLER with respect to the Business have been duly withheld or collected and have been or will be paid over to the appropriate governmental authorities. No audit of any such return, report or form is pending or, to the best of SELLER's knowledge, threatened. SELLER is not a party to any pending action or proceeding by any governmental authority for assessment or collection of Taxes with respect to the Business, and no claim for assessment or collection of Taxes has been asserted or, to SELLER'S knowledge, threatened against SELLER with respect to the Business. There are no tax liens upon any of the assets. As used in this Agreement, "Taxes" (or "Tax" where the context requires) shall mean all federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, value added, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll-related and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest or penalties with respect thereto.

(e) **Employee Plans.** SELLER has no collective bargaining agreements or employment agreements, organized labor agreements, bonus, deferred compensation, pension, profit sharing, or 401k or retirement plan agreements.

(f) **Maintenance of Operations.** SELLER shall keep its place of Business open and operative during and for not less than the hours customary for the Business of SELLER; lend its best efforts to cause its dealership to function in the ordinary course of its Business; and not acquire or dispose of any of its assets and EXHIBIT "A" properties or obligate itself to do so, except for the assets not included in the assets to be purchased by BUYER, including, but not limited to, the SELLER's motor vehicles deemed an Excluded Asset or which is rejected by BUYER in accordance with this Agreement or except as may be expressly provided for by the terms of this Agreement or except in the ordinary course of business.

(g) **Condition of Assets.** As of the date of this Agreement and as of the Closing date, all of SELLER's equipment, machinery and mechanical systems (i.e., plumbing, electrical, HVAC, mechanical and septic) are and will be in operable order, which representation shall not survive the Closing hereunder as provided in this Agreement, and that SELLER is and shall be, at Closing, in compliance with all OSHA requirements.

(h) **Franchise.** (i) Except as otherwise provided in Schedule 7(h), attached hereto, the SELLER's franchise agreement with Franchisor is in full force and effect, that SELLER has the right to operate its OEM franchise at the existing location and that SELLER is not in receipt of any notice of default or termination thereunder by Franchisor nor has any knowledge of any matter which would lead to a termination or default thereunder, and that SELLER has not heretofore received any unabated written notice of any facility, equipment or other franchise deficiency from Franchisor or any written notice requiring it to relocate the dealership operation, cautioning SELLER not to improve or expand the Premises, or requiring SELLER to improve or expand or otherwise modify its facility, equipment or the location thereof. The Operating Assets BUYER is purchasing hereunder will include all essential special tools and equipment required by Franchisor, and the Operating Assets shall be in the same order and condition as they were in as when BUYER conducted its physical inspections/property condition assessments as proved in Section 14 of this Agreement. The term "essential" special tools and equipment shall mean the OEM individual factory-brand special tools and equipment, each of which cost one hundred dollars ($100.00) or greater.

(ii) BUYER acknowledges that SELLER has discussed SELLER's current business and dealership financial and operating condition with BUYER. SELLER shall provide to BUYER a copy of its OEM factory financial statements within two (2) business days of submitting same to OEM, it being understood and agreed that SELLER will provide same solely as an accommodation to BUYER to enable BUYER to compare each of SELLER's monthly factory statements received as herein provided in this section of the Agreement (and BUYER acknowledges same), and the delivery and or review of same by BUYER or BUYER's financial representatives or any other agent or representative of BUYER, shall neither be relied upon in connection with, nor be deemed a part of, the Business Due Diligence contingency under section 14(c) of the Agreement entitling BUYER to the rights contained therein.

(i) **Insurance.** SELLER shall keep all of its insurable properties, which are the subject matter of this Agreement insured in accordance with its present practice.

(j) **Tenancies.** There are no tenancies at the Premises other than the Lease and Master Lease, which tenancy under the Lease shall be assigned from SELLER and assumed by BUYER at Closing as provided in section 11(a)(ii) of this Agreement.

(k) **Environmental.** To SELLER's knowledge: (i) Since the commencement date of the Lease, (A) SELLER has and is currently operating within the limits set forth in all applicable federal, State, county or local environmental permits, licenses, or authorizations, regardless of whether such permits, licenses, or authorizations are current, expired, or about

to expire, and (B) that SELLER has no knowledge of any claims which have been filed against, or notices received by the SELLER, alleging a violation of any such environmental permits, licenses, or authorizations;

(ii) Since the commencement date of the Lease, SELLER, its agents, employees and tenants in connection with SELLER's Business, have complied and shall continue to comply in all material aspects with all applicable laws, ordinances, rules, requirements and regulations of federal, state, county, and local governments and all agencies or other governmental entities thereof, including, without limitation, environmental, health, and safety, which affect the business operations at the Premises or its use thereof, and to which the SELLER may be subject, and SELLER has no knowledge of any claims filed against, or notices received by SELLER alleging a violation of any such laws, ordinances, rules, requirements or regulations; and

(iii) The Premises has not been used by SELLER to refine, produce, store, handle, or process Hazardous Substances (as that term is defined by applicable environmental law) in violation of appliable environmental laws.

(l) **Regulatory Compliance.** To SELLER's knowledge, SELLER has not received any notice from any federal, state or local regulatory or governmental authority having jurisdiction over the Premises and the Business conducted thereon indicating that the operation of SELLER's Business is not in compliance with any applicable laws and regulations pertaining thereto, including zoning, environmental, health, employment, fire or building ordinances or codes, and that to the knowledge of SELLER the Business and the Premises are in material compliance with all said laws.

(m) **Occupancy.** If required for the transfer of the Business, BUYER will, at its sole cost and expense, but with the prompt and full cooperation of the SELLER, obtain an Commercial Certificate of Continued Occupancy ("CO") in favor of BUYER prior to Closing authorizing the use of the Premises as a new and used motor vehicle dealership and all uses incidental thereto and, in connection therewith. However, should same require an expenditure of funds in excess of Fifteen Thousand Dollars ($15,000.00), BUYER shall the right to terminate this transaction, whereby ESCROWEE shall release to BUYER its deposit; provided further, however, that if and in the event that the cost to BUYER to obtain said CO exceeds the sum of Fifteen Thousand and 00/100 ($15,000.00) DOLLARS, then BUYER shall notify SELLER, in writing, as to whether or not it shall assume said excess costs, or (i) refuse to assume said excess costs and (ii) terminate the Agreement. If BUYER refuses to assume said excess costs and notify SELLER that it is terminating the Agreement, then SELLER shall then have the right to either (a) assume those costs to satisfy the requirements and/or conditions in excess of Fifteen Thousand and 00/100 ($15,000.00) DOLLARS so that BUYER will obtain the CO, or (b) permit BUYER to terminate this Agreement. In the event of a lawful termination hereunder, the Escrowee shall cause the return of the Deposit paid hereunder, and this Agreement shall be deemed null, void and without further force or effect. SELLER represents and warrants that to SELLER's knowledge as of the date hereof, all permits with respect to improvements to the

Premises have been closed, and that any and all variances or zoning resolution approval requirements for the Premises, for which SELLER applied for and obtained or for which it is responsible, have been fulfilled and satisfied. SELLER has neither knowledge nor notice of any uncured zoning code or building code violations as of the date of this Agreement and such representation will be true and correct at Closing or any interim notification cured prior to the date of Closing.

(n) **Maintenance of Assets.** SELLER's representatives, agents, or employees shall not remove from the Premises prior to Closing any of the Operating Assets set forth in paragraph #1(a). Furthermore, SELLER has not removed any equipment or accessories from the new vehicles to be purchased, or any motor vehicle that may be purchased, by BUYER hereunder, and such vehicles are equipped as per the manufacturer's/distributor's invoice.

(o) **Breach of Existing Agreements.** Except as otherwise provided herein including, but not limited to, the receipt of such consents, waivers and approvals of Franchisor, the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with or result in a breach or default under any provision of law, order of any court or other agency of government, or any note, debenture, mortgage, loan agreement or other instrument to which SELLER is a party or by which it is bound.

(p) **Warranties.** Except as provided in Schedule 7(p), attached hereto, SELLER has not issued service contracts, warranties, other than "factory" sponsored warranties in connection with its operation of the subject dealership. The preceding sentence shall not refer to or relate to SELLER’s sale of third-party extended- warranties and aftermarket products to its customers, which BUYER shall have no obligation to assume, which shall not be binding upon BUYER, and which are expressly excluded from this Agreement if not assumed by BUYER. Further, SELLER has not issued or given customers any policy agreements, good will commitments, or other understandings which promises such customers free or discounted products, merchandise, supplies, or services, or which obligates SELLER to provide same (e.g., free lifetime oil changes), and which if BUYER would rescind or not fulfill same after the date of Closing, would affect BUYER’S relations with such customers, or BUYER’S on-going business operations. Prior to Closing, SELLER shall notify in writing customers to which it has policy agreements, good will commitments, or understandings that BUYER is not assuming any of said obligations, and to the extent that same are not terminable by SELLER prior to the date of Closing, that SELLER shall remain responsible for same after Closing. SELLER has not (i) issued or sold any warranties or other “aftermarket” products in which the SELLER is the obligor or in which the SELLER has any liability to the customer or (ii) issued to any customer the right to receive “free” or discounted future services, parts or accessories. Purchaser agrees to remain liable for the completion or fulfillment of this obligation after the Closing Date. This subparagraph shall survive the Closing.

(q) **Removal of Debris.** SELLER will remove all debris from the dealership Premises prior to Closing, including, but not limited to, all used tires, batteries, drums and abandoned vehicles, if any.

(r) **Dispatch of Franchise Sale Notification.** SELLER shall reasonably cooperate with BUYER in connection with BUYER obtaining the approvals specified in Section 11(a) below, which shall include, without limitation, obtaining OEM franchise application forms for BUYER if OEM does not timely provide the application forms to BUYER. Contemporaneously with the execution of this Agreement, SELLER shall dispatch notification of the within Agreement to Franchisor, in accordance with the provisions of the New Jersey Franchise Practices Act (56:10-1 et seq.) ("Act").

(s) **Termination of Franchise.** Concurrently with Closing, unless requested by Franchisor sooner (and then within five (5) days of such request), SELLER shall voluntarily cause to be executed and delivered to Franchisor a concurrent dealer termination letter, and such other documentation requested by Franchisor, with respect to its Dealer Sales and Service Agreement and effective upon Closing in order to facilitate BUYER's application for a Dealer Sales and Service Agreement with Franchisor.

(t) **Corporate Information.** SELLER commenced its business operation on or about August 1, 2020, and that SELLER's federal identification number is 85-1087272. SELLER has not used any other corporate names, trade names and/or addresses within three (3) years last past, except as set forth in section 12 of this Agreement.

(u) **Employees.** SELLER represents that it employs less than fifty (50) full time employees which employment limits extend more than twelve months prior to the date of this Agreement.

(t) **Agreements.** attached hereto and made a part hereof as **EXHIBIT "C"** is a schedule of all material agreements, documents, and instruments by and between SELLER and Franchisor, currently in effect and/or executed as of the date hereof, including, without limitation, SELLER's Dealer Sales and Service Agreement and this schedule shall be updated as of the date of Closing.

(w) **Records.** SELLER shall not digitally purge its customer information and records for seven (7) years next succeeding the date of Closing.

(x) **Site Control.** SELLER has explained to BUYER that while the Premises has been subject to a site control understanding with the OEM, effective with Closing, SELLER will not have any further obligation to maintain site control with the OEM or have any responsibility in connection therewith, it being understood that SELLER's site control understanding with the OEM will be deemed null and void and without further effect.

**8. NEGATIVE COVENANTS OF SELLER PENDING CLOSING**. Except with the prior written consent of BUYER, SELLER shall not, after the date hereof and prior to the Closing Date: (a) Make or grant any general wage or salary increase to its employees; (b) Establish or make any increase in any employee pension or retirement plans or other employee benefit plans; (c) Enter into an employment or consulting agreement for personnel services, unless

in the ordinary course of business and which is not terminable without liability upon thirty (30) days' notice or less, or which the BUYER shall not be responsible for after Closing; (d) Incur or become subject to, or agree to incur and become subject to, any obligation or liability (except normal trade or business obligations incurred in the ordinary course of business); (e) Mortgage, pledge or subject to lien or any encumbrance any of its assets or properties, except pursuant to its floor plan financing source; (f) Sell, assign, transfer, convey, lease or otherwise dispose of, or agree to sell, assign, transfer, convey, lease, or otherwise dispose of, any of its assets included in EXHIBIT "A", and specifically excluding the Excluded Assets and such motor vehicles as BUYER shall reject in accordance with the terms of this Agreement; (g) Acquire, or agree to acquire, any material assets or personal property, except as may be provided in this Agreement, or except in the ordinary course of business; (h) Enter into any collective bargaining agreement, or, through negotiations or otherwise, make commitments or incur any liability to any labor organization unless the same is not binding upon BUYER; and (i) Enter into any other business transactions which are not in the ordinary course of business.

**9. REPRESENTATIONS WARRANTIES AND COVENANTS OF BUYER**. BUYER warrants represents and covenants to SELLER:

(a) BUYER is duly organized and existing in good standing under the laws of the State, is duly authorized to carry on its business, that all necessary company action to authorize the execution of this Agreement has been taken, and that this Agreement constitutes the valid and binding obligation of BUYER enforceable in accordance with its terms.

(b) There is no material litigation, judgments, or insolvency proceedings threatened or pending against BUYER which would impair BUYER's rights to purchase the subject assets.

(c) The execution, delivery and performance of this Agreement by the BUYER will be duly authorized by all requisite company action and the persons executing this Agreement on behalf of the BUYER and BUYER shall have full power and authority to do so and to perform every act and to execute and deliver every document and instrument necessary or appropriate to consummate the Transaction. No approval or consent of any other person is required in connection with the execution, delivery, and performance by the BUYER of this Agreement.

(d) This Asset Purchase Agreement constitutes the valid obligation of the BUYER, is legally binding, and is enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency and other laws and equitable principles affecting creditors' rights generally and the discretion of the courts in granting equitable remedies.

(e) The execution and delivery by the BUYER of this Asset Purchase Agreement and any other agreements, certificates, instruments and documents executed and delivered pursuant hereto, and the consummation by the BUYER of the transaction, will not constitute (with the giving of notice or the lapse of time or both) a violation of, be in conflict with,

result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both), or constitute a default under (i) any term or provision of the by-laws or operating agreement of the BUYER, as may be amended, (ii) any agreement, commitment or understanding to which the BUYER or any of the BUYER's members/shareholders is subject or by which it, he or she is bound, or (iii) any applicable law.

(f) BUYER has the funds, or the ability to obtain the funds by the Closing Date necessary to consummate the transaction that is the subject matter of this Asset Purchase Agreement, subject to the satisfaction of the financing contingency in section 11(b) of this Agreement.

(g) BUYER agrees to hire a sufficient number of SELLER'S employees such that neither the New Jersey nor Federal Warn Act applies to this transaction.

(f) BUYER shall retain the deal jackets/folders (for completed sales as well as terminated deals) for the minimum period required by New Jersey law. For a period of three (3) years following the Closing Date, or the applicable statute of limitations pertaining to the matter giving rise to the requested access, whichever is shorter, BUYER shall permit SELLER to access and review any deal jackets/folders and all sales and service files for sales and services occurring prior to the Closing Date, as well as any other records acquired by BUYER from SELLER hereunder, upon reasonable notice to BUYER.

(g) BUYER knows of no reason why BUYER's application should be rejected by the Franchisor.

(h) Should this Asset Purchase Agreement be terminated, BUYER, and his affiliated companies, agrees that they shall not solicit, offer to employ, or hire any employee of SELLER (who was an employee of SELLER prior to the date of termination) for a period of two (2) years subsequent to the date of termination of this Asset Purchase Agreement.

**10. REPRESENTATIONS, WARRANTIES AND COVENANTS TRUE AS OF CLOSING DATE**. All of the representations, warranties and covenants of SELLER and BUYER contained in this Agreement shall be true and correct and shall not have been materially breached on and as of the date of the Closing, and SELLER and BUYER shall so certify in writing with respect thereto at Closing, said representations, warranties, and covenants to expressly survive the Closing for a period of one (1) year next succeeding the date of Closing or as otherwise specified in this Agreement, with any action arising therefrom to be instituted within one (1) year and three (3) months from Closing. In the event that a representation, warranty or covenant shall have been breached prior to the date of Closing SELLER and/or BUYER shall have the right to remedy such breach so that as of the date of Closing such representation, warranty or covenant shall be true and correct.

**11. <u>CONTINGENCIES</u>.**

(a) The within conveyance by SELLER, and the performance of BUYER's obligations hereunder, are expressly contingent upon the following (unless waived by BUYER in writing):

(i) <u>Franchise</u>. BUYER shall have the right to obtain and/or satisfy (or waived by BUYER in writing the following within seventy-five (75) days from the date hereof ("Franchise Approval"): a written commitment from the Franchisor to issue a standard Dealer Sales and Service Agreement, authorizing BUYER's sale and factory authorized service of OEM motor vehicles, parts and accessories at the Premises, as presently constituted, all without the requirement of facility or equipment improvement, repair, relocation (in whole or in part), modification and/or expansion, other than what has been made known to BUYER prior to the date hereof. Notwithstanding the foregoing, BUYER shall be entitled to extend said seventy-five (75) day period for a period of thirty (30) days upon Notice to Seller.

(ii) <u>Lease.</u> BUYER represents that it has been given a copy of the Lease of the Premises prior to the date hereof and has reviewed same. BUYER acknowledges and agrees that at Closing, SELLER shall assign to BUYER and BUYER shall assume from SELLER, the Lease pursuant to an assignment and assumption agreement of the Lease ("Assignment"). This Agreement shall be contingent upon SELLER obtaining the consent of Landlord and the Master Landlord (the "Landlord's Consent") . Attached hereto and made a part hereof as **<u>EXHIBIT "D"</u>** is the form of Assignment and Assumption of Lease with Landlord's Consent to be executed by BUYER, SELLER, and the Landlord at or prior to Closing. As part of Landlord's Consent, the SELLER and any guarantor affiliate of SELLER shall be released from obligations under the Lease. This contingency shall be satisfied by SELLER within forty-five (45) days of the date hereof, and if not, either party may terminate this Agreement. The Lease required the guaranty of SELLER Principal, and in connection therewith BUYER shall provide or cause to be provided, as part of the assignment, assumption and landlord's consent, a substantially similar guaranty of BUYER's principal.

(iii) <u>Diligence.</u> BUYER shall use due diligence and exercise good faith and reasonable commercial efforts to satisfy the contingency set forth in subsection 11(a)(i), and SELLER shall use due diligence and exercise good faith and reasonable commercial efforts to satisfy the contingency set forth in subsection 11(a) (ii) hereof.

(b) <u>Right to Termination</u>. If and in the event that the Franchise Approval contingency set forth in this Section 11 (a)(i) is not obtained and/or satisfied by BUYER, or waived by BUYER (in writing), within (x) said seventy-five (75) days next succeeding the date hereof as to Section 11(a)(i), then BUYER shall have the right to terminate this Agreement upon written notice to SELLER, provided that BUYER shall have the right by written notice provided to SELLER prior to the expiration of the Franchise Approval contingency date hereof, to extend said period for one (1) additional period of thirty (30) days, provided further that BUYER provides Seller with documentation evidencing that it has been proceeding diligently and in good faith to

satisfy or obtain said contingency. If and in the event the Landlord's Consent contingency as set forth in this Section 11 (a)(ii) is not obtained and/or satisfied by SELLER within said forty-five (45) days next succeeding the date hereof, then BUYER or SELLER shall have the right to terminate this Agreement upon written notice to the other, provided that SELLER shall have the right by written notice provided to BUYER prior to the expiration of the Landlord Consent contingency date hereof whether or not BUYER has properly terminated this Agreement, to extend said Landlord's Consent contingency for one (1) additional period of fifteen (15) days, and provided further that SELLER provide BUYER with documentation evidencing that it has been proceeding diligently and in good faith to satisfy or obtain said contingency. In the event of such termination, the Escrowee is authorized to release to BUYER the Deposit paid hereunder within seven (7) days of written request for same.

(c) Financing Contingency. There is no financing contingency.

**12. TAX CLEARANCE.**

a. As of the Closing Date to Closing, SELLER agrees to provide BUYER with a tax clearance letter from State Department of Revenue ("Division"). SELLER shall comply with all escrow demands or suggestions from the Division. Escrows, if any are suggested or required by the Division's requirements or by law, shall be held by BUYER's attorney. The escrow shall be held pursuant to the terms and conditions of a bulk sale tax escrow agreement to be prepared by the parties' legal counsel prior to Closing and mutually agreed upon by BUYER and SELLER.

(b) SELLER warrants and represents that it has not used any other corporate names, trade names and/or addresses within three (3) years last past, except: "TEAM AUTO GROUP" and "VOLKSWAGEN OF FREEHOLD".

**13. INDEMNIFICATION.**

(a) SELLER and its SELLER Principal, jointly and severally, hereby agree to indemnify, defend, and hold BUYER harmless from, against and in respect of, and shall reimburse BUYER, as incurred, for all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses, asserted against, resulting to, imposed upon, suffered by or incurred by BUYER, by reason of or resulting from a breach or nonfulfillment of any representation, warranty, covenant, or agreement of SELLER contained in or made pursuant to this Agreement or the assertion against BUYER of any liability of SELLER not to be assumed by BUYER hereunder or arising out of SELLER's operation of the subject Business, third party creditor claims, including any claims made by the tax Division or any other State or federal taxing authorities, product liability and service repair claims of third parties, asserted or manifested prior to or after the Closing date arising out of claims for defects in design, materials or malfunctions occurring prior to the Closing date (the "BUYER's Claims").

(b) BUYER agrees to indemnify, defend, and hold SELLER harmless from, against and in respect of, and shall reimburse SELLER, as incurred, for all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses, asserted against, resulting to, imposed upon, suffered by or incurred by SELLER by reason of or relating from a breach or non-fulfillment of any representation, warranty, covenant or agreement of BUYER, arising out of the BUYER's operation of the subject Business after the date of Closing, including, without limitation, the Dealer Oil Change Program ("SELLER's Claims").

(c) The obligations and liabilities of the parties hereunder with respect to BUYER's Claims and SELLER's Claims (collectively, the “Claims") resulting from the assertion of liability by third parties shall be subject to the following terms and conditions: The party hereto seeking indemnification (the “Indemnitee") will give the other party hereto (the “Indemnitor") notice of any such Claims reasonably promptly after the Indemnitee receives notice thereof, and the other party shall have a reasonable period of time (not to exceed thirty (30) days) to cure or otherwise resolve the Claims. The Indemnitee shall then have the option of either defending the Claims on behalf of itself and the Indemnitor, or demanding that the defense be undertaken by the Indemnitor. In either case, the Indemnitor shall be liable for all expenses of the defense and for all liabilities or amounts paid in settlement on account of the Claims and all expenses paid with respect to any dispute concerning the indemnification provisions herein. In any event, the party not undertaking the defense shall have the right to intervene in the proceeding and participate at its own expense. If the Indemnitee elects to defend against any Claims, it shall not settle any such Claim without the consent of the Indemnitor. The indemnification hereunder shall be as incurred, so that no Indemnitee shall have to advance or expend any funds of his or its own.

(d) Failure of the Indemnitee to give reasonably prompt notice of any Claim or Claims shall not release, waive, or otherwise affect the Indemnitor's obligations with respect thereto, except to the extent that the Indemnitor can demonstrate actual loss and/or prejudice as a result of such failure. BUYER shall not be deemed to have notice of any Claim by virtue of knowledge acquired prior to the Closing date by an employee of SELLER who subsequently becomes employed by BUYER.

(e) Except as herein expressly provided, the indemnification rights of the parties hereto under this Agreement are independent of and in addition to such rights and remedies as the parties may have at law or in equity for any fraud, misrepresentation, breach of warranty, or failure to fulfill any agreement or covenant hereunder on the part of any party hereto, including, without limitation, the right to seek specific performance, rescission, or restitution, none of which rights or remedies shall be affected or diminished hereby.

(f) The parties hereto agree to pay promptly to any Indemnified Party the amount of all damages, losses, deficiencies, liabilities, costs, expenses, claims, and other obligations to which the foregoing indemnity relates.

(g) The Seller Principal is executing this Agreement in his individual capacity to evidence his approval and acceptance of the understandings outlined in this Section 13. Notwithstanding fraud, tax obligations and intentional actions or misrepresentations, SELLER's maximum indemnification obligation hereunder shall not exceed the Purchase Price and shall not be subject to SELLER indemnity until such time as any BUYER'S claims cumulatively exceed twenty-five thousand Dollars ($25,000.00).

(h) The indemnification provisions hereof shall survive Closing of title hereunder for a period of one (1) year next succeeding the date of Closing unless a claim for indemnification shall have been timely and properly within one (1) year and three (3) months from Closing, in which case the indemnification arising for such claim shall continue until the claim is fully resolved.

**14. <u>INVESTIGATIONS</u>**. BUYER shall be entitled to conduct the following investigations and inspections:

a. <u>Environmental Premises Aspects</u>.

i. Concurrently herewith, SELLER shall furnish to BUYER, to the extent in SELLER's possession, (A) information and documentation which may assist in BUYER's environmental inspection and investigation of the Premises to conduct and complete a Phase I environmental site assessment audit and additional environmental investigations of the Premises and wetlands and stream encroachment investigation of the Premises, (B) true and complete copies of all documents, submissions and correspondence provided by SELLER to the NJDEP, (C) documents, reports, directives and correspondence provided by the NJDEP to SELLER, (D) true copies of any sampling and test results obtained from samples and tests, and (E) any back title to the Premises ("Environmental Documentation"). SELLER represents that it does not have in its possession any of the above-stated Environmental Documentation.

ii. Within thirty (30) days next succeeding the date of execution hereof (the "DD Investigation Period"), BUYER shall have the right to perform a Phase I ESA and whatever other investigations and audits it deems reasonably necessary to determine that the Premises and its respective uses are in compliance with federal, state, county, and local environmental, zoning, health, safety and OSHA statutes, regulations, rulings or otherwise (the "Applicable Law"); Buyer shall not utilize the services of an LSRP and shall not conduct invasive testing or soil sampling Phase II activities at the site unless Landlord, Master Landlord, and Seller shall approve such Phase II activities and invasive testing prior to BUYER or its consultants conducting same. The cost of said investigations, audits, and investigations shall be borne solely by BUYER. BUYER shall provide SELLER with a copy of the Phase I ESA and any other investigation reports within the DD Investigation Period. If the investigations disclose that the Premises and/or its respective uses are not in compliance with Applicable Law and Buyer determines not to proceed with the Transaction, BUYER or SELLER may terminate this Agreement. BUYER shall be afforded one (1) fifteen (15) day extension of DD Inspection Period solely for Buyer to complete its environmental investigations as provided in this subsection 14.a.ii,

provided BUYER has been proceeding diligently and the request is made in writing prior to the termination of the DD Inspection Period.

iii. In such event of termination, the Deposit shall be refunded to BUYER within seven (7) days of written request for same, subject to BUYER first fulfilling its obligations under Section 26(b) below, and thereafter this Agreement shall be deemed null, void, and of no further effect.

iv. Should Buyer determine not to proceed, then BUYER, may give written notice of termination to SELLER prior to the expiration of the DD Investigation Period, then all rights and obligations of SELLER and BUYER under this Agreement shall terminate, the Deposit shall be returned by Escrowee to BUYER forthwith and SELLER and BUYER shall have no further rights and obligations under this Agreement, except those rights and obligations which expressly survive termination of this Agreement.

b. Physical Inspection Premises Aspects. In addition to the environmental investigation provided in subparagraph (a) hereof, BUYER may conduct, during the DD Investigation Period, any and all reasonable physical condition assessments and structural inspections of the Premises, including, without limitation, roof, HVAC, plumbing, electrical, mechanical systems, machinery, equipment, sewer/septic, structure, pest/insect infestation, radon, asbestos, or otherwise ("Physical Inspection"). If the Physical Inspections reveal conditions unreasonably unsatisfactory to the BUYER in its sole discretion, BUYER shall so notify SELLER within the DD Inspection Period and provide SELLER with a copy of its reports(s) (the "Physical Inspection Reports"). SELLER shall have the option to assume the cost of repairs by providing written notice of such intention to BUYER within seven (7) days of its receipt of the Physical Inspection Reports. In the event that SELLER refuses or fails to do so, BUYER shall have the option to assume the cost of repairs or to terminate this Agreement upon written notice to SELLER. In such event of termination, the Deposit paid hereunder shall be refunded to BUYER within seven (7) days of written request for same, and thereafter this Agreement shall be deemed null, void, and of no further effect. SELLER agrees to maintain the Premises, subject to ordinary wear and tear, pending Closing hereunder.

c. Business Due Diligence. It is expressly understood and agreed between the parties that this Agreement is expressly contingent upon (unless waived or modified by BUYER in writing) satisfaction of BUYER conducting whatever business due diligence investigations of SELLER'S non-confidential financial and business operations, and legal and accounting matters as BUYER shall reasonably require in its reasonable judgment ("Business Due Diligence") within the DD Investigation Period. SELLER shall promptly furnish the information reasonably required or requested by BUYER to the extent in SELLER's possession for BUYER to perform its Business Due Diligence. Buyer shall have the right to terminate this Agreement in the event that it is not reasonably satisfied with the results of its Business Due Diligence investigation as determined by Buyer in its sole discretion, by notification to SELLER as provided in and in accordance with Section 21 hereof, on or before the last day of DD Inspection Period, as may have been extended. In the event BUYER is dissatisfied with the Business Due Diligence, then BUYER shall have the

right to terminate this Agreement by written notice to the SELLER within the DD Inspection Period. In such event of termination, the Escrowee is authorized to release to BUYER the deposit monies paid hereunder, and this Agreement shall be deemed null, void, and of no further effect.

**15. ACCOUNTS RECEIVABLE.** (a) SELLER's accounts receivable, including, without limitation, factory receivables, shall remain the sole property of SELLER. BUYER agrees to accept payment on account of such accounts receivable from SELLER's customers, if and to the extent tendered, and to remit promptly said payments to SELLER and to cooperate with SELLER in the collection of said accounts receivable, provided, however, that nothing herein contained shall obligate BUYER to institute and/or participate in any collection action or proceeding, and provided further, however, that acceptance of any SELLER accounts receivable remittance shall not be deemed an admission of any successor liability.

(b) In the event that a check is issued by a third party to the wrong entity (e.g., a check is issued to SELLER when, in fact, it is for products and/or services provided and/or performed by BUYER), the erroneous payee on the check shall endorse it to the other party.

**16. ASSUMPTION OF CERTAIN OBLIGATIONS OF SELLER**. Within ten (10) days from the date of this Agreement, SELLER shall provide to BUYER a list of and copy of all contracts and obligations requested to be assumed attached hereto as **EXHIBIT "E"** ("Assumed Obligations"), which shall be updated at Closing, and SELLER and BUYER shall have ten (10) days from BUYER's receipt of the list and copies to agree a schedule of the Assumed Obligations. BUYER shall only assume the obligations that BUYER, itself, lists at Closing on a schedule attached to an Assignment and Assumption Agreement. Any and all payments, charges and/or credits with respect to any Assumed Obligations shall be apportioned and adjusted as of the date of Closing, and any fees or costs associated with the actual assignment which are asserted by the lienholder, lessor, or owner (i.e., preparation of documents, transfer fees) shall be borne by SELLER. SELLER shall indemnify and hold BUYER harmless from and against any claims asserted by the lessors or obligees of the Assumed Obligations, which claim is based upon facts arising and/or usage prior to the date of Closing, nd BUYER shall indemnify and hold SELLER harmless from and against any clients asserted by lessors or obligees of the Assumed Obligations, which claim arises from BUYER's usage form and after the date of Closing. In the event lienholder's, lessor's, or owner's consent is necessary with respect to any assignment, then SELLER and BUYER agree to obtain same prior to Closing.

**17. ADJUSTMENTS**.

(a) The following adjustments shall be made at Closing:

(i) Telephone and other utilities for the then-current period;

(ii) Employee wages, bonus, pro-rated vacation, sick days, and other entitlements to SELLER's employees shall be satisfied by SELLER concurrent with Closing;

(iii) Deposits on Outstanding Contracts and/or Orders;

(iv) Rent, security deposit, real estate taxes, and other applicable and/or required adjustments as provided in the Lease;

(v) Work-in-Process; and

(vi) Any and all other adjustments as required hereunder.

(b) SELLER shall reimburse BUYER for any equipment, accessories, parts, deposits for special parts orders, and/or the cost of labor (at BUYER's cost) that SELLER has or had agreed to provide or furnish third parties or customers of SELLER and to which BUYER will now have to provide or furnish ("WEOs"), if any. At Closing, BUYER and SELLER shall make an adjustment for those WEOs that can be computed as of that date. Thereafter, SELLER shall reimburse BUYER, within five (5) days of BUYER's written notification to SELLER of same, for the amount expended by BUYER with respect to further WEOs. SELLER's obligation to reimburse BUYER for all such WEOs shall survive closing of title hereunder.

**18.** **<u>RISK OF LOSS</u>**. Risk of loss by casualty and liability for personal injury, property and leasehold improvement damage (other than that caused by BUYER's site testing for which BUYER shall bear sole liability and for which BUYER shall provide indemnification in accordance with the terms of this Agreement, shall be borne by SELLER until Closing Date. If and in the event the dealership Premises and/or the subject matter of the within Agreement is damaged or destroyed (in whole or in part) prior to Closing to such an extent that normal business operations are terminated or disrupted for a continuous period in excess of two (2) weeks, then and in such event BUYER may elect to: (a) terminate the within Agreement and receive a return of the deposit monies paid hereunder within seven (7) days of written request for same; or (b)proceed to closing, provided it receives thereat an assignment of the insurance proceeds (to the extend said proceeds were not already received by SELLER, then in such event, BUYER shall receive a credit against the Purchase Price for same) and the exclusive rights to adjust the loss with SELLER's insurer. SELLER shall maintain its current insurance coverage in full force and effect insuring the Operating Assets, Premises and the subject matter of this Agreement. SELLER shall promptly notify BUYER in writing of any loss and/or damage contemplated by the provisions hereof.

**19.** **<u>CONDEMNATION</u>**. SELLER represents that it has neither knowledge nor notice of any condemnation or eminent domain proceeding, either existing or contemplated, against the Premises. If, prior to Closing, SELLER learns or receives notice of any condemnation proceeding, or if a declaration of taking is filed, or if any other action is filed in furtherance of a condemnation or eminent domain proceeding, then and in such event, BUYER shall either (a) accept an assignment of the condemnation rights and proceeds and shall close title without a reduction of the purchase price or (b) terminate this Agreement. The decision by BUYER shall be made within ten (10) days of the date SELLER gives BUYER notice hereunder. Time is of the essence in giving such notice. The notice to terminate or proceed as described herein shall be in writing. If

the notice is timely given for termination of this Agreement the Escrowee shall promptly return the Deposit monies paid hereunder to BUYER within seven (7) days of written request for same, and thereafter this Agreement shall be deemed null, void, and of no further effect.

**20.** **CLOSING**. Closing of title ("Closing") shall take place at SELLER's dealership facility Premises located at 4360 US Route 9, Freehold, New Jersey, or at such other place as the parties may mutually agree, no later than fifteen (15) days next succeeding the satisfaction (or waiver) of all of the contingencies set forth in this Agreement.

**21.** **NOTICES**. Any notice, communication, request, reply or advice, or other notice pertaining to this Agreement to be given, made or accepted by either party to the other, must be in writing, and shall be given, or be served, only by dispatching the same by Federal Express (or any other established overnight courier delivery service), e-mail, certified mail return receipt requested, or by facsimile ("Initial Notice"), provided a posting of the hard copy is sent within forty-eight (48) hours of said transmittal, and such notice so dispatched in any of the methods above, shall become effective on the date of receipt of the Initial Notice. For purposes thereof, the addresses of the parties hereto are as follows:

As to SELLER:

Theodore E. Schiller, Esq.
SCHILLER, PITTENGER & GALVIN, P.C.
1771 Front Street
Scotch Plains, New Jersey 07076
P:908-490-0444
F:908-490-0420
E-Mail: tschiller@schiller.law

As to BUYER: [redacted]

Any party may change the person and address to which notice is to be given by giving notice to the other party pursuant to this Section 21.

**22.** **INDEPENDENT COUNSEL**. This Agreement has been prepared by Schiller Pittenger & Galvin, PC ("SPG"), at the request of SELLER. BUYER represents that it has retained the services of [redacted] in connection herewith. BUYER further confirms that it has not relied, directly or indirectly, upon any communication, advice, or consultation with SPG, but, in fact, has relied solely and exclusively upon its independent judgment and upon the advice of FR.

**23.** **<u>BROKER</u>**. Each party warrants and represents to the other party that the Business was not shown to BUYER by any broker except for Blue Sky 1 LLC (the "**<u>Broker</u>**"), who represents the SELLER, and will be compensated by the SELLER. Should the closing occur, then at the Closing, SELLER shall pay a commission to Broker pursuant to the terms of a separate written agreement between SELLER and Broker (dated as of May 31, 2024, and accepted on June 1, 2024), and said commission shall be SELLER's sole and exclusive obligation. Each party agrees to indemnify, defend and hold the other party harmless from and against all damages and expenses, including, but not limited to, reasonable attorneys' fees, that the indemnified party may incur as a result of any claim of any broker (other than the Broker) who claims to have introduced the indemnifying party to this transaction. The provisions of this Section 23 shall survive the Closing.

**24.** **<u>NO SHOP</u>.** Neither SELLER nor SELLER Principal, representatives, agents, officers, assigns, or the like, shall (a) entertain, encourage, solicit, or initiate any inquiries, or make any proposal, that may reasonably be expected to lead to any proposal to purchase the Business and/or assets to be purchased hereunder, or purchase the stock or membership interest of the SELLER; (b) participate in any discussions or negotiations, or provide any third parties with any information relating to the Business and/or the assets to be purchased hereunder in connection therewith or this Agreement, or the subject matter thereof, or entertain any such inquiries or proposals, or (c) directly or indirectly, sell, offer for sale, or other disposition to any entity, person, or third party, other than BUYER, or solicit, entertain, or accept offers to purchase or acquire from any person, third party or entity, other than BUYER, with respect to the sale of the Business and/or assets to be purchased hereunder (the "No Shop Clause"). This No Shop Clause shall remain in effect and shall obligate SELLER while this Agreement remains in force and effect.

**25.** **<u>COVENANT NOT TO COMPETE</u>.**

(a) As an inducement for BUYER to enter into this Agreement, SELLER and SELLER Principal"), jointly and severally covenant and agree that, for a period of two (2) years next succeeding the date of Closing, neither shall:

b. <u>Ownership</u>. Directly or indirectly own and/or operate a new OEM motor vehicle dealership for the purpose of selling, leasing or servicing new OEM motor vehicles within a radius of twenty (20) miles from the Premises.

c. <u>Customers</u>. Solicit past or current customers of the SELLER by direct contact, <u>i.e.</u>, by e-mail, text, telephone or mail, for the purpose of selling, leasing or servicing new or used OEM motor vehicles, nor for any purpose whatsoever, nor disclose the owner data base of SELLER to any third party, without duration. SELLER Principal operates other motor vehicle businesses and solicitations of customers who may be on the lists of SELLER and Principal's other businesses, or general mailing or solicitations shall not be a violation hereof.

d. Employees. From the date hereof and for a period of two (2) years from Closing, directly solicit for the purpose of arranging employment or business association with current employees of SELLER or employees of BUYER unless BUYER fails to hire an employee of SELLER after Closing, or should hire and thereafter terminate any such employee.

(The foregoing hereinafter collectively referred to as the "Covenants".)

e. SELLER and the Principal recognize that BUYER will be irreparably damaged by any breach or threatened breach of its obligations pursuant to this paragraph and, accordingly, in the event of such breach or threatened breach, BUYER shall be entitled to institute legal proceedings and obtain injunctive relief to enjoin any breach or threatened breach by the SELLER or the Principal of said obligations. Said injunctive relief shall be in addition to any other remedies to which BUYER may be entitled as a result of said breach or threatened breach.

f. SELLER agrees that the Covenants contained herein are commercially reasonable and customary in the automotive industry and the State for a covenant not to compete.

**26. DISPUTE RESOLUTION.**

(a) Non-Binding Mediation. In the event any controversy or claim arises out of or related to this Agreement or the breach thereof, the dispute shall be submitted to non-binding mediation. This mediation shall be conducted in the county in which the dealership is located or in such other location mutually agreed to by the parties. If the parties are unable to agree on an acceptable mediator, the parties agree to submit the dispute for mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure. The mediation shall be conducted and completed within fifteen (15) days after referral of the dispute to the mediator or, if the mediator's schedule does not allow, as soon as the mediator's schedule allows. The expense of the mediation shall be borne equally between the parties.

(b) Arbitration. In the event of a dispute between the Parties with respect to any issue arising under this Agreement not resolved in mediation pursuant to Section (a) hereof, said dispute shall be determined by arbitration held in the county where the dealership is located.

(i) The Parties shall agree upon the appointment of a single arbitrator who shall be a fit and impartial person and who shall have had at least ten (10) years' experience as either an arbitrator or judge. If the Parties shall fail to agree upon the appointment of an arbitrator, then the arbitrator shall be appointed by the American Arbitration Association.

(ii) The arbitrator, after being duly sworn to perform his/her duties with impartiality and fidelity, shall proceed with all reasonable dispatch to determine the question submitted. The arbitration shall be conducted in accordance with the Rules of the American Arbitration Association (or any successor thereto), and the award of the arbitrator shall be binding, final and conclusive on the parties. The decision of the arbitrator shall be rendered within thirty (30) days after his/her appointment, and such decision shall be in writing and in duplicate, one counterpart thereof to be delivered to each of the parties. Either party shall have the right to enter a judgment based upon the award of the arbitrator.

(iii) The fees of the arbitrator as well as the expenses incident to the proceedings, shall be borne equally between the Parties.

**27. DEALER MANAGEMENT SYSTEM & CRM**. BUYER and SELLER acknowledge and understand that the transfer of a copy of a digital form of the Customer Information involves a joint and collaborative effort of the parties along with SELLER's DMS (Dealership Management System) vendor and requires the cooperation of the parties and the vendor. SELLER agrees to contact (or to authorize BUYER or BUYER's DMS vendor to contact) SELLER's DMS vendor and arrange for the transfer of a copy of the Customer Information that is in digital form on its DMS to BUYER on or before the Closing Date, either through the creation of a separate sign-on and creation of a mirror store on SELLER's DMS or transfer of a copy of the Customer Information to a location of BUYER's choice, it being contemplated that BUYER shall have all necessary access to these Records as of the Closing Date. BUYER and SELLER shall pay their own expenses charged by their respective DMS providers in connection with the transfer of the Customer Information, including creating a mirror store and separate sign-on as may be necessary or desirable. Should BUYER obtain access to the Customer Information prior to the Closing, BUYER shall hold the Customer Information in confidence in the same manner as it would treat its own confidential information. In the event the transaction contemplated herein does not close, any Customer Information in BUYER's possession or control shall be destroyed and BUYER shall be enjoined from using the Customer Information for its or any of its affiliates' benefit. These provisions shall survive any termination of this Agreement.

**28. MISCELLANEOUS PROVISIONS**.

(a) SELLER shall transfer to BUYER its rights to all telephone numbers, URLs, domain names, websites, and e-mail addresses used by SELLER in its operation of the dealership.

(b) SELLER shall furnish to BUYER a list of all employees, their rates of pay, including base pay, and any incentive, commission or bonus plans. Nothing contained in this paragraph, or elsewhere in this Agreement, shall be deemed to obligate BUYER to hire or offer employment to any employee of SELLER, or to adopt SELLER's employment policies. Any "re-hiring" of such employees by BUYER will be done on a voluntary and discretionary basis. Prior to Closing, SELLER shall provide written notice to its employees in full compliance with its obligations under COBRA. BUYER shall have the right to contact SELLER's employees within

ten (10) days prior to Closing, unless otherwise agreed to and coordinated by the parties. It is understood and agreed that BUYER is not assuming any current or potential SELLER COBRA issues with its employees, shall not be considered as a successor-in-interest to SELLER with respect to SELLER's COBRA issues with its employees, and that same are expressly excluded from the subject matter of this Agreement. SELLER shall remain liable and responsible for them, and BUYER shall have no responsibility or obligation concerning them. This provision shall survive Closing of title hereunder.

(c) SELLER shall deliver to BUYER at Closing a Bill of Sale for all assets to be transferred by SELLER hereunder which shall warrant title to BUYER free and clear of all liens and encumbrances affecting BUYER, statements of origin for vehicles purchased (together with statements of origin and unreported retail delivery cards for the vehicles purchased).

(d) This Agreement and all related documents executed concurrently herewith represent the complete understandings between the parties and their respective legal counsel, and supersede all previous negotiations or representations as to all matters whether described in said Agreement or not. This Agreement and all related documents executed concurrently herewith may be amended only by written instrument signed by both parties (or their respective legal counsel) and making express reference to the respective document to be amended.

(e) All applicable sales, transfer, documentary, use, filing and such other taxes and fees that may be due and payable by SELLER as a result of conveyance, assignment, transfer or delivery of the assets or Business to be conveyed and transferred hereunder, or levied on the SELLER shall be borne solely by the SELLER.

(f) SELLER shall permit its service records to remain with BUYER. BUYER will safeguard the records and permit SELLER access thereto during business hours. After the expiration of seven (7) years, computed from the date of Closing, SELLER may either remove the same from the Premises, or BUYER shall be permitted to abandon and discard the same.

(g) No requirement, obligation, remedy or provision of this Agreement shall be deemed to have been waived, unless so waived expressly in writing. The waiver of any such provision in one or more instances shall not be considered a waiver of the right to enforce such provision thereafter.

(h) All of the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto and their successors and assigns respectively.

(i) This Agreement may be executed in more than one counterpart, each copy of which shall serve as an original for all purposes, but all copies shall constitute but one and the same Agreement.

(j) The representations, covenants and obligations of SELLER as set forth in this Agreement shall survive the Closing for a period of one (1) year.

(k) The parties have jointly participated in the negotiation and drafting this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this

Agreement shall be construed as if drafted jointly by the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statue or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(l) This Agreement shall be construed in accordance with the laws of the State of New Jersey by action arising hereunder shall be instituted in the Superior Court of Monmouth County, New Jersey.

(m) All of the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto and their successors and assigns, respectively.

(n) The "headings" contained in this Agreement are the purposes of expediency and are not intended to otherwise bind the parties or interpret the content of the paragraph language they precede.

(o) As used herein, the masculine shall include the feminine; the singular shall include the plural; the neuter shall include the masculine and feminine; and vice versa.

(p) Concurrently herewith, SELLER and BUYER shall each deliver to the other original resolutions executed by their respective principals (i.e., stockholders and directors, members, or partners, as the case may be), authorizing the execution of this Agreement and the consummation of same.

(q) If either party is a prevailing party in any legal proceeding brought pursuant to the terms of this Agreement, it is entitled to recover from the non-prevailing party reasonable attorney's fees.

(r) Neither SELLER nor its Principal will assert that BUYER, or any related entity or affiliate, is responsible for the obligations of SELLER under a theory of successor liability unless any such claim is covered by BUYER'S indemnification obligations hereunder, and SELLER and its Principal will defend, indemnify and hold BUYER or any related entity or affiliate of BUYER, harmless from any claims of any third parties alleging same, except where BUYER may have assumed such liability, in accordance with, as provided in, and subject and pursuant to the terms and conditions of this Agreement. This provision, and the obligations and covenants therein, shall survive Closing hereunder.

(s) This Agreement is transmitted for examination only, and does not constitute an offer to sell the Premises. This Agreement shall become effective only upon execution thereof by both parties hereto. No rights are to be conferred upon the BUYER until this Agreement has been duly executed by the SELLER and BUYER and a copy of this Agreement, duly executed by SELLER and BUYER, has been delivered to the BUYER.

(t) With respect to any matter which survives Closing, BUYER and its Principal, [redacted] shall individually guaranty any obligations of BUYER hereunder.

(u) Failure of Buyer or Seller to terminate this Agreement within the time frames specified in each contingency or condition in this Agreement to which such party is obligated or subject, shall be deemed a waiver by that party to terminate the Agreement in accordance with the terms and conditions of that subject provision.

(v) This Agreement may not be assigned by either party unless mutually agreed to in writing by the BUYER and the SELLER.

(w) In the event the OEM exercises any right of first refusal, and in addition to any OEM reimbursement obligations under applicable law, the OEM or its assignee shall reimburse both BUYER and SELLER for all reasonable expenses paid or incurred by each party in: (i) evaluating and investigating each other, this transaction, SELLLER's assets and SELLER's business and negotiating and pursuing the acquisition of and sale of SELLER's assets and SELLER's business to BUYER, prior to the OEM's exercise of the right of first refusal; (ii) evaluating, investigating, negotiating, and pursuing the acquisition; and (iii) evaluating and investigating the OEM's exercise of the right of first refusal. The aforesaid expenses shall include, without limitation, legal and accounting expenses, expenses associated with title examinations, environmental assessments, consultants and other expenses directly related to the lease of the Premises and acquisition of SELLER's business assets as describe herein above.

(x) SELLER has explained to BUYER that it currently has an after-sell marketing and retention tool involving free lifetime oil changes for qualified customers who have purchased new and used vehicles from SELLER ("Dealer Oil Change Program"). BUYER agrees, effective with Closing, and in consideration of a credit at Closing in the amount of Twenty-Five Thousand Dollars ($25,000.00) that it shall assume and perform SELLER's obligations to provide free oil changes to qualified existing customers of SELLER who have purchased or leased new and used motor vehicles from SELLER, at BUYER's sole cost and expense.

[Signature Page Follows]

**IN WITNESS THEREOF**, the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and caused their proper corporate seal to be hereto affixed, the day and year first above written.

WITNESS: SELLER:

**TEAM AUTO GROUP, LLC**
**dba Volkswagen of Freehold**

DocuSigned by:

_____________________________ By: _____________________________
1F7D50BA7E894E8...
Robert Anthony Urrutia,
Authorized Signature

WITNESS: BUYER:

[redacted]

_____________________________

WITNESS: SELLER PRINCIPAL:

DocuSigned by:

_____________________________ By: _____________________________
1F7D50BA7E894E8...
Robert Anthony Urrutia

BUYER'S PRINCIPAL

[redacted]

[SIGNATURE PAGE]

**EXHIBIT "A"**

**SCHEDULE OF FURNITURE FIXTURES AND EQUIPMENT**

**[***A list may be prepared by BUYER and approved by SELLER in accordance with section 1(a) of the Agreement. Failure of BUYER to provide a list within 30 days of the date hereof shall be deemed a waiver by BUYER of its right to prepare a list and have it be made a part of this Agreement***]**

**EXHIBIT "B"**

**ALLOCATION OF THE PURCHASE PRICE**

| | |
|---|---|
| Franchise rights, good will, and other intangible assets: | $4,000,000.00 |

## EXHIBIT "C"

### SCHEDULE OF SELLER'S OEM DOCUMENTS/INFORMATION

**1.** Volkswagen of America Inc. Dealer Sales and Service Agreement with Seller dated August 5, 2020.

2. Notice of Termination Letter from Patrick Coyle, Vice President, Northeast Region, Volkswagen of America, Inc., dated May 28, 2024, to Team Auto Group, LLC dba Volkswagen of Freehold ("NT Letter")

3. Extension Letter to NT Letter from Thomas Andreuzzi, Senior Manager, Region Network Development, Northeast Region, undated, to Team Auto Group, LLC dba Volkswagen of Freehold.

4. BUYER acknowledges that the OEM has previously required a facility image update based upon CAP-X requirements for the dealership facility/premises.

**EXHIBIT "D"**

**ASSIGNMENT AND ASSUMPTION OF DEALERSHIP LEASE**

# EXHIBIT "E"

## ASSUMED OBLIGATIONS

1. Wells Fargo Vendor Financial
   CONTRACT #[redacted]
   $206.39
   -Canon Printers

2. Pitney Bowes Bank, Inc.
   CONTRACT #[redacted]
   $517.17 – Lease (quarterly)
   $47.00 - Postage
   -Postage/Supplies

3. Advanced Imaging System
   CONTRACT ID #[redacted]
   $161.73 (approximately – varies, based upon copies and materials)
   -Servicing and maintenance of Cannon printers

4. Leaf
   CONTRACT #[redacted]
   $10.72 – Insurance
   $362 - Invoice
   -Canon Lease

5. Great America Financial Services
   AGREEMENT #[redacted]
   $322.46
   -Keymaster

6. Tekion Corp. (services)
   CONTRACT #[redacted]
   $9,808.00 (subscription amount; invoice amount varies monthly based upon use and materials

7. Technology Finance (equipment financing re: Tekion)
   Agreement [redacted];
   $2,225.58, amended payment $2,131.27

8. KPL CR LLC (Landlord) – 100 Craig Road, Manalapan, NJ Lease Agreement
   Base Rent: $5,100 per month (motor vehicle storage lot)
   Security Deposit: $5,100.00

9. Ray Catena Motor Car South Sublease Agreement
   (4360 Route 9, Freehold, NJ)
   Base Rent: $70,000 month; triple net (Dealership Facility Lease)
   Security Deposit: $140,000.00

10. Seller's Dealer Oil Change Program as provided in section 28(x) of the Agreement

**[Unless otherwise stated above, Seller has provided Buyer with copies of the underlying documents]**

**SCHEDULE 7(c)**

**Litigation**

[Seller to provide reference to two (2) matters being handled by insurance, and one matter involving an employee]

**SCHEDULE 7(h)**

**Communications**

- Notice of Termination Letter from Patrick Coyle, Vice President, Northeast Region, Volkswagen of America, Inc., dated May 28, 2024, to Team Auto Group, LLC dba Volkswagen of Freehold ("NT Letter")

- Extension Letter to NT Letter from Thomas Andreuzzi, Senior Manager, Region Network Development, Northeast Region, undated, to Team Auto Group, LLC dba Volkswagen of Freehold.

- BUYER acknowledges that the OEM has previously required a facility image update based upon CAP-X requirements for the dealership facility/premises.

## SCHEDULE 7(p)

Other 3rd Party Service Warranties

1. All State
2. NESNA (aftermarket sales through NMAC)

Customer Good Will Matters

1. Free lifetime oil changes to SELLER's qualified existing customers who purchased or leased new and used vehicles from Seller, without charge (this obligation to be assumed by the Buyer).
2. Limited lifetime service warranty given to Seller's qualified customers who purchased or leased new and used cars motor vehicles from Seller (this obligation is not being assumed by Buyer, and is excluded from this Agreement).

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**") is made and entered into as of October 3, 2024 (the "**Effective Date**"), by and between **TEAM NISSAN, INC. d/b/a NISSAN OF PITTSFIELD**, a Massachusetts corporation ("**Seller**") and [redacted], a Massachusetts limited liability company ("**Buyer**"), and together with Seller, each a "**Party**" and collectively, the "**Parties**").

## W I T N E S S E T H

**WHEREAS**, Seller owns and operates a franchised Nissan ("Nissan") motor vehicle dealership (the "**Business**" or "**Dealership**") located at 25 W. Housatonic Street, Pittsfield, Massachusetts 01201 (the "**Dealership Premises**"), which sells and services Nissan motor vehicles pursuant to a dealer sales and service agreements (the "**Dealer Agreements**") with Nissan North America, Inc. (the "**Manufacturer**" or "**Factory**"), and also sells new parts and accessories and sells and services other used motor vehicles, and owns and leases certain assets used in conjunction therewith; and

**WHEREAS**, Buyer desires to purchase the Assets (as defined below) from Seller and to enter into a dealer sales and service agreement with the Manufacturer appointing Buyer as an authorized Nissan dealer at the Dealership Premises; and

**WHEREAS**, Seller desires to sell the Assets subject to and in accordance with the terms and conditions of this Agreement; and

**WHEREAS**, Buyer desires to assume from Seller and Seller desires to assign to Buyer (1) that certain Lease Agreement for the Dealership Premises dated June 15, 2011, between Southgate Motors, Inc. and Haddad Motor Group, Inc., as assigned and amended by (a) Amendment to Lease dated November 15, 2012 among Southgate Motors, Inc., Haddad Motor Group, Inc., and K & C Agar, Inc. (the "**Dealership Landlord**"), (b) Second Amendment to Lease dated December 11, 2020 between Landlord and Haddad Motor Group, Inc., and (c) Lease Assignment and Landlord Consent dated November 30, 2022 among Haddad Motor Group, Inc. (as assignor), Seller (as assignee) and Landlord with (collectively, the "**Dealership Lease**") and (2) that certain Commercial Rental Agreement for a vehicle storage lot (the "**Storage Lot Lease**") between Seller and Clock Tower Partners, LLC (the "**Storage Lot Landlord**"), each as more particularly set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the Parties' execution of this Agreement and the mutual covenants and promises hereinafter set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. **<u>SUBJECT MATTER; EXCLUDED ASSETS</u>**.

(a) Seller agrees to sell and transfer to Buyer at Closing (as defined below) all of Seller's right, title, and interest in the following assets (collectively, the "**Assets**"), free and clear of all liens, security interests, and encumbrances, and Buyer agrees to purchase and acquire the same from Seller at Closing:

(i) <u>Operating Assets</u>. Seller's Nissan franchise rights; all office, parts and service department and showroom furniture and equipment (including computers and telephone equipment), fixtures and tools; factory brand special tools and equipment; machinery and shop equipment; Seller's electronic and computer generated customer lists and records (sales, lease, parts and service), deal jackets, and customer files and operating data, including but not limited to marketing materials, customer leads and service files, whether same is stored physically or electronically (collectively "**Customer Information**"), except to the extent that any Customer Information that can be digitally/electronically transferred to Buyer onto Buyer's DMS or other operating system, Buyer shall have the right but not the obligation to elect to abandon certain physical Customer Information by written notice to Seller and such Physical Customer Information shall be deemed Excluded Assets to be removed by Seller within 15 days of the Closing Date; signs owned by Seller; the name "Nissan of Pittsfield" and related good will; business telephone and fax numbers; email addresses, websites, social media accounts registered or owned by the seller, and the URL www.nissanofpittsfield.com; leasehold improvements, catalogues and brochures; sales, service, parts and warranty manuals; display cases and cabinets; and personnel records related to Transferred Employees (as defined below); all information and documents that are necessary and/or which may be useful to Buyer in furtherance of the Business; and such other assets owned by Seller and utilized in the operation of said business, unless specifically referenced as excluded from this Agreement. The furniture, fixtures, tools, machinery and equipment as more particularly set forth on <u>Exhibit A, attached hereto</u> shall be in at least the same (ordinary wear and tear excepted) condition on the Closing Date as each was on the date of Buyer's Due Diligence Investigation, unless otherwise agreed to in writing between Buyer and Seller;

(ii) <u>Motor Vehicle Inventory</u>. (A) Seller's inventory of all new, unused, and never registered 2024 and 2025, and subsequent model year Nissan motor vehicles with less than two hundred fifty (250) miles as of the Closing Date (as defined below) ("**New Vehicles**"). Buyer shall have no obligation to purchase any 2024, 2025, and any subsequent model year new, unused, and never registered Nissan motor vehicles having more than two hundred forty-nine (249) miles as of the Closing Date, provided that New Vehicles that qualify as dealer swaps may have up to three hundred fifty (350) miles on the odometer at Closing.

(iii) Seller's inventory of used cars (including, Seller's service, parts and company vehicles and demonstrator vehicles) and service loaners, and other motor vehicles

not otherwise described in subparagraphs 1(a)(ii)(A) (collectively, "**Other Motor Vehicle Inventory**"), but only to the extent the parties agree with respect to a purchase price for any such motor vehicle.

(iv) Parts and Accessories Inventories.

(1) Seller's inventory of new, unused, undamaged, originally invoiced to Seller, non-obsolete, and returnable parts and accessories in original factory packaging (except in the case of multi-packaged items or items not received in separate packages) (where applicable), including Manufacturer's "fast-moving" parts ("**FMP**") and returnable Manufacturer new cores in stock, that are listed in the Manufacturer's latest current parts catalogues, with supplements in effect on the inventory valuation date described in Section 4 ("**Manufacturer Parts**"). Buyer will accept Seller's inventory of tires, batteries and other parts and accessories purchased by Seller through the Nissan tire, battery or other manufacturer purchase program, provided same are returnable under the Nissan tire purchase program. For the purpose of this Agreement, "obsolete" shall mean any part or accessory that (a) is non-returnable in the ordinary course (other than "FMP) or eligible for a one-time return in connection with the subject transaction, or (b) has not had recorded a retail sales activity during the 12-month period prior to Closing. Buyer shall not be required to accept non-returnable dirty cores in stock and Seller agrees that it shall return any and all dirty cores in stock prior to the Closing Date.

(2) Seller's inventory of miscellaneous supplies used or consumed in respect of the Business, including packaging materials, gasoline, oil, grease, fluids and solvents all of which is in unopened containers (where applicable) ("**Miscellaneous Supplies**").

(3) Seller's inventory of new and unused non-OEM parts and accessories (other than Manufacturer Parts) to be used on Nissan 2015 through current model year motor vehicles owned by Seller in respect of the Dealership to the extent returnable ("**Other Parts**").

(4) Seller represents that as of the Effective Date, the estimated value of Manufacturer Parts, Miscellaneous Supplies, and Other Parts in Seller's inventory is $100,000 and Seller shall use commercially reasonable efforts to maintain its inventory of Manufacturer Parts, Miscellaneous Supplies, and Other Parts at the level set forth in this subparagraph (a)(iii)(4), except to the extent necessary in the ordinary course of business.

(b) Assumption of Certain Liabilities. At the Closing, Seller shall assign, and Buyer shall assume (and shall agree to discharge, pay and perform in accordance with their terms) only the following liabilities (collectively, the "**Assumed Liabilities**"):

(i) Seller's then existing unfilled retail purchase and lease orders to customers under outstanding sales and contracts and/or orders ("**Contracts and/or**

**Orders**") (a list of which shall be prepared and provided to Buyer on the Closing Date), if any, between Seller and unrelated third-party purchasers for the sale or lease of a New Vehicle and/or a Demonstrator Vehicle, which contract must be representative of an arm's length transaction, with all Contracts and/or Orders for New Vehicles referencing a VIN and deliverable within ninety (90) days after Closing. With respect to the Contracts and/or Orders assumed by Buyer, at Closing Seller shall remit to Buyer all customer deposits paid on account thereof and, further, Buyer shall perform said contracts in place and stead of Seller and indemnify and hold Seller harmless with respect to all events or actions of Buyer after Closing. Seller represents and warrants that all Contracts and/or Orders assumed by Buyer will have been entered into in good faith in compliance with this paragraph and all applicable laws. Seller shall indemnify and hold Buyer harmless from any claim and all monetary loss as a result of an improper appraisal of any trade-in vehicle not consistent with used car guidebook prices in connection with any such Contract and/or Order, or any irregularity therein (including reasonable attorneys' fees and costs).

(ii) Those contracts and/or agreements set forth on Schedule 1(b), (collectively, the "**Assumed Contracts**"), with Seller assigning to Buyer the deposits associated with the Assumed Contracts, if any. With respect to the Assumed Contracts, Seller shall be responsible for any chargebacks of any nature or any arrearages (including, without limitation, late payment penalties, interest and similar charges) which accrued prior to the Closing. In the event any party, lienholder, lessors, or owner's consent is necessary with respect to any Assumed Contract, then the Seller agrees (with Buyer's cooperation as reasonably requested) to obtain same in writing prior to Closing.

(iii) Seller's inventories of sublet repairs, provided that same are "closed out" and the subject vehicles returned to the Dealership Premises prior to Closing, and work in process repairs for motor vehicles that are present at the Dealership Premises on the Closing Date, to the extent that any uncompleted repair orders have not been in process for more than ninety (90) days prior to the Closing Date ("**WIP**"), which shall be purchased for Seller's actual net direct cost of labor, parts and accessories. Seller shall furnish to Buyer a complete, true and accurate inventory of all such WIP, together with billings at retails rates for such work performed prior to Closing, and such supporting documentation as is reasonably necessary to evidence the amount and nature of such WIP.

(iv) The Purchase Price shall be reduced by an amount equal to the aggregate amount of any obligations relating to prepaid accessories or services due to customers of the Dealership as of the Closing Date, as specifically provided by Seller and delivered to Buyer at Closing (collectively "**We Owes**"), all of which shall be assumed and performed by Buyer provided same are disclosed in writing to Buyer prior to or at Closing.

(v) Buyer shall assume and Seller shall assign the Dealership Lease subject to Dealership Landlord's written consent, provided that Buyer shall not be required to assume the Dealership Lease in the event that Dealership Landlord makes Dealership Landlord's consent or Buyer's assumption subject to terms and conditions that are not

expressly set for in the Dealership Lease and are unacceptable to Buyer in its sole discretion and provided further that there are no uncured defaults by either Seller or Dealership Landlord under the Dealership Lease on the Closing Date. The assignment of the Dealership Lease will be memorialized at Closing by execution of an Assignment of Dealership Lease, Dealership Landlord Consent, and Dealership Landlord Estoppel (collectively, the "**Dealership Lease Assignment Documents**"), each in form and substance reasonably acceptable to Seller, Buyer and Dealership Landlord. Notwithstanding the foregoing, in the event that Seller is unable to secure a landlord estoppel, then Buyer will accept a reasonably acceptable tenant estoppel from Seller in lieu thereof.

(vi) Buyer shall assume and Seller shall assign the Storage Lot Lease, provided that there are no uncured defaults by either Seller or Storage Lot Landlord under the Storage Lot Lease on the Closing Date. The assignment of the Storage Lot Lease will be memorialized at Closing by execution of an Assignment of Storage Lot Lease and Written Notice of Assignment (collectively, the "**Storage Lot Lease Assignment**" and, along with the Dealership Lease Assignment Documents, collectively, the "**Lease Assignment Documents**"), each in form and substance reasonably acceptable to Seller and Buyer.

(vii) Buyer shall assume and Seller shall assign Seller's post-Closing obligations under that certain $500,000 Working Capital Loan (the "**WC Loan**") from Nissan Motor Acceptance Corporation ("**Lender**") subject to Lender's written consent, provided that Buyer shall not be required to assume the WC Loan in the event that the Lender makes Lender's consent or Buyer's assumption subject to terms and conditions that are not expressly set for in the WC Loan documents and are unacceptable to Buyer in its sole discretion and provided further that there are no uncured defaults by Seller under the WC Loan on the Closing Date. The assumption of the WC Loan will be memorialized at Closing by execution of an Assignment and Assumption of WC Loan and related documents as may be required by Lender (including the personal guaranty of Buyer's principal if required by Lender to replace Seller's Principal's (as defined beow) personal guaranty) (collectively, the "**WC Assumption Documents**"), each in form and substance reasonably acceptable to Seller, Buyer and Lender. Notwithstanding the foregoing, provided that Lender, Buyer, and Seller mutually agree, Lender and Buyer may enter into a new financing arrangement in lieu of the Buyer's assumption of the Seller's WC Loan (the "**New WC Loan**"), which shall nevertheless be deemed consideration paid by Buyer hereunder.

(c) Excluded Assets. Provided same accrued prior to Closing, the following shall not be sold, assigned or transferred to Buyer at Closing and shall be retained by Seller ("**Excluded Assets**"): Seller's factory receivables, accounts receivable (including, but not limited to, any "contracts in transit," rebates receivable, holdbacks, discounts receivable, both current and deferred); real property; cash on hand and in banks; motor vehicles and parts/accessories outside the scope of this Agreement (including, the Other Motor Vehicle

Inventory, which shall include specifically Seller's used and remarketed or previously reported sold vehicles, service loaners, Demonstrator Vehicles, new vehicles with over 5,000 miles, and model year New Vehicles prior to 2024) not purchased by the Buyer at closing; the consideration to be delivered by the Buyer pursuant to this Agreement; Seller's right to enforce this Agreement; and all other assets not expressly identified to be conveyed to Buyer herein. For ninety (90) days next succeeding the Closing Date, Buyer agrees to accept payment from third parties on account of Seller's accounts receivable if and to the extent tendered and to remit promptly said payments to Seller and to reasonably cooperate with Seller in the collection of said accounts receivable. Notwithstanding the foregoing Buyer shall not be deemed to have guaranteed collection of any of Seller's receivables. Buyer shall not be required to take any non-routine action or incur any expense in connection with the collection of Seller's receivables.

**2. AGGREGATE PURCHASE PRICE.** The purchase price ("Purchase Price") to be paid for the Assets to be conveyed hereunder is as follows:

(a) With respect to the Assets described in Section 1(a)(i), the total sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00), which is inclusive of the Buyer's assumption of the WC Loan (or New WC Loan, as the case may be) pursuant to Section 1(b)(vi); and

(b) With respect to the Assets identified in Sections 1(a)(ii) and 1(a)(iii), and Section 1(b)(iii), a sum to be calculated as set forth on Exhibit A.

**3. PAYMENT**. The Purchase Price (subject to adjustment at Closing) shall be paid and satisfied as follows:

(a) The sum of **ONE HUNDRED THOUSAND DOLLARS ($100,000.00)** (the "Deposit") paid by Buyer concurrently herewith, receipt of which is hereby acknowledged, and held in escrow by Seller's counsel ("Escrowee"), in its non-interest bearing attorney trust account and disbursed in accordance with this Agreement; and

(b) The balance, subject to adjustments contained herein, by wire transfer and assumption of the WC Loan (or New WC Loan, as the case may be) at Closing.

(c) Escrow Provisions. By its execution of a counterpart of this Agreement, the Escrowee hereby accepts its designation as the escrow agent with respect to the Deposit, acknowledges receipt of the Deposit, subject to collection, and agrees to hold, invest and disburse the same as herein provided. The Escrowee shall not be liable for any acts taken in good faith, shall only be liable for its willful default or action, or gross negligence, and may, in its sole discretion, rely in good faith upon the written notices, communications, orders or instructions given by any Party hereto; provided, however, that if any notice or correspondence is not executed by both Buyer and Seller, the Escrowee shall give to Buyer or Seller, as the case may be, copies of any notice or correspondence received from the

other and shall not take any actions with regard thereto for at least five (5) business days following the giving of such notice in order to provide such other Party with the opportunity to respond thereto. In the event of a disagreement between Seller and Buyer as to the disbursement of the Deposit, the Escrowee shall not disburse the Deposit and reserves the right to deposit said funds with a court of competent jurisdiction (the "Court"), by filing an interpleader action and Escrowee shall thereupon be discharged from the liability hereunder and shall be entitled to reimbursement from Seller and Buyer for all attorney's fees incurred and court costs expended in connection therewith. Seller and Buyer hereby agree to indemnify and hold harmless the Escrowee against any and all losses, claims, damages, liabilities and expenses which may be incurred by the Escrowee in connection with its acceptance of this appointment or the performance of its duties hereunder; provided, however, that if the Escrowee shall be found guilty of willful default or action, or gross negligence, then, in such event, the Escrowee shall bear all such losses, claims, damages and expenses. Buyer acknowledges that Schiller Pittenger & Galvin, PC is acting as Escrowee hereunder as well as representing Seller as its attorney in connection with the subject transaction. Buyer further acknowledges and agrees that Schiller Pittenger & Galvin, PC may represent Seller, as Seller's counsel in any action, suit or other proceeding between Seller and Buyer or in which Seller and Buyer may be involved.

**4. PARTS AND ACCESSORIES**. All of Seller's parts and accessories shall be inventoried on the weekend preceding Closing by an inventory service reasonably satisfactory to both Parties, and the cost of said inventory shall be borne equally between Buyer and Seller. At Closing, Seller shall assign to Buyer its unused rights to return Manufacturer Parts to Manufacturer pursuant to the Dealer Agreement, to the extent assignable.

**5. CLOSING.** Consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at Buyer's counsel's offices or such other mutually agreed upon location (or remotely if agreed to by the Parties) within fourteen (14) days of the later of (a) the end of the Due Diligence Period (as may be extended), (b) Buyer's receipt of the Manufacturer Approval (as defined below), and (c) the satisfactory (or applicable Party's waiver) of all other contingencies set forth in Sections 14 and 15, below (the "**Closing Date**").

**6. CUSTOMER RECORDS.**

(a) Buyer and Seller acknowledge and understand that the transfer of a copy of a digital form of the Customer Information involves a joint and collaborative effort of the Parties along with Seller's DMS (Dealership Management System) vendor and Buyer's DMS vendor. Seller agrees to contact (or to authorize Buyer or Buyer's DMS vendor to contact) Seller's DMS vendor and authorize said vendors to arrange for the transfer of a copy of the Customer Information that is in digital form on its DMS to Buyer on or before the Closing Date, either through the creation of a separate sign-on and creation of a mirror store on Seller's DMS or transfer of a copy of the Customer Information to a location of

Buyer's choice. Buyer and Seller shall pay their own expenses charged by their respective DMS providers in connection with the transfer of the Customer Information, including creating a mirror store and separate sign-on as may be necessary or desirable. Seller and Buyer mutually covenant and agree to cooperate with, and to cause its respective DMS vendor to cooperate with Buyer and Buyer's DMS vendor or Seller and Seller's DMS vendor (as the case may be) no later than one (1) business week prior to the Closing Date to prepare for the transfer of the digital/electronic Customer Information to Buyer's DMS and to commence and conclude the transfer of the digital/electronic Customer Information so that same is concluded on or one (1) day prior to the Closing Date.

(b) Should Buyer obtain access to the Customer Information prior to the Closing, Buyer shall hold the Customer Information in confidence in the same manner as it would treat its own confidential information, but in all events in a commercially reasonable manner. In the event the transaction contemplated herein does not close, any Customer Information in Buyer's possession or control shall be destroyed, and Buyer shall be enjoined from using the Customer Information for its or any of its affiliates' benefit.

**7. ADJUSTMENTS; ALLOCATION OF PURCHASE PRICE.**

(a) Adjustments. In addition to the adjustments described on Exhibit A and those others expressly required in this Agreement, payments and/or deposits related to Assumed Liabilities shall be adjusted between the Parties at Closing. All such payments and expenses shall be apportioned between Seller and Buyer as of the Closing Date, it being understood that Seller shall be responsible for any such obligations and liabilities accrued or allocable to periods prior to the Closing Date (whether or not then paid) and Buyer shall be responsible for any such obligations and liabilities accruing or allocable for the periods on and after the Closing Date.

(b) Allocation of Purchase Price. The Purchase Price shall be allocated among the Assets as follows:

(i) For the New Vehicle and Demonstrator Vehicle Inventories, the value determined in accordance with this Agreement;

(ii) For the goodwill of the Business, the sum of One Million Six Hundred Thousand Dollars ($1,600,000.00) (which includes $500,000 for the assumption of the WC Loan (or the New WC Loan, as the case may be));

(iii) For the Furniture, Fixtures, Equipment, Sales, Service and Marketing Lists, Manuals and Materials the sum of One Hundred Thousand Dollars ($100,000.00); and

(iv) For the Parts and Accessories, the sum of One Hundred Thousand Dollars ($100,000.00).

The Parties shall take all actions and file all of their respective returns (including, but not limited to IRS Form 8594 Asset Acquisition Statement) consistent with said allocation and shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as either Party may reasonably request from the other with respect to such allocation and IRS Form 8594 shall be attached to the Closing Statement.

**8. DUE DILIGENCE; FINANCING CONTINGENCY.**

(a) Due Diligence.

(i) Buyer shall have the right during the thirty (30) day period immediately following the Effective Date (the "**Due Diligence Period**") to conduct a phase I ("**Phase I**") environmental site assessment investigation (including a GPR study) and judgment, lien (e.g., UCC filings), bankruptcy, and municipality violations searches, and a physical inspection of the improvement on the Dealership Premises (along with any further investigation pursuant to this provisions, the "**Due Diligence Investigation**"). Notwithstanding the foregoing, in the event that the Phase I recommends further investigation of any Recognized Environmental Condition (REC), Buyer shall have the right to extend the Due Diligence Period for an additional 30 days (the "**Extended Due Diligence Period**") to further investigate the REC and to raise any matters in connection therewith in accordance with subsection (a)(ii) of this Section (the "**Extension**"), provided that the Extension is exercised within the initial 30-day Due Diligence Period upon written notice to Seller, which notice shall include a scope of work and timeline for completion of its Due Diligence Investigation related to the REC, which scope of work and timeline shall be subject to Seller's approval in its reasonable discretion. Buyer acknowledges and agrees that (1) it shall not retain or utilize a Licensed Site Professional (LSP) to conduct any aspect of the Due Diligence Investigation and (2) it will exercise its right to and shall complete any recommended further investigation, provided that the cost of same is not more than $5,000.

(ii) If the Due Diligence Investigation discloses a matter or matters that are unsatisfactory to Buyer in its sole discretion, then Buyer may terminate this Agreement by delivering written notice of same to Seller prior to the expiration of the Due Diligence Period or the Extended Environmental Due Diligence Period (if so extended) with respect to any unsatisfactory Environmental Condition only (as the case may be, the "**DD Notice**"). If Buyer so terminates this Agreement, Escrowee will promptly return the Deposit to Buyer and neither Party shall have any further rights or obligations under this Agreement, except for those rights and obligations which expressly survive such termination. If Buyer (i) does not timely deliver the DD Notice or (ii) provides notice of Buyer's intention to waive its right to terminate this Agreement under this Section and proceed to Closing in accordance with this Agreement, then this Agreement shall remain

in full force and effect and the Parties shall proceed to Closing in accordance with this Agreement.

(iii) Seller shall, upon reasonable prior notice, during normal business hours, permit Buyer's representatives to access to the Dealership Premises. Buyer shall not contact or disclose to Seller's employees any of the details pertaining to this Agreement or the existence thereof at any time prior to receipt of Manufacturer Approval (as defined below). In addition, Buyer agrees to maintain as confidential any and all information obtained during the Due Diligence Investigation. Unless waived in writing by Seller, all inspections shall be in the presence of Seller and/or Seller's representatives and in accordance with the following terms and conditions:

(1) Buyer shall not excavate, take any samples or conduct any invasive or destructive testing of or at the Dealership Premises without the consent of Seller which consent shall not be unreasonably withheld, conditioned, or delayed, provided, however that in the event that Buyer utilizes or intends to utilize a Licensed Site Professional (LSP) as its environmental consultant then Seller's refusal to consent to the foregoing request shall be deemed a reasonable withholding of consent for such testing;

(2) Buyer shall, at the conclusion of its inspections restore the Dealership Premises to the condition existing prior thereto, and this obligation shall survive any termination of this Agreement;

(3) Before commencing any aspect of inspection that involves physical inspection or testing, Buyer shall submit to Seller evidence of Buyer's and its environmental site analyst's general liability and workers' compensation insurance in a form and in amounts reasonably satisfactory to Seller and in accordance with industry standards, naming Seller as an additional insureds;

(4) Buyer agrees to and does hereby indemnify and hold harmless Seller against any loss, cost, damage, claims or expense which may arise from its or its agents', employees' or contractors' activities at the Dealership Premises; and this indemnification and hold harmless shall survive the Closing or earlier termination of this Agreement.

(iv) Seller has heretofore delivered to Buyer true and complete copies of any environmental reports (collectively, the "**Seller's Environmental Reports**") related to the Dealership Premises that are in its possession or control (collectively "**Materials**") as shown on Schedule 8(a)(iv) attached hereto and made a part hereof, however Seller makes no warranties or representations as to the work product of third parties and will not make any warranties or representations with respect to the accuracy or completeness of the Materials, except that same shall be correct copies thereof. The content of the Materials shall be deemed confidential information and shall be subject to the provisions of this Agreement for confidential information.

(b) Financing.

(i) Buyer shall have the right during the sixty (60) day period immediately following the Effective Date (the "**Financing Contingency Period**") to secure acquisition, working capital, and wholesale floor plan financing from Lender on terms acceptable to Buyer in its commercially reasonable discretion and with respect to working capital and wholesale floor plan financing, in amounts consistent with Manufacturer's requirements (the "**Financing Contingency**").

(ii) Prior to the expiration of the Financing Contingency Period, Buyer shall give written notice to Seller that (1) Buyer has secured acquisition financing or has waived its right to do so and will proceed to Closing, whereby this Agreement shall remain in full force and effect and the Parties shall proceed to Closing in accordance with this Agreement or (2) Buyer has not secured such financing and is electing to terminate this Agreement, in which case Escrowee will promptly return the Deposit to Buyer and neither Party shall have any further rights or obligations under this Agreement, except for those rights and obligations which expressly survive such termination, provided however, that if Buyer has been diligently pursuing the satisfaction of the Financing Contingency but Lender's approval has not been procured within the Financing Contingency Period, then Buyer shall have the right to extend the Financing Contingency Period for an additional thirty (30) days upon written notice to the Seller prior to the expiration of the Financing Contingency Period. Buyer's failure to provide the aforementioned notice shall be deemed an election by Buyer to have waived its right to secure such financing and to proceed to Closing in accordance with this Agreement.

(iii) Buyer hereby agrees that Buyer shall exercise due diligence, good faith, and prompt bona fide efforts to satisfy the Financing Contingency, including, without limitation, causing Buyer's principal to personally guaranty Buyer's financing obligations if so requested by Lender.

## 9. MANUFACTURER APPROVAL.

(a) The Parties' respective obligations to proceed to Closing are conditioned and contingent upon the Manufacturer's approval to issue and execute at Closing a standard form and term Dealer Sales and Service Agreement, including terms and conditions that are standard in the industry for the Manufacturer, between Buyer and Manufacturer authorizing Buyer's sale and factory authorized service of Nissan motor vehicles, parts, and accessories at the Dealership Premises as presently constituted without requirement of facility repair, relocation, or additional land purchase (collectively, "**Manufacturer Approval**"). Seller shall promptly dispatch notification of this APA to the Manufacturer in accordance with the applicable provisions of Massachusetts Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers, MA Gen L ch 93B § 1 *et seq.* (the "**Act**"),

(b) Buyer covenants and agrees to exercise due diligence, good faith, and its immediate and bona fide efforts to obtain the approval required hereunder. Seller shall cooperate with Buyer in connection with said approval, provided, however, that nothing herein contained shall obligate Seller to participate in any litigation or proceeding or arbitration relating to same. Seller shall promptly dispatch notification of the within Agreement to Manufacturer in accordance with the provisions of applicable law, and Buyer shall promptly submit to Manufacturer all information required by applicable law and Manufacturer to obtain the subject approval. Buyer covenants and agrees to reasonably cooperate with Manufacturer with respect to said approval, and further covenants and agrees that the franchise application shall be completed and filed by Buyer no later than ten (15) business days from Buyer's receipt of the application package from Seller or Manufacturer (as the case may be).

(c) Buyer shall have up to ninety (90) days from and after the Effective Date (the "**Contingency Period**") to obtain Manufacturer Approval, but shall use its best efforts to obtain such approval as soon as possible. In the event Manufacturer Approval is not procured within the Contingency Period, Seller or Buyer may give written notice to the other that it desires to terminate this Agreement, in which event the Deposit shall be returned by Escrowee to Buyer forthwith and without deduction and neither Party shall have any liability hereunder except for those provisions that expressly survive the termination of this Agreement, provided however, that if Buyer has been diligently pursuing the satisfaction of the Contingency Period but Manufacturer's Approval has not been procured within the Contingency Period, then Buyer shall have the right to extend the Contingency Period for an additional thirty (30) days upon written notice to the Seller prior to the expiration of the Contingency Period. If, however, Buyer has not or cannot satisfy the subject conditions precedent to Closing because: (1) Buyer has intentionally or willfully failed to furnish the information reasonably required by Manufacturer; or (2) Manufacturer's approval is not granted because Buyer has made any intentional or willful misrepresentation or omission on the applications or other materials filed by Buyer with Manufacturer; or (3) Buyer fails or refuses to execute a Dealer Sales and Service Agreement with Manufacturer that is commercially reasonable and comports with the terms of this Section 9 and are in accordance with Nissan Dealer Sales and Service agreements standards and terms for Massachusetts Nissan franchised dealerships, then Buyer shall be deemed to be in breach of this Agreement, the Deposit shall be provided to Seller as liquidated damages, and this Agreement shall be deemed null, void, and of no further effect and each Party shall be released from the other with respect to their respective obligations hereunder.

**10. RESERVED.**

**11. REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER.** The matters set forth in this Section 11 constitute representations, warranties and covenants by Seller which are now and shall, in all material respects, at the Closing be true and

correct. If Seller has actual knowledge that any of the representations and warranties contained in this Section 11 cease to be true in any material respect, Seller shall give prompt notice to Buyer thereof. For purposes of this Agreement, the representations and warranties contained in this Agreement, the term "Knowledge" of Seller shall mean the knowledge of Tony Urrutia ("**Seller's Principal**"). Each shall have a duty imposed or implied to investigate, inquire, inspect, or audit any such matters, however, there shall be no personal liability on the part of Seller's Principal, except pursuant to Section 20 hereof. Seller warrants, represents and covenants to and with Buyer as follows:

(a) Seller is a corporation duly organized and existing in good standing under the laws of the State of Massachusetts, is duly authorized to carry on the Business, has the requisite power and authority to own its properties and assets and this Agreement constitutes the valid and binding obligation of Seller enforceable in accordance with its terms. Seller has fully complied with all of the requirements of any statute governing the use and registration of fictitious names and has the legal right to use the names under which it operates its business, subject to its Dealer Agreement. There is no pending or threatened proceeding for the dissolution, liquidation, insolvency or rehabilitation of Seller. Seller owns and operates the Dealership pursuant to the Dealer Agreement. Seller has taken all action necessary to authorize the execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated herein. Seller's president and sole shareholder is Robert A. Urritia.

(b) Seller has good and marketable title to all of the Assets, which at Closing will be sold, transferred, and assigned to Buyer pursuant to this Agreement, free and clear of all claims, suits, liens, security interests, and encumbrances and, further, to Seller's Knowledge, the Assets are in material compliance with all laws, regulations and orders applicable to it, its business and operations, including, without limitation, any and all federal, state or local environmental law (except as may otherwise be disclosed in the Seller's Environmental Reports), statute, code, rule or regulation. With the exception of the Dealer Agreement, Seller is not subject to any contract, decree or injunction in which it is a party which restricts the continued operation of any business or the expansion thereof to other geographical areas, customers and suppliers or lines of business.

(c) Except as otherwise set forth on Schedule 11(c), there is no suit, action, litigation, insolvency proceedings, injunctions, judgments, or any other proceedings against Seller, or, to Seller's Knowledge, threatened, anticipated or contemplated against, by or affecting Seller, or the Assets, or which question the validity or enforceability of this Agreement or the transactions contemplated hereby, and to Seller's Knowledge there is no basis for any of the foregoing. There are no outstanding orders, decrees or stipulations issued by any governmental authority in any proceeding to which Seller is or was a party which have not been complied with in full or which continue to impose any material obligations on Seller.

(d) There is no broker, finder or similar intermediary which has acted for or on behalf of Seller in connection with this Agreement, and no other broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection herewith based on any action taken by Seller for which Buyer would be liable.

(e) The execution, delivery and performance of this Agreement by Seller and the execution, performance and delivery of all other agreements to be executed in connection with the Agreement have been and shall be duly, validly and sufficiently authorized by all required company action of Seller requisite thereto and Seller and the person executing this Agreement and all subsequent agreements in relation thereto has and shall have full, irrevocable and unlimited right, power and authority to bind Seller and perform all obligations under this Agreement.

(f) The execution, delivery and performance of this Agreement and all other agreements to be executed in connection with this Agreement does not and will not violate the terms of constitute a default under or be an event of default under any agreement, contract, note, deed of trust, indenture, judgment or decree or other document to which Seller is a party or by which the Assets are bound.

(g) Seller has duly filed all federal, state, county and local income, sales, property, withholding, franchise, information returns and other tax returns and reports, or appropriate and permitted extensions thereto, required to be filed by it with respect to the Dealership and the Assets. Each such return is true, correct, and complete in all material respects, and Seller has paid all taxes, assessments, amounts, interest and penalties due to any governmental authority thereunder. Seller has not received any notification from governmental authority asserting or threatening to assert any deficiency or assessment for additional taxes, interest, penalties or fines with respect to the Seller, its business, or the Assets

(h) Seller has not issued any nor offered for sale any Seller sponsored (commonly referred to as "in-house") warrantees, coupons or programs of any kind for discounted or free maintenance, tire replacement, oil change or other products which would extend beyond the Closing Date and for which Buyer may be deemed liable.

(i) Seller is not a party to any collective bargaining agreement or organized labor contract, employment contract, deferred compensation, pension, 401K Plan, or any other employee benefit plans, whether or not legally binding, and Seller is not currently paying any pension, deferred compensation or retirement allowance to any person. The consummation of this Agreement will not give rise to any withdrawal liability regarding any such 401K plan. Seller has complied in all material respects with applicable laws with respect to the payment of social security and unemployment taxes, and the withholding of income taxes, and Seller is not liable for any wages, or taxes (including interest and penalties thereon) for failure to comply with any of the foregoing. Seller is not delinquent

in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for services performed by them or amounts required to be reimbursed to such employees. Seller has complied in all material respects with the applicable requirements for its employee medical and benefit plans as set forth in the Internal Revenue Code and ERISA, including Section 4980B of the Code (as well as its predecessor provision, Section 162(k) of the Code) and Sections 601 through 608, inclusive, of ERISA, which provisions are hereinafter referred to collectively as "**COBRA**", and will continue to do so post-closing.

(j) Seller possesses all required licenses and governmental or official approvals, permits or authorizations for its business and operations, including with respect to the operations of the Dealership.

(k) The Dealership Premises constitutes all real property upon which Seller currently operates the Business. Seller does not utilize any other real property in connection with any facet of operation of the Dealership, including but not limited to motor vehicle sales, service or related storage, and Seller's current executed Nissan Dealership Facility Addendum attached hereto as Schedule 11(k) accurately sets forth Seller's facilities locations.

(l) Seller covenants and agrees that, between the date of this Agreement and the Closing Date, (i) the business of Seller shall be conducted only in, and Seller shall not take any action except in, the ordinary course of business consistent with the manner in which the Business is being operated as of the Effective Date; (ii) Seller shall use reasonable efforts to preserve and keep intact its business organizations, to keep available the services of its current employees and consultants, and to preserve Seller's present relationships with customers, suppliers and other persons with which it has business relations; and (iii) Seller shall maintain the Assets in their current condition and repair (reasonable wear and tear excepted) and maintain all insurance policies in accordance with present practices. Between the date of this Agreement and the Closing Date, Seller shall notify Buyer, in writing, of: (x) the commencement of litigation or proceedings by or against Seller or its principals, officers, employees and consultants that may materially and adversely impact the Business or the Assets; (y) any destruction of or damage in excess of twenty thousand dollars ($20,000.00) to the Assets; or (z) any changes to any Exhibits or Schedules to this Agreement. By way of amplification and not limitation, except as contemplated by this Agreement, Seller shall not, between the date of this Agreement and the Closing Date, directly or indirectly, do or propose or agree to do any of the following without the prior written consent of Buyer:

(i) acquire (including, without limitation, for cash or shares of stock, by merger, consolidation or acquisition of stock or assets) any interest in any corporation, partnership or other business organization or division thereof, or make any investment either by purchase of stock or securities, contributions of capital or property transfer;

(ii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse or otherwise as an accommodation become responsible for, the obligations of any person, or make any loans or advances, except for incurrence of indebtedness and floorplan financing of vehicle inventories in the ordinary course of business consistent with past practice;

(iii) enter into any contract (including an employment or consulting agreement for personnel services), other than in the ordinary course of business consistent with the manner in which the Business is being operated as of the Effective Date or terminable upon 30 days' notice or less or for which Buyer shall not be responsible after Closing;

(iv) swap New Vehicle inventory outside of the ordinary course of business, including a swap with any of its Affiliates without receiving a similar year and model Nissan vehicle in return or acquire any New Vehicle inventory from any of its Affiliates except in the ordinary course of business;

(v) sell, assign, lease, convey, transfer or otherwise dispose of (or agree to do any of those things) any of the Assets, other than in the ordinary course of business consistent with the manner in which the Business is being operated as of the Effective Date;

(vi) agree, in writing or otherwise, to take or authorize any of the foregoing actions or any action which would make any representation or warranty in this Agreement untrue or incorrect in any material respect;

(vii) take any action which would render any representation and/or warranty contained in this Agreement inaccurate in any material respect as of the date of Closing.

(m) Seller agrees to cooperate with Buyer in the preparation and filing of all forms, notifications, reports and information if any, required or reasonably deemed advisable pursuant to any law, rule or regulation in connection with the transactions contemplated by this Agreement and to use their respective efforts to agree jointly on a method to overcome any objections by any governmental authority to any such transactions.

(n) There are no uncured defaults by Seller or, to Seller's Knowledge, the Dealership Landlord under or pursuant to the Dealership Lease or the Storage Lot Landlord under or pursuant to the Storage Lot Lease. As of the Effective Date, the monthly base rent payable under the Dealership Lease is $9,229.83, the 2024 annual real estate taxes in the amount of $26,988.30 have been paid by Seller, and the Dealership Landlord is holding a security deposit in the amount of $9,229.83. As of the Effective Date, the monthly base rent payable under the Storage Lot Lease is $2,600, the Storage Lot Landlord has not

reclaimed the parking spaces pursuant to Section 11 of the Storage Lot Lease, and the Storage Lot Landlord is holding a security deposit in the amount of $1,000.00.

(o) Except for that certain Notice of Termination letter from Manufacturer to Seller dated August 8, 2024 and extended to October 14, 2024 (the "**NOT**"), Seller is in good standing with Nissan, is operating under a standard Nissan Dealer Sales and Service Agreement and has not received any notice of default or termination. Seller represents that it has not received any unabated written notice of any facility or other franchise deficiency from Nissan, and has no Knowledge of any facility or other franchise deficiency from Nissan. Seller represents that it has not received notice and has no Knowledge requiring it to or upgrade, enhance, or improve the Dealership or to relocate the Dealership from the Dealership Premises. Seller covenants and agrees to diligently pursue (or cause its legal counsel to diligently pursue) from the Manufacturer a further extension of the NOT on or prior to October 21, 2024. In the event that such an extension is not timely secured, Buyer may terminate this Agreement. In the event of such termination, Escrowee shall promptly return the Deposit to Buyer and neither Party shall have any further rights or obligations under this Agreement, except for those rights and obligations which expressly survive such termination

(p) The Assets shall be in at least in the same condition as the date that Buyer concluded its Due Diligence Investigation.

(q) Seller shall furnish to Buyer a list of all employees, their rates of pay, including base pay, and any incentive, commission or bonus plans. Buyer shall safeguard the information pursuant to applicable law.

(r) To the extent that the Federal Warn Act or NJ WARN Act may be or become applicable, Seller and Buyer will take any and all actions required or necessary to comply with the WARN Act and/or the NJ Warn Act, as the case may be, with respect to any event or occurrence affecting Seller or the Business. Buyer shall have no responsibility or liability under WARN, nor for any actions of Seller regarding its employees, and Seller shall have no responsibility or obligation with respect to any actions taken by Buyer with respect to any employees of Buyer from and after the date of closing of title to the assets hereunder.

(s) Seller has heretofore provided the Seller's Environmental Report to Buyer and except as otherwise set forth in the Seller's Environmental Report, to Seller's Knowledge:

(i) Seller has not received any notice of any uncured environmental, violations regarding the Dealership Premises; that Seller is currently operating within the limits set forth in all applicable federal, state, county or local environmental permits, licenses, or authorizations, regardless of whether such permits, licenses, or authorizations are current, expired, or about to expire; that Seller, its agents, employees and tenants have

complied and shall continue to comply with all applicable laws, ordinances, rules, requirements and regulations of federal, state, county, and local governments and all agencies or other governmental entities thereof, including, without limitation, environmental, health, and safety, which affect the business operations at the Dealership Premises or its use thereof, and to which the Seller may be subject; and that Seller has no Knowledge of any claims which have been filed against, or notices received by the Seller, alleging a violation of any such environmental permits, licenses, or authorizations, or of any such laws, ordinances, rules, requirements or regulations; and

(ii) There are no underground storage tanks ("**USTs**") at the Dealership Premises, including any USTs related or attached to, or remaining in place from any prior or presently existing lift utilizing a UST, and that any removal or abandonment of any USTs which may have been at the Dealership Premises was completed in a manner consistent with all applicable and relevant environmental and related laws and regulations, and that all documentation pertaining to said removal has been delivered to Buyer prior to or concurrently with the execution herewith; and

(iii) Seller has complied with: (A) all legal requirements relating to the discharge, handling, storage and transportation of hazardous substances, including the use of storage tanks; (B) all applicable permits, writs, orders, judgments, injunctions, governmental communications, decrees, informational requests or demands issued in accordance with, or arising under, any environmental laws; (C) all requirements relating to notice, record keeping and reporting arising under or in accordance with any environmental laws; (D) all requirements relating to obtaining and maintaining licenses, including certificates, permits, approvals and registrations required under environmental laws for the ownership and/or use of the Dealership Premises. All hazardous substances used at the Dealership Premises have been removed and disposed of in compliance with all applicable environmental laws. Hazardous substances shall be construed broadly to include any toxic or hazardous substance, material or waste, including petroleum and petroleum products but shall not include *de minimis* quantities of solvents, cleaning supplies and insecticides. Seller represents that it has not received any notices regarding or advising that the Seller and/or the Dealership Premises are not in compliance with, or are in violation of or are violating any environmental laws and represents that there are no pending actions by any governmental entity or other entity against or regarding Seller or the Dealership Premises arising from violations or alleged violations of, or incidents of non-compliance with environmental laws. Seller has handled hazardous waste in compliance with all applicable environmental laws including without limitation the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*, and all applicable laws of the State of Massachusetts, County of Berkshire, City of Pittsfield. Seller represents that there has been no release of a hazardous substance at the Dealership Premises; and

(iv) The Dealership Premises has never been used by Seller to refine, produce, handle or process "hazardous substances" (as that term is defined by applicable law), except in the ordinary course Seller's business or allowed by law; and

(v) Except as otherwise set forth in the Seller's Environmental Report, there are no recognized environmental concerns ("**REC's**") located at, under or adjacent to the Dealership Premises; and

(t) Seller commenced its business operations on or about November 30, 2022, and Seller's federal EIN is [redacted]

(u) Seller (i) will remove all debris from the Premises prior to Closing, including, but not limited to, all used tires, batteries, drums and abandoned vehicles; (ii) within ten (10) business days subsequent to the Closing Date, shall remove any Parts Inventory not purchased by Buyer; (ii) shall, concurrently with Closing, unless sooner requested by Nissan (and then within five (5) days of such request), and provided same are reasonably acceptable to Seller, voluntarily cause to be executed and delivered to Nissan a concurrent dealer termination letter, and such other documentation reasonably requested by Nissan, with respect to its Dealer Sales and Service Agreement and to be effective no sooner that the Closing Date in order to facilitate Buyer's application for a Dealer Sales and Service Agreement with Nissan; and/or (iii) will not assert that Buyer is responsible for the obligations of Seller under a theory of successor liability.

(v) As of the date hereof, there is in effect insurance coverage of the type, and in the amounts, as is customary for Seller's business and Assets, that Seller has not received any notice of cancellation or non-renewal of any policies with respect to said insurance coverage, and that Seller shall keep all of its insurable assets that are the subject matter of this Agreement insured in accordance with present practices.

(w) (i) Seller has met all applicable conditions and was eligible under all applicable Laws and published SBA guidance to apply for the Paycheck Protection Program established under the CARES Act and administered by the SBA to apply for the Paycheck Protection Program Loans ("PPP Loans") and receive the proceeds of the PPP Loans; (ii) all applications, documents and other information submitted and certifications, representations and warranties made by Seller to any Governmental Authority with respect to the PPP Loan were true, correct and complete when made and continue to be true, correct and complete; (iii) Seller has complied with all applicable Laws and published SBA guidance applicable to the Paycheck Protection Program and did not use any portion of the PPP Loan for any purpose that would render any portion of the PPP Loan ineligible for forgiveness under the Paycheck Protection Program; (v) to Seller's Knowledge, Seller has complied in all material respects with the CARES Act and has no plans to undertake any action in the future that would cause any violation thereof, and as of the date hereof, Seller has no outstanding liabilities of any kind with respect to the PPP Loans. Seller did not apply for employee retention tax credits (collectively, the "**ERTCs**"); and (vi) except for the PPP Loans, Seller has not received any loan under the Paycheck Protection Program from any other person or entity.

**12. <u>REPRESENTATIONS, WARRANTIES AND COVENANTS OF Buyer</u>.** Buyer warrants, represents and covenants to and with Seller as follows:

(a) Buyer is a limited liability company duly organized and existing in good standing under the laws of the State of Massachusetts and this Agreement constitutes the valid and binding obligation of Buyer enforceable in accordance with its terms. Buyer has taken all action necessary to authorize the execution and delivery of this Agreement, the performance of its respective obligations hereunder and the consummation of the transactions contemplated hereby.

(b) There is no suit, action, litigation, insolvency proceedings, judgments, or any other proceedings against Buyer, or, to Buyer's knowledge, threatened, anticipated or contemplated against, by or affecting Buyer, or which question the validity or enforceability of this Agreement, or the transactions contemplated hereby, and to Buyer's knowledge there is no basis for any of the foregoing.

(c) The execution, delivery and performance of this Agreement by Buyer and the execution, performance and delivery of all other agreements to be executed in connection with the Agreement have been and shall be duly, validly and sufficiently authorized by all required company action of Buyer requisite thereto and Buyer and the person executing this Agreement and all subsequent agreements in relation thereto has and shall have full, irrevocable and unlimited right, power and authority to bind Seller and perform all obligations under this Agreement.

(d) The execution, delivery and performance of this Agreement and all other agreements to be executed in connection with this Agreement does not and will not violate the terms of constitute a default under or be an event of default under any agreement, contract, note, deed of trust, indenture, judgment or decree or other document to which Buyer is a party.

(e) There is no litigation, insolvency proceedings, judgments, or any other proceedings pending or, to Buyer's knowledge, threatened against Buyer, which shall prevent Buyer from consummating the within Agreement.

(f) Buyer currently has and shall have at Closing immediately available cash, subject to the satisfaction of the Financing contingency as provided in Section 8(b) of this Agreement necessary to consummate the transactions contemplated by this Agreement, including without limitation sufficient funds to satisfy all Manufacturer requirements and payment to Seller of the Purchase Price.

(g) Buyer represents and warrants that it reasonably believes that it has sufficient knowledge of the application process and the qualification standards required by Manufacturer to make application to the Manufacturer for consideration to receive the Manufacturer Approval. Buyer further represents and warrants that it reasonably believes

that it will meet all of Manufacturer's requirements to obtain such approval (financial and otherwise).

(h) There is no broker, finder or similar intermediary which has acted for or on behalf of Buyer in connection with this Agreement, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection herewith based on any action taken by Buyer for which Seller would be liable.

(i) Buyer has relied and will rely on its own due diligence investigation, business judgement and the opinions of its advisors prior to executing this Agreement and prior to Closing (as the case may be), and Seller has made no representations or warranties except as expressly provided in this Agreement, and upon Closing shall accept the Assets in AS IS WHERE IS condition, subject to the terms and conditions of this Agreement.

(j) Buyer agrees to cooperate with Seller in the preparation and filing of all forms, notifications, reports and information, if any, required or reasonably deemed advisable pursuant to any law, rule or regulation in connection with the transactions contemplated by this Agreement and to use their respective efforts to agree jointly on a method to overcome any objections by any governmental authority to any such transactions.

(k) If any governmental authority requires that certificates of occupancy, certificates of continued occupancy, smoke detector certifications or other fire certificate or any other required municipal document, permit, or license to be issued in connection with the change in occupancy at the Dealership Premises (collectively, a "**CO**") Buyer shall, at its sole cost, obtain such CO and make any repairs, replacements, alterations and changes to the Dealership Premises required in connection therewith prior to the Closing; provided, however, that, if the cost of any such repairs, replacements, alterations and/or changes (collectively, "**Repair Costs**") would exceed Two Thousand Five Hundred Dollars ($2,500.00) in the aggregate (the "**Repair Costs Cap**"), Buyer will have the right, in Buyer's sole discretion, to (a) elect to incur Repair Costs in excess of the Repair Costs Cap and obtain the CO or (b) terminate this Agreement upon written notice to Seller (such notice, "**Buyer's CO Termination Notice**"), whereupon Escrowee shall refund the Deposit to Buyer and all rights and obligations of the parties hereunder will be null and void, except for those rights and obligations that expressly survive the termination of this Agreement. Notwithstanding the foregoing, within three (3) business days of Seller's receipt of Buyer's CO Termination Notice, Seller may, in its sole discretion deliver to Buyer a Nullification Notice. "Nullification Notice" means a written notice in which Seller agrees to assume responsibility to obtain the CO at Seller's cost and expense and accept from Buyer, at Closing, a credit in the amount of the Repair Costs Cap.

**13. <u>REPRESENTATIONS, WARRANTIES AND COVENANTS TRUE AS OF CLOSING DATE</u>**. All of the representations, warranties, covenants, and statements of Buyer and Seller herein contained shall be true and correct and shall not have been

breached on and as of the day of the Closing Date, with said representations, warranties, and covenants to expressly survive the Closing Date for a period of one (1) year next succeeding the Closing Date with claims arising during said one (1) year period being asserted with fifteen (15) months from the Closing Date in accordance with Section 20 and Buyer and Seller shall so certify in writing with respect thereto at Closing. and Buyer and Seller shall so certify in writing with respect thereto at Closing.

**14. <u>CONDITIONS TO OBLIGATIONS OF BUYER</u>**. The obligations of Buyer to make the payments and deliveries required pursuant to this Agreement and to consummate the transaction contemplated by this Agreement are subject to the fulfillment or waiver by Buyer in writing prior to or on the Closing Date of only the following conditions:

(a) All of Seller's representations and warranties made in in this Agreement shall be true and correct in all material respects as of the Closing Date;

(b) the Department (as defined below) shall have responded to the Bulk Sale Notice (as defined below);

(c) Buyer shall have received the Manufacturer Approval;

(d) The Financing Contingency shall have been satisfied or waived;

(e) Buyer shall have obtained all necessary licensing to operate as a new motor vehicles sales and service dealership in Massachusetts, including but not limited to a Massachusetts new motor vehicle dealer license and banking and insurance license and Buyer shall use commercially reasonable efforts to obtain such licensing;

(f) Delivery by Seller of all items in Section 16 herein;

(g) There shall not be, pending nor threatened, any action nor proceeding by or before any court or other governmental body which shall seek to restrain, prohibit, invalidate or collect damages arising out of the transactions contemplated hereby, and which, in the reasonable discretion and judgment of Buyer, makes it inadvisable to proceed with the transactions contemplated hereby; and

(h) Between the date hereof and the Closing Date none of the Assets or the Premises shall have been damaged by fire, flood, casualty, act of God or the public enemy or other cause (regardless of insurance coverage for such damage) which damages may have a material adverse effect thereon.

**15. <u>CONDITIONS TO OBLIGATIONS OF SELLER</u>**. The obligations of Seller to make the deliveries required pursuant to this Agreement and to consummate the transaction contemplated by this Agreement are subject to the fulfillment or waiver by Seller in writing prior to or on the Closing Date of only the following conditions:

(a) All of Buyer's representations and warranties shall be true and correct in all material respects as of the Closing Date;

(b) There shall not be, pending nor threatened, any action nor proceeding by or before any court or other governmental body which shall seek to restrain, prohibit, invalidate or collect damages arising out of the transactions contemplated hereby, and which, in the reasonable discretion and judgment of Seller, makes it inadvisable to proceed with the transactions contemplated hereby;

(c) Delivery by Buyer of all items in Section 17;

(d) Buyer shall have received the Manufacturer Approval;

(e) The Financing Contingency shall have been satisfied or waived.

**16. DELIVERIES BY SELLER AT THE CLOSING**. Seller shall deliver the following to Buyer at the Closing:

(a) a duly executed bill of sale for the Assets (the "**Bill of Sale**"), in a form reasonably agreed upon by the Parties, as will effectively convey to Buyer all title to and interest in the Assets, free and clear of all liens and encumbrances other than those related to Assumed Liabilities;

(b) an duly executed instrument of assignment and assumption with respect to the Assumed Liabilities (collectively, the "**Assumption Instrument**"), in a form reasonably agreed upon by the Parties, duly executed by Seller and including assignments of the Assumed Contracts, the Contracts and/or Orders including an assignment of all customer deposits, and other customary instruments of transfer and conveyance of the Assets;

(c) all instruments of title furnished by the Manufacturer for the New Vehicles being transferred (and if applicable, any other vehicles to be purchased by Buyer from Seller), each duly endorsed by Seller;

(d) a duly executed unanimous resolution of the members and manager of Seller authorizing the execution and delivery by Seller of this Agreement and the agreements contemplated hereby and approving the consummation of the transaction contemplated herein;

(e) a closing statement acceptable to Seller and Buyer showing the credits and adjustments contemplated herein (the "**Closing Statement**") duly executed by Seller;

(f) a duly executed certificate dated as of the Closing Date by Seller's Principal stating that the representations and warranties provided by Seller in this Agreement are true

and correct as of the date of Closing (except in each case for such representations and warranties as are dated as of a particular date, which shall be true and correct in all material respected as of such date); and

(g) a good standing certificate of Seller, issued by the State of Massachusetts dated subsequent to the execution date of this Agreement but within thirty (30) days of the Closing Date; Buyer's receipt from Seller of such documentation as may be required or duly executed, and in the form required by the Manufacturer (and reasonably acceptable to Seller) to confirm Seller's sale, surrender and/or transfer to Buyer of the Assets and the termination of its Nissan Dealer Agreement, a letter confirming closing, as of the Closing Date following consummation of the transactions contemplated hereunder, unless the Manufacturer requests such documentation or any other documentations reasonably required in connection with Buyer's Manufacturer's approvals in advance of the Closing Date;

(h) The Lease Assignment Documents duly executed by Seller and Dealership Landlord and Storage Lot Landlord, as applicable;

(i) The WC Assumption Documents, if applicable, duly executed by Seller and Lender; and

(j) such other bills of sale, assignments or certificates of title, documents and other instruments of transfer and conveyance as may reasonably be required by Buyer, each in form and substance reasonably satisfactory to Buyer and duly executed by Seller, including, without limitation an instrument from Seller assigning to Buyer (A) the right to return Manufacturer's Parts to Manufacturer and (B) Seller's phone numbers, email addresses, domain names, the URL, and social media accounts.

**17. DELIVERIES BY BUYER AT THE CLOSING**. Buyer shall deliver or cause to be delivered the following to Seller at the Closing:

(a) payment to Seller by wire transfer in immediately available funds of an amount equal to the sum of the Purchase Price (less the Deposit), PLUS or MINUS any adjustments for prorations and other payments and withholdings to be paid or otherwise borne by Seller or Buyer pursuant to this Agreement; provided, however, that Buyer, or Buyer's floorplan source, shall, subject to the pricing calculation methodologies set forth in Exhibit A, pay directly to Seller's floorplan source the amount required to release any liens held by such floorplan lender against the Assets and any such amount paid shall be credited against the Purchase Price;

(b) the Assumption Instrument, duly executed by Buyer;

(c) a duly executed resolution of all of the Manager of Buyer authorizing the execution and delivery by Buyer of this Agreement and the agreements contemplated hereby and approving the consummation of the subject transaction;

(d) the Closing Statement, duly executed by Buyer;

(e) a certificate dated as of the Closing Date executed by Buyer's Manager, stating that the representations and warranties provided by Buyer in this Agreement are true and correct as of the date of Closing (except in each case for such representations and warranties as are dated as of a particular date, which shall be true and correct in all material respected as of such date);

(f) The Lease Assignment Documents duly executed by Buyer;

(g) The WC Assumption Documents, if applicable, duly executed by Buyer;

(h) if required, the CO as provided in Section 12(l); and

(i) such other documents or instruments as may be reasonably required by Seller pursuant to this Agreement and duly executed, each in form and substance reasonably satisfactory to Buyer.

**18. RESTRICTIVE COVENANTS.**

(a) Seller Covenants: In order to ensure that Buyer will realize the benefits of the transactions contemplated herein, Seller, on behalf of itself and its affiliates and Seller's Principal (the "**Seller Parties**") each agrees that no such Seller Party shall do either of the following during the period commencing on the Closing Date and ending three (3) years after the Closing Date:

(i) Directly or indirectly, solicit for employment or engagement any (y) Transferred Employee or (z) person who is known by Seller to be employed by any Buyer Excluded Dealership (as defined below) (collectively the "**Buyer Restricted Employees**"), or in any manner seek to induce any Buyer Restricted Employee to leave his or her employment or to not seek employment with any Buyer Excluded Dealership; provided that the foregoing shall not prohibit the use of general solicitations not specifically targeted at any Buyer Restricted Employee or Buyer Excluded Dealership. For the purposes of this provision, the term "**Buyer Excluded Dealership**" shall mean any and all new motor vehicle dealerships owned and operated by any of Buyer Parties (as defined below) as of the Closing Date.

(ii) Knowingly and intentionally solicit those customers identified within the Customer Information by direct contact (i.e., by e-mail, telephone or mail) for

the purpose of selling, leasing or servicing Nissan motor vehicles. Seller shall not knowingly utilize Seller's Customer Information for any purpose whatsoever.

(iii) Engage directly or indirectly in the ownership and/or operation of a new motor vehicle dealership for the purpose of selling, leasing or servicing Nissan vehicles within a radius of fifty (50) miles from the Dealership Premises.

(iv) Engage directly or indirectly in motor vehicle service or warranty repair work involving Nissan motor vehicles within a radius of fifty (50) miles from the Dealership Premises.

(b) Each of the Parties agree and acknowledge that the restrictions contained in Section 18(a) are reasonable in scope and duration and are necessary to protect the Parties after the Closing. If any provision of Section 18, as applied to any Party or to any circumstance, is adjudged to be invalid or unenforceable, the same will in no way affect any other circumstance or the validity or enforceability of the remainder of this Agreement. If any such provision, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the Parties agree that the party making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form, such provision shall then be enforceable and shall be enforced. The Parties agree and acknowledge that the breach of this Section 18 will cause irreparable damage to the non-breaching Party and, upon breach of any provision of this Section 18, the non-breaching Party shall be entitled to injunctive relief, specific performance or other equitable relief; provided, however, that the foregoing remedies shall in no way limit any other remedies which the non-breaching Party may have (including the right to monetary damages).

**19. EMPLOYEES.**

(a) Prior to the Closing Date and in accordance with this provision, Buyer may offer employment to some or all of Seller's employees that are employed by Seller as of the Closing (the "**Employees**", and those Employees hired by Buyer, the "**Transferred Employees**"), to be effective as of the Closing Date. In order to facilitate the foregoing, Seller and Buyer shall promptly after receipt of Manufacturer Approval, conduct a joint meeting with the Employees to announce the transactions contemplated by this Agreement. Subsequent to said joint meeting, Buyer may independently contact Employees regarding employment for Buyer.

(b) Within ten (10) days of the date hereof, Seller shall deliver to Buyer a current list of Seller's employees together with pay scales and other remuneration details, including but not limited to accrued vacation, sick and personal days.

(c) On the Closing Date, Seller shall terminate the employment of the Transferred Employees, and shall fully pay and satisfy all outstanding liabilities of Seller

for wages and other compensation, including but not limited to any bonuses, personal, sick and vacation days, in whole or in part, that are due to Employees as of the Closing Date.

(d) Seller shall be responsible and remain liable for providing "**continuation coverage**" (within the meaning of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**")) as is required pursuant to COBRA with respect to (i) any employees (and their beneficiaries) terminated by Seller on the Closing Date and who do not accept Buyer's offer of employment pursuant to Section 19(a), (ii) former employees of Seller or qualified beneficiaries already on COBRA coverage with Seller on the Closing Date, and (iii) former employees of Seller or qualified beneficiaries who have not elected COBRA coverage, but have COBRA rights on the Closing Date. With respect to any of Seller's employees hired by Buyer who have agreed to enroll in Buyer's employee health insurance plan, Buyer will thereafter be responsible for providing such employees with COBRA benefits; to the extent such employees may become eligible for such benefit. It is understood and agreed that Buyer is not assuming any current or potential Seller COBRA issues with its employees, shall not be considered as a successor-in-interest to Seller with respect to Seller's COBRA issues with its employees, and that same are expressly excluded from the subject matter of this Agreement. This provision shall survive Closing of title hereunder.

## 20. INDEMNIFICATION.

(a) Agreement by Seller for Indemnification. Seller and Seller's Principal each agrees to indemnify, defend, and hold Buyer, its principals, shareholders, members, directors, officers, employees, agents and affiliates harmless from and against all claims, demands, actions, causes of actions, liabilities, obligations, expenses, losses, costs, deficiencies, liabilities, chargebacks of any nature and damages (including, without limitation, related reasonable out-of-pocket counsel and paralegal fees and expenses) incurred or suffered by Buyer arising out of or resulting from (i) any breach of a representation or warranty made by Seller in or pursuant to this Agreement; (ii) any breach of the covenants or agreements made by Seller in or pursuant to this Agreement; (iii) any inaccuracy in any certificate, instrument or other document delivered by Seller as required by this Agreement; (iv) any tax liabilities, including but not limited to those related to bulk transfer or sales and use tax, that may be due and owing to any state by Seller arising from activities occurring prior to the Closing Date; (v) any warranty or warranty or insurance chargeback obligations or liabilities relating to Seller or Seller's operation of its dealership business, (v) any and all liabilities or obligations relating to the operation of the Business arising prior to the Closing Date, including, without limitation, liabilities for breach of contract, liabilities arising in tort, liabilities for materials sold or services rendered, and liabilities to any creditors, except for those liabilities and obligations expressly assumed by Buyer pursuant to this Agreement, (collectively, "**Seller Indemnifiable Damages**"). This Section 20(a) shall immediately terminate on the fifteen (15) month anniversary of the Closing, however, shall remain in force and effect for claims brought by Buyer prior to that date.

(b) Agreement by Buyer for Indemnification. Buyer agrees to indemnify, defend, and hold Seller and its principals, shareholders, members, directors, officers, employees, agents and affiliates harmless from and against all claims, demands, actions, causes of actions, liabilities, obligations, expenses, losses, costs, deficiencies, liabilities, chargebacks of any nature and damages (including, without limitation, related reasonable out-of-pocket counsel and paralegal fees and expenses) incurred or suffered by Seller arising out of or resulting from (i) any breach of a representation or warranty made by Buyer in or pursuant to this Agreement; (ii) any breach of the covenants or agreements made by Buyer in or pursuant to this Agreement; (iii) any inaccuracy in any certificate, instrument or other document delivered by Buyer as required by this Agreement; (iv) any Assumed Liability; and (v) any and all liabilities or obligations relating to the operation of the Business arising on or after the Closing Date, including, without limitation, liabilities for breach of contract, liabilities arising in tort, liabilities for materials sold or services rendered, and liabilities to any creditors (collectively, "**Buyer Indemnifiable Damages**" and together with Seller Indemnifiable Damages, the "**Indemnifiable Damages**"). This section 20(b) shall immediately terminate on the fifteen (15) month anniversary of the Closing.

(c) Survival of Representations and Warranties. Each of the representations and warranties made by Buyer and Seller in this Agreement or pursuant hereto shall survive for a period of twelve (12) months after the Closing Date, but in no event shall survive beyond the applicable statute of limitations. No claim for the recovery of Indemnifiable Damages with respect to such representations and warranties may be asserted by Buyer or Seller after such representations and warranties shall thus expire; provided, however, that (1) claims for Indemnifiable Damages first asserted within the applicable period shall not thereafter be barred and (2) claims arising during said 12-month period may be asserted within the 15-month period mentioned above. Notwithstanding any knowledge of facts determined or determinable by any Party by investigation, each Party shall have the right to fully rely on the representations, warranties, covenants and agreements of the other Party contained in this Agreement or in any other documents or papers delivered in connection herewith. Each representation, warranty, covenant and agreement of the Parties contained in this Agreement is independent of each other representation, warranty, covenant and agreement.

(d) Indemnity Procedure. Buyer and Seller agree that, upon receipt by any Party of a third-party claim in respect of which indemnity may be sought under this Section 20, said Party (the "**Claimant**") shall give written notice within thirty (30) days of receipt of such claim (the "**Notice of Claim**") to the Party from whom indemnification may be sought hereunder (the "**Indemnitor**"). No indemnification under this Section 20 shall be available to any Party who fails to give the required Notice of Claim within fifteen (15) business days if the Party to whom such notice should have been given was unaware of the claim and was prejudiced by the failure to receive the Notice of Claim in a timely manner. The Indemnitor shall be entitled at its own expense to participate in the defense of any claim or action against the Claimant. The Indemnitor shall have the right to assume the entire defense of such claim, provided that (i) Indemnitor gives written notice of its desire to defend such claim (the "**Notice of Defense**") to the Claimant within fifteen (15) days after Indemnitor's receipt of

the Notice of Claim; (ii) Indemnitor's defense of such claim shall be without cost to Claimant or prejudice to Claimant's rights under this Section 20; (iii) counsel chosen by Indemnitor to defend such claim shall be reasonably acceptable to Claimant; (iv) the Indemnitor shall bear all costs and expenses in connection with the defense of such claim; and (v) Claimant shall have the right to receive periodic reports from Indemnitor and Indemnitor's counsel with respect to the status of the defense of such claim.

**21. TERMINATION.**

(a) Termination. This Agreement may be terminated at any time prior to Closing only:

(i) by mutual written consent of the Parties at any time prior to Closing; or;

(ii) pursuant to the terms and conditions of this Agreement, without fault of either Seller or Buyer; or

(iii) provided that Buyer is not then in breach of this Agreement, then by Buyer upon delivery of written notice to Seller in the event of a breach by Seller of any provision of this Agreement, including covenants, agreements, warranties or representations (provided that Buyer shall have previously provided Seller with written notice of such breach (to the extent that same is subject to cure) and a reasonable opportunity to cure such breach, such cure period not to exceed thirty (30) days from the date of such notice); or

(iv) provided that Seller is not then in breach of this Agreement, then by Seller upon delivery of written notice to Buyer in the event of a breach by Buyer of any provision of this Agreement, including covenants, agreements, warranties or representations (provided that Seller shall have previously provided Buyer with written notice of such breach (to the extent that same is subject to cure) and a reasonable opportunity to cure such breach, such cure period not to exceed thirty (30) days from the date of such notice).

(b) Effect of Termination as a Result of Uncured or Incurable Breach.

(i) Seller's Default. In the event of an incurable breach on the part of Seller or Seller's uncured breach of this Agreement following the aforementioned written notice and reasonable time to cure not to exceed thirty (30) days, Buyer's sole right and remedy shall be either: (i) to terminate this Agreement upon written notice to Seller and the Deposit, shall be returned to Buyer; or (ii) enforce specific performance upon Seller.

(ii) Buyer's Default. In the event of an incurable breach on the part of Buyer or Buyer's uncured breach of this Agreement following the aforementioned written

notice and reasonable time to cure not to exceed thirty (30) days, Seller may terminate this Agreement upon written notice to Buyer. In the event of such termination by Seller, the Escrowee shall release the Deposit to Seller as liquidated damages. Seller acknowledges that its relief for such incurable or uncured breach by Buyer under this Agreement shall be limited to the release of the Deposit as liquidated damages.

**22. RISK OF LOSS**. If, prior to the Closing Date, fire or any other casualty destroys the Assets or any material portion thereof, Buyer may, within ten (10) days following the date on which Buyer obtains knowledge of such destruction or taking, but in any event prior to the Closing Date, either (a) deduct from the Purchase Price the value of those Assets which were so destroyed or taken as is mutually agreed to by Buyer and Seller and to otherwise consummate the subject transaction, (b) proceed to Closing without any deduction, in which event Buyer will be entitled to receive all casualty insurance proceeds payable to Seller due to such destruction, if any, and Seller will assign such proceeds (or the right to receive such proceeds) to Buyer, or (c) in the event of a material loss, to terminate this Agreement.

**23. FURTHER ASSURANCES**.

(a) Records. Buyer shall preserve and keep, or cause to be preserved and kept, all records that have been transferred to Buyer as part of the subject transaction as provided in this Agreement (including, without limitation, the Customer Information) for at least seven (7) years, and provide Seller access to such records to the extent necessary or appropriate with respect to Manufacturer sales or service audits, IRS or state tax audits, or litigation or administrative actions or proceedings, at Seller's cost and expense. The access to such records shall be afforded by Buyer upon receipt of reasonable advance notice and during normal business hours and shall not disrupt the business of Buyer thereat.

(b) Winding Down. For a period of six (6) months following the Closing Date (the "**Wind Down Period**"), Buyer will cooperate, in all material respects, with Seller in its effort to maintain Seller's accounting records and wind-down of the Business. Buyer and Seller shall review all payments, mail, invoices, general correspondence, and any other business-related items ("**Post-Closing Business**") related to Seller's business operations prior to the Closing Date received by Buyer. With respect to Post-Closing Business between Buyer and Seller, the Parties will meet to review, reconcile, and settle such matters on at least a bi-weekly basis through the end of the Wind Down Period (unless the parties agree upon a different schedule), however, if the Parties or one of the Party's does not initiate a notice for the meeting, then neither Party has any obligation to meet. In furtherance of the foregoing, during the meetings during the Wind Down Period, Seller may have may access to the dealership's DMS server and a connected printer subject to the following: prior to Closing seller shall have entered into a post-closing program with the dealership's DMS provider to access only those Seller records on the dealership's DMS server, at Seller's sole cost and expense, in order to assist Seller in conducting its post-closing wind down accounting and Manufacturer related matters with respect to Seller. Seller will obtain its

own password and shall ensure with such DMS provider that it has no access to any of Buyer's data.

(c) Assumed Contracts. To the extent any Assumed Contract is not assignable without the consent of the other party thereto, this Agreement shall not constitute an assignment or attempted assignment thereof at any time prior to receipt of such consent. If such consent shall not be obtained on or before the Closing, Seller agrees to cooperate with Buyer after the Closing so as to provide Buyer with the benefits under any such Assumed Contract.

(d) Survival. The provisions of this Section 23 shall expressly survive the Closing.

**24. NOTICES.** Any notice, communication, request, reply or advice or other notice pertaining to this Agreement to be given, made or accepted by either Party to the other must be in writing and shall be given or be served only by dispatching the same by Federal Express (or any other established overnight courier delivery service), or email and regular mail, and such notice so dispatched shall become effective on the date of receipt. For purposes thereof, the addresses of the Parties hereto are as follows:

[redacted] [redacted]

As to Seller: CRAIG M. HELLER, ESQ.
Schiller Pittenger & Galvin, PC
1771 Front Street
Scotch Plains, New Jersey 07076
Phone -- 908 490 0444
Fax -- 908 490 0420
Email -- cheller@schiller.law

**25. ASSIGNMENT.** Neither this Agreement, nor any rights or obligations hereunder may be assigned by Buyer or Seller without the express prior written consent of other Party. Said consent may be withheld in the sole, absolute and unreviewable discretion of the non-assigning Party. The Parties agree that any sale, assignment, or other transfer of any interest in Seller or Buyer shall be deemed an assignment of this Agreement.

**26. BULK SALES NOTICE.** Within five (5) days of the Effective Date, Seller shall provide Buyer with all information needed to notify the Massachusetts Department of

Revenue (the "**Department**") as to the transfer of the Assets from Seller to Buyer, and Buyer shall have the immediate right to file the requisite notices with the Department. Seller shall cooperate with Buyer in connection with said notification, and Seller shall comply with all escrow or payment demands or suggestions from the Department (collectively, the "**Tax Escrow**"). If a Tax Escrow is suggested or required by the Department, the Tax Escrow shall be delivered by Seller to Buyer's attorney from the proceeds to be given to the Seller at Closing and held in escrow by Buyer's attorney until such time that the Department shall give notice to Buyer's attorney (the "**Bulk Sales Notice**") as to any deficiency in taxes which has not been paid by Seller in connection with the Assets ("**Seller's Tax Liability**"). Upon receipt of the Bulk Sales Notice, Buyer's attorney shall deliver the Tax Escrow to Seller less Seller's Tax Liability which Buyer's attorney shall deliver to the Department. To the extent that applicable law imposes a procedure or requirement(s) that are in addition or contrary to this Section 26, then this Section 26 shall be deemed amended as necessary to comply with applicable law.

**27. ABSENCE OF CERTAIN REPRESENTATIONS.** Seller makes no representations as to: (i) values, gross profits, expenses or net profits; or (ii) the value or condition of the Assets, except Seller represents that financial statements provided to Buyer (if any) are true and accurate. Buyer acknowledges that in entering into this Agreement, Buyer is relying solely on its own business judgment and accepts the assets being transferred and the respective Business "as is", except as may be otherwise expressly represented elsewhere herein.

**28. GOVERNING LAW; JURISDICTION; JURY TRIAL WAIVER.**

(a) Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts without regard to any principles of conflict of laws.

(b) Jurisdiction. Each of the Parties (a) consents to submit itself to the exclusive personal jurisdiction of the Superior Court sitting in the Commonwealth of Massachusetts, County of Berkshire, in any proceeding for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, (b) agrees that all claims in respect of such action or proceeding may be heard and determined only in such court, and (c) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on the other Party in any manner permitted by law.

(c) **JURY TRIAL WAIVER. EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY SUCH PROCEEDING.**

**29.** **ENTIRE AGREEMENT**. This writing and the exhibits annexed hereto, if any, are intended by the Parties as a final expression of their understanding and a complete and exclusive statement of the terms and conditions thereof. This Agreement may only be modified in a writing executed by the Parties hereto. This Agreement, and all related documents executed concurrently herewith may be amended only by written instrument signed by both Parties and making express reference to the respective document to be amended.

**30.** **MISCELLANEOUS PROVISIONS.**

(a) All of the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective Parties hereto and their successors and assigns respectively.

(b) This Agreement may be executed in more than one counterpart, each copy of which shall serve as an original for all purposes, but all copies shall constitute but one and the same Agreement.

(c) The "headings" contained in this Agreement are for the purposes of expediency and are not intended to otherwise bind the Parties or interpret the content of the paragraph language they precede.

(d) As used herein, the masculine shall include the feminine; the singular shall include the plural; the neuter shall include the masculine and feminine; and vice versa.

(e) The Parties have jointly participated in the negotiation and drafting this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(f) Each Party shall bear its own attorney fees, costs and expenses related to the negotiation and consummation of this Agreement. If a lawsuit is filed related to or arising from this Agreement, the successful Party shall be awarded its reasonable fees, costs, expenses and attorney's fees relating to the litigation.

(g) Upon a lawful termination of this Agreement, this Agreement shall be considered terminated, with the Parties having no further obligations to another Party, except as may be expressly stated in this Agreement.

(h) No requirement, obligation, remedy or provision of this Agreement shall be deemed to have been waived, unless so waived expressly in writing. The waiver of any such provision in one or more instances shall not be considered a waiver of the right to enforce such provision thereafter.

(i) This Agreement is transmitted for examination only, and does not constitute an offer to sell the Assets. This Agreement shall become effective only upon execution thereof by both Parties hereto. No rights are to be conferred upon Buyer until this Agreement has been duly executed by Seller and Buyer and a copy of this Agreement, duly executed by Seller and Buyer, has been delivered to Buyer.

(j) No Party hereto shall have the right or the authority to file this Agreement or any notice thereof of record in any public office, unless recording is required under applicable law in order to assert, vindicate, enforce or defend the Party's rights under this Agreement, and if not so required, recording is necessary in order to assert, vindicate, enforce or defend the Party's rights under this Agreement and the Agreement is filed in accordance with an agreed protective order reasonably acceptable to the Parties.

(k) The Parties agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein. Each of the Parties agrees to cooperate with the other in the preparation and filing of all forms, notifications, reports and information, if any, required or reasonably deemed advisable pursuant to any law, rule or regulation in connection with the transactions contemplated by this Agreement, and to use its commercially reasonable efforts to agree jointly on a method to overcome any objections by the Factory or governmental authority to any such transactions.

(l) In the event that Buyer determines that Buyer and Seller are required to complete a filing pursuant to the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976 ("HSR Act") then Buyer and Seller shall cooperate on a good faith, commercially reasonable basis to undertake such filing or notice and all costs, including any costs or fees associated therewith, (inclusive of fees incurred by Seller) shall be paid by Seller. Buyer and Seller shall also promptly notify the other in writing if it receives any notice, or otherwise becomes aware, of any action or proceeding instituted or threatened by any Governmental Authority or any third party to restrain or prohibit, or obtain damages in respect of this Agreement or the transactions contemplated by this Agreement. If applicable, the approval under HSR shall be a condition to closing.

(m) Buyer and its principals hereby acknowledge and agree that each will keep and hold as confidential the transactions contemplated in this Agreement (including the fact that either of said agreements exist), along with all information received from Seller, its affiliates, representatives or agents in connection with said transactions (collectively, the "**Seller Information**") in order that the Seller, Seller's principals, and Seller's affiliates do not suffer irreparable harm. The foregoing confidentiality/non-disclosure obligation shall not apply to disclosures required to be made by Buyer in order for Buyer to comply with Sections 6, 8(a), 8(b), 9, 14(d), and 26 of this Agreement, however Buyer shall nevertheless limit such disclosure to those persons reasonably deemed by Buyer to require such information for compliance with said provisions. All Seller Information shall be promptly returned to Seller or destroyed by Buyer in the event that this Agreement is terminated.

(n) Neither Seller nor its principal, representatives, agents, officers, assigns, or the like, shall (a) entertain, encourage, solicit, or initiate any inquiries, or make any proposal, that may reasonably be expected to lead to any proposal to purchase the Franchise and/or assets to be purchased hereunder, or purchase the stock or membership interest of the Seller; (b) participate in any discussions or negotiations, or provide any third parties with any information relating to the Franchise and/or the assets to be purchased hereunder in connection therewith or this Agreement, or the subject matter thereof, or entertain any such inquiries or proposals, or (c) directly or indirectly, sell, offer for sale, or other disposition to any entity, person, or third party, other than Buyer, or solicit, entertain, or accept offers to purchase or acquire from any person, third party or entity, other than Buyer, with respect to the sale of the Franchise and/or assets to be purchased hereunder (the **"No Shop Clause").** This No Shop Clause shall remain in effect and shall obligate Seller while this Agreement remains in force and effect.

*[remainder of page intentionally left blank – signature page to follow]*

**IN WITNESS WHEREOF,** the Parties hereto have hereunto set their hands and seals or caused these presents to be signed by their respective corporate officer and/or manager as of the day and year first above written.

Seller:
Team Nissan, Inc.
d/b/a Nissan of Pittsfield
a Massachusetts corporation

BY:_______________________________
Robert A. Urrutia, President

Buyer:
[redacted]

Seller's Principal solely with respect to Sections 11, 18, and 20:

_______________________________
Robert A. Urrutia

**ACKNOWLEDGMENT BY ESCROWEE**

The undersigned Escrowee acknowledges receipt of the Deposit in the amount of $100,000 and agrees to hold and disburse said funds in accordance with the terms of the subject Agreement.

SCHILLER PITTENGER & GALVIN, P.C.

_______________________________

IN WITNESS WHEREOF, the Parties hereto have hereunto set their hands and seals or caused these presents to be signed by their respective corporate officer and/or manager as of the day and year first above written.

Seller
Team Nissan, Inc.
d/b/a Nissan of Pittsfield
a Massachusetts corporation

BY: ______________________
Robert A. Urrutia, President

Buyer:

[redacted]

Seller's Principal solely with respect to
Sections 11, 18, and 20:

______________________
Robert A. Urrutia

**ACKNOWLEDGMENT BY ESCROWEE**

The undersigned Escrowee acknowledges receipt of the Deposit in the amount of $100,000 and agrees to hold and disburse said funds in accordance with the terms of the subject Agreement.

SCHILLER PITTENGER & GALVIN, P.C.

by ______________________
Craig M. Heller, Esq
Escrowee

**EXHIBIT A**

**SCHEDULE OF FURNITURE, FIXTURES AND EQUIPMENT**

# SCHEDULE OF FFE

SALES, PARTS, OFFICES:

14 DESKS

9 COMPUTERS

7 LAPTOPS

38 CHAIRS

13 PHONES

6 PRINTERS

SHOP:

10 LIFTS

1 ALINGMENT/LIFT

1 BRAKE LATHE

1 TIRE MACHINE

1 TIRE BALANCE

1 ENGINE LIFT

1 AIR COMPRESSOR

1 MIG WELDER

1 PRESS

# EXHIBIT B

## VALUATION AND ADJUSTMENTS

The Assets, with the exception of intangible assets, shall be valued as follows:

**New Vehicles**. New Vehicles will be valued as follows:

a) Seller's actual cost (the net cost paid by Seller to Nissan) of each New Vehicle determined in accordance with the Manufacturer invoice to Seller, including advertising charges (unless such advertising charges are separately rebated to the dealer and Seller has received or will receive such rebate), freight and handling; **plus**

b) The actual net cost to Seller of all optional Manufacturer parts and accessories installed by Seller in the New Vehicles in the ordinary course of business which do not invalidate Manufacturer's new vehicle limited warranty ("add-ons"), and with respect to Seller's New Vehicles, add-ons, Seller represents that any multiple vehicle add-ons such as wheel locks, striping, or etching are limited and in the ordinary and customary course of Manufacturer franchised dealership operations; **less**

c) To the extent received by, paid to, or to be paid to Seller by Nissan: the sum of all Manufacturer's allowances as of the Closing including but not limited to PDI's which have not been performed by Seller or other preparation allowances, in-transit (stock) allowances, gas credits, advertising credits, inventory allowances, interest credits, floor plan assistance or allowance, dealer marketing allowance, discounts, holdbacks, rebates, contests, model changes and similar Manufacturer's allowances applicable to specific automobiles transferred to Buyer on the Closing; **less**

d) The cost of repair for any damage to such New Vehicles, as mutually agreed to by the Parties. Notwithstanding the foregoing, Buyer shall not be obligated to purchase any New Vehicle which has sustained frame damage, damage which voids the Manufacturer warranty, or for which the cost of repair exceeds $1,000 or as otherwise agreed by the Parties at time of valuation; **less**.

e) The cost to replace any Nissan installed parts or accessories or options which are missing from any vehicle purchased by Buyer hereunder, including missing keys as well as the cost to repair any unrepaired damage to all vehicles.

f) With respect to any Other Motor Vehicle Inventory to which Buyer has no obligation to purchase to which Buyer may agree to purchase and Seller may agree to sell, a sum equal to such amount as the Parties may agree Buyer shall not be required to purchase any vehicle that has been reported as sold to the Manufacturer.

(g) Any dealer swapped vehicles purchased by Buyer hereunder shall be valued as if the vehicle was acquired directly by Seller from the Manufacturer, and subject further to the conditions provided in Section 11(l)(iv) of the Agreement.

**Work-in-Progress and sublet**. Work-in-Progress and sublet repairs will be valued at Seller's net direct cost, including parts and labor using the internal rate per standard factory formulas, and as more particularly provided in Section 1(b)(iii) of the Agreement.

**Prepaid Items**. Shall be identified and valued at their actual value. All personal property taxes, real property taxes and utilities shall be pro-rated as of the Closing Date in accordance with the Agreement. Customer deposits for undelivered vehicles will be transferred to Buyer. Buyer shall reimburse Seller for all prepaid expenses and all equipment lease security deposits and other deposits (other than customer deposits) which Buyer will benefit from after Closing.

**Assumed Contracts.** Any and all payments, charges and/or credits with respect to any Assumed Contracts shall be apportioned and adjusted as of the date of closing (to the extent same requires apportionment or adjustment), and any fees or costs associated with the actual assignment which are asserted by the party, lienholder, lessor, or owner (i.e., preparation of documents, transfer fees) shall be split equally between Buyer and Seller.

## SCHEDULE 1(b)

## ASSUMED CONTRACTS

1. Konica Bizhub Copier Lease Agreement with MacFarlane Office Products, Inc.

# SCHEDULE 8(a)(iv)

## ENVIRONMENTAL REPORTS

1. Phase I Report dated October 1993 and prepared by Fugro-McClelland (East), Inc.; and

2. Phase I Report dated October 22, 2022 and prepared by WjF GeoConsultants, Inc.

**SCHEDULE 11(c)**

**LITIGATION**

1. Nissan Motor Acceptance Company, LLC v. Team Nissan, Inc., et. al., Sup. Ct. Department, Massachusetts, Civil Action No.2776CV00115; and

2. Snow Plow matter that is being handled and is covered by Seller's insurance (Utica).

## SCHEDULE 11(k)

## DEALERSHIP FACILITY LOCATIONS

1. 25 West Housatonic Street, Pittsfield, MA (see Dealership Lease); and
2. South Church Street, Pittsfield, MA (see Storage Lot Lease).

# ASSET SALE AGREEMENT

**THIS AGREEMENT**, made this 27th day of September, 2024, by and between:

**TEAM IMPORTS LLC dba Team Mitsubishi Hartford,** a Connecticut corporation, with an address at 412 New Park Avenue, Hartford, Connecticut 06106 (hereinafter referred to as "SELLER");

and

[redacted]

## WITNESSETH:

**WHEREAS,** SELLER is the owner and operator of a certain motor vehicle establishment which conducts business 412 New Park Avenue, Hartford (Hartford County), Connecticut (the "Premises"), and is duly franchised by Mitsubishi Motors North America Inc. ("MMNA") for the sale of Mitsubishi motor vehicles, parts and accessories, and is licensed by the State of Connecticut to conduct said business at the Premises (the "Business"); and

**WHEREAS,** SELLER is desirous of selling and conveying its business enterprises and certain of the personal properties used in connection therewith; and

**WHEREAS,** BUYER is desirous of acquiring said assets; and

**WHEREAS,** the parties have reached an understanding with respect to the terms and conditions for such purchase and sale and are desirous of memorializing the same herein;

**NOW, THEREFORE,** in consideration of the terms, covenants and conditions hereinafter set forth, the parties hereto agree as follows:

1. **SUBJECT MATTER; EXCLUDED ASSETS**. SELLER agrees to sell and transfer to BUYER, and BUYER agrees to purchase and acquire from SELLER, at closing, the following assets, free and clear of all liens and encumbrances:

(a) Operating Assets. All of SELLER's right, title and interest in and to its (i) Business, including the goodwill, furniture, fixtures, tools, parts, vehicles, service vehicles, machinery, and equipment; Mitsubishi factory brand special tools and equipment subject to Section 16(c) hereof; Mitsubishi factory brand signs owned by

SELLER; SELLER'S computer-generated service and sales customer lists; sales and service customer files; sales, service, parts, and warranty manuals; display cases; catalogues, brochures, domain names; and announcement materials; personnel records; intellectual property; email addresses; websites; URL's; intellectual property; computers and all equipment related thereto; computer software; signs; telephone equipment; any and all trade names, including "Team Mitsubishi Hartford"; telephone and facsimile numbers; lease rights and leaseholds; and such other assets owned by SELLER and utilized in the operation of said business (all of which shall be in the same order and condition as on the date hereof on the date of closing), unless specifically excluded from this Agreement. The Operating Assets, the motor vehicle inventory, the Parts and Accessories Inventories, and other assets to be transferred are collectively referred to as the "**Purchased Assets**". The furniture, fixtures, tools, parts vehicles, service vehicles, machinery and equipment are more particularly set forth on **EXHIBIT "A"**.

(b) Motor Vehicle Inventory.

(i) SELLER's inventory of all new, unused, never registered, 2024 model year and later model year Mitsubishi motor vehicles with less than three hundred (300) miles on the odometer;

(ii) Upon delivery to the Premises, any and all then (at closing) current model year Mitsubishi motor vehicles consigned and invoiced to SELLER by MMNA, and not received by SELLER prior to closing. SELLER shall forthwith on demand of BUYER execute and deliver assignments of the statements of origin for such motor vehicles so purchased;

(iii) SELLER's inventory of motor vehicles not otherwise described in subparagraphs 1(b)(i) and (ii) ("Other Motor Vehicle Inventory"), but only to the extent the parties agree with respect to a purchase price for any such motor vehicle.

(c) Notwithstanding anything contained in this subparagraph (c) to the contrary, it is expressly understood and agreed that in the event that a vehicle required to be purchased hereunder is or has been damaged in excess of ONE THOUSAND DOLLARS ($1,000.00) (in the aggregate per vehicle), said damage is frame damage, or said damage must be disclosed to a customer under applicable Connecticut State law, BUYER shall not be obligated to purchase such vehicle(s) from SELLER.

(d) Parts, Accessories and Miscellaneous Inventories. SELLER's inventory of Mitsubishi parts and accessories, outside vendor parts and accessories, and the oil, gas, and grease inventories and supplies, as more specifically described in Section 2(h) hereof.

(e) Excluded Assets. SELLER's factory receivables, accounts receivable, and cash on hand and in banks, Company owned motor vehicles, new and used motor vehicles not identified herein or those vehicles as defined in subsection 1(b)(iii) for

which Buyer and Seller cannot in good faith determine a mutually acceptable purchase price, are excluded from this transaction.

2. **AGGREGATE PURCHASE PRICE.** The purchase price to be paid for the assets to be conveyed hereunder is as follows:

(a) With respect to the Operating Assets of SELLER described in subparagraph 1(a) hereof: The total sum of ONE MILLION DOLLARS ($1,000,000.00); and

(b) (i) With respect to the new, never registered motor vehicle inventory described in subparagraph 1(b)(i) and (ii) hereof: A sum equal to the factory invoice price for each said motor vehicle, less the following (if any) which have been paid to or received by or shall be paid to or received by SELLER: (i) factory holdbacks; (ii) Fifty (50%) Percent of manufacturer floor plan assistance; (iii) Fifty (50% of )advertising rebates or credits; (iv) any other credit from the manufacturer with respect to any purchased vehicles or then marketing or advertising credits, allowances or rebates; (v) any preparation allowances for any vehicles not prepared by SELLER prior to the date of closing for which SELLER will be paid; and (vi) the cost to effectuate unrepaired damage or missing equipment thereto, if any, plus the cost of any equipment added to any such vehicle.

(c) With respect to the Other Motor Vehicle Inventory described in subparagraph 1(b)(iii) hereof, such amounts as the parties may agree.

(d) BUYER shall not be required to purchase any vehicle that has been reported as sold to the manufacturer.

(g) Any swapped vehicles shall be valued as if the vehicle was acquired directly by SELLER from the manufacturer.

(h) With respect to the parts and accessories inventory described in subparagraph 1(d) hereof:

The parts and accessories to be purchased at closing pursuant to subparagraph 1(d) hereof shall include, dollar-for-dollar, (i) SELLER's entire inventory of new, undamaged, factory packaged (except in the instance of multi-packaged items not susceptible to packaging), and non-obsolete Mitsubishi parts and accessories (but inclusive of tires and Mitsubishi OEM fast moving parts and accessories), which are listed in MMNA's, current parts and accessories catalogue, ("Mitsubishi Parts and Accessories"), and (ii) SELLER's new merchantable outside vendor parts and accessories usable on 2019 and newer model year Mitsubishi vehicles, tires, and the gas, grease, and oil inventories ("Outside Vendor Parts and Accessories"). The Mitsubishi Parts and Accessories shall be computed at the then current Mitsubishi prices for each such item as listed in the MMNA catalog in effect on the closing date. The Outside Vendor Parts and Accessories shall be computed at SELLER's cost. All of SELLER's parts and accessories

shall be inventoried immediately prior to closing by an inventory service satisfactory to both parties, and the cost of said inventory shall be borne equally between BUYER and SELLER.

At closing, SELLER shall assign to BUYER its unused rights to return Parts and Accessories to MMNA pursuant to SELLER's Dealer Sales and Service Asset Sale Agreement, to the extent assignable.

3. **PAYMENT**.

(a) The aggregate purchase price (subject to adjustment at closing) shall be paid and satisfied as follows:

(i) The sum of ONE HUNDRED THOUSAND AND 00/100 ($100,000.00) DOLLARS (the "Deposit") paid by BUYER concurrently herewith, receipt of which is hereby acknowledged, and held in escrow by the law firm of Schiller, Pittenger & Galvin, P.C ("ESCROWEE"),in its non-interest bearing attorney trust account, until closing of title, to be paid to SELLER at Closing, or returned to BUYER in the event the contingencies hereinafter provided are not satisfied without fault, neglect, or omission(s)of BUYER;

(ii) The balance, subject to adjustments contained herein by wire transfer, at Closing.

(b) The foregoing purchase price shall be allocated in the manner set forth on **EXHIBIT "B"**, attached hereto and made a part hereof. The parties warrant and represent that said allocations were a prime subject matter of their negotiations and that they believe that these allocations truly reflect the economic value of the respective interests to be conveyed hereunder. The parties further warrant and represent that they shall not at any time, directly or indirectly, expressly or impliedly, take any action, with the taxing authorities or otherwise, inconsistent with the allocations outlined herein. At closing, the parties shall complete and execute Internal Revenue Service ("IRS") Asset Acquisition Statements under Section 1060 of the Internal Revenue Code of 1986 (IRS Form 8594) consistent with the allocation set forth on **EXHIBIT "B"**, and each covenants and agrees to file said form with their respective IRS income tax return for their respective tax periods covering the date of closing.

(c) The parties hereto shall, simultaneous hereto, execute the Escrow Agreement attached hereto as **EXHIBIT "C"**.

(d) In the event BUYER fails to close the transaction contemplated hereby in accordance with the terms hereof, the parties agree that SELLER shall be entitled to the Deposit as SELLER's sole and exclusive remedy therefor and that SELLER will not be entitled to any other further amounts hereunder, including, without limitation, a claim for special, consequential or any other damages against any person or

entity. The Deposit shall be considered as liquidated damages and as a consideration for reimbursement for any and all expenses incurred in connection with the transaction contemplated herein for any failure of such transaction to close. In such event, Escrowee shall release same to SELLER but only after providing BUYER with three (3) business days written notice and opportunity to object. Upon payment and delivery of the liquidated damages amount in accordance with the foregoing, this transaction shall be terminated and neither SELLER nor BUYER shall have any further liability hereunder. In the event of SELLER's default under this Agreement which remains uncured after applicable notice and applicable period to cure, if any, and its subsequent failure to close in accordance with the terms hereof, then BUYER may: (i) terminate this Agreement by giving written notice thereof to SELLER, whereupon the Deposit paid hereunder, shall be promptly returned to BUYER and upon payment and delivery, this transaction shall be terminated and the parties shall have no further liability to each other hereunder, each party being deemed fully released from the other with respect to their obligations under this Agreement; (ii) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Agreement; or (iii) proceed in court, but the BUYER's remedy shall be limited to the right to seek specific performance. If the other party does not object to the Claiming Party's written demand for the release of the deposit within said ten (10) day period referenced in subsection (f) below, then Escrowee shall promptly disburse the Deposit to the Claiming Party. In the event there is a dispute as to either party's failure to close or SELLER's default in accordance with the terms hereof, the party seeking payment of the Deposit (the "Claiming Party") shall make written demand for the Deposit on the Escrowee and the other party. If the other party objects to this demand in writing to the Escrowee within ten (10) days of the Claiming Party's written demand, then the Escrowee, upon notice to the parties, shall either (i) retain the Deposit , or, (ii) at its option, upon written notice to the SELLER and BUYER, avail itself of any procedure authorized by law to transfer the Deposit into a court of competent jurisdiction to await determination, or an accord and mutual agreement of SELLER and BUYER, with respect to the disposition of the Deposit . In the event the Deposit is deposited with a court of competent jurisdiction, the Escrowee shall have no further obligation under this Agreement.

4. **CLOSING.** Closing shall, at BUYER's discretion take place at the Premises, at the office of BUYER's attorney, at the office of SELLER attorney, or a such place as the parties may mutually determine and agree, within fifteen (15) days next succeeding the satisfaction of the contingencies in Sections 5 and10, and elsewhere in this Asset Sale Agreement. Execution of closing documents and payment of the purchase price may be accomplished remotely between legal counsel for BUYER and SELLER.

**5. ASSIGNMENT OF DEALERSHIP LEASE.** The SELLER leases the Premises from New Park Avenue Associates, LLC (**"Landlord"**) pursuant to that certain Lease Agreement by and between SELLER and Landlord, dated September 1, 20165 (the "Lease"), true copies of which are attached hereto and made a part hereof as **EXHIBIT "D"**. The Lease is guaranteed by Seller's principal, Robert Anthony Urrutia, a copy of which is also attached as part of **EXHIBIT "D".**. As a specific contingency to BUYER's performance under this Agreement, SELLER and BUYER shall obtain or cause to be

obtained, and BUYER shall have received, within forty-five (45) days of the date hereof (with the right of BUYER or SELER (but not both) to a thirty (30) day extension upon written notice to the other on or before the last day of the forty-five (45) day period ), the written consent of the Landlord to the assignment and assumption of the Lease to and by BUYER, such consent and lease assignment and assumption to be in a form mutually agreed to by BUYER, SELLER and Landlord (**"Lease Assignment Contingency"**), although BUYER and SELLER understand that Landlord's consent may be provided by Landlord under a separate writing or agreement. In connection with the foregoing, BUYER agrees to provide Landlord promptly with all reasonable and customary information requested by the Landlord as required under the terms of the Lease or as otherwise reasonably requested by Landlord. . Within fifteen (15) days from the date hereof, SELLER, BUYER, and their respective legal counsel shall prepare, negotiate, and finalize the proposed form of Lease Assignment and Assumption Agreement, and once prepared and agreed upon, shall forward the form to the Landlord; provided that the forgoing shall not take place if the Landlord or their counsel has their own forms of such documents or states that they will provide such forms. In the event the Lease Assignment Continency, is not obtained and/or satisfied within said forty-five (45) day period or the additional thirty (30) period (if said continency is extended as herein provided), then the BUYER or the SELLER shall have the right to terminate this Agreement upon written notice to the other. In the event of such termination, the Escrowee is authorized to release to BUYER the Deposit paid hereunder, and this Agreement shall be deemed null, void and of no further force or effect. SELLER and BUYER each covenant and agree to exercise due diligence, good faith and its bona fide efforts to satisfy the conditions required hereunder to obtain the consent of the Landlord and satisfy the Lease Assignment Contingency. The parties shall be equally responsible to pay to or reimburse the Landlord its attorney or other professional fees in connection with this consent, assignment and assumption. All other payments and charges with respect to the Lease, i.e., rent, security deposit, taxes, etc., shall be apportioned and/or adjusted as of the date of closing. BUYER shall cause its principal to personally guaranty the Lease in the form substantially similar to the Guaranty that Seller's Principal signed in connection with the Lease. SELLER further represents the to the following: SELLER has not received any written notice from the Landlord under the Lease claiming that the Landlord is in default of its obligations under the Lease which has not been cured other than for the payment of rent; to SELLER's knowledge the Lease is in full force and effect and nothing has occurred which, with the passage of time and/or with the giving of notice, might result in SELLER or the Landlord being in breach or default of its obligations under the Lease other than the payment of rent; SELLER has not agreed to pay any brokerage commissions or fees in connection with the Lease or in connection with any renewal of the Lease; or SELLER shall not modify, renew or extend the Lease, make any new leases for any portion of the Premises, nor enter into any contract, mortgage or other agreement affecting title to or the use, possession, operation and/or maintenance of the Premises, without advance written notification to BUYER. It is understood and agreed, and acknowledged by BUYER and SELLER that each shall cooperate with the other and use their respective reasonable efforts to promptly satisfy the Lease Assignment Contingency. In doing so, BUYER may, with the consent of SELLER, negotiate, discuss, and deal directly with the Landlord in connection with the Lease Assignment

Contingency and the satisfaction of same, and if the Landlord requires written confirmation as to same, SELLER will promptly provide such writing or documentation.

6. **OUTSTANDING SALES CONTRACTS AND ORDERS**. The parties understand that there may be, on the date of closing, outstanding sales contracts and/or orders ("Contracts and/or Orders") between SELLER and third-party purchasers for the sale or lease of new Mitsubishi motor vehicles. For the purpose of arranging for the proper fulfillment of said Contracts and/or Orders, the parties have agreed that SELLER shall assign those Contracts and/or Orders to BUYER at closing. BUYER covenants and agrees to perform said Contracts and/or Orders in place and instead of SELLER. SELLER agrees not to contract to sell motor vehicles in industry-wide short supply to other than valid third-party purchasers in arms-length transactions if such sales would prevent the BUYER from completing said Contracts and/or Orders.

SELLER shall, at closing, provide a credit to BUYER for the amount of each deposit received with respect to any Contracts and/or Orders to be assumed by BUYER.

BUYER shall not be obligated to accept any Contracts or Orders that do not show a profit or which demonstrate an "over-allowance" on a trade-in vehicle. The Contracts and/or Orders represent arms-length sales of ordered new, current-model year motor vehicles and previous-model year motor vehicles to third party purchasers unrelated to SELLER's principals and, provided further, that SELLER shall deliver to BUYER, at closing, all deposits paid on account thereof and documentation that the vehicle was timely ordered in the ordinary course of SELLER's Business. BUYER agrees to perform the Contracts and/or Orders in place and instead of SELLER. SELLER and BUYER shall equally share in the profit from each such sale, *i.e.,* SELLER shall receive fifty (50%) of the proceeds of the sale following deduction of customary expenses, such as commissions, and within (7) days of the delivery of each such vehicle, BUYER shall receive such proceed from SELLER. BUYER shall indemnify and hold SELLER harmless from any claims relating to or arising from BUYER'S performance of the Contracts and/or Orders. SELLER shall indemnify and hold BUYER harmless from any claim and all monetary loss as a result of an improper appraisal of any trade-in vehicle not consistent with used car guide book prices in connection with any such Contract and/or Order, or any irregularity therein (including reasonable attorneys' fees and costs). In the event that BUYER reasonably determines that a trade-in vehicle was not properly appraised in accordance with customary practices, BUYER has the right to require SELLER to purchase the vehicle for the appraised amount. BUYER shall have the right, prior to closing, to review and reasonably approve or reject any Contract and/or Order that will not realize a profit reasonably consistent with SELLER's present practices.

7. **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER**. SELLER represents and warrants to BUYER:

(a) Company Matters.

(i) The SELLER is a limited liability company, duly organized, validly existing, in good standing, and is authorized to do business in the State

of Connecticut. The SELLER has the power to enter into this Asset Sale Agreement, to perform all of its obligations hereunder, to own the Purchased Assets, and to conduct its business.

(ii) The execution, delivery and performance of this Asset Sale Agreement by the SELLER will have been duly authorized by all requisite action and the persons executing this Asset Sale Agreement on behalf of the SELLER shall have been authorized with the full power and authority to do so and to perform every act and to execute and deliver every document and instrument necessary or appropriate to consummate the transaction.

(iii) This Asset Sale Agreement constitutes the valid obligation of the SELLER, is legally binding, and is enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency and other laws and equitable principles affecting creditors' rights generally and the discretion of the courts in granting equitable remedies.

(iv) The execution and delivery by the SELLER of this Asset Sale Agreement and any other agreements, certificates, instruments and documents executed and delivered by pursuant hereto, and the consummation by the SELLER of the transaction, will not constitute (with the giving of notice or the lapse of time or both) a violation of, be in conflict with, result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both), or constitute a default under (i) any term or provision of the by-laws or operating agreement of the SELLER, as may be amended, (ii) any material agreement, commitment or understanding to which the SELLER is subject or by which it is bound, or (iii) any applicable law.

(v) That, to the best of SELLER's knowledge, except as otherwise provided herein, the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with or result in a breach or default under any provision of law, order of any court or other agency of government, or any note, debenture, mortgage, loan agreement or other instrument to which SELLER is a party or by which it is bound, except that MMNA, pursuant to its Dealer Sales and Service Agreement with SELLER, possesses a right of first refusal with respect to this Agreement.

(b) Title. The SELLER has good and marketable title to the Purchased Assets, respectively. The Purchased Assets will not, at closing, be subject to any liens or encumbrances, and shall be transferred free and clear of any liens or encumbrances.

(c) Taxes. The SELLER has duly filed its federal, state, county and local income, excise, sales, property, withholding, social security, franchise, license, information returns and other tax returns and reports as and when same has fallen due, or has obtained appropriate and permitted extensions thereto, required to be filed by it to the date hereof with respect to the Business and the Purchased Assets. To SELLER's, it has not received any notice for liability for any taxes, assessments, amounts, interest or

penalties of any nature whatsoever other than those for which the SELLER has created sufficient reserves or made other adequate provision. No governmental authority is now asserting or threatening to assert any deficiency or assessment for additional taxes, interest, penalties or fines with respect to the SELLER, the Business or the Purchased Assets.

(d) Books and Records. The financial statements and related financial and operational statements of the SELLER made or hereafter made available to the BUYER for inspection are complete in all material respects and fairly present the financial condition and the results of operations at the respective dates of and for the periods referred to in such records.

(e) Litigation. Except as set forth on **SCHEDULE 7(e)**, there is no litigation pending, or to the knowledge of the SELLER threatened, against or relating to the SELLER. There are no judgments, orders, decrees or awards before any court, department, commission, board, instrumentality or arbitrator which bind or affect the SELLER, the Business or the Purchased Assets.

(f) Compliance with Applicable Laws. The SELLER is and has been in compliance in all material respects with all applicable laws, and it is not and has not been either charged with, in receipt of any notice or warning of, or to the knowledge of SELLER, under investigation with respect to, any failure or alleged failure to comply with any provision of any applicable law.

(g) Assumed Contracts. The Assumed Contracts (as described in Section 15 of this Asset Sale Agreement) and **EXHIBIT "E"** are valid, binding and enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity. No event or condition has occurred and is continuing which, with or without the lapse of time or giving of notice, constitutes, or would ripen into or become, a breach of or default under an Assumed Contract by the SELLER, or, by any other party thereto, in any term, covenant or condition of each Assumed Contract. SELLER has the right to assign the Assumed Contracts to Buyer, subject to, as may be applicable, obtaining the consent as may be required, of the other party thereunder.

(h) Employment Matters.

(i) Except as set forth on **SCHEDULE 7(h)**, SELLER has no oral or written collective bargaining or employment agreements, organized labor agreement, bonus, deferred compensation, pension, profit sharing, welfare or health benefit, or retirement plan or arrangement, whether or not legally binding, nor is SELLER currently paying any pension, deferred compensation or retirement allowance to anyone, nor will the consummation of this Asset Sale Agreement give rise to any withdrawal liability regarding any such plan.

(ii) The SELLER is not delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation

for any services performed by them to the date hereof or amounts required to be reimbursed to such employees.

(iii) The SELLER has complied in all material respects with the applicable requirements for its employee medical and benefit plans as set forth in the Internal Revenue Code and ERISA, including Section 4980B of the Code (as well as its predecessor provision, Section 162(k) of the Code) and Sections 601 through 608, inclusive, of ERISA, which provisions are hereinafter referred to collectively as "**COBRA**."

(iv) SELLER shall furnish to BUYER a list of all employees, their rates of pay, including base pay, and any incentive, commission or bonus plans. BUYER shall safeguard the information pursuant to applicable law. Nothing contained in this Section, or elsewhere in this Agreement, shall obligate BUYER to hire any employee of SELLER, or to adopt SELLER's employment policies. Any "re-hiring" of such employees by BUYER will be done on a voluntary and discretionary basis. Prior to closing, SELLER shall provide written notice to its employees in accordance with COBRA. BUYER shall have the right to contact SELLER's employees within fifteen (15) days prior to closing to discuss the transactions contemplated by this Agreement and possible employment of said individuals by the BUYER, unless otherwise agreed to and coordinated by the parties.

(i) Environmental.

(i) Except as otherwise provided in this Agreement and the Environmental Reports (as hereinafter defined) and to SELLER's knowledge, that (A) Hazardous Substances used at the Premises have been used in compliance with applicable environmental laws: (B) it has not received any notices regarding or advising that the SELLER and/or the Premises are in violation of or violating any environmental laws of a material effect; and (iii) there are no pending actions by any governmental entity against or regarding the SELLER or the Premises arising from violations or alleged violations of environmental laws.

(ii) The SELLER has provided to BUYER copies of certain environmental reports concerning the Premises, a schedule of which is attached hereto and made a part hereof as **SCHEDULE** 7(i)(ii) (collectively the "Environmental Report").

(iii) Hazardous Substances shall be construed broadly to include any toxic or hazardous substance, material or waste, including petroleum and petroleum products.

(j) Manufacturer Communications. Except as set forth on **SCHEDULE 7(j)**, MMNA has not notified the SELLER that the Premises or operations are deficient or otherwise not in compliance with MMNA's requirements.

(k) Tradenames; Domain Names; Uniform Resource Locators

("URLs"). **SCHEDULE 7(k)** sets forth a complete list of all tradenames and trademarks that have been utilized by the SELLER in its Business and a list of business phone numbers and SELLER's Internet domain names or URLs registered, owned, or leased by the SELLER.

(l) Properties/Storage Lots. The only real estate used by the SELLER in the Business or necessary to the operation of the Business is the Premises. Except as provided on **SCHEDULE 7(l)**, attached hereto, SELLER does not lease or occupy any offsite storage lots for employee or customer parking, or for storage of motors other than the Premises and the Location set forth in **SCHEDULE 7(l).**

(m) Miscellaneous.

(i) That SELLER commenced its business operation on or about March 2021.

(ii) That SELLER's representatives, agents, or employees shall not remove from the Premises prior to closing any of the operating assets set forth in Section #1(a).

(iii) That SELLER has not removed any equipment or accessories from the new vehicles to be purchased by BUYER hereunder and such vehicles are equipped as per the manufacturer's/distributor's invoice.

(o) Covenants.

(i) That SELLER shall keep its Business open and operative during the hours it currently is open and operating for the Business of SELLER; and to continue to attempt to undertake the dealership to function in its current ordinary course of its Business; and not acquire or dispose of any of its assets and properties or obligate itself to do so, except as may be expressly provided by the terms of this Asset Sale Agreement, or except in the ordinary course of business.

(ii) That, as of the date hereof, there is in effect insurance coverage of the type, and in the amounts, as is customary for SELLER's Business that SELLER has not received any notice of cancellation or non-renewal of any policies with respect to said insurance coverage, and that SELLER shall keep all of its insurable assets that are the subject matter of this Asset Sale Agreement insured in accordance with present practices.

(iii) That SELLER will remove all debris from the Premises prior to closing, including, but not limited to, all used tires, batteries, drums and abandoned vehicles so that the Premises is delivered in "broom clean" condition. SELLER shall remove any Mitsubishi Parts & Accessories and/or Outside Vendor Parts & Accessories not purchased by BUYER or agreed to be retained by BUYER within ten (10) business days subsequent to closing.

(iv) Except with the prior written consent of BUYER, which consent shall not be unreasonably withheld nor unduly delayed, SELLER shall not, after the Due Diligence Period (as defined in Section 10(c) hereof) expires without termination of this Agreement, and prior to the closing date: (A) Enter into an employment or consulting agreement for personnel services, unless in the ordinary course of business and which is not terminable without liability upon thirty (30) days' notice or less, or which the BUYER shall not be responsible for after closing; (B) Incur or become subject to, or agree to incur and become subject to, any material obligation or liability (except normal trade or business obligations incurred in the ordinary course of business); (C) Sell, assign, transfer, convey, lease or otherwise dispose of, or agree to sell, assign, transfer, convey, lease, or otherwise dispose of, any of its assets, except in the ordinary course of business; and (D) Refrain from taking any action which would render any representation and/or warranty contained in this Asset Sale Agreement inaccurate in any material respect as of the date of closing, and SELLER agrees to use its best efforts to promptly notify BUYER of any claims or proceedings against SELLER that would have a material adverse effect on the assets of the Business.

(v) SELLER, its agents, employees and tenants, shall to comply with all applicable laws, ordinances, rules, requirements and regulations of federal, state, county, and local governments and all agencies or other governmental entities thereof, including, without limitation, environmental, health, and safety, which affect the business operations at the Premises or its use thereof, and to which the SELLER may be subject, and SELLER has no knowledge of any claims filed against, or notices received by SELLER alleging a violation of any such laws, ordinances, rules, requirements or regulations.

(vii) That, concurrently with closing, unless sooner requested by MMNA (and then within five (5) days of such request), SELLER shall voluntarily cause to be executed and delivered to MMNA a concurrent dealer termination letter, and such other documentation reasonably requested by MMNA, with respect to its Dealer Sales and Service Agreement and effective upon closing in order to facilitate BUYER's application for a Dealer Sales and Service Agreement with MMNA.

(viii) That SELLER shall pay any and all sales, personal or other taxes arising from or relating to the sale of the Purchased Assets which are the obligation of SELLER.

(ix) Neither SELLER nor its Principal will assert that BUYER is responsible for the obligations of SELLER under a theory of successor liability.

(x) That, as of the date of this Agreement and as of the closing date, substantially all of SELLER's equipment, machinery and mechanical systems (i.e., tools, systems and equipment utilized to service vehicles, plumbing, electrical, HVAC, mechanical and septic) are and will be in the same working order s the date that BUYER conducted its property condition expections, and that SELLER is and shall be, at closing, in full compliance with all OSHA requirements.

## 8. REPRESENTATIONS AND WARRANTIES OF BUYER.

Representations and Warranties by the BUYER. BUYER represents and warrants to SELLER:

(a) Company Matters. The following shall, as applicable, apply to BUYER or any permitted assignee of BUYER:

(i) Should BUYER assign it's rights hereunder to an entity, the entity is duly organized, validly existing and in good standing under the laws of the State of Connecticut.

(ii) The execution, delivery and performance of this Asset Sale Agreement by the BUYER will be duly authorized by all requisite company action and the persons executing this Asset Sale Agreement on behalf of the BUYER shall have full power and authority to do so and to perform every act and to execute and deliver every document and instrument necessary or appropriate to consummate the Transaction. No approval or consent of any other person is required in connection with the execution, delivery, and performance by the BUYER of this Asset Sale Agreement.

(iii) This Asset Sale Agreement constitutes the valid obligation of the BUYER and assignee, is legally binding, and is enforceable in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency and other laws and equitable principles affecting creditors' rights generally and the discretion of the courts in granting equitable remedies.

(iv) The execution and delivery by the BUYER of this Asset Sale Agreement and any other agreements, certificates, instruments and documents executed and delivered pursuant hereto, and the consummation by the BUYER of the transaction, will not constitute (with the giving of notice or the lapse of time or both) a violation of, be in conflict with, result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both), or constitute a default under (i) any term or provision of the by-laws or operating agreement of the BUYER, as may be amended, (ii) any agreement, commitment or understanding to which the BUYER or any of the BUYER's members/shareholders is subject or by which it, he or she is bound, or (iii) any applicable law.

(b) Authority. The BUYER has the power and authority to enter into this Asset Sale Agreement and to perform all of its obligations hereunder.

(c) Financing. BUYER has the funds necessary to consummate the subject transaction, subject to obtaining wholesale floor plan and acquisition/working capital financing as per Section 10(b) hereof.

(d) Taxes. BUYER shall pay any and all sales, personal or other taxes arising from or relating to the purchase of the Purchased Assets which are the obligation of BUYER.

(e) Occupancy. If and in the event the municipality in which the Premises is located requires submitting applications to, and/or obtaining inspections from the municipality's department(s) for a certificate of occupancy, certificate of continued valid occupancy, or zoning approval or permit (or similar documents) (collectively, the "**C/O**") in favor of the BUYER prior to Closing authorizing the use of the Premises as a new and used motor vehicle dealership and all uses incidental thereto, then BUYER will prepare, execute and submit the application and fees (the cost of such fees to be reimbursed to BUYER at Closing) and will coordinate any inspections required by the municipality or its departments at the Premises. SELLER will reasonably cooperate with BUYER, and the municipality and its departments in connection therewith.

**9. REPRESENTATIONS, WARRANTIES AND COVENANTS TRUE AS OF CLOSING DATE**. All of the representations, warranties and covenants contained Sections 7 and 8 hereof shall be true and correct and shall not have been breached on and as of the day of the closing date; said representations, warranties, and covenants to survive closing for a period of one (1) year, with any action arising therefrom to be instituted within one (1) year and three (3) months from Closing.

**10. CONTINGENCIES.**

The BUYER shall have the time periods referenced in each particular subsection in this Section 10 from the date of this Asset Sale Agreement to undertake and/or obtain the following unless expressly waived or modified by BUYER in writing:

(a) **FRANCHISE CONTINGENCY**.

(i) Within ninety (90) days, a written commitment from MMNA to issue a term form of Mitsubishi Dealer Sales and Service Agreement naming BUYER as the Dealer Principal (or such other equivalent term as MMNA may utilize), authorizing BUYER's sale and factory authorized service of Mitsubishi motor vehicles, parts, and accessories at the Premises, as presently constituted without requirement of facility expansion or modification and waiver of MMNA's rights to acquire the Operating Assets/Business (the "Franchise Contingency").

(ii) BUYER covenants and agrees to exercise due diligence, good faith, and its best, immediate, and bona fide efforts to obtain the approval required hereunder. BUYER represents and warrants that BUYER knows of no reason why MMNA would not approve the application of BUYER.

(iii) SELLER shall cooperate with BUYER in connection with said approval and obtain for BUYER all required application forms unless MMNA shall make those forms available on-line or in a web site, provided, however, that nothing herein contained shall obligate SELLER to participate in any litigation or proceeding or

arbitration relating to same. SELLER shall promptly dispatch notification of this Asset Sale Agreement to MMNA in accordance with the applicable provisions of Connecticut motor vehicle franchise laws. (the "Act"), and BUYER shall promptly submit to MMNA all commercially reasonable information required by the Act and by MMNA to obtain the subject approvals, within fifteen (15) days from the date BUYER receives the application materials from MMNA.

(b) **FINANCE CONTINGENCY.**

Within forty-five (45) days, BUYER shall have the right to obtain from an institutional lender ("Lender") (i) wholesale motor vehicle floorplan financing in amounts and upon prevailing terms, interest rate, and conditions, and consistent with MMNA's requirements and sufficient to purchase all new vehicles as contemplated by this Agreement, currently estimated at $3,000,000.00; and (ii) acquisition financing of no less than $650,000.00 with respect to the Operating Assets upon prevailing terms, conditions, and interest rate consistent with industry and Lender's standards (the "Financing Contingency"). BUYER acknowledges that the Lender will require that BUYER's Principal, William Ezedine (the "Principal") to personally guaranty said financing, and Buyer shall cause the Principal to agree same, and that the Lender's requirement for a personal guaranty shall not be a reason to terminate this Agreement for non-satisfaction of the Financing Contingency.

(c) **PREMISES DUE DILIGENCE.**

(A) BUYER shall have forty-five (45) days from the date hereof to undertake physical and environmental inspections of the Premises, and to satisfy itself as to zoning and other governmental regulations affecting the Premises ("Premises Due Diligence"), and to obtain such reports and studies as BUYER in its reasonable discretion may elect to commission at its sole cost and expense with respect to the Premises Due Diligence. Notwithstanding the above, BUYER shall not authorize any invasive investigations of the Premises without SELLER's consent. Any on-site inspections or testing of the Premises shall be conducted on forty-eight (48) hours' prior notice to SELLER (which notice may be oral or by email). SELLER shall have the right to have a representative present during such inspections or testing. Any such inspections shall be conducted by companies selected by BUYER. BUYER agrees to repair any damage to the Premises and to indemnify and hold SELLER harmless from any claim for liabilities, costs, expenses (including reasonable attorneys' fees incurred), damages or injuries arising out of or resulting from the inspection or testing of the Premises by BUYER or its agents, such obligation to indemnify shall survive the Closing or termination of this Agreement. BUYER shall (i) ensure that BUYER or BUYER's consultants maintain commercial general liability insurance and Premises damage insurance in the amount not less than $1,500,000 and in form and substance adequate to insure against all liability of BUYER and its consultants, respectively, and each of its agents, employees or contractors, arising out of their presence on the Premises or their inspections or testing of the same; and (ii) obtain all necessary approvals, permits and

licenses, comply with all applicable statutes, regulations, and ordinances, and will conduct its testing or investigations in a reasonable and workmanlike manner and so as to minimize any interference with the conduct of the business of the tenant at the Premises.

(B) It is SELLER's belief that the subject transaction and the operations conducted at the Premises does not subject Seller to the provisions of the Connecticut Transfer Act as set forth in Connecticut General Statutes 22a-134 et seq. ("Transfer Act"), as SELLER should not be deemed an Establishment under the Transfer Act. To the extent that the subject transaction and the operations conducted at the Premises would regard SELLER as an Establishment under the Act, then to the extent compliance is required by, under and to the Act, SELLER (or applicable, Landlord) will comply with same and shall be responsible to perform all work, studies and remediation (pre and post closing) and shall have the obligation to file all necessary Forms with the Connecticut Department of Energy and Environmental Protection, and shall be the Certifying Party.

(C) BUYER shall have forty-five (45) days from the date hereof to apply for and obtain a new vehicle dealer license from the State of Connecticut Department of Motor Vehicles, which may require approval from the one or more departments of the City of Hartford ("DMV Contingency").

(d) **TERMINATION.**

(i) If and in the event that the contingencies specifically referenced in subsection (a), (b), and/or (c) or Section 5 hereof are not obtained or satisfied without fault, neglect or omission(s) of BUYER, or waived by BUYER (in writing), within the timeframe referenced therein, then either party shall have the right to terminate this Asset Sale Agreement upon written notice to the other.

(ii) In the event of lawful termination pursuant to this Section 10, this Asset Sale Agreement shall be deemed null, void, and of no further effect, and the Escrowee is authorized to release the Deposit paid hereunder to Buyer.

**11. INDEMNIFICATION.**

(a) SELLER hereby agrees to indemnify, defend, and hold BUYER and its Principal harmless from, against and in respect of, and shall reimburse BUYER, as incurred, for all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses, asserted against, resulting to, imposed upon, suffered by or incurred by BUYER, by reason of or resulting from SELLER's operation of the Business prior to or as of the date of closing, or a breach or nonfulfillment of any representation, warranty, covenant, or agreement of SELLER contained in or made pursuant to this Asset Sale Agreement or the assertion against BUYER of any liability of SELLER not to be assumed by BUYER hereunder. (the "BUYER's Claims").

(b) BUYER hereby agrees to indemnify, defend, and hold SELLER and its Principal harmless from, against, and in respect of, and shall reimburse SELLER or as applicable its Principal, as incurred, for all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses, including, without limitation, interest, penalties and attorneys' fees and expenses, asserted against, resulting to, imposed upon, suffered by or incurred by SELLER, by reason of or resulting from BUYER's operation of the subject Business subsequent to closing, or a breach or nonfulfillment of any representation, warranty, covenant, or agreement of BUYER contained in or made pursuant to this Asset Sale Agreement ("SELLER's Claims").

(c) Except for third party indemnification obligations, neither party shall be liable to the other party for any special, incidental, consequential or punitive damages or losses of any kind that may be suffered by the other with respect to the subject matter of this Asset Sale Agreement. BUYER's right to indemnification, reimbursement or any other remedy based upon SELLER's representations, warranties, covenants and obligations in this Asset Sale Agreement (or any document executed in connection herewith) shall be vitiated, by any actual knowledge acquired by BUYER before the closing date, with respect to the accuracy or inaccuracy of, or compliance with, any such representation, warranty, covenant or obligation.

(d) The obligations and liabilities of the parties hereunder with respect to BUYER's Claims and SELLER's Claims (collectively, the "Claims") resulting from the assertion of liability by third parties shall be subject to the following terms and conditions: The party hereto seeking indemnification (the "Indemnitee") will give the other party hereto (the "Indemnitor") notice of any such Claims reasonably promptly after the Indemnitee receives notice thereof, and the other party shall have a reasonable period of time (not to exceed thirty (30) days) to cure or otherwise resolve the Claims. The Indemnitor shall then have the option of either defending the Claims on behalf of itself and the Indemnitee, or demanding that the defense be undertaken by the Indemnitor. In either case, the Indemnitor shall be liable for all reasonable and customary expenses of the defense and for all liabilities or amounts paid in settlement on account of the Claims and all expenses paid with respect to any dispute concerning the indemnification provisions herein. In any event, the party not undertaking the defense shall have the right to intervene in the proceeding and participate at its own expense. If the Indemnitee elects to defend against any Claims, it shall not settle any such Claim without the consent of the Indemnitor. The indemnification hereunder shall be as incurred, so that no Indemnitee shall have to advance or expend any funds of his or its own.

(e) Failure of the Indemnitee to give reasonably prompt notice of any Claim or Claims shall not release, waive, or otherwise affect the Indemnitor's obligations with respect thereto, except to the extent that the Indemnitor can demonstrate actual loss and prejudice as a result of such failure. BUYER shall not be deemed to have notice of any Claim by virtue of knowledge acquired prior to the closing date by an employee of SELLER who subsequently becomes employed by BUYER.

(f) Except as herein expressly provided, the indemnification rights of the parties hereto under this Asset Sale Agreement are independent of and in addition to such rights and remedies as the parties may have at law or in equity for any fraud, misrepresentation, breach of warranty, or failure to fulfill any agreement or covenant hereunder on the part of any party hereto, including, without limitation, the right to seek specific performance, rescission or restitution, none of which rights or remedies shall be affected or diminished hereby.

(g) The parties hereto agree to pay promptly to any Indemnified Party the amount of all damages, losses, deficiencies, liabilities, costs, expenses, claims, and other obligations to which the foregoing indemnity relates.

(h) Any claim which is the subject of an indemnity under this Section 12 which exists solely between BUYER and SELLER and does not include any third parties, to be viable, shall be instituted within one (1) year and three (3) months of Closing. All other indemnification obligations shall remain in existence for as long as any third party claims are or can be advanced pursuant to their applicable statutes of limitations.

**12. <u>ACCOUNTS RECEIVABLE OF SELLER</u>.** SELLER's accounts receivable, including, without limitation, factory receivables, shall remain the sole property of SELLER. BUYER agrees to accept payment on account of such accounts receivable from SELLER's customers if and to the extent tendered and to remit promptly said payments to SELLER and to cooperate with SELLER in the collection of said accounts receivable.

**13. <u>WORK IN PROCESS</u>.** BUYER shall reimburse SELLER on the closing date for SELLER's net direct cost of completed labor and parts installed, or materials used, or in process of installation on any uncompleted repair orders in process (for less than sixty (60) days) (or one hundred twenty (120) days for engine warranty work or for parts on MMNA parts backorder) and in SELLER's possession on the closing date. Said uncompleted repair orders shall become the property of BUYER. BUYER shall complete such repair work and shall be entitled to collect the entire proceeds covering such repair work from the customers of SELLER, and shall indemnify and hold SELLER harmless from any and all claims in connection with same for post-closing work (including reasonable attorneys' fees and costs).

**14. <u>ASSUMPTION OF CERTAIN OBLIGATIONS OF SELLER</u>.** BUYER shall assume, at closing, those certain leases and obligations of SELLER, specifically enumerated and described with copies of each underlying document on **<u>EXHIBIT "E"</u>**, attached hereto and made a part hereof (the "Assumed Contracts"). Any and all payments, charges and/or credits with respect to any Assumed Contracts shall be apportioned and adjusted as of the date of closing, and any fees or costs associated with the actual assignment which are asserted by the lienholder, lessor, or owner (<u>i.e.,</u> preparation of documents, transfer fees) shall be split equally between BUYER and SELLER. SELLER shall indemnify and hold BUYER harmless from and against any

claims asserted by the lessors or obligees of the Assumed Contracts, which claim is based upon facts arising and/or usage to the date of Closing. BUYER shall indemnify and hold the SELLER harmless from any and all loss, liability, damage or expense (including attorneys' fees and costs of litigation) resulting from the BUYER's failure to perform any act or fulfill any obligation under any of said Assumed Contracts accruing after the closing date. In the event lienholder's, lessor's, or owner's consent is necessary with respect to any assignment, then the parties agree to obtain same prior to closing. To the extent property must be delivered or returned to any third party as a result of the assumption, transfer, or termination of any of said Assumed Contracts, the BUYER agrees to cooperate in and effect such return.

**15. <u>ADJUSTMENTS</u>.** (a) The following adjustments shall be made at closing:

(1) Telephone and other utilities for the then-current period;

(2) Employee wages, sick days, personal days, and vacation days to SELLER's employees shall be satisfied and paid by SELLER concurrent with closing. All other benefits to be paid to the employees, e.g., sick days, personal days, and vacation days, after the date of closing shall be BUYER's responsibility as to any employees who were hired by the BUYER.

(3) Work-in-process pursuant to Section 13 hereof;

(4) The Assumed Contracts pursuant to Section 14 hereof;

(5) reimbursement to SELLER for the cost of any special tools or other equipment required by MMNA and invoiced to SELLER subsequent to the date hereof through the Closing Date;

(6) The rent, security deposit, and such other adjustments as required under and pursuant to the Lease; and

(7) Any and all other adjustments as required hereunder, including personal property taxes levied upon the Purchased Assets.

(b) SELLER shall reimburse BUYER for any equipment, accessories, parts, deposits for special parts orders, and/or the cost of labor (at BUYER's cost) that SELLER has or had agreed to provide or furnish third parties or customers of SELLER and to which BUYER will now have to provide or furnish ("WEOs"), if any. At Closing, BUYER and SELLER shall make an adjustment for those WEOs that can be computed as of that date. Thereafter, SELLER shall reimburse BUYER, within five (5) days of BUYER's written notification to SELLER of same, for the amount expended by BUYER with respect to further WEOs. SELLER's obligation to reimburse BUYER for all such WEOs shall survive Closing of title hereunder.

16. **RISK OF LOSS.** Risk of loss and/or damage to the Purchased Assets and the subject matter of this Asset Sale Agreement by casualty and liability for personal injury, property and leasehold improvement damage shall be borne by SELLER until closing. BUYER shall not be required to close under this Asset Sale Agreement if any building at the Premises, or any of the Premises, is not useable for its intended use as a result of fire or other casualty loss.

17. **CONDEMNATION.** Seller represents that it has neither knowledge nor written notice of any condemnation or eminent domain proceeding, either existing or contemplated, against the Premises. If, prior to Closing, Seller learns or receives written notice of any condemnation proceeding, or if a Declaration of Taking is filed, or if any other action is filed in furtherance of a condemnation or eminent domain proceeding, then and in such event, Buyer shall (a) accept an assignment of the condemnation rights and proceeds and shall close title with a proportionate reduction of the Purchase Price or (b) terminate this Asset Sale Agreement. In the event of the latter, the Escrowee shall promptly return the deposit monies paid hereunder to Buyer, and this Asset Sale Agreement shall be deemed null, void, and of no further effect.

18. **NOTICES.** Any notice, communication, request, reply or advice or other notice pertaining to this Asset Sale Agreement to be given, made or accepted by either party to the other must be in writing and shall be given or be served only by dispatching the same by Federal Express (or any other established overnight courier delivery service), by email, or by facsimile with hard copy to be received within two (2) business days of the party's receipt of the facsimile, and such notice so dispatched shall become effective on the date of receipt. For purposes thereof, the addresses of the parties hereto are as follows:

If to SELLER: Craig M. Heller, Esq.
Schiller, Pittenger & Galvin, P.C.
1771 Front Street
Scotch Plains, New Jersey 07076
cheller@schiller.law

[redacted]

19. **COMMISSIONS**. Each party warrants and represents to the other that the Business was not shown to BUYER by any broker pursuant to the terms of a separate written agreement between Seller and Broker. Each party agrees to indemnify, defend and hold the other party harmless from and against all damages and expenses, including, but not limited to, reasonable attorneys' fees, that the indemnified party may incur as a

result of any claim of any broker who claims to have introduced the indemnifying party to this transaction. The provisions of this Section 19 shall survive the Closing.

**20. INDEPENDENT COUNSEL** Theodore E. Schiller, Esq. of Schiller, Pittenger & Galvin, P.C. ("SP&G") has been retained as counsel to SELLER. BUYER has retained the services of Carl M. Porto II Esq. in connection herewith.

**21. ASSIGNMENT.** This Asset Sale Agreement may not be assigned by BUYER, except to an entity formed and owned by BUYER for the purpose of consummating this Agreement. Notwithstanding any such assignment BUYER as referenced in this document shall continue to be personally responsible under any provisions regarding approvals, guarantees and indemnification.

**22. HSR ACT AND NOTICE.** In the event that BUYER determines that BUYER and SELLER are required to complete a filing pursuant to the Hart-Scott-Rodino Anti-Trust Improvements Act of 1976 ("**HSR Act**") then BUYER and SELLER shall cooperate on a good faith, commercially reasonable basis to undertake such filing or notice and all costs, including any costs or fees associated therewith, (inclusive of fees incurred by SELLER) shall be paid by SELLER. BUYER and SELLER shall also promptly notify the other in writing if it receives any notice, or otherwise becomes aware, of any action or proceeding instituted or threatened by any Governmental Authority or any third party to restrain or prohibit, or obtain damages in respect of this Asset Sale Agreement or the transactions contemplated by this Asset Sale Agreement. If applicable, the approval under HSR shall be a condition to closing.

**23. TAX CLEARANCE.**

SELLER agrees to provide BUYER with all information needed to notify the applicable Connecticut taxing authorities in order for SELLER to obtain a Certificate of tax Clearance in its ordinary course. Escrows, if any are required by law or suggested by the Connecticut Department of Revenue ("CTDR"), shall be held by the attorney for the SELLER and released only upon instructions received from the state of Connecticut authorizing such release. Any payments required to be made from or at the time of the closing shall be paid from the purchase price and shall be made by BUYER'S legal counsel and remitted directly to the State of Connecticut. BUYER agrees to notify the CTDR within one (1) business day of the establishment of a closing date by the parties, however BUYER will notify the CTDR within two (2) business days of SELLER requesting same of BUYER by SELLER's written notification to BUYER.

**24. CONDITIONS PRECEDENT TO THE CLOSING.**

(a) Conditions Precedent to BUYER's Obligations to Complete the closing. The obligations of BUYER to perform its obligations under this Asset Sale Agreement and complete the closing of the transactions contemplated by this Asset Sale Agreement are subject to and contingent upon the occurrence of the following conditions with respect to BUYER and the fulfillment by SELLER, as the case may be, on or prior

to the closing date, of the following conditions, any one or more of which may be waived by BUYER:

(1) Representations, Warranties and Covenants. The representations and warranties of SELLER contained in this Asset Sale Agreement shall be materially true, complete and correct on and as of the closing date with the same force and effect as though made on and as of the closing date. SELLER shall have performed and complied with all covenants and agreements required by this Asset Sale Agreement to be performed or complied with by SELLER on or prior to the closing date.

(2) Injunction, Etc. At the closing, there shall not be any judgment, decree, injunction, ruling or order of any Governmental or regulatory body outstanding against any party hereto that prevents consummation of the transactions contemplated by this Asset Sale Agreement or any of the conditions to the consummation of the transaction contemplated by this Asset Sale Agreement.

(3) No Material Adverse Change. Since the date of this Asset Sale Agreement, there shall not have been any material adverse change in the condition (financial or otherwise), results of operations of the Business or performance of SELLER.

(4) Satisfaction. Satisfaction of BUYER contingencies as set forth in this Agreement, or BUYER's waiver of same.

(b) Documents to be Delivered by SELLER to be Received by BUYER. At the closing, SELLER shall deliver, or cause to be delivered, to BUYER the following documents, duly executed and/or the BUYER having received the following documents and/or agreements where applicable:

(1) Bill of Sale, dated the closing date;

(2) Certificate, executed by SELLER "SELLER's Bringdown Cert"), dated the closing date, confirming the matters set forth in Section 7 hereof;

(3) Resolution approving the transactions contemplated by this Asset Sale Agreement duly adopted by the Members, Shareholders and Directors of SELLER, and the incumbency of the officers of SELLER executing, on behalf of SELLER, this Asset Sale Agreement and the other agreements contemplated hereby;

(4) A certificate of legal existence of the SELLER, issued by the Connecticut Secretary of State dated subsequent to the execution date of this Asset Sale Agreement but within thirty (30) days of the closing date;

(5) BUYER's receipt of such documentation as may be required, and in the form required, by MMNA to confirm the sale to BUYER, surrender and/or transfer to BUYER of the Purchased Assets and the termination of its MMNA

Dealer Sales and Service Agreement as of the closing date following consummation of the transactions contemplated hereunder;

(6) BUYER having received a fully executed Assignment of SELLER's assignment of SELLER's parts return privileges;

(7) The Assignment and Assumption Agreement with respect to the SELLER's obligation(s) to be assumed by BUYER pursuant to Section 14 hereof;

(8) The Lease Assignment Agreement referenced in Section 5 hereof.

(9) BUYER having received such other documents, instruments and certificates as may be reasonably requested by BUYER, or BUYER's attorney, necessary or convenient to carrying out the intents and purposes and the transactions contemplated by this Asset Sale Agreement.

(c) Conditions Precedent to SELLER's Obligations to Complete the closing. The obligations of SELLER to complete the closing are subject to the fulfillment, on or prior to the closing date, of the following conditions, any one or more of which may be waived by SELLER:

(1) Representations and Warranties and Covenants. The representations and warranties of BUYER contained in this Asset Sale Agreement shall be materially true, complete and correct as of the closing date with the same force and effect as though made on and as of the closing date. BUYER shall have performed and complied with, or caused to be performed and complied with, all covenants and agreements required by this Asset Sale Agreement to be performed or complied with by BUYER on or prior to the closing date.

(2) Injunction, Etc. At the closing, there shall not be any judgment, decree, injunction, ruling or order of any Governmental or regulatory body outstanding against any party hereto that prevents consummation of the transaction contemplated by this Asset Sale Agreement or any of the conditions to the consummation of the transactions contemplated by this Asset Sale Agreement.

(3) Purchase Price and Other Monies Due. At the closing, BUYER, or BUYER's assign(s) shall have tendered the amounts required to be tendered by BUYER pursuant to this Asset Sale Agreement.

(4) Satisfaction. Satisfaction of SELLER contingencies as set forth in this Agreement, or SELLER's waiver of same.

(d) Documents to be Delivered by BUYER. At the closing, BUYER shall deliver, or cause to be delivered, to SELLER, the following documents, duly executed or certified to the reasonable satisfaction of SELLER's attorney:

(1) A Certificate, executed by BUYER ("BUYER's Bringdown Cert"), dated the closing date, confirming the matters set forth in Section 8.

(2) The Assignment and Assumption Agreement regarding those matters to be assumed pursuant to Section 15 hereof, and made a part hereof; and

(3) Resolution of BUYER approving the transactions.

(4) The Lease Assignment Agreement referenced in Section 5 hereof.

(5) Such other documents and instruments as may be reasonably requested by SELLER and its attorney and necessary to carry out the transactions contemplated by this Asset Sale Agreement.

(e) Conditions Precedent to Buyer and Seller Obligations to Close. As an express and prime inducement for the parties to enter into the within Agreement, concurrently herewith, the consent to the assignment and assumption of the Lease shall be siged and delivered to the parties at closing as provided in Section 5 hereof.

**25. COVENANT NOT TO COMPETE. COVENANT NOT TO COMPETE.** As an inducement for BUYER to enter into this Agreement, SELLER and Principal, jointly and severally covenant and agree that neither shall:

a. Ownership. For a period of two (2) years next succeeding the date of Closing directly or indirectly own and/or operate a new Mitsubishi motor vehicle dealership for the purpose of selling, leasing or servicing new Mitsubishi motor vehicles within a radius of twenty-five (25) miles from the Premises.

b. Customers. For a period of two (2) years next succeeding the date of Closing solicit past or current customers of the SELLER by direct contact, i.e., by e-mail, text, telephone or mail, for the purpose of selling, leasing or servicing new or used Mitsubishi motor vehicles, nor for any purpose whatsoever, nor disclose the owner data base of SELLER to any third party, without duration.

c. Employees. From the date hereof and for a period of two (2) years from Closing, directly solicit for the purpose of arranging employment or business association with current employees of SELLER, or employees of BUYER, unless an employee of SELLER is not hired by BUYER or should SELLER fire and thereafter terminate any such employee.

d. Service. For a period of two (2) years next succeeding the date of Closing, engage directly or indirectly in motor vehicle service or

warranty repair work involving Mitsubishi motor vehicles within a radius of twenty-five (25) miles from the Premises.

(The foregoing hereinafter collectively referred to as the "**Covenants**".)

SELLER and the Principal each recognize that BUYER may be irreparably damaged by any breach or threatened breach of its obligations pursuant to this Section and, accordingly, in the event of such breach or threatened breach, BUYER shall be entitled to institute legal proceedings and seek to obtain injunctive relief to enjoin any breach or threatened breach by the SELLER or the Principal of said obligations. Said injunctive relief shall be in addition to any other remedies to which BUYER may be entitled as a result of said breach or threatened breach. SELLER agrees that the Covenants contained herein are commercially reasonable and customary in the automotive industry and the State for a covenant not to compete. The Principals shall execute this Agreement to evidence their respective acceptance and approval to the understandings outlined in Section 25 of this Agreement.

**26. <u>MISCELLANEOUS PROVISIONS</u>.**

(a) All of the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto and their successors and assigns respectively.

(b) This Asset Sale Agreement shall be construed in accordance with the laws of the State of Connecticut.

(c) This writing and the exhibits annexed hereto are intended by the parties as a final expression of their understanding and/or a complete and exclusive statement of the terms and conditions thereof. This Asset Sale Agreement may only be modified in a writing executed by the parties hereto.

(d) This Asset Sale Agreement may be executed in more than one counterpart, each copy of which shall serve as an original for all purposes, but all copies shall constitute but one and the same Asset Sale Agreement.

(e) The "headings" contained in this Asset Sale Agreement are for the purposes of expediency and are not intended to otherwise bind the parties or interpret the content of the Section language they precede.

(f) As used herein, the masculine shall include the feminine; the singular shall include the plural; the neuter shall include the masculine and feminine; and vice versa.

(g) The parties have jointly participated in the negotiation and drafting this Asset Sale Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Asset Sale Agreement shall be construed as if drafted jointly by

the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Asset Sale Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(h) Each party shall bear its own attorney fees, costs and expenses related to the negotiation and consummation of this Asset Sale Agreement. If a lawsuit is filed related to or arising from this Asset Sale Agreement, the successful party shall be awarded its reasonable fees, costs, expenses and attorney's fees relating to the litigation.

(i) Upon a lawful termination of this Asset Sale Agreement, this Asset Sale Agreement shall be considered terminated, with the parties having no further obligations to another party, except as may be expressly stated in this Asset Sale Agreement.

(j) Concurrently herewith, SELLER and BUYER shall each deliver to the other original resolution executed by their respective principals (i.e. stockholders and directors, members, or partners, as the case may be), authorizing the execution of this Agreement and the consummation of same.

(k) All applicable sales, transfer, documentary, use, filing and such other taxes and fees that may be due and payable by SELLER as a result of conveyance, assignment, transfer or delivery of the assets or Business to be conveyed and transferred hereunder, or levied on the SELLER shall be borne solely by the SELLER.

(l) No requirement, obligation, remedy or provision of this Agreement shall be deemed to have been waived, unless so waived expressly in writing. The waiver of any such provision in one or more instances shall not be considered a waiver of the right to enforce such provision thereafter.

(m) The within conveyance is expressly contingent upon the surrender by SELLER of its existing MMNA Dealer Sales and Service Agreement with MMNA, and delivery of its concurrent resignations as a Mitsubishi dealer at the Premises and BUYER obtaining a MMNA Dealer Sales and Service Agreement for the Premises or receiving reasonable formal notification from MMNA that a fully executed MMNA Dealer Sales and Service Agreement will be provided to BUYER post-closing.

(n) If applicable in the State of Connecticut, BUYER will pay, in addition to the purchase price set forth herein, Connecticut sales tax on the portion of the purchase price allocated in **EXHIBIT "B"** hereof for the equipment, fixtures, equipment, and machinery of the Business to be sold hereunder. BUYER shall prepare, execute, and deliver such documentation necessary or required to be filed with the taxing authorities. In the event the appropriate taxing authority shall appraise the said chattels at an amount in excess of the allocation herein made thereon, BUYER agrees to pay the sales tax on the amount of said excess, upon three (3) days' written notice for such payment, which

notice shall be sent by certified mail, return receipt requested, after BUYER has either waived or exhausted its remedies to contest said assessment.

(o) To the extent applicable, SELLER has, and/or will take, any and all actions required or necessary to comply with the Worker Adjustment Retraining Notification Act and any applicable Connecticut state statute of similar nature ("WARN"), with respect to any event or occurrence as applicable, affecting SELLER or the Business, since the effective date of WARN. BUYER shall have no responsibility or liability under WARN, nor for any actions of SELLER regarding its employees prior to the date of closing, and SELLER shall have no responsibility or obligation with respect to any actions taken by BUYER with respect to any employees of BUYER from and after the date of closing of title to assets hereunder.

[*Signatures Appear on Following Page*]

*[SIGNATURE PAGE TO ASSET SALE AGREEMENT]*

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and caused their proper corporate seal to be hereto affixed, the day and year first above written.

SELLER:
**TEAM IMPORTS, LLC**
**dba Team Mitsubishi Hartford**

_______________ As to

By: Robert Anthony Urrutia, Manager

BUYER:

[redacted]

_______________ As to

*[SIGNATURE PAGE TO ASSET SALE AGREEMENT]*

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals or caused these presents to be signed by their proper corporate officers and caused their proper corporate seal to be hereto affixed, the day and year first above written.

SELLER:
**TEAM IMPORTS, LLC**
**dba Team Mitsubishi Hartford**

______________________ As to

______________________
By: Robert Anthony Urrutia, Manager

[redacted]

______________________ As to

# EXHIBIT A

## OPERATING ASSETS

**[follows]**

# Schedule of FFE

**offices**

18desks
18phones
30 chairs
12screens
6 printers
1 conference table

**Sales area**

1 podium
I welcome desk
5 sales tables
13 chairs
2 printers/copiers
7 screens

**Delivery area**

1 tv
2 tables
8 chairs
1 couch
1 water machine

**Service / parts**

4 desks
13 chairs
6 screens
3 printers
1 tv
1 couch
6 phones

| Machine Type | Quantity | Manufacturer | Model # / SKU | Serial # (If Applicable) |
|---|---|---|---|---|
| ~~Alignment Rack~~ | ~~1~~ | ~~Hunter~~ | ~~CTN-2083PS~~ | ~~GIC3401~~ leased* |
| ~~Alignment Computer~~ | ~~1~~ | ~~Hunter~~ | ~~HW3 /CTN2285PALLSS01~~ | ~~CIF494~~ leased* |
| Tire Balancer | 2 in Total | | | |
| | 1 | Hunter | CTN-2046 \ SWT | BDC3737 |
| | 1 | Mondolfo Ferro | MT3351 | MJD221753 |
| Tire Machine | 1 | Hunter | TCX53 Performance | 0-11461119/00A-16 |
| Mitsu Scan Tool | 1 | Panasonic | FZ-VUBG211U | 3ETSA12156 |
| Mitsu VCM Adapter | 1 | Bosch | MTS 6534 | 2308-89721894 |
| A/C Machine | 4 In Total | | | |
| | 1 | Robinair | 34288NI | 107994732 |
| | 1 | Robinair | MIT1234YF | 875072630 |
| | 1 | Robinair | MIT1234YF | 875260930 |
| | 1 | Robinair | 34788NI | 983506439 |
| Press | 3 In Total | | | |
| 20 Ton | 1 | Central Machinery | 60603 | 371951717 |
| 20 Ton | 1 | American Forge & Foundry | 820A | N\A |
| 12 Ton | 1 | Central Machinery | 60604 | 371951907 |
| Spring Compressor | 3 In Total | | | |
| Air assisted wall mounted | 1 | Quality Stainless Products | DB-8000-XL | DB-8000-XL-000534 |
| Manual wall mounted | 1 | Branick | 7600 | N/A |
| | 1 | | | |
| 2 Post Lift | 10 in Total | | | |
| | 1 | Forward Lift | I10N100M | NFI16I0025 |
| | 1 | Forward Lift | I10N100M | NFI16I0026 |
| | 1 | Forward Lift | I10N100M | NFI16I0027 |
| | 1 | Forward Lift | I10N100M | NFI16I0028 |
| | 1 | Forward Lift | I10N100M | NFI16I0029 |
| | 1 | Forward Lift | I10N400M | NHG18L0078 |
| | 1 | Forward Lift | I10N400M | NHG18L0079 |
| | 3 in Total | | | |
| | 1 | Rotary Lift | SPOA10N700 | CRZ19A0058 |
| | 1 | Rotary Lift | SPOA10N700 | CRZ19A0059 |

* to be assumed by Buyer

| | | | | |
|---|---|---|---|---|
| | 1 | Rotary Lift | SPOA10N700 | CRZ18J0012 |
| Air Compressor | 2 in Total | | | |
| | 1 | Champion Pneumatic | HER7F-8 | D188487 |
| | 1 | Champion Advantage Series | VR10-12 | D075340 |
| Key Machine | 2 In Total | | | |
| | 1 | Pro Source \ Key Line | GYMKANA MSC | 17930004307 |
| | 1 | PC+ Flash | 2455-01U | 106054 |
| Floor Jack | 4 in Total | | | |
| Telescopic Transmission Jack | 1 | Sunex Tools | 7793B | N\A |
| Telescopic Transmission Jack | 1 | American Forge & Foundry | 3190B | N\A |
| Low Profile Floor Jack | 1 | Daytona | DS300LPG | N\A |
| Telescopic Transmission Jack | 1 | Norco | 72500E | J1801909 |
| Brake Lathe | 2 In Total | | | |
| | 1 | Pro Cut | PFM 9.2 | 9LX-37117 |
| | 1 | Pro Cut | PFM 9.2 | 9LX-37118 |
| Oil Tank | 4 in Total | | | |
| 500 Gallon Waste Oil | 1 | Unknown Cube 500 Gallon | 500 Gallon | N/A |
| Waste Oil (in basement) | 1 | Atlantic Fabritech 275 Gallon | 275 Gallon | B8346033 |
| 0W20 | 1 | Pee Dee Tank | 275 gallon | A63583436 |
| 5W30 | 1 | Pee Dee Tank | 275 gallon | A60901317 |
| Oil Pump | 3 In Total | | | |
| Waste Oil | 1 | Blue | N/A | N/A |
| 0W20 | 1 | Graco | Mini Fire Ball 246775 | K417510 |
| 5W30 | 1 | Balcrank | Panther HP 1130-015 | N/A |
| Coolant Machine | 1 | Engine Clean Solutions | 08-0\3 | 5254 |
| Oil Drains | 8 in Total | | | |
| JohnDow Industries | 1 | JDI-16DC-E | N\A | N\A |
| Unknown | 2 | Black 25 Gallon | N/A | N\A |
| Unknown | 5 | Yellow/Red 30 Gallon | N/A | N/A |
| Napa | 1 | 815-5617 | N/A | 122021 |
| Bench Grinder | 1 | JET | N/A | N/A |
| Battery Charger | 1 | Associated | US20 | 327393 |
| Mitsu Battery Tester | 3 in Total | | | |

| | | | | |
|---|---|---|---|---|
| | 1 | Midtronics | CPX-930 | 423102635 |
| | 1 | Midtronics | CPX-930 | 319101298 |
| | 1 | Midtronics | CPX-930 | 319101412 |
| Welder | 1 | Miller | Millermatic 211 / 907614 | NC471050N |
| Cutting Torch | 1 | Smith | WH100 BJC | 3176109 |
| Engine Stands | 2 in Total | | | |
| | 1 | Duralast | 750 LBS | 2451EK001023L |
| | 1 | Napa | 5/8 Ton / 791-2004 | N201805000709 |
| Retractible Oil/ Air Hose Reel | 20 in Total | | | |
| Balcrank SignatureSeries | 1 | Evolution | 2140-008 | 398690-069 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-008 | 371870-141 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-008 | 398690-109 |
| Balcrank SignatureSeries | 1 | Evolution | 506828 | 398690-115 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371870-120 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371870-118 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371194-271 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371194-266 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371870-123 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 371194-340 |
| Balcrank SignatureSeries | 1 | Evolution | 506828 | 410026-082 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 393604-024 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-008 | 371870-126 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-013 | 371194-268 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-013 | 393604-186 |
| Balcrank SignatureSeries | 1 | Evolution | 2140-013 | 393604-162 |
| Balcrank SignatureSeries | 1 | Evolution | 506828 | 398690-188 |
| Balcrank SignatureSeries | 1 | Evolution | 506828 | 398690-047 |
| Balcrank SignatureSeries | 1 | Evolution | 506822 | 393604-034 |
| Advance Tool Design | 1 | ATD-31166 | N/A | N/A |
| Floor Fan | 5 in Total | | | |
| 36" High Velocty | 1 | Global | FE-90EdOL | N/A |
| Oscillating Fan | 1 | Dayton | 4C354C | N/A |
| 36" High Velocty | 2 | Central Machinery | N/A | N/A |

| | | | | |
|---|---|---|---|---|
| 36" High Velocty | 1 | Global | FE-90EdOL | N/A |
| Cheetah Tank | 2 in Total | | | |
| | 1 | Tire Service International | 5 gallon | UM195333 |
| | 1 | Unknown | 10 gallon N2 | TS2233147-2015 |
| Stand Assortment | 13 In Total | | | |
| Under Hoist Stand | 1 | Napa | 2 Ton / 791-2006 | N201803000238 |
| Under Hoist Stand | 1 | Unknown | N/A | N/A |
| 2 Ton Jack Stand | 1 | TEQ | TQ942 | N/A |
| 3 Ton Jack Stand | 4 | Daytona | N/A | N/A |
| 6 Ton Jack Stand | 2 | American Forge & Foundry | N/A | N/A |
| 4 Ton Jack Stand | 2 | Duralast | N/A | N/A |
| 4 Ton Jack Stand | 2 | Unknown | N/A | N/A |
| Fork Lift | 1 | Clark | C500-20 | 235-731-2202 672 |
| Washer Fluid Container | 1 | Cors | N/A | N/A |
| Engine Hoist | 2 in Total | | | |
| | 1 | Matco Tools | MEC2T | SS181101411 |
| | 1 | American Forge & Foundry | 3582 | 7401500402 |
| Evap Emissions Tester | 1 | Kent-Moore | J-41413-200 | 108261 |
| Jumper Pack | 1 | Booster Pac | ES5000 | 753-585-019 |
| | 1 | Unknown | JNC660 | N/A |
| Brake Flush Machine | 1 | Pure Brake Basic | Unknown | BB-00619 |
| Wheel Dolly | 2 | Pittsburgh | 1500 LBS | 371681725 |

# EXHIBIT "B"

## ALLOCATION OF PURCHASE PRICE

| | | |
|---|---|---|
| (a) | Furniture, Fixtures and Equipment: | $ 300,000.00 |
| (b) | Mitsubishi Franchise and Good Will | $ 700,000.00 |
| | TOTAL | **$1,000,000.00** |

**EXHIBIT "C"**

**ESCROW AGREEMENT**
**(Deposit)**

[follows]

# DEPOSIT ESCROW AGREEMENT

**THIS AGREEMENT**, made the ______ day of September, 2024 by and between **Team Imports LLC dba Team Mitsubishi Hartford** ("Seller") [redacted] ("Buyer"), an[redacted]

**W I T N E S S E T H:**

**WHEREAS**, Seller and Buyer have entered into an Asset Sale Agreement ("ASA"), of even date, a copy of which is incorporated herein by reference, pursuant to which Seller has agreed to sell and Buyer agreed to purchase certain assets as described in the ASA; and

**WHEREAS**, pursuant to Section 3(a)(i) of the ASA, Buyer has agreed to deposit with the Escrow Agent the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) ("Deposit") to be released in accordance with the terms of this Escrow Agreement and the ASA; and

**WHEREAS**, Schiller Pittenger & Galvin, PC, has agreed to act as Escrow Agent in accordance with the terms of this Escrow Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants herein and in the ASA, and in order to define the duties of the Escrow Agent, it is hereby agreed as follows:

1. Terms not expressly defined herein shall have the meaning given them in the ASA, as applicable.

2. Simultaneously with the complete execution and delivery of this Escrow Agreement, Buyer will deposit with the Escrow Agent the Deposit (the "Escrow Deposit") to be held by the Escrow Agent upon the terms and conditions provided in this Agreement and in the ASA, until authorized to deliver same as set forth herein. "Delivery", as used in this Escrow Agreement, shall be by wire transfer, personally, or any other method selected by the party entitled to receive the Escrow Deposit, or in the absence of such direction, by a nationally recognized overnight mail service of Escrow Agent's choosing, the expense of which shall be paid by the party

receiving the Escrow Deposit.

3. The Escrow Agent is authorized to hold the Escrow Deposit in its non-interest bearing IOLTA trust account in New Jersey until authorized to deliver same as follows:

(a) In the event there is a Closing of the transactions contemplated by the ASA, then the Escrow Agent shall deliver to Seller the full amount of the Escrow Deposit as provided in the ASA, which shall be applied in full against the cumulative Purchase Price to be paid under the ASA by Buyer to Seller and this Escrow Agreement shall terminate.

(b) In the event that the Escrow Agent receives written notification in accordance with the ASA, signed by Seller and Buyer, that the ASA has been terminated by the mutual consent of all the parties, then the Escrow Agent shall deliver to Buyer the Escrow Deposit and this Escrow Agreement shall terminate.

(c) In the event that either Seller or Buyer desires to make a demand upon the Escrow Agent for the Escrow Deposit, that party shall send a written notice to the Escrow Agent and the other parties. Such written notice shall sufficiently specify the basis for which such party is entitled to receive the Escrow Deposit in accordance with the terms and conditions of the ASA. Escrow Agent shall notify the other party of any such demand. In the event that the Escrow Agent does not receive a written objection from the non-demanding party(ies) within ten (10) days after such non-demanding party's or parties' receipt of such written notice from the demanding party, then the Escrow Agent shall release the Escrow Deposit to the demanding party in accordance with the terms of such demanding notice. In the event that the non-demanding party or parties do(es) give a timely objection in writing to the release of the Escrow Deposit to the demanding party, then the Escrow Agent shall continue to hold the Escrow Deposit in accordance with subparagraph (d) below.

(d) In the event of any dispute between Seller and Buyer as to the disposition of any portion of the Escrow Deposit, the Escrow Agent shall continue to hold the

entire Escrow Deposit with no liability until the dispute is resolved and/or the Escrow Agent is directed, either by mutual agreement and appropriate written instructions to the Escrow Agent signed by Seller and Buyer, or by either (i) a final non-appealable order, decree or judgment of a state or federal court having jurisdiction thereof, or (ii) an award of an arbitrator(s), to disburse such Escrow Deposit, or any part thereof. The Escrow Agent shall be under no duty to institute or defend any such proceedings. In any dispute between Seller and Buyer as to the disposition of the Escrow Deposit, the prevailing party shall be entitled to reimbursement from the other for all reasonable attorney's fees, costs and expenses incurred by the prevailing party in conjunction with the disposition proceeding.

Upon payment of the Escrow Deposit as provided in (a), (b), (c) and/or (d) above, any and all of the Escrow Agent's duties and responsibilities hereunder shall cease.

4. The parties acknowledge and agree that the Escrow Agent shall have no duty to investigate or ascertain the correctness or the status of any notice received pursuant to this Escrow Agreement and shall not be liable for payment of funds pursuant to the terms of this Escrow Agreement regardless of whether or not the facts contained in any notice are untrue or incorrect.

5. Seller and Buyer hereby each covenant and agree not to sue the Escrow Agent in connection with the appointment of the Escrow Agent or in the performance of the Escrow Agent's duties hereunder, except insofar as the Escrow Agent's liability, loss, expense or damage arises out of the Escrow Agent's own willful default of this Escrow Agreement, fraud or gross negligence. Seller and Buyer agree to indemnify and hold harmless the Escrow Agent against any losses, claims or expenses, which may be imposed upon the Escrow Agent or incurred by the Escrow Agent in connection with the acceptance of the appointment as provided or the performance of the Escrow Agent's duties hereunder, except insofar as the Escrow Agent's liability, loss, expense or damage arises out of the Escrow Agent's own willful default of this

Escrow Agreement, fraud or gross negligence. Notwithstanding anything to the contrary in this paragraph, the Seller and/or Buyer shall retain all rights given them under law to implead the Escrow Agent as a stakeholder in any action or proceeding in connection with the ASA.

6. The Escrow Agent shall not be liable for any good faith action(s) taken or omitted pursuant to this Escrow Agreement.

7. The Escrow Agent agrees not to accept any compensation for the performance of services as the Escrow Agent, but shall be entitled to any reasonable costs incurred thereby. Said costs shall be shared equally by Seller and Buyer.

8. To the extent that the terms of this Escrow Agreement contradict the terms of the ASA, the terms of this Escrow Agreement shall control.

9. All notices, requests, demands and other communication which are required or may be given hereunder shall be in writing and shall be deemed to have been duly given and delivered, unless otherwise specified herein, if delivered either (i) personally, or sent by (ii) registered or certified mail, return receipt requested, postage prepaid or (iii) a nationally recognized overnight mail service, postage prepaid (iv) by facsimile transmission (v) by email:

(a) If to Seller and Escrow Agreement to:

Theodore E. Schiller, Esq. (Escrow Agent)
Craig M. Heller, Esq (Seller)
Schiller & Pittenger, P.C.
1771 Front Street
Scotch Plains, New Jersey 07076
tschiller@schiller.law
cheller@schiller.law

[redacted]

10. Any dispute or breach arising under, or in connection with this Escrow Agreement or in relation to the release or payments of the Escrow Deposit or interest thereon shall exclusively be determined by the Superior Court, State of Connecticut. The venue of any such action shall be solely in Hartford County, State of Connecticut. Any award rendered thereon shall be final and conclusive upon the parties, and a judgment thereon may be entered in any court of competent jurisdiction.

11. The parties acknowledge and agree that notwithstanding this Agreement, Escrow Agent shall be permitted to continue to represent Seller in connection with the transactions contemplated by the ASA.

[Signatures Appear on Follows]

**IN WITNESS WHEREOF**, the parties have executed this Escrow Agreement as of the date and date first above written.

**WITNESS:**

**SELLER:**

**Team Imports LLC dba Team Mitsubishi Hartford**

______________________
As to

______________________
By: Robert Anthony Urrutia, Manager

[redacted]

______________________
As to

[Signature Page to Escrow Agreement]

# EXHIBIT "D"

## DEALERSHIP LEASE AND GUARANTY

[follows]

**LEASE AGREEMENT**
**BY AND BETWEEN**

**NEW PARK AVENUE ASSOCIATES, LLC**
**("LANDLORD")**

**AND**

**THE HARTFORD AUTO GROUP INC.**
**("TENANT")**

**Dated: September 1, 2016**

**Premises Address:**

**398-412 New Park Avenue, Hartford, Connecticut 06160**

# LEASE AGREEMENT

**THIS LEASE**, is made and entered into this 1st day of September, 2016 (the "Lease Execution Date"), by and between, New Park Avenue Associates, LLC, A Connecticut Limited Liability Corporation, with a principal place of business at 223 Broad Street, Forestville, Connecticut (hereinafter called "Landlord"), and The Hartford Auto Group, Inc., a Connecticut corporation, with an office and principal place of business at 505 North Colony Road Wallingford, Connecticut, (hereinafter called "Tenant").

Now, therefore, in consideration of the mutual promises and covenants contained herein and in consideration of the obligations assumed by Landlord and Tenant herein, the parties agree that Landlord does hereby let to Tenant and Tenant does hereby lease and take from Landlord, the premises hereinafter described to use for the business purposes consisting of the establishment and operation of an automobile sales franchise and/or dealership and for purposes incidental thereto or for such other lawful purpose as the Landlord may consent to which consent shall not be unreasonably withheld pursuant to the terms described herein, upon all of the terms, promises, covenants and agreements hereinafter set forth.

WITNESSETH:

## ARTICLE I. GRANT AND TERM

**1.1 Demised Premises.** Landlord hereby demises and leases to Tenant and the Tenant hereby hires and rents from Landlord that certain premises being the land and improvements thereon, (excluding the Riley Building which is to be removed by Landlord as soon as is practical but in no event later than January 31, 2017. Said removal shall be the financial responsibility of Landlord which shall be accomplished in a workmanlike manner. Landlord shall supply tenant with a standard "Hold Harmless/Indemnity Agreement" to be approved by Tenant's attorney. Landlord further agrees to supply Tenant with evidence of adequate casualty and workman's compensation insurance prior to commencement of the demolition), located on the premises known as 398-412 New Park Ave. Hartford, CT and more particularly described in Schedule A attached hereto and made a part hereof (the "Demised Premises").

**1.2 Commencement of Term.** The effective date of this Lease under which Tenant shall be entitled to occupy the Demised Premises pursuant to the terms and conditions set forth in this Lease hereinafter referred to as the "Commencement Date" shall be September 1, 2016.

**1.3 Length of Initial Term.** The initial term of the Lease shall be for seven (7) years commencing on September 1, 2016 and ending on August 31, 2023. ("Initial Term"). Notwithstanding the foregoing, Tenant shall be bound by all provisions of this Lease, from the date of the first occupancy of the Demised Premises by Tenant or its agents for any purpose prior to the Commencement date.

**1.4 Extension Options.** Absent the occurrence and continuation of a Tenant Default at the time of notice to Landlord and at the time an extension term commences, Tenant shall have the option to extend the Lease Term for four (4) term(s) of five (5) years each (referred to herein as the "Extension Terms"). To exercise the extension options, Tenant shall give Landlord written notice that Tenant is exercising such option at least ninety (90) days prior to the anniversary of the commencement of the then current term of the Lease. Should Tenant decide to not exercise its renewal options, the Landlord has the right to show the Demised Premises to prospective tenants with prior notice to the Tenant.

**1.5 Contingencies.**

Omitted Intentionally.

## ARTICLE II. CONSTRUCTION AND CONDITION OF THE LEASED PREMISES

**2.1** Except for the Landlord's Work defined below, Tenant is accepting the Demised Premises in "as is" condition. Tenant agrees that it has inspected the Demised Premises and that except as set forth in Section 11.2 of this Lease neither the Landlord nor any agent or employee of the Landlord has made any representation or warranty with respect to the Demised Premises or the suitability of same for the conduct of Tenant's business or use. Tenant warrants and represents that it has inspected the Demised Premises and the condition thereof and, except for the Landlord's work defined below and the removal of the Riley Building set forth in Section 1.1 of the Lease, agrees to accept the Demised Premises in "as is" condition, Landlord shall have no obligation to improve the Demised Premises in any way except as specifically provided hereunder.

Landlord shall perform, at its sole expense the repairs described below ("Landlord's Work"):

- Patch hole in lot by service entrance
- Repair broken sidewalk by Hummer entrance

Landlord's Work will be completed on or before forty five (45) days following the Lease Execution Date.

Other than the Landlord's Work and the removal of the Riley Building set forth in Section 1.1 of the Lease, any improvements, alterations or additions to the Demised Premises including, but not limited to new signs, are to be made by Tenant at its sole cost and expense and shall be subject to the written approval of Landlord, which will not be unreasonably withheld. Landlord agrees to allow any reasonable modifications to the Demised Premises in order to meet the criteria for a Mitsubishi automobile dealer franchise. Tenant warrants that all work done by it to and upon the Demised Premises will be performed in a good and workmanlike manner, using first class materials, and in strict accordance with applicable law.

## ARTICLE III. CONDUCT OF BUSINESS BY TENANT

**3.1** The Tenant shall have the right to use and occupy the Demised Premises for the business purposes consisting of the establishment and operation of an automobile sales franchise and/or dealership and for purposes incidental thereto or for such other lawful purpose as the Landlord may consent to which consent shall not be unreasonably withheld, and will comply with all lawful governmental requirements in connection with such use and purposes.

## ARTICLE IV. TENANT'S FIXTURES AND IMPROVEMENTS

**4.1** Provided the Tenant obtains the prior written consent of the Landlord which shall not be unreasonably withheld, the Tenant may at its own cost, make such alterations, improvements and additions to the Demised Premises as shall be reasonably required to adapt the same for the authorized use thereof as provided in Section 3.1 above. Any alterations, additions or improvements to the Premises made by the Tenant shall immediately become the property of the Landlord and shall remain upon and be surrendered with the premises as a part thereof at the end of the term. Nothing herein contained, however, shall preclude the

Tenant from removing from the Demised Premises its own removable furniture, trade fixtures, appliances and equipment provided such removal can be accomplished without damage or injury to the leasehold.

**4.2** Tenant shall promptly pay all contractors and materialmen hired by Tenant to furnish any labor materials which may give rise to the filing of a mechanic's lien against the premises. Should any such lien be made or filed, Tenant shall bond against or discharge the same within thirty (30) days after receipt of written request by Landlord.

**4.3** Landlord agrees that, within ten (10) days after receipt of written request from Tenant, it will join in any and all applications for permits, licenses or other authorizations required by any governmental or other body claiming jurisdiction in connection with any work which the Tenant may be hereunder, and will also join in any grants for easements for electric, telephone, gas, water, sewer and such other public utilities and facilities as may be reasonably necessary in the operation of the Demised Premises or any improvements that may be erected thereon.

**ARTICLE V. SIGNS**

**5.1** Tenant will not place or maintain on any portion of the exterior of the Leased Premises any signs, awning, or canopy, or advertising matter or other thing of any kind in violation of zoning regulations.

**Article VI. MAINTENANCE AND REPAIRS OF LEASED PREMISES**

**6.1** Maintenance of Demised Premises. During the Initial Term of this Lease, and any option periods, except for the roof, foundation, exterior walls and structural steel members, which shall be the responsibility of the Landlord, the Tenant shall at all times keep in good order, condition and repair the entire Demised Premises, including without limitation, the exterior entrances, all glass and show window moldings, and all partitions, doors, interior walls, fixtures and equipment and appurtenances thereto, including lighting, heating and plumbing fixtures and systems and any air conditioning system; and no replacement of any such systems, if necessary. Said maintenance shall also include, without limitation, periodic painting as is reasonably necessary. Landlord represents for the purpose of this Section 6.1 that the entire Demised Premises are in good order, condition and repair as aforesaid on the date hereof.

**6.2** If Tenant refuses or neglects to make any such repair within the prescribed time for curing of defaults under this Lease, after written demand to cure for failure to make a repair from Landlord, Landlord may make such repairs, and upon completion thereof, Tenant shall pay Landlord's cost for making such repairs upon presentation of a bill thereof as additional rent.

**6.3** At the expiration of the tenancy hereby created, Tenant shall surrender the Demised Premises in good condition, reasonable wear and tear excepted, and damage by unavoidable casualty excepted, and shall surrender all keys for the Demised Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Demised Premises. Tenant shall remove all of its trade fixtures before surrendering the premises as aforesaid and shall repair any damage to the Demised Premises caused thereby. Tenant's obligation to observe or perform this obligation shall survive the expiration or other termination of the term of this Lease.

**Article VII. INSURANCE, DESTRUCTION OF IMPROVEMENTS AND INDEMNITY**

**7.1 Hazard Insurance.** The Tenant shall, at the Tenant's sole cost and expense at all times during the term of this lease, keep all buildings and improvements upon the demised premises and all equipment, fixtures, motors, and machinery therein, and all additions thereto and replacements thereof, insured against loss, damage, and destruction by fire, and such other hazards as are covered by and protected against under policies of insurance commonly referred to and known as "extended coverage insurance", said insurance to be in an amount of the actual cash value replacement cost of the insurable buildings, improvements and equipment. Coverage may be provided under a blanket insurance policy carried by Tenant. Said policies of insurance shall be carried in companies authorized to do business in the jurisdiction in which the demised premises are located. Such insurance policies shall be written such that Landlord and Tenant are named as an insured party and loss payee. In the event that the Demised Premises shall at any time be during the term of the Lease be damaged by fire, flood, tornado or the elements or otherwise, Tenant shall, at Tenant's expense repair said damage and restore the demised Premises to its original condition. Landlord agrees that insurance proceeds shall be used therefor. Any unexpended funds shall be the property of the Tenant.

**7.2 Liability Insurance.** The Tenant shall maintain with respect to the Demised Premises a policy of comprehensive liability that names the Landlord as an insured party. During the Initial Term of the Lease, such policy shall be in an amount of at least FIVE MILLION AND 00/100 ($5,000,000.00) DOLLARS. If the Tenant exercises its option to renew the Lease, at the commencement of the Extension Term of the Lease, Tenant shall have such insurance reviewed by a licensed insurance agent of a major insurer in the State of Connecticut to determine insurance requirements and adequate policy amounts. All policy limits are subject to Landlord's approval, which approval shall not be unreasonably withheld.

**ARTICLE VIII. UTILITIES**

**8.1** From and after the date upon which Landlord delivers to Tenant possession of the Demised Premises, Tenant shall be solely responsible for and promptly pay all charges for heat, water, gas, electricity or any other utility used or consumed in the Demised Premises. In the event that the local water authority bills landlord for the water consumed by Tenant in the Demised Premises and Landlord becomes obligated to pay said water authority for said consumption by Tenant, then Landlord shall have the right to bill Tenant for Tenant's water use in accordance with the rate schedule and minimum service charge utilized by said water authority. Tenant shall pay Landlord as additional rent its water use charge within thirty (30) days after receipt by Tenant of a bill thereof. It is expressly agreed and understood that Landlord shall not be liable to Tenant for any interruption or suspension of utility services.

**ARTICLE IX. ESTOPPEL STATEMENT, ATTORNMENT, SUBORDINATION**

**9.1 Estoppel Statement.** Within ten (10) days after request thereof by Landlord, or in the event that upon any sale, assignment or hypothecation of the Demised Premises and/or the land thereunder by Landlord an offset statement shall be required from Tenant; Tenant agrees to deliver in recordable form a certificate to any proposed mortgagee or purchaser, or to Landlord, certifying (if such be the case) that this Lease is in full force and effect and that there are no defenses or offsets thereto, or stating those claimed by Tenant.

**9.2 Attornment.** Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by the Landlord covering the Leased Premises, attorn to the mortgagee in the event of strict foreclosure or to the purchaser upon any such foreclosure or sale and recognize such mortgagee or (as the case may be) purchaser as the Landlord under this Lease.

**9.3 Subordination.** Upon request of the Landlord, Tenant will subordinate its rights hereunder to the lien of any mortgage now or hereafter placed upon the land of which the Demised Premises are a party, and to all advances made or hereafter to be made upon the security thereof provided the Tenant has received a non-disturbance agreement from the mortgagee in form and substance agreeable to the Tenant providing that its interests shall not be affected by any such action. The word "mortgage" as used herein includes mortgage, deeds of trust or similar instruments and modifications, consolidations, extensions renewals, replacements or substitutes thereof.

**9.4 Attorney-in-Fact.** The Tenant, upon request of the party in interest, shall execute promptly such instruments or certificates to carry out the intent of Sections 9.2 and 9.3 above as shall be requested by the Landlord. If fifteen (15) days after the date of a written request by th Landlord to execute such instruments and delivery of the non-disturbance agreement agreeable to the Tenant, the Tenant shall not have executed the same, the Landlord may, at its option, cancel this Lease without incurring any liability on account thereof, and the term hereby granted is expressly limited accordingly.

**9.5** Tenant agrees to give any mortgagee of the premises within which the Leased Premises are a part which may in writing so request a duplicate notice of any letter to Landlord alleging a default by Landlord under this Lease and Tenant agrees that such mortgagee shall, thereafter have a reasonable time to correct or cure such default, as well as, Landlord, either such performance to be accepted by Tenant.

## ARTICLE X. ASSIGNMENT AND SUBLETTING

**10.1 Consent Required.** Tenant will not assign this Lease in whole or in part, nor sublet all or any part of the Leased Premises, without the prior written consent of the Landlord in each instance, which consent shall not be unreasonably withheld. The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Notwithstanding any assignment or sublease, Tenant shall remain primarily liable on this Lease during the term of this Lease and any extensions thereof and shall not be released from performing any of the terms, covenants and conditions of this Lease, but Tenant and such assignee shall thereafter be jointly and severally liable for the full and faithful performance of the obligations of Tenant under this Lease. If the Tenant is a corporation, the sale or transfer of fifty-one (51%) percent or more of its voting stock shall be deemed an assignment for purposes of this Article X.

## ARTICLE XI. WASTE, HAZARDOUS SUBSTANCES AND GOVERNMENTAL REGULATIONS

**11.1 Nuisance or Waste.** Tenant shall not commit or suffer to be committed any waste upon the Demised Premises. Tenant shall not allow hazardous substances to spill upon or contaminate the Demised Premises and will indemnify Landlord and save him harmless from all damages resulting from any such spill or

contamination. The Tenant shall have no responsibility or liability to Landlord or any other party for any such condition existing on the Premises on the Commencement Date.

**11.2 Compliance with Laws.** Tenant shall at Tenant's sole cost and expense, comply with all of the requirements of all county, municipal, state, federal and other applicable government authorities, now in force, or which may hereafter be in force, pertaining to the Demised Premises, and shall obey all municipal and county ordinances and federal and state statutes now in force or which may hereafter be in force as they apply to Tenants use and occupancy. Tenant shall have no obligation to so comply as to any condition existing on the Demised Premises as of the Commencement Date including but not limited any environmental condition. The Landlord represents, to the best of his knowledge, that as of the Commencement Date, the Premises comply with all such requirements, that the Premises contain no hazardous wastes or materials or asbestos and that there are no outstanding orders or judgment by any agency or court affecting the Demised Premises.

The Tenant shall have the right to contest by appropriate legal proceedings, without cost or expense to the Landlord, the validity of any law, order, ordinance, rule, regulation or requirement of the nature herein referred to, and if by the terms of any such law, ordinance order, rule or regulation or requirement compliance therewith may legally be held in abeyance without the incurrence of any lien charge or liability of any kind against the fee of the demised premises or the Tenant's leasehold interest in said premises, and without subjecting the Tenant or the Landlord to any liability of whatsoever nature for failure so to comply therewith, the Tenant may postpone compliance therewith until the final determination of any such proceedings, provided that all such proceeding shall be prosecuted with due diligence and dispatch.

## ARTICLE XII. EMINENT DOMAIN

**12.1 Total Condemnation of Demised Premises.** If the whole of the Demised Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding and all rentals shall be paid up to date.

**12.2 Partial Condemnation of Demised Premises.**

**(a)** If twenty (20%) percent or more of the Demised Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then the Tenant shall have the option to cancel and terminate this Lease upon notice thereof given to the Landlord within ninety (90)days after the vesting of title in such proceedings.

(b) In the event that less than twenty (20%) percent of the Demised Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, or in the event that twenty (20%) percent or more of the Demised Premises shall have been so taken, and Tenant shall not elect to terminate this Lease as set forth above, then the Landlord shall promptly restore the Demised Premises to a condition reasonably comparable under the circumstances to its condition at the time of such condemnation, less the portion lost in the taking; and this Lease shall thereafter continue in full force and effect. In such event of a partial taking, described hereinabove, from the effective date that physical possession is taken by the condemning authority through the end of the term of this Lease, the annual rental payable by the Tenant to Landlord under Section18.1 of this Lease shall be reduced by a fraction, the numerator of which shall be the

gross area of the Demised Premises so taken by the condemning authority and the denominator of which shall be the gross area of the Leased Premises on the date immediately prior to the effective date of such taking.

**12.3** In the event of any taking, partial or whole, under the provisions of Section 12.1 and 12.2, all of the proceeds of such award, judgment or settlement shall be and remain the sole and exclusive property of the Landlord, and Tenant shall not be entitled to any portion of such award, judgement or settlement. Tenant, however, may pursue its own claim against the condemning authority for any damages r award permitted under the applicable laws.

## ARTICLE XIII. DEFAULT OF THE TENANT

**13.1** If, during a term of this Lease, the Tenant shall default in the payment of the base rent obligations, or shall make default in the payment of any item of additional rent, or any part of the same, and such default is not remedied and shall continue for sixty (60) days after written notice thereof by the Landlord to the Tenant, or if such default is not capable of being remedied within such time and the Tenant does not begin and proceed with due diligence to remedy such default within a reasonable time, the Landlord shall have the option of declaring the Lease terminated upon giving sixty (60) days' written notice to the Tenant of its election so to terminate; and if such latter notice is given, the terms hereof shall cease, determine and expire, except as hereinafter provided in this Article, at the expiration of said sixty (60) days as though such date of termination were originally set for the expiration hereof, and the Tenant's obligations hereunder, except for the payment of past due rentals, shall cease and determine, and Tenant shall have be under no further obligations to Landlord hereunder.

## ARTICLE XIV. TENANT'S PROPERTY

**14.1** **Taxes on Leasehold.** Tenant shall be responsible for the timely payment of any and all municipal, county or state taxes assessed during the term of this Lease against the Demised Premises or any of the personal property being used and/or stored thereon. In the event Landlord receives any billing for said taxes and elects to pay them directly to the taxing authority, the Tenant agrees to reimburse Landlord for such payment within fifteen (15) days after being presented with said billings. Tenant shall be responsible for the payment of late fees that may be assessed against the Demised Premises during the Lease Term. Pursuant to Section 18.2 of this Lease, Tenant shall pay the real estate taxes in advance in amount of 1/12 of the taxes per month.

## ARTICLE XV. HOLDING OVER, SUCCESORS

**15.1** **Holding Over.** Any holding over after the expiration of the term hereof, with the consent of the Landlord shall be construed to be a tenancy from month to month on the terms and conditions herein specified, so far as applicable, except that during any such holdover period the rent is effect at the expiration of the term hereof shall be increased proportionately with the aggregate increase during the term of this Lease in the United States Bureau of Labor Statistics Price Index for all Items (Urban).

**15.2 Successors.** All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of the said parties.

**ARTICLE XVI. QUIET ENJOYMENT**

**16.1 Landlord's Covenant.** Upon payment by the Tenant of the rents herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the term hereby demised without hinderance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under the Landlord, subject nevertheless to the terms and conditions of this Lease, and subject to restrictions and easements or other matters as of record appear. Landlord hereby agrees that his breach of the provisions of this Section entitle the Tenant to legal and equitable remedies to compensate for this breach.

**ARTICLE XVII: NOTICES**

**17.1 Notice.** All notices required or permitted to be given by either party to the other under this Lease shall be effective only if given in writing and delivered by certified mail or registered mail, return receipt requested, addressed as follows or to such other address as either party may, from time to time, designate by notice given to the other party pursuant to this Paragraph. Notice shall be deemed to have been given as of the date mailing as shown on the post office receipt thereof:

| | |
|---|---|
| TO THE LANDLORD: | New Park Avenue Associates, LLC<br>Attn: Ken Crowley<br>PO #6000<br>Bristol, CT 06011 |
| COPY TO: | Atty. Paul J. Shea<br>104 Woodfield Rd.<br>Middlebury, CT 06762 |
| TO THE TENANT: | The Hartford Auto Group Inc.<br>505 North Colony Road<br>Wallingford, CT 06492 |
| COPY TO: | John F. Conway, Esquire<br>Loughlin Fitzgerald, PC<br>150 South Main Street<br>Wallingford, CT 06492 |

**ARTICLE XVIII: RENT**

**18.1 Base Rent**. The Landlord and the Tenant agree that in consideration for the improvements to the Demised Premises to be paid for and performed by the Tenant there shall be no Base Rent due for the first five months of the Initial Term of the Lease, with Tenant's first monthly Base Rent payment being due on February 1, 2017. On February 1, 2017 and for each month thereafter during the Initial Term, Base Rent payable monthly by Tenant to Landlord for each month of the Initial Term shall be Thirteen Thousand and 00/100 ($13,000.00) Dollars paid on the first (1st) of every month in accordance with the amounts set forth in Exhibit B attached hereto and incorporated herein. The monthly rent for each Extension Term shall be adjusted upward as set forth in the attached Exhibit B which is hereby incorporated and made a part of this paragraph of the Lease. Landlord acknowledges having received the sum of Fifty Thousand and 00/100 ($50,000.00) Dollars from Tenant upon the execution of this Lease which sum shall be non-refundable, but shall be applied to Tenant's Base Rent **only** payment obligations for February, March, April 2017 and a prorated portion of May, 2017.

**18.2 Additional Rent Based Upon Real Estate Taxes.** As Additional Rent, Tenant shall pay Landlord the annual real estate taxes and assessments assessed and levied against the Demised Premises on the first (1st) day of each month, in advance, in a sum equal to one-twelfth (1/12th) of the annual real estate taxes and assessments due and payable for the then calendar year. If at a time a payment is required the amount of the real estate taxes and assessments for the then calendar year shall not be known, Tenant shall pay Landlord, as additional rent, one-twelfth (1/12th) of the real estate taxes and assessments for the preceding calendar year; and upon ascertaining the real estate taxes and assessments for the current calendar year, Tenant shall pay Landlord any difference upon demand, or if Tenant shall be entitled to a credit, Landlord shall credit the excess against the next monthly installment(s) of additional rent falling due. Additional rent based upon real estate taxes and assessments payable for the first and last years of the Lease term shall be adjusted and prorated, so that Tennant shall be responsible for Landlord's prorated share for the period prior to and subsequent to the Lease term and Tenant shall pay Landlord his prorated share for the Lease term.

The funds owed to Landlord by Tenant during the first (5) months of the Lease will be as follows:

| | |
|---|---|
| Base Monthly Rent (91/1/16-1/1/17) | $ 00.00 |
| Real Estate Taxes | $ 7,562.05 |

Water and Electricity will be paid directly to supplier by Tenant as meters will be placed into Tenant's name.

**18.3 Monthly Payment Obligations.** Tenant and Landlord agree that the specified sums Tenant is obligated to pay to Landlord in monthly installments on the first (1st) day of each and every month that rent is due under this Lease is limited to the monthly rental payments set forth on Exhibit B attached hereto plus the monthly installments of Additional Rent based upon real estate taxes set forth in Section 18.2 above. Tenant agrees to pay Landlord, without previous demand therefore, the sums specified as set forth

herein payable in monthly installments on the first (1st) day of each and every month as set forth above. Tenant further agrees to pay a late charge of five (5%) per cent for each payment that is more than ten (10) days date.

Tenant will pay the rent to the following address:

New Park Associates, LLC
c/o Kenneth M. Crowley
PO# 6000
Bristol, CT 06011

As the rental payee.

or at any place from time to time designated by the Landlord.

**18.4 Additional Rent Based on Reimbursement to Landlord.** If Tenant shall fail to comply with or to perform any of the terms, conditions and covenants of this Lease, Landlord may (but with no obligation to do so) carry out and perform such terms, conditions and covenants, at the expense of the Tenant, which expense shall be payable by Tenant, as additional rent, upon the demand of the Landlord.

**ARTICLE XXIV: NET LEASE**

**19.1 Net Lease.** This is a "triple net Lease" and, except as herein otherwise expressly provided, the Landlord shall receive the fixed annual rent, additional rent and other sums required of the Tenant under this Lease, undiminished from all costs expenses and obligations of every kind relating to the Premises, which shall arise or become due during the Lease term, all of which shall be paid by Tenant just as if Tenant owned the property.

**ARTICLE XX: MISCELLANEOUS**

**20.1 Binding Effect.** All covenants, agreements, stipulations, provisions, conditions and obligations herein expressed and set forth shall extend to, bind and inure to the benefit of, as the case may require, the successors and assigns of Landlord and Tenant respectively, as fully as if such words were written wherever reference to Landlord or Tenant occurs in this Lease

**20.2 Complete Agreement.** Any stipulations, representations, promises or agreements, oral or written, made prior to or contemporaneously with this agreement shall have no legal or equitable consequences and the only agreement made and binding upon the parties with respect to the leasing of the Premises is contained herein, and it is the complete and total integration of the intent and understanding of Landlord and Tenant with respect to the leasing of the Premises.

**20.3 Severability.** If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the

application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**20.4 Amendment.** This Lease and the exhibits and schedules attached hereto and forming a part hereof are all incorporated herein and set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and other matters pertaining thereto, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**20.5 Counterparts.** This Lease may be executed in multiple counterparts and each counterpart shall be an original and all counterparts, together, shall constitute this Lease.

**20.6 Draftsmanship.** Landlord and Tenant each acknowledge that it has read this Lease, consulted with an attorney regarding its terms, and agrees with its terms as though that party had drafted this Lease itself. Landlord and Tenant agree that although this Lease was, by necessity, printed and assembled by one of the parties or its agents or attorneys, this Lease reflects the terms as agreed to by Landlord and Tenant, and each such party that assembled this Lease should merely be considered only the scrivener for the document. If a term or terms of this Lease is considered ambiguous, neither party shall be considered the draftsperson for the purpose of causing the terms of this Lease to be construed against that party.

**20.7 Rights and Remedies Not Waived.** No course of dealing or course of performance between Landlord and Tenant, or any failure or delay on the party of either of them in exercising any rights or remedies hereunder, shall operate as a waiver of any rights or remedies and no single or partial exercise of any rights or remedies hereunder shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder.

**20.8 Right of First Offer To Purchase.** Landlord shall not, at any time prior to the expiration of the Term of this Lease, or any extension thereof, sell the Demised Premises, or any interest therein, without first giving written notice thereof to Tenant of Landlord's intention to publicly place the Demised Premises on market, which notice is hereinafter referred to as "Notice of Sale."

The Notice of Sale shall include the exact and complete terms of the proposed sale.

For a period of 21 calendar days after receipt by Tenant of the Notice of Sale, Tenant shall have the right to give written notice to Landlord of Tenant's exercise of Tenant's right to purchase the Demised Premises, the interest therein proposed to be sold, or the property of which the Demised Premises are a part, on the same terms, price and conditions as set forth in the Notice of Sale.

In the event that Landlord does not receive written notice of Tenant's exercise of the right herein granted within said 21 day period there shall be a conclusive presumption that Tenant has elected NOT to exercise Tenant's right hereunder, and Landlord may publicly place property on market to sell the property to

any prospective purchaser, on substantially the same terms set forth in the Notice of Sale. Written notice is the exclusive means of exercise and "TIME IS OF THE ESSENCE" with regard to the 21 days.

In the event that Tenant declines to exercise its Right of First Offer to Purchase and, thereafter, the proposed transfer or sale is not consummated, the Tenant's right to purchase shall apply to any subsequent transaction.

If, however, said transfer or sale is, in fact, completed, then said right shall be extinguished and shall not apply to any subsequent transactions.

Notwithstanding the above, this right to purchase is intended to apply only to voluntary transfers involving third party transferees. This right to purchase shall not, therefore, apply: where the Demised Premises are taken by eminent domain or sold under threat of condemnation, to inter-family or inter-ownership transfers or to transfers by Landlord to a trust created by Landlord.

This right to purchase cannot be exercised: (i) during any period in which an Event of Default has occurred and is continuing or commencing with the giving of any notice of and Event of Default and continuing until said Event of Default is cured, (ii) during any period of time any rent is due but unpaid (without regard to whether notice thereof is give Tenant), or (iii) at any time Tenant has received 3 or more notices of Subsequent Default, whether or not the late payments or Events of Default are cured, during the 12 month period immediately preceding the delivery of the Notice of Sale. If the period for exercising the Right of First Offer to Purchase expires while it cannot be exercised then Landlord may sell the property as if Tenant has elected not to exercise said Right of First Offer to Purchase.

This Right of First Offer to Purchase shall terminate as to all subsequent offers if Tenant ever exercises it and is then unable to consummate the purchase.

**20.9 Personal Guarantee for First Seventeen (17) Months of Lease**. Upon the execution of the Lease by the Parties, John W. Mocadlo, an owner of the Tenant, shall give Landlord a personal guarantee in the form attached hereto as Schedule C, which guarantee will guarantee the payment of rent by the Tenant and the performance by the Tenant of all financial duties and obligations under the Lease agreement for the first Seventeen Months of the Lease Term, which guarantee would expire on January 30, 2017.

*[remainder of page intentionally left blank; signature pages follow]*

IN TESTIMONY WHEREOF, Landlord and Tenant have caused this Lease to be executed as a sealed instrument, as of the day and year set forth below but effective as of and from the Lease Execution Date first above written.

**LANDLORD:**

New Park Associates, LLC

By: ______________________

Name: ______________________

Title: ______________________

State of Connecticut )
)ss.
County of )

The foregoing instrument was acknowledged before me this ______ day of September, 2016, by ______________________, the of New Park Associates LLC a Connecticut Limited Liability Corporation on behalf of said entity.

______________________
Notary Public

My Commission Expires:

**TENANT:**

The Hartford Auto Group Inc.

By: ______________________

Name: John W. Mocadlo

Title: President

State of Connecticut )
)ss. Wallingford
County of New Haven )

The foregoing instrument was acknowledged before me this 25th day of August, 2016, by John W. Mocadlo, the President of The Hartford Auto Group Inc. a Connecticut Company on behalf of said entity.

______________________
Notary Public

My Commission Expires: 4-30-21

**EXHIBIT A**

**DESCRIPTION OF THE DEMISED PREMISES**

Schedule "A"

398-412 New Park Ave.,Hartford, CT

A certain Piece or Parcel of land with the buildings and improvements thereon, designated as Lot No. Two, 398-412 New Park Avenue situated in the City of Hartford, County of Hartford and the State of Connecticut, and bounded and described as follows:

Beginning at a point located in the Easterly Street Line of New Park Avenue which point marks the Southwesterly corner of land herein described; Thence S60◦ 11' 45"E a distance of 162.94 ft along the northerly boundary of Lot One to a point; Thence from said point S29◦ 42' 20"W along the northerly boundary of Lot One a distance of 19.65 ft to a point. Thence from said point S59◦ 47' 43"E along the northerly boundary of Lot One a distance of 33.41 ft. to appoint. Thence from said point S44◦ 07'21"E along the northerly boundary of Lot One a distance of 81.34 ft to a point located in the westerly Right of Way Line of land N/F National Railroad Passenger Corporation said point marking the Southeasterly corner of the parcel herein described; Thence from said point N30◦43' 35"E along the Westerly Right of Way line of National Railroad Passenger Corporation a distance of 493.32 ft to a point marking the Northeasterly corner of the parcel herein described; Thence from said point N60◦ 04' 35"W along land N/F Starwood Ceruzzi Hartford, LLC, a distance of 291.00 ft to a point marking the Northwesterly corner of the parcel herein described; Thence from said point S28◦ 42' 35"W along the Westerly Street Line of New Park Avenue a distance of 164.25 ft to a point; Thence from said point S28◦ 43' 55"W along the Westerly Street Line of New Park Avenue a distance of 287.29 ft to a point marking the point or place of beginning.

The above described parcel contains 3.00 Acres and is more particularly depicted and described as "Lot No. Two" on a map entitled "Prepared for New Park Avenue Associates, LLC. Lot Line Revision Plan, 398-430 New Park Avenue, Hartford and West Hartford, CT, Scale as noted December 18th 2015 (Revised March 14th, 2016) Prepared by PMPCA, LLC" said Map to be filed (or filed) in the Hartford City Clerk's Office and the West Hartford Town Clerk's Office and said map hereby being made a part of this description.

The above-described parcel is subject to such easements as of record may appear.

**EXHIBIT B**

**BASE RENT SCHEDULE PER LEASE SECTIONS 14.1 and 18.1**

| **Initial Term** | Monthly Rent | Annual Rent |
|---|---|---|
| Year One (September 1, 2016 – August 31, 2017) | | |
| September 1, 2016 – January 31, 2017 | $ 0.0 (Tenant receives Five Months Free Rent) | |
| February 1, 2017 – August 31, 2017 | $13,000.00 | $91,000.00 |
| Year Two (September 1, 2017 – August 31, 2018) | $13,000.00 | $156,000.00 |
| Year Three (September 1, 2018 – August 31, 2019) | $13,000.00 | $156,000.00 |
| Year Four (September 1, 2019 – August 31, 2020) | $13,000.00 | $156,000.00 |
| Year Five (September 1, 2020 – August 31, 2021) | $13,000.00 | $156,000.00 |
| Year Six (September 1, 2021 – August 31, 2022) | $13,520.00 | $162,240.00 |
| Year Seven (September 1, 2022 –August 31, 2023) | $14,060.00 | $168,720.00 |

**Ist Five Year Renewal Term, if and as Exercised by Tenant Per Section 1.4**

Base Rent to increase a minimum of 3% per annum over prior year with a maximum increase to be determined by referencing the cost of living index as published by the U.S. Department of Labor in existence on the first day of this Lease and on each anniversary date of this Lease. Said minimum increase, if any shall be computed by applying the cost of living increase to the prior year's base rent for each year within said 1st Five Year Renewal Term.

**2nd Five Year Renewal Term, if and as Exercised by Tenant Per Section 1.4 Year Thirteen**

Base Rent to increase the same as computed during prior Five Year Renewal Term.

**3rd Five Year Renewal Term, if and as Exercised by Tenant Per Section 1.4**

Base Rent to increase the same as computed during prior Five Year Renewal Term.

**4th Five Year Renewal Term, if and as Exercised by Tenant Per Section 1.4**

Base Rent to increase the same as computed during prior Five Year Renewal Term.

EXHIBIT C

**AGREEMENT OF PERSONAL GUARANTY FOR FIRST SEVENTEEN MONTHS OF LEASE TERM ATTACHED TO AND MADE A PART OF THE LEASE AGREEMENT DATED AUGUST 1, 2016 BETWEEN NEW PARK AVENUE ASSOCIATES, LLC ("LANDLORD") THE HARFORD AUTO GROUP INC. ("TENANT")**

The undersigned "GUARANTOR," in consideration of the making of the foregoing Lease Agreement between Tenant and Landlord, does hereby unconditionally guarantee the payment of the rent by the Tenant and the performance by Tenant of all the financial duties and obligations under the Lease Agreement that are incurred during the first seventeen months of the Lease Term.

It is expressly agreed and understood that the first seventeen months of the Lease Term is the period commencing on September 1, 2016 and ending on January 31, 2018. This guarantee expires on January 31, 2018 and the undersigned does not guarantee the payment of rent by the Tenant or the performance by Tenant of any financial duties and obligations under the Lease Agreement that are incurred after January 31, 2018.

**EXECUTED** to be effective as of the 1st day of September, 2016.

**GUARANTOR**:

Name: John W. Mocadlo

Business Address: 505 North Colony Road
Wallingford, Ct 06492

Residence Address: 34 Bayshore Drive
Milford, Ct 06406

# ASSIGNMENT AND ASSUMPTION OF LEASE

This ASSIGNMENT AND ASSUMPTION OF LEASE ("Assignment") dated July 31, 2020, by and between TEAM IMPORTS, LLC ("Assignee"), Hartford Auto Group, Inc. ("Assignor" or "Tenant"), New Park Avenue Associates, LLC (the "Landlord").

## WITNESSETH

**WHEREAS,** Landlord and Tenant entered into that certain lease (the "Lease") on or around September 1, 2016, whereby the Tenant leased from the Landlord the premises more specifically identified as 412 New Park Avenue, Hartford, Connecticut 06110 (the "Premises"); and

**WHEREAS,** the Assignor currently operates a Mitsubishi franchised automobile dealership (the "Dealership") from the Premises; and

**WHEREAS,** the Assignee has purchased the assets of the Dealership from the Assignor and, in connection with the Assignee's purchase of the assets of the Dealership, Assignee desires to assume, and Assignor desires to assign, the Lease to Assignee.

**NOW, THEREFORE,** in consideration of the above recitals and the mutual covenants hereinafter contained, the parties agree as follows:

1. Effective as of the date hereof, Assignor hereby assigns to Assignee all of its right, title and interest under the Lease. Assignor agrees to indemnify Assignee against and hold Assignee harmless from any and all cost, liability, loss, damage or expense, including but not limited to reasonable attorneys' fees, arising as a result of Assignor's breach of terms of the Lease on or prior to the date hereof.

2. Effective as of the date hereof, Assignee hereby assumes all of the Assignor's obligations under the Lease. Assignee agrees to indemnify Assignor against and hold Assignor harmless from any and all cost, liability, loss, damage or expense, including but not limited to reasonable attorneys' fees, arising as a result of Assignee's breach of the terms of the Lease after the date hereof.

3. The Landlord hereby consents to this Assignment and hereby agrees to solely look to Assignee for a default under the Lease as of the date hereof. To the best of Landlord's knowledge, Assignor is currently not in default under this Lease. Pursuant to Article 10.1 of the Lease, the execution of this Assignment by Assignor, Tenant and Landlord shall constitute the necessary consents and authorizations to allow Assignor to assign, and for Assignee to assume, the Lease.

4. By their respective execution hereof, the Landlord, Tenant Assignor acknowledge and represent that the Lease and Lease are in full force and effect. Further, the Landlord and Assignor acknowledge and represent that neither Party is in breach of the Lease.

5. This Assignment shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

6. All capitalized terms used herein, but not defined, shall have the meanings given to such terms in the Lease.

7. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same document.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

**TEAM IMPORTS, LLC**

__________________, as Assignee
Robert Urrutia, Managing Member

**HARTFORD AUTO GROUP, INC.**

__________________, as Assignor/Tenant
John Mocadlo, President

**NEW PARK AVENUE ASSOCIATES, LLC**

__________________, as Landlord
**By:** __________________
**Its:** __________________

# PERSONAL GUARANTY

**THIS GUARANTY** (the "Guaranty") is made this ___ day of August, 2020 ("Effective Date") by Robert Urrutia of 345 E. 80th Street, New York, New York and Herlof Sorensen of 160 Boegs Hill Road, Newtown, CT 06470 (collectively the "Guarantor") to and for the benefit of New Park Avenue Associates, LLC, (the "Landlord") a Connecticut limited liability company with an address of 223 Broad Street, Forestville, Connecticut.

**WHEREAS**, on or about September 1, 2016, the Landlord entered into a Lease Agreement with the Hartford Auto Group, Inc. concerning the real property located at 398-412 New Park Avenue, Hartford, Connecticut.

**WHEREAS**, Hartford Auto Group wishes to assign its interest in the Lease Agreement to Team Imports, LLC (the "Team Imports").

**WHEREAS**, the Landlord is agreeable to the assignment provided the principals of Team Imports agree to guarantee the payment and performance of the obligations of the tenant under the terms of the Lease; and,

**NOW THEREFORE**, in consideration of the Landlord's acceptance of the obligations of the tenant and as an inducement for the Landlord to consent to the assignment of the Lease to Team Imports, the Guarantor hereby unconditionally and personally guarantees as follows:

1. Payment and Performance. Guarantor does hereby fully and unconditionally guarantee to the Landlord that the Team imports shall make due and punctual payment of all obligations owed under the terms of the Lease.

Guarantor does hereby unconditionally and fully guarantee that the Team imports shall duly and punctually perform all of its other obligations, covenants and conditions contained in the Lease.

If Team imports shall at any time fail to make any such payments, then without requiring any notice from the Landlord and without requiring Landlord to take any action against the Team imports therefor, Guarantor shall make such payment or payments to Landlord, this Guaranty being a guaranty of payment and not of collection, and Guarantor shall, at Guarantor's sole cost and expense, promptly, diligently and continuously perform all such obligations, covenants and conditions.

2. Indemnification. Guarantor shall, without requiring any notice from Landlord and without requiring Landlord to take any proceedings against the Team Imports, at Guarantor's sole cost and expense for all direct and indirect costs, fully indemnify, save and hold harmless Landlord from all cost and damage which Landlord may suffer by reason of any failure by the Team Imports to perform any of the obligations of Team Imports under the Lease and fully reimburse and repay to Landlord any and all costs and expenses which Landlord may incur arising from any such failure, and from any and all loss, liability, expense, including legal fees and cost of litigation, and damage, suffered or incurred by Landlord in enforcing and procuring the performance of this Guaranty and the obligations of Team Imports guaranteed hereby.

3. Unconditional Guaranty. All of the obligations of Guarantor hereunder are unconditional and irrevocable and cannot be changed or terminated orally. Guarantor agrees that Guarantor's obligations hereunder shall not be impaired, modified or released in any manner whatsoever by any impairment, modification or release of the liability of Team Imports or Team Import's estate in bankruptcy or reorganization, or by any stay or other legal impediment in or arising from any bankruptcy or reorganization proceeding of Team Imports, resulting from the operations of any present or future provision of the Bankruptcy Code of 1978, as revised, or other similar State or Federal statute, or from the decision of any court.

4. Representations and Warranties of Guarantor. Guarantor hereby represents and warrants that, as of the date hereof:

a. That there is presently outstanding no litigation or contingent liabilities which could adversely affect the financial or other condition of Guarantor, and that no bankruptcy or insolvency proceedings of any kind have been filed, threatened or are outstanding by or against Guarantor, and Guarantor is not in default with regard to payment and performance of all loans, contracts and other agreements and obligations affecting Guarantor.

b. It is not necessary for the Landlord to inquire into the capacity or powers of Team Imports or the officers, directors, partners, or agents acting or purporting to act on its behalf.

c. Guarantor agrees that he will maintain himself and his financial affairs in such a manner so that he is able to make truthfully the representations herein contained at all times during the term of this Guaranty.

5. This Guaranty, all acts and transactions hereunder and the rights and obligations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Connecticut. All actions or proceedings arising directly or indirectly hereunder shall be litigated in a state court within the State of Connecticut.

6. Bind and Inure. The provisions of this Guaranty shall be construed in accordance with the laws of the State of Connecticut and shall bind and inure to the benefit of the parties hereto and their heirs, successors and assigns; the word "Guarantor" as used herein shall mean not only the original Guarantor named in the first paragraph of this Guaranty, but also the heirs, successors and assigns of the Guarantor.

**IN WITNESS WHEREOF,** Guarantor has caused this Guaranty to be duly executed and delivered as of the 31st day of July, 2020.

**GUARANTOR:**

Robert Urrutia, Individually

Herlof Sorensen, Individually

STATE OF CT )
) ss. July 31, 2020
COUNTY OF Litchfield )

On this 31st day of July, 2020, personally appeared Robert Urrutia, signer and sealer of the foregoing instrument, and he acknowledged the same to be his free act and deed, before me.

Keshia Marie Lewis
Commissioner of the Superior Court
Notary Public
My Commission Expires: 3/31/2025

KESHIA MARIE LEWIS
Notary Public, State of Connecticut
My Commission Expires 03/31/25

STATE OF CT )
) ss. July 31, 2020
COUNTY OF Litchfield )

On this 31st day of July, 2020, personally appeared Herlof Sorensen, signer and sealer of the foregoing instrument, and he acknowledged the same to be his free act and deed, before me.

Keshia Marie Lewis
Commissioner of the Superior Court
Notary Public
My Commission Expires 3/31/2025

2437785v.2

**EXHIBIT "E"**

**ASSUMED CONTRACTS**

- Tekion (DMS) and Technology Finance Corporation (Tekion) (equipment)
- Storage Lot Lease: 430 New Park Ave c/o Reese Commercial PO Box 918 Rocky Hill CT 06067 (month to month, monthly rent--$1,000)
- Pitney Bowes (postage meter and scale)
- Hunter alignment machine
  [attached documentation for same follows]
- Coffee machine (Crystal Rock) [Note: Seller unable to locate paperwork, will provide a copy of invoice to evidence the obligation within 5 days of the date of this Agreement) (Coffee machine obligation terminable upon 30 days' notice)

pitney bowes

# Lease Invoice

Go to pitneybowes.com/signin
- Make a payment
- **Live chat for immediate account support**
- For account management/maintenance
- Sign up for Autopay - **no more late fees**
- Sign up for Paperless Billing
- Still need help? Call 844-256-6444

| | |
|---|---|
| Account Number | [redacted] |
| **Invoice Number** | **3319271712** |
| Billing Period | Jul 13 2024 to Oct 12 2024 |
| Invoice Date | Jun 14 2024 |
| **AMOUNT DUE Jul 13 2024** | **$168.26** |

**DETAILS OF YOUR CHARGES** Billing period: Jul 13 2024 - Oct 12 2024

**Contract # 0041369688**

**0018444639** TEAM IMPORTS LLC, 412 New Park Ave, Hartford, CT, 061062959

| **Description** | **Total** |
|---|---|
| **ValueMax** | $30.00 |
| **SendPro C200, C300, C400** | $128.97 |
| Product/Serial #: 7H00 / 1357790 C Series IMI Meter | |
| Product/Serial #: 8H00 / 1357790 C Series IMI Base | |
| Product/Serial #: MP81 / 0224161 C Series Integrated Scale | |
| **State tax** | **$9.29** |
| **AMOUNT DUE** | **$168.26** |

**To pay by mail, complete and send the coupon below. Please allow 7-10 business days for mail and processing time.**



DUNS 83-178-3217, TAX ID 20-1344287 v *Tear off here* N-000917

**Pitney Bowes**
27 Waterview Drive
Shelton,CT 06484

**Pitney Bowes payment coupon**
**If you've chosen to pay by mail, please include this payment coupon with your payment.**

**Account #: 0018444640**
**Invoice date:** Jun 14, 2024
**Payment amount due: $168.26**

**Invoice #:** 3319271712
**Due date:** Jul 13, 2024

200000184446409331927171230000168260б

0018444640

PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC
PO BOX 981022
BOSTON MA 02298-1022

TAG IMPORTS LLC
VALERIE MYERS
412 NEW PARK AVE
HARTFORD CT 06106-2959

**Change of address/contact information?**
Please update at pitneybowes.com/us/support/addresschange.

pitney bowes

| Account Number | Invoice number | Invoice Date |
| --- | --- | --- |
| 0018444640 | 3319271712 | Jun 14 2024 |



NEW: Check your lease contract details at

**pitneybowes.com/us/contract**

## Important information

This transaction is governed by the terms and conditions of the applicable Pitney Bowes agreement, current as of the date of this invoice unless otherwise agreed to in writing by the parties.

### Payment

If we do not receive your payment by the Payment Due Date, late fees will apply. If your payment is returned, you're liable for any charges we incur. If you make a partial payment of the payment due, it doesn't change your contract or obligations to us.

**ValueMAX®** is a repair/replacement service for leased equipment in the event of loss, damage or theft. Program fees cover your participation in our **ValueMAX®** program which is more fully described in your lease contract. For more information visit our website - **pitneybowes.com/valuemax**



### You can pay your bill:

- **QUICKEST WAY TO PAY: pitneybowes.us/signin**
- By check, made payable to Pitney Bowes Global Financial Services LLC and sent with this *payment coupon* to:
  **PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC**
  **PO BOX 981022**
  **BOSTON MA 02298-1022**

# VIKING EQUIPMENT

**700 Industrial Park Road, Deep River, CT 06417**
**800.505.5058 / 860.526.9656 fax**

**Equipment Proposal Submitted to:**

Team Mitsubishi Hartford
412 New Park Avenue
Hartford, CT 06110-2971
Hector Ramos
475-316-6392

| Model | Description | Price |
|---|---|---|
| WA674 | Aligner with New premium compact cabinet and 27" Wide Screen LCD Display. | $15,812.00 |
| HE421ML | Sensors-Manual lift provides full range of travel for additional li height or to work with vehicle on the floor. Includes 4 Cameras, Three Dimensional Targets, QuickGrip Wheel Adaptors | $14,275.00 |
| RX10KPS | Scissor Lift, wireless connectivity, 10,000lb capacity, 166" 2WA WB, (2) 6,000lb Swing Jacks, PowerSlide turnplates. | $33,188.00 |
| 20-3438-1 | RX light kit for K model racks. | $1,193.00 |
| | Freight Estimate | $2,394.00 |
| | Sub-total | $66,862.00 |
| | Tax | $4,245.74 |
| | Total | $71,107.74 |

Install does not include air/electric connections
Proposal subject to change without notice

12/26/2023

**Payment Terms - Due on Receipt**

Accepted By: ______________________
Title: ______________________
Date: ______________________

**Prepared By:**
Jason Myers
860-993-4462 cell
860-526-9616 office
jason@vikingequip.com

# RE: 41253383 for TEAM IMPORTS LLC DBA TEAM MITSUBISHI- Approved

Bill Waddell <bwaddell@navitascredit.com>
Thu 1/18/2024 12:48 PM
To:Chastity Mercado <chastity.mercado@teamauto.com>
Cc:Hector Ramos <hector.ramos@teamauto.com>;Jason Myers <jason@vikingequip.com>

Good afternoon All:
Just confirming you received the below yesterday?

Any questions, please give me a call.
Thank you,
Bill

**Bill Waddell**
Vice President of Sales
Navitas Credit Corp.
*A United Community Bank Company*
303 Fellowship Rd Suite 310 | Mount Laurel, NJ 08054
Cell: 609-980-2939 Tel: 856.751.3700, ext. 138 | Fax: 866.956.1262 | www.navitascredit.com





**From:** Bill Waddell
**Sent:** Tuesday, January 16, 2024 4:13 PM
**To:** Chastity Mercado <chastity.mercado@teamauto.com>
**Cc:** Hector Ramos <hector.ramos@teamauto.com>; Jason Myers <jason@vikingequip.com>
**Subject:** 41253383 for TEAM IMPORTS LLC DBA TEAM MITSUBISHI- Approved

**Good afternoon Chasity, Hector and James:**
**James: It was a pleasure speaking with you today.**
**We received your Credit Application for the financing on your Hunter purchase with Jason @ Viking Equipment and now have it approved as follows:**
**Amount: $71,107.74 (see attached quote)**
**Term: 60 Months**
**Monthly Payment: $1,450.54**
**Advance Payments: First & Last Payments (leaves 58 remaining payments)**
**Doc Fee: $199.00**
**ACH Required**
**Early Buyout Addendum: YES**
**Your company takes title to the equipment day one and owns it, no buyout.**
**Shorter terms available:**
**48 Months @ $1,748.42**
**36 Months @ $2,246.90**
**24 Months @ $3,246.98**
**If you would like to procced, please reply and type ACCEPTED listing the desired term and send back to me. I will send you the E-docs (DocuSign Agreement) so a corporate officer can E-sign. Will need Robert Urrutia's email address to send out the DocuSign unless Chasity wants me to send to her?**

**Once we are in contract, I can issue the Purchase Order and deposit to Jason so he can set-up your install.**

**Any questions, please give me a call @ 609-980-2939.**

**Thank you,**
**Bill**

Bill Waddell
Vice President of Sales
Navitas Credit Corp.
*A United Community Bank Company*
303 Fellowship Rd Suite 310 | Mount Laurel, NJ 08054
Cell: 609-980-2939 Tel: 856.751.3700, ext. 138 | Fax: 866.956.1262 | www.navitascredit.com




*Notice: This Email message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. If you are not the intended addressee/recipient, you are hereby notified that any use of, disclosure, copying, distribution, or reliance on the contents of this Email information is strictly prohibited and may result in legal action against you. Please reply to the sender advising of the error in transmission and immediately delete/destroy the message and any accompanying documents. Thank you.*

AUTOMOTIVE SERVICE EQUIPMENT

**Questions? Call Bill Waddell 609-980-2939**
**Bwaddell@NavitasCredit.com**

## LESSEE INFORMATION

| Legally Registered Name: | Trade/DBA Name | Primary Contact |
|---|---|---|
| Team Imports LLC | Team Mitsubishi | Hector Ramos |

| Physical Address – (HQ or Existing Street Address) City, State, Zip Code | Phone Number | Ext. |
|---|---|---|
| 412 New Park Ave. Hartford, CT 06101 | | |

| Equipment Location – (New, If Moving or Expanding) City, State, Zip Code | Primary Contact Cell Phone |
|---|---|
| same as above | 475·316·6392 |

| Type of Business | State of Incorporation | Years in Business | # of Employees |
|---|---|---|---|
| ___Proprietorship ___Partnership ___C-Corporation ___S-Corporation ✓LLC ___Non Profit | CT | 3 Years ___ Months (Minimum 2 Years, Under Current Owner, Or Call For New Business Program Quote) | 40 |

| Do you Own the Equipment Location? (circle one) YES (NO) | Nature of Business | E-mail Address | Federal ID # |
|---|---|---|---|
| NO | Car Dealership | mihfap@teamauto.com | 84-5020352 |

## BUSINESS CHECKING INFORMATION

| Name of Bank: | Phone #: | Contact: | Average Balance: |
|---|---|---|---|
| Chase | | | • It is helpful to send the first page of the past 3 months bank statements |

## PRINCIPAL INFORMATION: NON PROFITS, PUBLIC COMPANIES, & MUNICIPALITIES MAY LEAVE BLANK

| Principal First Name | Last Name | Home Address (Street Address, City, State, Zip) |
|---|---|---|
| Robert | Urrutia | 37 Lakewood Terr. Newton, NJ 07860 |

| Title | % Ownership | Home Phone # | Cell Phone # | Social Security Number |
|---|---|---|---|---|
| Owner | 100 | | | |

| Principal First Name | Last Name | Home Address (Street Address, City, State, Zip) |
|---|---|---|
| | | |

| Title | % Ownership | Home Phone # | Cell Phone # | Social Security Number |
|---|---|---|---|---|
| | | | | |

## EQUIPMENT INFORMATION (Please fill out known information)

| Equipment Cost: | Are you purchasing additional equipment for your office you would like to lease, such as phones, computers, furniture, security…? | Lease Term | Expected Delivery Date | Purchase Option |
|---|---|---|---|---|
| $ 71,107.74 <br> Estimated Description: Aligner, sensor manual lift scissor lift <br> Please "X" All That Apply <br> X New <br> ___ Remanufactured <br> ___ Used | Circle: YES / (NO) | 24, 36, 48, (60) months (circle) <br> Shorter Terms Available Upon Request | | $1.00 <br> Other Options Available Upon Request |

## DEALER OR SUPPLIER INFORMATION

| Dealer: Viking Garage Equipment | Contact: Jason Myers | Phone: 860-993-4462 | E-Mail |
|---|---|---|---|

By signing below, the undersigned individual as principal of and/or guarantor for the applicant, authorizes ADG Capital, its designee, assigns or potential assigns, to review his/her personal credit profile provided by national credit bureaus in considering this application and for the purpose of the update, renewal, or extension of credit to the applicant or the collection of any resultant accounts. A fax or photocopy of this authorization shall be valid as the original. *** ALL PRINCIPLES LISTED ABOVE MUST SIGN THIS APPLICATION.**

Signature X [signature] Date 1/16/24 Signature X ______________ Date ______

**PLEASE SEND BACK TO BWADDELL@NAVITASCREDIT.COM**

DocuSign Envelope ID: [illegible]

NAVITAS CREDIT CORP. | A UNITED COMMUNITY BANK COMPANY

JAN 23,2024

Dear Team Imports LLC,

Thank you for your business. I have attached the documents required to finalize your transaction with Navitas Credit Corp. Please have the documents executed as described below:

**Equipment Lease, Rental or Finance Agreement:** Please sign and date the lower left side of the lease or finance agreement with the appropriate title.

**Personal Guaranty and/or Corporate Guaranty:** Please have the following individual(s) sign the Unconditional Guaranty Section:

**Other Documents:** Please execute any other documents included in this package.

**Company check for monies due:** For Initial Amount $2,901.08 and processing fees of $199.00 plus any applicable tax.

*We offer Automated Clearing House (ACH) for the amount listed above. Please fill out the following, sign and include with your lease document package:*

**I acknowledge that I am an authorized signer of the bank checking account below and authorize Navitas Credit Corp., or its assignee, to take all amounts, including applicable tax, currently due under Contract # 41253383 with us via ACH.**

Company: Team Imports LLC

Routing #: 021000021

Account #: [redacted]

Bank Name: Chase

Bank City/State: New York




Signature: DocuSigned by: [signature] 39A11F324990454...

Date: 1/24/2024

**This is a onetime ACH for the current amount due under the Agreement.**

**We require you to have all future amounts due remitted via ACH to Navitas Credit Corp., or its assignee, please sign below:**

**Signature:** DocuSigned by: [signature] **Date:** 1/24/2024

This document may be executed by facsimile, electronic or original signature and such a copy shall be treated as an original for all purposes.

***Please supply a copy of a Voided Company Check for the business listed on this agreement which is financing the equipment***

Should any of the information on the enclosed documents be incorrect, please notify me immediately at (866) 956-2848 so I can make the appropriate corrections.

Have my Rep contact me for alternative method

Sincerely,

William Waddell
Navitas Credit Corp.

DocuSign Envelope ID: [illegible]

**EQUIPMENT FINANCE AGREEMENT**

NAVITAS CREDIT CORP.
A UNITED COMMUNITY BANK COMPANY

BORROWER: Team Imports LLC (hereinafter referred to as "you" or "your") | DBA: Team Mitsubishi | Federal Tax ID# [redacted]
Address: 412 New Park Avenue | City: Hartford | State: CT | Zip: 06101 | Phone: (860) 406-5683
SECURED PARTY/ LENDER: NAVITAS CREDIT CORP. hereafter referred to as "We", "Us", or "Our" | VENDOR: Viking Garage Equipment, Inc. | AGREEMENT # [redacted]
(Vendor is not an agent of Secured Party nor is Vendor authorized to waive or alter any terms of this Agreement)

| Equipment Description / Quantity / Serial # / VIN# | | | |
|---|---|---|---|
| (1) Hunter Aligner Model#WA674, (1) Sensors-Manual lift Model #HE421ML, (1) Hunter Scissor Lift Model #RX10KPS & (1) RX Light Kit Model #20-3438-1 | Term in Months: 60 | First Payment: | $1,450.54 |
| | Monthly Payments: 60 @ $1,450.54 | Last Payment: | $1,450.54 |
| | | Security Deposit: | $0.00 |
| | | Other: | $199.00 |
| Equipment Location (if different than above address) 412 New Park Avenue Hartford CT 06101 | Amount Financed: $71,107.74 | INITIAL AMOUNT DUE: | $3,100.08 |

**TERMS AND CONDITIONS (PAGE 1 OF 2) – PLEASE READ CAREFULLY BEFORE SIGNING**

1. AGREEMENT: You want to acquire the above equipment ("Equipment") from a vendor selected by you ("Vendor") and have requested that we finance the purchase price for you. You unconditionally promise to pay us the sum of all of the monthly payments indicated above or on any schedule ("Payments") and you agree to all of the terms stated in this Agreement. You authorize us to insert any Equipment serial numbers and other identification data and any other omitted facts and to correct obvious errors. We may adjust the monthly payment amount to finance any taxes due at the inception of this Agreement or if the actual cost of the Equipment is less than 10% higher or lower than the amount that the Payment amount was based on. At our discretion we may apply any amounts received from you to any amount you owe under this Agreement.

2. TERM: This Agreement shall become effective and shall commence only after you direct us to make disbursements to your Vendor, we approve your Vendor's invoice, we sign this Agreement and we make the initial disbursement or any later date that we designate ("Commencement Date"). The term of this Agreement shall terminate upon the date that all of your payment and other obligations have been paid and satisfied in full ("Term"). The Initial Amount Due shall be due on the Commencement Date and subsequent monthly payments are due on the day we select, payable to a location to be designated by us. YOUR OBLIGATION TO PAY ALL PAYMENTS AND OTHER OBLIGATIONS TO US IS UNCONDITIONAL AND NOT SUBJECT TO ANY REDUCTION, SET-OFF, DEFENSE OR COUNTERCLAIM. THIS AGREEMENT MAY NOT BE CANCELED FOR ANY REASON WHATSOEVER AFTER COMMENCEMENT EXCEPT BY YOUR PAYMENT AND SATISFACTION OF ALL OF YOUR OBLIGATIONS HEREUNDER. We have the right, but not the obligation, to electronically withdraw funds from your bank account to pay for any unpaid Payments or other amounts due hereunder. You will provide us with any bank account information we request in order to process electronic payments.

3. EQUIPMENT: You agree that you are the owner of and have title to the Equipment, excluding any software. By signing the Pay Proceeds Direction at the end of this Agreement, you authorize us to pay your Vendor, either as a prepayment to your Vendor to initiate delivery or upon your acceptance of the Equipment when it is delivered. You hereby grant to us a first priority, purchase money security interest in the Equipment and all replacements, replacement parts, accessions and attachments now or hereafter made a part of the Equipment, and all cash and non-cash proceeds, and all general intangibles, accounts and chattel paper arising therefrom. You agree, at your expense, to protect and defend our interests in the Equipment. Further, you shall at all times keep the Equipment free from all legal process, liens and other encumbrances if asserted or made against you or the Equipment. You agree we have the right to inspect the Equipment upon reasonable notice to you.

4. NO WARRANTIES; NO AGENCY: WE ARE FINANCING THE EQUIPMENT FOR YOU "AS IS". WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF NON-INFRINGMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ORDINARY USE IN CONNECTION WITH THIS AGREEMENT. Neither the Vendor nor any other person is our agent, nor are they authorized to waive or change any term of this Agreement. No representation, guaranty or warranty by the Vendor or other person is binding on us. No breach by the Vendor will relieve or excuse your obligations to us. If you entered into a maintenance or service agreement the cost of which is included in the Payments, you acknowledge we are not a party to such agreements and are not responsible for any service, repairs, or maintenance of the Equipment. If you have a dispute with your Vendor about delivery, installation, service or any other matter, you must continue to perform all your obligations, hereunder.

5. SALE/ASSIGNMENT: YOU MAY NOT SELL, TRANSFER, ASSIGN OR LEASE THE EQUIPMENT OR YOUR OBLIGATIONS UNDER THIS AGREEMENT WITHOUT OUR PRIOR WRITTEN APPROVAL. We may sell, assign or transfer this Agreement or any part of it and/or our interest in the Equipment without notifying you and you agree that if we do, (i) the new Secured Party will have the same rights and benefits that we now have but will not have to perform any of our obligations, (ii) the rights of the new Secured Party will not be subject to any claims, defenses or setoffs that you may have against us or the Vendor, and (iii) you will not assert any claims, defenses or setoffs whatsoever against us or the new Secured Party.

6. SECURITY DEPOSIT: As security for the performance of all your obligations hereunder, you have deposited with us the amount set forth in the section shown as "Security Deposit". We have the right, but are not obligated, to apply the security deposit at any time to any amount you owe. Provided you have fully performed all of the provisions of this Agreement, we will return to you any then remaining balance of the security deposit. We will not keep the security deposit separate from our general funds and you shall not be entitled to any interest thereon.

7. CARE, USE AND LOCATION; LOSS: You are responsible for installing and keeping the Equipment in good working order and repair. You will keep and use the Equipment only for business or commercial purposes and in compliance with all applicable laws, ordinances or regulations and only at your address shown on this Agreement unless we agree to another location. You will not make any alterations to the Equipment without our prior written consent, nor will you permanently attach the Equipment to any real estate. In the event the Equipment is lost, stolen or damaged, so long as you are not in default hereunder, you shall have the option within

**TERMS AND CONDITIONS (PAGE 1 OF 2) – PLEASE READ CAREFULLY BEFORE SIGNING**

**By signing this Agreement you acknowledge that you have read and understand the terms and conditions on each page of this Agreement, and you warrant that the person signing this Agreement on your behalf has the authority to do so and to grant the power of attorney set forth in Section 13 of this Agreement.**

I AM AUTHORIZED TO SIGN THIS AGREEMENT ON BEHALF OF BORROWER:

X: (signature) [signature] Date Signed: 1/24/2024

Print Name & Title: Robert Urrutia Pres

ACCEPTED BY SECURED PARTY: NAVITAS CREDIT CORP., at Columbia, South Carolina

By: (signature) Date Accepted:

Print Name & Title:

UNCONDITIONAL GUARANTY:

For the purposes of this Guaranty, "you" and "your" refer to the person making the guaranty. "We", "us" and "our" refer to the Secured Party, our successors or assigns. You acknowledge that you have read and understood the Agreement and this Guaranty and that this is an irrevocable, joint, several and continuing guaranty. You agree that you have an interest in the Borrower's business, economic or otherwise, and that we would not enter into this Agreement without this Guaranty. You unconditionally guaranty that the Borrower will fully and promptly pay all its obligations under the Agreement and any future Agreements with us when they are due and will perform all its other obligations under the Agreement even if we modify or renew the Agreement, or if any payments made by the Borrower are rescinded or returned upon the insolvency, bankruptcy or reorganization of the Borrower, as if the payment had not been made. We do not have to notify you if the Borrower is in default under the Agreement. If the Borrower defaults, you will immediately pay and perform all obligations due under the Agreement. You agree that you will not be released or discharged if we: (i) fail to perfect a security interest in the Equipment or any other property which secures the obligations of Borrower or you to us ("Collateral"); (ii) fail to protect the Collateral; or (iii) abandon or release the Collateral or any obligor under the Agreement or this Guaranty. You agree that we do not have to proceed first against the Borrower or any Collateral. You hereby waive any right of exoneration, notice of acceptance of this Guaranty and of all other notices or demands of any kind in which you may be entitled to except for demand for payment. You will reimburse all expenses we incur in enforcing our rights against Borrower or you, including, without limitation, attorney's fees and costs. We may obtain information from and report to credit reporting agencies to enter into the Agreement or to enforce this Guaranty. You consent to personal jurisdiction, forum, choice of law and jury trial and transfer of venue waiver as stated in section 17. YOU AND WE EACH WAIVE TRIAL BY JURY IN ANY ACTION RELATING TO THE AGREEMENT OR THIS GUARANTY. This Guaranty may be executed by facsimile, electronic or original signature and such a copy shall be treated as an original for all purposes.

X: (signature) Date Signed:

Print Name:

X: (signature) Date Signed:

Print Name:

DocuSign Envelope ID: [illegible]

## TERMS AND CONDITIONS (PAGE 2 OF 2) – PLEASE READ CAREFULLY BEFORE SIGNING

one week of such event to: (i) repair or replace the Equipment or (ii) pay to us the unpaid balance of the remaining Payments hereunder discounted to present value at the rate of three percent (3%) (or such greater amount that may be required by law) plus any other amounts due or to become due hereunder. **UNDER NO CIRCUMSTANCES ARE WE RESPONSIBLE FOR SERVICE OR MAINTENANCE ON THE EQUIPMENT.**

8. **TAXES:** You will pay when due to your appropriate taxing authority, all taxes, fines and penalties relating to this Agreement or the Equipment, and any applicable registration or titling fees or other governmental charges, that are now or in the future assessed or levied by any government authority or required for the lawful possession and use of the Equipment. Sales taxes due upon the purchase of the Equipment and any other such governmental charges, if included in the purchase price, may be financed hereunder.

9. **INDEMNITY:** We are not responsible for any injuries or losses to you or any other person or property caused by the installation, operation, maintenance, ownership, possession or use of the Equipment. You agree to reimburse us for, hold us harmless from, and defend us against any claims made against us, and for losses or injuries suffered by us, including, without limitation, those arising out of the negligence, tort, or strict liability claims. This indemnity shall continue even after the Term has expired.

10. **INSURANCE:** You agree to maintain comprehensive liability insurance acceptable to us. You also agree to maintain insurance against the loss of or damage to the Equipment for an amount not less than the replacement cost and name us and our assigns as loss payee. If you fail to timely provide such proof to us, we may, but are not obligated to, obtain property loss insurance to protect our interests in the Equipment. If we secure insurance in the form and amounts we deem reasonable:(i) you will reimburse the premium, which may be higher than a premium that you might pay if you obtained the insurance, (ii) the premium may include a profit to us and/or one of our affiliates through an investment in reinsurance or otherwise, and (iii) we will not name you as an insured party and your interests may not be fully protected. Any insurance proceeds received for the Equipment will be applied, at our option, to repair or replace the Equipment, or to the remaining payments due or that become due hereunder, discounted at three percent (3%) (or such greater amount that may be required by law).

11. **DEFAULT:** You will be in default if : (i) you do not pay any amount when due; (ii) you break any of your promises or representations hereunder or under any other agreement with us; (iii) you become insolvent, commence dissolution proceedings, assign your assets for the benefit of your creditors, or a trustee is appointed to take control of your assets; (iv) you or any guarantor enters (voluntarily or involuntarily) into a bankruptcy or other insolvency-related proceeding; (v) you default on any obligations to any of your other creditors; (vi) you have made any untrue or misleading representations to us; (vii) any guarantor dies; or (viii) you change your name, state of organization, chief executive office and/or place of residence without providing us with 30 days prior written notice of such change.

12. **REMEDIES:** In the event of a default by you, we can: (i) cancel this Agreement; (ii) declare you in default under any other agreement you have with us, and exercise any or all remedies provided to us thereunder; (iii) disable the Equipment or require that you ship the Equipment to us at your expense; (iv) accelerate and demand that you pay all the remaining Payments due under this Agreement discounted to present value at three percent (3%) (or such greater amount that may be required by law) together with any other amounts due hereunder; and/or (v) pursue any of the remedies available to us under the UCC or any other law, including repossession of the Equipment or other Collateral. Interest shall accrue on all amounts due us from the date of default until paid at the rate of the lesser of (i) one and one-half percent (1.5%) per month and (ii) the maximum rate permitted by law ("Remedy Interest Rate"). You agree to reimburse us for all charges, costs, expenses and attorney's fees that we have to pay to enforce this Agreement. If you return the Equipment pursuant to clause "(iii)" above or we take possession of the Equipment, you agree to pay the cost of repossession, storing, shipping, repairing and selling or leasing the Equipment. You agree that we do not have to notify you that we are selling or leasing the Equipment except as otherwise required by law. You also agree that we are entitled to abandon the Equipment if we believe it to be in our best interest.

13. **BORROWER REPRESENTATIONS AND OTHER AUTHORIZATIONS:** You hereby represent, warrant and promise to us that: (i) you have had an adequate opportunity to study this Agreement and consult your legal and other advisors before signing, and this Agreement is enforceable against you in accordance with its terms; (ii) you are not subject to any bankruptcy proceeding; and (iii) if this document was sent by you to us electronically, it has not been altered in any way and any alteration or revision to any part of this or any attached documents will make all such alterations or revisions non-binding and void. You hereby authorize us, and appoint us or our designee as your attorney-in-fact, to endorse insurance proceeds and to execute and file financing statements (naming you as "Debtor") and documents of title and registration (if applicable) on the Equipment or Collateral, and you agree to reimburse us for our out-of-pocket costs relating thereto.

14. **FEES AND CHARGES:** If any part of any Payment is not made by you when due, you agree to pay us fifteen percent (15%) of each past due amount (or the maximum amount permitted by law, if less than 15%). You agree to pay an administrative fee of fifty dollars ($50.00) if any check or ACH is dishonored or returned. **AS A MATERIAL INDUCEMENT TO US TO ENTER INTO THIS AGREEMENT AND FINANCE YOUR EQUIPMENT, YOU AGREE THAT IF ANY PAYMENT, CHARGE OR FEE BILLED OR COLLECTED BY US IS FOUND TO EXCEED THE MAXIMUM AMOUNT ALLOWED BY LAW, THEN (I) WE MAY MODIFY ANY SUCH EXCESSIVE AMOUNT BILLED SO AS TO MAKE IT NOT EXCESSIVE, (II) WE MAY REFUND TO YOU THE EXCESSIVE AMOUNT, TOGETHER WITH INTEREST AT THE "REMEDY INTEREST RATE" (AS DEFINED IN SECTION 12), AND (III) THE FOREGOING SHALL BE YOUR EXCLUSIVE REMEDY FOR THE BILLING OR COLLECTING OF THE EXCESSIVE AMOUNTS AND YOU WILL NOT RAISE ANY OTHER CLAIM, COMPLAINT OR OBJECTION WITH RESPECT THERETO.**

15. **ENTIRE AGREEMENT; CHANGES:** This Agreement contains the entire agreement between you and us relating to the financing of the Equipment, and it may not be terminated or otherwise changed except in writing by both of us. A limiting endorsement on a check or other form of payment will not be effective to modify your obligations or any of the other terms of this Agreement, and we may apply any payment received without being bound by such limiting endorsements.

16. **COMPLIANCE; NOTICES:** In the event you fail to comply with any terms of this Agreement, we can, but we do not have to, take any action necessary to effect your compliance upon ten (10) days prior written notice to you. If we are required to pay any amount to obtain your compliance, the amount we pay plus all of our expense in causing your compliance, shall become additional obligations and shall be paid by you together with the next due payment. This Agreement is for the benefit of and is binding upon you, your personal representatives, successors and assigns. Any notice required by this Agreement or the UCC shall be deemed to be delivered when a record properly directed to the intended recipient has been (i) deposited with the US Postal Service, (ii) transmitted by facsimile or through the Internet, provided there is reasonably sufficient proof that it was received by the intended recipient; or (iii) has been personally delivered.

17. **CHOICE OF LAW; JURISDICTION: THIS AGREEMENT SHALL NOT BE BINDING UNTIL IT IS ACCEPTED BY US IN WRITING, AND YOU HEREBY STIPULATE THAT OUR ACCEPTANCE AND SIGNING OF THIS AGREEMENT IN SOUTH CAROLINA FOLLOWING YOUR SIGNATURE MEANS THAT THIS AGREEMENT WAS MADE IN SOUTH CAROLINA. YOU HEREBY ACKNOWLEDGE THAT OUR ACCOUNT SERVICING OPERATIONS (INCLUDING THOSE SERVICING YOUR ACCOUNT) ARE LOCATED IN SOUTH CAROLINA. YOU HEREBY AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF SOUTH CAROLINA, BUT WITHOUT GIVING EFFECT TO THE LAWS OF SOUTH CAROLINA GOVERNING CHOICE OF LAW. YOU CONSENT TO THE JURISDICTION OF THE STATE OR FEDERAL COURTS LOCATED IN THE STATE OF SOUTH CAROLINA FOR THE COUNTY OF LEXINGTON, AND AGREE THAT ANY ACTIONS OR PROCEEDINGS INITIATED BY YOU ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT (WHETHER SOUNDING IN BREACH OF CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT ONLY IN SUCH COUNTY IN SOUTH CAROLINA; PROVIDED HOWEVER, WE MAY BRING ACTION AGAINST YOU IN ANY STATE OR FEDERAL COURTS OUTSIDE SOUTH CAROLINA WE CHOOSE IN OUR SOLE DISCRETION, PROVIDED ONLY THAT SUCH COURT HAS PROPER JURISDICTION. IN THE EVENT THIS AGREEMENT IS ASSIGNED BY US, YOU CONSENT TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE ASSIGNEE'S PRINCIPAL PLACE OF BUSINESS. YOU UNDERSTAND THAT YOUR AGREEMENT TO SOUTH CAROLINA LAW AND YOUR SUBMISSION TO PERSONAL JURISDICTION IN SOUTH CAROLINA DIRECTLY BENEFITS US AND IS A MATERIAL INDUCEMENT TO OUR ENTERING INTO THIS AGREEMENT AND FINANCING YOUR EQUIPMENT.YOU AND WE EACH HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING, WHETHER BROUGHT IN CONTRACT OR TORT, OR AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.**

18. **MISCELLANEOUS:** No delay or failure by us to enforce our rights under this Agreement shall prevent us from enforcing any rights at a later time. If any part of this Agreement is determined to be unenforceable, all other parts will remain in full force and effect. Any Equipment discounts we may negotiate with Vendor accrue solely to our benefit. The original of this Agreement shall be that copy which bears your electronic, facsimile or original signature, and our electronic or original signature.

## PAY PROCEEDS DIRECTION TO FINANCE AGREEMENT

You hereby irrevocably instruct us to pay the Vendor(s) listed below for the Equipment listed on Vendor(s) proposals approved by us. You hereby acknowledge that the Equipment has been delivered and is acceptable in all respects OR the Equipment has NOT been delivered but you hereby authorize us to make payment to the Vendor(s) in order to initiate delivery. Disbursement by us in accordance with the foregoing instructions shall constitute payment and delivery to and receipt by you of any and all such proceeds.

DocuSigned by: [signature]

Print Name & Title: Robert Urrutia Pres    Date Signed: 1/24/2024

I hereby authorize, in my absence, ______ Telephone # ______ ,to verify my direction to disburse funds.

Vendor: Viking Garage Equipment, Inc.    Vendor:    Vendor:

NAVITAS CREDIT CORP. | A UNITED COMMUNITY BANK COMPANY

# Progress Payment Agreement

**Lessee/Borrower/Rentee: Team Imports LLC** **Agreement #:** [redacted]

In reference to the Agreement # **41253383**, between Lessee/Borrower/Rentee and Navitas Credit Corp. as Lessor/Secured Party/Rentor:

You negotiated with your supplier, **Viking Garage Equipment, Inc. ("Supplier")**, to acquire the equipment described in the Agreement (the "Agreement"). Your Supplier requires the payment of all or a substantial portion of the total cost of the equipment (the "Equipment Advance") to be paid to Supplier prior to your receipt and acceptance of the equipment. At your request, we will advance the Equipment Advance to Supplier prior to your receipt and acceptance of the equipment when we receive an invoice acceptable to us, but only on the condition that you agree to the following terms:

To induce us to make the Equipment Advance to Supplier prior to your receipt and acceptance of the equipment, **YOU AGREE THAT YOUR OBLIGATIONS (INCLUDING YOUR PAYMENT OBLIGATIONS) UNDER THE AGREEMENT HEREBY IMMEDIATELY COMMENCE. YOU FURTHER AGREE THAT THE AGREEMENT IS NON-CANCELABLE AND THAT YOU WILL TIMELY PERFORM ALL OF YOUR OBLIGATIONS UNDER THE AGREEMENT, INCLUDING MAKING THE MONTHLY PAYMENTS, WITHOUT ANY CLAIM OF SET-OFF, EVEN IF: (a) SOME OR ALL OF THE EQUIPMENT IS NOT DELIVERED AND/OR INSTALLED; (b) THE EQUIPMENT IS UNTIMELY DELIVERED AND/OR UNTIMELY INSTALLED; AND/OR (c) THE EQUIPMENT DOES NOT, AT THE TIME OF DELIVERY OR THEREAFTER, OPERATE PROPERLY OR THERE IS ANY OTHER NONCONFORMANCE IN THE EQUIPMENT OR IN ANY SERVICE.**

You acknowledge that you understand and agree that in the event you are not satisfied with the delivery or installation of the equipment that you shall only look to persons other than Lessor/Secured Party/Rentor such as the manufacturer, installer, or Supplier and shall not assert against Lessor/Secured Party/Rentor any claim or defense you may have with reference to the equipment, its delivery or non-delivery, or its installation. Upon your signing below, you authorize and direct us to pay the Equipment Advance to your Supplier and your promises under the Agreement will be irrevocable and unconditional in all respects and payments shall begin immediately and shall be due continuously hereafter.

A facsimile, electronic, or original copy of your signature on this Agreement bearing our original or electronic authorized signature will be treated as an original.

| | |
|---|---|
| NAVITAS CREDIT CORP. | Team Imports LLC |
| Lessor/Secured Party/Rentor | Lessee/Borrower/Rentee |
| | DocuSigned by: Robert Urrutia |
| Signature | Signature |
| | Pres |
| Title | Title |
| | 1/24/2024 |
| Date | Date |

NAVITAS CREDIT CORP. | A UNITED COMMUNITY BANK COMPANY

# EQUIPMENT ACCEPTANCE AND CONTRACT ACTIVATION

**COMPANY LEGAL NAME: Team Imports LLC**

**Thank you for your business! This is the Equipment Acceptance and Contract Activation for your new lease, finance or rental agreement with Navitas Credit Corp. We would like to review a few things with you before we commence your contract and pay your vendor. For your protection, please provide us the following information:**

- Please provide your Federal Tax ID Number [redacted]

**VENDOR AND EQUIPMENT INFORMATION:**
**Vendor Name: Viking Garage Equipment, Inc.**
**Equipment being financed: (1) Hunter Aligner Model#WA674, (1) Sensors-Manual lift Model #HE421ML, (1) Hunter Scissor Lift Model #RX10KPS & (1) RX Light Kit Model #20-3438-1**
**Equipment Location: 412 New Park Avenue Hartford CT 06101**

- Is the above Equipment Location correct? Yes, location shown is correct

  If no, enter the Equipment Location address here:

- As per your executed Progress Payment Agreement, at your request, we will advance funds to your vendor prior to the receipt and acceptance of the equipment. Upon your authorization we will advance 100% of the transaction immediately.

- Do you authorize us to release funds to your vendor? Yes- Release Funds

  If you are withholding authorization, please state your reason here:

DS [initials] By authorizing us to release funds to your vendor, we want to emphasize that regardless of when the equipment is received, the contract begins in full and is non-cancellable. You hereby acknowledge that you have no side agreement with the vendor regarding your obligation under the contract, nor is the vendor making any payments on your behalf to us.

ACH - MONIES DUE and FUTURE PAYMENTS
If you have provided us with your ACH information in your previously signed Document Package, your Advance Monies Due per your Contract will be debited TODAY.

If you were required to, or have chosen to have ALL FUTURE payments made through ACH, the next draft from your account will be drafted next month on your due date. Please refer to the chart below for your approximate payment due date.

| Funding Date | Due Date |
|---|---|
| 29th-5th | 1st of the Month |
| 6th - 12th | 10th of the Month |
| 13th-22nd | 15th of the Month |
| 23rd-28th | 25th of the Month |

TAXES AND INVOICING
- To ensure you meet any tax obligations you may have under this contract, we will bill you taxes as required UNLESS you provide us with a valid Tax Exemption Certificate. You may send it to your Sales Representative or contact the Customer Service department at 888-978-6353. If your contract is a Finance Agreement, taxes are not applicable.

- To receive your invoice electronically, please provide your preferred email address. Tonyu814@gmail.com

- Please provide us the Accounts Payable contact name: Bruce Novicky

  Accounts Payable Phone Number: 2033002209

  Accounts Payable Email address: Bruce@teamauto.com

By signing below, you confirm all changes or answers provided. If applicable, you authorize Lessor/Secured Party/Rentor to make such changes to your contract. The original of this Agreement shall be that copy which bears your electronic, facsimile or original signature.

| DocuSigned by: [signature] | Robert Urrutia | Pres | 1/24/2024 |
|---|---|---|---|
| Signature 8D...24908454... | Name | Title | Date Signed |

# EARLY PAYOFF ADDENDUM TO CONTRACT [redacted]

**Between Team Imports LLC and Navitas Credit Corp.**

This Addendum is made part of the Agreement referenced above ("Agreement") between Navitas Credit Corp. identified above ("we" "us" and "ours") and the Customer identified above ("you" and "your"). Any capitalized terms not defined herein shall have the same meaning set forth in the Agreement.

You acknowledge that you have requested the right to exercise an early buyout option ("Option"), provided the Agreement is current and no default exists. We hereby grant to you the right to exercise such Option and payoff the Agreement in its entirety any time after a minimum of 24 months has passed for an amount equal to (i) the net investment (calculated as the remaining payments due under the Agreement through the entire original term minus all future unearned interest), plus (ii) all taxes and other amounts due under the Agreement through the entire original term, plus (iii) all past due amounts owed to Navitas (collectively, the "Buyout Amount"). In order to exercise your Option, you must contact a representative of Navitas to obtain the Buyout Amount.

This Addendum supplements and amends the Agreement only to the extent and in the manner set forth above, and in all other respects, the Agreement will remain in full force and effect.

If you transmit this Addendum to us by fax or electronically, the fax or electronic version of this Addendum as received by us will be binding on you as if it were manually signed by you. However, no fax or electronic version of this Addendum will become effective and binding against us unless and until it is signed by us. We may in our sole discretion require you to deliver to us a copy of this Addendum with your original signature. You agree that the version of this Addendum signed by us shall constitute the original of this Addendum for all purposes.

**Acknowledged and Agreed To:**

Debtor: Team Imports LLC

Authorized Signer: DocuSigned by: [signature] Robert Urrutia

Date: 1/24/2024

**Accepted by Secured Party:**

Navitas Credit Corp.

Authorized Signer: ____________________

Date: ____________________

# VIKING EQUIPMENT

# Invoice

800-505-5058
DEEP RIVER, CT 06417
700 INDUSTRIAL PARK ROAD
DEEP RIVER, CT 06417

| Date | Invoice # |
|---|---|
| 1/24/2024 | 85129 |

| Bill To | Ship To |
|---|---|
| TEAM IMPORTS LLC DBA TEAM MITSUBISHI<br>412 NEW PARK AVE<br>HARTFORD, CT 06101 | TEAM IMPORTS LLC DBA TEAM MITSUBISHI<br>412 NEW PARK AVE<br>HARTFORD, CT 06101 |

| P.O. Number | Terms | Rep | Ship | Via | Due Date |
|---|---|---|---|---|---|
| 41253383 | Due on receipt | JM | 1/24/2024 | VIKING | 1/24/2024 |

| Serviced | Item Code | Description | Quantity | Price Each | Amount |
|---|---|---|---|---|---|
| | | AS PROPOSED: | | | |
| | WA674 | HUNTER ALIGNER | 1 | 15,812.00 | 15,812.00T |
| | HE421ML | HAWKEYE SENSORS - MANUAL LIFT | 1 | 14,275.00 | 14,275.00T |
| | RX10KPS | HUNTER 10,000LB SCISSOR LIFT 2 JACKS | 1 | 33,188.00 | 33,188.00T |
| | 20-3438-1 | LED KIT RX-K | 1 | 1,193.00 | 1,193.00T |
| | FREIGHT | FREIGHT | 1 | 2,394.00 | 2,394.00T |
| | | SUBTOTAL ON ABOVE PURCHASE | | | 66,862.00 |
| | | | | **Subtotal** | $66,862.00 |
| | | | | **Sales Tax (6.35%)** | $4,245.74 |

TERMS - DUE ON DELIVERY

**Total** **$71,107.74**

"Experience the Viking Advantage"

SCHILLER, PITTENGER & GALVIN, P.C.
ATTORNEYS AT LAW

SCOTCH PLAINS MORRISTOWN NEW YORK

JOHN J. DEMASSI, ESQ.
jdemassi@schiller.law

1771 Front Street
Scotch Plains, NJ 07076
Private Line: (908) 347-7147
t (908) 490-0444
f (908) 322-8510

September 20, 2024

E-Mail: Linda@bridgeviewabstract.com

Linda McKenna
Title Officer
Bridgeview Abstract, Inc.
One Bridge Plaza
Suite 730
Fort Lee, NJ 07024

Re: [redacted]

Dear Ms. Mckenna

Enclosed please find the following proposed documents for your review.

1. Deed ( I do not know the marital status of the Grantees.
2. Schedule A
3. Aff of Title
4. Sellers Cert(Git-rep)
5. 1099 S
6. Authorization
7. Estate Questionnaire
8. FIRPTA

The Seller's attorney fee is $1300.00. My office is holding the deposit of $25,000.00. I am in the process of obtaining a pay-off

Very truly yours,
SCHILLER, PITTENGER
& GALVIN, P.C.

John DeMassi, Esq.

# Order Form

TEKION

| Team Imports llc | Aug 16, 2022 | USD 8,904.00 | USD 36,550.00 |
|---|---|---|---|
| Hartford | TEK/80001028/2/2022 | Total Monthly | Total Upfront |

## Mitsubishi | Mitsubishi Motors Corp

| | |
|---|---|
| **F&I Menu** (per month) | 490.00 |
| **Advanced Analytics** (per month • USD 895 per product x 1) | 895.00 |
| **Sales Concierge** (per month) | 490.00 |
| **Core Platform** | 3,299.00 |
| **Accounting** (per month) | |
| **Service** (per month) | |
| **Parts** (per month) | |
| **Desking w/ Vehicle Inventory** (per month) | |
| **Foundation** (per month) | |
| **Tekion Forms Library** (per month • Unlimited access to all available forms) | |
| **Third Party Forms** (USD 0 per transaction • Fees are based on form usage. Passed through monthly.) | |
| **CRM** | |
| **CRM** (per month) | 1,200.00 |
| **Campaigns** (per month) | |

## Order Form

TEKION

| | |
|---|---|
| **Digital Service Experience** | 2,530.00 |
| **Communication** (per month) | |
| **Mobile check-In** (per month) | |
| **Multipoint Vehicle Inspection** (per month) | |
| **Online Appt Scheduler** (per month) | |
| **Consumer Portal** (per month) | |
| **ML Recommendations** (per month) | |
| **Tekion Pay** | 0.00 |
| **Variable Fee** 26 basis points (0.26% of transaction) | |
| **Fixed Fee** (USD 0.26 per transaction) | |
| **Interchange Fee** (100% of transaction) | |

## Total Monthly Subscription — USD 8,904.00

| | |
|---|---|
| **CRM Configuration & Staging** (Implementation Fee) | 6,550.00 |
| **Implementation Fee (Remote)** | 30,000.00 |
| **Data Conversion - Staging & Configuration** (Implementation Fee) | |
| **Document Conversion** (Implementation Fee • 5 years up to 7 years, Depending on total data storage amounts) | |
| **Implementation & Training (Onsite)** (Implementation Fee) | |
| **Implementation & Training (Remote)** (Implementation Fee) | |

## Net Upfront Fee Payable — USD 36,550.00

# Order Form

TEKION®

| Team Imports llc | Oct 11, 2022 | USD 0.00 | USD 5,333.00 |
|---|---|---|---|
| Hartford | TEK/80001028/11/2022 | Total Monthly | Total Upfront |

## Mitsubishi | Mitsubishi Motors Corp

| | |
|---|---|
| **Brother ADS-4900W Document Scanner**<br>(Upfront Fee • USD 695 per Device x 2) | **1,390.00** |
| **Parts Inventory Bundle** | |
| Zebra ZT230 Thermal Transfer Label Printer<br>(Upfront Fee • USD 995 per Device x 1) | 995.00 |
| Parts Inventory Labels (7000 labels/roll)<br>(Upfront Fee • USD 25 per Roll x 2) | 50.00 |
| ZT230/ZT411 Wax/Resin Thermal Transfer Ribbon<br>(Upfront Fee • USD 18 per Roll x 2) | 36.00 |
| Zebra DS8178-SR Bluetooth Barcode Scanner<br>(Upfront Fee • USD 695 per Device x 1) | 695.00 |
| **Vehicle Inventory Bundle** | |
| Zebra ZT230 Thermal Transfer Label Printer<br>(Upfront Fee • USD 995 per Device x 1) | 995.00 |
| Vehicle Inventory Labels (1200 labels/roll)<br>(Upfront Fee • USD 60 per ROll x 2) | 120.00 |
| ZT230/ZT411 Wax/Resin Thermal Transfer Ribbon<br>(Upfront Fee • USD 18 per Roll x 2) | 36.00 |
| **Epson LQ-680Pro Impact Printer (with Ethernet)**<br>(Upfront Fee • USD 875 per Device x 1) | **875.00** |
| **Epson LQ-680Pro Ribbon (7762L)**<br>(Upfront Fee • USD 8 per Device x 2) | **16.00** |
| **Shipping Costs**<br>(Upfront Fee • USD 1 per USD x 125 • Hardware shipping costs, charged on a pass-thru basis) | **125.00** |

## Net Upfront Fee Payable — USD 5,333.00

Above pricing is exclusive to Dealerships mentioned in this agreement only. Pricing excludes tax.

# Order Form

TEKION®

## Terms and Conditions

Consumables (labels, tags, thermal ribbon, toner, paper) are final-sale and non-returnable unless a manufacturer defect or incorrect product is discovered. All other hardware items carry a 30-Day return policy.

Hardware warranties are held by the manufacturer directly, unless otherwise specified. The customer is responsible for contacting the manufacturer in the event that hardware support is needed or a defect is determined during normal operation of said hardware. The customer can elect to purchase an extended warranty for hardware purchase via Tekion, at which point Tekion will file and arrange this with the manufacturer or warranty provider. The customer will be the main point of contact for this warranty and will be responsible for all interaction with each hardware manufacturer.

## Customer eAcceptance Details

Authorized Signer
**Bruce Novicky**

Signed on
**Nov 01, 2022 - 6:31 PM**

Authorized E-mail
**brucen@yourteamauto.com**

IP Address
**131.239.65.42**

# MASTER SUBSCRIPTION AGREEMENT

THIS MASTER SUBSCRIPTION AGREEMENT ("**AGREEMENT**") IS BETWEEN TEKION CORP ("**WE**," "**US**," "**OUR**," OR "**TEKION**") AND THE ENTITY LISTED IN THE ORDER FORM, INCLUDING ANY AFFILIATES USING THE SERVICES ( "**YOU**") AND SETS FORTH THE TERMS AND CONDITIONS GOVERNING ORDERS PLACED UNDER THIS AGREEMENT. BY ACCEPTING THIS AGREEMENT, YOU AGREE TO THE TERMS OF THIS AGREEMENT AND ACKNOWLEDGE RECEIPT OF OUR PRIVACY NOTICE. THIS AGREEMENT IS EFFECTIVE AS OF THE DATE ACCEPTED BY YOU ("**EFFECTIVE DATE**").

## 1. DEFINITIONS

**1.1.** Any capitalized terms that are not specifically defined in this Agreement can be found in the supplemental terms and conditions available here.

**1.2.** **"Cloud Services"** means any distinct, subscription-based, on-demand products and services offered by Us under the name "Tekion Cloud" or successor branding that You order under a free trial or an Order Form and We make available to You online via password-protected customer login, including any associated offline and mobile components.

**1.3.** **"Content"** means information obtained by Us from publicly available sources or Our third-party content providers, including but not limited to Third Party Forms, and made available to You through the Services, or pursuant to an Order Form, as more fully described in the User Documentation.

**1.4.** **"Equipment"** means the hardware and other equipment (proprietary and/or third party) provided by Us to You as listed in the Order Forms.

**1.5.** **"Force Majeure Event"** means circumstances beyond either party's reasonable control, including without limitation acts of God, flood, fire, earthquake or explosion, war, terrorism, invasion, riot or other civil unrest, embargoes or blockades in effect on or after the date of this Agreement, national or regional emergency, passage of applicable law or any action taken by a governmental or public authority, including imposing an embargo, export or import restriction, quota or other restriction or prohibition or any complete or partial government shutdown, or national or regional shortage of adequate power or telecommunications or transportation, or other similar cause beyond reasonable control of a party such that it could not have been prevented by reasonable precautions.

**1.6.** **"Order Form"** means an ordering document or online order specifying the Services to be provided hereunder that is entered into between You and Us, including any addenda and supplements thereto.

**1.7.** **"Services"** means the services and products (including hardware) provided by Us to You. "Services" exclude Content and Third Party Applications.

**1.8.** **"Third Party Application"** means a web-based or offline software application that is provided by a third party and which may interoperate with the Services.

**1.9.** **"Third Party Forms"** means forms and marketing materials that are developed or licensed by a third party to You or to Us and used by motor vehicle dealers to (i) sell, lease, or finance motor vehicles and (ii) sell insurance and warranty products.

**1.10.** **"User"** means an individual who is authorized by You to use a Service, for whom You have purchased a subscription (or in the case of any Services provided by Us without charge, for whom a Service has been provisioned), and to whom You (or, when applicable, Us at Your request) have supplied a user identification and password. Users may include, for example, Your employees, consultants, contractors and agents, and third parties with whom You transact business.



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

1.11. **"User Documentation"** means the applicable Service's technical and functional documentation (including product guides in any form or medium, including training videos) and its usage guides and policies, as updated from time to time (subject to the terms of this Agreement).

1.12. **"Your Data"** means any data or information that is submitted by or for You or Your Users in relation to the Services, excluding (i) Content and (ii) Third Party Applications. For the avoidance of doubt, Your Data includes any Personal Data (as defined in the Data Processing Agreement).

## 2. PROVISION OF SERVICES

2.1. *Provision of Services*. We will make the Services available to You in accordance with this Agreement. Certain Services may be subject to supplemental terms and conditions that can be found here. These supplemental terms will apply to You as part of this Agreement if Your Order Form includes such Services.

2.2. *Provision of Equipment*. We will provide You the Equipment listed in an Order Form to support Your use of the Cloud Services. You will provide, and be responsible for, any hardware, software, connectivity or licenses necessary to access and use the Cloud Services. You will ensure that Your Internet connectivity meets the minimum requirements specified by Us. You will also provide a suitable installation environment for the Equipment, and provide and install all site-specific wiring, cabling, electrical and other utilities required for installing the Equipment.

## 3. USE OF CLOUD SERVICES, EQUIPMENT AND CONTENT

3.1. *Subscriptions*. Unless otherwise provided in the applicable Order Form, (a) Cloud Services are purchased as subscriptions pursuant to an Order Form, (b) additional subscriptions may be added during a subscription term via an Order Form, and (c) any added subscriptions will terminate on the same date as the underlying subscriptions.

3.2. *Security*. You must keep Your registration information accurate and complete during the term of the Agreement. You are responsible for the security of passwords of all Users, for all activities that occur in User accounts, and for Your Users' compliance with this Agreement, the User Documentation, Order Forms and applicable laws and regulations. You must use commercially reasonable efforts to prevent unauthorized use of, or access to, the Services and must promptly notify Us: (a) of any unauthorized use of, or access to, a User's account; or (b) if any password is lost, stolen, disclosed to an unauthorized party or otherwise compromised, of which You become aware.

3.3. *Acceptable Use*. You must not: (a) make the Services or Content available to, or use the Services or Content for the benefit of, anyone other than You, (b) modify, copy or create derivative works based on the Services; (c) disassemble, reverse engineer, or decompile the Services or part thereof; (d) copy any ideas, features, content, functions, user interface or graphics of the Services, (e) use the Service in a way intended to work around the Service's technical limitations, recurring fees calculation, or usage limits, (f) use the Services to store or transmit malicious code or infringing, libelous, offensive, unlawful or tortious material, or material in violation of applicable law; (g) interfere with or disrupt the integrity or performance of the Services, (h) modify, delete or remove any ownership, title, trademark, patent or copyright notices from the Services; (i) unless otherwise set forth in this Agreement, sell, distribute, rent, lease, sublicense, display, modify, time share, outsource or otherwise provide the Services or Content to any third party or use it in a service bureau or outsourcing environment, (j) use the Services in violation of this Agreement, the Order Form, or User Documentation. We reserve the right, but have no obligation, to investigate any violation of this provision or misuse of the Services and take any action that we believe is reasonable and appropriate under the circumstances.

3.4. *Historical Data Conversion*. We will use reasonable efforts to convert Your historical data from your existing technology provider for the fees set forth in the Order Form. You will cooperate with Us by providing Us with the records, reports and other necessary information, access and documentation required for this purpose.



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**3.5.** *Your Legal Compliance*. You are responsible for complying with all applicable federal, state, and local laws, rules and regulations applicable to You and Your use of the Services, such as, without limitation, those related to advertising, electronic communications and solicitations, telemarketing, "do not call" and "do not contact" compliance, call recording, privacy and consumer protection including but not limited to Section 5 of the FTC Act (15 U.S.C. Section 45), the CAN-SPAM Act (15 U.S.C. Sections 7701-7713), the Telemarketing Consumer Fraud and Abuse Prevention Act (15 U.S.C. Sections 1601-1608), the Federal Trade Commission Telemarketing Sales Rule (16 C.F.R. 310.1, et seq.), and the Federal Communications Commission telemarketing regulations (47 C.F.R. 64.1200 et seq.). You bear the sole responsibility for ensuring that proper "unsubscribe", "do not call", "do not contact" and other privacy and consumer protection protocols are in use.

**4. THIRD PARTY PROVIDERS**

**4.1.** *Integration with Third Party Applications*. The Services may contain features designed to interoperate with Third Party Applications. These Third Party Applications are not part of the Services and the Agreement does not apply to them. We cannot guarantee the continued availability of such Service features, and may cease providing them without entitling You to any refund, credit, or other compensation, if for example and without limitation, the provider of a Third Party Application ceases to make the Third Party Application available for interoperation in a manner acceptable to Us.

**4.2.** *Third Party Applications and Your Data*. If You choose to use a Third Party Application with a Service, You grant Us permission to allow the Third Party Application and its provider to access Your Data as required for the interoperation of that Third Party Application with the Service. We are not responsible for any use, disclosure, modification or deletion of Your Data resulting from access by such Third Party Application or its provider.

**4.3.** *Third-Party Content*. Any third-party Content, including the Third Party Forms, we make accessible is provided on an "as-is" and "as available" basis without any warranty of any kind. You acknowledge and agree that We are not responsible for, and have no obligation to control, monitor, or correct, third-party Content. We disclaim all liabilities arising from or related to third-party Content.

**4.4.** *Mobile Access to Cloud Services*. You or Your Users may access certain Cloud Services through mobile applications obtained from third-party websites such as Android or Apple app store. The use of mobile applications may be governed by the terms and conditions presented upon download/access to the mobile application and not by the terms of the Agreement.

**5. FEES AND PAYMENT**

**5.1.** *Cloud Service Fees and Equipment Charges*. You will pay all fees specified in Order Forms. Except as otherwise specified in an Order Form, fees for Cloud Services are based on Cloud Services purchased and not actual usage.

**5.2.** *Invoicing and Payment*. All fees will be invoiced and must be paid in advance in accordance with the billing frequency stated in the applicable Order Form. Unless otherwise stated in an Order Form, invoiced charges are due net 30 days from the invoice date. You are responsible for providing complete and accurate billing and contact information to Us and notifying Us of any changes to such information.

**5.3.** *Overdue Charges*. If any invoiced amount is not received by Us by the due date, then without limiting Our rights or remedies, (a) those charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by applicable law, whichever is lower, and/or (b) We may condition future renewals and Order Forms on payment terms shorter than those specified in **Section 5.2.** For all past due invoices, You agree to pay all costs of collection (including collection agency fees), reasonable attorney fees and court costs. You agree to submit any disputes regarding fees in writing to Us within 30 days of the disputed invoice, otherwise the dispute will be waived and the fees therein will be final and not subject to challenge.



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**5.4.** *Suspension of Service and Acceleration*. If any amount owed by You under this Agreement is 90 or more days overdue, We may, without limiting Our other rights and remedies, accelerate Your unpaid fee obligations so that all such obligations become immediately due and payable, and suspend Our services to You until such amounts are paid in full. Other than for customers paying by credit card or direct debit whose payment has been declined, We will give You at least 10 days' prior written notice that Your account is overdue, before suspending services to You.

**5.5.** *Payment Disputes.* We will not exercise Our rights under **Section 5.3** or **Section 5.4** if You are disputing the applicable charges reasonably and in good faith and are cooperating diligently to resolve the dispute.

**5.6.** *Taxes*. Our fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including, for example, value-added, sales, use or withholding taxes, assessable by any jurisdiction whatsoever (collectively, "**Taxes**"). You are responsible for paying all Taxes associated with Your purchases hereunder. If We have the legal obligation to pay or collect Taxes for which You are responsible under this **Section 5.6**, We will invoice You and You will pay that amount unless You provide Us with a valid tax exemption certificate authorized by the appropriate taxing authority.

**5.7.** *Future Functionality*. You agree that Your purchases are not contingent on the delivery of any future functionality or features, or dependent on any oral or written public comments made by Us regarding future functionality or features.

**6. PROPRIETARY RIGHTS AND LICENSES**

**6.1.** *Reservation of Rights*. We or Our licensors retain all ownership and intellectual property rights in and to the Services and Content, derivative works thereof, and anything developed or delivered by or on behalf of Us under this Agreement. Except as expressly granted to You under this Section 6, all rights to Our assets and properties, including all intellectual property, are hereby reserved by Us.

**6.2.** *Your Data*. As between You and Us, You retain ownership of Your Data. You are responsible for the accuracy, quality, integrity, legality and reliability of Your Data. Subject to the terms and conditions of this Agreement, You grant Us a limited, worldwide, non-exclusive non-transferable and royalty-free license to access, use, process, copy, distribute, disclose, make derivative works of, perform, export and display Your Data, and any Third Party Products created by or for You: (a) to provide, maintain and improve the Services; (b) to prevent or address service, security, support or technical issues; (c) as required by applicable law; (d) to the maximum extent permitted under the terms of any consents/license received with respect to Your Data; and (d) as expressly permitted in writing by You. Notwithstanding the foregoing and anything to the contrary in the Agreement (including the DPA), and to the extent permitted by applicable Data Protection Laws, You acknowledge that We shall have a right to process Data for the purposes of creating anonymized or de-identified information for Our own legitimate business purposes, including where You have requested a Service that includes the provision of benchmarking reports, compiling anonymized benchmarking reports and statistics.

**6.3.** *Consents*. You represent and warrant that You have secured all rights in and to Your Data and all consents as may be necessary: (a) to grant Us the licenses contained in this Section 6; and (b) for the use of Your Data by Us and our service providers pursuant to the terms of this Agreement.

**6.4.** *Feedback*. You may from time to time provide suggestions, comments, or other feedback to Us with respect to the Services. You grant to Us a worldwide, perpetual, irrevocable and royalty-free license to use and incorporate into Our products and services any suggestion, enhancement request, recommendation, correction or other feedback provided by You or Users.

**7. DATA PROTECTION**



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**7.1.** *Protection of Your Data*. We will maintain reasonable administrative, physical, and technical safeguards that are designed to protect the security, integrity and confidentiality of Your Data. Those safeguards will include measures for preventing unauthorized access, use, modification, deletion and disclosure of Your Data as described in Our Data Processing Agreement. You are responsible for properly configuring and using the Services in a manner that will provide appropriate security and protection, for taking reasonable steps to secure Your Data. You and We will each comply with applicable Data Protection Laws and the Data Processing Agreement.

## 8. CONFIDENTIALITY

**8.1.** *Confidential Information*. "**Confidential Information**" means all information disclosed by a party ("**Disclosing Party**") to the other party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Your Confidential Information includes Your Data and any Personal Data contained therein; Our Confidential Information includes the Services and Content; and Confidential Information of each party includes the terms and conditions of this Agreement and all Order Forms (including pricing), as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party. However, Confidential Information does not include any information that (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party; provided that none of the foregoing exclusions will apply to Your Data, including without limitation any Personal Data.

**8.2.** *Protection of Confidential Information*. The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) to (i) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement and (ii) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its affiliates' employees and contractors who need that access to perform obligations under this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections not materially less protective of the Confidential Information than those herein. Neither party will disclose the terms of this Agreement or any Order Form to any third party other than its affiliates, legal counsel and accountants without the other party's prior written consent, provided that a party that makes any such disclosure will remain responsible for such affiliate's, legal counsel's or accountant's compliance with this "Confidentiality" section. Notwithstanding the foregoing, We may disclose the terms of this Agreement and any applicable Order Form under terms of confidentiality materially as protective as set forth herein: (a) to a subcontractor or Third Party Application provider to the extent necessary to perform Our obligations to You under this Agreement, or (b) in connection with a merger, acquisition, bankruptcy, dissolution, reorganization, sale of some or all of Our assets, financing, sale of all or a portion of Our business, a similar transaction or proceeding, or steps in contemplation of such activities.

**8.3.** *Compelled Disclosure*. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by applicable law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by applicable law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

## 9. WARRANTIES, EXCLUSIVE REMEDIES AND DISCLAIMERS



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**9.1.** *Mutual Warranties*. Each party represents that (a) it is duly organized and validly existing under the laws of the state or country of its incorporation or formation, (b) it has validly entered into this Agreement and that it has the power and authority to do so, (c) the Agreement is a valid obligation binding upon both Parties and enforceable in accordance with its terms, and (d) to the best of each party's respective knowledge, the execution, delivery, and performance of the Agreement by each party does not materially conflict with any agreement that party has with a third party.

**9.2.** *Our Warranties*. We warrant that during the term of this Agreement, (a) We will perform the Services using care and skill consistent with generally accepted industry standards, (b) We will not materially decrease the overall security of the Services, and (c) the Services will perform materially in accordance with the applicable User Documentation.

**9.3.** *Disclaimers*. EXCEPT AS EXPRESSLY PROVIDED IN SECTION 9.1 AND SECTION 9.2, THE SERVICES AND CONTENT ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND AND AT YOUR OWN RISK. WE DO NOT WARRANT THAT THE SERVICES WILL BE PERFORMED TIMELY, ERROR-FREE OR UNINTERRUPTED, THAT WE WILL CORRECT ALL SERVICES ERRORS, OR THAT THE SERVICES WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS. WE ALSO EXPRESSLY DISCLAIM ANY AND ALL LIABILITY FOR ANY ISSUES RELATED TO THE PERFORMANCE AND OPERATION OF THE SERVICES THAT ARISE FROM YOUR DATA OR THIRD PARTY CONTENT (INCLUDING THIRD PARTY FORMS) OR PRODUCTS OR SERVICES PROVIDED BY THIRD PARTIES.

**9.4.** *Exclusive Remedies*. FOR ANY BREACH OF THE SERVICES WARRANTY IN SECTIONS 9.2(A) AND (C), YOUR EXCLUSIVE REMEDY AND OUR ENTIRE LIABILITY SHALL BE THE CORRECTION OF THE DEFICIENT SERVICES THAT CAUSED THE BREACH OF WARRANTY, OR, IF WE CANNOT SUBSTANTIALLY CORRECT THE DEFICIENCY IN A COMMERCIALLY REASONABLE MANNER, YOU MAY END THE DEFICIENT SERVICES AND WE WILL REFUND TO YOU THE FEES FOR THE TERMINATED SERVICES THAT YOU PRE-PAID TO US FOR THE PERIOD FOLLOWING THE EFFECTIVE DATE OF TERMINATION.

**9.5.** *No Other Warranties*. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY MAKES ANY WARRANTY, REPRESENTATION OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, ARISING FROM COURSE OF DEALING, USAGE, TRADE OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY, REPRESENTATION OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

## 10. INDEMNIFICATION

**10.1.** *Indemnification by Us*. We will indemnify and defend You against any claim, demand, suit or proceeding made or brought against You by a third party alleging that any Service infringes or misappropriates such third party's intellectual property rights (a "**Claim Against You**"), and will indemnify You from any damages, including actual and statutory damages, fines, and penalties, reasonable attorney fees and costs finally awarded against You as a result of, or for amounts paid by You under a settlement approved by Us in writing of, a Claim Against You, provided You (x) promptly give Us written notice of the Claim Against You, (y) give Us sole control of the defense and settlement of the Claim Against You (except that We may not settle any Claim Against You unless it unconditionally releases You of all liability), and (z) give Us all reasonable assistance, at Our expense. If We receive information about an infringement or misappropriation claim related to a Service, We may in Our discretion and at no cost to You (i) modify the Services so that they are no longer claimed to infringe or misappropriate, (ii) obtain a license for Your continued use of that Service in accordance with this Agreement, or (iii) terminate Your subscriptions for that Service upon 30 days' written notice and refund You any prepaid fees covering the remainder of the term of the terminated subscriptions. The above defense and indemnification obligations do not apply: (I) to the extent a Claim Against You arises from a breach by You or Users of this Agreement; or (II) to the extent a Claim Against You arises from Your use of the Service in conjunction with any product or service not provided or authorized by Us.

**10.2.** *Indemnification by You*. You will indemnify and defend Us against any claim, demand, suit or proceeding made or brought against Us by a third party airsing out of Your violation of this Agreement (each a "**Claim Against Us**"), and You will indemnify Us from any damages, including actual and statutory damages, fines, and penalties, reasonable attorney fees and costs finally awarded against Us as a result of, or for any amounts paid by Us under a settlement approved by You in writing of, a



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

Claim Against Us, provided We (x) promptly give You written notice of the Claim Against Us, (y) give You sole control of the defense and settlement of the Claim Against Us (except that You may not settle any Claim Against Us unless it unconditionally releases Us of all liability), and (z) give You all reasonable assistance, at Your expense.

**10.3.** *Exclusive Remedy*. This Section 10 states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any type of claim described in Section 10.

**11. LIMITATION OF LIABILITY**

**11.1.** *Limitation of Liability*. SUBJECT TO SECTION 11.3 TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL OUR (OR OUR AFFILIATES') AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE, EXCEED THE FEES ACTUALLY PAID BY YOU UNDER THIS AGREEMENT DURING THE IMMEDIATELY PRECEDING TWELVE (12) MONTH PERIOD FOR THE SERVICE FROM WHICH THE CLAIM AROSE (OR, FOR A CLAIM ARISING BEFORE THE FIRST ANNIVERSARY OF THE EFFECTIVE DATE, THE AMOUNT PAID OR PAYABLE FOR THE FIRST TWELVE (12) MONTH PERIOD).

**11.2.** *Exclusion of Consequential and Related Damages*. IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES HAVE ANY LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT FOR ANY LOST PROFITS, REVENUES, GOODWILL, OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY, EVEN IF A PARTY OR ITS AFFILIATES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF A PARTY'S OR ITS AFFILIATES' REMEDY OTHERWISE FAILS OF ITS ESSENTIAL PURPOSE. THE FOREGOING DISCLAIMER WILL NOT APPLY TO THE EXTENT PROHIBITED BY APPLICABLE LAW.

**11.3.** *Exceptions.* SECTION 11.1 WILL NOT APPLY TO OR IN ANY WAY LIMIT: (i) A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 10, (ii) CLAIMS TO THE EXTENT BASED ON RECKLESS MISCONDUCT, GROSS NEGLIGENCE, WILLFUL MISCONDUCT AND/OR FRAUD OF A PARTY, (iii) YOUR PAYMENT OBLIGATIONS.

**12. TERM AND TERMINATION**

**12.1.** *Term of Agreement*. This Agreement commences on the Effective Date and continues until all Services under an Order Form have expired or have been terminated. Termination of one or more of the Services does not automatically terminate the entire Agreement unless all Services have expired or been terminated.

**12.2.** *Term of Cloud Services*. The term of each Cloud Service subscription shall be as specified in the applicable Order Form and may be terminated as set forth in the Order Form. Except as otherwise specified in an Order Form, Cloud Service subscriptions will automatically renew on a month-to-month basis unless either party gives the other notice of non-renewal at least 30 (thirty) days before the end of the relevant subscription term. Unless otherwise specified in an Order Form, all month-to-month renewals will be at Our applicable list price in effect at the time of the renewal. Upon the renewal of any Cloud Service and unless otherwise agreed, the term for which any Equipment associated with that Cloud Service are provided to You shall automatically renew for an additional period corresponding to the renewed Cloud Service subscription term.

**12.3.** *Termination*. A party may terminate this Agreement: (i) upon 30 (thirty) days written notice to the other party of a material breach of this Agreement by such other party if such breach remains uncured at the expiration of such period, (ii) if the other party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors; or (iii) upon upon 30 (thirty) days written notice to the other party for any reason or no reason whatsoever.

**12.4.** *Refund or Payment upon Termination*. If this Agreement is terminated by You in accordance with Section 12.3, We will refund You any prepaid fees covering the remainder of the term of all Order Forms after the effective date of termination. If this Agreement is terminated by Us in accordance with Section 12.3, You will pay any unpaid fees covering the remainder of the



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

term of all Order Forms. In no event will termination relieve You of Your obligation to pay any fees payable to Us for the period prior to the effective date of termination.

**12.5.** *Your Data Portability and Deletion*. Upon request by You made within 30 days after the effective date of termination or expiration of this Agreement, We will make Your Data available to You for export or download by secure file transfer in a format reasonably requested by You, and, at a minimum, in a format that is commercially useable apart from the Cloud Services. After such 30-day period, We will have no obligation to maintain or provide any Your Data. Upon termination or expiration of the Agreement, and subject to applicable law, We shall delete and procure the deletion of all copies of Your Data Processed by Us or Our Sub-Processors (as defined in the Data Processing Agreement) provided, however, that We will not be required to remove copies of Your Data from Our backup media and servers until such time as the backup copies are scheduled to be deleted, provided further that in all cases We will continue to protect Your Data in accordance with this Agreement. The foregoing deletion obligation will be subject to any retention obligations imposed on Us by applicable law.

**12.6.** *Transition Period before Final Termination*. Upon any termination of the Agreement, We shall, upon Your request, continue to provide the Services to You pursuant to the terms of this Agreement for a transitional period of up to three (3) months (the "**Transition Period**"), unless the parties agree to a longer period. Access to the Services during the Transition Period will be subject to the fees set out in the applicable Order Form, prorated on a monthly basis and payable in advance, based on the annual fees for the Services during the calendar period of the Transition Period if the Order Form has fees for such calendar period. During the Transition Period, We will provide cooperation and assistance as You may reasonably request to support an orderly transition to another provider of similar software or services. Such cooperation and assistance will be limited to consulting regarding Our Cloud Services and will be subject to a fee based on Our then-current rates for consulting services and such services will be set out in a statement of work agreed between the parties. Notwithstanding the foregoing, in the event of termination of this Agreement by Us due to a breach by You, We may withhold the provision of Transition Services and condition further performance upon (i) payment of undisputed fees then owed, (ii) prepayment of fees for further services, and (iii) receipt by Us of an officer's certificate from You certifying ongoing compliance with the terms of this Agreement during the Transition Period.

**12.7.** *Surviving Provisions.* Sections 1, 5, 6, 7, 8, 9, 10, 11, 12.4, 12.5, 12.6, 12.7 and 13 will survive any termination or expiration of this Agreement.

## 13. MISCELLANEOUS PROVISIONS

**13.1.** *Entire Agreement and Order of Precedence*. This Agreement is the entire agreement between You and Us regarding Your use of Services and Content and supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter. Except as otherwise provided herein, no modification, amendment, or waiver of any provision of this Agreement will be effective unless in writing and signed by the party against whom the modification, amendment or waiver is to be asserted. In the event of any conflict or inconsistency among the following documents, the order of precedence shall be (1) this Agreement, (2) Tekion Product Terms, which are incorporated by reference here, and (3) the applicable Order Form.

**13.2.** *Notices*. Except as otherwise specified in this Agreement, all notices related to this Agreement, except for notices of termination or an indemnifiable claim ("**Legal Notices**") which shall clearly be identifiable as Legal Notices and sent to Our Legal Department at legal@tekion.com, will be in writing and will be effective upon: (a) personal delivery, (b) the second business day after mailing, or (c) the day of sending by email. Legal Notices will be effective the day of sending by email as required above. Billing-related notices to You will be addressed to the relevant billing contact designated by You.

**13.3.** *Modifications*. As Our business evolves, we may change the terms of this Agreement (except any Order Forms). If we make a material change to this Agreement, we will provide You with reasonable notice prior to the change taking effect, either by emailing the email address associated with Your account, notifying You through our website, and/or by notifying You through the Services. You can review the most current version of the Agreement at any time by visiting https://tekion.com/legal. The



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

revised Agreement will become effective on the date set forth in our notice. Your access or use of the Service after the effective date of any modification will be deemed acceptance of the modified terms.

**13.4.** *Withdrawals*. We may withdraw a Service by posting a notice at least 12 (twelve) months prior to the effective date of the withdrawal. Upon withdrawal of a Service: (a) all support services relating to that Service will automatically stand withdrawn on the effective date of the withdrawal; and (b) We will continue to provide You the Service until the effective date of the withdrawal.

**13.5.** *Governing Law*. This Agreement, and any disputes arising out of or related hereto, will be governed exclusively by the Laws of the State of California, without regard to its conflicts of laws rules or the United Nations Convention on the International Sale of Goods.

**13.6.** *Venue; Waiver of Jury Trial; Fees*. The state and federal courts located in San Francisco County, California will have exclusive jurisdiction to adjudicate any dispute arising out of or relating to the Agreement or its formation, interpretation or enforcement. Each party hereby consents and submits to the exclusive jurisdiction of such courts. Each party also hereby waives any right to jury trial in connection with any action or litigation in any way arising out of or related to the Agreement. In any action or proceeding to enforce rights under the Agreement, the prevailing party will be entitled to recover its reasonable costs and attorney's fees.

**13.7.** *Assignment*. Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the other party's prior written consent (not to be unreasonably withheld) except that We may assign this Agreement (together with all Order Forms) without Your consent in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of Our assets. Any purported assignment in violation of this section is void. Subject to the foregoing, this Agreement will bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**13.8.** *Third Party License Terms (MarketScan)*. Lease, Finance and Cash purchase option calculations are provided to Your dealership by our technology partner, Market Scan. It is Market Scan's responsibility to ensure the accuracy of the data utilized to calculate the payments options that are reflected in Your Tekion subscription. While Market Scan's database contains most manufacturer and lender offerings, it might not contain information specific to Your dealership. You agree to be responsible to provide to Market Scan Information Systems, Inc. ("**Market Scan**"), on a timely, basis all regional and non-regional data regarding manufacturer and vehicle rebate, incentive, lease and or retail finance information as it becomes available. You further agree to provide Market Scan with Your electronic access to rebate, incentive, lease and retail finance data by providing Market Scan with valid login credentials to all applicable manufacturer and lender portals. Every Market Scan customer has a unique account and a unique database. You are providing this login information strictly to allow Market Scan to populate the information contained in Your unique, individual Market Scan database on Your behalf. You also agree to the Data Access Agreement with MarketScan.

**13.9.** *Relationship of the Parties; Third Party Beneficiaries*. The parties are independent contractors. This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties. There are no third-party beneficiaries under this Agreement.

**13.10.** *Force Majeure*. Any delay in performance caused by a Force Majeure Event is not a breach of the Agreement, provided that (i) such delay could not have been reasonably prevented or circumvented by the party whose performance is delayed (the "**Non-Performing Party**") through the use of alternate sources, work-around plans or other means, (ii) the Non-Performing Party uses commercially reasonable efforts to minimize the duration and impact of such delayed performance, and (iii) the Non-Performing Party promptly notifies the other party of any Force Majeure Event. The time for performance will be extended for a period equal to the duration of the conditions preventing performance. Any amounts payable under this Agreement shall be equitably adjusted such that You are not required to pay any amounts for Services that You are not receiving.



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**13.11.***Subcontracting*. We may subcontract parts of the Services to third parties. We will remain directly and primarily liable to You for the performance of all of Our obligations hereunder, including those assigned to or assumed by subcontractors, and for subcontractors' compliance with this Agreement. We shall ensure that each subcontractor complies, and that each subcontract includes provisions that require compliance by the applicable subcontractor with, the Our obligations under this Agreement. We shall not disclose to any subcontractor any of Your Confidential Information unless and until such Subcontractor has executed a nondisclosure agreement that is no less protective of Your rights than are the confidentiality provisions set forth in this Agreement.

**13.12.***Anti-Corruption*. You agree that You have not received or been offered any illegal or improper bribe, kickback, payment, gift, or thing of value from any of Our employees or agents in connection with this Agreement. Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction. If You learn of any violation of the above restriction, You will use reasonable efforts to promptly notify Our Legal Department at legal@tekion.com.

**13.13.***Publicity*. You grant Us the right to use Your company name and logo as a reference for marketing or promotional purposes on Our website and in other public or private communications with Our existing or potential customers subject to Your standard trademark usage guidelines as provided to Us from time-to-time.

**13.14.***Severability*. If any provision of the Agreement is held to be invalid or unenforceable, the invalidity or unenforceability will not affect the other provisions of the Agreement.

**13.15.***No Waiver*. A waiver of any breach of the Agreement is not deemed a waiver of any other breach. No waiver under the Agreement will be effective unless made in writing and signed by an authorized representative of the party being deemed to have granted the waiver.



Confidential Information - © 2022 Tekion Corp. 5934 Gibraltar Dr., Pleasanton, CA 94588 www.tekion.com

**SCHEDULE 7(e)**

**LITIGATION**

1. NMAC v. Team Imports, LLC, Robert Anthony Urrutia et al. (HHD-CV24-6189271-S; Sup. Ct., Judicial District of Hartford at Hartford)
2. Rizza, Pino individually and on behalf of a Class et al v. Team Imports LLC (HHD-CV24-619924-S, Sup Ct.; Judicial District of Hartford at Hartford [*Case has been reported to Seller's insurance provider and the claim number and adjuster information will be provided to Seller once assigned*]. Seller shall provide Buyer with evidence that Seller's insurance provider will cover the lawsuit within three (3) business days of Seller's receipt of same. In the event that Seller's insurance provider will not cover the lawsuit, Seller shall immediately notify Buyer in writing as to same, and then Buyer shall have the right to elect to terminate this Agreement based on that fact alone upon written notice to the Seller, which notice shall become effective thirty one (31) days from Seller's receipt of same. If Buyer does not elect to terminate this Agreement, then Buyer shall be deemed to have waived its right to elect to terminate this Agreement with respect to this lawsuit as provided herein. Notwithstanding Buyer's right to terminate the Agreement as provided herein, Seller shall have thirty (30) days from the date Seller has received notice of Buyer's election to terminate the Agreement to settle, have it withdrawn, or otherwise dismiss the lawsuit with the plaintiff. During said 30 day period, all other buyer contingency time frames as provided in the Agreement shall be tolled, but the Buyer shall continue to pursue or complete any such contingencies until and unless the lawsuit has been settled, withdrawn or dismissed, at which time Buyer and all contingencies will be extended as applicable.
3. Rivera Jr., Ernesto v. The Hartford Auto Group et al. (HHD-CV21-613786-S; Sup Ct, Judicial District of Hartford); case removed to Federal District Court, case #3:21-CV-01209-OAW. [*Case settled and closed as of 1.28.22*]

## SCHEDULE 7(i)(ii)

## ENVIRONMENTAL REPORTS

Phase I Environmental Site Assessment Report
Team Auto Group LLC, Hartford
398-412 New Park Avenue
Hartford, Connecticut

Submitted to:
Team Auto Group, LLC
398 – 412 New Park Avenue
Hartford, Connecticut 06106

Submitted by:
GEI Consultants, Inc.
455 Winding Brook Drive
Glastonbury, CT 06033
860-368-5300

April 6, 2020

# SCHEDULE 7(i)

## MANUFACTURER COMMUNICATIONS

**NONE**

# SCHEDULE 7(k)

## TRADE NAMES, PHONE NUMBERS, and DOMAIN NAMES/URLS

**[follows]**

**SCHEDULE 7(l)**

**STORAGE LOT**

- Storage Lot Lease: 430 New Park Ave c/o Reese Commercial PO Box 918 Rocky Hill CT 06067 (month to month, monthly rent--$1,000)

**PHONE NUMBERS**

| | |
|---|---|
| SALES: | 860 898 9656 |
| SERVICE: | 860 847 8647 |
| GENERAL: | 860 898 9656 |
| PARTS: | 860 934 0259 |

Schedule of URLs/Domain Names

| | |
|---|---|
| driveteammitsubishi.com | 12/1/2024 On |
| hartfordmitsu.com | 9/2/2027 On |
| macautogroupct.com | 2/13/2025 On |
| macmitsu.com | 6/23/2025 On |
| teamautoct.com | 2/5/2025 On |
| teammitsubishihartford.com | 2/5/2025 On |
| thenewmitsu.com | 11/8/2024 On |

MITSUBISHI MOTORS

**MITSUBISHI MOTORS NORTH AMERICA, INC.**
516 Heron Drive
Swedesboro, NJ 08085

November 20, 2024

**VIA EMAIL AND CERTIFIED MAIL RETURN RECEIPT**

Mr. Robert A. Urrutia
Team Imports LLC d/b/a Team Mitsubishi
412 New Park Ave.
Hartford, CT 06106
Tonyu814@gmail.com

**Re: Proposed Asset Sale of Team Mitsubishi**

Dear Mr. Urrutia:

This letter is in response to your proposed sale of certain assets relating to the Mitsubishi dealership owned by Team Imports LLC d/b/a Team Mitsubishi ("Dealer") to [redacted] "Buyer Candidate") as reflected in an Asset Sale Agreement (the "Proposed Asset Sale") submitted to Mitsubishi Motors North America, Inc. ("MMNA") on September 27, 2024.

MMNA does not consent to the Proposed Asset Sale because [redacted] the proposed Dealer Principal and Owner of the Buyer Candidate, lacks the necessary qualifications to own and operate a Mitsubishi dealership. MMNA relies on the experience, qualifications, and active involvement of the Dealer Principal and Owner in the operation and management of Mitsubishi dealerships, and material factors appropriately considered by MMNA when considering proposed transferees include the experience and qualifications of the proposed transferees as they relate to owning, operating, and managing a new car dealership. In his application, [redacted] disclosed that he has owned [redacted] a used car dealership, from May 2001 to the present but did not identify any business experience in operating or owning a new motor vehicle dealership. There is a significant difference between operating a used car dealership and the successful operation of a new car dealership. Specifically, experience effectively managing new vehicle sales—including vehicle allocation and inventory, incentive programs, fixed operations, warranty training and service, customer service, and the delivery of premier customer experience—are all essential to the successful operation of a new car dealership. Because [redacted] does not have the requisite experience operating or managing a new car dealership, MMNA does not consent to the Proposed Asset Sale.

MMNA also rejects the Proposed Asset Sale because [redacted] does not satisfy MMNA's financial requirements for a proposed transferee to own and operate a Mitsubishi dealership. Specifically, the Buyer Candidate and its Owner failed to submit, among other things, an unencumbered funds letter, a capital loan letter, a New Dealer Proforma, and a term sheet from a floorplan lender. These documents are needed by MMNA to verify that the Buyer Candidate could, if appointed as a Mitsubishi dealer, actually obtain the financing necessary to support and operate a new car dealership. [redacted] personal financial statement evidences he does not have the necessary liquid assets to purchase and operate a Mitsubishi dealership. Moreover, [redacted] was a defendant in several foreclosure

actions over the years and had two federal tax liens filed against him in 2013, which were not satisfied until 2015 and 2016, respectively. This demonstrates that [redacted] lacks the necessary character and the necessary financial qualifications to own and operate a Mitsubishi dealership.

Finally, MMNA does not consent to the Proposed Asset Sale because the information developed through a review of publicly available information demonstrates that association with [redacted] will not be beneficial to MMNA or the Mitsubishi brand. Specifically, MMNA has discovered that [redacted] executed a Stipulation and Order of Settlement in March 2012 in a matter captioned [redacted], an entity solely owned by [redacted] In that Stipulation and Order, [redacted] represented that he and his company had been made aware of a scheme to launder proceeds of violations of the International Emergency Economic Powers Act ("IEEPA") and narcotics transactions through the United States used car market, including through the purchase of used cars in the United States, their subsequent shipment to West Africa, and the involvement of Hizballah members and supporters in such money laundering; and that [redacted] acknowledged that he and any entity he owned or controlled in the future that engaged in the business of buying or selling automobiles "shall not enter into any transactions with any party who the [U.S. Government] has reason to believe is affiliated with Hizballah."

Because [redacted] lacks the necessary experience, qualifications, and demonstrated financial resources to own and operate a Mitsubishi dealership, MMNA rejects the Proposed Asset Sale. MMNA reserves all rights.

Regards,

**MITSUBISHI MOTORS NORTH AMERICA, INC.**

F.J. Vossenberg

Frans Jack Vossenberg, Regional Vice President
Northeast Region

cc: MMNA Legal Department
[redacted]