UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.
---------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**DECLARATION OF BRUCE NOVICKY IN SUPPORT OF PLAINTIFFS' MOTION FOR <u>SUMMARY JUDGMENT</u>**

I, Bruce Novicky, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

## BACKGROUND, ROLE, AND SCOPE OF THIS DECLARATION

1. I am the former Chief Operating Officer ("COO") of Plaintiffs Superb Motors Inc. ("Superb") and Team Auto Sales LLC ("Team").

2. During the period relevant to this case, I served as COO of Superb and Team and worked directly with Plaintiff Robert Anthony Urrutia ("Urrutia"), Superb's President and owner.

3. I also served as COO for Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield in Massachusetts.

4. Superb, Team, and Urrutia are referred to collectively herein as the "Superb Plaintiffs."

5. I respectfully submit this declaration in support of Plaintiffs' motion for summary judgment and address only matters within my personal knowledge or matters I learned through my work and my review of records maintained in the ordinary course of the dealerships' operations.

6. During my time as COO, my responsibilities included operational oversight, lender and floor-plan issues, inventory control, dealership-management records, bank and DMV matters, and coordination among the dealerships operated by Urrutia.

7. I interacted directly with Defendant Anthony Deo ("Deo") while he managed Superb and with employees, lenders, customers, vendors, banks, law-enforcement personnel, and other persons concerning the events described below.

8. I previously executed declarations in this action addressing portions of these events as the facts became known. See ECF Docket Entries 56-1, 86, 155, 157-1, and 401.

9. For clarity and completeness, I restate the facts from those declarations in a single chronological account, subject to the qualifications stated herein.

10. The facts did not become known to me all at once.

11. Some were known contemporaneously, while others were learned only after Deo was removed from Superb, records were secured and compared, vehicles were physically traced, and discovery proceeded.

12. Where I describe something I personally saw, heard, sent, or received, I say so directly.

13. Where I describe the result of my review of Superb's records, lender records, DMV records, or other documents, I identify that basis rather than representing that I personally observed the underlying transaction when it occurred.

14. My testimony concerns the operational events I handled: lender warnings, the physical inventory, the missing-vehicle investigation, communications I personally exchanged, police interactions, record reconciliation, and the steps taken when Superb shut down.

**SUPERB'S OPERATING SYSTEMS AND RECORDKEEPING**

15. Superb operated a licensed used-car dealership at 215 Northern Boulevard, Great Neck, New York.

16. Like other dealerships, Superb used floor-plan financing to acquire vehicle inventory and was required to maintain financed vehicles at an approved location, maintain accurate inventory records, and pay the floor-plan lender when a vehicle was sold or otherwise became ineligible for financing.

17. During the relevant period, Superb used a dealership-management system ("DMS"), first DealerTrack and later Tekion, to record vehicle inventory, retail and wholesale transactions, deal information, receivables, payoffs, and general-ledger entries.

18. Tekion was the primary system I used in the post-August 3, 2023 investigation to compare the vehicles carried on Superb's books in the general ledger against the vehicles physically present (or missing) and against lender, title, and customer records.

19. Superb also maintained deal jackets, vehicle titles, payoff files, lender statements, floor-plan reports, bank records, customer receipts, emails, text messages, and DMV records.

20. I am familiar with the manner in which these records were created and maintained because I regularly used them in performing my duties and supervised or worked with employees who created and maintained them.

21. The records annexed to this declaration were made or maintained at or near the time of the events reflected in them by persons with knowledge, were kept in the ordinary course of the dealerships' regularly conducted business, and were the types of records the dealerships regularly made and relied upon.

22. The top-down audit I was directed to conduct by Urrutia on and after August 3, 2023 required more than reading a single spreadsheet.

23. Urrutia and I compared the physical lot, the records in Tekion (where the general ledger was maintained), floor-plan reports, auction records, titles, DMV forms, customer files, repair information, bank deposits, and communications concerning individual vehicles.

24. An entry on the general ledger did not necessarily prove that a vehicle was physically present, although it should if the dealership is being managed properly.

25. This is because a general manager's responsibilities include ensuring all vehicles that are made available for sale are properly stocked in to the DMS system for accounting purposes.

26. For that reason, I started the audit by referring to the general ledger as an initial inventory count for a list of vehicles, determined which vehicles were unaccounted for, and then investigated the whereabouts of each vehicle.

**FEBRUARY 2023 POTENTIAL DOUBLE-FLOORING WARNINGS**

27. In February 2023, Nissan Motor Acceptance Company ("NMAC"), Superb's primary floor plan lender, identified vehicles associated with Superb that also appeared on another lender's floor-plan records, which is a violation of Superb's agreement with NMAC.[1]

28. An email from NMAC dated February 17, 2023 identified eight (8) units on a potential double-flooring report for Superb and instructed that, depending on whether Superb was the buyer or seller, the applicable lender had to be paid or the vehicle removed from the other floor plan until title was available. See copy of email correspondence annexed hereto as **Exhibit "A."**

29. On February 22 and 23, 2023, NMAC again identified six (6) units on its report and requested that the dealership resolve the potential double floorings. Id.

30. Alysia Cayer, then the dealerships' then-Chief Financial Officer, communicated with NMAC, Urrutia, and Deo concerning those vehicles and forwarded or copied me on portions of the correspondence in the course of our work.

31. I received or was copied on the communications shown in **Exhibit "A"** through my business email account, and **Exhibit "A"** is a true and accurate copy of the email chain as maintained in the dealerships' files.

32. These emails were made and kept in the ordinary course of Superb's and/or Team's business.

[1] This would be a violation of any floor plan lender's agreement with any dealership.

33. These February warnings from NMAC were serious because the same vehicle ordinarily cannot secure financing from two (2) floor-plan lenders at the same time.

34. At that point, the issue was being presented as a limited group of transactions that needed prompt payoff and title correction.

35. I did not then know that a later inventory and lender comparison would reveal a much larger set of discrepancies.

36. I also did not understand the February communications as permission for anyone to continue placing the same vehicle on more than one floor plan or to represent a vehicle as available inventory when it had already been sold, transferred, or was not physically available.

37. This is not the proper way to run an automobile dealership.

**MARCH AND APRIL 2023 COMMUNICATIONS CONCERNING FINANCIAL RECORDS AND FLUSHING BANK**

38. On March 21, 2023, Deo copied me, Urrutia, accountant Thomas Jones, CPA ("Jones") and attorney[2] Harry Thomasson ("Thomasson") on a demand for financial, lien, payoff, disbursement, and payroll records and referred to Jones and Thomasson as part of his forensic team. See ECF 38-6.

39. I received that communication in the course of my work for the dealerships.

40. During the same general period, Urrutia was exploring a broader banking relationship with Flushing Bank ("Flushing") through David Weinstein ("Weinstein"), and I assisted in sending corporate and financial information concerning all of Urrutia's four (4) dealerships, including Superb.

[2] I do not recall whether I knew then that Thomasson was an attorney; the email did not introduce him as one.

41. The materials I handled in that process related to Urrutia's dealerships and were being provided for the banking relationship Urrutia was pursuing.

42. I did not provide any document stating that Deo was the one-hundred-percent (100%) owner of Superb.

43. Deo also communicated with me directly by text message concerning a different contact at Flushing and the possibility of opening an account or obtaining financing for Superb.

44. In that exchange, Deo represented that he had a personal banker who was ready to open an account for Superb and that he could obtain a $500,000 line of credit.

45. Deo then wrote to me: "Bro. This guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home." See ECF 518-12.

46. Based on the surrounding conversation, I understood "this guy" to refer to the Flushing banker Deo was discussing, who I now understand to be Robert Puccio ("Puccio"), and I understood the reference to the credit underwriter to concern the same proposed Flushing transaction.

47. The statement stood out to me because Deo was saying that the banker and underwriter were "in his pocket," and that he could open a bank account faster if I supplied corporate information and the tax materials through his contact at Flushing.

48. I did not understand that message to authorize Deo to misstate Superb's ownership or to open an account excluding Urrutia.

49. I personally participated in the text-message exchange with Deo.

50. I sent and received the messages using my cellular telephone.

51. The contact shown for Deo was associated with the telephone number that I knew and regularly used to communicate with him about dealership business.

52. I recognize the language, sequence, and context of the messages as the communications I had with Deo.

53. Using my cellular telephone, I opened the text-message thread I had with Deo and took a screenshot of the messages annexed to this declaration.

54. The screenshot has not been materially altered (except for a court reporter affixing an exhibit mark) and are true and accurate copies of the messages as they appeared in my communications with Deo on my cellular telephone.

55. When Deo made this offer, I discussed it with Urrutia because it raised some eyebrows.

56. Urrutia initially told me in response that Deo's help was not necessary as Weinstein was already working on opening the accounts. See 518-12 ("Tony is already on top of it for all the stores").

57. Later on, when Weinstein was taking too long to open the account, Urrutia authorized me to send Deo solely Superb's filing receipt and certificate of incorporation for submission to his contact at Flushing Bank.

58. Urrutia and I saw no harm in submitting those documents because they were previously provided to Weinstein.

59. After Deo's removal on August 3, 2023, I found bank statements from Flushing in Superb's name.

60. We learned later on in discovery that Deo opened the account on April 4, 2023 with Flushing using documents in which Deo identified himself as Superb's one-hundred-percent (100%) owner and sole signer.

61. I did not know before the August 3, 2023 that the account had been opened.

62. It was my duty as COO to know of any changes in bank accounts and nobody told me that an account had been opened in April 2023.

63. Had the account been authorized, I would have been informed by Urrutia.

64. Urrutia never informed in April, May, June, or July 2023 about the fact that a bank account had been opened for Superb with Flushing.

65. In fact, I was the one who informed Urrutia about the existence of the bank account for Superb with Flushing, and he was shocked when he learned about that from me.

66. In addition, Urrutia and I were continuing efforts to open a bank account for Superb with Flushing through late July and early August, demonstrating we did not know that one had already been opened.

**JULY 2023 LENDER CONTACT AND THE DECISION TO CONDUCT AN AUDIT**

67. On July 31, 2023, while Urrutia was away on a family vacation, NMAC contacted me concerning vehicles associated with financing from more than one lender. See ECF 38-8.

68. NMAC's information showed that more than one lender had advanced funds in connection with the same vehicle or that a vehicle remained on one lender's records while appearing in another lender's collateral records.

69. In the automobile-dealership business, this is commonly referred to as double flooring.

70. As discussed above, double flooring violates the ordinary requirements of a floor-plan agreement and exposes the dealership and its guarantors to immediate payoff demands and termination of financing.

71. Given that Superb was cross-collateralized with three (3) other franchise dealerships Urrutia owned, termination of financing was an unbearable risk to operations.

72. The July 2023 contact from NMAC was materially different from an ordinary request to correct the occasional one-off title or payoff issue because NMAC identified *twenty-two (22) vehicles* that were double-floored.

73. In my history[3] of working at dealerships, I have never seen a double floor report showing that many vehicles.

74. As a result, I immediately spoke to Urrutia about the email and the call because it raised significant concerns.

75. The first thing we did to protect the floor plan line of credit for all four (4) dealerships was to make the payoff demanded as a result of the double-floor report.

76. I also called Deo in late July 2023 after NMAC contacted me and asked him to explain the identified double-floored vehicles; I specifically confronted him about the double-flooring information and the locations of vehicles carried on Superb's records.

77. Deo's explanations on the call did not jive with NMAC's report, nor did Deo provide me with a reliable location or transaction history for the vehicles at issue.

78. I immediately informed Urrutia of the lender's concerns and my inability to reconcile Deo's explanations with the records.

79. Because Urrutia was out of the country at the time, he directed me to conduct a physical inventory and determine whether the vehicles listed in Superb's records and floor-plan reports were actually present.

80. Urrutia then directed me to physically go to Superb and meet directly with Deo to discuss this issue after closing the month out at the four (4) dealerships, which took several days.

---

[3] I first started working at a dealership in 2007 and continue to do so, for nearly two (2) decades.

81. As a result, I was first able to drive[4] to Superb on Thursday, August 3, 2026.

82. Once at Superb, I immediately realized there was a problem because there were virtually no cars present at the dealership and the lot was practically empty.

83. I therefore contacted Alex Kikirov (a partner in Superb), Michael Morgan (an individual who works for an aftermarket product company Superb worked with), and Frank Messina (an employee at Mitsubishi Hartford) to help me find the missing vehicles by visiting the lots at Northshore and Sunrise to compare the information provided by NMAC (ECF 38-8) against the information then available from Superb's records (the general ledger in Tekion).

84. The purpose was to determine, vehicle by vehicle, whether each floor-planned vehicle was at an approved location and whether each vehicle listed in the general ledger within Tekion could be physically located or otherwise supported by transaction records.

**AUGUST 3, 2023 PHYSICAL INVENTORY AND DEO'S REMOVAL**

85. I began with the vehicles listed in the DMS' general ledger and compared them against the vehicles physically located at Superb and at other locations then known, such as Northshore and Sunrise.[5]

86. The inventory team inspected the lot, matched vehicle-identification numbers where available, reviewed keys and files, and recorded vehicles that could not be located during the initial count.

---

[4] Superb is located in Great Neck, New York and I lived in Brookfield, Connecticut at the time, typically working out of the Mitsubishi store in Hartford, Connecticut. I left from there on August 3, 2023 to get to Superb.

[5] Sometimes Deo moved vehicles to Northshore to have repairs done, as Superb did not have a repair shop; this scenario would never require so many vehicles from Superb to be there.

87. The initial comparison identified 102 vehicles listed in Superb's records that we could not then locate at Superb or otherwise reconcile.

88. The figure of 102 represented vehicles that were unaccounted for at that stage of the investigation; it did not mean that I had already determined that Deo misappropriated them.[6]

89. The size of the discrepancy nevertheless demonstrated that Superb's records did not reliably identify where its recorded inventory was located or what transaction had occurred for each vehicle, which was one of Deo's primary duties as a general manager at Superb.

90. Deo was confronted about the missing vehicles and was asked to identify their locations or provide supporting documentation.

91. For one vehicle, Deo stated that the vehicle had been sold.

92. I contacted the customer associated with the transaction in Superb's records to verify that explanation.

93. The customer denied purchasing the vehicle.

94. I then looked for a completed deal jacket, payment record, title record, or other documentation substantiating the purported sale.

95. I did not locate documentation supporting the sale as Deo had described it, and Deo did not provide documentation that resolved the discrepancy.

96. Other explanations Deo supplied similarly failed to reconcile the physical inventory with the lender and dealership records.

97. I reported these findings to Urrutia.

[6] Even if the vehicles were sold, as some of them turned out to be, it was Deo's responsibility to update Tekion to have the general ledger reflect the transaction occurred. Deo's failure to do so was a separate cause for concern.

98. Based on the lender information, the missing-vehicle count, and the unreconciled explanations, Urrutia removed Deo from Superb's day-to-day operations and directed a top-down audit.

**NASSAU COUNTY POLICE DEPARTMENT & THE AUGUST 2023 COMPLAINT**

99. As a result of the foregoing, at Urrutia's request, I contacted the Nassau County Police Department ("NCPD") the same day (on August 3, 2023) concerning Deo's removal and the vehicles that could not be located.

100. I sought law-enforcement assistance because the lender complaints and inventory count indicated that a substantial number of vehicles could not be accounted for.

101. While NCPD personnel were at Superb, I observed Deo and Marc Merckling ("Merckling") present at the dealership.

102. I also saw Dwight Blankenship ("Blankenship") at the premises, but he did not remain and appeared not to want to encounter NCPD personnel; I recall that he left shortly after I first saw him once NCPD was at the dealership.

103. Thomasson also later arrived while the police were present.

104. Thomasson stated that he was an attorney for Superb.

105. Before that day, I was unaware that Thomasson maintained an office inside Superb, which I first learned of that day.

106. Thomasson asked to speak privately with the NCPD and ultimately did so; I heard him yelling at them from where I stood.

107. Afterward, Thomasson began clearing items from the office he had been using.

108. I observed that files and a lamp were removed from what was apparently Thomasson's office.

109. After August 3, 2023, I reviewed Superb's records and located checks showing payments from Superb to Thomasson for legal services.

110. Those records were significant to me because I had not previously known the extent of Thomasson's office presence or work paid for by Superb.

111. After the NCPD investigated, I met with a Detective to prepare a supporting deposition for a criminal complaint against Deo concerning the missing vehicles.

112. The supporting deposition identified Deo as the person I believed responsible for the missing vehicles and requested action against Deo. See ECF 401-1.

113. The supporting deposition is a true and accurate copy of the draft supporting deposition the Detective provided to me for review before I signed the final version.

114. I knew that Merckling and Blankenship were current or former officers at NCPD, and that the NCPD did not move forward with any arrest of Deo to my knowledge.

115. The police response did not resolve the operational emergency, so I continued the vehicle-by-vehicle investigation using dealership records.

116. Urrutia and I also communicated with the Federal Bureau of Investigation concerning Deo's conduct since the NCPD was not acting on our complaint.

## THE POST-REMOVAL AUDIT AND THE CHANGING MISSING-VEHICLE COUNT

117. After Deo's removal, we secured and reviewed the records available to Superb and began reconciling each vehicle carried in the DMS' general ledger.

118. The initial list contained 102 vehicles that could not be located or explained during the first physical inventory, i.e., they were not physically present at Superb, where they should have been, as required by Superb's floor plan agreement with NMAC.

119. Superb and the other dealerships were at risk of termination unless the vehicles were returned.

120. As a result, this case was filed and Superb sought a temporary restraining Order and a preliminary injunction requiring that Deo return the vehicles.

121. After the order-to-show-cause papers were filed in August 2023, thirteen vehicles were located or otherwise reconciled, reducing the then-unaccounted count to eighty-nine.

122. Twelve additional vehicles were thereafter located or reconciled, reducing the count to seventy-seven.

123. On September 15, 2023, following a settlement conference before the Court, twenty-eight vehicles were returned by the Deo Defendants.

124. In addition, two Isuzu flatbed trucks that were not included on the original list were returned at the same time.

125. After crediting the twenty-eight listed vehicles, forty-nine vehicles from the list remained unaccounted for.

126. Six of those vehicles were identified as remaining in the possession of the Deo Defendants, i.e., the Deo Injuncted Vehicles, leaving forty-three vehicles that required further investigation.

127. The changing count reflects the progress of Superb's investigation and vehicle recoveries; it does not reflect inconsistent counting methods as argued by Thomasson and the Deo Defendants.

## OCTOBER 2, 2023 STATUS AND VEHICLES THEN LOCATED

128. By October 2, 2023, our investigation had also ascertained the whereabouts or disposition of the following twelve vehicles and removed them from the category of vehicles for which we sought returned:

2020 BMW X3 M, VIN 5YMTS0C02L9B09685.
2017 Mercedes-Benz C-Class, VIN 55SWF4KB0HU188660.
2019 Jeep Cherokee, VIN 1C4PJMDX3KD245817.
2013 BMW 5 Series Gran Turismo, VIN WBASP0C58DC988075.
2015 BMW M4, VIN WBS3U9C50FP967858.
2017 Ford Escape, VIN 1FMCU9JD3HUD14412.
2018 Jeep Wrangler Unlimited, VIN 1C4HJXFN5JW331845.
2018 Mercedes-Benz CLA, VIN WDDSJ4GB7JN508433.
2019 Land Rover Range Rover Velar, VIN SALYA2EX8KA791014.
2018 Audi S5 Sportback, VIN WAUB4CF56JA083170.
2019 Maserati Ghibli, VIN ZAM57YTLXK1316469.
2016 Maserati Quattroporte, VIN ZAM56RRAXG1187624.

129. After accounting for those developments, forty-three vehicles from the original records still required further investigation.

## LATER VEHICLE-BY-VEHICLE RECONSTRUCTION

130. Over the following months, I continued tracing the forty-three vehicles using DMV records, Tekion entries, titles, auction records, customer files, repair information, public vehicle-history information, and communications with persons involved in the transactions.

131. By March 2024, I had developed a transaction or location explanation for most of the forty-three vehicles, although the explanation did not always establish that Superb had received the proceeds or that its books had been corrected. See ECF 157-1.

132. I separated vehicles that had been wholesaled without being properly booked from vehicles for which the records showed a trade-in, reversed purchase, retail sale, title event, service location, or other explanation. Id.

133. "Accounted for" in this context means that I found sufficient information to explain why a vehicle was not physically present; it does not mean that the underlying transaction was authorized, properly recorded, or financially reconciled.

**<u>FIFTEEN VEHICLES WHOLESALED BUT NOT PROPERLY BOOKED</u>**

134. My investigation identified fifteen vehicles that had been transferred through wholesale transactions but remained open on Superb's records because the transactions were not properly booked in Tekion.

135. In an ordinary wholesale transaction, the vehicle is entered as sold, the buyer and sales price are recorded, the proceeds are receipted, the vehicle is removed from inventory, and the accounting entry is closed.

136. The records for these fifteen vehicles did not reflect that complete process.

137. DMV forms and related records indicated that most of the fifteen had been transferred to L&F Auto Sales, a wholesaler operated by Nethanel Orgad, and that three were transferred through other wholesale dealers.

138. The fifteen vehicles were as follows:

Stock SU1239, a 2014 Honda Pilot, VIN 5FNYF4H58EB056804.
Stock SU1275, a 2014 Ford Explorer, VIN 1FM5K7B8XEGA63757.
Stock SU0994A, a 2008 BMW 7 Series, VIN WBAHN83588DT77672.
Stock SU1338, a 2004 Nissan Quest, VIN 5N1BV28UX4N365724.
Stock SU1304, a 2013 BMW X5, VIN 5UXZV4C53D0E08930.
Stock SU1274A, a 2012 Dodge Grand Caravan, VIN 2C4RDGBG4CR249331.
Stock SU1216, a 2004 Toyota Sequoia, VIN 5TDBT44A84S221021.
Stock SU1104A, a 2007 Ford Explorer, VIN 1FMEU74E57UA52487.
Stock SU1128, a 2013 Hyundai Sonata, VIN 5NPEB4AC0DH635244.
Stock SU0895B, a 2010 Nissan Murano, VIN JN8AZ1MW1AW112694.
Stock SU1002A, a 2015 Jeep Grand Cherokee, VIN 1C4RJFCT1FC653909.
Stock SU848A, a 2010 Buick Enclave, VIN 5GALVBED8AJ256342.
Stock SU0619A, a 2016 Dodge Grand Caravan, VIN 2C4RDGEG7GR384403.
Stock SU1123, a 2015 Infiniti Q70L, VIN JN1BY1PR8FM830659.
Stock SU0890A, a 2014 Ford Explorer, VIN 1FM5K8D89EGA21518.

139. For stock SU1275, the records included a $1,500.00 cash receipt, but I did not locate a booked Tekion wholesale deal or a corresponding deposit into Superb's bank records.

140. This indicates that the cash payment was taken.

141. The March 2024 reconciliation I prepared reflected approximately $93,332 in general-ledger assets associated with these transactions, even though the vehicles were no longer physically present.

142. The failure to close those transactions distorted the inventory records and impaired our ability to reconcile Superb's books and determine what proceeds had been received.

**TWENTY-ONE VEHICLES FOR WHICH THE AUDIT FOUND A TRANSACTION OR LOCATION EXPLANATION**

143. The audit also identified twenty-one vehicles for which we found a transaction, title, service, trade-in, auction, or location explanation sufficient to remove the vehicle from the unresolved-missing category; those twenty-one vehicles were:

Stock SR1334, a 2016 BMW 3 Series, VIN WBA8E5G56GNU21721.
Stock SU1154, a 2018 Chevrolet Impala, VIN 1G1105S35JU116841.
Stock SU1313, a 2009 Ford Ranger, VIN 1FTYR14E39PA15942.
Stock SU1273, a 2006 Lexus GX470, VIN JTJBT20X660124417.
Stock SU1127, a 2007 BMW 5 Series, VIN WBANB53507CP08338.
Stock SU0960A, a 2018 Toyota Camry, VIN 4T1BZ1HK5JU014962.
Stock SU1221, a 2019 Audi Q7, VIN WA1LHAF72KD026699.
Stock SU1142, a 2020 Alfa Romeo Stelvio, VIN ZASPAKBN0L7C92090.
Stock SU1131, a 2019 Mercedes-Benz S-Class, VIN WDDUG8GB4KA445850.
Stock SU0942, a 2020 Land Rover Range Rover, VIN SALGS5SE6LA408198.
Stock SU1037, a 2017 Volkswagen Jetta, VIN 3VW4T7AJ8HM312579.
Stock SU0941A, a 2011 Porsche Cayenne, VIN WP1AB2A23BLA47985.
Stock SU0933, a 2019 Audi Q7, VIN WA1AAAF78KD002872.
Stock SU1082, a 2010 BMW 7 Series, VIN WBAKC8C56ACY68247.
Stock SU1305, a 2019 Mercedes-Benz CLA250, VIN WDDSJ4GB7KN725983.
Stock SU1297, a 2017 BMW X1, VIN WBXHT3C3XH5F81562.
Stock SU0930, a 2016 Audi S6, VIN WAUF2AFC3GN063552.
Stock SU1130, a 2019 Ford Mustang, VIN 1FATP8UH6K5190020.
Stock SU1210, a 2021 Dodge Durango, VIN 1C4SDJCT2MC520441.
Stock SU1120RF, a 2020 Chevrolet Malibu, VIN 1G1ZD5STXLF122021.
Stock SU0915BB, a 2018 BMW 7 Series, VIN WBA7F2C5XJB238313.

144. Some examples of clear improprieties follow.

145. Stock SU1154 was marked as a trade-in connected to the purchase involving stock SU1120RF, but the records indicated that SU1154 never physically arrived at Superb; vehicle-history information reflected service in Detroit, Michigan in February 2023 and an attempted Michigan registration on August 19, 2023, even though the vehicle had been offered for sale through Superb in July 2023.

146. Stock SU1313 appeared on Superb's general ledger, but the records indicated that the purported trade-in never came into Superb; vehicle-history information reflected service at a Walmart Auto Care facility in Georgia in July 2023.

147. Stock SU1142 was a Manheim auction purchase that had been reversed in May 2023 but nevertheless remained on Superb's general ledger.

148. Stock SU1131 had been sold in a retail transaction but remained on Superb's general ledger from February 2023; vehicle-history information also reflected that it was offered for sale again in July 2023 after the recorded retail sale.

149. The records reflected that stock numbers SU0942, SU1037, SU0941A, SU0933, SU1082, SU1305, SU1130, SU1210, SU1120RF, and SU0915BB had been sold but remained on Superb's general ledger.

150. In an ordinary transaction, a completed sale should be booked in Tekion, the money received should be receipted and deposited, and the vehicle should be removed from the general ledger; the fact that these sales were not accounted for in Tekion showed that Deo was engaged in improper conduct.

151. Another example of Deo's misconduct follows.

152. For stock SU1130, the transaction records reflected $36,358 in proceeds from an early-July 2023 sale, consisting of $10,000 by credit card, $8,000 in cash, and $18,358 by check.

153. The credit-card portion appeared in Superb's Chase records.

154. However, I did not locate a corresponding July 2023 deposit for the $8,000 cash payment, and the $18,358 check was ultimately found in the separate Flushing account opened in Superb's name.

155. The April through July 2023 bank statements I reviewed did not show corresponding ordinary cash or check deposits for the substantial cash and check receipts recorded in Tekion; instead, the deposits reflected on those statements were principally ACH, wire, or account-transfer entries.

156. Tekion reflected approximately $500,000.00 in cash receipts requiring reconciliation against Superb's bank deposits.

**SEVEN VEHICLES THAT REMAINED UNACCOUNTED FOR IN MARCH 2024**

157. After tracing the fifteen unbooked wholesale vehicles and the twenty-one vehicles for which a transaction or location explanation was found, seven of the forty-three vehicles remained without a sufficiently complete resolution in the record available to me in March 2024.

158. Those seven vehicles were:

Stock SU1312, a 2012 BMW X5, VIN 5UXZV4C57CL889887.
Stock SU1307, a 2021 Chevrolet Silverado 1500, VIN 3GCPYFED9MG383394.
Stock SU1276, a 2000 Mercedes-Benz M-Class, VIN 4JGAB74E1YA173539.
Stock SU0981A, a 2009 Ford Flex, VIN 2FMEK63C89BA19931.
Stock SU1114A, a 2011 BMW 5 Series, VIN WBAFU7C54BC879208.
Stock SU874B, a 2009 Audi Q5, VIN WA1KK78R59A048822.
Stock SU0936, a 2019 BMW 5 Series, VIN WBAJE7C5XKWW08935.

159. Until my tenure at Superb ended, I was never able to ascertain the whereabouts of any of these vehicles, except one.

160. The records concerning stock SU1307, the Chevrolet Silverado, contained a sequence of inconsistent descriptions and transactions. See 157-1 ¶¶ 63-71.

161. On February 2, 2023, Deo emailed me that he "would absolutely want to keep" the Silverado. See ECF 157-7.

162. On March 21, 2023, Deo emailed me that the Silverado "did not exist." See ECF 157-8.

163. On April 12, 2023, an NMAC audit communication reported the Silverado as sold. See ECF 157-9.

164. On April 29, 2023, Deo again referred to the Silverado in an email as the a vehicle that does not exist. See ECF 157-10.

165. Meanwhile, publicly available vehicle-history information reflected that a Florida title was issued shortly after the Silverado was offered for sale through Superb and that the vehicle was serviced in Florida on January 6, 2024. See 157-1 ¶ 68.

166. NMAC records further reflected that the same Silverado was placed on NMAC's floor-plan line again in June 2023 and was reported sold again on July 4, 2023. See ECF 157-11.

167. I also found a second deal record involving the same Silverado. See ECF 157-12.

168. Because the vehicle had been described as nonexistent, reported sold, placed on the floor plan again, and reported sold again, this established to me that Deo was engaging in fraud.

## THE 2019 AUDI Q7 ASSOCIATED WITH REGINE RAYMOND AND THE LOWE TEXT MESSAGES

169. One transaction I investigated separately concerned a 2019 Audi Q7 associated with a July 31, 2023 transaction for customer Regine Raymond.

170. The deal records reflected a stated sales price of $31,496.14 and a required $3,000 down payment.

171. Consistent with prior cash payments, I could not locate a corresponding $3,000.00 payment recorded in Superb's books or deposited into Superb's operating account.

172. Santander funded the customer transaction in the amount of $39,618.70 on August 3, 2023.

173. The records indicated that Raymond did not take delivery of the vehicle and that the Audi was not located on Superb's lot when the post-removal inventory was conducted.

174. The floor-plan records reflected that the vehicle had been placed on Superb's floor plan for $31,185.00 on June 8, 2023 and that the floor-plan obligation was paid on July 24, 2023.

175. During the later investigation, I received information that Deo was operating the Audi while it bore Superb dealer plate number 6111633.

176. I communicated by text message with Eugene Lowe concerning that vehicle and dealer plate.

177. Lowe was the General Sales Manager at Superb and testified before this Court on February 20, 2024.

178. I personally participated in the text-message exchange with Lowe.

179. I sent and received the messages using my cellular telephone and recognized Lowe's contact information as the number I used to communicate with him.

180. The content and context of the exchange were consistent with our discussion of the Audi and its location.

181. The exchange included or transmitted an image from Lowe stating that Deo was operating the Audi while the vehicle displayed Superb dealer plate number 6111633.

182. Using my cellular telephone, I opened the text-message thread I had with Lowe and took a screenshot of the message and image annexed to this declaration.

183. The screenshots have not been materially altered and are true and accurate copies of the messages and image as they appeared in my communication with Lowe on my cellular telephone.

184. A true and accurate copy of the text-message exchange with Lowe is annexed hereto as **Exhibit "B."**

185. After Deo's removal, Urrutia did not give him permission to retain or operate the Audi or to use Superb dealer plate number 6111633, and I was not aware of anyone at Superb giving him such permission.

186. My statement that the plate belonged to Superb is based on the dealership's dealer-plate records, which I reviewed in the course of my investigation.

187. The Audi was not recovered by Superb during the period of my investigation, and the transaction remained part of the unresolved vehicle and financial reconciliation.

**FLOOR-PLAN TERMINATIONS, SUPERB'S CLOSURE, & THE DMV WIND-DOWN**

188. The double-flooring findings and resulting lender demands had immediate operational consequences.

189. The records reflected a required payment of $760,868.75 to NMAC to cure the identified default, and NMAC ultimately terminated Superb's floor-plan financing.

190. The NextGear floor-plan relationship available through Team was also terminated.

191. Without floor-plan financing, Superb could not replenish inventory in the ordinary course and could not continue operating as a functioning retail dealership.

192. Although approximately thirty vehicles were recovered in September 2023, those vehicles became subject to the preliminary injunction and could not be sold in the ordinary course while the injunction remained in effect.

193. Superb was therefore left without a functioning floor-plan line and without the ability to sell the recovered inventory.

194. As a result, Superb ultimately laid off its sales staff, ceased dealership operations, and was forced to wind down, surrendering its DMV dealer license.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 3, 2026.

Bruce Novicky

Bruce Novicky