UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.
-------------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**DECLARATION OF ROBERT ANTHONY URRUTIA IN SUPPORT OF PLAINTIFFS' MOTION FOR <u>SUMMARY JUDGMENT</u>**

I, Robert Anthony Urrutia, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am the President of Plaintiffs Superb Motors Inc. ("Superb") and the sole member of Team Auto Sales LLC ("Team").[1]

2. Superb, Team, and I (the "Superb Plaintiffs") consist of one group of Plaintiffs in this case who have been defrauded and harmed by Defendant Anthony Deo ("Deo") and his cohort.

3. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at Superb and Team in addition to information I have learned from employees, customers, vendors, and other third parties concerning the Defendants and their conduct.

4. I respectfully submit this declaration in support of: (i) the Plaintiffs' combined motion for summary judgment against the Deo Defendants[2] on their claims for violations Racketeer Influenced & Corrupt Organizations Act ("RICO") as well as for breach of duty of loyalty and/or violation of the faithless servant doctrine, breach of fiduciary duty, fraud, and conversion claims under New York law; and (ii) the Superb Plaintiffs' motion for summary judgment against Defendant Flushing Bank for violation of Article 4 of the New York Uniform Commercial Code ("UCC") as well as against the Deo Defendants for unfair competition and civil conspiracy under New York law.

---

[1] I was also the owner of Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield, Massachusetts.

[2] The Deo Defendants consist of Anthony Deo, Sarah Deo, Harry Thomasson, Dwight Blankenship, Marc Merckling, Michael Laurie, Car Buyers NYC Inc., Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, and UEA Premier Motors Corp. (collectively hereinafter the "Deo Defendants").

## MY BACKGROUND AND THE BUSINESSES I BUILT

5. I have worked in the automobile industry for decades.

6. I did not begin as the owner of a group of dealerships.

7. I spent many years learning the business and building the lender, vendor, employee, and customer relationships that a dealership needs in order to survive.

8. After those years of work, I achieved my goal of owning dealerships.

9. By the time period relevant to this case, I owned and operated Superb, Team, Volkswagen of Freehold in New Jersey, Team Mitsubishi-Hartford in Connecticut, and Team Nissan of Pittsfield in Massachusetts, as well as Team.

10. Superb was my high-end used-car dealership in Great Neck, and Team – a separate entity altogether – was my New Jersey wholesale used-car operation.

11. At the outset of this case, the businesses collectively supported approximately 125 employees.

12. These businesses were not passive investments; I personally guaranteed and cross-collateralized financing, remained responsible for dealership licensing and lender compliance, and put my own reputation and assets behind the stores.

13. Their inventory, dealer plates, lender lines, dealership records, customer information, and goodwill were the product of decades of work.

14. The Irie Jam relationship and the customer base generated through that advertising, discussed further below, were especially important to Superb.

15. We spent substantial sums of money over time to reach customers in the Caribbean community, built a lead base through those efforts, maintained the information in Superb's CRM, and restricted access to it.

16. To me, that customer information was not an abstract spreadsheet; it represented the customers, reputation, and goodwill that I had paid and worked to build.

17. By the fall of 2022, I was managing significant changes across several stores, including the acquisition of Team Nissan in Pittsfield and a transition to a new dealership-management system (from DealerTrack to Tekion).

18. I was looking for someone who could help manage Superb day-to-day while I handled those other responsibilities; I was not looking to surrender Superb, its license, my final authority, or the businesses I had spent decades building.

19. That distinction – management help rather than a transfer of ownership – is the beginning of this story.

20. I gave Defendant Anthony Deo ("Deo") access because I believed he was an experienced dealership operator who would manage Superb for the benefit of Superb.

21. I did not agree that he or anyone working with him could use that access to create ownership claims, bank relationships, loans, transfers, competing dealerships, or vehicle movements for their own benefit.

22. As this Court knows, I previously executed many declarations in this case, and they are identified below.

23. For the sake of clarity, I repeat in this declaration many of the facts I previously declared, subject to certain qualifications stated herein.

24. I otherwise respectfully incorporate them by reference herein. See ECF Docket Entries 11, 17, 38, 50-1, 112, 204, 216, 220, 228, 229-3, 241, 251, 258, 261, 273, 282, 294, 304, 324, 334, 496, 497, and 507.

25. In my role as Superb's President and owner, I was familiar with Superb's regular recordkeeping practices.

26. Superb regularly maintained dealership management system ("DMS") and customer relationship management ("CRM") entries, deal jackets, title and payoff files, lender reports, accounting records, and bank statements in the ordinary course of its operations.[3]

27. The facts of this case developed in stages because I did not learn the full scope of the challenged conduct all at one time.

28. As records were recovered and witnesses testified, I submitted declarations addressing the facts then known to me.

## IDENTITY, BUSINESSES, OWNERSHIP, AND LICENSING

29. Team has its principal place of business in New Jersey; it first opened in or about November 2020.

30. At all relevant times, Superb operated a retail used car dealership from its lot located at 215 Northern Boulevard, Great Neck, NY.

31. The operation of a used car dealership in the State of New York requires a license (the "License") issued by the New York State Department of Motor Vehicles ("DMV").

32. The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance.

33. At all relevant times, I held the License as applicant for Superb.

34. At all relevant times, I controlled Superb in accordance with its Shareholders' Agreement.

---

[3] I am informed that these records and communications are admissible as business records pursuant to Rule 803(6) of the Federal Rules of Evidence ("FRE").

35. As it relates to Superb, I initially partnered with Bobby Clarke ("Clarke"), who owns a radio station named Irie Jam, 93.5 FM, and with whom I advertised to approximately over 2 million individuals in the Caribbean community that Irie Jam could reach both during and after my partnership with Clarke ended.

36. During my prior business relationship with Robert Clarke, substantial sums of money were spent on advertising.

37. Through that advertising and the operation of the dealerships, I developed a substantial customer list that I expected would help generate business for Superb.

38. Due to the unique nature of my partnership with Clarke, the customer list cannot be reverse engineered or independently generated without a substantial investment in Irie Jam, which the Defendants did not make.

39. Superb maintained information on leads sourced through Irie Jam and its other marketing efforts in a customer relationship management ("CRM") system, initially DriveCentric and, later, VINSolutions.

40. Superb took reasonable efforts to maintain the secrecy of this information, including by password protection, maintaining a firewall, and other measures.

**WHAT I LATER LEARNED ABOUT DEO AND LAURIE**

41. When I first dealt with Deo, I knew him only through the people who introduced us and through what he and Laurie told me.

42. Deo presented himself as an experienced dealership owner who had been wronged by a former partner.

43. Laurie presented himself as Deo's adviser, financier, and unofficial partner.

44. Neither disclosed the regulatory, ownership, or criminal history described below.

45. I later reviewed certified records[4] produced by the New York State Department of Motor Vehicles concerning Universal Exotic Autos Inc., a prior (and I believe first) dealership Deo owned. See copy of certified DMV records concerning Universal Exotic Autos Inc., facility 7116600, annexed hereto as **Exhibit "A."**

46. The facility history identifies facility number 7116600 at 908 Long Island Avenue in Deer Park and lists Anthony D. Deo as the corporation owner; the same certified facility history states that the dealer license was issued on November 21, 2013. Id.

47. The certified records also contain complaints in 2014 and 2017, a 999-day suspension ordered on October 30, 2017, another 999-day suspension ordered on July 5, 2018, a program audit, and a revocation order dated October 1, 2018. See copies of certified DMV records containing complaints against Universal Exotic Autos Inc. annexed hereto as **Exhibit "B,"** many of which include findings by the DMV that Deo committed fraud.

48. The October 1, 2018 permanent-revocation record is Order No. 003436 and lists two recordkeeping violations, failure to comply with a DMV audit, and two fraudulent-conduct violations; it also records monetary settlement or restitution entries. Id.

49. I did not know any of that when I agreed to let Deo manage Superb.

50. I also reviewed certified DMV notices concerning Defendant UEA Premier Motors Corp., facility number 7120672, at 180 Michael Drive in Syosset. See copies of certified DMV records annexed hereto as **Exhibit "C."**

---

[4] I am informed by my counsel that these certified records are admissible pursuant to Rule 44(a) of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") as well as Rules 902(1) and 902(4) of the FRE because they consist of domestic public documents that are sealed and signed and constitute an official publication of the record.

51. Multiple notices revoked the dealer license for UEA effective September 11, 2018, and another revoked it effective January 21, 2019. Id.

52. The stated causes included untimely submission of certificates of sale and ownership documents and violations of New York Vehicle and Traffic Law ("VTL") § 415-9(c) for committing a fraud or fraudulent practice or practicing dishonest or misleading advertising! Id.

53. The notices required surrender of the business certificate, MV-50 forms, dealer plates, registrations, and unissued plates, which ended the dealership's lawful ability to operate under that license. Id.

54. The UEA records in this case also show why the corporate names matter.

55. An executed UEA lease package identifies "SARA DEO" as chief executive officer on signature pages, while the DMV revocation notices identify "Sara Rahman" as the owner. See ECF 30-2 at 66; see also Sara Dep.[5] 22:11–20, 37:21–38:2.

56. The records place UEA, 180 Michael Drive, and the Deo-associated dealership operations in the same history that later reappeared in this case.

57. I also reviewed a 2016 Westlake dealer-confirmation record for UEA that identified Louis Beria ("Beria") as "Owner" as well as Deo's February 13, 2026 deposition testimony. See copy of documents produced by Westlake Financial annexed hereto as **Exhibit "D"** at 1, 13, and 20; see also Deo II Dep. 122:12-126:8; ECF 536 ¶¶ 12, 14, 15, and 979.

[5] To the extent copies of any deposition transcript referenced in this declaration is not linked, a copy of the deposition transcript is available in the accompanying Declaration of Emanuel Kataev, Esq.

58. Deo testified that Beria was not UEA's owner, that Beria was identified as owner "to get the bank," that the ownership statement was false, and that Deo knew it was false when it was submitted.

59. I also reviewed the publicly filed docket and judgment in United States v. Beria, the judgment entered March 9, 2021 reflects a federal fraud conviction, a 51-month term, three years of supervised release, and $1,621,979 in restitution. See No. 2:20-cr-53 (RWS) (JCF), ECF Docket Entry 16 (N.D. Ga. Mar. 9, 2021).

60. Beria was also criminally prosecuted in a separate, earlier-filed case in United States v. Beria, No. 2:20-cr-26 (RWS) (JCF) (N.D. Ga.).

61. I did not know in 2022 that Deo had previously admitted using a false lender-facing ownership representation.

62. I had never met Laurie or heard of DLA Capital before the November 3, 2022 meeting.

63. Laurie spoke for most of that meeting, presented himself as the financially sophisticated person supporting Deo, and was expected to help arrange approximately $1 million in working capital.

64. His participation gave Deo additional credibility with me.

65. I later reviewed the federal criminal complaint, a publicly available document, filed against Laurie. See United States v. Laurie, No. 18-cr-521 (BRM) (DEA), ECF Docket Entry 1.

66. The complaint charged that, while serving as a managing director and senior vice president of a federally insured financial institution, Laurie knowingly and corruptly accepted a $6,000 payment intending to be influenced and rewarded in connection with bank business, in violation of 18 U.S.C. § 215(a)(2). Id.

67. At his January 27, 2026 deposition, which I attended virtually, Laurie acknowledged the complaint, acknowledged that a criminal judgment was entered against him on February 19, 2019, and acknowledged a sentence that included one day of imprisonment based on time served, supervised release, and a fine. See Id., ECF Docket Entry 26.

68. At his February 27, 2026 deposition, which I attended virtually, Laurie initially denied having been sued for fraud; however, after reviewing the verified complaint in Savasta v. Laurie, he acknowledged that it contains a third cause of action for fraud, while denying that fraud or fraudulent intent occurred. See Laurie Dep. 89:3-90:16; see also 655330/2023 NYSCEF 1, 18, 23.

69. Laurie also testified at his deposition that he made the Flushing referral (discussed further below), may have helped obtain documents, and – critically – that he knew Deo was *not* the one-hundred-percent owner of Superb; indeed, when asked why, he answered in substance that otherwise "we would not be sitting here." See Laurie Dep. 102:16-23, 140:2-141:6 (Laurie testified that Urrutia "must have still owned the majority"; that "Urrutia wouldn't give up 100 percent until he got paid"; that "there was no final sale"; and that Laurie did not believe Deo was the 100% owner "because we wouldn't be sitting here").

70. Those admissions are important because Laurie was not a stranger to the financing effort; he was the person presented to me as Deo's financial adviser and partner.

71. Deo also has a federal criminal judgment against him; the judgment states that Deo was adjudicated guilty of conspiracy to commit wire fraud and wire fraud and was signed on January 15, 2016. ECF 385-2.

72. None of this history was disclosed to me before I placed trust in Deo and Laurie.

73. Had I known that the DMV had suspended and revoked Deo-associated dealer operations, that UEA had been revoked on express fraud and dishonest-practice charges, that Deo had admitted a knowingly false ownership statement to obtain bank access, or that Deo or Laurie had federal criminal judgments against them, I would not have entrusted Deo with Superb's operations, lender relationships, customer information, or financial access.

74. I therefore distinguish throughout this declaration between what I knew at the time and what I learned later from certified records, discovery, and sworn testimony.

75. The later records explain why events that initially looked to me like ordinary startup problems, accounting delays, or a dispute with Aaronson took on a very different meaning once the full picture was revealed.

**NEGOTIATIONS WITH DEO AND THE PUTATIVE OWNERSHIP TRANSACTION**

76. Michael Morgan and Frank Ventimiglia, individuals who are known to me in the automobile industry, introduced me to Deo in or about February 2022.

77. On November 3, 2022, I met with Deo and Michael Laurie concerning a possible transaction involving Superb, Northshore, and Sunrise.

78. I later caused Northshore's operations to be observed before deciding whether to proceed.

79. At the November 3 meeting, Laurie dominated the conversation and spoke for roughly eighty percent of it, even though he was described as Deo's adviser and financier rather than the proposed operating partner.

80. Deo spent time describing his dispute with Joshua Aaronson and portraying himself as the person being mistreated.

81. I sympathized with what he told me and viewed Laurie's presence as reassurance that the financial side of the proposal had been vetted.

82. The proposal appealed to me because I needed reliable day-to-day help at Superb, not because I wanted to walk away from the dealership.

83. The contemplated exchange depended on Deo delivering money and ownership interests in Northshore and Sunrise, while I retained control under final operating and shareholders' agreements.

84. My willingness to consider the arrangement was built on those specific promises.

85. The transaction then-discussed contemplated that Deo would contribute $500,000.00 for no more than a forty-nine-percent interest in Superb and that I would receive a twenty-five percent (25%) interest in each of Northshore and Sunrise.

86. This deal remained subject to operating and shareholders' agreements.

87. It did not authorize Deo to identify himself as Superb's sole owner.

88. A $100,000.00 check tendered in connection with the proposed transaction was returned unpaid on or about November 14 or 15, 2022; Deo explained that a deposited bank check was on hold.

89. Deo later wired $300,000.00 and $200,000.00 in separate transfers, and I did not know their prior source or path when I received them.

90. When the $100,000.00 check was returned, Deo told me that a bank check he had deposited was on hold and sent me a screenshot that appeared to support that explanation; I believed him.

91. When the later $300,000.00 and $200,000.00 wires arrived from Car Buyers NYC Inc ("Car Buyers"), I understood them as Deo finally performing his contribution; I did not then know the path by which the money had reached Car Buyers or the Libertas and attorney-account events later disclosed in discovery.

92. During the negotiations, I was shown financial information concerning Northshore and Sunrise and was told that those dealerships generated approximately $60,000.00 to $80,000.00 in monthly net income.

93. I also understood that Laurie was expected to assist with approximately $1 million in working-capital financing.

**DEO'S MANAGEMENT ROLE BEGINNING IN NOVEMBER 2022**

94. By November 17, 2022, I had taken the necessary steps to move forward with our partnership by reducing the inventory to market value and absorbing the November 2022 losses.

95. Deo signed both the Cross-Purchase Agreement and, later, the Shareholders' Agreement, which reflected our understanding between each other.

96. The Cross-Purchase Agreement provided for the sale of an interest in Superb in exchange for $500,000.00 and interests in Northshore and Sunrise described above.

97. The Shareholders' Agreement provided, essentially and in pertinent part, that I had full financial control and that Deo was a manager with limited power subject to my complete authority and unfettered discretion.

98. More specifically, the Shareholders' Agreement identifies me as the fifty-one percent (51%) majority shareholder and President; gives me day-to-day and personnel decisions, final approval of financing, sole check authorization, and sole control of Superb's bank accounts; and requires written majority-shareholder consent for mortgages, liens, security interests, loans, and guarantees. It identifies Deo as a 49% shareholder and gives him authority to propose a general manager subject to my approval. See ECF 11-6.

99. Deo was unable to consummate the transaction as set forth in the Cross-Purchase Agreement and never delivered[6] to me my membership interests in Northshore and Sunrise, respectively.

100. As a result, at all times hereinafter mentioned from November 2022 until August 2023, Deo was employed by Superb as its general manager and was otherwise engaged by Superb as its manager for Superb's benefit.

101. The timing made the transition unusually difficult.

102. I was acquiring Team Nissan, changing dealership-management systems, absorbing November losses, and dealing with an accounting department that had fallen behind.

103. Our chief financial officer left several months later, which made the backlog worse.

104. Those were real operational problems, and they initially gave Deo a plausible explanation for missing information and inconsistent reports.

---

[6] As this Court knows, the Hon. Jerome C. Murphy, J.S.C. granted summary judgment that Deo breached representations/warranties concerning his claimed 100%, free-and-clear ownership of Northshore and Sunrise and failed to transfer the promised interests, and this Court later found the *res judicata* elements met and gave that decision the same preclusive effect it would receive in New York. ECF 505.

105. As losses continued to appear through February 2023 (three to four months after he began operating Superb), Deo repeatedly assured me that he could turn the dealerships around; I was doubtful and informed him I will likely be closing Superb down since it is not profitable.

106. In an effort to remain in operational control, Deo proposed that he absorb the operating losses while I received fixed amounts per vehicle, sent optimistic projections, and blamed the accounting department, lenders, and Aaronson when the actual results did not match what he reported.

107. I continued to give him an opportunity because I believed the problems could be corrected through stronger oversight, and he basically provided me with a sweetheart deal in which I only stood to gain while any losses fell on him.

108. On or about February 22, 2023, my accounting team discovered that some vehicles had been floor-planned twice, which is prohibited under Superb's agreements with its lenders. Specifically, on February 17, 2023, NMAC identified eight potential overlapping NMAC/NextGear floor-plan entries. Alysia Cayer ("Cayer") (my then Chief Financial Officer) forwarded the notice to Deo, copied me, and directed that the proper line be paid. Follow-up correspondence on February 22–28 stated that six vehicles remained flagged and specifically asked when the 2017 Rolls-Royce would be paid; Deo answered that he had not received the check and would address it the following day. ECF 220-14 at 32-41; ECF 38 ¶ 48; ECF 38-9 at 12.

109. I immediately confronted Deo and required the problem to be corrected.

110. He blamed Aaronson and represented that the issue was connected to the Northshore and Sunrise dispute.

111. I did not treat the incident as permission for any further double flooring; I treated it as a serious problem that had to be fixed immediately.

112. At all times hereinafter mentioned from November 2022 until August 2023, Deo was employed by Superb as its general manager.

113. When I approved Deo's role in Superb's management, I expected him to act for Superb's benefit, follow the limits I placed on his authority, and report Superb's operations accurately to me.

114. After I removed Deo from day-to-day management and reviewed Superb's records, I learned of transactions and operational problems that had not been disclosed to me and that exposed Superb and my DMV license to substantial financial and regulatory risk.

115. Deo's appointment as manager for Superb was proposed by Deo and approved by me in accordance with Superb's Shareholders' Agreement and was based upon Deo's obligation and expectation that actions made concerning Superb would be made for Superb's benefit.

116. As Superb's manager, Deo was charged with the obligation and expectation that actions made concerning Superb would be made for its benefit.

117. As Superb's manager, I allowed Deo to handle the day-to-day operations of Superb, including vehicle inventory purchases, and certain aspects of financial reporting on behalf of Superb.

118. As Superb's manager, I allowed Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb.

119. As Superb's manager, Superb and I relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb.

120. As Superb's manager, Superb and I relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb and with respect to audits conducted by floor plan lenders.

121. By accepting the position as manager of Superb, Deo accepted the obligation to accurately report financial information of Superb.

122. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to accurately report financial information of Superb.

123. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory.

124. In reliance on accurate reporting and appropriate inventory practices at Superb, I personally guaranteed and cross-collateralized my other three dealerships in support of Superb's floor-plan financing.

125. Superb operated by using a DMS (initially DealerTrack and, later, Tekion) that was licensed by Superb to operate my other dealerships as well as Superb.

126. The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership.

127. Each time that Deo entered financial information into the DMS system, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders that such financial information was true and accurate.

128. Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders, that such vehicle inventory purchase was appropriate.

129. The Superb Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Superb incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by floor plan lenders.

130. The practical point is that I delegated daily work because no owner can be physically present at every dealership every hour; especially me, as I primarily reside outside of the country in Costa Rica.

131. I did not delegate the ownership of Superb, the right to speak falsely for me, or the right to use Superb's credit and property for another company.

132. For several months, the genuine disorder caused by the system transition and accounting backlog concealed the difference between ordinary operational mistakes and transactions that had been undertaken without my authority.

133. Once I recovered the bank, DMS, lender, title, vehicle, and communication records, the same names and entities appeared repeatedly at the points where authority, money, vehicles, and customer information changed hands.

**<u>RECURRING ROLES, ACCESS, AND COORDINATED ACTS</u>**

134. The same people repeatedly appeared in connected transactions complained of in this case.

135. On March 21, 2023, Deo copied Jones, Thomasson, Novicky, and me on his demand for Superb's financial, lien, payoff, disbursement, and payroll records and identified them as his forensic team. ECF 38-6 at 5-6; Jones Dep. 258.

136. The following day, after I authorized production, Deo texted me that the wording was "only to serve our purpose." ECF 38-2 at 43 (providing that on March 22, 2023 Cayer requested Urrutia's authorization; Urrutia authorized production; and the filed chain shows Cayer sending records that day); see also ECF 38 ¶¶ 41–44; ECF 38-6 at 1–6. Deo later swore that Cayer was fired to prevent a forensic examination and that he was surprised; but at his deposition, he acknowledged receiving a large volume of records, that he may have opened some, did not know whether they contained financial schedules, did not know what a trial balance was, admitted that he did not follow up with Cayer, and agreed that his declaration said he "now surmise[d]" the reason for her firing instead of his prior emphatic statement that this was the reason. ECF 30 ¶ 23; Deo Dep. 426:5–438:7. Critically, after Cayer left, Jones began reviewing and adjusting monthly statements through Deo. Jones Dep. 261:19–262:16, 294:18–295:20, 325:11–19.

137. Jones performed accounting work through Deo and Kernizant (at Deo's direction); Thomasson participated in ownership and lender communications and worked out of an office at Superb and, previously, Northshore; and Merckling and Blankenship continued operational work involving cash, inventory, audits, and vehicles at Northshore, Sunrise, and Superb.

138. This was not a series of strangers performing isolated tasks.

139. The same group worked through Northshore, Sunrise, Superb, Car Buyers, UEA, and Gold Coast-related entities.

140. Their functions connected ownership papers and financial statements to financing; financing and bank accounts to related-party transfers; and dealership access to customer information, cash, inventory, and vehicles.

141. I gave Deo limited management authority so he could operate Superb for the benefit of Superb; I did not authorize him or the people working with him to convert that access into ownership, open undisclosed Superb accounts, increase reported profit through unsupported entries, use Superb to pay another entity's obligations, deploy Superb's people or information for a competing dealership, or retain Superb vehicles after demand.

142. The acts described below repeatedly produced those results.

143. My permission for dealership personnel to move a vehicle was limited to ordinary dealership purposes such as transport, service, repair, or an identified shared-use arrangement; I did not authorize permanent removal, use for a competing dealership, or retention after demand.

144. Any bank access or device I allowed Deo to use on Superb's preexisting operating account did not authorize him to open a different Superb account as sole signer or to transfer Superb funds for another entity.

145. Critically, Sara Deo's testimony showed that she was not merely a spouse outside the businesses.

146. She testified that she completed paperwork to organize Northshore, opened its Chase account, added Deo and others as authorized signers, remained an authorized signer, and worked directly in dealership marketing, scheduling, customer calls, bookkeeping, daily deposits, and cash-safe reconciliation. Sara Dep. 68:14–18, 86:17–22, 148:12–150:23, 260:23–261:12, 275:23–276:23.

147. She also described circumstances in which she would oversee functions from service through accounting.

148. The documents likewise show recurring executive roles.

149. UEA records identify Sarah in a chief-executive role; a 2018 assignment identifies her as chief executive officer for UEA and Northshore and as a guarantor; and a June 2023 Gold Coast roster identifies her as vice president of Gold Coast Motors Automotive Group. ECF 30-2 at 66; ECF 38-12.

150. These records are consistent with an operational role across the Deo-associated dealership entities, not incidental family proximity; indeed, Sarah worked at and drew compensation from the dealerships, had an office at Northshore, was present consistently at least four days per week, worked directly with Deo across the dealership locations, handled marketing, was on Superb's payroll, completed organizational paperwork for Northshore, had bank access and signing authority, opened its Chase account and later added Deo, and sometimes helped prepare Superb's weekly schedule. Deo Dep. 232:21-236:22, 240:17-244:3, ECF 437-6 at FLUSHING8508-8513;[7] Sara Dep. 73:10–22, 126–150, 190:3–22, 207:7–17, 260:23–261:12; ECF 30-2 at 4, 16, 19, 54, 63–66; ECF 38-12.

151. I also reviewed the sworn testimony of Thomas Jones and Daniel O'Sullivan concerning the accounting practices used before Deo came to Superb.

152. From at least August 2021 through October 2022, Jones and Deo decided monthly adjustments and Jones directed O'Sullivan to enter them in the dealerships' DMS.

---

[7] Two Northshore operating agreements created in March 2023 are inconsistent: one lists Deo as 100% owner, while the other lists Deo as 99% owner and Sara as 1%; both recite June 15, 2020 as the commencement date. Deo testified that he created the document himself from an online template without an attorney. SMF ¶ 35; Deo Dep. 232:21–236:22, 240:17–244:3; ECF 437-6 at FLUSHING8508–FLUSHING8513.

153. O'Sullivan testified that the entries made the dealerships appear more profitable.

154. At Jones' deposition, he acknowledged that monthly statements could appear approximately $1.4 million better before year-end write-offs and understood that monthly financials were supplied to Ally.

155. Jones later supplied information for the Libertas transaction and worked on ownership and financial assurances used in the Flushing process.

156. The testimony is nevertheless important to understanding why the same accountant, ownership materials, and lender-facing financial information repeatedly appeared in the financing transactions that followed.

157. In a separate financial-statement episode, Jones testified that Deo supplied a target of $13.4 million in gross sales and $1,332,948 in net income while the May 2023 statement reflected approximately $9.4 million in revenue.

158. Jones testified that Deo supplied no mathematics supporting the target and that he had no basis for its accuracy other than Deo's say-so.

159. Jones further testified that neither the statement nor his transmittal identified the figures as a forecast. Jones Dep. 303:2-25, 307:2-24, 310:4-25, 311:2-24, 312:4-7. Jones also testified that showing profit was an "absolute must;" Deo supplied approximately $13.4 million in sales compared with approximately $9.4 million in actual sales; Jones had no basis for the supplied number other than Deo's say-so; the document was not labeled a forecast; and Jones knew the figures were not Superb's actual May operations. Jones Dep. 301:12–17, 302:19–303:22, 307:2–14, 310:12–24, 311:2–16. Jones further testified that he prepared a personal financial statement from figures supplied by Deo without reviewing underlying statements and subject to compilation/no-assurance limitations. Jones Dep. 145:4–19, 153:4–16, 269:18–270:3.

Meanwhile, Deo's personal financial statement did not list Superb as a Deo entity or asset. ECF 204-2; Jones Dep. 267:22–272:11.

**NOVEMBER 2022 FUNDING EVENTS AND SUBSEQUENT REPORTS TO LAW ENFORCEMENT**

160. During the relevant period, Dwight Blankenship and Marc Merckling worked for dealerships associated with Deo.

161. I later learned that one was a retired police officer and the other was an active police officer.

162. Beginning on August 3, 2023, I reported conduct I believed warranted investigation and provided supporting records to law-enforcement personnel.

163. On multiple occasions, Nassau County Police Department personnel told me that they regarded the matter as civil.

**NOVEMBER 2022 LIBERTAS FUNDING AND ATTORNEY-TRUST-ACCOUNT PATH**

164. The Libertas agreement records $750,000.00 in financing, a $15,000 fee, and $735,000 in net funds associated with Northshore and related entities; I did not apply for, receive, or control that loan. ECF 410-1, 410-2, 410-3, Thomasson Dep. 111:13-115:18, 123:15-124:17, 270:7-20, 274:8-19, 280:10-282:17; Deo II Dep. 90:10-91:17; Merckling Dep. 314-317.

165. I reviewed correspondence between Thomasson and counsel for the IAG Plaintiffs, as well as Thomasson's sworn testimony. ECF 410-2.

166. On November 18, 2022, Shanks expressly requested that the disputed $735,000 payment be sent to Thomasson's attorney trust account "to hold in escrow."

167. Thomasson responded that he would forward wiring instructions. Thomasson later testified that Deo asked him to have the funds pass through him and that he said, "sure."

168. The bank records show that a $735,000 replacement payment transmitted in the Libertas dispute entered Thomasson's IOLA account on November 21, 2022.

169. Thomasson testified that he went to the bank when the funds arrived, transferred approximately $723,000 to Car Buyers, and retained approximately $12,000 as legal fees. ECF 410-1, 410-2, 410-3, Thomasson Dep. 111:13-115:18, 123:15-124:17, 270:7-20, 274:8-19, 280:10-282:17; Deo II Dep. 90:10-91:17; Merckling Dep. 314-317.

170. Thomasson further testified that the transfer occurred within approximately 24 hours of receipt. Thomasson Dep. 113-117, 123:20-25, 278.

171. Deo testified that he directed Thomasson to send the funds to Car Buyers and identified the $723,000 Car Buyers receipt as the Libertas money.

172. Car Buyers thereafter made two transfers to me totaling $500,000.00. ECF 410-3 at 3-4.

173. I did not know the prior source or path of those two transfers when I received them.

174. These records establish what Thomasson was told, the wiring instructions he supplied, his control of the IOLA account, the speed and destination of the disbursement, Deo's direction, and Thomasson's retained fee.

175. I also reviewed the filed Libertas Seller Definition Addendum and electronic audit trail.

176. The Addendum records a signer using the name "Marc Merkling" and the title "Owner" for both Northshore and 189 Sunrise.

177. The audit records the document as emailed to, viewed by, and electronically signed under that name through an address bearing Anthony Deo's name at Northshore, with timestamps and IP addresses.

178. At his deposition, Merckling denied making the signature and testified that it might be Deo's; however, the agreement, Thomasson's testimony, Car Buyers bank record, and ECF 536 admissions establish substantial parts of the sequence: $735,000 in stated net proceeds, $723,000 sent onward to Car Buyers, $12,000 retained for legal fees, and Deo's direction to Thomasson to send the funds to Car Buyers. ECF 536 ¶¶ 956, 971–973. That combined record supports a circumstantial knowledge/purpose inference; a confession is not required.

**DECEMBER 2022 THROUGH JUNE 2023 NORTHSHORE/SUNRISE VEHICLE PIPELINE**

179. My January 24, 2025 declaration describes a state-court injunction in the Island Auto Group litigation as operating from December 14, 2022 through June 15, 2023 and restricting specified transfers or encumbrances of Northshore and Sunrise assets. ECF 220 ¶¶ 57-69, ECF 220-14 at 32-41, ECF 220-16.

180. The same declaration identified eighteen (18) Northshore or Sunrise vehicles, with an asserted aggregate value exceeding $1 million, that were transferred or sold to Superb in early 2023; it stated that five later became vehicles regulated by the federal preliminary injunction and that February records flagged eight of the eighteen for potential overlapping financing. Id.

**SUPERB'S OPERATIONS AND BUSINESS RECORDS**

181. Dealerships typically operate with the assistance of banks that provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership.

182. When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle, and certain rules attach as a condition of the financing, i.e., with limited exceptions, any such vehicle financed must be present and available for sale at the dealership.

183. The records I reviewed after August 3, 2023 reflected payments and transfers from Superb's operating funds for purposes that were not recorded as Superb business expenses; I did not authorize Superb funds to be used for Deo's personal benefit.

184. The payments, transfers, and unreconciled transactions identified in the audit reduced the working capital available for Superb's operations.

185. After August 3, 2023, my review of Superb's records disclosed transactions and accounting entries that had not been reported to me and that were inconsistent with the cash and inventory then available to Superb.

186. The post-August 3, 2023 audit identified separate categories of disputed activity, including bank transfers, cash and checks not reflected in available funds, vehicle and title problems, unpaid liens, and floor-plan deficiencies; I address those categories separately below.

187. The records I reviewed showed vehicle purchases and financing amounts that did not consistently correspond to the vehicles' acquisition costs, customer transactions that later had to be unwound, and financial entries that did not reconcile with Superb's bank and inventory records.

188. The records and communications I reviewed identified Sarah Deo, Blankenship, Merckling, Laurie, Thomasson, and Superb's accountants as persons who participated in particular transactions or aspects of Superb's operations.

189. While working at Superb, Merckling and Blankenship handled cash or check transactions and had access to Superb's safe. Merckling Dep. 97:2–98:10, 108:8–110:7; Blankenship Dep. 79:10–81:18.

190. I later learned that Sarah Deo had access to certain Superb operational information and customer-lead information; I did not authorize her to copy, retain, or use Superb's customer information for a business outside Superb.

191. I observed Thomasson continue to represent or assist Deo after disputes arose concerning the Libertas funds; Thomasson also testified that he stopped keeping time when he became salaried, received $3,000.00 per week beginning around July 2023 to represent Deo, maintained an office at Superb, and continued to represent the Deos in other matters for $1,000 per week later on. Thomasson Dep. 129-132, 178-181, 313:16-319:19.

192. Laurie testified that he signed no retainer for Thomasson's services and had seen no bills. Laurie Dep. 24-25.

193. Records and communications I reviewed reflect that Laurie assisted Deo with financing matters and communications concerning bank accounts, including the Flushing relationship; I did not authorize Laurie to open an account or obtain a loan in Superb's or Team's name.

194. The monthly financial statements and accounting records I reviewed after August 3, 2023 contained entries that did not reconcile with Superb's bank, inventory, and DMS records.

195. The Superb Plaintiffs' floor plan lenders financed the purchase of used vehicles at the rate of one hundred (100%) of the "black book wholesale clean" value.

196. In so doing, the Superb Plaintiffs' floor plan lenders and the Superb Plaintiffs reasonably expected that Superb would cover the balance of the purchase price not covered by the Floor Plan.

197. The records I reviewed showed transactions that temporarily increased reported receivables or cash but were later reversed, repurchased, or unwound, while cash and check receipts were not fully reflected in Superb's available funds.

198. The records I reviewed identified vehicle transactions in which the acquisition cost, lender advance, and amount recorded in Superb's books did not reconcile, resulting in funds that were not fully accounted for in Superb's available cash or inventory.

199. At least as early as November 2022, the Deo Defendants began purchasing used vehicle inventory for Superb that were grey-market vehicles.

200. In my experience operating automobile dealerships, a grey-market vehicle is a vehicle manufactured for a foreign market, including Canada.

201. The retail lenders with which Superb did business generally would not finance those vehicles, and financing one could result in a demand that Superb repurchase or unwind the customer loan.

202. After the grey-market transactions were discovered, lenders required certain customer loans to be repurchased or unwound, leaving Superb responsible for amounts that had previously been funded.

203. I was not advised before August 3, 2023 the extent to which grey-market vehicles were being purchased or retailed through Superb, and I did not authorize anyone to conceal those transactions from me or from Superb's lenders.

204. The financial statements I reviewed reflected revenue or profit from certain grey-market transactions that later had to be repurchased or unwound; the resulting liabilities were not disclosed to me at the time Deo engaged in these transactions.

205. Certain grey-market vehicles were acquired at lower prices than comparable United States-market vehicles.

206. Superb's financial statements initially reflected revenue or profit from those transactions without disclosing to me the potential repurchase or unwind exposure.

207. Had the Superb Plaintiffs been aware of the true nature of these transactions, they would not have approved of the purchases or financing of said grey-market vehicles.

208. The Deo Defendants committed this practice on a regular basis; some examples are provided herein.

209. Example 1: On February 25, 2023, the Deo Defendants arranged for Superb to sell a 2016 Audi S6 to Aleksandros Papavangjeli ("Papavangjeli") for $31,500.00.

210. According to my review of Superb's DMS, Papavangjeli purportedly paid $2,200.00 of the $4,500.00 down-payment by credit card and financed the balance, including fees and taxes, with a lender, Chase.

211. The records I reviewed after August 3, 2023 did not show the remaining $2,300 down payment deposited into Superb's operating account; I did not receive or authorize the diversion of that money.

212. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means.

213. On March 1, 2023, Chase paid Superb financed proceeds of $34,597.13.[8] ECF 220-2 at 25.

[8] The amounts do not always match up because lenders deduct advances, payoffs, reserves, warranties, cancellations and issue a net-payment; other times, loans for multiple vehicles are disbursed in a single amount.

214. After Papavangjeli complained in July 2023 that his vehicle had been at a repair shop since March 2023 and was unable to be fixed, Chase learned that Papavangjeli had purchased a grey-market vehicle, which was purchased by Deo on or around January 31, 2023. See copy of correspondence with Chase annexed hereto as **Exhibit "E."**

215. As a result, on July 21, 2023, Chase demanded the repurchase of Papavangjeli's retail contract. ECF 14-1 at 3 (first car).

216. On July 25, 2023, the vehicle was placed on Superb's floor plan line, despite the vehicle not being physically present on Superb's lot. Id. (indicating vehicle was on floor plan as of August 9, 2023).

217. The records I reviewed show that the vehicle was placed on Superb's floor-plan line and that the corresponding obligation to Chase was not timely repaid. Id.

218. I did not authorize the vehicle to be floor-planned without compliance with Superb's lender agreement.

219. Thus, the Deo Defendants were able to obtain $27,150.00 for a vehicle that was not in Superb's possession, which I was forced to pay back. ECF 220-2 at 90 (CK #12097).[9]

220. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle.

221. A payment record dated August 10, 2023 reflects that Superb paid $33,229.44 to satisfy the floor-plan obligation associated with this transaction. ECF 220-2 at 90 (CK #12097).

[9] The amount of the check was for $33,229.44, which is higher than what NMAC demanded at $27,150.00. This is typical, and can be due to a number of reasons, including refunds due for warranties, taxes, payoffs, overages on trade-in payoffs, etc.

222. The records I reviewed show that Chase's lien was not perfected, the customer retained the vehicle, and Superb was required to repay the related funded amount; I did not authorize the failure to perfect Chase's lien.

223. Example 2: On April 27, 2023, the Deo Defendants arranged for Superb to sell a 2019 BMW X3 to James Daughety ("Daughety") for $40,450.00.

224. Daughety made a down-payment of $7,500.00 in cash, which was receipted in Superb's DMS but not deposited in Superb's bank account with Chase, and the balance was financed with Chase.

225. On or around May 1, 2023, Chase paid Superb the financed proceeds of Daughety's retail contract in the amount of $40,058.00. ECF 220-2 at 51.

226. Based on my investigation, I learned that pursuant to Deo's instruction, the vehicle was not issued license plates immediately following the sale.

227. The vehicle was originally placed on Superb's floor plan line of credit on April, 19, 2023 for the amount of $35,075.00 and was subsequently paid off on May 19, 2023 after receipt of the financed proceeds on May 1, 2023.

228. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' retail lenders to fund Daughety's purchase, which was funded by interstate electronic means.

229. The records I reviewed showed that on June 13, 2023, *after* the May 1 retail-contract date and May 19, 2023 payoff, the vehicle was again placed on Superb's floor plan in the amount of $34,225.00.

230. A payment record dated July 6, 2023 reflects that Superb paid its floor-plan lender in connection with this transaction. ECF 220-2 at 80-81.

231. The DMV paperwork for the vehicle was not sent until July 12, 2023, more than two months after the customer's May 1, 2023 purchase.[10]

232. In July 2023, Chase demanded repurchase because the vehicle was a grey-market vehicle and the required lien had not been perfected, as reflected in Chase's demand and the transaction records. See **Exhibit "E."**

233. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for Daughety for the amount of $39,601.83. ECF 220-2 at 90 (CK #12099).

234. The records I reviewed show that the vehicle remained in Daughety's possession and was not recovered by Superb. I have not assigned a total-loss amount without accounting for the vehicle's value, any payment received, and any later recovery.

235. Example 3: On March 28, 2023, the Deo Defendants arranged for Superb to sell a 2019 Land Rover Range Rover Velar to Frankie & Alice Barnes ("Barnes") for $43,200.00.

236. Based on records I reviewed, Barnes paid $2,000.00 down by credit card and financed the balance, including fees and taxes, with a lender, Ally.

237. On April 3, 2023, Ally paid Superb financed proceeds in the amount of $49,868.09. ECF 220-2 at 39.

238. On April 18, 2023, Superb's floor plan lender paid $39,675.00, for the same vehicle, which had already been sold. Id. at 42.

239. However, the vehicle had not yet been received at Superb after its purchase from Manheim.

240. In addition, the vehicle was sold to another customer while in transit to Superb.

[10] Deo engaged in this conduct to delay the need to payoff the floor plan line of credit for the particular vehicle; he did this to float the store while he engaged in various schemes to siphon money out of the dealership.

241. As a result of the vehicle not being available in a timely manner, Barnes cancelled the sale. See copy of customer complaint annexed hereto as **Exhibit "F."**

242. On or about June 6, 2023, Superb submitted payment to Ally for the repurchase of the retail contract in the amount of $51,081.80. ECF 220-2.

243. A payment record I reviewed dated June 15, 2023 reflects that Superb paid its floor-plan lender in connection with this transaction.

244. Example 4: A further example identified in the records concerns a May 12, 2023 transaction for a 2021 Dodge Durango RT to Sarah Martin for $27,765.

245. Although a $10,000.00 down payment was required, with Martin financing the taxes and fees with Chase, no monies were receipted into Superb's DMS nor were any monies deposited in Superb's bank account with Chase.

246. On May 16, 2023, Chase paid Superb financed proceeds of $44,696.61. ECF 220-2 at 54.

247. The Deo Defendants failed to deliver the vehicle to Martin and Martin canceled the purchase and loan. See **Exhibit "E."**

248. In fact, the Deo Defendants never purchased the vehicle before making the sale.

249. On May 23, 2023, despite the fact the Deo Defendants never took possession of the vehicle, and it was already sold to another dealer by Manheim, the vehicle was placed on Superb's floor plan line.

250. Superb was funded $39,810 by its floor plan lender for the vehicle. ECF 220-2.

251. On May 31, 2023, Superb paid off the vehicle from their floor plan line for $39,810.00. ECF 220-2.

252. The Superb Plaintiffs later discovered that between May 2023 and June 2023, Deo arbitrated the purchase of aforementioned vehicle with Manheim New Jersey.

253. The inventory and floor-plan records show that the vehicle was not present at Superb when it was placed on Superb's floor-plan line and that the retail contract had not been canceled.

254. Communications and floor-plan records reflect an instruction to place the vehicle on the floor plan again on June 14, 2023 in the amount of $39,810, even though the retail sale had been canceled and the purchase from Manheim had been arbitrated. See copy of credit memo from Manheim showing vehicle was never purchased annexed hereto as **Exhibit "G."**

255. A payment record dated June 26, 2023 reflects that Superb paid its floor-plan lender in connection with this transaction. ECF 220-2.

256. In July 2023, Chase demanded the repurchase of the retail contract from the canceled sale because the vehicle was a grey-market vehicle. See **Exhibit "E."**

257. After failure to return the funds in a timely manner, the Superb Plaintiffs repaid Chase in August 2023. ECF 220-2.

258. Based on my post-August 3, 2023 review disclosed vehicle transactions in which the same vehicle or customer transaction was associated with more than one source of financing or inventory obligation; some examples are provided herein.

259. The audit identified transactions in which the same inventoried vehicle was associated with financing obligations to more than one lender, contrary to Superb's floor-plan agreements.

260. Superb's records and communications identified Deo, as general manager, as the person directing staff responsible for the floor-plan entries at issue.

261. The *Martin* transaction described below is one example in which the records reflected overlapping financing or inventory obligations for the same vehicle transaction.

262. The audit identified nearly two dozen vehicles that appeared in more than one floor-plan or financing record.

263. Those findings contributed to my decision on August 3, 2023 to remove Deo from management and order a physical inventory.

264. The Deo Defendants sold vehicles subject to Floor Plan financing by the Superb Plaintiffs' floor plan lenders without paying off the Floor Plan.

265. This created a deficiency toward repayment of the Floor Plan loan made by the Superb Plaintiffs' floor plan lenders to purchase each such vehicle.

266. As guarantor, I used funds from Superb and my other dealerships to satisfy demands made by Superb's floor-plan lenders.

267. Superb accepted customer trade-ins of vehicles to be used toward the customer's purchase of a vehicle ("Trade-ins" or "trade-in").

268. Trade-ins with existing loan or lease balances were required to be satisfied by Superb.

269. The Deo Defendants failed to have Superb pay off the existing loan or lease balances on numerous Trade-ins.

270. The prior owners of these traded-in vehicles remained liable to make payments on the remaining balance of their loan despite no longer having ownership or control of the Trade-in.

271. The Superb Plaintiffs were thus forced to pay off the loans at their own expense; some examples are described below.

272. Superb arranged financing for their customers through contracted lenders.

273. Superb has written agreements with these lenders that require Superb to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer.

274. These agreements also require Superb to repurchase any loan made by the lender to a consumer if Superb does not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title.

275. The Deo Defendants failed to have Superb perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Superb.

276. After the transactions described below were identified, lenders demanded that Superb repurchase or satisfy certain customer loans because the required lien, title, or transaction documentation had not been completed.

277. To protect Superb and my relationships with lenders used by my other dealerships, I caused payments to be made in response to lender demands

278. Records I reviewed showed that certain vehicles associated with Northshore remained in Northshore's DMV VerifiNY system after Northshore surrendered its DMV license, which interfered with completing title transfers to Superb; I was not told about that problem when the vehicles were recorded as sold to Superb.

279. Records I reviewed identify a transaction in or about April 2023 involving a 2017 Rolls-Royce Dawn[11] and an amount of approximately $192,159.

[11] On April 18, 2023, NMAC again identified the 2017 Rolls-Royce on a double-floor report. On April 19, Superb wired $210,900 to Car Buyers with a memo identifying the Rolls-Royce and two other NextGear vehicles; NextGear applied $162,708.94 to the Rolls-Royce on the Sunrise account. ECF 220 ¶¶ 67–69; ECF 220-16 at 1. Deo later swore that Urrutia placed the Rolls on Superb's floor plan without his knowledge or permission and that paperwork was forged; Thomasson later described an uncashed check. The filed records instead show a completed wire and NextGear receipt. ECF 30 ¶¶ 31–32, 47; ECF 327 ¶ 19; Thomasson Dep. 221:9–222:11.

280. In spite of being provided the title to the vehicle by Deo, Superb was never transferred the vehicle out of Northshore because it cannot be taken out of Northshore's account with the DMV VerifiNY system.

281. As a result, Superb is unable to sell this vehicle and five (5) other vehicles.

282. Records I reviewed reflect vehicle transfers from Northshore and/or Sunrise to Superb between January and April 2023.

283. I understood that a December 6, 2022 temporary restraining order addressed specified Northshore and Sunrise property.

284. The order was vacated on June 15, 2023.

285. Superb sells, on behalf of third party warranty providers, extended warranties to consumers.

286. During the post-August 3 audit, I reviewed records reflecting customer warranty fees collected by Superb and obligations to warranty companies that had not been paid.

287. The warranty records showed fees collected from customers while corresponding obligations to warranty providers remained unpaid; I did not authorize collected warranty fees to be used for an unrelated purpose.

288. The audit identified unpaid vendor obligations, incomplete registration paperwork for some out-of-state customers, and missing title documents.

289. Records I reviewed showed that certain unsold Superb vehicles were delivered to repair facilities while remaining subject to liens held by Superb's floor-plan lenders.

290. Despite due demand, however, the Deo Defendants have failed to disclose the identity or location of the various repair facilities housing these vehicles.

291. During the audit, I learned that certain unsold vehicles had been left at repair facilities, resulting in liens being placed on the vehicles.

292. I did not authorize vehicles to be abandoned at repair facilities or sold to satisfy storage or repair charges.

293. The Superb Plaintiffs remain liable to the Superb Plaintiffs' floor plan lenders to satisfy the loans on these vehicles.

294. I did not authorize Deo or any other defendant to exercise ownership or control over Team's or Superb's money, vehicles, records, or customer information outside the duties I had assigned.

295. My records review identified several separate categories of missing or disputed funds, including customer cash, checks, bank transfers, and other receipts.

296. Merckling, Blankenship, Sarah Deo, Laurie, Thomasson, and Superb's accountants performed different roles in the operations or transactions reflected in the records I reviewed.

297. Before the disputed Flushing account was opened, Deo was not an authorized signer on Superb's existing operating bank account; my understanding of this is based on the signature records for that account and period.

298. I did not authorize Deo to withdraw or transfer Superb funds for his personal benefit or for the benefit of Northshore, Sunrise, Car Buyers, Gold Coast, or another unrelated entity; the access rights for each account and period are reflected in the operative bank records.

299. The audit located checks drawn on Superb accounts that bore Deo's signature and were payable to Northshore or other recipients; I did not authorize checks for Deo's personal benefit or for an unrelated entity.

300. Two of the checks located in the audit were each in the amount of $37,500 and were payable from Superb to Northshore.

301. The records I reviewed identified lender financing associated with customer purchases that had been canceled but had not been timely terminated or returned; those records reflected an aggregate amount of at least $226,081.23.

302. I did not authorize customer loan proceeds to be retained or used for expenses unrelated to the corresponding Superb transaction.

303. Superb's continued access to floor-plan financing depended on compliance with its lender agreements, including the delivery of required financial reports and accurate inventory information.

304. In order for the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb, Superb was required to provide the Floor Plan lenders monthly financial reports.

305. During Deo's management of Superb, monthly financial reports were prepared or submitted by Deo and accounting personnel engaged by Superb through Deo.

306. The floor-plan agreements required materially accurate financial reporting and permitted lenders to restrict or discontinue financing if the reporting or collateral requirements were not satisfied.

307. Accounting personnel were engaged and paid by Superb to perform accounting work and assist with its financial reporting.

308. The records I reviewed show that the accounting personnel were performing work for Superb by at least April 2023.

309. Between at least April and July 2023, accounting personnel prepared or assisted with the monthly financial information provided to me and to Superb's floor-plan lenders.

310. The monthly reports prepared during that period included entries and adjustments that did not reconcile with Superb's DMS, bank, inventory, and lender records.

311. The records I reviewed show that the monthly reports were adjusted between at least April and July 2023.

312. The reports provided to me and to Superb's floor-plan lenders contained entries that did not reconcile with the underlying transaction records.

313. The monthly financial statements I reviewed after August 3, 2023 contained entries that did not reconcile with Superb's bank, DMS, inventory, and lender records.

314. Some of the unreconciled entries increased the profit shown on Superb's monthly reports and affected the financial information supplied in connection with the floor-plan relationship.

315. When the monthly reports and DMS entries were provided to me, I understood that they were being presented as accurate records of Superb's transactions and financial condition.

316. Examples of entries in Superb's DMS or financial statements that did not reconcile with the underlying transaction records are described below.

317. Email and accounting records I reviewed reflect that on May 12, 2023, Kendra Kernizant was instructed to make two adjusting journal entries totaling $61,559.16 for the April 2023 statement, which increased the reported profit to $27,842.00.

318. Email and accounting records I reviewed reflect that on June 12, 2023, Kernizant was instructed to make adjusting journal entries to the unit count of sold vehicles.

319. Kernizant was told that money found on schedules should be returned to income and was instructed to remove packs from the used-car inventory schedule; the records reflect an adjustment of $48,563.00 to the May 2023 statement, which increased the reported profit to $26,136.00.

320. The records also reflect instructions to adjust the count of sold vehicles so that eight unwound sales from prior months were not reflected in the same way in the current report, which increased the profit shown for Superb.

321. The accounting records reflect adjusting journal entries totaling $12,304.70 to the June 2023 statement, which increased the reported profit to $17,361.00.

322. The accounting records also reflect that money set aside for taxes was recorded as profit for Superb.

323. The records further reflect entries associated with forty-two transactions that did not close as expected; those entries increased reported gross revenue by approximately $1.5 million and reported gross profit by approximately $250,000.00 before final reconciliation. This coincides with Deo's June 14 email that closing the month "showing a profit" was an "absolute must." ECF 241-5 (JONES269); Jones Dep. 299:10–301:24; ECF 241-2 (JONES71, JONES77–79), ECF 241-3 (JONES271), ECF 241-4 (JONES272–275); Jones Dep. 302:3–312:7.

324. The April through July 2023 DMS and financial records I reviewed contain entries and unwound transactions that require reconciliation against the monthly statements.

325. The DMS and inventory records include sold vehicles and other vehicle entries that did not correspond to a vehicle then present in Superb's inventory; the examples are identified below.

326. I understood that Superb's DMS and monthly financial information would be considered by its floor-plan lenders in deciding whether to continue financing.

327. I relied on the monthly financial information presented to me in continuing my guarantees and permitting Deo to manage Superb's floor-plan relationship.

328. The floor-plan agreements required accurate financial and inventory reporting and permitted the lenders to restrict or terminate financing when those requirements were not met.

329. Had I known that the monthly reports did not reconcile with the underlying records, I would not have continued to rely on those reports or permitted the same management and reporting practices to continue.

330. Because the monthly reports did not disclose the deficiencies later identified in the audit, I was unaware before August 3, 2023 of the full extent of Superb's losses and obligations.

331. The financial statements presented to me before August 3, 2023 reflected profitability that did not reconcile with the bank, DMS, inventory, and lender records I later reviewed; those discrepancies delayed my discovery of Superb's actual financial condition.

332. After the losses and deficiencies at Superb were identified, NMAC, NextGear, and other lenders demanded payment; I caused payments to be made from Superb and my other dealerships.

333. In June 2023, before I knew that Deo intended to leave Superb, I first learned that certain vehicle transactions handled during Deo's management required Superb to repurchase retail contracts or buy back vehicles, including transactions involving grey-market vehicles.

334. I began arranging to address those lender demands and buybacks as they became known to me.

335. Learning of those particular problems in June did not disclose to me the full extent of the cash, inventory, title, lien, and lender deficiencies that I later found after August 3, 2023.

336. After the grey-market problem arose, Deo told me that he had not known that the vehicles could not be purchased or financed through Superb and agreed to contribute $75,000 toward the resulting losses.

337. Superb's July 2023 Chase statement shows a $75,000 wire credit from Northshore to Superb on July 25, 2023.

338. The same statement and the canceled checks show that Superb checks 12041 and 12042, each payable to Northshore for $37,500.00, were dated July 25, 2023 and cleared on July 28, 2023; I did not authorize either check. ECF 220-2 at 80.

339. Because the two checks total the same $75,000.00 as the wire credit, I do not treat that wire as a net $75,000.00 contribution by Deo.

## OTHER EXAMPLES OF DEO'S FRAUD IN 2023

340. The Deo Defendants routinely failed to perfect liens, resulting in liability to Superb and, ultimately, me.

341. As an example, on April 19, 2023, the Deo Defendants arranged for Superb to sell a 2017 BMW X6 to Timothy Jenkins ("Jenkins") for $37,595.00.

342. Jenkins paid $2,000.00 down (of which $1,400.00 in cash was receipted in to Superb's DMS but was never deposited in Superb's bank account, and $600.00 was paid by credit card), with the balance financed, including fees and taxes, with a lender, Chase.

343. On April 21, 2023, Chase paid Superb the financed proceeds of $40,681.20. ECF 220-2 at 43.

344. Per Deo's instruction the vehicle was not issued license plates immediately following the sale.

345. The DMV paperwork was not sent until July 12, 2023. See copies correspondence with Chase annexed hereto as **Exhibit "H."**

346. The DMV paperwork for this sold vehicle was not timely completed, and the records show that the vehicle was nevertheless placed on Superb's floor-plan line of credit; I did not authorize a sold vehicle to be placed on the floor plan.

347. The DMV paperwork remained incomplete while the vehicle appeared on Superb's floor-plan records even though it had been sold since April 2023; I did not authorize the vehicle to be represented to a floor-plan lender as unsold inventory.

348. In July 2023, Chase demanded repurchase of the retail contract because the required lien had not been perfected, as reflected in Chase's demand and the transaction records. See **Exhibit "H."**

349. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for the amount of $43,008.20. ECF 220-2 at 99 (CK #12098).

350. The Papavangjeli and Daughety transactions described above are two examples in which the records reflect that required liens were not perfected.

351. The Deo Defendants also routinely failed to have Superb pay off the existing loan or lease balances on numerous trade-ins; examples follow.

352. Example 1: On May 8, 2023, the Deo Defendants arranged for Superb to sell a 2019 Dodge Durango to Patricia Richards ("Richards") for $46,790.00.

353. Richards paid $2,500.00 down by credit card and financed the balance, including fees and taxes with a lender, TD Bank ("TD").

354. On May 15, 2023, TD paid the financed proceeds of $50,204.18. ECF 220-2.

355. The sale of the 2019 Dodge Durango produced a trade-in to be added to Superb's inventory.

356. The trade-in of Richards 2019 Dodge Caravan was valued at $12,100.00 by time of sale in October 2023; however, the Deo Defendants appraised the trade-in at $25,000.00 and added the vehicle to Superb's inventory for this amount in May 2023.

357. The payoff check to relieve Richards of her prior obligation and debt to Capital One was generated on or around July 10, 2023.

358. Payment was not forwarded to Capital One because the payoff check was held in Deo's desk drawer instead of being released.

359. The Deo Defendants did not pay off the loan from Capital One and Richards remained liable for the loan.

360. Because the trade-in lien had not been paid, the trade-in vehicle was later repossessed.

361. As a result, the vehicle was repossessed and Superb was then forced to pay the outstanding balance together with related late or repossession charges reflected in the payment records.

362. The records I reviewed did not show that the funds intended to pay the Capital One trade-in lien were applied to that lien.

363. Example 2: On June 3, 2023, Superb arranged to sell a 2016 Mercedes-Benz CLS, to Abdurashid Yusupov & Elcin Abdullaeva ("Yusupov") for $38,990.00.

364. Yusupov paid $1,000.00 by credit and financed the balance, including fees and taxes, with its lender, Ally.

365. On June 8, 2023, Ally paid Superb the financed proceeds of $38,952.95.

366. The sale to Yusupov produced a trade-in of a 2020 Nissan Maxima, valued at $26,500.00.

367. The payoff check to relieve Yusupov of the prior obligation and debt to Nissan NMAC was generated on or around July 3, 2023.

368. Payment was not forwarded to the lienholder because the payoff check was not approved for release by Deo.

369. In or about August or September 2023, the vehicle was repossessed by NMAC, after contacting the customer for payment and being informed by the customer that they were no longer in possession of the vehicle, as it had been traded-in at Superb.

370. The trade-in lien was not timely paid, and Superb did not retain the trade-in vehicle; I did not authorize the failure to pay the lien.

371. The unpaid trade-in liens exposed Superb and me, as the DMV license holder, to customer complaints and possible DMV consequences.

372. The unpaid trade-in liens affected my ability to maintain or obtain DMV licensing for dealership facilities and required me to respond to customer and agency issues arising from the unpaid balances.

373. I caused payments to be made to address unpaid trade-in obligations; the records I reviewed identify payments totaling $221,313.39 and additional payments totaling $118,530.15.

374. A further example identified in the records concerns a July 31, 2023 transaction for a 2019 Audi Q7 to Regine Raymond for $31,496.14.

375. Although a $3,000.00 down payment was required, no monies were recorded to Superb's books.

376. On August 3, 2023, Santander paid the financed proceeds in the amount of $39,618.70.

377. Raymond did not take delivery, and the vehicle was not located on Superb's lot.

378. I later observed or received information showing Deo operating the vehicle while it bore dealer plate number 6111633, which was a dealer plate he misappropriated from Superb. See copy of screenshot of text message exchange between Eugene Lowe and Bruce Novicky annexed hereto as **Exhibit "I."**

379. On June 8, 2023, the vehicle was added to Superb's floor plan line for the amount of $31,185.00 and paid off on July 24, 2023.

380. During this time, with an active Santander loan, Raymond was unable to drive the vehicle.

381. A record I reviewed, dated October 23, 2023, shows Deo operating Raymond's vehicle while it bore dealer plate number 6111633; I did not authorize Deo to use that vehicle.

382. To this day, the vehicle was never recovered by Superb, notwithstanding the fact that Superb is the titled owner.

383. Superb did not recover the Audi Q7 or the value reflected in its transaction records.

**FLUSHING BANK ACCOUNT, OWNERSHIP REPRESENTATIONS, & TRANSFERS**

384. After August 3, 2023, I uncovered bank and business records concerning Deo's unauthorized bank account opened with Flushing, and a $500,000.00 loan he obtained from Flushing for Northshore. Separate from that existing Superb balance, five NESNA ACH debits from Superb's Chase account on April 11, May 10, June 12, July 10, and August 8, 2023 total $426,967.11 and identify Northshore. Deo identified his handwriting and signature on the authorization and testified it was used to pay a Northshore advance from Superb; he identified no

written authorization and asserted that he did this pursuant to an oral agreement. ECF 11 ¶¶ 64–67; ECF 11-10 at 2; Deo Dep. 436:8–438:10, 440:1–442:20; ECF 324 ¶¶23–27.

385. Those records reflect transfers involving Northshore and accounts associated with dealerships later operated by Deo; the records and admitted testimony identify a $50,000.00 transfer – a ten percent (10%) fee – to Laurie's company, DLA Capital Partners, after the $500,000.00 loan was funded, a same-day $50,000.00 transfer to Car Buyers, a further $85,700.00 transfer to Car Buyers four (4) days later, and additional transfers to Car Buyers during April and May 2023. See Deo II Dep. 152:14-156:21; Buccino Dep. 302:13-303:2.

386. I did not apply for, receive, or control that loan, and I did not authorize Northshore loan proceeds to be used for Superb, Team, or a competing dealership.

387. I also discovered after August 3, 2023 that on April 4, 2023 Deo signed Flushing account-opening documents that identified him as a signer and one-hundred-percent (100%) owner of Superb; I never transferred one-hundred-percent ownership of Superb to Deo and did not authorize him to make that ownership representation.

388. The statement that Deo owned 100% of Superb was false; I never signed a stock certificate, stock-transfer instrument, shareholder consent, amendment, bill of sale, or assignment transferring one hundred percent of Superb to him, and although I contemplated giving him a 49% interest, he did not hold up his end of the bargain and that agreement has since been rescinded.

389. Flushing's records show that the disputed Superb account was opened on or about April 4, 2023. ECF 11-9.

390. Before the disputed account was opened, Flushing possessed historical Superb tax material identifying me as a sixty-percent owner and Robert Clarke as a forty-percent owner for 2021.

391. Those records did not identify Deo as an owner.

392. Whatever the precise percentage reflected in the operative 2023 corporate records, I had not transferred all of my ownership to Deo and remained an owner of Superb on April 4, 2023.

393. Buccino testified that Flushing possessed Superb's 2021 tax return before the account opened and that the accompanying K-1s identified me as a 60% owner and Robert Clarke as a 40% owner, while identifying no ownership interest for Deo." Buccino Dep. 268-278, 303:15–304:25; Kataev Decl. ¶ 14, **Exhibit "L"** at FLUSHING2199–2278; Kataev Decl. ¶ 15, **Exhibit "M"** at FLUSHING2052–2053;

394. My 2023 K-1 indicates that I am the 100% owner of Superb. See copy of 2023 Form K-1 for Superb annexed hereto as **Exhibit "J."**

395. David Weinstein, the Vice President and Branch Manager of Flushing's Borough Park branch, managed my intended banking relationship at Flushing.

396. Robert V. Puccio, the Vice President of Flushing's Business Banking Group located at 99 Park Avenue in Manhattan, later declared that Weinstein knew Puccio was coordinating the Superb account and knew the Great Neck joint venture involved another owner.

397. Puccio did not specifically recall knowing that the other owner was me or knowing that owner's percentage.

398. A March 31, 2023 email produced in discovery states that Puccio understood he would be opening the Great Neck joint venture Deo had with his partner and requested information for two signers.

399. Puccio later declared that Great Neck referred to Superb and that he understood the word partner to mean an owner.

400. The records available before the account opening indicated to Flushing personnel that Superb may have had more than one owner. ECF 538-1 ¶¶10–27, ECF 518-11, ECF 538-1 at 11 (FLUSHING04050), and 13-17 (FLUSHING04567-04571) (addressing the ownership/account materials and pre-opening discussion); Deo Dep. 200:4–205:22, 208:1–210:19, 309:23–317:25 (addressing what he supplied or signed).

401. I did not authorize Deo to identify himself to Flushing as Superb's one-hundred-percent (100%) owner.

402. Flushing accepted account-opening forms signed by Deo that identified him as a signer and one-hundred-percent owner.

403. I never signed those forms or transferred one-hundred-percent ownership of Superb to Deo.

404. Flushing's records show that by March 31, 2023 it had received information concerning the lawsuit filed by the IAG Plaintiffs against Deo before the disputed Superb account was opened on April 4, 2023. Buccino Dep. 305:2-18; Kataev Decl. ¶ 16, **Exhibit "N."**

405. Buccino further testified that Flushing had no system or stop to ensure required account-opening documents were received and reviewed before opening and that its system did not analyze submitted documents for conflicts or flag them. Buccino Dep. 205:10-18, 213:21-214:22.

406. I did want a Superb operating account opened at Flushing and authorized incorporation documents to be provided for that purpose; but I never authorized Deo to open the account as the sole signer and stated one-hundred-percent owner while omitting me, and I did not authorize use of the account to transfer Superb funds to Northshore or another unrelated entity.

407. I did not authorize Superb funds in the disputed Flushing account to be used to pay any defendant for conduct adverse to Superb.

408. The Superb statements identify 16 debits totaling $406,150: 15 transfers totaling $405,900 to Northshore account ending 8362 and one $250 payment to a Superb card ending 8634.

409. In his January 12, 2026 deposition, Deo agreed that he made the five May transfers shown on the statement, totaling $165,000, and testified that he alone controlled the account.

410. The same statements show additional transfers, but the testimony I reviewed does not contain an express admission by Deo that he personally initiated every one of the 15 transfers.

411. Northshore statements show matching receipts from Superb account ending 4591.

412. I did not authorize or initiate the 15 transfers totaling $405,900 from Superb account ending 4591 to Northshore account ending 8362.

413. Together with the $250 card payment, the statements show 16 debits[12] totaling $406,150; Deo expressly admitted making five May transfers totaling $165,000. Kataev Decl. ¶ 10, Ex. H at FLUSHING7115, FLUSHING07150, FLUSHING07161, FLUSHING07176, and FLUSHING07183; Deo Dep. 318-320; ECF 11 ¶ 121; ECF 518-25, Kataev Decl. ¶ 17, Ex. O at FLUSHING7242, FLUSHING07285–07286, FLUSHING07291–07292, and FLUSHING07307; ECF 437-13 at 6-7; Kataev Decl. ¶ 18, Ex. P at FLUSHING07077 and FLUSHING07094.

[12] In addition, Merckling testified that Deo asked him to go to the scene of an accident involving Deo's son and a Lamborghini; Merckling went and believed he later may have spoken with the insurer or made the claim. Merckling Dep. 240:5-17, 242:25-244:4. Zurich correspondence concerning claim 1340164772 states that Deo reported the claim on May 17, returned the representative's call on May 22, provided vehicle/repair-shop information, and selected a secure-payment link. It states Zurich issued payment after verification that the driver was an employee with permission. Zurich's payment record identifies Superb as claimant and payee, VIN 2PBA412LA01428, and $95,170.33 issued June 14, 2023. The Flushing statement records an identical June 15 Zurich credit. Kataev Decl. ¶ 21, Ex. S; Kataev Decl. ¶ 10, Ex. H at FLUSHING07161. Deo took the funds and left the Lamborghini in the shop without payment in full.

414. Discovery shows that Flushing processed account openings for Northshore and Sunrise and made a loan to Northshore while it possessed information concerning allegations in related litigation.

415. During the post-August 3, 2023 audit, I compared customer cash receipts recorded in Superb's DMS with deposits into Superb's bank accounts; I did not authorize Merckling or Blankenship to remove and retain customer cash from Superb's safe.

416. I did not authorize payments to Merckling or Blankenship from unrecorded customer cash.

417. The audit identified cash receipts recorded in the DMS that required reconciliation against bank deposits. Indeed, Superb's Chase statements through July 31, 2023 contain no entry identified as a branch cash deposit or physical customer-check deposit after the Flushing account opened. ECF 220 ¶ 46; ECF 220-2 at 39–43, 51–54, 61–64, 75–78.

418. The audit located Superb checks payable to Northshore and bearing Deo's signature.

419. During his January 12, 2026 deposition, Deo acknowledged signing check 12041 for $37,500 dated July 25, 2023.

420. He asserted that I orally authorized him to sign Superb checks; I did not authorize either of the two $37,500.00 checks.

421. In later testimony, Deo disputed the characterization that the two checks repaid the $75,000 wire and said that he did not recall the asserted repayment. ECF 11-16 at 3-4, 7-8, and 12; ECF 220-2 at 77 and 80; Deo Dep. 359:3-360:7 (asserted oral authorization, signature, and date of check 12041), 447:21-449:16 (denial of repayment characterization).

422. Before his removal, Deo caused five vehicles to be purchased through Manheim under Superb's account; the Manheim and Superb records identify the vehicles, purchase dates, amounts, and destinations.

## JULY-AUGUST 2023 DISCOVERY, REMOVAL, AUDIT, AND AFTERMATH

423. I compared the mid-year financial statement presented in this litigation with the DMS and general-ledger records available to me; the figures did not reconcile.[13]

424. On July 31, 2023, NMAC contacted Superb's Chief Operating Officer, Bruce Novicky.

425. Novicky informed me, and the related records reflect, that NMAC had identified vehicles associated with financing from more than one lender, contrary to Superb's floor-plan agreement.

426. The records reflected that more than one lender had advanced funds in connection with the same vehicle held or recorded as Superb inventory.

427. This practice is commonly called double flooring in the automobile-dealership business and is prohibited by Superb's floor-plan agreements.

428. Because of this prohibited conduct, I was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC and ultimately, NMAC terminated its floor plan financing for Superb. ECF 11 ¶¶ 99–109; ECF 11-14; ECF 220 ¶ 9; ECF 220-2; ECF 401 ¶ 1. NMAC's August 18, 2023 letter states termination effective September 18, demands the remaining balance, and identifies Team Imports LLC, Team Auto Group LLC, and Team Nissan

[13] I previously submitted a declaration concerning four March–April purchases to later June-dated certificates and a July 19 text thread in which Deo wrote to Kernizant, "Let me floor the NG cars," "How the Nextgear coming along," and "I need to do 300k both directions today," followed by July 5, 19, and 23 floor dates on the July 31 NMAC report. ECF 304 ¶¶ 48–54 and ECF 304-1.

Inc. as guarantors. ECF 17 at 7-9; ECF 38 ¶¶ 2-9 (also describing a then-current $391,698.48 NextGear demand for twelve vehicles and cumulative payoff exposure of $2,331,714.23).

429. Novicky told me that he confronted Deo about the double-flooring and that Deo's explanations did not account for the identified records and missing vehicles.

430. When Novicky informed me about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, I delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises.

431. The physical inventory and DMS comparison initially identified more than one hundred vehicles listed in Superb's records that the audit team could not locate.

432. Novicky told me that he confronted Deo about the missing vehicles; according to Novicky, Deo's explanations did not match the records or the information obtained from customers.

433. For one vehicle, Novicky told me that Deo stated the vehicle had been sold.

434. Novicky then contacted the customer listed for that transaction, and the customer denied purchasing the vehicle.

435. The audit did not locate documentation substantiating the asserted sale, and Deo was unable to provide any documentation to that effect.

436. Based on the missing-vehicle information and the explanations I received, I exercised my authority to remove Deo from Superb's day-to-day operations and directed a top-down audit. ECF 11 ¶¶ 111, 114-116.

437. The audit identified missing vehicles, unreconciled transactions, unpaid obligations, and discrepancies among the physical inventory, the DMS, the general ledger, bank records, and lender records.

438. The payment of approximately $760,000 associated with the double-flooring findings materially reduced Superb's working capital and contributed to the financial difficulties that followed.

439. I used working capital from my dealerships to make payments demanded by NMAC and NextGear.

440. Since September 2023, Superb and I have paid curtailments, interest, and insurance costs associated with the vehicles subject to the injunction. ECF 251 ¶ 32.

441. Bank and accounting records I reviewed reflect capital payments or contributions totaling $1,055,878.99 after September 20, 2023.

442. The post-August 3 review identified disputed transfers and other missing-fund categories.

443. The Flushing-account statements show 16 debits totaling $406,150: 15 transfers totaling $405,900 to Northshore account ending 8362 and one $250 payment to a Superb card ending 8634.

444. The Superb Plaintiffs were also forced to spend significant time uncovering the whereabouts of all the cars that were missing, which initially totaled 102 vehicles.

445. The Superb Plaintiffs counted 102 vehicles missing because those were the vehicles listed in Superb's general ledger which they were unable to locate.

446. It was Deo's responsibility as a general manager to maintain an accurate general ledger listing the vehicles actually in Superb's possession.

447. During Deo's tenure as general manager, Superb's general ledger did not accurately identify every vehicle then in Superb's possession or explain the location of every listed vehicle.

448. After the Order to show cause was filed in mid-August 2023, the Superb Plaintiffs found thirteen (13) of these vehicles, leaving eighty-nine (89) remaining.

449. Of those eighty-nine (89), another twelve (12) were then found, leaving seventy-seven (77) vehicles.

450. Of those, twenty-eight (28) were recovered, with an additional two (2) Isuzu flatbed trucks that were not on that list, on September 15, 2023, leaving forty-nine (49).

451. Further, six (6) vehicles remain in the possession of the Deo Defendants, leaving forty-three (43) remaining vehicles. ECF 112 ¶¶ 5–9; ECF 56-1 ¶¶ 3–5; ECF 507 ¶¶ 44–49; ECF 11-18 at 1–6; ECF 12-2 at 3; ECF 12-3 at 1; ECF 45 at 1–2.

452. The audit identified multiple vehicle transactions requiring further review, including missing vehicles, duplicate financing, incomplete title or lien work, and vehicles associated with customers who did not complete the recorded purchase. See, e.g., ECF 112 ¶¶ 12–36.

453. After removing Deo and other personnel from Superb's operations, I directed an investigation of the transactions and records created during their tenure.

## COMPETING DEALERSHIPS, CUSTOMER INFORMATION, AND OTHER DISCOVERED CONDUCT

454. In July 2023, Superb continued to conduct its dealership business from its licensed and established location at 215 Northern Boulevard in Great Neck, New York.

455. The vehicles maintained at that location were Superb's inventory and were available for Superb to advertise, display, sell, wholesale, or otherwise use in the ordinary course

of its dealership business, and – for the vehicles on a floor plan line of credit – as required by Superb's agreement with the floor plan lender.

456. Although I had allowed Deo to manage Superb's operations, I never gave him unrestricted authority to remove Superb's inventory from its lot.

457. Any authority he had to move a vehicle was limited to legitimate business purposes relating to that particular vehicle, such as taking it for service or repair.

458. Deo had no authority to move a substantial portion of Superb's inventory to another dealership for a promotional event.

459. On or about July 21, 2023, Anthony Deo and persons acting at his direction caused a substantial number of Superb's vehicles to be removed from Superb's lot and transported to Northshore Motor Leasing's premises at 180 Michael Drive in Syosset, New York. Blankenship Dep. 88:10–89:23.

460. The event at Northshore was publicly promoted as a grand opening.

461. During this litigation, Deo and certain other Defendants have sometimes called it a car show, and have specifically denied that it was a grand opening.

462. Publicly available information on Instagram suggests otherwise. See copy of Instagram post annexed hereto as **Exhibit "K"** ("A grand opening you don't want to miss"); Blankenship Dep. 123:17–124:15; Merckling Dep. 200:3–24, 201:2–9.

463. Whatever label they now use, it was a promotional event intended to attract customers, public attention, and business to Northshore or Gold Coast and the dealerships with which Deo was then involved with other than Superb.

464. I did not know in advance that this event was being planned.

465. I did not receive any text message, email, telephone call, or other communication advising me that Superb's vehicles would be removed for the event.

466. I did not authorize Deo to move Superb's vehicles to Northshore for a grand opening, car show, or any other promotional event.

467. I likewise did not authorize him to use Superb's inventory, employees, or other resources to promote Northshore, Sunrise, or any other dealership in which he claimed an interest.

468. I did not agree that Superb was relocating its operations to Northshore or to any other dealership.

469. Superb remained a separate dealership operating from 215 Northern Boulevard.

470. Nothing I said or did authorized Deo to hold out Superb's inventory as the inventory of Northshore or any other business.

471. I later learned that many of the vehicles normally maintained at Superb had been displayed at the event at Northshore.

472. I also learned that the movement of the vehicles was sufficiently extensive that persons familiar with Superb's inventory believed that Superb was closing or moving its operations.

473. I further learned that, when non-party Nethanel Orgad asked Deo why so many of Superb's vehicles had been moved, Deo stated in substance that he was moving the cars to Northshore and Sunrise because he was holding a grand opening and wanted to fill the showroom.

474. This was consistent with what I observed and later learned from Superb's records: a substantial portion of the inventory that should have been present at Superb was instead located at Northshore and other locations associated with Deo.

475. The vehicles were not promptly returned to Superb when the July 21, 2023 event concluded. ECF 11-18, ECF 12-2, ECF 12-3, ECF 45, ECF 56-1 ¶ 5, and ECF 112 ¶¶ 7–9; ECF 536 ¶¶ 951 and 964.

476. This made clear that the movement was not merely a temporary accommodation for a one-day event as Deo represented throughout this litigation.

477. Superb remained financially responsible for its vehicles and the obligations associated with them while Deo and those acting with him retained physical possession.

478. Because the vehicles were not at Superb, Superb could not freely display, advertise, retail, wholesale, refloor, or otherwise dispose of them in the ordinary course of business.

479. The removal therefore deprived Superb of the use of its inventory while leaving Superb exposed to the corresponding floorplan, payoff, title, and customer obligations prompting Superb's request for a preliminary injunction early on in this case.

480. The vehicles' absence also interfered with Superb's ability to generate the proceeds necessary to satisfy those obligations.

481. Instead of being used for Superb's benefit, Superb's assets were being used to promote dealership operations that Deo was developing apart from Superb.

482. The vehicles did not return voluntarily in the ordinary course.

483. On September 15, 2023, after a settlement conference before this Court, approximately thirty (30) vehicles were returned from Northshore to Superb.

484. Even then, not all of the vehicles removed from Superb had been returned.

485. The fact that approximately thirty (30) vehicles remained at Northshore until court intervention confirms the scale and duration of the unauthorized removal. ECF 40 ¶¶ 9–18, 20–

26; ECF 156-1 at 117:5–118:2; Blankenship Dep. 62:11–20, 89:19–90:2, 100:13–102:3, 141:24–146:2; Merckling Dep. 223:7–225:16, 305:7–16; Deo Dep. 57:1–22; ECF 56-1 ¶¶ 3–5.

486. This was not a situation involving one or two vehicles temporarily taken to a local event and brought back the same day.

487. From my perspective as Superb's owner, the July 2023 grand opening event was one part of a broader course of conduct in which Deo used Superb's vehicles, personnel, relationships, and financial resources to establish and promote dealership operations for himself at Northshore, Sunrise, and/or Gold Coast while leaving Superb responsible for the resulting liabilities.

488. Had Deo told me that he intended to remove Superb's inventory to fill another dealership's lot or showroom for a grand opening or car show, I would not have authorized it.

489. I first learned the full extent of what had occurred only after the vehicles had been removed and I began reviewing the condition of Superb's lot, its vehicle records, its floorplan obligations, and the information later provided by witnesses and obtained in this litigation.

490. Critically, I was on vacation with my family in Europe when Deo conducted this grand opening event; he apparently seized on my absence to strike then.

491. Deo's unauthorized removal and retention of Superb's inventory substantially damaged Superb by depriving it of possession and saleable inventory, interfering with its ordinary operations, and forcing Superb and me to address obligations associated with vehicles that Deo had removed and used for the benefit of other dealerships.

492. During discovery, I learned that Laurie understood the purpose of the July event to be to "drum up business for the dealerships" and described it as marketing.

493. That testimony confirmed my understanding that Superb's vehicles were used to promote dealership operations other than Superb.

494. I also learned that the event had been planned for at least several weeks before July 21, 2023.

495. Despite that advance planning, no one requested my permission to use Superb's inventory and no one advised me that the vehicles would be removed.

496. Dwight Blankenship later acknowledged that vehicles were moved from Superb to Northshore in connection with the July 21, 2023 event.

497. Although he characterized the event as a car show, the advertising shown to him described it as a grand opening.

498. Marc Merckling likewise admitted that a car show occurred on or about July 21, although he declined to accept the grand-opening description appearing in the promotional material.

499. His choice of terminology does not change that Superb's vehicles were transported to and displayed at Northshore.

500. Based on these events, I inferred that Deo intended to keep the vehicles he moved from Superb to Northshore to sell them.

501. The audit led me to investigate newly formed Gold Coast entities and whether Superb's vehicles, funds, or customer information had been used in connection with those businesses.

502. Corporate records I reviewed show that Deo formed or was associated with GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, GCC Smithtown, and Gold Coast Motors Automotive Group.

503. Other records indicated that certain assets or information associated with Superb were used in connection with those entities; I did not authorize that use.

504. I later learned that customer-lead or CRM information belonging to Superb had been accessed or used in connection with competing dealerships; I did not authorize that information to be copied, retained, or used outside Superb. ECF 38 ¶¶ 63–69 and ECF 38-12; ECF 50-1 ¶¶ 31–47; ECF 11 ¶¶ 132–141, 164–185; ECF 304 ¶¶87–88.

505. Based on the coordinated efforts between Deo, Sarah, Thomasson, Laurie, Blankenship, and Merckling, I can infer that they were working together for the common plan and goal of obtaining operational control over dealerships in order to conduct their fraudulent schemes and siphon money out of the dealerships.

506. Records I reviewed show that Sarah Deo had access to the disputed bank account and to Superb's CRM information; I did not authorize her to transfer Superb funds for an unrelated purpose or to use Superb's CRM information outside Superb.

507. I did not authorize Blankenship or Merckling to take or retain Superb customer cash.

508. When I contacted the Nassau County Police Department about removing Deo and the conditions at Superb, I was told that the matter was civil.

509. The financial records I reviewed contained entries and discrepancies that require reconciliation.

510. By the time the witnesses were deposed, the case no longer depended only on what I had reconstructed from Superb's records.

511. The testimony of the people who handled the accounts, deposits, vehicles, customer systems, lender documents, and financing supplied independent details about the roles summarized below.

**LATER SWORN TESTIMONY AND DISCOVERY CORROBORATION**

512. At the February 20, 2024 hearing, Merckling described repair, inventory, spreadsheet-location, and lender-audit work for Deo at Superb.

513. Blankenship testified that he was an operations manager, was regularly present at Superb, transported vehicles at Deo's or Merckling's direction, and moved Superb vehicles to Northshore for its grand opening.

514. Eugene Lowe testified that Northshore had no inventory of its own for that event and that the vehicles came from Superb. See Merckling Dep. 223:7-225:16; Blankenship Dep. 62:11-20, 89:19-90:2, 100:13-102:3, 141:24-146:2; ECF 156-1 117:5-118:2; Deo Dep. 57:1-22; ECF 40 ¶¶ 9-18, 20-26.

515. Merckling testified that he counted money already received, deposited customer cash at Chase and Flushing, tracked inventory, met with floor-plan auditors, and helped complete audit forms.

516. Those functions placed Merckling at the operational points where customer cash, bank deposits, inventory, lender audits, and dealership records intersected; his work was not limited to security.

517. Merckling also testified that he knew the location of the six vehicles regulated by the injunction and participated in transporting them from Deo's residence to Hicksville.

518. Blankenship testified that he worked for Deo, repaired and moved vehicles, handled alarms and physical closing functions, was regularly present at Superb, transported vehicles at

Deo's or Merckling's direction, and moved Superb vehicles to Northshore for the grand-opening event.

519. Lowe testified that Northshore had no inventory of its own for that event and that the vehicles came from Superb. ECF 156-1 at 117:3-18.

520. Deo acknowledged that Superb vehicles were taken to the event, although he disputed the details.

521. Blankenship is the direct event-transport witness; Merckling's separate vehicle evidence concerns the six later-regulated vehicles.

522. Merckling testified that for several months before the July 2023 event Northshore was not operating or selling cars and was only fixing cars. Merckling Dep. 305:7-16.

523. I reviewed Nethanel Orgad's filed sworn declaration. ECF 40.

524. Orgad stated that Deo required cash payments to be made to Merckling, that Merckling confirmed payment so vehicle titles would be released, and that Merckling later offered an identified group of vehicles for sale, negotiated the price, and demanded cash-only payment. Id.

525. Orgad also stated that he attended the July event at 180 Michael Drive, observed Superb vehicles there, and was told by Deo that vehicles were being moved to Northshore and Sunrise to fill the showroom for a grand opening. Id.

526. I did not authorize payments to Merckling or Blankenship from unrecorded customer cash. See Kataev Decl. ¶ 19, **Exhibit "Q"** at FLUSHING07212, FLUSHING07216, FLUSHING07223; and Kataev Decl. ¶ 17, **Exhibit "O"** FLUSHING07300.

527. The filed June 6, 2023 roster identifies Merckling as Chief Security Officer and Sarah as Vice President of Gold Coast Motors Automotive Group. ECF 38-12.

528. The same roster identifies Deo as President, Michael Laurie as Chief Financial Officer, and Dwight Blankenship as Operations Manager.

529. It therefore places Deo, Sarah, Laurie, Merckling, and Blankenship in formal leadership or operational roles in the same Gold Coast organization.

530. The filed exhibit also contains officer acknowledgments signed by Merckling and Laurie.

531. Merckling signed an acknowledgment accepting the terms and responsibilities of that officer position.

532. I rely on the roster and acknowledgment as evidence of their formal roles in that related dealership organization. Merckling Dep. 184:4-10, 185:10-17, 187:17-189:23; Deo II Dep. 175:19-176:7.

533. Deo later testified that Merckling was a guarantor when asked why a UCC search listed Merckling as a debtor for Gold Coast Motors of Syosset. Deo II Dep. 175:23–176:7.

534. I rely on Deo's sworn answer as evidence that Merckling's role extended to credit support.

535. Laurie admitted making the Flushing referral and testified that he may have helped Puccio obtain client documents.

536. Laurie served as Deo's financial consultant and business manager, helped obtain the $500,000.00 Flushing financing (as well as the $735,000.00 Libertas funds and $100,000.00 Hakim loan), jointly selected his business title with Deo, maintained an office at Superb and a Northshore-domain email address, received payments personally or through DLA Capital Partners, and received a $50,000 referral fee on $500,000 in financing. Thomasson Dep. 136:5-137:22, 178:9-21; Patrovic Dep. 48:21-51:2; Buccino Dep. 65:15-22, 124:13-24, 306:9-309:8; ECF 437-

8, Kataev Decl. ¶ 20, **Exhibit "R"** at FLUSHING6517, FLUSHING6520; Deo Dep. 350:9-17, Laurie Dep. 82:2-18, 188:2-20.

537. Jones worked with Deo and Thomasson concerning an ownership document furnished to Flushing and that Thomasson exchanged at least two communications with Flushing.

538. This was transaction-specific work concerning ownership proof and lender communications in the same financing transaction, not merely general professional contact.

539. Thomasson testified that he discussed the Justice Gianelli's temporary restraining Order with Deo and knew that Deo expected to purchase, but had not yet purchased, the other half of Superb.

540. A later email warned that moving money known to be the subject of a judicial proceeding would be a "serious mistake" while relaying Jones's ownership and tax assurances.

541. Those communications show that Thomasson was participating in the ownership and financing issues with knowledge that ownership and restraints were disputed.

542. Flushing's witness testified that Thomasson's March 31, 2023 letter gave the bank confidence in Deo's ownership representations[14] and that the letter, Jones's affidavit, and the total application package contributed to the bank's decision to proceed despite the lawsuit.

543. Public records identify Car Buyers, UEA, and several Gold Coast entities at 180 Michael Drive in Syosset and identify DLA at 1387 Monroe Street in Floral Park.

[14] In addition, an August 1, 2023 conditional commitment from Meadowbrook Mortgage identifies Deo as borrower for 3 Hunting Lane and a proposed $2,768M loan, subject to conditions including a CPA letter concerning 100% business ownership, a no-adverse-business-use letter, a signed third-party year-to-date P&L, and bank statements documenting source of funds. Kataev Decl. ¶ 22, Ex. T. Critically, Laurie testified, "we tried to get him a home loan," and separately testified that Urrutia "must have still owned the majority" and that he did not believe Deo owned 100% of Superb. See Laurie Dep. 103:21–105:21, 140:2–142:7.

544. I rely on the common address as evidence of an administrative connection among those entities when considered with the actor-specific bank transfers, officer roles, and operations described above; for example, the First Amended Verified Complaint in JCJD Inc. d/b/a Cherrywood Auto Sales and Service v. Deo, *et al.*, alleges diversion of sales proceeds, warranty money, and receivables and alleges use of Gold Coast/Regal entities. Thomasson testified that these allegations were similar to the allegations in this case. See Index No. 616451/2025NYSCEF 16 ¶¶1–6, 28–40; Thomasson Dep. 78:9–80:3.

545. Manheim records identify five purchases charged to Superb's auction account, including the VIN, date, amount, destination, and, where shown, buyer.

546. I attribute a purchase to a person only when the buyer field, communication, or testimony identifies that person.

547. My comparison of the mid-year statement with the DMS and general ledger found unreconciled figures, but I do not state a numerical discrepancy without a final reconciliation.

548. The records also identify particular transactions in which another person's identifying information may have been used.

549. Records produced in this litigation include a February 22, 2023 DMV application associated with GCC Sunrise and records concerning Deo's prior federal conviction. ECF 385-2; ECF 385-3.

550. The events and deficiencies described above caused losses to Superb and Team and resulted in lender demands, unpaid vendor or customer obligations, and harm to my dealership operations. ECF 38 ¶ 63.

551. The records reviewed in this case identify particular transactions in which another person's identifying information may have been used.

552. Customer and transaction records concerning Barnes reflect that she was told on or about March 28, 2023 that she had approval to purchase a vehicle.

553. Those records reflect a $2,000 credit-card down payment and that Barnes did not receive the vehicle when promised.

554. The customer complaint and financing records reflect that Barnes contacted Ally, learned that her application had been denied, and learned that a second application had been submitted for her spouse.

555. According to the customer complaint and related records, Barnes' spouse did not authorize the second financing application.

556. I learned that Barnes' spouse canceled the contract and made a complaint to the Better Business Bureau.

**IDENTIFIED ENTITIES AND INDIVIDUALS**

557. Business and public records I reviewed list Car Buyers NYC Inc., Gold Coast Motors of Syosset LLC, Gold Coast Motors of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Cars of LIC LLC, Gold Coast Cars of Roslyn LLC, Gold Coast Cars of Smithtown LLC, and UEA Premier Motors Corp. as corporations or limited liability companies with a principal place of business at 180 Michael Drive, Syosset, New York.

558. Business and public records I reviewed list DLA Capital Partners Inc. as a corporation with a principal place of business at 1387 Monroe Street, Floral Park, New York 11001.

559. Laurie represented to me that he's an advisor, financier, and unofficial partner of Deo's. Laurie Dep. 131:23-132:5, 102:16–23, 82:1-18, and 140:2-141:6.

## LOSSES AND VALUATION

560. The harm to me was not limited to disputed line items on a spreadsheet.

561. These dealerships represented decades of work, my savings, my credit, and my reputation with lenders, customers, vendors, and employees.

562. Once vehicle payoffs, lender demands, title problems, bank transfers, missing inventory, and customer obligations converged, I had to use money from my other stores and my personal resources simply to keep obligations from cascading further.

563. As the dispute continued, I lost stores that I had spent years building and was forced to sell my family home in New Jersey to pay legal expenses and address the fallout.

564. Superb, Team, and I sustained substantial losses after the events described above.

565. Based on my more than thirty years in the automobile industry, my ownership and direct oversight of the four dealerships, and my review of their ordinary-course financial and transaction records, I respectfully submit that, before the consequences of the Deo Defendants' conduct fully ripened, the dealerships had a combined value of approximately $15 million to $20 million. That valuation is supported by more than my personal estimate: when the three franchised dealerships were marketed in 2024 – after the misconduct had already begun to cause financial distress – independent prospective purchasers initially proposed headline purchase prices of $5.5 million for the goodwill and operating assets of Volkswagen of Freehold, $1.8 million for the goodwill and dealership assets of Team Nissan of Pittsfield, and $2.5 million for the goodwill and dealership assets of Team Mitsubishi-Hartford, before some combination of separately priced parts, fixed assets, receivables, and vehicle inventory; although those earlier letters-of-intent and draft agreements were nonbinding, they provide objective market corroboration of at least $9.8 million for those three dealerships alone and, in my judgment, establish a conservative floor for

what those businesses were worth before the distress. See copies of appropriately redacted letters of intent and related documents establishing valuations annexed hereto as **Exhibit "O."** When the parts, furniture, fixtures or other fixed assets, and receivables shown in the closest contemporaneous financial statements I reviewed – without including new or used vehicle inventory – the gross asset-side support was approximately $8.17 million for Volkswagen, $2.88 million for Nissan, and $3.07 million for Mitsubishi, subject to liabilities, collectability, and final closing adjustments. I conservatively valued Superb at approximately $2.5 million based upon its established high-end used-car operation, its saleable inventory and floor-plan capacity, its protected CRM and customer relationships, its lender and vendor relationships, and its accumulated goodwill; Superb's 2022 tax records further show the scale of that enterprise, including $18,730,333 in gross receipts and $1,311,227 in W-2 wages, figures I considered together with the temporary ordinary loss associated with the post-pandemic inventory correction. See copy of Superb 2022 tax return annexed hereto as **Exhibit "M."** Superb's 2023 federal income-tax return further corroborates both the scale of the dealership and the financial deterioration that occurred during the year in which the Deo Defendants' conduct was discovered. See copy of Superb 2023 tax return annexed hereto as **Exhibit "N."** The return reported $15,058,531 in gross receipts and $1,015,804 in W-2 wages and separately reported $816,914 in service-contract, finance-and-insurance, and license-and-title-fee income. Id. At the same time, cost of goods sold exceeded gross sales by $95,544, and, after operating deductions, Superb sustained a $1,625,191 ordinary business loss; its inventory declined from $2,446,353 at the beginning of the year to $1,571,391 at year-end, and its total book assets declined from $3,982,748 to $1,697,139. Id. My shareholder-basis schedule further reports $4,104,654 as basis from capital contributions during 2023. Id. I considered these figures, together with Superb's inventory,

workforce, customer relationships, operating systems, lender relationships, and goodwill, as evidence that Superb was a substantial operating dealership and that extraordinary capital was required as its financial condition collapsed. I did not equate gross receipts or book assets with fair market value, and I rely upon the underlying bank, lender, title, vehicle, and funding records described above—not the tax return standing alone—to establish the cause of Superb's losses. Separately, the three third-party headline proposals, together with my conservative valuation of Superb, therefore support the approximately a $15 million valuation, which is at the lower end of my estimate, while the separately recorded assets support an aggregate gross value approaching $20 million without counting vehicle inventory. The later executed APA base prices – $4 million for Volkswagen, $1.8 million for Nissan, and $1 million for Mitsubishi – did not represent what I believed the dealerships were worth in the ordinary course, but rather the reduced prices obtainable after the crisis caused by the Deo Defendants had impaired their liquidity and operations; Volkswagen's proposed purchaser ultimately terminated its transaction, Nissan's closing proceeds were entirely consumed by required payoffs and expenses, and Mitsubishi's proposed transfer was rejected by Mitsubishi Motors of North America. See **Exhibit "O."** The causal connection among all four dealerships was direct: I had personally guaranteed and cross-collateralized their financing, and, after the double-flooring and other unauthorized vehicle and banking conduct described above surfaced, NMAC identified twenty-two double-floored vehicles, required a $760,868.75 cure payment, and ultimately terminated Superb's floor-plan financing, while the NextGear line available through Team was also terminated and the vehicles later recovered could not be sold in the ordinary course; without floor-plan financing or the ability to sell that inventory, Superb could not continue functioning as a retail dealership. To prevent those defaults from cascading across the cross-collateralized group, I transferred $3,382,776 from my other dealerships and an additional

$783,000 from my personal resources to satisfy Superb-related payoff and operating obligations, thereby draining working capital from Volkswagen, Nissan, and Mitsubishi at the same time that lender demands, repossessions, grounded or restricted inventory, title problems, and the loss of financing made continued operations and ordinary-course sales impossible. This rapid depletion of nearly $5M due to the Deo Defendants' conduct caused the demise of all four of my dealerships and what I spent three (3) decades of my life building. Although I had considered discontinuing Superb's used-car operation in late 2022 before deciding to continue it with a new operator, and again considered closure when losses appeared during Deo's management, I chose to keep the dealership operating based on Deo's misrepresentations that he was properly and profitably operating Superb, although I later learned that the latter financial picture was itself affected by his deliberate acts in inaccurate reporting, undisclosed transactions, and other misconduct described herein; thus, those earlier considerations were not an independent decision or preexisting plan to close Superb. None of the four dealerships was otherwise slated or required to close, and, based on my personal knowledge of their operations, finances, employees, inventory, lender and manufacturer relationships, and the sequence by which the crisis spread from Superb to the three cross-collateralized franchise stores, I know that each dealership would have remained in operation, and none would have closed, but for the Deo Defendants' conduct and the resulting liquidity, lender, inventory, regulatory, and litigation consequences.

566. That accounting discipline does not change the sequence I personally experienced: I sought management help, retained ownership and final authority, later discovered unauthorized control over accounts, credit, records, customer information, and vehicles, and then supplied millions of dollars from other businesses and personal sources to address the resulting obligations.

**JULY-SEPTEMBER 2023 CHASE RECONCILIATION AND PAYOFF FUNDING**

567. Between July 2023 and September 20, 2023, after Superb's funding and payoff deficiencies were identified, I caused funds from other dealerships and from my personal resources to be transferred to or for Superb so that Superb could meet NMAC and other vehicle-payoff and operating obligations.

568. I submitted the Chase statements and accounting in response to the Deo Defendants' contention that I had taken $760,868.75 from Superb and had not supplied the funds I claimed. ECF 220 ¶¶ 9-15 and n.5; ECF 220-2 (underlying Chase statements); ECF 220-4 (Summary of Financials).

569. The Chase statements and the summary reflect $3,382,776 identified as dealership or store funding for July through September 2023 and $783,000 identified as personal funding for the same period, for a combined total of $4,165,776. ECF 220-2 (Chase statements); ECF 220-4 (Summary of Financials), entries labeled 'Store July-Sept' ($3,382,776), 'Personal July-Sept' ($783,000), and combined total ($4,165,776); ECF 220 ¶¶ 12-15.

570. The accounting was prepared from bank statements for Superb, my other dealerships, and my personal funding sources to trace inflows and outflows across the accounts. ECF 220-4; ECF 220 ¶¶ 9-15 and n. 5; ECF 220-2.

571. The total damages sustained by the Superb Plaintiffs that have been ascertained to date is summarized as follows: (i) over $2.5M in inventory and other losses in order to conceal the theft of over $2.0M in cash, checks and ACHs causing over $4.5M in losses; (ii) the value of the injuncted vehicles ($1.5M) and the losses incurred on the depreciation of those vehicles, totaling approximately $500,000.00 to date; and (iii) attorneys' fees, as well as numerous other outstanding liabilities that still remain to be determined at trial.

## CONCLUSION

572. I state the core facts directly.

573. I never transferred one-hundred-percent ownership of Superb to Deo. Although the Cross-Purchase and Shareholders' Agreements contemplated or stated a forty-nine-percent interest, I did not execute a separate stock certificate or transfer instrument, Deo did not perform the conditions I understood were required, and I contend that any claimed interest failed or was rescinded.

574. I never authorized Deo to represent himself as Superb's sole owner, open separate Superb accounts as sole signer, transfer Superb money for Northshore or Car Buyers, direct unsupported profit-increasing entries, use Superb's customer information for another dealership, or retain Superb vehicles after demand.

575. The same people repeatedly appeared at the necessary points of execution.

576. Sarah provided recurring entity, Northshore banking, customer-system, and dealership operations; Jones provided the financial entries, statements, and ownership materials; Merckling and Blankenship handled cash, deposits, audits, inventory, and vehicles; Thomasson provided the attorney-account, legal, and lender-communication channels; and Deo directed the activity and controlled the principal receiving entities.

577. The same recurring actors appeared at connected steps involving ownership materials, financing, bank accounts, accounting entries, customer information, inventory, and vehicle movement.

578. The combined result I observed was that control of Superb's property and business resources was moved away from me and placed under Deo's control without my authorization.

579. The bottom line is that ownership was not transferred; authority was limited; the challenged accounts, transfers, entries, competing use, and post-demand retention were not authorized; and the same group supplied the functions by which those acts were carried out.

580. I entered the relationship in 2022 because I believed Deo and Laurie could help operate and finance Superb while I managed other dealerships.

581. I did not know their prior history, and I did not understand that the same people and entities would later appear in the ownership papers, lender submissions, bank accounts, accounting entries, customer systems, cash handling, vehicle movement, and competing operations described above.

582. Once the documents are read together, the story is not one of a single bookkeeping mistake or a failed partnership.

583. It is the story of limited management access being used to take control of the business I had spent decades building.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3rd, 2026.

Robert Anthony Urrutia (Sep 3, 2026 18:51:23 PDT)

Robert Anthony Urrutia