Exhibit E to
Ronneburger Dec.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------------------x

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HIGHWAY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs, Case No.

- against - 2:23-cv-6188 (JMW) COUNTY

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

--------------------------------------------x

333 Earle Ovington Boulevard
Uniondale, New York

January 8, 2026
10:00 a.m.

Deposition of Plaintiff, ROBERT ANTHONY URRUTIA, pursuant to Court Order and Notice, before Diana Mitchell, a Notary Public of the State of New York.





A P P E A R A N C E S:

SAGE LEGAL LLC
Attorneys for Plaintiffs Superb Motors, Inc., Team Auto Sales, LLC and Robert Anthony Urrutia
18211 Jamaica Avenue,
Jamaica, New York 11423-2327
BY: EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
Attorneys for Plaintiffs 189 Sunrise Highway Auto LLC, Northshore Motor Leasing, LLC, Brian Chabrier, Joshua Aaronson, Jory Baron, Asad Khan, Iris Baron Representative of the Estate of David Baron, all Hylan Blvd Auto LLCs, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC
420 Lexington Avenue, Suite 2320
New York, New York 10170-0002
BY: JEFFREY RUDERMAN, ESQ.
(via Zoom)





A P P E A R A N C E S (Cont'd):

HARRY R. THOMASSON, ESQ.
Pro Se Defendant
3280 Sunrise Highway
Wantagh, New York 11793

CULLEN & DYKMAN, LLP
Attorneys for Defendant Flushing Bank
333 Earle Ovington Boulevard
Uniondale, New York 11553
BY: ARIEL RONNEBURGER, ESQ.

WEIR, LLP
Attorneys for Defendant Libertas Funding, LLC
The Widener Building
1339 Chestnut Street, Suite 500
Philadelphia, Pennsylvania 19107
BY: JEFFREY CIANCIULLI, ESQ.
(via Zoom)

ALSO PRESENT:
ANTHONY DEO
SARAH DEO
ALIVIA COONEY, Paralegal





IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the filing, sealing and certification of the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

- oOo -

ROBERT ANTHONY URRUTIA,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

THE COURT REPORTER: Please state your full name for the record.

THE WITNESS: My name is Robert Anthony Urrutia.

THE COURT REPORTER: Please state your address for the record.

THE WITNESS: My address is Estancia Del Sol, La Garita, Costa Rica.

* * *

EXAMINATION BY
MR. THOMASSON:

Q Good morning, Mr. Urrutia. My name is Harry Thomasson. I'm taking your deposition this morning.
Have you taken any medications or drugs of any type that would impact your ability to understand my questions this morning?





A None.
Q Is there any reason that you wouldn't be able to understand my questions this morning?
A None.
Q If I ask you any question that you don't understand, please let me know, I'm happy to rephrase it, all right?
A Okay.
Q Mr. Urrutia, where did you go to high school?
A Emerson Junior-Senior High School in New Jersey.
Q Did you go to college?
A No. I went one year but didn't finish it.
Q Where was that one year of college?
A Fairleigh Dickinson University.
Q Do you have any professional licenses of any type?
A No.





Q Do you have any professional training of any type?
A NADA School for Automotive.
Q Do you know what that stands for, NADA?
A National Association of Dealers, or something like that. I don't know that.
Q And that training consisted of what?
A Running dealerships, fixed operations, sales.
Q How long ago did you take that?
A Probably 20 years ago.
Q Was that a one-time course?
A Yeah, takes about a week or ten days.
Q Where did you go to take that?
A I forgot which state it's in.
Q But it was another state?
A Yeah.
Q Do you have any problems with





your memory at all, sir?
A No.
Q Please be sure to speak up so we can all hear, okay?
MS. S. DEO: Yes, thank you.
THE WITNESS: Sure.
Q When did you first meet Anthony Deo?
A I believe it was February of '22.
Q So that would be about --
A Nine months before.
Q -- nine months before you entered into a contract with him?
A Correct. I had nothing to do with that, though.
Q What were the circumstances under which you met Mr. Deo?
A I was introduced to him. I believe he was looking to get a partner in a dealership he was looking to buy or invest in.
Q Do you know what dealership that was?

everything.
Q Have you seen those emails?
A Yeah, I've seen everything, including your discovery, which is substantial.
Q You believe that you produced an operating agreement from Superb to Flushing Bank?
A I produced, I believe, just the -- the filing receipt, and there's one other piece of paper. Oh, the filing receipt and the EIN.
Q What documents do you believe that you gave to David Weinstein?
A I mean, everything he asked me for to open an account. I don't remember exactly, because some were LLCs and some were S corporations, so they required different types of documents, but in all of those documents, the only name that appeared was mine.
Q But you personally may not have provided him with these documents?
A No, but I was copied on the





email.
MS. RONNEBURGER: I am going to mark as Flushing 2 this document.
(Flushing Exhibit 2, Email Chain, marked for identification.)
MS. RONNEBURGER: I just want to confirm, Flushing Exhibit 1 was produced as Superb 000497 through 498. Flushing 2 was 000491 to 000492.
Q Have you seen these emails, Mr. Urrutia?
A I have.
Q Are you copied on these emails?
A These emails, no.
Q What are these emails?
A I think it was request for additional paperwork.
Q It was sent to who?
A To Bruce.
Q And they are from Leslie Cusano at Flushing Bank?





A Correct.
Q A moment ago you told me you were copied on the emails between Flushing Bank where they were providing documentation; is that correct?
A This is a request, I was copied where we actually sent the documentation, where the tax returns were attached.
RQ MS. RONNEBURGER: I would ask to the extent those were not produced, that you produce them.
We'll double-check, but to the extent his actual emails from his Gmail were not produced, we would ask to see them.
MR. KATAEV: Sure. You'll follow up in writing?
RQ MS. RONNEBURGER: Yes.
On Flushing 1, this text cuts off mid text. It says, "I wanted to follow up with you in more detail about our call yesterday. I sent you an email. The details are





there. I also wanted to tell you that you should open a," and then it stops. We'll follow up in writing, but if you could produce the substance of that email.
MR. KATAEV: Sure.
MS. RONNEBURGER: Thank you.
A For which one?
Q It was Flushing 1. It just cut off mid text.
MS. RONNEBURGER: I am going to mark this as Flushing 3. This particular document was produced as Deo 0000487 through 89.
(Flushing Exhibit 3, Email Chain, marked for identification.)
Q I will just give you a couple of moments.
Mr. Urrutia, do you recognize this email?
A I do.
Q On March 30, 2023, you told Robert Deo that you had already started the process a few days ago with Dave

Weinstein from the bank, you know him well; is that correct?

MR. KATAEV: You said Robert Deo.

MS. RONNEBURGER: I'm sorry, Anthony Deo.

A Yes, I did.

Q That process refers to the application process we just spoke about?

A Yeah, opening of the accounts.

Q Did you actually complete an application, if you know?

A I know we were very close. I know it was taking a long time. I chose at the end not to, but I don't know if we submitted everything. But around then we started again in August where they were going to actually come out with the dealerships, and the day of or the day before is when I opened the drawer and found all the statements.

Q You knew Dave Weinstein previous to this process?





A I knew -- I knew -- not before. Michael Morgan is a good friend from the car business, and he introduced me to him, and he said he was wonderful, that he had a great relationship with him, so that's where I knew him well, because Mike Morgan has a great relationship with him.

Q But you didn't know him well personally?

A No, no.

MS. RONNEBURGER: I am going to turn to what Mr. Thomasson had marked as Exhibit L previously.

MR. THOMASSON: Are we on the first page of that Exhibit?

MS. RONNEBURGER: Yes.

Q It's an email from Anthony Deo sent Monday, April 3, 2023, at 11:45 a.m. to Bruce Novicky and to you, Mr. Urrutia. Do you recall this email?

A I do.

Q In this email it states David Weinstein didn't have any of the





information for Superb to send over to Rob. Previously you had testified that either you or someone on your behalf had provided information to Mr. Weinstein, correct?

A Correct.

Q Did this surprise you to see Mr. Deo say this?

A It did.

Q Did you reach out to Mr. Weinstein and ask why he didn't have this information?

A I believe he might have sent me an email and asked me if it was okay to share again, not just a text, but I think it was also an email. And at this point, I think at some point Anthony Deo said that he knew people in the bank and had them in his pocket and could rush it because I'm going to be opening up a commercial account, takes forever, you know, they want, you know, your DNA, your everything. And he says, "Well, I know I have somebody in my pocket, the





underwriter and the VP. You know I can get it done quickly." And you know, that was a conversation.

I know at some point Bruce called me, he says, "You know Anthony says he still hasn't gotten the information." I said, "Just send it to him." But again, it's a filing receipt and some other pieces. I know it was two pieces of paper. It isn't -- I know there is a Know Your Customer, right, especially with the amounts of money we're talking about. Going through the accounts, I mean, I didn't think that was something that was created, which is Anthony opening an account as 100 percent owner without me knowing and having full control of.

Q Well, to that point you have stated that you didn't know Anthony was opening an account; however, did you, in response to these emails from Anthony, forward him the information he was asking for?

A I didn't, but I think Bruce might have.
Q Why was Anthony, Mr. Deo, provided with that information?
A Because we thought he could maybe move the opening of the accounts along just because.
Q Did you ever open an account with Flushing Bank?
A I didn't.
Q But you understood Mr. Deo to be working on opening an account with Flushing Bank?
A I did.
Q Did you ever follow up with him on that?
A No, because I chose not to.
Q Why?
A So we were with Chase Bank, and at one point I was buying another dealership, and an investor came in and gave us money, and they froze the account, I mean, for, like, a few days, which in a car dealership, if you could





imagine.
Q I understand.
A So they had questions about the investor. Turned out the investor was a Chase customer, and I was upset because it caused my dealerships a lot of problems. I'm like, "Dude, we got to move another account." Because Chase, you know, is -- is -- is very strict in a lot of this stuff, and that caused a lot of issues. So that's the reason I chose to even look at another bank.
I told Mike Morgan, Mike is like, "You should try Flushing. We have a great relationship, they're phenomenal. They do all of my business." And so that's when I reached out to Dave and I said, "Listen, you know I want to open all the bank accounts." I resolved the issue with Chase, and then I chose not to open the accounts and stay with Chase.
Q Did you convey that to Mr. Deo?
A I don't think so.





Q Did you tell him not to open an account with Flushing Bank?
A Bruce told him we weren't opening accounts anymore.
Q Do you know when Bruce told him that?
A I believe, like, right at the very beginning of April.
Q If you know, would that have been a written communication --
A Would that be --
Q -- or spoken, if you know?
A I'm not 100 percent sure, but I think I have seen an email or some communication where it says don't, you know, what I told Bruce, you know, maybe even David, you know, we're not going to go forward with opening the accounts. It might have been David actually I told that to.
Q Did you at any point, upon learning of the opening of the Flushing account, reach out to Flushing Bank?
A I did, the very day.





Q Do you know what date about that was?
A The 9th, August 9th, I believe.
Q Who did you reach out to?
A Dave Weinstein.
Q What did he say?
A He forwarded me everything he had on the accounts within minutes. I called him, I told him what happened. He -- you could tell he was thrown off by it, because we were working on opening accounts, including Superb, and I was, I'm like, "You're making me go through all these circles." Meaning, while you didn't tell me there was a Superb account opened, and he, like, stuttered. I said, "I need everything that you have on that account." And he did, he sent me everything. He sent me the signature cards, he sent me the -- all of the statements. I got them from -- I believe I have them in an email directly from him.

Q If you know, did Flushing Bank take any action on those accounts after that?
A Yeah, they started, you know. I only know what you sent in discovery what internally happened. Within a couple of days it seemed like David was, like, you know, didn't -- I mean, obviously, it created a lot of issues for him, and all of a sudden, he didn't want to talk anymore. But you know, after that it was all discovery.
Q Did you reach out to Mr. Deo at that time?
A No, I stopped talking to Deo on the 3rd, after what I saw he left behind, you know.
Q August 3rd?
A August 3rd is when I found out, yeah, that he had robbed us blind.
Q 2023?
A Yeah, yeah.
Q Do you currently have any accounts with Flushing Bank?





A I don't.
MS. RONNEBURGER: Flushing 4.
(Flushing Exhibit 4, Text Message, marked for identification.)
MS. RONNEBURGER: Just for the record, this was produced as Superb 000122.
A Okay.
Q Mr. Urrutia, have you seen this text message?
A I have.
Q If you know, who was this text message directed to?
A This was Anthony Deo sending it to Bruce Novicky.
Q In this email, and I think you spoke about it before, the text, it says, "I have my personal banker ready to open the Superb accounts with Flushing Bank. He will get me a 500,000k line, also." Did you ever ask Mr. Deo anything about this representation?
A That he could get the





500,000, no. He might have spoken to Bruce, but not me.
Q Did you tell him he could not open an account for Superb Motors?
A No, I didn't. I didn't tell him he could.
Q Well, here he stated to Bruce Novicky, "I have my personal banker ready to open the accounts for Flushing. He will get me a 500k line, also."
A Okay.
Q Did this raise any concern for you?
A No, David Weinstein was offering me the same thing. He told me if I wanted a $500,000 line of credit, that he could get me one.
Q But you did not tell Mr. Deo he could not do this?
A I didn't ask him to open a 500,000 line, nor did I open -- ask him to open a bank account.
Q When did you first become aware of this text message, if you know?





A Sometime in April probably.
Q April 2023?
A Yeah, Bruce -- I don't know that I saw the text as much as he called me. Bruce called me and said, "Hey, Anthony says he's got people at the bank that can move it along, and he can get us a $500,000 line." So I might have said, "If you can get them, then send them the," what do you call, "the receipt." Whatever, filing receipt, the whatever, the paperwork.
Again, all of that would have been if he could get it done with David is a bank, he knows all of the information from my dealerships. It wasn't, "Open a bank account for Anthony Deo at 100 percent ownership," you understand. It's not -- it's not -- nowhere is it even close to being said anywhere to go ahead and open the account and be 100 percent owner.
Q But you did not object to Mr. Deo speaking to Flushing Bank

directly?
A To ask to rush the process, yes.
Q Did you ask to be copied on those communications?
A No.
Q Would you generally ask to be copied on communications?
A Bruce would normally copy me on anything important.
Q So if Bruce, as we spoke about, would copy you on providing information to the bank, you did not ask Mr. Deo to copy you on providing information to the bank?
A No, at that time Bruce and Anthony were really working more together than me. I -- I got more involved towards the end of the month as we started to figure out where these dealerships were going to end up, but I mean, Bruce was my chief operating officer, and you know, anything that he thought he needed to check, he did. But





some stuff, simple stuff, he didn't always communicate it until the decision was made. Right, "Hey, we got a bank account ready to go."
"Oh, okay, open it. Oh, you know what, don't open it," right, or, "I'm taking a $500,000 loan."
"Okay, send me the paperwork," or, "Take the loan. Don't take the loan."
Q Do you know if Bruce ever had any communications with Anthony Deo about the account at this time?
A I didn't think it was to this extent, right. It wasn't anything -- anything further than this. It wasn't, Go ahead open it. Go ahead take the loan, you know.
And certainly, Anthony never communicated to him or me that he did open it. That would be the next part of it, okay. So we're trying to open an account, Anthony has somebody that can help him move it along. At some point,





"Hey, the accounts are open." Where is that email? Where is that text? It never happened.
Q Before you said you stopped opening these accounts because you resolved the issue with Chase Bank. You may have said this. I'm sorry. Do you know when about you resolved that issue with Chase Bank?
A Probably towards the very end of March. The transaction, you know, three days again in dealerships shutting down a bank account is a little nerve-wracking, so I wanted to have almost a second option.
But then, you know, last minute it was starting to get difficult, it was starting to be a process. I said just -- just let it go.
And -- and on top of that, we decided not to buy the dealership that we were going to buy, so I gave back the money to the investor. I'm -- I moved on with life.





Q Well, you resolved it in March 2023?
A Yeah.
Q This text is dated March 31st.
A Yeah, between March and April. There is an APA. I was going to buy Route 22 Nissan, I have an APA. You know, last minute I decided not to. We were -- we were in -- in the middle of a purchase and somebody else came in with, I guess, a better offer, and I saw the opportunity to actually back out of the deal because I -- I thought we were taking on too much.
Q And you believe it was conveyed to Anthony at this time that you no longer needed the Flushing Bank account?
A I believe Bruce did, yes.
Q In April or March of 2023?
A Correct.
Q But you still continued to provide him with information after that

time, or that was previous to that?
A No, the last information that was sent to Anthony was probably around the 2nd or the 3rd, which was that paper which -- which David already had.
Q That was prior to the issue being resolved with Chase?
A I'm sorry?
Q That was before the issue was resolved with Chase?
A I don't remember if the issue was resolved before or after. It was around the same time. But again, I -- I wanted a second option because, you know, I ran very large dealerships, and we always had two banks, you know, just in case. There was -- opening up a commercial bank account is not an easy thing.
And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio and saying, "Hey, I need to open a bank





account for Superb Motors," showing himself as a 100 percent CEO when he just provided you with a personal financial statement mentioning no ownership, nothing about Superb, all these other assets that don't exist, the $10 million in homes or 3 million in mortgages, and in no mention in that BFS of any -- any ownership for Superb.
But he sent one email to Rob Puccio to if he could open the account, and within a couple of days he had an account opened. I had been working on it for over a week.
Q Is this email you're referring to you saw in discovery, or is this something you saw previous to this action?
A It's both. Yeah, it is in the discovery actually.
Q But did you see any communications between Anthony Deo and Rob Puccio during the timeframe of March 2023 to April 2023?





A Yes.
Q What were those communications?
A Anthony Deo telling Rob Puccio that he needed the account from Superb opened, and later on he said, "I need two more accounts, a credit card account and a distribution account," which I guess they finally opened them in July, thank goodness, because if not I would have lost all my credit card money going into any bank account as well.
Q But were you copied on any communications with Mr. Deo sending information to Flushing Bank?
A No. I only saw that through discovery.
Honestly, your discovery --
Q Did you -- I'm sorry.
A -- your discovery was phenomenal. You sent me a lot of stuff I didn't know that could help me put a lot of this stuff together.
Q In this text message, this is





something you spoke about, it says, "Bro, this guy and the credit underwriter are in my pocket. Get me the info and 2021 taxes and I'll bring it home." Now, I understand this was not sent to you, but if you know, who was he referring to, "this guy"?
A I -- I -- I mean, this guy, I would understand from everything I saw in discovery, but this is an assumption, would be Rob Puccio. I don't know who the underwriter would be, but obviously, he got a $500,000 loan, and all due respect, with all your discovery, on March 31st, at this same time you internally communicated that Anthony Deo is being sued for millions of dollars for representing that he owns another dealership. The guy says, "I'm going to look deeper into this," which if he did, he would have known there's a TRO and that he shouldn't have been able to open bank accounts for Northshore and Sunrise, even less get a $500,000 loan in that

company name, and yet you did. There was no problem, it continued. At that point you still had $400,000 of that money sitting in the account that I'm sure you've lost at this point, you could have recouped it, but nothing, it just continued. So obviously, he did have some really good relationships in the bank, because again, I was ready to leave Chase because with a long-standing relationship with them, they switched me off in a heartbeat because something came up that they didn't like, right, from an investor, not even me. So it was just very...

**Q** So knowing all of this, what you just said about Anthony Deo, you allowed him to communicate with the bank to open up an account on behalf of your company?

**A** I didn't know that.

MR. KATAEV: Objection.

**A** I didn't find this out until after August. I thought Anthony Deo was





a nice guy, honestly. I was moving forward as soon as he got his license to go finish our deal and become partners with him.

I knew nothing about Anthony Deo's criminal activity, and please, read all my emails -- I mean my texts, which are on the record. The guy is a sweetheart. You meet him, you'd swear he's the nicest guy. He's the con man charisma guy of the group, but I didn't find out Anthony Deo was who he was until he robbed me blind.

And I've been in the car business for 39 years, 30-something years, never been in court once, nothing. I ran the biggest dealerships in the Northeast, and in four months he dismantled my business and everything I ever worked for. That's how good he is.

Now he's done it to somebody else, but I didn't find this out until after the fact, just so we're clear.

**Q** When did you learn that





Anthony Deo made this representation that he believed that he had these people at Flushing Bank on his side?

**A** In his pocket?

**Q** Yes.

MR. KATAEV: Objection. Asked and answered.

**A** Probably, again, he told it to Bruce. Bruce called me and said, "Listen, Anthony says he can get this thing opened up," and I said, "Okay, get it done." I mean...

**Q** You didn't ask Anthony about it personally?

**A** No.

**Q** You didn't have any discussions with him?

**A** No. To open a bank account, no, I did not.

**Q** Did you have any direct conversations with Mr. Deo about the Flushing Bank account, or was it all through Bruce?

**A** It was Bruce, and again, it





was just help of what we had started.

MS. RONNEBURGER: I don't have anything else.

MR. KATAEV: I have one quick line of questioning I'd like to clear up, Mr. Urrutia.

* * *

<u>EXAMINATION BY</u>
<u>MR. KATAEV</u>:

**Q** Mr. Urrutia, who were the only people that you know of at Flushing that could have opened the bank account?

**A** Myself and Bruce.

**Q** Who were the only people that worked for Flushing Bank that could have opened the bank account for Superb?

MS. RONNEBURGER: Objection. It's speculation.

MR. KATAEV: He can answer.

**A** Honestly, I thought David Weinstein, and then Rob Puccio, it seemed like he had a higher title, right, because I think David Weinstein says Branch VP, and I think Puccio has a

higher title, so I assumed that he was a little bit higher. That was it. But I thought one of those two was going to get the account opened.

**Q** Focusing on David Weinstein, did you have direct communications with him at any point about opening an account for Superb with Flushing?

**A** Yes.

**Q** In your communications with David Weinstein, did you tell him who owned Superb?

**A** Yes.

**Q** What did you tell him?

**A** That I owned Superb, and then later on I told him that Deo was -- was my partner.

**Q** Did you specify percentages?

**A** No, but everything that -- that he had only showed me that he was 100 percent, because Deo was never on the taxes, Deo was never added to stock certificates. There's no operating agreement. There is nothing, other than





the original cross-purchase agreement.

**Q** Moving to Rob Puccio, did you have any communications with Mr. Puccio?

**A** No, I never spoke to him.

**Q** To your knowledge, is there anyway that Mr. Puccio could have known that you are an owner of Superb?

**A** Yes, when David Weinstein sent him an email telling him that he was opening the Superb account -- that he was opening up all my other accounts and that he could help open the Superb account, but he mentioned that as a partner. I don't remember the exact wording, but that we were -- we were partners on the Superb account.

**Q** Are you referring to that as an email communication?

**A** Yes, email communication.

**Q** And to your knowledge and your memory, who was on that email communication?

**A** It was David Weinstein and Robert Puccio.





**Q** Were you on that email?

**A** No.

**Q** In that email communication, did David Weinstein tell Rob Puccio who the owners of Superb were or who the owners of Superb was?

MS. RONNEBURGER: Objection. If he knows.

**Q** In the email that you reviewed, did David Weinstein tell Rob Puccio who the owner of Superb was or who the owners of Superb were?

**A** I believe he put it almost as we were partners. That was, if I remember the exact -- I can't tell you the exact wording, but that we were partners.

**Q** Why are you saying that Flushing committed wrongdoing against you and Superb in this case?

**A** Because they opened a bank account as a 100 percent owner for somebody that, other than a filing certificate that I had sent and having





all the -- all the evidence -- evidence that I was the owner of Superb, they opened an account without ever telling me.

**Q** To your knowledge and belief, did Robert Puccio know that you were an owner of Superb?

**A** 100 percent.

MR. KATAEV: I have no further questions.

MS. RONNEBURGER: I have one question.

* * *

<u>FURTHER EXAMINATION BY MS. RONNEBURGER</u>:

**Q** In one of the documents we looked at it specifically stated that David Weinstein did not have any documents from Flushing Bank, so why do you believe that David Weinstein knew that you were an owner of Superb Motors?

**A** I told him. He had asked me about this $500,000 loan that, I guess, you guys, or Flushing Bank, was giving

out like candy, and I sent him my tax returns, personal, where Superb is listed. I sent them the tax returns for Superb. I sent them the tax returns for my other businesses, and you -- you've given them to me in discovery.
Q But you did, as you testified, identify Mr. Deo as your partner in Superb Motors to David Weinstein in a text message; is that correct?
A Yes.
Q And you just stated you never clarified the percentages of ownership; is that correct?
A It --
Q Yes or no?
A Yes.
MS. RONNEBURGER: I have no further questions.
MR. THOMASSON: I have a follow up.
* * *





FURTHER EXAMINATION BY MR. THOMASSON:
Q Do you know if Anthony Deo was informed at any time by anyone that you had informed Flushing Bank that he was your partner?
A I'm sorry, I didn't understand the question.
MR. KATAEV: Please repeat that.
Q You told Flushing Bank that Anthony Deo was your partner, correct?
A Yes.
Q Do you know if Anthony Deo was told that you told Flushing Bank he was your partner?
MR. KATAEV: Objection to form.
A I don't know that.
Q You don't know if he was or he wasn't?
A If he was told?
Q Yes. For example, would it have been in an email that you told





Flushing Bank that he was your partner, was Anthony Deo on that email, if you know?
A No, I didn't have that communication. It was David Weinstein, and again, this was from Flushing discovery, told Puccio that I had -- I had okayed the opening of -- I don't remember the exact wording. For Anthony to help open the account or something, that he was my partner, and he was opening up the other three accounts, and -- and after that I stopped, and the account was opened and the other ones were not, and I was never notified, nobody ever told me.
Q And you did at that time consider Anthony Deo to be your partner? When you told the bank that he was your partner, did you consider him to be your partner?
MR. KATAEV: Objection.
A I -- I thought we soon would be closing on the Sunrise and Northshore.





I was waiting for the license, and I went into this partnership with Anthony in good faith. I did want him to be my partner from what I knew.
Q So --
A But we never did.
Q All right, but I just want to understand, because it's not clear on the record. I want to make sure it is.
When you told Flushing Bank that he was your partner, did you consider him to be your partner at that time?
MR. KATAEV: Objection. Speculation. Calls for a conclusion.
A Not yet.
Q Not yet?
A Not yet. Again, we were opening an account.
Q When you told Flushing Bank that he was your partner, what did you mean?
A He was -- he was, I mean,

that was the idea, in that he was going to be my partner, right.
Q That he was going to be a part owner of Superb; is that right?
A Yes.
Q So when you told Flushing Bank that he was your partner, were you trying to suggest though Flushing Bank he was a part owner of Superb?
MR. KATAEV: Objection.
A No, I was just trying to use the person that he knew to see if he could help us move along the opening of the account.
Q But he was not your partner at the time that you told Flushing Bank he was your partner?
MR. KATAEV: Objection.
A No, we never finalized an operating agreement. I -- we never transferred stock certificates, and we never got operating agreements from him.
MR. THOMASSON: I have nothing else at this time.





MR. KATAEV: Jeff Ruderman, Jeff Cianciulli, any questions for the witness? Speak now or forever hold your peace.
MR. RUDERMAN: None for me.
MR. CIANCIULLI: I have no questions.
MR. KATAEV: Thank you.
(Time noted: 3:37 p.m.)





A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF )

I, ROBERT ANTHONY URRUTIA, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of January 8, 2026; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

____________________________
ROBERT ANTHONY URRUTIA

Signed and subscribed to before me, this day of , 2026.

________________________________________
Notary Public, State of New York





----------------I N D E X-------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| R.A. URRUTIA | MR. THOMASSON | 5, 270 |
| | MS. RONNEBURGER | 233, 268 |
| | MR. KATAEV | 264 |

MOTION: PAGE: 71

--------------DOCUMENT REQUEST--------------

PAGE: 239 Emails from Mr. Urrutia's Gmail account
239 Complete text from Flushing Exhibit 1

-----------------EXHIBITS-------------------

| DEFENDANTS' | | FOR I.D. |
|---|---|---|
| J | Email Chain | 62 |
| K | Superb Motors Inc. Statement of Profit and Loss, January 1, 2023 through May 31, 2023 | 91 |
| L | Email Chain with attached | 97 |
| V | Text Messages | 116 |
| FLUSHING | | FOR I.D. |
| 1 | Text Messages | 235 |
| 2 | Email Chain | 238 |
| 3 | Email Chain | 240 |