UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

Defendants.
-----------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

DECLARATION OF JOSHUA AARONSON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Joshua Aaronson declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am a plaintiff in this action and a manager or managing member of the Island Auto Group ("IAG"), a group of new and used automobile dealerships and related real-estate entities. The IAG Plaintiffs include Northshore Motor Leasing, LLC ("Northshore"), 189 Sunrise Hwy Auto, LLC ("Sunrise"), 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC, and Island Auto Management, LLC ("IAM").

2. In that role, I oversee managerial and high-level operations for the IAG dealerships and related real-estate holdings. I am familiar with the manner in which IAG maintains dealership-management, accounting, lender, bank, ownership, and licensing records and with the records I created, received, reviewed, or relied upon in conducting IAG business.

3. Wendy Kwun ("Kwun"), IAG's controller, maintains and reviews many of those records. Except where I identify a record or later-acquired information, the facts stated in this declaration are based on my personal knowledge.

4. David Baron ("Baron") was my father-in-law, and his wife, Iris Baron ("Iris"), is my mother-in-law. Beginning in or around May 2021, after Baron's death, I became involved with Defendants Anthony Deo ("Deo") and Sara Deo ("Sara") (collectively, the "Deos") in connection with Northshore and Sunrise, the subject of this action.

**SUPPORTING FACTS**

5. Baron, his brother Ron Baron, and others owned and operated new and used automobile dealerships that were commonly referred to as the Baron Group.

6. I became involved in the automobile-dealership business in approximately 2001 or 2002, initially working at the Baron Group dealerships, and later developed dealership operations of my own.

7. Automobile dealers commonly use a floor-plan line of credit to finance the purchase of vehicle inventory (a "Floor Plan"). The Floor Plan lender retains a lien on each floor-planned vehicle. By contract, when a floor-planned vehicle is sold, the dealership must promptly repay the Floor Plan lender the amount advanced for that vehicle, together with accrued interest charges, so that the Floor Plan lender's lien can be released.

8. I, together with other principals, managers, or members, own, operate, or control the dealerships and related entities that comprise the IAG Plaintiffs. Baron and Ron Baron held ownership interests in certain IAG dealerships in addition to their interests in Baron Group dealerships.

9. Because of the relationships among Baron, Ron Baron, me, and our common dealership ownership, the Baron Group and IAG maintained certain cross-financial arrangements. One such arrangement was that the dealerships used Ally Bank ("Ally") for floor-plan financing.

10. The Ally arrangement included cross-collateralization and cross-guaranties among dealerships and guarantors. The Ally lender and guaranty documents maintained in IAG's files memorialize those obligations.

11. Those guaranties exposed certain IAG principals and members to personal liability if a dealership failed to repay Ally. I was one of the guarantors and was personally exposed to liability for any Northshore or Sunrise unpaid Ally obligations. See **Ex. 8**.

12. Each IAG dealership had a local manager and a local controller responsible for day-to-day operations and regular financial transactions and entries. The local dealerships' financial operations remained subject to central IAG oversight from IAG's office in Staten Island.

**Deo Was Not an Owner of Either Sunrise or Northshore**

13. Northshore was formed in November 2017. It began operating as a used automobile dealership in 2018 at a facility at180 Michael Drive, in Syosset. Northshore's February 14, 2018 Operating Agreement identifies Baron, Asad Khan ("Khan"), and Brian Chabrier ("Chabrier") as its members. I have never seen an agreement executed by any Plaintiff that made Deo an owner or member of Northshore. **See Ex. 1**. A copy of the 2018 Operating Agreement is filed at 617224/2022 NYSCEF Doc. No. 4.

14. Baron and I owned Sunrise together with Raymond Phelan ("Phelan"), Jory Baron ("Jory"), and Chabrier, who was later added as an equal member. Sunrise was formed in 2014 and operated a used-car dealership at 189 Sunrise Highway in Amityville, New York. Sunrise's July 3, 2014 Operating Agreement was signed by Baron, me, Jory, and Phelan and identified the four of us as its original members. **See Ex. 9**. A copy is filed at 617224/2022 NYSCEF Doc. No. 28.

15. I have reviewed the DMV licensing records produced in this action concerning Sunrise. Those records identify Jory Baron, Brian Chabrier, and me—not Deo—as Sunrise's DMV owner applicants. I found no change-of-owner application executed by Deo and no DMV approval replacing us with Deo during the relevant period.

16. Deo was never identified in an executed Sunrise operating agreement, or in the DMV records I reviewed, as a member of, or DMV owner applicant for, Sunrise.

17. I first became directly engaged with Deo in May 2021, after Baron died and Iris, who was handling the estate, asked me to assist in overseeing Northshore and Sunrise for Baron's

estate. Baron had engaged Deo to manage Northshore in 2018 and Sunrise in 2021. After Baron's death, I continued to leave day-to-day operations in Deo's hands while I provided owner-level and IAG oversight.

18. I did not know until involved in this litigation of crucial historical information about Deo and Sara which, had I known at the time, I would not have allowed them to continue to manage Northshore and Sunrise.

19. Deo and Sara had previously owned two used automobile dealerships operating at the Northshore location, Universal Exotic Autos Inc. ("Universal Exotic") and UEA Premier Motors Corp. ("UEA"). For each dealership, one of them was the owner applicant of a license issued by the New York State Department of Motor Vehicles (the "DMV"). **See Ex. 10.**

20. In 2016, while operating those dealerships, Deo pled guilty to a felony conviction in the United States Southern District Court in New York for bank and wire fraud. **See Ex. 11**.

21. In 2017 the DMV suspended, and in 2018 revoked, their DMV licenses**. See Ex. 12.**

22. After Deo a Sara Deo's DMV licenses for Universal Exotic and UEA were suspended, Deo formed a new used automobile dealership in November 2017, Northshore. Ruderman Decl. ¶; Deo Dep. 129:14-130:3; ECF 385-3.[NS FORMATION FILING] Having a new entity and dealership location was still short of the DMV license and floor plan financing necessary to operate a used automobile dealership. Deo Dep. 56:23-57:18.

23. In my many years of experience as an owner applicant of numerous DMV licenses, I state with personal knowledge that the Deos' approval for a new DMV license with two (2) currently suspended DMV licenses would have been very problematic.

24. Floor plan financing would also have been problematic under Deo's criminal conviction in which he was prohibited from securing any new credit lines for period of five (5) years from his 2016 conviction. In fact, Universal Exotic's credit line was obtained by Deo's business colleague, Louis Beria ("Beria"), also with a felony conviction, signing a false lending agreement listing Beria as the owner of Universal Exotic. Beria had no relationship with Universal Exotic. Deo Dep. 124:1-126:8; **See Ex. 13**.

25. A mutual business acquaintance, Asad Khan ("Khan"), introduced Deo to Baron. Baron, Khan, and Brian Chabrier ("Chabrier") then became Northshore's members under the written Northshore Operating Agreement, while Deo was engaged as its manager. **See Ex. 1**. Chabrier was a longtime Baron Group employee who managed their Nissan dealership.

26. Baron, Khan, and Chabrier continued to be treated as Northshore's members in the 2018, 2019, and 2020 partnership returns and Schedules K-1. Those records allocated Northshore's reported income or loss to them and did not identify Deo as a member for those years. **See Ex. 3**.

27. Baron engaged Deo as Northshore's salaried manager, and Sarah Deo also worked at Northshore through payroll. **See Ex. 7**. The contemporaneous operating agreement, tax records, DMV records, payroll treatment, and dealership practices treated Deo as manager rather than a member. Jones later testified concerning his understanding of Deo's status. **Jones Dep. 77:11-25; 271:17-272:3.**

28. In February 2021, before Baron's death, Deo and Baron discussed a proposed purchase of Sunrise from its then-current members—Baron, me, Chabrier, Jory, and Phelan.

29. The proposed terms were memorialized in an unsigned writing. They required Deo to pay each member $10,000 down and an additional $3,000 per month until Deo could cross-

guarantee Sunrise with a franchised automobile dealership. **See Ex. 6**. copy of that writing is filed at 615683/2024 NYSCEF Doc. No. 7.

30. Deo paid each Sunrise member the initial $10,000 payment, but he did not make the required $3,000 monthly payments. The proposed terms and payment evidence are filed at 615683/2024 NYSCEF Doc. Nos. 7 and 64. Deo also never obtained a franchised dealership capable of cross-guaranteeing Sunrise. Deo therefore did not satisfy the proposed purchase conditions.

31. No transfer of Sunrise to Deo was completed, and no executed Sunrise operating agreement or assignment identified Deo as an owner. The proposed 2021 transaction was subject to conditions that were not satisfied, and the existing members did not execute or deliver assignments transferring their interests to Deo.

32. My Sunrise membership interest is reflected in Sunrise's ownership and tax records. **See Ex. 4**. Sunrise's tax records for 2018, 2019, and 2020 continued to identify me among Sunrise's members, consistently with my equal ownership interest.

33. I reported my Sunrise ownership interest on my personal tax returns and reported the distributive tax items shown on the Schedules K-1 issued to me. **See Ex. 14**.

34. Deo, though, was engaged as Sunrise's manager in early 2021 and was placed in charge of its day-to-day operations, for which he and Sara each received a salary of $2,500.00 per week. **See Ex. 7**, O'Sullivan Dep.119:5-120:14

35. When I became involved in checking in on Northshore and Sunrise after Baron's death, Deo was still serving as Northshore's manager and was in control of its day-to-day operations. He and Sara were both employed, each receiving a salary of $2,500.00 a week. Further,

Deo was receiving a commission of seven and one half (7-1/2 ) percent on the gross profit of each vehicle sold by Northshore and Sunrise. **See Ex. 7**, O'Sullivan Dep.120:15-121:15**.**

36. Before October 2022, neither Deo nor Sara told me that either of them owned Northshore or Sunrise or that they had been seeking records to enable them to file tax returns for Northshore or Sunrise as owners. Nor did I ever receive any writings from them in that regard. The ownership records I have seen, such as tax returns, DMV records, and executed operating-agreements, was inconsistent with such a position.

37. I reviewed the relevant communications produced in this action and am not aware of any written communication before October 2022 in which Deo complained that he was omitted as a Northshore or Sunrise owner or lacked information needed to file Northshore or Sunrise tax returns as an owner.

38. I also am not aware of any written communication before October 2022 in which Deo claimed that he lacked information needed to file Northshore tax returns for 2018, 2019, or 2020 as an owner.

**Deo's Responsibilities and Conduct as Manager**

39. In or around June 2021, I met with Deo concerning the ongoing operations of Northshore and Sunrise. We agreed that Deo would continue as the sole manager of both Dealerships and that Deo and Sara would continue receiving payroll compensation. Each Dealership paid each of them $2,500 per week, resulting in combined weekly compensation of $10,000 from both Dealerships. Deo also continued to receive the benefit of commissions equal to seven and one-half percent (7.5%) of the gross profit on vehicles sold by Northshore and Sunrise, which he caused to be paid to Car Buyers NYC, Inc. ("Car Buyers"), a corporation that he testified he solely owned. O'Sullivan Dep.119:5-121:15. **See Ex. 7**.

40. Consistent with that arrangement, Deo remained in day-to-day sole control of Northshore and Sunrise through August 2022.

41. I permitted Deo, as manager, to handle day-to-day operations, including vehicle-inventory purchases and financial reporting for Northshore and Sunrise. Deo's authority as manager carried the obligation to report complete and accurate financial information, purchase appropriate inventory, track the inventory, and comply with Ally's audit and payoff requirements.

42. By accepting managerial control, Deo understood that I and IAG expected him to report the dealerships' finances accurately and make appropriate inventory purchases for the dealerships. I and IAG relied on the appropriateness of Deo's inventory purchases when it allowed him to use Ally financing and cooperate directly in Ally audits.

43. I also permitted Deo direct access to the Ally Floor Plan to purchase inventory for Northshore and Sunrise.

44. As a condition of continued Floor Plan financing, IAG and Ally required Northshore and Sunrise to furnish monthly financial reports meeting Ally's lending requirements. Deo's authority as manager carried the obligation to provide these monthly reports. I and IAG likewise relied on the accuracy of the financial information Deo caused to be entered into the DMS and furnished to IAG and Ally.

45. I expected Deo to exercise the authority given to him for the benefit of Northshore and Sunrise, not for his own benefit or that of another entity.

46. Each time Deo caused financial information to be entered in the DMS and submitted or made available Northshore, Sunrise, IAG and Ally, I understood that entry to represent that the information was complete and accurate.

47. Each time Deo caused Northshore or Sunrise to purchase inventory, I understood that transaction to represent to me, Northshore, Sunrise, IAG and Ally that the purchase was appropriate for the dealership.

48. I and IAG relied on those representations by continuing to guarantee the Dealerships' Ally obligations, permitting Deo to use the DMS and Ally Floor Plan, and cooperating with Ally audits.

49. Because I believed the dealerships' reported information and inventory transactions were accurate, I allowed the IAG guaranties, including mine, supporting the Ally Floor Plan to remain in place.

50. Deo arranged for Northshore and Sunrise to acquire used-vehicle inventory using the Ally Floor Plan and dealt directly with Ally in doing so. Ally held a lien or security interest in each vehicle acquired with Floor Plan funds. By contract, upon sale of a floor-planned vehicle, the dealership was required within days to repay Ally's advance and accrued interest charges so the lien could be released.

51. As the manager controlling the dealerships' operations and bank disbursements, Deo was responsible for ensuring that Ally was timely paid for each sold floor-planned vehicle.

**The Monthly Financial Statements and Effect on the IAG Plaintiffs and Ally**

52. By no later than August 2021, Deo retained Thomas Jones, CPA ("Jones"), to perform monthly accounting work for Northshore and Sunrise. The DMS identifies numerous monthly adjusting journal entries from "JONES." The deposition testimony of Jones and O'Sullivan corroborate that the adjustments were determined solely by Deo and Jones and implemented by O'Sullivan at Jones' direction. O'Sullivan Dep.124:24-125:5, Jones Dep. 64:11-16. The monthly process continued through approximately October 2022.

53. Monthly financial statements generated from the DMS were provided to IAG and were used in connection with continued dealership operations and the Ally Floor Plan to induce IAG and Ally to maintain the credit line availability. Kwun had access the DMS, which enabled me to perform my function in assisting Iris. Initially, her work for the Dealerships principally consisted of assisting with the DMS transition and working with the title clerks' to more efficiently process the documentation needed to more rapidly obtain customer-loan funding to assist cash flow.

54. I tasked Kwun with their review and to alert me of any material concerns. The adjustments by Deo and Jones masked the financial distress of the Dealerships. Kwun's later review, as noted in her accompanying declarations, showed that the identified adjusting entries materially increased reported profitability or reduced reported losses. I had relied on the accuracy of the statements in permitting Deo continued access to the Ally Floor Plan.

55. Neither I nor, to my knowledge, the other IAG guarantors were aware that Deo and Jones were making adjustments that caused Northshore and Sunrise to appear more profitable than they were.

56. The records later reviewed by IAG also reflected non-auction vehicle purchases for which Ally funding of eighty (80%) percent was calculated by reference to wholesale book value rather than the Dealerships' actual acquisition cost. The expectation is that the Dealership would pay the twenty (20%) percent balance, not that low quality cars would be purchased. I later personally observed that some of the remaining vehicles were damaged, stripped, nonoperational, or worth substantially less than the values used in connection with financing, which Deo failed to disclose. Those transactions temporarily supplied cash but left the Dealerships with overleveraged or impaired inventory and increased payoff exposure.

57. I did not become aware of this until late 2022. Had IAG known the true condition, acquisition price, and financing structure of those transactions, I, Ally, Northshore or Sunrise would not have approved the purchases or allowed IAG's guaranties to support the financing.

58. A later physical inspection by IAG and an Ally audit found that multiple floor-planned vehicles could not be located and that multiple vehicles were damaged. **See Ex. 15**.

**Payments Deo Failed to Make on Trade-Ins Accepted by Northshore and Sunrise and to Ally for Floor Plan Payments**

59. Northshore and Sunrise accepted customer vehicles as trade-ins toward the purchase of replacement vehicles. When a trade-in was subject to an existing loan or lease, the dealership was contractually required to pay that balance promptly. As manager, Deo was responsible for ensuring that each trade-in loan was timely paid.

60. On August 30, 2022, Kwun informed me that O'Sullivan had delivered to her prepared but unissued trade-payoff checks totaling approximately $1 million and involving more than fifty-five transactions. I immediately directed that the Dealerships' finances be reviewed and that further access to Ally financing be restricted. O'Sullivan testified that Deo had directed him to hold the checks because there was insufficient funds. O'Sullivan Dep. 81:2-20, 185:6-13

61. As manager, Deo controlled or directed the use of dealership receipts and the prioritization of expenses. Sale proceeds were available and were required to be used to make the corresponding Ally and trade-in lien payoffs when due, after accounting for the particular transaction and any other legally required charges. Deo affirmatively chose not make those payoffs.

62. Because Chabrier, Jory, and I were the owner applicants for the DMV license, the unpaid trade payoffs exposed us and the Dealerships to customer claims, regulatory action, and

potential loss of the DMV licenses. The same violations threatened our ability to obtain or maintain DMV licensing for other dealership facilities.

63. Kwun and I agreed that she would conduct a transaction-level review of the Dealerships' finances. Her review disclosed millions of dollars in unpaid Ally obligations associated with vehicles that had been deliberately sold without repayment of the corresponding floor-plan advances. Because I and other IAG parties had guaranteed the shared Ally facility, IAG could not allow an Ally default to jeopardize me and other guarantors.

64. To prevent further injury to customers, protect the licenses and a default against the guarantors, I had Kwun arrange for IAG entities to advance funds to Northshore and Sunrise to satisfy the outstanding obligations.

65. As provided in detail in Kwun's accompanying declaration, I arranged for IAG entities to pay Ally more than $4 million to satisfy the Northshore and Sunrise Floor Plan deficiencies. The payments are reflected in Ally payoff records and IAG bank records.

**Deo Failed to Pay Warranty Companies and Vendors**

66. The records reviewed by Kwun also show that Northshore and Sunrise sold third-party service contracts and warranties but failed to remit the monies collected from customers to the warranty providers, even though Deo, as manager, was responsible for ensuring payment.

67. To protect the affected customers from cancellation of their warranties, I arranged for IAG entities to pay the unpaid warranty providers.

68. I also became aware of Deo doublebooking vehicles, meaning financing the same car twice. On April 30, 2022, Sunrise recorded a sale of a 2017 Mercedes-Benz to Marlon and Monique Harris for $27,765.00. The Harrises paid $3,000.00 down and Santander funded $25,875.00. The vehicle was not delivered, the transaction was canceled, and the vehicle was

transferred to Northshore, which later sold it to Bay Motors, Inc. for $30,136.00. Santander's proceeds were not timely returned, and IAG ultimately arranged payment of $32,294.42 in November 2022. **See Ex. 16.**

69. On or about April 4, 2022, Northshore recorded a sale of a 2013 Audi to Reid for more than $25,000.00. Santander funded $24,024.58. The transaction was canceled, the vehicle was transferred to Sunrise, and Sunrise later sold it to Rashawn Newsome for $26,090.00. Santander's proceeds were not timely returned, and IAG funded Northshore's eventual payment of $26,453.29. **See Ex. 16.**

**Ally's Hold on Further Floor Plan Financing for Northshore and Sunrise; My Proposed Agreement With Deo**

70. Because of the deficiencies discovered in September and October 2022, I arranged for Ally to place a hold on further Floor Plan financing for Northshore and Sunrise.

71. In or around October 2022, I demanded that Deo repay IAG for the losses and obligations IAG had funded. Deo initially promised that he would make IAG whole.

72. During October Deo and I discussed a proposed transfer of ownership and DMV-license responsibility for Northshore and Sunrise. The proposal was expressly conditioned on Deo repaying the IAG-funded deficiencies, obtaining a replacement floor-plan line and taking over as owner applicant on the DMV licenses.

73. In anticipation of a possible closing, and because the extended tax filing deadline for the Dealerships' 2021 tax returns was approaching, I permitted the 2021 returns to list Deo and Sarah Deo as owners solely as a conditionally authorized step toward the proposed transfer. That limited authorization did not waive the remaining conditions, execute an assignment, complete a closing, substitute Deo as a DMV owner applicant, or obtain DMV approval. **See Ex.17**.

74. Based on my dealership-licensing experience and the DMV change-of-business-ownership materials exchanged with Deo, a change in a licensed dealership's owner applicant required a DMV application and DMV approval. Filing a tax return alone did not transfer the DMV license or the underlying ownership interests.

75. Chabrier, Jory, and I would not permit Deo to continue operating, nor take ownership of, the Dealerships while we remained identified in DMV records and remained exposed to liability for his operation of the licensed facilities. Deo agreed to proceed on those conditions.

76. The email correspondence produced in this action shows that Deo was sent the DMV change-of-ownership application for Northshore and Sunrise, but he never returned an executed application. **See Ex. 18**.

77. Deo also failed to repay IAG's losses and failed to obtain a replacement Floor Plan line.

78. Because the required DMV application was never executed or approved and the repayment and financing conditions were never satisfied, the proposed transfer was never consummated and ownership of Northshore and Sunrise was not transferred to Deo.

79. In late November 2022, I arranged to take possession of some Ally-financed vehicles remaining at the Northshore lot. I personally observed vehicles that were missing components, stripped, nonoperational, damaged, or worth substantially less than the values previously presented in connection with financing. **See Ex. 15**.

**Libertas Funding LLC**

80. Despite the failure of the proposed transfer, Deo continued to act as though he could bind Northshore and Sunrise and sought additional financing in their names without member approval.

81. On November 18, 2022, $735,000.00 (the "Libertas Funds") was unexpectedly deposited into Sunrise's account. IAG then learned that Deo had signed a future-receivables agreement with Libertas Funding LLC ("Libertas") purportedly on Northshore's behalf (the "Libertas Agreement"). **See Ex. 19**. The Libertas Agreement and funding records are filed at ECF 410-1.

82. Kwun, who first discovered the deposit, and not knowing its source or purpose, withdrew the money using her regular Chase banking credentials and safeguarded the Libertas Funds by placing in an a holding account while we investigated the transaction and notified Libertas that Deo lacked authority to bind Northshore. .

83. That same day, I directed IAG's attorney, Russell Shanks ("Shanks"), to send Libertas a letter stating that Deo had no ownership interest in or authority to bind Northshore and requesting immediate contact. **See Ex. 20**.

84. I then received a call from Nassau County Police Detective Eric Marx, who threatened to arrest me unless the Libertas Funds were turned over. I described that call in my sworn state-court affidavit filed at 617224/2022 NYSCEF Doc. No. 32. I thought it odd that a police detective would take this position in what was, essentially a civil dispute. I later found out that one of Deo's privately hired bodyguards, who also handled cash and inventory at the Dealerships, Marc Merckling, was a Nassau County SWAT officer and accompanied Deo when he filed his complaint with Detective Marx.

85. Because Libertas threatened action against the Dealerships and the funds were disputed, I authorized Kwun to initiate a wire to attorney Harry Thomasson's ("Thomasson") trust account, arranged through our attorney, Russell Shanks ("Shanks"), based on the written communications from Shanks to hold the Libertas Funds in escrow pending resolution of the ownership and authority dispute. **See Ex. 21**.

86. The $735,000.00 was wired to Thomasson's trust account on November 21, 2022. **See Ex. 22**.

87. After the wire had been initiated, Thomasson advised that he would not hold the funds in escrow and transferred $723,000.00 to Car Buyers and retained $12,000.00 for what Thomasson testified were attorney's fees. **See Ex. 23** (email) and **Ex. 24** (bank statement).

88. Deo had no authorization from Northshore's members to enter the Libertas Agreement. Further, the Libertas Agreement concerned a purchase of Northshore's future receipts, meaning that the Libertas Funds under the Libertas Agreement belonged to Northshore, not Deo or Car Buyers. Further, the Libertas Agreement required the Libertas Funds to be used to benefit Northshore, which they did not. **See Ex. 19**.

**Flushing Bank**

89. Plaintiffs commenced an action in the New York Supreme Court, Nassau County (the "State Action"), in which Justice Sharon M.J. Gianelli issued a temporary restraining order restricting specified financing, pledging, or sales of Northshore assets (the "TRO").

90. With the TRO in place, in early 2023, Deo, working with Thomasson and Michael Laurie ("Laurie") and Laurie's contacts at Flushing Bank ("Flushing"), applied for a $500,000.00 secured loan in Northshore's name and proposed to encumber Northshore's assets. **See Ex. 25**.

Deo had no authority from Northshore's members or under the 2018 Northshore Operating Agreement to borrow in Northshore's name or grant a lien on Northshore's assets.

91. The Flushing loan could not close while Ally's UCC lien remained of record. After IAG-related parties satisfied the Ally obligations reflected in the payoff records, Thomasson, on behalf of Deo, assisted in procuring Ally's termination of its lien. Thomasson Dep. 100:23-1-1:6.

92. Thomasson further facilitated the Flushing loan by writing two letters to Flushing to allay their concerns about the State Action and TRO. **See Ex. 26**. Thomasson was aware of the intended recipients of his letter and the purpose thereof. Thomasson Dep. 101:3-103:1.

93. The Flushing agreement required the loan funds to be used for the benefit of Northshore. **See Ex. 25**. Flushing funded $500,000 into a Northshore account opened by Deo, but the resulting bank records show that Deo transferred $50,000.00 to Laurie's company, DLA capital, and most the balance was wired to Car Buyers. **See Ex. 27**. None of the Flushing loan proceeds were used for the benefit of Northshore. Deo Dep. 148:1-156:14.

94. The Flushing loan file contained documents that conflicted with the genuine 2018 Northshore Operating Agreement and the ownership and licensing records identifying Baron, Khan, and Chabrier—not Deo—as Northshore's members. The records even conflicted with each other. Deo provided a backdated operating agreement for Northshore showing Deo to be a ninety-nine (99%) percent owner and Sara a one (1%) owner. And another backdated operating agreement for Northshore showing Deo to be a one-hundred (100%) percent owner. **See Ex. 29.** Deo's one-hundred (100%) percent owner claim also conflicts with the tax return he provided and relied upon to claim authority to bind Northshore. **See Ex. 28.** Those records would have revealed that Deo lacked authority to borrow for or encumber Northshore.

95. Nevertheless, Flushing funded the loan and filed a UCC lien against Northshore's assets.

**The Damages Caused By Deo**

96. The transactions described herein caused substantial losses to me and the IAG Plaintiffs.

97. The Ally deficiencies, trade-payoff obligations, warranty obligations, missing or impaired inventory, and other amounts funded by identified IAG entities and individuals caused substantial losses.

98. Whether the missing funds were taken, diverted, or lost through unauthorized transactions, they belonged to Northshore or Sunrise and were required to pay customer, lender, and dealership obligations—not for Deo's personal use. These losses were caused by Deo's purposeful actions to hide the Dealership losses for his own benefit, and made the deliberate decision to withhold obligatory payments for trade loan payoffs and Ally Floor Plan financing, leaving IAG Plaintiffs to satisfy the obligations to protect themselves from the consequences of Deo's actions.

99. Even considering Deo's assertion that he owned one or both Dealerships, which is contrary to all documentary evidence, I never authorized him to use the Ally credit facility or the Dealerships' DMV licenses in a manner that left guaranteed floor-plan and trade-in obligations unpaid, to conceal liabilities from IAG, or to cause IAG to incur additional exposure. His asserted ownership did not pay or release the guarantees, substitute him on the DMV licenses, or reimburse the parties that cured those obligations.

100. Deo did not reimburse IAG for those Floor Plan payments or trade payoffs and did not provide a complete accounting of the proceeds that should have been available to pay Ally.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3, 2026.

Joshua Aaronson