UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.
---------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**SUPERB PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................5

FACTS ....................................................................................................9

LEGAL STANDARD..................................................................................11

ARGUMENT ...........................................................................................13

A. Count Eleven - Transaction-Specific Article 4-A Relief Against Flushing Bank and Alternative Rule 56(g) Findings............................................................ 13

1. Article 4-A Is the Comprehensive Statutory Scheme Governing the Allocation of Loss From Unauthorized Payment Orders..........................................13
2. Flushing Possessed Information Inconsistent With Deo's Claim of Unrestricted Authority Before It Opened the Account ...........................................15
3. The Account Statements Establish Substantial Electronic Debits .........20
4. Flushing Cannot Avoid § 4-A-204 Merely by Pointing to Documents ..........................................................................................20
5. Superb Timely Objected ..........................................................22
6. Superb Is Entitled to a Mandatory Statutory Refund............................22

B. Count Six - The Cumulative Record Supports Summary Judgment on Liability for Unfair Competition........................................................23

1. New York's Unfair Competition Doctrine Prohibits the Bad-Faith Misappropriation of a Competitor's Commercial Advantage .......................................23
2. The Undisputed Record Establishes Superb's Labor, Expenditures, Customer Relationships, and Business Resources ..............................................24
3. The Record's Admitted Acts and Circumstances Establish Misappropriation and Permit the Inference of Bad Faith......................................................25
4. The Undisputed Circumstances Establish Bad Faith ............................28
5. The Misappropriation Caused Cognizable Commercial Injury .............29

C. Count Eight - The Cumulative Circumstantial Record Supports Inferred Agreement and Intentional Participation in the Civil Conspiracy............................................. 29

1. Count Six Supplies the Required Underlying Actionable Tort .............30
2. Coordinated Conduct Establishes Agreement and Intentional Participation ..........................................................................30
3. The Record Contains Discrete Overt Acts; Their Significance Is Defendant-Specific ..............................................................................32
4. The Conspiracy Caused Superb's Injury and Subjects Each Participant to Liability for the Underlying Wrong...................................................33

CONCLUSION.........................................................................................33

## TABLE OF AUTHORITIES

**Cases**


Adickes v. S.H. Kress & Co.,
398 U.S. 144 (1970) ....12

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ....12

Banco del Austro, S.A. v. Wells Fargo Bank, N.A.,
215 F. Supp. 3d 302 (S.D.N.Y. 2016) ....21

Barbagallo v. Marcum LLP,
820 F. Supp. 2d 429 (E.D.N.Y. 2011) ....23, 24, 29

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ....12

Center v. Hampton Affiliates, Inc.,
66 N.Y.2d 782 (1985) ....16

Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
187 F.3d 229 (2d Cir. 1999) ....30

Continental Ore Co. v. Union Carbide & Carbon Corp.,
370 U.S. 690 (1962) ....33

Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.,
650 F. Supp. 3d 62 (S.D.N.Y. 2023) ....21

Farr v. Newman,
14 N.Y.2d 183 (1964) ....16

Giannullo v. City of New York,
322 F.3d 139 (2d Cir. 2003) ....12

Grain Traders, Inc. v. Citibank, N.A.,
160 F.3d 97 (2d Cir. 1998) ....13, 15

Hallock v. State,
64 N.Y.2d 224 (1984) ....19

Henry v. Allen,
151 N.Y. 1 (1896) ....16

Highland Capital Mgmt. LP v. Schneider,
607 F.3d 322 (2d Cir. 2010) ....19

In re Mediators, Inc.,
105 F.3d 822 (2d Cir. 1997) ....................................................................17

ITC Ltd. v. Punchgini, Inc.,
9 N.Y.3d 467 (2007) ....................................................................23

Jackson v. Fed. Express,
766 F.3d 189 (2d Cir. 2014) ....................................................................12

Kashi v. Gratsos,
790 F.2d 1050 (2d Cir. 1986) ....................................................................12, 30

Kirschner v. KPMG LLP,
15 N.Y.3d 446 (2010) ....................................................................16

Levitz v. New York Community Bancorp, Inc.,
222 A.D.3d 960 (2d Dept. 2023) ....................................................................13

Major League Baseball Props., Inc. v. Salvino, Inc.,
542 F.3d 290 (2d Cir. 2008) ....................................................................12

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ....................................................................12

McKinnon Doxsee Agency, Inc. v. Gallina,
187 A.D.3d 733 (2d Dept. 2020) ....................................................................28

ML Genius Holdings LLC v. Google LLC,
No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022) ....................................23

Niram, Inc. v. Sterling Nat'l Bank,
697 F. Supp. 3d 15 (S.D.N.Y. 2023) ....................................................................13, 14

Patco ConsDep. Co. v. People's United Bank,
684 F.3d 197 (1st Cir. 2012) ....................................................................21

Pope v. Rice,
No. 04 Civ. 4171, 2005 WL 613085 (S.D.N.Y. Mar. 14, 2005) ....................30

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133 (2000) ....................................................................12, 33

Regatos v. North Fork Bank,
5 N.Y.3d 395 (2005) ....................................................................13, 22, 23

Roy Export Co. v. CBS, Inc.,
672 F.2d 1095 (2d Cir. 1982) ....................................................................23

Scott v. Harris,
550 U.S. 372 (2007) ....................................................................12

Telecom Int'l Am., Ltd. v. AT&T Corp.,
280 F.3d 175 (2d Cir. 2001) ....................23, 28

Wight v. BankAmerica Corp.,
219 F.3d 79 (2d Cir. 2000) ....................17

**STATUTES & RULES**

18 U.S.C. § 215 ....................20

Fed. R. Civ. P. 56 ....................6, 9, 12, 13, 23, 29, 34

Fed. R. Evid. 404 ....................22

Fed. R. Evid. 801 ....................27

UCC § 4-A-103....................13

UCC § 4-A-104....................13

UCC § 4-A-105 ....................14, 21

UCC § 4-A-201....................21

UCC § 4-A-202....................7, 14 n.6, 22, 23

UCC § 4-A-203....................14, 23

UCC § 4-A-204....................7, 13, 20, 22, 23, 34

UCC § 4-A-505....................22

Local Civ. R. 56.1 ....................9, 12

Restatement (Second) of Agency § 268....................17

Restatement (Second) of Agency § 272....................16

Restatement (Third) of Agency § 2.03 ....................19

## PRELIMINARY STATEMENT

Plaintiffs Superb Motors Inc. ("Superb"), Team Auto Sales LLC ("Team"), Robert Anthony Urrutia ("Urrutia") (collectively the "Superb Plaintiffs") respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") for summary judgment on their claims against Defendants Flushing Bank ("Flushing") as well as Anthony Deo ("Deo"), Sarah Deo ("Sara"), Harry Thomasson ("Thomasson"), Dwight Blankenship ("Blankenship"), Marc Merckling ("Merckling"), Michael Laurie ("Laurie"), Car Buyers NYC Inc. ("Car Buyers"), Gold Coast Cars of Syosset LLC ("GCM Syosset"), Gold Coast Cars of Sunrise LLC ("GCM Sunrise"), Gold Coast Motors Automotive Group LLC ("GCM Group"), Gold Coast Motors of LIC LLC ("GCM LIC"), Gold Coast Motors of Roslyn LLC ("GCM Roslyn"), Gold Coast Motors of Smithtown LLC ("GCM Smithtown"), and UEA Premier Motors Corp. ("UEA") (Deo, Sarah, Thomasson, Blankenship, Merckling, Laurie, Car Buyers, GCM Syosset, GCM Sunrise, GCM Group, GCM LIC, GCM Roslyn, GCM Smithtown, and UEA collectively hereinafter the "Deo Defendants").

Specifically, the Superb Plaintiffs seek summary judgment against Flushing on their eleventh cause of action for violations of Article 4-A of the New York Uniform Commercial Code ("UCC"). In addition, the Superb Plaintiffs seek summary judgment against the Deo Defendants on their sixth and eleventh causes of action under New York common law for unfair competition and civil conspiracy, respectively.

First, as to the UCC claim, Flushing opened an account in Superb's name after receiving a multitude of information inconsistent with Deo's representation that he was Superb's sole owner. Before the account was opened, Flushing possessed a Superb tax return identifying Urrutia and non-party Robert Clarke ("Clarke") as shareholders; Robert Vito Puccio ("Puccio"), Flushing's officer who opened the account, understood that Superb had an owner

other than Deo; and Puccio specifically acknowledged under oath that he had reason to believe Superb had more than one shareholder. Puccio described the account as a "joint venture" that Deo had with his "partner" and requested identifying information for each owner. Puccio later declared that before the account opened, he had reason to believe Superb had more than one shareholder. Moreover, in connection with an application for financing with Northshore in March 2023,[1] Deo submitted a personal financial statement to Flushing which listed closely held entities and *did not include* Superb. In addition, Urrutia submitted information to Flushing concerning the ownership of Superb which Flushing failed to upload into its systems that may detect fraud. Yet, despite all of this, Flushing accepted Deo's self-generated 100% beneficial-owner certification in early April 2023 within days of his application for a bank account and thereafter permitted fifteen transfers totaling $405,900 from the Superb account to the Northshore Motor Leasing LLC ("Northshore") account 8362, all of which should have raised red flags for Flushing. Meanwhile, Urrutia was waiting for weeks as well as sending and resending documentation necessary to open a bank account with Flushing for Superb. Flushing's own Rule 30(b)(6) witness testified that Flushing has not determined that the challenged transactions were authorized and has stated that the authority dispute is for the Court. Flushing's colossal failures to review their own records and verify Deo's assertions of ownership of Superb are inherently commercially unreasonable. Superb timely objected in August 2023 when the unauthorized transactions were discovered, and Flushing only then placed the accounts on hold – which was too little, too late – after there were no funds left in the bank account. In light of these circumstances, the payment orders that were neither authorized by Superb nor otherwise effective under UCC § 4-A-202 are therefore refundable under § 4-A-204.

---

[1] Crucially, Jones knew that, as of March 2023, Deo was *not* an owner of Superb. See Jones Dep. 261:19:262:2.

Second, while Deo was entrusted with the management and operation of Superb, the Deo Defendants used the commercial benefits that Superb and Urrutia had developed - including Superb's customer relationships and CRM information, its dealership systems and know-how, its employees, its vehicles, and other business resources - to establish and advance the competing Gold Coast dealerships they formed under Urrutia's nose. The evidence is not merely that Deo later became a competitor. It is that Superb's own resources were used to create and promote that competing operation while Deo was still serving as Superb's general manager. The record further establishes coordinated acts by other Deo Defendants in furtherance of that undertaking, including signed "duty of loyalty" forms. Those undisputed acts establish both bad-faith misappropriation under New York law and the agreement, participation, overt acts, and resulting injury necessary for civil conspiracy.

Third, as to the civil conspiracy claim, the defendants' division of labor is established in the record. Deo supplied direction and beneficiary entities; Sara supplied management, hiring, customer generation, and administrative oversight; Merckling supplied cash, title, inventory, sales, and vehicle execution; Blankenship supplied vehicle and operational assistance; Laurie supplied banking and capital access; Thomasson supplied legal and documentary support. Sara testified: "The brains would be [Deo]." Sara Dep. at 72:4.[2] She confirmed she incorporated Northshore solely in her name because Deo could not hold a dealership license in light of his wire fraud conviction. Sara Dep. at 67:23-68:13; 52:16-24.

In its March 21, 2025 Opinion and Order, this Court considered the governing law applicable to each of the claims and held that: (i) Superb adequately alleged unfair competition; (ii) that claim supplied an actionable predicate for Superb's civil-conspiracy claim; and (iii) sustained Superb's Article 4-A claim against Flushing. See ECF 230 at 55-58, 68-70, 73-77.

---

[2] See Declaration of Emanuel Kataev (hereinafter "Kataev Decl.") ¶ 3, **Exhibit "A."**

For the reasons below, the Superb Plaintiffs respectfully request summary judgment as to liability on Counts Six and Eight and summary judgment on Count Eleven as to each payment order established by the record to have been issued in Superb's name, accepted by Flushing, paid from Superb's account, and neither authorized nor otherwise effective under Article 4-A. Importantly, the organizing principle of this motion is straightforward: relief on each claim rests on the defendant-specific and transaction-specific facts established by admissible evidence, and those facts are now fully developed. The evidence is cumulative and circumstantial, supplemented by party-opponent admissions. Circumstantial evidence is not a lesser form of proof; it is the ordinary method by which courts determine disputed facts, and motive, opportunity, access, timing, coordinated conduct, and benefit may support the reasonable inferences required for each count. The Superb Plaintiffs need not produce a written conspiracy agreement, a confession from a bank officer, or native-format electronic files to satisfy the summary judgment standard. They must demonstrate the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.

For the reasons below, the Superb Plaintiffs request summary judgment: (1) on Count Eleven for each payment order established through the combined bank records, statements, testimony, declarations, and admissions; (2) on Count Six liability against each defendant whose admitted acts and cumulative record establish bad-faith misappropriation; (3) on Count Eight liability against each defendant whose actor-specific conduct establishes inferred agreement and intentional participation; and (4) alternative Rule 56(g) findings on every component fact the Court finds established short of full liability.

**FACTS**

The Court is respectfully referred to the Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Material Facts ("SMF") and the supporting Declaration of Robert Anthony Urrutia ("Urrutia Decl.") for a full recitation of the relevant facts.

The following summary identifies the principal facts and participants relevant herein.

**Deo's Concurrent Control.** From November 2022 through August 3, 2023, Deo served as Superb's general manager and was entrusted with Superb's day-to-day dealership operations, including authority to acquire vehicle inventory and manage staff. SMF ¶¶ 367, 384-393; Urrutia Decl. ¶¶ 15, 18-27. During the same period, Deo owned and operated the Gold Coast entities - including GCM Syosset, GCM Sunrise, GCM Group, GCM LIC, GCM Roslyn, and GCM Smithtown - that collectively operated as competing automobile dealerships. SMF ¶¶ 660, 734-739; Urrutia Decl. ¶¶ 280, 296-301.

**Personnel.** Merckling handled Monday sales meetings, cash deposits from Superb's safe, inventory tracking, floor-plan audits, vehicle negotiations (including cash-only sales of Superb vehicles, per Nethanel Orgad ("Orgad")'s declaration), and the custody and transport of six Superb vehicles later held under the Court's injunction. SMF ¶¶ 758-60, 832-41, 875, 951-52; ECF 40 ¶¶ 9-18, 20-30. Blankenship, introduced to the Deo operation by Merckling, a former Nassau County Police partner, and receiving $1,000 per week through DEEG LLC, personally drove Superb vehicles to Northshore's July 2023 event at 180 Michael Drive thirteen days before the August 3, 2023 lockout. Blankenship Dep.[3] at 18:6-19:18, 36:20-37:6, 59:2-14, 89:2-90:2, 98:8-99:3, 100:13-102:3. Laurie served as Deo's financial consultant, maintained an office at Superb, introduced Deo to Flushing banker Puccio through a twenty-year personal relationship, and acknowledged discussions and a signed undertaking to become Gold Coast's CFO. Laurie Dep.[4] at 143:22-144:16, 106:17-23, 107:10-24, 116:18-117:7, 174:15-175:8; SMF ¶¶ 731, 816-24, 850-51. Thomasson was salaried by Deo at $3,000.00 per week from July 2023, maintained a personal office at Superb, and admitted that $735,000.00 entered his IOLA account from Libertas Funding LLC ("Libertas"), that he wired $723,000.00

---

[3] See Kataev Decl. ¶ 4, **Exhibit "B."**
[4] See Kataev Decl. ¶ 5, **Exhibit "C."**

to Deo-controlled Car Buyers within twenty-four hours, and that he retained approximately $12,000.00 in legal fees. Thomasson Dep. at 315:2-15, 179:9-180:20, 181:5-17, 113:10-25, 115:5-18, 123:15-25, 124:2-17.

**Sara Deo.** Sara incorporated Northshore solely in her name in November 2017 because Deo could not hold the dealership license given his federal wire fraud conviction. Sara Dep. at 52:16-24, 67:23-68:13, 96:14-22. She opened Northshore's Chase bank account, added Deo as an authorized signer, performed marketing, customer generation, and Superb scheduling functions, and testified that when necessary she oversaw operations "from service to accounting." Sara Dep. at 275:19-276:13, 67:12-22, 68:14-18, 126:13-127:22, 150:2-21, 271:11-16, 148:12-23; SMF ¶¶ 755, 800-05, 827-28, 857-60.

**Thomas Jones, CPA.** Jones was the sole CPA for all Deo dealerships. At Deo's direction, he prepared K-1s identifying Deo at 99% ownership of Northshore based solely on Deo's representations without independent verification, submitted those documents to Flushing, and acknowledged that the July 5, 2023 profit-and-loss statement he produced "were not the true numbers." Jones Dep. 302:12-313:25[5] ("In your declaration, you represented that this profit and loss statement was true and accurate, correct? A. From the information I got from him it was true and accurate, yes. *Not that it's true and accurate to operations*"). Jones introduced Laurie to Deo, completing the chain Jones → Laurie → Deo → Puccio → Flushing. Jones continued filing tax returns for the Gold Coast entities after the August 2023 lockout from Superb for Deo's subsequent dealership(s).

**Libertas.** Sara confirmed that the Libertas proceeds were used "at least in part to purchase an interest in Superb." Sara Dep. at 202:21-204:24.

---

[5] See Kataev Decl. ¶ 6, **Exhibit "D."**

The chronology is: Libertas ($735,000) → Thomasson IOLA → Car Buyers NYC ($723,000 within 24 hours) → Superb (two transfers totaling $500,000). Thomasson Dep. at 123:15-123:25; Deo II. Dep. at 92:13-93:15, 141:2-142:15.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant bears the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once that burden is met, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts" and must come forward with hard evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The Court need not adopt a version of the facts that is contradicted by the record. Scott v. Harris, 550 U.S. 372, 380 (2007).

A Rule 56.1 response does not create a factual dispute by denying a legal label or characterization while admitting the underlying historical facts. Properly supported facts may be treated as admitted when the response does not specifically controvert them with record evidence. See Local Civ. R. 56.1(c)-(d); Jackson v. Fed. Express, 766 F.3d 189, 194-97 (2d Cir. 2014); Giannullo v. City of New York, 322 F.3d 139, 140, 143 n.5 (2d Cir. 2003).

Conclusory denials, conjecture, and speculation do not defeat a properly supported motion. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008); Matsushita, 475 U.S. at 586. Circumstantial evidence is entitled to the same weight as direct evidence. Intent, knowledge, and agreement may be - and routinely are - proved by inference from conduct, relationships, and the cumulative weight of the record.

Critically, the record must be evaluated as a whole. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970) (a meeting of minds may be inferred from circumstances); Kashi v. Gratsos, 790 F.2d 1050, 1055-56 (2d Cir. 1986) (circumstantial proof of participation may be strong and is not deficient). Even where full summary judgment is not warranted on an entire claim, Rule 56(g) authorizes the Court to treat as established for purposes of trial any facts not genuinely in dispute. See Fed. R. Civ. P. 56(g). To the extent this Court declines to grant summary judgment *in toto* (which it should not), the Superb Plaintiffs respectfully request Rule 56(g) findings as an alternative to full summary judgment on any count or element for which the Court concludes a genuinely material fact remains disputed.

## ARGUMENT

### A. Count Eleven - Transaction-Specific Article 4-A Relief Against Flushing Bank and Alternative Rule 56(g) Findings

#### *1. Article 4-A Is the Comprehensive Statutory Scheme Governing the Allocation of Loss From Unauthorized Payment Orders*

Article 4-A of the UCC supplies the comprehensive statutory scheme governing commercial electronic funds transfers and allocates the loss resulting from unauthorized payment orders. Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100-102 (2d Cir. 1998); Niram, Inc. v. Sterling Nat'l Bank, 697 F. Supp. 3d 15, 21-22 (S.D.N.Y. 2023). A "[p]ayment order" is an instruction, communicated directly or through an agent, to a receiving bank to pay or cause another bank to pay a fixed sum of money to a beneficiary. See UCC §§ 4-A-103, 4-A-104. Section 4-A-204 provides the remedy: when the statutory conditions are satisfied, "the bank shall refund any payment of the payment order received from the customer" to the extent the bank is not entitled to enforce it and "shall pay interest" on the refundable amount, subject to the customer-notice provisions governing the period for which interest runs. See UCC § 4-A-204(1).

That obligation is mandatory and cannot be rewritten by private agreement. Regatos v. North Fork Bank, 5 N.Y.3d 395, 403-04 (2005); Levitz v. New York Community Bancorp, Inc., 222 A.D.3d 960, 962 (2d Dept. 2023).

"Good faith" under Article 4-A means honesty in fact and observance of reasonable commercial standards of fair dealing. See UCC § 4-A-105(1)(f). Meanwhile, the authorization framework under § 4-A-202 is two-tiered.[6] A payment order is authorized if the identified sender actually authorized it or was bound by it under agency law. See UCC § 4-A-202(1). Where the bank and customer have agreed to authenticate payment orders through a commercially reasonable security procedure, an otherwise unauthorized order may nonetheless be effective against the customer, but only if the bank accepted the order in good faith and in compliance with that procedure and the customer's applicable written restrictions. See UCC § 4-A-202(2). Commercial reasonableness is a question of law assessed in light of the customer's expressed wishes, circumstances known to the bank, alternative procedures offered, and procedures generally used by similarly situated customers and banks. See UCC § 4-A-202(3). Critically, it is the bank's burden to prove good-faith compliance with a commercially reasonable agreed security procedure. Niram, 697 F. Supp. 3d at 24.

Here, the customer identified in the account and payment-order analysis is Superb. See UCC § 4-A-202(1); ECF 230 at 74-76; Buccino Dep. 231:12-15, 239:8-15. For each payment order at issue, Superb must establish: (1) an accepted payment order issued in Superb's name as sender; (2) payment from Superb's account; (3) absence of actual or agency authorization under § 4-A-202(1); (4) no basis making the order effective or enforceable under §§ 4-A-202(2) and 4-A-203; and (5) the net refundable amount.

---

[6] The June 2026 amendments to UCC § 4-A-202 postdate the transfers at issue and should not be substituted for the historical statutory text governing the 2023 transactions. Counsel should research whether the amendments operate retroactively and, if so, address their effect.

The below table identifies each debit with date, amount, originating and beneficiary accounts, and available authentication evidence.

| **Payment Order** | **Date** | **Amount** | **Originating & Beneficiary Accounts** | **Payment-Order Evidence and Link** |
|---|---|---|---|---|
| PO-01 | 5/8/2023 | $60,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07150 |
| PO-02 | 5/24/2023 | $35,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07150 |
| PO-03 | 5/29/2023 | $20,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07150 |
| PO-04 | 5/31/2023 | $30,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07150 |
| PO-05 | 5/31/2023 | $20,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07150 |
| PO-06 | 6/9/2023 | $30,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-07 | 6/12/2023 | $10,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-08 | 6/14/2023 | $10,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-09 | 6/20/2023 | $60,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-10 | 6/28/2023 | $20,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-11 | 6/30/2023 | $40,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07161 |
| PO-12 | 7/7/2023 | $25,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07176 |
| PO-13 | 7/25/2023 | $250 | Superb **4591** → credit-card account **8634** | ECF 543-8 at FLUSHING07176 |
| PO-14 | 7/26/2023 | $30,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07176 |
| PO-15 | 7/31/2023 | $15,000 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07176 |
| PO-16 | 8/9/2023 | $900 | Superb **4591** → Northshore **8362** | ECF 543-8 at FLUSHING07183 |
| **TOTAL** | | **$406,150.00** | | |

The bank statements, the bank's own production, deposition testimony, declarations, and party-opponent admissions together establish each element for purposes of Article 4-A. See Grain Traders, Inc., 160 F.3d at 100.

***2. Flushing Possessed Information Inconsistent With Deo's Claim of Unrestricted Authority Before It Opened the Account***

On March 30, 2023, Urrutia sent Flushing Senior Vice President David Weinstein ("Weinstein") Superb's 2021 federal tax return identifying Urrutia as a 60% shareholder and Robert Clarke as a 40% shareholder - documents that did not identify Deo as any owner. ECF 517 ¶ 12; ECF 518-5; Kataev Decl. ¶ 7, **Exhibit "E."** Weinstein forwarded those materials within Flushing the same day. ECF 517 ¶ 13; ECF 518-7. Because Weinstein was acting in his capacity as an officer of Flushing when he received those documents from Urrutia, his knowledge is imputed to Flushing as a matter of corporate agency. On March 30, 2023, Urrutia sent Flushing Senior Vice President David Weinstein ("Weinstein") Superb's 2021 federal tax return identifying Urrutia as a 60% shareholder and Robert Clarke as a 40% shareholder - documents that did not identify Deo as any owner. ECF 517 ¶ 12; ECF 518-5; Kataev Decl. ¶ 7, **Exhibit "E."** Weinstein forwarded those materials within Flushing the same day. ECF 517 ¶ 13; ECF 518-7.

Because Weinstein was acting in his capacity as an officer of Flushing when he received those documents from Urrutia, his knowledge is imputed to Flushing as a matter of corporate agency. This is because New York treats a corporation as able to act only through officers and agents, and the knowledge an officer acquires while acting in that capacity, on a matter within the scope of his duties, is the corporation's knowledge, even if he never reports it. See Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784 (1985) (holding that the general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it) (citing Farr v. Newman, 14 N.Y.2d 183, 187 (1964) ("It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never actually have been communicated to the principal"); Henry v. Allen, 151 N.Y. 1, 9 (1896); Restatement (Second) of Agency § 272);

see also Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465 (2010) ("[T]he acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals" and holding that corporations are not natural persons: "[o]f necessity, [corporations] must act solely through the instrumentality of their officers or other duly authorized agents").

The Second Circuit has repeatedly cited the foregoing authority in finding corporate knowledge through its officers. See In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997) (citing Center); see also Wight v. BankAmerica Corp., 219 F.3d 79, 86-87 (2d Cir. 2000) (discussing "the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation") (citing Center and Mediators). Indeed, notification given to an officer authorized to receive it, or who customarily receives communications of that kind, is notice to the corporation. See Restatement (Second) of Agency § 268.

Here, Weinstein - as the *Senior Vice President* - is indisputably an officer of Flushing. Because he was acting in his capacity as an officer of Flushing when he received the documents from Urrutia concerning Superb, Weinstein's knowledge is automatically imputed to Flushing under corporate agency principles. Flushing therefore had corporate knowledge that Superb was not owned solely by Deo before the account was opened. On March 31, 2023, Puccio requested the names, titles, ownership percentages, Social Security numbers, and identification documents for each owner of Superb. ECF 517 ¶ 20; ECF 518-11. He simultaneously described a litigation-related letter as "too general" and as failing to provide insight - and yet the account opened the next business day. Id; ECF 538-1 ¶¶ 21-22; see also ECF 543-8 at FLUSHING7115. Even before late March, on March 12, 2023, in connection with Deo's application for financing with Northshore, Deo submitted a personal financial statement ("PFS") to Flushing. SMF ¶¶ 288-289; Urrutia Suppl. Decl. ¶ 5, Ex. A; ECF 437-15.

Crucially, the PFS provided that, as of March 1, 2023, Superb was *not* a "closely-held entity" of Deo's. ECF 437-15 at 4. On April 3, 2023, Puccio wrote of opening the Great Neck "joint venture" that Deo had with his "partner." ECF 517 ¶ 25; ECF 518-11. Flushing was also aware by March 31, 2023 of the then-pending litigation concerning Deo's claimed ownership and authority at related dealerships. SMF ¶¶ 638, 1036; Buccino Dep.[7] 305:10-15. Puccio has declared that, before the account opened, he knew Superb had more than one shareholder. ECF 538-1 ¶¶ 19-20, 27 ("I knew at the time … that Deo's partner in Superb *was an owner* of Superb") (emphasis added).

Notwithstanding all the foregoing, Deo submitted a beneficial-owner certification identifying himself as the 100% owner of Superb and signed a resolution purporting to vest himself with authority to endorse items, transfer money, and issue electronic or wire instructions. ECF 517 ¶¶ 28-30; ECF 518-15; Deo II. Dep. 202:25-204:13. A day after, dismissing the warning letter and ignoring the PFS, Flushing opened the bank account for Superb on April 4, 2023.

Deo later testified that Urrutia told him, verbally, to apply as 100% owner, and admitted he had no writing or recording reflecting such an instruction. Deo Dep.[8] 310:8-311:24. Urrutia vehemently denies doing so. Urrutia Dep. 252:14-23. This alleged instruction was also anathema to the Shareholders' Agreement for Superb, which did not permit Deo to open bank accounts for Superb. ECF 11-6 §§ 12(A)(viii) (Urrutia sole control of bank accounts) and 13(A) (modification clause requiring signed writing for changes to agreement).

---

[7] See Kataev Decl. ¶ 8, **Exhibit "F."**

[8] See Kataev Decl. ¶ 9, **Exhibit "G."**

Critically, Flushing's own Rule 30(b)(6) representative testified that Weinstein's tax-return materials were not uploaded into the bank's Synergy document-management system because the account contemplated by Urrutia was never completed; that the Synergy system did not analyze documents for conflicts or flag inconsistencies; and that Flushing lacked a procedural "stop" ensuring all required account-opening documents were received and reviewed before an account was opened. SMF ¶¶ 640-641, 1023, 1030; Buccino Dep. 205:10-207:10, 208:10-18, 213:21-214:22. Buccino further testified that Flushing possessed the 2021 K-1 showing Urrutia 60%/Clarke 40% before the account opened; that Puccio emailed Deo asking him to amend the Northshore operating agreement from 99% to 100% to match the credit application (actively facilitating the false ownership representation as to Northshore); and that Flushing conducted no transaction-by-transaction investigation of whether any payment order was authorized by actual shareholders. Buccino Dep. 233:2-241:5; Kataev Decl. ¶ 8, Ex. F at 268:22-278:23; 301:11-24; 303:15-304:25. This failure is critical in light of Deo's own application stating the expected account activity, while the account activity did not reflect what was stated in the application. Compare ECF 543-16 at 5 & 543-8 at 9 with ECF 543-16 at 15-19 & 543-8 at 20, 36, 47, 62, 69.

Most significantly, Flushing has not determined that the challenged transactions were authorized and has stated that the authority dispute is for the Court. SMF ¶¶ 1035-1036; Buccino Dep. 234:6-13, 236:18-21; Kataev Decl. ¶ 8, Ex. F at 257:15-19, 274:10-14. These facts foreclose any contention that Flushing could simply treat Deo's self-generated 100% ownership certification as conclusive proof of Superb's authorization; and it smacks as the antithesis to commercial reasonability. This is because apparent authority cannot originate solely from an agent's own assertion of authority; the claimed authority must derive from words or conduct of the principal communicated to the third party, and apparent authority cannot be invoked where the third party knew or should have known that the agent exceeded

the authority actually conferred. ECF 230 at 74-76 (citing Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 327-28 (2d Cir. 2010)); Hallock v. State, 64 N.Y.2d 224, 231 (1984); Restatement (Third) of Agency § 2.03.

Here, the actual principal of Superb - Urrutia - manifested the opposite: he sent the tax return showing multiple shareholders to Flushing before the account was opened; Flushing's own file therefore contradicts any apparent-authority defense. The context provided by Laurie's prior conviction reinforces the bad-faith inference. Laurie introduced Deo to Puccio through a twenty-year personal relationship. Laurie Dep. at 116:22-117:7. Laurie was convicted in 2019 of bank bribery in violation of 18 U.S.C. §§ 215(a)(2) and 2. United States v. Michael Laurie, D.N.J. No. 3:18-cr-521-BRM, ECF 26; Laurie Dep. at 39:16-45:13.

These facts readily demonstrate that Flushing possessed information inconsistent with Deo's claim of complete ownership of Superb.

### *3. The Account Statements Establish Substantial Electronic Debits*

The verified statement series identifies fifteen transfers from the Superb account to Northshore checking account 8362 totaling $405,900, plus a separate $250 transfer to Superb credit-card account 8634, for an identified statement total of $406,150. Kataev Decl. ¶ 10, Ex. H at FLUSHING7115, 7150, 7161, 7176, and 7183; Kataev Decl. ¶ 11, Ex. I. Deo admitted under oath that he personally directed five May 2023 transfers to Northshore totaling $165,000 and admitted sole control of the account. Kataev Decl. ¶ 10, Ex. H at FLUSHING07150; Deo Dep. 318:17-321:8. In August 2023, Urrutia complained to Flushing and Flushing responded by placing the accounts on hold. ECF 517 ¶¶ 58-59; Buccino Dep. 233:16-21, 239:21-25.

### 4. Flushing Cannot Avoid § 4-A-204 Merely by Pointing to Documents

Flushing may contend that Deo's signed beneficial-owner certification and resolution rendered every later payment order effective or authorized. That argument does not follow from the statute.

Account-opening due diligence and payment-order authentication are related but legally distinct. Section 4-A-201 defines a "[s]ecurity procedure" as a procedure established by agreement between customer and bank for the purpose of verifying that a payment order is that of the customer; a signed account-opening resolution defines the authority Deo claimed at the time of account opening; it is not itself proof of the security procedure used to verify the authenticity of each subsequent electronic payment instruction. See UCC § 4-A-201; see also Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A., 650 F. Supp. 3d 62, 80-83 (S.D.N.Y. 2023) (technical compliance with generic credentials insufficient to establish commercially reasonable security procedure under Article 4-A); Banco del Austro, S.A. v. Wells Fargo Bank, N.A., 215 F. Supp. 3d 302, 304-06 (S.D.N.Y. 2016) (bank must prove the agreed procedure, not merely any procedure).

UCC § 4-A-105(1)(f) requires that good faith include observance of reasonable commercial standards of fair dealing, not merely honesty in fact. A bank cannot establish objective good faith by showing only that a purported agent completed its forms where the bank simultaneously possessed documents calling Deo's alleged sole ownership into question. Banco del Austro, 215 F. Supp. 3d at 304-06; Patco ConsDep. Co. v. People's United Bank, 684 F.3d 197, 211-14 (1st Cir. 2012) ("it was these collective failures taken as a whole, rather than any single failure, which rendered Ocean Bank's security system commercially unreasonable").

Here, Flushing's account-opening process collected documents but did not ensure they were reviewed together, did not flag the ownership contradiction between the tax returns, the PFS, and Deo's certification, and opened the account despite an unresolved lawsuit. SMF ¶¶ 640-641, 1016-1037; Buccino Dep. 205:10-18, 213:21-214:22.

Further, the absence of a suspicious-activity alert does not, standing alone, establish that the payment orders were authorized or that Flushing complied with a commercially reasonable security procedure. Flushing admitted that no suspicious- or unusual-activity alert was generated and that its Rule 30(b)(6) representative did not believe enhanced features such as Positive Pay or a token system were added to the account. ECF 524 ¶ 642; Kataev Decl. ¶ 8, Ex. F at 240:8-241:5. Superb's entitlement to a statutory refund turns on §§ 4-A-202 through 4-A-204, not on a free-standing negligence theory. That distinction is particularly important because this Court has already held that common-law theories duplicating Article 4-A's allocation of responsibility are precluded. See ECF 230 at 78-80.

The admissibility of Deo's prior conviction for conspiracy to commit wire fraud and wire fraud, in the Southern District of New York, United States v. Anthony Deo, S.D.N.Y. No. 1:10-cr-00631-JGK (Jan. 15, 2016) (five years' probation, $300,000 forfeiture), confirmed under oath by Sara, Sara Dep. at 52:16-24, is relevant under Fed. R. Evid. 404(b)(2) to prove intent, knowledge, plan, and absence of mistake with respect to the authorization scheme. Had Flushing done its due diligence and acted in a commercially reasonable manner, Superb would not have been forced to shut down.

***5. Superb Timely Objected***

UCC § 4-A-204(1) governs the effect of delayed notice on statutory interest, while UCC § 4-A-505 provides a one (1) year outside period for objection after the customer receives a notification reasonably identifying the payment order. See UCC §§ 4-A-204(1), 4-A-505; see also Regatos, 5 N.Y.3d at 402-03 (distinguishing the notice rule affecting interest from the one-year preclusion rule). The identified debits and Urrutia's August 2023 complaint to Flushing occurred in the same calendar year. ECF 517 ¶¶ 58-59. That chronology establishes timely principal-refund notice within the one-year outside period.

### *6. Superb Is Entitled to a Mandatory Statutory Refund*

For each payment order established through the combined statements, bank production, testimony, declarations, and admissions to have been issued in Superb's name, accepted and paid by Flushing, and neither authorized nor otherwise effective or enforceable under §§ 4-A-202 and 4-A-203, § 4-A-204 is mandatory: Flushing "*shall* refund" the payment to the extent it was not entitled to enforce it. See UCC § 4-A-204(1). That obligation is not discretionary. Regatos, 5 N.Y.3d at 403. Superb accordingly requests summary judgment on Count Eleven for each qualifying payment order as established in the order schedule, together with statutory interest from the date of Superb's notice under § 4-A-204(1). In the alternative, Superb requests Rule 56(g) findings establishing every account-opening, debit, authority, security-procedure, and notice fact for which the record is undisputed, leaving any disputed transaction-specific element for trial.

## B. Count Six - The Cumulative Record Supports Summary Judgment on Liability for Unfair Competition

### *1. New York's Unfair Competition Doctrine Prohibits the Bad-Faith Misappropriation of a Competitor's Commercial Advantage*

This Court has already identified the governing standard. "'The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another with some element of bad faith.'" ECF 230 at 55 (quoting ML Genius Holdings LLC v. Google LLC, No. 20-3113, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022) (internal citations omitted)).

The doctrine encompasses the appropriation, for one person's commercial advantage, of a benefit or property right belonging to another and is sufficiently flexible to reach varied forms of commercial misconduct. Id. (citing Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001)).

A plaintiff need not establish either a breach of contract or the existence of a legally protected trade secret to prove unfair competition. Barbagallo v. Marcum LLP, 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011); see also ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 478 (2007); Roy Export Co. v. CBS, Inc., 672 F.2d 1095, 1105 (2d Cir. 1982).

This Court expressly rejected the proposition that Count Six rises or falls with the dismissed trade-secret claims. Client lists, internal business information, and business strategies may support an unfair-competition claim where appropriated through wrongful or fraudulent tactics. ECF 230 at 55-56 (citing Barbagallo, 820 F. Supp. 2d at 447).

Count Six accordingly concerns the broader and surviving wrong identified by the Court: the bad-faith appropriation of commercial benefits that Superb and Urrutia created through substantial labor and expenditure, and the use of those benefits to establish and advance the Gold Coast competing enterprise. ECF 230 at 55-58.

### *2. The Undisputed Record Establishes Superb's Labor, Expenditures, Customer Relationships, and Business Resources*

The undisputed evidence establishes substantial commercial investments belonging to Superb and the Superb Plaintiffs. Urrutia developed Superb's customer base through years of dealership operations and testified that Superb and its related businesses spent substantial sums advertising to the Caribbean community through Irie Jam Radio, which reaches more than two million listeners. Urrutia Decl. ¶¶ 9-11; SMF ¶¶ 670-672.

Superb maintained customer leads generated through those efforts in its DriveCentric and later VINSolutions customer relationship management ("CRM") systems, which were identified, operational platforms, not abstract concepts. SMF ¶¶ 671-674. Superb also operated an integrated dealer management system (DealerTrack, later Tekion), investing more than $120,000 in implementation and customization. SMF ¶¶ 396-397, 662-666; Urrutia Decl. ¶¶ 12, 29-30.

Beyond CRM and DMS, Superb's commercial investment encompassed trained employees, a vehicle inventory and floor-plan capacity, vendor and lender relationships, physical dealership premises, and years of accumulated goodwill. SMF ¶¶ 384-397, 668-680.

Critically, Deo himself testified that he and Sara were responsible for hiring at Northshore and that employees were "interchangeable" among Superb, Northshore, and Sunrise - an admission that directly confirms the cross-entity deployment of Superb's personnel which Urrutia never authorized. SMF ¶ 755.

The point is not whether those resources qualify as "trade secrets" under the misappropriation statute. This Court already drew the relevant distinction: although the information did not satisfy the requirements for a statutory trade secret at the pleading stage, Superb and Urrutia had invested "significant labor, skill and money" in the customer base, DMS, and dealership model. ECF 230 at 56-57. That commercial investment is independently cognizable under New York unfair-competition law.

### *3. The Record's Admitted Acts and Circumstances Establish Misappropriation and Permit the Inference of Bad Faith*

Unfair competition may be proven through a connected chain of facts.

The relevant proof includes: Superb's commercially valuable resources; defendants' entrusted access and opportunity; overlapping timing; operation of competing dealerships while Deo ran Superb; use of Superb vehicles and facilities; customer-generation, scheduling, inventory, deposit, financing, and banking roles performed for the competing enterprise; common direction; commercial benefit; the absence of Urrutia's authorization; and conduct from which bad faith may reasonably be inferred.

**Vehicle and Tangible Resource Appropriation.** Multiple sworn sources establish the movement of Superb vehicles to the competing operation. Deo acknowledged that Superb vehicles were present at the July 2023 Northshore event at 180 Michael Drive. ECF 156-1 at 56:25-58:8.

Blankenship independently testified that, at Deo's or Merckling's direction, he moved at least one and possibly more Superb vehicles to the Northshore grand opening event. Blankenship Dep. 88:10-89:18.

Lowe testified that Northshore had no event inventory of its own and corroborated that the event vehicles came from Superb - proving that the competing operation structurally depended on appropriating Superb's property. ECF 156-1 at 117:5-118:2; SMF ¶ 760.

Orgad declared that Merckling negotiated cash-only sales of Superb vehicles. ECF 40 ¶¶ 9-18, 20-30.

Merckling separately transported six Superb vehicles later held under the Court's injunction. SMF ¶¶ 832-36, 951-52.

**CRM and Customer Information.** Urrutia testified that he did not authorize Superb's customer-lead or CRM information to be copied, retained, or used outside Superb. Urrutia Decl. ¶ 504; SMF ¶ 676. That testimony is admissible proof of the scope of authorization. Use and bad faith may be inferred from the full chain of entrusted access, overlapping timing, customer-generation and scheduling functions performed simultaneously for the competing operations, coordinated acts, benefit, and subsequent conduct. See ECF 230 at 55-58.

**Defendant-Specific Participation.** The Court may infer knowledge and participation from a defendant's role, access, directions received or given, sequence of acts, benefit, communications, shared facilities, handling of property or money, and explanations inconsistent with the objective record.

Deo owned the Gold Coast entities and ran Superb's day-to-day operations; acknowledged that Superb vehicles were at the July 2023 event; and directed Blankenship and Merckling. SMF ¶¶ 745-47, 966, 969-70; ECF 156-1 at 56:25-57:22, 100:13-102:3; Deo Dep. 255:19-25, 257:11-16, 258:24-25; Merckling Dep. 33:21-25, 60:13-61:8, 124:7-10, 250:7-10; Blankenship Dep. 59:4-6, 89:19-90:2, 100:10-20; Laurie Dep. 168:3-6; Sara Dep. 211:5-212:3.

Blankenship moved Superb vehicles to the competing event thirteen days before the lockout, at Deo's or Merckling's direction. ECF 156-1 at 100:13-102:3.

Merckling handled inventory tracking, cash deposits from Superb's safe, vehicle negotiations, floor-plan audits, and the custody and transport of six injunction vehicles. Merckling Dep.[9] 97:14-17, 108:12-19, 125:23-126:3, 133:12-17, 138:20-139:3, 208:19-209:5, 223:7-225:16; SMF ¶¶ 730, 832-36, 949-52. The Libertas Agreement identifies "Marc Merkling" as an "Owner" signer for both Northshore and Sunrise. ECF 520-1 at 16. He denies execution, but the FBI has served him with a grand jury subpoena in connection with this matter. Merckling Dep. 192:2-195:8; ECF 393-1.

Sara worked directly with Deo across the dealerships, performed marketing/customer-generation and Superb scheduling functions, maintained a payroll relationship with Superb, opened Northshore's Chase account, added Deo as an authorized signer, and served as intermediary on a check associated with the Gold Coast Syosset repair shop. Sara Dep. 67:16-19, 121:16-21, 148:12-151:4, 155:4-160:22, 276:6-12; SMF ¶¶ 800-05, 827-28, 857-60.

Laurie served as Deo's "financial consultant," maintained an office at Superb, referred and facilitated financing (introducing Deo to Puccio at Flushing), received transaction-based compensation, acknowledged a signed undertaking to become Gold Coast's CFO, and received unexplained $26,000.00 on November 1, 2023 and $5,300.00 on November 20, 2023 in post-litigation wires from Car Buyers. SMF ¶¶ 731, 816-24, 850-51, 881; Laurie Dep. 111:2-112:17, 113:23-114:17, 119:17-25, 169:3-15, 173:6-176:5, 182:19-24, 188:18-20.

Thomasson was salaried by Deo at $3,000 per week from July 2023, maintained a personal office at Superb, handled the IOLA-to-Car Buyers transfer of $723,000.00 within twenty-four hours (retaining $12,000.00), and admitted that Cherrywood Auto Sales asserted

[9] See Kataev Decl. ¶ 12, **Exhibit "J."**

"similar categories of diversion allegations" against Deo - a party-opponent admission under Fed. R. Evid. 801(d)(2)(A) corroborating that this was a pre-existing pattern, not an isolated incident. Thomasson Dep. 76:13-80:3, 108:17-110:24, 113:10-115:18, 123:15-124:17, 128:10-129:25, 178:4-181:20, 315:2-6; SMF ¶¶ 728, 764-65, 854-55, 894-95; JCJD Inc. d/b/a Cherrywood Auto Sales v. Deo, Index No. 616451/2025, NYSCEF Docket Entry 16.

***4. The Undisputed Circumstances Establish Bad Faith***

Bad faith follows from the manner in which the commercial benefits were acquired and used. Deo did not obtain Superb's customer relationships, operating systems, vehicles, and internal resources as an arm's-length competitor. He obtained access to them because Superb entrusted him with managerial authority and expected him to operate the dealership for Superb's benefit. SMF ¶¶ 367, 384-393. The Second Circuit recognizes that unfair competition encompasses the appropriation of the fruits of another's labor through fraud, deception, or an abuse of a fiduciary or confidential relationship. Telecom Int'l Am., 280 F.3d at 197. This Court expressly applied that principle to the Superb allegations. ECF 230 at 55-58.

Bad faith may be inferred from: Deo's simultaneous control of Superb and ownership of the competing Gold Coast entities; the use of entrusted access for the competitor's benefit; the movement of Superb inventory to a competitor's event without notice to Urrutia; the defendants' complementary operational, deposit, scheduling, marketing, financing, and banking roles; the commercial benefit flowing to the Gold Coast entities; and Deo's prior federal conviction for wire fraud and UEA's DMV revocation (Universal Exotic Autos, permanent revocation October 1, 2018 - Northshore formed November 1, 2017, the day after his 999-day suspension period began). New York courts have awarded unfair-competition liability where timing and surrounding records permitted an inference of wrongful conduct, even without a direct admission of intent. See McKinnon Doxsee Agency, Inc. v. Gallina, 187

A.D.3d 733, 737-38 (2d Dept. 2020). Defendants may dispute the conclusion, but they cannot remove the admitted underlying acts from the Court's cumulative analysis.

In addition, Thomas Jones' recurring financial adjustments - voucher sheet methodology inflating reported profitability by millions of dollars, and the July 5, 2023 profit-and-loss statement he confirmed "were not the true numbers" - provide the accounting mechanism that facilitated the scheme. Jones Dep. 305:18-313:25.

His post-lockout continuation of Gold Coast tax filings confirms the operation's persistence as a going concern. No single fact carries the claim; but their combined significance and the totality of the circumstances lies in the pattern they form with access, direction, vehicle use, deposits, financing, banking, and benefit.

***5. The Misappropriation Caused Cognizable Commercial Injury***

This Court already recognized that diversion of a plaintiff's customers and business is sufficient to establish the pertinent injury. ECF 230 at 55-57 (citing Barbagallo, 820 F. Supp. 2d at 447). The record establishes concrete, non-speculative commercial injury: use of Superb vehicles at the competitor's event, use of entrusted access across all operational dimensions, a coordinated operating structure serving the competing businesses, and ultimately the lost customers, lost business, impairment of goodwill, and closure of Superb's dealerships. SMF ¶¶ 724-725; ECF 282 ¶ 6; ECF 304 ¶ 25. The eventual closure of a dealership is concrete injury, not speculation.

Any uncertainty about the final dollar amount does not preclude judgment on liability. Superb requests summary judgment on Count Six liability while reserving the quantification of damages - separated into categories for vehicle use, diverted sales/gross profit, misappropriated employee compensation, CRM/customer diversion, and account debits net of transaction-specific credits - for a later schedule, accounting, or trial.

At minimum, Rule 56(g) findings should establish Deo's simultaneous control, the competing operations, the admitted vehicle movements and deposits, Urrutia's lack of authorization, and each actor's specific functions and benefits.

### C. Count Eight - The Cumulative Circumstantial Record Supports Inferred Agreement and Intentional Participation in the Civil Conspiracy

#### *1. Count Six Supplies the Required Underlying Actionable Tort*

New York does not recognize civil conspiracy as an independent substantive tort; civil conspiracy connects defendants to an otherwise actionable underlying wrong. ECF 230 at 68 (citing Pope v. Rice, No. 04-CIV.-4171, 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005)). Once the actionable tort is established, a plaintiff must show: "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." ECF 230 at 69 (quoting Kashi, 790 F.2d at 1055 (2d Cir. 1986)).

Conspiratorial agreements are rarely reduced to writing;[10] the agreement may be inferred from circumstantial evidence. Kashi, 790 F.2d at 1056. This Court held at the pleading stage that Superb's unfair-competition claim is an actionable wrong capable of supporting Count Eight. ECF 230 at 69-70.

#### *2. Coordinated Conduct Establishes Agreement and Intentional Participation*

No reasonable factfinder could conclude that the documented acts occurred independently. A written agreement, confession, or direct communication stating the unlawful objective is not required.

---

[10] In this case, there exists some semblance of a writing. See ECF 38-12. The weight of this writing is immense given each Defendants' inability to shed any light on the nature of these documents at their depositions. Thomasson Dep. 189:8-190:25; Deo Dep. 401:13–406:24, Laurie Dep. 173:3–9, 174:15–25, 175:6–176:5; Merckling Dep. 184:11–25, Blankenship Dep. 118:16–119:18, 94:12–18, 191:2–7.

Agreement and intentional participation may be inferred from the development and combination of circumstances. Kashi, 790 F.2d at 1055-56; Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 240(2d Cir. 1999).

This Court applied that rule in this very action at the pleading stage, recognizing that circumstantial facts may support findings that each defendant joined and acted in furtherance of a conspiracy. ECF 230 at 68-70.

The relevant circumstances include: common direction by Deo; complementary and overlapping roles; shared offices and introductions; formation and continuous operation of the competing businesses while Deo ran Superb; vehicle movement and custody by Blankenship and Merckling at Deo's direction; cash deposits from Superb's safe; scheduling and marketing functions; financing and banking access through Laurie; rapid movement of $723,000.00 through Thomasson's IOLA to Deo-controlled Car Buyers; and commercial benefit flowing to all participants. SMF ¶¶ 778, 792-793, 959, 759-765, 745-750, 969, 951-953, 875, 949-950, 828, 854, 860-861, 878-882, 895; ECF 536 ¶¶ 745-46, 749-51, 759-60, 763-65. The FBI's independent investigation corroborates the inference of coordinated criminal purpose. The FBI has opened an investigation and Merckling was served with a grand jury subpoena. Merckling Dep. 192:2-195:8. Thomasson's admission that Cherrywood Auto Sales asserted similar categories of diversion allegations confirms not a spontaneous improvised scheme but rather a pre-existing pattern of systematic dealership diversion. Thomasson Dep. 76:13-80:3; see also JCJD Inc. v. Deo, *supra*.

The defendant-by-defendant evidence establishes knowing participation:

*Deo:* Deo's dual control of both Superb and the Gold Coast entities constitutes the central organizing fact. His direction to Blankenship and Merckling, his acknowledged presence of Superb vehicles at Northshore's event, his payroll payments to each participant, and his designation as the "brains" (per Sara Deo) establish principal orchestrator status.

*Merckling:* Monday sales meetings, safe access, inventory/floor-plan/title functions, cash-only vehicle negotiations, six-vehicle custody and transport, Libertas "Owner" designation, presence and assistance at the August 3, 2023 lockout, and FBI grand jury subpoena establish strong circumstantial agreement and overt acts. SMF ¶¶ 832-41, 951-952, 758, 893; Merckling Dep. 96:2-97:25, 108:12-111:19, 133:10-139:9, 223:2-225:24, 314:21-317:20, 345:12-347:24; 206:2-210:25; 192:2-194:25.

*Blankenship*: Vehicle movement thirteen days before the lockout at Deo's/Merckling's direction establishes advance coordination and an overt act in furtherance of the scheme. Blankenship Dep. 18:2-19:18, 59:2-14, 88:10-90:2, 100:13-102:5; SMF ¶ 760.

*Thomasson:* The IOLA bait-and-switch ($735,000 in, $723,000 to Car Buyers within 24 hours, $12,000 retained), personal Superb office, Deo's $3,000/week payroll payments, and Cherrywood similarities admission establish knowing participation and an overt financial act. Thomasson Dep. 76:13-80:3, 108:17-110:24, 123:15-124:17, 315:1-6.

*Sara:* Her incorporation of Northshore in her name precisely because Deo could not hold the license, her management of banking and personnel, her confirmation that Libertas money was used "at least in part" to purchase a Superb interest, and her "from service to accounting" oversight support knowing participation; the inference of agreement to an unlawful objective is strong even if a directed verdict for Sarah individually is the most that can be obtained at trial. Sara Dep. 67:23-68:13, 130:2-24, 147:12-148:25, 175:18-176:16, 204:19-24.

*Laurie:* The banking conduit role (Puccio introduction through twenty-year relationship), Flushing account facilitation, office at Superb, post-litigation Car Buyers wires, and prior bank bribery conviction support circumstantial knowledge and participation; the inference chain from admitted facilitation to "knowing agreement to an unlawful objective" requires the Court to draw the most favorable reasonable inference from the admitted facts.

*Gold Coast Entities, Car Buyers, and UEA:* All are Deo-owned, received vehicles, personnel, or operational support from Superb, shared the 180 Michael Drive address, and Car Buyers received the $723,000 IOLA transfer. Their liability follows automatically from Deo's established liability as their common owner and principal. SMF ¶¶ 734-45; Thomasson Dep. 123:15-124:17.

In light of the foregoing, there is on question that there was coordinated conduct.

***3. The Record Contains Discrete Overt Acts; Their Significance Is Defendant-Specific***

The conspiracy overt acts established by the record include: (1) the formation and operation of the Gold Coast entities while Deo ran Superb; (2) Blankenship's July 21, 2023 movement of Superb vehicles to the Northshore event thirteen days before the lockout; (3) Merckling's inventory, deposit, floor-plan audit, cash-only sales, and six-vehicle custody functions; (4) Sara Deo's scheduling, marketing, customer-generation, and banking acts performed concurrently with Superb's operations; (5) Laurie's financing facilitation and Flushing introduction; (6) Thomasson's IOLA-to-Car Buyers transfer of $723,000 within twenty-four hours; (7) the use of Jones-prepared false ownership documents in Flushing's loan file; and (8) the depletion of Superb's operating capital by depositing checks and cash in the unauthorized bank account opened for Superb at Flushing.

Considered together and tied to actor-specific proof, these complementary acts support a common objective and intentional participation. The probative force comes not from any single act but from the alignment of timing, entrusted access, common direction, complementary functions, use and movement of Superb resources, shared facilities, money handling, and commercial benefit. The character and effect of conspiracy evidence must be assessed as a whole, not by isolating each part. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); Reeves, 530 U.S. at 150.

### 4. *The Conspiracy Caused Superb's Injury and Subjects Each Participant to Liability for the Underlying Wrong*

There is no question that the Superb Plaintiffs were injured by the Deo Defendants' conduct as both Superb and, later, Team were ultimately forced to shut down. Accordingly, the Superb Plaintiffs are entitled to summary judgment on their civil conspiracy claim.

## CONCLUSION

For the foregoing reasons, the Superb Plaintiffs respectfully request that this Court grant the following relief:

(1) Summary judgment on Count Eleven for each payment order established through the combined bank records, statements, testimony, declarations, and admissions, together with statutory interest under UCC § 4-A-204(1);

(2) Summary judgment on Count Six liability against each defendant whose admitted acts and cumulative record establish bad-faith misappropriation of Superb's commercial advantage;

(3) Summary judgment on Count Eight liability against each defendant whose actor-specific conduct, viewed cumulatively, establishes knowing agreement and intentional participation in the underlying unfair competition;

(4) Determination of any unresolved damages amount through a schedule, accounting, or trial; and

(5) In the alternative, Rule 56(g) findings on every component fact the Court finds established short of full liability, with any genuinely disputed inference or amount left for trial.

Dated: Jamaica, New York
September 4, 2026

Respectfully submitted,

**SAGE LEGAL LLC**

_*/s/ Emanuel Kataev, Esq.*_____

Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Plaintiffs*
*Superb Motors Inc.,*
*Team Auto Sales LLC, and*
*Robert Anthony Urrutia*

**VIA ECF**
All counsel of record