-----------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, and J.P. MORGAN CHASE BANK, N.A.,

Defendants.

-----------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**DECLARATION OF WENDY KWUN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Wendy Kwun declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

## BACKGROUND AND BASIS OF KNOWLEDGE

1. At all relevant times, I have been the Controller of the Island Auto Group ("IAG"), a group of new- and used-automobile dealerships and related real-estate interests. Each dealership employs its own controller who reports to me. In that role, I oversee and review financial reporting, bank activity, intercompany advances, floor-plan payments, and other accounting functions for IAG and the dealerships described below.

2. The IAG entities that are plaintiffs in this action include Northshore Motor Leasing, LLC ("Northshore"), 189 Sunrise Hwy Auto LLC ("Sunrise") (together, the "Dealerships"), 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC, and Island Auto Management, LLC.

3. Plaintiff Joshua Aaronson ("Aaronson") is a managing principal of IAG and my immediate superior. As Controller, I oversee financial and operational functions for IAG, supervise employees who assist with those functions, have access to the dealerships' dealer-management and banking systems (the "DMS"), and maintain and review records concerning dealership operations.

4. Except where I expressly identify another source, the facts stated in this declaration are based on my personal involvement in the events described and my review of records maintained by IAG and the Dealerships in the ordinary course of business. Those records include DealerTrack/DMS records, general ledgers, trial balances, journal-entry reports, bank statements, cancelled checks, wire confirmations, payroll reports, commission reports, Ally

statements and payoff records, deal jackets, and trade-payoff records. IAG and the Dealerships made and maintained these records at or near the time of the recorded transactions through employees or automated systems with knowledge of the transactions; maintaining such records was a regular practice; and IAG and the Dealerships regularly relied upon them in conducting their business.

5. David Baron ("Baron"), together with his brother Ron Baron, owned and operated new- and used-car dealerships referred to as the Baron Group (the "Baron Group"). Baron died in May 2021. Aaronson, Baron's son-in-law, previously worked with the Baron Group before forming IAG. The Baron Group and IAG had overlapping ownership interests in certain dealerships and shared a vehicle-inventory floor-plan credit facility the ("Ally Floor Plan") with Ally Bank ("Ally").

6. The ownership and licensing records that I reviewed identify the Estate of David Baron, Brian Chabrier ("Chabrier"), and Asad Khan ("Khan") as Northshore's members or owners during the relevant period. The records that I reviewed identify the Estate of David Baron, Aaronson, Chabrier, Jory Baron ("Jory"), and Raymond Phelan ("Phelan") as Sunrise's members or owners. I found no executed assignment, member-approved transfer agreement, closing document, or DMV approval transferring an interest in either Dealership to Anthony Deo ("Deo") during the events described below.[1]

7. I was not involved with Northshore or Sunrise before approximately May 2021. When Baron died in May 2021, Iris Baron, Baron's widow, asked Aaronson to step in to assist

[1] I refer the Court to the documents referred to in the accompanying declarations of Aaronson and Chabrier upon which they rely to establish ownership.

with overseeing Northshore and Sunrise, which Baron used to take care of. In order for Aaronson to gain oversight of Northshore's and Sunrise's operations it brought them under the IAG administrative umbrella.

8. My direct involvement began when I assisted in transitioning the Dealerships from the Baron Group DMS to IAG's DealerTrack DMS, and obtained access to their Chase bank accounts. I did not obtain all of the Dealerships' historical financial information during that transition.

9. At that time Deo was managing Northshore and Sunrise, being responsible for the Dealerships' day-to-day operations. Aaronson continued to leave their day-to-day management to Deo. Sarah Deo, Deo's wife ("Sara"), also worked at the Dealerships. Northshore and Sunrise employed use the Ally Floor Plan for its vehicle inventory purchases. They each were being paid $2,500.00 per week, per dealership, totaling $10,000.00 per week. **See Ex. 7**. They were also being paid a seven and one-half percent (7.5%) of the gross profit on vehicles sold by Northshore and Sunrise. They issued those commission payments to Car Buyers NYC, Inc. ("Car Buyers")

10. Daniel O'Sullivan ("O'Sullivan"), the Dealerships' controller, was responsible for their financial recordkeeping and transactions, such as issuing payments, recording financial transactions and keeping financial track of the Dealerships operations, all for the use of Deo in operating the Dealerships. O'Sullivan is not an accountant and provides no financial advice or guidance.

11. Initially, my work for the Dealerships principally consisted of assisting with the DMS transition and working with the title clerks' to more efficiently process the documentation needed to more rapidly obtain customer-loan funding. I did not conduct a comprehensive review of the Dealerships' finances until their cash-flow problems became apparent in 2022.

**DEALERSHIP OPERATIONS AND DEO'S RESPONSIBILITIES**

12. A dealership manager is responsible for supervising personnel and managing inventory, sales, financing, payroll, cash flow, and the dealership's day-to-day operations. At Northshore and Sunrise, Deo selected and acquired used-vehicle inventory, accessed the Ally Floor Plan through interstate electronic communications, directed dealership personnel, and controlled or directed the prioritization and payment of dealership expenses.

13. A dealership ordinarily purchases inventory with floor-plan financing. The floor plan lender automatically obtains a lien on each vehicle purchased. The lien remains until the vehicle is sold and the corresponding floor plan advance is repaid. When an inventoried vehicle is sold, the corresponding floor-plan advance must promptly be repaid, for which the sale transaction proceeds are available. If a customer trades in a vehicle subject to an outstanding loan, the dealership must pay that loan so the lien on the trade can be released, again, for which the sale transaction proceeds are available.

14. For purchases of vehicles at established auctions, Ally ordinarily paid the seller directly through interstate electronic funding. For qualifying non-auction purchases, Ally would fund up to eighty (80%) percent of the vehicle's wholesale book value, irrespective of the Dealership's actual acquisition cost, because it presumed the vehicle was I good condition, and deposit the proceeds into the Dealership's bank account through interstate electronic funding.

15. The DMS records inventory, sales, financing, cash receipts, expenses, liabilities, and other financial activity. The financial information entered into the DMS is used to prepare monthly and annual financial statements. The Dealerships therefore depended upon complete and accurate DMS records, accurate monthly financial statements, timely repayment of sold inventory, and prompt collection of customer-loan proceeds.

16. Deo had direct access to, and initiated the requests for all, Ally Floor Plan financing. All vehicle and funding information was supposed to be recorded in the DMS. Each Dealership had an allocated Ally credit limit based on financial and other factors applied by Ally. In their last operational year, 2022, NS's credit limit was $5,175,000 and SR's credit limit was $2,325,000. **See Ex. 30**. Ally required monthly financial information and inventory inspections and could restrict, reduce, or terminate financing if its requirements were not satisfied.

17. Aaronson had personally guaranteed the obligations under the shared Ally Floor Plan. **See Ex. 8**. In deciding whether IAG would continue permitting Deo to access that facility, Aaronson and I relied on the Dealerships' DMS records and monthly financial statements.

18. Beginning by at least August 2021 Deo hired Thomas Jones, CPA ("Jones") to perform monthly accounting work for the Dealerships. The DMS identifies monthly adjusting journal entries from "JONES." It was my understanding, corroborated by the testimony of O'Sullivan and Jones, that the adjustments were determined monthly by Deo and Jones. Jones would then direct O'Sullivan to implement the adjustments into the DMS. O'Sullivan Dep.124:24-125:5, Jones Dep. 64:11-16. My later review of the DMS, trial balances, and supporting records showed that many of those entries increased reported profit or reduced reported losses without corresponding support in the underlying transaction records available to me.

19. Before the unpaid obligations were disclosed in late August 2022, as noted below, Aaronson and I did not know that the monthly financial information materially understated the Dealerships' losses and liabilities. Had the true condition been disclosed, I would have recommended that IAG immediately restrict Deo's access to the Ally Floor Plan, stop additional inventory purchases, and require a transaction-level reconciliation before permitting further use

of IAG's credit support.

**<u>DISCOVERY OF THE UNPAID OBLIGATIONS</u>**

20. By early 2022, Northshore and Sunrise were experiencing cash-flow problems. I began monitoring available cash and assisting personnel in obtaining prompt customer-loan funding so payroll and other obligations could be met. At that time, IAG knew that the Dealerships were performing poorly, but did not know the full extent of their unpaid obligations or losses.

21. On August 30, 2022, O'Sullivan sent me copies of prepared but unissued checks totaling approximately $1 million. He explained that those checks had been prepared to pay outstanding loans on vehicles that customers had traded to Northshore or Sunrise. They involved more than fifty-five transactions over approximately nine months. **See Ex. 31**. He expressed that he could no longer stave off the calls from many irate and threatening customers, and their lenders. O'Sullivan Dep. 181:12-16.

22. O'Sullivan advised that Deo had directed him not to issue the checks because the Dealerships lacked sufficient funds. O'Sullivan Dep. 81:2-20, 185:6-13. I promptly informed Aaronson and began a more comprehensive review of both Dealerships' finances.

23. At the end of August 2022, neither Dealership had sufficient cash to issue all of the prepared trade-in payoff checks. Failure to pay off the loan on a trade is a DMV violation and can result in fines, penalties and the revocation of the DMV license. The owner applicants, in this case, Aaronson, Chabrier and Jory, could have individual liability or possible criminal liability.

24. My review also disclosed many sold vehicles over the spring and summer for which the corresponding Ally Floor Plan advances had not been paid, although payment to Ally

was already due or shortly would become due. Aaronson had personally guaranteed obligations under the shared Ally Floor Plan, and he and IAG could not risk a default called by Ally. Further access by Deo to the Ally Floor Plan was then suspended by Aaronson.

25. My review further disclosed that Northshore and Sunrise had collected customer funds for third-party warranty products but had not remitted all those funds to the warranty providers. Nonpayment threatened the customers' warranty coverage and exposed the Dealerships and related IAG parties to additional claims and regulatory consequences.

26. The unpaid trade liens, floor-plan advances, warranty obligations, and other liabilities were inconsistent with the financial condition reflected in the monthly financial information previously presented to IAG. Proper bank reconciliations would have disclosed, among other things, checks recorded or prepared but never issued and liabilities for which adequate cash had not been reserved, which should have been reflected in the Dealerships' monthly financial statements. Deo had Jones prepare the bank reconciliations concealing the substantial discrepancies between the Dealerships actual financial condition. Jones Dep. 114:17-116:10.

## <u>DEO PRIORITIZED HIS COMPENSATION AND RELATED-PARTY PAYMENTS WHILE CONCEALING LOSSES</u>

27. While the Dealerships lacked sufficient cash to satisfy required Ally, trade-in lien, warranty, and other obligations, which condition Deo concealed, Deo, instead, chose payment of his and Sara's compensation and commissions to Car Buyers.

28. The significance of those payments is that Deo controlled the Dealerships' expenditures, continued to cause payments benefiting himself, his wife, and his outside company

leaving insufficient capital, while essential obligations of Northshore and Sunrise remained unpaid, and concealed the resulting deficiencies so that Ally would continue to finance floor plan purchases without intervention by IAG or Ally.

29. The false or unsupported entries and the omission of material unpaid liabilities presented a materially misleading picture of the Dealerships' condition. I relied on that information in recommending that IAG continue making its Ally credit support and administrative resources available. The statements below quantify the effect of identified entries; the Ally agreements and lender records must be used to establish what Ally received and whether any particular Ally advance was made in reliance on a particular statement.

30. I reviewed the adjustments that Deo and Jones applied from August 2021 through September 2022, the entire tenure of Jones' service at the Dealerships for Deo.

31. Each entry was recorded in the DMS as an adjusting journal entry with the source identified as "JONES." Comparing the entries (**See Ex. 32**) with the monthly trial balances (**See Ex. 33)**, I calculated the effect on reported profitability as set forth below. The attribution of the entries to Jones, O'Sullivan, and Deo is also addressed in their deposition testimony.

32. As noted in the schedule below, the adjustments increased cumulative reported profit by approximately $2,317,744.04 across the 14-month period. The adjusted trial balances report a cumulative loss of $296,230.32. Without the adjustments the cumulative loss would have been approximately $2,613,974.36.

| **Month** | **Reported profit (loss)** | **Jones P&L effect** | **Estimated pre-AJE profit (loss)** |
|---|---|---|---|
| Aug. 2021 | ($8,384.82) | $91,060.53 | ($99,445.35) |
| Sep. 2021 | **($2,431.92)** | $26,473.14 | ($28,905.06) |
| Oct. 2021 | ($18,652.74) | $118,579.00 | ($137,231.74) |
| Nov. 2021 | ($18,568.53) | $137,117.07 | ($155,685.60) |
| Dec. 2021 | $47,716.16 | $48,622.15 | ($905.99) |
| Jan. 2022 | ($2,921.39) | $169,211.89 | ($172,133.28) |
| Feb. 2022 | $3,225.15 | $98,209.00 | ($94,983.85) |
| Mar. 2022 | ($73,211.01) | $319,584.26 | ($392,795.27) |
| Apr. 2022 | ($101,725.04) | $87,719.77 | ($189,444.81) |
| May 2022 | ($142,050.06) | $204,659.47 | ($346,709.53) |
| Jun. 2022 | $46,536.67 | $72,674.69 | ($26,138.02) |
| Jul. 2022 | $51,693.47 | $149,931.63 | ($98,238.16) |
| Aug. 2022 | ($33,599.67) | $401,915.44 | ($435,515.11) |
| Sep. 2022 | ($43,856.59) | $391,986.00 | ($435,842.59) |
| **Total** | **($296,230.32)** | **$2,317,744.04** | **($2,613,974.36)** |

33. Because of the inaccurate financial information, I did not understand the full extent of the Dealerships' losses and unpaid obligations until the held trade-in payoff checks were disclosed and I undertook the later review. Had the true condition been accurately reflected, I would have immediately reported it to Aaronson and recommended that IAG restrict Deo's financial authority and stop further related-party payments pending investigation.

## ADVANCES AND PAYMENTS MADE TO CURE THE DEFICIENCIES

34. To prevent defaults, customer harm, regulatory consequences, and further damage to the shared Ally Floor Plan, for which Aaronson had personal liability, Aaronson directed me to arrange advances from available IAG entities to Northshore and Sunrise and to arrange direct payments of certain obligations. I personally initiated or arranged the transfers described below using IAG and Chase banking access.

35. The following funds were transferred to Northshore and recorded as loans or advances from the identified IAG entity: (a) September 15, 2022, $683,318.95 from 76 Fisk Street Realty LLC; (b) September 15, 2022, $8,917.58 from 446 Route 23 Auto LLC; (c) September 16, 2022, $385,597.10 from 2519 Hylan Blvd Auto LLC; (d) September 29, 2022, $100,929.00 from 1239 Hylan Blvd Auto LLC; (e) October 12, 2022, $200,112.00 from 1239 Hylan Blvd Auto LLC; (f) October 19, 2022, $421,019.00 from 1239 Hylan Blvd Auto LLC; (g) October 20, 2022, $201,020.00 from 1239 Hylan Blvd Auto LLC; (h) October 21, 2022, $231,021.00 from 1239 Hylan Blvd Auto LLC; (i) October 24, 2022, $80,124.00 from 1239 Hylan Blvd Auto LLC; and (j) October 28, 2022, $80,128.00 from 1239 Hylan Blvd Auto LLC**. See Ex. 34**.

36. In addition, I arranged physical deposits to Northshore from 1239 Hylan Blvd Auto LLC of $30,000.00 on September 23, 2022 and $200,000.00 on October 6, 2022. **See Ex. 34**.

37. The Northshore bank account statements show that the funds deposited into the account as described above, together with ordinary customer-loan funding and other receipts, were used in substantial part to satisfy Ally Floor Plan obligations which are listed in the bank account and in the following schedule.

| Date | Payee | Amount |
|---|---|---|
| 09/01/2022 | Smartcash Ally H | $25,605.00 |
| 09/02/2022 | Smartcash Ally H | $50,303.13 |
| 09/07/2022 | Smartcash Ally H | $29,139.23 |
| 09/08/2022 | Smartcash Ally H | $35,460.00 |
| 09/15/2022 | Smartcash Ally H | $43,510.00 |
| 09/16/2022 | Smartcash Ally H | $380,623.38 |
| 09/19/2022 | Smartcash Ally H | $202,416.00 |
| 09/20/2022 | Smartcash Ally H | $142,352.62 |
| 09/21/2022 | Smartcash Ally H | $102,172.50 |
| 09/22/2022 | Smartcash Ally H | $70,368.75 |
| 09/23/2022 | Smartcash Ally H | $84,372.54 |
| 09/27/2022 | Smartcash Ally H | $84,305.77 |
| 09/29/2022 | Smartcash Ally H | $204,145.00 |
| 09/30/2022 | Smartcash Ally H | $148,637.50 |
| 09/30/2022 | Smartcash Ally M | $750.00 |
| 10/03/2022 | Smartcash Ally H | $54,844.86 |

| Date | Payee | Amount |
|---|---|---|
| 10/06/2022 | Smartcash Ally H | $283,514.00 |
| 10/11/2022 | Smartcash Ally H | $83,761.27 |
| 10/12/2022 | Smartcash Ally H | $322,353.00 |
| 10/14/2022 | Smartcash Ally H | $372,945.00 |
| 10/18/2022 | Smartcash Ally H | $20,607.50 |
| 10/19/2022 | Smartcash Ally H | $302,263.86 |
| 10/20/2022 | Smartcash Ally H | $28,030.00 |
| 10/21/2022 | Smartcash Ally H | $73,143.27 |
| 10/24/2022 | Smartcash Ally H | $22,432.50 |
| 10/26/2022 | Smartcash Ally H | $200,642.50 |
| 10/27/2022 | Smartcash Ally H | $18,720.00 |
| 10/28/2022 | Smartcash Ally H | $81,245.00 |
| **Northshore Motors Subtotal** | | **$3,468,664.18** |

38. And the unpaid trade payoffs we also paid from that bank account as following checks listed below, a copy of the checks annexed as **Ex. 35**.

| Number of checks: 27 | Total amount: $667,923.44 |
|---|---|

| Date | Amount | Payee | Check No. |
|---|---|---|---|
| 07/11/2022 | $24,539.08 | Capital One Auto Finance | 4015 |
| 07/13/2022 | $9,844.24 | Teachers Federal Credit Union | 4118 |
| 07/28/2022 | $39,336.00 | Truist Retail Loans | 4141 |
| 09/06/2022 | $18,271.81 | Bridgecrest | 4331 |
| 09/09/2022 | $37,525.20 | Pentagon Federal Credit Union | 4381 |
| 09/19/2022 | $19,195.83 | Bethpage Federal Credit Union | 4408 |
| 09/26/2022 | $52,684.00 | Truist Retail Loans - Payoffs | 4465 |
| 10/13/2022 | $19,057.16 | Bridgecrest | 4541 |
| 10/13/2022 | $33,254.15 | Truist Retail Loans - Payoffs | 4542 |
| 10/13/2022 | $8,117.06 | Carvant Financial | 4543 |
| 10/13/2022 | $29,792.87 | Infiniti Financial | 4544 |
| 10/13/2022 | $40,230.50 | Capital One Auto Finance | 4545 |
| 10/14/2022 | $16,445.07 | Westlake Financial Services | 4548 |
| 10/18/2022 | $25,222.91 | Crescent Bank and Trust | 4556 |

| Date | Amount | Payee | Check No. |
|---|---|---|---|
| 10/19/2022 | $32,500.78 | Santander Consumer USA | 4557 |
| 10/19/2022 | $25,797.29 | Santander Consumer USA | 4558 |
| 10/19/2022 | $26,453.29 | Santander Consumer USA | 4559 |
| 10/19/2022 | $35,765.06 | Truist Retail Loans - Payoffs | 4560 |
| 10/19/2022 | $23,385.79 | Credit Acceptance | 4561 |
| 10/20/2022 | $25,222.91 | Crescent Bank and Trust | 4562 |
| 10/20/2022 | $33,294.59 | Bank of America | 4564 |
| 10/21/2022 | $8,124.98 | Carvant Financial | 4566 |
| 10/21/2022 | $37,412.82 | Santander Consumer USA | 4568 |
| 10/25/2022 | $17,120.15 | Teachers Federal Credit Union | 4574 |
| 10/25/2022 | $14,625.31 | Teachers Federal Credit Union | 4575 |
| 10/27/2022 | $14,704.59 | Credit Acceptance | 4572 |

39. The following funds were transferred to Sunrise and recorded as loans or advances from 1239 Hylan Blvd Auto LLC: (a) October 19, 2022, $101,019.00; (b) October 20, 2022, $80,120.00; (c) October 21, 2022, $65,121.00; and (d) October 24, 2022, $55,124.00. **See Ex. 36.**

40. I also arranged deposits or transfers from 1239 Hylan Blvd Auto LLC to Sunrise

of $50,000.00 on September 16, 2022 and $56,000.00 on October 21, 2022. **See Ex. 36**.

41. The Sunrise bank account statements show that the funds deposited into the account as described above, together with ordinary customer-loan funding and other receipts, were used in substantial part to satisfy Ally Floor Plan obligations which are listed in the bank account and in the following schedule.

| Date | Payee | Amount |
|---|---|---|
| 10/03/2022 | Smartcash Ally H | $53,000.08 |
| 10/04/2022 | Smartcash Ally H | $700.74 |
| 10/05/2022 | Smartcash Ally H | $32,424.42 |
| 10/06/2022 | Smartcash Ally H | $93,697.00 |
| 10/14/2022 | Smartcash Ally H | $75,333.00 |
| 10/17/2022 | Smartcash Ally H | $29,477.18 |
| 10/19/2022 | Smartcash Ally H | $128,763.75 |
| 10/20/2022 | Smartcash Ally H | $31,990.01 |
| 10/21/2022 | Smartcash Ally H | $105,779.52 |
| 10/24/2022 | Smartcash Ally H | $48,504.00 |
| 10/26/2022 | Smartcash Ally H | $253,572.23 |
| 10/27/2022 | Smartcash Ally H | $27,491.54 |

| Date | Payee | Amount |
|---|---|---|
| 10/28/2022 | Smartcash Ally H | $45,196.00 |
| **189 Sunrise Hwy Auto Subtotal** | | **$925,929.47** |

42. And the unpaid trade payoffs we also paid from that bank account as following checks listed below, a copy of the checks annexed as **Ex. 37**.

| **Number of checks: 4** | **Total amount: $99,879.40** |
|---|---|

| Date | Amount | Payee |
|---|---|---|
| 08/29/2022 | $28,642.16 | Capital One Auto Finance |
| 08/30/2022 | $4,000.00 | Truist Bank |
| 09/13/2022 | $36,117.21 | Capital One Auto Finance |
| 10/20/2022 | $31,120.03 | Bank of America N.A. |

43. On September 16, 2022 and September 28, 2022, I arranged direct payments by 1239 Hylan Blvd Auto LLC to Ally of $149,840.50 and $154,130.00, respectively, for floor-plan obligations arising from vehicles sold through the Dealerships without repayment of the applicable advances.

44. I also arranged for Island Auto Management, LLC to pay for Northshore's insurance for premises hazard and liability and for any vehicles that were not on the Ally Floor Plan, customer trade loan payoff, and Smartcash Ally for floor plan payment on sold vehicles, as follows:

## Checks

### *The Package Group Insurance*

| Date | Payee | Amount | Check No. |
|---|---|---|---|
| 08/08/2023 | The Package Group Insurance | $847.01 | 67 |
| 08/08/2023 | The Package Group Insurance | $1,686.18 | 66 |
| 05/17/2023 | The Package Group Insurance | $1,694.02 | 65 |
| 05/17/2023 | The Package Group Insurance | $3,372.36 | 64 |
| 03/13/2023 | The Package Group Insurance | $1,694.02 | 62 |
| 03/13/2023 | The Package Group Insurance | $3,372.36 | 61 |
| 01/30/2023 | The Package Group Insurance | $3,372.36 | 60 |
| 01/30/2023 | The Package Group Insurance | $1,694.02 | 59 |
| 12/15/2022 | The Package Group Insurance | $847.01 | 45 |
| 12/15/2022 | The Package Group Insurance | $1,686.18 | 44 |
| 11/15/2022 | The Package Group Insurance | $3,937.80 | 41 |
| 11/15/2022 | The Package Group Insurance | $7,859.64 | 42 |
| | **Subtotal** | **$32,062.96** | |

*Customer Payoffs*

| Date | Payee | Amount | Check No. |
|---|---|---|---|
| 01/13/2023 | GM Financial – Customer Payoff | $36,048.69 | 57 |
| 01/12/2023 | Truist Bank – Customer Payoff | $12,502.17 | 53 |
| 11/16/2022 | Chase Auto Finance – Customer Payoff | $21,237.92 | 39 |
| 11/14/2022 | Santander – Customer Payoff | $32,294.42 | 43 |
| 11/14/2022 | Santander – Customer Payoff | $25,276.65 | 38 |
| | **Subtotal** | **$127,359.85** | |

*Other Checks*

| Date | Payee | Amount | Check No. |
|---|---|---|---|
| 01/26/2023 | The Car Shop of Manheim | $8,428.89 | 58 |
| 01/17/2023 | Baron Nissan – Warranty Sold but Not Paid | $2,767.00 | 56 |
| 12/30/2022 | CarOffer – Wholesale Transaction Unwound | $22,653.00 | 48 |
| 12/22/2022 | Gabriel Cruz – Customer Cash Deposit Refund | $9,000.00 | 49 |
| 12/21/2022 | Auto PHD – Diagnostic and Repair | $2,818.50 | 47 |
| 12/20/2022 | Allegiance – Warranty Sold but Not Paid | $1,639.08 | 46 |
| | **Subtotal** | **$47,306.47** | |
| | **Total Checks** | **$206,729.28** | |

**Wire Transfers**

| Date | Payee | Amount |
|---|---|---|
| 02/01/2023 | ADP Payroll – Sunrise Auto 2022 Year-End Filings and W-2s | $333.69 |
| 02/01/2023 | ADP Payroll – Northshore 2022 Year-End Filings and W-2s | $697.08 |
| 11/23/2022 | Ally Bank – Sunrise Auto Returned SmartCash Payment | $6,379.56 |
| 11/22/2022 | Ally Bank – Northshore Floor-Plan Payoffs | $67,982.60 |
| | **Total Wire Transfers** | **$75,392.93** |

**ACH Debits**

| Date | Payee | Dealership/Account Identified | Amount |
|---|---|---|---|
| 04/10/2023 | VanguardDirect | Chase Checking | $250.00 |
| 03/08/2023 | SmartCash Ally H | Northshore Motors | $3,020.42 |
| 02/23/2023 | VanguardDirect | Sunrise Auto Outlet | $250.00 |
| 02/23/2023 | VanguardDirect | Chase Checking | $250.00 |
| 02/16/2023 | SmartCash Ally H | Northshore Motors | $12,423.04 |
| 02/16/2023 | SmartCash Ally H | 189 Sunrise | $4,169.29 |
| 02/08/2023 | SmartCash Ally H | 189 Sunrise | $3,697.54 |
| 02/08/2023 | SmartCash Ally H | Northshore Motors | $3,433.25 |
| 01/20/2023 | SmartCash Ally H | Northshore Motor Leasing | $12,925.66 |
| 01/20/2023 | SmartCash Ally H | 189 Sunrise Highway Auto | $4,090.77 |
| 01/10/2023 | SmartCash Ally H | Northshore Motor Leasing | $2,903.52 |
| 12/20/2022 | SmartCash Ally H | Northshore Motor Leasing | $106,263.43 |
| 12/20/2022 | SmartCash Ally H | 189 Sunrise Highway Auto | $3,790.96 |
| 12/14/2022 | SmartCash Ally H | Northshore Motor Leasing | $211,271.00 |

| Date | Payee | Dealership/Account Identified | Amount |
|---|---|---|---|
| 12/13/2022 | SmartCash Ally H | Northshore Motor Leasing | $26,505.00 |
| 12/13/2022 | SmartCash Ally H | 189 Sunrise Highway Auto | $25,900.00 |
| 12/08/2022 | SmartCash Ally H | Northshore Motor Leasing | $10,542.67 |
| | | **Total ACH Debits** | **$431,686.55** |

45. Attached as **Ex. 38** are the bank records reflecting these transaction.

46. Deo has not repaid any of the advances and payments described above.

**<u>SPECIFIC TRANSACTIONS DISCOVERED IN THE RECORDS</u>**

47. My review identified instances in which Deo acquired damaged or poor-condition vehicles outside established auctions for prices below the wholesale book value used by Ally, which was a fairly regular practice by Deo. Because Ally funded up to eighty percent of the wholesale book value without using the Dealership's actual purchase price, presuming the vehicle was in very good condition, the funding could exceed the acquisition price and leave the Dealership with an overleveraged vehicle. This would be a wrongful way to cover cash shortfalls in the short term, for Doe's personal benefit, but resulting in losses in the long term for the Dealerships. See **Ex. 39**.

48. On December 21, 2021, Northshore purchased a 2017 Audi from Herold Motor Cars for $31,000.00. The wholesale book value used for the funding request was $39,571.87, and Ally funded $31,657.50.

49. On January 25, 2022, Northshore purchased a 2019 Mercedes-Benz from Herold Motor Cars for $34,000.00. The wholesale book value used for the funding request was

$44,128.12, and Ally funded $35,302.50.

50. Also on January 25, 2022, Northshore purchased a 2016 Jaguar from Herold Motor Cars for $27,000.00. The wholesale book value used for the funding request was $36,365.62, and Ally funded $29,092.50.

51. The foregoing are examples of purchasing poor or damages vehicles, which condition Deo did not disclose to the Dealerships, IAG or Ally. The electronic request for interstate funding is in excess of the recorded acquisition price, all of which was to benefit Deo.

52. My review also identified transactions in which the same vehicle was used in successive sales after the first customer's sale or financing was canceled, but the first lender's proceeds were not promptly returned. Essentially, Deo financed the same vehicle twice, personally benefitting from the proceeds.

53. On April 30, 2022, Sunrise recorded a sale of a 2017 Mercedes-Benz to Marlon and Monique Harris for $27,765.00. The Harrises paid $3,000.00 down and Santander funded $25,875.00 after Deo's request through interstate electronic communications. The vehicle was not delivered, the transaction was canceled, and the vehicle was transferred to Northshore, which later sold it to Bay Motors, Inc. for $30,136.00. Santander's proceeds were not timely returned, and IAG ultimately arranged payment of $32,294.42 in November 2022. **See Ex. 16**.

54. On or about April 4, 2022, Northshore recorded a sale of a 2013 Audi to Reid for more than $25,000.00. Santander funded $24,024.58 including fees and taxes. The transaction was canceled, the vehicle was transferred to Sunrise, and Sunrise later sold it to Rashawn Newsome for $26,090.00. Santander's proceeds were not timely returned, and after Santander made demand for repayment, IAG funded Northshore's eventual payment of $26,453.29.

55. In all Deo failed to terminate and return over $240,000.00 of lender financing for

consumers who canceled their purchases. These funds benefited Deo and not the Dealerships.

56. Deo's son also continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG's consent. **See Ex. 40.**

57. Demand has been made for its return, but it has been refused.

**CASH RECEIPTS AND OTHER DEALERSHIP PROPERTY**

58. The record indicates that Deo took or directed the disposition of certain cash receipts, depriving the Dealerships, already experiencing losses hidden by financial manipulation, with the necessary funds to satisfy their obligations. O'Sullivan's testimony identified customer cash deposits and cash purchase proceeds that were received at Northshore or Sunrise but were not deposited into the appropriate dealership bank account. Merckling was involved in the handling of the cash. Annexed is a handwritten cash ledger that O'Sullivan testified was used at Sunrise to keep track of customer's cash deposits. O'Sullivan highlighted on the cash ledger $230,000.00 of those cash deposits that Deo personally took. **See Ex. 41**.

59. Although O'Sullivan testified that he accounted for all cash taken by crediting the cash against Deo's capital account, the DMS did not contain a capital account for Deo because he was not recorded as an owner. **See Ex. 42**. And, whether cash was recorded against an equity or any other account, the cash necessary to pay the Dealerships' obligations, ultimately paid by IAG, was simply taken by Deo.

60. It is the manager's absolute and primary responsibility to make sure that the payments to pay off loans on trades and pay floor plan financing are made and there can be no legitimate excuse for not doing so. The fact that Deo failed to make sure these payments were made is not a managerial mishap. It is a purposeful decision not to properly use and direct the

monies earmarked and dedicated for repayment of the floor plan lender and to pay off the loan on trades.

61. Adding to this is the fact that Deo purposefully hid the financial deficiencies from Plaintiffs and Ally by providing false financial information in order to perpetuate his personal gain at the expense of Plaintiffs.

62. Deo has never accounted for all of the funds missing from Northshore and Sunrise that should have been available to pay off the trade-in vehicles and the floor planned vehicles. Aaronson. Those funds were never repaid by Deo.

**DEO'S EFFORTS TO ACQUIRE NORTHSHORE AND SUNRISE FAIL**

63. In October 2022, after IAG had advanced substantial funds to address the deficiencies, Aaronson discussed with Deo a possible future transfer of ownership of Northshore and Sunrise. I was informed that any transfer was conditioned upon Deo satisfying the deficiencies, obtaining replacement floor-plan financing, completing the required ownership documents, and obtaining approval to change the owner applicants on the Dealerships' DMV licenses. Deo agreed to the terms.

64. Deo taking over the DMV Licenses was critical. At that time, Chabrier was the owner applicant for Northshore and Aaronson, Chabrier and Jory were the owner applicants for Sunrise. As owner applicant, one can be held personally liable for certain DMV infractions or violations or have the DMV License suspended or revoked and be prohibited from being issued any additional licenses by the DMV.

65. Because the extended filing deadline for the Dealerships' 2021 tax returns was approaching, Aaronson permitted Deo to arrange for the 2021 returns to list Deo and Sarah Deo as owners solely as a conditionally authorized step in anticipation of the proposed transfer. **See**

**Ex. 17**. That authorization did not waive or eliminate the other transfer conditions and did not itself execute an assignment, complete a closing, replace the existing DMV owner applicants, which must occur, or obtain DMV approval.

66. The contemplated transfer was never completed. After I sent Deo the DMV application to transfer owner applicant status for the licenses, Deo did not satisfy the deficiencies, obtain the required replacement financing, complete and return the required DMV ownership applications, or obtain DMV approval. **See Ex. 18**.

## THE LIBERTAS TRANSACTION

67. I have my own regular banking credentials for Northshore and Sunrise, and had been monitoring their accounts daily due to all the activity in funding to cover the deficiencies. On November 18, 2022, I discovered that Libertas Funding LLC ("Libertas") had unexpectedly deposited $735,000.00 into Sunrise's Chase account. I had not been advised in advance that the deposit was coming.

68. I subsequently learned that the deposit arose from an agreement (the "Libertas Agreement") purporting to sell $997,500.00 of Northshore's future receipts to Libertas for $735,000.00 (the "Libertas Funds"). **See Ex. 19**. Deo executed or submitted the transaction documents while claiming authority or ownership that he did not possess. Deo and Michael Laurie ("Laurie") testified that Deo engaged Laurie and his company, DLA Capital, to place the financing with Libertas. Laurie Dep. 102:18-23, 340:5-13. Notably, I could not envision Northshore having future receipts as it has essentially stopped operating.

69. At the time, I did not know the source or purpose of the Libertas Funds. I was concerned that the funds would be removed, so I took steps to safeguard them by placing the

Libertas Funds into one of our other accounts until it could be sorted out. I informed Aaronson of the unexpected deposit, of which he had no information.

70. After various communications with our attorney, Russell Shanks, at Aaronson's direction, on November 21, 2022, I initiated a wire of the Libertas Funds to the attorney trust account of Harry Thomasson. **See Ex. 22**.

71. Before I initiated the wire, I was advised that Thomasson had been instructed to hold the Libertas Funds in escrow pending the resolution of the dispute over the funds. **See Ex. 21**.

72. The Libertas Funds did not remain in Thomasson's trust account. Bank and trust-account records produced in this litigation show that Thomasson promptly disbursed $723,000.00 to Car Buyers, keeping $12,000.00 for himself as attorney's fees. **See Ex. 24**.

73. The records further show that Car Buyers transferred $500,000.00 of those proceeds to plaintiff Urrutia as part of an investment in Plaintiff Superb. **See Ex. 24**.

74. Neither Deo nor Car Buyers had any rights to the Libertas Funds, having been furnished for the purported purchase of Northshore's future receipts.

75. We demanded a return of the Libertas Funds, but that demand was refused.

76. Soon after the transaction, Libertas withdrew $19,791.70 from the Sunrise bank account on or a November 25, 2022. And Libertas made further efforts to withdraw funds from Sunrise's account.

## SUBSEQUENT ENCUMBRANCE OF NORTHSHORE'S ASSETS

77. In February and March 2023, Deo again worked with Michael Laurie and Thomasson to obtain a $500,000.00 loan from Flushing Bank secured by Northshore's assets.

Again, Deo had no authority to enter into the loan application and loan agreement as he was not the owner of Northshore.

78. The transaction occurred while an order issued by Justice Sharon M.J. Gianelli of the New York Supreme Court, Nassau County, restricted financing, pledging, or sales of Northshore assets. (the "TRO") **See Ex. 43**. Not only was the financing a violation of the TRO, but the loan was obtained by submitting false financial records.

79. Deo's Flushing application included a December 31, 2022 profit-and-loss statement reporting a $427,843.00 annual profit for Northshore. **See Ex.44**. It also included an October 2022 statement reporting a profit of $372,037.00. **See Ex. 45**. I have direct access to Northshore's DMS and printed the October 2022 statement directly therefrom. The actual financial records pulled from the DMS, even after earlier false financial adjustments artificially boosted Northshore's perceived profitability, showed a loss of $79,141.00. **See Ex. 46**.

80. I am also aware from other documentation and testimony, that Deo submitted a false personal financial statement on Jones letterhead to Flushing in which he stated that he owned millions of dollars of real estate, but it was demonstrably untrue, as Deo said he was not in title to the properties and had no legal ownership interest. **See Ex. 47**.

81. The $500,000.00 loan for working capital and improvements to Northshore was approved by Flushing and the loan was secured against the assets of Northshore, with a UCC lien filed. None of the loan funds were ultimately used for the benefit of Northshore. Within weeks of the loan funding, $50,000.00 was wired to Laurie's company, defendant DLA Capital, and the vast majority of the balance was wired to Car Buyers.

## RESULTING LOSSES AND NEED FOR AN ACCOUNTING

82. The conduct described above caused several distinct categories of loss: (a) identifiable cash or property taken from a Dealership; (b) compensation and related-party commissions that continued while the true condition was concealed; (c) unpaid floor-plan, trade-in, warranty, customer, and operating obligations; (d) advances and direct payments made by identified IAG entities to cure those obligations; and (e) costs, losses and encumbrances associated with the Libertas and Flushing transactions. Deo did not act alone. Sara created and administered entities and bank accounts. Merckling handled cash and inventory. Jones assisted in concealing the financial losses so that Deo could continue using the Ally Floor Plan and the Dealerships operating. And Thomasson and Laurie enabled Deo to secure $1,235,000.00 in financing on a dealership that Deo did not own, was no longer operating, lost millions of dollars, and had no inventory or assets.

83. Because Deo controlled and directed the Dealerships' operations and financial activity, and because the existing records do not explain the disposition of every cash receipt, transaction proceeds, or related-party payment, Northshore and Sunrise require a complete accounting from Deo.

84. We demanded that Deo account for all of the lost funds, but he has failed and refused to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3rd, 2026.

Wendy Kwun