UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

---------------------------------------------------------------X

Case No.: 2:23-cv-6188 (JMW)

IAG PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT ON CAUSES OF ACTION TWELVE, THIRTEEN, SIXTEEN, SEVENTEEN, AND TWENTY THROUGH TWENTY-FIVE

## TABLE OF CONTENTS


PRELIMINARY STATEMENT....4
STATEMENT OF FACTS....4
A. The Documents Identify Plaintiffs as Owners and Deo as Manager....4
B. Plaintiffs' Licenses and Guaranties Remained Exposed....6
C. False Reporting Preserved Deo's Compensation While Liabilities Accumulated....7
D. The Crisis, Conditional Transfer Discussions, and Later Diversions....9
LEGAL STANDARD....11
ARGUMENT....11
I. The Documentary Record Establishes That Deo Was a Manager And His Ownership Claim Would Not Excuse The Challenged Conduct....11
II. Counts Twelve and Sixteen....13
III. Counts Thirteen and Seventeen....15
IV. Counts Twenty Through Twenty-Three....16
V. Counts Twenty-Four and Twenty-Five....18
VI. Nonduplicative Relief and Rule 56(g)....19
CONCLUSION....20

**TABLE OF AUTHORITIES**

**Cases**

*Allen v. Zizzi Constr. Corp.*, 228 A.D.3d 478 (1st Dep't 2024)……………………………..15
*Bigio v. Coca-Cola Co*., 675 F.3d 163 (2d Cir. 2012)............................................................16
*Caprer v. Nussbaum*, 36 A.D.3d 176 (2d Dep't 2006)............................................................17
*Colavito v. New York Organ Donor Network, Inc*., 8 N.Y.3d 43 (2006)..................................13
*Columbia Memorial Hospital v. Hinds*, 38 N.Y.3d 253 (2022)……………………………….15
*Family Health Management, LLC v. Rohan Developments, LLC*, 207 A.D.3d 136 (1st Dep't 2022) ....................................................................................................................................13
*Gaidon v Guardian Life Ins. Co. of Am., 94 N.Y.2d 330 [1999]*
*Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014) ...........................................................................17
*LoPresti v. Terwilliger*, 126 F.3d 34, 41-42 (2d Cir. 1997)……………………………………14
*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173 (2011)………………………………...15
*Matter of Ardalan v. Safaie*, 239 A.D.3d 1433 (4th Dep't 2025)............................................18
*Parsons & Whittemore Enterprises Corp. et al. v. Schwartz*, 387 F. Supp. 2d 368 (S.D.N.Y. 2005) ………………………………………………………………………………………14,16
*Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776 (2d Dep't 2017).......................13
*Prignoli v. Bruczynski*, 2021 U.S. Dist. LEXIS 186052 (E.D.N.Y. 2021)……………………13,14
*Roberts v. LifeMD Atl. Patient Med. Care, P.C.* 2026 U.S. Dist. LEXIS 134598 (S.D.N.Y.)…15
*State of New York v. Seventh Regiment Fund, Inc*., 98 N.Y.2d 249 (2002)..............................13
*Thyroff v. Nationwide Mutual Insurance Co*., 460 F.3d 400, 403-04 (2d Cir. 2006)………….14
*United States v. Sampson*, 898 F.3d 270, 277 n.5 (2d Cir. 2018)………………………………13
*William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501 (1st Dep't 2018)............................16
*Zamora v. Fit Int'l Grp. Corp.*, 834 F. App'x 622, 627 (2d Cir. 2020)………………………...13

**Statutes and Rules**

Federal Rule of Civil Procedure 56 ......................................................................11,16,19
N.Y. Limited Liability Company Law § 409 ……………………………………………12
N.Y. Limited Liability Company Law § 601 ....................................................................12

## PRELIMINARY STATEMENT

This memorandum supports summary judgment on Causes of Action Twelve, Thirteen, Sixteen, Seventeen, and Twenty through Twenty-Five, arising from what Anthony Deo and Harry Thomasson did with two licensed automobile dealerships and a shared inventory credit facility after their owners entrusted him with day-to-day control. Anthony Deo ("Deo") has attempted throughout this action to begin the story at the end: he claims that he owned Northshore Motor Leasing, LLC ("Northshore") from its inception and acquired 189 Sunrise Hwy Auto LLC ("Sunrise") for $50,000 in 2021, and therefore could treat the companies, their cash, their receivables, and their credit as he wished. The contemporaneous documents show otherwise. They show that Deo was the paid manager of businesses owned and licensed in Plaintiffs' names, operating through an Ally Bank ("Ally") floor-plan facility supported by IAG and personally guaranteed by Joshua Aaronson ("Aaronson"). And even Deo's ownership premise would not entitle him to appropriate company property, falsify company records, leave secured and customer obligations unpaid, or shift the resulting losses to Plaintiffs.

## STATEMENT OF FACTS

### A. The Documents Identify Plaintiffs as Owners and Deo as Manager

Northshore was organized in November 2017 after the DMV licenses of dealerships previously operated by Deo and his wife, Sara Deo ("Sara") at the same Syosset location had been revoked. Northshore could not operate without a DMV facility license and could not acquire ordinary inventory without floor-plan financing. Deo was introduced to David Baron through Asad Khan. Baron provided access to the Baron Group's existing Ally relationship; Baron, Khan, and Brian Chabrier became Northshore's members; and Deo undertook to operate the dealership as its manager. Chabrier Decl. ¶¶ 7–43; Aaronson Decl. ¶¶ 11–31.

The ownership documents are uniform. The February 14, 2018 Northshore Operating Agreement was executed by Baron, Khan, and Chabrier and identifies them—and no one else—as the members. Chabrier signed Northshore's original DMV facility application as its owner applicant, the DMV approved it, and Northshore operated under the resulting certificate. Northshore's 2018, 2019, and 2020 partnership returns likewise identify Baron, Khan, and Chabrier as equal members, issue K-1s to them, and do not identify Deo as a member. Chabrier never executed an assignment to Deo, never approved an operating agreement admitting him as a member during the relevant period, and never authorized a DMV change-of-owner application replacing himself with Deo. SMF ¶¶ 29–54; Chabrier Decl. ¶¶ 14–43.

Sunrise's record is equally concrete. Its July 3, 2014 Operating Agreement identified Baron, Aaronson, Jory Baron, and Raymond Phelan as its original members; Chabrier later became an equal member. Its 2018–2020 tax records continued to identify the five members, while its DMV licensing records identified Aaronson, Jory Baron, and Chabrier—not Deo—as owner applicants. Aaronson and Chabrier also reported their ownership interests and the distributive tax items reflected on their Schedules K-1 on their personal tax returns. SMF ¶¶ 68–73, 82–83; Aaronson Decl. ¶¶ 20–22, 38–39; Chabrier Decl. ¶¶ 18–20, 30–32.

The $50,000 on which Deo relies did not consummate a sale. In February 2021 the Sunrise members discussed a proposed acquisition under an unsigned writing. Deo was to pay each of five members $10,000 down and then $3,000 per member each month until he obtained a franchised dealership capable of cross-guaranteeing Sunrise. Deo paid the initial $10,000 amounts, but did not make the required monthly payments, obtain the required franchise cross-guaranty, secure a replacement floor plan, execute assignments, or become a DMV owner

applicant. No closing occurred and none of the members transferred his interest. SMF ¶¶ 74–83; Aaronson Decl. ¶¶ 40–50; Chabrier Decl. ¶¶ 47–49.

The parties' conduct confirms the documents. Baron continued to inspect Northshore until his death. Baron, Khan, and Chabrier received disclosed member draws, and Northshore's tax items were allocated to them. Deo raised no documented ownership objection before October 2022. Instead, Northshore engaged him as manager in 2018 and Sunrise engaged him as manager in 2021. Each dealership paid Deo and Sara $2,500 per week through payroll, resulting in combined weekly compensation of $10,000 from Northshore and Sunrise. Deo also caused commissions equal to 7.5% of the gross profit on vehicles sold by both dealerships to be paid to Car Buyers NYC Inc. ("Car Buyers"), a company he solely owned. SMF ¶¶ 44–54, 80–91; Chabrier Decl. ¶¶ 21–45; Aaronson Decl. ¶¶ 40–47.

**B. Plaintiffs' Licenses and Guaranties Remained Exposed**

After Baron died in May 2021, Aaronson met with Deo to assess the dealerships. The agreement was again managerial: Deo would continue running Northshore and Sunrise for salary. He controlled inventory purchases, sales, personnel, customer transactions, the DealerTrack DMS, communications with Ally, and the order in which dealership obligations were paid. That authority carried the obligation to report accurately, purchase suitable inventory, preserve vehicle and customer funds, comply with Ally audits, and promptly pay trade-in liens and Ally advances when vehicles were sold. SMF ¶¶ 93–126; Chabrier Decl. ¶¶ 50–65; Aaronson Decl. ¶¶ 53–72.

The ownership and licensing structure mattered economically. Northshore and Sunrise used the IAG/Baron Group Ally facility, supported by cross-collateral and guaranty arrangements, and Aaronson was personally exposed on the dealerships' Ally obligations. At

the same time, Chabrier remained Northshore's DMV owner applicant and Aaronson and Jory Baron remained Sunrise's owner applicants. Thus Plaintiffs' credit and regulatory standing—not Deo's—remained exposed to the consequences of his management. SMF ¶¶ 55–67, 73, 105–126, 201–202; Aaronson Decl. ¶¶ 12–30, 35–36, 58–72, 95–97.

**C. False Reporting Preserved Deo's Compensation While Liabilities Accumulated**

Beginning by at least August 2021, Deo and Thomas Jones, CPA, the accountant Deo retained, used recurring monthly adjustments that caused Northshore and Sunrise to appear more profitable and less distressed than the underlying records showed. Jones and Deo selected adjustments and directed controller Daniel O'Sullivan to enter them in the DMS; the resulting statements were furnished to IAG and Ally to maintain the shared floor plan. IAG relied on that reporting by leaving its guaranties in place and permitting Deo to continue using the DMS and Ally credit. SMF ¶¶ 127–35, 938, 981–84, 991; Aaronson Decl. ¶¶ 69–77.

Kwun's present reconciliation of the fourteen (14) months from August 2021 through September 2022 reveals the size and consistent direction of the adjustments. For that period the adjusting entries increased reported profitability by approximately $2,317,744.04. Those fourteen (14) months collectively appeared to produce a loss of approximately $296,230.32, although the same trial balances would have reflected combined pre-adjustment losses of approximately $2,613,974.36. The adjustments repeatedly increased reported sales, reduced retail and wholesale vehicle costs, reduced warranty expense, and moved current expenses into balance-sheet accounts. Kwun Decl. ¶¶ 30–33.

While the reported numbers concealed the problem, the actual liabilities mounted. O'Sullivan testified that Deo instructed him to hold prepared trade-in payoff checks because the dealerships lacked cash. On August 30, 2022, O'Sullivan disclosed more than fifty-five held

transactions accumulated over approximately nine months, with checks exceeding $1.1 million. The ensuing review disclosed sold vehicles for which Ally had not been paid, missing and damaged inventory, unremitted warranty charges, customer and canceled-deal proceeds, and other obligations. SMF ¶¶ 168–220; Aaronson Decl. ¶¶ 75–103.

The records also identify more than $240,000 in lender proceeds that were not returned after customers canceled vehicle purchases. In one Sunrise transaction, Santander funded $25,875 for a sale that was canceled; the vehicle was moved to Northshore and resold, and IAG ultimately arranged a $32,294.42 repayment. In another, Santander funded $24,024.58 for a canceled Northshore transaction; the vehicle was moved to Sunrise and resold, and IAG funded the eventual $26,453.29 repayment. Kwun Decl. ¶¶ 52–55.

Kwun also authenticated a handwritten Sunrise cash ledger used to track customer deposits. O'Sullivan identified and highlighted approximately $230,000 in customer cash that Deo personally took. Although O'Sullivan testified that the cash was credited against a supposed Deo capital account, the DMS contained no capital account for Deo because he was not recorded as an owner. Those funds were not available to pay the dealerships' secured, customer, and operating obligations. Kwun Decl. ¶¶ 58–62.

The same financing pattern appears in non-auction inventory purchases. Deo regularly acquired poor or damaged vehicles below the wholesale book value used by Ally, while Ally advanced up to 80% of that book value on the assumption that the vehicles were in good condition. For example, Northshore paid $31,000 for a 2017 Audi and received $31,657.50 from Ally; paid $34,000 for a 2019 Mercedes-Benz and received $35,302.50; and paid $27,000 for a 2016 Jaguar and received $29,092.50. The transactions temporarily generated cash but left the

dealership with impaired, overleveraged inventory and increased payoff exposure. Kwun Decl. ¶¶ 47–51; Aaronson Decl. ¶¶ 65–67.

The causal mechanism was simple. Sales produced cash and immediate payoff duties. Deo controlled expenditures and chose not to discharge those duties, while the Deos continued receiving $10,000 in combined weekly payroll and Car Buyers continued receiving the 7.5% commission. The false monthly reporting concealed that the dealerships could not simultaneously meet their secured and customer obligations and continue those payments. That concealment kept the businesses open, preserved Deo's compensation stream, and enabled him to buy more inventory with Ally credit, enlarging the guaranteed deficit. When the scheme could no longer continue, IAG halted further floor-plan use and Plaintiffs funded the obligations Deo left behind. Kwun's schedules identify the originating IAG entities, dates, amounts, receiving dealership, and subsequent payments, including approximately $3.468 million in scheduled Northshore payments to Ally, 27 scheduled customer-payoff checks totaling $667,923.44, and direct Ally payments of $149,840.50 and $154,130.00. The advances into dealership accounts and the subsequent payments from those accounts are different stages of the same cure and are not claimed twice. SMF ¶¶ 189–231, 907–14; Aaronson Decl. ¶¶ 70–89; Kwun Decl. ¶¶ 34–46.

**D. The Crisis, Conditional Transfer Discussions, and Later Diversions**

Only after the deficiencies were exposed did the parties discuss a possible future transfer of Northshore and Sunrise to Deo. It was conditioned upon Deo making IAG whole, obtaining replacement floor-plan financing, executing the necessary ownership documents, and assuming DMV-license responsibility. Aaronson permitted the 2021 tax returns to list Deo and Sara as a provisional step toward that anticipated closing; a tax reporting entry did not itself transfer the LLC interests or DMV licenses. Deo never repaid the deficiencies, obtained replacement

financing, executed and returned the DMV applications, or obtained DMV approval. The proposed transfer therefore never closed. SMF ¶¶ 221–31; Aaronson Decl. ¶¶ 112–22.

Deo nevertheless proceeded as if he could use Northshore's property and credit personally. In November 2022 he purported to sell $997,500 of Northshore's future receipts to Libertas Funding LLC for $735,000 net without member authorization. After IAG disputed his authority, and took control of the funds, Deo's police connection resulted in a threat of arrest to Aaronson if the money was not turned over Harry Thomasson ("Thomasson"), Deo's attorney. These funds were transferred into to attorney Thomasson's IOLA under written instructions that it be held in escrow. Thomasson retained $12,000.00 and sent $723,000.00 to Car Buyers NYC Inc. ("Car Buyers"), Deo's wholly owned corporation; Deo admits that $500,000.00 funded his investment in Superb Motors Inc. ("Superb").

In early 2023 Deo also invoked Northshore to obtain a $500,000.00 Flushing Bank loan and encumber Northshore's assets while a state-court order restricted financing, pledging, or sales of Northshore assets. The loan application reported a $427,843 annual profit as of December 31, 2022 and a $372,037 profit for October 2022, while the October statement printed directly from Northshore's DMS reflected a $79,141 loss even after earlier profit-enhancing adjustments. Deo's personal financial statement represented he owned millions of dollars in real estate that for property that was not his. None of the proceeds benefited Northshore: $50,000,00 went to DLA Capital and most of the balance went to Car Buyers, while a UCC lien remained on Northshore's assets. SMF ¶¶ 234–300, 894–95, 940–45, 1051–64; Chabrier Decl. ¶¶ 59–61; Aaronson Decl. ¶¶ 90–106; Kwun Decl. ¶¶ 67–81.

These facts support the direct claims in Causes of Action Twelve, Thirteen, Sixteen, Seventeen, and Twenty through Twenty-Five. Plaintiffs seek judgment on liability where the

admissible record establishes every element; recovery of the identifiable $735,000.00; damages traceable to the particular entity that sustained or paid them; and accountings. Where a claimant allocation, amount, demand, transmission, or evidentiary foundation remains incomplete, Plaintiffs alternatively request findings under Rule 56(g) narrowing the issues for trial.

## LEGAL STANDARD

The Court is respectfully referred to Plaintiffs' joint memorandum of law for a compete recitation of the legal standard.

## ARGUMENT

### I. THE DOCUMENTARY RECORD ESTABLISHES THAT DEO WAS A MANAGER, AND HIS OWNERSHIP CLAIM WOULD NOT EXCUSE THE CHALLENGED CONDUCT

Deo's threshold defense is inconsistent with every category of contemporaneous documentary evidence. Northshore's executed 2018 Operating Agreement, original DMV application and certificate, three years of partnership returns, and K-1s identify Baron, Khan, and Chabrier as its members and Chabrier as its DMV license owner applicant. Sunrise's operating agreement, tax records, and DMV records identify its Plaintiff members and owner applicants. Deo appears instead in the operational and payroll record as the dealerships' manager. No executed assignment, member-approved operating agreement, closing document, or DMV approval transferred either dealership to him during the period when the losses accumulated. SMF ¶¶ 29–54, 68–91, 221–31; Chabrier Decl. ¶¶ 14–61; Aaronson Decl. ¶¶ 31–52, 112–22.

The $50,000.00 paid in connection with Sunrise proves only partial performance of an unconsummated conditional proposal. The writing required continuing monthly payments and

replacement credit support; the members retained their interests; and the DMV applicants were never changed. Likewise, the 2021 tax filings made after the 2022 crisis were a conditionally authorized step toward a contemplated later closing, not an assignment of LLC interests, a substitute for DMV approval, or retroactive authority for the conduct at issue. At minimum, the executed agreements, licensing records, pre-dispute tax returns, course of performance, and absence of transfer documents foreclose summary judgment for Deo on an unsupported assertion that he owned the companies from inception.

In any event, ownership is not a license to appropriate entity property or disregard entity obligations. A member has no interest in specific property of an LLC. N.Y. Ltd. Liab. Co. Law § 601. A manager must perform managerial duties in good faith and with the care an ordinarily prudent person in a like position would exercise. Id. § 409(a). Thus, even if Deo held some disputed economic or membership interest, Northshore's receivables, bank funds, vehicles, and credit remained Northshore's property; Sunrise's property remained Sunrise's; and the entities remained bound to pay their lenders, customers, warranty providers, and trade-in lienholders. Deo could not divert those assets to Car Buyers or Superb, falsify financial reporting, sell receivables or encumber assets without required company authority, or leave guaranteed obligations for Plaintiffs to cure.

The licensing and credit arrangements independently defeat Deo's premise that the consequences were his alone. Northshore and Sunrise operated under DMV licenses identifying Plaintiffs as owner applicants, exposing those Plaintiffs and their other dealerships to regulatory consequences from unpaid trade liens and dealership misconduct. The Dealerships also used an Ally Floor Plan facility supported by IAG and personally guaranteed by Aaronson. Deo accepted and used those benefits. Whether characterized as employee-manager, agent, de facto

manager, or claimed member-manager, he owed duties in exercising the entrusted authority and could not externalize the liabilities onto the license applicants and guarantors while retaining the benefits for himself.

## II. COUNTS TWELVE AND SIXTEEN: DEO CONVERTED IDENTIFIABLE DEALERSHIP PROPERTY

In *Prignoli v. Bruczynski*, 2021 U.S. Dist. LEXIS 186052 (E.D.N.Y. 2021), this Court relied upon New York law in defining conversion as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *United States v. Sampson*, 898 F.3d 270, 277 n.5 (2d Cir. 2018) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006)); *see also Zamora v. Fit Int'l Grp. Corp.*, 834 F. App'x 622, 627 (2d Cir. 2020).

Conversion requires the plaintiff's possessory right or interest in specific property and the defendant's unauthorized dominion, intentionally and without authority, in derogation of that right. *Zamora*, 834 F. App'x at 629; *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006); *Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 777–78 (2d Dep't 2017). "It is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Family Health Management, LLC v. Rohan Developments, LLC*, 207 A.D.3d 136, 143–46 (1st Dep't 2022). A determinate fund is convertible when it is entrusted or designated for a particular purpose and the defendant uses it otherwise; limited commingling does not necessarily defeat identifiability. *Id.*, at 143-46. Demand and refusal are unnecessary where possession was wrongful from the outset; they ordinarily matter when initial possession was lawful. *State v. Seventh Regiment Fund, Inc.*, 98

N.Y.2d 249, 259–61 (2002) (if demand would be futile because the circumstances show that the defendant knows it has no right to the goods, demand is not required). The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another. See *Prignoli* citing *LoPresti v. Terwilliger*, 126 F.3d 34, 41-42 (2d Cir. 1997) (internal citation omitted).

Count Twelve is supported most clearly by the Libertas Funds. Northshore's future receipts generated the $735,000.00 net value, the agreement designated a business purpose, and Northshore's members did not authorize Deo to monetize those receipts for personal investment. SMF ¶¶ 238–44, 997, 1051–52; Chabrier Decl. ¶¶ 66–67; Aaronson Decl. ¶¶ 113–22. Deo directed the replacement value into Car Buyers and admits that $500,000.00 funded his Superb investment. SMF ¶¶ 257–63; Deo II Dep. 90:10–91:17, 141:2–142:19. Northshore is entitled to liability judgment against Deo for $735,000.00.

The record also identifies a Northshore luxury Maserati, valued at almost $80,000 and paid for by IAG, that remains in the personal use of Deo's son without authorization. Demand was made for its return and was refused. The records also identify the approximately $230,000 in Sunrise customer cash highlighted by O'Sullivan as personally taken by Deo and more than $240,000 in canceled-deal lender proceeds that were not timely returned. SMF ¶¶ 217–20; Kwun Decl. ¶¶ 52–59. These identified categories support liability and the need for an accounting, subject to proof of entity ownership and avoidance of overlapping recovery.

For Count Sixteen, the record shows that Sunrise entrusted Deo with customer receipts, inventory, lender proceeds, and its bank activity; it also identifies canceled-sale proceeds, held

payoffs, unremitted funds, and an unauthorized $19,791.70 Libertas debit from the Sunrise account. SMF ¶¶ 168–220, 242–69; Aaronson Decl. ¶¶ 84–100, 113–15.

In the instant action, where the record identifies in great detail the funds converted by Deo and his cohorts, the Court thus should conclude that Deo is liable for conversion.

The Court should find in favor of the IAG Plaintiffs based on the voluminous evidence in the record demonstrating that Deo used the assets of Northshore and Sunrise for his personal gain. *Parsons & Whittemore Enterprises Corp. et al. v. Schwartz*, 387 F. Supp. 2d 368 (S.D.N.Y. 2005)(granting the plaintiffs summary judgment on their conversion claim on the ground that the defendant used company funds to satisfy, *inter alia*, his own personal financial obligations).

## III. COUNTS THIRTEEN AND SEVENTEEN: DEO WAS UNJUSTLY ENRICHED, IN THE ALTERNATIVE

An essential inquiry in an unjust enrichment claim, in addition to the defendant being enriched at the plaintiff's expense, is whether equity and good conscience prohibit the retention what is sought to be recovered. *Roberts* supra at 21-22**;** *Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253 (2022); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). "[E]quity does not allow a defendant . . . to keep misappropriated funds." *Allen v. Zizzi Constr. Corp.*, 228 A.D.3d 478 (1st Dep't 2024).

There are different categories of Deo's enrichment. There was compensation by way of salary and commission paid at the sacrifice of paying the loans on trades and the Ally Floor Plan.

There was the cash taken and receipts from double booking.

The clearest example of Deo benefitting at Plaintiffs' expense is the $723,000.00 delivered to Deo's wholly owned Car Buyers' account, plus Thomasson's $12,000 retention,

from the $735,000.00 Libertas Funds generated by Northshore's future receipts. Deo directed the receipt and admits the $500,000.00 use for the Superb investment. SMF ¶¶ 257–63; ECF 536 Resp. ¶ 260. The later Flushing transaction likewise placed almost $400,000 of Northshore borrowing into Car Buyers without Northshore benefit. SMF ¶¶ 297–99, 940–45; Aaronson Decl. ¶¶ 123–27. Equity does not permit Deo to retain benefits generated by Northshore's assets without company authorization.

Sunrise's proof establishes that Deo-controlled operations produced unpaid trade, Ally, warranty, customer, and canceled-deal liabilities while related-party compensation continued and IAG paid the consequences. SMF ¶¶ 168–220; Aaronson Decl. ¶¶ 84–100. That supports alternative restitution once the Sunrise-specific benefit is allocated. The Court should grant alternative liability to the extent it finds identifiable benefits not recovered in tort, or establish receipt, control, and nonpayment under Rule 56(g), reserving net restitution for the accounting or a damages hearing. *Parsons* supra at 377(granting summary even though "[t]he extent of damages may be determined at a later time." *Id*.)

## IV. COUNTS TWENTY THROUGH TWENTY-THREE: THOMASSON CONVERTED OR KNOWINGLY ENABLED THE $735,000.00 DIVERSION

Count Twenty applies the conversion principles above to Thomasson's own dominion. Count Twenty-One alleges that Thomasson aided Deo's conversion; Count Twenty-Two alleges that he aided Deo's fiduciary breach; and Count Twenty-Three alleges that he aided Deo's breach of loyalty. Aiding conversion requires a primary conversion, the defendant's actual knowledge thereof, and the defendant's substantial assistance to advance the conversion. *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012); *William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501, 503-05 (1st Dep't 2018). Aiding a fiduciary breach—including the alleged

loyalty breach—likewise requires an underlying breach, the aider's actual knowledge, substantial assistance, and resulting damage. *Krys v. Pigott*, 749 F.3d 117, 127–28 (2d Cir. 2014); *Caprer v. Nussbaum*, 36 A.D.3d 176, 193–94 (2d Dep't 2006). Actual knowledge may be inferred from strong circumstantial evidence, but constructive knowledge is insufficient. *Krys*, 749 F.3d at 127–28.

The evidence establishes an identified fund and affirmative conduct, not routine legal advice. Thomasson claimed to represent the affected entities, knew the payment arose from the Northshore/Libertas authority dispute, received written notice that it was being sent "to hold in escrow," supplied his IOLA instructions, accepted the $735,000.00 payment, retained $12,000, and sent $723,000.00 to Deo's Car Buyers account. SMF ¶¶ 249–58, 894–95, 1053–60; ECF 410-2; ECF 410-3; Aaronson Decl. ¶¶ 118–21, 138–40. He admitted that he was asked to let the funds "pass through" him and that he gave the money to the man who borrowed it. Thomasson Dep. 270:7–10, 282:12–17.

That sequence establishes unauthorized dominion for Count Twenty if the Court finds the stated escrow limitation governed Thomasson's receipt. At minimum, it establishes substantial assistance for Counts Twenty-One through Twenty-Three: his account and transfer were the instrument by which Deo obtained control. Actual knowledge follows from the written limitation, the live ownership and authority dispute, the same amount and compressed timing, and his decision to transfer the balance to Deo's wholly owned company. The underlying wrong is established by Deo's sale of Northshore receipts and direction of the replacement value to Car Buyers for his own purposes. SMF ¶¶ 238–63; Chabrier Decl. ¶¶ 66–67; Aaronson Decl. ¶¶ 113–22.

The record establishes Thomasson's acknowledgement of Deo's tortious acts which constituted conversion, breach of loyalty and breach of fiduciary duty, that Thomasson provided substantial assistance to advance the commission of Deo's tortious acts which proximately caused the harm on which the primary tortious liability is predicated.

The Court should grant judgment accordingly.

## V. COUNTS TWENTY-FOUR AND TWENTY-FIVE: NORTHSHORE AND SUNRISE ARE ENTITLED TO ACCOUNTINGS

An equitable accounting requires a fiduciary or confidential relationship, entrusted money or property imposing a duty to account, no adequate legal remedy, and, in some cases, demand and refusal. *Matter of Ardalan v. Safaie*, 239 A.D.3d 1433, 1434-35 (4th Dep't 2025). The remedy requires the person controlling financial records to disclose how entrusted property was used and return amounts shown to be due. Id.

Deo's fiduciary relationship and entrustment are established. He controlled Northshore's and Sunrise's inventory, customer transactions, cash flow, lender funding, payoffs, DMS reporting, and related-party payments. SMF ¶¶ 84–125; Chabrier Decl. ¶¶ 45–62; Aaronson Decl. ¶¶ 50–68. Known records show held payoff checks, sold-out-of-trust vehicles, missing or damaged inventory, cash and canceled-loan proceeds, warranty collections, intercompany transfers, Libertas and Flushing proceeds, and payments to Deo-controlled entities, but do not fully reconcile each receipt, disposition, credit, or liability. SMF ¶¶ 168–220, 234–300, 884, 908, 1050; Aaronson Decl. ¶¶ 84–100, 122, 137.

A damages award on the known $735,000.00 transaction will not reconstruct those other categories, and only Deo can explain transactions he directed that are absent or incomplete in company records. Northshore and Sunrise therefore seek accountings under oath, separately by

entity and transaction, with credits and duplications removed. If the Court finds a formal demand issue unresolved, it should establish the fiduciary relationship, entrustment, unreconciled categories, and duty to account under Rule 56(g).

## VI. THE COURT SHOULD ENTER NONDUPLICATIVE RELIEF AND, ALTERNATIVELY, RULE 56(g) FINDINGS

If any authentication, allocation, demand, reliance, or damages issue prevents complete judgment, Rule 56(g) supplies the proper narrower remedy. The Court should establish the undisputed management duties, reporting process, held-check and Ally-payoff mechanics, IAG cure payments, Libertas/IOLA transfer amounts and destinations, and Deo's admitted $500,000.00 to invest in Superb. The trial can then be limited to genuinely disputed claimant allocation, net damages, offsets, demand, or a particular statement's causal link.

## CONCLUSION

The IAG Plaintiffs respectfully request that the Court: (1) enter judgment for Northshore against Deo on Count Twelve as to the identifiable $735,000 Libertas replacement res and adjudicate Count Thirteen in the alternative without duplicate recovery; (2) enter judgment for Sunrise against Deo on Counts Sixteen and Seventeen to the extent the identified cash, canceled-deal proceeds, vehicles, and other determinate property and benefits are established; (3) enter judgment, on the supported primary or alternative theory, for Northshore against Thomasson on Counts Twenty through Twenty-Three for the same nonduplicative $735,000 injury; (4) order the accountings sought in Counts Twenty-Four and Twenty-Five; and (5) as to any element or amount not finally adjudicated, enter the Rule 56(g) findings identified above and grant such further relief as is just.

Dated: New York, New York
September 4, 2026

Respectfully submitted,

**Cyruli Shanks & Zizmor LLP**
**By:** *_/S/ Jeffrey Ruderman_*
**Jeffrey Ruderman Esq.**
**Attorneys for IAG Plaintiffs**
**520 Lexington Avenue, Suite 2320**
**New York, New York 10170**
**(212) 661-6800**
**Jruderman@cszlaw.com.**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Judge Wicks's Individual Practice Rule 3.C.2, I certify that this memorandum contains approximately 4,508 words, including the red attorney-review notes and excluding the tables of contents and authorities, as calculated by the program used to prepare it.

*_/S/ Jeffrey Ruderman_*
Jeffrey Ruderman, Esq.

VIA ECF

All counsel of record