EXHIBIT "48"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs, Case No. 2:23-cv-6188 (JMW)

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

----------------------------------------------X

February 13, 2026
9:19 a.m.

100 Federal Plaza
Central Islip, New York

CONTINUED EXAMINATION BEFORE TRIAL OF
ANTHONY DEO

(Caption continued:)

CONTINUED EXAMINATION BEFORE TRIAL of ANTHONY DEO, one of the Defendants herein, taken by the Plaintiffs and Co-Defendants, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony, and Notice and Order, held at the above-mentioned time and place, before Susan M. Cirrincione, a Notary Public of the State of New York.



A P P E A R A N C E S:

HONORABLE JAMES M. WICKS
100 Federal Plaza
Central Islip, New York

SAGE LEGAL LLC
Attorneys for Plaintiffs SUPERB MOTORS INC., TEAM AUTO SALES LLC and ROBERT ANTHONY URRUTIA
18211 Jamaica Avenue
Jamaica, NY 11423

BY: EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
Attorneys for Plaintiffs 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC, ISLAND AUTO MANAGEMENT, LLC, ASAD KHAN, IRIS BARON, 189 SUNRISE HWY AUTO LLC and NORTHSHORE MOTOR LEASING LLC
420 Lexington Avenue
Suite 2320
New York, NY 10170
BY: JEFFREY RUDERMAN, ESQ.



A P P E A R A N C E S: (Continued)

THE LINDEN LAW GROUP, P.C.
Attorneys for Defendants ANTHONY DEO, SARAH DEO, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, GOLD COAST CARS OF SYOSSET LLC, GOLD OAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, and GOLD COAST MOTORS OF SMITHTOWN LLC
250 Park Avenue
7th Floor
New York, NY 10017
BY: BONNIE WALKER, ESQ.

HARRY R. THOMASSON, JR., ESQ.
Attorney Pro Se for Defendant HARRY THOMASSON
3280 Sunrise Highway
Suite Box 112
Wantagh, NY 11793

CULLEN and DYKMAN LLP
Attorneys for Defendant FLUSHING BANK
333 Earle Ovington Boulevard
Second Floor
Uniondale, NY 11553

BY: ARIEL E. RONNEBURGER, ESQ.



A P P E A R A N C E S: (Continued)

ALSO PRESENT:

SARA DEO

ROBERT ANTHONY URRUTIA (Via Zoom)

ALIVIA COONEY, Paralegal, Sage Legal LLC (Via Zoom)

TAMMY ARONBAYER, Paralegal, Sage Legal LLC (Via Zoom)

JOSEPH BARLETTA, Videographer, Sherack Video

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.



Proceedings

THE VIDEOGRAPHER: We are on the record and the time now is approximately 9:19 a.m. Today's date is February 13th, 2026. This is the video deposition of Anthony Deo in the matter of Superb Motors Inc., et al. versus Anthony Deo, et al., index number 2:33-cv-6188, United States District Court, Eastern District of New York. My name is Joseph Barletta, legal videographer with Sherack Video in association with The Little Reporting Company. Today we are at Central Islip Federal Courthouse located at the 100 Federal Plaza, Central Islip, New York.

Will counsels please identify yourselves and state whom you represent.

MR. RUDERMAN: Good morning, Your Honor.

THE COURT: Good morning.



Proceedings

MR. RUDERMAN: Jeffrey Ruderman, Cyruli, Shanks and Zizmor on behalf of all the IAG plaintiffs.

THE COURT: Good morning, sir.

MR. KATAEV: Good morning, everyone. Emanuel Kataev of Sage Legal LLC for the plaintiffs, Superb Motors Inc., Team Auto Sales, LLC and Robert Anthony Urrutia.

MS. WALKER: Good morning. I'm Bonnie Walker. I'm with Linden Law Group and I'm here for defendant, Anthony Deo.

MS. RONNEBURGER: Good morning. I'm Ariel Ronneburger with the firm of Cullen and Dykman, LLP and I'm here for the defendant Flushing Bank.

THE COURT: Mr. Thomasson?

MR. THOMASSON: Harry Thomasson. I'm pro se.



Proceedings

THE COURT: Okay. All right, so before we get going, you're here today because I directed you to continue the deposition and complete it here today because of the rulings, and yesterday's was the latest. So I've received an email from Mr. Kataev. I know it was from him because he sent me his picture too, and that gave me the rough transcript of the two areas for questioning. I've reviewed them and here's how I'm going to rule on those:

The two of them, the first is the questions about, "Did you need Tony's permission to hire anyone?" And the response was, "My partner, we made decisions together." And then the followup was, "Did you need his permission to hire anyone?" Answer, "He was my partner. We made decisions

Page 10

Proceedings

together."

So Mr. Kataev, this is your application to do what; have him answer differently, what?

MR. KATAEV: The application, Your Honor, is to answer the question directly, to compel the witness to answer the question yes or no.

THE COURT: Okay, that's denied because he has answered it. That's his answer. His response is he was his partner and they made decisions together. So that presumes permission wasn't needed, was, I don't know, but it was a collective decision.

MR. KATAEV: That's precisely my point, Your Honor.

THE COURT: Okay. It's denied, okay?

Second one, "Did Ally provide money to Northshore to enable it to purchase used car

Page 11

Proceedings

inventory?" Answer, "Ally provided the floor plan." Question, "Did Ally provide money to Northshore to purchase used car vehicles?" Answer, "They provided the floor plan."

That one you need to answer yes, no or I don't know. You didn't answer that question, so you've got to answer that. What's the answer to that one? Let me phrase the question again.

MR. DEO: Okay.

THE COURT: Did Ally provide money to Northshore to enable it to purchase used car inventory?

MR. DEO: No.

THE COURT: Okay. All right, you can proceed. You have four hours left in the deposition, all right?

MR. RUDERMAN: Yes, sir.

THE COURT: That's total,

Page 12

Proceedings

unless there's an agreement that this is going beyond seven. Multiple parties doesn't matter. Seven is total.

MR. KATAEV: That was the agreement, that multiple parties all get seven hours. That's for Flushing Bank and that's Libertas --

THE COURT: It's all done in seven hours.

MR. RUDERMAN: In other words, we each have seven hours or --

THE COURT: No. The rule is, Rule 30D, and the case is under it, which I've looked at and I'm familiar with and I looked at it again last night, seven hours is total unless there's agreement among the parties or application is made to the court. No application was made, so I don't know if there was an agreement in

Page 13

Proceedings

part --

MR. KATAEV: There was agreement amongst the parties.

THE COURT: There was no agreement?

MR. KATAEV: There was.

THE COURT: What's the agreement?

MR. KATAEV: The agreement was that as soon as I finish my seven hours that he would have seven hours and so would Flushing.

THE COURT REPORTER: So 21 hours for a witness?

MR. KATAEV: It's an important witness.

MR. RUDERMAN: I don't believe after myself --

THE COURT: That's not happening. I don't care what the agreement is. That's not happening. You're not doing 21 hours with this witness. And there cannot be any duplication.



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 14

Proceedings
The cases are very clear on that. When you've got multiple parties asking questions, it is seven hours. The parties who are asking questions should confer and agree who's asking what. They can also agree, and I can grant, of course, more time than the seven, which I will, but it's not going to be 21 hours. That's not happening.
MR. RUDERMAN: I don't think, Your Honor, that Libertas or Flushing will come anywhere close --
THE COURT: How much do you need for Libertas or Flushing?
MS. RONNEBURGER: Well, I represent Flushing, so I can't speak --
THE COURT: And Libertas is not here, so too bad, so sad.
MS. RONNEBURGER: An hour, a little more.
THE COURT: So you have

Page 15

Proceedings
what, four hours? You will be done today.
MR. RUDERMAN: I will be done today, sir.
THE COURT: Okay, and your hour is not duplicative of what's been asked, it's questions that bear on Flushing?
MS. RONNEBURGER: It's questions directly related to Flushing.
THE COURT: Okay, and that's it then.
You're not asking questions, Mr. Thomasson, are you?
MR. THOMASSON: I don't anticipate asking any questions, but we're up to ten or twelve hours with this witness.
THE COURT: Ten or twelve hours? How many hours have you taken so far?
MS. RONNEBURGER: We spent seven hours with Mr. Kataev and we

Page 16

Proceedings
spent, it was --
MR. RUDERMAN: Your Honor?
THE COURT: This is going to end today, so you need to talk and divvy up whatever four hours you've got left today.
I know you've got to leave at 1:30.
MR. RUDERMAN: Your Honor, I will leave and they can continue and I can still be on the Zoom.
THE COURT: Okay, but four hours is it. The clock stops, done. He's done. So use it efficiently. There's no more time after that, okay?
MR. RUDERMAN: Your Honor, four hours of testimony time?
THE COURT: Yeah. Yeah. You can run the clocks. I'm not running the clocks. You run the clocks, but from the moment we started five minutes ago, you've got, as long as we're on the

Page 17

Proceedings
record, that's what you got. You got four hours of that, so use it wisely, alright?
MR. KATAEV: We've been asking, Your Honor, the videographer to track the testimony time, so --
THE COURT: That's up to you guys. That's up to you.
And the last thing I'll tell you is in chambers we can see and hear everything. So we are, we have it on. I am listening. My law clerks are listening. My courtroom deputy is listening to everything. I don't mean to babysit, but I'm going to babysit. So if there's any issues, we'll hear it and I'll come right back in, okay?
MR. RUDERMAN: Thank you.
MR. KATAEV: If we need a ruling, do we just say on the record we're waiting for The Court

Proceedings

for a ruling?

THE COURT: We're going to hear you. One of us will hear you for sure. All right?

MR. DEO: All right.

THE COURT: Again, if you want water or anything -- by the way, there's a bathroom right next door in the jury room. You can go right through that door. My jury rooms have bathrooms. It's closer than going all the way around.

MR. RUDERMAN: Thank you.

THE WITNESS: Thank you.

THE COURT: Okay? Thank you.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:26.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:28.



A. Deo

A N T H O N Y D E O, the Witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. RUDERMAN:

Q Mr. Deo, you just testified that it is not true that Ally provided monies to Northshore to be able to purchase vehicles; is that correct?

A Yes.

Q Where did Northshore receive moneys from? Did they receive it through its portal, the ability to use Ally's money in order to purchase vehicles?

A I don't understand the question, sir.

Q Did Northshore have the ability to use Ally, Ally's money, without necessarily receiving the money, to use Ally's money to enable it to purchase vehicles?

A I don't know.

Q What don't you understand, Mr. Deo?



A. Deo

A Your question.

Q What is it about my question that you do not understand?

A Well, I believe it was a line of credit.

Q Okay, a line of credit means that one party is providing the credit, correct?

A Yes.

Q So Ally is providing credit?

A Yes.

Q Credit is not an ephemeral term. It turns into money. It's talking about money, credit to lend money, not cash, but money in credit, correct?

A Okay. Okay.

Q So Ally provided that credit, which is essentially money, to enable Northshore to purchase vehicles for its inventory?

A That's how Northshore purchased vehicles, yes.

Q And when you purchased these vehicles using the Ally line of credit, Northshore was obligated to repay Ally for those funds?



A. Deo

A Absolutely.

Q Did there ever come a time where Northshore did not repay any of those funds that Ally had provided to purchase inventory?

A Not to my knowledge.

Q And your knowledge is based upon the fact that you were the owner, operator and involved in the operation of the business?

A I was the owner, yes. I am, sorry.

Q But your knowledge as to the fact that, as far as you know, it did not, that it always repaid Ally is based upon your knowledge as the owner and operator of the business, correct?

A I was told by Wendy Kwun and the controller, Daniel O'Sullivan. I get my information about floor plans from them.

Q So it's your testimony that you were never informed by Mr. O'Sullivan, Wendy Kwun or anybody else that there ever came a time when Northshore did not repay Ally for the moneys that were owed under the floor plan line?

A We always paid them.

A. Deo

Q My question --

A I'm sorry.

Q -- is you were never informed by Wendy Kwun, Mr. O'Sullivan or anybody else that there ever came a time when Northshore did not repay Ally for the money that it loaned?

A No.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:31.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:38.

THE COURT REPORTER: Mr. Deo, would you raise your right hand for me, please? Do you solemnly swear or affirm the testimony you're about to give is the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

MR. RUDERMAN: Mr. Deo, the



A. Deo

reporter just swore you in, but you were sworn in yesterday. Do you affirm now that the testimony you gave before this reporter just swore in was also under the oath you had just previously taken?

THE WITNESS: Yeah.

MR. RUDERMAN: Thank you.

(Deo's Exhibit 43A, financial statement, Flushing08560, was marked for identification, as of this date.)

Q (Handing) Mr. Deo, you've been handed a packet of documents. I'm going to represent to you that that is a series of documents provided to us by Flushing Bank in response our discovery demand.

A Okay.

Q You'll notice on the bottom right-hand side are Flushing's, we call them Bate stamps, beginning with Flushing08560. Do you see that?

A Yes.

Q This is a document that Flushing



A. Deo

represented to us was provided by you in connection with financing that was obtained from Northshore. Do you recognize this document?

A Not completely, but yes.

Q Do you recall providing financial records to Flushing in order to obtain financing from Flushing?

A Yes.

Q That was for Northshore, correct?

A Yes.

Q Was this document accurate and truthful when it was submitted to Flushing Bank?

A Yes.

Q Now, it shows on the bottom of the first page that the operating profit before income tax, which is the last line on that page, for the month of October 2022 was $76,130. Do you see that? I'm sorry, I apologize. It's me. There we go. Alright, it's bigger now. Can you see that? I can make it bigger if you need to.

MS. WALKER: Can you show where in the document again?

Q You see it's the last line on the left-hand side which says, highlighted? Do you



A. Deo

see it there? Do you see that line I highlighted?

A Okay, yes.

Q That says profit before income tax $76,130. Do you see that?

A Yes.

Q Was that number accurate as the profit for Northshore for that month?

A I don't know. I don't remember. I'm sorry. Yeah, I specifically don't remember.

Q You don't remember, but the document was presented to Flushing representing to them that it was accurate, even if you don't remember now?

A Yes.

Q To the right of that is the year to date indicating that the profit before income tax for Northshore through October 2022 was $372,037. Do you see that?

A Yes.

Q So again, when presented to Flushing, the representation was made that that was the accurate profit before income tax at that time for Northshore, correct?

A. Deo

A Yes, the year to date.
Q You had no reason to dispute that that number was accurate as presented to Flushing Bank, correct?
A No.
Q Now, you testified a few minutes ago that Northshore always paid Ally the moneys that were due for cars that had been sold, correct?
A Yes.
Q Did there ever come a time when Northshore was, prior to November of 2022, which is the Libertas time frame, prior to that, did there ever come a time when Northshore was unable to pay its regular debts as they came due, as far as you know?
A When Josh started selling the cars. That occurred in the summer prior to November.
Q Are you saying that after that, there did come a time when Northshore was unable to pay its debts as it regularly came due?
A Because he sold -- well --
Q My question --



A. Deo

A That's not a yes or no.
Q Quite right. My question is after the summer, did there come a time when Northshore was not able to pay its debts as they regularly came due?
A Yes.
Q Do you know the amount of money that Northshore was short in being able to satisfy its obligations?
A I don't know.
Q Did you ever look at any documents to see how much Northshore was short in paying its obligation?
A I may have. I don't remember.
Q Do you recall approximately the amount that it was?
A I don't remember.
Q Was it more than $100,000?
A I wouldn't know.
Q Was it a more than $1,000,000?
A I don't exactly remember.
Q Well, if Josh sold a number of cars, you're saying there was some type of a deficiency in Northshore --



A. Deo

A Yes. I'm sorry.
Q -- because he was selling them, you said, below what he should have been selling them for, correct?
A Yes.
Q What was the total inventory worth around that time at Northshore, approximately?
A I don't remember.
Q What you stated was that despite the fact that Northshore had some difficulty or deficiency pin aying its debts when it came due, though, it always paid Ally, correct?
A Yes.
Q So there was always money to pay the Ally, but maybe not money to pay other things; is that your testimony?
A That's incorrect.
Q When there came a time when Northshore was not able to regularly pay its debts, what debts were paid and what debts weren't paid?
A I don't understand your question.
Q Well, you're saying that there came a time after the summer of 2022 when



A. Deo

Northshore was not able to pay its debts as they regularly came due, correct?
A I didn't say that.
Q So let's clarify. Did there come a time prior to November 2022 when Northshore was not able to pay its debts as they regularly became due?
A No.
Q So at all times Northshore had sufficient funds coming in from its operations to pay its debts as it regularly came due?
A The deficiencies with Ally was a problem.
Q So let's put aside Ally for a moment. Other than Ally, did the Northshore ever have any difficulty, any deficiency in being able to pay its debts as they regularly came due other than for Ally?
A I'm sure there was problems at that point.
Q What type of problems?
A I don't remember specifically at the moment.
Q Well, were there deficiencies that

Page 30

A. Deo

debts could not be paid?
A Yeah, I'm sure.
Q Do you know approximately how much that was?
A I wouldn't know a specific number.
Q Can you give me a general number?
A I don't recall at the moment.
Q Mr. Deo, this was your business. You owned it. You ran, you hired, you fired, you kept track of everything in this business, but you have no recollection as to even a general number as to how much it was deficient in being able to pay its debts at that time?
A I don't remember.
Q With regard to Ally, do you recall what, how much it was deficient in being able to repay Ally at that time?
A I don't remember the number.
Q Do you remember the approximate number?
A Approximately, no.
Q Not even approximately? Could you tell me it was under or over $500,000?
A It could have been over.

Page 31

A. Deo

Q Is it your understanding that the sole reason for the deficiency in either paying its debts or paying Ally is because Josh was selling the cars during the summer?
A With a deficiency, yes.
Q Yet with regard to the deficiency and unable to pay its debts, you're showing that in October of 2022 you represented to Flushing Bank that it made a profit of $76,130, correct?
A Well, that's what it says here.
Q Well, that's true and accurate, isn't it?
A Yes.
Q You just testified that it was now unable to pay its debts after the summer of '82, the summer of 2022, because Josh sold some cars. So wouldn't that indicate that there wasn't a profit of $76,000 for October?
A Well, that's what I'm telling you. I don't recall exactly the amounts at that point. You asked if there were problems. I said yes, there were problems.
Q I asked if there were deficiencies and unable to pay the debt. That's my question.

Page 32

A. Deo

Yes or no, there were or were not deficiencies in the fact that Northshore could not satisfy its debts as they regularly became due after the summer of 2022?
A And I said they may have been, but mostly Ally.
Q Mostly Ally, okay. Well, Ally was the floor plan line, right, you testified about?
A Right.
Q That's a big number each month that you have to pay back when you sell cars, correct?
A Well, yeah, when you sell cars, you have to pay back.
Q If you're not able to pay back Ally because there wasn't sufficient funds, then how do you justify a $76,000 profit?
A This was a combination of the controller, Dan, Wendy, the CFO and Tom Jones put it together, the financial statement. I just, I went with what they gave me.
Q The document we're looking at right now was prepared by Mr. Jones and Mr. O'Sullivan; is that what you're saying?

Page 33

A. Deo

A And Wendy.
Q And Wendy. Do you know when Wendy was involved in putting this document together?
A Say it again. I didn't --
Q Do you know when Wendy was involved in putting this document together?
A When?
Q Yes.
A Well, every month they put together a financial statement. So if this is October, then it would be October.
Q It is your understanding that Wendy was involved in putting together the document that we're looking at right now, this financial statement?
A Every month.
Q But this one? I'm talking about this month.
A Yes.
Q And this is the document you relied upon as to its accuracy when it was presented to Flushing Bank, correct?
A Yes.
MR. RUDERMAN: Can we go

A. Deo

off the record?

THE VIDEOGRAPHER: Sure. Off the record at 9:49.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 9:51.

Q Mr. Deo, I've provided you with a document stapled together for you to review on paper. I have it now online for everybody else to see. We'll have this marked as 44.

(Deo's Exhibit 44, financial record, IAG002563, was marked for identification, as of this date.)

Q I'll represent to you that this was a document which was provided to your counsel. On the bottom you'll see our Bate stamp, IAG002563, which was provided about a year and a half ago to your counsel.

A Do you know which one?

Q Which counsel? It was provided your counsel, Mr. Levine, and it was also provided to Thomasson at that time.



A. Deo

I'm going to represent to you that this is a financial record provided to me by my client, and if you take a look at the top of that document, it's for same month of October 2022. Do you see that?

A I do.

Q Scroll down. You have the other document still in front of you, correct?

A Yes.

Q We're going to take a look at that last line, the last few lines we were looking at before. I'm going to highlight in the box so everybody can see, but that area where it says sales gross expense. Do you see that box?

A Yes.

Q I want you to take a look at the one I showed you before and this one and you see, I believe, that the sales amount is the same, correct?

A The first number is the same, yes.

Q Is the second number the same, year to date, just to the right of it?

A Yes.

Q Let's take a look at the gross for



A. Deo

just below the sales number. Do you see how much the gross is showing?

A Yes.

Q How much is that showing on the new one?

A Minus $279,289.

Q What is it showing in the one that you provided to Flushing Bank?

A $172,888.

Q That's a positive number, 172, correct?

A Yes.

Q You presented a document showing a plus, a positive gross of 170 plus thousand. The documents our client showed us from its pulling of the same financial record from they EMS system has a minus of $280,000. Can you explain that difference?

A I don't know why your numbers are different.

Q Let's go to the bottom line here. We have a profit. The last profit before income tax. Here it's showing a negative $375,048. Do you see that?



A. Deo

A Yes.

Q And the one you presented to Flushing showed a positive of over $70,000, correct?

A That was the correct one, yes.

Q I'm sorry, that was the correct one?

A Yes.

Q So you are saying the one on the documents in front of you is not correct?

A The last one you presented. I don't know what that is. I've never seen this.

Q Well, I understand you may not have seen it before, but when you say it's not correct, you just testified that you were not involved in the preparation of this document at all, correct?

A Well, The second one I've never seen this. The first one, this was given to me by the controller, Wendy, and Tom.

Q As you sit here today, you weren't involved in the preparation of either one of these documents, correct?

A I didn't prepare them, no.

A. Deo

Q So you sitting here today have no idea whether either one is correct; is that a fair statement?
A No, not true.
Q You know that the one that was provided to Flushing was correct?
A Because this one was presented to me. The second one, this is the first time I'm seeing the second one.
Q So the basis for your belief that the first one I gave you, the one you gave to Flushing, is correct is because it was given to you?
A It was given to me by them, yes.
Q That's the sole basis for your belief that it's accurate?
A Of course.
Q Who actually handed that document to you?
A It could have been Dan. He was the controller.
Q Now, you testified that there may have been, there may have been some deficiency in connection with the ability to pay some debts



A. Deo

in Northshore after the summer of 2022, you're not really sure how much, if, you're a little unclear, correct?
A Correct.
MR. RUDERMAN: Can we go off the record?
THE VIDEOGRAPHER: Sure. Off the record at 9:56.
(A discussion was held off the record.)
THE VIDEOGRAPHER: Back on the record at 9:58.
Q Mr. Deo?
A Yes.
Q You just testified that the documents that I was showing you, the one that showed numbers different than the one you presented to Flushing, you said that's the first time you've ever seen that before, correct?
A Yes.
Q Do you recall that there was a lawsuit in New York County that was started against you about December of 2022?
A Yes.



A. Deo

Q In that lawsuit, do you recall that the document that I just showed you was marked as an exhibit in that lawsuit?
A I don't know.
(Deo's Exhibit 44A, Chase Bank statement, IAG001807, was marked for identification, as of this date.)
Q All right, so you've been handed a document now. This is a document which, again, was presented in discovery. It is Bate stamped on the first page IAG001807. This is a bank statement from Northshore Motor Leasing for September 2022 and it is account number ending in 8112. Do you recall that this was the main operating account for Northshore?
A I would believe it was.
Q Okay, and you had full authority, check signing authority, to put money in and take money out? This was your account, correct?
A Yes.
Q You were in control of this account, correct?
A Among others.



A. Deo

Q Did you keep track of the moneys going in and out of this account in September of 2022?
A What do you mean, keep track?
Q In other words, take a look online, how are we doing, do we have enough cash available to pay our bills?
A Take a look, yes.
Q I'm sorry?
A Take a look, yes.
Q I'm going to draw your attention to the second page of the document. It should be highlighted somewhat. These are the deposits and additions. Take a look at September 15th, the first entry.
A Yes.
Q You see that? Okay. It states here book transfer, 76 Fisk, F-I-S-K, Street Realty LLC and it's referenced as a loan from Island Auto Group for the amount of $683,318.95. Do you see that?
A I see that.
Q Is this the first time you're seeing that?

Page 42

A. Deo

A I saw it in the statement.

Q I asked you if this is the first time. It this the first time you've seen that?

A I have might have seen it before, yes.

Q When did you see it before?

A I don't recall when.

Q Did you see it on or around the time that this deposit was made?

A I may or may not.

Q Were you aware at that time that a loan of over $680,000 was made to Northshore from Island Auto Group at that time?

A There was no loan.

Q So looking at this here, do you know what the reason was that $683,000 was deposited from an Island Auto Group related entity?

A I'm glad you asked.

Q I'm glad I asked as well.

A So am I allowed to tell you?

Q I'm anxious to hear what your answer is.

A Okay. So at this point Josh was

Page 43

A. Deo

circumventing Northshore Motors. He sold the cars through his Staten Island dealerships. He would get the money in his Staten Island dealerships, but Northshore was obligated to pay Ally for the cars that he sold. So he would transfer the money back to Northshore to pay Ally. So that's what these moneys are.

Q So it's your testimony that Josh Aaronson arranged to sell cars that were owned by Northshore and that he then sold the cars and deposited the money into the Northshore account and that's what this represents?

A Yes.

Q Does this 683 represent, as far as you know, the amount that he sold the cars for?

A I wouldn't be able to tell you. I don't have the exact accounting.

Q That would represent, if he sold, if he put in $683,000, that would be the money that was owed by Northshore to Ally?

A I can't tell you for sure.

Q So if what you're saying is true, then there should be records that there were vehicles sold by Josh that represent all of this

Page 44

A. Deo

amount of money?

A Absolutely.

MR. RUDERMAN: Sorry, I meant to share this. I apologize. I'm sorry, Bonnie, could you see that now?

MS. WALKER: Yeah.

MR. RUDERMAN: I apologize. I'm sorry.

Q So there's the next line from that. These are your bank statements, right? You get them every month, right?

A Yeah, it's Northshore's bank statements.

Q So when you saw they were listed as a loan, did you send an email, a text, reach out and saying why is this listed as a loan?

A I disagreed with Wendy on this.

Q So she said it was a loan?

A Well, between her and Josh.

Q Did Wendy tell you that she believed it was a loan?

A I don't recall the conversation, but I told her it wasn't a loan.

Page 45

A. Deo

Q She said no, it was a loan?

A I don't recall our conversation. I know I approached Wendy on it, yes.

Q What was the response of Wendy, if you know?

A As I said, I don't recall our conversation. I know I approached her with it.

Q And that was --

A Because she was at the building.

Q So this was only done verbally, there was no writing?

A I don't believe there was a writing.

Q And the next entry for $8,917.15, is that also the same idea, the cars were sold and he was putting the money back in?

A I would assume so.

Q Well, is there any other reason other than that?

A Well, I don't know the amounts, the exact amounts.

Q I'm not talking about the amounts.

A Okay.

Q I'm talking about all of these

A. Deo

entries which are listed on the bank statement as a loan, these you say were not a loan and was giving back the money for cars that were sold --

A To pay costs.

Q -- that were taken by Josh and sold, correct?

A Yes.

Q The next entry that I highlight is the first entry on September 16th. Do you see that one?

A Wait.

Q There's only one for September 16th. It's a deposit.

A Yes.

Q That one also is listed as a loan from Island Auto for $385,597.10. Do you see that?

A Yes.

Q That also represents the sale, the proceeds from the sale of vehicles that Josh took and sold?

A Yes.

Q Then if you skip down, there's another entry on September 23rd. This is a



A. Deo

deposit of $30,000. I can find the check. There's a check that was written out from one of the Island Auto entities. If you need me to find the check, I can do that, but is there any reason why there would have been a deposit from any Island Auto entity into the account other than the way you described?

A I wouldn't know.

Q Let's skip down now to the deposit on September 29th. There's only one. And that's also listed as from a loan from Island Auto Group for $100,929. Do you see that?

A Yes.

Q This is also, as far as your testimony, that this is also money that Josh was paying back to Northshore for cars that he had sold, correct?

A Yes.

Q We now have 100, we have almost 700, about $1.2 million of cars that he sold?

A I wouldn't be sure.

Q About?

A Okay.

Q Is that your testimony that based



A. Deo

on this, over the summer in 2022, Josh arranged to sell over $1.2 million of Northshore's cars and that he was paying this money back?

A Well, the moneys went to his company. So yeah, he was giving it back to Northshore so they could pay Ally.

Q So now if the dealerships were selling all these cars, as you described, as a loss, that's the way you testified earlier?

A Yes.

Q Wouldn't that affect the profitability of the dealership?

A I would assume so.

Q So again, looking back at the financial statement you have from October of 2022 showing that the dealership was profitable, is that number, do you still believe that that's accurate?

A I absolutely believe it is.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 10:07.

(A discussion was held off



A. Deo

the record.)

THE VIDEOGRAPHER: Back on the record at 10:09.

Q Mr. Deo, I've handed you a series of documents. We're going to have this marked as 45 and I'm going to represent to you that the stamp on the bottom right-hand side of LIB000332 is a document that was provided to us by Libertas. So Libertas represented to us that this was a document that you presented to them in connection with the Libertas financing, okay?

(Deo's Exhibit 45, Chase Bank statement, LIB000332, was marked for identification, as of this date.)

A Yes, correct.

Q I'm going to draw your attention, this is, again, that same account, North Shore Motor Leasing account ending in 8112. This is for the month of October 2022. Do you see that?

A Yes.

Q I'm going to draw your attention to page two of the document. I'm going to go down to the deposit on October 12th. If you can

Page 50

A. Deo

take a look at that?

A Yes.

Q This is listed, again, as a loan from Island Auto for $200,112. Do you see that?

A Yes.

Q So is it your testimony that that is also proceeds from cars that Josh sold?

A I believe so.

Q Did you --

A I disagree with the loan distinction, again, but yes.

Q Would there be any other explanation that you're aware of as to why this money would have been deposited from an Island Auto entity?

A No.

Q I'm going to draw your attention to October 19th, another deposit listed as a loan from Island Auto of $421,019. Do you see that?

A Yes.

Q Again, the same explanation as to why it's there?

A I believe so.

Page 51

A. Deo

Q The next one, October 20th, loan from Island Auto for $201,020. Do you see that?

A Yes.

Q Again, it's the same explanation as to why the moneys were deposited?

A I believe so.

Q And then October 24th another listed as loan from Island Auto for $80,124. Do you see that?

A Yes.

Q And that's the same understanding as to why that money was deposited?

A I believe so.

Q And then the last one on this page is October 28th, again, listed as a loan from Island Auto for $80,128. Do you see that?

A Yes.

Q Again, it's the same explanation as to why that money is there?

A Yes.

Q So now we have, so we have here over $1.2 million deposited over the course of a week and a half. Do you see that?

A I see that.

Page 52

A. Deo

Q Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that?

A Yes.

Q And it's your testimony that none of that money was a loan to cover deficiencies, but all of that money was simply Josh paying back for the cars that he had sold that he had taken from Northshore?

A I said it was cover to the deficiencies that he was creating, yes.

Q When you say the deficiencies he was creating, was there a deficiency other than the fact that he sold cars below, what you testified is below what he should be selling them for?

A Way below, yes.

Q So in other words, if a car should have been sold for $50,000 and he sold it for $20,000, he sold it for $30,000 below what he should sell it for, correct?

A Then that's the deficiency, yes.

Page 53

A. Deo

Q Well, the deficiency -- let me see if I can correct that, if I'm correct. The deficiency, though, would really be attributable to Ally as to how much had to be paid out? In other words, if you borrowed $50,000 from Ally to buy a car and he sold the car for $20,000, then there's an actual $30,000 --

A Yes, that's the deficiency.

Q Are you saying that as a result of him selling cars below what you believe they should be sold for, he created a 2.4 plus million dollar deficiency?

A It wasn't just what I believe. I'm telling what you the book value was versus what he was selling cars for. And I approached him on that. I told you that yesterday.

Q I want to be clear here. I want to make sure that I understand. You're claiming that $2.4 million that was deposited from Island Auto to Northshore was because of the losses that were incurred as a result of Josh selling the cars below what you think they should be sold for?

A And again, it's not what I think.

A. Deo

It's what it was worth. He was selling it way below what it was worth. That's what I'm saying.

Q I understand, but the deficiency of $2.4 plus million was a deficiency in the amount that he was selling them below what they needed to be sold for?

A Yes.

Q If we look at all of the cars that were sold by Josh, those numbers should match up; is that your understanding?

A More or less, yes.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 10:13.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:18.

Q Mr. Deo, I've handed you documents. This is a Chase Bank account ending in 9899 from 189 Sunrise Hwy Auto LLC.

(Plaintiff's Exhibit 46,



A. Deo

Chase Bank statement for account ending in 9899 from 189 Sunrise Hwy Auto LLC, was marked for identification, as of this date.)

Q And you're familiar with that entity, correct?

A Yes.

Q That's the entity you say you purchased in early 2021, correct?

A I did purchase it in February of '21.

Q All right, and this is another account which you had check-signing authority, oversight and oversaw this account?

A Yes.

Q This is THE account that was used by 189 Sunrise to operate its business?

A Yes. This was its operating account.

Q I represent to you on the bottom right is our Bate stamp of IAG001617. Do you see that?

A Yes.

Q I draw your attention to the third



A. Deo

page, which is a deposits, it's for deposits October 19th, 20th, 21 and 24. Do you see those?

A Yes.

Q Each one says it's a loan from Island Auto. The first one is for $101,019. The second one is for $80,120. The third one is for $65,121 and the fourth is $55,124. Do you see those?

A Yes.

Q Is the reason for these deposits, as far as you know, the same reason you previously testified, that there were cars that Josh sold and this was paying back the money for the cars that he sold?

A Those were to pay Ally, yes.

Q I understand the money was there to pay Ally. That's not my question. My question is is this the money you say was put in by Josh because he had sold cars from Sunrise and this was the proceeds of the cars that he had sold?

A I believe so.

MR. RUDERMAN: Can we go



A. Deo

off the record, please?

THE VIDEOGRAPHER: Off the record at 10:21.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:22.

Q Mr. Deo, before I go on, the document that we just had referred to, the bank statements from 189 Sunrise, was marked as Exhibit 46.

Mr. Deo, I'm handing you another document. We'll mark that as Exhibit 47, and this is a document which was provided to us by Flushing Bank. It's the first page Bate stamp Flushing00162. Do you see that?

A Yes.

(Deo's Exhibit 47, email chain, Flushing00162, was marked for identification, as of this date.)

Q And this appears to be an email, the top one from Robert Puccio on March 7th, 2023. Do you see that?

A. Deo
A Yes.
Q Regarding the Northshore Motor numerated loans, correct?
A Yes, that's the subject.
Q Who is Mr. Puccio, as far as you know?
A He represented Flushing Bank.
Q And he was a representative that Northshore was using at Flushing to obtain the financing, correct?
A It was a line of credit, yes.
Q He says here, referring to Stephen, when he's sending it to somebody at Flushing Bank, please see attached full year 2022 P and L for Northshore Motor. Do you see that?
A Yes.
Q Then scroll down to the second page and what is described as North Shore Motor Leasing LLC profit and loss statement for the year ending December 31st, 2022. Do you see that?
A Yes.
Q Do you know if you or somebody on


A. Deo
Northshore's behalf provided this document to Flushing in connection with this financing?
A I'm gonna assume that I sent it to him.
Q Do you recall this document?
A Not offhand, but it's a profit and a P and L statement.
Q Do you know who prepared this statement?
A At the moment, no.
Q Would it be something that you might have prepared?
A I didn't prepare P and L's.
Q Was Mr. Jones generally involved in preparing your P and L's?
A He would be someone and again, Dan would be.
Q This is in --
A This is after the --
Q This is after November of 2022, right, because it's gone a full year?
A Yeah. Probably not Wendy.
Q Probably not Wendy, probably not Dan, correct?


A. Deo
A No.
Q So somebody who was engaged by Northshore to prepare this?
A Probably.
Q It --
A Probably Tom.
Q So I'm going to draw your attention to the bottom line here stating net profit after tax of $427,843. Do you see that?
A Yes.
Q Is that number accurate?
A I believe so.
Q What's the basis for your belief that it's accurate?
A It was provided to me.
Q By whom?
A As I said, it was probably Tom.
Q Do you know where Tom would have received the information from to prepare this email?
A I guess the DMS.
Q Did you have access to the DMS after November of 2022?
A I know our access was cut off at


A. Deo
some point. I don't know exactly when.
Q So despite the fact that you testified that the dealership lost all this money because Josh sold all these cars, it's still your testimony that this accurately represents that Northshore profited $427,843 for 2022?
A I didn't say that the dealership lost the money.
Q Ultimately, the dealership, even with what Josh did, it still made a profit of $427,843; is that correct?
A I don't know how to answer that question. I'm not sure.
Q You're not sure if this number is accurate?
A No, that's not what I'm saying. Your question is with regards to what Josh did.
Q Well, you're saying that Josh took some action in selling cars causing losses of some kind to Northshore, correct?
A I didn't say that. I said it caused deficiencies in the payments to Ally, which had to be evened out. That's why he did

A. Deo
those --
Q So is it your testimony that after Josh paid those moneys, and we just went through the bank statements, it evened out the money that he had taken out by selling the cars?
A Well, we paid Ally with those, yes.
Q I'm saying but did that take care of --
A I think that would zero it out.
Q Just to make sure I'm clear here, is it your testimony that when Josh put that money back in in September and October of 2022, he had taken care of whatever deficiencies there may have been that he created so that it netted out to a zero?
A Yeah. He had to pay Ally what was due.
Q So he put the money in to cover those deficiencies so that Ally was completely paid off for the money he had taken when he sold those cars?
A Say that again. I'm sorry.
Q Let me rephrase the question.


A. Deo
A Yes.
Q So Josh arranged to put the money into the dealership to make sure Ally was paid off for any deficiencies that he may have created when he sold those cars?
A Yeah, he put back what was due.
Q Okay.
MR. RUDERMAN: Can we go off the record?
THE VIDEOGRAPHER: Yeah. Off the record at 10:27.
(A discussion was held off the record.)
THE VIDEOGRAPHER: Back on the record at 10:28.
Q Mr. Deo, I've handed you a document which has J,L&Co. on the top, which relates to Mr. Jones' accounting firm; is that correct?
A Yes.
Q It's entitled Anthony Deo statement of financial condition March 1st, 2023. Have you ever seen this document before?
A Yes.


A. Deo
Q When was the last time you saw it?
A I think back then.
Q Have you seen it since March of 2023?
A No, I haven't.
MR. RUDERMAN: Thank you. I'm sorry, I forgot to share the document. We're going to mark that as 48.
(Deo's Exhibit 48, Anthony Deo Statement of Financial Condition, March 1, 2023, was marked for identification, as of this date.)
Q On the next page -- I'm sorry, this was provided to us by Flushing Bank and you can see their Bate stamp on the bottom, Flushing00187. Do you see that?
A Yes.
Q So the second page is the statement by the accountants essentially saying that while they put this together, they based it upon information you provided. They didn't do their own audit. Do you understand that?


A. Deo
A Yes.
Q Do you recall providing information to Mr. Jones to enable him to prepare this document?
A Sure.
Q Did you provide any documents in order to have him be able to prepare this statement?
A No, I don't think any documents.
Q So you just told him?
A Yeah.
Q Did you tell him orally or did you send him an email, a text or something?
A It have could been a phone call.
Q You don't recall anything in writing with regard to sending him information even it was documents to make the report?
A I don't remember.
Q Now, the last page of the documents is the actual statement of financial condition. Do you see that?
A Yes.
Q Is all the information true and accurate as of the date of this statement?

A. Deo

A Back then, yes.

Q When you say you had cash in the bank of $657,000, was that a personal bank account, business or something else?

A I think it was a combination.

Q Where did you do your personal banking?

A In '23, I can't remember. Maybe Bank of America or Chase. Not Chase. Signature.

Q Is it your account, is it a joint account with your wife or something else?

A It could have been a combination.

Q So between the accounts that you had, your wife had and maybe the businesses had, you arrived at $657,000, correct?

A Roughly.

Q The notes receivable for $1,275,000, where did that number come in?

A From the tax returns and the DMSes from Northshore.

Q At that point in time, this was March of '23, right? That was after the lawsuit had been started already, correct?



A. Deo

A Yes.

Q And at that point in time you've been claiming that the business was destroyed by the temporary restraining order and the actions taken by Wendy and Josh and other people at that time, correct?

A Repeat that question.

Q I believe it was your allegation that as a result of the lawsuit that they started and the temporary restraining order that they got in December, January, February of 2022 it destroyed the business of Northshore.

A Well, yeah, it severely impacted it.

Q Okay, so in March 2023, what do you believe was the collectability of $1,275,000 for North Shore Motor Leasing accounts payable, the leases accounts receivable to you?

A I'm sorry.

Q Do you not understand the question?

A No.

Q Okay. So you're trying to obtain a loan for Northshore based upon these financial



A. Deo

records, correct?

A Yes.

Q That's the purpose of giving this to Flushing, to say you should lend Northshore money and I'm giving you information about financials to enable you, to assist you to consider whether we're a good credit risk or not, correct?

A Yes.

Q As part of that, you provided Northshore to Flushing with information indicating that you are owed $1,275,000 from Northshore?

A From Northshore, yes.

Q When you presented that, was it your understanding that that was a debt which you believe would be repaid by Northshore?

A I was hopeful that it would be, yes.

Q But at the time you did that, did Northshore have any capability to repay that amount?

A I was hoping it could get back to the point, yes.



A. Deo

Q So at some point in the future you thought maybe you could recover that money?

A Well, I mean we were trying to get it back going.

Q Weren't you were also working with Tony at Superb at that time?

A Yes.

Q I notice you don't list your interest in Superb here anywhere. Is there a reason why?

A I don't know why I didn't. I should have.

Q You have also $296,000 from Sunrise. Is that the same answer, that you were hoping to get money back from Sunrise?

A Yes.

Q Now you had values for these various interests that you have. Gold Coast Motors of Syosset worth $250,000, Gold Coast Motors of Sunrise worth $200,000, North Shore Motor Leasing worth $650,000 and Sunrise Auto Outlet at $180,000, correct?

A Yes.

Q Where did those valuations come

A. Deo

from?

A At this point I can't remember, but I'm sure there was a reason why.

Q Did you have any documents that might refresh your recollection as to how you came up with these numbers?

A I don't know.

Q What would you have looked at at the time to determine the values?

A Money on hand mostly, probably.

Q So did North Shore Motor Leasing have $650,000 in hand or something along those lines?

A Maybe assets.

Q What assets did it have?

A I think we had cars and other tangible assets.

Q Were those cars purchased with the floor plan money?

A Some of them was and some of them weren't.

Q How many cars did Northshore have that it purchased with cash?

A I don't remember at this point.



A. Deo

Q Do you think that it had approximately $600,000 in cars --

A All the cars, no.

Q Other than cars, the space was leased, correct? You didn't own that, correct?

A No.

Q You had some desks, computers. What other assets other than cars and some office equipment did Northshore have?

A There was a lot of equipment in there.

Q What type of equipment?

A Mechanic equipment, office equipment, computers.

Q Sitting here today, you believe that all those numbers that reflected were accurately calculated to the best of your ability?

A To the best of my ability, yes.

Q You have a residence listed in Dix Hills worth $1,498,000, correct?

A Yes.

Q What's the address for that residence?



A. Deo

A It's 4 Darius Court.

Q You list under mortgages payable $789,000, correct?

A Yes.

Q Who is the mortgage owed to?

A Citibank.

Q When did you take out that mortgage?

A I think it was 18 years ago.

Q Is that property titled in your name, your wife, both?

A My wife.

Q Under her married name or her maiden name?

A Oh, I don't --

Q Was is her maiden name, by the way?

A Rahman.

Q And that's R-A-H-M-A-N?

A Yes.

Q So it could be either one, you don't recall?

A I mean, it could be.

Q She currently still owns that



A. Deo

house?

A Yes.

Q Is anybody living at that house?

A No. We're fixing it up.

Q When was the last time you lived at that house? When was the last time you lived at that house?

A 2019.

Q The next property is listed in the Bronx worth $1,280,000. Do you see that?

A Yes.

Q What's the address of that property?

A 3011 Matthews.

Q When was that property purchased?

A A very long time ago. I don't remember exactly when.

Q Who was it purchased from?

A From?

Q Yes.

A I don't know.

Q Do you know if the property is held in your name or your wife's or some other?

A My dad.

Page 74

A. Deo
Q I'm sorry?
A My dad. It was my dad.
Q I'm sorry, you listed the property as yours. Were you on the title to the house at the time?
A I did for some point.
Q In March 1st, 2023, were you the titled deed --
A No, it wasn't deeded to me.
Q When you represented to Flushing that you owned a residence in the Bronx for $1,280,000, that was not accurate at the time, correct?
A No. No, I disagree with what you're saying.
Q So you did own it at the time?
A Yes. Not in title, but I did.
Q Well, you understand what owning property means, correct?
A Yes.
Q There's a deed transferred to you and that deed says you own the property, correct?
A That is your conventional way,

Page 75

A. Deo
yes.
Q That's conventional, correct?
A Yes.
Q Is there another way that one owns a piece of property that you relied upon when presenting it to Flushing Bank?
A Well, you can have ownership rights.
Q You had ownership rights?
A Yes.
Q What were those ownership rights to this property?
A That it was my property.
Q You said you had ownership rights. What were those rights?
A I don't understand your question.
Q Well, you didn't own the property. At the time it was deeded and titled to your father you said?
A Yes.
Q So you didn't own the property at the time?
A I guess it's your description.
Q Well, tell me how you had the

Page 76

A. Deo
right to list that as an asset of yours worth $1,280,000.
A I believe it was my property, yes.
Q What was the basis of your belief that it was your property?
A Because I was the one that purchased it with my dad.
Q But you were not on the deed?
A No, he was on the deed.
Q You purchased it with your dad, you said?
A Yes.
Q So at the time that the property was conveyed from some other party, both you and your dad purchased it at the same time?
A Yes.
Q And approximately when was that?
A A very long time ago. I don't remember exactly when.
Q Does your dad still own the property?
A It could be the late '90s.
Q I'm sorry?
A It could be the late '90s.

Page 77

A. Deo
Q Does your dad still own that property?
A My dad passed away.
Q I'm sorry. That's right. I apologize.
The mortgage that you list here for the Bronx property for $479,000, was that a mortgage you were obligated to pay?
A Yes.
Q You were on the note of the mortgage?
A I don't believe I was on the note. My dad was on the note, but I paid the mortgage.
Q So you paid the mortgage, but there was no obligation from the bank for you to pay it, correct?
A Say it again.
Q There was no obligation to the bank for you to pay it, you just paid it?
A I wasn't on the note.
Q What about the property at the residence of Old Westbury worth $5,295,000?
A Yes.
Q What was the address of that?

A. Deo

A That's 3 Hunting.
Q Can you give the entire address, please?
A 3 Hunting Lane, Old Westbury. It's 11568.
Q Was that property held, titled in your name, your wife's name or some other combination?
A It was a unique situation. We didn't transfer title yet.
Q Did you or did you not own the property at that time?
A I believe I did.
Q So you were on the deed?
A We didn't transfer title yet.
Q When you say, "we," somebody owns the --
A Well, the seller and us.
Q So the seller had not transferred the property to you?
A No.
Q You had not paid them the money to buy the property yet?
A There was a contract.



A. Deo

Q There was a contract?
A Yes.
Q A contract requires that at the end of the contract to close on it, right?
A Yes.
Q At the end of that closing, you, as the purchaser, give the seller all the money the contract requires to purchase the property, correct?
A Yes.
Q Did you ever give the seller all the money that was required under the contract?
A We never finished it.
Q Okay, so the deed was never transferred to you?
A I said that.
Q Well, you say that there's a mortgage here of $2,250,000, correct?
A It was a hard money. It was in place. It was a hard money in place for that amount.
Q So you borrowed $2,250,000?
A It was in place. We never completed it.



A. Deo

Q Did you actually borrow the money or not it?
A It never transferred hands.
Q The loan you referred to, the mortgage, never occurred either, it never closed?
A No. The whole transaction, we didn't complete it.
Q Did you believe that it was full and appropriate to present to Flushing Bank in March of 2023 that these were your assets that Flushing Bank relied upon in providing financing to Northshore at that time?
A I believed it was my asset.
MR. RUDERMAN: Can we go off the record for a second?
THE VIDEOGRAPHER: Yeah. Off the record at 10:43.
(Discussion held off the record.)
THE VIDEOGRAPHER: Back on the record at 10:45.
Q Mr. Deo, I've handed you a document, five-page document. It is from the



A. Deo

New York City Department of Finance Office of the City Register. Have you ever seen this document before?
A I am not sure.
MR. RUDERMAN: We'll mark this as 48A.
(Deo's Exhibit 48A, document from the New York City Department of Finance Office of the City Register, was marked for identification, as of this date.)
Q I'm going to represent to you that I obtained this document from a system called ACRIS, A-C-R-I-S, which is the system in which financial, real estates transactions are recorded in New York State.
A Okay.
Q And this is a recording of an order of the Supreme Court of the State of New York, County of the Bronx under index number 20595, 2006 by Justice Lucindo Suarez. That's L-U-C-I-N-D-O, S-U-A-R-E-Z. And the title is Motilal, M-O-T-I-L-A-L, Deo as the plaintiff, and the defendant is 3011 Matthews Inc., et al.

A. Deo

I want to go down to the decision and there's an Anthony Derrick Deo, individually and is present 3011 Matthews, Inc. Do you know Mr. Motilal Deo?

A That was my dad.

Q That was your dad, okay. Are you familiar with 3011 Matthews Inc.?

A That's the corporation.

Q Is Anthony Derrick Deo you, as far as you know?

A Yes.

Q So based on the order, this was a lawsuit started by your father against you and his company claiming that you forged his signature in transferring the deed to yourself or to this entity. Do you understand that?

A Yes.

Q Do you recall this?

A Yes.

Q This was an order directing the register to void out that transfer that the court found that you had, in fact, forged the deed transferring the property, which you listed as being owned by you, you transferred it from



A. Deo

your dad to yourself and this entity. Are you aware of it?

A I'm aware of it.

MR. RUDERMAN: Off the record.

THE VIDEOGRAPHER: Off the record at 10:47.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 10:52.

Q Mr. Deo, you've been provided with a document. It has been previously marked in this case in these depositions as Exhibit 3. It is the affidavit that you provided in the New York State action in County of Nassau that was commenced by our clients against you. Do you recall this document?

A Yes.

Q You read everything that's in this document? Not just now, but --

A Yeah, prior.

Q You swore that all the information in here is accurate and true, correct?



A. Deo

A Yes.

Q Now, yesterday I believe you testified that you never gave anybody the right to claim ownership over Northshore and that you and your wife were the only ones who have the right to claim that they owned Northshore, correct?

A Yes.

Q I draw your attention to paragraph seven, which is on page three of the document.

A Yes.

Q So in paragraph seven, it says in return for supplying the floor plan, Mr. Baron insisted that he be listed as the owner of my business with a, quote, right of redemption, close quote, his words, that we agreed to verbally.

In this affidavit you're indicating that Mr. Baron insisted that he have the, be listed as the owner of the business with a right of redemption. So wouldn't this indicate that Mr. Baron had the right to be listed as the owner of Northshore?

A For purposes of the floor plan and



A. Deo

banks, as you indicated yesterday, when they provided those applications to banks.

Q So only with regard to the banks he would be listed as the owner, but for all other purposes, it wouldn't be?

A It shouldn't be. That was my understanding at that point.

Q And those documents to the banks were not between you and Mr. Baron, it's just whatever he told the bank, correct?

A Yes.

Q So there was no transfer of your interest in Northshore to Mr. Baron at all, correct?

A None.

Q So what did he need a right of redemption for?

A Well, we would correct it with the banks and floor plan eventually.

Q What do you mean, correct it with the banks?

A Well, he said that he was the owner to the banks and the floor plan, so we were going to fix that later on.

A. Deo

Q How would you fix that?

A I didn't understand the details at that point.

Q Did you think that somehow you would tell the banks that you were actually the owner?

A I said I didn't understand the details of how it was going to be done. We were just trying to get Northshore going.

Q So your testimony is that when you stated in here that Mr. Baron was going to be listed as the owner of the business, it was solely with the banks and the right of redemption was that at some point in the future you would correct it with the banks perhaps?

A Banks and the floor plan, yes. That's why we insisted on K-1's.

Q Do you have any writings of any kind asking for those K-1's?

A We may have. I'm not sure.

Q Did you do a diligent search through all of your records to see if, in fact, whether you have such communication?

A I can't remember if I did. At



A. Deo

some point maybe.

Q Well, as part of this lawsuit, did you do a diligent search for any records related to either your claims or defenses in connection with this lawsuit?

A Oh, yeah, I did with Brian.

Q You produced all the documents that you believe you had that were responsive to the various demands?

A Yes.

Q Did you find any documents which indicated that you were asking for those K-1's, which you say you didn't get?

A I don't recall at the moment. I gave a lot of documents to Brian.

Q I understand. Do you recall if that was one of the documents?

A I don't recall.

MR. RUDERMAN: Can we off the record, please?

THE VIDEOGRAPHER: Yeah. Off the record at 10:56.

(A discussion was held off the record.)



A. Deo

THE VIDEOGRAPHER: Back on record at 11:06.

Q Mr. Deo, you have a document in front of you or a previous document? That's a profit and loss statement from December 31st, 2022. Do you recall we discussed that document? It's the email with Mr. Puccio.

A Yes.

Q With the profit and loss statement behind it and it showed a $472,000 profit. Do you recall that? It was a three-page document.

A Yes.

Q And as the owner of North Shore Motor Leasing, that would have been taxable to you, correct?

A Yes.

Q Did you, in fact, file an income tax return for 2022 that paid the taxes on that $472,000?

A Yes.

Q I'm going to direct to your attorney we call for the production of the tax returns.

MR. RUDERMAN: I believe



A. Deo

there was some other documents that I previously asked if Mr. Deo had any communications asking for K-1's. So I ask you to provide those as well. We'll follow up in writing.

Q Mr. Deo, do you see another document that you have in front of you? It's a bank statement from Bank of America for Car Buyers NYC Inc. We're going to mark this as Exhibit 49.

(Deo's Exhibit 49, bank statement from Bank of America for Car Buyers NYC Inc., was marked for identification, as of this date.)

Q I represent to you this is a document that we obtained by a subpoena to Bank of America. Car Buyers NYC Inc. is one of your companies, correct?

A Yes.

Q Do you recognize this document?

A It's a bank statement.

Q This is from November of 2022. I

A. Deo

ask you to take a look through that bank statement.

A Yes.

Q Do you recall this particular bank statement?

A I mean just by looking at it right now.

Q Now, as you previously testified, and it's all on the record, there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson?

A Yeah. They wired it back.

Q And it went to Mr. Thomasson's trust account, as far as you know?

A Escrow? Yeah.

Q Escrow account, yes.

Did Mr. Thomasson send you that money?

A Yes. He wired it to me.

Q When he wired it to you, did it go to you personally or some other entity?



A. Deo

A I think it went to this account.

Q So there is a deposit, it's called a NYTLR transfer?

A Yes.

Q From November 22nd, 2022 in the amount of $723,000.

A Yes.

Q So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account?

A Yes.

Q That was from the Libertas funds, correct?

A That's what it was supposed to be, yes.

Q Now, the amount that Mr. Thomasson got was $735,000. Do you recall that?

A Yes.

Q So there's a difference of $12,000?

A $12,000.

Q Did Mr. Thomasson keep that money?

A Well, I owed him money from past



A. Deo

and future work, so I told him to keep $12,000 and send me the rest.

Q Did you have any written communications with him regarding that?

A I think it was a phone call.

Q What about the direction for him to transfer the money to this particular account, was it in writing or by phone or something else?

A I think it was a phone call. I'm not sure.

Q Now, also on this bank statement is a transfer on, a withdrawal, the second one of November 22nd, 2022. Am I sharing that?

A What one?

Q Transfer, a wire transfer on November 22nd, 2022 in the amount of $300,000.

A Yes.

Q And that is a transfer to Star Performance Consulting. Do you see that?

A Yes.

Q Do you know who Star Performance Consulting is in connection with this?

A That is one of Tony Urrutia's



A. Deo

corporations.

Q So was this part of the $500,000 that you paid in connection with your Superb agreement?

A Yes.

Q If we scroll down a little further to the next page, it's the top of the next page, there's another wire on November 29th, 2022 also to Star Performance Consulting for $200,000. Do you see that?

A Yes.

Q Was that the balance of the $500,000 that was paid?

A Yes.

Q Now, right before the payment of $300,000 on November 22nd, there is a transfer to DLA Capital Partners for $15,000. Do you see that?

A Yes.

Q Do you know who DLA Capital Partners is?

A That is Michael Laurie's company.

Q Do you know why you paid him $15,000?

A. Deo

A That's his commission.
Q Commission on what?
A The Libertas, the Libertas funding.
Q What was Mr. Laurie's connection with the Libertas funding?
A Well, he introduced me to them.
Q Did he introduce you to them directly or did he introduce you to them through a broker of some kind?
A I think he introduced me to a broker who works with a number of lenders.
Q Are you familiar with a company National Business? National Business?
A No.
Q Now, if I scroll down on that page, that same page we were on, the next to the last entry is November 28, 2022. Do you see that?
A Yes.
Q That's for a wire transfer for $173,000 to Jun Wang and Associates. Do you see that?
A Yes.



A. Deo

Q Do you know what that money is for?
A That's for my house in Hunting Lane.
Q So the house you are currently living in, correct?
A Yes.
Q That was in connection with a contract to purchase that property, correct?
A Yes.
Q You're currently in litigation with the owner of that house, correct?
A Yes.
Q Alright. And in fact, you had started a lawsuit against Mr. Wei, W-E-I, correct?
A Yes.
Q That is in the Supreme Court of State of New York, County of Nassau, index number 612890, 2025 in which you make certain claims with regard to breaches by Mr. Wei in connection with the contract?
A Yes.
Q Do you know what the current



A. Deo

standing is of that lawsuit?
A Can I --
Q I'm just asking if you know.
A Well, it's the same thing. I think it was dismissed.
Q You have a lawsuit against the owner of the property, correct?
A Yes.
Q Do you have more than one?
A No. I think it was dismissed.
Q It was dismissed?
A Yes.
MR. RUDERMAN: Can we go off the record, please?
THE VIDEOGRAPHER: Yes. Off the record at 11:13.
(A discussion was held off the record.)
THE VIDEOGRAPHER: Back on the record at 11:15.
Q Mr. Deo, I'm showing you a document. It's called stock purchase agreement. I represent to you that this was a document that was provided mostly through Mr. Thomasson and



A. Deo

perhaps some of your other counsel in many filings they've done. Are you familiar with this document?
A Yes.
MR. RUDERMAN: I'd like to mark this as Exhibit 50.
(Deo's Exhibit 50, stock purchase agreement, was marked for identification, as of this date.)
Q Do you recognize this document?
A Yes.
Q It's been your statement throughout this case that you are the rightful owner of 189 Sunrise, correct?
A Yes.
Q You claim your ownership as a result of this stock purchase agreement?
A This and paying of the $50,000 to prior owners.
Q So now I'm going to draw your attention to the last page of this document. By the way, these documents were produced in this lawsuit by counsel at the time. It's marked DEO, the first page is DEO00076, and the last

Page 98

A. Deo

page, I don't see signatures on the page. I don't see any signatures on the page. Do you see any signatures on the pages of this document?

A On this document, no.

Q Do you have a copy of this document or an original of this document with any signatures on it?

A Actually, Brian Chabrier held this signature, the signed copy in the safe in his office. In a conversation with him, whenever anyone picked up their check, they would sign the document. I think Jory was the last one to sign it. They never returned the signed document to me.

Q You don't have a signed copy of the document?

A No. No. Brian does.

Q Does Brian have one with your signature on it?

A I think he did, yes.

Q Is this the agreement, the terms of the agreement by which you purchased your interest in Sunrise?

Page 99

A. Deo

A Yes, this was the stock purchase.

Q You stated that you purchased it by paying $10,000 to each one of the existing members, correct?

A Yes.

Q And that satisfied your obligations under the agreement?

A Yes.

Q I'm going to draw your attention to paragraph 1.2, bottom of the first page. It states here the purchase price of payment. Do you see that?

A Yes.

Q Is it says "the buyer." That's you, right?

A Yes.

Q "Is purchasing the shares from the seller for a total purchase price as follows: $50,000 and no cents upon execution of this agreement." You paid that, correct?

A Yes.

Q "Representing $10,000 to each of the five individual sellers," which is what you said you did, correct? You have the checks for

Page 100

A. Deo

that?

A Yes.

Q And then it says, "And $15,000 per month commencing on blank 2021 representing $3,000 to each of the five individual sellers for each month subsequent to the execution of the agreement until such time that the buyer," you, "is able to cross guaranty the corporation with a franchise automotive dealership defined as the purchase price."

Did you ever pay the $15,000 a month additional as required under this agreement?

A Actually, yes. And David died, Josh upped that amount to $30,000, which I continued to pay. The purpose of that was for the floor plan.

Q Well, you previously testified that the deal you had with David Baron for the floor plan was $15,000 a month, correct?

A That was for Northshore.

Q That was for Northshore?

A This is Sunrise.

Q Is the $15,000 per month that you

Page 101

A. Deo

say you paid for floor plan or for your purchase of the interest in Sunrise --

A No, it was the floor plan. That's why it has that, to get your own cross guaranty to provide your own floor plan. That's what the statement that you just read was.

Q Did you have an attorney represent you in connection with this transaction?

A At that point it was Chris Ring.

Q Did Mr. Ring review the documents, as far as you know?

A I'm sure he did.

Q Did you believe this document accurately reflects what the agreement of the parties was?

A Yeah.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Yeah. Off the record at 11:21.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 11:24.

Page 102

A. Deo

Q Mr. Deo, you've been presented with a document. This is a document which, through various proceedings so far, you've represented as a stock sale agreement for you to purchase Baron Nissan. Do you recognize this document?

A Yes.

Q This was pulled from the Nassau County Clerk's office, but it's the same document we've been presenting each time, correct?

A Yes.

Q It's dated May 17th, 2021, correct?

A Yes.

Q I'm just scrolling down the screen to the signature page. Could you go to the signature page, please?

MR. RUDERMAN: 51, please.

(Deo's Exhibit 51, stock sale agreement to purchase Baron Nissan, was marked for identification, as of this date.)

Q Under the seller's signature, we

Page 103

A. Deo

see a signature above David Baron. Do you see that?

A Yes.

Q Do you know that to be David Baron's signature?

A Absolutely.

Q In fact, you were down in Florida to get Mr. Baron's signature, correct?

A We actually signed this at his house.

Q Right. And I believe you have in your various affidavits that you say David died unexpectedly before coming back up, correct?

A Before coming up May 25th.

Q Right. Now, you say he died unexpectedly. Wasn't he seriously ill with cancer at the time?

A David did have cancer, yes.

Q He had very serious, cancer. You knew that, correct?

A Yes.

Q So he didn't die unexpectedly. He died unfortunately, but not unexpectedly, correct?

Page 104

A. Deo

A No one expected him to pass away, not even himself.

Q How do you know that?

A I mean, I met with him. There was no talks about him passing away. There was talks about our future.

Q Under the companies you see David Baron's signature, correct?

A Yes.

Q There is also a signature line for Ron Baron, correct?

A Yes.

Q Now, Ron Baron, pursuant to this agreement, owned half of the stock of Baron Nissan, correct?

A Yes.

Q Do you have any document that has Ron Baron's signature on it?

A Yes.

Q You do?

A Yes.

Q Have you presented it to anybody yet?

A I think it was.

Page 105

A. Deo

Q When was it presented?

A Oh, I don't know exactly when. In one of the cases.

Q Well, You recently brought an Order to Show Cause before Judge Driscoll in the action you started in the Supreme Court in Nassau County, correct?

A Yes.

Q And Mr. Thomasson is representing you in connection with that, right?

A Yes.

Q And Mr. Thomasson brought an Order to Show Cause to stop the sale of Baron Nissan, correct?

A Yes.

Q In that document, he presented no contract with Ron Baron's signature on it. Are you aware of that?

A I know there is a contract with Ron Baron's signature. I'm not sure what exactly was presented or what the court has.

Q Have you presented that document to any one of your attorneys?

A Yes.

A. Deo

Q Which attorney did you present it to?

A Numerous.

Q So they all have a copy of it?

A Chris Ring does, Harry does. I'm not sure if Brian Levine has it.

Q When did you meet with Ron to have him sign that?

A No, David had Ron sign it.

Q David had Ron sign it?

A Yes.

Q When did you first obtain a copy with Ron's signature on it?

A Somewhere between 2020 and 2021.

Q Did Ron sign it before David did?

A No. David signed first.

Q So David signs his on May 17th, 2021, correct?

A It's not the same contract. There's a different contract.

Q There's a different contract?

A Yes.

Q Okay. Have you ever provided a copy of that contract to your counsel?



A. Deo

A Yes.

Q Have you ever provided, in any filings with the court, a copy of that contract?

A I'm sure there is. I'm not a hundred percent sure. I'm sure there is.

Q Are the terms of that contract the same or different than the contract that we're looking at now?

A It's pretty much the same. The buyer changed. The old contract had Lenny Tarzia --

Q I'm sorry, the old contract had?

A Lenny Tarzia. Leonard Tarzia. And the new contract, he changed it to me. Lenny was just going to be on the lease.

Q Is there any contract wherein Ron Baron agreed to sell you his interest in Baron Nissan?

A Well, he agreed to sell Baron Nissan.

Q Please answer my question. Is there any contract in which Ron Baron agreed to sell you Baron Nissan?

A I believe so.



A. Deo

Q Where is that contract?

A I believe it's in the chain of contracts.

Q I'm sorry, you believe it's where?

A In the chain of contracts.

Q What does that mean, the chain of contracts?

A Between the first contract and this contract, and there was emails where Ron did, yes.

Q Were you in direct communication with Ron Baron?

A The lawyers and us, between David, Ron, myself, Chris Ring and Joseph -- I don't know his last name.

Q So you believe there is a contract signed by Ron Baron in which he agreed to sell you his interest in Baron Nissan?

A Ron Baron did agree to sell me.

Q Please answer my question. Is there an agreement in which Ron Baron signed stating that he agreed to sell his interest in Baron Nissan to you?

A I'm not sure.



A. Deo

MR. RUDERMAN: If there is such an agreement, I call for its production or any communication concerning it. Thank you.

Can we off the record, please?

THE VIDEOGRAPHER: Yes. Off the record at 11:30.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 11:32.

A Could I add something to the last question?

Q You want to modify the answer that you gave?

A Well, I just remembered. I just wanted to add.

Q What question was that that you are adding to?

A Was Ron Baron aware of my purchase of Baron Nissan.

Q I don't think that was my question.

A. Deo

A Well, I don't remember your particular question.

Q I asked whether there's a document that Ron Baron signed and if there is such a document, to produce it. I didn't ask the question whether he was aware of it. Thank you.

You've been provided with a two-page document. It's an email chain and from the bottom -- I'm going to have this marked as Exhibit 52.

(Deo's Exhibit 52, email chain, top one dated November 2, 2022, 11:06 a.m., was marked for identification, as of this date.)

Q It is an email from, starting from the bottom to the top, from Wendy Kwun, that is K-W-U-N, at Island Auto Group. It says to Anthony dated October 24th, 2022. Can you look at that last one on the page there, on the second page, which is actually the first in time, and tell me if you recall receiving this email.

A Yes.

Q So you had previously testified on



A. Deo

a license that needed to be, a license application that needed to be transferred over regarding Northshore and Sunrise to you at the DMV, correct?

A Yes.

Q You did receive the paperwork from Northshore and Sunrise to make that change with the DMV, correct?

A Yes.

Q On October 24th, 2022, you received an email from Wendy saying please fill out and sign and return them to you, correct?

A Yes.

Q And then the next email is dated Wednesday, November 2nd, 2022 from Wendy asking you, have you had a chance to fill out these two forms? So presumably, she didn't receive it yet, correct?

A That's what I read.

Q Did you respond to this email?

A I didn't respond to the email, but I had Dan work on the transfer documents and Dan had the documents at this point.

Q So he had them on November 2nd at



A. Deo

10:59, he already had them?

A He should have. Yes, we worked on it together.

Q Then there's another email on that same date from Josh Aaronson to Wendy in which you were copied, right? Anthonyd@Northshoremotors1.com is your email, right?

A Yes.

Q So just a few minutes later, he says, "Hi, Anthony. Please make sure to get this back to us today. Thank you."

You say you did give it back to them?

A I had, like I said, Daniel O'Sullivan worked on it with me and he had the documents.

Q When you say worked on it with you, what needed to be done that he worked on?

A Just filling out the application.

Q You were incapable of filling it out yourself?

A I am capable.

Q So why did you have Dan work on



A. Deo

it?

A Because he was my controller.

Q What information was on there that needed the controller to prepare?

A He is my controller, so he helped me with a DMV application.

Q And you signed this application?

A I'm sure I did.

Q How did you ensure that it was then transferred over to Josh and Wendy?

A I -- I mean Daniel was in constant contact with them.

Q Did you ever ask Daniel if he ever gave it to them?

A I can't remember.

Q Did you ever follow up with either Josh or Wendy to say hey, did you get it?

A Well, obviously there's an issue because they eventually returned the license without transferring it to me. So there was an issue there somewhere.

Q That's not my question. Did you ever follow up with them and ask --

A I do not remember.

A. Deo

Q Did you ever follow up at any time to make sure that the license to operate the two dealerships you're claiming were yours got transferred to you?
A Of course I did.
Q You did? So how did you go about following up with that?
A By looking it up online.
Q You didn't send an email to Josh and Wendy, hey, did you send it in?
A I don't recall at that point.
Q Do you recall at any point?
A I don't recall.
Q So you just look online to see whether or not it actually happened?
A Yes.
Q When did you look it up online?
A (Indicating).
Q When?
A I'm sure there was various times.
Q How did you good about doing that?
A Google.
Q What did you look for on a Google search?



A. Deo

A New York State DMV license.
Q Is that information available publicly?
A I'm sure it is.
Q Well, did you know that when you were doing your Google search? Did you know that when you were doing your Google search?
A Sure.
Q That that would be available publically?
A Sure.
Q So as somebody who has been in the car business at this point in time for six years, the way that you were going to find out whether your license was submitted to the DMV was doing a Google search?
A Well, yeah, because it would update the dates.
Q Did you ever contact DMV directly?
A We spoke at some point. I don't remember exactly when.
Q Who did you speak to?
A Joe Fello.
Q When did you speak to him?



A. Deo

A I don't recall exactly when.
Q Do you recall a time frame?
A 2023.
Q Sometime in 2023?
A Yes.
Q Is that before or after you submitted the new application for the Gold Coast entities?
A Before.
Q Do you have a copy of the dated application with your signature on it?
A I don't.
MR. RUDERMAN: Can we go off the record, please?
THE VIDEOGRAPHER: Yup. Off the record at 11:38.
(Discussion held off the record.)
THE VIDEOGRAPHER: Back on the record at 11:40.
Q Mr. Deo, yesterday we discussed your ownership of UEA Premier Motors Corp., correct?
A Yes.



A. Deo

Q I believe you testified that that was a company which you or your wife together wholly owned, correct?
A Yes.
Q And that was a used car automobile dealership, retail dealership?
A Yes.
Q Operating out of 180 Michael Drive?
A Yes.
Q I believe you said you didn't recall who held the license on that, correct?
A No.
Q Are you familiar with a gentleman by the name of Louis Beria?
A Yes.
Q How do you know Mr. Beria?
A We worked together in Dolphin Realty.
Q Dolphin Realty?
A Yes.
Q What is Dolphin Realty?
A A real estate firm.
Q What did it do?

Page 118

A. Deo

A Buy, sell houses, list houses, like a normal real estate business.
Q Was it like a broker to the public or did it do its own investments?
A Oh, no, it's a broker to the public.
Q So if somebody wanted to list their house for sale, they might come to Dolphin Realty?
A Yes.
Q Also, if somebody wanted to buy a house, they might go to you to show houses around that they might purchase?
A They would go to Dolphin, yes.
Q Where was Dolphin Realty located?
A It's closed now. It used to be located in West Babylon.
Q That was a licensed real estate?
A Yes.
Q You mentioned previously you held a real estate license, correct?
A Yes. I was a real estate broker.
Q Did you use your real estate brokerage license --

Page 119

A. Deo

A No.
Q Just let me finish my question.
A I'm sorry.
Q That's all right. The reporter can't get us both speaking at the same time.
A Gotcha.
Q Did you use your real estate broker's license in connection with Dolphin Realty?
A No.
Q Did you have your own real estate license when you were operating Dolphin Realty?
A I don't recall.
Q Did you need a real estate license when you were operating Dolphin Realty?
A No.
Q What did you do for Dolphin Realty?
A Looked at properties, assessed properties. He would get houses to negotiate short sales, loan modifications.
Q You personally were not engaging in brokerage activities for Dolphin Realty?
A No.

Page 120

A. Deo

Q Was Mr. Beria engaging in brokerage activities --
A I'm sure, yes.
Q To your knowledge, did he have a real estate license?
A I think so.
Q Do you know if Mr. Beria continued to operate Dolphin Realty?
A If he continued? What do you mean?
Q Continued to run that business.
A I'm sure he did.
Q When was this, when you were operating Dolphin Realty?
A I don't know exactly. 2015 maybe. I'm not sure. I'm sorry.
Q Were you operating Dolphin Realty at the same time that you were operating any of the car dealerships?
A No.
Q So it was beforehand?
A Before.
Q And when you stopped operating Dolphin Realty, is that when you first started

Page 121

A. Deo

getting into ownership of the automobile dealerships?
A Yes.
Q Was Mr. Beria involved with automobile dealerships at all?
A Not really.
Q Did you close up Dolphin Realty together?
A No. No. That was his family's business.
Q Were you an employee there?
A I wouldn't consider that, no.
Q Did you earn any income from it?
A I had some commissions, I'm sure.
Q So you received commissions like a 1099, as an outside contractor?
A Yeah.
Q But that was Mr. Beria's business?
A Yes.
Q After you left Dolphin, as far as you know, he continued to operate Dolphin for a while?
A To my knowledge.
Q About for how long, if you know?

A. Deo

A I wouldn't know.

Q After you left Dolphin Realty, did you have any further communication with Mr. Beria?

A I'm sure we spoke.

Q But you had no further business dealings with him, correct?

A I don't think so, no.

MR. RUDERMAN: I'm going to have this marked, please.

(Deo's Exhibit 53, dealer agreement between Westlake Financial Services and UEA Premier Motors Corp., was marked for identification, as of this date.)

Q Let me know when you're finished.

A Sure. I'm done.

Q You done?

A Yes.

MR. RUDERMAN: Can we go back on the record, please?

THE VIDEOGRAPHER: We didn't go off.

MR. RUDERMAN: Oh, I'm



A. Deo

sorry. Silly me. Okay.

Q Mr. Deo, have you had an opportunity to review this document?

A Yes.

Q I'm going to represent to you this is a document that we received by a subpoena served on Westlake Financial Services. Yesterday I believe we showed you a similar document in connection with Northshore Motor, which was signed by Brian Chabrier. Do you recall that?

A Yes, I do.

Q So this is a dealer agreement between Westlake Financial Services and UEA Premier Motors Corp. Do you see that?

A Yes.

Q Do you recognize seeing this document before?

A I mean, it's a similar document, yes.

Q I'm saying do you recall seeing this document between UEA Premier and Westlake?

A At that time, sure.

Q Now, on the first page it says



A. Deo

Louis Beria's name. Do you see that?

A Yes.

Q And then on the last page it's signed by UEA Premier Motors Corp., or at least there's a signature above the name Louis Beria with a signature saying Louis Beria. Do you see that?

A Yes.

Q It's dated October 17, 2016?

A Yes.

Q And his title is listed as owner?

A I see.

Q Were you aware that this document was signed by Mr. Beria as the owner of UEA?

A At that point, yes.

Q Was, in fact, Mr. Beria the owner at that time?

A No.

Q Was he ever the owner of UEA --

A No.

Q How did it come about that Mr. Beria signed this as owner?

A It's the -- to get the bank.

Q Sorry?



A. Deo

A It's to get the bank. So it's an application to get the bank financing.

Q You were the owner, correct?

A Yes.

Q Why didn't you sign it as the owner?

A I don't recall the circumstances at that point, no.

Q Is it perhaps because as a result of your judgment, your criminal judgment, you believed that you could not obtain more financing and that's why you didn't sign it?

A I am not sure.

Q Is this information that was provided to Westlake Services for your company on your behalf false in that it stated that Beria was the owner?

A Well, he wasn't the owner.

Q So it was false, correct?

A Yes.

Q You knew that it was false when it was submitted, correct?

A I guess yes.

Q Did Mr. Beria actually have any

A. Deo

relationship with UEA Premier Motors at all?

A I'm assuming we still had contacts, so yes.

Q Whether he had contacts, did he have anything to do with the business of the dealership?

A No.

Q Do you know what, if anything, he was doing business wise or he was just doing the Dolphin or something else?

A What he was doing business wise, no.

Q Do you know whether Mr. Beria ever had any criminal convictions?

A I found out later on, yes.

Q What did you find out later on?

A That he was arrested.

Q When did you find that out?

A Specific date I'm not sure.

Q Was it before or after this October 17th, 2016?

A Oh, I don't know when he was arrested.

Q Do you know if he was arrested



A. Deo

before you had him sign this document for the bank?

A I don't know when he was arrested.

Q Do you know what he was arrested for?

A It had something to do with real estate in Georgia.

Q Did you provide any information to any governmental agencies, such as a U.S. attorney or FBI, in connection with that criminal conviction or criminal arrest?

A No.

Q You previously testified that you were that afraid for your life during your criminal matter because there were people after you with guns. Do you recall that?

A Yes.

Q Were you afraid that Mr. Beria was one of those people?

A No.

Q Or anybody on behalf of Mr. Beria?

A No.

Q You never did say who was after you. Who was after you with guns?



A. Deo

A I don't know the specific people's names.

Q Do you know why they were after you with guns?

A I don't know.

Q So how do you know they were after you?

A Because I got threats at that time.

Q From whom?

A I don't recall.

Q How were these threats manifested to you?

A It was a long time ago. I don't remember.

Q Are you threatened very often that someone wants to kill you?

A Say again?

Q Are you threatened very often by people who want to kill you?

MS. WALKER: Objection.

Q You can answer the question.

A No.

Q Somebody threatened they wanted to



A. Deo

kill you; is that what you're saying?

A Yes.

Q You don't remember who it was, correct?

A No.

Q You don't remember when it was, correct?

A Time frame, 15 years ago.

Q You don't remember why they threatened you, right?

A No.

Q You don't remember what it was about at all?

A Well, it had something to do with my corporation.

Q So you cooperated with the investigation concerning your particular issue when you had a criminal conviction, correct?

A It wasn't my issue.

Q But you had a criminal conviction, correct?

A Yes.

Q In connection with that, the circumstances, you cooperated with the FBI or

A. Deo

the U.S. attorney?

A The investigation was of someone else.

Q Not part of what you were convicted for?

A No.

Q Who's that person that was being investigated?

A There was a number of companies.

Q Do you remember the names of any of those companies?

A Novelty Realty. There was -- I forget the title company's name, and a mortgage bank. It was association with Novelty.

Q Did any of these entities have any relationship to Mr. Laurie?

A Laurie? No.

Q Did any of these businesses have any relationship with Mr. Beria?

A No.

Q Were there any individuals behind these entities that you're aware of?

A Yes.

Q Do you believe that those



A. Deo

individual or individuals were the ones that sent someone to threaten you with your life?

A Yes.

Q Who were these people?

A I don't remember their names at the moment. There was a lot of them.

Q There were a lot of people that were under investigation that you were working with?

A Yes.

Q One or some of them hired or engaged some people to threaten you with your life?

A At that point that was my belief, yes.

Q That was in 2015, approximately?

A Time frame, around 15 years ago probably.

Q After that one incident where you were threatened, did they ever threaten you again, as far as you recall?

A I don't remember.

Q As a matter of fact, you said that that threat that happened about 15 years ago,



A. Deo

you later hired, engaged a police officer or former police officer Marc Merckling for security, correct?

A I felt more comfortable with him around, yes.

MR. RUDERMAN: Can we go off the record, please?

THE VIDEOGRAPHER: Yes. Off the record at 11:53.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 11:58.

Q Mr. Deo, going back to the Libertas transaction. You testified that you asked Mr. or you engaged Mr. Laurie for financing and he ended up bringing you ultimately to Libertas, correct?

A I didn't hear the last part.

Q You engaged Mr. Laurie for financing and he directed you ultimately to Libertas, correct?

A Well, either through someone else or, but that's who we ended up with.



A. Deo

Q Had you ever heard of Libertas before Mr. Laurie connected you?

A No.

Q What was the purpose of going to Libertas? What were you trying to do?

A Working capital.

Q How much money were you seeking at that time?

A I'm not sure. I submitted my documents in to see how much I was approved for.

Q What did you intend to use the money for?

A For the business.

Q Can you be more specific when you say "for the business"?

A Working capital.

Q Was the dealership undercapitalized at that time?

A At that point that's when the whole ruination was occurring, so...

Q Well, you testified that Josh Aaronson paid back all the money that was owed to Ally so it came out to be a net zero.

A That Ally moneys, yes.

A. Deo

Q The Ally moneys. Were there other problems with the dealership other than that?

A Well, we were shut down. It wasn't operating like a normal business, but it still had expenses to carry on.

Q When --

A I think there were employees. We still had the lease.

Q You say you were shut down. When were you shut down?

A Well, we weren't operating like a normal business.

Q When you say, "we weren't operating," at what point in time are you referring to?

A At the end of 2022 going into 2023.

Q Do you mean in December of 2022? Could you narrow that down?

A Well, towards the end. I mean, it was a couple of months.

Q When you say weren't operating, why weren't you operating?

A Because he shut down the floor



A. Deo

plans.

Q He shut down the floor plans. You're talking about Josh?

A Josh, yes.

Q Do you know when he shut down the floor plans?

A Precisely I don't know, but I know it was towards the end of the year.

Q So you needed working capital to do what with, exactly?

A To, you know, restart everything and just get the business back up and running.

Q So the money was earmarked for use for that purpose?

A To get the business back up and running, yes.

Q And in fact, when you applied for the financing through Libertas, that's what you told them the money was going to be used for, correct?

A For working capital, yes.

MR. RUDERMAN: Can we go off the record please?

THE VIDEOGRAPHER: Yes.



A. Deo

Off the record at 12:01.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:02.

Q Mr. Deo, I've provided you with a document for your review. This is a document with Libertas' name on and it was provided to us by Libertas with the first Bates number LIB000001. It's five zeros. Do you recall ever seeing this document before?

A Yes.

MR. RUDERMAN: I'd like this marked as 54, please. Thank you.

(Deo's Exhibit 54, document LIB000001, Agreement of Sale of Future Receipts, was marked for identification, as of this date.)

Q What do you recognize this document generally to be?

A It was the agreement for the loan that I had with Libertas.

Q I'm going to ask you to turn to



A. Deo

page, if you look on the right, bottom right-hand side. You'll see that it has one designation, LIB. Can you go to the one LIB and then 11?

A It's blank.

Q Go to 12 then. I'm sorry. Okay. There are two signatures there. Can you see that?

A Yes.

Q Do you recognize those signatures?

A Those are my signatures.

Q Okay, and it says your name. I see your name, Anthony D. Deo, twice there.

A Yes.

Q There is also Marc Merckling's name there. Do you see that?

A I see that, yes.

Q Any idea how Marc's Merckling's name got on this?

A That had to be a computer glitch.

Q As far as you know, you signed this document on behalf of Northshore, correct?

A Yes. It was a DocuSign.

Q Going to the next page that ends

Page 138

A. Deo

in 13, there's a couple more signatures there. Are those your signatures?

A It's blurry.

Q If you're able to make a distinction. If not --

A It's blurry.

Q Too blurry, okay.

Then on the next page there's another few signature lines. Do you see those?

A Yes.

Q Are those your signatures?

A Yes.

Q So there is, again, another one on the sixteenth page, I believe. Are those your signatures?

A Yes.

Q This is a document that you signed on behalf of Northshore for Libertas, correct?

A Northshore and 189, yes.

Q And 189. This was for Libertas to provide $750,000 in financing to Northshore and Sunrise?

A Yes, I think that's what was the amount.

Page 139

A. Deo

Q Right, and they took $15,000 off the top, right, as a fee?

A There was some sort of a fee.

Q I draw your attention to --

MR. RUDERMAN: Go off the record for a second?

THE VIDEOGRAPHER: Sure. Off the record at 12:06.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:07.

Q Mr. Deo, I'm drawing your attention to page five of the document. That's also blown up on the screen to make it a little easier to see. It states in paragraph 16 that the merchant, that's Northshore and 189 Sunrise, agrees, covenants, represents and warrants as follows at the time it executes this agreement and on a continuing basis until such time as purchaser has received the completion amount or merchant has filed for bankruptcy or gone out of business in the ordinary course. And subparagraph A entitled business purpose, use of

Page 140

A. Deo

purchase price in bold letters, merchant represents and warrants that it's entering into this agreement solely for the business purposes and not for personal, family and household purposes. And then in regular type, merchant agrees to use the purchase price exclusively for the benefit and advancement of merchant's business operations and for no other purpose. Did you see that?

A Absolutely.

Q Did you read this when you signed it?

A May or may not. It's, you know, page five, paragraph 16. I probably just skimmed through it.

Q Were you aware that there was a requirement by Libertas in your application and their approval that the funds that they were going to be providing could only be used for the business of Northshore and Sunrise?

A I mean, that was my intention.

Q Ultimately, did you use those funds for the purpose of Northshore and Sunrise?

A It's my belief that I did.

Page 141

A. Deo

Q We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct?

A Yes.

Q $723,000 went into that account, correct?

A Yes.

Q That was the money that had come from Libertas, correct?

A Yes.

Q And then within a day or two after you transferred $500,000 of those funds to Mr. Urrutia's company, correct?

A Yes.

Q Was that money from Libertas not used to invest into the Superb transaction?

A No.

Q Why do you say that?

A Because Tony had a franchise, it was supposed to cross guaranty Northshore Motors and 189 Sunrise.

Q So that money was okay to use for that purpose because of the cross guaranty; is

Page 142

A. Deo

that you are position?

A Yes.

Q What about the $173,000 that was paid to the landlord or the owner of the property on Hunting. Was that also for business purpose?

A What does that have to do with the Libertas money?

Q Well, you got $723,000, correct?

A Yes.

Q In the account. You used $500,000 of that to pay to Tony Urrutia's company, correct?

A Yes.

Q Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct?

A I wired the money, yes.

Q Was not that money from the Libertas funds?

A It was not.

Q Did you have other money that was available that did not come from Libertas?

A I'm sure I did.

Page 143

A. Deo

Q What's the basis for your belief that you had other money?

A Because I had other accounts, other things going in and out.

Q Is it just a coincidence that the account that the $723,000 came in on, that money went out of that account for that real estate transaction soon thereafter?

A Yes.

Q The cross guaranty that you were talking about, was that ever executed?

A Because of the --

Q My question is was that cross guaranty ever executed?

A Yes.

Q Was it executed by Mr. Urrutia? Was it ever signed and executed by Mr. Urrutia?

A I believe so.

Q Do you have a copy of that document?

A I don't know if I did, no.

Q Have you ever presented it to any of your attorneys?

A The cross purchase agreement? I'm

Page 144

A. Deo

sure I did, yes.

Q One that was signed by Mr. Urrutia.

A I don't know if I have one signed by him, no.

Q In fact, you have several lawsuits with Mr. Urrutia which that is at issue, correct?

A Say that again.

Q You have several lawsuits with Mr. Urrutia in which the cross guaranty is an issue in the court?

A There's a lot of issues.

Q That's not what I asked you.

A I don't know.

MR. RUDERMAN: Can we go off the record, please?

THE VIDEOGRAPHER: Yeah. Off the record at 12:12.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:14.

Q Mr. Deo, in referencing to the

Page 145

A. Deo

cross guaranty, that is in reference to the cross purchase agreement, correct, that you had with --

A Yes.

Q In the cross purchase agreement, is there a reference to a cross guaranty?

A I -- I don't know.

Q Are there any other documents that you're aware of that concern this cross guaranty obligation?

A I mean, if it's not in the cross purchase agreement, that's the only thing we had.

Q Now, you also, we discussed the Flushing loan as well, correct? You remember the Flushing loan in March of 2023 we discussed, correct?

A Yes.

Q What was the purpose in going to Flushing to obtain financing at that time?

A Working capital.

Q Was Northshore an operating entity at that time?

A It was still open. The license

Page 146

A. Deo

had not been given back yet.

Q Was it buying and selling cars?

A Not at the level it's supposed to, but it was still open.

Q Was it buying and selling cars?

A Yes.

Q Did it have any floor plan financing?

A Yes.

Q Who was the floor plan financing?

A Westlake I think at that point.

Q Were you aware at that time that Judge Gianelli in the Supreme Court action issued an injunction restraining any transactions, financing, liens, et cetera and so forth with regard to Northshore and 189 Sunrise?

A I didn't know the details of that.

Q You knew that there was some sort of an order from the court, but you didn't know what the restrictions were?

A Yeah. I wasn't fully abreast of what to do and what you can't do.

Q Without telling me what you discussed, you did discuss it with your attorney

Page 147

A. Deo

at the time, correct?

A We talked.

Q Your attorney at the time was Mr. Thomasson?

A Yes.

Q Did you ever see a copy of the actual order of the court?

A No.

Q Would it be fair to say that based on your conversations after having spoke to Mr. Thomasson, you did not believe that the financing and the sales that you were doing with Northshore would be violative of the court order?

A No, I didn't think so.

Q Now, you say you intended to use the Flushing funds for working capital, correct?

A Yes.

Q You had gone, actually, to Flushing back in August of 2022 for the first time trying to get some sort of financing from them, correct?

A Repeat that. I'm sorry.

Q The transaction which you actually

Page 148

A. Deo

closed with Flushing was in March or so of 2023, correct?

A If you say so. I don't remember exactly when.

Q But it was in 2023?

A I think so.

Q In fact, you had tried to obtain some type of financing back in August of 2022 with Flushing. Do you remember that?

A I don't recall.

Q So you don't recall ever going to Flushing Bank for any type of financing prior to 2023?

A I don't recall.

Q Now, did you, in fact, advise Flushing that you intended to use the money for working capital?

A I'm sure I did, yes.

Q In fact, that was what their expectation was, correct?

A I'm not sure.

Q Well, based upon what you told them, correct?

A I would assume so.

Page 149

A. Deo

Q Did you actually draw down on that $500,000 credit line?

A I think I did, yes.

Q Do you know what the money was actually used for when it was drawn down?

A In particular I don't know.

Q If I told you that money was drawn down and then transferred Car Buyers Network, does that make sense? Car Buyers NYC, Inc.

A I would have to see the transaction.

MR. RUDERMAN: Go off the record?

THE VIDEOGRAPHER: Sure. Off the record at 12:18.

(A discussion held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:31.

Q Mr. Deo, I do not have a printout of the Flushing Bank statements for the Northshore account, but I do have them online and I'd like to show them to you through your counsel's laptop.

Page 150

A. Deo

MR. RUDERMAN: This is 55, please.

(Deo's Exhibit 55, Flushing Bank Statement of Account, Flushing07269, was marked for identification, as of this date.)

Q So this is documents, came from documents that were produced to us by Flushing Bank. Do you see that? The first page has Flushing Bate stamp 07269, and go back up, this is the bank statement from North Shore Motor Leasing beginning on March 17th, 2023 ending March 31st, 2023. Do you see that?

A Yes.

Q This is around the time when Northshore Motor Leasing obtained the $500,000 line of credit from Flushing, correct?

A Yes.

Q In fact, if we look on the statement March 22nd, we see Flushing says advance to Northshore Motor $500,000, correct?

A Yes.

Q So it would appear that Northshore Motor drew down on the entire credit line at one

Page 151

A. Deo

time. Is that what it looks like to you?

A Say that again? I'm sorry.

Q It looks like Northshore drew down on the entire credit line at one time because there's a $500,000 advance on March 22nd.

A I don't know.

Q Do you not see that?

A I see the advance.

Q Of $500,000. Do you see that?

A Yeah.

Q That was the amount of the credit line, was it not?

A Yes.

Q So it was the entire credit line was drawn down at that one time?

A I think it was put in there.

Q Okay. The entire advance was funded at that time?

A Yes.

Q Okay. Is that a fair statement?

A Yes.

Q Okay. And the money was then to be used for the betterment of Northshore Motors, correct?

Page 152

A. Deo

A Yes, for working capital.

Q Working capital. The next transaction that we have -- let's go back. Before that $500,000 was there, there was a $2,000 deposit on March 20th from Car Buyers, correct?

A Yes.

Q And then there was a $1,500 origination fee which was drawn out?

A Yes.

Q Leaving $500 in the account?

A Yes.

Q So then the account gets funded with $500,000, and then the next transaction after that is a transaction on March 22nd wherein $50,000 was transferred out to DLA Capital Partners. Do you see that?

A Yes.

Q What was that for?

A That was his commission.

Q So ten percent?

A Yes.

Q Out of the $500,000, ten percent or $50,000 was paid to Michael Laurie's company,

Page 153

A. Deo

DLA, as a commission for assisting in getting this financing, correct?

A Yes.

Q The next transaction we have is on that same day, wire transfer fee of $30. The next transaction on the same day is $50,000 to go to Car Buyers NYC. Do you see that?

A Yes.

Q The next transaction after the wire fee on March 27th is another wire transfer to Car Buyers NYC for $85,700. Do you see that?

A Yes.

Q There was no other money in that account other than the $2,000 originally put in by Car Buyers that didn't come from the financing, correct?

A Yes.

Q So so far, out of the $500,000, $185,700 was used either to pay a commission to Mr. Laurie or was used to pay Car Buyers NYC, correct?

A Yes.

Q Were the funds that went to Car Buyers NYC used for the betterment of North

Page 154

A. Deo

Shore Leasing?
A I don't remember.
Q Well, you previously testified Car Buyers NYC was a consulting company, correct?
A Yes.
Q You're one of the consultants that worked for that company, correct?
A Yes.
Q I believe we'd asked at the time and you weren't sure, were there any other consultants that worked for Car Buyers NYC?
A No.
Q When the money went into Car Buyers NYC, what did you do with it, if you know?
A I don't recall.
Q But it didn't go to North Shore Leasing, correct?
A It wasn't wired to Northshore, no.
Q And then we're going to scroll down to the next month's statement, April 1st, 2023, and we see there's a April 3rd loan payment of $9,752.78 and then check order, and then the next big transaction is, again, on

Page 155

A. Deo

April 6th to Car Buyers for $75,700, correct?
A Yes.
Q That didn't go to the operations of North Shore Leasing, correct?
A That's false.
Q And then the next transaction is to Car Buyers for $500 on April 13th, correct? Do you see that? I can't seem to highlight it, but it's on April 13th.
A Yes.
Q There is another one on April 17th to Car Buyers for $25,000, right?
A Yes.
Q And then another one on April 25th to Car Buyers for $25,000, correct?
A Yes.
Q And then another one to Car Buyers on April 27th for $40,000?
A Yes.
Q Now the credit line is down to $138,000 and change at the end of April, correct?
A Yes.
Q Out of that $500,000, so far 360

Page 156

A. Deo

somewhat thousand, none of it went to Northshore Leasing's operations, correct?
A Not directly.
Q So if we're going to take a look at the May statement and again, we have a payment of a loan for $9,700, and then we've got three payments, $35,000 on May 2nd, $60,000 on May 8th and $20,000 on May 15th, all to Car Buyers, correct?
A Yes.
Q Again, those funds didn't go to North Shore Leasing, correct?
A Correct.
Q Then you've got a bunch of other checks here. Now we jump to May 24th, May 30th, check, a wire to Car Buyers for $25,000 and another one for $40,000. I do see, though, there's some transfers in. Do you know what these transfers came in from or for?
A I don't recall.
Q And then another payment to North Shore on May 31st to a Flagstar Bank. Do you know when that Flagstar Bank was opened?
A I don't recall.

Page 157

A. Deo

Q Do you recall opening an account at Flagstar Bank for Northshore?
A It was called Signature at that point, I think.
Q So you had opened an account at Signature, and when that change happened, Flagstar took over?
A Yes, I recall that.
Q Do you recall opening up a Signature account for Northshore?
A Yes.
Q Do you know when that happened?
A Precisely, no.
Q You said that Northshore was operating on a more limited basis at the end of 2022 and through 2023?
A Yes.
Q Where was the primary account being used by Northshore for its operations at that time? Was it that Signature Flagstar account?
A I think we had the Signature account and we had the Flushing account. I don't recall if there's anything else.

Page 158

A. Deo

Q Going down to the next statement, the next entry on May 31st. Again, $20,000 to Car Buyers Network. Do you see that?

A Yes.

Q As far as we sit here today, how much of that $500,000 that Flushing provided a credit line for was used towards the operations of Northshore?

A I don't know.

Q Do you know if anything was used for the operations of Northshore?

A I don't know.

MR. RUDERMAN: Can we go off?

THE VIDEOGRAPHER: Off the record at 12:40.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:44.

Q Mr. Deo, when you first formed Northshore, did you have an operating agreement?

A No.

Q Is there a reason why?

Page 159

A. Deo

A It's not necessary. It was my wife and myself.

Q What was the basis of your understanding that it's not necessary just because it was your wife and yourself?

A I didn't think we needed one.

Q At some point did you feel otherwise, that you did need an operating agreement?

A I think we needed one for Libertas and I know we needed one for Flushing.

Q So in order for them to provide whatever financing they did, they required that you have an operating agreement?

A They asked for it, yes.

Q At that point in time did you prepare and sign an operating agreement?

A Yes.

Q That would be, Libertas was in November or so of 2022, correct?

A I think so, yes.

Q Around March or so of 2023 was Flushing, correct?

A Well, yes.

Page 160

A. Deo

Q So prior to those dates, you never had an operating agreement for Northshore?

A No.

Q You prepared an operating agreement at that time?

A Yes.

Q Where did you get the form for an operating agreement?

A Online.

Q Did anybody assist you in filling it out?

A No.

Q I believe you testified that you intended on having both your wife and yourself on the operating agreement because it was a LLC, something along those lines. Do you recall what I'm talking about?

A Well, Citrin Cooperman told us that we needed to have two people because it wasn't a single member LLC, something like that.

Q Right. So because it's not a single member LLC, you need to have at least two people, even if they have a small percentage interest, right?

Page 161

A. Deo

A That's what they said, yes.

Q So you assigned your wife one percent interest and you got a 99 percent interest, correct?

A Yes.

Q So the tax return, which was then filed on behalf of Northshore and Sunrise reflected those percentages, as you understand?

A Yes. Yes.

MR. RUDERMAN: We can go back on?

THE VIDEOGRAPHER: We didn't go off.

Q Mr. Deo, I'm going to share my screen. Mr. Deo, did you have an opportunity to review a document I presented to you? And I'm going to ask you if you recognize that document.

A Yes.

Q What do you recognize that document to be?

A It's an operating agreement.

Q It's an operating agreement for North Shore Motor Leasing?

A Yes.

Page 162

A. Deo

MR. RUDERMAN: Can I have that marked as 56, please.

(Deo's Exhibit 56, Operating Agreement, Flushing07258, was marked for identification, as of this date.)

Q I'll represent to you, you can see the Bate stamp on the bottom, it's a Flushing document provided to us, 07258. Do you see that?
A Yes.
Q If we scroll down to the last, the next to the last page of the document, there's two signature lines there.
A Yes.
Q And it says certification of member, right? Correct?
A Yes.
Q It has your name at 99 percent, Sara Deo at one percent, correct?
A Yes.
Q And that's your signature, yes?
A Yes.
Q And that's your wife's signature?

Page 163

A. Deo

A Yes.
Q And then the next page is a list of managers and again, your signature and your wife's signature, correct?
A Correct.
Q Now, this says this is signed and agreed June 15th of 2020. Do you see that?
A Yes.
Q But this document wasn't created on June 15th of 2020, right?
A No.
Q You dated it as of June 15th, 2020?
A Well, yes.
Q Why did you pick that date?
A Because that was what all the CPA's agreed upon with the taxes. So it was correlated with the tax returns.
Q In order for you to pursue the loan with Flushing, they wanted to make sure that your operating agreement matched the tax returns as to showing ownership; is that what you're saying?
A I didn't say that.

Page 164

A. Deo

Q So what are you saying then?
A You asked why we chose --
Q Let me withdraw my question.
You said the CPA's agreed. Well, what CPA's are you referring to?
A It was that email chain with Citrin Cooperman, Tom Jones, Josh, Wendy and myself.
Q My question is not why did you pick to divide that up between yourself and your wife. My question is why did you pick June 15th, 2020.
A And that's what I'm answering. That date was -- that date was determined during that email chain.
Q Were Citrin Cooperman and Wendy involved with your loan with Flushing in March of 2023?
A No.
Q Was this operating agreement signed in October of 2022 when your tax return was done?
A I don't know when I prepared this. I'm not sure. I can't remember.

Page 165

A. Deo

Q Well, was this done, as far as you know, specifically in order to obtain the Flushing loan?
A As I said, I used it for both. I used it for Libertas and I think I used it for Flushing also.
Q Other than the financing, you don't recall you prepared an operating statement because you didn't need one, an operating agreement, at that time?
A Correct.
Q That was not a decision that the CPA's or Citrin Cooperman were involved in when you went to get the Libertas loan, right?
A What was not a decision?
Q As to when to date the operating agreement.
A Well, I correlated the date to the tax returns.
Q So you looked at the tax returns, you saw the date that it showed you were now the owner and you created an operating agreement that reflected that same date?
A Yes.

A. Deo

Q Did you think there was anything wrong with dating an operating agreement prior to the date it was actually signed?

MS. WALKER: Objection.

A It just said that we were the owners on that date. It didn't say the date we signed. So I just correlated it to the date.

Q It says signed -- I'm going to the last page. Signed and agreed this 15th day of June, 2020. Does that mean to you that you're indicating on this document that this document was actually signed on June 15th, 2020?

A Not to my knowledge.

Q Do you think --

A My understanding was that that's the date where the ownership was settled with the 99 and the one percent.

Q Despite the fact that it says the document was signed this 15th of June, 2020, you don't believe that's actually what it means?

A Well, to my understanding I just correlated it to the date.

Q But You thought that was okay in the circumstance, correct?



A. Deo

A I didn't understand what you're asking.

Q Well, you didn't see any difficulty in doing that, in signing it as of June 2020?

A I disagree with what you're saying.

Q You did see a problem signing it as of June 2020?

A I don't understand your question. I'm sorry.

Q My question was you didn't see any problem signing this document as of June 15, 2020 even though it wasn't June 15, 2020?

A That's incorrect.

Q You did see a problem with it?

A That's incorrect.

Q So it's both a problem and not a problem?

A Your question is what the problem is.

Q What don't you understand?

A I didn't say I didn't understand.

Q Well, I asked you did you think it



A. Deo

was a problem? You said no. I said did you not think it was a problem? You said no. So is it a problem or is it not a problem?

A No.

Q Not a problem, okay. Is that your answer?

A Yes.

Q Okay, fine.

MR. RUDERMAN: Can we go off for a record?

THE VIDEOGRAPHER: Yes. Off the record at 12:53.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 12:54.

Q Mr. Deo, I'm going to show you another document. It's entitled Operating Agreement for North Shore Motor Leasing LLC.

A Yes.

MR. RUDERMAN: I'd like to have this marked as 57.

(Deo's Exhibit 57, Operating Agreement for North



A. Deo

Shore Motor Leasing LLC, was marked for identification, as of this date.)

Q Do you recognize this document?

A It's the same operating agreement.

Q This is, as you can see, it's Bate stamped from Flushing again?

A Yes.

Q Flushing Bank, and the first page is Bate stamp 8508.

A Yes.

Q I draw your attention to page, to the next to the last page of the document where it say certification of member. Do you see that?

A Yes.

Q This one says Anthony Deo percent is 100 percent, correct?

A Yes.

Q And then the next page it has just your signature as manager and dated June 15th. Signed and agreed this 15th day of June, 2020. Do you see that?

A Yes.

Page 170

A. Deo

Q Was the North Shore Leasing, North Shore Motor Leasing, owned by you 100 percent or 99 percent?

A It was 99 me, one percent my wife.

Q Where did this agreement you provided to Flushing Bank, what happened that caused you to sign this agreement?

A I don't recall.

Q Do you recall having any communications or written or oral from Flushing Bank indicating, or anybody at Flushing Bank, indicating that it was problematic for your wife to have a one percent interest in the company?

A I don't remember.

Q So you have no idea why you have two operating agreements both given to Flushing Bank in connection with this transaction?

A I don't remember the circumstance.

MR. RUDERMAN: Can we go off the record, please?

THE VIDEOGRAPHER: Yeah. Off the record at 12:56.

(A discussion was held off the record.)

Page 171

A. Deo

THE VIDEOGRAPHER: Back on the record at 12:58.

Q Mr. Deo, I've presented you with two stapled packets of document. I'm going to have, the first page, the first one I'm going to mark has a control number of S0950. Do you see that on one of them? That would be on the first page on the top left.

A (Indicating).

Q S0950? On the top left of the document there's a control number inquiry. There's a box where it says control number inquiry. Right below that where it says control (indicating).

MR. RUDERMAN: We'll have that one marked as 58.

(Deo's Exhibit 58, Control Number Inquiry, IAG000049, was marked for identification, as of this date.)

Q That's 58. I'm going to represent to you, Mr. Deo, that this is a document which was provided to your counsel from our firm and that first page is Bate stamped IAG000049.

Page 172

A. Deo

A I've never seen this.

Q Sorry?

A I've never seen this.

Q I understand. Have you ever seen anything that looks like this, these types of documents?

A May or may not. I mean, it looks like accounting entries.

Q So I'm going to represent again that this was produced by my client's financing from the dealer track system with regard to a particular vehicle that, if you go to the second page, from Mr. Alifonso, Mr. Wagner Alifonso, with regard to a vehicle that he purchased and traded in from Sunrise, okay?

I'm assuming you don't have any recollection of this person, correct?

A No.

Q What I'm going to show you is on the third page of the document you see a check. Do you see that?

A I see a picture of a check, yes.

Q That is a check from Island Auto Management to Truist Bank from Island Auto

Page 173

A. Deo

Management. Have you ever heard of Truist Bank?

A Yes.

Q To your knowledge, in your business, what is Truist Bank?

A It's a bank.

Q Are they one of the banks which provide automobile financing?

A They may have.

Q Now, this check here indicates that Island Auto Management paid off this vehicle, paid off an unpaid loan for this vehicle on January 10th, 2023. Do you see that? Do you see that check dated January 10th, 2023?

A Yes.

Q And the indication here is that this was an unpaid loan on a traded-in vehicle, okay? Now I'm not asking you to agree to that. My question is do you have any reason to understand why Island Auto would have had to pay off any unpaid trades from a vehicle that had been sold and traded into Sunrise?

A I don't know.

Q As far as you know, did any of that occur?

Page 174

A. Deo

A I don't know.

Q Well, did Sunrise and Northshore satisfy all traded, all loans of vehicles traded into it in connection with a transaction?

A To my knowledge, yes.

Q What's the basis for your knowledge?

A There was no issues.

Q Well, how do you know there were no issues?

A I would be informed by the controller.

Q You say, the reason you say there were no issues because you say the controller never told you there were issues?

A Yeah. He didn't bring anything up.

Q Was the name of the controller you're referring to Mr. O'Sullivan?

A Yes.

Q Is it your testimony that Mr. O'Sullivan never informed you at any time in the fall of 2022 or in January of 2023 that there were any issues with regard to vehicle,

Page 175

A. Deo

trade-in vehicles whose loans had not been paid off?

A No.

Q So this is the first time you're hearing about that?

A Hearing about what?

Q That there is a claim that there were vehicles whose trades were not paid off.

A Yes.

MR. RUDERMAN: Can we go off the record?

THE VIDEOGRAPHER: Yeah. Off the record at 1:03.

(A discussion was held off the record.)

THE VIDEOGRAPHER: Back on the record at 1:04.

Q Mr. Deo, does Marc Merckling have any interest, ownership interest, in Gold Coast Motors of Syosset?

A Gold Coast Motors of Syosset, no.

Q If I told you that a UCC lien search for Gold Coast Motors of Syosset shows that Marc Merckling's name was listed as one of

Page 176

A. Deo

the debtors, would that surprise you?

A No.

Q Why would Mr. Merckling be listed as one of the debtors in connection with that entity?

A He was a guarantor.

Q Now, there was a Mazerati SUV that your son was driving when he was in college, correct?

A Yes.

Q Where is that vehicle right now?

A It's in my possession.

Q Who's driving that vehicle?

A My son, myself.

Q Who is it registered to?

A It's not registered.

Q It's not registered to anybody?

A Not at the moment.

Q Is it insured?

A Yes, it is.

Q How is it insured without a registration?

A We have umbrella coverage.

Q I'm sorry?

Page 177

A. Deo

A We have an umbrella coverage.

Q When you say "we," you mean you personally?

A My family, yes.

Q You and your wife have an umbrella coverage --

A Along with the business.

Q So there's no automobile coverage on that car, correct?

A Well, there is insurance on it.

Q There's no automobile policy on it, correct?

A No particular one, no.

Q Does it have license plates on it?

A No.

Q Is it being driven without a license plate?

A We have dealer plates.

Q So you put dealer plates on the car?

A Yes.

Q And what dealer plates are being used?

A Syosset.



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 178

A. Deo

Q That vehicle was originally financed when it was first taken in, correct, on a floor plan?
A Repeat your question.
Q That vehicle was purchased originally by Northshore Motors, correct?
A Yes.
Q When it was purchased, it was purchased with floor plan financing?
A Yes.
Q That financing at some point was paid off?
A Yes.
Q Who paid that off?
A Northshore.
Q That was Northshore's funds that went out to pay that, pay that off?
A Well, Daniel O'Sullivan was supposed to take the moneys owed to me to pay that off from Northshore.
Q What do you mean Daniel O'Sullivan was supposed to take that money from you? I don't understand.
A I have receivable with Northshore.

Page 179

A. Deo

He was supposed to reduce the receivables.
Q The actual payoff, was that floor plan with Ally?
A Yes.
Q To your recollection, what entity paid Ally for the floor plan for that particular vehicle?
A To my recollection, Northshore.
Q But you believe that in the receivables portion of the financial records of Northshore that was supposed to be offset against the moneys you're owed from Northshore?
A Yes.
Q Do you know if that was ever done?
A I don't know.
Q Is it your understanding that Northshore paid all of the warranty contracts that it had obtained from customers?
A Absolutely.
Q And the funds to pay for that were paid out of Northshore's bank account?
A Yes.
Q Do you know that for a fact or you're just assuming that?

Page 180

A. Deo

A I'm just taking that for granted because that's what Danny would do.
Q As you sit here today, you don't know whether that's true or not, you're just assumed that Danny would pay them?
A Yes.
Q You have no knowledge of anybody informing you at any particular time that there were a number of warranties which had not been paid by Northshore?
A Well, there were a couple of them not paid and Danny had to settle it up because he double paid for some and then he had to reduce that. So there was some accounting to do. I think he did it.
Q All of that is done through Northshore's funds, though, correct?
A Yes.
Q You're not aware of any moneys being used by the Island Auto Group or any of them to pay for any of the unpaid warranties, correct?
A I am not sure, no.
Q Why are you not sure?

Page 181

A. Deo

A I said I don't know.
Q It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure?
A I don't know.
Q Other than the tax returns which you filed for Northshore and Sunrise and the contract that we talked about earlier with Sunrise, are there any other documents that you have which you claim established that you are currently the owner of Northshore and Sunrise?
A We have leases for Northshore and Sunrise that my wife and I personally guaranteed. We have bank accounts that we opened up for Northshore and Sunrise from inception. Well, Northshore from inception. Sunrise in '21. I mean there might be other documents that I can't think of it right this second.
Q I'm going to ask for production of any other documents which have not yet been produced which support that position. I'm going ask you to provide those to your counsel and I'm asking for production of those documents.

Page 182

A. Deo

Who handled, in Northshore and Sunrise, who handled the cash deposits, putting it into the bank?

A The controllers, Marc sometimes.

Q If a customer came in and gave a deposit or purchased the car for cash, that would go initially to whom?

A The salesperson, then finance and then the safe.

Q Where was the safe located in each one of the dealerships?

A We had a few in the back office.

Q In both dealerships?

A Yes. Well, no. In Sunrise I think it was one.

Q Who had access to those safes?

A The controllers, managers, myself.

Q Was it a key or a combination?

A It was a combination. I think one was a key. I don't remember which one.

Q What was the process to get that money out of the safe?

A I don't understand the question.

Q Well, could anybody just walk in

Page 183

A. Deo

and take the money out or did you have a process where certain people were dedicated, this is their job, take the money out of the safe or whatever needed to be done?

A Well, that's the controller's job.

Q The controller would be the person to take the money out of the safe?

A Yes.

Q What about counting it? How did you make sure all that was done properly?

A I mean, between the managers there were checks and balances.

Q And then if the controller took the money out of the safe, he would give it to, for example, Mr. Merckling to make the deposit into the bank account, correct?

A Yes.

Q Did Mr. Blankenship ever make deposits as well of cash?

A I don't recall.

Q So it was mostly Mr. Merckling?

A To my knowledge, and Dan.

Q When the money was deposited into the bank, was there any check to make sure? I

Page 184

A. Deo

don't mean a check, but a reference to know that the amount of money that was given by Mr. O'Sullivan to Mr. Merckling and the deposit that went into the bank matched?

A Oh, I don't know.

Q Now, you went to the police, the Nassau County Police Department, concerning the Libertas issue, correct?

A Yes.

Q You filed a police report, correct?

A Yes.

Q Do you know a Detective Marks?

A Yes.

Q Did you know Detective Marks beforehand?

A No.

Q Do you know how you ended up with Detective Marks?

A I don't know.

Q Did you bring anybody with you to meet with the police department or Detective Marks?

A Marc drove me there, yes.

Page 185

A. Deo

Q You said Marc drove you there?

A Yes.

Q Where were you at the time beforehand, that you were being driven?

A Northshore.

Q And where was Marc?

A At Northshore.

Q Is there a reason why you didn't drive yourself?

A I was a little devastated.

Q You needed Marc for what purpose?

A He drove me.

Q You could have asked somebody, anybody else. Is there a reason you chose Marc to drive you as opposed to somebody else?

A He was there. He offered.

Q You told him what had happened?

A Yeah, he was aware.

Q And he offered to drive you to the police department?

A Sure.

Q Did he speak to Detective Marks at all?

A No.

Page 186

A. Deo

Q Did he speak to anybody at the police department at all?

A Well, when we entered, between him and myself, we told them why we were there and they escorted us I think to the back or to a room.

Q Did Mr. Merckling identify himself as a former police officer?

A I am not sure.

Q Did anybody recognize him or indicate that they knew who he was?

A I don't know.

Q Did he ever mention to Detective Marks that he was a former police officer?

A I don't know.

Q You were there, right? To the extent that you were there, did you hear it?

A I don't know.

Q You don't know or you don't remember?

A I don't know.

Q Did you think there was a benefit to having a former police officer accompany you to file this police report?

Page 187

A. Deo

A No.

Q Now, when you took out the Libertas funds, do you know how much money had to be repaid?

A Somewhere in the whereabouts of $900,000.

Q Do you know how, over what period of time that had to be repaid?

A I don't recall at the moment.

Q You can look. If I represent to you that it was over the course of a year, does that sound right?

A On or about, yes.

Q And it was going to be weekly withdrawals of over $19,000?

A Yes.

Q When you took out the Libertas funds, did you expect that Northshore or Sunrise would have an additional 19 plus thousand dollars every week in order to pay back the Libertas funds?

A It was my intention, yes.

Q Was it a reasonable expectation?

A To my knowledge, yes.

Page 188

A. Deo

Q Well, what was your expectation that there would be those kind of funds sufficiently available over the course of the next year?

A I don't understand your question.

Q Well, when you took out the money, you anticipated you'd be repaying that money or the entity would be repaying that money, correct?

A Yes.

Q Did you do any projections to see how $80,000 a month could be repaid?

A I mean that was -- we made sufficient amount of money at both dealerships, when operating.

Q If you pay back $900,000 over the course of one year, did the dealership ever have profit of $900,000 over the course of a year?

A I'm sure we had, yeah.

Q Well, you showed the $472,000 of profit for Northshore in 2022 in that financial statement. Do you remember that one?

A Yes.

Q Sunrise was about half the volume,

Page 189

A. Deo

correct?

A Yes.

Q Even given that, it would be another 200 somewhat thousand dollars?

A Yes.

Q So six, $700,000 maximum profit?

A Yes, bottom line.

Q Was that before or after you got any income distributed to you?

A Well, that should be after.

Q How much money did you draw out from the dealership in 2022?

A I don't recall. It would be under tax returns.

Q Well, did you have any regular draws, financial draws, out of Northshore and Sunrise over the course of '21 and '22?

A What do you mean by that?

Q Did you take money out of the dealerships over the course of '21 and '22 on any regular basis?

A Commissions and salaries, sure.

Q Do you know how much that was?

A I don't remember.

A. Deo

Q That would be reflected on your tax returns?

A Yes.

Q So you believe that after paying yourself whatever you were supposed to be paid and paying all the other obligations of the dealership, you thought in November of 2022 there would be sufficient funds to pay almost a million dollars back to Libertas?

A Yes.

Q When you took the money out in Flushing, did they know that Libertas was looking to collect almost a million dollars?

A I don't know.

Q Did you disclose it to them?

A I don't remember.

Q Do you think there was enough money to pay both Libertas and Flushing Bank when you took out another $500,000 from Northshore?

A Yes.

Q Was there, in fact, enough money to pay them back? Was there, in fact, enough money to pay Libertas and/or Flushing?



A. Deo

A I don't understand the question.

Q Was there enough money in Northshore and Sunrise to pay back Libertas and Flushing?

A Eventually, no.

Q Did it, in fact, pay back those loans?

A Some of it.

Q It paid back about four payments or so, a little bit more, to Libertas, correct?

A No, more.

Q Six payments?

A I think it was seven or eight.

Q Well, Libertas testified that somewhere in early January the payments stopped. Does that sound right to you?

A I don't remember.

Q But Libertas has not paid back for most of the amount of money that was supposed to be paid back, correct?

A Say that again.

Q Libertas was not repaid most of the money that was supposed to be paid back?

A No.



A. Deo

Q Have they commenced any action against you to collect on any of that?

A Not that I know of, no.

Q Did you guaranty the Flushing loan?

A I think I did.

Q Has Flushing started any action against you for the repayment of moneys?

A No.

Q Has anybody made a claim against you saying you were supposed to repay that moneys?

A I don't think so.

Q Do you have any knowledge as to why Libertas has chosen, presumably chosen, not to pursue a claim against you at this time?

A I wouldn't know.

Q Do you have any reason to understand why Flushing is not pursuing any claim against you at this time?

A I wouldn't know.

MR. RUDERMAN: Mr. Deo, thank you very much. I have no further questions. Let's go off



A. Deo

the record.

THE VIDEOGRAPHER: Off the record at 1:19.

(A recess was taken.)

(Mr. Ruderman left the proceedings and did not return.)

THE VIDEOGRAPHER: Back on the record at 1:50.

MS. RONNEBURGER: Good afternoon, Mr. Deo. My name is Ariel Ronneburger. I'm with the firm of Cullen and Dykman LLP and we represent Flushing Bank. It's our codefendant in the matter. I'll just be asking you a few questions today. I know some of it may reference your previous testimony and I do have your transcript if you need to see it from the first time you were deposed.

THE WITNESS: Oh, okay.

EXAMINATION BY MS. RONNEBURGER:

Page 194

A. Deo

Q So you previously testified that you had a conversation with Tony Urrutia and Bruce Novicky about opening an account for Superb Motors with Flushing Bank; is that correct?

A Yes.

Q What was the substance of that conversation, if you remember?

A Well, the purpose of opening the Flushing account was for us to obtain a line of credit for working capital for Superb.

Q Is it accurate to say then that Tony Urrutia was aware that you were going to contact Flushing Bank about opening an account for Superb Motors?

A Absolutely. I forwarded an email.

MS. RONNEBURGER: I'd like to mark this as Deo 59.

(Deo's Exhibit 59, email chain, top one dated August 17, 2023, 12:10 p.m., was marked for identification, as of this date.)

MS. RONNEBURGER: I believe I'm sharing that.

Page 195

A. Deo

MR. KATAEV: Yes.

Q If you can just take a quick look at that. Let me know when you have a chance.

A Yes, I'm ready.

Q You testified previously that you had received a list of information from Flushing Bank that the bank needed for opening an account for Superb; is that correct?

A Yes.

Q Is the email all the way on the bottom from Robert Puccio at Flushing Bank --

A Yes.

Q -- dated March 31st, is that that email with the request for information?

A Yes.

Q According to this email, you forwarded Flushing Bank's request for information to Bruce Novicky and Tony Urrutia on March 31st, 2023 at 11:56 a.m.; is that correct?

A Yes.

Q Why did you forward that email?

A Because I needed to get information to open the account.

Q And then if we look above that on

Page 196

A. Deo

April 3rd, 2023 at 11:45 a.m., you send another email to Bruce and Tony which says good morning, guys. Dave Weinstein didn't have any of the information for Superb to send over to Rob. Can you please help me in gathering the information needed so I can get this done ASAP? All I need is the formation documentation. And then you ask for for corporations we will need the certificate of incorporation and filing receipt.

By "get this done," what did you mean?

A To open up the account.

Q The formation documentation you were requesting was for Superb Motors, correct?

A Yes.

Q At the top there's an email dated August 17th, 2023 from yourself to Mr. Puccio where you say please see email chain below. This shows that their current claims are totally absurd.

What did you mean by their current claims are totally absurd?

A That Tony was not aware that I opened up the accounts.

Page 197

A. Deo

Q Did Tony provide you with any of the information needed to open the accounts?

A Absolutely, between himself and Bruce.

MS. RONNEBURGER: I'm going to mark this as Deo 60.

(Deo's Exhibit 60, email chain plus Certificate of Incorporation of Superb Motors, was marked for identification, as of this date.)

A Yes.

Q If you look at, it's several pages in, it says, it's Bate stamped as Flushing05955 and it says Certificate of Incorporation of Superb Motors, Incorporated. Is this the document you requested from Tony?

A Yes, the formation docs.

Q And if we look at these emails, it looks like this was forwarded to you from Tony on April 3rd, 2023 at 3:37; is that correct?

A Yes.

Q So Tony was aware you were applying for the account as Superb Motors,



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

A. Deo

correct?
A Absolutely.
Q And he provided you with the documentation that you requested, correct?
A Yes.
Q I'm going to show you what was previously marked as Deo 25. It's a text message (handing). Previously you testified that this is a text message between you and Bruce Novicky; is that correct?
A Yes.
Q There's a statement here which says bro, this guy and the credit writer are in my pocket. Get me the info and 2021 taxes and I will bring it home.
You testified earlier that "this guy" referred to Robert Puccio; is that correct?
A Yes.
Q You also testified earlier that the statement that Puccio was "in your pocket" was a figure of speech; is that correct?
A Correct.
Q You testified earlier that by "in your pocket" you meant that you knew Robert



A. Deo

Puccio; is that correct?
A That we did business before, yes.
Q What was the nature of that business?
A He got me a line for Northshore.
Q And do you recall when that was?
A I think March, yes.
Q Did you ever offer any money to Robert Puccio in connection with opening an account or getting a loan at Flushing Bank?
A Absolutely not.
Q Did you ever offer anything that you would consider to be an incentive to Puccio in connection with opening an account or taking out a loan at Flushing Bank?
A Absolutely not.
Q Did you ever offer anyone at Flushing Bank anything that you would have considered to be an incentive for either opening an account or taking out a loan at Flushing Bank?
A Absolutely not.
Q I'm going to show you what was previously marked as Deo 26 (handing). Just let



A. Deo

me know when you're done.
A Yes. Yes.
Q You previously testified that you completed this application for an account for Superb Motors at Flushing Bank with the knowledge and approval of Tony Urrutia; is that correct?
A Yes.
Q Did you complete this application yourself?
A Yes.
Q Is that your signature on the application?
A Yes, it is.
Q Now, here it says you were a hundred percent owner of Superb Motors. Do you see that?
A Yes.
Q Now, in your previous testimony you stated that you told Robert Puccio that you and Tony Urrutia were partners; is that correct?
A Yes.
Q Did you ever have any discussion of ownership interest in Superb Motors with Mr.



A. Deo

Puccio?
A No.
Q Did you ever tell him, Mr. Puccio, that Tony Urrutia had any ownership interest in Superb Motors?
A Not that I recall, no.
Q You also previously testified that it was agreed upon by Tony and yourself that you would represent that you were a hundred percent owner of Superb Motors to Flushing Bank; is that correct?
A Yes.
Q When did this conversation happen, if you recall?
A It would have been prior to me applying for the account and the line of credit.
Q Do you know how you had that conversation? Was it by phone, by email?
A A phone conversation.
Q And it was not recorded, correct?
A No.
Q Is it your testimony today that Mr. Urrutia knew that you were going to state that you were a hundred percent owner of Superb

Page 202

A. Deo

on this application?

A Absolutely. And that -- I'm sorry.

Q Go ahead.

A Well, he actually said that he wants nothing to do with the line of credit, that I had to be a hundred percent guarantor for any moneys that we borrowed.

Q Did he ever see this application, if you know?

A I don't know.

Q But he was aware that you were going to state you were a hundred percent owner, to the best of your knowledge?

A Of course.

Q By submitting this application, you represented to Flushing Bank that you were a hundred percent owner of Superb?

A Yes.

Q At any time did you tell anyone at Flushing Bank that you were not a hundred percent owner of Superb Motors?

A No.

MS. RONNEBURGER: I'm going to mark this as Deo 61.

(Deo's Exhibit 61, document from Flushing Bank, Certification of Beneficial Owner(s), was marked for identification, as of this date.)

Q (Handing).

A Okay.

Q I want you to specifically look at the page Bates stamped Flushing Bank, it's Flushing04590.

A Okay.

Q It says resolution of authority on top. Do you see that?

A Yes.

Q And then it says account title, Superb Motors, Incorporated. Do you see that?

A Yes.

Q Now, in the middle it says there's depository and withdrawal authorization, signing authorization, borrowing authorization. Do you see that?

A Yes.

Q And if you briefly look through them, it says, for example, that the persons listed below are authorized to endorse, collect, deposit or negotiate any and all checks, bills of exchange. Is that your name underneath the depository and withdrawal authorization?

A Yes.

Q Is that your name underneath the borrowing authorization?

A Yes.

Q Is that your signature on this document?

A Yes.

Q Is it fair to say that you represented to Flushing Bank by signing this document that you had authority to conduct deposits and withdrawals and signing on behalf of Superb Motors?

MR. KATAEV: Objection to form.

A Yes.

Q After the Superb account was opened, did you tell anyone that the account had been opened?

A Yes.

Page 205

A. Deo

Q Who?

A Tony, Bruce, Kendra, the controller.

Q How did you tell them?

A Verbally. We were supposed to move all our accounts into all of the -- to all Flushing accounts, which would be payments from loan proceeds, credit cards. Everything was supposed to go into Flushing.

Q Do you recall, did you have that conversation with all those individuals collectively?

A No. No. It was at different times.

Q And it was, for all of them it was verbal?

A Yes.

Q Did you provide any of those individuals with any documentation showing the account had been opened?

A I don't remember.

Q Do you know if you received any bank statements for the Superb account?

A Yeah. They were all at the

A. Deo

office.

Q Where did you keep them at the office?

A They were at -- in my office.

Q Did anyone go in your office?

A Sure.

Q Where did you keep them in your office?

A On the -- on the cabinets.

Q Was that somewhere publicly visible if somebody --

A Well, not to the public, but to the controller, to Bruce. Tony was rarely there.

Q Do you know if the controller or Bruce, did they ever look at them, if you know?

A Of course.

Q So Bruce, you believe Bruce Novicky looked at the bank statements for the Superb Motors account at Flushing Bank?

A He should have seen it. I believe he did, maybe.

Q So it is your testimony that you believe that Bruce Novicky and Tony Urrutia were



A. Deo

aware that this Superb Motors account had been opened?

A Absolutely.

MR. KATAEV: Objection.

MS. RONNEBURGER: I'd like to mark this as Deo 62 (handing).

(Deo's Exhibit 62, email chain, top one dated August 17th, 2023, 12:09 p.m., was marked for identification, as of this date.)

Q Let me know when you've had a chance to read that.

A Yes.

Q So at the bottom of this it's dated August 17th, 2023 at 10:03 a.m. Robert Puccio states, he asks for a copy of the Superb Motors operating agreement ASAP. And he states also please confirm your ownership percent in Superb Motors. This is an urgent matter as your accounts will be closed if not received today.

If you know, do you know why it was urgent?

A No, I don't know at this point.

Q Okay. If we look above, you



A. Deo

responded to Robert at 12:09 on that same day, August 17th. You say good morning, Rob. In November 2022 I bought 50 percent of Superb Motors. Subsequently, I purchased the full hundred percent in February 2023 and our lawyers have been working on a contract that states that amount. Now there is a current disagreement that transpired two weeks ago. That is why you are being told the contrary.

Do you recall this email?

A Yes.

Q So in this statement, in this email you tell Robert Puccio that you bought 50 percent of Superb Motors in November of 2022. Is that an accurate statement?

A At that point, yes.

Q Now, you state that you purchased a hundred percent of Superb Motors in February of 2023. Is that an accurate statement?

A Yes.

Q Do you have any documentation showing that you purchased a hundred percent --

A No documents.

Q -- of Superb Motors?



A. Deo

A No documents. It was an agreement with Tony and I.

Q What kind of agreement?

A It was a verbal agreement that was supposed to be transpired into an actual contract.

Q Did you pay Tony any money in February of 2023 for that purchase?

A It was monthly payments. His amount went from $10,000 a month to around 40 plus per month.

Q Do you have any documentary proof of those payments?

A Oh, yeah, bank statements.

MS. RONNEBURGER: We would just call for the production of anything that shows the same.

Q In here you state that the lawyers have been working on a contract that states that amount. Was there ever any finalized contract?

A No.

Q Do you have any draft contracts?

A No drafts.

Q Do you know who the lawyers were

A. Deo

working on this?

A Well, representing me was Harry.

Q But you never saw any draft contracts drafted by Harry or --

A It didn't formulate into an actual paper.

Q Did you speak with Tony or Harry about it?

A Sure.

Q When you sent this email to Robert Puccio on August 17th, did you believe, to the best of your knowledge, that you were a hundred percent owner of Superb Motors?

A Yes.

Q Did you ever, after this time, tell Robert Puccio or anyone else at Flushing Bank that you were not a hundred percent owner?

A No.

Q I'm going to show you what's previously been marked as Plaintiff's, it's Deo 13 (handing).

A Okay.

Q Now, you also previously testified that you sought to open accounts for Northshore



A. Deo

and 189 Sunrise at Flushing Bank; is that correct?

A Yes.

Q Did you also seek to take out a loan for either entity at Flushing Bank?

A Yes.

Q Which one?

A Northshore.

Q Did you ultimately receive that loan?

A Yes.

Q Now, in this email there's a number of attachments. Why were you forwarding all of these attachments to Robert Puccio?

A It was the process of opening the accounts and the application for the line of credit.

Q If we look at, I know we've looked at this document many times today. If we go to Flushing00116.

MR. KATAEV: Could you close out of the tools app so we can actually see it better?

Q This is the operating agreement



A. Deo

for Northshore Motors, correct?

A Yes.

Q You testified that you prepared this document, correct?

A Yes.

Q So if we scroll down to, if we look at what's marked Flushing00121. So it states that you were 99 percent owner, correct, and that your wife, Sara Deo, is one percent owner, correct?

A Yes.

Q Was it your understanding as of the date you sent this to Flushing Bank that you were the 99 percent owner of Northshore Motors and that your wife, Sara, was the one percent owner?

A Yes.

Q Why did you provide this document to Flushing Bank?

A I think it was requested.

Q Did you believe that this document showed your ownership in Northshore Motors?

A Yes.

Q If we look at Flushing00123. Are



A. Deo

you familiar with this document?

A Yes. It's my K-1.

Q Does it state what shows that you're a 99 percent owner --

A Yes.

Q -- of Northshore Motors? Which is what matches the operating agreement, correct?

A Yes.

Q Did you use this K-1 to file tax returns?

A Yes.

Q Do you believe this K-1 is accurate?

A Yes.

Q Who prepared this K-1?

A It was prepared by Citrin Cooperman.

Q Let's look at Flushing00127.

A Yes.

Q So again, this shows, is this your K-1 for 189 Sunrise?

A Yes.

Q And this shows your ownership as 99 percent; is that correct?

Page 214

A. Deo

A Yes.

Q As of 2021, correct?

A Yes.

Q Was this K-1 used to file your tax returns?

A Yes.

Q And who prepared this?

A This was also prepared by Citrin Cooperman.

Q To the best of your knowledge, this document is accurate?

A Yes.

Q We have the same thing if you look at Flushing00130. This is the operating agreement for 189 Sunrise. You prepared this, correct?

A Yes.

Q And again, on Flushing00135, you are 99 percent owner of 189 Sunrise, according to this document, and Sara is one percent, correct?

A Correct.

Q Did you believe at the time you provided these documents to Flushing Bank that

Page 215

A. Deo

they were an accurate representation of your ownership in the companies?

A Yes.

Q I'm going to show you, this is what we're going to mark as 63.

(Deo's Exhibit 63, email dated March 21, 2023, 1:45 p.m., was marked for identification, as of this date.)

Q (Handing). Let me know when you've had a moment to look at that.

A Yes.

Q So I just want to look at the email first. It's from Robert Puccio to you. It's dated March 21st, 2023 and its subject Flushing Bank/Northshore Motor Leasing.

A Yes.

Q You say please see attached, and then this was in response to a previous email where Mr. Puccio said please see the attached. We need it to say that you are a hundred percent owner to match the credit application. Sorry for the delay.

Now, if we look at, and we did

Page 216

A. Deo

look at this before, Flushing0168, it now says you are a hundred percent owner. Did you complete the credit application to say that you were a hundred percent owner of Northshore?

A I don't remember the actual application at this point.

Q Do you recall why you made this change?

A To be a hundred percent? I don't remember.

Q I'm going to show you what we'll mark as Deo 64.

(Deo's Exhibit 64, email chain, top one dated April 3, 2023 at 5:36 p.m., was marked for identification, as of this date.)

Q (Handing).

A Okay.

Q So I'd like you to look at the email from Robert Puccio to you dated April 3rd, 2023 at 11:22 a.m. Do you see that? It's right in the middle of the first page.

A Yes.

Page 217

A. Deo

Q Toward the end he says also, about the letter your attorney provided, is it possible to get something more detailed? This is too general and does not provide insight into the situation.

If you know, what is the situation he's referencing?

A This was '23. I think it was the lawsuit in December.

Q Did you have any communications with Mr. Puccio about this lawsuit other than this?

A No, just this.

Q And just one other quick question on this. As David and I understand, I will only be opening the joint venture you have with your partner, which will be located in Great Neck. And that refers to Superb Motors, you previously testified, correct?

A Yes.

Q On April 3rd, 2023 at 5:36 p.m., you said hi, Rob. I've attached a letter from my attorney, and there are two attachments to this email. I want you to look at the one that

Page 218

A. Deo

says Flushing04043. This is an affidavit of Thomas Jones, CPA.

A Yes.

Q In a case in the Supreme Court of the Nassau County is Brian Chabrier versus Anthony Deo. The index number is 617224 of 2022. And who is Thomas Jones again?

A Tom Jones is my CPA.

Q If you recall, why did you send this affidavit to Flushing Bank?

A I don't remember why.

Q If you could just take a look at the affidavit from Mr. Jones.

A Okay.

MR. KATAEV: Do you have a docket entry number?

MS. RONNEBURGER: No. It's not on this. This was the document produced by Flushing Bank which was in its files.

Q In this affidavit at paragraph ten, Mr. Jones states it was my understanding that there was a hundred percent agreement between the above-captioned parties and their

Page 219

A. Deo

accountants just last fall that Anthony Deo owns 99 percent of Northshore Motor Leasing and 189 Sunrise Highway Auto, LLC and that Sara Deo owns one percent of each company and that their ownership interests in Northshore Motor Leasing LLC commenced on June 15th, 2020, and their ownership interests in 189 Sunrise Highway Auto, LLC commenced on February 12th, 2021.

Reading this statement, do you believe this is an accurate statement by Mr. Jones?

A Yes.

Q Does this help you recall why you provided this document to Flushing Bank?

A To show ownership.

Q When you contacted Flushing Bank to open an account for Northshore, you believed you were the owner of Northshore according to the operating agreement, correct?

A Yes.

Q And when you applied for accounts on behalf 189 Sunrise, you believed you were the owner according to the operating agreements, correct?

Page 220

A. Deo

A Yes.

MR. KATAEV: Objection, twofold questions.

MS. RONNEBURGER: I don't have any further questions.

THE WITNESS: Okay, thank you.

THE VIDEOGRAPHER: Are we done? Let me just go off the record.

Off the record at 2:24.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on the record at 2:30.

MR. KATAEV: Good afternoon, everyone. This is counsel for Superb, plaintiffs, confirming on behalf of all plaintiffs that we have no further questions. The only issues that we do need to discuss are confirming Blankenship's deposition virtually on

Page 221

A. Deo

February 18th, finding a new date for Sara Deo and confirming a new date for Michael Laurie. We don't have a date for him. So I'd like to meet to confer on that to figure that out. I recognize that Bonnie may not be able to do that, but if we can't work it out, that would be the subject of further discovery motion practice.

THE COURT REPORTER: Mr. Kataev, do you want a copy of the transcript today?

MR. KATAEV: Yes, for plaintiffs, both sets of plaintiffs.

THE COURT REPORTER: Ms. Ronneburger, did you want a copy of the transcript today?

MS. RONNEBURGER: Yes.

THE VIDEOGRAPHER: This concludes the deposition of Anthony Deo. The time now is approximately 2:31 p.m. We are

A. Deo
off the record.
(Time noted: 2:31 p.m.)



A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF )

I, ANTHONY DEO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of February 13, 2026; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____________________________
ANTHONY DEO

Signed and subscribed to before me this
_________ day of _______________, 20__.

______________________________________
Notary Public, State of New York



INDEX TO TESTIMONY


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Anthony Deo | Mr. Ruderman | 19 |
| | Ms. Ronneburger | 193 |


INDEX TO EXHIBITS


| DEO'S EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 43A | Financial statement, Flushing 08560 | 23 |
| Exhibit 44 | Financial record, IAG002563 | 34 |
| Exhibit 44A | Chase Bank statement, IAG001807 | 40 |
| Exhibit 45 | Chase Bank statement, LIB000332 | 49 |
| Exhibit 46 | Chase Bank statement for account ending in 9899 from 189 Sunrise Hwy Auto LLC | 54 |
| Exhibit 47 | Email chain, top one dated March 7, 2023, 6:04 p.m., Flushing00162 | 57 |
| Exhibit 48 | Anthony Deo Statement of Financial Condition, March 1, 2023 | 64 |
| Exhibit 48A | Document from the New York City Department of Finance, Office of the City Register | 81 |




INDEX TO EXHIBITS
(Continued)


| DEO'S EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 49 | Bank statement from Bank of America for Car Buyers NYC Inc. | 89 |
| Exhibit 50 | Stock purchase agreement | 97 |
| Exhibit 51 | Stock sale agreement to purchase Baron Nissan | 102 |
| Exhibit 52 | Email chain, top one dated November 2, 2022, 11:06 a.m. | 110 |
| Exhibit 53 | Dealer agreement between Westlake Financial Services and UEA Premier Motors Corp. | 122 |
| Exhibit 54 | Agreement of Sale of Future Receipts, LIB000001 | 136 |
| Exhibit 55 | Flushing Bank statement, Flushing07269 | 150 |
| Exhibit 56 | Operating Agreement, Flushing07258 | 162 |
| Exhibit 57 | Operating Agreement for North Shore Motor Leasing LLC | 168 |
| Exhibit 58 | Control Number Inquiry, IAG000049 | 171 |
| Exhibit 59 | Email chain, top one dated August 17, 2023, 12:10 p.m. | 194 |

INDEX TO EXHIBITS
(Continued)

| DEO'S EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 60 | Email plus Certificate of Incorporation of Superb Motors | 197 |
| Exhibit 61 | Flushing Bank Certification of Beneficial Owner(s) | 203 |
| Exhibit 62 | Email chain, top one dated August 17, 2023, 12:09 p.m. | 207 |
| Exhibit 63 | Email dated March 21, 2023, 1:45 p.m. | 215 |
| Exhibit 64 | Email chain, top one dated April 3, 2023, 5:36 p.m. | 216 |

TO BE PRODUCED/INSERTED

| DESCRIPTION | PAGE |
|---|---|
| Tax returns | 88 |
| Any communications asking for K-1's | 89 |
| Agreement which Ron Baron signed stating that he agreed to sell his interest in Baron Nissan to Anthony Deo or any communication concerning it | 109 |
| Any other documents that the witness has which he claims establishes that he is the owner of Northshore and Sunrise | 181 |
| Production of anything that shows the witness paid any money to Tony for purchase | 209 |



C E R T I F I C A T E

I, SUSAN M. CIRRINCIONE, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness(es) whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness(es).

I further certify that I am not related, either by blood or marriage, to any of the parties in this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of February, 2026.



______________________________
SUSAN M. CIRRINCIONE



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Superb Motors Inc, Et Al. v. Deo, Anthony, Et Al.
DATE OF DEPOSITION: 2/13/2026
WITNESSES' NAME: Anthony Deo

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________
Anthony Deo

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ___________, 20__.

_______________ _______________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 1:17 3:12

**0**

**07258** 162:10
**07269** 150:11
**08560** 224:10

**1**

**1** 64:13 213:3 213:10,13,16 213:22 214:5 224:21
**1's** 86:18,20 87:13 89:5 226:18
**1,000,000** 27:21
**1,275,000** 66:20 67:17 68:13
**1,280,000** 73:11 74:13 76:3
**1,498,000** 71:22
**1,500** 152:9
**1.2** 47:21 48:3 51:23 99:11
**10,000** 99:4,23 209:11
**100** 1:22 3:4 7:17 47:20 169:19 170:3
**100,000** 27:19
**100,929** 47:13
**10017** 4:11
**101,019** 56:7
**10170** 3:20
**102** 225:8
**109** 226:19
**1099** 121:17
**10:03** 207:16
**10:07** 48:24
**10:09** 49:4
**10:13** 54:17
**10:18** 54:21
**10:21** 57:4
**10:22** 57:8
**10:27** 63:12
**10:28** 63:16
**10:43** 80:19
**10:45** 80:23
**10:47** 83:8
**10:52** 83:12
**10:56** 87:23
**10:59** 112:2
**10th** 173:13,14
**11** 137:5
**110** 225:9
**112** 4:16
**11423** 3:9
**11553** 4:20
**11568** 78:6
**11793** 4:16
**11:06** 88:3 110:14 225:10
**11:13** 96:17
**11:15** 96:21
**11:21** 101:21
**11:22** 216:23
**11:24** 101:25
**11:30** 109:9
**11:32** 109:13
**11:38** 116:17
**11:40** 116:21
**11:45** 196:2
**11:53** 132:10
**11:56** 195:20
**11:58** 132:14
**12** 137:7
**12,000** 91:22,23 92:2
**122** 225:11
**1239** 1:7 3:16
**12:01** 136:2
**12:02** 136:6
**12:06** 139:9
**12:07** 139:13
**12:09** 207:10 208:2 226:10
**12:10** 194:22 225:23
**12:12** 144:20
**12:14** 144:24
**12:18** 149:16
**12:31** 149:20
**12:40** 158:17
**12:44** 158:21
**12:53** 168:13
**12:54** 168:17
**12:56** 170:23
**12:58** 171:3
**12th** 49:25 219:9
**13** 1:21 138:2 210:22 223:10
**136** 225:14
**138,000** 155:22
**13th** 7:5 155:8 155:10
**15** 129:9 131:18,25 167:14,15
**15,000** 93:18,25 100:4,12,21,25 139:2
**150** 225:16
**1580** 1:6 3:15
**1581** 1:6 3:14
**1591** 1:7 3:15
**15th** 41:15 156:9 163:8,11 163:13 164:13 166:10,13,20 169:22,23 219:7
**16** 139:17 140:15
**162** 225:17
**1632** 1:7 3:15
**168** 225:19
**16th** 46:10,14
**17** 124:10 194:21 225:23 226:9

**170** 36:15
**171** 225:21
**172** 36:11
**172,888** 36:10
**173,000** 94:23 142:4,17
**17th** 102:14 106:18 126:22 150:13 155:12 196:18 207:9 207:16 208:3 210:12
**18** 72:10
**180** 117:9
**180,000** 69:23
**181** 226:21
**18211** 3:9
**185,700** 153:20
**189** 1:4,18 3:13 3:18 54:24 55:3,18 57:11 97:15 138:20 138:21 139:18 141:23 146:17 211:2 213:22 214:16,20 219:3,8,23 224:17
**18th** 221:2
**19** 187:20 224:4
**19,000** 187:16
**193** 224:5
**194** 225:22
**197** 226:5
**19880** 227:24
**19th** 50:19 56:3
**1:03** 175:14
**1:04** 175:18
**1:19** 193:4
**1:30** 16:9
**1:45** 215:8 226:11
**1:50** 193:9
**1st** 63:23 74:8 154:22

**2**

**2** 110:13 225:10
**2,000** 152:6 153:15
**2,250,000** 79:19 79:23
**2.4** 52:3 53:12 53:20 54:6
**2.5** 52:3
**2/13/2026** 228:3
**20** 223:19 228:22
**20,000** 52:23 53:7 156:9 158:3
**200** 189:5
**200,000** 69:21 93:10
**200,112** 50:5
**2006** 81:22
**201,020** 51:3
**2015** 120:16 131:17
**2016** 124:10 126:22
**2019** 73:9
**2020** 106:15 163:8,11,14 164:13 166:11 166:13,20 167:6,10,15,15 169:23 219:7
**2021** 55:10 100:5 102:14 106:15,19 198:15 214:3 219:9
**2022** 24:18 25:19 26:13 28:25 29:6 31:9,17 32:5 35:6 39:2,24 40:15 41:4 48:2,17 49:21 58:16,22 59:21 60:24 61:8 62:14 67:12 88:7,19 89:25 91:6 92:15,18 93:9 94:19 110:14,19 111:11,16 134:17,19 147:21 148:9 157:17 159:21 164:22 174:24 188:22 189:13 190:8 208:4,15 218:8 225:10
**2023** 57:25 63:24 64:5,13 67:16 74:8 80:12 116:4,5 134:18 145:17 148:2,6,14 150:13,14 154:23 157:17 159:23 164:19 173:13,14 174:24 194:22 195:20 196:2 196:18 197:22 207:10,16 208:6,20 209:9 215:8,16 216:16,23 217:22 224:19 224:21 225:23 226:9,11,13
**2025** 95:21
**2026** 1:21 7:5 223:11 227:20
**203** 226:7
**20595** 81:22
**207** 226:9

**209** 226:24
**20th** 51:2 56:3 152:6
**21** 13:15,24 14:11 55:12 56:3 181:18 189:18,21 215:8 226:11
**215** 226:11
**216** 226:12
**21st** 215:16
**22** 189:18,21
**22nd** 91:6 92:15,18 93:17 150:21 151:6 152:16
**23** 1:8 3:17 66:9,24 217:9 224:10
**2320** 3:19
**23rd** 46:25
**24** 56:3
**24th** 51:8 110:19 111:11 156:16
**25** 198:8
**25,000** 155:13 155:16 156:17
**250** 4:10
**250,000** 69:20
**2519** 1:7 3:16
**25th** 103:15 155:15
**26** 199:25
**279,289** 36:7
**27th** 153:11 155:19 227:20
**28** 94:19
**280,000** 36:18
**28th** 51:16
**296,000** 69:14
**29th** 47:11 93:9
**2:23** 1:11
**2:24** 220:12
**2:30** 220:16
**2:31** 221:25 222:3
**2:33** 7:9
**2nd** 111:16,25 156:8

**3**

**3** 78:2,5 83:15 216:16 226:13
**3,000** 100:6
**30** 153:6
**30,000** 47:2 52:23 53:8 100:16
**300,000** 92:18 93:17
**3011** 73:15 81:25 82:4,8
**30d** 12:17
**30th** 156:16
**31** 2:10
**31st** 58:22 88:6 150:14 156:23 158:3 195:14 195:20
**3280** 4:15
**333** 4:19
**34** 224:11
**35,000** 156:8
**360** 155:25
**372,037** 25:20
**375,048** 36:24
**385,597.10.** 46:17
**3:37** 197:22
**3rd** 154:23 196:2 197:22 216:22 217:22

**4**

**4** 72:2
**40** 209:11 224:13
**40,000** 155:19 156:18
**420** 3:19
**421,019** 50:20
**427,843** 60:10 61:7,13
**43a** 23:10 224:10
**44** 34:12,13 224:11
**446** 1:8 3:17
**44a** 40:6 224:13
**45** 49:7,13 224:14
**46** 54:25 57:12 224:16
**47** 57:14,19 224:18
**472,000** 88:11 88:20 188:21
**479,000** 77:8
**48** 64:10,11 224:20
**48a** 81:7,8 224:22
**49** 89:12,13 224:14 225:5

**5**

**5,295,000** 77:23
**50** 97:7,8 208:4 208:14 225:7
**50,000** 52:22 53:6 97:19 99:20 152:17 152:25 153:7
**500** 152:12 155:8
**500,000** 30:24 93:3,14 141:14 142:12 149:3 150:17,22 151:6,10 152:5 152:15,24

153:19 155:25 158:7 190:20
**51** 102:20,21 225:8
**52** 110:11,12 225:9
**53** 122:12 225:11
**54** 136:15,17 224:16 225:14
**55** 150:2,4 225:16
**55,124** 56:9
**56** 162:3,4 225:17
**57** 168:23,24 224:18 225:19
**58** 171:17,18,22 225:21
**59** 194:19,20 225:22

**6**

**60** 197:7,8 226:5
**60,000** 156:8
**600,000** 71:3
**61** 203:2,3 226:7
**612890** 95:21
**617224** 218:7
**6188** 1:11 7:9
**62** 207:7,8 226:9
**63** 215:6,7 226:11
**64** 216:14,15 224:20 226:12
**65,121** 56:9
**650,000** 69:22 70:13
**657,000** 66:4,17
**680,000** 42:13
**683** 43:15
**683,000** 42:17 43:20
**683,318.95.** 41:21
**6th** 155:2

**7**

**7** 224:19
**70,000** 37:4
**700** 47:21
**700,000** 189:7
**723,000** 91:7 141:5,7 142:10 143:7
**735,000** 90:12 91:19 141:3
**75,700** 155:2
**750,000** 138:22
**76** 1:8 3:16 41:19
**76,000** 31:19 32:18
**76,130** 24:18 25:6 31:10
**789,000** 72:4
**7th** 4:10 57:24

**8**

**8,917.15** 45:15
**80,000** 188:13
**80,120** 56:8
**80,124** 51:9
**80,128** 51:17
**81** 224:22
**8112** 40:16 49:20
**82** 31:16
**85,700** 153:12
**8508** 169:11
**88** 226:17
**89** 225:5 226:18
**8th** 156:9

**9**

**9,700** 156:7
**9,752.78** 154:24
**900,000** 187:7 188:17,19
**90s** 76:23,25
**97** 225:7
**9899** 54:24 55:3 224:16
**99** 161:4 162:20 166:18 170:4,5 212:9 212:15 213:5 213:25 214:20 219:3
**9:19** 1:21 7:4
**9:26** 18:21
**9:28** 18:25
**9:31** 22:12
**9:38** 22:16
**9:49** 34:4
**9:51** 34:8
**9:56** 39:9
**9:58** 39:13

**a**

**a.m.** 1:21 7:4 110:14 195:20 196:2 207:16 216:23 225:10
**aaronson** 1:5 3:14 43:10 90:15 112:6 133:23
**ability** 19:15,19 38:25 71:19,20
**able** 19:10 27:5 27:9 28:20 29:2,7,18 30:14,17 32:16 43:17 65:8 100:9 138:5 221:8
**above** 2:12 103:2 124:6 195:25 207:25 218:25
**abreast** 146:22

**absolutely** 21:2 44:3 48:20 103:7 140:11 179:20 194:17 197:4 198:3 199:12,17,23 202:3 207:4
**absurd** 196:21 196:23
**access** 60:23,25 182:17
**accompany** 186:24
**account** 40:15 40:17,21,24 41:3 43:12 47:7 49:19,20 52:4 54:23 55:2,14,15,17 55:20 66:5,12 66:13 90:18,20 91:2,12 92:9 141:4,5,7 142:12 143:7,8 149:23 150:5 152:12,14 153:15 157:2,6 157:11,19,22 157:24,24 179:22 183:17 194:4,11,15 195:8,24 196:13 197:25 199:11,15,21 200:5 201:17 203:17 204:22 204:23 205:21 205:24 206:21 207:2 219:18 224:16
**accountants** 64:22 219:2
**accounting** 43:18 63:19 172:9 180:15
**accounts** 66:15 67:18,19 91:11 143:4 181:15 196:25 197:3 205:7,8 207:21 210:25 211:17 219:22
**accuracy** 33:22
**accurate** 24:12 25:8,14,24 26:4 31:12 38:17 48:19 60:12,15 61:17 65:25 74:13 83:25 194:13 208:16,20 213:14 214:12 215:2 219:11
**accurately** 61:6 71:18 101:15
**acris** 81:15
**action** 61:21 83:17 105:7 146:14 192:2,8 227:16
**actions** 67:5
**activities** 119:24 120:3
**actual** 53:8 65:21 147:8 179:3 209:6 210:6 216:7
**actually** 38:19 80:2 86:6 98:10 100:15 103:10 110:21 114:16 125:25 147:20,25 149:2,6 166:4 166:13,21 202:6 211:24
**add** 109:14,19
**adding** 109:21
**additional** 100:13 187:20
**additions** 41:15
**address** 71:24 73:13 77:25 78:3
**advance** 150:22 151:6,9,18
**advancement** 140:8
**advise** 148:16
**affect** 48:12
**affidavit** 83:16 84:19 218:2,11 218:14,22
**affidavits** 103:13
**affirm** 22:20 23:4
**afraid** 127:15 127:19
**afternoon** 193:11 220:18
**agencies** 127:10
**ago** 16:24 26:8 34:21 72:10 73:17 76:19 128:15 129:9 131:18,25 208:9
**agree** 14:6,8 108:20 173:18
**agreed** 6:4,9,13 84:17 107:18 107:20,23 108:18,23 163:8,18 164:5 166:10 169:23 201:9 226:19
**agreement** 12:2 12:7,21,25 13:4,6,9,10,22 93:5 96:23 97:9,18 98:23 98:24 99:8,21 100:8,14 101:15 102:5

102:22 104:15 108:22 109:3 122:13 123:14 136:18,23 139:20 140:4 143:25 145:3,6 145:13 158:23 159:10,15,18 160:3,6,9,16 161:22,23 162:5 163:22 164:21 165:11 165:18,23 166:3 168:20 168:25 169:6 170:6,8 207:18 209:2,4,5 211:25 213:8 214:16 218:24 219:20 225:7,8 225:11,14,17 225:19 226:19
**agreements** 170:17 219:24
**agrees** 139:19 140:7
**ahead** 202:5
**al** 7:8,9 81:25 228:2,2
**alifonso** 172:14 172:14
**alivia** 5:8
**allegation** 67:9
**allowed** 42:22
**ally** 10:23 11:2 11:4,15 19:9 19:20 20:10,17 20:23,24 21:5 21:14,23 22:7 26:8 28:13,16 29:13,15,16,19 30:16,18 31:4 32:7,8,8,17 43:6,8,21 48:7 53:5,6 56:17 56:19 61:24 62:7,18,21 63:4 133:24,25 134:2 179:4,7
**ally's** 19:15,20 19:21
**alright** 17:4 24:20 52:2 95:15
**america** 66:10 89:10,14,20 225:5
**amount** 27:8,17 35:19 41:21 43:16 44:2 54:7 68:23 79:22 91:7,18 92:18 100:16 138:25 139:22 151:12 184:3 188:15 191:20 208:8 209:11 209:21
**amounts** 31:21 45:21,22,23
**answer** 9:24 10:5,8,9,13 11:2,6,8,10,11 11:12 42:24 61:14 69:15 107:22 108:21 109:16 128:23 168:7
**answered** 10:12
**answering** 164:14
**answers** 223:12
**anthony** 1:4,13 1:25 2:8 3:8 4:5 5:7 7:6,8 8:12,17 63:22 64:11 82:3,10 110:19 112:12 137:14 169:18 218:7 219:2 221:24 223:8 223:16 224:4 224:20 226:20 228:2,3,21
**anthonyd** 112:8
**anticipate** 15:18
**anticipated** 188:8
**anxious** 42:23
**anybody** 21:22 22:5 73:4 84:4 104:23 127:22 160:11 170:12 176:18 180:8 182:25 184:22 185:15 186:2 186:11 192:11
**apologize** 24:19 44:5,9 77:6
**app** 211:23
**appear** 150:24
**appears** 57:23
**application** 10:4,7 12:22 12:24 111:3 112:21 113:7,8 116:8,12 125:3 140:18 200:5 200:10,14 202:2,10,17 211:17 215:23 216:4,8
**applications** 85:3
**applied** 135:18 219:22
**applying** 197:25 201:17
**approached** 45:4,8 53:16
**appropriate** 80:11

**approval** 140:19 200:7
**approved** 133:11
**approximate** 30:20
**approximately** 7:4 27:16 28:8 30:4,22,23 71:3 76:18 131:17 221:25
**april** 154:22,23 155:2,8,10,12 155:15,19,22 196:2 197:22 216:16,22 217:22 226:13
**area** 35:14
**areas** 9:13
**ariel** 4:21 8:19 193:12
**aronbayer** 5:10
**arranged** 43:10 48:2 63:3
**arrest** 127:12
**arrested** 126:18,24,25 127:4,5
**arrived** 66:17
**article** 2:10
**asad** 1:5 3:17
**asap** 196:7 207:18
**aside** 29:15
**asked** 15:8 31:22,24 42:3 42:20,21 89:3 110:4 132:17 144:15 154:10 159:16 164:3 167:25 185:14
**asking** 14:4,5,7 15:15,18 17:6 86:20 87:13 89:4 96:4 111:16 167:3 173:18 181:25 193:16 226:18
**asks** 207:17
**assessed** 119:20
**asset** 76:2 80:15
**assets** 70:15,16 70:18 71:9 80:12
**assigned** 161:3
**assist** 68:7 160:11
**assisting** 153:2
**associates** 94:23
**association** 7:14 130:15
**assume** 45:18 48:14 59:4 148:25
**assumed** 180:6
**assuming** 126:3 172:17 179:25
**attached** 58:15 215:19,21 217:23
**attachments** 211:14,15 217:24
**attention** 41:12 49:18,23 50:18 55:25 60:9 84:10 97:22 99:10 139:5,15 169:13
**attorney** 4:14 88:23 90:14 101:8 106:2 127:11 130:2 146:25 147:4 217:3,24
**attorneys** 3:7 3:13 4:5,19 105:24 143:24
**attributable** 53:4
**audit** 64:25
**august** 147:21 148:9 194:21 196:18 207:9 207:16 208:3 210:12 225:23 226:9
**authority** 40:19 40:20 55:14 203:14 204:16
**authorization** 203:21,22,22 204:6,9
**authorized** 204:3
**auto** 1:4,4,6,7,7 1:7,7,8,8,8,18 3:8,13,15,15,15 3:16,16,16,17 3:17,18 8:11 41:21 42:14,18 46:17 47:4,7 47:13 50:5,16 50:20 51:3,9 51:17 52:5 53:21 54:24 55:4 56:7 69:22 110:18 172:24,25 173:11,20 180:21 219:4,8 224:17
**automobile** 117:6 121:2,6 173:8 177:9,12
**automotive** 1:15 4:8 100:10
**available** 41:8 115:3,10 142:24 188:4

**avenue** 3:9,19 4:10
**aware** 42:12 50:14 83:3,4 105:19 109:22 110:7 124:14 130:23 140:17 145:10 146:13 180:20 185:19 194:14 196:24 197:24 202:13 207:2
**aying** 28:12

**b**

**babylon** 118:18
**babysit** 17:18 17:18
**back** 17:20 18:24 22:15 32:12,15,16 34:7 39:12 43:7 45:17 46:4 47:17 48:4,6,15 49:3 52:11 54:20 56:15 57:7 62:14 63:7,15 64:3 66:2 68:24 69:5,16 80:22 83:11 88:2 90:16 96:20 101:24 103:14 109:12 112:13,14 116:20 122:22 132:13,15 133:23 135:13 135:16 136:5 139:12 144:23 146:2 147:21 148:9 149:19 150:11 152:4 158:20 161:12 168:16 171:2 175:17 182:13 186:6 187:21 188:17 190:10 190:24 191:4,7 191:10,19,21 191:24 193:8 220:15
**bad** 14:22
**balance** 93:13
**balances** 183:13
**bank** 1:17,18 4:19 8:22 12:9 23:17 24:13 26:5 31:10 33:23 36:9 40:7,13 44:12 44:14 46:2 49:14 54:23 55:2 57:10,16 58:8,15 62:5 64:17 66:4,4 66:10 75:7 77:16,20 80:11 80:13 85:11 89:10,10,13,14 89:19,24 90:2 90:5 92:13 124:24 125:2,3 127:3 130:15 141:2 148:13 149:22 150:5 150:10,12 156:23,24 157:3 169:10 170:7,12,12,18 172:25 173:2,5 173:6 179:22 181:15 182:4 183:17,25 184:5 190:19 193:14 194:5 194:15 195:8,8 195:12 199:11 199:16,19,22 200:6 201:11 202:18,22 203:4,11 204:15 205:24 206:20,21 209:15 210:18 211:2,6 212:14 212:20 214:25 215:17 218:11 218:20 219:15 219:17 224:13 224:14,16 225:5,5,16 226:7
**bank's** 195:18
**banking** 66:8
**bankruptcy** 139:23
**banks** 85:2,3,4 85:9,20,22,24 86:6,14,16,17 173:7
**barletta** 5:11 7:12
**baron** 1:5,6,6 3:14,18 84:14 84:20,23 85:10 85:14 86:12 100:20 102:6 102:22 103:2 104:12,14,15 105:14 107:18 107:18,20,23 107:24 108:13 108:18,19,20 108:22,24 109:22,23 110:5 225:8 226:19,20
**baron's** 103:6,9 104:9,19 105:18,21
**based** 21:7,14 47:25 64:23 67:25 82:13 147:10 148:23

**basis** 38:11,16 60:14 76:5 139:21 143:2 157:16 159:4 174:7 189:22
**bate** 23:22 34:19 40:12 55:22 57:16 64:18 150:11 162:9 169:7,11 171:25 197:15
**bates** 136:10 203:11
**bathroom** 18:9
**bathrooms** 18:12
**bear** 15:9
**beginning** 23:22 150:13
**behalf** 8:4 59:2 125:17 127:22 137:23 138:19 161:8 204:17 219:23 220:20
**belief** 38:11,17 60:14 76:5 131:15 140:25 143:2
**believe** 13:19 20:5 35:19 40:18 45:13 48:18,20 50:9 50:25 51:7,14 53:11,14 56:24 60:13 67:9,17 68:18 71:16 76:4 77:13 78:14 80:10 84:3 87:9 88:25 101:14 103:12 107:25 108:3,5,17 117:2,12 123:9 130:25 138:15 143:19 147:12 154:10 160:14 166:21 179:10 190:5 194:24 206:19,22,25 210:12 212:22 213:13 214:24 219:11
**believed** 44:23 80:15 125:12 219:18,23
**beneficial** 203:5 226:8
**benefit** 140:8 186:23
**beria** 117:16,18 120:2,8 121:5 122:5 124:6,7 124:15,17,23 125:18,25 126:14 127:19 127:22 130:20
**beria's** 121:19 124:2
**best** 71:18,20 202:15 210:13 214:11
**better** 211:24
**betterment** 151:24 153:25
**beyond** 12:3
**big** 32:11 154:25
**bigger** 24:20,21
**bills** 41:8 204:4
**bit** 191:11
**blank** 100:5 137:6
**blankenship** 1:13 4:6 183:19
**blankenship's** 220:24
**blood** 227:15
**blown** 139:16
**blurry** 138:4,7 138:8
**blvd** 1:6,6,7,7,7 1:8 3:14,15,15 3:16,16,16
**bold** 140:2
**bonnie** 4:12 8:15 44:6 221:8
**book** 41:19 53:15
**borrow** 80:2
**borrowed** 53:6 79:23 202:9
**borrowing** 203:22 204:9
**bottom** 23:20 24:15 34:19 36:22 49:8 55:21 60:9 64:18 99:11 110:10,17 137:2 162:9 189:8 195:12 207:15
**bought** 208:4 208:14
**boulevard** 4:19
**box** 4:16 35:13 35:15 171:13
**breaches** 95:22
**brian** 1:5 3:14 87:7,16 98:10 98:19,20 106:7 123:11 218:6
**briefly** 203:25
**bring** 174:17 184:22 198:16
**bringing** 132:18
**bro** 198:14
**broker** 94:11 94:13 118:4,6 118:23
**broker's** 119:9

**brokerage** 118:25 119:24 120:3
**bronx** 73:11 74:12 77:8 81:21
**brought** 105:5 105:13
**bruce** 194:4 195:19 196:3 197:5 198:11 205:3 206:14 206:17,19,19 206:25
**building** 45:10
**bunch** 156:15
**business** 21:9 21:15 30:9,11 55:18 66:5 67:4,13 84:16 84:21 86:13 94:15,15 115:14 118:3 120:12 121:11 121:19 122:7 126:6,10,12 133:14,16 134:5,13 135:13,16 139:24,25 140:4,9,21 142:6 173:5 177:8 199:3,5
**businesses** 66:16 130:19
**buy** 53:7 78:24 118:2,12
**buyer** 99:15 100:8 107:11
**buyers** 1:14 89:11,15,20 91:12 141:5 149:9,10 152:6 153:8,12,16,21 153:25 154:5 154:12,15 155:2,8,13,16 155:18 156:10 156:17 158:4 225:5
**buying** 146:3,6

**c**

**c** 3:2 4:3 5:3 81:15,23 223:2 227:3,3
**cabinets** 206:10
**calculated** 71:18
**call** 23:21 65:15 88:23 92:6,11 109:3 209:17
**called** 81:14 91:3 96:23 157:4
**cancer** 103:18 103:19,20
**capability** 68:22
**capable** 112:24
**capital** 1:17 93:18,21 133:7 133:17 135:10 135:22 145:22 147:18 148:18 152:2,3,18 194:12
**caption** 2:3
**captioned** 218:25
**car** 1:14 10:25 11:5,17 52:21 53:7,7 89:10 89:15,20 91:11 115:14 117:6 120:20 141:5 149:9,10 152:6 153:8,12,16,21 153:24 154:4 154:12,14 155:2,8,13,16 155:18 156:9 156:17 158:4 177:10,21 182:7 225:5
**cards** 205:9
**care** 13:21 62:9 62:15
**carry** 134:6
**cars** 1:14,14 4:7,7 26:9,19 27:24 31:5,17 32:12,14 43:3 43:6,10,11,16 45:16 46:4 47:17,21 48:3 48:9 50:8 52:11,17 53:11 53:16,23 54:10 56:14,16,21,22 61:5,21 62:6 62:23 63:6 70:17,19,23 71:3,4,5,9 146:3,6
**case** 1:10 12:17 83:15 97:14 218:5 228:2
**cases** 14:2 105:4
**cash** 20:14 41:7 66:3 70:24 182:3,7 183:20
**cause** 105:6,14
**caused** 61:24 170:8
**causing** 61:21
**central** 1:23 3:5 7:16,18
**cents** 99:20
**certain** 95:21 183:3

**certificate** 196:10 197:9 197:16 226:5
**certification** 6:6 162:17 169:15 203:4 226:7
**certify** 223:8 227:7,14
**cetera** 146:16
**cfo** 32:20
**chabrier** 1:5 3:14 98:10 123:11 218:6
**chain** 57:20 108:3,6,7 110:9,13 164:7 164:16 194:21 196:19 197:9 207:9 216:16 224:18 225:9 225:22 226:9 226:12
**chambers** 17:12
**chance** 111:17 195:4 207:13
**change** 111:8 155:22 157:7 216:10 228:5
**changed** 107:11,15
**chase** 1:18 40:6 49:13 54:23 55:2 66:10,10 224:13,14,16
**check** 40:20 47:2,3,5 55:14 98:13 154:24 156:17 172:21 172:23,24 173:10,14 183:25 184:2
**checks** 99:25 156:16 183:13 204:4
**chose** 164:3 185:15
**chosen** 192:16 192:16
**chris** 101:10 106:6 108:15
**circumstance** 166:25 170:19
**circumstances** 125:8 129:25
**circumventing** 43:2
**cirrincione** 2:13 227:5,25
**citibank** 72:7
**citrin** 160:19 164:8,17 165:14 213:17 214:9
**city** 81:2,3,9,11 224:23,24
**civil** 2:10
**claim** 84:5,7 97:17 175:8 181:11 192:11 192:17,21
**claiming** 53:19 67:4 82:15 114:4
**claims** 87:5 95:22 196:20 196:23 226:22
**clarify** 29:5
**clear** 14:2 53:18 62:12
**clerk's** 102:10
**clerks** 17:15
**client** 35:4 36:16
**client's** 172:11
**clients** 83:18
**clock** 16:14
**clocks** 16:21,22 16:23
**close** 14:15 79:5 84:17 121:8 211:23
**closed** 80:7 118:17 148:2 207:21
**closer** 18:12
**closing** 79:7
**coast** 1:14,14 1:15,15,15,16 4:6,7,8,8,9 69:19,20 116:8 175:20,22,24
**codefendant** 193:15
**coincidence** 143:6
**collect** 190:14 192:3 204:3
**collectability** 67:17
**collective** 10:18
**collectively** 205:13
**college** 176:9
**combination** 32:19 66:6,14 78:9 182:19,20
**come** 14:14 17:20 21:3 26:12,15,22 27:4 29:5 66:20 69:25 118:9 124:22 141:10 142:24 153:16
**comfortable** 132:5
**coming** 29:11 103:14,15
**commenced** 83:18 192:2 219:7,9
**commencing** 100:5

**commission** 94:2,3 152:21 153:2,20 228:25
**commissions** 121:15,16 189:23
**communication** 86:24 108:12 109:4 122:4 226:20
**communicati...** 89:4 92:5 170:11 217:11 226:18
**companies** 89:21 104:8 130:10,12 215:3
**company** 7:15 48:6 82:15 93:23 94:14 117:3 125:16 141:15 142:13 152:25 154:5,8 170:14 219:5
**company's** 130:14
**compel** 10:9
**complete** 9:6 80:9 200:10 216:4 223:11
**completed** 79:25 200:5
**completely** 24:5 62:21
**completion** 139:22
**computer** 137:21
**computers** 71:8 71:15
**concern** 145:10
**concerning** 109:5 129:18 184:8 226:20
**concludes** 221:23
**condition** 63:23 64:13 65:22 224:21
**conduct** 204:16
**confer** 14:6 221:6
**confirm** 207:19
**confirming** 220:20,24 221:3
**connected** 133:3
**connection** 24:3 38:25 49:12 59:3 87:5 92:24 93:4 94:6 95:9 95:23 101:9 105:11 119:9 123:10 127:11 129:24 170:18 174:5 176:5 199:10,15
**consider** 68:8 121:13 199:14
**considered** 199:20
**constant** 113:12
**consultants** 154:7,12
**consulting** 92:21,24 93:10 154:5
**contact** 113:13 115:20 194:15
**contacted** 219:17
**contacts** 126:4 126:5
**continue** 9:5 16:11
**continued** 1:24 2:3,7 4:3 5:3 100:17 120:8 120:10,12 121:22 225:2 226:2
**continuing** 139:21
**contract** 78:25 79:2,4,5,9,13 95:10,23 105:18,20 106:20,21,22 106:25 107:4,7 107:8,11,13,15 107:17,23 108:2,9,10,17 181:9 208:7 209:7,20,21
**contractor** 121:17
**contracts** 108:4 108:6,8 179:18 209:23 210:5
**contrary** 208:10
**control** 40:23 171:7,12,13,14 171:18 225:21
**controller** 21:18 32:20 37:21 38:22 113:3,5,6 174:13,15,19 183:7,14 205:4 206:14,16
**controller's** 183:6
**controllers** 182:5,18
**conventional** 74:25 75:3
**conversation** 44:24 45:3,8 98:12 194:3,9 201:14,19,20

205:12
**conversations** 147:11
**conveyed** 76:15
**convicted** 130:6
**conviction** 127:12 129:19 129:21
**convictions** 126:15
**cooney** 5:8
**cooperated** 129:17,25
**cooperman** 160:19 164:8 164:17 165:14 213:18 214:10
**copied** 112:7
**copy** 98:7,11,17 106:5,13,25 107:4 116:11 143:20 147:7 207:17 221:13 221:20
**corp** 1:16 116:23 122:15 123:16 124:5 225:13
**corporation** 82:9 100:9 129:16
**corporations** 93:2 196:9
**correct** 19:11 20:8,15 21:16 24:10 25:25 26:5,10 28:5 28:13 29:3 31:10 32:13 33:23 35:9,20 36:12 37:5,6,7 37:11,16,18,24 38:3,7,13 39:4 39:5,20 40:21 40:24 46:7 47:18 49:17 52:24 53:3,3 55:7,10 58:4 58:11 59:25 61:13,22 63:20 66:17,25 67:7 68:2,9 69:23 71:6,6,22 72:4 74:14,20,24 75:3 77:17 79:10,19 83:25 84:8 85:11,15 85:19,21 86:16 88:16 89:21 90:14 91:15 95:7,10,13,17 96:8 97:15 99:5,21,25 100:21 102:12 102:15 103:9 103:14,21,25 104:9,12,16 105:8,15 106:19 111:5,9 111:13,19 116:24 117:4 117:13 118:22 122:8 125:4,20 125:23 129:5,8 129:19,22 132:4,19,23 135:21 137:23 138:19 141:5,8 141:11,15 142:10,14,18 144:9 145:3,16 145:18 147:2 147:18,23 148:3,21,24 150:18,22 151:25 152:7 153:3,17,22 154:5,8,19 155:2,5,8,16,23 156:3,10,13,14 159:21,24 161:5 162:18 162:21 163:5,6 165:12 166:25 169:19 172:18 176:10 177:10 177:13 178:3,7 180:18,23 183:17 184:9 184:12 188:10 189:2 191:11 191:21 194:6 195:9,20 196:15 197:22 198:2,5,11,18 198:22,23 199:2 200:8,22 201:12,21 211:3 212:2,5 212:9,11 213:8 213:25 214:3 214:17,22,23 217:20 219:20 219:25 223:13
**correlated** 163:19 165:19 166:8,23
**costs** 46:5
**counsel** 6:6 34:19,21,23,24 97:2,24 106:25 171:24 181:24 220:19
**counsel's** 149:25
**counsels** 7:20
**counting** 183:10
**county** 39:23 81:21 83:17 95:20 102:10 105:8 184:8 218:6 223:6
**couple** 134:22 138:2 180:12

**course** 14:8 38:18 51:23 114:6 139:24 187:12 188:4 188:18,19 189:18,21 202:16 206:18
**court** 1:2 6:16 7:10,25 8:6,23 9:2 10:11,21 11:15,20,25 12:11,16,23 13:5,8,14,20 14:16,21,25 15:6,13,21 16:4,13,20 17:9,25 18:3,7 18:16 22:17 72:2 81:20 82:23 95:19 105:7,22 107:4 144:13 146:14 146:20 147:8 147:14 218:5 221:12,18
**courthouse** 7:17
**courtroom** 17:16
**covenants** 139:19
**cover** 52:9,13 62:20
**coverage** 176:24 177:2,7 177:9
**cpa** 1:14 218:3 218:9
**cpa's** 1:17 163:18 164:5,6 165:14
**created** 53:12 62:16 63:6 163:10 165:23
**creating** 52:14 52:16
**credit** 20:6,7,8 20:10,12,14,15 20:17,23 58:12 68:8 149:3 150:18,25 151:5,12,15 155:21 158:8 194:12 198:14 201:17 202:7 205:9 211:18 215:23 216:4
**criminal** 125:11 126:15 127:12,12,16 129:19,21
**cross** 100:9 101:5 141:22 141:25 143:11 143:14,25 144:12 145:2,3 145:6,7,10,12
**cullen** 4:18 8:20 193:13
**current** 95:25 196:20,22 208:8
**currently** 72:25 95:6,12 181:12
**customer** 182:6
**customers** 179:19
**cut** 60:25
**cv** 1:11 7:9
**cyruli** 3:12 8:3

**d**

**d** 19:2 81:23 137:14 223:2
**dad** 73:25 74:3 74:3 76:8,11 76:16,21 77:2 77:4,14 82:6,7 83:2
**dan** 32:20 38:21 59:18,25 111:23,23 112:25 181:3 183:23
**daniel** 21:18 112:16 113:12 113:14 178:19 178:22
**danny** 180:3,6 180:13
**darius** 72:2
**date** 7:5 23:13 25:18 26:2 34:16 35:23 40:9 49:16 55:5 57:22 64:15 65:25 81:12 89:17 97:10 102:24 110:15 112:6 122:16 126:20 136:20 150:7 162:7 163:16 164:15,15 165:17,19,22 165:24 166:4,7 166:7,8,17,23 169:4 171:21 194:23 197:12 203:7 207:11 212:14 215:10 216:18 221:2,4 221:5 228:3
**dated** 102:14 110:13,19 111:15 116:11 124:10 163:13 169:22 173:14 194:21 195:14 196:17 207:9 207:16 215:8 215:16 216:16 216:22 224:19 225:10,23

226:9,11,13
**dates** 115:19 160:2
**dating** 166:3
**dave** 196:4
**david** 1:6 100:15,20 103:2,5,13,19 104:8 106:10 106:11,16,17 106:18 108:14 217:16
**day** 141:13 153:6,7 166:10 169:23 208:2 223:19 227:20 228:22
**deal** 100:20
**dealer** 122:12 123:14 172:12 177:19,20,23 225:11
**dealership** 48:13,17 61:4 61:9,11 63:4 100:10 117:7,7 126:7 133:18 134:3 188:18 189:13 190:8
**dealerships** 43:3,5 48:8 114:4 120:20 121:3,6 182:12 182:14 188:15 189:21
**dealings** 122:8
**debt** 31:25 68:17
**debtors** 176:2,5
**debts** 26:16,23 27:5 28:12,21 28:21,21 29:2 29:7,12,18 30:2,14 31:4,8 31:16 32:4 38:25
**december** 39:24 58:22 67:12 88:6 134:19 217:10
**decision** 10:18 82:2 165:13,16
**decisions** 9:21 9:25 10:15
**dedicated** 183:3
**deed** 74:9,22,23 76:9,10 78:15 79:15 82:16,24
**deeded** 74:10 75:19
**defendant** 4:14 4:19 8:17,22 81:25
**defendants** 1:19 2:8,9 4:5
**defenses** 87:5
**deficiencies** 29:13,25 31:24 32:2 52:9,14 52:15 61:24 62:15,21 63:5
**deficiency** 27:25 28:12 29:17 31:3,6,7 38:24 52:16,25 53:2,4,9,13 54:5,6
**deficient** 30:13 30:17
**defined** 100:10
**delay** 215:24
**demand** 23:18
**demands** 87:10
**denied** 10:12 10:22
**deo** 1:13,13,25 2:8 4:5,6 5:6 7:7,8 8:17 11:14,19 18:6 19:1,8,25 20:1 21:1 22:1,18 22:25 23:1,14 24:1 25:1 26:1 27:1 28:1 29:1 30:1,9 31:1 32:1 33:1 34:1 34:9 35:1 36:1 37:1 38:1 39:1 39:14 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 49:5 50:1 51:1 52:1 53:1 54:1 54:22 55:1 56:1 57:1,9,13 58:1 59:1 60:1 61:1 62:1 63:1 63:17,22 64:1 64:12 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 80:24 81:1,24 82:1,3,5,10 83:1,13 84:1 85:1 86:1 87:1 88:1,4 89:1,3,8 90:1 91:1 92:1 93:1 94:1 95:1 96:1,22 97:1 97:25 98:1 99:1 100:1 101:1 102:1,2 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,22 117:1 118:1

119:1 120:1 121:1 122:1 123:1,3 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1,15 133:1 134:1 135:1 136:1,7 137:1,14 138:1 139:1,14 140:1 141:1 142:1 143:1 144:1,25 145:1 146:1 147:1 148:1 149:1,21 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1,22 159:1 160:1 161:1,15,16 162:1,21 163:1 164:1 165:1 166:1 167:1 168:1,18 169:1 169:18 170:1 171:1,4,23 172:1 173:1 174:1 175:1,19 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1,23 193:1 193:11 194:1 194:19 195:1 196:1 197:1,7 198:1,8 199:1 199:25 200:1 201:1 202:1 203:1,2 204:1 205:1 206:1 207:1,7 208:1 209:1 210:1,21 211:1 212:1,10 213:1 214:1 215:1 216:1,14 217:1 218:1,7 219:1,2,4 220:1 221:1,3 221:24 222:1 223:8,16 224:4 224:20 226:20 228:2,3,21

**deo's** 23:10 34:13 40:6 49:13 57:19 64:11 81:8 89:13 97:8 102:21 110:12 122:12 136:17 150:4 162:4 168:24 171:18 194:20 197:8 203:3 207:8 215:7 216:15 224:8 225:3 226:3

**deo00076** 97:25

**department** 81:2,10 184:8 184:23 185:21 186:3 224:23

**deposed** 193:22

**deposit** 42:10 46:14 47:2,6 47:10 49:25 50:19 91:3 152:6 182:7 183:16 184:4 204:4

**deposited** 42:18 43:12 50:15 51:6,13 51:23 52:4 53:20 183:24

**deposition** 7:6 9:6 11:22 220:25 221:23 223:10 228:3

**depositions** 83:15

**depository** 203:21 204:6

**deposits** 41:14 56:2,2,12 182:3 183:20 204:17

**deputy** 17:16

**derrick** 82:3,10

**described** 47:8 48:9 58:20

**description** 75:24 224:9 225:4 226:4,16

**designation** 137:4

**desks** 71:8

**despite** 28:10 61:3 166:19

**destroyed** 67:4 67:13

**detailed** 217:4

**details** 86:3,9 146:18

**detective** 184:14,16,20 184:23 185:23 186:14

**determine** 70:10

**determined** 164:15

**devastated** 185:11

**die** 103:23

**died** 100:15 103:13,16,24

**difference** 36:19 91:21

**different** 36:21 39:18 106:21 106:22 107:8 205:14
**differently** 10:5
**difficulty** 28:11 29:17 167:5
**diligent** 86:22 87:4
**direct** 88:22 108:12
**directed** 9:5 132:22
**directing** 82:21
**direction** 92:7
**directly** 10:8 15:11 94:10 115:20 156:4
**disagree** 50:11 74:15 167:7
**disagreed** 44:19
**disagreement** 208:8
**disclose** 190:16
**discovery** 23:18 40:12 221:11
**discuss** 146:25 220:23
**discussed** 88:7 116:22 145:15 145:17 146:25
**discussion** 18:22 22:13 34:5 39:10 48:25 54:18 57:5 63:13 80:20 83:9 87:24 96:18 101:22 109:10 116:18 132:11 136:3 139:10 144:21 149:17 158:18 168:14 170:24 175:15 200:24 220:13
**dismissed** 96:6 96:11,12
**dispute** 26:3
**distinction** 50:12 138:6
**distributed** 189:10
**district** 1:2,2 7:10,11
**divide** 164:11
**divvy** 16:6
**dix** 71:21
**dla** 1:16 93:18 93:21 152:17 153:2
**dms** 60:22,23
**dmses** 66:21
**dmv** 111:5,9 113:7 115:2,16 115:20
**docket** 218:17
**docs** 197:19
**document** 23:25 24:4,12 24:23 25:13 32:23 33:4,7 33:15,21 34:10 34:18 35:5,9 36:14 37:17 38:19 40:3,11 40:11 41:13 49:9,11,24 57:10,14,15 59:2,6 63:18 63:24 64:9 65:5 80:25,25 81:4,9,14 83:14,19,22 84:11 88:4,5,7 88:12 89:9,19 89:23 96:23,24 97:4,11,22 98:5,6,8,8,14 98:16,18 101:14 102:3,3 102:7,11 104:18 105:17 105:23 110:4,6 110:9 123:4,7 123:10,19,20 123:23 124:14 127:2 136:8,8 136:12,17,22 137:23 138:18 139:15 143:21 161:17,18,21 162:10,14 163:10 166:12 166:12,20 167:14 168:19 169:5,14 171:5 171:12,23 172:21 197:18 203:3 204:12 204:16 211:20 212:5,19,22 213:2 214:12 214:21 218:20 219:15 224:22
**documentary** 209:13
**documentation** 196:8,14 198:5 205:20 208:22
**documents** 23:15,17 27:12 36:16 37:11,24 39:17 49:6 54:23 65:7,10 65:18,21 70:5 85:9 87:8,12 87:16,18 89:2 97:23 101:11 111:23,24 112:18 133:11 145:9 150:8,9 172:7 181:10 181:19,22,25

208:24 209:2 214:25 226:21
**docusign** 137:24
**doing** 13:23 41:7 114:22 115:7,8,17 126:10,10,12 147:13 167:5
**dollar** 53:13
**dollars** 187:21 189:5 190:10 190:14
**dolphin** 117:19 117:21,23 118:9,15,16 119:9,13,16,18 119:24 120:9 120:15,18,25 121:8,21,22 122:3 126:11
**door** 18:10,11
**double** 180:14
**draft** 209:23 210:4
**drafted** 210:5
**drafts** 209:24
**draw** 41:12 49:18,23 50:18 55:25 60:8 84:10 97:21 99:10 139:5 149:2 169:13 189:12
**drawing** 139:14
**drawn** 149:6,8 151:16 152:10
**draws** 189:17 189:17
**drew** 150:25 151:4
**driscoll** 105:6
**drive** 117:10 185:10,16,20
**driven** 177:17 185:5
**driving** 176:9 176:14
**drove** 184:25 185:2,13
**due** 26:9,17,23 27:6 28:12 29:3,8,12,19 32:4 62:19 63:7
**duly** 19:3 227:9
**duplication** 13:25
**duplicative** 15:7
**dwight** 1:13 4:6
**dykman** 4:18 8:21 193:13

**e**

**e** 3:2,2 4:3,3,21 5:3,3 19:2
81:23 95:16 223:2,2 227:3 227:3
**earle** 4:19
**earlier** 48:10 181:9 198:17 198:20,24
**early** 55:10 191:16
**earmarked** 135:14
**earn** 121:14
**easier** 139:17
**eastern** 1:2 7:11
**effect** 6:15
**efficiently** 16:16
**eight** 191:14
**either** 31:3 37:23 38:3 72:22 80:6 87:5 113:17 132:24 153:20 199:20 211:6 227:15
**email** 9:9 44:17 57:19,23 60:21 65:14 88:8 110:9,12,16,23 111:12,15,21 111:22 112:5,8 114:10 164:7 164:16 194:17
194:20 195:11 195:15,17,22 196:3,17,19 197:8 201:19 207:8 208:11 208:14 210:11 211:13 215:7 215:15,20 216:15,22 217:25 224:18 225:9,22 226:5 226:9,11,12
**emails** 108:10 197:20
**emanuel** 3:10 8:9
**employee** 121:12
**employees** 134:8
**ems** 36:18
**enable** 10:25 11:17 19:22 20:18 65:4 68:7
**ended** 132:18 132:25 184:19
**endorse** 204:3
**ends** 137:25
**engaged** 60:3 131:13 132:2 132:17,21
**engaging** 119:23 120:2

**ensure** 113:10
**entered** 186:4
**entering** 140:3
**entire** 78:3 150:25 151:5 151:15,18
**entities** 47:4 116:9 130:16 130:23
**entitled** 63:22 139:25 168:19
**entity** 42:19 47:7 50:16 55:7,9 82:17 83:2 90:25 145:23 176:6 179:6 188:9 211:6
**entries** 46:2 172:9
**entry** 41:16 45:15 46:9,10 46:25 94:19 158:3 218:17
**ephemeral** 20:12
**equipment** 71:10,11,13,14 71:15
**errata** 228:1
**es** 227:8,13
**escorted** 186:6
**escrow** 90:19 90:20 91:11 141:4
**esq** 3:10,21 4:12,14,21
**essentially** 20:18 64:22
**established** 181:11
**establishes** 226:22
**estate** 1:6 117:24 118:3 118:19,22,23 118:24 119:8 119:12,15 120:6 127:8 143:8
**estates** 81:16
**et** 7:8,9 81:25 146:16 228:2,2
**evened** 61:25 62:5
**eventually** 85:20 90:12 113:20 191:6
**everybody** 34:11 35:14
**exact** 43:18 45:22
**exactly** 27:22 31:21 61:2 73:18 76:20 105:3,22 115:22 116:2 120:16 135:11 148:5
**examination** 1:24 2:7 6:7,14 19:6 193:24 224:3
**examined** 19:5
**example** 183:16 204:2
**except** 6:10
**exchange** 204:5
**exclusively** 140:7
**excuse** 90:13
**executed** 143:12,15,17 143:18
**executes** 139:20
**execution** 99:20 100:7
**exhibit** 23:10 34:13 40:4,6 49:13 54:25 57:12,14,19 64:11 81:8 83:15 89:12,13 97:7,8 102:21 110:11,12 122:12 136:17 150:4 162:4 168:24 171:18 194:20 197:8 203:3 207:8 215:7 216:15 224:10,11,13 224:14,16,18 224:20,22 225:5,7,8,9,11 225:14,16,17 225:19,21,22 226:5,7,9,11,12
**exhibits** 224:7 224:9 225:2,4 226:2,4
**existing** 99:4
**expect** 187:19
**expectation** 148:21 187:24 188:2
**expected** 104:2
**expense** 35:15
**expenses** 134:6
**expires** 228:25
**explain** 36:19
**explanation** 50:14,23 51:5 51:19
**extent** 186:18

**f**

**f** 41:19 227:3
**fact** 21:8,12 28:11 32:3 52:17 61:3 82:23 86:23 88:18 95:15 103:8 124:17 131:24 135:18

144:7 148:8,16 148:20 150:20 166:19 179:24 190:23,24 191:7
**fair** 38:4 147:10 151:21 204:14
**fall** 174:24 219:2
**false** 125:17,20 125:22 155:6
**familiar** 12:19 55:6 82:8 94:14 97:3 117:15 213:2
**family** 140:5 177:5
**family's** 121:10
**far** 15:23 21:13 26:17 43:15 47:15 56:13 58:6 82:10 90:18 101:12 102:4 121:21 131:22 137:22 153:19 155:25 158:6 165:2 173:24
**father** 75:20 82:14
**fbi** 127:11 129:25
**february** 1:21 7:5 55:11 67:12 208:6,19 209:9 219:9 221:2 223:10 227:20
**federal** 1:22 3:4 6:2 7:16,18
**fee** 139:3,4 152:10 153:6 153:11
**feel** 159:8
**fello** 115:24
**felt** 132:5
**figure** 198:22 221:7
**file** 88:18 186:25 213:10 214:5
**filed** 139:23 161:8 181:8 184:11
**files** 218:21
**filing** 6:7 196:10
**filings** 97:3 107:4
**fill** 111:12,17
**filling** 112:21 112:22 160:11
**finalized** 209:21
**finance** 81:2,10 182:9 224:23
**financed** 178:3
**financial** 23:11 24:6 32:21 33:11,16 34:14 35:3 36:17 48:16 63:23 64:12 65:21 67:25 81:16 122:14 123:8 123:15 179:11 188:22 189:17 224:10,11,21 225:12
**financials** 68:7
**financing** 24:3 24:7 49:12 58:11 59:3 80:13 125:3,13 132:18,22 135:19 138:22 145:21 146:9 146:11,16 147:13,22 148:9,13 153:3 153:17 159:14 165:8 172:11 173:8 178:10 178:12
**find** 47:2,5 87:12 115:15 126:17,19
**finding** 221:2
**fine** 168:9
**finish** 13:11 119:3
**finished** 79:14 122:17
**fired** 30:10
**firm** 8:20 63:19 117:24 171:24 193:13
**first** 9:17 19:3 24:16 35:21 37:20 38:9,12 39:19 40:13 41:16,24 42:3 42:4 46:10 56:7 57:16 97:25 99:11 106:13,17 108:9 110:21 120:25 123:25 136:10 147:21 150:10 158:22 169:10 171:6,6 171:8,25 175:5 178:3 193:21 215:15 216:24
**fisk** 1:8 3:16 41:19
**five** 16:24 80:25 99:24 100:6 136:11 139:15 140:15
**fix** 85:25 86:2
**fixing** 73:5

**flagstar** 156:23 156:24 157:3,8 157:21
**floor** 4:10,20 11:3,7 21:19 21:24 32:9 70:20 84:14,25 85:20,24 86:17 100:18,21 101:2,4,6 134:25 135:3,7 146:8,11 178:4 178:10 179:3,7
**florida** 103:8
**flushing** 1:17 4:19 8:22 12:9 13:13 14:14,17 14:19 15:9,12 23:17,25 24:7 24:8,13 25:13 25:23 26:5 31:9 33:23 36:9 37:4 38:7 38:13 39:19 57:16 58:8,10 58:15 59:3 64:17 68:5,12 74:11 75:7 80:11,13 145:16,17,21 147:18,21 148:2,10,13,17 149:22 150:4,9 150:11,18,21 157:24 158:7 159:12,24 162:9 163:21 164:18 165:4,7 169:8,10 170:7 170:11,12,17 190:13,19,25 191:5 192:5,8 192:20 193:14 194:5,11,15 195:7,12,18 199:11,16,19 199:21 200:6 201:11 202:18 202:22 203:4 203:11 204:15 205:8,10 206:21 210:17 211:2,6 212:14 212:20 214:25 215:17 218:11 218:20 219:15 219:17 224:10 225:16 226:7
**flushing's** 23:21
**flushing00116** 211:21
**flushing00121** 212:8
**flushing00123** 212:25
**flushing00127** 213:19
**flushing00130** 214:15
**flushing00135** 214:19
**flushing00162** 57:17,20 224:19
**flushing00187** 64:19
**flushing0168** 216:2
**flushing04043** 218:2
**flushing04590** 203:12
**flushing05955** 197:15
**flushing07258** 162:6 225:18
**flushing07269** 150:6 225:16
**flushing08560** 23:12,22
**follow** 89:6 113:17,24 114:2
**following** 114:8
**follows** 19:5 99:19 139:20
**followup** 9:22
**force** 6:15
**forged** 82:15,23
**forget** 130:14
**forgot** 64:8
**form** 6:10 160:8 204:20
**formation** 196:8,14 197:19
**formed** 158:22
**former** 132:3 186:9,15,24
**forms** 111:18
**formulate** 210:6
**forth** 146:17 227:9
**forward** 195:22
**forwarded** 194:17 195:18 197:21
**forwarding** 211:14
**found** 82:23 126:16
**four** 11:22 15:2 16:6,13,19 17:3 191:10
**fourth** 56:9
**frame** 26:14 116:3 129:9 131:18
**franchise** 100:10 141:21
**front** 35:9 37:11 88:5 89:9

**full** 40:19 58:15 59:22 80:10 208:5
**fully** 146:22
**funded** 151:19 152:14
**funding** 1:17 90:11 94:5,7
**funds** 20:25 21:4 29:11 32:17 90:10 91:14 140:19 140:24 141:14 142:21 147:18 153:24 156:12 178:17 179:21 180:18 181:4 187:4,19,22 188:3 190:9
**further** 6:9,13 93:7 122:4,7 192:25 220:6 220:21 221:10 227:14
**future** 69:2 86:15 92:2 104:7 136:19 225:14

**g**

**g** 223:2
**gathering** 196:6
**general** 30:7,13 217:5
**generally** 59:15 136:22
**gentleman** 117:15
**georgia** 127:8
**getting** 121:2 153:2 199:11
**gianelli** 146:14
**give** 22:21 30:7 78:3 79:8,12 112:14 183:15
**given** 37:20 38:13,15 146:2 170:17 184:3 189:4 223:13 227:12
**giving** 46:4 48:6 68:4,6
**glad** 42:20,21
**glitch** 137:21
**go** 18:10,18 22:9 24:20 33:25 36:22 39:6 48:21 49:24 54:14 56:25 57:9 63:9 80:16 82:2 90:24 96:14 101:18 102:18 114:7 116:14 118:13 118:15 122:21 122:24 132:7 135:23 137:4,7 139:6 144:17 149:13 150:11 152:4 153:8 154:18 155:4 156:12 158:14 161:11,14 168:10 170:20 172:13 175:11 182:8 192:25 202:5 205:10 206:6 211:20 220:10
**going** 9:3,15 12:3 14:10 16:4 17:18 18:3,13 23:15 35:2,11,13 41:3,12 49:6,7 49:18,23,24 50:18 60:8 64:9 69:5 81:13 85:25 86:9,10,12 88:22 89:11 97:21 99:10 107:16 110:10 115:15 122:10 123:6 132:15 133:5 134:17 135:20 136:25 137:25 140:20 143:5 145:20 148:12 154:21 156:5 158:2 161:15,18 166:9 168:18 171:5,6,22 172:10,20 181:21,23 187:15 194:14 197:6 198:7 199:24 201:24 202:14,25 210:20 215:5,6 216:13
**gold** 1:14,14,15 1:15,15,16 4:6 4:7,7,8,8,9 69:19,20 116:8 175:20,22,24
**gonna** 59:4
**good** 7:23,25 8:6,8,14,18 68:8 114:22 193:10 196:3 208:3 220:17
**google** 114:23 114:24 115:7,8 115:17
**gotcha** 119:7
**governmental** 127:10
**grant** 14:8
**granted** 180:2
**great** 217:18

**gross** 35:15,25 36:3,15
**group** 1:15 4:5 4:8 8:16 41:21 42:14,18 47:13 110:18 180:21
**guaranteed** 181:15
**guarantor** 176:7 202:8
**guaranty** 100:9 101:5 141:22 141:25 143:11 143:15 144:12 145:2,7,10 192:5
**guess** 60:22 75:24 125:24
**guns** 127:17,25 128:5
**guy** 198:14,18
**guys** 17:10 196:4

**h**

**h** 19:2 72:20
**half** 34:21 51:24 104:15 188:25
**hand** 22:19 23:21 24:25 49:8 70:11,13 137:3 227:20
**handed** 23:15 38:19 40:10 49:5 54:22 63:17 80:24
**handing** 23:14 57:13 198:9 199:25 203:8 207:7 210:22 215:11 216:19
**handled** 182:2 182:3
**hands** 80:4
**happen** 201:14
**happened** 114:16 131:25 157:7,13 170:7 185:18
**happening** 13:21,23 14:11
**hard** 79:20,21
**harry** 1:13 4:14 4:14 8:24 106:6 210:3,5 210:8
**hear** 17:13,20 18:4,4 42:23 132:20 186:18
**heard** 133:2 173:2
**hearing** 175:6,7
**held** 2:11 18:22 22:13 34:5 39:10 48:25 54:18 57:5 63:13 73:24 78:7 80:20 83:9 87:24 96:18 98:10 101:22 109:10 116:18 117:13 118:21 132:11 136:3 139:10 144:21 149:17 158:18 168:14 170:24 175:15 220:13
**help** 196:6 219:14
**helped** 113:6
**hereinbefore** 227:9
**hereto** 6:5
**hereunto** 227:19
**hey** 113:18 114:11
**hi** 112:12 217:23
**highlight** 35:13 46:9 155:9
**highlighted** 24:25 25:3 41:14
**highway** 4:15 219:4,8
**hills** 71:22
**hire** 9:19,24
**hired** 30:10 131:12 132:2
**home** 198:16
**honor** 7:24 10:7,20 14:13 16:3,10,18 17:6
**honorable** 3:4
**hopeful** 68:19
**hoping** 68:24 69:16
**hour** 14:23 15:7
**hours** 11:22 12:8,12,14,20 13:12,13,15,24 14:5,11 15:2 15:20,22,22,25 16:6,14,19 17:3
**house** 73:2,4,7 73:8 74:5 95:4 95:6,13 103:11 118:9,13 142:18
**household** 140:5
**houses** 118:2,2 118:13 119:21
**hundred** 107:6 200:17 201:10 201:25 202:8 202:14,19,22 208:6,19,23

210:13,18 215:22 216:3,5 216:11 218:24
**hunting** 78:2,5 95:4 142:6
**hwy** 1:4,18 3:13,18 54:24 55:4 224:17
**hylan** 1:6,6,7,7 1:7,8 3:14,15 3:15,15,16,16

**i**

**iag** 8:4
**iag000049** 171:19,25 225:21
**iag001617** 55:22
**iag001807** 40:7 40:13 224:13
**iag002563** 34:14,20 224:12
**idea** 38:3 45:16 137:19 170:16
**identification** 23:13 34:15 40:8 49:15 55:5 57:21 64:14 81:12 89:16 97:10 102:24 110:15 122:16 136:20 150:7 162:7 169:3 171:20 194:23 197:11 203:6 207:11 215:9 216:18
**identify** 7:21 186:8
**impacted** 67:14
**important** 13:17
**incapable** 112:22
**incentive** 199:14,20
**inception** 181:17,17
**incident** 131:20
**income** 24:17 25:5,18,24 36:23 88:18 121:14 189:10
**incorporated** 197:17 203:18
**incorporation** 196:10 197:10 197:16 226:5
**incorrect** 28:18 167:16,18
**incurred** 53:22
**index** 7:9 81:21 95:20 218:7 224:2,7 225:2 226:2
**indicate** 31:18 84:23 186:12
**indicated** 85:2 87:13
**indicates** 173:10
**indicating** 25:18 68:13 84:20 114:19 166:12 170:12 170:13 171:10 171:15
**indication** 173:16
**individual** 99:24 100:6 131:2
**individually** 82:3
**individuals** 130:22 131:2 205:12,20
**info** 198:15
**information** 21:19 60:20 64:24 65:4,17 65:24 68:6,12 83:24 113:4 115:3 125:15 127:9 195:7,15 195:19,24 196:5,6 197:3
**informed** 21:21 22:4 174:12,23
**informing** 180:9
**initially** 182:8
**injunction** 146:15
**inquiry** 171:12 171:14,19 225:21
**inserted** 226:15
**insight** 217:5
**insisted** 84:15 84:20 86:18
**insurance** 177:11
**insured** 176:20 176:22
**intend** 133:12
**intended** 147:17 148:17 160:15
**intention** 140:22 187:23
**interest** 69:10 85:14 98:25 101:3 107:18 108:19,23 160:25 161:4,5 170:14 175:20 175:20 200:25 201:5 226:20
**interested** 227:17
**interests** 69:19 219:6,8

**introduce** 94:9 94:10
**introduced** 94:8,12
**inventory** 11:2 11:18 20:19 21:5 28:7
**invest** 141:18
**investigated** 130:9
**investigation** 129:18 130:3 131:9
**investments** 118:5
**involved** 21:9 33:4,7,14 37:17,23 59:15 121:5 164:18 165:14
**iris** 1:5 3:18
**island** 1:8 3:17 41:21 42:14,18 43:3,4 46:17 47:4,7,12 50:5 50:15,20 51:3 51:9,17 52:5 53:20 56:7 110:18 172:24 172:25 173:11 173:20 180:21
**islip** 1:23 3:5 7:16,18
**issue** 113:19,22 129:18,20 144:8,13 184:9
**issued** 146:15
**issues** 17:19 144:14 174:9 174:11,15,16 174:25 220:22

**j**

**j** 63:18
**j.p.** 1:18
**jamaica** 3:9,9
**james** 3:4
**january** 67:12 173:13,14 174:24 191:16
**jeffrey** 3:21 8:2
**jmw** 1:11
**job** 183:4,6
**joe** 115:24
**joint** 66:12 217:17
**jones** 1:14,17 32:20,24 59:15 63:19 65:4 164:8 218:3,8 218:9,14,23 219:12
**jory** 1:5 3:14 98:14
**joseph** 5:11 7:12 108:15
**josh** 26:18 27:23 31:4,17 42:25 43:9,25 44:21 46:6,21 47:16 48:2 50:8 52:10 53:22 54:11 56:15,21 61:5 61:12,19,20 62:4,13 63:3 67:6 100:16 112:6 113:11 113:18 114:10 133:22 135:4,5 164:8
**joshua** 1:5 3:14
**jr** 4:14
**judge** 105:6 146:14
**judgment** 125:11,11
**jump** 156:16
**jun** 94:23
**june** 163:8,11 163:13 164:12 166:11,13,20 167:6,10,14,15 169:22,23 219:7
**jury** 18:10,11
**justice** 81:22
**justify** 32:18

**k**

**k** 41:19 86:18 86:20 87:13 89:5 110:18 213:3,10,13,16 213:22 214:5 223:2 226:18
**kataev** 3:10 8:8 8:9 9:10 10:3,6 10:19 12:6 13:3,7,10,16 15:25 17:5,23 195:2 204:19 207:5 211:22 218:16 220:3 220:17 221:13 221:15
**keep** 41:2,5 91:24 92:2 206:3,8
**kendra** 205:3
**kept** 30:11
**key** 182:19,21
**khan** 1:5 3:18
**kill** 128:18,21 129:2
**kind** 61:22 86:20 94:11 188:3 209:4
**knew** 103:21 125:22 146:19 186:12 198:25 201:24

**know** 9:10 10:17 11:9 12:25 16:8 19:23 21:13 25:10 26:17 27:8,11,20 30:4,6 33:3,6 34:22 36:20 37:13 38:6 40:5 42:17 43:16 45:4,6,8 45:21 47:9 56:13 58:7,25 59:9 60:19,25 61:2,14 69:12 70:8 73:22,23 82:4,11 90:18 92:23 93:21,24 95:2,25 96:4 101:12 103:5 104:4 105:3,20 108:16 115:6,7 117:18 120:8 120:16 121:22 121:25 122:2 122:17 126:9 126:14,23,25 127:4,5 128:2 128:4,6,7 135:6,8,8,12 137:22 140:14 143:22 144:5 144:16 145:8 146:18,20 149:5,7 151:7 154:16 156:19 156:24 157:13 158:10,11,13 159:12 164:24 165:3 173:23 173:24 174:2 174:10 179:15 179:16,24 180:5 181:2,6 184:2,6,14,16 184:19,21 186:13,16,19 186:20,22 187:4,8 189:24 190:13,15 192:4,18,22 193:17 195:4 200:2 201:18 202:11,12 205:23 206:16 206:17 207:12 207:22,22,24 209:25 211:19 215:11 217:7

**knowledge** 21:6,7,12,14 120:5 121:24 166:14 173:4 174:6,8 180:8 183:23 187:25 192:15 200:7 202:15 210:13 214:11

**kwun** 21:17,22 22:5 110:17

**l**

**l** 58:16 59:8 81:23,24,24 223:2

**l&co** 63:18

**l's** 59:14,16

**landlord** 142:5 142:17

**lane** 78:5 95:5

**laptop** 149:25

**late** 76:23,25

**latest** 9:8

**laurie** 1:13 4:6 130:17,18 132:17,21 133:3 153:21 221:4

**laurie's** 93:23 94:6 152:25

**law** 2:10 4:5 8:16 17:15

**lawsuit** 39:23 40:2,4 66:24 67:10 82:14 87:3,6 95:16 96:2,7 97:24 217:10,12

**lawsuits** 144:7 144:11

**lawyers** 108:14 208:6 209:19 209:25

**lease** 107:16 134:9

**leased** 71:6

**leases** 67:19 181:13

**leasing** 1:5,18 3:14,18 40:14 49:20 58:21 67:18 69:22 70:12 88:15 150:13,17 154:2,19 155:5 156:13 161:24 168:20 169:2 170:2,3 215:17 219:3,6 225:19

**leasing's** 156:3

**leave** 16:8,11

**leaving** 152:12

**left** 11:22 16:7 24:25 121:21 122:3 171:9,11 193:6

**legal** 3:7 5:8,10 7:12 8:10

**lend** 20:14 68:5

**lenders** 94:13

**lenny** 107:11 107:14,16

**leonard** 107:14

**letter** 217:3,23

**letters** 140:2

**level** 146:4
**levine** 34:24 106:7
**lexington** 3:19
**lib** 137:4,4
**lib000001** 136:11,18 225:15
**lib000332** 49:8 49:14 224:15
**libertas** 1:17 12:10 14:13,17 14:21 26:14 49:10,10,12 90:11 91:14 94:4,4,7 132:16,19,23 133:2,6 135:19 136:9,10,24 138:19,21 140:18 141:11 141:17 142:9 142:21,24 159:11,20 165:6,15 184:9 187:4,18,22 190:10,13,19 190:25 191:4 191:11,15,19 191:23 192:16
**lic** 1:15 4:8
**license** 111:2,2 113:20 114:3 115:2,16 117:13 118:22 118:25 119:9 119:13,15 120:6 145:25 177:15,18
**licensed** 118:19
**lien** 175:23
**liens** 146:16
**life** 127:15 131:3,14
**limited** 157:16
**linden** 4:5 8:16
**line** 20:5,7,23 21:24 24:17,24 25:2 32:9 35:12 36:22 44:11 58:12 60:9 104:11 149:3 150:18 150:25 151:5 151:13,15 155:21 158:8 189:8 194:11 199:6 201:17 202:7 211:17 228:5
**lines** 35:12 70:14 138:10 160:17 162:15
**list** 69:9 72:3 76:2 77:7 118:2,8 163:3 195:7
**listed** 44:16,18 46:2,16 47:12 50:4,19 51:9 51:16 71:21 73:10 74:4 82:24 84:15,21 84:24 85:5 86:13 124:12 175:25 176:4 204:3
**listening** 17:14 17:15,16
**litigation** 95:12
**little** 1:17 7:14 14:24 39:3 93:7 139:16 185:11 191:11
**lived** 73:6,7
**living** 73:4 95:7
**llc** 1:4,4,5,6,7,7 1:7,7,8,8,8,9,14 1:15,15,15,16 1:16,17,18,18 3:7,8,13,14,15 3:15,15,16,16 3:16,17,17,17 3:18,18 4:7,7,8 4:8,9,9 5:9,10 8:10,12 41:20 54:24 55:4 58:21 160:16 160:21,23 168:20 169:2 219:4,7,9 224:17 225:20 228:1
**llp** 1:17 3:12 4:18 8:21 193:13
**loan** 41:20 42:13,15 44:17 44:18,20,23,25 45:2 46:3,3,16 47:12 50:4,11 50:20 51:2,9 51:16 52:9 56:6 67:25 80:5 119:22 136:23 145:16 145:17 154:23 156:7 163:21 164:18 165:4 165:15 173:12 173:17 192:6 199:11,16,21 205:9 211:6,11
**loaned** 22:7
**loans** 58:4 174:4 175:2 191:8
**located** 7:17 118:16,18 182:11 217:18
**long** 16:25 73:17 76:19 121:25 128:15
**look** 27:12 35:4 35:11,17,25

41:6,9,11,15 50:2 54:10 90:2 110:19 114:15,18,24 137:2 150:20 156:5 187:11 195:3,25 197:14,20 203:10,25 206:17 207:25 211:19 212:8 212:25 213:19 214:14 215:12 215:14,25 216:2,21 217:25 218:13
**looked** 12:18 12:19 70:9 119:20 165:21 206:20 211:19
**looking** 32:23 33:15 35:12 42:16 48:15 90:7 107:9 114:9 190:14
**looks** 151:2,4 172:6,8 197:21
**loss** 48:10 58:21 88:6,10
**losses** 53:21 61:21
**lost** 61:4,10
**lot** 71:11 87:16 131:7,8 144:14
**louis** 117:16 124:2,6,7
**lucindo** 81:22

**m**

**m** 2:12 3:4 72:20 81:24 223:2 227:5,25
**made** 9:21,25 10:15 12:23,24 25:23 31:10 42:10,13 61:12 188:14 192:11 216:9
**maiden** 72:15 72:17
**main** 40:16
**make** 24:21 53:19 62:12 63:4 65:18 95:21 111:8 112:12 114:3 138:5 139:16 149:10 163:21 183:11,16,19 183:25
**management** 1:9 3:17 172:25 173:2 173:11
**manager** 169:22
**managers** 163:4 182:18 183:12
**manifested** 128:13
**marc** 1:13 4:6 132:3 137:16 175:19,25 182:5 184:25 185:2,7,12,15
**marc's** 137:19
**march** 57:24 63:23 64:4,13 66:24 67:16 74:8 80:12 145:17 148:2 150:13,14,21 151:6 152:6,16 153:11 159:23 164:18 195:14 195:20 199:8 215:8,16 224:19,21 226:11
**mark** 57:14 64:9 81:6 89:11 97:7 171:7 194:19 197:7 203:2 207:7 215:6 216:14
**marked** 23:12 34:12,15 40:4 40:8 49:6,15 55:4 57:11,20 64:14 81:11 83:14 89:15 97:9,24 102:23 110:10,14 122:11,15 136:15,19 150:6 162:3,6 168:23 169:3 171:17,20 194:22 197:11 198:8 199:25 203:5 207:10 210:21 212:8 215:9 216:17
**marks** 184:14 184:16,20,24 185:23 186:15
**marriage** 227:15
**married** 72:14
**match** 54:11 215:23
**matched** 163:22 184:5
**matches** 213:8
**matter** 7:7 12:4 127:16 131:24 193:15 207:20 227:18
**matthews** 73:15 81:25 82:4,8
**maximum** 189:7

**mazerati** 176:8
**mean** 17:17 41:5 69:4 72:24 85:21 90:7 104:5 108:7 113:12 120:11 123:20 134:19,21 140:22 145:12 166:11 172:8 177:3 178:22 181:18 183:12 184:2 188:14 189:19 196:12 196:22
**means** 20:7 74:20 166:21
**meant** 44:5 198:25
**mechanic** 71:14
**meet** 106:8 184:23 221:6
**member** 160:21 160:23 162:18 169:15
**members** 99:5
**mention** 186:14
**mentioned** 2:12 118:21
**merchant** 139:18,23 140:2,6
**merchant's** 140:8
**merckling** 1:13 4:6 132:3 175:19 176:4 183:16,22 184:4 186:8
**merckling's** 137:16,19 175:25
**message** 198:9 198:10
**met** 104:5
**michael** 1:13 4:6 93:23 117:9 152:25 221:4
**middle** 203:20 216:24
**million** 47:21 48:3 51:23 52:3 53:13,20 54:6 190:10,14
**minus** 36:7,18
**minutes** 16:24 26:7 112:11
**modifications** 119:22
**modify** 109:16
**moment** 16:23 29:16,24 30:8 59:11 87:15 131:7 176:19 187:10 215:12
**money** 10:24 11:4,16 19:15 19:20,21,21 20:13,13,14,14 20:18 22:7 27:8 28:15,16 40:20,21 43:4 43:7,12,20 44:2 45:17 46:4 47:16 48:4 50:15 51:13,20 52:9 52:10 56:15,18 56:20 61:5,10 62:5,14,20,22 63:3 68:6 69:3 69:16 70:11,20 78:23 79:8,13 79:20,21 80:2 90:22 91:10,24 91:25 92:8 95:2 133:8,13 133:23 135:14 135:20 141:10 141:17,24 142:9,19,20,23 143:3,7 148:17 149:5,8 151:23 153:14 154:14 178:23 182:23 183:2,4,8,15,24 184:3 187:4 188:7,8,9,15 189:12,20 190:12,19,23 190:25 191:3 191:20,24 199:9 209:8 226:24
**moneys** 19:14 21:24 26:8 41:2 43:8 48:5 51:6 62:4 133:25 134:2 178:20 179:13 180:20 192:9 192:13 202:9
**monies** 19:9
**month** 24:18 25:9 32:11 33:10,17,19 35:5 44:13 49:21 52:2,3 100:5,7,13,21 100:25 188:13 209:11,12
**month's** 154:22
**monthly** 209:10
**months** 134:22
**morgan** 1:18
**morning** 7:24 7:25 8:6,8,14 8:19 196:3 208:3
**mortgage** 72:6 72:9 77:7,9,12 77:14,15 79:19 80:6 130:14

**mortgages** 72:3
**motilal** 81:24 82:4
**motion** 221:11
**motor** 1:5,18 3:13,18 40:14 49:20 58:3,16 58:20 67:18 69:22 70:12 88:15 123:10 150:12,17,22 150:25 161:24 168:20 169:2 170:3 215:17 219:3,6 225:19
**motors** 1:4,15 1:15,16,16,16 3:7 4:7,8,8,9 7:7 8:11 43:2 69:20,21 116:23 122:15 123:16 124:5 126:2 141:22 151:24 175:21 175:22,24 178:7 194:5,16 196:15 197:10 197:17,25 200:6,17,25 201:6,11 202:23 203:18 204:18 206:21 207:2,18,20 208:5,15,19,25 210:14 212:2 212:15,23 213:7 217:19 225:13 226:6 228:2
**move** 205:7
**multiple** 12:4,7 14:3

**n**

**n** 3:2 4:3 5:3 19:2,2 72:20 81:23 110:18 223:2,2
**n.a.** 1:18
**name** 7:12 72:12,14,15,17 73:24 78:8,8 108:16 117:16 124:2,6 130:14 136:9 137:13 137:14,17,20 162:20 174:19 175:25 193:11 204:5,8 228:2 228:3
**names** 128:3 130:11 131:6
**narrow** 134:20
**nassau** 83:17 95:20 102:9 105:8 184:8 218:6
**national** 94:15 94:15
**nature** 199:4
**necessarily** 19:20
**necessary** 159:2,5
**neck** 217:18
**need** 9:19,23 11:8 14:17 16:5 17:23 24:21 47:4 85:17 119:15 159:9 160:23 165:10 193:20 196:7,9 215:22 220:23
**needed** 10:16 54:8 111:2,3 112:20 113:5 135:10 159:7 159:11,12 160:20 183:5 185:12 195:8 195:23 196:7 197:3
**negative** 36:24
**negotiate** 119:21 204:4
**net** 60:9 133:24
**netted** 62:16
**network** 149:9 158:4
**never** 21:21 22:4 37:13,19 79:14,15,24 80:4,6,6 84:4 98:15 127:24 160:2 172:2,4 174:16,23 210:4
**new** 1:2,23 2:13 3:5,20 4:11 7:11,18 19:4 36:6 39:23 81:2,9,17,20 83:16 95:20 107:15 115:2 116:8 221:2,3 223:4,22 224:22 227:6 228:1
**night** 12:20
**nissan** 102:6,23 104:16 105:14 107:19,21,24 108:19,24 109:23 225:8 226:20
**normal** 118:3 134:5,13
**north** 49:19 58:20 67:18 69:21 70:12 88:14 150:12 153:25 154:18 155:5 156:13

156:22 161:24 168:20,25 170:2,2 225:19
**northshore** 1:5 1:18 3:13,18 10:24 11:5,16 19:10,13,19 20:18,20,24 21:4,23 22:6 24:4,10 25:9 25:19,25 26:8 26:13,15,22 27:5,9,13,25 28:8,11,20 29:2,6,10,16 32:3 39:2 40:14,17 42:13 43:2,5,7,11,12 43:21 47:17 48:7 52:4,12 53:21 58:3,10 58:16 60:4 61:7,22 66:22 67:13,25 68:5 68:12,14,15,18 68:22 70:23 71:10 80:14 84:5,7,24 85:14 86:10 100:22,23 111:4,8 123:10 137:23 138:19 138:20,22 139:18 140:21 140:24 141:22 145:23 146:17 147:14 149:23 150:17,22,24 151:4,24 154:20 156:2 157:3,11,15,20 158:9,12,23 160:3 161:8 174:3 178:7,16 178:21,25 179:9,12,13,18 180:11 181:8 181:12,13,16 181:17 182:2 185:6,8 187:19 188:22 189:17 190:21 191:4 199:6 210:25 211:9 212:2,15 212:23 213:7 215:17 216:6 219:3,6,18,19 226:22
**northshore's** 44:14 48:3 59:2 178:17 179:22 180:18 181:4
**northshorem...** 112:8
**notary** 2:13 6:15 19:3 223:22 227:5 228:25
**note** 77:11,13 77:14,21
**noted** 222:3
**notes** 66:19
**notice** 2:11 23:20 69:9
**novelty** 130:13 130:15
**november** 26:13,20 29:6 59:21 60:24 89:25 91:6 92:15,18 93:9 93:17 94:19 110:13 111:16 111:25 159:21 190:8 208:4,15 225:10
**novicky** 194:4 195:19 198:11 206:20,25
**number** 7:9 25:8 26:4 27:23 30:6,7 30:13,19,21 32:11 35:21,22 36:2,11 40:15 48:18 60:12 61:16 66:20 81:21 94:13 95:21 130:10 136:10 171:7 171:12,13,19 180:10 211:14 218:7,17 225:21
**numbers** 36:20 39:18 54:11 70:7 71:17
**numerated** 58:4
**numerous** 106:4
**ny** 3:9,20 4:11 4:16,20
**nyc** 1:14 89:11 89:15,20 149:10 153:8 153:12,21,25 154:5,12,15 225:6
**nytlr** 91:4

**o**

**o** 19:2,2 81:23 81:24 223:2
**o'sullivan** 21:18,21 22:5 32:25 112:17 174:20,23 178:19,22 181:3 184:4
**oast** 4:7
**oath** 23:6 223:10
**objection** 128:22 166:5

204:19 207:5 220:3
**objections** 6:10
**obligated** 20:24 43:5 77:9
**obligation** 27:14 77:16,19 145:11
**obligations** 27:10 99:8 190:7
**obtain** 24:7 58:10 67:24 106:13 125:12 145:21 148:8 165:3 194:11
**obtained** 24:3 81:14 89:19 150:17 179:19
**obviously** 113:19
**occur** 173:25
**occurred** 26:19 80:6
**occurring** 133:21
**october** 24:18 25:19 31:9,19 33:12,12 35:6 48:16 49:21,25 50:19 51:2,8 51:16 56:3 62:14 110:19 111:11 124:10 126:22 164:22
**offer** 199:9,13 199:18
**offered** 185:17 185:20
**offhand** 59:7
**office** 71:10,14 81:2,10 98:12 102:10 182:13 206:2,4,5,6,9 224:23
**officer** 132:2,3 186:9,15,24
**offset** 179:12
**oh** 72:16 87:7 105:3 118:6 122:25 126:23 184:6 193:23 209:15
**okay** 9:2 10:11 10:21,22 11:14 11:20 15:6,13 16:13,17 17:21 18:16 20:7,16 20:16 23:19 25:4 32:8 40:19 41:18 42:25 45:24 47:24 49:12 63:8 67:16,24 79:15 81:18 82:7 106:24 123:2 137:7,13 138:8 141:24 151:18,21,23 166:24 168:6,9 172:16 173:18 193:23 203:9 203:13 207:25 210:23 216:20 218:15 220:7
**old** 77:23 78:5 107:11,13
**ones** 84:6 131:2
**online** 34:11 41:7 114:9,15 114:18 149:23 160:10
**open** 145:25 146:5 195:24 196:13 197:3 210:25 219:18
**opened** 156:24 157:6 181:16 196:25 204:23 204:24 205:21 207:3
**opening** 157:2 157:10 194:4 194:10,15 195:8 199:10 199:15,20 211:16 217:17
**operate** 55:18 114:3 120:9 121:22
**operating** 24:16 40:17 55:19 117:9 119:13,16 120:15,18,19 120:24 134:5 134:12,15,23 134:24 145:23 157:16 158:23 159:9,15,18 160:3,5,9,16 161:22,23 162:5 163:22 164:21 165:9 165:10,17,23 166:3 168:19 168:25 169:6 170:17 188:16 207:18 211:25 213:8 214:15 219:20,24 225:17,19
**operation** 21:9
**operations** 29:11 140:9 155:4 156:3 157:20 158:8 158:12
**operator** 21:8 21:15
**opportunity** 123:4 161:16
**opposed** 185:16
**oral** 170:11
**orally** 65:13

**order** 2:11 19:15 24:7 65:8 67:5,11 81:20 82:13,21 105:6,13 146:20 147:8 147:15 154:24 159:13 163:20 165:3 187:21
**ordinary** 139:24
**original** 98:8
**originally** 153:15 178:2,7
**origination** 152:10
**outcome** 227:18
**outlet** 69:23
**outside** 121:17
**oversaw** 55:15
**oversight** 55:15
**ovington** 4:19
**owed** 21:24 43:21 68:13 72:6 91:25 133:23 178:20 179:13
**own** 64:25 71:6 74:17,23 75:18 75:22 76:21 77:2 78:12 101:5,6 118:5 119:12
**owned** 30:10 43:10 74:12 82:25 84:7 104:15 117:4 170:3
**owner** 21:8,10 21:15 84:15,21 84:24 85:5,24 86:7,13 88:14 95:13 96:8 97:15 124:12 124:15,17,20 124:23 125:4,7 125:18,19 142:5 165:23 181:12 200:17 201:11,25 202:14,19,23 203:5 210:14 210:18 212:9 212:11,15,17 213:5 214:20 215:23 216:3,5 219:19,24 226:8,22
**owners** 97:20 166:7
**ownership** 75:8 75:10,12,15 84:5 97:17 116:23 121:2 163:23 166:17 175:20 200:25 201:5 207:19 212:23 213:24 215:3 219:6,8 219:16
**owning** 74:19
**owns** 72:25 75:5 78:17 219:2,4

**p**

**p** 3:2,2 4:3,3 5:3,3 58:16 59:8,14,16
**p.c.** 4:5
**p.m.** 194:22 207:10 215:8 216:17 217:22 221:25 222:3 224:19 225:23 226:10,11,13
**packet** 23:15
**packets** 171:5
**page** 24:16,17 40:13 41:13 49:24 51:15 56:2 57:16 58:20 64:16,21 65:20 80:25 84:11 88:12 93:8,8 94:18 94:18 97:22,25 98:2,2,3 99:11 102:18,19 110:9,20,21 123:25 124:4 137:2,25 138:9 138:15 139:15 140:15 150:10 162:14 163:3 166:10 169:10 169:13,14,21 171:6,9,25 172:14,21 203:11 216:24 224:3,9 225:4 226:4,16 228:5
**pages** 98:4 197:14
**paid** 21:25 26:8 28:13,21,22 30:2 53:5 62:4 62:7,22 63:4 77:14,15,20 78:23 88:19 93:4,14,24 99:21 101:2 133:23 142:5 152:25 173:11 173:12 175:2,9 178:13,15 179:7,18,22 180:11,13,14 190:6 191:10 191:19,21,24 226:24
**paper** 34:11 210:7
**paperwork** 111:7

**paragraph** 84:10,13 99:11 139:17 140:15 218:22
**paralegal** 5:8 5:10
**park** 4:10
**part** 13:2 68:11 87:3 93:3 130:5 132:20
**particular** 90:5 92:8 110:3 129:18 149:7 172:13 177:14 179:7 180:9
**parties** 6:5 12:4 12:7,22 13:4 14:3,5 101:16 218:25 227:16
**partner** 9:21,25 10:14 217:18
**partners** 1:17 93:18,22 152:18 200:22
**party** 20:8 76:15
**pass** 104:2
**passed** 77:4
**passing** 104:6
**past** 91:25
**pay** 26:16,23 27:5 28:15,16 28:20 29:2,7 29:12,18 30:14 31:8,16,25 32:12,15,16 38:25 41:8 43:5,7 46:5 48:7 56:17,19 62:18 77:9,17 77:20 100:12 100:17 142:13 142:17 153:20 153:21 173:20 178:18,18,20 179:21 180:6 180:22 181:4 187:21 188:17 190:9,19,24,25 191:4,7 209:8
**payable** 67:18 72:3
**paying** 27:13 31:3,4 47:17 48:4 52:10 56:15 97:19 99:4 190:5,7
**payment** 93:16 99:12 154:24 156:7,22
**payments** 61:24 156:8 191:10,13,16 205:8 209:10 209:14
**payoff** 179:3
**people** 67:6 127:16,20 128:21 131:5,8 131:13 160:20 160:24 183:3
**people's** 128:2
**percent** 107:6 152:22,24 161:4,4 162:20 162:21 166:18 169:18,19 170:3,4,5,14 200:17 201:10 201:25 202:8 202:14,19,23 207:19 208:4,6 208:15,19,23 210:14,18 212:9,10,15,16 213:5,25 214:20,21 215:22 216:3,5 216:11 218:24 219:3,5
**percentage** 160:24
**percentages** 161:9
**performance** 92:21,23 93:10
**period** 52:5 187:8
**permission** 9:19,23 10:16
**person** 130:8 172:18 183:7
**personal** 66:4,7 140:5
**personally** 90:25 119:23 177:4 181:14
**persons** 204:2
**phone** 65:15 92:6,9,11 201:19,20
**phrase** 11:13
**pick** 163:16 164:11,12
**picked** 98:13
**picture** 9:11 172:23
**piece** 75:6
**pin** 28:12
**place** 2:12 79:21,21,24
**plaintiff** 81:24
**plaintiff's** 54:25 210:21
**plaintiffs** 1:10 2:9 3:7,13 8:5 8:10 220:19,21 221:16,17
**plan** 11:3,7 21:24 32:9 70:20 84:14,25 85:20,24 86:17 100:18,21 101:2,4,6 146:8,11 178:4 178:10 179:4,7

**plans** 21:19 135:2,3,7
**plate** 177:18
**plates** 177:15 177:19,20,23
**plaza** 1:22 3:4 7:18
**please** 7:20 22:19 57:2 58:15 78:4 87:21 96:15 102:19,20 107:22 108:21 109:7 111:12 112:12 116:15 122:11,22 132:8 135:24 136:15 144:18 150:3 162:3 170:21 196:6 196:19 207:19 215:19,21
**plus** 36:15,15 53:12 54:6 187:20 197:9 209:12 226:5
**pocket** 198:15 198:21,25
**point** 10:20 29:21 31:22 42:25 61:2 66:23 67:3 68:25 69:2 70:3,25 74:7 85:8 86:4,15 87:2 101:10 111:24 114:12 114:13 115:14 115:21 124:16 125:9 131:15 133:20 134:15 146:12 157:5 159:8,17 178:12 207:24 208:17 216:8
**police** 132:2,3 184:7,8,11,23 185:21 186:3,9 186:15,24,25
**policy** 177:12
**portal** 19:15
**portion** 179:11
**position** 142:2 181:23
**positive** 36:11 36:15 37:4
**possession** 176:13
**possible** 181:3 217:4
**practice** 2:10 221:11
**precisely** 10:20 135:8 157:14
**premier** 1:16 116:23 122:14 123:16,23 124:5 126:2 225:12
**preparation** 37:17,23
**prepare** 37:25 59:14 60:4,20 65:5,8 113:5 159:18
**prepared** 32:24 59:9,13 160:5 164:24 165:9 212:4 213:16 213:17 214:8,9 214:16
**preparing** 59:16
**present** 5:5 80:11 82:3 106:2
**presented** 25:13,22 26:4 33:23 36:14 37:3,12 38:8 39:19 40:12 49:11 68:16 102:2 104:23 105:2,17,22,23 143:23 161:17 171:4
**presenting** 75:7 102:11
**presumably** 111:18 192:16
**presumes** 10:16
**pretty** 107:10
**previous** 88:5 193:18 200:20 215:20
**previously** 23:7 56:14 83:14 89:3 90:9 100:19 110:25 118:21 127:14 141:2 154:4 194:2 195:6 198:8,9 199:25 200:4 201:8 210:21,24 217:19
**price** 99:12,19 100:11 140:2,7
**primary** 157:19
**printout** 149:21
**prior** 26:13,14 26:19 29:6 52:2 83:23 97:20 148:13 160:2 166:3 201:16
**pro** 4:14 8:25
**probably** 59:23 59:24,24 60:5 60:7,18 70:11 131:19 140:15
**problem** 29:14 167:9,14,17,19

167:20,21 168:2,3,4,4,6
**problematic** 170:13
**problems** 29:20 29:22 31:22,23 134:3
**proceed** 11:21
**proceedings** 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 102:4 193:7
**proceeds** 46:21 50:8 56:22 205:9
**process** 182:22 183:2 211:16
**produce** 110:6
**produced** 87:8 97:23 150:9 172:11 181:23 218:20 226:15
**production** 88:23 109:4 181:21,25 209:17 226:24
**profit** 24:16 25:5,9,18,24 31:10,19 32:18 36:23,23 58:21 59:7 60:10 61:12 88:6,10 88:11 188:19 188:22 189:7
**profitability** 48:13
**profitable** 48:17
**profited** 61:7
**projections** 188:12
**proof** 209:13
**properly** 183:11
**properties** 119:20,21
**property** 72:11 73:10,14,16,23 74:4,20,23 75:6,13,14,18 75:22 76:4,6 76:14,22 77:3 77:8,22 78:7 78:13,21,24 79:9 82:24 95:10 96:8 142:6
**provide** 10:24 11:4,16 65:7 89:5 101:6 127:9 138:22 159:13 173:8 181:24 197:2 205:19 212:19 217:5
**provided** 11:3 11:6 19:9 20:17 21:5 23:17 24:2 34:9,18,20,23 34:25 35:3 36:9 38:7 49:9 57:15 59:2 60:16 64:17,24 68:11 83:13,16 85:3 90:11,13 96:25 106:24 107:3 110:8 125:16 136:7,9 158:7 162:10 170:7 171:24 198:4 214:25 217:3 219:15
**providing** 20:8 20:10 24:6 65:3 80:13 140:20
**public** 2:13 6:15 19:4 118:4,7 206:13 223:22 227:5 228:25
**publically** 115:11
**publicly** 115:4 206:11
**puccio** 57:24 58:6 88:8 195:12 196:18 198:18,21 199:2,10,14 200:21 201:2,4 207:17 208:14 210:12,17 211:15 215:15 215:21 216:22 217:12
**pulled** 102:9
**pulling** 36:17
**purchase** 10:25 11:5,17 19:10 19:16,22 20:19 21:5 55:11 79:9 95:10 96:23 97:9,18 99:2,12,19 100:11 101:2 102:6,22 109:22 118:14 140:2,7 143:25 145:3,6,13 209:9 225:7,8 226:25
**purchased** 20:20,22 55:10 70:19,24 73:16 73:19 76:8,11 76:16 98:24 99:3 172:15 178:6,9,10 182:7 208:5,18 208:23

**purchaser** 79:8 139:22
**purchasing** 99:18
**purpose** 68:4 100:17 133:5 135:15 139:25 140:9,24 141:25 142:7 145:20 185:12 194:10
**purposes** 84:25 85:6 140:4,6
**pursuant** 2:9 104:14
**pursue** 163:20 192:17
**pursuing** 192:20
**put** 29:15 32:21 33:10 40:20 43:20 56:20 62:13,20 63:3 63:7 64:23 151:17 153:15 177:20
**putting** 33:4,7 33:14 45:17 182:3

**q**

**question** 6:11 10:8,10 11:4 11:10,13 19:17 20:2,3 22:2 26:25 27:3 28:23 31:25 56:19,20 61:15 61:19 62:25 67:8,22 75:17 107:22 108:21 109:15,20,25 110:3,7 113:23 119:3 128:23 143:14 164:4 164:10,12 167:11,13,21 173:19 178:5 182:24 188:6 191:2 217:15
**questioning** 9:14
**questions** 9:18 14:4,6 15:8,11 15:16,18 192:25 193:17 220:4,6,22
**quick** 195:3 217:15
**quite** 27:3
**quote** 84:16,17

**r**

**r** 3:2 4:3,14 5:3 72:20 81:15,23 227:3
**rahman** 72:19
**raise** 22:18
**ran** 30:10
**rarely** 206:14
**reach** 44:17
**read** 83:21 101:7 111:20 140:12 207:13 223:9
**reading** 219:10
**ready** 195:5
**real** 81:16 117:24 118:3 118:19,22,23 118:24 119:8 119:12,15 120:6 127:7 143:8
**really** 39:3 53:4 121:7
**realty** 1:8 3:17 41:20 117:20 117:21,23 118:10,16 119:10,13,16 119:19,24 120:9,15,18,25 121:8 122:3 130:13
**reason** 26:3 31:3 42:17 45:19 47:6 56:12,13 69:11 70:4 158:25 173:19 174:14 185:9,15 192:19 228:5
**reasonable** 187:24
**recall** 24:6 27:16 30:8,16 31:21 39:22 40:2,16 42:8 44:24 45:3,7 59:6 65:3,16 72:23 82:19 83:19 87:15,17 87:19 88:7,12 90:5 91:19 110:22 114:12 114:13,14 116:2,3 117:13 119:14 123:12 123:22 125:8 127:17 128:12 131:22 136:11 148:11,12,15 154:17 156:21 156:25 157:2,9 157:10,25 160:17 165:9 170:9,10 183:21 187:10 189:14 199:7 201:7,15 205:11 208:11 216:9 218:10 219:14

**receipt** 196:10
**receipts** 136:19 225:14
**receivable** 66:19 67:19 178:25
**receivables** 179:2,11
**receive** 19:13 19:14 111:7,18 211:10
**received** 9:9 60:20 111:12 121:16 123:7 139:22 195:7 205:23 207:21
**receiving** 19:21 110:22
**recently** 105:5
**recess** 193:5
**recognize** 24:4 89:23 97:11 102:6 123:18 136:21 137:11 161:18,20 169:5 186:11 221:7
**recollection** 30:12 70:6 91:9 172:18 179:6,9
**record** 7:3 17:2 17:25 18:19,21 18:23,25 22:10 22:12,14,16 34:2,4,6,8,14 35:3 36:17 39:7,9,11,13 48:22,24 49:2 49:4 54:15,17 54:19,21 57:2 57:4,6,8 63:10 63:12,14,16 80:17,19,21,23 83:6,8,10,12 87:21,23,25 88:3 90:10 96:15,17,19,21 101:19,21,23 101:25 109:6,9 109:11,13 116:15,17,19 116:21 122:22 132:8,10,12,14 135:24 136:2,4 136:6 139:7,9 139:11,13 144:18,20,22 144:24 149:14 149:16,18,20 158:17,19,21 168:11,13,15 168:17 170:21 170:23,25 171:3 175:12 175:14,16,18 193:2,4,9 220:11,12,14 220:16 222:2 223:12,13 224:11 227:12
**recorded** 81:17 201:21
**recording** 81:19
**records** 24:7 43:24 68:2 86:23 87:4 179:11
**recover** 69:3
**redemption** 84:16,22 85:18 86:15
**reduce** 179:2 180:15
**reference** 145:2 145:7 184:2 193:18
**referenced** 41:20
**referencing** 144:25 217:8
**referred** 57:10 80:5 198:18
**referring** 58:13 134:16 164:6 174:20
**refers** 217:19
**reflected** 71:17 161:9 165:24 190:2
**reflects** 101:15
**refresh** 70:6
**regard** 30:16 31:7 65:17 85:4 95:22 146:17 172:12 172:15 174:25
**regarding** 58:3 92:5 111:4
**regards** 61:19
**register** 81:3,11 82:22 224:24
**registered** 176:16,17,18
**registration** 176:23
**regular** 26:16 140:6 189:16 189:22
**regularly** 26:23 27:6 28:20 29:3,7,12,18 32:4
**related** 15:11 42:18 87:4 227:14
**relates** 63:19
**relationship** 126:2 130:17 130:20
**relied** 33:22 75:6 80:13
**remained** 181:5

**remember** 25:10,11,12,15 27:15,18,22 28:9 29:23 30:15,19,20 65:19 66:9 70:3,25 73:18 76:20 86:25 110:2 113:16 113:25 115:22 128:16 129:4,7 129:10,13 130:11 131:6 131:23 145:16 148:4,10 154:3 164:25 170:15 170:19 182:21 186:21 188:23 189:25 190:17 191:18 194:9 205:22 216:7 216:12 218:12
**remembered** 109:18
**repaid** 21:14 68:18 187:5,9 188:13 191:23
**repay** 20:24 21:4,23 22:7 30:18 68:22 192:12
**repaying** 188:8 188:9
**repayment** 192:9
**repeat** 67:8 147:24 178:5
**rephrase** 62:25
**report** 65:18 184:11 186:25
**reporter** 13:14 22:17 23:2,5 119:5 221:12 221:18
**reporting** 7:15 228:1
**represent** 7:22 14:19 23:16 34:17 35:2 43:15,19,25 49:7 55:21 81:13 89:18 96:24 101:8 123:6 162:8 171:22 172:10 187:11 193:14 201:10
**representation** 25:23 215:2
**representative** 1:6 58:9
**represented** 24:2 31:9 49:10 58:8 74:11 102:5 202:18 204:15
**representing** 25:13 99:23 100:5 105:10 210:3
**represents** 43:13 46:20 61:7 139:19 140:3
**request** 195:15 195:18
**requested** 197:18 198:5 212:21
**requesting** 196:15
**required** 79:13 100:13 159:14
**requirement** 140:18
**requires** 79:4,9
**reserved** 6:11
**residence** 71:21 71:25 74:12 77:23
**resolution** 203:14
**respective** 6:6
**respond** 111:21 111:22
**responded** 208:2
**response** 9:20 10:13 23:18 45:5 215:20
**responsive** 87:9
**rest** 92:3
**restart** 135:12
**restraining** 67:5,11 146:15
**restrictions** 146:21
**result** 53:10,22 67:10 97:18 125:10
**retail** 117:7
**return** 84:14 88:19 111:13 161:7 164:22 193:7
**returned** 90:13 98:15 113:20
**returns** 66:21 88:24 163:19 163:23 165:20 165:21 181:7 189:15 190:3 213:11 214:6 226:17
**review** 34:10 101:11 123:4 136:8 161:17
**reviewed** 9:14
**right** 9:3 11:21 11:23 17:20 18:5,6,9,11 22:18 23:21 25:17 27:3 32:9,10,24

33:15 35:23 40:10 44:12,13 49:8 55:13,22 59:22 66:24 76:2 77:5 79:5 84:4,7,16,22,23 85:17 86:14 90:7 93:16 99:16 103:12 103:16 105:11 112:7,9 119:5 129:11 137:2,3 139:2,3 155:13 160:22,25 162:18 163:11 165:15 171:14 176:12 181:19 186:17 187:13 191:17 216:23
**rightful** 97:14
**rights** 75:9,10 75:12,15,16
**ring** 101:10,11 106:6 108:15
**risk** 68:8
**rob** 196:5 208:3 217:23
**robert** 1:4 3:8 5:7 8:12 57:24 195:12 198:18 198:25 199:10 200:21 207:16 208:2,14 210:11,17 211:15 215:15 216:22
**ron** 104:12,14 104:19 105:18 105:21 106:8 106:10,11,16 107:17,23 108:10,13,15 108:18,20,22 109:22 110:5 226:19
**ron's** 106:14
**ronneburger** 4:21 8:18,19 14:18,23 15:10 15:24 193:10 193:12,25 194:18,24 197:6 202:25 207:6 209:16 218:18 220:5 221:19,21 224:5
**room** 18:10 186:7
**rooms** 18:12
**roslyn** 1:16 4:9
**rough** 9:12
**roughly** 66:18
**route** 1:8 3:17
**ruderman** 3:21 7:23 8:2,3 11:24 12:13 13:18 14:12 15:4 16:3,10 16:18 17:22 18:14,18 19:7 22:9,25 23:9 33:25 39:6 44:4,9 48:21 54:14 56:25 63:9 64:7 80:16 81:6 83:5 87:20 88:25 96:14 97:6 101:18 102:20 109:2 116:14 122:10 122:21,25 132:7 135:23 136:14 139:6 144:17 149:13 150:2 158:14 161:11 162:2 168:10,22 170:20 171:16 175:11 192:23 193:6 224:4
**ruination** 133:21
**rule** 9:15 12:16 12:17
**rules** 2:10
**ruling** 17:24 18:2
**rulings** 9:7
**run** 16:21,22 120:12
**running** 16:22 135:13,17

**s**

**s** 3:2 4:3 5:3 41:19 81:15,23 203:5 226:8 228:5
**s0950** 171:7,11
**sad** 14:22
**safe** 98:11 182:10,11,23 183:4,8,15
**safes** 182:17
**sage** 3:7 5:8,10 8:9
**salaries** 189:23
**sale** 46:20,21 102:5,22 105:14 118:9 136:18 225:8 225:14
**sales** 1:4 3:8 8:12 35:15,19 36:2 119:22 147:13
**salesperson** 182:9
**sara** 5:6 162:21 212:10,16 214:21 219:4 221:3
**sarah** 1:13 4:6

**satisfied** 99:7
**satisfy** 27:10 32:3 174:4
**saw** 42:2 44:16 64:2 165:22 210:4
**saying** 26:21 27:24 28:24 32:25 37:10 43:23 44:18 53:10 54:4 61:18,20 62:9 64:22 74:16 111:12 123:22 124:7 129:2 163:24 164:2 167:8 192:12
**says** 24:25 25:5 31:11 35:14 56:6 58:13 74:23 84:13 99:15 100:4 110:18 112:12 123:25 137:13 150:21 162:17 163:7 166:9,19 169:18 171:13 171:14 196:3 197:15,16 198:14 200:16 203:14,17,20 204:2 216:3 217:2 218:2
**screen** 102:17 139:16 161:16
**scroll** 35:8 58:19 93:7 94:17 154:21 162:13 212:7
**scrolling** 102:17
**se** 4:14 8:25
**sealing** 6:7
**search** 86:22 87:4 114:25 115:7,8,17 175:24
**second** 4:20 10:23 35:22 37:19 38:9,10 41:13 56:8 58:19 64:21 80:17 92:14 110:21 139:7 172:13 181:20
**security** 132:4
**see** 17:12 23:23 24:19,21,24 25:2,2,6,20 27:13 34:12,19 35:6,14,15,19 36:2,25 41:18 41:22,23 42:7 42:9 44:6 46:10,17 47:13 49:21 50:5,20 51:3,10,17,24 51:25 52:6 53:2 55:23 56:3,10 57:17 57:25 58:15,16 58:22 60:10 64:18,19 65:22 73:11 86:23 89:8 92:21 93:11,18 94:19 94:23 98:2,3,4 99:13 103:2,2 104:8 114:15 123:16 124:2,7 124:13 133:11 137:3,8,14,17 137:18 138:10 139:17 140:10 147:7 149:11 150:10,14,21 151:8,9,10 152:18 153:8 153:12 154:23 155:9 156:18 158:4 162:8,10 163:8 167:4,9 167:13,17 169:7,15,24 171:7 172:21 172:22,23 173:13,14 188:12 193:20 196:19 200:18 202:10 203:15 203:18,23 211:24 215:19 215:21 216:23
**seeing** 38:10 41:25 123:18 123:22 136:12
**seek** 211:5
**seeking** 133:8
**seem** 155:9
**seen** 37:13,15 37:20 39:20 42:4,5 63:24 64:4 81:3 172:2,4,5 206:22
**sell** 32:12,14 43:10 48:3 52:24 107:18 107:20,24 108:18,20,23 118:2 226:19
**seller** 78:19,20 79:8,12 99:19
**seller's** 102:25
**sellers** 99:24 100:6
**selling** 26:18 28:3,4 31:5 48:9 52:18 53:11,16,22 54:2,7 61:21 62:6 146:3,6
**send** 44:17 65:14 90:21 92:3 114:10,11

196:2,5 218:10
**sending** 58:14 65:17
**sense** 149:10
**sent** 9:11 59:4 131:3 210:11 212:14
**september** 40:15 41:3,15 46:10,13,25 47:11 62:14
**series** 23:16 49:5
**serious** 103:20
**seriously** 103:17
**served** 123:8
**services** 122:14 123:8,15 125:16 225:12
**set** 227:9,19
**sets** 221:16
**settle** 180:13
**settled** 166:17
**seven** 12:3,5,8 12:12,14,20 13:12,13 14:4 14:9 15:25 84:11,13 191:14
**several** 144:7 144:11 197:14
**severely** 67:14
**shanks** 3:12 8:3
**share** 44:5 64:8 161:15
**shares** 99:18
**sharing** 92:15 194:25
**sheet** 228:1
**sherack** 5:11 7:13
**shore** 49:19 58:20 67:18 69:21 70:12 88:14 150:12 154:2,18 155:5 156:13,23 161:24 168:20 169:2 170:2,3 225:19
**short** 27:9,13 119:22
**show** 24:22 105:6,14 118:13 149:24 168:18 172:20 198:7 199:24 210:20 215:5 216:13 219:16
**showed** 35:18 36:16 37:4 39:18 40:3 88:11 123:9 141:2 165:22 188:21 212:23
**showing** 31:8 36:3,5,8,14,24 39:17 48:17 96:22 163:23 205:20 208:23
**shows** 24:15 175:24 196:20 209:18 213:4 213:21,24 226:24
**shut** 134:4,10 134:11,25 135:3,6
**side** 23:21 24:25 49:8 137:3
**sign** 98:13,15 106:9,10,11,16 111:13 125:6 125:13 127:2 159:18 170:8
**signature** 66:11 82:16 98:11,21 102:18,19,25 103:2,6,9 104:9,11,19 105:18,21 106:14 116:12 124:6,7 138:10 157:4,7,11,21 157:23 162:15 162:23,25 163:4,5 169:22 200:13 204:11 227:24
**signatures** 98:2 98:3,4,9 137:8 137:11,12 138:2,3,12,16
**signed** 6:14,16 98:11,15,17 103:10 106:17 108:18,22 110:5 113:8 123:11 124:5 124:15,23 137:22 138:18 140:12 143:18 144:3,5 163:7 164:22 166:4,8 166:9,10,13,20 169:23 223:18 226:19
**signing** 40:20 55:14 167:5,9 167:14 203:21 204:15,17
**signs** 106:18
**silly** 123:2
**similar** 123:9 123:20
**simply** 52:10
**single** 160:21 160:23
**sir** 8:7 11:24 15:5 19:18
**sit** 37:22 158:6 180:4

**sitting** 38:2 71:16
**situation** 78:10 217:6,7
**six** 115:14 189:7 191:13
**sixteenth** 138:15
**skimmed** 140:16
**skip** 46:24 47:10
**small** 160:24
**smithtown** 1:16 4:9
**sold** 26:9,24 27:23 31:17 43:2,6,11,16,19 43:25 45:16 46:4,7,22 47:18,21 50:8 52:11,17,22,22 52:23 53:7,12 53:24 54:8,11 56:15,16,21,23 61:5 62:22 63:6 173:22
**sole** 31:3 38:16
**solely** 86:14 140:4
**solemnly** 22:20
**somebody** 58:14,25 60:3 78:17 115:13 118:8,12 128:25 185:14 185:16 206:12
**somewhat** 41:14 156:2 189:5
**son** 176:9,15
**soon** 13:11 143:9
**sorry** 21:11 22:3 24:19 25:11 28:2 37:7 41:10 44:4,6,10 62:24 64:8,16 67:20 74:2,4 76:24 77:5 107:13 108:5 119:4 120:17 123:2 124:25 137:7 147:24 151:3 167:12 172:3 176:25 202:4 215:23
**sort** 139:4 146:19 147:22
**sought** 210:25
**sound** 187:13 191:17
**space** 71:5
**speak** 14:20 115:23,25 185:23 186:2 210:8
**speaking** 119:6
**specific** 30:6 126:20 128:2 133:15
**specifically** 25:11 29:23 165:3 203:10
**speech** 198:22
**spent** 15:24 16:2
**spoke** 115:21 122:6 147:11
**ss** 223:5
**stamp** 34:20 49:8 55:22 57:16 64:18 150:11 162:9 169:11
**stamped** 40:12 169:8 171:25 197:15 203:11
**stamps** 23:22
**standing** 96:2
**stapled** 34:10 171:5
**star** 92:20,23 93:10
**started** 16:24 26:18 39:23 66:25 67:11 82:14 95:16 105:7 120:25 192:8
**starting** 110:16
**state** 2:13 7:21 19:4 81:17,20 83:17 95:20 115:2 201:24 202:14 208:18 209:19 213:4 223:4,22 227:6
**stated** 28:10 86:12 99:3 125:17 200:21
**statement** 23:11 32:21 33:11,16 38:4 40:7,14 42:2 46:2 48:16 49:14 55:2 58:21 59:8,10 63:23 64:12,22 65:9,21,25 88:6,10 89:10 89:14,24 90:3 90:6 92:13 97:13 101:7 150:5,12,21 151:21 154:22 156:6 158:2 165:9 188:23 198:13,21 208:13,16,20 219:10,11 224:10,13,14 224:16,20 225:5,16

**statements** 44:12,15 57:11 62:5 141:3 149:22 205:24 206:20 209:15
**staten** 43:3,4
**states** 1:2 7:10 41:18 99:12 139:17 207:17 207:18 208:7 209:20 212:9 218:23
**stating** 60:9 108:23 226:19
**stephen** 58:14
**stipulated** 6:4,9 6:13
**stipulations** 6:2
**stock** 96:23 97:8,18 99:2 102:5,21 104:15 225:7,8
**stop** 105:14
**stopped** 120:24 191:16
**stops** 16:14
**street** 1:8 3:17 41:19
**suarez** 81:22
**subject** 58:5 215:16 221:10
**submitted** 24:13 115:16 116:8 125:23 133:10
**submitting** 202:17
**subparagraph** 139:25
**subpoena** 89:19 123:7
**subscribed** 223:18 228:22
**subsequent** 100:7
**subsequently** 208:5
**substance** 194:8
**sufficient** 29:11 32:17 188:15 190:9
**sufficiently** 188:4
**suite** 3:19 4:16
**summer** 26:19 27:4 28:25 31:5,16,17 32:5 39:2 48:2
**sunrise** 1:4,15 1:18 3:13,18 4:7,15 54:24 55:3,18 56:21 57:11 69:15,16 69:21,22 90:12 97:15 98:25 100:24 101:3 111:4,8 138:23 139:18 140:21 140:24 141:23 146:17 161:8 172:16 173:22 174:3 181:8,10 181:12,14,16 181:18 182:3 182:15 187:19 188:25 189:18 191:4 211:2 213:22 214:16 214:20 219:4,8 219:23 224:17 226:23
**superb** 1:4 3:7 7:7 8:11 69:7 69:10 93:4 141:18 194:5 194:12,16 195:9 196:5,15 197:10,17,25 200:6,17,25 201:6,11,25 202:19,23 203:18 204:18 204:22 205:24 206:21 207:2 207:17,20 208:4,15,19,25 210:14 217:19 220:19 226:5 228:2
**supplying** 84:14
**support** 181:23
**supposed** 91:16 141:22 146:4 178:20,23 179:2,12 190:6 191:20,24 192:12 205:6 205:10 209:6
**supreme** 81:20 95:19 105:7 146:14 218:5
**sure** 18:5,20 22:11 29:20 30:3 34:3 39:3 39:8 43:22 47:22 48:23 53:19 54:16 61:15,16 62:12 63:4 65:6 70:4 81:5 86:21 92:12 101:13 105:21 106:7 107:5,6,6 108:25 112:12 113:9 114:3,21 115:5,9,12 120:4,13,17 121:15 122:6 122:18 123:24 125:14 126:20 133:10 139:8 142:25 144:2 148:19,22 149:15 154:11

163:21 164:25 180:24,25 181:5 183:11 183:25 185:22 186:10 188:20 189:23 206:7 210:10
**surprise** 176:2
**susan** 2:12 227:5,25
**suv** 176:8
**swear** 22:20
**swore** 23:2,6 83:24
**sworn** 6:16 19:3 23:3 227:9 228:22
**syosset** 1:14 4:7 69:20 175:21 175:22,24 177:25
**system** 36:18 81:14,15 172:12

**t**

**t** 19:2 81:24 223:2 227:3,3
**take** 35:4,11,17 35:25 40:21 41:6,9,11,15 50:2 62:9 72:8 90:2 156:5 178:20,23
183:2,4,8 189:20 195:3 211:5 218:13
**taken** 2:8 15:23 23:7 46:6 52:12 62:6,15 62:22 67:6 178:3 193:5 223:9
**talk** 16:5
**talked** 147:3 181:9
**talking** 20:13 33:18 45:23,25 135:4 143:12 160:18
**talks** 104:6,7
**tammy** 5:10
**tangible** 70:18
**tarzia** 107:12 107:14,14
**tax** 24:17 25:5 25:19,24 36:24 60:10 66:21 88:19,23 161:7 163:19,22 164:22 165:20 165:21 181:7 189:15 190:3 213:10 214:5 226:17
**taxable** 88:15
**taxes** 88:19 163:18 198:15
**team** 1:4 3:8 8:11
**tell** 17:12 30:24 42:22 43:17,22 44:22 65:13 75:25 86:6 110:22 201:4 202:21 204:23 205:5 208:14 210:17
**telling** 31:20 53:15 146:24
**temporary** 67:5 67:11
**ten** 15:19,21 152:22,24 218:23
**term** 20:12
**terms** 98:23 107:7
**testified** 19:5,8 26:7 31:15 32:9 37:16 38:23 39:16 48:10 52:18 56:14 61:4 84:4 90:9 100:19 110:25 117:2 127:14 132:16 133:22 154:4 160:14 191:15 194:2 195:6 198:9,17 198:20,24
200:4 201:8 210:24 212:4 217:20
**testimony** 2:11 16:19 17:8 21:20 22:21 23:4 28:17 43:9 47:16,25 50:7 52:8 61:6 62:3,13 86:11 174:22 193:19 200:20 201:23 206:24 223:9 223:12 224:2 227:8,12
**text** 44:17 65:14 198:8,10
**thank** 17:22 18:14,15,16 23:9 64:7 109:5 110:7 112:13 136:15 192:24 220:7
**thing** 17:11 96:5 145:13 214:14
**things** 28:17 143:5
**think** 14:13 53:23,25 62:11 64:3 65:10 66:6 70:17 71:2 72:10 86:5 91:2 92:6

92:11 94:12 96:6,11 98:14 98:22 104:25 109:24 120:7 122:9 134:8 138:24 146:12 147:16 148:7 149:4 151:17 157:5,23 159:7 159:11,22 165:6 166:2,15 167:25 168:3 180:16 181:19 182:16,20 186:6,23 190:18 191:14 192:7,14 199:8 212:21 217:9
**third** 55:25 56:8 172:21
**thomas** 1:14 218:3,8
**thomasson** 1:13 4:14,15 8:23,24,25 15:16,17 34:25 90:14,21 91:18 91:24 96:25 105:10,13 147:5,12
**thomasson's** 90:17 91:11 141:4
**thought** 69:3 166:24 190:8
**thousand** 36:15 156:2 187:20 189:5
**threat** 131:25
**threaten** 131:3 131:13,21
**threatened** 128:17,20,25 129:11 131:21
**threats** 128:9 128:13
**three** 84:11 88:12 156:8
**time** 2:12 6:11 7:3 14:9 16:16 16:19 17:8 21:3,22 22:6 25:25 26:12,14 26:15,22 27:4 28:8,19,25 29:6 30:14,18 34:25 38:9 39:20 41:24 42:4,4,10,12,14 52:5 64:2 66:23 67:3,7 68:21 69:7 70:10 73:6,7 73:17 74:6,13 74:17 75:19,23 76:14,16,19 78:13 80:14 97:24 100:8 102:11 103:18 110:22 114:2 115:14 116:3 119:6 120:19 123:24 124:18 128:10,15 129:9 131:18 133:9,19 134:15 139:20 139:21 142:16 145:21,24 146:13 147:2,4 147:22 150:16 151:2,5,16,19 154:10 157:21 159:17 160:6 165:11 174:23 175:5 180:9 185:4 187:9 192:17,21 193:21 202:21 210:16 214:24 221:24 222:3
**times** 29:10 114:21 205:15 211:20
**title** 74:5,18 78:11,16 81:23 124:12 130:14 203:17
**titled** 72:11 74:9 75:19 78:7
**today** 7:15 9:4 9:7 15:3,5 16:5 16:7 37:22 38:2 71:16 112:13 158:6 180:4 193:17 201:23 207:21 211:20 221:14 221:20
**today's** 7:4
**together** 9:22 10:2,15 32:21 33:4,7,11,14 34:10 64:23 112:4 117:3,19 121:9
**told** 21:17 44:25 53:17 65:11 85:11 92:2 135:20 148:23 149:8 160:19 174:16 175:23 185:18 186:5 200:21 208:10
**tom** 32:20 37:21 60:7,18 60:19 164:8 218:9
**tony** 69:7 92:25 141:21 142:13 194:3,14 195:19 196:3 196:24 197:2

197:18,21,24 200:7,22 201:5 201:9 205:3 206:14,25 209:3,8 210:8 226:24
**tony's** 9:19
**took** 46:22 61:20 139:2 142:17 157:8 183:14 187:3 187:18 188:7 190:12,20
**tools** 211:23
**top** 35:4 57:24 63:18 93:8 110:13,17 139:3 171:9,11 194:21 196:17 203:15 207:9 216:16 224:18 225:9,22 226:9 226:12
**total** 11:25 12:5 12:21 28:7 99:19
**totally** 196:20 196:23
**toward** 217:2
**towards** 134:21 135:9 158:8
**track** 17:7 30:11 41:2,5 172:12
**trade** 175:2
**traded** 172:16 173:17,22 174:4,4
**trades** 173:21 175:9
**transaction** 80:8 101:9 132:16 141:18 143:9 147:25 149:12 152:4 152:15,16 153:5,7,10 154:25 155:7 170:18 174:5
**transactions** 81:16 146:16
**transcript** 9:13 193:20 221:14 221:20 223:9 223:11 227:11
**transfer** 41:19 43:7 78:11,16 82:22 85:13 91:4 92:8,14 92:17,17,20 93:17 94:22 111:23 153:6 153:11
**transferred** 74:22 78:20 79:16 80:4 82:25 91:10 111:3 113:11 114:5 141:14 149:9 152:17
**transferring** 82:16,24 113:21
**transfers** 156:19,20
**transpired** 208:9 209:6
**trial** 1:24 2:7 6:12
**tried** 148:8
**true** 19:9 31:12 38:5 43:23 65:24 83:25 180:5 223:11 223:13 227:11
**truist** 172:25 173:2,5
**trust** 90:18
**truth** 22:22,22 22:23
**truthful** 24:13
**trying** 67:24 69:4 86:10 133:6 147:22
**turn** 136:25
**turns** 20:13
**twelve** 15:20,22
**twice** 137:14
**two** 9:13,17 49:24 110:9 111:17 114:3 137:8 141:13 160:20,23 162:15 170:17 171:5 208:9 217:24
**twofold** 220:4
**type** 27:24 29:22 71:13 140:6 148:9,13
**types** 172:6

**u**

**u** 81:23,23 110:18
**u.s.** 127:10 130:2
**ucc** 175:23
**uea** 1:16 116:23 122:14 123:15,23 124:5,15,20 126:2 225:12
**ultimately** 61:11 132:19 132:22 140:23 211:10
**umbrella** 176:24 177:2,6
**unable** 26:16 26:22 31:8,16 31:25
**unclear** 39:4
**under** 12:18 21:24 23:6 30:24 72:3,14

79:13 81:21 99:8 100:13 102:25 104:8 131:9 189:14 223:10
**undercapitali...** 133:19
**underneath** 204:5,8
**understand** 19:17,24 20:4 28:23 37:14 53:19 54:5 56:18 64:25 67:21 74:19 75:17 82:17 86:3,8 87:17 161:9 167:2,11 167:23,24 172:5 173:20 178:24 182:24 188:6 191:2 192:20 217:16
**understanding** 31:2 33:13 51:12 54:12 68:17 85:8 159:5 166:16 166:22 179:17 212:13 218:23
**unexpectedly** 103:14,17,23 103:24
**unfortunately** 103:24
**uniondale** 4:20
**unique** 78:10
**united** 1:2 7:10
**unpaid** 173:12 173:17,21 180:22 181:5
**update** 115:19
**upped** 100:16
**urgent** 207:20 207:23
**urrutia** 1:4 3:8 5:7 8:13 143:17,18 144:4,8,12 194:3,14 195:19 200:7 200:22 201:5 201:24 206:25
**urrutia's** 92:25 141:15 142:13
**use** 16:15 17:3 19:15,20,21 118:24 119:8 133:12 135:14 139:25 140:7 140:23 141:24 142:18 147:17 148:17 213:10
**used** 10:25 11:5 11:17 55:17 117:6 118:17 135:20 140:20 141:18 142:12 149:6 151:24 153:20,21,25 157:20 158:8 158:11 165:5,6 165:6 177:24 180:21 214:5
**using** 20:23 58:10

**v**

**v** 228:2
**valuations** 69:25
**value** 53:15
**values** 69:18 70:10
**various** 69:19 87:10 102:4 103:13 114:21
**vehicle** 172:13 172:15 173:12 173:13,17,21 174:25 176:12 176:14 178:2,6 179:8
**vehicles** 11:6 19:10,16,22 20:19,21,23 43:25 46:21 174:4 175:2,9
**venture** 217:17
**verbal** 205:17 209:5
**verbally** 45:11 84:18 205:6
**veritext** 228:1
**versus** 7:8 53:15 218:6
**video** 5:12 7:6 7:13
**videographer** 5:11 7:2,13 17:7 18:20,24 22:11,15 34:3 34:7 39:8,12 48:23 49:3 54:16,20 57:3 57:7 63:11,15 80:18,22 83:7 83:11 87:22 88:2 96:16,20 101:20,24 109:8,12 116:16,20 122:23 132:9 132:13 135:25 136:5 139:8,12 144:19,23 149:15,19 158:16,20 161:13 168:12 168:16 170:22 171:2 175:13 175:17 193:3,8 220:9,15 221:22

**violative** 147:14
**virtually** 220:25
**visible** 206:12
**void** 82:22
**volume** 188:25

**w**

**w** 95:16 110:18 223:2
**wagner** 172:14
**wait** 46:12
**waiting** 17:25
**waived** 6:8
**walk** 182:25
**walker** 4:12 8:14,15 24:22 44:8 128:22 166:5
**wang** 94:23
**want** 18:8 35:17 53:18,18 82:2 109:16 128:21 203:10 215:14 217:25 221:13,19
**wantagh** 4:16
**wanted** 109:19 118:8,12 128:25 163:21
**wants** 128:18 202:7
**warranties** 180:10,22
**warrants** 139:19 140:3
**warranty** 179:18
**water** 18:8
**way** 18:9,13 47:8 48:10 52:20 54:2 72:18 74:25 75:5 97:23 115:15 195:11 227:17
**we've** 17:5 102:11 156:7 211:19
**wednesday** 111:16
**week** 51:24 187:21
**weekly** 187:15
**weeks** 208:9
**wei** 95:16,22
**weinstein** 196:4
**wendy** 21:17 21:21 22:5 32:20 33:2,3,3 33:6,14 37:21 44:19,22 45:4 45:5 59:23,24 67:6 110:17 111:12,16 112:6 113:11 113:18 114:11 164:8,17
**went** 32:22 48:5 62:4 90:12,17 91:2 141:3,4,7 143:8 153:24 154:14 156:2 165:15 178:18 184:5,7 209:11
**west** 118:18
**westbury** 77:23 78:5
**westlake** 122:13 123:8 123:15,23 125:16 146:12 225:12
**whereabouts** 187:6
**whereof** 227:19
**wholly** 117:4
**wicks** 3:4
**wife** 66:13,16 72:12,13 84:6 117:3 159:3,6 160:15 161:3 164:12 170:5 170:13 177:6 181:14 212:10 212:16
**wife's** 73:24 78:8 162:25 163:5
**wire** 92:17 93:9 94:22 153:6,11 153:11 156:17
**wired** 90:16,23 90:24 142:19 154:20
**wise** 126:10,12
**wisely** 17:4
**withdraw** 164:4
**withdrawal** 92:14 203:21 204:6
**withdrawals** 187:16 204:17
**witness** 10:9 13:15,17,24 15:20 18:15 19:2 22:24 23:8 193:23 220:7 224:3 226:21,24 227:8,13,19
**witnesses'** 228:3
**words** 12:14 41:6 52:21 53:6 84:17
**work** 92:2 111:23 112:25 221:9
**worked** 112:3 112:17,19,20 117:19 154:8

154:12
**working** 69:6 131:9 133:7,17 135:10,22 145:22 147:18 148:18 152:2,3 194:12 208:7 209:20 210:2
**works** 94:13
**worth** 28:7 54:2,3 69:20 69:21,22 71:22 73:11 76:2 77:23
**writer** 198:14
**writing** 45:12 45:14 65:17 89:7 92:9
**writings** 86:19
**written** 47:3 92:4 170:11
**wrong** 166:3

**x**

**x** 1:3,20

**y**

**y** 19:2
**yeah** 16:20,20 23:8 25:11 30:3 32:14 44:8,14 48:6 59:23 62:18 63:7,11 65:12 67:14 80:18 83:23 87:7,22 90:16,19 101:17,20 115:18 121:18 144:19 146:22 151:11 170:22 174:17 175:13 185:19 188:20 205:25 209:15
**year** 25:17 26:2 34:21 35:23 58:15,22 59:22 135:9 187:12 188:5,18,19
**years** 72:10 115:15 129:9 131:18,25
**yesterday** 23:3 53:17 84:3 85:2 116:22 123:9
**yesterday's** 9:8
**york** 1:2,23 2:14 3:5,20 4:11 7:11,19 19:4 39:23 81:2,9,17,21 83:17 95:20 115:2 223:4,22 224:23 227:6 228:1
**yup** 116:16

**z**

**z** 81:23
**zero** 62:11,17 133:24
**zeros** 136:11
**zizmor** 3:12 8:4
**zoom** 5:7,9,10 16:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.