EXHIBIT "49"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X
SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

PLAINTIFFS,

-against-

Case No.: 2:23-cv-6188(JMW)

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

DEFENDANTS.
-------------------------------------------X

DATE: March 4, 2026
TIME: 10:08 A.M

Page 2

DEPOSITION of the Defendant, HARRY THOMASSON, taken by the Plaintiffs, pursuant to a Court Order and to the Federal Rules of Civil Procedure, held at the offices of Cullen & Dykman LLP, 333 Earle Ovington Boulevard, Second Floor, Uniondale, New York 11553, before Kim Draper, a Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

SAGE LEGAL LLC
Attorneys for the Plaintiffs
SUPERB MOTORS INC., TEAM AUTO SALES LLC And ROBERT ANTHONY URRUTIA
18211 Jamaica Avenue
Jamaica, New York 11423
BY: EMANUEL KATAEV, ESQ.

CYRULI SHANKS & ZIZMOR LLP
Attorneys for the Plaintiffs
189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC
420 Lexington Avenue, Suite 2320
New York, New York 10170
BY: JEFFREY RUDERMAN, ESQ.

WEIR LLP
Attorneys for Defendant
LIBERTAS FUNDING LLC
1339 Chestnut Street, St 500
Philadelphia, PA 19107
BY: JEFF CIANCUILLI, ESQ.

(Appearances continue.)

Page 4

THE LINDEN LAW GROUP, P.C.
Attorneys for the Defendants
ANTHONY DEO, SARAH DEO, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC,
250 Park Avenue, 7th Floor
New York, New York 10017
BY: NOT PRESENT

HARRY R. THOMASSON, JR., ESQ.
Attorney Pro Se for Defendant HARRY THOMASSON
3280 Sunrise Highway, Suite Box 112
Wantagh, New York 11793

CULLEN & DYKMAN, LLP
Attorneys for the Defendant
FLUSHING BANK
333 Earle Ovington Boulevard
Uniondale, New York 11553
BY: ARIEL E. RONNEBURGER, ESQ.

ALSO PRESENT:
Tony Urrutia
Deo
Etelle Abramov
Tammy Abramov

* * *

Page 5

F E D E R A L S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

* * * *

H. THOMASSON

H A R R Y  T H O M A S S O N, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. KATAEV:

Q. Please state your name for the record.

A. Harry Thomasson, Esq.

Q. What is your address?

A. 3280 Sunrise Highway, Box 112, Wantagh, New York 11793.

THE REPORTER: Mr. Ruderman, would you like a copy today?

MR. KATAEV: We are gonna split.

THE REPORTER: Mr. Ronneburger, would you like a copy today?

MS. RONNEBURGER: I don't think so at this time. I will let you know.

MR. RUDERMAN: Before you begin, I spoke to Mr. Cianciulli the attorney for Libertas. He has an



H. THOMASSON

online hearing this morning and will join later.

If somebody tries to come in, please let him in when he shows up. Jeff cancel tries to come in, please let him in with you.

THE REPORTER: Okay.

BY MR. KATAEV:

Q. Good morning, Mr. Thomasson. Before we begin, will you agree to the usual federal stipulations which for the record are filing, sealing and certification is waived. Objections except as to form are reserved for trial, and that this examination may be sworn to before any notary public?

A. Yes.

Q. I will be asking you and you will be answering questions today about yourself, Superb, Team, Robert Anthony Urrutia, Island Auto Group, our claims against you and other defendants and other related subjects.

Do you understand that?



H. THOMASSON

A. Yes.

Q. Your testimony today is subject to the same oath and same penalty of perjury, as if you were testifying in a court; do you understand that?

A. I understand.

Q. Have you ever been deposed before?

A. I don't think so.

Q. I'm not gonna belabor the ground rules you're an attorney yourself, but I do wanna emphasize two important ground rules.

First, if you don't understand the question, tell me and I rephrase it. If you answer the question I will assume that you understood it, okay?

A. I understand.

Q. We're looking for your best recollection of events today. We're gonna be speaking about events that cover many years going back to 2018 through the present.

While I don't want you to guess



H. THOMASSON

at answers, even if your memory is not crystal clear, I'm still entitled to your best recollection; do you understand that?

A. I understand.

Q. You understand both of those ground rules?

A. Yes, I do.

Q. Is there any reason you cannot participate in today's deposition and provide truthful answers to questions?

A. No reason that I know of.

Q. Have you consumed any drugs, alcohol or medication within the past to 24 hours that you would or will affect your ability to testify truthfully?

A. No.

Q. Is there any reason you can think of as to why you cannot give truthful answers today?

A. No.

Q. You go by the name Harry Roger Thomasson Jr., correct?

A. Yes.

Q. Is there any other name that

H. THOMASSON

you go by?

A. No.

Q. Did you prepare for today's deposition?

A. No.

Q. Did you review any documents about this case prior to today's deposition or the deposition?

A. No.

Q. Did you discuss your deposition with anybody?

A. No.

Q. Have you consulted which any attorneys about this deposition?

A. No.

Q. Have you contacted any ethics hotline in connection with your representation of the defendants in this case?

A. No.

Q. Have you consulted with any ethics counsel about your representation of the defendants in this case?

A. No.



H. THOMASSON

Q. Have you contacted your malpractice insurance broker or carrier in connection with this case?

A. I don't have one.

Q. Have you looked at any documents that concern this case in general ever since it started in connection with today's deposition?

A. I don't understand that question. Are you asking me if I looked at documents in general in this case or if I look at documents for this deposition?

Q. For the deposition.

A. You already asked me that, no.

Q. You provide your address earlier in connection with being sworn in as 3820 Sunrise Highway, correct?

A. Yes, that's my mailing address for all purposes in this case.

Q. But that's not the address where you reside, is it?

A. No.

Q. You reside at 282 North Linden Street in Massapequa?



H. THOMASSON

A. No.

Q. Where do you currently reside?

A. No, that was my former home I live in Lindenhurst and my address is private.

Q. I am asking you for your current address and I'd like for you to answer that question?

A. It's private.

Q. Are you refusing to answer the question?

A. Yes, I am.

MR. KATAEV: Okay. We're gonna mark that for a ruling. We'll be calling the Judge about that later.

Q. Do you rent or own that residence?

A. What residence?

Q. The residence where you live?

A. Rent.

Q. Do you own any real property?

A. My name is still on the 228 North Linden Street residence, but the divorce is getting finalized. In fact, I



H. THOMASSON

just signed the deed over to her, but I don't think it's recorded yet.

So I don't know what that makes that residence. I don't know how to answer that question.

Q. Understood. Other than that residence that is subject to settlements or proceedings is there any other real property that you own?

A. No.

Q. When did you buy that property the one that's subject to the divorce proceeding?

A. September 11, 2002.

Q. After the divorce proceeding are finalized, you will no longer be the owner of that property?

A. Correct.

Q. There is no other real property that you own, correct?

A. Correct.

Q. You live by yourself?

A. I do.

Q. What is your date of birth?

Page 14

H. THOMASSON
A. 3/2/62.
Q. Were you born in the US?
A. Yes.
Q. In what state?
A. Connecticut.
Q. In connection with the divorce that you just testified, about who filed the summons and complaint or summons with notice in connection with that divorce; who was the plaintiff?
A. I did, although I don't understand what it has to do with this case.
Q. Is there only one action related to your divorce?
A. Yes.
Q. Have you ever discussed anything related to this case with you're soon to be ex wife?
A. No.
Q. Have you been married prior to this marriage?
A. I did have a brief marriage, last century, when I was young.

Page 15

H. THOMASSON
Q. Have you ever been arrested?
A. No.
Q. Have you ever been convicted of any crime?
A. No.
Q. Have you ever committed a crime?
A. Not that I know of.
Q. Have you ever cooperated with any law enforcement agency in connection with your work?
A. What do you mean by, cooperated?
Q. Have you had discussions with any law enforcement agency in connection with your work as an attorney?
A. Yes.
Q. When was the first time that you ever had discussions with law enforcement in connection with your work?
A. 1989.
Q. What was the most recent time that you ever had any discussions with law enforcement in connection with your work?

Page 16

H. THOMASSON
A. I spoke with law enforcement for sure in January of this year. I am not sure if it was also in February.
Q. Which agency was that?
A. Suffolk county police.
Q. Did that communication have anything to do with this case?
A. No.
Q. You made representations that you spoke to law enforcement in connection with this case, correct?
A. Yes, I did.
Q. When was the last time that you did that?
A. I spoke with the FBI and the US attorney's office in October of 2024 in connection with this case, after they served a grand jury subpoena on Mark Merckling.
Q. Are you aware as to whether anyone else was served with a grand jury subpoena?
A. I am not aware of anyone else having been served a grand jury subpoena.

Page 17

H. THOMASSON
Q. To your knowledge, the only grand jury subpoena that you're aware of is the only one for Mr. Merckling, correct?
A. That's the only one I'm aware of.
Q. How did you come to learn that a grand jury subpoena was issued to Mr. Merckling or served upon Mr. Merckling?
A. He called to discuss it with me.
Q. He called you directly?
A. Yes.
Q. When Mr. Merckling called you, to your knowledge, was it the purpose of seeking your advice?
A. Yes.
Q. Are you a criminal defense attorney?
A. I've done criminal defense work my entire career.
Q. Once you learned about the grand jury subpoena what did you discuss with Mr. Merckling?
A. The topic was how it was gonna

Page 18

H. THOMASSON

be dealt with.
Q. What did you decide to do after learning about the grand jury subpoena?
A. I decided to contact the FBI and the US attorney.
Q. How did you know who to contact the FBI?
A. The subpoena had the US attorneys contact information on it. And the FBI agent left his card, as best I can recall.
Q. When you say that the FBI agent left his card, are you saying that Mr. Merckling received the grand jury subpoena at the same time he also received the card?
A. As far as I know, yes.
Q. What was the identity of the agent who left his or her card?
A. I don't know the name off the top of my head.
Q. Do you remember anything about the individual?
A. No.
Q. Was the individual that left a

Page 19

H. THOMASSON

card, did he have a greek name?
A. I don't know.
Q. What about the United States attorney that -- was that Catherine Mirabile, M-I-R-A-B-I-L-E?
A. I don't know. I don't remember her name, it was a woman.
Q. Did you reach out to Ms. Mirabile via e-mail?
A. I believe we may have e-mailed each other, yes.
Q. What did you say in your e-mail to Ms. Mirabile.
A. I don't recall.
Q. Did you represent to Ms. Mirabile that you represent Mr. Merckling?
A. Well, I don't wanna guess, so I don't recall. I presume I did, I don't recall.
Q. Do you recall whether you identified yourself as representing anyone else?
A. I don't recall anything about what we exchanged, if we had e-mails, I

Page 20

H. THOMASSON

think we had one or two.
Q. What do you recall was Ms. Mirabile's response to your e-mail?
A. Well, I don't recall whether it was a response to the e-mail or a phone call that we had or both.
But ultimately, she had documents she wanted to review and said she would get back to me.
Q. Did you call Ms. Mirabile or did she call you?
A. Well, she wouldn't have known of my existence in dealing with that subpoena unless I called her, so I presume I called her first. She may have called me back if I didn't reach her, I don't know.
MR. KATAEV: We're gonna call for the production of all e-mails exchanged between yourself and any United States attorney including Ms. Mirabile.
I will follow up in writing.
Q. The conversation that you told me about by phone, was that the only

Page 21

H. THOMASSON

conversation you had with Ms. Mirabile?
A. What I said was, I believe I spoke to her one or two times. So, I don't know if I had more than one, if I did it was only one or two more times. It wasn't many times that we spoke.
Q. Were all of those conversations in October of 2024?
A. As I can recall, yes.
Q. In connection with your representation of Mr. Deo, did you come to learn of an individual named Louis Beria, B-E-R-I-A?
A. That name does not ring a bell, no.
Q. Are you aware that Mr. Berry has been issued a subpoena?
A. Are you saying in connection with this case or in connection with the grand jury?
Q. In connection with this case.
A. There are a lot of subpoenas that have been issued. I don't recall that off the top of my head. I may have seen

H. THOMASSON

that.

Q. Have you made any effort to contact Mr. Beria?

A. No.

Q. Have you received any instruction to contact Mr. Beria?

A. Well, I don't wanna get into what clients have or haven't said to me, but as to that particular question, no.

Q. You recognize that not every communication with a client is privileged, right?

A. Yes.

Q. Do you recognize that the only communications that would be privileged are those communications in which legal advice is sought, right?

A. Well, I don't want to summarize the law on the matter, but generally speaking, I understand that advice is privileged.

Q. You would agree with me that if you were given an instruction to do something that that would not constitute a



H. THOMASSON

communication for the purpose of legal advice, correct?

A. I would not necessarily agree with that. It could be the extension of legal advice. You know, it would depend on the circumstances.

Q. Are you aware of any efforts by anyone to contact with Mr. Beria in connection to the subpoena that was issued to him?

A. No.

Q. Do you recall appearing telephonically at an oral argument on September 14, 2023 before Judge Merchant in this case?

A. Vaguely.

Q. In that oral argument you made representations about Mr. Deo's criminal history, correct?

A. I vaguely remember that.

Q. How did you come to learn the details of what you represented to the court?

A. I don't recall specifically.



H. THOMASSON

Q. You represented to the court that Mr. Deo has two police officers around him because the federal government was not willing or able to provide them protection for the rest of his life; do you recall that?

A. Yes, I mean, that certainly wasn't the exclusive reason, but it was a reason that I know that he was happy that they're both police officers.

Q. How do you know that?

A. From discussions with Anthony Deo?

Q. Did you ever have any discussions about why Mr. Deo has two police officers around him with Mr. Merckling or Mr. Blankenship?

A. No, I don't have a memory of discussing their duties at any time in working for and with the Deos.

Q. To your knowledge, what is the reason that Mr. Deo had concerns for his safety and welfare, such that he needed two police officers around him?



H. THOMASSON

A. I believe that would violate attorney client privilege because it was based on conversations I had with Anthony Deo in my representation of him.

MR. KATAEV: We will mark that for a ruling.

Q. When did you first get introduced to Mr. Deo?

A. It was sometime around the middle of 2020. And I recall it was still during lockdown from COVID.

Q. Frank Ventimiglia introduced you to him, correct?

A. Yes.

Q. And Mr. Ventimiglia is a former client of yours, correct?

A. Yes. Are you talking about at the time that he introduced me, yes, he was a former client at that point.

Q. You represented Mr. Ventimiglia in connection with a lawsuit against the dealership that Mr. Ventimiglia worked at, right?

A. Yes, at this point a long time

Page 26

H. THOMASSON
ago. It was probably about 20 years ago.
Q. Other than your representation of Mr. Ventimiglia in that case, have you represented Mr. Ventimiglia in any other matter?
A. I believe I have, yes.
Q. When was the last time that you represented Mr. Ventimiglia?
A. He actually just came to me to help -- for me to help him with a matter.
Q. How did Mr. Ventimiglia introduce you to Mr. Deo?
A. I don't understand the question.
Q. In what manner did Mr. Ventimiglia communicate to you that he wishes to refer to Mr. Deo to you?
A. I can't recall at this time, I'd be guessing at this point, that was 2020. I can't recall.
Q. At the time that Mr. Ventimiglia referred you to Mr. Deo or vice versa referred Mr. Deo to you, were you representing Mr. Ventimiglia at that time?

Page 27

H. THOMASSON
A. In 2020?
Q. Yes.
A. No.
Q. At the time that Mr. Ventimiglia referred Mr. Deo to you, what relationship if any did Mr. Ventimiglia have to Mr. Deo in 2020?
A. He worked at Northshore.
Q. Mr. Ventimiglia was an employee of Mr. Deo, correct?
A. Well, no, as far as I knew he was an employee of Northshore.
Q. To your knowledge, did Mr. Deo hire Mr. Ventimiglia?
A. I really don't have any knowledge about that.
Q. In connection with your representation of Mr. Deo, did you assist him in any way to apply for a license with the New York State Department of Motor Vehicles?
A. No.
Q. To your knowledge, was Mr. Deo ever denied a license from the DMV?

Page 28

H. THOMASSON
A. I don't know about his dealings with DMV.
Q. Setting aside representation of Mr. Deo in connection with DMV licenses, did you ever discuss with Mr. Deo DMV licenses that he sought to obtain?
A. Are you talking about before he obtained them or after he obtained them?
Q. At any point.
A. Well, during the course of this case, that's been an issue and I've had discussions within the context of this case with him about the licenses but, you know, license, licenses, but all of it was after the fact. Nothing was beforehand. I don't deal -- I never dealt with them on that kind of a level.
Q. Were you aware at the time that Mr. Deo was applying for a DMV license that he was doing so?
A. No.
Q. To your knowledge, Mr. Deo pled guilty to federal wire fraud in 2016, correct?

Page 29

H. THOMASSON
A. Based on what you've presented in this case, yes.
Q. When did you first come to learn that?
A. The specifics?
Q. Yes.
A. At his deposition.
Q. What about generally speaking, when did you first learn?
MR. KATAEV: Off the record.
(Whereupon, an off-the-record discussion was held.)
Let the record reflect that Mr. Ciancuilli representing Libertas has joined.
Q. If you can remember the question.
A. Can you read it back please?
THE REPORTER: Yes.
(Whereupon, the last question was read back by the reporter.)
A. I first learned about that in connection with the state lawsuit that was filed by the Island Auto Group in Nassau

H. THOMASSON
Supreme. In that case it was alleged that he had been convicted and I didn't know about that until that lawsuit.
Q. That lawsuit was filed in December of 2022, right?
A. Yes.
Q. After you learned about the conviction by reading the pleadings in that lawsuit, did you have any discussions with Mr. Deo about that?
A. I'm sure I did. I don't recall them at this time.
Q. Did you come to learn about the circumstances upon which Mr. Deo was charged with this crime?
A. No.
Q. Do you know what the charges are related to?
A. No.
Q. Do you have any knowledge as to whether it had something to do with a mortgage?
A. I really don't.
Q. Who is Aashish Udayaan?


H. THOMASSON
A. I believe he's a young man that works with Anthony and Sarah since, I don't know roughly 2024.
Q. Is Mr. Udayaan still working with the Deos?
A. Yes.
Q. You represent Mr. Udayaan in connection with another case arising out of this matter, right?
A. I don't know that it's arising out of these cases, no. I don't -- I don't think that it is.
Yeah, there is a matter in which I represent him. He's been sued as well.
Q. Have you ever had any discussions with Mr. Udayaan, about anything?
A. About that case.
Q. Have you ever met Mr. Udayaan in person?
A. Yes.
Q. Have you ever been a party to any other lawsuit as either a defendant or


H. THOMASSON
a plaintiff?
A. Yes.
Q. One such action is your divorce proceeding, correct?
A. Yes.
Q. The divorce action that you filed only has a summons with notice and no other proceedings, correct?
A. As best I can recall, yes.
Q. You were also a defendant in a lawsuit brought by the mortgagee of your home, correct?
A. Yes.
Q. That lawsuit was filed against you because you were not paying the mortgage, correct?
A. Yes.
Q. You later resolved that lawsuit, right?
A. What's that?
Q. You later resolved that lawsuit, right?
A. Yeah.
Q. Did you resolve that lawsuit


H. THOMASSON
with your own funds or someone else's funds?
A. That has nothing to do with this case Mr. Kataev. It got resolved.
Q. Are you refusing to answer?
A. Well, we're not divorced yet. It was resolved with marital funds.
Q. No funds out of outside of marital funds, correct?
A. No.
Q. Now, in connection with your representation of Mr. Deo you sued Island Auto Group before, correct?
A. Yes. You are referring to the other action the one that was just remanded to Nassau Supreme?
Q. No. Prior to the lawsuit that Mr. Ruderman filed in December of 2022, had you filed a lawsuit.
A. Oh, the summons with notice, yes.
Q. That lawsuit was withdrawn on notice, correct?
A. Yes.

Page 34

H. THOMASSON

Q. Why was it withdrawn?

A. It was filed to try and protect the Deos, since I really didn't know what was going on and the $735,000 that Anthony had just taken out, which is what I was told at the time, that he definitely is the person responsible for, had been taken illegally by Josh Aaronson.

So I said look, if this is gonna go anywhere, I don't know what's gonna happen, you know, we can file this as a placeholder to see, you know, to just try and protect you.

After that the lawsuit was filed by the IAG people just a few weeks later. And we just decided to deal with the matter through that lawsuit instead of the first one.

There was no need to have two lawsuits at that point. I really had no idea what was going on. It took me a long time to look into everything to try and understand what took place.

So we just eliminated that

Page 35

H. THOMASSON

first one. We never served it.

Q. Is it fair to say that that original lawsuit was filed solely related to the $735,000?

A. And unsure of what else could happen.

Q. You decided to withdraw the lawsuit because those funds were ultimately returned by Mr. Aaronson, correct?

A. That wasn't the sole reason for withdrawing it, no.

Q. That was a reason?

A. Um, there just was no need to continue with that in light of the lawsuit that IAG filed. I've never been one that cares that much about whether my client is a plaintiff or a defendant. If they're gonna be in a case, you know, try to be practical and economical as much as possible.

Q. In the December 2022 lawsuit filed by Island Auto Group against Mr. Deo, there were allegations in the complaint that the plaintiffs there believed that you

Page 36

H. THOMASSON

were still holding funds in escrow; is that correct?

A. I couldn't tell you, it's in that complaint. It's been a long time since I last read it. It speaks for itself. Whatever's in it, is in it.

MR. KATAEV: I send a request for sharing. Thank you.

Let's take a look at the screen please. Referring to paragraphs 105 to 106.

I will represent that this is NYSCEF document 31 and Index 617224 of 2022, in the lawsuit filed by Island Auto Group against the Deos.

This will be marked as Thomasson's Exhibit 1.

(Whereupon, Thomasson's Exhibit 1, NYSCEF document 31, was marked as for identification as of this date by the Reporter.)

A. What is it you want me to read?

Q. 105 and 106.

A. I see it.

Page 37

H. THOMASSON

Q. Upon reviewing paragraph 106, do you recall any representation you made to Island Auto Group that you were still holding these funds?

A. I didn't speak with them very much at all, no. I tried as best I could to keep our communications in writing 'cause I just didn't understand what was going on.

Q. The earlier lawsuit that we discussed that was withdrawn, do you recall when that was filed?

A. The summons with notice that I filed?

Q. Correct.

A. It was the end of November 2022.

MR. KATAEV: Off the record.

(Whereupon, a brief recess was taken.)

Q. You testified that the lawsuit was withdrawn in part because the funds had already been received back, right?

A. Whatever my testimony was it

Page 38

H. THOMASSON

was. I think that was a small part of withdrawing it but there's no doubt that the money was given back.

Q. When was the money given back such that it was placed in your attorney escrow account?

A. It was November of 2022, I don't know the exact date.

Q. Your bank records would reflect that, right?

A. No question.

MR. KATAEV: Okay. I wanna refer your attention to the summons of notice on the screen.

It is docket entry 1 in NYSCEF document entry 1 for 616542 of 2022.

(Whereupon, Thomasson's Exhibit 2, NYSCEF docket entry 1 for 616542, was marked as for identification as of this date by the Reporter.)

Q. Based on your review of that document when was the summons of notice filed?

A. Well, the stamp on it says

Page 39

H. THOMASSON

November 23, 2022.

Q. Scrolling down to the bottom, it's also dated November 23, 2022, correct?

A. I see it, yes.

Q. You electronically file your documents, correct?

A. I electronically filed some documents, yes.

Q. You don't use an outside service to electronically file any documents, do you?

A. Never.

Q. If I told you that based on the bank records the funds were placed back in your escrow account on or about November 22, 2023.

Does that change your testimony about why the lawsuit was withdrawn?

A. The $735,000 dollars didn't have a lot to do with why it was withdrawn.

Q. You're also a defendant in a lawsuit filed by one of your clients Jill and Mike Enterprises, correct?

A. Yes.

Page 40

H. THOMASSON

Q. What is the current status of that lawsuit?

A. It is proceeding.

Q. Are there any motions pending?

A. I don't think so.

Q. If I understood your testimony correctly before you don't have any malpractice insurance coverage, correct?

A. Correct.

Q. In that lawsuit you are accused of, among other things telling your clients client that you can help them commit arson at the restaurant, correct?

A. Yes, they did, yes, they said that.

Q. You deny that?

A. Oh, 100 percent.

MR. KATAEV: I'm marking Thomasson's Exhibit 3.

(Whereupon, Thomasson's Exhibit 3, NYSCEF docket entry 1 Index number 615345/2023, was marked as for identification as of this date by the Reporter.)

Page 41

H. THOMASSON

Which is NYSCEF docket entry 1 Index number 615345/2023.

I'm direct the witness to review paragraph eight, which I've highlighted.

A. Okay.

Q. Having had the opportunity to review this paragraph, can you identify the person that you knew that can help them commit arson?

A. Um, it was a -- I did introduce Michael Madison, no, withdrawn.

I did set up a meeting between Michael Madison and someone he asked me to meet with, someone that he knew through his brother that I had previously represented.

Q. For the record, Michael Madison is a principal of the plaintiff, Jill and Mike Enterprises?

A. Yes. He asked to meet with that person. And I even remember saying to him that it was kind of odd that he was asking me to set that up. Since he and I both knew that that person was a friend of

Page 42

H. THOMASSON

Michael Madison's brother. I said why don't you just go to your brother to meet with this guy, he said he had some business he wanted to discuss with this guy, and he said because my brother moved to the Carolinas, and it would just be easier since you know him as well, if you could set it up.

So I set up a meeting between two person people. What took place in meeting I wasn't present for.

Q. Understood. But to your understanding, the discussion about arson was between Michael Madison and that individual?

A. 100 percent, and I found out afterwards because that people person called me up to chew me out over the fact that that's what this guy brought up to him. And he was mad as hell about it. And I didn't know what he -- I didn't know what he wanted to talk about. I just knew he asked if I could set up a meeting that's all I did it for.

Page 43

H. THOMASSON

Q. What is the identity of the person you introduced Michael Madison to?

A. His first name is Doug. I'd have to double check on his last name. It's been a long time.

Q. Did you introduce Michael Madison or his wife Jill to anyone related to this case?

A. Oh, no, no. They are not involved in this at all. I barely knew his wife.

Q. You were also involved in an action as a defendant in a personal injury is case arising of a car accident, correct?

A. Oh, I believe so, yeah.

Q. You were sued together with an individual named Maxwell Thomasson, correct?

A. Yeah.

Q. Is Maxwell your son?

A. Yeah, he had borrowed my car and had an accident.

Q. That case a has been resolved, right?

Page 44

H. THOMASSON

A. Yes.

Q. You also have a lawsuit in which you sued an individual named DiMarco, correct?

A. Yes.

Q. That lawsuit arises out of what I understand is a street fight that occurred, right?

A. I wouldn't put it that way, but I understand what you're saying.

Q. So you tell me what happened that led to this lawsuit?

A. It has nothing to do with this case, Mr. Kataev.

Q. I understand your objection to relevance, but I'd like for you to answer a question.

A. A man made a gesture at me across the street from me and when I walked across the street to talk with him about it he hit me.

Q. What was the gesture that he made to you?

A. He gave me the finger and made

Page 45

H. THOMASSON

a lewd gesture as well.

Q. The lawsuit you filed against Mr. DiMarco was dismissed, correct?

A. Well, it's up on appeal.

Q. To your knowledge was the appeal decided?

A. No.

Q. In the appeal the appellate division issued an order to show cause as to why you should not be sanctioned, correct?

A. Initially, yes.

Q. That decision on the order to show cause remains pending, correct?

A. Yes.

Q. You also represented Superb previously in connection with a complaint filed in federal court by an individual named Shory; do you recall that?

A. Yes.

Q. What is your understanding or your memory and your knowledge, the allegations that formed the basis for that complaint?

H. THOMASSON

A. I don't recall. I was involved for a very brief period of time. Roughly a month maybe in July and August of 2023.

Q. Did you conduct any investigation of the facts related to that case?

A. I believe I filed an answer in that case. So I would have been checking on what happened, yes.

Q. In that case I'll represent to you that the sum and substance of the complaint is that the dealership failed to register the vehicle and remit taxes to the state despite obtaining payments for both the registration fee and the taxes; does that ring a bell?

A. No. If you're representing that that's what it says, I'm sure it does. But, like I say, I had a very brief involvement in that nearly three years ago. I don't recall much about it. I know it happened but I don't know much about it.

Q. This was not the first case in which you represented the Deos, in



H. THOMASSON

connection with a customer dispute at a dealership, correct?

A. Well, I would say that that question has poor form, because I don't think that I ever represented the Deos in connection with customer complaints, I represented dealerships.

Q. Let's rephrase the question. This is not the first time you represented dealerships owned and/or operated by the Deos in connection with complaints made by customers, correct?

A. Correct.

Q. In fact you've previously represented to the court numerous times that you've represented the Deos and the dealerships that they operate and/or own in connection with customer complaints in court and before the DMV, correct?

A. I have represented Northshore, 189 Sunrise and Superb in court involving -- in court cases involving allegations by customers. I have also represented those dealerships or at least Northshore and 189



H. THOMASSON

Sunrise with regard to consumer affairs complaints.

I do not have a present memory of representing any of those dealerships to the DMV.

Q. Outside of those three dealerships that you've identified, I'm setting aside any dealerships any other dealerships owned and/or operated by the Deos, have you ever represented any other dealership in connection with customer complaints at the DMV before consumer agencies or courts?

A. Yes.

Q. Which dealership or dealerships were those?

A. I can't recall names, I can tell you that I first started dealing with dealerships in the 1990s in connection with where I was working at that time up in Massachusetts. And it also happened here in New York prior to my working with Northshore. I dealt with dealership issues for just a couple of other dealerships, and



H. THOMASSON

I don't recall their names.

Q. Outside of dealerships owned and/or operated by the Deos, how many other dealerships have you represented as an attorney?

A. Since I first became an attorney?

Q. Yes.

A. I would say between -- I don't wanna guess, but I would say it is between five and ten.

Q. Prior to the time that you came to represent the Deos at Northshore and Sunrise, when was the last time you had represented a dealership in connection with any matter?

A. It would have been earlier this century, but I can't tell you exactly when.

Q. Early 2000s?

A. It could have been 2000s, it also could have been, you know, in the early -- up through the early teens as well.

Q. So there was at least

H. THOMASSON
approximately five to ten years of gap time between the last time that you represented a dealership and the time you represented the Deos as a dealership, correct?
A. I would say that number is closer to five.
Q. What were the circumstances upon which you ceased to represent the prior dealerships before the Deos?
A. Well, I seem to recall one of them was sold and I think another one went out of business.
Q. Has any dealership ever terminated your representation as an attorney prior to your involvement with the Deos?
A. No.
MR. KATAEV: Off the record.
(Whereupon, a brief recess was taken.) Thomasson's Exhibit 4.
During an off the record conversation. I presented the witness with an exhibit that will be marked as Thomasson's Exhibit 4.



H. THOMASSON
It is a complaint filed in federal court by an individual named Alexander Owhonda, O-W-H-O-N-D-A against among another parties Northshore Motor Leasing, LLC.
(Whereupon, Thomasson's Exhibit 4, complaint filed in federal court by an individual named Alexander Owhonda, was marked as for identification as of this date by the Reporter.)
Q. Mr. Thomasson, do you recognize this document?
A. Yes.
Q. You represented Northshore in connection with this complaint, correct?
A. Yes.
Q. Generally speaking in this complaint, the plaintiff accuses Northshore of engaging in fraud, correct?
A. In sum and substance, yes. That was the accusation.
Q. One of the causes of action against Northshore was for fraud, correct?



H. THOMASSON
A. I believe so.
Q. Referring you to the 48 page of the 67 page complaint. The first cause of action is for common law fraud, correct?
A. It seems to say that, yes.
Q. I just observed you taking notes in a notepad in front of you?
A. Yes.
Q. What is that you wrote down?
A. I'm just taking a note with regard to trial preparation.
MR. KATAEV: We're gonna call for the production of any notes that you take at the end of the deposition.
So just be forewarned about that.
Q. Do you recall having any of issues or disputes with Mr. Deo in the course of your representation of Northshore in connection with this case that we just discussed?
A. Not that I can recall.
Q. What was that?



H. THOMASSON
A. Not that I can recall.
MR. KATAEV: Marking Thomasson's Exhibit 5.
Which is docket entry 21 from the same case. A one page letter filed by Mr. Thomasson.
I'm gonna give the witness an had opportunity to read.
(Whereupon, Thomasson's Exhibit 5, Docket entry 21, was marked as for identification as of this date by the Reporter.)
A. I see what it says.
Q. Having read this letter that you drafted does that refresh your recollection as to any disputes or issues that you had with Mr. Deo in connection with this case?
A. No, it does not.
Q. You ultimately did not move to withdraw, correct?
A. That's correct. I don't know what happened at this point. I don't recall off the top of my head, four years

Page 54

H. THOMASSON

ago.

Q. Was the reason that you sought to withdraw because Mr. Deo asked to you to do something unethical?

A. I don't ever recall a client asking me to do something unethical, any client, so I don't think that that happened here either. I don't recall what this letter is referring to.

Q. Do you recall whether you advised Mr. Deo to settle this case due to any exposure?

A. That case was settled. It was resolved and Northshore didn't have to pay a penny. There was no finding against Northshore at all.

Q. So your representation is that you were able to settle this case without paying any funds?

A. This case got settled without anyone -- without Northshore having to pay any funds. I don't know what CAC did. It was dropped as against Northshore.

MR. KATAEV: Placing on the

Page 55

H. THOMASSON

screen Thomasson's Exhibit 6.

This is NYSCEF document entry document 41 from the same case.

(Whereupon, Thomasson's Exhibit 6, NYSCEF docket entry 41, was marked as for identification as of this date by the Reporter.)

Q. This is another letter filed by you, correct?

A. It looks like it.

Q. In this letter on the letterhead you represent your address as Suite 112 at 3208 Sunrise Highway, correct?

A. I see that.

Q. There is no suite at 3280 Sunrise Highway, correct?

A. No. That's post -- a private post office box location.

Q. Filings in this case your letterhead says box 112, correct?

A. It says whatever it says.

Q. You purposefully changed this to say Suite 112 in this letter, correct?

A. I don't know who changed that.

Page 56

H. THOMASSON

Q. Do you have any support staff that assist you with preparing letters?

A. I have had assistant at various times in my career. I don't know how that worked its way into a letterhead, but I'm sure that, you know, I don't pay any attention to the letterhead when I'm writing.

Q. All right. We'll take a look at the contents of the letter. Showing you the first page. Let me know when you're done reading the first three paragraphs.

A. What do you want me to read?

Q. First three paragraphs.

A. Okay.

Q. In this letter you are apprising the federal court about the existence of the lawsuit filed by Island Auto Group against the Deos, correct?

A. The letter speaks for itself.

Q. You also explained to the court that you're a defendant in that action, correct?

A. The letter speaks for itself.

Page 57

H. THOMASSON

Q. Let's read throughout the fourth paragraph on page one down to the next page.

A. Okay.

MR. KATAEV: Off the record.

(Whereupon, a brief recess was taken.)

Q. Have you had an opportunity to review the remainder of this letter the docket entry 41 of the Owhonda case while we were off the record, right?

A. Yes.

Q. In this letter you represent to the court that the files of Northshore were taken and that you are handicapped from defending the case, right?

A. The letter speaks for itself.

Q. But that's what you told the court, yes?

A. Whatever the letter says is what I represented to the court.

Q. And Mr. Thomasson that's not responsive to my question.

I'm asking you to confirm if

H. THOMASSON

that's what you said. Can I have an answer to that?

A. But your summation isn't word for word. It's not as though you're quoting it. In general, I made representations to the court in this letter, yes.

Q. Part of those representations were that you are handicapped from defending Northshore in the case because you do not have the files, correct?

A. Yes.

Q. What efforts, if any, did you make to obtain the files?

A. I had conversations I know with Russell Shanks about the files in connection with that case.

That state case, while it was still in state court I had conversations on more than one occasion with Russell Shanks.

Q. Other than verbal conversations, did you ever make any formal demand in writing to obtain the files?

A. I don't know.



H. THOMASSON

Q. At the end of the letter you represent to the court that you would like for the court to adjourn the arbitration until such time that the ownership of Northshore could be decided, correct?

A. It says what it says the letter, letter speaks for itself.

Q. Did you ask for an adjournment so that the ownership of Northshore could be decided?

A. I asked for the reasons that are in that letter. Which are related to the fact that ownership at that point was undecided.

Q. You also wrote that should the Nassau court determine instead that your clients are not the owners to the business that you would like time to allow for time for substitution of counsel; do you see that?

A. I do see it.

Q. In this letter you acknowledge the possibility that the Deos are not the owners of Northshore, correct?



H. THOMASSON

A. I never thought that there was any possibility of that, no. But I understand that it certainly could happen, it was not within my control.

Q. You acknowledge the possibility that the court decided against you, correct?

A. I acknowledge that a court could decide that issue differently than I saw it, yes.

Q. Also in this letter you represent to the court that the co-defendant, Credit Acceptance Corp settled its portion of the case, both with the substantial payment of money as well as forgiving the loan at issue, correct?

A. That's what it says.

Q. To your knowledge, when Credit Acceptance Corp did those things, did Credit Acceptance Corp require the Deos or Northshore to pay money back to it as a result of doing that?

A. Credit Acceptance Corp?

Q. Yes.



H. THOMASSON

A. No.

Q. What is your basis for saying that?

A. Because I know that I settled that case with no liability to Northshore.

Q. From Credit Acceptance Corp's side and the plaintiff's side?

A. Correct.

Q. Did you review the agreement that Northshore had with Credit Acceptance Corp during your representation of Northshore in this case?

A. I don't understand that question.

Q. To your knowledge is there any agreement between Northshore and Credit Acceptance Corp?

A. From this case?

Q. Yes.

A. No, there is none.

Q. Outside of this case, is there any general agreement between Northshore and Credit Acceptance Corp?

A. Not to my knowledge.

Page 62

H. THOMASSON
MR. KATAEV: Now, we're gonna call for the production from the Deos of any agreement that they have from Credit Acceptance Corp related to Northshore.
We'll follow up in writing.
A. There isn't one, but you can ask for it.
Q. How do you know there isn't one?
A. Because I'm the one that resolved this case and I know that there isn't one.
Q. To your knowledge, how did Credit Acceptance Corp lend the plaintiff money for this transaction?
A. I don't know what Credit Acceptance Corp did, and certainly not at this point. I have no memory of what went on in detail in that case. But I know that it resolved with no liability whatsoever to Northshore. It was just dropped as to Northshore.
MR. KATAEV: Off the record.

Page 63

H. THOMASSON
(Whereupon, an off-the-record discussion was held.)
Mr. Thomasson I'm showing you a document that's going to be marked as Thomasson's Exhibit 7.
It is a another letter submitted in connection with the case docket entry 43.
(Whereupon, Thomasson's Exhibit 7, Docket entry 43, was marked as for identification as of this date by the Reporter.)
Q. I will give you an opportunity to read it, but I wanna tell you where my question is going to be focused on.
A. I've read that first page.
Q. Let's go on to the second page.
A. Can you move that arrow, please?
MR. KATAEV: Let the record reflect I complied with the witnesses request.
A. The one in the middle of the paragraph, it is just a word there I can't

Page 64

H. THOMASSON
read. Thank you. Okay, I read the letter.
Q. At the top of page two you make a representation that Northshore is at this time a shell with no assets, correct?
A. As far as I knew, as of the date of this letter, that's what I knew at the time that I wrote that sentence.
Q. How did you know that?
A. From discussions with the Deos.
Q. You also knew that because you personally visited those dealerships, correct?
A. No, I don't know how that would impact knowing that it's a shell with no assets. That's just what -- as far as I understood the owners of those businesses told me was their condition.
Q. Did there come a time when you visited either Northshore or Sunrise and observed that there was no normal activity of a dealership going on?
A. No.
Q. Are you familiar with the cross purchase agreement between Mr. Deo and Mr.

Page 65

H. THOMASSON
Urrutia?
A. From this case only, yes, I didn't know about it beforehand.
Q. Mr. Deo never asked you to review it or advise him on it?
A. No, I knew nothing about Superb. I didn't even know it existed until sometime in 2023.
Q. Did Mr. Deo ever informally ask you for any advice about such agreements?
A. What agreements?
Q. Agreements such as the cross purchase agreement or any agreement to obtain an interest in a dealership?
A. No.
Q. You're also representing Mr. Deo in connection with a lawsuit against the commercial landlord of the Hicksville dealership, he is operating, correct?
A. Yes.
Q. What is the basis for the claims that you brought against that landlord?
A. Which landlord?

Page 66

H. THOMASSON

Q. The landlord of the Hicksville location.

A. There have been two of them, I don't know which one you're referring to.

Q. Let's take a step back. When you say there have been two of them, you're saying there have been two landlords in Hicksville?

A. Yes. At some point there was one landlord and then that landlord sold to someone else.

Q. So there were two landlords for the same property?

A. Yes.

Q. There is only one lawsuit related to that landlord, correct?

A. Are you talking about the incident with the two guys and the hammer and the knife?

Q. Yes.

A. Is that what you're talking about?

Q. Yes.

A. That's the only lawsuit that I

Page 67

H. THOMASSON

brought against any landlord over there and I do know about that case.

Q. What was the purpose of bringing that lawsuit against the landlord?

A. Well, it was a pretty serious matter. From what I was told and I don't have any firsthand knowledge, but from what I learned about it there was a physical attack with threats of murder.

Threats of murder brought in relation to a landlord deciding and having a conversation with the two perpetrators that he'd would be happy to have them come in as tenants 'cause I think an offer was made to pay more than the Deos were paying and then he basically arranged for them to get the Deos out of there.

And these two guys took that to mean physical and verbal threats. And they engaged in something. Were arrested for it. As far as -- I don't know anything about the status of that but I was told that they were arrested and that there was a restraining order.

Page 68

H. THOMASSON

Q. Were you involved in obtaining a restraining order?

A. No.

MR. KATAEV: Showing what we will mark as Thomasson's Exhibit 8.

It is NYSCEF docket entry 4 from Index number 608820/2025.

It is a letter to Gary Calmenson.

(Whereupon, Thomasson's Exhibit 8, NYSCEF docket entry 4 Index 608820/2025, was marked as for identification as of this date by the Reporter.)

Q. Before you read the letter, to your knowledge who is Gary Calmeson?

A. Now that I see the name I believe that he might have been the first of the two landlords.

Q. You are saying in here that you represent Mr. Deo, Ben Pramod and Asshish Udayaan, correct?

A. Yes. I believe those were the three people who were attacked.

Page 69

H. THOMASSON

Q. What is Mr. Pramod's relationship to Mr. Deo?

A. Like Mr. Udayaan, he's a young man that works in the dealership.

Q. And Mr. Udayaan, do you have knowledge as to whether he is involved in assisting Mr. Deo obtain floor plan lines of credit?

A. I don't know anything about what those two young men do.

Q. Same question for Mr. Pramod, do you have any knowledge that Mr. Pramod is assisting Mr. Deo with obtaining a floor plan line of credit?

A. I have no knowledge of what they do for and with the Deos at dealerships. I have no knowledge of that. I don't get involved with dealership operations. I don't know anything about that.

Q. Is it fair to say that the goal of filing this lawsuit was to permit Mr. Deo to continue to operate from that location without paying rent?

Page 70

H. THOMASSON

A. That wasn't a goal of mine.
Q. Do you have any knowledge as to whether Mr. Deo was timely in paying rent to the landlord at this property?
A. I don't know what happened between he and Mr. Calmenson after that.
Q. To your knowledge are there any mechanics that worked at that location for Mr. Deo's dealership?
A. I don't know anything about mechanics in any of these dealerships at any time.
Q. To your knowledge, is Mr. Deo still operating out of this dealership at this location, to your knowledge?
A. As far as I know, yes.
Q. In connection with this lawsuit, have you spoken to either Mr. Merckling or Mr. Blankenship?
A. Not that I know of, no.
Q. The reason why the landlord at the Hicksville property was trying to evict Mr. Deo was because Mr. Deo was not paying rent, correct?

Page 71

H. THOMASSON

A. That's a different landlord, but, yes.
Q. To your knowledge when did the change in landlord's occur or when did the property get sold to the new landlord?
A. I don't know.
MR. KATAEV: Showing Thomasson's Exhibit 9.
I will represent to you that this is NYSCEF document history for this case we were just discussing.
(Whereupon, Thomasson's Exhibit 9, NYSCEF document history, was marked as for identification as of this date by the Reporter.)
Q. Do you recognize this?
A. I presume that's an accurate representation of the electronic docket of that case, that's what it looks like. I need a quick walk. I'm sorry.
MR. KATAEV: Off the record.
(Whereupon, a brief recess was taken.)
Q. You filed the summons with

Page 72

H. THOMASSON

notice in this case on April 24, 2025, correct?
A. That's what it indicates.
Q. You never filed any affidavit of service here, did you?
A. I don't know, what -- if there were additional pages to this or not.
Q. On the face of this docket there is no affidavit of service, right?
A. On the page you're showing me there's no affidavit of service filed there.
Q. Notwithstanding that there is a demand for a complaint filed on May 27, 2025, right?
A. If that's what it says, yeah.
Q. To your knowledge when is the complaint due after the demand for a complaint is filed?
A. I'm only here as a fact witness, not as an expert.
Q. I'm not asking you as an expert, I'm asking to your knowledge when is it due?

Page 73

H. THOMASSON

A. Typically between 20 and 30 days thereafter.
Q. Okay. Has the complaint been filed in this case?
A. Apparently not. If this is the only page of the docket sheet.
Q. Well, was it intentional for you not to file a complaint?
A. No, as a fact matter of fact it wasn't.
Q. Were you given any instruction by Mr. Deo not to file a complaint?
A. No, in fact I thought it was, I know it's done.
Q. Are you aware of the existence of any litigation between Mr. Deo and the landlord of the residential property in which he resides?
A. There was an eviction that I was not a part of, yes.
Q. How did you come to know that?
A. I don't recall.
MR. KATAEV: Showing you Thomasson's Exhibit 10.

Page 74

H. THOMASSON

It is NYSCEF docket entry 77 and index 612890/2025.

(Whereupon, Thomasson's Exhibit 10, NYSCEF docket entry 77 Index 612890/2025, was marked as for identification as of this date by the Reporter.)

Q. Have you ever seen this decision and order?
A. No.
Q. Referring your attention to a factual summary beginning on the bottom of page two through the second paragraph at the top of page three. Please read it let me know when you're done.
A. Okay. I read it through the sentence that ends per month at the top of page three.
Q. I want you to read the last paragraph as well, please. "Plaintiff did not close through unpaid rent".
A. I see what it says.
Q. You are aware that Mr. Deo is currently residing 3 Hunting Lane in Old

Page 75

H. THOMASSON

Westbury, right?
A. Yes.
Q. You are aware that he claims that he's the owner of that property, right?
A. I know that he intended to be the owner of that property. I don't think he became the owner of that property.
Q. In this decision from the court, there was a finding made by the court that the title owner of that property is Jiying Wei, is that right?
A. I never read this decision.
Q. But based on what you're reading now that the court made the finding in that regard?
A. That seems to indicate, if this is a writing from the court, it indicates that Jiying Wei is the owner.
Q. Has Mr. Deo ever asked you for any legal services in connection with the purchase of this property?
A. No.
Q. Were you aware that Mr. Deo has

Page 76

H. THOMASSON

not paid rent at this property from July of 2023 through June of 2025?
A. No.
Q. Is it surprising to you that Mr. Deo has not paid rent at his residence for approximately two years?
A. I don't know that my opinion is relevant. I don't -- I don't know if he has or he hasn't. I don't know anything about the case. I don't have any basis to respond.
Q. You are representing Mr. Deo, however, in a lawsuit brought by the owners of Cherrywood Auto, right?
A. Yes.
Q. Is it fair to say that the allegations in the Cherrywood lawsuit are strikingly similar to the allegations in this lawsuit?
A. I have no idea.
Q. Have you read the complaint in the Cherrywood lawsuit?
A. I'm sure that I did.
Q. Have you read the complaint in

Page 77

H. THOMASSON

this case?
A. When you say this case you're talking about the federal case before magistrate Wicks?
Q. Yes.
A. Yes, it was last year that I last read the last complaint.
Q. Based on your knowledge and recollection from reading the complaint in this case before Judge Wicks and in the Cherrywood action, is it fair to say that the actions against Mr. Deo are similar?
A. I don't recall all of the allegations in the Cherrywood case. I don't recall all of the allegations. There are many counts in this case. I don't know how to compare the two cases.

MR. KATAEV: Showing you Thomasson's Exhibit 11.

It is NYSCEF docket entry 16 index 616451/2025.

(Whereupon, Thomasson's Exhibit 11, NYSCEF docket entry 16 index 616451/2025, was marked as for

H. THOMASSON
identification as of this date by the Reporter.)
Q. Are you familiar with this document?
A. Yes, I believe that I have seen that.
Q. Referring you to paragraph one. It states in sum and substance that "plaintiff's claims arise from a coordinated scheme by defendant Anthony Deo and defendant Ben Joseph Pramod to misappropriate and divert sales proceeds, warranty monies, and other receivables of plaintiffs using forged and falsified paperwork, false insurances regarding lien payoffs and warranty remittances and unauthorized endorsement/deposit of checks payable to either plaintiff Cherrywood Service or plaintiff Cherrywood Auto Sales"; do you see that?
A. I see what it says, yes, in paragraph number one.
Q. In this Superb case the plaintiffs both the Island Auto Group



H. THOMASSON
plaintiffs and the Superb plaintiffs make similar allegations that Mr. Deo diverted and misappropriated sales proceeds, correct?
A. Yes.
Q. In this case, both the Island Auto Group plaintiffs and the Superb plaintiffs make similar allegations that the Mr. Deo misappropriated and diverted warranty monies, correct?
A. This paragraph certainly speaks for itself and it says that.
Q. My question is, this paragraph which speaks for itself is similar to paragraphs in the complaint in our case, correct?
A. Similar, yes.
Q. The same question with number three. Other receivables of plaintiffs. The plaintiffs in this case make similar allegations that others receivables of the plaintiffs in this case were misappropriated and diverted by Mr. Deo, correct?



H. THOMASSON
A. Those allegations are similar from both cases, yes.
MR. KATAEV: Showing you Thomasson's Exhibit 12.
I will represent this is NYSCEF docket entry 1 of Index 624451/2025.
It is a lawsuit filed by Albert Hakim against Anthony Deo.
(Whereupon, Thomasson's Exhibit 12, NYSCEF docket entry 1 of Index 624451/2025, was marked as for identification as of this date by the Reporter.)
Q. Do you see that?
A. I do.
Q. Are you aware of the existence of this lawsuit?
A. I don't know that I am.
Q. Has Mr. Deo asked you to represent him in connection with this lawsuit?
A. Nothing that I recall.
Q. Do you know who Albert Hakim is?



H. THOMASSON
A. No, I do not.
Q. Referring you to page two the first page of the complaint following the summons and paragraph fours through seven. Going into the third page.
Can you please read it and let me know when you're done.
A. Okay.
Q. Are you aware that Mr. Deo obtained a loan had from Mr. Hakim?
A. No.
Q. Are you familiar with the entity identified in paragraph five as Northshore Funding and Management LLC?
A. No. Not off the top of my head.
Q. When did you first begin to practice law?
A. 1989.
Q. Did you open up your own practice or did you work somewhere first?
A. I worked someplace first.
Q. Where did you work?
A. I worked for a lawyer named

Page 82

H. THOMASSON

John Zolonez.
Q. Is that the only firm you worked with before opening up your own firm?
A. No.
Q. Who else have you worked for?
A. A lawyer named Jeffrey Wilder.
Q. Other than those two did you work for anyone else before going on out on your own?
A. No, excuse me, did I work for anyone else, yes.
Q. Who else?
A. When I came here, I worked for a firm for called Steinberg, Finio and Berger.
Q. Other than that firm and the other two that you identified have you ever worked for any other firm before going out on your own?
A. No.
Q. What about the firm, in which Gary Fischoff is a partner?
A. At some point he joined

Page 83

H. THOMASSON

Steinberg Finio and Berger, and he was in that law firm. I don't think that law firm exists anymore.
Q. When did you first begin to practice as a solo, just the year?
A. It would have been in the 1990s, first in Massachusetts.
Q. What about in New York?
A. It would've been Somewhere around 2006 or 2007.
Q. What prompted your decision to go out on your own?
A. I always wanted to practice on my own. The two individual lawyers and the law firm that I worked for were all small practices that gave me the background I needed and wanted to work on my own.
Q. What were the circumstances upon which you separated from employment with the two individuals that you originally worked with?
A. It was in starting my own practice, I ended up eventually doing that instead of just working for those two

Page 84

H. THOMASSON

individuals.
Q. Were you terminated by any of them?
A. No.
Q. What about from the firm that you worked at in New York, what were the circumstances of your separation from employment there?
A. I was going on out on my own.
Q. It was your decision to leave them?
A. Yes.
Q. Have you ever met with David Baron?
A. I believe by coincidence I was introduced to him one day at Northshore. But, I don't remember what, if anything was discussed.
Q. And that's because sometimes you worked out of Northshore, correct?
A. I never worked out of Northshore.
Q. What were the circumstances upon which you were present at Northshore

Page 85

H. THOMASSON

when you first met David Baron?
A. While Northshore was operating there were a handful of times I was there, to speak with Anthony Deo about whatever I was dealing with at that time. Maybe it was also sometimes that I was getting a check, if they were paying a bill.
Q. When you met with Mr. Deo at Northshore to work on whatever you were dealing with at the time, it's fair to say that it related solely to customer complaints at either the administrative agency level, with consumer affairs, DMV or a lawsuit, correct?
A. No.
Q. What were the other duties you had with respect to your representation of Northshore at the time that you met David Baron?
A. I wouldn't say that I had duties, when they had something that they wanted to bounce off of me and have me handle or ask me about, they would reach out to me. I didn't have duties to them.

Page 86

H. THOMASSON

And the subject matters of those contacts with the Deos and Northshore. It was really just Anthony Deo. I didn't know Sarah until after the lawsuit was filed in December of 2022 by IAG Group.

But I mean we did communicate but I really didn't know her at all. When we communicated, it was -- I think it was either an e-mail or a phone call. When she was filling in details of something that Anthony had previously discussed with me that he wanted me to handle.

What we had in the way of work were consumer affairs type complaints. There was a lawsuit or two and I'm sure there were other things. But I can't recall off the top of my head. It was years ago.

Q. The lawsuits that you referred to are by customers of the dealership, correct?

A. Well one of them you showed earlier, the Owhonda federal action, that was one.

Page 87

H. THOMASSON

Q. Do you recall what the other one was?

A. I don't.

Q. To your knowledge and recollection was it a customer that sued?

A. I don't recall.

Q. Is it fair to say that your representation of Mr. Deo and his business interests consisted primarily of issues with customer disputes?

A. Yes, I would say that's right. Over the course of about -- I would say three years at the three dealerships there were, altogether maybe a dozen of those situations that I dealt with.

Q. In the course of your representation of Mr. Deo's business interests in connection with those consumer cases you investigated those complaints, correct?

A. Yes.

Q. In your investigation of the complaints did you find that any of the customers claims had merit?

Page 88

H. THOMASSON

A. As a matter of fact I found that to be the case rarely if ever. And almost everything that I handled for them ended up getting resolved with little or no payments of any sort.

I recall there was a lawsuit that actually went to trial and there were a couple of those and they lost. The other side the consumers. Consumer affairs cases were resolved without any findings by consumer affairs.

That Owhonda case was resolved with no payment, no finding against Northshore. You know, it was just typical work from my experience in dealing with dealerships, that used car dealerships go through.

Q. You discussed in your testimony a case that went to trial. Which case or cases were those?

A. I know there was a small claim action in Nassau last year, that resolved with a finding against the plaintiff.

I know there was an action

Page 89

H. THOMASSON

somewhere in the City and it resolved with a finding against that plaintiff. Those are the two that I recall going to trial.

Q. Each of those cases are small claims cases?

A. For sure, one of them was, it's possible both were, but I can't say for sure.

Q. In each of those cases at trial who appeared if anyone to serve as a witness for the defendant dealership?

A. No one.

Q. Is it fair to say that you were able to succeed in these cases by cross examining the plaintiff and making arguments without the need for any testimony from the defendant?

A. Yes.

Q. Were you ever requested to perform any legal services in connection with an agreement between Mr. Deo and Mr. Baron for the purchase of Baron Nissan?

A. I was not involved in that deal in any way shape or form, except that after

Page 90

H. THOMASSON

Deo signed some documents and paid some money in connection with that, I was informed that he put me or my name and/or address into one or more of the documents a as a contact person in case of notice after the deal was done. I was told that.

But, I was not in any way shape or form involved in that transaction prior to and including the day that the documents were executed and monies were paid. I knew nothing about it, had nothing to do with it.

Q. Do you know an individual by the is name of Michael Morgan?

A. I've heard that name in connection with this case. I can't say that I know him.

Q. Are you aware that you sued him in the lawsuit that you filed against the plaintiffs in this case?

A. Yes.

Q. What is the basis for your lawsuit against Mr. Morgan?

A. I don't recall.

Page 91

H. THOMASSON

Q. In connection with your representation of Mr. Deo and his business interest, have you ever drafted or provided him with any operating agreements?

A. Not that I know of.

Q. Did you ever have any discussions with Mr. Deo about operating agreements?

A. No.

MR. KATAEV: Showing you Thomasson's Exhibit 13.

I will represent to you that this is a exhibit filed by Mr. Ruderman on behalf of the Island Auto Group dealerships in the lawsuit they filed against Mr. Deo Index 617224/2022.

(Whereupon, Thomasson's Exhibit 13, Exhibit Operating agreement filed in Index 617224/2022, was marked as for identification as of this date by the Reporter.)

Q. Do you recognize this document?

A. From this lawsuit, yes.

Page 92

H. THOMASSON

Q. Are you aware of the existence of any operating agreement for Northshore other than this one?

A. I'm not aware of the existence of any operating agreement for Northshore.

Q. Do you have any basis to dispute that this is the valid and only operating agreement for Northshore?

A. There is absolutely nothing about this document that I think is legitimate.

Q. What is your basis for saying that this document is not legitimate?

A. Because of Exhibit Q to my complaint.

Q. What is Exhibit Q to your complaint?

A. That contains the obviously false stock certificate had that was faxed from Baron Nissan to Chase Bank, on the night of the so called David Baron incident, for the purpose of removing the Deos from their own account, from their own bank account at Chase. It's obvious to me

Page 93

H. THOMASSON

that that document and this document never surfaced anywhere on earth prior to that date and are therefore phony, especially in connection with the fact that the stock certificate book was not obtained until five months after the date on the stock certificate.

Q. Do you know the date of the stock certificate offhand?

A. I believe that that stock certificate that was faxed from Baron Nissan to Chase Bank on the night of the so called David Baron incident, when he took the corporate book out of Northshore. I believe is dated January of 2018, and the corporate book was obtained in June of 2018. So, on its face that's fake.

Q. So that's your basis for saying that the stock certificate is fake, but what about the operating agreement?

A. Like the stock certificate it never showed up until after the date of the David Baron incident and only in connection with this lawsuit.

Page 94

H. THOMASSON

This hand filled out document, there's no way of knowing the authenticity of it. I think that it's completely fake. I believe fully with the results of my investigation.

Q. In the course of your investigation, did you uncover any stock certificates signed by Mr. Deo?

A. No, the corporate book was taken from what I learned on the evening of the David Baron incident.

Q. You represented Mr. Deo prior to the David Baron incident, correct?

A. I don't know that I did. I represented Northshore prior to the David Baron incident. I don't know that I ever represented Mr. Deo up until that point.

Q. Did you engage in any efforts in discovery to prove that the operating agreement is not valid?

A. I don't know. There's been a lot of work done on these cases.

Q. Did you perform any services for Mr. Deo in relation to any pandemic

Page 95

H. THOMASSON

related relief funds?

A. No.

Q. You never prepared any paperwork?

A. No.

Q. Were you ever asked to advise on any such paperwork?

A. No.

Q. Are you aware of the fact that there was an application submitted for Northshore in which Mr. Deo listed was listed as a 50 percent owner together with Mr. Baron, David Baron?

A. Can you repeat that please?

MR. KATAEV: Can you read it back?

THE REPORTER: Yes.

(Whereupon, the last question was read back by the reporter.)

A. No. Not off the top of my head.

Q. To your knowledge did Mr. Deo submit that application?

A. I don't know. I don't know

Page 96

H. THOMASSON

about that. If I've seen something like that in this case, I have no current memory of it.

Q. Can you identify who Thomas Jones is?

A. I discovered in December of 2022 that he was the accountant for Northshore, and maybe also 189 Sunrise. I don't remember for sure if he was, but.

Q. Prior to December of 2022, did you know of the existence of Jones, Little and Co and/or Thomas Jones?

A. Thomas Jones wasn't -- I think Jones and Little, I'm not positive, but I think so were involved in a lawsuit that I was involved in 20 years ago.

I don't think I knew or met or had any reason to talk to him in the course of that case.

In fact I still don't think that I've met with him, but I do think I called him in December of 2022, when I learned that he was the accountant for Northshore when this lawsuit was brought to

Page 97

H. THOMASSON

my attention. The December 2022 lawsuit at that IAG Group filed.

I had to give him a call, find out who the dealerships accountant was and I had to give him a call to find out -- I didn't understand what was going on where there was suddenly a dispute of ownership. That was not anything that I understood at that time or for a long time thereafter.

So I just thought that the best place to check was with the dealerships accountant. Find out what was being put on tax returns.

Q. What was the substance of your communications with Mr. Jones?

A. I believe that I had a conversation with him. I don't remember the specifics but in December of 2022 I was calling with the specific question in response to having read the papers initially filed in the state lawsuit by the IAG plaintiffs claiming ownership. That's what I was calling to find out about, from his viewpoint who the owner was.

H. THOMASSON

That was the brief conversation that we had at that time was centered on that subject.

Q. What did Mr. Jones say to you in response to those inquiries?

A. He informed me at time that there was no dispute. That Anthony Deo and Sarah Deo were the owners of Northshore as far as he knew and understood because he had just prepared tax returns and filed tax returns that were initially drafted by the IAG Group's accountants and approved by Josh Aaronson, with Anthony and Sarah as the owners.

So in sum and substance he seemed to be as confused as I was over someone else claiming ownership.

Q. Did you have any involvement in connected Mr. Deo to Mr. Jones?

A. Not at all, no. I didn't even know until December of 2022, who the dealerships accountant was.

Q. Are you aware of the existence of any lawsuits against Jones, Little and



H. THOMASSON

Co by other dealerships?

A. No.

Q. Are you aware that Hustedt Chevrolet, the same defendant that you previously sued on behalf of Mr. Ventimiglia, previously filed a lawsuit against Jones Little and Co?

A. It's possible that at some point that I found out that that happened, I don't really know any details.

Q. You were not involved as an attorney in that lawsuit, correct?

A. I don't think that I was involved in any way in that lawsuit, with the possible exception, there was a time there was a time, ten to 15 years ago, when one of the parties that I represented in the Hustedt Chevrolet lawsuit from 20 years ago came to me and needed me to defend a deposition for her. I did that. I remember the owner of Hustedt being at that deposition, a guy named Charlie Chalom. You know, no, I wasn't involved in any way shape or form in that lawsuit with the



H. THOMASSON

possible exception of -- I know I defended a deposition for this woman. I don't know if that was the lawsuit or some other lawsuit.

I know that it involved Charles Chalom. So, you know, I'm trying to be as accurate as I can from many years ago.

Q. To your knowledge and recollection was Jones Little and Co being accused of fraud in that case where you represented of a third party that was subpoenaed for a deposition?

A. I have no knowledge of that lawsuit.

Q. Do you utilize the services of Thomas Jones or Jones Little Co for your firm or for yourself?

A. No.

Q. Do you know Mr. Jones personally?

A. No.

Q. Are you aware of the existence of UCC liens placed by Ally at both Northshore and Sunrise, at any point in



H. THOMASSON

time?

A. At some point in time, yes. When it came time to get them removed I believe I called and spoke to an attorney about that at Ally.

Q. Did you submit anything in writing in connection with the request to have it removed?

A. I don't know.

MR. KATAEV: I'm gonna ask you to a conduct a search of your records to see if you submitted anything in writing to Ally concerning UCC liens placed on Northshore and Sunrise. And ask you to produce those documents.

I'll follow up in writing.

A. I don't know. If there's anything it's not much.

Q. But, it's fair to say you were involved in making a request to remove the UCC liens, correct?

A. I don't know that that was the subject. I know that there was one or more

Page 102

H. THOMASSON

UCC liens. I know I had a conversation with somebody at Ally. I believe it was an attorney. Beyond that, I really don't know anything else.

Q. The purpose for seeking the removal of the UCC liens was for obtaining a loan from Flushing Bank, correct?

A. I have no knowledge of that. I had no knowledge of the Libertas or Flushing Bank dealings beforehand. Anything I've learned about that have been in this lawsuit.

Although, in between I may have been asked at some point to speak with them about the Deos inability to make repayments. I had no knowledge of those loans or bank dealings at all beforehand, nothing at all. Nobody came to me with anything.

Q. You deny any involvement or representation in connection with the application for funds from Flushing Bank and Libertas?

A. 100 percent. Never even knew

Page 103

H. THOMASSON

about it.

Q. Earlier today when we were looking at the letters you submitted in connection with the Owhonda case, you referred to the removal of files by Island Auto Group from Northshore and Sunrise, correct?

A. Yes.

Q. That incident, the removal of the files specifically occurred in November of 2022, correct?

A. From what I've been told, yes.

Q. You don't have firsthand knowledge you didn't observe anyone removing files?

A. I don't have firsthand knowledge of anything in these cases.

Q. But you did visit the dealership prior to the files being removed, correct?

A. Yes.

Q. After the files were removed did you ever visit the dealership again?

A. I believe I was at 189 Sunrise

Page 104

H. THOMASSON

once, maybe twice in my life maximum, and one or both of those visits would have been before November of 2022.

Northshore I was at five, six, seven times in my life. All but maybe one visit was before November of 2022. I think I was there once, after it was shuddered by the IAG Group.

Q. So it's fair to say that you got an opportunity to observe what was going on at the premises of both Northshore and Sunrise before and after the files and other items were removed, correct?

A. I never was at 189 Sunrise after November of 2022. I don't know what happened there after November of 2022. I believe when I was at 189 Sunrise for some reason I have a memory, I think that I was there twice, once to get documents from somebody and I think I was only in the -- in the parking lot. And I was only inside of that former gas station is what it looked like to me, once.

I just went into whatever door

Page 105

H. THOMASSON

was there and again I had to meet with somebody briefly to get something, I don't know what it was. So, I really don't know much firsthand about 189 Sunrise.

I was in Northshore prior to November of 2022 a handful of times. Although, I can't say that I was looking around. I don't know that there was much there that I knew about. I mean just from passing through on my way to meet Anthony and then leave. That's all I did. I didn't know anyone there other than I knew Frank Ventimiglia, if he was there when I was there, I would have said hello, but I say that as a matter of practice, certainly than as from any memory because it's been so long.

But I don't have a lot of knowledge about what was going on. I mean even just visually at Northshore, I didn't know what was going on there. I passed through go to Anthony's office. We would talk about whatever we had to talk to and then I would leave.

Page 106

H. THOMASSON

If I saw somebody, the only two people I would have had any knowledge of, I think that I recall waving a few -- a couple of times to Sarah. I barely had ever met the woman prior to December of 2022.

I would have said hello to Frank if he was there. I didn't know anybody else there.

Q. When you came to Northshore after November of 2022, did you observe the same amount of vehicles present on the lot?

A. Can you repeat that please?

(Whereupon, the last question was read back by the reporter.)

A. No, because prior November of 2022 it was a car dealership with vehicles there. Let me be clear about something, there were two big rooms at Northshore, one of which I was never in. So the real showroom that you had to walk through to go see Anthony was the only room that I was in. That was always full of cars when I was there, except on the roughly one

Page 107

H. THOMASSON

occasion that I was there after November 2022 and there were no cars in that room. I was -- I don't think that I was ever in the other big room.

Q. It's fair to say that there were no vehicles on the lot after November of 2022 outside, correct?

A. I have no way of knowing what vehicles were outside and belonged to Northshore versus all of the people who worked in the immediate vicinity of Northshore and at Northshore. I don't know, what -- I cannot sit here and tell you that I ever saw and knew that a car outside was for sale from Northshore.

That's not something that I had any knowledge of. I've never dealt with car sales involving any dealership, and I don't know anything about that at Northshore.

Q. With that qualification, understanding that you didn't know which cars were for sale and which cars were just employees, did you still observe less

Page 108

H. THOMASSON

vehicles present after November of 2022?

A. Outside?

Q. Outside.

A. I have no memory of that one way or the other, I can't say.

Q. Were you ever involved in or provided any legal advice to Mr. Deo in connection with warranty advances?

A. No.

Q. When was the first time you became aware that Mr. Deo submitted an application to Libertas for funding?

A. In December of 2022, was the first time that I became aware of Libertas Funding.

Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022?

A. Yes. All though that just slipped my mind when I answered. I don't know that it changes the question -- that it changes the answer, because I didn't know anything about Libertas.

Didn't know that, all I knew is

Page 109

H. THOMASSON

that money borrowed by Anthony Deo was taken by Josh Aaronson. That's what I knew in connection with the $735,000. If the word Libertas was spoken I have no memory of that. But I didn't care. I didn't care where he got his money from. I have never cared where any client gets any money from, it is not my business. I knew about the taking of the money and that it was given back.

I knew more about the Libertas when a few weeks later, I don't know how but I had to communicate with them about a all of what was going on, because I was -- I had, you know, just found out about the lawsuit and they had questions. I don't remember how I came to speak with them.

Q. Is it fair to say that you became aware of the existence of the funding and the existence of the dispute at the same time?

A. Which dispute are you talking about?

Q. Over the $735,000 by Libertas?

Page 110

H. THOMASSON

A. There is no question that the first I learned about the fact that Anthony had borrowed $735,000 was when Josh Aaronson had to given back $735,000.

That's when I found out that it was borrowed money by Anthony. That was the extent of what I knew from Anthony's standpoint at that time. I didn't care and it wasn't relevant to that dispute where it came from.

Q. Setting aside where it came from, you learned about the existence of the funding or money received by Mr. Deo at the same time that you learned about the dispute, correct?

A. I found out about the existence of that loan when I found out that the money obtained by Mr. Deo on behalf of his dealerships was taken by Josh Aaronson and had to be returned.

That's when I found out about it. I can't tell you what date that is, but it was late November of 2022. I specifically found out about Libertas a

Page 111

H. THOMASSON

couple of weeks after that. After the lawsuit was filed in state court by the IAG parties.

Q. It's fair to say that the Mr. Deo is the individual who informed you about these funds and that Mr. Aronson took them, correct?

A. Yes, albeitbriefly.

Q. What did you do in response learning about this issue that Mr. Deo called you about?

A. I don't know how at this point but Russell Shanks and I were put in touch with each other.

Q. What happened once you were put in touch with him?

A. There was one or more e-mails that Russell Shanks and I exchanged, that was the only way that we communicated at my insistence.

Q. What was the result of your discussions with Mr. Shanks?

A. The money was returned. I was told the police wanted it returned to Mr.

Page 112

H. THOMASSON

Deo. I was told that Mr. Aronson was going to return the money. I told them that it was gonna be returned to Mr. Deo and then that's just what happened.

Q. Did you speak to anyone at the police in connection with Mr. Deo contacting them to make the complaint against Mr. Aaronson?

A. Not that I recall. I certainly didn't meet with anybody. I wasn't involved in that way at all. Didn't know about it until after Mr. Deo went.

I can't say one way or the other if somebody called me then they called me. But, I don't recall at this point speaking with anybody in the police department.

Q. Did you have any discussions with Mr. Merckling or Mr. Blankenship in connection with the criminal complaint against Mr. Aaronson?

A. No, I never really knew those two gentlemen until August of 2023.

Q. Did you speak to Detective Marx

Page 113

H. THOMASSON

about this criminal complaint?

A. Nothing that I recall.

Q. Did you ever meet with Detective Marx?

A. Definitely not.

Q. Did you ever meet with Detective Marx?

A. Definitely not.

Q. When Mr. Aronson returned the funds where did he return them?

A. The funds came into my IOLA account.

Q. What were the circumstances upon which that occurred?

A. I would have communicated something to Russell Shanks.

Q. In other words you told Mr. Shanks to deposit it into your escrow account, correct?

A. Absolutely not. What I said was is if I'm going to be involved here's my IOLA account. If you wanna send it to me, send it to me. It's going back to Mr. Deo.

H. THOMASSON

Q. The reason you wanted it to go to your escrow account is because you did not want Mr. Shanks to know where the funds were going to go, correct?

A. Absolutely not, not at all, I didn't care about -- it's quite the opposite. I told him I wouldn't be told what I was doing with the funds. I believe I told him that they were going back to Mr. Deo, which was my full intention.

It wasn't anyone else's money but his. I don't even think there's a dispute over that. It's his money, personally guaranteed by him.

Q. Did you ask Mr. Shanks at any point at all before providing your account information for your escrow account to deliver the funds to Mr. Deo directly?

A. I'm not sure, I'm not sure. I don't think that we spoke verbally. I think everything was done in writing. I don't even wanna guess at what is and isn't in the writings. You know, you can get mixed up with your intent versus whether or



H. THOMASSON

not you said it. All I know is I was told that Anthony had just obtained these funds, they were taken, they were coming back and I know that I agreed with Mr. Deo to give him back his money, less whatever fee I was owed at the time.

Q. What discussions did you have with Mr. Deo about delivering the funds to him?

A. All I remember is that I asked him how he wanted to get it and he said you can wire it. And I asked for the wiring instructions for whatever bank account he wanted it wired to and I sent it.

I know it was pretty quick. I don't think that I had those funds in my account for more than 24 hours.

Q. Mr. Deo provided you the financial account numbers in writing, correct?

A. I don't know. Because at least theoretically I could have been on the telephone with him and taken a note, so I don't know.



H. THOMASSON

Q. Generally speaking, you exchanged text messages with Mr. Deo, correct?

A. I have exchanged text messages with Mr. Deo, yes.

Q. And similarly you have exchanged e-mails with Mr. Deo, correct?

A. Yes.

Q. When Mr. Deo provided you the financial account numbers, the routing number, and account number to deliver the funds to, did he provide you with the name on the account?

A. If it was necessary for wiring purposes I would have had it, otherwise I don't know if I did or not.

Q. In order to make the wire transfer from your escrow account what do you have to do?

A. I don't do a lot of wires and when I do them I think that I just go to the bank and do it at the bank.

Q. Physically?

A. Physically.



H. THOMASSON

Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct?

A. As far as I know, yeah.

Q. You don't know use an online or web based application at Bank of America to make any wires, right?

A. I may have also began to -- I don't know when I began to access my IOLA account online, so I don't know.

I could have theoretically done it myself, but I don't think I did because I know that I did a wire for someone last year and went to the bank for it, you know, I'm a habitual creature.

I don't think that I would have changed the way that I did that. I think that I just did it in the bank.

Q. In order to process a wire at a branch of a bank you have to fill out paperwork and sign it, correct?

A. I'm sure.

MR. KATAEV: To the extent that

H. THOMASSON
you remain in possession of any copy of such a written document requesting the wire, I'm gonna call for the production of it.
I'll follow up in writing.
A. Do you think that could have lunch now?
MR. KATAEV: Off the record.
(Whereupon, a lunch recess was taken.)
Please read back the last question and answer.
THE REPORTER: Sure.
(Whereupon, the last question was read back by the reporter.)
Q. Mr. Thomasson, are you ready to continue?
A. Yes.
Q. Mr. Thomasson, during the deposition today so far we've taken approximately three breaks, correct?
A. Yes.
Q. During any of the three breaks have you discussed your testimony with



H. THOMASSON
anybody?
A. No.
Q. Going back to our discussion before the break regardless of how the wire was initiated, generally speaking you typically need to identify the holder of the account you're wiring funds to, correct?
A. Yes, whatever information is needed for the wire is needed for the wire, yes.
Q. Do you have any specific recollection that the account holder is necessary to be identified?
A. I don't know if the name on the account matters as much as the account number. I don't know whether it does or it doesn't.
Q. You don't remember?
A. No, I don't. I haven't made that many wires in my life that I have a particular knowledge or memory of that. And I haven't done one in a long time now.
Q. When did you first review the



H. THOMASSON
agreement that Mr. Deo entered into with Libertas as a principal of Northshore and/or Sunrise?
A. What agreement are you talking about?
Q. The Libertas agreement.
A. I saw documents produced in this case, beginning I think in 2023. I definitely did not see any documents related to his loans, his direct dealings with Libertas and Flushing, until after they occurred. And I believe it would have been after the night of the lock out in early August of 2023.
Q. So, it's fair to say, based on your testimony that you did not advise Mr. Deo in connection with the Libertas agreement before he entered into it, correct?
A. 100 percent, didn't even know about it.
Q. After you came into possession of the Libertas agreement and had an opportunity to review it, did you give Mr.



H. THOMASSON
Deo any advice about the Libertas agreement?
A. None that I know of.
Q. After reading the Libertas agreement, did it come to your attention that Mr. Deo violated provisions of that agreement?
A. I don't have a clear memory of reading that agreement in any detail. I'm aware that it exists. I've heard of your allegations. I don't think that I spent much time dealing with loan documents.
I mean I know that, I think that it was Flushing that produced something like is 8,000 pages of documents. I can assure you while I would've glanced through that and I did, I couldn't tell you much in detail about them. And I do not think it's any different for Libertas.
MR. RUDERMAN: Have we started?
MR. KATAEV: Can you hear me? Off the record. We were on mute, we took it off mute.
Can read back the last two

Page 122

H. THOMASSON
questions and answers please? At least to give them that.
(Whereupon, the last two questions and answers were read back by the reporter.)
A. I don't have a clear memory of reading it in any detail.
Q. After reading the Libertas agreement, so it's fair to say based on your testimony that you did not do a deep dive review of Mr. Deo's agreement with Libertas as a principal of Northshore and/or Sunrise?
A. I agree with that statement 100 percent.
Q. That's the case to this day, right, you have not reviewed it in any detail to this day?
A. That's true, yes.
Q. Why is it that you didn't review this agreement?
A. I didn't think of any reason that it was necessary for me to review it. Now, that I expect to change as trial

Page 123

H. THOMASSON
approaches, but I haven't had reason to be overly concerned about that agreement until I'm getting ready for trial.
Then I'll -- by then I'll know what is and isn't in it and how necessary or concerned I am or am not. You know, I'll make those decisions then. With all of the work in this case and prioritizing work in this case, reviewing documents is cumbersome and slow. There is probably in excess of a 100,000 pages of documents in this case and I have not read all of them in depth.
Q. When you received the wire from Mr. Aaronson into your IOLA account the amount of the wire was $735,000 even, correct?
A. As best I can recall, yes.
Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct?
A. As best I can recall that sounds correct, yes.

Page 124

H. THOMASSON
Q. The difference in the amount is $12,000, correct?
A. That's the difference, yes.
Q. The $12,000 was kept by you for legal services performed for Mr. Deo and his business interests, correct?
A. That's correct.
Q. If I recall correctly you made representations to the court that that amount was outstanding and due to you for services performed, correct?
A. I believe that that was partially for past services already rendered and expected upcoming services, but I don't know what they are at this point off the top of my head.
Q. What is your agreement with Mr. Deo in connection with the legal services you performed for him in general?
A. Well, I had through November of 2022 I served as outside counsel when they needed something. What that meant was if and when they needed me they would contact me and let me know and we would -- I would

Page 125

H. THOMASSON
take care of whatever it was. I believe there was billing up until November of 2022. You know, I'm gonna guess that there were a half a dozen bills between my start during or about 2020 through the end of November of 2022, there was billing.
After that it changed. There wasn't billing after that, you know, we ended up having to deal with these cases.
Q. If I understood your testimony correctly before November of 2022 you submitted bills to Mr. Deo with what I presume to be hourly charges, correct?
A. As best I can recall, yes. About a handful, about a half a dozen.
Q. What was your hourly rate, if any?
A. I can't recall.
Q. Approximately how much in total do you believe you billed Mr. Deo for services performed from the inception of representation until November of 2022?
A. Prior to November of 2022, I would say there was between $15,000 billed

Page 126

H. THOMASSON

over roughly two and a half years.
Q. That was on an hourly basis, correct?
A. That's correct.
Q. Do you recall what, if any, down payment was required at time?
A. From back in 2020?
Q. At the inception, yes.
A. Yeah, I don't think there was. I think that we just simply -- I wasn't doing much. I didn't know much of what was going on. I was handling some outside stuff. There wasn't a lot of work involved and I billed it.
Q. The billing that you performed was based on time entries for specific dates with a description of the services performed, correct?
A. Yeah.
Q. Do you use a practice management system of any kind to issue those bills?
A. No.
Q. What is it that you use in

Page 127

H. THOMASSON

order to prepare invoices?
A. I will keep a handwritten note of time on a case. I will put it into the file, when it comes time to bill I transfer that to a bill and destroy the handwritten note.
Q. You manually write it into a Word file, when you do the bill?
A. I create the bill on Word, yes.
Q. You manually typed the bill on a Word file?
A. Yes.
Q. You stated that after November of 2022, you stopped billing Mr. Deo on an hourly basis, correct?
A. Yes.
Q. What precipitated that change?
A. The lawsuit that was filed by the IAG plaintiffs.
Q. When the lawsuit was filed, what occurred such that you stopped billing hourly and came to some other agreement?
A. I just explained to him that we'll have to see how this goes. I don't

Page 128

H. THOMASSON

know if we're gonna do formal billing or not. I had obtained a retainer to deal with what had happened in November of 2022, with the expectation that there was gonna be some sort of litigation and it wasn't necessary to bill it. That was by agreement between me and Mr. Deo, you know, after a conversation.
Q. How much was the down payment?
A. It was a fraction of the $12,000. Something tells me that that number is not a coincidence. I don't remember how I arrived at $12,000. I think it's a very good chance since I commonly ask for retainers between $5,000 and $7,500. That was probably what I was doing in that instance, not knowing where it was going and no expectation for what ended up happening. And the rest was just some money that was owed at that time, I don't know for what.
Q. You say that you stopped billing on an hourly basis. How did you determine how much Mr. Deo owes you for

Page 129

H. THOMASSON

your services if you no longer billed them on an hourly basis?
A. Because we at some point in time between -- at some point in 2023, we reached an agreement that I would be on salary.
Q. What was the salary amount?
A. I believe what we agreed upon was $3,000 a week. That was going to involve a number of things.
Q. So, is it fair to say that at the time that you deducted $12,000 that was payment for one month of services in November of 2022?
A. No, I don't think that in 2022 we were talking about any kind of a salary. I think the $12,000 is just as I've now said several times, it was payment for some work was that was already done. I think it was for two things now that I think about it.
I think it had to do with some tickets that I was dealing with for them. As well as an expected retainer given that

H. THOMASSON

we didn't know where the dispute with Josh Aaronson was headed.

Q. You are aware as an attorney your requirement under the New York rules of professional conduct, to have a written retainer agreement for any retainer in which you expect to receive $3,000 or more under the retainer, right?

A. I'm aware of that. I didn't think that the circumstances in this case rose to that level. I do think we may have one or more written agreements.

MR. KATAEV: I'm gonna call for the production of any retainer agreements or other agreements relating to the provision of legal services for Mr. Deo and his business interest, as you refer to them.

We'll follow up in writing.

Q. Notwithstanding the fact that you stopped billing Mr. Deo on an hourly basis, do you still keep track of the time that you spent on the matters you work on for him?



H. THOMASSON

A. Currently?

Q. Yes.

A. No.

Q. When did you stop keeping track of the time that you spent on the cases you work on for him?

A. For sure when I became salaried.

Q. Is Mr. Deo current in his obligations to you?

A. Well, our agreement changed but, yes, he's current.

Q. How did your agreement change since then?

A. Once he got ruined by all of this, they weren't able and didn't need to keep me on the prior salary, which of encompassed a lot of things including representing their corporate interests, which at the time included Northshore, 189 Sunrise, Superb, and it was anticipated that he was also going to be purchasing the other half of Mr. Urrutia's interest in Superb, and Mr. Urrutia's interest in a



H. THOMASSON

dealership in Hartford, Connecticut.

So, all of that obviously changed first with the IAG lawsuit and then with Mr. Urrutia joining the IAG plaintiffs and eventually that stopped and ceased.

Q. When to your recollection did Mr. Deo stop paying you $3,000 a week?

A. Somewhere in the vicinity of me getting disqualified. I would say, I would say early 2024.

Q. When was the last time Mr. Deo paid you?

A. We subsequently, when they kind of finally got a little bit back on their feet again, they started paying me weekly again I think about a year ago. Maybe a little less. Maybe, yeah, you know, maybe it was late last spring or early last summer is when they started paying me again weekly.

Q. What is the amount they started paying you last year?

A. $1,000.

Q. They are current on their



H. THOMASSON

obligations to you now?

A. Yes.

Q. These payments that are being made that's for services that you're currently performing, right?

A. Yes.

Q. In connection with your representation of the Deo defendants in this case you work together with Mr. Benjamin, right?

A. I worked together with Mr. Benjamin, is that the question?

Q. Yes.

A. I don't know that I would put it that way, but we speak as lawyers on these cases.

Q. When you meet with the Deo defendants or Mr. Deo by himself to consult with him and advise him in connection with your representation of him in this case, is Mr. Benjamin present as well?

A. I have never had a meeting with Mr. Benjamin and Mr. Deo. In fact, I've only met Mr. Benjamin once.

H. THOMASSON

Q. When was the last time that you gave counsel and advice to Mr. Deo in connection with this lawsuit?
A. This lawsuit?
Q. Yes.
A. I haven't spoken with him about this lawsuit since I was disqualified. So, it would have been before that. I couldn't say when.
Q. So, the payments that you're receiving from Mr. Deo currently are for services performed in other litigation, not involving this specific case?
A. Correct, doesn't involve this case at all.
Q. You met with Mr. Deo in connection with his deposition on January 12th and February 12th, correct?
A. No.
Q. You didn't have any phone calls with Mr. Deo in connection with his depositions on January 12th and February 12th?
A. Not in relation to his



H. THOMASSON

depositions, no.
Q. You represented Mr. Deo in the lawsuit filed by the Island Auto Group plaintiffs in state court before Justice Gianelli, correct?
A. Yes.
Q. On December 14, 2022 Justice Gianelli issued a temporary restraining order, didn't she?
A. Yes.
Q. That temporary restraining order was in effect until in or about mid June of 2023, right?
A. Thereabouts.
Q. Under the terms of the temporary restraining order issued by Justice Gianelli, Mr. Deo was not allowed to, among other things encumber Northshore and Sunrise, including with respect to vehicles, right?
A. Her order speaks for itself. I'm not going to guess at language without the document in front of me. And when you put it in front of me, I'm going to say



H. THOMASSON

that it speaks for itself.
Whatever it was that he was and wasn't supposed to do was in that order.
Q. Generally speaking you advised Mr. Deo in connection with his obligations and the conduct that he was prohibited from doing under the temporary restraining order, correct?
A. I don't know that I would put it that way. I'm sure we discussed it at some point in time, but I don't remember what the exact conversation was. So, I hesitate to try and summarize it to you.
MR. KATAEV: Let the record reflect that placed up on the screen is what will be marked as Thomasson's Exhibit 13A. It is NYSCEF document 42 index 617224/2022. Titled order to show cause with temporary restraints.
(Whereupon, Thomasson's Exhibit 13, NYSCEF document 42 index 617224/2022, order to show cause with temporary restraints, was marked as



H. THOMASSON

for identification as of this date by the Reporter.)
Q. Do you see this document?
A. Yes.
Q. In the section beginning in the middle of page three. It states that, "pending a hearing and determination of this motion that Mr. Deo or anyone acting on his behalf is enjoined and restrained from the following conduct listed in the exhibit", correct?
A. Yes.
Q. Having reviewed this document now, did you inform advise Mr. Deo about the fact that he was prohibited from taking any actions listed in here following the issuance of this order to show cause?
A. As a matter of practice I would have discussed it with him, but I do not remember what was said in that conversation at this point.
Q. In connection with your representation of Mr. Deo in this case and any related case, did you come to learn

H. THOMASSON

that Mr. Deo violated any provision in this order to show cross?

A. I haven't made that determination, no.

Q. Did you make any effort to ascertain whether Mr. Deo violated any such restriction on the TRO?

A. Well, I'm not going to get into all of what I do in preparation for these actions. But, that being said, I'm aware of the allegations that you and others on behalf of the plaintiffs have made suggesting that there were violations of this. But, that's not a determination that I've made.

Q. In the course of representing Mr. Deo in this case, you did come to learn that Mr. Deo sold vehicles from Northshore to Superb in February of 2023, correct?

A. Could you repeat that question?

MR. KATAEV: Read it back, please.

(Whereupon, the last question was read back by the reporter.)



H. THOMASSON

A. I don't know that.

Q. Setting aside that you don't have knowledge of that, if Mr. Deo sold vehicles from Northshore to Superb in February of 2023, you acknowledge that that would be a violation of this TRO, correct?

A. I haven't made that determination. And I don't know, I would have to sit down and evaluate documents myself to be able to make that determination.

Q. But, assuming that Mr. Deo sold vehicles from the Northshore to Superb in February of 2023 at the time that this TRO, which was in effect from December of 2022, until June of 2023, is that would be a violation, correct?

A. I don't know that. I've never made that determination and I haven't sat down and looked at the documents enough to know one way or the other whether it would be a violation or not, I don't know.

Q. Were you involved in assisting Mr. Deo with opening any bank account?



H. THOMASSON

A. Never.

Q. Are you aware that Mr. Deo opened bank accounts for Northshore and Sunrise in March of 2023?

A. No.

Q. If Mr. Deo opened bank accounts in March of 2023 that would be a violation of Justice Gianelli's temporary restraining order, correct?

A. I don't know that.

Q. You didn't take the time to review the temporary restraining order?

A. I'm sure I did at the time. I know that it was vacated June of 2023. I haven't given it much thought since and I certainly haven't reviewed it.

Q. Your testimony is that you just don't know today whether it would be a violation?

A. That's right.

Q. You would have known in March of 2023 had?

MS. RONNEBURGER: Objection to the form.



H. THOMASSON

A. I don't know. I don't know whether it would have or it wouldn't have been, you know, I knew the order better back then.

Q. Are you aware that Mr. Deo submitted operating agreements listing himself as either a 100 percent owner or 99 percent owner of Northshore and/or Sunrise to Flushing Bank?

A. No, I have no firsthand knowledge of that.

Q. Have you seen any stock certificates identifying Mr. Deo as a member of either Northshore or Sunrise?

A. I don't know. I don't think so, but I don't know.

Q. But, you were aware that Mr. Deo was seeking to obtain a loan from Flushing Bank, weren't you?

A. Never. No firsthand knowledge of that.

Q. Isn't it true that you prepared a letter?

A. To Flushing Bank?

Page 142

H. THOMASSON

Q. Yes.

A. There was an exchange that took place, that I believe took place after of everything had gone down with Flushing Bank. Whatever it was he was doing with Flushing Bank. And Flushing Bank needed answers that I was asked to provide.

So, I wrote a letter and had contact with them once, like I did with Libertas. Both of which. As far as I can recall were after the fact.

And I certainly knew nothing of their finances. I don't know anything about their finances to this day.

Q. The letter that you described in your testimony to Flushing Bank, was that made at the request of Flushing Bank or the request of Mr. Deo?

A. At this point I certainly don't know. I don't know if they reached me or I was asked by the Deos to reach them, I don't know what happened.

I just remember that I had some exchange with them.

Page 143

H. THOMASSON

MR. KATAEV: Let's mark Thomasson's exhibit 14.

(Whereupon, Thomasson's Exhibit 14, One page letter bate's stamped Flushing 3835, was marked as for identification as of this date by the Reporter.)

Q. I will represent to you, Mr. Thomasson that this is a one page letter drafted by you bate's stamped Flushing 3835. Please take the opportunity to review the body of the letter and let me know when you're done.

A. I've read the letter.

Q. This letter doesn't have any direct addressee, correct?

A. No, it doesn't. That would've been asked for from the client that they needed for whatever purposes they needed.

But, it was not -- I don't recall where that went.

Q. You knew that this letter was going to go to Flushing Bank when you prepared it, right?

Page 144

H. THOMASSON

MS. RONNEBURGER: Objection to the form.

A. I have no way of knowing that whether I did or did not then. But I will say this, I remember when Flushing Bank first became introduced into this lawsuit, which I don't think was until on or August of 2023. I do not think they were in the initial lawsuit. I remember thinking to myself I've never heard of this bank in my life for any reason.

Q. Other than Flushing Bank were you aware of any other intended recipient of this letter?

MS. RONNEBURGER: Objection to the form.

A. I'm not aware of any recipient that this letter was intended for, if it was discussed with me then, I don't recall it now.

Q. Did you send this letter to Flushing Bank?

A. I don't know.

Q. When you prepared this letter,

Page 145

H. THOMASSON

did you send it to Mr. Deo?

A. It looks like something I would have given to Mr. Deo.

Q. To your knowledge did Mr. Deo send this to Flushing Bank instead of you?

A. I have no knowledge of that, certainly no firsthand knowledge.

Q. To your knowledge has Mr. Deo sent this letter to any other than Flushing Bank?

A. I have no knowledge.

Q. Did you authorize Mr. Deo to send this letter to anyone he deems fit?

A. If I gave it to him I would have known the reasons, but I don't know what they are now.

Q. You represented in this letter that you expected a decision on your motion to dismiss in less than 60 days, correct?

A. Well, that's what it says.

Q. Have you ever received a decision from any Supreme court within 60 days?

A. Yes.

Page 146

H. THOMASSON

Q. You did not received a decision on this motion to dismiss within 60 days of this letter, did you?

A. No. I think it was just over that.

Q. You received a decision on this case in or about June 15, 2023, correct?

A. Yes.

Q. After you received a decision in this case, did you provide a copy of the decision to Flushing Bank?

A. I have no idea.

Q. Do you recall --

A. I don't -- I know that I didn't have much involvement in my lifetime with Flushing Bank. I seem to recall a letter and/or e-mail that said -- I don't even think that I spoke to someone.

Q. Do you recall engaging in any letter campaign with Justice Gianelli seeking a position on the pending motion?

A. I do not recall that. No, I'm sure that I had correspondence with the court but what it was for, I don't know,

Page 147

H. THOMASSON

not off the top of my head.

MR. KATAEV: Thomasson's Exhibit 15. I will represent this is docket entry 28 in the same lawsuit that we've been discussing, the Island Auto Group against Deo index number 617224/2022.

(Whereupon, Thomasson's Exhibit 15, Docket entry 28 Index 617224/2022, was marked as for identification as of this date by the Reporter.)

Q. Please take an opportunity to read the entire letter and let me know when you're done.

A. I've read it.

Q. Scrolling to page two.

A. Is there more?

Q. That is it. Taking to this bottom, I'll highlight it for you your statement.

"My clients desperately need a ruling from this court as soon as possible", do you see that?

Page 148

H. THOMASSON

A. Yes.

Q. Why did you tell Justice Gianelli that you "desperately need a ruling from the court as soon as possible"?

A. I know they were harmed egregiously by the shuttering of those businesses and the actions taken against them by the IAG Group commencing at the end of November of 2022.

Q. It was also affecting Mr. Deo's ability to procure a loan, wasn't it?

A. I have no knowledge of that. At that time I know that the Aaronson parties and the IAG parties had harmed them terribly.

Q. This letter is dated March of 31, 2023, correct?

A. That's what it says.

Q. This letter that you told me was submitted to Flushing Bank is also dated March 31, 2023, correct?

MS. RONNEBURGER: Objection to the form.

A. You said that was submitted to

Page 149

H. THOMASSON

Flushing Bank, I did not say that that was submitted to Flushing Bank. You said that was submitted to Flushing Bank. It may have been, but I don't know as I sit here now who that letter went to, I do not know. This March 31st letter that starts off, to whom it may concern, I have no knowledge of where that letter went.

Q. But they're both the same date, right?

A. They both say that, yes.

Q. At the end of this letter you say, "we need the court to act as soon as possible on the paperwork submitted today PLEASE". All capital letters, do you see that?

A. Yes.

Q. What was the cause for the urgency in getting a decision as soon as possible?

A. They were hurt terribly by what was going on and were losing their businesses and leases at those businesses and it was a problem.

H. THOMASSON

Q. Going to the top of the second page, I've highlighted a section that says, "there are multiple attorney generals/consumer affairs complaints, several state actions and one federal action currently pending against Northshore", do you see that?

A. I see it.

Q. All of those complaints and actions in state and federal court are by customers grieved by Mr. Deo's conduct at Northshore, correct?

A. They were all, as far as I can remember, consumer affairs type complaints regardless of which of those locations they were at. As far as I can recall, I think that we prevailed on just about every single one of the matters that I handled.

So I don't know that there was ever a finding in any of these instances against the actions of Northshore.

Q. I didn't ask you about the findings, I asked you whether these complaints and actions were by customers



H. THOMASSON

who claimed that they were grieved by Mr. Deo's conduct?

A. Not one of them to the best of my knowledge involved an allegation against Mr. Deo.

Q. In these complaints and actions Mr. Deo was accused of fraud, correct?

A. I don't know that.

Q. When you were retained by Northshore to represent it in these cases, you dealt solely with Mr. Deo, correct?

A. No, I also had some dealings with Sarah. Even more arms length than the arms length dealings I had with Anthony. I wasn't close at all with the Deos prior to December of 2022. But, I dealt with both of them.

Q. In the course of your representation of Northshore and these complaints and actions referenced in this exhibit, you did not deal with Brian Chabrier, correct?

A. No.

Q. You did not deal with Jory



H. THOMASSON

Baron, correct?

A. Correct.

Q. You did not deal with Asad Khan, correct?

A. Never.

Q. Did you deal with any principal of what you now understand to be Island Auto Group at the time that you were representing Mr. Deo's interest in Northshore for these cases?

A. I never met a single person associated with Island Auto Group in this lawsuit prior to their depositions. Which were all in or about January of 2026.

Q. In these complaints and lawsuits none of the principles of Island Auto Group were identified as individuals who caused some alleged harm to the people bringing those cases, correct?

A. I don't recall if any individuals whether they were from Island Auto Group or anywhere else including the Deos that were specifically identified in these lawsuits. I seem to recall that it



H. THOMASSON

was had the salesperson said this and the salesperson said that. That isn't any of the Deos or any of the IAG individual plaintiffs. I don't recall any of them being named. Not saying they weren't, I'm just saying at this point, that wasn't what any of those cases were about. It was about Northshore there might have been one or two involving 189 Sunrise and I think there was one or two matters involving Superb.

Nothing that stood out to me is out of the ordinary for used car dealerships, in my experience.

Q. In the course of representing Northshore you never gave counsel or advice to any of the principles of Island Auto Group, correct?

A. I never spoke to any of the Island Auto Group group plaintiffs prior to their depositions, during or about to January of 2026.

Q. What about written correspondence?

Page 154

H. THOMASSON
A. I do not believe that I ever had any written correspondence at any time with any of the individual IAG plaintiffs.
Q. In this case, the federal case that is the subject of this deposition, you've submitted sworn declarations, correct?
A. Yes, I believe so.
MR. KATAEV: I'm gonna show you Thomasson's Exhibit 16.
(Whereupon, Thomasson's Exhibit 16, ECF docket entry 30-1 a declaration was marked as for identification as of this date by the Reporter.)
A. These exhibits are gonna be described somewhere in the transcript?
Q. Yes, I described them. So this, ECF docket entry 30-1 in this case before Judge Wicks. It is declaration that you submitted.
It is 12 pages I'd like to just focus on a specific portion but if you need to read something feel free to tell me.

Page 155

H. THOMASSON
I'd like for you to read the beginning of paragraph 13.
A. I've read the paragraph 13.
Q. Just the first line of 14 without going into subsection A.
A. I'm sorry what did you need me to read?
Q. Just the highlighted portion.
A. Okay.
MR. KATAEV: Let the record reflect I'm scrolling down over the next two pages to subsection N of paragraph 14, which I've highlighted for the witness to review.
A. Okay.
Q. At the beginning of the commencement of this case that's the subject of today's deposition there was a motion made for injunctive relief to, among other things have vehicles returned from Mr. Deo back to the lot of Superb, correct?
A. Yes.
Q. That's because vehicles were removed from Superb's lot and placed on a

Page 156

H. THOMASSON
lot at Northshore and/or at Sunrise, correct?
A. Yes. I don't know that there were any Sunrise, but, yes, I know what you're talking about.
Q. The vehicles were moved from Superb to Northshore for a car event or a grand opening, correct?
A. I have no knowledge of that.
Q. Were you invited to attend that car event or a grand opening?
A. I have no knowledge of that. If I was invited, I know I didn't go. But, I don't have a memory of being invited either.
Q. In this sworn declaration you make representations about the status of the vehicles, correct?
A. It is what it is. Yeah. It says what it says.
Q. How did you know that more than half of the vehicles are not in Mr. Deo's possession?
A. I know at that -- in fact, I

Page 157

H. THOMASSON
think that that was the time and reason why I went to Northshore again. That it was in connection with these cars and that injunction. I seem to recall being there. I believe I was there during an audit. So I just wanted to know what cars were there and those were the cars that were there.
Q. The audit that you're referring to is by a floor plan lender, correct?
A. Yes.
Q. Is that the only time that you were present for a floor plan audit?
A. Definitely the only time that I was there for a floor plan audit. It was after the lockout in August of 2023 that that audit took place. Maybe it could have also been in September, it was August or September.
Tony Urrutia had taken some sort of steps to had the involve Nissan or NMAC as they're known. I was at Northshore to see what vehicles were there myself. I wanted to make sure that I had an understanding of what was there.

H. THOMASSON

Q. Did you take notes during that time?

A. I don't know.

MR. KATAEV: To the extent that you're in possession of any notes at that day that you visited Northshore while a floor plan audit was ongoing, we're gonna call for the production of those notes.

We'll follow up in writing.

Q. Who, if anyone, do you recall speaking with from the floor plan lender on the ground at the audit?

A. I remember the gentleman was there, I do not believe we spoke.

Q. Who spoke to the individual if anyone that you observed?

A. I don't recall who was there at that time. I don't remember who was there at that time. I don't know who opened the door, I don't know.

Someone had to be there because I had no way of gaining access.

Q. Sometime in March of 2023, Mr.



H. THOMASSON

Deo sent an e-mail to Mr. Urrutia, among others with you copied, demanding a forensic examination of Mr. Urrutia's dealerships, correct?

A. Yes, I'm aware of that.

Q. Did you have any discussions with Mr. Deo prior to his sending that e-mail?

A. Absolutely not. In fact I specifically went to him and said, what am I could doing on this and what is it?

Q. What did he say to you?

A. I seem to recall him saying something to the effect of -- and this is without waiving any privileges, I believe he said he had found, you know, I don't think this was his word, but in sum and substance, he was saying some sort of wrongdoing in the accounts and he thought that it was -- and he thought that it was the then controller or CFO, whatever position she held, I didn't know the person, and he didn't need me to do anything or get involved, but he wanted her



H. THOMASSON

to see that a lawyer's name was on the e-mail, so that she knew it was serious and that she was going to potentially have issues if she wasn't honest in responding. In sum and substance that's what he was doing. My name was put on that without any discussion beforehand.

Q. Did he tell you that he was doing this in an effort to have her removed from her position?

A. No, he didn't say that at all. He just said he saw things that were going on that only she or someone above her would be able to do and so he was starting with her and he wanted to find out what was going on that he thought there were improprieties of money being taken out of Superb's accounts.

Q. In response to this e-mail, Mr. Urrutia caused the CFO to send you and Mr. Deo and Mr. Jones more than 200 e-mails containing financial documentation, correct?

A. I don't know how many there



H. THOMASSON

were, and I can assure you that I paid absolutely no attention to it at the time.

Q. You were not asked to do so, correct?

A. I was not asked to do so, and I had no interest in it. It was -- my name wound up in the e-mail chain. Then all of a sudden, there were a whole bunch of e-mails with my name on it that had nothing to do with me.

Q. You've accused Mr. Urrutia of engaging in financial improprieties while at Superb throughout this case, haven't you?

A. I have, because I believe that that's what finally was determined. That it was not the woman that Mr. Urrutia fired but since it continued afterward, Mr. Deo eventually determined he thought that it was Mr. Urrutia himself taking money to prop up other businesses.

Q. You had the means, given the financial information you were provided in more than 200 e-mails to determine what

H. THOMASSON

whether that allegation is true, correct?
A. I have no idea since I've never looked at those e-mails.
Q. You didn't undertake an effort to review those e-mails in order to determine whether the allegation that Mr. Urrutia engaged in financial improprieties was true, correct?
A. I didn't know what was in the e-mails. So there was no way of knowing whether I should or shouldn't review them for any particular purpose, except for the fact that I was told that it wasn't needed it was so that people thought that I was involved when in fact I wasn't. And I had no interest in those e-mails.
Q. When you called Mr. Deo to find out what you were doing with this, that was because you read the e-mail and understood that Mr. Deo was looking to do a forensic examination, correct?
A. Not necessarily. An e-mail could come in that I saw, hadn't read yet and asked him about. And I've done this



H. THOMASSON

more than once. I see an e-mail come in, what am I gonna find out is in that e-mail. And depending upon what I'm told, there were times when I then do not also read an e-mail, if it turns out that it's simply not something that needs to suck my time.
Q. You're not aware of any investigation conducted by Mr. Deo into whether Mr. Urrutia engaged in any financial impropriety, correct?
A. He told me that he looked into things and saw money missing and didn't know at the time who did it. But, he has subsequently told me that he believes it was Mr. Urrutia who did it.
Q. You have not presented any evidence in this case of Mr. Urrutia engaging in any financial impropriety, thus far, correct?
A. I anticipate the noticed deposition of one or more people from Chase Bank is going to occur later this month and we will find out more of that.
Q. In other words at this moment



H. THOMASSON

of time there has been no such evidence presented to the court in any filing, correct?
A. At, at this time we do not possess any documents that we've obtained from his bank accounts.
MR. KATAEV: I'm referring to you Thomasson's Exhibit 17.
I will represent to you that this is ECF docket entry 12-2, containing an August 11, 2022 letter that you sent to me via e-mail.
(Whereupon, Thomasson's Exhibit 17, ECF docket entry 12-2 was marked as for identification as of this date by the Reporter.)
Q. Do you recognize this document?
A. That is my letterhead.
Q. I wanna focus your attention to a specific portion of the letter. I'm happy to give you an opportunity to read the whole thing. Let me highlight it first.
Do you see here at the bottom



H. THOMASSON

of page one paragraph two.
"And last Thursday night when Mr. Novicky called the police Mr. Lo informed the police that every car is accounted for"; do you see that?
A. I see that.
Q. Going to page two paragraph three, you also wrote in your letter.
"Last Thursday night after the police spoke to three Superb people about this issue, Bruce Novicky, Anthony Deo and Eugene Lo. Upon information and belief, Mr. Novicky conveniently had that list you gave me last night at his disposal before calling the police, then gave it to them that night. Yet after speaking with Mr. Deo and Mr. Lo my client was allowed to leave without any criminal recourse"; do you see that?
A. Yes.
Q. In this description of what occurred on last Thursday night, I will represent was August 3, 2023, you did not identify that Mr. Merckling or Blankenship

H. THOMASSON

were subject to any criminal investigation by the Nassau County Police Department, correct?

A. What I said here is that the police spoke to three people about this issue. I did not say that they spoke to Mr. Merckling or Mr. Blankenship.

Q. And that's because the police, as far as you know did not speak to Mr. Merckling or Mr. Blankenship, correct?

A. I had no knowledge either way. Mr. Merckling was there before me. I didn't know if he had spoken to the police, but in front of me, the only three people that they spoke to that night were Mr. Deo, Mr. Novicky, and Mr. Lowe.

Q. Referring to the final paragraph of your letter on page three. I've highlighted portion that I'll read to you.

"Electronic records don't lie. I have more than apparently your clients think that they manage to keep for my client"; do you see that?



H. THOMASSON

A. I see it.

Q. What are you referring to when you say, "you have more than apparently your client think that they manage to keep for my client"?

A. I don't know what it is that I could have been referring to at that time.

Q. Are there any documents that you believe the plaintiffs in this case or the Superb plaintiffs specifically managed, believed that they managed to keep from Mr. Deo?

A. No question. They emptied out Northshore an Sunrise. They emptied -- they took all of the records that could show a lot of things that we don't we do not have at this time. Having also managed to removed the Deos on the night of the David Baron incident from their own bank accounts, we don't have access to those records yet either.

Q. But Mr. Urrutia from Superb had nothing to do with those incidents preceding his meeting Mr. Deo, right?



H. THOMASSON

A. But that's not what the question was, that you asked.

Q. This is a letter to me about Superb. My question is, what is it that you're saying you have more than we believe we managed to keep from you or from Mr. Deo?

A. I already said I don't know what I was referring to there. I'm sure I something on my mind at this time not having seen this letter for two and a half years, I don't know what it was.

Q. To your knowledge have you through, have you or any attorney of Mr. Deo produced any of the documents that you're referring to here?

A. I don't know what I'm referring to here.

Q. Is it fair to say that you just made this statement for pomp and circumstance?

A. No, that's not fair to say. That's not the way that I operate. I said that, I had a reason for saying it, I had a



H. THOMASSON

clear reason for saying it. As we spoke now, two and a half years later, I'd love to know what it was. I don't know what it was.

MR. KATAEV: Thomasson's Exhibit 18.

DCF docket entry 13. A letter dated August 21, 2023.

(Whereupon, Thomasson's Exhibit 18, DCF docket entry 13, was marked as for identification as of this date by the Reporter.)

Q. Again, I'm happy to give you the opportunity to read any portion of the letter, but I'm gonna focus your attention on this portion here. Which I've highlighted. I'll read for the record.

"Just over two weeks ago Anthony Urrutia directly and by and through one or more of plaintiff's employees called the police on Anthony Deo accused him of stealing 102 automobiles and $760,000, changed the locks on Deo after he operated the Superb store for and with Urrutia since

Page 170

H. THOMASSON

December of 2022 and placed armed guards at the Superb dealership to keep Deo out of the dealership". Do you see that?

A. Yes.

Q. In this letter you make the representation that the subject of Superb's complaint to the police was Mr. Deo and only Mr. Deo, correct?

A. That is all that it refers to. Although, obviously, I intended anybody that were the Anthony Deo people were certainly a part of that.

Q. You didn't mention Mr. Merckling or Mr. Blankenship in this letter, right?

A. I didn't, but of course we all know they were certainly the subject of all of that. It's not as though they could go back into the dealership and they didn't.

Q. Well, I'm referring to the statement that says, "called the police on Anthony Deo", referring to that portion calling the police.

You did not refer to Mr.

Page 171

H. THOMASSON

Merckling or Mr. Blankenship, correct?

A. The letter speaks for itself. Their names are not mentioned.

Q. You also made a representation that the Gold Coast defendants are not actively selling automobiles at this time anyway, do you see that?

A. I see it.

Q. That was in connection with our request for injunctive relief, you had agreed that both sides should not sell any vehicles, right?

A. I don't know that it says that, but it says the Gold Coast defendants are not actively selling automobiles at this time.

Q. When you refer to the Gold Coast defendants, that includes Northshore and Sunrise, right?

A. That's not what it says. I usually refer to them separately. I have no memory of ever calling 189 Sunrise and Northshore, Gold Coast defendants. I don't have a memory of that.

Page 172

H. THOMASSON

Q. When you say the Gold Coast defendants are not actively selling automobiles, that's since November of 2022, correct?

A. It says at this time anyway, it doesn't say since November of 2022, it says at that time, which was whatever the date of that letter was, that's what it says.

Q. You were present at Superb on August 3, 2023 when the Nassau County police department was called there, right?

A. After the fact I arrived, yes.

Q. You came there because you were asked by Mr. Deo to come there, right?

A. Yes.

Q. When you arrived there you asked to speak directly to the officers responding from the Nassau county police department, correct?

A. I don't know that I asked to speak with them. I seem to recall them coming and speaking to me.

Q. What did they say to you and what did you say to them?

Page 173

H. THOMASSON

A. He said your clients are being accused of stealing over a 100 cars and almost a million dollars. I said, this is news to me. I'll talk with the client. I'll go outside and speak with whoever's here and I'll find out what I can.

Q. Who did you speak to after that?

A. I went outside and I spoke with Anthony Deo and Mark Merckling. I don't know if Blankenship had shown up at that point.

Q. Before you went to speak to Mr. Deo and Merckling, did you say anything else to the Nassau county police officers or did they say anything else to you?

A. I mean, I can't remember every word that was said, but it was focused on allegations of a 102 stolen cars and $760,000 in money that was news to me.

Q. To your knowledge did the Nassau County police officer speak directly with Mr. Deo?

A. Not after I arrived.



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 174

H. THOMASSON

Q. To your knowledge before you arrived did the Nassau police officer speak to Mr. Deo?
A. I don't know.
Q. You didn't ask him, you didn't ask Mr. Deo?
A. I may very well have, but I don't remember every detail of the conversation from that night off the top of my head.
Q. What did you discuss with Mr. Deo and Mr. Merckling after you spoke to the police officers?
A. In sum and substance, we discussed these allegations and they stood there adamantly denying these allegations.
Q. Did you conduct any investigation into the allegations?
A. There wasn't anything to discuss at that -- to investigate at that moment, beyond for me talking to Anthony and Mark.
Q. What happened after you had that discussion with Mr. Deo and Mr.

Page 175

H. THOMASSON

Merckling?
A. I spoke to the detective, I said that they adamantly deny the accusations and under no circumstances did they steal anything.
Q. Other than that did you discuss anything else with them?
A. No.
Q. Did you attempt to convince the police officers that Mr. Deo was the true owner or sole owner of Superb?
A. No, there was no discussion about ownership, that I can recall.
Q. Do you recall that as a result of the police being called Mr. Deo was caused to be removed from the dealership premises and the locks were changed?
A. Well, I don't know that I would put it that way. I mean at that time, if there was gonna be an assertion that he was the sole owner of Superb then I would've been saying that what was going on was entirely illegal. And, you know they can't lock him out. He's the sole owner. I know

Page 176

H. THOMASSON

that that didn't happen because if he was the sole owner and if I had any understanding at that time, that he was the sole owner I would have handled it differently.
What I knew was that there was someone else at that time who was his partner in that business called Tony Urrutia. I don't think that I ever met the man at that point. If I had, you know, conceivably could have been an introduction.
But I definitely had never spoken to Tony Urrutia at that point. And all I knew was is that was that man was locking Anthony Deo and his people out of that dealership and accusing them of wrong doing.
Q. I understand that you conveyed to the officer that Mr. Deo denies any wrongdoing.
A. Right.
Q. But my specific question is, did you seek to object to Mr. Deo being

Page 177

H. THOMASSON

removed from the dealership or locked out of the dealership?
A. Well, I know that I said he was at least a part owner, as far as I knew there were two partners in that business. That's what little I knew at that point. I didn't know a lot about that business. And I know that for the sake of keeping the piece I told Anthony and Mark that they were gonna have to leave.
If the partner was insisting with the cops present, and I believe they were changing locks already that night or maybe I was told that they were about to change the locks.
But either way, I said look whatever had this is, we'll deal with it, but I don't think you should be staying here tonight, I think that I need to leave.
Q. You advised them that, correct?
A. Absolutely.
Q. As a result of the decision and your advice for Mr. Deo to leave, did you decide that you needed to take steps to

Page 178

H. THOMASSON
retrieve personal belongings of yours?
A. Oh, yes.
Q. What personal belongings did you have at Superb?
A. Two to three weeks earlier after having a discussion with Anthony Deo I learned that he was -- let me start again, please. Withdrawn. Sometime before the middle of July, during July of 2023, but I don't think it was even quite half way through the month, I learned from Anthony Deo that he was going to be purchasing the other half of Superb.
And I learned he was going to be purchasing a dealership belonging to Tony Urrutia in Hartford, Connecticut. There was also some discussion of a point, as it's called in the business, some right to a dealership that Urrutia had in Danbury Connecticut. This was of remarkable interest to me because at that point in time, unbeknownst to Anthony Deo, I was looking at and considering the possibility of moving to Connecticut. And I was

Page 179

H. THOMASSON
actively looking at that time to move up there. So when he said this to me, I said to him, you know, is it your intention to keep me as your attorney? And he said absolutely, I wanna do that. And that's when I told him that I was looking to actively to move to Connecticut.
What we ended up discussing was, he said at that time that he would want me to represent of all of the dealerships. That was when we reached a financial agreement.
And I said to him, I am gonna need an office in New York because under the law, if I'm gonna be practicing in New York I have to maintain a presence here. And if I move to Connecticut I don't think that I'm going to have any residence that I keep in New York for the purposes of satisfying the contact necessity. And he said, well why don't you just take an office in one of the dealerships down here, and I said, well, the one that is closest if I'm coming from Connecticut is Superb.

Page 180

H. THOMASSON
That was the one that was farthest north and west that Anthony Deo had an interest in at that time.
So, he said, you know, when I said, you know, I would prefer Superb to avoid having to drive any further once I got down here, if we were gonna do it this way. He said why don't you just go ahead and take it now and then you'll have it and you can do whatever you need to with Connecticut when you need to do it. At that point I had plans for a -- for two weeks in August of 2023 in Connecticut, to actively search for a place to live.
So I went ahead and threw some typical office stuff into an office at Superb. I had a couple of personal items that I thought, you know, would dress up the office a little bit, make it a little bit nicer. I had a painting from a dear friend of mine, who has subsequently died, I don't think it has any value to anyone else but it certainly does have value to me. I had a lamp that had been given to me

Page 181

H. THOMASSON
by my mother or -- no, no, no not that lamp. I had a lamp that I had purchased that I wasn't using and I had a perfect place for it in that office. So, I threw a few things into that office and went there two to three times before the lockout, working on Superb matters while I was there.
Q. What about files, did you maintain files at that office?
A. I don't think I had any actual files there. If I had or needed files I believe that I just took them with me in my briefcase to and from there when I was there on two or three occasions utilizing that office.
In fact I was in that office and packing up my belongings when the police came in to talk to me that night.
Q. Your testimony is that you were already packing your stuff to take with you of your own accord, not because the police were there?
A. I was packing up my stuff

Page 182

H. THOMASSON

because of what was said to me to get me to come there, in addition to what I saw for myself once I got there.

I mean it was obvious that it was over. I didn't know what was gonna happen, but it was obvious that whatever was going on between Deo and Urrutia was over with that night.

Q. You believe from your review of filings in this case that you were accused of stealing the lamp from the office of Superb, correct?

A. I seem to recall there was an accusation of having something to do with the lamp. And in response I seem to recall sending in a copy of my purchase off of Amazon.

Q. When you submitted the copy of your purchase, you redacted the payment information, correct?

A. Oh, I don't know, maybe I did. I don't know, I have no memory.

Q. To your knowledge, was it you that purchased that lamp or someone else?

Page 183

H. THOMASSON

A. I purchased that lamp.

Q. Mr. Deo did not?

A. Oh, no absolutely not. I purchased that lamp. I got it off of Amazon.

MR. KATAEV: We're gonna call for the production of the un redacted payment receipt.

We'll follow up in writing.

Q. On the day that you present --

A. Why? Is that still an issue in this case, the lamp?

Q. We'll deal with it off the record.

On the day that you were at Superb on August 3, 2023, there were not many vehicles located on the lot, correct?

A. No, I don't agree with that.

Q. To your knowledge and recollection, how many vehicles were located on the lot outside of Superb on August 3, 2023?

A. Now bear in mind I hadn't been there many times. But it didn't look to me

Page 184

H. THOMASSON

particularly different than it ever did. I did not understand over -- I didn't even know that a 100 cars could fit on that lot and it wasn't empty.

Q. There were some cars located on that lot?

A. There were some cars in that lot. I didn't count them. But, obviously Mr. Urrutia has the tapes. I certainly hope that we can all see them at some point.

Q. But, you don't disagree with me that on September 15, 2023 following a settlement conference before Judge Wicks, that evening approximately 30 vehicles were subpoena returned from Northshore to Superb, correct?

A. Give or take. Approximately that sounds about right. I knew that they were over there because I had ended up going over there for that audit. So I know what was at Northshore.

Q. At the time that you were there at Northshore for the audit prior to August

Page 185

H. THOMASSON

3, 2023 you knew that those vehicles belonged to Superb, correct?

A. I did not understand your question. You confused me when you started throwing a date in there. It confused me. At what time are you ask -- at what point are you asking me and which vehicles? I'm confused.

Q. That's okay. I'll rephrase. On the date that you were present at Northshore for the audit.

A. Right, okay. That only happened once.

Q. Exactly. On that date you were aware that the vehicle subject to the audit were owned by Superb, correct?

A. Not because of seeing any documentation, but knowing that the audit was precipitated by something Tony Urrutia had done regarding Superb vehicles, and NMAC was there looking for vehicles that also were also in some way connected to Superb. I don't know anything about what vehicles belonged to which dealership and

Page 186

H. THOMASSON

when.
Q. You're familiar with the cross purchase agreement that was filed in this case, correct?
A. I've seen it.
Q. To your knowledge, that cross purchase agreement called for Mr. Deo to transfer 25 interests in Northshore and Sunrise, respectively to Mr. Urrutia, correct?
A. I don't know what the exact percentages are, but if that's your representation I have no reason to doubt it.
Q. You are familiar with the fact, setting aside the amount of the percentage that there was some interest that Mr. Deo was to deliver to Mr. Urrutia, correct?
A. Yes.
Q. You're not aware as you sit here today and you haven't seen any documents transferring any such interest in Northshore or Sunrise from Mr. Deo to Mr. Urrutia, correct?

Page 187

H. THOMASSON

A. I haven't seen anything beyond that and I wasn't a part of the transaction, so I don't know anything about it.
Q. You never asked Mr. Deo for any documentation supporting that any interest was actually transferred from Mr. Deo, Northshore or Sunrise to Mr. Urrutia, correct?
A. I don't know.
Q. You're not aware of the existence of any first amended, amended or second amended operating agreements of Northshore or Sunrise indicating Mr. Urrutia's interest in Northshore and Sunrise respectively, correct?
A. I don't know at this time. If something is out there, I don't know about it.
Q. As you sit here today as far as you know no such transfer ever occurred, correct?
A. I don't know whether it did or it did not. I wasn't a part of one.

Page 188

H. THOMASSON

Q. Have you had any contact with an individual named Robert Puccio?
A. No.
Q. Have you engaged in any attempts to contact Mr. Puccio?
A. No.
Q. Do you know if Mr. Deo ever made any attempts to contact Mr. Puccio?
A. No.
Q. Were you present at any of the dealerships at issue here that Superb Northshore or Sunrise, when any representative of Flushing Bank was also present?
A. Never.
Q. You've been present at every single deposition in this case more or less?
A. No, there have been some I've missed. You know more than half I've been at, yes.
Q. You have observed employee agreements that were drafted for Gold Coast Motors Automotive Group, correct?

Page 189

H. THOMASSON

A. Employee agreements, I don't have a memory of that term, no.
Q. Do you recall drafting any employee agreements for Gold Coast Motors Automotive Group at any point in time?
A. No.
MR. KATAEV: Showing you Thomasson's Exhibit 19.
I will represent to you that this is a document electronically filed at ECF docket entry 38-12.
It is an 11 page document called company newsletter.
(Whereupon, Thomasson's Exhibit 19, ECF docket entry 38-12 was marked as for identification as of this date by the Reporter.)
Q. Do you recognize this document?
A. I recognize it from having been shown during the depositions.
Q. Did you not --
A. Not a document that I'm familiar with otherwise.
Q. Did you draft this document?

Page 190

H. THOMASSON

A. No.

Q. Do you know who drafted this document?

A. No.

Q. Do you know of any meeting that occurred between the individuals listed in this document?

A. I was not a part of whatever this is.

Q. Did you advise Mr. Deo in connection with the fiduciary duties of corporate officers?

A. No.

Q. Did you tell Mr. Deo about the duty of care, a duty of loyalty, or duty of good faith?

A. No, never had a conversation about this document, I don't think in my life.

Q. You did not draft, I'm referring to page six this acknowledgment, did you?

A. No, I don't have any firsthand knowledge about that document.

Page 191

H. THOMASSON

Q. Referring to back to the over 200 e-mails that Mr. Urrutia caused to be sent to you, Mr. Deo, and Mr. Jones, did you have any conversations with Mr. Deo about the fact that those e-mails were sent?

A. All I recall is from the beginning he said that I was being put on there to make sure of that whoever this controller or CFO was, was aware that a lawyer was on the e-mails to make sure she took it all very seriously and responded appropriately.

Then for whatever e-mailing went on was some sort of e-mail chain. I don't know that 200 is the right number. But whatever it was I never read any of those e-mails.

Q. Other than that conversation which you previously testified about, did you ever have any other conversations with Mr. Deo about the production of the information?

A. No. Can we take a five minute

Page 192

H. THOMASSON

break?

Q. Sure.

MR. KATAEV: Off the record.

(Whereupon, a brief recess was taken.)

Q. Mr. Thomasson, Mr. Deo had conversations with you about the fact that Mr. Urrutia lived in Costa Rica, right?

A. I don't know how I learned about Costa Rica.

Q. When did you first learn about the fact that Mr. Urrutia lived in Costa Rica?

A. During the course of this case but I couldn't say when. It was certainly after the night of the lockout.

Q. Did you ever ask Mr. Deo about any information concerning Mr. Urrutia's residence in Costa Rica?

A. I don't know how I found out about it and I don't know who I spoke to about it, it's been quite some time.

Q. Did you ever conduct any investigation as to, since when Mr. Urrutia

Page 193

H. THOMASSON

began to live in Costa Rica?

A. I don't recall at this time what I found out and when I found out about Costa Rica. It was at least two years ago, probably more.

Q. Are you aware that Mr. Urrutia has lived in Costa Rica prior to the time he met Mr. Deo?

A. I think he's had ties there for quite some time. But I know that he didn't consider it his residence until -- it hasn't been that long that I knew he considered it his residence, sometimes maybe last fall that he considered his residence.

Before that I did not know that he considered it to be his residence.

Q. You've made repeated representations to this court and other courts that you had conducted a investigation into certain claims that Mr. Deo has against my clients the Island Auto Group plaintiffs and others, right?

A. I did conduct an investigation

Page 194

H. THOMASSON

that resulted in the production of the complaint and amended complaint in the other action.

Q. In the course of that investigation or any other investigation or that you that you performed related to this case, did you analyze how much money Mr. Deo invested in Superb, if any?

A. No. How much money he invested in Superb? No, because I wanted bank records. We are just on the verge of hopefully starting that process finally.

Q. Isn't it true that in your initial September of 2023 declaration that we looked at previously, ECF docket entry 30-1, you informed the court that Mr. Urrutia spends about 90 percent give or take of his time in Costa Rica?

A. Whatever I filed with the court speaks for itself. I know that at some point in 2023 I found out about Costa Rica, I feel pretty sure that it was after the night of the lockout and not before.

And, you know, I just don't

Page 195

H. THOMASSON

remember at this point how I found that out or who I found out it out from and what went into finding that out.

Q. You've repeatedly made arguments to this court and statements of fact to this court that, to the court in this case that Mr. Urrutia has fled the country, correct?

A. Oh, we definitely feared that, no question about it.

Q. That statement that you've repeatedly made to the court is not true though, is it?

A. As it turns out he came back and that certainly turned out to be a surprise to me. I really didn't think that he would.

Q. Are you prepared to withdraw those statements that you've made that Mr. Urrutia has fled the country and will never return to the United States of America?

A. I don't know that I have any plan of withdrawing any statements that I've made. I made every statement that I

Page 196

H. THOMASSON

could at the time I made them, I made them in good faith. It doesn't mean that every single word that ever comes out of a lawyer's mouth is a 100 percent accurate because we can later find out different things.

But I do know that at the time that I was saying that one or more documents in one or more of these cases indicated that Mr. Urrutia lived in New Jersey. And I don't think that he ever changed had that statement and those representations or withdrew them after he, as we now know says he resides in Costa Rica. I just didn't know that he was going to come back.

Q. You have received in the course of your representation in this case a copy of an August 2023 had capital call letter in Mr. Urrutia to Deos, correct?

A. I don't know.

Q. Have you been asked for any counselor advice in connection with the capital call letter by Mr. Deo?

Page 197

H. THOMASSON

A. Absolutely not.

MR. KATAEV: Showing you Thomasson's Exhibit 20.

This is the capital call letter filed at ECF docket entry 112-7 in this case that's subject to this deposition.

(Whereupon, Thomasson's Exhibit 20, ECF docket entry 112-7 was marked as for identification as of this date by the Reporter.)

Q. I'm scrolling to the second page which contains the contents of the letter. After your review of this can you is confirm whether have you've been present with this letter?

A. I don't have to review it any more than I am, I don't think I've ever seen that letter.

Q. Mr. Deo didn't ask you for any advice in connection with this letter?

A. Correct, none that I have any memory of.

Q. To your knowledge, Mr. Deo

Page 198

H. THOMASSON

never responded to that letter, correct?
A. I have no knowledge of whether he did or he didn't.
MR. KATAEV: Showing you Thomasson's Exhibit 21.
It is a letter from Nissan filed at ECF docket entry 14-1, dated August 9, 2023.
(Whereupon, Thomasson's Exhibit 21, ECF docket entry 14-1, was marked as for identification as of this date by the Reporter.)
A. What is it you're asking me about this letter?
Q. Where it's highlighted in the third paragraph. There's a reference that a number of vehicles were stolen following an inventory audit completed on August 8, 2023, correct?
A. Well, I don't know that NMAC can find that there was stolen vehicles. I imagine that's Mr. Urrutia's position.
Q. I'm not asking you to tell me that it's true or not. I'm asking you to

Page 199

H. THOMASSON

confirm that that's what it says?
A. This letter says whatever it says. I've never seen it before.
Q. I'll represent to you that it was filed in this case after you entered the notice of appearance.
A. I am sure that it was it. It doesn't mean that I looked at it, and it doesn't mean I have any memory of it. I have no memory of this letter.
Q. In this letter Nissan is demanding $1.1 million from Mr. Urrutia and Superb, right?
A. That's what it says.
Q. There's a reference to an Exhibit A, right?
A. There is a reference to Exhibit A.
MR. KATAEV: Let the record reflect that I've moved the exhibit to page three, titled Exhibit A.
Q. Do you see a list of cars?
A. Sorry, could we go back to the first page again?

Page 200

H. THOMASSON

Q. Sure.
MR. KATAEV: Let the record reflect that complied with the witness's request.
A. Yeah, it doesn't say how many cars. Yeah, it just makes reference to a number of vehicles and Exhibit A. Yep. Go ahead. You can go to Exhibit A.
Q. In Exhibit A, there's a list of approximately 20 or so cars, correct?
I'll represent to you that there are 30 cars listed here.
A. Yeah. There's about 30 cars there, yeah.
Q. To your knowledge, are any of these vehicles, vehicles that were taken by Mr. Deo from Superb to Northshore?
A. I have absolutely no idea.
Q. Your testimony was that you were present for an audit at Northshore in order to comply with the floor plan agreement that Nissan had with Superb, correct?
A. Yes, sometime after this date

Page 201

H. THOMASSON

there was an audit that I was present for. Maybe it was -- I don't know. I don't know when it was. I think that it was shortly after this, the date of this letter, yes, I was there.
Q. You understand generally with all of your years of experience in the dealership industry that if a car is placed on a floor plan line of credit and is not capable of being physically touched by an auditor, that the dealership has to pay the full amount owed for that car, correct?
A. At least loosely that's my understanding. Although I'm not -- I've never been involved in floor plans.
Q. Given the existence of this letter and my representation to you that Superb caused this demands of $1.1 million to be paid, is it fair to say that these vehicles were never produced back to Superb?
A. I have absolutely no idea what happened, none. I have no firsthand knowledge whatsoever and I'm not gonna

H. THOMASSON

speculate.

Q. Did you ever have any discussions with Mr. Deo about the contents of this letter?

A. No. Not that I know of. I mean I see those vehicle ID numbers. There's no way of knowing, you know, which vehicles that is versus the vehicles that I saw at Northshore the one day that I was there. You know, I don't know.

MR. KATAEV: I'm showing you Thomasson's Exhibit 22.

Which is ECF docket entry 14-2 in this case. An August 15, 2023 letter from Nissan to Mr. Urrutia at Superb.

(Whereupon, Thomasson's Exhibit 22, ECF docket entry 14-2, was marked as for identification as of this date by the Reporter.)

Q. Focusing your attention to the beginning of the final paragraph of page one. Is it fair to say that Nissan found that the vehicle listed in Exhibit A were



H. THOMASSON

not available for inspection at Superb?

A. The document says whatever the document says. I don't have any memory of anyone asking me in August of 2023 to look at vehicles at Northshore. Perhaps they should have.

Q. Can you recall that I sent letters to Mr. Deo demanding that he return the vehicles so that we can comply with the audit, to which you responded?

A. I may have very well have. Although, how did Nissan find out that vehicles were not on the lot? They just happened to wander on the lot?

I think Mr. Urrutia shot himself in the foot, that's what I think Mr. Urrutia did. Because as it turns out, the vehicles -- once I became involved and the federal court became involved, I cooperated, you may remember, in returning almost all of the vehicles that were at Northshore.

Q. But you didn't cooperate in returning them prior to us filing the



H. THOMASSON

lawsuit, correct?

A. I didn't know much about vehicles. I didn't know who owned what vehicle. I wasn't asking who owned what vehicle. All I know is if you wanted to pick up the phone and call me and say we've got have some vehicles at Northshore can you help us get them back, I would have done so.

Q. In this Exhibit A the fifth vehicle is a Rolls Royce Dawn, correct?

A. I see what it says.

Q. That vehicle is still in the possession of Mr. Deo, correct?

A. I have no idea. I don't know off the top of my head what vehicles he has. I seem to recall there were six or eight or so that he had. But I don't know what they are off the top of my head.

Q. You previously represented in court in connection with the Island Auto Group state court action that if a vehicle is on the floor plan of the dealership that that vehicle belongs to the dealership,



H. THOMASSON

correct?

A. I believe that the vehicles are owned by the dealership, subject to the security interest of the floor plan.

Q. Can you explain why Mr. Deo has not returned the six Deo injunction vehicles, given that they were on the floor plan and paid off by Mr. Urrutia at Superb?

A. I think that it's disputed, I think there were disputes over those six vehicle. I don't that that's an entirely black and white issue.

Although at this point it's been several years. I don't remember the issues with the few vehicles that Deo still has.

Q. You have sued Mr. Urrutia on behalf of Mr. Deo on the grounds that among other things he caused an individual named Mr. Bisson to issue a death threat to Mr. Deo, correct?

A. I think that allegation has been made, yes.

Q. You say state in your complaint

Page 206

H. THOMASSON

that Mr. Bissoon spoke to Mr. Urrutia, correct?
A. I don't know what the complaint says off the top of my head about it. I haven't read that in quite some time, I'm sure it's in there.
MR. KATAEV: Thomasson's Exhibit 23.
I will represent to you Mr. Thomasson, that this is NYSCEF docket entry 1, Index 615683/2024.
(Whereupon, Thomasson's Exhibit 23, NYSCEF docket entry 1 Index 615683/2024, was marked as for identification as of this date by the Reporter.)
Q. I am going to direct your attention to paragraph 317. On page 95 of the complaint please read it.
A. It's interesting to me, Mr. Kataev that this does not say that Mr. Urrutia did that. It does not say that, it says the Urrutia defendants, its does not say Mr. Urrutia.

Page 207

H. THOMASSON

Q. What is the basis for you to allege in this complaint that Mr. Bissoon spoke to anyone or more of the Urrutia defendants?
A. Because Mr. Bissoon made the allegation that Mr. Deo had done something wrong at Superb. Mr. Bissoon comes to the amazing conclusion with absolutely no firsthand knowledge that it was Mr. Deo who did something wrong at Superb and that could only come from one of the Urrutia co-defendants. I believe that that statement is accurate in all respects. There's no questioning what it is, that Bissoon said in Exhibit V, 'cause it's attached.
Q. Did you ask Mr. Bissoon or anyone who else who said what to whom?
A. I haven't found Mr. Bissoon yet.
Q. Are you aware that Mr. Bissoon has been an employee of Mr. Deo since before he met Mr. Urrutia?
A. I learned that at some point

Page 208

H. THOMASSON

during the course of this case.
Q. Did you learn that after you filed this complaint?
A. I don't know.
Q. Are you aware that Mr. Urrutia never spoke to or met Mr. Bissoon at the time this text message was sent?
A. I don't know whether he did or he didn't. I don't know whether it's a truthful or an untruthful statement. What I know is that the information that contained in that threat, I believe only could have come from one or more of the Urrutia defendants.
Q. So, it's fair to say that the allegations made in this complaint are based on your belief, right?
A. I think that particular allegation is pretty clear to me.
Q. You don't have any evidence that Mr. Urrutia or any of the Urrutia co-defendants, as you refer to in there, had any communications with Mr. Bissoon, correct?

Page 209

H. THOMASSON

A. Well, I know that he worked there after the lockout at Superb, Mr. Bissoon did.
Again, I think that the exhibit itself is pretty clear evidence that somebody at Superb told him that Deo was the cause of whatever happened at Superb, which I don't happen think is true.
Q. Did you investigate whether Mr. Bissoon's statements about what he did wrong to Jeremy in the text message?
A. I remember that now that you say it, I believe that I looked into it. I don't remember what I found out about that at this point. It's a year and a half or more ago that that was filed.
Q. Are you aware that Mr. Deo bough Mr. Bissoon's vehicle, I believe it was a trade in and failed to pay it off?
A. You're saying Mr. Deo was operating a dealership in his own name and did that, I don't believe it, no.
Q. I apologize. The question was on Mr. Bissoon's vehicle, Jeremy's vehicle?

Page 210

H. THOMASSON
A. I don't know anything about it.
Q. And you didn't ask anything about it, correct?
A. Oh, I'm sure I did. I just don't have a present memory of it, a year and a half or more later.
Q. Do you have any knowledge as to whether Mr. Bisson ever is met with or spoke with Mr. Urrutia, knowledge or evidence?
A. I don't know as we speak, I don't know whether he did or he didn't. I don't recall what it is. I found out about that before I filed that document, I haven't looked at it since. I've looked for Mr. Bisson, I still haven't found him.
Q. You claim generally in this complaint that Mr. Urrutia interfered with Mr. Deo's business relationships, correct?
A. I don't know you have to show me what language you're talking about.
Q. Referring to you paragraph 273. "Within and other acts and omissions between the Urrutia/Aaronson defendants in

Page 211

H. THOMASSON
conjunction the lenders constitute a conspiracy to breach all contracts with the plaintiffs and to intentionally interfere with the Deo's business at issue here".
Do you see where it says that?
A. Yes, I see it says that.
Q. Which business relationships were interfered with by Superb?
A. I think he's interfered with all of Mr. Deo's operating businesses by and through, I think he's interfered with all of Mr. Deo's ongoing businesses starting with Northshore and 189 Sunrise and he's done all that he can to interfere with the Gold Coast business, and perhaps others. I don't recall off the top of my head what their names are.
Q. What conduct did Mr. Urrutia engage in to tortuously interfere with Mr. Deo's business relationships by and through Northshore?
A. You're basically asking me to repeat the complaint which I cannot do. It's whatever I set forth in the complaint

Page 212

H. THOMASSON
is what I'm alleging.
Q. As you sit here right now you can't tell me?
A. I cannot layout that 200 page complaint with over 400 or 500 paragraphs. No, I can't off the top of my head.
Q. Generally speaking with regard to any dealership, what conduct is it that Mr. Urrutia engaged in to interfere with Mr. Deo's business relationships?
A. I think that he has spoken extensively to the lenders to make sure that they -- the floor plan providers specifically, I think he's interfered with the businesses through the floor plan providers. I think he's interfered with the businesses through false allegations in these lawsuits. I think he has filed bad faith lawsuits against the Deo defendants.
Q. What evidence do you have supporting your thoughts?
A. Well, I certainly have attorney work product that I won't discuss here. But beyond that, I think that he has been

Page 213

H. THOMASSON
dishonest. I'll give you a good example. In the Gold Coast lawsuit that he brought, he testified that he does not have an interest in Gold Coast. Yet, he's got a lawsuit maintaining that he does have an interest in Gold Coast, for example, that's one.
MR. KATAEV: Can you read back just my question?
THE REPORTER: Yes.
(Whereupon, the last question was read back by the reporter.)
Q. Do you recall generally speaking a motion for contempt that was filed by the Superb plaintiffs based on evidence that you and Mr. Deo engaged in perjury?
A. No.
MR. KATAEV: Showing you Thomasson's Exhibit 24. ECF docket entry 324, A declaration has been filed in this case.
(Whereupon, Thomasson's Exhibit 24, ECF docket entry 324, was marked

H. THOMASSON

as for identification as of this date by the Reporter.)

Q. Paragraph ten through 12. Is it fair to say that Mr. Deo has never disputed these facts?

A. What facts are you referring to?

Q. Ten through 12.

A. I know that he does dispute that. I think that he says he had authority when checks were written for him to do so. Whether or not that was taken care of by any of the parties with the bank, whatever the bank would meet or want on that is a different matter.

But, I think that Mr. Deo's position is that he had authority to write checks when he needed to do so.

Q. He did not have authority according to the shareholders agreement that he signed for Superb, correct?

A. Right, but I think that there were plenty of conversations between Tony Urrutia and Anthony Deo, which, as is



H. THOMASSON

common, I find with car dealerships and the owners of car dealerships, there there's a lot of things that are said verbally and not always reduced to writing.

Q. Are you familiar with concept, the legal concept of a merger/entire agreement clause?

A. Yes, I am. I know that what you're talking about. All I can say is I don't think that that stops automobile dealers from not completing the paperwork.

Q. But you do agree with me shareholders agreement has such a clause, right?

A. It speaks for itself, whatever is in the shareholders agreement is in the shareholders agreement.

Q. You don't have any evidence of Mr. Deo's authority to sign checks, correct?

A. He says he was given authority to operate the business as he needed to for the benefit of all of those businesses.

Q. The only evidence you have of



H. THOMASSON

Mr. Deo's authority is his own self serving testimony, correct?

A. I don't know that that's the case. I can't recall every single solitary piece of evidence in this case or document or pages in a case with literally hundreds of thousands of pages of documents. I don't know whether it's out there or not, off the top of my head, I don't recall.

Q. Let's look at 13, 14 and 15 please?

A. Okay. I've read it.

Q. This contention by Mr. Urrutia has never been disputed by Mr. Deo, either through himself or through you, correct?

A. All I can say is that is absolutely adamantly disputed and I can tell you that there is no way on earth that ACH payments can come out of Superb's accounts without Tony Urrutia or his people knowing and approving same. No chance because he had security on those accounts.

Q. The same question for paragraph 16, 17, and 18.



H. THOMASSON

A. I don't know anything about that one. Not off the top of my head.

Q. To your knowledge, this contention was never disputed, correct?

A. I don't know.

Q. With respect to what you just testified about for 13, 14 and 15, you do not have any evidence to contradict this, right?

A. I know that there was security on the account, so it couldn't have happened without their knowledge and approval in a timely fashion.

Q. How do you know that there was security on the Chase account for Superb?

A. Because I believe of at that Chase account had positive pay at Superb.

Q. What is the basis of your belief that there was positive pay?

A. I don't know what I saw at this point, but I think they may have also had texting at Superb and tokens were at Northshore and 189 Sunrise. Sometimes I get them mixed up and it's the other way

H. THOMASSON

around. I know that each of these Chase accounts for those three dealerships had security, and I don't remember how I found that out.

MR. KATAEV: We're gonna propound some interrogatories to you directly, asking you for the basis upon which you are saying there were security features such as positive pay, texting and any other security features on the Chase account for Superb. We'll ask you to submit sworn responses under oath.

We will follow up in writing.

Q. Referring to paragraphs 19, 20 and 21. Would you agree with me that these sworn statements are false?

A. The documents speak for themselves. I can't tell you that they are or that they aren't.

I know that he's summarizing filings that we made. I don't know that I agree with his summaries. There's no way for me to answer this question without



H. THOMASSON

having more documents in front of me.

Q. You don't dispute generally speaking that Mr. Deo opened an account with Flushing Bank for Superb, do you?

A. I have learned about that in this case.

Q. You don't have any evidence in writing that Mr. Deo was authorized to open the account by Mr. Urrutia, correct?

A. No, but I have been told what happened. I think that I learned what happened there. It is what it is. I do have writings, yeah, there are writings that I think dispute that.

Q. What are the writings?

A. I know that there's -- I believe it's texts, it could be e-mails, it could be both, that Tony Urrutia and Anthony Deo were possibly also with Bruce Novicky, writing each other about the Flushing accounts and matters that were going on. I think that I have seen these texts and e-mails. I think that Urrutia knew and authorized had one or more people



H. THOMASSON

on his behalf to give documentation to Deo for his dealings with Flushing.

I know that there was some line of credit they were discussing. I know that Deo takes the position that Urrutia didn't want anything to do with it since Deo was gonna be a 100 percent owner of Superb and said, you just go ahead and do it yourself.

I know what Deo's position is on that. Like I say, I know that I've seen texts and/or e-mails about Flushing of after the fact.

MR. KATAEV: We will also propound an interrogatory for you to pinpoint that evidence that you referred to.

Q. With regard to that evidence you referred to outside of text messages, which I believe have been produced in this case and filed on the docket, why hasn't Mr. Deo produced this evidence for our review?

A. What is it you're talking



H. THOMASSON

about?

Q. The evidence that you're referring to?

A. I think that's been produced.

MR. KATAEV: We will propound an interrogatory to that effect, so you can identify that evidence.

Q. Referring to paragraph 28 through 30 of the declaration.

Do you agree with me that Mr. Deo has not disputed the fact that Mr. Deo himself asked Mr. Urrutia to place the Rolls Royce on a floor plan line of credit?

A. I don't know what opportunity he did or didn't have to dispute that. I can say that I know that he disputes any wrongdoing involving that car.

Q. Setting aside wrongdoing, this allegation in paragraph 28 says that Deo, "Mr. Deo swore that Mr. Urrutia floored the Rolls Royce without Mr. Deo's knowledge, right?

A. Well, that sure seems to dispute the next sentence. In that it says

Page 222

H. THOMASSON

that the next sentence, has never been disputed. I don't understand, 28 seems to dispute 29, and then 30 says there's no dispute of 29. All I can tell you is, it says what it says. And I don't think that Deo admits to wrongdoing involving that Rolls Royce. I don't -- I'm not aware of anything he admits to having done wrong.

He has an answer for anything you wanna ask him about, he can explain it.

Q. Looking at 42 through 45 please.

A. Okay.

Q. Do you dispute that that the sworn representations by both you and Mr. Deo that Mr. Merckling never worked at Superb was false?

A. Yes, I absolutely do. Mark Merckling testified himself that he did not work for Superb.

MR. KATAEV: A quick break. I believe I'm done, but let me confirm with my client.

THE REPORTER: Ariel, did you

Page 223

H. THOMASSON

decide if you want to order a copy today?

MS. RONNEBURGER: Actually, I will order one.

MR. THOMASSON: Did you wanna split one?

MS. RONNEBURGER: Sure.

MR. KATAEV: I have no further questions.

THE WITNESS: Thank you.

EXAMINATION BY

MR. RUDERMAN:

Q. Good afternoon, Mr. Thomasson. As you know my name is Jeff Ruderman from Cyruli, Shanks and Zizmor. We represent the IAG defendants. I'm going to follow up some questions for you this afternoon.

Mr. Thomasson, I know that in various filings with the court, you've submitted what I'll refer to as the Baron Nissan contract and the 189 Sunrise Highway contract. I can show them to you if you need to.

A. I know what you're talking

Page 224

H. THOMASSON

about.

Q. Other than those two agreements, are you aware of any written agreements between Anthony and Sarah Deo or any entity that they may own and any of my clients?

A. Not off the top of my head. I'm not saying there aren't any, but I can't recall off the top of my head.

Q. You don't remember seeing any; is that a fair statement?

A. I don't know if I did or I didn't. The volume in this case is so tremendous, you know, I don't know if I did or I didn't.

Q. Have you reviewed what would the central documents related to this case?

A. I don't know what you mean by central documents, certainly to me central documents are the exhibits attached to the complaint that I filed.

But, that being said, I don't know if there's more agreements in writing between our clients or not. I don't know

Page 225

H. THOMASSON

off the top of my head.

Q. You do refer to in this litigation and the litigation that you filed that has been remanded, referring to an agreement to provide floor plan financing from my clients to Northshore and Sunrise, correct?

A. Yes.

Q. Do you know if there's any written agreement concerning that agreement between the parties?

A. Nothing comes to mind.

Q. Do you know what the terms of that agreement are?

A. I believe that David Baron and then Josh Aaronson agreed to continue what David Baron had done. Which was to provide floor plans at Northshore for the Deos. Then they also ended up doing that at 189 Sunrise.

Q. In preparation for the defense of this action and commencing that other action, you were familiar with what exactly the terms of that oral agreement were,

H. THOMASSON

correct?

A. I certainly would have had all of the details of, you know, in the forefront of my mind then, whereas at this point I haven't focused on that issue in years.

Q. Are you aware of the amount of the floor plans financing was that required to be provided to Northshore and Sunrise according to your complaint and the defendant in this action?

A. Not off the top of my head.

Q. Do you know if in fact, there is a dollar figure of amount floor plan financing that was supposed to be provided?

A. I don't know off the top of my head whether there was or there wasn't at this point. I don't remember what the details were.

Q. Where would you have gotten the details from concerning what the terms of the agreement were?

A. Well, primarily the Deos.

Q. Do you know if the Deos ever



H. THOMASSON

told you exactly what the terms of that agreement were?

A. I believe they did and I put specifics into the complaint that I did, as best I could at that time. I don't know if I put every single detail in, I don't know if that was our intent or not. I'm just saying that I would have spoken to them about that issue.

Q. Well, you are aware as an attorney practicing for 30 or 40 years, that when you allege a breach of contract in a complaint, you're required to state the terms of the agreement and which terms were breached, correct?

A. And I did that to the best of my ability in that case.

Q. Since I've reviewed your multi-page complaint, I could not find any specific term as to the amount of the floor plan financing, would be fair to say that you don't know when you drafted it, you were not aware as to what the amount of that floor plan finance was?



H. THOMASSON

A. I don't know what I was and wasn't aware of at the time of the drafting. Maybe I just made a mistake and I did not put it in, I don't know.

Q. So it's possible over a 100 pages of an allegation, you don't know because you may have forgotten to actually to put in what terms of the agreement you allege is breached; is that a fair to say?

A. It may be, if that is what you're representing about the complaint. I don't know without going back and looking at it myself. I wouldn't know firsthand at this point. It's just too long and too many details.

Q. What was the term of the agreement, how long were they obligated to provide that financing?

A. I don't know off the top of my head.

Q. Are you familiar with the statute of frauds?

A. I am familiar with the statute of frauds.



H. THOMASSON

Q. If an agreement could not be performed within one year, right, that needs to be writing, correct?

A. Roughly speaking, yes.

Q. If there was no agreement between the parties and you cannot point to any ends to this agreement, wasn't the agreement violative of the statute of fraud that you allege was breached?

A. I am not gonna be passing judgment on how the statute of fraud -- frauds applies to this case. I will just that say that, I don't know the details that you're asking for at this time.

Q. Do you know if it is the position in the complaint that my clients were supposed to provide floor plan financing for as long if Mr. Deo wanted them to provide it and my client had no right to say no at some point and stop?

A. I do not think that was part of case, no, I don't think so.

My problem is that instead of just leaving or just ending the

Page 230

H. THOMASSON

relationship, I think they took affirmative steps to harm the Deos and their businesses and I think they still do.

Q. So, the allegations in the complaint where you alleged numerous times that my clients stopped providing financing, it was a breach of an agreement, is or is not part of the complaint?

A. I'm sorry, I didn't hear the last part.

Q. Is or is not part of the complaint?

A. I'm sorry, could you repeat that question, please?

(Whereupon, the last question was read back by the reporter.)

A. The complaint speaks for itself Mr. Ruderman. I don't know off the top of my head what's in that 108 some odd page complaint right now.

Q. Did you know it at the time?

A. Of course.

Q. At the time that you drafted it you knew whether or not the agreement had

Page 231

H. THOMASSON

an end date?

A. I don't know what I knew about that agreement at the time that complaint was drafted. I don't remember as I sit here today. I didn't review anything in preparation for today and I don't recall that particular detail involving that very lengthy two year investigation.

Q. Your complaint alleges essentially that Mr. Deo owned Northshore and Sunrise and the only relationship my client had to these dealerships, whatsoever, was providing floor plan financing; is that a fair statement?

A. No.

Q. No. So, what other relationship did my client have to Northshore and Sunrise throughout that term, prior to when things fell apart, let's say in November or so of 2022, what was the nature of their business relationship?

A. It was for your clients to provide a floor plan and as I recall they

Page 232

H. THOMASSON

insisted as part of that to also have considerable, at least review and were added to bank accounts. And I think that it was hand in hand, those two things were, you know, it allowed your clients to be totally in charge of the money, at my client's dealerships.

That was the deal my clients did with the devil, as I call it. They ended up giving up control over their own finances and that was what allowed this whole circumstance to become what it has.

Q. So, is it your understanding that your client did not have financial control over these dealerships and my clients had complete financial control of the dealerships?

A. Anthony Deo had day to day operative control over his own dealerships but when it came to finances there wasn't anything in my view from what I can tell that took place a that was not known in a timely fashion by your clients.

Q. That wasn't my question. I

Page 233

H. THOMASSON

didn't ask if my client knew, I'm talking about control.

Who controlled the finances of Northshore and Sunrise?

A. Well, that is a very difficult line to draw. Let's just say at that Deos had some control over their finances at those dealerships, they did not have complete control over those finances. Your clients had a lot of control over the finances. I think that both sides knew what was going on with the finances.

Q. What control did my client have over the finances that your client did not have?

A. Well, I think your clients could approve or disapprove of any particular transaction that took place at those dealerships.

Q. When you say transaction, what transaction are you referring to?

A. Every transaction that dealership could be involved with financially, your clients had knowledge

H. THOMASSON

over and if there was an issue, they absolutely could impact that decision.

Q. That's again not my question. The dealerships are being run on a day to day business, correct?

A. As far as I know, as far as I know I wasn't there, but I presume that they were operating daily.

Q. Daily decisions are made with regard to finances of the dealership, correct, buying and selling cars, et cetera, correct?

A. Yes.

Q. Who was making those daily decisions, as far as you know?

A. I think that the Deos were operating these dealerships with your clients approving or disapproving of anything they did.

Q. So you think every purchase of a car required the approval of my client; is that what your understanding is?

A. No, your word is required, I'm not saying that. What I am saying is both



H. THOMASSON

sides had control of finances involving bank accounts. With regard to those bank accounts the Deos, of course were operating and signing checks and doing things that your clients knew fully they were doing.

No one could in good faith say they didn't know it. But if they had an objection to anything, your clients had the ability to stop it and I think that your clients were in fact taking money from time to time from these dealerships, regardless of whether or not the Deos liked it or not.

Q. Prior to November of 2022, do you have, have you seen any evidence of any instance where my client approved or disapproved of any transaction that Anthony Deo wanted concerning the dealership?

A. I have not been told of that, that they disapproved of what he was doing. I know they had the capability to do so. If it was something that they didn't like they had the ability to stop it.

But I'll know a lot more after I do the deposition of Chase.



H. THOMASSON

Q. What would be in the deposition of Chase that would answer that question?

A. I'm gonna find out about security on these accounts, and who had it.

Q. Isn't it true that you've been provided with all of the bank statements from the Chase accounts?

A. I wanna know about tokens, texting, and positive pay. I believe that those systems existed, one or more of those three systems existed at each one of those three dealerships.

And I think that we're gonna find out who has sign in credentials, all of that. I need to find out control over the bank accounts that I have not yet gotten from Chase.

Q. Let's presume that my client has a right to decline any particular transaction that your client instituted, are you aware how would your deposition of Chase help you determine whether in fact my client did decline any transactions that your clients tried to institute?



H. THOMASSON

A. I understand those systems, I believe in each instance and I'm no expert on them, but I'm talking about those security systems now, that I believe that one or more existed on each of those accounts. I believe that the plaintiffs in this case for each of those three dealerships, the IAG plaintiffs from Northshore and 189 Sunrise, and the Team Auto plaintiffs for Superb had to approve or disapprove of every transaction.

Q. Again, you're not answering my question. Let's presume that my client had to approve every single transaction.

Do you believe that by deposing Chase you will be able to determine whether my client ever rejected any of the transactions your client wanted --

A. I would think that it would exist somewhere in the records, yes.

Q. Have you subpoenaed Chase for records to show wherein my client rejected, when your client tried to do some sort of financial transaction?

H. THOMASSON

A. I anticipate those subpoenas going out very soon.

Q. So, you still haven't served the subpoenas?

A. Not yet.

Q. And you're aware of our March 31st deadline, correct?

A. Yeah.

Q. Let's assume that my client did not reject any transactions, that your client tried to institute, would that mean that your clients claim that my client somehow interfered with his business would not be valid?

A. Well, I think it would strengthen in where in one or more others ways. Because if they approved all transactions, then you would don't have any transactions that you allege Anthony Deo committed some sort of wrongdoing, that you could complain about. If it was reviewed and approved at that time by your people, then what happens to your case?

Q. Well, what if the documents



H. THOMASSON

were never submitted or withheld by Mr. Deo and not submitted, not submitted to a financial transaction. Let me withdraw the question.

What if Mr. Deo did not inform my client about certain observations that needed to be repaid and causing the dealership to owe a lot of money that my client was unaware of?

A. I don't know that that was possible.

Q. Why don't you think that was possible?

A. Well, if there's a car at the dealership presumably it's on a floor plan. The minute that happens your people had 100 percent control over that car.

Q. What makes you think my clients had 100 percent control over that car at that time?

A. Because you were 100 percent in charge of the floor plan. So you, you had --

Q. But --



H. THOMASSON

A. I'm not finished. I'm not finished. Your clients were 100 percent in charge of the floor plans at those dealerships. You know, I'm talking about, I don't have to do this each time, the IAG plaintiffs at Northshore and 189 Sunrise, the Team Auto plaintiffs at Superb, were 100 percent in charge of the floor plans.

They were, as far as I'm concerned from what I can tell, they had complete control over those bank accounts. There wasn't five cents that could get spent without some plaintiff in this case knowing it.

Q. I think you misunderstood me.

A. Let me finish.

Q. Okay, go ahead.

A. We also have as part of this situation the IAG and Team Auto plaintiffs are entirely in charge of the people in charge of finances at the these dealerships. They weren't Deo people, they were Aaronson and David Baron people at Northshore and 189 Sunrise. And they



H. THOMASSON

Urrutia people at Superb. So in combination you had every end point for money was covered by these plaintiffs.

So, when they wanna allege that Deo did something wrong with any of the accounts, with any transaction in these accounts, I think that's absolutely a lie.

Q. There was an affidavit submitted in connection with the New York action by Daniel O'Sullivan.

Do you know who Dan O'Sullivan is?

A. I believe that he is an Aaronson guy that worked at Northshore.

Q. What makes you think he was an Aaronson guy?

A. Because he wasn't a Deo guy.

Q. What made him not a Deo guy; whose employee was he?

A. Well, he may have been paid by Northshore, but he certainly was an Aaronson guy.

Q. How do you know he was an Aaronson guy; what is an Aaronson guy?

Page 242

H. THOMASSON

A. Because he was put there are there by David Baron or Josh Aaronson.

Q. And because he was put in there, is that the sole basis for your belief that he was the watchdog in making sure that Mr. Deo didn't do anything wrong?

A. I'm so glad that you said that. Yes, I think that there was more than one watchdog watching Deo at each of these dealerships.

Q. So then Mr. O'Sullivan though put an affidavit stating that over the course of a couple of years he watched and didn't report that there was cash being taken from customer deposits, and not being deposited into the bank account?

A. Well how --

Q. Are you aware of that?

A. How convenient, that one of your people says something so convenient to your case. And this guy kept his mouth shut over fraud that he's personally saw? A, I don't believe a word of that, that he kept his mouth shut.

Page 243

H. THOMASSON

And B, if there was anything being taken from are those dealerships, I certainly think it was being taken only with the full knowledge and approval of the people in charge of the finances.

Q. That's, again because Mr. O'Sullivan was their guy there guy, correct?

A. In the instance of Mr. O'Sullivan?

Q. Yes.

A. Yes, I think there was more than just that.

Q. With regard to, you testified earlier about a situation where Mr. Deo was removed from his own bank accounts in Chase in 2020. Do you recall that?

A. On the night of the David Baron incident, yes.

Q. What, if anything, are you aware of that Mr. Deo did to restore himself to the bank accounts?

A. I don't know that that ever happened. Whatever accounts he and Sarah

Page 244

H. THOMASSON

were removed from in June of -- I think that it was 2020, it might have been 2021, I can't remember which now.

But I believe that the Baron incident took place in June of one of those two years. That night, they were removed after David Baron acquired and took the corporate book and filled out a piece of paper backdating it.

They sent it to Chase it's as obvious as can be that at that point there was a bank account that was two or more years old or about two years old, that your people had been granted signatory authority at their insistence to be on the account and then through obtaining that, that corporate book that night and filling out the stock document, if they had that in January of 2018 they would have opened the accounts. They wouldn't have had to have their names added to the account as signers only. They wouldn't have had to take back the accounts on the night of the Baron incident 'cause you would have had those

Page 245

H. THOMASSON

stock documents for two years at that point.

It was as obvious as can be to me that that what they did.

Q. Was that because Mr. Deo had been operating the company and stealing money left and right so they had to jump in and stop the --

A. By all means --

THE REPORTER: I can't get anything when you talk simultaneously.

Q. Why is your conclusion any better than my conclusion I just gave you?

We have different conclusions, the same set of facts; can't either be at play?

A. Well, first of all not one person, not you or Kataev has ever said boo about the subject matter of that document sent to Chase that night.

I've never received any explanation from that and I'm quite certain that I never will.

Page 246

H. THOMASSON

The fact of the matter the Deos were removed on the night of the David Baron incident from their own Chase bank accounts, and Chase said, these people have a stock certificate, we can't put you back on. And they were excluded from their own accounts.

I don't think they ever got back on that account or accounts however many there were.

Q. They never took any action to go to court saying we're the owners, therefore we should be back on the account, correct?

A. No, because what they were being told on a regular basis is what I've learned that if they kept causing so many problems, opening their mouths about bank accounts and late tax documents and late K-1s, we'll pull our floor plan, and you'll have nothing.

So they were stuck inside their own business being leveraged by the people that they partnered with who, they put in

Page 247

H. THOMASSON

charge of the finances. They had no -- they had no control over their own finances.

Q. So now have you seen one document, did you produce one document which supports any claim for what you just said, where Mr. Deo --

A. Exhibit --

THE REPORTER: My hands are off the machine.

Q. What you just said where Mr. Deo complained saying that, I need my K-1s I am waiting for documents, anything along those lines?

A. They indicate to me that that was a regular conversation that they had with David Baron. And they were constantly put off, put off, put off.

Q. In the words of you, Mr. Thomasson, how convenient for him to say that these things, right, without any backup or any paperwork, is his testimony any better than Mr. O'Sullivan's where you claim isn't it convenient that he can

Page 248

H. THOMASSON

testify about things with no backup, your client can testify about the -- or your former clients can testify.

Is there any difference between them both testifying without one piece of paper that you allege?

A. There is a difference. First of all, you say he was stealing from these bank accounts, please.

It's now March 5, 2026, I still need somebody to say to me, look at that transaction in that account, that's Anthony Deo stealing money. That has not happened, I have not seen that happen in these cases.

But I'll tell you what I do have exhibits A to Z attached to my complaint and those exhibits include very importantly Exhibit Q.

Exhibit Q is this very convenient backdated stock certificate from January of 2018 when the stock book wasn't purchased until June of 2018.

I have the receipt attached to my complaint as well. Feel free to explain

Page 249

H. THOMASSON

that Mr. Ruderman.

Q. Mr. Thomasson, how long have you been practicing law?

A. I was admitted in 1989.

Q. Have you ever done any corporate work before?

A. I've done some corporate work before.

Q. Have you ever prepared unanimous written consent for a client to open a business?

A. I'm sure I have.

Q. Have you ever done shareholders meetings and voting at meetings in connection with a corporation or LLC?

A. I have.

Q. Have you ever had a client come to you, say a small company and says, you know what we never filled out our stock book, it is now three years later. We need to fill them out now, the date we formed the company; has that ever happened to you?

A. No.

Q. Do you think that is illegal or

Page 250

H. THOMASSON

inappropriate?

A. I don't know. I have never given it any thought. What I do is if you are gonna do it, don't be so sloppy as to date something before the book was produced.

Q. Why is did that make a difference, because it's not illegal, unless it is illegal to backdate a document to the date when the --

A. If you wanna --

Q. Do you understand my question?

A. Yeah, I understand what your point is. If you want to say to me that I that I'm correct on the night of the David Baron incident, this is the night they filled out the stock certificates for the first time, you can feel free to say that. I'd be delighted.

Q. I don't know when it was filled out. My point is, is that --

A. Well, that interest in-- well, go ahead.

Q. My point is if they filled it

Page 251

H. THOMASSON

out in June of 2018, but it was dated as of January 2018, when they came to that agreement, wouldn't that still be a valid legal agreement?

A. I don't know that it would be because they had three people on that agreement. And I don't think at least two of them had even been met yet at that point by Anthony Deo.

So, I don't know how there could be an agreement with Asad Khan or the other one that was on the agreement when they hadn't even met or discussed anything before.

Q. Why did they have to meet with Mr. Deo?

A. I don't know that they were a part of any agreement with Anthony Deo. He doesn't know that they were either.

Q. What makes you think they had to be part of an agreement with Mr. Deo?

A. It was the Deos' business.

Q. Mr. Deo testified they hadn't started operating it. He formed the

Page 252

H. THOMASSON

company, but he hadn't started operating; so what made his business?

A. Because they formed it and it was theirs.

Q. What did they own, anybody can form a company by hiring one of these incorporators to file a company, that doesn't make the company theirs, does it?

A. In this instance I absolutely think that it did. They did more than that. It's a totality of the circumstances, they did a lot more than that, then just forming it.

Q. Doesn't an LLC, according to the New York State LLC law require an operating agreement in order to operate an LLC?

A. The New York law on that subject speaks for itself. I would never do so myself. I'm not an expert on anything, as far as I'm concerned.

I'm not here as an expert, I'm here as a fact witness.

Q. Did you ever see an LLC

Page 253

H. THOMASSON

agreement with Anthony and Sarah Deo's name on it dated in 2018 for Northshore?

A. I don't know.

Q. Did you ever see one for them in 2019?

A. I don't know.

Q. How about 2020?

A. I don't know if I've seen any operating agreements for Northshore involving the Deos. I don't know as I sit here today.

Q. We you at the Flushing deposition?

A. I was that one of them, yes.

Q. Did you see me introduce two separate operating agreements from Anthony Deo and Sarah Deo?

A. I don't know. Off the top of my head. I don't know if you did or not.

MR. RUDERMAN: Why don't we find that and bring it up.

Q. Can you see the document in front of you?

A. Yes.

H. THOMASSON

MR. RUDERMAN: We will mark this as Thomasson's Exhibit 25.
This is a document that we had marked at the Flushing deposition.
It is a document that was produced by Flushing with the bate's stamp 7258.
This is a document provided to Flushing in connection with the financing with Flushing in March of 2023.
It is entitled Northshore Motor Leasing LLC.
(Whereupon, Thomasson's Exhibit 25, Bate's stamp 7258, was marked as for identification as of this date by the Reporter.)
Q. Would you agree that that's the name of the company we were discussing Mr. Thomasson?
A. Yes.
Q. I am going to go to the sixth page of this agreement. Flushing 7263. You see that there is something called certification of member.



H. THOMASSON

It states, "the undersigned hereby agree, acknowledge and certified the foregoing operating agreement is adopted and approved by each member as of 15 of June 2020." Do you see that?
A. Yes, I see it.
Q. It's signed by with Anthony Deo. He admitted that that was his signature?
A. Okay.
Q. And that his wife signed below him; do you see that?
A. I see it.
Q. Yet this document wasn't presented or shown to anybody until it was used to obtain financing with Flushing in 2023.
Would it be illegal for Mr. Deo to have dated this document in June of 2020, when in fact he prepared it in June of 2023?
A. That is speculative. I don't know that he did or he didn't. All I can tell you is it speaks for itself.



H. THOMASSON

Q. Let me rephrase the question. Do you think that it would have been fraud or violative, if in fact you prepared it in 2023, but did it 2020?
MS. RONNEBURGER: Objection to the form.
A. I have no idea what the entirety of the circumstances would be that would make it legal or illegal, fraud or not fraudulent. I'm just not a judge, Mr. Ruderman. I can't do that.
Q. The idea here is whether you can backdate. Sign and backdate an operating agreement; that's what I'm asking you, correct?
A. Well, I guess you are now. I never have. That's not the kind of practice that I run that I would agree to be backdating documents, I just don't.
Q. My question is, because you are accusing my clients of some wrongdoing by allegedly backdating an operating agreement.
I'm asking you whether or not



H. THOMASSON

if Deos did the same thing, would that also be as wrong as you claim my clients would be?
A. All I can say is, in this particular circumstance, I think that your clients absolutely committed a fraud attempting to steal those businesses and got caught.
Then everybody had to unravel it. It was only getting unraveled through the tax returns. As soon as the tax returns were done and straightened out, such that the Aaronson Group couldn't get themselves in any further trouble, the tax returns are straightened out, okay fine. Then, since it wasn't their business they left and ruined it.
That's the core of what they did, and it's unshakable in my mind that they did it.
Q. Why did Mr. Deo who claims to formed the company and owned the company since 2018, say that he formed the company and owned it as of 2018 or even 2017 when

Page 258

H. THOMASSON

he formed the company?
A. I don't understand what you just asked me.
Q. You claim that Mr. Deo formed the company in end of 2017, and it was his company for whole long, and that the 2018 operating agreement was fraudulent, correct?
A. The 2018 operating agreement from your clients?
Q. Yes.
A. Yes.
Q. Okay. Yet here he is now preparing his own the operating agreement and does not say that, I'm a member since 2018, he says I have been a member since 2020; do you see that?
A. Yes, I do.
Q. Do you know why he has did not say that he was a member since he formed the company as he alleges?
A. It looks like to me like what happened here is -- first of all, I think we all agree that Anthony and Sarah Deo

Page 259

H. THOMASSON

where the only members at 99 percent and one percent from June 15, 2020 forward in time as agreed to by Josh Aaronson in the tax returns that he asked his accountants to prepare.
Q. I don't know that everyone agrees with that, but --
A. Well, I think that we all do agree that it happened. And that that's exactly what Josh Aaronson arranged with his accountants and then approved those tax returns.
Q. Mr. Thomasson, it's not an answer to my question.
A. Well let me finish. So having the approval to straighten out what happened, dating back to June of 2020, there is noting in this representation as far as I'm concerned, that's inaccurate based on what you have on the screen.
There's a big difference when we're talking about the people who were trying to steal the company, backdating documents for nefarious purposes. There's

Page 260

H. THOMASSON

nothing nefarious about this operating agreement in light of those approved tax returns. This is consistent with those tax returns. There's nothing improper about this document.
Q. So, now you're aware and you're admitting that this document was not prepared until after those tax returns were prepared in October of 2022, correct?
A. I don't know. I don't know which came first the chicken or the egg?
Q. You just testified just now --
THE REPORTER: No, I can't take down two of you at the same time, please.
Q. -- that this document was prepared in order to conform to the agreement that you allege was made in October of 2020 --
A. No.
Q. -- wherein it was agreed that the tax returns would now show the Deos as owners in June of 2020.
This document could not have

Page 261

H. THOMASSON

been prepared in June of 2020, because that agreement that you were talking about wasn't made until October of 2020, correct?
A. The fact matter of the matter is, I do not know when this document was prepared. I had nothing to do with this document. I have no firsthand knowledge of this document.
All I'm saying is it is consistent with the facts of this case that these people as of June 15, 2020, I think before that, but inarguably as of June 15, 2020, absolutely had every right to have this document in their possession. And apparently they did.
I don't know when it was filled out and I don't know why. All I could tell you is there's nothing in this document that I think is inaccurate, and that stands in contrast to the document that I'm talking about with regard to Exhibit Q, the document that was faxed from Baron Nissan on the night of the David Baron incident to remove the Deos from their own bank

Page 262

H. THOMASSON

account.

Q. You're the arbiter of who's right, who's wrong, is that what you're saying?

My clients were wrong when they field backdated ones allegedly and your clients are not wrong when they backdated?

A. I'm not saying that they backdated this. Did Mr. Deo say he backdated? Because --

Q. Is it your understanding that June in June 15, 2020 it was ever understood at that moment that Mr. Deo was going to -- on that specific date which is the same date which matches the date on the tax returns you keep referring to, that you knew clairvoyantly that two years from now you were gonna enter into an agreement with Mr. Aaronson to suddenly decide as of June 15, that he would own the companies; is that your position?

A. Of course not. It was always his business.

Q. How did you know that on June

Page 263

H. THOMASSON

15th that was exactly the date that matches the agreement that you said was made in October of 2022?

A. All I can say is, I don't have any firsthand knowledge of this document, Mr. Ruderman, how many ways would you like me to say that?

I do not have any firsthand knowledge of when this was prepared. I was --

Q. You don't know anything about, you don't know when it was prepared, you don't know if it is right or if it's wrong?

A. But, what I know do is that this date and what is on that document on that page that you are showing me with Anthony Doe as of June 15, 2020, 99 percent owner of this and Sarah Doe one percent owner of Northshore, is absolutely accurate and approved by Josh Aaronson.

Q. In October of 2022, correct?

A. That they were the owners, at least in --

Q. You --

Page 264

H. THOMASSON

A. Yes, that was when he approved it.

Q. Approved by Josh Aaronson in October of 2022, correct?

A. Yes.

MR. RUDERMAN: This is document is Thomasson's Exhibit 26.

This is another operating agreement. Bate's stamped with Flushing 8508.

(Whereupon, Thomasson's Exhibit 26, Bate's stamp 8508, was marked as for identification as of this date by the Reporter.)

Q. Have you ever seen this document before?

A. Can you show me the top?

Q. Yes. This was also marked at the Flushing deposition. I'm gonna draw your attention to page six of this document. Here is the certification of Mr. Deo, dated, "the undersigned hereby agrees and acknowledges that the foregoing operating agreement is adopted and approved

Page 265

H. THOMASSON

by each member as of this 15th day of June 2020 and it is a signed by Anthony Deo as a 100 percent owner; do you see that?

A. I see it.

Q. Mr. Deo acknowledges his signature there. This is a document dated the same day, which you say was accurate in June of 2020. Do you know which one was accurate are you 100 percent in June 15, 2020?

A. Based owned Josh Aaronson's approval, I believe those tax returns indicated 99 percent and one percent for the purposes of the keeping the partnership formed, because as we all know and it's just a 100 percent one person it can result in the elimination of the partnership.

I don't know what this was prepared for or why. I have no firsthand knowledge of this document.

Q. As far as you understand, this document is not consistent with you said agreement was in October of 2022 by Mr. Aaronson?

Page 266

H. THOMASSON

A. Well, I don't know what it was for. I don't know what it is for. Let's say for example --

THE REPORTER: Please.

Q. Let me finish. It's an operating agreement for Northshore dated as of June 15, 2020 in which to say Anthony Deo is the 100 percent member. Is that consistent or inconsistent with what you understand Mr. Aaronson agreed to in October of 2022?

A. He obviously agreed to 99 and one. Not 100, although I think it was everyone's intent for it to be 100 Anthony, it was for tax purposes only. Sarah was listed as one percent.

I feel that the Deos was always considered and I think that Josh always considered it to be of Anthony's business in that regard. Sarah's one percent was always just for tax purposes.

Q. Do you think you could have two operating agreements operating at the same time with each one having a different

Page 267

H. THOMASSON

percentage ownership?

A. No, I don't think so. But, again, it could depend on what they're for.

Q. So you can chose the operating agreement back and forth as to who you were submitting it to; is that what you're saying?

A. I think that people can and do change their operating agreements. I think they've got a right to change it as they need to.

Q. So that would mean that the tax return for this company is 2020, correct, this is in 2020 would have had to shown that Anthony owned a 100 percent of company, correct?

A. I don't know what this document -- I have no knowledge of this document, Mr. Ruderman.

For example, let's say this was prepared and never used. It was intended for something that didn't end up happening. Maybe there was a loan being applied for and someone indicated we need a 100 percent

Page 268

H. THOMASSON

not 99. So they were going to do something to help get a loan, but then it didn't happen. I don't know what this document was for and who acted on it and who didn't act on it. I have no knowledge of this document, Mr. Ruderman.

There's no need for you to -- I have no firsthand knowledge. There's no need for you to ask me what conclusions I draw from this because I don't have any.

Q. Well, it is your testimony, you keep showing tax returns for 2020 and 2021 for Northshore and Sunrise, correct?

A. If that's the years of those tax returns that's attached as my exhibits G and H, yes.

Q. In each one of those returns you show that Anthony Deo owns 99 percent and Sarah Deo owns one percent --

A. I don't show anything, Mr. Ruderman. Those documents show that.

Q. The tax returns show that, correct?

A. Yes.

Page 269

H. THOMASSON

Q. Yet, you're saying that despite the tax returns showing that, you see no problem in changing an operating agreement just to receive a loan, despite the fact that the tax return doesn't match that; you don't have a problem with?

A. I never said that. I never said that. What I said to you --

(Simultaneous cross talk.)

THE REPORTER: I can't make a record, if I can't hear you.

Q. You change it whenever you want if you want to take out a loan, you change it, you can't change it?

A. You can change your operating agreement is.

Q. But it means it needs to be consistent with your tax returns, correct?

A. It would seem to me that that's a better practice, yes.

Q. Thank you.

A. But, I have no firsthand knowledge in this case.

Q. You testified that when Mr. Deo

Page 270

H. THOMASSON

reached out to you, back in November of 2022, about the $735,000, that you said that he had obtained the funds and you're involved in getting those funds back, correct?

A. I was not involved in getting the funds back. All that happened was, I was asked to have the funds pass through me and I said, sure.

Q. Do you know why it was asked to have the funds passed through to you?

A. I don't recall anymore why. I know he had a reason. I just think he wanted it handled by the lawyers at that point. In light of the fact that he was gonna get the money back. I don't think he cared that much about who gave it, but I think it mattered to him that he wanted the lawyer involved at that point.

Q. You have no reason to understand why, when you said, he, by the way, who you're referring to?

A. Anthony Deo.

Q. You said Anthony Deo wanted the

Page 271

H. THOMASSON

lawyer involved?

A. I think Anthony Deo reached out to me to tell me about this. No one else reached out to me to tell me about this. It's not a mystery.

Anthony Deo told me money was stolen, it's coming back, I want you to get involved. This is the name of the guy you've gotta converse with. I believe that I conversed with Russell Shanks via e-mail only. That's my memory.

Q. You don't know why Mr. Deo wanted you to go through an attorney when essentially your instructions were as soon as you got the money to get it to him?

A. That's correct.

Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you?

A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all.

What do you mean $735,000 disappeared from your account. And your

Page 272

H. THOMASSON

ex-business partner who just left took it?

I was stunned. I couldn't believe it actually.

MR. RUDERMAN: We will mark this as Thomasson's Exhibit 27.

This is an e-mail dated November 18, 2022.

The first e-mail from the bottom up it's from Russell Shanks to Detective Marx.

(Whereupon, Thomasson's Exhibit 27, E-mail, was marked as for identification as of this date by the Reporter.)

Q. The first e-mail, where he tells Detective Marx that he's going to be arranging to get the money to Mr. Deo through his attorney.

Then, there's an e-mail from Mr. Shanks to you.

"Mr. Thomasson as continued below our client has agreed to wire the funds to you to hold in escrow. Please provide wire instructions".

Page 273

H. THOMASSON

Do you recall seeing this e-mail before?

A. I haven't seen it. I haven't seen that e-mail since it was sent, I'm quite sure.

It sounds about right and that's the reason why I responded the way I did about the escrow. I told him, no.

Q. You told him, no, what?

A. I told him that nobody was gonna tell me what to do with the money. Everything I knew about this situation was simple.

And it was quite simple. This money was taken from Anthony Deo that he had just obtained. And I had to get it back to Anthony Deo. That's all I understood about the situation.

Q. That wasn't my question. My question is, in response to Mr. Shanks asking you to take the funds and put it in your escrow account and hold it in escrow, did you respond saying no one tells me what to do with my money in my escrow account?

Page 274

H. THOMASSON

A. As far as I can recall, yes.
Q. Then he writes also, "upon confirmation of same, please contact me to attempt to resolve all outstanding issues", correct?
A. It says what it says.
Q. In response here on your e-mail dated November 18th, "Mr. Shanks, I will forward you my wiring instructions after dinner tonight".
When did you tell him that you wouldn't be holding it in an escrow and no one can tell you what to do with it?
A. I don't know. There was an e-mail that I sent him.
Q. Did you send the e-mail before he wired the money?
A. As far as I know.
MR. RUDERMAN: I'm bringing up another e-mail. We will mark this as Thomasson's Exhibit 28. The e-mail November 21, 2022.
(Whereupon, Thomasson's Exhibit 28, E-mail from 11/21/22, was marked

Page 275

H. THOMASSON

as for identification as of this date by the Reporter.)
Q. This is an e-mail from you to Mr. Shanks and it is dated November 21, 2022. It is rather lengthy. Can you read that?
A. I can read it, yes. You want me to read it? I need a minute, just give me a minute. I have to read the first page. I am done with that page.
Q. Now, this e-mail dated November 21, 2022 you indicate that you know the wire has been initiated, it still hasn't shown up in your account still somewhere processing, correct?
A. It speaks for itself.
Q. Is that your understanding?
A. In sum and substance I'm letting him know there's a problem.
Q. No, in sum and substance, you're saying you know that the wire was initiated, but I still hasn't hit your account, yet, you're checking up in sum and substance, right?

Page 276

H. THOMASSON

A. Yep.
Q. In this e-mail you say, "no one on the planet earth will be telling me what I can and cannot do with my clients money if and when it arrives in my account"; do you see that?
A. Yes.
Q. You did not tell him that you were going hold it in escrow until after he initiated the wire, correct?
A. All I know is he certainly could have stopped if he didn't wanna do it.
Q. Just answer my question. Isn't it true that you did not tell him that you would not hold it in escrow until after he initiated the wire?
A. That is true. All though there was no agreement for me to hold it in escrow. That was just something he throw in. At no time did anybody use that other than in one sentence for Russell Shanks. That was never used with me before.
Q. Let's go back to the prior

Page 277

H. THOMASSON

exhibit. This is the e-mail you received from Mr. Shanks. You're attorney, you've been practicing for a lot of years, aren't you?
A. Yes.
Q. The attorney says, I'm going to send you money, and he directs you.
"As indicated below our client has agreed to wire the funds in question to you on Monday to hold in escrow".
Did you understand that to mean anything other than you were being asked to hold the money in escrow?
A. I don't know when I saw that word or what I thought of it.
Can you show me my response?
Q. Yes. That's --
A. I wanna see my response, I wanna see the time. That is a Friday night at 6:35.
Q. On Friday, November 18th at 6:27 --
A. Yeah.
Q. -- you responded eight minutes

H. THOMASSON

later. "Mr. Shanks I will forward you my wire instructions after dinner tonight".

But, you did not say, but I will not hold the money in escrow?

A. I wasn't dealing with that very thoroughly, it was not my intention to send anything at length. I'm sure I was in the middle of dinner at 6:30 on a Friday.

Q. I didn't ask you for your excuses Mr. Thomasson. You're an attorney --

A. I'm the just telling you what I said.

THE REPORTER: I can't make a record with all the cross talking.

MR. KATAEV: Please don't talk over him. Let him finish please.

BY MR. RUDERMAN:

Q. As an attorney, you received an e-mail from another attorney directing you the hold money in escrow and you did not respond to him after receiving that e-mail whether you were eating dinner or whatever you were doing. You did not respond



H. THOMASSON

saying, I will not agree to hold that money in escrow, correct?

A. My e-mail speaks for itself Mr. Ruderman. I am quite sure --

Q. You did not send that to him; correct or incorrect?

A. My e-mail speaks for itself.

Q. So, you didn't actually tell him you wouldn't hold it in escrow until after he initiated the wire, that's what the e-mail shows. Do you have any excuse for that?

A. My e-mails speak for themselves.

Q. When you are being sued for acting improperly in connection with money being sent to you to hold in escrow, and you say you did nothing wrong, wasn't taking the money under direct instruction to hold money in escrow and then taking the money and then not holding it escrow and not saying you wouldn't agree, isn't that a wrongdoing?

A. Absolutely not. I did nothing



H. THOMASSON

wrong in connection with that. There was no agreement for escrow. It was an instruction --

Q. Didn't you --

A. Don't interrupt me now, I'm in the middle of my answer.

Q. Go ahead, finish up. I am waiting go ahead.

A. I had someone who stole $735,000 as I understood it from the police. That's what I understood the police did. The police accused Josh Aaronson of stealing that money and told him he had to give it back. It came from my client.

My involvement was brief. I didn't understand what was going on and it was going back to my client. I told him at my convenience that it was going back to my client. And if that happened to after it was initiated and before the wire hit, then he should have stopped the wire. If he had a problem with that. Because if it didn't come to me, Mr. Ruderman, it would have



H. THOMASSON

gone directly to Anthony Deo. There was no agreement, no discussion, nothing was ever done regarding escrow, nothing, zero.

Other than an instruction from some lawyer I didn't know that wanted be hold it an escrow. And before I got that money I told him I wasn't holding it. I did nothing wrong, period.

Q. When you're directed by an attorney to hold money in escrow, you don't think that's a direction?

A. I have never in my life --

Q. You don't think that is a direction to either reject or accept?

A. I have never in my career, I've never had someone tell me what to do with money that wasn't a party or a client of mine, never happened.

I had some strange lawyer telling me what to do with my clients money, no chance that was gonna happen, and that's exactly in sum and substance, what I told him, before I ever got the money.

He should've stopped it if he

Page 282

H. THOMASSON
didn't like that answer.
Q. So it's his fault?
A. It was entirely Josh Aaronson's fault. Stealing --
Q. But, wouldn't you --
A. I am in the middle of speaking. Mr. Ruderman this will be last time you interrupt me. We will be done with my questioning the next time you interrupt me. I am not finished.
Josh Aaronson absolutely is at fault for steeling $735,000. He knew damn well wasn't his. He knew damn well that Anthony Deo had taken that money. He is a thief. That is what he is. I gave the money back to the man who borrowed it.
Q. Now, I'm gonna refer to the Baron agreement. If I need to pull it up for you, but I believe the agreement that you presented to the court numerous times does not have the signature of Ron Baron.
Do you recall that or do you need me to bring up the document?
A. No, I kind of recall that.

Page 283

H. THOMASSON
Q. Have you ever seen that agreement, the same agreement that you've been presenting in court with Ron Baron's signature on it?
A. I have seen an agreement with Ron Baron's signature. I don't know that it's the same one, but it was the same transaction.
Q. Was Mr. Deo a party to that transaction?
A. Yes.
Q. So, you've seen an agreement in which it was agreed to sell the shares of Baron Nissan to Mr. Deo, and it had both David Baron's signature on it and Ron Baron's signature on it?
A. Yes, I believe so.
Q. Have you produced that document?
A. I believe I gave it to Russell Shanks.
Q. Did you produce it in court when you were there a month or so ago trying to stop the sale of Baron Nissan?

Page 284

H. THOMASSON
A. I believe that's when I produced it.
Q. If I were to represent to you the document you produced to court does not have Ron Baron's signature on it?
A. I would take your word for it, but I have a memory that I gave him one. I know I have a memory of walking in that door with one.
Q. The one that you filed in court does not have it on there.
A. I think you're right. Deo caught that and produced another document to me.
Q. Have you produced that, have you filed that in court?
A. I think that I handed it up to Judge Driscoll in that case. And I believe I gave a copy to Mr. Shanks and/or the gentleman that was with him. Although I don't remember his name off the top of my head.
Q. Mr. Harmenist?
A. I think.

Page 285

H. THOMASSON
Q. You think that you actually handed that document containing Ron Baron's signature to the Judge and to the other parties?
A. I thought I did. I thought I did. I have a memory of saying something about it, and when I did I thought I handed it up. But --
Q. I'm gonna tell you that we don't have such a document.
A. Okay.
Q. I'm gonna ask you, if you have such a document to produce that document as soon as possible, because I think it's an important document.
A. Fair enough.
Q. Now, you've also presented an agreement for the purchase of Sunrise, correct?
A. Yeah, I don't know. Was it an agreement? I remember that it has checks.
MR. RUDERMAN: Well, I'm going to share my screen. I am going to represent this is the document.

H. THOMASSON

It's marked with your bate's stamp on it, or at least Mr. Deo's attorney's bate's stamp, whoever it was at the time.

Bate's stamp VO-000076. We will mark this as Thomasson's Exhibit 29.

This is what is represented to us as the stock purchase agreement in connection with Sunrise.

(Whereupon, Thomasson's Exhibit 29, Bate's stamp VO-000076, was marked as for identification as of this date by the Reporter.)

Q. Have you ever seen this document before?

A. It's been some time. Can I see the signature pages?

Q. There is no signatures on this document. I'll show you. There are no signatures on the one I have been presented.

My question to is have you ever seen this document that was signed by



H. THOMASSON

anybody?

A. I have not present memory of that.

Q. Now, in this agreement, there's the purchase price payment under section 1.2. Do you see that section that I highlighted?

A. Yes.

Q. The first portion of it says, "the buyer is purchasing the shares from the seller for a total purchase price as follows".

Then there is a number of conditions. "One, $50,000 and no dollars upon execution of this agreement representing $10,000 to each of the five individuals sellers". Do you see that?

A. Yeah.

Q. You had presented five checks for $15,000 each. Do you recall producing those checks, I can show them to you if want to see them?

A. I'm just reading that paragraph. I see it, I see what it says.



H. THOMASSON

Q. The first portion says there is gonna be $50,000 paid, which is $10,000 for each of the five individual sellers, correct?

A. I see it.

Q. All right. You presented several times five checks for $10,000 each to these five individuals; do you recall doing that?

A. Yes.

Q. It also says, it says, "and $15,000 per month commencing on blank 2021 representing $3,000 to each of the five individual sellers; do you see that?

A. I see what it says.

Q. Have you ever seen any documents indicating that the other charge of payments in this agreement were ever made?

A. I have not.

Q. The third part says that those payments will continue for each subsequent month to the execution until such time that buyers able to cross guarantee the



H. THOMASSON

corporation or the franchise automotive dealership?

A. I see what it says.

Q. Do you recall ever seeing the document which meets the condition as the purchase price in this document?

A. That's not what it says Mr. Ruderman. It says, purchase price and payment. Purchase price is $50,000 and then they were gonna -- they contemplated having some payments thereafter.

Q. Excuse me, no, you're misreading this. It says "purchase price as follows:" That means everything after as far as the purchase price, does it not?

A. That's not what the title on the paragraph said. I was just reading the title. Purchase price and payment.

Q. Purchase price and payment?

A. Yeah.

Q. Which is purchase price and which is payment; how do you know which is which?

A. Well, it seems pretty obvious

Page 290

H. THOMASSON

that the purchase price was $50,000 and some additional payments thereafter in the way this document was contemplated. But, you're telling me it was never signed.

Q. Is it your understanding, the purchase price here; do you see the definition here?

A. Yeah, I see it.

Q. Doesn't it indicate that the purchase price is defined as everything that comes before it?

A. I see what you're saying Mr. Ruderman. All I can tell you is -- did this get executed or not, as far as you know I haven't seen this executed?

Q. Let me back up. It has been Mr. Deo's position I think by you that he purchased the Sunrise dealership in February of 2021 and owns it since February of 2021, because he paid $50,000.

A. Yes.

Q. It has been the consistent position of Mr. Deo and it's alleged by you while you were representing him?

Page 291

H. THOMASSON

A. It's more than that, but, yes, we do allege that he owns that dealership since February 2021.

Q. The only thing that was presented is this document unsigned and five checks of $10,000 representing $50,000, correct?

A. The only thing that's been presented?

Q. In connection with proof this transaction closed, that it was satisfied is five checks of $10,000 each?

A. No, that's not the only proof.

Q. There is other proof that the ownership occurred?

A. Yes.

Q. I am talking about from a transactional point of view?

A. I know what you're talking about, yes. I think there is other proof.

Q. What other transaction documents do you have?

A. I think that the Mesba transfer is absolute proof of his taking over

Page 292

H. THOMASSON

ownership. Mesba is gonna give someone that's not the owner of the dealership the warranty responsibility?

He's going to assume the warranty responsibility without being the owner, which of course we all know was approved by Josh Aaronson in writing.

Q. What was the proof by Josh Aaronson in writing?

A. His ownership of 189 Sunrise.

Q. When was that provided in writing; are you talking about the tax return again?

A. Yes.

Q. That was in October of 2022. I am talking about in February of 2021. This document is dated in 2021, January of 2021. The checks from February of 2021.

This document which is what was presented by Mr. Deo as proof that he bought 189 Sunrise was presented in this document and $50,000.

And according to this document, which Mr. Deo said he understands is what

Page 293

H. THOMASSON

represents his purchase, has parts to it in order to complete the purchase.

I'm asking you if you've seen the other parts that are required under this agreement. You said you've not seen the other payments of $15,000 a month and I asked you about the cost guarantee and also referenced here. And then you went on and you talked about something else.

Have you seen this cross guarantee of the corporation with franchise automotive dealership that completes the purchase price?

A. I do not agree with the summary of your question, that only by following this unsigned paragraph, was there a transaction. I don't agree with that. There was a transaction, in my view combined with the payment of money in February of 2021, the assuming of the lease, the assumption of the Mesba contracts and the approval as owner by Josh Aaronson in tax returns beginning in February 2021 which included the Josh

Page 294

H. THOMASSON

Aaronson's accountants providing K-1s saying that Anthony Deo and Sarah Deo were the two owners since February of 2021, I think says in combination that they are the owners of Sunrise, yes.

Q. So, the provisions of this agreement don't necessarily have to be complied with is what --

A. Not unless the parties executed it. Did they? I have not seen --

Q. Were you representing Mr. Deo in connection with this transaction?

A. Never. Never knew about and I never heard about it.

Q. So, you don't know what the deal was, do you?

A. I have no firsthand knowledge Mr. Ruderman if you think --

Q. But, you --

A. Don't interrupt me. I told you to stop doing that. I am still speaking. I am still speaking.

Q. You paused for a moment and I thought you were done. Go on with what you

Page 295

H. THOMASSON

were saying.

A. All I can say is, I have no firsthand knowledge of what happened between these people.

That's it. My first involvement ever. Do you understand what the word ever means, Mr. Ruderman?

My first involvement ever with anything involving your people and Mr. Kataev's people and the Deos was when Josh Aaronson stole $735,000.

That was my first knowledge of those people. No knowledge otherwise. So that we're clear in this case, going forward.

Q. Are you finished?

A. Yes.

Q. So, is it fair to say that you have absolutely no idea, sitting here today, as to what to the agreement was, since there's no signed agreement, as you pointed out, you have no idea sitting here today as to what the actual agreement was between Mr. Deo and the party selling

Page 296

H. THOMASSON

Sunrise?

A. I know from my investigation only. Not from my firsthand knowledge.

Q. Thank you. You've represented in court as part of these discussions in October and November of 2022 between my clients and your client with regard to transferring ownership of the dealerships, that your client needed to submit an application of change of ownership to the DMV.

Do you recall what I'm talking about?

A. Can you repeat that question please?

(Whereupon, the last question was read back by the reporter.)

A. No.

Q. Were you aware that there was a requirement that there be a change in the DMV of who was listed as owner of the dealership in order to effectuate transfer of the DMV license?

A. No.

Page 297

H. THOMASSON

Q. You don't recall an oral argument that we made before Justice Gianelli where we discussed the fact that there was a license ownership change application which was sent to your client to execute and send that to my client with a to bond to submit to the DMV?

A. I do not recall that. I'm not saying that it didn't happen, mind you, I just have no memory of that.

MR. RUDERMAN: This is a document that was filed in the Nassau county court. I believe it was actually filed by you Mr. Thomasson, I'm not quite sure.

Index number 617224 that was our original action in this under Exhibit F.

We're gonna mark this as Thomasson's Exhibit 30.

(Whereupon, Thomasson's Exhibit 30, E-mail chain, was marked as for identification as of this date by the Reporter.)

Page 298

H. THOMASSON

Q. In this e-mail chain, this is between my client, Wendy and Josh and your client Mr. Deo, your former client Mr. Deo.

A. Am I on that e-mail chain?

Q. You are not this e-mail. This is before you got involved.

A. Okay.

Q. This is an e-mail from November 24, 2022 sent from Wendy to Anthony Deo, Dan O'Sullivan and to Josh. It says, "Anthony, attached please find the DMV bond applications. Please print, fill out, sign and return them to me ASAP".

This is the application which was required in order to change the license ownership with the DMV to Mr. Deo.

Then, there's another e-mail that is here on Wednesday, November 2nd, a week later, when he says Anthony, "have you had a chance to fill out these two forms?"

And then later on, the same day Josh send an e-mail.

"Hi, Anthony, please make sure to get this back to us today".

Page 299

H. THOMASSON

You represent at an oral argument before Justice Gianelli that in fact Mr. Deo did in fact send it back and that my client purposely held on to it. In fact I think you made that argument to me as well.

Do you have any idea what I am talking about?

A. I do not remember that, no.

Q. Do you have any knowledge or any documents which support any claim that Anthony Deo completed the application and sent it back to my clients to be filed with the DMV?

A. As of this moment, today I just don't know the answer to that question.

MR. RUDERMAN: All right. So I'm gonna follow up again with a request for any documents that you may have, which concern the submission of that DMV application back to my clients.

I will follow that up in writing.

Page 300

H. THOMASSON

A. Okay.

MR. RUDERMAN: This was marked today, but let's mark it again, the order to show cause.

We will mark this again as Thomasson's Exhibit 31.

(Whereupon, Thomasson's Exhibit 31, Order to show cause, was marked as for identification as of this date by the Reporter.)

Q. This is the same order Mr. Kataev showed you before; do you recall seeing that today?

A. Yes.

Q. On the third page, and it says --

MR. KATAEV: We do not see it.

MR. RUDERMAN: Okay.

Q. On the third page of the order it says. "Further ordered that pending a hearing and determination of this motion that Deos and anyone acting on his behalf be enjoined and restrained from; A, take an action to sell, lease, transfer, pledge or

Page 301

H. THOMASSON

otherwise encumber the assets of Northshore and Sunrise including but not limited to any motor vehicles"; do you see that?

A. I see it.

Q. Would you agree that selling motor vehicles owned by Northshore or Sunrise would be a violation of this order to show cause?

A. The document speaks for itself. That seems as though the -- it would violate paragraph A, based on what you just said.

Q. It would be your understanding that borrowing money that Northshore and Sunrise, borrowing money and providing a security interest in Northshore and Sunrise and its assets, would also be a violation of this order to show cause?

A. Again, the document speaks for itself. I hesitate to say what does and doesn't violate it, because I don't know how a Judge would look at it, and that's the only thing that matters.

On its face -- on its face --

Page 302

H. THOMASSON

Q. Thank you. Mr. Thomasson you are an attorney practicing for a long time. You haven't do with this all the time. Your answer's not, oh, I don't know client, the Judge will decide.

Your understanding of this order to show cause would be if somebody were to borrow money from these companies, and provide a loan on the actions of these companies that your understanding it would be a violation of the provision which says to not encumber the assets of Northshore or Sunrise?

A. Before you interrupted me again, I was going to say, on its face it looks like that would be a violation of this order.

Q. Thank you. Were you ever aware that Mr. Deo was involved in obtaining a loan from Flushing Bank in which he pledged the assets of Northshore during the period when this TRO was in place?

MS. RONNEBURGER: Objection to the form.

Page 303

H. THOMASSON

A. I am aware from this case, after the fact, yes.

Q. You're saying at the time you had no knowledge whatsoever that Mr. Deo was seeking, did you know that Mr. Deo was seeking to obtain a loan which might encumber the assets of the dealership?

A. I am not aware of anything that the Deos had ever done regarding money before they did it. I'm aware of things after the fact, but I have never in any way been involved in anything involving their loans or opening accounts or making bank deposits or bank withdrawals or writing checks at these dealerships or any of that before it happened. Not a thing.

Q. You're aware what UCC means, correct?

A. Yes.

Q. You know what UCC 1 is?

A. Yes.

Q. What is your understanding as to what a UCC 1 is?

A. Again, I'm no expert, it's a

Page 304

H. THOMASSON

lien on solid material including cars.

Q. Weren't you requested by Mr. Deo to get involved in trying to get a release of the UCC 1 against the Northshore dealership, which is held by Ally Bank?

A. I was told that it was going to be released, and he wanted me to like get that. And I contacted them, and they said you want us to send it to you, okay, we will send it to you.

Q. Why would he want a release of lien on a dealership which has a TRO restricting it from getting any other liens?

A. I've never connected those dots Mr. Ruderman at the time.

All I know was my client asked me to get a UCC release that he was expecting from Ally Bank, so I called them and they sent it to me.

Q. So, you asked no questions saying, Anthony, there's a restraining order prohibiting you from selling cars, from getting liens, from doing anything to

Page 305

H. THOMASSON

Northshore which encumbered assets, why are you asking me to get a lien release; you never asked that question?

A. I was not in any way shape or form curious as to any reason for the lien release that is not the way it was presented to me. It was presented to me that they are going to provide a release, would you get it for us Harry?

I thought it was a rather ministerial thing, I just thought it was in due course. I never connected that and I didn't care what he was doing. I have no involvement in their financial situations, never have.

There have been times when they've come to me after the fact, and I've learned of things. Such as the purchase of Superb or the Libertas loan or the Flushing loan. I never knew of any of those things before they happened. No knowledge whatsoever. I was never consulted?

Q. So, a month later Mr. Deo comes to you and says, I need a letter from you

Page 306

H. THOMASSON
stating that the lawsuit that was filed against me indicating that we don't have a right to operate the order on Northshore, but he said, I am not going to tell you what's it's for.
You did not suspect after knowing that he wanted a lien release that place he was trying to obtain financing from somebody?
A. I they ever any clue that he was obtaining financing and it wasn't my business. As for our conversations, I don't remember with any specificity what he needed that letter for. I don't remember. Did you ask him about it? He might know.
Q. I believe you testified earlier that you would have known at the time you wrote the letter?
A. Oh, I'm sure I would have, but I don't know what that is now.
Q. So, would it be fair to say though, that if you knew at the time that Mr. Deo was trying to obtain financing from Flushing, that we put a lien on the

Page 307

H. THOMASSON
dealerships, you would have told him, I'm not giving you that letter it because that would implicate me in violating the TRO?
A. I don't remember what he asked for that letter for. You are asking about a hypothetical here as far as I'm concerned.
Q. No.
A. It is. Because that isn't what happened. I had no knowledge that he was doing anything that could have violated that restraining order.
If there was going to be a determination that he did violate the restraining order, I think it was incumbent upon you to go to Judge Gianelli who issued that restraining order and alleged a violation.
As of right now there is no violation of that restraining order that was ever found by any Judge.
Q. You testified that you would have known at the time as to what he wanted it for, and certainly you would not have

Page 308

H. THOMASSON
assisted him to violate the TRO, correct?
A. Correct.
Q. We can assume that if you knew what he wanted it for and he was asking Flushing for a loan, which would violate the TRO that he must have given you some other reason as to why he wanted that letter; is that a fair statement?
A. I have no memory of what that reason was. I can't speculate right now. I do not believe I would have done anything that violated the restraining order.
But, I don't remember what our conversation was about at that time.
Q. But, it could not have been where he told you that he's using it to get a loan with Flushing cause you never would have provided if that was what he told you?
A. And I know he has never discussed any loan he has ever sought with me beforehand. That much I know.
How much more time do we have left?
MR. KATAEV: Off the record.

Page 309

H. THOMASSON
(Whereupon, an off-the-record discussion was held.)
MR. RUDERMAN: What was the last answer?
THE REPORTER: I'll read it back.
(Whereupon, the last answer was read back by the reporter.)
Q. Now, your testimony is that the absolute proof of ownership is a tax return showing that the parties own a dealership or own entity, correct?
A. There is more than that.
Q. But, you were relying upon the fact that there are tax returns filed with Anthony and Sarah's names for K-1s showing they owned Northshore and Sunrise, correct?
A. As approved and created by Josh Aaronson's accountants and approved by Josh Aaronson. Those returns are impactful, yes.
Q. Now, you're also aware that there are earlier tax returns at Northshore which show that Brian Chabrier, Asad Khan

Page 310

H. THOMASSON

and David Baron owned the dealerships, correct?

A. Yes.

Q. Wouldn't that also be proof that, at least at that time they owned the dealerships?

A. No.

Q. That's because they fraudulently prepared those tax returns?

A. That was all done without the Deo's knowledge or approval. Once David Baron, Brian Chabrier and Asad Khan had control over the finances at the dealership, and so generously offered their accountants, in reality what was happening is they were just taking over the ownership of that dealership.

When the Deos found out -- well, they filed their own tax returns because they weren't getting the tax documents they needed.

So they filed their own tax returns and then when Josh Aaronson found that the Deos had done so, that's when it

Page 311

H. THOMASSON

hit the fan, is my understanding and the results of my investigation.

Q. Do you know who was receiving the financial benefit of Northshore for 2018 and 2019?

A. I don't understand the question.

Q. Well, the dealership hopefully is profitable, right?

A. Well, yes. A lot people were taking money out of that dealership. Go forward from there.

Q. Do you believe that Mr. Deo and Mrs. Deo were profiting from the dealership?

A. I don't know what money they took from the dealership, beyond their paychecks.

Q. So, is it your understanding that all ownership profits from Northshore for 2018 and 2019 went to the IAG, Asad Khan, Brian Chabrier and David Baron?

A. I do not know what monies they took yet.

Page 312

H. THOMASSON

Q. Was it your understanding that they took money out of the dealership?

A. Yes.

Q. I'm asking you, do you know whether or not the Deos got any money other than what their salaries would have been?

A. I believe so, but I am a little fuzzy on that. It's been a long time since I've looked at that issue.

Q. What's your basis to believe that David Baron, Asad Khan or Brian Chabrier took money out of the dealerships, the dealership, Northshore?

A. I don't remember how that came to me.

Q. Well, you made an allegation. Is it based upon documents that you've seen, somebody told you that?

A. It might from years ago, when I still represented the Deos in this case. I may have gone over those Chase bank records with them.

It's been a long time since I represented them on it, and I'm just not

Page 313

H. THOMASSON

clear how I found that out. You know, it's a lot of information that I had to find out. Everything about this case I had to find out secondhand. Where it came to me and when it came to me, you know, with eight million pieces of information, I can be still be a little foggy on when and how, for the purposes of the deposition.

Q. Putting aside where you got the information from, do you believe it to be true that David Baron, Asad Khan and Brian Chabrier took money out of the dealership for their own benefit?

A. Yes, I do believe that.

Q. Now, you said that you entered into a new agreement with Anthony Deo regarding your compensation where you receive a weekly salary, correct?

A. Yes.

Q. Approximately when was that agreement entered into?

A. I would guesstimate around, I don't know last May or June.

Q. Then maybe I'm confused. I got

Page 314

H. THOMASSON

the impression that they started paying you again last May or June, but the agreement originally started much earlier.

Am I misunderstanding your earlier testimony?

A. If you're talking about the $1,000 that happened pretty much all at once. That we agreed that's what they were gonna have to start paying me something. They had gotten themselves to the point where they were back on their feet a little bit and they were able to.

With all of the work I've been doing they were gonna have to pay me something. That's what they were able to do and that's what we agreed upon at that time.

Q. Let me back up then. When I was listening to your testimony with Mr. Kataev originally, you were on an hourly basis for doing any work for the Northshore or Sunrise through November or December of 2022, correct?

A. Yes.

Page 315

H. THOMASSON

Q. After that you said that you entered into an agreement for a weekly salary of $3,000 a week?

A. Yes. That was definitely in the vicinity of July of 2023.

Q. I didn't understand. July of 2023?

A. Yes, at that point we started discussing a lot more work for me. I was gonna be representing multiple dealerships. There was a lot of oars in the water, including this lawsuit. That's what we agreed upon, we were gonna be doing at that point going forward. I think we even had an agreement for one or more potential increases as dealerships were added. At that time he was talking with Tony Urrutia, both about getting the other half of Superb and getting a point and a dealership in Connecticut.

I know about the dealership in Connecticut and that it was legitimate, because I had to start working on that deal.

Page 316

H. THOMASSON

Q. What was your arrangement financial arrangement with regard to the work that you were doing in connection with the original state court action until July of 2023 when you came up with that $3,000 a week agreement?

A. I don't remember what we were doing at that time. I think it was a few sporadic payments. I wasn't doing a lot other than that and I think that is all I was getting paid on between December of 2022, you know, up until June or July of 2023 this was, this case in its original state form was all that I was doing. I don't think there was a lot of money that changed hands in those months.

Q. When you were representing all the other defendants earlier in the case, was it your arrangement that you solely seek fees from Anthony and Sarah and you would not be seeking fees the other defendants that you were representing?

A. Yes, that was the agreement they and I had conversations and in which I

Page 317

H. THOMASSON

felt confident that they really hadn't done much wrong and weren't particularly big parts of the case. That is was predominantly Aaronson later joined by Urrutia against the Deos was the way I though pretty much that everybody viewed this as, you know, being the bulk of the action.

MR. RUDERMAN: Emmanuel can you pull up the complaint that you had, I forget what it was marked as.

The complaint that you pulled up before?

MR. KATAEV: Which one?

MR. RUDERMAN: Off the record.

(Whereupon, a brief recess was taken.)

THE REPORTER: Before we start, please keep in mind, my job is to take down every word that's said.

I'm trying to get everything all of you are saying.

Please keep in mind, I'm trying to keep a clean record here.

H. THOMASSON

Q. Other than the arrangement that you have with the Deos, have you ever entered into an arrangement with a client where you were on salary?

A. Yes.

Q. What was the circumstance of that?

A. It was a similar circumstance. One jumps to mind right now where I served as outside counsel for them and they didn't need or want to be billed to death hourly, and they were gonna be busy months and there were gonna be quiet months and whatever it was that I was gonna be doing for them, we just agreed on a number that I would get every month, whatever it is I had to handle I did. That was a very good relationship that I had for a number of years with that business.

I think I may have done that a couple of other times similarly.

Q. You are currently being paid, whatever you are being paid, what person or entity is paying you this weekly salary?



H. THOMASSON

A. You mean from the Deos right now?

Q. Right now you said you being paid a weekly salary now, and for that weekly salary you are continuing to represent them -- oh, excuse me, I apologize.

Back when you were representing them, were you getting a weekly salary for some period of time?

A. I still represent Deos in matters outside of this case.

Q. So, you're getting a salary now from the Deos for other matters?

A. Yes.

Q. How much, you are getting a $1,000 a week; is that what you said?

A. Yes.

Q. Who is paying you, where is the money coming from?

A. I don't pay much attention to the checks. They've given me checks and wherever they come from, not my business. I represent them and any business of theirs



H. THOMASSON

that needs any work and I get paid from them and/or their businesses. I don't pay much attention to it.

Q. Well, aren't they obligated and you obligated to get a 1099 at the end of the year for the amount of money they paid you?

A. I presume that that has or will happen and it hasn't.

Q. What about, this litigation is going on since 2023. What about the period of time from 2023, 2024, 2025; in none of those years do you ever recall receiving a 1099 from any of those entities or individuals?

A. There was a long time where I didn't not have any funds from them.

Q. Sitting here today, do you recall receiving a 1099 --

A. I mean, as soon as the case got going -- sorry?

Q. Siting here today, you don't recall any of the 1099s reflected in the salary payments?



H. THOMASSON

A. Yeah, I don't know if I did and what they said.

Q. I am going to turn your attention back to the complaint, I do not recall what it was marked as.

This was previously marked and this is the state court complaint which was recently remanded. This is the one that you filed?

A. Yeah.

Q. You and Mr. Kataev were discussing paragraph 317 --

A. Yeah.

Q. -- with regard to the threats allegedly made by Mr. Bissoon, correct?

A. Yes.

Q. I believe that your testimony was that you understood it to be perfectly clear that Mr. Bissoon could only have known that the problems with the business were allegedly or alleged to have been made by Mr. Deo, could only have come from other defendants; other either Mr. Urrutia or one of the other defendants; am I

Page 322

H. THOMASSON

mischaracterizing your testimony?
A. I think that's what it says and I think that is what I said, yes.
Q. Okay. But it doesn't say that Mr. Bissoon found out about what happened from them, it says that they arranged the Urrutia defendants arranged for him to receive death threats.
Now just because he found out or allegedly found out about bad things which supposedly happened by Mr. Deo, does not mean he was told to make death threats to Mr. Deo, correct?
A. I don't know what conversation Mr. Bissoon had with anyone at Superb.
Q. Right, but you came to a conclusion. The conclusion is reflected in the allegations.
Your conclusion that you testified was you concluded that he must have found from the other Urrutia defendants that they claimed Mr. Deo caused the problems with the business. That was the conclusion you said you came to.

Page 323

H. THOMASSON

But your allegation doesn't say that Mr. Bissoon found out about the allegations about what Mr. Deo did.
It says that they arranged for him to make death threats; where do you come to that conclusion?
A. Well, it was a death threat that he alleged in his text, as I understood it.
I believe that whatever caused him to do that only could have come from the Urrutia defendants.
Q. What you really meant to say in this paragraph was not that they arranged for him to make death threats, but they told him information which he then decided on his own to make a death threat?
A. Um, I don't know. I believe what I wrote is accurate. That's what I know.
Q. You believe that the Urrutia defendants arranged for him to make death threats to your client?
A. Yes, I absolutely believe that

Page 324

H. THOMASSON

they were firing this young man up and did so recklessly and in complete disregard for how he was gonna react, yep.
Q. And they did so because they expected him to make a death threat; that's what your allegation is?
A. I believe that they told him lies for the purpose of getting him to react against Anthony Deo, yes.
Q. Do you believe that they understood that to mean he would make a death threat?
A. I think that they were reckless in what they said to him and it ended up causing a death threat.
Q. Well, your allegations do not say, they were reckless in making allegations and that he therefore made a death threat. You're saying they arranged for him to make a death threat.
Are you alleging that they arranged for him to make a death threat or they riled him up so much that he decided on his own to make a death threat; which

Page 325

H. THOMASSON

one is it?
A. What's written is what's written. I believe what's written is accurate.
MR. RUDERMAN: I have no further questions at this time.
MR. RONNEBURGER: I have no questions.
MR. KATAEV: No further questions.
(Whereupon, at 5:39 P.M., the Examination of this witness was concluded.)

° ° ° °

H. THOMASSON
D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

____________________________
HARRY THOMASSON

Subscribed and sworn to before me this _____ day of ________________ 20___.

____________________________
NOTARY PUBLIC



H. THOMASSON
E X H I B I T S
THOMASSON'S EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | NYSCEF document 31 | 36 |
| Exhibit 2 | Docket entry 1 for 616542 | 38 |
| Exhibit 3 | Docket entry 1, Index 615345/2023 | 40 |
| Exhibit 4 | complaint filed in federal court named Alexander Owhonda | 51 |
| Exhibit 5 | Docket entry 21 | 53 |
| Exhibit 6 | Docket entry 41 | 55 |
| Exhibit 7 | Docket entry 43 | 63 |
| Exhibit 8 | Docket entry 4 | 68 |
| Exhibit 9 | NYSCEF document history | |
| Exhibit 10 | Docket entry 77 Index 612890/2025 | 74 |
| Exhibit 11 | NYSCEF docket entry 16 index 616451/2025 | 77 |
| Exhibit 12 | NYSCEF docket entry 1 of Index 624451/2025 | 80 |
| Exhibit 13 | Operating agreement Index 617224/2022 | 91 |
| Exhibit 13A | Order to show cause with temporary restraints | 136 |
| Exhibit 14 | One page letter bate's stamped Flushing 3835 | 143 |
| Exhibit 15 | Docket entry 28 Index 617224/2022 | 147 |
| Exhibit 16 | ECF docket entry 30-1 a declaration | 154 |
| Exhibit 17 | ECF docket entry 12-2 | 164 |
| Exhibit 18 | ECF docket entry 13 | 169 |
| Exhibit 19 | ECF docket entry 38-12 | 189 |
| Exhibit 20 | ECF docket entry 112-7 | 197 |
| Exhibit 21 | ECF docket entry 14-1 | 198 |
| Exhibit 22 | ECF docket entry 14-2 | 202 |
| Exhibit 23 | docket entry 1 615683/2024 | 206 |
| Exhibit 24 | ECF docket entry 324 | 213 |
| Exhibit 25 | Bate's stamp 7258 | 254 |



H. THOMASSON
DCF docket entry

| | | |
|---|---|---|
| Exhibit 26 | Bate's stamp 8508 | 264 |
| Exhibit 27 | E-mail | 272 |
| Exhibit 28 | E-mail from 11/21/22 | 274 |
| Exhibit 29 | Bate's stamp VO-000076 | 286 |
| Exhibit 30 | E-mail chain | 297 |
| Exhibit 31 | Order to show cause | 300 |

(Exhibits retained by Counsel.)

I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. KATAEV | 6 |
| MR. RUDERMAN | 223 |


INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| Production of all e-mails exchanged between yourself and any United States attorney including Ms. Mirabile | 20 |
| Production of any notes that you take at the deposition | 52 |
| Production from the Deos of any agreement that they have from Credit Acceptance Corp related to Northshore | 62 |
| Conduct a search of your records to see if you submitted anything in writing to Ally concerning UCC liens placed on Northshore and Sunrise | 101 |
| To the extent that you remain in possession of any copy of such a written document, call production of it | 117 |



H. THOMASSON

| | |
|---|---|
| Production of any retainer agreements or other agreements relating to the provision of legal Services for Mr. Deo and his business interest | 130 |
| To the extent that you're in possession of any notes from day that you visited Northshore while a floor plan audit was ongoing, production of those notes | 158 |
| Production of the un redacted payment receipt | 183 |
| Propound some interrogatories to you directly, asking you for the basis upon which you are saying there were security features such as positive pay, texting and any other security features on the Chase account for Superb. We'll ask you to submit sworn responses under oath | 218 |
| Propound an interrogatory for you to pinpoint that evidence that you referred to | 220 |
| Propound an interrogatory to that effect, so you can identify that evidence | 221 |
| If you have such a document to produce that document as soon as possible | 285 |
| Request for any documents that you may have, which concern the submission of that DMV application back to my clients | 299 |

H. THOMASSON

QUESTIONS MARKED FOR RULINGS

| QUESTION | PAGE | LINE |
|---|---|---|
| What is the reason that Mr. Deo had concerns for his safety and welfare, such that he needed two police officers around him? | 24 | 22 |
| Where do you currently reside? | 12 | 3 |



H. THOMASSON

C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF NEW YORK )

I, Kim Draper, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of March 2026.



Kim Draper



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME:
Superb Motors Inc, Et Al. v. Deo, Anthony, Et Al.
DATE OF DEPOSITION: 3/4/2026
WITNESSES' NAME: Harry Thomasson

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________
Harry Thomasson

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ___________, 20__.

____________________ ____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES:

**&**

**&** 1:18 2:7 3:9 4:14 5:17

**0**

**000076** 286:6 286:13 328:5

**1**

**1** 5:17 36:18,20 38:16,17,19 40:22 41:2 80:7,11 206:12 206:14 303:21 303:24 304:5 327:4,4,5,12,21
**1,000** 132:24 314:8 319:18
**1.1** 199:13 201:19
**1.2.** 287:7
**10** 73:25 74:5 327:10
**10,000** 287:17 288:3,8 291:7 291:13
**100** 40:18 42:17 102:25 120:21 122:15 141:8 173:3 184:4 196:5 220:8 228:6 239:17,20,22 240:3,9 265:4 265:10,17 266:9,14,15 267:16,25
**100,000** 123:12
**10017** 4:8
**101** 328:20
**10170** 3:15
**102** 169:23 173:20
**105** 36:11,24
**106** 36:12,24 37:2
**108** 230:20
**1099** 320:6,15 320:20
**1099s** 320:24
**10:08** 1:24
**11** 13:15 77:20 77:24 164:12 189:13 327:11
**11/21/22** 274:25 328:4
**112** 4:12 6:12 55:14,21,24
**112-7** 197:6,10 327:19
**11423** 3:6
**11553** 2:9 4:16
**117** 328:23
**11793** 4:12 6:13
**12** 80:5,11 154:23 214:4,9 327:12 330:7
**12,000** 124:3,5 128:12,14 129:13,18
**12-2** 164:11,15 327:18
**1239** 1:7 3:13
**12th** 134:19,19 134:23,24
**13** 91:12,20 136:23 155:3,4 169:8,11 216:11 217:8 327:13,18
**130** 329:2
**1339** 3:19
**136** 327:14
**13a** 136:18 327:14
**14** 23:15 135:8 143:3,5 155:5 155:14 216:11 217:8 327:15
**14-1** 198:8,11 327:20
**14-2** 202:14,19 327:20
**143** 327:15
**147** 327:16
**15** 99:17 146:8 147:4,10 184:14 202:15 216:11 217:8 255:5 259:3 261:12,13 262:13,21 263:18 265:10 266:8 327:16
**15,000** 125:25 287:21 288:13 293:7
**154** 327:17
**158** 329:5
**1580** 1:6 3:12
**1581** 1:6 3:12
**1591** 1:7 3:12
**15th** 263:2 265:2
**16** 77:21,24 154:11,13 216:25 327:11 327:17
**1632** 1:7 3:13
**164** 327:18
**169** 327:18
**17** 164:9,15 216:25 327:18
**18** 169:7,11 216:25 272:8 327:18
**18211** 3:6
**183** 329:8
**189** 1:4,19 3:10 47:22,25 96:9 103:25 104:15 104:18 105:5 131:21 153:10 171:23 211:14 217:24 223:22

225:20 237:10 240:7,25 292:11,22 327:19
**18th** 274:9 277:22
**19** 189:9,16 218:16 327:19
**19107** 3:20
**197** 327:19
**198** 327:20
**1989** 15:22 81:20 249:5
**1990s** 48:20 83:8
**1s** 246:21 247:13 294:2 309:17

**2**

**2** 38:19 327:4
**20** 26:2 73:2 96:17 99:19 197:4,10 200:11 218:16 326:19 327:19 328:14 332:22
**200** 160:22 161:25 191:3 191:17 212:5
**2000s** 49:20,21
**2002** 13:15
**2006** 83:11
**2007** 83:11
**2016** 28:24
**2017** 257:25 258:6
**2018** 8:23 93:16,18 244:20 248:22 248:23 251:2,3 253:3 257:24 257:25 258:7 258:10,17 311:6,22
**2019** 253:6 311:6,22
**202** 327:20
**2020** 25:11 26:21 27:2,8 125:6 126:8 243:18 244:3 253:8 255:6,21 256:5 258:18 259:3,18 260:20,24 261:2,4,12,14 262:13 263:18 265:3,9,11 266:8 267:14 267:15 268:13
**2021** 244:3 268:13 288:13 290:20,21 291:4 292:17 292:18,18,19 293:21,25 294:4
**2022** 30:6 33:19 35:22 36:15 37:18 38:8,17 39:2,4 86:6 96:8,11 96:23 97:2,19 98:22 103:12 104:4,7,16,17 105:7 106:7,12 106:18 107:3,8 108:2,14,19 110:24 124:22 125:4,7,12,23 125:24 127:15 128:4 129:15 129:16 135:8 139:16 148:10 151:17 164:12 170:2 172:4,7 231:21 235:14 260:10 263:4 263:22 264:5 265:24 266:12 270:3 272:8 274:23 275:6 275:13 292:16 296:7 298:10 314:24 316:13
**2023** 23:15 39:17 46:4 65:9 76:3 112:24 120:9 120:15 129:5 135:14 138:20 139:6,15,17 140:5,8,15,23 144:9 146:8 148:18,22 157:16 158:25 165:24 169:9 172:11 178:10 180:14 183:17 183:23 184:14 185:2 194:15 194:22 196:20 198:9,20 202:15 203:5 254:11 255:18 255:22 256:5 315:6,8 316:6 316:14 320:12 320:13
**2024** 16:17 21:9 31:4 132:11 320:13
**2025** 72:2,16 76:3 320:13
**2026** 1:23 152:15 153:23 248:11 331:20
**206** 327:21
**21** 53:5,11 169:9 198:6,11 218:17 274:23 275:5,13 327:7 327:20

**213** 327:21
**218** 329:10
**22** 39:17 202:13,19 327:20 330:4
**220** 329:15
**221** 329:17
**223** 328:11
**228** 12:23
**23** 1:8 3:14 39:2,4 206:9 206:14 327:21
**2320** 3:15
**24** 9:14 72:2 115:18 213:21 213:25 298:10 327:21 330:4
**25** 186:9 254:3 254:15 327:22
**250** 4:7
**2519** 1:7 3:13
**254** 327:22
**26** 264:8,13 328:3
**264** 328:3
**27** 72:15 272:6 272:13 328:4
**272** 328:4
**273** 210:23
**274** 328:4
**28** 147:5,10 221:9,20 222:3 274:22,25 327:16 328:4
**282** 11:24
**285** 329:19
**28598** 331:23
**286** 328:5
**29** 222:4,5 286:8,13 328:5
**297** 328:5
**299** 329:21
**2:23** 1:12
**2nd** 298:19

**3**

**3** 40:20,22 74:25 165:24 172:11 183:17 183:23 185:2 327:5 330:7
**3,000** 129:10 130:8 132:8 288:14 315:4 316:6
**3/2/62** 14:2
**3/4/2026** 332:3
**30** 5:16 73:2 184:16 200:13 200:14 221:10 222:4 227:12 297:21,23 328:5
**30-1** 154:13,20 194:17 327:17
**300** 328:6
**31** 36:14,20 148:18,22 300:7,9 327:4 328:6
**317** 206:19 321:13
**31st** 149:7 238:8
**3208** 55:14
**324** 213:22,25 327:21
**3280** 4:12 6:12 55:16
**333** 2:7 4:16
**36** 327:4
**38** 327:4
**38-12** 189:12 189:16 327:19
**3820** 11:18
**3835** 143:6,12 327:15

**4**

**4** 1:23 50:21,25 51:8 68:7,12 327:6,9
**40** 227:12 327:5
**400** 212:6
**41** 55:4,6 57:11 327:8
**42** 136:19,23 222:12
**420** 3:15
**43** 63:9,11 327:8
**446** 1:8 3:14
**45** 222:12
**48** 52:3

**5**

**5** 53:4,11 248:11 327:7
**5,000** 128:16
**50** 95:13
**50,000** 287:15 288:3 289:10 290:2,21 291:8 292:23
**500** 3:19 212:6
**51** 327:6
**52** 328:16
**53** 327:7
**55** 327:8
**5:39** 325:12

**6**

**6** 55:2,6 327:8 328:10
**60** 145:20,23 146:3
**608820/2025** 68:8,13
**612890/2025** 74:3,6 327:10
**615345/2023** 40:23 41:3 327:5
**615683/2024** 206:12,15 327:21

**616451/2025** 77:22,25 327:11
**616542** 38:17 38:19 327:4
**617224** 36:14 297:17
**617224/2022** 91:18,21 136:19,24 147:8,11 327:13,16
**6188** 1:12
**62** 328:18
**624451/2025** 80:7,12 327:12
**63** 327:8
**67** 52:4
**68** 327:9
**6:27** 277:23
**6:30** 278:9
**6:35** 277:21
**6th** 331:20

**7**

**7** 63:6,11 327:8
**7,500** 128:17
**723,000** 123:23
**7258** 254:7,15 327:22
**7263** 254:23
**735,000** 34:5 35:5 39:20 109:4,25 110:4 110:5 123:17 270:3 271:24 280:11 282:13 295:12
**74** 327:10
**76** 1:8 3:13
**760,000** 169:23 173:21
**77** 74:2,5 327:10,11
**7th** 4:7

**8**

**8** 68:6,12 198:19 327:9
**8,000** 121:16
**80** 327:12
**8508** 264:11,13 328:3

**9**

**9** 71:9,14 198:9 327:9
**90** 194:18
**91** 327:13
**95** 206:19
**99** 141:8 259:2 263:18 265:14 266:13 268:2 268:19

**a**

**a.m** 1:24
**aaronson** 1:5 3:11 34:9 35:10 98:14 108:18 109:3 110:5,20 112:9 112:22 123:16 130:3 148:14 210:25 225:17 240:24 241:15 241:17,23,25 241:25 242:3 257:14 259:4 259:11 262:20 263:21 264:4 265:25 266:11 280:14 282:12 292:8,10 293:24 295:12 309:21 310:24 317:5
**aaronson's** 265:12 282:4 294:2 309:20
**aashish** 30:25
**ability** 9:16 148:12 227:18 235:10,23
**able** 24:5 54:19 89:15 131:17 139:11 160:15 237:17 288:25 314:13,16
**above** 160:14 326:6
**abramov** 4:20 4:21
**absolute** 291:25 309:11
**absolutely** 92:10 113:21 114:6 159:10 161:3 177:22 179:6 183:4 197:2 200:19 201:23 207:9 216:18 222:19 234:3 241:8 252:10 257:7 261:14 263:20 279:25 282:12 295:20 323:25
**accept** 281:15
**acceptance** 60:14,20,21,24 61:7,11,18,24 62:5,16,19 328:19
**access** 117:11 158:24 167:21
**accident** 43:15 43:23
**accord** 181:23
**account** 38:7 39:16 92:24,25 108:19 113:13 113:20,23 114:3,17,18 115:14,18,20 116:11,12,14 116:19 117:12

119:8,14,17,17 123:16,22,22 139:25 217:12 217:16,18 218:12 219:4 219:10 242:17 244:13,16,22 246:10,14 248:13 262:2 271:25 273:23 273:25 275:15 275:24 276:6 329:13
**accountant** 96:8,24 97:5 97:13 98:23
**accountants** 98:13 259:5,12 294:2 309:20 310:16
**accounted** 165:6
**accounts** 140:4 140:7 159:20 160:19 164:7 167:21 216:21 216:23 218:3 219:22 232:4 235:3,4 236:5 236:8,17 237:7 240:12 241:7,8 243:17,23,25 244:21,24 246:5,8,10,20
248:10 303:14
**accurate** 71:18 100:8 196:5 207:14 263:20 265:8,10 323:20 325:5
**accusation** 51:23 182:15
**accusations** 175:5
**accused** 40:11 100:11 151:8 161:12 169:22 173:3 182:11 280:13
**accuses** 51:20
**accusing** 176:18 256:22
**ach** 216:20
**acknowledge** 59:23 60:6,9 139:6 255:3
**acknowledges** 264:24 265:6
**acknowledg...** 190:22
**acquired** 244:8
**act** 149:14 268:6
**acted** 268:5
**acting** 137:9 279:17 300:23
**action** 14:15 32:4,7 33:16
43:14 51:24 52:5 56:23 77:12 86:24 88:23,25 150:7 194:4 204:23 225:23,24 226:12 241:11 246:12 297:18 300:25 316:5 317:9 331:16
**actions** 77:13 137:17 138:11 148:8 150:6,11 150:22,25 151:7,21 302:10
**actively** 171:7 171:16 172:3 179:2,8 180:15
**activity** 64:21
**acts** 210:24
**actual** 181:12 295:24
**actually** 26:10 88:8 187:8 223:4 228:8 272:4 279:9 285:2 297:15
**adamantly** 174:17 175:4 216:18
**added** 232:4 244:22 315:17
**addition** 182:3
**additional** 72:8 290:3
**address** 6:11 11:16,19,21 12:5,8 55:13 90:5
**addressee** 143:17
**adjourn** 59:4
**adjournment** 59:9
**administer** 5:11
**administrative** 85:13
**admits** 222:7,9
**admitted** 249:5 255:9
**admitting** 260:8
**adopted** 255:4 264:25
**advances** 108:9
**advice** 17:16 22:17,21 23:3 23:6 65:11 108:8 121:2 134:3 153:17 177:24 196:24 197:22
**advise** 65:6 95:7 120:17 133:20 137:15

190:11
**advised** 54:12 136:5 177:21
**affairs** 48:2 85:14 86:15 88:10,12 150:5 150:15
**affect** 9:15
**affecting** 148:11
**affidavit** 72:5 72:10,12 241:9 242:13
**affirmative** 230:2
**afternoon** 223:14,18
**afterward** 161:19
**agencies** 48:14
**agency** 15:11 15:16 16:5 85:14
**agent** 18:11,13 18:19
**ago** 26:2,2 46:21 54:2 86:19 96:17 99:17,20 100:8 132:17 169:19 193:5 209:17 283:24 312:20
**agree** 7:11 22:23 23:4 122:15 183:19 215:13 218:17 218:24 221:11 254:18 255:3 256:19 258:25 259:10 279:2 279:23 293:15 293:18 301:6
**agreed** 5:5,20 115:5 129:9 171:12 225:17 259:4 260:22 266:11,13 272:23 277:10 283:14 314:9 314:17 315:14 318:16
**agreement** 61:10,17,23 62:4 64:25 65:14,14 89:22 91:20 92:3,6,9 93:21 94:21 120:2,5,7,19,24 121:3,6,8,10 122:10,12,22 123:3 124:18 127:23 128:8 129:6 130:7 131:12,14 179:13 186:4,8 200:23 214:21 215:8,14,17,18 225:6,11,11,15 225:25 226:23 227:3,15 228:9 228:18 229:2,6 229:8,9 230:8 230:25 231:4 251:4,5,8,12,13 251:19,22 252:17 253:2 254:23 255:4 256:15,24 258:8,10,15 260:3,19 261:3 262:19 263:3 264:10,25 265:24 266:7 267:6 269:4,17 276:20 280:3 281:3 282:19 282:20 283:3,3 283:6,13 285:19,22 286:10 287:5 287:16 288:19 293:6 294:8 295:21,22,24 313:17,22 314:3 315:3,16 316:7,24 327:13 328:18
**agreements** 65:11,12,13 91:5,9 130:13 130:16,16 141:7 187:14 188:24 189:2,5 224:4,5,24 253:10,17 266:24 267:10 329:3,3
**agrees** 259:8 264:23
**ahead** 180:9,16 200:9 220:9 240:18 250:24 280:8,9
**al** 332:2,2
**albeitbriefly** 111:9
**albert** 80:8,24
**alcohol** 9:14
**alexander** 51:4 51:9 327:6
**allegation** 151:5 162:2,7 205:23 207:7 208:20 221:20 228:7 312:17 323:2 324:7
**allegations** 35:24 45:24 47:23 76:18,19 77:15,16 79:3 79:9,22 80:2 121:12 138:12 173:20 174:16 174:17,19 208:17 212:18 230:5 322:19

323:4 324:17 324:19
**allege** 207:3 227:13 228:10 229:10 238:20 241:5 248:7 260:19 291:3
**alleged** 30:2 152:19 230:6 290:24 307:18 321:22 323:9
**allegedly** 256:23 262:7 321:16,22 322:11
**alleges** 231:10 258:22
**alleging** 212:2 324:22
**allow** 59:19
**allowed** 135:18 165:18 232:6 232:12
**ally** 100:24 101:6,14 102:3 304:6,20 328:21
**altogether** 87:15
**amazing** 207:9
**amazon** 182:18 183:6
**amended** 187:13,13,14 194:3
**america** 117:8 195:22
**amount** 106:13 123:17,21 124:2,11 129:8 132:22 186:17 201:13 226:8 226:15 227:21 227:24 320:7
**analyze** 194:8
**answer** 8:17 12:9,11 13:5 33:6 44:17 46:8 58:2 108:23 118:13 218:25 222:10 236:3 259:15 276:15 280:7 282:2 299:17 309:5,8
**answer's** 302:5
**answered** 108:21
**answering** 7:20 237:13
**answers** 9:2,11 9:20 122:2,5 142:8
**anthony** 1:4,13 3:5 4:3 7:21 24:13 25:4 31:3 34:5 78:11 80:9 85:5 86:4,12 98:8,14 105:11 106:23 109:2 110:3,7 115:3 151:15 165:12 169:20,22 170:12,23 173:11 174:22 176:17 177:10 178:7,13,23 180:3 214:25 219:20 224:5 232:19 235:17 238:20 248:13 251:10,19 253:2,17 255:8 258:25 263:18 265:3 266:8,15 267:16 268:19 270:24,25 271:3,7 273:16 273:18 281:2 282:15 294:3 298:10,12,20 298:24 299:13 304:23 309:17 313:17 316:21 324:10 332:2
**anthony's** 105:23 110:8 266:20
**anticipate** 163:21 238:2
**anticipated** 131:22
**anybody** 10:12 106:10 112:11 112:17 119:2 170:11 252:6 255:16 276:22 287:2
**anymore** 83:4 270:13
**anyway** 171:8 172:6
**apart** 231:20
**apologize** 209:24 319:8
**apparently** 73:6 166:23 167:4 261:16
**appeal** 45:5,7,9
**appearance** 199:7
**appearances** 3:22
**appeared** 89:11
**appearing** 23:13
**appellate** 45:9
**application** 95:11,24 102:23 108:13 117:8 296:11 297:6 298:15 299:13,22 329:22

**applications** 298:13
**applied** 267:24
**applies** 229:13
**apply** 27:20
**applying** 28:20
**apprising** 56:18
**approaches** 123:2
**appropriately** 191:14
**approval** 217:14 234:22 243:5 259:17 265:13 293:23 310:12
**approve** 233:18 237:11,15
**approved** 98:13 235:16 238:18,23 255:5 259:12 260:3 263:21 264:2,4,25 292:8 309:19 309:20
**approving** 216:22 234:19
**approximately** 50:2 76:7 118:22 125:20 184:16,19 200:11 313:21
**april** 72:2
**arbiter** 262:3
**arbitration** 59:4
**argument** 23:14,18 297:3 299:3,6
**arguments** 89:17 195:6
**ariel** 4:17 222:25
**arises** 44:7
**arising** 31:9,11 43:15
**armed** 170:2
**arms** 151:14,15
**aronson** 111:7 112:2 113:10
**arranged** 67:17 259:11 322:7,8 323:5,15,23 324:20,23
**arrangement** 316:2,3,20 318:2,4
**arranging** 272:18
**arrested** 15:2 67:21,24
**arrived** 128:14 172:13,17 173:25 174:3
**arrives** 276:6
**arrow** 63:19
**arson** 40:13 41:11 42:14
**asad** 1:5 3:11 152:4 251:12 309:25 310:13 311:22 312:12 313:12
**asap** 298:14
**ascertain** 138:7
**aside** 28:4 48:9 110:12 139:3 186:17 221:19 313:10
**asked** 11:15 41:15,21 42:24 54:4 59:12 65:5 75:21 80:20 95:7 102:15 115:11 115:13 142:8 142:22 143:19 150:24 161:4,6 162:25 168:3 172:15,18,21 187:6 196:23 221:13 258:4 259:5 270:9,11 277:13 293:8 304:18,22 305:4 307:5
**asking** 7:19 11:11 12:7 41:24 54:7 57:25 72:23,24 185:8 198:14 198:24,25 203:5 204:5 211:23 218:8 229:15 256:15 256:25 273:22 293:4 305:3 307:6 308:5 312:5 329:10
**assertion** 175:21
**assets** 64:5,16 301:2,18 302:13,22 303:8 305:2
**asshish** 68:22
**assist** 27:19 56:3
**assistant** 56:4
**assisted** 308:2
**assisting** 69:8 69:14 139:24
**associated** 152:13
**assume** 8:17 238:10 292:5 308:4
**assuming** 139:13 293:21
**assumption** 293:22
**assure** 121:17 161:2

**attached** 207:17 224:21 248:17,24 268:16 298:12
**attack** 67:10
**attacked** 68:25
**attempt** 175:10 274:5
**attempting** 257:8
**attempts** 188:6 188:9
**attend** 156:11
**attention** 38:14 56:8 74:12 97:2 121:6 161:3 164:20 169:16 202:22 206:19 264:21 319:22 320:4 321:5
**attorney** 4:11 6:25 8:12 15:17 17:19 18:6 19:5 20:21 25:3 38:6 49:6,8 50:16 99:13 101:5 102:4 130:4 150:4 168:15 179:5 212:23 227:12 271:14,19 272:19 277:3,7 278:11,20,21 281:11 302:3 328:15
**attorney's** 16:17 286:4
**attorneys** 3:4,9 3:18 4:3,15 10:15 18:10
**audit** 157:6,9 157:13,15,17 158:8,14 184:22,25 185:12,16,19 198:19 200:21 201:2 203:11 329:7
**auditor** 201:12
**august** 46:4 112:24 120:15 144:8 157:16 157:18 164:12 165:24 169:9 172:11 180:14 183:17,23 184:25 196:20 198:9,19 202:15 203:5
**authenticity** 94:3
**authority** 214:12,18,20 215:20,22 216:2 244:15
**authorize** 145:13
**authorized** 5:11 219:9,25
**auto** 1:3,4,6,6,7 1:7,7,8,8,8,19 3:5,10,12,12,12 3:13,13,13,14 3:14 7:22 29:25 33:14 35:23 36:16 37:4 56:20 76:15 78:20,25 79:8 91:16 103:7 135:4 147:7 152:9,13 152:18,23 153:18,21 193:23 204:22 237:11 240:8 240:20
**automobile** 215:11
**automobiles** 169:23 171:7 171:16 172:4
**automotive** 1:16 4:5 188:25 189:6 289:2 293:13
**available** 203:2
**avenue** 3:6,15 4:7
**avoid** 180:7
**aware** 16:21,24 17:3,5 21:17 23:8 28:19 73:16 74:24 75:4,25 80:17 81:10 90:19 92:2,5 95:10 98:24 99:4 100:23 108:12 108:15 109:20 121:11 130:4 130:10 138:11 140:3 141:6,18 144:14,18 159:6 163:8 185:16 186:21 187:12 191:11 193:7 207:22 208:6 209:18 222:8 224:4 226:8 227:11 227:24 228:3 236:22 238:7 242:19 243:22 260:7 296:20 302:19 303:2,9 303:11,18 309:23

**b**

**b** 19:6 21:14 243:2 327:2

**back** 8:23 20:10,17 29:19 29:22 37:24 38:4,5 39:15 60:22 66:6 95:17,20 106:16 109:11 110:5 113:24 114:10 115:4,6 118:12,16 119:4 121:25 122:5 126:8 132:15 138:22 138:25 141:5 155:22 170:20 191:2 195:15 196:17 199:24 201:21 204:9 213:9,13 228:13 230:17 244:23 246:6 246:10,14 259:18 267:6 270:2,5,8,17 271:8 273:18 276:25 280:15 280:19,20 282:17 290:17 296:18 298:25 299:4,14,23 309:7,9 314:12 314:19 319:9 321:5 329:22

**backdate** 250:10 256:14 256:14

**backdated** 248:21 262:7,8 262:10,11

**backdating** 244:10 256:20 256:23 259:24

**background** 83:17

**backup** 247:23 248:2

**bad** 212:19 322:11

**bank** 1:18,19 4:15 38:10 39:15 92:21,25 93:13 102:8,11 102:18,23 115:14 116:23 116:23 117:3,8 117:16,20,22 139:25 140:4,7 141:10,20,25 142:6,7,7,17,18 143:24 144:6 144:11,13,23 145:6,11 146:12,17 148:21 149:2,3 149:4 163:23 164:7 167:20 188:14 194:11 214:15,15 219:5 232:4 235:3,3 236:7 236:17 240:12 242:17 243:17 243:23 244:13 246:4,19 248:10 261:25 302:21 303:14 303:15 304:6 304:20 312:22

**barely** 43:11 106:5

**baron** 1:5,5,6 3:11,11,12 84:15 85:2,20 89:23,23 92:21 92:22 93:12,14 93:24 94:12,14 94:17 95:14,14 152:2 167:20 223:21 225:16 225:18 240:24 242:3 243:19 244:5,8,24 246:4 247:18 250:17 261:23 261:24 282:19 282:22 283:15 283:25 310:2 310:13 311:23 312:12 313:12

**baron's** 283:4,7 283:16,17 284:6 285:3

**based** 25:4 29:2 38:22 39:14 75:15 77:9 117:8 120:16 122:10 126:17 208:18 213:16 259:21 265:12 301:12 312:18

**basically** 67:17 211:23

**basis** 45:24 61:3 65:22 76:11 90:23 92:7,13 93:19 126:3 127:16 128:24 129:3 130:23 207:2 217:19 218:8 242:5 246:17 312:11 314:22 329:11

**bate's** 143:5,11 254:7,15 264:10,13 286:2,4,6,13 327:15,22 328:3,5

**bear** 183:24

**began** 117:10 117:11 193:2

**beginning** 74:13 120:9 137:6 155:3,17

191:9 202:23 293:24
**behalf** 91:15 99:6 110:19 137:10 138:13 205:19 220:2 300:23
**belabor** 8:11
**belief** 165:13 208:18 217:20 242:6
**believe** 19:11 21:3 25:2 26:7 31:2 43:16 46:8 52:2 68:19,24 78:6 84:16 93:11,16 94:5 97:17 101:5 102:3 103:25 104:18 114:9 120:13 124:13 125:2 125:21 129:9 142:4 154:2,9 157:6 158:16 159:16 161:16 167:10 168:6 177:13 181:14 182:10 205:3 207:13 208:13 209:14,19,23 217:17 219:18 220:21 222:23 225:16 227:4 236:10 237:3,5 237:7,16 241:14 242:24 244:5 265:13 271:10 272:4 282:20 283:18 283:21 284:2 284:19 297:14 306:17 308:12 311:14 312:8 312:11 313:11 313:15 321:18 323:11,19,22 323:25 324:8 324:11 325:4
**believed** 35:25 167:12
**believes** 163:15
**bell** 21:15 46:17
**belonged** 107:10 185:3 185:25
**belonging** 178:16
**belongings** 178:2,4 181:19
**belongs** 204:25
**ben** 68:22 78:12
**benefit** 215:24 311:5 313:14
**benjamin** 133:11,13,22 133:24,25
**berger** 82:17 83:2
**beria** 21:13 22:4,7 23:9
**berry** 21:17
**best** 8:20 9:4 18:11 32:10 37:7 97:11 123:19,24 125:15 151:4 227:6,17
**better** 141:4 245:15 247:24 269:21
**beyond** 102:4 174:22 187:2 212:25 311:18
**big** 106:20 107:5 259:22 317:3
**bill** 85:8 127:5 127:6,9,10,11 128:7
**billed** 125:21 125:25 126:15 129:2 318:12
**billing** 125:3,7 125:9 126:16 127:15,22 128:2,24 130:22
**bills** 125:5,13 126:23
**birth** 13:25
**bissoon** 205:21 206:2 207:3,6 207:8,16,18,20 207:22 208:7 208:24 209:4 210:9,17 321:16,20 322:6,16 323:3
**bissoon's** 209:11,19,25
**bit** 132:15 180:20,21 314:13
**black** 205:13
**blank** 288:13
**blankenship** 1:14 4:4 24:18 70:20 112:20 165:25 166:8 166:11 170:15 171:2 173:12
**blood** 331:16
**blvd** 1:6,6,7,7,7 1:8 3:12,12,12 3:13,13,13
**body** 143:13
**bond** 297:8 298:12
**boo** 245:20
**book** 93:6,15 93:17 94:10 244:9,18 248:22 249:21

250:6
**born** 14:3
**borrow** 302:9
**borrowed** 43:22 109:2 110:4,7 282:17
**borrowing** 301:15,16
**bottom** 39:3 74:13 147:21 164:25 272:10
**bough** 209:19
**bought** 292:22
**boulevard** 2:8 4:16
**bounce** 85:23
**box** 4:12 6:12 55:19,21
**branch** 117:22
**breach** 211:3 227:13 230:8
**breached** 227:16 228:10 229:10
**break** 119:5 192:2 222:22
**breaks** 118:22 118:24
**brian** 1:5 3:10 151:22 309:25 310:13 311:23 312:12 313:12
**brief** 14:24 37:20 46:3,20 50:20 57:7 71:23 98:2 192:5 280:17 317:17
**briefcase** 181:15
**briefly** 105:3
**bring** 253:22 282:24
**bringing** 67:5 152:20 274:20
**broker** 11:3
**brother** 41:17 42:2,3,6
**brought** 32:12 42:20 65:23 67:2,11 76:14 96:25 213:3
**bruce** 165:12 219:20
**bulk** 317:8
**bunch** 161:9
**business** 42:4 50:13 59:18 87:9,18 91:3 109:9 124:7 130:18 176:9 177:6,8 178:19 210:20 211:5,8 211:16,21 212:11 215:23 231:22 234:6 238:14 246:24 249:12 251:23 252:3 257:17 262:24 266:20 272:2 306:13 318:20 319:24 319:25 321:21 322:24 329:4
**businesses** 64:17 148:8 149:24,24 161:22 211:11 211:13 212:16 212:18 215:24 230:3 257:8 320:3
**busy** 318:13
**buy** 13:12
**buyer** 287:11
**buyers** 1:14 4:4 123:21,22 288:25
**buying** 234:12

**c**

**c** 3:2 326:2 331:2,2
**cac** 54:23
**call** 20:7,11,12 20:18 52:13 62:3 86:10 97:4,6 118:4 130:14 158:9 183:7 196:20 196:25 197:5 204:7 232:10 328:24
**called** 6:2 17:10 17:12,14 20:15 20:16,16 42:19 82:16 92:22 93:14 96:23 101:5 111:12 112:15,16 162:18 165:4 169:21 170:22 172:12 175:16 176:9 178:19 186:8 189:14 254:24 304:20
**calling** 12:16 97:20,24 165:16 170:24 171:23
**calls** 134:21
**calmenson** 68:10 70:7
**calmeson** 68:17
**campaign** 146:21
**cancel** 7:6
**capability** 235:21
**capable** 201:11
**capital** 1:17 149:16 196:20 196:25 197:5
**car** 1:14 4:4 43:15,22 88:17 106:18 107:15

107:19 123:20 123:22 153:14 156:8,12 165:5 201:9,13 215:2 215:3 221:18 234:22 239:15 239:18,20
**card** 18:11,14 18:16,19 19:2
**care** 109:6,6 110:9 114:7 125:2 190:16 214:14 305:14
**cared** 109:8 270:18
**career** 17:21 56:5 281:16
**cares** 35:17
**carolinas** 42:7
**carrier** 11:3
**cars** 1:15,15 4:5,5 106:24 107:3,24,24 157:4,7,8 173:3,20 184:4 184:6,8 199:23 200:7,11,13,14 234:12 304:2 304:24
**case** 1:11 10:8 10:20,24 11:4 11:7,12,20 14:14,19 16:8 16:12,18 21:20 21:22 23:16 26:4 28:12,13 29:3 30:2 31:9 31:20 33:5 35:19 43:9,15 43:24 44:15 46:7,9,11,24 52:22 53:6,19 54:12,14,19,21 55:4,20 57:11 57:17 58:11,18 58:19 60:15 61:6,13,19,22 62:13,21 63:8 65:3 67:3 71:12,20 72:2 73:5 76:11 77:2,3,4,11,15 77:17 78:24 79:7,16,21,23 88:3,13,20,20 90:6,17,21 96:3,20 100:11 103:5 120:9 122:17 123:9 123:10,13 127:4 130:11 133:10,21 134:14,16 137:24,25 138:18 146:8 146:11 154:5,5 154:20 155:18 161:14 163:18 167:10 182:11 183:13 186:5 188:18 192:15 194:8 195:8 196:19 197:7 199:6 202:15 208:2 213:23 216:5,6,7 219:7 220:22 224:14,18 227:18 229:13 229:23 237:8 238:24 240:14 242:22 261:11 269:24 284:19 295:15 303:2 312:21 313:4 316:14,19 317:4 319:13 320:21 332:2
**cases** 31:12 47:23 77:18 80:3 87:20 88:10,21 89:5 89:6,10,15 94:23 103:18 125:10 131:6 133:17 151:11 152:11,20 153:8 196:10 248:15
**cash** 242:15
**catherine** 19:5
**caught** 257:9 284:14
**cause** 37:9 45:10,15 52:4 67:15 136:20 136:24 137:18 149:19 207:16 209:8 244:25 300:5,9 301:9 301:19 302:8 308:18 327:14 328:6
**caused** 152:19 160:21 175:17 191:3 201:19 205:20 322:23 323:11
**causes** 51:24
**causing** 239:8 246:18 324:16
**ceased** 50:9 132:6
**centered** 98:3
**central** 224:18 224:20,20
**cents** 240:13
**century** 14:25 49:19
**certain** 193:22 239:7 245:24
**certainly** 24:8 60:4 62:19 79:12 105:16 112:10 140:17

142:13,20 145:8 170:13 170:18 180:24 184:10 192:16 195:16 212:23 224:20 226:3 241:22 243:4 276:12 307:25
**certificate** 92:20 93:6,8 93:10,12,20,22 246:6 248:21
**certificates** 94:9 141:14 250:18
**certification** 5:8 7:14 254:25 264:22
**certified** 255:3
**certify** 326:4,8 331:9,14
**cetera** 234:13
**cfo** 159:22 160:21 191:11
**chabrier** 1:5 3:10 151:23 309:25 310:13 311:23 312:13 313:13
**chain** 161:8 191:16 297:23 298:2,5 328:5
**chalom** 99:23 100:7
**chance** 128:15 216:22 281:22 298:21
**change** 39:18 71:5 122:25 127:18 131:14 177:16 267:10 267:11 269:13 269:14,15,16 296:11,21 297:5 298:16 332:5
**changed** 55:23 55:25 117:19 125:8 131:12 132:4 169:24 175:18 196:13 316:17
**changes** 108:22 108:23
**changing** 177:14 269:4
**charge** 232:7 239:23 240:4,9 240:21,22 243:6 247:2 288:18
**charged** 30:16
**charges** 30:18 125:14
**charles** 100:6
**charlie** 99:23
**chase** 1:19 92:21,25 93:13 163:22 217:16 217:18 218:2 218:12 235:25 236:3,8,18,23 237:17,22 243:17 244:11 245:22 246:4,5 312:22 329:13
**check** 43:5 85:8 97:12
**checking** 46:9 275:24
**checks** 78:18 214:12,19 215:20 235:5 285:22 287:20 287:22 288:8 291:7,13 292:19 303:16 319:23,23
**cherrywood** 76:15,18,23 77:12,15 78:19 78:20
**chestnut** 3:19
**chevrolet** 99:5 99:19
**chew** 42:19
**chicken** 260:12
**chose** 267:5
**cianciulli** 6:24
**ciancuilli** 3:20 29:15
**circumstance** 168:22 232:13 257:6 318:7,9
**circumstances** 23:7 30:15 50:8 83:19 84:8,24 113:14 130:11 175:5 252:13 256:9
**city** 89:2
**civil** 2:6
**claim** 88:22 210:18 238:13 247:7,25 257:3 258:5 299:12
**claimed** 151:2 322:23
**claiming** 97:23 98:18
**claims** 7:22 65:23 75:4 78:10 87:25 89:6 193:22 257:22
**clairvoyantly** 262:18
**clause** 215:8,14
**clean** 317:25
**clear** 9:3 106:19 121:9 122:7 169:2 208:20 209:6 295:15 313:2 321:20

**client** 22:12 25:3,17,20 35:17 40:13 54:6,8 109:8 143:19 165:18 166:25 167:5,6 173:5 222:24 229:20 231:13 231:18 232:15 233:2,14,15 234:22 235:16 236:19,21,24 237:14,18,19 237:23,24 238:10,12,13 239:7,10 248:3 249:11,18 272:23 277:9 280:16,19,21 281:18 296:8 296:10 297:6,7 298:3,4,4 299:5 302:5 304:18 318:4 323:24
**client's** 232:8
**clients** 22:9 39:23 40:12 59:18 147:23 166:23 173:2 193:23 224:7 224:25 225:7 229:17 230:7 231:24 232:6,9 232:17,24 233:11,17,25 234:19 235:6,9 235:11 236:25 238:13 239:19 240:3 248:4 256:22 257:3,7 258:11 262:6,8 276:5 281:21 296:8 299:14 299:23 329:22
**close** 74:22 151:16
**closed** 291:12
**closer** 50:7
**closest** 179:24
**clue** 306:11
**coast** 1:15,15 1:15,16,16,17 4:4,5,5,6,6,6 171:6,15,19,24 172:2 188:24 189:5 211:16 213:3,5,7
**coincidence** 84:16 128:13
**combination** 241:3 294:5
**combined** 293:20
**come** 7:4,6 17:7 21:12 23:22 29:4 30:14 64:19 67:14 73:22 121:6 137:25 138:18 162:24 163:2 172:15 182:3 196:17 207:12 208:14 216:20 249:18 280:25 305:18 319:24 321:23 323:7 323:12
**comes** 127:5 196:4 207:8 225:13 290:12 305:24
**coming** 115:4 172:23 179:25 271:8 319:21
**commencem...** 155:18
**commencing** 148:9 225:23 288:13
**commercial** 65:19
**commission** 332:25
**commit** 40:13 41:11
**committed** 15:7 238:21 257:7
**common** 52:5 215:2
**commonly** 128:15
**communicate** 26:17 86:7 109:14
**communicated** 86:9 111:20 113:16
**communication** 16:7 22:12 23:2
**communicati...** 22:16,17 37:8 97:16 208:24
**companies** 262:21 302:9 302:11
**company** 189:14 245:7 249:19,23 252:2,7,8,9 254:19 257:23 257:23,24 258:2,6,7,22 259:24 267:14 267:17
**compare** 77:18
**compensation** 313:18
**complain** 238:22
**complained** 247:13
**complaint** 14:9 35:24 36:5 45:18,25 46:13

51:2,8,17,20 52:4 72:15,19 72:20 73:4,9 73:13 76:22,25 77:8,10 79:16 81:4 92:16,18 112:8,21 113:2 170:8 194:3,3 205:25 206:4 206:20 207:3 208:4,17 210:19 211:24 211:25 212:6 224:22 226:11 227:5,14,20 228:12 229:17 230:6,9,13,18 230:21 231:4 231:10 248:18 248:25 317:11 317:13 321:5,8 327:6
**complaints** 47:7,12,19 48:3,13 85:13 86:15 87:20,24 150:5,10,15,25 151:7,21 152:16
**complete** 232:17 233:10 240:12 293:3 324:3
**completed** 198:19 299:13
**completely** 94:4
**completes** 293:13
**completing** 215:12
**complied** 63:22 200:4 294:9
**comply** 200:22 203:10
**conceivably** 176:12
**concept** 215:6,7
**concern** 11:7 149:8 299:21 329:21
**concerned** 123:3,7 240:11 252:22 259:20 307:8
**concerning** 101:14 192:19 225:11 226:22 235:18 328:21
**concerns** 24:23 330:4
**concluded** 322:21 325:14
**conclusion** 207:9 245:14 245:15 322:18 322:18,20,25 323:7
**conclusions** 245:16 268:10
**condition** 64:18 289:6
**conditions** 287:15
**conduct** 46:5 101:12 117:4 130:6 136:7 137:11 150:12 151:3 174:18 192:24 193:25 211:19 212:9 328:20
**conducted** 163:9 193:21
**conference** 184:15
**confident** 317:2
**confirm** 57:25 197:16 199:2 222:23
**confirmation** 274:4
**conform** 260:18
**confused** 98:17 185:5,6,9 313:25
**conjunction** 211:2
**connected** 98:20 185:23 304:16 305:13
**connecticut** 14:6 132:2 178:17,21,25 179:8,18,25 180:12,14 315:21,23
**connection** 10:18 11:4,8 11:17 14:7,10 15:11,16,21,25 16:11,18 21:11 21:19,20,22 23:10 25:22 27:18 28:5 29:24 31:9 33:12 45:18 47:2,7,12,19 48:12,20 49:16 51:17 52:22 53:18 58:18 63:8 65:18 70:18 75:22 80:21 87:19 89:21 90:3,17 91:2 93:5,24 101:8 102:22 103:5 108:9 109:4 112:7,21 120:18 124:19 133:8,20 134:4 134:18,22 136:6 137:23 157:4 171:10

190:12 196:24 197:22 204:22 241:10 249:16 254:9 279:17 280:2 286:11 291:11 294:13 316:4
**consent** 249:11
**consider** 193:12
**considerable** 232:3
**considered** 193:14,15,18 266:19,20
**considering** 178:24
**consisted** 87:10
**consistent** 260:4 261:11 265:23 266:10 269:19 290:23
**conspiracy** 211:3
**constantly** 247:18
**constitute** 22:25 211:2
**consult** 133:19
**consulted** 10:14,22 305:23
**consumed** 9:13
**consumer** 48:2 48:13 85:14 86:15 87:19 88:10,12 150:5 150:15
**consumers** 88:10
**contact** 18:5,7 18:10 22:4,7 23:9 90:6 124:24 142:10 179:21 188:2,6 188:9 274:4
**contacted** 10:17 11:2 304:9
**contacting** 112:8
**contacts** 86:2
**contained** 208:13
**containing** 160:23 164:12 285:3
**contains** 92:19 197:14
**contemplated** 289:11 290:4
**contempt** 213:15
**contention** 216:14 217:5
**contents** 56:11 197:14 202:4
**context** 28:13
**continue** 3:22 35:15 69:24 118:18 225:17 288:23
**continued** 161:19 272:22
**continuing** 319:6
**contract** 223:22,23 227:13
**contracts** 211:3 293:23
**contradict** 217:9
**contrast** 261:21
**control** 60:5 232:11,16,17 232:20 233:3,8 233:10,11,14 235:2 236:16 239:18,20 240:12 247:3 310:14
**controlled** 233:4
**controller** 159:22 191:11
**convenience** 280:20
**convenient** 242:20,21 247:21,25
248:21
**conveniently** 165:14
**conversation** 20:24 21:2 50:23 67:13 97:18 98:2 102:2 128:9 136:13 137:21 174:10 190:18 191:20 247:17 271:22 308:15 322:15
**conversations** 21:8 25:4 58:16,20,23 191:5,22 192:8 214:24 306:13 316:25
**converse** 271:10
**conversed** 271:11
**conveyed** 176:20
**convicted** 15:4 30:3
**conviction** 30:9
**convince** 175:10
**cooperate** 203:24
**cooperated** 15:10,14

203:21
**coordinated** 78:11
**copied** 159:3
**cops** 177:13
**copy** 5:14,17 6:15,19 118:2 146:11 182:17 182:19 196:19 223:2 284:20 328:24
**core** 257:19
**corp** 1:17 60:14 60:20,21,24 61:12,18,24 62:5,16,19 328:19
**corp's** 61:7
**corporate** 93:15,17 94:10 131:20 190:13 244:9,18 249:7 249:8
**corporation** 249:16 289:2 293:12
**correct** 9:23 11:18 13:19,21 13:22 16:12 17:4 23:3,20 25:14,17 27:11 28:25 32:5,9 32:13,17 33:10 33:14,24 35:10 36:3 37:16 39:4,7,24 40:9 40:10,14 43:15 43:19 44:5 45:4,12,15 47:3,13,14,20 50:5 51:17,21 51:25 52:5 53:22,23 55:10 55:14,17,21,24 56:20,24 58:12 59:6,25 60:8 60:17 61:9 64:5,13 65:20 66:17 68:23 70:25 72:3 79:5,11,17,25 84:21 85:15 86:22 87:21 94:14 99:13 101:23 102:8 103:8,12,21 104:14 107:8 110:16 111:8 113:20 114:5 115:21 116:4,8 117:5,23 118:22 119:9 120:20 123:18 123:23,25 124:3,7,8,12 125:14 126:4,5 126:19 127:16 134:15,19 135:6 136:9 137:12 138:20 139:7,18 140:10 143:17 145:20 146:8 148:18,22 150:13 151:8 151:12,23 152:2,3,5,20 153:19 154:8 155:22 156:3,9 156:19 157:10 159:5 160:24 161:5 162:2,9 162:22 163:11 163:20 164:4 166:4,11 170:9 171:2 172:5,20 177:21 182:13 182:21 183:18 184:18 185:3 185:17 186:5 186:11,19,25 187:10,17,23 188:25 195:9 196:21 197:23 198:2,20 200:11,24 201:13 204:2 204:12,15 205:2,22 206:3 208:25 210:4 210:20 214:22 215:21 216:3 216:16 217:5 219:10 225:8 226:2 227:16 229:4 234:6,12 234:13 238:8 243:9 246:15 250:16 256:16 258:9 260:10 261:4 263:22 264:5 267:14 267:17 268:14 268:24 269:19 270:6 271:17 274:6 275:16 276:11 279:3,7 285:20 288:5 291:8 303:19 308:2,3 309:13 309:18 310:3 313:19 314:24 321:16 322:14 326:9
**correctly** 40:8 124:9 125:12
**corresponden...** 146:24 153:25 154:3
**cost** 293:8
**costa** 192:9,11 192:13,20 193:2,5,8 194:19,22 196:15

**counsel** 5:6,17 10:23 59:20 124:22 134:3 153:17 318:11 328:7
**counselor** 196:24
**count** 184:9
**country** 195:9 195:21
**counts** 77:17
**county** 16:6 166:3 172:11 172:19 173:16 173:23 297:14 331:4
**couple** 48:25 88:9 106:5 111:2 180:18 242:14 318:22
**course** 28:11 52:21 87:13,17 94:7 96:19 138:17 151:19 153:16 170:17 192:15 194:5 196:18 208:2 230:23 235:4 242:14 262:23 292:7 305:13
**court** 1:2 2:5 5:13 8:6 23:24 24:2 45:19 47:16,20,22,23 51:3,8 56:18 56:22 57:15,20 57:22 58:7,20 59:3,4,17 60:7 60:9,13 75:11 75:12,16,19 111:3 124:10 135:5 145:23 146:25 147:24 148:5 149:14 150:11 164:3 193:20 194:17 194:20 195:6,7 195:7,13 203:20 204:22 204:23 223:20 246:13 282:21 283:4,23 284:5 284:11,17 296:6 297:14 316:5 321:8 327:6
**courts** 48:14 193:21
**cover** 8:22
**coverage** 40:9
**covered** 241:4
**covid** 25:12
**cpa** 1:14
**cpa's** 1:18
**create** 127:10
**created** 309:19
**creature** 117:17
**credentials** 236:15
**credit** 60:14,19 60:21,24 61:7 61:11,17,24 62:5,16,18 69:9,15 201:10 220:5 221:14 328:19
**crime** 15:5,8 30:16
**criminal** 17:18 17:20 23:19 112:21 113:2 165:19 166:2
**cross** 64:24 65:13 89:15 138:3 186:3,7 269:10 278:16 288:25 293:11
**crystal** 9:3
**cullen** 2:7 4:14
**cumbersome** 123:11
**curious** 305:6
**current** 12:8 40:2 96:3 131:10,13 132:25
**currently** 12:3 74:25 131:2 133:6 134:12 150:7 318:23 330:7
**customer** 47:2 47:7,19 48:12 85:12 87:6,11 242:16
**customers** 47:13,24 86:21 87:25 150:12 150:25
**cv** 1:12
**cyruli** 3:9 223:16

**d**

**d** 5:2 51:4 326:2 328:8
**daily** 234:9,10 234:15
**damn** 282:13 282:14
**dan** 241:12 298:11
**danbury** 178:20
**daniel** 241:11
**date** 1:23 13:25 36:21 38:9,21 40:24 51:11 53:12 55:7 63:12 64:7 68:14 71:16 74:7 78:2 80:13 91:22 93:4,7,9,23 110:23 137:2

143:7 147:12 149:10 154:15 164:16 169:12 172:8 185:6,11 185:15 189:17 197:11 198:12 200:25 201:5 202:20 206:16 214:2 231:2 249:22 250:6 250:11 254:16 262:15,16,16 263:2,16 264:14 272:14 275:2 286:15 297:24 300:10 332:3
**dated** 39:4 93:16 148:17 148:22 169:9 198:8 251:2 253:3 255:20 264:23 265:7 266:7 272:7 274:9 275:5,12 292:18
**dates** 126:18
**dating** 259:18
**david** 1:6 3:11 84:14 85:2,19 92:22 93:14,24 94:12,14,16 95:14 167:20 225:16,18 240:24 242:3 243:19 244:8 246:3 247:18 250:16 261:24 283:16 310:2 310:12 311:23 312:12 313:12
**dawn** 204:12
**day** 84:17 90:10 122:17 122:19 142:15 158:7 183:11 183:16 202:10 232:19,19 234:5,6 265:2 265:8 298:22 326:19 329:6 331:20 332:22
**days** 5:16 73:3 145:20,24 146:3
**dcf** 169:8,11 328:2
**deadline** 238:8
**deal** 28:17 34:17 89:24 90:7 125:10 128:3 151:22 151:25 152:4,7 177:18 183:14 232:9 294:17 315:25
**dealers** 215:12
**dealership** 25:23 46:13 47:3 48:12,16 48:24 49:16 50:4,5,14 64:22 65:15,20 69:5,19 70:10 70:15 86:21 89:12 103:20 103:24 106:18 107:19 132:2 170:3,4,20 175:17 176:18 177:2,3 178:16 178:20 185:25 201:9,12 204:24,25 205:4 209:22 212:9 233:24 234:11 235:18 239:9,16 289:3 290:19 291:3 292:3 293:13 296:23 303:8 304:6,13 309:12 310:15 310:18 311:9 311:12,16,18 312:3,14 313:13 315:20 315:22
**dealerships** 47:8,11,18,25 48:5,8,9,10,16 48:20,25 49:3 49:5 50:10 64:12 69:18 70:12 87:14 88:17,17 91:16 97:5,12 98:23 99:2 110:20 153:15 159:5 179:12,23 188:12 215:2,3 218:3 231:13 232:8,16,18,20 233:9,20 234:5 234:18 235:12 236:13 237:9 240:5,23 242:11 243:3 296:9 303:16 307:2 310:2,7 312:13 315:11 315:17
**dealing** 20:14 48:19 85:6,11 88:16 121:13 129:24 278:6
**dealings** 28:2 102:11,18 120:11 151:13 151:15 220:3
**dealt** 18:2 28:17 48:24 87:16 107:18 151:12,17

**dear** 180:21
**death** 205:21 318:12 322:9 322:13 323:6,8 323:16,18,23 324:6,13,16,20 324:21,23,25
**december** 30:6 33:19 35:22 86:6 96:7,11 96:23 97:2,19 98:22 106:6 108:14 135:8 139:16 151:17 170:2 314:23 316:12
**decide** 18:3 60:10 177:25 223:2 262:20 302:6
**decided** 18:5 34:17 35:8 45:7 59:6,11 60:7 323:17 324:24
**deciding** 67:12
**decision** 45:14 74:10 75:10,14 83:12 84:11 145:19,23 146:2,7,10,12 149:20 177:23 234:3
**decisions** 123:8 234:10,16
**declaration** 154:14,21 156:17 194:15 213:22 221:10 327:17
**declarations** 154:7
**decline** 236:20 236:24
**deducted** 129:13
**deed** 13:2
**deems** 145:14
**deep** 122:11
**defend** 99:20
**defendant** 2:3 3:18 4:11,15 31:25 32:11 35:18 39:22 43:14 56:23 60:14 78:11,12 89:12,18 99:5 226:12
**defendants** 1:21 4:3 7:23 10:19,24 133:9 133:19 171:6 171:15,19,24 172:3 206:24 207:5,13 208:15,23 210:25 212:20 223:17 316:19 316:23 321:24 321:25 322:8 322:23 323:13 323:23
**defended** 100:2
**defending** 57:17 58:11
**defense** 17:18 17:20 225:22
**defined** 290:11
**definitely** 34:7 113:6,9 120:10 157:14 176:14 195:10 315:5
**definition** 290:8
**delighted** 250:20
**deliver** 114:19 116:12 186:19
**delivering** 115:9
**demand** 58:24 72:15,19
**demanding** 159:3 199:13 203:9
**demands** 201:19
**denied** 27:25
**denies** 176:21
**deny** 40:17 102:21 175:4
**denying** 174:17
**deo** 1:13,13 4:3 4:3,20 21:12 24:3,14,16,23 25:5,9 26:13 26:18,23,24 27:6,8,11,14,19 27:24 28:5,6 28:20,23 30:11 30:15 33:13 35:23 52:20 53:18 54:4,12 64:25 65:5,10 65:18 68:22 69:3,8,14,24 70:4,14,24,24 73:13,17 74:24 75:21,25 76:6 76:13 77:13 78:11 79:3,10 79:24 80:9,20 81:10 85:5,9 86:4 87:9 89:22 90:2 91:3,8,17 94:9 94:13,18,25 95:12,23 98:8 98:9,20 108:8 108:12 109:2 110:14,19 111:6,11 112:2 112:4,7,13 113:25 114:11 114:19 115:5,9

115:19 116:3,6 116:8,10 120:2 120:18 121:2,7 123:21 124:6 124:19 125:13 125:21 127:15 128:8,25 130:18,22 131:10 132:8 132:12 133:9 133:18,19,24 134:3,12,17,22 135:3,18 136:6 137:9,15,24 138:2,7,18,19 139:4,13,25 140:3,7 141:6 141:14,19 142:19 145:2,4 145:5,9,13 147:7 151:6,8 151:12 155:22 159:2,8 160:22 161:19 162:18 162:21 163:9 165:12,18 166:16 167:13 167:25 168:8 168:16 169:22 169:24 170:3,8 170:9,12,23 172:15 173:11 173:15,24 174:4,7,13,25 175:11,16 176:17,21,25 177:24 178:7 178:13,23 180:3 182:8 183:3 186:8,18 186:24 187:6,8 188:8 190:11 190:15 191:4,5 191:23 192:7 192:18 193:9 193:23 194:9 196:25 197:21 197:25 200:18 202:4 203:9 204:15 205:6,7 205:16,19,22 207:7,10,23 209:7,18,21 212:20 213:17 214:5,25 216:15 219:4,9 219:20 220:2,6 220:8,23 221:12,13,20 221:21 222:7 222:17 224:5 229:19 231:11 232:19 235:18 238:20 239:2,6 240:23 241:6 241:18,19 242:7,10 243:16,22 245:6 247:8,13 248:14 251:10 251:17,19,22 251:24 253:18 253:18 255:9 255:19 257:22 258:5,25 262:10,14 264:23 265:3,6 266:9 268:19 268:20 269:25 270:24,25 271:3,7,13,18 272:18 273:16 273:18 281:2 282:15 283:10 283:15 284:13 290:24 292:21 292:25 294:3,3 294:12 295:25 298:4,4,10,17 299:4,13 302:20 303:5,6 304:4 305:24 306:24 311:14 311:15 313:17 321:23 322:12 322:14,23 323:4 324:10 329:4 330:4 332:2

**deo's** 23:19 70:10 87:18 122:12 148:11 150:12 151:3 152:10 156:23 210:20 211:5 211:11,13,21 212:11 214:17 215:20 216:2 220:11 221:22 253:2 286:3 290:18 310:12

**deos** 24:21 31:6 34:4 36:16 46:25 47:6,12 47:17 48:11 49:4,14 50:5 50:10,17 56:20 59:24 60:21 62:3 64:10 67:16,18 69:17 86:3 92:24 102:16 142:22 151:16 152:24 153:4 167:19 196:21 225:19 226:24,25 230:3 233:7 234:17 235:4 235:13 246:2 251:23 253:11 257:2 260:23 261:25 266:18 295:11 300:23 303:10 310:19 310:25 312:6 312:21 317:6

318:3 319:2,12 319:15 328:18
**department** 27:21 112:18 166:3 172:12 172:20
**depend** 23:6 267:4
**depending** 163:4
**deposed** 8:8
**deposing** 237:16
**deposit** 78:18 113:19
**deposited** 242:17
**deposition** 2:3 5:8,9,14 9:10 10:5,8,9,11,15 11:9,13,14 29:8 52:16 99:21,23 100:3 100:13 118:21 134:18 154:6 155:19 163:22 188:18 197:8 235:25 236:2 236:22 253:14 254:5 264:20 313:9 328:17 332:3
**depositions** 134:23 135:2 152:14 153:22 189:21
**deposits** 242:16 303:15
**depth** 123:14
**described** 142:16 154:18 154:19
**description** 126:18 165:22 327:3
**desperately** 147:23 148:4
**despite** 46:15 269:2,5
**destroy** 127:6
**detail** 62:21 121:10,19 122:8,19 174:9 227:7 231:8
**details** 23:23 86:11 99:11 226:4,20,22 228:16 229:14 271:21
**detective** 112:25 113:5,8 175:3 272:11 272:17
**determination** 137:8 138:5,15 139:9,12,20 300:22 307:15
**determine** 59:17 128:25 161:25 162:7 236:23 237:17
**determined** 161:17,20
**devil** 232:10
**died** 180:22
**difference** 124:2,4 248:5 248:8 250:9 259:22
**different** 71:2 121:20 184:2 196:6 214:16 245:16 266:25
**differently** 60:10 176:6
**difficult** 233:6
**dimarco** 44:4 45:4
**dinner** 274:11 278:3,9,24
**direct** 41:4 120:11 143:17 206:18 279:20
**directed** 281:10
**directing** 278:21
**direction** 281:12,15
**directly** 17:12 114:19 169:20 172:18 173:23 218:8 281:2 329:10
**directs** 277:8
**disagree** 184:13
**disappeared** 271:25
**disapprove** 233:18 237:12
**disapproved** 235:17,20
**disapproving** 234:19
**discovered** 96:7
**discovery** 94:20
**discuss** 10:11 17:10,23 28:6 42:5 174:12,21 175:7 212:24
**discussed** 14:18 37:12 52:23 84:19 86:12 88:19 118:25 136:11 137:20 144:20 174:16 251:14 297:4 308:21
**discussing** 24:20 71:12 147:6 179:9 220:5 254:19 315:10 321:13

**discussion** 29:13 42:14 63:3 119:4 160:8 174:25 175:13 178:7 178:18 281:3 309:3
**discussions** 15:15,20,24 24:13,16 28:13 30:10 31:18 64:10 91:8 111:23 112:19 115:8 159:7 202:4 296:6
**dishonest** 213:2
**dismiss** 145:20 146:3
**dismissed** 45:4
**disposal** 165:15
**dispute** 47:2 92:8 97:8 98:8 109:21,23 110:10,16 114:14 130:2 214:10 219:3 219:15 221:16 221:25 222:4,5 222:15
**disputed** 205:10 214:6 216:15,18 217:5 221:12 222:3
**disputes** 52:20 53:17 87:11 205:11 221:17
**disqualified** 132:10 134:8
**disregard** 324:3
**district** 1:2,2
**dive** 122:12
**divert** 78:13
**diverted** 79:3 79:10,24
**division** 45:10
**divorce** 12:25 13:13,16 14:7 14:10,16 32:4 32:7
**divorced** 33:7
**dla** 1:17
**dmv** 27:25 28:3 28:5,6,20 47:20 48:6,13 85:14 296:12 296:22,24 297:8 298:12 298:17 299:15 299:22 329:22
**docket** 38:16 38:19 40:22 41:2 53:5,11 55:6 57:11 63:9,11 68:7 68:12 71:19 72:9 73:7 74:2 74:5 77:21,24 80:7,11 147:5 147:10 154:13 154:20 164:11 164:15 169:8 169:11 189:12 189:16 194:16 197:6,10 198:8 198:11 202:14 202:19 206:12 206:14 213:21 213:25 220:22 327:4,5,7,8,8,9 327:10,11,12 327:16,17,18 327:18,19,19 327:20,20,21 327:21 328:2
**document** 36:14,20 38:17 38:23 51:14 55:3,4 63:5 71:11,14 78:5 91:24 92:11,14 93:2,2 94:2 118:3 135:24 136:18,23 137:4,14 164:18 189:11 189:13,19,23 189:25 190:4,8 190:19,25 203:3,4 210:15 216:6 244:19 245:21 247:6,6 250:10 253:23 254:4,6,8 255:15,20 260:6,8,17,25 261:6,8,9,15,19 261:21,23 263:6,16 264:7 264:17,22 265:7,21,23 267:18,19 268:4,7 282:24 283:20 284:5 284:14 285:3 285:11,14,14 285:16,25 286:17,21,25 289:6,7 290:4 291:6 292:18 292:20,23,24 297:13 301:10 301:20 327:4,9 328:24 329:19 329:19
**documentation** 160:23 185:19 187:7 220:2
**documents** 10:7 11:7,12 11:13 20:9 39:7,9,12 90:2 90:5,10 101:17 104:20 120:8 120:10 121:13

121:16 123:10 123:12 139:10 139:21 164:6 167:9 168:16 186:23 196:10 216:8 218:19 219:2 224:18 224:20,21 238:25 245:2 246:20 247:14 256:20 259:25 268:22 288:18 291:23 299:12 299:20 310:22 312:18 328:12 328:13 329:21
**doe** 263:18,19
**doing** 28:21 60:23 83:24 114:9 126:12 128:17 136:8 142:6 159:12 160:7,10 162:19 176:19 225:20 235:5,6 235:20 278:25 288:10 294:22 304:25 305:14 307:12 314:15 314:22 315:14 316:4,9,10,15 318:15
**dollar** 226:15
**dollars** 39:20 173:4 287:15
**door** 104:25 158:22 284:10
**dots** 304:16
**double** 43:5
**doubt** 38:3 186:14
**doug** 43:4
**dozen** 87:15 125:5,16
**draft** 189:25 190:21
**drafted** 53:16 91:4 98:12 143:11 188:24 190:3 227:23 230:24 231:5
**drafting** 189:4 228:4
**draper** 2:10 331:7,24
**draw** 233:7 264:20 268:11
**dress** 180:19
**driscoll** 284:19
**drive** 180:7
**dropped** 54:24 62:23
**drugs** 9:13
**due** 54:12 72:19,25 124:11 305:13
**duly** 6:3 326:5 331:11
**duties** 24:20 85:17,22,25 190:12
**duty** 190:16,16 190:16
**dwight** 1:14 4:3
**dykman** 2:7 4:14

**e**

**e** 3:2,2 4:17 5:2 5:2 19:6,10,11 19:13,25 20:4 20:6,19 21:14 86:10 111:18 116:8 146:18 159:2,9 160:3 160:20,22 161:8,10,25 162:4,6,11,17 162:20,23 163:2,3,6 164:13 191:3,6 191:12,15,16 191:19 219:18 219:24 220:13 271:11 272:7,9 272:13,16,20 273:3,5 274:8 274:16,17,21 274:22,25 275:4,12 276:3 277:2 278:21 278:23 279:4,8 279:12,14 297:23 298:2,5 298:6,9,18,23 326:2 327:2 328:4,4,5,8,14 331:2,2
**earle** 2:8 4:16
**earlier** 11:17 37:11 49:18 86:24 103:3 178:6 243:16 306:17 309:24 314:4,6 316:19
**early** 49:20,23 49:23 120:15 132:11,19
**earth** 93:3 216:19 276:4
**easier** 42:7
**eastern** 1:2
**eating** 278:24
**ecf** 154:13,20 164:11,15 189:12,16 194:16 197:6 197:10 198:8 198:11 202:14 202:19 213:21 213:25 327:17 327:18,18,19 327:19,20,20 327:21

**economical** 35:20
**effect** 5:12,15 135:13 139:16 159:15 221:7 329:17
**effectuate** 296:23
**effort** 22:3 138:6 160:10 162:5
**efforts** 23:8 58:14 94:19
**egg** 260:12
**egregiously** 148:7
**eight** 41:5 204:19 277:25 313:7
**either** 31:25 54:9 64:20 70:19 78:19 85:13 86:10 141:8,15 156:16 166:12 167:22 177:17 216:15 245:17 251:20 281:15 321:24
**electronic** 71:19 166:22
**electronically** 39:6,8,11 189:11
**eliminated** 34:25
**elimination** 265:18
**else's** 33:2 114:12
**emanuel** 3:7
**emmanuel** 317:10
**emphasize** 8:13
**employee** 27:10 27:13 188:23 189:2,5 207:23 241:20
**employees** 107:25 169:21
**employment** 83:20 84:9
**emptied** 167:14 167:15
**empty** 184:5
**encompassed** 131:19
**encumber** 135:19 301:2 302:13 303:8
**encumbered** 305:2
**ended** 83:24 88:5 125:10 128:19 179:9 184:21 225:20 232:11 324:15
**endorsement** 78:18
**ends** 74:18 229:8
**enforcement** 15:11,16,21,25 16:2,11
**engage** 94:19 211:20
**engaged** 67:21 162:8 163:10 188:5 212:10 213:17
**engaging** 51:21 146:20 161:13 163:19
**enjoined** 137:10 300:24
**enter** 262:19
**entered** 120:2 120:19 199:6 313:16,22 315:3 318:4
**enterprises** 39:24 41:20
**entire** 17:21 147:15 215:7
**entirely** 175:24 205:12 240:21 282:4
**entirety** 256:9
**entities** 320:15
**entitled** 9:3 254:12
**entity** 81:14 224:6 309:13 318:25
**entries** 126:17
**entry** 38:16,17 38:19 40:22 41:2 53:5,11 55:3,6 57:11 63:9,11 68:7 68:12 74:2,5 77:21,24 80:7 80:11 147:5,10 154:13,20 164:11,15 169:8,11 189:12,16 194:16 197:6 197:10 198:8 198:11 202:14 202:19 206:12 206:14 213:22 213:25 327:4,5 327:7,8,8,9,10 327:11,12,16 327:17,18,18 327:19,19,20 327:20,21,21 328:2
**errata** 332:1
**escrow** 36:2 38:7 39:16 113:19 114:3 114:18 116:19 272:24 273:9

273:23,23,25 274:13 276:10 276:17,21 277:11,14 278:5,22 279:3 279:10,18,21 279:22 280:3 281:4,7,11
**especially** 93:4
**esq** 3:7,16,20 4:10,17 6:10
**essentially** 231:11 271:15
**estate** 1:6 3:11
**et** 234:12 332:2 332:2
**etelle** 4:20
**ethics** 10:17,23
**eugene** 165:13
**evaluate** 139:10
**evening** 94:11 184:16
**event** 156:8,12
**events** 8:21,22
**eventually** 83:24 132:6 161:20
**everybody** 257:10 317:7
**everyone's** 266:15
**evict** 70:23
**eviction** 73:20
**evidence** 163:18 164:2 208:21 209:6 210:11 212:21 213:17 215:19 215:25 216:6 217:9 219:8 220:17,19,23 221:3,8 235:15 329:15,18
**ex** 14:20 272:2
**exact** 38:9 136:13 186:12
**exactly** 49:19 185:15 225:24 227:2 259:11 263:2 281:23
**examination** 6:6 7:16 159:4 162:22 223:12 325:13 328:9 331:10,12
**examined** 6:5
**examining** 89:16
**example** 213:2 213:7 266:4 267:21
**except** 5:21 7:14 89:25 106:25 162:13
**exception** 99:16 100:2
**excess** 123:12
**exchange** 142:3 142:25
**exchanged** 19:25 20:20 111:19 116:3,5 116:8 328:14
**excluded** 246:7
**exclusive** 24:9
**excuse** 82:12 279:12 289:13 319:7
**excuses** 278:11
**execute** 297:7
**executed** 90:11 290:15,16 294:10
**execution** 287:16 288:24
**exhibit** 36:18 36:19 38:18 40:20,21 50:21 50:24,25 51:7 53:4,10 55:2,5 63:6,10 68:6 68:11 71:9,13 73:25 74:4 77:20,23 80:5 80:10 91:12,14 91:19,20 92:15 92:17 136:18 136:22 137:12 143:3,4 147:4 147:9 151:22 154:11,12 164:9,14 169:7 169:10 189:9 189:15 197:4,9 198:6,10 199:17,18,21 199:22 200:8,9 200:10 202:13 202:18,25 204:11 206:9 206:13 207:16 209:5 213:21 213:24 247:9 248:19,20 254:3,14 261:22 264:8 264:12 272:6 272:12 274:22 274:24 277:2 286:7,12 297:19,21,22 300:7,8 327:3 327:3,4,4,5,6,7 327:8,8,9,9,10 327:11,12,13 327:14,15,16 327:17,18,18 327:19,19,20 327:20,21,21 327:22 328:3,4 328:4,5,5,6
**exhibits** 154:17 224:21 248:17 248:18 268:16

327:2 328:7
**exist** 237:21
**existed** 65:8 236:11,12 237:6
**existence** 20:14 56:19 73:16 80:17 92:2,5 96:12 98:24 100:23 109:20 109:21 110:13 110:17 187:13 201:17
**exists** 83:4 121:11
**expect** 122:25 130:8
**expectation** 128:5,19
**expected** 124:15 129:25 145:19 324:6
**expecting** 304:20
**experience** 88:16 153:15 201:8
**expert** 72:22,24 237:3 252:21 252:23 303:25
**expires** 332:25
**explain** 205:6 222:11 248:25
**explained** 56:22 127:24
**explanation** 245:24
**exposure** 54:13
**extension** 23:5
**extensively** 212:13
**extent** 110:8 117:25 158:5 328:23 329:5

**f**

**f** 5:2 297:19 331:2
**face** 72:9 93:18 301:25,25 302:16
**fact** 12:25 28:16 42:19 47:15 59:14 72:21 73:10,10 73:14 88:2 93:5 95:10 96:21 110:3 130:21 133:24 137:16 142:12 156:25 159:10 162:14,16 172:13 181:18 186:16 191:6 192:8,13 195:7 220:14 221:12 226:14 235:11 236:23 246:2 252:24 255:21 256:4 261:5 269:5 270:16 297:4 299:4,4 299:6 303:3,12 305:18 309:16
**facts** 46:6 214:6,7 245:17 261:11
**factual** 74:13
**failed** 46:13 209:20
**fair** 35:3 69:22 76:17 77:12 85:11 87:8 89:14 101:21 104:10 107:6 109:19 111:5 120:16 122:10 129:12 168:20 168:23 201:20 202:24 208:16 214:5 224:12 227:22 228:10 231:15 285:17 295:19 306:22 308:9
**faith** 190:17 196:3 212:20 235:7
**fake** 93:18,20 94:4
**fall** 193:15
**false** 78:16 92:20 212:18 218:18 222:18
**falsified** 78:15
**familiar** 64:24 78:4 81:13 186:3,16 189:24 215:6 225:24 228:22 228:24
**fan** 311:2
**far** 18:17 27:12 64:6,16 67:22 70:17 98:10 117:2,6 118:21 142:11 150:14 150:17 163:20 166:10 177:5 187:21 234:7,7 234:16 240:10 252:22 259:20 265:22 274:2 274:19 289:16 290:15 307:7
**farthest** 180:2
**fashion** 217:14 232:24
**fault** 282:3,5,13
**faxed** 92:20 93:12 261:23
**fbi** 16:16 18:5,8 18:11,13

**feared** 195:10
**features** 218:10 218:12 329:11 329:12
**february** 16:4 134:19,23 138:20 139:6 139:15 290:20 290:20 291:4 292:17,19 293:21,25 294:4
**federal** 2:6 7:12 24:4 28:24 45:19 51:3,8 56:18 77:4 86:24 150:6,11 154:5 203:20 327:6
**fee** 46:16 115:6
**feel** 154:25 194:23 248:25 250:19 266:18
**fees** 316:21,22
**feet** 132:16 314:12
**fell** 231:20
**felt** 317:2
**fiduciary** 190:12
**field** 262:7
**fifth** 204:11
**fight** 44:8
**figure** 226:15
**file** 34:12 39:6 39:11 73:9,13 127:5,9,12 252:8
**filed** 14:8 29:25 30:5 32:8,15 33:19,20 34:3 34:16 35:4,16 35:23 36:15 37:13,15 38:24 39:8,23 45:3 45:19 46:8 51:2,8 53:7 55:9 56:19 71:25 72:5,12 72:15,20 73:5 80:8 86:5 90:20 91:14,17 91:20 97:3,22 98:11 99:7 111:3 127:19 127:21 135:4 186:4 189:12 194:20 197:6 198:8 199:6 208:4 209:17 210:15 212:19 213:16,23 220:22 224:22 225:5 284:11 284:17 297:13 297:15 299:14 306:2 309:16 310:20,23 321:10 327:6
**files** 57:15 58:12,15,17,24 103:6,11,16,20 103:23 104:13 181:10,11,13 181:13
**filing** 5:7 7:13 69:23 164:3 203:25
**filings** 55:20 182:11 218:23 223:20
**fill** 117:22 249:22 298:13 298:21
**filled** 94:2 244:9 249:20 250:18,21,25 261:17
**filling** 86:11 244:18
**final** 166:18 202:23
**finalized** 12:25 13:17
**finally** 132:15 161:17 194:13
**finance** 227:25
**finances** 142:14 142:15 232:12 232:21 233:4,8 233:10,12,13 233:15 234:11 235:2 240:22 243:6 247:2,4 310:14
**financial** 115:20 116:11 160:23 161:13 161:24 162:8 163:11,19 179:13 232:15 232:17 237:25 239:4 305:15 311:5 316:3
**financially** 233:25
**financing** 225:7 226:9,16 227:22 228:19 229:19 230:8 231:15 254:10 255:17 306:9 306:12,24
**find** 87:24 97:4 97:6,13,24 160:16 162:18 163:3,24 173:7 196:6 198:22 203:13 215:2 227:20 236:4 236:15,16 253:22 298:12 313:3,5
**finding** 54:16 75:11,16 88:14

88:24 89:3 150:21 195:4
**findings** 88:11 150:24
**fine** 257:16
**finger** 44:25
**finio** 82:16 83:2
**finish** 240:17 259:16 266:6 278:18 280:8
**finished** 240:2 240:3 282:11 295:17
**fired** 161:18
**firing** 324:2
**firm** 82:3,5,16 82:18,20,23 83:3,3,16 84:6 100:18
**first** 6:3 8:15 15:19 20:16 25:8 29:4,10 29:23 34:19 35:2 43:4 46:24 47:10 48:19 49:7 52:4 56:12,13 56:15 63:17 68:19 81:4,18 81:22,23 83:5 83:8 85:2 108:11,15 110:3 119:25 132:4 144:7 155:5 164:24 187:13 192:12 199:25 245:19 248:8 250:19 258:24 260:12 272:9,16 275:10 287:10 288:2 295:6,9 295:13 326:5
**firsthand** 67:8 103:14,17 105:5 141:11 141:21 145:8 190:24 201:24 207:10 228:14 261:8 263:6,9 265:20 268:9 269:23 294:18 295:4 296:4
**fischoff** 82:24
**fisk** 1:8 3:13
**fit** 145:14 184:4
**five** 49:12 50:2 50:7 81:14 93:7 104:5 191:25 240:13 287:17,20 288:4,8,9,14 291:7,13
**fled** 195:8,21
**floor** 2:8 4:7 69:8,14 157:10 157:13,15 158:8,13 200:22 201:10 201:16 204:24 205:5,8 212:14 212:16 221:14 225:6,19 226:9 226:15 227:21 227:25 229:18 231:14,25 239:16,23 240:4,9 246:21 329:7
**floored** 221:21
**flushing** 1:18 4:15 102:8,11 102:23 120:12 121:15 141:10 141:20,25 142:5,7,7,17,18 143:6,11,24 144:6,13,23 145:6,10 146:12,17 148:21 149:2,3 149:4 188:14 219:5,22 220:3 220:13 253:13 254:5,7,9,10,23 255:17 264:11 264:20 302:21 305:20 306:25 308:6,18 327:15
**focus** 154:24 164:20 169:16
**focused** 63:16 173:19 226:6
**focusing** 202:22
**foggy** 313:8
**follow** 20:23 62:7 101:18 118:6 130:20 158:11 183:10 218:15 223:17 299:19,24
**following** 81:4 137:11,17 184:14 198:18 293:16
**follows** 6:5 287:13 289:15
**foot** 203:17
**force** 5:15
**forefront** 226:5
**foregoing** 255:4 264:24 326:8
**forensic** 159:4 162:21
**forewarned** 52:17
**forged** 78:15
**forget** 317:12
**forgiving** 60:17
**forgotten** 228:8
**form** 5:21 7:15 47:5 89:25 90:9 99:25

140:25 144:3 144:17 148:24 252:7 256:7 302:25 305:6 316:15
**formal** 58:23 128:2
**formed** 45:24 249:22 251:25 252:4 257:23 257:24 258:2,5 258:21 265:16
**former** 12:4 25:16,20 104:23 248:4 298:4
**forming** 252:14
**forms** 298:21
**forth** 211:25 267:6 331:11
**forward** 259:3 274:10 278:2 295:16 311:13 315:15
**found** 42:17 88:2 99:10 109:16 110:6 110:17,18,22 110:25 159:17 192:21 193:4,4 194:22 195:2,3 202:24 207:20 209:15 210:14 210:17 218:4
307:22 310:19 310:24 313:2 322:6,10,11,22 323:3
**four** 53:25
**fours** 81:5
**fourth** 57:3
**fraction** 128:11
**franchise** 289:2 293:12
**frank** 25:13 105:14 106:9
**fraud** 28:24 51:21,25 52:5 100:11 151:8 229:9,12 242:23 256:3 256:10 257:7
**frauds** 228:23 228:25 229:13
**fraudulent** 256:11 258:8
**fraudulently** 310:10
**free** 154:25 248:25 250:19
**friday** 277:20 277:22 278:9
**friend** 41:25 180:22
**front** 52:8 135:24,25 166:15 219:2 253:24
**full** 106:24 114:11 201:13 243:5
**fully** 94:5 235:6
**funding** 1:18 3:19 81:15 108:13,16 109:21 110:14
**funds** 33:2,3,8 33:9,10 35:9 36:2 37:5,23 39:15 54:20,23 95:2 102:23 111:7 113:11 113:12 114:4,9 114:19 115:3,9 115:17 116:13 117:3 119:8 270:4,5,8,9,12 272:24 273:22 277:10 320:18
**further** 5:20 180:7 223:9 257:15 300:21 325:7,10 326:8 331:14
**fuzzy** 312:9

**g**

**g** 268:17
**gaining** 158:24
**gap** 50:2
**gary** 68:9,17 82:24
**gas** 104:23
**general** 11:7,12 58:6 61:23 124:20
**generally** 22:20 29:9 51:19 116:2 119:6 136:5 201:7 210:18 212:8 213:14 219:3
**generals** 150:5
**generously** 310:15
**gentleman** 158:15 284:21
**gentlemen** 112:24
**gesture** 44:19 44:23 45:2
**getting** 12:25 85:7 88:5 123:4 132:10 149:20 257:11 270:5,7 304:14 304:25 310:21 315:19,20 316:12 319:10 319:14,17 324:9
**gianelli** 135:6,9 135:18 146:21 148:4 297:4 299:3 307:17

**gianelli's** 140:9
**give** 9:19 53:8 63:14 97:4,6 115:5 120:25 122:3 164:22 169:14 184:19 194:18 213:2 220:2 275:9 280:15 292:2
**given** 22:24 38:4,5 73:12 109:10 110:5 129:25 140:16 145:4 161:23 180:25 201:17 205:8 215:22 250:4 308:7 319:23 326:10 331:13
**giving** 232:11 307:3
**glad** 242:8
**glanced** 121:17
**go** 9:22 10:2 34:11 42:3 63:18 83:13 88:17 105:23 106:22 114:2,5 116:22 143:24 156:14 170:19 173:6 180:9 199:24 200:8,9 220:9 240:18 246:13 250:24 254:22 271:14 276:25 280:8,9 294:25 307:17 311:12
**goal** 69:22 70:2
**goes** 127:25
**going** 8:23 34:5 34:22 37:10 63:5,16 64:22 81:6 82:10,20 84:10 89:4 97:7 104:12 105:20,22 109:15 112:2 113:22,24 114:5,10 119:4 126:13 128:19 129:10 131:23 135:23,25 138:9 143:24 149:23 150:2 155:6 160:4,13 160:17 163:23 165:8 175:23 178:13,15 179:19 182:8 184:22 196:16 206:18 219:23 223:17 228:13 233:13 238:3 254:22 262:15 268:2 271:23 272:17 276:10 277:7 280:18 280:19,20 285:23,24 292:5 295:15 302:16 304:7 305:9 306:5 307:14 315:15 320:12,22 321:4
**gold** 1:15,15,15 1:16,16,17 4:4 4:5,5,6,6,6 171:6,15,18,24 172:2 188:24 189:5 211:16 213:3,5,7
**gonna** 6:16 8:11,21 12:14 17:25 20:18 34:11,12 35:19 52:13 53:8 62:2 101:11 112:4 118:4 125:4 128:2,5 130:14 154:10 154:17 158:9 163:3 169:16 175:21 177:11 179:14,16 180:8 182:6 183:7 201:25 218:6 220:8 229:11 236:4 236:14 250:5 262:19 264:20 270:17 273:12 281:22 282:18 285:10,13 288:3 289:11 292:2 297:20 299:19 314:10 314:15 315:11 315:14 318:13 318:14,15 324:4
**good** 7:10 128:15 190:17 196:3 213:2 223:14 235:7 318:18
**gotta** 271:10
**gotten** 226:21 236:18 314:11
**government** 24:4
**grand** 16:19,22 16:25 17:3,8 17:23 18:4,15 21:21 156:9,12
**granted** 244:15
**greek** 19:2
**grieved** 150:12 151:2
**ground** 8:12,14 9:7 158:14
**grounds** 205:19
**group** 1:16 4:2 4:6 7:22 29:25 33:14 35:23

36:16 37:4 56:20 78:25 79:8 86:6 91:16 97:3 103:7 104:9 135:4 147:7 148:9 152:9,13 152:18,23 153:19,21,21 188:25 189:6 193:24 204:23 257:14
**group's** 98:13
**guarantee** 288:25 293:8 293:12
**guaranteed** 114:15
**guards** 170:2
**guess** 8:25 19:18 49:11 114:23 125:4 135:23 256:17
**guessing** 26:20
**guesstimate** 313:23
**guilty** 28:24
**guy** 42:4,5,20 99:23 241:15 241:17,18,19 241:23,25,25 242:22 243:8,8 271:9
**guys** 66:19 67:19

**h**

**h** 6:1,2,2 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1

232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1,17 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1,2 328:1 329:1 330:1 331:1

**habitual** 117:17

**hakim** 80:9,24 81:11

**half** 125:5,16 126:2 131:24 156:23 168:12 169:3 178:11 178:14 188:21 209:16 210:7 315:19

**hammer** 66:19

**hand** 94:2 232:5,5 331:20

**handed** 284:18 285:3,8

**handful** 85:4 105:7 125:16

**handicapped** 57:16 58:10

**handle** 85:24 86:13 318:18

**handled** 88:4 150:19 176:5 270:15

**handling** 126:13

**hands** 247:10 316:17

**handwritten** 127:3,6

**happen** 34:12 35:7 60:4 176:2 182:7 209:9 248:15 268:4 281:22 297:10 320:10

**happened** 44:12 46:10,23 48:22 53:24 54:8 70:6 99:10 104:17 111:16 112:5 128:4 142:23 174:24 185:14 201:24 203:15 209:8 217:13 219:12,13 243:25 248:14 249:23 258:24 259:10,18 270:8 280:21 281:19 295:4 303:17 305:22 307:11 314:8 322:6,12

**happening** 128:20 267:23 310:16

**happens** 238:24 239:17

**happy** 24:10 67:14 164:22 169:14

**harm** 152:19 230:3

**harmed** 148:6 148:15

**harmenist** 284:24

**harry** 1:13 2:4 4:10,11 6:10 9:22 305:10 326:15 332:3 332:21

**hartford** 132:2 178:17

**head** 18:21 21:25 53:25 81:17 86:18 95:22 124:17 147:2 174:11 204:17,20 206:5 211:18 212:7 216:10 217:3 224:8,10

225:2 226:13 226:18 228:21 230:20 253:20 284:23
**headed** 130:3
**hear** 121:22 230:10 269:12
**heard** 90:16 121:11 144:11 294:15
**hearing** 7:2 137:8 300:22
**held** 2:6 29:13 63:3 159:23 299:5 304:6 309:3
**hell** 42:21
**hello** 105:15 106:8
**help** 26:11,11 40:13 41:10 204:9 236:23 268:3
**hereinbefore** 326:11 331:11
**hereunto** 331:19
**hesitate** 136:14 301:21
**hi** 298:24
**hicksville** 65:19 66:2,9 70:23
**highlight** 147:21 164:23
**highlighted** 41:6 150:3 155:9,14 166:20 169:18 198:16 287:8
**highway** 4:12 6:12 11:18 55:14,17 223:22
**hire** 27:15
**hiring** 252:7
**history** 23:20 71:11,14 327:9
**hit** 44:22 275:23 280:22 311:2
**hold** 272:24 273:23 276:10 276:17,20 277:11,14 278:5,22 279:2 279:10,18,21 281:7,11
**holder** 119:7,14
**holding** 36:2 37:5 274:13 279:22 281:8
**home** 12:4 32:13
**honest** 160:5
**hope** 184:11
**hopefully** 194:13 311:9
**hotline** 10:18
**hourly** 125:14 125:17 126:3 127:16,23 128:24 129:3 130:22 314:21 318:12
**hours** 9:15 115:18
**hundreds** 216:7
**hunting** 74:25
**hurt** 149:22
**hustedt** 99:4,19 99:22
**hwy** 1:4,19 3:10
**hylan** 1:6,6,7,7 1:7,8 3:12,12 3:12,13,13,13
**hypothetical** 307:7

**i**

**iag** 34:16 35:16 86:6 97:3,23 98:13 104:9 111:3 127:20 132:4,5 148:9 148:15 153:4 154:4 223:17 237:9 240:6,20 311:22
**idea** 34:22 76:21 146:13 162:3 200:19 201:23 204:16 256:8,13 295:20,23 299:8
**identification** 36:21 38:20 40:24 51:11 53:12 55:7 63:12 68:14 71:15 74:7 78:2 80:13 91:22 137:2 143:7 147:12 154:15 164:16 169:12 189:17 197:11 198:12 202:20 206:16 214:2 254:16 264:14 272:14 275:2 286:14 297:24 300:10
**identified** 19:22 48:8 81:14 82:19 119:15 152:18 152:24
**identify** 41:9 96:5 119:7 165:25 221:8 329:17

**identifying** 141:14
**identity** 18:18 43:2
**illegal** 175:24 249:25 250:9 250:10 255:19 256:10
**illegally** 34:9
**imagine** 198:23
**immediate** 107:12
**impact** 64:15 234:3
**impactful** 309:21
**implicate** 307:4
**important** 8:13 285:16
**importantly** 248:19
**impression** 314:2
**improper** 260:5
**improperly** 279:17
**improprieties** 160:18 161:13 162:8
**impropriety** 163:11,19
**inability** 102:16
**inaccurate** 259:20 261:20
**inappropriate** 250:2
**inarguably** 261:13
**inception** 125:22 126:9
**incident** 66:19 92:23 93:14,24 94:12,14,17 103:10 167:20 243:20 244:6 244:25 246:4 250:17 261:24
**incidents** 167:24
**include** 248:18
**included** 131:21 293:25
**includes** 171:19
**including** 20:21 90:10 131:19 135:20 152:23 301:3 304:2 315:13 328:15
**inconsistent** 266:10
**incorporators** 252:8
**incorrect** 279:7
**increases** 315:17
**incumbent** 307:16
**index** 36:14 40:22 41:3 68:8,12 74:3,5 77:22,24 80:7 80:11 91:17,21 136:19,23 147:7,10 206:12,14 297:17 327:5 327:10,11,12 327:13,16
**indicate** 75:18 247:16 275:13 290:10
**indicated** 196:11 265:14 267:25 277:9
**indicates** 72:4 75:19
**indicating** 187:15 288:18 306:3
**individual** 18:23,25 21:13 42:16 43:18 44:4 45:19 51:3,9 83:15 90:14 111:6 153:4 154:4 158:17 188:3 205:20 288:4 288:15
**individuals** 83:21 84:2 152:18,22 190:7 287:18 288:9 320:16
**industry** 201:9
**inform** 137:15 239:6
**informally** 65:10
**information** 18:10 114:18 119:10 161:24 165:13 182:21 191:24 192:19 208:12 313:3,7 313:11 323:17 328:12,13
**informed** 90:4 98:7 111:6 165:5 194:17
**initial** 144:10 194:15
**initially** 45:13 97:22 98:12
**initiated** 119:6 275:14,23 276:11,18 279:11 280:22
**injunction** 157:5 205:7
**injunctive** 155:20 171:11

**injury** 43:14
**inquiries** 98:6
**inside** 104:22 246:23
**insisted** 232:2
**insistence** 111:21 244:16
**insisting** 177:12
**inspection** 203:2
**instance** 128:18 235:16 237:3 243:10 252:10
**instances** 150:21
**institute** 236:25 238:12
**instituted** 236:21
**instruction** 22:7,24 73:12 279:20 280:4 281:5
**instructions** 115:14 271:15 272:25 274:10 278:3
**insurance** 11:3 40:9
**insurances** 78:16
**intended** 75:7 144:14,19 170:11 267:22
**intent** 114:25 227:8 266:15
**intention** 114:11 179:4 278:7
**intentional** 73:8
**intentionally** 211:4
**interest** 65:15 91:4 130:19 131:24,25 152:10 161:7 162:17 178:22 180:3 186:18 186:23 187:7 187:16 205:5 213:5,7 250:23 301:17 329:4
**interested** 331:17
**interesting** 206:21
**interests** 87:10 87:19 124:7 131:20 186:9
**interfere** 211:4 211:15,20 212:10
**interfered** 210:19 211:9 211:10,12 212:15,17 238:14
**interrogatories** 218:7 329:10
**interrogatory** 220:16 221:7 329:15,17
**interrupt** 280:6 282:9,10 294:21
**interrupted** 302:15
**introduce** 26:13 41:12 43:7 253:16
**introduced** 25:9,13,19 43:3 84:17 144:7
**introduction** 176:13
**inventory** 198:19
**invested** 194:9 194:10
**investigate** 174:21 209:10
**investigated** 87:20
**investigation** 46:6 87:23 94:6,8 163:9 166:2 174:19 192:25 193:22 193:25 194:6,6 231:9 296:3 311:3
**invited** 156:11 156:14,15
**invoices** 127:2
**involve** 129:11 134:15 157:21
**involved** 43:11 43:13 46:2 68:2 69:7,19 89:24 90:9 96:16,17 99:12 99:15,24 100:6 101:22 108:7 112:12 113:22 126:14 139:24 151:5 159:25 162:16 201:16 203:19,20 233:24 270:5,7 270:20 271:2,9 298:7 302:20 303:13 304:4
**involvement** 46:21 50:16 98:19 102:21 146:16 280:17 295:7,9 305:15
**involving** 47:22 47:23 107:19 134:14 153:10 153:11 221:18 222:7 231:8 235:2 253:11

295:10 303:13
**iola** 108:19 113:12,23 117:11 123:16
**iris** 1:5 3:11
**island** 1:8 3:14 7:22 29:25 33:13 35:23 36:16 37:4 56:19 78:25 79:7 91:15 103:6 135:4 147:7 152:8,13 152:17,22 153:18,21 193:23 204:22
**issuance** 137:18
**issue** 28:12 60:10,17 111:11 126:22 165:12 166:7 183:12 188:12 205:13,21 211:5 226:6 227:10 234:2 312:10
**issued** 17:8 21:18,24 23:10 45:10 135:9,17 307:17
**issues** 48:24 52:20 53:17 87:10 160:5
205:16 274:5
**items** 104:14 180:18

**j**

**j.p.** 1:19
**jamaica** 3:6,6
**january** 16:3 93:16 134:18 134:23 152:15 153:23 244:20 248:22 251:3 292:18
**jeff** 3:20 7:6 223:15
**jeffrey** 3:16 82:8
**jeremy** 209:12
**jeremy's** 209:25
**jersey** 196:12
**jill** 39:23 41:19 43:8
**jiying** 75:13,20
**jmw** 1:12
**job** 317:20
**john** 82:2
**join** 7:3
**joined** 29:16 82:25 317:5
**joining** 132:5
**jones** 1:14,18 96:6,12,13,14 96:15 97:16
98:5,20,25 99:8 100:10,17 100:17,20 160:22 191:4
**jory** 1:5 3:11 151:25
**joseph** 78:12
**josh** 34:9 98:14 109:3 110:4,20 130:2 225:17 242:3 259:4,11 263:21 264:4 265:12 266:19 280:13 282:4 282:12 292:8,9 293:23,25 295:12 298:3 298:11,23 309:19,20 310:24
**joshua** 1:5 3:10
**jr** 4:10 9:23
**judge** 5:13 12:16 23:15 77:11 154:21 184:15 256:11 284:19 285:4 301:23 302:6 307:17,22
**judgment** 229:12
**july** 46:4 76:2 178:10,10 315:6,7 316:5
316:13
**jump** 245:8
**jumps** 318:10
**june** 76:3 93:17 135:14 139:17 140:15 146:8 244:2,6 248:23 251:2 255:6,20 255:21 259:3 259:18 260:24 261:2,12,13 262:13,13,20 262:25 263:18 265:2,9,10 266:8 313:24 314:3 316:13
**jury** 16:19,22 16:25 17:3,8 17:23 18:4,15 21:21
**justice** 135:5,8 135:18 140:9 146:21 148:3 297:3 299:3

**k**

**k** 246:21 247:13 294:2 309:17
**kataev** 3:7 6:7 6:16 7:9 12:14 20:18 25:6 29:11 33:5 36:8 37:19

38:13 40:19 44:15 50:19 52:13 53:3 54:25 57:6 62:2,25 63:21 68:5 71:8,22 73:24 77:19 80:4 91:11 95:16 101:11 117:25 118:9 121:22 130:14 136:15 138:22 143:2 147:3 154:10 155:11 158:5 164:8 169:6 183:7 189:8 192:4 197:3 198:5 199:20 200:3 202:12 206:8 206:22 213:9 213:20 218:6 220:15 221:6 222:22 223:9 245:20 278:17 300:13,18 308:25 314:21 317:15 321:12 325:10 328:10

**kataev's** 295:11

**keep** 37:8 127:3 130:23 131:18 166:24 167:5 167:12 168:7 170:3 179:5,20 262:17 268:13 317:20,24,25

**keeping** 131:5 177:9 265:15

**kept** 124:5 242:22,25 246:18

**khan** 1:5 3:11 152:5 251:12 309:25 310:13 311:23 312:12 313:12

**kim** 2:9 331:7 331:24

**kind** 28:18 41:23 126:22 129:17 132:14 256:18 282:25

**knew** 27:12 41:10,16,25 42:23 43:11 64:6,7,11 65:7 90:11 96:18 98:10 102:25 105:10,13 107:15 108:25 109:3,9,12 110:8 112:23 141:4 142:13 143:23 160:3 176:7,16 177:5 177:7 184:20 185:2 193:13 219:25 230:25 231:3 233:2,12 235:6 262:18 273:13 282:13 282:14 294:14 305:21 306:23 308:4

**knife** 66:20

**know** 6:22 9:12 13:4,5 15:9 18:7,17,20 19:3,7 20:17 21:5 23:6 24:10,12 28:2 28:14 30:3,18 31:4,11 34:4 34:11,12,13 35:19 38:9 42:8,22,22 46:22,23 49:22 53:23 54:23 55:25 56:5,7 56:12 58:16,25 61:5 62:10,13 62:18,21 64:9 64:14 65:4,8 66:5 67:3,22 69:10,20 70:6 70:11,17,21 71:7 72:7 73:15,22 74:16 75:7 76:8,9,10 77:17 80:19,24 81:8 86:4,8 88:15,22,25 90:14,18 91:6 93:9 94:15,17 94:22 95:25,25 96:12 98:22 99:11,24 100:2 100:3,6,7,20 101:10,19,24 101:25 102:2,4 104:16 105:4,4 105:9,13,22 106:9 107:14 107:20,23 108:22,24,25 109:13,16 111:13 112:12 114:4,24 115:2 115:5,16,22,25 116:17 117:6,7 117:11,12,15 117:16 119:16 119:18 120:21 121:4,14 123:5 123:7 124:16 124:25 125:4,9 126:12 128:2,8 128:22 130:2 132:18 133:15 136:10 139:2,9 139:19,22,23 140:11,15,19 141:2,2,4,16,17 142:14,21,21 142:23 143:14

144:24 145:16 146:15,25 147:15 148:6 148:14 149:5,6 150:20 151:9 156:4,5,14,22 156:25 157:7 158:4,21,22 159:17,23 160:25 162:10 163:14 166:10 166:14 167:7 168:9,13,18 169:4,4 170:18 171:14 172:21 173:12 174:5 175:19,24,25 176:11 177:4,8 177:9 179:4 180:5,6,19 182:6,22,23 184:4,22 185:24 186:12 187:4,11,18,19 187:22,24 188:8,21 190:3 190:6 191:17 192:10,21,22 193:11,17 194:21,25 195:23 196:8 196:15,16,22 198:21 201:3,3 202:6,8,11,11 204:3,4,6,16,19 206:4 208:5,9 208:10,12 209:2 210:2,12 210:13,21 214:10 215:9 216:4,9 217:2 217:6,11,15,21 218:2,22,23 219:17 220:4,5 220:11,12 221:15,17 223:15,19,25 224:13,15,15 224:19,24,25 225:10,14 226:4,14,17,25 227:6,7,23 228:2,5,7,13,14 228:20 229:14 229:16 230:19 230:22 231:3 232:6 234:7,8 234:16 235:8 235:21,24 236:9 239:11 240:5 241:12 241:24 243:24 249:20 250:3 250:21 251:6 251:11,18,20 253:4,7,9,11,19 253:20 255:24 258:20 259:7 260:11,11 261:6,17,18 262:25 263:12 263:13,14,15 265:9,16,19 266:2,3 267:18 268:4 270:11 270:14 271:13 271:22 274:15 274:19 275:13 275:20,22 276:12 277:15 281:6 283:7 284:9 285:21 289:23 290:16 291:20 292:7 294:16 296:3 299:17 301:22 302:5 303:6,21 304:18 306:16 306:21 308:20 308:22 311:4 311:17,24 312:5 313:2,6 313:24 315:22 316:13 317:8 321:2 322:15 323:19,21

**knowing** 64:15 94:3 107:9 128:18 144:4 162:11 185:19 202:8 216:22 240:15 306:8

**knowledge** 17:2,15 24:22 27:14,17,24 28:23 30:21 45:6,23 60:19 61:16,25 62:15 67:8 68:17 69:7,13,16,18 70:3,8,14,16 71:4 72:18,24 77:9 87:5 95:23 100:9,14 102:9,10,17 103:15,18 105:20 106:3 107:18 119:23 139:4 141:12 141:21 145:5,7 145:8,9,12 148:13 149:8 151:5 156:10 156:13 166:12 168:14 173:22 174:2 182:24 183:20 186:7 190:25 197:25 198:3 200:16 201:25 207:10 210:8,10 217:4 217:13 221:22 233:25 243:5 261:8 263:6,10 265:21 267:19 268:6,9 269:24

Case 2:23-cv-06188-JMW Document 557-2 Filed 09/04/26 Page 126 of 165 PageID #: 24464



294:18 295:4 295:13,14 296:4 299:11 303:5 305:22 307:11 310:12
**known** 20:13 140:22 145:16 157:22 232:23 306:18 307:24 321:21

**l**

**l** 5:2,2 19:6 326:2
**lamp** 180:25 181:3,3 182:12 182:16,25 183:2,5,13
**landlord** 65:19 65:24,25 66:2 66:11,11,17 67:2,5,12 70:5 70:22 71:2,6 73:18
**landlord's** 71:5
**landlords** 66:8 66:13 68:20
**lane** 74:25
**language** 135:23 210:22
**late** 110:24 132:19 246:20 246:20
**laurie** 1:14 4:4
**law** 4:2 15:11 15:16,20,24 16:2,11 22:20 52:5 81:19 83:3,3,16 179:16 249:4 252:16,19
**lawsuit** 25:22 29:24 30:4,5 30:10 31:25 32:12,15,20,23 32:25 33:18,20 33:23 34:15,18 35:4,9,15,22 36:15 37:11,22 39:19,23 40:3 40:11 44:3,7 44:13 45:3 56:19 65:18 66:16,25 67:5 69:23 70:19 76:14,18,20,23 80:8,18,22 85:15 86:5,16 88:7 90:20,24 91:16,25 93:25 96:16,25 97:2 97:22 99:7,13 99:15,19,25 100:4,5,15 102:13 109:17 111:3 127:19 127:21 132:4
134:4,5,8 135:4 144:7,10 147:5 152:14 204:2 213:3,6 306:2 315:13
**lawsuits** 34:21 86:20 98:25 152:17,25 212:19,20
**lawyer** 81:25 82:8 191:12 270:20 271:2 281:6,20
**lawyer's** 160:2 196:5
**lawyers** 83:15 133:16 270:15
**layout** 212:5
**learn** 17:7 21:13 23:22 29:5,10 30:14 137:25 138:18 192:12 208:3
**learned** 17:22 29:23 30:8 67:9 94:11 96:24 102:12 110:3,13,15 178:8,12,15 192:10 207:25 219:6,12 246:18 305:19
**learning** 18:4 111:11
**lease** 293:22 300:25
**leases** 149:24
**leasing** 1:4,19 3:10 51:6 254:13
**leave** 84:11 105:12,25 165:19 177:11 177:20,24
**leaving** 229:25
**led** 44:13
**left** 18:11,14,19 18:25 245:8 257:18 272:2 308:24
**legal** 3:4 22:17 23:2,6 75:22 89:21 108:8 124:6,19 130:17 215:7 251:5 256:10 329:3
**legitimate** 92:12,14 315:23
**lend** 62:16
**lender** 157:10 158:13
**lenders** 211:2 212:13
**length** 151:14 151:15 278:8

**lengthy** 231:9 275:6
**letter** 53:6,15 54:10 55:9,12 55:24 56:11,17 56:21,25 57:10 57:14,18,21 58:8 59:2,8,8 59:13,23 60:12 63:7 64:2,7 68:9,16 141:24 142:9,16 143:5 143:10,13,15 143:16,23 144:15,19,22 144:25 145:10 145:14,18 146:4,17,21 147:15 148:17 148:20 149:6,7 149:9,13 164:12,21 165:9 166:19 168:4,12 169:8 169:16 170:6 170:16 171:3 172:9 196:20 196:25 197:5 197:15,17,20 197:22 198:2,7 198:15 199:3 199:11,12 201:5,18 202:5 202:16 305:25 306:15,19 307:3,6 308:9 327:15
**letterhead** 55:13,21 56:6 56:8 164:19
**letters** 56:3 103:4 149:16 203:9
**letting** 275:20
**level** 28:18 85:14 130:12
**leveraged** 246:24
**lewd** 45:2
**lexington** 3:15
**liability** 61:6 62:22
**libertas** 1:18 3:19 6:25 29:15 102:10 102:24 108:13 108:15,24 109:5,12,25 110:25 120:3,7 120:12,18,24 121:2,5,20 122:9,13 142:11 305:20
**lic** 1:16 4:6
**license** 27:20 27:25 28:15,20 296:24 297:5 298:16
**licenses** 28:5,7 28:14,15
**lie** 166:22 241:8
**lien** 78:16 304:2,13 305:3 305:6 306:8,25
**liens** 100:24 101:14,23 102:2,7 304:15 304:25 328:22
**lies** 324:9
**life** 24:6 104:2 104:6 119:22 144:12 190:20 281:13
**lifetime** 146:16
**light** 35:15 260:3 270:16
**liked** 235:13
**limited** 301:3
**linden** 4:2 11:24 12:24
**lindenhurst** 12:5
**line** 69:15 155:5 201:10 220:4 221:14 233:7 330:3 332:5
**lines** 69:8 247:15
**list** 165:14 199:23 200:10
**listed** 95:12,13 137:11,17 190:7 200:13 202:25 266:17 296:22
**listening** 314:20
**listing** 141:7
**literally** 216:7
**litigation** 73:17 128:6 134:13 225:4,4 320:11
**little** 1:18 88:5 96:12,15 98:25 99:8 100:10,17 132:15,18 177:7 180:20 180:20 312:8 313:8 314:12
**live** 12:5,20 13:23 180:15 193:2
**lived** 192:9,13 193:8 196:11
**llc** 1:3,4,4,6,6,7 1:7,7,8,8,8,9,15 1:15,16,16,17 1:17,18,19,20 3:4,5,10,10,12 3:12,12,13,13 3:13,14,14,14 3:19 4:5,5,6,6,6 4:7 51:6 81:15 249:16 252:15

252:16,18,25 254:13 332:1
**llp** 1:18 2:7 3:9 3:18 4:14
**lo** 165:4,13,18
**loan** 60:17 81:11 102:8 110:18 121:13 141:19 148:12 267:24 268:3 269:5,14 302:10,21 303:7 305:20 305:21 308:6 308:18,21
**loans** 102:18 120:11 303:14
**located** 183:18 183:22 184:6
**location** 55:19 66:3 69:25 70:9,16
**locations** 150:16
**lock** 120:14 175:25
**lockdown** 25:12
**locked** 177:2
**locking** 176:17
**lockout** 157:16 181:7 192:17 194:24 209:3
**locks** 169:24 175:18 177:14 177:16
**long** 25:25 34:22 36:5 43:6 97:10 105:18 119:24 193:13 228:15 228:18 229:19 249:3 258:7 302:3 312:9,24 320:17
**longer** 13:17 129:2
**look** 11:13 34:10,23 36:10 56:10 177:17 183:25 203:5 216:11 248:12 301:23
**looked** 11:6,11 104:24 139:21 162:4 163:12 194:16 199:9 209:14 210:16 210:16 312:10
**looking** 8:20 103:4 105:8 162:21 178:24 179:2,7 185:22 222:12 228:13
**looks** 55:11 71:20 145:3 258:23 302:17
**loosely** 201:14
**losing** 149:23
**lost** 88:9
**lot** 21:23 39:21 94:23 104:22 105:19 106:13 107:7 116:21 126:14 131:19 155:22,25 156:2 167:17 177:8 183:18 183:22 184:4,7 184:9 203:14 203:15 215:4 233:11 235:24 239:9 252:13 277:4 311:11 313:3 315:10 315:12 316:10 316:16
**louis** 21:13
**love** 169:3
**lowe** 166:17
**loyalty** 190:16
**lunch** 118:8,10

**m**

**m** 6:2 19:6
**machine** 247:11
**mad** 42:21
**made** 16:10 22:3 23:18 37:3 44:19,24 44:25 47:12 58:6 67:16 75:11,16 119:21 123:20 124:9 133:5 138:4,13,16 139:8,20 142:18 155:20 168:21 171:5 188:9 193:19 195:5,13,20,25 195:25 196:2,2 205:24 207:6 208:17 218:23 228:4 234:10 241:19 252:3 260:19 261:4 263:3 288:20 297:3 299:6 312:17 321:16 321:22 324:19
**madison** 41:13 41:15,18 42:15 43:3,8
**madison's** 42:2
**magistrate** 77:5
**mail** 19:10,13 20:4,6 86:10 146:18 159:2,9 160:3,20 161:8 162:20,23 163:2,3,6 164:13 191:16

271:11 272:7,9 272:13,16,20 273:3,5 274:8 274:16,17,21 274:22,25 275:4,12 276:3 277:2 278:21 278:23 279:4,8 279:12 297:23 298:2,5,6,9,18 298:23 328:4,4 328:5
**mailed** 19:11
**mailing** 11:19 191:15
**mails** 19:25 20:19 111:18 116:8 160:22 161:10,25 162:4,6,11,17 191:3,6,12,19 219:18,24 220:13 279:14 328:14
**maintain** 179:17 181:11
**maintaining** 213:6
**make** 58:15,23 64:3 79:2,9,21 102:16 112:8 116:18 117:9 123:8 138:6 139:11 156:18 157:24 170:6 180:20 191:10 191:12 212:13 250:8 252:9 256:10 269:11 278:15 298:24 322:13 323:6 323:16,18,23 324:6,12,21,23 324:25
**makes** 13:4 200:7 239:19 241:16 251:21
**making** 89:16 101:22 234:15 242:6 303:14 324:18
**malpractice** 11:3 40:9
**man** 31:2 44:19 69:5 176:11,16 282:17 324:2
**manage** 166:24 167:5
**managed** 167:11,12,18 168:7
**management** 1:9 3:14 81:15 126:22
**manner** 26:16
**manually** 127:8 127:11
**marc** 1:14 4:4
**march** 1:23 140:5,8,22 148:17,22 149:7 158:25 238:7 248:11 254:10 331:20
**marital** 33:8,10
**mark** 12:15 16:19 25:6 68:6 143:2 173:11 174:23 177:10 222:19 254:2 272:5 274:21 286:7 297:20 300:4,6
**marked** 36:17 36:20 38:20 40:23 50:25 51:10 53:11 55:6 63:5,11 68:13 71:15 74:6 77:25 80:12 91:21 136:17,25 143:6 147:11 154:14 164:15 169:11 189:16 197:10 198:11 202:19 206:15 213:25 254:5 254:15 264:13 264:19 272:13 274:25 286:2 286:14 297:23 300:3,9 317:12 321:6,7 330:2
**marking** 40:19 53:3
**marriage** 14:23 14:24 331:16
**married** 14:22
**marx** 112:25 113:5,8 272:11 272:17
**massachusetts** 48:22 83:8
**massapequa** 11:25
**match** 269:6
**matches** 262:16 263:2
**material** 304:2
**matter** 22:20 26:6,11 31:10 31:14 34:18 49:17 67:7 73:10 88:2 105:16 137:19 214:16 245:21 246:2 261:5,5 331:18
**mattered** 270:19
**matters** 86:2 119:17 130:24 150:19 153:11 181:8 219:22

301:24 319:13 319:15
**maximum** 104:2
**maxwell** 43:18 43:21
**mean** 15:13 24:8 67:20 86:7 105:10,20 121:14 173:18 175:20 182:5 196:3 199:9,10 202:7 224:19 238:12 267:13 271:24 277:12 319:2 320:21 322:13 324:12
**means** 161:23 245:10 269:18 289:15 295:8 303:18
**meant** 124:23 323:14
**mechanics** 70:9 70:12
**medication** 9:14
**meet** 41:16,21 42:3 105:2,11 112:11 113:4,7 133:18 214:15 251:16
**meeting** 41:14 42:10,12,24 133:23 167:25 190:6
**meetings** 249:15,15
**meets** 289:6
**member** 141:15 254:25 255:5 258:16,17,21 265:2 266:9
**members** 259:2
**memory** 9:2 24:19 45:23 48:4 62:20 96:3 104:19 105:17 108:5 109:5 119:23 121:9 122:7 156:15 171:23 171:25 182:23 189:3 197:24 199:10,11 203:4 210:6 271:12 284:8,9 285:7 287:3 297:11 308:10
**men** 69:11
**mention** 170:14
**mentioned** 171:4
**merchant** 23:15
**merckling** 1:14 4:4 16:20 17:4 17:9,9,14,24 18:15 19:17 24:18 70:20 112:20 165:25 166:8,11,13 170:15 171:2 173:11,15 174:13 175:2 222:17,20
**merger** 215:7
**merit** 87:25
**mesba** 291:24 292:2 293:22
**message** 208:8 209:12
**messages** 116:3 116:5 220:20
**met** 31:21 84:14 85:2,9 85:19 96:18,22 106:6 133:25 134:17 152:12 176:10 193:9 207:24 208:7 210:9 251:9,14
**michael** 1:14 4:4 41:13,15 41:18 42:2,15 43:3,7 90:15
**mid** 135:13
**middle** 25:11 63:24 137:7 178:10 278:9 280:7 282:7
**mike** 39:24 41:20
**million** 173:4 199:13 201:19 313:7
**mind** 108:21 168:11 183:24 225:13 226:5 257:20 297:10 317:20,24 318:10
**mine** 70:2 180:22 281:19
**ministerial** 305:12
**minute** 191:25 239:17 275:9 275:10
**minutes** 277:25
**mirabile** 19:6 19:10,14,17 20:11,22 21:2 328:15
**mirabile's** 20:4
**misappropriate** 78:13
**misappropria...** 79:4,10,24
**mischaracteri...** 322:2
**misreading** 289:14
**missed** 188:21

Case 2:23-cv-06188-JMW Document 557-2 Filed 09/04/26 Page 131 of 165 PageID #: 24469



**missing** 163:13
**mistake** 228:4
**misunderstan...** 314:5
**misunderstood** 240:16
**mixed** 114:25 217:25
**moment** 163:25 174:22 262:14 294:24 299:16
**monday** 277:11
**money** 38:4,5 60:16,22 62:17 90:3 109:2,7,8 109:10 110:7 110:14,19 111:24 112:3 114:12,14 115:6 128:21 160:18 161:21 163:13 173:21 194:8,10 232:7 235:11 239:9 241:4 245:8 248:14 270:17 271:7,16,20 272:18 273:12 273:16,25 274:18 276:5 277:8,14 278:5 278:22 279:2 279:17,20,21 279:22 280:14 281:8,11,18,22 281:24 282:15 282:17 293:20 301:15,16 302:9 303:10 311:12,17 312:3,6,13 313:13 316:16 319:21 320:7
**monies** 78:14 79:11 90:11 108:17 311:24
**month** 46:4 74:18 129:14 163:23 178:12 283:24 288:13 288:24 293:7 305:24 318:17
**months** 93:7 316:17 318:13 318:14
**morgan** 1:19 90:15,24
**morning** 7:2,10
**mortgage** 30:23 32:17
**mortgagee** 32:12
**mother** 181:2
**motion** 137:9 145:19 146:3 146:22 155:20 213:15 300:22
**motions** 40:5
**motor** 1:4,19 3:10 27:21 51:6 254:12 301:4,7
**motors** 1:3,16 1:16,16,17,17 3:5 4:5,6,6,7 188:25 189:5 332:2
**mouth** 196:5 242:22,25
**mouths** 246:19
**move** 53:21 63:19 179:2,8 179:18
**moved** 42:6 156:7 199:21
**moving** 178:25
**multi** 227:20
**multiple** 150:4 315:11
**murder** 67:10 67:11
**mute** 121:23,24
**mystery** 271:6

**n**

**n** 3:2 5:2 6:2 51:4 155:13 326:2 328:8
**n.a.** 1:19
**name** 6:8 9:22 9:25 12:23 18:20 19:2,8 21:15 43:4,5 68:18 90:4,15 90:16 116:13 119:16 160:2,7 161:7,10 209:22 223:15 253:2 254:19 271:9 284:22 332:2,3
**named** 21:13 43:18 44:4 45:20 51:3,9 81:25 82:8 99:23 153:6 188:3 205:20 327:6
**names** 48:18 49:2 171:4 211:18 244:22 309:17
**nassau** 29:25 33:17 59:17 88:23 166:3 172:11,19 173:16,23 174:3 297:13
**nature** 231:22
**nearly** 46:21
**necessarily** 23:4 162:23 294:8
**necessary** 116:15 119:15

122:24 123:6 128:7
**necessity** 179:21
**need** 34:20 35:14 71:21 89:17 119:7 131:17 147:23 148:4 149:14 154:24 155:7 159:24 177:20 179:15 180:11 180:12 223:24 236:16 247:13 248:12 249:21 267:12,25 268:8,10 271:19 275:9 282:19,24 305:25 318:12
**needed** 24:24 83:18 99:20 119:11,11 124:23,24 142:7 143:20 143:20 162:14 177:25 181:13 214:19 215:23 239:8 296:10 306:15 310:22 330:5
**needs** 163:7 229:4 269:18 320:2
**nefarious** 259:25 260:2
**never** 28:17 35:2,16 39:13 60:2 65:5 72:5 75:14 84:22 93:2,23 95:4 102:25 104:15 106:21 107:18 109:7 112:23 133:23 139:19 140:2 141:21 144:11 152:6 152:12 153:17 153:20 162:3 176:14 187:6 188:16 190:18 191:18 195:21 198:2 199:4 201:16,21 208:7 214:5 216:15 217:5 222:2,17 239:2 245:23,25 246:12 249:20 250:3 252:20 256:18 267:22 269:8,8 276:24 281:13,16,17 281:19 290:5 294:14,14,15 303:12 304:16 305:4,13,16,21 305:23 308:18 308:20
**new** 1:2 2:9,10 3:6,15,15 4:8,8 4:12,16 6:4,13 27:21 48:23 71:6 83:9 84:7 130:5 179:15 179:16,20 196:11 241:10 252:16,19 313:17 331:3,4 331:8 332:1
**news** 173:5,21
**newsletter** 189:14
**nicer** 180:21
**night** 92:22 93:13 120:14 165:3,10,15,17 165:23 166:16 167:19 174:10 177:14 181:20 182:9 192:17 194:24 243:19 244:7,18,24 245:22 246:3 250:16,17 261:24 277:20
**nissan** 89:23 92:21 93:13 157:21 198:7 199:12 200:23 202:16,24 203:13 223:22 261:23 283:15 283:25
**nmac** 157:22 185:22 198:21
**normal** 64:21
**north** 11:24 12:24 180:2
**northshore** 1:4 1:19 3:10 27:9 27:13 47:21,25 48:24 49:14 51:6,16,20,25 52:21 54:15,17 54:22,24 57:15 58:11 59:6,10 59:25 60:22 61:6,11,13,17 61:23 62:6,23 62:24 64:4,20 81:15 84:17,21 84:23,25 85:3 85:10,19 86:3 88:15 92:3,6,9 93:15 94:16 95:12 96:9,25 98:9 100:25 101:15 103:7 104:5,12 105:6 105:21 106:11 106:20 107:11 107:13,13,16 107:21 120:3 122:13 131:21 135:19 138:19

139:5,14 140:4 141:9,15 150:8 150:13,22 151:11,20 152:11 153:9 153:17 156:2,8 157:3,22 158:7 167:15 171:19 171:24 184:17 184:23,25 185:12 186:9 186:24 187:9 187:15,16 188:13 200:18 200:21 202:10 203:6,23 204:8 211:14,22 217:24 225:7 225:19 226:10 231:11,19 233:5 237:10 240:7,25 241:15,22 253:3,10 254:12 263:20 266:7 268:14 301:2,7,15,17 302:13,22 304:5 305:2 306:4 309:18 309:24 311:5 311:21 312:14 314:22 328:19 328:22 329:6

**notary** 2:10 6:4 7:17 326:22 331:7 332:25

**note** 52:11 115:24 127:3,7

**notepad** 52:8

**notes** 52:8,14 158:2,6,10 328:16 329:6,7

**notice** 14:10 32:8 33:21,24 37:14 38:15,23 72:2 90:6 199:7

**noticed** 163:21

**noting** 259:19

**notwithstandi...** 72:14 130:21

**november** 37:17 38:8 39:2,4,16 103:11 104:4,7 104:16,17 105:7 106:12 106:17 107:2,7 108:2,19 110:24 124:21 125:3,7,12,23 125:24 127:14 128:4 129:15 148:10 172:4,7 231:21 235:14 270:2 272:8 274:9,23 275:5 275:12 277:22 296:7 298:9,19 314:23

**novicky** 165:4 165:12,14 166:17 219:21

**number** 40:22 41:3 50:6 68:8 78:23 79:19 116:12,12 119:18 128:13 129:11 147:8 191:17 198:18 200:8 287:14 297:17 318:16 318:19 327:3

**numbers** 115:20 116:11 202:7

**numerous** 47:16 230:6 282:21

**nyc** 1:14 4:4 123:21

**nyscef** 36:14,20 38:16,19 40:22 41:2 55:3,6 68:7,12 71:11 71:14 74:2,5 77:21,24 80:6 80:11 136:18 136:23 206:11 206:14 327:4,9 327:11,12

**o**

**o** 5:2 6:2,2 51:4 51:4 326:2

**o'sullivan** 241:11,12 242:12 243:8 243:11 298:11

**o'sullivan's** 247:24

**oars** 315:12

**oath** 5:12 8:4 218:14 329:14

**object** 176:25

**objection** 44:16 140:24 144:2 144:16 148:23 235:9 256:6 302:24

**objections** 5:21 7:14

**obligated** 228:18 320:5,6

**obligations** 131:11 133:2 136:6

**observations** 239:7

**observe** 103:15 104:11 106:12 107:25

**observed** 52:7 64:21 158:18 188:23

**obtain** 28:7 58:15,24 65:15 69:8 141:19 255:17 303:7 306:9,24
**obtained** 28:9,9 81:11 93:6,17 110:19 115:3 128:3 164:6 270:4 273:17
**obtaining** 46:15 68:2 69:14 102:7 244:17 302:20 306:12
**obvious** 92:25 182:5,7 244:12 245:4 289:25
**obviously** 92:19 132:3 170:11 184:9 266:13
**occasion** 58:21 107:2
**occasions** 181:16
**occur** 71:5 163:23
**occurred** 44:9 103:11 113:15 120:13 127:22 165:23 187:22 190:7 291:16
**october** 16:17 21:9 260:10,20 261:4 263:4,22 264:5 265:24 266:12 292:16 296:7
**odd** 41:23 230:20
**offer** 67:15
**offered** 310:15
**offhand** 93:10
**office** 16:17 55:19 105:23 179:15,23 180:17,17,20 181:5,6,11,17 181:18 182:12
**officer** 173:23 174:3 176:21
**officers** 24:3,11 24:17,25 172:18 173:16 174:14 175:11 190:13 330:5
**offices** 2:7
**oh** 33:21 40:18 43:10,16 178:3 182:22 183:4 195:10 210:5 302:5 306:20 319:7
**okay** 7:8 8:18 12:14 38:13 41:7 56:16 57:5 64:2 73:4 74:17 81:9 155:10,16 185:10,13 216:13 222:14 240:18 255:11 257:16 258:14 285:12 298:8 300:2,19 304:10 322:5
**old** 74:25 244:14,14
**omissions** 210:24
**once** 17:22 104:2,8,20,24 111:16 131:16 133:25 142:10 163:2 180:7 182:4 185:14 203:19 310:12 314:9
**ones** 262:7
**ongoing** 158:8 211:13 329:7
**online** 7:2 117:7,12
**open** 81:21 219:9 249:12
**opened** 140:4,7 158:21 219:4 244:20
**opening** 82:4 139:25 156:9 156:12 246:19 303:14
**operate** 47:18 69:24 168:24 215:23 252:17 306:4
**operated** 47:11 48:10 49:4 169:24
**operating** 65:20 70:15 85:3 91:5,8,20 92:3,6,9 93:21 94:20 141:7 187:14 209:22 211:11 234:9 234:18 235:4 245:7 251:25 252:2,17 253:10,17 255:4 256:15 256:23 258:8 258:10,15 260:2 264:9,25 266:7,24,24 267:5,10 269:4 269:16 327:13
**operations** 69:20
**operative** 232:20
**opinion** 76:8
**opportunity** 41:8 53:9 57:9

63:14 104:11 120:25 143:12 147:14 164:22 169:15 221:15
**opposite** 114:8
**oral** 23:14,18 225:25 297:2 299:2
**order** 2:5 45:10 45:14 67:25 68:3 74:10 116:18 117:4 117:21 127:2 135:10,13,17 135:22 136:4,9 136:19,24 137:18 138:3 140:10,13 141:4 162:6 200:22 223:2,5 252:17 260:18 293:3 296:23 298:16 300:5,9 300:12,20 301:8,19 302:8 302:18 304:24 306:4 307:13 307:16,18,21 308:13 327:14 328:6
**ordered** 300:21
**ordinary** 153:14
**original** 5:9,17 35:4 297:18 316:5,14
**originally** 83:22 314:4,21
**outcome** 331:17
**outside** 33:9 39:10 48:7 49:3 61:22 107:8,10,16 108:3,4 124:22 126:13 173:6 173:10 183:22 220:20 318:11 319:13
**outstanding** 124:11 274:5
**overly** 123:3
**ovington** 2:8 4:16
**owe** 239:9
**owed** 115:7 128:21 201:13
**owes** 128:25
**owhonda** 51:4 51:10 57:11 86:24 88:13 103:5 327:7
**own** 12:17,22 13:10,21 33:2 47:18 81:21 82:4,11,21 83:13,15,18,23 84:10 92:24,24 167:20 181:23 209:22 216:2 224:6 232:11 232:20 243:17 246:4,7,24 247:3 252:6 258:15 261:25 262:21 309:12 309:13 310:20 310:23 313:14 323:18 324:25
**owned** 47:11 48:10 49:3 185:17 204:4,5 205:4 231:11 257:23,25 265:12 267:16 301:7 309:18 310:2,6
**owner** 13:18 75:5,8,9,12,20 95:13 97:25 99:22 141:8,9 175:12,12,22 175:25 176:3,5 177:5 220:8 263:19,20 265:4 292:3,7 293:23 296:22
**owners** 59:18 59:25 64:17 76:14 98:9,15 215:3 246:13 260:24 263:23 294:4,6
**ownership** 59:5 59:10,14 97:8 97:23 98:18 175:14 267:2 291:16 292:2 292:11 296:9 296:11 297:5 298:17 309:11 310:17 311:21
**owns** 268:19,20 290:20 291:3

**p**

**p** 3:2,2 5:2
**p.c.** 4:2
**p.m.** 325:12
**pa** 3:20
**packing** 181:19 181:22,25
**page** 52:3,4 53:6 56:12 57:3,4 63:17 63:18 64:3 72:11 73:7 74:14,15,19 81:3,4,6 137:7 143:5,10 147:18 150:3 165:2,8 166:19 189:13 190:22 197:14 199:22 199:25 202:23

206:19 212:5 227:20 230:20 254:23 263:17 264:21 275:11 275:11 300:16 300:20 327:3 327:15 328:9 328:13 330:3 332:5
**pages** 72:8 121:16 123:12 154:23 155:13 216:7,8 228:7 286:19
**paid** 76:2,6 90:2,11 132:13 161:2 201:20 205:9 241:21 288:3 290:21 316:12 318:23 318:24 319:5 320:2,7
**painting** 180:21
**pandemic** 94:25
**paper** 244:10 248:7
**papers** 97:21
**paperwork** 78:16 95:5,8 117:23 149:15 215:12 247:23
**paragraph** 37:2 41:5,9 57:3 63:25 74:14,21 78:8 78:23 79:12,14 81:5,14 155:3 155:4,14 165:2 165:8 166:19 198:17 202:23 206:19 210:23 214:4 216:24 221:9,20 287:25 289:18 293:17 301:12 321:13 323:15
**paragraphs** 36:11 56:13,15 79:16 212:6 218:16
**park** 4:7
**parking** 104:22
**part** 37:23 38:2 58:9 73:21 170:13 177:5 187:3,25 190:9 229:23 230:9 230:11,12 232:2 240:19 251:19,22 288:22 296:6
**partially** 124:14
**participate** 9:10
**particular** 22:10 119:23 162:13 208:19 231:8 233:19 236:20 257:6
**particularly** 184:2 317:3
**parties** 5:7 51:5 99:18 111:4 148:15,15 214:14 225:12 229:7 285:5 294:10 309:12 331:15
**partner** 82:24 176:9 177:12 272:2
**partnered** 246:25
**partners** 1:18 177:6
**partnership** 265:15,18
**parts** 293:2,5 317:4
**party** 31:24 100:12 281:18 283:10 295:25
**pass** 270:9
**passed** 105:22 270:12
**passing** 105:11 229:11
**past** 9:14 124:14
**paused** 294:24
**pay** 54:15,22 56:7 60:22 67:16 201:12 209:20 217:18 217:20 218:11 236:10 314:15 319:22 320:3 329:12
**payable** 78:19
**paychecks** 311:19
**paying** 32:16 54:20 67:16 69:25 70:4,24 85:8 132:8,16 132:20,23 314:2,10 318:25 319:20
**payment** 60:16 88:14 126:7 128:10 129:14 129:19 182:20 183:9 287:6 289:10,19,20 289:23 293:20 329:9
**payments** 46:15 88:6 133:4 134:11 216:20 288:19 288:23 289:12

290:3 293:7 316:10 320:25
**payoffs** 78:17
**penalty** 8:4
**pending** 40:5 45:15 137:8 146:22 150:7 300:21
**penny** 54:16
**people** 34:16 42:11,18 68:25 106:3 107:11 152:19 162:15 163:22 165:11 166:6,15 170:12 176:17 216:21 219:25 238:23 239:17 240:21,23,24 241:2 242:21 243:6 244:15 246:5,24 251:7 259:23 261:12 267:9 295:5,10 295:11,14 311:11
**percent** 40:18 42:17 95:13 102:25 120:21 122:16 141:8,9 194:18 196:5 220:8 239:18 239:20,22 240:3,9 259:2 259:3 263:18 263:19 265:4 265:10,14,14 265:17 266:9 266:17,21 267:16,25 268:19,20
**percentage** 186:17 267:2
**percentages** 186:13
**perfect** 181:4
**perfectly** 321:19
**perform** 89:21 94:24
**performed** 124:6,12,20 125:22 126:16 126:19 134:13 194:7 229:3
**performing** 133:6
**period** 46:3 281:9 302:22 319:11 320:12
**perjury** 8:5 213:18
**permit** 69:23
**perpetrators** 67:13
**person** 31:22 34:8 41:10,22 41:25 42:11,18 43:3 90:6 152:12 159:24 245:20 265:17 318:24
**personal** 43:14 178:2,4 180:18
**personally** 64:12 100:21 114:15 242:23
**philadelphia** 3:20
**phone** 20:6,25 86:10 134:21 204:7
**phony** 93:4
**physical** 67:9 67:20
**physically** 116:24,25 201:11
**pick** 204:7
**piece** 177:10 216:6 244:9 248:6
**pieces** 313:7
**pinpoint** 220:17 329:15
**place** 34:24 42:11 97:12 142:4,4 157:17 180:15 181:5 221:13 232:23 233:19 244:6 302:23 306:9 326:11
**placed** 38:6 39:15 100:24 101:15 136:16 155:25 170:2 201:9 328:22
**placeholder** 34:13
**placing** 54:25
**plaintiff** 14:11 32:2 35:18 41:19 51:20 62:16 74:21 78:19,20 88:24 89:3,16 240:14
**plaintiff's** 61:8 78:10 169:21
**plaintiffs** 1:10 2:4 3:4,9 35:25 78:15,25 79:2 79:2,8,9,20,21 79:23 90:21 97:23 127:20 132:5 135:5 138:13 153:5 153:21 154:4 167:10,11 193:24 211:4 213:16 237:7,9 237:11 240:7,8 240:20 241:4
**plan** 69:8,15 157:10,13,15 158:8,13

195:24 200:22 201:10 204:24 205:5,9 212:14 212:16 221:14 225:6 226:15 227:22,25 229:18 231:14 231:25 239:16 239:23 246:21 329:7
**planet** 276:4
**plans** 180:13 201:16 225:19 226:9 240:4,9
**play** 245:18
**pleadings** 30:9
**please** 6:8 7:5,6 29:19 36:11 63:20 74:15,21 81:7 95:15 106:14 118:12 122:2 138:23 143:12 147:14 149:16 178:9 206:20 216:12 222:13 230:15 248:10 260:16 266:5 272:24 274:4 278:17 278:18 296:16 298:12,13,24 317:20,24
**pled** 28:23
**pledge** 300:25
**pledged** 302:21
**plenty** 214:24
**point** 25:20,25 26:20 28:10 34:21 53:24 59:14 62:20 66:10 82:25 94:18 99:10 100:25 101:3 102:15 111:13 112:17 114:17 124:17 129:4,5 136:12 137:22 142:20 153:7 173:13 176:11 176:15 177:7 178:18,22 180:13 184:12 185:7 189:6 194:22 195:2 205:14 207:25 209:16 217:22 226:6,19 228:15 229:7 229:21 241:3 244:12 245:3 250:15,22,25 251:9 270:16 270:20 291:19 314:11 315:9 315:15,20
**pointed** 295:23
**police** 16:6 24:3 24:11,17,25 111:25 112:7 112:17 165:4,5 165:11,16 166:3,6,9,14 169:22 170:8 170:22,24 172:12,19 173:16,23 174:3,14 175:11,16 181:20,23 280:12,13,13 330:5
**pomp** 168:21
**poor** 47:5
**portion** 60:15 154:24 155:9 164:21 166:20 169:15,17 170:23 287:10 288:2
**position** 146:22 159:23 160:11 198:23 214:18 220:6,11 229:17 262:22 290:18,24
**positive** 96:15 217:18,20 218:10 236:10 329:12
**possess** 164:6
**possession** 118:2 120:23 156:24 158:6 204:15 261:15 328:24 329:6
**possibility** 59:24 60:3,6 178:24
**possible** 35:21 89:8 99:9,16 100:2 147:25 148:5 149:15 149:21 228:6 239:12,14 285:15 329:20
**possibly** 219:20
**post** 55:18,19
**potential** 315:16
**potentially** 160:4
**practical** 35:20
**practice** 81:19 81:22 83:6,14 83:24 105:16 126:21 137:19 256:19 269:21
**practices** 83:17
**practicing** 179:16 227:12 249:4 277:4 302:3

**pramod** 68:22 69:12,13 78:12
**pramod's** 69:2
**preceding** 167:25
**precipitated** 127:18 185:20
**predominantly** 317:5
**prefer** 180:6
**premier** 1:17
**premises** 104:12 175:18
**preparation** 52:12 138:10 225:22 231:7
**prepare** 10:4 127:2 259:6
**prepared** 95:4 98:11 141:23 143:25 144:25 195:19 249:10 255:21 256:4 260:9,10,18 261:2,7 263:10 263:13 265:20 267:22 310:10
**preparing** 56:3 258:15
**presence** 179:17
**present** 4:8,19 8:24 42:12 48:4 84:25 106:13 108:2 133:22 157:13 172:10 177:13 183:11 185:11 188:11,15,17 197:16 200:21 201:2 210:6 287:3
**presented** 29:2 50:23 163:17 164:3 255:16 282:21 285:18 286:23 287:20 288:7 291:6,10 292:21,22 305:8,8
**presenting** 283:4
**presumably** 239:16
**presume** 19:19 20:15 71:18 125:14 234:8 236:19 237:14 320:9
**pretty** 67:6 115:16 194:23 208:20 209:6 289:25 314:8 317:7
**prevailed** 150:18
**previously** 41:17 45:18 47:15 86:12 99:6,7 191:21 194:16 204:21 321:7
**price** 287:6,12 289:7,9,10,14 289:16,19,20 289:22 290:2,7 290:11 293:14
**primarily** 87:10 226:24
**principal** 41:19 120:3 122:13 152:7
**principles** 152:17 153:18
**print** 298:13
**prior** 10:8 14:22 33:18 48:23 49:13 50:10,16 90:9 93:3 94:13,16 96:11 103:20 105:6 106:6,17 125:24 131:18 151:16 152:14 153:21 159:8 184:25 193:8 203:25 231:20 235:14 276:25
**prioritizing** 123:9
**private** 12:6,10 55:18
**privilege** 25:3
**privileged** 22:12,16,22
**privileges** 159:16
**pro** 4:11
**probably** 26:2 123:11 128:17 193:6
**problem** 149:25 229:24 269:4,7 275:20 280:24
**problems** 246:19 321:21 322:24
**procedure** 2:6
**proceeding** 13:14,16 32:5 40:4
**proceedings** 13:9 32:9
**proceeds** 78:13 79:4
**process** 117:21 194:13
**processing** 275:16
**procure** 148:12
**produce** 101:16 247:6 283:23 285:14 329:19
**produced** 120:8 121:15

168:16 201:21 220:21,23 221:5 250:7 254:6 283:19 284:3,5,14,16
**producing** 287:21
**product** 212:24
**production** 20:19 52:14 62:3 118:5 130:15 158:9 183:8 191:23 194:2 328:14 328:16,18,24 329:2,7,8
**professional** 130:6
**profitable** 311:10
**profiting** 311:15
**profits** 311:21
**prohibited** 136:7 137:16
**prohibiting** 304:24
**prompted** 83:12
**proof** 291:11 291:14,15,21 291:25 292:9 292:21 309:11 310:5
**prop** 161:22
**property** 12:22 13:10,12,18,20 66:14 70:5,23 71:6 73:18 75:5,8,9,12,23 76:2
**propound** 218:7 220:16 221:6 329:10 329:15,17
**protect** 34:3,14
**protection** 24:5
**prove** 94:20
**provide** 9:11 11:16 24:5 116:13 142:8 146:11 225:6 225:18 228:19 229:18,20 231:25 272:25 302:10 305:9
**provided** 91:4 108:8 115:19 116:10 161:24 226:10,16 236:7 254:8 292:12 308:19
**providers** 212:14,17
**providing** 114:17 230:7 231:14 294:2 301:16
**provision** 130:17 138:2 302:12 329:3
**provisions** 121:7 294:7
**public** 2:10 6:4 7:17 326:22 331:7 332:25
**puccio** 188:3,6 188:9
**pull** 246:21 282:19 317:11
**pulled** 317:13
**purchase** 64:25 65:14 75:23 89:23 182:17 182:20 186:4,8 234:21 285:19 286:10 287:6 287:12 289:7,9 289:10,14,16 289:19,20,22 290:2,7,11 293:2,3,14 305:19
**purchased** 181:3 182:25 183:2,5 248:23 290:19
**purchasing** 131:23 178:14 178:16 287:11
**purpose** 17:15 23:2 67:4 92:23 102:6 162:13 324:9
**purposefully** 55:23
**purposely** 299:5
**purposes** 11:20 116:16 143:20 179:20 259:25 265:15 266:16 266:22 313:9
**pursuant** 2:5
**put** 44:10 90:4 97:13 111:14 111:16 127:4 133:15 135:25 136:10 160:7 175:20 191:9 227:4,7 228:5 228:9 242:2,4 242:13 246:6 246:25 247:19 247:19,19 273:22 306:25
**putting** 313:10

**q**

**qualification** 107:22
**question** 8:16 8:17 11:11 12:9,12 13:6 22:10 26:15 29:18,21 38:12

44:18 47:5,9 57:24 61:15 63:16 69:12 79:14,19 95:19 97:20 106:15 108:22 110:2 118:13,15 133:13 138:21 138:24 167:14 168:3,5 176:24 185:5 195:11 209:24 213:10 213:12 216:24 218:25 230:15 230:16 232:25 234:4 236:3 237:14 239:5 250:13 256:2 256:21 259:15 273:20,21 276:15 277:10 286:24 293:16 296:15,17 299:17 305:4 311:8 330:3
**questioning** 207:15 282:10
**questions** 7:20 9:11 109:17 122:2,5 223:10 223:18 304:22 325:7,9,11 330:2
**quick** 71:21 115:16 222:22
**quiet** 318:14
**quite** 114:7 178:11 192:23 193:11 206:6 245:24 273:6 273:15 279:5 297:16
**quoting** 58:6

**r**

**r** 3:2 4:10 5:2 6:2,2 19:6 21:14 326:2 331:2
**rarely** 88:3
**rate** 125:17
**rather** 275:6 305:11
**reach** 19:9 20:17 85:24 142:22
**reached** 129:6 142:21 179:12 270:2 271:3,5
**react** 324:4,10
**read** 29:19,22 36:6,23 53:9 53:15 56:14 57:2 63:15,17 64:2,2 68:16 74:15,17,20 75:14 76:22,25 77:8 81:7 95:16,20 97:21 106:16 118:12 118:16 121:25 122:5 123:13 138:22,25 143:15 147:15 147:17 154:25 155:2,4,8 162:20,24 163:5 164:22 166:20 169:15 169:18 191:18 206:6,20 213:9 213:13 216:13 230:17 275:6,8 275:9,10 296:18 309:6,9
**reading** 30:9 56:13 75:16 77:10 121:5,10 122:8,9 287:24 289:18
**ready** 118:17 123:4
**real** 12:22 13:9 13:20 106:21
**reality** 310:16
**really** 27:16 30:24 34:4,21 86:4,8 99:11 102:4 105:4 112:23 195:17 317:2 323:14
**realty** 1:8 3:14
**reason** 9:9,12 9:18 24:9,10 24:23 35:11,13 54:3 70:22 96:19 104:19 114:2 122:23 123:2 144:12 157:2 168:25 169:2 186:14 270:14,21 273:8 305:6 308:8,11 330:4 332:5
**reasons** 59:12 145:16
**recall** 18:12 19:15,19,20,21 19:24 20:3,5 21:10,24 23:13 23:25 24:6 25:11 26:19,21 30:12 32:10 37:3,12 45:20 46:2,22 48:18 49:2 50:11 52:19,24 53:2 53:25 54:6,9 54:11 73:23 77:14,16 80:23 86:18 87:2,7 88:7 89:4 90:25 106:4 112:10,16

113:3 117:2 123:19,24 124:9 125:15 125:19 126:6 142:12 143:22 144:20 146:14 146:17,20,23 150:17 152:21 152:25 153:5 157:5 158:12 158:19 159:14 172:22 175:14 175:15 182:14 182:16 189:4 191:8 193:3 203:8 204:18 210:14 211:17 213:14 216:5 216:10 224:10 231:7,25 243:18 270:13 273:2 274:2 282:23,25 287:21 288:9 289:5 296:13 297:2,9 300:13 320:14,20,24 321:6
**receipt** 183:9 248:24 329:9
**receivables** 78:14 79:20,22
**receive** 130:8 269:5 313:19 322:9
**received** 18:15 18:16 22:6 37:24 110:14 117:4 123:15 145:22 146:2,7 146:10 196:18 245:23 277:2 278:20
**receiving** 134:12 278:23 311:4 320:14 320:20
**recent** 15:23
**recently** 321:9
**recess** 37:20 50:20 57:7 71:23 118:10 192:5 317:17
**recipient** 144:14,18
**reckless** 324:14 324:18
**recklessly** 324:3
**recognize** 22:11,15 51:13 71:17 91:24 164:18 189:19 189:20
**recollection** 8:21 9:4 53:17 77:10 87:6 100:10 119:14 132:7 183:21
**record** 6:9 7:13 29:11,12,14 37:19 41:18 50:19,22 57:6 57:12 62:25 63:2,21 71:22 118:9 121:23 136:15 155:11 169:18 183:15 192:4 199:20 200:3 269:12 278:16 308:25 309:2 317:16 317:25 331:12
**recorded** 13:3
**records** 38:10 39:15 101:12 166:22 167:16 167:22 194:12 237:21,23 312:22 328:20
**recourse** 165:19
**redacted** 182:20 183:8 329:8
**reduced** 215:5
**refer** 26:18 38:14 130:19 170:25 171:18 171:22 208:23 223:21 225:3 282:18
**reference** 198:17 199:16 199:18 200:7
**referenced** 151:21 293:9
**referred** 26:23 26:24 27:6 86:20 103:6 220:18,20 329:16
**referring** 33:15 36:11 52:3 54:10 66:5 74:12 78:8 81:3 157:9 164:8 166:18 167:3,8 168:10 168:17,18 170:21,23 190:22 191:2 210:23 214:7 218:16 221:4,9 225:5 233:22 262:17 270:23
**refers** 170:10
**reflect** 29:14 38:10 63:22 136:16 155:12 199:21 200:4
**reflected** 320:24 322:18
**refresh** 53:16
**refusing** 12:11 33:6

**regard** 48:2 52:12 75:17 212:8 220:19 234:11 235:3 243:15 261:22 266:21 296:8 316:3 321:15
**regarding** 78:16 185:21 281:4 303:10 313:18
**regardless** 119:5 150:16 235:12
**register** 46:14
**registration** 46:16
**regular** 246:17 247:17
**reject** 238:11 281:15
**rejected** 237:18 237:23
**related** 7:24 14:16,19 30:19 35:4 43:8 46:6 59:13 62:5 66:17 85:12 95:2 120:11 137:25 194:7 224:18 328:19 331:15
**relating** 130:17 329:3
**relation** 67:12 94:25 134:25
**relationship** 27:7 69:3 230:2 231:12 231:18,23 318:19
**relationships** 210:20 211:8 211:21 212:11
**release** 304:5 304:12,19 305:3,7,9 306:8
**released** 304:8
**relevance** 44:17
**relevant** 76:9 110:10
**relief** 95:2 155:20 171:11
**relying** 309:15
**remain** 118:2 328:23
**remainder** 57:10
**remains** 45:15
**remanded** 33:16 225:5 321:9
**remarkable** 178:21
**remember** 18:22 19:7 23:21 29:17 41:22 84:18 96:10 97:18 99:22 109:18 115:11 119:20 128:14 136:12 137:21 142:24 144:6,10 150:15 158:15 158:20 173:18 174:9 195:2 203:21 205:15 209:13,15 218:4 224:11 226:19 231:5 244:4 271:21 284:22 285:22 299:10 306:14 306:15 307:5 308:14 312:15 316:8
**remit** 46:14
**remittances** 78:17
**removal** 102:7 103:6,10
**remove** 101:22 261:25
**removed** 101:4 101:9 103:21 103:23 104:14 155:25 160:10 167:19 175:17 177:2 243:17 244:2,7 246:3
**removing** 92:23 103:16
**rendered** 124:15
**rent** 12:17,21 69:25 70:4,25 74:22 76:2,6
**repaid** 239:8
**repayments** 102:17
**repeat** 95:15 106:14 138:21 211:24 230:14 296:15
**repeated** 193:19
**repeatedly** 195:5,13
**rephrase** 8:16 47:9 185:10 256:2
**report** 242:15
**reporter** 6:14 6:18 7:8 29:20 29:22 36:22 38:21 40:25 51:12 53:13 55:8 63:13 68:15 71:16 74:8 78:3 80:14 91:23 95:18,20 106:16 118:14

118:16 122:6 137:3 138:25 143:8 147:13 154:16 164:17 169:13 189:18 197:12 198:13 202:21 206:17 213:11,13 214:3 222:25 230:17 245:11 247:10 254:17 260:14 264:15 266:5 269:11 272:15 275:3 278:15 286:15 296:18 297:25 300:11 309:6,9 317:19
**reporting** 332:1
**represent** 19:16,17 31:8 31:15 36:13 46:11 49:14 50:9 55:13 57:14 59:3 60:13 68:22 71:10 80:6,21 91:13 143:9 147:4 151:11 164:10 165:24 179:11 189:10 199:5 200:12 206:10 223:16 284:4 285:25 299:2 319:7,12 319:25
**representation** 10:19,23 21:12 25:5 26:3 27:19 28:4 33:13 37:3 50:15 52:21 54:18 61:12 64:4 71:19 85:18 87:9,18 91:3 102:22 125:23 133:9 133:21 137:24 151:20 170:7 171:5 186:14 196:19 201:18 259:19
**representations** 16:10 23:19 58:7,9 124:10 156:18 193:20 196:14 222:16
**representative** 1:5 3:11 188:14
**represented** 23:23 24:2 25:21 26:5,9 41:17 45:17 46:25 47:6,8 47:10,16,17,21 47:24 48:11 49:5,16 50:3,4 51:16 57:22 94:13,16,18 99:18 100:12 135:3 145:18 204:21 286:9 296:5 312:21 312:25
**representing** 19:22 26:25 29:15 46:18 48:5 65:17 76:13 131:20 138:17 152:10 153:16 228:12 287:17 288:14 290:25 291:7 294:12 315:11 316:18,23 319:9
**represents** 293:2
**request** 36:8 63:23 101:8,22 142:18,19 171:11 200:5 299:20 329:21
**requested** 89:20 304:3 328:12
**requesting** 118:3
**require** 60:21 252:16
**required** 126:7 226:9 227:14 234:22,24 293:5 298:16
**requirement** 130:5 296:21
**reserved** 5:22 7:15
**reside** 11:22,24 12:3 330:7
**residence** 12:18 12:19,20,24 13:5,8 76:6 179:19 192:20 193:12,14,16 193:18
**residential** 73:18
**resides** 73:19 196:15
**residing** 74:25
**resolve** 32:25 274:5
**resolved** 32:19 32:22 33:5,8 43:24 54:15 62:13,22 88:5 88:11,13,23 89:2
**respect** 85:18 135:20 217:7
**respective** 5:6
**respectively** 186:10 187:17

**respects** 207:14
**respond** 76:12 273:24 278:23 278:25
**responded** 191:13 198:2 203:11 273:8 277:25
**responding** 160:5 172:19
**response** 20:4,6 97:21 98:6 111:10 160:20 182:16 273:21 274:8 277:17 277:19
**responses** 218:14 329:13
**responsibility** 292:4,6
**responsible** 34:8
**responsive** 57:24
**rest** 24:6 128:20
**restaurant** 40:14
**restore** 243:22
**restrained** 137:10 300:24
**restraining** 67:25 68:3 135:9,12,17 136:8 140:9,13 304:23 307:13 307:16,18,21 308:13
**restraints** 136:21,25 327:14
**restricting** 304:14
**restriction** 138:8
**result** 60:23 111:22 175:15 177:23 265:17
**resulted** 194:2
**results** 94:5 311:3
**retained** 151:10 328:7
**retainer** 128:3 129:25 130:7,7 130:9,15 329:2
**retainers** 128:16
**retrieve** 178:2
**return** 112:3 113:11 195:22 203:9 267:14 269:6 292:14 298:14 309:11
**returned** 35:10 108:18 110:21 111:24,25 112:4 113:10 155:21 184:17 205:7
**returning** 203:21,25
**returns** 97:14 98:11,12 257:12,13,16 259:5,13 260:4 260:5,9,23 262:17 265:13 268:13,16,18 268:23 269:3 269:19 293:24 309:16,21,24 310:10,20,24
**review** 10:7 20:9 38:22 41:5,9 57:10 61:10 65:6 119:25 120:25 122:12,22,24 140:13 143:13 155:15 162:6 162:12 182:10 197:15,18 220:24 231:6 232:3
**reviewed** 122:18 137:14 140:17 224:17 227:19 238:22
**reviewing** 37:2 123:10
**rica** 192:9,11 192:14,20 193:2,5,8 194:19,22 196:16
**right** 22:13,18 25:24 30:6 31:10 32:20,23 37:24 38:11 43:25 44:9 56:10 57:12,17 72:10,16 75:2 75:6,13 76:15 87:12 117:9 122:18 130:9 133:6,11 135:14,21 140:21 143:25 149:11 167:25 170:16 171:13 171:20 172:12 172:15 176:23 178:19 184:20 185:13 191:17 192:9 193:24 199:14,17 208:18 212:3 214:23 215:15 217:10 221:23 229:3,21 230:21 236:20 245:8 247:22 261:14 262:4 263:14 267:11

273:7 275:25 284:13 288:7 299:18 306:4 307:20 308:11 311:10 318:10 319:2,4 322:17
**riled** 324:24
**ring** 21:15 46:17
**robert** 1:4 3:5 7:21 188:3
**roger** 9:22
**rolls** 204:12 221:14,22 222:8
**ron** 282:22 283:4,7,16 284:6 285:3
**ronneburger** 4:17 6:18,20 140:24 144:2 144:16 148:23 223:4,8 256:6 302:24 325:8
**room** 106:23 107:3,5
**rooms** 106:20
**rose** 130:12
**roslyn** 1:17 4:6
**roughly** 31:4 46:3 106:25 126:2 229:5
**route** 1:8 3:14
**routing** 116:11
**royce** 204:12 221:14,22 222:8
**ruderman** 3:16 6:14,23 33:19 91:15 121:21 223:13,15 230:19 249:2 253:21 254:2 256:12 263:7 264:7 267:20 268:7,22 272:5 274:20 278:19 279:5 280:25 282:8 285:23 289:9 290:14 294:19 295:8 297:12 299:18 300:3,19 304:17 309:4 317:10,16 325:6 328:11
**ruined** 131:16 257:18
**rules** 2:6 8:12 8:14 9:7 130:5
**ruling** 12:15 25:7 147:24 148:5
**rulings** 330:2
**run** 234:5 256:19
**russell** 58:17,21 111:14,19 113:17 271:11 272:10 276:23 283:21

**s**

**s** 3:2 5:2,2 6:2,2 327:2 332:5
**safety** 24:24 330:5
**sage** 3:4
**sake** 177:9
**salaried** 131:9
**salaries** 312:7
**salary** 129:7,8 129:17 131:18 313:19 315:4 318:5,25 319:5 319:6,10,14 320:25
**sale** 107:16,24 283:25
**sales** 1:3 3:5 78:13,21 79:4 107:19
**salesperson** 153:2,3
**sanctioned** 45:11
**sarah** 1:13 4:3 31:3 86:5 98:9 98:14 106:5 151:14 224:5 243:25 253:2 253:18 258:25 263:19 266:16 268:20 294:3 316:21
**sarah's** 266:21 309:17
**sat** 139:20
**satisfied** 291:12
**satisfying** 179:21
**saw** 60:11 106:2 107:15 120:8 160:13 162:24 163:13 182:3 202:10 217:21 242:23 277:15
**saying** 18:14 21:19 41:22 44:11 61:3 66:8 68:21 92:13 93:19 153:6,7 159:14 159:19 168:6 168:25 169:2 175:23 196:9 209:21 218:9 224:9 227:9 234:25,25 246:13 247:13 261:10 262:5,9 267:8 269:2 273:24 275:22

279:2,23 285:7 290:13 294:3 295:2 297:10 303:4 304:23 317:23 324:20 329:11
**says** 38:25 46:19 53:14 55:21,22,22 57:21 59:7,7 60:18 72:17 74:23 78:22 79:13 145:21 148:19 150:3 156:21,21 170:22 171:14 171:15,21 172:6,7,9 196:15 199:2,3 199:4,15 203:3 203:4 204:13 206:5,24 211:6 211:7 214:11 215:22 221:20 221:25 222:4,6 222:6 242:21 249:19 258:17 274:7,7 277:7 287:10,25 288:2,12,12,16 288:22 289:4,8 289:9,14 294:5 298:11,20 300:16,21
302:12 305:25 322:3,7 323:5
**scheme** 78:11
**screen** 36:10 38:15 55:2 136:16 259:21 285:24
**scrolling** 39:3 147:18 155:12 197:13
**se** 4:11
**sealing** 5:7 7:13
**search** 101:12 180:15 328:20
**second** 2:8 63:18 74:14 150:2 187:14 197:13
**secondhand** 313:5
**section** 137:6 150:3 287:6,7
**security** 205:5 216:23 217:11 217:16 218:4 218:10,11 236:5 237:5 301:17 329:11 329:12
**see** 34:13 36:25 39:5 53:14 55:15 59:20,22 68:18 74:23 78:21,22 80:15
101:13 106:23 120:10 127:25 137:4 147:25 149:16 150:8,9 157:23 160:2 163:2 164:25 165:6,7,20 166:25 167:2 170:4 171:8,9 184:11 199:23 202:7 204:13 211:6,7 252:25 253:5,16,23 254:24 255:6,7 255:13,14 258:18 265:4,5 269:3 276:7 277:19,20 286:18 287:7 287:18,23,25 287:25 288:6 288:15,16 289:4 290:7,9 290:13 300:18 301:4,5 328:21
**seeing** 185:18 224:11 273:2 289:5 300:14
**seek** 176:25 316:21
**seeking** 17:16 102:6 141:19 146:22 303:6,7 316:22
**seem** 50:11 146:17 152:25 157:5 159:14 172:22 182:14 182:16 204:18 269:20
**seemed** 98:17
**seems** 52:6 75:18 221:24 222:3 289:25 301:11
**seen** 21:25 74:9 78:6 96:2 141:13 168:12 186:6,22 187:2 197:20 199:4 219:23 220:12 235:15 247:5 248:15 253:9 264:16 273:4,5 283:2,6,13 286:16,25 288:17 290:16 293:4,6,11 294:11 312:19
**self** 216:2
**sell** 171:12 283:14 300:25
**seller** 287:12
**sellers** 287:18 288:4,15
**selling** 171:7,16 172:3 234:12 295:25 301:6

304:24
**send** 36:8 113:23,24 144:22 145:2,6 145:14 160:21 271:20 274:17 277:8 278:7 279:6 297:7 298:23 299:4 304:10,11
**sending** 159:8 182:17
**sent** 108:18 115:15 145:10 159:2 164:13 191:4,7 203:8 208:8 244:11 245:22 273:5 274:16 279:18 297:6 298:10 299:14 304:21
**sentence** 64:8 74:18 221:25 222:2 276:23
**separate** 253:17
**separated** 83:20
**separately** 171:22
**separation** 84:8
**september** 13:15 23:15 157:18,19 184:14 194:15
**serious** 67:6 160:3
**seriously** 191:13
**serve** 89:11
**served** 16:19,22 16:25 17:9 35:2 124:22 238:4 318:10
**service** 5:16 39:11 72:6,10 72:12 78:20
**services** 75:22 89:21 94:24 100:16 124:6 124:12,14,15 124:19 125:22 126:18 129:2 129:14 130:18 133:5 134:13 329:4
**serving** 216:2
**set** 41:14,24 42:9,10,24 211:25 245:17 331:11,20
**setting** 28:4 48:9 110:12 139:3 186:17 221:19
**settle** 54:12,19
**settled** 54:14,21 60:15 61:5
**settlement** 184:15
**settlements** 13:8
**seven** 81:5 104:6
**several** 129:19 150:6 205:15 288:8
**shanks** 3:9 58:17,21 111:14,19,23 113:17,19 114:4,16 223:16 271:11 272:10,21 273:21 274:9 275:5 276:23 277:3 278:2 283:22 284:20
**shape** 89:25 90:8 99:25 305:5
**share** 285:24
**shareholders** 214:21 215:14 215:17,18 249:14
**shares** 283:14 287:11
**sharing** 36:9
**sheet** 73:7 332:1
**shell** 64:5,15
**shortly** 201:4
**shory** 45:20
**shot** 203:16
**should've** 281:25
**show** 45:10,15 136:20,24 137:18 138:3 154:10 167:17 210:21 223:23 237:23 260:23 264:18 268:19 268:21,22,23 277:17 286:21 287:22 300:5,9 301:9,19 302:8 309:25 327:14 328:6
**showed** 86:23 93:23 300:13
**showing** 56:11 63:4 68:5 71:8 72:11 73:24 77:19 80:4 91:11 189:8 197:3 198:5 202:12 213:20 263:17 268:13 269:3 309:12 309:17
**shown** 173:12 189:21 255:16 267:15 275:15

**showroom** 106:22
**shows** 7:5 279:12
**shuddered** 104:8
**shut** 242:23,25
**shuttering** 148:7
**side** 61:8,8 88:10
**sides** 171:12 233:12 235:2
**sign** 117:23 215:20 236:15 256:14 298:13
**signatory** 244:15
**signature** 255:10 265:7 282:22 283:5,7 283:16,17 284:6 285:4 286:19 331:23
**signatures** 286:20,22
**signed** 5:10,12 5:15 13:2 90:2 94:9 214:22 255:8,12 265:3 286:25 290:5 295:22
**signers** 244:22
**signing** 235:5
**similar** 76:19 77:13 79:3,9 79:15,18,21 80:2 318:9
**similarly** 116:7 318:22
**simple** 273:14 273:15
**simply** 126:11 163:6
**simultaneous** 269:10
**simultaneously** 245:13
**single** 150:19 152:12 188:18 196:4 216:5 227:7 237:15
**sit** 107:14 139:10 149:5 186:21 187:21 212:3 231:5 253:11
**siting** 320:23
**sitting** 295:20 295:23 320:19
**situation** 240:20 243:16 273:13,19
**situations** 87:16 305:15
**six** 104:5 190:22 204:18 205:7,11 264:21
**sixth** 254:22
**slipped** 108:21
**sloppy** 250:5
**slow** 123:11
**small** 38:2 83:16 88:22 89:5 249:19
**smithtown** 1:17 4:7
**sold** 50:12 66:11 71:6 138:19 139:4 139:13
**sole** 35:11 175:12,22,25 176:3,5 242:5
**solely** 35:4 85:12 151:12 316:20
**solid** 304:2
**solitary** 216:5
**solo** 83:6
**somebody** 7:4 102:3 104:21 105:3 106:2 112:15 209:7 248:12 302:8 306:10 312:19
**someplace** 81:23
**son** 43:21
**soon** 14:20 117:3 147:24 148:5 149:14 149:20 238:3 257:12 271:15 285:15 320:21 329:19
**sorry** 71:21 155:7 199:24 230:10,14 320:22
**sort** 88:6 128:6 157:21 159:19 191:16 237:24 238:21
**sought** 22:18 28:7 54:3 308:21
**sounds** 123:25 184:20 273:7
**speak** 37:6 85:5 102:15 109:18 112:6,25 133:16 166:10 172:18,22 173:6,8,14,23 174:3 210:12 218:19 279:14
**speaking** 8:22 22:21 29:9 51:19 112:17 116:2 119:6 136:5 158:13 165:17 172:23

212:8 213:15 219:4 229:5 282:7 294:22 294:23
**speaks** 36:6 56:21,25 57:18 59:8 79:12,15 135:22 136:2 171:3 194:21 215:16 230:18 252:20 255:25 275:17 279:4,8 301:10,20
**specific** 97:20 119:13 126:17 134:14 154:24 164:21 176:24 227:21 262:15
**specifically** 23:25 103:11 110:25 152:24 159:11 167:11 212:15
**specificity** 306:14
**specifics** 29:6 97:19 227:5
**specified** 326:11
**speculate** 202:2 308:11
**speculative** 255:23
**spends** 194:18
**spent** 121:12 130:24 131:6 240:14
**split** 6:17 223:7
**spoke** 6:24 16:2 16:11,16 21:4 21:7 101:5 114:21 146:19 153:20 158:16 158:17 165:11 166:6,7,16 169:2 173:10 174:13 175:3 192:22 206:2 207:4 208:7 210:10
**spoken** 70:19 109:5 134:7 166:14 176:15 212:12 227:9
**sporadic** 316:10
**spring** 132:19
**ss** 331:4
**st** 3:19
**staff** 56:2
**stamp** 38:25 254:7,15 264:13 286:3,4 286:6,13 327:22 328:3,5
**stamped** 143:5 143:11 264:10 327:15
**standpoint** 110:9
**stands** 261:20
**start** 125:5 178:8 314:10 315:24 317:19
**started** 11:8 48:19 121:21 132:16,20,22 185:5 251:25 252:2 314:2,4 315:9
**starting** 83:23 160:15 194:13 211:14
**starts** 149:7
**state** 2:10 6:4,8 14:5 27:21 29:24 46:15 58:19,20 97:22 111:3 135:5 150:6,11 204:23 205:25 227:14 252:16 316:5,15 321:8 331:3,8
**stated** 127:14
**statement** 122:15 147:22 168:21 170:22 195:12,25 196:13 207:14 208:11 224:12 231:15 308:9
**statements** 195:6,20,24 209:11 218:18 236:7
**states** 1:2 19:4 20:21 78:9 137:7 195:22 255:2 328:15
**stating** 242:13 306:2
**station** 104:23
**status** 40:2 67:23 156:18
**statute** 228:23 228:24 229:9 229:12
**staying** 177:19
**steal** 175:6 257:8 259:24
**stealing** 169:23 173:3 182:12 245:7 248:9,14 280:14 282:5
**steeling** 282:13
**steinberg** 82:16 83:2
**step** 66:6
**steps** 157:21 177:25 230:3
**stipulated** 5:5 5:20
**stipulations** 7:12

**stock** 92:20 93:5,7,10,11,20 93:22 94:8 141:13 244:19 245:2 246:6 248:21,22 249:20 250:18 286:10
**stole** 280:10 295:12
**stolen** 173:20 198:18,22 271:8
**stood** 153:13 174:16
**stop** 131:5 132:8 229:21 235:10,23 245:9 283:25 294:22
**stopped** 127:15 127:22 128:23 130:22 132:6 230:7 276:13 280:23 281:25
**stops** 215:11
**store** 169:25
**straighten** 259:17
**straightened** 257:13,16
**strange** 281:20
**street** 1:8 3:14 3:19 11:25 12:24 44:8,20 44:21
**strengthen** 238:17
**strikingly** 76:19
**stuck** 246:23
**stuff** 126:14 180:17 181:22 181:25
**stunned** 272:3
**subject** 8:3 13:8,13 86:2 98:4 101:25 154:6 155:19 166:2 170:7,18 185:16 197:7 205:4 245:21 252:20
**subjects** 7:24
**submission** 299:22 329:22
**submit** 95:24 101:7 218:13 296:10 297:8 329:13
**submitted** 63:8 95:11 101:13 103:4 108:12 125:13 141:7 148:21,25 149:3,4,15 154:7,22 182:19 223:21 239:2,3,3 241:10 328:21
**submitting** 267:7
**subpoena** 16:19,23,25 17:3,8,23 18:4 18:9,15 20:15 21:18 23:10 184:17
**subpoenaed** 100:13 237:22
**subpoenas** 21:23 238:2,5
**subscribed** 326:18 332:22
**subsection** 155:6,13
**subsequent** 288:23
**subsequently** 132:14 163:15 180:22
**substance** 46:12 51:22 78:9 97:15 98:16 159:19 160:6 174:15 275:19,21,25 281:23
**substantial** 60:16
**substitution** 59:20
**succeed** 89:15
**suck** 163:7
**sudden** 161:9
**suddenly** 97:8 262:20
**sued** 31:15 33:13 43:17 44:4 87:6 90:19 99:6 205:18 279:16
**suffolk** 16:6
**suggesting** 138:14
**suite** 3:15 4:12 55:14,16,24
**sum** 46:12 51:22 78:9 98:16 159:18 160:6 174:15 275:19,21,24 281:23
**summaries** 218:24
**summarize** 22:19 136:14
**summarizing** 218:22
**summary** 74:13 293:15
**summation** 58:4
**summer** 132:20
**summons** 14:9 14:9 32:8

33:21 37:14 38:14,23 71:25 81:5
**sunrise** 1:4,15 1:19 3:10 4:5 4:12 6:12 11:18 47:22 48:2 49:15 55:14,17 64:20 96:9 100:25 101:15 103:7 103:25 104:13 104:15,18 105:5 120:4 122:14 131:22 135:20 140:5 141:9,15 153:10 156:2,5 167:15 171:20 171:23 186:10 186:24 187:9 187:15,17 188:13 211:14 217:24 223:22 225:8,21 226:10 231:12 231:19 233:5 237:10 240:7 240:25 268:14 285:19 286:11 290:19 292:11 292:22 294:6 296:2 301:3,8 301:16,17 302:14 309:18 314:23 328:22
**superb** 1:3 3:5 7:21 45:17 47:22 65:8 78:24 79:2,8 131:22,25 138:20 139:5 139:14 153:12 155:22 156:8 161:14 165:11 167:11,23 168:5 169:25 170:3 172:10 175:12,22 178:5,14 179:25 180:6 180:18 181:8 182:13 183:17 183:22 184:18 185:3,17,21,24 188:12 194:9 194:11 199:14 200:18,23 201:19,22 202:17 203:2 205:9 207:8,11 209:3,7,8 211:9 213:16 214:22 217:16 217:18,23 218:13 219:5 220:9 222:18 222:21 237:11 240:8 241:2 305:20 315:19 322:16 329:13 332:2
**superb's** 155:25 160:19 170:7 216:20
**support** 56:2 299:12
**supporting** 187:7 212:22
**supports** 247:7
**supposed** 136:4 226:16 229:18
**supposedly** 322:12
**supreme** 30:2 33:17 145:23
**sure** 16:3,4 30:12 46:19 56:7 76:24 86:16 89:7,9 96:10 114:20 114:20 117:24 118:14 131:8 136:11 140:14 146:24 157:24 168:10 191:10 191:12 192:3 194:23 199:8 200:2 206:7 210:5 212:13 221:24 223:8 242:7 249:13 270:10 273:6 278:8 279:5 297:16 298:24 306:20
**surfaced** 93:3
**surprise** 195:17
**surprising** 76:5
**suspect** 306:7
**swore** 221:21
**sworn** 5:10 6:3 7:16 11:17 154:7 156:17 218:14,18 222:16 326:5 326:18 329:13 331:11 332:22
**syosset** 1:15 4:5
**system** 126:22
**systems** 236:11 236:12 237:2,5

**t**

**t** 5:2,2 6:2 326:2 327:2 331:2,2
**take** 36:10 52:15 56:10 66:6 125:2 140:12 143:12 147:14 158:2 177:25 179:22 180:10 181:22 184:19 191:25 194:19 244:23

260:14 269:14 273:22 284:7 300:24 317:21 328:17
**taken** 2:4 34:6 34:8 37:21 50:21 57:8,16 71:24 94:11 109:3 110:20 115:4,24 118:11,21 148:8 157:20 160:18 192:6 200:17 214:13 242:16 243:3,4 273:16 282:15 317:18
**takes** 220:6
**talk** 42:23 44:21 96:19 105:24,24 173:5 181:20 245:12 269:10 278:17
**talked** 293:10
**talking** 25:18 28:8 66:18,22 77:4 109:23 120:5 129:17 156:6 174:22 210:22 215:10 220:25 223:25 233:2 237:4 240:5 259:23 261:3,22 278:16 291:18 291:20 292:13 292:17 296:13 299:9 314:7 315:18
**tammy** 4:21
**tapes** 184:10
**tax** 97:14 98:11 98:11 246:20 257:12,12,15 259:5,12 260:3 260:4,9,23 262:17 265:13 266:16,22 267:13 268:13 268:16,23 269:3,6,19 292:13 293:24 309:11,16,24 310:10,20,21 310:23
**taxes** 46:14,16
**team** 1:3 3:5 7:21 237:10 240:8,20
**teens** 49:23
**telephone** 115:24
**telephonically** 23:14
**tell** 8:16 36:4 44:12 48:19 49:19 63:15 107:14 110:23 121:18 148:3 154:25 160:9 190:15 198:24 212:4 216:19 218:20 222:5 232:22 240:11 248:16 255:25 261:18 271:4,5 273:12 274:12 274:14 276:9 276:16 279:9 281:17 285:10 290:14 306:5
**telling** 40:12 276:4 278:13 281:21 290:5
**tells** 128:12 272:17 273:24
**temporary** 135:9,12,17 136:8,20,25 140:9,13 327:14
**ten** 49:12 50:2 99:17 214:4,9
**tenants** 67:15
**term** 189:3 227:21 228:17 231:20
**terminated** 50:15 84:3
**terms** 135:16 225:14,25 226:22 227:2 227:15,15 228:9
**terribly** 148:16 149:22
**testified** 6:5 14:8 37:22 191:21 213:4 217:8 222:20 243:15 251:24 260:13 269:25 306:17 307:23 322:21
**testify** 9:16 248:2,3,4 326:5
**testifying** 8:5 248:6
**testimony** 8:3 37:25 39:18 40:7 88:19 89:18 118:25 120:17 122:11 125:11 140:18 142:17 181:21 200:20 216:3 247:23 268:12 309:10 314:6 314:20 321:18 322:2 326:6,10 331:13
**text** 116:3,5 208:8 209:12 220:20 323:9

**texting** 217:23 218:11 236:10 329:12
**texts** 219:18,24 220:13
**thank** 36:9 64:2 223:11 269:22 296:5 302:2,19
**theirs** 252:5,9 319:25
**theoretically** 115:23 117:13
**thereabouts** 135:15
**thief** 282:16
**thing** 164:23 257:2 291:5,9 301:24 303:17 305:12
**things** 40:12 60:20 86:17 129:11,21 131:19 135:19 155:21 160:13 163:13 167:17 181:6 196:7 205:20 215:4 231:20 232:5 235:5 247:22 248:2 303:11 305:19,21 322:11
**think** 6:20 8:10 9:19 13:3 20:2 31:13 38:2 40:6 47:6 50:12 54:8 67:15 75:8 83:3 86:9 92:11 94:4 96:14,16,18,21 96:22 99:14 104:7,19,21 106:4 107:4 114:13,21,22 115:17 116:22 117:14,18,19 118:7 120:9 121:12,14,20 122:23 126:10 126:11 128:14 129:16,18,20 129:21,23 130:11,12 132:17 141:16 144:8,9 146:5 146:19 150:17 153:10 157:2 159:18 166:24 167:5 176:10 177:19,20 178:11 179:18 180:23 181:12 190:19 193:10 195:17 196:12 197:19 201:4 203:16,17 205:10,11,23 208:19 209:5,9 211:10,12 212:12,15,17 212:19,25 214:11,17,23 215:11 217:22 219:12,15,23 219:24 221:5 222:6 229:22 229:23 230:2,4 232:4 233:12 233:17 234:17 234:21 235:10 236:14 237:20 238:16 239:13 239:19 240:16 241:8,16 242:9 243:4,13 244:2 246:9 249:25 251:8,21 252:11 256:3 257:6 258:24 259:9 261:12 261:20 266:14 266:19,23 267:3,9,10 270:14,17,19 271:3 281:12 281:14 284:13 284:18,25 285:2,15 290:18 291:21 291:24 294:5 294:19 299:6 307:16 315:15 316:9,11,16 318:21 322:3,4 324:14
**thinking** 144:10
**third** 81:6 100:12 198:17 288:22 300:16 300:20
**thomas** 1:14 96:5,13,14 100:17
**thomasson** 1:13 2:4 4:10 4:11 6:1,10 7:1 7:10 8:1 9:1,23 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,18 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1,13 52:1 53:1,7 54:1 55:1 56:1 57:1

Case 2:23-cv-06188-JMW Document 557-2 Filed 09/04/26 Page 155 of 165 PageID #: 24493



57:23 58:1
59:1 60:1 61:1
62:1 63:1,4
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1,17,20
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1,10 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1,7
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1,11
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1,6,14,19
224:1 225:1
226:1 227:1
228:1 229:1
230:1 231:1
232:1 233:1
234:1 235:1
236:1 237:1
238:1 239:1
240:1 241:1
242:1 243:1
244:1 245:1
246:1 247:1,21
248:1 249:1,3
250:1 251:1
252:1 253:1
254:1,20 255:1
256:1 257:1
258:1 259:1,14
260:1 261:1
262:1 263:1
264:1 265:1
266:1 267:1
268:1 269:1
270:1 271:1
272:1,22 273:1
274:1 275:1
276:1 277:1
278:1,11 279:1
280:1 281:1
282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1,15
298:1 299:1
300:1 301:1
302:1,2 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1,15 327:1
328:1 329:1
330:1 331:1
332:3,21

**thomasson's**
36:18,19 38:18
40:20,21 50:21

50:25 51:7 53:4,10 55:2,5 63:6,10 68:6 68:11 71:9,13 73:25 74:4 77:20,23 80:5 80:10 91:12,19 136:17,22 143:3,4 147:3 147:9 154:11 154:12 164:9 164:14 169:6 169:10 189:9 189:15 197:4,9 198:6,10 202:13,18 206:8,13 213:21,24 254:3,14 264:8 264:12 272:6 272:12 274:22 274:24 286:7 286:12 297:21 297:22 300:7,8 327:2
**thoroughly** 278:7
**thought** 60:2 73:14 97:11 140:16 159:20 159:21 160:17 161:20 162:15 180:19 250:4 277:16 285:6,6 285:8 294:25 305:11,12
**thoughts** 212:22
**thousands** 216:8
**threat** 205:21 208:13 323:8 323:18 324:6 324:13,16,20 324:21,23,25
**threats** 67:10 67:11,20 321:15 322:9 322:13 323:6 323:16,24
**three** 46:21 48:7 56:13,15 68:25 74:15,19 79:20 87:14,14 118:22,24 137:7 165:9,11 166:6,15,19 178:6 181:7,16 199:22 218:3 236:12,13 237:8 249:21 251:7
**threw** 180:16 181:5
**throw** 276:21
**throwing** 185:6
**thursday** 165:3 165:10,23
**tickets** 129:24
**ties** 193:10
**time** 1:24 5:22 6:21 15:19,23 16:14 18:16 24:20 25:19,25 26:8,19,22,25 27:5 28:19 30:13 34:7,23 36:5 43:6 46:3 47:10 48:21 49:13,15 50:2 50:3,4 59:5,19 59:19 64:5,8 64:19 70:13 85:6,11,19 97:10,10 98:3 98:7 99:16,17 101:2,3,4 108:11,15 109:22 110:9 110:15 115:7 119:24 121:13 126:7,17 127:4 127:5 128:21 129:5,13 130:23 131:6 131:21 132:12 134:2 136:12 139:15 140:12 140:14 148:14 152:9 154:3 157:2,12,14 158:3,20,21 161:3 163:7,14 164:2,5 167:8 167:18 168:11 171:7,17 172:6 172:8 175:20 176:4,8 178:23 179:2,10 180:4 184:24 185:7 187:18 189:6 192:23 193:3,8 193:11 194:19 196:2,8 206:6 208:8 227:6 228:3 229:15 230:22,24 231:4 235:11 235:12 238:23 239:21 240:6 250:19 259:4 260:15 266:25 276:22 277:20 282:8,10 286:5 286:18 288:24 302:3,4 303:4 304:17 306:18 306:23 307:24 308:15,23 310:6 312:9,24 314:18 315:18 316:9 319:11 320:13,17 325:7 326:10
**timely** 70:4 217:14 232:24

**times** 21:4,6,7 47:16 56:5 85:4 104:6 105:7 106:5 129:19 163:5 181:7 183:25 230:6 282:21 288:8 305:17 318:22
**title** 75:12 289:17,19
**titled** 136:19 199:22
**today** 6:15,19 7:20 8:3,21 9:20 103:3 118:21 140:19 149:15 186:22 187:21 223:3 231:6,7 253:12 295:21,24 298:25 299:16 300:4,14 320:19,23
**today's** 9:10 10:4,8 11:9 155:19
**together** 43:17 95:13 133:10 133:12
**tokens** 217:23 236:9
**told** 20:24 34:7 39:14 57:19 64:18 67:7,23 90:7 103:13 111:25 112:2,3 113:18 114:8,8 114:10 115:2 148:20 162:14 163:4,12,15 177:10,15 179:7 209:7 219:11 227:2 235:19 246:17 271:7 273:9,10 273:11 280:14 280:19 281:8 281:24 294:21 304:7 307:2 308:17,19 312:19 322:13 323:17 324:8
**tonight** 177:20 274:11 278:3
**tony** 4:19 157:20 176:9 176:15 178:17 185:20 214:24 216:21 219:19 315:18
**took** 34:22,24 42:11 67:19 93:14 111:7 121:24 142:3,4 157:17 167:16 181:14 191:13 230:2 232:23 233:19 244:6,8 246:12 272:2 311:18,25 312:3,13 313:13
**top** 18:21 21:25 53:25 64:3 74:15,18 81:16 86:18 95:21 124:17 147:2 150:2 174:10 204:17,20 206:5 211:17 212:7 216:10 217:3 224:8,10 225:2 226:13 226:17 228:20 230:19 253:19 264:18 284:22
**topic** 17:25
**tortuously** 211:20
**total** 125:20 287:12
**totality** 252:12
**totally** 232:7
**touch** 111:14 111:17
**touched** 201:11
**track** 130:23 131:5
**trade** 209:20
**transaction** 62:17 90:9 187:4 233:19 233:21,22,23 235:17 236:21 237:12,15,25 239:4 241:7 248:13 283:9 283:11 291:12 291:22 293:18 293:19 294:13
**transactional** 291:19
**transactions** 236:24 237:19 238:11,19,20
**transcript** 154:18 326:9,9
**transfer** 116:19 117:5 127:5 186:9 187:22 291:24 296:23 300:25
**transferred** 187:8
**transferring** 186:23 296:9
**tremendous** 224:15
**trial** 5:22 7:15 52:12 88:8,20 89:4,10 122:25 123:4
**tried** 37:7 236:25 237:24 238:12

**tries** 7:4,6
**tro** 138:8 139:7 139:15 302:23 304:13 307:4 308:2,7
**trouble** 257:15
**true** 108:17 122:20 141:23 162:2,9 175:11 194:14 195:13 198:25 209:9 236:6 276:16 276:19 313:12 326:9 331:12
**truth** 326:5
**truthful** 9:11 9:19 208:11
**truthfully** 9:16
**try** 34:3,13,23 35:19 136:14
**trying** 70:23 100:7 259:24 283:25 304:4 306:9,24 317:22,24
**turn** 321:4
**turned** 195:16
**turns** 163:6 195:15 203:18
**twice** 104:2,20
**two** 8:13 20:2 21:4,6 24:3,16 24:24 34:20 42:11 64:3 66:4,7,8,13,19 67:13,19 68:20 69:11 74:14 76:7 77:18 81:3 82:9,19 83:15,21,25 86:16 89:4 106:2,20 112:24 121:25 122:4 126:2 129:21 147:18 153:10,11 155:13 165:2,8 168:12 169:3 169:19 177:6 178:6 180:13 181:7,16 193:5 224:3 231:9 232:5 244:7,13 244:14 245:2 251:8 253:16 260:15 262:18 266:23 294:4 298:21 330:5
**type** 86:15 150:15
**typed** 127:11
**typical** 88:15 180:17
**typically** 73:2 119:7

**u**

**u** 5:2
**ucc** 100:24 101:14,23 102:2,7 303:18 303:21,24 304:5,19 328:21
**udayaan** 30:25 31:5,8,18,21 68:23 69:4,6
**uea** 1:17
**ultimately** 20:8 35:9 53:21
**um** 35:14 41:12 323:19
**un** 183:8 329:8
**unanimous** 249:11
**unauthorized** 78:18
**unaware** 239:10
**unbeknownst** 178:23
**uncover** 94:8
**undecided** 59:15
**under** 130:5,9 135:16 136:8 175:5 179:15 218:14 279:20 287:6 293:5 297:18 329:14
**undersigned** 255:2 264:23
**understand** 7:25 8:6,7,15 8:19 9:4,5,6 11:10 14:13 22:21 26:14 34:24 37:9 44:8,11,16 60:4 61:14 97:7 152:8 176:20 184:3 185:4 201:7 222:3 237:2 250:13,14 258:3 265:22 266:11 270:22 277:12 280:18 295:7 311:7 315:7
**understanding** 42:14 45:22 107:23 157:25 176:4 201:15 232:14 234:23 262:12 271:23 275:18 290:6 301:14 302:7 302:11 303:23 311:2,20 312:2
**understands** 292:25

**understood** 8:18 13:7 40:7 42:13 64:17 97:9 98:10 125:11 162:20 262:14 273:19 280:11,12 321:19 323:10 324:12
**undertake** 162:5
**unethical** 54:5 54:7
**uniondale** 2:9 4:16
**united** 1:2 19:4 20:21 195:22 328:14
**unpaid** 74:22
**unravel** 257:10
**unraveled** 257:11
**unshakable** 257:20
**unsigned** 5:14 291:6 293:17
**unsure** 35:6
**untruthful** 208:11
**upcoming** 124:15
**urgency** 149:20
**urrutia** 1:4 3:5 4:19 7:22 65:2 132:5 157:20 159:2 160:21 161:12,18,21 162:8 163:10 163:16,18 167:23 169:20 169:25 176:10 176:15 178:17 178:20 182:8 184:10 185:20 186:10,19,25 187:9 191:3 192:9,13,25 193:7 194:18 195:8,21 196:11,21 199:13 202:16 203:16,18 205:9,18 206:2 206:23,24,25 207:4,12,24 208:6,15,22,22 210:10,19,25 211:19 212:10 214:25 216:14 216:21 219:10 219:19,24 220:6 221:13 221:21 241:2 315:18 317:6 321:24 322:8 322:22 323:13 323:22
**urrutia's** 131:24,25 159:4 187:16 192:19 198:23
**use** 39:10 117:7 126:21,25 276:22
**used** 5:14 88:17 153:14 255:17 267:22 276:24
**using** 78:15 181:4 308:17
**usual** 7:12
**usually** 171:22
**utilize** 100:16
**utilizing** 181:16

**v**

**v** 207:16 332:2
**vacated** 140:15
**vaguely** 23:17 23:21
**valid** 92:8 94:21 238:15 251:4
**value** 180:23 180:24
**various** 56:4 223:20
**vehicle** 46:14 185:16 202:7 202:25 204:5,6 204:12,14,23 204:25 205:12 209:19,25,25
**vehicles** 27:22 106:13,18 107:7,10 108:2 135:21 138:19 139:5,14 155:21,24 156:7,19,23 157:23 171:13 183:18,21 184:16 185:2,8 185:21,22,25 198:18,22 200:8,17,17 201:21 202:9,9 203:6,10,14,19 203:22 204:4,8 204:17 205:3,8 205:16 301:4,7
**ventimiglia** 25:13,16,21,23 26:4,5,9,12,17 26:23,25 27:6 27:7,10,15 99:7 105:14
**verbal** 58:22 67:20
**verbally** 114:21 215:4
**verge** 194:12
**veritext** 332:1
**versa** 26:24
**versus** 107:11 114:25 202:9

**vice** 26:23
**vicinity** 107:12 132:9 315:6
**view** 232:22 291:19 293:19
**viewed** 317:7
**viewpoint** 97:25
**violate** 25:2 301:12,22 307:15 308:2,6
**violated** 121:7 138:2,7 307:12 308:13
**violating** 307:4
**violation** 139:7 139:18,23 140:8,20 301:8 301:18 302:12 302:17 307:19 307:21
**violations** 138:14
**violative** 229:9 256:4
**visit** 103:19,24 104:7
**visited** 64:12 64:20 158:7 329:6
**visits** 104:3
**visually** 105:21
**vo** 286:6,13 328:5
**volume** 224:14
**voting** 249:15

**w**

**w** 51:4
**waiting** 247:14 280:9
**waived** 5:9 7:14
**waiving** 159:16
**walk** 71:21 106:22
**walked** 44:20
**walking** 284:9
**wander** 203:15
**wanna** 8:13 19:18 22:8 38:13 49:11 63:15 113:23 114:23 164:20 179:6 222:11 223:6 236:9 241:5 250:12 276:13 277:19 277:20
**want** 8:25 22:19 36:23 56:14 74:20 114:4 179:11 214:15 220:7 223:2 250:15 269:13,14 271:8 275:8 287:23 304:10 304:12 318:12
**wantagh** 4:12 6:13
**wanted** 20:9 42:5,23 83:14 83:18 85:23 86:13 111:25 114:2 115:12 115:15 157:7 157:24 159:25 160:16 194:11 204:6 229:19 235:18 237:19 270:15,19,25 271:14 281:6 304:8 306:8 307:24 308:5,8
**warranty** 78:14 78:17 79:11 108:9 292:4,6
**watchdog** 242:6,10
**watched** 242:14
**watching** 242:10
**water** 315:12
**waving** 106:4
**way** 27:20 44:10 56:6 86:14 89:25 90:8 94:3 99:15,24 105:11 107:9 108:6 111:20 112:12,14 117:19 133:16 136:11 139:22 144:4 158:24 162:11 166:12 168:24 175:20 177:17 178:12 180:9 185:23 202:8 216:19 217:25 218:24 270:23 273:8 290:4 303:12 305:5,7 317:6 331:17
**ways** 238:18 263:7
**we've** 118:21 147:6 164:6 204:7
**web** 117:8
**wednesday** 298:19
**week** 129:10 132:8 298:20 315:4 316:7 319:18
**weekly** 132:16 132:21 313:19 315:3 318:25 319:5,6,10
**weeks** 34:16 109:13 111:2 169:19 178:6

180:14
**wei** 75:13,20
**weir** 3:18
**welfare** 24:24 330:5
**wendy** 298:3 298:10
**went** 50:12 62:20 88:8,20 104:25 112:13 117:3,16 143:22 149:6,9 157:3 159:11 173:10,14 180:16 181:6 191:16 195:4 293:9 311:22
**west** 180:3
**westbury** 75:2
**whatever's** 36:7
**whatsoever** 62:22 201:25 231:14 303:5 305:23
**whereof** 331:19
**white** 205:13
**whoever's** 173:6
**wicks** 77:5,11 154:21 184:15
**wife** 14:20 43:8 43:12 255:12
**wilder** 82:8
**willing** 24:5
**wire** 28:24 115:13 116:18 117:4,15,21 118:4 119:5,11 119:11 123:15 123:17,20 272:23,25 275:14,22 276:11,18 277:10 278:3 279:11 280:22 280:23
**wired** 115:15 123:21 274:18
**wires** 116:21 117:9 119:22
**wiring** 115:13 116:15 119:8 274:10
**wishes** 26:18
**withdraw** 35:8 53:22 54:4 195:19 239:4
**withdrawals** 303:15
**withdrawing** 35:12 38:3 195:24
**withdrawn** 33:23 34:2 37:12,23 39:19 39:21 41:13
178:9
**withdrew** 196:14
**withheld** 239:2
**witness** 5:10,16 5:18 6:3 41:4 50:24 53:8 72:22 89:12 155:15 223:11 252:24 325:13 331:10,13,19
**witness's** 200:5
**witnesses** 63:22
**witnesses'** 332:3
**woman** 19:8 100:3 106:6 161:18
**word** 58:4,5 63:25 109:5 127:9,10,12 159:18 173:19 196:4 234:24 242:24 277:16 284:7 295:8 317:21
**words** 113:18 163:25 247:20
**work** 15:12,17 15:21,25 17:20 81:22,24 82:10 82:12 83:18 85:10 86:14 88:16 94:23
123:9,10 126:14 129:20 130:24 131:7 133:10 212:24 222:21 249:7,8 314:14,22 315:10 316:4 320:2
**worked** 25:23 27:9 56:6 70:9 81:23,25 82:4 82:7,15,20 83:16,22 84:7 84:21,22 107:12 133:12 209:2 222:17 241:15
**working** 24:21 31:5 48:21,23 83:25 181:8 315:24
**works** 31:3 69:5
**would've** 83:10 121:17 143:18 175:22
**wound** 161:8
**write** 127:8 214:18
**writes** 274:3
**writing** 20:23 37:8 56:9 58:24 62:7 75:19 101:8,14

101:18 114:22 115:20 118:6 130:20 158:11 183:10 215:5 218:15 219:9 219:21 224:24 229:4 292:8,10 292:13 299:25 303:15 328:21
**writings** 114:24 219:14,14,16
**written** 118:3 130:6,13 153:24 154:3 214:12 224:4 225:11 249:11 325:3,4,4 328:24
**wrong** 176:18 207:8,11 209:12 222:9 241:6 242:7 257:3 262:4,6 262:8 263:14 279:19 280:2 281:9 317:3
**wrongdoing** 159:20 176:22 221:18,19 222:7 238:21 256:22 279:24
**wrote** 52:10 59:16 64:8 142:9 165:9 306:19 323:20

**x**

**x** 1:3,21 327:2 328:8

**y**

**y** 6:2
**yeah** 31:14 32:24 43:16,20 43:22 72:17 117:6 126:10 126:20 132:18 156:20 200:6,7 200:14,15 219:14 238:9 250:14 277:24 285:21 287:19 289:21 290:9 321:2,11,14
**year** 16:3 77:7 83:6 88:23 117:16 132:17 132:23 209:16 210:6 229:3 231:9 320:7
**years** 8:23 26:2 46:21 50:2 53:25 76:7 86:19 87:14 96:17 99:17,19 100:8 126:2 168:13 169:3 193:5 201:8 205:15 226:7 227:12 242:14 244:7,14,14 245:2 249:21 262:18 268:15 277:4 312:20 318:20 320:14
**yep** 200:8 276:2 324:4
**york** 1:2 2:9,11 3:6,15,15 4:8,8 4:12,16 6:4,13 27:21 48:23 83:9 84:7 130:5 179:15 179:17,20 241:10 252:16 252:19 331:3,4 331:8 332:1
**young** 14:25 31:2 69:4,11 324:2

**z**

**z** 248:17
**zero** 281:4
**zizmor** 3:9 223:16
**zolonez** 82:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.