UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

ANTHONY DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC,

Defendants.

---------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY <u>JUDGMENT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

FACTS ..... 5

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

A. Count One — All Plaintiffs' Claim Under 18 U.S.C. § 1962(c) ..... 6

a. Enterprise ..... 7

b. Participation in the Conduct of the Enterprise ..... 12

c. Pattern of Racketeering Activity ..... 16

d. Mail and Wire Fraud Predicates ..... 20

e. RICO Injury and Causation ..... 26

B. Count Three - All Plaintiffs' § 1962(d) Conspiracy Claim ..... 28

C. Count Two - Superb Plaintiffs' Claim Under § 1962(a) ..... 30

D. Count Four - Superb Plaintiffs' § 1962(d) Conspiracy to Violate § 1962(a) ..... 35

E. Count Five — Superb's Request for Equitable Relief Under § 1964(a) ..... 36

F. Counts 14, 18, and 28 - Breach of Duty of Loyalty / Faithless Servant ..... 39

G. Counts 15, 19, and 27 - Breach of Fiduciary Duty ..... 45

H. Counts 26 and 9 - Fraud Claims ..... 47

I. Counts 7, 12, and 20 - Conversion Claims ..... 53

CONCLUSION ..... 55

# Table of Authorities

## Cases


Adamson v. Miller,
808 Fed. Appx. 14 (2d Cir. 2020) .......... 6

Alkhatib v. N.Y. Motor Grp. LLC,
No. 13-CV-2337, 2015 WL 3507340 (E.D.N.Y. June 3, 2015) .......... 6

Ambac Assurance Corp. v. Countrywide Home Loans, Inc.,
31 N.Y.3d 569 (2018) .......... 48

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 5

Boyle v. United States,
556 U.S. 938 (2009) .......... 7

Calderon v. Mullarkey Realty, LLC,
No. 14-CIV.-2616, 2018 WL 2871834 (E.D.N.Y. June 10, 2018) .......... 39

Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,
4 N.Y.2d 403 (1958) .......... 48

Chevron Corp. v. Donziger,
833 F.3d 74 (2d Cir. 2016) .......... 37

Chevron Corp. v. Donziger,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) .......... 38

City of Binghamton v. Whalen,
141 A.D.3d 145 (3d Dept. 2016) .......... 40, 41

City of New York v. Gordon,
155 F. Supp. 3d 411, 427 (S.D.N.Y. 2015) .......... 7, 11, 12, 16, 20, 31

Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
187 F.3d 229 (2d Cir. 1999) .......... 28, 35

DDJ Mgmt., LLC v. Rhone Grp. L.L.C.,
15 N.Y.3d 147 (2010) .......... 48

EBC I, Inc. v. Goldman, Sachs & Co.,
5 N.Y.3d 11 (2005) .......... 46

Empire Merchants, LLC v. Reliable Churchill LLLP,
902 F.3d 132 (2d Cir. 2018) .......... 20

Feiger v. Iral Jewelry, Ltd.,

41 N.Y.2d 928 (1977) ........................................ 41

Grasshoff v. Etra,
135 A.D.3d 574 (1st Dept. 2016) ........................................ 54

H.J. Inc. v. Northwestern Bell Tel. Co.,
492 U.S. 229 (1989) ........................................ 16, 19, 39

Hakim v. Deo,
Nassau Cnty. Index No. 624451/2025 ........................................ 18, 32

Holmes v. Sec. Inv. Prot. Corp.,
503 U.S. 258 (1992) ........................................ 26

Ideal Steel Supply Corp. v. Anza,
373 F.3d 251 (2d Cir. 2004) ........................................ 31, 34

Ideal Steel Supply Corp. v. Anza,
547 U.S. 451 (2006) ........................................ 31

Ideal Steel Supply Corp. v. Anza,
652 F.3d 310 (2d Cir. 2011) ........................................ 31

Jeffreys v. City of N.Y.,
426 F.3d 549 (2d Cir. 2005) ........................................ 6

Lama Holding Co. v. Smith Barney Inc.,
88 N.Y.2d 413 (1996) ........................................ 48

Lamdin v. Broadway Surface Adv. Corp.,
272 N.Y. 133 (1936) ........................................ 41

LoPresti v. Terwilliger,
126 F.3d 34 (2d Cir. 1997) ........................................ 53

Marmelstein v. Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue,
11 N.Y.3d 15 (2008) ........................................ 46

MetLife Invs. USA Ins. Co. v. Zeidman,
734 F. Supp. 2d 304 (E.D.N.Y. 2010) ........................................ 48

N.Y.C. Transit Auth. v. Morris J. Eisen, P.C.,
276 A.D.2d 78 (1st Dept. 2000) ........................................ 48

Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,
875 F.3d 107 (2d Cir. 2017) ........................................ 6

Northeast Gen. Corp. v. Wellington Adv.,
82 N.Y.2d 158 (1993) ........................................ 46

Ouaknine v. MacFarlane,

897 F.2d 75 (2d Cir. 1990) ........ 31, 34

Owen v. Hurlbut,
80 Misc. 3d 1234(A) (Sup. Ct. Monroe Cnty. 2023) ........ 40

Pasternack v. Lab. Corp. of Am. Holdings,
27 N.Y.3d 817 (2016) ........ 48

Phansalkar v. Andersen Weinroth & Co.,
344 F.3d 184 (2d Cir. 2003) ........ 39, 41

Reves v. Ernst & Young,
507 U.S. 170 (1993) ........ 12

Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alimentari S.p.A.,
638 Fed. Appx. 87 (2d Cir. 2016) ........ 46

Salinas v. United States,
522 U.S. 52 (1997) ........ 14, 28, 35

Spool v. World Child Int'l Adoption Agency,
520 F.3d 178 (2d Cir. 2008) ........ 16

Stein v. County of Nassau,
417 F. Supp. 3d 191 (E.D.N.Y. 2019) ........ 6

United States v. Carboni,
204 F.3d 39 (2d Cir. 2000) ........ 20

United States v. Deo,
No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016) ........ 4, 11, 20, 24, 39

United States v. Laurie,
No. 3:18-cr-521 (BRM) (D.N.J. Feb. 19, 2019) ........ 4, 11, 14

United States v. Viola,
35 F.3d 37 (2d Cir. 1994) ........ 12
Western Electric Co. v. Brenner,
41 N.Y.2d 291 (1977) ........ 41

William Floyd Union Free Sch. Dist. v. Wright,
61 A.D.3d 856 (2d Dept. 2009) ........ 40

**Statutes**

18 U.S.C. § 215 ........ 14

18 U.S.C. § 1343 ........ 11, 20

18 U.S.C. § 1344 ........ 20

18 U.S.C. § 1349 ... 16, 20

18 U.S.C. § 1961 ... 7, 16, 20

18 U.S.C. § 1962 ... 4, 6, 7, 28, 30, 35

18 U.S.C. § 1964 ... 7, 26, 37

12 C.F.R. § 210.25 ... 15

**Rules**

Fed. R. Civ. P. 56 ... 1, 5, 6, 55

Fed. R. Evid. 201 ... 15

Fed. R. Evid. 404 ... 4, 11, 20, 24

Fed. R. Evid. 801 ... 19, 38

**Other Authorities**

Cherrywood Auto Sales,
Nassau Cnty. Index No. 616451/2025 ... 18, 38

Urrutia v. Gold Coast Motors of Syosset LLC,
Nassau Cnty. Index No. 611909/2025 ... 38

Restatement (Second) of Torts § 874,
cmt. a ... 46

Federal Reserve Regulation J,
12 C.F.R. § 210.25 et seq. ... 15

## PRELIMINARY STATEMENT

Plaintiffs Superb Motors Inc. ("Superb"), Team Auto Sales LLC ("Team"), and Robert Anthony Urrutia ("Urrutia") (collectively the "Superb Plaintiffs"), together with 189 Sunrise Hwy Auto LLC ("Sunrise"), Northshore Motor Leasing, LLC ("Northshore"), Brian Chabrier ("Chabrier"), Joshua Aaronson ("Aaronson"), Jory Baron ("Baron"), Asad Khan ("Khan"), Iris Baron as Representative of the Estate of David Baron (the "Estate"), 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC, and Island Auto Management, LLC (collectively the "IAG Plaintiffs," and with the Superb Plaintiffs, "Plaintiffs"), respectfully submit this combined memorandum of law in support of their motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or the "Rule") against Defendants Anthony Deo ("Deo"), Sarah Deo ("Sara"), Harry Thomasson ("Thomasson"), Dwight Blankenship ("Blankenship"), Marc Merckling ("Merckling"), Michael Laurie ("Laurie"), Car Buyers NYC Inc. ("Car Buyers"), Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC (the "Gold Coast" dealerships), and UEA Premier Motors Corp. ("UEA") (collectively the "Deo Defendants").

Plaintiffs seek judgment on the RICO claims in Counts One through Five, and on the New York claims for breach of the duty of loyalty and faithless-servant liability (Counts 14, 18, and 28), breach of fiduciary duty (Counts 15, 19, and 27), fraud (Counts 9 and 26), and conversion (Counts 7, 12, and 20). The record does not describe a manager who made bookkeeping errors, or a lawyer who misunderstood an escrow instruction, nor a spouse who signed papers she did not read. It describes a Deo-centered association-in-fact that treated other people's dealerships as a credit facility, a title mill, and a cash drawer.

The method was stable across entities and years. Deo asserted whatever ownership percentage the counterparty needed at the time. Thomas Jones, CPA ("Jones") at Deo's direction, dressed those assertions in monthly adjustments, K-1s, compilation reports, and lender-facing profit figures. Sara built and administered the entities and accounts that made the paper look institutional. Merckling ran the lot, the cash, the titles, and – on Libertas' agreement – signed as "Owner." Thomasson supplied the attorney IOLA account that turned a disputed $735,000.00 merchant-funding payment into $723,000.00 at Car Buyers and a $12,000.00 fee for himself. Laurie opened the door to Flushing to obtain a $500,000.00 loan and a separate bank account for Superb through which funds can be siphoned from Superb to Car Buyers. The same people working at Northshore then took the resulting position inside Superb and used Superb's accounts, vehicles, employees, and customers to stand up Gold Coast. SMF ¶¶ 127-35, 237-63, 633-80, 755, 758-60, 800-60, 845-49, 951-60, 991-93, 1016-60; ECF 410-2; ECF 410-3; ECF 520-1.

That is not a theory. It is the path of specifically identified money. In November 2022, Libertas funded approximately $735,000.00 against Northshore's future receipts. Deo had no authority to engage in that transaction. Shanks wrote that the funds were to be wired to Thomasson "to hold in escrow." Thomasson did not reject the restriction before he sent wiring instructions. He rejected it after the wire was in motion, took in $735,000.00 through his IOLA account, sent approximately $723,000.00 to Deo's company Car Buyers, and kept approximately $12,000.00. Car Buyers then wired $500,000.00 toward Deo's promised "investment" in Superb—the transaction that put Deo inside Superb's management, accounts, and floor. Northshore received no operational benefit and remained exposed on the Libertas loan. SMF ¶¶ 237-63, 341, 954-58; ECF 410-1; ECF 410-2; ECF 410-3; Thomasson Dep. 113:10-115:18, 123:15-124:17, 270:7-10, 274:8-19. Sara later admitted the Libertas money was used "at least in part to purchase an interest in Superb." Sara Dep. 203:4-204:12.

Justice Murphy later rescinded the Cross-Purchase Agreement for Deo's fraud and held that Deo has no ownership interest in Superb.

The Flushing file is the same scheme with a different letterhead. In March 2023 Deo caused to be submitted a Statement of Financial Condition dated March 1, 2023, compiled by Jones from figures Deo supplied, with no deeds, no mortgages, no bank statements, and a personal financial statement Jones conceded meant the firm did "not stand behind this document at all." Jones Dep. 145:4-19, 316:14-316:20; SMF ¶¶ 288-89, 849; ECF 204-2. Deo testified that he furnished the information, that he knew it was accurate, and that he gave it to Flushing so Flushing would approve a $500,000.00 facility. Deo II Dep. 65:20-66:2, 67:24-68:10. The statement reported $12,966,000.00 in assets and $9,175,000.00 in net worth. It listed Superb nowhere. It did list a Bronx residence at 3011 Matthews Avenue worth $1,280,000.00 with a $479,000.00 mortgage, and an Old Westbury residence at 3 Hunting Lane worth $5,295,000.00 with a $2,250,000.00 mortgage. ECF 204-2; SMF ¶¶ 290, 294. But Deo admitted he owned neither house and owed neither mortgage.

The books were run the same way. From at least August 2021 through October 2022, Deo and Jones selected monthly adjustments and Jones directed them into the dealerships' DMS. The entries made the stores look profitable when they were not. Jones also later prepared, on Deo's "absolute must" profit instruction, a Superb P&L that lifted revenue from approximately $9.4 million to $13.4 million and admitted the numbers "were not the true numbers." SMF ¶¶ 127-35, 991-93; Jones Dep. 299:19-316:16; O'Sullivan Dep. 105:6-113:6. Plaintiffs do not seek judgment on this motion against the dismissed CPA defendants. They cite Jones because his testimony is a party-opponent window into how Deo ran the enterprise: invent the number, wrap it in a professional work product, transmit it to the lender. Jones was Deo's agent through which his fraud funneled through and seeped out at every dealership Deo touched.

Each remaining defendant supplied a discrete function that the scheme required and that an outsider could not have performed. Sara organized Northshore after UEA's licenses were revoked, opened its Chase account, signed as CEO and personal guarantor on ownership and assignment papers representing that she and Deo owned 100%, kept an office, and testified that when necessary she would "oversee everything from service to accounting." Sara Dep. 68:3-18, 83:13-86:22, 145:5-151:4; SMF ¶¶ 800-05, 827-28, 857-60. Merckling ran Monday sales meetings, cash, the safe, inventory, floor-plan audits, and title release; transported vehicles later held under this Court's injunction; and appears in Libertas's authenticated audit trail as the electronic "Owner" signer for both Northshore and Sunrise. ECF 520-1 at 16, 18; SMF ¶¶ 758-60, 832-41, 875, 951-52. Blankenship was Superb's salaried operations manager, made cash deposits, and drove Superb vehicles to the July 2023 Gold Coast Syosset event. SMF ¶¶ 677, 760; Blankenship Dep. 100:13-102:3. Thomasson decided whether $735,000.00 would be preserved for Northshore or delivered to Deo, and he delivered it. Laurie introduced Deo to Flushing officer Puccio after Laurie's own federal conviction for bank bribery. United States v. Laurie, No. 3:18-cr-521 (BRM) (D.N.J. Feb. 19, 2019). Deo directed all of it. He had already pled guilty to conspiracy to commit wire fraud and wire fraud. United States v. Deo, No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016). That conviction is not atmosphere. It is Rule 404(b) proof that he knew false ownership and false asset representations, sent by wire, are how one obtains other people's money. The harm is not derivative and it is not a battle of inferences. Northshore lost the $735,000.00 stream and the credit and lien consequences that followed. Superb lost the exclusive use of its account authority, vehicles, employees, CRM, and goodwill when those assets were redeployed through Flushing and Gold Coast. The investment injury under § 1962(a) is the distinct next step: racketeering proceeds moved IOLA to Car Buyers to Superb, and that position is what made the later looting possible. SMF ¶¶ 257-63, 633-80, 951-52, 1016-41.

The same pattern is now alleged concerning the next stores in line. Continuity is not a forecast; it is how this enterprise functions to profit from repeated and unabated fraud.

The legal labels—§ 1962(c), § 1962(a), § 1962(d), § 1964(a), fraud, conversion, fiduciary breach, faithless servant—follow from those acts. They do not precede them. On this record, no reasonable jury is required to decide whether Deo committed fraud. All the facts are admitted, documented, or both. What remains is the application of settled law to a closed evidentiary file. Plaintiffs respectfully request that the Court grant summary judgment on the claims identified above and, if any discrete issue of intent, tracing, or damages is reserved, that the Court treat the undisputed component facts as established under Rule 56(g).

## FACTS

The Court is respectfully referred to the Plaintiffs' Rule 56.1 Statement of Material Facts, supplemented with citations, as well as the Declarations of Aaronson, Chabrier, Kwun, Urrutia, and non-party Bruce Novicky ("Novicky"), Emanuel Kataev, Esq., Jeffrey C. Ruderman, Esq., and Russel J. Shanks, Esq. as well as the Supplemental Declaration of Urrutia for a recitation of the facts.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

A factual dispute is "genuine" only where the evidence would permit a reasonable jury to return a verdict for the nonmoving party, and a fact is "material" only where it could affect the outcome under the governing substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the Court considers the record as a whole and draws all permissible factual inferences in favor of the nonmovant. Id. at 255.

A fact is material for the purposes of resolving a summary judgment motion "when it might affect the outcome of the suit under the governing law." See Adamson v. Miller, 808 Fed. Appx. 14, 16 (2d Cir. 2020). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Jeffreys v. City of N.Y., 426 F.3d. 549, 553 (2d Cir. 2005)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" See Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017). Once the moving party has met its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" and instead must offer "some hard evidence showing that its version of the events is not wholly fanciful." See Stein v. County of Nassau, 417 F. Supp. 3d 191, 197 (E.D.N.Y. 2019) (citations omitted). Here, the Deo Defendants can adduce no such evidence. Critically, Rule 56 does not require direct, "100%," confession, or bullet-proof evidence; the Rules expressly permits the Court to infer facts from evidence such as depositions, documents, electronically stored information, declarations, admissions, interrogatory answers, and other record materials. See Fed. R. Civ. P. 56(c)(1)(A).

## ARGUMENT

### A. Count One — All Plaintiffs' Claim Under 18 U.S.C. § 1962(c)

It is unlawful for a "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c). As this Court explained in its March 21, 2025 Opinion and Order, a defendant may be liable under RICO where, through two or more acts constituting a pattern of racketeering activity, the defendant directly or indirectly participated in the affairs of an enterprise involved in interstate commerce. See ECF 230 at 24-25 (citing Alkhatib v. N.Y. Motor Grp. LLC, 2015 WL 3507340, at *8 (E.D.N.Y. June 3, 2015)).

Accordingly, Plaintiffs must establish: (1) the existence of an enterprise affecting interstate or foreign commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs; (4) through a pattern of racketeering activity; and (5) injury to Plaintiffs' business or property proximately caused by the RICO violation. See 18 U.S.C. §§ 1962(c), 1964(c).

Courts in this Circuit have granted summary judgment on § 1962(c) claims on a comparable record of coordinated, multi-actor misconduct producing a direct property injury. See City of N.Y. v. Gordon, 155 F. Supp. 3d 411, 427 (S.D.N.Y. 2015) (granting summary judgment on a civil RICO claim where the defendant participated in an association-in-fact that used interstate transportation and related commercial channels to move property and inflict a direct business-or-property injury). For the reasons set forth herein, this Court should similarly grant summary judgment on Plaintiffs' RICO claim.

**a. Enterprise**

A RICO "enterprise" includes an association-in-fact. See 18 U.S.C. § 1961(4). As this Court has already held, that association must have a common purpose, relationships among those associated with it, and longevity sufficient to pursue the purpose. See ECF 230 at 25 (citing Boyle v. United States, 556 U.S. 938, 946 (2009)). Hierarchy, bylaws, and regular meetings are not required; and critically, an informal group qualifies when its members function as a continuing unit. Id. at 946-48; see also Gordon, 155 F. Supp. 3d at 427.

The Deo Defendants constituted and participated in that enterprise.

**Common purpose.** The purpose was not to run a dealership. It was to obtain and keep other people's credit, cash, vehicles, customers, titles, and ownership authority, and to park the proceeds in Deo-controlled entities.

Every major episode served that purpose: monthly books inflated for Ally; Northshore's future receipts sold to Libertas without member authority; $735,000.00 moved through Thomasson's IOLA to Car Buyers; a $500,000.00 "investment" used to enter Superb; a personal financial statement given to Flushing that invented houses and mortgages Deo did not own; a 100% Superb ownership certification to the same bank weeks later; and Superb's accounts, cars, and people redeployed through Gold Coast. SMF ¶¶ 127-35, 237-63, 288-95, 633-80, 951-60, 991-93, 1016-60.

**Relationships.** The same people performed complementary functions across Universal Exotic Autos, UEA, Northshore, Sunrise, Superb, Car Buyers, and Gold Coast. Deo directed and took the benefit. Sara built the entities and accounts. Jones, at Deo's direction, supplied the lender-facing numbers and ownership paper. Merckling ran cash, inventory, titles, and signed Libertas's Agreement as "Owner." Thomasson supplied the IOLA conduit and the letter Flushing wanted, and knowingly represents Deo and his entities to stave off those aggrieved by his fraud. Laurie opened the Flushing door. Blankenship moved cash and Superb vehicles as an operations manager. SMF ¶¶ 127-35, 237-63, 733-60, 800-60, 845-49, 951-60, 991-93, 1037-60; ECF 410-2; ECF 410-3; ECF 520-1. That is an association, not parallel coincidence.

**Longevity.** The unit ran from the August 2021 monthly adjustments through the November 2022 Libertas funding, the March–April 2023 Flushing facility and Superb account, and the summer 2023 Gold Coast event and vehicle movements. The method did not change when the store name did. See Boyle, 556 U.S. at 946-48. And the unit continues to this day. Sara was not a spouse standing offstage. She organized Northshore after UEA's licenses were revoked, opened its Chase account, added Deo to it, kept an office, worked across the stores, and testified that when necessary she would "oversee everything from service to accounting." Sara Dep. 68:3-18, 83:13-86:22, 121:16-21, 145:5-151:4, 275:1-276:23; SMF ¶¶ 800-05, 827-28, 857-60.

In 2018 she signed UEA papers as CEO and a UEA-to-Northshore assignment as CEO of both entities and as personal guarantor, representing that she and Deo owned 100%. ECF 30-2 at 16, 54, 63-66.[1] She later admitted the Libertas money was used "at least in part to purchase an interest in Superb." Sara Dep. 203:4-204:12.

Jones was the accounting node. From at least August 2021 through October 2022 at Northshore and Sunrise, he and Deo selected monthly adjustments and Jones had O'Sullivan, an IAG controller, enter them in the DMS. The entries made the stores look about profitable when they were not. SMF ¶¶ 127-31, 991; Jones Dep. 23:3-25, 25:6-14, 26:4-20, 132:4-133:8; O'Sullivan Dep. 105:6-113:6. Jones also packed information for Libertas. He worked with Deo and Thomasson on ownership paper for Flushing. He compiled Deo's March 1, 2023 Statement of Financial Condition from Deo's figures, with no deeds, mortgages, or bank statements, under a legend Jones conceded meant the firm did "not stand behind this document at all." Jones Dep. 145:4-19, 316:14-316:20; SMF ¶¶ 288-89, 845-49, 1059-60; ECF 204-2. That statement listed a Bronx house at 3011 Matthews Avenue ($1,280,000.00 asset / $479,000.00 mortgage) and an Old Westbury house at 3 Hunting Lane ($5,295,000.00 / $2,250,000.00). Deo then admitted he was on neither deed and neither mortgage. SMF ¶¶ 290-95; Deo II Dep. 73:10-83:4; ECF 437 Ex. P. Jones knew Deo "was not an owner" of Superb when first engaged, then prepared documents and returns treating him as one based on email. Jones Dep. 299:19-316:16. He was named to Deo's "forensic team" in the March 21, 2023 demand for Superb's books. SMF ¶ 845.

---

[1] As another example, the ownership record for Northshore changed with the Deo's desire to obtain financing from banks. The Northshore and Sunrise operating agreements dated in 2020 and 2021 listed Deo at 99% and Sarah at 1%, while another Northshore version identifies Deo as 100% owner. Deo testified that he created the Northshore agreement later from an online template, selected a date to correlate with tax returns, identified his and Sara's signatures, and supplied inconsistent versions to Flushing. Deo Dep. 158:22–170:19, 212:1–220:19; SMF ¶¶ 35, 977. Sarah acknowledged the 99/1 arrangement, and the later change to 100%. Sara Dep. 191:3–193:17.

Merckling was not "security." He ran Monday sales meetings, cash, the safe, inventory, floor-plan audits, title release, and vehicle movement, including the six cars later held under injunction. SMF ¶¶ 758-60, 832-41, 875, 951-52; ECF 40 ¶¶ 9-18, 20-30. Libertas's DocuSign audit records "Marc Merkling" signing as "Owner" for Northshore and Sunrise. ECF 520-1 at 16, 18. That record ends the claim that he learned of the financing later and never executed it. SMF ¶ 883; Merckling Dep. 121:5-8, 145:21-146:6. Merckling counted money already received and made deposits. Merckling Dep. 97:1-21, 108:8-110:7. Orgad's declaration puts cash demands, title release, and a cash-only negotiation for identified Superb vehicles on him. ECF 40 ¶¶ 9-18, 20-30.

Blankenship made cash deposits, was Superb's salaried operations manager from May 4 through August 3, 2023 at $1,300 a week, and drove Superb vehicles to the July 2023 Gold Coast Syosset event. ECF 95-3 at 7-8; Blankenship Dep. 79:10-81:18, 100:13-102:3; SMF ¶¶ 677, 760; ECF 156-1 at 57:1-22, 117:5-118:2. That is operational authority inside the same structure.

Thomasson was not an uninvolved lawyer. Deo asked to route the money through him. Thomasson said "sure." Thomasson Dep. 270:7-10; SMF ¶¶ 854, 1058. Shanks wrote that the funds were to be wired "to hold in escrow." Thomasson did not reject that restriction before he sent wiring instructions. He announced rejection after the wire was moving. His IOLA then received $735,000.00; he sent $723,000.00 to Car Buyers and kept $12,000.00. ECF 410-2; ECF 410-3; Thomasson Dep. 113:10-115:18, 123:15-124:17, 274:8-19, 280:10-281:9; SMF ¶¶ 253-58, 1056. That is control and disposition of the *res*. In that regard, his conduct – which was not forthright – presents sufficient circumstantial evidence that he knowingly aided and abetted Deo's fraud.

The same structure then operated on Superb.

Deo admitted Superb cars went to the Syosset event; Blankenship drove them; Merckling moved them too; Sara remained in administration and cash reconciliation. SMF ¶¶ 677, 755, 760, 800-05, 827-28, 857-60, 951-52. Personnel and property moved on one chain of command.

The enterprise is distinct from the people in it. The participants are natural persons and separate LLCs and corporations. The association's affairs were the cross-entity financing, the shifting ownership paper, the IOLA and Flushing wires, and the reuse of cars, titles, employees, and customers. Legitimate dealership functions—sales, inventory, floor plan—existed apart from the fraud and supply the distinctness the Second Circuit requires. Six actors, six functions, the same stores, more than two years, and a method that followed Deo from Universal Exotic Autos to UEA to Northshore and Sunrise to Superb to Gold Coast, and then to Cherrywood and Regal Autohaus, is *Boyle*.[2] SMF ¶¶ 127-35, 237-63, 755, 758-60, 800-60, 951-60, 991-93, 1037-60. Deo's 2016 judgment for conspiracy to commit wire fraud and wire fraud must also be considered. See United States v. Deo, No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016) (ECF 31; 18 U.S.C. §§ 1349, 1343; probation and $300,000 forfeiture). It is Rule 404(b) proof of knowledge, intent, plan, and absence of mistake: he already knew that false asset and ownership representations, sent by wire, are how one gets a lender to release money. Laurie's bank-bribery conviction is the same kind of proof for the Flushing introduction. See United States v. Laurie, No. 3:18-cr-521 (BRM) (D.N.J. Feb. 19, 2019).

[2] Indeed, the record shows that Deo operated many dealerships over the course of more than a decade, beginning with Universal Exotic Autos, then UEA Premier, then Northshore and Sunrise, then Superb, then Cherrywood Auto in which JCJD Inc is suing him, and now Regal Autohaus. Open-ended continuity is supported by the enterprise's demonstrated regular method of operation. The same participants repeatedly used shifting ownership documents, lender-facing financial statements, controlled accounts, and cross-entity movement of money, personnel, customers, and vehicles. The repetition of those methods across successive entities, together with the continuing accounting and ownership-document activity through this day, permits the inference that the conduct was the enterprise's regular way of doing business rather than an isolated transaction.

The enterprise is the group that put those skills back to work on Plaintiffs' stores.

**b. Participation in the Conduct of the Enterprise**

Section 1962(c) requires that the defendant take part in the "operation or management" of the enterprise. See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). This Court has already framed the test: the question is whether the defendant played some part in directing the enterprise's affairs, not whether he merely sold it goods or services. See ECF 230 at 36. Direction of an essential phase is enough. See Gordon, 155 F. Supp. 3d at 427; United States v. Viola, 35 F.3d 37, 41 (2d Cir. 1994). Each individual defendant directed such a phase.

**Deo.** He is the decision-maker. He told Jones that statements "showing a profit" were an "absolute must." He caused the March 1, 2023 Statement of Financial Condition to go to Flushing, testified that he supplied the figures and knew they were accurate, and then admitted he did not own the Bronx house, did not own the Old Westbury house, was on neither deed, and owed neither listed mortgage. SMF ¶¶ 288-95, 991; Deo II Dep. 65:20-66:2, 67:24-68:10, 73:10-83:4; ECF 204-2; ECF 437 Ex. P. He certified himself to the same bank as Superb's 100% beneficial owner. ECF 517 ¶¶ 28-30. He directed that $735,000.00 pass through Thomasson's IOLA and land at Car Buyers, the company he controls. SMF ¶¶ 253-63. He is not a peripheral associate. He ran the enterprise and was "the brains," as Sara put it. Sara Dep. at 72:4.

**Sara.** She built the platform the enterprise used. After Universal Exotic Autos and UEA lost their DMV licenses, she organized Northshore, opened its Chase account, added Deo to it, signed as UEA's CEO and as personal guarantor on papers representing that she and Deo owned 100%, kept an office, worked the stores with him, and testified that when necessary she would "oversee everything from service to accounting." Sara Dep. 68:3-18, 83:13-86:22, 121:16-21, 145:5-151:4; SMF ¶¶ 800-05, 827-28, 857-60; ECF 30-2 at 16, 54, 63-66.

She took part in the ownership-percentage discussions and later admitted the Libertas money was used "at least in part to purchase an interest in Superb." Sara Dep. 191:3-193:17, 203:4-204:12. Entity formation, banking infrastructure, ownership paper, and personnel are operation of the enterprise, not spousal courtesy.

**Merckling.** He directed Monday sales meetings and sales staff, decided cash deposits and safe access, handled inventory and floor-plan audits, released titles, negotiated cars, and moved vehicles. SMF ¶¶ 758-60, 832-41, 875, 951-52; ECF 40 ¶¶ 9-18, 20-30. Libertas' own DocuSign file identifies "Marc Merkling" as the electronic "Owner" signer for Northshore and Sunrise. ECF 520-1 at 16, 18. That record ends the claim that he learned of the financing later and never signed it. SMF ¶ 883; Merckling Dep. 121:5-8, 145:21-146:6. A person who runs the lot, controls the cash, faces the floor-plan auditor, and signs as Owner is conducting the enterprise's affairs. See Viola, 35 F.3d at 41.

**Thomasson.** He alone controlled the IOLA account. Deo asked to route the money through him. He said "sure." Shanks wrote that the funds were to be wired "to hold in escrow." Thomasson sent wiring instructions without rejecting that restriction, announced rejection only after the wire was moving, took in $735,000.00, sent $723,000.00 to Car Buyers, and kept $12,000.00. Thomasson Dep. 113:10-115:18, 123:15-124:17, 270:7-10, 274:8-19, 280:10-282:17; ECF 410-2; ECF 410-3; SMF ¶¶ 253-58, 854-55, 1056. Choosing whether the *res* is preserved or delivered is direction of an essential phase. It is not legal advice.

**Blankenship.** He worked Deo's stores across Northshore and Sunrise, made cash deposits, served as Superb's salaried operations manager from May 4 through August 3, 2023 at $1,300 a week, and drove Superb vehicles to the July 2023 Gold Coast Syosset event. ECF 95-3 at 7-8; Blankenship Dep. 79:10-81:18, 100:13-102:3; SMF ¶¶ 677, 760; ECF 156-1 at 57:1-22. Plaintiffs submit that entrusted operations, cash handling, and the Syosset transport satisfy Reves.

If the Court disagrees, the same facts are knowing facilitation under § 1962(d). See Salinas v. United States, 522 U.S. 52, 63-65 (1997).

**Laurie.** He introduced Deo to Flushing officer Puccio (who he has known for over twenty years), which is how the $500,000.00 facility and the later Superb account were obtained. ECF 538-1 ¶¶ 3-7. He had already been convicted of bank bribery for corruptly accepting a payment intending to be influenced in connection with bank business. United States v. Michael Laurie, D.N.J. No. 3:18-cr-521 (BRM), ECF 26 (judgment February 19, 2019). Laurie confirmed under oath that a criminal judgment was entered against him for knowingly and corruptly accepting a payment intending to be influenced in connection with bank business, in violation of 18 U.S.C. § 215(a)(2). Laurie Dep. 39-62. This conviction for corrupt bank dealings is directly relevant to Laurie's role introducing Deo to Puccio, a banker, for the Flushing lending relationship through which the $500,000.00 facility and subsequent unauthorized transfers were obtained. Putting a convicted bank-bribery defendant between Deo and the lending officer is not an arm's-length referral. It is how the enterprise reached Flushing.

**Jones.** Plaintiffs do not seek judgment here against the dismissed CPA defendants. See ECF 230. His testimony still shows how Deo directed the financial half of the enterprise. Jones compiled, on Deo's figures and with no supporting documents, the March 1, 2023 statement that listed the Bronx and Old Westbury houses and mortgages Deo did not own. Jones Dep. 145:4-19, 316:14-316:20; SMF ¶¶ 288-95; ECF 204-2.

Jones also prepared the Superb P&L that lifted revenue from about $9.4 million to $13.4 million and admitted "the numbers in here were not the true numbers." Jones Dep. 299:19-316:16; SMF ¶ 991. He directed adjusting entries at Deo's behest without Urrutia. Jones Dep. 23:3-25, 25:6-14. Those are not bookkeeping services sold to a customer. They are discretion over the numbers the enterprise showed lenders.

Jones testimony reveals participation at the direction of Deo in the operation of the enterprise's affairs through conduct that goes beyond routine accounting services.

First, Jones prepared Deo's personal statement of financial condition (dated March 1, 2023) for the Flushing loan application without any supporting documentation—no bank statements, deeds, mortgage statements, or promissory notes—and conceded that the personal financial statement essentially meant "we don't stand behind this document at all." Jones Dep. 316:14-316:20. That statement listed a Bronx residence at 3011 Matthews Avenue worth $1,280,000.00 with a $479,000.00 mortgage, and an Old Westbury residence at 3 Hunting Lane worth $5,295,000.00 with a $2,250,000.00 mortgage. ECF 204-2; SMF ¶¶ 290, 294. Deo admitted he was on neither deed and neither mortgage; that the Bronx house was his father's, subject to a 2007 Bronx County order expunging a deed the court found Deo had forged; and that he never closed on, paid for, or mortgaged the Old Westbury house. SMF ¶¶ 291-95; Deo II Dep. 73:10-83:4; ECF 437 Ex. P.

Third, Jones directed (at Deo's behest) controller Kernizant to make profit-increasing adjusting journal entries at Deo's behest without consulting authorized owner Urrutia. Jones Dep. 23:3-25, 25:6-14. These three categories of conduct – creating false lender-facing financial statements, preparing false personal financial condition statements for bank loan applications, and directing unauthorized adjusting entries into dealership DMS records – constitute the exercise of discretion over essential phases of the enterprise's financial management.

Interstate commerce is not a close question. Flushing payment orders moved on Fedwire or CHIPS. See 12 C.F.R. § 210.25 *et seq.* Bank of America account ending 9499 cleared through a nationally chartered bank whose processing sits outside New York; that architecture is subject to notice under Rule 201.

The Libertas package was transmitted, viewed, and signed across state lines—Libertas in Connecticut, Deo in New York—as the DocuSign audit records by IP. ECF 520-1. In addition, nationwide car sales, floor-plan lending, ACH debits, and the $735,000.00 and $500,000.00 wires independently suffice. SMF ¶¶ 134-35, 232-63, 633-45, 845-49, 991-93, 1016-60; ECF 410-1; ECF 410-2; ECF 410-3.

Reves does not require that every defendant have run every store. It requires that each have directed some part of the association's affairs. Deo set the object and took the money. Sara built the entities and accounts. Merckling ran the lot and signed as Owner. Thomasson decided the fate of $735,000.00. Laurie opened the bank and "raised capital." Blankenship moved the cash and the cars. Jones, at Deo's direction, wrote the numbers the banks were shown. That is operation and management. Summary judgment is available where the record, as here, shows that each defendant directed an essential phase of those affairs. See Gordon, 155 F. Supp. 3d at 427 (granting summary judgment where the defendant conducted enterprise affairs by supplying the operational means—here, interstate carriage and related documentation—through which the association moved property and realized the scheme's proceeds).

**c. Pattern of Racketeering Activity**

A "pattern of racketeering activity" requires at least two qualifying predicates, 18 U.S.C. § 1961(5), that are related and continuous. Continuity is closed-ended when related predicates run for a substantial period, or open-ended when the predicates by their nature threaten continued criminal activity. See ECF 230 at 28-29 (citing Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183-84 (2d Cir. 2008)); H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989). Related predicate acts over more than two years have supported summary judgment. See Gordon, 155 F. Supp. 3d at 424-425.

This case is not one dispute about one store. It is the same method deployed at multiple dealerships and used on successive books, lenders, accounts, and lots.

The predicates are related by victim, purpose, and means. Each was done to obtain or keep credit, cash, cars, customers, or ownership authority that belonged to Plaintiffs, by false ownership paper, false financials, or unauthorized wires. The August 2021–October 2022 monthly adjustments hid the IAG losses from IAG and Ally. The November 2022 Libertas package monetized Northshore's receipts after that floor plan line of credit was taken from Deo and moved cash toward Superb. The March 1, 2023 personal financial statement told Flushing that Deo owned houses and mortgages he did not own and omitted Superb; weeks later, he certified himself to the same bank as Superb's 100% owner. The Flushing account then moved Superb's money. The Gold Coast event and the injunction cars used Superb's property for the next store. SMF ¶¶ 127-35, 232-63, 288-95, 633-80, 845-49, 951-60, 977, 991-93, 1016-60; ECF 204-2; ECF 410-1; ECF 520-1. That is one scheme with chapters, not three coincidences.

**Closed-ended continuity.** The span is at least August 2021 through August 2023—two full years. See H.J. Inc., 492 U.S. at 241.

- **August 2021-October 2022**: Deo and Jones selected monthly DMS adjustments that made the IAG stores look about $1.4 million better on the financial statements Ally received. SMF ¶¶ 127-35, 991; Jones Dep. 132:4-133:8; O'Sullivan Dep. 105:6-113:6.

- **November 2022**: the Libertas DocuSign package, the $735,000.00 funding, the IOLA receipt, the $723,000.00 transfer to Car Buyers, and the $500,000.00 wires into Superb. SMF ¶¶ 237-63; ECF 410-1; ECF 410-2; ECF 410-3; ECF 520-1.

- **March 2023**: Jones compiled, from Deo's figures and with no deeds or mortgages, the Statement of Financial Condition listing 3011 Matthews Avenue at $1,280,000.00 with a $479,000.00 mortgage and 3 Hunting Lane at $5,295,000.00 with a $2,250,000.00 mortgage. Deo testified he stood behind those numbers so Flushing would fund him, then admitted he was on neither deed and neither mortgage, that a 2007 Bronx County order had expunged a deed the court found he forged on his father's house, and that he never closed on Old Westbury. SMF ¶¶ 288-95; Deo Dep. (Feb. 13, 2026) 65:20-68:10, 73:10-83:4; ECF 204-2; ECF 437 Ex. P. Flushing then funded $500,000.00 into Northshore. SMF ¶ 297.

- **April 2023**: Deo opened the Superb Flushing account as 100% beneficial owner—after the personal financial statement had omitted Superb entirely—and the challenged wires, ACH debits, and the $210,900.00 Rolls-Royce payment followed. SMF ¶¶ 633-45, 1016-41; ECF 517 ¶¶ 28-30.

- **June-July 2023**: the "absolute must" profit instruction, the $13.4 million P&L Jones admitted was "not the true numbers," the Syosset event, and the movement of Superb cars. SMF ¶¶ 677, 760, 951-52, 991; Jones Dep. 299:19-316:16.

Each step used the last one as a springboard. The cooked IAG books kept the floor plan alive long enough to sell the future receipts to Libertas at Northshore. The funds from Libertas funded the entry into Superb. The personal financial statement and the 100% certification opened Flushing. And Flushing paved the way for Deo to open the lot at Gold Coast. Relatedness is the through-line, not an inference from rhetoric.

**Open-ended continuity.** The same method is the enterprise's regular way of doing business, so the threat does not end with these Plaintiffs. See H.J. Inc., 492 U.S. at 241.

The tools did not retire in August 2023. Jones kept doing Gold Coast work for the same people after the Superb lockout and had already issued K-1s treating Deo as Northshore and Sunrise owner on Deo's say-so, with no ownership file. Jones Dep. 23:3-25. The July 5, 2023 P&L was prepared during the Gold Coast period, not as a relic of 2021. Jones Dep. 299:19-316:16; SMF ¶ 991. Ownership paper still moves when a lender asks. Deo Dep. 158:22-170:19, 212:1-220:19; SMF ¶¶ 35, 977.

The successive stores further confirm the threat of Deo and his gang is not hypothetical. Cherrywood Auto, Nassau Index No. 616451/2025, alleges diversion of sales proceeds, warranty money, and receivables by forged paper and unauthorized endorsements—the same categories at issue here. Hakim v. Deo, Nassau Index No. 624451/2025, alleges an unpaid $100,000.00 oral loan in November 2022, the same month as Libertas. Those pleadings are not findings. They are evidence that the method was available for the next counterparty. Even now at Gold Coast/Regal Autohaus, Deo's chicanery lives on. See ECF 550 ¶¶ 6-8.

Thomasson closed the loop himself. He admitted the Cherrywood and Superb complaints contain "similar categories of diversion allegations." That is a party-opponent admission under Rule 801(d)(2). See H.J. Inc., 492 U.S. at 241.

Merckling's testimony that FBI agents questioned him and served a grand-jury subpoena is consistent with that threat. Merckling Dep. 192-195; ECF 393-1. No charge is required; the point is that the conduct was not a private bookkeeping quarrel that ended when Urrutia changed the locks. It was serious enough to warrant law enforcement attention.

Similarly, Jones confirmed that he continued to provide accounting services to Gold Coast entities after his engagement with Superb, serving the same actors through the same methods across a succession of dealership relationships. Jones Dep. 23:3-25. His preparation of K-1s for Northshore and Sunrise treating Deo as owner based solely on Deo's representations - without independent verification of ownership documentation - demonstrates the same pattern of unverified ownership facilitation deployed consistently from Northshore and Sunrise through Superb and into Gold Coast operations. This continuity of accounting method, following the same actor (Deo) through successive entities, independently establishes the "regular way of doing business" that satisfies open-ended continuity under H.J. Inc.

Moreover, Jones' provision of the July 5, 2023 fabricated P&L - prepared at Deo's instruction shortly before the lockout and during the Gold Coast operational period - demonstrates that the enterprise's use of false financial statements was not a historical artifact of the 2021-2022 period but an active, ongoing method employed through at least the summer of 2023. Jones Dep. 299:19-316:16; SMF ¶ 991.

Two years of related predicates satisfy closed-ended continuity standing alone. The reuse of the same ownership lies, the same financial statements trick, the same escrow-to-affiliate path, and the same next-store deployment satisfies open-ended continuity standing alone. Either ground is enough; here, the record supplies both.

**d. Mail and Wire Fraud Predicates**

Mail fraud and wire fraud are racketeering activity under RICO. 18 U.S.C. § 1961(1). So is bank fraud. 18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1344). Each predicate requires a scheme to defraud, money or property as the object, fraudulent intent, and use of the mails or interstate wires in furtherance of the scheme. See ECF 230 at 28 (citing Empire Merchants, LLC v. Reliable Churchill LLLP, 902 F.3d 132, 137 (2d Cir. 2018)). Authenticated electronic transmissions plus a documented scheme to obtain property have supported summary judgment on such predicates. See Gordon, 155 F. Supp. 3d at 426-27.

The scheme is the same one already described: obtain credit, cash, cars, and account authority that belonged to Plaintiffs by false ownership, false assets, and false profits, then move the proceeds through Deo-controlled accounts. The object was money and property – the Libertas funding, the Flushing loan, Superb's account, Superb's cars, etc. The intent is evident from the conduct; Deo used inconsistent ownership percentages as the counterparty changed. He ordered statements "showing a profit" as an "absolute must." He routed Northshore's receipts to Car Buyers. He told Flushing, in a financial statement he claimed was accurate, that he owned two houses and two mortgages he did not own, then certified himself to the same bank as Superb's 100% owner after the same personal financial statement omitted Superb. SMF ¶¶ 257-63, 288-95, 633-45, 977, 991-93; ECF 204-2; ECF 517 ¶¶ 28-30.

Rule 404(b) independently supplies knowledge, intent, plan, and the absence of a mistake. Deo pleaded guilty to conspiracy to commit wire fraud and wire fraud. United States v. Deo, No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016) (ECF 31; 18 U.S.C. §§ 1349, 1343). He already knew that false asset and ownership representations, sent by wire, are how one gets a lender to release money. See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).

The wires themselves are not in dispute. What follows is the predicate schedule.

**Predicate 1 — Libertas DocuSign package and the $735,000.00 path (November 2022).**

The Seller Definition Addendum of the Libertas Agreement electronically represented ownership and authority over Northshore and Sunrise. The DocuSign audit records delivery, viewing, execution, and completion across state lines (Libertas in Connecticut, signers in New York). ECF 410-1; ECF 520-1; SMF ¶¶ 237-42, 972. Merckling appears as "Owner." ECF 520-1 at 16, 18. The same scheme then moved on successive wires: funds to Sunrise; the replacement $735,000.00 into Thomasson's IOLA after Shanks's "hold in escrow" instruction; $723,000.00 from that IOLA to Car Buyers; $500,000.00 from Car Buyers toward Superb; and approximately $173,000.00 toward the Hunting Lane landlord. ECF 410-2; ECF 410-3; SMF ¶¶ 253-63. This cluster alone supplies more than two predicates.[3]

**Predicate 2 — March 1, 2023 Statement of Financial Condition.**

Jones admitted preparing Deo's personal statement of financial condition (dated March 1, 2023) for the Flushing loan application without any supporting documentation and without verifying any of the stated asset values. Jones Dep. 316:14-316:20. This document was transmitted to Flushing as part of the loan application package that induced the $500,000.00 facility and subsequent Superb account opening, constituting an additional wire fraud (and bank fraud) predicate that is now directly supported by Jones' own deposition testimony.

Crucially, Jones prepared a personal financial statement ("PFS") for Deo which was given to Flushing omitted Superb as a closely held entity of Deo's, meaning Deo disclosed no ownership interest in Superb on the statement. ECF 437-15.

[3] This scheme alone satisfies the two (2) predicate act requirement: (i) Deo caused the funds intended for Libertas to be wired to Sunrise (first wire); (ii) the funds returned to Thomasson's IOLA account after Deo caused Aaronson to wire the funds to him based on threats of criminal prosecution (second wire); (iii) Thomason wired virtually all the funds to Car Buyers (third wire); (iv) Deo wired $500,000.00 (fourth and fifth wire) to Superb to engage in his investment-fraud scheme and $213,000.00 (sixth wire) to his residential landlord, thereby fraudulently using the funds he contractually agreed with Libertas would be for the benefit of Northshore.

The same personal financial statement is independently damning for a second, and more elementary, reason: Deo used it to tell Flushing that he owned two residences, and carried two mortgages against them, that he did not own and had never financed. Jones prepared the March 1, 2023 Statement of Financial Condition from figures Deo supplied, without bank statements, deeds, mortgage statements, or any other supporting document, and under a personal financial statement that Jones later conceded meant his accounting firm did "not stand behind this document at all." Jones Dep. 145:4-19, 316:14-316:20; SMF ¶¶ 288-89, 849. Deo nevertheless testified that he supplied the information, that he knew the statement was accurate, and that he gave it to Flushing so Flushing would approve the $500,000.00 Northshore facility. SMF ¶¶ 288-89; Deo II Dep. 65:20-66:2, 67:24-68:10; ECF 204-2; ECF 437 Ex. O.

The face of the statement listed, among other assets, a "Residence – Bronx, NY" at $1,280,000.00 with a corresponding "Mortgage Payable[]" of $479,000.00, and a "Residence – Old Westbury, NY" at $5,295,000.00 with a corresponding mortgage payable of $2,250,000.00. ECF 204-2; ECF 437 Ex. O. Together with a Dix Hills residence and an "International" residence, those four lines were used to support reported total assets of $12,966,000.00 and net worth of $9,175,000.00. Id. Superb does not appear anywhere on the statement as a closely-held entity or other asset. Id.; Jones Dep. 267:22-272:11.

Deo then admitted, line by line, that the real-estate and mortgage entries were false.

As to the Bronx property, the PFS treated 3011 Matthews Avenue as Deo's asset and as collateral for a $479,000.00 mortgage in his name. SMF ¶ 290; Deo II Dep. 73:10-74:7. He was not on the deed. He was not on the mortgage. He knew he did not own the property. SMF ¶ 291; Deo II Dep. 74:3-10, 73:10-75:15, 76:2-77:21. The house belonged to his father, Motilal Deo. After Deo caused a deed transferring the property to 3011 Matthews Inc. – an entity associated with Deo and Sarah Deo – his father sued him for forging that deed. SMF ¶ 292; Deo II Dep. 74:3-10, 80:24-83:4.

On September 21, 2007, the Hon. Lucinda Suarez, J.S.C. of Supreme Court, Bronx County, found for the father and directed the City Register to expunge the forged deed. SMF ¶ 293; Deo II Dep. 81:19-83:4; ECF 437 Ex. P. Deo admitted knowledge of that order at his deposition. Deo II Dep. 80:24-83:4. Sixteen years later, he still listed the same house, and a mortgage against it, as his own on a statement he handed a bank.

As to the Old Westbury property, the PFS treated 3 Hunting Lane as Deo's $5,295,000.00 residence and as security for a $2,250,000.00 mortgage. SMF ¶ 294; Deo II Dep. 77:22-78:6; ECF 204-2. He was not on the deed. He was not on any mortgage. He never closed. He never paid the purchase price. He never borrowed the $2,250,000.00. SMF ¶ 295; Deo II Dep. 77:22-80:15. His eventual explanation – that he "believed it was [his] asset" because he had been in contract – does not convert an unclosed contract into title, and it does not create a mortgage that was never originated. The statement did not disclose a contingent contract right. It listed a residence and a mortgage payable.

Jones confirmed the obvious accounting consequence. If the mortgages do not exist, the statement is inaccurate; if the asset statements are "outright false," that is "a problem." Jones Dep. 275:11-20, 279:6-10; SMF ¶¶ 980, 998. Jones also confirmed that he never verified the values. Jones Dep. 316:14-316:20.

Those admissions establish each element of a wire-fraud (and bank-fraud) predicate without further inference. The scheme was to obtain Flushing credit and a banking relationship by inflating Deo's apparent net worth and borrowing capacity. The object was money: the $500,000.00 Northshore facility and the later Superb account opened on the same relationship. Intent follows from Deo's own testimony that he furnished the figures, certified them as accurate, and submitted them so Flushing would approve the loan, coupled with his later admission that he did not own either house, was on neither deed, and had originated neither mortgage—and, as to the Bronx house, that a court had already adjudicated his deed a forgery.

Use of the wires is the compilation's transmission into Flushing's file and the interstate payment-order system that then funded the facility. SMF ¶¶ 288-89, 297; ECF 204-2; ECF 437 Ex. O. The same document is independently admissible under Rule 404(b) as proof of knowledge, intent, plan, and absence of mistake: Deo had already been convicted of wire fraud in connection with a mortgage, United States v. Deo, No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016), and then reused the same category of false real-estate representation to obtain new credit.

The personal financial statement also fixes two other lies in time. On March 1, 2023, Deo was not holding Superb out as his entity. On April 4, 2023, he told the *same bank* he owned 100% of it. ECF 204-2; ECF 517 ¶¶ 28-30. And on August 1, 2023, when he applied for a mortgage on his own home, he listed the same residential addresses and explained they were rentals he does not own and/or never owned when, in the personal financial statement, he stated he owned multiple properties. ECF 543-20 at 20-21. He told Flushing he owned the houses when he wanted a line; he told another lender he did not own them when ownership would have been inconvenient. That shows intent to defraud.

Every wire-fraud element is evident. The scheme? Inflate net worth to obtain Flushing credit. The object? The $500,000.00 loan and the banking relationship for Superb that followed. The intent? Deo's certification of accuracy plus his later admissions, including a court-expunged forged deed. The predicate act? A wire transmission into Flushing's file and the interstate payment system that funded the loan. SMF ¶¶ 288-89, 297. And then there is the Rule 404(b) evidence that Deo reused the mortgage-fraud method for which he had already been convicted.

**Predicate 3 — March 15, 2023 Northshore Flushing application.**

The application to Flushing stated approximately $16.8 million in revenue while the store was effectively shuttered. SMF ¶¶ 845-49; Buccino Dep. 124:13-24.

Inconsistent operating agreements, an accountant's affidavit, and Thomasson's litigation letter traveled with it. Flushing proceeded on the package anyway. SMF ¶¶ 977, 1037-60; Buccino Dep. 306:9-309:8. A Puccio email reflecting a conversation with "Tom" about intended use of the line places Jones' work inside the same submission. ECF 550-1; SMF ¶ 1059.

**Predicate 4 — April 4, 2023 Superb account opening as 100% beneficial owner.**

Deo certified himself as Superb's 100% owner and signed a resolution purporting to give himself unilateral transaction authority, after Urrutia had already sent Flushing tax materials showing other shareholders, including himself, and after the March 1 personal financial statement had omitted Superb. SMF ¶¶ 633-45, 1016-40; ECF 517 ¶¶ 12-34.

**Predicate 5 — NESNA ACH debits, April–August 2023.**

Five ACH debits totaling $426,967.11 left the Superb Flushing account on the interstate ACH network for Northshore warranty-advance obligations. SMF ¶¶ 1016-41. Superb was under no obligation to pay for Northshore's debts, especially in light of Deo's failure to secure Urrutia a twenty-five percent (25%) membership interest.

**Predicate 6 — Fifteen Superb-to-Northshore transfers totaling $405,900.00.**

Fifteen electronic transfers left Superb's account for Northshore without the authorized owners' knowledge or consent. SMF ¶¶ 633-45. Each transfer is its own wire, its own predicate act.

**Predicate 7 — April 19, 2023 $210,900.00 Superb wire to Car Buyers.**

The wire purchased for Superb a Rolls-Royce on Deo's claimed authority when he was under a temporary restraining Order issued by the Hon. Sharon M.J. Gianiell, J.S.C. forbidding the sale of any automobiles owned by Northshore or Sunrise. SMF ¶¶ 1016-41.

**Predicate 8 — Ally floor-plan fundings on false monthly financials.**

Each Ally advance Deo initiated on the IAG line was a wire. The monthly statements that supported those advances were the adjusted statements Jones and Deo built from August 2021 through October 2022, which could appear approximately $1.4 million better before year-end write-offs, and which both men knew Ally received. SMF ¶¶ 127-35, 991; Jones Dep. 132:4-133:8; O'Sullivan Dep. 105:6-113:6.

The Plaintiffs recognize in this motion that Jones is not a defendant. See ECF 230. His testimony still proves the predicates. At Deo's direction, Jones packaged Deo's invented houses and mortgages. Jones built the $13.4 million P&L Deo directed him to do, which he admitted at his deposition was "not the true numbers." Jones Dep. 299:19-316:16; SMF ¶ 991. Jones also directed false adjusting entries without Urrutia. Jones Dep. 23:3-25, 25:6-14. That is how the false statements got onto the wires.

Two predicates would be enough. The file has eight clusters, and several of those clusters are themselves multiple wires. There is therefore sufficient evidence of predicate acts to support summary judgment.

**e. RICO Injury and Causation**

A private civil RICO plaintiff must establish injury to its "business or property by reason of" the § 1962 violation. See 18 U.S.C. § 1964(c). This requires proximate causation: a sufficiently direct relationship between the RICO violation and the asserted injury. See ECF 230 at 30 (citing, *inter alia*, Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992)).

That direct-injury requirement is regularly resolved as a matter of law where the diverted funds, credit, or property belonged to the plaintiff and moved through the predicates themselves. See Gordon, 155 F. Supp. 3d at 427 (granting summary judgment on RICO injury and causation where the plaintiff's property loss flowed directly from the predicate acts rather than from a remote or derivative harm).

Here, the injury was direct and concrete. Northshore's future receipts generated the $735,000.00 funding at the center of the Libertas dispute; the $735,000.00 replacement payment was placed in IOLA, $723,000.00 was sent to Car Buyers, and $12,000.00 was retained by Thomasson, while Northshore received no operational benefit and remained exposed on the transaction. SMF ¶¶ 238-63, 954-58, 971-73; ECF 410-1; ECF 410-2; ECF 410-3. The Flushing loan inflicted a second, equally direct injury to the IAG Plaintiffs. The March 1, 2023 PFS and the March 15 loan application were the transmissions that induced the $500,000.00 Northshore line. SMF ¶¶ 288-97, 845-49; ECF 204-2. Deo then moved almost $400,000.00 of that line toward Car Buyers and did not use the facility for Northshore operations. SMF ¶¶ 298-99. He also placed a UCC lien on Northshore's assets without authority. SMF ¶ 300. The admittedly false PFS was how the credit was obtained and how Northshore's assets were encumbered. The Ally predicates injured the IAG Plaintiffs a third way. The monthly statements that looked about $1.4 million better were the wires that kept the IAG floor plan alive while the stores were being hollowed out. SMF ¶¶ 127-35, 991. When the line finally failed, the deficiency and the lost floor-plan capacity sat on the IAG Plaintiffs, not on Deo.

Meanwhile, Superb's injury is also the movement of its own property. Deo opened a Flushing account in Superb's name as purported 100% owner—after the March 1 PFS had omitted Superb and after Urrutia had already sent Flushing tax materials showing other shareholders, including himself. SMF ¶¶ 633-45, 1016-40; ECF 517 ¶¶ 12-34. From that account: (i) fifteen transfers totaling $405,900.00 went to Northshore; (ii) five NESNA ACH debits for Northshore's obligations totaled $426,967.11; and (iii) $210,900.00 went to Car Buyers for a Rolls-Royce he was forbidden from selling. SMF ¶¶ 633-45, 1016-41. Those are Superb's dollars that left on the predicates.

Superb also lost the exclusive use of its vehicles, employees, customer relationships, CRM information, account authority, and commercial resources when those assets were deployed through the Gold Coast operation and the challenged Flushing account. SMF ¶¶ 633-80, 724-25, 951-52, 1016-41; ECF 40 ¶¶ 20-30. Worst of all, Superb shut down permanently, unquestionably demonstrating the most serious form of injury.

**B. Count Three - All Plaintiffs' § 1962(d) Conspiracy Claim**

18 U.S.C. 1962(d) makes it unlawful to conspire to violate RICO's substantive provisions. To establish a RICO conspiracy, a plaintiff must establish an agreement to violate a substantive provision of RICO. See ECF 230 at 41 (citing Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999)).

A conspirator need not personally commit every predicate act; the issue is whether the defendant knowingly agreed to facilitate a scheme that, if completed, would constitute the substantive RICO violation. See Salinas v. United States, 522 U.S. 52, 63-66 (1997).

The same coordinated-facilitation record has supported summary judgment on a companion RICO claim. See Gordon, 155 F. Supp. 3d at 427 (granting summary judgment on RICO liability where multiple participants used complementary functions—sourcing, transportation, and delivery—to carry out the same continuing scheme); see also *Salinas*, 522 U.S. at 63–66 (a conspirator is liable for agreeing to facilitate the scheme even if he does not personally commit every predicate).

The agreement is established circumstantially by coordinated action and division of labor. Sarah's entity and banking authority, Jones' financial adjustments and ownership work at the direction of Deo, Merckling's operational and Libertas-linked conduct, Blankenship's assistance with deposits and moving vehicles, and Thomasson's IOLA transfer all advanced the same Deo-directed objective across the same entities.

Their continuing compensation, direct communications, shared records, and conduct after notice show knowing facilitation, not accidental parallel activity. SMF ¶¶ 127-35, 237-63, 755, 758-60, 800-60, 951-60, 977, 991-93, 1025, 1037-60.

The evidence is especially strong against Thomasson under § 1962(d): he knew about the ownership dispute, received the express "hold in escrow" instruction from Shanks, agreed to receive the funds, waited until the transfer was in motion to reject the restriction, retained a fee, and delivered the balance to Car Buyers, Deo's company, rather than Northshore, the intended beneficiary. ECF 410-2; ECF 410-3; Thomasson Dep. 113:10-115:18, 123:15-124:17, 270:7-10, 274:8-19, 280:10-282:17; SMF ¶¶ 253-58, 854-55, 954-58, 1054-58.

The conspiracy evidence is mutually reinforcing across defendants. Sarah's knowledge is established by her participation in the discussions among Deo, Jones, Kwun, Aaronson, and Citrin Cooperman about the changing ownership percentages. Sara Dep. 191:3-193:17.

Merckling's conspiratorial agreement is established by his cross-entity work pattern, his presence in Monday sales meetings, his handling of cash and vehicle inventory in coordination with Deo, and the Libertas record identifying him as an "Owner" signer. Blankenship's conspiratorial agreement follows from his cross-entity deployment and direct participation in the vehicle transportation to the Gold Coast Syosset event, which advanced the competing operation using Superb's assets. Blankenship Dep. 100:13-102:3.

Jones' testimony provides additional and powerful circumstantial evidence of conspiratorial agreement for § 1962(d) purposes. Several independent *indicia* establish Jones' knowing facilitation of the enterprise's scheme at Deo's direction.

First, Jones was formally designated as part of Deo's "forensic team" in a March 21, 2023 demand for Superb's financial records, revealing the coordinated nature of the relationship between Deo and Jones.

Second, Jones directed controller Kernizant to make profit-increasing adjusting entries without consulting authorized owner Urrutia, demonstrating that Jones was taking operational direction from Deo rather than from Superb's actual principals.

Third, Jones coordinated with Thomasson on ownership documents furnished to Flushing, a collaboration reflected in defendants' own Rule 56.1 response acknowledging that Jones worked with Deo and Thomasson "concerning an ownership document furnished to Flushing." SMF ¶ 1059.

The totality of these indicia satisfies the Salinas standard for knowing facilitation and conspiratorial agreement. And their personal histories are consistent with that agreement. Deo and Sara are married. ECF 316 ¶ 31. Deo met Merckling through PAL football; Deo then hired him as "security" at Northshore. Sara Dep. 262:24-263:3; SMF ¶ 246; Merckling Dep. 60:13-61:8. Merckling referred Blankenship into the same operation. SMF ¶ 763; Merckling Dep. 75:22-25. Thomasson kept an office at Superb and was on Deo's weekly payroll. SMF ¶¶ 688, 728; Thomasson Dep. 179:10-180:4; Blankenship Dep. 133:16-134:3. Laurie called Deo a friend, used a Superb office, signed as "business manager," took $50,000.00 of the Flushing line into DLA, and moved money both ways when one of them was short. SMF ¶¶ 731, 821, 878, 881, 940-42; Laurie Dep. 98:15-17, 100:15-25, 111:25-112:13, 130:3-131:2, 182:22-183:7. These facts demonstrate how intertwined and connected the Deo Defendant co-conspirators are to each other.

**C. Count Two - Superb Plaintiffs' Claim Under § 1962(a)**

18 U.S.C. § 1962(a) prohibits a person who has received income derived, directly or indirectly, from a pattern of racketeering activity in which that person participated as a principal from using or investing that income, or its proceeds, in the acquisition, establishment, or operation of an enterprise engaged in or affecting interstate or foreign commerce. See 18 U.S.C. § 1962(a).

A private plaintiff asserting § 1962(a) must establish not only the underlying pattern of racketeering and the defendant's receipt and investment of racketeering income, but an injury caused by the use or investment of that racketeering income, as distinguished from an injury caused merely by the predicate racketeering acts themselves. See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 264 (2d Cir. 2004), rev'd on other grounds, 547 U.S. 451 (2006); see also Ouaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir. 1990).

The Second Circuit has recognized precisely this investment-injury theory where racketeering proceeds are plowed into a competing operation that then harms the plaintiff. See Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 327 (2d Cir. 2011) (holding that the use of racketeering income to establish and operate a competing facility alleged a distinct § 1962(a) investment injury); cf. Gordon, 155 F. Supp. 3d at 427 (granting summary judgment on civil RICO liability where the undisputed transactional path from the predicates to the plaintiff's property loss left no jury question on causation).

Here, racketeering income was generated through Northshore, Sunrise, and Superb. The Car Buyers records trace approximately $723,000.00 into Deo's controlled company and show two transfers totaling $500,000.00 toward Deo's promised Superb investment. ECF 410 ¶¶ 12, 16-18; ECF 410-3; SMF ¶¶ 257-63, 341. Sara admitted the Libertas money was used "at least in part to purchase an interest in Superb." Sara Dep. 203:4-204:12. That investment placed Deo inside Superb with managerial access to its account authority, personnel, vehicles, customers, CRM information, and goodwill; those assets were then deployed for the competing Gold Coast operation. SMF ¶¶ 633-80, 724-25, 733-60, 951-52; ECF 40 ¶¶ 20-30; ECF 156-1 at 57:1-22; Blankenship Dep. 100:13-102:3.

The concentration of enterprise activity in November 2022 is further evidenced by a separate $100,000.00 loan allegation occurring during the identical time period.

Hakim v. Deo, which was filed November 12, 2025), alleges that Hakim advanced $100,000.00 in November 2022 at Deo's direction to North Shore Funding and Management LLC, a separate entity Deo created, under an oral agreement, and that the loan was not repaid by the agreed December 21, 2022 deadline. Laurie confirmed under oath that he connected Hakim to Deo for that $100,000.00 loan and that he was "not sure" there was a written agreement covering his brokerage. Laurie Dep. (ECF 447-1) at 850:1-888:13. The temporal overlap of the Hakim loan, the Libertas $735,000.00 disbursement, the IOLA-to-Car Buyers transfer, the $500,000.00 wires to Superb, and the Cross-Purchase Agreement execution – all within November–December 2022 – demonstrates the enterprise's coordinated deployment of multiple funding sources through multiple channels during a compressed operational window. The purpose behind Deo's intensive effort to scare up money was to purchase an interest in Superb in order to obtain operational control over it. ECF 11 ¶¶ 10-32; SMF ¶¶ 253-63, 341.

The traced path from racketeering proceeds to the injury-causing investment is established by the following documented chain: (a) Libertas disbursed $735,000.00 in net proceeds secured against Northshore and associated entities, ECF 410-1 at LIB000001-05; SMF ¶¶ 253-55; (b) the $735,000.00 entered Thomasson's IOLA account on November 21, 2022, Thomasson Dep. 113:10-115:18; ECF 410-2; SMF ¶¶ 253-55; (c) Thomasson transferred approximately $723,000.00 to Car Buyers and retained approximately $12,000.00 as fees, Thomasson Dep. 123:15-124:17; ECF 410-3; SMF ¶¶ 257-58, 1056; (d) Deo directed the transfer and identified the Car Buyers receipt as the Libertas money, Deo II Dep. 90:10-91:17; (e) Car Buyers made two wire transfers totaling $500,000.00 to Urrutia/Superb, ECF 11-5; SMF ¶¶ 257, 341; (f) from the same Car Buyers pool Deo also wired approximately $173,000.00 toward the Hunting Lane landlord, Deo II Dep. 142:4-19; 94:19-95:11; and (g) Deo obtained managerial access to Superb's operations in November 2022 concurrent with receipt of the $500,000.00, ECF 11 ¶¶ 10-32.

This chain satisfies the "use or investment" requirement of § 1962(a) because the bank records, the transaction chronology, and Sara's admission permit the inference that the Libertas proceeds moved through Thomasson's IOLA account and Car Buyers into the $500,000.00 contribution through which Deo obtained managerial access to Superb. Sara Dep. 203:4-204:12. The distinct investment injury arose from that access, which enabled Deo's later control of Superb's banking, personnel, vehicles, customers, and commercial information.

That investment was not passive equity. It conferred upon Deo managerial access to Superb's account authority, enabling: (i) the later Flushing account opening and unauthorized payment orders, including Deo's April 4, 2023 certification of himself as 100% beneficial owner, fifteen Superb-to-Northshore transfers totaling $405,900.00, NESNA ACH debits totaling $426,967.11, and the April 19, 2023 $210,900.00 wire to Car Buyers for a Rolls-Royce, SMF ¶¶ 633-45, 1016-41; ECF 517 ¶¶ 12-34; (ii) personnel, enabling redeployment of employees to Gold Coast, including Blankenship's tenure as Superb's salaried operations manager at $1,300 per week from May 4 through August 3, 2023, ECF 95-3 at 7-8; SMF ¶¶ 677, 760; (iii) vehicles, enabling transportation to the competing Syosset operation and Merckling's movement of the six cars later held under injunction, SMF ¶¶ 677, 760, 951-52; ECF 156-1 at 57:1-22; Blankenship Dep. 100:13-102:3; ECF 40 ¶¶ 20-30; (iv) customers and CRM information, enabling diversion of business relationships, SMF ¶¶ 724-25; and (v) goodwill, enabling the competing platform to trade on Superb's established reputation. This is precisely the type of "acquisition or operation" investment that § 1962(a) targets: racketeering proceeds used to obtain a position of control from which further harm is inflicted.

The same investment position is what made the March–April 2023 Flushing loan possible. After Deo was inside Superb, Jones compiled the March 1, 2023 Statement of Financial Condition from Deo's figures – listing the Bronx and Old Westbury houses and mortgages Deo did not own, and omitting Superb – and Deo used that compilation to obtain

the $500,000.00 Northshore facility at the same bank where, weeks later, he opened the Superb account as purported 100% owner. ECF 204-2; SMF ¶¶ 288-97, 633-45; Deo Dep. (Feb. 13, 2026) 65:20-83:4; ECF 437 Ex. P. Of that Flushing line, $50,000.00 went to Laurie's DLA Capital Partners and the balance moved predominantly to Car Buyers. SMF ¶¶ 940-42; Deo II Dep. 152:14-19, 153:19-23. Those later Flushing movements are additional operation of the enterprise with invested racketeering proceeds. They are not a substitute for the November 2022 investment injury; they are what the investment enabled.

The investment-caused injury is analytically distinct from the predicate-act injury, satisfying the Second Circuit's requirement under Ideal Steel and Ouaknine. See Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 264 (2d Cir. 2004); Ouaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir. 1990). The predicate injury is Northshore's loss of the $735,000.00 stream when it hit Car Buyers. The investment injury is what happened after $500,000.00 of that stream was used to buy Deo a seat inside Superb: the Flushing account, the stripped cash, the Syosset cars, and the Gold Coast platform. Justice Murphy later rescinded the Cross-Purchase Agreement for Deo's fraud and held that Deo has no ownership interest in Superb, which confirms that the position itself was obtained by misrepresentation and that the harm flowing from that position is not a legitimate equity return. SMF ¶ 1066.

Jones' testimony corroborates the § 1962(a) investment-injury analysis in one critical additional respect. Sara admitted at her deposition that the Libertas money was used "at least in part to purchase an interest in Superb." Sara Dep. 203:4-204:12. Jones' admissions confirm that he prepared the very K-1s and tax returns for Northshore and Sunrise that provided the false ownership foundation enabling the Libertas transaction in the first place. Jones Dep. 23:3-25; SMF ¶¶ 845-49. His accounting work, at the direction of Deo, thus is a crucial link in the § 1962(a) chain: he facilitated the racketeering-income generation through false financial statements provided to Libertas (the source of the $735,000.00).

This provides additional corroborative support for the investment-nexus element. More importantly, this was the beginning of the end for Superb. Once Deo got in, he worked his way to remove Alysia Cayer, which placed the accounting department into limbo, and brought Jones in to "assist" while the search for Cayer's replacement went on. ECF 11 ¶¶ 74-75; SMF ¶ 845; Jones Dep. 299:19-316:16. From there, Superb was quickly stripped of its cash and assets through the schemes identified herein—the Flushing account, the $405,900.00 in Superb-to-Northshore transfers, the $426,967.11 in NESNA ACHs, the $210,900.00 Rolls-Royce wire, the Syosset event, and the Gold Coast deployment of Superb's people and cars. SMF ¶¶ 633-80, 951-52, 1016-41.

As a result, Superb is entitled to its RICO claim under § 1962(a).

**D. Count Four - Superb Plaintiffs' § 1962(d) Conspiracy to Violate § 1962(a)**

Count Four is governed by the same 18 U.S.C. § 1962(d) conspiracy standard discussed above, but the object of the conspiracy is the violation of § 1962(a). Thus, Superb must establish an agreement among the relevant Deo Defendants to obtain racketeering income and use or invest that income or its proceeds in the acquisition, establishment, or operation of the enterprise, together with cognizable injury arising from that unlawful investment. See Cofacredit, 187 F.3d at 244; see also Salinas, 522 U.S. at 63-66.

Where the record traces racketeering proceeds into the acquisition or operation of the enterprise and shows coordinated facilitation of that investment, summary judgment follows on the same terms as the underlying § 1962(a) theory. See Ideal Steel, 652 F.3d at 327 (investment of racketeering proceeds into a competing operation supplies the distinct injury § 1962(a) requires); Gordon, 155 F. Supp. 3d at 427 (granting summary judgment on RICO liability where complementary actors jointly advanced the same property-diversion scheme).

The same coordinated acts establish the § 1962(a) conspiracy.

Deo requested and controlled the flow; Thomasson supplied the IOLA conduit and sent the balance to Car Buyers; the controlled company supplied the investment vehicle; and the resulting investment placed Deo and his personnel inside Superb, where vehicles, customers, employees, and account authority were diverted to a competing operation. SMF ¶¶ 253-63, 633-80, 733-60, 951-58. The participants did not need to agree on every downstream expenditure; their knowing facilitation of the receipt, transfer, investment, and use of the proceeds satisfies Salinas. The object of their agreement is specific: the receipt of racketeering income to profit from the dealerships to the detriment of the actual owners.

The investment injury required by Ideal Steel and Ouaknine is the same injury already traced on Count Two: the $500,000.00 seat inside Superb enabled the Flushing account, the $405,900.00 Superb-to-Northshore transfers, the $426,967.11 NESNA ACHs, the $210,900.00 Rolls-Royce wire, the removal of Cayer and insertion of Jones, and the Gold Coast use of Superb's cars, people, customers, and goodwill. SMF ¶¶ 633-80, 951-52, 1016-41; ECF 11 ¶¶ 74-75; compare with Ideal Steel, 373 F.3d at 264; Ouaknine, 897 F.2d at 82-83. Justice Murphy's rescission of the Cross-Purchase Agreement for Deo's fraud confirms that the acquired position was itself tainted. SMF ¶ 1066.

The participants did not need to sit in one room and allocate every later ACH. They needed to agree to get the Libertas money, run it through Car Buyers, and use it to get Deo inside Superb. The IOLA instructions, the Owner signature, Sara's admission, the $500,000.00 wires, and the immediate use of Superb's accounts and cars reflect that agreement through their conduct. See Salinas, 522 U.S. at 63-66.

**E. Count Five — Superb's Request for Equitable Relief Under § 1964(a)**

Section 1964(a) grants district courts authority to "prevent and restrain" violations of § 1962 through appropriate equitable orders. See 18 U.S.C. § 1964(a).

This Court has recognized that § 1964(a) supplies equitable remedies for RICO violations and permitted Plaintiffs' RICO equitable-relief theory to proceed against the Deo Defendants. See ECF 230 at 43-44. The record shows a continuing ability to shift money, vehicles, customers, titles, and account authority through related entities and participants, including conduct after the ownership dispute and after injunctive orders. SMF ¶¶ 633-80, 733-60, 951-52, 1016-41. Merckling transported the six vehicles later held under this Court's injunction. SMF ¶¶ 951-52. Deo admitted Superb cars went to the July 2023 Gold Coast Syosset event; Blankenship drove them. ECF 156-1 at 57:1-22; Blankenship Dep. 100:13-102:3; SMF ¶¶ 677, 760. The Flushing account, opened on a 100% ownership certification after the March 1, 2023 PFS omitted Superb, was the channel for $405,900.00 in Superb-to-Northshore transfers, $426,967.11 in NESNA ACH debits, and the $210,900.00 Rolls-Royce wire to Car Buyers. SMF ¶¶ 633-45, 1016-41; ECF 517 ¶¶ 12-34; ECF 204-2. Superb therefore seeks relief requiring return and preservation of its property and records, and preventing further transfer or use of Superb (or any other dealerships) assets through the Gold Coast and related entities.

The Second Circuit has read Section 1964(a) to permit permanent equitable relief to a private civil-RICO plaintiff who proves liability and business/property injury. Chevron Corp. v. Donziger, 833 F.3d 74, 137-39, 151 (2d Cir. 2016). As demonstrated below, the Deo Defendants have engaged in ongoing and likely future § 1962 conduct, as demonstrated by their conduct at both Cherrywood and Regal Autohaus, such that irreparable harm is likely to occur and legal remedies are inadequate. As a result, this Court should issue an injunction barring the Deo Defendants from operating any dealership. The district court judgment affirmed in Donziger likewise demonstrates that private-plaintiff equitable relief is available once RICO liability and a continuing ability to exploit the proceeds are shown. See Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 639-41 (S.D.N.Y. 2014) (imposing a constructive trust

and injunctive restraints under § 1964(a) after the plaintiff proved that the defendants obtained and then sought to exploit property through a pattern of racketeering), aff'd, 833 F.3d 74 (2d Cir. 2016).

Urrutia's supplemental declaration puts that continuing ability on this record. ECF 550 ¶¶ 6-8. After Superb was stripped and left for dead, Cherrywood Auto Sales sued Deo for the same categories of diversion at issue here. JCJD Inc. d/b/a Cherrywood Auto Sales v. Deo, Nassau Index No. 616451/2025, NYSCEF Doc. No. 16; ECF 550 ¶ 6. Thomasson himself admitted that the Cherrywood and Superb complaints contain "similar categories of diversion allegations." That is a party-opponent admission under Rule 801(d)(2). The method therefore clearly did not retire with this case.

The same declaration shows the method operating at the store built with Superb's people and cars. Gold Coast Motors of Syosset LLC, doing business as Regal Autohaus – the Syosset location to which Superb vehicles were taken – is the subject of Urrutia's separate Nassau action and of public reports that a customer was sold a car she never received and was then billed for the loan. ECF 550 ¶ 7 & n.3; Urrutia v. Gold Coast Motors of Syosset LLC, Nassau Index No. 611909/2025, NYSCEF Doc. Nos. 1, 6. Those reports are not findings of this Court. They are evidence that the Gold Coast platform, stocked with Superb assets, remains an operating outlet for the same commercial pattern. Damages for the 2023 transfers will not police the next title, the next ACH, or the next store name.

Urrutia traces that pattern across a decade of successive dealerships: Universal Exotic Autos; UEA Premier; Northshore, titled through Sara after Deo's federal fraud conviction; Sunrise through IAG; Superb; Cherrywood; and now Regal Autohaus. ECF 550 ¶ 8; United States v. Deo, No. 1:10-cr-631 (JGK) (S.D.N.Y. Jan. 15, 2016) (ECF 31). Open-ended continuity and § 1964(a) restraint are the same fact on two doctrines. The enterprise's regular way of doing business is to take a store, take its credit and cars, and reopen under a new name.

See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989). Legal remedies after each store is emptied of assets are inadequate. The next victim is not before this Court and will not be made whole by a money judgment in this case.

Donziger authorizes the remedy once liability and a continuing ability to exploit the proceeds are shown. Both are shown here. The Court already has injunctive process in this case; Defendants moved cars anyway. SMF ¶¶ 951-52. The appropriate restraint is therefore not another order that assumes voluntary compliance with a vehicle list. It is an order that (i) requires immediate return and freeze of Superb vehicles, titles, records, CRM data, and account proceeds still in Defendants' possession or control, including through Car Buyers and the Gold Coast entities; (ii) imposes a constructive trust on those assets and on any proceeds traceable to the Libertas $735,000.00, the Flushing $500,000.00 line, and the Superb Flushing account; and (iii) enjoins the Deo Defendants from owning, managing, or operating any motor-vehicle dealership, and from opening or controlling any account in the name of Superb, Northshore, Sunrise, or any Plaintiff entity. See Donziger, 974 F. Supp. 2d at 639-41; 18 U.S.C. § 1964(a). That relief is no broader than the violation. The violation is their business method; preventing and restraining it requires taking the next store off the table. This Court should do so.

**F. Counts 14, 18, and 28 - Plaintiffs are Entitled to Summary Judgment for Breach of the Duty of Loyalty and Under the Faithless Servant Doctrine**

Under New York law, an employee or agent owes the principal an undivided duty of loyalty and must exercise the utmost good faith in performing the duties entrusted to him. See ECF 230 at 88 (citing Calderon v. Mullarkey Realty, LLC, No. 14-CIV.-2616, 2018 WL 2871834, at *7 (E.D.N.Y. June 10, 2018), and Phansalkar v. Andersen Weinroth & Co., 344 F.3d 184, 200 (2d Cir. 2003)).

A faithless employee or agent is generally required to account to the principal for secret profits and benefits obtained through the agency and may be required to forfeit compensation received during the period of disloyal service. See Phansalkar, 344 F.3d at 200-03.

New York courts grant summary judgment – and order forfeiture of compensation – where the record shows repeated, duty-tainted disloyalty rather than a single isolated lapse. See City of Binghamton v. Whalen, 141 A.D.3d 145, 147-49 (3d Dept. 2016) (granting summary judgment on faithless-servant liability and damages where an employee engaged in repeated acts of disloyalty over a multi-year period, and holding that otherwise competent performance does not defeat forfeiture); William Floyd Union Free Sch. Dist. v. Wright, 61 A.D.3d 856, 859 (2d Dept. 2009) (complete and permanent forfeiture of compensation is warranted for repeated acts of disloyalty); Owen v. Hurlbut, 80 Misc. 3d 1234(A), 2023 N.Y. Slip Op. 51164(U), at *8 (Sup. Ct. Monroe Cnty. Nov. 2, 2023) (granting summary judgment on a faithless-servant claim and ordering disgorgement of compensation where the fiduciary formed a new entity and stripped the old entity of its business).

**i. The IAG Plaintiffs have proven Deo's breach of duty of loyalty**

As discussed in Western Electric Co. v. Brenner, 41 N.Y.2d 291, 295 (1977), the employer-employee relationship is one of contract, express or implied, and the relevant law in considering the obligations of one to the other is within the purview of master-servant and principal-agent. A fundamental element of that relationship is that an employee must be loyal to his employer and is "prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Lamdin v. Broadway Surface Adv. Corp., 272 N.Y. 133, 138 (1936). "Clearly, an employee must not seek to acquire indirect advantages from third persons for performing duties and obligations owed to his employer." Western Electric, 41 N.Y.2d at 295. A faithless employee is generally required to forfeit compensation earned, whether salary or commissions. It does not "make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent." Feiger

v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928-29 (1977); Phansalkar, 344 F.3d at 200-07; City of Binghamton, 141 A.D.3d at 147-50.

Deo was Northshore's and Sunrise's salaried manager, not a stranger dealing at arm's length. SMF ¶¶ 84-91, 102-25; Chabrier Decl. ¶¶ 45-60; Aaronson Decl. ¶¶ 50-68. His assigned work included accurate reporting, prudent inventory purchases, timely trade-in and floor-plan payoffs, and safeguarding each dealership's property. Id. The record establishes repeated conduct directly adverse to both employers: monthly reporting adjustments that concealed losses; directions to hold payoff checks; failure to pay Ally on sold inventory; continued related-party payments while essential debts accumulated; unaccounted cash, lender proceeds, warranties, and inventory; and the unauthorized use of Northshore's future receipts and later credit for Deo-controlled purposes. SMF ¶¶ 127-220, 234-300, 938, 991; Aaronson Decl. ¶¶ 69-100, 113-27.

This was not one isolated error. The reporting process recurred from at least August 2021 through October 2022; more than fifty-five trade-payoff transactions accumulated over roughly nine months; the unpaid floor-plan exposure required more than $4 million in IAG-funded cure payments; and Deo then financed against Northshore's future receipts in November 2022. SMF ¶¶ 131, 196-210, 238-63. The acts permeated the very functions for which Deo was paid – cash management, inventory financing, creditor payment, and reporting. Northshore and Sunrise are therefore entitled to judgment on liability on Counts Fourteen and Eighteen and to forfeiture of Deo's compensation for the proven period of disloyal service, with the amount determined from authenticated payroll and payment records.

The amounts confirm that the conduct went to the heart of Deo's compensated duties. The fourteen-month reconciliation identifies approximately $2.318 million of profit-enhancing adjustments; the records identify $230,000.00 in Sunrise cash taken by Deo and more than $240,000 in unreturned canceled-deal financing; and IAG's schedules identify millions of

dollars in Ally and customer obligations that Plaintiffs funded. During the same period, the dealerships continued paying the Deos $10,000 per week and paying Car Buyers its 7.5% commission. Kwun Decl. ¶¶ 30-59; Aaronson Decl. ¶¶ 47, 61-89; see City of Binghamton, 141 A.D.3d at 147 ("defendant's admission to stealing more than $50,000.00 from plaintiff over the course of a nearly six-year period constitutes conclusive proof of such facts and established plaintiff's entitlement to judgment as a matter of law on the issue of liability").

Deo was paid to manage Northshore and Sunrise for their owners, yet used that entrusted position to direct undisclosed financial adjustments, sell Northshore's future receipts without member authority, route the resulting economic benefit through controlled entities, retain customer cash and canceled-loan proceeds, and use dealership property for his own purposes. SMF ¶¶ 84-92, 107-35, 192-220, 224-63, 748, 751-54, 955, 967, 971-73, 991-93. He directed the $735,000.00 Libertas replacement payment into Thomasson's IOLA and on to Car Buyers, and identified that receipt as the Libertas money. ECF 410-2; ECF 410-3; Deo II Dep. 90:10-91:17; SMF ¶¶ 253-63. Sara admitted those funds were used "at least in part to purchase an interest in Superb." Sara Dep. 203:4-204:12. That is secret profit from the agency.

He then used the same agency to obtain the March 2023 Flushing loan with a PFS that listed a Bronx house and mortgage he did not own and an Old Westbury house and mortgage he never closed on, and he moved almost $400,000.00 of that line off Northshore, including $50,000.00 to Laurie's DLA Capital Partners. ECF 204-2; SMF ¶¶ 288-99, 940-42; Deo Dep. (Feb. 13, 2026) 73:10-83:4; ECF 437 Ex. P. A manager who encumbers the employer's assets to fund his affiliate has not been loyal for even one of the weeks he was paid.

**ii. The Superb Plaintiffs have proven Deo's breach of duty of loyalty**

Superb entrusted Deo with managerial access, employees, vehicles, customers, systems, and banking relationships.

While owing undivided loyalty, he formed and operated competing Gold Coast entities, used interchangeable personnel, moved Superb vehicles to the Syosset operation, opened and controlled a separate account in Superb's name, and used Superb commercial resources for the competing enterprise. SMF ¶¶ 367, 633-80, 724-25, 733-60, 951-52, 1016-41; ECF 40 ¶¶ 20-30. The account he opened was opened on a 100% beneficial-owner certification after the March 1, 2023 PFS omitted Superb and after Urrutia had sent Flushing tax materials showing other shareholders. SMF ¶¶ 633-45, 1016-40; ECF 517 ¶¶ 12-34; ECF 204-2. From that account he caused fifteen transfers totaling $405,900.00 to Northshore, five NESNA ACH debits totaling $426,967.11, and a $210,900.00 wire to Car Buyers for a Rolls-Royce. SMF ¶¶ 633-45, 1016-41. He admitted Superb cars went to the July 2023 Syosset event; Blankenship drove them; Merckling moved the six cars later held under injunction; Orgad puts Superb cars into a cash-only negotiation. ECF 156-1 at 57:1-22; Blankenship Dep. 100:13-102:3; SMF ¶¶ 677, 760, 951-52; ECF 40 ¶¶ 20-30. Blankenship was on Superb's payroll as operations manager at $1,300 a week while that was happening. ECF 95-3 at 7-8. Competing with the principal, on the principal's payroll, with the principal's cars, is the Owen fact pattern.

**iii. Deo Must Disgorge All Compensation Paid to him by both sets of Plaintiffs**

Because the disloyalty was repeated and permeated the management functions entrusted to Deo, the forfeiture period should run from the first proved disloyal act through termination of the agency. SMF ¶¶ 107-35, 192-263, 367, 633-80, 724-60, 951-60, 991-93, 1016-41.

The faithless-servant doctrine's reach in this case extends to the entirety of Deo's tenure because the record demonstrates not isolated acts of disloyalty but a systematic and pervasive program of self-dealing that infected every category of managerial function entrusted to him. See Phansalkar, 344 F.3d at 200-03.

The financial-adjustment scheme operated monthly from at least August 2021, making the dealerships appear more profitable to lenders while undermining their actual financial health. The Libertas transaction diverted $735,000.00 in Northshore's own proceeds without member authorization. The Flushing account opening and subsequent payment orders diverted Superb's money and credit without the authorized owners' knowledge. The Gold Coast operations used Superb's personnel, vehicles, and customers for the competing enterprise while Deo remained on Superb's payroll. Jones' testimony provides additional support for the faithless-servant analysis by confirming the method and duration of the disloyal financial-adjustment program. Jones confirmed that the monthly DMS adjustments reflected a recurring process from at least August 2021, whereby he and Deo selected adjustment figures and Jones directed O'Sullivan, and later Kernizant, to enter them without authorization from Urrutia or the other principal owners. Jones Dep. 23:3-25, 25:6-14; O'Sullivan Dep. 105:6-112:20. The fact that Jones directed Superb's own controller to make these entries at Deo's behest, bypassing the authorized ownership and management structure, confirms that Deo's disloyal conduct was systematic and pervasive rather than episodic. With respect to the disgorgement period, the evidence establishes that the first provable disloyal act occurred no later than August 2021 – when the monthly accounting adjustments began – and continued through at least August 2023, when the vehicle movement and competing Gold Coast operations were confirmed. Accordingly, the forfeiture period encompasses at minimum the full two-year span from August 2021 through August 2023, with the period of August 2021 through November 2022 attributed to the IAG Plaintiffs and November 2022 through August 2023 attributed to the Superb Plaintiffs. The weekly $10,000 paid to the Deos and the 7.5% Car Buyers commissions during the IAG period, and Deo's Superb-period compensation including the use of Superb payroll for Blankenship and Thomasson, are the forfeiture base. Kwun Decl. ¶¶ 30-59; Aaronson Decl. ¶¶ 47, 61-89; ECF 95-3 at 7-8; Thomasson Dep. 129-132, 313:16-319:19.

**G. Counts 15, 19, and 27 - Northshore, Sunrise, and Superb are Entitled to Summary Judgment on their Breach of Fiduciary Duty Claims**

To establish breach of fiduciary duty under New York law, a plaintiff must establish (1) the existence of a fiduciary duty; (2) a knowing breach of that duty; and (3) damages resulting from the breach. See ECF 230 at 90. A fiduciary relationship exists where one person is under a duty to act for or give advice for the benefit of another concerning matters within the scope of the relationship. Id.

Summary judgment is routinely granted on that showing where a manager uses entrusted control to divert assets, opportunities, or competing operations.

**i. The IAG Plaintiffs have proven Deo's breach of fiduciary duty**

A breach-of-fiduciary-duty cause of action requires a fiduciary relationship between two persons, with one of them having a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. See Marmelstein v. Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue, 11 N.Y.3d 15, 21 (2008) (citing EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11 (2005) (quoting Restatement (Second) of Torts § 874 cmt. a)). While the establishment of a fiduciary relationship is necessarily a fact-specific inquiry, two essential elements are de facto control and dominance. Northeast Gen. Corp. v. Wellington Adv., 82 N.Y.2d 158, 162 (1993); see also Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alimentari S.p.A., 638 Fed. Appx. 87 (2d Cir. 2016).

Such a relationship is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's-length business transactions. See EBC I, 5 N.Y.3d at 19-20; ECF 230 at 90-92.

Deo's entrusted managerial control created duties to act for each Dealership's benefit, disclose material financial facts, avoid self-dealing, protect company property, and account for entrusted transactions. The same established acts satisfy misconduct, but the remedy differs from faithless-servant forfeiture. Deo knew the dealerships could not cover held trade and Ally

payoff checks, participated in monthly reporting that hid the condition, allowed IAG's guaranties to remain exposed, and directed or benefited from transfers to Car Buyers. SMF ¶¶ 127-220, 234-300; Aaronson Decl. ¶¶ 69-100, 113-27. Northshore and Sunrise were deprived of cash and property that should have satisfied their obligations, while IAG affiliates and guarantors paid the resulting lender, customer, warranty, and operating liabilities. SMF ¶¶ 203-16, 907-14; Aaronson Decl. ¶¶ 90-100, 128-35. That is misconduct and resulting economic injury as a matter of law.

Based upon the record herein, there can be no dispute that Deo exerted total control and dominance, through his own actions and those of his cohorts, over, inter alia, Northshore and Sunrise.

The quantified records further show resulting injury rather than merely deficient management. The adjusting entries concealed approximately $2,613,974.36 in pre-adjustment losses during the fourteen reviewed months; the unpaid canceled-deal financing and customer deposits deprived the dealerships of funds needed for mandatory obligations; and identified IAG entities were required to fund the ensuing Ally and customer cure payments. Kwun Decl. ¶¶ 30-59.

The fiduciary relationship arose from Deo's compensated control over operations, finances, inventory, customer transactions, lender dealings, and records. SMF ¶¶ 84-92, 107-35, 748, 751-54.

He knowingly breached by selling Northshore's future receipts without member authority, causing the proceeds to be routed away from Northshore, directing recurring financial adjustments, retaining cash and canceled-loan proceeds, and using corporate assets for himself and related entities. SMF ¶¶ 238-63, 288-99, 991-93; ECF 410-2; ECF 410-3. The March 1, 2023 PFS and the $500,000.00 Flushing line against Northshore's assets, obtained on

houses he did not own, is additional self-dealing with the principal's credit. ECF 204-2; SMF ¶¶ 288-97; Deo Dep. (Feb. 13, 2026) 73:10-83:4; ECF 437 Ex. P.

The Court should enter liability judgment on Counts Fifteen and Nineteen.

**ii. The Superb Plaintiffs have proven Deo's breach of fiduciary duty**

Deo's authority over Superb's operations, employees, vehicles, customer information, and banking relationships created a fiduciary duty independent of any disputed equity interest. Justice Murphy has already held that Deo has no ownership interest in Superb and rescinded the Cross-Purchase Agreement for fraudulent misrepresentation. SMF ¶ 1066. The duty therefore rests on entrusted management, not on stock.

He breached it by opening and controlling a separate Superb account at Flushing, deploying Superb vehicles and personnel through the Gold Coast operation, using internal commercial resources to benefit competing entities, and withholding or moving property after demand and court intervention. SMF ¶¶ 367, 633-80, 724-60, 951-52, 1016-41. The quantified account injury is the $405,900.00, the $426,967.11, and the $210,900.00 identified above. The chattel injury is the Syosset and injunction cars. ECF 40 ¶¶ 20-30; ECF 156-1 at 57:1-22.

**H. Counts 26 and 9 - The IAG and Superb Plaintiffs are Entitled to Summary Judgment on their Fraud Claims**

Under New York law, common-law fraud requires proof of (1) a material misrepresentation or omission of fact; (2) knowledge of its falsity; (3) intent to defraud; (4) reasonable reliance by the plaintiff; and (5) resulting damages. See ECF 230 at 71 (citing MetLife Invs. USA Ins. Co. v. Zeidman, 734 F. Supp. 2d 304, 312 (E.D.N.Y. 2010)).

Those elements may be established as a matter of law where the speaker's falsity, knowledge, and the plaintiff's reliance are documented rather than inferred from rhetoric. See N.Y.C. Transit Auth. v. Morris J. Eisen, P.C., 276 A.D.2d 78, 85-87 (1st Dept. 2000) (granting

summary judgment on common-law fraud where a prior federal RICO conviction and the civil record established knowing material misrepresentations, justifiable reliance, and resulting damages); Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 406-07 (1958) (a knowing false representation of present fact, made to induce reliance and causing injury, is actionable fraud).

**i. The IAG Plaintiffs have proven Deo's fraud**

Common-law fraud requires a material misrepresentation or omission known to be false, intent to induce reliance, the plaintiff's justifiable reliance, and direct pecuniary injury. Pasternack v. Lab. Corp. of Am. Holdings, 27 N.Y.3d 817, 827-29 (2016); Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 31 N.Y.3d 569, 578-83 (2018). Formal financial representations may be reasonably relied upon where the recipient obtained them for the very purpose of assessing the transaction. DDJ Mgmt., LLC v. Rhone Grp. L.L.C., 15 N.Y.3d 147, 154-56 (2010). Fraud damages are the plaintiff's actual out-of-pocket loss caused by reliance, not every loss associated with the relationship. Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421-22 (1996).

The false representation was the recurring presentation of Northshore and Sunrise monthly financials as complete and accurate while Deo and Jones selected adjustments that made the businesses appear more profitable and concealed unpaid liabilities.

Deo knew the real condition because he controlled expenditures and instructed O'Sullivan concerning held checks and unpaid Ally obligations. The process recurred monthly from at least August 2021 through September 2022, and the statements were furnished to IAG and Ally to preserve financing. SMF ¶¶ 104-18, 126-35, 192-211, 938, 981-84, 991; Aaronson Decl. ¶¶ 53-74, 87-97.

Each reliance episode has the same five facts. First, the specific false statement: month-end DMS reports that could appear approximately $1.4 million better before year-end write-

offs, and, later, the July 5, 2023 P&L lifting revenue from approximately $9.4 million to $13.4 million. Jones Dep. 132:4-133:8, 299:19-316:16; O'Sullivan Dep. 105:6-113:6; SMF ¶ 991. Second, the date and recipient: monthly transmissions to IAG and Ally from at least August 2021 through October 2022, and the July 5, 2023 P&L at Deo's direction. SMF ¶¶ 127-35, 991. Third, knowledge of falsity: O'Sullivan entered the manual adjustments; Jones admitted the July figures "were not the true numbers"; Deo ordered statements "showing a profit" as an "absolute must." Jones Dep. 301:12-17, 299:19-316:16; O'Sullivan Dep. 105:6-113:6. Fourth, reliance: IAG left guaranties in place, left Deo on the DMS and the Ally line, and kept buying inventory. SMF ¶¶ 105-18, 133-45; Aaronson Decl. ¶¶ 57-63, 72, 82. Fifth, harm: more than $4 million to Ally plus identified trade, warranty, customer, and operating obligations paid by IAG. SMF ¶¶ 177, 186, 203-16, 907-14; Aaronson Decl. ¶¶ 90-100, 128-35. The July 5, 2023 P&L – Deo's dictated $13.4 million gross / $1.33 million net against actual revenue of approximately $9.4 million – is the single clearest document of knowing falsity at Deo's direction and anchors the fraud proof.

The fourteen-month reconciliation supplies transaction-level proof of material falsity. The entries increased reported profitability by $2,317,744.04 and transformed approximately $2,613,974.36 in combined pre-adjustment losses into an apparent aggregate loss of only approximately $296,230.32.

The repeated direction of the entries – increasing sales, reducing vehicle and warranty costs, and moving current expenses into balance-sheet accounts – supports an inference that the distortion was systematic rather than accidental. Kwun Decl. ¶¶ 30-33.

Intent is supported by the recurring process, Deo's control over both the concealed obligations and the adjustments, the necessity of apparently acceptable monthly financials to maintain the floor plan, and the continuation of compensation and payments to his company. IAG's reliance was direct: Aaronson states that IAG relied on the reporting by leaving

guaranties in place, permitting Deo's continued DMS and Ally access, and allowing the inventory-financing structure to continue; had the true condition and financing structure been disclosed, he would not have approved the purchases or continued the guaranty exposure. SMF ¶¶ 105-18, 133-45; Aaronson Decl. ¶¶ 57-63, 72, 82.

That reliance produced measurable injury when IAG affiliates and guarantors paid the concealed liabilities: more than $4 million to Ally plus identified trade, warranty, customer, and operating obligations. SMF ¶¶ 177, 186, 203-16, 907-14; Aaronson Decl. ¶¶ 90-100, 128-35. The sequence is causal, not merely chronological: accurate reporting would have led IAG to stop or restrict Deo's authority and floor-plan use before additional exposure accumulated. The same scheme's lender-facing use and the later Libertas and Flushing submissions corroborate knowledge and intent, but the IAG Plaintiffs do not substitute Ally's, Libertas's, or Flushing's reliance for their own. Pasternack, 27 N.Y.3d at 828-29.

The Court should enter judgment on Count Twenty-Six for each IAG plaintiff whose declaration and payment records establish its receipt of the false reporting, reliance decision, and direct out-of-pocket payment. At minimum, Rule 56(g) should establish Deo's reporting duty and control, the monthly adjustment process, the statements' profit-enhancing effect, IAG's continuation of guaranties and access in reliance, the August 2022 revelation, and the resulting IAG-funded cure, leaving only statement-level or claimant-level allocation for trial.

The fraud proof is not limited to an accusation that the books were "wrong." Jones and Deo selected recurring monthly adjustments; O'Sullivan entered them and testified that they made the dealerships appear more profitable; Jones acknowledged that monthly statements could appear approximately $1.4 million better before year-end write-offs and that such statements were supplied to Ally; and Deo later demanded statements "showing a profit" as an

"absolute must." SMF ¶¶ 127-35, 991-93; Jones Dep. 132:4-133:8, 301:12-17; O'Sullivan Dep. 105:6-113:6.

Jones' testimony provides the direct testimonial foundation for both the "knowledge of falsity" and "intent to defraud" elements of the IAG fraud claims. Jones admitted under oath that the figures in the July 5, 2023 P&L statement "were not the true numbers" and that Deo had specifically instructed him to close out the statements "showing a profit" as an "absolute must." Jones Dep. 299:19-316:16; SMF ¶ 991.

This admission directly establishes: (1) the fact of falsity, i.e., the P&L did not reflect actual revenue; (2) knowledge of falsity, i.e., Jones, the document's preparer, knew the numbers were not true; and (3) the direction-of-intent chain, i.e., Deo dictated specific false numbers to Jones, who prepared and transmitted the document knowing they were false. Together, Jones' testimony and Deo's "absolute must" instruction establish the knowing fraudulent intent required for summary judgment on the IAG fraud claim without relying solely on circumstantial inference.

Additionally, Jones' admitted preparation of Deo's personal financial statement for Flushing without supporting documentation constitutes a separate and independently provable false financial representation transmitted in connection with the $500,000.00 loan application. Jones Dep. 316:14-316:20; ECF 204-2. That statement listed a Bronx residence at 3011 Matthews Avenue worth $1,280,000.00 with a $479,000.00 mortgage, and an Old Westbury residence at 3 Hunting Lane worth $5,295,000.00 with a $2,250,000.00 mortgage. SMF ¶¶ 290, 294; ECF 204-2. Deo admitted he was on neither deed and neither mortgage; that the Bronx house was his father's, subject to Justice Suarez's September 21, 2007 order expunging a deed the court found Deo had forged; and that he never closed on, paid for, or mortgaged the Old Westbury house. SMF ¶¶ 291-95; Deo Dep. (Feb. 13, 2026) 73:10-83:4; ECF 437 Ex. P. On August 1, 2023, when applying for a mortgage on his own home, he listed the same addresses

and explained they were rentals he does not own and/or never owned. ECF 543-20 at 20-21. Those are knowing misrepresentations of present fact, made to induce Flushing to extend credit against Northshore, and they independently satisfy falsity, knowledge, and intent. This false PFS, prepared by Deo's own accountant with admitted knowledge that the PFS carried no reliability guarantee, supports both the IAG and Superb fraud claims by establishing a pattern of fabricated financial documentation submitted to lenders.

**ii. The Superb Plaintiffs have proven Deo's fraud**

The strongest Superb fraud proof concerns specific ownership and authority representations. Flushing received principal-side material identifying Urrutia and Clarke as shareholders, while Deo later certified himself, with no proof whatsoever, as 100% owner and signed a resolution purporting to give himself unilateral transaction authority. SMF ¶¶ 633-45, 1016-40; ECF 517 ¶¶ 12-34. The March 1, 2023 PFS given to the same bank omitted Superb entirely. ECF 204-2; Jones Dep. 267:22-272:11.

Another example of direct evidence involves Deo's representation to Urrutia that he was investing $500,000.00 for a forty-nine-percent interest in Superb while actually using racketeering proceeds for that investment, a material omission (that the funds derived from the unauthorized Northshore-Libertas transaction) that induced Urrutia to admit Deo to managerial access over Superb. ECF 11 ¶¶ 10-32; ECF 11-5; SMF ¶¶ 257, 341; Sara Dep. 203:4-204:12.

This fraudulent inducement into the Superb management relationship is distinct from the lender-directed misrepresentations and independently supports the Superb fraud count: (1) the representation was that Deo was contributing legitimate capital; (2) Deo knew the capital derived from the unauthorized Libertas transaction, Deo II Dep. 90:10-91:17; ECF 410-3; (3) the intent was to obtain managerial access to Superb; (4) Urrutia reasonably relied on the representation of a legitimate capital contribution, ECF 11 ¶¶ 10-32; and (5) the reliance caused Superb's injury by conferring the managerial access Deo then abused. SMF ¶¶ 633-80, 1016-

41. Indeed, Justice Murphy rescinded the Cross-Purchase Agreement due to Deo's fraud, finding fraudulent misrepresentation, failure to consummate, and that Deo has no ownership interest in Superb. SMF ¶ 1066. Those findings are entitled to issue-preclusive effect here.

**I. Counts 7, 12, and 20 - Plaintiffs are Entitled to Summary Judgment on their Conversion Claims**

Under New York law, conversion is the "unauthorized exercise of dominion over personal property in interference with the plaintiff's legal title or superior right of possession." See ECF 230 at 61 (citing LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)). A plaintiff therefore establishes conversion by demonstrating (1) legal ownership or an immediate superior right of possession to specifically identifiable property and (2) the defendant's unauthorized dominion over that property. Id. New York courts grant summary judgment on conversion where specifically identifiable funds or chattels are taken without authority—including funds routed through an attorney escrow or IOLA account and vehicles or cash removed from the owner's control. See Grasshoff v. Etra, 135 A.D.3d 574, 575 (1st Dept. 2016) (affirming summary judgment for conversion where the defendant received specifically identified funds in an escrow account and transferred them to a third party without permission).

**a. Count 12 - Northshore against Deo**

Northshore's property was specifically identifiable: $997,500 of its defined future receipts and the $735,000.00 net value paid for them under the Libertas agreement. Deo had no member authorization to sell the revenue stream or take its value personally. He nevertheless directed the $735,000.00 replacement payment through Thomasson's IOLA account to Car Buyers, and the resulting funds were used for Deo-related investments and expenditures rather than Northshore, including the $500,000.00 Superb "investment" and approximately $173,000.00 toward the Hunting Lane landlord. SMF ¶¶ 253-63, 341, 954-58, 973; ECF 410-2; ECF 410-3; Deo II Dep. 90:10-91:17, 142:4-19. Northshore also has a specifically

identifiable claim to the Flushing $500,000.00 line taken against its assets and moved to Car Buyers and DLA. SMF ¶¶ 297-99, 940-42.

**b. Count 20 - Northshore Against Thomasson**

Thomasson received a specifically identified $735,000.00 payment after written notice that it was being sent "to hold in escrow." ECF 410-2; SMF ¶¶ 253-55.

He did not reject the condition before providing wiring instructions and admitted that his contrary announcement came only after the transfer was initiated. Thomasson Dep. 274:8-19, 280:10-281:9.

He then exercised dominion inconsistent with preservation: approximately $723,000.00 went to Car Buyers and approximately $12,000.00 was retained. ECF 410-3; Thomasson Dep. 113:10-115:18, 123:15-124:17; SMF ¶¶ 257-58, 1056. Grasshoff is this case: identifiable funds in an attorney escrow, transferred to a third party without the owner's authority.

**c. Count 7 - Superb**

The Deo Defendants misappropriated the Superb Plaintiffs' vehicles and specific sums of cash. Deo admitted taking Superb vehicles to the July 2023 Syosset event; Blankenship supplied the direct transportation testimony and Lowe corroborated it; Merckling separately transported the six vehicles later held under the injunction; and Orgad identified Superb vehicles offered in a cash-only transaction. ECF 156-1 at 57:1-22, 117:5-118:2; Blankenship Dep. 100:13-102:3; SMF ¶¶ 677, 760, 951-52; ECF 40 ¶¶ 20-30. The separate Flushing account and challenged debits identify a second category of specific property: $405,900.00, $426,967.11, and $210,900.00. SMF ¶¶ 633-45, 1016-41. Those sums are identifiable. Dominion is the wires. Authority is absent. That is conversion.

## CONCLUSION

For the reasons set forth *supra*, Plaintiffs respectfully request that this Court grant Plaintiffs' motion pursuant to Rule 56, for summary judgment on the foregoing claims, and for such other and further relief as the Court may deem just, equitable and proper.

Alternatively, if the Court concludes that a particular defendant's intent, a disputed signature, strict tracing, or a damages amount remains triable, Plaintiffs request an order under Rule 56(g) treating the undisputed component facts as established.

Dated: Jamaica, New York
September 1, 2026

Respectfully submitted,

**SAGE LEGAL LLC**

*__/s/ Emanuel Kataev, Esq.____*

Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.com

*Attorneys for Plaintiffs*
*Superb Motors Inc.,*
*Team Auto Sales LLC, and*
*Robert Anthony Urrutia*

**CYRULI SHANKS & ZIZMOR LLP**

_______/s________________________
Jeffrey Ruderman, Esq.
420 Lexington Avenue, Suite 2320
New York, NY 10170-0002
(212) 661-6800 (office)
(347) 379-4622 (direct dial)
(212) 661-5350 (facsimile)
jruderman@cszlaw.com

*Attorneys for Remaining Plaintiffs*

**VIA ECF**
All counsel of record