UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SUPERB MOTORS INC., TEAM AUTO SALES LLC, ROBERT ANTHONY URRUTIA, 189 SUNRISE HWY AUTO LLC, NORTHSHORE MOTOR LEASING, LLC, BRIAN CHABRIER, JOSHUA AARONSON, JORY BARON, ASAD KHAN, IRIS BARON REPRESENTATIVE OF THE ESTATE OF DAVID BARON, 1581 HYLAN BLVD AUTO LLC, 1580 HYLAN BLVD AUTO LLC, 1591 HYLAN BLVD AUTO LLC, 1632 HYLAN BLVD AUTO LLC, 1239 HYLAN BLVD AUTO LLC, 2519 HYLAN BLVD AUTO LLC, 76 FISK STREET REALTY LLC, 446 ROUTE 23 AUTO LLC and ISLAND AUTO MANAGEMENT, LLC,

Plaintiffs,

-against-

DEO, SARAH DEO, HARRY THOMASSON, DWIGHT BLANKENSHIP, MARC MERCKLING, MICHAEL LAURIE, THOMAS JONES, CPA, CAR BUYERS NYC INC., GOLD COAST CARS OF SYOSSET LLC, GOLD COAST CARS OF SUNRISE LLC, GOLD COAST MOTORS AUTOMOTIVE GROUP LLC, GOLD COAST MOTORS OF LIC LLC, GOLD COAST MOTORS OF ROSLYN LLC, GOLD COAST MOTORS OF SMITHTOWN LLC, UEA PREMIER MOTORS CORP., DLA CAPITAL PARTNERS INC., JONES, LITTLE & CO., CPA'S LLP, FLUSHING BANK, LIBERTAS FUNDING LLC, J.P. MORGAN CHASE BANK, N.A., 189 SUNRISE HWY AUTO LLC, and NORTHSHORE MOTOR LEASING, LLC

Defendants.
-------------------------------------------------------------------X

**Case No.: 2:23-cv-6188 (JMW)**

**PLAINTIFFS' COMBINED LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR RESPECTIVE MOTIONS <u>FOR SUMMARY JUDGMENT</u>**

Plaintiffs Superb Motors Inc. ("Superb"), Team Auto Sales LLC ("Team"), Robert Anthony Urrutia ("Urrutia") (Superb, Team, and Urrutia collectively hereinafter the "Superb Plaintiffs"), and Plaintiffs 189 Sunrise Hwy Auto LLC ("Sunrise"), Northshore Motor Leasing, LLC ("Northshore"), Brian Chabrier, ("Chabrier") Joshua Aaronson ("Aaronson"), Jory Baron ("Jory"), Asad Khan ("Khan"), Iris Baron Representative of the Estate of David Baron ("Iris"), 1581 Hylan Blvd Auto LLC, 1580 Hylan Blvd Auto LLC, 1591 Hylan Blvd Auto LLC, 1632 Hylan Blvd Auto LLC, 1239 Hylan Blvd Auto LLC, 2519 Hylan Blvd Auto LLC, 76 Fisk Street Realty LLC, 446 Route 23 Auto LLC and Island Auto Management, LLC (collectively "IAG Plaintiffs") (Superb Plaintiffs and IAG Plaintiffs collectively hereinafter the "Plaintiffs"), by their respective attorneys Sage Legal LLC and Cyruli Shanks & Zizmor LLP, hereby respectfully submit this Statement of Material Facts Pursuant to Local Civil Rule 56.1 in Support of their Motion for Summary Judgment (hereinafter "SMF") against Defendants Deo ("Deo"), Sarah Deo ("Sara"), Harry Thomasson ("Thomasson"), Dwight Blankenship ("Blankenship"), Marc Merckling ("Merckling"), Michael Laurie ("Laurie"), Car Buyers NYC Inc. ("Car Buyers"), Gold Coast Cars of Syosset LLC, Gold Coast Cars of Sunrise LLC, Gold Coast Motors Automotive Group LLC, Gold Coast Motors of LIC LLC, Gold Coast Motors of Roslyn LLC, Gold Coast Motors of Smithtown LLC, UEA Premier Motors Corp., (collectively the "Deo Defendants") DLA Capital Partners Inc. ("DLA Capital"), Flushing Bank ("Flushing"), and Libertas Funding LLC ("Libertas") (collectively hereinafter the "Defendants").

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**IAG Plaintiffs**

1. In 2016, Deo pled guilty and was convicted in the United States District Court for the Southern District of New York of two counts of federal wire fraud in connection with a mortgage. ECF 385-2.

2. In 2014, Deo opened a used car dealership under the name of UEA Premier Motors Corp. ("UEA"). Kataev Decl. Ex. G Deo Dep. 120:17-121:15.

3. Operating a used car dealership requires a license from the New York State Department of Motor Vehicles ("DMV"). Aaronson Decl. ¶¶ 19, 22; Deo Dep. 452:7-10.

4. The application for a license from the DMV requires the applicant to disclose whether they have ever been convicted or pled guilty to a felony. Ex. 2.

5. The DMV application required Deo to disclose that he had previously pleaded guilty and had been convicted of a felony in the Southern District of New York. ECF 385-3 at 6.

6. Providing false information on the application to the DMV "may be punishable as a criminal offense." ECF 385-3 at 8.

7. Prior to 2023, Deo, although owning and operating used car dealerships, does not recall submitting an application to the DMV in his own name. Deo Dep. 452:7-456:7.

8. The DMV license applicant can be held personally responsible for actions in violation of DMV regulations. ECF 385-3.

9. That license for UEA was subsequently revoked by the DMV for various reasons, including fraudulent activities with consumers. Kataev Decl. Ex. G Deo Dep. 459:19-460:5; Ex. 12.

10. Part of Deo's criminal judgment was that he was prohibited from obtaining future credit lines without the approval of the probation department for a period of five (5) years. ECF 385-2.

11. In October 2016 Deo arranged for UEA to enter into an agreement with Westlake Financial Services so that UEA could provide financing to its customers. Urrutia Decl. ¶ 57, Ex. D.

12. Deo arranged for Luis Beria ("Beria") to sign the Westlake agreement with UEA as UEA's owner. Deo Dep. Dec. 13, 2026 ("Deo II Dep."), 123:6-125:24; Urrutia Decl. ¶ 57, Ex. D.

13. Beria was not an owner of UEA. Deo II Dep. 123:6-125:24.

14. The Westlake Agreement with UEA provided false information. Deo II Dep. 123:6-125:24; Urrutia Decl. ¶ 57, Ex. D.

15. Deo was aware that the Westlake Agreement with UEA provided false information. Ruderman Decl. ¶ 3; Kataev Decl. Ex. G Deo II Dep. 123:6-125:24.

16. In 2013, Deo and Sara opened a used car dealership under the name Universal Exotic Autos Inc. ("Universal Exotic"). Kataev Decl. Ex. G; Deo Dep. 112:9-19, 114:11-117:19.

17. The DMV records note that Sara was the owner of Universal Exotic. Urrutia Decl. ¶ 45, Ex. A.

18. That license was subsequently revoked in October 2017 by the DMV for various reasons, including fraudulent activities with consumers. Kataev Decl. Ex. G; Deo Dep. 504:5-505:4; Urrutia Decl. ¶ 45, Ex. A.

19. After the licenses for all of Deo's used car dealerships were revoked, Deo still had the lease and location at 180 Michael Drive, Syosset, New York. ECF 30-2.

20. Deo then formed a new company called Northshore Motor Leasing LLC ("Northshore") that was organized in New York State in November 2017. Kataev Decl. Ex. G Deo Dep. 56:23-57:18.

21. In order for Deo to operate Northshore, it needed a license from the DMV. Kataev Decl. Ex. G; Deo Dep. 129:14-130:3, Aaronson Decl. ¶ 22.

22. Automobile dealers typically operate by obtaining floor plan credit line financing from a lender to purchase vehicle inventory (a "Floor Plan"). Ruderman Decl. ¶ 3; ECF 204 ¶¶ 7-9; Aaronson Decl. ¶ 7.

23. The Floor Plan for any particular inventoried vehicle is satisfied when the vehicle is sold. ECF 204 ¶ 10; Aaronson Decl. ¶ 7.

24. Deo needed a Floor Plan for Northshore to purchase used car inventory. ECF 204 ¶ 12;Kataev Decl. Ex. G Deo Dep. 97:9-18; 203:10-22, 456:8-23; 494:16-496:4.

25. Around that time Deo was introduced to David Baron ("Baron") through a mutual acquaintance, plaintiff Khan. Chabrier Decl. ¶ 6; Deo Dep. 130:24-132:19, 494:16-496:4.

26. Baron, along with his brother Ron Baron, and others, was the owner of new and used car dealerships (the "Baron Group") which had an existing Floor Plan with Ally Bank ("Ally"). Chabrier Decl. ¶ 5.

27. Chabrier was an employee of Baron Nissan which dealership was part of the Baron Group. Chabrier Decl. ¶ 4; Chabrier Dep. 14:3-15.

28. Deo and Baron came to an arrangement in 2018 concerning opening and operating Northshore. Chabrier Decl. ¶ 7; Deo Dep. 494:16-502:13, 508:4-514:3.

29. Baron, Khan and Chabrier became the owners of Northshore in 2018. Chabrier Decl. ¶ 8; Chabrier Dep. 75:14-76:3; Khan Dep. 11:10-14, 18:3-6; 30:23-31:9; 617224/2022 NYSCEF 4 and 60.

30. Baron arranged for Ally to provide Northshore with a Floor Plan. Chabrier Decl. ¶ 9; Deo Dep. 494:16-502:13, 508:4-514:3.

31. Northshore was to purchase its used car inventory using the Ally Floor Plan. Chabrier Decl. ¶ 9; Deo Dep. 494:16-502:13, 508:4-514:3.

32. Northshore has an operating agreement dated and entered into on February 14, 2018 signed by Baron, Khan and Chabrier (the "Northshore Operating Agreement"). Chabrier Decl. ¶ 10; 617224/2022 NYSCEF 4.

33. The 2018 Northshore Operating Agreement lists Baron, Khan and Chabrier as the sole members. Chabrier Decl. ¶ 10; 617224/2022 NYSCEF 4.

34. Until March 2023 there was no operating agreement listing Deo as a member of Northshore. Chabrier Decl. ¶ 11; Deo Dep. 152:19-155:11, 157:6-12; 617224/2022 NYSCEF 4.

35. In March 2023 there are two contemporaneous operating agreement listing Deo as a member of Northshore, one listing Deo as the 100% owner and one listing Deo as the 99% owner and Sara as the 1% owner. Ruderman Decl. ¶ 5; Kataev Decl. Ex G; Deo Dep. 232:21-236:22, 240:17-244:3; FLUSHING8508-FLUSHING8513; FLUSHING00116–FLUSHING00122; Ex 29.

36. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been listed as an owner or member of Northshore. Deo Dep. 550:25-552:25; Deo II Dep. 86:19-87:19.

37. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been provided with information necessary for him to file taxes in 2018, 2019 or 2020 listing him as an owner or member of Northshore. Ruderman Decl. ¶ 3; Kataev Decl. Ex G; Deo Dep. 550:25-552:25; Deo II Dep. 86:19-87:19.

38. In 2018 it was agreed that Chabrier would submit Northshore's application to the DMV on behalf of Northshore as an owner of Northshore. Chabrier Decl. ¶ 12; Chabrier Dep. 48:14-22.

39. Chabrier submitted the Northshore DMV application listing himself as owner. Chabrier Decl. ¶ 12; Chabrier Dep. 48:14-22.

40. The Northshore DMV application was approved by the DMV. Chabrier Decl. ¶ 12.

41. Northshore began operations in 2018 under the license which had been obtained with Chabrier as the owner applicant. Chabrier Decl. ¶ 13; Deo Dep. 129:18-130:19, 472:23-476:6.

42. If a license applicant is no longer associated with the licensed dealership, the DMV license applicant must be changed to the new owner. Aaronson Decl. ¶ 74; Kwun Decl. ¶ 65; Deo II Dep. 110:25-111:6; Deo Dep. 483:18-484:11.

43. Changing an existing DMV license applicant to a new owner requires a DMV change of owner application, which must be approved by the DMV. Chabrier Decl. ¶ 13; Aaronson Decl. ¶ 74; Kwun Decl. ¶ 66; Deo II Dep. 110:25-113:25; Deo Dep. 483:18-484:11.

44. From 2018 through May 2021 Baron would regularly come to the Northshore dealership to check on its operations. Chabrier Decl. ¶ 17; O'Sullivan Dep. 122:7-14, 123:12-124:19.

45. During that same period of time Baron, Khan, and Chabrier would each come to the Northshore dealership occasionally and receive a payment recorded as a shareholder draw. Chabrier Decl. ¶ 18; O'Sullivan Dep. 132:3-134:10.

46. Deo was aware of these payments being made to Baron, Khan and Chabrier. Chabrier Decl. ¶ 18.

47. As owners of Northshore, Baron, Khan and Chabrier were entitled to its profits. Chabrier Decl. ¶ 20; Jones Dep. 33:18-24.

48. Northshore filed tax returns for 2018, 2019 and 2020. Chabrier Decl. ¶ 21; Ex. 21.

49. In each of the tax returns for 2018, 2019 and 2020 the members of Northshore were listed as Baron, Khan and Chabrier. Chabrier Decl. ¶ 21; Ex. 21.

50. In each of the tax returns for 2018, 2019 and 2020 Baron, Khan and Chabrier each received a K-1. Chabrier Decl. ¶ 22; Ex. 21.

51. The K-1's for Northshore would equally divide any profit or losses of Northshore between Baron, Khan and Chabrier. Chabrier Decl. ¶ 22; Ex. 21.

52. The K-1's to Baron, Khan and Chabrier from Northshore for each year showed a profit. Chabrier Decl. ¶ 22; Ex. 21.

53. The Profit on a K-1 would only be apportioned to one who is listed as an owner of Northshore. Chabrier Decl. ¶ 22; Ex. 21.

54. Baron, Khan and Chabrier would have had to pay income tax on any income shown on their Northshore K-1. Chabrier Decl. ¶ 24; Jones Dep. 38:17-39:12.

55. Aaronson is the son-in-law of Baron, and Baron's wife, Iris. Aaronson Decl. ¶ 4.

56. Aaronson had been involved in Baron's automobile dealership businesses and then had gone out on his own with his own dealership operations. Aaronson Decl. ¶ 6.

57. Aronson, along with other principles, own and operate various dealerships. Aaronson Decl. ¶ 8.

58. The dealership group headed by Aaronson is referred to as the Island Auto Group ("IAG"). Aaronson Decl. ¶ 1.

59. These dealerships are managed under the IAG banner. Aaronson Decl. ¶ 1.

60. Baron and Ron Baron had ownership interest in some of the IAG dealerships. Aaronson Decl. ¶ 8.

61. Because of relationships between Aaronson, Baron and Ron Baron and their common ownership of the some of the dealerships, they had certain cross financial arrangements. Aaronson Decl. ¶ 9.

62. One of these arrangements was that all of the dealerships used Ally for their Floor Plan. Aaronson Decl. ¶ 9.

63. Having this cross financial arrangement between the Baron Group and IAG also required certain cross collateral and cross guarantees with Ally. Aaronson Decl. ¶ 10.

64. The cross guarantees made certain of the IAG members personally liable for the Ally financing. Aaronson Decl. ¶ 11.

65. Each dealership in managed by a local manager and its financial operations are handled by a local controller. Aaronson Decl. ¶ 12.

66. Each dealership's financial operations is subject to central oversight by Island Auto management located in Staten Island. Aaronson Decl. ¶ 12.

67. Aaronson, along with other managers or members, controls the IAG Plaintiffs. Aaronson Decl. ¶ 8.

68. Aaronson and Baron have an ownership interest in Sunrise along with Chabrier, Raymond Phalen ("Phalen") and Jory. Aaronson Decl. ¶ 14; 617224/2022 NYSCEF 28.

69. Sunrise was a used car dealership located at 189 Sunrise, Amityville, New York formed in 2014. Aaronson Decl. ¶ 14.

70. Sunrise has an operating agreement dated and entered into on July 3, 2014 signed by Baron, Joshua Aaronson, Jory Baron and Phelan. Aaronson Decl. ¶ 14; 617224/2022 NYSCEF 28.

71. The 2014 operating agreement for Sunrise list Baron, Joshua Aaronson, Jory Baron and Phelan as the sole members. Aaronson Decl. ¶ 14; 617224/2022 NYSCEF 28.

72. Prior to 2018, Chabrier became an additional, equal member in Sunrise. Chabrier Decl. ¶ 25; Chabrier Dep. 75:17-76:3.

73. The DMV license owner applicants for Sunrise were Aaronson and Jory. Aaronson Decl. ¶ 15.

74. In February 2021 Deo and Baron negotiated for Deo to purchase Sunrise from its then current members, Baron, Aaronson, Chabrier, Jory and Phalen. Aaronson Decl. ¶ 28.

75. Although unsigned, the terms of the agreement were in writing and required Deo to pay each member $10,000.00 down and to pay each member an additional $3,000.00 per month until Deo could cross guarantee Sunrise with a franchise automotive dealership. Aaronson Decl. ¶ 29; 615683/2024 NYSCEF 64.

76. Deo paid each Sunrise member $10,000.00. Aaronson Decl. ¶ 30; 615683/2024 NYSCEF 64.

77. Deo did not pay each Sunrise member $3,000.00 per month thereafter. Aaronson Decl. ¶ 30.

78. Deo was never able to cross guarantee Sunrise with a franchise automotive dealership. Aaronson Decl. ¶ 30.

79. There was no operating agreement for Sunrise listing Deo as an owner of Sunrise. Aaronson Decl. ¶ 31.

80. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been listed as an owner or member of Sunrise. Aaronson Decl. ¶ 37.

81. There is no written communication prior to October 2022 in which Deo raises any concern or issue that he has not been provided with information necessary for him to file taxes listing him as an owner or member of Sunrise. Aaronson Decl. ¶ 37.

82. Sunrise filed tax returns for 2018, 2019 and 2020. Aaronson Decl. ¶ 32.

83. In each of the tax returns for 2018, 2019 and 2020 the members of Sunrise were listed as Baron, Aaronson, Jory, Chabrier and Phalen. Aaronson Decl. ¶¶ 14, 32.

**Deo Assumes the Obligations as Manager of Northshore and Sunrise**

84. In 2018, Deo was engaged by Northshore as its manager. Chabrier Decl. ¶ 32; Chabrier Dep. 76:18-21, 77:25-78:19.

85. Sara was engaged to work in Northshore beginning in 2018. Chabrier Decl. ¶ 32.

86. In 2021, Deo was engaged by Sunrise as its manager. Chabrier Decl. ¶ 33; Chabrier Dep. 84:14-25.

87. Sara was engaged to work in Sunrise beginning in 2021. Chabrier Decl. ¶ 33.

88. Deo was solely in charge of all of the operations of Northshore and Sunrise through August 2022. Chabrier Decl. ¶ 35; 617224/2022 NYSCEF 60.

89. Members of limited liability companies cannot be paid a salary. Jones Dep. 33:14-17.

90. As an employee of Northshore and Sunrise, both Deo and Sara were paid a salary by Northshore and Sunrise. Chabrier Decl. ¶ 37; O'Sullivan Dep. 119:5-120:10.

91. As an employee of Northshore and Sunrise, Deo also paid a percentage of gross sales to Car Buyers. Chabrier Decl. ¶ 39; O'Sullivan Dep. 119:5-121:3

92. Deo was the sole shareholder of Car Buyers. Deo Dep. 357:8-358:2; Deo II Dep. 89:18-22.

93. David Baron died on May 25, 2021. Deo Dep. 171:3-5.

94. Before Baron died, the individual management and accounting for Northshore and Sunrise were handled at the dealership level at its location through a dealership management system ("DMS") that was licensed by the Baron Group to operate all their other managed dealerships. Kwun Decl. ¶ 8; O'Sullivan Dep. 59:12-60:16.

95. The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership including keeping track of inventory, sales, financing and all financial records and recordkeeping. Kwun Decl. ¶ 15; O'Sullvan Dep. 59:12-60:16.

96. Northshore hired Daniel O'Sullivan ("O'Sullivan") as its controller in or around 2019. Chabrier Decl. ¶ 40; O'Sullivan Dep. 217:15-218:2..

97. Sunrise hired O'Sullivan as its controller in or around 2021. Chabrier Decl. ¶ 40; O'Sullivan Dep. 48:22-50:2.

98. In performing his function as controller for Northshore and Sunrise, O'Sullivan took his orders solely from Deo. Chabrier Decl. ¶ 42; O'Sullivan Dep. 223:11-14, 232:15-18.

99. After Baron's death, his estate was being handled by his wife, Iris. Aaronson Decl. ¶ 17; Iris Dep. 13:25-14:12.

100. Iris was never involved in Baron's automobile businesses. Iris Dep. 10:16-11:3.

101. Iris requested that Aaronson assist her in dealing with Northshore and Sunrise. Iris Dep. 13:25-14:12, 23:15-24:9; Aaronson Dep. 19:6-20:3, 40:22-41:14.

102. In or around June 2021 Aaronson agreed and met with Deo concerning the operations of Northshore and Sunrise. Aaronson Decl. ¶ 39.

103. It was agreed that Deo would continue to be solely in charge of all of the operations of Northshore and Sunrise and receive a salary. Aaronson Decl. ¶ 39.

104. By Deo accepting the obligation to be solely in charge of all of the operations of Northshore and Sunrise he agreed to accurately report financial information of Northshore and Sunrise and to make appropriate vehicle inventory purchases. Aaronson Decl. ¶ 41.

105. Northshore, Sunrise and the IAG Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Northshore and Sunrise incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with Ally to use the Floor Plan. Aaronson Decl. ¶ 48.

106. Therefore, Aaronson permitted the IAG Plaintiffs to continue to provide and guarantee the Ally Floor Plan of Northshore and Sunrise. Aaronson Decl. ¶ 49.

107. As Northshore's and Sunrise's manager, Deo handled all operations of Northshore and Sunrise. Aaronson Decl. ¶ 40.

108. As Northshore and Sunrise's manager, Deo was charged with the obligation and expectation that actions made concerning Northshore and Sunrise would be made for their benefit. Aaronson Decl. ¶ 45.

109. As Northshore and Sunrise's manager, Aaronson allowed Deo to handle the day-to-day operations of Northshore and Sunrise, including vehicle inventory purchases, and all aspects of financial reporting on behalf of Northshore and Sunrise. Aaronson Decl. ¶ 41.

110. As Northshore and Sunrise's manager, Aaronson allowed Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ 43.

111. As Northshore and Sunrise's manager, Northshore, Sunrise and the IAG Plaintiffs relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ 44.

112. As Northshore and Sunrise's manager, Northshore, Sunrise and the IAG Plaintiffs relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise and with respect to audits conducted by Ally. Aaronson Decl. ¶ 42.

113. By accepting the position as manager of Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise. Aaronson Decl. ¶ 41.

114. By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to accurately report financial information of Northshore and Sunrise. Aaronson Decl. ¶ 44.

115. By accepting the right to deal directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory. Aaronson Decl. ¶¶ 43-44.

116. Each time that Deo entered financial information into the DMS system, by doing so, he represented to Northshore, Sunrise, the IAG Plaintiffs and Ally that such financial information was true and accurate. Aaronson Decl. ¶ 46.

117. Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to Northshore, Sunrise, the IAG Plaintiffs and Ally that such vehicle inventory purchase was appropriate. Aaronson Decl. ¶ 47.

118. The IAG Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Northshore and Sunrise incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by Ally. Aaronson Decl. ¶ 48.

119. In order for Aaronson to assist Iris in dealing with Northshore and Sunrise, he had the controller of IAG, Wendy Kwun ("Kwun"), was given access to the DMS system at Northshore and Sunrise. Aaronson Decl. ¶ 53.

120. When Northshore and Sunrise were experiencing cash flow issues, Aaronson asked Kwun to monitor the cash flow and provide assistance in the administrative aspects of closing out sales and registrations faster to generate quicker funding by a customer's financing company. Aaronson Decl. ¶ 53.

121. Deo arranged for Northshore and Sunrise to purchase used vehicle inventory using the Ally Floor Plan. Aaronson Decl. ¶ 50; Deo II Dep. 70:12-25, 178:2-16.

122. Ally maintained a lien on all vehicles purchased using the Floor Plan. Aaronson Decl. ¶ 50.

123. When a vehicle was sold, within days Ally was to be repaid the amount borrowed to purchase that vehicle, plus accrued interest, in order to release the lien or security interest Ally placed on the vehicle. Aaronson Decl. ¶ 50.

124. As Northshore's and Sunrise's manager Deo dealt directly with Ally on behalf of Northshore and Sunrise in using the Floor Plan to purchase vehicle inventory for Northshore and Sunrise. Aaronson Decl. ¶ 50.

125. As Northshore's and Sunrise's manager Deo was responsible for assuring that Ally was timely repaid for all sold vehicles purchased using the Floor Plan. Aaronson Decl. ¶ 51.

**Deo Falsified Financial Statements at Northshore & Sunrise with his Accountants**

126. In order for IAG Plaintiffs and Ally to continue to provide the Floor Plan to Northshore and Sunrise, Northshore and Sunrise were required to provide IAG Plaintiffs and Ally monthly financial reports. Aaronson Decl. ¶ 44.

127. Deo engaged the services of Thomas Jones, CPA ("Jones") on behalf of Northshore and Sunrise to work on their monthly financial reporting. Aaronson Decl. ¶ 52; Jones Dep. 55:3-8.

128. Deo engaged the services of Jones at least as early as August 2021. Aaronson Decl. ¶ 52; Jones Dep. 73:24-74:8.

129. Each month Jones and Deo would decide on adjustments to the financial records of Northshore and Sunrise. Aaronson Decl. ¶ 52; Jones Dep. 23:3-25, 25:6-14, 26:4-20, 63:25-64:16, 92:3-15, 119:16-120:11.

130. After Jones and Deo decided on adjustments to the financial records of Northshore and Sunrise, Jones would have O'Sullivan enter those adjustments into Northshore's and Sunrise's DMS system. Aaronson Decl. ¶ 52; O'Sullivan Dep. 105:6-112:20.

131. Deo and Jones made adjustments to Northshore's and Sunrise's monthly financial information every month between at least August 2021 through October 2022. Aaronson Decl. ¶ 52; Jones Dep. 23:3-25, 25:6-14, 26:4-20, 63:25-64:16, 92:3-15, 119:16-120:11.

132. Many of those adjustments had the effect of making Northshore and Sunrise appear more profitable on a monthly basis than they actually were. Kwun Decl. ¶ 32.

133. The IAG Plaintiffs and Ally were unaware that Deo and Jones made adjustments to the monthly Northshore and Sunrise financial statements that had the effect of making Northshore and Sunrise appear more profitable on a monthly basis than they actually were. Aaronson Decl. ¶ 54.

134. The monthly financial statements were provided to the IAG Plaintiffs and Ally as required for the floor plan financing for Northshore and Sunrise to continue. Aaronson Decl. ¶ 53.

135. The monthly financial statements were provided to the IAG Plaintiffs and Ally to induce the IAG Plaintiffs and Ally to continue to provide the Floor Plan financing for Northshore and Sunrise. Aaronson Decl. ¶ 53.

**Deo Manipulates Used Vehicle Purchases**

136. Because Deo operated Northshore and Sunrise for his personal benefit rather than the benefit of Northshore and Sunrise and its members, Northshore and Sunrise were without sufficient capital to purchase quality used vehicle inventory. Kwun Decl. ¶ 28.

137. Purchasing quality used vehicle inventory required an investment of capital as Ally financed the purchase of non-auction used vehicles at the rate of eighty (80%) of the wholesale book value of such vehicle in very good condition. Kwun Decl. ¶ 14.

138. In so doing, Ally, Northshore, Sunrise and the IAG Plaintiffs reasonably expected that Northshore and Sunrise would cover the balance of the purchase price not covered by the Ally Floor Plan. Aaronson Decl. ¶ 56.

139. It was discovered in 2022 that Deo had been purchasing used vehicle inventory for Northshore and Sunrise that were in poor and damaged condition. Aaronson Decl. ¶¶ 56-57.

140. Deo did not advise Ally, Northshore, Sunrise or the IAG Plaintiffs that he was purchasing used vehicle inventory in poor and damaged condition. Aaronson Decl. ¶¶ 56-57.

141. Because the vehicles were in poor and damaged condition, Deo was able to arrange for Northshore and Sunrise to purchase the vehicles for less than the amount Ally would finance for eighty (80%) percent of the purchase of the same vehicle had it been in very good condition. Kwun Decl. ¶ 47.

142. By so doing, Ally funded the purchases at eighty (80%) of the wholesale book value of each such vehicle as if they been in very good condition. Kwun Decl. ¶ 47.

143. The amount Ally funded to Northshore and Sunrise was in excess of the purchase price of the vehicles. Kwun Decl. ¶ 47.

144. The excess funds funded by Ally were then part of the Northshore and Sunrise funds then taken by Deo, leaving Northshore, Sunrise or the IAG Plaintiffs subject to repay Ally the fully funded amount if the vehicle did not sell for at least the Floor Plan funding amount. Kwun Decl. ¶ 47.

145. Had Northshore, Sunrise, the IAG Plaintiffs or Ally been aware of the true nature of these transactions, they would not have approved of the purchases or financing. Aaronson Decl. ¶ 57.

146. Deo committed this practice on a regular basis, some examples provided herein. Kwun Decl. ¶ 47.

147. Example 1: On December 21, 2021 Deo arranged for Northshore to purchase a 2017 Audi for $31,000.00 from Herold Motor Cars. Kwun Decl. ¶ 48.

148. The wholesale book value of this vehicle in very good condition was $39,571.87. Kwun Decl. ¶¶ 47-48.

149. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ 47.

150. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ 51.

151. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition. Kwun Decl. ¶ 51.

152. As such, Ally funded the purchase for $31,657.50, eighty (80%) percent of the book value. Kwun Decl. ¶¶ 14, 48.

153. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ 51.

154. Example 2: On January 25, 2022 Deo arranged for Northshore to purchase a 2019 Mercedes Benz for $34,000.00 from Herold Motor Cars. Kwun Decl. ¶ 49.

155. The wholesale book value of this vehicle in very good condition was $44,128.12. Kwun Decl. ¶ 49.

156. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ 47.

157. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ 51.

158. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition. Kwun Decl. ¶ 51.

159. As such, Ally funded the purchase for $35,302.50, eighty (80%) percent of the book value. Kwun Decl. ¶¶ 14, 49.

160. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ 51.

161. Example 3: On January 25, 2022 Deo arranged for Northshore to purchase a 2016 Jaguar for $27,000.00 from Herold Motor Cars. Kwun Decl. ¶ 50.

162. The wholesale book value of this vehicle in very good condition was $36,365.62. Kwun Decl. ¶ 50.

163. The price paid to Herold Motor Cars reflected the poor and damaged condition of the vehicle. Kwun Decl. ¶ 47.

164. Deo requested by interstate electronic communication for Ally to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ 51.

165. Deo did not advise the Managing Members, Northshore, Sunrise, the IAG Plaintiffs or Ally of the vehicle's poor and damaged condition. Kwun Decl. ¶ 51.

166. As such, Ally funded the purchase for $29,092.50, eighty (80%) percent of the book value. Kwun Decl. ¶¶ 14, 50.

167. For the benefit of the Plan, Deo retained the difference between the funding amount and the purchase price. Kwun Decl. ¶ 51.

168. Deo arranged to finance certain motor vehicles twice, wrongfully taking the improperly obtained funds. Kwun Decl. ¶ 52.

169. For example, on April 30, 2022 Deo arranged for Sunrise to sell a 2017 Mercedes Benz to Marlon and Monique Harris ("Harris") for $27,765.00. Kwun Decl. ¶ 53.

170. Harris paid $3,000.00 down and financed the balance, including fees and taxes, with a lender, Santander Consumer USA ("Santander"). Kwun Decl. ¶ 53.

171. Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ 53.

172. Santander paid Sunrise financed proceeds of $25,875.00. Kwun Decl. ¶ 53.

173. Deo failed to deliver the vehicle to Harris and Harris canceled the purchase and loan. Kwun Decl. ¶ 53.

174. Deo then transferred the vehicle to Northshore, which then sold it to Bay Motors, Inc. for $30,136.00. Kwun Decl. ¶ 53.

175. Santander demanded the return of the proceeds from the canceled sale. Kwun Decl. ¶ 53.

176. Deo did not return the proceeds to Santander. Kwun Decl. ¶ 53.

177. Aaronson became aware of the Santander demand in November 2022, and arranged for IAM to pay Santander the full amount due, which by that time was $32,294.42. Aaronson Decl. ¶ 68.

178. On or about April 4, 2022 Deo arranged for Northshore to sell a 2013 Audi to Reid ("Reid") for a price in excess $25,000.00. Kwun Decl. ¶ 54.

179. Reid financed the balance, including fees and taxes, with a lender, Santander. Kwun Decl. ¶ 54.

180. Deo requested by interstate electronic communication for Santander to fund the purchase, which was funded by interstate electronic means. Kwun Decl. ¶ 54.

181. Santander paid Northshore financed proceeds of $24,024.58. Kwun Decl. ¶ 54.

182. Deo failed to deliver the vehicle to Reid and the transaction and loan was canceled. Kwun Decl. ¶ 54.

183. Deo then transferred the vehicle to Sunrise, which then sold it to Rashawn Newsome for $26,090.00. Kwun Decl. ¶ 54.

184. Santander demanded the return of the proceeds from the canceled sale. Kwun Decl. ¶ 54.

185. Deo did not return the proceeds to Santander. Kwun Decl. ¶ 54.

186. Aaronson became aware of the Santander demand in October 2022, and arranged for IAG to fund Northshore to pay Santander the full amount due, which by that time was $26,453.29. Aaronson Decl. ¶¶ 69-71.

187. An inspection by IAG Plaintiffs as well as an audit by Ally of the floor planned vehicles revealed that several vehicles could not be located. Aaronson Decl. ¶ 58.

188. That audit also revealed that several vehicles were damaged. Aaronson Decl. ¶ 58.

**Deo Fails to Cause Northshore and Sunrise to Pay Off Existing Loans on Vehicle Trade-Ins**

189. Northshore and Sunrise each accepted customer trade-ins of vehicles to be used toward their purchase (the "Trade-ins" or "trade-in"). Aaronson Decl. ¶ 59.

190. Trade-ins with existing loan or lease balances were required to be timely satisfied by Northshore or Sunrise in accordance with their respective dealer agreements. Aaronson Decl. ¶ 59.

191. As Northshore's and Sunrise's manager, Deo was responsible for assuring that the existing loan or lease for each vehicle traded in by a customer was timely paid off. Aaronson Decl. ¶ 59.

192. Over the course of his management of Northshore and Sunrise, Deo directed O'Sullivan to hold onto checks that had been issued by Northshore and Sunrise to pay off the existing loans of vehicles traded in. O'Sullivan Dep. 82:17-83:14, 87:10-89:8.

193. Deo did so because there was insufficient funds to pay those checks. O'Sullivan Dep. 94:15-95:3, 186:7-21.

194. The prior owners of these traded-in vehicles remained liable to make payments on the debt despite no longer having ownership or control of the vehicle. O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16, 184:2-185:19.

195. Many customers were reaching out to O'Sullivan complaining that their loans for their traded in vehicles had not been paid by Northshore and Sunrise. O'Sullivan Dep. 44:15-45:13, 77:15-24, 78:6-11, 179:16-180:25, 182:5-16.

196. On August 30, 2022 O'Sullivan notified Kwun that Deo had asked O'Sullivan to hold a total of over $1,100,000.00 of trade payoff checks. O'Sullivan Dep. 183:16-185:19.

197. The trade payoff checks represented over fifty-five (55) sale transactions over a period of nine (9) months. Kwun Decl. ¶ 21; Ex. 31.

198. There had been insufficient funds in the Northshore and Sunrise bank account during that period of time to cover the trade payoff checks. Kwun Decl. ¶ 23; O'Sullivan Dep. 94:15-95:3, 186:7-21.

199. There was insufficient funds in the Northshore and Sunrise bank account at that time to cover the trade payoff checks. O'Sullivan Dep. 94:15-95:3, 186:7-21.

200. When O'Sullivan informed Kwun about the unpaid trade payoffs, she informed Aaronson. O'Sullivan Dep. 176:3-14, 181:2:182:16.

201. Deo's direction to O'Sullivan for Northshore and Sunrise not to pay off the loans on the Trade-ins had potential criminal liability, civil liability, and loss of the DMV Licenses for the DMV license applicants, Chabrier, Aaronson, and Jory. Kwun Decl. ¶ 23.

202. Deo's direction to O'Sullivan for Northshore and Sunrise not to pay off the loans on the Trade-ins affected Chabrier's, Aaronson's and Jory's ability to obtain a DMV License for any other dealership facility. Kwun Decl. ¶ 64.

203. In order to avert the consequences of Deo's failure to pay off the loans on Trade-ins, Aaronson arranged for various IAG entities to loan Northshore and Sunrise the funds necessary to satisfy these outstanding obligations. Aaronson Decl. ¶ 64; Kwun Decl. ¶ 34.

204. Those funds were never repaid by Deo. Aaronson Decl. ¶ 77; Kwun Decl. ¶ 46.

205. During the spring and summer of 2022 Deo sold vehicles subject to Floor Plan financing by Ally without paying off the Floor Plan to Ally for those sold vehicles. Kwun Decl. ¶ 24.

206. Deo did so by instructing O'Sullivan not to make the payments. O'Sullivan Dep. 179:16-180:2.

207. This created a deficiency toward repayment of the Floor Plan made by Ally to purchase each such vehicle. Kwun Decl. ¶ 24.

208. Aaronson became aware in September 2022 and October 2022 that Deo had withheld payments to payoff the Ally Floor Plan. Aaronson Decl. ¶¶ 63, 70.

209. There were insufficient funds in the Northshore and Sunrise bank accounts to repay Ally for the Floor Plan. Kwun Decl. ¶ 24.

210. As guarantor, Aaronson arranged for various IAG Plaintiffs to pay Ally over $4,000,000.00 to satisfy Northshore's and Sunrise's Floor Plan deficiency. Aaronson Decl. ¶ 65; Kwun Decl. ¶ 34.

211. Deo has never accounted for all of the funds missing from Northshore and Sunrise that should have been available to pay off the trade-in vehicles and the floor planned vehicles. Aaronson Decl. ¶ 100; Kwun Decl. ¶ 84.

**Deo Failed to Pay Warranty Companies and Vendors, and Failed to Account for Dealer and Other License Plates**

212. Deo arranged for Northshore and Sunrise to sell third-party warranty providers' extended warranties to consumers. Kwun Decl. ¶ 25.

213. Deo did not use the funds received by these customers to pay the third-party providers for these warranties. Kwun Decl. ¶ 25.

214. Northshore and Sunrise had issued warranties to consumers and collected the fees but Deo failed to pay $100,748.11 due to the warranty companies, which would have resulted in the voiding of the warranties for which consumers have paid. Kwun Decl. ¶ 25.

215. As Northshore's and Sunrise's manager Deo was responsible for assuring that the customer-purchased warranties for each vehicle were paid to the warranty company. Kwun Decl. ¶¶ 12, 27, 82.

216. Aaronson arranged for IAG entities to pay for the unpaid warranties. Kwun Decl. ¶ 34.

**Deo Takes and Uses Dealership Assets for His Own Purposes**

217. Deo took hundreds of thousands of dollars in customers' cash deposits from Northshore and Sunrise rather than deposit the money in Northshore's and/or Sunrise's accounts. Kwun Decl. ¶ 58; O'Sullivan Dep. 153:17-158:5, 159:5-161:19.

218. Deo failed to terminate and return over $240,000.00 of lender financing for consumers who canceled their purchases. Kwun Decl. ¶ 55.

219. Deo took those loan proceeds for his own benefit. Kwun Decl. ¶ 52.

220. Deo's son continues to drive, for his personal use, a luxury Maserati, valued at almost $80,000 and paid for by IAG, without IAG's consent. Kwun Decl. ¶ 56.

**Deo Falsely Claims Full Ownership of Northshore and Sunrise to Obtain The Libertas Funds and Converts the Libertas Funds**

221. Due to the financial deficiencies in Northshore and Sunrise discovered in September and October 2022, Aaronson arranged for Ally to put a hold on any further Floor Plan financing for Northshore and Sunrise. Aaronson Decl. ¶ 70.

222. In or around October 2022, Aaronson demanded that Deo repay the IAG Plaintiffs for all of the losses the IAG Plaintiffs covered arising from Deo's actions. Aaronson Decl. ¶ 71.

223. Deo promised that he would make good on all of the losses. Aaronson Decl. ¶ 71.

224. As part of Deo resolving all of the deficiencies funded by the IAG Plaintiffs, in October and November 2022, Aaronson and Deo were negotiating a transfer of the ownership in Northshore and Sunrise, and transfer of the DMV license applicant to Deo, in exchange for Deo's repayment of the losses incurred by the IAG Plaintiffs and obtaining a new Floor Plan line. Aaronson Decl. ¶ 72.

225. In anticipation of Deo's completion of, and as one of the conditions to transfer of ownership, Aaronson agreed to Deo's filing of 2021 tax returns for Northshore and Sunrise listing Deo and Sara as owners. Aaronson Decl. ¶ 73.

226. Even though Aaronson had allowed Deo to file the 2021 taxes listing himself and Sara as owners of Northshore and Sunrise, Aaronson would not and could not allow the actual transfer of ownership to take place until the DMV license ownership transfer was approved as Chabrier, Aaronson and Jory could not permit Deo to continue to operate Northshore and Sunrise while they were still listed as owner with the DMV and continued to be personally liable for Deo's actions as the dealership operator. Aaronson Decl. ¶ 75.

227. Deo agreed to move forward with the exchange under the terms laid out by the IAG Plaintiffs. Aaronson Decl. ¶ 75.

228. Deo was sent the DMV application to transfer the Northshore and Sunrise DMV license to list Deo as the owner. Aaronson Decl. ¶ 76; Kwun Decl. ¶ 66.

229. Deo did not return a signed DMV application to transfer the Northshore and Sunrise license to list Deo as the owner. Aaronson Decl. ¶ 76; Kwun Decl. ¶ 66.

230. Deo did not satisfy any of his obligations to repay the losses incurred by the IAG Plaintiffs, or obtain a new floor plan line. Aaronson Decl. ¶ 77.

231. Because Deo did not sign and return the application to transfer the Northshore and Sunrise license to Deo as the owner, did not satisfy his obligation to repay the losses incurred by the IAG Plaintiffs, or obtain a new floor plan line, Deo did not complete the transfer agreement and the ownership of Northshore and Sunrise was not effectuated. Aaronson Decl. ¶ 78.

232. In November 2022, Deo and other Deo Defendants began negotiation with the Superb Plaintiffs to buy into certain of the Superb Plaintiffs' automobile dealership business, offering to pay $500,000.00 plus a percentage of the ownership Deo represented to have in both Northshore and Sunrise. ECF 11 ¶¶ 10-19.

233. Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit for the Deo Defendants' investment in Superb, which bounced due to insufficient funds. ECF 11 ¶¶ 23-24; ECF 11-2.

234. Deo then applied for financing with Libertas for Northshore and Sunrise. Ruderman Decl. ¶ 6; ECF 410-1.

235. Deo was introduced to Libertas by Laurie. Kataev Decl. Ex. C; Laurie Dep. 84:18-86:8, 103:21-104:2.

236. Libertas operates out of its offices in Connecticut. Kataev Decl. Ex. K; Patrovic Dep. 7:12-14; ECF 410-1.

237. Laurie facilitated Deo providing the information to Libertas. Kataev Decl. Ex. K; Laurie Dep. 119:17-120:2.

238. Deo and Libertas entered into an agreement on behalf of Northshore and Sunrise in which Northshore sold $997,500.00 of its future receipts (the "Future Receipts") to Libertas for the purchase price of $750,000.00 less a $15,000.00 funding fee (the "Libertas Funds"). Ruderman Decl. ¶ 6; ECF 410-1.

239. Deo made such agreement despite not having ownership of Northshore and Sunrise. Ex. 1, Ex. 3, Ex. 4, Ex. 4, Ex. 6.

240. In the application to Libertas, Deo represented to Libertas that the financing would be used for investment in Northshore. Ex. 19; ECF 410 ¶¶ 5-6; ECF 410-1.

241. The documentation and communication between Deo and Libertas were made by electronic means. Kataev Decl. Ex. K; ECF 410-1.

242. Libertas approved the financing of $750,000.00 and wired the Libertas Funds of $735,000.00 to Sunrise's account in New York on November 18, 2022 after deducting a $15,000.00 origination fee. Kataev Decl. Ex. K; Ex. 19; Kwun Decl. P 67; ECF 410 ¶ 7; ECF 410-1.

**Despite His Obligation to Safeguard the Libertas Funds, Thomasson Aids and Abets Deo's Conversion by Disbursing the Libertas Funds to Deo**

243. On November 18, 2022, the IAG Plaintiffs became aware of the Libertas Agreement and took reasonable steps to ensure that Deo would not abscond with the Libertas Funds, by withdrawing and safeguarding the Libertas Funds. Kwun Decl. ¶ 69.

244. That same day, Aaronson directed his attorney, Russell Shanks ("Shanks"), to overnight a letter to Libertas advising that Deo had no ownership in Northshore and that they should reach out to Shanks immediately. Ex. 20

245. That letter was emailed to Deo that same day. Ruderman Decl. ¶ 9.

246. Deo hired Merckling, a retired Nassau County police officer with no prior automobile dealership experience, to work at Northshore around the end of 2020 or the beginning of 2021. Jones Dep. 215:13-21; Merckling Dep. 33:14-25; 53:15-22; 60:13-22; 61:2-8; 122:25-123:3.

247. On November 18, 2022 Merckling accompanied Deo to the Nassau County police department, Second Precinct, and filed a criminal complaint with Detective Eric Marx ("Marx") alleging that Aaronson stole the Libertas Funds. Merckling Dep. 98:15-102:10, 57:24-58:16.

248. Despite the fact that the issue of the Libertas Funds was a civil matter, Marx threatened to have Aaronson arrested if the Libertas Funds were not immediately turned over to Sunrise. Aaronson Decl. 84.

249. Thomasson claimed to be the attorney for Northshore, Sunrise, and Deo. Ruderman Decl. ¶ 10

250. Thomasson was aware that the Libertas Funds were paid by Libertas to Northshore (and deposited in Sunrise's account) for the purported sale of the Future Receipts. Ex. 19

251. Thomasson was aware that there was a dispute among IAG Plaintiffs, Deo, and Libertas concerning Deo's right to have acted on Northshore's behalf with respect to the sale of the Future Receipts. Ex. 20, Ex. 21 and Ex. 23.

252. Thomasson was aware that there was a dispute concerning the rights to the Libertas Funds. Ruderman Decl. ¶ 7; Ex. 20, Ex. 21 and Ex. 23.

253. As a direct result of the threats by Detective Marx, Aaronson agreed to place the Libertas Funds into Thomasson's attorney trust account to hold in escrow for safekeeping pending resolution of the parties' dispute, rather than turn over the Libertas Funds to Deo, who was not the rightful owner of the Libertas Funds. Aaronson Decl. 85.

254. On November 18, 2022 Shanks emailed Thomasson agreeing to wire the Libertas Funds to Thomasson's trust account asking him to place the Libertas Funds in his escrow account. Ex. 21.

255. In response, that same day, Thomasson provided Shanks with the wiring instructions. ECF 410-2.

256. After the wire transmitting the Libertas Funds to Thomasson's trust account had been sent on November 21, 2022, Thomasson advised that he would not hold the Libertas Funds in escrow. Ex. 23.

257. Thomasson immediately disbursed all but $12,000.00 of the Libertas Funds to Car Buyers, an entity solely owned and controlled by Deo. Ex. 24; ECF 410 ¶ 9; ECF 410-3; Ex. 49 Thomasson Dep. 123:15-124:17.

258. Thomasson retained the $12,000.00 as attorneys' fees. Ruderman Decl. ¶ 11; ECF 410 ¶ 9; ECF 410-3; Ex. 49; Thomasson Dep. 123:15-124:17.

259. Deo did not use any of the Libertas Funds for the benefit of Northshore. Ex. 24; ECF 410 ¶¶ 11-13, 17-19.

260. On the very next day, November 22, 2022, Deo paid $300,000.00 of his investment to the Superb Plaintiffs using the Libertas Funds. Ex. 24; ECF 410 ¶ 12; ECF 410-3.

261. On November 29, 2022, Deo paid the other $200,000.00 of his investment to the Superb Plaintiffs using the Libertas Funds. Ex. 24; ECF 410 ¶ 12; ECF 410-3.

262. Deo also paid $15,000.00 to DLA Capital Partners Inc, which was essentially to Laurie. Ex. 24; ECF 410 ¶ 16; ECF 410-3.

263. Deo also paid $213,000.00 to Jun Wang and Associates ("Wang") towards the purchase of the residence he was renting at 3 Hunting Lane, Old Westbury, NY 11568. Ex. 24; ECF 410 ¶ 17; ECF 410-3.

264. Deo never closed on the purchase of the house and did not pay rent. Ruderman Decl. ¶ 3; Kataev Decl. Ex. G; Deo II Dep. 77:22-80:15; 612890/2025 NYSCEF

265. Wang brought an action against Deo and obtained a warrant of eviction. 612890/2025 NYSCEF 30.

266. Deo then commenced an action against Wang in New York Supreme Court, Nassau County seeking to restrain Wang from evicting Deo, alleging various wrongdoing by the Wang. 612890/2025 NYSCEF 2.

267. That action by Deo was dismissed shortly thereafter by the Nassau County Supreme Court. 612890/2025 NYSCEF 72.

268. On or about November 25, 2022 Libertas withdrew $19,791.70 from Sunrise's account without authorization. Kwun Decl. ¶ 76.

269. Libertas has continued to try to withdraw funds from Sunrise's account. Kwun Decl. ¶ 76.

**Deo Further Encumbers and Diverts Northshore's Assets**

270. In December 2022, the IAG Plaintiffs obtained a temporary restraining order, restraining Deo from obtaining any financing against Northshore or pledging any assets of Northshore or selling any assets of Northshore (the "TRO"). 617224/2022 NYSCEF 42.

271. Deo was aware of this TRO. Thomasson Dep. 135:3-139:23.

272. Thomason was aware of this TRO. Ex. 49; Thomasson Dep. 135:3-139:23.

273. In early 2023, Deo, working with Laurie and Laurie's connections at Flushing, sought to obtain a secured loan for Northshore secured by Northshore's assets. Kataev Decl. Ex. C Laurie Dep. 118:11-119:22.

274. Deo had no authority to obtain loans for Northshore. Aaronson Decl. ¶ 90.

275. Obtaining such a loan was prohibited by the TRO. Ex. 43; 617224/2022 NYSCEF 42.

276. Deo, falsely claiming to be the sole owner of Northshore, arranged to borrow funds from Flushing. Ex. 25.

277. Thomason was informed by Deo in February or March of 2023 that he sought financing for Northshore from Flushing in violation of the TRO. Ex. 49; Thomasson Dep. 140:7-141:5; 148:11-149:18.

278. Deo and Thomasson were aware that Ally still held a blanket lien on all assets of Northshore in February of 2023. Ex. 49 Thomasson Dep. 304:3-21.

279. In order for Flushing to approve the loan to Northshore they required the lien by Ally to be removed. Ex. 25.

280. Because the IAG Plaintiffs had paid off all of the deficiencies due to Ally by Deo's actions, Ally no longer had assets to protect with the lien. Ruderman Decl. ¶ 12.

281. Thomason then facilitated the removal of Ally's lien in order to assist Deo in obtaining a loan for Northshore from Flushing in violation of the TRO. Ex. 49 Thomasson Dep. 304:3-21.

282. Flushing also became aware of the lawsuit by plaintiffs against Deo at the time they were providing the financing to Northshore in March 2023. Ruderman Decl. ¶ 2

283. In order to assist Deo in his loan application for Northshore and for funding from Flushing, Thomasson provided assurance by letter to Flushing that despite the lawsuit Flushing should provide financing to Northshore and Deo. Ex. 26; Ex. 49 Thomasson Dep. 143:9-145:21; FLUSHING3835.

284. In the application for Flushing, Deo submitted a December 31, 2022 profit and loss statement. Kataev Decl. Ex. G; Deo II Dep. 58:19-60:18; Ex. 44.

285. That profit and loss statement contained false information. Kwun Decl. ¶ 79; Ex.44

286. In connection with that application for Flushing, Deo submitted the October 2022 Northshore financial statement. Kataev Decl. Ex. G Deo II Dep 35:2-38:20; Ex. 45.

287. That October 2022 financial statement was false. Kwun Decl. ¶ 79, Ex. 45 and Ex. 46.

288. In connection with the loan from Flushing, Deo submitted a personal financial statement. Ruderman Decl. ¶ 3; Kataev Decl. Ex. GDeo II Dep. 65:3-12; ECF 437-15.

289. Deo was aware that Flushing was relying upon the accuracy of his personal financial statement and the other financial information in order to approve the loan. Deo II Dep. 67:24-68:10.

290. On that personal financial statement Deo represented that he personally owned a property in the Bronx located at 3011 Matthews Avenue. Deo II Dep. 73:10-74:7; ECF 437-15.

291. Deo did not own that property in the Bronx and he knew he did not own the property. Deo II Dep. 73:13-74:10

292. The Bronx property had belonged to Deo's father and his father sued him for forging a deed transferring the Brox property to a company formed by Sara. Deo II Dep. 73:10-74:10, 81:19-83:4.

293. The Court found in favor of Deo's father, and expunged the forged deed. Deo II Dep. 74:3-10, 81:19-83:4.

294. On the personal financial statement, Deo represented that he personally owned the property in Old Westbury located at 3 Hunting Lane. Deo II Dep. 77:22-78:6; ECF 437-15.

295. Deo did not own that property in Old Westbury and knew he did not own it. Deo II Dep. 78:7-79:17.

296. In the loan application to Flushing, Deo represented that the funds for the loan would be used to help the operations of Northshore.Kataev Decl. Ex. G Deo II Dep. 151:23-153:18; ; Ex. 25.

297. Flushing approved the loan and in March 2023 funded the $500,000.00 into a bank account for Northshore opened at Flushing. Ex. 50

298. By May 2023 Deo transferred almost $400,000.00 of those funds to his account at Car Buyers. Ex. 50

299. Deo did not use any of the funds lent by Flushing for the benefit of Northshore. Kataev Decl. Ex. G; Deo II Dep. 158:6-13; Ex. 50.

300. Deo granted Flushing a UCC-lien on all of Northshore's assets without authorization. Ruderman Decl. ¶ 14.

301. Obtaining a loan and providing a lien in favor of Flushing against the assets of Northshore was a violation of the terms of the Supreme Court TRO. Ex. 43.

302. The Deo Defendants stated they would use the Flushing loan proceeds to invest in their automobile dealerships. Buccino Dep. 84:23–85:19; 86:12–89:7; FLUSHING08497; FLUSHING00196.

303. As of late June 2023, Deo's operations at Northshore completely ceased. ECF 157-15 ¶¶ 5-10; Merckling Dep. 305:7–16; Chabrier Dep. 79:15–18.

304. On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that: (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was impossible to place me back in the position I was now that the Cross-Purchase Agreement has been voided. 618608/2023 NYSCEF 134.

305. This Court found that Justice Murphy's decision was entitled to *res judicata* effect. ECF 505.

**Superb Plaintiffs**

306. Urrutia began his automotive career in 1992 and have since managed some of the most successful dealership groups in the Northeast. ECF 294 ¶ 8.

307. In 2020, during the height of the pandemic, Urrutia acquired his first dealership. ECF 294 ¶ 9.

308. After opening his first dealership in 2020, Urrutia quickly transformed it from an underperforming location into one of the top-performing dealerships in the Northeast. ECF 294 ¶ 11.

309. Urrutia was the President of Superb and a member of Team. ECF 11 ¶ 1.

310. In March 2022, Urrutia moved to Costa Rica and primarily lives there. ECF 251 ¶ 10 n. 2.

311. Superb is a corporation with its place of business at 215 Northern Boulevard, Great Neck, NY. 618608/2023 NYSCEF 78 ¶¶ 3-4; 618608/2023 NYSCEF 79 and 80.

312. Plaintiff Superb first opened in or about 2021. 618608/2023 NYSCEF 78 ¶ 3.

313. In June 2021, Urrutia launched Superb with Bobby Clarke ("Clarke") who is of Caribbean descent and a co-owner of a Caribbean radio station employee Urrutia hired at a prior dealership he managed. ECF 294 ¶ 12.

314. In late 2022, Clarke chose to exit Superb after losing advertising revenue from competing dealerships due to their agreement not to allow other dealerships to advertise to their Caribbean audience. ECF 294 ¶ 17.

315. At that point, Urrutia was faced with the decision to either close the used car operations at Superb or bring in a new operator who could expand its market reach. ECF 294 ¶ 20.

316. By then, Urrutia had already expanded to two (2) franchise dealerships, had Superb operating, and was in the process of closing on a third franchise with Nissan as a minority dealer. ECF 294 ¶ 21.

317. Plaintiff Team is and was a limited liability company duly with its principal place of business in New Jersey. Urrutia Decl. ¶ 29.

318. Team first opened in or about November 2020. Urrutia Decl. ¶ 29.

**The Deo Defendants Move on to Their Next Victims – Superb, Team, & Urrutia**

**i. Deo Obtains Putative Ownership & Operational Control of Superb**

319. At all times relevant, since its inception in June 2021, Urrutia was the President and majority or sole shareholder of Superb. 618608/2023 NYSCEF 78 ¶¶ 1-6.

320. In addition to Superb, Urrutia owned Volkswagen of Freehold, Team –Mitsubishi-Hartford, and Team Nissan of Pittsfield, Massachusetts. ECF 11 ¶ 2.

321. Urrutia is also the sole member of Team, which is an automobile wholesaler that owns thirteen (13) vehicles that the Deo Defendants have absconded with and failed to return until this Court required them to return them to the Superb Plaintiffs. ECF 507 ¶ 1; ECF 11 ¶¶ 2, 193; ECF 112 ¶ 44; ECF 157-1 ¶ 77; ECF 258 ¶ 24.

**a. <u>Deo meets with Urrutia and gains his confidence</u>**

322. Urrutia met with Deo in November 2022, having been previously introduced through a mutual friend in the automobile industry, at which time Deo held himself out to be qualified to run an automobile dealership and sought to enter into a partnership with Urrutia at Superb. ECF 11 ¶¶ 10-19.

323. During this meeting, Laurie was present, and dominated the conversation, speaking roughly eighty percent (80%) of the time, despite his supposed role as "advisor, financier, and unofficial partner" of Deo. ECF 11 ¶¶ 13-14; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

324. Urrutia and Deo entered into a Cross-Purchase Agreement (the "Cross Purchase Agreement") dated as of December 1, 2022, in which Deo would pay Urrutia $500,000.00 and issue him a twenty-five percent (25%) interest in Northshore Motor Leasing LLC ("Northshore") and 189 Sunrise Hwy Auto LLC ("Sunrise") in exchange for Deo obtaining a forty-nine percent (49%) interest in Superb. ECF 11 ¶¶ 20-23; ECF 11-1.

325. Prior to entering into and included in the Cross-Purchase Agreement, Deo made representations and warranties to Urrutia that, among other things, he:

(i) is the sole owner of Northshore and Sunrise, respectively;

(ii) has full power and legal right to transfer and deliver units of Northshore and Sunrise, respectively;

(iii) has not made any representation or warranty that constitutes an untrue statement of a material fact or omits to state a material fact necessary to make it not misleading; and

(iv) has no pending or threatened suit, action, bankruptcy, or administrative proceeding, or other arbitration or proceeding, which could adversely affect the ability of Deo to perform any of his obligations, including Deo's obligation to convey the units of Northshore and Sunrise free and clear of all liens and encumbrances.

ECF 11-1.

326. Deo issued a check to Urrutia on November 14, 2022, in the amount of $100,000.00 as a deposit on the foregoing agreement in furtherance of his schemes to defraud. ECF 11 ¶ 24; ECF 11-2.

327. However, this check bounced the following day due to being returned for insufficient funds. ECF 11 ¶ 24; ECF 11-2.

328. On November 16, 2022, Deo reached out to explain that he had deposited a bank check to cover his payment to me and did not understand why the check bounced; he even shared a screenshot displaying the funds he deposited were in a "hold" status. ECF 11 ¶ 25; ECF 11-3.

329. By November 17, 2022, Urrutia had taken the necessary steps to move forward with our partnership by reducing the inventory to market value and absorbing the November 2022 losses. Urrutia Decl. ¶ 94; ECF 38 ¶ 22.

330. Deo clarified that his inability to immediately provide the agreed-upon $500,000.00 investment in Superb was a direct result of his problems with Aaronson. ECF 11 ¶¶ 27-28, 30.

331. On November 23, 2022, in order to induce Urrutia to make this deal with him, Deo provided Urrutia with financial statements showing that Northshore and Sunrise were profitable; Urrutia later learned that these statements were false. 618608/2023 NYSCEF 78 ¶ 20.

332. Urrutia later learned the truth was that Deo had no ownership interest in Northshore or Sunrise, obtained $735,000.00 from Libertas Funding LLC (which would be repaid, with interest, from the future receivables of Northshore and/or Sunrise), and misappropriated those funds for himself. ECF 11 ¶¶ 32 n. 4, 38.

333. What's worse, despite Aaronson proving he was entitled to those funds, he was nonetheless threatened with arrest by a detective if he did not turn the funds over to Deo. 617224/2022 NYSCEF 74 ¶¶ 15–17.

334. This is detailed in Aaronson's affidavit in a state court action filed by Aaronson and others against Deo last December, which I only recently learned of. 617224/2022 NYSCEF 32.

335. As it turns out, Deo employs a retired and active police officer – Dwight Blankenship and Marc Merckling – and Urrutia believes Deo was able to exercise undue influence through his relationships with these officers to force Aaronson to turn these funds over. Urrutia Decl. ¶ 161; ECF 95 ¶¶ 11-15, 95-3.

336. Similarly, despite aggressively seeking the arrest of Deo since August 3, 2023 when Urrutia uncovered his fraudulent scheme and providing a mountain of evidence to support my allegations, to this day, Deo has not yet been arrested for his crimes. Urrutia Decl. ¶ 162.

337. In contrast, as discussed further *infra*, despite the Superb Plaintiffs' presentation of innumerable evidence of Deo's criminal wrongdoing at Superb, the Nassau County Police Department repeatedly informed the Superb Plaintiffs that it was a civil matter. Urrutia Decl. ¶ 163.

338. Urrutia also learned, as set forth in detail herein, that Thomasson assisted Deo in stealing these funds by utilizing his attorney escrow account. ECF 11 ¶ 29.

339. Due to Thomasson's direct participation in the perpetuation of Deo's fraudulent scheme, unbeknownst to Urrutia, Thomasson enabled Deo to pay Urrutia funds which were fraudulently obtained from Libertas. Id.; Urrutia Decl. ¶ 164-168.

340. Indeed, on November 21, 2022, $735,000.00 was wired into Thomasson's escrow account due to Blankenship's and Merckling's intervention with the NCPD in making Aaronson believe that he would be arrested if he did not turn over the $735,000.00 fraudulently obtained from Libertas. Urrutia Decl. ¶ 169.

341. Deo then wired Urrutia $500,000.00 in two (2) separate wires of $300,000.00 on November 22, 2022, and $200,000.00 on November 29, 2022, both of which were issued from Car Buyers NYC Inc. despite the fact those funds obviously came from Thomasson's escrow account.

ECF 11 ¶ 32; ECF 11-5; Urrutia Decl. ¶¶ 172-174.

342. Having paid for his shares of Superb with these stolen funds, on December 1, 2022, Deo executed the Cross-Purchase Agreement. ECF 11 ¶ 33; ECF 11-1; ECF 11-5.

343. Deo thus invested in Superb in furtherance of his scheme to defraud. Id.

**b. Deo has limited powers as a minority shareholder of Superb**

344. A few weeks after he executed the Cross-Purchase Agreement, Deo executed a Shareholders' Agreement. ECF 11 ¶¶ 40-43; ECF 11-6; ECF 11-7; ECF 11-8.

345. The Shareholders' Agreement provides that Urrutia holds a fifty-one percent (51%) interest in Superb while Deo owns a forty-nine percent (49%) interest in Superb. ECF 11-6.

346. The Shareholders' Agreement provides that Urrutia is the President, and that he, alone, and independent of any other shareholders, directors, and officers may exercise: (i) the right to make all decisions concerning day-to-day operations of the Corporation, or to delegate such authority as the President desires; and (ii) the right to hire and/or terminate all employees of the Corporation, except as otherwise provided, it being expressly agreed, that this power does not include the right to terminate a Shareholder. ECF 11-6.

347. It similarly provides that all actions requiring shareholder consent require the written consent of least a majority of the voting shares; crucially, this includes the granting of any mortgage, lien, or other security interest in the assets of Superb or any loans or guarantees by Superb. ECF 11-6.

348. The Shareholders' Agreement restricts the right to sell the stock of Superb only by a majority of the voting stock of Superb, *i.e.*, by written consent of Urrutia as majority shareholder.

349. It provides that, among other responsibilities, Urrutia has:

(i) final say on hiring and firing of employees and all other personnel decisions, including but not limited to third party vendors, agents and/or contractors;

(ii) capitalization of the Corporation;

(iii) establishment of policies and standards for services provided by Superb, as well as supervision and complete authority over Superb's activities;

(iv) review and final approval of financing arrangements with lending institutions to be utilized by Superb in financing the purchase of used vehicles by customers and approval of creditworthiness of potential purchasers of automobiles; and

(v) supervision and complete control of the accounting department of Superb, which shall include but not be limited to sole check authorization and sole control of bank accounts owned by Superb.

ECF 11-6.

350. In contrast, Deo's only responsibilities under the Shareholders' Agreement were to propose an individual who will serve as the General Manager of the day-to-day operations of Superb, whom Urrutia had final authority to approve or reject. ECF 11 ¶ 41; ECF 11-6.

351. As Deo did not propose any individual, he served as General Manager of Superb. ECF 11 ¶ 41; 618608/2023 NYSCEF 78 ¶¶ 35-37, 84

352. Notwithstanding the clear and unambiguous language in the foregoing agreements, Superb Plaintiffs later learned that Deo made a series of material false representations. 618608/2023 NYSCEF 78 ¶¶ 20-31, 33.

353. First, despite his representation that he is the sole member of Northshore and Sunrise, it was discovered that, in fact, Deo is not the sole member of either; in fact, within five (5) days of entering into the Cross-Purchase Agreement, Deo was sued by the actual owners of Northshore and Sunrise! 618608/2023 NYSCEF 78 ¶¶ 21-27.

354. In that action, the *real* owners of Northshore and Sunrise alleged that Deo has engaged in financial improprieties and massive fraud that is strikingly similar to the conduct complained of with respect to Superb. 617224/2022 NYSCEF 1.

355. Second, because Deo never held any membership interest in Northshore or any ownership interest in Sunrise, Deo misrepresented that he had full power and legal right to transfer and deliver shares of Northshore and Sunrise to Plaintiff. 618608/2023 NYSCEF 78 ¶¶ 19-28.

356. Third, Deo made a material misrepresentation when he informed Urrutia that there was no active or anticipated litigation against him, as Northshore and Sunrise commenced an action against him in state court, and Deo received threats of litigation from the IAG Plaintiffs well before signing the Cross-Purchase Agreement! Id.

357. Moreover, Deo himself sued Aaronson and others on November 23, 2022, less than two (2) weeks prior to the time he signed the Cross-Purchase Agreement indicating that there was no active litigation. 616542/2022 NYSCEF 1.

**c. Deo's Sweetheart Deal to Remain General Manager at Superb**

358. Within his first two months, by January 10, 2023, Deo incurred over $100,000.00 in losses in operating Superb. ECF 11 ¶¶ 44-46.

359. As a result, Urrutia considered terminating the partnership. ECF 11 ¶ 47.

360. In order to remain in control, Deo proposed absorbing all losses, with Urrutia receiving fixed payments for every car sold, regardless of whether the monthly financial statement revealed a profit or a loss, with the understanding that Urrutia will not invest any more capital into Superb as that would fall on Deo. ECF 11 ¶¶ 48-49.

361. Urrutia accepted this proposal, as it was a win-win for him in that he received income from every car sold and Deo took on the weight of managing Superb. ECF 11 ¶ 49.

362. Deo continued to incur losses and had many excuses for his poor performance. ECF 11 ¶¶ 54-57.

**d. Urrutia's DMV License & Deo's Position as General Manager**

363. At all relevant times, Superb operated a retail used car dealership from its lot located at 215 Northern Boulevard, Great Neck, NY. Urrutia Decl. ¶ 30.

364. The operation of a used car dealership in the State of New York requires a license (the "License") issued by the DMV. Urrutia Decl. ¶ 31.

365. The application for the License requires an individual applicant who remains responsible as the licensee for the dealership's compliance. Urrutia Decl. ¶ 32.

366. At all relevant times, Urrutia held the License as applicant for Superb. Urrutia Decl. ¶ 33; ECF 11-6 §§ 1(B)-(C) and 2.

367. At all times hereinafter mentioned from November 2022 until August 2023, Deo was employed by Superb as its general manager. Urrutia Decl. ¶¶ 100, 112.

368. As an employee and general manager of Superb, Deo was obligated to act in the best interests of Superb and its majority or sole shareholder Urrutia. Urrutia Decl. ¶ 113.

369. Deo, however, took numerous actions for his own benefit, causing damage to the Superb Plaintiffs and jeopardizing Urrutia's DMV license. Urrutia Decl. ¶ 114.

**ii. Deo Engages in a Scheme with Other Defendants to Pilfer Superb Plaintiffs' Assets**

370. Dealerships typically operate with the assistance of banks that provide "floor plan" financing, which is collateralized by the vehicles available for sale at the dealership. Urrutia Decl. ¶ 181; ECF 204 ¶¶ 7-9.

371. When a dealership obtains such financing, the bank that provides same perfects a security interest in the vehicle, and certain rules attach as a condition of the financing, *i.e.*, with limited exceptions, any such vehicle financed must be present and available for sale at the dealership. Urrutia Decl. ¶ 182; ECF 204 ¶¶ 14-15.

372. Unbeknownst to the Superb Plaintiffs and its floor plan lenders, since at least November 2022, Deo had been using the business operating funds of Superb for his own use and purposes. Urrutia Decl. ¶¶ 183, 298–300, 408–413; Deo Dep. 319:17–320:20.

373. Deo's personal use of Superb's business operating funds left Superb without sufficient capital to operate. Urrutia Decl. ¶ 184, 438–441.

374. Deo devised various schemes to keep Superb capitalized, or appear to be capitalized, so that he could continue to siphon off Superb's funds. Urrutia Decl. ¶¶ 185, 314, 317–323; ECF 241-5 (JONES269); Jones Dep. 299:10–301:24, 302:3–312:7.

375. The schemes entailed the systematic pilfering of funds from the Superb Plaintiffs and its floor plan lenders, many of which were employed by Deo against the IAG Plaintiffs. Urrutia Decl. ¶¶ 298–300, 314, 317–323, 408–421, 437–443; Aaronson Decl. ¶¶ 68–77, 128–137; O'Sullivan Dep. 179:16–180:6.

376. The scheme involved deceiving the Superb Plaintiffs and its floor plan lenders into funding, at inflated amounts, the purchasing of vehicle inventory, deceiving customers and other lending institutions, and manipulating financial records to conceal the subterfuge. Urrutia Decl. ¶¶ 108, 187, 197–198, 225–266, 304–323, 342–350; ECF 220-14 at 32–41; ECF 241-5 (JONES269); Jones Dep. 299:10–301:24, 302:3–312:7.

377. In implementing this scheme, Deo enlisted the services of Sara, Blankenship, Merckling, Laurie, Thomasson, and Deo's accountants, each with a significant role to play.

Urrutia Decl. ¶ 188; ECF 95 ¶¶ 11-20; ECF 95-3.

378. Merckling and Blankenship continued to assist Deo in siphoning cash out of Superb, and were responsible for all monetary transactions (i.e., cash and checks), as they were with the IAG Plaintiffs, and had access to the safe at Superb. Urrutia Decl. ¶ 189; ECF 95 ¶¶ 11-15, 95-3; Merckling Dep. 108:12–19, 110:2–7, 335:21–25; Blankenship Dep. 80:9–81:5.

379. Sara continued to manage the enterprise and misappropriate leads and other proprietary information from Superb. Urrutia Decl. ¶¶ 190, 504, 506; ECF 38-12; Sara Dep. 145:5–153 & Exs. 6, 8; Deo Dep. 532:7–15; Kwun Dep. 210:9–12.

380. Thomasson, whose improper unauthorized release of the Libertas funds resulted in Deo becoming involved with the Superb Plaintiffs, continued to defend Deo against those who pursued claims against him despite his knowledge that Deo engaged in fraudulent and unlawful conduct. Urrutia Decl. ¶¶ 85, 89, 96, 164–174, 191; ECF 410-1, 410-2, 410-3; Thomasson Dep. 111:13–115:18, 123:15–124:17, 129:4–132:24, 178:4–181:20, 270:7–20, 274:8–19, 280:10–282:17, 313:16–319:19; 617224/2022 NYSCEF Doc. 74 ¶¶ 15–17.

381. Laurie continued in his alleged role as financier to create the illusory image of Deo as being a successful businessman, while assisting Deo in his daily operations of carrying out the various fraudulent schemes, including by helping him set up bank accounts he was not authorized to implement (as Laurie did with Flushing) and obtaining loans under the Plaintiffs' name (such as the Flushing loan and the Libertas Funds). Urrutia Decl. ¶ 193, 385, 535-537; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5; Laurie Dep. 82:2–9, 85:2–86:13, 116:18–119:16, 179:2–8; ECF 410-1; Buccino Dep. 65:15–22, 124:13–24.

382. Deo's accountants continued to cook the books to make Superb appear profitable at the behest of Deo. Urrutia Decl. ¶ 194.

383. Each of these parties agreed with Deo to implement the scheme and to perform their role in furtherance of their schemes. Urrutia Decl. ¶¶ 188-194.

384. In November 2022, Deo was engaged by Superb as its manager for Superb's benefit. Urrutia Decl. ¶ 100.

385. Deo's appointment as manager for Superb was proposed by Deo and approved by Urrutia in accordance with Superb's Shareholders' Agreement and was based upon Deo's obligation and expectation that actions made concerning Superb would be made for Superb's benefit. Urrutia Decl. ¶ 115.

386. As Superb's manager, Deo was charged with the obligation and expectation that actions made concerning Superb would be made for its benefit. Urrutia Decl. ¶ 116.

387. As Superb's manager, Urrutia allowed Deo to handle the day-to-day operations of Superb, including vehicle inventory purchases, and certain aspects of financial reporting on behalf of Superb. Urrutia Decl. ¶ 117.

388. As Superb's manager, Urrutia allowed Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb. Urrutia Decl. ¶ 118.

389. As Superb's manager, Urrutia and Superb relied upon the accuracy of Deo's financial reporting to allow Deo to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb. Urrutia Decl. ¶ 119.

390. As Superb's manager, Urrutia and Superb relied upon the appropriateness of Deo's vehicle inventory purchases in allowing Deo to deal directly with floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb and with respect to audits

conducted by floor plan lenders. Urrutia Decl. ¶ 120.

391. By accepting the position as manager of Superb, Deo accepted the obligation to accurately report financial information of Superb. Urrutia Decl. ¶ 121.

392. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to accurately report financial information of Superb. Urrutia Decl. ¶ 122.

393. By accepting the right to deal directly with the Superb Plaintiffs' floor plan lenders on behalf of Superb in using the Floor Plan to purchase vehicle inventory for Superb, Deo accepted the obligation to make appropriate vehicle inventory purchases and to track inventory. Urrutia Decl. ¶ 123.

394. At all relevant times, Urrutia controlled Superb in accordance with its Shareholders' Agreement. Urrutia Decl. ¶ 34.

395. By Deo accepting the obligation to accurately report financial information of Superb and to make appropriate vehicle inventory purchases, Urrutia personally guaranteed and cross-collateralized his other three (3) dealerships to guarantee the Floor Plan of Superb. Urrutia Decl. ¶ 124; ECF 18-1 (filed under seal); ECF 220-13 (listing Urrutia as guarantor).

396. Superb operated by using a DMS (initially DealerTrack and, later, Tekion) that was licensed by Superb to operate Urrutia's other dealerships as well as Superb. Urrutia Decl. ¶ 125.

397. The DMS was a comprehensive integrated system used to handle and record almost every aspect of operating an automobile dealership. Urrutia Decl. ¶ 126.

398. Each time that Deo entered financial information into the DMS system, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders that such financial information was true and accurate. Urrutia Decl. ¶ 127.

399. Each time that Deo purchased a vehicle for inventory purchases, by doing so, he represented to the Superb Plaintiffs and its floor plan lenders, that such vehicle inventory purchase was appropriate. Urrutia Decl. ¶ 128.

400. The Superb Plaintiffs reasonably relied upon these representations in agreeing to continue to guarantee the obligations of Superb incurred by Deo, allow Deo to submit financial information into the DMS system and deal directly with the floor plan lenders to use the Floor Plan, and to cooperate in any audits by floor plan lenders. Urrutia Decl. ¶ 129.

**iii. Deo Manipulates Used Vehicle Purchases**

401. The Superb Plaintiffs' floor plan lenders financed the purchase of used vehicles at the rate of one hundred (100%) of the "black book wholesale clean" value. Urrutia Decl. ¶ 195.

402. In so doing, the Superb Plaintiffs' floor plan lenders and the Superb Plaintiffs reasonably expected that Superb would cover the balance of the purchase price not covered by the Floor Plan. Urrutia Decl. ¶ 196.

403. Because the Deo Defendants had been using Superb's operating funds for their own purposes, they needed to fund fraudulent deals in order to make Superb appear profitable and maintain bank balances; they did so in an apparent Ponzi-like scheme, even though these fraudulent deals would eventually result in a buyback or an unwinding of the deal, in order to "float" Superb while they siphoned cash and check payments out of Superb. Urrutia Decl. ¶¶ 197, 223–233, 294–300, 312–323, 408–420; ECF 220 ¶ 46; ECF 220-2 at 39–43, 51–54, 61–64, 75–81, 90; ECF 241-5 (JONES269); Jones Dep. 299:10–301:24, 302:3–312:7; Deo Dep. 318:2-320:20.

404. The Deo Defendants devised a method to not only purchase used cars, but to withdraw additional and other funds at the expense of the Superb Plaintiffs. Urrutia Decl. ¶ 198.

405. At least as early as November 2022, the Deo Defendants began purchasing used vehicle inventory for Superb that were grey-market vehicles. Urrutia Decl. ¶ 199; ECF 38 ¶ 37.

406. Grey-market vehicles are Canadian vehicles that cost less due to the inability to finance them as retail banks do not permit them to be financed, but which the Deo Defendants nonetheless financed with retail banks (in violation of Superb's dealer agreement) with the full knowledge that all such retailed grey-market vehicles would cause the retail bank to require Superb to return the funds upon discovering that the vehicle financed was a grey-market vehicle. Urrutia Decl. ¶¶ 199–219, 223–233; ECF 38 ¶ 37; ECF 14-1 at 3; ECF 220-2 at 25, 51, 80–81, 90.

407. The Deo Defendants knew that the banks would require the funds issued for the grey-market vehicles to be returned, but proceeded to do so in order to siphon more and more money out of Superb, and the Deo Defendants intended for the Superb Plaintiffs to be left with the liability for these deals after they had already taken the money earned from this scheme out of Superb. Urrutia Decl. ¶¶ 202–220, 223–233, 244–260, 317–323, 408–413; ECF 14-1 at 3; ECF 220-2 at 25, 51, 54, 80–81, 90; ECF 241-5 (JONES269); Jones Dep. 299:10–301:24, 302:3–312:7.

408. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that they were purchasing grey-market vehicles, because the Deo Defendants knew or should have known that the grey-market vehicles had little to no value to Superb as a used car dealer because most customers cannot afford to purchase a vehicle without some form of financing and none of the retail banks Superb worked with would finance a grey-market vehicle. Urrutia Decl. ¶¶ 200-203; 214–220, 223–233, 244–257; Ex. E (July 21, 2023 Chase Issues email); ECF 14-1 at 3; ECF 220-2 at 90.

409. The reason the Deo Defendants did not advise the Superb Plaintiffs that they were purchasing grey-market vehicles was because the Deo Defendants schemed to maximize the damage to Superb by creating artificial profits and fraudulent financial statements when they knew the retail banks would later seek for Superb to return the entire amount funded for such deals. Urrutia Decl. ¶¶ 204–206, 214–220, 223–233, 244–257, 312–323; ECF 14-1 at 3; ECF 220-2 at 25, 51, 54, 90; ECF 241-2 (JONES71, JONES77–79); ECF 241-3 (JONES271); ECF 241-4 (JONES272–275); ECF 241-5 (JONES269); Jones Dep. 299:10–301:24, 302:3–312:7; Ex. E (July 21, 2023 Chase Issues email).

410. Indeed, because of the grey-market vehicles, the Deo Defendants were able to arrange for Superb to purchase the vehicles for less than an American vehicle and thus make Superb appear more profitable, which was necessary to keep Urrutia's confidence in Deo. Urrutia Decl. ¶¶ 205-206.

411. Had the Superb Plaintiffs been aware of the true nature of these transactions, they would not have approved of the purchases or financing of said grey-market vehicles. Urrutia Decl. ¶ 207.

412. The Deo Defendants committed this practice on a regular basis; some examples are provided herein. Urrutia Decl. ¶ 208.

413. Example 1: On February 25, 2023, the Deo Defendants arranged for Superb to sell a 2016 Audi S6 to Aleksandros Papavangjeli ("Papavangjeli") for $31,500.00. Urrutia Decl. ¶ 209.

414. According to Superb's DMS, Papavangjeli purportedly paid $2,200.00 of the $4,500.00 down-payment by credit card and financed the balance, including fees and taxes, with a lender, Chase. Urrutia Decl. ¶ 210.

415. The remaining $2,300.00 for the down-payment was not recorded in Superb's DMS, and was – upon information and belief – stolen by the Deo Defendants. Urrutia Decl. ¶ 211.

416. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 212.

417. On March 1, 2023, Chase paid Superb financed proceeds of $34,597.13. Urrutia Decl. ¶ 213.

418. After Papavangjeli complained in July 2023 that his vehicle had been at a repair shop since March 2023 and was unable to be fixed, Chase learned that Papavangjeli had purchased a grey-market vehicle, which was purchased by Deo on or around January 31, 2023. Urrutia Decl. ¶ 214.

419. As a result, on July 21, 2023, Chase demanded the repurchase of Papavangjeli's retail contract. Urrutia Decl. ¶ 215.

420. On July 25, 2023, the vehicle was placed on Superb's floor plan line, despite the vehicle not being physically present on Superb's lot. Urrutia Decl. ¶ 216.

421. Critically, the Deo Defendants failed to cause Superb to pay Chase back as demanded; the Deo Defendants thus knowingly floored the vehicle in violation of Superb's agreement with its floor plan lender. Urrutia Decl. ¶¶ 216-219.

422. Thus, the Deo Defendants were able to obtain $27,150.00 for a vehicle that was not in Superb's possession. Urrutia Decl. ¶ 219.

423. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ 220.

424. On August 10, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back $33,229.44 after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ 221.

425. Indeed, due to the Deo Defendants' fraud, Papavangjeli obtained the vehicle free of charge, which he was able to do because the Deo Defendants failed to perfect a lien against the vehicle on behalf of Chase as required by its dealer agreement. Urrutia Decl. ¶ 222.

426. Example 2: On April 27, 2023, the Deo Defendants arranged for Superb to sell a 2019 BMW X3 to James Daughety ("Daughety") for $40,450.00. Urrutia Decl. ¶ 223.

427. Daughety made a down-payment of $7,500.00 in cash, which was receipted in Superb's DMS but not deposited in Superb's bank account with Chase, and the balance was financed with Chase. Urrutia Decl. ¶ 224.

428. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 212.

429. On or around May 1, 2023, Chase paid Superb the financed proceeds of Daughety's retail contract in the amount of $40,058.00. Urrutia Decl. ¶ 225.

430. Pursuant to Deo's instruction, the vehicle was not issued license plates immediately following the sale. Urrutia Decl. ¶ 226.

431. The vehicle was originally placed on Superb's floor plan line of credit on April, 19, 2023 for the amount of $35,075.00 and was subsequently paid off on May 19, 2023 after receipt of the financed proceeds on May 1, 2023. Urrutia Decl. ¶ 227.

432. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' retail lenders to fund Daughety's purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 228.

433. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ 220.

434. On June 13, 2023, the vehicle was improperly "re-floored," *after the May 1, 2023 contract date*, on Superb's floor plan for the amount of $34,225.00. Urrutia Decl. ¶ 229.

435. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 212.

436. The Deo Defendants did not advise the Superb Plaintiffs' floor plan lenders nor the Superb Plaintiffs that the vehicle was a grey-market vehicle. Urrutia Decl. ¶ 220.

437. On July 6, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ 230.

438. The DMV paperwork for the vehicle was not sent until July 12, 2023 despite the fact the customer purchased the vehicle on May 1, 2023, almost three (3) months earlier. Urrutia Decl. ¶ 231.

439. On July 21, 2023, Chase demanded the repurchase of the retail contract because it discovered the vehicle was a grey-market vehicle and due to the Deo Defendants' failure to perfect a lien on the vehicle as required by its dealer agreement with Chase. Urrutia Decl. ¶ 232.

440. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for Daughety for the amount of $39,601.83. Urrutia Decl. ¶ 233.

441. Due to the Deo Defendants' fraudulent conduct, the vehicle remains in Daughety's possession, resulting in a total loss to Superb. Urrutia Decl. ¶ 234.

442. Example 3: On March 28, 2023, the Deo Defendants arranged for Superb to sell a 2019 Land Rover Range Rover Velar to Frankie & Alice Barnes ("Barnes") for $43,200.00. Urrutia Decl. ¶ 235.

443. Barnes paid $2,000.00 down by credit card and financed the balance, including fees and taxes, with a lender, Ally. Urrutia Decl. ¶ 236.

444. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 212.

445. On April 3, 2023, Ally paid Superb financed proceeds in the amount of $49,868.09. Urrutia Decl. ¶ 237.

446. On April 18, 2023, Superb's floor plan lender paid $39,675.00, for the same vehicle, which had already been sold. Urrutia Decl. ¶ 238.

447. However, the vehicle had not yet been received at Superb after its purchase from Manheim. Urrutia Decl. ¶ 239.

448. In addition, the vehicle was sold to another customer while in transit to Superb. Urrutia Decl. ¶ 240.

449. As a result of the vehicle not being available in a timely manner, Barnes cancelled the sale. Urrutia Decl. ¶ 241.

450. On or about June 6, 2023, Superb submitted payment to Ally for the repurchase of the retail contract in the amount of $51,081.80. Urrutia Decl. ¶ 242.

451. On June 15, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ 243.

452. Example 4: to show the great extent to which the Deo Defendants went to defraud the Plaintiffs and their customers, on May 12, 2023, the Deo Defendants arranged for Superb to sell a 2021 Dodge Durango RT to Sarah Martin ("Martin") for $27,765.00. Urrutia Decl. ¶ 244.

453. Although a $10,000.00 down payment was required, with Martin financing the taxes and fees with Chase, no monies were receipted into Superb's DMS nor were any monies deposited in Superb's bank account with Chase. Urrutia Decl. ¶ 245.

454. On May 16, 2023, Chase paid Superb financed proceeds of $44,696.61. Urrutia Decl. ¶ 246.

455. The Deo Defendants failed to deliver the vehicle to Martin and Martin canceled the purchase and loan. Urrutia Decl. ¶ 247.

456. In fact, the Deo Defendants never purchased the vehicle before making the sale. Urrutia Decl. ¶ 248.

457. On May 23, 2023, despite the fact the Deo Defendants never took possession of the vehicle, and it was already sold to another dealer by Manheim, the vehicle was placed on Superb's floor plan line. Urrutia Decl. ¶ 249.

458. The Deo Defendants requested by interstate electronic communication for the Superb Plaintiffs' floor plan lenders to fund the purchase, which was funded by interstate electronic means. Urrutia Decl. ¶ 212.

459. Superb was funded $39,810 by its floor plan lender for the vehicle. Urrutia Decl. ¶ 250.

460. On May 31, 2023, Superb paid off the vehicle from their floor plan line for $39,810.00. Urrutia Decl. ¶ 251.

461. The Superb Plaintiffs later discovered that between May 2023 and June 2023, Deo arbitrated the purchase of aforementioned vehicle with Manheim New Jersey. Urrutia Decl. ¶ 252.

462. The Deo Defendants therefore knew that the vehicle was not present at the dealership when he placed the vehicle on Superb's floor plan line of credit, nor did the Deo Defendants cancel the retail contract. Urrutia Decl. ¶ 253.

463. Thus, despite the fact that the vehicle sale was arbitrated and the car was never ultimately purchased by the customer, the Deo Defendants instructed to "re-floor" vehicle on June 14, 2023 in the amount of $39,810.00. Urrutia Decl. ¶ 254.

464. On June 26, 2023, the Deo Defendants caused Superb to pay the Superb Plaintiffs' floor plan lender back after having benefitted from the use of the improperly obtained funds. Urrutia Decl. ¶ 255.

465. On July 21, 2023, Chase demanded the repurchase of the retail contract from the canceled sale because the vehicle was a grey-market vehicle. Urrutia Decl. ¶ 256.

466. After failure to return the funds in a timely manner, the Superb Plaintiffs repaid Chase in August 2023. Urrutia Decl. ¶ 257.

**iv. Deo Double-books Financing & Double-floors the Superb Plaintiffs' Vehicles**

467. The Deo Defendants devised another scheme to pilfer money from the Superb Plaintiffs. Urrutia Decl. ¶ 258.

468. The Deo Defendants arranged to finance the same inventoried motor vehicle twice, wrongfully taking the improperly obtained funds and in violation of the Superb Plaintiffs' agreements with its floor plan lenders. Urrutia Decl. ¶ 259.

469. Deo personally directed staff at Superb to double-floor vehicles. Urrutia Decl.¶ 260; ECF 507 ¶¶ 31-32, 34-41; ECF 304 ¶¶ 48-53; ECF 304-1.

470. One example of double-booking is the deal with Martin, discussed *supra,* which illustrates how the Deo Defendants engaged in this scheme. Urrutia Decl. ¶ 261.

471. Deo also engaged in double-flooring in late February 2023. ECF 11 ¶¶ 58-63.

472. Deo blamed Aaronson of the IAG Plaintiffs and expressed frustration about trying to manage three (3) dealerships in separate locations; Urrutia directed Deo to focus on Superb. Id.

473. In another example, discussed further below, the Deo Defendants double-floored nearly two dozen vehicles, leading to an August 3, 2023 internal audit by the Superb Plaintiffs, Deo's immediate removal as general manager, and damages in excess of $760,000.00 for those vehicles alone. ECF 304 ¶ 46-53; ECF 304-1; ECF 304-2; Urrutia Decl. ¶¶ 262-263.

**v. The Deo Defendants Fail to Pay Off Floor Plan Following Sales**

474. The Deo Defendants sold vehicles subject to Floor Plan financing by the Superb Plaintiffs' floor plan lenders without paying off the Floor Plan. Urrutia Decl. ¶ 264.

475. This created a deficiency toward repayment of the Floor Plan loan made by the Superb Plaintiffs' floor plan lenders to purchase each such vehicle. Urrutia Decl. ¶ 265.

476. As guarantor, the Superb Plaintiffs had to pay the Superb Plaintiffs' floor plan lenders over $2,500,000.00 to satisfy Superb's Floor Plan deficiency. Urrutia Decl. ¶ 266, 428, 567–570; ECF 11 ¶¶ 99–109; ECF 11-14; ECF 38 ¶¶ 2–9; ECF 220 ¶¶ 9–15; ECF 220-2; ECF 220-4.

**vi. The Deo Defendants Fail to Cause Superb to Pay Off Existing Loans on Vehicle Trade-Ins by Customers**

477. Superb accepted customer trade-ins of vehicles to be used toward the customer's purchase of a vehicle ("Trade-ins" or "trade-in"). Urrutia Decl. ¶ 267.

478. Trade-ins with existing loan or lease balances were required to be satisfied by Superb. Urrutia Decl. ¶ 268.

479. The Deo Defendants failed to have Superb pay off the existing loan or lease balances on numerous Trade-ins. Urrutia Decl. ¶¶ 269, 351.

480. The prior owners of these traded-in vehicles remained liable to make payments on the remaining balance of their loan despite no longer having ownership or control of the Trade-in. Urrutia Decl. ¶ 270.

481. The Superb Plaintiffs were thus forced to pay off the loans at their own expense; some examples are described below. Urrutia Decl. ¶ 271.

482. Example 1: On May 8, 2023, the Deo Defendants arranged for Superb to sell a 2019 Dodge Durango to Patricia Richards ("Richards") for $46,790.00. Urrutia Decl. ¶ 352.

483. Richards paid $2,500.00 down by credit card and financed the balance, including fees and taxes with a lender, TD Bank ("TD"). Urrutia Decl. ¶ 353.

484. On May 15, 2023, TD paid the financed proceeds of $50,204.18. Urrutia Decl. ¶ 354.

485. The sale of the 2019 Dodge Durango produced a trade-in to be added to Superb's inventory. Urrutia Decl. ¶ 355.

486. The trade-in of Richards 2019 Dodge Caravan was valued at $12,100.00 by time of sale in October 2023; however, the Deo Defendants appraised the trade-in at $25,000.00 and added the vehicle to Superb's inventory for this amount in May 2023. Urrutia Decl. ¶ 356.

487. The payoff check to relieve Richards of her prior obligation and debt to Capital One was generated on or around July 10, 2023. Urrutia Decl. ¶ 357.

488. Payment was not forwarded to Capital One because the payoff check was held in Deo's desk drawer instead of being released. Urrutia Decl. ¶ 358.

489. The Deo Defendants did not pay off the loan from Capital One and Richards remained liable for the loan. Urrutia Decl. ¶ 359.

490. Due to the fact the trade-in had not been paid off, the vehicle was later repossessed and Superb was caused to pay off the balance of the outstanding loan in addition to late fees and repossession fees. Urrutia Decl. ¶ 361.

491. The Deo Defendants retained the proceeds that were to have been used to pay off the loan to Capital One. Urrutia Decl. ¶ 362.

492. Example 2: On June 3, 2023, Superb arranged to sell a 2016 Mercedes-Benz CLS, to Abdurashid Yusupov & Elcin Abdullaeva ("Yusupov") for $38,990.00. Urrutia Decl. ¶ 363.

493. Yusupov paid $1,000.00 by credit and financed the balance, including fees and taxes, with its lender, Ally. Urrutia Decl. ¶ 364.

494. On June 8, 2023, Ally paid Superb the financed proceeds of $38,952.95. Urrutia Decl. ¶ 365.

495. The sale to Yusupov produced a trade-in of a 2020 Nissan Maxima, valued at $26,500.00. Urrutia Decl. ¶ 366.

496. The payoff check to relieve Yusupov of the prior obligation and debt to Nissan NMAC was generated on or around July 3, 2023. Urrutia Decl. ¶ 367.

497. Payment was not forwarded to the lienholder because the payoff check was not approved for release by Deo. Urrutia Decl. ¶ 368.

498. In or about August or September 2023, the vehicle was repossessed by NMAC, after contacting the customer for payment and being informed by the customer that they were no longer in possession of the vehicle, as it had been traded-in at Superb. Urrutia Decl. ¶ 369.

499. The Deo Defendants therefore caused Superb to lose this vehicle due to their refusal to pay the lien on the vehicle off as required for a trade-in. Urrutia Decl. ¶ 370.

500. Example 3: On July 15, 2023, customer Andreia De Olivera Pereira traded in the 2016 Ford F150 ("2016 F150") in exchange for a 2018 Ford F-150, VIN No.: 1FTFW1E56JFD20487, which Superb sold to Pereira. ECF 294 ¶ 83.

501. The 2016 F150 had a remaining balance of $27,603.87 due to Lendbuzz Funding ("Lendbuzz"). ECF 294 ¶ 84.

502. Deo never caused this remaining balance to be paid off despite selling the 2018 F150 and receiving bank financing plus a $5,000.00 down-payment by credit card and/or cash, of which the cash portion was never deposited in Superb's bank account. ECF 294 ¶ 85.

503. As a result of this conduct, Pereira's credit was likely destroyed, as he remained liable to pay off the balance which Deo was responsible for paying once he accepted the 2016 F150 as a trade-in. ECF 294 ¶ 86.

504. Meanwhile, Deo floored the 2016 F150 upon receiving it in July 2023, leaving Superb unable to sell the vehicle because he moved it way from Superb's lot and only returned subject to the Injunction. ECF 294 ¶ 87.

505. As a result of the foregoing, in or about March 2024, since this vehicle was never paid off due to Deo's fraudulent conduct, Lendbuzz repossessed the vehicle. ECF 294 ¶ 88.

506. The Deo Defendants' failure to cause Superb to pay off the loans on the Trade-ins has potential criminal liability, civil liability, and loss of the DMV Licenses. Urrutia Decl. ¶ 371.

507. The Deo Defendants' failure to have Superb pay off the loans may also affect the ability of the Urrutia to obtain a DMV License for any other dealership facility. Urrutia Decl. ¶ 372.

508. In order to avert the consequences of the Deo Defendants' failure to pay off the loans on Trade-ins, the Superb Plaintiffs satisfied $221,313.39 of the outstanding obligations and has paid another $118,530.15 thereafter. Urrutia Decl. ¶ 373.

**vii. The Deo Defendants Failed to Perfect Liens on Behalf of Various Lenders, Resulting in Additional Liability to Superb**

509. Superb arranged financing for their customers through contracted lenders. Urrutia Decl. ¶ 272.

510. Superb has written agreements with these lenders that require Superb to ensure that title to any vehicle they finance has a lien placed thereon to protect the lender in the event of a default by the consumer. Urrutia Decl. ¶ 273.

511. These agreements also require Superb to repurchase any loan made by the lender to a consumer if Superb does not follow their contractual requirements when arranging the loan, such as the failure to place a lien on the title. Urrutia Decl. ¶ 274.

512. The Deo Defendants failed to have Superb perfect liens on behalf of the various lenders upon the sale and financing of numerous vehicles sold by Superb. Urrutia Decl. ¶ 275.

513. As a result of the Deo Defendants' actions, in clear violation of Superb's lender agreements, those lenders demanded repurchase of various loans. Urrutia Decl. ¶ 276.

514. In order to protect the investment of the Superb Plaintiffs and their goodwill with these lenders, with whom they have other agreements through other dealerships owned by Urrutia, Superb has paid over $500,000.00. Urrutia Decl. ¶¶ 277, 221, 233, 242, 349, 373; ECF 220-2 at 90, 99.

515. As an example, on April 19, 2023, the Deo Defendants arranged for Superb to sell a 2017 BMW X6 to Timothy Jenkins ("Jenkins") for $37,595.00. Urrutia Decl. ¶ 341.

516. Jenkins paid $2,000.00 down (of which $1,400.00 in cash was receipted in to Superb's DMS but was never deposited in Superb's bank account, and $600.00 was paid by credit card), with the balance financed, including fees and taxes, with a lender, Chase. Urrutia Decl. ¶ 342.

517. On April 21, 2023, Chase paid Superb the financed proceeds of $40,681.20. Urrutia Decl. ¶ 343.

518. Per Deo's instruction the vehicle was not issued license plates immediately following the sale. Urrutia Decl. ¶ 344.

519. The DMV paperwork was not sent until July 12, 2023. Urrutia Decl. ¶ 345.

520. The reason why the Deo Defendants did not send out the DMV paperwork was to allow them to place the sold vehicle on Superb's floor plan line of credit, despite the fact a sold vehicle should never be placed on a floor plan line. Urrutia Decl. ¶ 346.

521. By holding back the DMV paperwork, the Deo Defendants were able to show Superb's floor plan lender that they maintained title to the vehicle in order to improperly floor the vehicle. Urrutia Decl. ¶ 347.

522. In July 2023, Chase demanded the repurchase of the retail contract due to the Deo Defendants' failure to perfect the lien as required. Urrutia Decl. ¶ 348.

523. On August 11, 2023, Superb submitted payment to Chase for the repurchase of the retail contract for the amount of $43,008.20. Urrutia Decl. ¶ 349.

524. Another two (2) examples of Deo's scheme in failing to perfect liens are the Papavangjeli and Daughety deals referenced *supra*. Urrutia Decl. ¶ 350.

### viii. The Deo Defendants Sold Superb Vehicles They Did Not Own Under False Pretenses

525. The Deo Defendants sold Superb vehicles that they knew were not capable of being transferred to Superb, as the vehicles were stuck in limbo in Northshore's DMV VerifiNY system following the surrender of its DMV License, and the Deo Defendants did not have the authority or the ability to transfer these vehicles from Northshore to Superb. Urrutia Decl. ¶ 278.

526. For example, in or about April 2023, Deo sold Superb a 2017 Rolls Royce Dawn for approximately $192,159.00. Urrutia Decl. ¶ 279.

527. In spite of being provided the title to the vehicle by Deo, Superb was never transferred the vehicle out of Northshore because it cannot be taken out of Northshore's account with the DMV VerifiNY system. Urrutia Decl. ¶ 280.

528. As a result, Superb is unable to sell this vehicle and five (5) other vehicles. Urrutia Decl. ¶ 281.

529. Further, the Deo Defendants sold the Superb Plaintiffs vehicles from Northshore and/or Sunrise between January and April 2023 when they were forbidden from doing so for the period of December 6, 2022 through June 15, 2023 by a temporary restraining Order ("TRO") of the Hon. Sharon M.J. Gianelli, J.S.C. ("Justice Gianelli") issued in favor of the IAG Plaintiffs. Urrutia Decl. ¶¶ 282-284; 617224/2022 NYSCEF 42; ECF 220 ¶¶ 59-64, 66; ECF 220-14, ECF 220-15; ECF 38-9.

### ix. The Deo Defendants Failed to Pay Warranty Companies and Vendors

530. Superb sells, on behalf of third party warranty providers, extended warranties to consumers. Urrutia Decl. ¶ 285.

531. Upon information and belief, under the Deo Defendants' direction, Superb has issued warranties to consumers and collected the fees but have failed to pay over $436,000.00 due to the warranty companies, which will result in the voiding of the warranties for which consumers have paid. Urrutia Decl. ¶ 286.

532. The Deo Defendants have used these collected fees for their own benefit. Urrutia Decl. ¶ 287.

533. The Deo Defendants have caused Superb to fail to pay more than $100,000.00 owed to vendors; in addition, the Deo Defendants have not completed the documentation necessary to complete registrations for out-of-state customers and cannot account for numerous missing titles on vehicles. Urrutia Decl. ¶¶ 231–234, 276, 278–281, 288, 340–350; Exs. E, H; ECF 220-2 at 90, 99.

**x. Deo Wastes Company Assets and Further Obligates Superb Plaintiffs**

534. The Deo Defendants delivered certain unsold vehicles owned by Superb and liened by the Superb Plaintiffs' floor plan lenders to repair facilities to be repaired. Urrutia Decl. ¶ 289.

535. Despite due demand, however, the Deo Defendants have failed to disclose the identity or location of the various repair facilities housing these vehicles. Urrutia Decl. ¶ 290.

536. Upon information and belief, one or more of the repair facilities has placed a garagemen's lien on one or more of these vehicles for repair and/or storage charges. Urrutia Decl. ¶ 291.

537. The Deo Defendants have failed to arrange for payment to these facilities or alert the Superb Plaintiffs of any garagemen's lien, resulting – upon information and belief – in the sale of these vehicles at auction to satisfy the garagemen's lien. Urrutia Decl. ¶¶ 289–293; Merckling Dep. 115:6–121:4, 320:5–326:4.

538. The Superb Plaintiffs remain liable to the Superb Plaintiffs' floor plan lenders to satisfy the loans on these vehicles. Urrutia Decl. ¶ 293.

539. As an additional egregious example of the Deo Defendants' brazen conduct, on July 31, 2023, the Deo Defendants arranged to sell a 2019 Audi Q7, to Regine Raymond ("Raymond") for $31,496.14, with $3,000.00 down and the rest, including taxes and fees, to be financed by Santander. Urrutia Decl. ¶¶ 374-376.

540. Although a $3,000.00 down payment was required, no monies were recorded to Superb's books. Urrutia Decl. ¶ 375.

541. On August 3, 2023, Santander paid the financed proceeds in the amount of $39,618.70. Urrutia Decl. ¶ 376.

542. However, Raymond never took actual delivery of vehicle because Deo kept the vehicle in his possession, and not on Superb's lot or showroom. Urrutia Decl. ¶¶ 377-378.

543. On June 8, 2023, the vehicle was added to Superb's floor plan line for the amount of $31,185.00 and paid off on July 24, 2023. Urrutia Decl. ¶ 379.

544. During this time, with an active Santander loan, Raymond was unable to drive the vehicle. Urrutia Decl. ¶ 380.

545. On October 23, 2023, Deo was seen operating Raymond's vehicle, with a dealer plate bearing the number 6111633, for his personal use. Urrutia Decl. ¶¶ 378, 381.

546. To this day, the vehicle was never recovered by Superb, notwithstanding the fact that Superb is the titled owner. Urrutia Decl. ¶ 382.

547. The Deo Defendants' conduct with respect to the Audi Q7 resulted in a total loss to Superb. Urrutia Decl. ¶ 383.

### xi. The Deo Defendants Take and Use Dealership Assets for Their Own Purposes

548. The Deo Defendants have been treating Team, Superb, and their respective assets as their own. Urrutia Decl. ¶¶ 294, 298–300, 408–413, 496–506; Deo Dep. 318:17–321:8; Blankenship Dep. 88:10–89:18; ECF 156-1 at 56:25–58:8, 100:13–102:3, 117:5–118:2; ECF 40 ¶¶ 9–18, 20–30; ECF 38 ¶¶ 63–69 & ECF 38-12; ECF 50-1 ¶¶ 31–47; ECF 11 ¶¶ 132–141, 164–185; ECF 304 ¶¶ 87–88; Kataev Decl. ¶ 10, Ex. H at FLUSHING7115, 7150, 7161, 7176, 7183.

549. Deo has personally taken over $1,252,558.59 in customers' cash deposits, unauthorized ACH transactions, checks, and other cash, rather than deposit or keep the money in Superb's account. Urrutia Decl. ¶ 295; ECF 11-12; ECF 40 ¶¶ 8-11, 16-19, 29.

550. Deo was assisted in taking these customer cash deposits and other cash by Merckling, Blankenship, Sara, Laurie, Thomasson, and Deo's accountants. Urrutia Decl. ¶ 296; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 95 ¶¶ 11-20, 95-3; ; Merckling Dep. 301:10-18.

551. Deo was not a signatory on Superb's bank account. Urrutia Decl. ¶ 297; ECF 11-11.

552. Deo had no authority to withdraw any funds from Superb's bank accounts. Urrutia Decl. ¶ 298; ECF 11-6.

553. Despite having no authority, Deo had been issuing and signing checks from its accounts to pay for his personal expenses, among other things. ECF 11-16; Urrutia Decl. ¶¶ 183, 298–300, 408–413 & n.12.

554. For example, Deo issued two checks in the amounts of $37,500.00 each, with both checks from Superb to Northshore. Urrutia Decl. ¶ 300; ECF 11-16.

555. In addition, the Deo Defendants failed to terminate at least $226,081.23 of lender financing for consumers who canceled their purchases. Urrutia Decl. ¶ 301.

556. Upon information and belief, Deo personally took those loan proceeds and/or utilized those funds in order to float his fraudulent operations and to make Superb appear profitable in an effort to continue his schemes undetected. Urrutia Decl. ¶¶ 153–159, 183–184, 240, 231 n.10, 298–310, 574, 576; Jones Dep. 301:12–17, 302:19–303:22, 307:2–14, 310:12–24, 311:2–16.

**xii. The Deo Defendants Falsified Financial Statements at Superb with the Assistance of Deo's Accountants**

557. In order for the Deo Defendants to perpetuate their financial wrongdoings, they needed the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb. Urrutia Decl. ¶ 303.

558. In order for the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb, Superb was required to provide the Floor Plan lenders monthly financial reports. Urrutia Decl. ¶ 304.

559. These monthly financial reports were provided to the Superb Plaintiffs and their Floor Plan lenders by the Deo Defendants and their accountants. Urrutia Decl. ¶ 305.

560. Had the Deo Defendants and their accountants provided the Superb Plaintiffs and their Floor Plan lenders accurate monthly financial reports, they would have discontinued providing the Floor Plan to Superb because the accurate monthly financial reports would not have satisfied their financial requirements. Urrutia Decl. ¶ 306.

561. The Deo Defendants engaged the services of their accountants for Superb to work on its financial reporting. Urrutia Decl. ¶ 307.

562. The Deo Defendants engaged the services of the accountants at least as early as April 2023. Urrutia Decl. ¶ 308.

563. Each month during the Deo Defendants' tenure overseeing and managing Superb since April 2023, their accountants were engaged and paid by Superb to assist the Deo Defendants in preparing the information necessary to create the monthly financial reports. Urrutia Decl. ¶ 309.

564. During their tenure overseeing and managing Superb, they falsely manipulated Superb's monthly financial reports submitted to the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ 310; ECF 11 ¶¶ 80-84; ECF 38 ¶ 64.

565. The Deo Defendants and their accountants intentionally manipulated Superb's monthly financial information every month between at least April 2023 through July 2023. Urrutia Decl. ¶ 311; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

566. The Deo Defendants and their accountants falsified the monthly financial statements provided to the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ 312; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

567. The Deo Defendants and their accountants falsified the monthly financial statements with an intent to defraud the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ 313-314; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

568. The Deo Defendants and their accountants falsified the monthly financial statements to induce the Superb Plaintiffs and their Floor Plan lenders to continue to provide the Floor Plan to Superb. Urrutia Decl. ¶ 314; ECF 11 ¶¶ 80-84; ECF 241 ¶¶ 11-15; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

569. Each financial entry by the Deo Defendants and their accountants was a representation that such entry was true and accurate and could be relied upon by the Superb Plaintiffs and their Floor Plan lenders. Urrutia Decl. ¶ 315; ECF 11 ¶¶ 80-84.

570. Examples of fraudulent entries made by the Deo Defendants and their accountants into the DMS include those described below. Urrutia Decl. ¶ 316; ECF 11 ¶¶ 80-84; ECF 11-13; ECF 169-5; ECF 170-3; ECF 241-1; ECF 241-2; ECF 241-3; ECF 241-4; ECF 241-5.

571. On May 12, 2023, the Deo Defendants and their accountants directed Superb's controller, Kendra Kernizant ("Kernizant"), to make two (2) adjusting journal entries in the amount $61,559.16 for the April 2023 financial statement in order to show a false profit of $27,842.00. Urrutia Decl. ¶ 317.

572. The Deo Defendants and their accountants further directed Kernizant on June 12, 2023 to make adjusting journal entries to the unit count of sold vehicles. Urrutia Decl. ¶ 318.

573. Kernizant was told that there was money found on schedules to be put back into income and directed to make journal entries removing packs from used car inventory schedule and made adjusting entries for $48,563.00 to change the May 2023 financial statement in order to show a false profit of $26,136.00. Urrutia Decl. ¶ 319.

574. The Deo Defendants and their accountants also directed Kernizant to make adjusting journal entries to the unit count of sold vehicles, to not reflect eight (8) unwound sales from prior months, the effect of which was designed to show a greater profit for Superb. Urrutia Decl. ¶ 320.

575. Kernizant made adjusting journal entries for the amount $12,304.70 to change the June 2023 financial statement in order to show a false profit of $17,361.00. Urrutia Decl. ¶ 321.

576. The Deo Defendants and their accountants also directed Kernizant to add money set aside for taxes as "profit" for Superb. Urrutia Decl. ¶ 322.

577. The Deo Defendants and their accountants similarly directed Kernizant to first add, and then not unwind, forty-two (42) deals that fell through with no expectation of consummating those deals, which added $1.5M in profit and $250,000.00 in reported gross profit. Urrutia Decl. ¶ 323.

578. Indeed, the Deo Defendants and their accountants – who closed every statement from April 2023 through July 2023 – imputed income from the foregoing fake deals, which resulted in the illusion that Superb is profitable and permitted the Deo Defendants to run off with over $800,000.00 in missing cash and checks from customer deposits, and over $450,000.00 in ACH transactions to pay other debts that are not Superb's, among myriad other damages. Urrutia Decl. ¶¶ 324, 415-421; ECF 40 ¶¶ 8-11, 16-19, 29; ECF 183-1 ¶ 616; ECF 524 ¶¶ 650, 653–656; ECF 11 ¶¶ 64–67, 79, 122, 126–128; ECF 11-10 at 2; ECF 11-12; ECF 11-16; ECF 324 ¶¶ 23–27; Deo Dep. 436:8–438:10, 440:1–442:20.

579. The Deo Defendants also directed Kernizant to floor sold vehicles and other vehicles that did not exist, which are discussed in various examples, *supra*. Urrutia Decl. ¶ 325.

580. The financial information stored on the DMS as directed to be entered by the Deo Defendants and their accountants is the information considered in extending the Superb Plaintiffs' Floor Plan to Superb. Urrutia Decl. ¶ 326.

581. The Superb Plaintiffs' and their Floor Plan lenders reasonably relied upon the falsified monthly financial statements to continue to provide the Floor Plan to Superb. Urrutia Decl. ¶ 327.

582. The Superb Plaintiffs and their Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the Deo Defendants and their accountants were committing the wrongdoings alleged. Urrutia Decl. ¶ 328.

583. The Superb Plaintiffs and the Floor Plan lenders would not have continued to provide the Floor Plan to Superb had they been aware that the monthly financial statements were false. Urrutia Decl. ¶ 329.

584. Due to the falsified monthly financial statements, the Superb Plaintiffs and the Floor Plan lenders were unaware of the significant losses accruing at Superb. Urrutia Decl. ¶ 330.

585. The Deo Defendants and their accountants falsified the financial statements to create the illusion that Superb was profitable so that they can continue to steal from the Superb Plaintiffs and prevent the Superb Plaintiffs from discovering their fraud. Urrutia Decl. ¶ 331.

586. When the Superb Plaintiffs and the Floor Plan lenders became aware of the significant losses accruing at Superb, the Floor Plan lenders demanded that all financial deficiencies owed to them be repaid, which the Superb Plaintiffs did, causing them significant damages. Urrutia Decl. ¶ 332.

587. The Superb Plaintiffs covered the numerous claims and financial deficiencies created by the Deo Defendants. Urrutia Decl. ¶¶ 550, 574, 580.

588. The Deo Defendants engaged in the conduct complained to hide all of their financial improprieties and to steal funds from Superb. Urrutia Decl. ¶¶ 571.

589. Worst of all, the Deo Defendants and their accountants submitted a falsified mid-year financial statement to this Court showing approximately an additional $3M in gross with $1.3M in profit, that is similarly false, as Superb's DMS system does not reflect these numbers;

the Deo Defendants apparently pulled these numbers out of thin air. Urrutia Decl. ¶ 423; ECF 30-6.

### xiii. The Straw That Broke the Camel's Back

590. On July 31, 2023, one of Superb's floor plan lenders, Nissan Motor Acceptance Corporation ("NMAC"), contacted Bruce Novicky ("Novicky"), the Chief Operating Officer ("COO") of Superb, to inform him that NMAC discovered that vehicles it financed were also financed, in breach of Superb's floor plan agreement with NMAC, with another bank. Urrutia Decl. ¶¶ 424-425; ECF 11 ¶¶ 99-107; ECF 11-14, ECF 401 ¶ 1.

591. Such acts mean that two lenders lent money to Superb to buy the same car for inventory. Urrutia Decl. ¶ 426.

592. This practice is called "double flooring" in dealership lexicon and is prohibited. Urrutia Decl. ¶ 427.

593. Because of this prohibited conduct, Urrutia was required to pay NMAC $760,868.75 to cure the default under Superb's agreement with NMAC and ultimately, NMAC terminated its floor plan financing for Superb. ECF 11 ¶¶ 109; ECF 220 ¶ 9; ECF 11-14; ECF 220-2; Urrutia Decl. ¶ 428.

594. Novicky confronted Deo about this, who provided inadequate explanations. ECF 11 ¶¶ 100, 107-108; Urrutia Decl. ¶ 429.

595. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants each substantially assisted Deo in carrying out this scheme by acting as his agents at his direction in, among other things, filling out applications for financing and making material misrepresentations in said applications, discussing together the plan to defraud Superb Plaintiffs and the floor plan financing companies, and profiting from the scheme together. Urrutia Decl. ¶¶

153-159, 505; ECF 95 ¶¶ 11-20; ECF 95-3; ECF 95-4; ECF 95-5; Jones Dep. 301:12–17, 302:19–303:22, 307:2–14, 311:2–16.

596. Superb and Urrutia thus were damaged by the Defendants' conduct, including – but not limited to – by causing Superb's floor plan line of credit with NMAC to be terminated, resulting in a finding of irreparable harm by this Court. ECF 55 at 19 ("In light of the foregoing record and the possibility of losing Superb Motors as a going concern …, the Court concludes that Superb has demonstrated irreparable harm").

597. When Novicky informed Urrutia about the double-flooring, it caused great concern such that, on August 3, 2023, consistent with his authority over the day-to-day operations at Superb under the Shareholders' Agreement, Urrutia delegated to Novicky the task of conducting a physical inventory at Superb in order to ensure that (i) all "floor planned" vehicles were on premises at Superb as required; and (ii) that all vehicles entered into the dealership management system ("DMS") were also on premises. ECF 11 ¶ 111; Urrutia Decl. ¶ 430.

598. The inventory resulted in the astonishing amount of over one hundred (100) vehicles missing despite the fact that they were listed as assets in Superb's DMS system and on its general ledger. ECF 11 ¶ 112; ECF 11-15; ECF 507 ¶¶ 44-49; Urrutia Decl. ¶ 431.

599. Novicky confronted Deo about the missing vehicles; in response, Deo demonstrably lied as to certain vehicles and failed to adequately explain why other vehicles were missing from Superb. ECF 11 ¶ 113; Urrutia Decl. ¶ 432.

600. As an example of Deo's clear lies, Deo explained that one particular vehicle was sold. ECF 11 ¶ 114; Urrutia Decl. ¶ 433.

601. However, when Novicky contacted the customer listed for that purchase, the customer denied purchasing that particular vehicle. ECF 11 ¶ 114; Urrutia Decl. ¶ 434.

602. Moreover, Deo was unable or unwilling to supply documentation to substantiate the supposed sale. ECF 11 ¶ 115; Urrutia Decl. ¶ 435.

603. Due to the foregoing, Urrutia exercised his right to remove Deo from the day-to-day operations of Superb and instituted a top-down audit of all operations. ECF 11 ¶ 116; Urrutia Decl. ¶ 436.

604. The findings included incontrovertible proof of Deo's duplicity and clear breaches of his fiduciary obligations. Urrutia Decl. ¶ 437.

605. Deo's conduct uncovered on August 3, 2023 resulted in Superb contacting the Nassau County Police Department ("NCPD") to report the crimes perpetrated by Deo. ECF 86 ¶ 3; ECF 401 ¶¶ 5-6, 9-12; ECF 401-1.

606. Merckling was present with Deo at the time the NCPD arrived. ECF 401 ¶ 15.

607. The fallout from having to pay off $760,000.00 in double-floored vehicles was the first domino to fall in the demise of Superb. Urrutia Decl. ¶ 438.

608. Urrutia was forced to use all his working capital for all four (4) of his dealerships to make payoffs to NMAC and Next Gear Capital Corp. due to the Deo Defendants' conduct, which resulted in the loss of approximately $1,900,000.00 with: (i) about $1,600,000.00 as a direct result conversion of the vehicles to another lot for the grand opening of their competing dealership; and (ii) around $300,000.00 due to the Deo Defendants' double-flooring of other vehicles. Urrutia Decl. ¶ 439; ECF 251 ¶ 30.

609. Since September 2023, the Superb Plaintiffs paid down the floor plan line of credit with curtailments, interest, and insurance costs of over $600,000.00 solely for the injuncted vehicles. Urrutia Decl. ¶ 440; ECF 251 ¶ 32.

610. All in, Superb was forced to pay a total of $4,165,776.00 in payoffs between July 2023 and September 20, 2023. ECF 220 ¶¶ 9-13, 11 n. 6, 15, 15 n. 7; ECF 220-2, 220-4; Urrutia Decl. ¶ 569.

611. Urrutia was also forced to pay in capital in the amount of $1,055,878.99 after September 20, 2023. Urrutia Decl. ¶ 441; ECF 220 ¶¶ 40-42; ECF 220-9.

612. Deo diverted approximately $663,000.00 in funds from Superb, consisting of $257,000.00 in cash and $406,000.00 in other funds. Urrutia Decl. ¶¶ 415–417, 442-443; ECF 11 ¶¶ 79, 122, 126; ECF 11-12.

613. The Superb Plaintiffs were also forced to spend significant time uncovering the whereabouts of all the cars that were missing, which initially totaled 102 vehicles. Urrutia Decl. ¶ 444; ECF 112 ¶ 5.

614. The Superb Plaintiffs counted 102 vehicles missing because those were the vehicles listed in Superb's general ledger which they were unable to locate. Urrutia Decl. ¶ 445; ECF 507 ¶¶ 44-49.

615. It was Deo's responsibility as a general manager to maintain an accurate general ledger listing the vehicles actually in Superb's possession. Urrutia Decl. ¶ 446; ECF 507 ¶¶ 44-49.

616. Deo willfully failed to fulfill his duty to accurately list all vehicles in Superb's possession in the general ledger. Urrutia Decl. ¶ 447; ECF 507 ¶¶ 44-49.

617. After the Order to show cause was filed in mid-August 2023, the Superb Plaintiffs found thirteen (13) of these vehicles, leaving eighty-nine (89) remaining. Urrutia Decl. ¶ 448; ECF 112 ¶ 6; ECF 34.

618. Of those eighty-nine (89), another twelve (12) were then found, leaving seventy-seven (77) vehicles. Urrutia Decl. ¶ 449; ECF 112 ¶ 7; ECF 56-1 ¶ 5.

619. Of those, twenty-eight (28) were recovered, with an additional two (2) Isuzu flatbed trucks that were not on that list, on September 15, 2023, leaving forty-nine (49). Urrutia Decl. ¶ 450; ECF 112 ¶ 8; ECF 56-1 ¶¶ 3-4.

620. Further, six (6) vehicles remain in the possession of the Deo Defendants, leaving forty-three (43) remaining vehicles. Urrutia Decl. ¶ 451; ECF 112 ¶ 9.

621. The Superb Plaintiffs were able to uncover the whereabouts of most of these remaining forty-three (43) vehicles, except for about seven (7), which remain completely unaccounted for. ECF 157-1 ¶¶ 15-71.

622. Deo engaged in all sorts of nefarious conduct with vehicles during his tenure at Superb. Urrutia Decl. ¶ 452; ECF 112 ¶¶ 11-23 (a representative sampling of examples concerning how Deo conducted himself with the vehicles).

623. As a result of Deo's conduct, Superb's and Team's floor plan lenders terminated their agreements with Superb and Team, respectively. ECF 38 ¶ 2; ECF 157-1 ¶¶ 8-9; ECF 507 ¶¶ 19-20.

**xiv. The Full Extent of the Deo Defendants' Fraudulent Schemes Come to Surface**

624. Upon removing the Deo Defendants from Superb, the Superb Plaintiffs conducted an investigation into their conduct. Urrutia Decl. ¶ 453.

625. Urrutia discovered that Deo misrepresented to Flushing that he is the sole owner of Superb in order to open and maintain a bank account for Superb with Flushing. ECF 11 ¶¶ 73, 117; Urrutia Decl. ¶ 387.

626. Deo's representation to Flushing was blatantly false. ECF 11 ¶¶ 118; Urrutia Decl. ¶ 388.

627. Deo successfully opened a bank account for Superb on or about April 4, 2023. Urrutia Decl. ¶ 389; ECF 11-9.

628. Deo was successful in his plan to open a separate bank account for Superb because he sowed turmoil with Superb's accounting department and capitalized on the accounting department's backlog. ECF 11 ¶¶ 68-75.

629. A month prior, Urrutia began the process of opening an account with Flushing in March 2023. ECF 11 ¶ 73 n. 10; ECF 50-3; ECF 50-4.

630. When Urrutia began that process, Flushing requested of Urrutia information, documents, and records – many of which he provided – including his tax returns and other documents which indicate that he is the majority shareholder of Superb. Id.; Urrutia Decl. ¶¶ 390-392.

631. Urrutia spoke directly with David Weinstein ("Weinstein") – the Vice President and Branch Manager of Flushing's Borough Park branch – and Mr. Weinstein knew that he was the majority shareholder of Superb. Urrutia Decl. ¶¶ 389-397; ECF 11 ¶ 73 n. 10; ECF 50-3; ECF 50-4.

632. Around the same time, on March 31, 2023, Deo had contacted Robert Puccio ("Puccio") – the Vice President of Flushing's Business Banking Group located at 99 Park Avenue in Manhattan, who Deo represented was his "personal banker" – to open an account; notably, Puccio's email referenced a request for information for "Signer 1" and "Signer 2." Urrutia Decl. ¶ 399; ECF 50-3; ECF 50-4.

633. On the same day, Weinstein asked Urrutia whether Urrutia wanted to share his personal tax returns with Puccio, and Weinstein also asked Urrutia for the name of Urrutia's partner at Superb, thereby establishing both that both Weinstein and Puccio knew Deo was not the

sole shareholder of Superb, given that Weinstein was in contact with Puccio about opening an account at Superb. Urrutia Decl. ¶ 400; Puccio Decl. ¶¶ 12-20, 27; Deo Dep. 314:2-318:4.

634. The very same day, Deo informed Novicky that he has a personal banker ready to open an account for Superb with Flushing and that Deo can obtain a $500,000.00 line of credit as well. Novicky Decl. ¶ 44.

635. Deo added: "Bro. This guy and the Credit underwriter are in my pocket. Get me the info and 2021 taxes and I will bring it home." Novicky Decl. ¶ 45.

636. Within days of these communications, Deo successfully opened a bank account with Flushing completely unbeknownst to Urrutia. ECF 11 ¶¶ 73; ECF 11-9.

637. Flushing knew or should have known that Deo was not a shareholder of Superb and was not authorized to open a bank account for Superb. Urrutia Decl. ¶¶ 389-403; Puccio Decl. ¶¶ 12-20, 27; Buccino Dep. 304:4-25; FLUSHING2238.

638. Flushing knew or should have known that Deo was not authorized to open an account for Superb because it was made aware on March 31, 2023 of a lawsuit filed against Deo by the IAG Plaintiffs in November 2022. Urrutia Decl. ¶¶ 404-405; Buccino Dep. 305:2-18; FLUSHING3766.

639. Flushing understood Urrutia's complaint that the opening of the Superb account was unauthorized, that all resulting activity in that account was likewise unauthorized according to Urrutia. Buccino Dep. 271:18-22.

640. Flushing had no system or "stop" to ensure that required account-opening documents were actually received and reviewed before an account was opened; its witness testified the bank is "working on fixing that." Buccino Dep. 213:21-214:22.

641. Flushing's account-opening system was "not that detailed" and would not analyze submitted documents for conflicts or flag them to the user. Buccino Dep. 205:10-18.

642. Flushing's systems never triggered any suspicious- or unusual-activity on the accounts Deo maintained. Buccino Dep.269:22-270:3.

643. Deo's actions violated the Shareholders' Agreement because only Urrutia had check authorization and only Urrutia was to have control over bank accounts owned by Superb. ECF 11-6.

644. Deo opened this account to divert Superb's funds to an account that he can control. ECF 11 ¶¶ 76-79, 120; ECF 11-9; Urrutia Decl. ¶ 406.

645. In the short four (4) months that Deo was unsupervised (because he orchestrated the removal of Superb's CFO and replaced her with Thomas Jones and Jones, Little & Co, CPAs, LLC), Deo began to steal every dollar he could; critically, while there were cash and check deposits at Superb from November 2022 through March 2023, there were zero in cash or check deposits by Deo from April 2023 through July 2023, which were diverted to the account he opened for Superb with Flushing Bank. ECF 220 ¶¶ 46-47, ECF 220-2; ECF 11-9.

646. Upon information and belief, Deo paid Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants out of funds placed in this account for their substantial assistance in carrying out his fraudulent schemes. Urrutia Decl. ¶ 407.

647. Urrutia also learned that Deo misappropriated customer payments for certain vehicles sold by depositing those funds into the unauthorized Flushing account and then transmitting those funds into his own accounts and, upon information and belief, into those of Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountant for their

substantial assistance to Deo in carrying out his unlawful schemes. ECF 11 ¶¶ 77-79; Urrutia Decl. ¶¶ 408-411; ECF 95 ¶¶ 11-20; ECF 95-3; ECF 95-4; ECF 95-5.

648. To Urrutia's knowledge, Deo misappropriated approximately $455,000.00 under this scheme. ECF 11 ¶¶ 121; Urrutia Decl. ¶ 413.

649. Further, discovery in this case after the original complaint was filed has shown that Flushing knew about the litigation between the Deo Defendants and the IAG Plaintiffs as well as the existence of the TRO issued by Justice Gianelli, but nonetheless permitted the Deo Defendants to open a bank account for both Northshore and Sunrise with Flushing and issue a loan to Northshore at the behest of Deo. Urrutia Decl. ¶ 414.

650. Urrutia also discovered that Deo misappropriated cash payments from customers by receipting the cash into Superb's DMS system but never depositing any of those cash payments into Superb's bank account and, instead, pocketing the money for himself. Urrutia Decl. ¶ 415; ECF 11 ¶¶ 79, 122; ECF 11-12.

651. Upon information and belief, Defendants Merckling and Blankenship substantially assisted Deo in this scheme by physically taking the cash out of the safe at Superb and failing to deposit the cash into Superb's bank account as required. ECF 11 ¶ 123; Urrutia Decl. ¶ 415; ECF 40 ¶¶ 8-11, 16-19, 29.

652. Upon information and belief, Defendants Merckling and Blankenship were paid out of these cash funds because they are officers with the NCPD and are not permitted to have any outside employment without advance approval from the NCPD. ECF 11 ¶ 125; Urrutia Decl. ¶ 416.

653. To Urrutia's knowledge, Deo misappropriated in excess of $400,000.00 under this scheme. ECF 11 ¶ 126; Urrutia Decl. ¶ 417, 413.

654. Deo knew that only Urrutia had sole check authorization, including because he executed the Shareholders' Agreement stating so. ECF 11 ¶ 127; ECF 11-6.

655. Notwithstanding this, Deo signed multiple checks from Superb's bank accounts that were under the control of Urrutia, although Deo had no authority to sign any checks from any bank account maintained by Superb. ECF 11-16.

656. During its top-down audit, Urrutia discovered that Deo routinely wrote and signed checks issued by Superb made payable to Northshore, other entities Deo owns, Thomasson, Laurie, and others; none of these checks was authorized and each was signed by Deo despite the fact he had no authority to do so. ECF 11 ¶ 128; Urrutia Decl. ¶¶ 418-421; ECF 11-16.

657. Before Deo was removed from Superb, the Deo Defendants purchased five (5) vehicles from Manheim, an automobile auctioneer, under Superb's account. ECF 11 ¶ 129; Urrutia Decl. ¶ 422; ECF 11-17.

658. Upon information and belief, the Deo Defendants intended to sell these vehicles for 100% profit with no cost to Defendants and to leave Superb holding the proverbial bag. Urrutia Decl. ¶¶ 454-500.

**xv. The Deo Defendants Stole Superb's Proprietary Information to Open its own Dealerships**

659. In trying to understand Deo's motive for engaging in these schemes, the top-down audit conducted by Urrutia soon made Deo's intentions very clear. ECF 11 ¶ 131; Urrutia Decl. ¶ 501.

660. Unbeknownst to Urrutia, Deo had formed various corporate entities – GCC Syosset, GCC Sunrise, GCC LIC, GCC Roslyn, and GCC Smithtown – and his plan was to steal from Urrutia in order to begin his own group of dealerships to be operated under the newly formed master entity Gold Coast Motors Automotive Group. ECF 11 ¶ 132; Urrutia Decl. ¶¶ 502-503.

661. Prior to Deo's working relationship with Urrutia, Deo had no familiarity with Urrutia's dealership processes and know-how, which Urrutia imparted to him as a business partner for the mutual success of Superb. ECF 11 ¶ 133.

662. For example, Urrutia introduced Deo to Tekion, a unique DMS system that was specifically customized for Superb. ECF 11 ¶ 134.

663. Urrutia also taught Deo the process of successfully operating an automobile dealership using Tekion, such as processes to streamline dealership operations, inventory management, cash flow management, and reporting features that identify areas of improvement. ECF 11 ¶ 134; ECF 38-2 at 38 (February 23, 2023 text messages).

664. The information Urrutia imparted to Deo was unique, confidential, and proprietary. ECF 11 ¶ 135.

665. Specifically, the DMS system Urrutia implemented at Superb is unique because it was custom-designed for Superb and cost over $120,000.00 to set up. ECF 11 ¶ 136.

666. It contained the blueprint for Urrutia's success at his dealerships because Urrutia knew how to use the customized features of Tekion to operate dealerships profitably. ECF 11 ¶ 136.

667. During the top-down audit, Novicky discovered that Deo sought to misappropriate this customized, unique, and proprietary blueprint for the purpose of setting it up at his own group of dealerships. ECF 11 ¶¶ 137-138; ECF 40 ¶¶ 21-28.

668. In addition, in a blatant breach of his fiduciary duties to Superb and Urrutia, Deo had Superb employees work for his own group of dealerships *while they were employed by Superb and were being paid to perform work only for Superb!* ECF 11 ¶ 139.

669. Moreover, Deo illegally imparted the confidential know-how Urrutia imparted to him, as well as the proprietary information Superb had in its possession, i.e., Superb's customer lists with contact information of its customers, customized Tekion DMS system, and other sensitive information, to these employees for the purpose of setting up Deo's own group of dealerships. ECF 11 ¶ 140.

670. Urrutia initially partnered with Bobby Clarke ("Clarke"), who owns a radio station named Irie Jam, 93.5 FM, and with whom Urrutia advertised to over 2 million listeners in the Caribbean community both during and after his partnership with Clarke ended. Urrutia Decl. ¶ 35; ECF 38-4 and 38-5.

671. That partnership included approximately $1.5M in advertising, which generated the substantial customer list Urrutia developed to foster business at Superb. Urrutia Decl. ¶¶ 35-38;

672. Due to the unique nature of Urrutia's partnership with Clarke, the customer list cannot be reverse engineered or independently generated without a substantial investment in Irie Jam, which the Defendants did not make. Urrutia Decl. ¶ 38.

673. To add insult to injury, Deo and the employees he poached misappropriated Superb's customer list and used it to divert Superb's customers to other dealerships, including those in which Deo had an interest. ECF 11 ¶ 141.

674. The Superb Plaintiffs maintained information on leads sourced through Irie Jam and its other marketing efforts in a customer relationship management ("CRM") system, initially DriveCentric and, later, VINSolutions. Urrutia Decl. ¶ 39.

675. The Superb Plaintiffs took reasonable efforts to maintain the secrecy of this information, including by password protection, maintaining a firewall, and other measures. Urrutia Decl. ¶ 40.

676. The Deo Defendants misappropriated Superb's data from its CRM system to jumpstart their competing group of dealerships. Urrutia Decl. ¶ 504.

677. The Deo Defendants misappropriated Superb's vehicles from Superb's lot to their new dealership in Syosset. ECF 40 ¶¶ 21-28; ECF 156-1 at 56:25-57:22, 98:15-102:14, 116:12-119:13, 124:11-24, 126:19-22; ECF 204 ¶ 27 n. 4.

678. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants each substantially assisted Deo in carrying out his unlawful schemes. Urrutia Decl. ¶ 505; ECF 95 ¶¶ 11-20, 95-3; ECF 95-4; ECF 95-5.

679. Sara managed and controlled the improperly-opened bank account in which Superb's funds were diverted, and misappropriated Superb's CRM system. Urrutia Decl. ¶ 506.

680. Blankenship and Merckling each misappropriated cash payments paid to Superb by customers of Superb and abused their authority as former or active police officers in carrying out their actions at the behest of Deo. Urrutia Decl. ¶ 507; ECF 40 ¶¶ 8-11, 16-19, 29.

681. For example, when Urrutia called the NCPD to remove Deo, upon information and belief, Blankenship and Merckling used their positions as retired and active police officers to stymie an investigation and to protect Deo from being arrested for his blatantly criminal conduct. Urrutia Decl. ¶¶ 160–163, 505, 508.

682. Laurie enabled Defendants by substantially assisting them in opening a bank account at Flushing, with whom Laurie has a relationship through his business DLA Capital. ECF 11 ¶ 146; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

683. Laurie knew that Deo was not the 100% shareholder of Superb because he had sat in on meetings with Urrutia and Deo and knew that Urrutia was the majority shareholder of Superb with sole check authorization and sole control of all Superb bank accounts. ECF 11 ¶ 147; ECF 95 ¶¶ 16-20; ECF 95-3; ECF 95-4; ECF 95-5.

684. Similarly, although Deo's accountants knew that Superb was operating at a loss, they nonetheless altered journal entries in its accounting systems to create the appearance that it was operating profitably in order to deceive Urrutia and have him maintain his confidence in Deo. ECF 11 ¶ 148.

685. Deo's accountants were thus complicit in the fraudulent schemes perpetrated by Deo, and Deo's accountants aided and abetted Deo and the remaining Defendants in carrying out the fraudulent schemes. Urrutia Decl. ¶ 509; Jones Dep. 301:12–17.

686. Finally, Thomasson serves as counsel to the Deo Defendants and substantially assisted them in carrying out their unlawful schemes by defending their blatantly criminal conduct despite knowing that Defendants have engaged in fraud; Thomasson engaged in the aforesaid fraud together with the remaining Defendants. ECF 11 ¶¶ 149-150.

687. For example, although Thomasson purports to maintain an office at 3820 Sunrise Highway, Wantagh, NY, this address is a UPS Store and not an office. ECF 11 ¶ 151.

688. Instead, Thomasson maintained an office at Superb where he directly conspired with and carried out the directives of Deo in furthering his unlawful schemes for the benefit of Deo, Thomasson, and the remaining Defendants. ECF 11 ¶ 152; ECF 86 ¶¶ 4-7.

689. Urrutia also learned and is continuing to learn of other schemes to plunder and destroy Superb. ECF 11 ¶ 154.

690. For example, on February 22, 2023, Deo defrauded the New York State Department of Motor Vehicles ("DMV") when he applied for a license for GCC Sunrise by lying on the application falsely claiming that he had never been convicted of a felony when, in fact, he had pled guilty, and was convicted in 2016, to Federal wire fraud in relation to a mortgage. ECF 11 ¶ 154-155; Urrutia Decl. ¶ 549; ECF 385-2; ECF 385-3.

691. Defendants engaged in wide-ranging schemes to defraud the Superb Plaintiffs through wire fraud and the use of forged instruments. ECF 11 ¶ 160.

692. Defendants Sara, Thomasson, Blankenship, and Merckling aided and abetted Deo in delivering unauthorized checks to banks and presenting them for payment. ECF 11 ¶ 161.

693. Defendant Laurie and Deo's accountants enabled wire fraud and the use of forged instruments to occur by creating or submitting the forged instruments, *i.e.*, false financial records, false bank applications, and false loan applications, to assist in the remaining Defendants' scheme to steal from Superb. ECF 11 ¶ 162.

694. Defendants Sara, Thomasson, Blankenship, Merckling, Laurie, and Deo's accountants assisted Deo in setting up his competing group of dealerships built with the stolen trade secrets and confidential information of Superb, which these Defendants did in exchange for payments by Deo out of the funds stolen from Superb. ECF 11 ¶ 163.

695. Defendants are currently benefitting from the confidential information Urrutia developed and sourced over thirty years in the automobile dealership industry, and since 2020, when he came to own his first dealership, which Defendants stole from the Superb Plaintiffs. ECF 11 ¶ 164.

696. This information includes Superb's customer lists, Urrutia's contacts, including Tekion and Superb's customized DMS system from Tekion, and other proprietary information. ECF 11 ¶ 165.

697. Superb's business model, its customer lists, information related to its revenues and profit margins, and the related information Deo obtained during his employment with Superb are confidential and proprietary, and took great costs and efforts to create, including Urrutia's decades of experience in the automobile industry, the relationships Urrutia developed with contacts in the automobile industry, and the unique know-how he has in how to successfully operate automobile dealerships. ECF 11 ¶ 166.

698. Urrutia went through painstaking efforts, time, and money to build the group of dealerships he owns to what it is today. ECF 11 ¶ 167.

699. Superb and Urrutia have spent the last three years marketing Superb, developing its brand, and cultivating relationships with Superb's customers and contacts in the automobile industry, many of whom worked with Urrutia for decades. ECF 11 ¶ 168.

700. Deo only learned of Superb's know-how and trade secrets through his fiduciary relationship with Urrutia, for the sole purpose of maximizing Superb's success, and Defendants have sought to exploit this information through improper means. ECF 11 ¶ 169.

701. Defendants have done so by working with Deo to pillage and plunder Superb because Deo has paid and is paying other Defendants out of the funds he has stolen from Superb for their assistance in carrying out his fraudulent schemes. ECF 11 ¶ 169.

702. Superb's trade secrets, including but not limited to its customer lists, employees, processes, and unique DMS system are vital to its business; possession of that information, which Defendants, as set forth herein, misappropriated in contravention of their fiduciary duty to Plaintiff

and in violation of the law, provided Plaintiff a unique competitive advantage in the automobile dealership industry, a competitive advantage it has been stripped of by Defendants' unlawful acts. ECF 11 ¶¶ 170.

703. Superb took many reasonable measures to keep its confidential information secret, including restricting access to this information only to employees who have a fiduciary duty to Superb, all of whom are required to maintain it in a secured computer system protected by firewalls and other appropriate safeguards, such as usernames and passwords. ECF 11 ¶¶ 171-172.

704. The confidential information derives independent economic value from not being generally known to and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information. Urrutia Decl. ¶¶ 13-16, 26, 39-40; ECF 11 ¶ 173.

705. This confidential information is related to services used in and intended for use in interstate or foreign commerce because Superb sells vehicles in New Jersey, Connecticut, Pennsylvania, and Massachusetts, among others, in the regular course of its business. ECF 11 ¶ 174.

706. Deo, Sara, Thomasson, Blankenship, and Merckling knew and had reason to know that the trade secrets and confidential information they obtained – including customer lists, financial information, details about customers, and Superb's proprietary DMS system – were acquired by improper means. This is evidenced by their bad faith conduct in plundering, pillaging, and massacring the goodwill and value of Superb. ECF 11 ¶¶ 175-176.

707. The unauthorized acts of Defendants in using critical confidential information to cut Superb out of its business in order to build a competing group of dealerships is unlawful. ECF 11 ¶ 177.

708. There was no other way to obtain this information and Deo, Sara, Thomasson, Blankenship, and Merckling used it as a "roadmap" and "step by step manual" to establish their own operations to the exclusion of Superb and Urrutia to whom they owed fiduciary duties. ECF 11 ¶ 178.

709. For example, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to expend time, effort, and money in building a customized DMS system. ECF 11 ¶ 179.

710. They simply stole it from Superb and Urrutia. ECF 11 ¶ 179.

711. Similarly, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to search for customers; they simply diverted them from Superb to their own group of dealerships. ECF 11 ¶ 180.

712. Moreover, Deo, Sara, Thomasson, Blankenship, and Merckling did not need to hire and pay employees; they simply had Superb's employees work for the benefit of their own group of dealerships while being paid by Superb. ECF 11 ¶ 181.

713. Superb's trade secrets and confidential information that Deo, Sara, Thomasson, Blankenship, and Merckling misappropriated through gaining the trust of Urrutia by and through Deo's fiduciary relationship as a minority shareholder of Superb provided them with the ability to duplicate operational, service, and development techniques that Urrutia has spent years, if not decades, establishing. Meanwhile, Deo, Sara, Thomasson, Blankenship, and Merckling through subterfuge gained access to information that they would have no other way of obtaining. ECF 11 ¶ 182.

714. Deo, Sara, Thomasson, Blankenship, and Merckling misappropriated confidential and trade secret information by improper means; no permission was given to them to utilize Superb's customer lists, customer information, proprietary DMS system, financial information, and details about its customers for any purpose except for the benefit of Superb. ECF 11 ¶ 183.

715. It is obvious from the brazen tactics of Deo, Sara, Thomasson, Blankenship, and Merckling's that they are actively engaged in a scheme to plunder and to destroy Superb - a company Urrutia spent years building. ECF 11 ¶ 184.

716. Upon information and belief, a significant number of Superb's customers had been solicited by Deo, Sara, Thomasson, Blankenship, and Merckling using Superb's trade secrets and confidential information. ECF 11 ¶ 185.

717. The Deo Defendants' conduct harmed the Plaintiffs, its banking partners, vendors, and consumers at large. Urrutia Decl. ¶ 550; ECF 38 ¶ 63.

718. The Deo Defendants routinely engaged in identity theft in order to profit from their fraudulent schemes. Urrutia Decl. ¶ 551.

719. As an example, with respect to customer Barnes, discussed *supra*, this customer was told she had approval to purchase a vehicle on March 28, 2023. Urrutia Decl. ¶ 552.

720. However, after leaving a down-payment of $2,000.00 by credit card, Barnes never received the vehicle when promised. Urrutia Decl. ¶ 553.

721. Barnes then contacted Ally to discuss the deal and learned that her financing application was denied and that a second application was submitted for Barnes' spouse without his consent. Urrutia Decl. ¶ 554-555.

722. Barnes had no knowledge that a financing application was sent by the Deo Defendants using his identity. Urrutia Decl. ¶ 555.

723. Barnes' spouse canceled the fraudulent contract and made a complaint with the Better Business Bureau against Superb. Urrutia Decl. ¶ 556.

724. Urrutia has been forced to shut down all four of his dealerships due to the Deo Defendants' conduct. ECF 282 ¶ 6; ECF 304 ¶ 25.

725. The total damages sustained by the Superb Plaintiffs that have been ascertained to date is summarized as follows: (i) over $2.5M in inventory and other losses in order to conceal the theft of over $2.0M in cash, checks and ACHs causing over $4.5M in losses; (ii) the value of the injuncted vehicles ($1.5M) and the losses incurred on the depreciation of those vehicles, totaling approximately $500,000.00 to date; and (iii) attorneys' fees, as well as numerous other outstanding liabilities that still remain to be determined at trial. Urrutia Decl.. ¶¶ 564, 571.

**Additional Statements of Material Facts**

726. The Deos live in a mansion in Old Westbury, NY, which they leased but refuse to pay rent, as set forth in a complaint they filed against their landlord in an apparent effort to continue not to pay rent and forestall eviction proceedings. See Deo, *et al.* v. Wei, Index No.: 612890/2025 (Nassau County Supreme Court), NYSCEF Docket Entries 1 (complaint dated June 13, 2025) and 30 (warrant of eviction dated April 10, 2025).

727. Harry R. Thomasson, Esq. ("Thomasson") is an attorney-at-law who resides in the State of New York within the County of Nassau, and operates his law practice outside of a UPS Store mailbox which he sometimes misleadingly refers to as a suite. Complaint ¶ 32; Urrutia Decl. ¶¶ 575-576.

728. Thomasson works for the Deos. Thomasson Dep. 124:18-125:4 ("Q. What is your agreement with Mr. Deo in connection with the legal services you performed for him in general? A. Well, I had through November of 2022 I served as outside counsel when they needed something.

What that meant was if and when they needed me they would contact me and let me know and we would -- I would take care of whatever it was. I believe there was billing up until November of 2022."); 125:12-15; 125:24-126:2; 131:5-9 ("Q. When did you stop keeping track of the time that you spent on the cases you work on for him? A. For sure when I became salaried."); 131:16-132:11; 151:10-18; 179:10-180:4 ("he said at that time that he would want me to represent of [*sic*] all of the dealerships. That was when we reached a financial agreement. And I said to him, I am gonna need an office in New York […] [a]nd he said, well why don't you just take an office in one of the dealerships down here," and they decided on Superb); 313:16-316:17; 319:9-19 ("Q. […] Back when you were representing them, were you getting a weekly salary for some period of time? A. I still represent Deos in matters outside of this case. Q. So, you're getting a salary now from the Deos for other matters? A. Yes. Q. How much, you are getting a $1,000 a week; is that what you said? A. Yes."); Blankenship Dep. 133:16-134:3 ("Q. Mr. Thomasson had an office at Superb, correct? A. Yes. […]").

729. Dwight Blankenship ("Blankenship") is an active police officer who works for the Deos. Complaint ¶ 33; Blankenship Dep. 20:18-21:19; 34:16-20; 36:20-37:6 (Blankenship does not remember exactly how much Deo paid him, only that it was a weekly salary of approximately $1,000, regardless of number of hours worked); 47:24-51:13; 54:25-55:20 (Blankenship had a typical schedule of 9:00 to 6:00, which sometimes varied); 56:20-23 ("Q. During your first time working with Mr. Deo before you took a break, you were considered an employee of Northshore, correct? A. Yes, sir."); 57:6-58:12 (Blankenship was paid via 1099 through a corporate entity named Deeg LLC); 59:4-6 ("Q. Mr. Deo paid money to [your company Deeg LLC] for services you performed for him, correct? A. Yes."); 62:11-20 (Blankenship assisted in repairing cars, moving them around, setting alarms, locking up the facility); 64:9-14 (Blankenship kept personal

items including a mug at the dealership); 86:22-87:2; 100:18-20 ("Q. Was there ever any task that Mr. Deo asked you to do that you didn't do? A. Not that I'm aware of, no."); 101:14-16 ("Q. Now, you testified that you worked at Northshore as a liaison for service, right? A. Yes, sir."); 115:16-20; 116:23-25 ("Q. You typically worked at Northshore, right? A. It could have been at Northshore or down at Sunrise."); 131:16-25; 132:5-8; 134:22-25; 141:16-19; 141:24-142:2; 145:13-146:2 ("Q. […] Did you physically work at Sunrise at any time? A. Yes. Q. And did you apportion your time between Sunrise and Northshore? A. Yes. Q. How did you determine which -- where you would be or which hours or days you would spend there? A. Depending on what was getting done, what cars needed to be taken to mechanics, like I stated, mechanics, glass, if there was a problem with the car or it wasn't starting and stuff like that, I would run back and forth."); 174:2-7; 176:21-177:14; 215:3-16.

730. Marc Merckling ("Merckling") is a retired police officer who works for the Deos. Compl. ¶ 34; Merckling Dep. 33:21-25 (Deo wanted Merckling to come do security); 39:9-21 (Merckling believes he was paid weekly, mostly by check); 39:25-40:15 (Merckling believes that at some point he was put on ACH payroll); 40:21-25 (Merckling worked different hours every week); 41:19-42:6 (Merckling was paid the same amount every week regardless of hours worked); 42:25-43:4 ("on the four days I was off, I worked there"); 43:13-18 ("I worked four days, then I was off four days. […] [I]t wasn't the same days every week. […]"); 56:13-15 ("Q. After your retirement, did you start working with Mr. Deo full-time? A. Yes"); 60:13-22 (Merckling first started working for Deo around end of 2020 or beginning of 2021, at Northshore Motor Leasing, LLC); 62:9-11; 64:18-23; 65:25-66:4; 67:2-5; 67:12-24 (Deo currently pays Merckling $1,500 per week; in the past when Merckling was part-time, he believes it may have been $1,000 per week); 68:17-20 (Merckling believes Deo provided him a W-2 at Northshore); 68:24-69:3 (Deo paid

Merckling to his corporation); 72:19-21 (Merckling is still currently employed by Deo); 75:12-21; 95:25-96:6 (Merckling sometimes worked at Sunrise as well, but was mostly at Northshore); 96:10-15 (Merckling provided the same security services at Sunrise as he did at Northshore); 123:22-124:3 (along with security, Merckling and Blankenship help with menial tasks); 180:6-181:6; 267:14-18 ("were you an employee or did you work for Northshore when it was operating? A. Yes. Q. Okay. What about Sunrise? A. Yes"); 285:19-21 ("I believe I got forms that I had to give to my accountant doing my taxes").

731. Michael Laurie ("Laurie") is a principal of DLA Capital who works for Deo. Compl. ¶ 35; Laurie Dep. 98:15-17 ("I'd use an office in and out [of Superb] every now and then for a short period of time"); 100:15-25 ("Q. Did Mr. Deo pay you in any manner for your assistance to him at any of the dealerships [he] operated? A. I would have to look back to see what funds I received from him. But he did help me when I needed help from his funds"); 106:17-107:2 (Laurie maintained an office at Superb for more than a month); 111:25-112:13 (Laurie signed off an e-mail with the title of "business manager," "[b]ecause I was helping him and it makes it easier when you are an inside third party push. […] "Q. Whose decision was it to do that? A. Probably Deo and I, and that I would help him. Q. You decided together? A. Probably"); 112:14-17 (Deo gave Laurie an e-mail address from his domain name at Northshore); 114:24-25 ("If [Deo] paid me, it would have been via check or wire"); 115:7-12 (When Deo paid Laurie, it could have been either DLA or Laurie personally, "depending what it was for"); 119:17-25 (Laurie gets paid when deals close; has a vested interest in moving things along); 130:19-131:2 (Deo would discuss floor planning with Laurie, in his role as Deo's business manager); 155:13-16 (Laurie utilized access to the office at Northshore to help Deo); 188:18-20 (Through his work with Deo, Laurie received $50,000 for the Flushing Bank loan).

732. Laurie is a convicted felon who was previously arrested for engaging in bribery in relation to a bank he worked at. Compl. ¶ 36; Savasta v. Laurie, Index No.: 655330/2023, NYSCEF Docket Entry 1; Laurie Dep. 84:14-17; 89:3-90:9.

733. Car Buyers NYC Inc. ("Car Buyers") is and was a corporation with its principal place of business at 180 Michael Drive, Syosset, NY. Urrutia Decl. ¶ 557.

734. Gold Coast Motors of Syosset LLC ("GCC Syosset") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

735. Gold Coast Motors of Sunrise LLC ("GCC Sunrise") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

736. Gold Coast Motors Automotive Group LLC ("GCM Auto") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

737. Gold Coast Cars of LIC LLC ("GCC LIC") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

738. Gold Coast Cars of Roslyn LLC ("GCC Roslyn") is and was a limited liability company duly with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

739. Gold Coast Cars of Smithtown LLC ("GCC Smithtown") is and was a limited liability company with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

740. UEA Premier Motors Corp. ("UEA Premier") is and was a corporation with its principal place of business at 180 Michael Drive, Syosset, NY. Id.

741. Car Buyers, GCC Syosset, GCC Sunrise, GCM Auto, GCC LIC, GCC Roslyn and GCC Smithtown are collectively referred to herein as the "Deo Dealerships." Compl. ¶ 45.

742. DLA Capital is and was a corporation with its principal place of business at 1387 Monroe Street, Floral Park, NY 11001. Urrutia Decl. ¶ 558.

743. Libertas is and was a foreign limited liability company with offices located at 411 West Putnam Avenue, Suite 220, Greenwich, Connecticut 06830. Compl. ¶ 47; D'Aprile Dep. 14:21-15:6; Patrovic Dep. 7:12-14.

744. Flushing was and is a commercial bank with central headquarters located at 330 RXR Plaza in Uniondale. Compl. ¶ 48; Buccino Dep. 15:12-16.

745. At all relevant times, Deo was the owner of the "Gold Coast" entities, made up of Gold Coast Sunrise, Gold Coast Syosset, Gold Coast Motors Automotive Group, Gold Coast LIC, Gold Coast Roslyn, and Gold Coast Smithtown. Deo Dep. 105:20-106:3; 255:19-22; 257:11-16; 258:24-25.

746. At all relevant times, Deo was in charge of running Superb as a general manager. Urrutia Dep. 32:8-18; 34:13-18; 144:22-23.

747. This consisted of Deo being authorized only to conduct day-to-day operations; Deo did not have authority to do anything else. Merckling Dep. 250:7-10 ("Q. […] From November of '22 until August of '23, Mr. Deo was in control of operations at Superb; correct? A. He was. Yes"); Urrutia Dep. 32:13-15 ("Everything else was pretty much he was not allowed to do anything but run the business as a general manager").

748. At all relevant times, Deo was similarly responsible for running the day-to-day operations of Northshore and Sunrise. Deo Dep. 140:20-142:2; Chabrier Dep. 76:18-21 ("Q. Who had responsibility for the day-to-day operations of Northshore? A. That would be Deo. He was the general manager"); 77:25-78:15 ("Q. At some point in time, Mr. Deo became the general manager of Northshore? A. Correct. Q. When did that occur? A. From the day we opened. Q. What responsibilities did Mr. Deo have with respect to Northshore? A. Day-to-day operations. Q. What did that include? A. Selling cars, buying cars, hiring employees. Q. When you say 'buying cars,'

you mean buying inventory? A. Correct"); 79:19-80:3 ("Q. Would Mr. Deo oversee the finance office? A. Yes. Q. Would he oversee the sales department? A. Yes. Q. Generally, he oversaw the whole operations, correct? A. Yes"); 84:14-25 (Deo was engaged as manager of Sunrise); 89:6-11; 90:9-14; Merckling Dep. 249:4-250:5 ("Q. […] was Mr. Deo in control of operations at Northshore, whatever those operations were? A. Yeah, […] Yes, he was in control of operations. Q. Same question for Sunrise. Was Mr. Deo in control of operations there? A. Yes. […] Q. […] up until the time he gave up the lease, he was in control of operations at Sunrise; correct? A. Yes").

749. Deo was on payroll at Superb as a general manager. Urrutia Dep. 163:6-112; 163:19-164:4.

750. Deo's main purpose at Superb, Northshore, and Sunrise was to operate the dealerships in order to facilitate the sale of vehicles. Merckling Dep. 250:15-251:7.

751. This included authority to draw under the floor plan for purchase of inventory (i.e. to buy cars), and to send related information to the relevant bank. Chabrier Dep. 81:19-82:11.

752. This also included authority to handle financial transactions and reporting on behalf of Northshore and Sunrise. Chabrier Dep. 90:21-92:3.

753. Deo did not have any authority over Northshore or Sunrise beyond this. Chabrier Dep. 62:4-20; 80:16-19 ("Q. Was Mr. Deo on any – an authorized signer on the account? A. Don't believe Anthony was a [*sic*] authorized signer, no"); 83:15-23 ("Q. If Mr. Deo needed a check to purchase any inventory, to buy something for purposes of running the day-to-day operations, how would he go about getting that check? A. Danny O'Sullivan, or the comptroller at the time, would cut a check, and I would sign or Mr. Baron would sign it"). 91:11-92:3 (Deo could handle getting deals approved, buying cars, selling cars, and taking deposits, but "Q. Anything else? A. No"); 100:21-101:3; 117:5-9 ("Q. With regard to Mr. Deo's responsibilities as a general manager, was

Mr. Deo permitted to arrange for any financing for the businesses? A. No").

754. Critically, Deo was never an owner of, and never had any membership interest, in Superb, Northshore, or Sunrise. Chabrier 86:3-6 ("Q. At any time was Mr. Deo an owner of 189 Sunrise or have any membership interest? A. No"); 110:2-5 ("Q. […] Do you know why the 2021 tax return lists Mr. Deo as having a 99 percent interest in Northshore? A. No"); 110:23-111:4 ("Q. […] Were you aware, on the 2021 tax return for 189 Sunrise, that it included a K-1 which shows Mr. Deo also had a 99 percent interest in that entity? A. No"); Urrutia Dep. 48:13-49:8 (Deo cannot own a dealership due to his probationary status for wire fraud, which would render him unable to get a license… "So do I think he was an owner, no"); 54:3-10 ("Q. What were your thoughts on Exhibit G where Josh Aaronson approved Deo as owner on tax returns? […] A. That Josh was trying to get Anthony to take over the liabilities of the dealerships. Q. Generally speaking, when you're listed as the owner on tax returns, wouldn't that make you the owner? […] A. No, absolutely not"); 166:3-20 ("Q. […] "it's your position since November of 2022 that Deo never became a 49 percent owner; is that correct? A. Correct"); 236:3-5 ("A. […] he wasn't 100 percent owner of Superb").

755. Deo masterminded an Enterprise of individuals engaged in the common purpose of concerted fraudulent conduct and racketeering activity, by manipulating his managerial position at the Plaintiffs' dealerships; he brought in his own "gang" of employees to Superb, Northshore, and Sunrise, who each made up the Enterprise. Deo Dep. 337:12-338:11 ("[…] A. Oh, the employees were interchangeable, […] Q. You had all of the employees that worked at Superb work on Northshore and Sunrise as well, correct? […] A. […] we had employees at all three locations"); 536:12-537:10 (Deo and Sara were each responsible, with the assistance of Wendy Kwun, for hiring people at Northshore); 575:19-20 ("Q. Hiring and firing? A. We did that"); Urrutia Dep.

29:21-30:12 ("to me, this is a gang, you know. […] I am not the only one suing them. This is three, I think, you have going on, plus you have another dealership now, so that would be a fourth. […] it's a gang that kind of coordinates everything, you being the facilitator. You know you have an accounting department that creates, or an accountant, that creates fake financials, you have muscle and guys that handle logistics"); 131:2-4 ("the whole game plan of the gang you're with is to rip off people and commit fraud").

756. Deo hired CPA Tom Jones to perform accounting services for Northshore – specifically, to prepare tax returns – in or around 2020. Deo Dep. 591:12-22; 593:12-594:4.

757. Deo further rounded out his enterprise by misappropriating and working with employees of Plaintiffs', including Wendy Kwun and Daniel O'Sullivan, and of non-Deo Defendants, including Rob Puccio of Flushing Bank. Blankenship Dep. 106:2-11; 106:15-108;4 (Kwun was instrumental in removing files from the dealership); Buccino Dep. 275:9-13 ("there may have been conversations between Deo and Puccio in the process of opening the account where they spoke about how the funds were going to be used, but that wouldn't be documented *per se*").

758. The members of the Enterprise worked together to carry out their fraudulent conduct and racketeering activity. Blankenship Dep. 211:19-20 ("I talked to Marc probably once a week. We were partners for ten years"); 213:15-214:6; 235:7-10; Buccino Dep. 268:10-15 (Laurie may have referred other customers to Puccio over the years); 90:4-8; 109:3-16; 126:7-22 (Jones worked with Kwun); Deo II Dep. 184:22-25 (Deo brought Merckling with him to meet with the police department or Detective Marks); Jones Dep. 55:3-13 (Jones worked with O'Sullivan to prepare tax returns because O'Sullivan "had all the records and details"); Merckling Dep. 78:19-23 (Merckling and Blankenship worked together sometimes); Blankenship 82:7-18 (Merckling and Blankenship worked together sometimes); Merckling Dep. 220:4-8 ("A. […] I would go to

both [Northshore and Sunrise]. Q. But is it fair to say when Mr. Deo was at one, you would be at the other? A. No, not always. Most of the time we were together"); 218:17-23 ("Q. You coordinated with each other about what you were doing for the day through text messages; correct? A. Or phone calls. Q. You would use both phone calls and text messages; right? A. Yes"); Blankenship Dep. 90:15-24 (Blankenship and Merckling have had text messages for the last ten years, and also called each other on the phone); O'Sullivan Dep. 108:16-21 (Jones would meet with Deo every time); 146:9-20 (Merckling hosted Monday morning meetings in which he would give direction to the salespeople, and would otherwise interact with the salespeople regularly); Blankenship Dep. 63:11-64:3 (Merckling had informed Blankenship that the Nassau County Police Department was present at Superb and that they were being removed); 65:22-66:3 (Blankenship, Merckling, and Harry were speaking on the sidewalk at the time of removal from Superb); 143:9-11 (O'Sullivan reported to Deo and Kwun); Sara Dep. 193:18-20 ("Q. Have you ever spoken to Thomas Jones about anything ever in your life? A. Sure"); Thomasson Dep. 115:22-116:9 (Thomasson has exchanged text messages and e-mails with Deo); 151:10-18 (Thomasson dealt with both Deo and Sara); 172:10-16 (Deo asked Thomasson to come to Superb when the Nassau County Police Department was called there on August 3, 2023); Jones Dep. 58:22-25 ("Q. [...] if you needed to review the trial balance and other schedules, how did you get them? A. Dan would print them out").

759. For example, the Enterprise worked together to deposit cash from the safe after it is reconciled, "at least twice or three times a week," with depositing done by Blankenship and/or Merckling, and reconciling done by Kwun and/or O'Sullivan. Sara. Dep. 260:22-261:12; Blankenship Dep. 178:5-8 (there was a safe in the back office at Sunrise); 179:3-180:6 (anybody could put money in and not get money out of the safes; for example, salesmen and F&I put money

into the safe, O'Sullivan would retrieve deposits, Merckling had access, and Deo had access); O'Sullivan Dep. 247:11-13 ("Tom Jones did the reconciliations, I just was supplied him [*sic*] a copy of the statements"); 248:9-13 ("Q. You inputted the information that would result in the schedules, then you gave him the schedules to do the reconciliations, correct? A. Yes").

760. As another example Blankenship was tasked with moving cars from Superb to Northshore ("Could have anybody. It could have been Gene, it could have been Marc, it could have been Mr. Deo"). Blankenship Dep. 89:19-90:2.

761. In other instances, Deo siloed members of the Enterprise from each others' affairs. Blankenship Dep. 152:23-153:11 (Blankenship does not know whether the papers he created listing vehicles and their conditions were put into any jackets or computer systems); Merckling Dep. 88:18-22 ("I did my job. That's all I can do. I don't get involved in anything else that's going on").

762. At times, Deo even siloed himself from the activities of his own employees. Sara Dep. 602:13-603:5 ("Q. Do you know if Jones ever prepared any adjusting entries to the financial records of the dealership of Northshore of Sunrise? A. I wasn't involved in that nitty-gritty of what they were doing. Q. So if he made any adjusting entries, it was done without your knowledge? A. I didn't have to be made aware of that. That was between the accounting department, the CFO and Tom Jones. [...] I didn't play a role in that"); Deo II Dep. 58:19-59:18 ("I didn't prepare P and L's"; Jones and O'Sullivan did); 86:8-10 ("I didn't understand the details of how it was going to be done. We were just trying to get Northshore going").

763. Members of the Enterprise referred each other to fellow members of the Enterprise. Merckling Dep. 75:22-25 (Merckling referred Deo to Blankenship); Laurie Dep. 116:22-117:7 (Laurie referred Deo to Rob Puccio at Flushing Bank, among other lenders); 125:4-5 (Tom Jones

"is the one who referred [Laurie] originally to Mr. Deo").

764. Members of the Enterprise worked in offices, or were otherwise physically present, at Superb, Northshore, and/or Sunrise. Jones Dep. 97:23-99:4; O'Sullivan Dep. 108:8-12 (O'Sullivan, Deo, and Sara each had their own offices at Northshore, in addition to Frank Ventimiglia's office, another office, and a conference room); Laurie Dep. 98:15-17 ("I'd use an office in and out [of Superb] every now and then for a short period of time"); 106:17-107:2 (Laurie maintained an office at Superb for more than a month); 155:13-16 (Laurie utilized access to the office at Northshore to help Deo); Thomasson Dep. 179:10-180:4 (Thomasson had an office in Superb); O'Sullivan Dep. 108:16-18 (Jones would work in the conference room); 147:22-148:25 (at some point, an office was built, "in the last six months right off the showroom," for Merckling); Blankenship Dep. 136:15-138:23 ("I was in between the sales floor and being back in the back with the mechanics or at the podium"; this was an open space for people to do work, with a desk in front of it and two seats behind it, near Ventimiglia's office); 139:24-140:15 (there were approximately five or six offices); 140:19-141:15 (at some point Kwun took over Ventimiglia's office in the back, which was when Ventimiglia moved to the office off of the sales floor); Sara Dep. 261:22-262:5 (Kwun had an office); Laurie Dep. 155:5-16 (Laurie used Kwun's office sometimes); 98:15-17 ("I'd use an office in and out every now and then for a short period of time"); Urrutia Dep. 222:13-16 ("[Thomasson was] in the dealership, [Thomasson] had an office in my dealership that I didn't know anything about").

765. Members of the Enterprise even kept personal belongings at the offices. Thomasson Dep. 181:3-9 ("I had a lamp that I had purchased that I wasn't using and I had a perfect place for it in that office. So, I threw a few things into that office and went there two to three times before the lockout, working on Superb matters while I was there").

766. "I feel like all the people that [Thomasson] just mentioned [Thomasson, Blankenship, Merckling, Laurie, Sara, Deo] are all in cahoots to, you know, hurt businesses and call up people, like myself, that were just trying to fight for things that were rightfully theirs, and use their power to take advantage of somebody by using their, you know, their badge, let's just call it, like, by using their powers that may be to try and hurt individuals like me who are just trying to run a business and live my life." Aaronson Dep. 222:23-224:13.

767. Despite the dealership(s) being owned by Chabrier, Jory, and Khan, Thomasson never dealt with them, or anyone associated with IAG. Thomasson Dep. 151:19-152:14; 153:16-23.

768. When Deo was removed from Superb on August 3, 2023 by the Nassau County Police Department, members of the Enterprise showed up to retrieve their items and congregate. Blankenship Dep. 63:11-64:3 (Merckling had informed Blankenship that the Nassau County Police Department was present at Superb and that they were being removed); 65:22-66:3 (Blankenship, Merckling, and Harry were speaking on the sidewalk at the time of removal from Superb); Thomasson Dep. 172:10-16 (Q. You came there because you were asked by Mr. Deo to come there, right? A. Yes); Blankenship Dep. 209:17-21; 216:10-14.

769. Notably, members of the Enterprise ceased working for Deo after Deo was removed from Superb on August 3, 2023. Blankenship Dep. 98:24-99:6; 215:3-16.

770. Finally, multiple members of the Enterprise have histories of engaging in similar fraudulent conduct. Compl. ¶ 36; 655330/2023 NYSCEF 1; Laurie Dep. 84:14-17; 89:3-90:9; Buccino Dep. 164:8-11 (Buccino did not know that Laurie has pled guilty to accepting a bribe while working at a Bank); Merckling Dep. 247:21-25; Thomasson Dep. 23:18-25:5; Deo II Dep. 125:10-14 ("Q. Is it perhaps because as a result of your judgment, your criminal judgment, you

believed that you could not obtain more financing and that's why you didn't sign it? A. I am not sure"); Urrutia Decl. ¶¶ 575-576.

771. Deo sold vehicles to people who lived outside the state of New York. Merckling Dep. 244:15-18; 251:5-252:2.

772. There were customers from outside the state of New York at Sunrise and Superb. Merckling Dep. 244:25-246:11.

773. When vehicles would be purchased at auction, bids would be entered online. Deo Dep. 535:19-25.

774. Within this online auction system, information would be placed onto a dashboard which the controller or CFO would be able to see, and which could be used to communicate with Ally to floor plan said vehicle. Sara Dep. 536:2-10.

775. Deo himself got a W-2 from Northshore. Deo Dep. 550:10-13.

776. Deo brought in his own "guys," including Merckling, Blankenship, and others. Urrutia Dep. 14:12-15:8.

777. Merckling has been friends with Deo since 2009. Merckling Dep. 92:13-93:4 (the first and only time Merckling met David Baron was at Northshore, when he was visiting Deo as a friend); Sara Dep. 262:24-263:3 ("Q. And do you know how Anthony came to know of Mr. Merckling? A. I think through football, PAL football or something like that").

778. Deo hired Merckling to work at Northshore and Sunrise to provide security services, starting around end of 2020 to beginning of 2021. Jones Dep. 215:13-21; Merckling Dep. 60:13-22; 61:2-8; Deo Dep. 131:24-132:6 ("Q. [...] you later hired, engaged a police officer Marc Merckling for security, correct? A. I felt more comfortable with him around, yes"); Merckling Dep. 62:23-63:6 ("Q. Is it common for automobile dealerships to have security there? A. I don't

know. Q. Have you ever witnessed any dealership have hired security on the premises? A. Again, I've never been in another dealership, so I don't know"); 219:24-220:4 ("Q. Is it fair or accurate to state that when Mr. Deo was at Northshore, oftentimes you'll be asked to be at Sunrise? A. I was at -- I would go to both"); 322:8-11 ("Q. […] you were at the Northshore dealership and Sunrise dealership frequently; correct? A. Yes"); O'Sullivan Dep. 143:11-19; Aaronson Dep. 189:17-19; Sara Dep. 262:21-23 ("Q. […] who hired Mr. Merckling? A. Anthony"); 263:4-23 ("Q. And what was Mr. Merckling's responsibility other than taking money to the bank? A. Security, mainly security. […] Marc Merckling was there for security. Q. Like a security guard? A. No. He's not a security guard. He was there for security, Anthony's security, my security. Q. As a body guard for you or your husband? A. Kind of. Q. Why was that necessary? A. Because of prior dealings with people that Anthony had"); 272:24-273:4; 273:21-25; Merckling Dep. 33:21-25 ("Q. How did it come to be that you ended up working for Mr. Deo? A. I believe we just had a conversation, and he asked me if I wanted to come and do security"); 75:12-21; 95:25-96:6 ("I went back and forth sometimes, but I was – majority of the time, I was at Northshore"); 96:10-15 ("Q. Is it fair to say that you provided the same services […] at Sunrise that you did at Northshore? A. Yes. Q. And that's security; correct? A. Yes"); 124:7-10 ("I worked for Anthony. I didn't work for Superb. I never got paid from Superb Motors"); 188:5-9 (but admits he was present at Superb); 261:15-25; 267:13-18 ("Q. […] were you an employee or did you work for Northshore when it was operating? A. Yes. Q. Okay. What about Sunrise? A. Yes"); Sara Dep. 264:4-8 ("Q. […] Anthony hired Mr. Merckling as security for you and him based on dealings with prior unidentified parties; correct? A. Yes").

779. Merckling worked different hours each week; worked four days with Deo, then four days for the police department; and believes he worked every week. Merckling Dep. 40:21-25;

65:25-66:4; 42:25-43:4; 43:13-18; 42:15-16.

780. After Merckling retired, he started working with Deo full-time, five days per week. Merckling Dep. 56:13-15; 64:18-23.

781. At all times, Merckling was paid $1,000.00 weekly, mostly by check, regardless of hours worked. Merckling Dep. 39:9-21; 67:2-5; 67:21-24; 41:19-42:6; 180:6-181:6; 181:22-182:6.

782. At some point, Merckling was put onto direct payment through ACH payroll at Northshore. Merckling Dep. 39:25-40:12.

783. Deo paid Merckling via Merckling's corporation, Merck 27 Inc. Merckling Dep. 68:24-69:8.

784. Meckling was, at least once, paid from Deo via the Car Buyers NYC Inc. account. Merckling Dep. 228:7-13.

785. Merckling even worked for Deo during a period of time in which Merckling was not paid, "because business got real bad." Merckling Dep. 68:11-16; 181:10-21 ("He paid me when he could pay me. That -- that's the understanding we had. Q. You never followed up with him about it and asked, "Hey, when am I going to get paid?" A. No, 'cause I know when he could afford it, he would give it to me. Q. Was there ever a period of time where he didn't pay you for two or three months? A. Two or three months? I don't recall. I -- it's possible").

786. Merckling maintains that he has no documents related to his employment with Deo. Merckling Dep. 72:22-25.

787. Merckling's role went beyond that of a typical employee; for example, he went to the scene of a car accident Deo's son was in, and made an insurance claim related thereto. Merckling Dep. 240:5-17; 242:25-243:17.

788. Merckling worked "varied" hours, dependent upon his schedule with the Nassau County Police Department. O'Sullivan Dep. 149:2-11 ("he worked a lot of off hours. He would be working at night when I left"); Merckling Dep. 41:2-4.

789. Merckling is still currently employed by Deo. Merckling Dep. 72:19-21.

790. Currently, Deo pays Merckling $1,500.00 each week. Merckling Dep. 67:12-20.

791. Merckling referred Deo to Blankenship, primarily Deo needed help with day-to-day operations including service and preparing cars for delivery, but also because Blankenship is a retired police officer who "wouldn't let anything happen if he was there." Merckling Dep. 75:22-77:14.

792. Blankenship was "was one of Anthony's guys, he brought him in. As far as I knew, he was one of his security guys and was going to be helping in the dealership with logistics and whatever Anthony needed him to do." Urrutia Dep. 14:12-19; Blankenship Dep. 115:16-20 ("They asked me to come back because Marc got sick"); Aaronson Dep. 189:20-24.

793. Blankenship was paid by Deo through his entity, Deeg LLC, which he was advised, perhaps by Merckling, to form for the purpose of being paid through an entity rather than personally. Blankenship Dep. 174:2-175:10; 176:21-177:14.

794. Blankenship (and presumably others) had to retrieve their "stuff," their "personal belongings, on the day the police came to remove them. Blankenship Dep. 209:17-21; 216:10-14.

795. Merckling and Blankenship were purportedly hired to perform menial tasks and security. Merckling Dep. 123:22-124:2 ("Q. Do you agree with Mr. Deo's characterization of you and Mr. Blankenship here as low-level workers who will help with menial tasks? A. Yeah, that along with security").

796. Deo hired Thomasson to provide legal services for the Enterprise and its related entities. Laurie Dep. 24:11-13; Merckling Dep. 23:9-12 ("Q. […] Have you ever had any communications directly with Mr. Thomasson at any point in time? A. Yes"); 85:22-23 ("I only had him as an attorney for a short period of time"); 193:11-194:2 (Thomasson was Merckling's attorney when he was questioned/subpoenaed by the FBI); 267:19-268:8 (Q. […] Mr. Thomasson at some point was your attorney; correct? A. Correct. […] I have talked to Harry before. Q. […] you spoke to him individually without other people? A. Yes"); Urrutia Dep. 15:16-16:3; 30:15-21 ("I think you're the facilitator. You're the one who handles all the legal stuff to make sure that it takes years and years before anybody is able to get any kind of justice, so I think you're part of the criminal gang, yes"); 131:2-6 ("the whole game plan of the gang you're with is to rip off people and commit fraud, and you're part of everything, you know, you're just one arm of it"); Thomasson Dep. 25:8-12; 124:21-125:7 (Thomasson "served as outside counsel when they needed something"; his bills for Deo started "during or about 2020 through the end of November of 2022"); Blankenship Dep. 222:13-17 ("he was the lawyer"); Deo II Dep. 91:18-92:3; Thomasson Dep. 17:14-17 ("Q. When Mr. Merckling called you, to your knowledge, was it the purpose of seeking your advice? A. Yes"); 17:22-18:17; 104:5-7; 124:2-8; 131:16-132:6; 151:10-18; 270:11-20 (Deo wanted funds passed through Thomasson); 314:14-18; 314:21-25; 315:9-25 ("we started discussing a lot more work for me. I was gonna be representing multiple dealerships. […]"); Deo II Dep. 210:3 ("Well, representing me was Harry"); 146:24-147:6; Urrutia Dep. 226:14-15 ("There are plenty of checks of my money that went to you"); Merckling Dep. 23:9-12 ("Q. [...] Have you ever had any communications directly with Mr. Thomasson at any point in time? A. Yes").

797. "Prior to November of 2022, I would say there was between [*sic*] $15,000 billed over roughly two and a half years." Thomasson Dep. 125:24-126:2.

798. Thomasson only stopped timekeeping for Deo once he became salaried, upon which Thomasson received a weekly salary of $3,000. Thomasson Dep. 131:5-9; 313:16-24; 316:2-17; 179:9-13 ("What we ended up discussing was, he said at that time that he would want me to represent of all of the dealerships. That was when we reached a financial agreement"); 315:2-6 ("That was definitely in the vicinity of July of 2023").

799. Currently, Thomasson still represents the Deos in matters outside of this case, and is paid a salary of $1,000.00 per week. Thomasson Dep. 319:12-19.

800. Sara was employed by Deo, and had an office at Northshore. Aaronson Dep. 36:10-23; Sara Dep. 79:16-18 (Sara "[m]aybe" received health insurance at Superb).

801. Sara used to be at the dealership, "consistently, at least four days" per week. Sara Dep. 262:6-10.

802. Even when Sara was out, she handled her responsibilities. Sara Dep. 271:6-10 ("I tried to do as much as I can from my bed").

803. Sara "work[ed] directly with Anthony" at Sunrise and the other locations. J. Baron Dep. 34:13-21; 35:9-10; 35:22-24 ("I do know she worked extremely closely with her husband at these locations"); 36:11-16 ("Sarah worked directly with her husband. Whether she was physically at that location or not, she worked directly with Anthony in the auto business and in the businesses that he was involved in").

804. Sara mainly fulfilled marketing responsibilities. Sara Dep. 67:16-19; 271:11-19.

805. Sara was on payroll at Superb. Urrutia Dep. 163:13-18.

806. Frank Ventimiglia was "the finance guy" at Superb. Blankenship Dep. 119:19-120:25.

807. Deo hired CPA Tom Jones to perform accounting services for Northshore, in or around 2020. Deo Dep. 591:12-22; 592:14-16 ("the CPA for Northshore prior to 2020 was David's RWC. But then we had those incidents, and I needed to have my own"); 593:12-22; Jones Dep. 228:8-13 ("He needed monthly accounting services to review the financial statements and the general ledger and the schedules. […] It was to go over the operations"); 56:6-10 ("Q. You were hired? A. Yes. Q. Anthony told that you he wanted to engage your services? A. Yes"); Chabrier Dep. 46:14-16 ("Q. Do you know anyone by the name of Thomas Jones? A. Personally, no, I don't").

808. Jones also performed accounting services for Sunrise. Jones Dep. 34:18-35:10.

809. In addition, Jones performed accounting services for other Deo entities, including Northshore, Car Buyers NYC Inc., and Gold Coast Cars of Syosset LLC. Jones Dep. 34:18-35:10; Sara Dep. 98:19-99:3 ([…] Q. And whose CPA is [Jones]? A. I believe, ours. […]"); Jones Dep. 225:22-226:21.

810. Together with Tom Jones, Deo hired Kwun and O'Sullivan to make adjustments to financial statement. Sara Dep. 603:21-604:21 ("[…] that is too heavy in accounting for me to play a role in. That's why I hired people to do that. […] So if they thought that there were adjustments to be made if they worked together on a financial statement, why would I disagree with that. That's three very capable people. […] It was their job. They were the professionals. They provided me at the end of it with what their results were"); 605:5-7 ("When you hire three people, again, this is their specialty. This is what they do to do it"); Jones Dep. 71:23-72:4; 127:2-4 ("Q. Did you accommodate [Deo] by making those adjusting entries? A. If it was reasonable, yes").

811. From June 2021 until the dealerships closed or towards the end of 2022, Kwun came to the dealership at least two or three times per week, and she had an office. Sara Dep. 261:22-262:5; Merckling Dep. 143:8-13 ("Wendy was at Northshore quite often […] some weeks she was there every day").

812. O'Sullivan was Deo's controller. Deo Dep. 112:16-113:7 (O'Sullivan helped Deo fill out the DMV application and had the necessary documents; "He is my controller, so he helped me with a DMV application"); O'Sullivan Dep. 48:22-49:9 (O'Sullivan worked at Northshore).

813. Deo would tell O'Sullivan what to do, and O'Sullivan would do it. O'Sullivan Dep. 112:9-23 ("Q. Did you ever ask Anthony [questions about adjusting accounts]? A. No, it is above my pay grade. Q. This is what you were told to do and you just did it? A. Yeah"); 172:3-6 ("Q. Were you part of that conversation or were you just told what to do? A. I was just told what to do"); 172:12-173:4 ("Q. You weren't told why were you doing anything, just now what to do? A. Yes […]"); 81:13-82:5 ("A. I did not pay it off until Anthony told me to pay it off. [...] Q. Was this something which he said to you after something happened or did he say, let me tell you the way that I run my dealership or something like that? A. Yes, I will tell you when to pay the cars off").

814. Deo and Laurie engaged Rob Puccio at Flushing Bank to assist in opening the Superb accounts therein, as well as in obtaining a $500,000.00 line. Urrutia Dep. 250:18-251:12 (Deo stated to Bruce Novicky, "I have my personal banker ready to open the Superb accounts with Flushing Bank. He will get me a 500,000k line, also"); 257:18-258:15 ("opening up a commercial bank account is not an easy thing. And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio […] But he sent one email to Rob Puccio to […] if he could open the account, and within a couple of days he had an

account opened. I had been working on it for over a week"); 259:25-260:12 (In Deo's text "this guy and the credit underwriter are in my pocket," Urrutia guesses that "this guy" is referring to Rob Puccio); 234:10-16 (Puccio was one of the VPs at Flushing, who was working with Deo); Buccino Dep. 143:17-18 ("Mr. Puccio gathered documentation in relation to the application"); 144:10-14 ("He was taking steps to try to see if the account could be opened"); Deo Dep. 198:24-199:6 ("Q. You testified earlier that by 'in your pocket' you meant that you knew Robert Puccio; is that correct? A. That we did business before, yes. Q. What was the nature of that business? A. He got me a line for Northshore").

815. Puccio earns commission for loans he books. Buccino Dep. 132:20-133:5.

816. Laurie has served as financial consultant and business manager to Deo and his entities. Laurie Dep. 143:24-144:8; 111:25-112:8; 97:17-25.

817. For example, Laurie helped Superb obtain a loan of $500,000 with Flushing Bank. Laurie Dep. 114:6-17.

818. Laurie has financial incentive to facilitate loans. Laurie Dep. 119:17-25.

819. Laurie even helped Deo secure a home loan. Laurie Dep. 103:21-104:2.

820. Deo and Laurie decided together on the title Laurie should use for their activities. Laurie Dep. 112:4-13.

821. Laurie maintained an office at Superb for at least over a month, and otherwise had access to Kwun's office, including for the purpose of helping Deo. Laurie Dep. 106:17-107:2; 155:5-16; 98:15-17.

822. Laurie had an email address from Deo's own domain name at Northshore. Laurie Dep. 112:14-17.

823. Laurie was paid by Deo via check or wire, to either Laurie personally or DLA Capital Partners, a corporation solely owned by Laurie. Laurie Dep. 114:18-25; 115:7-12; 100:15-25; 108:9-20; Urrutia Decl. ¶¶ 575-576.

824. Laurie was paid referral fees on the loans that were paid; for example, Deo once paid Laurie's company $50,000 as a ten percent commission for Laurie's assisting in obtaining $500,000 financing. Laurie Dep. 145:3-16; 188:15-20; Deo II Dep. 152:20-153:4; 93:16-94:13.

825. Laurie represented to Urrutia that he's an advisor, financier, and unofficial partner of Deo's. Laurie Dep. 131:23-132:5; Urrutia Decl. ¶ 559.

826. As operator of Northshore, Deo "went and oversaw kind of -- if he felt like it -- the sales department and what's happening in service, a little of everything. There was no set duties." Sara Dep. 276:24-277:9 ("Q. Was he there most days? A. Most days, yeah"); 278:17-25 (Deo's responsibilities were "[t]o kind of see what's happening in the business, sales, service kind of a thing").

827. Sara was familiar with the procedure for daily deposits and reconciling of cash in the safe. Sara Dep. 260:22-261:12.

828. Sara was also responsible for bringing customers into the dealership. Aaronson Dep. 38:10-23.

829. Merckling provided security services at the dealerships, to protect Deo, the dealership, its employees, and anyone else there. Merckling Dep. 64:2-17; 96:10-15.

830. Part of Merckling's job at Northshore was to deal with any irate customers who got out of hand. Sara Dep. 272:24-273:4; Merckling Dep. 153:18-20 ("if something happened that I thought might get violent, I would get involved").

831. Merckling was also expected to perform duties related to cars or customers. Merckling Dep. 96:21-24.

832. For example, one of Merckling's duties at Northshore, Sunrise, and/or Superb was helping out with tracking vehicle inventory. Merckling Dep. 125:23-126:3.

833. Merckling "counted money that was already taken in." Merckling Dep. 97:8-13.

834. Part of Merckling's duties included making deposits of cash payments at the bank. Merckling Dep. 97:14-17; 108:12-19 (Merckling visited Chase Bank Flushing Bank to make cash deposits of customer payments).

835. Merckling negotiated the sale of some cars. Merckling Dep. 133:12-17; 208:19-209:5 (Merckling was given guidelines on how much they could sell for).

836. Merckling met with auditors from floor plan lenders who review audits and helped out with related forms. Merckling Dep. 138:20-139:3.

837. Blankenship also helped with locating cars for audits. Merckling Dep. 141:9-12.

838. Merckling drove Deo to the dealership sometimes. Merckling Dep. 65:15-24.

839. Merckling signed documents on behalf of Northshore and Sunrise. D'Aprile Dep. 154:11-15.

840. Merckling's name was listed as one of the debtors on a UCC lien search for Gold Coast Motors of Syosset. Deo II Dep. 175:23-176:7 ("[…] He was a guarantor").

841. Merckling went with Deo to the police station to fill out a report against Aaronson – for taking $735,000 of his own entity's money out of the Sunrise bank account – with Detective Marx. Merckling Dep. 98:15-102:10 ("[…] Q. Did you make Detective Marx aware that you worked for the Nassau County Police Department? A. I might have told him I was retired. […] Q. Why did Mr. Deo take you along with him to the police department? A. He was obviously very

upset, and he wanted somebody there with him for moral support, and we're friends"); 57:24-58:16 (Merckling met Marx the night Deo filed a police report in relation to the $735,000 allegedly taken by Aaronson); 99:12-100:7.

842. Blankenship would give Deo or Ventimiglia lists of cars that came in, and what work was needed on each. Blankenship Dep. 151:6-152:8.

843. Both Merckling and Blankenship were responsible for transporting cars and otherwise servicing them. Urrutia Dep. 186:20-187:10 ("I believe both Merckling and Blankenship said that they were taking cars to shops for windows, for tires, so at somebody's direction. I don't know who it was, but mostly Anthony"; "Q. They were driving cars to and from shops; is that a fair way of putting it? A. Yeah").

844. Blankenship was also involved in making cash deposits and moving inventory. Urrutia Dep. 30:24-31:12.

845. Jones performed monthly reconciliations for the company bank accounts, after O'Sullivan provided him with a copy of the statements. O'Sullivan Dep. 235:14-22; 246:11-247:9; Deo Dep. 594:5-595:17; 596:4-8 (Deo is "sure" there were monthly meetings with he and Jones to review the financial records of Northshore); Jones Dep. 206:9-22.

846. Deo asked Jones to create a profit and loss statement for Superb, year to date January 1, 2023 through May 31, 2023. Jones Dep. 302:19-24.

847. Information was supplied by Jones to Libertas. Manzueta Dep. 109:9-14.

848. Jones worked together with Deo and Thomasson to provide a document to Puccio at Flushing Bank proving Deo's ownership. Deo II Dep. 217:15-219:16.

849. Jones prepared other documents for Deo as well. Jones Dep. 145:4-9 ("Q. Do you recall whether Mr. Deo asked you or your firm to prepare a personal statement for him in

connection with any financing? A. I do know that he needed a personal financial statement, that we did”).

850. Laurie participated in the Enterprise by connecting Deo to financial institutions, who then lent Deo money under fraudulent conditions. Laurie Dep. 116:18-117:7 (“Q. To your knowledge, you helped Mr. Deo obtain a loan from Libertas through National Funding, correct? A. I made the referral”; Laurie connected Deo with Rob Puccio at Flushing Bank, who Laurie had known for “20 years,” since they “used to work at the same bank many years ago”); 118:11-119:5; 84:18-85:5; (Laurie helped Deo secure a loan of a $100,000 from Albert Hakim and $500,000 from Flushing, as well as referred him to National Funding, “the company that got them the lender that has money”); 120:8-121:10 (Laurie referred Deo to Signature/Flagstar Bank); Urrutia Dep. 229:18-19 (Laurie introduced Deo to Flushing Bank); 114:6-17 (Laurie helped Superb obtain a loan of $500,000 with Flushing Bank).

851. In addition beyond making referrals, Laurie “may have helped make sure [Puccio] got the right documents from the client if he’s not sure what they are requesting, to make sure that he receives what he needs.” Laurie Dep. 119:11-16.

852. Moreover, Laurie was almost always present at meetings with Deo and Urrutia and “did 80 percent of the speaking” when Urrutia met with Deo. Urrutia Dep. 229:2-230:22; Laurie Dep. 123:8-10.

853. Thomasson exchanged emails (at least two communications) with Flushing Bank. Patrovic Dep. 46:6-16; 49:3-51:2.

854. Deo otherwise directed Thomasson to get involved in a myriad of matters, none of which Thomasson maintains he ever questioned. Thomasson Dep. 271:7-23 (“Deo told me money was stolen, it’s coming back, I want you to get involved. This is the name of the guy you’ve gotta

converse with. I believe that I conversed with Russell Shanks via e-mail only. That's my memory. Q. You don't know why Mr. Deo wanted you to go through an attorney when essentially your instructions were as soon as you got the money to get it to him? A. That's correct. Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all"); 47:21-48:3 ("I have represented Northshore, 189 Sunrise and Superb […] in court cases involving allegations by customers. I have also represented those dealerships or at least Northshore and 189 Sunrise with regard to consumer affairs complaints"); 150:2-19 ("[...] As far as I can recall, I think that we prevailed on just about every single one of the matters that I handled"); 85:3-8; 85:17-86:3; 87:8-88:18; 105:6-25; 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]"); 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835; 160:9-19; 173:2-21 (Thomasson spoke to Deo, Merckling, and police); 177:17-22 (Thomasson advised the Enterprise to leave the dealership); 200:20-201:6 (Thomasson was present for an audit at Northshore in order to comply with the floor plan agreement that Nissan had with Superb); 203:19-204:10 ("once I became involved and the federal court became involved, I cooperated, you may remember, in returning almost all of the vehicles that were at Northshore [...] I didn't know much about vehicles. I didn't know who owned what vehicle. I wasn't asking who owned what vehicle. All I know is if you wanted to pick up the phone and call me and say we've got have some vehicles at Northshore can you help us get them back, I would have done

so"); 226:25-227:10; 270:7-10 ("[...] I was asked to have the funds pass through me and I said, sure"); 149:13-25 (Thomasson urged the court, in all capital letters, to make a decision as soon as possible, because the Enterprise was "hurt terribly by what was going on and were losing their businesses and leases at those businesses and it was a problem"); 101:21-102:5 (Thomasson "had a conversation with somebody at Ally").

855. In one of these emails, sent by Thomasson to Phil at National Business, who then forwarded same to Jessica Patrovic at Flushing Bank, Thomasson wrote:

> Dear Phil, we've spoken about this and I pointed out to my client it would be a serious mistake for my client to move money that we have been notified is the subject of a judicial proceeding and one specifically targeting inter alia that money. No offense intended to anyone, but we all know that moving that money before a decision is made by the court would be a mistake. That said, I also told Anthony that if he has payments due under the terms of your contract, he can and should continue to make such payments. Lastly, please also be aware that as I informed everyone on this email chain within the last hour, I'm told by the company's accountant Tom Jones, that he's confident in Anthony's ownership of these businesses for a variety of reasons. Notably, that he was told in writing by Josh and Ms. Kuhn that Anthony is the 99 percent shareholder as represented on the taxes Mr. Jones filed on behalf of Anthony and those corporations. By the way, he also told me that he coordinated the filing of those returns with Citrin, which is Josh's accounting firm. I'm sorry for the troubles, but as I dig into all of this in the last two weeks, I feel confident and still feel confident in Anthony's position. I find Josh's efforts to be inconvenient at best, but after speaking with Tom Jones yesterday, I believe that I will have information by tomorrow that should help to resolve problems in short order. I will continue to keep everyone informed as soon as I have relevant information.

Patrovic Dep. 48:21-51:2.

856. Jones and Libertas participated in the Enterprise's fraudulent and racketeering affairs by communicating directly with each other. D'Aprile Dep. 123:21-24 (Jones communicated directly with Gaetano D'Aprile and Delson Manzueta), 124:15-21; Manzueta Dep. 65:2-8.

857. Sara recalls filled out paperwork to get Northshore organized. Sara Dep. 86:16-22.

858. Sara had access to Northshore's bank accounts and was a signer. Sara Dep. 121:16-21.

859. For example, Sara opened the Chase Bank account for Northshore, and then added Deo a few weeks later. Sara Dep. 276:6-12; 190:12-17 ("Q. […] you wanted to set up new Chase accounts for Superb with Tony and Anthony as signers; right? A. That's what the email said, yes").

860. Sara would sometimes help out with making the weekly schedule at Superb. Sara Dep. 150:9-151:4.

861. Sara participated in the Enterprise by fulfilling marketing responsibilities to attract new customers as victims. Sara Dep. 67:16-19.

862. Kwun and Jones, and/or possibly Daniel O'Sullivan, were involved in the preparation of financial records/statements for Deo. Deo II Dep. 35:2-37:25 ("[…] The first one, this was given to me by the controller, Wendy, and Tom. […] I didn't prepare them, no"); 38:11-22; Deo II Dep. 33:10-20; 64:21-65:6 ("[...] Q. Do you recall providing information to Mr. Jones to enable him to prepare the document? A. Sure"); Jones Dep. 68:5-10.

863. Jones helped Deo with an EIDL loan. Deo Dep. 597:4-7.

864. O'Sullivan made adjusting entries. O'Sullivan Dep. 165:15-166:22.

865. O'Sullivan participated in the Enterprise by paying the bills at Northshore and Sunrise. O'Sullivan Dep. 20:6-8.

866. O'Sullivan was "more hands on" at Northshore than at Sunrise. O'Sullivan Dep. 54:2-6.

867. O'Sullivan made sure that sale money matched money that went out to pay the lender. O'Sullivan Dep. 29:14-23.

868. O'Sullivan would track deals in the system, including inputting and taking deals off. O'Sullivan Dep. 22:14-21.

869. O'Sullivan would communicate with the floor plan company on behalf of Northshore and Sunrise. O'Sullivan Dep. 219:23-220:13.

870. At times, Deo instructed O'Sullivan not to pay Ally (the largest amount being four to six cars). O'Sullivan Dep. 181:2-6.

871. O'Sullivan performed so many duties "running both" Northshore and Sunrise that he successfully convinced Deo to hire another person to help with him paperwork. O'Sullivan Dep. 222:5-20.

872. At Northshore, O'Sullivan posted the financial statement and sent it off to Lincoln Mercury and Ally each month. O'Sullivan Dep. 99:22-100:5.

873. When payments had to be made on trade ins and/or on warranty obligations, O'Sullivan made those payments. O'Sullivan Dep. 246:4-10.

874. O'Sullivan interacted with the salespeople "all the time." O'Sullivan Dep. 147:11-14.

875. The controllers (O'Sullivan and Kwun) handled depositing cash into the bank, in addition to Merckling and Blankenship. Deo II Dep. 182:2-5; 182:17-18 ("Q. Who had access to those safes? A. The controllers, managers, myself"); 183;14-23; Merckling Dep. 111:11-13 ("Q. You had access to the safe at Superb; correct? A. So did a lot of people"); O'Sullivan Dep. 245:9-12 ("Q. The only other people that made bank deposits were Marc and Dwight when it was a large number, is that right? A. Yes").

876. "Wendy and Dan supplied Ally with the monthly financials." Deo Dep. 582:21-583:12.

877. Controllers were primarily responsible for taking the money out of the safe. Deo II Dep. 182:25-183:9.

878. Deo discussed floor planning with Laurie, because Laurie "was his business manager" and "friend." Laurie Dep. 130:3-131:2.

879. Laurie assisted Deo in filling out paperwork for opening a bank account. Laurie Dep. 141:13-142:2 ("[...] If people have a question and they say what do I put here or what are they asking me, I may say let's call the bank or let's confirm. [...]").

880. Laurie attempted to supply floor plan lending to Deo. Laurie Dep. 129:12-15 ("There was one guy that I spoke to in Florida but nothing ever came of it").

881. Laurie even helped Deo when "he was in a deep spot" by paying Car Buyers $5,300 in November 2023. Laurie Dep. 182:22-183:7.

882. Puccio participated in the Enterprise by tracking and working on loan applications for Deo, with Deo and Laurie. Buccino Dep. 109:3-16; FLUSHING15.

883. Deo had a pattern of keeping members of his Enterprise and their activities siloed from the others. Thomasson Dep. 188:2-10 (Thomasson had no contact with Puccio, has not attempted to contact Puccio, and no knowledge of Deo's attempts to contact Puccio); 98:21-23 ("I didn't even know until December of 2022, who the dealerships [*sic*] accountant was"); Merckling Dep. 61:2-8 (Merckling was hired solely by Deo, and Merckling did not speak to anyone else during this hiring); 121:5-8 ("Q. Did you personally assist Mr. Deo in applying for the loan? A. No. I didn't even know about the loan until they took the money"); 43:24-44:5 (Merckling did not do any work related to Deo's DMV license); 145:21-146:6 (Merckling played no role in executing the loan from Libertas); 208:17-18 (Merckling did not make up the prices of cars); Thomasson Dep. 48:4-6 ("I do not have a present memory of representing any of those dealerships to the

DMV"); 188:23-190:25 (Thomasson did not draft or have involvement with employee agreements for Gold Coast Motors Automotive Group, or the company newsletter and/or any acknowledgment therein); ECF 38-12; ECF 112-7; Thomasson Dep. 96:18-197:24 (Deo did not ask Thomasson for advice regarding the capital call letter sent by Urrutia in August 2023); 201:17-202:2 ("I have absolutely no idea what happened, none. I have no firsthand knowledge whatsoever and I'm not gonna speculate"); 203:4-7 ("I don't have any memory of anyone asking me in August of 2023 to look at vehicles at Northshore. Perhaps they should have"); 305:5-16 ("I was not in any way shape or form curious as to any reason for the lien release that is not the way it was presented to me. It was presented to me that they are going to provide a release, would you get it for us Harry? I thought it was a rather ministerial thing, I just thought it was in due course. I never connected that and I didn't care what he was doing. I have no involvement in their financial situations, never have"); 65:10:16 ("Q. Did Mr. Deo ever informally ask you for any advice about such agreements? A. What agreements? Q. Agreements such as the cross purchase agreement or any agreement to obtain an interest in a dealership? A. No"); 89:20-90:13 ("Q. Were you ever requested to perform any legal services in connection with an agreement between Mr. Deo and Mr. Baron for the purchase of Baron Nissan? A. I was not involved in that deal in any way shape or form, except that after Deo signed some documents and paid some money in connection with that, I was informed that he put me or my name and/or address into one or more of the documents a [*sic*] as a contact person in case of notice after the deal was done. I was told that. But, I was not in any way shape or form involved in that transaction prior to and including the day that the documents were executed and monies were paid. I knew nothing about it, had nothing to do with it"); 110:17-21 ("I found out about the existence of that loan when I found out that the money obtained by Mr. Deo on behalf of his dealerships was taken by Josh Aaronson and had to be returned"); 225:6-21

("[...] Q. Do you know if there's any written agreement concerning that agreement between the parties? A. Nothing comes to mind"); Sara Dep. 193:15-17 ("I don't speak to Tom Jones because I don't have involvement with accounting"); 263:9-10 ("I do not have any firsthand knowledge of when this was prepared"); 267:19 ("I have no knowledge of this document"); O'Sullivan Dep. 108:16-109:16 (Jones would meet with Deo in the conference room, and Jones would come out and hand O'Sullivan a piece of paper with all of the adjusting entries he wanted O'Sullivan to make); 90:18-24 (O'Sullivan was not involved in applying for the PPP loan); 91:23-92:2 (O'Sullivan does not know who, if anyone, was involved in putting together the documentation to submit for the PPP loans); Thomasson Dep. 27:18-23 ("Q. In connection with your representation of Mr. Deo, did you assist him in any way to apply for a license with the New York State Department of Motor Vehicles? A. No"); 92:2-6 (Thomasson is "not aware of the existence of any operating agreement for Northshore); 102:6-21 ("I had no knowledge of the Libertas or Flushing Bank dealings [...] Q. You deny any involvement or representation in connection with the application for funds from Flushing Bank and Libertas? A. 100 percent. Never even knew about it"); Jones Dep. 209:18-210:4 ("Q. Do you recall at any time knowing what Mr. Deo planned to do with the funds that he -- the funds that he was trying to obtain from Flushing Bank? A. No, I don't. Q. Did you know that he actually obtained the loan from Flushing Bank? A. No, I was not aware. Q. Did you ever prepare a tax return for Superb Motors? A. No"); O'Sullivan Dep. 90:11-24 ("[...] I wasn't involved in getting [PPP loans], I think that Anthony handled most of them. Q. When did you first became aware of a PPP loan? A. When we got the money. Q. Until you got money, did you know about it? A. I heard about it, but it was -- I wasn't involved in applying for it").

884. Deo took money, cars, plates, and cash. Aaronson Dep. 122:24-123:14 ("[...] he took a lot of cash that supposedly was never deposited into banks. [...]"); Chabrier Dep. 155:24-156:6 ("According to my comptroller at the time, Danny questioned why there were large sums of cash that never made it to the bank account that I found out later. So Anthony had taken that money that never made it into the Northshore bank accounts"); 156:20-22 ("Danny told me that he had given Anthony cash and it didn't get deposited in the bank"); 157:6-21 ("[Danny] told us when he still worked there. When he was questioned where some cash was. [...] It was a large sum of money. I don't recall the exact amount"); Deo II Dep. 46:16-47:19; 47:25-48:7; 50:4-9; 50:13-22; 56:66-17; 51:2-25 (over $1.2 million in deposits over one and a half weeks); 52:2-7 ("Q. Alright, so from the prior month and this month, about 2.4, $2.5 million deposited into the Northshore account from Island Auto over that period of time. Do you see that? A. Yes"); 52:8-54:9 (Deo maintains this was to cover deficiencies created by Aaronson); Deo Dep. 613:3-12 ("Q. Was there ever a situation that you became aware of where there was insufficient funds in Northshore to pay off the floor plan lender in a timely fashion? A. Well, coming down to when it started getting, I guess, hostile when Josh decided to pull out, lets say, everything just started to unravel because when you stop buying cars then the production stops and Northshore became not as robust as it once was"); 94:19-95:11 (wire transfer for $173,000 for Deo's house at Hunting Lane); 142:4-19 ("Q. What about the $173,000 that was paid to the landlord or the owner of the property on Hunting. Was that also for business purpose? A. What does that have to do with the Libertas money? Q. Well, you got $723,000, correct? A. Yes. Q. In the account. You used $500,000 of that to pay to Tony Urrutia's company, correct? A. Yes. Q. Then you also, at that same time, took out $173,000 to pay to the landlord for the use of that house, correct? A. I wired the money, yes"); O'Sullivan Dep. 203:5-204:2 (in an affidavit, O'Sullivan estimated that the customer deposits which Deo failed to put into

the bank exceed $230,000); 232:19-22 ("Q. And the cash would be given to Deo [*sic*] and sometimes not make it into the account, is that right? A. Correct"); 235:14-22; 239:3-6.

885. For example, Deo was writing checks from Superb accounts, despite his not being authorized to do so. Urrutia Dep. 76:16-24 ("[...] Q. Totalling how much money? A. About 206,000, I believe [...]").

886. According to the shareholders' agreement that Deo signed for Superb, Deo did not have authority to sign checks on behalf of Superb. Thomasson Dep. 214:20-23.

887. In spite of same, Flushing Bank account had "a lot of transactions, generally speaking." Buccino Dep. 208:17-24.

888. For example, upon receiving the $500,000.00 loan from Flushing, Deo immediately moved $50,000.00 to Car Buyers NYC Inc. Buccino Dep. 302:13-15.

889. Four days later, there was an additional wire to Car Buyers NYC Inc. for $85,700. Buccino Dep. 302:23-303:2; FLUSHING1359.

890. Deo created fake deals in order to float Superb as a going concern. Urrutia Dep. 183:5-24 (From what I understand, customers would come in, and you know, have an intent of buying a car, they would do the credit applications, they'd do the whole deal, then he'd tell them the car was in the shop, he'd deliver it to them. He'd submit the deal to the bank, one week, two weeks, three weeks, the customer's calling, Well, this happened, this happened. By the time he left, some of those cars were sitting in shops that you -- you wouldn't deliver, and customers never got the car, and I had to refund them the money, and I had to pay off the loans that the banks had put on those cars"); 177:6-23 ("[...] Q. [...] There were customers at Superb who bought a car they never got? A. Yes. [...]"); 178:21-22 (there were maybe ten (10) to fifteen (15) cars that did not get delivered); 155:24-156:20 ("there's deals that cancelled that were never taken out of the

statements. So they were counted as profit, meanwhile, they never existed. There was hundreds of thousands of dollars of cash from April through July that never made one dollar into the operating account, they all went to the Flushing account. [...] Not one penny from April 1st through July -- I'm sorry, August 3rd, ever made it into the operating account, but they were accounted for in those statements as -- as profit, because they were counted as COD's, they were counted as down payments, but yet they never made it into the account. They were pushed off into a schedule as a receivable").

891. Deo purchased approximately forty (40) to fifty (50) gray market cars. Urrutia Dep. 175:15-176:15.

892. Jones fabricated documents and financial statements "to show a business did much better than it did," in order to help secure loans for Deo. Aaronson Dep. 171:23-172:15; Urrutia Dep. 204:21-205:24 ("[...] it was a lot of deals that were supposed to be unwound that cancelled that he left on the statement to inflate profits. [...]"); 206:15-20 (instead of 45 cars per month, Superb sold 37 or 38).

893. Merckling and Blankenship participated in wholesale deals in order to sell cars for cash and pocket the cash. Urrutia Dep. 87:9-18.

894. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 108:17-20 ("Q. Isn't it true monies that were returned by Mr. Aaronson were sent to your IOLA account in November of 2022? A. Yes"); 115:2-15 (Thomasson wired these funds to Deo); 117:2-6 ("Q. As far as you can recall you went to the bank as soon as the funds were received in order to conduct the wire transfer, correct? A. As far as I know, yeah"); 123:15-19 (wire from Aaronson into Thomasson's IOLA account was $735,000); Deo II Dep.

90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); 91:3-17 ("Q. So there is a deposit, it's called a NYTLR transfer? A. Yes. Q. From November 22nd, 2022 in the amount of $723,000. A. Yes. Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes"); 141:2-12 ("Q. We previously showed the bank statements where the $735,000, which went into Mr. Thomasson's escrow account, went into your Car Buyers account, $723,000, correct? A. Yes. Q. $723,000 went into that account, correct? A. Yes. Q. That was the money that had come from Libertas, correct? A. Yes"); 271:18-272:4 ("Q. You did not ask Mr. Deo why do you need an attorney for this, why don't they send the money to you? A. I don't remember the details of the conversation. I know that I had no understanding of what was going on at all. What do you mean $735,000 disappeared from your account. And your ex-business partner who just left took it? I was stunned. I couldn't believe it actually").

895. Thomasson then wired $723,000.00 to the Car Buyers NYC Inc. account for Deo. Thomasson Dep. 123:20-25 ("Q. When you made a wire out to Car Buyers NYC Inc to Mr. Deo, the wired amount from your account to the Car Buyers account was $723,000 even, correct? A. As best I can recall that sounds correct, yes").

896. Jones notes that he is "not aware" of whether or not the way accounting was done for Northshore to Car Buyers was the proper way. Jones Dep. 218:10-17.

897. For each car sold, money owed to the floor plan was not paid each time. O'Sullivan Dep. 194:14-22.

898. There came a time when Northshore and/or Sunrise were having financial difficulties and were unable to meet their monthly obligations. Jones Dep. 108:3-10; 109:10-14; O'Sullivan Dep. 89:20-90:2 ("the business slowed down and we got a little hesitate [*sic*] to pay some of the things off").

899. Cars were sold at a loss, which affected the profitability of the dealership. Deo II Dep. 48:8-14.

900. For example, "Anthony floored the car, never paid off the car and kept his $10,000." Urrutia Dep. 121:10-25; 122:8-18.

901. Deo sold cars at a deficiency, creating debt owed to Ally. Deo II Dep. 53:3-9; O'Sullivan Dep. 178:9-20 ("[...] I did not keep track. It was only like three or four thousand loss on a car, something like that. [...]").

902. Merckling received three cars through Northshore and Sunrise, through his relationship with Deo. Merckling Dep. 63:11-18.

903. Merckling stole cash from Superb at Deo's direction. Urrutia Dep. 140:24-141:14 ("[...] There are certain deposit slips of cash that he took to the illegal bank accounts that he opened with Flushing that had written on them from the teller, and again, he deposited most of the money, so his handwriting is on most of the deposit slips, but it's specifically written on there who delivered the cash, and that is Marc Merckling").

904. Car Buyers NYC Inc. was paid significant amounts of money out of Northshore. Jones Dep. 217:2-6.

905. Deo stole hundreds of thousands of dollars from the dealerships. O'Sullivan Dep. 235:23-236:2 ("Q. To the best of your knowledge, Anthony took in excess of $200,000 in cash from those businesses, right? A. I would guess so, yes").

906. In addition to stealing money from Northshore, Deo stole cars and dealer plates. Aaronson Dep. 122:5-20; 128:24-129:15 ("there were millions and millions of dollars worth of supposed cars that either we couldn't find, we couldn't touch, and when we did find and touch them, they were – significantly had a less value than what he represented to the bank, and that those cars were stripped, nonoperational, meaning the engines wouldn't work, the engines were missing. So in general, everything that Anthony touched that I saw firsthand when I went down when we had all this problem, the bank said, "You owe us millions of dollars for these cars." I firsthand saw that the cars were not what Anthony presented the cars as").

907. Aaaronson believes that Deo cost Northshore motors at least four to five million dollars. Aaronson Dep. 120:17-121:6; 144:8-9 ("He cost my family millions of dollars"); 186:12-15; 253:22-254:5; Deo II Dep. 178:12-21 (some point paid off by Northshore); 179:6-9 (Northshore paid Ally for the floor plan for a particular vehicle); 180:17-19; 181:3-6 ("Q. It's possible that Dan O'Sullivan did not pay them out of Northshore's funds and they remained unpaid, you're just not sure? A. I don't know").

908. "[T]here were several debts in the business that were owed because of Deo, and there were cars missing because of Deo, and we had responsibilities as Island Auto Group who runs a very efficient business and has none of these issues with any of our other dealerships, and because of the actions of Deo, we now had responsibilities to pay off Ally Bank customers' payoffs

because we were on the motor vehicle. All the reasons why we needed Deo off taking over our, motor vehicle license, which he just chose to never do. So we had obligations. When I say winding down, I mean winding down all the problems that were created by Deo is what I'm referencing." Aaronson Dep. 117:3-22; 117:23-118:3 ("[...] Anthony has his handprints and fingerprints all over this thing"); 67:21-23 ("millions and millions and millions of dollars were given back because of losses because of Deo"); 30:11-31:8 ("There was millions of dollars owed of a business that Anthony was operating and running to then-customers. Our bank that we were -- that my mother-in-law guaranteed was owed a lot of money for cars that we couldn't find. There were cars, like, for example, Mr. Deo's son was driving that we asked to get back, a Maserati, and we owed that money to the bank. There was a lot of money owed, and we couldn't find the cars, and Anthony was well aware of it. And then when we found some cars, Anthony told us, I'm using as an example, were worth 50,000. It turns out the cars were worth 5,000, and parts were taken off of them, and so we knew that we were in big trouble, and we knew that there was something not right that was going on at that business, so we immediately knew that we were going to have a problem"); 68:11 ("A lot of money was lost"); 194:25-195:10 (Deo stole millions of dollars from Northshore through fraudulent and unethical means, including not paying off customers' cars); 195:25-196:13; 196:14-17 ("Q. [...] it is your specific allegation that he took money he was not entitled to from Northshore, correct? A. Yes"); 199:12-23; 200:16-22.

909. For several months prior to the car show in July of 2023, Northshore was not operating or selling cars, and was only fixing cars. Merckling Dep. 305:7-16.

910. Northshore has been closed for about three years, since early 2023. Chabrier Dep. 35:18-21; 79:15-18; 159:3-11 ("[...] They are not in business anymore, so there's that").

911. It's "[b]een a while" since Chabrier last received income from Northshore. Chabrier Dep. 34:20-35:17; Deo Dep 595:18-23 ("[...] after David passed we nosedived. [...]").

912. Superb has closed as well. ECF 95 ¶¶ 7-10; ECF 155 ¶¶ 4-7; ECF 95-2; ECF 157-1 ¶¶ 10-13; Urrutia Dep. 11:11-13 ("Q. Do you at this time have any dealership that you're operating? A. No"); 24:6-7 ("I've lost control of all my stores"); 180:12 ("the stores are closed").

913. IAG paid debts caused by Deo out of their own accounts. Aaronson Dep. 148:17-149:11.

914. Iris and/or the Estate of David Baron paid debts at Northshore that were caused by Deo. Aaronson Dep. 149:12-150:12.

915. As of December 16, 2022, an amount of $918,333.20 is still due to Libertas, after four payments. D'Aprile Dep. 134:5-10; 134:25-135:4.

916. The initial $735,000 that was financed from Libertas was not fully returned. Patrovic Dep. 57:3-15.

917. There were only seven payments of $19,791.70 each, totaling $138,541.90. Patrovic Dep. 57:16-25.

918. Deducting from the full contractual amount of $997,500, this means $859,063.10 was still due. Patrovic Dep. 58:2-14.

919. There were insufficient funds to pay the balance on same. Patrovic Dep. 70:18-22.

920. There remains an obligation to repay the debt to Libertas. Patrovic Dep. 85:10-86:6.

921. Similarly, at Sunrise, Deo incurred damages by "not paying off floor plan vehicles, not paying customers back, not paying customers' warranties, …." J. Baron Dep. 49:20-50:3.

922. "Q. Was there enough money in Northshore and Sunrise to pay back Libertas and Flushing? A. Eventually, no." Deo II Dep. 191:3-9 (they only paid back some of the loans); 191:23-25 ("Q. Libertas was not repaid most of the money that was supposed to be paid back? A. No"); 68:21-69:5 ("Q. But at the time you did that, did Northshore have any capability to repay that amount? A. I was hoping it could get back to the point, yes. Q. So at some point in the future you thought maybe you could recover that money? A. Well, I mean we were trying to get it back going"); 69:14-17 ("Q. You have also $296,000 from Sunrise. Is that the same answer, that you were hoping to get money back from Sunrise? A. Yes").

923. Nissan sent a letter demanding $1.1 million from Urrutia and Superb, for thirty (30) cars that were taken by Deo from Superb to Northshore. Thomasson Dep. 199:12-200:19.

924. Merckling took cash from Superb, among other damaging acts. Urrutia Dep. 140:14-141:14 ("He sold cars for cash that were never receipted. He moved inventory without authority. He manipulated floor plans. He was listed as a general manager in the DMS system and with the audit companies. […] There are certain deposit slips of cash that he took to the illegal bank accounts that he opened with Flushing that had written on them from the teller, and again, he deposited most of the money, so his handwriting is on most of the deposit slips, but it's specifically written on there who delivered the cash, and that is Marc Merckling").

925. At the time Deo left, an estimated ten to twelve cars were sitting in the shops undelivered. Urrutia Dep. 183:25-184:4.

926. Aaronson and Urrutia had discussed how Deo damaged them both in the same way. Aaronson Dep. 205:16-206:16; Urrutia Dep. 108:5-6 ("[...] the business shut down, [...]"); 119:24-120:6; Aaronson Dep. 144:2-3 ("Anthony caused, you know, a lot of damage to a lot of people"); Urrutia Dep. 177:6-23 ("[...] Q. [...] There were customers at Superb who bought a car they never

got? A. Yes. Q. So then what happened? A. I had to pay all -- all of it off").

927. Deo purchased approximately forty (40) to fifty (50) gray market cars that Urrutia "had to pay off afterwards." Urrutia Dep. 175:15-176:15.

928. Each car that Superb actually took in was "about a negative $3,000." Urrutia Dep. 207:4-12.

929. Deo stole money that was rightfully Superb's. Urrutia Dep. 182:5-183:4 ("Let's see, 500,000 ACH money from NESNA, about 300,000 in cash, 500,000 that went into the Flushing account from customers, another 2 plus, $250,000 worth of checks from Chase. Obviously, the cars that I paid for that he claims are not mine, but in – in total, the losses exceed 5 million, but he pocketed about 2 and a half million, but he needed to create this -- this, you know, the money in the banks so he could hide what he was stealing. So the banks also, the bank accounts always looked healthy because he was generating fake deals to put money into the bank, so we never dropped below a number that would make me uncomfortable, and while he was pocketing all the deposits and cash"); ECF 11-10.

930. Urrutia had to pay off cars on the floor plans. Urrutia Dep. 197:12-22.

931. Superb made no money between December 1, 2022 and January 31, 2023, and only lost money during that time. Urrutia Dep. 207:13-19, 207:20-209:8 ("[...] The $500,000 Deo gave me he lost in profits between December and February. [...]"); 209:15-210:11 ("I had to write down the inventory at 6, 700,000, I don't remember the exact amount, and I had to pay down the NESNA loan, so that was another 300,000 something. So I didn't keep it, I used it to pay down the debt of the store as agreed with Anthony for him to go into a store that wasn't carrying the overage of all the cars from COVID. You do remember that, right, that people were paying $25,000 for a $17,000 car because there was no inventory? Well, Anthony came in, that was towards the tail end of that,

I took all those hits, I took all those losses, because it wouldn't have been fair for Anthony to take them, right? So I took the money, and I bought down all the inventory so he had a fair shot at selling cars and making money"); 131:18-20 ("You cost me my business by being part of the whole organization that does what you do"); 82:25-85:12 (Urrutia suffered financial difficulty at all three of his stores other than Superb, also due to Deo's schemes); 109:17-24 (all were closed by December 2024 or January 2025 latest); 181:6-9 ("Q. So Deo you blame for your difficulty with all of your dealerships; is that right? A. The collapse of them, yeah"); 181:10-12 (there was no mismanagement at the stores before Deo).

932. For example, NMAC first began lowering Urrutia's limits "[r]ight after" Urrutia called them to tell them about his problem with Deo and that he had stolen at least forty-three (43) cars. Urrutia Dep. 85:20-87:6.

933. Flushing Bank issued a loan to Deo in 2023. Deo II Dep. 147:25-148:11.

934. Libertas agreed to provide funding to Deo in excess of $400,000, around $730,000 to $750,000. D'Aprile Dep. 26:15-27:10; 95:15-18.

935. This amount was to be paid back in $19,000 weekly. Deo II Dep. 187:11-25.

936. The IAG Plaintiffs were required to loan Northshore and/or Sunrise money because it was undercapitalized due to Deo's fraudulent conduct. Deo II Dep. 42:12-43:22; 46:16-47:19; 47:25-48:7; 50:4-22; 51:2-25; 52:2-25; 53:3-54:9; 56:6-17.

937. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo).

938. Deo made accounting adjustment entries to the dealerships' books to make them appear more profitable than they really are. O'Sullivan Dep. 111:25-112:4 ("Q. Would those

entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24-113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. …").

939. The purported purpose in seeking financing from Flushing Bank was to obtain working capital. Deo II Dep. 145:20-22; 147:17-19; 151:23-152:2; 194:10-12.

940. The $500,000.00 loan from Flushing Bank to Northshore went to Laurie's company DLA Capital Partners. Deo II Dep. 152:14-19 ("Q. So then the account gets funded with $500,000, and then the next transaction after that is a transaction on March 22nd wherein $50,000 was transferred out to DLA Capital Partners. Do you see that? A. Yes").

941. The $500,000 loan from Flushing Bank to Northshore went almost exclusively to Car Buyers NYC. Deo II Dep. 153:6-18 ("The next transaction on the same day is $50,000 to go to Car Buyers NYC. Do you see that? A. Yes. Q. The next transaction after the wire fee on March 27th is another wire transfer to Car Buyers NYC for $85,700. Do you see that? A. Yes. Q. There was no other money in that account other than the $2,000 originally put in by Car Buyers that didn't come from the financing, correct? A. Yes"); Buccino Dep. 302:13-15 ("upon receiving the $500,000 loan, Mr. Deo immediately moved $50,000 to Car Buyers, correct? A. That's what it looks like, yes"); 302:23-303:2 ("four days later there is an additional wire to Car Buyers for $85,700. Do you see that? A. Yes"); FLUSHING1194; FLUSHING1359.

942. Deo asserts that the loan proceeds were used to pay himself commissions to another entity, Car Buyers NYC Inc. Deo II Dep. 153:19-23 ("Q. [...] out of the $500,000, $185,700 was used either to pay a commission to Mr. Laurie or was used to pay Car Buyers NYC, correct? A. Yes").

943. Several transactions to Car Buyers followed. Deo II Dep. 154:21-155:20 ("Q. And then we're going to scroll down to the next month's statement, April 1st, 2023, and we see there's a April 3rd loan payment of $9,752.78 and then check order, and then the next big transaction is, again, on April 6th to Car Buyers for $75,700, correct? A. Yes. Q. That didn't go to the operations of North Shore Leasing, correct? A. That's false. Q. And then the next transaction is to Car Buyers for $500 on April 13th, correct? Do you see that? I can't seem to highlight it, but it's on April 13th. A. Yes. Q. There is another one on April 17th to Car Buyers for $25,000, right? A. Yes. Q. And then another one on April 25th to Car Buyers for $25,000, correct? A. Yes. Q. And then another one to Car Buyers on April 27th for $40,000? A. Yes"); 156:5-11 ("Q. So if we're going to take a look at the May statement and again, we have a payment of a loan for $9,700, and then we've got three payments, $35,000 on May 2nd, $60,000 on May 8th and $20,000 on May 15th, all to Car Buyers, correct? A. Yes"); 156:15-21 ("Q. Then you've got a bunch of other checks here. Now we jump to May 24th, May 30th, check, a wire to Car Buyers for $25,000 and another one for $40,000. I do see, though, there's some transfers in. Do you know what these transfers came in from or for? A. I don't recall"); 158:2-5.

944. Deo did not utilize the loan proceedings from Flushing Bank for the operations of Northshore. Deo II Dep. 158:6-13 ("Q. As far as we sit here today, how much of that $500,000 that Flushing provided a credit line for was used towards the operations of Northshore? A. I don't know. Q. Do you know if anything was used for the operations of Northshore? A. I don't know"); Deo II Dep. 156:12-14 ("Q. Again, those funds didn't go to North Shore Leasing, correct? A. Correct").

945. Funds from Flushing Bank were not used for Northshore. Deo II Dep. 153:24-154:20 ("Q. Were the funds that went to Car Buyers NYC used for the betterment of North Shore Leasing? A. I don't remember. Q. Well, you previously testified Car Buyers NYC was a consulting company, correct? A. Yes. Q. You're one of the consultants that worked for that company, correct? A. Yes. Q. I believe we'd asked at the time and you weren't sure, were there any other consultants that worked for Car Buyers NYC? A. No. Q. When the money went into Car Buyers NYC, what did you do with it, if you know? A. I don't recall. Q. But it didn't go to North Shore Leasing, correct? A. It wasn't wired to Northshore, no").

946. There exists a general requirement for Libertas funds to be used for the benefit of the businesses that were entering into the transaction. D'Aprile Dep. 111:23-112:9; 113:10-12 ("We hope they're not used for something other than benefitting the business"); Deo II Dep. 133:5-17 ("Q. What was the purpose of going to Libertas? What were you trying to do? A. Working capital. [...] Q. What did you intend to use the money for? A. For the business. Q. Can you be more specific when you say "for the business"? A. Working capital."); 135:10-22.

947. Flushing Bank failed to conduct an investigation into Deo's conduct. Buccino Dep. 209:9-20 ("Q. In your tenure and experience at Flushing Bank for the number of years you've worked there, it's fair to say that you've reviewed many statements in which you've seen typical disbursements from a bank account such as payroll, you know, checks paid for rent, and so on and so forth, correct? A. Yes. Q. In your review of this particular account, you did not see any such payments being made, correct? A. I don't recall").

948. Laurie was aware about the limitations of Deo's shareholders' agreement with Urrutia. Laurie Dep. 128:8-19 ("Urrutia sent him something in writing [...] Urrutia gave him the authority to run the business").

949. Merckling visited Chase Bank to make deposits of customer payments. Merckling Dep. 108:15-19.

950. Merckling visited Flushing Bank to make cash deposits there. Merckling Dep. 108:12-14.

951. Merckling was familiar with the six injuncted vehicles that are currently being held by Deo in Hicksville, and that they were first at Deo's house. Merckling Dep. 223:7-17; 223:24-224:6 ("[...] I know there was a garage that he had them in. [...]").

952. Merckling was involved in transporting the injuncted vehicles from the garage to Hicksville. Merckling Dep. 225:2-16.

953. Blankenship was also involved in making cash deposits and moving inventory. Urrutia Dep. 30:24-31:20 ("[...] there was cash stolen, and his name appears on some of the deposit slips of cash that never made it into my bank accounts, so yes, I do believe it"); 33:10-13 (Blankenship stole cash and checks from Superb).

954. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo).

955. Deo conspired with his accountants to make Northshore and Sunrise look more profitable than they actually were. O'Sullivan Dep. 111:25-112:4 ("Q. Would those entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24-113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. Q. Positive where the dealership looked better than it actually was doing? A. Yes").

956. Thomasson assisted Deo in improperly using funds obtained via Libertas and Flushing Bank. Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas

Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account"); 91:3-17 ("[...] Q. So is your recollection that that was the money that was transferred from Mr. Thomasson's escrow accounts to the Car Buyers account? A. Yes. Q. That was from the Libertas funds, correct? A. That's what it was supposed to be, yes").

957. For example, Thomasson even wrote a letter to Flushing Bank persuading them to give Deo said funds. Thomasson Dep. 144:25-145:4; FLUSHING3835.

958. Thomasson was also involved in wire fraud pertaining to these funds. Thomasson Dep. 282:12-17 ("Josh Aaronson absolutely is at fault for steeling $735,000. He knew damn well wasn't his. He knew damn well that Anthony Deo had taken that money. He is a thief. That is what he is. I gave the money back to the man who borrowed it").

959. Merckling was involved in stealing cash deposits, among other tasks. Merckling Dep. 135:5-7 ("It wasn't just cash. It was any wholesaler. We accepted cash or checks"); 131:19-24 ("Q. Is it fair to say that you performed pretty much any task that Mr. Deo would ask you to perform? A. Any task? I -- I don't know about any task, but if he asked me to help him out with something, I would"); Chabrier Dep. 158:15-17 ("Danny told me Marc was the one that brought the money to the bank so").

960. Deo was unable to sell vehicles due to his extensive fraudulent conduct. Thomasson Dep. 171:15-17 ("Gold Coast defendants are not actively selling automobiles at this time"); 184:13-23 ("Q. But, you don't disagree with me that on September 15, 2023 following a

settlement conference before Judge Wicks, that evening approximately 30 vehicles were subpoena returned from Northshore to Superb, correct? A. Give or take. Approximately that sounds about right. I knew that they were over there because I had ended up going over there for that audit. So I know what was at Northshore").

961. Urrutia no longer operates or owns any dealerships. Urrutia Dep. 11:11-13 ("Q. Do you at this time have any dealership that you're operating? A. No"); 24:6-7 ("I've lost control of all my stores").

962. In addition, Defendants misappropriated Plaintiffs' physical spaces. Aaronson Dep. 140:2-17 ("[Sara] would lock people out of an office and not allow them in an office when they wanted entry into an office"); 259:17-21 ("[...] Sarah was locking up titles, [...]").

963. Defendants misappropriated Plaintiffs' cars for use at a grand opening event. Sara Dep. 212:8-213:6; Laurie Dep. 152:6-21.

964. Deo returned some, but not all, of the vehicles misappropriated by him from Superb in July 2023. Thomasson Dep. 184:14-23 ("on September 15, 2023 following a settlement conference before Judge Wicks, that evening approximately 30 vehicles were subpoena returned from Northshore to Superb, correct? A. Give or take. Approximately that sounds about right. I knew that they were over there because I had ended up going over there for that audit. So I know what was at Northshore"); 205:3-5 ("I believe that the vehicles are owned by the dealership, subject to the security interest of the floor plan"); Urrutia Dep. 85:25-86:24; 87:9-18; 144:24-146:5 ("[...] There's a certain amount [...] that I know he sold to wholesalers for cash and pocketed the money"); 148:13-21.

965. Deo has no basis to maintain any entitlement to any of the injuncted vehices. Thomasson Dep. 205:6-13 ("Q. Can you explain why Mr. Deo has not returned the six Deo injunction vehicles, given that they were on the floor plan and paid off by Mr. Urrutia at Superb? A. I think that it's disputed, I think there were disputes over those six vehicle [*sic*]. I don't that that's an entirely black and white issue").

966. Deo had no authority to take Superb's vehicles out of its lot other than in the regular course of business. Urrutia Dep. 33:20-25 ("What else did he do, other than taking money, that he did wrongfully? A. Moved cars without authorization to the lots out in Long Island"); 34:3-8 ("Who would he have needed to get authorization to move cars from? A. To that lot, from me, but I guess Anthony Deo gave him the authorization to move the cars for the grand opening").

967. Deo misappropriated cash deposits for himself. O'Sullivan Dep. 160:18-25 ("Q. You also stated that sometimes Anthony would take the cash? A. Correct. Q. What type of circumstances might that be? A. He would say give me the cash and I will take care of it. Just record it"); 161:10-162:4; 165:4-9 ("Q. Was there any record to show which money did not make it into the bank, which cash, was there any record of what cash did not make it to the bank? A. Yeah, whenever Anthony's capital account was reduced"); 179:10-14 ("there were like a couple of cars sold for cash, but they were like real small cars, like a $500 junk car we took in trade, that might get sold for $500").

968. Deo used Superb's assets without authority. Urrutia Dep. 75:17-22 ("If a business's entire inventory is taken out, money is stolen, he signed an ACH form that he was not authorized to do in April as well to take money to pay his debt for these other stores that had been shuttered").

969. Deo utilized the Superb Plaintiffs' employees, vehicles, and other assets to open a competing dealership and have a grand opening event (or car show). Urrutia Decl. ¶¶ 574-578; Laurie Dep. 168:3-6 ("Q. To your knowledge, what was the purpose of the July 2023 event with the cars? A. To drum up business for the dealerships. It's marketing"); Sara Dep. 211:5-212:3 ("Q. Were you involved in any way, shape, or form planning the event? A. No. Q. What's your understanding as to vehicles taken from Superb to the Northshore lot for the purpose of the event? A. My understanding is, they were having a car show. And that's pretty much it. Q. To your knowledge, why was it necessary for the vehicles to be taken from Superb to Northshore for the event? A. Well, it's a car show, so you need cars there. Everyone was made aware, including Urrutia -- Urrutia. The staff, everyone, helped them get this event organized, and it was a successful event from what I hear. Q. How do you know the event was successful? A. There was a lot of people. Everyone joined in for the car show"); 213:11-18 ("how soon before the event did Mr. Deo have this discussion with Tony? A. How soon, like how much previous advance notice, I don't know. If I had to guess, couple of weeks or something leading towards the date. I don't remember specifics").

970. Urrutia did not know about the grand opening. Urrutia Dep. 76:10-15 ("Did you know about the grand opening? A. No. Q. You never received any texts or anything that would say that? A. No").

971. The IAG Plaintiffs were able to remove the funds Deo procured from Libertas from the bank account it went into. Aaronson Dep. 108:23-109:10 ("Q. And had you caused $735,000 to be taken from an account at that time? A. Yes. Q. What is it that you did to take that money? Please walk me through your steps, please. A. I don't remember exactly, but I believe we were able to take the money out of the account, and it was -- it was out of Sunrise … I believe, in order

to pay back all the money that we owed to the banks and consumers"); 109:14-110:2 ("we had access to the bank, and we withdrew the money from the bank. Q. Who is 'we'? A. Me and my office. Q. What do you mean when you say your office? A. Someone who works in my office did it. Most likely … Kwun. Q. So your memory is that you and … Kwun took that money; is that right? A. Correct"); 110:4-9 ("it was in … Sunrise's account, that's where the money was put in, and then we took it out of there, and I don't know exactly where it went, but I would imagine it would be one of the [IAG] accounts"); 182:17-22 ("We were the owners of the DMV licenses, right. [...]").

972. Libertas requires the funds it provides to be used for the benefit of the business. Deo II Dep. 140:6-11 ("merchant agrees to use the purchase price exclusively for the benefit and advancement of merchant's business operations and for no other purpose. Did you see that? A. Absolutely"); 151:23-152:2 ("Q. [...] the money was then to be used for the betterment of Northshore Motors, correct? A. Yes, for working capital"); Libertas Agreement; D'Aprile Dep. 114:13-17 ("Libertas more than expects, but it requires that the party financing use that money for the benefit of the business; correct? A. Yes").

973. Deo directed Thomasson to wire the Libertas Funds to Car Buyers NYC Inc. Deo II Dep. 90:10-91:2 ("there was the funds that were provided by Libertas Funding of $735,000 that went to Sunrise and eventually it was returned. Excuse me, it was provided to your attorney, Mr. Thomasson, correct, by Mr. Aaronson? A. Yeah. They wired it back. Q. And it went to Mr. Thomasson's trust account, as far as you know? A. Escrow? Yeah. Q. Escrow account, yes. Did Mr. Thomasson send you that money? A. Yes. He wired it to me. Q. When he wired it to you, did it go to you personally or some other entity? A. I think it went to this account").

974. Urrutia would have owned 25% of Northshore, had Deo not violated their agreement by encumbering. Urrutia Dep. 59:19-60:7 ("Q. So you knew at the time you entered into the contracts that those two dealerships were shuttered? A. No, I found out in January -- I'm sorry. End of December or beginning of January, I was told that he couldn't sell cars because Josh was holding the license hostage. I only found out the dealerships were shuttered through this case because he's mentioned it several times, which again brings up the point, how did you sell me or give me 25 percent of two dealerships that were shuttered?").

975. Libertas eventually locked Deo out of the account. Deo Dep. 616:6-16.

976. Deo and/or Sara were not the owner(s) of any Plaintiff dealerships. Urrutia Dep. 48:13-49:10; 125:15-23 ("Q. [...] when you were dealing with Mr. Deo in November of '22, you owned Superb 100 percent? A. Yes. Q. [...] you owned it by yourself, right? A. Correct, yes"); 166:3-20; Aaronson Dep. 21:25-22:13 (DMV paperwork shows that Northshore is owned by Khan, Chabrier, and David Baron); 110:23-111:7 ("Who were the owners of Island Auto Group right now today? A. Ronny Baron, the estate of David Baron, myself and Marcello Scherino. Q. How long has that been the case? A. A little over 11 years, I believe"); 234:12-16 ("have you ever seen an agreement between any of the plaintiffs and Deo regarding the ownership of Northshore Motors? A. Not that I am aware of, no"); J. Baron Dep. 16:3-11 ("Q. Do you know if Deo has a claim of ownership at Baron Nissan? A. I am aware that that is his claim. Q. Was the buyer informed of that claim? A. The buyer did not need to be informed of that claim because it is a false claim"); Chabrier Dep. 21:9-10 (Sara was not an owner of Northshore); 85:17-86:6 (Deo was never an owner or member of Sunrise); Deo II Dep. 69:9-13; 208:22-209:7 (Deo has no documents showing that he purchased 100% of Superb);Sara Dep. 197:18-198:6 (Sara had no stock certificates listing her membership interest in Northshore, Sunrise, and/or Superb); 246:11-25

(despite Sara's claim that she and Deo own all of Northshore and Sunrise, she does not think this is reflected in any documentation with the DMV); Jones Dep. 77:11-25 (Jones did not ever see any paperwork concerning Deo's ownership of Sunrise); 271:17-272:3 ("Q. [...] Deo disclosed to you that he had no interest in Superb at that time, correct? A. Correct"); FLUSHING189.

977. In spite of same, Deo and Sara represented themselves as 100% owners on tax returns, on other documents, and to members of the Enterprise. Aaronson Dep. 92:19-22; Chabrier Dep. 116:20-25 (K-1 shows that Deo has a 99% interest in Sunrise); 130:2-7 (in 2022 tax returns, Deo reported himself as having a 99% interest in Northshore); Deo II Dep. 84:22-85:8 ("wouldn't this indicate that Mr. Baron had the right to be listed as the owner of Northshore? A. For purposes of the floor plan and banks, as you indicated yesterday, when they provided those applications to banks. Q. So only with regard to the banks he would be listed as the owner, but for all other purposes, it wouldn't be? A. It shouldn't be. That was my understanding at that point"); 169:18-170:9; 170:16-19 ("Q. So you have no idea why you have two operating agreements both given to Flushing Bank in connection with this transaction? A. I don't remember the circumstance"); FLUSHING8508; 202:17-24 ("Q. By submitting this application, you represented to Flushing Bank that you were a hundred percent owner of Superb? A. Yes"); 215:19-216:8 (says Deo is 100% owner of Northshore); 217:15-219:16 (affirmation provided by Jones to Flushing Bank to show ownership); Sara Dep. 46:14-18 ("We own, not manage"); 67:12-15; 83:23-84:10 (Sara claims that the operating agreement identifying David Baron, Chabrier, and Khan as members of Northshore is fake); 191:3-192:2; Jones Dep. 135:6-9 ("you had prepared the 2019, 2020, tax returns for Anthony and Sarah Deo, right? A. Right"); 173:19-21; 339:17-20 (Deo represented to Jones that Deo and S.Deo were the members of Northshore); Manzueta Dep. 101:14-16 ("The tax returns from Tax Guard did confirm the 99-percent ownership"); Merckling Dep. 151:14-19 ("Q.

What is the basis for your knowledge or belief that Mr. Deo was the owner of Superb? A. He was the only one there and he told me he was the owner. That's the only knowledge that I have"); O'Sullivan Dep. 205:21-24 ("Q. Did anybody ever tell you that Deo was not listed as the owner for these licenses? A. No"); 249:8-16 (O'Sullivan thought that Deo was an owner of Northshore because "[h]e was signing the checks and he had a capital account"); Urrutia Dep. 215:7-216:5; Manzueta Dep. 57:16-20 ("we assumed because … he had 99 percent ownership that he had written authority to [*sic*] on behalf of that legal entity"); FLUSHING0168; FLUSHING4043.

978. Similarly, Deo did not have authority to write checks on behalf of Superb. Thomasson Dep. 214:20-23.

979. Deo knew his application with Westlake was false when he submitted it. Deo II Dep. 125:15-24 ("Q. Is this information that was provided to Westlake Services for your company on your behalf false in that it stated that Beria was the owner? A. Well, he wasn't the owner. Q. So it was false, correct? A. Yes. Q. You knew that it was false when it was submitted, correct? A. I guess yes").

980. Deo knew that his personal financial statement was inaccurate when he submitted it. Jones Dep. 275:11-20 ("Q. … My question is, if there are in fact no mortgages, is this statement inaccurate? [...] A. I mean in general, yes, it would be").

981. Deo provided Jones false numbers to use on financial statements. Jones Dep. 302:25-303:12; 316:14-16.

982. Specifically, Deo had Jones make adjusting entries which increased profits. Jones Dep. 127:2-4 ("Q. Did you accommodate [Deo] by making those adjusting entries? A. If it was reasonable, yes").

983. Deo provided financial records to Flushing Bank in order to obtain financing from same for Northshore. Deo II Dep. 24:6-11.

984. Deo's personal financial statement contained false representations. Deo II Dep. 25:5-26:2 ("Q. That says profit before income tax $76,130. Do you see that? A. Yes. Q. Was that number accurate as the profit for Northshore for that month? A. I don't know. I don't remember. I'm sorry. Yeah, I specifically don't remember. [...] Q. To the right of that is the year to date indicating that the profit before income tax for Northshore through October 2022 was $372,037. Do you see that? A. Yes. Q. So again, when presented to Flushing, the representation was made that that was the accurate profit before income tax at that time for Northshore, correct? A. Yes, the year to date"); 31:7-11 ("Q. Yet with regard to the deficiency and unable to pay its debts, you're showing that in October of 2022 you represented to Flushing Bank that it made a profit of $76,130, correct? A. Well, that's what it says here"); 36:2-37:6 ("Do you see how much the gross is showing? A. Yes. Q. How much is that showing on the new one? A. Minus $279,289. Q. What is it showing in the one that you provided to Flushing Bank? A. $172,888. Q. That's a positive number, 172, correct? A. Yes. [...] Q. Let's go to the bottom line here. We have a profit. The last profit before income tax. Here it's showing a negative $375,048. Do you see that? A. Yes. Q. And the one you presented to Flushing showed a positive of over $70,000, correct? A. That was the correct one, yes"); FLUSHING8560.

985. Deo borrowed funds from Flushing Bank by falsely representing himself as sole owner of Northshore. Buccino Dep. 257:3-7; 266:17-20 ("I recall a conversation about documents that were given to David Weinstein by Tony Urrutia that the documents were inconsistent. I don't recall specifically what those documents were"); 218:14-23 ("Q. … the documentation on file for the LLC was also complete and satisfactory to give the authority to the accounts, correct? A. Yes.

Q. And that is referring to Northshore based on the fact that Mr. Deo provided an operating agreement listing himself originally initially as 99-percent owner and then amended it to list himself as 100-percent owner, correct? A. Based on the entire documentation, yes").

986. Notably, Deo had submitted a document on behalf of Northshore allegedly signed by David Baron – despite David Baron having passed away by then. Jones Dep. 174:14-175:13.

987. In other document(s) to Flushing Bank, Deo listed the annual revenue or budget for 2022 as $17 million and $8 million, despite the account not ultimately seeing these numbers. Buccino Dep. 298:12-20.

988. Moreover, Flushing Bank had noted to Deo that the operating agreement showing 99% ownership does not match his credit application showing 100% ownership. Buccino Dep. 324:23-325:11; 99:11-16.

989. Deo's profit and loss statement was not accurate. Deo II Dep. 58:19-59:18; FLUSHING162.

990. Similarly, a letter from Thomasson dated March 31, 2023 falsely "gave [Flushing Bank] confidence in the representations from Mr. Deo regarding his ownership of the businesses." Buccino Dep. 306:9-307:7; 309:4-8 ("Q. This was enough for you to -- for Flushing Bank to accept this representation and no longer have any concerns? A. I believe we also received something from the accountant, generally speaking, yes"); 65:15-22 ("[...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate"); Urrutia Dep. 134:22-24 ("Q. You think I'm being dishonest in what I'm doing in these lawsuits? A. Absolutely"); FLUSHING3835; Buccino Dep. 205:5-9 ("Q. It's fair to say that when you looked at the information produced by Mr. Weinstein, you understood that there was an issue with the documents produced by Mr. Deo, correct? A.

Yes").

991. O'Sullivan and Jones prepared adjusting entries that made the dealership look like it was doing better financially than it actually was. O'Sullivan Dep. 111:25-112:4 ("Q. Would those [adjusting] entries make the dealership look like they had more money or more profitable? A. Yes"); 112:24-113:6 ("Q. Do you know whether making those adjusting entries affected the monthly financial statements? A. Yes. Q. Positive where the dealership looked better than it actually was doing? A. Yes"); Deo Dep. 603:21 ("An adjustment can mean anything"); Jones Dep. 23:7-25; 26:12-15; 58:22-25; 132:4-133:8 ("Q. Would that mean that if you just printed out the financial statements for the year, it would artificially show that the dealership was $1.4 million to the better than it actually was? A. On a monthly basis, but at year end we would write it off. Q. You would write that off at the end of the year? A. Correct. Q. Each month it wouldn't show that, though? A. Potentially not, yes. Q. Each month, these financial statements are being presented by Anthony to Ally to get floor plan financing, correct? A. As far as I know, they are, yes. Q. So, each month would not necessarily reflect that each month it was accruing at the time end of the year $1.4 million in expenses which weren't being shown to Ally? [...] A. Again, I don't know what was in that account, but that could be."); 165:9-19; 167:8-169:2.

992. For example, in documents provided to Libertas, financial records were fabricated to show more operating profit in one month than for the whole year. D'Aprile Dep. 175:10-21.

993. Similarly, Deo requested that Jones inflate profit and loss statements to appear more profitable. Urrutia Dep. 92:6-93:18; 94:3-12; 155:20-23 ("there's a couple of emails from Deo making sure to tell Thomas Jones to make sure that those statements show a profit, no matter what"); Jones Dep. 296:6-11 ("Q. [...] what, if anything, stopped Mr. Deo from telling Ms. Kernizant directly to make these changes? A. I don't know if there is anything that would");

301:12-17 ("Q. At the end of this e-mail, before he thanks you, Mr. Deo asked for your help to close out the statements today showing a profit. He says that this is an absolute must, correct? A. That's what it says, yes").

994. Deo used a myriad of excuses to explain missing funds. Urrutia Dep. 72:20-73:24.

995. To the extent that Merckling and Blankenship did not themselves sign deposit slips, Deo forged their signatures when depositing cash. Merckling Dep. 337:5-13 (at Flushing Bank); 337:21-24; 338:12-19; 339:18-22.

996. Deo improperly backdated operating agreements to serve his purposes. Thomasson 255:19-25 ("Would it be illegal for Mr. Deo to have dated this document in June of 2020, when in fact he prepared it in June of 2023? A. That is speculative. I don't know that he did or he didn't. All I can tell you is it speaks for itself").

997. Libertas' funding was to be used for the benefit of Northshore, not to purchase another business. Patrovic Dep. 87:8-12 ("the money is supposed to be, is expected to be used for the benefit of the business itself; correct? A. Yes"); 87:24-88:12 ("Q. [...] had Libertas known that the $735,000 would've been taken by Mr. Deo and used for him personally to buy into some other business, do you think Libertas would have financed this transaction? [...] A. [...] I'm not sure. [...]").

998. Jones acknowledged the problems with Deo's false statements in his personal financial statement. Jones Dep. 279:6-10 ("Q. [...] is it fair to say that if the statement contained in the personal financial statement is outright false, that that's a problem? A. Okay, I'll say it's a problem").

999. Jones explained discrepancies in amounts as "not material," and merely matching exactly what Deo asked for. Jones Dep. 307:15-308:8; 309:18-21.

1000. David Baron of the IAG Plaintiffs relied on the accuracy of the financial statements after they were prepared by Deo and his accountants. O'Sullivan Dep. 125:6-9 ("Q. If David came in, would he be seeing the financial statements before or after those adjustments? A. After").

1001. These falsified tax returns and other documents were necessary in order to obtain approval for loans with Libertas and Flushing Bank. Manzueta Dep. 27:22-28:7; Patrovic Dep. 23:17-23 ("Q. [...] So does the entity in which you are considering financing have to have a certain level of profitability in order for the financing to proceed? A. It's pretty nuanced. It's on a deal-by-deal basis"); 20:3-14 ("It's revenue-based Financing. [...] We are underwriting based on the business's sales. We're generally looking at minimum, the last three months of -- of their sales. And we are funding essentially based on what we assume will be their future sales based on [...] how we underwrote that"); Deo II Dep. 67:24-68:10 ("Q. [...] So you're trying to obtain a loan for Northshore based upon these financial records, correct? A. Yes. Q. That's the purpose of giving this to Flushing, to say you should lend Northshore money and I'm giving you information about financials to enable you, to assist you to consider whether we're a good credit risk or not, correct? A. Yes"); 160:2-7 (Deo did not have an operating agreement for Northshore prior to that time); 164:21-165:12; Jones Dep. 278:16-279:5 ("[...] Q. The banks and other institutions that issue credit, rely on these documents to determine whether a person is worthy of receiving credit, right? A. On certain documents, yes").

1002. Deo's stated purpose for the Libertas loan was to obtain working capital. Deo II Dep. 133:5-7.

1003. Flushing Bank was aware that the dealerships Deo operated were not profitable. Buccino Dep. 287:2-7 ("there is a subsequent email about an hour and a half later from Mr. Puccio stating that Sunrise does not qualify because they need to see -- the bank needs to see two years of

consecutive profitability on the tax return. Do you see that? A. Yes"); 109:22-110:14 ("Q. Now Mr. Puccio writes later on that same day, he says 'Due to the 2019 and 2020 loss for 189 Sunrise, that entity will not qualify.' Do you know what he's referring to? A. Specifically, no. Q. He says, 'We will need to see two years consecutive profitability on the tax return.' And would it be fair to say that the taxers would need to show some sort of profit in order to qualify for the loan? A. That seems fair, yes. [...]").

1004. Jones was willing to aid Deo in his fraud. Jones Dep. 299:14-18 ("Q. If Mr. Deo asked you to help and produce a financial statement that shows a profit, what would you do or say? A. If there was a legitimate way to do it, then I would look to do it").

1005. By virtue of Flushing Bank's extensive financing process, and Deo's obtaining of a loan, the Plaintiff dealerships were lead to believe that the dealerships were doing better financially than they actually were. Buccino Dep. 38:20-23 ("Q. Do you know if there is any investigation to verify the financial reporting that's provided by a customer? A. I know we do investigations"); 40:16-22 ("We have a credit center within the business banking department that does review fabrications of applicants" with "probably 20 to 30" employees); 58:13-16 ("The business banking department would review the totality of the application and all of its investigations in determining whether or not it would move forward"); 192:12-15 ("Q. I understand that your position is then Flushing Bank acted appropriately based on the information available to it, correct? A. Yes").

1006. By virtue of Libertas' extensive financing process, and Deo's obtaining of a loan, the Plaintiff dealerships were lead to believe that the dealerships were doing better financially than they actually were. D'Aprile Dep. 24:3-7 ("I'm an underwriter. I [...] analyze company's fundamentals and make a decision on what the company could afford in a transaction of lending");

27:11-14 ("Q. [...] Mr. Manzueta, the supervisor, who worked with you on that transaction? Yes. He was"); 33:25-34:10 ("[...] we analyze all the bank statements, all the financials, all proof of ownerships, everything that is provided to us to make a decision on the dollar amount, the terms, and -- and then we send out the approval to the ISO and then the ISO speaks to the client to see if that will -- if he takes the terms and conditions); 35:4-9 ("Q. So as part of your job in processing these requests, do you have to go through that checklist and make sure that all of the items on the checklist are satisfied? A. Always"); 35:17-20 ("we ask for paperwork, and if the paperwork comes and it clears and everything checks out, that's how you check it off"); 38:13-14 ("we can fund based on our guidelines"); 42:4-5 ("I review everything that is presented to me"); 47:5-24; 50:23-51:4 ("Q. And would it be your responsibility to then look at the tax return provided and the tax return that was filed and compare and make sure that they match? A. Yes"); 52:17-22 ("Q. And would you always be looking for the P&L and balance sheet [...] of the year prior to the application as well as the year of the application to date? A. We try. Yes"); 53:25-54:12 ("when you get the financial information, what is it that you are looking for in those financials? A. How healthy the company is. Q. And can you explain to me what you mean by "how healthy the company is"? A. If they're losing money or making money or breaking even. Q. And how would you go about making that determination? A. By looking at the numbers, at the financials"); 55:23-25 ("how long have you been working in the finance-related business? A. Since November of 2014"); 56:8-9 ("We look at everything as a whole"); 57:15-20 ("If Libertas became aware in that the financial information provided was not accurate, would Libertas proceed with the funding of that transaction? A. No"); 57:24-58:8; 60:12-20 ("Q. You said 12 months of bank statements? What is it you are looking for in those bank statements? A. Mostly, it's cash flow, how cash is being used, how much funds they have in their account in the beginning of the month, throughout the month,

at the end of the month, if they have other financing in there"); 62:13-19 ("Would you then determine when refinancing a two-way car dealership what their gross profit was? A. Yes. By looking at their dealership financial statements at that period of time"); 69:19-25 ("Q. Does it conduct a credit search, a credit search for the guarantor? A. Yes. Q. Is there a minimum credit score that Libertas looks at with regard to a guarantor? A. Yes"); 72:24-73:8 ("I review tax returns to make sure that the client is an owner of the entity and I review the tax returns to make sure that the numbers are profitable and I review the tax returns to make sure that the numbers that we have that were provided match the numbers with the Tax Guards we get in real-time IRS tax data. I am not a CPA"); 73:19-74:2 ("Q. [...] does Libertas ensure that when it sees a K-1 on a partnership tax return proving that it's the owner that they also ensure that the owner who claims to be the owner filed his personal tax return showing ownership of that entity? A. Yes"); 89:11-90:4 ("Q. Once you completed your funding and the contract is signed, do you have any further involvement in the transaction? A. Yes. We conduct an interview with the client"); 94:9-22 (Libertas reviewed records, including tax returns and financial records, for both Northshore and Sunrise); 108:19-109:11 ("Under the Libertas guidelines, we were able to justify that the company would be able to handle those payment, those weekly payments. [...] Q. So you're saying here that as financial analyst, you reviewed all the financial records of both of these dealerships and you determined that [...] over the course of a year, these dealerships could satisfy all of their regular monthly financial obligations and still have enough free cash flow to pay almost a million dollars back in the course of one year to Libertas? Is that your testimony? A. Yes"); 139:3-5 ("Q. And part of the review would be to see the cash flows, monies coming in and monies going out; correct? A. Yes"); 139:6-16; 142:9-12 ("you felt satisfied at the end of the interview with the responses of Mr. Deo? A. We felt satisfied. Yes"); 143:5-11 ("in looking at the profitability, you would want to ensure that the

monies that are coming in to the dealership are from revenue, not from some other source; correct? A. Correct"); 145:9-12 ("[...] We have people that review it"); 168:19-23 ("Is it your understanding that in fact you did have all of the other financial statements that you required? A. If I remember correctly, yes"); 169:7-11 ("Q. So in reviewing this document, what specifically on the document would you be paying attention to? A. Everything is being paid attention to"); 186:23-187:2 ("[...] Just to make sure that you have all your ducks in a row"); 188:22-25 ("you would look at the deposits for the different banks to determine how much income was coming in? A. Correct"); 199:25-200:3 ("Q. [...] you would've reviewed the entire tax return? A. We would've. Yes"); 203:23-204:5 ("Q. And is your practice to check and verify any of the information that's contained on this tax return? A. Yes. Q. And did you in fact check and verify the information on the tax return? A. I must have"); 221:4-7 ("Does Libertas do anything other than provide financing to corporations? A. No"); 221:15-222:10 (certain transactions triggered the use of Tax Guard); 225:5-9; 225:20-226:5; 226:25-227:4 ("would you have obtained all documentation for at least some of those three years? A. Yes"); 227:16-17; 231:21-232:4; 232:12-16 ("You have no current memory of having seen Tax Guard be incorrect on determining ownership of a corporation; do you? A. No"); 234:17-235:5; 237:21-238:19; Manzueta Dep. 37:6-23; 39:17-40:19; 41:4-25; 42:2-8 ("[...] we have metrics and guidelines with regards to what the [re]payment would be. [...]"); 43:18-44:7; 44:22-45:6; 48:23-49:6 ("When we reviewed it, [...] we do look for any anomalies. We look for, you know, transfers. We look for anything [...] that seems out of place when it comes to the actual accounts. On this one in particular, if memory serves me correctly, there was nothing that was really out of place"); 58:4-7 ("Because of the – the wages and income transcripts, it confirmed the fact that he owned 99 percent of the business."); 58:11-22 ("[...] what Tax Guard does, is pull tax returns in addition to wage and income on the personal tax returns. It would be able to provide that

information. When we had the Tax Guards, it provided the wage and income transcripts, which confirmed 99 percent, which was what was showing on the tax returns on the K-1 statement"); 77:13-20 ("You're concerned about the financial viability, future financial viability of this entity; correct? A. That's correct. Q. All right. Because without it, Libertas is not getting paid; correct? A. Yeah. That's also correct"); 93:3-12 ("give or take, we see about 2,000. Our approval rate is about 25 percent. Our funded ratio is somewhere in the ballpark of about 5 to 10 percent. So if you're doing the ratios, you know, 2100 over 12 months, I mean, you're looking at, you know, 24,000 files. You do about 5 percent of that. That's how much we fund, how many clients we fund on an annual basis"); 101:14-16 ("The tax returns from Tax Guard did confirm the 99-percent ownership"); 110:5-13 ("did you confirm that both entities were owned by the principal applying for the funding? A. Through Tax Guard. That's correct. Through the income transcript indicated that it was on 99 percent. Q. You also pulled a credit report for Mr. Deo; correct? A. That's correct"); Patrovic Dep. 12:20-13:4 ("Q. [...] So what is your relationship to Libertas? A. I handle all of our post-funding operations. So I oversee our general servicing and our collections teams and processes. Q. And how long have you been in that position? A. Nine years"); 13:13-16 ("since November of 2022 you've been performing pretty much the same function for Libertas? A. Yes"); 14:20-25 ("Q. Do you know when Libertas began operating? A. September, 2016. Q. And do you recall when you started working there? A. December, 2016"); 16:7-25.

1007. Moreover, Plaintiffs justifiably relied on the expertise of members of Deo's Enterprise. Jones Dep. 143:12-16 ("Q. Has your firm ever provided or prepared profit and loss statements for clients in connection with obtaining financing? A. Yes"); 152:3-12 ("What is an independent accounts compilation report? A. That's just a summary of the assets and liabilities of a company or a person based on their information they give us. Q. Is this something that you

prepared for other clients throughout the years? A. Yes").

1008. Deo's fraudulent conduct caused Plaintiffs damage. Aaronson Dep. 199:12-23 ("[...] all he did [...] was commit fraud").

1009. Aaronson appropriately removed the $735,000.00 wrongfully obtained by Deo from Libertas because he was a signer on the bank account and was a member of Northshore. Chabrier Dep. 134:11-135:5 ("Q. Josh had authority to take that money out of the account, did he not? A. Yes. Q. Do you know why he put it into another account? A. Because I believe Anthony owed him money. Cars weren't paid off and he took his money. [...] Anthony owed him money for payoffs and stuff like that. Q. Are you saying Josh took the 735,000 because Anthony Deo owed Josh money? A. He owed for payoffs and stuff").

1010. Deo was funded with a $500,000.00 loan to Northshore. Chabrier Dep. 147:3-5 ("Anthony took a loan out in Northshore's name, which is mine, and got authorization"); Deo II Dep. 210:24-211:12 ("Q. Now, you also previously testified that you sought to open accounts for Northshore and 189 Sunrise at Flushing Bank; is that correct? A. Yes. Q. Did you also seek to take out a loan for either entity at Flushing Bank? A. Yes. Q. Which one? A. Northshore. Q. Did you ultimately receive that loan? A. Yes"); Buccino Dep. 287:8-10 ("Q. Based on this email, is it fair to say that only North Shore's application went through? A. That's what it would seem like, yes"); 54:22-24 ("Q. In connection with the approval of the loan, do you know if that loan was funded? A. I'm fairly certain it was, yes"); Buccino Dep. 54:18-21 ("Do you know how much he was approved for? A. I believe it was $500,000, but I may be mistaken"); 54:22-24 ("Q. In connection with the approval of the loan, do you know if that loan was funded? A. I'm fairly certain it was, yes"); 124:13-24 ("this letter was provided to … Puccio in connection with the financing sought by … Deo for Northshore …, correct, as far as you know? A. Yes. Q. And as a result of this letter

and … the other affidavit it was the decision of Flushing … to proceed with the financing despite the … lawsuit? A. As a result of this letter the other letter and the totality of the application, yes").

1011. Flushing Bank's approval process did not rely on Puccio, whose work necessarily had to be reviewed by another employee at the bank. Buccino Dep. 51:18-21 ("the approval process, though, would not be in the hands of Mr. Puccio as a business banker, correct? A. No").

1012. Flushing Bank remains inconclusive regarding whether the transactions at issue in Superb's account were authorized. Buccino Dep. 233:22-234:13 ("Q. How come to this date that Flushing Bank has not made a determination as to whether the transactions at issue in the Superb account were authorized or not? A. We're going to let the court do that. Q. Does Flushing Bank have a position on the subject? A. No"); 236:18-237:13 ("Q. And did you later determine that they were unauthorized? A. We have not made any such determinations. Q. Are you aware of any rules or law that requires a bank to make a determination as to whether a transaction is authorized upon a complaint that it was not? A. No. Q. Based on your review of the Uniform Commercial Code, is Flushing Bank under any obligation to make this kind of determination based on a customer complaint? [...] A. We have no claims about specific transactions. Q. When Mr. Urrutia contacted Flushing Bank in August of 2023, did that not constitute a claim that the transactions were not authorized? A. Arguably").

1013. One of the documents Flushing Bank seeks from the corporate entity is the operating agreement or the shareholders agreement. Buccino Dep. 225:21-25; 228:22-229:3 (though this policy is suspiciously lacking; "Q. [...] why does Flushing Bank need an operating agreement for an LLC, but does not need a shareholders agreement for a corporation? A. That's our policy, it's been vetted and approved by regulators").

1014. According to the shareholders' agreement that Deo signed for Superb, Deo did not have authority to sign checks on behalf of Superb. Thomasson Dep. 214:20-23.

1015. Flushing Bank failed to see a red flag in noting to Deo that the operating agreement for Northshore showed 99% ownership, which did not match his credit application showing 100% ownership; Flushing Bank thus failed to concerns regarding Deo's representations concerning his alleged ownership of Northshore. Buccino Dep. 324:23-325:11; Buccino Dep. 99:11-16.

1016. Moreover, Deo's account was formed based on fraudulent documentation. Buccino Dep. 275:18-22 ("He presented the normal account ownership documentation and account opening documentation that we required that showed us he had authority. Q. You've reviewed those documents, correct? A. The bank reviewed the documents, yes"); 276:22-277:3 ("it's our practice to collect documentation that would outline usually who had authority over which corporate entity. Generally speaking, it's our procedure to request documentation that would outline who has authority to act on behalf of a business"); 277:10-12 ("we require business documentation in addition to the certificate of beneficial ownership"); 277:25-278:23.

1017. Flushing Bank failed to detect that Superb was already in the process of opening a bank account for itself by its real owner, Urrutia. Buccino Dep. 214:14-22 ("If you tried to open an account for an entity that already has an account, you would be prompted and know that there is already accounts for that entity. And you'll have to work within that information. I don't know if I would describe it as quote/unquote 'a red flag.' But you wouldn't be able to open the second account without knowledge that the first account exists"); Buccino Dep. 214:24-215:17 ("would someone at Flushing Bank opening the account for an entity that already has an account be alerted to the fact that an earlier account was opened? A. So assuming you were using the same tax ID number you would be alerted to the existing account, yes. Q. And how would that occur? A. When

you went to enter the new entity within our database within our core system, when you put in that tax ID number for the existing account, the existing profile for that entity would come up. Q. Wore that occurrence in and of itself result in any investigation being performed? A. No, because we have plenty of businesses that have multiple accounts, so it happens all the time").

1018. Flushing Bank failed to act in a commercially reasonable manner by failing to investigate Urrutia's complaint of an unauthorized bank account being opened and the resultant unauthorized transfers. Buccino Dep. 52:5-15 ("Q. So did you communicate with whomever it would be that would ultimately approve, whether it was a person or committee that ultimately approved the loan, whether they were aware of this ownership dispute at the time that they approved the loan and funded it? A. No. Q. Was it a concern of yours that there may have been a dispute at the time that the bank was aware of when the loan was approved? A. No").

1019. Flushing Bank's document gathering process failed to detect and prevent Deo's fraud. Buccino Dep. 58:13-16 ("The business banking department would review the totality of the application and all of its investigations in determining whether or not it would move forward"); 143:17-18 ("Mr. Puccio gathered documentation in relation to the application"); 144:4-14 (Puccio otherwise served as an advocate in application approval); Deo II Dep. 211:13-18 ("Q. Now, in this email there's a number of attachments. Why were you forwarding all of these attachments to Robert Puccio? A. It was the process of opening the accounts and the application for the line of credit").

1020. Flushing Bank improperly relied upon the fraudulent operating agreement provided by Deo. Buccino Dep. 97:7-98:16 (senior loan closer Rosemary Miller requested an updated operating agreement); 98:25-99:10.

1021. Flushing Bank improperly relied upon the fraudulent letter provided by Thomasson, and it was not commercially reasonable for them to do so. Buccino Dep. 123:15-124:24; 126:2-6.

1022. Flushing Bank issued the loan without having both sets of tax returns. Buccino Dep. 288:9-12 ("was it commercially reasonable for the bank to issue a loan without having both sets of tax returns. A. Yes"); 288:24-289:8 ("[...] If the bank required something and then waived that requirement, it was because they were satisfied with other documentation that was presented"); 289:22-290:7 ("[...] Q. These facts that were brought up by Steven are circumstances in which Flushing Bank would normally decline to issue a loan, correct? A. Possibly").

1023. Flushing Bank did not adequately assess whether documents provided were accurate. Buccino Dep. 294:8-12 ("Q. Do you know whether personal financial statements are reviewed for accuracy and to confirm that they are true and accurate? A. To the extent they could be reviewed, but I don't know"); 192:8-15 ("[...] Whether or not Mr. Deo was truthful was not for me to determine"); 205:5-9 ("Q. It's fair to say that when you looked at the information produced by Mr. Weinstein, you understood that there was an issue with the documents produced by Mr. Deo, correct? A. Yes"); 108:6-14 ("Q. Do you know if anybody at Flushing Bank followed up to confirm the accuracy of any of the numbers in this profit and loss statement? A. I don't know. Q. Do you know if it's a process and procedure for Flushing Bank to require some sort of support for a profit and loss statement such as this? A. I don't know").

1024. Flushing Bank issued the loan without knowledge as to the Libertas financing and default. Buccino Dep. 122:8-16 ("Q. Do you know whether or not Anthony Deo ever disclosed to Flushing Bank about the Libertas Funding and/or the fact that it was in default? A. I don't know. Q. Do you know whether Flushing Bank would have financed the transaction at issue if it knew

about the Libertas financing and default? A. I don't know").

1025. Flushing Bank issued the loan to Deo despite the existence of a TRO preventing same, and despite policy preventing same. Sara Dep. 244:16-245:10 ("Q. [...] was it your understanding that the TRO prevented either you or Mr. Deo from obtaining any loans or pledging any property of Northshore and/or Sunrise? A. More or less. [...] Q. Despite that restraint, did you and/or your husband obtain a loan from Flushing Bank in February or March of 2023 or perhaps April of 2023 on behalf of Northshore or Sunrise? [...] THE WITNESS: Exactly"); Buccino Dep. 188:24-190:4 ("[...] if there's an order a valid court order that says no bank or no institution should open an account for this person or this entity then we would do that. Q. Even if the account was already opened, correct? A. Well, if the account had already been opened and it shouldn't have been, then we would at the very least put a hold on the account. Q. That's standard Flushing Bank policy, correct? A. Yes").

1026. Flushing Bank issued the loan despite awareness and being in possession of documents demonstrating that Deo had no ownership interest in Superb. Buccino Dep. 304:4-20; 304:21-25 ("Q. [...] is it fair to say that Flushing Bank had in its possession documents indicating that Mr. Deo did not have any ownership interest in Superb at least for 2021? A. Yes").

1027. Flushing Bank "didn't do their due diligence in order to give a loan." Aaronson Dep. 162:24-163:4.

1028. For example, they seemingly did not follow their own security procedure surrounding monitoring bank accounts for suspicious activity. Buccino Dep. 268:22-269:8 ([...] "accounts overall are risk rated based on who the customer is, what kind of transactions they are doing, and then we have certain applications and systems in place that will notice a repetition of funds moving out, amounts of funds moving out, location of funds moving out, things of that

nature that will raise flags for deeper review"); 269:22-270:3 ("Q. Has any activity on any of the accounts maintained by Mr. Deo on behalf of various corporate entities ever been triggered by the search for suspicious or unusual account activity by the systems in place to find it? A. I don't believe so, no"); 302:16-303:5 (transfer of $50,000 to Car Buyers, Inc. Was not flagged as suspicious activity); 68:10-15 ("Q. [...] does the bank have some process in place to review or to oversee transactions in and out of an account to see whether or not there may be some illegal activity going on? A. Okay, yes"); 68:21-70:14 (the Bank Security Act team would know more about this; "they have protocols and procedures in place. And there were certain limits and certain kinds of transactions that would get raised, [...]"); 72:18-25 ("they have protocols and procedures in place to flag certain transactions based on amounts or a destination. So that would cause a review. But just the simple fact that we gave the customer a loan, and then all of the funds shortly thereafter went out, wouldn't necessarily require a BSA or a regulatory review"); 194:13-22 ("I'm fairly certain that there would have been SARS filed probably on this matter. If not before then definitely after the lawsuit was filed and the fraud was claimed. [...] suspicious activity report that our BSA team would file for suspicious activity"); 195:5-8 ("Q. Are you aware of any SARS report filed in relation to this case prior to August of 2023? A. No"); 238:19-22 ("I know there was no complaint or inquiry with regards to the transactions because that wasn't our bank response to this entire process").

1029. Flushing Bank failed to utilize security features. Buccino Dep. 272:13-273:5 ("Q. To your knowledge, were there any security features on the accounts opened by Mr. Deo for Superb? A. Nothing beyond normal account security interest. Q. What are the normal account security interests? A. Well, the same systems that we use for suspicious activity reporting could also detect fraud and track, you know, elicit funds being moved back and forth, things of that

nature. Q. And those security features are the same across the board for any bank account, correct? A. Yes. Q. To your knowledge, there were no added security features for the Flushing Bank account for Superb, correct? A. I don't recall there being any"); 57:20-58:6 ("Q. So there would be a procedure within the business banking department to just determine whether the litigation that involves an applicant does or does not affect the business loan application? [...] A. Maybe there is a procedure and policy for that. Q. But there's no attorney in the business banking department, correct? A. Correct"); 186:4-13 ("I think in most cases there is an automation for a first level review and then both in Oasis and in the ACH there is then a second level manual review after it's been flagged. Q. If the automated system does not detect anything, it never gets to the second level of review where an individual looks at it, correct? A. That's more likely than not true, yes"); 201:21-202:3 ("Presumably when the lawsuit was filed and the matter was discussed internally a search was done to see if there had been transactions that should have gotten flagged and reviewed, but to my knowledge there's nothing that came up from any of those searches that we found to be concerned"); 241:2-5 ("Q. [...] no such security features were added to the account Flushing had opened for Superb, correct? A. I don't believe so, no").

1030. Buccino essentially admitted that the security procedure was subpar. Buccino Dep. 213:23-214:7 ("there's a procedure and a policy as to what is required to open the account, but there isn't a system in place to guarantee that all those documents or whatever they are are actually taken in. There's a review after that that has to happen, but there's not like a stop per se that prevents you from opening the account without something. Or at least there wasn't, we're working on fixing that").

1031. Flushing Bank did not conduct proper investigations, which were warranted. Buccino Dep. 261:10-11 ("If there are specific requirements with funds usage, then we might investigate"); Buccino Dep. 163:5-13 (decided not to investigate whether any employee of Flushing Bank was accepting bribes); 164:17-20 ("Q. Are you aware as to any requirement that Flushing Bank thoroughly investigate any allegations of accepting bribes by its employees? A. I'm not"); 238:25-239:11 ("When the accounts were held, we did a review to determine if the hold should last or if it should come back off and let Mr. Deo transact. We determined not to in an abundance of caution, but we didn't do any investigation into individual transactions. Mr. Urrutia did not submit any kind of formal complaint with regards to specific transactions. And from Mr. Deo's standpoint, I'm not sure if he was in a position to do so because he wasn't the customer on the account").

1032. Flushing Bank did not comply with its Know Your Customer policy to detect and prevent fraud. Buccino Dep. 171:4-12; 172:15-176:18.

1033. Flushing Bank did not utilize its Oasis tool to detect and prevent Deo's fraud. Buccino Dep. 183:23-184:20 ("[Oasis] reviews checks of a certain limit. I believe it changes periodically depending on our four teams internal determinations. But any check over a certain amount would be reviewed against the account history of that check to make sure that the signature lines up, that the check number lines up with all the recent checks, that there's no repeat of the same check number. It will also have a cursory review of the check amount and the payee name to make sure that it doesn't appear to have been doctored in any way, shape or form. [...] Q. And while Oasis is typically used to determine whether there are any fraud in relation to checks issued, does Oasis also get used for wire transfers or ACHs? A. No").

1034. Flushing Bank's fraud department was not properly utilized to prevent and detect Deo's fraud. Buccino Dep. 199:11-200:3 ("Q. You referred to a fraud protection, is that a specific department that Flushing Bank has? A. We have a fraud department, yes. Q. Does the fraud department utilize any sort of ticketing system in terms of various fraud events that may occur? A. They work kind of hand in hand with the BSA team to review suspicious activity and fraudulent activity and they use some of the same things. Q. Is there any sort of repository for potentially detecting fraud that gets flagged when reviewed? A. The fraud, both the fraud and BSA teams have repositories for their investigations, so that's probably what you're talking about"); 201:11-13 ("The fraud team has some semblance of tracking to determine cases that come up and how they're handled and what their final review is").

1035. Flushing acknowledges that Deo's representations to it are questionable. Buccino Dep. 257:15 ("We know his representations are in question").

1036. In spite of the litigation against Deo – which should have called his authorization into question – Flushing Bank has maintained that "we are going to let the Court determine that." Buccino Dep. 257:16-19; 274:10-14 ("Q. Has Flushing Bank, as of this date, made any determination as to whether Mr. Urrutia has authority over Superb? A. No. Again, we are going to let the Court do that"); 305:10-15 ("Q. It's fair to say that as of March 31, 2023, Flushing Bank was at least aware of the complaint allegations listed in this complaint that we're looking at, correct? [...] A. Yes"); 56:14-57:9 ("[...] is it your understanding that Flushing Bank became aware of that lawsuit prior to its funding or approval of funding of the loan? A. Yes"); 237:17-238:6 ("The account was put on hold as discussed. And the lawsuit here was filed, and at that point it became a determination for the court to make. Q. There was approximately a two-week stretch in time between the date the lawsuit was filed and the date Mr. Urrutia contacted Flushing Bank. In

that short time frame was any complaint, inquiry or investigation opened as to whether the transactions were authorized? A. No. Q. How do you know that? A. Because it wasn't part of our response to the initial reference by Mr. Urrutia"); 186:22-187:3 ("is Flushing Bank required to search for publicly-available information concerning lawsuits about the customer that is seeking to open an account? A. To my knowledge that is not a requirement, no"); 194:6-9 ("Q. Did Flushing Bank make any determination as to whether Mr. Deo engaged in fraud? A. No").

1037. Flushing Bank improperly relied upon a letter by Thomasson stating that he expected the decision on his motion to dismiss in sixty days. Buccino Dep. 306:9-307:7 ("[...] [This letter] gave us confidence in the representations from Mr. Deo regarding his ownership of the businesses"); 65:15-22 ("I did see a letter from Mr. Thomasson at the time, yes. [...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate").

1038. Moreover, Flushing Bank relied upon words by Jones which gave it comfort ("… it was something along the lines of them having filed tax documentation on behalf of … Deo or the business reflecting the ownership interest as presented to us, because they have assurances or because a sale had gone through that made that the new ownership"). Buccino Dep. 66:17-25.

1039. Flushing Bank maintains that Deo merely had apparent authority to act on behalf of Northshore, but notes that this was due to documentation and representations; which, as we have established, were fraudulent. Buccino Dep. 258:11-19; 260:16-20 ("Q. Do you know whether Flushing Bank has made any determination as to whether the financial records provided by Mr. Deo about North Shore were true and accurate? A. No, we have not"); 266:17-20 ("I recall a conversation about documents that were given to David Weinstein by Tony Urrutia that the documents were inconsistent. I don't recall specifically what those documents were"); 318:14-23

("Q. You stated that the documentation on file for the LLC was also complete and satisfactory to give the authority to the accounts, correct? A. Yes. Q. And that is referring to North Shore based on the fact that Mr. Deo provided an operating agreement listing himself originally initially as 99-percent owner and then amended it to list himself as 100-percent owner, correct? A. Based on the entire documentation, yes"); 324:23-325:3 ("Q. So do you recall the incident in which Flushing Bank told Mr. Deo that the operating agreement showing 99-percent ownership does not match his credit application showing that he's 100-percent owner? A. Yes"); 325:4-11 ("Does the fact that there was a discrepancy between the percentage of ownership there alone, does that fact give rise to any concern by Flushing Bank that Mr. Deo was not being truthful on his application? A. No. Q. Why is that? A. Further dialogue satisfied this situation").

1040. Moreover, Flushing Bank was aware that Urrutia objected to Deo's authority. Buccino Dep. 271:2-9; 271:18-22 ("Since he complained about the account opening being unauthorized, do you understand his complaint to also mean that any resultive activity in that account was also unauthorized? A. Yes"); 272:9-12; 232:18-233:4 ("Q. Is it fair to say that when Mr. Urrutia contacted Flushing Bank and complained about the unauthorized transactions on the account, he was calling as an agent of Superb? [...] A. He was claiming to be an agent of Superb, yes. Q. … he did provide evidence of his ownership in Superb, correct? A. Yes").

1041. In fact, in response to the complaint as a security measure, Flushing Bank put a hold on that account to prevent any further activity. Buccino Dep. 271:23-272:2; 273:23-274:9.

1042. Puccio of Flushing Bank was aware that there were two signers on the account. Buccino Dep. 309:22-310:12 ("Q. And in this list of documents he asks for signer one and the signer two information, correct? A. Yes. Q. And that's because Mr. Puccio knew that there were two signers on this account, right? [...] A. I don't know what Mr. Puccio knew. Q. Generally

speaking, Flushing Bank would not ask for the identity of two signers if it had no basis to believe that there were two signers, correct? A. It might have been conditional if there were two signers to provide information for both. I don't know").

1043. Deo committed fraud by representing he was the 100% owner of Superb to open a bank account for it. Urrutia Dep. 257:18-258:15 ("opening up a commercial bank account is not an easy thing. And as a matter of fact, it surprised me a lot to see how quickly and easily he was able to open it by just sending a quick text to Rob Puccio and saying, "Hey, I need to open a bank account for Superb Motors," showing himself as a 100 percent CEO when he just provided you with a personal financial statement mentioning no ownership, nothing about Superb, all these other assets that don't exist, the $10 million in homes or 3 million in mortgages, and in no mention in that BFS of any – any ownership for Superb. But he sent one email to Rob Puccio to if he could open the account, and within a couple of days he had an account opened. I had been working on it for over a week").

1044. By the end, there was only $2,000.00 left in the Flushing Bank account. Buccino Dep. 211:12-22.

1045. Flushing Bank was damaged by Deo's inability or refusal to pay back the loan. Buccino Dep. 193:12-19.

1046. Deo admits to encumbering Northshore's assets and committing to use the funds financed for the benefit of Northshore. Deo Dep. 140:17-22 ("Q. Were you aware that there was a requirement by Libertas in your application and their approval that the funds that they were going to be providing could only be used for the business of Northshore and Sunrise? A. I mean, that was my intention").

1047. The Deo Defendants took dealership vehicles for personal use. Merckling Dep. 284:18-21 ("Q. Okay. And were you asked to provide any compensation to the dealership for the use of that vehicle? A. No"); 283:20-25 ("Q. So did Mr. Deo tell you that one of the benefits of working for him was that he could allow you to use one of the cars owned by the dealership and you could use it for your purposes? A. Yes").

1048. Deo caused the dealerships he operated to suffer losses such that they were unable to pay their debts. O'Sullivan Dep. 186:18-21 ("I might have a $100,000 in the bank account, the payoffs might be $200,000, I couldn't payoff the trades").

1049. Deo misappropriated dealer plates. Aaronson Dep. 123:18-124:4 ("Q. Did you ever see him yourself take plates? A. Yes, we were aware that he had the plates on the car, yes. [...] I saw that Anthony was driving around with our dealer plates, and Anthony told me that he had our plates").

1050. The IAG Plaintiffs understood that Deo caused a lot of liabilities for them and had no intention of paying it. Aaronson Dep. 258:23-25 ("We knew we owed our bank a lot of money and Anthony wasn't going to be the one paying it"); 194:25-195:13 ("Q. You believe that … Deo took millions of dollars somehow out of Northshore … that he was not entitled to, right? A. Yes, he -- whether he took it or not, he lost it, and he, you know, did things that would be unethical, fraudulent, millions of dollars, yes, and not paid off customers' cars, et cetera, et cetera, yes. Q. But all those cars are, in fact, today paid off; is that right? A. By [IAG], yes").

1051. Deo committed Northshore to repaying $900,000.00 in future receivables for the $735,000.00 loan, thereby encumbering Northshore. Deo II Dep. 187:3-7 ("Q. Now, when you took out the Libertas funds, do you know how much money had to be repaid? A. Somewhere in the whereabouts of $900,000").

1052. Libertas gave a loan to Deo on behalf of Northshore, without Chabrier's (or any other member's) authorization. Chabrier Dep. 145:2-11.

1053. Thomasson did not review the Libertas Agreement. Thomasson Dep. 122:9-16.

1054. Thomasson purports to have advised Deo about the contours of a preliminary injunction issued by Justice Gianelli, but cannot recall specific details. Thomasson Dep. 136:5-13 ("[...] I'm sure we discussed [the conduct Deo was prohibited from doing under the temporary restraining order] at some point in time, but I don't remember what the exact conversation was"); 137:14-22 ("[...] As a matter of practice I would have discussed it with him, [...]").

1055. Thomasson had knowledge that Deo was going to – but did not yet – purchase the other half of Superb. Thomasson Dep. 178:9-21.

1056. Thomasson played an instrumental role in wire fraud between Aaronson and Deo. Thomasson Dep. 113:10-114:15 (Aaronson returned funds to Thomasson's IOLA account, which were to go back to Deo); 115:2-15 (Thomasson wired these funds to Deo); 274:8-19 (Thomasson e-mailed Shanks on November 18, 2022 "I will forward you my wiring instructions [...]"); 280:10-281:9 ("[...] I told him at my convenience that it was going back to my client. And if that happened to [*sic*] after it was initiated and before the wire hit, then he should have stopped the wire. If he had a problem with that. [...]"); 282:12-17 ("Josh Aaronson absolutely is at fault for steeling [*sic*] $735,000. He knew damn well wasn't his. He knew damn well that Deo had taken that money. He is a thief. That is what he is. I gave the money back to the man who borrowed it").

1057. Thomasson admits aiding Deo in his fraud. Thomasson Dep. 144:25-145:4 (letter "looks like something [Thomasson] would have given to Mr. Deo"); FLUSHING3835.

1058. Thomasson knowingly aided Deo in his fraud. Thomasson Dep. 270:7-10 ("[...] I was asked to have the funds pass through me and I said, sure"); FLUSHING3835.

1059. A letter from Thomasson dated March 31, 2023 falsely "gave [Flushing Bank] confidence in the representations from Mr. Deo regarding his ownership of the businesses." Buccino Dep. 306:9-307:7; 309:4-8 ("Q. This was enough for you to -- for Flushing Bank to accept this representation and no longer have any concerns? A. I believe we also received something from the accountant, generally speaking, yes"); 65:15-22 ("[...] It generally said that the dispute was a normal business dispute, but they expected a resolution shortly and that Mr. Deo's ownership presentation was still valid and legitimate"); FLUSHING3835.

1060. As a result of this letter, an attached affidavit from Jones, and the totality of the application, Flushing Bank decided to proceed with financing despite the fact that there was a lawsuit. Buccino Dep. 124:13-24; FLUSHING6517; FLUSHING6520.

1061. The application for a loan at Flushing Bank requires the borrower to inform the bank what it intends to do with the funds. Buccino Dep. 67:6-9.

1062. Thomasson damaged the Plaintiffs by "[h]elping facilitate some of the fraudulent activities that Deo performed at that location in regards to his $735,000 loan, the inability to repay customers' -- pay customers' warranties, things like that." J. Baron Dep. 20:19-21:7; 23:6-9; Aaronson Dep. 150:21-151:2 ("I wanted the money that was taken, the $735,000 that was then given back to you to be held in escrow, and you chose to give it back to Deo, which caused me a lot of harm"); Chabrier Dep. 47:3-11 (Thomasson damaged Northshore by taking the $730,000 [*sic*] "[o]btained by Northshore, which [Chabrier] own[s]").

1063. The IAG Plaintiffs were harmed by Thomasson's conduct. Aaronson Dep. 167:23-168:5 ("I can't see how anyone can represent someone who has caused this much damage to somebody. So in my eyes, that you have caused a lot of unnecessary damage for a very, you know, to a lot of people for someone who is a very bad person").

1064. Thomasson knowingly facilitated the Deo Defendants' fraud. Aaronson Dep. 21:8-12 ("[...] You helped facilitate and you were aware of what was going on and helped facilitate that with Anthony"); Urrutia Dep. 221:5-10 ("you helped the group do everything that was done to me. You have a specific role and a job, and you've done it, and everybody else has done their job in their role to get us where we are today. And you have done it not just to me, you've done it to Josh, you've done it to another dealership, and now you have another open dealership, I'm sure in a few months that will be the case, and if not, I know what you put that poor guy, the landlord, through. You have another case with him accusing him of stuff. I know that the house that you supposedly owned, you did something to that poor lady for a half a million dollars' worth of rent. Not you, that one not you specifically, but just I know there is a lot of stuff that seems to be -- be what's done"); Urrutia Dep. 222:2-16 ("Q. What I am trying to figure out here is are there any specifics that you know that I did outside of these legal cases to harm you? That's all I'm asking. A. You facilitated knowingly what -- what has been going on. Q. And you have firsthand knowledge that I knew what Deo was doing at Superb; is that your position? A. You were -- you were in the dealership, you had an office in my dealership that I didn't know anything about, right?").

1065. On November 14, 2023, Urrutia sued Deo in the Supreme Court of the State of New York for Deo's breaches of representations and warranties in the Cross-Purchase Agreement, seeking a declaratory judgment, rescission based on fraudulent inducement, breach of contract, rescission based on breach of contract, and attorneys' fees & costs. 618608/2023 NYSCEF 1.

1066. On September 23, 2025, the Hon. Jerome C. Murphy, J.S.C. ("Justice Murphy") granted Urrutia summary judgment against Deo, finding that (i) Deo breached the Cross-Purchase Agreement by fraudulent misrepresentation; (ii) Deo failed to consummate the transaction; (iii) has no ownership interest in Superb; and (iv) rescissory damages are warranted because it was

impossible to place me back in the position I was now that the Cross-Purchase Agreement has been voided. 618608/2023 NYSCEF 134.

1067. This Court found that Justice Murphy's decision was entitled to *res judicata* effect. ECF 505.

1068. Over the course of thirty (30) years, Urrutia cultivated franchise relationships, forged trust with major banks, developed a loyal customer base, obtained floor plan financing on favorable terms, strong vendor partnerships, and ironclad goodwill in the community; in just a few months without proper supervision, Deo dismantled all of it. ECF 294 ¶¶ 26-27.

1069. As a result, Urrutia can no longer qualify for a franchise, obtain floorplan financing, or restore the professional relationships he destroyed. ECF 294 ¶ 28.

1070. At the time, the dealerships Urrutia built were collectively valued at approximately $15 million to $20 million; today, they are worth nothing, and Urrutia has been left with millions in debt. ECF 294 ¶ 30-35; ECF 304 ¶ 26; Urrutia Decl. ¶ 565.

1071. Deo was given operational control over Northshore and Sunrise to manage the day-to-day business. Aaronson Dep. 18:25-19:5 ("Q. But it would be fair to say, would it not, that you met him because of business and not because of a personal reason? A. Yes"); 39:24-40:5 ("Q. And do you know whether or not Anthony Deo had any control over any of the Northshore bank accounts after David Baron's death? A. I believe he had access to some bank accounts"); 40:8-18 ("I know Anthony signed checks from the bank accounts, so yes, it was with my knowledge. Q. Did you allow him to sign checks? A. Yes. Q. What authority was Anthony Deo given in the operation of Northshore Motors? A. To run the business, to run the day-to-day business").

Dated: September 4, 2026

Respectfully submitted,

**SAGE LEGAL LLC**
*/s/ Emanuel Kataev, Esq.*
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.com

*Attorneys for Plaintiffs*
*Superb Motors Inc.,*
*Team Auto Sales LLC, and*
*Robert Anthony Urrutia*

**CYRULI SHANKS & ZIZMOR LLP**
/s
Jeffrey Ruderman, Esq.
420 Lexington Avenue, Suite 2320
New York, NY 10170-0002
(212) 661-6800 (office)
(347) 379-4622 (direct dial)
(212) 661-5350 (facsimile)
jruderman@cszlaw.com

*Attorneys for Remaining Plaintiffs*

**VIA ECF**
All counsel of record